**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| | Case No. 16-11626 (BLS) |
| ESSAR STEEL  MINNESOTA LLC and ESML HOLDINGS INC.,[1] | (Jointly Administered) |
| Debtors. | |
| MESABI METALLICS COMPANY LLC (F/K/A ESSAR STEEL MINNESOTA LLC), | |
| Plaintiff | |
| v. | Adv. Proc. No. 17-51210 (BLS) |
| CLEVELAND-CLIFFS, INC. (F/K/A CLIFFS NATURAL RESOURCES, INC.); DOES 1-10 | |
| Defendants. | |

## AMENDED COMPLAINT

Plaintiff Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) ("**Mesabi**"

or "**Plaintiff**") as debtor and debtor in possession in the above-captioned jointly administered

chapter 11 case, for its complaint ("**Complaint**") against Cleveland-Cliffs, Inc. (f/k/a Cliffs

Natural Resources, Inc.) ("**Cliffs**") and certain Doe defendants, Does 1-10[2] (collectively,

---

[1] Essar Steel Minnesota LLC has changed its name to Mesabi Metallics Company LLC.  The last four digits of its federal taxpayer identification number are 8770.  The last four digits of ESML Holdings Inc.'s federal taxpayer identification number are 8071.

[2] The Plaintiff believes certain individuals or entities have acted in concert with Cliffs, which the Plaintiff is investigating.  The Plaintiff intends to amend this Complaint to include those individuals and entities by name and seek the relief requested in this Complaint against them at the appropriate time.

"**Defendants**") for, among other claims of relief, tortious interference with Plaintiff's contractual and business relationships in violation of Minnesota state law, violation of antitrust laws under Sections 1 and 2 of the Sherman Act and applicable Minnesota state law, violation of the automatic stay under Section 362 of the Bankruptcy Code, and civil conspiracy, alleges as follows:

## NATURE OF THE CASE

Already controlling virtually the entire open market for blast furnace pellets within the Great Lakes Pellet and Iron Market (as defined below), Cliffs has long coveted Mesabi's surface and mineral leases, and sought to solidify and preserve its monopoly position.  Having failed to block Mesabi's attempt to enter into the Great Lakes Pellet and Iron Market and secure the Debtors' assets for itself legally in an open public auction conducted during the bankruptcy proceeding, Cliffs (and other Defendants in conspiracy with it) has now resorted to illegal attempts to obstruct consummation of the Debtors' plan of reorganization (the "**Plan**")[3] in an effort to block completion of the Project (as defined below).

Cliffs (and other Defendants in conspiracy with it) has engaged in a course of conduct designed to interfere with and impede Mesabi's contracts and business relationships and prevent the confirmed Plan from becoming effective, thereby keeping Mesabi from completing the Project and competing with Cliffs' in the Great Lakes Pellet and Iron Market. Cliffs (and other Defendants in conspiracy with it) has unabashedly resorted to contacting Mesabi's contractors, mineral lessors, professionals, other goods and service providers, and potential customers with a single, but effective threat: if you do business with Mesabi (or the Plan Sponsor, Chippewa),

---

[3] Where the context requires, each capitalized term used but not otherwise defined herein shall have the meaning ascribed to such term in the Plan.

Cliffs won't do business with you.

The Defendants' efforts to interfere with Mesabi's affairs have caused significant delay and additional unnecessary expense as Mesabi seeks to consummate the Plan.  As described below, Mesabi and Chippewa have made great progress toward implementing the Plan, but prompt action is needed to remediate harm caused by the Defendants to date, prevent jeopardy to the confirmed Plan, and avoid future damage to Mesabi and its creditors that could result from Cliffs' established course of conduct.  In addition to damages, the Debtors also seek injunctive relief to enjoin Defendants from engaging in any activity designed to interfere with the Debtors' and Chippewa's contractual rights and business relations, or otherwise conspire to prevent consummation of the Plan and completion of the transactions contemplated in the Plan.

The Defendants' intentional actions constitute tortious interference with Mesabi's business, anticompetitive violations of Sections 1 and 2 of title 15 of the United States Code, 15 U.S.C. § 2 (the "**Sherman Act**"), and anticompetitive acts under Minnesota state law.  They also constitute acts to obtain possession of or exercise control over property of the Debtors' estates, in violation of Section 362 of the Bankruptcy Code.  Without this Court's relief, the unmistakable and irreparable harm to Mesabi's business and the Debtors' estates will continue, with a very real risk of precluding consummation of the Plan and causing the Debtors' liquidation.

## JURISDICTION AND VENUE

1.      This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

2.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

3

3.      This Court has personal jurisdiction over Defendants pursuant to Bankruptcy Rule 7004.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      All Defendants are properly joined in this action pursuant to Rule 20 of the Federal Rules of Civil Procedure, made applicable by Bankruptcy Rule 7020, because the right to relief asserted against all Defendants arises out of the same transaction, occurrence, or series of transactions and occurrences, and questions of law and fact common to all Defendants and/or certain categories of Defendants will arise in this action.

## THE PARTIES

6.      Plaintiff Mesabi is a limited liability company organized and licensed under the laws of the State of Minnesota, with its principal place of business at 555 West 27th Street, Hibbing, Minnesota 55746.  Mesabi is the wholly owned subsidiary of ESML Holdings Inc. ("**Holdings**," together with Mesabi, the "**Debtors**"), a holding company, organized and licensed under the laws of the State of Delaware.

7.      Based upon information and belief, Defendant Cliffs is a corporation organized under the laws of the State of Ohio with its principal place of business in Cuyahoga County, Cleveland, Ohio.  The registered agent for service of process for Cliffs is James D. Graham, whose address is listed with the Ohio Secretary of State as 200 Public Square Suite 3300, Cleveland, Ohio 44114.

8.      Does 1-10 are Defendants whose true names, identities and capacities are presently unknown to the Plaintiff.   As and when the names, identities, and capacities of these fictitiously named Defendants become known, Plaintiff will amend this Complaint to set forth

4

these Defendants' true names, identities, and capacities and otherwise proceed against them as if they had been named parties upon the commencement of this adversary proceeding in accordance with Rules 15 and 25 of the Federal Rules of Civil Procedure, made applicable to this proceeding by Bankruptcy Rules 7015 and 7025.   This may include affiliates, agents, or representatives of Cliffs.

## FACTUAL BACKGROUND

### A.    The Debtors' Chapter 11 Cases

9.      Mesabi is a company formed to develop and operate an iron ore pellet production facility (the "**Project**") located in the Mesabi Iron Range in northern Minnesota.  Mesabi has entered into valid contracts with various parties to provide construction, engineering and professional services that are integral to the Project.  On an ongoing basis, Mesabi has sought to enter into additional commercial relationships in support of the Project.  As discussed below, the Debtors' Plan has been confirmed.  It is well settled that a confirmed plan of reorganization is an enforceable, court-approved contract between a debtor and all parties in interest.  Thus, the Plan constitutes an enforceable contract between the Debtors, their creditors, and the Plan Sponsor.

10.     On July 8, 2016, the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), thereby commencing the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").  The Debtors manage their property as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

11.     On July 19, 2016, the United States Trustee for the District of Delaware appointed the Official Committee of Unsecured Creditors (the "**Committee**").  To date, no trustee or examiner has been requested or appointed in these Chapter 11 Cases.

Americas 93411239

12.     At all relevant times, Cliffs is and has been aware of the Debtors' Chapter 11 Cases.  In fact, Cliffs has actively participated in the Chapter 11 Cases by, among other things, filing an objection to, and appearing for the hearing on, the Debtors' motion for discovery under Rule 2004 of the Bankruptcy Rules [D.I. 234].  Cliffs knew of the confirmation of the Debtors' Plan, the Debtors' need for financing, and related pleadings and objection deadlines.

13.     Cliffs actively participated in an auction conducted as part of the Debtors' Plan process and submitted bids in an attempt to acquire the Debtors' assets pursuant to the related bid procedures.  Cliffs was unsuccessful in its attempts to purchase the Debtors' assets as its bids were at a much lower value and were ultimately determined to be inferior to the winning bidder and ultimate plan sponsor, Chippewa Capital Partners, LLC ("**Chippewa**" or the "**Plan Sponsor**").  Cliffs failed to bid to become the plan sponsor and assume leases and permits already in effect so that the Project could be completed timely and start operations.  Rather, Cliffs' bid represented liquidation value and Cliffs' ownership would have enabled it to warehouse the Debtors' valuable mineral rights just so that Cliffs could retain its monopoly position.

**B.**     **Debtors' Plan of Reorganization and Events Subsequent to Confirmation**

14.     On June 13, 2017, the Court confirmed the Plan and entered its *Findings of Fact, Conclusions of Law, and Order Confirming the Third Amended Chapter 11 Plan of Reorganization for Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc. Proposed by the Debtors* [D.I. 1025] (the "**Confirmation Order**").  No party appealed the Confirmation Order and the Confirmation Order became final and non-appealable on June 27, 2017.

6

15.     At confirmation, the Debtors received overwhelming support for the Plan from each voting class of creditors.  This support was due in large part to Chippewa's sponsorship, its agreement to provide immediate funding to Mesabi, and its commitment to invest $250 million of new equity into Mesabi on the Effective Date of the Plan.

16.     Since the auction, Chippewa has provided substantial funding to Mesabi and Mesabi has recommenced construction on the Project.

17.     In confirming the Plan, this Court found that "the Debtors will have sufficient means to meet all of their obligations under the Plan" and that the record established that "the Reorganized Debtor will emerge from bankruptcy as a viable, financially healthy entity, unlikely to be in need of further financial reorganization, and likely to be able to incrementally complete the Project."  Confirmation Order, ¶ II.  Therefore, absent Cliffs' improper interference, Mesabi has demonstrated that it would likely be able to complete construction of the Project and successfully enter the Great Lakes Pellet and Iron Market and compete with Cliffs.

18.     Since confirmation of the Plan, in furtherance of consummation, the Debtors have successfully assumed key mineral and surface leases through settlement agreements with GPIOP [D.I. 1168] and the DNR [D.I. 1025, 1057, 1171], which agreements provide for assumption of the Debtors' mineral and surface leases as of the Effective Date of the Plan.

19.     Pursuant to the Plan and Confirmation Order, if the Effective Date of the Plan does not occur within six months of the Confirmation Date, the Mineral and Surface Leases shall be deemed rejected, and the Debtors will be required to immediately surrender such leases.  Confirmation Order, ¶ 45.  A settlement agreement between the Debtors and the DNR, however, provides that if the Effective Date does not occur on or prior to September 30, 2017, the DNR

Americas 93411239

mineral and surface leases shall be deemed rejected, and the Debtors will be required to immediately surrender such leases. *See* D.I. 1057, 1176. In addition, as part of the agreement reached with GPIOP, if the Effective Date does not occur on or before October 31, 2017, the GPIOP Mineral Leases shall be deemed rejected, and the Debtors will be required to immediately surrender such leases. *See* D.I. 1168.

20. In connection with the lease assumption agreements discussed above, in addition to completing the existing Project, Mesabi and Chippewa have made material progress and taken major steps toward implementing the Plan. Notably, Chippewa has committed to build a hot-briquetted iron ("**HBI**") facility, bringing value-added production to Minnesota's Mesabi Iron Range (the "**Iron Range**") for the first time. The combined projects will create hundreds of new jobs and generate many tens of millions of dollars in contributions to both state and local revenues, making the iron mining and production industry in Minnesota more competitive and less of a monopoly controlled by Cliffs.

21. To that end, Chippewa has entered into an agreement with an engineering company, Tenova, with respect to construction of a long-anticipated, value-added plant on the Project site, which will produce HBI. Chippewa has begun making payments on a $1.25 million engineering contract for design of that project, which will be financed separately.

22. Additionally, Chippewa has engaged Kiewit, one of the largest and most respected construction contractors in the United States. The Debtors and Chippewa have worked with Kiewit on a highly expedited basis as Kiewit has conducted a comprehensive review of the Project in anticipation of Kiewit assuming the role of general contractor to complete the Project. The parties have entered into a preliminary agreement with respect to the Project, and are

8

negotiating a comprehensive general contractor's agreement under which Kiewit will supervise local contractors and its own internal resources at the expansive Project.

23.     While the Debtors continue to progress toward consummation of the Plan, Cliffs has consistently interfered with the Debtors' reorganization and continues to interfere with the closing of the transactions contemplated in the Plan and necessary to the occurrence of the Effective Date.  Cliffs' actions have already caused delays, forced the Debtors to renegotiate agreements with multiple parties in interest, and required Mesabi to seek to engage alternative service providers.

**C.     History of Cliffs' Ongoing Interference with Mesabi's Operations**

24.     Cliffs is a direct competitor of Mesabi.  Cliffs operates iron ore and pellet production facilities in northern Minnesota, and upon information (including Cliffs' own assertions) and belief, Cliffs controls virtually all of the public market for blast furnace pellets in the Great Lakes Pellet and Iron Market.

25.     Cliffs' intent to acquire the Debtors' assets, particularly the Debtors' leases with the DNR (the "**DNR Leases**") existed long before the DNR made any decision to terminate the DNR Leases and certainly before the commencement of the Chapter 11 Cases.  Indeed, by at least 2015 and periodically since that time to date, Cliffs maintained persistent communications with the State of Minnesota and Governor Mark Dayton regarding Cliffs' proposed terms to take over the DNR Leases and pressure to terminate the DNR Leases with the Debtors.  Attached hereto as **Exhibit 1** are examples of relevant correspondence between Cliffs and the DNR regarding the Debtors' DNR Leases.

26.     As Lourenco Goncalves explained in public statements on November 16, 2016,

9

there are "three different markets for iron ore, they're completely separate.  One is the international market that's basically dominated by China and surrounding countries for fines and some lump ore, that's one business.  The other business is the pellet business.  The pellet business is the one that the Samarco thing affected in the – especially hitting Europe and the Middle Eastern operations, especially the DRI Middle Eastern Operations."  Mr. Goncalves went on to explain that the "**third business is the business that we [Cliffs] dominate here in the United States is the pellet business within the Great Lakes**" (the "**Great Lakes Pellet and Iron Market**") (emphasis added).

27.     The Great Lakes Pellet and Iron Market is exactly the market Mesabi is seeking to enter and in which Mesabi will be Cliffs' primary, if not only, competition.  Thus, on behalf of Cliffs, Mr. Goncalves has (i) specifically identified the Great Lakes Pellet and Iron Market as the relevant geographic and product market are the market for the public sale of iron ore pellets; and (ii) admitted that Cliffs dominates and controls the relevant market.

28.     Mr. Goncalves has openly boasted about Cliffs' iron ore business in the United States, characterizing it as a "beast."  Specifically, Mr. Goncalves has touted Cliffs' monopolistic power in the Great Lakes Pellet and Iron Market to the public during Cliffs' quarterly earnings calls, including as follows:

   a.  On October 27, 2016, Mr. Goncalves commented that "[r]ecently, the pellet market in the Great Lakes got even tighter as Magnetation ceased operations at the beginning of [October 2016] bringing Cliffs back to its long-standing position as the only merchant pellets supplier in the Great Lakes."

   b.  On July 27, 2017, Mr. Goncalves stated: "How is this business able to achieve its

10

EBITDA margins of nearly 40% in the metals and mining industry in the United States where EBITDA margins of 9.5%, 10% are considered to be very good and 15% are considered great.  Number one, cost to enter.  Cliffs is the only real merchant supplier within the Great Lakes markets, and we have all the good clients under long-term contracts, covering pretty much all their pellet requirements."

c.   Mr. Goncalves further explained on July 27, 2017 that "[t]he same advantage that make our U.S. iron ore pellet business so powerful will make our HBI business powerful as well.  Just like our pellets, we will be the only merchant supplier of virgin iron units in the region.  So right off the bat, we have a huge logistical advantage over the competition."

29.   Mr. Goncalves' bold statements on Cliffs' market control and the fact that Cliffs is able to maintain extremely high margins – over four times those of comparable metal and mining industries – because of Cliffs' monopoly power ("Cliffs is the only real merchant supplier within the Great Lakes markets") and the extremely high "costs to enter" the Great Lakes Pellet and Iron Market have shown to be true.

30.   By way of nonexclusive example, Cliffs' recent transactions with ArcelorMittal USA LLC ("**ArcelorMittal**") provide a striking demonstration of Cliffs' market domination and power.  The veracity of Cliffs' claims and resulting harm to the Great Lakes Pellet and Iron Market are readily apparent from the size of ArcelorMittal's proof of claim in these Chapter 11 Cases.  Prior to commencement of these Chapter 11 Cases, ArcelorMittal entered into a binding contract with Mesabi for the provision of pellets in the Great Lakes Pellet and Iron Market at an

11

agreed pricing schedule for a number of years.  At that time, Mesabi was competing with Cliffs for ArcelorMittal's business, and the price terms of the contract reflected a healthy competitive market for pellets within the Great Lakes Pellet and Iron Market.  When the Debtors failed to perform under the contract, ArcelorMittal was forced instead to obtain the pellets the Debtors would have provided from Cliffs, which by its own admission was once again the only merchant supplier of pellets in the Great Lakes Pellet and Iron Market.  As a result of Cliffs' monopoly power, ArcelorMittal will pay in excess of $600 million more for these same pellets to Cliffs than ArclorMittal would have paid to the Debtors in a competitive market.[4]

31.     With respect to ArcelorMittal, Mr. Goncalves also claimed on Cliffs' earning calls that Cliffs has "locked up" the "vast majority of [its] sales tonnage….for several years," and that U.S. Steel could not sell pellets to ArcelorMittal because Cliffs has locked ArcelorMittal up as a client:  "I also try to understand where U.S. Steel is going to sell their pellets, because – certainly not to ArcelorMittal because I know the contracts we have in place."[5]

32.     More generally, Mr. Goncalves boasted on the April 2017 earnings call that Cliffs has taken all of the clients – potential customers for competitors and potential competitors like Mesabi – off the market for years:  "Where [is U.S. Steel] going to sell the pellets, if that is part of your question?  I have no idea, because the clients are taking [sic].  I will sell to them in 2017, 2018, 2019, 2020, 2021, 2022, and then 2023, one contract will end.  And then, 2024, a second

---

[4] ArcelorMittal filed a proof of claim in excess of $1 billion, however, after significant effort and negotiation the Debtors have reached an agreement with ArcelorMittal and filed their Motion for Entry of an Order Approving the Agreement [D.I. 1065], which seeks to allow ArcelorMittal's proof of claim in the amount of $605 million.

[5] Mr. Goncalves has separately asserted in a 2015 earnings call that "I have never seen U.S. Steel as a competitor. U.S. Steel is a steel maker. They are integrated backwards, and they have upstream pellet production. . . We look forward to see U.S. Steel coming back at full force and in full capacity.  They are not a competitor of Cliffs Natural Resources."

contract and then – and it's too far away.  By that time, I'll be very old."  And during the February 2017 earnings call, Mr. Goncalves similarly bragged that "with solid demand and [the] exclusive nature of our contracts, keeping wannabe competitors watching from the outside and talking a good game, at this point, we are sold out for 2017."

33.    If Cliffs' exclusive or otherwise restrictive arrangements with pellet customers such as ArcelorMittal, are permitted to continue it could prevent new entrants from being able to provide any meaningful alternative to Cliffs' dominant market position.

34.    As Mr. Goncalves explained, this is great for Cliffs' profit margins; however, it is devastating to customers in the Great Lakes Pellet and Iron Market and their consumers.

35.    This also demonstrates why Cliffs is uniquely incentivized to prevent the Debtors from successfully entering into the Great Lakes Pellet and Iron Market and HBI markets. Indeed, in touting Cliffs' new deal with ArcelorMittal in a July 28, 2016 earnings call, Mr. Goncalves explained that the agreement preserved Cliffs' "position as ArcelorMittal's sole supplier from the outside" and that such agreement was particularly beneficial to Cliffs because it prevented any potential new entrant in the market from doing business with ArcelorMittal for 10 years, stating that "[w]ith the signature of this contract, any potential competitor of Cliffs within the Great Lakes will have 10 years to start producing pellets or to improve the quality of the pellets just to try again," thus creating yet another intentional barrier to entry into the Great Lakes Pellet and Iron Market.

36.    For years, Cliffs has embarked on an exclusionary scheme to derail Mesabi's entry into the Great Lakes Pellet and Iron Market.  Cliffs did not keep its intentions secret. Rather, Mr. Goncalves has, among other things, openly admitted that Cliffs would use

13

exclusionary methods to put Mesabi (and other competitors) out of business, threatened third parties not to do business with a Cliffs competitor – specifically Mesabi – and made disparaging and intimidating remarks about Mesabi, all in an effort to interfere with Mesabi's prospective business opportunities and keep its competitive threat at bay.  For example:

a.  In October 2015, in a not-so-veiled threat to the unions, miners, municipalities, and politicians in the area, Mr. Goncalves told the Mesabi Daily News that the Project, once complete, would directly compete with Cliffs, and that "[i]f they [the Project] go online, I will shut down a plant up there the same day."

b.  During Cliffs' quarterly earnings call on July 28, 2016, Mr. Goncalves stated that "[Plaintiff] is also known as Neverland.  Never finished, never producing pellets, never paying anyone" and asserted that "We have a signed commitment with Governor Dayton that we have – we are – as soon as [Plaintiff] vacates the site, the leases are ours."   At the time of that "signed commitment," Mesabi's predecessor was actively seeking to reorganize and continue construction.

c.  On information and belief, Cliffs has sought to intimidate local businesspeople and community leaders in an effort to get them to oppose the reorganization of Mesabi, notwithstanding that local businesses and communities will benefit enormously from the Project.[6] As an example, at an April 6, 2017 meeting with local officials, Mr. Goncalves said of Mesabi that if he could, he would come "with a bulldozer and take them out." As to those who would support the project,

---

[6] Under the Plan, the highest recoveries will be paid to local contractors and vendors, who will also benefit from the large amount of work to be generated by constructing and supplying the Project.  Local communities will also benefit, as the Project will significantly increase the local tax base and fund local government and services.

he said that "you're either with me or you're against me."

d.  According to the sworn testimony of the DNR's Director of Lands and Minerals Division, Jess Richards, Cliffs repeatedly pressured the State of Minnesota to terminate the Debtors' mineral leases, threatening to walk away from any potential project on the site unless the State terminated the Debtors' leases on Cliffs' behalf.

e.  Mr. Richards further testified that Cliffs asked the DNR to contact the Debtors' lenders to convince them to withdraw their support of the Debtors and to instead back Cliffs' attempts to have the Debtors' Mineral Leases terminated.

f.  On information and belief, in January 2015, Mr. Goncalves met with legislators from northern Minnesota and criticized the State of Minnesota's decision to work with Mesabi towards extending Mesabi's date to repay a State monetary grant to build infrastructure for the Project.

g.  Cliffs repeatedly disparaged the Debtors in written correspondence with the DNR and the governor of Minnesota.  On or about June 27, 2016, Cliffs' lobbyists contacted the DNR and the governor's office to criticize the Debtors' attempts to get letters of support from lessors and vendors, commenting that "this effort by [Debtors] to pressure these contractors stands as yet one more example of that company's questionable ethics and business practices."  On or about June 23, 2016, in a letter to the governor of Minnesota, Cliffs wrote that the Debtors and their financial backers "have proven on a repeated basis to have flawed timing, an undefined strategy, an inability to execute and, worst of all – questionable ethics."

15

37.     Beginning in 2014 and continuing through the first half of 2015, Cliffs flew aircrafts over the Debtors' property to obtain aerial photographs of the progress of construction on the Project site and apparently used the photos to paint a misleading picture of the progress to, on information and belief, local businesspeople and community leaders.

38.     Mr. Goncalves' hostile pronouncements and Cliffs' onslaught of threats and disparagement make clear to all stakeholders that Cliffs expects exclusive control of the market. On or about November 12, 2015, an Iron Range Congressional representative observed that Cliffs' employees appear to expect the government's assistance in monopolizing the market, rebuking a Cliffs lobbyist that "Cliffs' employees are also of the misunderstanding that the government [has] far more control over market conditions and eliminating competition than we ever could."

**D.     In the Face of Plan Consummation, Cliffs Ratchets Up Its Anti-Competitive Conduct to Prevent Mesabi from Competing in the Market[7]**

39.     This Court's confirmation of the Plan did little to abate Cliffs' campaign for Mesabi's demise in order to continue Cliffs' monopolization of the Great Lakes Pellet and Iron Market.    Having failed to acquire the Debtors' assets and liquidate the Project, and as confirmation of the Plan approached and was ultimately achieved, Cliffs threatened to withhold its business from various of Mesabi's key contractors, engineers, professionals and potential customers to prevent them from doing business with Mesabi.    These contractors, engineers, and professionals are essential to bringing Mesabi's iron ore pellet production facilities online, and of

---

[7] Cliffs may try to justify its actions as competitive, relying on an alleged 2024 expiration of its life-of-mine at its Hibbing Taconite facility in Minnesota.  This is a red herring.  First and foremost, seven years is plenty of time for Cliffs to develop an alternative business strategy for this asset, without trying to secure the termination of the Debtors' mineral leases.  Second, the Debtors understand that Cliffs has or can secure access to adjacent mineral resources such that the Hibbing Taconite life-of-mine can be extended beyond the year 2024.

course, the potential customers are key to the viability of the Debtors' Plan. Cliffs is thereby blocking competition from entering the market precisely because Cliffs has leverage over such contractors, engineers, professionals and potential customers by virtue of its market dominance. By threatening to "blacklist" these local and regional businesses, including causing them to withdraw or rescind their agreements with Mesabi, Cliffs has caused delays and costs to be incurred by Mesabi. Cliffs' interference with Mesabi's operations poses a threat to implementation of the Plan and to creditor recoveries thereunder.

40.     On information and belief, Cliffs has informed numerous third-party contractors, engineers and professionals that Cliffs will not work with those businesses and individuals who do business with Mesabi or ERP Iron Ore, LLC ("**ERP**"), Chippewa's affiliate that purchased Magnetation LLC. Indeed, Mesabi has been told by some contractors that they could no longer quote work on Mesabi projects because of their relationship with Cliffs. Some specific examples of Cliffs' intimidating tactics are described below.

41.     Barr Engineering Co. ("**Barr**") has a long history of performing integral professional engineering and environmental permitting services on the Project, dating back to the Project's initial engineering and development stage, prior to Mesabi's predecessor's purchase of the Project, and continuing through the bankruptcy proceeding. In fact, Barr was retained by Chippewa during the Chapter 11 Cases to play an expanded role at the Project. Barr's work in this regard was critical to achieving the Effective Date of the Plan.

42.     Yet, abruptly, on or about August 15, 2017, Barr refused to do any further work on the Project and sent a letter (the "**Barr Letter**") to Robb Bigelow, managing director at ERP and Chippewa, informing Mr. Bigelow that "Barr Engineering Co. regretfully must decline to

17

perform further work under its contract with Chippewa Capital Partners LLC relating to the [Project] site." A true and correct copy of the Barr Letter is attached hereto as **Exhibit 2**. Barr employees similarly informed Mesabi that Barr would not perform further work for Mesabi on several workstreams for which Mesabi had relied on Barr to comply with and manage environmental permitting and various engineering needs. On information and belief, Barr's decision to discontinue doing any further work for Mesabi was solely due to threats and pressures from Cliffs—in particular, Cliffs' message to Barr that if Barr continued to work with Mesabi, Cliffs would cease doing current and future work with Barr.

43. Because of Barr's abrupt resignation, Mesabi had to solicit and secure alternative engineering and construction support, as well as environmental support, to ensure permit compliance. Moreover, the Barr resignation impacted the timetable for preconstruction work, for bringing another contractor up to speed, and for negotiating arrangements with the project manager which arrangements were, in turn, necessary to the debt financing process. All of the foregoing events caused additional expense and further delay to the occurrence of the Effective Date and the Debtors' ultimate consummation of the Plan.

44. On information and belief, Cliffs has made improper "refusal to deal" threats to many more companies than just Barr, successfully coercing some of those companies to cut ties with Mesabi.

45. On information and belief, one major contractor that has been openly supportive of Mesabi, was threatened, and subsequently blackballed by Cliffs.

46. Northern Industrial Erectors, Inc. ("**NIE**") is a major contractor at the Project that has been supportive of Mesabi's reorganization. On information and belief, NIE had done

18

business with Cliffs for a number of years on many projects but has been threatened and excluded from further work by Cliffs due to its work for Mesabi.  For example, within the past year, NIE prepared and submitted a proposal to Cliffs that was evaluated by Cliffs' local managers and identified as being the best bid.  After being initially informed to start mobilizing for work, NIE was informed that Cliffs' corporate headquarters refused to issue the purchase order and directed that no work should be given to NIE in the future because NIE does work with Mesabi.  On information and belief, Cliffs has since ceased providing bid packages to NIE, one of the largest and most experienced contractors in the Iron Range.

47.     Mesabi engaged the Environmental Law Group ("**ELG**") to provide legal services and counsel related to the procurement and maintenance of environmental permits necessary to the construction and operation of the Project.  ELG provided such services to Mesabi prior to the commencement of the Chapter 11 Cases, and, pursuant to this Court's Aug, 9, 2016 Order [D.I. 205] was employed as an ordinary course professional during the Chapter 11 Cases.  Pursuant to the OCP Order, ELG continued to provide legal services and counsel to Mesabi, and Mesabi timely paid ELG for those services.

48.     Yet, similar to other instances of business interference discussed herein, on May 18, 2017, ELG contacted the Debtors' general counsel and resigned from its representation of Mesabi, effective June 1, 2017, citing the instructions of Cliffs, a presumably larger client, as its reason for resignation.  A true and correct copy of the Debtors' correspondence with ELG is attached hereto as **Exhibit 3**.

49.     When ELG began representing Mesabi it obtained consent from both Cliffs and Mesabi to undertake concurrent representation of both clients; however, at a critical stage in the

Debtors' reorganization and restructuring process, when ELG was in the middle of representing Mesabi with time-sensitive permitting issues related to recommencement of construction on the Project, Cliffs withdrew its consent to ELG's representation of Mesabi.

50.     Upon information and belief, Cliffs withdrew its consent, not for any legitimate business purpose, but to cause delay and upheaval in the Debtors' construction process and, ultimately, to derail the Debtors' attempt to consummate the Plan and construct and start competitive operations.

51.     Glacier Park Iron Ore Properties LLC ("**GPIOP**") is a mineral lessor who leases certain mineral rights (the "**GPIOP Mineral Leases**") to the Debtors.  The GPIOP Mineral Leases were not assumed pursuant to the Plan, but are necessary to the Project.  Shortly after confirmation, the Debtors moved to assume the GPIOP Mineral Leases, to which GPIOP objected.  In late-August 2017, Chippewa, the Debtors and the GPIOP were able to eventually reach a consensual resolution that provided for the assumption of the GPIOP Mineral Leases on the Effective Date [D.I. 1168] (the "**GPIOP Settlement**").

52.     Upon information and belief, during the time between Plan confirmation and the GPIOP Settlement, as Chippewa and the Debtors sought to work with GPIOP to assume the GPIOP Mineral Leases, Cliffs approached GPIOP to undermine the negotiating process and obtain the GPIOP Mineral Leases for its own use.  At certain points, the negotiations with GPIOP came close to falling through, which Debtors believe is a direct result of Cliffs' efforts to obtain the GPIOP Mineral Leases for itself.  Moreover, the Debtors believe certain terms of the GPIOP Settlement were driven by Cliff's efforts to obtain the GPIOP Mineral Leases, and that certain terms of the GPIOP Settlement are worse for Mesabi as a result.  These constitute not

20

only a direct interference with the Debtors' leasehold and contractual interests in the GPIOP Mineral Leases, but also an effort to derail the Plan as the ore body that is the subject of the GPIOP Mineral Leases represents a material portion of the future mining plan for the Project.

53.     Midrex Technologies, Inc. ("**Midrex**") is a company with which Chippewa and ERP had been working to develop future plans to construct a HBI plant near the Project site in order to comply with the DNR settlement agreement and ensure that Mesabi retains the DNR Mineral and Surface Leases.  ERP had entered into a nondisclosure agreement and provided confidential information to Midrex in connection with ongoing negotiations pursuant to which Midrex was to provide its direct reduced iron technology to ERP, together with project financing support.

54.     On June 9, 2017, Midrex sent a letter  (the "**Midrex Letter**") to Tom Clarke, ERP and Chippewa's CEO, explaining that it was working on "another potential direct reduction project within the Great Lakes Region" and "have chosen to focus on this existing opportunity at the present time."  A true and correct copy of the Midrex Letter is attached hereto as **Exhibit 4**. In a subsequent conversation, ERP and Chippewa learned that Cliffs had approached Midrex's corporate parent in Japan about building an HBI plant, after which the corporate parent instructed Midrex not to deal with ERP or Chippewa.  ERP and Chippewa did not require that Midrex work exclusively for them; however, on information and belief, Midrex's corporate parent was instructed by Cliffs to cease dealings with ERP and Chippewa.  Notably, on June 15, 2017, only six days after Midrex stopped working on the HBI plan to be constructed near the Project Site, Cliffs announced it was building an almost identical plant in Toledo, Ohio, and that "Midrex Technologies was selected to design, engineer, and procure equipment for the new plan

21

. . . ."[8]  Mesabi believes Cliffs knew Midrex was working on an HBI plant near the Project Site and entered into an agreement with Midrex to construct a nearly identical facility in Ohio in order to subvert the DNR settlement agreement and obtain control of the DNR Mineral and Surface Leases.

55.    Upon information and belief, Cliffs' primary intent throughout this dealing was to prevent Midrex from working with Mesabi to complete its own HBI project elsewhere.

56.    Cliffs' successful effort to cause Midrex to withdraw from discussions with Chippewa caused Chippewa to have to divert significant time and resources to finding a replacement for Midrex at the very time such resources were needed elsewhere.  This effort ultimately resulted in the agreement with Tenova, described above.

57.    Additionally, upon information and belief, Cliffs has made threatening remarks to certain major domestic steel producers doing business in the Iron Range by saying that if such parties were to buy iron ore pellets from Mesabi, Cliffs would not supply them with any of its own pellets.

58.    Finally, on information and belief, in August 2017, Cliffs participated in a town hall meeting in the iron ore range of northern Minnesota where the Project is located and invited several of the contractors that have or will work on the Project, as well as influential local businesspeople.  The Debtors believe that the purpose of the meeting was to influence those individuals to put pressure on the DNR such that it would not want to amend the original August 31, 2017 deadline contained in the DNR settlement agreement.  The Debtors understand that Mr. Goncalves attended the meeting in person and addressed the crowd, with his comments focused

---

[8] http://www.businesswire.com/news/home/20170615005276/en/Cliffs-Natural-Resources-Announces-HBI-Production-Plant

Americas 93411239

on reasons the DNR should terminate the leases on August 31, 2017.

59.     The Debtors understand that the Doe Defendants acted in concert with Cliffs in certain or all of the foregoing, which actions were pursuant to a common design and scheme to pursue an unlawful object or course of action to be accomplished by unlawful means with the purpose of competing against Mesabi, to Mesabi's detriment.

## CLAIMS

## FIRST CLAIM FOR RELIEF

**(Tortious Interference with Contractual Rights)**
**(Against Cliffs)**

60.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 59 of this Complaint with the same force and effect as though fully set forth herein.

61.     In addition to the Plan, Plaintiff and certain vendors, suppliers, and contractors are parties to valid, binding and enforceable contracts for construction of the Project.

62.     Cliffs knows of the existence of Plaintiff's contracts and their purpose for construction of the Project.

63.     As described above, Cliffs has forced and attempted to force various contract counter-parties to cease working with the Plaintiff.

64.     On information and belief, Cliffs tortiously interfered with the rights of Mesabi and its contract counter-parties under the existing contracts.

65.     Cliffs intentionally acted in a way to procure the breach of and termination of the Debtors' existing contracts.

66.     Cliffs' conduct was not justified.

67.     As a direct and proximate result of Cliffs' conduct, Mesabi suffered damages due

23

to Cliffs' tortious interference as alleged above and in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

**(Tortious Interference with Business Relations or Prospective Economic Advantage)**
**(Against Cliffs)**

68.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 67 of this Complaint with the same force and effect as though fully set forth herein.

69.     In addition to the Plan, Plaintiff and certain vendors, suppliers, and contractors are parties to valid, binding and enforceable contracts for construction of the Project.

70.     Plaintiff has business relationships and expectancies with various vendors, suppliers, and contractors, with a probability of future economic benefit to Plaintiff.

71.     Cliffs knows of the existence of Plaintiff's contracts and their purpose for construction of the Project.  Cliffs also knows of the existence of Plaintiff's business relationships with other vendors, suppliers, and contractors.

72.     On information and belief, Cliffs tortiously interfered with Mesabi's contracts and its business relationships and expectancies with necessary vendors, suppliers, and contractors.

73.     As a direct and proximate result of Cliffs' conduct, Mesabi suffered damages due to Cliffs' tortious interference as alleged above and in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF

**(Violation of Section 1 of the Sherman Act – Agreements in Restraint of Trade)**
**(Against Cliffs)**

74.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 73 of this Complaint with the same force and effect as though fully set forth herein.

75.     Cliffs possesses substantial market power in the Great Lakes Pellet and Iron

24

Market, as demonstrated by Cliffs' high market share, barriers to entry, its actual exclusion of competition, and its ability to charge supracompetitive prices in the Great Lakes Pellet and Iron Market.

76.     As alleged above, Cliffs has entered into agreements with customers and carriers with the purpose and effect of unreasonably restraining trade and commerce in the Great Lakes Pellet and Iron Market.

77.     Cliffs' solicitation and enforcement of the exclusionary contracts described above constitute unlawful agreements, contracts, and concerted activity that unreasonably restrain trade in the Great Lakes Pellet and Iron Market in violation of Section 1 of the Sherman Act.

78.     Cliffs' exclusionary contracts have foreclosed a substantial share of competitors and had anticompetitive effects in the Great Lakes Pellet and Iron Market.

79.     Cliffs' exclusionary contracts have no procompetitive benefit or justification.  The anticompetitive effects of its exclusionary contracts outweigh any purported procompetitive justifications.

80.     As a result of Cliffs' conduct, and the harm to competition caused by that conduct, Plaintiff has suffered substantial injuries to its business and property in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.  Plaintiff will suffer further injury unless the Court enjoins Cliffs from its unlawful conduct and continuing violations of the antitrust laws under 15 U.S.C. § 26.

81.     Plaintiff is also entitled to recover from Cliffs costs of suit, including reasonable attorney fees, as provided by 15 U.S.C. §§ 15 and 26.

Americas 93411239

## FOURTH CLAIM FOR RELIEF

**(Violation of Section 2 of the Sherman Act – Monopolization)**
**(Against Cliffs)**

82.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 81 of this Complaint with the same force and effect as though fully set forth herein.

83.     Cliffs has monopolized the relevant market in violation of Section 2 of the Sherman Act.

84.     The relevant product market in this case is the Great Lakes Pellet and Iron Market, as discussed above.

85.     The relevant geographic market in this case is the Great Lakes region, which includes the Iron Range in Minnesota.

86.     At all relevant times, Cliffs possessed monopoly power in the Great Lakes Pellet and Iron Market, as demonstrated by Cliffs' admitted control over pricing.  As noted above, Cliffs charges prices for its products at levels that allow it to achieve profit margins of more than four times the prevailing profit margins in the industry.  In addition, Cliffs' high market share, barriers to entry, and Cliffs' actual exclusion of competition have cemented Cliff's monopoly power.

87.     Through the scheme described above, including by blackballing vendors and threatening potential customers, and other conduct likely to be revealed in discovery, Cliffs has willfully and unlawfully maintained and enhanced its monopoly power.  Cliffs' scheme constitutes exclusionary conduct within the meaning of Section 2 of the Sherman Act.

88.     Cliffs' scheme has suppressed competition and produced anticompetitive effects in the Great Lakes Pellet and Iron Market, including causing Plaintiff's antitrust injury and

damages.

89.    Cliffs' conduct has no procompetitive benefit or justification.    The anticompetitive effects of its behavior outweigh any purported procompetitive justifications.

90.    As a result of Cliffs' conduct, and the harm to competition caused by that conduct, Plaintiff has suffered substantial injuries to its business and property in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.  Plaintiff will suffer further injury unless the Court enjoins Cliffs from its unlawful conduct and continuing violations of the antitrust laws under 15 U.S.C. § 26.

91.    Plaintiff is also entitled to recover from Cliffs costs of suit, including reasonable attorney fees, as provided by 15 U.S.C. §§ 15 and 26.

## FIFTH CLAIM FOR RELIEF

**(Violation of Section 2 of the Sherman Act – Attempted Monopolization)**
**(Against Cliffs)**

92.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 91 of this Complaint with the same force and effect as though fully set forth herein.

93.    Plaintiff is informed and believes, and on that basis alleges, Cliffs has attempted to monopolize the Great Lakes Pellet and Iron Market in violation of Section 2 of the Sherman Act.

94.    At all relevant times, Cliffs has possessed substantial monopoly power in the Great Lakes Pellet and Iron Market, as demonstrated by Cliffs' power over pricing, high market share, and manipulation of its strong position in the U.S. markets to secure volumes and improve profitability.

95.    Plaintiff is informed and believes, and on that basis alleges, Cliffs has

27

implemented the anticompetitive scheme set forth above with the specific intent to monopolize the Great Lakes Pellet and Iron Market.  Cliffs' anticompetitive conduct, includes, but is not limited to (a) its agreements with the parties identified above, and other parties, that attempt to lock Mesabi out of the iron ore business; (b) Cliffs' threats to parties currently doing business with Mesabi or contemplating doing business with Mesabi; and (c) exclusive or otherwise restrictive agreements with potential customers of Mesabi, including but not limited to ArcelorMittal, in an attempt to lock competitors and potential competitors such as Mesabi out of the market for years to come.  Cliffs' scheme constitutes exclusionary conduct within the meaning of Section 2 of the Sherman Act.

96.    Upon information and belief, Cliffs' scheme has suppressed competition and produced anticompetitive effects in the Great Lakes Pellet and Iron Market, including causing Plaintiff's antitrust injury and damages.

97.    Upon information and belief, there is a dangerous probability that Cliffs will succeed in unlawfully extending its monopoly in the Great Lakes Pellet and Iron Market through its anticompetitive scheme.   Cliffs' scheme has suppressed competition and has produced anticompetitive effects in the Great Lakes Pellet and Iron Market, including Plaintiff's antitrust injury and damages.

98.    Cliffs' conduct has no procompetitive benefit or justification.    The anticompetitive effects of Cliffs' behavior outweigh any purported procompetitive justifications.

99.    As a result of Cliffs' conduct, and the harm to competition caused by that conduct, Plaintiff has suffered substantial injuries to its business and property in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.  Plaintiff will suffer

28

further injury unless the Court enjoins Cliffs from its unlawful conduct and continuing violations of the antitrust laws under 15 U.S.C. § 26.

100.    Plaintiff is also entitled to recover from Cliffs costs of suit, including reasonable attorney fees, as provided by 15 U.S.C. §§ 15 and 26.

## SIXTH CLAIM FOR RELIEF

### (Violation of Minn. Stat. § 325D.52 – Monopolization)
### (Against Cliffs)

101.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 100 of this Complaint with the same force and effect as though fully set forth herein.

102.    As alleged above, Plaintiff is informed and believes, and on that basis alleges, Cliffs has monopolized the Great Lakes Pellet and Iron Market in violation of Section 325D.52 of the Minnesota Statutes ("**Minn. Stat.**").

103.    At all relevant times, Cliffs has possessed substantial monopoly power in the Great Lakes Pellet and Iron Market, as demonstrated by Cliffs' high market share and manipulation of its strong position in the U.S. markets to secure volumes and improve profitability.

104.    Plaintiff is informed and believes, and on that basis alleges, Cliffs has implemented the anticompetitive scheme set forth above with the specific intent to monopolize the Great Lakes Pellet and Iron Market.  Cliffs' scheme constitutes exclusionary conduct within the meaning of Section 325D.52 of the Minnesota Statutes.

105.    Upon information and belief, Cliffs' scheme has suppressed competition and produced anticompetitive effects in the Great Lakes Pellet and Iron Market, including causing Plaintiff's antitrust injury and damages.

106.   Cliffs' conduct has no procompetitive benefit or justification.   The anticompetitive effects of Cliffs' behavior outweigh any purported procompetitive justifications.

107.   As a result of Cliffs' conduct, and the harm to competition caused by that conduct, Plaintiff has suffered substantial injuries to its business and property in an amount to be proven at trial and automatically trebled, as provided by Minn. Stat. § 325D.57.  Plaintiff will suffer further injury unless the Court enjoins Cliffs from its unlawful conduct and continuing violations of the antitrust laws under Minn. Stat. § 325D.58.

## SEVENTH CLAIM FOR RELIEF

### (Violation of Minn. Stat. § 325D.52 – Attempted Monopolization)
### (Against Cliffs)

108.   Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 107 of this Complaint with the same force and effect as though fully set forth herein.

109.   As alleged above, Plaintiff is informed and believes, and on that basis alleges, Cliffs has attempted to monopolize the Great Lakes Pellet and Iron Market in violation of Section 325D.52 of the Minnesota Statutes.

110.   At all relevant times, Cliffs has possessed substantial monopoly power in the Great Lakes Pellet and Iron Market, as demonstrated by Cliffs' high market share and manipulation of its strong position in the U.S. markets to secure volumes and improve profitability.

111.   Plaintiff is informed and believes, and on that basis alleges, Cliffs has implemented the anticompetitive scheme set forth above with the specific intent to monopolize the Great Lakes Pellet and Iron Market.  Cliffs' scheme constitutes exclusionary conduct within the meaning of Section 325D.52 of the Minnesota Statutes.

30

112.    Upon information and belief, Cliffs' scheme has suppressed competition and produced anticompetitive effects in the Great Lakes Pellet and Iron Market, including causing Plaintiff's antitrust injury and damages.

113.    Cliffs' conduct has no procompetitive benefit or justification.    The anticompetitive effects of Cliffs' behavior outweigh any purported procompetitive justifications.

114.    As a result of Cliffs' conduct, and the harm to competition caused by that conduct, Plaintiff has suffered substantial injuries to its business and property in an amount to be proven at trial and automatically trebled, as provided by Minn. Stat. § 325D.57.  Plaintiff will suffer further injury unless the Court enjoins Cliffs from its unlawful conduct and continuing violations of the antitrust laws under Minn. Stat. § 325D.58.

### EIGHTH CLAIM FOR RELIEF

**(Civil Contempt for Violation of the Automatic Stay)**
**(Against Cliffs and Does 1-10)**

115.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 114 of this Complaint with the same force and effect as though fully set forth herein.

116.    Upon the commencement of the Chapter 11 Cases on July 8, 2016, Plaintiff triggered the protections of Section 362 of the Bankruptcy Code (the "**Automatic Stay**").

117.     The Automatic Stay prohibits, among other things, "any act to obtain possession of property of the estate or of property from the estate" and "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under [the Bankruptcy Code]."  11 U.S.C. § 362(a)(3) & (a)(6).

118.    Cliffs is, and has been, aware that Mesabi had initiated the Chapter 11 Cases, and, upon information and belief, is and has been aware of the ongoing developments during the

31

Chapter 11 Cases.

119.    Plaintiff is informed and believes, and on that basis alleges, that the Defendants intentionally violated the automatic stay with malice and oppression, knowing that their actions would cause substantial harm to the Plaintiff and with a willful and conscious disregard of the Plaintiff's rights.   The Plaintiff seeks compensatory damages and an award of exemplary or punitive damages in an amount sufficient to punish all Defendants and deter similar conduct in the future.

120.    Plaintiff also requests that the Court issue an order holding all Defendants in contempt of court for their violation of the Automatic Stay and issue appropriate sanctions as a result of their contempt pursuant to Section 105 of the Bankruptcy Code.

## NINTH CLAIM FOR RELIEF

**(Injunctive Relief)**
**(Against Cliffs and Does 1-10)**

121.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 120 of this Complaint with the same force and effect as though fully set forth herein.

122.    Plaintiff requests that Cliffs be enjoined from (i) contacting or threatening any existing contractors, employees or consultants working on the Project or being engaged to work on the Project, regarding the Project, or threatening their relationship or prospective relationship with Cliffs based on their work on the Debtors' Project, (ii) threatening any potential contractors, employees, or consultants who may be engaged to work on the Project including  by threatening to discontinue their relationship or prospective relationship with Cliffs if they work on the Project; (iii) interfering with state, local, or other governmental approvals related to the Project, (iv) interfering with debt or equity financing sources for the consummation of the Plan, and (v)

any other actions designed to prevent consummation of the Plan and implementation of the Debtors' construction and business plan.

## TENTH CLAIM FOR RELIEF

**(Civil Conspiracy)**
**(Against Cliffs and Does 1-10)**

123.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 122 of this Complaint with the same force and effect as though fully set forth herein.

124.    Defendants acted in concert and pursuant to a common design and scheme to pursue an unlawful object or course of action to be accomplished by unlawful means, with the purpose of competing against Mesabi to Mesabi's detriment.

125.    Defendants committed acts in furtherance of the conspiracy, including, not limited to, tortious interference with Mesabi's contractual rights, tortious interference with Mesabi's business relationships, violation of the Automatic Stay, and anti-trust claims, without a reasonable or lawful excuse.  All Defendants were willful participants in this joint activity.

126.    As a direct and proximate result of these unlawful acts, Mesabi has suffered damages as alleged above and in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Mesabi prays for relief and judgment against Defendants as follows:

A.    Enter judgment in favor of the Plaintiff and against the Defendants in this action on each claim;

B.    Enjoin Defendants from (i) contacting or threatening any existing contractors, employees or consultants working on the Project or being engaged to work on the Project,

33

regarding the Project, or threatening their relationship or prospective relationship with Cliffs based on their work on the Debtors' Project, (ii) threatening any potential contractors, employees, or consultants who may be engaged to work on the Project including by threatening to discontinue their relationship or prospective relationship with Cliffs if they work on the Project; (iii) interfering with state, local, or other governmental approvals related to the Project, (iv) interfering with debt or equity financing sources for the consummation of the Plan, and (v) any other actions designed to prevent consummation of the Plan and implementation of the Debtors' construction and business plan.

C.      Award general and compensatory damages in favor of the Plaintiff on all claims against the Defendants to those claims, jointly and severally, for all damages sustained by Mesabi, in an amount to be proven at trial, plus prejudgment interest;

D.      Award treble damages as allowed by law;

E.      Award all appropriate equitable remedies, including injunctive relief, as allowed by law, in favor of the Plaintiff on all claims against the Defendants, including but not limited to an order enjoining Cliffs from entering into exclusive or restrictive arrangements with purchasers of pellet products, as well as an order enjoining the other anticompetitive conduct described above;

F.      Award punitive damages and prejudgment interest in favor of the Plaintiff as allowed by law;

G.      Award any declaratory relief that may be necessary and appropriate;

H.      Award Plaintiff its attorneys' fees, costs, and other expenses incurred in this action, as allowed by law; and

Americas 93411239

I.        Grant Plaintiff such other and further relief as the Court considers appropriate.

Dated: September 11, 2017                **FOX ROTHSCHILD LLP**

                                         */s/ Jeffrey M. Schlerf*
                                         Jeffrey M. Schlerf (DE No. 3047)
                                         Carl D. Neff (DE No. 4895)
                                         919 North Market Street, Suite 300
                                         Wilmington, Delaware 19801-3062
                                         Telephone:     (302) 654-7444
                                         Facsimile:     (302) 656-8920
                                         jschlerf@foxrothschild.com
                                         cneff@foxrothschild.com


                                         **WHITE & CASE LLP**

                                         Thomas E Lauria (admitted *pro hac vice*)
                                         Matthew C. Brown (admitted *pro hac vice*)
                                         Southeast Financial Center
                                         200 South Biscayne Boulevard, Suite 4900
                                         Miami, Florida 33131-2352
                                         Telephone:     (305) 371-2700
                                         Facsimile:     (305) 385-5744
                                         tlauria@whitecase.com
                                         mbrown@whitecase.com


                                         Glenn M. Kurtz (admitted *pro hac vice*)
                                         1221 Avenue of the Americas
                                         New York, New York 10020-1095
                                         Telephone:     (212) 819-8200
                                         Facsimile:     (212) 354-8113
                                         gkurtz@whitecase.com


                                         Craig H. Averch (admitted *pro hac vice*)
                                         Ronald K. Gorsich (admitted *pro hac vice*)
                                         555 South Flower Street, Suite 2700
                                         Los Angeles, California 90071-2433
                                         Telephone:     (213) 620-7700
                                         Facsimile:     (213) 452-2329
                                         caverch@whitecase.com
                                         rgorsich@whitecase.com

Americas 93411239

Peter Carney (*pro hac vice* pending)
Charles Moore  (*pro hac vice* pending)
701 Thirteenth Street, NW
Washington, District of Columbia 20005-3807
Telephone:     (202) 626-3600
Facsimile:     (202) 639-9355
pcarney@whitecase.com
charlesmoore@whitecase.com

*Attorneys for the Debtors and Debtors in Possession*