## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| ESSAR STEEL MINNESOTA LLC and ESML HOLDINGS INC.,[1] | Case No. 16-11626 (BLS) |
| | (Jointly Administered) |
| Debtors. | |
| MESABI METALLICS COMPANY LLC (F/K/A ESSAR STEEL MINNESOTA LLC), | |
| Plaintiff | |
| v. | Adv. Proc. No. 17-51210 (BLS) |
| CLEVELAND-CLIFFS, INC. (F/K/A CLIFFS NATURAL RESOURCES, INC.); CLEVELAND-CLIFFS MINNESOTA LAND DEVELOPMENT LLC; GLACIER PARK IRON ORE PROPERTIES LLC; and DOES 1-10 | |
| Defendants. | |

## SECOND AMENDED COMPLAINT AND (SUBSTANTIVE AND NON-SUBSTANTIVE) OBJECTION TO CLAIM NOS. 55 AND 224

Plaintiff Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) ("**Mesabi**" or "**Plaintiff**") as debtor and debtor in possession in the above-captioned jointly administered chapter 11 case, for its second amended complaint ("**Complaint**") against Cleveland-Cliffs, Inc. (f/k/a Cliffs Natural Resources, Inc.) ("**Cliffs**"), Cleveland-Cliffs Minnesota Land Development LLC ("**Cliffs Minnesota**"), Glacier Park Iron Ore Properties LLC ("**GPIOP**"), and certain Doe

---

[1] Essar Steel Minnesota LLC has changed its name to Mesabi Metallics Company LLC.  The last four digits of its federal taxpayer identification number are 8770.  The last four digits of ESML Holdings Inc.'s federal taxpayer identification number are 8071.

defendants, Does 1-10[2] (collectively, "**Defendants**") for, among other claims of relief, breach of contract, breach of the covenant of good faith and fair dealing, tortious interference with Plaintiff's contractual and business relationships in violation of Minnesota state law, violation of antitrust laws under Sections 1 and 2 of the Sherman Act and applicable Minnesota state law, violation of the automatic stay under Section 362 of the Bankruptcy Code, civil conspiracy, civil contempt, avoidance and recovery of unauthorized post-petition transfers, claims disallowance, and injunctive and declaratory relief, alleges as follows:

## NATURE OF THE CASE

Cliffs is a monopolistic predator, intent on preventing Mesabi from competing with Cliffs.

Already controlling virtually the entire open market for blast furnace pellets within the Great Lakes Pellet and Iron Market (as defined below), Cliffs has long coveted Mesabi's surface and mineral leases, in order to solidify and preserve its monopoly position and prevent development and production of the related lands and minerals.  Having failed to block Mesabi's attempt to enter into the Great Lakes Pellet and Iron Market and secure Mesabi's assets for itself in an open public auction conducted during the bankruptcy proceeding, Cliffs (and other Defendants in conspiracy with it) has now resorted to surreptitious and underhanded attempts to obstruct consummation of Mesabi's confirmed plan of reorganization (the "**Plan**")[3] and block completion of the Project.

Long before Mesabi ever sought bankruptcy protection, Cliffs (and other Defendants in

---

[2] Plaintiff believes certain individuals or entities have acted in concert with the Defendants, which Plaintiff is investigating.  Plaintiff intends to amend this Complaint to include those individuals and entities by name and seek the relief requested in this Complaint against them at the appropriate time.

[3] Where the context requires, each capitalized term used but not otherwise defined herein shall have the meaning ascribed to such term as defined herein or in the *Third Amended Chapter 11 Plan of Reorganization of Mesabi Metallics Company LLC  (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc.* [D.I. 990].

conspiracy with it) engaged in a course of conduct designed to interfere with and impede Mesabi's contracts and business relationships, and ultimately to keep Mesabi from completing the Project and competing with Cliffs in the Great Lakes Pellet and Iron Market.

When Cliffs failed to purchase Mesabi's assets in bankruptcy, Cliffs ratcheted up its anti-competitive interference with the Mesabi's contracts and business relationships, to prevent the confirmed Plan from becoming effective, and eliminate its only threat of competition in the market.  Cliffs unabashedly resorted to contacting Mesabi's contractors, mineral lessors, professionals, other goods and service providers, and potential customers with a single, but effective threat: if you do business with Mesabi (or the Plan Sponsor, Chippewa), Cliffs – which controls the relevant geographic and product markets – won't do business with you.  Despite this interference, Mesabi and the Plan Sponsor were making great progress toward consummating the Plan and were progressing with construction of the Project.

With Mesabi at the doorstep of reorganization and a massive new money investment, however, Cliffs resorted to a last gasp, desperate attempt to snuff out its upstart competitor. When the path towards consummation of the Plan and the successful reorganization of Mesabi appeared to have cleared, on December 11, 2017, Cliffs dropped what it no doubt considered to be a bombshell – announcing that it had purportedly acquired and/or leased from GPIOP "parcels that were formerly leased by GPIOP to [Mesabi]."  Cliffs further declared it was "time for [Cliffs] to sit at the table with responsible parties and develop a realistic solution for this site." As discussed below, the only solution that would satisfy Cliffs is the elimination of Mesabi as a competitor.  Well known to Cliffs, the mineral rights associated with such properties are important to Mesabi's future viability.  Tellingly, Cliffs and GPIOP negotiated their deal entirely in secret, keeping even the fact that they were negotiating (in violation of GPIOP's contractual obligations to Mesabi) from Mesabi, the Plan Sponsor, and apparently even from Superior

3

Mineral Resources, LLC ("**Superior**"), the co-lessor with GPIOP of certain mineral rights to Mesabi that Cliffs purported to acquire.

However, Cliffs' attempt to deprive Mesabi of necessary mineral rights was misguided and ineffective.  By Court order, the Mineral Leases are to be assumed on the Effective Date by Mesabi for the benefit of the Reorganized Debtor.  Further, the Mineral Leases have not been terminated and the Reorganized Debtor has an unqualified right to step into the shoes of Mesabi with respect to such leases.  As further alleged, and as sought through the declaratory relief sought herein, Mesabi's property rights remain intact, and all defaults under the Mineral Leases will be deemed cured or waived when the Plan goes effective.  In short, even before considering the illegality of Cliffs' conduct, Cliffs may, at most, be positioned as Mesabi's landlord with respect to certain mineral rights.

In addition to being ineffective, the Cliffs Transaction is a further illegal and anti-competitive attempt to prevent Mesabi from reorganizing, and competing with Cliffs.  Cliffs has no present intent to mine the GPIOP properties.  Mesabi still retains rights to adjacent lands that are necessary for the economic mining of the GPIOP properties or build the Project with its associated value, including jobs for the community.  Indeed, Cliffs acknowledged in its own press release announcing the deal that it was not motivated by any present intention to mine the properties, but rather by "leverage."  Put simply, Cliffs wants to leverage Mesabi out of its market and out of business. The primary value to Cliffs of the purported acquisition is preventing Mesabi from proceeding with its development efforts, for the purpose of blocking Mesabi from entering the market and competing with Cliffs.  Any direct benefits to Cliffs from the parcels are contingent on Cliffs putting Mesabi out of business and gaining the adjacent lands and surface rights held and/or controlled by Mesabi.

Upon information and belief, the transaction between Cliffs and GPIOP was the

culmination of a several-month conspiracy between GPIOP and Cliffs to breach GPIOP's ongoing obligation to negotiate and execute the Restated Mineral Leases, and instead attempt to convey Mesabi's mineral rights to Cliffs.  Upon information and belief, Cliffs and Cliffs Minnesota have no legitimate business purpose for acquiring the GPIOP Property Interests. Cliffs' and Cliffs Minnesota's purpose is the destruction of the Project and the unlawful elimination of a competitor within the Great Lakes Pellet and Iron Market.

The Defendants' efforts to interfere with Mesabi's affairs have caused significant delay and additional, unanticipated expense as Mesabi seeks to consummate the Plan.  As described below, Mesabi and the Plan Sponsor have made great progress toward implementing the Plan, but prompt action is needed to remediate harm caused by the Defendants to date, prevent jeopardy to the confirmed Plan and the success of the Reorganized Debtor, and avoid future damage to Mesabi and its current and former creditors that could result from Cliffs' established course of conduct.  In addition to seeking damages, the recovery of which will benefit the Debtors' secured and unsecured creditors, Plaintiff also seeks declaratory relief, that the Debtors' and Reorganized Debtor's rights in the Mineral Leases were not terminated and remain valid, and that the Debtors' and Reorganized Debtor's rights in the Mineral Leases and Restated Mineral Leases are senior to any purported transfers to Cliffs of the GPIOP Property Interests. Plaintiff also seeks injunctive relief to enjoin Defendants from engaging in any activity designed to interfere with Mesabi's and the Plan Sponsor's property and contractual rights and business relations, or otherwise conspire to prevent consummation of the Plan and completion of the transactions contemplated in the Plan.

The Defendants' intentional actions constitute tortious interference with Mesabi's contracts and business, anticompetitive violations of Sections 1 and 2 of title 15 of the United States Code, 15 U.S.C. § 2 (the "**Sherman Act**"), and anticompetitive acts under Minnesota state

law.  They also constitute acts to obtain possession of or exercise control over property of the Debtors' estates, in violation of section 362 of the Bankruptcy Code.

Plaintiff now seeks to avoid and recover from Defendants, or from any other person or entity for whose benefit the transfer was made, all unauthorized transfers made subsequent to the commencement of the Chapter 11 Cases, pursuant to sections 549 and 550 of title 11 of the United States Code (the "**Bankruptcy Code**").  Plaintiff also seeks to disallow, pursuant to section 502(d) of the Bankruptcy Code, any claim that Defendants have filed or asserted against the Debtors, or that have been scheduled for the benefit of the Defendants.  Plaintiff does not waive but hereby reserves all rights, including rights of the Debtors, to object to any such claim for any reason, including, but not limited to, any reason set forth in sections 502(a) through (j) of the Bankruptcy Code.

Without this Court's relief, the unmistakable and irreparable harm to Mesabi's business and to all stakeholders in the Chapter 11 Cases will continue, with a very real risk of preventing the Reorganized Debtor from succeeding.

<u>**JURISDICTION AND VENUE**</u>

1.      This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").  This adversary proceeding relates to the Chapter 11 Cases pending before the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").  Mesabi consents, pursuant to Bankruptcy Rule 7008 and Local Rule 7008-1, to the entry of a final order by the Bankruptcy Court in connection with this Complaint to the extent that it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

6

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

3.      This Court has personal jurisdiction over Defendants pursuant to Bankruptcy Rule 7004.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      All Defendants are properly joined in this action pursuant to Rule 20 of the Federal Rules of Civil Procedure, made applicable by Bankruptcy Rule 7020, because the right to relief asserted against all Defendants arises out of the same transaction, occurrence, or series of transactions and occurrences, and questions of law and fact common to all Defendants and/or certain categories of Defendants will arise in this action.

6.      Pursuant to this Court's *Order Granting Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 1142(b) for Entry of Order Implementing the Provisions of the Plan with Respect to the Cliffs Claims* [D.I. 1335], after the occurrence of the Effective Date, the claims set forth in this Complaint shall vest in the Reorganized Debtor and will be pursued by the Reorganized Debtor as Tranche 2 Claims for its benefit, as well as the benefit of the Debtors' secured and unsecured creditors, pursuant to the Plan.

## THE PARTIES

7.      Plaintiff Mesabi is a limited liability company organized and licensed under the laws of the State of Minnesota, with its principal place of business at 17113 County Road 58, P.O. Box 25, Nashwauk, MN 55769.  Mesabi is the wholly owned subsidiary of ESML Holdings Inc. ("**Holdings**," together with Mesabi, the "**Debtors**"), a holding company, organized and licensed under the laws of the State of Delaware.

8.      Based upon information and belief, Defendant Cliffs is a corporation organized under the laws of the State of Ohio with its principal place of business in Cuyahoga County, Cleveland, Ohio.  The registered agent for service of process for Cliffs is James D. Graham,

whose address is listed with the Ohio Secretary of State as 200 Public Square Suite 3300, Cleveland, Ohio 44114.  According to Cliffs, it is the "only real merchant supplier within the Great Lakes markets."

9.      Based upon information and belief, Defendant Cliffs Minnesota is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Cleveland, Ohio.  The registered agent for service of process for Cliffs Minnesota is the Corporation Trust Company with an address listed with the Delaware Department of State as 1209 Orange Street, Wilmington, Delaware 19801.

10.     Based upon information and belief, Defendant GPIOP is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Houston, Texas.  The registered agent for service of process for GPIOP is the Corporation Service Company with an address listed with the Delaware Department of State as 251 Little Falls Drive, Wilmington, Delaware 19808.

11.     Does 1-10 are Defendants whose true names, identities and capacities are presently unknown to Plaintiff.   As and when the names, identities, and capacities of these fictitiously named Defendants become known, Plaintiff will amend this Complaint to set forth these Defendants' true names, identities, and capacities and otherwise proceed against them as if they had been named parties upon the commencement of this adversary proceeding in accordance with Rules 15 and 25 of the Federal Rules of Civil Procedure, made applicable to this proceeding by Bankruptcy Rules 7015 and 7025.  Without limitation, the fictitiously named Defendants may include affiliates, agents, or representatives of Cliffs.

## FACTUAL BACKGROUND

### A.    The Debtors' Chapter 11 Cases

12.     Mesabi is a company formed to develop and operate an iron ore pellet production

facility (the "**Project**") located in the Mesabi Iron Range in northern Minnesota.  Mesabi has entered into contracts with various parties to provide construction, engineering and professional services that are integral to the Project.  On an ongoing basis, Mesabi has sought to enter into additional commercial relationships in support of the Project.

13.    On July 8, 2016, the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), thereby commencing the Chapter 11 Cases.  The Debtors manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

14.    On July 19, 2016, the United States Trustee for the District of Delaware appointed the Official Committee of Unsecured Creditors (the "**Committee**").  To date, no trustee or examiner has been requested or appointed in these Chapter 11 Cases.

15.    At all relevant times, Cliffs is and has been aware of the Debtors' Chapter 11 Cases.  In fact, Cliffs has actively participated in the Chapter 11 Cases by, among other things, filing an objection to, and appearing for the hearing on, both the Debtors' motion for discovery under Bankruptcy Rule 2004 [D.I. 234] and the Debtors' later certification relating to the implementation of certain provisions of the Plan [D.I. 1304].  Additionally, on December 14, 2017, Cliffs purchased GPIOP's Claim Nos. 55 and 224 in the Chapter 11 Cases.  *See* D.I. 1370, 1371.

16.    Further, Cliffs actively participated in an auction conducted as part of the Plan process and submitted bids for the Debtors' assets pursuant to the related bid procedures.  Cliffs was unsuccessful in its attempts to purchase the Debtors' assets as its bids were at a much lower value and were ultimately determined to be inferior to the winning bidder and ultimate plan sponsor, Chippewa Capital Partners, LLC ("**Chippewa**" or the "**Plan Sponsor**").  Cliffs declined to bid to become the plan sponsor and assume leases and permits already in effect so that the

Project could be completed timely and start operations.  Rather, Cliffs bid solely for the Debtors'

hard assets, which would have allowed Cliffs to keep such assets out of the hands of a competitor

and fortify Cliffs' monopoly position in the Great Lakes Pellet and Iron Market.

**B.      Debtors' Plan of Reorganization and Events Subsequent to Confirmation**

17.      With Chippewa as Plan Sponsor, on June 8, 2017, the Debtors filed the Plan,

which contemplated and provided for, among other things, the contribution of equity and debt

financing sufficient to support assumption of important mineral and surface leases, as well as the

construction and ultimate operation of the Project.

18.      On June 13, 2017, the Court confirmed the Plan and entered its *Findings of Fact,*

*Conclusions of Law, and Order Confirming the Third Amended Chapter 11 Plan of*

*Reorganization for Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and*

*ESML Holdings Inc. Proposed by the Debtors* [D.I. 1025] (the "**Confirmation Order**").  No

party appealed the Confirmation Order and the Confirmation Order became final and non-

appealable on June 27, 2017.  It is well settled that a confirmed plan of reorganization is an

enforceable, court-approved contract between a debtor and all parties in interest.  Thus, the Plan

constitutes an enforceable contract between the Debtors, their creditors, and the Plan Sponsor.

19.      At confirmation, the Debtors received overwhelming support for the Plan from

each voting class of creditors.  This support was due in large part to Chippewa's sponsorship, its

agreement to provide immediate funding to Mesabi, and its commitment to invest $250 million

of new equity into Mesabi.

20.      Since the auction, Chippewa has provided substantial funding to Mesabi and

Mesabi has recommenced construction on the Project.

21.      In confirming the Plan, this Court found that "the Debtors will have sufficient

means to meet all of their obligations under the Plan" and that the record established that "the

Reorganized Debtor will emerge from bankruptcy as a viable, financially healthy entity, unlikely to be in need of further financial reorganization, and likely to be able to incrementally complete the Project." Confirmation Order, ¶ II.  Indeed, Mesabi has been working diligently with GPIOP, DNR and other stakeholders both before and since the Confirmation Order to finalize the agreements necessary to complete the Project. As described below, many of these agreements already have been executed.  Therefore, absent Cliffs' improper interference, Mesabi has demonstrated that it would likely be able to complete construction of the Project and successfully enter the Great Lakes Pellet and Iron Market and compete with Cliffs.

22.     Mesabi has always been focused on retention of its mineral rights.  Prior to confirmation of the Plan, the Debtors entered into amended leases and related agreements with Langdon/Warren, which agreements were approved by the Bankruptcy Court [D.I. 515] and were critical to maintenance of the Langdon/Warren Mineral Leases.  Additionally, since confirmation of the Plan, in furtherance of its consummation, the Debtors have successfully assumed key mineral and surface leases through settlement agreements with the DNR [D.I. 1025, 1057, 1171] and Chippewa, the Debtors, GPIOP, and Superior entered into the GPIOP Settlement, discussed below, which agreements provide for assumption certain of the Debtors' mineral and surface leases as of the Effective Date.

23.     Pursuant to the Plan and Confirmation Order, if the Effective Date does not occur within six months of the Confirmation Date, unless otherwise agreed by the relevant parties, the Mineral and Surface Leases shall be deemed rejected, and the Debtors will be required to immediately surrender such leases.  Confirmation Order, ¶ 45.  The Mineral Leases were specifically excluded from assumption under the Plan, and therefore from paragraph 45 of the Confirmation Order.  *See* Plan, § 1.1(91) (defining "Mineral and Surface Leases" to exclude the Mineral Leases).  A settlement agreement between the Debtors and the DNR, however, provides

11

that if the Effective Date does not occur on or prior to December 31, 2017, the DNR Leases shall be deemed rejected, and the Debtors will be required to immediately surrender such leases.  *See* D.I. 1057, 1176, 1231.  Additionally, an agreement between the Debtors and Langdon/Warren provides for the same extension through December 31, 2017.  *See* D.I. 1358.

24.     In connection with the lease assumption agreements discussed above, in addition to completing the existing Project, Mesabi and Chippewa have made material progress and taken major steps toward implementing the Plan.  Chippewa has engaged Kiewit, one of the largest and most respected construction contractors in the United States.  Mesabi and Chippewa have worked with Kiewit on a highly expedited basis as Kiewit has conducted a comprehensive review of the Project in anticipation of Kiewit assuming the role of general contractor to complete the Project.  The parties have entered into a preliminary agreement with respect to the Project, and are negotiating a comprehensive general contractor's agreement under which Kiewit will supervise local contractors and its own internal resources at the expansive Project.  Kiewit will assume a prominent leadership role and has prepared a comprehensive engineering, procurement, and construction plan for the Project.

25.     In addition, Chippewa has committed to build a hot-briquetted iron ("**HBI**") facility, bringing value-added production to Minnesota's Mesabi Iron Range (the "**Mesabi Iron Range**") for the first time.  The combined projects will create hundreds of new jobs and generate many tens of millions of dollars in contributions to both state and local revenues, making the iron mining and production industry in Minnesota more competitive and less of a monopoly controlled by Cliffs.

26.     To that end, Chippewa has entered into an agreement with an engineering company, Tenova, with respect to construction of a long-anticipated, value-added plant on the Project site, which will produce HBI.  Chippewa has begun making payments on a $1.25 million

engineering contract for design of that project, which will be financed separately. To further advance the project, Chippewa organized and attended a meeting in Monterrey, Mexico with Tenova and Kiewit to evaluate an operating HBI furnace.  The purpose of the visit was twofold: (1) to evaluate the furnace for constructability purposes; and (2) to identify the path forward to formally bid the project from a design and construction standpoint.  As a result of this strategic meeting, Chippewa received formal bids for both Kiewit and Tenova to advance work on the Project.

27.    While Mesabi continues to progress toward consummation of the Plan, Cliffs has consistently interfered with Mesabi's reorganization and continues to interfere with the closing of the transactions contemplated in the Plan.  Cliffs' actions have already caused delays, forced Mesabi to renegotiate agreements with multiple Project vendors, and required Mesabi to engage alternative service providers.

## C.    History of Cliffs' Ongoing Interference with Mesabi's Operations and the Relevant Market

28.    Cliffs is a direct competitor of Mesabi.  Cliffs operates iron ore and pellet production facilities in northern Minnesota, and upon information (including Cliffs' own assertions) and belief, Cliffs controls virtually all of the public market for blast furnace pellets in the Great Lakes Pellet and Iron Market.

29.    Access to mineral rights to support its pellet production is essential to Mesabi's future success.  In order to ensure the necessary access, Mesabi entered into numerous mineral and other leases with several different lessors.  Taken together, these leases provide Mesabi with approximately 20,000 contiguous acres.  Mesabi sited its production facility so as to maximize efficiency in utilizing these interests.  Maintaining the entire assemblage has always been essential to realizing the efficiencies underlying Mesabi's key investment assumptions related to

the Project.

30.      Cliffs has long sought to acquire Mesabi's assets and prevent Mesabi from

entering the Great Lakes Pellet and Iron Market.  In particular Cliffs has long pursued Mesabi's

interests leased from the DNR (the "**DNR Leases**").  Indeed, by at least 2015 and periodically

since that time to date, Cliffs has persistently pressured the State of Minnesota and the Minnesota

governor's office to terminate the DNR Leases with Mesabi and allow Cliffs to take over the

DNR Leases.  Attached hereto as **Exhibit 1** are examples of relevant correspondence between

Cliffs and the DNR regarding Mesabi's DNR Leases.  Now, having failed to procure the DNR

Leases, Cliffs has moved to take control of the Mineral Leases.

31.      As Lourenco Goncalves explained in public statements on November 16, 2016,

there are "three different markets for iron ore, they're completely separate.  One is the

international market that's basically dominated by China and surrounding countries for mines

and some lump ore, that's one business.  The other business is the pellet business.  The pellet

business is the one that the Samarco thing affected in the – especially hitting Europe and the

Middle Eastern operations, especially the DRI Middle Eastern Operations."  Mr. Goncalves went

on to explain that the "**third business is the business that we [Cliffs] dominate here in the

United States is the pellet business within the Great Lakes**" (the "**Great Lakes Pellet and

Iron Market**") (emphasis added).

32.      The "Great Lakes" is a geographic region that includes the Iron Range of

Minnesota.  The Iron Range of Minnesota actually includes four, distinct, iron ranges, one of

which is the Mesabi Iron Range.  The Mesabi Iron Range is largely located within Itasca and St.

Louis counties in Minnesota, and is the largest iron range within the Iron Range of Minnesota.

33.      On information and belief, the Mesabi Iron Range, where Mesabi intends to

complete the Project and mine iron ore to commercialize and sell, is one of the most productive

and promising iron ore mining areas in the United States.  The Mesabi Iron Range is also a significant source of taconite, a type of iron formation for which there has been increasing demand in recent years.

34.     As the primary, if not only, open-market supplier of pellets made from Great Lakes iron ore, Cliffs possesses market power in the Great Lakes Pellet and Iron Market.  Cliffs' position as the primary or only producer in the relevant market gives Cliffs the power to maintain prices for their products at higher than competitive levels.  No other iron ore producers engaged in the open market in the Great Lakes region have sufficient iron ore or pellet sales, customers, or other market presence to force Cliffs to compete on price, quality, or other factors.  Indeed, as set forth in paragraph 31 and elsewhere in this Complaint, Cliffs' own statements confirm Cliffs' market dominance.

35.     The Great Lakes Pellet and Iron Market is exactly the market Mesabi is seeking to enter and in which Mesabi will be Cliffs' primary, if not only, competition.  Thus, on behalf of Cliffs, Mr. Goncalves has (a) specifically identified the Great Lakes Pellet and Iron Market as the relevant geographic and product market as the market for the public sale of iron ore pellets; and (b) admitted that Cliffs dominates and controls the relevant market.

36.     Mr. Goncalves has openly boasted about Cliffs' iron ore business in the United States, characterizing it as a "beast."  Specifically, Mr. Goncalves has touted Cliffs' monopoly power in the Great Lakes Pellet and Iron Market to the public during Cliffs' quarterly earnings calls, including as follows:

  a.  On October 27, 2016, Mr. Goncalves commented that "[r]ecently, the pellet market in the Great Lakes got even tighter as Magnetation ceased operations at the beginning of [October 2016] bringing Cliffs back to its long-standing position as the only merchant pellets supplier in the Great Lakes."

b.  On July 27, 2017, Mr. Goncalves stated: "How is this business able to achieve its EBITDA margins of nearly 40% in the metals and mining industry in the United States where EBITDA margins of 9.5%, 10% are considered to be very good and 15% are considered great.  Number one, cost to enter.  Cliffs is the only real merchant supplier within the Great Lakes markets, and we have all the good clients under long-term contracts, covering pretty much all their pellet requirements."

c.  Mr. Goncalves further explained on July 27, 2017 that "[t]he same advantage that make our U.S. iron ore pellet business so powerful will make our HBI business powerful as well.  Just like our pellets, we will be the only merchant supplier of virgin iron units in the region.  So right off the bat, we have a huge logistical advantage over the competition."

37.  Mr. Goncalves' bold statements on Cliffs' market control and the fact that Cliffs is able to maintain extremely high margins – over four times those of comparable metal and mining industries – because of Cliffs' monopoly power ("Cliffs is the only real merchant supplier within the Great Lakes markets") and the extremely high "costs to enter" the Great Lakes Pellet and Iron Market have shown to be true.

38.  By way of nonexclusive example, Cliffs' recent transactions with ArcelorMittal USA LLC ("**ArcelorMittal**") provide a striking demonstration of Cliffs' market domination and power.  The veracity of Cliffs' claims and resulting harm to the Great Lakes Pellet and Iron Market are readily apparent from the size of ArcelorMittal's proof of claim in these Chapter 11 Cases.  Prior to commencement of these Chapter 11 Cases, ArcelorMittal entered into a binding contract with Mesabi for the provision of pellets in the Great Lakes Pellet and Iron Market at an agreed pricing schedule for a number of years.  At that time, Mesabi was competing with Cliffs

16

for ArcelorMittal's business, and the price terms of the contract reflected a healthy competitive market for pellets within the Great Lakes Pellet and Iron Market.  When Mesabi failed to perform under the contract, ArcelorMittal was forced instead to obtain the pellets Mesabi would have provided from Cliffs, which by its own admission was once again the only merchant supplier of pellets in the Great Lakes Pellet and Iron Market.  As a result of Cliffs' monopoly power, ArcelorMittal will pay in excess of $600 million more for these same pellets to Cliffs than ArcelorMittal would have paid to Mesabi in a competitive market.[4]

39.     With respect to ArcelorMittal, Mr. Goncalves also claimed on Cliffs' earning calls that Cliffs has "locked up" the "vast majority of [its] sales tonnage….for several years," and that U.S. Steel, an integrated steel producer, could not sell pellets to ArcelorMittal because Cliffs has locked ArcelorMittal up as a client:  "I also try to understand where U.S. Steel is going to sell their pellets, because – certainly not to ArcelorMittal because I know the contracts we have in place."[5]

40.     More generally, Mr. Goncalves boasted on the April 2017 earnings call that Cliffs has taken all of the clients – potential customers for competitors and potential competitors like Mesabi – off the market for years:  "Where [is U.S. Steel] going to sell the pellets, if that is part of your question?  I have no idea, because the clients are taking [sic].  I will sell to them in 2017, 2018, 2019, 2020, 2021, 2022, and then 2023, one contract will end.  And then, 2024, a second contract and then – and it's too far away.  By that time, I'll be very old."  And during the

---

[4] ArcelorMittal filed a proof of claim in excess of $1 billion, alleging that such amount was the amount above the Mesabi contract that ArcelorMittal would have to pay Cliffs to obtain comparable product; however, after significant effort and negotiation the Debtors have reached an agreement with ArcelorMittal and filed their Motion for Entry of an Order Approving the Agreement [D.I. 1065], which seeks to allow ArcelorMittal's proof of claim in the amount of $605 million.

[5] Mr. Goncalves has separately asserted in a 2015 earnings call that "I have never seen U.S. Steel as a competitor. U.S. Steel is a steel maker. They are integrated backwards, and they have upstream pellet production. . . We look forward to see U.S. Steel coming back at full force and in full capacity.  They are not a competitor of Cliffs Natural Resources."

February 2017 earnings call, Mr. Goncalves similarly bragged that "with solid demand and [the] exclusive nature of our contracts, keeping wannabe competitors watching from the outside and talking a good game, at this point, we are sold out for 2017."

41.     If Cliffs' exclusive or otherwise restrictive arrangements with pellet customers such as ArcelorMittal, are permitted to continue it could prevent new entrants from being able to provide any meaningful alternative to Cliffs' dominant market position.

42.     As Mr. Goncalves explained, this is great for Cliffs' profit margins; however, it is devastating to customers in the Great Lakes Pellet and Iron Market and their consumers.

43.     This also demonstrates why Cliffs is uniquely incentivized to prevent Mesabi from successfully entering into the Great Lakes Pellet and Iron Market and HBI markets. Indeed, in touting Cliffs' new deal with ArcelorMittal in a July 28, 2016 earnings call, Mr. Goncalves explained that the agreement preserved Cliffs' "position as ArcelorMittal's sole supplier from the outside" and that such agreement was particularly beneficial to Cliffs because it prevented any potential new entrant in the market from doing business with ArcelorMittal for 10 years, stating that "[w]ith the signature of this contract, any potential competitor of Cliffs within the Great Lakes will have 10 years to start producing pellets or to improve the quality of the pellets just to try again," thus creating yet another barrier to entry into the Great Lakes Pellet and Iron Market.

44.     For years, after obtaining the dominant share of the Great Lakes Iron and Pellet Market, Cliffs has embarked on an exclusionary scheme to derail Mesabi's entry into the Great Lakes Pellet and Iron Market.  For years, Cliffs did not keep its intentions secret.  Rather, Mr. Goncalves has, among other things, openly admitted that Cliffs would use exclusionary methods to put Mesabi (and other competitors) out of business, threatened third parties not to do business with a Cliffs competitor – specifically Mesabi – and made disparaging and intimidating remarks

about Mesabi, all in an effort to interfere with Mesabi's prospective business opportunities and keep its competitive threat at bay.  For example:

a.  In October 2015, in an overt threat to the unions, miners, municipalities, and politicians in the area, Mr. Goncalves told the Mesabi Daily News that the Project, once complete, would directly compete with Cliffs, and that "[i]f the[] [Project] go[es] online, I will shut down a plant up there the same day."

b.  During Cliffs' quarterly earnings call on July 28, 2016, Mr. Goncalves stated that "[Mesabi] is also known as Neverland.  Never finished, never producing pellets, never paying anyone," and asserted that "[Cliffs] ha[s] a signed commitment with Governor Dayton that we have – we are – as soon as [Mesabi] vacates the site, the leases are ours."  At the time of that "signed commitment," Mesabi was actively seeking to reorganize and continue construction.

c.  On information and belief, Cliffs has sought to intimidate local businesspeople and community leaders in an effort to get them to oppose Mesabi's reorganization efforts, notwithstanding that local businesses and communities will benefit enormously from the Project.[6] As an example, at an April 6, 2017 meeting with local officials, Mr. Goncalves said that if he could, he would come "with a bulldozer and take [Mesabi] out." As to those who would support the project, he said that "you're either with me or you're against me."

d.  According to the sworn testimony of the DNR's Director of Lands and Minerals Division, Jess Richards, Cliffs repeatedly pressured the State of Minnesota to

---

[6] Under the Plan, the highest recoveries will be paid to local contractors and vendors, who will also benefit from the large amount of work to be generated by constructing and supplying the Project.  Local communities will also benefit, as the Project will significantly increase the local tax base and fund local government and services.

terminate Mesabi's mineral leases, threatening to walk away from any potential

project on the site unless the State terminated Mesabi's leases on Cliffs' behalf.

e.   Mr. Richards further testified that Cliffs asked the DNR to contact Mesabi's

lenders to convince them to withdraw their support of Mesabi and to instead back

Cliffs' attempts to have Mesabi's DNR Leases terminated.

f.   On information and belief, in January 2015, Mr. Goncalves met with legislators

from northern Minnesota and criticized the State of Minnesota's decision to work

with Mesabi towards extending Mesabi's date to repay a State monetary grant to

build infrastructure for the Project.

g.   Cliffs repeatedly disparaged Mesabi in written correspondence with the DNR and

the governor of Minnesota.  On or about June 27, 2016, Cliffs' lobbyists

contacted the DNR and the governor's office to criticize the Debtors' attempts to

get letters of support from lessors and vendors, commenting that "this effort by

[Mesabi] to pressure these contractors stands as yet one more example of that

company's questionable ethics and business practices."  On or about June 23,

2016, in a letter to the governor of Minnesota, Cliffs wrote that Mesabi and its

financial backers "have proven on a repeated basis to have flawed timing, an

undefined strategy, an inability to execute and, worst of all – questionable ethics."

h.   Beginning in 2014 and continuing through the first half of 2015, Cliffs flew

aircraft over Mesabi's property to obtain aerial photographs of the progress of

construction on the Project site and apparently used the photos to paint a

misleading picture of the progress to, on information and belief, local

businesspeople and community leaders.

45.     Mr. Goncalves' hostile pronouncements and Cliffs' onslaught of threats and

disparagement make clear to all stakeholders that Cliffs expects exclusive control of the market.

On or about November 12, 2015, a Mesabi Iron Range Congressional representative observed

that Cliffs' employees appear to expect the government's assistance in monopolizing the market,

rebuking a Cliffs lobbyist that "Cliffs' employees are also of the misunderstanding that the

government [has] far more control over market conditions and eliminating competition than we

ever could."

D.    **In the Face of Plan Consummation, Cliffs Ratchets up Its Anti-Competitive Conduct to Prevent Mesabi from Competing in the Market[7]**

46.    Cliffs knew of the confirmation of the Plan, the Debtors' need for financing, and

related pleadings and objection deadlines; however, this Court's confirmation of the Plan did not

deter Cliffs' campaign for Mesabi's demise in order to continue Cliffs' monopolization of the

Great Lakes Pellet and Iron Market.  Having failed to acquire Mesabi's assets and liquidate the

Project through the Debtors' auction process, and as confirmation of the Plan approached and

was ultimately achieved, Cliffs threatened to withhold its business from various of Mesabi's key

contractors, engineers, professionals and potential customers to prevent them from doing

business with Mesabi.  These contractors, engineers, and professionals are essential to bringing

the Project online, and of course, the potential customers are key to the viability of the

Reorganized Debtor.  Cliffs is thereby blocking competition from entering the market precisely

because Cliffs has leverage over such contractors, engineers, professionals and potential

customers by virtue of its market dominance.  By threatening to "blacklist" these local and

regional businesses, including causing them to withdraw or rescind their agreements with

---

[7] Cliffs may try to justify its actions as competitive, relying on an alleged 2024 expiration of its life-of-mine at its Hibbing Taconite facility in Minnesota.  This is a red herring.  First and foremost, seven years is plenty of time for Cliffs to develop an alternative business strategy for this asset, without trying to secure the termination of Mesabi's mineral leases.  Second, Mesabi understands that Cliffs has or can secure access to adjacent mineral resources such that the Hibbing Taconite life-of-mine can be extended beyond the year 2024.

Mesabi, Cliffs has caused unnecessary and harmful delays and imposed significant costs on Mesabi. Cliffs' interference with Mesabi's operations poses a threat to implementation of the Plan and to creditor recoveries thereunder.

47.     On information and belief, Cliffs has informed numerous third-party contractors, engineers and professionals that Cliffs will not work with those businesses and individuals who do business with Mesabi or ERP Iron Ore, LLC ("**ERP**"), Chippewa's affiliate that purchased Magnetation LLC. Indeed, Mesabi has been told by some contractors that they could no longer "work on Mesabi projects" because of their relationship with Cliffs. Some specific examples of Cliffs' intimidating tactics are described below:

48.     Barr Engineering Co. ("**Barr**") has a long history of performing essential professional engineering and environmental permitting services on the Project, dating back to the Project's initial engineering and development stage (prior to Mesabi's predecessor's purchase of the Project) and continuing through the bankruptcy proceeding. In fact, Barr was retained by Chippewa during the Chapter 11 Cases to play an expanded role at the Project. Barr's work in this regard was critical to allowing the Plan to go effective.

49.     Yet, by letter to Robb Bigelow, managing director at ERP and Chippewa, dated August 15, 2017 (the "**Barr Letter**"), Barr suddenly refused to do any further work on the Project, informing Mr. Bigelow that "Barr Engineering Co. regretfully must decline to perform further work under its contract with Chippewa Capital Partners LLC relating to the [Project] site." A true and correct copy of the Barr Letter is attached hereto as **Exhibit 2**. Barr employees similarly informed Mesabi that Barr would not perform further work for Mesabi on several workstreams for which Mesabi had relied on Barr to comply with and manage environmental permitting and various engineering needs. On information and belief, Barr's decision to discontinue doing any further work for Mesabi was solely due to threats and pressures from

22

Cliffs—in particular, Cliffs' message to Barr that if Barr continued to work with Mesabi, Cliffs would cease doing current and future work with Barr.

50.    Because of Barr's abrupt resignation, Mesabi had to solicit and secure alternative engineering and construction support, as well as environmental support, to ensure permit compliance.  Moreover, the Barr resignation impacted the timetable for preconstruction work, for bringing another contractor up to speed, and for negotiating arrangements with the project manager which arrangements were, in turn, necessary to the debt financing process.  All of the foregoing events caused additional expense and have further delayed the Effective Date and the ultimate consummation of the Plan.

51.    On information and belief, Cliffs has made improper "refusal to deal" threats to many companies in addition to Barr, successfully coercing some of those companies to cut ties with Mesabi.

52.    On information and belief, Northern Industrial Erectors, Inc. ("**NIE**") a major contractor that has been openly supportive of Mesabi, was threatened and subsequently blackballed by Cliffs.

53.    NIE is a major contractor at the Project that has historically been supportive of Mesabi's reorganization.  On information and belief, NIE had done business with Cliffs for a number of years on many projects but was threatened and excluded from further work by Cliffs due to its work for Mesabi.

54.    Mesabi engaged the Environmental Law Group ("**ELG**") several years prior to the Petition Date to provide legal services and counsel related to the procurement and maintenance of environmental permits necessary to the construction and operation of the Project. ELG provided such services to Mesabi prior to the commencement of the Chapter 11 Cases, and, pursuant to this Court's August 9, 2016 Order [D.I. 205] (the "**OCP Order**") was employed as

an ordinary course professional during the Chapter 11 Cases.  Pursuant to the OCP Order, ELG continued to provide legal services and counsel to Mesabi, and Mesabi timely paid ELG for those services.

55.    Yet, similar to other instances of business interference discussed herein, on May 18, 2017, ELG contacted Mesabi's general counsel and resigned from its representation of Mesabi, effective June 1, 2017, citing the instructions of Cliffs, a presumably larger client, as its reason for resignation.  A true and correct copy of Mesabi's correspondence with ELG is attached hereto as **Exhibit 3**.

56.    When ELG began representing Mesabi it obtained consent from both Cliffs and Mesabi to undertake concurrent representation of both clients; however, at a critical stage in Mesabi's reorganization and restructuring process, when ELG was in the middle of representing Mesabi with time-sensitive permitting issues related to recommencement of construction on the Project, Cliffs withdrew its consent to ELG's representation of Mesabi.

57.    Upon information and belief, Cliffs withdrew its consent, not for any legitimate business purpose, but to cause delay and upheaval in Mesabi's construction process and, ultimately, to derail Mesabi's attempt to consummate the Plan and start competitive operations.

58.    Midrex Technologies, Inc. ("**Midrex**") is a company with which Chippewa and ERP had been working to develop plans for an HBI plant near the Project site in order to comply with the DNR settlement agreement and ensure that Mesabi retains the DNR Leases.  ERP had entered into a nondisclosure agreement and provided confidential information to Midrex in connection with ongoing negotiations pursuant to which Midrex was to provide its direct reduced iron technology to ERP, together with project financing support.

59.    On June 9, 2017, Midrex sent a letter  (the "**Midrex Letter**") to Tom Clarke, ERP and Chippewa's CEO, explaining that it was working on "another potential direct reduction

project within the Great Lakes Region" and "have chosen to focus on this existing opportunity at

the present time."  A true and correct copy of the Midrex Letter is attached hereto as **Exhibit 4**.

In a subsequent conversation, ERP and Chippewa learned that Cliffs had approached Midrex's

corporate parent in Japan about building an HBI plant, after which the corporate parent

instructed Midrex not to deal with ERP or Chippewa.  ERP and Chippewa did not require that

Midrex work exclusively for them; however, on information and belief, Midrex's corporate

parent was instructed by Cliffs to cease dealings with ERP and Chippewa.  Notably, on June 15,

2017, only six days after Midrex stopped working on the HBI plant to be constructed near the

Project Site, Cliffs announced it was building an almost identical plant in Toledo, Ohio, and that

"Midrex Technologies was selected to design, engineer, and procure equipment for the new plant

. . . ."[8]  Mesabi believes Cliffs knew Midrex was working on an HBI plant near the Project Site

and entered into an agreement with Midrex to construct a nearly identical facility in Ohio in

order to subvert the DNR settlement agreement and obtain control of the DNR Leases.

60.    Upon information and belief, Cliffs' primary intent throughout this dealing was to

prevent Midrex from working with Mesabi to complete its own HBI project elsewhere.  Cliffs

has specifically stated this intention through its CEO, Mr. Goncalves, who said "[t]he same

advantage that make our U.S. iron ore pellet business so powerful will make our HBI business

powerful as well.  Just like our pellets, we will be the only merchant supplier of virgin iron units

in the region."

61.    Cliffs' success in causing Midrex to withdraw from discussions with Chippewa

forced Chippewa to divert significant time and resources to finding a replacement for Midrex at

the very time such resources were needed elsewhere.  This effort ultimately resulted in the

---

[8] http://www.businesswire.com/news/home/20170615005276/en/Cliffs-Natural-Resources-Announces-HBI-Production-Plant

agreement with Tenova, described above.

62.     Additionally, upon information and belief, Cliffs has made threatening remarks to certain major domestic steel producers doing business in the Mesabi Iron Range by saying that if such parties were to buy iron ore pellets from Mesabi, Cliffs would not supply them with any of its own pellets.

63.     Further, on information and belief, in August 2017, Cliffs participated in a town hall meeting in the iron ore range of northern Minnesota where the Project is located and invited several of the contractors that have or will work on the Project, as well as influential local businesspeople.  Mesabi believes that the purpose of the meeting was to influence those individuals to put pressure on the DNR such that it would not want to amend the original August 31, 2017 deadline contained in the DNR settlement agreement.  Mesabi understands that Mr. Goncalves attended the meeting in person and addressed the crowd, with his comments focused on reasons the DNR should terminate the leases on August 31, 2017.

**E.      Cliffs and Cliffs Minnesota Instigate GPIOP's Misconduct in Connection with the GPIOP Settlement, and Ultimately the Illegally Attempted, But Ineffective, Transfer to Cliffs of the Mineral Leases and Related Properties**

64.     Mesabi is party to those certain mineral leases, dated as of November 29, 2006, by and between GPIOP and/or Superior as lessors and successors in interest and Mesabi as lessee, referred to as the "MSI/BLGN Lease," "GNIOP 100% Lease," and "MSI 50% Lease," (as from time to time amended, including pursuant to the Omnibus Lease Amendment, as defined below, collectively, and with all related or ancillary documents, the "**Mineral Leases**").

65.     The Mineral Leases are a key component of Mesabi's overall mineral rights portfolio, and as part of that portfolio are central to Mesabi's future plans for the Project.

66.     Over the course of the Mineral Leases, Mesabi has paid more than $10 million in minimum royalties, as required by section 9 of the Mineral Leases (such aggregate amounts, as

accumulated prior to the commencement of mining, the "**Prepaid Royalties**").  The Prepaid

Royalties are subject to offset by Mesabi as set forth in section 9 of the Mineral Leases.

67.    On February 2, 2017, in conjunction with filing of the then-operative version of

the Plan (the "**Original Plan**"), the Debtors filed a notice of motion to assume unexpired mineral

leases (the "**Assumption Notice**").  The Assumption Notice provided notice to lessors that the

Original Plan incorporated and constituted a motion to assume certain executory contracts and

unexpired leases of the Debtors, including but not limited to, the Mineral and Surface Leases and

the Mineral Leases.

68.    In response to the Assumption Notice, on April 12, 2017, GPIOP filed an

objection to the assumption of the Mineral Leases (the "**GPIOP Objection**").

69.    Following negotiations, GPIOP and the Debtors entered into a stipulation

regarding assumption of the Mineral Leases (the "**Stipulation**").  Pursuant to the Stipulation, the

Parties agreed that the assumption of the Mineral Leases would be addressed by a separate

motion.  The Bankruptcy Court entered an order approving the Stipulation [D.I. 924] on April

24, 2017.

70.    On April 25, 2017, GPIOP withdrew the GPIOP Objection [D.I. 927].  While the

Mineral Leases were not then assumed pursuant to the Plan, they remained necessary to the

Project.

71.    On June 27, 2017, shortly after confirmation of the Plan and as contemplated in

the Stipulation, the Debtors filed a motion to assume the Mineral Leases [D.I. 1056] (the

"**Motion to Assume**"), to which GPIOP objected [D.I. 1093] on July 14, 2017.

72.    On August 28, 2017, Chippewa, the Debtors, GPIOP, and Superior were able to

reach a consensual resolution that anticipated and provided for the assumption of the Mineral

Leases on the Effective Date, and entered into that certain Settlement Agreement – Glacier Park

(inclusive of attachments, the "**GPIOP Settlement**") and the associated Omnibus Amendment of Certain Leases and Permitting Assumption Pursuant to 11 U.S.C. § 365 (the "**Omnibus Lease Amendment**").  The GPIOP Settlement and Omnibus Lease Amendment together were intended to identify the terms of the Restated Mineral Leases between GPIOP, Superior, and the Reorganized Debtor, preserving all rights and obligations under the Mineral Leases, as amended.

73.     On August 30, 2017, this Court entered the *Agreed Order Granting Debtors' Motion Pursuant to Sections 105(a) and 365 of the Bankruptcy Code Authorizing Assumption of the GPIOP Mineral Leases, as Amended* [D.I. 1168] (the "**Assumption Order**") which, among other things, approved the GPIOP Settlement and the Omnibus Lease Amendment.

74.     In general, the GPIOP Settlement, approved as part of the Assumption Order, provides for the assumption of the Mineral Leases by Mesabi upon the Effective Date of the Plan on the terms set forth in the GPIOP Settlement.  The GPIOP Settlement conditions such assumption on the occurrence of the Effective Date by October 31, 2017 and the payment by Mesabi to GPIOP and Superior in the aggregate amount of $600,000 to be applied to royalties coming due under the Mineral Leases through January 2018.  Settlement Agr., ¶ 3.  Mesabi made this payment on or about September 15, 2017.

75.     The GPIOP Settlement separately provides that, on or prior to the Effective Date (without regard to when the Effective Date may occur), GPIOP, Superior, and the Reorganized Debtor[9] are obligated to use commercially reasonable efforts to restate the form of the Mineral Leases in a manner acceptable to GPIOP, Superior, and the Reorganized Debtor (the "**Restated Mineral Leases**"), "which Restated Mineral Leases shall be fully enforceable and effective on the Effective Date" and in substance "preserve all rights and obligations under the Minerals [sic]

---

[9] The Reorganized Debtor is a third party beneficiary to the Settlement Agreement and will execute a joinder thereto on the Effective Date.  *Id.*at ¶ 10.

Leases, subject to the modifications described [in the GPIOP Settlement (inclusive of the Omnibus Amendment)], and contain terms and conditions substantially similar to the Mineral Leases . . . ." *Id.* at ¶ 4(a). In any event, "[t]he Mineral Leases *will* be deemed amended and restated by consent on the Effective Date of the Plan." *Id.* (emphasis added).

76. The GPIOP Settlement states that, if the Effective Date does not occur prior to October 31, 2017 or a later date agreed by the parties (the "**Rejection Condition**"), the Mineral Leases will be automatically deemed rejected pursuant to 11 U.S.C. § 365. *Id.* at ¶ 3(d). However, the GPIOP Settlement does *not* provide that the Mineral Leases will be terminated as a consequence. Rather, the GPIOP Settlement permits GPIOP and Superior, as applicable, to take further actions with respect to the Mineral Leases (and underlying real property) following the Rejection Condition without regard to the automatic stay or any other provision of the Bankruptcy Code. *Id.* at ¶ 3(d). There is no corresponding waiver in the GPIOP Settlement of any state law limits on termination, including under the terms of the Mineral Leases. Indeed, paragraph 3(e) of the GPIOP Settlement provides, without qualification, that "[t]he Mineral Leases shall remain in full force and effect until the Restated Mineral Leases become fully effective and enforceable." *Id.* at ¶ 3(e).

77. Notwithstanding the occurrence of the Rejection Condition, the GPIOP Settlement remains effective until the Debtors withdraw the Plan or announce that the Effective Date will not occur. *See id.* at ¶ 8(a), (b). Until then, each party to the GPIOP Settlement is obligated to use its respective commercially reasonable efforts to carry out the terms of the agreement, *id.* at ¶ 16, including the negotiation and execution of the Restated Mineral Leases among the Reorganized Debtor, GPIOP, and Superior, *id.* at ¶ 4. This construct permitted the Debtors and the Reorganized Debtor to retain their rights in the Mineral Leases notwithstanding rejection.

78.     The Omnibus Lease Amendment provides for certain limited modifications of the economic terms of the Mineral Leases.  It waives prior prepayments, changes the minimum royalty payments and mining plan schedule and adds a cross-default provision with respect to certain mineral leases between Mesabi and the State of Minnesota.  Otherwise, the Omnibus Lease Amendment "does not modify the terms of the Mineral Leases, and the unamended terms of the Mineral Leases shall remain in full force and effect."  *Id.* at ¶ 2.  Notably, the Omnibus Lease Amendment does not provide for any special termination rights following the occurrence of the Rejection Condition.

79.     Moreover, paragraph 3(e) of the GPIOP Settlement provides that "[a]s of the Effective Date of the Plan, GPIOP and Superior agree that any pre-Effective Date breaches or defaults under the Mineral Leases are cured, and if not curable, are waived." This provision contains no limitation as to breaches or defaults prior to the occurrence of the Rejection Condition.

80.     Finally, the Assumption Order states that the GPIOP Settlement and the Omnibus Lease Amendment are approved, *id.* at ¶ 2, and that

> Pursuant to sections 105(a) and 365 of the Bankruptcy Code, the Mineral Leases, as amended, ***are assumed as of the effective date of the Plan***.

*Id.* at ¶ 3 (emphasis added).  This Court retained jurisdiction over the terms of the Assumption Order.  *Id.* at ¶ 6.

81.     Upon information and belief, during the time between the Plan's confirmation and the GPIOP Settlement, as Chippewa and Mesabi sought to work with GPIOP to assume the Mineral Leases, Cliffs approached GPIOP to undermine the negotiating process and try to obtain the Mineral Leases.  At certain points, Mesabi's negotiations with GPIOP became inexplicably difficult, which upon information and belief was a direct result of Cliffs' efforts to obtain the

Mineral Leases.  Moreover, Mesabi believes certain terms of the GPIOP Settlement were driven by Cliff's efforts to obtain the Mineral Leases, and that certain terms of the GPIOP Settlement are worse for Mesabi as a result.

82.    These actions constitute not only a direct interference with Mesabi's leasehold and contractual interests in the Mineral Leases, but also an effort to derail the Plan as the Mineral Leases represent a material portion of the future mining plan for the Project.

83.    Pursuant to the terms of the GPIOP Settlement, from August 28, 2017, GPIOP was obligated to negotiate in good faith the form of and execute the Restated Mineral Leases on "terms and conditions *substantially similar* to the Mineral Leases."  GPIOP Settlement, ¶ 4(a) (emphasis added).  Indeed, paragraph 4(b) of the GPIOP Settlement states this obligation explicitly: "Each of GPIOP, Superior and the Reorganized Debtor shall use commercially reasonable efforts to negotiate and execute the Restated Mineral Leases, and shall not unreasonably withhold, delay, or condition their consent or execution of the Restated Mineral Leases."  GPIOP Settlement, ¶ 4(b).  Instead, during the course of negotiations with Mesabi and the Plan Sponsor, GPIOP was focused on forcing a sale of the property related to the Mineral Leases, or negotiating substantially revised terms of a new lease.   Additionally, GPIOP told David Pauker and Susan Fennessey (the CRO and COO/GC of the Debtors, respectively) directly that it was interested in selling its property interests, rather than leasing them.  To date, notwithstanding the best efforts of Mesabi and the Plan Sponsor, the form of each of the Restated Mineral Leases has not been fully negotiated and the Restated Mineral Leases have not been executed.  Thus, in accordance with the GPIOP Settlement, on the Effective Date, the Restated Mineral Leases will be deemed amended and restated by consent on the terms already set forth in the Mineral Leases.

84.    Upon information and belief, the Plan Sponsor, GPIOP, and Superior had reached

advanced stages of negotiations related to the Mineral Leases in early December 2017.   Indeed, although the Effective Date had not occurred by October 31, 2017, Mesabi and the Plan Sponsor were able to secure extensions of the time to go effective from other Mineral Lessors, including the DNR, and GPIOP specifically stated to David Pauker and Susan Fennessey that it, GPIOP, intended to continue to negotiate in good faith and would not be the reason Mesabi was not able to consummate the Plan.   Moreover, GPIOP went even further and assured Mesabi that it had contacted the Minnesota governor's office as well as the DNR and other interested parties and told them that they were still working with Mesabi and the Plan Sponsor in good faith and intended to execute Restated Mineral Leases.   Upon information and belief, these calls were an important part of Mesabi's and the Plan Sponsor's efforts to keep all interested parties invested in the Project and moving forward toward ultimate consummation of the Plan. Furthermore, the Plan Sponsor relied on GPIOP's representations in order to continue to provide funding for the Debtors' operations; Mesabi also continued to incur administrative expenses based in part on GPIOP's reassurance that it would continue to work with the parties.   The Prepetition Lenders also relied on GPIOP's representations of their continued support in negotiations with the Plan Sponsor related to the Prepetition Lender Notes.

85.    As the Court is aware, Mesabi has most recently resolved a dispute with certain Prepetition Lenders with respect to the indenture governing the Prepetition Lender Notes to be issued pursuant to the Plan.   This dispute stemmed from certain changes to the form of indenture required to facilitate contemplated Exit Financing and is emblematic of the substantial challenges Mesabi has faced in its six month push to consummate the Plan.   Resolution of this dispute on

December 7, 2017,[10] seemed then to have cleared the way for the Plan to go effective and bring about a successful resolution of these Chapter 11 Cases.

86.      Unbeknownst to Mesabi, however, upon information and belief, the "negotiations" GPIOP had with the Plan Sponsor were a pretense and GPIOP was either being unduly influenced by Cliffs or directly conspiring with them to kill the Project and Plan by improperly attempting to transfer lease rights to Cliffs.

87.      A new and completely unanticipated complication was introduced on December 11, 2017.  A press release issued Cliffs that morning provides as follows:

> [Cliffs] announced today that its wholly-owned subsidiary, Cleveland-Cliffs Minnesota Land Development LLC, completed an acquisition of certain real estate interests located in Itasca County west of Nashwauk, Minnesota from [GPIOP].   The interests include a combination of undivided and whole fee interests as well as mineral and surface leases, all lying within the Biwabik Iron Formation. The acreage acquired is approximately 553 acres and the acreage being leased is approximately 3,215 acres.
>
> Cliffs expects to be able to leverage the acquired real estate interests to develop a financially sustainable plan for the site, which may be considered as other iron ore resources deplete.  The purchased properties include parcels that were formerly leased by GPIOP to [Mesabi], formerly known as Essar Steel Minnesota. [Mesabi's] lease rights terminated on October 31, 2017 when it failed to exit bankruptcy in connection with Chippewa's inability to timely secure funding and other consents for its plan to take [Mesabi] out of bankruptcy at that time.
>
> Lourenco Goncalves, Chairman, President and Chief Executive Officer, said, "We are enthused about the acquisition of this property, which came into play after Chippewa failed to follow through on its obligation to obtain financing and a bankruptcy exit for [Mesabi] by October 31.  Despite several botched attempts by others, it is now the time for [Cliffs] to sit at the table with other responsible parties and develop a realistic solution for this site." Mr. Goncalves added: "[Cliffs] has been in Minnesota for 115 years, and we currently employ approximately 1,750 people in three separate mining and pelletizing operations throughout the state. As the new owner of this real estate, we know our responsibilities and will not disappoint the people of Minnesota."

---

[10] Mesabi, the Prepetition Lenders, and the Plan Sponsor reached an agreement in principle on all outstanding issues following a Court-ordered mediation before Judge Peck.  Final documentation on this resolution was approved by the Court on December 12, 2017 [D.I. 1362].

*Cleveland-Cliffs Inc. Announces Acquisition of Real Estate Interests in Itasca County, Minnesota*
(Dec. 11, 2017), *available at* http://www.clevelandcliffs.com/English/news-center/news-
releases/news-releases-details/2017/Cleveland-Cliffs-Inc-Announces-Acquisition-of-Real-
Estate-Interests-in-Itasca-County-Minnesota/default.aspx (the "**Cliffs Release**").

88.     On information and belief, all of the mineral and surface rights that are subject to
the Mineral Leases, and were intended to be subject to the Restated Mineral Leases, are included
in the real estate interests purportedly acquired by Cliffs Minnesota pursuant to the Cliffs
Transaction (the "**GPIOP Property Interests**").  Thus, despite GPIOP's obligation to negotiate
the form of and execute the Restated Mineral Leases, upon information and belief, Cliffs,
through its wholly-owned subsidiary Cliffs Minnesota, has entered into an agreement to acquire
the GPIOP Property Interests, which represent a material portion of the future mining plan for
the Project.

89.     Pursuant to the Mineral Leases, however, GPIOP was obligated to "defend
[Mesabi], its successors and assigns, in the full and peaceful possession of the leasehold estate
established [by the Mineral Leases], against all lawful claims and demands whatsoever."

90.     GPIOP gave Mesabi no warning or indication that it intended to sell or lease the
GPIOP Property Interests to Cliffs.  The first Mesabi and the Plan Sponsor learned that GPIOP
did not intend to honor its obligations to Mesabi, including its obligation to execute the Restated
Mineral Leases, was on December 11, 2017.  Before Mesabi and the Plan Sponsor saw the Cliffs
Release, GPIOP abruptly announced on a conference call with the Plan Sponsor that it was
bound by a confidentiality agreement barring it from discussing the matter further.  On the basis
of this purported agreement, GPIOP has refused to provide any information to the Plan Sponsor
regarding the agreements and/or transactions described in the Cliffs Release (collectively, the
"**Cliffs Transaction**") or continue discussions with the Plan Sponsor.  On information and

belief, even Superior, the owner of an undivided 50% interest in much of the mineral rights that are subject to the Mineral Leases, was kept in the dark regarding the Cliffs Transaction: Superior did not participate in the Cliffs Transaction; did not consent to the Cliffs Transaction; did not know of the Cliffs Transaction before it closed; and did not transfer any of its interests to Cliffs.

91.     Upon information and belief, prior to and after August 28, 2017, the date of the GPIOP Settlement's execution, GPIOP was involved in discussions with Cliffs regarding Cliffs' potential acquisition of the GPIOP Property Interests.  Indeed, the due diligence and preparation that is required to close a transaction as complex as the mixed purchase and lease of nearly 4,000 acres of land and related mineral rights necessarily requires multiple months of intense negotiation and drafting before such a transaction can be completed.  Thus, on information and belief, GPIOP and Cliffs were engaged in discussions regarding the Cliffs Transaction in direct contravention of GPIOP's obligations under the GPIOP Settlement.

92.     Upon information and belief, Cliffs Minnesota was formed by Cliffs more than three weeks prior to the rejection trigger in the GPIOP Settlement, and conceived of even earlier than that, for the sole purpose of acquiring the GPIOP Property Interests.

93.      Without access to the GPIOP Property Interests over which Cliffs and Cliffs Minnesota have purportedly acquired control, Mesabi would likely be unable to complete the Project.  Much of the acreage that Cliffs and Cliffs Minnesota acquired from GPIOP that falls within the area for which Mesabi currently has a permit to mine (the "**Permit to Mine Area**"), and much of what could be mined in the next several years, is surrounded by land owned or leased by Mesabi for the Project, and is not generally accessible to Cliffs and Cliffs Minnesota. For a mining company to mine the Permit to Mine Area economically, the entire group of available mineral leases within the area must be under the mining company's control.  In other words, Cliffs and Cliffs Minnesota have acquired acreage on which they cannot practicably

perform mining activities for the foreseeable future, unless Mesabi is forced to abandon the

Project.  Furthermore, the permits granting Mesabi the right to mine are uniquely tied to Mesabi

as the permit holder and cannot be simply transferred to Cliffs or Cliffs Minnesota.  On

information and belief, these facts were known to Defendants when the Cliffs Transaction was

agreed to.

94.     If effective as intended by Cliffs and Cliffs Minnesota, the foreseeable result of

the Cliffs Transaction would be to prevent Plaintiff from completing the Project and, ultimately,

to cause the Project to fail and Plaintiff to be forced to cease operations or, at least, to make it

much more expensive and time-consuming to implement.  If Plaintiff is prevented from

competing in that market, Cliffs would then maintain its monopoly in the Great Lakes Pellet and

Iron Market.  On information and belief, this was always the intention of Cliffs and Cliffs

Minnesota.

95.      Upon information and belief, Cliffs and Cliffs Minnesota have no legitimate

business purpose for buying and/or leasing the GPIOP Property Interests.  Rather, their sole

purpose for entering into the Cliffs Transaction, whatever it entails, is the destruction of the

Project and unlawful elimination of a competitor within the Mesabi Iron Range.  Notably, in

Cliffs' press release announcing the Cliffs Transaction, Cliffs stated that it intended to use the

acquired real estate as "leverage."  Upon information and belief, GPIOP was aware of Cliffs'

intentions and knowingly participated in Cliffs' attempts to eliminate competition in the Mesabi

Iron Range.

96.     On information and belief, the Cliffs Transaction is the latest attempt in Cliffs'

broad scheme to unlawfully prevent Mesabi from competing with Cliffs in the Mesabi Iron

Range in northern Minnesota.  As discussed above, Cliffs' intent to acquire Mesabi's assets

existed long before its failed bid for such assets during the bankruptcy process, and has

36

continued since.  This Court's confirmation of the Plan and subsequent implementation orders simply required Cliffs to be more creative in its anticompetitive attempts to destroy Mesabi. Notwithstanding Cliffs' varied and wrongful interferences, Mesabi is prepared to consummate the Plan and go effective.

97.     Upon information and belief, Cliffs' interference caused delay and significantly increased the cost of the Plan's consummation.

98.     Mesabi understands that the Doe Defendants acted in concert with Cliffs in certain or all of the foregoing, which actions were pursuant to a common design and scheme to pursue an unlawful object or course of action to be accomplished by unlawful means with the purpose of competing against Mesabi, to Mesabi's detriment.

## CLAIMS

## FIRST CLAIM FOR RELIEF

### (Tortious Interference with Contractual Rights)
### (Against Cliffs and Cliffs Minnesota)

99.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 98 of this Complaint with the same force and effect as though fully set forth herein.

100.     In addition to the Plan, Plaintiff and certain vendors, suppliers, and contractors are parties to valid, binding and enforceable contracts for construction of the Project.

101.     At all relevant times, Cliffs and/or Cliffs Minnesota have known of the existence of Plaintiff's contracts, including the GPIOP Settlement and the Mineral Leases, and their purpose for construction, and ultimately operation, of the Project.

102.     As described above, Cliffs and/or Cliffs Minnesota has forced and attempted to force various contract counter-parties to cease working with Plaintiff.

103.     On information and belief, Cliffs and/or Cliffs Minnesota tortiously interfered

with the rights of Mesabi and its contract counter-parties under the existing contracts.

104.    Cliffs and/or Cliffs Minnesota intentionally acted in a way to procure the breach

of and termination of Mesabi's existing contracts.

105.    Cliffs' and/or Cliffs Minnesota's conduct was not justified.

106.    As a direct and proximate result of Cliffs' and/or Cliffs Minnesota's conduct,

Mesabi suffered damages due to Cliffs' and/or Cliffs Minnesota's tortious interference as alleged

above and in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

**(Tortious Interference with Business Relations or Prospective Economic Advantage)**
**(Against Cliffs and Cliffs Minnesota)**

107.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs

1 through 106 of this Complaint with the same force and effect as though fully set forth herein.

108.    In addition to the Plan, Plaintiff and certain vendors, suppliers, and contractors are

parties to valid, binding and enforceable contracts for construction of the Project.

109.    Plaintiff has business relationships and expectancies with various vendors,

suppliers, and contractors, with a probability of future economic benefit to Plaintiff.

110.    At all relevant times, Cliffs and/or Cliffs Minnesota have known of the existence

of Plaintiff's contracts and their purpose for construction of the Project the existence of

Plaintiff's business relationships with other vendors, suppliers, and contractors described herein.

111.    On information and belief, Cliffs and/or Cliffs Minnesota tortiously interfered

with Mesabi's contracts and its business relationships and expectancies with necessary vendors,

suppliers, and contractors.

112.    As a direct and proximate result of Cliffs' and/or Cliffs Minnesota's conduct,

Mesabi suffered damages due to Cliffs' and/or Cliffs Minnesota's tortious interference as alleged

above and in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF

### (Breach of Contract – GPIOP Settlement)
### (Against GPIOP)

113.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 112 of this Complaint with the same force and effect as though fully set forth herein.

114.    The GPIOP Settlement is a valid, binding, and enforceable contract between GPIOP, Superior, Chippewa, and the Debtors.

115.    GPIOP breached its legal obligations under the GPIOP Settlement by failing to comply with the terms of paragraph 4(a) thereof.

116.    Pursuant to paragraph 4(a) of the GPIOP Settlement, GPIOP agreed to "negotiate and execute amended and restated agreements to supersede the Mineral Leases in their entirety" with the Reorganized Debtor, on "terms and conditions substantially similar to the Mineral Leases."

117.    Pursuant to paragraph 4(b) of the GPIOP Settlement, GPIOP agreed to "use commercially reasonable efforts to negotiate and execute the Restated Mineral Leases [with the Reorganized Debtor]" and "not unreasonably withhold, delay, or condition their consent or execution of the Restated Mineral Leases."

118.    By seeking instead to substantially alter the terms of the Restated Mineral Leases, or to negotiate a sale rather than a lease, and by simultaneously negotiating the terms of the Cliffs Transaction with Cliffs, GPIOP violated paragraphs 4(a) and 4(b) of the GPIOP Settlement.

119.    Plaintiff has suffered damages resulting from the breach in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

### (Breach of Contract – Mineral Leases)
### (Against GPIOP)

120.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 119 of this Complaint with the same force and effect as though fully set forth herein.

121.    The GPIOP Settlement is a valid, binding, and enforceable contract between GPIOP, Superior, Chippewa, and the Debtors and incorporates the terms of the Omnibus Lease Amendment.

122.    GPIOP breached its legal obligations under the Mineral Leases by failing to comply with the terms of section 2 of the operating agreement incorporated in the Mineral Leases and sections 8 and 11 of the Omnibus Lease Amendment.

123.    Pursuant to the indenture of lease incorporated in the Mineral Leases, GPIOP covenanted that it would defend Mesabi "in the full and peaceful possession of the leasehold estate established [by the Mineral Leases], against all lawful claims and demands whatsoever." Furthermore, pursuant to section 2 of the operating agreement incorporated in the Mineral Leases, GPIOP covenanted that Mesabi would "enjoy the quiet and peaceful possession of the Premises . . . during the continuance of [the Mineral Leases]."

124.    Pursuant to section 8 of the Omnibus Lease Amendment, no "rights, interests, or obligations under [the Omnibus Lease] Amendment or the Mineral Leases may be assigned, transferred, or disposed of without the Parties' prior written consent."

125.    Pursuant to section 11 of the Omnibus Lease Amendment, GPIOP agreed to "use commercially reasonable efforts to take, or cause to be taken, all appropriate action, and to do, or cause to be done, all things necessary to fully reflect, consummate, perform and make effective the terms and provisions of [the Omnibus Lease] Amendment . . . ."

126.    By allowing Cliffs and/or Cliffs Minnesota to interfere with Mesabi's rights under the Mineral Leases, GPIOP breached its covenants under the Mineral Leases.

127.    By transferring the rights, interests, and obligations under the Mineral Leases, GPIOP violated section 8 of the Omnibus Lease Amendment.

128.    By failing to negotiate the form of and execute the Restated Mineral Leases, GPIOP violated section 11 of the Omnibus Lease Amendment.

129.    Plaintiff has suffered damages resulting from the breach in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### (Breach of Implied Covenant of Good Faith and Fair Dealing – GPIOP Settlement) (Against GPIOP)

130.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 129 of this Complaint with the same force and effect as though fully set forth herein.

131.    Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing requiring that one party not unjustifiably hinder the other party's performance of the contract.

132.    The GPIOP Settlement is a valid, binding, and enforceable contract between GPIOP, Superior, Chippewa, and the Debtors, and is governed by Minnesota law.

133.    While GPIOP engaged in the pretense of participating in negotiations required by the GPIOP Settlement with Plaintiff regarding the Restated Mineral Leases, it was simultaneously negotiating with Cliffs and/or Cliffs Minnesota with the intent to effectuate the Cliffs Transaction.

134.    GPIOP's failure to negotiate the form of and execute the Restated Mineral Leases in good faith prevented Plaintiff from performing its obligations under the GPIOP Settlement.

41

135.    GPIOP has no business justification for such failure to negotiate the form of and execute the Restated Mineral Leases, as required by the GPIOP Settlement.

136.    Plaintiff has suffered damages resulting from the breach in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF

### (Breach of Implied Covenant of Good Faith and Fair Dealing – Mineral Leases) (Against GPIOP)

137.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 136 of this Complaint with the same force and effect as though fully set forth herein.

138.    Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing requiring that one party not unjustifiably hinder the other party's performance of the contract.

139.    The Mineral Leases, as amended by the Omnibus Lease Amendment are valid, binding, and enforceable contract between GPIOP, Superior, Chippewa, and Mesabi, and are governed by Minnesota law.

140.    While GPIOP engaged in the pretense of participating in negotiations required by the Omnibus Lease Amendment with Plaintiff regarding the Restated Mineral Leases, it was simultaneously negotiating with Cliffs and/or Cliffs Minnesota to effectuate the Cliffs Transaction.

141.    GPIOP's transfer of the GPIOP Property Interests and related failure to negotiate the form of and execute the Restated Mineral Leases in good faith prevented Plaintiff from performing its obligations under the Mineral Leases, as set forth in the Omnibus Lease Amendment.

142.    GPIOP has no business justification for such failure to negotiate the form of and

execute the Restated Mineral Leases, as required by the Omnibus Lease Amendment.

143.    Plaintiff has suffered damages resulting from the breach in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF

### (Violation of Section 1 of the Sherman Act – Agreements in Restraint of Trade)
### (Against Cliffs, Cliffs Minnesota, and GPIOP)

144.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 143 of this Complaint with the same force and effect as though fully set forth herein.

145.    Cliffs possesses substantial market power in the Great Lakes Pellet and Iron Market, as demonstrated by, among other things, Cliffs' high market share, barriers to entry, its actual exclusion of competition, and its ability to charge supracompetitive prices in the Great Lakes Pellet and Iron Market.

146.    As alleged above, Cliffs, using its market power as leverage and as a threat, has entered into agreements with the customers and third parties identified above, among others, including without limitation the Cliffs Transaction with GPIOP, on its own and/or through Cliffs Minnesota, with the purpose and effect of unreasonably restraining trade and commerce in the Great Lakes Pellet and Iron Market.

147.    Cliffs' solicitation and enforcement of the exclusionary contracts described above, including any such conduct engaged in through Cliffs Minnesota, constitute unlawful agreements, contracts, and concerted activity that unreasonably restrain trade in the Great Lakes Pellet and Iron Market in violation of Section 1 of the Sherman Act.

148.    Cliffs' exclusionary contracts, including contracts entered into through Cliffs Minnesota, have foreclosed a substantial share of competitors and had anticompetitive effects in the Great Lakes Pellet and Iron Market.

149. Cliffs' exclusionary contracts have no procompetitive benefit or justification. The anticompetitive effects of its exclusionary contracts outweigh any purported procompetitive justifications.

150. As a result of Cliffs' conduct and, among other things, GPIOP's complicity in and agreement to that conduct where applicable, the harm to competition caused by that conduct, Plaintiff has suffered substantial injuries to its business and property in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15. Moreover, Plaintiff will suffer further injury unless the Court enjoins Cliffs from its unlawful conduct and continuing violations of the antitrust laws under 15 U.S.C. § 26. Such injunctive relief should include, but not be limited to, to the extent necessary to protect the Debtors' and the Reorganized Debtor's rights under and interests in the GPIOP Settlement, the Mineral Leases, and the Restated Mineral Leases, unwinding the Cliffs Transaction.

151. Plaintiff is also entitled to recover from Cliffs, Cliffs Minnesota, and/or GPIOP the costs of this suit, including reasonable attorney fees, as provided by 15 U.S.C. §§ 15 and 26.

## EIGHTH CLAIM FOR RELIEF

### (Violation of Section 2 of the Sherman Act – Monopolization)
### (Against Cliffs and Cliffs Minnesota)

152. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 151 of this Complaint with the same force and effect as though fully set forth herein.

153. Cliffs has monopolized the relevant market in violation of Section 2 of the Sherman Act.

154. The relevant product market in this case is the Great Lakes Pellet and Iron Market, as defined and described above.

155. The relevant geographic market in this case is the Great Lakes region, which

44

includes the Mesabi Iron Range in Minnesota.

156.    At all relevant times, Cliffs possessed monopoly power in the Great Lakes Pellet and Iron Market, as demonstrated by, among other things, Cliffs' high market share and admitted control over pricing.  As noted above, Cliffs charges prices for its products at levels that allow it to achieve profit margins of more than four times the prevailing profit margins in the industry. In addition, Cliffs' high market share, barriers to entry, and Cliffs' actual exclusion of competition have cemented Cliffs' monopoly power.

157.    Plaintiff is informed and believes, and on that basis alleges, Cliffs has implemented the anticompetitive scheme set forth above with the specific intent to maintain its monopoly over the Great Lakes Pellet and Iron Market.  Cliffs' anticompetitive conduct, includes, but is not limited to (a) its agreements with the parties identified above, and other parties, on its own and/or through Cliffs Minnesota, that attempt to lock Mesabi out of the iron ore business; (b) Cliffs' threats to parties currently doing business with Mesabi or contemplating doing business with Mesabi; and (c) exclusive or otherwise restrictive agreements with potential customers of Mesabi, including but not limited to ArcelorMittal, in an attempt to lock competitors and potential competitors such as Mesabi out of the market for years to come. Cliffs' scheme constitutes exclusionary conduct within the meaning of Section 2 of the Sherman Act.

158.    Through the scheme described above, including by blackballing vendors, threatening potential customers, buying/leasing properties with no legitimate business purpose and with the sole purpose of preventing rivals from competing, and other conduct likely to be revealed in discovery, Cliffs has willfully and unlawfully maintained and enhanced its monopoly power.  Cliffs' scheme constitutes exclusionary conduct within the meaning of Section 2 of the Sherman Act.

159.    Cliffs' scheme has suppressed competition and produced anticompetitive effects in the Great Lakes Pellet and Iron Market, including causing Plaintiff's antitrust injury and damages.

160.    Cliffs' conduct has no procompetitive benefit or justification.  The anticompetitive effects of its behavior outweigh any purported procompetitive justifications.

161.    As a result of Cliffs' conduct, on its own and/or through Cliffs Minnesota, and the harm to competition caused by that conduct, Plaintiff has suffered substantial injuries to its business and property in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.  Moreover, Plaintiff will suffer further injury unless the Court enjoins Cliffs from its unlawful conduct and continuing violations of the antitrust laws under 15 U.S.C. § 26. Such injunctive relief should include, but not be limited to, to the extent necessary to protect the Debtors' and the Reorganized Debtor's rights under and interests in the GPIOP Settlement, the Mineral Leases, and the Restated Mineral Leases, unwinding the Cliffs Transaction.

162.    Plaintiff is also entitled to recover from Cliffs costs of suit, including reasonable attorney fees, as provided by 15 U.S.C. §§ 15 and 26.

## NINTH CLAIM FOR RELIEF

### (Violation of Section 2 of the Sherman Act – Attempted Monopolization)
### (Against Cliffs and Cliffs Minnesota)

163.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 162 of this Complaint with the same force and effect as though fully set forth herein.

164.    Cliffs has attempted to monopolize the Great Lakes Pellet and Iron Market in violation of Section 2 of the Sherman Act.

165.    At all relevant times, Cliffs has possessed substantial monopoly power in the Great Lakes Pellet and Iron Market, as demonstrated by Cliffs' power over pricing, high market

share, and manipulation of its strong position in the U.S. markets to secure volumes and improve profitability.

166.    Plaintiff is informed and believes, and on that basis alleges, Cliffs has implemented the anticompetitive scheme set forth above with the specific intent to monopolize the Great Lakes Pellet and Iron Market.  Cliffs' anticompetitive conduct, includes, but is not limited to (a) its agreements with the parties identified above, and other parties, on its own and/or through Cliffs Minnesota, that attempt to lock Mesabi out of the iron ore business; (b) Cliffs' threats to parties currently doing business with Mesabi or contemplating doing business with Mesabi; and (c) exclusive or otherwise restrictive agreements with potential customers of Mesabi, including but not limited to ArcelorMittal, in an attempt to lock competitors and potential competitors such as Mesabi out of the market for years to come.  Cliffs' scheme constitutes exclusionary conduct within the meaning of Section 2 of the Sherman Act.

167.    Upon information and belief, Cliffs' scheme has suppressed competition and produced anticompetitive effects in the Great Lakes Pellet and Iron Market, including causing Plaintiff's antitrust injury and damages.

168.    Upon information and belief, there is a dangerous probability that Cliffs will succeed in unlawfully extending its monopoly in the Great Lakes Pellet and Iron Market through its anticompetitive scheme.   Cliffs' scheme has suppressed competition and has produced anticompetitive effects in the Great Lakes Pellet and Iron Market, including Plaintiff's antitrust injury and damages, based on the statements and conduct described above.

169.    Cliffs' conduct has no procompetitive benefit or justification.  The anticompetitive effects of Cliffs' behavior outweigh any purported procompetitive justifications.

170.    As a result of Cliffs' conduct, on its own and/or through Cliffs Minnesota, and the harm to competition caused by that conduct, Plaintiff has suffered substantial injuries to its

business and property in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.  Moreover, Plaintiff will suffer further injury unless the Court enjoins Cliffs from its unlawful conduct and continuing violations of the antitrust laws under 15 U.S.C. § 26. Such injunctive relief should include, but not be limited to, to the extent necessary to protect the Debtors' and the Reorganized Debtor's rights under and interests in the GPIOP Settlement, the Mineral Leases, and the Restated Mineral Leases, unwinding the Cliffs Transaction.

171.    Plaintiff is also entitled to recover from Cliffs costs of suit, including reasonable attorney fees, as provided by 15 U.S.C. §§ 15 and 26.

## TENTH CLAIM FOR RELIEF

### (Violation of Minn. Stat. § 325D.52 – Monopolization)
### (Against Cliffs and Cliffs Minnesota)

172.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 171 of this Complaint with the same force and effect as though fully set forth herein.

173.    As alleged above, Plaintiff is informed and believes, and on that basis alleges, Cliffs has monopolized the Great Lakes Pellet and Iron Market in violation of Section 325D.52 of the Minnesota Statutes ("**Minn. Stat.**").

174.    At all relevant times, Cliffs has possessed substantial monopoly power in the Great Lakes Pellet and Iron Market, as demonstrated by Cliffs' high market share and manipulation of its strong position in the U.S. markets to secure volumes and improve profitability.

175.    Plaintiff is informed and believes, and on that basis alleges, Cliffs has implemented the anticompetitive scheme set forth above with the specific intent to monopolize the Great Lakes Pellet and Iron Market.  Cliffs' scheme constitutes exclusionary conduct within the meaning of Minn. Stat. § 325D.52.

176.    Upon information and belief, Cliffs' scheme has suppressed competition and produced anticompetitive effects in the Great Lakes Pellet and Iron Market, including causing Plaintiff's antitrust injury and damages.

177.    Cliffs' conduct has no procompetitive benefit or justification.  The anticompetitive effects of Cliffs' behavior outweigh any purported procompetitive justifications.

178.    As a result of Cliffs' conduct, on its own and/or through Cliffs Minnesota, and the harm to competition caused by that conduct, Plaintiff has suffered substantial injuries to its business and property in an amount to be proven at trial and automatically trebled, as provided by Minn. Stat. § 325D.57.  Moreover, Plaintiff will suffer further injury unless the Court enjoins Cliffs from its unlawful conduct and continuing violations of the antitrust laws under Minn. Stat. § 325D.58.  Such injunctive relief should include, but not be limited to, to the extent necessary to protect the Debtors' and the Reorganized Debtor's rights under and interests in the GPIOP Settlement, the Mineral Leases, and the Restated Mineral Leases, unwinding the Cliffs Transaction.

## ELEVENTH CLAIM FOR RELIEF

**(Violation of Minn. Stat. § 325D.52 – Attempted Monopolization)**
**(Against Cliffs and Cliffs Minnesota)**

179.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 178 of this Complaint with the same force and effect as though fully set forth herein.

180.    As alleged above, Plaintiff is informed and believes, and on that basis alleges, Cliffs has attempted to monopolize the Great Lakes Pellet and Iron Market in violation of Minn. Stat. § 325D.52.

181.    At all relevant times, Cliffs has possessed substantial monopoly power in the Great Lakes Pellet and Iron Market, as demonstrated by Cliffs' high market share and

manipulation of its strong position in the U.S. markets to secure volumes and improve profitability.

182.     Plaintiff is informed and believes, and on that basis alleges, Cliffs has implemented the anticompetitive scheme set forth above with the specific intent to monopolize the Great Lakes Pellet and Iron Market.  Cliffs' scheme constitutes exclusionary conduct within the meaning of Minn. Stat. § 325D.52.

183.     Upon information and belief, Cliffs' scheme has suppressed competition and produced anticompetitive effects in the Great Lakes Pellet and Iron Market, including causing Plaintiff's antitrust injury and damages.

184.     Cliffs' conduct has no procompetitive benefit or justification.  The anticompetitive effects of Cliffs' behavior outweigh any purported procompetitive justifications.

185.     As a result of Cliffs' conduct, on its own and/or through Cliffs Minnesota, and the harm to competition caused by that conduct, Plaintiff has suffered substantial injuries to its business and property in an amount to be proven at trial and automatically trebled, as provided by Minn. Stat. § 325D.57.  Plaintiff will suffer further injury unless the Court enjoins Cliffs from its unlawful conduct and continuing violations of the antitrust laws under Minn. Stat. § 325D.58.  Such injunctive relief should include, but not be limited to, to the extent necessary to protect the Debtors' and the Reorganized Debtor's rights under and interests in the GPIOP Settlement, the Mineral Leases, and the Restated Mineral Leases, unwinding the Cliffs Transaction.

## TWELFTH CLAIM FOR RELIEF

### (Civil Contempt for Violation of the Automatic Stay)
### (Against Cliffs, Cliffs Minnesota, and Does 1-10)

186.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 185 of this Complaint with the same force and effect as though fully set forth herein.

187.    Upon the commencement of the Chapter 11 Cases on July 8, 2016, Plaintiff triggered the protections of section 362 of the Bankruptcy Code (the "**Automatic Stay**").

188.    The Automatic Stay prohibits, among other things, "any act to obtain possession of property of the estate or of property from the estate" and "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under [the Bankruptcy Code]."  11 U.S.C. § 362(a)(3) & (a)(6).

189.    Cliffs is, and has been, aware that Mesabi had initiated the Chapter 11 Cases, and, upon information and belief, is and has been aware of the ongoing developments during the Chapter 11 Cases.

190.    Plaintiff is informed and believes, and on that basis alleges, that the Defendants intentionally violated the automatic stay with malice and oppression, knowing that their actions would cause substantial harm to Plaintiff and with a willful and conscious disregard of Plaintiff's rights.  Plaintiff seeks compensatory damages and an award of exemplary or punitive damages in an amount sufficient to punish all Defendants and deter similar conduct in the future.

191.    Plaintiff also requests that the Court issue an order holding all Defendants in contempt of court for their violation of the Automatic Stay and issue appropriate sanctions as a result of their contempt pursuant to Section 105 of the Bankruptcy Code.

## THIRTEENTH CLAIM FOR RELIEF

### (Declaratory Relief)
### (Against Cliffs, Cliffs Minnesota, and Does 1-10)

192.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 191 of this Complaint with the same force and effect as though fully set forth herein.

193.    On information and belief, in engaging in the Cliffs Transaction Defendants intentionally sought to obtain possession of property of the Debtors' estates, with malice and

oppression, knowing that their actions would cause substantial harm to Plaintiff and with a willful and conscious disregard of Plaintiff's rights.

194.    Plaintiff requests that this Court declare that Defendants violated the Automatic Stay in engaging in the Cliffs Transaction.

195.    Plaintiff further requests that this Court declare that the Cliffs Transaction is void, as an action taken in order to obtain possession of property of the estate or of property from the estate, in violation of the Automatic Stay as set forth in Section 362 of the Bankruptcy Code.

## FOURTEENTH CLAIM FOR RELIEF

### (Civil Contempt for Violation of a Court Order)
### (Against Cliffs, Cliffs Minnesota, and GPIOP)

196.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 195 of this Complaint with the same force and effect as though fully set forth herein.

197.    The Assumption Order was entered by the Bankruptcy Court on August 30, 2017.

198.    Plaintiff is informed and believes, and on that basis alleges, that the Defendants intentionally violated the Assumption Order, knowing that their actions would cause substantial harm to Plaintiff, and with a willful and conscious disregard of Plaintiff's rights.

199.    Plaintiff seeks compensatory damages and an award of exemplary or punitive damages in an amount sufficient to punish Defendants and deter similar conduct in the future.

200.    Plaintiff also requests that the Court issue an order holding all Defendants in contempt of court for their violation of the Assumption Order and issue appropriate sanctions as a result of their contempt, pursuant to Section 105 of the Bankruptcy Code.

## FIFTEENTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Fraudulent Transfers - 11 U.S.C. § 548(a)(1)(B))
### (Against GPIOP)

201.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs

1 through 200 of this Complaint with the same force and effect as though fully set forth herein.

202.    Mesabi transferred certain amounts as part of the Prepaid Royalties to or for the

benefit of GPIOP within two (2) years of the Petition Date (the "**Avoidable Royalties**").

203.    As transferred to GPIOP, the Avoidable Royalties constitute a transfer of an

interest in the property of Mesabi, as a debtor-in-possession in the Chapter 11 Cases.

204.    The Avoidable Royalties were transferred for less than fair consideration and less

than a reasonably equivalent value.

205.    At the times of, and subsequent to, payment of the Avoidable Royalties, the

Debtors had at least one creditor with an allowable unsecured claim for liabilities, which

remained unsatisfied as of the Petition Date.

206.    The Avoidable Royalties (1) were paid when the Debtors were insolvent; (2)

rendered the Debtors insolvent; (3) left the Debtors with unreasonably small capital in relation to

the Debtors' business at the time; or (4) were made for the benefit of an insider.

207.    By virtue of the foregoing, the Avoidable Royalties were fraudulent transfers

avoidable under section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiff is entitled to recover

the Avoidable Royalties under section 550 of the Bankruptcy Code.

## SIXTEENTH CLAIM FOR RELIEF

**(Avoidance of Unauthorized Post-Petition Transfers – 11 U.S.C. § 549)**
**(Against Cliffs, Cliffs Minnesota, and GPIOP)**

208.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs

1 through 207 of this Complaint with the same force and effect as though fully set forth herein.

209.    Under section 549 of the Bankruptcy Code, a debtor in possession "may avoid a

transfer of property of the estate – (1) that occurs after the commencement of the case; and

(2)(A) that is authorized only under section 303(f) or 542(c) of this title; or (B) that is not

authorized under the Bankruptcy Code or by the Court."  11 U.S.C. § 549(a).

210.    By enacting the Cliffs Transaction, GPIOP transferred Mesabi's property rights under the Mineral Leases and the Omnibus Lease Amendment to Cliffs and/or Cliffs Minnesota. The Cliffs Transaction constitutes a transfer of interests of Mesabi in property that was made after the Petition Date.

211.    The Cliffs Transaction was never authorized by the Bankruptcy Code, the order approving the GPIOP Settlement, or any other order of this Court.  The Cliffs Transaction was, in fact, prohibited by section 8 of the Omnibus Lease Amendment.

212.    Pursuant to section 549 of the Bankruptcy Code, Plaintiff is entitled to avoid the Cliffs Transaction.

## SEVENTEENTH CLAIM FOR RELIEF

**(Recovery of Avoided Transfers – 11 U.S.C. § 550)**
**(Against Cliffs, Cliffs Minnesota, and GPIOP)**

213.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 212 of this Complaint with the same force and effect as though fully set forth herein.

214.    Section 550(a) of the Bankruptcy Code provides that, to the extent that a transfer is avoided under, among others, sections 548 and 549 of the Bankruptcy Code, Plaintiff is entitled to recover, for the benefit of its estate, the property transferred or, if the court so orders, the value of such property from (a) the initial transferee of such transfer or the entity for whose benefit such transfer was made or (b) any immediate or mediate transferee of such initial transferee.  11 U.S.C. § 550(a).

215.    Defendants Cliffs and/or Cliffs Minnesota were the initial transferees of the Cliffs Transaction or the immediate or mediate transferee of such initial transferee or the person for whose benefit the Cliffs Transaction was made.

216.    Defendant GPIOP was the initial transferee of the Avoidable Royalties, or the immediate or mediate transferee of such initial transferee or the person for whose benefit the Avoidable Royalties were paid.

217.    Pursuant to 11 U.S.C. § 550(a), Plaintiff is entitled to recover from Defendants Cliffs and/or Cliffs Minnesota the Cliffs Transaction and from Defendant GPIOP the Avoidable Royalties, plus costs of this action.

## EIGHTEENTH CLAIM FOR RELIEF

### (Disallowance of Claim Nos. 55 and 224 – 11 U.S.C. § 502(d))
### (Against Cliffs)

218.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 217 of this Complaint with the same force and effect as though fully set forth herein.

219.    Plaintiff objects to the allowance of proofs of claim no. 55 and 224 ("**Claim Nos. 55 and 224**") in their entirety.

220.    On December 14, 2017, GPIOP transferred Claim Nos. 55 and 224 to Cliffs. *See* D.I. 1370, 1371.

221.    Cliffs is a transferee of transfers avoidable under section 548 of the Bankruptcy Code, which property is recoverable under section 550 of the Bankruptcy Code.

222.    Cliffs has not turned over such property, for which Cliffs is liable under 11 U.S.C. § 550.

223.    Claim Nos. 55 and 224 are unenforceable against the Debtors under applicable law.

224.    Mesabi has examined Claim Nos. 55 and 224 and supporting documentation thereto, as well as the Debtors' books and records, to determine whether such claims are accurate and represents bona fide liabilities.  Upon such review, Mesabi has determined that Claim Nos.

55 and 224 do not reflect Mesabi's records and thus are objectionable pursuant to section 502(b)(1) of the Bankruptcy Code.

225.   Pursuant to 11 U.S.C. § 502(d), any and all Claims of Cliffs and/or Cliffs' assignees against the Debtors' chapter 11 estates, including those asserted in Claim Nos. 55 and 224, must be disallowed until such time as Cliffs turns over the Avoidable Royalties, plus interest thereon and costs.

## NINETEENTH CLAIM FOR RELIEF

### (Injunctive Relief)
### (Against Cliffs and Does 1-10)

226.   Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 225 of this Complaint with the same force and effect as though fully set forth herein.

227.   Plaintiff requests that Cliffs be enjoined from (i) contacting or threatening any existing contractors, employees or consultants working on the Project or being engaged to work on the Project, regarding the Project, or threatening their relationship or prospective relationship with Cliffs based on their work on the Project, (ii) threatening any potential contractors, employees, or consultants who may be engaged to work on the Project including  by threatening to discontinue their relationship or prospective relationship with Cliffs if they work on the Project; (iii) interfering with state, local, or other governmental approvals related to the Project, (iv) interfering with debt or equity financing sources for the consummation of the Plan, and (v) any other actions designed to prevent consummation of the Plan and implementation of the Mesabi's construction and business plan.

## TWENTIETH CLAIM FOR RELIEF

### (Injunctive Relief)
### (Against All Defendants)

228.   Plaintiff repeats and re-alleges each and every allegation contained in paragraphs

1 through 227 of this Complaint with the same force and effect as though fully set forth herein.

229.    Plaintiff requests that Defendants be enjoined from taking any further action to implement the Cliffs Transaction, including, but not limited to, any action in furtherance of the recording or perfection of any interest in property or otherwise, associated with the Cliffs Transaction, and/or in furtherance of any purported termination of the Mineral Leases.

## TWENTY-FIRST CLAIM FOR RELIEF

### (Declaratory Relief – 28 U.S.C. §§ 2201 *et seq.*)
### (Against All Defendants)

230.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 229 of this Complaint with the same force and effect as though fully set forth herein.

231.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, this Court has the power to declare the rights, status and other legal relations of the parties whether or not further relief could be claimed.

232.    A real and substantial justiciable controversy exists between Plaintiff and the Defendants as to whether the Mineral Leases are terminated.

233.    Cliffs asserted in the Cliffs Release that the properties subject of the Cliffs Transaction "include parcels that were formerly leased by GPIOP to [Mesabi] . . . . [Mesabi's] lease rights terminated on October 31, 2017 when it failed to exit bankruptcy . . . ."

234.    Plaintiff disputes that the Mineral Leases are terminated.

235.    On information and belief, the basis for Cliffs' assertion that "[Mesabi's] lease rights terminated on October 31, 2017 when it failed to exit bankruptcy . . . ." is the GPIOP Settlement which provides for the automatic rejection of the Mineral Leases as of October 31, 2017 if the Plan's Effective Date did not occur by such date and permits GPIOP to thereafter take any action with respect to the Mineral Leases and the related real property notwithstanding

any provisions of the Bankruptcy Code, including the automatic stay imposed pursuant to 11 U.S.C. § 362(a).

236.    The Plan's Effective Date did not occur by October 31, 2017.

237.    Rejection pursuant to 11 U.S.C. § 365 constitutes a breach but not a termination.

238.    The breach resulting from rejection pursuant to 11 U.S.C. § 365 is non-monetary in nature.

239.    Under the terms of the Mineral Leases, GPIOP may terminate on the basis of a non-monetary default only by giving thirty (30) days' notice to cure (subject to tolling pursuant to a valid arbitration demand by Plaintiff) and only if Plaintiff fails to cure its default prior to the expiration of the cure period.

240.    GPIOP took no action to terminate the Mineral Leases after October 31, 2017, including, without limitation, by issuing a notice to cure to Plaintiff stemming from its breach pursuant to 11 U.S.C. § 365 or otherwise.

241.    Plaintiff is entitled to a declaration that the Mineral Leases are not terminated.

### TWENTY-SECOND CLAIM FOR RELIEF

**(Declaratory Relief – 28 U.S.C. §§ 2201 *et seq.*)**
**(Against All Defendants)**

242.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 241 of this Complaint with the same force and effect as though fully set forth herein.

243.    A real and substantial justiciable controversy exists between Plaintiff and the Defendants as to whether the Mineral Leases were or shall be assumed pursuant to 11 U.S.C. § 365 as of the Effective Date.

244.    As heretofore alleged, the Defendants have asserted that the Mineral Leases are terminated, which assertion is incompatible with Plaintiff's assumption of such leases as of the

Effective Date.

245.    Pursuant to the Assumption Order, "[p]ursuant to sections 105(a) and 365 of the Bankruptcy Code, the Mineral Leases, as amended, are assumed as of the effective date of the Plan."

246.    The Assumption Order is a writing agreed by GPIOP, Superior, and the Debtors and entered as an order by the Bankruptcy Court.

247.    The GPIOP Settlement provides that "[a]s of the Effective Date of the Plan, GPIOP and Superior agree that any pre-Effective Date breaches or defaults under the Mineral Leases are cured, and if not curable, are waived."

248.    Plaintiff is entitled to a declaration that the Mineral Leases are or were assumed on the Effective Date of the Plan.

## TWENTY-THIRD CLAIM FOR RELIEF

**(Declaratory Relief – 28 U.S.C. §§ 2201 *et seq.*)**
**(Against All Defendants)**

249.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 248 of this Complaint with the same force and effect as though fully set forth herein.

250.    A real and substantial justiciable controversy exists between Plaintiff and the Defendants as to whether the Reorganized Debtor is entitled to succeed to the rights of the Debtors under the Mineral Leases as of the Effective Date.

251.    As heretofore alleged, the Defendants have asserted that the GPIOP Mineral Leases are terminated, which assertion is incompatible with the Reorganize Debtor's succession to Plaintiff's rights under such leases as of the Effective Date.

252.    The GPIOP Settlement provides that:

On or prior to the Effective Date of the Plan, GPIOP, Superior and the

Reorganized Debtor shall negotiate and execute amended and restated agreements to supersede the Mineral Leases in their entirety (the "Restated Mineral Leases"), which Restated Mineral Leases shall become fully effective and enforceable on the Effective Date. The Restated Mineral Leases shall be in form and substance acceptable to GPIOP, Superior and the Reorganized Debtor, preserve all rights and obligations under the Minerals Leases, subject to the modifications described herein, and contain terms and conditions substantially similar to the Mineral Leases unless otherwise agreed by GPIOP, Superior and the Reorganized Debtor. The Mineral Leases will be deemed amended and restated by consent on the Effective Date of the Plan.

253.    The GPIOP Settlement agreement is in full force and effect and is binding on GPIOP, the Debtors, the Reorganized Debtor and Superior.  The Reorganized Debtor is specifically named as a third party beneficiary of the GPIOP Settlement.

254.    Plaintiff is entitled to a declaration that the Mineral Leases, as amended by the Omnibus Lease Amendment, are deemed amended and restated by consent of GPIOP and Superior as of the Effective Date, with the Reorganized Debtor succeeding to all rights of the Debtors thereunder.

### TWENTY-FOURTH CLAIM FOR RELIEF

**(Declaratory Relief – 28 U.S.C. §§ 2201 *et seq.*)**
**(Against All Defendants)**

255.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 254 of this Complaint with the same force and effect as though fully set forth herein.

256.    A real and substantial justiciable controversy exists between Plaintiff and the Defendants as to whether Cliffs enjoys superior rights in the GPIOP Property Interests to the rights of Plaintiff and the Reorganized Debtor.

257.    As heretofore alleged, the Defendants have implied they enjoy superior rights in the GPIOP Property Interests.

258.    Plaintiff's rights in the GPIOP Property Interests, to which the Reorganized Debtor succeeded on the Effective Date of the Plan as heretofore alleged, are established of

record with the Itasca County Registrar of Titles as Document No. T000050412 and recorded

with the Itasca County Recorder as Document No. A0000605819 on or about December 7, 2006,

as amended by Registrar of Titles Document No. T000056156.

259.    Cliffs' interests in the GPIOP Property Interests, if any, were acquired on or about

December 11, 2017 and established of record December 13, 2017, as Document No.

T000064047.

260.    At the time that Cliffs acquired its interests in the GPIOP Property Interests, if

any, it had constructive notice of Plaintiff's and the Reorganized Debtor's interests.

261.    At the time that Cliffs acquired its interests in the GPIOP Property Interests, if

any, it had actual notice of Plaintiff's and the Reorganized Debtor's interests.

262.    Plaintiff is entitled to a declaration that its interests in the GPIOP Property

Interests, to which the Reorganized Debtor succeeded on the Effective Date, are superior to the

interests of Cliffs, if any, in the GPIOP Property Interests.

## TWENTY-FIFTH CLAIM FOR RELIEF

### (Civil Conspiracy)
### (Against All Defendants)

263.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs

1 through 262 of this Complaint with the same force and effect as though fully set forth herein.

264.    Defendants acted in concert and pursuant to a common design and scheme to

pursue an unlawful object or course of action to be accomplished by unlawful means, with the

purpose of preventing Mesabi from competing against Cliffs, to Mesabi's detriment.

265.    Defendants committed acts in furtherance of the conspiracy, including, not limited

to, tortious interference with Mesabi's contractual rights, tortious interference with Mesabi's

business relationships, violation of the Automatic Stay, and anti-trust claims, without a

reasonable or lawful excuse.  All Defendants were willful participants in this joint activity.

266.    As a direct and proximate result of these unlawful acts, Mesabi has suffered

damages as alleged above and in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Mesabi prays for relief and judgment against Defendants as

follows:

A.    Enter judgment in favor of Plaintiff and against the Defendants in this action on

each claim;

B.    Enjoin Defendants from (i) contacting or threatening any existing contractors,

employees or consultants working on the Project or being engaged to work on the Project,

regarding the Project, or threatening their relationship or prospective relationship with Cliffs

based on their work on the Project, (ii) threatening any potential contractors, employees, or

consultants who may be engaged to work on the Project including  by threatening to discontinue

their relationship or prospective relationship with Cliffs if they work on the Project; (iii)

interfering with state, local, or other governmental approvals related to the Project, (iv)

interfering with debt or equity financing sources for the consummation of the Plan, and (v) any

other actions designed to prevent consummation of the Plan and implementation of Mesabi's

construction and business plan.

C.    Avoid the Cliffs Transaction and direct the Defendants to unwind the transactions

related thereto and return to Plaintiff the property that is subject of the Cliffs Transaction,

pursuant to 11 U.S.C. §§ 549 and 550, plus the costs and expenses of this action, including,

without limitation, attorneys' fees;

D.    Disallow any claims held or filed by the Defendants against Plaintiff until the

Defendants return the Cliffs Transaction to Plaintiff pursuant to 11 U.S.C. § 502(d);

E.      Award general and compensatory damages in favor of Plaintiff on all claims

against the Defendants to those claims, jointly and severally, for all damages sustained by

Mesabi, in an amount to be proven at trial, plus prejudgment interest;

F.      Award treble damages as allowed by law;

G.      Award all appropriate equitable remedies, including injunctive relief, as allowed

by law, in favor of Plaintiff on all claims against the Defendants, including but not limited to an

order enjoining Cliffs and Cliffs Minnesota from entering into exclusive or restrictive

arrangements with purchasers of pellet products, an order enjoining the other anticompetitive

conduct described above, an order enjoining Cliffs, Cliffs Minnesota, and GPIOP from taking

any further action to implement the Cliffs Transaction, including, but not limited to, any action in

furtherance of the recording or perfection of any interest in property or otherwise, associated

with the Cliffs Transaction, and/or in furtherance of any purported termination of the Mineral

Leases;

H.      Award punitive damages and prejudgment interest in favor of Plaintiff as allowed

by law;

I.      Award any declaratory relief that may be necessary and appropriate, including but

not limited to an order declaring (i) that the Mineral Leases are not terminated and are or were

assumed on the Effective Date of the Plan, (ii) that the Mineral Leases, as amended by the

Omnibus Lease Amendment, are deemed amended and restated by consent of GPIOP and

Superior as of the Effective Date, with the Reorganized Debtor succeeding to all rights of the

Debtors thereunder, and (iii) that Mesabi's interests in the GPIOP Property Interests, to which

the Reorganized Debtor succeeded on the Effective Date, are superior to the interests of Cliffs

and/or Cliffs Minnesota, if any, in the GPIOP Property Interests.

J.      Award Plaintiff its attorneys' fees, costs, and other expenses incurred in this

action, as allowed by law; and

K.    Grant Plaintiff such other and further relief as the Court considers appropriate.

Dated: January 23, 2018                **FOX ROTHSCHILD LLP**

*/s/ Jeffrey M. Schlerf*
Jeffrey M. Schlerf (DE No. 3047)
Carl D. Neff (DE No. 4895)
919 North Market Street, Suite 300
Wilmington, Delaware 19801-3062
Telephone:    (302) 654-7444
Facsimile:    (302) 656-8920
jschlerf@foxrothschild.com
cneff@foxrothschild.com

**WHITE & CASE LLP**

Thomas E Lauria (admitted *pro hac vice*)
Matthew C. Brown (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131-2352
Telephone:    (305) 371-2700
Facsimile:    (305) 385-5744
tlauria@whitecase.com
mbrown@whitecase.com

Glenn M. Kurtz (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020-1095
Telephone:    (212) 819-8200
Facsimile:    (212) 354-8113
gkurtz@whitecase.com

Craig H. Averch (admitted *pro hac vice*)
Ronald K. Gorsich (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071-2433
Telephone:    (213) 620-7700
Facsimile:    (213) 452-2329
caverch@whitecase.com
rgorsich@whitecase.com

*Attorneys for Plaintiff*