IN UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x

| | |
|---|---|
| *In re:* | Chapter 11 |
| | |
| **ESSAR STEEL MINNESOTA LLC and ESML HOLDINGS INC.,**[1] | **Case No. 16-11626 (BLS)** |
| | **(Jointly Administered)** |
| **Reorganized Debtors.** | |

-------------------------------------------------------------x

| | |
|---|---|
| **MESABI METALLICS COMPANY LLC (F/K/A ESSAR STEEL MINNESOTA LLC),** | **Adv. Proc. No. 17-51210 (BLS)** |
| **Plaintiff,** | Related to Adv. Docket No. 18 |
| v. | **DEFENDANT CLEVELAND-CLIFFS INC.'S ANSWER AND COUNTERCLAIMS TO SECOND AMENDED COMPLAINT AND RESPONSE TO (SUBSTANTIVE AND NON-SUBSTANTIVE) OBJECTION TO CLAIM NOS. 55 AND 224** |
| **CLEVELAND-CLIFFS INC. (F/K/A CLIFFS NATURAL RESOURCES, INC.); CLEVELAND-CLIFFS MINNESOTA LAND DEVELOPMENT LLC; GLACIER PARK IRON ORE PROPERTIES LLC; and DOES 1-10,** | |
| **Defendants.** | |

-------------------------------------------------------------x

| | |
|---|---|
| **CLEVELAND-CLIFFS INC. (F/K/A CLIFFS NATURAL RESOURCES, INC.); and CLEVELAND-CLIFFS MINNESOTA LAND DEVELOPMENT LLC,** | **[JURY DEMAND ENDORSED HEREON]** |
| **Counterclaim-Plaintiffs,** | |
| v. | |
| **MESABI METALLICS COMPANY LLC (F/K/A ESSAR STEEL MINNESOTA LLC); CHIPPEWA CAPITAL PARTNERS, LLC; and THOMAS M. CLARKE,** | |
| **Counterclaim-Defendants.** | |

-------------------------------------------------------------x

---

[1]     Essar Steel Minnesota LLC has changed its name to Mesabi Metallics Company LLC.

## PRELIMINARY STATEMENT

For more than a decade, Plaintiff Mesabi Metallics Company LLC ("Mesabi"), and its predecessor Essar Steel Minnesota LLC ("Essar"), have tied up resources on the Iron Range with broken promises. This litigation, backed by the Plan Sponsor Chippewa Capital Partners, LLC ("Chippewa") and its Chief Executive Officer Thomas M. Clarke ("Mr. Clarke"), looks to blame someone other than Mesabi and its predecessor for its pre- and post-petition troubles. As Mesabi's predecessor has already recognized, however, the root of these troubles runs to the Essar family tree, not the defendants here. Now Mesabi and Chippewa are trying to divert attention from their own repeated missteps and missed deadlines with over-heated allegations directed at Defendant Cleveland-Cliffs Inc. ("Cliffs"). At the same time, they continue to assert, in other pleadings and publicly through Mr. Clarke's recurring media statements, that Mesabi has sufficient funding, mineral rights and support to fulfill its plans to sell into a global market. Putting the accuracy of those statements aside, they undercut Mesabi's allegations. Mesabi filed this suit to discourage Cliffs or others from making use of the natural resources that Mesabi, Chippewa, and Mr. Clarke have held hostage.

Mesabi's history belies its allegations concerning why and how fulfillment of its confirmed plan is now in jeopardy. More than a decade ago, Mesabi's predecessor Essar began its ill-fated attempts to build and operate a large-capacity iron ore mine and pellet plant at the site of the former Butler Mine outside Nashwauk, Minnesota. In 2008, with backing from Essar's parent, Essar Global Fund Ltd., Essar bought out the former owner of the Butler Mine site and took over its efforts at development. But the project was never anything more than a construction site. When Cliffs visited the site in July 2015 at Essar's invitation, it was readily apparent that Essar's efforts had yet to produce anything and its claims of the project's state of completion were substantially overstated. By November 2015, Essar had ceased construction,

had fallen behind in its payment obligations to subcontractors and vendors, had missed key performance milestones in its sales contracts and had failed to satisfy government grant reimbursement obligations and other conditions of its surface and mineral leases.  See Decl. of Sanjay Bhartia, in Support of Debtors' First Day Pleadings, ¶¶ 19-31 [D.I. 14.] ("Bhartia First Day Decl.").  When the State of Minnesota informed Essar that it would exercise its rights to terminate Essar's mineral leases pursuant to the terms of those contracts, Essar filed these Chapter 11 Cases.  Bhartia First Day Decl. ¶¶ 13, 21.

Mesabi's predecessor, Essar, told this Court that its efforts were stymied not by a competitor, but by its parent and its affiliates, who, in Essar's own words, "orchestrated and directed every material aspect of [Essar's] business."  Compl. ¶ 1, Essar Steel Minn. v. Essar Global Fund Ltd., et al., Case 17-50001 (adversary proceeding in the Chapter 11 Cases brought by the Debtors against Essar parent and affiliates).  Instead of developing the Project, Essar's parent and affiliates siphoned off the value and left Essar "with a half-completed iron ore pellet plant" and "over a billion dollars in claims asserted against it that are directly attributable to the Essar Affiliates' failures to fulfill their obligations with respect to the Project."  Id. ¶ 2.  Essar's parent and affiliates "funneled money paid to them for Project uses to wherever it was deemed to be needed by those in control of Essar Global and Essar Affiliates, without regard for corporate structures, operative contracts, or the law – or any repayment ability," all of which left Essar with an unfinished Project that it could not complete.  Id. ¶¶ 3-8.  After filing the Chapter 11 Cases, Essar changed its name to Mesabi to try to distance itself from Essar Global and its attendant problems.  Id. n.2.

Mesabi barely made it out of bankruptcy protection, with last-minute deals and money and influence from Chippewa, but Mesabi still is not positioned to complete the promised

Project.  Prior to exiting bankruptcy, Mesabi procured a series of extensions for go-effective deadlines for funding tied to certain of its mineral leases.  Mesabi repeatedly missed these deadlines, but hobbled along by reducing the scope of its exit commitments.  The Reorganized Debtors ultimately exited bankruptcy protection by going effective on December 22, 2017 without any financing, without any large customer agreements, and with no substantial mineral right leases secured, as has been widely reported.  With the Omnibus Amendment signed on December 21, 2017, Chippewa simply secured another extension beyond the Effective Date—to June 30, 2018—for Mesabi to keep trying to show it is a viable business worthy of further investment, while at the same time intimidating others into continuing to sit on the sidelines and to watch their rights and property interests go unused.

Mesabi's claims in this suit ignore, however, that Mesabi lost a large portion of its mineral leases for the Project when it missed the go-effective deadline of October 31, 2017. Under the clear terms of its leases with Glacier Park Iron Ore Properties LLC ("Glacier Park") and Superior Mineral Resources, LLC ("Superior"), when this deadline passed unmet, those leases were rejected and reverted to their original owners.  Glacier Park and Superior then were free to "take any action" with their lands.  Glacier Park took that opportunity to make a productive use of its property interests by entering into a transaction with Cliffs' affiliate Cleveland-Cliffs Minnesota Land Development LLC ("Cliffs Minnesota") on December 9, 2017.

Mesabi and Chippewa currently lack enforceable mineral lease rights for more than 90% of the lands Essar held under lease when it filed the Chapter 11 Cases.[2]  By way of the Omnibus Amendment, they nevertheless continue to try to hold most of these lands hostage.  Under the

---

[2]    See Bhartia First Day Decl. ¶ 13 ("The Debtors mainly lease their mineral rights, with a relatively small share of their mineral rights owned by ESML. The Debtors' largest percentage of mineral rights is leased from the Minnesota DNR, representing approximately 41.6% of the Debtors' total mineral rights (under approximately 2,500 acres), followed by [GPIOP], representing approximately 33.4%, Superior Mineral Resources LLC representing approximately 17.2%, and the Langdon/Warren families representing approximately 4.4%.").

Omnibus Amendment, Mesabi and Chippewa agreed that the State mineral leases were rejected, but somehow got the State to believe it should forbear from taking any actions and could allow these leases to be reinstated if a number of conditions are met by June 30, 2018—paying off remaining Mechanics Liens claims by January 31, securing an off-take agreement or agreements for at least 4.2 million metric tons, obtaining "binding and enforceable debt and/or equity commitments required [under] the Master Lease" and securing Superior's mineral interests, even though Superior's leases, like Glacier Park's, were rejected and reverted when the Effective Date failed to occur on October 31, 2017.  See Omnibus Amendment, at ¶ 3.  Brokering deals for mineral leases in this manner is beyond the State's power.  Even if enforceable, Mesabi's new extension under the Omnibus Amendment only promises more delays and further ties up development of valuable mineral lands on the Iron Range.

Despite having convinced the people of Minnesota and the State to enter into agreements that purport to tie up government funds and valuable mineral rights on public and private lands, which agreements were outside the State's authority under Minnesota statutes, the Project has never come close to delivering on the promises that Essar—and now Mesabi and Chippewa— have made.  Mesabi, its predecessor Essar, and Chippewa have for years left the mineral deposits in Minnesota undeveloped, with repeated, numerous delays and unfulfilled promises.  It still seems extremely unlikely that those promises ever will be fulfilled.

Recognizing these hard realities, Mesabi (like Essar before it) now seeks to pin the blame for its decade-long commercial failure on Cliffs.  Mesabi claims that Cliffs has undertaken a series of actions to prevent Mesabi from developing the Project and competing against Cliffs. Nothing could be further from the truth.  The actions that Mesabi seeks to challenge (to the extent that they occurred at all) have nothing to do with any effort to exclude Mesabi or

01:22917216.1

Chippewa from competing.  Mesabi and Chippewa are doing that well enough on their own.

Rather, as Cliffs has stated many times, it is seeking to apply its 170 years of mining experience

to put the site's valuable mineral lands to good use as part of future plans for continued mining

operations in concert with Cliffs' established facilities on the Northern Minnesota Iron Range.

Cliffs is positioning itself to be ready to do so in the quite likely event that Mesabi and

Chippewa, through their own missteps and inexperienced efforts, put themselves out of business.

Cliffs did not engage in tortious interference, conspiracy, or any other alleged

wrongdoing with Glacier Park or any other entity, and neither did any of Cliffs' affiliates.

Glacier Park, like Mesabi's other alleged former contract counterparties or business associates,

had every right to take the actions that it did after extricating itself from its dealings with Mesabi

and Chippewa.  Instead of admitting that Mesabi's rights are exhausted, or were non-existent

from the outset, Mesabi, Chippewa and Clarke continue to use litigation and threats of litigation

to deflect attention from their own failures to secure financing, keep vendors, and hold on to

enforceable lease rights.

Mesabi's and Chippewa's continued pursuit of claims against Cliffs, and now additional

defendants, has nothing to do with the merits, any injury to competition, or even to Mesabi.

Mesabi and Chippewa, heavily influenced by Mr. Clarke, continue to push these claims against

Cliffs in an attempt to keep others on the sidelines and to look for leverage against Cliffs, who

Mr. Clarke admits he owes significant money to for other business deals.  Indeed, Mr. Clarke's

public statements contradict the allegations in the Second Amended Complaint that Cliffs and

others have injured Mesabi, or will continue to do so in the future if unchecked by this Court.

Chippewa and Mr. Clarke have repeatedly told the public that Mesabi intends to sell into a global

market and is actively engaged in preparations to do so, undeterred by Cliffs.  For example, at

01:22917216.1

the end of December 2017, Mr. Clarke told the Duluth News Tribune that Mesabi had ample

mining reserves available and that the Project had customers for its ore both domestically and in

China; at the end of January 2018 he told them Mesabi had sufficient mineral rights to proceed

and that "We're going to use much of our ore to make pig iron and we're going to sell the rest to

China"; and in February 2018 he again told them that the Project could proceed and that he plans

to use its finished taconite pellets to make pig iron at the site and to ship the other half by train to

Mexico and via the Great Lakes to Asia.

It is clear that this lawsuit has more to do with the fact that Chippewa gained exclusive

control over the adversary proceeding in December 2017—and 50% interest in any recovery

[D.I. 1355]—than with any alleged harm.  After missing multiple deadlines to go effective, and

then "going effective" only by promising to obtain later financing, the smoke and mirrors game

continues.

Accordingly, Cliffs, by and through its undersigned counsel, for its answer to Mesabi's

Second Amended Complaint and (Substantive and Non-Substantive) Objection to Claim Nos. 55

and 224 (the "<u>Second Amended Complaint</u>"), states as follows:[3]

## <u>ANSWER AND RESPONSE TO CLAIM OBJECTIONS</u>

Cliffs asserts that the headings and sub-headings and "Nature of the Case" section of the

Second Amended Complaint are argumentative and require no response.  To the extent any

response is deemed necessary, Cliffs denies each and every allegation deemed to be contained in

each such heading and sub-heading and in the "Nature of the Case" section of the Second

Amended Complaint.  All allegations in the Second Amended Complaint, if not expressly

admitted, are denied.

---

[3] Capitalized terms not defined herein shall have the meanings given to them in the Second Amended Complaint or the applicable exhibits to the Second Amended Complaint.

## JURISDICTION AND VENUE

1.      This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  This adversary proceeding relates to the Chapter 11 Cases pending before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  Mesabi consents, pursuant to Bankruptcy Rule 7008 and Local Rule 7008-1, to the entry of a final order by the Bankruptcy Court in connection with this Complaint to the extent that it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

**ANSWER:**    In response to Paragraph 1, Cliffs admits that Mesabi purports to bring this action as an adversary proceeding under Federal Rule of Bankruptcy Procedure 7001 related to the above-captioned bankruptcy case, and admits that Mesabi consents to the bankruptcy court entering final orders and judgments in connection with this adversary proceeding.  Except as so admitted, referred and denied, Cliffs denies each and every allegation in Paragraph 1.

2.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

**ANSWER:**    The allegations in Paragraph 2 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 2 to include factual allegations that require a response, Cliffs denies them.

3.      This Court has personal jurisdiction over Defendants pursuant to Bankruptcy Rule 7004.

**ANSWER:**    The allegations in Paragraph 3 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 3 to include factual allegations that require a response, Cliffs denies them.

01:22917216.1

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**ANSWER:**    The allegations in Paragraph 4 are legal conclusions to which no response

is required.  To the extent that the Court deems Paragraph 4 to include factual allegations that

require a response, Cliffs denies them.

5.      All Defendants are properly joined in this action pursuant to Rule 20 of the Federal Rules
        of Civil Procedure, made applicable by Bankruptcy Rule 7020, because the right to relief
        asserted against all Defendants arises out of the same transaction, occurrence, or series of
        transactions and occurrences, and questions of law and fact common to all Defendants
        and/or certain categories of Defendants will arise in this action.

**ANSWER:**    The allegations in Paragraph 5 are legal conclusions to which no response

is required.  To the extent that the Court deems Paragraph 5 to include factual allegations that

require a response, Cliffs denies them.

6.      Pursuant to this Court's *Order Granting Debtors' Motion Pursuant to 11 U.S.C. §§105(a)
        and 1142(b) for Entry of Order Implementing the Provisions of the Plan with Respect to
        the Cliffs Claims* [D.I. 1335], after the occurrence of the Effective Date, the claims set
        forth in this Complaint shall vest in the Reorganized Debtor and will be pursued by the
        Reorganized Debtor as Tranche 2 Claims for its benefit, as well as the benefit of the
        Debtors' secured and unsecured creditors, pursuant to the Plan.

**ANSWER:**    In response to Paragraph 6, Cliffs states that the Order Granting Debtors'

Motion Pursuant to 11 U.S.C. §§ 105(a) and 1142(b) for Entry of Order Implementing the

Provisions of the Plan with Respect to Cliffs Claims [D.I. 1355] is a written document which

speaks for itself, and Cliffs refers to it for a fair and accurate portrayal of its contents and, on that

basis, denies any allegations in Paragraph 6 inconsistent therewith.

### THE PARTIES

7.      Plaintiff Mesabi is a limited liability company organized and licensed under the laws of
        the State of Minnesota, with its principal place of business at 17113 County Road 58,
        P.O. Box 25, Nashwauk, MN 55769.  Mesabi is the wholly owned subsidiary of ESML
        Holdings Inc. ("Holdings," together with Mesabi, the "Debtors"), a holding company,
        organized and licensed under the laws of the State of Delaware.

**ANSWER:**    In response to Paragraph 7, Cliffs is without knowledge or information

01:22917216.1

sufficient to form a belief as to the truth or falsity of the allegations contained therein, and on

that basis denies each and every allegation in Paragraph 7.

8.      Based upon information and belief, Defendant Cliffs is a corporation organized under the laws of the State of Ohio with its principal place of business in Cuyahoga County, Cleveland, Ohio.  The registered agent for service of process for Cliffs is James D. Graham, whose address is listed with the Ohio Secretary of State as 200 Public Square Suite 3300, Cleveland, Ohio 44114.  According to Cliffs, it is the "only real merchant supplier within the Great Lakes markets."

**ANSWER:**      In response to Paragraph 8, Cliffs admits that it is a corporation organized

under the laws of the State of Ohio with is principal place of business at 200 Public Square, Suite

3300, Cleveland, Ohio 44114, and that James D. Graham is its registered agent for service of

process.  The remaining allegations in Paragraph 8 purport to characterize or paraphrase

statements made during an earnings report conference call on July 27, 2017; the transcript of that

call speaks for itself and Cliffs refers to it for a fair and accurate portrayal of its contents.  Except

as so admitted and referred, Cliffs denies all remaining allegations in Paragraph 8.

9.      Based upon information and belief, Defendant Cliffs Minnesota is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Cleveland, Ohio.  The registered agent for service of process for Cliffs Minnesota is the Corporation Trust Company with an address listed with the Delaware Department of State as 1209 Orange Street, Wilmington, Delaware 19801.

**ANSWER:**      In response to Paragraph 9, Cliffs admits that Cleveland-Cliffs Minnesota

Land Development LLC ("Cliffs Minnesota") is a limited liability company formed under the

laws of the State of Delaware with its registered agent for service of process as The Corporation

Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801,

and its principal place of business at 200 Public Square, Suite 3300, Cleveland, Ohio 44114.

Responding further, Cliffs avers that Cliffs Minnesota is an affiliate of Cliffs.

10.     Based upon information and belief, Defendant GPIOP is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Houston, Texas.  The registered agent for service of process for GPIOP is the

Corporation Service Company with an address listed with the Delaware Department of State as 251 Little Falls Drive, Wilmington, Delaware 19808.

**ANSWER:**   In response to Paragraph 10, Cliffs admits that Glacier Park Iron Ore Properties LLC ("Glacier Park") is a limited liability company formed under the laws of Delaware with its registered agent for service of process as Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808, and further avers that its principal place of business is in Hibbing, Minnesota.  Except as so admitted and averred, Cliffs denies all remaining allegations in Paragraph 10.

11.   Does 1-10 are Defendants whose true names, identities and capacities are presently unknown to Plaintiff.   As and when the names, identities, and capacities of these fictitiously named Defendants become known, Plaintiff will amend this Complaint to set forth these Defendants' true names, identities, and capacities and otherwise proceed against them as if they had been named parties upon the commencement of this adversary proceeding in accordance with Rules 15 and 25 of the Federal Rules of Civil Procedure, made applicable to this proceeding by Bankruptcy Rules 7015 and 7025.  Without limitation, the fictitiously named Defendants may include affiliates, agents, or representatives of Cliffs.

**ANSWER:**   In response to Paragraph 11, Cliffs admits that Mesabi has alleged it will file a further amended complaint seeking to assert claims for relief against additional defendants named as "Does 1-10" in the Second Amended Complaint, which "Does 1-10" Mesabi asserts may be "affiliates, agents, or representatives of Cliffs."  Cliffs denies that any such "affiliates, agents, or representatives" exist that could be liable in any way to Mesabi.  Except as so admitted and denied, Cliffs denies each and every remaining allegation in Paragraph 11.

## FACTUAL BACKGROUND

### A.   The Debtors' Chapter 11 Cases

12.   Mesabi is a company formed to develop and operate an iron ore pellet production facility (the "Project") located in the Mesabi Iron Range in northern Minnesota.  Mesabi has entered into contracts with various parties to provide construction, engineering and professional services that are integral to the Project.  On an ongoing basis, Mesabi has

01:22917216.1

sought to enter into additional commercial relationships in support of the Project.

**ANSWER:**    In response to Paragraph 12, Cliffs admits that Essar Steel Minnesota LLC

("Essar") was formed for the purported purpose of building and operating an iron ore mine and

pellet production plant in Nashwauk, Minnesota, which is in the Mesabi Iron Range.

Responding further, Cliffs avers that Essar changed its name to Mesabi Metallics Company LLC

in January 2017 to attempt to distinguish itself from other Essar Global Fund Ltd. affiliates, who

Mesabi alleges transferred Mesabi's assets to other Essar Global affiliates and caused its failure

to build and operate a mine or plant, and to distinguish its own past failed attempts at

development.  Except as so admitted and averred, Cliffs denies each and every remaining

allegation in Paragraph 12.

13.    On July 8, 2016, the Debtors each filed voluntary petitions for relief under chapter 11 of
title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing the
Chapter 11 Cases.  The Debtors manage their properties as debtors-in-possession
pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

**ANSWER:**    In response to Paragraph 13, Cliffs admits the factual allegations therein.

14.    On July 19, 2016, the United States Trustee for the District of Delaware appointed the
Official Committee of Unsecured Creditors (the "Committee").  To date, no trustee or
examiner has been requested or appointed in these Chapter 11 Cases.

**ANSWER:**    In response to Paragraph 14, Cliffs admits the factual allegations therein.

15.    At all relevant times, Cliffs is and has been aware of the Debtors' Chapter 11 Cases.  In
fact, Cliffs has actively participated in the Chapter 11 Cases by, among other things,
filing an objection to, and appearing for the hearing on, both the Debtors' motion for
discovery under Bankruptcy Rule 2004 [D.I. 234] and the Debtors' later certification
relating to the implementation of certain provisions of the Plan [D.I. 1304].  Additionally,
on December 14, 2017, Cliffs purchased GPIOP's Claim Nos. 55 and 224 in the Chapter
11 Cases. See D.I. 1370, 1371.

**ANSWER:**    In response to Paragraph 15, Cliffs admits that it became aware of the

Debtors' Chapter 11 Cases soon after the filing on July 8, 2016 because the filing was widely

reported in the media.  Further answering, Cliffs avers that the filing was intended to, and did,

prevent leases from reverting later that day due to Essar's multiple breaches of its obligations thereunder.  Responding further, Cliffs avers that it followed the Chapter 11 Cases because the State of Minnesota had, since at least April 2015, engaged Cliffs in discussions concerning whether Cliffs would be interested in the site then occupied by Essar (now Mesabi) in the event that Essar did not meet its obligations under the State's leases, as stated in the correspondence between Cliffs and the State attached to the Second Amended Complaint as Exhibit 1.  Cliffs further admits that it was involuntarily pulled into the Chapter 11 Cases in August 2016 by the Debtors filing of the *Motion of the Debtor for Entry of an Order Directing Discovery from Cliffs Natural Resources Inc. Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure* [D.I. 234; D.I. 235], to which Cliffs filed an *Objection* [D.I. 298] and then appeared for the hearing on.  The Court, in denying the Debtors' request for most of the discovery sought, specifically noted that the Debtors harbored a "vague hope and suspicion that the root of their troubles may lie in a competitor," namely Cliffs.  [D.I. 355]  Cliffs further admits that the Debtors again pulled Cliffs into the Chapter 11 Cases in September 2017 by filing this adversary proceeding and seeking to keep this litigation out of the Litigation Trusts under the Plan by giving exclusive control over this litigation to the Plan Sponsor, Chippewa Capital Partners, LLC ("Chippewa") pursuant to a *Certification of Counsel* [D.I. 1304].  Cliffs admits that it filed an *Objection* to this action [D.I. 1314] and appeared at a telephonic hearing regarding the *Objection*. Despite stating herein that "prompt action is needed to remediate harm . . . , prevent jeopardy to the confirmed Plan . . . , and avoid future damage," the Debtors did not take initial steps to serve the adversary complaint on Cliffs until November 29, 2017, two-and-a-half months later and only when the service deadline loomed.  Cliffs further admits that, after Cliffs Minnesota purchased and leased certain property interests from Glacier Park, Cliffs filed a *Transfer of*

*Claim Other Than For Security* for Claim Nos. 55 and 224 that had been filed by Glacier Park in

the Chapter 11 Cases [D.I. 1370; D.I. 1371]. Cliffs refers to each of these filed documents for a

fair and accurate portrayal of its contents. Except as so admitted, denied, averred, and referred,

Cliffs denies each and every allegation in Paragraph 15.

16.    Further, Cliffs actively participated in an auction conducted as part of the Plan process and submitted bids for the Debtors' assets pursuant to the related bid procedures. Cliffs was unsuccessful in its attempts to purchase the Debtors' assets as its bids were at a much lower value and were ultimately determined to be inferior to the winning bidder and ultimate plan sponsor, Chippewa Capital Partners, LLC ("Chippewa" or the "Plan Sponsor"). Cliffs declined to bid to become the plan sponsor and assume leases and permits already in effect so that the Project could be completed timely and start operations. Rather, Cliffs bid solely for the Debtors' hard assets, which would have allowed Cliffs to keep such assets out of the hands of a competitor and fortify Cliffs' monopoly position in the Great Lakes Pellet and Iron Market.

**ANSWER:**    In response to Paragraph 16, Cliffs admits that it submitted a bid for the

Debtors' assets pursuant to the procedures established for the auction conducted as part of the

Plan process, and that its bid did not contemplate Cliffs acting as the Plan sponsor. Cliffs further

admits that the Debtors chose Chippewa as the auction winner and Plan Sponsor after Chippewa

represented that, by the Effective Date, it would secure $650 million of senior debt financing and

make a $250 million equity investment to fund completion of the project (and restart and

operation of Magnetation assets) and would ensure assumption of all mining and surface leases.

[D.I. 919.] Further answering, Cliffs avers that Chippewa failed to meet these conditions by the

Effective Date: Chippewa did not secure $650 million in funding, nor did it effect assumption of

all mining and surface leases. Responding further, Cliffs avers that its bid reflected a good faith

estimate of the value of the assets in liquidation. Except as so admitted and averred, Cliffs

denies each and every allegation in Paragraph 16.

B.    **Debtors' Plan of Reorganization and Events Subsequent to Confirmation**

01:22917216.1

13

17.     With Chippewa as Plan Sponsor, on June 8, 2017, the Debtors filed the Plan, which contemplated and provided for, among other things, the contribution of equity and debt financing sufficient to support assumption of important mineral and surface leases, as well as the construction and ultimate operation of the Project.

**ANSWER:**     In response to Paragraph 17, Cliffs admits that the Debtors filed the Third

Amended Chapter 11 Plan of Reorganization of Mesabi Metallics Company LLC (f/k/a Essar

Steel Minnesota LLC) and ESML Holdings Inc. [D.I. 990] on June 8, 2017, and that Chippewa

was the Plan Sponsor.  The remaining allegations in Paragraph 17 purport to paraphrase and

characterize the Third Amended Chapter 11 Plan of Reorganization of Mesabi Metallics

Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc. [D.I. 990], a written

document which speaks for itself, and to which Cliffs refers for a fair and accurate portrayal of

its contents.  Except as so admitted and referred, Cliffs denies each and every allegation in

Paragraph 17.

18.     On June 13, 2017, the Court confirmed the Plan and entered its *Findings of Fact, Conclusions of Law, and Order Confirming the Third Amended Chapter 11 Plan of Reorganization for Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc. Proposed by the Debtors* [D.I. 1025] (the "Confirmation Order").  No party appealed the Confirmation Order and the Confirmation Order became final and non-appealable on June 27, 2017.  It is well settled that a confirmed plan of reorganization is an enforceable, court-approved contract between a debtor and all parties in interest.  Thus, the Plan constitutes an enforceable contract between the Debtors, their creditors, and the Plan Sponsor.

**ANSWER:**     In response to Paragraph 18, Cliffs admits that this Court entered an order

confirming the Plan on June 13, 2017, which document was titled *Findings of Fact, Conclusions*

*of Law, and Order Confirming the Third Amended Chapter 11 Plan of Reorganization for*

*Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc.*

*Proposed by the Debtors* [D.I. 1025] (the "Confirmation Order").  The Confirmation Order is a

written document which speaks for itself, and to which Cliffs refers for a fair and accurate

portrayal of its contents.  The remaining allegations in Paragraph 18 contain legal conclusions to

which no response is required.  To the extent that the Court deems the remainder of Paragraph 18

to include factual allegations that require a response, Cliffs denies all remaining allegations

except as so admitted and referred herein.

19.     At confirmation, the Debtors received overwhelming support for the Plan from each
        voting class of creditors.  This support was due in large part to Chippewa's sponsorship,
        its agreement to provide immediate funding to Mesabi, and its commitment to invest
        $250 million of new equity into Mesabi.

        **ANSWER:**     In response to Paragraph 19, Cliffs admits that the Plan was confirmed.

Except as so admitted, Cliffs denies each and every allegation in Paragraph 19.

20.     Since the auction, Chippewa has provided substantial funding to Mesabi and Mesabi has
        recommenced construction on the Project.

        **ANSWER:**     In response to Paragraph 20, Cliffs admits that Chippewa has provided

funding to Mesabi, but denies that Mesabi had sufficient funding to complete construction of the

Project as of the Effective Date, through Chippewa or otherwise.  Except as so admitted and

denied, Cliffs denies each and every remaining allegation in Paragraph 20.

21.     In confirming the Plan, this Court found that "the Debtors will have sufficient means to
        meet all of their obligations under the Plan" and that the record established that "the
        Reorganized Debtor will emerge from bankruptcy as a viable, financially healthy entity,
        unlikely to be in need of further financial reorganization, and likely to be able to
        incrementally complete the Project."  Confirmation Order, ¶ II.  Indeed, Mesabi has been
        working diligently with GPIOP, DNR and other stakeholders both before and since the
        Confirmation Order to finalize the agreements necessary to complete the Project. As
        described below, many of these agreements already have been executed.  Therefore,
        absent Cliffs' improper interference, Mesabi has demonstrated that it would likely be able
        to complete construction of the Project and successfully enter the Great Lakes Pellet and
        Iron Market and compete with Cliffs.

        **ANSWER:**     In response to Paragraph 21, Cliffs admits that Mesabi has not executed

agreements with all stakeholders necessary to complete construction of the Project.  As to the

allegations in Paragraph 21 concerning Mesabi's diligence, Cliffs is without knowledge or

information sufficient to form a belief as to the truth or falsity of such allegations and on that

basis denies them.  To the extent that the allegations in Paragraph 21 purport to paraphrase or

characterize the Confirmation Order, it is a written document that speaks for itself, and Cliffs

refers to it for a fair and accurate portrayal of its contents.  Except as so admitted, denied, and

referred, Cliffs denies each and every remaining allegation in Paragraph 21.

22.     Mesabi has always been focused on retention of its mineral rights.  Prior to confirmation
        of the Plan, the Debtors entered into amended leases and related agreements with
        Langdon/Warren, which agreements were approved by the Bankruptcy Court [D.I. 515]
        and were critical to maintenance of the Langdon/Warren Mineral Leases.  Additionally,
        since confirmation of the Plan, in furtherance of its consummation, the Debtors have
        successfully assumed key mineral and surface leases through settlement agreements with
        the DNR [D.I. 1025, 1057, 1171] and Chippewa, the Debtors, GPIOP, and Superior
        entered into the GPIOP Settlement, discussed below, which agreements provide for
        assumption certain of the Debtors' mineral and surface leases as of the Effective Date.

        **<u>ANSWER:</u>**     To the extent that the allegations in Paragraph 22 purport to paraphrase or

characterize leases and agreements between Mesabi and others that have been filed with this

Court, those written documents speak for themselves, and Cliffs refers to each such document for

a fair and accurate portrayal of its contents.  Except as so referred, Cliffs denies each and every

remaining allegation in Paragraph 22.

23.     Pursuant to the Plan and Confirmation Order, if the Effective Date does not occur within
        six months of the Confirmation Date, unless otherwise agreed by the relevant parties, the
        Mineral and Surface Leases shall be deemed rejected, and the Debtors will be required to
        immediately surrender such leases.  Confirmation Order, ¶ 45.  The Mineral Leases were
        specifically excluded from assumption under the Plan, and therefore from paragraph 45
        of the Confirmation Order.  See Plan, § 1.1(91) (defining "Mineral and Surface Leases"
        to exclude the Mineral Leases).  A settlement agreement between the Debtors and the
        DNR, however, provides that if the Effective Date does not occur on or prior to
        December 31, 2017, the DNR Leases shall be deemed rejected, and the Debtors will be
        required to immediately surrender such leases.  *See* D.I. 1057, 1176, 1231.  Additionally,
        an agreement between the Debtors and Langdon/Warren provides for the same extension
        through December 31, 2017.  *See* D.I. 1358.

        **<u>ANSWER:</u>**     In response to Paragraph 23, Cliffs admits that the mineral leases for the

properties that Mesabi contemplates using to complete the Project were subject to conditions

precedent, including that the Effective Date must occur by a specific date, as stated in each lease.

01:22917216.1

Further answering, Cliffs avers that the mineral leases with Glacier Park and Superior were rejected and reverted after October 31, 2017.  Cliffs further avers that the mineral leases with the State DNR were rejected on December 31, 2017 and thereafter improperly held by the State for Mesabi's benefit, purportedly under the terms of the Omnibus Amendment signed on December 21, 2017 between Chippewa, Mesabi, Itasca County, and the State, which actions were outside the State's authority under Minnesota statutes.  To the extent that the allegations in Paragraph 23 purport to paraphrase or characterize the Confirmation Order and such leases and agreements between Mesabi and others that have been filed with this Court, those written documents speak for themselves, and Cliffs refers to each such document for a fair and accurate portrayal of its contents.  Except as so admitted, averred, and referred, Cliffs denies each and every remaining allegation in Paragraph 23.

24.    In connection with the lease assumption agreements discussed above, in addition to completing the existing Project, Mesabi and Chippewa have made material progress and taken major steps toward implementing the Plan.  Chippewa has engaged Kiewit, one of the largest and most respected construction contractors in the United States.  Mesabi and Chippewa have worked with Kiewit on a highly expedited basis as Kiewit has conducted a comprehensive review of the Project in anticipation of Kiewit assuming the role of general contractor to complete the Project.  The parties have entered into a preliminary agreement with respect to the Project, and are negotiating a comprehensive general contractor's agreement under which Kiewit will supervise local contractors and its own internal resources at the expansive Project.  Kiewit will assume a prominent leadership role and has prepared a comprehensive engineering, procurement, and construction plan for the Project.

**ANSWER:**    In response to Paragraph 24, Cliffs is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations concerning Kiewit, and on that basis denies these allegations.  Responding further, Cliffs denies that "in addition to completing the existing Project, Mesabi and Chippewa have made material progress and taken major steps toward implementing the Plan."  Cliffs avers that, although Chippewa brought the Reorganized Debtors out of bankruptcy protection, Chippewa did not meet the original

01:22917216.1

requirements of the Plan that were subject to solicitation and voting requirements of the

Bankruptcy Code—as has been widely reported, they have no financing, no substantial customer

agreements, no experienced taconite operator, and almost no iron ore interests actually under

lease.  Except as so denied and averred, Cliffs denies each and every remaining allegation in

Paragraph 24.

25.     In addition, Chippewa has committed to build a hot-briquetted iron ("HBI") facility,
        bringing value-added production to Minnesota's Mesabi Iron Range (the "Mesabi Iron
        Range") for the first time.  The combined projects will create hundreds of new jobs and
        generate many tens of millions of dollars in contributions to both state and local
        revenues, making the iron mining and production industry in Minnesota more
        competitive and less of a monopoly controlled by Cliffs.

        **ANSWER:**     In response to Paragraph 25, Cliffs admits that Chippewa has stated it will

build a hot-briquetted iron ("HBI") facility at the Project site and has promised to "create

hundreds of new jobs and generate many tens of millions of dollars in contributions to both state

and local revenues."  Cliffs avers that to date Mesabi has failed to keep such promises to the

people of Minnesota or to meet its obligations under the Plan.  Except as so admitted, denied,

and averred, Cliffs denies each and every remaining allegation in Paragraph 25.  In particular,

Cliffs denies that "the iron mining and production industry in Minnesota" is "a monopoly

controlled by Cliffs."

26.     To that end, Chippewa has entered into an agreement with an engineering company,
        Tenova, with respect to construction of a long-anticipated, value-added plant on the
        Project site, which will produce HBI.  Chippewa has begun making payments on a $1.25
        million engineering contract for design of that project, which will be financed separately.
        To further advance the project, Chippewa organized and attended a meeting in
        Monterrey, Mexico with Tenova and Kiewit to evaluate an operating HBI furnace.  The
        purpose of the visit was twofold: (1) to evaluate the furnace for constructability purposes;
        and (2) to identify the path forward to formally bid the project from a design and
        construction standpoint.  As a result of this strategic meeting, Chippewa received formal
        bids for both Kiewit and Tenova to advance work on the Project.

        **ANSWER:**     In response to Paragraph 26, Cliffs is without knowledge or information

01:22917216.1

18

sufficient to form a belief as to the truth or falsity of the allegations contained therein, and on

that basis denies each and every allegation in Paragraph 26.

27.    While Mesabi continues to progress toward consummation of the Plan, Cliffs has consistently interfered with Mesabi's reorganization and continues to interfere with the closing of the transactions contemplated in the Plan.  Cliffs' actions have already caused delays, forced Mesabi to renegotiate agreements with multiple Project vendors, and required Mesabi to engage alternative service providers.

    **ANSWER:**    In response to Paragraph 27, Cliffs denies the allegations therein.

**C.    History of Cliffs' Ongoing Interference with Mesabi's Operations and the Relevant Market**

28.    Cliffs is a direct competitor of Mesabi.  Cliffs operates iron ore and pellet production facilities in northern Minnesota, and upon information (including Cliffs' own assertions) and belief, Cliffs controls virtually all of the public market for blast furnace pellets in the Great Lakes Pellet and Iron Market.

    **ANSWER:**    In response to Paragraph 28, Cliffs admits that it operates iron ore and

pellet production facilities in northern Minnesota, but denies each and every remaining allegation

therein.  In particular, Cliffs denies that the "Great Lakes Pellet and Iron Market" is a properly

defined relevant market; that Cliffs "controls" any properly defined relevant market; and that

Cliffs is injuring competition in any properly defined relevant market.  Responding further,

Cliffs avers that Chippewa and Mr. Clarke have repeatedly told this Court and the public that

Mesabi intends to sell into a global market and is actively engaged in preparations to do so,

undeterred by Cliffs and contrary to the allegations in the Second Amended Complaint.  For

example, in June 2017 Chippewa represented to this Court that it was "actively engaged in

negotiating non-binding offtake commitments with several parties" following its "strategy to

secure commitments from a number of North American steel producers or global commodity

trading partners" [D.I. 1010-1 at 10]; in June 2017 Mr. Clarke represented to this Court that he

had "received extensive and serious interest from a number of players in the Midwest steel

production market and [is] in negotiations for binding commitments and offtake agreements with

a sufficient number of such customers to sell up to the whole production contemplated under the

Business Plan" [D.I. 1009 at 6]; on or about December 23, 2017 Mr. Clarke confirmed to the

Duluth News Tribune that the Project would use 2.5 million tons for its on-site iron plant and

"[t]he other 4.5 million tons annually has been pledged to a Chinese steelmaker"; on or about

January 23, 2018 Mr. Clarke told the Duluth News Tribune that "We're going to use much of our

ore to make pig iron and we're going to sell the rest to China"; and on or about February 19, 2018

Mr. Clarke again told the Duluth News Tribune that the Project will use its finished taconite

pellets to make pig iron at the site and will ship the other half by train to Mexico and via the

Great Lakes to Asia.  Except as so admitted, denied, and averred, Cliffs denies each and every

remaining allegation in Paragraph 28.

29.     Access to mineral rights to support its pellet production is essential to Mesabi's future
        success.  In order to ensure the necessary access, Mesabi entered into numerous mineral
        and other leases with several different lessors.  Taken together, these leases provide
        Mesabi with approximately 20,000 contiguous acres.  Mesabi sited its production facility
        so as to maximize efficiency in utilizing these interests.  Maintaining the entire
        assemblage has always been essential to realizing the efficiencies underlying Mesabi's
        key investment assumptions related to the Project.

        **ANSWER:**     In response to Paragraph 29, Cliffs admits that Mesabi previously was a

party to mineral leases.  To the extent that the allegations in Paragraph 29 purport to paraphrase

or characterize these leases, each such lease is a written document that speaks for itself, and

Cliffs refers to each such document for a fair and accurate portrayal of its contents.  Responding

further, Cliffs is without knowledge or information sufficient to form a belief as to the truth or

falsity of the remaining allegations, and on that basis denies them.  Except as so admitted,

denied, and referred, Cliffs denies each and every remaining allegation in Paragraph 29.

30.     Cliffs has long sought to acquire Mesabi's assets and prevent Mesabi from entering the
        Great Lakes Pellet and Iron Market.  In particular Cliffs has long pursued Mesabi's

01:22917216.1

interests leased from the DNR (the "DNR Leases").  Indeed, by at least 2015 and periodically since that time to date, Cliffs has persistently pressured the State of Minnesota and the Minnesota governor's office to terminate the DNR Leases with Mesabi and allow Cliffs to take over the DNR Leases.  Attached hereto as Exhibit 1 are examples of relevant correspondence between Cliffs and the DNR regarding Mesabi's DNR Leases. Now, having failed to procure the DNR Leases, Cliffs has moved to take control of the Mineral Leases.

**ANSWER:**    In response to Paragraph 30, Cliffs denies that the "Great Lakes Pellet and Iron Market" is a properly defined relevant market; that Cliffs has sought to "prevent Mesabi from entering" any properly defined relevant market; and that Cliffs is injuring competition in any properly defined relevant market.  Responding further, Cliffs admits that, in response to the State of Minnesota's request for a declaration of interest, Cliffs stated in 2015 that it would be interested in the site in the event that Mesabi's project did not proceed.  To the extent that the allegations in Paragraph 30 purport to paraphrase or characterize correspondence between Cliffs and the State of Minnesota and the Minnesota DNR, examples of which are attached as Exhibit 1, this correspondence consists of written documents that speak for themselves, and Cliffs refers to each such document in Exhibit 1 for a fair and accurate portrayal of its contents. Except as so admitted, denied, and referred, Cliffs denies each and every remaining allegation in Paragraph 30.

31.    As Lourenco Goncalves explained in public statements on November 16, 2016, there are "three different markets for iron ore, they're completely separate.  One is the international market that's basically dominated by China and surrounding countries for mines and some lump ore, that's one business.  The other business is the pellet business.  The pellet business is the one that the Samarco thing affected in the – especially hitting Europe and the Middle Eastern operations, especially the DRI Middle Eastern Operations."  Mr. Goncalves went on to explain that the "**third business is the business that we [Cliffs] dominate here in the United States is the pellet business within the Great Lakes" (the "Great Lakes Pellet and Iron Market**") (emphasis added).

**ANSWER:**    Cliffs admits that Paragraph 31 purports to paraphrase or characterize statements made by Lourenco Goncalves, Chairman, President and Chief Executive Officer of

Cliffs ("Mr. Goncalves"), at the Goldman Sachs Global Metals & Mining Conference on

November 16, 2016.  Cliffs refers to the full transcript of these statements for a fair and accurate

portrayal of their contents.  Responding further, Cliffs denies that the "Great Lakes Pellet and

Iron Market" is a properly defined relevant market; that Cliffs "dominate[s]" any properly

defined relevant market; and that Cliffs is injuring competition in any properly defined relevant

market.  Except as so admitted, denied, and referred, Cliffs denies each and every remaining

allegation in Paragraph 31.

32.     The "Great Lakes" is a geographic region that includes the Iron Range of Minnesota.  The
        Iron Range of Minnesota actually includes four, distinct, iron ranges, one of which is the
        Mesabi Iron Range.  The Mesabi Iron Range is largely located within Itasca and St. Louis
        counties in Minnesota, and is the largest iron range within the Iron Range of Minnesota.

        **ANSWER:**     In response to Paragraph 32, Cliffs admits that the Great Lakes are located

in the northern Midwest region of the United States, which includes Minnesota, but otherwise

denies the remaining allegations therein.  In particular, Cliffs disagrees with the description of

the iron range and, therefore, denies the allegations as stated.

33.     On information and belief, the Mesabi Iron Range, where Mesabi intends to complete the
        Project and mine iron ore to commercialize and sell, is one of the most productive and
        promising iron ore mining areas in the United States.  The Mesabi Iron Range is also a
        significant source of taconite, a type of iron formation for which there has been
        increasing demand in recent years.

        **ANSWER:**     In response to Paragraph 33, Cliffs admits that the Mesabi Iron Range is

an iron ore mining area in the United States and a source of taconite, a type of iron ore for which

there is commercial demand.  Cliffs further admits that Mesabi has stated that it intends "to

complete the Project" in the Mesabi Iron Range "and mine iron ore to commercialize and sell,"

but avers that Mesabi's actions to date demonstrate that none of these stated goals are viable.

Responding further, Cliffs avers that it has owned iron ore mineral leases in the Mesabi Iron

Range since 1902 and first mined iron ore there in 1905.  Except as so admitted and averred,

Cliffs denies each and every remaining allegation in Paragraph 33.

34.     As the primary, if not only, open-market supplier of pellets made from Great Lakes iron
        ore, Cliffs possesses market power in the Great Lakes Pellet and Iron Market.  Cliffs'
        position as the primary or only producer in the relevant market gives Cliffs the power to
        maintain prices for their products at higher than competitive levels.  No other iron ore
        producers engaged in the open market in the Great Lakes region have sufficient iron ore
        or pellet sales, customers, or other market presence to force Cliffs to compete on price,
        quality, or other factors.  Indeed, as set forth in paragraph 31 and elsewhere in this
        Complaint, Cliffs' own statements confirm Cliffs' market dominance.

        **ANSWER:**     In response to Paragraph 34, Cliffs admits that it is the oldest iron ore

mining company in the United States, and that it supplies iron ore pellets to customers in North

America and from time to time elsewhere from its mines and pellet plants in Michigan and

Minnesota.  Responding further, Cliffs denies that the "Great Lakes Pellet and Iron Market" is a

properly defined relevant market; that Cliffs "possesses market power" in any properly defined

relevant market; and that Cliffs is injuring competition in any properly defined relevant market.

Further answering, Cliffs avers that multiple other companies mine iron ore and produce pellets

in the Great Lakes region and elsewhere and that those companies routinely and vigorously

compete to sell products to customers in competition with Cliffs.  To the extent that Mesabi is

alleging that Cliffs sells pellets at higher than competitive prices, such allegation is denied.

Except as so admitted, denied, and averred, Cliffs denies each and every remaining allegation in

Paragraph 34.

35.     The Great Lakes Pellet and Iron Market is exactly the market Mesabi is seeking to enter
        and in which Mesabi will be Cliffs' primary, if not only, competition.  Thus, on behalf of
        Cliffs, Mr. Goncalves has (a) specifically identified the Great Lakes Pellet and Iron
        Market as the relevant geographic and product market as the market for the public sale of
        iron ore pellets; and (b) admitted that Cliffs dominates and controls the relevant market.

        **ANSWER:**     In response to Paragraph 35, Cliffs denies the allegations therein.  In

particular, Cliffs denies that the "Great Lakes Pellet and Iron Market" is a properly defined

relevant market; that Cliffs "dominates and controls" any properly defined relevant market; and that Cliffs is injuring competition in any properly defined relevant market.  Responding further, Cliffs avers that Chippewa and Mr. Clarke have repeatedly told this Court and the public that Mesabi intends to sell into a global market and is actively engaged in preparations to do so, undeterred by Cliffs and contrary to the allegations in the Second Amended Complaint.  For example, in June 2017 Chippewa represented to this Court that it was "actively engaged in negotiating non-binding offtake commitments with several parties" following its "strategy to secure commitments from a number of North American steel producers or global commodity trading partners" [D.I. 1010-1 at 10]; in June 2017 Mr. Clarke represented to this Court that he had "received extensive and serious interest from a number of players in the Midwest steel production market and [is] in negotiations for binding commitments and offtake agreements with a sufficient number of such customers to sell up to the whole production contemplated under the Business Plan" [D.I. 1009 at 6]; on or about December 23, 2017 Mr. Clarke confirmed to the Duluth News Tribune that the Project would use 2.5 million tons for its on-site iron plant and "[t]he other 4.5 million tons annually has been pledged to a Chinese steelmaker"; on or about January 23, 2018 Mr. Clarke told the Duluth News Tribune that "We're going to use much of our ore to make pig iron and we're going to sell the rest to China"; and on or about February 19, 2018 Mr. Clarke again told the Duluth News Tribune that the Project will use its finished taconite pellets to make pig iron at the site and will ship the other half by train to Mexico and via the Great Lakes to Asia.

36.     Mr. Goncalves has openly boasted about Cliffs' iron ore business in the United States, characterizing it as a "beast."  Specifically, Mr. Goncalves has touted Cliffs' monopoly power in the Great Lakes Pellet and Iron Market to the public during Cliffs' quarterly earnings calls, including as follows:

a. On October 27, 2016, Mr. Goncalves commented that "[r]ecently, the pellet market in the Great Lakes got even tighter as Magnetation ceased operations at the beginning of [October 2016] bringing Cliffs back to its long-standing position as the only merchant pellets supplier in the Great Lakes."

b. On July 27, 2017, Mr. Goncalves stated: "How is this business able to achieve its EBITDA margins of nearly 40% in the metals and mining industry in the United States where EBITDA margins of 9.5%, 10% are considered to be very good and 15% are considered great. Number one, cost to enter. Cliffs is the only real merchant supplier within the Great Lakes markets, and we have all the good clients under long-term contracts, covering pretty much all their pellet requirements."

c. Mr. Goncalves further explained on July 27, 2017 that "[t]he same advantage that make our U.S. iron ore pellet business so powerful will make our HBI business powerful as well. Just like our pellets, we will be the only merchant supplier of virgin iron units in the region. So right off the bat, we have a huge logistical advantage over the competition."

**ANSWER:** Cliffs admits that the allegations in Paragraph 36 and its subparts purport to paraphrase or characterize statements made by Mr. Goncalves during conference calls for Cliffs' quarterly earnings reports, including a conference call held on October 27, 2016 to report the company's earnings for the third quarter of 2016 and a conference call held on July 27, 2017 to report the company's earnings for the second quarter of 2017. Cliffs refers to the full transcript of each of these conference calls for a fair and accurate portrayal of its contents. Responding further, Cliffs denies that the "Great Lakes Pellet and Iron Market" is a properly defined relevant market; that Cliffs has "monopoly power" in any properly defined relevant market; and that Cliffs is injuring competition in any properly defined relevant market. Except as so admitted, denied, and referred, Cliffs denies each and every remaining allegation in Paragraph 36.

37. Mr. Goncalves' bold statements on Cliffs' market control and the fact that Cliffs is able to maintain extremely high margins – over four times those of comparable metal and mining industries – because of Cliffs' monopoly power ("Cliffs is the only real merchant supplier within the Great Lakes markets") and the extremely high "costs to enter" the Great Lakes

Pellet and Iron Market have shown to be true.

**ANSWER:**    In response to Paragraph 37, Cliffs denies the allegations therein.

38.    By way of nonexclusive example, Cliffs' recent transactions with ArcelorMittal USA LLC ("ArcelorMittal") provide a striking demonstration of Cliffs' market domination and power.  The veracity of Cliffs' claims and resulting harm to the Great Lakes Pellet and Iron Market are readily apparent from the size of ArcelorMittal's proof of claim in these Chapter 11 Cases.  Prior to commencement of these Chapter 11 Cases, ArcelorMittal entered into a binding contract with Mesabi for the provision of pellets in the Great Lakes Pellet and Iron Market at an agreed pricing schedule for a number of years.  At that time, Mesabi was competing with Cliffs for ArcelorMittal's business, and the price terms of the contract reflected a healthy competitive market for pellets within the Great Lakes Pellet and Iron Market.  When Mesabi failed to perform under the contract, ArcelorMittal was forced instead to obtain the pellets Mesabi would have provided from Cliffs, which by its own admission was once again the only merchant supplier of pellets in the Great Lakes Pellet and Iron Market.  As a result of Cliffs' monopoly power, ArcelorMittal will pay in excess of $600 million more for these same pellets to Cliffs than ArcelorMittal would have paid to Mesabi in a competitive market.[4]

**ANSWER:**    In response to Paragraph 38 and footnote 4, Cliffs admits that at the time

that Essar filed its Chapter 11 Cases, Essar had a contract with ArcelorMittal to supply iron ore

pellets through 2026, and that Essar failed to perform under this contract.  Cliffs avers that after

Essar failed to perform under its contract with ArcelorMittal, ArcelorMittal terminated its

contract with Essar on May 27, 2016.  In the meantime, ArcelorMittal had an existing iron ore

pellet supply contract with Cliffs, and beginning in July 2014 ArcelorMittal requested and

purchased additional pellets from Cliffs to cover the shortfall in its anticipated pellet supply from

Essar due to Essar's failure to perform.  In May 2016, following arms-length negotiations,

ArcelorMittal entered into a new contract with Cliffs to supply iron ore pellets for a fixed term,

including in part pellets that Essar had contracted to supply.  Responding further, Cliffs admits

that ArcelorMittal submitted a proof of claim in the Chapter 11 Cases in September 2016 that

---

4    ArcelorMittal filed a proof of claim in excess of $1 billion, alleging that such amount was the amount above the Mesabi contract that ArcelorMittal would have to pay Cliffs to obtain comparable product; however, after significant effort and negotiation the Debtors have reached an agreement with ArcelorMittal and filed their Motion for Entry of an Order Approving the Agreement [D.I. 1065], which seeks to allow ArcelorMittal's proof of claim in the amount of $605 million.

sought in excess of $1 billion based on ArcelorMittal's estimate of its cover damages [Claim No.

121], and that ArcelorMittal agreed to a settlement with the Debtors that provides for an allowed

claim of $605 million, which the Debtors told this Court was a "fair and reasonable" amount that

"include[ed] an appropriate present value discount to take into account future substitute iron ore

pellet purchases by ArcelorMittal" from Cliffs under ArcelorMittal's contract with Cliffs [D.I.

1065].  To the extent that the allegations in Paragraph 38 and footnote 4 purport to characterize

or paraphrase such documents, those written documents speak for themselves, and Cliffs refers

to each such document for a fair and accurate portrayal of its contents.  Responding further,

Cliffs denies that the "Great Lakes Pellet and Iron Market" is a properly defined relevant market;

that Cliffs "dominat[es]" or has "monopoly power" in any properly defined relevant market; and

that the price terms in Essar's contract with ArcelorMittal "reflected a healthy competitive market

for pellets."  Except as so admitted, denied, averred, and referred, Cliffs denies each and every

remaining allegation in Paragraph 38 and footnote 4.

39.  With respect to ArcelorMittal, Mr. Goncalves also claimed on Cliffs' earning calls that
Cliffs has "locked up" the "vast majority of [its] sales tonnage….for several years," and
that U.S. Steel, an integrated steel producer, could not sell pellets to ArcelorMittal
because Cliffs has locked ArcelorMittal up as a client:  "I also try to understand where
U.S. Steel is going to sell their pellets, because – certainly not to ArcelorMittal because I
know the contracts we have in place."[5]

   **ANSWER:**    Cliffs admits that the allegations in Paragraph 39 and footnote 5 purport to

paraphrase or characterize statements made by Mr. Goncalves during a conference call held on

February 9, 2017 to report the company's quarterly earnings for the fourth quarter of 2016 and

during a conference call held on April 29, 2015 to report the company's quarterly earnings for the

first quarter of 2015.  Cliffs refers to the full transcript of each of these conference calls for a fair

---

[5]    Mr. Goncalves has separately asserted in a 2015 earnings call that "I have never seen U.S. Steel as a
competitor.  U.S. Steel is a steel maker. They are integrated backwards, and they have upstream pellet
production. . . We look forward to see U.S. Steel coming back at full force and in full capacity. They are
not a competitor of Cliffs Natural Resources."

and accurate portrayal of its contents.  Except as so admitted and referred, Cliffs denies each and

every remaining allegation in Paragraph 39 and footnote 5.

40.      More generally, Mr. Goncalves boasted on the April 2017 earnings call that Cliffs has
         taken all of the clients – potential customers for competitors and potential competitors
         like Mesabi – off the market for years:  "Where [is U.S. Steel] going to sell the pellets, if
         that is part of your question?  I have no idea, because the clients are taking [sic].  I will
         sell to them in 2017, 2018, 2019, 2020, 2021, 2022, and then 2023, one contract will end.
         And then, 2024, a second contract and then – and it's too far away.  By that time, I'll be
         very old."  And during the February 2017 earnings call, Mr. Goncalves similarly bragged
         that "with solid demand and [the] exclusive nature of our contracts, keeping wannabe
         competitors watching from the outside and talking a good game, at this point, we are sold
         out for 2017."

         **ANSWER:**      Cliffs admits that the allegations in Paragraph 40 purport to paraphrase or

characterize statements made by Mr. Goncalves during a conference call held on February 9,

2017 to report the company's quarterly earnings for the fourth quarter of 2016 and during a

conference call held on April 27, 2017 to report the company's quarterly earnings for the first

quarter of 2017.  Cliffs refers to the full transcript of each of these conference calls for a fair and

accurate portrayal of its contents.  Except as so admitted and referred, Cliffs denies each and

every remaining allegation in Paragraph 40.

41.      If Cliffs' exclusive or otherwise restrictive arrangements with pellet customers such as
         ArcelorMittal, are permitted to continue it could prevent new entrants from being able to
         provide any meaningful alternative to Cliffs' dominant market position.

         **ANSWER:**      In response to Paragraph 41, Cliffs denies the allegations therein.

42.      As Mr. Goncalves explained, this is great for Cliffs' profit margins; however, it is
         devastating to customers in the Great Lakes Pellet and Iron Market and their consumers.

         **ANSWER:**      In response to Paragraph 42, Cliffs denies the allegations therein.

43.      This also demonstrates why Cliffs is uniquely incentivized to prevent Mesabi from
         successfully entering into the Great Lakes Pellet and Iron Market and HBI markets.
         Indeed, in touting Cliffs' new deal with ArcelorMittal in a July 28, 2016 earnings call,
         Mr. Goncalves explained that the agreement preserved Cliffs' "position as ArcelorMittal's
         sole supplier from the outside" and that such agreement was particularly beneficial to
         Cliffs because it prevented any potential new entrant in the market from doing business

with ArcelorMittal for 10 years, stating that "[w]ith the signature of this contract, any potential competitor of Cliffs within the Great Lakes will have 10 years to start producing pellets or to improve the quality of the pellets just to try again," thus creating yet another barrier to entry into the Great Lakes Pellet and Iron Market.

**ANSWER:**      In response to Paragraph 43, Cliffs denies that the "Great Lakes Pellet and Iron Market" or the "HBI market" refer to any properly defined relevant market(s).  Cliffs further denies that it is in any other way injuring competition in any properly defined relevant market.  Further answering, Cliffs avers that Mesabi had an iron ore pellet sales contract with ArcelorMittal until Mesabi failed to perform for reasons related to Mesabi's own incompetence and its affiliates' malfeasance, and further avers that Chippewa and Mr. Clarke have repeatedly stated that Mesabi would produce iron ore for other uses and to sell to customers around the world.  Responding further, Cliffs admits that the allegations in Paragraph 43 purport to paraphrase or characterize statements made by Mr. Goncalves during a conference call held on July 28, 2016 to report the company's quarterly earnings for the second quarter of 2016.  Cliffs refers to the full transcript of this conference call for a fair and accurate portrayal of its contents.  Except as so admitted, denied, averred, and referred, Cliffs denies each and every remaining allegation in Paragraph 43.

44.    For years, after obtaining the dominant share of the Great Lakes Iron and Pellet Market, Cliffs has embarked on an exclusionary scheme to derail Mesabi's entry into the Great Lakes Pellet and Iron Market.  For years, Cliffs did not keep its intentions secret.  Rather, Mr. Goncalves has, among other things, openly admitted that Cliffs would use exclusionary methods to put Mesabi (and other competitors) out of business, threatened third parties not to do business with a Cliffs competitor – specifically Mesabi – and made disparaging and intimidating remarks about Mesabi, all in an effort to interfere with Mesabi's prospective business opportunities and keep its competitive threat at bay.  For example:

**ANSWER:**      Cliffs denies the allegations in Paragraph 44.  Responding further to each subpart of Paragraph 44, Cliffs states:

a.    In October 2015, in an overt threat to the unions, miners, municipalities, and

01:22917216.1

politicians in the area, Mr. Goncalves told the Mesabi Daily News that the Project, once complete, would directly compete with Cliffs, and that "[i]f the[] [Project] go[es] online, I will shut down a plant up there the same day."

**ANSWER:**    In response to subpart a of Paragraph 44, Cliffs admits that on October 17, 2015 the Mesabi Daily News reported in an article, entitled *Cliffs CEO: Essar Jeopardizes Range Facility*, that Mr. Goncalves said during an earlier interview with the newspaper, "If they go online, I will shut down a plant up there the same day[.] . . . We have fully planned for the worst case scenario." Cliffs denies that this statement is or was "an overt threat to the unions, miners, municipalities, and politicians in the area" or anywhere else. Paragraph 44 subpart a and the October 17, 2015 article misrepresent and take out of context the statements Mr. Goncalves made in his earlier interview, in which he referred to changing market dynamics and decreased demand related to the potential for iron ore pellet overcapacity in the United States. In fact, on October 19, 2015, the next business day following publication of the October 17 article, Cliffs issued a news release entitled *Cliffs Natural Resources Inc. Addresses Recent Minnesota Media Reports*, to address this misrepresentation. Cliffs' release stated that Cliffs "does not have any current plans to permanently idle or close any of its Minnesota mines." Responding further, Cliffs avers that the same October 17 article states that an Essar source told the newspaper that "they [Essar] already have contracts in place for the pellets" and that Essar did not plan to compete for customers with any current Minnesota mines. Except as so admitted, denied, and averred, Cliffs denies each and every remaining allegation in subpart a of Paragraph 44.

b. During Cliffs' quarterly earnings call on July 28, 2016, Mr. Goncalves stated that "[Mesabi] is also known as Neverland. Never finished, never producing pellets, never paying anyone," and asserted that "[Cliffs] ha[s] a signed commitment with Governor Dayton that we have – we are – as soon as [Mesabi] vacates the site, the leases are ours." At the time of that "signed commitment," Mesabi was actively seeking to reorganize and continue construction.

**ANSWER:**    Cliffs admits that the allegations in subpart b of Paragraph 44 purport to

paraphrase or characterize statements made by Mr. Goncalves during a conference call held on

July 28, 2016 to report the company's earnings for the second quarter of 2016. Cliffs refers to

the full transcript of this conference call for a fair and accurate portrayal of its contents.

Responding further, Cliffs avers that Essar never finished the site, never produced pellets, and

left Minnesota trades, vendors, service providers, and contractors and subcontractors with

millions of dollars in unpaid work. As to the allegations in subpart b of Paragraph 44 concerning

Mesabi's conduct, Cliffs is without knowledge or information sufficient to form a belief as to the

truth or falsity of such allegations and on that basis denies them. Except as so admitted, denied,

and referred, Cliffs denies each and every remaining allegation in subpart b of Paragraph 44.

> c.  On information and belief, Cliffs has sought to intimidate local businesspeople
> and community leaders in an effort to get them to oppose Mesabi's reorganization
> efforts, notwithstanding that local businesses and communities will benefit
> enormously from the Project.[6] As an example, at an April 6, 2017 meeting with
> local officials, Mr. Goncalves said that if he could, he would come "with a
> bulldozer and take [Mesabi] out." As to those who would support the project, he
> said that "you're either with me or you're against me."

**ANSWER:**   In response to subpart c of Paragraph 44 and footnote 6, Cliffs denies that

the alleged statements, or any other actions by Cliffs, "sought to intimidate local businesspeople

and community leaders in an effort to get them to oppose Mesabi's reorganization efforts."

Further answering, Cliffs admits that on April 6, 2017 Mr. Goncalves attended Cliffs' annual

"State of the Company" luncheon meeting in Chisholm, Minnesota; that Cliffs invites local

business and political officials to its annual "State of the Company" luncheon every year, and

several did attend the April 6, 2017 luncheon; that Mr. Goncalves made public comments at a

press conference that followed his presentation at the April 6, 2017 luncheon; and that an April

---

[6]     Under the Plan, the highest recoveries will be paid to local contractors and vendors, who will also benefit
from the large amount of work to be generated by constructing and supplying the Project. Local
communities will also benefit, as the Project will significantly increase the local tax base and fund local
government and services.

6, 2017 article in the Duluth News Tribune entitled *Cliffs CEO pushes 'sense of urgency' in opposing Mesabi Metallics* reported that Mr. Goncalves said, "in an interview with local media," that "I can't come with a bulldozer and take them out, because if I could I would have done that already. . . . You guys have the power, as the community, as the ones that understand what you're talking about, to do that or not. . . . Let's see if after today you guys get the sense of urgency."  Cliffs admits that, as part of a larger set of statements, Mr. Goncalves may have said "you're either with me or you're against me," but expressly denies that this statement was made in an effort to intimidate.  As to the allegations in subpart c of Paragraph 44 and footnote 6 concerning the benefit of the Project and the Plan to local businesses and communities, Cliffs is without knowledge or information sufficient to form a belief as to the truth or falsity of such allegations and on that basis denies them.  To the extent that the allegations in footnote 6 purport to paraphrase or characterize the Plan, this document speaks for itself, and Cliffs refers to it for a fair and accurate portrayal of its contents.  Except as so admitted, denied, and referred, Cliffs denies each and every remaining allegation in subpart c of Paragraph 44 and footnote 6.

> d. According to the sworn testimony of the DNR's Director of Lands and Minerals Division, Jess Richards, Cliffs repeatedly pressured the State of Minnesota to terminate Mesabi's mineral leases, threatening to walk away from any potential project on the site unless the State terminated Mesabi's leases on Cliffs' behalf.

> e. Mr. Richards further testified that Cliffs asked the DNR to contact Mesabi's lenders to convince them to withdraw their support of Mesabi and to instead back Cliffs' attempts to have Mesabi's DNR Leases terminated.

**ANSWER:**    In response to subparts d and e of Paragraph 44, Cliffs admits that Jess Richards, Director of Lands and Minerals Division for the Minnesota DNR ("Mr. Richards"), testified at a hearing in the Chapter 11 Cases on November 14, 2016, a transcript of which is filed at D.I. 551.  Responding further, Cliffs admits that the State of Minnesota engaged Cliffs in discussions concerning whether Cliffs would be interested in the site and related mineral leases

in the event that Essar did not meet its obligations under the State's leases, as stated in the correspondence between Cliffs and the State attached to the Second Amended Complaint as Exhibit 1 and in Mr. Richards' November 14, 2016 testimony filed at D.I. 551, but Cliffs denies that it pressured or threatened the State or that Mr. Richards so testified.  To the extent that the allegations in subparts d and e of Paragraph 44 purport to paraphrase or characterize Mr. Richards' testimony or Cliffs' correspondence with the State, the transcription filed at D.I. 551 and the correspondence attached as Exhibit 1 to the Second Amended Complaint speak for themselves, and Cliffs refers to each for a fair and accurate portrayal of its contents.  Except as so admitted, denied, and referred, Cliffs denies each and every remaining allegation in subparts d and e of Paragraph 44.

> f.   On information and belief, in January 2015, Mr. Goncalves met with legislators from northern Minnesota and criticized the State of Minnesota's decision to work with Mesabi towards extending Mesabi's date to repay a State monetary grant to build infrastructure for the Project.

**ANSWER:**   In response to subpart f of Paragraph 44, Cliffs admits that on January 12, 2015 Mr. Goncalves and other Cliffs' employees met with state legislators from northern Minnesota, known as the "Iron Range Delegation," and discussed, among other things, the State of Minnesota's grants to Essar (now Mesabi) related to the Project and Cliffs' future business plans for its Minnesota operations.  Responding further, Cliffs avers that the purpose of this January 2015 meeting was to discuss Cliffs' iron ore mining and processing operations in Minnesota and Michigan, current iron ore and steel market conditions, and the company's important role as a major employer on the Iron Range.  Except as so admitted and averred, Cliffs denies each and every remaining allegation in subpart f of Paragraph 44.

> g.   Cliffs repeatedly disparaged Mesabi in written correspondence with the DNR and the governor of Minnesota.  On or about June 27, 2016, Cliffs' lobbyists contacted the DNR and the governor's office to criticize the Debtors' attempts to get letters

01:22917216.1

of support from lessors and vendors, commenting that "this effort by [Mesabi] to pressure these contractors stands as yet one more example of that company's questionable ethics and business practices."  On or about June 23, 2016, in a letter to the governor of Minnesota, Cliffs wrote that Mesabi and its financial backers "have proven on a repeated basis to have flawed timing, an undefined strategy, an inability to execute and, worst of all – questionable ethics."

**ANSWER:**    In response to subpart g of Paragraph 44, Cliffs admits that the State of Minnesota engaged Cliffs in discussions concerning whether Cliffs would be interested in the site and related mineral leases in the event that Essar did not meet its obligations under the State's leases, as stated in the correspondence between Cliffs and the State attached to the Second Amended Complaint as Exhibit 1, including a letter dated June 23, 2016.  Responding further, Cliffs admits that its government affairs personnel contacted the Minnesota governor's office regarding Essar's efforts in June 2016 to have its contractors and vendors, many of whom Essar owed substantial sums of money, contact the governor on Essar's behalf to request an extension of the State's mineral leases with Essar and an extension of Essar's state grant repayment obligations, and that Cliffs' personnel told the governor's office that Cliffs believed Essar's request was "yet one more example of that company's questionable ethics and business practices."  To the extent that the allegations in subpart g of Paragraph 44 purport to paraphrase or characterize Cliffs' correspondence with the State, such written documents speak for themselves, and Cliffs refers to each for a fair and accurate portrayal of its contents.  Except as so admitted and referred, Cliffs denies each and every remaining allegation in subpart g of Paragraph 44.

    h.  Beginning in 2014 and continuing through the first half of 2015, Cliffs flew aircraft over Mesabi's property to obtain aerial photographs of the progress of construction on the Project site and apparently used the photos to paint a misleading picture of the progress to, on information and belief, local businesspeople and community leaders.

**ANSWER:**    In response to subpart h of Paragraph 44, Cliffs admits that it obtained

aerial photographs of the Project site in November 2014 and in January 2015; that these

photographs showed the progress of construction on the site at the time the photographs were

taken; and that Cliffs shared photographs with members of the Iron Range Delegation during the

January 12, 2015 meeting.  Responding further, Cliffs denies that these photographs "paint a

misleading picture of the progress" or that it used the photos in an attempt to mislead local

businesspeople and community leaders as to progress at the site.  Except as so admitted and

denied, Cliffs denies each and every remaining allegation in subpart h of Paragraph 44.

45.     Mr. Goncalves' hostile pronouncements and Cliffs' onslaught of threats and
        disparagement make clear to all stakeholders that Cliffs expects exclusive control of the
        market.  On or about November 12, 2015, a Mesabi Iron Range Congressional
        representative observed that Cliffs' employees appear to expect the government's
        assistance in monopolizing the market, rebuking a Cliffs lobbyist that "Cliffs' employees
        are also of the misunderstanding that the government [has] far more control over market
        conditions and eliminating competition than we ever could."

        **ANSWER:**      In response to Paragraph 45, Cliffs admits that a Minnesota state

legislator, Carly Melin, sent an email to a Cliffs employee on November 12, 2015, in which she

requested a meeting with Mr. Goncalves and stated that "Cliffs employees are also of the

misunderstanding that the government, and particularly the range delegation, have far more

control over market conditions and eliminating competition than we [i.e., the government] ever

could."  Cliffs denies all remaining allegations in Paragraph 45 and specifically that Ms. Melin

"observed that Cliffs' employees appear to expect the government's assistance in monopolizing

the market."  Responding further, Cliffs avers that its government relations personnel responded

to Ms. Melin to confirm that neither Cliffs nor its employees had requested that the government

attempt to influence market conditions or competition.  More specifically, Cliffs avers that its

government relations personnel responded to Ms. Melin and stated, in part, "To the extent that

Cliffs' engagement on this issue has been construed as hostility toward the Range Delegation, or

has given the impression that you all control the ultimate outcome of this project, that was certainly not our intent.  To the contrary, we know that Essar controls its own fate, and we have simply been hoping for the opportunity to work with the Delegation/State to provide everyone a backup plan in the event of failure while that opportunity is available."  Except as so admitted, denied, and averred, Cliffs denies each and every remaining allegation in Paragraph 45.

**D.**     **In the Face of Plan Consummation, Cliffs Ratchets up Its Anti-Competitive Conduct to Prevent Mesabi from Competing in the Market**[7]

46.     Cliffs knew of the confirmation of the Plan, the Debtors' need for financing, and related pleadings and objection deadlines; however, this Court's confirmation of the Plan did not deter Cliffs' campaign for Mesabi's demise in order to continue Cliffs' monopolization of the Great Lakes Pellet and Iron Market.  Having failed to acquire Mesabi's assets and liquidate the Project through the Debtors' auction process, and as confirmation of the Plan approached and was ultimately achieved, Cliffs threatened to withhold its business from various of Mesabi's key contractors, engineers, professionals and potential customers to prevent them from doing business with Mesabi.  These contractors, engineers, and professionals are essential to bringing the Project online, and of course, the potential customers are key to the viability of the Reorganized Debtor.  Cliffs is thereby blocking competition from entering the market precisely because Cliffs has leverage over such contractors, engineers, professionals and potential customers by virtue of its market dominance.  By threatening to "blacklist" these local and regional businesses, including causing them to withdraw or rescind their agreements with Mesabi, Cliffs has caused unnecessary and harmful delays and imposed significant costs on Mesabi.  Cliffs' interference with Mesabi's operations poses a threat to implementation of the Plan and to creditor recoveries thereunder.

> **ANSWER:**     In response to Paragraph 46 and footnote 7, Cliffs denies the allegations

therein.

47.     On information and belief, Cliffs has informed numerous third-party contractors, engineers and professionals that Cliffs will not work with those businesses and individuals who do business with Mesabi or ERP Iron Ore, LLC ("ERP"), Chippewa's affiliate that purchased Magnetation LLC.  Indeed, Mesabi has been told by some contractors that they could no longer "work on Mesabi projects" because of their

---

[7]     Cliffs may try to justify its actions as competitive, relying on an alleged 2024 expiration of its life-of-mine at its Hibbing Taconite facility in Minnesota. This is a red herring. First and foremost, seven years is plenty of time for Cliffs to develop an alternative business strategy for this asset, without trying to secure the termination of Mesabi's mineral leases. Second, Mesabi understands that Cliffs has or can secure access to adjacent mineral resources such that the Hibbing Taconite life-of-mine can be extended beyond the year 2024.

01:22917216.1

relationship with Cliffs.  Some specific examples of Cliffs' intimidating tactics are described below:

**ANSWER:**   In response to Paragraph 47, Cliffs is without knowledge or information

sufficient to form a belief as to the truth or falsity of allegations concerning what "Mesabi has

been told by some contractors," and on that basis denies such allegations.  Responding further,

Cliffs denies each and every remaining allegation in Paragraph 47.

48.     Barr Engineering Co. ("Barr") has a long history of performing essential professional engineering and environmental permitting services on the Project, dating back to the Project's initial engineering and development stage (prior to Mesabi's predecessor's purchase of the Project) and continuing through the bankruptcy proceeding.  In fact, Barr was retained by Chippewa during the Chapter 11 Cases to play an expanded role at the Project.  Barr's work in this regard was critical to allowing the Plan to go effective.

**ANSWER:**   In response to Paragraph 48, Cliffs is without knowledge or information

sufficient to form a belief as to the truth or falsity of allegations therein, and on that basis denies

them.

49.     Yet, by letter to Robb Bigelow, managing director at ERP and Chippewa, dated August 15, 2017 (the "Barr Letter"), Barr suddenly refused to do any further work on the Project, informing Mr. Bigelow that "Barr Engineering Co. regretfully must decline to perform further work under its contract with Chippewa Capital Partners LLC relating to the [Project] site."  A true and correct copy of the Barr Letter is attached hereto as Exhibit 2. Barr employees similarly informed Mesabi that Barr would not perform further work for Mesabi on several workstreams for which Mesabi had relied on Barr to comply with and manage environmental permitting and various engineering needs.  On information and belief, Barr's decision to discontinue doing any further work for Mesabi was solely due to threats and pressures from Cliffs—in particular, Cliffs' message to Barr that if Barr continued to work with Mesabi, Cliffs would cease doing current and future work with Barr.

**ANSWER:**   In response to Paragraph 49, Cliffs denies the allegations concerning

Cliffs' conduct, and otherwise denies for lack of knowledge as to their truth the remaining

allegations therein.  To the extent that the allegations in Paragraph 49 purport to paraphrase or

characterize Exhibit 2, which appears to be a letter from Barr to Robb Bigelow dated August 15,

2017, it is a written document that speaks for itself, and Cliffs refers to it for a fair and accurate

portrayal of its contents.

50.     Because of Barr's abrupt resignation, Mesabi had to solicit and secure alternative
        engineering and construction support, as well as environmental support, to ensure permit
        compliance.  Moreover, the Barr resignation impacted the timetable for preconstruction
        work, for bringing another contractor up to speed, and for negotiating arrangements with
        the project manager which arrangements were, in turn, necessary to the debt financing
        process.  All of the foregoing events caused additional expense and have further delayed
        the Effective Date and the ultimate consummation of the Plan.

        **ANSWER:**     In response to Paragraph 50, Cliffs is without knowledge or information

sufficient to form a belief as to the truth or falsity of allegations therein, and on that basis denies

them.  Further answering, Cliffs avers that Chippewa told this Court that it had engaged Kiewit

as early as June 2017 to review the undertaking required to complete the Project, and that Mesabi

has admitted herein in Paragraph 24 that it engaged Kiewit, "one of the largest and most

respected construction contractors in the United States," to "assume a prominent leadership role"

and that Kiewit "has prepared a comprehensive engineering, procurement, and construction plan

for the Project."

51.     On information and belief, Cliffs has made improper "refusal to deal" threats to many
        companies in addition to Barr, successfully coercing some of those companies to cut ties
        with Mesabi.

        **ANSWER:**     In response to Paragraph 51, Cliffs denies the allegations therein.

52.     On information and belief, Northern Industrial Erectors, Inc. ("NIE") a major contractor
        that has been openly supportive of Mesabi, was threatened and subsequently blackballed
        by Cliffs.

        **ANSWER:**     In response to Paragraph 52, Cliffs denies the allegations therein.

53.     NIE is a major contractor at the Project that has historically been supportive of Mesabi's
        reorganization.  On information and belief, NIE had done business with Cliffs for a
        number of years on many projects but was threatened and excluded from further work by
        Cliffs due to its work for Mesabi.

        **ANSWER:**     In response to Paragraph 53, Cliffs is without knowledge or information

sufficient to form a belief as to the truth or falsity of allegations concerning whether "NIE

[Northern Industrial Erectors, Inc.] is a major contractor at the Project that has historically been

supportive of Mesabi's reorganization," and on that basis denies such allegations.  Responding

further, Cliffs admits that NIE has worked with Cliffs in the distant past and avers that in or

around 2012 NIE stopped responding to requests for bids and did no further work for Cliffs.

Cliffs further avers that NIE sought to re-engage with Cliffs in or around 2016 but Cliffs did not

re-engage NIE.  Further answering, Cliffs denies that NIE "was threatened and excluded from

further work by Cliffs due to [NIE's] work for Mesabi."  Except as so admitted, denied, and

averred, Cliffs denies each and every remaining allegation in Paragraph 53.

54.     Mesabi engaged the Environmental Law Group ("ELG") several years prior to the
        Petition Date to provide legal services and counsel related to the procurement and
        maintenance of environmental permits necessary to the construction and operation of the
        Project.  ELG provided such services to Mesabi prior to the commencement of the
        Chapter 11 Cases, and, pursuant to this Court's August 9, 2016 Order [D.I. 205] (the
        "OCP Order") was employed as an ordinary course professional during the Chapter 11
        Cases.  Pursuant to the OCP Order, ELG continued to provide legal services and counsel
        to Mesabi, and Mesabi timely paid ELG for those services.

        **ANSWER:**     In response to Paragraph 54, Cliffs admits that the Environmental Law

Group ("ELG") was employed as an ordinary course professional during the Chapter 11 Cases

pursuant to this Court's August 9, 2016 Order [D.I. 205].  Responding further, Cliffs is without

knowledge or information sufficient to form a belief as to the truth or falsity of the remaining

allegations in Paragraph 54, and on that basis denies them.

55.     Yet, similar to other instances of business interference discussed herein, on May 18,
        2017, ELG contacted Mesabi's general counsel and resigned from its representation of
        Mesabi, effective June 1, 2017, citing the instructions of Cliffs, a presumably larger
        client, as its reason for resignation.  A true and correct copy of Mesabi's correspondence
        with ELG is attached hereto as Exhibit 3.

        **ANSWER:**     In response to Paragraph 55, Cliffs denies the allegations concerning

Cliffs' conduct, and otherwise denies for lack of knowledge as to their truth the remaining

01:22917216.1

39

allegations therein.  To the extent that the allegations in Paragraph 55 purport to paraphrase or

characterize Exhibit 3, which appears to be an email dated May 18, 2017 from Jeremy P.

Greenhouse, an attorney with ELG, to Ryan Heule, Mitchell Brunfelt, and Susan Fennessey,

each with an email address ending "@mesabimetallics.com," Exhibit 3 is a written document that

speaks for itself, and Cliffs refers to it for a fair and accurate portrayal of its contents.

56.  When ELG began representing Mesabi it obtained consent from both Cliffs and Mesabi
     to undertake concurrent representation of both clients; however, at a critical stage in
     Mesabi's reorganization and restructuring process, when ELG was in the middle of
     representing Mesabi with time-sensitive permitting issues related to recommencement of
     construction on the Project, Cliffs withdrew its consent to ELG's representation of
     Mesabi.

     **ANSWER:**      In response to Paragraph 56, Cliffs admits that ELG requested that Cliffs

consent to ELG's concurrent representation of both Cliffs and Essar and that Cliffs initially

consented, but denies that Cliffs thereafter withdrew its consent.  Responding further, Cliffs

avers that ELG informed Cliffs on or before May 18, 2017 that ELG would not continue work

for Essar based on ELG's assessment of potential conflicts.  Except as so admitted, denied, and

averred, Cliffs denies each and every remaining allegation in Paragraph 56.

57.  Upon information and belief, Cliffs withdrew its consent, not for any legitimate business
     purpose, but to cause delay and upheaval in Mesabi's construction process and,
     ultimately, to derail Mesabi's attempt to consummate the Plan and start competitive
     operations.

     **ANSWER:**      In response to Paragraph 57, Cliffs denies the allegations therein.

58.  Midrex Technologies, Inc. ("Midrex") is a company with which Chippewa and ERP had
     been working to develop plans for an HBI plant near the Project site in order to comply
     with the DNR settlement agreement and ensure that Mesabi retains the DNR Leases.
     ERP had entered into a nondisclosure agreement and provided confidential information to
     Midrex in connection with ongoing negotiations pursuant to which Midrex was to
     provide its direct reduced iron technology to ERP, together with project financing
     support.

     **ANSWER:**      In response to Paragraph 58, Cliffs is without knowledge or information

01:22917216.1

40

sufficient to form a belief as to the truth or falsity of allegations therein, and on that basis denies

them.

59.      On June 9, 2017, Midrex sent a letter  (the "Midrex Letter") to Tom Clarke, ERP and
Chippewa's CEO, explaining that it was working on "another potential direct reduction
project within the Great Lakes Region" and "have chosen to focus on this existing
opportunity at the present time."  A true and correct copy of the Midrex Letter is attached
hereto as Exhibit 4.  In a subsequent conversation, ERP and Chippewa learned that Cliffs
had approached Midrex's corporate parent in Japan about building an HBI plant, after
which the corporate parent instructed Midrex not to deal with ERP or Chippewa.  ERP
and Chippewa did not require that Midrex work exclusively for them; however, on
information and belief, Midrex's corporate parent was instructed by Cliffs to cease
dealings with ERP and Chippewa.  Notably, on June 15, 2017, only six days after Midrex
stopped working on the HBI plant to be constructed near the Project Site, Cliffs
announced it was building an almost identical plant in Toledo, Ohio, and that "Midrex
Technologies was selected to design, engineer, and procure equipment for the new plant .
. . ."[8]  Mesabi believes Cliffs knew Midrex was working on an HBI plant near the Project
Site and entered into an agreement with Midrex to construct a nearly identical facility in
Ohio in order to subvert the DNR settlement agreement and obtain control of the DNR
Leases.

**ANSWER:**      In response to Paragraph 59, Cliffs admits that it issued a press release on

June 15, 2017 that announced that Cliffs would build its first HBI production facility in Toledo,

Ohio, and that "Midrex Technologies was selected to design, engineer and procure equipment for

the new plant."  Cliffs' June 15, 2017 press release is a written document that speaks for itself,

and Cliffs refers to it for a fair and accurate portrayal of its contents.  Responding further, Cliffs

denies that it required Midrex to discontinue doing any further work for ERP or Chippewa after

June 9, 2017.  Further answering, to the extent that Mesabi is alleging that Cliffs announced a

$700 million project six days after June 9, 2017 to interfere with Mesabi's business, such

allegation is ludicrous on its face.  Cliffs avers that it had been planning a DRI facility for years

and, in fact, originally considered sites in Minnesota.  Cliffs otherwise denies the allegations in

Paragraph 59 concerning Cliffs' conduct, and otherwise denies for lack of knowledge as to their

---

8        http://www.businesswire.com/news/home/20170615005276/en/Cliffs-Natural-Resources-Announces-
HBIProduction-Plant

01:22917216.1

truth the remaining allegations in Paragraph 59.  To the extent that the allegations in Paragraph

59 purport to paraphrase or characterize Exhibit 4, which appears to be a letter from Midrex to

Mr. Clarke dated June 9, 2017, it is a written document that speaks for itself, and Cliffs refers to

it for a fair and accurate portrayal of its contents.  Except as so admitted, denied, averred, and

referred, Cliffs denies each and every remaining allegation in Paragraph 59.

60.    Upon information and belief, Cliffs' primary intent throughout this dealing was to prevent Midrex from working with Mesabi to complete its own HBI project elsewhere.  Cliffs has specifically stated this intention through its CEO, Mr. Goncalves, who said "[t]he same advantage that make our U.S. iron ore pellet business so powerful will make our HBI business powerful as well.  Just like our pellets, we will be the only merchant supplier of virgin iron units in the region."

**ANSWER:**    Cliffs admits that the allegations in Paragraph 60 purport to paraphrase or

characterize statements made by Mr. Goncalves during conference calls for Cliffs' earnings

reports, including a conference call held on July 27, 2017 to report the company's quarterly

earnings for the second quarter of 2017.  Cliffs refers to the full transcript of the conference call

for a fair and accurate portrayal of its contents.  Responding further, Cliffs denies that it selected

Midrex to design, engineer and procure equipment for Cliffs' HBI plant in Toledo, Ohio based on

an intent "to prevent Midrex from working with Mesabi."  Except as so admitted, denied, and

referred, Cliffs denies each and every remaining allegation in Paragraph 60.

61.    Cliffs' success in causing Midrex to withdraw from discussions with Chippewa forced Chippewa to divert significant time and resources to finding a replacement for Midrex at the very time such resources were needed elsewhere.  This effort ultimately resulted in the agreement with Tenova, described above.

**ANSWER:**    In response to Paragraph 61, Cliffs denies that it caused Midrex to

withdraw from discussions with Chippewa.  As to the remaining allegations in Paragraph 61,

Cliffs is without knowledge or information sufficient to form a belief as to the truth or falsity of

such allegations, and on that basis denies them.

01:22917216.1

62.  Additionally, upon information and belief, Cliffs has made threatening remarks to certain major domestic steel producers doing business in the Mesabi Iron Range by saying that if such parties were to buy iron ore pellets from Mesabi, Cliffs would not supply them with any of its own pellets.

**ANSWER:**    In response to Paragraph 62, Cliffs denies the allegations therein.

63.  Further, on information and belief, in August 2017, Cliffs participated in a town hall meeting in the iron ore range of northern Minnesota where the Project is located and invited several of the contractors that have or will work on the Project, as well as influential local businesspeople.  Mesabi believes that the purpose of the meeting was to influence those individuals to put pressure on the DNR such that it would not want to amend the original August 31, 2017 deadline contained in the DNR settlement agreement.  Mesabi understands that Mr. Goncalves attended the meeting in person and addressed the crowd, with his comments focused on reasons the DNR should terminate the leases on August 31, 2017.

**ANSWER:**    In response to Paragraph 63, Cliffs denies for lack of information what

Mesabi means by a "town hall meeting"; denies that it or Mr. Goncalves participated in a town

hall meeting in the northern Minnesota Iron Range in August 2017; and otherwise denies each

and every remaining allegation therein.

**E.    Cliffs and Cliffs Minnesota Instigate GPIOP's Misconduct in Connection with the GPIOP Settlement, and Ultimately the Illegally Attempted, But Ineffective, Transfer to Cliffs of the Mineral Leases and Related Properties**

64.  Mesabi is party to those certain mineral leases, dated as of November 29, 2006, by and between GPIOP and/or Superior as lessors and successors in interest and Mesabi as lessee, referred to as the "MSI/BLGN Lease," "GNIOP 100% Lease," and "MSI 50% Lease," (as from time to time amended, including pursuant to the Omnibus Lease Amendment, as defined below, collectively, and with all related or ancillary documents, the "Mineral Leases").

**ANSWER:**    In response to Paragraph 64, Cliffs admits that Mesabi was a party to

certain leases, but avers that all such leases have since been rejected by virtue of Mesabi's failure

to meet certain conditions and reverted.

65.  The Mineral Leases are a key component of Mesabi's overall mineral rights portfolio, and as part of that portfolio are central to Mesabi's future plans for the Project.

**ANSWER:**    In response to Paragraph 65, Cliffs is without knowledge or information

01:22917216.1

43

sufficient to form a belief as to the truth or falsity of what constitutes "a key component of

Mesabi's overall mineral rights portfolio," and on that basis denies the allegations therein.

66.     Over the course of the Mineral Leases, Mesabi has paid more than $10 million in
        minimum royalties, as required by section 9 of the Mineral Leases (such aggregate
        amounts, as accumulated prior to the commencement of mining, the "Prepaid Royalties").
        The Prepaid Royalties are subject to offset by Mesabi as set forth in section 9 of the
        Mineral Leases.

        **ANSWER:**     In response to Paragraph 66, Cliffs is without knowledge or information

sufficient to form a belief as to the truth or falsity of the allegations concerning payments that

Mesabi allegedly has made or failed to make under the Mineral Leases, and on that basis denies

each and every such allegation therein.  To the extent that the allegations in Paragraph 66 purport

to paraphrase or characterize the Mineral Leases, those are written documents that speak for

themselves, and Cliffs refers to each such document for a fair and accurate portrayal of its

contents.  Except as so denied and referred, Cliffs denies each and every remaining allegation in

Paragraph 66.

67.     On February 2, 2017, in conjunction with filing of the then-operative version of the Plan
        (the "Original Plan"), the Debtors filed a notice of motion to assume unexpired mineral
        leases (the "Assumption Notice").  The Assumption Notice provided notice to lessors that
        the Original Plan incorporated and constituted a motion to assume certain executory
        contracts and unexpired leases of the Debtors, including but not limited to, the Mineral
        and Surface Leases and the Mineral Leases.

        **ANSWER:**     In response to Paragraph 67, Cliffs admits the factual allegations therein.

68.     In response to the Assumption Notice, on April 12, 2017, GPIOP filed an objection to the
        assumption of the Mineral Leases (the "GPIOP Objection").

        **ANSWER:**     In response to Paragraph 68, Cliffs admits the factual allegations therein.

69.     Following negotiations, GPIOP and the Debtors entered into a stipulation regarding
        assumption of the Mineral Leases (the "Stipulation").  Pursuant to the Stipulation, the
        Parties agreed that the assumption of the Mineral Leases would be addressed by a
        separate motion.  The Bankruptcy Court entered an order approving the Stipulation [D.I.
        924] on April 24, 2017.

**ANSWER:**    In response to Paragraph 69, Cliffs admits that a Stipulation was entered and approved [D.I. 924], but otherwise denies for lack of knowledge as to their truth the factual allegations therein.

70.    On April 25, 2017, GPIOP withdrew the GPIOP Objection [D.I. 927].  While the Mineral Leases were not then assumed pursuant to the Plan, they remained necessary to the Project.

**ANSWER:**    In response to Paragraph 70, Cliffs admits that on April 25, 2017 Glacier Park filed a *Notice of Withdrawal* [D.I. 927] of its *Objection to Assumption of Mineral Leases* [D.I. 888] previously filed on April 12, 2017, each of which is a written document that speaks for itself and to which Cliffs refers for a fair and accurate portrayal of its contents.  Responding further, Cliffs admits that the Mineral Leases were not assumed pursuant to the Plan, and that Mesabi has alleged that the Mineral Leases are "necessary to the Project."  Except as so admitted and referred, Cliffs denies each and every remaining allegation in Paragraph 70.

71.    On June 27, 2017, shortly after confirmation of the Plan and as contemplated in the Stipulation, the Debtors filed a motion to assume the Mineral Leases [D.I. 1056] (the "Motion to Assume"), to which GPIOP objected [D.I. 1093] on July 14, 2017.

**ANSWER:**    In response to Paragraph 71, Cliffs admits that the Motion [D.I. 1056] was filed on June 27, 2017 and that Glacier Park objected [D.I. 1093] on July 14, 2017, and otherwise denies the factual allegations therein.

72.    On August 28, 2017, Chippewa, the Debtors, GPIOP, and Superior were able to reach a consensual resolution that anticipated and provided for the assumption of the Mineral Leases on the Effective Date, and entered into that certain Settlement Agreement – Glacier Park (inclusive of attachments, the "GPIOP Settlement") and the associated Omnibus Amendment of Certain Leases and Permitting Assumption Pursuant to 11 U.S.C. § 365 (the "Omnibus Lease Amendment").  The GPIOP Settlement and Omnibus Lease Amendment together were intended to identify the terms of the Restated Mineral Leases between GPIOP, Superior, and the Reorganized Debtor, preserving all rights and obligations under the Mineral Leases, as amended.

**ANSWER:**    In response to Paragraph 72, Cliffs admits that Chippewa, the Debtors,

Glacier Park, and Superior Mineral Resources, LLC ("Superior") entered into two separate and related agreements dated as of August 28, 2017, a Settlement Agreement – Glacier Park (the "Glacier Park Settlement") and an Omnibus Lease Amendment, each of which were filed with this Court on August 29, 2017 pursuant to a certification of counsel and attached as exhibits to an *Agreed Order* entered on August 30, 2017 [D.I. 1168].  The Glacier Park Settlement and the Omnibus Lease Amendment each are written documents that speak for themselves, and Cliffs refers to each for a fair and accurate portrayal of its contents.  Except as so admitted and referred, Cliffs denies each and every remaining allegation in Paragraph 72.

73.    On August 30, 2017, this Court entered the *Agreed Order Granting Debtors' Motion Pursuant to Sections 105(a) and 365 of the Bankruptcy Code Authorizing Assumption of the GPIOP Mineral Leases, as Amended* [D.I. 1168] (the "Assumption Order") which, among other things, approved the GPIOP Settlement and the Omnibus Lease Amendment.

    **ANSWER:**    In response to Paragraph 73, Cliffs admits that on August 30, 2017 this Court entered the Agreed Order Granting Debtors' Motion Pursuant to Sections 105(a) and 365 of the Bankruptcy Code Authorizing Assumption of the GPIOP Mineral Leases, as Amended [D.I. 1168] (the "Assumption Order"), which is a written document that speaks for itself, and Cliffs refers to it for a fair and accurate portrayal of its contents.  Except as so admitted and referred, Cliffs denies each and every remaining allegation in Paragraph 73.

74.    In general, the GPIOP Settlement, approved as part of the Assumption Order, provides for the assumption of the Mineral Leases by Mesabi upon the Effective Date of the Plan on the terms set forth in the GPIOP Settlement.  The GPIOP Settlement conditions such assumption on the occurrence of the Effective Date by October 31, 2017 and the payment by Mesabi to GPIOP and Superior in the aggregate amount of $600,000 to be applied to royalties coming due under the Mineral Leases through January 2018.  Settlement Agr., ¶ 3.  Mesabi made this payment on or about September 15, 2017.

    **ANSWER:**    In response to Paragraph 74, Cliffs admits the factual allegations therein. To the extent that the allegations in Paragraph 74 purport to paraphrase or characterize the

Glacier Park Settlement, it is a written document that speaks for itself, and Cliffs refers to it for a fair and accurate portrayal of its contents.

75.     The GPIOP Settlement separately provides that, on or prior to the Effective Date (without regard to when the Effective Date may occur), GPIOP, Superior, and the Reorganized Debtor[9] are obligated to use commercially reasonable efforts to restate the form of the Mineral Leases in a manner acceptable to GPIOP, Superior, and the Reorganized Debtor (the "Restated Mineral Leases"), "which Restated Mineral Leases shall be fully enforceable and effective on the Effective Date" and in substance "preserve all rights and obligations under the Minerals [sic] Leases, subject to the modifications described [in the GPIOP Settlement (inclusive of the Omnibus Amendment)], and contain terms and conditions substantially similar to the Mineral Leases . . . ." *Id*. at ¶ 4(a).  In any event, "[t]he Mineral Leases *will* be deemed amended and restated by consent on the Effective Date of the Plan." *Id.* (emphasis added).

    **ANSWER:**    In response to Paragraph 75, Cliffs denies the allegations therein.  To the extent that the allegations in Paragraph 75 purport to paraphrase or characterize the Glacier Park Settlement, it is a written document that speaks for itself, and Cliffs refers to it for a fair and accurate portrayal of its contents.  Responding further, Cliffs avers that on October 31, 2017, the Mineral Leases were rejected and reverted to the lessors, who were free to do whatever they wanted, and that the Mineral Leases were not subject to reinstatement under Section 4 of the Glacier Park Settlement.

76.     The GPIOP Settlement states that, if the Effective Date does not occur prior to October 31, 2017 or a later date agreed by the parties (the "Rejection Condition"), the Mineral Leases will be automatically deemed rejected pursuant to 11 U.S.C. § 365.  *Id.* at ¶ 3(d). However, the GPIOP Settlement does *not* provide that the Mineral Leases will be terminated as a consequence.  Rather, the GPIOP Settlement permits GPIOP and Superior, as applicable, to take further actions with respect to the Mineral Leases (and underlying real property) following the Rejection Condition without regard to the automatic stay or any other provision of the Bankruptcy Code.  *Id.* at ¶ 3(d). There is no corresponding waiver in the GPIOP Settlement of any state law limits on termination, including under the terms of the Mineral Leases.  Indeed, paragraph 3(e) of the GPIOP Settlement provides, without qualification, that "[t]he Mineral Leases shall remain in full force and effect until the Restated Mineral Leases become fully effective and enforceable." *Id.* at ¶ 3(e).

---

[9]     The Reorganized Debtor is a third party beneficiary to the Settlement Agreement and will execute a joinder thereto on the Effective Date. *Id.* at ¶ 10.

**ANSWER:**    In response to Paragraph 76, Cliffs denies the allegations therein.  To the extent that the allegations in Paragraph 76 purport to paraphrase or characterize the Glacier Park Settlement, it is a written document that speaks for itself, and Cliffs refers to it for a fair and accurate portrayal of its contents.  Responding further, Cliffs avers that the Mineral Leases were rejected under Section 3(d) of the Glacier Park Settlement when the Effective Date did not occur by October 31, 2017, as Mesabi concedes in Paragraph 76, and further avers that, under the applicable rules of contract interpretation, Section 3(d) specifically extinguished all of Mesabi's and the Reorganized Debtors' rights in the Mineral Leases, without the need for a separate termination, by reverting the leases to Glacier Park and Superior and confirming that Glacier Park and Superior may take "any action" thereafter.

77.    Notwithstanding the occurrence of the Rejection Condition, the GPIOP Settlement remains effective until the Debtors withdraw the Plan or announce that the Effective Date will not occur.  *See id.* at ¶ 8(a), (b).  Until then, each party to the GPIOP Settlement is obligated to use its respective commercially reasonable efforts to carry out the terms of the agreement, *id*. at ¶ 16, including the negotiation and execution of the Restated Mineral Leases among the Reorganized Debtor, GPIOP, and Superior, *id.* at ¶ 4.  This construct permitted the Debtors and the Reorganized Debtor to retain their rights in the Mineral Leases notwithstanding rejection.

**ANSWER:**    In response to Paragraph 77, Cliffs denies the allegations therein.  To the extent that the allegations in Paragraph 77 purport to paraphrase or characterize the Glacier Park Settlement, it is a written document that speaks for itself, and Cliffs refers to it for a fair and accurate portrayal of its contents.  Responding further, Cliffs avers that, under the applicable rules of contract interpretation, Sections 4, 8 and 16 of the Glacier Park Settlement cannot be construed to create a separate, ongoing obligation to negotiate and execute a restated mineral lease notwithstanding rejection as alleged in Paragraph 77.

78.    The Omnibus Lease Amendment provides for certain limited modifications of the economic terms of the Mineral Leases.  It waives prior prepayments, changes the minimum royalty payments and mining plan schedule and adds a cross-default provision

01:22917216.1

with respect to certain mineral leases between Mesabi and the State of Minnesota. Otherwise, the Omnibus Lease Amendment "does not modify the terms of the Mineral Leases, and the unamended terms of the Mineral Leases shall remain in full force and effect." *Id.* at ¶ 2. Notably, the Omnibus Lease Amendment does not provide for any special termination rights following the occurrence of the Rejection Condition.

**ANSWER:**    In response to Paragraph 78, Cliffs denies the allegations therein. To the extent that the allegations in Paragraph 78 purport to paraphrase or characterize the Omnibus Lease Amendment, it is a written document that speaks for itself, and Cliffs refers to it for a fair and accurate portrayal of its contents.

79.    Moreover, paragraph 3(e) of the GPIOP Settlement provides that "[a]s of the Effective Date of the Plan, GPIOP and Superior agree that any pre-Effective Date breaches or defaults under the Mineral Leases are cured, and if not curable, are waived." This provision contains no limitation as to breaches or defaults prior to the occurrence of the Rejection Condition.

**ANSWER:**    In response to Paragraph 79, Cliffs denies the allegations therein. To the extent that the allegations in Paragraph 79 purport to paraphrase or characterize the Glacier Park Settlement, it is a written document that speaks for itself, and Cliffs refers to it for a fair and accurate portrayal of its contents.

80.    Finally, the Assumption Order states that the GPIOP Settlement and the Omnibus Lease Amendment are approved, id. at ¶ 2, and that

> Pursuant to sections 105(a) and 365 of the Bankruptcy Code, the Mineral Leases, as amended, *are assumed as of the effective date of the Plan.*

*Id.* at ¶ 3 (emphasis added). This Court retained jurisdiction over the terms of the Assumption Order. *Id.* at ¶ 6.

**ANSWER:**    In response to Paragraph 80, Cliffs admits the factual allegations therein. To the extent that the allegations in Paragraph 80 purport to paraphrase or characterize the Assumption Order, it is a written document that speaks for itself, and Cliffs refers to it for a fair and accurate portrayal of its contents.

81.    Upon information and belief, during the time between the Plan's confirmation and the GPIOP Settlement, as Chippewa and Mesabi sought to work with GPIOP to assume the Mineral Leases, Cliffs approached GPIOP to undermine the negotiating process and try

to obtain the Mineral Leases.  At certain points, Mesabi's negotiations with GPIOP became inexplicably difficult, which upon information and belief was a direct result of Cliffs' efforts to obtain the Mineral Leases.  Moreover, Mesabi believes certain terms of the GPIOP Settlement were driven by Cliff's efforts to obtain the Mineral Leases, and that certain terms of the GPIOP Settlement are worse for Mesabi as a result.

**ANSWER:**     In response to Paragraph 81, Cliffs denies that "during the time between the Plan's confirmation and the [Glacier Park] Settlement, as Chippewa and Mesabi sought to work with [Glacier Park] to assume the Mineral Leases, Cliffs approached [Glacier Park] to undermine the negotiating process and try to obtain the Mineral Leases."  Responding further, Cliffs is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 81 concerning Mesabi's negotiations with Glacier Park, and on that basis denies them.  On information and belief, Cliffs further avers that Chippewa and Mesabi, in negotiations led by Mr. Clarke, refused to further compensate Superior or Glacier Park for any extension past October 31, 2017 because they believed (erroneously) that Superior and Glacier Park would have no other options, and therefore Mr. Clarke knowingly and intentionally allowed the leases to be rejected and reverted.  Cliffs otherwise denies each and every remaining allegation in Paragraph 81.

82.     These actions constitute not only a direct interference with Mesabi's leasehold and contractual interests in the Mineral Leases, but also an effort to derail the Plan as the Mineral Leases represent a material portion of the future mining plan for the Project.

**ANSWER:**     In response to Paragraph 82, Cliffs denies the allegations therein.

83.     Pursuant to the terms of the GPIOP Settlement, from August 28, 2017, GPIOP was obligated to negotiate in good faith the form of and execute the Restated Mineral Leases on "terms and conditions *substantially similar* to the Mineral Leases."  GPIOP Settlement, ¶ 4(a) (emphasis added).  Indeed, paragraph 4(b) of the GPIOP Settlement states this obligation explicitly: "Each of GPIOP, Superior and the Reorganized Debtor shall use commercially reasonable efforts to negotiate and execute the Restated Mineral Leases, and shall not unreasonably withhold, delay, or condition their consent or execution of the Restated Mineral Leases."  GPIOP Settlement, ¶ 4(b).  Instead, during the course of negotiations with Mesabi and the Plan Sponsor, GPIOP was focused on forcing a sale of the property related to the Mineral Leases, or negotiating substantially

revised terms of a new lease.   Additionally, GPIOP told David Pauker and Susan Fennessey (the CRO and COO/GC of the Debtors, respectively) directly that it was interested in selling its property interests, rather than leasing them.  To date, notwithstanding the best efforts of Mesabi and the Plan Sponsor, the form of each of the Restated Mineral Leases has not been fully negotiated and the Restated Mineral Leases have not been executed.  Thus, in accordance with the GPIOP Settlement, on the Effective Date, the Restated Mineral Leases will be deemed amended and restated by consent on the terms already set forth in the Mineral Leases.

**ANSWER:**   In response to Paragraph 83, Cliffs is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations concerning Mesabi's negotiations with Glacier Park, and on that basis denies them.  To the extent that the allegations in Paragraph 83 purport to paraphrase or characterize the Glacier Park Settlement, it is a written document that speaks for itself, and Cliffs refers to it for a fair and accurate portrayal of its contents.  Except as so denied and referred, Cliffs denies each and every remaining allegation in Paragraph 83.

84.   Upon information and belief, the Plan Sponsor, GPIOP, and Superior had reached advanced stages of negotiations related to the Mineral Leases in early December 2017. Indeed, although the Effective Date had not occurred by October 31, 2017, Mesabi and the Plan Sponsor were able to secure extensions of the time to go effective from other Mineral Lessors, including the DNR, and GPIOP specifically stated to David Pauker and Susan Fennessey that it, GPIOP, intended to continue to negotiate in good faith and would not be the reason Mesabi was not able to consummate the Plan.  Moreover, GPIOP went even further and assured Mesabi that it had contacted the Minnesota governor's office as well as the DNR and other interested parties and told them that they were still working with Mesabi and the Plan Sponsor in good faith and intended to execute Restated Mineral Leases.  Upon information and belief, these calls were an important part of Mesabi's and the Plan Sponsor's efforts to keep all interested parties invested in the Project and moving forward toward ultimate consummation of the Plan. Furthermore, the Plan Sponsor relied on GPIOP's representations in order to continue to provide funding for the Debtors' operations; Mesabi also continued to incur administrative expenses based in part on GPIOP's reassurance that it would continue to work with the parties.  The Prepetition Lenders also relied on GPIOP's representations of their continued support in negotiations with the Plan Sponsor related to the Prepetition Lender Notes.

**ANSWER:**   In response to Paragraph 84, Cliffs admits that "the Effective Date had not occurred by October 31, 2017"; that "Mesabi and the Plan Sponsor were able to secure

01:22917216.1

51

extensions of time to go effective from other Mineral Lessors, including the DNR," by October

31, 2017; and that Glacier Park and Superior did not agree to an extension of the Effective Date

beyond October 31, 2017.  Except as so admitted, Cliffs denies each and every remaining

allegation in Paragraph 84.

85.     As the Court is aware, Mesabi has most recently resolved a dispute with certain
        Prepetition Lenders with respect to the indenture governing the Prepetition Lender Notes
        to be issued pursuant to the Plan.  This dispute stemmed from certain changes to the form
        of indenture required to facilitate contemplated Exit Financing and is emblematic of the
        substantial challenges Mesabi has faced in its six month push to consummate the Plan.
        Resolution of this dispute on December 7, 2017,[10] seemed then to have cleared the way
        for the Plan to go effective and bring about a successful resolution of these Chapter 11
        Cases.

        **ANSWER:**     In response to Paragraph 85 and footnote 10, Cliffs is without knowledge

or information sufficient to form a belief as to the truth or falsity of the allegations concerning

Mesabi's dispute with the Prepetition Lenders, and on that basis denies them.  To the extent that

the allegations in Paragraph 85 and footnote 10 purport to paraphrase or characterize the

document filed with this Court at D.I. 1362, this is a written document that speaks for itself, and

Cliffs refers to it for a fair and accurate portrayal of its contents.  Except as so denied and

referred, Cliffs denies each and every remaining allegation in Paragraph 85 and footnote 10.

86.     Unbeknownst to Mesabi, however, upon information and belief, the "negotiations"
        GPIOP had with the Plan Sponsor were a pretense and GPIOP was either being unduly
        influenced by Cliffs or directly conspiring with them to kill the Project and Plan by
        improperly attempting to transfer lease rights to Cliffs.

        **ANSWER:**     In response to Paragraph 86, Cliffs denies the allegations therein.

87.     A new and completely unanticipated complication was introduced on December 11,
        2017.  A press release issued Cliffs that morning provides as follows:

                [Cliffs] announced today that its wholly-owned subsidiary, Cleveland-Cliffs
                Minnesota Land Development LLC, completed an acquisition of certain real

---

10      Mesabi, the Prepetition Lenders, and the Plan Sponsor reached an agreement in principle on all outstanding
        issues following a Court-ordered mediation before Judge Peck. Final documentation on this resolution was
        approved by the Court on December 12, 2017 [D.I. 1362].

estate interests located in Itasca County west of Nashwauk, Minnesota from [GPIOP].  The interests include a combination of undivided and whole fee interests as well as mineral and surface leases, all lying within the Biwabik Iron Formation. The acreage acquired is approximately 553 acres and the acreage being leased is approximately 3,215 acres.

Cliffs expects to be able to leverage the acquired real estate interests to develop a financially sustainable plan for the site, which may be considered as other iron ore resources deplete.  The purchased properties include parcels that were formerly leased by GPIOP to [Mesabi], formerly known as Essar Steel Minnesota. [Mesabi's] lease rights terminated on October 31, 2017 when it failed to exit bankruptcy in connection with Chippewa's inability to timely secure funding and other consents for its plan to take [Mesabi] out of bankruptcy at that time.

Lourenco Goncalves, Chairman, President and Chief Executive Officer, said, "We are enthused about the acquisition of this property, which came into play after Chippewa failed to follow through on its obligation to obtain financing and a bankruptcy exit for [Mesabi] by October 31.  Despite several botched attempts by others, it is now the time for [Cliffs] to sit at the table with other responsible parties and develop a realistic solution for this site." Mr. Goncalves added: "[Cliffs] has been in Minnesota for 115 years, and we currently employ approximately 1,750 people in three separate mining and pelletizing operations throughout the state. As the new owner of this real estate, we know our responsibilities and will not disappoint the people of Minnesota."

*Cleveland-Cliffs Inc. Announces Acquisition of Real Estate Interests in Itasca County, Minnesota* (Dec. 11, 2017), available at http://www.clevelandcliffs.com/English/news-center/news-releases/news-releases-details/2017/Cleveland-Cliffs-Inc-Announces-Acquisition-of-Real-Estate-Interests-in-Itasca-County-Minnesota/default.aspx (the "Cliffs Release").

**ANSWER:**     In response to Paragraph 87, Cliffs admits that on December 11, 2017, it issued a press release ("Cliffs' Dec. 11, 2017 Press Release") to announce that its affiliate, Cliffs Minnesota, had acquired certain real estate interests of Glacier Park in Itasca County, Minnesota, including properties that had formerly been leased by Glacier Park to Mesabi (the "Cliffs/Glacier Park Transaction").  Cliffs' Dec. 11, 2017 Press Release is a written document that speaks for itself, and Cliffs refers to it for a fair and accurate portrayal of its contents.  Except as so admitted and referred, Cliffs denies each and every remaining allegation in Paragraph 87.

88.     On information and belief, all of the mineral and surface rights that are subject to the Mineral Leases, and were intended to be subject to the Restated Mineral Leases, are included in the real estate interests purportedly acquired by Cliffs Minnesota pursuant to the Cliffs Transaction (the "GPIOP Property Interests").  Thus, despite GPIOP's obligation to negotiate the form of and execute the Restated Mineral Leases, upon information and belief, Cliffs, through its wholly-owned subsidiary Cliffs Minnesota, has entered into an agreement to acquire the GPIOP Property Interests, which represent a material portion of the future mining plan for the Project.

        **ANSWER:**      In response to Paragraph 88, Cliffs admits that the Cliffs/Glacier Park

Transaction resulted in the transfer of fee simple or leasehold interests from Glacier Park to

Cliffs Minnesota for all of the properties that Glacier Park previously had leased to Essar (now

Mesabi) under the Mineral Leases.  Responding further, Cliffs avers that the Cliffs/Glacier Park

Transaction was initiated and completed after the October 31, 2017 deadline in the Glacier Park

Settlement, at which time Glacier Park was not subject to any alleged "obligation to negotiate the

form of and execute the Restated Mineral Leases" based on the clear terms of the Glacier Park

Settlement.  Except as so admitted and averred, Cliffs denies each and every remaining

allegation in Paragraph 88.

89.     Pursuant to the Mineral Leases, however, GPIOP was obligated to "defend [Mesabi], its successors and assigns, in the full and peaceful possession of the leasehold estate established [by the Mineral Leases], against all lawful claims and demands whatsoever."

        **ANSWER:**      In response to Paragraph 89, the allegations therein purport to paraphrase

or characterize the Mineral Leases, the Glacier Park Settlement, and the Omnibus Lease

Amendment, each of which is a written document that speaks for itself, and Cliffs refers to each

for a fair and accurate portrayal of its contents.  Except as so referred, Cliffs denies each and

every allegation in Paragraph 89.

90.     GPIOP gave Mesabi no warning or indication that it intended to sell or lease the GPIOP Property Interests to Cliffs.  The first Mesabi and the Plan Sponsor learned that GPIOP did not intend to honor its obligations to Mesabi, including its obligation to execute the Restated Mineral Leases, was on December 11, 2017.  Before Mesabi and the Plan Sponsor saw the Cliffs Release, GPIOP abruptly announced on a conference call with the

Plan Sponsor that it was bound by a confidentiality agreement barring it from discussing the matter further.  On the basis of this purported agreement, GPIOP has refused to provide any information to the Plan Sponsor regarding the agreements and/or transactions described in the Cliffs Release (collectively, the "Cliffs Transaction") or continue discussions with the Plan Sponsor.  On information and belief, even Superior, the owner of an undivided 50% interest in much of the mineral rights that are subject to the Mineral Leases, was kept in the dark regarding the Cliffs Transaction: Superior did not participate in the Cliffs Transaction; did not consent to the Cliffs Transaction; did not know of the Cliffs Transaction before it closed; and did not transfer any of its interests to Cliffs.

**ANSWER:**      In response to Paragraph 90, Cliffs avers that after October 31, 2017, the leases reverted and Glacier Park was free to "take any action with respect to the Mineral Leases and the leased properties and interests and such actions will not constitute a violation of the automatic stay or any other provisions of the Bankruptcy Code."  Glacier Park Settlement § 3(d).  Cliffs admits that Superior owns "an undivided 50% interest" in certain of the properties that are part of the Cliffs/Glacier Park Transaction and did not participate in the Cliffs/Glacier Park Transaction or transfer any of its interests to Cliffs Minnesota, but denies that Superior's consent or knowledge was necessary to the Cliffs/Glacier Park Transaction.  Responding further, Cliffs is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 90 concerning Mesabi's or the Plan Sponsor's knowledge and Glacier Park's conduct, and on that basis denies them.  Except as so admitted, denied, and averred, Cliffs denies each and every remaining allegation in Paragraph 90.

91.      Upon information and belief, prior to and after August 28, 2017, the date of the GPIOP Settlement's execution, GPIOP was involved in discussions with Cliffs regarding Cliffs' potential acquisition of the GPIOP Property Interests.  Indeed, the due diligence and preparation that is required to close a transaction as complex as the mixed purchase and lease of nearly 4,000 acres of land and related mineral rights necessarily requires multiple months of intense negotiation and drafting before such a transaction can be completed.  Thus, on information and belief, GPIOP and Cliffs were engaged in discussions regarding the Cliffs Transaction in direct contravention of GPIOP's obligations under the GPIOP Settlement.

**ANSWER:**      In response to Paragraph 91, Cliffs denies the allegations therein.

01:22917216.1

55

92.     Upon information and belief, Cliffs Minnesota was formed by Cliffs more than three weeks prior to the rejection trigger in the GPIOP Settlement, and conceived of even earlier than that, for the sole purpose of acquiring the GPIOP Property Interests.

**ANSWER:**     In response to Paragraph 92, Cliffs admits that it formed Cliffs Minnesota on October 9, 2017.  Except as so admitted, Cliffs denies each and every remaining allegation in Paragraph 92.

93.     Without access to the GPIOP Property Interests over which Cliffs and Cliffs Minnesota have purportedly acquired control, Mesabi would likely be unable to complete the Project.  Much of the acreage that Cliffs and Cliffs Minnesota acquired from GPIOP that falls within the area for which Mesabi currently has a permit to mine (the "Permit to Mine Area"), and much of what could be mined in the next several years, is surrounded by land owned or leased by Mesabi for the Project, and is not generally accessible to Cliffs and Cliffs Minnesota.  For a mining company to mine the Permit to Mine Area economically, the entire group of available mineral leases within the area must be under the mining company's control.  In other words, Cliffs and Cliffs Minnesota have acquired acreage on which they cannot practicably perform mining activities for the foreseeable future, unless Mesabi is forced to abandon the Project.  Furthermore, the permits granting Mesabi the right to mine are uniquely tied to Mesabi as the permit holder and cannot be simply transferred to Cliffs or Cliffs Minnesota.  On information and belief, these facts were known to Defendants when the Cliffs Transaction was agreed to.

**ANSWER:**     In response to Paragraph 93, Cliffs admits that Mesabi claims it "would likely be unable to complete the Project" without the properties that Cliffs Minnesota acquired in the Cliffs/Glacier Park Transaction, but denies that "Cliffs and Cliffs Minnesota have acquired acreage on which they cannot practicably perform mining activities for the foreseeable future, unless Mesabi is forced to abandon the Project," that Cliffs or Cliffs Minnesota would like to "simply transfer[]" the permits held by Mesabi, and that Mesabi currently holds viable permits to mine.  Responding further, Cliffs avers that it is working on a pre-feasibility study for a mine plan and intends to mine the land that Cliffs Minnesota acquired in the Cliffs/Glacier Park Transaction.  Except as so admitted, denied, and averred, Cliffs denies each and every remaining allegation in Paragraph 93.

01:22917216.1

94.     If effective as intended by Cliffs and Cliffs Minnesota, the foreseeable result of the Cliffs Transaction would be to prevent Plaintiff from completing the Project and, ultimately, to cause the Project to fail and Plaintiff to be forced to cease operations or, at least, to make it much more expensive and time-consuming to implement.  If Plaintiff is prevented from competing in that market, Cliffs would then maintain its monopoly in the Great Lakes Pellet and Iron Market.  On information and belief, this was always the intention of Cliffs and Cliffs Minnesota.

**ANSWER:**    In response to Paragraph 94, Cliffs denies the allegations therein.

95.     Upon information and belief, Cliffs and Cliffs Minnesota have no legitimate business purpose for buying and/or leasing the GPIOP Property Interests.  Rather, their sole purpose for entering into the Cliffs Transaction, whatever it entails, is the destruction of the Project and unlawful elimination of a competitor within the Mesabi Iron Range. Notably, in Cliffs' press release announcing the Cliffs Transaction, Cliffs stated that it intended to use the acquired real estate as "leverage."  Upon information and belief, GPIOP was aware of Cliffs' intentions and knowingly participated in Cliffs' attempts to eliminate competition in the Mesabi Iron Range.

**ANSWER:**    In response to Paragraph 95, Cliffs denies the allegations therein.  To the

extent that the allegations in Paragraph 95 purport to paraphrase or characterize Cliffs' Dec. 11,

2017 Press Release, it is a written document that speaks for itself, and Cliffs refers to it for a fair

and accurate portrayal of its contents.  Responding further, Cliffs avers that it is working on a

pre-feasibility study for a mine plan and intends to mine the land that Cliffs Minnesota acquired

in the Cliffs/Glacier Park Transaction, which is consistent with the full statement in Cliffs' Dec.

11, 2017 Press Release that "Cliffs expects to be able to leverage the acquired real estate interests

to develop a financially sustainable plan for the site, which may be considered as other iron ore

resources deplete."

96.     On information and belief, the Cliffs Transaction is the latest attempt in Cliffs' broad scheme to unlawfully prevent Mesabi from competing with Cliffs in the Mesabi Iron Range in northern Minnesota.  As discussed above, Cliffs' intent to acquire Mesabi's assets existed long before its failed bid for such assets during the bankruptcy process, and has continued since.  This Court's confirmation of the Plan and subsequent implementation orders simply required Cliffs to be more creative in its anticompetitive attempts to destroy Mesabi. Notwithstanding Cliffs' varied and wrongful interferences, Mesabi is prepared to consummate the Plan and go effective.

01:22917216.1

**ANSWER:**     In response to Paragraph 96, Cliffs denies the allegations therein.

97.     Upon information and belief, Cliffs' interference caused delay and significantly increased the cost of the Plan's consummation.

**ANSWER:**     In response to Paragraph 97, Cliffs denies the allegations therein.

98.     Mesabi understands that the Doe Defendants acted in concert with Cliffs in certain or all of the foregoing, which actions were pursuant to a common design and scheme to pursue an unlawful object or course of action to be accomplished by unlawful means with the purpose of competing against Mesabi, to Mesabi's detriment.

**ANSWER:**     In response to Paragraph 98, Cliffs denies the allegations therein.

## CLAIMS

## FIRST CLAIM FOR RELIEF
### (Tortious Interference with Contractual Rights)
### (Against Cliffs and Cliffs Minnesota)

99.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 98 of this Complaint with the same force and effect as though fully set forth herein.

**ANSWER:**     In response to Paragraph 99, Cliffs repeats and realleges its responses to

each and every allegation contained in Paragraphs 1 through 98 as if fully set forth herein.

100.     In addition to the Plan, Plaintiff and certain vendors, suppliers, and contractors are parties to valid, binding and enforceable contracts for construction of the Project.

**ANSWER:**     The allegations in Paragraph 100 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 100 to include factual

allegations that require a response, Cliffs is without knowledge or information sufficient to form

a belief as to the truth or falsity of the allegations concerning Mesabi's "contracts for construction

of the Project," and so denies them and all remaining allegations therein on that basis.

101.     At all relevant times, Cliffs and/or Cliffs Minnesota have known of the existence of Plaintiff's contracts, including the GPIOP Settlement and the Mineral Leases, and their purpose for construction, and ultimately operation, of the Project.

**ANSWER:**     In response to Paragraph 101, Cliffs admits that it knew of the existence of

01:22917216.1

58

the Glacier Park Settlement after it was filed with this Court on August 29, 2017, and that it

knew of the existence of the Mineral Leases as of at least April 2015 when the State of

Minnesota requested that Cliffs provide a declaration of interest.  Except as so admitted, Cliffs

denies each and every remaining allegation in Paragraph 101 that relates to Cliffs.

102.    As described above, Cliffs and/or Cliffs Minnesota has forced and attempted to force various contract counter-parties to cease working with Plaintiff.

 **ANSWER:** In response to Paragraph 102, Cliffs denies each and every allegation that

relates to Cliffs.

103.    On information and belief, Cliffs and/or Cliffs Minnesota tortiously interfered with the rights of Mesabi and its contract counter-parties under the existing contracts.

 **ANSWER:** The allegations in Paragraph 103 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 103 to include factual

allegations that require a response, Cliffs denies the allegations that relate to Cliffs.

104.    Cliffs and/or Cliffs Minnesota intentionally acted in a way to procure the breach of and termination of Mesabi's existing contracts.

 **ANSWER:** The allegations in Paragraph 104 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 104 to include factual

allegations that require a response, Cliffs denies the allegations that relate to Cliffs.

105.    Cliffs' and/or Cliffs Minnesota's conduct was not justified.

 **ANSWER:** The allegations in Paragraph 105 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 105 to include factual

allegations that require a response, Cliffs denies the allegations that relate to Cliffs.

106.    As a direct and proximate result of Cliffs' and/or Cliffs Minnesota's conduct, Mesabi suffered damages due to Cliffs' and/or Cliffs Minnesota's tortious interference as alleged above and in an amount to be proven at trial.

 **ANSWER:** The allegations in Paragraph 106 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 106 to include factual

allegations that require a response, Cliffs denies them.

### SECOND CLAIM FOR RELIEF
**(Tortious Interference with Business Relations or Prospective Economic Advantage)**
**(Against Cliffs and Cliffs Minnesota)**

107.   Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 106 of this Complaint with the same force and effect as though fully set forth herein.

**ANSWER:**   In response to Paragraph 107, Cliffs repeats and realleges its responses to

each and every allegation contained in Paragraphs 1 through 106 as if fully set forth herein.

108.   In addition to the Plan, Plaintiff and certain vendors, suppliers, and contractors are parties to valid, binding and enforceable contracts for construction of the Project.

**ANSWER:**   The allegations in Paragraph 108 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 108 to include factual

allegations that require a response, Cliffs is without knowledge or information sufficient to form

a belief as to the truth or falsity of the allegations concerning Mesabi's "contracts for construction

of the Project" and so denies them and all remaining allegations therein on that basis.

109.   Plaintiff has business relationships and expectancies with various vendors, suppliers, and contractors, with a probability of future economic benefit to Plaintiff.

**ANSWER:**   The allegations in Paragraph 109 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 109 to include factual

allegations that require a response, Cliffs is without knowledge or information sufficient to form

a belief as to the truth or falsity of the allegations concerning Mesabi's "business relationships

and expectancies" and so denies them and all remaining allegations therein on that basis.

110.   At all relevant times, Cliffs and/or Cliffs Minnesota have known of the existence of Plaintiff's contracts and their purpose for construction of the Project the existence of Plaintiff's business relationships with other vendors, suppliers, and contractors described herein.

**ANSWER:**    In response to Paragraph 110, Cliffs denies each and every allegation that

relates to Cliffs.

111.    On information and belief, Cliffs and/or Cliffs Minnesota tortiously interfered with
Mesabi's contracts and its business relationships and expectancies with necessary
vendors, suppliers, and contractors.

**ANSWER:**    The allegations in Paragraph 111 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 111 to include factual

allegations that require a response, Cliffs denies each and every allegation that relates to Cliffs.

112.    As a direct and proximate result of Cliffs' and/or Cliffs Minnesota's conduct, Mesabi
suffered damages due to Cliffs' and/or Cliffs Minnesota's tortious interference as alleged
above and in an amount to be proven at trial.

**ANSWER:**    The allegations in Paragraph 112 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 112 to include factual

allegations that require a response, Cliffs denies them.

### THIRD CLAIM FOR RELIEF
**(Breach of Contract – GPIOP Settlement)**
**(Against GPIOP)**

113.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1
through 112 of this Complaint with the same force and effect as though fully set forth
herein.

**ANSWER:**    In response to Paragraph 113, Cliffs repeats and realleges its responses to

each and every allegation contained in Paragraphs 1 through 112 as if fully set forth herein.

114.    The GPIOP Settlement is a valid, binding, and enforceable contract between GPIOP,
Superior, Chippewa, and the Debtors.

**ANSWER:**    In response to Paragraph 114, Cliffs states that the Third Claim for Relief

is not asserted against Cliffs, and thus no response is required.

01:22917216.1

115.    GPIOP breached its legal obligations under the GPIOP Settlement by failing to comply with the terms of paragraph 4(a) thereof.

    **ANSWER:**    In response to Paragraph 115, Cliffs states that the Third Claim for Relief

is not asserted against Cliffs, and thus no response is required.

116.    Pursuant to paragraph 4(a) of the GPIOP Settlement, GPIOP agreed to "negotiate and execute amended and restated agreements to supersede the Mineral Leases in their entirety" with the Reorganized Debtor, on "terms and conditions substantially similar to the Mineral Leases."

    **ANSWER:**    In response to Paragraph 116, Cliffs states that the Third Claim for Relief

is not asserted against Cliffs, and thus no response is required.

117.    Pursuant to paragraph 4(b) of the GPIOP Settlement, GPIOP agreed to "use commercially reasonable efforts to negotiate and execute the Restated Mineral Leases [with the Reorganized Debtor]" and "not unreasonably withhold, delay, or condition their consent or execution of the Restated Mineral Leases."

    **ANSWER:**    In response to Paragraph 117, Cliffs states that the Third Claim for Relief

is not asserted against Cliffs, and thus no response is required.

118.    By seeking instead to substantially alter the terms of the Restated Mineral Leases, or to negotiate a sale rather than a lease, and by simultaneously negotiating the terms of the Cliffs Transaction with Cliffs, GPIOP violated paragraphs 4(a) and 4(b) of the GPIOP Settlement.

    **ANSWER:**    In response to Paragraph 118, Cliffs states that the Third Claim for Relief

is not asserted against Cliffs, and thus no response is required.

119.    Plaintiff has suffered damages resulting from the breach in an amount to be determined at trial.

    **ANSWER:**    In response to Paragraph 119, Cliffs states that the Third Claim for Relief

is not asserted against Cliffs, and thus no response is required.

01:22917216.1

## FOURTH CLAIM FOR RELIEF
### (Breach of Contract – Mineral Leases)
### (Against GPIOP)

120.  Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 119 of this Complaint with the same force and effect as though fully set forth herein.

  **ANSWER:**    In response to Paragraph 120, Cliffs repeats and realleges its responses to

each and every allegation contained in Paragraphs 1 through 119 as if fully set forth herein.

121.  The GPIOP Settlement is a valid, binding, and enforceable contract between GPIOP, Superior, Chippewa, and the Debtors and incorporates the terms of the Omnibus Lease Amendment.

  **ANSWER:**    In response to Paragraph 121, Cliffs states that the Fourth Claim for Relief

is not asserted against Cliffs, and thus no response is required.

122.  GPIOP breached its legal obligations under the Mineral Leases by failing to comply with the terms of section 2 of the operating agreement incorporated in the Mineral Leases and sections 8 and 11 of the Omnibus Lease Amendment.

  **ANSWER:**    In response to Paragraph 122, Cliffs states that the Fourth Claim for Relief

is not asserted against Cliffs, and thus no response is required.

123.  Pursuant to the indenture of lease incorporated in the Mineral Leases, GPIOP covenanted that it would defend Mesabi "in the full and peaceful possession of the leasehold estate established [by the Mineral Leases], against all lawful claims and demands whatsoever." Furthermore, pursuant to section 2 of the operating agreement incorporated in the Mineral Leases, GPIOP covenanted that Mesabi would "enjoy the quiet and peaceful possession of the Premises . . . during the continuance of [the Mineral Leases]."

  **ANSWER:**    In response to Paragraph 123, Cliffs states that the Fourth Claim for Relief

is not asserted against Cliffs, and thus no response is required.

124.  Pursuant to section 8 of the Omnibus Lease Amendment, no "rights, interests, or obligations under [the Omnibus Lease] Amendment or the Mineral Leases may be assigned, transferred, or disposed of without the Parties' prior written consent."

  **ANSWER:**    In response to Paragraph 124, Cliffs states that the Fourth Claim for Relief

is not asserted against Cliffs, and thus no response is required.

01:22917216.1

125.    Pursuant to section 11 of the Omnibus Lease Amendment, GPIOP agreed to "use commercially reasonable efforts to take, or cause to be taken, all appropriate action, and to do, or cause to be done, all things necessary to fully reflect, consummate, perform and make effective the terms and provisions of [the Omnibus Lease] Amendment . . . ."

        **ANSWER:**    In response to Paragraph 125, Cliffs states that the Fourth Claim for Relief

is not asserted against Cliffs, and thus no response is required.

126.    By allowing Cliffs and/or Cliffs Minnesota to interfere with Mesabi's rights under the Mineral Leases, GPIOP breached its covenants under the Mineral Leases.

        **ANSWER:**    In response to Paragraph 126, Cliffs states that the Fourth Claim for Relief

is not asserted against Cliffs, and thus no response is required.

127.    By transferring the rights, interests, and obligations under the Mineral Leases, GPIOP violated section 8 of the Omnibus Lease Amendment.

        **ANSWER:**    In response to Paragraph 127, Cliffs states that the Fourth Claim for Relief

is not asserted against Cliffs, and thus no response is required.

128.    By failing to negotiate the form of and execute the Restated Mineral Leases, GPIOP violated section 11 of the Omnibus Lease Amendment.

        **ANSWER:**    In response to Paragraph 128, Cliffs states that the Fourth Claim for Relief

is not asserted against Cliffs, and thus no response is required.

129.    Plaintiff has suffered damages resulting from the breach in an amount to be determined at trial.

        **ANSWER:**    In response to Paragraph 129, Cliffs states that the Fourth Claim for Relief

is not asserted against Cliffs, and thus no response is required.

## FIFTH CLAIM FOR RELIEF
### (Breach of Implied Covenant of Good Faith and Fair Dealing – GPIOP Settlement)
### (Against GPIOP)

130.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 129 of this Complaint with the same force and effect as though fully set forth herein.

        **ANSWER:**    In response to Paragraph 130, Cliffs repeats and realleges its responses to

01:22917216.1

each and every allegation contained in Paragraphs 1 through 129 as if fully set forth herein.

131.   Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing requiring that one party not unjustifiably hinder the other party's performance of the contract.

    **ANSWER:**   In response to Paragraph 131, Cliffs states that the Fifth Claim for Relief

is not asserted against Cliffs, and thus no response is required.

132.   The GPIOP Settlement is a valid, binding, and enforceable contract between GPIOP, Superior, Chippewa, and the Debtors, and is governed by Minnesota law.

    **ANSWER:**   In response to Paragraph 132, Cliffs states that the Fifth Claim for Relief

is not asserted against Cliffs, and thus no response is required.

133.   While GPIOP engaged in the pretense of participating in negotiations required by the GPIOP Settlement with Plaintiff regarding the Restated Mineral Leases, it was simultaneously negotiating with Cliffs and/or Cliffs Minnesota with the intent to effectuate the Cliffs Transaction.

    **ANSWER:**   In response to Paragraph 133, Cliffs states that the Fifth Claim for Relief

is not asserted against Cliffs, and thus no response is required.

134.   GPIOP's failure to negotiate the form of and execute the Restated Mineral Leases in good faith prevented Plaintiff from performing its obligations under the GPIOP Settlement.

    **ANSWER:**   In response to Paragraph 134, Cliffs states that the Fifth Claim for Relief

is not asserted against Cliffs, and thus no response is required.

135.   GPIOP has no business justification for such failure to negotiate the form of and execute the Restated Mineral Leases, as required by the GPIOP Settlement.

    **ANSWER:**   In response to Paragraph 135, Cliffs states that the Fifth Claim for Relief

is not asserted against Cliffs, and thus no response is required.

136.   Plaintiff has suffered damages resulting from the breach in an amount to be determined at trial.

    **ANSWER:**   In response to Paragraph 136, Cliffs states that the Fifth Claim for Relief

is not asserted against Cliffs, and thus no response is required.

01:22917216.1

**SIXTH CLAIM FOR RELIEF**
**(Breach of Implied Covenant of Good Faith and Fair Dealing – Mineral Leases)**
**(Against GPIOP)**

137.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 136 of this Complaint with the same force and effect as though fully set forth herein.

    **ANSWER:**    In response to Paragraph 137, Cliffs repeats and realleges its responses to

each and every allegation contained in Paragraphs 1 through 136 as if fully set forth herein.

138.    Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing requiring that one party not unjustifiably hinder the other party's performance of the contract.

    **ANSWER:**    In response to Paragraph 138, Cliffs states that the Sixth Claim for Relief

is not asserted against Cliffs, and thus no response is required.

139.    The Mineral Leases, as amended by the Omnibus Lease Amendment are valid, binding, and enforceable contract between GPIOP, Superior, Chippewa, and Mesabi, and are governed by Minnesota law.

    **ANSWER:**    In response to Paragraph 139, Cliffs states that the Sixth Claim for Relief

is not asserted against Cliffs, and thus no response is required.

140.    While GPIOP engaged in the pretense of participating in negotiations required by the Omnibus Lease Amendment with Plaintiff regarding the Restated Mineral Leases, it was simultaneously negotiating with Cliffs and/or Cliffs Minnesota to effectuate the Cliffs Transaction.

    **ANSWER:**    In response to Paragraph 140, Cliffs states that the Sixth Claim for Relief

is not asserted against Cliffs, and thus no response is required.

141.    GPIOP's transfer of the GPIOP Property Interests and related failure to negotiate the form of and execute the Restated Mineral Leases in good faith prevented Plaintiff from performing its obligations under the Mineral Leases, as set forth in the Omnibus Lease Amendment.

    **ANSWER:**    In response to Paragraph 141, Cliffs states that the Sixth Claim for Relief

is not asserted against Cliffs, and thus no response is required.

01:22917216.1

142.    GPIOP has no business justification for such failure to negotiate the form of and execute the Restated Mineral Leases, as required by the Omnibus Lease Amendment.

      **ANSWER:**    In response to Paragraph 142, Cliffs states that the Sixth Claim for Relief

is not asserted against Cliffs, and thus no response is required.

143.    Plaintiff has suffered damages resulting from the breach in an amount to be determined at trial.

      **ANSWER:**    In response to Paragraph 143, Cliffs states that the Sixth Claim for Relief

is not asserted against Cliffs, and thus no response is required.

**SEVENTH CLAIM FOR RELIEF**
**(Violation of Section 1 of the Sherman Act – Agreements in Restraint of Trade)**
**(Against Cliffs, Cliffs Minnesota, and GPIOP)**

144.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 143 of this Complaint with the same force and effect as though fully set forth herein.

      **ANSWER:**    In response to Paragraph 144, Cliffs repeats and realleges its responses to

each and every allegation contained in Paragraphs 1 through 143 as if fully set forth herein.

145.    Cliffs possesses substantial market power in the Great Lakes Pellet and Iron Market, as demonstrated by, among other things, Cliffs' high market share, barriers to entry, its actual exclusion of competition, and its ability to charge supracompetitive prices in the Great Lakes Pellet and Iron Market.

      **ANSWER:**    The allegations in Paragraph 145 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 145 to include factual

allegations that require a response, Cliffs denies them.  In particular, Cliffs denies that the "Great

Lakes Pellet and Iron Market" is a properly defined relevant antitrust market; that Cliffs

"possesses substantial market power" in any properly defined relevant market; and that Cliffs is

injuring competition in any properly defined relevant market.

146.    As alleged above, Cliffs, using its market power as leverage and as a threat, has entered into agreements with the customers and third parties identified above, among others, including without limitation the Cliffs Transaction with GPIOP, on its own and/or

through Cliffs Minnesota, with the purpose and effect of unreasonably restraining trade and commerce in the Great Lakes Pellet and Iron Market.

**ANSWER:**    The allegations in Paragraph 146 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 146 to include factual allegations that require a response, Cliffs denies them.  In particular, Cliffs denies that the "Great Lakes Pellet and Iron Market" is a properly defined relevant market, and otherwise refers to its response to Paragraph 28.

147.    Cliffs' solicitation and enforcement of the exclusionary contracts described above, including any such conduct engaged in through Cliffs Minnesota, constitute unlawful agreements, contracts, and concerted activity that unreasonably restrain trade in the Great Lakes Pellet and Iron Market in violation of Section 1 of the Sherman Act.

**ANSWER:**    The allegations in Paragraph 147 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 147 to include factual allegations that require a response, Cliffs denies them.  In particular, Cliffs denies that the "Great Lakes Pellet and Iron Market" is a properly defined relevant market.

148.    Cliffs' exclusionary contracts, including contracts entered into through Cliffs Minnesota, have foreclosed a substantial share of competitors and had anticompetitive effects in the Great Lakes Pellet and Iron Market.

**ANSWER:**    The allegations in Paragraph 148 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 148 to include factual allegations that require a response, Cliffs denies them.  In particular, Cliffs denies that the "Great Lakes Pellet and Iron Market" is a properly defined relevant market.

149.    Cliffs' exclusionary contracts have no procompetitive benefit or justification.  The anticompetitive effects of its exclusionary contracts outweigh any purported procompetitive justifications.

**ANSWER:**    The allegations in Paragraph 149 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 149 to include factual

01:22917216.1

allegations that require a response, Cliffs denies them.

150.    As a result of Cliffs' conduct and, among other things, GPIOP's complicity in and
        agreement to that conduct where applicable, the harm to competition caused by that
        conduct, Plaintiff has suffered substantial injuries to its business and property in an
        amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.
        Moreover, Plaintiff will suffer further injury unless the Court enjoins Cliffs from its
        unlawful conduct and continuing violations of the antitrust laws under 15 U.S.C. § 26.
        Such injunctive relief should include, but not be limited to, to the extent necessary to
        protect the Debtors' and the Reorganized Debtor's rights under and interests in the GPIOP
        Settlement, the Mineral Leases, and the Restated Mineral Leases, unwinding the Cliffs
        Transaction.

        **ANSWER:**    The allegations in Paragraph 150 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 150 to include factual

allegations that require a response, Cliffs denies the allegations that relate to Cliffs.

151.    Plaintiff is also entitled to recover from Cliffs, Cliffs Minnesota, and/or GPIOP the costs
        of this suit, including reasonable attorney fees, as provided by 15 U.S.C. §§ 15 and 26.

        **ANSWER:**    The allegations in Paragraph 151 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 151 to include factual

allegations that require a response, Cliffs denies them.

## EIGHTH CLAIM FOR RELIEF
### (Violation of Section 2 of the Sherman Act – Monopolization)
### (Against Cliffs and Cliffs Minnesota)

152.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1
        through 151 of this Complaint with the same force and effect as though fully set forth
        herein.

        **ANSWER:**    In response to Paragraph 152, Cliffs repeats and realleges its responses to

each and every allegation contained in Paragraphs 1 through 151 as if fully set forth herein.

153.    Cliffs has monopolized the relevant market in violation of Section 2 of the Sherman Act.

        **ANSWER:**    The allegations in Paragraph 153 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 153 to include factual

allegations that require a response, Cliffs denies them.

154.   The relevant product market in this case is the Great Lakes Pellet and Iron Market, as defined and described above.

**ANSWER:**   The allegations in Paragraph 154 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 154 to include factual allegations that require a response, Cliffs denies them.  In particular, Cliffs denies that the "Great Lakes Pellet and Iron Market" is a properly defined relevant market.

155.   The relevant geographic market in this case is the Great Lakes region, which includes the Mesabi Iron Range in Minnesota.

**ANSWER:**   The allegations in Paragraph 155 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 155 to include factual allegations that require a response, Cliffs denies them.

156.   At all relevant times, Cliffs possessed monopoly power in the Great Lakes Pellet and Iron Market, as demonstrated by, among other things, Cliffs' high market share and admitted control over pricing.  As noted above, Cliffs charges prices for its products at levels that allow it to achieve profit margins of more than four times the prevailing profit margins in the industry.  In addition, Cliffs' high market share, barriers to entry, and Cliffs' actual exclusion of competition have cemented Cliffs' monopoly power.

**ANSWER:**   The allegations in Paragraph 156 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 156 to include factual allegations that require a response, Cliffs denies them.  In particular, Cliffs denies that the "Great Lakes Pellet and Iron Market" is a properly defined relevant market; that Cliffs has "monopoly power" in any properly defined relevant market; and that Cliffs is injuring competition in any properly defined relevant market..

157.   Plaintiff is informed and believes, and on that basis alleges, Cliffs has implemented the anticompetitive scheme set forth above with the specific intent to maintain its monopoly over the Great Lakes Pellet and Iron Market.  Cliffs' anticompetitive conduct, includes, but is not limited to (a) its agreements with the parties identified above, and other parties, on its own and/or through Cliffs Minnesota, that attempt to lock Mesabi out of the iron

ore business; (b) Cliffs' threats to parties currently doing business with Mesabi or contemplating doing business with Mesabi; and (c) exclusive or otherwise restrictive agreements with potential customers of Mesabi, including but not limited to ArcelorMittal, in an attempt to lock competitors and potential competitors such as Mesabi out of the market for years to come.  Cliffs' scheme constitutes exclusionary conduct within the meaning of Section 2 of the Sherman Act.

**ANSWER:**    The allegations in Paragraph 157 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 157 to include factual allegations that require a response, Cliffs denies them.  In particular, Cliffs denies that the "Great Lakes Pellet and Iron Market" is a properly defined relevant market.

158.    Through the scheme described above, including by blackballing vendors, threatening potential customers, buying/leasing properties with no legitimate business purpose and with the sole purpose of preventing rivals from competing, and other conduct likely to be revealed in discovery, Cliffs has willfully and unlawfully maintained and enhanced its monopoly power.  Cliffs' scheme constitutes exclusionary conduct within the meaning of Section 2 of the Sherman Act.

**ANSWER:**    The allegations in Paragraph 158 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 158 to include factual allegations that require a response, Cliffs denies them.

159.    Cliffs' scheme has suppressed competition and produced anticompetitive effects in the Great Lakes Pellet and Iron Market, including causing Plaintiff's antitrust injury and damages.

**ANSWER:**    The allegations in Paragraph 159 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 159 to include factual allegations that require a response, Cliffs denies them.  In particular, Cliffs denies that the "Great Lakes Pellet and Iron Market" is a properly defined relevant market.

160.    Cliffs' conduct has no procompetitive benefit or justification.  The anticompetitive effects of its behavior outweigh any purported procompetitive justifications.

**ANSWER:**    The allegations in Paragraph 160 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 160 to include factual

allegations that require a response, Cliffs denies them.

161.    As a result of Cliffs' conduct, on its own and/or through Cliffs Minnesota, and the harm
to competition caused by that conduct, Plaintiff has suffered substantial injuries to its
business and property in an amount to be proven at trial and automatically trebled, as
provided by 15 U.S.C. § 15.  Moreover, Plaintiff will suffer further injury unless the
Court enjoins Cliffs from its unlawful conduct and continuing violations of the antitrust
laws under 15 U.S.C. § 26.  Such injunctive relief should include, but not be limited to, to
the extent necessary to protect the Debtors' and the Reorganized Debtor's rights under and
interests in the GPIOP Settlement, the Mineral Leases, and the Restated Mineral Leases,
unwinding the Cliffs Transaction.

  **ANSWER:** The allegations in Paragraph 161 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 161 to include factual

allegations that require a response, Cliffs denies them.

162.    Plaintiff is also entitled to recover from Cliffs costs of suit, including reasonable attorney
fees, as provided by 15 U.S.C. §§ 15 and 26.

  **ANSWER:** The allegations in Paragraph 162 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 162 to include factual

allegations that require a response, Cliffs denies them.

## NINTH CLAIM FOR RELIEF
### (Violation of Section 2 of the Sherman Act – Attempted Monopolization)
### (Against Cliffs and Cliffs Minnesota)

163.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1
through 162 of this Complaint with the same force and effect as though fully set forth
herein.

  **ANSWER:** In response to Paragraph 163, Cliffs repeats and realleges its responses to

each and every allegation contained in Paragraphs 1 through 162 as if fully set forth herein.

164.    Cliffs has attempted to monopolize the Great Lakes Pellet and Iron Market in violation of
Section 2 of the Sherman Act.

  **ANSWER:** The allegations in Paragraph 164 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 164 to include factual

01:22917216.1

allegations that require a response, Cliffs denies them.  In particular, Cliffs denies that the "Great

Lakes Pellet and Iron Market" is a properly defined relevant market.

165.   At all relevant times, Cliffs has possessed substantial monopoly power in the Great Lakes
       Pellet and Iron Market, as demonstrated by Cliffs' power over pricing, high market share,
       and manipulation of its strong position in the U.S. markets to secure volumes and
       improve profitability.

       **ANSWER:**   The allegations in Paragraph 165 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 165 to include factual

allegations that require a response, Cliffs denies them.  In particular, Cliffs denies that the "Great

Lakes Pellet and Iron Market" is a properly defined relevant market; that Cliffs has "monopoly

power" in any properly defined relevant market; and that Cliffs is injuring competition in any

properly defined relevant market..

166.   Plaintiff is informed and believes, and on that basis alleges, Cliffs has implemented the
       anticompetitive scheme set forth above with the specific intent to monopolize the Great
       Lakes Pellet and Iron Market.  Cliffs' anticompetitive conduct, includes, but is not limited
       to (a) its agreements with the parties identified above, and other parties, on its own and/or
       through Cliffs Minnesota, that attempt to lock Mesabi out of the iron ore business; (b)
       Cliffs' threats to parties currently doing business with Mesabi or contemplating doing
       business with Mesabi; and (c) exclusive or otherwise restrictive agreements with
       potential customers of Mesabi, including but not limited to ArcelorMittal, in an attempt
       to lock competitors and potential competitors such as Mesabi out of the market for years
       to come.  Cliffs' scheme constitutes exclusionary conduct within the meaning of Section
       2 of the Sherman Act.

       **ANSWER:**   The allegations in Paragraph 166 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 166 to include factual

allegations that require a response, Cliffs denies them.  In particular, Cliffs denies that the "Great

Lakes Pellet and Iron Market" is a properly defined relevant market.

167.   Upon information and belief, Cliffs' scheme has suppressed competition and produced
       anticompetitive effects in the Great Lakes Pellet and Iron Market, including causing
       Plaintiff's antitrust injury and damages.

       **ANSWER:**   The allegations in Paragraph 167 are legal conclusions to which no

01:22917216.1

73

response is required.  To the extent that the Court deems Paragraph 167 to include factual

allegations that require a response, Cliffs denies them.  In particular, Cliffs denies that the "Great

Lakes Pellet and Iron Market" is a properly defined relevant market.

168.   Upon information and belief, there is a dangerous probability that Cliffs will succeed in unlawfully extending its monopoly in the Great Lakes Pellet and Iron Market through its anticompetitive scheme.   Cliffs' scheme has suppressed competition and has produced anticompetitive effects in the Great Lakes Pellet and Iron Market, including Plaintiff's antitrust injury and damages, based on the statements and conduct described above.

**ANSWER:**   The allegations in Paragraph 168 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 168 to include factual

allegations that require a response, Cliffs denies them.  In particular, Cliffs denies that the "Great

Lakes Pellet and Iron Market" is a properly defined relevant market.

169.   Cliffs' conduct has no procompetitive benefit or justification.  The anticompetitive effects of Cliffs' behavior outweigh any purported procompetitive justifications.

**ANSWER:**   The allegations in Paragraph 169 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 169 to include factual

allegations that require a response, Cliffs denies them.

170.   As a result of Cliffs' conduct, on its own and/or through Cliffs Minnesota, and the harm to competition caused by that conduct, Plaintiff has suffered substantial injuries to its business and property in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.  Moreover, Plaintiff will suffer further injury unless the Court enjoins Cliffs from its unlawful conduct and continuing violations of the antitrust laws under 15 U.S.C. § 26.  Such injunctive relief should include, but not be limited to, to the extent necessary to protect the Debtors' and the Reorganized Debtor's rights under and interests in the GPIOP Settlement, the Mineral Leases, and the Restated Mineral Leases, unwinding the Cliffs Transaction.

**ANSWER:**   The allegations in Paragraph 170 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 170 to include factual

allegations that require a response, Cliffs denies them.

01:22917216.1

171.   Plaintiff is also entitled to recover from Cliffs costs of suit, including reasonable attorney fees, as provided by 15 U.S.C. §§ 15 and 26.

**ANSWER:**   The allegations in Paragraph 171 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 171 to include factual allegations that require a response, Cliffs denies them.

## TENTH CLAIM FOR RELIEF
### (Violation of Minn. Stat. § 325D.52 – Monopolization)
### (Against Cliffs and Cliffs Minnesota)

172.   Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 171 of this Complaint with the same force and effect as though fully set forth herein.

**ANSWER:**   In response to Paragraph 172, Cliffs repeats and realleges its responses to each and every allegation contained in Paragraphs 1 through 171 as if fully set forth herein.

173.   As alleged above, Plaintiff is informed and believes, and on that basis alleges, Cliffs has monopolized the Great Lakes Pellet and Iron Market in violation of Section 325D.52 of the Minnesota Statutes ("Minn. Stat.").

**ANSWER:**   The allegations in Paragraph 173 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 173 to include factual allegations that require a response, Cliffs denies them.  In particular, Cliffs denies that the "Great Lakes Pellet and Iron Market" is a properly defined relevant market.

174.   At all relevant times, Cliffs has possessed substantial monopoly power in the Great Lakes Pellet and Iron Market, as demonstrated by Cliffs' high market share and manipulation of its strong position in the U.S. markets to secure volumes and improve profitability.

**ANSWER:**   The allegations in Paragraph 174 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 174 to include factual allegations that require a response, Cliffs denies them.  In particular, Cliffs denies that the "Great Lakes Pellet and Iron Market" is a properly defined relevant market.

175.   Plaintiff is informed and believes, and on that basis alleges, Cliffs has implemented the anticompetitive scheme set forth above with the specific intent to monopolize the Great Lakes Pellet and Iron Market.  Cliffs' scheme constitutes exclusionary conduct within the meaning of Minn. Stat. § 325D.52.

**ANSWER:**   The allegations in Paragraph 175 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 175 to include factual allegations that require a response, Cliffs denies them.  In particular, Cliffs denies that the "Great Lakes Pellet and Iron Market" is a properly defined relevant market.

176.   Upon information and belief, Cliffs' scheme has suppressed competition and produced anticompetitive effects in the Great Lakes Pellet and Iron Market, including causing Plaintiff's antitrust injury and damages.

**ANSWER:**   The allegations in Paragraph 176 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 176 to include factual allegations that require a response, Cliffs denies them.  In particular, Cliffs denies that the "Great Lakes Pellet and Iron Market" is a properly defined relevant market.

177.   Cliffs' conduct has no procompetitive benefit or justification.  The anticompetitive effects of Cliffs' behavior outweigh any purported procompetitive justifications.

**ANSWER:**   The allegations in Paragraph 177 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 177 to include factual allegations that require a response, Cliffs denies them.

178.   As a result of Cliffs' conduct, on its own and/or through Cliffs Minnesota, and the harm to competition caused by that conduct, Plaintiff has suffered substantial injuries to its business and property in an amount to be proven at trial and automatically trebled, as provided by Minn. Stat. § 325D.57.  Moreover, Plaintiff will suffer further injury unless the Court enjoins Cliffs from its unlawful conduct and continuing violations of the antitrust laws under Minn. Stat. § 325D.58.  Such injunctive relief should include, but not be limited to, to the extent necessary to protect the Debtors' and the Reorganized Debtor's rights under and interests in the GPIOP Settlement, the Mineral Leases, and the Restated Mineral Leases, unwinding the Cliffs Transaction.

**ANSWER:**   The allegations in Paragraph 178 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 178 to include factual

allegations that require a response, Cliffs denies them.

### ELEVENTH CLAIM FOR RELIEF
#### (Violation of Minn. Stat. § 325D.52 – Attempted Monopolization)
#### (Against Cliffs and Cliffs Minnesota)

179.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1
        through 178 of this Complaint with the same force and effect as though fully set forth
        herein.

        **ANSWER:**    In response to Paragraph 179, Cliffs repeats and realleges its responses to

each and every allegation contained in Paragraphs 1 through 178 as if fully set forth herein.

180.    As alleged above, Plaintiff is informed and believes, and on that basis alleges, Cliffs has
        attempted to monopolize the Great Lakes Pellet and Iron Market in violation of Minn.
        Stat. § 325D.52.

        **ANSWER:**    The allegations in Paragraph 180 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 180 to include factual

allegations that require a response, Cliffs denies them.  In particular, Cliffs denies that the "Great

Lakes Pellet and Iron Market" is a properly defined relevant market.

181.    At all relevant times, Cliffs has possessed substantial monopoly power in the Great Lakes
        Pellet and Iron Market, as demonstrated by Cliffs' high market share and manipulation of
        its strong position in the U.S. markets to secure volumes and improve profitability.

        **ANSWER:**    The allegations in Paragraph 181 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 181 to include factual

allegations that require a response, Cliffs denies them.  In particular, Cliffs denies that the "Great

Lakes Pellet and Iron Market" is a properly defined relevant market.

182.    Plaintiff is informed and believes, and on that basis alleges, Cliffs has implemented the
        anticompetitive scheme set forth above with the specific intent to monopolize the Great
        Lakes Pellet and Iron Market.  Cliffs' scheme constitutes exclusionary conduct within the
        meaning of Minn. Stat. § 325D.52.

        **ANSWER:**    The allegations in Paragraph 182 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 182 to include factual

allegations that require a response, Cliffs denies them.  In particular, Cliffs denies that the "Great

Lakes Pellet and Iron Market" is a properly defined relevant market.

183.    Upon information and belief, Cliffs' scheme has suppressed competition and produced
        anticompetitive effects in the Great Lakes Pellet and Iron Market, including causing
        Plaintiff's antitrust injury and damages.

        **ANSWER:**      The allegations in Paragraph 183 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 183 to include factual

allegations that require a response, Cliffs denies them.  In particular, Cliffs denies that the "Great

Lakes Pellet and Iron Market" is a properly defined relevant market.

184.    Cliffs' conduct has no procompetitive benefit or justification.  The anticompetitive effects
        of Cliffs' behavior outweigh any purported procompetitive justifications.

        **ANSWER:**      The allegations in Paragraph 184 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 184 to include factual

allegations that require a response, Cliffs denies them.

185.    As a result of Cliffs' conduct, on its own and/or through Cliffs Minnesota, and the harm
        to competition caused by that conduct, Plaintiff has suffered substantial injuries to its
        business and property in an amount to be proven at trial and automatically trebled, as
        provided by Minn. Stat. § 325D.57.  Plaintiff will suffer further injury unless the Court
        enjoins Cliffs from its unlawful conduct and continuing violations of the antitrust laws
        under Minn. Stat. § 325D.58.  Such injunctive relief should include, but not be limited to,
        to the extent necessary to protect the Debtors' and the Reorganized Debtor's rights under
        and interests in the GPIOP Settlement, the Mineral Leases, and the Restated Mineral
        Leases, unwinding the Cliffs Transaction.

        **ANSWER:**      The allegations in Paragraph 185 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 185 to include factual

allegations that require a response, Cliffs denies them.

01:22917216.1

## TWELFTH CLAIM FOR RELIEF
### (Civil Contempt for Violation of the Automatic Stay)
### (Against Cliffs, Cliffs Minnesota, and Does 1-10)

186.   Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 185 of this Complaint with the same force and effect as though fully set forth herein.

   **ANSWER:**   In response to Paragraph 186, Cliffs repeats and realleges its responses to

each and every allegation contained in Paragraphs 1 through 185 as if fully set forth herein.

187.   Upon the commencement of the Chapter 11 Cases on July 8, 2016, Plaintiff triggered the protections of section 362 of the Bankruptcy Code (the "Automatic Stay").

   **ANSWER:**   In response to Paragraph 187, Cliffs admits the factual allegations therein.

188.   The Automatic Stay prohibits, among other things, "any act to obtain possession of property of the estate or of property from the estate" and "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under [the Bankruptcy Code]."  11 U.S.C. § 362(a)(3) & (a)(6).

   **ANSWER:**   In response to Paragraph 188, Cliffs admits that the allegations appear to

set forth a portion of section 362 of the Bankruptcy Code.  Responding further, Cliffs states that

section 362 of the Bankruptcy Code speaks for itself and, on that basis, denies any allegations in

Paragraph 188 inconsistent therewith.

189.   Cliffs is, and has been, aware that Mesabi had initiated the Chapter 11 Cases, and, upon information and belief, is and has been aware of the ongoing developments during the Chapter 11 Cases.

   **ANSWER:**   In response to Paragraph 189, Cliffs admits that it became aware of the

Debtors' Chapter 11 Cases soon after the filing on July 8, 2016 because the filing was widely

reported in the media.  Responding further, Cliffs avers that it followed the Chapter 11 Cases

because the State of Minnesota had, since at least April 2015, engaged Cliffs in discussions

concerning whether Cliffs would be interested in the site then occupied by Essar (now Mesabi)

in the event that Essar did not meet its obligations under the State's leases, as stated in the

correspondence between Cliffs and the State attached to the Second Amended Complaint as Exhibit 1.  Cliffs further admits that the Debtors pulled Cliffs into the Chapter 11 Cases in August 2016 by filing the *Motion of the Debtor for Entry of an Order Directing Discovery from Cliffs Natural Resources Inc. Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure* [D.I. 234; D.I. 235], to which Cliffs filed an *Objection* [D.I. 298] and then appeared for the hearing on.  This Court, in denying the Debtors' request for most of the discovery sought, specifically noted that the Debtors harbored a "vague hope and suspicion that the root of their troubles may lie in a competitor," namely Cliffs.  [D.I. 355]  Cliffs further admits that the Debtors again pulled Cliffs into the Chapter 11 Cases in September 2017 by filing this adversary proceeding and seeking to keep this litigation out of the Litigation Trusts under the Plan by giving exclusive control over this litigation to the Plan Sponsor, Chippewa, pursuant to a *Certification of Counsel* [D.I. 1304], to which Cliffs filed an *Objection* [D.I. 1314].  Despite stating herein that "prompt action is needed to remediate harm . . . , prevent jeopardy to the confirmed Plan . . . , and avoid future damage," the Debtors did not take initial steps to serve the adversary complaint on Cliffs until November 29, 2017, two-and-a-half months later and only when the service deadline loomed.  Cliffs further admits that, after Cliffs Minnesota purchased and leased certain property interests from Glacier Park, Cliffs filed a *Transfer of Claim Other Than For Security* for Claim Nos. 55 and 224 that had been filed by Glacier Park in the Chapter 11 Cases [D.I. 1370; D.I. 1371].  Cliffs refers to each of these filed documents for a fair and accurate portrayal of its contents.  Responding further, Cliffs denies that it "is and has been aware of the ongoing developments during the Chapter 11 Cases" other than as admitted in this response to Paragraph 189.  Except as so admitted, denied, and referred, Cliffs denies each and every remaining allegation in Paragraph 189.

01:22917216.1

190.    Plaintiff is informed and believes, and on that basis alleges, that the Defendants intentionally violated the automatic stay with malice and oppression, knowing that their actions would cause substantial harm to Plaintiff and with a willful and conscious disregard of Plaintiff's rights.  Plaintiff seeks compensatory damages and an award of exemplary or punitive damages in an amount sufficient to punish all Defendants and deter similar conduct in the future.

    **ANSWER:**    The allegations in Paragraph 190 are legal conclusions and general characterizations regarding Mesabi's claims to which no response is required.  To the extent that the Court deems Paragraph 190 to include factual allegations that require a response, Cliffs denies the allegations that relate to Cliffs.

191.    Plaintiff also requests that the Court issue an order holding all Defendants in contempt of court for their violation of the Automatic Stay and issue appropriate sanctions as a result of their contempt pursuant to Section 105 of the Bankruptcy Code.

    **ANSWER:**    In response to Paragraph 191, Cliffs admits that Mesabi purports to request that this Court issue an order and sanctions based on allegations that contain legal conclusions and general characterizations regarding Mesabi's claims to which no response is required.  To the extent that the Court deems Paragraph 191 to include factual allegations that require a response, Cliffs denies them.

### THIRTEENTH CLAIM FOR RELIEF
### (Declaratory Relief)
### (Against Cliffs, Cliffs Minnesota, and Does 1-10)

192.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 191 of this Complaint with the same force and effect as though fully set forth herein.

    **ANSWER:**    In response to Paragraph 192, Cliffs repeats and realleges its responses to each and every allegation contained in Paragraphs 1 through 191 as if fully set forth herein.

193.    On information and belief, in engaging in the Cliffs Transaction Defendants intentionally sought to obtain possession of property of the Debtors' estates, with malice and oppression, knowing that their actions would cause substantial harm to Plaintiff and with a willful and conscious disregard of Plaintiff's rights.

01:22917216.1

**ANSWER:**     The allegations in Paragraph 193 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 193 to include factual allegations that require a response, Cliffs denies the allegations that relate to Cliffs.

194.     Plaintiff requests that this Court declare that Defendants violated the Automatic Stay in engaging in the Cliffs Transaction.

**ANSWER:**     In response to Paragraph 194, Cliffs admits that Mesabi purports to request that this Court issue a declaration based on allegations that contain legal conclusions and general characterizations regarding Mesabi's claims to which no response is required.  To the extent that the Court deems Paragraph 194 to include factual allegations that require a response, Cliffs denies them.

195.     Plaintiff further requests that this Court declare that the Cliffs Transaction is void, as an action taken in order to obtain possession of property of the estate or of property from the estate, in violation of the Automatic Stay as set forth in Section 362 of the Bankruptcy Code.

**ANSWER:**     In response to Paragraph 195, Cliffs admits that Mesabi purports to request that this Court issue a declaration based on allegations that contain legal conclusions and general characterizations regarding Mesabi's claims to which no response is required.  To the extent that the Court deems Paragraph 195 to include factual allegations that require a response, Cliffs denies them.

**FOURTEENTH CLAIM FOR RELIEF**
**(Civil Contempt for Violation of a Court Order)**
**(Against Cliffs, Cliffs Minnesota, and GPIOP)**

196.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 195 of this Complaint with the same force and effect as though fully set forth herein.

**ANSWER:**     In response to Paragraph 196, Cliffs repeats and realleges its responses to each and every allegation contained in Paragraphs 1 through 195 as if fully set forth herein.

01:22917216.1

197.    The Assumption Order was entered by the Bankruptcy Court on August 30, 2017.

**ANSWER:**    In response to Paragraph 197, Cliffs admits the factual allegations therein.

198.    Plaintiff is informed and believes, and on that basis alleges, that the Defendants intentionally violated the Assumption Order, knowing that their actions would cause substantial harm to Plaintiff, and with a willful and conscious disregard of Plaintiff's rights.

**ANSWER:**    The allegations in Paragraph 198 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 198 to include factual

allegations that require a response, Cliffs denies the allegations that relate to Cliffs.

199.    Plaintiff seeks compensatory damages and an award of exemplary or punitive damages in an amount sufficient to punish Defendants and deter similar conduct in the future.

**ANSWER:**    In response to Paragraph 199, Cliffs admits that Mesabi purports to seek

damages based on allegations that contain legal conclusions and general characterizations

regarding Mesabi's claims to which no response is required.  To the extent that the Court deems

Paragraph 199 to include factual allegations that require a response, Cliffs denies them.

200.    Plaintiff also requests that the Court issue an order holding all Defendants in contempt of court for their violation of the Assumption Order and issue appropriate sanctions as a result of their contempt, pursuant to Section 105 of the Bankruptcy Code.

**ANSWER:**    In response to Paragraph 200, Cliffs admits that Mesabi purports to

request that this Court issue an order and sanctions based on allegations that contain legal

conclusions and general characterizations regarding Mesabi's claims to which no response is

required.  To the extent that the Court deems Paragraph 200 to include factual allegations that

require a response, Cliffs denies them.

## FIFTEENTH CLAIM FOR RELIEF
### (Avoidance and Recovery of Fraudulent Transfers - 11 U.S.C. § 548(a)(1)(B))
### (Against GPIOP)

201.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 200 of this Complaint with the same force and effect as though fully set forth herein.

   **ANSWER:**    In response to Paragraph 201, Cliffs repeats and realleges its responses to

each and every allegation contained in Paragraphs 1 through 200 as if fully set forth herein.

202.     Mesabi transferred certain amounts as part of the Prepaid Royalties to or for the benefit of GPIOP within two (2) years of the Petition Date (the "Avoidable Royalties").

   **ANSWER:**    In response to Paragraph 202, Cliffs states that the Fifteenth Claim for

Relief is not asserted against Cliffs, and thus no response is required.

203.     As transferred to GPIOP, the Avoidable Royalties constitute a transfer of an interest in the property of Mesabi, as a debtor-in-possession in the Chapter 11 Cases.

   **ANSWER:**    In response to Paragraph 203, Cliffs states that the Fifteenth Claim for

Relief is not asserted against Cliffs, and thus no response is required.

204.     The Avoidable Royalties were transferred for less than fair consideration and less than a reasonably equivalent value.

   **ANSWER:**    In response to Paragraph 204, Cliffs states that the Fifteenth Claim for

Relief is not asserted against Cliffs, and thus no response is required.

205.     At the times of, and subsequent to, payment of the Avoidable Royalties, the Debtors had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

   **ANSWER:**    In response to Paragraph 205, Cliffs states that the Fifteenth Claim for

Relief is not asserted against Cliffs, and thus no response is required.

206.     The Avoidable Royalties (1) were paid when the Debtors were insolvent; (2) rendered the Debtors insolvent; (3) left the Debtors with unreasonably small capital in relation to the Debtors' business at the time; or (4) were made for the benefit of an insider.

   **ANSWER:**    In response to Paragraph 206, Cliffs states that the Fifteenth Claim for

Relief is not asserted against Cliffs, and thus no response is required.

207.    By virtue of the foregoing, the Avoidable Royalties were fraudulent transfers avoidable under section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiff is entitled to recover the Avoidable Royalties under section 550 of the Bankruptcy Code.

    **ANSWER:**    In response to Paragraph 207, Cliffs states that the Fifteenth Claim for

Relief is not asserted against Cliffs, and thus no response is required.

### SIXTEENTH CLAIM FOR RELIEF
**(Avoidance of Unauthorized Post-Petition Transfers – 11 U.S.C. § 549)**
**(Against Cliffs, Cliffs Minnesota, and GPIOP)**

208.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 207 of this Complaint with the same force and effect as though fully set forth herein.

    **ANSWER:**    In response to Paragraph 208, Cliffs repeats and realleges its responses to

each and every allegation contained in Paragraphs 1 through 207 as if fully set forth herein.

209.    Under section 549 of the Bankruptcy Code, a debtor in possession "may avoid a transfer of property of the estate – (1) that occurs after the commencement of the case; and (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or (B) that is not authorized under the Bankruptcy Code or by the Court."  11 U.S.C. § 549(a).

    **ANSWER:**    In response to Paragraph 209, Cliffs admits that the allegations appear to

set forth a portion of section 549 of the Bankruptcy Code.  Responding further, Cliffs states that

section 549 of the Bankruptcy Code speaks for itself and, on that basis, denies any allegations in

Paragraph 209 inconsistent therewith.

210.    By enacting the Cliffs Transaction, GPIOP transferred Mesabi's property rights under the Mineral Leases and the Omnibus Lease Amendment to Cliffs and/or Cliffs Minnesota. The Cliffs Transaction constitutes a transfer of interests of Mesabi in property that was made after the Petition Date.

    **ANSWER:**    In response to Paragraph 210, Cliffs denies the allegations therein.

211.    The Cliffs Transaction was never authorized by the Bankruptcy Code, the order approving the GPIOP Settlement, or any other order of this Court.  The Cliffs Transaction was, in fact, prohibited by section 8 of the Omnibus Lease Amendment.

        **ANSWER:**    In response to Paragraph 211, Cliffs denies the allegations therein.

212.    Pursuant to section 549 of the Bankruptcy Code, Plaintiff is entitled to avoid the Cliffs Transaction.

        **ANSWER:**    The allegations in Paragraph 212 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 212 to include factual allegations that require a response, Cliffs denies them.

### SEVENTEENTH CLAIM FOR RELIEF
### (Recovery of Avoided Transfers – 11 U.S.C. § 550)
### (Against Cliffs, Cliffs Minnesota, and GPIOP)

213.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 212 of this Complaint with the same force and effect as though fully set forth herein.

        **ANSWER:**    In response to Paragraph 213, Cliffs repeats and realleges its responses to each and every allegation contained in Paragraphs 1 through 212 as if fully set forth herein.

214.    Section 550(a) of the Bankruptcy Code provides that, to the extent that a transfer is avoided under, among others, sections 548 and 549 of the Bankruptcy Code, Plaintiff is entitled to recover, for the benefit of its estate, the property transferred or, if the court so orders, the value of such property from (a) the initial transferee of such transfer or the entity for whose benefit such transfer was made or (b) any immediate or mediate transferee of such initial transferee.  11 U.S.C. § 550(a).

        **ANSWER:**    In response to Paragraph 214, Cliffs admits that the allegations appear to set forth a portion of section 550 of the Bankruptcy Code.  Responding further, Cliffs states that section 550 of the Bankruptcy Code speaks for itself and, on that basis, denies any allegations in Paragraph 214 inconsistent therewith.

215.    Defendants Cliffs and/or Cliffs Minnesota were the initial transferees of the Cliffs Transaction or the immediate or mediate transferee of such initial transferee or the person for whose benefit the Cliffs Transaction was made.

**ANSWER:**   The allegations in Paragraph 215 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 215 to include factual allegations that require a response, Cliffs denies them.

216. Defendant GPIOP was the initial transferee of the Avoidable Royalties, or the immediate or mediate transferee of such initial transferee or the person for whose benefit the Avoidable Royalties were paid.

**ANSWER:**   The allegations in Paragraph 216 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 216 to include factual allegations that require a response, Cliffs denies them.

217. Pursuant to 11 U.S.C. § 550(a), Plaintiff is entitled to recover from Defendants Cliffs and/or Cliffs Minnesota the Cliffs Transaction and from Defendant GPIOP the Avoidable Royalties, plus costs of this action.

**ANSWER:**   The allegations in Paragraph 217 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 217 to include factual allegations that require a response, Cliffs denies them.

## EIGHTEENTH CLAIM FOR RELIEF
### (Disallowance of Claim Nos. 55 and 224 – 11 U.S.C. § 502(d))
### (Against Cliffs)

218. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 217 of this Complaint with the same force and effect as though fully set forth herein.

**ANSWER:**   In response to Paragraph 218, Cliffs repeats and realleges its responses to each and every allegation contained in Paragraphs 1 through 217 as if fully set forth herein.

219. Plaintiff objects to the allowance of proofs of claim no. 55 and 224 ("Claim Nos. 55 and 224") in their entirety.

**ANSWER:**   In response to Paragraph 219, Cliffs admits that Mesabi purports to object to the allowance of proofs of claim nos. 55 and 224 ("Claim Nos. 55 and 224") in their entirety.

01:22917216.1

220.    On December 14, 2017, GPIOP transferred Claim Nos. 55 and 224 to Cliffs.  *See* D.I. 1370, 1371.

    **ANSWER:**    In response to Paragraph 220, Cliffs admits the factual allegations therein.

221.    Cliffs is a transferee of transfers avoidable under section 548 of the Bankruptcy Code, which property is recoverable under section 550 of the Bankruptcy Code.

    **ANSWER:**    The allegations in Paragraph 221 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 221 to include factual allegations that require a response, Cliffs denies them.

222.    Cliffs has not turned over such property, for which Cliffs is liable under 11 U.S.C. § 550.

    **ANSWER:**    The allegations in Paragraph 222 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 222 to include factual allegations that require a response, Cliffs denies them.

223.    Claim Nos. 55 and 224 are unenforceable against the Debtors under applicable law.

    **ANSWER:**    The allegations in Paragraph 223 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 223 to include factual allegations that require a response, Cliffs denies them.

224.    Mesabi has examined Claim Nos. 55 and 224 and supporting documentation thereto, as well as the Debtors' books and records, to determine whether such claims are accurate and represents bona fide liabilities.  Upon such review, Mesabi has determined that Claim Nos. 55 and 224 do not reflect Mesabi's records and thus are objectionable pursuant to section 502(b)(1) of the Bankruptcy Code.

    **ANSWER:**    In response to Paragraph 224, Cliffs avers that the Second Amended Complaint does not include any actual evidence related to Claims No. 55 and 224 (via declaration or other means) and thus, on its own, is insufficient to overcome the prima facia validity of Claim Nos. 55 and 224.  Responding further, Cliffs is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations concerning

01:22917216.1

Mesabi's examination and determination, and on that basis denies them.  The remaining

allegations in Paragraph 224 are legal conclusions to which no response is required.  To the

extent that the Court deems Paragraph 224 to include additional factual allegations that require a

response, Cliffs denies them.

225.    Pursuant to 11 U.S.C. § 502(d), any and all Claims of Cliffs and/or Cliffs' assignees
        against the Debtors' chapter 11 estates, including those asserted in Claim Nos. 55 and
        224, must be disallowed until such time as Cliffs turns over the Avoidable Royalties, plus
        interest thereon and costs.

        **ANSWER:**    The allegations in Paragraph 225 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 225 to include factual

allegations that require a response, Cliffs denies them.

## NINETEENTH CLAIM FOR RELIEF
### (Injunctive Relief)
### (Against Cliffs and Does 1-10)

226.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1
        through 225 of this Complaint with the same force and effect as though fully set forth
        herein.

        **ANSWER:**    In response to Paragraph 226, Cliffs repeats and realleges its responses to

each and every allegation contained in Paragraphs 1 through 225 as if fully set forth herein.

227.    Plaintiff requests that Cliffs be enjoined from (i) contacting or threatening any existing
        contractors, employees or consultants working on the Project or being engaged to work
        on the Project, regarding the Project, or threatening their relationship or prospective
        relationship with Cliffs based on their work on the Project, (ii) threatening any potential
        contractors, employees, or consultants who may be engaged to work on the Project
        including  by threatening to discontinue their relationship or prospective relationship with
        Cliffs if they work on the Project; (iii) interfering with state, local, or other governmental
        approvals related to the Project, (iv) interfering with debt or equity financing sources for
        the consummation of the Plan, and (v) any other actions designed to prevent
        consummation of the Plan and implementation of the Mesabi's construction and business
        plan.

        **ANSWER:**    In response to Paragraph 227, Cliffs admits that Mesabi purports to

request injunctive relief based on allegations that contain legal conclusions and general

characterizations regarding Mesabi's claims to which no response is required.  To the extent that

the Court deems Paragraph 227 to include factual allegations that require a response, Cliffs

denies them.

### TWENTIETH CLAIM FOR RELIEF
**(Injunctive Relief)**
**(Against All Defendants)**

228.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1
through 227 of this Complaint with the same force and effect as though fully set forth
herein.

**ANSWER:**    In response to Paragraph 228, Cliffs repeats and realleges its responses to

each and every allegation contained in Paragraphs 1 through 227 as if fully set forth herein.

229.    Plaintiff requests that Defendants be enjoined from taking any further action to
implement the Cliffs Transaction, including, but not limited to, any action in furtherance
of the recording or perfection of any interest in property or otherwise, associated with the
Cliffs Transaction, and/or in furtherance of any purported termination of the Mineral
Leases.

**ANSWER:**    In response to Paragraph 229, Cliffs admits that Mesabi purports to

request injunctive relief based on allegations that contain legal conclusions and general

characterizations regarding Mesabi's claims to which no response is required.  To the extent that

the Court deems Paragraph 229 to include factual allegations that require a response, Cliffs

denies them.

### TWENTY-FIRST CLAIM FOR RELIEF
**(Declaratory Relief – 28 U.S.C. §§ 2201 et seq.)**
**(Against All Defendants)**

230.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1
through 229 of this Complaint with the same force and effect as though fully set forth
herein.

**ANSWER:**    In response to Paragraph 230, Cliffs repeats and realleges its responses to

each and every allegation contained in Paragraphs 1 through 229 as if fully set forth herein.

01:22917216.1

90

231.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201 et seq., this Court has the power to declare the rights, status and other legal relations of the parties whether or not further relief could be claimed.

**ANSWER:**    In response to Paragraph 231, Cliffs admits that the allegations purport to paraphrase or characterize a portion of the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*  Responding further, Cliffs states that the Uniform Declaratory Judgment Act speaks for itself and, on that basis, denies any allegations in Paragraph 231 inconsistent therewith.

232.    A real and substantial justiciable controversy exists between Plaintiff and the Defendants as to whether the Mineral Leases are terminated.

**ANSWER:**    The allegations in Paragraph 232 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 232 to include factual allegations that require a response, Cliffs denies them.

233.    Cliffs asserted in the Cliffs Release that the properties subject of the Cliffs Transaction "include parcels that were formerly leased by GPIOP to [Mesabi] . . . .  [Mesabi's] lease rights terminated on October 31, 2017 when it failed to exit bankruptcy . . . ."

**ANSWER:**    In response to Paragraph 233, Cliffs admits that the allegations purport to paraphrase or characterize Cliffs' Dec. 11, 2017 Press Release, which is a written document that speaks for itself, and Cliffs refers to it for a fair and accurate portrayal of its contents.

234.    Plaintiff disputes that the Mineral Leases are terminated.

**ANSWER:**    In response to Paragraph 234, Cliffs admits the factual allegations therein.

235.    On information and belief, the basis for Cliffs' assertion that "[Mesabi's] lease rights terminated on October 31, 2017 when it failed to exit bankruptcy . . . ." is the GPIOP Settlement which provides for the automatic rejection of the Mineral Leases as of October 31, 2017 if the Plan's Effective Date did not occur by such date and permits GPIOP to thereafter take any action with respect to the Mineral Leases and the related real property notwithstanding any provisions of the Bankruptcy Code, including the automatic stay imposed pursuant to 11 U.S.C. § 362(a).

**ANSWER:**    In response to Paragraph 235, Cliffs admits that Mesabi's lease rights

terminated on October 31, 2017 pursuant to the terms of the Glacier Park Settlement, which is a

written document that speaks for itself, and Cliffs refers to it for a fair and accurate portrayal of

its contents and, on that basis, denies any allegations in Paragraph 235 inconsistent therewith.

Except as so admitted, denied, and referred, Cliffs denies each and every remaining allegation in

Paragraph 235.

236.    The Plan's Effective Date did not occur by October 31, 2017.

    **ANSWER:**    In response to Paragraph 236, Cliffs admits the factual allegations therein.

237.    Rejection pursuant to 11 U.S.C. § 365 constitutes a breach but not a termination.

    **ANSWER:**    The allegations in Paragraph 237 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 237 to include factual

allegations that require a response, Cliffs denies them..

238.    The breach resulting from rejection pursuant to 11 U.S.C. § 365 is non-monetary in
        nature.

    **ANSWER:**    The allegations in Paragraph 238 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 238 to include factual

allegations that require a response, Cliffs denies them..

239.    Under the terms of the Mineral Leases, GPIOP may terminate on the basis of a non-
        monetary default only by giving thirty (30) days' notice to cure (subject to tolling
        pursuant to a valid arbitration demand by Plaintiff) and only if Plaintiff fails to cure its
        default prior to the expiration of the cure period.

    **ANSWER:**    In response to Paragraph 239, Cliffs admits that the allegations purport to

paraphrase or characterize the terms of the Mineral Leases, as amended by the Omnibus Lease

Amendment and the Glacier Park Settlement, each of which is a written document that speaks for

itself, and Cliffs refers to each these documents for a fair and accurate portrayal of its contents

and, on that basis, denies any allegations in Paragraph 239 inconsistent therewith.  Except as so

admitted, denied, and referred, Cliffs denies each and every remaining allegation in

Paragraph 239.

240.    GPIOP took no action to terminate the Mineral Leases after October 31, 2017, including, without limitation, by issuing a notice to cure to Plaintiff stemming from its breach pursuant to 11 U.S.C. § 365 or otherwise.

    **ANSWER:**    In response to Paragraph 240, Cliffs denies that Glacier Park was required

to take any action to terminate the Mineral Leases after October 31, 2017 pursuant to the terms

of the Glacier Park Settlement, and denies the remaining allegations in Paragraph 240.

241.    Plaintiff is entitled to a declaration that the Mineral Leases are not terminated.

    **ANSWER:**    The allegations in Paragraph 241 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 241 to include factual

allegations that require a response, Cliffs denies them.

**TWENTY-SECOND CLAIM FOR RELIEF**
**(Declaratory Relief – 28 U.S.C. §§ 2201 et seq.)**
**(Against All Defendants)**

242.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 241 of this Complaint with the same force and effect as though fully set forth herein.

    **ANSWER:**    In response to Paragraph 242, Cliffs repeats and realleges its responses to

each and every allegation contained in Paragraphs 1 through 241 as if fully set forth herein.

243.    A real and substantial justiciable controversy exists between Plaintiff and the Defendants as to whether the Mineral Leases were or shall be assumed pursuant to 11 U.S.C. § 365 as of the Effective Date.

    **ANSWER:**    The allegations in Paragraph 243 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 243 to include factual

allegations that require a response, Cliffs denies them.

244.    As heretofore alleged, the Defendants have asserted that the Mineral Leases are
        terminated, which assertion is incompatible with Plaintiff's assumption of such leases as
        of the Effective Date.

    **ANSWER:**    In response to Paragraph 244, Cliffs admits the factual allegations therein.

245.    Pursuant to the Assumption Order, "[p]ursuant to sections 105(a) and 365 of the
        Bankruptcy Code, the Mineral Leases, as amended, are assumed as of the effective date
        of the Plan."

    **ANSWER:**    In response to Paragraph 245, Cliffs admits that the allegations purport to

paraphrase or characterize the Assumption Order, which is a written document that speaks for

itself, and Cliffs refers to it for a fair and accurate portrayal of its contents and, on that basis,

denies any allegations in Paragraph 245 inconsistent therewith.

246.    The Assumption Order is a writing agreed by GPIOP, Superior, and the Debtors and
        entered as an order by the Bankruptcy Court.

    **ANSWER:**    In response to Paragraph 246, Cliffs admits that the allegations purport to

paraphrase or characterize the Assumption Order, which is a written document that speaks for

itself, and Cliffs refers to it for a fair and accurate portrayal of its contents and, on that basis,

denies any allegations in Paragraph 246 inconsistent therewith.

247.    The GPIOP Settlement provides that "[a]s of the Effective Date of the Plan, GPIOP and
        Superior agree that any pre-Effective Date breaches or defaults under the Mineral Leases
        are cured, and if not curable, are waived."

    **ANSWER:**    In response to Paragraph 247, Cliffs admits that the allegations purport to

paraphrase or characterize the Glacier Park Settlement, which is a written document that speaks

for itself, and Cliffs refers to it for a fair and accurate portrayal of its contents and, on that basis,

denies any allegations in Paragraph 247 inconsistent therewith.

248.    Plaintiff is entitled to a declaration that the Mineral Leases are or were assumed on the
        Effective Date of the Plan.

    **ANSWER:**    The allegations in Paragraph 248 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 248 to include factual

allegations that require a response, Cliffs denies them.

**TWENTY-THIRD CLAIM FOR RELIEF**
**(Declaratory Relief – 28 U.S.C. §§ 2201 et seq.)**
**(Against All Defendants)**

249.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1
        through 248 of this Complaint with the same force and effect as though fully set forth
        herein.

      **ANSWER:**    In response to Paragraph 249, Cliffs repeats and realleges its responses to

each and every allegation contained in Paragraphs 1 through 248 as if fully set forth herein.

250.    A real and substantial justiciable controversy exists between Plaintiff and the Defendants
        as to whether the Reorganized Debtor is entitled to succeed to the rights of the Debtors
        under the Mineral Leases as of the Effective Date.

      **ANSWER:**    The allegations in Paragraph 250 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 250 to include factual

allegations that require a response, Cliffs denies them.

251.    As heretofore alleged, the Defendants have asserted that the GPIOP Mineral Leases are
        terminated, which assertion is incompatible with the Reorganize Debtor's succession to
        Plaintiff's rights under such leases as of the Effective Date.

      **ANSWER:**    In response to Paragraph 251, Cliffs admits the factual allegations therein.

252.    The GPIOP Settlement provides that:

> On or prior to the Effective Date of the Plan, GPIOP, Superior and the
> Reorganized Debtor shall negotiate and execute amended and restated agreements
> to supersede the Mineral Leases in their entirety (the "Restated Mineral Leases"),
> which Restated Mineral Leases shall become fully effective and enforceable on
> the Effective Date. The Restated Mineral Leases shall be in form and substance
> acceptable to GPIOP, Superior and the Reorganized Debtor, preserve all rights
> and obligations under the Minerals Leases, subject to the modifications described
> herein, and contain terms and conditions substantially similar to the Mineral
> Leases unless otherwise agreed by GPIOP, Superior and the Reorganized Debtor.
> The Mineral Leases will be deemed amended and restated by consent on the
> Effective Date of the Plan.

      **ANSWER:**    In response to Paragraph 252, Cliffs admits that the allegations purport to

paraphrase or characterize the Glacier Park Settlement, which is a written document that speaks

for itself, and Cliffs refers to it for a fair and accurate portrayal of its contents and, on that basis,

denies any allegations in Paragraph 252 inconsistent therewith.

253.    The GPIOP Settlement agreement is in full force and effect and is binding on GPIOP, the
        Debtors, the Reorganized Debtor and Superior.  The Reorganized Debtor is specifically
        named as a third party beneficiary of the GPIOP Settlement.

        **ANSWER:**     The allegations in Paragraph 253 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 253 to include factual

allegations that require a response, Cliffs denies them.

254.    Plaintiff is entitled to a declaration that the Mineral Leases, as amended by the Omnibus
        Lease Amendment, are deemed amended and restated by consent of GPIOP and Superior
        as of the Effective Date, with the Reorganized Debtor succeeding to all rights of the
        Debtors thereunder.

        **ANSWER:**     The allegations in Paragraph 254 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 254 to include factual

allegations that require a response, Cliffs denies them.

## TWENTY-FOURTH CLAIM FOR RELIEF
### (Declaratory Relief – 28 U.S.C. §§ 2201 et seq.)
### (Against All Defendants)

255.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1
        through 254 of this Complaint with the same force and effect as though fully set forth
        herein.

        **ANSWER:**     In response to Paragraph 255, Cliffs repeats and realleges its responses to

each and every allegation contained in Paragraphs 1 through 254 as if fully set forth herein.

256.    A real and substantial justiciable controversy exists between Plaintiff and the Defendants
        as to whether Cliffs enjoys superior rights in the GPIOP Property Interests to the rights of
        Plaintiff and the Reorganized Debtor.

        **ANSWER:**     The allegations in Paragraph 256 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 256 to include factual

allegations that require a response, Cliffs denies them.

257.    As heretofore alleged, the Defendants have implied they enjoy superior rights in the GPIOP Property Interests.

    **ANSWER:**    In response to Paragraph 257, Cliffs denies the factual allegations therein.

258.    Plaintiff's rights in the GPIOP Property Interests, to which the Reorganized Debtor succeeded on the Effective Date of the Plan as heretofore alleged, are established of record with the Itasca County Registrar of Titles as Document No. T000050412 and recorded with the Itasca County Recorder as Document No. A0000605819 on or about December 7, 2006, as amended by Registrar of Titles Document No. T000056156.

    **ANSWER:**    In response to Paragraph 258, Cliffs admits that the documents described in Paragraph 258 exist in the record of the Itasca County Recorder or the Itasca County Registrar of Title.  Responding further, Cliffs denies that Mesabi and the Reorganized Debtor had any rights in the property that was the subject of the Cliffs/Glacier Park Transaction as of the date of that transaction or as of the Effective Date.  Cliffs avers that Cliffs Minnesota lawfully acquired certain real estate interests from Glacier Park after the Mineral Leases were rejected and reverted, and thereafter recorded those interests.  Except as so admitted, denied, and averred, Cliffs denies each and every remaining allegation in Paragraph 258.

259.    Cliffs' interests in the GPIOP Property Interests, if any, were acquired on or about December 11, 2017 and established of record December 13, 2017, as Document No. T000064047.

    **ANSWER:**    In response to Paragraph 259, Cliffs admits that its affiliate, Cliffs Minnesota, acquired leasehold interests from Glacier Park on December 9, 2017, and evidence of such interests was recorded with the Itasca County Registrar of Title on December 13, 2017, as Document No. T000064047, and with the Itasca County Recorder on December 13, 2017, as Document No. A000718601.  Responding further, Cliffs states that its affiliate, Cliffs Minnesota, acquired fee simple interests from Glacier Park on December 9, 2017, and evidence of such interests was recorded with the Itasca County Registrar of Title on December 12, 2017, as

Document No. T000064041.  Each of these recorded documents is a written document that speaks for itself, and Cliffs refers to each for a fair and accurate portrayal of its contents.  Except as so admitted, denied, and referred, Cliffs denies each and every remaining allegation in Paragraph 259.

260.    At the time that Cliffs acquired its interests in the GPIOP Property Interests, if any, it had constructive notice of Plaintiff's and the Reorganized Debtor's interests.

    **ANSWER:**    The allegations in Paragraph 260 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 260 to include factual allegations that require a response, Cliffs denies them.  Responding further, Cliffs denies that Mesabi and the Reorganized Debtor had any rights in the property that was the subject of the Cliffs/Glacier Park Transaction as of the date of that transaction or as of the Effective Date. Cliffs avers that Cliffs Minnesota lawfully acquired certain real estate interests from Glacier Park after the Mineral Leases were rejected and reverted, and thereafter recorded those interests. Except as so denied and averred, Cliffs denies each and every remaining allegation in Paragraph 260.

261.    At the time that Cliffs acquired its interests in the GPIOP Property Interests, if any, it had actual notice of Plaintiff's and the Reorganized Debtor's interests.

    **ANSWER:**    The allegations in Paragraph 261 are legal conclusions to which no response is required.  To the extent that the Court deems Paragraph 261 to include factual allegations that require a response, Cliffs denies them.  Responding further, Cliffs denies that Mesabi and the Reorganized Debtor had any rights in the property that was the subject of the Cliffs/Glacier Park Transaction as of the date of that transaction or as of the Effective Date. Cliffs avers that Cliffs Minnesota lawfully acquired certain real estate interests from Glacier Park after the Mineral Leases were rejected and reverted, and thereafter recorded those interests.

Except as so denied and averred, Cliffs denies each and every remaining allegation in

Paragraph 261.

262.    Plaintiff is entitled to a declaration that its interests in the GPIOP Property Interests, to which the Reorganized Debtor succeeded on the Effective Date, are superior to the interests of Cliffs, if any, in the GPIOP Property Interests.

    **ANSWER:**    The allegations in Paragraph 262 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 262 to include factual

allegations that require a response, Cliffs denies them.

## TWENTY-FIFTH CLAIM FOR RELIEF
### (Civil Conspiracy)
### (Against All Defendants)

263.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 262 of this Complaint with the same force and effect as though fully set forth herein.

    **ANSWER:**    In response to Paragraph 263, Cliffs repeats and realleges its responses to

each and every allegation contained in Paragraphs 1 through 262 as if fully set forth herein.

264.    Defendants acted in concert and pursuant to a common design and scheme to pursue an unlawful object or course of action to be accomplished by unlawful means, with the purpose of preventing Mesabi from competing against Cliffs, to Mesabi's detriment.

    **ANSWER:**    The allegations in Paragraph 264 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 264 to include factual

allegations that require a response, Cliffs denies them.

265.    Defendants committed acts in furtherance of the conspiracy, including, not limited to, tortious interference with Mesabi's contractual rights, tortious interference with Mesabi's business relationships, violation of the Automatic Stay, and anti-trust claims, without a reasonable or lawful excuse.  All Defendants were willful participants in this joint activity.

    **ANSWER:**    The allegations in Paragraph 265 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 265 to include factual

01:22917216.1

allegations that require a response, Cliffs denies them.

266.    As a direct and proximate result of these unlawful acts, Mesabi has suffered damages as alleged above and in an amount to be proven at trial.

**ANSWER:**    The allegations in Paragraph 266 are legal conclusions to which no

response is required.  To the extent that the Court deems Paragraph 266 to include factual

allegations that require a response, Cliffs denies them.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Mesabi prays for relief and judgment against Defendants as follows:

A.    Enter judgment in favor of Plaintiff and against the Defendants in this action on each claim;

B.    Enjoin Defendants from (i) contacting or threatening any existing contractors, employees or consultants working on the Project or being engaged to work on the Project, regarding the Project, or threatening their relationship or prospective relationship with Cliffs based on their work on the Project, (ii) threatening any potential contractors, employees, or consultants who may be engaged to work on the Project including  by threatening to discontinue their relationship or prospective relationship with Cliffs if they work on the Project; (iii) interfering with state, local, or other governmental approvals related to the Project, (iv) interfering with debt or equity financing sources for the consummation of the Plan, and (v) any other actions designed to prevent consummation of the Plan and implementation of Mesabi's construction and business plan.

C.    Avoid the Cliffs Transaction and direct the Defendants to unwind the transactions related thereto and return to Plaintiff the property that is subject of the Cliffs Transaction, pursuant to 11 U.S.C. §§ 549 and 550, plus the costs and expenses of this action, including, without limitation, attorneys' fees;

D.    Disallow any claims held or filed by the Defendants against Plaintiff until the Defendants return the Cliffs Transaction to Plaintiff pursuant to 11 U.S.C. § 502(d);

E.    Award general and compensatory damages in favor of Plaintiff on all claims against the Defendants to those claims, jointly and severally, for all damages sustained by Mesabi, in an amount to be proven at trial, plus prejudgment interest;

F.    Award treble damages as allowed by law;

G.    Award all appropriate equitable remedies, including injunctive relief, as by law, in favor of Plaintiff on all claims against the Defendants, including but not limited to an order enjoining Cliffs and Cliffs Minnesota from entering into exclusive or restrictive arrangements with purchasers of pellet products, an order enjoining the other anticompetitive conduct described above, an order enjoining Cliffs, Cliffs Minnesota, and GPIOP from taking any further action to implement the Cliffs Transaction, including, but not limited to, any action in

01:22917216.1

furtherance of the recording or perfection of any interest in property or otherwise, associated with the Cliffs Transaction, and/or in furtherance of any purported termination of the Mineral Leases;

H.   Award punitive damages and prejudgment interest in favor of Plaintiff as allowed by law;

I.   Award any declaratory relief that may be necessary and appropriate, including but not limited to an order declaring (i) that the Mineral Leases are not terminated and are or were assumed on the Effective Date of the Plan, (ii) that the Mineral Leases, as amended by the Omnibus Lease Amendment, are deemed amended and restated by consent of GPIOP and Superior as of the Effective Date, with the Reorganized Debtor succeeding to all rights of the Debtors thereunder, and (iii) that Mesabi's interests in the GPIOP Property Interests, to which the Reorganized Debtor succeeded on the Effective Date, are superior to the interests of Cliffs and/or Cliffs Minnesota, if any, in the GPIOP Property Interests.

J.   Award Plaintiff its attorneys' fees, costs, and other expenses incurred in this action, as allowed by law; and

K.   Grant Plaintiff such other and further relief as the Court considers appropriate.

**ANSWER:**   In response to the "Prayer for Relief" and "Wherefore" paragraph, including subparts A through K, Cliffs denies that Mesabi is entitled to any relief and denies all allegations contained therein.

## JURY DEMAND

Pursuant to Bankruptcy Rules 9015 and 5005, Cliffs demands a jury trial on each count of the Second Amended Complaint.

## RULE 7012(B) STATEMENT

Pursuant to Bankruptcy Rule 7012(b), Cliffs hereby gives notice that it does not consent to entry of final orders or judgment by the bankruptcy court.

## AFFIRMATIVE DEFENSES

Cliffs sets forth below its affirmative defenses.  Each defense is asserted as to all claims against Cliffs.  By setting forth these affirmative defenses, Cliffs does not assume the burden of proving any fact, issue, or element of a cause of action where such burden properly belongs to

01:22917216.1

Mesabi.  Moreover, nothing stated herein is intended or shall be construed as an admission that any particular issue or subject matter is relevant to Mesabi's allegations.

As separate and distinct affirmative defenses, Cliffs alleges as follows:

### First Affirmative Defense:

The Second Amended Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense:

Mesabi's claims are barred, in whole or in part, by the express terms of the Glacier Park Settlement, the Mineral Leases, or the Assumption Order.

### Third Affirmative Defense:

Mesabi's claims are barred, in whole or in part, to the extent that there is no cognizable legal injury and Mesabi has suffered no damages.

### Fourth Affirmative Defense:

Mesabi's claims are barred, in whole or in part, by the doctrines of waiver, estoppel, laches, and unclean hands.

### Fifth Affirmative Defense:

Mesabi's claims are barred, in whole or in part, for failure of Mesabi to satisfy the condition(s) precedent in the Glacier Park Settlement, the Mineral Leases, or the Assumption Order.

### Sixth Affirmative Defense:

Mesabi's claims are barred, in whole or in part, on the ground that any conduct of Cliffs was based on its economic interest or was otherwise justified.

### Seventh Affirmative Defense:

Mesabi's claims are barred, in whole or in part, on the ground that any conduct of Cliffs was privileged.

01:22917216.1

### Eighth Affirmative Defense:

Mesabi's claims are barred, in whole or in part, on the ground that Mesabi has failed to mitigate damages.

### Ninth Affirmative Defense:

Mesabi is barred from recovery because it materially breached the contract(s) on which it has based its claims, including but not limited to any contracts on which it bases its First and Second Claims for Relief.

### Tenth Affirmative Defense:

Mesabi's claims are barred, in whole or in part, because its alleged contract counterparties have fully performed, including but not limited to any counterparties to the contracts on which it bases its First and Second Claims for Relief.

### Eleventh Affirmative Defense:

Mesabi's claims are barred, in whole or in part, by the doctrine of impossibility of performance, including but not limited to the impossibility of performance by any counterparties to the contracts on which it bases its First and Second Claims for Relief.

### Twelfth Affirmative Defense:

Mesabi's claims are barred, in whole or in part, by the doctrine of avoidance, including but not limited to the avoidance of any contracts on which it bases its First and Second Claims for Relief.

### Thirteenth Affirmative Defense:

Mesabi's claims are barred, in whole or in part, on the ground that any conduct engaged in by Cliffs has been reasonable, based upon independent business and economic justifications, without any purpose or intent to injure competition.

01:22917216.1

### Fourteenth Affirmative Defense:

Mesabi's claims are barred, in whole or in part, because Cliffs' actions were taken in pursuit of its own economic interests, not by wrongful means.

### Fifteenth Affirmative Defense:

If Mesabi has suffered or will suffer damages, such damages were not caused by Cliffs but are solely due to the fault, negligence, or other conduct of Mesabi or other parties or individuals for which Cliffs has no responsibility.  There is no causal relationship between the losses alleged, if any, and any alleged wrongful acts or omissions by Cliffs.

### Sixteenth Affirmative Defense:

Any injury suffered by Mesabi is not an injury which the antitrust laws are designed to prevent, or which flows from anything which would make Cliffs' alleged conduct unlawful under the antitrust laws.

### Seventeenth Affirmative Defense:

Mesabi's claims are barred, in whole or in part, because Cliffs' conduct did not lessen competition in any relevant properly defined market.

### Eighteenth Affirmative Defense:

Mesabi's claims are barred, in whole or in part, because none of Cliffs' challenged actions or omissions substantially lessened competition within any properly defined market.

### Nineteenth Affirmative Defense:

All or some of Mesabi's claims are barred by the Noerr-Pennington doctrine.

### Twentieth Affirmative Defense:

Mesabi's claims against Cliffs are barred to the extent any actionable conduct was committed by any individual acting ultra vires.

01:22917216.1

## Twenty-first Affirmative Defense:

Mesabi's claims are barred to the extent they are based on alleged acts, conduct, or statements of Cliffs that are specifically permitted by law.

## Twenty-second Affirmative Defense:

Mesabi's claims are barred to the extent any injuries or damages Mesabi may have suffered were caused solely and proximately by the acts and omissions of others, and not by Cliffs.

## Twenty-third Affirmative Defense:

Mesabi's claims are barred, in whole or in part, because Cliffs is not liable for the acts of any other defendant.

## Twenty-fourth Affirmative Defense:

Mesabi's claims for injunctive relief are barred to the extent that Mesabi has available an adequate remedy at law.

## Twenty-fifth Affirmative Defense:

The Second Amended Complaint, in whole or in part, fails to state an adequate basis for an award of treble damages.

## Twenty-sixth Affirmative Defense:

Mesabi's claims are barred, in whole or in part, because Cliffs did not interfere with the business relations between Mesabi and any third-party.

## Twenty-seventh Affirmative Defense:

Mesabi's claims are barred, in whole or in part, because Cliffs did not act with the purpose of harming Mesabi nor did Cliffs' conduct constitute a crime or an independent tort.

01:22917216.1

## **Twenty-eighth Affirmative Defense:**

Cliffs has not knowingly and intentionally waived any applicable affirmative defenses and reserves the right to raise additional affirmative defenses as they become known to it through discovery in this matter.  Cliffs further reserves the right to amend its answer and/or affirmative defenses accordingly and/or to delete affirmative defenses that it determines are not applicable during the course of subsequent discovery.

**WHEREFORE,** Defendant Cliffs respectfully requests that this Court enter proposed facts and conclusions of law to the District Court recommending entry of a judgment in Cliffs' favor and against Plaintiff Mesabi by adjudging and decreeing that:

A.      Mesabi's claims as to Cliffs be dismissed with prejudice;

B.      Cliffs has not violated Sections 1 or 2 of the Sherman Act, 15 U.S.C. §§ 1, 2;

C.      Cliffs has not violated any applicable state unfair competition laws;

D.      Cliffs has not violated any orders of this Court;

E.      Mesabi is not entitled to any relief under 11 U.S.C. §§ 549 and 550;

F.      Mesabi is not entitled to any relief under 11 U.S.C. § 502;

G.      Mesabi is not entitled to recover any damages from Cliffs;

H.      Mesabi is not entitled to punitive damages;

I.      Mesabi is not entitled to equitable relief;

J.      Cliffs recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

K.      Cliffs receive such other or further relief as may be just and proper.

01:22917216.1

## **COUNTERCLAIMS**

1.      The Cliffs Counterclaim-Plaintiffs incorporate by reference all above responses as if fully set forth herein, and assert the following counterclaims against Counterclaim-Defendant Mesabi, Counterclaim-Defendant Chippewa, and Counterclaim-Defendant Mr. Clarke for their interference with the Cliffs Counterclaim-Plaintiffs' prospective business, wrongfully intimidating Superior into abandoning a potential transaction with the Cliffs Counterclaim-Plaintiffs, conspiring to improperly harm the Cliffs Counterclaim-Plaintiffs' business interests, defaming Cliffs, and other related claims.

2.      In January 2018, Cliffs contacted Superior about a possible real estate transaction. After Cliffs, through its affiliate Cliffs Minnesota, acquired property interests from Glacier Park, Cliffs and Cliffs Minnesota became Superior's co-tenants.  Cliffs and Cliffs Minnesota wanted to work with Superior as Cliffs had done multiple times in the past on other mining real estate.

3.      Cliffs, Cliffs Minnesota, and Superior attempted to negotiate a potential real estate transaction throughout January 2018.

4.      Mesabi, Chippewa, and Mr. Clarke sought to stop Cliffs and Cliffs Minnesota from finalizing a deal with Superior.  Mesabi, with direction, guidance, and assistance from Chippewa and Mr. Clarke, amended its complaint in this action to add Glacier Park as a party by alleging claims related to Glacier Park's recent real estate transaction with Cliffs Minnesota and interactions with Cliffs.

5.      Mesabi, Chippewa, and Mr. Clarke used the lawsuit against Glacier Park to coerce Superior into abandoning its ongoing discussions and open dialogue with Cliffs and Cliffs Minnesota.

01:22917216.1

6.      After interfering with Cliffs and Cliffs Minnesota's potential transaction with Superior, Mr. Clarke defamed Cliffs in letters to local unions and in the press, which harmed Cliffs' reputation.

7.      Because of Mesabi's, Chippewa's, and Mr. Clarke's wrongful interference, Cliffs and Cliffs Minnesota lost the benefit they would have enjoyed in consummating a transaction with Superior.  Cliffs and Cliffs Minnesota are entitled to damages, including punitive damages, for each of Mesabi's, Chippewa's, and Mr. Clarke's malicious misconduct.

## PARTIES

8.      Counter-Plaintiff Cleveland-Cliffs Inc. is a corporation organized under the laws of the State of Ohio with is principal place of business at 200 Public Square, Suite 3300, Cleveland, Ohio 44114.  Founded in 1847, Cliffs is the oldest independent iron ore mining company in the United States.  Cliffs supplies iron ore pellets to customers in North America from its mines and pellet plants in Minnesota and Michigan.

9.      Counter-Plaintiff Cleveland-Cliffs Minnesota Land Development LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 200 Public Square, Suite 3300, Cleveland, Ohio 44114.  Cliffs and Cliffs Minnesota are referred to collectively herein as the "Cliffs Counterclaim-Plaintiffs."

10.      On information and belief, Counter-Defendant Mesabi Metallics Company LLC is a limited liability company organized and licensed under the laws of the State of Minnesota, with its principal place of business at 17113 County Road 58, P.O. Box 25, Nashwauk, MN 55769, and is a wholly-owned subsidary of ESML Holdings Inc.  Mesabi is formerly known as Essar Steel Minnesota LLC.

01:22917216.1

11.     On information and belief, Counter-Defendant Chippewa Capital Partners, LLC is a limited liability corporation organized and licensed under the laws of Minnesota, with its principal place of business at 15 Appledore Lane, Natural Bridge, VA 24578.  Chippewa became Plan Sponsor on or about April 26, 2017.  Chippewa acquired Mesabi on or about June 13, 2017.

12.     On information and belief, Counter-Defendant Thomas M. Clarke is principal and Chief Executive Officer of Chippewa as well as the Chief Executive Officer of Mesabi. Mr. Clarke is a resident of Virginia.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).  This is a non-core proceeding pursuant to 28 U.S.C. § 157(b).

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1409.

15.     This Court has jurisdiction of these counterclaims pursuant to Federal Rule of Bankruptcy Procedure 7013.

## FACTUAL ALLEGATIONS

16.     Cliffs was founded in 1847 in Cleveland, Ohio to mine hematite and magnetite ores in Michigan's Upper Peninsula.  2017 marked Cliffs' 170 year anniversary in the iron ore mining business.

17.     Cliffs has mined iron ore in Minnesota since 1905 when it opened the Crosby mine near Nashwauk in Itasca County.

18.     Today Cliffs operates four iron ore mines in the United States, three of which are located in Minnesota (Northshore, United Taconite, and Hibbing mines).  Its U.S.-based mines currently can produce approximately 27.4 million long tons of iron ore pellets annually for use in the steelmaking process.

01:22917216.1

## Superior's Property Interests

19.     Superior has been involved in mining land management in Minnesota for over a century.  Its roots go back to the 1890s, when three families, the Pillsburys, Bennetts, and Longyears, formed a partnership to oversee iron ore companies after discovering iron ore on the Pillsbury family's land.  The families continued working together throughout the 20th century, forming various corporations and joint ventures to manage and administer their Minnesota mining lands.  In 2009, the families consolidated their holdings of various companies into Superior Mineral Resources LLC, and operate today as one entity.

20.     Cliffs and Superior have worked together in the iron ore mining business for decades.  Through this extended business relationship, Superior has leased to Cliffs, or managed leases for other fee owners to Cliffs, thousands of acres of mineral lands in Minnesota and Michigan.

21.     Currently, Superior both leases land to Cliffs and manages land leases to Cliffs near Hibbing, Minnesota, which lands Cliffs uses to mine iron ore for use at its Hibbing Taconite facility.  Superior also currently leases land in Michigan to Cliffs for mining operations.

22.     Cliffs maintains regular contact with Superior regarding the leases and mineral asset management, including royalty payments and rate adjustments, lease expiration and renewal, operations, and administrative paperwork.

23.     Throughout their business relationship, Superior has engaged with Cliffs to negotiate long-term leases for available mineral lands.  For example, the parties recently extended significant leasehold interests at Hibbing Taconite Company.

24.     Superior owns an undivided 50% co-tenancy interest in certain parcels of land in the Mesabi Iron Range near the Butler Mine outside Nashwauk, Minnesota totaling

01:22917216.1

110

approximately 1059 acres ("Property Interests").  Glacier Park owned the remaining

50% co-tenancy interest in the Property Interests until December 9, 2017.

25.    On November 29, 2006, Superior and Glacier Park entered into a lease agreement

with Minnesota Steel Industries LLC ("Minnesota Steel") to lease the Property Interests for

taconite ore mining purposes.  The parties entered into an operating agreement the same day

(together with the lease, the "Co-tenancy Mineral Lease").

26.    On information and belief, on or about January 1, 2012, Minnesota Steel

Industries LLC's rights to the Co-tenancy Mineral Lease were transferred to Essar Steel

Minnesota LLC ("Essar Steel").

27.    On July 8, 2016, Essar Steel and ESML Holdings Inc. (together, "the Debtors")

filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code,

11 U.S.C. §§ 101, et seq. ("Bankruptcy Code").  The Debtors listed the Co-tenancy Mineral

Lease on their Schedule G: Executory Contracts and Unexpired Leases.  [See D.I. 224 at 106.]

28.    By operation of the Bankruptcy Code, the Debtors' July 8, 2016 petition filing

initiated an automatic stay on all of the assets of the Debtors' estates.  The automatic stay

prohibited Glacier Park and Superior from exercising their respective rights to terminate

the Co-tenancy Mineral Lease.  Glacier Park and Superior were therefore required to continue

performance under the Co-tenancy Mineral Lease until the Debtors assumed or rejected

the Co-tenancy Mineral Lease pursuant to section 365 of the Bankruptcy Code.

29.    On June 8, 2017, the Debtors filed the *Third Amended Chapter 11 Plan of

Reorganization of Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML

Holdings Inc.* [D.I. 990] (the "Plan"), which "constituted a motion to assume the Mineral and

Surface Leases pursuant to section 365(a) and (b) of the Bankruptcy Code."  [D.I. 990 at 47.]

01:22917216.1

The Co-tenancy Mineral Lease was included in the definition of "Mineral and Surface Leases" as used in the Third Amended Plan.  [Id. at 9.]

30.     On July 14, 2017, Glacier Park objected to the Debtors' attempted assumption of the Co-tenancy Mineral Lease, as well as Glacier Park's other leases with the Debtors.  [D.I. 1093.]  Glacier Park stated that the Debtors had not met their burden to show that they could cure defaults under the Co-tenancy Mineral Lease nor provide adequate assurance of future performance under the Co-tenancy Mineral Lease.  [Id.]

31.     On August 28, 2017, Superior, Chippewa, the Debtors, and Glacier Park executed the Glacier Park Settlement.  [D.I. 1168-1.]  The Glacier Park Settlement specifically conditioned any assumption of the Co-tenancy Mineral Lease on the occurrence of the Effective Date (as defined in the Third Amended Plan) happening on or before October 31, 2017.  See Glacier Park Settlement § 3(b).  If the Effective Date did not occur by October 31, 2017, "the [Co-tenancy Mineral Lease] will be automatically rejected . . . and revert to . . . [Glacier Park] and Superior, as applicable, without further Bankruptcy Court proceedings or litigation." See id. § 3(d).

32.     The Effective Date did not occur until December 22, 2017.

33.     On information and belief, Glacier Park and Superior wanted the Property Interests to be free from restriction and used to generate revenue through productive mining operations as soon as possible.

**Mesabi's Attack on Glacier Park**

34.     On December 11, 2017, Cliffs announced that its affiliate, Cliffs Minnesota, had completed an acquisition of certain real estate interests located in Itasca County west of Nashwauk, Minnesota from Glacier Park.  The interests included a combination of Glacier Park's

01:22917216.1

undivided and whole fee interests as well as mineral and surface leases within the Mesabi Iron

Range.  The Cliffs Counterclaim-Plaintiffs acquired approximately 553 acres, including Glacier

Park's 50% interest in the Property Interest, and leased approximately 3,215 acres from Glacier

Park.

35.     By purchasing Glacier Park's ownership rights in the Property Interests, the Cliffs

Counterclaim-Plaintiffs became Superior's co-tenant.

36.     On December 22, 2017, Mesabi filed its Motion for Leave to Amend Complaint

[D.I. 8] ("Motion to Amend") in this action, attaching its Second Amended Complaint to its

motion.

37.     Through the Second Amended Complaint, Mesabi sought to add Glacier Park as a

party to Mesabi's ongoing litigation with Cliffs.  Mesabi alleged that when Glacier Park

transferred its property interests on December 9, 2017, Glacier Park breached the Glacier Park

Settlement, breached the Co-tenancy Mineral Lease and other leases with Mesabi, breached its

implied covenant of good faith and fair dealing, made an agreement in restraint of trade, violated

certain provisions of the Bankruptcy Code, and engaged in civil conspiracy.  The Second

Amended Complaint also added Cliffs Minnesota as a party.

38.     All allegations against Glacier Park in the Second Amended Complaint concern

Glacier Park's transfer of its real estate interests to the Cliffs Counterclaim-Plaintiffs.

39.     Mesabi's claims against Glacier Park are without merit.

40.     The Glacier Park Settlement's plain language expressly conditions any assumption

of leases on the Effective Date occurring on or before October 31, 2017.  Glacier Park Settlement

§ 3(b).

41.     The Effective Date did not occur until December 22, 2017.

42.     Because the Effective Date did not occur by October 31, 2017, the Co-tenancy

Mineral Lease was "automatically rejected . . . and revert[ed] to [Glacier Park] and Superior, as

applicable, without further Bankruptcy Court proceedings." Id. § 3(d) (emphasis added).

43.     The Glacier Park Settlement further provided that if the Effective Date did not

occur by October 31, 2017, "[Glacier Park] and Superior, as applicable, may take any action with

respect to the Mineral Leases and the leased properties and interests and such actions will not

constitute a violation of the automatic stay or any other provisions of the Bankruptcy Code." Id.

44.     With the Glacier Park Settlement's condition precedent unmet, Glacier Park was

free to take any action with respect to its mineral leases, including selling the underlying

property and mineral interests to another party free and clear of any encumbrances.

45.     Even if Mesabi was still somehow able to assume the Co-tenancy Mineral Lease

and other leases with Glacier Park after their automatic rejection and reversion on October 31,

Mesabi would have only lessee rights pursuant to those leases.  Glacier Park could still sell

interests it retained, including ownership of the parcels and its rights as Mesabi's lessor.

46.     Mesabi did not name Glacier Park as a party in the Second Amended Complaint

because Mesabi believed its claims against Glacier Park have merit.  Rather, Mesabi added

Glacier Park to intimidate any other entity, specifically Superior, from considering similar

business transactions with the Cliffs Counterclaim-Plaintiffs.

**Chippewa and Mr. Clarke's Involvement**

47.     On April 26, 2017, Chippewa became the bankruptcy plan sponsor.  Since then,

Chippewa has maintained an active role in the Debtors' continued bankruptcy proceedings and

attempted reorganization.

01:22917216.1

48.     On information and belief, Mr. Clarke is Chief Executive Officer of Chippewa, and he has the authority "to cause Chippewa to effectuate the transactions contemplated by the [Third Amended] Plan."  [D.I. 1009.]

49.     On information and belief, Chippewa and Mr. Clarke were involved in the decision to name Glacier Park as a party in the Second Amended Complaint, and they did so to deter other parties from conducting business with the Cliffs Counterclaim-Plaintiffs.

50.     In the alternative, Chippewa and Mr. Clarke assisted Mesabi in filing the Second Amended Complaint, knowing that Glacier Park had not acted improperly in transferring its interests to the Cliffs Counterclaim-Plaintiffs and that Glacier Park was added to strategically deter other parties from conducting business with the Cliffs Counterclaim-Plaintiffs.

51.     The State of Minnesota, specifically the Minnesota Department of Natural Resources ("DNR"), has also been involved in the administration of the bankruptcy estate.

52.     When the Debtors filed their petition on July 8, 2016, they included several leases with the State of Minnesota on their Schedule G: Executory Contracts and Unexpired Leases ("State Leases").  [See D.I. 224 at 105-06.]  When the Debtors filed the first amended plan, the State objected to the Debtors' attempted assumption of the State Leases.  [See D.I. 1057-1 at 1-2.]

53.     Minnesota Statute § 93.1925, entitled "Negotiated Leases," states that the DNR commissioner may issue an iron ore or taconite iron ore mining lease for State-owned lands to an applicant through negotiations only under certain circumstances and "with the approval of the Executive Council."

54.     The *Master Lease Amendment Agreement Amending Certain Leases and Permitting Assumption Pursuant to 11 U.S.C. § 365* ("First DNR Settlement") among the DNR,

Chippewa, the Debtors, and two other entities controlled by Mr. Clarke sought to resolve issues related to the proposed assumption of the State Leases and other aspects of the Plan. [D.I. 1057-1.]

55.    Under the First DNR Settlement, the DNR agreed to amend certain provisions of the State Leases contingent upon certain commitments by Chippewa and Mesabi.  The First DNR Settlement provides, in a section titled "Executive Council Approval," that "This Agreement is subject to approval of the Minnesota Executive Counsel pursuant to Minn. Stat. § 93.1925 (2016)."  [D.I. 1057-1 at 12.]

56.    The First DNR Settlement established a deadline to secure the Exit Facility and Investment (as defined in the Plan) of August 31, 2017, among other deadlines.  The First DNR Settlement also established a go-effective deadline of August 31, 2017 to avoid rejection and reversion of the State Leases and allow for assumption.  That is, if the Effective Date did not occur on or before August 31, 2017, the State Leases would be "deemed rejected pursuant to 11 U.S.C. § 365" and would automatically revert to the State, and the DNR "may take any action with respect to the Leases and the leased properties and interests" thereafter.  [D.I. 1057 at 3-4; D.I. 1057-1 at 4-5.]

57.    Based on records maintained by the State and made available to the public, the Executive Council did approve the First DNR Settlement with the August 31, 2017 deadlines.

58.    After that there were two additional extensions, agreed to among the DNR, Chippewa, and the Debtors and entered by the Court, that extended the deadlines to secure the Exit Facility and Investment and to avoid rejection of the State Leases and allow for assumption: a first extension from August 31, 2017 to September 30, 2017 [D.I. 1176]; and then a second extension from September 30, 2017 to December 31, 2017 [D.I. 1231].

01:22917216.1

59.     Each of these extensions was presented to the Court pursuant to a Certification of Counsel.  [D.I. 1171; D.I. 1227.]

60.     Based on records maintained by the State and made available to the public, the Executive Council did not approve either the first extension or the second extension.

61.     On information and belief, each of these extensions was entered into to avoid rejection and reversion of the State Leases.

62.     On December 21, 2017, the DNR, Chippewa, the Debtors, and Itasca County entered into a third agreement that purports to extend deadlines for exit financing and assumption of the State Leases (the "Omnibus Amendment").

63.     The Omnibus Amendment extends the then-applicable December 31, 2017 deadline to secure the Exit Facility and Investment to June 30, 2018.

64.     The Omnibus Amendment did not extend the rejection deadline, and the State leases are deemed rejected and reverted as of December 31, 2017.  The Omnibus Amendment stated, however, that Chippewa, the Debtors, and Mesabi "shall have the right to reinstate and assume the [State] Leases in the event that the Debtors, Reorganized Debtor, and/or Plan Sponsor . . . [o]n or before June 30, 2018, secure by fee or leasehold, each and every Superior mineral interest parcel within the boundaries of the current mine plan that is the subject of the [Co-tenancy Mineral Lease]."  [See Adv. D.I. 10-4.]

65.     Based on records maintained by the State and made available to the public, the Executive Council did not approve the Omnibus Agreement.

66.     The Omnibus Amendment conditioned Chippewa and Mesabi's ability to assume the State Leases on securing the Co-Tenancy Mineral Lease from Superior.

67.     On information and belief, because of this requirement in the Omnibus Amendment, Chippewa, Mr. Clarke, and Mesabi decided to aggressively pursue baseless litigation against Glacier Park to ensure that Superior would be intimidated into not doing a deal with anyone else for the Property Interests.

**The Cliffs Counterclaim-Plaintiffs' Proposed Deal with Superior**

68.     Meanwhile, the Cliffs Counterclaim-Plaintiffs were exploring business opportunities with their newly-acquired interests from Glacier Park, with the intent to mine the land.  The Cliffs Counterclaim-Plaintiffs by mid-December had begun work on a pre-feasibility study for a mine plan incorporating the Property Interests.

69.     The Cliffs Counterclaim-Plaintiffs desired to work with Superior, their co-tenant in the Property Interests, in the amicable and professional manner that the parties had enjoyed in the past throughout their longstanding business relationship.

70.     On or about January 3, 2018, the Cliffs Counterclaim-Plaintiffs contacted Superior via phone to discuss their ongoing relationship as co-tenants in the Property Interests and a potential transaction that would allow the Cliffs Counterclaim-Plaintiffs to begin to conduct mining operations utilizing the Property Interests.

71.     On January 3, Superior informed the Cliffs Counterclaim-Plaintiffs that legal counsel advised Superior not to engage in any business transactions with the Cliffs Counterclaim-Plaintiffs involving the Property Interests.  Superior believed Mesabi had added Glacier Park as a party in the (then proposed) Second Amended Complaint because of Glacier Park's real estate transaction with the Cliffs Counterclaim-Plaintiffs.  Superior believed the Second Amended Complaint was written so that Mesabi could similarly add Superior as a party

01:22917216.1

to the litigation if Superior engaged in any transaction with the Cliffs Counterclaim-Plaintiffs related to the Property Interests.

72.     Superior never denied interest in a deal involving the Property Interests.  Superior told the Cliffs Counterclaim-Plaintiffs that they could continue communicating with Superior about a potential transaction.

73.     On or about January 9, 2018, representatives from the Cliffs Counterclaim-Plaintiffs visited Superior to continue transaction discussions.  Superior stated that it would continue discussing the possibility of a deal, and expressed interest in a transaction structure similar to the Cliffs Counterclaim-Plaintiffs' acquisition of Glacier Park's interests.

74.     Superior and the Cliffs Counterclaim-Plaintiffs discussed the possibility of a nondisclosure agreement during the Cliffs Counterclaim-Plaintiffs' January 9 visit.  The Cliffs Counterclaim-Plaintiffs sent Superior a draft nondisclosure agreement via email the following week.

75.     The Cliffs Counterclaim-Plaintiffs continued to communicate with Superior in early January 2018 via email about a mutually beneficial commercial arrangement between the parties.

76.     If a deal with Superior were finalized, the Cliffs Counterclaim-Plaintiffs would gain several economic benefits, including the full unfettered use and enjoyment of the land, the opportunity to mine the property's valuable iron ore for processing and sale, and full rights to all profits from mining operations on the land.

**Mesabi Interferes with the Cliffs Counterclaim-Plaintiffs' Proposed Deal with Superior**

77.     On information and belief, each of Mesabi, Chippewa, and Mr. Clarke was aware of the Cliffs Counterclaim-Plaintiffs' efforts to enter into a real estate transaction with Superior.

78.     On information and belief, each of Mesabi, Chippewa, and Mr. Clarke was aware of the Cliffs Counterclaim-Plaintiffs' efforts to obtain real estate interests in the Mesabi Iron Range.  Cliffs publicized its and Cliffs Minnesota's acquisition of Glacier Park real estate interests in a press release on December 11, 2017.

79.     On information and belief, Chippewa contacted Superior early in January 2018 about the Property Interests on behalf of Mesabi.  Robb Bigelow, a Chippewa representative, contacted Superior to ask Superior that it engage in discussions about the Property Interests exclusively with Mesabi.

80.     On information and belief, Superior told Chippewa and Mesabi about Superior's ongoing discussions to engage in a transaction with the Cliffs Counterclaim-Plaintiffs related to Superior's rights in the Property Interests.

81.     On information and belief, each of Mesabi, Chippewa, and Mr. Clarke was aware of Cliffs' other mining operations in Minnesota.

82.     On information and belief, each of Mesabi, Chippewa, and Mr. Clarke was aware of the Cliffs Counterclaim-Plaintiffs' desire to mine the taconite iron ore at the former Butler Mine.

83.     On information and belief, each of Mesabi, Chippewa, and Mr. Clarke was aware of the Cliffs Counterclaim-Plaintiffs' attempts to acquire all rights necessary to conduct mining operations in the Property Interests, including Superior's participation as a co-tenant.

84.     On information and belief, each of Mesabi, Chippewa, and Mr. Clarke was aware of the economic advantages that the Cliffs Counterclaim-Plaintiffs would gain if they consummated a transaction with Superior.

01:22917216.1

85.     On January 23, 2018 the Court granted Mesabi's Motion to Amend.  The same day, Mesabi filed its Second Amended Complaint [Adv. D.I. 18].

86.     On January 24, 2018, Cliffs sent Superior a Proposal to Acquire Certain Real Property Interests in Superior Mineral Resources LLC (the "Proposal").  Cliffs sent Superior the Proposal to formalize its and Cliffs Minnesota's ongoing negotiations to acquire Superior's property interests and to demonstrate the Cliffs Counterclaim-Plaintiffs' intent in consummating a deal with Superior, and requested a response by 5:00 p.m. on January 29, 2018.

87.     On or about January 26, 2018, Mesabi served the Second Amended Complaint on Glacier Park by hand delivery with a Summons and Notice of Pretrial Conference in an Adversary Proceeding [Adv. D.I. 20] ("Glacier Park Summons").

88.     On or about January 28, 2018, the Cliffs Counterclaim-Plaintiffs emailed Superior to request a phone call the following day to discuss the Proposal ahead of the response deadline.

89.     On or about January 29, 2018, the Cliffs Counterclaim-Plaintiffs sent a follow-up email on the same topic as the email sent on or about January 28, 2018.

90.     A few hours later, James Hecimovich, Superior's President and Chief Executive Officer, responded with a letter stating that Superior "has determined not to pursue a transaction regarding these real property interests with Cleveland-Cliffs at this time."

91.     The Cliffs Counterclaim-Plaintiffs received no other explanation for Superior's sudden withdrawal from considering a transaction with the Cliffs Counterclaim-Plaintiffs.

92.     On information and belief, Mesabi threatened Superior with legal action similar to the claims it brought against Glacier Park if Superior chose to engage in any transaction with the Cliffs Counterclaim-Plaintiffs concerning the Property Interests.

01:22917216.1

93.     On information and belief, Mesabi used the Second Amended Complaint and Glacier Park Summons to bolster its threat to Superior.

94.     On information and belief, Chippewa and Mr. Clarke participated in contacting Superior with Mesabi to threaten Superior with legal action if it did not withdraw from negotiations with the Cliffs Counterclaim-Plaintiffs.

95.     In the alternative, Chippewa and/or Mr. Clarke directed that Mesabi contact Superior to threaten Superior with legal action if it did not withdraw from negotiations with the Cliffs Counterclaim-Plaintiffs.

96.     On information and belief, Superior withdrew from considering a transaction with the Cliffs Counterclaim-Plaintiffs on January 29, 2018 because of Mesabi's, Chippewa's, and Mr. Clark's interferences.

97.     Mesabi, Chippewa, and Mr. Clarke successfully used the Second Amended Complaint and Glacier Park Summons to bully Superior into backing out of its anticipated deal with the Cliffs Counterclaim-Plaintiffs.

98.     As a result of Mesabi's, Chippewa's, and Mr. Clarke's influence, the Cliffs Counterclaim-Plaintiffs lost the economic advantages they would have gained if they consummated a transaction with Superior.

**Mr. Clarke's Continued Interference**

99.     After disrupting the Cliffs Counterclaim-Plaintiffs' prospective transaction with Superior, Mr. Clarke continued to impede the Cliffs Counterclaim-Plaintiffs' business in Minnesota with other third parties.

100.    On or about February 19, 2018, Mr. Clarke sent letters to USW offices in and around the Mesabi Iron Range ("Clarke Letters").

01:22917216.1

101.    The Clarke Letters use false statements of fact to defame Cliffs and to characterize Mr. Clarke as a better business partner to USW and other third parties.

102.    To support his position and to show he is more dedicated to Minnesota mining operations than Cliffs is, Mr. Clarke states that he and his companies have "assumed over $200 million of UMWA pension liabilities, on mines closed by Cliffs, during the dark days of 2015." In context, Mr. Clarke represents that he has the best interests of Minnesota mining retirees and employees in mind, but Cliffs does not.

103.    Multiple facts in Mr. Clarke's statement are false.  Cliffs did not sell closed mines. The mines were still in operation when sold by Cliffs.  The assumed liabilities in the transaction included items other than pension liabilities.  And the total value of all assumed liabilities did not meet or exceed $200 million.

104.    Mr. Clarke also states that he owns "more stock than 17 of the 18 Directors and Executive Officers of Cliffs."  In context, Mr. Clarke represents that he has a greater investment in Cliffs than almost all of Cliffs' highest-level employees and that because Cliffs' Directors and Executive Officers are not as invested in their own company, they must not believe in Cliffs' business operations in Minnesota and elsewhere.

105.    A similar statement was republished in the February 19, 2018 Duluth News Tribune article "Clarke reaches out to Steelworkers, Cliffs CEO," which is available to the general public at http://www.duluthnewstribune.com/business/energy-and-mining/4406039-clarke-reaches-out-steelworkers-cliffs-ceo ("Clarke Article").

106.    The Clarke Article republished the false statement that, with his recent purchase of 110,000 shares of Cliffs stock, Mr. Clarke owns "more than any Cliffs corporate officer except Goncalves, who is the single largest Cliffs owner at 404,000 shares."

01:22917216.1

107.    Mr. Clarke's stock ownership statements are false.  Cliffs has nine Directors and Executive Officers who each own more than 110,000 shares of Cliffs stock.

108.    Additionally, Mr. Goncalves currently owns 3,575,614 shares of Cliffs stock, and at the time of the Clarke Article owned 3,253,150 shares of Cliffs stock, over eight times the amount reported.  Mr. Clarke's statement was incorrect at the time he made it, and is even more so now.

109.    By making these false statements, Mr. Clarke impugned Cliffs' reputation to USW, other recipients of the Clarke Letters, and the general public.

110.    By making these false statements, Mr. Clarke intends to convince USW, other recipients of the Clarke Letters, and the general public that Cliffs does not care about mining operations in Minnesota because it unloads large amounts of pension liabilities, closes mines, and does not have Directors and Executive Officers who care enough about Cliffs' business to hold sufficient stakes in their own company.

111.    Mr. Goncalves and other Cliffs Officers and Directors' stock ownership is publically available via Form 4 filings with the SEC.

112.    Mr. Clarke knew that these statements were false at the time he stated them.

113.    In the alternative, Mr. Clarke made these statements with reckless disregard as to their truth or falsity.

114.    On information and belief, Mr. Clarke sent the Clarke Letters and made statements in the Clarke Article purposefully to harm Cliffs' reputation.

115.    On information and belief, Mr. Clarke has made similar false statements of fact to other third parties in an effort to further disparage Cliffs' reputation and to disrupt Cliffs business in Minnesota.

01:22917216.1

116.    Mr. Clarke's statements defame Cliffs.  Mr. Clarke's statements claim that Cliffs unloads large liabilities to the detriment of union pension recipients, that Cliffs closes Minnesota mining operations, that Cliffs' Officers and Directors do not hold sufficient stakes in the company because they do not believe in it, and that Cliffs is only interested in blockading Mr. Clarke from bringing business to the Mesabi Iron Range.  None of these assertions by Mr. Clarke are true.

117.    USW, other unions, and other third parties that do business with Cliffs think less of Cliffs because of Mr. Clarke's false statements.

**COUNT I**
**TORTIOUS INTERFERENCE WITH**
**A PROSPECTIVE BUSINESS ADVANTAGE AS TO SUPERIOR**
**(AGAINST MESABI, CHIPPEWA, AND CLARKE)**

118.    The Cliffs Counterclaim-Plaintiffs repeat and reallege the allegations in paragraphs 1 through 117 as if fully set forth herein.

119.    Throughout January 2018, the Cliffs Counterclaim-Plaintiffs and Superior engaged in multiple discussions about transferring or leasing Superior's interests in the Property Interests to the Cliffs Counterclaim-Plaintiffs.

120.    Given Superior and Cliffs' business history, ongoing negotiations about a transfer or lease involving the Property Interests, and Cliffs Counterclaim-Plaintiffs' intent to mine the Property Interests, the Cliffs Counterclaim-Plaintiffs had a reasonable expectation that Superior would transfer or lease its interests to the Cliffs Counterclaim-Plaintiffs.

121.    Mesabi, Chippewa, and Mr. Clarke knew that the Cliffs Counterclaim-Plaintiffs would benefit from a transaction with Superior involving its interests in the Property Interests and that Superior and the Cliffs Counterclaim-Plaintiffs were in discussions about a potential transaction.

01:22917216.1

122.     Mesabi, Chippewa, and Mr. Clarke intentionally interfered with the Cliffs Counterclaim-Plaintiffs' attempts to acquire or lease Superior's interests in the Property Interests by threatening Superior with litigation and exerting undue pressure and influence on Superior.

123.     The interferences by Mesabi, Chippewa, and Mr. Clarke were wrongful.  Mesabi had no basis to file a lawsuit against Superior.  Mesabi named Glacier Park as a party in the Second Amended Complaint to use the outstanding lawsuit to influence and intimidate Superior into not conducting a business transaction with Cliffs.  Mesabi, Chippewa, and Mr. Clarke used the outstanding lawsuit against Glacier Park to intimidate Superior into not conducting a business transaction with the Cliffs Counterclaim-Plaintiffs.

124.     On January 29, 2018, Superior informed the Cliffs Counterclaim-Plaintiffs that it would not pursue a transaction involving the Property Interests with the Cliffs Counterclaim-Plaintiffs.

125.     If Mesabi, Chippewa, and Mr. Clarke had not interfered with the Cliffs Counterclaim-Plaintiffs and Superior's attempted transaction, it is reasonably probable that the Cliffs Counterclaim-Plaintiffs would have realized a business advantage from their discussions with Superior.

126.     As a result of Mesabi's, Chippewa's, and Mr. Clarke's interference, the Cliffs Counterclaim-Plaintiffs have suffered damage to their business, damage to future prospective business, and other economic losses.

127.     Because Mesabi, Chippewa, and Mr. Clarke acted maliciously in interfering with the Cliffs Counterclaim-Plaintiffs and Superior's negotiations, Cliffs Counterclaim-Plaintiffs are also entitled to punitive damages.

128.     The Cliffs Counterclaim-Plaintiffs also request that Mesabi, Chippewa, and

Mr. Clarke be enjoined from contacting or threatening Superior with litigation for entering into a

transaction with the Cliffs Counterclaim-Plaintiffs that involves the Property Interests.

## COUNT II
## CIVIL CONSPIRACY
## (AGAINST MESABI, CHIPPEWA, AND CLARKE)

129.     The Cliffs Counterclaim-Plaintiffs repeat and reallege the allegations in

paragraphs 1 through 128 as if fully set forth herein.

130.     Mesabi, Chippewa, and Mr. Clarke acted in concert and pursuant to a common

design to thwart the Cliffs Counterclaim-Plaintiffs' efforts to enjoy a business advantage in

purchasing property rights from Superior.

131.     Mesabi, Chippewa, and Mr. Clarke agreed that they would accomplish this goal

through improper means, including tortiously interfering with the Cliffs Counterclaim-Plaintiffs'

prospective business advantage.

132.     Each of Mesabi, Chippewa, and Mr. Clarke committed acts to further their

conspiracy, including (but not limited to) filing a lawsuit against Glacier Park for transacting

with the Cliffs Counterclaim-Plaintiffs, using the Mesabi lawsuit to coerce Superior, and exerting

undue and unlawful influence on Superior.

133.     As a result of the conspiracy, the Cliffs Counterclaim-Plaintiffs have suffered

damage to their business, damage to future prospective business, and other economic losses.

01:22917216.1

## COUNT III
## AIDING AND ABETTING TORTIOUS INTERFERENCE
## WITH A PROSPECTIVE BUSINESS ADVANTAGE
## (AGAINST CHIPPEWA AND CLARKE)

134.    The Cliffs Counterclaim-Plaintiffs repeat and reallege the allegations in paragraphs 1 through 133 as if fully set forth herein.

135.    As described above, Mesabi tortiously interfered with the Cliffs Counterclaim-Plaintiffs' prospective business advantage.

136.    Chippewa and Mr. Clarke knew that Mesabi's interference was wrong.

137.    Nonetheless, Chippewa and Mr. Clarke assisted Mesabi in tortiously interfering with the Cliffs Counterclaim-Plaintiffs' prospective business advantage by providing resources and guidance necessary for Mesabi to commit its wrongful acts.

138.    Chippewa and Mr. Clarke encouraged Mesabi to tortiously interfere with the Cliffs Counterclaim-Plaintiffs' prospective business advantage.

139.    With Chippewa's and Mr. Clarke's assistance, Mesabi was successful in coercing Superior to withdraw from ongoing negotiations with the Cliffs Counterclaim-Plaintiffs regarding the Cliffs Counterclaim-Plaintiffs' acquisition of the Property Interests.

140.    As a result of Chippewa's and Mr. Clarke's assistance, the Cliffs Counterclaim-Plaintiffs have suffered damage to their business, damage to future prospective business, and other economic losses.

01:22917216.1

**COUNT IV**
**LIBEL**
**(AGAINST CLARKE)**

141.     The Cliffs Counterclaim-Plaintiffs repeat and reallege the allegations in paragraphs 1 through 140 as if fully set forth herein.

142.     On or about February 19, 2018, published the Clarke Letters to the USW and other third parties.

143.     Also on February 19, 2018, Mr. Clarke made statements to the Duluth News Tribune about the Clarke Letters and their contents.  That same day, the Duluth News Tribune published the Clarke Article, which was broadly disseminated to the general public.

144.     The Clarke Letters and Clarke Article contain statements of fact that are false, including:

      a.   That Mr. Clarke assumed over $200 million of UMWA pension liabilities from Cliffs;

      b.   That Cliffs closed mines in 2015;

      c.   That Mr. Clarke owns more Cliffs stock than 17 of the 18 Directors and Executive Officers of Cliffs; and

      d.   That Mr. Goncalves owns only 404,000 shares of Cliffs stock.

145.     Mr. Clarke knew these statements were false at the time he made them, or in the alternative did not act reasonably in attempting to discover the truth or falsity or defamatory character of his statements.

146.     The statements in the Clarke Letters and Clarke Article remain available to their direct recipients and to the general public.

01:22917216.1

147.    Mr. Clarke's statements reflect negatively upon Cliffs so as to cause injury to Cliffs' reputation, goodwill, and business interests.

148.    Because Mr. Clarke made his defamatory statements to purposefully harm Cliffs' reputation, Cliffs is entitled to punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE,** the Cliffs Counterclaim-Plaintiffs request that this Court enter proposed findings of fact and conclusions of law to the District Court, recommending the entry of a judgment against Counterclaim-Defendants Mesabi, Chippewa, and Clarke that grants relief as follows:

A.    Recommending entry of a judgment in favor of the Cliffs Counterclaim-Plaintiffs and against Counterclaim-Defendants Mesabi, Chippewa, and Clarke on each counterclaim;

B.    Recommending entry of an award of general and compensatory damages in favor of the Cliffs Counterclaim-Plaintiffs on each counterclaim against the Counterclaim-Defendants to each counterclaim, jointly and severally as applicable, for all damages sustained by the Cliffs Counterclaim-Plaintiffs in an amount to be determined at trial, including pre- and post-judgment interest, as allowed by law;

C.    Recommending entry of injunctive or equitable relief;

D.    Recommending entry of an award of the Cliffs Counterclaim-Plaintiffs' attorneys' fees, costs, and other expenses incurred in this counterclaim action, as allowed by law; and

E.      Recommending the granting of Counterclaim-Plaintiff Cliffs such other and

further relief as this Court deems appropriate.

## **JURY DEMAND**

Pursuant to Bankruptcy Rules 9015 and 5005, the Cliffs Counterclaim-Plaintiffs demand

a jury trial on each count of the Counterclaims.

## **RULE 7012(B) STATEMENT**

Pursuant to Bankruptcy Rule 7012(b), and Local Rule 7012-1, the Cliffs Counterclaim-

Plaintiffs hereby give notice that they do not consent to entry of final orders or judgment by the

bankruptcy court with respect to their Counterclaims.

01:22917216.1

Dated:    February 26, 2018        Respectfully submitted,
          Wilmington, Delaware

                                   */s/ M. Blake Cleary*
                                   M. Blake Cleary (No. 3614)
                                   YOUNG CONAWAY STARGATT
                                   & TAYLOR, LLP
                                   Rodney Square
                                   1000 North King Street
                                   Wilmington, DE 19801
                                   Telephone:  (302) 571-6600
                                   Facsimile:   (302) 571-1253
                                   Email: mbcleary@ycst.com

                                        -and-

                                   Robert S. Faxon (admitted pro hac vice)
                                   Thomas Wearsch (admitted pro hac vice)
                                   JONES DAY
                                   North Point
                                   901 Lakeside Avenue
                                   Cleveland, OH  44114.1190
                                   Telephone:  +1.216.586.3939
                                   Facsimile:  +1.216.579.0212
                                   E-mail:  rfaxon@jonesday.com
                                            twearsch@jonesday.com

                                   *Attorneys for Defendants and Counterclaim-*
                                   *Plaintiffs Cleveland-Cliffs Inc. and*
                                   *Cleveland-Cliffs Minnesota Land*
                                   *Development LLC*