## IN UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------------x

|  |  |  |
|---|---|---|
| *In re:* | : | **Chapter 11** |
|  | : |  |
| **ESSAR STEEL MINNESOTA LLC and** | : | **Case No. 16-11626 (BLS)** |
| **ESML HOLDINGS INC.,**[1] | : |  |
|  | : | **(Jointly Administered)** |
| **Reorganized Debtors.** | : |  |
|  | : |  |

----------------------------------------------------------------x

|  |  |  |
|---|---|---|
| **MESABI METALLICS COMPANY LLC** | : | **Adv. Proc. No. 17-51210 (BLS)** |
| **(F/K/A ESSAR STEEL MINNESOTA LLC),** | : |  |
|  | : | Related to Adv. Docket No. 18 |
| **Plaintiff,** | : |  |
|  | : | **OPENING BRIEF IN SUPPORT** |
| **v.** | : | **OF DEFENDANTS** |
|  | : | **CLEVELAND-CLIFFS INC.'S** |
| **CLEVELAND-CLIFFS INC. (F/K/A CLIFFS** | : | **AND CLEVELAND-CLIFFS** |
| **NATURAL RESOURCES INC.);** | : | **MINNESOTA LAND** |
| **CLEVELAND-CLIFFS MINNESOTA LAND** | : | **DEVELOPMENT LLC'S** |
| **DEVELOPMENT LLC; GLACIER PARK** | : | **JOINT MOTION FOR PARTIAL** |
| **IRON ORE PROPERTIES LLC; and** | : | **SUMMARY JUDGMENT ON** |
| **DOES 1-10,** | : | **PLAINTIFF MESABI** |
|  | : | **METALLICS COMPANY LLC'S** |
| **Defendants.** | : | **SECOND AMENDED** |
|  | : | **COMPLAINT** |

----------------------------------------------------------------x

|  |  |
|---|---|
| **CLEVELAND-CLIFFS INC. (F/K/A CLIFFS** | : |
| **NATURAL RESOURCES INC.); and** | : |
| **CLEVELAND-CLIFFS MINNESOTA LAND** | : |
| **DEVELOPMENT LLC,** | : |
|  | : |
| **Counterclaim-Plaintiffs,** | : |
|  | : |
| **v.** | : |
|  | : |
| **MESABI METALLICS COMPANY LLC** | : |
| **(F/K/A ESSAR STEEL MINNESOTA LLC);** | : |
| **CHIPPEWA CAPITAL PARTNERS, LLC; and** | : |
| **THOMAS M. CLARKE,** | : |
|  | : |
| **Counterclaim-Defendants.** | : |

----------------------------------------------------------------x

---

[1]  Essar Steel Minnesota LLC has changed its name to Mesabi Metallics Company LLC.

M. Blake Cleary (No. 3614)
Michael S. Neiburg (No. 5275)
YOUNG CONAWAY STARGATT
& TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email:    mbcleary@ycst.com
             mneiburg@ycst.com

                -and-

Robert S. Faxon  (admitted <u>pro hac vice</u>)
Thomas Wearsch  (admitted <u>pro hac vice</u>)
Kristin S.M. Morrison  (admitted <u>pro hac vice</u>)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114.1190
Telephone:  +1.216.586.3939
Facsimile:  +1.216.579.0212
E-mail:  rfaxon@jonesday.com
             twearsch@jonesday.com
             kmorrison@jonesday.com

*Attorneys for Cleveland-Cliffs Inc. and
Cleveland-Cliffs Minnesota Land Development LLC*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... ii

I.      PRELIMINARY STATEMENT ..................................................................... 1

II.     NATURE AND STAGE OF PROCEEDING ................................................. 5

III.    SUMMARY OF ARGUMENT ....................................................................... 7

IV.     STATEMENT OF FACTS .............................................................................. 8

        A.      The Reorganized Debtors Lost Their Lease Rights Through Inaction ................. 8

        B.      The Second Amended Complaint ..................................................... 16

V.      ARGUMENT ................................................................................................ 20

        A.      Summary Judgment Standard ........................................................... 20

        B.      The Cliffs Defendants are Entitled to Judgment as a Matter of Law.................. 20

                1.      Contract Interpretation Entitles the Cliffs Defendants to Judgment as a Matter of Law ................................................................. 20

                2.      The Second Amended Complaint Relies Upon a Selective, and Incorrect, Reading of the Glacier Park Settlement ................................ 23

VI.     CONCLUSION.............................................................................................. 34

01:23032887.1

## TABLE OF AUTHORITIES

**Page**

C<small>ASES</small>

Advantage Consulting Grp., Ltd. v. ADT Sec. Sys., Inc.,
    306 F.3d 582 (8th Cir. 2002) ..................................................................................................32

AIG Centennial Ins. Co. v. Fraley-Landers,
    450 F.3d 761 (8th Cir. 2006) ..................................................................................................22

Art Goebel, Inc. v. N. Suburban Agencies, Inc.,
    567 N.W.2d 511 (Minn. 1997).................................................................................................22

Aslakson v. Home Sav. Ass'n,
    416 N.W.2d 786 (Minn. Ct. App. 1987) .................................................................................34

Bank Midwest, Minnesota, Iowa, N.A. v. Lipetzky,
    674 N.W.2d 176 (Minn. 2004)...........................................................................................21, 22

C & S Acquisitions Corp. v. Northwest Aircraft, Inc.,
    153 F.3d 622 (8th Cir. 1998) ..................................................................................................33

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986).................................................................................................................20

Chergosky v. Crosstown Bell, Inc.,
    463 N.W.2d 522 (Minn. 1990)...............................................................................22, 25, 29, 31

Christensen v. PennyMac Loan Servs., LLC,
    988 F. Supp. 2d 1036 (D. Minn. 2013) ...................................................................................34

Consol. Grain & Barge Co. v. Madgett,
    928 F.2d 816 (8th Cir. 1991) ..................................................................................................33

Crossroads Church of Prior Lake, MN v. County of Dakota,
    800 N.W.2d 608 (Minn. 2011).................................................................................................22

Denelsbeck v. Wells Fargo & Co.,
    666 N.W.2d 339 (Minn. 2003).................................................................................................22

enXco Dev. Corp. v. N. States Power Co.,
    No. 11-1171, 2013 WL 1364242 (D. Minn. Apr. 4, 2013),
    aff'd, 758 F.3d 940 (8th Cir. 2014) .........................................................................................23

01:23032887.1

# TABLE OF AUTHORITIES

**Page**

GB Biosciences Corp. v. Ishihara Sangyo Kaisha, Ltd.,
  270 F. Supp. 2d 476 (D. Del. 2003) ...................................................................20

Glacial Plains Cooperative v. Chippewa Valley Ethanol Co., LLLP,
  No. 76-cv-14-332, 2015 WL 12827697 (Minn. Dist. Ct. Sept. 1, 2015)................32

Hansen v. Phillips Beverage Co.,
  487 N.W.2d 925 (Minn. Ct. App. 1992) ...............................................................34

In re Dura Automotive Systems, Inc.,
  379 B.R. 257 (Bankr. D. Del. 2007) ...................................................................20

In re Trico Marine Servs., Inc.,
  450 B.R. 474 (Bankr. D. Del. 2011) (Shannon, J.)..................................................24

In re Victory Markets, Inc.,
  221 B.R. 298 (B.A.P. 2d Cir. 1998).....................................................................25

In re Worldwide Direct, Inc.,
  Adv. No. 09–52841, 2010 WL 3435380 (Bankr. D. Del. Aug. 27, 2010)..............21

Intel Corp. v. Broadcom Corp.,
  173 F. Supp. 2d 201 (D. Del. 2001)................................................................20, 21

Kallok v. Medtronic, Inc.,
  573 N.W.2d 356 (Minn. 1998)..............................................................................34

King v. Dalton Motors, Inc.,
  109 N.W.2d 51 (Minn. 1961)................................................................................33

Lidstrom v. Mundahl,
  246 N.W.2d 16 (Minn. 1976)................................................................................22

Lindgren v. Clearwater National Corp.,
  517 N.W.2d 574 (Minn. 1994)..............................................................................33

M.M. Silta, Inc. v. Cleveland-Cliffs, Inc.,
  No. 08–CV–01372, 2008 WL 11349885 (D. Minn. Dec. 1, 2008) ...................22, 28

Miller v. Common Sch. Dist. No. 99, Lyon Cty.,
  43 N.W.2d 102 (Minn. 1950).................................................................................28

# TABLE OF AUTHORITIES

**Page**

Mulcahy v. Fenton Sub Parcel D, LLC,
  No. A10-23, 2010 WL 4181263 (Minn. Ct. App. Oct. 26, 2010) ...................................22, 29

Murphy v. John Hancock Mutual Life Ins. Co.,
  270 N.W. 136 (Minn. 1936)....................................................................................................22

Nat'l City Bank v. Engler,
  777 N.W.2d 762 (Minn. Ct. App. 2010) ...........................................................................26, 29

Necchi S.p.A. v. Necchi Sewing Machine Sales Corp.,
  348 F.2d 693 (2d Cir. 1965)...................................................................................................33

Ohio Calculating, Inc. v. CPT Corp.,
  846 F.2d 497 (8th Cir. 1988) ...........................................................................................32, 33

Qwinstar Corp. v. Anthony,
  882 F.3d 748 (8th Cir. 2018), as amended (Feb. 26, 2018).........................................26, 29, 31

Podpeskar v. Makita U.S.A. Inc.,
  247 F. Supp. 3d 1001 (D. Minn. 2017)...................................................................................34

R.A., Inc. v. Anheuser-Busch, Inc.,
  556 N.W.2d 567 (Minn. Ct. App. 1996).................................................................................34

Richie Co., LLP. v. Lyndon Ins. Grp., Inc.,
  316 F.3d 758 (8th Cir. 2003) .................................................................................................33

State Farm Fire & Cas. Co. v. Honeywell Intern., Inc.,
  No. 3:03CV1741, 2005 WL 2020330 (M.D. Pa. Aug. 19, 2005)...........................................20

Tamarind Resort Assocs. v. Gov't of the Virgin Islands,
  138 F.3d 107 (3d Cir. 1998)...................................................................................................20

Westway Holdings Corp. v. Tate & Lyle PLC,
  No. 08-CV-841, 2009 WL 1370940 (D. Del. May 13, 2009)..................................................34

Winger Assocs., Inc. v. Acky-Minnetonka Ltd. P'ship,
  No. C7-01-1418, 2001 WL 1607659 (Minn. Ct. App. Dec. 18, 2001)....................................33

**RULES**

Fed. R. .Bankr. P. 7012 ............................................................................................................7

01:23032887.1

# TABLE OF AUTHORITIES

**Page**

Fede. R. Bankr. P. 7056 ................................................................................1, 20

Fed. R. Civil P. 56....................................................................................1, 20

D. Del. L.R. 7.1.3(c) ...................................................................................5, 7

D. Del. L.R. 7012-1 ........................................................................................7

Del. Bankr. L.R. 7007-2(b) ..........................................................................5, 7

## STATUTES

11 U.S.C. § 365........................................................................23, 25, 27

11 U.S.C. § 1123(b)(2) ................................................................................25

MINN. STAT. Chapter 560 ............................................................................15

## OTHER AUTHORITIES

Black's Law Dictionary (10th ed. 2014) .......................................................28

Restatement (Second) of Contracts § 203, cmt e (1981) ...............................32

Restatement (Second) of Contracts § 224 (1981)..........................................23

Richard A. Lord, Williston on Contracts § 38:7 (4th ed. 1990) ....................23

Pursuant to Federal Rule of Civil Procedure 56 and Federal Rule of Bankruptcy

Procedure 7056, Defendants Cleveland-Cliffs Inc. ("Cliffs") and Cleveland-Cliffs Minnesota

Land Development LLC ("Cliffs Minnesota") (collectively, the "Cliffs Defendants") move for

partial summary judgment on Plaintiff Mesabi Metallics Company LLC's ("Mesabi" or the

"Reorganized Debtors," and prior to the Effective Date, the "Debtors") Second Amended

Complaint [Adv. D.I. 18] (the "Second Amended Complaint").[2]  In support of their motion for

partial summary judgment (the "Motion"), filed concurrently herewith, the Cliffs Defendants

respectfully represent as follows:

## I.    PRELIMINARY STATEMENT

1.    This Court should grant the Cliffs Defendants' Motion because the causes of

action at issue are based upon contract and property rights that do not exist as a matter of law.

This issue is ripe for decision now because, as the Court noted in its Order regarding the

Reorganized Debtors' motion to amend, "the parties have invited the Court to rule as a final

matter upon the current status of the leases," and the Court may construe the applicable

agreements and orders in the context of a motion for partial summary judgment to do so.  [Adv.

D.I. 17 at ¶ 8.]  There are no genuine issues of material fact, and indeed no additional facts

needed, to decide this issue.  As the Reorganized Debtors told the court at the January 18th

hearing, "based on this Court's order [D.I. 1168 (the "Approval Order")], based on the documents

that are attached to this Court's order, and based on the leases themselves this Court can make

that determination."  [Jan. 18, 2018 Hr'g Tr. at 17:4-19.[3]]

---

[2]    Capitalized terms not defined herein shall have the meanings given to them in the Second Amended Complaint or the applicable exhibits to the Second Amended Complaint.

[3]    Attached as Exhibit A to the Declaration of Kristin S.M. Morrison in Support of Defendants Cleveland-Cliffs Inc.'s and Cleveland-Cliffs Minnesota Land Development LLC's Joint Motion for Partial Summary Judgment on Plaintiff Mesabi Metallics Company LLC's Second Amended Complaint (the "Morrison Declaration").

2.      When read as a whole, the clear terms of the Court's order and the Debtors'

contract with Glacier Park Iron Ore Properties LLC ("Glacier Park" or "GPIOP") are fatal to the

causes of action pertaining to Glacier Park's transfer of its property interests to Cliffs' wholly-

owned subsidiary Cliffs Minnesota.  The Second Amended Complaint asserts that Cliffs, Cliffs

Minnesota, and Glacier Park violated the Debtors', the Reorganized Debtors', and/or the Plan

Sponsor Chippewa Capital Partners, LLC's ("Chippewa") interests in property previously

obtained under a lease contract and related settlement agreement with Glacier Park.  Based on

the clear and unambiguous terms of the relevant contract, however, these asserted property

interests were non-existent at the time of the alleged wrongdoing by Cliffs, Cliffs Minnesota, and

Glacier Park.  The Cliffs Defendants accordingly are entitled to summary judgment in their favor

on the First, Second, Third, Fourth, Fifth, Sixth, Thirteenth, Fourteenth, Fifteenth, Sixteenth,

Seventeenth, Twentieth, Twenty-First, Twenty-Second, Twenty-Third, and Twenty-Fourth

Claims For Relief.

3.      Glacier Park's leases with the Debtors were governed by a settlement agreement

that extended the Debtors' deadline to go effective from August 31 until October 31, 2017,

in exchange for finality for Glacier Park if the Debtors did not meet the deadline.  [D.I. 1168-1

(the "Glacier Park Settlement")].[4]  The Glacier Park Settlement expressly conditioned several

key property interests on the Effective Date occurring on or before October 31, 2017, following

the previously missed August 31 deadline:  (i) any lease assumption required the Effective Date

to occur on or before October 31, 2017 (Glacier Park Settlement § 3(b)); and (ii) if the Effective

Date did not occur by October 31, "the Mineral Leases will be automatically rejected . . . and

revert to GPIOP and Superior, as applicable, without further Bankruptcy Court proceedings"

---

[4]      Attached as Exhibit B to the Morrison Declaration (Exhibit B includes the Approval Order and the
Omnibus Lease Amendment, which is Exhibit 1 to the Glacier Park Settlement).

(id. § 3(d) (emphasis added)).  The parties explicitly agreed that after rejection and reversion, Glacier Park and Superior "may take any action with respect to the Mineral Leases and the leased properties and interests and such actions will not constitute a violation of the automatic stay or any other provision of the Bankruptcy Code."  Id.  The Approval Order, entered by this Court on August 30, 2017, approved each of these terms and conditions.  [D.I. 1168 at ¶ 2.]

4.      The material facts are not in dispute:  the Glacier Park Settlement and the Approval Order are valid and binding and their terms are unambiguous;[5] the Approval Order approved the terms and conditions set out in the Glacier Park Settlement;[6] the occurrence of the Effective Date by October 31, 2017 was a condition precedent to assumption of the Mineral Leases under Section 3(b) of the Glacier Park Settlement;[7] if the Effective Date did not occur by October 31, 2017, then the Mineral Leases also would be rejected and would revert under Section 3(d) of the Glacier Park Settlement;[8] Section 3(d) further provided that Glacier Park "may take any action" after rejection and reversion, and that "such actions will not constitute a violation of the automatic stay or any other provision of the Bankruptcy Code";[9] the Effective Date did not occur by October 31, 2017;[10] Glacier Park did not consent to an extension of the

---

[5]      [Jan. 18, 2018 Hr'g Tr. at 17:4-19 (Ex. A)]; 2d Am. Compl. ¶¶ 72-74 [Adv. D.I. 18]; Cliffs' Ans. ¶¶ 72-74 [Adv. D.I. 34]; Cliffs Minnesota's Ans. ¶¶ 72-74 [Adv. D.I. 35]; Glacier Park's Ans. ¶¶ 27-29 (responding to 2d Am. Compl. ¶¶ 72-74) [Adv. D.I. 30].

[6]      [D.I. 1168 at ¶ 2]; 2d Am. Compl. ¶¶ 74, 80 [Adv. D.I. 18]; Cliffs' Ans. ¶¶ 74, 80 [Adv. D.I. 34]; Cliffs Minnesota's Ans. ¶¶ 74, 80 [Adv. D.I. 35]; Glacier Park's Ans. ¶¶ 29, 33 (responding to 2d Am. Compl. ¶¶ 74, 80) [Adv. D.I. 30].

[7]      2d Am. Compl. ¶ 74 [Adv. D.I. 18]; Cliffs' Ans. ¶ 74 [Adv. D.I. 34]; Cliffs Minnesota's Ans. ¶ 74 [Adv. D.I. 35]; Glacier Park's Ans. ¶ 29 (responding to 2d Am. Compl. ¶ 74) [Adv. D.I. 30].

[8]      2d Am. Compl. ¶ 76 [Adv. D.I. 18]; Cliffs' Ans. ¶ 76 [Adv. D.I. 34]; Cliffs Minnesota's Ans. ¶ 76 [Adv. D.I. 35]; Glacier Park's Ans. ¶ 30 (responding to 2d Am. Compl. ¶ 76) [Adv. D.I. 30].

[9]      2d Am. Compl. ¶ 235 [Adv. D.I. 18]; Cliffs' Ans. ¶ 235 [Adv. D.I. 34]; Cliffs Minnesota's Ans. ¶ 235 [Adv. D.I. 35]; Glacier Park's Ans. ¶ 109 (responding to 2d Am. Compl. ¶ 235) [Adv. D.I. 30]; see also [Adv. D.I. 12 at ¶¶ 23, 29].

[10]     2d Am. Compl. ¶ 236 [Adv. D.I. 18]; Cliffs' Ans. ¶ 236 [Adv. D.I. 34]; Cliffs Minnesota's Ans. ¶ 236 [Adv. D.I. 35]; Glacier Park's Ans. ¶ 109 (responding to 2d Am. Compl. ¶ 236) [Adv. D.I. 30].

October 31, 2017 deadline;[11] the Mineral Leases were rejected by the Debtors and reverted to Glacier Park on November 1, 2017;[12] Glacier Park transferred its interests to Cliffs Minnesota well after the October 31 deadline passed;[13] and Cliffs Minnesota recorded its interests with the Office of the County Recorder for Itasca County, Minnesota on December 12 and 13, 2017.[14]

5.      When these undisputed facts are applied to the plain language of the Glacier Park Settlement and the Approval Order, it is clear that many of the causes of action asserted in the Second Amended Complaint are unsupportable.  After years of Glacier Park's leases being held but not used, first by Essar and then Mesabi, the Glacier Park Settlement provided finality to Glacier Park for its property ownership interests, and allowed it to move forward unencumbered when the condition precedent to assumption failed.  Glacier Park did so when, in December, it transferred its interests to Cliffs' affiliate, Cliffs Minnesota.  The claims asserted by the Reorganized Debtors in the Second Amended Complaint ask the Court to endorse an interpretation of the Approval Order and the Glacier Park Settlement that, despite their plain language, binds Glacier Park to the Reorganized Debtors (and now Chippewa) in perpetuity even though the Mineral Leases have been rejected and reverted and the Plan has gone effective.  This construction is wrong as a matter of law, and the Cliffs Defendants are entitled to judgment as a result.

---

[11]    [Jan. 18, 2018 Hr'g Tr. at 40:14-19 ("THE COURT: There is no allegation, correct, that GPIOP has not consented to an extension of the October 31 deadline, right?  MR. FAXON: There is no allegation that there was an extension of the October 31 deadline.  THE COURT: Okay.") (Ex. A).]

[12]    [Jan. 18, 2018 Hr'g Tr. at 13:20-14:2, 17:12, 23:2-4 (Ex. A)]; 2d Am. Compl. ¶ 235 [Adv. D.I. 18]; Cliffs' Ans. ¶ 235 [Adv. D.I. 34]; Cliffs Minnesota's Ans. ¶ 235 [Adv. D.I. 35]; Glacier Park's Ans. ¶ 109 (responding to 2d Am. Compl. ¶ 235) [Adv. D.I. 30]; see also [Adv. D.I. 12 at ¶¶ 23, 29].

[13]    [See Adv. D.I. 10-7 (Cliffs' Dec. 11, 2017 Press Release).]

[14]    Id.; 2d Am. Compl. ¶ 259 (acknowledging recording) [Adv. D.I. 18]; Cliffs' Ans. ¶ 259 [Adv. D.I. 34]; Cliffs Minnesota's Ans. ¶ 259 [Adv. D.I. 35]; Glacier Park's Ans. ¶ 127 (responding to 2d Am. Compl. ¶ 259) [Adv. D.I. 30].

6.      The Cliffs Defendants therefore ask the Court to enter proposed findings of fact and conclusions of law to the District Court recommending entry of an order to grant their Motion and enter summary judgment in their favor on the First, Second, Third, Fourth, Fifth, Sixth, Thirteenth, Fourteenth, Fifteenth, Sixteenth, Seventeenth, Twentieth, Twenty-First, Twenty-Second, Twenty-Third, and Twenty-Fourth Claims For Relief in the Second Amended Complaint.

## II.      NATURE AND STAGE OF PROCEEDING

Pursuant to Del. Bankr. L.R. 7007-2(b) and D. Del. L.R. 7.1.3(c), set forth below is a statement of the nature and stage of the proceeding before the Court.

7.      On September 7, 2017, the Debtors commenced this adversary proceeding by filing a complaint against Cliffs and Does 1–10. [Adv. D.I. 1.]  In the original complaint, the Debtors alleged that Cliffs and unknown individuals or entities, among other things: (i) tortiously interfered with its contractual and business relationships in violation of state and federal law; (ii) violated section 362 of the Bankruptcy Code; and (iii) engaged in a civil conspiracy.  On September 11, 2017, the Debtors amended the original Complaint to add an "f/k/a" to Plaintiff's name in the caption (the "First Amended Complaint").  [Adv. D.I. 3.]  The First Amended Complaint did not contain any other changes.

8.      After months of languishing, and near the deadline for service, on November 29, 2017, the Debtors first served the First Amended Complaint on Cliffs.  On December 8, 2017, Cliffs and the Debtors agreed to extend Cliffs' deadline for responding to the First Amended Complaint until February 15, 2018.  [See Adv. D.I. 6.]

9.      In December 2017, the Debtors and other creditors assigned interests in this litigation to Chippewa.  Chippewa gained complete control of the litigation against Cliffs and half of any recovery.  [D.I. 1355.]

10.     The Debtors emerged from reorganization on December 22, 2017 when they filed the Notice of Effective Date.  [D.I. 1398.]

11.     Less than two hours prior to filing the Notice of Effective Date on December 22, 2017, the Reorganized Debtors filed a Motion For Leave to Amend Complaint that sought approval of the Second Amended Complaint.  [Adv. D.I. 8.]  In the Second Amended Complaint, the Reorganized Debtors, among other things, added Glacier Park and Cliffs Minnesota as defendants and added 15 additional claims for relief against the defendants, all, or virtually all, of which are based on new factual allegations related to Glacier Park's transfer of its property interests to Cliffs Minnesota.

12.     On January 9, 2018, Cliffs filed an objection to the Reorganized Debtors' Motion for Leave to Amend on the grounds of bad faith and futility of amendment, arguing that the new allegations and causes of action pertaining to Glacier Park's transfer were not supported by the proper construction of the Glacier Park Settlement and the Approval Order.  [Adv. D.I. 10.]

13.     Following a hearing on January 18, 2018, the Court on January 23, 2018 granted the Reorganized Debtors' Motion for Leave to Amend.  [Adv. D.I. 17.]  In its order, the Court acknowledged that the arguments presented on the parties' competing construction of the relevant contractual terms may be appropriate for summary judgment.  Id. ¶ 8.

14.     On January 23, 2018, the Reorganized Debtors filed the Second Amended Complaint.  [Adv. D.I. 18.]  On January 26, 2018, they served summonses on Cliffs Minnesota and Glacier Park, establishing a February 26, 2018 answer date for each.  [See Adv. D.I. 19, 20.]

15.     On February 13, 2018, Cliffs and the Debtors agreed to extend Cliffs' deadline for responding to the Second Amended Complaint from February 15, 2018 to February 26, 2018.  [See Adv. D.I. 28.]

16.     On February 26, 2018, the Cliffs Defendants filed separate Answers to the Second Amended Complaint and asserted joint counterclaims against Chippewa, the Reorganized Debtors, and Mr. Clarke.  [Adv. D.I. 34, 35.]

17.     On February 26, 2018, Glacier Park filed its separate Answer to the Second Amended Complaint and asserted counterclaims against Mesabi.  [Adv. D.I. 30.]  Glacier Park also filed a Motion for Partial Summary Judgment (the "Glacier Park Motion") and a Declaration and Brief in Support on the same day.  [Adv. D.I. 31, 32, 33.]  The Glacier Park Motion seeks summary judgment on all claims against Glacier Park, specifically the Third, Fourth, Fifth, Sixth, Fourteenth, Sixteenth, Twentieth, Twenty-First, Twenty-Second, Twenty-Third, and Twenty-Fourth Claims For Relief in the Second Amended Complaint.

### III.    SUMMARY OF ARGUMENT

Pursuant to Del. Bankr. L.R. 7007-2(b) and D. Del. L.R. 7.1.3(c), set forth below is a summary of the Cliffs Defendants' argument, stating in separate, numbered paragraphs the legal propositions upon which the Cliffs Defendants rely.[15]

18.     The Cliffs Defendants are entitled to judgment as a matter of law on the basis of contract interpretation.  Most of the causes of action asserted in the Second Amended Complaint arise out of conduct that the Reorganized Debtors believe violates the Debtors', the Reorganized Debtors', and/or Chippewa's property interests and rights under the Glacier Park Settlement.  The Reorganized Debtors acknowledge, however, that whether or not such interests and rights exist depends on the construction of the relevant contractual terms in the Glacier Park Settlement and the Approval Order.  There are no disputed material facts that bear on this issue.  The clear terms

---

[15]     The Cliffs Defendants do not consent to entry of final orders or judgments by the Bankruptcy Court in connection with the Adversary Proceeding pursuant to Bankruptcy Rule 7012 and Local Rule 7012-1.

of the Glacier Park Settlement establish that the purported property interests and rights do not exist.  The Approval Order does not alter this interpretation.

19.     The Cliffs Defendants accordingly ask the Court to enter proposed findings of fact and conclusions of law to the District Court recommending entry of summary judgment in their favor on the First, Second, Third, Fourth, Fifth, Sixth, Thirteenth, Fourteenth, Fifteenth, Sixteenth, Seventeenth, Twentieth, Twenty-First, Twenty-Second, Twenty-Third, and Twenty-Fourth Claims For Relief to the extent that each of these causes of action rely upon the purported property interests and rights.

## IV.     STATEMENT OF FACTS

In support of their motion for partial summary judgment, the Cliffs Defendants set forth below the following statement of the undisputed material facts as to which there is no genuine issue to be tried:[16]

### A.     The Reorganized Debtors Lost Their Lease Rights Through Inaction

20.     Mesabi's predecessor Essar Steel Minnesota ("Essar") filed the Chapter 11 cases to stave off its mineral lessors' abilities to retake their mineral interests.  See Voluntary Petition of ESML Holdings Inc. [D.I. 1.]  The State's decision to terminate Essar's leases for failure to perform was the catalyst to the Debtors' filing.  In the Debtors' own words, "the potential termination of these mineral leases—the core source of supply of raw material for operation of the Facility—provided an impetus for the Debtors' filing of the Chapter 11 Cases."  See Decl. of Sanjay Bhartia, in Support of Debtors' First Day Pleadings, ¶ 13 [D.I. 14] ("Bhartia First Day

---

[16]     Except as otherwise stated, all facts set forth herein come from the undisputed allegations in the Second Amended Complaint.  Although the Cliffs Defendants dispute many of the characterizations of these facts as they are alleged in the Second Amended Complaint, which disputes are noted in the Cliffs Defendants' Answers to the Second Amended Complaint, the underlying bare facts are not in dispute.

01:23032887.1

Decl.").[17]

21.    Glacier Park and Superior each had mineral leases with Essar at the time that it filed.  These leases pertained to mineral land parcels that Glacier Park and Superior held in fee jointly as co-tenants, each with an undivided 50% interest in the whole (the "MSI BLGN Indenture of Lease") and to mineral land parcels that Glacier Park owned 100% in fee (the "MSI 100% Indenture of Lease") and 50% in fee (the "MSI 50% Indenture of Lease").  These leases were entered into in November 2006, but as of Essar's bankruptcy filing in July 2016, only nominal development had taken place on the lands.  Essar's filing froze further development of Glacier Park's and Superior's mineral land parcels.

22.    When the Debtors in February 2017 attempted to assume Glacier Park's and Superior's leases as part of the Plan, Glacier Park objected, and all of these leases were exempted from assumption pursuant to the Plan.  Chippewa, the Debtors, Glacier Park, and Superior thereafter entered into two separate and related agreements dated as of August 28, 2017, the Glacier Park Settlement and an Omnibus Lease Amendment.  The parties signed the Glacier Park Settlement on August 28, 2017, and the Debtors submitted it to the Court as an agreed order pursuant to certification of counsel on August 29, 2017 as required by Section 8(a) of the agreement.  Glacier Park Settlement § 8(a) (Ex. B).  The Court entered the Approval Order on August 30, 2017, which approved "all of the[] terms and conditions" of the Glacier Park Settlement.  [D.I. 1168 (Ex. B).]

---

[17]    See also id. at ¶ 24 ("[T]he State of Minnesota has recently taken the position that ESML's mineral lease agreements with the Minnesota DNR, which account for approximately 41.6% of ESML's access to iron ore—the raw material, around which the Project is being developed and which is essential for the plant's production—may be terminated after noon on July 8, 2016.  A loss of access to the natural resources provided under these leases would be devastating to ESML and its stakeholders, and would nullify many years of effort and hundreds of millions of dollars invested to date.  In addition to the catalysts described below, this threat of loss of ESML's largest group of mineral leases was the proverbial straw that broke the camel's back, requiring that the Debtors commence these Chapter 11 Cases without delay.") (emphasis added).

01:23032887.1

23.     Under the Glacier Park Settlement, Glacier Park and Superior received finality
and the ability to take control of their property rights, in exchange for giving the Debtors the 61-
day extension.  After years of failed development, Glacier Park and Superior received a clear end
date—October 31, 2017.

24.     Although the Glacier Park Settlement provided an extension from August 31 to
October 31 for the Debtors to assume the Superior and Glacier Park leases, it specifically
conditioned the validity of any assumption on the occurrence of the Effective Date by October
31, 2017.  See Glacier Park Settlement § 3(b).  The Glacier Park Settlement further provided that
if the Effective Date did not occur by October 31, "the mineral leases will be automatically
rejected . . . and revert to GPIOP and Superior, as applicable, without further Bankruptcy Court
proceedings."  See id. § 3(d).  The parties explicitly agreed that after rejection and reversion,
"GPIOP and Superior, as applicable, may take any action with respect to the Mineral Leases and
the leased properties and interests and such actions will not constitute a violation of the
automatic stay or any other provision of the Bankruptcy Code."  Id. (emphases added).

25.     Concurrently, the Debtors were attempting to secure their mineral leases with the
State of Minnesota Department of Natural Resources ("DNR").  In conjunction with Plan
negotiations, the DNR and the Debtors entered into the First DNR Settlement in June 2017 that
provided Chippewa with a deadline of August 31, 2017 to secure the Exit Facility and
Investment and effectuate the Plan.  [D.I. 1057.]  If Chippewa failed to do so, the leases with the
State of Minnesota would be rejected and revert to the State.

26.     In late August 2017, it became apparent that the Debtors would not meet their
deadlines to go effective, which would preclude their ability to assume the DNR leases and also
the leases with Glacier Park and Superior.  Through stipulations and settlements that were

ultimately approved by this Court, the Debtors and Chippewa negotiated extensions of the

deadline with Minnesota through September 30, 2017 [D.I. 1176] and through October 31, 2017

with Superior and Glacier Park [D.I. 1168-1].

27.    Although certainly aware of the October 31 deadline to assume the Glacier Park

and Superior leases, the Debtors and Chippewa let this date pass without securing another

extension of the October 31 deadline from Glacier Park and Superior.  On December 1, 2017,

Glacier Park filed a Proof of Claim in the Chapter 11 Case seeking rejection damages under its

leases with Mesabi based on the October 31 rejection.  [Claim No. 224.]  Superior took the same

position as Glacier Park and filed a Proof of Claim for rejection damages under its shared lease

with Mesabi on January 22, 2018 based on the same October 31 rejection.  [Claim No. 230.]

28.    Against this backdrop, on December 11, 2017, Cliffs announced that its affiliate,

Cliffs Minnesota, had acquired Glacier Park's real estate interests in the Nashwauk Range,

including properties that had formerly been leased by Glacier Park to Essar (the "Cliffs/Glacier

Park Transaction").  See Press Release, Cleveland-Cliffs Inc., Cleveland-Cliffs Inc. Announces

Acquisition of Real Estate Interests in Itasca County, Minnesota (Dec. 11, 2017),

http://www.clevelandcliffs.com/English/news-center/news-releases/news-releases-

details/2017/Cleveland-Cliffs-Inc-Announces-Acquisition-of-Real-Estate-Interests-in-Itasca-

County-Minnesota/default.aspx ("Cliffs' Dec. 11, 2017 Press Release") [Adv. D.I. 10-7]; see also

Compl. ¶ 87.

29.    Following Cliffs' acquisition, Chippewa CEO Tom Clarke publicly stated that

Mesabi would not need Glacier Park's former real estate interests to move forward.  See, e.g.,

John Myers, Mesabi Metallics Ready To Emerge From Bankruptcy, Grand Rapids Herald-

Review, Dec. 23, 2017, http://www.grandrapidsmn.com/free_press/mesabimetallics-ready-to-

emerge-from-bankruptcy/article_549aa200-e766-11e7-894c-8fb42169f056.html (attached as

Exhibit C to the Morrison Declaration).  Indeed, Chippewa rushed the Plan into effectiveness on

December 22, the same day the Reorganized Debtors filed their Motion for Leave to Amend.

But Chippewa still had not obtained the promised funding necessary for the project, despite

having received further extensions from the State.[18]  Instead, the Effective Date was achieved by

Chippewa convincing certain other parties to waive important Plan requirements (without any

notice to this Court) and acknowledging State of Minnesota leases had been rejected in exchange

for further extensions by the State.  [See D.I. 1398; Adv. D.I. 10-4 at ¶¶ 1-7.]

      30.    Even though it has gone effective, what Chippewa now has is another extension—

this time to June 30, 2018—in the desperate hope that it can find financing for the project.  The

Omnibus Amendment that Chippewa, Mesabi, and Minnesota government entities signed just

one day prior to going effective (but did not file with this Court) amended this Court's earlier

orders to remove several conditions precedent to the Effective Date.  See Omnibus Amendment

at ¶¶ 1-7 [Adv. D.I. 10-4] (attached as Exhibit D to the Morrison Declaration).  This Omnibus

Amendment provides that the state leases have been deemed rejected as of December 31, 2017,

but Chippewa has the right to reinstate the leases if a number of conditions are met—paying off

remaining Mechanics Liens claims by January 31, securing an off-take agreement or agreements

for at least 4.2 million metric tons, obtaining "binding and enforceable debt and/or equity

commitments required [under] the Master Lease," and securing "each and every Superior mineral

interest parcel within the boundaries of the current mine plan."  See id. at ¶ 3.

      31.    The positions that Mesabi has taken in this proceeding and in arguments before

---

[18]    Chippewa also missed the second extended go-effective deadline in its agreements with the State of Minnesota, failing to emerge by September 30.  [See D.I. 1057-1; D.I. 1171; D.I. 1176; D.I. 1227; D.I. 1231.]  Chippewa was able to negotiate a further extension to December 31 with the State in exchange for payment to Minnesota contractors who had worked on the original Essar project.  [See D.I. 1227; D.I. 1231.]

this Court are completely inconsistent with its position in the Omnibus Amendment effective December 21, 2017.  In this proceeding, Mesabi's position is that the Glacier Park and Superior leases were reinstated on the Effective Date, giving Mesabi continuing ownership rights to each and every mineral interest parcel covered by those leases.  Yet in the Omnibus Amendment, Mesabi agreed that it still needed to secure "each and every Superior mineral interest parcel within the boundaries of the current mine plan."  See id. at ¶ 3.

32.     Mr. Clarke's actions since Mesabi filed this lawsuit are in conformance with the belief that Glacier Park's and Superior's leases were rejected by Mesabi and the property reverted to the lessors as of November 1, 2017.  On or about February 28, 2018, Mr. Clarke spent $69 million to acquire Superior's mineral land parcels through another of his affiliate companies, Miranda Mineral Resources, LLC ("Miranda").  Mr. Clarke announced the acquisition in a local newspaper article on March 8, 2018.  John Myers, Chippewa Capital Partners Buys Land, Half of Nashwauk Ore, DULUTH NEWS TRIBUNE, Mar. 8, 2018, https://www.duluthnewstribune.com/business/energy-and-mining/4415074-chippewa-capital-partners-buys-land-half-nashwauk-ore (attached as Exhibit E to the Morrison Declaration).

33.     Based on documents that Miranda filed with the Itasca County, Minnesota Office of the Registrar of Title, each dated March 5, 2018, Miranda entered into a Purchase Agreement with Superior dated February 28, 2018 to purchase Superior's real estate interests that were subject to the Glacier Park Settlement, totaling 1,040 acres.  Miranda paid approximately $69 million to Superior in the form of $30.5 million in cash for approximately 440 acres and an additional $38.5 million for the remaining approximate 600 acres.  Miranda also borrowed $37 million from Superior through a Promissory Note secured by a mortgage granted by Miranda to Superior on the aforementioned 600 acres.  (Mortgage, Security Agreement, and Assignment of

Rents and Leases at 2 (attached as <u>Exhibit F</u> to the Morrison Declaration); Subordination and

Attornment Agreement at 1 (attached as <u>Exhibit G</u> to the Morrison Declaration).)

34.      In the documents filed with the Itasca County, Minnesota Office of the Registrar

of Title, Mesabi and Miranda assert that the "MSI BLGN indenture of Lease dated as of

November 29, 2006" between Superior, Glacier Park, and Essar that was part of the Glacier Park

Settlement remains in effect, and Mesabi and Miranda each purport to be successors-in-interest

to that lease.  (Subordination and Attornment Agreement at 1 (Ex. G).)  Because that lease was

rejected and reverted per the terms of the Glacier Park Settlement when the Effective Date did

not occur on or before October 31, 2017,[19] however, Superior and Glacier Park each have taken

the position that this lease is no longer effective.  Each of Superior's and Glacier Park's Proofs of

Claim filed in the Chapter 11 Cases claims damages "after rejection of the [lease] became

effective on November 1, 2017."  [Claim 224 at 3 (Glacier Park); Claim 230 at 4 (Superior).][20]

35.      Contrary to Mesabi's and Miranda's assertions, whether or not Mesabi has any

lease rights to Superior's former mineral lands remains subject to the dispute before this Court.

In the article announcing the acquisition, Mr. Clarke confirmed that the current dispute before

this Court includes whether "we still had the lease rights to that land."  Myers, <u>Chippewa Capital</u>

<u>Partners Buys Land, Half of Nashwauk Ore</u> (Ex. E).  Continuing, Mr. Clarke asserted, "[b]ut

---

[19]      Even if Mesabi and Chippewa held valid leases with any of Cliffs, Cliffs Minnesota, Glacier Park, or Superior on the Effective Date, those leases would have been breached by virtue of the December 31, 2017 rejection of the state leases under the cross-default provision of the Omnibus Lease Amendment to the Glacier Park Settlement.  (Ex. B at 16 (Omnibus Lease Amendment ¶ 6).)

[20]      The documents that Miranda filed with the Itasca County, Minnesota Office of the Registrar of Title dated March 5, 2018 contain further flaws regarding the precise nature of the interests conveyed.  Each Quit Claim Deed purports to quit claim the entire property, not Superior's 50% interest alone, without regard for Cliffs Minnesota's 50% interest.  (<u>See</u> Quit Claim Deed T000064262 (attached as <u>Exhibit H</u> to the Morrison Declaration); Quit Claim Deed T000064263 (attached as <u>Exhibit I</u> to the Morrison Declaration).)  Miranda purports to have mortgaged the entire interest conveyed by Superior, which appears to be the entire property.  (<u>See</u> Ex. F.)  Cliffs Minnesota, as a 50% interest holder, has not agreed to mortgage any property interest to Miranda.  If the Mortgage, Security Agreement, and Assignment of Rents and Leases is valid as written, Miranda has slandered Cliffs Minnesota's title to the property.

01:23032887.1

with this purchase, it removes any doubt that it's our land and our ore" and "[w]e're going to start mining right now." Id. Mr. Clarke went on to state "In the worst-case scenario, we are 50-50 partners with Cliffs in that ore. But we own the land we need. We have the mining permit. We will get the state . . . . Things are rapidly falling into place now. Good things are happening." Id. Mr. Clarke has since acknowledged that Cliffs validly purchased Glacier Park's 50% interest in the parcels that Miranda has now purchased from Superior and is purporting to lease to Mesabi. A recent article in Bloomberg Businessweek profiling Mr. Clarke's plans for the Nashwauk site stated, "Clarke says he and Cliffs are 50-50 partners in some places," and quoted Mr. Clarke as saying "I see opportunity" at the site. Matt Robinson and Bryan Gruley, What's a Nursing-Home Operator Doing Running an Iron Mine?, BLOOMBERG BUSINESSWEEK, Mar. 21, 2018, https://www.bloomberg.com/news/features/2018-03-21/what-s-a-nursing-home-operator-doing-running-an-iron-mine (attached as Exhibit J to the Morrison Declaration).

36.     Indeed, the fact that all three parties have brought motions for summary judgment before discovery even begins demonstrates that this is a threshold issue that must be resolved first before the remainder of this case may continue. The resolution of the Mineral Leases issue will allow the parties to resolve issues that extend beyond this case. It will stop the parties from having to take unnecessary actions with respect to the land and will clarify the parties' current relationship. Mr. Clarke already is starting to take actions that may impact the land. Cliffs has been forced to do so as well.[21] A determination in this Court as to whether the Mineral Leases

---

[21]     As a result of Miranda's acquisition, Cliffs Minnesota and Miranda are now co-tenants to the former Glacier Park/Superior mineral interest parcels. No co-tenant may mine its mineral lands without the other co-tenant's approval or a court order under Minnesota law. See MINN. STAT. Chapter 560. Because the status of the mineral leases remains in dispute, no party claiming rights in those mineral interest parcels under the leases should be allowed to begin mining operations. To protect its interests, on February 26, 2018, Cliffs Minnesota filed an action against Superior in Minnesota state court under Minnesota Statutes Chapter 560 to obtain a court order granting Cliffs Minnesota permission to mine the land it owned as a co-tenant with Superior. This is a statutory action that requires the court to decide who are the owners of the land described in that complaint. Cliffs had attempted to negotiate a transaction or other agreement with

are effective is fundamental to resolving the parties' disputes.

### B.    The Second Amended Complaint

37.    The Debtors filed their first adversary complaint against Cliffs in September 2017.  In that original Complaint, the Debtors alleged that Cliffs and unknown individuals or entities (sued as "Does 1-10") had "engaged in a course of conduct designed to interfere with and impede Mesabi's contracts and business relationships and prevent the confirmed Plan from becoming effective, thereby keeping Mesabi from completing the Project and competing with Cliffs' in the Great Lakes Pellet and Iron Market."  [Adv. D.I. 3, at 2.]  This complaint contained nine claims for relief based on allegations that Cliffs and the unnamed Does (i) tortiously interfered with the Debtors' contractual and business relationships in violation of state and federal law; (ii) violated federal and state antitrust laws; (iii) violated section 362 of the Bankruptcy Code; and (iv) engaged in a civil conspiracy.

38.    On December 22, 2017, before Cliffs' original answer date arrived and only hours before going effective, the Debtors filed a Motion to request leave to file a Second Amended Complaint.  [See Adv. D.I. 8; D.I. 1398 (Notice of Effective Date of Plan).]

39.    The Second Amended Complaint added factual allegations and claims that focus on the Cliffs/Glacier Park Transaction and its purported effect on the Debtors' Plan.  As stated in the Second Amended Complaint, the Reorganized Debtors interpret the Glacier Park Settlement as providing, on its own or through the Approval Order, the following rights to the Reorganized Debtors:

---

Cliffs Minnesota's co-tenant prior to filing that action, but its efforts were frustrated as noted in the Cliffs Defendants' counterclaims in this adversary proceeding.  Cliffs Minnesota filed an amended complaint in the Minnesota action on March 20, 2018 to name Miranda and Mesabi as additional defendants.  That action is now captioned Cleveland-Cliffs Minnesota Land Development LLC v. Superior Mineral Resources LLC, Miranda Mineral Resources, LLC, and Mesabi Metallics Company LLC, Court File No. 31-CV-18-575 (Ninth Judicial Dist. Ct. Itasca County, MN).  A determination in this Court as to whether the leases are effective will inform the Minnesota state court proceeding.

(a)      Assumption of the Mineral Leases on December 22, 2017;

(b)      Continuing, "intact" property rights in the Mineral Leases following

rejection and reversion of the property rights under Section 3(d); and

(c)      A seemingly perpetual and exclusive "ongoing obligation [by Glacier

Park] to negotiate and execute the Restated Mineral Leases" with the Debtors under Sections

4(a) and (b).  See 2d Am. Compl., Nature of the Case [Adv. D.I. 18].

40.      The Reorganized Debtors rely upon this interpretation of purported "rights" under

the Glacier Park Settlement and related factual allegations for the following causes of action that

attack the Cliffs/Glacier Park Transaction:

- First Claim for Relief, Tortious Interference with Contractual Rights, ¶¶ 99–106 (alleging Cliffs and Cliffs Minnesota induced Glacier Park to breach provisions creating the Debtors' purported rights);

- Second Claim for Relief, Tortious Interference with Prospective Economic Advantage, ¶¶ 107–112 (alleging Cliffs and Cliffs Minnesota interfered with the Debtors' ability to gain an economic advantage through their purported rights);

- Third Claim for Relief, Breach of Glacier Park Settlement, ¶¶ 113–119 (alleging Glacier Park breached provisions creating the Debtors' purported rights, including by entering into the transaction with Cliffs and Cliffs Minnesota);

- Fourth Claim for Relief, Breach of Glacier Park Settlement, ¶¶ 120–129 (alleging Glacier Park breached provisions creating the Debtors' purported rights, including by entering into the transaction with Cliffs and Cliffs Minnesota and allowing them to interfere with these rights);

- Fifth Claim for Relief, Breach of Implied Covenant of Good Faith and Fair Dealing, ¶¶ 130–136 (alleging Glacier Park breached implied covenant through same conduct alleged in third claim for relief);

- Sixth Claim for Relief, Breach of Implied Covenant of Good Faith and Fair Dealing, ¶¶ 137–143 (alleging Glacier Park breached implied covenant through same conduct alleged in fourth claim for relief);

- Thirteenth Claim for Relief, Declaratory Relief for Violation of the Automatic Stay, ¶¶ 192–195 (alleging the Mineral Leases remained property of the Debtors' estates by virtue of these provisions, and Cliffs and Cliffs Minnesota intentionally sought to obtain this property in violation of the automatic stay);

- Fourteenth Claim for Relief, Civil Contempt for Violation of the Assumption Order, ¶¶ 196–200 (alleging Cliffs, Cliffs Minnesota and Glacier Park violated the

Assumption Order, presumably by interfering with the Debtors' purported right to assume the Mineral Leases);

- Fifteenth Claim for Relief, Avoidance and Recovery of Fraudulent Transfers, ¶¶ 201–207 (alleging the Debtors may avoid pre-petition royalties paid to Glacier Park pursuant to the Mineral Leases);

- Sixteenth Claim for Relief, Avoidance of Unauthorized Post-Petition Transfers, ¶¶ 208–212 (alleging the Debtors retained property rights under the Mineral Leases by virtue of these provisions, and Glacier Park's purported transfer of the Mineral Leases to Cliffs and Cliffs Minnesota was an unauthorized post-petition transfer);

- Seventeenth Claim for Relief, Recovery of Avoided Transfers, ¶¶ 213–217 (alleging the Debtors retained property rights under the Mineral Leases by virtue of these provisions, and Glacier Park's purported transfer of the Mineral Leases to Cliffs and Cliffs Minnesota was an unauthorized post-petition transfer that the Debtors can avoid);

- Twentieth Claim for Relief, Injunctive Relief, ¶¶ 228–229 (seeking injunctive relief related to purported interests in Mineral Leases by virtue of these provisions);

- Twenty-First Claim for Relief, Declaratory Relief as to Termination of the Mineral Leases, ¶¶ 230–241 (seeking declaration that the Debtors retain rights under the Mineral Leases by virtue of these provisions, and these rights were not terminated by operation of Section 3(d));

- Twenty-Second Claim for Relief, Declaratory Relief as to Assumption of the Mineral Leases, ¶¶ 242–248 (seeking declaration that, by virtue of these provisions, the Debtors could assume the Mineral Leases because they were not terminated);

- Twenty-Third Claim for Relief, Declaratory Relief as to Restatement of the Mineral Leases, ¶¶ 249–254 (seeking declaration that, by virtue of these provisions, the Mineral Leases should be deemed amended and restated as of the Effective Date because they were not terminated); and

- Twenty-Fourth Claim for Relief, Declaratory Relief as to Superiority of Rights to the Mineral Leases, ¶¶ 255–262 (seeking declaration that, by virtue of these provisions, the Debtors have continuing, and superior, rights to the Mineral Leases).

41.     Although the Reorganized Debtors try to impugn Cliffs Minnesota's December

2017 acquisition of Glacier Park's property interests in the Second Amended Complaint, the

following facts are undisputed:

(a)     The Effective Date did not occur by October 31, 2017 (2d Am. Compl.

01:23032887.1

-18-

¶ 236);

      (b)     Glacier Park did not consent to an extension of the October 31, 2017

deadline under the Glacier Park Settlement (<u>see</u> Jan. 18, 2018 Hr'g Tr. at 40:14-19 (Ex. A));

      (c)     The Debtors agreed to a Second Amendment and the Omnibus

Amendment with the State of Minnesota and other parties, but not Glacier Park or Superior (<u>see</u>

[D.I. 1227]; Omnibus Amendment at 1 [Adv. D.I. 10-4] (Ex. D));

      (d)     The Debtors' lease interests were rejected and reverted to Glacier Park and

Superior under Section 3(b) when the October 31 deadline passed (<u>see</u> Glacier Park Settlement

§ 3(b) (Ex. B));

      (e)     Under the express terms of the Glacier Park Settlement and the order

entered by this Court approving the same [D.I. 1168 (Ex. B)], once the October 31 deadline

passed, Glacier Park was free to "take any action with respect to the Mineral Leases and the

leased properties and interests and such actions will not constitute a violation of the automatic

stay or any other provision of the Bankruptcy Code" (<u>see</u> Glacier Park Settlement § 3(d) (Ex.

B));

      (f)     Despite attempts to characterize the Cliffs/Glacier Park Transaction as

"secret" (2d Am. Compl., Nature of the Case at 4), the transaction was announced as soon as it

was effective and the property transfers were immediately registered with the State (<u>see</u> <u>id.</u> ¶ 259

(acknowledging recording)); and

      (g)     The Cliffs/Glacier Park Transaction occurred well after—about six weeks

after—the October 31 Glacier Park Settlement deadline (<u>see</u> Adv. D.I. 10-7 (Cliffs' Dec. 11,

2017 Press Release)).

# V.     ARGUMENT

## A.     Summary Judgment Standard

42.     Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56; Fed. R. Bankr. P. 7056; see also In re Dura Automotive Systems, Inc., 379 B.R. 257, 264 (Bankr. D. Del. 2007).  In a motion for summary judgment, the moving party "bears the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party "may satisfy its burden on summary judgment by demonstrating that there is an absence of evidence to support the case of the nonmoving party."  Intel Corp. v. Broadcom Corp., 173 F. Supp. 2d 201, 222 (D. Del. 2001).

## B.     The Cliffs Defendants are Entitled to Judgment as a Matter of Law

### 1.     Contract Interpretation Entitles the Cliffs Defendants to Judgment as a Matter of Law

43.     "Disputes involving the interpretation of unambiguous contracts are resolvable as a matter of law, and are, therefore, appropriate cases for summary judgment." GB Biosciences Corp. v. Ishihara Sangyo Kaisha, Ltd., 270 F. Supp. 2d 476, 481 (D. Del. 2003) (citing Tamarind Resort Assocs. v. Gov't of the Virgin Islands, 138 F.3d 107, 110 (3d Cir. 1998).  A court should grant summary judgment where the underlying contract from which the claims arise is clear and does not support the claims to be asserted.  See, e.g., State Farm Fire & Cas. Co. v. Honeywell Intern., Inc., No. 3:03CV1741, 2005 WL 2020330, at *5 (M.D. Pa. Aug. 19, 2005) (granting

summary judgment because of clear and plain language of a contract); In re Worldwide Direct,

Inc., Adv. No. 09–52841, 2010 WL 3435380, at *4 (Bankr. D. Del. Aug. 27, 2010). Because

contract interpretation is a matter of law for the court, the court is not required to accept a

plaintiff's incorrect interpretation—a legal conclusion—when reviewing a motion for summary

judgment. See Intel Corp., 173 F. Supp. 2d at 206 ("Contract interpretation is treated as a

question of law.").

44.     The Reorganized Debtors' causes of action rely on the false premise that the

Glacier Park Settlement, on its own or through the Approval Order, provides the Reorganized

Debtors with the following rights:

(a)     Assumption of the Glacier Park Mineral Leases on the December 22, 2017

Effective Date;

(b)     Continuing, "intact" property rights in the Mineral Leases following the

October 31 rejection and reversion of the property rights under Section 3(d); and

(c)     An "ongoing obligation [by Glacier Park] to negotiate and execute the

Restated Mineral Leases" with the Debtors under Sections 4(a) and (b) even after rejection and

reversion.

See 2d Am. Compl., Nature of Action. But these rights do not exist under the plain language of

the Glacier Park Settlement.

45.     The Glacier Park Settlement and the underlying Mineral Leases are governed by

Minnesota law. See Glacier Park Settlement ¶ 18. Minnesota recognizes that, where a contract

is unambiguous and the "terms of the contract may be given their plain and ordinary meaning,

construction of the contract is a matter for the court." See Bank Midwest, Minnesota, Iowa, N.A.

v. Lipetzky, 674 N.W.2d 176, 179 (Minn. 2004). A contract is not ambiguous unless, "'based

upon its language alone, it is reasonably susceptible of more than one interpretation.'" Denelsbeck v. Wells Fargo & Co., 666 N.W.2d 339, 346–47 (Minn. 2003) (quoting Art Goebel, Inc. v. N. Suburban Agencies, Inc., 567 N.W.2d 511, 515 (Minn. 1997)).  "'If a contract is unambiguous, then the language must be given its plain and ordinary meaning and will be enforced by the courts even if the results are harsh.'"  Bank Midwest, 674 N.W.2d at 179 (quoting Denelsbeck, 666 N.W.2d at 346–47).

46.    When performing its interpretation under Minnesota law, the court must "construe a contract as a whole and attempt to harmonize all clauses of the contract."  Chergosky v. Crosstown Bell, Inc., 463 N.W.2d 522, 525 (Minn. 1990).  To give meaning to all of the contract's provisions through this harmonization, it is well-established that "more specific language takes precedence over the more general language."  Bank Midwest, 674 N.W.2d at 181 n.8; accord Mulcahy v. Fenton Sub Parcel D, LLC, No. A10-23, 2010 WL 4181263, at *6 (Minn. Ct. App. Oct. 26, 2010); M.M. Silta, Inc. v. Cleveland-Cliffs, Inc., No. 08–CV–01372, 2008 WL 11349885, at *5 (D. Minn. Dec. 1, 2008).  The court should avoid "[c]ontract constructions that would lead to an absurd result or render provisions meaningless."  Mulcahy, 2010 WL 4181263, at *6.

47.    Following these principles, unambiguous conditions precedent must be enforced even if the resulting interpretation defeats a party's rights.  "A conditional promise prevents anyone from acquiring any rights under the contract unless those conditions occur."  Lidstrom v. Mundahl, 246 N.W.2d 16, 18 (Minn. 1976) (citing Murphy v. John Hancock Mutual Life Ins. Co., 270 N.W. 136 (Minn. 1936)).  Said differently, "[u]nder general contract law, unfulfilled conditions prevent enforcement" of the contract right subject to the condition.  Crossroads Church of Prior Lake MN v. County of Dakota, 800 N.W.2d 608, 615–16 (Minn. 2011).

"'Unlike a mere contract term, the breach of which must be material before it excuses another party from performing, one party's failure to fulfill a condition precedent entirely excuses any remaining obligations of the other party.'" enXco Dev. Corp. v. N. States Power Co., No. 11-1171, 2013 WL 1364242, at *6 (D. Minn. Apr. 4, 2013) (quoting AIG Centennial Ins. Co. v. Fraley-Landers, 450 F.3d 761, 763 (8th Cir. 2006) (citing Richard A. Lord, Williston on Contracts § 38:7 (4th ed. 1990); Restatement (Second) of Contracts § 224 (1981))), aff'd, 758 F.3d 940 (8th Cir. 2014).

## 2. The Second Amended Complaint Relies Upon a Selective, and Incorrect, Reading of the Glacier Park Settlement

48. The Reorganized Debtors do not contend that the terms of the Glacier Park Settlement are ambiguous or should be given anything other than their plain meaning. Instead, the Reorganized Debtors' Second Amended Complaint just omits the terms that do not support the interpretation required to provide property interests to the Debtors, the Reorganized Debtors, and/or Chippewa. When read as a whole applying Minnesota contract interpretation principles, the clear terms of the Glacier Park Settlement do not provide these parties with any of the rights they purport to rely upon for their causes of action against the Cliffs Defendants.

### (a) The Mineral Leases Were Rejected And Could Not Be Assumed

49. In every instance in which the Reorganized Debtors state that the Mineral Leases have been assumed, the Second Amended Complaint relies exclusively upon Approval Order paragraph 3's assumption language: "Pursuant to sections 105(a) and 365 of the Bankruptcy Code, the Mineral Leases, as amended, are assumed as of the effective date of the Plan." See 2d Am. Compl. ¶ 80 (quoting D.I. 1168 ¶ 3.); see also id. ¶¶ 196–200, 242–248. In the immediately preceding paragraph, however, the Approval Order approves "all of the[] terms and conditions" of the Glacier Park Settlement. [D.I. 1168 ¶ 2 (emphases added).] One of those approved

conditions is "that such assumption shall only become enforceable and effective upon (i) the

occurrence of the Effective Date of the Plan on or before October 31, 2017."  Glacier Park

Settlement § 3(b).

50.     Under applicable contract interpretation principles, which apply to the Approval

Order here, the Court must endeavor to adopt an interpretation that preserves meaning for all

provisions, including conditions precedent.[22]  Paragraph 2 of the Approval Order reinforces the

specific conditions to assumption by approving the specific conditions in the Glacier Park

Settlement.  The Second Amended Complaint concedes that Section 3(b)(i) of the Glacier Park

Settlement "conditions such assumption [of the Mineral Leases] on the occurrence of the

Effective Date by October 31, 2017" (see 2d Am. Compl. ¶ 74), and that "the Effective Date had

not occurred by October 31, 2017" (Id. ¶¶ 84, 236).  When the condition precedent to assumption

failed, the leases could not be assumed, and paragraph 3 of the Approval Order does not change

this result.

51.     The Reorganized Debtors try to escape this clear interpretation by giving undue

weight to paragraph 3 of the Approval Order.  [2d Am. Compl. ¶¶ 243-248; Jan. 18, 2018 Hr'g

Tr. at 21:25-22:22 (Ex. A).]  First and foremost, the Approval Order neither controls over the

terms of the Glacier Park Settlement nor amends that agreement.  Per the plain terms of the

Glacier Park Settlement, the Approval Order was to be sought only to approve the Debtors'

obligations under the Glacier Park Settlement:  "The Debtors shall seek a Bankruptcy Court

order approving their obligations under this Agreement under certification of counsel within 1

business day of full execution hereof by the Parties."  Glacier Park Settlement § 8(a).  Timing

alone—that the Approval Order came after entry into the Glacier Park Settlement—should not

---

[22]     "When construing an agreed or negotiated form of order, such as the [Assumption] Order in this case, the Court approaches the task as an exercise of contract interpretation rather than the routine enforcement of a prior court order."  In re Trico Marine Servs., Inc., 450 B.R. 474, 482 (Bankr. D. Del. 2011) (Shannon, J.).

control the Court's interpretation and does not turn the Approval Order into an amendment, rather than an approval as required under Section 8(a).

52.    To accept that the Approval Order somehow provides for unconditional assumption through paragraph 3—so long as the Plan went effective at some later date beyond October 31, 2017—renders both the immediate preceding provision of the Approval Order and Section 3 of the Glacier Park Settlement meaningless.  The Reorganized Debtors' Second Amended Complaint can only stand if the Court ignores critical provisions in both the Approval Order and the Glacier Park Settlement.  Such an interpretation fails to "construe a contract as a whole" and does not "harmonize all clauses" as required.  <u>Chergosky</u>, 463 N.W.2d at 525.[23]

53.    The Reorganized Debtors' interpretation also violates the maxim that specific provisions control over general.  Because the specific condition precedent to assumption failed, the general approval of assumption in the Approval Order is not enforceable.

54.    Further, a debtor may not assume a contract that has been rejected, absent consent.  <u>See, e.g.</u>, <u>In re Victory Markets, Inc.</u>, 221 B.R. 298, 304 (B.A.P. 2d Cir. 1998) (refusing to allow a debtor to assume, and thus deeming rejected, a non-residential real property lease, despite a previous order authorizing the conditional assumption of the lease, after the debtor failed to satisfy the conditions precedent within the extended window provided by the court); 11 U.S.C. § 1123(b)(2) ("Subject to [1123(a)], a plan may . . . subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor <u>not previously rejected under such section</u>.") (emphasis added).  Once the Mineral Leases were rejected under Section 3(d) of the Glacier Park Settlement when the Effective Date

---

[23]    Contrary to the Reorganized Debtors' arguments (<u>see</u> Jan. 18, 2018 Hr'g Tr. at 21:25-22:22) (Ex. A), they could not cure the failure to satisfy the condition precedent to assumption in Section 3(b) by going effective at a later date under Section 3(e).  Section 3(e) provided for a cure of "any pre-Effective Date breaches or defaults under the Mineral Leases," not under the Glacier Park Settlement.  Glacier Park Settlement § 3(e) (Ex. B).

did not occur by October 31, 2017, they could not be revived by operation of a general

assumption clause, otherwise the specific conditions to assumption and the rejection provision

would be rendered entirely superfluous.

55.     In addition, under Minnesota law "[a]ny '[a]pparent conflicts between clauses will

be resolved by giving full effect to principal and more important clauses and subordinating

thereto those of minor importance.'" Qwinstar Corp. v. Anthony, 882 F.3d 748, 755 (8th Cir.

2018), as amended (Feb. 26, 2018) (quoting Nat'l City Bank v. Engler, 777 N.W.2d 762, 765

(Minn. Ct. App. 2010)).  Here, the parties afforded more importance to the terms and conditions

in Section 3: they specifically carved Section 3(d) out of the termination provision in the Glacier

Park Settlement (see Glacier Park Settlement § 8(a)), and specifically added paragraph 2 to the

Approval Order (see D.I. 1161-2).  Moreover, if the Reorganized Debtors were correct that

paragraph 3 of the Approval Order could always revive the leases by providing for post-

rejection, unconditional assumption, then even having sent a termination notice after October 31,

2017 would not have given Glacier Park finality.  That construction cannot be correct.

> **(b)     All Rights Under the Mineral Leases Reverted to Glacier Park
> on October 31, 2017, Including Full Rights to Transfer**

56.     Section 3(d) of the Glacier Park Settlement specifically extinguishes all of

Debtors' and the Reorganized Debtors' rights in the Mineral Leases by reverting the leases to

Glacier Park and Superior and confirming that Glacier Park and Superior may take "any action"

thereafter.  The Reorganized Debtors concede that the Mineral Leases were rejected under

Section 3(d) when the Effective Date did not occur by October 31, 2017.  2d Am. Compl. ¶ 76.

By operation of the next clause of this specific provision—which is not mentioned in the Second

Amended Complaint (see id. ¶¶ 230–241)—all rights under the Mineral Leases "revert[ed] to

[Glacier Park] and Superior, as applicable, without further Bankruptcy Court proceedings or

litigation." <u>See</u> Glacier Park Settlement § 3(d). The next sentence specifically states that "[i]n such circumstances," meaning based on this rejection and reversion, "[Glacier Park] and Superior, as applicable, may take <u>any action</u> with respect to the Mineral Leases and the leased properties and interests and such actions will not constitute a violation of the automatic stay or any other provisions of the Bankruptcy Code." <u>See</u> <u>id</u>. (emphasis added).

57.     The Second Amended Complaint asserts that Section 3(d) of the Glacier Park Settlement "does not provide that the Mineral Leases will be terminated," stating in paragraph 76:

> 76.     The GPIOP Settlement states that, if the Effective Date does not occur prior to October 31, 2017 or a later date agreed by the parties (the "**Rejection Condition**"), the Mineral Leases will be automatically deemed rejected pursuant to 11 U.S.C. § 365. *Id.* at ¶ 3(d). However, the GPIOP Settlement does ***not*** provide that the Mineral Leases will be terminated as a consequence. Rather, the GPIOP Settlement **permits** GPIOP and Superior, as applicable, **to take further actions** with respect to the Mineral Leases (and underlying real property) following the Rejection Condition without regard to the automatic stay or any other provision of the Bankruptcy Code. *Id.* at ¶ 3(d). There is no corresponding waiver in the GPIOP Settlement of any state law limits on termination, including under the terms of the Mineral Leases. Indeed, paragraph 3(e) of the GPIOP Settlement provides, without qualification, that "[t]he Mineral Leases shall remain in full force and effect until the Restated Mineral Leases become fully effective and enforceable." *Id.* at ¶ 3(e).

2d Am. Compl. ¶ 76 (bold underline emphases added).

58.     Section 3(d) of the Glacier Park Settlement actually says:

> (d)     The Mineral Leases will be automatically rejected pursuant to Section 365 of the Bankruptcy Code and revert to GPIOP and Superior, as applicable, without further Bankruptcy Court proceedings or litigation in the event the Effective Date of the Plan does not occur by October 31, 2017, or such later date agreed by the Parties. In such circumstance, GPIOP and Superior, as applicable, **may take any action** with respect to the Mineral Leases and the leased properties and interests and such actions will

01:23032887.1

> not constitute a violation of the automatic stay or any other
> provisions of the Bankruptcy Code.

Glacier Park Settlement § 3(d) (bold underline emphasis added).

59.     In other words, the Second Amended Complaint asserts that the Glacier Park

Settlement does not provide for reversion.  When a lease "reverts" back to the lessor, all

associated property interests in the leasehold estate return to the lessor, meaning the lessee has no

rights remaining.  See Black's Law Dictionary (10th ed. 2014) (defining "automatic reversion" as

"The spontaneous revesting in a grantor of property that the grantor had earlier disposed of, as

with a fee simple determinable.").  In this sense, revert has same legal impact as terminate.  See,

e.g., Miller v. Common Sch. Dist. No. 99, Lyon Cty., 43 N.W.2d 102, 104 (Minn. 1950) (holding

that land grant stating conveyance would "revert" to grantor if usage conditions changed meant

that all grantee's interests would terminate upon condition occurring and return to grantor).

Thus, once the leases were rejected and reverted to Glacier Park by operation of Section 3(d), no

additional steps were necessary to treat the leases as "terminated."  Moreover, the word "any" in

Section 3(d) infused Glacier Park with discretion and negates the idea of exclusion, or

exclusivity, with respect to what actions could be taken after rejection and reversion.

60.     The language in Section 3(d) of the Glacier Park Settlement, which specifically

extinguishes all of the Debtors' and the Reorganized Debtors' rights in the Mineral Leases by

reversion, "governs the more general language" found in other parts of the Glacier Park

Settlement or the Mineral Leases.  MM Silta Inc., 2008 WL 11349885, at *5 (applying

Minnesota law contract interpretation rules to hold "the RSA language which specifically

extinguishes all performance of services and rights under the RSA at termination governs the

more general language concerning 'covenants and agreements' contained in Section 2.2" that

appeared to survive termination).  Although the Glacier Park Settlement and the Mineral Leases

may contain other provisions that provide how the lease rights may be terminated by other means, such as those cited in the Second Amended Complaint (see 2d Am. Compl. ¶¶ 76–79, 230–41), those general provisions only apply while the lease rights remain intact, prior to any rejection and reversion under Section 3(d). The same is true for the general statement in Section 3(e) about curing pre-Effective Date breaches under the Mineral Leases; this provision cannot undo the fact that the Mineral Leases were rejected and reverted when the October 31 deadline was missed. See supra ¶ 49 n. 20. Contrary to the Reorganized Debtors' assertions, upon reversion, Glacier Park and Superior did not need to take any action to terminate the Mineral Leases.

61. This construction also gives meaning to all of the sections in the Glacier Park Settlement, rather than rendering the clear "revert" language meaningless. See Mulcahy, 2010 WL 4181263, at *6 (applying Minnesota law to hold that specific contract language stating that a transaction would not go forward if a condition was not met would control over more general language providing for actions to be taken at closing, which could be applicable only when the condition was met). The Reorganized Debtors have conceded that their interpretation gives no meaning to "revert" in Section 3(d). [Jan. 18, 2018 Hr'g Tr. at 30:2-9, 62:6-10 (Ex. A).] This interpretation violates Minnesota contract interpretation principles and cannot stand as a matter of law. "'Because of the presumption that the parties intended the language used to have effect,' Minnesota courts 'will attempt to avoid an interpretation of the contract that would render a provision meaningless.'" Qwinstar, 882 F.3d at 755 (quoting Chergosky, 463 N.W.2d at 526). Moreover, "[a]ny '[a]pparent conflicts between clauses will be resolved by giving full effect to principal and more important clauses and subordinating thereto those of minor importance.'" Id. (quoting Engler, 777 N.W.2d at 765).

62.     By operation of the specific reversion provision in Section 3(d), Glacier Park, therefore, was relieved of any duties to the Debtors, and the Debtors were stripped of all rights in the Mineral Leases.  Glacier Park did not need to send a separate termination notice under the terms of the Mineral Leases to get back its leasehold interest.  When given their plain meaning, the clear, unambiguous terms of the contract confirm that the Debtors did not retain any property interests in the Mineral Leases after rejection—and, therefore, there were no rights in existence on the Effective Date for the Reorganized Debtors to assume.[24]

> **(c)     The Purported "Ongoing Obligation to Negotiate and Execute the Restatement Mineral Leases" Is Not a Separate, Enforceable Provision**

63.     The Reorganized Debtors also assert in the Second Amended Complaint that, despite all the other conditional provisions, Section 4 of the Glacier Park Settlement operated as a "separate[]" requirement that "obligated [Glacier Park] to use commercially reasonable efforts to restate the form of the Mineral Leases in a manner acceptable to [Glacier Park], Superior, and the Reorganized Debtor" at any time "without regard to when the Effective Date may occur." 2d Am. Compl ¶ 75.  Even if the parties failed to negotiate, Section 4 would still operate to give the Reorganized Debtors their desired property interests under the rejected and reverted leases because, under their reading of the last sentence in Section 4(a), the leases would be restated as of the Effective Date without further action by any party.  Id.  According to the Reorganized Debtors, "[t]his construct permitted the Debtors and the Reorganized Debtor to retain their rights in the Mineral Leases notwithstanding rejection."  Id. ¶ 77 (emphasis added).  The problem with

---

[24]     Comparing the language in Sections 3(b) and 3(d) of the Glacier Park Settlement with paragraph 2 of the Omnibus Amendment with the State demonstrates that the Glacier Park Settlement does not provide the rights that Mesabi asserts.  In contrast to the Glacier Park Settlement, the Omnibus Amendment never uses the term "revert."  The Omnibus Amendment instead specifies that the leases do not terminate, even though rejected, and details how the rejected leases may be reinstated.  [See Omnibus Amendment at ¶¶ 2, 4 (Ex. D).]  The Glacier Park Settlement contains none of this, which provides further support for why Mesabi's proffered interpretation fails as a matter of law.

"this construct," however, is that it violates clear principles of contract interpretation and Minnesota law.

64.     First, Section 4 could not create a separate, ongoing obligation because it is contrary to Section 3, which provides for several conditions precedent to the Debtors retaining any interests in the Mineral Leases.  After the specific reversion provision in Section 3(d) took effect, the more general negotiation obligations in Section 4 have no application.  Only this construction follows the applicable rules of contract interpretation, namely that specific provisions addressing a situation control over more general and that a contract must be read as a whole to give meaning to all provisions and not render any meaningless.  If the Court accepted the Reorganized Debtors' interpretation, this would "render[] the first clause [Section 3(d)] meaningless because there is seemingly no context in which that clause would apply, and Minnesota courts 'will attempt to avoid an interpretation of the contract that would render a provision meaningless.'"  Qwinstar, 882 F.3d at 756 (quoting Chergosky, 463 N.W.2d at 526).

65.     Second, the last sentence in Section 4(a) is not an independent clause.  The last sentence in Section 4(a) states: "The Mineral Leases will be deemed amended and restated by consent on the Effective Date of the Plan." (Glacier Park Settlement § 4(a).)  This clause does not stand alone to revive the rejected and reverted leases for the Reorganized Debtors as restated leases on the Effective Date.  Instead, it is dependent on the Mineral Leases still being in effect—i.e., that the conditions in Section 3 had been met.  If so, then the last sentence in Section 4(a) provides the date upon which any earlier negotiated restated leases would be deemed effective, as the immediately preceding sentences in Section 4(a) provide for the parties to negotiate the terms of restated leases "[o]n or prior to the Effective Date of the Plan." (Id.)  Only this construction gives effect to all of the provisions in the Glacier Park Settlement, including all

of Section 3 and Section 4.  Indeed, "[i]f we recognize the [first] provisions as the principal and more important clauses in this contract, the [second provision] still serves a purpose." Advantage Consulting Grp., Ltd. v. ADT Sec. Sys., Inc., 306 F.3d 582, 586 (8th Cir. 2002) (applying Minnesota law; noting "it makes sense that parties will address issues of more importance first, followed by those of less importance[;] . . . although a term's location in a contract is certainly not dispositive, it may be indicative, of intent"); see also Restatement (Second) of Contracts § 203, cmt. e (1981) ("If the specific or exact can be read as an exception or qualification of the general, both are given some effect . . . .").

66.    Although unstated, the logical result of the Reorganized Debtors' argument is that, even if Glacier Park had given a termination notice to the Debtors after rejection by operation of Section 3(d), at any time thereafter Section 4 still gave the Reorganized Debtors the right to assert that it had Restated Mineral Leases.  This interpretation would give the Reorganized Debtors greater rights on the Effective Date than were retained by the Debtors on the immediately prior date.  That construction cannot be correct.[25]

67.    Finally, even if Section 4 somehow could be invoked after rejection and reversion, it cannot be enforced.  Minnesota does not recognize "agreements to agree" like what is set out in Section 4.  "An agreement to agree means the parties are agreeing to agree in the future.  It's too vague for the courts to interpret, and as the 8th Circuit noted in Ohio Calculating, unenforceable because the Court would have no idea where the breach occurred or what the remedy would be."  Glacial Plains Cooperative v. Chippewa Valley Ethanol Co., LLLP, No. 76-

---

[25]    Based on the recent actions taken with respect to Superior's mineral lands, see supra ¶¶ 32-33, it appears the Reorganized Debtors doubt their own interpretation.  Rather than stand on the continuing validity of the lease with Superior, as they are trying to do with Glacier Park, the Reorganized Debtors have purchased Superior's lands outright to the tune of $69 million through an affiliate of Chippewa and have asserted that this affiliate leased the lands back to the Reorganized Debtors.  These actions are inconsistent with their position in this action that the lease remains in place.

cv-14-332, 2015 WL 12827697, at *7 (Minn. Dist. Ct. Sept. 1, 2015) (citing Ohio Calculating,

Inc. v. CPT Corp., 846 F.2d 497, 501 (8th Cir. 1988)).  The Minnesota Supreme Court has held

that language such that "[t]he parties shall enter into a definite purchase agreement which shall

be drafted by the buyers within 30 days" is unenforceable because it "merely created an

agreement to negotiate in good faith."  Lindgren v. Clearwater National Corp., 517 N.W.2d 574,

574 (Minn. 1994); see also Winger Assocs., Inc. v. Acky-Minnetonka Ltd. P'ship, No. C7-01-

1418, 2001 WL 1607659, at *1 (Minn. Ct. App. Dec. 18, 2001) (holding lease option to renew

clause was unenforceable agreement to agree where language stated "Landlord and Tenant will

use their best efforts to determine whether or not they can reach an agreement as to terms for the

option period within sixty (60) days after notice is received from Tenant of its intent to exercise

the option.").  "Under Minnesota law, agreements to negotiate in good faith in the future are

unenforceable as a matter of law."[26] C & S Acquisitions Corp. v. Northwest Aircraft, Inc., 153

F.3d 622, 626 (8th Cir. 1998).

68.    Under the clear terms of the Glacier Park Settlement and the Approval Order,

none of the Debtors', the Reorganized Debtors', Chippewa's, or Mr. Clarke's asserted rights exist.

Each of the causes of action against the Cliffs Defendants is based upon these purported

contract-based rights, as set forth above, supra at ¶¶ 39–40.  Therefore, each fails as a matter of

---

[26]    See also Richie Co., LLP. v. Lyndon Ins. Grp., Inc., 316 F.3d 758, 761–62, n.4 (8th Cir. 2003) (holding an
agreement that a party "will enter into" an agreement that is "substantially identical" to a prior existing
agreement is not sufficient to be an enforceable provision because such language "spoke of future actions
and agreements contemplated but not yet completed by the parties" and creates only an unenforceable
agreement to negotiate in good faith) (citing King v. Dalton Motors, Inc., 109 N.W.2d 51, 52–53 (Minn.
1961)); Consol. Grain & Barge Co. v. Madgett, 928 F.2d 816, 817–18 (8th Cir. 1991) (holding that an
agreement to negotiate in good faith over profit-sharing issue was unenforceable as a contract); Ohio
Calculating, 846 F.2d at 501–02 (holding agreements to negotiate in good faith "generally are deemed
unenforceable because they provide neither a basis for determining the existence of a breach nor for giving
an appropriate remedy"; "it is altogether too conjectural that the parties would have agreed and on what
terms . . . there is no way that anyone could foresee what would have come from examining the possibility
of executing a new contract, even if this were done in the utmost good faith'" (quoting Necchi S.p.A. v.
Necchi Sewing Machine Sales Corp., 348 F.2d 693, 698 (2d Cir. 1965)).

01:23032887.1

law on the basis of contract interpretation.[27]  As a result, the Cliffs Defendants are entitled

summary judgment on the Second Amended Complaint's causes of action[28] that rely upon or

relate to these purported non-existent rights.

## VI.    CONCLUSION

Based on the foregoing, the Cliffs Defendants respectfully request that this Court grant

their motion for partial summary judgment and enter proposed findings of fact and conclusions

of law to the District Court recommending entry of summary judgment in their favor on the First,

---

[27]    The first claim against the Cliffs Defendants, tortious interference with contract, alleges that Cliffs and Cliffs Minnesota induced Glacier Park to breach the Glacier Park Settlement and the Mineral Leases, both of which are governed by Minnesota law.

There must be an actual breach of contract to assert a tortious interference with contract claim.  Kallok v. Medtronic, Inc., 573 N.W.2d 356, 362 (Minn. 1998) (stating that intentional procurement of a breach of a contract is required for a tortious interference claim).  Minnesota recognizes that a failed condition precedent also defeats a tortious interference claim based on the same contract.  R.A., Inc. v. Anheuser-Busch, Inc., 556 N.W.2d 567, 570 (Minn. Ct. App. 1996) (dismissing tortious interference with contract claim based on contract with condition precedent where the condition precedent did not occur).  The only specific breaches alleged are in new claims three and four, in which the Reorganized Debtors assert that Glacier Park breached Sections 4(a) and (b) of the Glacier Park Settlement and sections of the Mineral Leases providing the Debtors certain rights during the continuation of the Mineral Leases.  See 2d Am. Compl. ¶¶ 113–129.  As discussed, by operation of the specific provision in Section 3(d) of the Glacier Park Settlement, all rights under the Mineral Leases reverted to Glacier Park and it was relieved of any duties to the Debtors under Section 4.

Without an enforceable contract right that could have been breached, the Reorganized Debtors cannot state a claim for tortious interference with contract.  Kallok, 573 N.W.2d at 362; Hansen v. Phillips Beverage Co., 487 N.W.2d 925, 927–28 (Minn. Ct. App. 1992) (affirming dismissal of tortious interference with a contract claim "[b]ecause no contract exists").  "[T]he significance of a condition precedent in the context of a claim for tortious interference with contract" is that "'[a] conditional promise prevents a party from acquiring any rights under the contract unless those conditions occur. . . . If the event required by the condition does not occur, there can be no breach of contract, since the contract is unenforceable.'"  R.A., Inc., 556 N.W.2d at 570 (quoting Aslakson v. Home Sav. Ass'n, 416 N.W.2d 786, 789 (Minn. Ct. App. 1987)).

Simply stated, a party cannot have procured a breach of a contract right that does not exist, and the Cliffs Defendants are entitled to a judgment as a matter of law.

[28]    The Court should grant summary judgment to the Cliffs Defendants on the Twentieth Claim for Relief on the additional ground that "injunctive relief" cannot be asserted as a standalone cause of action.  Instead, it is an equitable remedy that may be sought in connection with other, separate claims.  See, e.g., Podpeskar v. Makita U.S.A. Inc., 247 F. Supp. 3d 1001, 1013 (D. Minn. 2017) (granting motion to dismiss stand-alone declaratory and injunctive relief claim); Westway Holdings Corp. v. Tate & Lyle PLC, No. 08-CV-841, 2009 WL 1370940, at *8 (D. Del. May 13, 2009) (dismissing separate count for injunctive relief because "[t]his Court recognizes that a claim for injunctive relief is not a separate cause of action in the Complaint, but an equitable remedy"); Christensen v. PennyMac Loan Servs., LLC, 988 F. Supp. 2d 1036, 1046 (D. Minn. 2013) ("The claim for injunctive relief is a request for a remedy, not a separate cause of action.").

01:23032887.1

-34-

Second, Third, Fourth, Fifth, Sixth, Thirteenth, Fourteenth, Fifteenth, Sixteenth, Seventeenth,

Twentieth, Twenty-First, Twenty-Second, Twenty-Third, and Twenty-Fourth Claims For Relief

to the extent that each of these causes of action rely upon the purported property interests and

rights.

Dated: March 28, 2018　　　　　　　YOUNG CONAWAY STARGATT & TAYLOR, LLP
Wilmington, Delaware

*/s/ M. Blake Cleary*
M. Blake Cleary (No. 3614)
Michael S. Neiburg (No. 5275)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email: mbcleary@ycst.com
　　　　mneiburg@ycst.com

-and-

JONES DAY
Robert S. Faxon (admitted pro hac vice)
Thomas Wearsch (admitted pro hac vice)
Kristin S.M. Morrison  (admitted pro hac vice)
North Point
901 Lakeside Avenue
Cleveland, OH  44114.1190
Telephone:  +1.216.586.3939
Facsimile:  +1.216.579.0212
E-mail:  rfaxon@jonesday.com
　　　　twearsch@jonesday.com
　　　　kmorrison@jonesday.com

*Attorneys for Cleveland-Cliffs Inc. and*
*Cleveland-Cliffs Minnesota Land Development LLC*

01:23032887.1

-35-