## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| ESSAR STEEL MINNESOTA LLC and ESML HOLDINGS INC., | Case No. 16-11626 (BLS) |
| Debtors. | (Jointly Administered) |
| MESABI METALLICS COMPANY LLC (F/K/A ESSAR STEEL MINNESOTA LLC), | Adv. Proc. No. 17-51210 (BLS) |
| Plaintiff, | Re D.I. 30, 31, 33 |
| v. | |
| CLEVELAND-CLIFFS, INC. (F/K/A CLIFFS NATURAL RESOURCES, INC.); CLEVELAND-CLIFFS MINNESOTA LAND DEVELOPMENT LLC; GLACIER PARK IRON ORE PROPERTIES LLC; and DOES 1-10, | |
| Defendants. | |

### PLAINTIFF'S MEMORANDUM OF LAW (A) IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT; AND (B) IN OPPOSITION TO DEFENDANT GLACIER PARK IRON ORE PROPERTIES LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**WHITE & CASE LLP**
Thomas E Lauria (admitted *pro hac vice*)
Glenn M. Kurtz (admitted *pro hac vice*)
Joshua Berman (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020-1095
Telephone:     (212) 819-8200
Facsimile:     (212) 354-8113

Craig H. Averch (admitted *pro hac vice*)
Ronald K. Gorsich (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone:     (213) 620-7700
Facsimile:     (213) 452-2329

**BAYARD, P.A.**
Justin R. Alberto (No. 5126)
Evan T. Miller (No. 5364)
Daniel N. Brogan (No. 5723)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
Telephone:     (302) 655-5000
Facsimile:     (302) 658-6395

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ........................................................................... 2

II.     JURISDICTION ............................................................................................... 5

III.    FACTUAL BACKGROUND .............................................................................. 6

        A.      Background of the Mineral Leases ...................................................... 6

        B.      Efforts to Preserve the Mineral Leases in the Bankruptcy Cases ........... 7

        C.      Resolution of the GPIOP/Superior Lease Proceedings.......................... 8

        D.      Events Subsequent to the Settlement Agreement and Entry of the
                Assumption Order ............................................................................. 9

IV.     SUMMARY JUDGMENT STANDARD ........................................................... 11

V.      ARGUMENT ................................................................................................ 13

        A.      The Mineral Leases Were Assumed on the Effective Date by the Plain
                Terms of the Assumption Order ........................................................ 13

        B.      Even Without Regard to the Modification in the Assumption Order,
                Plaintiff Is Entitled to Summary Judgment on the Subject Counts Under
                the Plain Terms of the Settlement Agreement and Minnesota Law ......... 16

                1.      The Mineral Leases Did Not Terminate on November 1, 2017 ........ 17

                2.      Plaintiff Was Entitled to Assume the Mineral Leases on the
                        Effective Date Because Enforcing the October 31, 2017 Effective
                        Date as a Condition Would Work a Forfeiture and Conflict with
                        Minnesota Law........................................................................... 24

                        i.       Judgment in Favor of GPIOP Would Result in an
                                 Inequitable and Impermissible Forfeiture. ............................ 28

                        ii.      The Mineral Leases and Minnesota Law Require Notice
                                 and an Opportunity to Cure .............................................. 30

                        iii.     The Consequences of the Forfeiture GPIOP Requests
                                 Would Materially Harm Mesabi and Provide GPIOP with a
                                 Windfall .......................................................................... 34

                3.      Section 3 of the Settlement Agreement Caused the Mineral Leases
                        to "Ride Through" the Chapter 11 Cases..................................... 35

                4.      Whether or Not the Mineral Leases "Rode Through" or Were
                        Assumed, They Were Deemed Amended and Restated for
                        Plaintiff's Benefit and Became Fully Enforceable by Plaintiff on
                        the Effective Date Pursuant to Section 4 ..................................... 38

VI.     CONCLUSION.............................................................................................. 44

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ............................................................................................12

*Chavarriaga v. N.J. Dep't of Corr.*,
  806 F.3d 210 (3d Cir. 2015) ................................................................................13

*Chertok v. Phelan (In re Phelan)*,
  2017 Bankr. LEXIS 502 (Bankr. M.D. Pa. Feb. 21, 2017) ..................................40

*Delta Mills, Inc. v. GMAC Commer. Fin. LLC (In re Delta Mills, Inc.)*,
  404 B.R. 95 (Bankr. D. Del. 2009) ......................................................................13

*Forklift LP v. iS3C, Inc. (In re Forklift LP)*,
  363 B.R. 388 (Bankr. D. Del. 2007) ....................................................................14

*Hon v. Stroh Brewery Co.*,
  835 F.2d 510 (3d Cir. 1987) ................................................................................12

*Imation Corp. v. Koninklijke Philips Elecs. N.V., U.S.*,
  586 F.3d 980 (Fed. Cir. 2009) ............................................................................24

*In re Beck*,
  272 B.R. 112 (Bankr. E.D. Pa. 2002) ..................................................................21

*In re Carter*,
  506 B.R. 83 (Bankr. D. Ariz. 2014) ......................................................................6

*In re CB Holding Corp.*,
  448 B.R. 684 (Bankr. D. Del. 2011) ....................................................................18

*In re Clean Burn Fuels, LLC*,
  540 B.R. 195 (Bankr. M.D.N.C. 2015) ..................................................................6

*In re DBSI, Inc.*,
  409 B.R. 720 (Bankr. D. Del. 2009) ....................................................................18

*In re JZ L.L.C.*,
  371 B.R. 412 (B.A.P. 9th Cir. 2007) ..............................................................38, 40

*In re Onco Inv. Co.*,
  316 B.R. 163 (Bankr. D. Del. 2004) ....................................................................13

*In re Our Alchemy, LLC*,
  2017 Bankr. LEXIS 879 (Bankr. D. Del. Mar. 31, 2017) ..............................18, 19

*In re Overseas Shipholdings Grp., Inc.*,
  2015 Bankr. LEXIS 1802 (Bankr. D. Del. June 1, 2015) ..........................18, 19, 22

*In re Pearlman*,
  515 B.R. 887 (Bankr. M.D. Fla. 2014) ..................................................................6

*In re Polysat, Inc.*,
  152 B.R. 886 (Bankr. E.D. Pa. 1993) ..............................................................39

*In re Seven Hills, Inc.*,
  403 B.R. 327 (Bankr. D.N.J. 2009) ...............................................................31

*In re Teleglobe Commc'ns Corp.*,
  304 B.R. 79 (D. Del. 2004).............................................................................18

*In re Trico Marine Services, Inc.*,
  450 B.R. 474 (Bankr. D. Del. 2011) ...............................................................15

*Kaucher v. Cty. of Bucks*,
  455 F.3d 418 (3d Cir. 2006)............................................................................12

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986).........................................................................................13

*Medical Malpractice Insurance Association v. Hirsh (In re Lavigne)*,
  114 F.3d 379 (2d Cir. 1997)......................................................................18, 19

*NLRB v. Bildisco & Bildisco*,
  465 U.S. 513 (1984).........................................................................................39

*Ohio Calculating, Inc. v. CPT Corp.*,
  846 F.2d 497, 501 (8th Cir. 1988) ..................................................................47

*Ray v. Twp. of Warren*,
  626 F.3d 170 (3d Cir. 2010)............................................................................12

### STATE CASES

*Austin v. Wacks*,
  15 N.W. 409 (Minn. 1883)...............................................................................28

*Baker Domes, Div. of R.M. Baker Co. v. Wolfe*,
  403 N.W.2d 876 (Minn. Ct. App. 1987) ........................................................28

*Bank Midwest v. Lipetzky*,
  674 N.W.2d 176 (Minn. 2004).......................................................................16

*Bly v. Bublitz*,
  464 N.W.2d 531 (Minn. Ct. App. 1990)..........................................................35

*Boatwright Constr., Inc. v. Kemrich Knolls*,
  306 Minn. 519 (1976) ......................................................................................27

*BOB Acres, LLC v. Schumacher Farms, LLC*,
  797 N.W.2d 723 (Minn. Ct. App. 2011)....................................................26, 29

*Brookfield Trade Ctr. v. Cty. of Ramsey*,
  584 N.W.2d 390 (Minn. 1998)...................................................................17, 23

*Chergosky v. Crosstown Bell, Inc.*,
  463 N.W.2d 522 (Minn. 1990).........................................................................17

*Cloverdale Foods v. Pioneer Snacks*,
   580 N.W.2d 46 (Minn. Ct. App. 1998) .......................................................................27, 30

*Cole v. Paulson*,
   380 N.W.2d 215 (Minn. Ct. App. 1986) ..............................................................................33

*Constr. Mortg. Investors Co. v. Darrel A. Farr Dev. Corp.*,
   2010 Minn. App. Unpub. LEXIS 802 (Minn. Ct. App. Aug. 10, 2010). ...............................25

*Edina Dev. Corp. v. Hurrle*,
   670 N.W.2d 592 (Minn. Ct. App. 2003) ..............................................................................34

*Energetics, Ltd. v. Whitmill*,
   442 Mich. 38 (1993) ...........................................................................................................22

*Giles Props. v. Kukacka*,
   2007 Minn. App. Unpub. LEXIS 384 (Minn. Ct. App. Apr. 24, 2007) ................................26

*Gill v. Bradley*,
   21 Minn. 15 (Minn. 1874) ..................................................................................................28

*Harris v. Bolin*,
   310 Minn. 391 (1976) .........................................................................................................31

*Hideaway, Inc. v. Gambit Invs., Inc.*,
   386 N.W.2d 822 (Minn. App. 1986) ...................................................................................31

*Jupiter Oil Co. v. Snow*,
   819 S.W.2d 466 (Tex. 1991) ...............................................................................................22

*Minneapolis v. Republic Creosoting Co.*,
   201 N.W. 414 (Minn. 1924) ...............................................................................................16

*Naftalin v. John Wood Co.*,
   263 Minn. 135 (1962) .........................................................................................................31

*Oster v. Medtronic, Inc.*,
   428 N.W.2d 116 (Minn. Ct. App. 1988) .............................................................................23

*Skogberg v. Huisman*,
   2003 Minn. App. LEXIS 1043 (Minn. Ct. App. Aug. 19, 2003) ..........................................27

*Storer Cable T.V., Inc. v. Summerwinds Apartments Assocs., Ltd.*,
   493 So. 2d 417 (Fla. 1986) .................................................................................................21

*Trollen v. City of Wabasha*,
   287 N.W. 2d 645 (Minn. 1979) ..........................................................................................30

*Valspar Refinish, Inc. v. Gaylord's, Inc.*,
   764 N.W.2d 359 (Minn. 2009) ...........................................................................................41

*Wurdenmann v. Hjelm*,
   257 Minn. 450 (Minn. 1960) ..............................................................................................33

*Zimmerman v. Meyer*,
   2005 Minn. App. LEXIS 581 (Minn. Ct. App. May 31, 2005) .............................................28

## FEDERAL STATUTES

11 U.S.C. § 365(d)(4) ................................................................................8, 37, 38

11 U.S.C. § 365(g) ...............................................................................3, 19, 20, 36

11 U.S.C. § 365 ...........................................................................................17, 36

## FEDERAL RULES

Fed. R. Civ. P. 56(a) ...............................................................................................12

## STATE STATUTES

Minn. Stat. §§ 93.001 *et seq.* ..................................................................................22

Minn. Stat. § 504B.001 ............................................................................................22

Minn. Stat. § 504B.291 ......................................................................................22, 35

Minn. Stat. § 559.21.........................................................................................33, 34

## TREATISES

8 Corbin on Contracts § 37.2 .................................................................................30

Restatement (Second) of Contracts, § 227 (1981) ......................................................26

Restatement (Second) of Contracts, § 229 (1981) ........................................27, 30, 31

Williston on Contracts 4th § 46:11 .........................................................................30

Pursuant to Rule 56 of the Federal Rules of Civil Procedure (the "**Civil Rules**"), made applicable in the above-captioned action pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Plaintiff Mesabi Metallics Company LLC ("**Plaintiff**," or, "**Mesabi**") hereby files its motion (the "**Mesabi MSJ**") for partial summary judgment on (i) counts 3, 4, 5, 6, 14, 16, 20, 21, 22, 23, and 24 (collectively, the "**Subject Complaint Counts**") of its *Second Amended Complaint and (Substantive and Non-Substantive) Objection to Claim Nos. 55 and 224* [Adv. D.I. 18] (the "**Complaint**"); and (ii) counterclaims 2 and 3 (the "**Subject Counterclaim Counts**," and, together with the Subject Complaint Counts, the "**Subject Counts**") of *Glacier Park Iron Ore Properties LLC's Answer to Second Amended Complaint and Counterclaims* [Adv. D.I. 30] (the "**GPIOP Answer and Counterclaims**") on the grounds set forth herein.  On substantially the same grounds, Plaintiff opposes *Defendant Glacier Park Iron Ore Properties LLC's Motion for Partial Summary Judgment* [Adv. D.I. 31] (the "**GPIOP MSJ**") filed by Glacier Park Iron Ore Properties LLC ("**GPIOP**").[1]  In support of its motion and in opposition to the GPIOP MSJ,[2] Plaintiff states:

---

[1]    In support of the GPIOP MSJ, GPIOP filed its *Opening Brief in Support of Defendant Glacier Park Iron Order Properties LLC's Motion for Partial Summary Judgment* [Adv. D.I. 33] (the **"GPIOP Opening Brief"**) and *Declaration of David A. Schlagel* [Adv. D.I. 32].

[2]    Since this brief constitutes both an opening ***and*** answering brief, Plaintiff believes the page limitations prescribed under Local Rule 7007-2(a)(iv) should be considered accordingly.  To that end, Plaintiff has filed, contemporaneously herewith, a motion to exceed the page limitations set forth in Local Rule 7007-2.

## I.   PRELIMINARY STATEMENT[3]

Plaintiff was blindsided on December 11, 2017, when its covetous competitor, Cliffs,[4] announced that it had acquired from GPIOP hundreds of acres of Plaintiff's most crucial mineral rights.  Cliff's crowed in its press release that this outcome was the result of Plaintiff's "fail[ure] to exit bankruptcy" by October 31, 2017, in connection with Plaintiff's new investor's "inability to timely secure funding and other consents for its plan to take [Plaintiff] out of bankruptcy at that time."   The purpose of the GPIOP MSJ is to rewrite the governing agreements between Plaintiff, GPIOP, and Superior to hew to Cliffs' narrative.  The purpose of Plaintiff's response and cross-motion is to enforce those agreements as written.

GPIOP's motivation to so revise history is simple.  GPIOP derived tremendous benefits from the governing agreements.  Pursuant to the Mineral Leases, Plaintiff made in excess of $10 million in royalty prepayments.  In the Settlement Agreement, Plaintiff agreed to waive any credit for those payments on the Effective Date.  As part of the Settlement Agreement, GPIOP was paid in advance through January 2018.  And, pursuant to the Settlement Agreement, GPIOP was assured that, once the Plan went effective, tens of millions of dollars of mechanics' liens would be wiped from its properties.  With these benefits in hand, GPIOP then secretly negotiated to sell or lease the properties to Cliffs, monetizing for a second time the mineral interests for which Plaintiff had already paid so dearly.

Plaintiff did not agree to let GPIOP do this.  It did not agree that GPIOP could materially disrupt Plaintiff's reorganization efforts without notice.  It did not agree that GPIOP could subject Plaintiff's mineral rights to competing claims by Cliffs.  It did not agree to give GPIOP

---

[3]   Plaintiff submits that this Preliminary Statement and the Factual Background below provides the nature and stage of the proceeding in accordance with Local Rule 7007-2(b)(i)(C).

[4]   Capitalized terms have the meanings ascribed to them below.

tens of millions of dollars in benefits and have nothing to show for it once its Plan went effective. What Plaintiff did agree was that, upon the effectiveness of its Plan, it would fully perform under the Mineral Leases. And, Plaintiff further agreed that GPIOP would have the *right* to terminate the Mineral Leases and take back the underlying property rights, subject to a limited opportunity for Plaintiff to cure, if GPIOP lost patience with the Plan process.

Plaintiff brought its Plan effective on December 22, 2017 and is, as a result, entitled to and expecting to enjoy all benefits under its Mineral Leases with GPIOP, without interference from Cliffs or anyone else. Plaintiff's expectations derive directly from the text of the Settlement Agreement and related documents. In relevant part:

- Effective Date has the same meaning in the Settlement Agreement that it does in the Plan, and it is not tied to any particular date. Settlement Agr., § 1, Plan, § 1.1(50). Because that date did not occur by October 31, 2017, pursuant to Section 3(d) of the Settlement Agreement, the Debtors were deemed to automatically reject the Mineral Leases on November 1, 2017. Settlement Agr., § 3(d) (the "Mineral Leases will be automatically rejected . . . in the event the Effective Date of the Plan does not occur by October 31, 2017 . . . ."). This constituted a breach of the Mineral Leases. 11 U.S.C. § 365(g). GPIOP and Superior were free to respond to such breach in accordance with the terms of the Mineral Leases and any such response would "not constitute a violation of the automatic stay or any other provisions of the Bankruptcy Code." Settlement Agr., §3(d).

- While the automatic stay was terminated for GPIOP and Superior, the Mineral Leases were not. "Reversion" of the Mineral Leases does not mean termination and GPIOP and Superior had to effect a termination by giving notice under the Mineral Leases and applicable Minnesota law in order to terminate them. The exemption from the automatic stay in the Settlement Agreement allowed them to do so but nothing in the Settlement Agreement excused them from doing so in order to effect a termination. So long as the leases were not terminated, they would "remain *in full force and effect until the Restated Mineral Leases become fully effective and enforceable.*" *Id.* at § 3(e); *see also* Assumption Order, ¶ 3 ("the Mineral Leases, as amended, are assumed as of the effective date of the Plan").

- The Restated Mineral Leases, defined as the "amended and restated agreements to supersede the Mineral Leases," are between GPIOP/Superior and the ***Reorganized***

Debtor, and "shall become fully effective and enforceable *on the Effective Date*." *Id.* at §4(a).[5]

- Further, the Omnibus Lease Amendment, through which GPIOP, Superior, and the Debtors agreed "to amend rights and obligations by and between them under the Mineral Leases effective as of the date of [the Settlement] Agreement," *id.* at §3(a), does not disturb the termination provisions in the Mineral Leases or provide that the Mineral Leases would be terminated upon their rejection by the Debtor. *See* Omnibus Lease Amendment, § 2 ("the unamended terms of the Mineral Leases shall remain in full force and effect.").

Not only did no termination of the Mineral Leases occur, but the Debtors' breach resulting from rejection was cured when the Effective Date occurred: "As of the Effective Date of the Plan, GPIOP and Superior agree that any pre-Effective Date breaches or defaults under the Mineral Leases are cured, and if not curable, are waived." Settlement Agr., §3(e). All of the above is plainly written in the Settlement Agreement, the Omnibus Lease Amendment, and the Assumption Order.

GPIOP's contrary interpretation of the relevant documents—even just those that it acknowledges—is fraught with inconsistencies. Its motion for summary judgment is a request that the Court rewrite the Mineral Leases and the Settlement Agreement, and pretend that one of two substantive paragraphs of the Assumption Order just isn't there. GPIOP's claim that the parties intended that the Mineral Leases were automatically "extinguished" if the Effective Date occurred after October 31, 2017 is facially inconsistent with the express terms of the Settlement Agreement, Omnibus Lease Amendment, and Assumption Order, as explained above. And

---

[5] To the extent the parties failed to reach agreement on the terms of the Restated Mineral Leases, Section 4(a) of the Settlement Agreement provides that the Mineral Leases would simply become the Restated Mineral Leases:

The Restated Mineral Leases shall be in form and substance acceptable to GPIOP, Superior, and the Reorganized Debtor, described herein, and contain terms and conditions substantially similar to the Mineral Leases unless otherwise agreed by GPIOP, Superior and the Reorganized Debtor. *The Mineral Leases will be deemed amended and restated by consent on the Effective Date of the Plan.*

GPIOP's interpretation of Section 4 would require the Court to simply erase it or subject it to a condition—that it applies only to situations in which the Effective Date occurs by October 31, 2017—that is contrary to the completely different condition the Parties actually agreed to in the clear and unambiguous language of Section 8.  For GPIOP to prevail, the unstated condition GPIOP wants to write into Section 4 would also need to be written into various other sections of the Settlement Agreement, Omnibus Lease Amendment, and Assumption Order.

GPIOP argues that Plaintiff's position—that the Settlement Agreement did not terminate the Mineral Leases—is absurd.  Not so.  It is not absurd to require, if GPIOP wanted October 31, 2017 to act as a condition precedent with respect to every provision in the Settlement Agreement, Omnibus Lease Amendment, and Assumption Order, that the agreements actually say that, rather than saying otherwise.  It is not absurd to require that, if GPIOP wanted the Mineral Leases to terminate automatically (in spite of the termination provisions in the Mineral Leases), that the language of the Settlement Agreement and Omnibus Lease Amendment, say as much, rather than saying otherwise.  It is not absurd to require GPIOP to give notice of termination as set forth in the provisions of the Mineral Leases, if in fact GPIOP wanted to terminate the Mineral Leases.  It is not absurd to require that, if GPIOP wanted the Reorganized Debtor's rights in the Restated Mineral Leases to be conditional in any way, that the language of the Settlement Agreement and the Omnibus Lease Amendment, say that, rather than saying otherwise.

Based on the plain text of the Parties' agreements, and as further set forth herein, GPIOP's motion must be denied and Mesabi's cross-motion granted.

## II.   JURISDICTION

1.    The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Amended Standing Order of Reference* entered by the United States District Court for the District of Delaware on February 29, 2012, and the Court's inherent authority to interpret

and enforce its own orders.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b).[6]

Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.    FACTUAL BACKGROUND

### A.    Background of the Mineral Leases

2.    Plaintiff was formed to develop and operate a fully-integrated pellet production facility (the "**Project**") in the western Mesabi Iron Range in northern Minnesota.  In furtherance of its objective, through leases and acquisitions from numerous lessors and sellers, Plaintiff assembled a patchwork of mining interests and other rights covering over 20,000 contiguous acres.

3.    Plaintiff acquired rights constituting part of this patchwork from GPIOP and Superior Mineral Resources LLC ("**Superior**") through the following leases (collectively, the "**Mineral Leases**") and related operating agreements, each dated as of November 29, 2006 and as from time to time thereafter amended[7]: (i) MSI 100% Indenture of Lease and MSI 100% Operating Agreement; (ii) MSI 50% Indenture of Lease and MSI 50% Operating Agreement; and (iii) MSI BLGN Indenture of Lease and MSI BLGN Operating Agreement.  Each Mineral Lease is in substantially the same form and contains the same termination provision pursuant to

---

[6]    Even if this matter were not a core proceeding, GPIOP consented to the Court's entry of a final order by filing the GPIOP MSJ.  *See In re Pearlman*, 515 B.R. 887, 892 n.21 (Bankr. M.D. Fla. 2014) (a request for partial summary judgment waived a *Stern* objection); *In re Clean Burn Fuels, LLC*, 540 B.R. 195, 199 n.2 (Bankr. M.D.N.C. 2015) (filing a motion for summary judgment deemed consent to the bankruptcy court's entry of a final judgment, even though defendant did not consent to entry of a final judgment in its answer); *In re Carter*, 506 B.R. 83, 88 (Bankr. D. Ariz. 2014) (deemed wavier of *Stern* objection by summary judgment movant necessary to "to prevent litigation conduct that could be described as sandbagging, 'heads I win; tails you lose,' or second bite at the apple strategy").

[7]    The Mineral Leases and related operating agreements are attached as **Exhibits A-1** through **C-2** to the *Appendix in Support of Plaintiff's Memorandum of Law (a) in Support of its Motion for Partial Summary Judgment and (b) in Opposition to Defendant Glacier Park Iron Ore Properties LLC's Motion for Partial Summary Judgment*, filed concurrently herewith (the **"Appendix"**).

which Plaintiff is entitled to written notice specifying any non-monetary default and is afforded

not fewer than thirty days to cure any default so specified.  *See* Mineral Leases, 2-3.

        **B.**        **Efforts to Preserve the Mineral Leases in the Bankruptcy Cases**

        4.        On July 8, 2016, Mesabi and ESML Holdings Inc. (together, the "**Debtors**") each

filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the

"**Bankruptcy Code**"), thereby commencing the Debtors' bankruptcy cases (the "**Chapter 11**

**Cases**").  The Debtors managed their properties as debtors-in-possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code.

        5.        Given the importance of the Mineral Leases to the Project, Plaintiff sought during

the Bankruptcy Cases to maintain those interests so as to preserve the planned economies of the

Project and maximize Plaintiff's chances of a successful reorganization.

        6.        On February 2, 2017, the Debtors filed their initial chapter 11 plan of

reorganization [D.I. 690] (the "**Original Plan**").  In connection with the Original Plan, the

Debtors filed a notice of their intention to assume certain unexpired mineral leases [D.I. 692]

(the "**Assumption Notice**"), including the Mineral Leases with GPIOP and Superior.

        7.        In response to the Assumption Notice, on April 12, 2017, GPIOP filed an

objection to the Debtors' proposed assumption of the Mineral Leases in the Original Plan

[D.I. 888] (the "**GPIOP Objection**").  The Parties resolved the GPIOP Objection by stipulation

[D.I. 924-1] (the "**Stipulation**") approved by the Court on April 24, 2017 [D.I. 924].  Pursuant to

the Stipulation, the Debtors agreed that the motion to assume contained in the Original Plan, as it

related to the Mineral Leases only, would be withdrawn, that the assumption of the Mineral

Leases would be addressed by a separate motion, and that the protections of section 365(d)(4)

were waived with respect to the Mineral Leases.

        8.        On June 8, 2017, the Debtors filed their third amended plan of reorganization

[D.I. 990] (as from time to time amended, the "**Plan**"), which contemplated and provided for, among other things, the contribution of equity and debt financing sufficient to support assumption of important mineral and surface leases, as well as the construction and ultimate operation of the Project.

9.    On June 13, 2017, the Court confirmed the Plan and entered its *Findings of Fact, Conclusions of Law, and Order Confirming the Third Amended Chapter 11 Plan of Reorganization for Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc. Proposed by the Debtors* [D.I. 1025] (the "**Confirmation Order**").  No party appealed the Confirmation Order and the Confirmation Order became final and non-appealable on June 27, 2017.

10.    Also on June 27, 2017, as contemplated in the Stipulation, the Debtors filed a motion to assume the Mineral Leases [D.I. 1056] (the "**Motion to Assume**"), to which GPIOP objected [D.I. 1093] on July 14, 2017.

C.    **Resolution of the GPIOP/Superior Lease Proceedings**

11.    On August 28, 2017, the Parties resolved the Motion to Assume by settlement (the "**Settlement Agreement**"), which incorporated that certain omnibus lease amendment (the "**Omnibus Lease Amendment**") attached as Exhibit 1 thereto.  The Settlement Agreement was approved by the Court upon entry of an agreed order on August 30, 2017 [D.I. 1168] (the "**Assumption Order**"), which is now final and not subject to appeal.   The terms of the Assumption Order were negotiated and agreed among the Parties.  *See Certification of Counsel in Connection with the Debtors' Motion Pursuant to Sections 105(a) and 365 of the Bankruptcy Code Authorizing Assumption of the GPIOP Mineral Leases* [D.I. 1161] (the "**Assumption COC**").  A true and correct copy of the Assumption COC is attached as **Exhibit D** to the Appendix.  True and correct copies of the Assumption Order, the Settlement Agreement, and the

Omnibus Lease Amendment are attached as **Exhibit E** to the Appendix.

12.     The proper interpretation of the Settlement Agreement, including the Omnibus Lease Amendment, and the Assumption Order is the subject of the GPIOP MSJ and this Mesabi MSJ.

> **D.     Events Subsequent to the Settlement Agreement and Entry of the Assumption Order**

13.     On September 7, 2017, Plaintiff Mesabi filed the *Original Complaint* [Adv. D.I. 1] against Defendant Cleveland-Cliffs, Inc. ("**Cliffs**") and Does 1-10, thereby initiating this adversary proceeding.

14.     On September 11, 2017, at the request of the case administrator of the Court, Plaintiff filed an amended complaint solely to add an "f/k/a" to Plaintiff's name in the caption of the pleading [Adv. D.I. 3].

15.     October 31, 2017 passed without the Plan going effective.  As a result, on November 1, 2017, the Mineral Leases were rejected in accordance with the terms of the Settlement Agreement.  However, neither GPIOP nor Superior took any action to terminate the Mineral Leases in accordance with their terms and Plaintiff continued discussions regarding the Mineral Leases with GPIOP and Superior.  Moreover, neither GPIOP nor Superior took any action to force Mesabi off of the Leased Properties (as defined below) on or after November 1, 2017, and Mesabi has thereafter remained on the Leased Properties.

16.     On November 29, 2017, Plaintiff served the amended complaint on Cliffs [Adv. D.I. 4].

17.     On December 8, 2017, Plaintiff Mesabi and Cliffs entered into a stipulation to extend the time for Cliffs to respond to the Complaint [Adv. D.I. 6], which was approved by order of the Court on December 12, 2017 [Adv. D.I. 7].

18.    On December 11, 2017, Cliffs issued a press release, in relevant part, as follows:

[Cliffs] announced today that its wholly-owned subsidiary, Cleveland-Cliffs Minnesota Land Development LLC [("**Cliffs Minnesota**")], completed an acquisition of certain real estate interests . . . from [GPIOP].  The interests include a combination of undivided and whole fee interests as well as mineral and surface leases, all lying within the Biwabik Iron Formation.  The acreage acquired is approximately 553 acres and the acreage being leased is approximately 3,215 acres.

Cliffs expects to be able to leverage the acquired real estate interests to develop a financially sustainable plan for the site, which may be considered as other iron ore resources deplete.  The purchased properties include parcels that were formerly leased by GPIOP to [Mesabi], formerly known as Essar Steel Minnesota. [Mesabi's] lease rights terminated on October 31, 2017 when it failed to exit bankruptcy in connection with Chippewa's inability to timely secure funding and other consents for its plan to take [Mesabi] out of bankruptcy at that time.

Lourenco Goncalves, Chairman, President and Chief Executive Officer, said, "We are enthused about the acquisition of this property, which came into play after Chippewa failed to follow through on its obligation to obtain financing and a bankruptcy exit for [Mesabi] by October 31.  Despite several botched attempts by others, it is now the time for [Cliffs] to sit at the table with other responsible parties and develop a realistic solution for this site."

Cleveland-Cliffs Inc. Announces Acquisition of Real Estate Interests in Itasca County, Minnesota (Dec. 11, 2017), available at http://www.clevelandcliffs.com/English/news-center/news-releases/news-releases-details/2017/Cleveland-Cliffs-Inc-Announces-Acquisition-of-Real-Estate-Interests-in-Itasca-County-Minnesota/default.aspx (the "**Cliffs Release**").

19.    Plaintiff alleges in the Complaint that the transaction described in the Cliffs Release (the "**Cliffs Transaction**") had been in the works for some time.  Cliffs Minnesota, the entity that served as the acquisition vehicle for such rights, was created on October 9, 2017,[8] well before the November 1, 2017 rejection of the Mineral Leases.  Nonetheless, GPIOP gave the Debtors no warning or indication that it intended to sell or lease to any third party its rights in the properties covered by the Mineral Leases (the "**Leased Properties**"), even as it continued

---

[8]    *Query* "Cleveland-Cliffs Minnesota Land Development LLC" *at* Delaware Business Entity Search, https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx.

discussions with Chippewa Capital Partners, LLC ("**Chippewa**," or, the "**Plan Sponsor**"), the Plan Sponsor under the Plan.

20.     On December 22, 2017 (the "**Effective Date**"), Plaintiff filed its *Motion to Amend Complaint* (the "**Motion to Amend**") [Adv. D.I. 8] in order to protect its rights in the Leased Properties from Cliffs' and GPIOP's unlawful interference.  Shortly thereafter, on the same date, the Plan went effective in accordance with its terms [D.I. 1398].  As a consequence, Plaintiff became the Reorganized Debtor.  Plan, § 1.1(134).

21.     On January 9, 2018, Cliffs filed an opposition to the Motion to Amend [Adv. D.I. 10].  The arguments set forth by Cliffs therein are largely the same arguments that GPIOP now advances in support of the GPIOP MSJ.  On January 23, 2018, the Court entered its *Memorandum Order Granting Plaintiff's Motion to Amend Complaint* (the "**Amendment Order**") [Adv. D.I. 17], finding that Plaintiff's proposed amendments to the Complaint were not futile.

22.     On January 23, 2018, pursuant to the Amendment Order, Plaintiff filed the Complaint.  GPIOP filed the GPIOP MSJ and GPIOP Answer and Counterclaims on February 26, 2018.  Pursuant to the schedule agreed by the parties and entered by the Court [Adv. D.I. 44], Mesabi hereby timely opposes the GPIOP MSJ and requests summary judgment in its favor on the Subject Counts.  Each of the Subject Counts turns on whether Plaintiff is entitled to the benefits of the Mineral Leases, as Plaintiff contends, or whether they were irrevocably terminated as of November 1, 2017, as GPIOP contends.

## IV.     SUMMARY JUDGMENT STANDARD

23.     Summary judgment is not "a disfavored procedural shortcut but rather . . . an integral part of the [Civil] Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)

(quoting Fed. R. Civ. P. 1). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.*, 447 U.S. at 322-23; *Hon v. Stroh Brewery Co.*, 835 F.2d 510, 512 (3d Cir. 1987). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006). In determining whether summary judgment is appropriate, the Court must "view the facts and draw inferences in the light most favorable to the nonmoving party." *Ray v. Twp. of Warren*, 626 F.3d 170, 173 (3d Cir. 2010). Summary judgment on contract claims is appropriate where the language of a contract is unambiguous. *Delta Mills, Inc. v. GMAC Commer. Fin. LLC* (*In re Delta Mills, Inc.*), 404 B.R. 95, 106 (Bankr. D. Del. 2009) (citing *Faulkner v. Nat'l Geographic Soc'y*, 452 F. Supp. 2d 369, 375 (S.D.N.Y. 2006)). A contract is not ambiguous simply because the parties assert different meanings for a contractual provision. *In re Onco Inv. Co.*, 316 B.R. 163, 167 (Bankr. D. Del. 2004).

24. The moving party has the initial burden of supporting the position that there is no genuinely disputed issue of material fact. Fed. R. Civ. P. 56(a). The non-moving party must then come forward with material facts showing a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To carry its burden once shifted, the non-moving party must "do more than create some metaphysical doubt as to the material facts." *Id.* at 586; *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 218 (3d Cir. 2015).

25. As further set forth below, the facts material to the Subject Counts are not in dispute. In fact, the Court only needs to look to the unambiguous language of the Settlement Agreement, the Omnibus Lease Amendment, and the Assumption Order to find for Plaintiff on the Subject Counts. Accordingly, the Mesabi MSJ should be granted and the GPIOP MSJ

denied.

## V.    ARGUMENT

### A.    The Mineral Leases Were Assumed on the Effective Date by the Plain Terms of the Assumption Order

26.    Plaintiff's continued interest in the Mineral Leases is definitively established in the Assumption Order, which provides, in relevant part:

> Pursuant to sections 105(a) and 365 of the Bankruptcy Code, the Mineral Leases, as amended, are assumed as of the effective date of the Plan.

Assumption Order, ¶ 3.  The Effective Date occurred on December 22, 2017.  By the unqualified and explicit terms of the Assumption Order, the Mineral Leases were assumed by the Reorganized Debtor on such date.  The terms of the Assumption Order must control over any contrary terms of the Settlement Agreement both because the Assumption Order is an order and because it is later in time.

27.    The Assumption Order gives effect to the terms of the Settlement Agreement and therefore does so subject to the terms of the Assumption Order.  In *Forklift LP v. iS3C, Inc.* (*In re Forklift LP*), 363 B.R. 388 (Bankr. D. Del. 2007), Judge Walsh concluded that the terms of a confirmation order control over contrary terms of a plan as a matter of law because "[a] plan of reorganization has no effect without a court's confirmation."  *Id.* at 396 ("When the plan and the confirmation order contradict, 'the confirmation order prevails.'") (quoting *Guardian S&L Ass'n v. Arbors Assocs.* (*In re Arbors Assocs.*), No. 97-2099, 1999 U.S. App. LEXIS 162, at *11 (6th Cir. Jan. 4, 1999) and collecting cases).

28.    Confirmation orders are to plans as the Assumption Order is to the Settlement Agreement.  Section 8(a) provides that all obligations under the Settlement Agreement could be fully enforced only upon this Court's approval.  Settlement Agr., § 8(a) (Debtors' obligations under agreement entirely contingent upon the Court's approval).  The Assumption Order is the

mechanism by which the Settlement Agreement became fully enforceable. Thus, by the reasoning of *Forklift LP*, the Assumption Order's provisions must control over contrary provisions in the Settlement Agreement. Where Paragraph 3 of the Assumption Order provides that, "[p]ursuant to sections 105(a) and 365 of the Bankruptcy Code, the Mineral Leases, as amended, are assumed as of the effective date of the Plan," the Mineral Leases as amended by the Omnibus Lease Amendment will be assumed as of the Plan's Effective Date notwithstanding any purported unsatisfied conditions to assumption in the Settlement Agreement.[9]

29.      Even if the Court were to find that the Assumption Order does not automatically control over the terms of the Settlement Agreement by virtue of its status as an effectuating order, the Assumption Order would still control as a matter of contract interpretation and requires assumption of the Mineral Leases on the Effective Date by agreement of the Parties.

30.      In *In re Trico Marine Services, Inc.*, 450 B.R. 474, 482 (Bankr. D. Del. 2011), this Court noted that it interprets agreed forms of order, like the Assumption Order, in the same way as it interprets contracts. Quoting the Third Circuit, the Court there observed that "'the strongest manifestation of [contractual] intent is the wording of the agreement itself.'" *Id.* (quoting *Nova Chem., Inc. v. Sekisui Plastics Co.*, 579 F.3d 319, 323 (3d Cir. 2009). Here, the wording of Paragraph 3 is clear and unconditional: the Mineral Leases will be "assumed as of the effective date of the Plan."

31.      While avoiding the issue of the Assumption Order entirely in the GPIOP MSJ, GPIOP is likely to argue that the Assumption Order conflicts with what it calls the "condition

---

[9]   For the reasons more fully set forth below, though the Mineral Leases were automatically rejected on November 1, 2017, the occurrence of the Effective Date cured or waived all breaches by consent pursuant to Section 3(e) of the Settlement Agreement. Rejection is a breach. 11 U.S.C. § 365(g). It was cured or waived by agreement of the Parties at the same time as the Mineral Leases were assumed pursuant to Paragraph 3 of the Assumption Order.

precedent to assumption of the [] Mineral Leases contained in Section 3(b) of the Settlement Agreement." GPIOP Opening Br., 8. A conflict between these two provisions must be resolved in favor of the later in time as a valid amendment to the Settlement Agreement.

32.     Section 19 of the Settlement Agreement sets forth the requisite formalities for an amendment: merely a "written agreement of the Parties." Settlement Agr., § 19. As described in the Assumption COC, the form of Assumption Order is just that: the Debtors, the Plan Sponsor, and GPIOP "agreed upon the form of the revised proposed order . . . authorizing assumption of the GPIOP Mineral Leases, as the GPIOP Mineral Leases are amended pursuant to [the] Settlement Agreement." Assumption COC ¶ 3. A blackline included with the Assumption COC reflects that, while the Parties negotiated several changes to the original proposed form of Assumption Order, undisturbed is Paragraph 3's mandate that assumption *will* occur on the Plan's effective date.

33.     As an amendment or otherwise as an integrated part of the Settlement Agreement, the agreed Assumption Order necessarily controls over the Settlement Agreement as a matter of Minnesota law because the agreed Assumption Order is later in time. *See* 8 Dunnell Minn. Digest Contracts § 8.06 (2017) ("Where there is inconsistency in the related documents constituting a contract, the later stipulations will control."); *Minneapolis v. Republic Creosoting Co.*, 201 N.W. 414, 418 (Minn. 1924) (holding that the quantity term in a later contract controls over contrary quantity term specified in an earlier, incorporated contract).

34.     The provision of the Assumption Order approving "all of the[] terms and conditions" of the Settlement Agreement does not elevate those terms over the unqualified statement that the Mineral Leases "are assumed as of the effective date of the Plan." In interpreting a contract, "'more specific language takes precedence over the more general language.'" *Bank Midwest v. Lipetzky*, 674 N.W.2d 176, 181 n.8 (Minn. 2004) (internal citations

omitted).  The Assumption Order's blanket approval of the Settlement Agreement in Paragraph 2 is the definition of general.  The explicit statement in Paragraph 3 that assumption will occur on the Effective Date is specific.  It must control.  Further, any interpretation that the Mineral Leases were *not* assumed on the Effective Date would render Paragraph 3 of the Assumption Order meaningless.  If the Assumption Order did nothing but approve the Settlement Agreement, Paragraph 2 would have been all that was required.  Ignoring Paragraph 3 violates the principle that courts should "avoid an interpretation of [a] contract that would render a provision meaningless."  *Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 526 (Minn. 1990); *see also Brookfield Trade Ctr. v. Cty. of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998).

35.     The terms of the Assumption Order are clear and unambiguous and no further inquiry into the parties' intent is required or permitted.  Summary judgment on the Subject Counts should enter in Plaintiff's favor.

   **B.     Even Without Regard to the Modification in the Assumption Order, Plaintiff Is Entitled to Summary Judgment on the Subject Counts Under the Plain Terms of the Settlement Agreement and Minnesota Law**

36.     Even if the Assumption Order did not preserve Plaintiff's rights in respect of the Mineral Leases and Restated Mineral Leases, such rights continue for the reasons set forth in Sections B.2, B.3, and B.4, below.  Important to first note, however, is that the Settlement Agreement did not terminate or "extinguish" the Mineral Leases as GPIOP claims.  The passage of October 31, 2017 without the Plan going effective resulted merely in a rejection of the Mineral Leases that was excused when the Plan went effective on December 22, 2017—just fifty-two days later.  On that date, all prior breaches, including rejection, were cured or waived under the express terms of the Settlement Agreement and the Reorganized Debtor was entitled to all rights and benefits of the Mineral Leases going forward.

### 1. The Mineral Leases Did Not Terminate on November 1, 2017

37.     Section 3(d) of the Settlement Agreement provides as follows:

> The Mineral Leases will be automatically rejected pursuant to Section 365 of the Bankruptcy Code and revert to GPIOP and Superior, as applicable, without further Bankruptcy Court proceedings or litigation in the event the Effective Date of the Plan does not occur by October 31, 2017, or such later date agreed by the Parties. In such circumstance, GPIOP and Superior, as applicable, may take any action with respect to the Mineral Leases and the leased properties and interests and such actions will not constitute a violation of the automatic stay or any other provisions of the Bankruptcy Code.

Settlement Agr., § 3(d). The Plan did not go effective by October 31, 2017. As a consequence, the Mineral Leases were rejected on November 1, 2017.

38.     However, a rejection does not constitute a termination of an unexpired lease. *In re Teleglobe Commc'ns Corp.*, 304 B.R. 79, 83 (D. Del. 2004) ("[A] rejection and surrender of a nonresidential real property lease is a breach of the lease and not a termination thereof . . . ."); *In re DBSI, Inc.*, 409 B.R. 720, 731 (Bankr. D. Del. 2009) (Walsh, J.) ("It is well-settled that the rejection of a lease pursuant to § 365 results in a prepetition breach; it does not constitute a termination of the lease.") (citing *In re Austin Dev. Co.*, 19 F.3d 1077, 1082-83 (5th Cir. 1994); *In re Modern Textile, Inc.*, 900 F.2d 1184, 1191 (8th Cir. 1990); *Leasing Serv. Corp. v. First Tenn. Bank Nat'l Ass'n*, 826 F.2d 434, 437 (6th Cir. 1987)); *see also In re CB Holding Corp.*, 448 B.R. 684, 686-87 (Bankr. D. Del. 2011) (Walrath, J.) (quoting *In re DBSI*, 409 B.R. at 731); *In re Overseas Shipholdings Grp., Inc.*, No. 12-20000, 2015 Bankr. LEXIS 1802, at *8 (Bankr. D. Del. June 1, 2015) (Walrath, J.) (citing 11 U.S.C. § 365(g) and collecting cases); *In re Our Alchemy, LLC*, No. 16-11596, 2017 Bankr. LEXIS 879, at *3 (Bankr. D. Del. Mar. 31, 2017) (Gross, J.) ("The cases in this jurisdiction are uniform in holding that rejection of an executory contract is a breach and not a termination of the contract."). GPIOP ignores the uniform case law within this jurisdiction in favor of contrary rules found elsewhere. *See* GPIOP Opening Br. at 15 (citing various decisions from outside of the Third Circuit concerning the effect of

rejection).  In this District, the rule is that rejection does not terminate the lease.

39.     *Medical Malpractice Insurance Association v. Hirsh* (*In re Lavigne*), 114 F.3d

379, 387 (2d Cir. 1997), which has been followed in this District,[10] illustrates how an agreement

can have continued vitality even after rejection.  In that case, the debtor rejected his malpractice

insurance policy and specifically canceled his existing coverage thereunder.  However, the policy

provided that the debtor was entitled to purchase tail coverage upon cancellation of primary

coverage and he sought to do so.  His insurance carrier refused to provide tail coverage on the

basis that the policy had been rejected.  The Second Circuit found that the rejection was not a

sufficient breach to terminate the debtor's right to obtain tail coverage under the rejected policy.

The Second Circuit explained:

> because the rejection does not terminate all contractual and statutory obligations,
> [insurer] is not absolved from providing extended coverage.  Rejection simply
> cancelled the existing coverage and triggered the policy's sixty-day automatic
> extended reporting period and option to purchase additional tail coverage.

*Id*. at 389.

40.     Since mere rejection does not constitute a termination, an agreement regarding the

rejection of an unexpired lease must expressly and specifically provide for termination if that is

what the parties intended.  *In re Overseas Shipholdings Grp*., 2015 Bankr. LEXIS 1802, at *7-8

("If the parties had intended a termination of the Overlease [in a stipulation regarding rejection],

they would have used that language.").

41.     Here, there is no reference to any "termination" of the Mineral Leases.   In

addition to "rejection," the Settlement Agreement provides only for "rever[sion]" of the Mineral

Leases (as opposed to the underlying property interests) if the Plan did not go effective by

---

[10]   *See In re Our Alchemy*, 2017 Bankr. LEXIS 879, at *5 (citing *Lavigne* for the proposition
that "[t]he parties' rights flowing from the breach [resulting from rejection] of the
Agreements are then determined by applicable state law").

October 31, 2017.  Settlement Agr., § 3(d).  "Reversion" of the "Mineral Leases" cannot mean that the Mineral Leases were terminated by operation of Section 3(d).[11]  As more fully explained below, reversion of the "Mineral Leases" means that the contractual rights suspended by the Chapter 11 Cases reverted to GPIOP on October 31, 2017.  Put simply, GPIOP's right to terminate the Mineral Leases automatically reverted to GPIOP.  The Mineral Leases did not automatically terminate by "reversion."

42.     First, Section 3(e) provides that the Mineral Leases would remain in full force and effect until the Plan's Effective Date, without regard to when such date might occurr.  Specifically, Section 3(e) provides "[t]he Mineral Leases *shall remain in full force and effect* until the Restated Mineral Leases become fully effective and enforceable."  Settlement Agr., § 3(e).  Section 4 provides that the Restated Mineral Leases "shall become fully effective and enforceable on the Effective Date."  *Id.* at § 4(a).[12]  Reading "revert" as "terminate" would be directly contrary to Section 3(e)'s mandate that the Mineral Leases "remain in full force and effect" until any date on which the Plan might become effective—including on December 22, 2017 when it did.

43.     Second, the Omnibus Lease Amendment, made effective as of the date of the

---

[11]   GPIOP's Third Counterclaim for Relief in its Answer asserts a claim for breach of contract due to rejection of the Mineral Leases as of November 1, 2017.  Nowhere in its counterclaim does GPIOP assert that the Mineral Leases were terminated.  *See* GPIOP Answer and Counterclaims [Adv. D.I. 30], ¶ 153 ("[R]ejection of the GPIOP Mineral Leases and the MSI/BLGN Mineral Lease constituted a breach of each of those leases.  11 U.S.C. § 365(g).").

[12]   "Effective Date" in the Settlement Agreement means the same thing as it does in the Plan.  Settlement Agr., § 1.  The Plan definition of "Effective Date" is not tied to any particular date or deadline.  Rather, it is the date on which the Plan would become effective after all conditions precedent to effectiveness were satisfied or waived.  Plan, § 1.1(50).  The "Effective Date" for the purposes of the Plan, and therefore the Settlement Agreement, is December 22, 2017 when the Plan actually did go effective.

Assumption Order,[13] leaves undisturbed the termination provisions in the Mineral Leases. In relevant part, the Mineral Leases afford Mesabi not fewer than thirty days after written notice from GPIOP and Superior of a non-monetary default to cure such default prior to termination. *See* Mineral Leases, 2-3. Had the Parties intended that the Mineral Leases would terminate immediately if the Plan was not effective by October 31, 2017 or as a consequence of the non-monetary default of rejection, 11 U.S.C. § 365(g), they could have easily made the Omnibus Lease Amendment reflect this deviation from the terms of the original Mineral Leases. That they did not evinces the Parties' intent that the existing termination provisions remain operative for all purposes such that GPIOP would be able to consider its options, and would have to issue a notice of non-monetary default upon rejection in order to terminate. *Cf. In re Beck*, 272 B.R. 112, 121 (Bankr. E.D. Pa. 2002) (noting, with respect to rejected car lease, that "since the lease contract is not terminated by rejection, the parties are not foreclosed from performance post-bankruptcy and the extant contract will define the terms of the performance . . . .").

44.     Third, the words "revert" and "terminate" have different meanings. The Settlement Agreement says the "Mineral Leases" (but not the underlying property interests) will "revert." It does not say the Mineral Leases will "terminate." In the context of a real property lease, reversion of the underlying property interests is the consequence of termination of the lease, but leases themselves do not "revert." Leases only end by "termination." *See, e.g.*, MN St. Tax. Rep. (CCH) P 00676 (Apr. 27, 1977) ("Upon the ***termination of appellant's lease*** in 1971, the Orwell ***properties reverted*** to the possession of Great Northern Iron Ore Properties.");

---

[13]   GPIOP says that the Omnibus Lease Amendment would become effective only upon an assumption occurring on or before October 31, 2017. GPIOP Opening Br. 18. This is incorrect. *See* Settlement Agreement, § 3(a) (parties agreed "to amend rights and obligations by and between them under the Mineral Leases effective as of the date of this Agreement pursuant to the omnibus amendment attached as Exhibit 1").

*Storer Cable T.V., Inc. v. Summerwinds Apartments Assocs., Ltd.*, 493 So. 2d 417, 421 (Fla. 1986) ("During the term of the lease, the landlord's ownership is what the law calls a reversionary interest, because absolute ***ownership will revert*** back to the landlord ***upon the termination of the lease*** at some time in the future."); *Jupiter Oil Co. v. Snow*, 819 S.W.2d 466, 468 (Tex. 1991) ("[U]pon the ***termination of the lease***, ***the mineral estate ordinarily reverts*** to the grantors of the lease, their heirs or assigns."); *Energetics, Ltd. v. Whitmill*, 442 Mich. 38, 48 (1993) ("It is evident that the transfer of an interest in oil and gas occurs both when a lease takes effect and when ***the leasehold interest reverts*** to the interest owner ***upon termination of the lease***.").

45.     This usage convention is not followed just by courts; it is also accepted among GPIOP, Superior, and Plaintiff.  The Mineral Leases and related operating agreements contain over seventy instances of the word "terminate" in reference to how the Mineral Leases might end.  They do not contain one instance of the word "revert."  *Cf.* Minn. Stat. §§ 504B.001[14] *et seq.* (governing interests between landlords and tenants with no reference to the terms "revert" or "reversion"); Minn. Stat. §§ 93.001 *et seq.* (governing state mineral lands and leases with no reference to the terms "revert" or "reversion").

46.     Again, the Settlement Agreement does ***not*** provide that the underlying property interests—the Leased Properties—will revert on November 1, 2017 without an effective Plan. And, more importantly, it does not provide that the Mineral Leases will "terminate" as they must in order for the Leased Properties to revert.  "If the parties had intended a termination . . . they would have used that language." *In re Overseas Shipholdings Grp.*, 2015 Bankr. LEXIS 1802, at

---

[14]   Section 504B.291 specifically provides that for leases with terms of more than 20 years, the landlord must provide the tenant with at least 30 days' notice of lease cancellation/eviction, and that the lessee may remedy defaults during that time.

*7-8.  The Parties here did not.  The "reversion" of the Mineral Leases was not intended as a termination.

47.     Fourth, and finally, Section 3(d) itself shows that "revert" does not mean "terminate."  Following the "reversion" language, Section 3(d) goes on to provide that, if the Plan did not go effective by October 31, 2017, "GPIOP and Superior, as applicable, ***may take any action with respect to the Mineral Leases*** and the leased properties and interests and such actions will not constitute a violation of the automatic stay or any other provisions of the Bankruptcy Code."  Settlement Agr., § 3(d) (emphasis added).  Under well-accepted principles of contract interpretation, the Settlement Agreement must be interpreted to give this provision meaning.  *Brookfield Trade*, 584 N.W.2d at 394 ("[W]e are to interpret a contract in such a way as to give meaning to all of its provisions.").  If failure of the Effective Date to occur by October 31 ***did*** cause the Mineral Leases to terminate automatically, there would be no further "action with respect to the Mineral Leases" for GPIOP or Superior to take and thus nothing to be stayed. The Mineral Leases would be terminated, done and gone.  And, if the Mineral Leases were terminated, the Debtors would have no rights in them to be protected by the automatic stay.[15] Hence, "reversion" could not have meant "termination."

48.     To the extent that the term "revert" gives rise to an internal inconsistency in the Settlement Agreement, it is the task of the Court to harmonize the conflicting provisions.  *Oster v. Medtronic, Inc*., 428 N.W.2d 116, 119 (Minn. Ct. App. 1988) ("Where there is an apparent conflict between two clauses or provisions of a contract, it is the court's duty to find harmony between them and to reconcile them if possible.").  This is easily done.  Reading Section 3(d)

---

[15] Just as neither GPIOP nor Superior took advantage of their stay relief pursuant to Section 3(d) to terminate the Mineral Leases, they also failed to attempt to remove Plaintiff from the Leased Properties, as they would have been entitled to do if they truly believed that Plaintiff was holding over on an after November 1, 2017.

together with the rest of the Settlement Agreement, the Parties' intent in deeming a rejection by the Debtors under the circumstances specified in Section 3(d) is clear: it would give GPIOP and Superior the *right to commence termination* of the Mineral Leases under state law due to the agreed non-monetary default of rejection.

49.     This is the only interpretation under which Section 3(d)'s exemption from "the automatic stay or any other provisions of the Bankruptcy Code" (but ***not*** an exemption from the Mineral Leases or state law) to "take any action with respect to the Mineral Leases" makes any sense.  Under this sole logical interpretation, "rever[sion]" of the Mineral Leases (as opposed to the underlying property rights) refers to the return of the contractual right that, by operation of the automatic stay, was involuntarily ceded by GPIOP upon the order for relief: the ***right*** to terminate the Mineral Leases.[16]  Once that right to terminate reverted to GPIOP on November 1, 2017, GPIOP was free to exercise it.  But it was also ***obligated*** to exercise it, still subject to the terms of the Mineral Leases and state law, if a termination was what GPIOP wanted.

50.     Thus understood, the effect of the automatic rejection provision in Section 3(d) was to give GPIOP and Superior the power to force the Debtors to make their Plan go effective within thirty days of notice after October 31, 2017 or else risk losing the Mineral Leases altogether.  This reserved to GPIOP and Superior the flexibility in their approach that they

---

[16]   That a distinction between contractual rights under the Mineral Leases and the underlying property rights and interests was intended is further shown by the second sentence of Section 3(d), which refers to both the "Mineral Leases ***and*** the leased properties and interests."  If GPIOP and Superior had intended that both their rights in respect of the Mineral Leases ***and*** the underlying "leased properties and interests" would automatically revert after October 31 if the Plan was not effective, they would have used the same language in the first sentence of Section 3(d).  They did not.  The difference should be read as intentional.  *See Imation Corp. v. Koninklijke Philips Elecs. N.V., U.S.*, 586 F.3d 980 (Fed. Cir. 2009) (New York law) ("Where one provision of an agreement contains a particular reference, the omission of this reference from any similar provision 'must be assumed to have been intentional under accepted canons of contract construction.'") (quoting *U.S. Fid. Guar. Co. v. Annunziata*, 67 N.Y.2d 228, 223 (1986)).

desired for terminating the Mineral Leases depending on how things were proceeding in the Chapter 11 Cases following automatic rejection under Section 3(d)—namely to then decide whether they still wanted to support the Plan. The Debtors' payment of royalties through January 20, 2018 is also consistent with the expectation that the Mineral Leases would continue for at least some period (which could be no less than thirty days under the Mineral Leases) after October 31, 2017.

51.    For the reasons that follow, GPIOP's and Superior's failure to terminate the Mineral Leases resulted in the Reorganized Debtor being entitled to all rights under the Mineral Leases on and after the Effective Date

> **2.    Plaintiff Was Entitled to Assume the Mineral Leases on the Effective Date Because Enforcing the October 31, 2017 Effective Date as a Condition Would Work a Forfeiture and Conflict with Minnesota Law**

52.    GPIOP contends that Mesabi was not entitled to assume the Mineral Leases because the Effective Date did not occur by October 31, 2017, and such occurrence constitutes a condition precedent pursuant to Section 3(b). Section 3(b) is, however, a mere covenant and not condition to the assumption of the Mineral Lease. In any event, the failure of the Effective Date to occur prior to October 31, 2017 was immaterial as time was not of the essence.

53.    As a general matter, conditions precedent are disfavored under Minnesota law. *Constr. Mortg. Investors Co. v. Darrel A. Farr Dev. Corp.*, 2010 Minn. App. Unpub. LEXIS 802, at *15 (Aug. 10, 2010) (citing *Mrozik Constr., Inc. v. Lovering Assocs.*, 461 N.W.2d 49, 51-52 (Minn. App. 1990); Restatement (Second) of Contracts § 227 cmt. b (1981)). As GPIOP recites, a condition precedent is "'any fact except mere lapse of time which must exist or occur before a duty of immediate performance by the promisor can arise.'" GPIOP Opening Br., 12 (quoting *Carl Bolander & Sons*, 298 Minn. 428, 433 (1974)). It then characterizes the operation of the October 31, 2017 date as what a condition precedent cannot be: a mere lapse of time. *See*

*id.* at 14 ("Where, as in the present case, a debtor elects—or is deemed by *the passage of time*— to have rejected a lease . . . .") (emphasis added).

54.     The condition precedent to the assumption of the Mineral Leases was the occurrence of the Effective Date, not the Effective Date occurring by October 31, 2017.  Only if the Effective Date would not occur at all would the Settlement Agreement be terminated and rejection pursuant to Section 3(d) be made incurable.  Settlement Agr., § 8(b).  Mesabi failed to go effective by October 31, 2017, but going effective fifty-two days later is not so grievous as to warrant excusing GPIOP's future performance.  *See, e.g.*, *Giles Props. v. Kukacka*, No. A06-1275, 2007 Minn. App. Unpub. LEXIS 384, at *8-9 (Apr. 24, 2007) (affirming an award of specific performance in favor of a buyer of real property years after the agreed closing date where "[t]he October 31, 2002, closing date came and went without action by either party," even though the seller refused to grant an extension of the closing date prior to that deadline); *BOB Acres, LLC v. Schumacher Farms, LLC*, 797 N.W.2d 723, 728 (Minn. Ct. App. 2011) (finding that nothing beyond the bare contractual recital that time was of the essence supported finding that closing date was the "root or essence of the contract" and that such breach was immaterial); *see also* Restatement (Second) of Contracts § 229, cmt. c. (1981) ("A court need not excuse entirely the non-occurrence of the condition, but may merely excuse its non-occurrence during the period of time it would otherwise have to occur . . . if it concludes that the time of its occurrence is not a material part of the agreed exchange.  This conclusion is sometimes summed up by the phrase that "time is not of the essence.").

55.     Under Minnesota law, breach of a lease or contract can result in termination of the breaching party's rights only if that breach is material.  *Cloverdale Foods v. Pioneer Snacks*, 580 N.W.2d 46, 49 (Minn. Ct. App. 1998); *Skogberg v. Huisman*, No. C7-02-2059, 2003 Minn. App. LEXIS 1043, *6 (Minn. Ct. App. Aug. 19, 2003).  A material breach is one "that is so

fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract, and that is so substantial and fundamental that it defeats the object of the parties in entering into the contract." *Cloverdale Foods*, 580 N.W.2d at 49 (internal quotations and citations omitted).  To the extent that Plaintiff did agree that it could only enjoy the benefits of the Mineral Leases if the Plan became effective by October 31, 2017 (which Plaintiff disputes), a delay of fewer than eight weeks in the Effective Date was not sufficiently material to warrant termination of Plaintiff's rights in leases with thirty year terms.  GPIOP was paid minimum royalties pursuant to the Settlement Agreement through January 2018.  Settlement Agr., § 3(b). When the Plan became effective, the Leased Properties were relieved of all Mechanics' Lien Claims in accordance with Section 2.  And, Plaintiff waived "in excess of $10 million of prepayments" of royalties under the Mineral Leases when the Plan became effective.  *See id.* at § 5.  The occurrence of the Effective Date on December 22, 2017 rather than October 31, 2017 was simply not material because GPIOP still got what it bargained for in spite of the slight delay. *Cf. Boatwright Constr., Inc. v. Kemrich Knolls*, 306 Minn. 519 (1976) (failure of property developer to surface roads in subdivision in accordance with contract by February 1968 did not constitute material breach where roads were surfaced by municipality in October 1969).

56.     That the October 31, 2017 date was immaterial is confirmed by the Parties' failure to provide in the Settlement Agreement that time was of the essence.  Under Minnesota law, time may be made of the essence expressly by the contract or "by implication from the situation of the parties or the nature of the case." *Austin v. Wacks*, 15 N.W. 409, 410 (Minn. 1883); *see also Gill v. Bradley*, 21 Minn. 15, 19 (Minn. 1874) (stating "'[t]ime is not generally deemed in equity to be of the essence of the contract, unless the parties have expressly so treated it, or it necessarily follows from the nature and circumstances of the contract'").  Just because a contract contains a performance deadline does not make time of the essence. *Baker Domes, Div. of R.M. Baker Co.*

*v. Wolfe*, 403 N.W.2d 876, 878 (Minn. Ct. App. 1987). Merely specifying October 31, 2017 as the time by which the Effective Date was to occur in order to assume the Mineral Leases is not an adequate indicia of intent from which to surmise that time was of the essence, particularly when the Parties continued to negotiate the amended terms of the to-be-restated Mineral Leases after October 31, 2017 and neither GPIOP nor Superior took any action to terminate the Mineral Leases or force Mesabi off of the Leased Properties when October 31 came and went without the Plan going effective.

57.     Indeed, even where a contract does have a provision expressly providing that time is of the essence—unlike the Settlement Agreement—courts may still find this is not dispositive of a party's right to cancel or rescind a contract where the parties' actions indicate that the contract had not terminated. *See Zimmerman v. Meyer*, 2005 Minn. App. LEXIS 581, at *4-6, 10 (Minn. Ct. App. May 31, 2005) (where there was a time is of the essence clause in a real estate purchase agreement, but neither party acted as though time was of the essence, failing to make preparations for a closing on the set date, the parties intentionally relinquished their rights to close on that date); *BOB Acres, LLC*, 797 N.W.2d at 727-29 (where purchase agreement contained recitation that time was of the essence, but the closing date passed without the scheduled closing and neither party took action to meet that deadline and continued to negotiate beyond that date, the purchase agreement remained valid and enforceable) (citing *Wolff v. McCrossan*, 210 N.W.2d 41, 44 (Minn. 1973) ("Minnesota case law is in accord with the proposition that where the course of conduct of a party entitled to the performance of certain terms or conditions of a contract has led the other party to believe that such performance will not be required until it has become too late to perform, the person who has so conducted himself is barred from asserting the right he had.")); *see also* 8 Dunnell Minn. Digest Contracts § 10.14 (2017) ("Where the parties proceed in disregard of the provisions of a contract, they are deemed

to have waived them."). The present case is an even stronger example of a situation where the language of the contract and surrounding indicia point to the conclusion that time was not of the essence, especially given GPIOP and Superior's lack of action against Mesabi as it remained on the Leased properties after October 31, 2017.

58.     Notably, in Section 3(d), the same deadline is expressly made subject to extension affirming the Parties' shared intent that the October 31, 2017 deadline might move. And, Section 3(b) required the Debtors to pay projected royalties due through January 2018, consistent with the expectation that the Mineral Leases would continue into 2018. With the Plan going effective in December 2017, GPIOP received the same benefits and payments as it would have had the Plan gone effective fifty-two days earlier on October 31, 2017. The October 31, 2017 date was not a condition precedent and not a material term.

### i.     Judgment in Favor of GPIOP Would Result in an Inequitable and Impermissible Forfeiture.

59.     The requirement that a breach be material is a corollary to the principle that forfeitures are disfavored. *Cloverdale Foods*, 580 N.W.2d at 49. Even where time is of the essence and a material condition, in order to prevent forfeiture, a court of equity may relieve a party from the forfeiture that would otherwise occur as the result of delay. *See* Williston on Contracts 4th § 46:11; Restatement (Second) of Contracts § 229 ("To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange"); 8 Corbin on Contracts § 37.2 (recognizing that equity may give relief against an express time is of the essence provision in order to avoid a forfeiture). Because there is no such provision in the Settlement Agreement, there is further cause to prevent forfeiture.

60.     It is well-established that "equity abhors a forfeiture." *See, e.g.*, *In re Seven Hills, Inc.*, 403 B.R. 327, 335 (Bankr. D.N.J. 2009) ("A court of equity abhors forfeitures, and will not

lend its aid to enforce them.") (quoting *Jones v. Guaranty and Indemnity Co.*, 101 U.S. 622, 628 (1879)); *Hideaway, Inc. v. Gambit Invs., Inc.*, 386 N.W.2d 822, 824 (Minn. App. 1986) ("It is well established that forfeitures are not favored and will not be enforced when great injustice would be done and when the one seeking the forfeiture is adequately protected without the forfeiture.") (internal citation omitted); *Trollen v. City of Wabasha*, 287 N.W.2d 645, 648 (Minn. 1979) (holding equity relieved the lessee from strict compliance with a lease provision requiring notice of renewal be given six months prior to expiration of the rental period); Restatement (Second) of Contracts, § 229 (1981) ("To the extent that the non-occurrence of a condition could cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange.").

61.      As noted by the Minnesota Supreme Court:

> Whenever reasonably possible, a construction ***against*** a forfeiture will be adopted. ***To this end, a contract will be construed not to provide for a forfeiture unless there is a clear expression or manifestation of the intent of the parties in this respect***; and, where the contract does so provide, the provision will be strictly construed.

*Naftalin v. John Wood Co.*, 263 Minn. 135, 147-48 (1962) (quoting 17 C.J.S., Contracts, § 320) (emphases added). Moreover, the "[o]ne claiming forfeiture carries a heavy burden of establishing his right thereto by clear and unmistakable proof." *Id.* at 148 (internal citation omitted); *see also Harris v. Bolin*, 310 Minn. 391, 393 (1976) (determining that those claiming forfeiture must show that the equities are on their side). In sum, "contracts should be construed as to avoid a forfeiture." *Hideaway, Inc.*, 386 N.W.2d at 824 (citing *Myhere v. Severson*, 21 Minn. 189, 191 (1941)).

62.      As discussed above, the Mineral Leases do not provide the requisite clear and unmistakable proof of the Parties' intent with respect to forfeiture. Although the Parties agreed to effectuate the Plan by October 31, 2017, the Settlement Agreement does not evince an intent

of the Parties that a failure to meet that covenant would result in complete forfeiture of the Mineral Leases and rights under the Restated Mineral Leases.

### ii.     The Mineral Leases and Minnesota Law Require Notice and an Opportunity to Cure

63.     Protection against the forfeiture sought by GPIOP is agreed by the Parties in the Mineral Leases and enshrined in Minnesota statutory law.

64.     As already noted, each Mineral Lease contains the same termination provision pursuant to which Plaintiff is entitled to written notice specifying any non-monetary default and is afforded not fewer than thirty days to cure any default so specified.  Specifically, the Mineral Leases provide:

> [I]n case and as often as Lessee shall make default in the performance of, or violate any of its several covenants, as set forth in the Operating Agreement and in this Lease, or shall breach any of the conditions thereof or hereof, ***and such default or breach shall continue uncorrected or unsatisfied for a period of . . . thirty (30) days after written notice thereof shall be given to Lessee by Lessors in the event of a non-monetary default under this Lease or the Operating Agreement***, then . . . [the Mineral Leases] shall instantly cease and terminate.

Mineral Leases, 2-3 (emphasis added).  Each of the Mineral Leases also provides, in relevant part:

> . . . that if such covenant or covenants shall be performed or such breach shall be cured during such period of . . . thirty (30) days in the case of a non-monetary default, such default or breach shall be deemed to have been cured . . . .

*Id.*

65.     Moreover, each of the related operating agreements also provides for a 30-day written notice period with an opportunity to cure:

> . . . if Lessee fails to keep, observe and perform any of the other covenants, agreements, and conditions in this Operating Agreement to be kept and performed by Lessee, and . . . ***if such other non-monetary default continues for thirty (30) days after receipt by Lessee of written notice from Lessor specifying the default complained of***, then . . . Lessor shall have the right at its election, at any time thereafter while such default continues, to declare this Operating Agreement and the Indenture of Lease terminated . . . .

Operating Agreement attached to the Mineral Leases, Section 22 (emphasis added).

66.     None of these provisions was amended in the Omnibus Lease Amendment. Indeed, each was confirmed.  *See* Omnibus Lease Amendment, ¶ 2 ("Except as provided herein, this Amendment does not modify the terms of the Mineral Leases, and the unamended terms of the Mineral Leases shall remain in full force and effect.").

67.     Further, Minnesota law contains various protections against forfeitures of real property interests, including notice and the opportunity to cure before termination or eviction. Minnesota Statutes § 559.21 sets forth conditions that must be met under Minnesota law in order to terminate contracts for the conveyance of real estate or an interest in real estate.  *See* Minn. Stat. § 559.21, subd. 2(a) (setting forth such conditions for contracts entered after July 31, 1985). To terminate such a contract under Minnesota law, the seller must provide the purchaser with 60 days' written notice, during which time the purchaser may cure existing defaults and make certain payments necessary to maintain the contract.  *Id.*

68.     Although § 559.21 typically applies to contracts for the sale of real estate, *see Cole v. Paulson*, 380 N.W.2d 215, 218 (Minn. Ct. App. 1986) (declining to apply Minn. Stat. § 559.21 to a lease because it is not a contract for sale); *Wurdenmann v. Hjelm*, 257 Minn. 450, 456-62 (Minn. 1960) (declining to apply Minn. Stat. § 559.21 to a lease and option agreement), application to the Mineral Leases is appropriate as the Mineral Leases have conveyance characteristics absent from typical leases.  The Mineral Leases convey more than a right to use the Leased Properties and return them at the end of the lease term; rather, the Mineral Leases entitle Mesabi to extract and retain parts of the Leased Properties and not return what has been extracted at the end of the lease term.

69.     Taconite mining in the Mesabi Range is conducted exclusively by open-pit mining methods.[17]   This method uses drilling and explosives to blast the taconite into small pieces.  Those pieces are then collected and transported to a processing plant, where they are crushed, separated, and formed into pellets.  These pellets are then sold and transported to be turned into steel.[18]  This process results in huge pits from which the ore is mined, taken, and never returned, resulting in permanent changes to the landscape, the real property, and the remaining value of that real property.

70.     In contrast to a typical lease, where the value of the leasehold interest is not diminished as a result of the lessee's use, the Mineral Leases, which span decades, entitle Mesabi to extract and permanently retain for itself the substantial value of the leasehold interest.  In this sense, the Mineral Leases resemble a conveyance of real estate, for which Minnesota law has clearly stated an intent to avoid the harsh result of forfeiture.  *See Edina Dev. Corp. v. Hurrle*, 670 N.W.2d 592, 597 (Minn. Ct. App. 2003) (noting the purpose of the Minn. Stat. § 559.21 is to "provide buyers with notice of impending cancellation and to **avoid the harsh result of forfeiture** by allowing buyers a reasonable time to remedy their default") (emphasis added).

71.     Minnesota courts have specifically held that where a contractual agreement is in conflict with Minnesota Statutes § 559.21, the statutory cure period applies.  *See Bly v. Bublitz*, 464 N.W.2d 531, 534 (Minn. Ct. App. 1990) (citing Minn. Stat. § 559.21 ("The notice required by this section must be given **notwithstanding any provisions in the contract to the contrary**

---

[17]   *See generally* Great Lakes Indian Fish & Wildlife Comm'n Envtl. Section, *Iron Mining in the Lake Superior Basin,* (2011), http://midwestadvocates.org/assets/resources/GLIFWC_Taconite_Publication.pdf.

[18]   *Id.*; *see also* Minn. Dept. of Nat'l Res., *Digging into Minnesota Minerals*, https://www.dnr.state.mn.us/education/geology/digging/taconite.html (last visited March 22, 2018); *Declaration of Sanjay Bhartia In Support Of Debtors' First Day Pleadings* [D.I. 14], ¶ 9.

. . . .") (emphasis added)).  To the extent the Settlement Agreement purports to deprive Plaintiff of its statutory cure rights, the statute must control.

72.     Further, Minnesota has a comprehensive scheme governing eviction actions that preserve rights to tenants even after termination of their leases.  Minnesota Statutes § 504B.291, subdivision 2, which relates to nonresidential leases with terms greater than 20 years, provides:

> If the lease [subject to an action to recover] is for a term of more than 20 years, the action may not begin until the landlord serves a written notice on the tenant and on all creditors with legal and equitable recorded liens on the property.  The notice must state: (1) the lease will be canceled unless the amounts, agreements, and legal obligations in default are paid or performed within 30 days, or a longer specified period; and (2) if the amounts, agreements, and legal obligations are not paid or performed within that period, then the landlord may evict the tenant at the expiration of the period.

Minn. Stat. § 504B.291, subd. 2(a).  In short, if a tenant under a lease of more than 20 years, like the Mineral Leases, holds over after termination and cures its past defaults, it is entitled to redeem the lease.  Tellingly, neither GPIOP nor any successor has attempted to evict Plaintiff from the Leased Properties.  Should it do so, Plaintiff will claim the benefit of its cure under Section 3(e), make full and current payment, and revive its term of years.  Plaintiff's rights in the Mineral Leases are fully protected in this manner as well.  Minnesota's policy against forfeiture of long-term leases is so strong that even termination does not cut off the lessees rights without notice and an opportunity to cure.

73.     Here, where the notice terms contained in the Mineral Leases were clearly bargained for, were never amended, and remained in full force and effect, keeping GPIOP to its agreement to provide thirty days' notice to cure under the Mineral Leases aligns with Minnesota's manifest public policy requiring such notice.  Thus, the Settlement Agreement must be interpreted to give meaning and effect to the notice provisions in the Mineral Leases and not to work a forfeiture.  Plaintiff remains entitled to written notice specifying any non-monetary default and is afforded not less than thirty days to cure any default so specified prior to

termination of the Mineral Leases.  Plaintiff is unaware of any such default as a result of the operation of Section 3(e)'s waiver and deemed cure on the Effective Date.

### iii.　　The Consequences of the Forfeiture GPIOP Requests Would Materially Harm Mesabi and Provide GPIOP with a Windfall

74.　　Losing the Mineral Leases would impair the Project and adversely impact the Reorganized Debtor's efforts to carry out the Debtors' reorganization.  Expecting to have the benefit of their use, Plaintiff has invested substantially in the Leased Properties, significantly improving GPIOP's (and any of its successors') position and interests in the Leased Properties in numerous ways, including (i) the payment of amounts sufficient to effectuate the release of tens of millions of dollars in mechanics' liens encumbering the Leased Properties, (ii) dismissal of multiple state court foreclosure actions that would have subjected GPIOP to liability for such mechanics' liens, (iii) pre-payment of more than $10 million of royalties to GPIOP and its predecessors through January 2018, and (iv) maintenance of all permits and permissions necessary to carry out mining activities on the Property.

75.　　Over the course of the Chapter 11 Cases, Mechanics' Lien Claims, based upon existing mechanics' liens, were filed in the aggregate amount of over $75 million.  Thinking it necessary under state law to preserve their mechanics' liens, certain holders of Mechanics' Lien Claims also filed actions in the Minnesota state court, seeking to foreclose on property to which their liens attached, including certain Leased Properties.  These state foreclosure actions were removed and transferred to this Court, where the resulting adversary proceedings 16-51543 and 16-51877 (the "**Mechanics' Lien Adversary Proceedings**") were stayed until further order.

76.　　On the Effective Date, holders of Mechanics' Lien Claims were paid in full the amounts due under the Plan and all mechanics' liens were released.  Plan, § 7.6; Confirmation Order, ¶¶ 48-49.  With all mechanics' liens resolved, the Mechanics' Lien Adversary Proceedings have been or will shortly be dismissed.  Had the Effective Date not occurred, the

mechanics' liens would not have been released, and would still attach to the property set forth in the Mechanics' Lien Adversary Proceedings, including the Leased Properties. Eventually, the Mechanics' Lien Adversary Proceedings would have gone forward, potentially resulting in foreclosure and related damage to all defendants, including GPIOP.

77.     Mesabi has also pre-paid quarterly royalties to GPIOP and Superior and their respective predecessors through January 2018 in the total aggregate amount of more than $10 million, *see* Settlement Agr., § 5, with the most recent amount paid to GPIOP on January 17, 2018 in the amount of $238,686.38.[19] Mesabi is also the only entity that currently holds the permits necessary to mine the Leased Properties and to process the ore, and so is the only company that can mine the Leased Properties. It took Mesabi years to obtain all necessary permits, including a permit to mine, air emissions permit, water permits, and other related permits. As acknowledged by prior testimony on the record, it could take years to complete requisite environmental studies, feasibility studies, and other permit process requirements and obtain similar requisite permits, further delaying the mining process to produce economic benefits in the Leased Properties.

### 3.     Section 3 of the Settlement Agreement Caused the Mineral Leases to "Ride Through" the Chapter 11 Cases

78.     Ignoring equity's aversion to forfeiture, GPIOP contends that Section 3(b) of the Settlement Agreement precludes assumption of the Mineral Leases after October 31, 2017. Even if GPIOP's read of Section 3(b) is correct, this does not mean the Debtors could not thereafter enjoy the benefits of the Mineral Leases. Contrary to GPIOP's assertion that "a debtor-in-possession must either assume or reject an unexpired lease or executory contract," GPIOP

---

[19]   Certain issues regarding this royalty payment are pending before this Court pursuant to GPIOP's *Motion for an Order Authorizing Deposit of Funds into the Registry of the Court* [D.I. 1459] and Mesabi's response thereto [D.I. 1482].

Opening Br., 14, a third alternative is available: do nothing and let the agreement "ride through" the bankruptcy. *In re JZ L.L.C.*, 371 B.R. 412, 422 (B.A.P. 9th Cir. 2007) ("[T]he Bankruptcy Code . . . contemplates three alternatives with respect to executory contracts in chapter 11 cases: assume, reject, or no action.").

79.     Plaintiff acknowledges that, by the terms of the Settlement Agreement, the Mineral Leases were "automatically rejected pursuant to Section 365 of the Bankruptcy Code" on November 1, 2017.  As already discussed, this rejection constitutes a mere breach of the Mineral Leases.  But this breach, like all others, was cured or waived on the Effective Date.

80.     Section 3(e) of the Settlement Agreement provides that, on the Effective Date, "any pre-Effective Date breaches or defaults under the Mineral Leases [we]re cured, and if not curable, [we]re waived."  Settlement Agr., § 3(e).  Section 3(e) makes no reference to and is not conditioned upon the occurrence of the Effective Date by October 31, 2017.  Rather, the vitality of Section 3(e) is governed entirely by Section 8(b) of the Settlement Agreement.

81.     Section 8(b), in turn, provides the general rule that the Settlement Agreement will terminate only if "the Plan is withdrawn or revoked prior to the Effective Date, or it is announced by the Debtors and Chippewa that the Effective Date of the Plan will not occur."  *Id.* at § 8(b).  Like the Plan, Section 8(b) contains no requirement that the Effective Date occur by any given date.  Thus, so long as the occurrence of the Effective Date remained in prospect, the Settlement Agreement, as approved by the Court, would remain wholly effective and binding.

82.     Because Mesabi never withdrew the Plan nor announced the Effective Date would not occur, the Settlement Agreement—including Section 3(e)—remained in effect as of the Effective Date.  Section 3(e) therefore operated as written on the Effective Date to bring Mesabi into good standing under the terms of the Mineral Leases by GPIOP and Superior agreeing that

all defaults, including rejection pursuant to Section 3(d), were cured or waived.[20]  In effect, by operation of Section 3(e), rejection never happened, paving the way for assumption by consent post-rejection.   But, even if GPIOP is correct that assumption, too, never happened, the consequence is that the Mineral Leases "rode through" the Chapter 11 Cases.

83.    The "ride through" doctrine provides that, in a chapter 11 case, "where a debtor has failed to expressly assume or reject a prepetition lease agreement or executory contract, that lease or contract will be unaffected by the bankruptcy filing."  *In re Polysat, Inc*., 152 B.R. 886, 890 (Bankr. E.D. Pa. 1993); *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 546 n.12 (1984) ("In the unlikely event that the contract is neither accepted nor rejected, it will 'ride through' the bankruptcy proceeding and be binding on the debtor even after a discharge is granted.").

84.    Although ride through does not ordinarily operate in the context of non-residential real property leases due to the limitations of Bankruptcy Code section 365(d)(4), *see JZ L.L.C.*, 371 B.R. at 423 & n.13, GPIOP waived the protections of that provision both by (a) extending, in the Settlement Agreement, the deadline to assume or reject past the Plan's confirmation date; and (b) entering into the Stipulation approved by order entered April 24, 2017.  D.I. 924-1, ¶ 5 ("GPIOP hereby consents to an extension of the time to assume or reject the [Mineral] Leases under Section 365(d)(4) until the hearing on any motion to assume the leases.").  *See Chertok v. Phelan* (*In re Phelan*), 2017 Bankr. LEXIS 502, at *15-16 (Bankr. M.D. Pa. Feb. 21, 2017) (noting that protections of § 365(d)(4) are waivable) (citing *George v. City of Morro Bay* (*In re George*), 177 F.3d 885, 888-89 (9th Cir. 1999) (setting forth circumstances under which 11 U.S.C. § 365(d)(4) may be waived)).  Notably, although GPIOP refers to section 365(d)(4) by

---

[20]    Notably, as the "Surviving Section" under Section 8, rejection pursuant to Section 3(d) would remain effective only if the Effective Date did ***not*** occur because the Plan was withdrawn or Chippewa and the Debtors gave up on bringing it effective.  *See* Settlement Agreement, § 8(b).

analogy in passing to support its position, *see* GPIOP Opening Br. 15, 16, it does not and cannot assert that section 365(d)(4) did or could have operated with respect to the Mineral Leases following GPIOP's waivers.

85.    The words of Section 3(e) are plain and unmistakably evince the Parties' intent that the Mineral Leases remain effective through and after the Effective Date, with all pre-Effective Date breaches—which embrace rejection—cured or waived upon the occurrence of the Effective Date:

> As of the Effective Date of the Plan, GPIOP and Superior agree that any pre-Effective Date breaches or defaults under the Mineral Lease are cured, and if not curable, are waived.  The Mineral Leases shall remain in full force and effect until the Restated Mineral Leases become fully effective and enforceable [i.e., on the Effective Date].

Settlement Agr., § 3(e).  To read this provision other than as permitting ride-through would require the Court to re-write it.  This Court cannot do.  *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 364-65 (Minn. 2009) ("We have consistently stated that when a contractual provision is clear and unambiguous, courts should not rewrite, modify, or limit its effect by a strained construction.").

86.    For the foregoing reasons, the Mineral Leases "rode through" the Chapter 11 Cases, with all defaults cured or waived on the Effective Date, and Mesabi is entitled to all rights and benefits of such leases and is subject to all corresponding obligations and burdens.

### 4.    Whether or Not the Mineral Leases "Rode Through" or Were Assumed, They Were Deemed Amended and Restated for Plaintiff's Benefit and Became Fully Enforceable by Plaintiff on the Effective Date Pursuant to Section 4

87.    Section 4 of the Settlement Agreement gives wholly independent rights to the "Reorganized Debtor"—as distinguished from the "Debtor"—to enjoy the full benefits of the Mineral Leases on the Effective Date, without regard to whether (i) the Effective Date occurred before or after October 31, 2017; or (ii) the Debtors previously assumed or rejected the Mineral

Leases.

88.    In full, Section 4 of the Settlement Agreement provides:

(a) On or prior to the Effective Date of the Plan, GPIOP, Superior and the Reorganized Debtor *shall negotiate and execute amended and restated agreements to supersede the Mineral Leases in their entirety* (the "Restated Mineral Leases"), *which Restated Mineral Leases shall become fully effective and enforceable on the Effective Date*. The Restated Mineral Leases shall be in form and substance acceptable to GPIOP, Superior and the Reorganized Debtor, preserve all rights and obligations under the Minerals Leases, subject to the modifications described herein, and *contain terms and conditions substantially similar to the Mineral Leases unless otherwise agreed* by GPIOP, Superior and the Reorganized Debtor. *The Mineral Leases will be deemed amended and restated by consent on the Effective Date of the Plan*.

(b) Each of GPIOP, Superior and the Reorganized Debtor shall use commercially reasonable efforts to negotiate and execute the Restated Mineral Leases, and shall not unreasonably withhold, delay, or condition their consent or execution of the Restated Mineral Leases.

Settlement Agr., ¶ 4 (emphases added).  This language is clear and susceptible to only one interpretation:  GPIOP and Superior were obligated to give Plaintiff—as the Reorganized Debtor—all benefits under the Mineral Leases as of the Effective Date, subject only to amendments as agreed to by the parties.  Whether or not any amendments were agreed before the Effective Date, "[t]he Mineral Leases w[ere] deemed amended and restated by consent on the Effective Date of the Plan." *Id*.

89.    The distinction between the Debtors, in Section 3, and the Reorganized Debtor, in Section 4, was deliberate and carefully calculated.  Further, the separate rights in favor of the Reorganized Debtor were supported by substantial consideration.  The parties to the Settlement Agreement are as follows (together, the "**Parties**"): (i) Chippewa; (ii) Mesabi and ESML Holdings, as Debtors; (iii) GPIOP; and (iv) Superior.  *Id*. at 1.  Chippewa, as Plan Sponsor, would and did become the owner of the Reorganized Debtor upon the occurrence of the Effective Date in exchange for the Investment.  Plan, § 7.3.  And, as of the Effective Date of the

Plan, the Reorganized Debtor was entitled to and did become a Party to the Settlement Agreement "as if executed by the Reorganized Debtor in the first instance" by executing a joinder. Settlement Agr., § 10.[21]

90.      The Reorganized Debtor is burdened with substantial financial obligations under the Settlement Agreement—obligations it would only be able to satisfy with Chippewa's cash. Pursuant to Section 2 of the Settlement Agreement, Chippewa and the other Parties agreed that the Reorganized Debtor would remove any liens on the Leased Properties outstanding as of the Effective Date and indemnify GPIOP and Superior with respect to such liens "on and after the Effective Date." Settlement Agr., § 2. This obligation arose without reference to the date on which the Effective Date would occur. *See id.* (no date limitation on when Effective Date would need to occur in order for the Reorganized Debtor to be bound by its obligations).

91.      It would have made no sense for Chippewa to unconditionally commit the Reorganized Debtor to spend Chippewa's cash after the Effective Date to clear liens from the Leased Properties if the Settlement Agreement did not assure the Reorganized Debtor of rights in the Leased Properties as of the Effective Date. Section 4 provides the Reorganized Debtor those rights.

92.      To achieve this, Section 4 makes the Reorganized Debtor's rights **completely independent** of whether the Mineral Leases are rejected under Section 3 and **not conditioned** on assumption or occurrence of the Effective Date by any particular time. GPIOP contends that the Court must not read Section 4 "so as to eliminate the requirement of Section 3 that the Effective Date occur by October 31, 2017." To the contrary, the Court must read Section 4 in that manner because it is exactly what the words of the Settlement Agreement require.

---

[21] The joinder was executed and is of record in these proceedings. [D.I. 12-2].

93.     Section 4, like all other provisions of the agreement, became fully effective and enforceable on August 30, 2017 when the Court entered the Assumption Order.  Settlement Agreement § 8(a) ("This [Settlement Agreement] and [the Omnibus Lease Amendment], and all the rights and obligations of any and all Parties thereunder, shall become fully effective and enforceable on the date [of execution]; *provided*, *however*, that the Debtors' obligations under [such documents] shall be subject to the Bankruptcy Court's approval of this Agreement by Bankruptcy Court order.").  Other than the Approval Order, there was no condition precedent to the effectiveness of the Settlement Agreement.

94.     Section 8 likewise governs termination of the effectiveness of Section 4.  As already discussed, Section 8(b) is the general termination provision in the Settlement Agreement and provides that the agreement will become "null and void" only "in the event the Plan is withdrawn or revoked prior to the Effective Date, or it is announced by the Debtors and Chippewa that the Effective Date of the Plan will not occur."  Settlement Agr., § 8(b).  Section 4 does not contain any other termination provision nor does it contain or refer to any deadline for the Effective Date to occur.  The plain language of the Settlement Agreement unambiguously provides that Section 4 survives as long as the Settlement Agreement does.  Because the Effective Date occurred before any of Section 8(b)'s termination triggers, Section 4(a) operated in accordance with its terms and the "Mineral Leases w[ere] deemed amended and restated by consent on the Effective Date of the Plan."  Settlement Agr., § 4(a).

95.     GPIOP has two responses to the plain language of Sections 4(a) and 8(b).  First, it says enforcing Section 4(a) by its plain terms would render Section 3's limitations on assumption "meaningless."  GPIOP Opening Br., 17.  Second, it says such enforcement would lead to the "absurd result" of binding GPIOP to "negotiate with the Debtors in perpetuity unless the Debtors either revoked the Mesabi Plan or announced the Effective Date would never occur." *Id.* at 18.

96.    Section 4 does not render Section 3 meaningless because the two provisions provide two separate sets of rights in favor of parties that, while obviously related, were under separate control during the relevant time periods.  Rights under Section 3 lie in favor of the pre-effective date Debtors.  *See* Settlement Agr., ¶ 3.  Chippewa could not independently ensure that the Plan would go effective by October 31, 2017.  *See* Plan, § 11.3 (Debtors' consent required to waive certain material conditions to effectiveness).  Section 4's provision of rights in favor of the Reorganized Debtor ensured that, if Debtors failed to bring the Plan effective by October 31, 2017, Chippewa, upon a later Effective Date, would not be stuck funding liabilities with respect to the Leased Properties in which the Reorganized Debtor had no rights.  It would make no sense for Chippewa to fund millions of dollars on the Effective Date to allow the Reorganized Debtor to clear mechanics' liens from the Leased Properties and prevent foreclosure of the Leased Properties if the Reorganized Debtor would have no rights in the Leased Properties.

97.    Section 3 is also not redundant to Section 4 because Section 4 could not operate after an effective termination pursuant to the terms of the Mineral Leases (i.e., thirty days' notice to cure) as permitted by the stay relief afforded by Section 3.  Section 4 provides that the Mineral Leases be "amended and restated" as of the Effective Date, and "preserve all rights and obligations under the Mineral Leases."  Were there a termination prior to the Effective Date upon thirty days' notice from GPIOP, as permitted pursuant to Section 3, it would leave nothing to amend or restate and no rights and obligations to preserve.  Having chosen not to exercise its rights of termination, GPIOP's concerns about being bound to "to negotiate with the Debtors in perpetuity" are without basis.

98.    Further, the plain language interpretation of Section 4(a) as obligating GPIOP to negotiate with the Debtors until the Effective Date occurred or the Settlement Agreement terminated in accordance with its terms is not "absurd," as GPIOP contends.  The Debtors' Plan

was either going to go effective in the near term following confirmation or die on the vine as Chippewa would have no reason to fund into perpetuity a plan that would not be consummated. In addition to impracticability of funding the continued accrual of administrative expenses, the Project could not lie idle indefinitely.  The Debtors simply had too many moving parts to keep in place in order to achieve a successful reorganization for the window to last far into 2018, if at all. From a practical standpoint, the Plan would have been withdrawn or the Debtors and Chippewa would have announced it would not go effective in early 2018 had the Effective Date not occurred when it did.[22]  The consequence of this, pursuant to Section 8(b), would have been to release GPIOP from its obligation to negotiate under Section 4(a).  GPIOP was never bound in perpetuity to negotiate with the Debtors or the Reorganized Debtor.  Mesabi's plain language interpretation of Section 4(a) yields no absurd result.

99.     Further, GPIOP is wrong that Section 4(a) is an unenforceable agreement to agree.  The parties were clearly aware of limitations under Minnesota law on enforcing "agreements to agree."  Section 4 and the Omnibus Lease Agreement constitute the parties' drafting solution to avoid problems resulting from those limits.

100.     The parties did agree in Section 4(a) to engage in further negotiations with respect to the Mineral Leases in favor of the Reorganized Debtor.  But, more importantly, they also agreed what would happen if there were no negotiations or if they were unsuccessful: the Parties would live with the terms of the Mineral Leases.  Section 4(a) concludes by providing, without limitation or qualification, including the failure or success of negotiations regarding the form of Restated Mineral Leases, that the Mineral Leases "will be deemed amended and restated by

---

[22]   This functional period in which Mesabi would either swim or sink is, incidentally, coextensive with the period for which GPIOP demanded in the Settlement Agreement that the Debtors prepay royalties—through January 2018.

consent on the Effective Date."  Settlement Agr., ¶ 4(a).  Because the Restated Mineral Leases are defined as the "amended and restated agreements to supersede the Mineral Leases," such deemed amendment by consent makes the Mineral Leases (as amended by the Omnibus Lease Amendment) the Restated Mineral Leases on the Effective Date.

101.    Put simply, Section 4(a) is an agreement to honor the exact terms of the Mineral Leases *unless* all parties agree to something different.[23]  The resulting obligations are therefore concrete and not too vague for courts to interpret; a court could easily determine whether the breach occurred or what the remedy would be.  *See Ohio Calculating, Inc. v. CPT Corp.*, 846 F.2d 497, 501 (8th Cir. 1988) (Minnesota law) (noting the reason agreements to agree are unenforceable in Minnesota is that "they provide neither a basis for determining the existence of a breach nor for giving an appropriate remedy").  A court would need only to read the Mineral Leases and the Omnibus Lease Amendment to determine the Parties' respective rights. Section 4(a) is fully enforceable and binding as written.  On the Effective Date, the Reorganized Debtor became entitled to all rights and benefits of the Mineral Leases as deemed restated as the Restated Mineral Leases.

## VI.    CONCLUSION

For all of the foregoing reasons, when the Effective Date of the Plan occurred on December 22, 2017, all breaches and defaults under the Mineral Leases were cured or waived pursuant to Section 3(e) of the Settlement Agreement, and the Mineral Leases were assumed by the Debtors for the benefit of the Reorganized Debtor or "rode through" the Chapter 11 Cases for

---

[23]    Clearly, the Parties recognized that further negotiations regarding the terms of the Mineral Leases might be unsuccessful or not occur at all.  The Parties entered into the Omnibus Lease Amendment as part of the Settlement Agreement so the terms that they had to have were agreed as a requisite "meeting of the minds" ***before*** they agreed that the Mineral Leases would constitute the Restated Mineral Leases in the absence of any further changes.

the benefit of the Reorganized Debtor and/or were deemed amended and restated as the Restated Mineral Leases for the benefit of the Reorganized Debtor.   Accordingly, summary judgment should enter in Plaintiff's favor on each of the Subject Counts.

[*remainder of page intentionally left blank*]

Dated: March 28, 2018  **BAYARD, P.A.**
      Wilmington, Delaware

*/s/ Justin R. Alberto*
Justin R. Alberto (No. 5126)
Evan T. Miller (No. 5364)
Daniel N. Brogan (No. 5723)
600 N. King Street, Suite 400
Wilmington, DE 19801
Telephone: (302) 655-5000
Facsimile:  (302) 658-6395
E-mail:  jalberto@bayardlaw.com
        emiller@bayardlaw.com
        dbrogan@bayardlaw.com

-and-

**WHITE & CASE LLP**
Thomas E Lauria (admitted *pro hac vice*)
Matthew C. Brown (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131-2352
Telephone:     (305) 371-2700
Facsimile:     (305) 385-5744
tlauria@whitecase.com
mbrown@whitecase.com

Glenn M. Kurtz (admitted *pro hac vice*)
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone:     (212) 819-8200
Facsimile:     (212) 354-8113
gkurtz@whitecase.com

Craig H. Averch (admitted *pro hac vice*)
Ronald K. Gorsich (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071-2433
Telephone:     (213) 620-7700
Facsimile:     (213) 452-2329
caverch@whitecase.com
rgorsich@whitecase.com

{BAY:03253584v1}