## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| ESSAR STEEL MINNESOTA LLC and ESML HOLDINGS INC.,[1] | Case No. 16-11626 (BLS) |
| Debtors. | (Jointly Administered) |
| MESABI METALLICS COMPANY LLC (F/K/A ESSAR STEEL MINNESOTA LLC), | |
| Plaintiff | Adv. Proc. No. 17-51210 (BLS) |
| v. | Re: D.I.s 46 and 47 |
| CLEVELAND-CLIFFS, INC. (F/K/A CLIFFS NATURAL RESOURCES, INC.); CLEVELAND-CLIFFS MINNESOTA LAND DEVELOPMENT LLC; GLACIER PARK IRON ORE PROPERTIES LLC; and DOES 1-10 | Hearing Date and Time: |
| Defendants. | May 15, 2018 at 11:00 a.m. Eastern |
| GLACIER PARK IRON ORE PROPERTIES LLC, | |
| Counterclaim-Plaintiff | |
| v. | |
| MESABI METALLICS COMPANY LLC (F/K/A ESSAR STEEL MINNESOTA LLC), | |
| Counterclaim-Defendant. | |

---

[1] Essar Steel Minnesota LLC has changed its name to Mesabi Metallics Company LLC. The last four digits of its federal taxpayer identification number are 8770. The last four digits of ESML Holdings Inc.'s federal taxpayer identification number are 8071.

{BAY:03264722v1}

CLEVELAND-CLIFFS, INC. (F/K/A CLIFFS
NATURAL RESOURCES, INC.);
CLEVELAND-CLIFFS MINNESOTA LAND
DEVELOPMENT LLC,

                            Counterclaim-Plaintiffs

        v.

MESABI METALLICS COMPANY LLC
(F/K/A ESSAR STEEL MINNESOTA LLC)

                            Counterclaim-Defendant.

---

CLEVELAND-CLIFFS, INC. (F/K/A CLIFFS
NATURAL RESOURCES, INC.);
CLEVELAND-CLIFFS MINNESOTA LAND
DEVELOPMENT LLC,

                            Third-Party Plaintiffs

        v.

CHIPPEWA CAPITAL PARTNERS, LLC; and
THOMAS M. CLARKE,

                            Third-Party Defendants.

---

**PLAINTIFF'S OPPOSITION TO DEFENDANTS CLEVELAND-CLIFFS INC.'S
AND CLEVELAND-CLIFFS MINNESOTA LAND DEVELOPMENT LLC'S
JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF
<u>MESABI METALLICS COMPANY LLC'S SECOND AMENDED COMPLAINT</u>**

{BAY:03264722v1}

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ................................................................................. 1

II.     JURISDICTION AND AUTHORITY TO ENTER FINAL ORDERS............................. 3

III.    FACTUAL BACKGROUND................................................................................... 6

        A.      Background of the Mineral Leases ........................................................ 6

        B.      Efforts to Preserve the Mineral Leases in the Bankruptcy Cases .......................... 7

        C.      Resolution of the GPIOP/Superior Lease Proceedings............................................ 8

        D.      Events Subsequent to the Settlement Agreement; Entry of the Assumption
                Order .................................................................................................................. 8

IV.     OPPOSITION ...................................................................................................... 11

        A.      The Settlement Agreement Did Not Terminate the Mineral Leases..................... 11

        B.      The Mineral Leases Were Assumed as of the Effective Date .............................. 16

                1.      The Assumption Order Unqualifiedly Provides for Assumption as
                        of the Effective Date of the Plan................................................................ 17

                2.      To the Extent It Constitutes a Condition Precedent to Assumption,
                        the October 31, 2017 Deadline Must Be Excused to Prevent a
                        Forfeiture.................................................................................................... 20

                        i.      Construction of Section 3(b) and 3(d) as the Cliffs Parties
                                Request Would Result in a Disproportionate Forfeiture............... 23

                        ii.     Bringing the Plan Effective by October 31, 2017, Rather
                                Than Fifty-Two Days Later, Was Not a Material Provision ........ 27

                        iii.    The Settlement Agreement Does Not Clearly and
                                Unmistakably Demonstrate the Parties' Intent to Cause a
                                Forfeiture.................................................................................... 30

                3.      Even If Section 3(b) Were Strictly Construed as a Condition
                        Precedent to Assumption, the Mineral Leases Rode Through the
                        Chapter 11 Cases....................................................................................... 31

        C.      Section 4 of the Settlement Agreement Creates Independent Rights in
                Favor of the Reorganized Debtor............................................................................. 33

        D.      Plaintiff Retains Possession and Is Entitled Under Minnesota Law to
                Redeem the Mineral Leases Even If Terminated.................................................... 38

        E.      The Cliffs Parties Cannot Have Summary Judgment on All Counts Based
                Solely on Their Reading of the Settlement Agreement ........................................ 39

V.      CONCLUSION.......................................................................................................... 40

AMERICAS 94430021

## TABLE OF AUTHORITIES

<u>Page(s)</u>

### FEDERAL CASES

*Chertok v. Phelan (In re Phelan)*,
   2017 Bankr. LEXIS 502 (Bankr. M.D. Pa. Feb. 21, 2017)......................................................32

*Forklift LP v. iS3C, Inc. (In re Forklift LP)*,
   363 B.R. 388 (Bankr. D. Del. 2007) .....................................................................................17

*Imation Corp. v. Koninklijke Philips Elecs. N.V., U.S.*,
   586 F.3d 980 (Fed. Cir. 2009).................................................................................................13

*In re Carter*,
   506 B.R. 83 (Bankr. D. Ariz. 2014).........................................................................................5

*In re CB Holding Corp.*,
   448 B.R. 684 (Bankr. D. Del. 2011) .....................................................................................12

*In re DBSI, Inc.*,
   409 B.R. 720 (Bankr. D. Del. 2009) .....................................................................................12

*In re JZ L.L.C.*,
   371 B.R. 412 (B.A.P. 9th Cir. 2007).................................................................................31, 32

*In re Our Alchemy, LLC*,
   No. 16-11596, 2017 Bankr. LEXIS 879 (Bankr. D. Del. Mar. 31, 2017) ..............................12

*In re Overseas Shipholdings Grp., Inc.*,
   No. 12-20000, 2015 Bankr. LEXIS 1802 (Bankr. D. Del. June 1, 2015).........................11, 15

*In re Polysat, Inc.*,
   152 B.R. 886 (Bankr. E.D. Pa. 1993) .....................................................................................32

*In re Trico Marine Services, Inc.*,
   450 B.R. 474 (Bankr. D. Del. 2011) .....................................................................................18

*NLRB v. Bildisco & Bildisco*,
   465 U.S. 513 (1984).................................................................................................................3, 32

### FEDERAL STATUTES

11 U.S.C. § 365(d)(4) ...........................................................................................................7, 26, 32

11 U.S.C. § 365................................................................................................................. *passim*

### STATE CASES

*Austin v. Wacks*,
   15 N.W. 409 (Minn. 1883).........................................................................................................28

{BAY:03264722v1}                                 (ii)

*Baker Domes, Div. of R. M. Baker Co. v. Wolfe*,
    403 N.W.2d 876 (Minn. Ct. App. 1987) ................................................................28

*Bank Midwest v. Lipetzky*,
    674 N.W.2d 176 (Minn. 2004) ..............................................................................19

*Bly v. Bublitz*,
    464 N.W.2d 531 (Minn. Ct. App. 1990) ................................................................21

*Brookfield Trade Ctr. v. Cty. of Ramsey*,
    584 N.W.2d 390 (Minn. 1998) ..............................................................................15

*Chergosky v. Crosstown Bell, Inc.*,
    463 N.W.2d 522 (Minn. 1990) ..............................................................................19

*Energetics, Ltd. v. Whitmill*,
    442 Mich. 38 (1993) .............................................................................................13

*Gill v. Bradley*,
    21 Minn. 15 (Minn. 1874) ....................................................................................28

*Jupiter Oil Co. v. Snow*,
    819 S.W.2d 466 (Tex. 1991) .................................................................................13

*Minneapolis v. Republic Creosoting Co.*,
    201 N.W. 414 (Minn. 1924) ..................................................................................19

*Naftalin v. John Wood Co.*,
    263 Minn. 135 (1962) ........................................................................16, 29, 30, 31

*Storer Cable T.V., Inc. v. Summerwinds Apartments Assocs., Ltd.*,
    493 So. 2d 417 (Fla. 1986) ...................................................................................12

*Valspar Refinish, Inc. v. Gaylord's, Inc.*,
    764 N.W.2d 359 (Minn. 2009) ..............................................................................33

## STATE STATUTES

Minn. Stat. § 504B.291, subd. 2(a) ...........................................................21, 38, 39

Minn. Stat. § 559.21 ....................................................................................................21

## TREATISES

Restatement (Second) of Contracts § 229 ........................................................22, 23, 27

Plaintiff Mesabi Metallics Company LLC ("**Plaintiff**," or, "**Mesabi**") hereby files its opposition to *Defendants Cleveland-Cliffs Inc.'s and Cleveland-Cliffs Minnesota Land Development LLC's Joint Motion for Partial Summary Judgment on Plaintiff Mesabi Metallic Company LLC's Second Amended Complaint* [D.I. 46] (the "**Cliffs MSJ**"),[1] filed by Defendants Cleveland-Cliffs Inc. ("**Cliffs**") and Cleveland-Cliffs Minnesota Land Development LLC ("**Cliffs Minnesota**," and, together with Cliffs, the "**Cliffs Parties**") with respect to counts 1, 2, 3, 4, 5, 6, 13, 14, ,15, 16, 17, 20, 21, 22, 23, and 24 (collectively, the "**Subject Counts**") of Plaintiff's *Second Amended Complaint and (Substantive and Non-Substantive) Objection to Claim Nos. 55 and 224* [Adv. D.I. 18] (the "**Amended Complaint**"). The Cliffs Parties set forth the grounds for the Cliffs MSJ in the opening brief filed in support thereof [D.I. 47] (the "**Cliffs Opening Brief**"). In opposition to the Cliffs MSJ, Plaintiff states:

## I.    PRELIMINARY STATEMENT

Like GPIOP, the Cliffs Parties are asking this Court to order a forfeiture of Plaintiff's valuable lease interests based on their own self-serving reading of the Settlement Agreement and Assumption Order. But the text of these documents simply does not support their request. On the contrary, it is Plaintiff's proffered reading of the Settlement Agreement and Assumption

---

[1]    The Cliffs MSJ is filed in accordance with the schedule agreed by Plaintiff, the Cliffs Parties, and Glacier Park Iron Ore Properties LLC ("**GPIOP**") and approved by the Court on March 20, 2018 [D.I. 44] (the "**Scheduling Order**"). GPIOP filed on February 26, 2018, a motion for summary judgment [D.I. 31] (the "**GPIOP MSJ**") on counts 3, 4, 5, 6, 14, 16, 20, 21, 22, 23, and 24 of the Amended Complaint (the "**GPIOP Counts**"), together with a brief in support thereof [D.I. 33] (the "**GPIOP Opening Brief**"). In accordance with the Scheduling Order, Mesabi filed a motion for summary judgment [D.I. 49] (the "**Mesabi MSJ**," and, together with the GPIOP MSJ and the Cliffs MSJ, the "**MSJs**") on the GPIOP Counts as well as counterclaims 2 and 3 of the *Glacier Park Iron Ore Properties LLC's Answer to Second Amended Complaint and Counterclaims* [D.I. 30] (such counterclaims collectively with the GPIOP Counts, the "**Mesabi Counts**"), together with a combined brief in support of the Mesabi MSJ and in opposition to the GPIOP MSJ [D.I. 51] (the "**Mesabi Opening Brief**"). Where the context requires, each capitalized term used but not otherwise defined herein shall have the meaning ascribed to such term in the Mesabi Opening Brief.

Order that respects both the plain language and clear objective of those documents. As set forth in the Mesabi Opening Brief, if GPIOP wanted to terminate the Mineral Leases and give Cliffs an immediately usable interest in the Leased Properties, it was obligated to issue Plaintiff a notice of termination after October 31, 2017, subject to an opportunity to cure. There is no dispute that GPIOP failed to do so.

As the Court is aware, November 1, 2017 came and went without a notice of termination from GPIOP to Plaintiff. That date also came and went without a notice to Mesabi to quit the Leased Properties. Indeed, GPIOP accepted Plaintiff's continued possession of the Leased Properties until December 11, 2017, and even engaged in discussions with Plaintiff regarding the terms of in-progress amended and restated Mineral Leases. And only after GPIOP and the Cliffs Parties blindsided Plaintiff with their surprise December 11, 2017 announcement—that GPIOP had sold or leased its interests in the Leased Properties to Cliffs Minnesota—did GPIOP and the Cliffs Parties roll out their new litigation position.

Of course, Plaintiff had no way of knowing what GPIOP and Cliffs were up to behind Plaintiff's back, from the time GPIOP and Cliffs began negotiations began (likely no later than early October 2017) and the time they consummated the purported Cliffs Transaction. Accordingly, Mesabi had no opportunity to point out the grave problem with their scheme.

Plaintiff respectfully submits that this was not an accident. Cliffs approached GPIOP, bound it to a confidentiality agreement, and conducted secret negotiations, all in order to effectuate a transfer of assets that were central to a confirmed plan of reorganization and still subject to the exclusive jurisdiction of this Court.

Cliffs hoped that this would be the final act of intimidation and interference to send Plaintiff packing for good, exiting Cliffs' jealously guarded iron and iron pellet market. Yet confident in its legal rights, and mindful of the wrongfulness of the Cliffs Parties' conduct,

{BAY:03264722v1}

2

Plaintiff remained undeterred. It brought its Plan effective on December 22, 2017, thereby preserving its rights in the Leased Properties pursuant to the Assumption Order and Settlement Agreement, and leaving Cliffs with either a reversionary interest or subordinate lease interest in the various parcels comprising the Leased Properties.

With Plaintiff unwilling to simply fold, the Cliffs Parties are now left asking the Court to contort the Settlement Agreement and Assumption Order to achieve an improper objective that is contrary to the clear objectives of all the work that has gone into this reorganization. The Court should reject the Cliffs Parties' distortions and should not permit their abusive conduct to impair Plaintiff's valuable, hard-won interests through their requested forfeiture. Even if the Cliffs Parties' interpretation of the relevant documents were compelling (it isn't), the reasonableness of Plaintiff's interpretation precludes the relief they seek. In Minnesota, a court can grant a contractual forfeiture only where the parties' intent to effect a forfeiture is "unmistakable" on the face of the agreement. Where any reasonable reading would avoid a forfeiture, that is the reading the court must adopt. The underlying policy is amplified in a bankruptcy proceeding where, as here, the effects of a forfeiture would be felt broadly by many parties in interest.

Plaintiff respectfully asks this Court to reject the Cliffs Parties' efforts to hijack the value in these proceedings and use this Court as an instrument of its monopolistic endeavors. The Court should grant the Mesabi MSJ so that Mesabi can proceed with its efforts to preserve value, create jobs, and provide a return to its creditors and new investors alike.

## II.    JURISDICTION AND AUTHORITY TO ENTER FINAL ORDERS

1. As the Cliffs Parties explain, the dispute here turns on "property interests and rights" that will be determined by "the construction of the relevant contractual terms in the [Settlement Agreement] and the [Assumption] Order." Cliffs Opening Br., ¶ 18. The Cliffs Parties move for summary judgment on the Subject Counts only "to the extent that each of these

causes of action rely upon the purported property interests and rights." *Id.* at ¶ 19.

2.    The Cliffs Parties do not directly address the Court's authority with respect to the Cliffs MSJ, but imply that such authority is limited to "hearing" it and entering proposed findings of fact and conclusions of law in accordance with 28 U.S.C. § 157(c)(1).  *See* Cliff's MSJ, 3.[2]  Cliffs is mistaken.  This Court has full authority to both hear and determine the Cliffs MSJ in accordance with § 157(b) for not fewer than four reasons.

3.    First, the matter is core within the meaning of 28 U.S.C. § 157(b) as it "aris[es] in" the Chapter 11 Cases.  28 U.S.C. § 157(b)(1).  The Settlement Agreement and Assumption Order were the resolution of Plaintiff's motion to assume the Mineral Leases under section 365 of the Bankruptcy Code.  Matters relating to assumption and rejection "arise in" bankruptcy because they exist only in the context of bankruptcy.  *Schroeder v. New Century Holdings, Inc.* (*In re New Century Holdings, Inc.*), 387 B.R. 95, 104 (Bankr. D. Del. 2008).  In addition to being core, because such an action "stems from the bankruptcy itself," it is constitutionally subject to determination by this Court.  *Stern v. Marshall*, 564 U.S. 462, 499, 131 S. Ct. 2594, 2618 (2011); *see also TSA Stores, Inc. v. M J Soffe, LLC* (*In re TSAWD Holdings, Inc.*), 565 B.R. 292, 297 (Bankr. D. Del. 2017) (citing *Stern*).  It does not matter that the Subject Counts are not bankruptcy law claims.  Where they are "irreversibly intertwined" with the "indisputably core proceedings" relating to the assumption or rejection of the Mineral Leases, they are subject to determination by this Court.  *Carr v. New Century TRS Holdings, Inc.* (*In re New Century TRS Holdings, Inc.*), 544 Fed. App'x 70, 73 (3d Cir. 2017) (claimant's fraudulent inducement claim relating to court-approved resolution of claims against estate subject to determination by bankruptcy court; "*Stern* inapposite").

4.    Second, the Assumption Order, which approved and gave effect to the Settlement

---

[2]    *But see id.* at Ex. A, 2 (reciting that Court has authority "to determine" Cliffs MSJ).
{BAY:03264722v1}

Agreement, is an order of the Court.  This Court maintains jurisdiction of and the power to determine matters concerning the interpretation, enforcement, and implementation of its own orders.  *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009).  This remains true after *Stern v. Marshall*.  *ARDI Ltd. P'ship v. Buncher Co.* (*In re River Entm't Co.*), 467 B.R. 808, 817 (Bankr. W.D. Pa. 2012) (*Stern* "inapposite" to proceeding to enforce prior order which "was the intended resolution of several issues in the bankruptcy"); *Moore v. Paladini* (*In re CD Liquidation Co., LLC*), 462 B.R. 124, at 135-36 (Bankr. D. Del. 2011) (*Stern* did not apply to bar the bankruptcy court from enforcing the terms of its own confirmation order).

5.      Third, the Cliffs Parties are deemed to have consented to this Court's jurisdiction to decide the Subject Counts.  They can assert rights under the Settlement Agreement and Assumption Order only as GPIOP's successor.  *See* Settlement Agr., ¶¶ 9, 10, 14 (Settlement Agreement Binding only on successors; no third party beneficiaries; no assignment absent consent).  In such capacity, the Cliffs Parties are bound by GPIOP's consent to the Bankruptcy Court's jurisdiction "to hear and determine all matters arising from or related to [the Assumption Order]" and the Court's order approving such consent.  Assumption Order, ¶ 6.  Bankruptcy courts can always determine matters by consent of the parties.  11 U.S.C. § 157(c)(2); *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. ----, 135 S. Ct. 1932, 1949 (2015); *see also Wright v. Bayview Loan Servs., LLC*, 2014 U.S. Dist. LEXIS 158645, at *15-16 (C.D. Cal. Nov. 6, 2014) (citing retention of jurisdiction provision in disputed stipulation as part of consent analysis).

6.      Fourth, the Cliffs Parties waived their objection to the Court's entry of a final order on the Subject Counts.  On January 9, 2018, Cliffs filed its *Objection of Defendant Cleveland-Cliffs Inc. to Plaintiffs Motion for Leave to Amend Complaint* [D.I. 10], requesting that the Court refuse the Amended Complaint because the Settlement Agreement and Assumption Order terminated the rights Mesabi was seeking to enforce.  The Cliffs Parties now

request summary judgment on the same grounds. Cliffs cannot ask the Court for an interpretation of the Settlement Agreement and later argue the Court lacks authority to make such an interpretation. *Cf. In re Carter*, 506 B.R. 83, 88 (Bankr. D. Ariz. 2014) (deeming wavier of *Stern* objection by summary judgment movant "to prevent litigation conduct that could be described as sandbagging, 'heads I win; tails you lose,' or second bite at the apple strategy").

7.    For all of these reasons, the Court has both jurisdiction and authority to enter a final order on the Cliffs MSJ, as well as the GPIOP MSJ and the Mesabi MSJ.

## III.    FACTUAL BACKGROUND

### A.    Background of the Mineral Leases

8.    Plaintiff was formed to develop and operate a fully-integrated pellet production facility (the "**Project**") in the Mesabi Iron Range in northern Minnesota. In furtherance of its objective, through leases and acquisitions from numerous lessors and sellers, Plaintiff assembled a patchwork of mining interests and other rights covering over 20,000 contiguous acres.

9.    Plaintiff acquired rights constituting part of this patchwork from GPIOP and Superior Mineral Resources LLC ("**Superior**") through the following leases (collectively, the "**Mineral Leases**") and related operating agreements, each dated as of November 29, 2006 and as from time to time thereafter amended[3]: (i) MSI 100% Indenture of Lease and MSI 100% Operating Agreement; (ii) MSI 50% Indenture of Lease and MSI 50% Operating Agreement; and (iii) MSI BLGN Indenture of Lease and MSI BLGN Operating Agreement. Each Mineral Lease is in substantially the same form and contains the same termination provision pursuant to which Plaintiff is entitled to written notice specifying any non-monetary default and is afforded

---

[3]    The Mineral Leases and related operating agreements are attached as **Exhibits A-1** through **C-2** to the *Appendix in Support of Plaintiff's Memorandum of Law (a) in Support of its Motion for Partial Summary Judgment and (b) in Opposition to Defendant Glacier Park Iron Ore Properties LLC's Motion for Partial Summary Judgment* [D.I. 52] (the **"Mesabi MSJ Appendix"**).

{BAY:03264722v1}

not fewer than thirty days to cure any default so specified.  *See* Mineral Leases, 2-3.

**B.     Efforts to Preserve the Mineral Leases in the Bankruptcy Cases**

10.     Given the importance of the Mineral Leases to the Project, Plaintiff sought during the Chapter 11 Cases to maintain those interests so as to preserve the planned economies of the Project and maximize Plaintiff's chances of a successful reorganization.

11.     On February 2, 2017, the Debtors filed their initial chapter 11 plan of reorganization [D.I. 690] (the "**Original Plan**").  In connection with the Original Plan, the Debtors filed a notice of their intention to assume certain unexpired mineral leases [D.I. 692] (the "**Assumption Notice**"), including the Mineral Leases with GPIOP and Superior.

12.     In response to the Assumption Notice, on April 12, 2017, GPIOP filed an objection to the Debtors' proposed assumption of the Mineral Leases in the Original Plan [D.I. 888] (the "**GPIOP Objection**").  The Parties resolved the GPIOP Objection by stipulation [D.I. 924-1] (the "**Stipulation**") approved by the Court on April 24, 2017 [D.I. 924].  Pursuant to the Stipulation, the Debtors agreed that the assumption of the Mineral Leases would be addressed by a separate motion, rather than through the plan process, and that the protections of section 365(d)(4) were waived with respect to the Mineral Leases.

13.     On June 8, 2017, the Debtors filed their third amended plan [D.I. 990] (as from time to time amended, the "**Plan**"), which contemplated and provided for, among other things, the contribution of equity and debt financing sufficient to support assumption of important mineral and surface leases, as well as the construction and ultimate operation of the Project.

14.     On June 13, 2017, the Court confirmed the Plan and entered its *Findings of Fact, Conclusions of Law, and Order Confirming the Third Amended Chapter 11 Plan of Reorganization for Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc. Proposed by the Debtors* [D.I. 1025] (the "**Confirmation Order**").

15.     On June 27, 2017, as contemplated in the Stipulation, the Debtors filed a motion to assume the Mineral Leases [D.I. 1056] (the "**Motion to Assume**"), to which GPIOP objected [D.I. 1093] on July 14, 2017.

**C.      Resolution of the GPIOP/Superior Lease Proceedings**

16.     On August 28, 2017, the Parties resolved the Motion to Assume by settlement (the "**Settlement Agreement**"), which incorporated that certain omnibus lease amendment (the "**Omnibus Lease Amendment**") attached as Exhibit 1 thereto.  The Settlement Agreement was approved by the Court upon entry of an agreed order on August 30, 2017 [D.I. 1168] (the "**Assumption Order**"), which is now final and not subject to appeal.  The terms of the Assumption Order were negotiated and agreed among the Parties.  *See Certification of Counsel in Connection with the Debtors' Motion Pursuant to Sections 105(a) and 365 of the Bankruptcy Code Authorizing Assumption of the GPIOP Mineral Leases* [D.I. 1161] (the "**Assumption COC**").  A true and correct copy of the Assumption COC is attached as **Exhibit D** to the Appendix.  True and correct copies of the Assumption Order, the Settlement Agreement, and the Omnibus Lease Amendment are attached as **Exhibit E** to the Appendix.

17.     The proper interpretation of the Settlement Agreement, including the Omnibus Lease Amendment, and the Assumption Order is the subject of the MSJs.

**D.      Events Subsequent to the Settlement Agreement; Entry of the Assumption Order**

18.     On September 7, 2017, Plaintiff Mesabi filed the *Original Complaint* [Adv. D.I. 1] against Cliffs and Does 1-10, thereby initiating this adversary proceeding.

19.     October 31, 2017 passed without the Plan going effective.  As a result, on November 1, 2017, the Mineral Leases were rejected in accordance with the terms of the Settlement Agreement.  However, neither GPIOP nor Superior took any action to terminate the Mineral Leases in accordance with their terms and Plaintiff continued discussions regarding the

Mineral Leases with GPIOP and Superior.  Moreover, neither GPIOP nor Superior took any action to force Mesabi off of the Leased Properties on or after November 1, 2017, and Mesabi has thereafter remained on the Leased Properties.

20.    On December 11, 2017, Cliffs issued a press release, in relevant part, as follows:

[Cliffs] announced today that its wholly-owned subsidiary, [Cliffs Minnesota], completed an acquisition of certain real estate interests . . . from [GPIOP].  The interests include a combination of undivided and whole fee interests as well as mineral and surface leases, all lying within the Biwabik Iron Formation.  The acreage acquired is approximately 553 acres and the acreage being leased is approximately 3,215 acres.

Cliffs expects to be able to leverage the acquired real estate interests to develop a financially sustainable plan for the site, which may be considered as other iron ore resources deplete.  The purchased properties include parcels that were formerly leased by GPIOP to [Mesabi], formerly known as Essar Steel Minnesota. [Mesabi's] lease rights terminated on October 31, 2017 when it failed to exit bankruptcy in connection with Chippewa's inability to timely secure funding and other consents for its plan to take [Mesabi] out of bankruptcy at that time.

Lourenco Goncalves, Chairman, President and Chief Executive Officer, said, "We are enthused about the acquisition of this property, which came into play after Chippewa failed to follow through on its obligation to obtain financing and a bankruptcy exit for [Mesabi] by October 31.  Despite several botched attempts by others, it is now the time for [Cliffs] to sit at the table with other responsible parties and develop a realistic solution for this site."

Cleveland-Cliffs Inc. Announces Acquisition of Real Estate Interests in Itasca County, Minnesota (Dec. 11, 2017), available at http://www.clevelandcliffs.com/English/news-center/news-releases/news-releases-details/2017/Cleveland-Cliffs-Inc-Announces-Acquisition-of-Real-Estate-Interests-in-Itasca-County-Minnesota/default.aspx (the "**Cliffs Release**").

21.    Plaintiff alleges in the Complaint that the transaction described in the Cliffs Release (the "**Cliffs Transaction**") had been in the works for some time.  Cliffs Minnesota, the entity that served as the acquisition vehicle for such rights, was created on October 9, 2017,[4] well

---

4    *Query* "Cleveland-Cliffs Minnesota Land Development LLC" *at* Delaware Business Entity Search, https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx.

{BAY:03264722v1}

AMERICAS 94430021

before the November 1, 2017 rejection of the Mineral Leases.  Nonetheless, GPIOP gave the

Debtors no warning or indication that it intended to sell or lease to any third party its rights in the

properties covered by the Mineral Leases (the "**Leased Properties**"), even as it continued

discussions with Chippewa, the Plan Sponsor under the Plan.

22.     On December 22, 2017 (the "**Effective Date**"), Plaintiff filed its *Motion to Amend*

*Complaint* (the "**Motion to Amend**") [Adv. D.I. 8] in order to protect its rights in the Leased

Properties from Cliffs' and GPIOP's unlawful interference.  Shortly thereafter, on the same date,

the Plan went effective in accordance with its terms [D.I. 1398].  As a consequence, Plaintiff

became the Reorganized Debtor.  Plan, § 1.1(134).

23.     On January 9, 2018, Cliffs filed an opposition to the Motion to Amend [Adv.

D.I. 10].  Cliffs' arguments therein are largely the same arguments the Cliffs Parties now

advance in support of their MSJ.  On January 23, 2018, the Court entered its *Memorandum*

*Order Granting Plaintiff's Motion to Amend Complaint* (the "**Amendment Order**") [Adv.

D.I. 17], finding that Plaintiff's proposed amendments to the Complaint were not futile.

24.     The MSJs followed.  Each of the Subject Counts turns on whether Plaintiff is

entitled to the benefits of the Mineral Leases, as Plaintiff contends, or whether they were

irrevocably terminated as of November 1, 2017, as the Cliffs Parties contend.  For the reasons

that follow, the Cliffs MSJ must be denied.[5]  For the same reasons, the GPIOP MSJ must also be

---

[5]    Even if the Cliffs Parties were to show entitlement to summary judgment on the Subject
Counts (which they cannot), their claimed rights to the Leased Properties remain the subject of
Plaintiff's antitrust claims.   As described in paragraphs 86 through 96 of the Amended
Complaint, the Cliffs Transaction constitutes part of Cliffs' ongoing violations of federal and
state antitrust law.  Dominant firms may be prohibited from engaging in activities that are
otherwise legal, hard-nosed competitive actions.  *See United States v. Dentsply Int'l, Inc.*, 399
F.3d 181, 187 (3d Cir. 2005) ("Behavior that otherwise might comply with antitrust law may be
impermissibly exclusionary when practiced by a monopolist."); *LePage's, Inc.*, 324 F.3d 141,
151-52 (3d Cir. 2003) (cautioning that "a monopolist is not free to take certain actions that a
company in a competitive (or even oligopolistic) market may take").   Because the Cliffs
{BAY:03264722v1}

denied and the Mesabi MSJ must be granted.

## IV.    OPPOSITION

25.    The Cliffs Parties contend that Plaintiff has no further rights in the Mineral Leases under the plain terms of the Settlement Agreement.  Their argument proceeds in three parts. First, they assert that the Mineral Leases were irretrievably rejected under Section 3 of the Settlement Agreement and could not thereafter be assumed, asking the Court to disregard Paragraph 3 of the Assumption Order; Section 3(e)—the waiver and cure provision—of the Settlement Agreement; and Section 4 of the Settlement Agreement.  Second, they claim the Settlement Agreement terminated the Mineral Leases and all associated rights based on a strained interpretation of the word "revert."  Third, and finally, they assert that Section 4 of the Settlement Agreement is subject to a purported termination condition in Section 3, where the Settlement Agreement plainly provides that Section 4 is subject only to the termination provisions of Section 8(b).  For the reasons stated below, the Cliffs Parties are wrong.  The Settlement Agreement preserved, rather than terminated, Plaintiff's rights in the Mineral Leases.

### A.    The Settlement Agreement Did Not Terminate the Mineral Leases

26.    The Cliffs Parties ask the Court to read the word "revert" in Section 3(d) of the Settlement Agreement as "terminate."  Cliffs Opening Br., ¶ 59.  If the Parties to the agreement had intended a termination, they would have used that word.  Instead, they used "revert."  In the context of Section 3, "reversion" of the Mineral Leases (as opposed to the underlying property interests) was clearly intended to return to GPIOP the essential right taken from it by operation of the automatic stay: the *right* to terminate the Mineral Leases.

27.    Section 3(d) provides, in whole:

---

Transaction is part of Cliffs' broad, multi-faceted anticompetitive scheme to exclude Mesabi from the Great Lakes iron ore and pellet market, the Cliffs MSJ has no bearing on Mesabi's antitrust claims, even if the leases did not violate Mesabi's contract rights.

The Mineral Leases will be automatically rejected pursuant to Section 365 of the Bankruptcy Code and revert to GPIOP and Superior, as applicable, without further Bankruptcy Court proceedings or litigation in the event the Effective Date of the Plan does not occur by October 31, 2017, or such later date agreed by the Parties. In such circumstance, GPIOP and Superior, as applicable, may take any action with respect to the Mineral Leases and the leased properties and interests and such actions will not constitute a violation of the automatic stay or any other provisions of the Bankruptcy Code.

Settlement Agr., § 3(d).

28.     In *In re Overseas Shipholdings Group., Inc.*, Judge Walrath held that parties stipulating to a lease rejection must separately provide for termination if that is what they intend. 2015 Bankr. LEXIS 1802, at *7-8 (Bankr. D. Del. June 1, 2015) ("If the parties had intended a termination of the Overlease [in a stipulation regarding rejection], they would have used that language."). Here, the Parties only agreed that the Mineral Leases would be "rejected" and "revert."[6] They did not agree to termination.

29.     As an initial matter, "revert" and "terminate" are not synonyms, as the Cliffs Parties suggest. Reversion is what happens to real property interests when leases terminate. Leases themselves do not "revert."[7] The Cliffs Parties' own authorities follow this convention,[8]

---

[6]     Notably, the Cliffs Parties do not and cannot argue that automatic rejection of the Mineral Leases resulted in termination. "It is well-settled that the rejection of a lease pursuant to § 365 results in a prepetition breach; it does not constitute a termination of the lease." *In re DBSI, Inc.*, 409 B.R. 720, 731 (Bankr. D. Del. 2009) (Walsh, J.) (collecting cases); *see also In re Teleglobe Commc'ns Corp.*, 304 B.R. 79, 83 (D. Del. 2004) ("[A] rejection and surrender of a nonresidential real property lease is a breach of the lease and not a termination thereof . . . ."); *In re CB Holding Corp.*, 448 B.R. 684, 686-87 (Bankr. D. Del. 2011) (Walrath, J.) (quoting *In re DBSI*, 409 B.R. at 731); *In re Our Alchemy, LLC*, 2017 Bankr. LEXIS 879, at *3 (Bankr. D. Del. Mar. 31, 2017) (Gross, J.) ("The cases in this jurisdiction are uniform in holding that rejection of an executory contract is a breach and not a termination of the contract.").

[7]     *See, e.g.*, MN St. Tax. Rep. (CCH) P 00676 (Apr. 27, 1977) ("Upon the **termination of appellant's lease** in 1971, the Orwell **properties reverted** to the possession of Great Northern Iron Ore Properties."); *Storer Cable T.V. v. Summerwinds Apts. Assocs.*, 493 So. 2d 417, 421 (Fla. 1986) ("During the term of the lease, the landlord's ownership is what the law calls a reversionary interest, because absolute **ownership will revert** back to the landlord **upon the termination of the lease** at some time in the future."); *Jupiter Oil Co. v. Snow*, 819 S.W.2d 466, 468 (Tex. 1991) ("[U]pon the **termination of the lease**, **the mineral estate ordinarily reverts** to {BAY:03264722v1}

as did the Parties to the Settlement Agreement: their underlying Mineral Leases and related operating agreements contain over seventy instances of the word "terminate" in reference to how the Mineral Leases might end.  They contain not one instance of the word "revert."

30.    In the Settlement Agreement, those same Parties chose to apply the word "revert" to the Mineral Leases but excluded from the "reversion" the underlying "leased properties and interests."  *Compare* Settlement Agr., § 3(d), first sentence (only Mineral Leases "revert") *with id.* at § 3(d), second sentence (following reversion GPIOP and Superior free "take any action with respect to the Mineral Leases *and the leased properties and interests*") (emphasis added). The Parties' exclusion of the "leased properties and interests" from the effect of reversion must be given effect.  *See Imation Corp. v. Koninklijke Philips Elecs. N.V., U.S.*, 586 F.3d 980 (Fed. Cir. 2009) (New York law) ("Where one provision of an agreement contains a particular reference, the omission of this reference from any similar provision 'must be assumed to have been intentional under accepted canons of contract construction.'") (quoting *U.S. Fid. Guar. Co. v. Annunziata*, 67 N.Y.2d 228, 223 (1986)).

31.    While "reversion" of a lease contract, as opposed to a leased property, has no generally accepted meaning, it makes a great deal of sense in the context of Section 3(d).  When the Debtors commenced their Chapter 11 Cases, section 362(a) of the Bankruptcy Code operated automatically to strip GPIOP and Superior of their contractual rights to terminate the Mineral Leases.  *See In re Valley Media, Inc.*, 279 B.R. 105, 137 (Bankr. D. Del. 2002) (noting that

---

the grantors of the lease, their heirs or assigns."); *Energetics, Ltd. v. Whitmill*, 442 Mich. 38, 48 (1993) ("[T]he transfer of an interest in oil and gas occurs both when a lease takes effect and when *the leasehold interest reverts* to the interest owner *upon termination of the lease*.").

[8]    *See* Cliffs Opening Br., ¶ 59 (citing Black's Law Dictionary (10th ed. 2014) for definition of "automatic reversion," i.e., "'[t]he spontaneous revesting in a grantor *of property* the grantor had earlier disposed of . . . .'" and *Miller v. Common Sch. Dist. No. 99, Lyon Cty.*, 43 N.W.2d 102, 104 (Minn. 1950), which discusses circumstances under which "title [to real property] shall revert to the grantor").

{BAY:03264722v1}

11 U.S.C. § 362 prohibits "terminating [] agreements post-petition"). In order to terminate the leases, GPIOP and Superior would need that right back—it would need to "revert" to them.

32.     This is exactly what the second sentence of Section 3(d) says is the consequence of reversion. It says that "[i]n such circumstance"—namely upon rejection and reversion— "GPIOP and Superior, as applicable, may take any action with respect to the Mineral Leases and the leased properties and interests and such actions *will not constitute a violation of the automatic stay or any other provisions of the Bankruptcy Code*." Settlement Agr., § 3(d). Put another way, Section 3(d) provides that "reversion" would free GPIOP and Superior from the restrictions of the Bankruptcy Code, and specifically the automatic stay. It *does not* provide that they would be free from the requirements of the Mineral Leases or Minnesota law.

33.     Given that GPIOP and Superior were entitled to stay relief upon "reversion," but not relief from the terms of the Mineral Leases or Minnesota law, the only reasonable reading of "reversion" of the "Mineral Leases" is that the lessors did in fact get back their right to terminate in accordance with and subject to the terms of the Mineral Leases and Minnesota law. Indeed, if "revert" actually did mean terminate, the stay relief afforded by Section 3(d) to "take any action *with respect to the Mineral Leases* and the leased properties and interests" would make no sense because the Mineral Leases would be gone and there would be no further action with respect to the Mineral Leases for the lessors to take.

34.     With its termination rights restored as a consequence of automatic reversion of the "Mineral Leases," GPIOP was cleared as of November 1, 2017 to issue Plaintiff a notice of termination based upon the stipulated non-monetary breach of rejection, *see* 11 U.S.C. § 365(g); n.6, *supra*, in accordance with the terms of the Mineral Leases. Required notice under the Mineral Leases affords Plaintiff not fewer than thirty (30) days to cure a non-monetary breach. Mineral Leases, 2-3. Upon receipt of such a notice, pursuant to Section 3(e) of the Settlement

{BAY:03264722v1}
AMERICAS 94430021

Agreement, Plaintiff would have been entitled to cure its breach-by-rejection (and all other outstanding breaches) by making its Plan go effective before GPIOP's termination did. Settlement Agr., § 3(e) ("As of the Effective Date of the Plan . . . any pre-Effective Date breaches or defaults under the Mineral Leases are cured, and if not curable, are waived.").[9]

35.    Thus understood, the effect of the automatic rejection and reversion of the Mineral Leases pursuant to Section 3(d) was to give GPIOP and Superior the power to force the Debtors to make their Plan go effective within thirty days of notice after October 31, 2017 or else risk losing the Mineral Leases altogether.  This reserved to GPIOP and Superior the flexibility in their approach for terminating the Mineral Leases depending on how things were proceeding in the Chapter 11 Cases after October 31—namely to decide whether they still wanted to support the Plan.  The Debtors' payment, pursuant to Section 3(b), of royalties due January 20, 2018 is also consistent with the expectation that the Mineral Leases would continue for at least some period (which could be no less than thirty days under the Mineral Leases) after October 31, 2017.

36.    The Cliffs Parties assert that their construction of "revert" as "terminate" is superior to Plaintiff's interpretation because Plaintiff's interpretation gives revert no meaning. Cliffs Opening Br. ¶ 61.  For the reasons just stated, this is simply not true.[10]  It is the Cliffs Parties' interpretation of "revert" that is impermissible as it gives the word a different meaning

---

[9]    Whereas Plaintiff's interpretation of "revert" harmonizes Section 3(d) with Section 3(e), the Cliffs Parties' interpretation creates an irreconcilable conflict between the two.  Section 3(e) provides without qualification that "[t]he Mineral Leases shall remain in full force and effect until the Restated Mineral Leases become fully effective and enforceable," which, pursuant to Section 4, would occur on the Plan's Effective Date.  Termination of the Mineral Leases by Section 3(d) would be contrary to this provision.  In contrast, termination in accordance with the terms of the Mineral Leases would not be, as such termination would necessarily follow notice and the Debtors' failure to bring the Plan effective within the applicable notice period.  These circumstances would likely be accompanied by termination of the entire Settlement Agreement in accordance with Section 8(b), based on the Debtors' admission that the Plan would not go effective at all, the result being that Section 3(e) would thereafter have no force or effect.

[10]    It also never was true. The meaning Plaintiff ascribes to "revert" is the same now as it was in its reply in support of its motion for leave to file the Amended Complaint.  [D.I. 12 at ¶¶ 55-59].

{BAY:03264722v1}

than it has and renders the balance of Section 3(d) meaningless, violating the rule that courts "are to interpret a contract in such a way as to give meaning to all of its provisions." *Brookfield Trade Ctr. v. Cty. of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998).

37.     In sum, if the Parties to the Settlement Agreement "had intended a termination [thereof], they would have used that language." *In re Overseas Shipholdings Grp.*, 2015 Bankr. LEXIS 1802, at *7-8. They didn't. The Court must honor the Parties' choice of words and give effect to the associated provisions. Only Plaintiffs' interpretation does so. Because GPIOP did not avail itself of the right of termination that reverted to it on November 1, 2017, the Mineral Leases were not terminated prior to the Effective Date. By GPIOP and Superior's agreement, "[a]s of the Effective Date of the Plan . . . any pre-Effective Date breaches or defaults under the Mineral Leases [we]re cured, and if not curable, [we]re waived." Settlement Agr., § 3(e).[11]

38.     Finally, even if "revert" *could* be read as "terminate," enforcing Section 3(d) as such would result in an impermissible forfeiture. As more fully discussed in Section IV.B.2.iii., *infra*, a contract construction against a forfeiture must be adopted "[w]henever reasonably possible." *Naftalin v. John Wood Co.*, 263 Minn. 135, 147 (1962). Because Plaintiff's interpretation is at the very least reasonable, if not unavoidable, it must be adopted over the Cliffs Parties' interpretation that would result in a forfeiture.

**B.     The Mineral Leases Were Assumed as of the Effective Date**

39.     The Mineral Leases were assumed as of the Effective Date of the Plan under the plain terms of the Assumption Order. If they were not, the Court must still find that they were assumed on the Effective Date in order to avoid a forfeiture of Plaintiff's valuable rights under

---

[11]     The Cliffs Parties ask that the Court re-write Section 3(e) to make it subject to the purported condition of Sections 3(b) and 3(d), i.e., that that Plan go effective by October 31, 2017. Section 3(e) is subject to the Settlement Agreement's general termination provision which, as discussed further herein, was never triggered.

the Mineral Leases and a windfall for GPIOP's interest, through which the Cliffs Parties claim.

1.    **The Assumption Order Unqualifiedly Provides for Assumption as of the Effective Date of the Plan**

40.    The Mineral Leases were assumed on the Effective Date by the plain terms of the Assumption Order.  Plaintiff's continued interest in the Mineral Leases is definitively established in the Assumption Order, which provides, in relevant part:

> Pursuant to sections 105(a) and 365 of the Bankruptcy Code, the Mineral Leases, as amended, are assumed as of the effective date of the Plan.

Assumption Order, ¶ 3.  The Effective Date occurred on December 22, 2017.  By the unqualified and explicit terms of the Assumption Order, the Mineral Leases were assumed by the Reorganized Debtor on such date.  The terms of the Assumption Order must control over any contrary terms of the Settlement Agreement both because the Assumption Order is an order and because it is later in time.

41.    The Assumption Order gives effect to the terms of the Settlement Agreement and therefore does so subject to the terms of the Assumption Order.  In *Forklift LP v. iS3C, Inc.* (*In re Forklift LP*), 363 B.R. 388 (Bankr. D. Del. 2007), Judge Walsh concluded that the terms of a confirmation order control over contrary terms of a plan as a matter of law because "[a] plan of reorganization has no effect without a court's confirmation."  *Id.* at 396 ("When the plan and the confirmation order contradict, 'the confirmation order prevails.'") (quoting *Guardian S&L Ass'n v. Arbors Assocs.* (*In re Arbors Assocs.*), 1999 U.S. App. LEXIS 162, at *11 (6th Cir. Jan. 4, 1999) and collecting cases).

42.    Confirmation orders are to plans as the Assumption Order is to the Settlement Agreement.  Section 8(a) provides that all obligations under the Settlement Agreement could be fully enforced only upon this Court's approval.  Settlement Agr., § 8(a) (Debtors' obligations under agreement entirely contingent upon the Court's approval).  The Assumption Order is the

mechanism by which the Settlement Agreement became fully enforceable.  Thus, by the reasoning of *Forklift LP*, the Assumption Order's provisions must control over contrary provisions in the Settlement Agreement.  Where Paragraph 3 of the Assumption Order provides that, "[p]ursuant to sections 105(a) and 365 of the Bankruptcy Code, the Mineral Leases, as amended, are assumed as of the effective date of the Plan," the Mineral Leases as amended by the Omnibus Lease Amendment will be assumed as of the Plan's Effective Date notwithstanding any purported unsatisfied conditions to assumption in the Settlement Agreement.[12]

43.     Even if the Court were to find that the Assumption Order does not automatically control over the terms of the Settlement Agreement by virtue of its status as an effectuating order, the Assumption Order would still control as a matter of contract interpretation and requires assumption of the Mineral Leases on the Effective Date by agreement of the Parties.

44.     In *In re Trico Marine Services, Inc.*, 450 B.R. 474, 482 (Bankr. D. Del. 2011), this Court noted that it interprets agreed forms of order in the same way as it interprets contracts. Quoting the Third Circuit, the Court there observed that "'the strongest manifestation of [contractual] intent is the wording of the agreement itself.'"  *Id.* (quoting *Nova Chem., Inc. v. Sekisui Plastics Co.*, 579 F.3d 319, 323 (3d Cir. 2009).  Here, the wording of Paragraph 3 is clear and unconditional: the Mineral Leases will be "assumed as of the effective date of the Plan."

45.     The Cliffs Parties argue that these words cannot mean what they say because they are contrary to Section 3 of the Settlement Agreement and Paragraph 2 of the Assumption Order, the latter of which provides that the Settlement Agreement and the Omnibus Lease Agreement are approved.  Under ordinary contract interpretation principles, Paragraph 3 of the Assumption

---

[12]   For the reasons more fully set forth below, though the Mineral Leases were automatically rejected on November 1, 2017, the occurrence of the Effective Date cured or waived all breaches by consent pursuant to Section 3(e) of the Settlement Agreement.  Rejection is a breach.  11 U.S.C. § 365(g).  It was cured or waived by agreement of the Parties at the same time as the Mineral Leases were assumed pursuant to Paragraph 3 of the Assumption Order.

Order controls over Section 3 of the Settlement Agreement both as an amendment to the Settlement Agreement and as a later-in-time expression of the Parties' agreement.

46.     Section 19 of the Settlement Agreement sets forth the requisite formalities for an amendment:  merely a "written agreement of the Parties."  Settlement Agr., § 19.  As described in the Assumption COC, the form of Assumption Order is just that: the Debtors, the Plan Sponsor, Superior and GPIOP "agreed upon the form of the revised proposed order . . . authorizing assumption of the GPIOP Mineral Leases, as the GPIOP Mineral Leases are amended pursuant to [the] Settlement Agreement."  Assumption COC ¶ 3.  It is axiomatic that amendments properly modify the agreements that they amend.  Moreover, under Minnesota law, later portions of integrated documents forming a single agreement control over earlier portions. *See* 8 Dunnell Minn. Digest Contracts § 8.06 (2017) ("Where there is inconsistency in the related documents constituting a contract, the later stipulations will control."); *Minneapolis v. Republic Creosoting Co*., 201 N.W. 414, 418 (Minn. 1924) (holding that the quantity term in a later contract controls over contrary quantity term specified in an earlier, incorporated contract).

47.     Put simply, the Assumption Order does not need to be harmonized with the Settlement Agreement as the Cliffs Parties insist.  *See* Cliffs Opening Br., ¶ 52.  Whether as an amendment or otherwise as a later integrated part of the Settlement Agreement, the agreed Assumption Order controls over contrary terms in the Settlement Agreement.

48.     Further, the Cliffs Parties' reminder that "specific provisions control over general" defeats its arguments with respect to Paragraph 2 of the Assumption Order.  *See id.* at ¶¶ 53-54; *see also Bank Midwest v. Lipetzky*, 674 N.W.2d 176, 181 n.8 (Minn. 2004). Paragraph 2 of the Assumption Order approving the Settlement Agreement does not elevate the Settlement Agreement's terms over the unqualified statement in Paragraph 3 that the Mineral Leases "are assumed as of the effective date of the Plan."  Paragraph 2's blanket approval of the

{BAY:03264722v1}

Settlement Agreement is general.  The statement in Paragraph 3 that assumption will occur on the Effective Date is specific.  It must control.  Further, any interpretation that the Mineral Leases were *not* assumed on the Effective Date would render Paragraph 3 of the Assumption Order meaningless.  If the Assumption Order did nothing but approve the Settlement Agreement, Paragraph 2 would have been all that was required.  Ignoring Paragraph 3 violates the principle that courts should "avoid an interpretation of [a] contract that would render a provision meaningless." *Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 526 (Minn. 1990).

49.     Finally, the Cliffs Parties assert that the Mineral Leases cannot be assumed following their November 1, 2017 rejection pursuant to Section 3(d) of the Settlement Agreement because "a debtor may not assume a contract that has been rejected, absent consent." Cliffs Opening Br., ¶ 54 (citing *In re Victory Markets, Inc.*, 221 B.R. 298, 304 (B.A.P. 2d Cir. 1998)).  Here, there *was* consent.  That consent is manifested in Paragraph 3 of the Assumption Order, which provides, by agreement of the Parties, for assumption of the Mineral Leases on the effective date of the Plan, which is not limited to Effective Dates that occur prior to November 1. Such consent is further manifested in Section 3(e) of the Settlement Agreement, which provides that, as of the Effective Date, all prior breaches are cured or waived.  Prior rejection is no bar to assumption under the Settlement Agreement and Assumption Order.

50.     The terms of the Assumption Order are clear and unambiguous and no further inquiry into the parties' intent is required or permitted.  The Cliffs Parties must be denied summary judgment on the Subject Counts.

## 2.     To the Extent It Constitutes a Condition Precedent to Assumption, the October 31, 2017 Deadline Must Be Excused to Prevent a Forfeiture

51.     The Cliffs Parties assert that Sections 3(b) and 3(d) of the Settlement Agreement subject Mesabi's right of assumption to an absolute condition precedent.  To the extent they are correct that Paragraph 3 of the Assumption Order does not eliminate the purported condition

{BAY:03264722v1}

altogether, they are incorrect that the condition is absolute.

52.     Equity abhors a forfeiture.  *See, e.g.*, *In re Seven Hills, Inc.*, 403 B.R. 327, 335

(Bankr. D.N.J. 2009) ("A court of equity abhors forfeitures, and will not lend its aid to enforce

them.") (quoting *Jones v. Guar. & Indem. Co.*, 101 U.S. 622, 628 (1879)).  This is especially true

in bankruptcy reorganization cases, where equity aids the parties in generating maximum return

for the benefit of the many interested stakeholders and bars them from diverting assets for the

benefit of individual stakeholders.  In particular, "lease forfeiture clauses are liberally construed

in favor of the bankrupt lessee, especially in reorganization cases."  *In re Shelco, Inc.*, 107 B.R.

483, 487 (Bankr. D. Del. 1989) (citing *Finn v. Meighan*, 325 U.S. 300 (1945); *In re Fleetwood*

*Motel Corp.*, 335 F.2d 857 (3d Cir. 1964)).

53.     So too under Minnesota law, where "[f]orfeitures are not favored and will not be

enforced when great injustice [would be] done thereby and the one seeking the forfeiture is

adequately protected without [the forfeiture]."  *Warren v. Driscoll*, 242 N.W. 346, 347 (Minn.

1932); *see also Hideaway, Inc. v. Gambit Invs., Inc.*, 386 N.W.2d 822, 824 (Minn. App. 1986).[13]

54.     Ignoring this, the Cliffs Parties quote *enXco Development Corp. v. Northern*

---

[13]  Minnesota's strong policy disfavoring forfeitures of real property interests is also codified in various parts of the Minnesota Statutes.  These include § 504B.291, discussed in Section IV.D., *infra*, and § 559.21, which sets forth certain requirements to terminate contracts for the conveyance of real property interests.  These include that the seller provide the purchaser 60 days' written notice of termination, during which time the purchaser may cure existing defaults and make certain payments necessary to maintain the contract.  Minn. Stat. § 559.21, subd. 2(a).

Although § 559.21 by its terms applies to contracts for the sale of real estate, application to the Mineral Leases is appropriate as the Mineral Leases have conveyance characteristics absent from typical leases.  In contrast to a typical lease, where the value of the leasehold interest is not diminished as a result of the lessee's use, the Mineral Leases, which span decades, entitle Mesabi to extract and permanently retain for itself the substantial value of the leasehold interest.  In this sense, the Mineral Leases resemble a conveyance of real estate, for which Minnesota law has clearly stated an intent to avoid the harsh result of forfeiture.

Where a private contract is in conflict with § 559.21, the statutory cure period applies.  *See Bly v. Bublitz*, 464 N.W.2d 531, 534 (Minn. Ct. App. 1990) (citing Minn. Stat. § 559.21 ("The notice required by this section must be given ***notwithstanding any provisions in the contract to the contrary*** . . . .") (emphasis added)).

{BAY:03264722v1}

*States Power Co.*, 2013 WL 1364242, at *6 (D. Minn. Apr. 4, 2013), for the proposition that Section 3(b)'s Effective Date deadline must be strictly enforced without regard to the consequences or materiality of the delay between the date stated and the actual date of the Effective Date:  "'Unlike a mere contract term, the breach of which must be material before it excuses another party from performing, one party's failure to fulfill a condition precedent entirely excuses any remaining obligations of the other party.'"  Cliffs Opening Br., ¶ 47 (quoting *enXco Dev. Corp.*, 2013 WL 1364242, at *6 (quoting *AIG Cent. Ins. Co. v. Fraley Landers*, 450 F.3d 761, 763 (8th Cir. 2006))).

55.    Even if this is true as a general proposition, it is not true where strict enforcement would result in a forfeiture.  *Capistrant v. Lifetouch Nat'l Sch. Studios, Inc.*, 899 N.W.2d 844, 856 (Minn. Ct. App. 2017)[14] (finding that *AIG Cent. Ins.*, the Eighth Circuit case quoted in *enXco* and, in turn, by the Cliffs Parties, "*do*[*es*] *not accurately reflect* Minnesota's more flexible approach to conditions precedent that result in disproportionate forfeitures—an approach in accord with section 229 of the Restatement (Second) of Contracts.") (emphasis added).

56.    As set forth in the Restatement, "[t]o the extent that the non-occurrence of a condition could cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange."  Restatement (Second) of Contracts, § 229 (1981).  Where a condition is expressed in terms of performance of an act by a date certain, a court may prevent a forfeiture by "merely excus[ing] its non-occurrence during the period of time in which it would otherwise have to occur, if it concludes that the time of its occurrence is not a material part of the agreed exchange.  This conclusion is sometimes summed up by the phrase that 'time is not of the essence.'"  Restatement (Second) of

---

[14]    *Capistrant* is presently the subject of a review proceeding before the Minnesota Supreme Court, Case No. A16-1829.  *Capistrant v. Lifetouch Nat'l Sch. Studios, Inc*., 2017 Minn. LEXIS 668 (Minn. Sept. 27, 2017).

{BAY:03264722v1}

AMERICAS 94430021

Contracts § 229, cmt. c.  The court in *Capistrant*, 899 N.W.2d at 855, applied these provisions to prevent a forfeiture caused by a three-month delay in performance of a condition precedent.

57.     Here, construing Section 3(b) and 3(d) of the Settlement Agreement to terminate Plaintiff's rights under the Mineral Leases would result in a disproportionate forfeiture as to Plaintiff.  Time was not expressly made of the essence in the Settlement Agreement and GPIOP was exposed to no greater risk as a consequence of the Plan going effective on December 22, 2017 rather than fifty-two days earlier on October 31. Moreover, the Cliffs Parties' interpretative gymnastics cannot satisfy the "unmistakable proof" standard necessary to win a forfeiture.

i.      **Construction of Section 3(b) and 3(d) as the Cliffs Parties Request Would Result in a Disproportionate Forfeiture**

58.     As the *Capistrant* court explained,

"In determining whether [a] forfeiture is 'disproportionate,' a court must weigh the extent of the forfeiture by the obligee against the importance to the obligor of the risk from which he sought to be protected and the degree to which that protection will be lost if the non-occurrence of the condition is excused to the extent required to prevent forfeiture."

899 N.W.2d at 855 (quoting Restatement (Second) of Contracts, cmt. b.).

59.     If Section 3(b) and 3(d) of the Settlement Agreement were construed to deprive Plaintiff of all its rights under the Mineral Leases, it would result in a disproportionate forfeiture. The loss to Plaintiff would be tremendous.  In contrast, GPIOP was adequately protected under the Settlement Agreement against risks stemming from the short delay in going effective.

60.     Losing the Mineral Leases would impair the Project and adversely impact the Reorganized Debtor's efforts to carry out the Debtors' reorganization.  Despite the quotations the Cliffs Parties selectively culled from Internet articles, the record is well established in the Chapter 11 Cases that the Mineral Leases are of substantial importance to the Project.  Attached as Exhibit 3 to the *Reply in Support of Plaintiff's Motion for Leave to Amend Complaint* [D.I. 12] is a map of Plaintiff's mine plan, outlined in yellow, with those GPIOP and GPIOP/Superior

{BAY:03264722v1}

Leased Properties that Cliffs Minnesota purchased in the Cliffs Transaction marked with a "C."

These Leased Properties make up approximately 45% of Plaintiff's permit to mine area.[15]  These

are the same properties the Cliffs Parties are now actively trying to prevent Plaintiff from

mining.  *See* Cliffs Opening Br., ¶ 36 n.21 (explaining Cliffs Parties' efforts to prevent Plaintiff

from mining properties as to which Cliffs Minnesota is now purportedly the co-tenant of

Mesabi-affiliate Miranda following Miranda's acquisition of Superior's interests in the subject

properties).  Only by permitting a forfeiture of Plaintiff's rights in the Mineral Leases will Cliffs

have any basis for its efforts to interfere with Plaintiff's mining rights.[16]

---

[15]   As explained in the declaration of William Everett filed October 5, 2016:

> The initial permit to mine area was strategically selected and designed based upon the make-up and quality of the magnetic ore in that area, the anticipated operational efficiencies of being able to access and mine the ore in that area, and being able to blend the different grades or quality of ore in that area so as to maximize the quality of the pellets that [Mesabi] would be able to produce.  This is fully documented in the over 200 page NI43-101 feasibility study completed by Met-Chem Canada Inc. and Barr Engineering Company for the [P]roject completed in December 2012. . . . To maximize efficiencies and to minimize the costs involved in transporting the crude ore from the mine site to [Mesabi's] ore processing facilities, [Mesabi] has designed and actually constructed its facilities so as to be in very close proximity to the initial permit to mine area.  A fundamental tenet for the [Project] involves limiting the distance between mining and production operations.  This affords [Mesabi] a distinct competitive advantage in the ore market by reducing its production costs relative to neighboring mining operations.

Declaration of William L. Everett in Support of Debtors' Objection to Minnesota Department of Natural Resources' Motion for Relief from Stay or in the Alternative for an Order Shortening the Time to Assume the Nonresidential Leases [D.I. 403], ¶ 9

[16]   Even if Cliffs Minnesota took fee or lease interests in the Leased Properties on or about December 11, 2017, it did so subject to Plaintiff's senior interest in the Leased Properties.

> Under Minnesota law, the purchaser of an interest in real property—whether fee, leasehold or other—takes the property subject to known senior interests.  *Midcountry Bank v. Krueger*, 762 N.W.2d 278, 286 (Minn. Ct. App. 2009).  Because Minnesota is a race-notice state, absent an agreement to subordinate, the priority of an interest in real estate is based on the date of recording.  *Citizens Bank v. Raven Trading Partners*, 786 N.W.2d 274, 278, 286 (Minn. 2010) (citing Minn. State. §§ 386.41, 507.34).  As explained in *Citizens Bank*:

{BAY:03264722v1}

61.     Not only are the Mineral Leases of great value to Plaintiff, but it has invested substantially in them.  As reflected in the Settlement Agreement, Plaintiff made over $10 million in prepaid royalty payments to preserve its interests in the Leased Properties.  Settlement Agr., § 5 ("[T]he Debtors have made in excess of $10 million of prepayments pursuant to the terms and conditions of the Mineral Leases.").  In connection with the Settlement Agreement, Plaintiff prepaid another $600,000 in royalties for credit through January 2018.  *Id.* at § 3(b).

62.     In addition, Plaintiff improved the Leased Properties by satisfying tens of millions of dollars in mechanics' liens that encumbered them, in fact stopping foreclosure by certain lien creditors.  Mechanics' Lien Claims in the Chapter 11 Cases were filed in the aggregate amount of over $75 million.   Certain holders of Mechanics' Lien Claims also filed actions in the Minnesota state court, seeking to foreclose on property to which their liens attached, including

---

The Minnesota Recording Act gives protection to those who [acquire interests in real] property in good faith, for valuable consideration, and who first record their interests, by providing that

> [e]very conveyance of real estate shall be recorded in the office of the county recorder of the county where such real estate is situated; and every such conveyance not so recorded shall be void as against any subsequent purchaser in good faith and for a valuable consideration of the same real estate . . . whose conveyance is first duly recorded.

Minn. Stat. § 507.34.

*Id.* at 278.  Once recorded, all persons have constructive notice of the interest recorded.  Minn. Stat. § 507.34 ("The record, as herein provided, of any instrument properly recorded shall be taken and deemed notice to parties.").

    Plaintiff's interests in the Leased Properties were established of record on December 7, 2006 by filings in the applicable recording offices, Itasca County Registrar of Titles Document Nos. T000050412 and T000050413 and Itasca County Recorder Document Nos. A0000605818 and A0000605819.  True and correct copies of the recorded Mineral Leases are attached to Plaintiff's request for judicial notice filed concurrently herewith.  Moreover, the Cliffs Parties had actual notice of Plaintiff's interests, evidenced by their reference to such interest in the Cliffs Release.  *See* ¶ 20, *supra.*  Therefore, it is Plaintiff, and not the Cliffs Parties or GPIOP, that is entitled to summary judgment on count 24 of the Amended Complaint.

{BAY:03264722v1}

certain Leased Properties.  These foreclosure actions were removed and transferred to this Court, where the resulting adversary proceedings 16-51543 and 16-51877 were stayed until further order.  On the Effective Date, holders of Mechanics' Lien Claims were paid in full the amounts due under the Plan and all mechanics' liens were released.  Plan, § 7.6; Confirmation Order, ¶¶ 48-49.

63.     Finally, it took Mesabi years to obtain all permits necessary to mine the Leased Properties, including a permit to mine, air emissions permit, water permits, and other related permits.  As acknowledged by prior testimony on the record, it would take years for another party to complete requisite environmental studies, feasibility studies, and other permit process requirements and to obtain similar requisite permits.

64.     Balancing the tremendous hardship Plaintiff would suffer "against the importance to the obligor of the risk from which he sought to be protected and the degree to which that protection will be lost if the non-occurrence of the condition is excused to the extent required to prevent forfeiture," it is clear the requested forfeiture would be disproportionate.  The October 31, 2017 date, which had already been extended by two months, Cliffs Opening Br., ¶ 3,[17] was an artificial deadline with little meaning in the context of the thirty-year Mineral Leases. GPIOP's interest in the Mineral Leases was to generate income from the Leased Properties.  At GPIOP's insistence in the Settlement Agreement, Plaintiff prepaid its royalties to GPIOP due in October 2017 and January 2018.  *See* Settlement Agr., § 3(b).  Plaintiff committed in the Settlement Agreement to performing under the Mineral Leases on and after the Effective Date of its Plan.  *See id.* at §§ 3(e), 4(a), & Ex. 1, § 2.  So long as the Plan went effective during the period for which Plaintiff had been prepaid its royalties, its interests were well protected.

---

[17]   Moreover, Cliffs and GPIOP's predecessor in interest, GNIOP, waived the deadlines in § 365(d)(4)(A) of the Bankruptcy Code.  And, GPIOP waived any obligation under § 365(d)(2) to have the leases assumed before or in connection with confirmation of the Plan.

{BAY:03264722v1}

65.     The forfeiture the Cliffs Parties seek would not just be disproportionate; it would result in a windfall for the Cliffs/GPIOP interest.  Enforcing the forfeiture would effectively result in monetization of the valuable minerals underlying the Mineral Leases *twice*.  First, through Plaintiffs' millions in prepaid royalties (with Plaintiff not receiving value in return), and second through the sale to Cliffs Minnesota.  Further, Cliffs and GPIOP would benefit from Plaintiff's payment of tens of millions more to wipe the various mechanics liens from the Leased Properties and have to give nothing in return.  There can be no doubt the Cliffs Parties are requesting the kind of disproportionate forfeiture that Minnesota courts seek to avoid.

### ii.     Bringing the Plan Effective by October 31, 2017, Rather Than Fifty-Two Days Later, Was Not a Material Provision

66.     The only material condition precedent to Plaintiff's rights in the Mineral Leases was the occurrence of the Effective Date, not the Effective Date occurring by October 31, 2017.  Only if the Effective Date would not occur at all would the Settlement Agreement be terminated and rejection pursuant to Section 3(d) be made incurable.  Settlement Agr., § 8(b).  The October 31, 2017 deadline was, at best, a secondary condition of negligible importance.  *See* Restatement (Second) of Contracts, § 229, cmt. c., ill. 3 (substantive performance obligation coupled with performance deadline may be treated as separate conditions, the latter of which may be excused).  Plaintiff's bringing the Plan effective on December 22, 2017, just fifty-two days after the October 31, 2017 deadline, must be excused to prevent a disproportionate forfeiture.

67.     As more fully explained herein, the occurrence of the Effective Date was paramount to the Settlement Agreement.  In the Assumption Order, the Parties agreed that the Mineral Leases would be assumed on the Plan's effective date without limitation as to when such date occurred.  Assumption Order, ¶ 3.  Likewise, the continued vitality of the entire Settlement Agreement was conditioned on the Effective Date being in prospect.  Pursuant to Section 8(b), the Settlement Agreement would remain in effect until the Debtors withdrew the Plan or they

{BAY:03264722v1}

and the Plan Sponsor announced the Effective Date would not occur.  Settlement Agr., ¶ 8(b).

This provision permitted Section 4 of the Settlement Agreement to remain in full force and effect

through the December 22, 2017, whereupon Plaintiff became independently entitled to all rights

under the Mineral Leases in the form of the Restated Mineral Leases.  *Id.* at § 4(a); *see*

Section IV.C., *infra*.  The same provision permitted Sections 2, 5, 6, and 7 to remain in effect

through the December 22, 2017.  By virtue of the Effective Date occurring, (a) Superior and

GPIOP were entitled to (i) have all mechanics' liens removed from the Leased Properties at

Plaintiffs expense, and (ii) a waiver of Plaintiffs' prepaid royalties; (b) their proofs of claim

would be withdrawn; and (c) they would receive releases.  ***None*** of these provisions was

conditioned on the Effective Date occurring by October 31, 2017.  Had such date been material,

it would have governed ***all*** provisions of the Settlement Agreement.  It didn't.  It wasn't material.

68.     Notably, in Section 3(d), the October 31 deadline is expressly made subject to

extension, affirming the Parties' shared understanding that the date was not crucial or inherently

meaningful.  And, Section 3(b) required the Debtors to pay royalties due in January 2018,

consistent with the expectation that the Mineral Leases would continue into 2018.  With the Plan

going effective in December 2017, GPIOP received the same benefits and payments as it would

have had the Plan gone effective fifty-two days earlier on October 31, 2017.  While going

effective before the term of the prepaid royalties expired in January 2018 might have been of

material importance to ensure GPIOP received timely payment of royalties due, the October 31,

2017 Effective Date deadline simply was not.

69.     This is confirmed by the Parties' failure to provide in the Settlement Agreement

that time was of the essence.  Under Minnesota law, time may be made of the essence expressly

by the contract or "by implication from the situation of the parties or the nature of the case."

*Austin v. Wacks*, 15 N.W. 409, 410 (Minn. 1883); *see also Gill v. Bradley*, 21 Minn. 15, 19

{BAY:03264722v1}

28

(1874) (stating "'[t]ime is not generally deemed in equity to be of the essence of the contract, unless the parties have expressly so treated it, or it necessarily follows from the nature and circumstances of the contract'").  Just because a contract contains a performance deadline does not make time of the essence.  *Baker Domes, Div. of R.M. Baker Co. v. Wolfe*, 403 N.W.2d 876, 878 (Minn. Ct. App. 1987).  The nature and circumstances of the Settlement Agreement simply do not compel the conclusion that time was of the essence.

70.    *Capistrant*, 899 N.W.2d 844, is illustrative of the effect of delayed performance in a condition precedent case.  There, a dispute arose between an employer and employee regarding the terms of an employment agreement.  Upon his resignation, as part of his non-compete obligations under the agreement, the employee was obligated to "immediately" turn over all documents in his possession relating to his employment.  Instead of doing so, on his last day of work, he emailed himself customer lists, business strategy documents, and financial information belonging to the company.  He further retained 19,000 pages of similarly sensitive documents in several bankers' boxes.  899 N.W.2d at 850.  Only through litigation, approximately three months after his resignation, did the employee return the documents to the employer.

71.    The trial court found that the employer was excused from paying approximately $2.6 million in outstanding commissions to the employee based on his failure to "immediately" return the employer's property at the conclusion of his employment as required by the agreement.  It based this conclusion on the language of the agreement conditioning payment of commissions on compliance with "all obligations under the Agreement."  The appellate court reversed, finding that the "immediate" return provision was not sufficiently material to enforce where the consequence would result in a disproportionate forfeiture.  *Id.* at 856.

72.    Here, merely specifying October 31, 2017 as the time by which the Effective Date was to occur (if not extended) is not an adequate indicium of intent from which to surmise that

{BAY:03264722v1}

time was of the essence.  This is particularly true when the Parties continued to negotiate amended terms of the to-be-restated Mineral Leases after October 31, 2017 and neither GPIOP nor Superior took any action to terminate the Mineral Leases or force Mesabi off of or clear title to the Leased Properties when October 31 came and went without the Plan going effective.

### iii.      The Settlement Agreement Does Not Clearly and Unmistakably Demonstrate the Parties' Intent to Cause a Forfeiture

73.      The Minnesota Supreme Court imposes on persons seeking a forfeiture the "heavy burden of establishing his right thereto by clear and unmistakable proof." *Naftalin v. John Wood Co.*, 263 Minn. 135, 148 (1962).  Thus, "[w]henever reasonably possible, a construction against a forfeiture will be adopted.  To this end, a contract will be construed not to provide for a forfeiture unless there is a clear expression or manifestation of the intent of the parties in this respect . . . ." *Id.* at 147-48.

74.      The appellate court in *Capistrant* heeded this command in reversing the trial court.  The trial court had accepted the employer's reading of the employment agreement as a "clear expression of the parties' intent with respect to forfeiture upon a failure to return property [upon the employee's resignation]."  899 N.W.2d 854.  Seeking a construction that did not result in a forfeiture as commanded by *Naftalin*, the appellate court adopted a reading extremely charitable to the employee.  The condition precedent plainly required the employee to have complied with "all . . . obligations under the Agreement," and the obligation to return property was an express obligation under the Agreement. Nonetheless, noting its positioning within the agreement and the fact that it was a one-time obligation and the condition precedent implied complete performance over a period of years, the court found the contract language did not rise to the requisite "clear and unmistakable proof of the parties' intent with respect to forfeiture" required for enforcement.  *Id.* at 854-55.  As a result, per *Naftalin*, the unsatisfied condition precedent could not cause a forfeiture.

{BAY:03264722v1}

75.     The Settlement Agreement provides an even weaker basis than the employment agreement in *Capistrant* on which to infer a forfeiture was intended.  This is independently sufficient to prevent the forfeiture the Cliffs Parties request.  Because Paragraph 3 of the Assumption Order can be read as eliminating the deadline for assumption entirely, it ***must be*** read this way under *Capistran* and *Naftalin*.  And, the Parties eschewed the word "terminate" in Section 3(d), requiring GPIOP and Superior to effect termination by the strictures of the Mineral Leases (which neither did) before Section 3(e) operated to cure the November 1 rejection.  Likewise, because the plain language of Section 4(a) preserves rights of the Reorganized Debtor in the Mineral Leases separate from the Section 3 rights, Section 3 cannot be read as causing a forfeiture of such rights.  The Cliffs Parties' answer to this is to ask the Court to export the October 31 deadline found only in Section 3(b) and 3(d) to ***every other provision*** of the Settlement Agreement, including Sections 3(e) and 4(a) (and Paragraph 3 of the Assumption Order), in order to effect the requested forfeiture.  *See* Cliffs Opening Br., ¶¶ 64-65.  This effort to ***read in*** forfeiture provisions is precisely the opposite of *Naftalin's* mandate to read them ***out*** wherever possible.  It cannot be countenanced by the Court.

**3.      Even If Section 3(b) Were Strictly Construed as a Condition Precedent to Assumption, the Mineral Leases Rode Through the Chapter 11 Cases**

76.     Even if the Cliffs Parties correctly read Sections 3(b) and 3(d) as preclusive of assumption, this does not mean Plaintiff could not thereafter enjoy the benefits of the Mineral Leases.  A debtor in possession that neither assumes nor rejects an unexpired lease may continue to perform under that lease, causing it to "ride through" the bankruptcy.  *In re JZ L.L.C.*, 371 B.R. 412, 422 (B.A.P. 9th Cir. 2007) ("[T]he Bankruptcy Code [] contemplates three alternatives with respect to executory contracts in chapter 11 cases: assume, reject, or no action.").

77.     Plaintiff acknowledges that, by the terms of the Settlement Agreement, the Mineral Leases were "automatically rejected pursuant to Section 365 of the Bankruptcy Code"

{BAY:03264722v1}

AMERICAS 94430021

on November 1, 2017. As already discussed, this rejection constitutes a mere breach of the Mineral Leases. But this breach, like all others, was cured or waived on the Effective Date by operation of Section 3(e), which is subject only to the unambiguous termination provision of Section 8(b) and is no way conditioned upon the Effective Date occurring by October 31, 2017.

78.     Because the termination conditions of Section 8(b) were never triggered, Section 3(e) operated as written on the Effective Date to bring Mesabi into good standing under the terms of the Mineral Leases by GPIOP and Superior agreeing that all defaults, including rejection pursuant to Section 3(d), were cured or waived.[18] In effect, by operation of Section 3(e), rejection never happened, paving the way for assumption by consent post-rejection. But, even if the Cliffs Parties are correct that assumption, too, never happened, the consequence is that the Mineral Leases "rode through" the Chapter 11 Cases.

79.     The "ride through" doctrine provides that, in a chapter 11 case, "where a debtor has failed to expressly assume or reject a prepetition lease agreement or executory contract, that lease or contract will be unaffected by the bankruptcy filing." *In re Polysat, Inc*., 152 B.R. 886, 890 (Bankr. E.D. Pa. 1993); *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 546 n.12 (1984) ("In the unlikely event that the contract is neither accepted nor rejected, it will 'ride through' the bankruptcy proceeding and be binding on the debtor even after a discharge is granted.").

80.     Although ride through does not ordinarily operate in the context of a non-residential real property lease due to the limitations of Bankruptcy Code section 365(d)(4), *see JZ L.L.C.*, 371 B.R. at 423 & n.13, GPIOP waived the protections of that provision both by (a) extending, in the Settlement Agreement, the deadline to assume or reject past the Plan's

---

[18]   As the "Surviving Section" under Section 8, rejection pursuant to Section 3(d) would remain effective only if the Effective Date did ***not*** occur because the Plan was withdrawn or Chippewa and the Debtors gave up on bringing it effective. *See* Settlement Agreement, § 8(b). This shows the Parties' intent that only non-occurrence of the Effective Date at all would make the Mineral Leases irredeemable under the Settlement Agreement.

{BAY:03264722v1}

AMERICAS 94430021

confirmation date; and (b) entering into the Stipulation approved by order entered April 24, 2017.  D.I. 924-1, ¶ 5 ("GPIOP hereby consents to an extension of the time to assume or reject the [Mineral] Leases under Section 365(d)(4) until the hearing on any motion to assume the leases.").  *See Chertok v. Phelan* (*In re Phelan*), 2017 Bankr. LEXIS 502, at *15-16 (Bankr. M.D. Pa. Feb. 21, 2017) (noting that protections of § 365(d)(4) are waivable).  Section 365(d)(4) has no applicability following GPIOP's waivers.

81.     The words of Section 3(e) are plain and unmistakably evince the Parties' intent that the Mineral Leases remain effective through and after the Effective Date, with all pre-Effective Date breaches cured or waived upon the occurrence of the Effective Date:

> As of the Effective Date of the Plan, GPIOP and Superior agree that any pre-Effective Date breaches or defaults under the Mineral Lease are cured, and if not curable, are waived.  The Mineral Leases shall remain in full force and effect until the Restated Mineral Leases become fully effective and enforceable [i.e., on the Effective Date].

Settlement Agr., § 3(e).  To read this provision other than as permitting ride-through would require the Court to re-write it.  This the Court cannot do.  *Valspar Refinish*, 764 N.W.2d at 364-65 (Minn. 2009) ("We have consistently stated that when a contractual provision is clear and unambiguous, courts should not rewrite, modify, or limit its effect by a strained construction.").

82.     For the foregoing reasons, the Mineral Leases "rode through" the Chapter 11 Cases, with all defaults cured or waived on the Effective Date, and Mesabi is entitled to all rights and benefits of such leases and is subject to all corresponding obligations and burdens.

## C.     Section 4 of the Settlement Agreement Creates Independent Rights in Favor of the Reorganized Debtor

83.     Section 4 of the Settlement Agreement gives wholly independent rights to the "Reorganized Debtor"—as distinguished from the "Debtor"—to enjoy all benefits of the Mineral Leases on the Effective Date, without regard to whether (i) the Effective Date occurred before or after October 31, 2017; or (ii) the Debtors previously assumed or rejected the Mineral Leases.

{BAY:03264722v1}

AMERICAS 94430021

84.    In full, Section 4(a) of the Settlement Agreement provides:

(a) On or prior to the Effective Date of the Plan, GPIOP, Superior and the Reorganized Debtor *shall negotiate and execute amended and restated agreements to supersede the Mineral Leases in their entirety* (the "Restated Mineral Leases"), *which Restated Mineral Leases shall become fully effective and enforceable on the Effective Date*. The Restated Mineral Leases shall be in form and substance acceptable to GPIOP, Superior and the Reorganized Debtor, preserve all rights and obligations under the Minerals Leases, subject to the modifications described herein, and *contain terms and conditions substantially similar to the Mineral Leases unless otherwise agreed* by GPIOP, Superior and the Reorganized Debtor. *The Mineral Leases will be deemed amended and restated by consent on the Effective Date of the Plan*.

Settlement Agr., ¶ 4(a) (emphases added).  This language is clear and susceptible to only one interpretation:  GPIOP and Superior were obligated to give Plaintiff—as the Reorganized Debtor—all benefits under the Mineral Leases as of the Effective Date, subject only to amendments as agreed to by the parties.  Whether or not any amendments were agreed before the Effective Date, "[t]he Mineral Leases w[ere] deemed amended and restated by consent on the Effective Date of the Plan." *Id.*

85.    The distinction between the Debtors, in Section 3, and the Reorganized Debtor, in Section 4, was deliberate and carefully calculated.  Further, the separate rights in favor of the Reorganized Debtor were supported by substantial consideration.  The Parties to the Settlement Agreement are as follows: (i) Chippewa; (ii) Mesabi and ESML Holdings, as Debtors; (iii) GPIOP; and (iv) Superior.  *Id.* at 1.  Chippewa, as Plan Sponsor, would and did become the owner of the Reorganized Debtor upon the occurrence of the Effective Date in exchange for the Investment.  Plan, § 7.3.  And, as of the Effective Date of the Plan, the Reorganized Debtor was entitled to and did become a Party to the Settlement Agreement "as if executed by the Reorganized Debtor in the first instance" by executing a joinder.  Settlement Agr., § 10.[19]

86.    The Reorganized Debtor is burdened with substantial financial obligations under

---

[19]    The joinder was executed and is of record in these proceedings.  [D.I. 12-2].

{BAY:03264722v1}

AMERICAS 94430021

the Settlement Agreement—obligations it would only be able to satisfy with Chippewa's cash. Pursuant to Section 2 of the Settlement Agreement, Chippewa and the other Parties agreed that the Reorganized Debtor would remove any liens on the Leased Properties outstanding as of the Effective Date and indemnify GPIOP and Superior with respect to such liens "on and after the Effective Date." Settlement Agr., § 2. This obligation arose without reference to the date on which the Effective Date would occur. *See id.* (no date limitation on when Effective Date would need to occur in order for the Reorganized Debtor to be bound by its obligations). It would have made no sense for Chippewa to unconditionally commit the Reorganized Debtor to spend Chippewa's cash after the Effective Date to clear liens from the Leased Properties if the Reorganized Debtor were not assured of rights in the Leased Properties as of the Effective Date. Section 4 provides the Reorganized Debtor those rights.

87.     To achieve this, Section 4 makes the Reorganized Debtor's rights ***completely independent*** of whether the Mineral Leases are rejected under Section 3 and ***not conditioned*** on assumption or occurrence of the Effective Date by any particular time. The Cliffs Parties argue that Section 4 can operate only if Section 3's condition of a pre-November 1 Effective Date is met. This has no basis in the text of the Settlement Agreement.

88.     Pursuant to Section 8, Section 4 and all other provisions of the agreement became fully effective and enforceable on August 30, 2017 when the Court entered the Assumption Order. Settlement Agreement § 8(a). Other than the Approval Order, there was no condition precedent to the effectiveness of the Settlement Agreement.

89.     Section 8 likewise governs termination of the effectiveness of Section 4. As previously noted, Section 8(b) is the general termination provision in the Settlement Agreement and provides that the agreement will become "null and void" only "in the event the Plan is withdrawn or revoked prior to the Effective Date, or it is announced by the Debtors and

{BAY:03264722v1}

35

AMERICAS 94430021

Chippewa that the Effective Date of the Plan will not occur." Settlement Agr., § 8(b). Section 4 does not contain any other termination provision nor does it contain or refer to any deadline for the Effective Date to occur. The plain language of the Settlement Agreement unambiguously provides that Section 4 survives as long as the Settlement Agreement does. Because the Effective Date occurred before any of Section 8(b)'s termination triggers, Section 4(a) operated in accordance with its terms on December 22, 2017 and the "Mineral Leases w[ere] deemed amended and restated by consent on the Effective Date of the Plan." Settlement Agr., § 4(a).

90.     The Cliffs Parties have two responses to the plain language of Sections 4(a) and 8(b). First, they say enforcing Section 4(a) by its plain terms would render Section 3's limitations on assumption "meaningless." Cliffs Opening Br., 64. Second, they say deemed restatement would impossibly revive the Mineral Leases after rejection, reversion, and even termination. *Id.* at ¶ 65.

91.     Section 4 does not render Section 3 meaningless because the two provisions provide two separate sets of rights in favor of parties that, while obviously related, were under separate control during the relevant time periods. Rights under Section 3 lie in favor of the pre-effective date Debtors. *See* Settlement Agr., ¶ 3. Chippewa could not independently ensure that the Plan would go effective by October 31, 2017. *See* Plan, § 11.3 (Debtors' consent required to waive certain material conditions to effectiveness). Section 4's provision of rights in favor of the Reorganized Debtor ensured that, if Debtors failed to bring the Plan effective by October 31, 2017, Chippewa, upon a later Effective Date, would not be stuck funding liabilities with respect to the Leased Properties in which the Reorganized Debtor had no rights. It would make no sense for Chippewa to fund millions of dollars on the Effective Date to allow the Reorganized Debtor to clear mechanics' liens from the Leased Properties and prevent foreclosure of the Leased Properties if the Reorganized Debtor would have no rights in the Leased Properties.

92.     Section 3 is also not redundant to Section 4 because Section 4 could not operate after an effective termination pursuant to the terms of the Mineral Leases (i.e., thirty days' notice to cure) as permitted by Section 3.  Section 4 provides that the Mineral Leases be "amended and restated" as of the Effective Date, and "preserve all rights and obligations under the Mineral Leases."  Were there a termination prior to the Effective Date upon thirty days' notice from GPIOP, it would leave nothing to amend or restate and no rights and obligations to preserve.  However, where the Mineral Leases were merely rejected and reverted, rights under those agreements were not terminated, remained intact, and GPIOP and Superior could and did agree that they would be restated in favor of the Reorganized Debtor.

93.     The Cliffs Parties next argue that Section 4(a) is an unenforceable agreement to agree.  Wrong again.  The Parties did agree in Section 4(a) to engage in further negotiations with respect to the Mineral Leases in favor of the Reorganized Debtor.  But they also agreed what would happen if there were no negotiations or if negotiations failed: the Parties would live with the terms of the Mineral Leases, as amended by the Omnibus Lease Amendment.  Section 4(a) concludes with the unqualified statement that the Mineral Leases "will be deemed amended and restated by consent on the Effective Date."  Settlement Agr., ¶ 4(a).  Because the Restated Mineral Leases are defined as the "amended and restated agreements to supersede the Mineral Leases," such deemed amendment by consent makes the Mineral Leases (as amended by the Omnibus Lease Amendment) the Restated Mineral Leases on the Effective Date.

94.     Put simply, Section 4(a) is an agreement to honor the exact terms of the Mineral Leases *unless* all parties agree to something different.  The resulting obligations are therefore concrete and not too vague for courts to interpret; a court could easily determine whether the breach occurred or what the remedy would be.  *See Ohio Calculating, Inc. v. CPT Corp.*, 846 F.2d 497, 501 (8th Cir. 1988) (Minnesota law) (noting the reason agreements to agree are

{BAY:03264722v1}

unenforceable in Minnesota is that "they provide neither a basis for determining the existence of a breach nor for giving an appropriate remedy").  A court would need only to read the Mineral Leases and the Omnibus Lease Amendment to determine the Parties' respective rights. Section 4(a) is fully enforceable and binding as written.  On the Effective Date, the Reorganized Debtor became entitled to all rights and benefits of the Mineral Leases as deemed restated as the Restated Mineral Leases.

### D.      Plaintiff Retains Possession and Is Entitled Under Minnesota Law to Redeem the Mineral Leases Even If Terminated

95.      Even if the Cliffs Parties were right on every argument, and even if the Court could grant them the forfeiture they desire, Plaintiff would still be entitled under Minnesota law to redeem the Mineral Leases in any eviction proceeding by Cliffs Minnesota.  Minnesota Statutes § 504B.291, subdivision 2, provides:

> If the lease [subject to an action to recover] is for a term of more than 20 years, the action may not begin until the landlord serves a written notice on the tenant and on all creditors with legal and equitable recorded liens on the property.  The notice must state: (1) the lease will be canceled unless the amounts, agreements, and legal obligations in default are paid or performed within 30 days, or a longer specified period; and (2) if the amounts, agreements, and legal obligations are not paid or performed within that period, then the landlord may evict the tenant at the expiration of the period.

Minn. Stat. § 504B.291, subd. 2(a).  In short, if a tenant under a lease of more than 20 years, like the Mineral Leases, holds over after termination and cures its past defaults, it is entitled to redeem the lease.  Tellingly, neither GPIOP nor Cliffs Minnesota has attempted to evict Plaintiff from the Leased Properties.  Should any party do so, Plaintiff will claim the benefit of its cure under Section 3(e) of the Settlement Agreement, make full and current payment, and revive its term of years.  Plaintiff's rights in the Mineral Leases are fully protected in this manner as well.

96.      Judge Balick considered a similar right under Maryland law in *In re Shelco Inc.*, 107 B.R. 483, and readily applied it in the bankruptcy context to permit revival of a lease that

had terminated prepetition.  As she explained, even though the lease had terminated and the debtor "had no legal rights under the lease," where the debtor's continued possession was sufficient under state law to preserve a right of revival, the debtor was entitled to assume its lease upon cure of all defaults.  107 B.R. at 486.

97.    Here, the Reorganized Debtor retains possession of the Leased Properties. Minnesota law permits it to redeem the Mineral Lease by curing under state law.  By the plain words of Section 3(e), it cured all defaults by agreement when the Effective Date occurred.  It has since attempted to remain in compliance with its payment obligations under the Mineral Leases.[20]  Even if Plaintiff is unable to assume the Mineral Leases, the Court should determine that Plaintiff's continued possession and cure of all defaults entitles it to the benefit of Minnesota Statute § 504B.291 and grant summary judgment in Plaintiff's favor on this basis as well.

**E.    The Cliffs Parties Cannot Have Summary Judgment on All Counts Based Solely on Their Reading of the Settlement Agreement**

98.    Even if the words of the Settlement Agreement permitted enforcement as the Cliffs Parties request, they would still not be entitled to summary judgment on the following Subject Counts:

> **Counts 1, 2**.  In Count 1 Plaintiff alleges interference with contractual rights under the Mineral Lease, the Settlement Agreement, and other agreements between Plaintiff and third parties.  *See* Am. Compl., ¶¶ 100-106.  In Count 2 Plaintiff alleges interference with business relations and prospective economic advantage with contracts and business relationships not limited to its relationship with GPIOP or rights under the Settlement Agreement and Mineral Leases.  *Id.* at ¶¶ 108-112.  Even if the Settlement Agreement and Mineral Leases had no further effect after October 31, 2017, as the Cliffs Parties contend, this does not preclude claims based on pre-October 31, 2017 interference. Moreover, it does not preclude claims for interference relating to other agreements or other business relationships.

---

[20]   GPIOP refused Plaintiff's tender of its most recent payment and the disposition of that payment is now a matter pending before the Court.  *See* GPIOP's *Motion for an Order Authorizing Deposit of Funds into the Registry of the Court* [D.I. 1459] and Mesabi's response thereto [D.I. 1482].

{BAY:03264722v1}

AMERICAS 94430021

**Counts 3, 4, 5, 6, 15**.  Plaintiff did not assert these claims against the Cliffs Parties.  They have no standing to move for summary judgment on such claims.  Because they cannot have judgment on Count 15, the Cliffs Parties likewise cannot have judgment on Count 17.

## V.    CONCLUSION

For all of the foregoing reasons, when the Effective Date of the Plan occurred on December 22, 2017, all breaches and defaults under the Mineral Leases were cured or waived pursuant to Section 3(e) of the Settlement Agreement, and the Mineral Leases were assumed by the Debtors for the benefit of the Reorganized Debtor or "rode through" the Chapter 11 Cases for the benefit of the Reorganized Debtor and/or were deemed amended and restated as the Restated Mineral Leases for the benefit of the Reorganized Debtor.  Even if they were not, the Cliffs Parties request by the Cliffs MSJ an unenforceable forfeiture.  In any event, Plaintiff retains possession of the Leased Properties and is entitled to cure any outstanding breaches and retain all rights under the Mineral Leases.  Accordingly, the Cliffs Parties' request for summary judgment on the Subject Counts must be denied and summary judgment should enter in Plaintiff's favor on each of the Mesabi Counts.

Dated: April 16, 2018

**WHITE & CASE LLP**
Thomas E Lauria (admitted *pro hac vice*)
Glenn M. Kurtz (admitted *pro hac vice*)
Joshua Berman (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020-1095
Telephone:    (212) 819-8200
Facsimile:    (212) 354-8113

Craig H. Averch (admitted *pro hac vice*)
Ronald K. Gorsich (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone:    (213) 620-7700
Facsimile:    (213) 452-2329

*Attorneys for Plaintiff*

**BAYARD, P.A.**

 /s/ Justin R. Alberto
Justin R. Alberto (No. 5126)
Evan T. Miller (No. 5364)
Daniel N. Brogan (No. 5723)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
Telephone:    (302) 655-5000
Facsimile:    (302) 658-6395
jalberto@bayardlaw.com
emiller@bayardlaw.com
dbrogan@bayardlaw.com

{BAY:03264722v1}

40

AMERICAS 94430021