# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ESSAR STEEL MINNESOTA LLC and ESML HOLDINGS INC.<br><br>   Debtors. | Chapter 11<br><br>Case No. 16-11626 (BLS)<br><br>(Jointly Administered) |
| MESABI METALLICS COMPANY LLC,<br><br>   Plaintiff,<br><br>v.<br><br>CLEVELAND-CLIFFS INC. (F/K/A CLIFFS NATURAL RESOURCES INC.); CLEVELAND-CLIFFS MINNESOTA LAND DEVELOPMENT LLC; GLACIER PARK IRON ORE PROPERTIES LLC, AND DOES 1-10<br><br>   Defendants. | Adv. Proc. No. 17-51210 (BLS)<br><br>**Re: Docket Nos. 18, 30, 31, 33-35, 46-47, 49, 51, 67, 72-74, 81-82** |
| CLEVELAND-CLIFFS INC. (F/K/A CLIFFS NATURAL RESOURCES INC.); CLEVELAND-CLIFFS MINNESOTA LAND DEVELOPMENT LLC; GLACIER PARK IRON ORE PROPERTIES LLC<br><br>   Counterclaim-Plaintiffs,<br><br>v.<br><br>MESABI METALLICS COMPANY LLC<br><br>   Counterclaim-Defendant. | |

Justin R. Alberto, Esq.
BAYARD, P.A.
600 North King Street
Suite 400
Wilmington, DE 19801

Craig Averch, Esq.
WHITE & CASE LLP
555 South Flower Street, Suite 2700
Los Angeles, CA 90071-2433

*Attorneys for Mesabi Metallics Company LLC, Chippewa Capital Partners, LLC, and Thomas M. Clarke*

M. Blake Cleary, Esq.
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1000 North King Street
Wilmington, DE 19801

Robert S. Faxon, Esq.
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190

*Attorneys for Cleveland-Cliffs, Inc. and Cleveland-Cliffs Minnesota Land Development LLC*

William P. Bowden, Esq.
ASHBY & GEDDES, P.A.
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

Christopher J. Harayda, Esq.
Dennis M. Ryan, Esq.
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
90 South 7th Street
Minneapolis, MN 55402-3901

*Attorneys for Glacier Park Iron Ore Properties LLC*

## OPINION[1]

Before the Court are cross-motions for partial summary judgment in this adversary proceeding. Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC ("ESML")) (hereinafter "Mesabi" or the "Plaintiff") is an iron ore mining and processing company, and the

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

2

reorganized debtor. The dispute here centers around certain mineral leases (collectively, the "Leases") in the Mesabi Range in Minnesota that it has held as lessee since 2006. Those Leases are highly valuable to its operations. More specifically, this dispute concerns whether Mesabi still holds rights under those Leases. Defendants in this adversary proceeding contend that the Leases have been rejected, and that the rights under the Leases have been transferred to another lessee pursuant to newly-executed leases. Mesabi has sued Glacier Park Iron Ore Properties ("GPIOP") and Cleveland-Cliffs, Inc. ("Cliffs Inc."), together with its affiliate Cleveland-Cliffs Minnesota Land Development LLC ("Cliffs MN," and collectively with Cliffs Inc., "Cliffs"), alleging a host of claims against them. GPIOP is the lessor under the Leases, and Cliffs is the putative lessee under the new leases. The defendants have also asserted a number of counterclaims against Mesabi, and each party has filed separate motions for partial summary judgment. For the reasons that follow, the Court will GRANT the motions filed by GPIOP and Cliffs, and it will DENY the motion filed by Mesabi.

## I.  Background

Located in Nashwauk, Minnesota, the land at issue has been in use by the mining industry for over a century. In 1906, the Lake Superior Company, Ltd., the then-owner of the property, established the Great Northern Trust and transferred its interest in the property to the trust. According to the terms of the trust agreement, the trust would expire 20 years following the death of the last survivor of 18 individuals named in the agreement. And upon expiration, the trust would convey the property back to the Lake Superior Company, or whichever entity held the reversionary interest at that time.

In 2006, the Great Northern Trust entered into a series of mineral leases with ESML as lessee. The Leases remained in effect through 2016, when GPIOP[2] became the owner of the property and lessor under the Leases.[3] By that time, ESML and ESML Holdings, Inc. (the "Debtors") had already filed petitions for relief under Chapter 11.[4] The Leases provided for payment of royalties to the lessor based on the amount of iron ore extracted from the leased property. They also contained a minimum production requirement which, if not satisfied, gave the lessor the right to terminate the Leases. Thus, the Leases incentivized ESML to begin extracting iron ore as soon as possible, and afforded the lessor a remedy if it was not realizing the economic benefits it had bargained for.

ESML had long struggled with the construction of its ore processing plant and failed to meet the threshold production requirements in 2014 and again in 2016 after the Leases were amended. In January 2017, the record reflects that ESML and GPIOP entered into a forbearance agreement for each of the Leases. The forbearance agreement contemplated the following: (1) ESML would remain current on all royalty payments; (2) this Court would confirm ESML's reorganization plan and the plan would become effective; (3) all contractor and subcontractor liens on leased parcels would be released; (4) construction at the project would resume; and (5) this Court would approve the forbearance agreement. The Debtors then filed their initial Chapter 11 plan of reorganization the following month [Docket No. 690]. Along with that filing, the Debtors also filed a notice of their intention to assume the Leases with GPIOP.

---

[2] GPIOP is co-owner with Superior Mineral Resources.

[3] The last survivor of the 18 individuals named in the trust agreement died on April 6, 1995. As the trust agreement outlined, the trust expired in 2015, 20 years following the death of the last survivor. The trustees then proceeded with the wind down process and finalized the conveyance of the property to GPIOP, which held the reversionary interest, on November 3, 2016.

[4] The Debtors filed their cases on July 8, 2016.

4

GPIOP filed an objection [Docket No. 888] to the proposed plan to assume the Leases, stating that the Debtors would not be able to cure the defaults under the Leases and did not provide adequate assurance of future performance as prescribed under the Bankruptcy Code. The Leases were removed from the initial plan via a Court-approved stipulation [Docket No. 924], and the Court subsequently confirmed the Debtors' third amended Chapter 11 Plan (the "Plan") on June 13, 2017 without reference to assumption of the Leases [Docket Nos. 990, 1025]. The Debtors filed a separate motion to assume the Leases on June 27, 2017 and GPIOP again objected.

On August 28, 2017, GPIOP, the Debtors, Superior Mineral Resources, LLC, and Chippewa Capital Partners, LLC ("Chippewa"), the Plan sponsor, entered into a comprehensive settlement agreement (hereinafter the "Settlement Agreement" or the "Agreement") that was intended to resolve the dispute regarding assumption of the Leases [Docket No. 1161]. The Settlement Agreement, and the interpretation thereof, form the crux of this dispute.[5]

The Settlement Agreement[6] provided, among other things, that Mesabi's assumption of the Leases was contingent on the Plan going effective no later than October 31, 2017. If the Plan became effective, any pre-assumption defaults would be deemed waived, and the Leases would be amended by the parties to reflect the contractual relationship going forward. The Settlement Agreement reached by the parties afforded material relief to both Mesabi and GPIOP. For Mesabi, the Agreement provided certainty regarding the assumption of the Leases, assuming its Plan became effective. For GPIOP, the Agreement provided a date by which it would either

---

[5] The Court approved the Settlement Agreement on August 30, 2017 [Docket No. 1168].

[6] The provisions in the Settlement Agreement are quoted and discussed in greater detail *infra*.

5

enjoy a contractual relationship with a lessee whose Plan has become effective, or it would have its property back in its possession to do with as it deemed prudent.

Critically, the October 31, 2017 deadline lapsed before the Plan became effective, and according to §3(d) of the Settlement Agreement, the Leases were "automatically rejected" and they "revert[ed]" to GPIOP and Superior.  Settlement Agreement, § 3(d).[7]  The Plaintiff does not dispute that the Plan did not become effective by October 31, 2017, and the Plaintiff further acknowledges that the Leases were in fact rejected pursuant to the terms of the Settlement Agreement.

Soon thereafter, on December 9, 2017, Cliffs Inc. entered into an agreement with GPIOP, whereby GPIOP executed new leases that conveyed the mineral rights that had previously been subject to the Leases to Cliffs MN.  Two days later, Cliffs Inc. publicly announced its acquisition of the property via the new leases with GPIOP.  Mesabi quickly went effective with its confirmed Plan on December 22, 2017.

That same day, Mesabi filed a motion to amend the original complaint in this adversary proceeding, which had been originally filed against Cliffs Inc. and other defendants – but not against GPIOP – in September 2017.  Cliffs opposed that motion, but the Court granted it over Cliffs' objections and Mesabi amended the complaint on January 23, 2018 to join GPIOP as a defendant in this suit.

This dispute over the properties requires the Court to rule upon three cross-motions for partial summary judgment filed by GPIOP, Cliffs, and Mesabi.  The amended complaint alleges 25 claims for relief, ranging from tortious interference, to breach of contract, to violations of the Sherman Act, to conspiracy.  But the motions for partial summary judgment boil down to a

---

[7] GPIOP subsequently filed a Proof of Claim for rejection damages under the Leases.

single question: pursuant to the Settlement Agreement, did Mesabi retain the right to assume the Leases despite the fact that its Plan failed to go effective by October 31, 2017?  If the answer is yes, then the Leases were assumed by Mesabi and summary judgment must be entered in its favor.  If the answer is no, then GPIOP was free to enter new leases with Cliffs and summary judgment is merited in their favor.  The Court turns now to the respective arguments of the parties.

## II.  The Parties' Positions

Cliffs and GPIOP center their argument on contract interpretation.  Their position can be simply stated, and relies on the plain terms of the Settlement Agreement entered into by the parties and approved by the Court.  In a nutshell, Cliffs and GPIOP read the Settlement Agreement to have given the Debtors the right to assume the Leases if their Plan became effective by October 31, 2017.  Since the Plan did not go effective by that date, the Settlement Agreement clearly provided that the Leases were rejected and reverted to GPIOP.  Subsequent to that date, Cliffs states that GPIOP entered into new Leases with Cliffs, and the Debtors have no rights remaining as to the Leases or the underlying property.  Cliffs and GPIOP contend that, because there are no disputes of material fact, summary judgment is merited in their favor under their interpretation of the Settlement Agreement.

In contrast to Cliffs' and GPIOP's tightly framed argument, Mesabi asks the Court to follow a multi-step analysis through the Settlement Agreement and the order approving it (the "Settlement Order") to conclude that its failure to go effective by October 31, 2017 had no impact on its ability to assume the Leases.  Mesabi's argument runs as follows:  the Settlement Agreement gave Mesabi an absolute right to assume the Leases if its Plan became effective on or before October 31, 2017.  That did not happen, so the Leases were rejected – *but not terminated* – on November 1, 2017, and GPIOP never took any steps thereafter to terminate the Leases.

7

Thus, when the Plan went effective on December 22, 2017, the Settlement Agreement provided that the rejected Leases were assumed and further provided that all pre-assumption defaults were waived. Mesabi reasons that missing the October 31 deadline was merely a waivable pre-assumption default.

Separately, Mesabi contends that, even if the Court does not accept its construction of the Settlement Agreement, it should still prevail because the alternative would result in forfeiture of the Leases by the reorganized debtor, and forfeiture is strongly disfavored under governing Minnesota law. Finally, Mesabi places substantial weight on the fact that this Court's order approving the Settlement Agreement – entered in August 2017 – stated that the Leases "are assumed as of the Effective Date of the Plan." It is Mesabi's position that this Order governs and provides that the Leases were assumed, irrespective of when the effective date happened, so long as the Plan ultimately became effective.

### III. Jurisdiction, Venue, and the Summary Judgment Standard

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(b). *See Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 168-69 (3d Cir. 2004) ("[T]he jurisdiction of the non-Article III bankruptcy courts is limited after confirmation of a plan. But where there is a close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan or incorporated litigation trust agreement, retention of post-confirmation bankruptcy court jurisdiction is normally appropriate."). This is a core proceeding

within the meaning of 28 U.S.C. § 157(b).[8] Furthermore, venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

Rule 56 of the Federal Rules of Civil Procedure, made applicable to this proceeding through Bankruptcy Rule 7056, states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) "[S]ummary judgment will not lie if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248 (internal quotation omitted). In other words, "[i]f reasonable minds could differ as to the import of the evidence ... a verdict should not be directed." *Id.* at 250-51 (citation omitted). In a contract case, summary judgment is appropriate where the contract language is clear and unambiguous. *Tamarind Resort Assocs. v. Gov't of V.I.*, 138 F.3d 107, 110 (3d Cir. 1998). And, a contract is unambiguous if it is "reasonably capable of only one construction." *Id.* at 110-11 (citation omitted).

The movant "bears the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S 317, 323 (1986). And "[w]hen the moving party has carried its burden ... the nonmoving party must come forward

[8] Cliffs initially stated that it did not consent to entry of final orders or judgments by this Court. Cliffs' Motion for Summary Judgment, n. 2. However, the record reflects that at the May 15 hearing Cliffs consented to this Court's authority to issue final orders in this adversary proceeding.

with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (emphasis in original) (internal quotation omitted). "On summary judgment, [the Court] must draw all reasonable inferences in favor of the nonmoving party." *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 333 (3d Cir. 1995).

### IV. Discussion

The gravamen of this dispute lies in contract interpretation.[9] Central to the issues here are the provisions agreed to by the parties in the Settlement Agreement, and the Court must determine, pursuant to principles of contract interpretation under Minnesota law,[10] the effect of Mesabi's failure to go effective with its Plan by October 31, 2017. The following provisions in the Settlement Agreement are relevant to this discussion and are excerpted below:

> 3. <u>Amendments to and Assumption of Mineral Leases</u>.
>
> (a) Mesabi, GPIOP and Superior agree to amend the rights and obligations by and between them under the Mineral Leases effective as of the date of this Agreement pursuant to the omnibus amendment[11] ...
>
> (b) The Mineral Leases shall be assumed by Mesabi, *provided that such assumption shall only become enforceable and effective upon (i) the occurrence of the Effective Date of the Plan on or before October 31, 2017,* and (ii) then only if Mesabi has paid to GPIOP and Superior the sum of $600,000.00 which sum shall be credited on a pro rata basis among the Mineral Leases to the minimum royalty payments due thereunder on October 20, 2017 and January 20, 2018 no later than September 15, 2017 ...

---

[9] The Court acknowledges Mesabi's argument regarding the controlling nature of the Settlement Order, but the Court remains unconvinced. The Settlement Order "approved" the "terms and conditions" contained in the Settlement Agreement. Settlement Order, ¶ 2. It did not function to modify the terms agreed to by the parties. Thus, the terms of the Settlement Agreement still control on these issues.

[10] It is undisputed that the Settlement Agreement is governed by the laws of the State of Minnesota. Settlement Agreement, § 18. The Court therefore applies the laws of that state in interpreting the Settlement Agreement.

[11] The Settlement Agreement incorporated the omnibus amendment that was entered between Chippewa, Mesabi, GPIOP, and Superior [Docket No. 1168-1].

(d) *The Mineral Leases will be automatically rejected pursuant to Section 365 of the Bankruptcy Code and revert to GPIOP and Superior, as applicable, without further Bankruptcy Court proceedings or litigation in the event the Effective Date of the Plan does not occur by October 31, 2017*, or such later date agreed by the Parties. In such circumstance, GPIOP and Superior, as applicable, may take any action with respect to the Mineral Leases and the leased properties and interests and such actions will not constitute a violation of the automatic stay or any other provisions of the Bankruptcy Code ...

(e) As of the Effective Date of the Plan, GPIOP and Superior agree that any pre-Effective Date breaches or defaults under the Mineral Leases are cured, and if not curable, are waived. The Mineral Leases shall remain in full force and effect until the Restated Mineral Leases become fully effective and enforceable.

4. <u>Restatement of Mineral Leases</u>.

(a) On or prior to the Effective Date of the Plan, GPIOP, Superior and the Reorganized Debtor shall negotiate and execute amended and restated agreements to supersede the Mineral Leases in their entirety (the "Restated Mineral Leases"), which Restated Mineral Leases shall become fully effective and enforceable on the Effective Date. The Restated Mineral Leases shall be in form and substance acceptable to GPIOP, Superior and the Reorganized Debtor, preserve all rights and obligations under the Minerals Leases, subject to the modifications described herein, and contain terms and conditions substantially similar to the Mineral Leases unless otherwise agreed by GPIOP, Superior and the Reorganized Debtor. The Mineral Leases will be deemed amended and restated by consent on the Effective Date of the Plan ...

(b) Each of GPIOP, Superior and the Reorganized Debtor shall use commercially reasonable efforts to negotiate and execute the Restated Mineral Leases, and shall not unreasonably withhold, delay, or condition their consent or execution of the Restated Mineral Leases.

8. <u>Effectiveness of this Agreement; Termination</u>.

(a)  This Agreement ... shall become fully effective and enforceable on the date on which each of the Parties shall have executed and delivered counterpart signature pages of this Agreement ... provided, however, ... that Section 3(d) ... shall be fully effective and enforceable on the date on which each of the Parties shall have executed and delivered counterpart signature pages of this Agreement, and shall remain fully effective and enforceable regardless of whether the Bankruptcy Court enters an order approving this Agreement.

(b)  Except as to [§3(d)], which shall remain effective and enforceable, in the event the Plan is withdrawn or revoked prior to the Effective Date, or it is announced by the Debtors and Chippewa that the Effective Date of the Plan will not occur

> ... shall be null and void, and the Parties shall be returned to the status quo ante as if this Agreement ... had never existed.

Settlement Agreement, §§ 3(a), (b), (d)-(e), 4(a)-(b), and 8(a)-(b) (emphasis added).

Cliffs and GPIOP argue that summary judgment should be granted for them because the foregoing provisions are clear and do not support Mesabi's position. Specifically, § 3(b) explicitly states that assumption "shall only become enforceable and effective upon (i) the occurrence of the Effective Date of the Plan on or before October 31, 2017 ... ." Settlement Agreement, § 3(b). Thus, the Leases could not be assumed in December 2017 because they were rejected on November 1, 2017.[12] And upon that rejection, all rights under the Leases reverted back to GPIOP, including the right to transfer.

The Settlement Agreement clearly states that October 31, 2017 was a material condition precedent, not a mere lapse of time. As such, when November 1 arrived without Mesabi going effective, the Leases were rejected, reverted to GPIOP, and GPIOP could take "any action" thereafter, as provided for in the Settlement Agreement. Settlement Agreement, § 3(d). GPIOP's transfer of its interests to Cliffs by way of new leases constituted such an action.

The Court agrees with Cliffs' and GPIOP's construction of the Settlement Agreement. The Settlement Agreement is a contract between the parties, approved by the Court. Minnesota common law on contract interpretation is consistent with well-settled general principles of the law of contract. Under Minnesota law, "[t]he construction and effect of a contract presents a question of law, unless an ambiguity exists." *Brookfield Trade Ctr., Inc. v. Cty. of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998) (citing *Trondson v. Janikula*, 458 N.W.2d

---

[12] Case law teaches that a debtor may not assume a rejected contract, absent consent of the non-debtor counterparty. *See, e.g.*, *Charter Asset Corp. v. Victory Mkts., Inc. (In re Victory Mkts., Inc.)*, 221 B.R. 298 (B.A.P. 2d Cir. 1998).

679, 681 (Minn. 1990)). "[W]hen a contractual provision is clear and unambiguous, courts should not rewrite, modify, or limit its effect by a strained construction." *Travertine Corp. v. Lexington-Silverwood*, 683 N.W.2d 267, 271 (Minn. 2004) (citations omitted). However, "[i]f there is ambiguity, extrinsic evidence may be used, and construction of the contract is a question of fact for the jury unless such evidence is conclusive." *Hickman v. SAFECO Ins. Co. of Am.*, 695 N.W.2d 365, 369 (Minn. 2005) (citation omitted).

"In interpreting the contract, the language is to be given its plain and ordinary meaning." *Brookfield Trade Ctr.*, 584 N.W.2d at 394 (citation omitted). Furthermore, "contract terms [are to be read] in the context of the entire contract and [courts] will not construe the terms so as to lead to a harsh and absurd result." *Id.* (citation omitted). "Additionally, [the Court is to] interpret a contract in such a way as to give meaning to all of its provisions." *Id.* (citation omitted).

The record reflects that the Settlement Agreement was negotiated at arms'-length, between sophisticated parties represented by able professionals. And at bottom, it is an unremarkable agreement designed to address a relatively common dynamic in Chapter 11 bankruptcy cases: a non-debtor contract counterparty is frustrated and concerned regarding a debtor's ability to perform in the future. The debtor recognizes the importance of the contract to its reorganization and commits to have its house in order by a date certain. If it meets the deadline, the counterparty consents to assumption, presumably with a properly recapitalized and reorganized debtor. The agreed deadline provides the counterparty with confidence that it will either have a healthy partner or it will be free from the contract: it will not be stuck in the limbo of bankruptcy indefinitely. Finally, the debtor obtains an additional, less obvious benefit from

the arrangement, in that it serves to focus the attention of other stakeholders to engage with the debtor, negotiate and reach a deal in advance of the looming deadline.

Cliffs and GPIOP contend that the October 31, 2017 deadline operated as a condition precedent to Mesabi's ability to assume the Leases. The Court agrees. Under Minnesota law, a condition precedent is defined as "any fact except mere lapse of time which must exist or occur before a duty of immediate performance by the promisor can arise." *Carl Bolander & Sons, Inc. v. United Stockyards Corp.*, 215 N.W.2d 473, 476 (Minn. 1974) (internal quotation omitted). "No particular code words are needed to form an express condition." *Minnwest Bank Cent. v. Flagship Props. LLC*, 689 N.W.2d 295, 299 (Minn. Ct. App. 2004) (internal quotation and alterations omitted). "Conditions precedent are generally disfavored" under Minnesota law. *Constr. Mortg. Inv'rs Co. v. Farr*, No. A09-1960, 2010 WL 3119443, at *6 (Minn. Ct. App. Aug. 10, 2010) (citing *Mrozik Constr., Inc. v. Lovering Assocs.*, 461 N.W.2d 49, 51-52 (Minn. App. 1990)). But, "[i]f a condition precedent does not occur, the contract is unenforceable." *Id.* (citing *R.A., Inc. v. Anheuser-Busch, Inc.*, 556 N.W.2d 567, 570 (Minn. App. 1996)); *see also AIG Centennial Ins. Co. v. FraleyLanders*, 450 F.3d 761, 763 (8th Cir. 2006) ("Unlike a mere contract term, the breach of which must be material before it excuses another party from performing, one party's failure to fulfill a condition precedent entirely excuses any remaining obligations of the other party.").

As previously discussed, the Settlement Agreement expressly states that assumption of the Leases would occur, "provided that such assumption *shall only become enforceable and effective upon (i) the occurrence of the Effective Date of the Plan on or before October 31, 2017* ... ." Settlement Agreement, ¶ 3(a) (emphasis added). And if that did not occur, which it did not,

"[t]he Mineral Leases will be automatically rejected ... and revert[13] to GPIOP and Superior, as applicable, without further Bankruptcy Court proceedings or litigation ... ." *Id.* at ¶ 3(d). That language is clear and not susceptible to multiple interpretations.

Paragraph 3(d) demonstrates that the binding effect of the Settlement Agreement's terms, including those subsequent to ¶ 3, were contingent on the Plan going effective by October 31, 2017. The Plan's effectiveness before October 31, 2017 functioned as a condition precedent that required satisfaction for the other provisions to become operative. This condition precedent is valid and enforceable: it was an integral and material element that the parties bargained for. Mesabi's failure to meet this deadline relieves, or excuses, GPIOP of any further obligations under the Leases, and the Court is not satisfied that GPIOP was required by the Settlement Agreement to take additional steps to terminate the Leases.[14] In sum, the Agreement had a clear condition precedent, undisputedly that condition was not met, the Leases were deemed rejected, and GPIOP was thereupon entitled to enter into new leases.

Mesabi's reading of the Settlement Agreement renders the October 31, 2017 date meaningless. The Court has a duty to give meaning to all terms of the contract. *Brookfield*, 584 N.W.2d at 394. Further, the Court is not persuaded by Mesabi's forfeiture argument. This is not

---

[13] As discussed, "[i]n interpreting the contract, the language is to be given its plain and ordinary meaning." *Brookfield Trade Ctr., Inc. v. Cty. of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998). Case law is sparse regarding the definition and usage of the term "revert," and it is not a term of art in bankruptcy parlance. The Oxford English Dictionary provides the following applicable definitions for context: "[t]o recover[;]" or "[t]o return to the former possessor or his heirs[.]" The Oxford English Dictionary (2d ed. 2004). Those definitions provide a foundation to work from for interpreting the Settlement Agreement. Upon those definitions, the rights under the Leases reverted, or returned, back to GPIOP when Mesabi failed to go effective by October 31, 2017, as was required in the Settlement Agreement.

[14] The Court notes that, in analogous circumstances, Section 365(d)(4) of the Bankruptcy Code requires, in the context of the passage of a deadline to assume a lease, that the lease "shall be deemed rejected, and the trustee shall immediately surrender that property to the lessor[.]" 11 U.S.C. § 365(d)(4)(A).

a forfeiture, it is simply a common contractual provision[15] between sophisticated parties that set a deadline for action.[16]

As noted above, it is the Court's duty to decipher the parties' intent according to the plain language of their contract, in this case, the Settlement Agreement. The parties' intent here is abundantly clear. GPIOP did not want to be left hanging indefinitely with an ailing and unproductive lessee, so it resolved its objection by negotiating for a date certain by which its rights and obligations would be determined. For Mesabi's part, the Settlement Agreement placed its destiny squarely in its own hands and removed the risk and uncertainty posed by GPIOP's objection to its assumption motion. The Agreement plainly required Mesabi to go effective with the Plan by October 31, 2017 for the Leases to be assumed. It did not, and its failure to do so is fatal to its ability to assume the Leases. In this case, the Court will not permit the parties to evade or alter the plain consequences of what they bargained for in their Agreement.

## V. Conclusion

For the foregoing reasons, the Court will grant both GPIOP's and Cliffs' motions, and will deny Mesabi's motion. The parties are instructed to confer and provide a written form of order to the Court within 14 days of the date hereof in accordance with this ruling.

Dated: Wilmington, Delaware
       July 23, 2018

_____
Brendan Linehan Shannon
United States Bankruptcy Judge

---

[15] Case law teaches that a court is not free to "excuse the non-occurrence of [a] condition [precedent]" when "the time of its occurrence was [] a material part of the agreed exchange." *Capistrant v. Lifetouch Nat'l Sch. Studios, Inc.*, 899 N.W.2d 844, 855 (Minn. Ct. App. 2017) (quoting Restatement (Second) of Contracts § 229 (Am. Law Inst. (1981))). The October 31, 2017 condition precedent was a material part of the Settlement Agreement.

[16] Because the Court rules that this case is based strictly on contract interpretation, and that the Agreement's interpretation favors the defendants, the Court does not reach Mesabi's subsequent arguments, such as its arguments pertaining to "ride through" and Minnesota Statutes § 504B.291.