## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>ESSAR STEEL MINNESOTA LLC and ESML HOLDINGS INC.,[1]<br><br>   Debtors. | Chapter 11<br><br>Case No. 16-11626 (CTG)<br><br>(Jointly Administered) |
| MESABI METALLICS COMPANY LLC (F/K/A ESSAR STEEL MINNESOTA LLC),<br><br>   Plaintiff<br><br> v.<br><br>CLEVELAND-CLIFFS, INC. (F/K/A CLIFFS NATURAL RESOURCES, INC.); CLEVELAND-CLIFFS MINNESOTA LAND DEVELOPMENT LLC; GLACIER PARK IRON ORE PROPERTIES LLC; and DOES 1-10<br><br>   Defendants. | Adv. Proc. No. 17-51210 (CTG) |
| GLACIER PARK IRON ORE PROPERTIES LLC,<br><br>   Counterclaim-Plaintiff<br><br> v.<br><br>MESABI METALLICS COMPANY LLC (F/K/A ESSAR STEEL MINNESOTA LLC),<br><br>   Counterclaim-Defendant. | |

## PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION TO ENJOIN DEFENDANTS FROM EXECUTING STATE LEASES

---

[1] Essar Steel Minnesota LLC has changed its name to Mesabi Metallics Company LLC.  The last four digits of its federal taxpayer identification number are 8770.

AMERICAS 123569006

## <u>TABLE OF CONTENTS</u>

I.   Mesabi Has Shown a Likelihood of Success on the Merits ..................................... 2

    A.   Cliffs Effectively Concedes That It Has Monopoly Power .................................. 2

    B.   Mesabi Has Shown that Cliffs Engaged in Exclusionary Conduct ....................... 3

        1.   Contracts ................................................................................................... 3

        2.   Service Providers ...................................................................................... 5

        3.   GPIOP Property ........................................................................................ 6

        4.   Cliffs' Exclusionary Scheme .................................................................... 7

        5.   Section 1 Claims ....................................................................................... 8

    C.   Mesabi Has Shown that It Suffered Injury in Fact and Antitrust Injury ............... 8

        1.   Mesabi Has Shown Injury in Fact Because Cliffs Conduct Was a "Material Cause" of Its Injury ................................................................... 8

        2.   Mesabi Has Shown it has Suffered Antitrust Injury ................................ 10

II.   Mesabi's Harm is Irreparable and Can by Remedied by a Preliminary Injunction .......... 11

    A.   Mesabi's Harm is Irreparable and Cliffs Does Little to Suggest Otherwise ......... 11

    B.   A Preliminary Injunction Would Remedy the Harm it Would Suffer if Cliffs were Permitted to Assume the State Leases ...................................................... 13

        1.   A Preliminary Injunction Would Preserve Mesabi's Ability to Seek Ultimate Relief Through its Antitrust Action and Stave Off Any Irreparable Harm ...................................................................................... 13

        2.   Mesabi's Loss of the Option to Acquire the State Leases is an Injury that will be Remedied By a Preliminary Injunction .................................. 14

        3.   A Preliminary Injunction to Preserve the Status Quo Pending the Outcome of a Federal Antitrust Litigation is Consistent with Principles of Federalism ............................................................................................ 14

III.   Cliffs' Claim of Harm is Speculative, a Product of its Own Delay, and Lacks Credibility ................................................................................................................... 15

IV.   The Public Stands to Lose More if Mesabi's Project is Shuttered ................................. 17

i

Docket No. 733
Filed: 5/22/23
FILED UNDER SEAL

V.    Cliffs' Claim for a $1.7 Billion Bond is Unsupported, Speculative, and Patently
Unreasonable..................................................................................................................... 18

ii

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*3M Unitek Corp. v. Ormco Co.*,
 96 F. Supp. 2d 1042 (C.D.Cal.2000) ........................................................................20

*AB Electrolux v. Bermil Indus. Corp.*,
 481 F. Supp. 2d 325 (S.D.N.Y.2007)........................................................................20

*Abbott Labs. V. Teva Pharms. USA, Inc.*,
 432 F Supp. 2d 408 (D. Del. 2006)..........................................................................6

*Addamax Corp. v. Open Software Found.*,
 964 F. Supp. 549 (D. Mass. 1997) ...........................................................................9

*Am. ORT, Inc. v. ORT Israel*,
 2009 U.S. Dist. LEXIS 10202 (S.D.N.Y. Jan. 21, 2009)........................................18

*Am. President Lines, LLC v. Matson, Inc.*,
 2022 U.S. Dist. LEXIS 179822 (D.D.C. Sept. 30, 2022) ........................................10

*Bd. of Trade of City of Chicago v. United States*,
 246 U.S. 231 (1918)...................................................................................................7

*Brookins v. Bonnell*,
 362 F. Supp. 379 (E.D. Pa. 1973) ...........................................................................18

*Clinton v. City of N.Y.*,
 524 U.S. 417 (1998)..................................................................................................14

*Copper Valley Coal Co. v. United Mine Workers*,
 753 F. Supp. 580 (W.D. Pa. 1990)............................................................................8

*Doctor's Assocs. Inc. v. Stuart*,
 85 F.3d 975 (2d Cir. 1996).......................................................................................18

*Dombrowski v. Pfister*,
 380 U.S. 479 (1965)..................................................................................................15

*Gov't Emps. Ins. Co. v. Relief Med., P.C.*,
 554 F. Supp. 3d 482 (E.D.N.Y. 2021) .....................................................................15

*In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*,
 967 F.3d 264 (3d Cir. 2020).......................................................................................7

AMERICAS 123569006

*Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*,
    441 F. Supp. 2d 552 (S.D.N.Y. 2006)......................................................................19

*Johnson v. Kelly*,
    583 F.2d 1242 (3d Cir. 1978)...............................................................................14

*LePage's, Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003)....................................................................................4

*Lorain Journal Co. v. United States*,
    342 U.S. 143 (1951)................................................................................................5

*Multiflex, Inc. v. Samuel Moore & Co.*,
    709 F.2d 980 (5th Cir. 1983)...................................................................................7

*Oakley, Inc. v. Sunglass Hut Int'l*,
    2001 U.S. Dist. LEXIS 23572 (C.D. Cal. Dec. 7, 2001) ......................................20

*Rossi v. Standard Roofing*,
    156 F.3d 452 (3d Cir. 1998)....................................................................................8

*Synthes, Inc. v. Gregoris*,
    228 F. Supp. 3d 421 (E.D. Pa. 2017) ...................................................................19

*Temple Univ. v. White*,
    941 F.2d 201 (3d Cir. 1991)..................................................................................20

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
    142 F.3d 90 (2d Cir. 1998)......................................................................................6

*U.S. v. Brown Univ.*,
    5 F.3d 658 (3d Cir. 1993)........................................................................................7

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005)....................................................................................6

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ..............................................................................3, 5

*Wenner Media LLC v. N. & Shell N. Am. Ltd.*,
    2005 U.S. Dist. LEXIS 1925 (S.D.N.Y. Feb. 8, 2005).........................................11

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012)....................................................................................6

iv

## STATUTES AND RULES

Minn. Stat. § 93.1925................................................................................................................11

Sherman Act § 2.................................................................................................................3, 4, 5, 8

AMERICAS 123569006

Docket No. 733
Filed: 5/22/23
FILED UNDER SEAL

Mesabi has been litigating this case for nearly six years in an effort to hold Cliffs to account for its anticompetitive conduct. Mesabi simply wants to be free of Cliffs' interference so that it can complete its Project and provide customers and the people of Minnesota with high-quality products and good-paying jobs. Cliffs, however, has been working even longer to "make sure [Mesabi's Project] is not completed." Suggs Ex. 22, CLIFFS_000175413, at p. 11. Now Cliffs is trying to deal Mesabi the final blow by obtaining the State Leases before this Court can rule on Mesabi's claims. Mesabi requests a preliminary injunction to prevent Cliffs from doing so. Mesabi merely asks the Court to maintain the status quo with respect to Cliffs' property interests at the Project site until the Court has an opportunity to adjudicate the case on a complete record.

Cliffs spends much of its brief arguing that Mesabi should be denied an injunction because it once had the State Leases and lost them. That argument has nothing to do with whether an injunction is appropriate now. Worse, Cliffs' position is like cutting off someone's legs and then faulting them for not being able to run. Mesabi lost the State Leases because of Cliffs. If not for Cliffs' actions, Mesabi would have maintained the State Lease because it would have secured financing for its Project and begun operations long ago. Cliffs' own CEO admitted this. Testifying about the effects of Cliffs' acquisition of the GPIOP Property on the Project's financing, he stated, ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████    Morr. Ex. 5, Goncalves Dep. Tr. 48:22-49:3. He stated that ████████████

████████████████████████████████████████████████    Suggs Ex. 5,

Goncalves Dep. Tr. 240:3–8.

AMERICAS 123569006

Docket No. 733
Filed: 5/22/23
FILED UNDER SEAL

Cliffs' attempts to deflect responsibility by blaming Mesabi should be rejected. And Cliffs fares no better when it takes on the actual merits of Mesabi's motion. Importantly, Cliffs does not contest Mesabi's evidence showing Cliffs is a monopolist. Instead, Cliffs argues that it has not excluded Mesabi from the market because, for instance, there remains a chance that Mesabi could complete the Project. That is not the appropriate standard, but, even if it were, Cliffs almost certainly would eliminate that chance by executing the State Leases. Indeed, Cliffs' documents show that Cliffs ███████████████████████████████████████████████████████████

███████████████  Suggs Ex. 25, CLIFFS_000584190. Cliffs' latest gambit is just one in a long line of efforts to exclude Mesabi from the market, and to date it has been successful.[2]

Nor can Cliffs reasonably assert Mesabi will not suffer irreparable harm if it shuts down and goes bankrupt. The law is clearly to the contrary. Indeed, the primary purpose of Mesabi's lawsuit is to put a stop to Cliffs' monopolistic acts and position Mesabi to build its Project, which becomes impossible if Mesabi no longer exists. No amount of damages can compensate for that.

For all these reasons, the Court should grant Mesabi's motion.

## I.    Mesabi Has Shown a Likelihood of Success on the Merits

### A.    Cliffs Effectively Concedes That It Has Monopoly Power And Intended to Monopolize

Mesabi's PI Motion details the economic and documentary evidence establishing (1) the relevant market is the Great Lakes blast furnace pellet market, and (2) Cliffs is a monopolist in that market. PI Mot. 15–16. Cliffs makes no effort to rebut Mesabi's evidence on this issue, offering only conclusory denials. *See, e.g.*, Opp. 26. Thus, Mesabi is likely to prove that Cliffs is

---

[2] Below Mesabi has included many more reasons why Cliffs' arguments are insufficient, but replying to Cliffs' 49-page brief in 29 hours necessarily limits how much information Mesabi can provide at this time.

AMERICAS 123569006

Docket No. 733
Filed: 5/22/23
FILED UNDER SEAL

a monopolist in the Great Lakes blast furnace pellet market, and its conduct must be viewed against that backdrop.

Cliffs also does not seriously contest the evidence that Cliffs had a "specific intent to monopolize" the relevant market.  PI Mot. 22-24.  Therefore, Mesabi is likely to succeed on this element of its attempted monopolization claim.

### B.    Mesabi Has Shown that Cliffs Engaged in Exclusionary Conduct

Cliffs engaged in an exclusionary scheme that included, among other things, (1) tying up customers with long-term, exclusive contracts, (2) preventing Mesabi from working with critical contractors and others, and (3) acquiring property in the middle of Mesabi's Project boundary with no intent to use it except to kill Mesabi's Project.  PI Mot. 5–10.

### 1.    Contracts

Cliffs defends its contracts by arguing Mesabi was not foreclosed from the market.  Opp. 31.  But Cliffs does not dispute that there are very few customers in the Great Lakes blast furnace pellet market, and Cliffs' own CEO testified that Cliffs



*See* PI Mot. 4.  These customers accounted for a huge share of pellet consumption in the market.

*See* Suggs Ex. 70, CLIFFS_000017772; Suggs Ex. 3, Zona Rep. Table 4.  Courts have held that "a monopolist's use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation."  *United States v. Microsoft Corp.*,

AMERICAS 123569006

Docket No. 733
Filed: 5/22/23
FILED UNDER SEAL

253 F.3d 34, 70 (D.C. Cir. 2001); *see also LePage's, Inc. v. 3M*, 324 F.3d 141, 159 (3d Cir. 2003)

(citing *Microsoft* approvingly).

Cliffs argues that Mesabi was not foreclosed from the market because it signed "non-binding letters of intent or term sheets" with certain potential customers. Opp. 31. But most of those arrangements were for sales to customers <u>outside</u> the product or geographic market, only highlighting Mesabi's foreclosure. Those sales could have no impact on Cliffs' monopoly power. For instance, Mesabi's term sheet with Nucor was for "DR grade pellets," a different product than the blast furnace pellets that Cliffs monopolized in the Great Lakes. Morr. Ex. 42. Cliffs also cites agreements with Riverdale Commodities SA and Mercuria, but those are trading companies, and those contracts include, for example, sales of "DR Grade Pellet" and "BF Grade Pellet for Exports," which also are outside the relevant market. Morr. Ex. 99 at pp. 23-24.

Cliffs contends that its long-term contracts have legitimate business justifications. Opp. 32. But the statements of Cliffs' CEO show that those purported justifications are mere pretexts, and that Cliffs' real intent was to block a potential competitor from "start[ing] [its] pellet plant."[3] Suggs Ex. 27, CLIFFS_000025288. That conclusion is further supported by the fact that Cliffs' customers wanted both shorter contracts and an alternative source of supply from Mesabi.

████████████████████████████████████████████████████████

████████████  In negotiations with Cliffs, ████████████████████████

████████████████████████████████████████████████████████

████████████████████ ████████████████████

---

[3] Cliffs' comparisons to Mesabi's contracts are unavailing. Opp. 33. The entire premise of section 2 of the Sherman Act is that monopolists are sometimes prohibited from engaging in the same conduct as non-monopolists.
[4] Highlighting AMUSA's lack of options, Goncalves testified that, ████████████████████████████
████████████████████ Morr. Ex. 5, Goncalves 91:12-16.

AMERICAS 123569006

Docket No. 733
Filed: 5/22/23
FILED UNDER SEAL

In sum, Mesabi is likely to succeed in showing that Cliffs—an admitted monopolist—executed exclusive, long-term contracts substantially foreclosing Mesabi from entering the market.

## 2.     <u>Service Providers</u>

Cliffs does not deny that, after years during which various service providers worked for both Cliffs and Mesabi without problem, Cliffs suddenly refused to work with them unless they cut off Mesabi.  PI Mot. 5–7.  That alone establishes an antitrust violation.  *See Lorain Journal Co. v. United States*, 342 U.S. 143 (1951) (affirming injunction against monopolist newspaper that refused to buy ads from companies that sold to competitor).  Indeed, even threats by a monopolist to stop working with a supplier unless it terminates its relationship with a competitor are unlawful.  *See United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (affirming Microsoft violated section 2 by threatening supplier for working with competitor).

Cliffs again claims it has legitimate business justifications for refusing to permit the suppliers to work with Mesabi.  It is telling, however, that all of Cliffs' support for such justifications comes from self-serving testimony provided years later in this litigation.  Opp. 35.  Cliffs does not identify a single contemporaneous document suggesting even that Cliffs was *concerned* about "a startup firm piggy-backing on its investment by hiring all of the same contractors," let alone that Cliffs implemented its Mesabi-specific policy for that reason.  Opp. 35.  To the contrary, Cliffs' documents show that ███████████████████████████████████ ████████████████████████████  Suggs Ex. 33, CLIFFS_000137983.

Cliffs also does not dispute that there were much less restrictive ways to accomplish its claimed business justification, such as non-disclosure agreements.  Suggs Ex. 2, Emmott Rep. ¶ 26, 161-163, 167.  Nor does Cliffs dispute that its actions delayed construction of the Project and raised Mesabi's costs, and that monopolists violate the Sherman Act by doing so.  *See* PI Mot. at

AMERICAS 123569006

Docket No. 733
Filed: 5/22/23
FILED UNDER SEAL

19; *see also ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271 (3d Cir. 2012) (exclusive-dealing contracts "may slow the rival's expansion" and "injury results from the delay that the dominant firm imposes on the smaller rival's growth."). For these reasons, Mesabi is likely to prevail on its monopolization claims.

### 3.    GPIOP Property

It is undisputed that Cliffs' acquisition of the GPIOP Property "dramatically reduc[ed] the value of the Project . . . and render[ed] Mesabi's mine plan useless." PI Mot. at 20. Indeed, Cliffs' CEO stated ████████████████████████████████████████████████████████ ██████  PI Mot. at 20-21. At minimum, Cliffs' transaction severely altered the economics of the Project, and such changes, at minimum, delayed when the Project could begin operations. PI Mot. 8–10, 20–21. Cliffs thus misses the point in arguing that the acquisition "did not exclude Mesabi from any market" just because Mesabi can still enter the market *years into the future*. Opp. 28; *see also Abbott Labs. V. Teva Pharms. USA, Inc.*, 432 F Supp. 2d 408, 423 (D. Del. 2006) ("complete[] foreclose[ure] . . . is not the correct legal standard").

Cliffs argues that it acquired the GPIOP Property "to put it to use." Opp. 29. But Cliffs' CEO told a different story a month after the deal, saying the GPIOP Property could "be put to die." Suggs Ex. 69, CLIFFS_000021625. It also is inconsistent with Cliffs' statements that the property was worthless on its own. PI Mot at 20. And Cliffs has not put the land to use in the five-plus years since acquiring it. Thus, the logical conclusion is that Cliffs did not intend to use the property, and its litigation-driven explanations for the acquisition are pretextual. *See Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 101 (2d Cir. 1998) ("A jury could find [purchasing parcels that are 'essentially undevelopable'] was not motivated by a valid business justification."); *see also United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 197 (3d Cir. 2005) ("Dentsply's alleged

6

justification was pretextual and did not excuse its exclusionary practices"). And that is before even considering (1) the many Cliffs' statements about the company's plans to acquire land to stymie competition, and (2) the evidence Cliffs is willing to mislead others about its intentions with respect to property at the Project site. PI Mot. at 20; Suggs Ex. 26, CLIFFS_000287255.

This latter two categories of evidence are examples of the many documents that show Cliffs' intent to eliminate competition from Mesabi. PI Mot. 22-24. Cliffs tries to dismiss such documents as mere "colorful statements," but they are much more than that, as they demonstrate Cliffs' anticompetitive intent. *See Bd. of Trade of City of Chicago v. United States*, 246 U.S. 231 (1918) ("[K]nowledge of intent may help the court to interpret facts and to predict consequences"); *U.S. v. Brown Univ.*, 5 F.3d 658, 672 (3d Cir. 1993) ("[C]ourts often look at a party's intent to help it judge the likely effects of challenged conduct.").

### 4. Cliffs' Exclusionary Scheme

Mesabi has shown that each above act constitutes unlawful monopolization, but Mesabi's case is even more powerful when the conduct is considered together. *See* PI Mot. 21; *see also In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264, 270 (3d Cir. 2020) ("[W]e look at 'all the acts taken together [to determine whether they] show the willful acquisition or maintenance of a monopoly.'"). Cliffs cannot wave away the need to evaluate its conduct as a whole by relying on a footnote from a 1986 decision in Illinois. PI Mot. 35.

Cliffs similarly relies on inapposite authority to argue its disparagement is not actionable as part of its overall scheme. The Third Circuit has recognized disparagement can be part of a monopolization claim. *See In re Suboxone*, 967 F.3d 264, 270 (3d Cir. 2020); *see also Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 992 (5th Cir. 1983) (citing defendant's statements that competitor's products were inferior as support for attempted monopolization claim).

7

Docket No. 733
Filed: 5/22/23
FILED UNDER SEAL

Considering Cliffs' actions overall, Mesabi has shown it is likely to succeed on the merits of its monopolization claim and its attempted monopolization claim.  PI Mot. 22-23.

5.     **Section 1 Claims**

Rather than attempt to address Mesabi's arguments showing it will succeed on its section 1 claims, PI Mot. 24–25, Cliffs simply refers to its deficient Section 2 arguments discussed above.  Those arguments remain deficient under Section 1.  Cliffs also claims that it did not agree with Barr Engineering and other service providers to stop working for Mesabi.  Opp. 37.  Cliffs is wrong on that count, also.  *See, e.g.*, Suggs Ex. 44, CLIFFS_000031556, at -57 ████████████████████

████████████████████████████████████████████; Morr. Ex. 19, ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

C.     **Mesabi Has Shown that It Suffered Injury in Fact and Antitrust Injury**

1.     **Mesabi Has Shown Injury in Fact Because Cliffs Conduct Was a "Material Cause" of Its Injury**

Cliffs suggests Mesabi must prove that Cliffs' actions were the *sole cause* of Mesabi's injury.  Opp. at 37–38.  Cliffs is wrong.  A plaintiff need only show the defendant's conduct was a "material cause" of plaintiff's injury, "not exhaust all possible alternative sources of injury." *Rossi v. Standard Roofing*, 156 F.3d 452, 483 (3d Cir. 1998) (quoting *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 114 n.9 (1969)); *see also Copper Valley Coal Co. v. United Mine Workers*, 753 F. Supp. 580, 582 (W.D. Pa. 1990) (citing *Zenith Radio Corp.*, 395 U.S. at 114 n.9) (plaintiff "need not show the unlawful violation is the sole cause of the injuries").

8

Docket No. 733
Filed: 5/22/23
FILED UNDER SEAL

Cliffs tries to sidestep the material cause requirement by arguing Mesabi itself is to blame for the injuries it suffered. *See* Opp. at 37-40. Cliffs contends that "Mesabi's problems are rooted in Essar's repeated failures to fund the project sufficiently, which culminated in the bankruptcy." Opp. at 38. However, because Mesabi gained a fresh start following its bankruptcy filing, its focus in this case is on the impact of Cliffs' actions after filing. It is that conduct, when Mesabi was trying to emerge from bankruptcy (and Essar was no longer Mesabi's parent), that has blocked Mesabi from completing the Project. *See* Mot. at 18-20. Cliffs' other assertions likewise do not undercut Mesabi's argument that Cliffs materially caused Mesabi's injuries. For example, Cliffs asserts Mesabi did not take the necessary action to secure the GPIOP leases. Opp. at 38-39. Setting aside Cliffs' mischaracterizations, the fact remains that Cliffs prevented Mesabi from extending those leases, and it did so to block the Project. *See* PI Mot. 7. By Cliffs' own admission, that acquisition (as well as Cliffs' other anticompetitive conduct) stopped Mesabi from entering the market and becoming Cliffs' only competitor. *See* PI Mot. 8–9, 25–26.

Similarly, Cliffs' assertion that Mesabi is a "fledgling enterprise" that has only itself to blame for its injuries is disproved by Cliffs' own documents and statements demonstrating its intent to keep Mesabi out of the market and the <u>effects</u> of its conduct. *See* Opp. at 38 (quoting *Van Dyk Rsch. Corp. v. Xerox Corp.*, 631 F.2d 251, 255 (3d Cir. 1980)); Mot. at 23 and § III. Cliffs' reliance on *Van Dyk* and *Addamax Corp. v. Open Software Found.*, 964 F. Supp. 549 (D. Mass. 1997) is misplaced. *See* Opp. at 37-38. In both cases, the court identified significant, independent events that caused the plaintiff competitors to fail. *See Van Dyk*, 631 F.2d 251, 256 (citing failed merger and SEC investigation); *Addamax Corp.*, 964 F. Supp. at 554-5 (referring to plaintiffs' "complex, expensive" product that lacked approval from trade groups). By contrast, virtually all of Mesabi's problems can be traced to Cliffs' actions that caused major disruptions as Mesabi was

AMERICAS 123569006

Docket No. 733
Filed: 5/22/23
FILED UNDER SEAL

trying to obtain financing. *See* Suggs Ex. 3, Zona Rep. at ¶¶ 80–90; Suggs. Ex. 1, Davis Rep. at ¶¶ 18–20. Just two months after approval of Mesabi's reorganization plan, Barr engineering left the Project based on an agreement with Cliffs, leaving Mesabi without a key vendor. PI Mot. at 6, 18-19. Then, just as Mesabi was preparing to exit bankruptcy in December of 2017—another critical period—Cliffs acquired the GPIOP property, causing a "catastrophic effect" that Cliffs' CEO said ████████████████ *See id.* at 9, 20-21.

### 2.    Mesabi Has Shown It Has Suffered Antitrust Injury

Cliffs incredibly claims that foreclosing a new competitor from a monopolized market does not lead to antitrust injury, Opp 41–42, which is plainly wrong. *See, e.g.*, *Am. President Lines, LLC v. Matson, Inc.*, 2022 U.S. Dist. LEXIS 179822, at *13–14 (D.D.C. Sept. 30, 2022) (holding allegations defendant foreclosed sole competitor from market "implicate quintessential antitrust injuries" such as "reduced output . . . , increased prices, and diminished quality of service"). Unsurprisingly, Dr. Doug Zona determined Cliffs' exclusionary conduct caused these precise economic effects. *See* PI Mot. at 26.

Cliffs attempts to rebut Dr. Zona's opinion by mischaracterizing his "but-for" price analysis. The assertion that Dr. Zona "purports to estimate Mesabi's but-for prices by assuming that Mesabi would have charged prices set by formulas in its 2014 contracts with AMUSA and Algoma" is flatly incorrect. Opp. at 41. Dr. Zona calculated but-for prices by using a market simulation, not these two contracts. *See* Suggs Ex. 3, Zona Rep. § V.C.2. That simulation shows Mesabi's entry would have led to up to a 10% decrease in price and an additional 7 million tons of annual production capacity in the market. *See id.* at Table 8 Scenario 1, Table 7. Further, Mesabi's foreclosure was particularly harmful because Mesabi was anticipated to have much lower costs compared to Cliffs. *Id.* at ¶ 83, Table 6. Dr. Zona's analysis of the AMUSA and Algoma

AMERICAS 123569006

Docket No. 733
Filed: 5/22/23
FILED UNDER SEAL

contracts was not to establish but-for prices, but merely to demonstrate Cliffs' now-conceded monopoly power and the potential for price reductions with Mesabi's entry.  *Id.* at ¶ 101.

## II.     Mesabi's Harm is Irreparable and Can by Remedied by a Preliminary Injunction

### A.     Mesabi's Harm is Irreparable and Cliffs Does Little to Suggest Otherwise

Mesabi has made a clear showing, through Mr. Sutherland's declaration and the documentary record, that without the State Leases, Mesabi is likely to declare bankruptcy because a viable business plan is not feasible without the State Leases.  Sutherland Decl. ¶ 15; PI Mot. 27–29; Opp. 8 (noting Mesabi declared bankruptcy because it risked losing the State Leases).  Mesabi also risks permanently losing valuable employees with highly sought-after skills and in many cases, over a decade of experience with Mesabi's project.   Sutherland Decl. ¶¶ 11–14.  Additionally, Mesabi also risks permanently losing the contractors that are currently providing ongoing engineering, construction, and electrical services.  Sutherland Decl. ¶ 13.

These harms are irreparable.  Mot. 28.  Cliffs does not even argue otherwise, choosing instead to claim that Mesabi's irreparable harm is entirely self-inflicted.  But the facts show that Cliffs has leveraged its anticompetitive conduct, namely, its acquisition of the GPIOP Property and the resulting delays to the Project, to create the conditions necessary to negotiate for the State Leases.  Opp. at 6 (acknowledging that owning GPIOP Property was a "statutory prerequisite to be eligible for state mineral leases under Minn. Stat. §93.1925").  And as far as Mesabi is aware, based on its own interactions with the DNR, Cliffs has done so without even informing the DNR that its rights to the GPIOP Property are subject to the outcome of this litigation.

Contrary to Cliffs' suggestion (Opp. 24), at the preliminary injunction phase, certainty of harm is not required, *Wenner Media LLC v. N. & Shell N. Am. Ltd.*, 2005 U.S. Dist. LEXIS 1925,

AMERICAS 123569006

Docket No. 733
Filed: 5/22/23
FILED UNDER SEAL

at *10 (S.D.N.Y. Feb. 8, 2005).  Mesabi has sufficiently shown that irreparable harm is likely enough.

Cliffs argues that Mesabi's harm is not irreparable because Mesabi has requested monetary damages to compensate it for Cliffs' exclusionary conduct.  Opp. 22–23.  But this argument fails because Mesabi's monetary damages do not account for Cliffs' acquisition of the State Leases, nor does Mesabi's damages analysis consider a scenario where Mesabi ceases to exist.

Cliffs' cannot reasonably claim that Mesabi delayed seeking relief.  As Cliffs concedes in its Opposition, a party seeking preliminary injunctive relief must show irreparable harm that is "immediate."  Opp. at 22.   Mesabi's harm became "immediate" when, on May 4, 2023, Cliffs announced that it had entered into a "lease arrangement that has already been negotiated between [Cliffs] and [the DNR]."  Opp. at 1; Mot. 10.  With that announcement, the prospect of Mesabi's irreparable harm crystallized, and Mesabi immediately sought relief and filed this motion.

Finally, Cliffs claims Mesabi could continue its Project without the State Leases.  To support that claim, Cliffs cites a Jefferies report that states "Mesabi has a plan that would allow it to mine from its owned resources for the next 26 years."  Opp. at 25.  But that report was based on the November 2020 NI 43-101 Report prepared by DRA Metchem, which was prepared at a time when Mesabi held the State Leases. *See* Morr. Ex. 66 at MESABI04288509 (noting reliance on NI 43-101 Report, and that "NI 43-101 Report has not been updated or revised since [December 2, 2020]" and that "If the NI 43-101 Report were to be updated, the Company cannot assure you that there would be no material changes to the  . . . reserve and resource data").  Cliffs' misreading of this document does not overcome Mr. Sutherland's testimony that, if Cliffs signs the State Leases, Mesabi will lack access to sufficient ore within its permit-to-mine area to be able to recoup its investment in the Project.  Sutherland Decl. ¶¶ 8–10.  Without the ability to recoup its investment,

AMERICAS 123569006

Docket No. 733
Filed: 5/22/23
FILED UNDER SEAL

Mesabi's operations will likely cease, employees will be laid off, construction will halt, and Mesabi will likely become insolvent.

**B.    A Preliminary Injunction Would Remedy Mesabi's Harm**

Cliffs also argues that Mesabi's harm, even if irreparable, is not capable of being remedied by a preliminary injunction that this Court could issue—namely, an injunction precluding Cliffs from entering into a lease agreement for the State Leases pending the outcome of this litigation. Cliffs is incorrect.   First, Mesabi's request that this Court preliminarily enjoin *Cliffs* from entering into the State Leases preserves Mesabi's ability to vindicate its right in this antitrust action, and thereby, become the best option, by far, for the State to select to develop the State's properties. Second, a preliminary injunction would remedy Mesabi's injury of losing its option to pursue the State Leases—an injury that courts in this circuit have found sufficient to confer standing.   And third, a federal court enjoining a *future* state action pending the outcome of a federal litigation, in aid of that federal court's jurisdiction, is consistent with the principles of federalism.

**1.    A Preliminary Injunction Would Preserve Mesabi's Requested Relief in This Action and Stave Off Irreparable Harm**

Mesabi seeks a preliminary injunction to prevent Cliffs from executing the State Leases because, if Cliffs is permitted to sign the leases now—prior to a resolution on the merits of this litigation—Mesabi likely will be unable to continue operating.   Sutherland Decl. ¶ 11.  In that scenario, even if Mesabi ultimately prevails on the merits and Cliffs' acquisition of the GPIOP Property is voided—leaving Cliffs without its basis to obtain the State Leases—Mesabi would likely no longer exist to benefit from that relief.  On the other hand, if Mesabi obtains a preliminary injunction, it not only will be able to continue operating and position itself to compete for the State Leases after this case is resolved (and the Cliffs-imposed barriers are lifted), Mesabi would become the clear best candidate to assume the State Leases if Cliffs is forced to relinquish the GPIOP

13

Docket No. 733
Filed: 5/22/23
FILED UNDER SEAL

Property it wrongfully acquired.  Thus, a preliminary injunction would remedy the immediate irreparable harm that Mesabi would suffer if Cliffs signs the State Leases now, and it would prevent Cliffs from preempting the ultimate injunctive relief Mesabi is seeking.

### 2.  A Preliminary Injunction Would Remedy Mesabi's Loss of the Option to Acquire the State Leases

Cliffs asserts that a preliminary injunction would not guarantee that Mesabi would ultimately be able to obtain the State Leases. Opp. 18–19.  Essentially, Cliffs argues that Mesabi's claimed irreparable harm or injury is not redressable through Mesabi's proposed interim relief. Court's frequently address this issue in the context of Article III standing, and the Supreme Court has held that the loss of an option to bid is an injury that is sufficient to confer standing, and a guarantee of ultimate success in the bid is not required to show that such injury is redressable. *See Clinton v. City of N.Y.*, 524 U.S. 417, 431 (1998) ("Even if the outcome of the second trial is speculative, the reversal, like the President's cancellation, causes a significant immediate injury by depriving the defendant of the benefit of a favorable final judgment.").  Consistent with those holdings, Mesabi is seeking to preserve its option to bid or negotiate for the State Leases so that it can ultimately enjoy "the benefit of a favorable final judgment" in this litigation, making a preliminary injunction an appropriate remedy.  *See id.*

### 3.  A Preliminary Injunction to Preserve the Status Quo Pending the Outcome of a Federal Antitrust Litigation is Consistent with Principles of Federalism

In a last-ditch effort to assert that a preliminary injunction would not redress the harm to Mesabi from Cliffs' execution of the State Leases, Cliffs claims that principles of federalism preclude this Court from issuing a preliminary injunction.  Opp. 20–21.  But a federal court enjoining a private party from taking actions that would irreparably harm another private party is consistent with principles of federalism. *See, e.g.*, *Johnson v. Kelly*, 583 F.2d 1242, 1252 (3d Cir.

14

Docket No. 733
Filed: 5/22/23
FILED UNDER SEAL

1978) (neither federalism principles, nor the *Younger* doctrine, prohibit an action against private parties to enjoin them from pursuing state proceedings).

Moreover, even if this Court is concerned that federalism issues are potentially implicated here, a federal court granting preliminary relief to temporarily enjoin a defendant from engaging in *future* action with the state is consistent with federalism principles. *See, e.g.*, *Gov't Emps. Ins. Co. v. Relief Med., P.C.*, 554 F. Supp. 3d 482, 496-97, 504–05 (E.D.N.Y. 2021) (recognizing federal district court's authority to enjoin "Defendants from *commencing* [state court actions]" and granting preliminary injunction for same) (emphasis added); *Dombrowski v. Pfister*, 380 U.S. 479, 484 n. 2 (1965) ("[The Anti-Suit Injunction Act] and its predecessors do not preclude injunctions against the institution of state court proceedings, but only bar stays of suits already instituted."). The preliminary injunction Mesabi seeks does not offend federalism principles because it seeks only to enjoin *future* actions of a private party with the state.

### III.    Cliffs' Claimed Harm is Speculative, a Result of Its Own Delay, and Not Credible

Cliffs argues that "granting the motion would cause Cliffs far greater harm than denying the injunction would Mesabi," Opp. 42, because "an injunction would drive a hole through Cliffs' integrated business plan years in the making." Opp. 43. But Cliffs' claim of harm is based on at least two dubious premises: (1) that, absent a preliminary injunction, Cliffs would be able supply its Hibbing Taconite ("HibTac") facility with iron ore mined from the Project site by 2026 (three years from now), and (2) that Cliffs needs to keep HibTac operational to avoid injury.

Cliffs' claim that it can supply HibTac from the state lands is not only speculative—it is directly contradicted by Cliffs' own testimony and contemporaneous business documents. Indeed, in the Cliffs 30(b)(6) deposition of Gabe Johnson, ███████████████████████████

██████████████████████████████████████████████████████████

AMERICAS 123569006

████████████████████████████████████████████ Suggs Decl. Ex. 64, CLIFFS_000102245 at 55; Morr. Ex. 1, Johnson (30(b)(b)) Dep. Tr. at 68:24-69:1. ████████

████████████████████████████████████████████████████████

███████████████████████ *Id.* at 57.  Cliffs provides no basis to conclude those estimates are now inaccurate. ████████████████████████████████████████

██████████████████████████ *Id.* at 59.

If Cliffs truly faced the dire outcomes that it claims it will suffer if the Court grants a preliminary injunction, Cliffs would have taken much swifter action to plan for the closure of HibTac.  Cliffs has had "more than ten years" to develop such a plan.  Holihan Decl. ¶ 12.  Among the options that Cliffs has considered are options that Cliffs itself controls.  Suggs Ex. 62, CLIFFS_000732537; Suggs Ex. 63, CLIFFS_000732523.  Also, in 2021, Cliffs stated that it could supply HTC with "land already under the control of Cleveland-Cliffs."  Suggs Ex. 66, Jimmy Lovrien, Cliffs says it has plan to save Hibbing Taconite without land swap. But it won't say how, Duluth News Tribune (Feb 8., 2021).   Yet Cliffs now incredibly claims it has instead put the fate of HibTac in the hands of various courts and state agencies that it cannot control.

Moreover, Cliffs' CEO stated that, if the state declines to grant Cliffs to State Leases and instead puts them up for auction, Cliffs will not bid in the auction.  Suggs Ex. 20, *Cliffs CEO: Minnesota mine will close without mineral rights*, AP News (Nov. 18, 2022).  If the future of HibTac depended on those State Leases, Cliffs would participate in that auction.

There are yet additional reasons to doubt Cliffs' claims.  In a previous effort to obtain the State Leases, Cliffs demonstrated its willingness to say anything—even untruths—to convince the State to give it the State Leases:

████████████████████████████████████████████████████

16



Suggs Ex. 26, CLIFFS_0000287255.  Given all this, Cliffs' claims of harm simply cannot be credited.

Cliffs also cannot show it would suffer irreparable harm if a preliminary injunction issues. In fact, the Holihan Declaration does the opposite.  Mr. Holihan does not state that Cliffs will become insolvent if it does not obtain the State Leases.  Moreover, Mr. Holihan estimates the monetary loss to Cliffs if it does not obtain the State Leases, showing that Cliffs' supposed injury can be adequately remedied with monetary damages.  Holihan Decl. ¶ 35.  Finally, the parade of horribles imagined by Mr. Holihan is built on a series of speculative assumptions, and even if they came to pass, would not be caused by the entry of a preliminary injunction, but by Cliffs' strategic decision not to use its own internal resources to supply HibTac.  *See* Holihan Decl. ¶¶ 44, 46-49 (discussing supposed harms "*if*" Cliffs is forced to shut down or idle steelmaking).

## IV.    <u>The Public Stands to Lose More if Mesabi's Project is Shuttered</u>

Cliffs argues that the public interest weighs in its favor because (1) the State of Minnesota has already determined the public interest is best served by giving the State Leases to Cliffs; and (2) any delay occasioned by a preliminary injunction would create a production gap for Hibbing Taconite, potentially causing a loss of tax revenue and jobs for the local community.  These arguments fail.

First, it is not in the interest of the State of Minnesota to award the State Leases to a Cliffs when the legal prerequisite for entering into those leases with Cliffs—its ownership of the GPIOP mineral rights—is contested in federal antitrust litigation.  Indeed, if Cliffs is permitted to execute the State Leases, but later loses the GPIOP properties in the antitrust litigation, the properties are

AMERICAS 123569006

Docket No. 733
Filed: 5/22/23
FILED UNDER SEAL

once again thrown into limbo.  Only this time, Mesabi would no longer exist to provide a path forward for developing the State Leases.  Second, as discussed above, whether this Court issues a preliminary injunction or not, Hibbing Taconite will close at the end of 2026.  According to Cliffs' own documents, ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ Suggs Decl. Ex. 64, CLIFFS_000102245, at -55.  Finally, now that Cliffs effectively concedes its monopoly power, it cannot seriously argue that moving the market from one to two competitors would benefit customers in the Great Lakes market with more supply, lower prices, and increased alternatives. Suggs Ex. 3, Zona Rep. §§ V.B–C.

## V.    Cliffs' Proposed $1.7 Billion Bond is Unsupported, Speculative, and Unreasonable

Cliffs proposes a bond of $1.7 billion—an amount that exceeds Cliffs' net income for 2022. Suggs Ex. 67 ("For the full year 2022, the Company generated net income of $1.4 billion, or $2.55 per diluted share attributable to Cliffs shareholders.").   Not only is such a bond facially unreasonable and speculative, it fails for the same reason that Cliffs' claims of private harm fails: Cliffs cannot show that the preliminary injunction would cause it to be unable to supply HibTac from the state lands before HibTac runs out of ore in 2026.  In fact, any delay in extending the life of HibTac is a product of Cliffs' own making.

"[W]here the enjoined party has shown no likelihood of harm," a bond is not required. *Am. ORT, Inc. v. ORT Israel*, 2009 U.S. Dist. LEXIS 10202, at *14-16 (S.D.N.Y. Jan. 21, 2009); s*ee Doctor's Assocs. Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).  Courts in the Third Circuit agree.  *Brookins v. Bonnell*, 362 F. Supp. 379, 384 (E.D. Pa. 1973) (no bond required where "no harm will result to defendants if this order is later vacated").  Moreover, "the bond amount cannot

18

be purely speculative." *Synthes, Inc. v. Gregoris*, 228 F. Supp. 3d 421, 447 (E.D. Pa. 2017); *accord Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, 441 F. Supp. 2d 552, 566 (S.D.N.Y. 2006) ("[A] court is not required to order security in respect of claimed economic damages that are no more than speculative."). Thus, "the burden is on the party seeking security to establish a rational basis for the amount of the proposed bond." *Int'l Equity Invs.*, 441 F. Supp. 2d at 566.

As explained above, ███████████████████████████████████████████
███████████████████████ *See also* Suggs Ex. 64, CLIFFS_000102245 at 57. That will not be done before HibTac runs out of iron ore in 2026. In any event, any shutdown of HibTac is a product of Cliffs' own decision-making. Cliffs has ignored other options and made no effort to develop the GPIOP Property that Cliffs already owns at the Project site. Nor does Cliffs explain why it cannot supply its steel mills with iron ore from other sources if HibTac shuts down.

Moreover, Cliffs fails to adequately explain how it will suffer $1.7 billion in harm if it is forced to wait the relatively short period before this case goes to trial before possibly obtaining the State Leases. *See* D.I. 712 (Ninth Am. Discovery Plan and Scheduling Order) (Summary Judgment hearing scheduled for December 20, 2023). Assuming this case is tried by May 2024 (one year from now), Cliffs' claimed injury for that single year exceeds its 2022 net income of $1.4 billion. Suggs Ex. 67. Such a hastily prepared calculation, supported only by a declaration making questionable assumptions, is plainly speculative, and speculation cannot support a request for a bond. *See, e.g.*, *Synthes, Inc. v. Gregoris*, 228 F. Supp. 3d 421, 447-48 (E.D. Pa. 2017) (denying bond based on "future compensation," which "is likely to vary substantially," making calculation "largely speculative.").

When a defendant's purported damages from a preliminary injunction are excessive, or purely speculative, courts often require a bond substantially lower than the requested bond amount.

19

*See, e.g.*, *Oakley, Inc. v. Sunglass Hut Int'l*, 2001 U.S. Dist. LEXIS 23572, at *36 (C.D. Cal. Dec. 7, 2001) (ordering $100,000 security bond after finding lack of evidence to substantiate defendant's requests for bond ranging from $5 million to $100 million); *3M Unitek Corp. v. Ormco Co.*, 96 F. Supp. 2d 1042, 1052 (C.D.Cal.2000) (calling defendant's request for $10 million security bond "excessive" and "purely speculative" and finding $500,000 bond appropriate); *AB Electrolux v. Bermil Indus. Corp.*, 481 F. Supp. 2d 325, 336–37 (S.D.N.Y.2007) (setting $350,000 security bond amount after finding defendant provided no basis for asserting $3 to $5 million in lost profits).

Finally, Cliffs' request for a $1.7 billion bond should be seen for what it really is:  an attempt to prevent Mesabi from obtaining the relief it needs to vindicate its rights in this antitrust action.  The Third Circuit recognizes the "special nature of suits to enforce important federal rights" and that "[a] district court should consider the impact that a bond requirement would have on enforcement of such a right, in order to prevent undue restriction of it."  *Temple Univ. v. White*, 941 F.2d 201, 220 (3d Cir. 1991).  Here, Cliffs' insistence on a $1.7 billion bond would effectively ensure that Mesabi could not obtain a preliminary injunction, with the likely result that Mesabi would cease to exist.  No such bond is required.  Mesabi therefore requests that this Court order Mesabi to provide, at most, a nominal bond, given the speculative nature of Cliffs' harm and that (1) under no circumstances would Cliffs be able to supply HibTac from the Project site before 2026, (2) Cliffs' own strategic decisions—and not any order of this Court—have led to HibTac's current situation, and (3) Cliffs has other options for continuing its steel operations.

For all the foregoing reasons, Mesabi's motion for a preliminary injunction should be granted in full, consistent with Mesabi's Proposed Order.

AMERICAS 123569006

Docket No. 733
Filed: 5/22/23
FILED UNDER SEAL

Dated: May 22, 2023

Respectfully submitted,
**BAYARD, P.A.**

*/s/Daniel N. Brogan*
Evan T. Miller (No. 5364)
Daniel N. Brogan (No. 5723)
600 N. King Street, Suite 400
Wilmington, Delaware  19801
Telephone:  (302) 655-5000
Facsimile:  (302) 658-6395
emiller@bayardlaw.com
dbrogan@bayardlaw.com

**WHITE & CASE LLP**

David H. Suggs (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Facsimile:  (212) 354-8113
dsuggs@whitecase.com

C. Kelly Newman (admitted *pro hac vice*)
75 State Street
Boston, MA 02109
Telephone: (617) 979-9300
Facsimile: (617) 979-9301
kelly.newman@whitecase.com

*Attorneys for Plaintiff Mesabi Metallics Company LLC*

21