**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>ESSAR STEEL MINNESOTA LLC and ESML HOLDINGS INC.,[1]<br><br>      Debtors. | Chapter 11<br><br>Case No. 16-11626 (CTG)<br><br>(Jointly Administered) |
| MESABI METALLICS COMPANY LLC (F/K/A ESSAR STEEL MINNESOTA LLC),<br><br>      Plaintiff<br><br>   v.<br><br>CLEVELAND-CLIFFS, INC. (F/K/A CLIFFS NATURAL RESOURCES, INC.); CLEVELAND-CLIFFS MINNESOTA LAND DEVELOPMENT LLC; GLACIER PARK IRON ORE PROPERTIES LLC; and DOES 1-10<br><br>      Defendants. | Adv. Proc. No. 17-51210 (CTG) |
| GLACIER PARK IRON ORE PROPERTIES LLC,<br><br>      Counterclaim-Plaintiff<br><br>   v.<br><br>MESABI METALLICS COMPANY LLC (F/K/A ESSAR STEEL MINNESOTA LLC),<br><br>      Counterclaim-Defendant. | |

**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION TO ENJOIN DEFENDANTS FROM EXECUTING STATE LEASES**

---

[1] Essar Steel Minnesota LLC has changed its name to Mesabi Metallics Company LLC. The last four digits of its federal taxpayer identification number are 8770.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 3

    I.     Industry Overview .................................................................................. 3

    II.    Mesabi's Investment in and Efforts to Complete the Project ................................. 4

    III.   Cliffs' Anticompetitive Actions Concerning Mesabi's Vendors ........................... 5

    IV.   Cliffs' Anticompetitive Acquisition of the GPIOP Property ................................. 7

    V.    The DNR's Decision to Award the State Leases to Cliffs .................................. 10

    VI.   Mesabi Will Suffer Severe Consequences If Cliffs Signs the State Leases ......... 11

ARGUMENT ........................................................................................................ 12

    I.     Legal Standard for Granting a Prohibitory Preliminary Injunction ..................... 12

    II.    Mesabi Is Likely to Succeed on the Merits of Its Antitrust Claims ..................... 14

         A.    Mesabi Is Likely to Succeed on Its Monopolization Claim ..................... 15

             1.     Cliffs Has Monopoly Power in a Relevant Market ...................... 15

             2.     Cliffs Excluded Mesabi from the Market with Its Exclusive Customer Contracts ................................................................... 16

             3.     Cliffs Excluded Mesabi from the Market with Its Exclusive Service Provider Contracts .......................................................... 18

             4.     Cliffs Excluded Mesabi from the Market with Its Acquisition of the GPIOP Property ................................................................... 20

             5.     Cliffs' Exclusionary "Monopoly Broth" ...................................... 21

         B.    Mesabi Is Likely to Succeed on Its Attempted Monopolization Claim .... 22

         C.    Mesabi Is Likely to Succeed on Its Unreasonable Restraint Claim .......... 24

         D.    Mesabi Is Likely to Succeed in Demonstrating It Suffered Antitrust Injury ............................................................................................... 25

         E.    Mesabi Is Likely to Demonstrate It Is Entitled to Injunctive Relief ......... 27

i

Docket No. 715
Filed: 5/12/23
Filed Under Seal

III.    Mesabi Will Suffer Irreparable Harm If Cliffs Signs the State Leases.................. 27

IV.    The Balance of Equities Weighs in Mesabi's Favor............................................. 29

CONCLUSION............................................................................................................................ 30

AMERICAS 123332817

Docket No. 715
Filed: 5/12/23
Filed Under Seal

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Needle, Inc. v. NFL*,
    560 U.S. 183 (2010)..................................................................................................14

*Broadcom Corp. v. Qualcomm Inc.*,
    501 F.3d 297 (3d Cir. 2007)...................................................................15, 16, 26

*C.G. v. Saucon Valley Sch. Dist.*,
    571 F. Supp. 3d 430 (E.D. Pa. 2021) ......................................................................13

*California v. Am. Stores Co.*,
    495 U.S. 271 (1990)..................................................................................................27

*City of Anaheim v. S. Cal. Edison Co.*,
    955 F.2d 1373 (9th Cir. 1992) .................................................................................21

*City of Mishawaka v. Am. Elec. Power Co.*,
    616 F.2d 976 (7th Cir. 1980), *cert. denied*, 449 U.S. 1096 (1981).........................21

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962)..................................................................................................21

*Doran v. Salem Inn, Inc.*,
    422 U.S. 922 (1975)............................................................................................28, 29

*EUSA Pharma (US), Inc. v. Innocoll Pharms. Ltd.*,
    594 F. Supp. 2d 570 (E.D. Pa. 2009) ......................................................................27

*Girl Scouts of Manitou Council, Inc. v.*
    *Girl Scouts of the United States of Am. Inc.*,
    549 F.3d 1079 (7th Cir. 2008) .................................................................................28

*GN Netcom, Inc. v. Platronics, Inc.*,
    967 F. Supp. 2d 1082 (D. Del. 2013).......................................................................26

*Highmark, Inc. v. Upmc Health Plan*,
    276 F.3d 160 (3d Cir. 2001).....................................................................................14

*In re Keurig Green Mt. Singleserve Coffee Antitrust Litig.*,
    383 F. Supp. 3d 187 (S.D.N.Y. 2019)......................................................................19

AMERICAS 123332817

Docket No. 715
Filed: 5/12/23
Filed Under Seal

*In re Mushroom Direct Purchaser Antitrust Litig.*,
   2016 U.S. Dist. LEXIS 177839 (E.D. Pa. Dec. 13, 2016) ......................................................20

*Leegin Creative Leather Prods. v. PSKS, Inc.*,
   551 U.S. 877 (2007)................................................................................................................23

*LePage's, Inc. v. 3M*,
   324 F.3d 141 (3d Cir. 2003)........................................................................................... passim

*McNeil Nutritionals, LLC v. Heartland Sweeteners LLC*,
   566 F. Supp. 2d 378 (E.D. Pa. 2008) ......................................................................................13

*McWane, Inc. v. FTC*,
   783 F.3d 814 (11th Cir. 2015) .................................................................................................19

*Minard Run Oil Co. v. U.S. Forest Serv.*,
   670 F.3d 236 (3d Cir. 2011)........................................................................................12, 28, 30

*Multistate Legal Stud. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns*,
   63 F.3d 1540 (10th Cir. 1995) .................................................................................................19

*Neo Gen Screening, Inc. v. TeleChem Int'l, Inc.*,
   69 F. App'x 550 (3d Cir. 2003) ........................................................................................12, 13, 29

*Novartis Consumer Health, Inc. v Johnson & Johnson-Merck Consumer Pharms.*
   *Co.*, 290 F.3d 578 (3d Cir 2002) .......................................................................................29, 30

*Reilly v. City of Harrisburg*,
   858 F.3d 173 (3d Cir. 2017).............................................................................................13, 14

*Swift & Co. v. United States*,
   196 U.S. 375 (1905)................................................................................................................21

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
   142 F.3d 90 (2d Cir. 1998)......................................................................................................23

*U.S. v. Price*,
   688 F.2d 204 (3d Cir. 1982)....................................................................................................12

*United States v. Dentsply Int'l Inc.*,
   399 F.3d 181 (3d Cir. 2005)....................................................................................................25

*Van Dyk Research Corp. v. Xerox Corp.*,
   631 F.2d 251 (3d Cir. 1980)....................................................................................................26

*W. Penn Allegheny Health Sys. v. UPMC*,
   627 F.3d 85 (3d Cir. 2010)......................................................................................................22

iv

Docket No. 715
Filed: 5/12/23
Filed Under Seal

*Wheelabrator Frackville Energy Co. v Morea Culm Servs., Inc.*,
 1990 US Dist LEXIS 7192 (E.D. Pa. June 8, 1990) ................................................................29

*ZF Meritor, LLC v. Eaton Corp.*,
 696 F.3d 254 (3d Cir. 2012).................................................................................16, 17, 25

## STATUTES AND RULES

Clayton Act § 16 ..........................................................................................................26

Minn. Stat. Ann. § 93.1925..........................................................................................11

Sherman Act, 15 U.S.C. § 1..............................................................................14, 23, 27

Sherman Act, 15 U.S.C. § 2.................................................................................. passim

AMERICAS 123332817

Docket No. 715
Filed: 5/12/23
Filed Under Seal

Plaintiff Mesabi Metallics Company LLC ("Mesabi")[2] hereby moves (the "Motion"), pursuant to Federal Rules of Civil Procedure 65, as made applicable to the above-captioned adversary proceeding by Federal Rules of Bankruptcy Procedure 65, for an order preliminarily enjoining Defendants Cleveland-Cliffs Inc. and Cleveland-Cliffs Minnesota Land Development LLC (together, "Cliffs") from executing or otherwise entering into certain mineral leases, as set forth below and in Mesabi's accompanying proposed order (the Proposed Order").

WHEREFORE, for all the reasons stated below, Mesabi respectfully requests this Court to enter an order granting the Motion as set forth in the Proposed Order.

## PRELIMINARY STATEMENT

Late last week, Cliffs announced that it had reached an agreement to acquire a package of iron ore mineral leases (the "State Leases") located in and around the property where Mesabi is building the project that is at the center of this litigation, an iron ore mine and pelletization plant in northern Minnesota (the "Project"). Mesabi requests emergency relief to prevent Cliffs, as soon as May 25, 2023, from executing the State Leases, an action that would shatter the status quo, irreparably injure Mesabi (likely forcing it to seek bankruptcy protection), and effectively bypass the judge and jury in an attempt to dictate resolution of key issues in this adversary proceeding.

Importantly, Cliffs is only in a position to obtain the State Leases because of its anticompetitive acquisition of the "GPIOP Property" (defined below), an acquisition that Mesabi is challenging in this case. Indeed, if Mesabi obtains the relief it has requested in the antitrust action, it would regain control of the GPIOP Property, and Cliffs would be unable to secure the State Leases. Permitting Cliffs to obtain those State Leases now, and likely kill the Project, would

---

[2] Mesabi is formerly known as Essar Steel Minnesota LLC. For consistency and ease of understanding, this brief at times uses "Mesabi" to refer to the entity while it was still known as Essar Steel Minnesota LLC.

1

reward Cliffs for its anticompetitive actions and allow it to sidestep the judicial process, because even if Mesabi ultimately prevails on its antitrust claims, it may no longer exist to get the benefit of its requested relief.

Mesabi easily meets the standard for obtaining a preliminary injunction that maintains the status quo. If Cliffs is permitted to sign the State Leases, it would be calamitous for Mesabi, likely causing the company to cease operations and lay off employees, pushing the company into bankruptcy. Such effects are quintessential examples of the irreparable injuries that preliminary injunctions are intended to prevent. These severe injuries heavily tip the balance of the equities in Mesabi's favor, not least because Cliffs would not be prejudiced if it is unable to obtain the State Leases now. Indeed, Cliffs and Mesabi are involved in another dispute over use of the GPIOP Property (the 560 Litigation, discussed below), and that matter, too, is informally stayed, maintaining the status quo.

Mesabi also is likely to succeed on the merits of its antitrust claims (as well as its other claims). Discovery in the case has proved what Mesabi has long suspected: that Cliffs' mission, all the way up to its CEO Lourenco Goncalves, was to ███████████████████████████ ███████ Suggs Ex. 22, CLIFFS_000175413, at p. 11. Land acquisitions specifically were a means for Cliffs to ███████████████████████████████████████ ███████████████████████████████████ Suggs Ex. 23, CLIFFS_000539963, at p. 9. By suppressing competition, Cliffs was able to preserve its monopoly in the market for blast furnace iron ore pellets, giving it the ability ████████████████ ███████████████████████████ Suggs Ex. 24, CLIFFS_000539715.

The State Leases themselves have played a major role in Cliffs' monopolistic designs. Cliffs concluded that, if it secured the State Leases, it could ███████████████████████

2

██████    Suggs Ex. 25, CLIFFS_000584190.  And Cliffs was willing to cast ethics aside to get the leases and destroy Mesabi. ███████████████████████████



Suggs Ex. 26, CLIFFS_000287255.

The information presented in this Motion is only the tip of the iceberg, compiled in the little time available since Mesabi learned late last week about Cliffs' backroom negotiations to obtain the State Leases.  But it powerfully demonstrates that Cliffs has worked relentlessly to prevent Mesabi from bringing new output to the market, harming competition and customers.

For these reasons, and as explained below, the Court should issue a preliminary injunction prohibiting Cliffs from executing or otherwise entering into the State Leases or taking any other action that would alter the status quo with respect to its ownership or the possession of property rights within or adjacent to Mesabi's Project site.

## STATEMENT OF FACTS

### I.    Industry Overview

Iron ore is a key input for steel production.  Suggs Ex. 2, Expert Report of Roger Emmott ("Emmott Rep."), ¶ 20.  While iron ore comes in various forms, steelmakers in the Great Lakes region that operate blast furnaces almost exclusively consume iron ore from pellets.  *Id.* at ¶ 87.

As of 2017, Cliffs described itself as "the sole supplier of blast furnace pellets to this industry."  *See* Suggs Ex. 27, CLIFFS_000025288.  Its dominance in the Great Lakes was

AMERICAS 123332817

Docket No. 715
Filed: 5/12/23
Filed Under Seal

protected from outside competition by high transportation costs. Suggs Ex. 28, CLIFFS_000630190 ("the Great Lakes region . . . is geographically isolated from the seaborne market"); Suggs Ex. 29, CLIFFS_000179490 ███████████████████████████████████ ███████████████████████████████████ Accordingly, steelmakers in the Great Lakes that needed to buy pellets were dependent on Cliffs. There were only a few such customers (*e.g.*, ArcelorMittal, AK Steel, Algoma Steel, and Stelco), and Cliffs had long-term contracts to supply the biggest. Suggs Ex. 5, Goncalves Dep. Tr. 31:9–13 ██████████████████████████████ ███████████████████████████████████████████████████████████████

## II.   Mesabi's Investment in and Efforts to Complete the Project

Mesabi is attempting to break Cliffs' monopoly in the Great Lakes by building a new iron ore mine and pellet plant in Minnesota, and Mesabi has made considerable progress, constructing facilities and preparing its Project site for mining (*e.g.*, removing earth covering the iron ore and conducting an extensive drilling program to evaluate the mineral resources within the Project boundary). Suggs Ex. 16, *Our History*, Mesabi Metallics Company LLC, http://www.mesabimetallics.com/our-history. Since 2017 alone, Mesabi has invested more than $339 million in the Project. Suggs Ex. 17, *Mesabi Metallics Gearing Up for 2023 Project Restart*, http://www.mesabimetallics.com/mesabi-metallics-gearing-up-for-2023-project-restart.

As of June 8, 2017, Mesabi had a plan to obtain financing to complete the Project that had been approved by the Court. Order Confirming Third Amended Reorganization Plan, *In re Essar Steel Minnesota LLC and ESML Holdings Inc.*, No. 16-11626 (CTG) (Bankr. D. Del. Dec. 22, 2017), D.I. 1398. The plan was sponsored by Chippewa Capital Partners ("Chippewa"). Third Amended Chapter 11 Plan of Reorganization, *In re Essar Steel Minnesota LLC and ESML Holdings, Inc.*, No. 16-11626 (CTG) (Bankr. D. Del. June 8, 2017), D.I. 990.

4

Mesabi also had a permit to mine from the State of Minnesota, and it had developed a mine plan for the Project, which detailed the properties that Mesabi planned to mine and when it planned to mine them, taking into account a host of factors such as the quality of the iron ore and its location relevant to Mesabi's facilities.  Sutherland Decl. ¶ 5.

A miner needs certain property rights to mine the land included in its mine plan.  *Id.* at ¶ 6.  As is common, Mesabi did not own in fee simple all of the property at its Project site.  *Id.* at ¶ 6.  The mineral deposit sits on 165 parcels of approximately 40 acres each, and Mesabi leased mineral and surface rights for some of the land from others, including both private landowners and the State of Minnesota.  Suggs Ex. 55, MESABI01188065; Sutherland Decl. ¶ 6.  The parcels that Mesabi leased from the state, specifically the Minnesota Department of Natural Resources ("DNR"), included over 2,500 acres that were critical to Mesabi's Project, making up a huge portion of Mesabi's total mineral rights and also including essential surface rights.  Suggs Ex. 56, MESABI03707150; Sutherland Decl. ¶ 7.  As of June 8, 2017, Mesabi either possessed the rights it needed for its mine plan or was negotiating to regain them and expected to succeed.  Sutherland Decl. ¶ 8.  For instance, on June 19, 2017, Mesabi and the DNR entered into a Master Lease Amendment.  Suggs Ex. 57, MESABI01640093.

As explained below, however, Cliffs has wreaked havoc with Mesabi's property rights for the Project, in addition to thwarting it in other ways.

## III.    Cliffs' Anticompetitive Actions Concerning Mesabi's Vendors

Building the Project requires substantial expertise from third parties, including for services such as engineering, permitting, and construction.  ██████████████████████████████████ ████████████████████████████████████████  Suggs Ex. 30, CLIFFS_000733316 █

████████████████████████████████████████████████████████████████

5

Docket No. 715
Filed: 5/12/23
Filed Under Seal

████████████████████████████████████████████████████

███████████████████████ Suggs Ex. 31, CLIFFS_000150139 ████████████

████████████████████████████████████████████████████

████████ Suggs Ex. 32, CLIFFS_000154773 █████████████████████

████████████████████████████████████████████████████

███████████████████████████████ Suggs Ex. 6, Holihan (30(b)(6)) Dep. Tr.

139:10–17 ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ And

because Cliffs is a major employer in the area, it was able to persuade contractors and others to

stop working for Mesabi.  Suggs Ex. 4, Fedor Dep. Tr. 148:8–11 ("We had three major projects

going on at the time, so I assume we would have been important.").

Barr Engineering ("Barr") is the most significant company to fall prey to Cliffs' tactics.

Barr had worked on the Project since the 1990s and had "irreplaceable" experience.  Suggs Ex. 2,

Emmott Rep. ¶¶ 157–160; Suggs Ex. 13, Vuppuluri (30(b)(6) Dep. Tr. 32:12–20 ("[Barr has] been

associated with the project from [the] late 1990s"); Suggs Ex. 12, Sutherland (30(b)(6)) Dep. Tr.

210:21–211:1 ("I think they're somewhat irreplaceable"); Suggs Ex. 11, Fennessey (Mesabi

30(b)(6)) Dep. Tr. 185:4–11 ("Barr conducted engineering for the original plan layouts; original

plan mineral processing system; the basic project engineering . . . ; crusher and concentrator

design; the power system design; the original tailings basin design; the project flow sheets.").

In May 2017, ███████████████████████████████████████

████████████████████████████████████████████████████

████████ Suggs Ex. 33, CLIFFS_000137983.  Following Cliffs' pressure campaign, Barr agreed

6

with Cliffs to stop working for Mesabi in August 2017, leaving Mesabi without a key contractor at a critical time in the Project's life.  Suggs Ex. 8, Clarke Dep. Tr. 178:8–10 ("Q. When did Barr leave the project? A. Shortly after being threatened by Cleveland-Cliffs.").

Other suppliers also stopped working for Mesabi due to Cliffs.  Suggs Ex. 13, Vuppuluri (30(b)(6)) Dep. Tr. 16:19–17:5 (Environmental Law Group and Jamar "specifically at the direction and threats of Cliffs . . . withdrew from Mesabi Metallics").  Losing the ability to work with these suppliers greatly delayed the Project and required Mesabi to incur substantial additional costs. Suggs Ex. 9, Bigelow Dep. Tr. 311:7–12 ("When you're facing the [State] deadlines that were imposed . . . to lose your key engineering vendor . . . can train wreck your project.").

## IV.    Cliffs' Anticompetitive Acquisition of the GPIOP Property

Further undermining Mesabi's Project, Cliffs acquired a patchwork of land—unusable to itself—in the middle of Mesabi's Project boundary, and then simply sat on it.

For many years, Mesabi had leases for mineral and surface rights with Glacier Park Iron Ore Properties LLC ("GPIOP"), a private company that owned land within Mesabi's Project boundary.  Mesabi was in the process of renegotiating those leases in the fall of 2017 when Cliffs swooped in and made a deal with GPIOP to acquire the GPIOP Property, closing the deal on December 9, 2017.  2d. Am. Compl. ¶ 64; Suggs Ex. 8, Clarke Dep. Tr. 304:15–17; 305:2–5, 306:15–307:1; Suggs Ex. 2, Emmott Rep. ¶¶ 95, 109; Suggs Ex. 18, Dec. 11, 2017 Press Release: "Cleveland-Cliffs Inc. Announces Acquisition of Real Estate Interests in Itasca County, Minnesota").

 Cliffs acquired the GPIOP Property despite concluding that it had "no value" on its own— unsurprising given that, as shown on the map below, the property consists of a patchwork of non-contiguous parcels that fall entirely within Mesabi's Project site.    Suggs  Ex.  34,

AMERICAS 123332817

CLIFFS_000028345 (emphasis added); *see also* Suggs Ex. 35, CLIFFS_000580724, at -725

████████████████████████████████████████████████████████████████

████████████████    Suggs Ex. 2, Emmott Rep. ¶¶ 96–104.  The white squares on the below map

represent the GPIOP Property, the blue squares are state lands, and the red line surrounding those

and other colored squares is the Project boundary.



Cliffs' acquisition substantially shrank the iron ore available for Mesabi to mine—severely

reducing the Project's value—and broke up the Mesabi-controlled property into a patchwork of

disconnected parcels.  Suggs Ex. 2, Emmott Rep. ¶ 102.  Cliffs itself concluded that, due to its

acquisition, "[Mesabi] cannot mine that site without a deal with Cleveland-Cliffs."  Suggs Ex. 14,

State of Minnesota Meeting of the Executive Council Tr., at 20; *see also* Suggs Ex. 5, Goncalves

AMERICAS 123332817

Docket No. 715
Filed: 5/12/23
Filed Under Seal

Dep. Tr. 240:17–23 ███████████████████████████████████████████

████████████████████████████████████████████ Even property rights that Mesabi

retained were thrown into uncertainty.  In particular, Mesabi and Cliffs now share the mineral

rights to certain properties, and Cliffs filed litigation (the "560 Litigation") in Minnesota asking

the court to grant Cliffs alone the right to mine that land (the litigation has been transferred to this

Court and is stayed informally).  *Cleveland-Cliffs Minnesota Land Development LLC et al. v.*

*Miranda Mineral Resources, LLC et al.*, No. 1:18-ap-50416 (Bankr. D. Del. Apr. 9, 2018).

Cliffs' acquisition had a "catastrophic" effect on Mesabi.  Suggs Ex. 13, Vuppuluri

(30(b)(6)) Dep. Tr. 20:7–10 ("That transaction was a -- had a catastrophic effect on Mesabi

Metallics by essentially acquiring lease interests in pretty much half of the resource space.").  In

addition to slashing the company's value, Mesabi was forced to invest considerable time and

money to work around the GPIOP Property.  Suggs Ex. 2, Emmott Rep. ¶ 181 ("Mesabi was

required to produce new mine plans and commission a second NI 43-101 report to try to alleviate

investors' concerns."); Suggs Ex. 13, Vuppuluri (30(b)(6)) Dep. Tr. at 21:12–22.  Mesabi also had

to acquire new property to ensure continued access to some iron ore.  Suggs Ex. 12, Sutherland

(30(b)(6)) Dep. Tr. 186:8–187:18; Suggs Ex. 11, Fennessey (Mesabi 30(b)(6)) Dep. Tr. 120:14–

121:9; Suggs Ex. 1, Expert Report of Graham Davis ("Davis Rep.") ¶ 64 ("Losing access to the

GPIOP parcels that Cliffs acquired and leased from GPIOP forced Mesabi to acquire land to

mitigate the impact of this loss.").  Most consequentially in the long term, Cliffs' acquisition (along

with its other actions) frightened away potential financing for the Project.  Suggs Ex. 13, Vuppuluri

(30(b)(6)) Dep. Tr. 76:6–80:4 ("Each [potential lender], the first question on pretty much most of

the interaction was about the Cliffs interference - with the Cliffs interference and Cliffs presence

within Mesabi's boundary and particularly permit to mine, how can we convince them that Mesabi

Metallics will be a viable entity for financing."); Suggs Ex. 2, Emmott Rep. ¶¶ 182–183.

Since acquiring the GPIOP Property, Cliffs has not developed the land in any meaningful way.  Suggs Ex. 7, Johnson (30(b)(6)) Dep. Tr. 96:18–25 ███████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████ 130:13–18

████████████████████████████████████████████████████

████████████████████████████████████ 113:17–114:20 ██████████

██████████████████████████████████

## V.    The DNR's Decision to Award the State Leases to Cliffs

If not for Cliffs' actions, Mesabi would have obtained the financing it needed to build the Project, completed construction, and started operations no later than spring 2020.  Suggs Ex. 13, Vuppuluri (30(b)(6)) Dep. Tr. 31:11–32:9, 72:10–22.  Instead, Mesabi has been forced to divert significant resources just to alleviate the anticompetitive harm caused by Cliffs while struggling to find the necessary financing.  Suggs Ex. 13, Vuppuluri (30(b)(6)) Dep. Tr. 21:12–24:1; 73:9–74:5; 125:9–128:9; 153:10–14.  As a result, Mesabi was unable to retain the State Leases.  Suggs Ex. 13, Vuppuluri (30(b)(6)) Dep. Tr. 125:14–17.  But Mesabi has been negotiating with the State of Minnesota to regain the State Leases, and its current mine plans depend on access to that state land.  Sutherland Decl. ¶ 8.

On May 4, 2023, however, Cliffs suddenly announced that it had reached an agreement with the DNR concerning the State Leases and that it "look[ed] forward to the Minnesota Executive Council's review and approval of this lease package on May 25."  Suggs Ex. 19, *Cleveland-Cliffs Reaches Agreement for State of Minnesota Iron Ore Mineral Leases at Nashwauk*, Cleveland-Cliffs (May 4, 2023), https://www.clevelandcliffs.com/news/news-

10

Docket No. 715
Filed: 5/12/23
Filed Under Seal

releases/detail/589/cleveland-cliffs-reaches-agreement-for-state-of-minnesota.  Cliffs reached this

agreement out of sight of the public without any auction or bidding process; in fact, Cliffs stated

publicly that it would not participate in an auction.  Suggs Ex. 20, *Cliffs CEO: Minnesota mine*

*will close without mineral rights*, AP News (Nov. 18, 2022), https://apnews.com/article/business-

minnesota-minneapolis-hibbing-lourenco-goncalves-b3a9d6387a2f61c51be648cbccdffb31.

Cliffs is in a position to obtain the State Leases only as a result of its anticompetitive

acquisition of the GPIOP Property.  An applicant for the State Leases must own or lease iron ore

"adjacent to" the state-owned iron ore, Minn. Stat. Ann. § 93.1925, and Cliffs does not own or

lease any iron ore adjacent to the state ore other than the ore in the GPIOP Property.  Accordingly,

Cliffs' backroom deal to obtain the State Leases would never have been possible without its prior

anticompetitive acquisition of the GPIOP Property (even though Cliffs' ability to mine much of

the GPIOP Property is still disputed in the 560 Litigation, Suggs Ex. 10, Everett Dep. Tr. 255:14–

256:21).

Mesabi is challenging Cliffs' acquisition in this litigation and has requested an injunction

to "[a]void the [acquisition of the GPIOP Property] and direct the Defendants to unwind the

transactions related thereto and return to Plaintiff the property that is subject of the" acquisition.

*See* 2d Am. Compl., Prayer for Relief ¶ C.  Mesabi also has asked the Court to enjoin Cliffs "from

taking any further action to implement the" transaction.  *See* 2d Am. Compl., Prayer for Relief

¶ G.  Allowing Cliffs to execute the State Leases would condone an end run around the relief

Mesabi is seeking in this case and help Cliffs finally realize its plan to "sink" Mesabi.  Suggs Ex.

25, CLIFFS_000584190; *see also* Suggs Ex. 26, CLIFFS_000287255.

## VI.    Mesabi Will Suffer Severe Consequences If Cliffs Signs the State Leases

The State Leases are critical to Mesabi's ability to economically mine the property at its

11

Docket No. 715
Filed: 5/12/23
Filed Under Seal

Project site.  Sutherland Decl. ¶¶ 9–11.  Indeed, for its Project to be viable, Mesabi must be able to mine the land subject to the State Leases.[3]  *Id.*  If Cliffs obtains the State Leases, Mesabi likely would be forced to shut down its operations because it would not make business sense for Mesabi to continue operating and investing in a project that lacks access to sufficient iron ore to earn a return on the money invested.  Sutherland Decl. ¶ 11.

Ceasing operations would have dire consequences.  *Id.* at ¶ 12.  Mesabi would have to lay off highly skilled employees who have significant Project experience.  *Id.*  Many employees would be unavailable to Mesabi in the future if Mesabi were ever able to resume operations, because they would need to find other employment.  *Id.*  Mesabi likely would lose contractors and possibly breach its contracts, which could lead to litigation, and Mesabi may not be able to secure those contracts in the future.  *Id.* at ¶ 13.  Laying off employees and terminating contracts would also cause Mesabi to lose goodwill with employees, suppliers, and service providers who have worked with Mesabi. *Id.* at ¶ 14.  Ultimately, without the State Leases, Mesabi likely would be forced to file for bankruptcy protection.  *Id.* at ¶ 15.

## ARGUMENT

## I.    Legal Standard for Granting a Prohibitory Preliminary Injunction

"The office of a preliminary injunction is to preserve the status quo until, upon final hearing, the court may grant full relief."  *U.S. v. Price*, 688 F.2d 204, 212 (3d Cir. 1982) (internal citations omitted).  To obtain a preliminary injunction "a plaintiff must show: '(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4)

---

[3] Mesabi owns other mineral rights, but those mineral rights are too limited to justify the financial investment needed to complete the Project.  Sutherland Decl. ¶ 10.  Further, Mesabi would not be able to feasibly mine the land subject to those mineral rights without access to the state property.  *Id.* at ¶ 9.

AMERICAS 123332817

Docket No. 715
Filed: 5/12/23
Filed Under Seal

that the public interest favors such relief.'" *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 249–50 (3d Cir. 2011) (quoting *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004)).

"A sufficiently strong showing on either the likelihood of success or irreparable harm may justify an injunction, though a petitioner's showing on the other factors may be lacking." *Neo Gen Screening, Inc. v. TeleChem Int'l, Inc.*, 69 F. App'x 550, 554 (3d Cir. 2003). Thus, "the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while supporting some preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 178 (3d Cir. 2017) (quoting *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F. 3d 721, 725 (7th Cir. 2009)). In addition, while the moving party bears the burden of showing irreparable harm and a likelihood of success on the merits, the moving party need not show the harm (or lack thereof) that the non-moving party might suffer if the injunction issues:

> As a matter of logic, the moving party cannot have the burden to introduce evidence showing the harm that will be suffered by the opposing party if the injunction is issued. . . . [I]f the non-moving party feels it will suffer greater harm or irreparable harm from the injunction, it has the burden to so demonstrate.

*Neo Gen Screening*, 69 F. App'x at 554; *see also Reilly*, 858 F.3d at 177 (disavowing cases requiring moving party to show all four elements).

Further, "the moving party's burden of proof varies depending on which type of preliminary injunction is sought, prohibitory or mandatory." *C.G. v. Saucon Valley Sch. Dist.*, 571 F. Supp. 3d 430, 439 (E.D. Pa. 2021). A prohibitory injunction seeks to maintain "the status quo until a decision on the merits of the case is rendered." *Id.* at 483 (quoting *Acierno v. New Castle Cty.*, 40 F.3d 645, 647 (3d Cir. 1994)).[4] For that reason, a party seeking a prohibitory injunction

---

[4] A mandatory injunction, on the other hand, commands some positive action, or provides the moving party with substantially all the relief sought, which relief cannot be undone. *Saucon Valley*, 571 F. Supp. 3d at 438–39.

AMERICAS 123332817

need only show that his or her likelihood of success on the merits is "significantly better than negligible but not necessarily more likely than not." *Reilly*, 858 F.3d at 179; *see also McNeil Nutritionals, LLC v. Heartland Sweeteners LLC*, 566 F. Supp. 2d 378, 387 n.2 (E.D. Pa. 2008) ("This requested relief is clearly prohibitory, not mandatory, and McNeil, therefore, need not demonstrate a heightened burden of proof to warrant its requested injunctive relief.").

## II.     Mesabi Is Likely to Succeed on the Merits of Its Antitrust Claims

Discovery in this litigation is ongoing, with expert discovery scheduled to conclude in August.  After discovery ends, the parties will more fully brief the merits of the case in their summary judgment motions—a process that will afford both the Court and the parties more time to consider and make use of the substantial evidentiary record than is available in this expedited motion practice.  Even a brief review of the existing record, however, makes clear that Mesabi is likely to prevail at trial on its claims, and by all means, Mesabi's odds of success are "significantly better than negligible." *Reilly*, 858 F. 3d at 179.

For present purposes, Mesabi focuses on its claims under the Sherman Act, 15 U.S.C. §§ 1, 2.  Section 1 prohibits agreements that unreasonably restrain trade, while Section 2 outlaws monopolization as well as attempted monopolization.  *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 190 (2010).  Cliffs has engaged in a pattern of anticompetitive conduct that violates both statutes, preventing Mesabi from completing its Project and thereby depriving consumers of the benefit of competition from a new, low-cost source of blast furnace pellets.

Cliffs' anticompetitive conduct includes at least the following: (1) its long-term, exclusive contracts with purchasers of blast furnace pellets, which foreclosed Mesabi from the market; (2) its agreements forbidding vital engineering and construction companies (and others) from working on Mesabi's Project; and (3) its acquisition of the GPIOP Property, which mooted Mesabi's mine

AMERICAS 123332817

Docket No. 715
Filed: 5/12/23
Filed Under Seal

plan, delayed the Project, significantly increased Mesabi's costs, and spooked potential investors.

The evidence set forth below is more than sufficient to make "a prima facie case," *Highmark, Inc. v. Upmc Health Plan*, 276 F.3d 160, 173 (3d Cir. 2001), that these actions, individually and collectively, violate both Section 1 and Section 2 of the Sherman Act.  Mesabi's expert economist has determined that Cliffs' conduct caused Mesabi damages of nearly $2 billion.

### A.    Mesabi Is Likely to Succeed on Its Monopolization Claim

Section 2 of the Sherman Act prohibits a company with monopoly power from willfully acquiring or maintaining that power.  *LePage's, Inc. v. 3M*, 324 F.3d 141, 146 (3d Cir. 2003).  Thus, the first step in establishing a Section 2 violation is proving monopoly power.  *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007) (citations omitted).  If a company is shown to have monopoly power, the Sherman Act prohibits it from maintaining that power through "exclusionary" or "anticompetitive" conduct.  *LePage's*, 324 F.3d at 146–47, 152.

### 1.    Cliffs Has Monopoly Power in a Relevant Market

The record—including both direct and indirect evidence—will show Cliffs' monopoly power in a relevant market, namely the market for blast furnace pellets in the Great Lakes region. Suggs Ex. 3, Expert Report of Douglas Zona ("Zona Rep.") § IV.  The relevant product market is the market for blast furnace pellets.  *See id.* at § III.B; Suggs Ex. 36, CLIFFS_000197377; Suggs Ex. 27, CLIFFS_000025288.  The Great Lakes region is a separate geographic market because it is protected from outside competition by high transportation costs.  *See* Suggs Ex. 3, Zona Rep. § III.C; Suggs Ex. 28, CLIFFS_000630190; Suggs Ex. 29, CLIFFS_000179490 at p. 5.

██████████████████████████████████████████████████████████████ *See*

Suggs Ex. 37, CLIFFS_000315934 at -38 ███████████████████████

███████████████████████████████████████  Suggs Ex. 38, CLIFFS_000629184

AMERICAS 123332817

Docket No. 715
Filed: 5/12/23
Filed Under Seal

████████████████████████████████████████████████████████

██████████████████████████ Suggs Ex. 39, CLIFFS_000538182 at -88 (████████████████

██████████████████████ Suggs Ex. 40, CLIFFS_000046391 at -93 ("How is this business

able to achieve EBITDA margins of nearly 40% in the metals and mining industry in the United

States, where EBITDA margins of 9.5%, 10% are considered to be very good, and 15% are

considered great? Number one, cost to enter. Cliffs is the only real merchant supplier within the

Great Lakes market. . . .   Number three, barriers to entry."); Suggs Ex. 27, CLIFFS_000025288

("we are the sole supplier of blast furnace pellets to this industry").

Cliffs' dominance allows it to raise prices and restrict output.  *See* Suggs Ex. 41,

CLIFFS_000634212 ██████████████████████████████████████████████████

████████ Suggs Ex. 24, CLIFFS_000539715 ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ These are classic economic indicators

of monopoly power.  *See Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007)

("The existence of monopoly power may be proven through direct evidence of supracompetitive

prices and restricted output.")

## 2.    Cliffs Excluded Mesabi from the Market with Its Exclusive Customer Contracts

"'Anticompetitive conduct' can come in too many different forms, and is too dependent

upon context, for any court or commentator ever to have enumerated all the varieties." *LePage's*,

324 F.3d at 152 (quoting *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080,

1087 (D.C. Cir. 1998)).  However, a "good illustration" of conduct that violates Section 2 includes

"enter[ing] into exclusive agreements with retailers in an effort to exclude rivals' products."

*LePage's*, 324 F.3d at 153–154 (citing *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 783

16

(6th Cir. 2002)).  "Exclusive dealing arrangements are of special concern when imposed by a monopolist."  *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271 (3d Cir. 2012) (citation omitted).  Indeed, in both *LePage's* and *ZF Meritor*, the Third Circuit upheld jury verdicts that the defendants had violated Section 2, including by "entering into exclusive dealing contracts with large customers."  *LePage's*, 324 F.3d at 157; *ZF Meritor*, 696 F.3d at 267.

Cliffs did exactly that in this case.  Most notably, in 2016 Cliffs signed a <u>ten-year</u> exclusive contract to supply blast furnace pellets to ArcelorMittal USA ("AMUSA"), one of only a small number of buyers of such pellets in the Great Lakes region and the largest by far.  Cliffs thus locked up AMUSA for a decade, █████████████████████████████████ *See* Suggs Ex. 42, CLIFFS_000536945 █████████████████████████████ ████████████████████████████████████ Suggs Ex. 25, CLIFFS_000584190 ███████████████████████████████████████████████████████ Cliffs also had eight- and ten-year contracts with AK Steel, one of the few other purchasers of blast furnace pellets in the Great Lakes.  *See, e.g.*, Suggs Ex. 21, Cliffs Form 10-K Annual Report for the fiscal year ended Dec. 31, 2014, at 10 (describing contracts).

Cliffs' CEO bragged about the impact that Cliffs' exclusive contracts would have on Mesabi's ability to start operations.  Suggs Ex. 27, CLIFFS_000025288 ("Nobody can, out[side] of Cleveland-Cliffs, sell to ArcelorMittal. . . . So it's not something, oh, I'm going to start my pellet plant and then I will try to compete.  Nah, that's not going to happen."); Suggs Ex. 5, Goncalves Dep. Tr. 31:4–13 ████████████████████████████████ ██████████████████████████████████

Mesabi thus will be able to show Cliffs' contracts substantially foreclosed Mesabi from the market in violation of the Sherman Act.  *See, e.g.*, *LePage's*, 324 F.3d at 154; *ZF Meritor*, 696

AMERICAS 123332817

F.3d at 286 (condemning agreements with five- and seven-year exclusivity terms).

**3.      Cliffs Excluded Mesabi from the Market with Its Exclusive Service Provider Contracts**

Cliffs also entered exclusive agreements with suppliers that were crucial to Mesabi's Project. The most notable of these is Barr Engineering, one of the most, if not the most, important contractors on Mesabi's Project. As of 2017, Barr had provided engineering services to the Project for approximately two decades and was deeply involved in essential Project work, such as developing the process for converting iron ore into blast furnace pellets. Suggs Ex. 13, Vuppuluri (30(b)(6)) Dep. Tr. 16:5–12; Suggs Ex. 11, Fennessey (Mesabi 30(b)(6)) Dep. Tr. 185:3–11. Barr also played a major role in permitting for the Project, and being located nearby gave it a sizable advantage over other contractors because it had essential knowledge of the local regulatory environment and geography (*e.g.*, dealing with protected areas such as the Boundary Waters). Suggs Ex. 11, Fennessey (Mesabi 30(b)(6)) Dep. Tr. 185:18–186:2; Suggs Ex. 13, Vuppuluri (30(b)(6)) Dep. Tr. 34:4–13.

For years, Barr had worked for both Mesabi and Cliffs. Suggs Ex. 43, CLIFFS_000351898 (showing Barr working on a Cliffs project in 2014); Suggs Ex. 13, Vuppuluri (30(b)(6)) Dep. Tr. 32:12–20 ("Barr . . . has been associated with this particular asset at Nashwauk for over 20 years, until . . . 2017."). In August 2017, however, Cliffs suddenly told Barr that if Barr continued working for Mesabi, it could no longer work for Cliffs. Suggs Ex. 8, Clarke Dep. Tr. 184:20–185:11 ("We asked [Barr] to come back and be the engineering firm to complete the entire project. . . . He didn't know how to say this to me, but he had been threatened in no uncertain terms by representatives of Cleveland-Cliffs that if he didn't stop work on the project, he would never receive work again anywhere. And he told me, 'Tom, I've got whatever, 30, 40 engineers. This would be the end of our company.'"). Barr acceded to Cliffs' demands to stop

18

working for Mesabi, Suggs Ex. 59 (Letter to Robb Bigelow from Barr's Joseph Vespa), leaving Mesabi without a key service provider at a critical period—just as Mesabi was trying to obtain project financing and emerge from bankruptcy.

Around the same time, Cliffs reached similar agreements with other companies that had been working for both Mesabi and Cliffs to that point.  Suggs Ex. 13, Vuppuluri (30(b)(6)) Dep. Tr. 15:11–17:5 (Environmental Law Group and Jamar "specifically at the direction and threats of Cliffs . . . withdrew from Mesabi Metallics."); Suggs Ex. 44, CLIFFS_000031556, at -57 ("I ensured JAMAR lived up to the promise I made to [a Cliffs employee] to support Cliffs 100%. We have done all [that] Cliffs has asked of us . . . . We have not signed any document of public support for [Mesabi] . . . .").  There was no reasonable business justification for Cliffs to insist that these service providers stop assisting Mesabi.  Suggs Ex. 2, Emmott Rep. ¶¶ 161–163, 167.

Like its exclusive agreements with customers, Cliffs' exclusive agreements with service providers were also anticompetitive, depriving Mesabi of crucial contractors, and thus impeding Mesabi's ability to complete the Project and enter the blast furnace pellet market.  Cliffs' actions were intended to and did maintain Cliffs' monopoly by raising Mesabi's costs, in violation of the Sherman Act.  *See, e.g.*, *Multistate Legal Stud. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns*, 63 F.3d 1540, 1550 (10th Cir. 1995) (inquiry is whether defendants' actions "impair[ed] opportunities of rivals"); *McWane, Inc. v. FTC*, 783 F.3d 814, 832 (11th Cir. 2015) ("an exclusive dealing arrangement can be harmful when it allows a monopolist to maintain its monopoly power by raising its rivals' costs sufficiently to prevent them from growing into effective competitors"); *In re Keurig Green Mt. Singleserve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 239 (S.D.N.Y. 2019) (exclusionary conduct "violates the law when it has the effect of raising rivals' costs by foreclosing efficient means of distribution to actual or potential competitors").

AMERICAS 123332817

Docket No. 715
Filed: 5/12/23
Filed Under Seal

**4.      Cliffs Excluded Mesabi from the Market with Its Acquisition of the GPIOP Property**

Perhaps the most egregious example of Cliffs' monopolistic conduct is its December 2017 acquisition of the GPIOP Property, a deal intended to scuttle the Project. ████████████ ███████████████████████████████████████████████████████████████ Suggs Ex. 34, CLIFFS_000028345 ██████████████████████████████████████ ██████████████████████████████████ *see also* Suggs Ex. 35, CLIFFS_000580724, at -725 ████████████████████████████████████████████████████████████████████ ██████████████████ Suggs Ex. 2, Emmott Rep. ¶¶ 96–104.

Yet Cliffs proceeded with the acquisition anyway because its value to Cliffs was preventing Mesabi from entering the market.  Before acquiring the GPIOP Property, ████████████ ████████████████████████████████████████████████████████████████████ ██████████████████ Suggs Ex. 45, CLIFFS_000690190 at -92.  In fact, the acquisition was the culmination of a long effort by Cliffs to use land acquisitions to block the Project. *See* Suggs Ex. 23, CLIFFS_000539963 at p. 9 ("████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████ Suggs Ex. 46, CLIFFS_000292377 ████████████████████████████████████████████████████████████████████ ████████████████████████████████

As Cliffs anticipated, its acquisition was ruinous for Mesabi, dramatically reducing the value of the Project by reducing the iron ore available and rendering Mesabi's mine plan useless. Suggs Ex. 13, Vuppuluri (30(b)(6)) Dep. Tr. 20:7–10.

Goncalves himself stated that the 2017 acquisition effectively killed the Project, leaving

Mesabi unable to "mine that site without a deal with Cleveland-Cliffs." Suggs Ex. 14, State of Minnesota Meeting of the Executive Council Tr., at 20; *see also* Suggs Ex. 5, Goncalves Dep. Tr. 239:3–241:8 ████████████████████████████████████

In sum, by acquiring the GPIOP Property, Cliffs intended to and did exclude Mesabi from the market in violation of the Sherman Act. *See, e.g.*, *In re Mushroom Direct Purchaser Antitrust Litig.*, 2016 U.S. Dist. LEXIS 177839, at *47–48 (E.D. Pa. Dec. 13, 2016) (rejecting argument that defendant's acquisition of mushroom-growing properties "to reduce the amount of land available for mushroom production" did not violate the antitrust laws).

### 5. Cliffs' Exclusionary "Monopoly Broth"

While each of Cliffs' actions individually establishes a Section 2 violation, those actions are properly viewed collectively. As the Supreme Court has held, "In [monopolization] cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); *see also Swift & Co. v. United States*, 196 U.S. 375, 396 (1905) ("[W]hatever we may think of [the 'constituent elements' of the scheme] separately when we take them up as distinct charges, they are alleged sufficiently as elements of the scheme. . . . [T]hey are bound together as the parts of a single plan. The plan may make the parts unlawful."). "The relevant inquiry is the anticompetitive effect of [defendant's] exclusionary practices considered together." *LePage's*, 324 F.3d at 162. Put another way, "[i]t is the mix of the various ingredients . . . in a monopoly broth that produces the unsavory flavor." *City of Mishawaka v. Am. Elec. Power Co.*, 616 F.2d 976, 986 (7th Cir. 1980), *cert. denied*, 449 U.S. 1096 (1981); *see also City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376, 1378 (9th Cir. 1992) (courts should not "focus on specific individual acts of an accused monopolist while

AMERICAS 123332817

Docket No. 715
Filed: 5/12/23
Filed Under Seal

refusing to consider their overall combined effect").

In addition to Cliffs' actions discussed above—depriving Mesabi of customers, stealing its long-time contractors, and snatching up property within Mesabi's Project boundary—Cliffs took other steps to hinder Mesabi. For instance, Cliffs repeatedly disparaged Mesabi's Project to investors, calling it a "piece of s***," accusing Mesabi and its affiliates of being "a criminal enterprise," and asking, "[w]ho else would give money to a loser like [Mesabi's parent]?" Suggs Ex. 58, MESABI00692536, at -36; Suggs Ex. 47, CLIFFS_000022566, at -74; Suggs Ex. 48, CLIFFS_000049104, at -08; Suggs Ex. 5, Goncalves Dep. Tr. 41:10–42:1.

These actions cast a black cloud over the Project and devastated Mesabi's ability to obtain project financing, with potential lenders repeatedly questioning the Project's viability without the GPIOP Property. Suggs Ex. 13, Vuppuluri (30(b)(6)) Dep. Tr. 76:6–80:4. The lack of financing prevented Mesabi from proceeding with the planned construction of the Project, eventually leading to Mesabi losing the mineral rights it had leased from the state. Suggs Ex. 13, Vuppuluri (30(b)(6)) Dep. Tr. 84:6–87:16, 125:9–129:19. All of this prevented Mesabi from entering the market. Cliffs would only compound these anticompetitive effects if it is able to obtain the State Leases.

### B.      Mesabi Is Likely to Succeed on Its Attempted Monopolization Claim

Mesabi also will be able to establish that Cliffs violated Section 2's prohibition on attempted monopolization. "The elements of attempted monopolization are (1) that the defendant has a specific intent to monopolize, and (2) that the defendant has engaged in anticompetitive conduct that, taken as a whole, creates (3) a dangerous probability of achieving monopoly power." *W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 108 (3d Cir. 2010).

Mesabi will have no difficulty showing that Cliffs created a dangerous probability of monopolizing the market, because Cliffs in fact monopolized the market, as discussed above.

AMERICAS 123332817

Regarding intent, Cliffs' documents are littered with proof that it wanted to eliminate competition from Mesabi and maintain its monopoly, and that it was actively working to do so:

-  Suggs Ex. 22, CLIFFS_000175413, at p. 11.

- Suggs Ex. 49, CLIFFS_000113105.

- Suggs Ex. 25, CLIFFS_000584190.

- Suggs Ex. 50, CLIFFS_000197335 at -37.

- Suggs Ex. 51, CLIFFS_000280598.

- Goncalves threatened to "screw" short sellers just like Cliffs had "been doing in Nashwauk [the location of Mesabi's Project] for a while." Suggs Ex. 52, CLIFFS_000471805 at -09.

Cliffs also targeted competition from another nascent competitor, Magnetation. *See* Suggs Ex. 53, CLIFFS_000197475  Suggs Ex. 54, CLIFFS_000309896

Such statements are clear evidence of an intent to monopolize. *See Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 101 (2d Cir. 1998) ("To begin with, defendants' intent can be derived from their words. Defendants' officials frequently affirmed their stated goal of preventing Tops from entering the Jamestown market."). Cliffs' acquisition of the GPIOP Property is a particularly strong example of its intent. *See id.* at 93 ("The Quality defendants purchased for above-market value two non-contiguous land parcels with no street frontage, which are, by themselves, essentially undevelopable. A jury could find this conduct was not motivated by a

23

valid business justification.").

**C.     Mesabi Is Likely to Succeed on Its Unreasonable Restraint Claim**

Section 1 of the Sherman Act prohibits agreements that unreasonably restrain trade.  *See Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007).  Courts typically assess whether an agreement unreasonably restrains trade by examining whether the agreement harms or benefits competition, most commonly using what is known as the "rule of reason" analysis.  *Id.* at 885–86.  Applying the rule of reason involves "weigh[ing] all of the circumstances of a case."  *Id.* at 885.  Relevant factors include a company's market power and "the restraint's history, nature, and effect."  *Id.* at 885–86 (citations omitted).

Under this standard, Mesabi is likely to prove that at least three categories of Cliffs' agreements unreasonably restrain trade:  its long-term exclusive contracts with major purchasers of blast furnace pellets; its exclusive agreements with service providers that they would no longer work with Mesabi; and its agreements relating to the GPIOP Property.

As discussed above, the effect of its agreements has been to block Mesabi's ability to introduce new production of blast furnace pellets to the market.  Blocking a new entrant clearly harms competition.  *LePage's*, 324 F.3d at 159 ("When a monopolist's actions are designed to prevent one or more new or potential competitors from gaining a foothold in the market by exclusionary, i.e. predatory, conduct, its success in that goal is not only injurious to the potential competitor but also to competition in general.").  That competitive harm outweighs any possible competitive benefit from Cliffs' agreements.

For instance, Cliffs acquired the GPIOP Property in December 2017 and has done virtually nothing to develop that property since.  The acquisition thus has produced no benefit to competition.  Even if Cliffs planned to mine the GPIOP Property at some point, it would have been

24

as a monopolist, having succeeded in foreclosing new competition from Mesabi.   Thus, customers would not enjoy the benefits of lower-priced, competitive products.  Suggs Ex. 3, Zona Rep. ¶¶ 93–97.

Cliffs' agreements with Barr Engineering and other suppliers also have no reasonably positive effect on competition.  The providers had worked for both Mesabi and Cliffs for years with no problems. *See* Suggs Ex. 2, Emmott Rep. ¶¶ 161–163; Suggs Ex. 4, Fedor Dep. Tr. 52:3–6 ███████████████████████████████████████████████████████

██████████████████ Suggs Ex. 4, Fedor Dep. Tr. 53:7–13 (███████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████ Cliffs did not benefit competition by suddenly demanding that the vendors work exclusively for Cliffs.

Finally, pellet supply contracts with much shorter terms are commonplace in the Great Lakes.  Suggs Ex. 2, Emmott Rep. at ¶ 173 ("[T]here have been numerous examples of pellet supply contracts in the Great Lakes that are well under ten years in length.").  Far from wanting to be locked into ten-year or similar long-term contracts with Cliffs, Cliffs' customers wanted an alternative supplier of blast furnace pellets.  *Id.*  And it is axiomatic that customers would want lower prices and additional supply.  This alone shows that any benefit from the contracts was outweighed by the competitive harms.  *ZF Meritor*, 696 F.3d at 277 (denying defendant's motion for judgment as a matter of law, in part, because direct purchasers were "dissatisfied" with and held "hostage" by long-term agreements with defendant monopolist).

**D.    <u>Mesabi Is Likely to Succeed in Demonstrating It Suffered Antitrust Injury</u>**

Mesabi also will establish that it suffered the "antitrust injury" needed to prevail on its Sherman Act claims.  Antitrust injury is a "harm of the type the antitrust laws were intended to

25

prevent" that "flows from that which makes defendants' acts unlawful." *ZF Meritor*, 696 F.3d at 281.    Antitrust injury includes being blocked from the market by a monopolist's exclusionary conduct, because such conduct is "not only injurious to the potential competitor but also to competition in general." *LePages's*, 324 F.3d at 159; *see also United States v. Dentsply Int'l Inc.*, 399 F.3d 181, 191 (3d Cir. 2005) ("Consumer injury results from the delay that the dominant firm imposes on the smaller rival's growth."); *GN Netcom, Inc. v. Platronics, Inc.*, 967 F. Supp. 2d 1082, 1086 (D. Del. 2013) ("[E]xclusive dealing arrangements can result in an antitrust injury 'by allowing one supplier of goods or services unreasonably deprive other suppliers of a market for their goods.'" (quoting *ZF Meritor*, 696 F.3d at 270)).

Mesabi suffered antitrust injury here because, among other things, Cliffs' exclusionary conduct prevented Mesabi from entering the market for blast furnace pellets in the Great Lakes region.    Indeed, as demonstrated by Mesabi's expert Doug Zona, Cliffs' foreclosure of Mesabi from the market resulted in substantial anticompetitive effects, keeping at least 7 million tons of blast furnace pellets out of the market each year, production that would have lowered prices.  Suggs Ex. 3, Zona Rep. ¶¶ 92, 97.

As discussed above, Mesabi will show that Cliffs caused Mesabi's injuries and the anticompetitive effects (although Mesabi need not show that Cliffs was the sole cause of its injuries, only a "material cause," *Van Dyk Research Corp. v. Xerox Corp.*, 631 F.2d 251, 254–55 (3d Cir. 1980)).   For instance, Cliffs' actions—including locking up customers, causing key vendors to leave the Project, and its purchase of the GPIOP Property—prevented Mesabi from obtaining the financing it needed to build the Project.  Suggs Ex. 13, Vuppuluri 30(b)(6) Dep. 32:10–34:15, 72:10–74:5, 79:6–80:4; *see also* Suggs Ex. 2, Emmott Rep. ¶¶ 176–188.

26

### E.     <u>Mesabi Is Likely to Demonstrate It Is Entitled to Injunctive Relief</u>

Having shown antitrust injury, Mesabi will also be able to establish it is entitled to injunctive relief. Section 16 of the Clayton Act authorizes injunctive relief for violations of the antitrust laws where a private plaintiff shows at least the "threat" of antitrust injury. *See Broadcom Corp.*, 501 F.3d at 321. There are "no restrictions or exceptions to the forms of injunctive relief a private plaintiff may seek or that a court may order." *California v. Am. Stores Co.*, 495 U.S. 271, 281 (1990).

Here, Mesabi's request for injunctive relief includes unwinding Cliffs' acquisition of the GPIOP Property and any related transactions, including transactions related to the State Leases. *See, e.g.*, 2d Am. Compl., Prayer for Relief ¶¶ C, G. Such a remedy would be appropriate and would position Mesabi to regain the State Leases.

For all of the reasons above, Mesabi is likely to prevail on its claims that Cliffs violated Sections 1 and 2 of the Sherman Act by entering into long-term exclusive supply contracts, causing suppliers to stop working for Mesabi, and acquiring the GPIOP Property, among other things, entitling Mesabi to relief, including injunctive relief.

### III.     <u>Mesabi Will Suffer Irreparable Harm If Cliffs Signs the State Leases</u>

To make a showing of irreparable harm, the moving party "must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *EUSA Pharma (US), Inc. v. Innocoll Pharms. Ltd.*, 594 F. Supp. 2d 570, 582 (E.D. Pa. 2009).

As discussed above, for its Project to be viable, Mesabi must be able to access and mine the land subject to the State Leases. Sutherland Decl. ¶¶ 9–10. If Cliffs enters into those State Leases, Mesabi likely would be forced to stop operating rather than continuing to invest in a Project that lacks access to sufficient iron ore resources to earn a return on the money invested. *Id.* at ¶

27

11.

Ceasing operations would have dire consequences. *Id.* at ¶ 12. Mesabi would have to lay off employees who have significant experience with the Project and highly specialized skills, and many of them would be unavailable to Mesabi in the future. *Id.* at ¶ 12. Additionally, Mesabi would lose contracts with suppliers and service providers, possibly resulting in litigation, and Mesabi might not be able to secure those contracts again in the future. *Id.* at ¶ 13. Such events would cause Mesabi to lose goodwill with employees, suppliers, and service providers that have worked on the Project. *Id.* at ¶ 14. These types of injuries are irreparable. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of Am. Inc.*, 549 F.3d 1079, 1090 (7th Cir. 2008) (holding "potential loss of property, employees, or its entire business, as well as damage to its goodwill" are "real and irreparable" harms).

Moreover, given the above consequences, losing the State Leases likely would force Mesabi to file for bankruptcy protection. Sutherland Decl. ¶ 15. As the Supreme Court has stated, "[c]ertainly [bankruptcy] sufficiently meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975); *see also Minard Run*, 670 F.3d at 255 (approving the trial court's finding of irreparable harm because the "drilling moratorium had dramatically affected [movants'] business and would probably cause them to shut down or go bankrupt if it continued").

Actions affecting real property interests are particularly likely to cause irreparable harm because real property is unique. In *Minard*, the Third Circuit affirmed a preliminary injunction to prevent actions that would reduce the value of certain mineral rights. *See Minard Run*, 670 F.3d at 256. The court held that the unique nature of property rights makes preliminary injunctive relief "particularly appropriate." *Minard Run*, 670 F.3d at 256 (quoting *RoDa Drilling Co. v. Siegal*,

AMERICAS 123332817

Docket No. 715
Filed: 5/12/23
Filed Under Seal

552 F.3d 1203, 1210 (10th Cir. 2009)).  The same rationale applies here.  Absent a preliminary injunction that prevents Cliffs from entering into the State Leases, Cliffs will be able to stifle competition by causing Mesabi to halt operations, lose its employees, lose its contractors, and likely file for bankruptcy.  Thus, Cliffs will be able to achieve its anticompetitive ends, even if it loses its lawsuit against Mesabi.  Such harm to Mesabi—and to competition—is irreparable.  *See Doran*, 422 U.S. at 932.

## IV.    The Balance of Equities Weighs in Mesabi's Favor

In deciding whether to grant a preliminary injunction, a district court must balance the relative harm to the parties, *i.e.*, the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued.  *Novartis Consumer Health, Inc. v Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir 2002).  "[T]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor." *Id.* at 597.  "[T]he moving party has the burden to show the harm it will suffer if no injunction issues, and if the non-moving party feels it will suffer greater harm or irreparable harm from the injunction, it has the burden to so demonstrate."  *Neo Gen Screening*, 69 F. App'x at 554.

Mesabi stands to suffer significant (and irreparable) harm if Cliffs obtains the State Leases. *See supra* at 27–28.  Indeed, Mesabi has invested substantially in the Project, all of which investment could be lost upon Cliffs' acquisition of the State Leases.  *See supra* at 4–5, 11–12; Sutherland Decl. ¶¶ 11, 15.  Such harms support granting Mesabi's requested injunction.  *See Wheelabrator Frackville Energy Co. v Morea Culm Servs., Inc.*, 1990 US Dist LEXIS 7192, at *81 (E.D. Pa. June 8, 1990) (granting preliminary injunction and finding balance of equities favored plaintiff who made "substantial capital investment" and would "continue to suffer further financial damages" if court denied relief).

29

Further, the public interest weighs in favor of preventing Cliffs from disrupting the status quo.  If Cliffs is able to sign the State Leases, it will be side-stepping the judicial process and benefitting from its anticompetitive conduct.  Also, if a jury later determines that Cliffs must forfeit the State Leases but Mesabi no longer exists to assume them, the people of Minnesota may be deprived of the benefits of the resources in the state-owned land.  *Minard*, 670 F.3d at 257 (recognizing that "granting the injunction would vindicate the public's interests in aiding the local economy").  Granting the requested preliminary injunction avoids that risk—something decidedly in the public interest.  *See also Novartis*, 290 F.3d at 597 ("[W]here the plaintiff has demonstrated a likelihood of success on the merits, the public interest leans even more toward granting the injunction.").

While Mesabi does not bear the burden to show whether and to what extent Cliffs will suffer harm if the injunction were granted, there is no reason to believe Cliffs will suffer any harm if this Court prevents it from entering the State Leases during the waning time left in this case. Cliffs acquired the GPIOP Property more than five years ago, and it has demonstrated no urgency to develop it, letting that property sit idle ever since.  Suggs Ex. 5, Goncalves Dep. 171:18–173:8.

## CONCLUSION

For all the foregoing reasons, Mesabi's motion for a preliminary injunction should be granted in full, consistent with Mesabi's Proposed Order.

AMERICAS 123332817

Dated: May 12, 2023

Respectfully submitted,
**BAYARD, P.A.**

*/s/Daniel N. Brogan*
Evan T. Miller (No. 5364)
Daniel N. Brogan (No. 5723)
600 N. King Street, Suite 400
Wilmington, Delaware  19801
Telephone:  (302) 655-5000
Facsimile:  (302) 658-6395
emiller@bayardlaw.com
dbrogan@bayardlaw.com

**WHITE & CASE LLP**

David H. Suggs (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Facsimile:  (212) 354-8113
dsuggs@whitecase.com

C. Kelly Newman (admitted *pro hac vice*)
75 State Street
Boston, MA 02109
Telephone: (617) 979-9300
Facsimile: (617) 979-9301
kelly.newman@whitecase.com

*Attorneys for Plaintiff Mesabi Metallics Company LLC*

31

AMERICAS 123332817

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>ESSAR STEEL MINNESOTA LLC and ESML HOLDINGS INC.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 16-11626 (CTG)<br><br>(Jointly Administered) |
| MESABI METALLICS COMPANY LLC (F/K/A ESSAR STEEL MINNESOTA LLC),<br><br>Plaintiff<br><br>v.<br><br>CLEVELAND-CLIFFS, INC. (F/K/A CLIFFS NATURAL RESOURCES, INC.); CLEVELAND-CLIFFS MINNESOTA LAND DEVELOPMENT LLC; GLACIER PARK IRON ORE PROPERTIES LLC; and DOES 1-10<br><br>Defendants. | Adv. Proc. No. 17-51210 (CTG) |
| GLACIER PARK IRON ORE PROPERTIES LLC,<br><br>Counterclaim-Plaintiff<br><br>v.<br><br>MESABI METALLICS COMPANY LLC (F/K/A ESSAR STEEL MINNESOTA LLC),<br><br>Counterclaim-Defendant. | |

---

[1] Essar Steel Minnesota LLC has changed its name to Mesabi Metallics Company LLC.  The last four digits of its federal taxpayer identification number are 8770.

**[PROPOSED] ORDER GRANTING PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION TO
ENJOIN DEFENDANTS FROM EXECUTING STATE LEASES**

The Court, having considered the parties' submissions on Plaintiff Mesabi Metallics Company LLC's ("Mesabi") Motion for Preliminary Injunction to Enjoin Defendants from Executing State Leases ("Motion"), and having found sufficient grounds favoring the issuance of a preliminary injunction, it is **HEREBY ORDERED THAT:**

1.  Mesabi's Motion is **GRANTED**, as set forth therein;

2.  Cleveland-Cliffs, Inc., Cleveland-Cliffs Minnesota Land Development LLC, and their officers, partners, agents, servants, employees, parents, subsidiaries, divisions, affiliate corporations, other related business entities and all persons acting in concert, participation, or in privity with them, and their successors and assigns (collectively, "Cliffs") are enjoined from signing, executing, or otherwise entering into leases with the State of Minnesota for mineral or property rights within or adjacent to the boundary of the site where Mesabi is building an iron ore mine and pelletizing plant near Nashwauk, Minnesota ("Project Site"), including the mineral and property rights described in Appendix A ("State Leases"), pending the outcome of this adversary proceeding;

3.  Unless otherwise ordered by the Court or agreed by Cliffs and Mesabi, Cliffs shall take all steps necessary to maintain the status quo with respect to its ownership or possession of property rights within or adjacent to the Project Site;

4.  This Order shall remain in force and effect until the resolution of this adversary proceeding, unless before that time the Court, for good cause, alters the parameters of this Order.

Docket No. 715-1
Date Filed: 5/12/23
Filed Under Seal

Dated: _____
Wilmington, Delaware



_____
UNITED STATES BANKRUPTCY JUDGE

Docket No. 715-1
Date Filed: 5/12/23
Filed Under Seal

## Appendix A

## Legal Description of the State Leases

1.      The minerals and mineral rights in East Half of Southwest Quarter (E1/2-SW1/4) and Lot Seven (7), all in Section Six (6), Township Fifty-six (56) North, Range Twenty-two (22) West of the Fourth Principal Meridian.

2.      The minerals and mineral rights in Lot One (1), Section Seven (7), Township Fifty-six (56) North, Range Twenty-two (22) West of the Fourth Principal Meridian.

3.      Southeast Quarter of Northwest Quarter (SE1/4-NW1/4), North Half of Southwest Quarter (N1/2-SW1/4), Southwest Quarter of Southwest Quarter (SW1/4-SW1/4), all in Section One (1), Township Fifty-six (56) North, Range Twenty-three (23) West of the Fourth Principal Meridian.

4.      East Half of Southeast Quarter (E1/2-SE1/4), Section One (1), Township Fifty-six (56) North, Range Twenty-three (23)West of the Fourth Principal Meridian.

5.      Lot Two (2), Section Two (2), Township Fifty-six (56) North, Range Twenty-three (23) West of the Fourth Principal Meridian.

6.      Southwest Quarter of Southwest Quarter (SW1/4-SW1/4), Section Two (2), Township Fifty-six (56) North, Range Twenty-three (23)West of the Fourth Principal Meridian.

7.      The minerals and mineral rights in Southwest Quarter of Southeast Quarter (SW1/4-SE1/4), Section Three (3), Township Fifty-six (56) North, Range Twenty-three (23) West of the Fourth Principal Meridian.

8.      Southwest Quarter (SW1/4), South Half of Southeast Quarter (S1/2-SE1/4), all in Section Nine (9), Township Fifty-six (56) North, Range Twenty-three (23) West of the Fourth Principal Meridian.

9.      Northeast Quarter of Northeast Quarter (NE1/4-NE1/4); and the minerals and mineral rights in Northwest Quarter of Northeast Quarter (NW1/4-NE1/4); all in Section Ten (10), Township Fifty-six (56) North, Range Twenty-three (23) West of the Fourth Principal Meridian.

10.     Southwest Quarter of Northwest Quarter (SW1/4-NW1/4); and Northwest Quarter of Southwest Quarter (NW1/4-SW1/4), all in Section Ten (10), Township Fifty-six (56) North, Range Twenty-three (23) West of the Fourth Principal Meridian.

11.     Southeast Quarter (SE1/4), Section Ten (10), Township Fifty-six (56) North, Range Twenty-three (23)West of the Fourth Principal Meridian.

12.     Northwest Quarter of Northwest Quarter (NW1/4-NW1/4), Section Eleven (11), Township Fifty-six (56) North, Range Twenty-three (23) West of the Fourth Principal Meridian.

i

13. Lot Two (2), Section Eleven (11), Township Fifty-six (56) North, Range Twenty-three (23) West of the Fourth Principal Meridian.

14. The minerals and mineral rights in East Half of Northeast Quarter (E1/2-NE1/4), Section Twelve (12), Township Fifty-six (56) North, Range Twenty-three (23) West of the Fourth Principal Meridian.

15. Northeast Quarter of Northeast Quarter (NE1/4-NE1/4), South Half of Northeast Quarter (S1/2-NE1/4), all in Section Fourteen (14), Township Fifty-six (56) North, Range Twenty-three (23) West of the Fourth Principal Meridian.

16. Lot One (1), Lot Two (2), all in Section Fifteen (15), Township Fifty-six (56) North, Range Twenty-three (23) West of the Fourth Principal Meridian.

17. North Half of Northeast Quarter (N1/2-NE1/4), Southeast Quarter of Northeast Quarter (SE1/4-NE1/4), Northeast Quarter of Southeast Quarter (NE1/4-SE1/4), all in Section Sixteen (16), Township Fifty-six (56) North, Range Twenty-three (23) West of the Fourth Principal Meridian.

18. Northeast Quarter of Southeast Quarter (NE1/4-SE1/4); and the minerals and mineral rights in Northwest Quarter of Southeast Quarter (NW1/4-SE1/4) and South Half of Southeast Quarter (S1/2-SE1/4); all in Thirty-six (36), Township Fifty-seven (57) North, Range Twenty-three (23) West of the Fourth Principal Meridian.

19. The minerals and mineral rights, without warranty of title, in Lot Four (4), Section Thirty-one (31), Township Fifty-seven (57) North, Range Twenty-two (22) West of the Fourth Principal Meridian.

20. The minerals and mineral rights, without warranty of title, in East Half of Southeast Quarter (E1/2-SE1/4), Section Thirty-one (31), Township Fifty-seven (57) North, Range Twenty-two (22) West of the Fourth Principal Meridian.

21. The minerals and mineral rights, without warranty of title, in an undivided one-half (1/2) interest in North Half of Southeast Quarter (N1/2-SE1/4), Section Nine (9), Township Fifty-six (56) North, Range Twenty-three (23) West of the Fourth Principal Meridian.

22. The minerals and mineral rights, without warranty of title, including the 32.33 acres interest in the surface thereof owned by the state through tax forfeiture, in Southwest Quarter of Southwest Quarter (SW1/4 -SW1/4), Section Ten (10), Township Fifty-six (56) North, Range Twenty-three (23) West of the Fourth Principal Meridian.

23. The minerals and mineral rights, without warranty of title, including the interest in the surface thereof, if any, in southeast diagonal one-half of Southwest Quarter of Southwest Quarter (SW1/4-SW1/4), and Southeast Quarter of Southwest Quarter (SE1/4-SW1/4),

Docket No. 715-1
Date Filed: 5/12/23
Filed Under Seal

Section Eleven (11), Township Fifty-six (56) North, Range Twenty-three (23) West of the Fourth Principal Meridian.

24. The minerals and mineral rights, without warranty of title, including the interest in the surface thereof, if any, in an undivided one-half (1/2) interest in Southwest Quarter of Southeast Quarter (SW1/4-SE1/4), Section Eleven (11), Township Fifty-six (56) North, Range Twenty-three (23) West of the Fourth Principal Meridian.

25. The minerals and mineral rights, without warranty of title, including the interest in the surface thereof, if any, in an undivided one-half (1/2) interest in Northwest Quarter of Northeast Quarter (NW1/4-NE1/4), Section Fourteen (14), Township Fifty-six (56) North, Range Twenty-three (23) West of the Fourth Principal Meridian.

26. The minerals and mineral rights, without warranty of title, in Southeast Quarter of Northwest Quarter (SE1/4-NW1/4), Section Fourteen (14), Township Fifty-six (56) North, Range Twenty-three (23) West of the Fourth Principal Meridian.

27. The minerals and mineral rights, without warranty of title, including the interest in the surface thereof, if any, in Southeast Quarter of Southeast Quarter (SE1/4-SE1/4), Section Thirty-five (35), Township Fifty-seven (57) North, Range Twenty-three (23) West of the Fourth Principal Meridian.

28. The minerals and mineral rights, without warranty of title, including the interest in the surface thereof, if any, in North Half of Southeast Quarter (N1/2-SE1/4), Southwest Quarter of Southeast Quarter (SW1/4-SE1/4), and Southeast Quarter of Southeast Quarter, except railroad right of way (SE1/4-SE1/4), Section Thirty (30), Township Fifty-seven (57) North, Range Twenty-two (22) West of the Fourth Principal Meridian.

29. The minerals and mineral rights, without warranty of title, including the interest in the surface thereof, if any, in Northeast Quarter (NE1/4), Section Thirty-one (31), Township Fifty-seven (57) North, Range Twenty-two (22) West of the Fourth Principal Meridian.

30. The minerals and mineral rights, without warranty of title, including the interest in the surface thereof owned by the state, if any, in West Half of Northwest Quarter (W1/2-NW1/4), Northwest Quarter of Southwest Quarter (NW1/4-SW1/4), except the East 100 feet of the North 560 feet, and except the East 50 feet, Southwest Quarter of Southwest Quarter (SW1/4-SW1/4), except Highway right of way 2.83 acres, and except Revised Description 1 as described in Document Number 428891 filed of record on March 17, 1992 in the Itasca County Recorder's Office, more particularly described as:

    Beginning at the southwest corner of the Southwest Quarter of Southwest Quarter (SW1/4-SW1/4) Section 32, Township 57, Range 22, proceed Easterly on the South line of Southwest Quarter of Southwest Quarter (SW1/4-SW1/4) for a distance of 896.30 feet to Point A on the west right of way line of State Highway Number 65 as it is now defined. The above said South line has an assumed bearing of South 89 degrees 40 minutes 30

iii

seconds East, thence proceed along the west right of way line of State Highway Number 65 to Point B, Point B is determined thusly:  from Point A proceed North 38 degrees 57 minutes 39 seconds East for a distance of 621.62 feet to Point B, thence South 81 degrees 2 minutes 34 seconds West for a distance of 245.41 feet to Point C which is the surface crest of this open pit mine, thence westerly and northwesterly along the existing surface crest of this open pit mine for an approximate distance of 1,151 feet, intersecting the West line of the Southwest Quarter of Southwest Quarter (SW1/4-SW1/4) Section 32, Township 57, Range 22 to Point D, thence South 1 degree 0 minutes 0 seconds W. along the West line of the Southwest Quarter of Southwest Quarter (SW1/4-SW1/4) to the point of beginning for a distance of 820 feet, containing 14 acres;

all in Section Thirty-two (32), Township Fifty-seven (57) North, Range Twenty-two (22) West of the Fourth Principal Meridian.

Docket No. 715-1
Date Filed: 5/12/23
Filed Under Seal