**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br>ESSAR STEEL MINNESOTA LLC and ESML HOLDINGS INC.,[1]<br><br>Debtors. | Chapter 11<br>Case No. 16-11626 (CTG)<br>Jointly Administered |
| MESABI METALLICS COMPANY LLC (F/K/A ESSAR STEEL MINNESOTA LLC),<br><br>Plaintiff<br><br>v.<br><br>CLEVELAND-CLIFFS, INC. (F/K/A CLIFFS NATURAL RESOURCES, INC.); CLEVELAND-CLIFFS MINNESOTA LAND DEVELOPMENT LLC; GLACIER PARK IRON ORE PROPERTIES LLC; and DOES 1-10<br><br>Defendants. | Adv. Proc. No. 17-51210 (CTG) |
| GLACIER PARK IRON ORE PROPERTIES LLC,<br>Counterclaim-Plaintiff<br><br>v.<br><br>MESABI METALLICS COMPANY LLC (F/K/A ESSAR STEEL MINNESOTA LLC),<br><br>Counterclaim-Defendant. | |

---

[1] Essar Steel Minnesota LLC has changed its name to Mesabi Metallics Company LLC.  The last four digits of its federal taxpayer identification number are 8770.  The last four digits of ESML Holdings Inc.'s federal taxpayer identification number are 8071.

CLEVELAND-CLIFFS INC. (F/K/A CLIFFS
NATURAL RESOURCES INC.); CLEVELAND-
CLIFFS MINNESOTA LAND DEVELOPMENT
LLC,

> Third-Party Plaintiffs

    v.

CHIPPEWA CAPITAL PARTNERS,
LLC; and THOMAS M. CLARKE,

> Third-Party Defendants.

# APPENDIX TO PLAINTIFF MESABI METTALICS COMPANY LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## <u>VOLUME XIII</u>
## Exhibit 89 – 99

## INDEX OF APPENDIX

| Exhibit No. | Description of Exhibit | Appendix Pages |
|---|---|---|
| **VOLUME I** | | |
| 1<br>Filed Under Seal | Deposition of Paul Finan dated July 12, 2022 | A000001 - A000054 |
| 2<br>Filed Under Seal | Deposition of Kelly Tompkins dated August 9, 2022 | A000055 - A000122 |
| 3<br>Filed Under Seal | Deposition of Curtis Geissler (AMUSA) dated December 13, 2022 | A000123 - A000189 |
| 4<br>Filed Under Seal | Deposition of Lourenco Goncalves dated March 7, 2023 | A000190 - A000261 |
| 5<br>Filed Under Seal | Deposition of Matthew Zajac dated March 24, 2023 | A000262 - A000295 |
| 6<br>Filed Under Seal | Deposition of Frank Kozleuchar (USS) dated December 13, 2022 | A000296 - A000353 |
| 7<br>Filed Under Seal | Deposition of Madhu Vuppuluri dated April 26, 2023 | A000354 - A000400 |
| 8<br>Filed Under Seal | Deposition of Jonathan M. Orszag dated October 13, 2023 | A000401 - A000459 |
| 9<br>Filed Under Seal | Opening Expert Report of Roger N. Emmott (Mesabi) dated April 28, 2023 | A000460 - A000538 |
| 10<br>Filed Under Seal | Opening Expert Report of J. Douglas Zona (Mesabi) dated April 28, 2023 | A000539 - A000624 |
| 11<br>Filed Under Seal | Expert Report of David Persampieri (Cliffs) dated July 28, 2023 | A000625 - A000669 |
| 12<br>Filed Under Seal | Expert Report of Jonathan M. Orszag (Cliffs) dated July 28, 2023 | A000670 - A000787 |
| 13<br>Filed Under Seal | Expert Report of Richard J. Lambert (Cliffs) dated July 28, 2023 | A000788 - A000867 |
| 14<br>Filed Under Seal | Reply Expert Report of J. Douglas Zona (Mesabi) dated September 8, 2023 | A000868 - A000928 |

| | VOLUME II | |
|---|---|---|
| 15<br>Filed Under Seal | Agreement titled Pellet Sale and Purchase Agreement (MESABI03345910) | A000929 - A000937 |
| 16<br>Filed Under Seal | Report titled NI 43-101 Technical Report for the ESML Project 7Mmt/y Pellet Plant and Expansion to 14 Mmt/y (MESABI01184328) | A000938 - A001187 |
| | VOLUME III | |
| 17<br>Filed Under Seal | Agreement titled Pellet Sale and Purchase Agreement by and among Essar Resources Inc., Essar Steel Minnesota LLC and Arcelormittal USA LLC (MESABI00623100) | A001188 - A001239 |
| 18<br>Filed Under Seal | Presentation titled Cliffs - USIO Strategy Development Overview 2013 (CLIFFS_000553687) | A001240 - A001346 |
| 19<br>Filed Under Seal | Presentation titled Cliffs Natural Resources Inc. 2014 (CLIFFS_000315934) | A001347 - A001362 |
| | VOLUME IV | |
| 20<br>Filed Under Seal | Agreement titled Amended and Restated Pellet Sale and Purchase Agreement by and among Essar Steel Ltd., Essar Steel Minnesota LLC and Arcelormittal USA LLC (AM0005745) | A001363 - A001413 |
| 21<br>Filed Under Seal | Agreement titled Pellet Sale and Purchase Agreement by and between Essar Steel Minnesota LLC and Essar Steel Algoma Inc. (MESABI02930231) | A001414 - A001460 |
| 22<br>Filed Under Seal | Email dated May 9, 2014 from Kelly Tompkins to William Boor, re: Essar Minnesota (CLIFFS_000533279) | A001461 - A001464 |
| 23<br>Filed Under Seal | Email dated November 27, 2014 from Lourenco Goncalves to Peter Cohen et al, re: Roadshow Presentation needs improvement, attaching a PDF titled Cliffs Roadshow (CLIFFS_000629184) | A001465 - A001468 |
| 24<br>Filed Under Seal | Presentation titled Cliffs Natural Resources Inc. - Senior Secured Notes Offering 2014 (CLIFFS_000629446) | A001469 - A001510 |
| 25<br>Filed Under Seal | Email dated January 14, 2015 from Eric Knorr to Danielle Lewis, re: Ilmenite (AM0003926) | A001511 - A001514 |

| 26 Filed Under Seal | Email dated February 6, 2015 from Lourenco Goncalves to Paul Finan, re: ArcelorMittal Opportunity Costs (CLIFFS_000634591) | A001515 - A001517 |
|---|---|---|
| 27 Filed Under Seal | Presentation titled Cliffs Natural Resources Inc. - Senior Secured First Lien Notes (CLIFFS_000554450) | A001518 - A001546 |
| 28 Filed Under Seal | Presentation titled Cliffs Natural Resources Inc. - Senior Secured First Lien Notes (CLIFFS_000554478) | A001547 - A001576 |
| 29 Filed Under Seal | Email dated March 6, 2015 from Paul Finan to Lourenco Goncalves et al, re: CLF and Arcelor Mittal (CLIFFS_000628063) | A001577 - A001579 |
| 30 Filed Under Seal | Email dated March 17, 2015 from Paul Finan to Lourenco Goncalves et al, re Cliffs Natural Resources (CLF US) (Outperform) - Dinner with CEO shows lots of underlying action on restructuring while iron ore pries whither further (CLIFFS_000545931) | A001580 - A001584 |
| 31 Filed Under Seal | Email dated March 28, 2015 from Lourenco Goncalves to Paul Finan, re: Meeting with Gov. Dayton (CLIFFS_000315098) | A001585 - A001591 |
| 32 | Presentation titled Cliffs Natural Resources - A Differentiated Iron Ore Producer 2015 (CLIFFS_000000872) | A001592 - A001609 |
| 33 Filed Under Seal | Email dated April 9, 2015 from Kelly Tompkins to Paul Finan, re: Jeffries Steel and Metals Summit Recap (CLIFFS_000539715) | A001610 - A001612 |
| 34 Filed Under Seal | Email dated May 8, 2015 from Lourenco Goncalves to Paul Finan, re: ArcelorMittal Quarterly Conference Call - Question on Cliffs Contracts (CLIFFS_000314890) | A001613 - A001617 |
| 35 Filed Under Seal | Presentation titled Great Lakes Pellet Market Overview (CLIFFS_000106362) | A001618 - A001625 |
| **VOLUME V** | | |
| 36 Filed Under Seal | Transcript titled Q2 2015 Earnings Call (CLIFFS_000288939) | A001626 - A001641 |

| 37<br>Filed Under Seal | Presentation titled United Steelworkers Bargaining Information (CLIFFS_000190592) | A001642 - A001672 |
|---|---|---|
| 38<br>Filed Under Seal | Presentation titled Cliffs Natural Resources Inc. - A Differentiated Iron Ore Producer 2015 (CLIFFS_000538182) | A001673 - A001688 |
| 39<br>Filed Under Seal | Email dated October 7, 2015 from Lourenco Goncalves to Paul Finan and Kelly Tompkins, re: Investor Reaction (CLIFFS_000314545) | A001689 - A001692 |
| 40<br>Filed Under Seal | Agreement titled Second Amended and Restated Pellet Sale and Purchase Agreement by and among Essar Steel Ltd., Essar Steel Minnesota LLC and Arcelormittal USA LLC (MESABI03604255) | A001693 - A001728 |
| 41<br>Filed Under Seal | Presentation titled AM USA Management Committee Meeting (AM0000159) | A001729 - A001740 |
| 42<br>Filed Under Seal | Presentation titled Cliffs Natural Resources Inc. State of the Company (CLIFFS_000197377) | A001741 - A001758 |
| 43<br>Filed Under Seal | Email dated March 8, 2016 from Neil Kohlberg to Eric Knorr, re: Possible pellet combinations.xlsx (AM0008909) | A001759 - A001760 |
| 44<br>Filed Under Seal | Presentation titled Iron Ores Beneficiation & Concentrate production + pellets for BF and DR route (CLIFFS_000322798) | A001761 - A001834 |
| 45<br>Filed Under Seal | Email dated May 31, 2016 from Lourenco Goncalves to Michael Gambardella, re: Cliffs Natural Resources - Upgrading CLF to Overweight and Raising EPS on Higher Steel Pricing (CLIFFS_000291043) | A001835 - A001838 |
| 46<br>Filed Under Seal | Presentation titled Long term pellet sourcing (AM0023311) | A001839 - A001861 |
| **VOLUME VI** | | |
| 47<br>Filed Under Seal | Agreement titled Pellet Sale and Purchase Agreement by and among Cliffs Natural Resources Inc., Cliffs Mining Company, the Cleveland-Cliffs Iron Company and Arcelormittal USA LLC (CLIFFS_000017772) | A001862 - A001893 |

| 48<br>Filed Under Seal | Presentation titled Cliffs Natural Resources - A Differentiated Iron Ore Producer 2016 (CLIFFS_000179490) | A001894 - A001907 |
|---|---|---|
| 49<br>Filed Under Seal | Presentation titled Cliffs Natural Resources - A Differentiated Iron Ore Producer (CLIFFS_000054598) | A001908 - A001920 |
| 50<br>Filed Under Seal | Email dated April 7, 2017 from Patricia Persico to Lourenco Goncalves et al, re: State of the Company Media Report - April 6, 2017, attaching a PDF titled State of the Company Media Report - April 6, 2017 (CLIFFS_000045624) | A001921 - A001929 |
| 51 | Presentation titled Cliffs Natural Resources Inc. - 170 Years of Mining (CLIFFS_000001001) | A001930 - A001947 |
| 52<br>Filed Under Seal | Presentation titled Leveraging Our Core Strength for the Next Century of Mining (CLIFFS_000034873) | A001948 - A001964 |
| 53<br>Filed Under Seal | Presentation titled Cliffs Ironville HBI Project (CLIFFS_000020471) | A001965 - A001991 |
| 54 | Transcript titled Q2 2017 Earnings Call (CLIFFS_000046391) | A001992 – A002003 |
| 55<br>Filed Under Seal | Agreement titled Pellet Sale and Purchase Agreement (CLIFFS_000018144) | A002004 - A002035 |
| 56<br>Filed Under Seal | Document titled Cleveland Cliffs Inc. Minutes Meeting on November 29, 2017 (CLIFFS_000025288) | A002036 - A002044 |
| 57<br>Filed Under Seal | Presentation titled Hibbing Taconite Extension (CLIFFS_000172510) | A002045 - A002062 |
| 58<br>Filed Under Seal | Presentation titled Cliffs - Goldman Sachs Leveraged Finance Conference (CLIFFS_000024850) | A002063 - A002076 |
| 59<br>Filed Under Seal | Presentation titled Cleveland-Cliffs Inc. 2018 (CLIFFS_000263072) | A002077 - A002091 |
| **VOLUME VII** | | |
| 60 | Transcript titled Q2 2018 Earnings Call (CLIFFS_000022566) | A002092 - A002104 |

| 61<br>Filed Under Seal | Email dated November 13, 2018 from Daniel Lewis to Sean Donnelly, re: Update on USS replacement and Cliffs position (AM0032175) | A002105 - A002110 |
|---|---|---|
| **VOLUME VIII** | | |
| 62<br>Filed Under Seal | Report titled Mesabi Metallics Project Technical Report (MESABI04288726) | A002111 - A002390 |
| **VOLUME IX** | | |
| 63<br>Filed Under Seal | Financial Statement titled Essar Steel Minnesota LLC Financial Statements as of and for the Years Ended March 31, 2013 and 2012, and the Period from October 22, 2007 (Inception) through March 31, 2013, and Independent Auditors' Report (MESABI00749241) | A002391 - A002420 |
| 64<br>Filed Under Seal | Presentation titled Cliffs HBI Opportunity (CLIFFS_000039645) | A002421 - A002439 |
| 65<br>Filed Under Seal | Presentation titled Cleveland-Cliffs: Enabling Production of Clean Steel (CLIFFS_000591542) | A002440 - A002445 |
| 66<br>Filed Under Seal | Presentation titled Cleveland Port Authority Meeting (CLIFFS_000182071) | A002446 - A002457 |
| 67 | Report titled ArcelorMittal Annual Report 2015 | A002458 - A002688 |
| 68 | Report titled ArcelorMittal Annual Report 2019 | A002689 - A003031 |
| **VOLUME X** | | |
| 69 | Report titled ArcelorMittal Annual Report 2022 | A003032 - A003489 |
| 70 | Report titled Stelco 2022 Annual Report | A003490 - A003582 |
| 71 | Guidelines titled Horizontal Merger Guidelines | A003583 - A003620 |
| 72 | Article titled The return of Stelco: U.S. Steel Canada changing its name back | A003621 - A003628 |

| 73<br>Filed Under Seal | Addendum to Supplemental Proofs of Claim of Essar Steel Algoma Against Mesabi dated January 18, 2018 | A003629 - A003645 |
|---|---|---|
| 74 | Transcript titled Q4 2018 Earnings Call | A003646 - A003663 |
| 75 | Article titled Cliffs will idle Northshore Mining, Tilden Mine until late summer | A003664 - A003668 |
| 76<br>Filed Under Seal | Affidavit of Pascal Nobecourt (Iron Ore Company of Canada), dated March 6, 2023 | A003669 - A003672 |
| **VOLUME XI** | | |
| 77<br>Filed Under Seal | Declaration of Matthew Holihan in Support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction, dated May 21, 2023 [D.I. 727] | A003673 - A003730 |
| 78 | Algoma Steel Group Inc. 2023 40-F | A003731 - A004085 |
| 79 | Website titled Rio Tinto - Who we are | A004086 - A004089 |
| 80 | Website titled Cliffs - Executive Team | A004090 - A004097 |
| 81 | Website titled Cliffs - About | A004098 - A004105 |
| 82 | Website titled Algoma Steel Inc. - Website Landing Page | A004106 - A004109 |
| 83 | Website titled Mesabi Metallics Company LLC - The Project | A004110 - A004111 |
| 84 | Website title New World Encyclopedia - Great Lakes region (North America) | A004112 - A004117 |
| 85 | Website titled Stelco - Our Facilities | A004118 - A004121 |
| 86 | Website titled Stelco - Our History | A004122 - A004128 |
| 87 | Website titled United States Steel - About Us | A004129 - A004132 |

| VOLUME XII | | |
|:---:|:---|:---:|
| 88 | Website titled Wikipedia - Great Lakes | A004133 - A004164 |
| **VOLUME XIII** | | |
| 89 | Cliffs 2014 10-K | A004165 - A004687 |
| 90 | AK Steel 2015 10-K | A004688 - A004825 |
| 91 | Cliffs 2015 10-K | A004826 - A005078 |
| 92 | Cliffs 2016 10-K | A005079 - A005259 |
| 93 | Cliffs 2017 10-K | A005260 - A005486 |
| 94 | Cliffs 2018 10-K | A005487 - A005675 |
| 95 | AK Steel 2019 10-K | A005676 - A005904 |
| 96 | Cliffs 2019 10-K | A005905 - A006073 |
| 97 | Cliffs 2020 10-K | A006074 - A006539 |
| 98 | Cliffs 2022 10-K | A006540 - A006678 |
| 99 Filed Under Seal | Email dated October 18, 2016 from Paul R. Finan to Lourenco Goncalves, re: U.S. Steel (CLIFFS_000057714) | A006679 - A006680 |

# EXHIBIT 89

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2014

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from _____ to _____.

Commission File Number: 1-8944



## CLIFFS NATURAL RESOURCES INC.
*(Exact Name of Registrant as Specified in Its Charter)*

| Ohio | 34-1464672 |
|---|---|
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(I.R.S. Employer Identification No.)* |
| 200 Public Square, Cleveland, Ohio | 44114-2315 |
| *(Address of Principal Executive Offices)* | *(Zip Code)* |

**Registrant's Telephone Number, Including Area Code: (216) 694-5700**
**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of Each Class** | **Name of Each Exchange on Which Registered** |
|---|---|
| Common Shares, par value $0.125 per share | New York Stock Exchange |
| Depositary Shares, each representing a 1/40th ownership interest in a share of 7.00% Series A Mandatory Convertible Preferred Stock, Class A | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**
**NONE**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.     YES ☒     NO ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.     YES ☐     NO ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.     YES ☒     NO ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).     YES ☒     NO ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.     ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒     Accelerated filer ☐     Non-accelerated filer ☐     Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).     YES ☐     NO ☒

As of June 30, 2014, the aggregate market value of the voting and non-voting common shares held by non-affiliates of the registrant, based on the closing price of $15.05 per share as reported on the New York Stock Exchange — Composite Index, was $2,397,182,297 (excluded from this figure is the voting stock beneficially owned by the registrant's officers and directors).

The number of shares outstanding of the registrant's common shares, par value $0.125 per share, was 153,279,552 as of February 23, 2015.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's proxy statement for its 2015 annual meeting of shareholders are incorporated by reference into Part III.

Table of Contents

**TABLE OF CONTENTS**

|  |  | **Page Number** |
|---|---|---|
| **DEFINITIONS** |  | 1 |
| **PART I** |  |  |
| Item 1. | Business | 4 |
|  | Executive Officers of the Registrant | 20 |
| Item 1A. | Risk Factors | 21 |
| Item 1B. | Unresolved Staff Comments | 32 |
| Item 2. | Properties | 33 |
| Item 3. | Legal Proceedings | 44 |
| Item 4. | Mine Safety Disclosures | 47 |
| **PART II** |  |  |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 48 |
| Item 6. | Selected Financial Data | 51 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 53 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 101 |
| Item 8. | Financial Statements and Supplementary Data | 102 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 185 |
| Item 9A. | Controls and Procedures | 185 |
| Item 9B. | Other Information | 186 |
| **PART III** |  |  |
| Item 10. | Directors, Executive Officers and Corporate Governance | 187 |
| Item 11. | Executive Compensation | 187 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 187 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 187 |
| Item 14. | Principal Accountant Fees and Services | 187 |
| **PART IV** |  |  |
| Item 15. | Exhibits and Financial Statement Schedules | 188 |
| **SIGNATURES** |  | 189 |

Table of Contents

## DEFINITIONS

The following abbreviations or acronyms are used in the text. References in this report to the "Company," "we," "us," "our" and "Cliffs" are to Cliffs Natural Resources Inc. and subsidiaries, collectively. References to "A$" or "AUD" refer to Australian currency, "C$" to Canadian currency and "$" to United States currency.

| Abbreviation or acronym | Term |
|---|---|
| Amapá | Anglo Ferrous Amapá Mineração Ltda. and Anglo Ferrous Logística Amapá Ltda. |
| AG | Autogenous Grinding |
| Anglo | Anglo American plc |
| APBO | Accumulated Postretirement Benefit Obligation |
| ArcelorMittal | ArcelorMittal (as the parent company of ArcelorMittal Mines Canada, ArcelorMittal USA and Dofasco, as well as, many other subsidiaries) |
| ArcelorMittal USA | ArcelorMittal USA LLC (including many of its North American affiliates, subsidiaries and representatives. References to ArcelorMittal USA comprise all such relationships unless a specific ArcelorMittal USA entity is referenced) |
| ASC | Accounting Standards Codification |
| Barrick | Barrick Gold Corporation Inc. |
| BART | Best Available Retrofit Technology |
| Bloom Lake | The Bloom Lake Iron Ore Mine Limited Partnership |
| BNSF | Burlington Northern Santa Fe, LLC |
| CCAA | Companies' Creditors Arrangement Act (Canada) |
| CFR | Cost and freight |
| Chromite Project | Cliffs Chromite Ontario Inc. |
| CIRB | Canadian Industrial Relations Board |
| CLCC | Cliffs Logan County Coal LLC |
| Clean Water Act | Federal Water Pollution Control Act |
| Cliffs Chromite Far North Inc. | Entity previously known as Spider Resources Inc. |
| Cliffs Chromite Ontario Inc. | Entity previously known as Freewest |
| CN | Canadian National Railway Company |
| Cockatoo Island | Cockatoo Island Joint Venture |
| CODM | Chief Operating Decision Maker |
| Compensation Committee | Compensation and Organization Committee |
| Consent Order | Administrative Order by Consent |
| Consolidated Thompson | Consolidated Thompson Iron Mining Limited (now known as Cliffs Québec Iron Mining ULC) |
| CQIM | Cliffs Québec Iron Mining ULC (formerly known as Cliffs Québec Iron Mining Limited) |
| $Cr^2O^3$ | Chromium Oxide |
| CSAPR | Cross-State Air Pollution Rule |
| DD&A | Depreciation, depletion and amortization |
| DEP | U.S. Department of Environment Protection |
| Directors' Plan | Cliffs Natural Resources Inc. 2014 Nonemployee Directors' Compensation Plan |
| Dodd-Frank Act | Dodd-Frank Wall Street Reform and Consumer Protection Act |
| Dofasco | ArcelorMittal Dofasco Inc. |
| EBITDA | Earnings before interest, taxes, depreciation and amortization |
| Empire | Empire Iron Mining Partnership |
| EPA | U.S. Environmental Protection Agency |
| EPS | Earnings per share |
| EPSL | Esperance Port Sea and Land |
| ERM | Enterprise Risk Management |
| Essar | Essar Steel Algoma Inc. |
| Essar Sale Agreement | 2002 Pellet Sale and Purchase Agreement as amended |
| Exchange Act | Securities Exchange Act of 1934, as amended |
| FASB | Financial Accounting Standards Board |
| Fe | Iron |
| (Fe,Mg) (Cr,Al,Fe)2O4 | Mineral Chromite |
| FeT | Total Iron |
| FIP | Federal Implementation Plan |
| FMSH Act | U.S. Federal Mine Safety and Health Act 1977, as amended |

1

Table of Contents

| Abbreviation or acronym | Term |
|---|---|
| Freewest | Freewest Resources Canada Inc. (now known as Cliffs Chromite Ontario Inc.) |
| GAAP | Accounting principles generally accepted in the United States |
| GHG | Greenhouse gas |
| Hibbing | Hibbing Taconite Company |
| ICE Plan | Amended and Restated Cliffs 2007 Incentive Equity Plan, as amended |
| INR | INR Energy, LLC |
| IRS | U.S. Internal Revenue Service |
| Ispat | Ispat Inland Steel Company |
| Koolyanobbing | Collective term for the operating deposits at Koolyanobbing, Mount Jackson and Windarling |
| LCM | Lower of cost or market |
| LIBOR | London Interbank Offered Rate |
| LIFO | Last-in, first-out |
| LTVSMC | LTV Steel Mining Company |
| MDEQ | Michigan Department of Environmental Quality |
| MMBtu | Million British Thermal Units |
| Moody's | Moody's Investors Service, Inc., a subsidiary of Moody's Corporation, and its successors |
| MPCA | Minnesota Pollution Control Agency |
| MPI | Management Performance Incentive Plan |
| MPSC | Michigan Public Service Commission |
| MPUC | Minnesota Public Utilities Commission |
| MRPS | Mandatory redeemable preference shares |
| MRRT | Minerals Resource Rent Tax (Australia) |
| MSHA | U.S. Mine Safety and Health Administration |
| MWh | Megawatts per hour |
| n/m | Not meaningful |
| NAAQS | National Ambient Air Quality Standards |
| NBCWA | National Bituminous Coal Wage Agreement |
| NDEP | Nevada Department of Environmental Protection |
| Ni | Nickel |
| $NO_2$ | Nitrogen dioxide |
| $NO_x$ | Nitrogen oxide |
| Northshore | Northshore Mining Company |
| NPDES | National Pollutant Discharge Elimination System, authorized by the U.S. Clean Water Act |
| NRD | Natural Resource Damages |
| NSPS | New Source Performance Standards |
| NYSE | New York Stock Exchange |
| Oak Grove | Oak Grove Resources, LLC |
| OCI | Other comprehensive income (loss) |
| OPEB | Other postretirement benefits |
| OPEB cap | Medical premium maximums |
| P&P | Proven and Probable |
| PBO | Projected benefit obligation |
| Pinnacle | Pinnacle Mining Company, LLC |
| Pluton Resources | Pluton Resources Limited |
| Reconciliation Act | Health Care and Education Reconciliation Act |
| Ring of Fire properties | Black Thor, Black Label and Big Daddy chromite deposits in Ontario, Canada |
| ROA | Return on asset |
| RTWG | Rio Tinto Working Group |
| S&P | Standard & Poor's Rating Services, a division of Standard & Poor's Financial Services LLC, a subsidiary of The McGraw-Hill Companies, Inc., and its successors |
| SARs | Stock Appreciation Rights |
| SEC | U.S. Securities and Exchange Commission |
| Severstal | Severstal Dearborn, LLC |
| Silver Bay Power | Silver Bay Power Company |

2

Table of Contents

| Abbreviation or acronym | Term |
|---|---|
| SIP | State Implementation Plan |
| SMCRA | Surface Mining Control and Reclamation Act |
| SO2 | Sulfur dioxide |
| Sonoma | Sonoma Coal Project |
| Spider | Spider Resources Inc. (now known as Cliffs Chromite Far North Inc.) |
| STRIPS | Separate Trading of Registered Interest and Principal of Securities |
| Substitute Rating Agency | A "nationally recognized statistical rating organization" within the meaning of Section 3 (a)(62) of the Exchange Act, selected by us (as certified by a certificate of officers confirming the decision of our Board of Directors) as a replacement agency of Moody's or S&P, or both of them, as the case may be |
| Tilden | Tilden Mining Company |
| TMDL | Total Maximum Daily Load |
| TRIR | Total Reportable Incident Rate |
| TSR | Total Shareholder Return |
| U/G | Underground |
| UMWA | United Mineworkers of America |
| United Taconite | United Taconite LLC |
| UP 1994 | 1994 Uninsured Pensioner Mortality Table |
| U.S. | United States of America |
| U.S. Steel Canada | U.S. Steel Canada Inc., a subsidiary of United States Steel Corporation |
| USW | United Steelworkers |
| Vale | Companhia Vale do Rio Doce |
| VEBA | Voluntary Employee Benefit Association trusts |
| VNQDC Plan | 2005 Voluntary NonQualified Deferred Compensation Plan, as amended |
| VWAP | Volume Weighted Average Price |
| Wabush | Wabush Mines Joint Venture |
| Weirton | ArcelorMittal Weirton Inc. |
| WISCO | Wugang Canada Resources Investment Limited, a subsidiary of Wuhan Iron and Steel (Group) Corporation |
| Zamin | Zamin Ferrous Ltd |
| 1974 PP | The UMWA 1974 Pension Plan |
| 2008 Director's Plan | Nonemployee Directors' Compensation Plan, as amended and restated 12/31/2008 |
| 2012 Equity Plan | Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan |

3

Table of Contents

PART I

**Item 1.**　　　*Business*

**Introduction**

Cliffs Natural Resources Inc. traces its history back to 1847. Today, we are a leading mining and natural resources company.  We are a major supplier of iron ore pellets to the North American steel industry from our mines and pellet plants located in Michigan and Minnesota. Cliffs also produces low-volatile metallurgical coal in the U.S. from its mines located in Alabama and West Virginia. Additionally, Cliffs operates an iron ore mining complex in Western Australia and owns two non-operating iron ore mines in Eastern Canada. Driven by the core values of safety, social, environmental and capital stewardship, our employees endeavor to provide all stakeholders with operating and financial transparency.

We are organized through a global commercial group responsible for sales and delivery of our products and operations groups responsible for the production of the minerals that we market. Our operations are organized according to product category and geographic location: U.S. Iron Ore, Asia Pacific Iron Ore, North American Coal and Eastern Canadian Iron Ore.

In the U.S., we currently operate  five iron ore mines in Michigan and Minnesota and  two metallurgical coal operations located in Alabama and West Virginia. Our Asia Pacific operations consist solely of our Koolyanobbing iron ore mining complex in Western Australia. We also own two iron ore mines in Eastern Canada, although we have currently shutdown one of the mines due to its unsustainable high cost structure and the other mine has ceased all production and transitioned to "care-and-maintenance" mode.

### *Re-focusing the Company on our Core U.S. Iron Ore Business*

Our leadership changed over the past year. Subsequent to our 2014 Annual Meeting of Shareholders, where shareholders elected six new directors to our Board of Directors, including our new Chairman, President and Chief Executive Officer, Lourenco Goncalves, our Board changed substantially. The reconstituted Board of Directors has established a strategy to return the Company to its core strengths.

We have shifted from a diversification based strategy to one that focuses on strengthening our U.S. Iron Ore operations. We are the market-leading iron ore producer in the U.S., supplying differentiated iron ore pellets under long-term contracts, some of which begin to expire in the end of 2016, to the largest U.S. steel producers. Pricing protections and long-term supply, certainty provided by our existing contracts and our low-cost operating profile positions U.S. Iron Ore as our most stable and profitable business. We expect to continue to strengthen U.S. Iron Ore cost operating profile through our operational expertise and disciplined capital allocation policies.

### *Eastern Canadian Iron Ore*

The Cliffs' Wabush Scully mine in Newfoundland and Labrador was idled by the end of the first quarter of 2014 and subsequently began to commence permanent closure in the fourth quarter of 2014. With costs unsustainably high, it was not economically viable to continue running this operation. Approximately 500 employees at both the Wabush Scully mine and the Pointe Noire rail and port operation in Québec were impacted by these actions.

On November 19, 2014, we announced the pursuit of an exit option for our Eastern Canadian Iron Ore operations. With the expansion no longer viable and the Bloom Lake operation remaining unprofitable, we have shifted our focus to executing an exit option for Eastern Canadian Iron Ore operations that minimizes the cash outflows and associated liabilities.

During the fourth quarter of 2014, we disclosed that, despite our cost-cutting progress at our Bloom Lake mine, we concluded that Phase I alone was not economically feasible based on our current operating plans. For the Bloom Lake mine to be profitable, we concluded that Phase II of the Bloom Lake mine must be developed to reduce the overall cash cost of operations. We could only develop Phase II of the Bloom Lake mine if we had been able to secure new equity partners to share in the capital costs, which we estimated to be approximately $1.2 billion. As the equity partners were unable to commit within the short timeframe we required, we determined that the Phase II expansion of the Bloom Lake mine was no longer a viable option for us and we shifted our focus to considering available possibilities and executing an exit option for Eastern Canadian Iron Ore operations that minimized the cash outflows and associated liabilities. In December 2014, iron ore production at the Bloom Lake mine was suspended and the Bloom Lake mine was placed in "care-and-maintenance" mode.

4

On January 27, 2015, we announced that Bloom Lake General Partner Limited and certain of its affiliates, including Cliffs Québec Iron Mining ULC (collectively, the "Bloom Lake Group") commenced restructuring proceedings in Montreal, Québec, under the CCAA. The Bloom Lake Group had recently suspended operations, and for several months we were exploring options to sell certain of our Canadian assets, among other initiatives. The decision to seek protection under the CCAA was based on a thorough legal and financial analysis of the options available to the Bloom Lake Group. The Bloom Lake Group was no longer generating any revenues and was not able to meet its obligations as they came due. The initial CCAA order addressed the Bloom Lake Group's immediate liquidity issues and permits the Bloom Lake Group to preserve and protect its assets for the benefit of all stakeholders while restructuring and sale options are explored. As part of the CCAA process, the Court has appointed FTI Consulting Canada Inc. as the Monitor. The Monitor's role in the CCAA process is to monitor the activities of the Bloom Lake Group and provide assistance to the Bloom Lake Group and its stakeholders in respect of the CCAA process.

## Business Segments

Our Company's operations are organized and managed according to product category and geographic location: U.S. Iron Ore, Asia Pacific Iron Ore, North American Coal and Eastern Canadian Iron Ore. Amapá, which was sold in the fourth quarter of 2013, previously was reported through our Latin American Iron Ore operating segment, which did not meet the criteria for a reportable segment. Additionally, Sonoma, which was sold in the fourth quarter of 2012, previously was reported through our Asia Pacific Coal operating segment, which did not meet the criteria for a reportable segment.

Segment information reflects our strategic business units, which are organized to meet customer requirements and global competition. We have historically evaluated segment performance based on sales margin, defined as revenues less cost of goods sold, and operating expenses identifiable to each segment. Additionally, beginning in the third quarter of 2014, concurrent with the change of a majority of our Board of Directors and appointment of our new Chairman, President and Chief Executive Officer in August 2014, management began to evaluate segment performance based on EBITDA, defined as Net Income (Loss) before interest, income taxes, depreciation, depletion and amortization, and Adjusted EBITDA, defined as EBITDA excluding certain items such as impairment charges, impacts of permanently idled, closed or sold facilities, foreign currency remeasurement, severance and other costs associated with the change in control, litigation judgments and intersegment corporate allocations of SG&A costs. Management uses and believes that investors benefit from referring to these measures in evaluating operating and financial results, as well as in planning, forecasting and analyzing future periods as these financial measures approximate the cash flows associated with the operational earnings. Financial information about our segments, including financial information about geographic areas, is included in *Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations* and NOTE 2 - SEGMENT REPORTING included in *Item 8. Financial Statements and Supplementary Data* of this Annual Report on Form 10-K.

### U.S. Iron Ore

We are a major global iron ore producer, primarily selling production from U.S. Iron Ore to integrated steel companies in the U.S. and Canada. We manage and operate five iron ore mines located in Michigan and Minnesota. The U.S.-based mines currently have an annual rated capacity of 32.9 million tons of iron ore pellet production, representing 56 percent of total U.S. pellet production capacity. Based on our equity ownership in these mines, our share of the annual rated production capacity is currently 25.5 million tons, representing 44 percent of total U.S. annual pellet capacity.

A004172

The following chart summarizes the estimated annual pellet production capacity and percentage of total U.S. pellet production capacity for each of the respective iron ore producers as of December 31, 2014:

**U.S. Iron Ore Pellet**

**Annual Rated Capacity Tonnage**

|  | Current Estimated Capacity (Tons in Millions)[1] | Percent of Total U.S. Capacity |
|---|---|---|
| All Cliffs' managed mines | 32.9 | 56.3 % |
| Other U.S. mines | | |
| U.S. Steel's Minnesota ore operations | | |
| Minnesota Taconite | 14.3 | 24.6 |
| Keewatin Taconite | 5.4 | 9.2 |
| Total U.S. Steel | 19.7 | 33.8 |
| ArcelorMittal USA Minorca mine | 2.8 | 4.8 |
| Magnetation | 3.0 | 5.1 |
| Total other U.S. mines | 25.5 | 43.7 |
| Total U.S. mines | 58.4 | 100.0 % |

[1] Tons are long tons (2,240 pounds)

Our U.S. iron ore production generally is sold pursuant to long-term supply agreements with various price adjustment provisions. For the year ended December 31, 2014, we produced a total of 29.7 million tons of iron ore pellets, including 22.4 million tons for our account and 7.3 million tons on behalf of steel company partners of the mines.

We produce various grades of iron ore pellets, including standard and fluxed, for use in our customers' blast furnaces as part of the steelmaking process. The variation in grades results from the specific chemical and metallurgical properties of the ores at each mine and whether or not fluxstone is added in the process. Although the grade or grades of pellets currently delivered to each customer are based on that customer's preferences, which depend in part on the characteristics of the customer's blast furnace operation, in many cases our iron ore pellets can be used interchangeably. Industry demand for the various grades of iron ore pellets depends on each customer's preferences and changes from time to time. In the event that a given mine is operating at full capacity, the terms of most of our pellet supply agreements allow some flexibility in providing our customers iron ore pellets from different mines.

Standard pellets require less processing, are generally the least costly pellets to produce and are called "standard" because no ground fluxstone, such as limestone or dolomite, is added to the iron ore concentrate before turning the concentrate into pellets. In the case of fluxed pellets, fluxstone is added to the concentrate, which produces pellets that can perform at higher productivity levels in the customer's specific blast furnace and will minimize the amount of fluxstone the customer may be required to add to the blast furnace.

Each of our U.S. Iron Ore mines is located near the Great Lakes. The majority of our iron ore pellets are transported via railroads to loading ports for shipment via vessel to steelmakers in North America.

Our U.S. Iron Ore sales are influenced by seasonal factors in the first quarter of the year as shipments and sales are restricted by the Army Corp of Engineers due to closure of the Soo Locks and the Welland Canal on the Great Lakes. During the first quarter, we continue to produce our products, but we cannot ship those products via lake vessel until the conditions on the Great Lakes are navigable, which causes our first quarter inventory levels to rise. Our limited practice of shipping product to ports on the lower Great Lakes or to customers' facilities prior to the transfer of title has somewhat mitigated the seasonal effect on first quarter inventories and sales, as shipment from this point to the customers' operations is not limited by weather-related shipping constraints. At December 31, 2014 and 2013, we had approximately 1.4 million and 1.2 million tons of pellets, respectively, in inventory at lower lakes or customers' facilities.

A004173

*U.S. Iron Ore Customers*

Our U.S. Iron Ore revenues primarily are derived from sales of iron ore pellets to the North American integrated steel industry, consisting of three major customers. Generally, we have multi-year supply agreements with our customers. Sales volume under these agreements largely is dependent on customer requirements, and in many cases, we are the sole supplier of iron ore to the customer. Historically, each agreement has contained a base price that is adjusted annually using one or more adjustment factors. Factors that could result in a price adjustment include spot pricing, measures of general industrial inflation and steel prices. Additionally, certain of our supply agreements have a provision that limits the amount of price increase or decrease in any given year.

During 2014, 2013 and 2012, we sold 21.8 million, 21.3 million and 21.6 million tons of iron ore pellets, respectively, from our share of the production from our U.S. Iron Ore mines. The segment's five largest customers together accounted for a total of 95 percent, 87 percent and 91 percent of U.S. Iron Ore product revenues for the years 2014, 2013 and 2012, respectively. Effective September 16, 2014, AK Steel completed the acquisition of Severstal North America's integrated steelmaking assets located in Dearborn, Michigan. For comparative purposes, we have combined historical data of AK Steel for all periods presented. Refer to *Concentration of Customers* below for additional information regarding our major customers.

### Asia Pacific Iron Ore

Our Asia Pacific Iron Ore operations are located in Western Australia and, as of December 31, 2014, consist solely of our wholly owned Koolyanobbing complex. Our 50 percent equity interest in Cockatoo Island also was included in these operations through September 2012, at which time we sold our interest.

The Koolyanobbing operations serve the Asian iron ore markets with direct-shipped fines and lump ore. The lump products are fed directly to blast furnaces, while the fines products are used as sinter feed. The variation in the two export product grades reflects the inherent chemical and physical characteristics of the ore bodies mined as well as the supply requirements of our customers. In September 2010, our Board of Directors approved a capital project at our Koolyanobbing operation, which was completed in the second quarter of 2012, and increased production capacity at Koolyanobbing to approximately 11.0 million metric tons annually. Production in 2014 was 11.4 million metric tons, compared with 11.1 million metric tons in 2013 and 10.7 million metric tons in 2012.

Koolyanobbing is a collective term for the operating deposits at Koolyanobbing, Mount Jackson and Windarling. There are approximately 70 miles separating the three mining areas. Banded iron formations host the mineralization, which is predominately hematite and goethite. Each deposit is characterized with different chemical and physical attributes and, in order to achieve customer product quality, ore in varying quantities from each deposit must be blended together.

Crushing and blending are undertaken at Koolyanobbing, where the crushing and screening plant is located. Once the blended ore has been crushed and screened into a direct lump and fines shipping product, it is transported by rail approximately 360 miles south to the Port of Esperance, via Kalgoorlie, for shipment to our customers in Asia.

On July 31, 2012, we entered into a definitive asset sale agreement with our joint venture partner, HWE Cockatoo Pty Ltd., to sell our beneficial interest in the mining tenements and certain infrastructure of Cockatoo Island to Pluton Resources, which agreement was amended on August 31, 2012. On September 7, 2012, the closing date, Pluton Resources paid a nominal sum of AUD $4.00 and assumed ownership of the assets and responsibility for the environmental rehabilitation obligations and other assumed liabilities not inherently attached to the tenements acquired. The rehabilitation obligations and assumed liabilities that inherently are attached to the tenements were transferred to Pluton Resources upon registration by the Department of Mining and Petroleum denoting Pluton Resources as the tenement holder. Upon final settlement of the sale, which was completed during the second quarter of 2013, we extinguished approximately $18.6 million related to the estimated cost of the rehabilitation. As of December 31, 2013, we had no remaining rehabilitation obligations related to Cockatoo Island. Our production at Cockatoo Island continued until the completion of Stage 3 mining in September 2012. Our portion of Cockatoo's annual production of iron ore premium fines totaled 0.6 million metric tons in 2012. We had no production at Cockatoo Island in 2014 and 2013 due to the sale of our interest in Cockatoo Island during the third quarter of 2012.

A004174

*Asia Pacific Iron Ore Customers*

Asia Pacific Iron Ore's production is under contract with steel companies primarily in China, Japan, Korea and Taiwan. Generally, we have two-year or three-year term supply agreements with steel producers in China and two-year supply agreements in Japan. Pricing for our Asia Pacific Iron Ore customers consists of shorter-term pricing mechanisms of various durations up to one month based on the average of daily spot prices that are generally associated with either unloading each shipment or the time of loading. The existing contracts are due to expire at various dates until March 2015 for our Chinese and Japanese customers which are customarily renewed in conjunction with our customers' fiscal year.

During 2014, 2013 and 2012, we sold 11.5 million, 11.0 million and 11.7 million metric tons of iron ore, respectively, from our Western Australia mines. No Asia Pacific Iron Ore customer comprised more than 10 percent of Cliffs consolidated sales in 2014, 2013 or 2012. Asia Pacific Iron Ore's five largest customers accounted for approximately 38 percent of the segment's sales in 2014, 42 percent in 2013 and 44 percent in 2012.

### North American Coal

We own and operate two low-volatile metallurgical coal operations located in Alabama and West Virginia that currently have a rated capacity of 6.5 million tons of production annually as of December 31, 2014. In 2014, we sold a total of 7.4 million tons, compared with 7.3 million tons in 2013 and 6.5 million tons in 2012. In the fourth quarter of 2014, we sold our CLCC assets, which consisted of two high-volatile metallurgical coal mines and a thermal coal mine. The sale was completed on December 31, 2014. Sales tons at the CLCC operations were 2.4 million tons, 2.2 million tons and 2.1 million tons for the years ended December 31, 2014, 2013, and 2012, respectively, and are included in the sales tons disclosed above.

Metallurgical coal generally is sold at a premium over the more prevalently mined thermal coal, which generally is utilized to generate electricity. Metallurgical coal receives this premium because of its coking characteristics, which include contraction and expansion when heated, and volatility, which refers to the loss in mass when coal is heated in the absence of air. Coals with lower volatility are valued more highly than coals with a higher volatility.

Each of our North American coal mines are positioned near rail or barge lines providing access to international shipping ports, which allows for export of our coal production.

*North American Coal Customers*

North American Coal's metallurgical coal production is sold to global integrated steel and coke producers in Europe, North America, China, India and South America and its thermal coal production was sold to energy companies and distributors in North America and Europe. Approximately 56 percent of our 2014 and 70 percent of our 2013 production was committed under contracts of at least one year. Approximately 45 percent of our projected 2015 sales has been committed and priced. North American contract negotiations are largely completed, and international contract negotiations recently have begun. The remaining tonnage primarily is pending price negotiations with our international customers, which typically is dependent on settlements of Australian pricing for metallurgical coal. International customer contracts typically are negotiated on a fiscal year basis extending from April 1 through March 31, whereas customer contracts in North America typically are negotiated on a calendar year basis extending from January 1 through December 31.

International and North American sales represented 64 percent and 36 percent, respectively, of our North American Coal sales in 2014. This compares with 61 percent and 39 percent, respectively, in 2013 and 66 percent and 34 percent, respectively, in 2012. The segment's five largest customers together accounted for a total of 48 percent, 57 percent and 50 percent of North American Coal product revenues for the years 2014, 2013 and 2012, respectively. Refer to *Concentration of Customers* below for additional information regarding our major customers.

### Eastern Canadian Iron Ore

We own two iron ore mines in Eastern Canada, the Bloom Lake mine and the Wabush Scully mine.

As disclosed in the first quarter of 2014, at the end of March 2014, we idled our Wabush Scully mine in Newfoundland and Labrador and in November 2014, we began to implement the permanent closure plan for the mine. The idle and ultimate closure was driven by the unsustainable high cost structure. Additionally, we disclosed in November 2014, that we were pursuing exit options for our Bloom Lake mine. As disclosed in January 2015, active production at the Bloom Lake mine has ceased and the mine has transitioned to "care-and-maintenance" mode. Together, the shutdown of the Wabush Scully mine and the cessation of operations at our Bloom Lake mine represent a complete curtailment of our Eastern Canadian Iron Ore operations.

A004175

We had been producing a concentrate product at our Bloom Lake operation and, starting in the second half of 2013 through the idle in the first quarter of 2014, we had been producing a concentrate product at our Wabush operation in Eastern Canada. The concentrate products had been marketed toward steel producers, predominately based in Asia, that have sintering capabilities at their steel-making operations. The Bloom Lake concentrate was blended with other sinter fines and materials at high temperatures, creating a direct charge product used in blast furnace operations.

We produced "high manganese" pellets, both in standard and fluxed grades, through June 2013 at our Wabush operation in Eastern Canada, where there is more natural manganese in the crude ore than is found at our other operations. The manganese contained in the iron ore mined at Wabush cannot be removed entirely during the concentrating process.

For the year ended December 31, 2014, we produced a total of 6.2 million metric tons of concentrate.

Both Eastern Canadian Iron Ore mines are located near the St. Lawrence Seaway. Our iron ore products had been transported via railroads to loading ports for shipment via vessel to steelmakers in North America or into the international seaborne market.

*Eastern Canadian Iron Ore Customers*

Our Eastern Canadian Iron Ore revenues were derived from sales to customers in Asia, Europe and North America. We had various customers for iron ore concentrate and pellets, of which our partner in the Bloom Lake mine is considered a major customer for iron ore concentrate. Pricing for our Eastern Canadian Iron Ore customers consisted primarily of short-term pricing arrangements that were linked to spot market pricing.

During 2014, 2013 and 2012, we sold 7.2 million, 8.6 million and 8.9 million metric tons of iron ore concentrate and pellets, respectively, from our Eastern Canadian Iron Ore mines, with the segment's five largest customers together accounting for a total of 88 percent, 70 percent and 62 percent of Eastern Canadian Iron Ore product revenues, respectively. Refer to *Concentration of Customers* below for additional information regarding our major customers.

**Investments**

*Amapá*

On December 27, 2012, our Board of Directors authorized the sale of our 30 percent interest in Amapá. Per this original agreement, together with Anglo, we were to sell our respective interest in a 100 percent sale transaction to Zamin.

On March 28, 2013, an unknown event caused the Santana port shiploader to collapse into the Amazon River, preventing further ship loading by the mine operator, Anglo. In light of the Santana port shiploader collapse and subsequent evaluation of the effect that this event had on the carrying value of our investment in Amapá as of June 30, 2013, we recorded an impairment charge of $67.6 million in the second quarter of 2013.

On August 28, 2013, we entered into additional agreements to sell our 30 percent interest in Amapá to Anglo for nominal cash consideration, plus the right to certain contingent deferred consideration upon the two-year anniversary of the closing. The closing was conditional on obtaining certain regulatory approvals and the additional agreement provided Anglo with an option to request that we transfer our interest in Amapá directly to Zamin. Anglo exercised this option and the transfer to Zamin closed in the fourth quarter of 2013. Our interest in Amapá previously was reported as our Latin American iron ore operating segment.

*Sonoma*

On July 10, 2012, we entered into a definitive share and asset sale agreement to sell our 45 percent economic interest in the Sonoma joint venture coal mine located in Queensland, Australia. Upon completion of the transaction on November 12, 2012, we collected approximately AUD $141.0 million in net cash proceeds. The assets sold included our interests in the Sonoma mine along with our ownership of the affiliated wash plant, which were previously reported as our Asia Pacific Coal operating segment. Production and sales totaled approximately 2.8 million and 2.9 million metric tons of coal, respectively, through the sale completion date.

A004176

**Applied Technology, Research and Development**

We have been a leader in iron ore mining and process technology for more than 160 years. We operated some of the first mines on Michigan's Marquette Iron Range and pioneered early open-pit and underground mining methods. From the first application of electrical power in Michigan's underground mines to the use of today's sophisticated computers and global positioning satellite systems, we have been a leader in the application of new technology to the centuries-old business of mineral extraction. Today, our engineering and technical staffs are engaged in full-time technical support of our operations and improvement of existing products.

With state-of-the-art equipment and experienced technical professionals, we remain on the forefront of mining technology. We have an unsurpassed reputation for our pelletizing technology, delivering a world-class quality product to a broad range of sophisticated end users. We are a pioneer in the development of emerging reduction technologies, a leader in the extraction of value from challenging resources and a frontrunner in the implementation of safe and sustainable technology. Our technical experts are dedicated to excellence and deliver superior technical solutions tailored to our customer base.

**Concentration of Customers**

Based on re-casted information to account for the acquisition of Severstal assets in Dearborn, Michigan by AK Steel in 2014 and 2012, we had two customers that individually accounted for more than 10 percent of our consolidated product revenue. In 2013, we had one customer that individually accounted for more than 10 percent of our consolidated product revenue. Product revenue from those customers represented in the chart below totaled approximately $1.6 billion, $1.5 billion and $1.6 billion of our total consolidated product revenue in 2014, 2013 and 2012, respectively, and is attributable to our U.S. Iron Ore, North American Coal and Eastern Canadian Iron Ore business segments. The following represents sales revenue from each of these customers as a percentage of our total consolidated product revenue, as well as the portion of product sales for U.S. Iron Ore, Eastern Canadian Iron Ore and North American Coal that is attributable to each of these customers in 2014, 2013 and 2012, respectively:

| Customer[2] | Percentage of Total Product Revenue[1] | | |
| --- | --- | --- | --- |
| | **2014** | 2013 | 2012 |
| ArcelorMittal | **22%** | 19% | 17% |
| AK Steel[3] | **15%** | 9% | 12% |

[1] Excluding freight and venture partners' cost reimbursements.

[2] Includes subsidiaries.

[3] Effective September 16, 2014, AK Steel completed the acquisition of Severstal North America's integrated steelmaking assets located in Dearborn, Michigan. For comparative purposes, we have combined historical data for all periods presented.

| Customer[2] | Percentage of U.S. Iron Ore Product Revenue[1] | | | Percentage of North American Coal Product Revenue[1] | | | Percentage of Eastern Canadian Iron Ore Product Revenue[1] | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | **2014** | 2013 | 2012 | **2014** | 2013 | 2012 | **2014** | 2013 | 2012 |
| ArcelorMittal | **40%** | 36% | 32% | **7%** | 7% | 5% | **—%** | 10% | 9% |
| AK Steel[3] | **28%** | 21% | 27% | **—%** | —% | —% | **—%** | —% | —% |

[1] Excluding freight and venture partners' cost reimbursements.

[2] Includes subsidiaries.

[3] Effective September 16, 2014, AK Steel completed the acquisition of Severstal North America's integrated steelmaking assets located in Dearborn, Michigan. For comparative purposes, we have combined historical data for all periods presented.

10

Table of Contents

### ArcelorMittal USA

Our pellet supply agreements with ArcelorMittal USA are the basis for supplying pellets to ArcelorMittal USA, which is based on customer requirements, except for the Indiana Harbor East facility, which is based on customer excess requirements. The following table outlines the expiration dates for each of the respective agreements:

| Facility | Agreement Expiration |
| --- | --- |
| Cleveland Works and Indiana Harbor West facilities | December 2016 |
| Indiana Harbor East facility | January 2017 |

ArcelorMittal USA is a 62.3 percent equity participant in Hibbing, as well as, a 21.0 percent equity partner in Empire with limited rights and obligations.

In 2014, 2013 and 2012, our U.S. Iron Ore pellet sales to ArcelorMittal were 10.2 million, 9.5 million and 8.6 million tons, respectively, and our Eastern Canadian Iron Ore pellet and concentrate sales to ArcelorMittal were none, 0.9 million and 0.7 million metric tons, respectively.

In 2014, 2013 and 2012, our North American Coal sales to ArcelorMittal were 0.5 million, 0.5 million and 0.3 million tons, respectively. We do not have any contracts with ArcelorMittal associated with the remaining North American Coal operations, due to our major contract with ArcelorMittal being transferred to the buyer of our CLCC operations. The sale of CLCC was completed on December 31, 2014.

### AK Steel

On September 16, 2014, AK Steel announced an acquisition of Severstal North America's integrated steelmaking assets located in Dearborn, Michigan. We have a long-term relationship to supply iron ore pellets to Severstal's steelmaking assets at that location. Upon consummation of the acquisition, the contract was automatically assigned to AK Steel. The combination of sales pursuant to our preexisting sales agreement with AK Steel and the acquisition of the Dearborn facility with its sales agreement accounts for more than 10 percent of our consolidated product revenue in 2014.

On August 29, 2013 we entered into a new agreement with AK Steel to provide iron ore pellets to AK Steel for use in its Middletown, Ohio and Ashland, Kentucky blast furnace facilities. This contract includes minimum and maximum tonnage requirements for each year between 2014 and 2023.

Under the original agreement entered into with Severstal in 2006, we supply all of the Dearborn, Michigan facility's blast furnace pellet requirements through 2022, subject to specified minimum and maximum requirements in certain years. AK Steel was the successor by merger of this contract and it remains in force. In September 2014, we entered into an amendment to the Dearborn contract with AK Steel to document the 2013 base pricing provisions, among other things, which resulted from an arbitration ruling in May 2014.

In 2014, 2013 and 2012, our U.S. Iron Ore pellet sales to AK Steel and the acquired Dearborn facility were 5.8 million, 4.1 million and 5.7 million tons, respectively.

## Competition

Throughout the world, we compete with major and junior mining companies, as well as metals companies, both of which produce steelmaking raw materials, including iron ore and metallurgical coal.

### North America

In our U.S. Iron Ore business segment, we primarily sell our product to steel producers with operations in North America. In our now shuttered Eastern Canadian Iron Ore business segment, we primarily had provided our product to the seaborne market for Asian steel producers. We compete directly with steel companies that own interests in iron ore mines, including ArcelorMittal and U.S. Steel, and with major iron ore exporters from Australia and Brazil. Additionally, in the last year, there has been a 38 percent increase in steel imported into the U.S. to 44.3 million tons during the first 11 months of 2014, despite the imposition of new import tariffs last summer. This reduced demand for U.S. produced steel and directly affect the demand for iron ore within North America.

In the coal industry, our North American Coal business segment competes with many metallurgical coal producers of various sizes, including Alpha Natural Resources, Inc., Patriot Coal Corporation, CONSOL Energy Inc., Arch Coal, Inc., Walter Energy, Inc., Peabody Energy Corp. and other producers located in North America and globally.

A number of factors beyond our control affect the markets in which we sell our iron ore and coal. Continued demand for our iron ore and metallurgical coal and the prices obtained by us primarily depend on the consumption patterns of the steel industry in the U.S., China and elsewhere around the world, as well as the availability, location, cost of transportation and competing prices. Coal consumption patterns primarily are affected by demand, environmental and other governmental regulations and technological developments. The most important factors on which we compete are delivered price, coal quality characteristics such as heat value, sulfur, ash, volatile matter and moisture content and reliability of supply. Metallurgical coal, which primarily is used to make coke, a key component in the steelmaking process, generally sells at a premium over thermal coal due to its higher quality and value in the steelmaking process.

### Asia Pacific

In our Asia Pacific Iron Ore business segment, we export iron ore products to the Asia Pacific markets, including China, Japan, Korea and Taiwan. In the Asia Pacific marketplace, we compete with major iron ore exporters from Australia, Brazil, South Africa and India. These include Anglo, BHP Billiton, Fortescue Metals Group Ltd., Rio Tinto plc and Vale, among others.

Competition in steelmaking raw materials is predicated upon the usual competitive factors of price, availability of supply, product quality and performance, service and transportation cost to the consumer of the raw materials.

## Environment

Our mining and limited exploration activities are subject to various laws and regulations governing the protection of the environment. We conduct our operations in a manner that is protective of public health and the environment and believe our operations are in compliance with applicable laws and regulations in all material respects.

Environmental issues and their management continued to be an important focus at each of our operations throughout 2014. In the construction of our facilities and in their operation, substantial costs have been incurred and will continue to be incurred to avoid undue effect on the environment. Our capital expenditures relating to environmental matters totaled approximately $33 million, $32 million and $31 million, in 2014, 2013 and 2012, respectively. It is estimated that capital expenditures for environmental improvements will total approximately $42 million in 2015. Estimated expenditures in 2015 are comprised of approximately $35 million for projects in our U.S. Iron Ore operations and $7 million in our North American Coal operations for various water treatment, air quality, dust control, selenium management, tailings management and other miscellaneous environmental projects.

### Regulatory Developments

Various governmental bodies continually promulgate new or amended laws and regulations that affect our Company, our customers and our suppliers in many areas, including waste discharge and disposal, the classification of materials and products, air and water discharges and many other environmental, health and safety matters. Although we believe that our environmental policies and practices are sound and do not expect that the application of any current laws or regulations reasonably would be expected to result in a material adverse effect on our business or financial condition, we cannot predict the collective adverse impact of the expanding body of laws and regulations.

Specifically, there are several notable proposed or potential rulemakings or activities that could potentially have a material adverse impact on our facilities in the future depending on their ultimate outcome: Climate Change and GHG Regulation, Regional Haze, $NO_2$ and $SO_2$ National Ambient Air Quality Standards, Cross State Air Pollution Rule, increased administrative and legislative initiatives related to coal mining activities, Mercury TMDL and Minnesota Taconite Mercury Reduction Strategy's evolving scope of the Clean Water Act and definition of "Waters of the United States" and Selenium Discharge Regulation.

12

*Climate Change and GHG Regulation*

With the complexities and uncertainties associated with the U.S. and global navigation of the climate change issue as a whole, one of our significant risks for the future is mandatory carbon legislation. Policymakers are in the design process of carbon regulation at the state, regional, national and international levels. The current regulatory patchwork of carbon compliance schemes presents a challenge for multi-facility entities to identify their near-term risks. Amplifying the uncertainty, the dynamic forward outlook for carbon regulation presents a challenge to large industrial companies to assess the long-term net impacts of carbon compliance costs on their operations. Our exposure on this issue includes both the direct and indirect financial risks associated with the regulation of GHG emissions, as well as potential physical risks associated with climate change. We are continuing to review the physical risks related to climate change utilizing a formal risk management process.

Internationally, mechanisms to reduce emissions are being implemented in various countries, with differing designs and stringency, according to resources, economic structure and politics. We expect that momentum to extend carbon regulation will continue. Australia and Canada are signatories to the Kyoto Protocol. As such, our facilities in each of these countries are impacted by the Kyoto Protocol, but in varying degrees according to the mechanisms each country establishes for compliance and each country's commitment to reducing emissions. Australia and Canada are considered Annex 1 countries, meaning that they are obligated to reduce their emissions under the Protocol. The impact of the Kyoto Protocol on our Canadian operations has diminished with the idling of our Canadian operations.

In Australia, legislation for a carbon tax was passed in July 2012. The direct impact of the carbon tax on our Asia Pacific operations primarily occurs through increased fuel costs. The tax was estimated to result in an increase in direct costs of approximately A$3.5 million per year however following a change of Federal Government in September 2013 the carbon tax was repealed in July 2014.

In the U.S., federal carbon regulation potentially presents a significantly greater impact to our operations. To date, the U.S. has not legislated carbon constraints. In the absence of comprehensive federal carbon legislation, numerous state and regional regulatory initiatives are under development or are becoming effective, thereby creating a disjointed approach to carbon control. On June 25, 2013, President Obama issued a memorandum directing the EPA to develop carbon emission standards for both new and existing power plants under the Clean Air Act's NSPS. On January 8, 2014, the EPA proposed NSPS regulating carbon dioxide emissions from new fossil fuel-fired power plants. On June 2, 2014, EPA proposed the 'Clean Power Plan' which consists of NSPS regulating carbon dioxide from existing power plants at a level 30 percent below 2005 levels by 2030. States must submit Clean Power Plan SIPs by June 2016, though extension waivers will be made available. As proposed these rules would not affect our Silver Bay power generating facility.

As an energy-intensive business, our GHG emissions inventory captures a broad range of emissions sources, such as iron ore furnaces and kilns, coal thermal driers, diesel mining equipment and our wholly owned Silver Bay power generation plant, among others. As such, our most significant regulatory risks are: (1) the costs associated with on-site emissions levels, and (2) the costs passed through to us from power generators and distillate fuel suppliers.

We believe our exposure can be reduced substantially by numerous factors, including currently contemplated regulatory flexibility mechanisms, such as allowance allocations, fixed process emissions exemptions, offsets and international provisions; emissions reduction opportunities, including energy efficiency, biofuels, fuel flexibility, emerging shale gas, coal mine methane offset reduction; and business opportunities associated with new products and technology.

We have worked proactively to develop a comprehensive, enterprise-wide GHG management strategy aimed at considering all significant aspects associated with GHG initiatives to plan effectively for and manage climate change issues, including risks and opportunities as they relate to the environment, stakeholders, including shareholders and the public, legislative and regulatory developments, operations, products and markets.

*Regional Haze*

In June 2005, the EPA finalized amendments to its regional haze rules. The rules require states establish goals and emission reduction strategies for improving visibility in all Class I national parks and wilderness areas. Among the states with Class I areas are Michigan, Minnesota, Alabama and West Virginia in which we currently own and manage mining operations. The first phase of the regional haze rule (2008-2018) requires analysis and installation of BART on eligible emission sources and incorporation of BART and associated emission limits into SIPs.

Minnesota submitted a regional haze SIP to the EPA on December 30, 2009, and a supplement to the SIP on May 8, 2012. Michigan submitted its regional haze SIP to the EPA on November 5, 2010. During the second quarter of 2012, the EPA also sent information requests to all taconite facilities requesting information on $SO_2$ and NOx emissions

Table of Contents

and control technology assessments. On June 12, 2012, the EPA approved revisions to the Minnesota SIP addressing regional haze, but also announced it was deferring action on emission limitations that Minnesota intended to represent BART for taconite facilities. On August 15, 2012, the EPA proposed to deny the Michigan and Minnesota taconite SIP BART determinations and simultaneously proposed a separate FIP for taconite facilities. During the comment period for the proposed FIP rule, the taconite industry and other stakeholders developed detailed comments and shared information to address furnace specific case-by-case circumstances. On January 15, 2013, the EPA signed the final FIP for taconite facilities. The final FIP reflects progress toward a more technically and economically feasible regional haze implementation plan and eliminates the need for investing in additional $SO_2$ emission control equipment. However, we remain concerned about the technical and economic feasibility of EPA's BART determination for NOx emissions and we filed a petition for review in the 8th Circuit Court and subsequently received a judicial stay of the FIP which enabled us to conduct a detailed engineering analysis to determine the impact of the regulations on each unique iron ore indurating furnace affected by this rule. The results of this analysis enabled us to reach a settlement with EPA which was public noticed in the Federal Register on January 30, 2015. Cost estimates associated with the settlement are reflected in our 5-year capital plan.

### $NO_2$ and $SO_2$ National Ambient Air Quality Standards

During the first half of 2010, the EPA promulgated rules that require states to use a combination of air quality monitoring and computer modeling to determine areas of each state that are in attainment with new $NO_2$ and $SO_2$ standards and those areas that are not in attainment with such standards. During the third quarter of 2011, the EPA issued guidance to the regulated community on conducting refined air quality dispersion modeling and implementing the new $NO_2$ and $SO_2$ standards. The $NO_2$ and $SO_2$ standards have been challenged by various large industry groups. Accordingly, at this time, we are unable to predict the final impact of these standards. During June 2011, our Minnesota iron ore mining operations received a request from the MPCA to develop modeling and compliance plans and timelines by which each facility would demonstrate compliance with present and proposed NAAQS as well as regional haze requirements outlined in the SIP. Compliance must be achieved by June 30, 2017 according to the initial state orders, although the EPA has indicated that the $SO_2$ attainment area designation timelines have been extended out to 2020. We continue to assess options by which to achieve compliance and seek alignment between the state and federal expectations.

### Cross State Air Pollution Rule

On July 6, 2011, the EPA promulgated the CSAPR, which was intended to be an emissions trading rule for $SO_2$ and NOx. Northshore's Silver Bay Power Plant would have been subject to this rule, however Minnesota elected to follow EPA guidance allowing CSAPR to stand as BART. CSAPR was vacated by the D.C. Circuit Court during the third quarter of 2012. Late in 2014, the Supreme Court re-instated CSAPR with an effective date of January 1, 2015, re-instating the obligations of this rule for Silver Bay Power. Immediate compliance obligations are being met at this time, with the material obligation being procurement of the first year of emissions allowances by March 2016 for the 2015 operating year. Silver Bay Power is completing the engineering and permitting work to install controls that will limit the cost exposure to the trading market. The allowance pricing market is continuing to fluctuate so price impacts are not yet certain, we anticipate the annual costs will be less than $1 million for 2015 and gradually decreasing to less than $400,000 per year after we complete our emission reduction project in 2017.

### Increased Administrative and Legislative Initiatives Related to Coal Mining Activities

Although the focus of significantly increased government activity related to coal mining in the U.S. is generally targeted at eliminating or minimizing the adverse environmental impacts of mountaintop coal mining practices, these initiatives have the potential to impact all types of coal operations, including subsurface longwall mining typically deployed for recovering metallurgical coal. Specifically, the coordinated efforts by various federal agencies to further regulate mountaintop mining have slowed issuance of the permits required by many mining projects in Appalachia. Due to the developing nature of these initiatives and their potential to disrupt even routine mining and water permit practices in the coal industry, we are unable to predict whether these initiatives could have a material effect on our coal operations in the future. We are working closely with our trade associations to monitor the various rulemaking developments in an effort to enable us to develop viable strategies to minimize the financial impact to the business.

14

Table of Contents

*Mercury TMDL and Minnesota Taconite Mercury Reduction Strategy*

TMDL regulations are contained in the Clean Water Act.  As a part of Minnesota's Mercury TMDL Implementation Plan, in cooperation with the MPCA, the taconite industry developed a Taconite Mercury Reduction Strategy and signed a voluntary agreement in 2009 to effectuate its terms.  The strategy includes a 75 percent target reduction of mercury air emissions from Minnesota pellet plants collectively by 2025.  It recognizes that mercury emission control technology currently does not exist and will be pursued through a research effort.  According to the voluntary agreement, any developed technology must meet the "adaptive management criteria" such that the technology must be economically feasible, must not impact pellet quality, and must not cause excessive corrosion in pellet furnaces, associated duct work and existing wet scrubbers on the furnaces.

According to the voluntary agreement, the mines proceeded with medium- and long-term testing of possible technologies.  For Cliffs, the requirements in the voluntary agreement applies to the United Taconite and Hibbing facilities.  At this time, we are unable to predict the potential impacts of the voluntary Taconite Mercury Reduction Strategy.  However, a number of research projects were conducted between 2011 and 2014 as the industry continues to assess options for reduction.  While injection of powdered activated carbon into furnace off-gasses for mercury capture in the wet scrubbers showed positive initial results, further testing during 2013 yielded lower overall potential. Alternate technologies are presently being assessed in our ongoing efforts to develop cost effective mercury reduction technologies for our indurating furnaces.

On September 22, 2014, Minnesota promulgated the Mercury Air Emissions Reporting and Reduction Rule mandating mercury air emissions reporting and reduction. The adopted rule expanded applicability to all of our Minnesota operations and requires submitting a mercury reduction plan in 2018 to reduce mercury emissions from all of our Minnesota taconite furnaces by 72 percent by January 2025 and 70 percent reduction from Northshore's industrial boilers by January 1, 2018. The adopted rule does not include all four Adaptive Management Criteria for evaluating mercury reduction, which were agreed upon in the October 2009 Minnesota's Mercury TMDL Implementation Plan.

To date, there is currently no proven technology to cost effectively reduce mercury emissions from taconite furnaces to the target level of 72 percent that would meet all four Adaptive Management Criteria. We remain concerned about the technical and economic feasibility to reduce taconite mercury emissions by 72 percent and are conducting detailed engineering analysis to determine the impact of the regulations on each unique iron ore indurating furnace affected by this rule. The results of this analysis will guide further dialog with the MPCA regarding our implementation of the requirements.

*Selenium Discharge Regulation*

Our North American Coal operations have numerous NPDES permits with either selenium discharge limits or draft permits with selenium limits. We have achieved, or have projects underway that will achieve compliance at all discharges. As such, we do not believe this issue will likely have a material impact to our North American Coal operations.

In Michigan, the MDEQ issued renewed NPDES permits for our Empire mine in December 2011 and for our Tilden mine in 2012. Our Michigan operations at Empire and Tilden are developing compliance strategies to meet new selenium process water limits according to the permit conditions. Empire and Tilden submitted the Selenium Storm Water Management Plan to the MDEQ in December 2011. The Selenium Storm Water Management Plan outlines the activities that will be undertaken to address selenium in storm water discharges from our Michigan operations. The activities include the evaluation of structural controls, non-structural controls, site specific standards, and evaluation of potential impacts to groundwater. Pilot treatment systems have had good initial results and evaluation work continues. An initial estimate for full scale implementation of storm water treatment systems and structural selenium controls at both facilities is approximately $63 million. The results from the evaluation of existing pilot and demonstration-scale work will determine if these structural controls are utilized, or if alternatives must be applied.

Tilden's NPDES permit renewal became effective on November 1, 2012.  The permit contains a compliance schedule for selenium with a limit of five µg/l that will be effective as of November 1, 2017, at Tilden's Gribben Tailings Basin outfall.  Tilden has initiated a prudent and feasible alternatives analysis to further define solutions and cost estimates. Preliminary testing and engineering for end-of-pipe solutions indicates capital costs are likely to be less than the previously estimated range of $96 million to $146 million. The next phase of engineering and updated cost estimates are scheduled to be concluded in the first half of 2015. In May 2014, the EPA proposed new selenium fish tissue limits and a lower lentic water column concentration criterion which may increase the cost for treatment. We are incorporating this contingency into our planning and treatment technology development.

15

*Definition of "Waters of the United States" Under the Clean Water Act*

The EPA and Army Corps of Engineers' proposed rule, "Definition of 'Waters of the United States' Under the Clean Water Act," 79 Fed. Reg. 22188 (Apr. 21, 2014), attempts to add clarity to which waters are jurisdictional under the federal Clean Water Act, and will apply to all Clean Water Act programs, including the Sec. 402 and Sec. 404 permitting programs, Sec. 311 spill prevention program and Sec. 401 state certification process.  It is unclear how the federal and state agencies will implement and enforce the final rule, and how the courts will interpret going forward, however, there is substantial cause to be concerned in several areas of the draft.  The draft regulation may expand EPA's authority under the Clean Water Act to many traditionally unregulated mine features such as mine pits, pit lakes, on site ditches, water retention structures, and tailings basins creating a new burden on our U.S. facilities.  This could further be interpreted to add questionable regulatory authority over the groundwater connections between these features and nearby traditionally navigable waters.  We are actively participating in the rulemaking development and assessing the potential impacts to our operations.

For additional information on our environmental matters, refer to *Item 3. Legal Proceedings* and NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS in *Item 8. Financial Statements and Supplementary Data* of this Annual Report on Form 10-K.

## Energy

### Electricity

The state of Michigan is a deregulated electricity state, which affords our mines the ability to purchase electrical energy supply from various suppliers while continuing to purchase distribution service from the incumbent utility. As of September 1, 2013, our Tilden and Empire mines in Michigan exercised the right to purchase electrical supply from Integrys Energy Services while continuing to purchase distribution service from Wisconsin Electric Power Company. The pricing of electricity in the deregulated market is based on the Midwestern Independent System Operator Day-Ahead price. Beginning on February 1, 2015, we began purchasing our electricity supply from the Wisconsin Electric Power Company in a regulated fashion as we terminated our contract with Integrys Energy Services. As of February 1, 2015, Wisconsin Electric Power Company is the sole supplier of electric power to our Empire and Tilden mines. Wisconsin Electric Power Company provides 300 megawatts of electricity to Empire and Tilden at rates that are regulated by the MPSC. The Empire and Tilden mines are subject to changes in Wisconsin Electric Power Company's rates, such as base interim rate changes that Wisconsin Electric Power Company may self-implement and final rate changes that are approved by the MPSC in response to applications filed by Wisconsin Electric Power Company. Additionally, Empire and Tilden are subject to frequent changes in Wisconsin Electric Power Company's power supply adjustment factor.

Electric power for the Hibbing and United Taconite mines is supplied by Minnesota Power. On September 16, 2008, the mines finalized agreements with terms from November 1, 2008 through December 31, 2015. The agreements were approved by the MPUC in 2009.

Silver Bay Power Company, a wholly owned subsidiary of ours, with a 115 megawatt power plant, provides the majority of Northshore's electrical energy requirements. Silver Bay Power has an interconnection agreement with Minnesota Power for backup power when excess generation is necessary.

Wabush had a 20-year agreement with Newfoundland Power, which ended December 31, 2014. This agreement allowed for an exchange of water rights in return for the power needs for Wabush's mining operations. Beginning on January 1, 2015, Wabush has a short-term electricity agreement with Newfoundland Hydro Power.  The pricing of this agreement is set by the Labrador industrial rate policy. The Wabush pelletizing operation and the Bloom Lake operation in Québec are served by Québec Hydro, which provides power under regulated rates that are set on an annual basis.

The Oak Grove mine and Concord Preparation Plant are supplied electrical power by Alabama Power under a five-year contract that continues in effect until terminated by either party providing written notice to the other in accordance with applicable rules, regulations and rate schedules. Rates of the contract are subject to change during the term of the contract as regulated by the Alabama Public Services Commission.

Electrical power to the Pinnacle Complex is supplied by the Appalachian Power Company under a regulated electrical supply contract. The contract specifies the applicable rate schedule, minimum monthly charge and power capacity furnished. Rates, terms and conditions of the contract are subject to the approval of the Public Service Commission of West Virginia.

Koolyanobbing and its associated satellite mines draw power from independent diesel-fueled power stations and generators. Diesel power generation capacity has been installed at the Koolyanobbing operations.

16

*Process Fuel*

We have a long-term contract providing for the transport of natural gas on the Northern Natural Gas Pipeline for our U.S. Iron Ore operations. Our Pinnacle and Oak Grove coal operations also use natural gas, but purchase it through their local regulated utility, Mountaineer Gas and Alabama Gas Co., respectively. At U.S. Iron Ore, the Empire and Tilden mines have the capability of burning natural gas, coal or, to a lesser extent, oil. The Hibbing and Northshore mines have the capability to burn natural gas and oil. The United Taconite mine has the ability to burn coal, natural gas and petroleum coke. Consistent with 2014, we expect during 2015 our U.S. Iron Ore operations will utilize both natural gas and coal to heat furnaces and produce power at our Silver Bay Power facility. At Eastern Canadian Iron Ore, the Wabush mine has the capability to burn bunker fuel, stove and furnace oils and coke breeze and the Bloom Lake mine has the ability to burn stove and furnace oils. Our Eastern Canadian Iron Ore process fuel is primarily supplied by Imperial Oil, a subsidiary of Exxon Mobil, through contracts.

## Employees

As of December 31, 2014, we had a total of 5,386 employees.

| | **2014** | 2013 | 2012 |
|---|---|---|---|
| **U.S. Iron Ore**[1] | | | |
| Salaried | **658** | 700 | 715 |
| Hourly | **2,705** | 2,825 | 2,976 |
| Total | **3,363** | 3,525 | 3,691 |
| **Asia Pacific Iron Ore**[2] | | | |
| Salaried | **139** | 177 | 216 |
| Hourly | **—** | — | — |
| Total | **139** | 177 | 216 |
| **North American Coal** | | | |
| Salaried | **237** | 379 | 406 |
| Hourly | **821** | 1,207 | 1,210 |
| Total | **1,058** | 1,586 | 1,616 |
| **Eastern Canadian Iron Ore**[2] | | | |
| Salaried | **231** | 407 | 459 |
| Hourly | **320** | 973 | 956 |
| Total | **551** | 1,380 | 1,415 |
| **Corporate & Support Services** | | | |
| Salaried | **275** | 470 | 625 |
| Hourly | **—** | — | 26 |
| Total | **275** | 470 | 651 |
| **Total** | **5,386** | 7,138 | 7,589 |

[1] Includes our employees and the employees of the U.S. Iron Ore joint ventures.

[2] Excludes contracted mining employees

As of December 31, 2014, approximately 85.0 percent of our U.S. Iron Ore hourly employees, approximately 100.0 percent of our Eastern Canadian Iron Ore hourly employees and approximately 100.0 percent of our North American Coal hourly employees were covered by collective bargaining agreements.

Hourly employees at our Michigan and Minnesota iron ore mining operations, excluding Northshore, are represented by the USW. The labor agreements that cover approximately 2,200 USW-represented employees at our Empire and Tilden mines in Michigan, and our United Taconite and Hibbing mines in Minnesota are effective September 1, 2012 through September 30, 2015. Employees at our Northshore operations are not represented by a union and are not, therefore, covered by a collective bargaining agreement.

Hourly employees at our Eastern Canadian Iron Ore operations also are represented by the USW. The labor agreement with the USW that covers our represented employees at Bloom Lake is effective from September 1, 2013

A004184

through August 31, 2016. The labor agreement with the USW that covers our represented employees at our Pointe Noire facility, is effective from March 1, 2014 through February 28, 2020.

Hourly employees at our Lake Superior and Ishpeming railroads are represented by seven unions covering approximately 105 employees. The labor agreements that cover these employees reopened for bargaining on December 31, 2014 and we are actively bargaining with the seven unions that represent them for successor agreements. These employees negotiate under the Railway Labor Act, which provides that labor agreements remain in force until replaced by a successor agreement. Under the Railway Labor Act work stoppages cannot occur until the parties have engaged in substantial negotiations, have mediated any disputes and have received a release from the National Mediation Board.

Hourly production and maintenance employees at our Pinnacle Complex and Oak Grove mines are represented by the UMWA. Our labor agreements with the UMWA at those locations are effective July 1, 2011 through December 31, 2016. Those agreements are identical in all material respects to the NBCWA of 2011 between the UMWA and the National Bituminous Coal Operators' Association.

Employees at our Asia Pacific Iron Ore, Corporate and Support Services are not represented by a union and are not, therefore, covered by collective bargaining agreements.

### Safety

Safety is our primary core value as we continue towards a zero incident culture at our operating facilities.  We continuously monitor, track and measure our safety performance and make changes where necessary.  Best practices are shared globally to ensure each mine site can embed our policies, procedures and learnings for enhanced workplace safety. We measure progress toward achieving our objective against regularly established benchmarks, including measuring company-wide TRIR. During 2014, our TRIR (including contractors) was 2.02 per 200,000 man-hours worked.

Refer to *Exhibit 95 Mine Safety Disclosures (filed herewith)* for mine safety information required in accordance with Section 1503(a) of the Dodd-Frank Act.

### Available Information

Our headquarters are located at 200 Public Square, Cleveland, Ohio 44114-2315, and our telephone number is (216) 694-5700. We are subject to the reporting requirements of the Exchange Act and its rules and regulations.  The Exchange Act requires us to file reports, proxy statements and other information with the SEC. Copies of these reports and other information can be read and copied at:

SEC Public Reference Room
100 F Street N.E.
Washington, D.C. 20549

Information on the operation of the Public Reference Room may be obtained by calling the SEC at 1-800-SEC-0330.

The SEC maintains a website that contains reports, proxy statements and other information regarding issuers that file electronically with the SEC. These materials may be obtained electronically by accessing the SEC's home page at *www.sec.gov*.

We use our website, *www.cliffsnaturalresources.com*, as a channel for routine distribution of important information, including news releases, investor presentations and financial information. We also make available, free of charge on our website, our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to these reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act, as soon as reasonably practicable after we electronically file these documents with, or furnish them to, the SEC. In addition, our website allows investors and other interested persons to sign up to receive automatic email alerts when we post news releases and financial information on our website.

We also make available, free of charge on our website, the charters of the Audit Committee, Governance and Nominating Committee and Compensation and Organization Committee as well as the Corporate Governance Guidelines and the Code of Business Conduct & Ethics adopted by our Board of Directors. These documents are available through our investor relations page on our website at *ir.cliffsnaturalresources.com*. The SEC filings are available by selecting "Financial Information" and then "SEC Filings," and material and corporate governance is available by selecting "Corporate Governance" for the Board Committee Charters, operational governance guidelines and the Code of Business Conduct and Ethics.

18

Table of Contents

References to our website or the SEC's website do not constitute incorporation by reference of the information contained on such websites, and such information is not part of this Annual Report on Form 10-K.

Copies of the above-referenced information are also available, free of charge, by calling (216) 694-5700 or upon written request to:

Cliffs Natural Resources Inc.
Investor Relations
200 Public Square
Cleveland, OH 44114-2315

19

A004186

Table of Contents

**EXECUTIVE OFFICERS OF THE REGISTRANT**

Following are the names, ages and positions of the executive officers of the Company as of   February 25, 2015. Unless otherwise noted, all positions indicated are or were held with Cliffs Natural Resources Inc.

| Name | Age | Position(s) Held |
|------|-----|------------------|
| Lourenco Goncalves | 57 | Chairman of the Board, President and Chief Executive Officer (August 2014 - present); Chairman, President and Chief Executive Officer of Metals USA Holdings Corp., an American manufacturer and processor of steel and other metals (May 2006 - April 2013); President, Chief Executive Officer and a director of Metals USA Inc. (February 2003 - April 2006). |
| Terry G. Fedor | 50 | Executive Vice President, United States Iron Ore (January 2014 - present); Vice President (February 2011 - January 2014); Vice President and General Manager (March 2005 - February 2011) of ArcelorMittal Cleveland, a fully integrated steelmaking facility. |
| James D. Graham | 49 | Executive Vice President (November 2014 - present); Chief Legal Officer (March 2013 - present); Secretary (March 2014 - present); Vice President (January 2011 - October 2014); General Counsel - Global Operations (January 2011 - March 2013); Assistant General Counsel (April 2007 - December 2010). |
| Maurice D. Harapiak | 53 | Executive Vice President, Human Resources (June 2014 - present); Regional Director, Human Resources - Barrick Gold of North America, a gold mining company (November 2011 - June 2014); Senior Director, Human Resources, Capital Projects - Barrick Gold Corporation, a gold mining company (November 2007 - November 2011). |
| Terrence R. Mee | 45 | Executive Vice President, Global Commercial (October 2014 - present); Vice President, Global Iron Ore Sales (February 2014 - October 2014); Senior Vice President, Global Iron Ore Sales (March 2012 - February 2014); Senior Vice President, Global Iron Ore & Metallic Sales (January 2011 - March 2012); Vice President, Sales and Transportation (September 2007 - January 2011). |
| Terrance M. Paradie | 46 | Executive Vice President (March 2013 - present); Chief Financial Officer (October 2012 - present); Treasurer (September 2014 - February 2015); Senior Vice President (January 2011 - March 2013); Assistant General Manager - Michigan Operations (March 2012 - September 2012); Corporate Controller (October 2007 - March 2012); Chief Accounting Officer (July 2009 - March 2012); Vice President (October 2007 - January 2011). |
| Clifford T. Smith | 55 | Executive Vice President, Seaborne Iron Ore (January 2014 – present); Executive Vice President, Global Operations (July 2013 - January 2014); Executive Vice President, Global Business Development (March 2013 - July 2013); Senior Vice President, Global Business Development (January 2011 - March 2013); Vice President, Latin American Operations(September 2009 - January 2011). |
| P. Kelly Tompkins | 58 | Executive Vice President, Business Development (October 2014 - present); Executive Vice President, External Affairs and President, Global Commercial (November 2013 - October 2014); Chief Administrative Officer (July 2013 - November 2013); Executive Vice President, Legal, Government Affairs and Sustainability (May 2010 - July 2013). Chief Legal Officer (January 2011 - January 2013); President, Cliffs China (October 2012 - November 2013); Executive vice president and chief financial officer of RPM International Inc., a specialty coatings and sealants manufacturer (June 2008 - May 2010). |
| David L. Webb | 57 | Executive Vice President (January 2014 - present); Senior Vice President, Global Coal (July 2011 - January 2014); Vice president and general manager of Mid-West Operations for Patriot Coal Corp., a producer of thermal and metallurgical coal (2007 - June 2011). |
| Timothy K. Flanagan | 37 | Vice President, Corporate Controller & Chief Accounting Officer (March 2012 - present); Assistant Controller (February 2010 - March 2012); and Director, Internal Audit (April 2008 - February 2010). |

All executive officers serve at the pleasure of the Board. There are no arrangements or understandings between any executive officer and any other person pursuant to which an executive officer was selected to be an officer of the Company. There is no family relationship between any of our executive officers, or between any of our executive officers and any of our directors.

Table of Contents

**Item 1A.**         *Risk Factors*

An investment in our common shares or other securities is subject to risk inherent to our business and our industry. Described below are certain risks and uncertainties, the occurrences of which could have a material adverse effect on us. Before making an investment decision, you should consider carefully all of the risks described below together with the other information included in this report. The risks and uncertainties described below are not the only ones we face. Although we have significant risk management policies, practices and procedures aimed to mitigate these risks, uncertainties may nevertheless impair our business operation. This report is qualified in its entirety by these factors.

Our ERM function provides a framework for management's consideration of risk when making strategic, financial, operational and/or project decisions. The framework is based on ISO 31000, an internationally recognized risk management standard. Management uses a consistent methodology to identify and assess risks, determine and implement risk mitigation actions, and monitor and communicate information about the Company's key risks. Through these processes, we have identified six categories of risk that we are subject to: (I) economic and market, (II) regulatory, (III) financial, (IV) operational, (V) development and sustainability and (VI) human capital. The following risk factors are presented according to these key risk categories.

**I.   ECONOMIC   AND   MARKET RISKS**

***The volatility of commodity prices, namely iron ore and coal, affects our ability to generate revenue, maintain stable cash flow and to fund our operations, including growth and expansion projects.***

As a mining company, our profitability is dependent upon the price of the commodities that we sell to our customers, namely iron ore and coal. The prices of iron ore and coal have fluctuated historically and are affected by factors beyond our control, including: steel inventories; international demand for raw materials used in steel production; rates of global economic growth, especially construction and infrastructure activity that requires significant amounts of steel; recession or reduced economic activity in the U.S., China, India, Europe and other industrialized or developing countries; uncertainties or weaknesses in global economic conditions such as the sovereign debt crisis in Europe and the U.S. debt ceiling; changes in production capacity of other iron ore and metallurgical coal suppliers, especially as additional supplies come online or where there is a significant increase in imports of steel into the U.S. or Europe; weather-related disruptions or natural disasters that may impact the global supply of iron ore and metallurgical coal; and the proximity, capacity and cost of infrastructure and transportation.

Our earnings, therefore, may fluctuate with the prices of the commodities we sell. To the extent that the prices of these commodities significantly decline for an extended period of time, we may have to revise our operating plans, including curtailing production, reducing operating costs and capital expenditures and discontinuing certain exploration and development programs. We also may have to take impairments on our assets, inventory and/or goodwill. Sustained lower prices also could cause us to reduce existing reserves if certain reserves no longer can be economically mined or processed at prevailing prices. We may be unable to decrease our costs in an amount sufficient to offset reductions in revenues and may incur losses. These events could have a material adverse effect on us.

***Uncertainty or weaknesses in global economic conditions and reduced economic growth in China could affect adversely our business.***

The world prices of iron ore and coal are influenced strongly by international demand and global economic conditions. Uncertainties or weaknesses in global economic conditions, including the ongoing sovereign debt crisis in Europe, could affect adversely our business and negatively impact our financial results. In addition, the current level of international demand for raw materials used in steel production is driven largely by industrial growth in China. If the economic growth rate in China slows for an extended period of time, or if another global economic downturn were to occur, we would likely see decreased demand for our products and decreased prices, resulting in lower revenue levels and decreasing margins. We are not able to predict whether the global economic conditions will continue or worsen and the impact it may have on our operations and the industry in general going forward.

***Capacity expansions within the mining industry could lead to lower global iron ore and coal prices, impacting our profitability.***

Continued global growth of iron ore and coal demand, particularly from China, resulted in iron ore and metallurgical coal suppliers expanding their production capacity. The supply of both iron ore and metallurgical coal has increased due to these expansions. In the current iron ore and coal markets, an increase in our competitors' capacity could result in excess supply of these commodities, resulting in downward pressure on prices. This decrease in pricing would adversely impact our sales, margins and profitability.

21

A004188

Table of Contents

***If steelmakers use methods other than blast furnace production to produce steel or use other inputs, or if their blast furnaces shut down or otherwise reduce production, the demand for our iron ore and coal products may decrease.***

Demand for our iron ore and coal products is determined by the operating rates for the blast furnaces of steel companies. However, not all finished steel is produced by blast furnaces; finished steel also may be produced by other methods that use scrap steel, pig iron, hot briquetted iron and direct reduced iron. North American steel producers also can produce steel using imported iron ore or semi-finished steel products, which eliminates the need for domestic iron ore. Future environmental restrictions on the use of blast furnaces also may reduce our customers' use of their blast furnaces. Maintenance of blast furnaces may require substantial capital expenditures. Our customers may choose not to maintain, or may not have the resources necessary to maintain, their blast furnaces. If our customers use methods to produce steel that do not use iron ore and coal products, demand for our iron ore and coal products will decrease, which would affect adversely our sales, margins and profitability.

***Due to economic conditions and volatility in commodity prices, our customers could approach us about modification of their supply agreements. Modifications to our sales agreements potentially could be made due to such volatility, which could impact adversely our sales, margins, profitability and cash flows.***

Although we have contractual commitments for sales in our U.S. Iron Ore and Eastern Canadian Iron Ore business for 2015 and beyond, the uncertainty in global economic conditions may adversely impact the ability of our customers to meet their obligations. As a result of such market volatility, our customers could approach us about modifying their supply agreements. Any modifications to our sales agreements could adversely impact our sales, margins, profitability and cash flows. These discussions or potential actions by our customers could also result in contractual disputes, which could ultimately require arbitration or litigation, either of which could be time consuming and costly. Any such disputes could impact adversely our sales, margins, profitability and cash flows.

## II.   REGULATORY RISKS

***We are subject to extensive governmental regulation, which imposes, and will continue to impose, potential significant costs and liabilities on us. Future laws and regulation or the manner in which they are interpreted and enforced could increase these costs and liabilities or limit our ability to produce iron ore and coal products.***

New laws or regulations, or changes in existing laws or regulations, or the manner of their interpretation or enforcement, could increase our cost of doing business and restrict our ability to operate our business or execute our strategies. This includes, among other things, the possible taxation under U.S. law of certain income from foreign operations, compliance costs and enforcement under the Dodd-Frank Wall Street Reform and Consumer Protection Act, and costs associated with complying with the Patient Protection and Affordable Care Act and the Healthcare and Education Reconciliation Act of 2010 and the regulations promulgated thereunder. In addition, we are subject to various federal, provincial, state and local laws and regulations in each jurisdiction in which we have operations for employee health and safety, air quality, water pollution, plant, wetlands and wildlife protection, reclamation and restoration of mining properties, the discharge of materials into the environment, the effects that mining has on groundwater quality and availability, and related matters. Numerous governmental permits and approvals are required for our operations. We cannot be certain that we have been or will be at all times in complete compliance with such laws, regulations, permits and approvals. If we violate or fail to comply with these laws, regulations, permits or approvals, we could be fined or otherwise sanctioned by regulators. Compliance with the complex and extensive laws and regulations that we are subject to imposes substantial costs, which we expect will continue to increase over time because of increased regulatory oversight, adoption of increasingly stringent environmental standards, and increased demand for remediation services leading to shortages of equipment, supplies and labor, as well as other factors.

Specifically, there are several notable proposed or recently enacted rulemakings or activities to which we would be subject or that would further regulate and/or tax our customers, namely the North American integrated steel producer customers that may also require us or our customers to reduce or otherwise change operations significantly or incur significant additional costs, depending on their ultimate outcome. These emerging or recently enacted rules and regulations include: numerous air regulations, such as climate change and greenhouse gas regulation, regional haze regulation, NAAQS including but not limited to those for $NO_2$ and $SO_2$, the CSAPR; increased administrative and legislative initiatives related to coal mining activities; Minnesota's Mercury Air Emissions Reporting and Reduction Rule, Mercury Total Maximum Daily Load requirements and Taconite Mercury Reduction Strategy; selenium discharge regulation; expansion of federal jurisdictional authority to regulate groundwater, and various other water quality regulations. Such new or more stringent legislation, regulations, interpretations or orders, when enacted, could have a material adverse effect on our business, results of operations, financial condition or profitability.

A004189

Table of Contents

***Although the numerous regulations, operating permits and our management systems mitigate potential impacts to the environment, our operations may inadvertently impact the environment or cause exposure to hazardous substances, which could result in material liabilities to us.***

Our operations currently use and have used in the past, hazardous materials, and, from time to time, we have generated solid and hazardous waste. We may be subject to claims under federal, provincial, state and local laws and regulations for toxic torts, natural resource damages and other damages as well as for the investigation and clean-up of soil, surface water, sediments, groundwater and other natural resources. Such claims for damages and reclamation may arise out of current or former conditions at sites that we own, lease or operate currently, as well as sites that we or our acquired companies have owned, leased or operated, and at contaminated sites that have always been owned, leased or operated by our joint-venture partners. Our liability for such claims may be joint and several, so that we may be held responsible for more than our share of the contamination or other damages, or even for the entire share. We are subject to a variety of potential liability exposures arising, or otherwise involved in remediation activities, at certain sites. In addition to currently owned, leased or operated sites, these include sites where we formerly conducted iron ore and/or coal mining or processing or other operations, inactive sites that we currently own, predecessor sites, acquired sites, leased land sites and third-party waste disposal sites. We may be named as a responsible party at other sites in the future and we cannot be certain that the costs associated with these additional sites will not be material.

We also could be held liable for any and all consequences arising out of human exposure to hazardous substances used, released, or disposed of by us. In particular, we and certain of our subsidiaries are involved in various claims relating to the exposure of asbestos and silica to seamen who sailed until the mid-1980s on the Great Lakes vessels formerly owned and operated by certain of our subsidiaries. The full impact of these claims continues to be unknown. Uncertainty also remains as to whether insurance coverage will be sufficient and whether other defendants named in these claims will be able to fund any costs arising out of these claims.

Environmental impacts as a result of our operations, including exposures to hazardous substances or wastes associated with our operations, could result in costs and liabilities that could materially and adversely affect our margins, cash flow or profitability.

***We may be unable to obtain and renew permits necessary for our operations, which could reduce our production, cash flows and profitability. We also could face significant permit and approval requirements that could delay our commencement or continuation of exploration and production operations, which, in turn, could affect materially our cash flows and profitability.***

Prior to commencement of mining, we must submit to and obtain approval from the appropriate regulatory authority of plans showing where and how mining and reclamation operations are to occur. These plans must include information such as the location of mining areas, stockpiles, surface waters, haul roads, tailings basins and drainage from mining operations. All requirements imposed by any such authority may be costly and time-consuming and may delay commencement or continuation of exploration or production operations.

Mining companies must obtain numerous permits that impose strict conditions on various environmental and safety matters in connection with coal and iron ore mining. These include permits issued by various federal, state and provincial agencies and regulatory bodies. The permitting rules are complex and may change over time, making our ability to comply with the applicable requirements more difficult or impractical and costly, possibly precluding the continuance of ongoing operations or the development of future mining operations. The public, including special interest groups and individuals, have certain rights under various statutes to comment upon, submit objections to, and otherwise engage in the permitting process, including bringing citizens' lawsuits to challenge such permits or mining activities. Accordingly, required permits may not be issued or renewed in a timely fashion (or at all), or permits issued or renewed may be conditioned in a manner that may restrict our ability to efficiently conduct our mining activities. Such inefficiencies could reduce our production, cash flows and profitability.

***Our North American coal operations are subject to increasing levels of regulatory oversight making it more difficult to obtain and maintain necessary operating permits.***

The current political and regulatory environment in the U.S. is disposed negatively toward coal mining, with particular focus on certain categories of mining such as mountaintop removal techniques. Therefore, our coal mining operations in North America are subject to increasing levels of scrutiny. Although we do not engage in mountaintop mining, emerging U.S. regulatory efforts targeted at eliminating or minimizing the adverse environmental impacts of mountaintop and underground coal mining practices have impacted all types of coal operations. These regulatory initiatives could cause material impacts, delays, or disruptions to our coal operations due to our inability to obtain new or renewed permits or modifications to existing permits.

23

Table of Contents

***Underground mining is subject to increased safety regulation and may require us to incur additional compliance costs.***

Recent mine disasters have led to the enactment and consideration of significant new federal and state laws and regulations relating to safety in underground coal mines. These laws and regulations include requirements for constructing and maintaining caches for the storage of additional self-contained self-rescuers throughout underground mines; installing rescue chambers in underground mines; continuous tracking of and communication with personnel in the mines; installing cable lifelines from the mine portal to all sections of the mine to assist in emergency escape; submission and approval of emergency response plans; and new and additional safety training. Additionally, new requirements for the prompt reporting of accidents and increased fines and penalties for violations of these and existing regulations have been implemented. These new laws and regulations may cause us to incur substantial additional costs, which may impact adversely our results of operations, financial condition or profitability.

### III. FINANCIAL RISKS

***A substantial majority of our sales are made under term supply agreements to a limited number of customers that contain price-adjustment clauses that could affect adversely the stability and profitability of our operations.***

In 2014, a majority of our U.S. Iron Ore, North American Coal and Eastern Canadian Iron Ore sales, and almost all of our Asia Pacific Iron Ore sales were made under term supply agreements to a limited number of customers. In 2014, five customers together accounted for approximately 72 percent of our U.S. Iron Ore, Eastern Canadian Iron Ore, and North American Coal product sales revenues (representing more than 57 percent of our consolidated revenues). For North American Coal, prices typically are agreed upon for a 12-month period and typically are adjusted each year. Our Asia Pacific Iron Ore contracts are due to expire at various dates until March 2015 for our Chinese and Japanese customers. As of December 31, 2014, our U.S. Iron Ore contracts had an average remaining duration of four years. We cannot be certain that we will be able to renew or replace existing term supply agreements at approximately the same volume levels, prices or with similar profit margins when they expire. A loss of sales to our existing customers could have a substantial negative impact on our sales, margins and profitability.

Our U.S. Iron Ore term supply agreements contain a number of price adjustment provisions, including price escalators and adjustments based on general industrial inflation rates, the price of steel and the international price of iron ore pellets, among other factors, that are out of our control and that may adjust the prices under those agreements generally on an annual basis.

***Changes in credit ratings issued by nationally recognized statistical rating organizations could adversely affect our cost of financing and the market price of our securities.***

Credit rating agencies could downgrade our ratings either due to factors specific to our business, a prolonged cyclical downturn in the mining industry, or macroeconomic trends (such as global or regional recessions) and trends in credit and capital markets more generally. Any decline in our credit ratings would likely result in an increase to our cost of financing, including resulting in an increase of the interest rate applicable on these senior notes, limit our access to the capital markets, significantly harm our financial condition and results of operations, hinder our ability to refinance existing indebtedness on acceptable terms and have an adverse effect on the market price of our securities.

***We rely on our joint venture partners in our mines to meet their payment obligations and we are subject to risks involving the acts or omissions of our joint venture partners when we are not the manager of the joint venture.***

We co-own and manage three of our five U.S. Iron Ore mines and one of our two Eastern Canadian Iron Ore mines with various joint venture partners that are integrated steel producers or their subsidiaries, including ArcelorMittal, U.S. Steel Canada Inc., and WISCO. We rely on our joint venture partners to make their required capital contributions and to pay for their share of the iron ore that each joint venture produces. Our U.S. Iron Ore and Eastern Canadian Iron Ore joint venture partners are also our customers. If one or more of our joint venture partners fail to perform their obligations, the remaining joint venture partners, including ourselves, may be required to assume additional material obligations, including significant capital contribution, pension and postretirement health and life insurance benefit obligations. The premature closure of a mine due to the failure of a joint venture partner to perform its obligations could result in significant fixed mine-closure costs, including severance, employment legacy costs and other employment costs; reclamation and other environmental costs; and the costs of terminating long-term obligations, including energy and transportation contracts and equipment leases. For example, with respect to the Bloom Lake mine, CQIM's joint venture partner did not fully participate in calls for capital contributions, resulting in additional financial burden for CQIM. This additional burden was one of multiple factors in CQIM's decision to file for a stay under CCAA.

Table of Contents

We cannot control the actions of our joint venture partners, especially when we have a minority interest in a joint venture. Further, in spite of performing customary due diligence prior to entering into a joint venture, we cannot guarantee full disclosure of prior acts or omissions of the sellers or those with whom we enter into joint ventures. Such risks could have a material adverse effect on the business, results of operations or financial condition of our joint venture interests.

***We may not be able to recover the carrying value when divesting assets or businesses.***

When we divest assets or businesses, we may not be able to recover the carrying value of these assets, which potentially could have a material adverse impact on our results of operations, shareholders' equity and capital structure. Also, if we were to sell a percentage of a business, there are inherent risks of a joint venture relationship as noted in the risk factor above.

***Our ability to collect payments from our customers depends on their creditworthiness.***

Our ability to receive payment for products sold and delivered to our customers depends on the creditworthiness of our customers. With respect to our Asia Pacific business unit, payment typically is received as the products are shipped and much of the product is secured by bank letters of credit. By contrast, in our U.S. Iron Ore business unit, generally, we deliver iron ore products to our customers' facilities in advance of payment for those products. Under this practice for our U.S. customers, title and risk of loss with respect to U.S. Iron Ore products does not pass to the customer until payment for the pellets is received; however, there is typically a period of time in which pellets, for which we have reserved title, are within our customers' control. Where we have identified credit risk with certain customers, we have put in place alternate payment terms from time to time.

Consolidations in some of the industries in which our customers operate have created larger customers. These factors have caused some customers to be less profitable and increased our exposure to credit risk. Customers in other countries may be subject to other pressures and uncertainties that may affect their ability to pay, including trade barriers, exchange controls, and local, economic and political conditions. Downturns in the economy and disruptions in the global financial markets in recent years have affected the creditworthiness of our customers from time to time. Some of our customers are highly leveraged. If economic conditions worsen or prolonged global, national or regional economic recession conditions return, it is likely to impact significantly the creditworthiness of our customers and could, in turn, increase the risk we bear on payment default for the credit we provide to our customers and could limit our ability to collect receivables. Failure to receive payment from our customers for products that we have delivered could affect adversely our results of operations, financial condition and liquidity.

***Our operating expenses could increase significantly if the price of electrical power, fuel or other energy sources increases.***

Our mining operations require significant use of energy. Operating expenses at all of our mining locations are sensitive to changes in electricity prices and fuel prices, including diesel fuel and natural gas prices. These items make up approximately 25 to 30 percent in the aggregate of our operating costs in our U.S. Iron Ore locations, for example. Prices for electricity, natural gas and fuel oils can fluctuate widely with availability and demand levels from other users. During periods of peak usage, supplies of energy may be curtailed and we may not be able to purchase them at historical rates. A disruption in the transmission of energy, inadequate energy transmission infrastructure, or the termination of any of our energy supply contracts could interrupt our energy supply and affect adversely our operations. While we have some long-term contracts with electrical suppliers, we are exposed to fluctuations in energy costs that can affect our production costs. As an example, our mines in Minnesota are subject to changes in Minnesota Power's rates, such as rate changes that are reviewed and approved by the state public utilities commission in response to an application filed by Minnesota Power. We also enter into market-based pricing supply contracts for natural gas and diesel fuel for use in our operations. Those contracts expose us to price increases in energy costs, which could cause our profitability to decrease significantly.

In addition, U.S. public utilities are expected to pass through additional capital and operating cost increases related to new or pending U.S. environmental regulations that are expected to require significant capital investment and use of cleaner fuels in the future and which may impact U.S. coal-fired generation capacity. We are estimating that power rates for our electricity-intensive operations could increase above 2014 levels by up to 13 percent by 2019, representing an increase of approximately $8 per MWh by 2019 for our U.S. operations. These environmental regulations are also forcing the future closure of the Presque Isle Power Plant in the Upper Peninsula of Michigan which supplies electricity to our mines in Michigan.

25

Table of Contents

***The availability of capital may be limited.***

We may need to access the capital markets to finance ongoing operations, any development of existing mining properties and our other cash requirements. Our substantial indebtedness could make it more difficult for us to borrow money in the future and may reduce the amount of money available to finance our operations and other business activities and may have other detrimental consequences, including the following: requiring us to dedicate a substantial portion of our cash flow from operations to the payment of principal, premium, if any, and interest on our debt, which will reduce funds available for other purposes; exposing us to the risk of increased interest costs if the underlying interest rates rise on our existing credit facility or other variable rate debt; making it more difficult to obtain surety bonds, letters of credit or other financing, particularly during periods in which credit markets are weak; causing a decline in our credit ratings; limiting our ability to compete with companies that are not as leveraged and that may be better positioned to withstand economic downturns; and limiting our flexibility in planning for, or reacting to, and increasing our vulnerability to, changes in our business, the industry in which we compete and general economic and market conditions. If we further increase our indebtedness, the related risks that we now face, including those described above, could intensify. We cannot predict the general availability or accessibility of capital to finance such projects in the future.

***We are subject to a variety of financial market risks.***

Financial market risks include those caused by changes in the value of investments, changes in commodity prices, interest rates and foreign currency exchange rates. We have established policies and procedures to manage such risks; however, certain risks are beyond our control and our efforts to mitigate such risks may not be effective. These factors could have a material adverse effect on our results of operations.

***Our existing and future indebtedness may limit cash flow available to invest in the ongoing needs of our business, which could prevent us from fulfilling our obligations under our senior notes.***

As of December 31, 2014, we had an aggregate principal amount of $2,995.8 million of total debt, $308 million of which was secured (excluding outstanding letters of credit), and $290.9 million of cash on our balance sheet. Our level of indebtedness could have important consequences to you. For example, it could:

- require us to dedicate a substantial portion of our cash flow from operations to the payment of debt service, reducing the availability of our cash flow to fund working capital, capital expenditures, acquisitions and other general corporate purposes;

- increase our vulnerability to adverse economic or industry conditions;

- limit our ability to obtain additional financing in the future to enable us to react to changes in our business;

- place us at a competitive disadvantage compared to businesses in our industry that have less indebtedness; or

- limit our ability to pay dividends on or purchase or redeem our capital stock.

Our substantial level of indebtedness could limit our ability to obtain additional financing on acceptable terms or at all for working capital, capital expenditures and general corporate purposes. Our liquidity needs could vary significantly and may be affected by general economic conditions, industry trends, performance and many other factors not within our control. If we are unable to generate sufficient cash flow from operations in the future to service our debt, we may be required to refinance all or a portion of our existing debt. However, we may not be able to obtain any such new or additional debt on favorable terms or at all.

Additionally, any failure to comply with covenants in the instruments governing our debt could result in an event of default which, if not cured or waived, would have a material adverse effect on us.

***We may not be able to generate sufficient cash to service all of our debt, and may be forced to take other actions to satisfy our obligations under our debt, which may not be successful.***

Our ability to make scheduled payments on or to refinance our debt obligations, including our senior notes, and to fund planned capital expenditures and expansion efforts and any strategic alliances or acquisitions we may make in the future depends on our ability to generate cash in the future and our financial condition and operating performance, which are subject to prevailing economic and competitive conditions and to certain financial, business and other factors beyond our control. We cannot assure you that we will maintain a level of cash flows from operating activities sufficient to permit us to pay the principal, premium, if any, and interest on our debt, including our senior notes.

If our cash flows and capital resources are insufficient to fund our debt service obligations, we may be forced to reduce or delay investments and capital expenditures, or to sell assets, seek additional capital or restructure or refinance our debt, including our senior notes. Any refinancing of our debt could be at higher interest rates and may require us to

26

Table of Contents

comply with more onerous covenants, which could further restrict our business operations. These measures may not be successful and may not permit us to meet our scheduled debt service obligations. If our operating results and available cash are insufficient to meet our debt service obligations, we could face substantial liquidity problems and might be required to dispose of material assets or operations to meet our debt service and other obligations. We may not be able to consummate those dispositions or to obtain the proceeds that we could realize from them, and these proceeds may not be adequate to meet any debt service obligations then due. Further, we may need to refinance all or a portion of our debt on or before maturity, and we cannot assure you that we will be able to refinance any of our debt on commercially reasonable terms or at all.

**We are subject to risks relating to the CCAA filing by the Bloom Lake Group.**

The Bloom Lake Group commenced the CCAA process in January 2015 to address the Bloom Lake Group's immediate liquidity issues and to preserve and protect its assets for the benefit of all stakeholders while restructuring and/or sale options are explored.  Certain obligations of the Bloom Lake Group, including equipment loans, were guaranteed by Cliffs.  It is possible that (a) as part of the CCAA process (i) claims may be asserted by or on behalf of the Bloom Lake Group against non-debtor affiliates of the Bloom Lake Group and/or (ii) claims of non-debtor affiliates against the Bloom Lake Group may be challenged and (b) creditors of the Bloom Lake Group may assert claims against non-debtor affiliates of the Bloom Lake Group under the guarantees discussed above.  While we anticipate the restructuring and/or sale of the Bloom Lake Group assets may mitigate these risks, to the extent that any claims are successful or the Bloom Lake Group's obligations guaranteed by Cliffs are not satisfied in full by any such restructuring or sale, Cliffs could be held liable for certain obligations.

## IV.    OPERATIONAL RISKS

**Mine closures entail substantial costs. If we close one or more of our mines, our results of operations and financial condition would likely be affected adversely.**

If we close any of our mines, our revenues would be reduced unless we were able to increase production at our other mines, which may not be possible. The closure of a mining operation involves significant fixed closure costs, including accelerated employment legacy costs, severance-related obligations, reclamation and other environmental costs, and the costs of terminating long-term obligations, including customer, energy and transportation contracts and equipment leases. We base our assumptions regarding the life of our mines on detailed studies we perform from time to time, but those studies and assumptions are subject to uncertainties and estimates that may not be accurate. We recognize the costs of reclaiming open pits and shafts, stockpiles, tailings ponds, roads and other mining support areas based on the estimated mining life of our property. If we were to significantly reduce the estimated life of any of our mines, the mine-closure costs would be applied to a shorter period of production, which would increase costs per ton produced and could significantly and adversely affect our results of operations and financial condition.

A North American mine permanent closure could accelerate and significantly increase employment legacy costs, including our expense and funding costs for pension and other postretirement benefit obligations. A number of employees would be eligible for immediate retirement under special eligibility rules that apply upon a mine closure. All employees eligible for immediate retirement under the pension plans at the time of the permanent mine closure also could be eligible for postretirement health and life insurance benefits, thereby accelerating our obligation to provide these benefits. Certain mine closures would precipitate a pension closure liability significantly greater than an ongoing operation liability. Finally, a permanent mine closure could trigger severance-related obligations, which can equal up to sixteen weeks of pay per employee in some jurisdictions, depending on length of service. As a result, the closure of one or more of our mines could adversely affect our financial condition and results of operations.

At the end of March 2014, we idled our Wabush Scully mine in Newfoundland and Labrador, and in the fourth quarter of 2014, we began to implement the permanent closure plan for the mine. Additionally, we disclosed in November 2014 that we were pursuing exit options for our Bloom Lake mine and as disclosed in January 2015, active production at Bloom Lake mine has completely ceased and the mine has transitioned to "care-and-maintenance" mode. To mitigate closure costs in connection with the potential shutdown of the Bloom Lake mine, our Canadian affiliates that operate the mine commenced restructuring proceedings under the CCAA. However, there can be no assurance that we will not have any material obligations in connection with the potential shutdown of the Bloom Lake mine despite the CCAA filing.

27

Table of Contents

***Our sales and competitive position depend on the ability to transport our products to our customers at competitive rates and in a timely manner.***

In our U.S. Iron Ore operations, disruption of the lake and ocean-going vessels and rail transportation services because of weather-related problems, including ice and winter weather conditions on the Great Lakes or St. Lawrence Seaway, climate change, strikes, lock-outs, or other events and lack of alternative transportation sources, could impair our ability to supply iron ore to our customers at competitive rates or in a timely manner and, thus, could adversely affect our sales, margins and profitability. Similarly, our North American Coal operations depend on international vessels and rail transportation services, as well as the availability of dock capacity, and any disruptions to those services or the lack of dock capacity could impair our ability to supply coal to our customers at competitive rates or in a timely manner and, thus, could adversely affect our sales and profitability. Further, reduced dredging and environmental changes, particularly at Great Lakes ports, could impact negatively our ability to move our iron ore and coal products because lower water levels restrict the tonnage that vessels can haul, resulting in higher freight rates.

Our Asia Pacific Iron Ore operations also are dependent upon rail and port capacity. Disruptions in rail service or availability of dock capacity could similarly impair our ability to supply iron ore to our customers, thereby adversely affecting our sales and profitability. In addition, our Asia Pacific Iron Ore operations are also in direct competition with the major world seaborne exporters of iron ore and our customers face higher transportation costs than most other Australian producers to ship our products to the Asian markets because of the location of our major shipping port on the south coast of Australia. Further, increases in transportation costs, including volatile fuel rates, decreased availability of ocean vessels or changes in such costs relative to transportation costs incurred by our competitors could make our products less competitive, restrict our access to certain markets and have an adverse effect on our sales, margins and profitability.

***Natural disasters, weather conditions, disruption of energy, unanticipated geological conditions, equipment failures, and other unexpected events may lead our customers, our suppliers or our facilities to curtail production or shut down operations.***

Operating levels within the mining industry are subject to unexpected conditions and events that are beyond the industry's control. Those events could cause industry members or their suppliers to curtail production or shut down a portion or all of their operations, which could reduce the demand for our iron ore and coal products, and could affect adversely our sales, margins and profitability.

Interruptions in production capabilities inevitably will increase our production costs and reduce our profitability. We do not have meaningful excess capacity for current production needs, and we are not able to quickly increase production at one mine to offset an interruption in production at another mine.

A portion of our production costs are fixed regardless of current operating levels. As noted, our operating levels are subject to conditions beyond our control that can delay deliveries or increase the cost of mining at particular mines for varying lengths of time. These include weather conditions (for example, extreme winter weather, tornadoes, floods, and the lack of availability of process water due to drought) and natural and man-made disasters, pit wall failures, unanticipated geological conditions, including variations in the amount of rock and soil overlying the deposits of iron ore and coal, variations in rock and other natural materials and variations in geologic conditions and ore processing changes.

The manufacturing processes that take place in our mining operations, as well as in our processing facilities, depend on critical pieces of equipment. This equipment may, on occasion, be out of service because of unanticipated failures. In addition, many of our mines and processing facilities have been in operation for several decades, and the equipment is aged. In the future, we may experience additional material plant shutdowns or periods of reduced production because of equipment failures. Further, remediation of any interruption in production capability may require us to make large capital expenditures that could have a negative effect on our profitability and cash flows. Our business interruption insurance would not cover all of the lost revenues associated with equipment failures. Longer-term business disruptions could result in a loss of customers, which adversely could affect our future sales levels and, therefore, our profitability.

Regarding the impact of unexpected events happening to our suppliers, many of our mines are dependent on one source for electric power and for natural gas. A significant interruption in service from our energy suppliers due to terrorism, weather conditions, natural disasters, or any other cause can result in substantial losses that may not be fully recoverable, either from our business interruption insurance or responsible third parties.

28

Table of Contents

***We are subject to risks involving operations and sales in multiple countries.***

We supply raw materials to the global integrated steel industry with substantial assets located outside of the U.S. We conduct operations in the U.S., Canada and Australia. As such, we are subject to additional risks beyond those relating to our U.S. operations, such as fluctuations in currency exchange rates; potentially adverse tax consequences due to overlapping or differing tax structures; burdens to comply with multiple and potentially conflicting foreign laws and regulations, including export requirements, tariffs, economic sanctions and other barriers, environmental health and safety requirements, and unexpected changes in any of these laws and regulations; the imposition of duties, tariffs, import and export controls and other trade barriers impacting the seaborne iron ore and coal markets; difficulties in staffing and managing multi-national operations; political and economic instability and disruptions, including terrorist attacks; disadvantages of competing against companies from countries that are not subject to U.S. laws and regulations, including the Foreign Corrupt Practices Act; and uncertainties in the enforcement of legal rights and remedies in multiple jurisdictions. If we are unable to manage successfully the risks associated with operating our global business, these risks could have a material adverse effect on our business, results of operations or financial condition.

***Our profitability could be affected adversely by the failure of outside contractors to perform.***

Asia Pacific Iron Ore uses contractors to handle many of the operational phases of their mining and processing operations and, therefore, we are subject to the performance of outside companies on key production areas. A failure of any of these contractors to perform in a significant way would result in additional costs for us, which also could affect adversely our production rates and results of operations.

***Coal mining is complex due to geological characteristics of the region.***

The geological characteristics of coal reserves, such as depth of overburden and coal seam thickness, make them complex and costly to mine. As mines become depleted, replacement reserves may not be available when required or, if available, may not be capable of being mined at costs comparable to those characteristic of the depleting mines, and, therefore, decisions to defer mine development activities may adversely impact our ability to substantially replace future coal production. These factors could materially adversely affect our mining operations and cost structures, which could affect adversely our sales, profitability and cash flows.

***We may not be able to complete divestitures of our non-core assets at acceptable prices or at all.***

As an extension of our re-focused U.S. Iron Ore strategy, we are currently in the process of streamlining our portfolio of non-core assets. Asia Pacific Iron Ore, North American Coal and Eastern Canadian Iron Ore have been identified as non-core assets and will be considered for monetization. However, we may not be able to sell any non-core assets at sales prices acceptable to us or at all. Gains or losses on the sales of, or lost operating income from, non-core assets may affect our profitability. Moreover, we may incur asset impairment charges related to divestitures that reduce our profitability. Our divestiture activities may also present financial, managerial and operational risks. Those risks include diversion of management attention from existing businesses, difficulties separating personnel and financial and other systems, adverse effects on existing business relationships with suppliers and customers and indemnities and potential disputes with the buyers. Any of these factors could affect our financial condition and results of operations.

## V.    DEVELOPMENT AND SUSTAINABILITY RISKS

***The cost and time to implement a strategic capital project may prove to be greater than originally anticipated.***

We undertake strategic capital projects in order to enhance, expand or upgrade our mines and production capabilities. Our ability to achieve the anticipated increased volumes, revenues or otherwise realize acceptable returns on strategic capital projects that we may undertake is subject to a number of risks, many of which are beyond our control, including a variety of market (such as a volatile pricing environment for iron ore), operational, permitting and labor-related factors. Further, the cost to implement any given strategic capital project ultimately may prove to be greater and may take more time than originally anticipated. Inability to achieve the anticipated results from the implementation of our strategic capital projects, or the incurring of unanticipated implementation costs, penalties or inability to meet contractual obligations could affect adversely our results of operations and future earnings and cash flow generation.

A004196

Table of Contents

***We continually must replace reserves depleted by production. Our exploration activities may not result in additional discoveries.***

Our ability to replenish our ore reserves is important to our long-term viability. Depleted ore reserves must be replaced by further delineation of existing ore bodies or by locating new deposits in order to maintain production levels over the long term. Resource exploration and development are highly speculative in nature. Our exploration projects involve many risks, require substantial expenditures and may not result in the discovery of sufficient additional mineral deposits that can be mined profitably. Once a site with mineralization is discovered, it may take several years from the initial phases of drilling until production is possible, during which time the economic feasibility of production may change. Substantial expenditures are required to establish recoverable proven and probable reserves and to construct mining and processing facilities. As a result, there is no assurance that current or future exploration programs will be successful and there is a risk that depletion of reserves will not be offset by discoveries or acquisitions.

***We rely on estimates of our recoverable reserves, which is complex due to geological characteristics of the properties and the number of assumptions made.***

We regularly evaluate our iron ore and coal reserves based on revenues and costs and update them as required in accordance with SEC Industry Guide 7 and historically, the Canadian Institute of Mining, Metallurgy & Petroleum's Definition Standards on Mineral Resources and Mineral Reserves. In addition, our Asia Pacific Iron Ore business segment has published reserves that follow the Joint Ore Reserve Code in Australia, with certain changes to our Western Australian reserve values to make them comply with SEC requirements. There are numerous uncertainties inherent in estimating quantities of reserves of our mines, including many factors beyond our control.

Estimates of reserves and future net cash flows necessarily depend upon a number of variable factors and assumptions, such as production capacity, effects of regulations by governmental agencies, future prices for iron ore and coal, future industry conditions and operating costs, severance and excise taxes, development costs and costs of extraction and reclamation, all of which may vary considerably from actual results. Estimating the quantity and grade of reserves requires us to determine the size, shape and depth of our mineral bodies by analyzing geological data, such as samplings of drill holes, tunnels and other underground workings. In addition to the geology assumptions of our mines, assumptions are also required to determine the economic feasibility of mining these reserves, including estimates of future commodity prices and demand, the mining methods we use, and the related costs incurred to develop and mine our reserves. For these reasons, estimates of the economically recoverable quantities of mineralized deposits attributable to any particular group of properties, classifications of such reserves based on risk of recovery and estimates of future net cash flows prepared by different engineers or by the same engineers at different times may vary substantially as the criteria change. Estimated ore reserves could be affected by future industry conditions, geological conditions and ongoing mine planning. Actual volume and grade of reserves recovered, production rates, revenues and expenditures with respect to our reserves will likely vary from estimates, and if such variances are material, our sales and profitability could be affected adversely.

***Defects in title or loss of any leasehold interests in our properties could limit our ability to mine these properties or result in significant unanticipated costs.***

A portion of our mining operations are conducted on properties we lease, license or as to which we have easements or other possessory interests ("leased properties"). Consistent with industry practice, title to most of these leased properties and mineral rights are not usually verified until we make a commitment to develop a property, which may not occur until after we have obtained necessary permits and completed exploration of the leased property. In some cases, title with respect to leased properties is not verified at all because we instead rely on title information or representations and warranties provided by lessors or grantors. We do not maintain title insurance on our owned or leased properties. A title defect or the loss of any lease, license or easement for any leased property could adversely affect our ability to mine the associated reserves. In addition, from time to time the rights of third parties for competing uses of adjacent, overlying, or underlying lands such as for, roads, easements and public facilities may affect our ability to operate as planned if our title is not superior or arrangements cannot be negotiated.

Any challenge to our title could delay the exploration and development of some reserves, deposits or surface rights, cause us to incur unanticipated costs and could ultimately result in the loss of some or all of our interest in those reserves or surface rights. In the event we lose reserves, deposits or surface rights, we may have to shut down or significantly alter the sequence of our mining operations, which may adversely affect our future production, revenues and cash flows. Additionally, if we lose any leasehold interests relating to any of our preparation plants or loadout facilities, we may need to find an alternative location to process our iron ore or coal and load it for delivery to customers, which could result in significant unanticipated costs. Finally, we could incur significant liability if we inadvertently mine on property we do not own or lease.

30

A004197

Table of Contents

***In order to continue to foster growth in our business and maintain stability of our earnings, we must maintain our social license to operate with our stakeholders.***

As a mining company, maintaining a strong reputation and consistent operational and safety history is vital in order to continue to foster growth and maintain stability in our earnings. As sustainability expectations increase and regulatory requirements continue to evolve, maintaining our social license to operate becomes increasingly important. We strive to incorporate social license expectations in our ERM program. Our ability to maintain our reputation and strong operating history could be threatened, including by circumstances outside of our control. If we are not able to respond effectively to these and other challenges to our social license to operate, our reputation could be damaged significantly. Damage to our reputation could affect adversely our operations and ability to foster growth in our Company.

***Estimates and timelines relating to new development and expansion projects are uncertain and we may incur higher costs and lower economic returns than estimated.***

Mine development and expansion projects projects typically require a number of years and significant expenditures during the development or expansion phase before production is possible. Such projects could experience unexpected problems and delays during development, construction and mine start-up or expansion.

Our decision to develop a project typically is based on the results of feasibility studies, which estimate the anticipated economic returns of a project. The actual project profitability or economic feasibility may differ from such estimates as a result of any of the following factors, among others: changes in tonnage, grades and metallurgical characteristics of ore to be mined and processed; estimated future prices of the relevant ore; changes in customer demand; higher construction and infrastructure costs; the quality of the data on which engineering assumptions were made; higher production costs; adverse geotechnical conditions; availability of adequate labor force; availability and cost of water and power; availability and cost of transportation; fluctuations in inflation and currency exchange rates; availability and terms of financing; delays in obtaining environmental or other government permits or changes in laws and regulations including environmental laws and regulations; weather or severe climate impacts; and potential delays relating to social and community issues.

Our future development activities may not result in the expansion or replacement of current production with new production, or one or more of these new production sites or facilities may be less profitable than currently anticipated, or may not be profitable at all, any of which could have a material adverse effect on our sales, margins and cash flows.

## VI.  HUMAN CAPITAL RISKS

***Our profitability could be affected adversely if we fail to maintain satisfactory labor relations.***

Production in our mines is dependent upon the efforts of our employees. We are party to labor agreements with various labor unions that represent employees at our operations. Such labor agreements are negotiated periodically, and, therefore, we are subject to the risk that these agreements may not be able to be renewed on reasonably satisfactory terms. It is difficult to predict what issues may arise as part of the collective bargaining process, and whether negotiations concerning these issues will be successful. Due to union activities or other employee actions, we could experience labor disputes, work stoppages, or other disruptions in our production of coal and iron ore that could affect us adversely. The USW represents all hourly employees at our U.S. Iron Ore and Eastern Canadian Iron Ore operations owned and/or managed by Cliffs or its subsidiary companies except for Northshore. Our labor agreements with the USW at four of our U.S. Iron Ore operations expire in September 2015. Since this is an expiration year for our labor agreements, there is an increased probability of a disruption at our U.S. Iron Ore operations in 2015.

If we enter into a new labor agreement with any union that significantly increases our labor costs relative to our competitors or fail to come to an agreement upon expiry, our ability to compete may be materially and adversely affected.

***We may encounter labor shortages for critical operational positions, which could affect adversely our ability to produce our products.***

We are predicting a long-term shortage of skilled workers for the mining industry and competition for the available workers limits our ability to attract and retain employees. Additionally, at our U.S. mining locations, many of our mining operational employees are approaching retirement age. As these experienced employees retire, we may have difficulty replacing them at competitive wages.

31

A004198

Table of Contents

***Our expenditures for post-retirement benefit and pension obligations could be materially higher than we have predicted if our underlying assumptions differ from actual outcomes, there are mine closures, or our joint venture partners fail to perform their obligations that relate to employee pension plans.***

We provide defined benefit pension plans and OPEB to certain eligible union and non-union employees in North America, including our share of expense and funding obligations with respect to unconsolidated ventures. Our pension expense and our required contributions to our pension plans are affected directly by the value of plan assets, the projected and actual rate of return on plan assets, and the actuarial assumptions we use to measure our defined benefit pension plan obligations, including the rate at which future obligations are discounted.

We cannot predict whether changing market or economic conditions, regulatory changes or other factors will increase our pension expenses or our funding obligations, diverting funds we would otherwise apply to other uses.

Signatories to labor agreements with the UMWA have participated for decades in the 1974 PP. The 1974 PP has been underfunded for a number of years and has a current total underfunded liability in excess of $4.3 billion. Our Pinnacle and Oak Grove mines are signatories to labor agreements with the UMWA, making them participants in the 1974 PP. If Pinnacle or Oak Grove were to withdraw from the 1974 PP or if a mass withdrawal were to occur, we would become obligated to satisfy the withdrawal liability owed to the 1974 PP.

We have calculated our unfunded pension and OPEB obligations based on a number of assumptions. If our assumptions do not materialize as expected, cash expenditures and costs that we incur could be materially higher. Moreover, we cannot be certain that regulatory changes will not increase our obligations to provide these or additional benefits. These obligations also may increase substantially in the event of adverse medical cost trends or unexpected rates of early retirement, particularly for bargaining unit retirees.

***We depend on our senior management team and other key employees, and the loss of these employees could adversely affect our business.***

Our success depends in part on our ability to attract and motivate our senior management and key employees. Achieving this objective may be difficult due to a variety of factors, including fluctuations in the global economic and industry conditions, competitors' hiring practices, cost reduction activities, and the effectiveness of our compensation programs. Competition for qualified personnel can be intense. We must continue to recruit, retain, and motivate our senior management and key personnel in order to maintain our business and support our projects. A loss of senior management and key personnel could prevent us from capitalizing on business opportunities, and our operating results could be adversely affected.

**Item 1B.**        ***Unresolved Staff Comments***

We have no unresolved comments from the SEC.

32

Table of Contents

**Item 2.** *Properties*

The following map shows the locations of our operations and offices as of  December 31, 2014:



**General Information about the Mines**

All of our iron ore mining operations are open-pit mines. Additional pit development is underway as required by long-range mine plans. At our U.S. Iron Ore and Asia Pacific Iron Ore mines, drilling programs are conducted periodically for the purpose of refining guidance related to ongoing operations.

Our North American Coal operations consist of underground mines. Drilling programs are conducted periodically for the purpose of refining guidance related to ongoing operations.

Geologic models are developed for all mines to define the major ore and waste rock types. Computerized block models for iron ore and stratigraphic models for coal are constructed that include all relevant geologic and metallurgical data. These are used to generate grade and tonnage estimates, followed by detailed mine design and life of mine operating schedules.

33

Table of Contents

### *U.S. Iron Ore*

The following map shows the locations of our U.S. Iron Ore operations as of  December 31, 2014:



We directly or indirectly own and operate interests in  five U.S. Iron Ore mines located in Michigan and Minnesota from which we produced  22.4 million, 20.3 million and 22.0 million tons of iron ore pellets in 2014, 2013 and 2012, respectively, for our account. We produced 7.3 million, 6.9 million and 7.5 million tons, respectively, on behalf of the steel company partners of the mines.

Our U.S. Iron Ore mines produce from deposits located within the Biwabik and Negaunee Iron Formation, which are classified as Lake Superior type iron formations that formed under similar sedimentary conditions in shallow marine basins approximately two billion years ago. Magnetite and hematite are the predominant iron oxide ore minerals present, with lesser amounts of goethite and limonite. Quartz is the predominant waste mineral present, with lesser amounts of other chiefly iron bearing silicate and carbonate minerals. The ore minerals liberate from the waste minerals upon fine grinding.

| Mine | Cliffs Ownership | Infrastructure | Mineralization | Operating Since | Current Annual Capacity[1,2] | 2014 Production[2,3] | Mineral Owned | Rights Leased |
|---|---|---|---|---|---|---|---|---|
| Empire | 79% | Mine, Concentrator, Pelletizer | Magnetite | 1963 | 5.5 | 4.3 | 53% | 47% |
| Tilden | 85% | Mine, Concentrator, Pelletizer, Railroad | Hematite & Magnetite | 1974 | 8.0 | 7.6 | 100% | —% |
| Hibbing | 23% | Mine, Concentrator, Pelletizer | Magnetite | 1976 | 8.0 | 7.7 | 3% | 97% |
| Northshore | 100% | Mine, Concentrator, Pelletizer, Railroad | Magnetite | 1990 | 6.0 | 5.2 | —% | 100% |
| United Taconite | 100% | Mine, Concentrator, Pelletizer | Magnetite | 1965 | 5.4 | 4.9 | —% | 100% |

[1] Annual capacity is reported on a wet basis in millions of long tons, equivalent to 2,240 pounds.

[2] Figures reported on 100% basis.

[3] 2014 Production from Empire includes 2.4 million long tons tolled to Tilden.

### *Empire Mine*

The Empire mine is located on the Marquette Iron Range in Michigan's Upper Peninsula approximately 15 miles southwest of Marquette, Michigan. The Empire mine has produced between 3.0 million and 4.9 million tons of iron ore pellets annually over the past five years, of which between 1.3 million and 2.4 million tons annually over the past five years were tolled to Tilden mine.

We own 79 percent of Empire and a subsidiary of ArcelorMittal USA has retained the remaining  21 percent ownership in Empire with limited rights and obligations, which it has a unilateral right to put to us at any time. This right has not been exercised. Each partner takes its share of production pro rata; however, provisions in the partnership agreement allow additional or reduced production to be delivered under certain circumstances. We own directly

A004201

Table of Contents

approximately one-half of the remaining ore reserves at the Empire mine and lease them to Empire. A subsidiary of ours leases the balance of the Empire reserves from other owners of such reserves and subleases them to Empire. Operations consist of an open pit truck and shovel mine, a concentrator that utilizes single stage crushing, AG mills, magnetic separation and floatation to produce a magnetite concentrate that is then supplied to the on-site pellet plant.

### Tilden Mine

The Tilden mine is located on the Marquette Iron Range in Michigan's Upper Peninsula approximately five miles south of Ishpeming, Michigan. Over the past five years, the Tilden mine has produced between 7.5 million and 7.8 million tons of iron ore pellets annually. We own 85 percent of Tilden, with the remaining minority interest owned by a subsidiary of U.S. Steel Canada Inc. Each partner takes its share of production pro rata; however, provisions in the partnership agreement allow additional or reduced production to be delivered under certain circumstances. We own all of the ore reserves at the Tilden mine and lease them to Tilden. Operations consist of an open pit truck and shovel mine, a concentrator that utilizes single stage crushing, AG mills, magnetite separation and floatation to produce hematite and magnetic concentrates that are then supplied to the on-site pellet plant.

The Empire and Tilden mines are located adjacent to each other. The logistical benefits include a consolidated transportation system, more efficient employee and equipment operating schedules, reduction in redundant facilities and workforce and best practices sharing. Two railroads, one of which is wholly owned by us, link the Empire and Tilden mines with Lake Michigan at the loading port of Escanaba, Michigan and with the Lake Superior loading port of Marquette, Michigan.

### Hibbing Mine

The Hibbing mine is located in the center of Minnesota's Mesabi Iron Range and is approximately ten miles north of Hibbing, Minnesota and five miles west of Chisholm, Minnesota. Over the past five years, the Hibbing mine has produced between 5.9 million and 8.1 million tons of iron ore pellets annually. We own 23 percent of Hibbing, a subsidiary of ArcelorMittal has a 62.3 percent interest and a subsidiary of U.S. Steel has a 14.7 percent interest. Each partner takes its share of production pro rata; however, provisions in the joint venture agreement allow additional or reduced production to be delivered under certain circumstances. Mining is conducted on multiple mineral leases having varying expiration dates. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates. Hibbing operations consist of an open pit truck and shovel mine, a concentrator that utilizes single stage crushing, AG mills and magnetic separation to produce a magnetite concentrate, which is then delivered to an on-site pellet plant. From the site, pellets are transported by BNSF rail to a ship loading port at Superior, Wisconsin operated by BNSF.

### Northshore Mine

The Northshore mine is located in northeastern Minnesota, approximately two miles south of Babbitt, Minnesota on the northeastern end of the Mesabi Iron Range. Northshore's processing facilities are located in Silver Bay, Minnesota, near Lake Superior. Crude ore is shipped by a wholly owned railroad from the mine to the processing and dock facilities at Silver Bay. Over the past five years, the Northshore mine has produced between 3.9 million and 5.8 million tons of iron ore pellets annually. Two of the four production lines at Northshore were idled beginning January 5, 2013 but the idled lines reopened during the first quarter of 2014. One of the four furnaces in the Northshore pellet plant became idled in January 2015 and is expected to remain idled throughout the year. The Northshore mine began production under our management and ownership on October 1, 1994. We own 100 percent of the mine. Mining is conducted on multiple mineral leases having varying expiration dates. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates. Northshore operations consist of an open pit truck and shovel mine where two stages of crushing occur before the ore is transported along a wholly owned 47-mile rail line to the plant site in Silver Bay. At the plant site, two additional stages of crushing occur before the ore is sent to the concentrator. The concentrator utilizes rod mills and magnetic separation to produce a magnetite concentrate, which is delivered to the pellet plant located on-site. The plant site has its own ship loading port located on Lake Superior.

Table of Contents

*United Taconite Mine*

The United Taconite mine is located on Minnesota's Mesabi Iron Range in and around the city of Eveleth, Minnesota. The United Taconite concentrator and pelletizing facilities are located ten miles south of the mine, near the town of Forbes, Minnesota. Over the past five years, the United Taconite mine has produced between 4.9 million and 5.4 million tons of iron ore pellets annually. We own 100 percent of the mine. Mining is conducted on multiple mineral leases having varying expiration dates. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates. United Taconite operations consist of an open pit truck and shovel mine where two stages of crushing occur before the ore is transported by rail to the plant site located ten miles to the south. At the plant site an additional stage of crushing occurs before the ore is sent to the concentrator. The concentrator utilizes rod mills and magnetic separation to produce a magnetite concentrate, which is delivered to the pellet plant. From the site, pellets are transported by CN rail to a ship loading port at Duluth, Minnesota operated by CN.

**Asia Pacific Iron Ore**

The following map shows the location of our Asia Pacific Iron Ore operation as of  December 31, 2014:



In Australia, we own and operate the Koolyanobbing operations and owned and operated a  50 percent interest in the Cockatoo Island iron ore mine until we sold it in September 2012. We produced 11.4 million metric tons, 11.1 million metric tons and 11.3 million metric tons in 2014, 2013 and 2012, respectively. The 2012 production tons include tons produced at the Koolyanobbing operations and the Cockatoo Island iron ore mine.

The mineralization at the Koolyanobbing operations is predominantly hematite and goethite replacements in greenstone-hosted banded iron formations. Individual deposits tend to be small with complex ore-waste contact relationships. The reserves at the Koolyanobbing operations are derived from 10 separate mineral deposits distributed over a 70 mile operating radius.

| Mine | Cliffs Ownership | Infrastructure | Mineralization | Operating Since | Current Annual Capacity[1] | 2014 Production | Mineral Owned | Rights Leased |
|------|------|------|------|------|------|------|------|------|
| Koolyanobbing | 100% | Mine, Road Haulage, Crushing-Screening Plant | Hematite & Goethite | 1994 | 11.0 | 11.4 | —% | 100% |

[1] Annual capacity is reported on a wet basis in millions of metric tons, equivalent to 2,205 pounds.

*Koolyanobbing*

The Koolyanobbing operations are located 250 miles east of Perth and approximately 30 miles northeast of the town of Southern Cross. Koolyanobbing produces lump and fines iron ore. Mining is conducted on multiple mineral leases having varying expiration dates. Mining leases routinely are renewed as they approach their respective expiration dates. In 2011, a significant permitting milestone was achieved with the granting of regulatory approvals necessary to develop above the water table at Windarling's W1 deposit. In 2013, environmental approvals were obtained for deepening of the Windarling W1 pit and deepening of the Koolyanobbing A/B/C pits.

36

Table of Contents

Over the past five years, the Koolyanobbing operation has produced between 8.2 million and 11.4 million metric tons annually. The expansion project at Koolyanobbing increasing annual capacity to 11 million metric tons was completed in 2012. Ore material is sourced from nine separate open pit mines and delivered by typical production trucks or road trains to a crushing and screening facility located at Koolyanobbing. All of the ore from the Koolyanobbing operations is transported by rail to the Port of Esperance, 360 miles to the south, for shipment to Asian customers.

**North American Coal**

The following map shows the locations of our North American Coal operations as of   December 31, 2014:



Throughout 2014, we directly owned and operated three North American coal mining complexes from which we produced a total of   7.5 million, 7.2 million and 6.4 million tons of coal in 2014, 2013 and 2012, respectively. We no longer own CLCC as the sale of the CLCC assets was completed on December 31, 2014, and therefore CLCC is not denoted on the map above. The production tons include 2.5 million tons, 2.1 million tons and 2.2 million tons of coal produced by CLCC in 2014, 2013 and 2012, respectively. Our coal production at each mine is shipped within the U.S. by rail or barge. Coal for international customers is shipped through the ports of Mobile, Alabama; Norfolk, Virginia; and New Orleans, Louisiana.

Coal seams mined at all of our North American Coal operations are Pennsylvanian Age and derived from the Pocahontas 3 and 4 seams at the Pinnacle Complex and the Blue Creek Seam at Oak Grove, which produce high quality, low ash metallurgical products.

| Mine | Cliffs Ownership | Infrastructure | Primary Coal Type | Operating Since | Current Annual Capacity[1] | 2014 Production | Mineral Owned | Rights Leased |
|---|---|---|---|---|---|---|---|---|
| Pinnacle Complex | 100% | U/G Mine, Preparation Plant, Load-out | Low-Volatile Metallurgical | 1969 | 4.0 | 2.7 | —% | 100% |
| Oak Grove | 100% | U/G Mine, Preparation Plant, Load-out | Low-Volatile Metallurgical | 1972 | 2.5 | 2.3 | —% | 100% |

[1] Annual capacity is on a wet basis in millions of short tons, equivalent to 2,000 pounds.

*Pinnacle Complex*

The Pinnacle Complex includes the Pinnacle and Green Ridge mines and is located approximately 30 miles southwest of Beckley, West Virginia. The Pinnacle mine has been in operation since 1969. Over the past five years, the Pinnacle mine has produced between 1.1 million and 2.8 million tons of coal annually. The Green Ridge mines became operational in 2004 and have ranged from no production to 0.1 million tons of coal annually in the last five years. In February 2010, the Green Ridge No. 1 mine was closed permanently due to exhaustion of the economic reserves at the mine. In addition, the Green Ridge No. 2 mine was idled in January 2012. Pinnacle utilizes continuous miners and a longwall plow system; Green Ridge utilizes only continuous miners. Both facilities share preparation, processing and load-out facilities.

37

Table of Contents

*Oak Grove*

The Oak Grove mine is located approximately 25 miles southwest of Birmingham, Alabama. The mine has been in operation since 1972. Over the past five years, the Oak Grove mine has produced between 1.0 million and 2.3 million tons of coal annually. In 2011, a new shaft and support facilities were commissioned in order to reduce the transport time for supplies and personnel to the working face. The previous shaft still is utilized in a support role. Oak Grove utilizes a long wall shearer with continuous miners. Preparation, processing and rail load-out facilities are located on-site. The preparation plant at Oak Grove incurred significant tornado damage during 2011. The plant rebuild included new equipment and improvements to the process design that enhanced the performance of the plant, which returned to normal operating capacity in January 2012.

**Eastern Canadian Iron Ore**

The following map shows the locations of our Eastern Canadian Iron Ore operations as of   December 31, 2014:



We own interests in two non-operating iron ore mines in the Canadian Provinces of Québec and Newfoundland and Labrador from which we had been producing iron ore concentrate through December 2014 and produced iron ore pellets through June 2013. We produced 6.2 million, 8.7 million and 8.5 million metric tons of iron ore product in 2014, 2013 and 2012, respectively, from these two mines. In May 2011, we acquired Consolidated Thompson along with its 75 percent interest in the Bloom Lake property. In the fourth quarter of 2013, our interest in Bloom Lake increased by an aggregate of 7.8 percent, bringing our interest to 82.8 percent in the Bloom Lake property.

38

Table of Contents

Our Eastern Canadian mines had been producing from deposits located within the area known as the Labrador Trough and are composed of iron formations, which are classified as Lake Superior type. Lake Superior type iron formations consist of banded sedimentary rocks that formed under similar conditions in shallow marine basins approximately two billion years ago. The Labrador Trough region experienced considerable metamorphism and folding of the original iron deposits. Magnetite and hematite are the predominant iron oxide ore minerals present, with lesser amounts of goethite and limonite. Quartz is the predominant waste mineral present, with lesser amounts of other chiefly iron bearing silicate minerals. The ore minerals liberate from the waste minerals upon fine grinding.

| Mine | Cliffs Ownership | Infrastructure | Mineralization | Operating Since | Current Annual Capacity[1, 2] | 2014 Production[2] | Mineral Owned | Rights Leased |
|------|------|------|------|------|------|------|------|------|
| Wabush[3] | 100% | Mine, Concentrator, Pelletizer, Railroad | Hematite | 1965 | 5.6 | 0.3 | —% | 100% |
| Bloom Lake[4] | 82.8% | Mine, Concentrator, Railroad | Hematite | 2010 | 7.2 | 5.9 | —% | 100% |

[1] Annual capacity is reported on a wet basis in millions of metric tons, equivalent to 2,205 pounds.

[2] Figures reported on 100% basis.

[3] At the end of March 2014, we idled our Wabush Scully mine in Newfoundland and Labrador and began to implement the permanent closure plan for the mine.

[4] In December 2014, iron ore production at the Bloom Lake mine was suspended and the Bloom Lake mine was placed in "care-and-maintenance" mode.

*Wabush Mine*

The Wabush mine has been in operation since 1965. Over the past five years, the Wabush mine has produced between 0.3 million and 3.9 million metric tons of iron ore pellets and concentrate annually. Mining was conducted on several mineral leases having varying expiration dates. Mining leases are routinely renegotiated and renewed as they approach their respective expiration dates. The Wabush mine and concentrator are located in Wabush, Newfoundland and Labrador, and the pelletizing operations and dock facility are located in Pointe Noire, Québec. At the mine, operations consisted of an open pit truck and shovel mine, a concentrator that utilizes single stage crushing, AG mills and gravity separation to produce an iron concentrate. Concentrates had been shipped by rail 300 miles to Pointe Noire where they were pelletized through June 2013 for shipment via vessel within Canada, to the U.S. and other international destinations. Concentrates had been shipped directly from Pointe Noire for sinter feed.

As disclosed in the first quarter of 2014, at the end of March 2014, we idled our Wabush Scully mine in Newfoundland and Labrador and began to implement the permanent closure plan for the mine in October 2014. The idle and move to ultimate closure was driven by the unsustainable high cost structure. The pellet plant operations at Pointe Noire had been idled since the second quarter of 2013.

*Bloom Lake Mine*

The Bloom Lake mine and concentrator are located approximately nine miles southwest of Fermont, Québec. As previously mentioned, our acquisition of Consolidated Thompson in May 2011 included a 75 percent majority ownership in the Bloom Lake operation. During the fourth quarter of 2013, CQIM's interest in the property increased by an aggregate of 7.8 percent to 82.8 percent after CQIM paid both its own and WISCO's proportionate shares of the cash call for the first half of 2013. As a result, WISCO's interest was diluted to 17.2 percent. Since the acquisition in May 2011, the Bloom Lake mine has produced between 3.5 million and 5.9 million metric tons of iron ore concentrate annually. Phase I of the Bloom Lake mine was commissioned in March 2010, and consisted of an open pit truck and shovel mine, a concentrator that utilizes single stage crushing, an AG mill and gravity separation to produce an iron concentrate. From the site, concentrate is transported 320 miles by rail to a ship loading port in Pointe Noire, Québec.

The Bloom Lake mine assets were included in the CCAA filing made in January 2015. For more information see "*Eastern Canadian Iron Ore*" in Item 1 - Business.

39

Table of Contents

**Advanced Exploration and Development Properties**

The following map shows the locations of our advanced exploration and development properties as of   December 31, 2014:



We have several advanced exploration projects located in the Canadian provinces of British Columbia, Ontario and Québec in different stages of evaluation at this time. Work historically completed on these properties includes geological mapping, drilling and sampling programs, and initial and advance stage engineering studies. In alignment with our capital allocation strategy, we anticipate minimal levels of exploration spending to continue in 2015 and beyond.

*Chromite Project*

Cliffs Chromite Ontario's primary assets are situated in the Ring of Fire area, James Bay lowlands, of northern Ontario. These chromite properties are located approximately 155 miles north of the town of Nakina (on the CN railroad mainline) and about 50 miles east of the First Nations community of Webequie. We have a controlling position in three chromite deposits that occur in close proximity to each other: a 100 percent interest in each of the Black Label and Black Thor chromite deposits and a 70 percent interest in the Big Daddy chromite deposit. KWG Resources Inc. owns the remaining 30 percent. We have completed a prefeasibility study on the Black Thor deposit, the largest of the three deposits. On November 20, 2013, we suspended indefinitely our Chromite Project in Northern Ontario. Earlier in 2013, prior to the indefinite suspension of our Chromite Project, we suspended the environmental assessment activities because of pending issues impeding the progress of the project. The Chromite Project remained suspended throughout 2014. Given the uncertain timeline and risks associated with the development of necessary infrastructure to bring this project online, we do not expect to allocate any significant additional capital to the project, and are currently seeking to exit the Chromite Project through a possible sale of all or part of the assets or holding subsidiaries.

These chromite deposits are orthomagmatic stratiform deposits of unusual thickness and size.  Mineralization consists of chromite crystals [(Fe,Mg)(Cr,Al,Fe)$_2$O$_4$] ranging from massive chromite bands to interbedded and disseminated chromite.

*Decar Property*

The Decar Property is located 56 miles northwest of Fort St. James, British Columbia, Canada and consists of 60 mineral claims covering 95 square miles.  We own a 60 percent interest in the Decar Property and First Point Minerals Corp. owns the remaining 40 percent.  In 2012, 2011 and 2010, we performed exploration activities on the property and in 2013 completed a scoping study to further evaluate the potential economics and viability of an operation producing a high-grade nickel concentrate that could be marketable to various end users.  In 2013, our interest in the property increased from 51 percent to 60 percent as a result of completing the scoping study in accordance with the 2009 option agreement between Cliffs and First Point Minerals. Our Decar project program for 2014 has consisted of basic ongoing activity related to First Nations engagement and baseline environmental studies completed early in 2014. During 2014, we limited spending on the Decar Property. Given the uncertain timeline and risks associated with the development of necessary infrastructure to bring this project online, we do not expect to allocate any significant additional capital to the project.

The mineralization consists of the nickel-iron alloy awaruite (Ni $_{2-3}$Fe). Awaruite is disseminated in serpentinized peridotite; it occurs as relatively coarse grains between 50 to 400 μm in size. Awaruite has been observed throughout the entire extent of the peridotite but four zones of stronger mineralization have been identified.  The four zones are the Baptiste, Sidney, Target B and Van targets.  Prior to suspending spending on the Decar Property, exploration programs,

40

Table of Contents

resource definition drilling and engineering studies associated with the scoping study had focused on the Baptiste prospect.

*Labrador Trough South*

The Labrador Trough South property is located approximately 150 miles north of Sept-Iles, Québec and 30 miles southwest of the town of Fermont, Québec. Provincial highway 389 crosses the south and east sides of the property and provides year-round access. The property consists of a total of 636 non-contiguous claims covering roughly 130 square miles. Several areas containing iron mineralization have been further defined utilizing aerial geophysics, outcrop mapping and diamond drilling. These areas are known as: Lamêlée, Peppler Lake, Hobdad, Lac Jean and Faber. To date most of the exploration efforts focused on the first three areas. Cliffs acquired 100 percent ownership of the claims as part of the Consolidated Thompson acquisition in 2011. During 2014, we limited spending on the Labrador Trough South property. Given the uncertain timeline and risks associated with the development of necessary infrastructure to bring this project online, we do not expect to allocate any significant additional capital to the project. The Labrador Trough South property was included in the CCAA filing made in January 2015.

The Labrador Trough South property is situated in the Knob Lake Group of sedimentary rocks including Lake Superior-type banded iron formations. Here, the Labrador Trough is crossed by the Grenville Front. Trough rocks in the Grenville Province are highly metamorphosed, complexly folded and structurally dislocated. The high-grade metamorphism of the Grenville Province is responsible for recrystallization of both iron oxides and silica producing coarse-grained sugary quartz, magnetite, specular hematite schists and gneisses that are of improved quality for concentrating and processing. Potentially recoverable minerals in the project are predominantly magnetite and subordinate hematite.

## Mineral Policy

We have a corporate policy prescribing internal control and procedures with respect to auditing and estimating of minerals. The procedures contained in the policy include the calculation of mineral estimates at each property by our engineers, geologists and accountants, as well as third-party consultants. Management compiles and reviews the calculations, and once finalized, such information is used to prepare the disclosures for our annual and quarterly reports. The disclosures are reviewed and approved by management, including our president and chief financial officer. Additionally, the long-range mine planning and mineral estimates are reviewed annually by our Audit Committee. Furthermore, all changes to mineral estimates, other than those due to production, are adequately documented and submitted to senior operations officers for review and approval. Finally, periodic reviews of long-range mine plans and mineral reserve estimates are conducted at mine staff meetings, senior management meetings and by independent experts.

## Mineral Reserves

Reserves are defined by SEC Industry Standard Guide 7 as that part of a mineral deposit that could be economically and legally extracted and produced at the time of the reserve determination. All reserves are classified as proven or probable and are supported by life-of-mine plans.

Reserve estimates are based on pricing that does not exceed the three-year trailing average of benchmark prices for iron ore and coal adjusted to our realized price. For the three-year period 2011 to 2013, the average international benchmark price of 62 percent Fe CFR China was $145 per dry metric ton. For the same period, the benchmark coal prices FOB U.S. East Coast were $219 per metric ton for low-volatile coal.

41

Table of Contents

We evaluate and analyze mineral reserve estimates in accordance with our mineral policy and SEC requirements. The table below identifies the year in which the latest reserve estimate was completed.

| Property | Date of Latest Economic Reserve Analysis |
|---|---|
| **U.S. Iron Ore** | |
| Empire | 2009 |
| Tilden | 2011 |
| Hibbing | 2012 |
| Northshore | 2012 |
| United Taconite | 2013 |
| **Asia Pacific Iron Ore** | |
| Koolyanobbing | 2013 |
| **North American Coal** | |
| Pinnacle Complex | 2013 |
| Oak Grove | 2012 |

**Iron Ore Reserves**

Ore reserve estimates for our iron ore mines as of  December 31, 2014 were estimated from fully designed open pits developed using three-dimensional modeling techniques. These fully designed pits incorporate design slopes, practical mining shapes and access ramps to assure the accuracy of our reserve estimates. In the first quarter of 2014, we made the decision to idle all production at our Wabush mine. Production at our Wabush mine was idled by the end of March 2014, and in November 2014, we determined to implement the permanent closure plan for the mine, which became effective in the fourth quarter of 2014. On November 19, 2014, we announced that we are pursuing exit options for our Eastern Canadian Iron Ore operations, which may result in the closure of the Bloom Lake mine. Additionally, as disclosed on January 2, 2015, active production at Bloom Lake mine has completely ceased and the mine has transitioned to "care-and-maintenance" mode. As a result, the reserves previously reported for Wabush and Bloom Lake mines have been removed from our reserve estimates. All of our remaining operations reserves have been adjusted net of 2014 production.

A004209

Table of Contents

### *U.S. Iron Ore*

All tonnages reported for our U.S. Iron Ore operating segment are in long tons of 2,240 pounds, have been rounded to the nearest 100,000 and are reported on a 100 percent basis.

**U.S. Iron Ore Mineral Reserves**
**as of December 31, 2014**
**(In Millions of Long Tons)**

| Property | Cliffs Share | Proven | | Probable | | Proven & Probable | | Saleable Product [2,3] | | Previous Year | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Tonnage | % Grade | Tonnage | % Grade | Tonnage | % Grade[5] | Process Recovery[4] | Tonnage | P&P Crude Ore | Saleable Product |
| Empire | 79% | 14.6 | 20.9 | — | — | 14.6 | 20.9 | 32% | 4.7 | 4.7 | 1.4 |
| Tilden Hematite[1] | 85% | 454.3 | 35.7 | 130.0 | 36.1 | 584.3 | 35.8 | 34% | 199.6 | 604.6 | 207.2 |
| Tilden Magnetite | 85% | 66.0 | 29.1 | 11.7 | 29.2 | 77.7 | 29.1 | 38% | 29.5 | 84.6 | 31.9 |
| Total Tilden | 85% | 520.3 | | 141.7 | | 662.0 | | 35% | 229.1 | 689.2 | 239.1 |
| Hibbing | 23% | 239.5 | 18.9 | 20.7 | 18.9 | 260.2 | 18.9 | 26% | 68.0 | 287.5 | 75.4 |
| Northshore | 100% | 323.7 | 25.5 | 712.6 | 24.8 | 1,036.3 | 25.0 | 34% | 351.8 | 1,051.4 | 356.9 |
| United Taconite | 100% | 409.2 | 23.1 | 65.9 | 22.9 | 475.1 | 23.1 | 34% | 159.2 | 489.4 | 164.1 |
| **Totals** | | **1,507.3** | | **940.9** | | **2,448.2** | | | **812.8** | **2,522.2** | **836.9** |

[1] Tilden hematite reported grade is percent FeT; all other properties are percent magnetic iron

[2] Saleable product is a standard pellet containing 60 to 66 percent Fe calculated from both proven and probable mineral reserves

[3] Saleable product is reported on a dry basis; shipped products typically contain 1 to 4 percent moisture

[4] Process recovery includes all factors for converting crude ore tonnage to saleable product

[5] Cutoff grades are 15 percent magnetic iron for Hibbing and Empire, 17 percent for United Taconite, 19 percent for Northshore and 20 percent for Tilden. Cutoff for Tilden hematite is 25 percent FeT.

As previously announced, we entered into an agreement with our partner at the Empire mine on February 24, 2014 in regard to an extension of the mine life until 2016. Reserve figures for the Empire mine have been updated to reflect the increased crude ore tonnage and pellet production we expect to realize based on the extended mine life.

Table of Contents

### Asia Pacific Iron Ore

All tonnages reported for our Asia Pacific Iron Ore operating segment are in metric tons of 2,205 pounds, have been rounded to the nearest 100,000 and are reported on a 100 percent basis.

**Asia Pacific Iron Ore Mineral Reserves**
**as of December 31, 2014**
**(In Millions of Metric Tons)[1]**

| Property | Cliffs Share | Proven | | Probable | | Proven & Probable | | Previous Year Total |
|---|---|---|---|---|---|---|---|---|
| | | Tonnage | % Fe | Tonnage | % Fe | Tonnage | % Fe[2] | Tonnage |
| Koolyanobbing | 100% | 6.5 | 57.9 | 54.3 | 60.1 | 60.8 | 59.8 | 64.5 |

[1] Tonnages reported are saleable product reported on a dry basis; shipped products contain approximately 3 percent moisture

[2] Cutoff grade is 54 percent FeT

## Coal Reserves

Coal reserves estimates for our North American underground mines as of December 31, 2014 were estimated using three-dimensional modeling techniques, coupled with scheduled mine plans. The Pinnacle operations and Oak Grove operations reserves have not changed net of 2014 mine production. Effective December 31, 2014, the sale of the CLCC assets was completed and, as a result, the reserves previously reported have been removed from our reserve estimates.

### North American Coal

All tonnages reported for our North American Coal operating segment are in short tons of 2,000 pounds, have been rounded to the nearest 100,000 and are reported on a 100 percent basis.

**Recoverable Coal Reserves**
**as of December 31, 2014**
**(In Millions of Short Tons)[1]**

| Property/Seam | Cliffs Share | Category[2] | Coal Type | Mine Type | Reserve Classification | | | Quality | | Previous Year |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Proven | Probable | Total P&P | % Sulfur | As Received Btu/lb | Total P&P |
| Pinnacle Complex | | | | | | | | | | |
| Pocahontas No 3 | 100% | Assigned | Metallurgical | U/G | 29.0 | 9.9 | 38.9 | 0.92 | 14,000 | 41.6 |
| Pocahontas No 4 | 100% | Unassigned | Metallurgical | U/G | 2.8 | 0.5 | 3.3 | 0.51 | 14,000 | 3.3 |
| Oak Grove | | | | | | | | | | |
| Blue Creek Seam | 100% | Assigned | Metallurgical | U/G | 28.7 | 4.0 | 32.7 | 0.57 | 14,000 | 35.0 |
| Totals | | | | | 60.5 | 14.4 | 74.9 | | | 79.9 |

[1] Recoverable coal is reported on a wet basis containing approximately 6 percent moisture

[2] Assigned reserves represent coal that can be mined without a significant capital expenditure, whereas unassigned reserves will require significant capital expenditures before production could be realized

## Item 3.    Legal Proceedings

*Alabama Dust Litigation.* There are currently three cases in the Alabama state court system that comprise the Alabama Dust Litigation. Generally, these claims are brought by nearby homeowners who allege that dust emanating from the Concord Preparation Plant causes damage to their properties. All three of these cases are active and settlement discussions are proceeding. It is possible that these types of complaints may continue to be filed in the future, but the overall impact of these cases is not anticipated currently to have a material financial impact on our business.

*Bloom Lake Investigation*. CQIM, Bloom Lake General Partner Limited and Bloom Lake were investigated by Environment Canada in relation to alleged violations of Section 36(3) of the Fisheries Act that prohibits the deposit of a deleterious substance in water frequented by fish or in any place where the deleterious substance may enter any such water and Section 40(3) of the Fisheries Act in relation to an alleged failure to comply with a direction of an inspector. The investigation covered several alleged incidents that occurred between April 2011 and October 2012. The Bloom Lake investigation was settled on December 19, 2014 resolving all allegations and included a fine of C$1.5 million and a contribution to the Environmental Damages Fund of C$6.0 million. CQIM, Bloom Lake General Partner Limited and Bloom Lake entered into a Management Directive with Environment Canada which outlines compliance obligations to address these concerns going forward.

*Essar Litigation.* The Cleveland-Cliffs Iron Company, Northshore Mining Company and Cliffs Mining Company (collectively, the "Cliffs Plaintiffs") filed a complaint against Essar in the U.S. District Court for the Northern District of Ohio, Eastern Division, on January 12, 2015, asserting that Essar breached the Essar Sale Agreement by, among other things, failing to take delivery of and pay for its nominated ore in 2014, failing to make certain payments under a true up provision, and disclosing confidential information. The complaint also seeks a declaration that Essar is not entitled to receive certain credit payments under the terms of the Essar Sale Agreement. The Cliffs Plaintiffs seek damages in excess of $90 million. Essar filed an Answer and Counterclaim on February 11, 2015, seeking damages in excess of $160 million for various alleged breaches of the Essar Sale Agreement, including failure to deliver ore, overcharging for certain deliveries, failure to pay certain credit payments and disclosing confidential information.

*Maritime Asbestos Litigation.* The Cleveland-Cliffs Iron Company and/or The Cleveland-Cliffs Steamship Company have been named defendants in 489 actions brought from 1986 to date by former seamen claiming damages for various illnesses allegedly suffered as the result of exposure to airborne asbestos fibers while serving as crew members aboard the vessels previously owned or managed by our entities until the mid-1980s. All of these actions have been consolidated into multidistrict proceedings in the Eastern District of Pennsylvania, along with approximately 30,000 other cases from various jurisdictions that were filed against other defendants. Through a series of court orders, the docket has been reduced to approximately 3,500 active cases. We are a named defendant in approximately 50 cases. These cases are in the discovery phase. The court has dismissed the remainder of the cases without prejudice. Those dismissed cases could be reinstated upon application by plaintiffs' counsel. The claims against our entities are insured in amounts that vary by policy year; however, the manner in which coverage will be applied remains uncertain. Our entities continue to vigorously contest these claims and have made no settlements on them.

*Pinnacle Mine Environmental Litigation.* On June 22, 2010, the West Virginia DEP filed a lawsuit in the Wyoming County Circuit Court against the Pinnacle mine alleging past non-compliance with its NPDES discharge permit. The complaint seeks injunctive relief and penalties. An initial penalty proposal of $1.0 million was offered by the West Virginia DEP in March 2012; however, Pinnacle disagrees with the alleged violations and has met with the DEP to present facts supporting a review and reduction of the proposed penalty.

*Pointe Noire Investigation.* Wabush Mines was investigated by Environment Canada in relation to alleged violations of (i) Section 36(3) of the Fisheries Act, which prohibits the deposit of a deleterious substance in water frequented by fish or in any place where the deleterious substance may enter any such water, and (ii) Section 5.1 of the Migratory Bird Convention Act, 1994. The Québec Ministry of Sustainable Development, Environment, Wildlife and Parks also conducted an investigation into alleged violations of Section 8 of the Hazardous Material Regulation, which prohibits the discharge of a hazardous material to the environment.  The investigations covered events surrounding and leading up to the alleged release of approximately 1,320 gallons of fuel oil into the Bay of Sept-Iles on September 1, 2013.  We cooperated with the investigators and agency response officials. In April 2014, the Québec Ministry of Justice filed a penalty charge related to the incident. The Pointe Noire investigation was settled in December 2014. A fine of C$750,000 and C$61,000 in costs were agreed to be paid. We are anticipating a report by the Québec Ministry related to their assessment of the cleanup activities and further direction related to requirements for additional environmental monitoring, if any.

*Putative Class Action Lawsuits.* In May 2014, alleged purchasers of our common shares filed suit in the U.S. District Court for the Northern District of Ohio against us and certain current and former officers and directors of the Company. The action is captioned Department of the Treasury of the State of New Jersey and Its Division of Investment v. Cliffs Natural Resources Inc., et al., No. 1:14-CV-1031. The action asserts violations of the federal securities laws based on alleged false or misleading statements or omissions during the period of March 14, 2012 to March 26, 2013, regarding operations at our Bloom Lake mine in Québec, Canada, and the impact of those operations on our finances and outlook, including sustainability of the dividend, and that the alleged misstatements caused our common shares to trade at artificially inflated prices. The lawsuit seeks class certification and an award of monetary damages to the putative class in an unspecified amount, along with costs of suit and attorneys' fees. On October 21, 2014, defendants filed a motion to dismiss this action. The lawsuit has been referred to our insurance carriers.

[Table of Contents]

In June 2014, an alleged purchaser of the depositary shares issued by Cliffs in a public offering in February 2013 filed a putative class action, which is currently pending in the U.S. District Court for the Northern District of Ohio and is captioned Rosenberg v. Cliffs Natural Resources Inc., et al., No. 1:14-cv-01531, The suit asserts claims against us, certain current and former officers and directors of the Company, and several underwriters of the offering, alleging disclosure violations in the registration statement regarding operations at our Bloom Lake mine and the impact of those operations on our finances and outlook. This action seeks class certification and monetary relief in an unspecified amount, along with costs of suit and attorneys' fees. This lawsuit has been referred to our insurance carriers.

*The Rio Tinto Mine Site.* The Rio Tinto Mine Site is an historic underground copper mine located near Mountain City, Nevada, where tailings were placed in Mill Creek, a tributary to the Owyhee River. Site investigation and remediation work is being conducted in accordance with a Consent Order dated September 14, 2001 between the NDEP and the RTWG composed of the Company, Atlantic Richfield Company, Teck Cominco American Incorporated and E. I. duPont de Nemours and Company. The Consent Order provides for technical review by the U.S. Department of the Interior Bureau of Indian Affairs, the U.S. Fish and Wildlife Service, U.S. Department of Agriculture Forest Service, the NDEP and the Shoshone-Paiute Tribe of the Duck Valley Reservation (collectively, "Rio Tinto Trustees"). In recognition of the potential for an NRD claim, the parties actively pursued a global settlement that would include the EPA and encompass both the remedial action and the NRD issues.

The NDEP published a Record of Decision for the Rio Tinto Mine, which was signed on February 14, 2012 by the NDEP and the EPA. On September 27, 2012, the agencies subsequently issued a proposed Consent Decree, which was lodged with the U.S. District Court for the District of Nevada and opened for 30-day public comment on October 4, 2012. The Consent Decree subsequently was finalized on May 20, 2013. Under the terms of the Consent Decree, the RTWG has agreed to pay over $29 million in cleanup costs and natural resource damages to the site and surrounding area. The Company's share of the total settlement cost, which includes remedial action, insurance and other oversight costs, is approximately $12 million.

Under the terms of the Consent Decree, the RTWG will be responsible for removing mine tailings from Mill Creek, improving the creek to support redband trout and improving water quality in Mill Creek and the East Fork Owyhee River. Previous cleanup projects included filling in old mine shafts, grading and covering leach pads and tailings, and building diversion ditches. NDEP will oversee the cleanup, with input from EPA and monitoring from the nearby Shoshone-Paiute Tribes of Duck Valley.

*Shareholder Derivative Lawsuits.* In June and July 2014, alleged shareholders of Cliffs filed three derivative actions in the Cuyahoga County, Ohio, Court of Common Pleas asserting claims against certain current and former officers and directors of the Company. These actions, captioned Black v. Carrabba, et al., No. CV-14-827803, Asmussen v. Carrabba, et al., No. CV-14-829259, and Williams, et al. v. Carrabba, et al., No. CV-14-829499, allege that the individually named defendants violated their fiduciary duties to the Company by, among other things, disseminating false and misleading information regarding operations at our Bloom Lake mine in Québec, Canada, and the impact of those operations on our finances and outlook, including sustainability of the dividend, failing to maintain internal controls, and failing to appropriately oversee and manage the Company. The complaints assert additional claims for unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. The complaints seek damages, restitution, and equitable relief against the individually named defendants and in favor of the Company, along with costs of suit and attorneys' fees. These lawsuits have been referred to our insurance carriers. As these are derivative actions, we have been named only as a nominal defendant.

*Southern Natural Gas Lawsuit:* On July 23, 2014, Southern Natural Gas Company, L.L.C. filed a lawsuit in the Circuit Court of Jefferson County, Alabama (Case No. 68-CV-2014-900533.00) against the Company and others. The suit seeks to prevent coal mining activity underneath a gas pipeline at our Oak Grove property and to require defendants to pay the costs associated with relocating that pipeline. The suit seeks declaratory judgment, permanent injunctive relief and nuisance damages. The Circuit Court denied our motion to dismiss the complaint and we subsequently filed a petition for a writ of mandamus in the Alabama Supreme Court requesting that it direct the Circuit Court to dismiss the case for lack of subject matter jurisdiction. We filed a motion to stay discovery pending the Alabama Supreme Court's decision on the mandamus petition. Unless and until that motion is granted, discovery is ongoing in the Circuit Court. We also filed a Joinder of Additional Parties, including Kinder Morgan, Inc., and a Counterclaim, asserting breach or repudiation of easement agreements, interference with business relations, and slander of title.

*Taconite MACT Compliance Review.* EPA Region 5 issued Notices of Violation during the first quarter of 2014 to Empire, Tilden and United Taconite related to alleged historical violations of the Taconite MACT rule and certain elements of the respective state-issued Title V operating permits. Initial meetings were held with the EPA in the second quarter of 2014. While the matter has been referred to the DOJ for enforcement, the overall impact is not anticipated currently to have a material impact on our business.

46

*Worldlink Arbitration.*  In October 2011, our wholly owned subsidiary, CQIM, along with Bloom Lake General Partner Limited and The Bloom Lake Iron Ore Mine Limited Partnership, instituted an arbitration claim against the Bloom Lake mine's former customer, Worldlink Resources Limited, for material and/or fundamental breaches of the parties' 2007 offtake agreement for the purchase and sale of iron concentrate produced at the Bloom Lake mine. Our subsidiaries filed the arbitration claim with the International Court of Arbitration of the International Chamber of Commerce pursuant to the dispute resolution provisions of the offtake agreement. Our subsidiaries terminated the offtake agreement with Worldlink in August 2011 due to Worldlink's failure to fulfill its obligations under the agreement and Worldlink's demand to renegotiate the price of the iron ore concentrate in spite of being party to a long-term offtake agreement. Our subsidiaries claimed damages for the breach of the offtake agreement in excess of $85 million and Worldlink counterclaimed for damages in excess of $100 million.  In November 2014, the arbitrators decided in favor of Worldlink and awarded it damages in an amount of approximately $71 million as well as approximately $25 million in accrued interest from the date of termination of the offtake agreement in August 2011 and arbitration costs. This judgment has been included in the CCAA filing of the Bloom Lake Group and will be treated as an unsecured claim.

**Item 4.**        ***Mine Safety Disclosures***

We are committed to protecting the occupational health and well-being of each of our employees. Safety is one of our core values, and we strive to ensure that safe production is the first priority for all employees.  Our internal objective is to achieve zero injuries and incidents across the Company by focusing on proactively identifying needed prevention activities, establishing standards and evaluating performance to mitigate any potential loss to people, equipment, production and the environment. We have implemented intensive employee training that is geared toward maintaining a high level of awareness and knowledge of safety and health issues in the work environment through the development and coordination of requisite information, skills and attitudes. We believe that through these policies, we have developed an effective safety management system.

Under the Dodd-Frank Act, each operator of a coal or other mine is required to include certain mine safety results within its periodic reports filed with the SEC. As required by the reporting requirements included in §1503(a) of the Dodd-Frank Act and Item 104 of Regulation S-K, the required mine safety results regarding certain mining safety and health matters for each of our mine locations that are covered under the scope of the Dodd-Frank Act are included in Exhibit 95 of *Item 15. Exhibits and Financial Statement Schedules* of this Annual Report on Form 10-K.

Table of Contents

**PART II**

**Item 5.**   ***Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities***

**Stock Exchange Information**

Our common shares (ticker symbol CLF) are listed on the NYSE.

**Common Share Price Performance and Dividends**

The following table sets forth, for the periods indicated, the high and low sales prices per common share as reported on the NYSE and the dividends declared per common share:

|  | 2014 | | | 2013 | | |
|---|---|---|---|---|---|---|
|  | **High** | **Low** | **Dividends** | High | Low | Dividends |
| First Quarter | $ 26.63 | $ 17.40 | $ **0.15** | $ 40.40 | $ 17.95 | $ 0.15 |
| Second Quarter | 21.25 | 13.60 | **0.15** | 23.75 | 15.50 | 0.15 |
| Third Quarter | 18.41 | 10.19 | **0.15** | 25.95 | 15.41 | 0.15 |
| Fourth Quarter | 11.70 | 5.63 | **0.15** | 28.98 | 19.88 | 0.15 |
| Year | 26.63 | 5.63 | $ **0.60** | 40.40 | 15.41 | $ 0.60 |

At February 23, 2015, we had 1,312 shareholders of record.

On January 22, 2015, we amended the Amended and Restated Multicurrency Credit Agreement (Amendment No. 6) among Cliffs Natural Resources Inc. and various lenders dated August 11, 2011 (as further amended by Amendment No. 1 as of October 16, 2012, Amendment No. 2 as of February 8, 2013, Amendment No. 3 as of June 30, 2014, Amendment No. 4 as of September 9, 2014 and Amendment No. 5 as of October 24, 2014), or revolving credit agreement, to effect the following, among other items:

- a reduction of the permitted amount of quarterly dividends on our common shares to not more than $0.01 per share in any fiscal quarter.

On January 26, 2015, we announced that our Board of Directors had decided to eliminate the quarterly dividend of $0.15 per share on our common shares. The decision is applicable to the first quarter of 2015 and all subsequent quarters. The elimination of the common share dividend provides us with additional free cash flow of approximately $92 million annually, which we intend to use for further debt reduction. We see accelerated debt reduction as a more effective means of protecting our shareholders than continuing to pay a common share dividend.

48

A004215

Table of Contents

**Shareholder Return Performance**

The following graph shows changes over the past five-year period in the value of $100 invested in: (1) Cliffs' common shares; (2) S&P 500 Stock Index; (3) S&P 500 Steel Group Index; and (4) S&P Midcap 400 Index. The values of each investment are based on price change plus reinvestment of all dividends reported to shareholders.



|  | | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| **Cliffs Natural Resources Inc.** | Return % |  | 70.69 | -19.24 | -34.74 | -30.37 | **-71.69** |
|  | Cum $ | 100.00 | 170.69 | 137.85 | 89.97 | 62.65 | **17.74** |
| **S&P 500 Index - Total Returns** | Return % |  | 15.07 | 2.11 | 16.00 | 32.39 | **13.69** |
|  | Cum $ | 100.00 | 115.07 | 117.50 | 136.30 | 180.44 | **205.14** |
| **S&P 500 Steel Index** | Return % |  | 33.86 | -23.01 | -11.84 | 13.86 | **-9.06** |
|  | Cum $ | 100.00 | 133.86 | 103.06 | 90.86 | 103.45 | **94.08** |
| **S&P Midcap 400 Index** | Return % |  | 26.64 | -1.74 | 17.86 | 33.50 | **9.77** |
|  | Cum $ | 100.00 | 126.64 | 124.43 | 146.66 | 195.79 | **214.92** |

49

Table of Contents

**Issuer Purchases of Equity Securities**

The following table presents information with respect to repurchases by the Company of our common shares during the periods indicated.

### ISSUER PURCHASES OF EQUITY SECURITIES

| Period | Total Number of Shares (or Units) Purchased [1] | Average Price Paid per Share (or Unit) | Total Number of Shares (or Units) Purchased as Part of Publicly Announced Plans or Programs | Maximum Number (or Approximate Dollar Value) of Shares (or Units) that May Yet be Purchased Under the Plans or Programs [2] |
|---|---|---|---|---|
| October 1 - 31, 2014 | — | $ — | — | $200,000,000 |
| November 1 - 30, 2014 | 5,792 | $ 10.73 | — | $200,000,000 |
| December 1 - 31, 2014 | 3,119 | $ 6.71 | — | $200,000,000 |
| **Total** | **8,911** | **$ 9.32** | **—** | **$200,000,000** |

---

[1]  These shares were delivered to us by employees to satisfy tax withholding obligations due upon the vesting or payment of stock awards or scheduled distributions from our VNQDC Plan.

[2]  On August 25, 2014, the Board of Directors authorized a new share repurchase plan pursuant to which we may buy back our outstanding common shares in the open market or in private negotiated transactions up to a maximum of $200 million. No shares have been purchased through December 31, 2014. The authorization is active until December 31, 2015.

A004217

**Item 6.**    *Selected Financial Data*

### Summary of Financial and Other Statistical Data - Cliffs Natural Resources Inc. and Subsidiaries

| Financial data (in millions, except per share amounts) * | 2014 (g) | 2013 (f) | 2012 (d) | 2011 (c) | 2010 (b) |
|---|---|---|---|---|---|
| Revenue from product sales and services | $ 4,623.7 | $ 5,691.4 | $ 5,872.7 | $ 6,563.9 | $ 4,483.8 |
| Cost of goods sold and operating expenses | (4,172.3) | (4,542.1) | (4,700.6) | (3,953.0) | (3,025.1) |
| Other operating expense | (9,896.7) | (478.3) | (1,480.9) | (314.1) | (225.9) |
| Operating income (loss) | (9,445.3) | 671.0 | (308.8) | 2,296.8 | 1,232.8 |
| Income (loss) from continuing operations | (8,311.6) | 359.8 | (1,162.5) | 1,792.5 | 997.4 |
| Income and gain on sale from discontinued operations, net of tax | — | 2.0 | 35.9 | 20.1 | 22.5 |
| Net income (loss) | (8,311.6) | 361.8 | (1,126.6) | 1,812.6 | 1,019.9 |
| Loss (income) attributable to noncontrolling interest | 1,087.4 | 51.7 | 227.2 | (193.5) | — |
| Net income (loss) attributable to Cliffs shareholders | (7,224.2) | 413.5 | (899.4) | 1,619.1 | 1,019.9 |
| Preferred stock dividends | (51.2) | (48.7) | — | — | — |
| Income (loss) attributable to Cliffs common shareholders | $ (7,275.4) | $ 364.8 | $ (899.4) | $ 1,619.1 | $ 1,019.9 |
| Earnings (loss) per common share attributable to Cliffs shareholders - basic | | | | | |
|   Continuing operations | $ (47.52) | $ 2.39 | $ (6.57) | $ 11.41 | $ 7.37 |
|   Discontinued operations | — | 0.01 | 0.25 | 0.14 | 0.17 |
| Earnings (loss) per common share attributable to Cliffs shareholders - basic | $ (47.52) | $ 2.40 | $ (6.32) | $ 11.55 | $ 7.54 |
| Earnings (loss) per common share attributable to Cliffs shareholders - diluted | | | | | |
|   Continuing operations | $ (47.52) | $ 2.36 | $ (6.57) | $ 11.34 | $ 7.32 |
|   Discontinued operations | — | 0.01 | 0.25 | 0.14 | 0.17 |
| Earnings (loss) per common share attributable to Cliffs shareholders - diluted | $ (47.52) | $ 2.37 | $ (6.32) | $ 11.48 | $ 7.49 |
| Total assets | $ 3,164.0 | $ 13,121.9 | $ 13,574.9 | $ 14,541.7 | $ 7,778.2 |
| Long-term debt obligations (including capital leases) | $ 3,055.1 | $ 3,189.5 | $ 4,196.3 | $ 3,821.5 | $ 1,881.3 |
| Net cash from operating activities | $ 358.9 | $ 1,145.9 | $ 514.5 | $ 2,288.0 | $ 1,320.0 |
| Distributions to preferred shareholders cash dividends (e) | | | | | |
|   - Per depositary share | $ 1.75 | $ 1.66 | — | — | — |
|   - Total | $ 51.2 | $ 48.7 | — | — | — |
| Distributions to common shareholders cash dividends (a) | | | | | |
|   - Per share | $ 0.60 | $ 0.60 | $ 2.16 | $ 0.84 | $ 0.51 |
|   - Total | $ 92.5 | $ 91.9 | $ 307.2 | $ 118.9 | $ 68.9 |
| Repurchases of common shares | — | — | — | $ 289.8 | — |
| Common shares outstanding - basic (millions) | | | | | |
|   - Average for year | 153.1 | 151.7 | 142.4 | 140.2 | 135.3 |
|   - At year-end | 153.2 | 153.1 | 142.5 | 142.0 | 135.5 |
| **Iron ore and coal production and sales statistics** | | | | | |
| *(tons in millions - U.S. Iron Ore and North American Coal; metric tons in millions - Asia Pacific Iron Ore and Eastern Canadian Iron Ore)* | | | | | |
| Production tonnage - U.S. Iron Ore | 29.7 | 27.2 | 29.5 | 31.0 | 28.1 |
|   - Asia Pacific Iron Ore | 11.4 | 11.1 | 11.3 | 8.9 | 9.3 |
|   - North American Coal | 7.5 | 7.2 | 6.4 | 5.0 | 3.2 |
|   - Eastern Canadian Iron Ore | 6.2 | 8.7 | 8.5 | 6.9 | 3.9 |
| Production tonnage - (Cliffs' share) | | | | | |
|   - U.S. Iron Ore | 22.4 | 20.3 | 22.0 | 23.7 | 21.5 |
|   - Eastern Canadian Iron Ore | 6.2 | 8.7 | 8.5 | 6.9 | 3.9 |
| Sales tonnage - U.S. Iron Ore | 21.8 | 21.3 | 21.6 | 24.2 | 23.0 |
|   - Asia Pacific Iron Ore | 11.5 | 11.0 | 11.7 | 8.6 | 9.3 |
|   - North American Coal | 7.4 | 7.3 | 6.5 | 4.2 | 3.3 |
|   - Eastern Canadian Iron Ore | 7.2 | 8.6 | 8.9 | 7.4 | 3.3 |

A004218

Table of Contents

\* On July 10, 2012, we entered into a definitive share and asset sale agreement to sell our 45 percent economic interest in the Sonoma joint venture coal mine located in Queensland, Australia. Additionally, on September 27, 2011, we announced our plans to cease and dispose of the operations at the renewaFUEL biomass production facility in Michigan. On January 4, 2012, we entered into an agreement to sell the renewaFUEL assets to RNFL Acquisition LLC. The results of operations of the Sonoma joint venture and renewaFUEL operations are reflected as discontinued operations in the accompanying consolidated financial statements for all periods presented.

(a) On May 11, 2010, our Board of Directors increased our quarterly common share dividend from $0.0875 to $0.14 per share. The increased cash dividend was paid on June 1, 2010, September 1, 2010 and December 1, 2010 to shareholders on record as of May 14, 2010, August 13, 2010 and November 19, 2010, respectively. In addition, the increased cash dividend was paid on March 1, 2011 and June 1, 2011 to shareholders on record as of February 15, 2011 and April 29, 2011, respectively. On July 12, 2011, our Board of Directors increased the quarterly common share dividend by 100 percent to $0.28 per share. The increased cash dividend was paid on September 1, 2011, December 1, 2011 and March 1, 2012 to our shareholders on record as of the close of business on August 15, 2011, November 18, 2011 and February 15, 2012, respectively. On March 13, 2012, our Board of Directors increased the quarterly common share dividend by 123 percent to $0.625 per share. The increased cash dividend was paid on June 1, 2012, August 31, 2012 and December 3, 2012 to our shareholders on record as of April 27, 2012, August 15, 2012 and November 23, 2012, respectively. On February 11, 2013, our Board of Directors approved a reduction to our quarterly cash dividend rate by 76 percent to $0.15 per share. The decreased dividend of $0.15 per share was paid on March 1, 2013, June 3, 2013, September 3, 2013 and December 2, 2013 to our common shareholders of record as of the close of business on February 22, 2013, May 17, 2013, August 15, 2013 and November 22, 2013, respectively. Additionally, in 2014, the dividend of $0.15 per share was paid on March 3, 2014, June 3, 2014, September 2, 2014 and December 1, 2014 to our common shareholders of record as of the close of business on February 21, 2014, May 23, 2014, August 15, 2014 and November 15, 2014, respectively.

(b) On January 27, 2010, we acquired all of the remaining outstanding shares of Freewest, including its interest in the Ring of Fire properties in Northern Ontario Canada. On February 1, 2010, we acquired entities from our former partners that held their respective interests in Wabush, thereby increasing our ownership interest from 26.8 percent to 100 percent. On July 30, 2010, we acquired all of the coal operations of privately owned INR, and since that date, the operations acquired from INR have been conducted through our wholly owned subsidiary known as CLCC. Results for 2010 include Freewest's, Wabush's and CLCC's results since the respective acquisition dates. As a result of acquiring the remaining ownership interest in Freewest and Wabush, our 2010 results were impacted by realized gains of $38.6 million primarily related to the increase in fair value of our previous ownership interest in each investment held prior to the business acquisition.

In December 2010, we completed a legal entity restructuring that resulted in a change to deferred tax liabilities of $78.0 million on certain foreign investments to a deferred tax asset of $9.4 million for tax basis in excess of book basis on foreign investments as of December 31, 2010. A valuation allowance of $9.4 million was recorded against this asset due to the uncertainty of realization. The deferred tax changes were recognized as a reduction to our income tax provision in 2010.

(c) On May 12, 2011, we completed our acquisition of Consolidated Thompson by acquiring all of the outstanding common shares of Consolidated Thompson for C$17.25 per share in an all-cash transaction including total debt less cash. Results for 2011 include the results for Consolidated Thompson since the acquisition date.

In 2011, during our annual goodwill impairment test in the fourth quarter, a goodwill impairment charge of $27.8 million was recorded for our CLCC reporting unit, within the North American Coal operating segment, impacting Other operating expense.

(d) Upon performing our annual goodwill impairment test in the fourth quarter of 2012, goodwill impairment charges of $997.3 million and $2.7 million were recorded for our CQIM and Wabush reporting units, respectively, both within the Eastern Canadian Iron Ore operating segment. We also recorded an impairment charge of $49.9 million related to our Eastern Canadian Iron Ore operations to reduce those assets to their estimated fair value as of December 31, 2012 due to the idling of the pelletizing facility at Pointe Noire. All of these charges impacted Other operating expense.

As a result of the approval for the sale of our 30 percent interest in Amapá, an impairment charge of $365.4 million was recorded through Equity income (loss) from ventures for the year ended December 31, 2012.

(e) On March 20, 2013, our Board of Directors declared a cash dividend of $13.6111 per preferred share, which is equivalent to approximately $0.34 per depositary share. The cash dividend was paid on May 1, 2013 to our preferred shareholders of record as of the close of business on April 15, 2013. On May 7, 2013, September 9, 2013, and November 11, 2013, our Board of Directors declared a quarterly cash dividend of $17.50 per preferred share, which is equivalent to approximately $0.44 per depositary share. The cash dividends were paid on August 1, 2013, November 1, 2013, and February 3, 2014 to our preferred shareholders of record as of the close of business on July 15, 2013, October 15, 2013, and January 15, 2014, respectively. The cash dividend was paid on May 1, 2013 to our preferred shareholders of record as of the close of business on April 15, 2013. On February 11, 2014, May 13, 2014, and September 8, 2014, our Board of Directors declared a quarterly cash dividend of $17.50 per preferred share, which is equivalent to approximately $0.44 per depositary share. The cash dividends were paid on May 1, 2014, August 1, 2014 and November 3, 2014, to our preferred shareholders of record as of the close of business on April 15, 2014, July 15, 2014, and October 15, 2014, respectively. On November 19, 2014, our Board of Directors declared a quarterly cash dividend of $17.50 per preferred share, which is equivalent to approximately $0.44 per depositary share. The cash dividend of $12.8 million will be paid on February 2, 2015 to our preferred shareholders of record as of the close of business on January 15, 2015.

(f) Upon performing our annual goodwill impairment test in the fourth quarter of 2013, a goodwill impairment charge of $80.9 million was recorded for our Cliffs Chromite Ontario and Cliffs Chromite Far North reporting units within our Ferroalloys operating segment. We also recorded other long-lived asset impairment charges of $169.9 million, of which $154.6 million relates to our Wabush reporting unit within our Eastern Canadian Iron Ore operating segment to reduce those assets to their estimated fair value as of December 31, 2013. All of these charges impacted *Other operating expense.*

(g) During 2014, we recorded an impairment of goodwill and other long-lived assets of $73.5 million and $8,956.4 million, respectively. The goodwill impairment charge of $73.5 million related to our Asia Pacific Iron Ore reporting unit. The other long-lived asset impairment charges of $8,956.4 million related to our Wabush operation and Bloom Lake operation within our Eastern Canadian Iron Ore operating segment, our Asia Pacific Iron Ore operating segment and our CLCC thermal operation, Oak Grove operation and Pinnacle operation within our North American Coal operating segment, along with impairments charged to reporting units within our Other reportable segments. The impairment charges were primarily a result of changes in life-of-mine cash flows due to declining pricing for both global iron ore and low-volatile metallurgical coal, which impacts our estimate of long-term pricing, along with changes in strategic focus including exploratory phases of possible divestiture of the operations as the new Chief Operating Decision Maker views Eastern Canadian Iron Ore, Asia Pacific Iron Ore, North American Coal and Ferroalloys as non-core assets. The CLCC assets were sold in the fourth quarter of 2014 on December 31, 2014, resulting in a loss on sale of $419.6 million.

A004219

Table of Contents

**Item 7.**        ***Management's Discussion and Analysis of Financial Condition and Results of Operations***

Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") is designed to provide a reader of our financial statements with a narrative from the perspective of management on our financial condition, results of operations, liquidity and other factors that may affect our future results. The following discussion should be read in conjunction with the Consolidated Financial Statements and related notes that appear elsewhere in this document.

**Industry Overview**

The key driver of our business is demand for steelmaking raw materials from U.S. steelmakers. In 2014, the U.S. produced approximately 88 million metric tons of crude steel, making the U.S. the third largest producer in the world after China and Japan. This represents an approximate 2 percent increase in U.S. crude steel production when compared to 2013. U.S. total steel capacity utilization was approximately 77 percent in 2014 and 2013. Additionally, in 2014, China produced approximately 823 million metric tons of crude steel, or approximately  50 percent of total global crude steel production. These figures represent an approximate 1 percent increase in Chinese crude steel production when compared to 2013. Average global total steel capacity utilization was about 77 percent in 2014, an approximate 2 percent decrease from 2013. Throughout 2014, global crude steel production grew about 1 percent compared to 2013.

We expect economic growth in the U.S. to continue in 2015, and correspondingly expect steel demand to remain at healthy levels. While the industry demand will be supported by an improving housing market and a strengthened automotive sector, demand from energy companies is expected to decrease as oil prices remain at depressed levels. Additionally, the steel industry should face continued pressure from surging imports, which reached record levels in 2014, as the strength of the U.S. dollar continues to increase and continued oversupply of the global steel industry. In China, demand for steel should increase slightly compared to 2014, although at a rate far below growth percentages recorded earlier in the decade. In 2014, the increase in seaborne supply of iron ore was expected by many, but the slowdown in demand from Chinese end markets was unexpected and negatively impacted spot prices for iron ore. We expect seaborne iron ore prices to remain pressured unless there are vast structural changes to the supply/demand picture, including increased Chinese demand or iron ore capacity cuts.

The global price of iron ore is influenced significantly by the worldwide supply of iron ore and by Chinese demand.  The global supply of iron ore continues to increase, which has put downward pressure on current spot pricing. However, the impact of this volatility on our U.S. Iron Ore revenues is dampened because the pricing in our long-term contracts are mostly structured to minimize the short-term impact of the fluctuations in the seaborne iron ore price.

As a result of the long-term contracts, as discussed above, our U.S. Iron Ore revenues only experienced realized revenue rate decreases of   12 percent and 9 percent for the three months and year ended December 31, 2014, respectively, when compared to the comparable prior year periods versus the much higher decrease in Platts 62 percent Fe fines spot price. The Platts 62 percent Fe fines spot price decreased 45 percent to an average price of $74 per ton for the three months ended December 31, 2014 compared to the respective quarter of 2013. In comparison, the year to date Platts 62 percent Fe fines spot pricing also has decreased 29 percent to an average price of $97 per ton during the year ended December 31, 2014. These large decreases in Platts 62 percent Fe fines spot price were driven by insufficient growth in Chinese demand to absorb the additional seaborne supply. The spot price volatility impacts our realized revenue rates, particularly in our Asia Pacific Iron Ore and Eastern Canadian Iron Ore business segments because their contracts correlate heavily to world market spot pricing.

The metallurgical coal market continues to be in an oversupplied position due to increased supply from Australian producers. Those producers, benefiting from a devaluated local currency, are very competitive in European and South American markets.  Recent reductions in global coal supply have yet to make an impact on pricing.

Consistent with the above, the quarterly benchmark price for premium low-volatile hard coking coal between Australian metallurgical coal suppliers and Japanese and Korean consumers decreased 21 percent to a full-year average of $126 per metric ton in 2014 versus the 2013 full-year average of  $159 per metric ton. The benchmark pricing has remained relatively flat from the second quarter of 2014 to the fourth quarter of 2014 at approximately $120 per metric ton.

Our consolidated revenues for the years ended December 31, 2014  and 2013 were $4.6 billion and $5.7 billion, respectively, with net loss from continuing operations per diluted share of $47.52 and net income from continuing operations per diluted share of  $2.36, respectively. Net income in 2014 was impacted primarily by $9.0 billion of long-lived asset impairment recorded in the second half of 2014 along with $73.5 million of goodwill impairment recorded in the third quarter of 2014. Also, net income in 2014 was impacted by lower market pricing for our products, which decreased

53

product revenues by $1.0 billion for the year ended December 31, 2014 when compared to 2013. Results for the year were also impacted by the $419.6 million loss on the sale of our CLCC assets in 2014. The CLCC assets were sold on December 31, 2014. Additionally, results for the year ended December 31, 2014 were impacted negatively by $96.3 million related to a litigation judgment against the Bloom Lake Group , $92.6 million of minimum shipment penalties and  $90.7 million of Wabush idle costs. Net income in 2013 was impacted negatively by $154.6 million of other long-lived asset impairment charges related to our Wabush operations within our Eastern Canadian Iron Ore operating segment, an $80.9 million goodwill impairment charge related to our Cliffs Chromite Ontario and Cliffs Chromite Far North reporting units within our Ferroalloys operating segment and reported in our Other reportable segments and a $67.6 million asset impairment charge related to our investment in Amapá. This was offset by lower exploration spending in 2013, primarily related to the Chromite project.

**Strategy**

### *Re-focusing the Company on our Core U.S. Iron Ore Business*

We have shifted from a diversification based strategy to one that focuses on strengthening our U.S. Iron Ore operations. We are the market-leading iron ore producer in the U.S., supplying differentiated iron ore pellets under long-term contracts, some of which begin to expire in the end of 2016, to the largest U.S. steel producers. Pricing protections and long-term supply, certainty provided by our existing contracts and our low-cost operating profile positions U.S. Iron Ore as our most stable and profitable business. We expect to continue to strengthen U.S. Iron Ore cost operating profile through our operational expertise and disciplined capital allocation policies.

### *Reviewing All Other Businesses for Either Optimization, Divestiture or Shutdown*

As an extension of our re-focused U.S. Iron Ore strategy, we continue to consider further divestitures of Eastern Canadian Iron Ore, Asia Pacific Iron Ore and North American Coal businesses. We believe the assets from these non-core segments have value and will only consummate a transaction where we believe the price fairly and adequately represents such value. For more information regarding the status of our divestiture of our Eastern Canadian Iron Ore business, see "Recent Developments" below.

Asia Pacific Iron Ore is a well-recognized and reliable supplier to steelmakers in Asia. To date, Asia Pacific Iron Ore has been a steady cash flow contributor, benefiting from a premium price for its high lump iron ore mix and minimal required capital expenditures to maintain production. We look to operate our North American Coal business at breakeven levels of EBITDA generation in 2015 given the current environment for high quality metallurgical coal. We are focused on limiting capital expenditures while continuing to meet environmental, safety and permission to operate requirements.

### *Maintaining Discipline on Costs and Capital Spending and Improving our Financial Flexibility*

We believe our ability to execute our strategy is dependent on our financial position, balance sheet strength and financial flexibility to manage through volatility in commodity prices. We have developed a highly disciplined financial and capital expenditure plan with a focus on improving our cost profile and increasing long-term profitability. We are focused on sizing our organization to better fit our new strategic direction and streamlining our businesses' support functions by eliminating duplication. Our capital allocation plan is focused on strengthening our core U.S. Iron Ore operations to promote greater free cash flow generation.

**Competitive Strengths**

### *Highly Stable and Resilient U.S. Iron Ore Operations*

Our U.S. Iron Ore segment is the core focus of our business strategy. The U.S. Iron Ore segment is the primary contributor to our consolidated results, generating 54 percent and 89 percent of consolidated revenue and Adjusted EBITDA, respectively, for the year ended December 31, 2014. U.S. Iron Ore produces differentiated iron ore pellets that are customized for use in customers' blast furnaces as part of the steelmaking process. The grades of pellets currently delivered to each customer are based on that customer's preferences, which depend in part on the characteristics of the customer's blast furnace operation. We believe our long history of supplying customized pellets to the U.S. steel producers has resulted in a co-dependency between us and our customers. This co-dependency has positioned Cliffs to claim a substantial portion of the total U.S. iron ore market. Based on Cliffs' equity ownership in its U.S. mines, Cliffs' share of the annual rated production capacity is 25.5 million tons, representing 44 percent of total U.S. annual pellet capacity. Long-lived assets with an average mine life of approximately 30 years provide the opportunity to maintain our significant market position well into the future.

We believe U.S. Iron Ore is uniquely positioned in the global iron ore market due to its reduced exposure to seaborne iron ore pricing. More than half of U.S. Iron Ore production is sold through stable long-term contracts that are

structured with formula-based pricing that mitigates the impact of seaborne price volatility on our business. Additionally, certain of our supply agreements have a provision that limits the amount of price increases or decreases in any given year. The impact of the pricing protections from our contracts is clearly evidenced in our U.S. Iron Ore financial performance. U.S. Iron Ore's realized revenue rate decreased 12 percent and 9 percent for the three months and year ended December 31, 2014, respectively, compared to a 45 percent and 29 percent decline in the Platts 62 percent Fe fines spot price over the same periods.

In addition, we maintain materially lower costs compared to our competition as a result of our proximity to U.S. steelmaking operations. Our costs are lower as a result of inherent transportation advantages associated with our mine locations near the Great Lakes which allows for transportation via railroads and loading ports. U.S. Iron Ore mines also benefit from on-site pellet production and ore production facilities located a short distance from the mines. These advantages translated to a cash production costs in the three months and year ended December 31, 2014 of $59 per ton and $64 per ton, respectively, which included the cost to mine, concentrate and pelletize, certain transportation costs and site administration costs.

### Competitive Asia Pacific Iron Ore Operations

Although our annual production tonnage is substantially less than our competitors in the seaborne market, the Asia Pacific Iron Ore business maintains a competitive position with the major Australian iron ore producers. We produce a product mix of approximately 52 percent lump ore and 48 percent fines, which is a significantly higher lump mix than the major producers in Australia. This lump ore currently commands a premium in the seaborne market over iron ore fines.

Further, our Asia Pacific Iron Ore segment is a cost competitive producer and requires modest ongoing sustaining capital expenditures to continue our operations. Cash production costs during the three months and year ended December 31, 2014, were $43 per ton and $49 per ton, respectively. Over the remaining life of the mine, the capital expenditure requirements are estimated to be approximately $50 million or $1 per ton.

## Recent Developments

### Eastern Canadian Iron Ore

Our Wabush Scully mine in Newfoundland and Labrador was idled by the end of the first quarter of 2014 and subsequently began to commence permanent closure in the fourth quarter of 2014. With costs unsustainably high, it was not economically viable to continue running this operation. Approximately 500 employees at both the Wabush Scully mine and the Pointe Noire rail and port operation in Québec were impacted by these actions.

On November 19, 2014, we announced that we were pursuing exit options for our Eastern Canadian Iron Ore operations.

During the fourth quarter of 2014, we disclosed that, despite our cost-cutting progress at our Bloom Lake mine, we concluded that Phase I alone was not economically feasible based on our current operating plans. For the Bloom Lake mine to be profitable, we concluded that Phase II of the Bloom Lake mine must be developed to reduce the overall cash cost of operations. We could only develop Phase II of the Bloom Lake mine if we had been able to secure new equity partners to share in the capital costs, which we estimated to be approximately $1.2 billion. As the new equity partners were unable to commit within the short timeframe we required, we determined that the Phase II expansion of the Bloom Lake mine was no longer a viable option for us and we shifted our focus to considering available possibilities and executing an exit option for Eastern Canadian Iron Ore operations that minimized the cash outflows and associated liabilities. In December 2014, iron ore production at the Bloom Lake mine was suspended and the Bloom Lake mine was placed in "care-and-maintenance" mode.

On January 27, 2015, we announced that the Bloom Lake Group commenced restructuring proceedings in Montreal, Québec, under the CCAA. The Bloom Lake Group had recently suspended operations and for several months we were exploring options to sell certain of our Canadian assets, among other initiatives. The decision to seek protection under the CCAA was based on a thorough legal and financial analysis of the options available to the Bloom Lake Group. The Bloom Lake Group was no longer generating any revenues and was not able to meet its obligations as they came due. The initial CCAA order addressed the Bloom Lake Group's immediate liquidity issues and permits the Bloom Lake Group to preserve and protect its assets for the benefit of all stakeholders while restructuring and sale options are explored. As part of the CCAA process, the Court has appointed FTI Consulting Canada Inc. as the Monitor. The Monitor's role in the CCAA process is to monitor the activities of the Bloom Lake Group and provide assistance to the Bloom Lake Group and its stakeholders in respect of the CCAA process.

*Worldlink Arbitration*

In October 2011, our wholly owned subsidiary, CQIM, along with Bloom Lake General Partner Limited and The Bloom Lake Iron Ore Mine Limited Partnership, instituted an arbitration claim against the Bloom Lake mine's former customer, Worldlink Resources Limited, for material and/or fundamental breaches of the parties' 2007 offtake agreement for the purchase and sale of iron concentrate produced at the Bloom Lake mine. Our subsidiaries filed the arbitration claim with the International Court of Arbitration of the International Chamber of Commerce pursuant to the dispute resolution provisions of the offtake agreement. Our subsidiaries terminated the offtake agreement with Worldlink in August 2011 due to Worldlink's failure to fulfill its obligations under the agreement and Worldlink's demand to renegotiate the price of the iron ore concentrate in spite of being party to a long-term offtake agreement. Our subsidiaries claimed damages for the breach of the offtake agreement in excess of $85 million, and Worldlink counterclaimed for damages in excess of $100 million. In November 2014, the arbitrators decided in favor of Worldlink and awarded it damages in an amount of approximately $71 million as well as approximately $25 million in accrued interest from the date of termination of the offtake agreement in August 2011 and arbitration costs. This judgment has been included in the CCAA filing of the Bloom Lake and will be treated as an unsecured claim.

*CLCC*

On December 2, 2014, we entered into a definitive agreement to sell our CLCC assets in southern West Virginia to Coronado Coal II, LLC for $174 million in cash as well as the assumption of certain liabilities, of which $155 million has been collected as of December 31, 2014 . The sale closed on December 31, 2014.

The CLCC assets, which we acquired in 2010, included two underground high-volatile metallurgical coal mines, Powellton No. 1 and Lower War Eagle, and the Toney Fork No. 2 surface thermal coal mine. The facilities included a coal preparation and processing plant and a train batch-weight load-out facility with access to rail. In 2014, the CLCC operations produced 1.5 million tons of metallurgical coal out of the 6.6 million total tons of metallurgical coal North American Coal produced for us, and the CLCC operations also produced 0.9 million tons of thermal coal. In 2013, the CLCC operations produced 1.5 million tons of metallurgical coal out of the 6.6 million total tons of the metallurgical coal North American Coal produced for us, and the CLCC operations also produced 0.6 million tons of thermal coal.

We recorded a loss on the sale of CLCC assets of approximately $419.6 million on a pre-tax basis in the fourth quarter of 2014.

*Share Buyback*

On August 25, 2014, the Board of Directors authorized us to buy back our outstanding common shares in the open market or in private negotiated transactions up to a maximum of $200 million. At that time, we obtained approval from our bank group to ensure the buyback program could be effectively implemented in a timely manner. The Company is not obligated to make any purchases under the buyback program and it may be suspended or discontinued by the Company at any time. No shares have been purchased through December 31, 2014. The authorization is active until December 31, 2015.

*Credit Facility Amendments*

On October 24, 2014, we entered into an agreement to amend our existing revolving credit agreement (Amendment No. 5). The amended terms remove the current maximum balance sheet leverage ratio of debt to capitalization of less than 45 percent, which was a covenant introduced in June 2014, and replaced that covenant with a maximum leverage ratio covenant of secured debt to EBITDA that is not to exceed 3.5 times. The minimum interest coverage ratio requirement of 3.5 times was subsequently reduced to 2.0 times upon completion of certain collateral actions within 60 days of the execution of the amendment. The collateral requirements were satisfied as of December 23, 2014. The amendment also reduced the size of the existing facility from $1.250 billion to $1.125 billion and included a security agreement.

On January 22, 2015, we entered into an agreement to further amend our existing revolving credit agreement (Amendment No. 6). The further amended terms waived the event of default related to a CCAA filing for Canadian entities. The CCAA filing for our Bloom Lake Group was made subsequent to the effectiveness of this amendment. The amendment also reduced the size of the existing facility from $1.125 billion to $900 million, with a further reduction to $750 million on May 31, 2015.

Each of these amendments to our credit agreement facilitate financial flexibility for us to execute our strategy and provide us a consistent source of liquidity. Refer to NOTE 5 - DEBT AND CREDIT FACILITIES and NOTE 21 - SUBSEQUENT EVENTS for further details of the amendments.

56

Table of Contents

*Debt*

During the fourth quarter, we announced a tender offer to purchase our public debt at discounts, as well as a new secured notes offering, driven by our desire to pay down debt. However, the tender offers were terminated because our debt refinancing was postponed due to perceived adverse market conditions. After the postponement, we used our liquidity to execute the repurchase of our senior notes in the open market. During the fourth quarter 2014, we were able to pay down $300 million in aggregate principal in total debt less cash. By the end of the year, we had total debt less cash of $2.7 billion, with total debt of $3.0 billion, zero drawn on our revolving credit facility, and $291.0 million of cash and cash equivalents. In January 2015, we further reduced total debt by approximately $159 million through senior note repurchases in the open market with approximately $106 million of net proceeds from the sale of CLCC and cash from operations.

**Business Segments**

Our Company's operations are organized and managed according to product category and geographic location: U.S. Iron Ore, Asia Pacific Iron Ore, North American Coal and Eastern Canadian Iron Ore.

**Results of Operations – Consolidated**

*2014 Compared to 2013*

The following is a summary of our consolidated results of operations for the years ended December 31, 2014 and 2013:

| | **2014** | 2013 | Variance Favorable/ (Unfavorable) |
|---|---|---|---|
| | | **(In Millions)** | |
| Revenues from product sales and services | $ **4,623.7** | $ 5,691.4 | $ (1,067.7) |
| Cost of goods sold and operating expenses | **(4,172.3)** | (4,542.1) | 369.8 |
| Sales margin | $ **451.4** | $ 1,149.3 | $ (697.9) |
| Sales margin % | **9.8%** | 20.2% | (10.4)% |

*Revenues from Product Sales and Services*

Sales revenue for the year ended December 31, 2014 decreased $1,067.7 million, or 18.8 percent, from 2013. The decrease in sales revenue during 2014 compared to 2013 was primarily attributable to the decrease in market pricing for our products, which impacted revenues by $1.0 billion for the year ended December 31, 2014.

Changes in world market pricing impacts our revenues each year. During 2014, iron ore revenues were impacted primarily by the decrease in the Platts 62 percent Fe fines spot price, which declined 28.5 percent to an average price of $97 per ton, resulting in decreased revenues of $830.8 million, excluding the impact of Wabush tons sold. The decrease in our realized revenue rates during 2014 compared to 2013 was 9.5 percent, 32.8 percent and 26.7 percent for our U.S. Iron Ore, Asia Pacific Iron Ore and Eastern Canadian Iron Ore operations, respectively. Also, the decision to idle Wabush impacted the period-over-period revenues negatively by $288.0 million. Furthermore, during 2014, our North American Coal business segment experienced continued downward pricing pressures, which negatively impacted revenues by $176.8 million and decreased our realized revenue rate by 23.6 percent. Partially offsetting these decreases was an increase in revenues period-over-period as a result of higher iron ore and coal sales volumes of $183.5 million for the year ended December 31, 2014.

Refer to "Results of Operations – Segment Information" for additional information regarding the specific factors that impacted revenue during the period.

*Cost of Goods Sold and Operating Expenses*

Cost of goods sold and operating expenses for the years ended December 31, 2014 and 2013 were $4,172.3 million and $4,542.1 million, respectively, a decrease of $369.8 million, or 8.1 percent year-over-year.

Cost of goods sold and operating expenses for the year ended December 31, 2014 decreased as costs were impacted positively as a result of the Wabush idle that occurred during the second quarter of 2014, which reduced costs by $304.4 million period-over-period. Operational efficiencies and cost cutting efforts across all of our business units have reduced costs for the year ended December 31, 2014 by $217.0 million. Also, as a result of favorable foreign exchange rates in 2014 versus 2013, we realized lower costs of $93.8 million. Partially offsetting these decreases were an increase in costs period-over-period as a result of higher iron ore and coal sales volumes of $141.6 million for the year ended December 31, 2014. Additionally, we incurred incrementally higher lower-of-cost-or-market inventory charges of $56.8 million for the year ended December 31, 2014, as a result of the continued downward pricing pressure.

Refer to "Results of Operations – Segment Information" for additional information regarding the specific factors that impacted our operating results during the period.

*Other Operating Income (Expense)*

The following is a summary of other operating income (expense) for the years ended December 31, 2014 and 2013:

| | | (In Millions) | | | | |
|---|---|---|---|---|---|---|
| | **2014** | | 2013 | | Variance Favorable/ (Unfavorable) | |
| Selling, general and administrative expenses | $ | **(208.7)** | $ | (231.6) | $ | 22.9 |
| Exploration costs | | **(8.8)** | | (59.0) | | 50.2 |
| Impairment of goodwill and other long-lived assets | | **(9,029.9)** | | (250.8) | | (8,779.1) |
| Gain (loss) on disposal of assets | | **(423.0)** | | 16.7 | | (439.7) |
| Miscellaneous - net | | **(226.3)** | | 46.4 | | (272.7) |
| | $ | **(9,896.7)** | $ | (478.3) | $ | (9,418.4) |

Selling, general and administrative expenses during the year ended December 31, 2014 decreased $22.9 million over 2013. The year ended December 31, 2014 was favorably impacted by $37.2 million for employment costs related to cost savings actions and reduced year-over-year expense of $10.5 million related to pension and other postemployment benefits. Offsetting these cost reductions was an increase in costs related to the proxy contest and the change in control of the majority of our Board of Directors. We incurred substantial costs associated with various advisors, including bankers, attorneys and others. Costs associated with these events were approximately $26.6 million for the year ended December 31, 2014.

Exploration costs decreased by $50.2 million during the year ended December 31, 2014 from 2013, primarily due to decreases in costs at our Ferroalloys operations and Global Exploration Group operations. Ferroalloys and the Global Exploration Group are reported within our Other reportable segments. Our Ferroalloys operating segment had cost decreases of $38.8 million in 2014 over 2013 due to the decision made in the fourth quarter of 2013 to indefinitely suspend the Chromite Project and to not allocate additional capital for the project given the uncertain timeline and risks associated with the development of necessary infrastructure to bring the project online. Our Global Exploration Group had cost decreases of $8.0 million in 2014 over 2013, due to lower overhead and professional services spend. In alignment with our capital allocation strategy, we anticipate minimal levels of exploration spending to continue in 2015 and beyond.

Impairment of goodwill and other long-lived assets were $9,029.9 million and $250.8 million during the years ended December 31, 2014 and 2013, respectively. During the year ended December 31, 2014, we recorded goodwill impairment of $73.5 million related to our Asia Pacific Iron Ore reporting unit. We also recorded other long-lived asset impairment charges of $8,956.4 million during 2014. The charges are related to our Wabush mine and Bloom Lake mine within our Eastern Canadian Iron Ore operating segment, our Asia Pacific Iron Ore operating segment and our CLCC thermal operation, which was sold during the fourth quarter of 2014, Oak Grove operation and Pinnacle operation within our North American Coal operating segment, along with impairments charged to reporting units within our *Other* reportable segments. The impairment charges were primarily a result of management determining that the carrying value of the asset groups may not be recoverable primarily due to long-term price forecasts as part of management's long-range planning process. Updated estimates of long-term prices for all products, specifically the Platts 62 percent Fe fines spot price, which particularly effects Eastern Canadian Iron Ore and Asia Pacific Iron Ore business segments because their contracts correlate heavily to world market spot pricing, and the benchmark price for premium low-volatile hard coking coal were lower than prior estimates. These estimates were updated based upon current market conditions, macro-

A004225

economic factors influencing the balance of supply and demand for our products and expectations for future cost and capital expenditure requirements. Additionally, a new CEO, Lourenco Goncalves, was appointed by the Board of Directors in early August 2014 and subsequently identified as the CODM in accordance with ASC 280, Segment Reporting. The new CODM views Eastern Canadian Iron Ore, Asia Pacific Iron Ore, North American Coal and Ferroalloys as non-core assets and has communicated plans to evaluate the business units for a change in strategy including possible divestiture. These factors, among other considerations utilized in the individual impairment assessments, indicate that the carrying value of the respective asset groups and Asia Pacific Iron Ore goodwill may not be recoverable. Refer to NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS  for further information.

During the fourth quarter of 2013, we continued to experience higher than expected production costs and operational inefficiencies at our Wabush operations within our Eastern Canadian Iron Ore operating segment that have resulted in continued declines in our profitability of that business, which represents an asset group for purposes of testing our long-lived assets for recoverability. Driven by the unsustainable high cost structure, which was not economically viable to continue running the operations, we announced on February 11, 2014, the decision to idle the production of our Wabush Scully mine by the end of the first quarter and began to implement the permanent closure plan for the mine . Upon completion of an impairment analysis, it was determined the fair value was less than the carrying value of the asset group, which resulted in an impairment of other long-lived assets of $154.6 million at December 31, 2013.

Additionally during the fourth quarter of 2013, a goodwill impairment charge of  $80.9 million was recorded for our Cliffs Chromite Ontario and Cliffs Chromite Far North reporting units within our Ferroalloys operating segment. Ferroalloys and the Global Exploration Group are reported within our Other reportable segments. The goodwill impairment charge was primarily a result of the decision to indefinitely suspend the Chromite Project and to not allocate additional capital for the project given the uncertain timeline and risks associated with the development of necessary infrastructure to bring the project online.

Net loss on disposal of assets was $ 423.0 million during the year ended December 31, 2014, compared to a net gain on disposal of assets of $  16.7 million in 2013. The net loss on disposal of assets for 2014 was primarily attributable to the loss of $  419.6 million incurred on the sale of our CLCC assets.

The following is a summary of Miscellaneous - net for the year ended December 31, 2014 and 2013:

| | (In Millions) | | |
| --- | --- | --- | --- |
| | 2014 | 2013 | Variance Favorable/ (Unfavorable) |
| Foreign exchange remeasurement | $ 30.7 | $ 64.0 | $ (33.3 ) |
| Litigation judgment | (96.3) | — | $ (96.3 ) |
| Minimum shipment penalties | (92.6) | (37.3) | (55.3 ) |
| Wabush idle costs | (90.7) | (7.4) | (83.3 ) |
| Other | 22.6 | 27.1 | (4.5 ) |
| | $ (226.3 ) | $ 46.4 | $ (272.7 ) |

Miscellaneous – net expense was unfavorable by $272.7 million during the year ended December 31, 2014 in comparison to 2013. The year ended December 31, 2014 was impacted negatively by $83.3 million as a result of our first quarter 2014 decision to idle and subsequently close the Wabush mine. These costs include idling and closure costs, employment-related expenditures and contract costs. During the year ended December 31, 2014, we incurred costs of $96.3 million related to an unfavorable litigation judgment in the Worldlink arbitration and $ 92.6 million for failure to meet minimum monthly shipment requirements. We recorded $36.4 million during the third quarter of 2014 related to minimum shipment penalties associated with the cancellation of the Wabush mine rail contract. The remaining increase in minimum shipment penalties were a result of the continued delay in the Bloom Lake Phase II expansion and idling of the Bloom Lake operations and subsequent transition to "care-and-maintenance" mode. The contract containing the minimum shipment penalties associated with the Bloom Lake mine has been included in the CCAA filing and will be treated as an unsecured claim.  Additionally, for the year ended December 31, 2014, there was an unfavorable incremental impact of $33.3 million due to the change in foreign exchange re-measurement on short-term intercompany notes, Australian bank accounts that are denominated in U.S. dollars and certain monetary financial assets and liabilities, which are denominated in something other than the functional currency of the entity.

A004226

*Other Income (Expense)*

The following is a summary of other income (expense) for the years ended December 31, 2014 and 2013:

| | (In Millions) | | |
| --- | --- | --- | --- |
| | **2014** | 2013 | Variance Favorable/ (Unfavorable) |
| Interest expense, net | **(185.2)** | (179.1) | (6.1) |
| Other non-operating income (expense) | **26.8** | (2.6) | 29.4 |
| | $ **(158.4)** | $ (181.7) | $ 23.3 |

The increase in interest expense in 2014 compared to 2013 was attributable primarily to the change in borrowing capacity of our revolving credit facility which resulted in $3.7 million of unamortized debt issuance costs being expensed as of the effective date of the amendment. Refer to NOTE 5 - DEBT AND CREDIT FACILITIES for further information.

Other non-operating income increased by $29.4 million during the year ended December 31, 2014 in comparison to 2013. The increase in other non-operating income was mainly due to our repurchase of debt in the fourth quarter of 2014 that resulted in a $16.2 million gain on extinguishment of debt. Additionally, other non-operating income was impacted positively in the current period by $7.8 million of income related to the sale of our remaining shares in a marketable security as a decision was made to liquidate the asset in 2014.

*Income Taxes*

Our tax rate is affected by permanent items, such as depletion and the relative amount of income we earn in various foreign jurisdictions with tax rates that differ from the U.S. statutory rate. It also is affected by discrete items that may occur in any given period, but are not consistent from period to period. The following represents a summary of our tax provision and corresponding effective rates for the years ended December 31, 2014 and 2013:

| | (In Millions) | | |
| --- | --- | --- | --- |
| | **2014** | 2013 | Variance |
| Income tax benefit (expense) | $ **1,302.0** | $ (55.1) | $ 1,357.1 |
| Effective tax rate | **13.6%** | 11.3% | 2.3% |

60

A004227

A reconciliation of our income tax attributable to continuing operations computed at the U.S. federal statutory rate for the years ended December 31, 2014 and 2013 is as follows:

| | **(In Millions)** | | | |
|---|---|---|---|---|
| | **2014** | | 2013 | |
| Tax at U.S. statutory rate of 35 percent | **$(3,361.3)** | **35.0 %** | $ 171.3 | 35.0 % |
| Increases/(Decreases) due to: | | | | |
| Foreign exchange remeasurement | **(4.1)** | **—** | (2.6) | (0.5) |
| Non-taxable loss (income) related to noncontrolling interests | **290.1** | **(3.0)** | (1.5) | (0.3) |
| Impact of tax law change | **13.0** | **(0.1)** | — | — |
| Percentage depletion in excess of cost depletion | **(87.9)** | **0.9** | (97.6) | (19.9) |
| Impact of foreign operations | **592.0** | **(6.2)** | (10.2) | (2.1) |
| Income not subject to tax | **(46.5)** | **0.5** | (106.6) | (21.8) |
| Goodwill impairment | **22.7** | **(0.2)** | 20.5 | 4.2 |
| State taxes, net | **(43.6)** | **0.5** | 5.6 | 1.1 |
| Settlement of financial guaranty | **(343.3)** | **3.6** | — | — |
| Manufacturer's deduction | **—** | **—** | (7.9) | (1.6) |
| Valuation allowance | **1,660.6** | **(17.3)** | 73.0 | 14.9 |
| Tax uncertainties | **0.2** | **—** | 19.6 | 5.3 |
| Prior year adjustments made in current year | **(10.4)** | **0.1** | (11.4) | (3.6) |
| Other items - net | **16.5** | **(0.2)** | 2.9 | 0.6 |
| Provision for income tax benefit and effective income tax rate including discrete items | **$(1,302.0)** | **13.6 %** | $ 55.1 | 11.3 % |

Our tax provision for the year ended December 31, 2014 was a benefit of $1,302.0 million and a 13.6 percent effective tax rate compared with an expense of $55.1 million and an effective tax rate of 11.3 percent for the prior-year. The change in the income tax benefit from the prior-year expense is due primarily to the impairment of global long-lived assets offset by valuation allowances on future tax benefits that management has determined are not recoverable and the settlement of a financial guaranty. The impact of foreign operations relates to losses in foreign jurisdictions where the statutory rates, ranging from 25 percent to 30 percent, differ from the U.S. statutory rate of 35 percent. Other items include non-deductible goodwill impairment as well as a decrease in the tax benefit from interest income not subject to tax.

Income not subject to tax includes the tax benefit of the non-taxable interest income that is $46.5 million for the year ended December 31, 2014. Of this, $27.8 million, relates to an intercompany note between the U.S. and Canada. This note was restructured on April 27, 2014 and will no longer result in an income tax benefit after this date. An additional, $18.7 million relates to an intercompany note which was originally between Canada and Australia, but was restructured on December 4, 2014 and is now between Luxembourg and Australia. The balance of the MRPS is $236.0 million at December 31, 2014 with an interest rate of 9.4 percent and a maturity date of December 31, 2020. The balances of the intercompany loans are not permanently invested in the subsidiaries.

See NOTE 9 - INCOME TAXES for further information.

***Equity Loss from Ventures***

Equity loss from ventures for the year ended December 31, 2014 of $9.9 million compares to equity loss from ventures for the year ended December 31, 2013 of $74.4 million. The equity loss from ventures for the year ended December 31, 2014 primarily is comprised of the impairment charge of $9.2 million related to a Global Exploration Group investment. The equity loss from ventures for the year ended December 31, 2013 primarily is comprised of the impairment charge of $67.6 million related to our 30 percent ownership interest in Amapá, the sale of which was approved by the Board of Directors in December 2012. The sale closed in the fourth quarter of 2013.

61

Table of Contents

*Noncontrolling Interest*

Noncontrolling interest primarily is comprised of our consolidated, but less-than-wholly owned subsidiaries at the Bloom Lake and Empire mining operations. The net loss attributable to the noncontrolling interest related to Bloom Lake was $1,113.3 million and $66.5 million for the years ended December 31, 2014 and 2013, respectively. The net loss in 2014 was driven by other long-lived asset impairment charges recorded in the second half of 2014 for the Bloom Lake mine of $6.2 billion, of which $1.1 billion was allocated to the noncontrolling interest. This would not have impacted earnings comparably in 2013.

The net income attributable to the noncontrolling interest related to the Empire mining venture was $26.9 million and $20.7 million for the years ended December 31, 2014 and 2013, respectively.

## Results of Operations – Consolidated

*2013 Compared to 2012*

The following is a summary of our consolidated results of operations for the years ended  December 31, 2013 and 2012:

| | | | (In Millions) | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2013 | | 2012 | | Variance Favorable/ (Unfavorable) | |
| Revenues from product sales and services | $ | 5,691.4 | $ | 5,872.7 | $ | (181.3 ) |
| Cost of goods sold and operating expenses | | (4,542.1) | | (4,700.6) | | 158.5 |
| Sales margin | $ | 1,149.3 | $ | 1,172.1 | $ | (22.8 ) |
| Sales margin % | | 20.2% | | 20.0% | | 0.2% |

*Revenues from Product Sales and Services*

Sales revenue for the year ended December 31, 2013 decreased $181.3 million, or 3.1 percent, from 2012.

The decrease in sales revenue during 2013 compared to 2012 primarily was attributable to lower worldwide iron ore sales volumes of 1.4 million tons, or $174.7 million, and lower realized revenue rates for coal products of 15.5 percent year-over-year, which resulted in a decrease of $135.1 million. These decreases were offset partially by higher North American Coal sales volumes of 762 thousand tons, or $91.1 million.

Refer to "Results of Operations – Segment Information " for additional information regarding the specific factors that impacted revenue during the period.

*Cost of Goods Sold and Operating Expenses*

Cost of goods sold and operating expenses  for the years ended  December 31, 2013 and 2012 were  $4,542.1 million and $4,700.6 million, a decrease of $158.5 million, or 3.4 percent, year-over-year.

Cost of goods sold and operating expenses  for the year ended December 31, 2013 decreased primarily as a result of cost rate decreases of $143.7 million and a favorable foreign exchange rate impact of $70.9 million. Cost rate decreases of $122.1 million at our North American Coal operations were driven primarily due to reduced headcount, cost savings measures and more effective operating efficiency. These cost decreases were offset partially by additional costs of $72.5 million related to supply and product inventory write-downs predominately at our Wabush mine within our Eastern Canadian Iron Ore operations during the year ended December 31, 2013.

Refer to "Results of Operations – Segment Information " for additional information regarding the specific factors that impacted our operating results during the period.

62

A004229

*Other Operating Income (Expense)*

Following is a summary of other operating income (expense) for the years ended December 31, 2013 and 2012:

| | | | | | | Variance Favorable/ (Unfavorable) |
|---|---|---|---|---|---|---|
| | | 2013 | | 2012 | | |
| Selling, general and administrative expenses | $ | (231.6) | $ | (282.5) | $ | 50.9 |
| Exploration costs | | (59.0) | | (142.8) | | 83.8 |
| Impairment of goodwill and other long-lived assets | | (250.8) | | (1,049.9) | | 799.1 |
| Gain (loss) on disposal of assets | | 16.7 | | 1.2 | | 15.5 |
| Miscellaneous - net | | 46.4 | | (6.9) | | 53.3 |
| | $ | (478.3) | $ | (1,480.9) | $ | 1,002.6 |

(In Millions)

Selling, general and administrative expenses during the year ended December 31, 2013 decreased $50.9 million, over 2012. The year ended December 31, 2013 was impacted positively by reductions in outside service spending, general travel and employee-related expenses and technology spending of $42.7 million, $20.5 million and $7.1 million, respectively. These decreases were offset partially by $16.4 million in severance costs related to the voluntary and involuntary terminations as a result of cost savings actions for the year ended December 31, 2013 compared to 2012.

Exploration costs decreased by $83.8 million during the year ended December 31, 2013 from 2012, primarily due to decreases in spend at our Ferroalloys operations and Global Exploration Group operations. Ferroalloys and the Global Exploration Group are reported within our Other reportable segments. Our Global Exploration Group had cost decreases of $48.6 million in 2013 over 2012, due to lower drilling and professional services spend for certain projects. Our Ferroalloys operations had cost decreases of $28.8 million in 2013 over 2012. During 2012, there were increased engineering and drilling costs for external resources utilized to support the Chromite Project feasibility study.

During the fourth quarter of 2013, we continued to experience higher than expected production costs and operational inefficiencies at our Wabush operations within our Eastern Canadian Iron Ore operating segment that resulted in continued declines in our profitability of that business, which represents an asset group for purposes of testing our long-lived assets for recoverability. Driven by the unsustainable high cost structure, which was not economically viable to continue running the operations, we announced on February 11, 2014, we would idle the production of our Wabush Scully mine by the end of the first quarter. The mine was idled by the end March 2014 and in the fourth quarter of 2014 we began to implement the permanent closure plan for the mine. Upon completion of an impairment analysis, it was determined the fair value was less than the carrying value of the asset group, which resulted in an impairment of other long-lived assets of $154.6 million at December 31, 2013.

Additionally during the fourth quarter of 2013, a goodwill impairment charge of $80.9 million was recorded for our Cliffs Chromite Ontario and Cliffs Chromite Far North reporting units within our Ferroalloys operating segment. Ferroalloys is reported within our Other reportable segments. The goodwill impairment charge was primarily a result of the decision to indefinitely suspend the Chromite Project and to not allocate additional capital for the project given the uncertain timeline and risks associated with the development of necessary infrastructure to bring the project online.

During the fourth quarter of 2012, upon performing our 2012 annual goodwill impairment assessments, a goodwill impairment charge of $997.3 million was recorded for our CQIM reporting unit within the Eastern Canadian Iron Ore operating segment. The impairment charge for our CQIM reporting unit was driven by the project's lower than anticipated long-term profitability coupled with delays in achieving full operational capacity and higher capital and operating costs. Additionally, a goodwill impairment charge of $2.7 million was recorded for our Wabush reporting unit. This charge was primarily a result of downward adjustments to our long-term pricing estimates and higher operating costs due to lower production.

Miscellaneous – net was favorable by $53.3 million during the year ended December 31, 2013 from 2012. The year ended December 31, 2013 was impacted positively as a result of incremental gains of $67.3 million due to foreign exchange re-measurement on short-term intercompany notes, Australian bank accounts that are denominated in U.S. dollars and certain monetary financial assets and liabilities, which are denominated in something other than the functional currency of the entity. Additionally, there was an increase of $31.6 million and $24.3 million, respectively, in net insurance recoveries related to North American Coal mines and various legal settlements period-over-period. These incremental increases were offset partially by the incurred casualty losses in 2013 of $19.1 million related to the Pointe Noire oil spill

as well as minimum contractual rail shipment tonnage not being met due to the delay in the Bloom Lake II expansion, which resulted in incurred penalties of $37.3 million.

### Other Income (Expense)

Following is a summary of other income (expense) for the years ended  December 31, 2013 and 2012:

| | (In Millions) | | |
|---|---|---|---|
| | 2013 | 2012 | Variance Favorable/ (Unfavorable) |
| Interest expense, net | (179.1) | (195.6) | 16.5 |
| Other non-operating income (expense) | (2.6) | 2.6 | (5.2) |
| | $ (181.7) | $ (193.0) | $ 11.3 |

The decrease in interest expense in 2013 compared to 2012 was attributable primarily due to reduced interest expense of $35.7 million related to the repurchase of the $325.0 million private placement senior notes. This decrease was offset partially by additional interest expense of $20.3 million related to the $500 million 3.95 percent senior notes issued in December 2012. Refer to NOTE 5 - DEBT AND CREDIT FACILITIES for further information.

### Income Taxes

Our tax rate is affected by permanent items, such as depletion and the relative amount of income we earn in various foreign jurisdictions with tax rates that differ from the U.S. statutory rate. It also is affected by discrete items that may occur in any given period, but are not consistent from period to period. The following represents a summary of our tax provision and corresponding effective rates for the December 31, 2013 and 2012:

| | (In Millions) | | |
|---|---|---|---|
| | 2013 | 2012 | Variance |
| Income tax expense | $ (55.1) | $ (255.9) | $ 200.8 |
| Effective tax rate | 11.3% | (51.0)% | 62.3% |

64

A reconciliation of our income tax attributable to continuing operations computed at the U.S. federal statutory rate for the   years ended  December 31, 2013 and 2012 is as follows:

| | | (In Millions) | | |
|---|---|---|---|---|
| | 2013 | | 2012 | |
| Tax at U.S. statutory rate of 35 percent | $ 171.3 | 35.0 % | $ (175.6) | 35.0 % |
| Increases/(Decreases) due to: | | | | |
| Foreign exchange remeasurement | (2.6) | (0.5) | 62.3 | (12.4) |
| Non-taxable loss (income) related to noncontrolling interests | (1.5) | (0.3) | 61.0 | (12.0) |
| Impact of tax law change | — | — | (357.1) | 71.2 |
| Percentage depletion in excess of cost depletion | (97.6) | (19.9) | (109.1) | 21.7 |
| Impact of foreign operations | (10.2) | (2.1) | 65.2 | (13.0) |
| Income not subject to tax | (106.6) | (21.8) | (108.0) | 21.5 |
| Goodwill impairment | 20.5 | 4.2 | 202.2 | (40.3) |
| State taxes, net | 5.6 | 1.1 | 7.3 | (1.5) |
| Manufacturer's deduction | (7.9) | (1.6) | (4.7) | 0.9 |
| Valuation allowance | 73.0 | 14.9 | 634.5 | (126.5) |
| Tax uncertainties | 19.6 | 5.3 | (14.8) | 2.9 |
| Prior year adjustments made in current year | (11.4) | (3.6) | (5.7) | 1.1 |
| Other items - net | 2.9 | 0.6 | (1.6) | 0.4 |
| Income tax expense | $ 55.1 | 11.3 % | $ 255.9 | (51.0)% |

In 2013, our income tax expense decreased by $200.8 million compared to 2012. The decrease in income tax expense year over year related primarily to various items recorded in 2012 including the placement of a full valuation allowance on the asset related to the Alternative Minimum Tax credit, the effect of currency elections on remeasurement, and the goodwill impairment related to Bloom Lake. Additionally, we recorded approximately $11.4 million of tax benefit in 2013 related primarily to adjustments to prior-year current and deferred tax balances.

See NOTE 9 - INCOME TAXES  for further information.

### Equity Loss from Ventures

Equity loss from ventures for the year ended December 31, 2013  of $74.4 million compares to equity loss from ventures for the year ended December 31, 2012 of $404.8 million. The equity loss from ventures for the year ended December 31, 2013 primarily was comprised of the impairment charge of $67.6 million related to our 30 percent ownership interest in Amapá, the sale of which was approved by the Board of Directors in December 2012. The sale closed in the fourth quarter of 2013. The equity loss from ventures for 2012 was comprised primarily of an impairment charge of $365.4 million related to the sale of our ownership interest in Amapá. Additionally, our equity loss consisted of our share of operating losses of $4.9 million for the year ended December 31, 2013, compared with operating losses of $31.4 million for 2012. Amapá's equity loss from operations in 2012 was attributable primarily to our share of a settlement charge taken in the third quarter of 2012 for the termination of a transportation agreement that resulted in a $10.2 million loss and a $5.5 million adjustment related to tax credits that we determined would not be realizable.

### Income and Gain on Sale from Discontinued Operations, net of tax

Income and Gain on Sale from Discontinued Operations, net of tax  was comprised primarily of the gain on the sale of Sonoma and the loss on the operations of the 45 percent economic interest in the Sonoma joint venture coal mine for the year ended December 31, 2012. The sale of Sonoma resulted in a net gain of $38.0 million that was recorded upon the completion of the sale on November 12, 2012. The Sonoma joint venture operations resulted in a net loss of $2.1 million for the year ended December 31, 2012. Income from discontinued operations, net of tax in 2013 related to additional income tax benefit resulting from the actual tax gain from the sale of Sonoma included on the 2012 tax return, which was filed during the three months ended September 30, 2013.

A004232

*Noncontrolling Interest*

Noncontrolling interest primarily was comprised of our consolidated, but less-than-wholly owned subsidiaries at the Bloom Lake and Empire mining operations. The net loss attributable to the noncontrolling interest related to Bloom Lake was $66.5 million and $252.0 million for the years ended December 31, 2013 and 2012, respectively. The net loss in 2012 was driven by an impairment of goodwill of $997.3 million, of which $249.3 million was allocated to the noncontrolling interest.

The net income attributable to the noncontrolling interest related to the Empire mining venture was $20.7 million and $25.9 million for the years ended December 31, 2013 and 2012, respectively

***Results of Operations – Segment Information***

Our Company's primary operations are organized and managed according to product category and geographic location. Segment information reflects our strategic business units, which are organized to meet customer requirements and global competition. We evaluate segment performance based on sales margin, defined as revenues less cost of goods sold and operating expenses identifiable to each segment. This measure of operating performance is an effective measurement as we focus on reducing production costs.

We have historically evaluated segment performance based on sales margin, defined as revenues less cost of goods sold, and operating expenses identifiable to each segment. Additionally, beginning in the third quarter of 2014, concurrent with the change of a majority of our Board of Directors in August, 2014, which constituted and triggered a "change in control" as defined in our equity plans, management began to evaluate segment performance based on EBITDA, defined as *Net Income (Loss)* before interest, income taxes, depreciation, depletion and amortization, and Adjusted EBITDA, defined as EBITDA excluding certain items such as impairment charges, impacts of permanently idled, closed or sold facilities, foreign currency remeasurement, severance and other costs associated with the change in control, litigation judgments and intersegment corporate allocations of SG&A costs. Management uses and believes that investors benefit from referring to these measures in evaluating operating and financial results, as well as in planning, forecasting and analyzing future periods as these financial measures approximate the cash flows associated with the operational earnings.

66

*2014 Compared to 2013*

| | | 2014 | 2013 |
|---|---|---|---|
| | | (In Millions) | |
| Net Income (Loss) | $ | (8,311.6) | $ 361.8 |
| Less: | | | |
| Interest expense, net | | (185.2) | (179.1) |
| Income tax benefit (expense) | | 1,302.0 | (55.1) |
| Depreciation, depletion and amortization | | (504.0) | (593.3) |
| EBITDA | $ | (8,924.4) | $ 1,189.3 |
| Less: | | | |
| Impairment of goodwill and other long-lived assets | $ | (9,029.9) | $ (250.8) |
| Loss on sale of Cliffs Logan County Coal | | (419.6) | — |
| Wabush mine impact | | (158.7) | (72.7) |
| Bloom Lake mine impact | | (137.9) | 46.5 |
| Foreign exchange remeasurement | | 30.7 | 64.0 |
| Proxy contest and change in control costs in SG&A | | (26.6) | — |
| Litigation judgment | | (96.3) | (9.6) |
| Severance in SG&A | | (15.8) | (16.4) |
| Total Adjusted EBITDA | $ | 929.7 | $ 1,428.3 |
| EBITDA: | | | |
| U.S. Iron Ore | $ | 805.6 | $ 1,000.1 |
| Asia Pacific Iron Ore | | (369.8) | 500.4 |
| North American Coal | | (1,326.8) | 129.5 |
| Eastern Canadian Iron Ore | | (7,673.9) | (192.8) |
| Other | | (359.5) | (247.9) |
| Total EBITDA | $ | (8,924.4) | $ 1,189.3 |
| Adjusted EBITDA: | | | |
| U.S. Iron Ore | $ | 831.2 | $ 1,030.8 |
| Asia Pacific Iron Ore | | 264.6 | 525.7 |
| North American Coal | | (28.5) | 154.0 |
| Eastern Canadian Iron Ore | | — | — |
| Other | | (137.6) | (282.2) |
| Total Adjusted EBITDA | $ | 929.7 | $ 1,428.3 |

EBITDA for the year ended December 31, 2014 decreased by $ 10,113.7 million on a consolidated basis from 2013. The decrease was primarily driven by the goodwill and long-lived asset impairment charges recorded during 2014 of $7,269.2 million, $624.2 million, $857.5 million and $279.0 million related to the Eastern Canadian Iron Ore, Asia Pacific Iron Ore, North American Coal and Other segments, respectively. Additionally, lower sales margins across all operating segments negatively impacted EBITDA and was the main driver in the change of Adjusted EBITDA, which decreased by $498.6 million for the year ended December 31, 2014 from the comparable period in 2013. See further detail below for additional information regarding the specific factors that impacted each reportable segments' sales margin during 2014.

67

A004234

Table of Contents

*U.S. Iron Ore*

The following is a summary of U.S. Iron Ore results for the years ended December 31, 2014 and 2013:

| | | | | | | | | (In Millions) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Changes due to: | | | | | |
| | | Year Ended December 31, | | | | Revenue and cost rate | | Sales volume | | Idle cost/production volume variance | | Freight and reimburse-ment | | Total change |
| | | 2014 | | 2013 | | | | | | | | | | |
| Revenues from product sales and services | $ | 2,506.5 | $ | 2,667.9 | $ | (233.6) | $ | 60.8 | $ | — | $ | 11.4 | $ | (161.4) |
| Cost of goods sold and operating expenses | | (1,796.1) | | (1,766.0) | | (34.4) | | (33.2) | | 48.9 | | (11.4) | | (30.1) |
| Sales margin | $ | 710.4 | $ | 901.9 | $ | (268.0) | $ | 27.6 | $ | 48.9 | $ | — | $ | (191.5) |

| | | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|---|
| *Per Ton Information* | | 2014 | | 2013 | Difference | | Percent change |
| Realized product revenue rate[1] | $ | 102.36 | $ | 113.08 | $ | (10.72) | (9.5)% |
| Cash production cost | | 64.09 | | 64.65 | | (0.56) | (0.9)% |
| Non-production cash cost | | 0.82 | | 0.43 | | 0.39 | 90.7 % |
| Cost of goods sold and operating expense rate[1] (excluding DDA) | | 64.91 | | 65.08 | | (0.17) | (0.3)% |
| Depreciation, depletion & amortization | | 4.92 | | 5.65 | | (0.73) | (12.9)% |
| Total cost of goods sold and operating expense rate | | 69.83 | | 70.73 | | (0.90) | (1.3)% |
| Sales margin | $ | 32.53 | $ | 42.35 | $ | (9.82) | (23.2)% |
| | | | | | | | |
| Sales tons[2] (In thousands) | | 21,840 | | 21,299 | | | |
| Production tons[2] (In thousands) | | | | | | | |
| Total | | 29,733 | | 27,234 | | | |
| Cliffs' share of total | | 22,431 | | 20,271 | | | |

[1] Excludes revenues and expenses related to domestic freight, which are offsetting and have no impact on sales margin. Revenues also exclude venture partner cost reimbursements.

[2] Tons are long tons (2,240 pounds).

Sales margin for U.S. Iron Ore was $710.4 million for the year ended December 31, 2014, compared with the sales margin of $901.9 million for the year ended December 31, 2013. The decline compared to the prior year is attributable to a decrease in revenue of $161.4 million as well as an increase in cost of goods sold and operating expenses of $30.1 million. Sales margin per ton decreased 23.2 percent to $32.53 during the year ended December 31, 2014 compared to 2013.

Revenue decreased by $172.8 million, excluding the increase of $11.4 million of freight and reimbursements, from the prior year, predominantly due to:

- The average year-to-date realized product revenue rate declined by $10.72 per ton or 9.5 percent to $102.36 per ton in 2014, which resulted in a decrease of $233.6 million. This decline is a result of:

  ◦ Changes in customer pricing negatively affected the realized revenue rate by $6 per ton driven primarily by the period-over-period reduction in Platts 62 percent Fe fines spot price and by new base pricing from an additional contract; and

  ◦ Realized revenue rates impacted negatively by $5 per ton related to one major customer contract with a reduced average selling price due to a contractual change in the 2014 pricing mechanism.

68

Table of Contents

- Primarily offset by higher sales volumes of 541 thousand tons or $60.8 million due to:

  ◦ Higher Great Lakes sales due to increased contracted tons in 2014 from two customers due to separate contract extensions/amendments, higher demand from a customer due to the Great Lakes freeze preventing the customer from reaching its self-produced ore along with increased nominations in 2014 for two major customer contracts.

  ◦ Partially offset by decreased export sales due to increased 2014 Great Lakes nominations and low market pricing providing a disincentive for spot shipment opportunities along with reduced spot sales that occurred with one customer in the prior-year not recurring for as much tonnage in 2014.

Cost of goods sold and operating expenses in 2014 increased  $18.7 million, excluding the increase of  $11.4 million of freight and reimbursements from the prior year, predominantly as a result of:

- Higher costs related to increased mobile equipment repairs and increased maintenance and repair costs primarily driven by increased kiln repairs at Empire in 2014 due to the 2016 life-of-mine extension, mill repair at the Hibbing mine, along with higher costs related to increased energy rates in the first quarter of 2014; and

- Increased sales volumes, as discussed above, that increased costs by  $33.2 million compared to the prior-year period.

- Partially offset by lower idle costs of  $48.9 million due to restarting the two production lines at our Northshore mine during the first quarter of 2014 that were previously idled in January 2013 and the non-recurrence of the 2013 summer shutdown of the Empire mine in 2014.

*Production*

Cliffs' share of production in its U.S. Iron Ore segment increased by  10.7 percent in 2014 when compared to 2013. There was increased production at our Empire mine of 1.3 million tons in 2014 as a result of the non-recurrence of the summer shutdown that occurred in 2013, beginning early in the second quarter and ending in the third quarter. Additionally, there was an increase in production of 1.4 million tons at the Northshore mine during 2014, as we restarted the two idled furnaces in the first quarter of 2014. We had previously idled two of the four furnaces at the Northshore mine in January 2013. These increases were partially offset by decreased production of 260 thousand tons at our United Taconite mine due to extreme weather and unplanned maintenance outages. One of the four furnaces in the Northshore pellet plant became idled in January 2015 and is expected to remain idled throughout the year.

69

Table of Contents

*Asia Pacific Iron Ore*

The following is a summary of Asia Pacific Iron Ore results for the years ended  December 31, 2014 and 2013:

| | **(In Millions)** | | | | | | | |
| | | | Change due to: | | | | | |
| | **Year Ended December 31,** | | Revenue and cost rate | Sales volume | Exchange rate | Freight and reimburse-ment | Total change | |
| | **2014** | 2013 | | | | | | |
| Revenues from product sales and services | $  866.7 | $ 1,224.3 | $    (414.8) | $   54.8 | $     (4.5) | $    6.9 | $    (357.6) | |
| Cost of goods sold and operating expenses | (745.0) | (857.2) | 102.7 | (37.9) | 54.3 | (6.9) | 112.2 | |
| Sales margin | $  121.7 | $   367.1 | $    (312.1) | $   16.9 | $    49.8 | $    — | $    (245.4) | |

| *Per Ton Information* | **Year Ended December 31,** | | Difference | Percent change |
| | **2014** | 2013 | | |
| Realized product revenue rate[1] | $   74.56 | $  110.87 | $    (36.31) | (32.8)% |
| Cash production cost | 49.41 | 58.02 | (8.61) | (14.8)% |
| Non-production cash cost | 1.95 | 5.69 | (3.74) | (65.7)% |
| Cost of goods sold and operating expense rate[1] (excluding DDA) | 51.36 | 63.71 | (12.35) | (19.4)% |
| Depreciation, depletion & amortization | 12.65 | 13.92 | (1.27) | (9.1)% |
| Total cost of goods sold and operating expense rate | 64.01 | 77.63 | (13.62) | (17.5)% |
| Sales margin | $   10.55 | $   33.24 | $    (22.69) | (68.3)% |
| | | | | |
| Sales tons[2] (In thousands) | 11,531 | 11,043 | | |
| Production tons[2] (In thousands) | 11,352 | 11,109 | | |

[1] We began selling a portion of our product on a CFR basis in 2014. As such, the information above excludes revenues and expenses related to freight, which are offsetting and have no impact on sales margin.

[2] Metric tons (2,205 pounds).

Sales margin for our Asia Pacific Iron Ore segment decreased to  $121.7 million during the year ended December 31, 2014 compared with $367.1 million for the same period in 2013. Sales margin per ton decreased 68.3 percent to $10.55 per ton in 2014 compared to 2013.

Revenue decreased by $364.5 million during the year ended December 31, 2014 over the prior year, excluding the increase of  $6.9 million of freight and reimbursements, primarily as a result of:

- An overall decrease to the average realized revenue rate, which resulted in a decrease of  $414.8 million, primarily as a result of a decrease in the Platts 62 percent Fe fines spot price to an average of $97 per ton from $135 per ton in the prior-year period,

- Partially offset by the higher sales volume of  11.5 million tons during the year ended December 31, 2014 compared with  11.0 million tons during the prior-year period due to strong rail deliveries and increased production, resulting in an increase in revenue of $54.8 million.

Cost of goods sold and operating expenses in the year ended  December 31, 2014 decreased $119.1 million, excluding the increase of  $6.9 million of freight and reimbursements, compared to 2013 primarily as a result of:

- Reduced mining costs of $81.2 million mainly due to lower mining contractor costs primarily resulting from a focus on efficiencies across the operation, lower sales royalties of $23.9 million primarily attributable to the decline in the Platts 62 percent Fe fines spot price, and lower logistics costs of $12.0 million primarily attributable to the finalization of the port dispute.  These cost savings are partially offset

70

A004237

Table of Contents

by an increase in site administration expenses of $9.6 million due to realignment of head count to the sites and severance payments of $1.6 million; and

- Favorable foreign exchange rate variances of $54.3 million or $5 per metric ton.

- These decreases were offset partially by higher sales volumes, as discussed above, that resulted in increased costs of $37.9 million compared to the prior year.

*Production*

Production at our Asia Pacific Iron Ore segment increased 243 thousand metric tons or 2.2 percent during the year ended December 31, 2014 when compared to 2013. The increase in production tons compared to the prior-year period is mainly attributable to increased rail capacity as there were less train delays and better loading procedures implemented to get more tons into each wagon.

**North American Coal**

The following is a summary of North American Coal results for the years ended December 31, 2014 and 2013:

| | | | | | | (In Millions) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Change due to: | | | | | | |
| | | Year Ended December 31, | | | | Revenue and cost rate | | Sales volume | | Inventory write-down | | Freight and reimburse-ment | | Total change |
| | | 2014 | | 2013 | | | | | | | | | | |
| Revenues from product sales and services | $ | 687.1 | $ | 821.9 | $ | (176.8) | $ | 12.8 | $ | — | $ | 29.2 | $ | (134.8) |
| Cost of goods sold and operating expenses | | (822.9) | | (836.4) | | 89.1 | | (13.0) | | (33.4) | | (29.2) | | 13.5 |
| Sales margin | $ | (135.8) | $ | (14.5) | $ | (87.7) | $ | (0.2) | $ | (33.4) | $ | — | $ | (121.3) |

| | | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|---|
| *Per Ton Information* | | 2014 | | 2013 | Difference | Percent change |
| Realized product revenue rate[1] | $ | 77.31 | $ | 101.20 | $ (23.89) | (23.6)% |
| Cash production cost | | 68.64 | | 75.27 | (6.63) | (8.8)% |
| Non-production cash cost | | 12.58 | | 10.20 | 2.38 | 23.3 % |
| Cost of goods sold and operating expense rate[1] (excluding DDA) | | 81.22 | | 85.47 | (4.25) | (5.0)% |
| Depreciation, depletion & amortization | | 14.45 | | 17.72 | (3.27) | (18.5)% |
| Total cost of goods sold and operating expense rate | | 95.67 | | 103.19 | (7.52) | (7.3)% |
| Sales margin | $ | (18.36) | $ | (1.99) | $ (16.37) | n/m |
| | | | | | | |
| Sales tons[2] (In thousands) | | 7,400 | | 7,274 | | |
| Production tons[2] (In thousands) | | 7,536 | | 7,221 | | |

[1] Excludes revenues and expenses related to domestic freight, which are offsetting and have no impact on sales margin.

[2] Tons are short tons (2,000 pounds).

Sales margin for the North American Coal segment decreased to a loss of $135.8 million during the year ended December 31, 2014, compared to a sales margin loss of $14.5 million during the year ended December 31, 2013. Sales margin per ton decreased to a loss of $18.36 per ton in 2014 compared to a sales margin loss of $1.99 per ton in the prior year.

71

Revenues from product sales and services were $687.1 million, which is a decrease of $164.0 million over the prior-year period, excluding the increase of $29.2 million of freight and reimbursements, predominantly due to:

- A decrease in our realized product revenue rate of $176.8 million or 23.6 percent on a per-ton basis for the year ended December 31, 2014. This decline is a result of:

  ◦ The downward trend in market pricing period over period, including a decrease of $33 per ton in the 2014 average benchmark price, along with a more favorable impact in 2013 from carryover contracts; and

  ◦ An unfavorable change in product mix negatively impacting the realized revenue rate by $5 per ton primarily attributable to lower domestic sales of high-volatile and low-volatile metallurgical coal which required higher export sales and increased sales of thermal coal, both of which are unfavorable to the overall realized revenue rate.

- Partially offset by sales volume increases of 126 thousand tons or 1.7 percent during 2014 in comparison to the prior-year resulting in an increase in revenue of $12.8 million, primarily due to higher thermal coal sales due to a new contract offset by decreased sales of high-volatile metallurgical coal resulting from non-renewal of a customer contract. The decreased sales of high-volatile metallurgical coal was partly mitigated by an increase in export sales.

Cost of goods sold and operating expenses in 2014 decreased $42.7 million, excluding the increase of $29.2 million of freight and reimbursements from the comparable period in the prior year, predominantly as a result of:

- Decreased spending of $26.6 million on production costs due to increased focus on reducing external services and administrative costs at our low-volatile metallurgical coal mines, a reduction in depreciation, amortization and depletion expense of $21.9 million in 2014 due to the long-lived asset impairments taken during the current year, and decreased costs related to royalties and severance taxes of $14.0 million due to a reduced year-over-year revenue rate; and

- The impact of lower-of-cost-or-market inventory charges resulted in lower costs of $15.9 million as inventory was sold.

- Partially offset by:

  ◦ An unfavorable variance in the lower-of-cost-or-market inventory charge of $33.4 million in comparison to the prior-year period as the lower-of-cost-or-market inventory charges at December 31, 2014 and 2013 were $44.5 million and $11.1 million, respectively; and

  ◦ Higher sales volume attributable to additional thermal coal sales, as discussed above, resulted in an additional $13.0 million of costs.

*Production*

Production of low- and high-volatile metallurgical coal in 2014 was 6.6 million tons, which is consistent with the prior-year production. Due to increased demand for thermal coal in 2014, we increased production at our thermal coal mine from one shift to two shifts in the first quarter of 2014 to align production with customer demand. Thermal coal production was 927 thousand tons during 2014, which is an increase of 46.7 percent compared to the prior year. The increase in thermal coal production was the primary contributor to our increased overall coal production in 2014. Additionally in August 2014, the Oak Grove mine set its one-day production record by producing 14 thousand tons in one day.

In the fourth quarter of 2014, we sold our CLCC assets. Production tons at CLCC were 2.5 million tons and 2.1 million tons for the years ended December 31, 2014 and 2013, respectively, and are included in the production tons disclosed above.

72

Table of Contents

*Eastern Canadian Iron Ore*

The following is a summary of Eastern Canadian Iron Ore results for the  years ended December 31, 2014 and 2013:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | **(In Millions)** | | | | | |
| | | | | Change due to: | | | | |
| | Year Ended December 31, | | Revenue and cost rate | Sales volume | Wabush idle [2] | Inventory write-down | Exchange rate | Total change |
| | **2014** | 2013 | | | | | | |
| Revenues from product sales and services | $ 563.4 | $ 978.7 | $ (182.4) | $ 55.1 | $ (288.0) | $ — | $ — | $ (415.3) |
| Cost of goods sold and operating expenses | (808.3) | (1,082.0) | 10.7 | (57.5) | 304.4 | (23.4) | 39.5 | 273.7 |
| Sales margin | $ (244.9) | $ (103.3) | $ (171.7) | $ (2.4) | $ 16.4 | $ (23.4) | $ 39.5 | $ (141.6) |

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| *Per Ton Information* | **2014** | 2013 | Difference | Percent change |
| Realized product revenue rate [3] | **81.19** | $ 110.79 | $ (29.60) | (26.7)% |
| Cash production cost | **81.04** | 86.20 | (5.16) | (6.0)% |
| Non-production cash cost | **10.50** | 3.67 | 6.83 | 186.1 % |
| Cost of goods sold and operating expense rate (excluding DDA) [3] | **91.54** | 89.87 | 1.67 | 1.9 % |
| Depreciation, depletion & amortization [3] | **19.78** | 25.79 | (6.01) | (23.3)% |
| Total cost of goods sold and operating expense rate [3] | **111.32** | 115.66 | (4.34) | (3.8)% |
| Sales margin [3] | **$ (30.13)** | $ (4.87) | $ (25.26) | n/m |
| | | | | |
| Bloom Lake sales tons | **6,162** | 5,665 | | |
| Wabush sales tons | **1,066** | 2,886 | | |
| Sales tons[1] (In thousands) | **7,228** | 8,551 | | |
| | | | | |
| Bloom Lake production tons | **5,940** | 5,877 | | |
| Wabush production tons | **280** | 2,778 | | |
| Production tons[1] (In thousands) | **6,220** | 8,655 | | |

[1] Tons are metric tons (2,205 pounds).

[2] As a result of the Wabush mine idle, all revenue and cost activity related to the Wabush mine has been quantified in the Wabush idle column of the chart above.

[3] As a result of the Wabush mine idle, all revenue and cost activity related to the Wabush mine has been excluded from the Per Ton Information above. Per Ton Information relates to the Bloom Lake mine only.

We reported a sales margin loss for our Eastern Canadian Iron Ore segment of  $244.9 million for the year ended December 31, 2014, compared with a sales margin loss of $103.3 million for the year ended December 31, 2013. Sales margin per metric ton for the Bloom Lake mine increased to a loss of $30.13 per metric ton for the year ended December 31, 2014 compared to a sales margin loss of  $4.87 per metric ton for 2013.

Revenue decreased by $415.3 million for the year ended December 31, 2014 when compared to prior year, primarily due to:

- A reduction in revenue of  $288.0 million due to idling of the Wabush Scully mine in Newfoundland and Labrador at the end of March 2014 and the idling of the Wabush pellet plant in June 2013; and

73

Table of Contents

- An overall decrease to the Bloom Lake mine average realized revenue rate, which resulted in a decrease of $182.4 million, primarily as a result of a decrease in the Platts 62 percent Fe fines spot price to an average of $97 per ton from $135 per ton in the prior year,

- Partially offset by higher sales volumes at the Bloom Lake mine of 497 thousand tons resulting in an increase to revenue of $55.1 million, which was primarily related to the timing of customer shipments that were delayed from the end of 2013 into 2014 as a result of adverse weather conditions.

Cost of goods sold and operating expenses during the year ended December 31, 2014 decreased from 2013 by $273.7 million primarily due to:

- Lower costs of $304.4 million due to idling the Wabush pellet plant in June 2013 and idling of the Wabush Scully mine in Newfoundland and Labrador at the end of March 2014;

- Favorable foreign exchange rate variances of $39.5 million; and

- Reduced costs mainly attributable to lower depreciation, depletion and amortization costs of $24.2 million year-over-year primarily as a result of long-lived asset impairments taken in the third quarter of 2014 along with reduced spending on external services,

- Partially       offset
  by:

  ◦ Higher sales volumes at the Bloom Lake facilities as discussed above resulting in increased costs of $57.5 million compared to the prior-year period;

  ◦ Unfavorable foreign exchange contract hedging impacts of $13.6 million year-over-year driven by the de-designation of foreign currency hedges; and

  ◦ An unfavorable variance of $23.4 million in lower-of-cost-or-market inventory charges at our Bloom Lake operation. Lower-of-cost-or-market charges were $27.9 million in 2014, primarily attributable to market declines in Platts spot rate pricing as well as higher cost of inventory driven by the timing of maintenance activities and mine development up until production ceased at Bloom Lake and the mine entered "care-and-maintenane" mode on December 31, 2014. The Bloom Lake mine had lower-of-cost-or-market inventory charges of $4.5 million in 2013.

*Production*

The Bloom Lake facility produced 5.9 million tons of iron ore concentrate in each of the years ended December 31, 2014 and 2013, respectively. As we have previously disclosed, despite our cost-cutting progress at our Bloom Lake mine, we have concluded that Phase I alone is not economically feasible based on our current operating plans. We also determined that the Phase II expansion of the Bloom Lake mine was no longer a viable option for us and we shifted our focus to considering available possibilities and executing an exit option for Eastern Canadian Iron Ore operations that minimizes the cash outflows and associated liabilities. In December 2014, iron ore production at the Bloom Lake mine was suspended and the Bloom Lake mine was placed in ''care-and-maintenance'' mode.

Production at the Wabush facility was 0.3 million tons of iron ore concentrate during the year ended December 31, 2014 and 1.6 million tons of iron ore concentrate and 1.2 million tons of iron ore pellets during the year end December 31, 2013, respectively. Due to high production costs and lower pellet premium pricing, we idled production at the Wabush pellet plant and transitioned to producing an iron ore concentrate product from our Wabush Scully mine during June 2013. At the end of March 2014, we idled our Wabush Scully mine in Newfoundland and Labrador and began to implement the permanent closure plan for the mine in the fourth quarter of 2014.

74

Table of Contents

*2013 Compared to 2012*

| | (In Millions) | | |
|---|---|---|---|
| | 2013 | | 2012 |
| Net Income (Loss) | $ | 361.8 | $ (1,126.6) |
| Less: | | | |
| Interest expense, net | | (179.1) | (195.6) |
| Income tax benefit (expense) | | (55.1) | (255.9) |
| Depreciation, depletion and amortization | | (593.3) | (525.8) |
| EBITDA | $ | 1,189.3 | $ (149.3) |
| Less: | | | |
| Impairment of goodwill and other long-lived assets | $ | (250.8) | $ (1,049.9) |
| Impairment of equity method investment | | — | (365.4) |
| Loss on sale of Cliffs Logan County Coal | | — | — |
| Wabush mine impact | | (72.7) | (30.1) |
| Bloom Lake mine impact | | 46.5 | 6.4 |
| Foreign exchange remeasurement | | 64.0 | (3.2) |
| Proxy contest and change in control costs in SG&A | | — | — |
| Litigation judgment | | (9.6) | — |
| Severance in SG&A | | (16.4) | — |
| Total Adjusted EBITDA | $ | 1,428.3 | $ 1,292.9 |
| EBITDA: | | | |
| U.S. Iron Ore | $ | 1,000.1 | $ 1,045.3 |
| Asia Pacific Iron Ore | | 500.4 | 387.3 |
| North American Coal | | 129.5 | 74.0 |
| Eastern Canadian Iron Ore | | (192.8) | (1,103.3) |
| Other | | (247.9) | (552.6) |
| Total EBITDA | $ | 1,189.3 | $ (149.3) |
| Adjusted EBITDA: | | | |
| U.S. Iron Ore | $ | 1,030.8 | $ 1,085.6 |
| Asia Pacific Iron Ore | | 525.7 | 402.1 |
| North American Coal | | 154.0 | 106.7 |
| Eastern Canadian Iron Ore | | — | — |
| Other | | (282.2) | (301.5) |
| Total Adjusted EBITDA | $ | 1,428.3 | $ 1,292.9 |

EBITDA for the year ended December 31, 2013 increased by $1,338.6 million on a consolidated basis from 2012. The increase was primarily driven by the favorable fluctuation in goodwill and long-lived asset impairment charges recorded during 2013 compared to 2012 for the Eastern Canadian Iron Ore segment. For the years ended December 31, 2013 and 2012, we recorded goodwill and long-lived asset impairment charges of $154.6 million and $1,049.9 million, respectively, related to the Eastern Canadian Iron Ore segment. Additionally, lower exploration and SG&A expense of $134.7 million when comparing 2013 to 2012 positively impacted EBITDA and was a main driver in the change of Adjusted EBITDA, which increased by $135.4 million for the year ended December 31, 2013 from 2012. See further detail below regarding the specific factors that impacted the sales margin of each reportable segment sales margin during 2013.

Table of Contents

***U.S. Iron Ore***

Following is a summary of U.S. Iron Ore results for the years ended December 31, 2013 and  2012:

| | | | | | (In Millions) | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Change due to | | | |
| | Year Ended December 31, | | Revenue and cost rate | Sales volume | Idle cost/Production volume variance | Freight and reimburse-ment | Total change | |
| | 2013 | 2012 | | | | | | |
| Revenues from product sales and services | $ 2,667.9 | $ 2,723.3 | $ (24.5) | $ (39.6) | $ — | $ 8.7 | $ (55.4) | |
| Cost of goods sold and operating expenses | (1,766.0) | (1,747.1) | 11.7 | 10.4 | (32.3) | (8.7) | (18.9) | |
| Sales margin | $ 901.9 | $ 976.2 | $ (12.8) | $ (29.2) | $ (32.3) | $ — | $ (74.3) | |

| Per Ton Information | Year Ended December 31, | | Difference | Percent change |
|---|---|---|---|---|
| | 2013 | 2012 | | |
| Realized product revenue rate[1] | $ 113.08 | $ 114.29 | $ (1.21) | (1.1)% |
| Cash production cost | 64.65 | 63.28 | 1.37 | 2.2 % |
| Non-production cash cost | 0.43 | 1.22 | (0.79) | (64.8)% |
| Cost of goods sold and operating expenses rate[1] (excluding DDA) | 65.08 | 64.50 | 0.58 | 0.9 % |
| Depreciation, depletion & amortization | 5.65 | 4.66 | 0.99 | 21.2 % |
| Total cost of goods sold and operating expenses rate | 70.73 | 69.16 | 1.57 | 2.3 % |
| Sales margin | $ 42.35 | $ 45.13 | $ (2.78) | (6.2)% |
| | | | | |
| Sales tons [2] (In thousands) | 21,299 | 21,633 | | |
| Production tons [2] (In thousands) | | | | |
| Total | 27,234 | 29,526 | | |
| Cliffs' share of total | 20,271 | 21,992 | | |

[1] Excludes revenues and expenses related to domestic freight, which are offsetting and have no impact on sales margin. Revenues also exclude venture partner cost reimbursements.

[2] Tons are long tons (2,240 pounds).

Sales margin for U.S. Iron Ore was $901.9 million for the year ended December 31, 2013, compared with the sales margin of $976.2 million for the year ended December 31, 2012. The decline compared to the prior year is attributable to a decrease in revenue of $55.4 million as well as an increase in cost of goods sold and operating expenses of $18.9 million. Sales margin per ton decreased 6.2 percent to $42.35 during the year ended December 31, 2013 compared to 2012.

Revenue decreased by $64.1 million, excluding the increase of  $8.7 million of freight and reimbursements, from the prior year, predominantly due to:

• Lower sales volumes of 334 thousand sales tons or  $39.6 million:

  ◦ Primarily driven by the expiration of one contract with a continuing customer, a lower full-year nomination by a customer, reduced tonnage with a customer due to their force majeure and the bankruptcy of one customer in 2012,

  ◦ Partially offset by the placement of an additional 1.2 million export tons primarily due to pellet contracts transferred from Wabush as well as trial and spot cargoes in Europe during 2013

Table of Contents

when compared to the prior year. We additionally benefited from additional customer demand, specifically additional spot contracts with a major customer in the Great Lakes region.

- A decline in the average revenue rate, which resulted in a decrease of $24.5 million also was a contributing factor to the decrease in year-over-year revenues. The average year-to-date realized product revenue rate declined by $1.21 per ton or 1.1 percent to $113.08 per ton in 2013. This decline is a result of:

  ◦ Unfavorable customer mix impacted the realized revenue rates by $3 per ton primarily due to higher sales tonnage to overseas customers, which have lower realized revenue rates driven by additional transportation costs to move inventory from the U.S. Iron Ore mine locations to the international port locations in Québec, which reduces our realized revenue rate per ton; and

  ◦ Realized revenue rates were impacted negatively by $1 per ton as a result of discounts given during 2013 as a part of recently extended contracts,

  ◦ Partially offset by one customer contract that increased the average rate by $3 per ton due to the reset of their contract base rate.

Cost of goods sold and operating expenses in 2013 increased $10.2 million, excluding the increase of $8.7 million of freight and reimbursements compared to the prior year, predominantly as a result of:

- Higher idle costs of $32.3 million due to the previously announced temporary idling of production at the Empire mine and the idle of two of the four production lines at our Northshore mine, offset by;

- Lower sales volumes decreased costs by $10.4 million compared to the prior year;

- Lower costs of $12.0 million attributable to timing of tolling cost distribution to Empire mine partner ArcelorMittal when compared to the prior year; and

- Lower costs of $11.6 million due to a reduction in electrical energy rates at Empire and Tilden mines as a result of switching energy suppliers, reduced contractor spend of $29.4 million and optimized maintenance spend of $21.1 million and partially offset by increased costs of $16.6 million due to higher rates for natural gas and supplies as well as increased costs of $17.5 million related to deeper pit hauls as compared to 2012.

*Production*

Cliffs' share of production in our U.S. Iron Ore segment decreased by 7.8 percent during the year ended  December 31, 2013 when compared to 2012. Beginning on January 5, 2013, we idled two of the four furnaces at the Northshore mine for the remainder of 2013 and into the first quarter of 2014, which resulted in decreased production of 1.4 million tons when compared to the year ended December 31, 2012. During the first quarter of 2014, we restarted the two idled furnaces.

77

Table of Contents

*Asia Pacific Iron Ore*

Following is a summary of Asia Pacific Iron Ore results for the years ended December 31, 2013 and 2012:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | **(In Millions)** | | | | |
| | Year Ended December 31, | | Change due to | | | | |
| | | | Revenue and cost rate | Sales Volume | Completion of Cockatoo Mining Stage 3 | Exchange Rate | Total change |
| | 2013 | 2012 | | | | | |
| Revenues from product sales and services | $ 1,224.3 | $ 1,259.3 | $  39.5 | $ (0.2) | $  (77.0) | $ 2.7 | $ (35.0) |
| Cost of goods sold and operating expenses | (857.2) | (948.3) | (22.2) | 0.2 | 51.2 | 61.9 | 91.1 |
| Sales margin | $  367.1 | $  311.0 | $  17.3 | $  — | $  (25.8) | $ 64.6 | $  56.1 |

| Per Ton Information | Year Ended December 31, | | Difference | Percent change |
|---|---|---|---|---|
| | 2013 | 2012 | | |
| Realized product revenue rate | $ 110.87 | $ 107.81 | $  3.06 | 2.8 % |
| Cash production cost | 58.02 | 62.02 | (4.00) | (6.4)% |
| Non-production cash cost | 5.69 | 6.16 | (0.47) | (7.6)% |
| Cost of goods sold and operating expenses rate (excluding DDA) | 63.71 | 68.18 | (4.47) | (6.6)% |
| Depreciation, depletion & amortization | 13.92 | 13.00 | 0.92 | 7.1 % |
| Total cost of goods sold and operating expenses rate | 77.63 | 81.18 | (3.55) | (4.4)% |
| Sales margin | $  33.24 | $  26.63 | $  6.61 | 24.8 % |

| | | |
|---|---|---|
| Sales tons [1] (In thousands) | 11,043 | 11,681 |
| Production tons [1] (In thousands) | 11,109 | 11,260 |

[1] Metric tons (2,205 pounds). Cockatoo Island production and sales are reflected at our 50 percent share during the first half of 2012.

Sales margin for our Asia Pacific Iron Ore segment increased to $367.1 million during the year ended December 31, 2013 compared with $311.0 million for the same period in 2012. Sales margin per metric ton increased 24.8 percent to $33.24 per metric ton in 2013 compared to 2012.

Revenue decreased by $35.0 million during the year ended December 31, 2013 over the prior year primarily as a result of:

•   The completion of the mining of Stage 3 at Cockatoo and the sale of our interest at the end of the third quarter of 2012, resulting in a revenue decrease of $77.0 million or 636 thousand metric tons compared to the prior year.

•   These decreases were offset partially by an increase in our realized product revenue rate for the year ended December 31, 2013 that resulted in an increase of $39.5 million or 2.8 percent on a per-ton basis. This increase is driven mainly by:

   ◦   The Platts 62 percent Fe index increased to an average of $135 per metric ton from $130 per metric ton during the prior year, which positively impacted the revenue rate resulting in an increase of $56.6 million or $5 per metric ton to our realized revenue rate; and

   ◦   The low-grade iron ore sales campaign in 2012 that did not recur in 2013, which positively impacted the revenue rate variance resulting in an increase of $40.6 million or $4 per metric ton,

   ◦   Offset by a reduction to our realized revenue rate due to:

78

Table of Contents

- Unfavorable change in foreign exchange contract hedging impacts of $26.7 million or $2 per metric ton period over period; and

- Lower iron ore content on standard product in 2013 resulting in a reduction of realized product revenue rate of $22.7 million or $2 per metric ton.

Cost of goods sold and operating expenses in the year ended  December 31, 2013 decreased $91.1 million compared to 2012 primarily as a result of:

- The completion of the mining of Stage 3 at Cockatoo and the sale of our interest at the end of the third quarter of 2012, resulting in a decrease in costs of $51.2 million in 2013 compared to the prior year; and

- Favorable foreign exchange rate variances of  $61.9 million or $6 per metric ton.

- Partially offset by higher logistics costs of $29.6 million mainly attributable to higher railed tons and higher ship-loading handling charges in 2013 slightly mitigated by lower mining and crushing costs of $6.6 million due to improved efficiencies.

*Production*

Production at our Asia Pacific Iron Ore segment decreased 151 thousand metric tons or 1.3 percent during the year ended   December 31, 2013 when compared to 2012. We completed the mining of Stage 3 at Cockatoo and sold our interest during the third quarter of 2012, resulting in a decrease of 590 thousand metric tons in total production during the year 2013 compared to 2012. The decrease was offset partially by the increased production of 439 thousand metric tons at Koolyanobbing in 2013 resulting from the completion of the Koolyanobbing expansion project during mid-2012, which provided additional ore processing and rail and port capabilities that drove performance increases at this mine.

79

Table of Contents

*North American Coal*

Following is a summary of North American Coal results for the years ended December 31, 2013 and 2012:

| | | | | | | (In Millions) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Change due to: | | | | |
| | Year Ended December 31, | | | Revenue and cost rate | | Sales Volume | | Freight and reimburse-ment | | Total change |
| | 2013 | | 2012 | | | | | | | |
| Revenues from product sales and services | $ 821.9 | $ | 881.1 | $ | (135.1) | $ | 91.1 | $ | (15.2) | $ (59.2) |
| Cost of goods sold and operating expenses | (836.4) | | (882.9) | | 122.1 | | (90.8) | | 15.2 | 46.5 |
| Sales margin | $ (14.5) | $ | (1.8) | $ | (13.0) | $ | 0.3 | $ | — | $ (12.7) |

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| *Per Ton Information* | 2013 | 2012 | Difference | Percent change | |
| Realized product revenue rate[1] | $ 101.20 | $ 119.79 | $ (18.59) | (15.5)% | |
| Cash production cost | 75.27 | 92.34 | (17.07) | (18.5)% | |
| Non-production cash cost | 10.20 | 12.65 | (2.45) | (19.4)% | |
| Cost of goods sold and operating expenses rate[1] (excluding DDA) | 85.47 | 104.99 | (19.52) | (18.6)% | |
| Depreciation, depletion & amortization | 17.72 | 15.08 | 2.64 | 17.5 % | |
| Total cost of goods sold and operating expenses rate | 103.19 | 120.07 | (16.88) | (14.1)% | |
| Sales margin | $ (1.99) | $ (0.28) | $ (1.71) | n/m | |
| | | | | | |
| Sales tons [2] (In thousands) | 7,274 | 6,512 | | | |
| Production tons [2] (In thousands) | 7,221 | 6,394 | | | |

[1] Excludes revenues and expenses related to domestic freight, which are offsetting and have no impact on sales margin.

[2] Tons are short tons (2,000 pounds).

Sales margin for the North American Coal segment decreased to a loss of $14.5 million during the year ended December 31, 2013, compared to a sales margin loss of $1.8 million during the year ended December 31, 2012. Sales margin per ton decreased to a loss of $1.99 per ton in 2013 compared to a sales margin loss of $0.28 per ton in the prior year.

Revenues from product sales and services were $821.9 million, which is a decrease of $44.0 million over the prior-year period, excluding the decrease of $15.2 million of freight and reimbursements, predominantly due to:

• A decrease in our realized product revenue rate of $135.1 million or 15.5 percent on a per-ton basis for the year ended December 31, 2013. This decline is a result of:

  ◦ The downward trend in market pricing period over period, including a 24 percent decrease in the quarterly benchmark price, partially mitigated by annually priced contracts, carryover contracts and product mix from our high-volatile metallurgical coal,

  ◦ Slightly offset by a shift in product sales mix. The sales mix for low-volatile metallurgical, high-volatile metallurgical and thermal coal was 69.6 percent, 21.6 percent and 8.8 percent, respectively, in 2013 compared to 68.1 percent, 19.9 percent and 12.0 percent, respectively, for 2012. The total mix impact was favorable by $1 per ton based on the higher price of low-volatile coal and lower rates for thermal coal.

80

Table of Contents

- Partially offset by a sales volume increase of 762 thousand tons or 11.7 percent during the year ended December 31, 2013 in comparison to the prior year resulted in an increase in revenue of $91.1 million, primarily due to:

   ◦ Increases in low-volatile and high-volatile metallurgical coal sales of 907 thousand tons in 2013 due to increased production volumes when compared to the prior year and the force majeure related to the April 2011 tornado that extended into April 2012,

   ◦ Partially offset by a reduction in thermal coal sales of 145 thousand tons due to reduced market demand.

Cost of goods sold and operating expenses in 2013 decreased $31.3 million, excluding the decrease of $15.2 million of freight and reimbursements from the prior year, predominantly as a result of:

- Decreased costs related to labor of approximately $40.0 million and maintenance and external services of approximately $75.0 million at our mines with full operating production in 2012 and 2013 due to reduced headcount, cost savings measures and more effective operating efficiency; and

- Favorable variance in the lower-of-cost-or-market inventory charge of $13.3 million in comparison to the prior year as the lower-of-cost-or-market inventory charges at December 31, 2013 and 2012 were $11.1 million and $24.4 million, respectively,

- Partially offset by higher sales volume attributable to additional low-volatile and high-volatile metallurgical coal sales, as discussed above, resulted in an additional $90.8 million of costs; and

- The accelerated closure of the Dingess-Chilton mine during the first quarter of 2013 and Lower War Eagle mine moving into the production stage of mining in November 2012 resulted in the recording of $18.0 million or $2 per ton of additional depreciation and depletion during 2013.

*Production*

Production of low- and high-volatile metallurgical coal increased 18.2 percent in 2013 compared to 2012. Low-volatile production increased 803 thousand tons over the prior year due to improved operating efficiency. High-volatile metallurgical coal production levels in 2013 increased 212 thousand tons or 16.3 percent as a result of the Lower War Eagle mine moving into production during the fourth quarter of 2012, offset partially by the closure of Dingess-Chilton during the first quarter of 2013. Beginning in the second quarter of 2012 and continuing through 2013, we experienced a decline in demand for thermal coal. Accordingly, over this time period, we reduced production at our thermal mine to one shift to align production with customer demands. This resulted in reduced production of 188 thousand tons in 2013 compared to 2012. Due to increased thermal coal demand in 2014, we increased production at our thermal coal mine to two shifts beginning in the first quarter of 2014 to align production with 2014 customer demand. In the fourth quarter of 2014, we sold our CLCC assets. Production tons at CLCC were 2.1 million tons and 2.1 million tons for the years ended December 31, 2013 and 2012, respectively, and are included in the production tons disclosed above.

81

Table of Contents

*Eastern Canadian Iron Ore*

Following is a summary of Eastern Canadian Iron Ore results for the years ended December 31, 2013 and 2012:

| | | | | | (In Millions) | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Change due to | | | | |
| | Year Ended December 31, | | Revenue and cost rate | Sales Volume | Idle cost / Production volume variance | Inventory write-down | Exchange Rate | Total change |
| | 2013 | 2012 | | | | | | |
| Revenues from product sales and services | $ 978.7 | $ 1,008.9 | $ 27.7 | $ (57.9) | $ — | $ — | $ — | $ (30.2) |
| Cost of goods sold and operating expenses | (1,082.0) | (1,130.3) | 32.1 | 53.4 | 26.3 | (72.5) | 9.0 | 48.3 |
| Sales margin | $ (103.3) | $ (121.4) | $ 59.8 | $ (4.5) | $ 26.3 | $ (72.5) | $ 9.0 | $ 18.1 |

| Per Ton Information | Year Ended December 31, | | Difference | Percent change |
|---|---|---|---|---|
| | 2013 | 2012 | | |
| Realized product revenue rate | $ 114.45 | $ 112.93 | $ 1.52 | 1.3 % |
| Cash production cost | 91.68 | 108.24 | (16.56) | (15.3)% |
| Non-production cash cost | 13.98 | 0.35 | 13.63 | n/m |
| Cost of goods sold and operating expenses rate (excluding DDA) | 105.66 | 108.59 | (2.93) | (2.7)% |
| Depreciation, depletion & amortization | 20.87 | 17.93 | 2.94 | 16.4 % |
| Total cost of goods sold and operating expenses rate | 126.53 | 126.52 | 0.01 | — % |
| Sales margin | $ (12.08) | $ (13.59) | $ 1.51 | n/m |

| | 2013 | 2012 |
|---|---|---|
| Bloom Lake sales tons | 5,665 | 5,693 |
| Wabush sales tons | 2,886 | 3,241 |
| Sales tons [1] (In thousands) | 8,551 | 8,934 |
| Bloom Lake production tons | 5,877 | 5,450 |
| Wabush production tons | 2,778 | 3,065 |
| Production tons [1] (In thousands) | 8,655 | 8,515 |

[1] Tons are metric tons (2,205 pounds).

We reported a sales margin loss for our Eastern Canadian Iron Ore segment of $103.3 million for the year ended December 31, 2013, compared with a sales margin loss of $121.4 million for the year ended December 31, 2012. Sales margin per ton improved to a loss of $12.08 per ton for the year ended December 31, 2013 compared to a sales margin loss of $13.59 per ton for 2012.

Revenue decreased by $30.2 million for the year ended December 31, 2013 when compared to prior year, primarily due to:

- Lower sales volumes of 383 thousand tons. The reduction in tons sold resulted in a decrease to revenue of $57.9 million, which was related primarily to the transition and idling of pellet production at Wabush as pellet sales decreased by 1.7 million tons period-over-period, offset partially by the sale of 1.4 million more metric tons of Wabush Scully mine sinter feed in 2013 compared with 2012,

- Partially offset by the increase to the average revenue rate, which resulted in an increase of $27.7 million, driven by changes in spot market pricing offset by lower pellet premiums due to a shift in product mix, primarily as a result of:

  ◦ An increase to the Platts 62 percent Fe spot rate to an average of $135 per metric ton from $130 per metric ton in the prior year resulted in an increase of $5 per metric ton; and

Table of Contents

○ An increase due to favorable provisional pricing adjustments related to prior-year sales and higher premiums for iron content in comparison to the prior year, increasing the average revenue rate by $2 per metric ton and $1 per metric ton, respectively;

○ Offset by a change in product mix as our Eastern Canadian Iron Ore segment ceased pellet production at our Wabush facility in June 2013 and began producing only sinter feed until the Wabush facility was idled at the end of March 2014 and we began to implement the permanent closure plan for the mine in the fourth quarter of 2014. During 2013, 17 percent of products sold were pellets, compared to 36 percent in the prior year, which resulted in the realized revenue rate decreasing by $4 per metric ton due to lower average pellet premiums; and

○ Further offset by timing impacts of a negative $2 per metric ton period over period, primarily due to approximately 300 thousand metric tons of carryover pellets that were in sold in 2012 and based on 2011 contract pricing, which was substantially higher due to 2011 full-year market pricing.

Cost of goods sold and operating expenses during the year ended  December 31, 2013 decreased from 2012 by  $48.3 million primarily due to:

• Lower sales volumes at the Wabush and Bloom Lake facilities resulted in decreased costs of $50.3 million and $3.1 million, respectively, compared to the prior year;

• Incremental idle production costs at our Wabush operations of  $26.3 million in 2012 that did not recur in 2013; and

• Favorable foreign exchange rate variances of  $9.0 million,

• Partially offset by inventory write-downs primarily at our Wabush facility of $68.0 million related to a supplies inventory write-down of $29.7 million, lower-of-cost-or-market charges of $19.8 million and unsaleable inventory impairment charges of $18.5 million recorded during 2013.

*Production*

The Bloom Lake facility produced 5.9 million and 5.4 million metric tons of iron ore concentrate during the years ended  December 31, 2013 and 2012, respectively. During the first quarter of 2014, we announced that we were exploring various strategic alternatives for our Bloom Lake mine. We continued to operate the Bloom Lake mine Phase I operations on a reduced tailings and water management capital plan throughout 2014 and the Phase II expansion remained on hold. In the fourth quarter of 2014, all production at Bloom Lake mine was halted and the mine transitioned to "care-and-maintenance" status.

Production at the Wabush facility was 2.8 million and 3.1 million metric tons during the years ended  December 31, 2013 and 2012, respectively. Due to high production costs and lower pellet premium pricing, we idled production at our Pointe Noire iron ore pellet plant and transitioned to producing an iron ore concentrate product from our Wabush Scully mine during June 2013. At the end of March 2014, we idled our Wabush Scully mine in Newfoundland and Labrador and began to implement the permanent closure plan for the mine in the fourth quarter of 2014. The idle was driven by the unsustainable high cost structure, which resulted in operations that are not economically viable to run over time.

## Liquidity, Cash Flows and Capital Resources

Our primary sources of liquidity are cash generated from our operating and financing activities. Our capital allocation process is focused on prioritizing all potential uses of future cash flows. We continue to focus on cash generation in our business operations as well as reductions of any discretionary expenditures in order to ensure we are positioned to face the challenges and uncertainties of the volatile pricing markets for our products.

Based on current mine plans and subject to future iron ore and coal prices and supply and demand, we expect our operating cash flows generated in 2015 to be sufficient to cover our budgeted capital expenditures and dividend requirements. Furthermore, we supplement this cash generation with adequate liquidity via financing arrangements to fund our normal business operations and strategic initiatives through our revolving credit agreement. During the fourth quarter of 2014, we generated positive cash flows from operations and were able to reduce our overall total debt less cash position by approximately $300 million, including the repurchase of $45 million aggregate principal amount of our senior notes. Additionally, in January 2015, we further reduced total debt by approximately $159 million through senior note repurchases in the open market with approximately $106 million of net proceeds from the sale of CLCC and cash

from operations. Based on current market conditions, we expect to be able to fund our requirements for at least the next 12 months.

As a result of the Bloom Lake Group commencing restructuring proceedings under the CCAA, the initial order obtained on January 27, 2015 addressed the Bloom Lake Group's immediate liquidity issues by staying creditor claims and permitting the Bloom Lake Group to preserve and protect its assets for the benefit of all stakeholders while restructuring and/or sale options are explored. Certain obligations, including certain equipment loans, were guaranteed by Cliffs and totaled approximately $145 million. Through this court monitored process, we anticipate the restructuring and/or sale of the Bloom Lake Group assets may mitigate the impact of these obligations to Cliffs' liquidity during 2015. Cash and cash equivalents of the Bloom Lake Group were $17.2 million at December 31, 2014.

Refer to "Outlook" for additional guidance regarding expected future results, including projections on pricing, sales volume and production for our various businesses.

The following discussion summarizes the significant activities impacting our cash flows during 2014 as well as those expected to impact our future cash flows over the next 12 months. Refer to the Statements of Consolidated Cash Flows for additional information.

### Operating Activities

Net cash provided by operating activities decreased to $358.9 million for the year ended December 31, 2014, compared to cash provided by operating activities of $1,145.9 million for 2013. The decrease in operating cash flows in 2014 were primarily due to lower operating results as previously discussed.

Net cash provided by operating activities improved to $1,145.9 million for the year ended December 31, 2013, compared to cash provided by operating activities of $514.5 million for 2012. The increase in operating cash flow in 2013 was primarily due to the timing of payments related to 2011 income taxes in early 2012, other changes in working capital and reduced exploration and selling, general and administrative costs.

We expect economic growth in the U.S. to continue in 2015, and correspondingly expect steel demand to remain at healthy levels. While the industry demand will be supported by an improving housing market and a strengthened automotive sector, demand from energy companies is expected to decrease as oil prices remain at depressed levels. Additionally, the steel industry should face continued pressure from surging imports, which reached record levels in 2014, as the strength of the U.S. dollar continues to increase and continued oversupply of the global steel industry. In China, demand for steel should increase slightly compared to 2014, although at a rate far below growth percentages recorded earlier in the decade. In 2014, the increase in seaborne supply of iron ore was expected by many, but the slowdown in demand from Chinese end markets was unexpected and negatively impacted spot prices for iron ore. We expect seaborne iron ore prices to remain pressured unless there are vast structural changes to the supply/demand picture, including increased Chinese demand or iron ore capacity cuts.

Coupled with efficient tax structures, our U.S. operations and our financing arrangements provide sufficient capital resources; however, if we were to repatriate earnings, we would be subject to income tax. Our U.S. cash and cash equivalents balance at December 31, 2014 was $136.1 million, or approximately 46.8 percent of our consolidated total cash and cash equivalents balance of $290.9 million. As of December 31, 2014 and 2013, we had no restrictions on our borrowing capacity of our U.S.-based revolving credit facility inclusive of the changes made through Amendment No. 6. Furthermore, historically we have been able to raise additional capital through private financings and public debt and equity offerings, the bulk of which, to date, have been U.S.-based. If the demand for our product weakens and/or pricing deteriorates for a prolonged period, we have the financial and operational flexibility to reduce production, delay capital expenditures, sell assets and reduce overhead costs to provide liquidity in the absence of cash flow from operations.

### Investing Activities

Net cash used in investing activities was $103.6 million for the year ended December 31, 2014, compared with $811.3 million for 2013. We had capital expenditures of $284.1 million and $861.6 million for the years ended December 31, 2014 and 2013, respectively. Offsetting our investments in property, plant and equipment, during 2014, we had cash proceeds from investing activities of $155.0 million from the sale of CLCC.

84

Net cash used by investing activities was $811.3 million for the year ended December 31, 2013, compared with $961.8 million for 2012. We had capital expenditures of $861.6 million and $1,127.5 million for the years ended December 31, 2013 and 2012, respectively. Our main capital investment focus had been on the construction of the Bloom Lake mine's operations. On the ramp-up and expansion projects at Bloom Lake mine, we spent approximately $426 million and approximately $475 million during the years ended December 31, 2013 and 2012, respectively. In addition, the expenditures for the Bloom Lake tailings and water management system totaled $191 million and $99 million in 2013 and 2012, respectively.

Up until the first quarter of 2014, our main capital investment focus was on the construction of the Bloom Lake mine's operations, at which time we placed the Phase II expansion on hold. We subsequently determined that the Phase II expansion of the Bloom Lake mine was no longer a viable option for us and we shifted our focus to considering available possibilities and executing an exit option for Eastern Canadian Iron Ore operations that minimizes the cash outflows and associated liabilities. In December 2014, iron ore production at the Bloom Lake mine was suspended and the Bloom Lake mine was placed in ''care-and-maintenance'' mode. Prior to Bloom Lake mine entering "care and maintenance" mode, on the expansion projects at the Bloom Lake mine, we spent approximately $51 million and approximately $426 million during the years ended December 31, 2014 and 2013, respectively, which predominately relates to work performed in 2013. In addition, the expenditures for the Bloom Lake tailings and water management system totaled $92 million and $191 million in 2014 and 2013, respectively. Additionally, we spent approximately $140 million and $203 million globally on expenditures related to sustaining capital excluding the Bloom Lake tailings and water management in 2014 and 2013, respectively. Sustaining capital spend includes infrastructure, mobile equipment, environmental, safety, fixed equipment, product quality and health.

In alignment with our strategy to focus on allocating capital among key priorities related to liquidity management, and business investment, we anticipate total cash used for capital expenditures in 2015 to be approximately $125 million to $150 million.

### *Financing Activities*

Net cash used by financing activities was $288.3 million for the year ended December 31, 2014, compared with $171.9 million for 2013. Net cash used includes dividend distributions of $143.7 million and $127.6 million for the years ended December 31, 2014 and 2013, respectively. Additionally, cash used by financing activities during 2014 included $28.8 million for the repurchase of senior notes and $20.9 million for the repayment of equipment loans. In 2013, we had net repayments under our credit facilities of $325.0 million, which was partially offset by cash provided by financing activities of $164.8 million from equipment loans. Additionally, we completed public offerings of 29.25 million depositary shares and 10.35 million common shares, resulting in net proceeds of $709.4 million and $285.3 million, respectively, after underwriting fees and discounts of which a portion of the net proceeds were used to repay the $847.1 million outstanding under the term loan.

Net cash used by financing activities during 2013 was $171.9 million, compared to net cash provided by financing activities of $119.6 million for 2012. Cash flows provided by financing activities during 2012 included $497.0 million in net proceeds from the issuance of the $500.0 million 3.95 percent senior notes, completed through a public offering in December 2012. A portion of the net proceeds from the senior notes offering was used on December 28, 2012 to repay the $270.0 million and $55.0 million aggregate principal amount of outstanding private placement senior notes and also for the repayment of a portion of the borrowings outstanding under the term loan facility and the revolving credit facility. In addition, we had net borrowings and repayments under the revolving credit facility of $325.0 million and cash calls from our joint venture partners resulted in net cash receipts of $95.4 million. Offsetting the proceeds from financing activities in 2012 were dividend distributions of $307.2 million and $124.8 million for term loan repayments.

On September 10, 2014, we announced that our Board of Directors approved a buy back of outstanding common shares in the open market or in private negotiated transactions up to a maximum of $200 million dollars. We are not obligated to make any purchases, and the repurchase program may be suspended or discontinued at any time. The authorization is active until December 31, 2015.

On January 26, 2015, we announced that our Board of Directors had decided to eliminate the quarterly dividend of $0.15 per share on our common shares. The decision is applicable to the first quarter of 2015 and all subsequent quarters. The elimination of the common share dividend provides us with additional free cash of approximately $92 million annually, which we intend to use for further debt reduction, including the repurchase of senior notes at a discount. We see accelerated debt reduction as a more effective means of protecting our shareholders than continuing to pay a common share dividend.

A004252

Table of Contents

The following represents our future cash commitments and contractual obligations as of December 31, 2014:

| Contractual Obligations | Total | Less than 1 Year | 1 - 3 Year | 3 - 5 Year | More Than 5 Years |
|---|---|---|---|---|---|
| | | | | **Payments Due by Period [1] (In Millions)** | |
| Long-term debt | $ 2,995.8 | $ 21.8 | $ 46.3 | $ 530.1 | $ 2,397.6 |
| Interest on debt [2] | 1,901.0 | 163.0 | 323.4 | 278.6 | 1,136.0 |
| Operating lease obligations | 51.2 | 12.0 | 17.7 | 11.6 | 9.9 |
| Capital lease obligations | 198.6 | 84.8 | 61.0 | 31.8 | 21.0 |
| Purchase obligations: | | | | | |
| Open purchase orders | 174.3 | 144.9 | 29.4 | — | — |
| Minimum royalty payments | 34.7 | 2.8 | 5.7 | 15.3 | 10.9 |
| Minimum "take or pay" purchase commitments [3] | 1,229.8 | 382.7 | 624.8 | 148.6 | 73.7 |
| Total purchase obligations | 1,438.8 | 530.4 | 659.9 | 163.9 | 84.6 |
| Other long-term liabilities: | | | | | |
| Pension funding minimums | 216.7 | 42.5 | 34.2 | 73.8 | 66.2 |
| OPEB claim payments | 461.7 | 6.8 | 13.6 | 14.4 | 426.9 |
| Environmental and mine closure obligations | 261.2 | 5.2 | 7.9 | 55.3 | 192.8 |
| Personal injury | 12.0 | 4.0 | 4.9 | 0.4 | 2.7 |
| Total other long-term liabilities | 951.6 | 58.5 | 60.6 | 143.9 | 688.6 |
| Total | $ 7,537.0 | $ 870.5 | $ 1,168.9 | $ 1,159.9 | $ 4,337.7 |

[1]  Includes our consolidated obligations.

[2]    For the $500 million senior notes, interest is calculated using a fixed rate of 3.95 percent from 2015 to maturity in January 2018. For the $400 million senior notes, interest is calculated using a fixed rate of 5.90 percent from 2015 to maturity in March 2020. For the $1.3 billion senior notes, interest is calculated for the $500 million 10-year notes using a fixed rate of 4.80 percent from 2015 to maturity in October 2020, and the $800 million 30-year notes using a fixed rate of 6.25 percent from 2015 to maturity in October 2040. For the $700 million senior notes, interest is calculated using a fixed rate of 4.875 percent from 2015 to maturity in April 2021. For the $140.8 million of equipment loans, interest is calculated using the fixed rate associated with each of the equipment loans from 2015 to maturity in 2020.

[3]    Includes minimum railroad transportation obligations, minimum electric power demand charges, minimum coal, diesel and natural gas obligations and minimum port facility obligations.

The above table does not reflect $74.7 million of unrecognized tax benefits, which we have recorded for uncertain tax positions as we are unable to determine a reasonable and reliable estimate of the timing of future payments. Included in the above table are the cash commitments and contractual obligations associated with the Bloom Lake Group that have been included in the CCAA filing, most of which we believe will be treated as unsecured claims. Because of the uncertainty of the CCAA process, we are unable to determine a reasonable and reliable estimate of amounts and timing of future payments related to the obligations of the Bloom Lake Group.

Refer to NOTE 20 - COMMITMENTS AND CONTINGENCIES of the Consolidated Financial Statements for additional information regarding our future commitments and obligations.

Table of Contents

***Capital Resources***

We expect to fund our business obligations from available cash, current and future operations and existing borrowing arrangements. We also may pursue other funding strategies in the capital markets to strengthen our liquidity. The following represents a summary of key liquidity measures as of December 31, 2014 and December 31, 2013:

| | (In Millions) | |
| --- | --- | --- |
| | **December 31, 2014** | December 31, 2013 |
| Cash and cash equivalents | **$        290.9** | $        335.5 |
| Available revolving credit facility | **$      1,125.0** | $      1,750.0 |
| Revolving loans drawn | **—** | — |
| Senior notes | **2,855.0** | 2,900.0 |
| Senior notes drawn | **(2,855.0 )** | (2,900.0 ) |
| Letter of credit obligations and other commitments | **(149.5 )** | (8.4 ) |
| Borrowing capacity available | **$        975.5** | $      1,741.6 |

Our primary source of funding is our revolving credit facility, which matures on October 16, 2017. We also have cash on hand, generated by the business, which totaled $290.9 million as of December 31, 2014. The combination of cash and availability under the credit facility gave us approximately $1.3 billion in liquidity entering the first quarter of 2015, which is expected to be used to fund operations and capital expenditures. As noted below, however, the availability under our revolving credit agreement was reduced to $900 million in January 2015 and will be reduced to $750 million on May 31, 2015.

On January 22, 2015, we amended the revolving credit agreement (Amendment No. 6) to effect the following:

- Reduces the size of the existing facility from $1.125 billion to $900 million at the closing of this amendment with a further reduction to $750 million on May 31, 2015.

- Permits certain of our subsidiaries and joint ventures related to our Canadian operations (collectively, the "Canadian Entities") to enter into a restructuring (the "Canadian Restructuring").

- Permits costs and expenses incurred in connection with the Canadian Restructuring in an amount not to exceed $75 million to be added back to the calculation of EBITDA.

- Adds limitations with respect to investments in the Canadian Entities after the Canadian Restructuring.

- Adds limitations on the guaranty of indebtedness of a Canadian Entity by us or our subsidiaries (other than by another Canadian Entity).

- Permits additional liens on the assets of the Canadian Entities.

- Reduces the permitted amount of quarterly dividends on our common shares to not more than $0.01 per share in any fiscal quarter.

- Grants a security interest in our as-extracted collateral and certain of our subsidiaries.

- Excludes certain indebtness and obligations of the Canadian Entities from the representations, covenants and events of default.

The amended facility retains substantial financial flexibility for management to execute our strategy and provides us a consistent source of liquidity.

On October 24, 2014, we amended the revolving credit agreement (Amendment No 5.) to effect the following:

- Reduces the size of the existing facility from $1.250 billion to $1.125 billion.

- Grants a valid and perfected first-priority (subject to certain permitted liens) security interest in certain property and assets of the Company and certain of its subsidiaries, subject to customary exclusions all specified in a security agreement.

87

A004254

Table of Contents

- With effect as of September 30, 2014, removes the maximum balance sheet leverage ratio of debt to capitalization of less than 45 percent, which was a covenant introduced in June 2014, and replaces that covenant with a maximum leverage ratio covenant of secured debt to EBITDA that is not to exceed 3.5 times.

- Retains the minimum interest coverage ratio requirement of 3.5 times, and was subsequently reduced to 2.0 times upon completion of certain collateral actions within 60 days of the execution of the amendment. The collateral requirements were satisfied as of December 23, 2014.

- Subjects restricted payments (including the $200 million share repurchase, which was approved in September 2014) and current dividend structure to a $400 million liquidity test.

- Adds limitations regarding acquisitions, investments (including investments in non-wholly owned subsidiaries and joint ventures) and subsidiary debt.

- Eliminates the accounts receivable securitization facility.

- Terminates the ability to have foreign borrowers under the revolving credit agreement.

The amended facility retains substantial financial flexibility for management to execute our strategy and provides us a consistent source of liquidity.

On September 9, 2014, we amended the revolving credit agreement (Amendment No. 4) to effect the following:

- Permitting a one-time exemption of up to $200 million in share repurchases (consummated in a single transaction or series of related transactions), effective until December 31, 2015. We are not obligated to make any purchases and the program may be suspended or discontinued at any time.

- Reducing the size of the existing unsecured facility from $1.75 billion to $1.25 billion.

- Adding restrictions on the granting of certain pledges and guarantees.

- Adding an obligation to enter into a security agreement, on or before June 30, 2015, to grant security interests to secure obligations under the revolving credit agreement on U.S. receivables and inventory, other than receivables and related property subject to certain existing receivable securitization or other facilities, a pledge of 65 percent of the stock of all material, wholly-owned first-tier foreign subsidiaries and a pledge of all of the stock of all material U.S. subsidiaries, in each case, subject to certain limitations.

All terms of Amendment No. 3 as of June 30, 2014, as discussed below, remained in place and were not changed by Amendment No. 4 as of September 9, 2014.

On June 30, 2014, we amended the revolving credit agreement (Amendment No. 3) to effect the following:

- Replacing the current maximum leverage covenant ratio of debt to earnings of less than  3.5 times with a maximum balance sheet leverage ratio of debt to capitalization of less than 45 percent.

- Resetting the minimum interest coverage ratio from 2.5 to 1.0 to the ratio of  3.5 to 1.0.

- Amending the definition of EBITDA to include certain cash charges related to the Company's Wabush mine and other cash restructuring charges and the definition of net worth to exclude up to $1 billion in non-cash impairment charges.

- Modifying the covenants restricting certain investments and acquisitions, the incurrence of certain indebtedness and liens, and the amount of dividends that may be declared or paid and shares that may be repurchased.

As of December 31, 2014 and 2013, we were in compliance with all applicable financial covenants related to the revolving credit agreement.

Although we believe that the revolving credit agreement provides us sufficient liquidity to support our operating and investing activities, we continue to refine our capital structure to achieve an optimal mix and level of debt, equity and other prudent financing arrangements. Several credit markets may provide additional capacity should that become necessary. The bank market may provide funding through a secured credit facility, term loan or bridge loan. Additionally, we have access to the bond market as a source of capital. The risk associated with these credit markets is a significant increase in borrowing costs as a result of limited capacity and market conditions.

88

A004255

As we have previously disclosed, we have contemplated replacing our revolving credit facility with a secured asset-based revolving credit facility, and we are currently in discussions with lenders about putting such a facility in place. We cannot guarantee that we will be successful in obtaining an asset-based revolving credit facility on commercially acceptable terms or at all.

We intend from time to time to seek to retire or purchase our outstanding senior notes with cash on hand, borrowings from existing credit sources or new debt financings and/or exchanges for debt or equity securities, in open market purchases, privately negotiated transactions or otherwise. Such repurchases, if any, will depend on prevailing market conditions, our liquidity requirements, contractual restrictions and other factors, and the amounts involved may be material.

### Off-Balance Sheet Arrangements

In the normal course of business, we are a party to certain off-balance sheet arrangements. These arrangements include minimum "take or pay" purchase commitments, such as minimum electric power demand charges, minimum coal, diesel and natural gas purchase commitments, minimum railroad transportation commitments and minimum port facility usage commitments; financial instruments with off-balance sheet risk, such as bank letters of credit and bank guarantees; and operating leases, which primarily relate to equipment and office space. Liabilities related to these arrangements are not reflected on our Statements of Consolidated Financial Position . However, the underlying obligations that they secure, such as asset retirement obligations, self-insured workers' compensation liabilities, royalty obligations and certain post-retirement benefit obligations, are reflected in our Statements of Consolidated Financial Position .

We may be required to provide financial assurance in order to perform the post-mining reclamation required by our mining permits, pay our production royalties, pay workers' compensation claims under self-insured workers' compensation laws in various states, pay retiree benefits and perform certain other obligations. In order to provide the required financial assurance, we generally use surety bonds and/or letters of credit, and, effective with Amendment No. 5 to the revolving credit agreement, letters of credit are primarily issued under our revolving credit facility. Previously we had an unsecured, uncommitted letter of credit line with Scotiabank. With the recent credit rating downgrades, we experienced an increase in requests for financial assurance to be provided. Additionally, with the Bloom Lake Group CCAA filing, approximately $15 million of surety bonds and letters of credit backing obligations have been called and settled in cash in early 2015.

## Market Risks

We are subject to a variety of risks, including those caused by changes in commodity prices, foreign currency exchange rates and interest rates. We have established policies and procedures to manage such risks; however, certain risks are beyond our control.

### Pricing Risks

#### Commodity Price Risk

Our consolidated revenues include the sale of iron ore pellets, iron ore concentrate, iron ore lump and fines, low-volatile metallurgical coal, high-volatile metallurgical coal and thermal coal. However, during the fourth quarter of 2014, we sold our high-volatile metallurgical coal and thermal coal mines in the sale of the CLCC assets. The sale of the CLCC assets closed on December 31, 2014, and therefore beyond 2014, we will no longer have revenues associated with high-volatile metallurgical coal and thermal coal. Our financial results can vary significantly as a result of fluctuations in the market prices of iron ore and coal. World market prices for these commodities have fluctuated historically and are affected by numerous factors beyond our control. The world market price that most commonly is utilized in our iron ore sales contracts is the Platts 62 percent Fe fines spot rate pricing, which can fluctuate widely due to numerous factors, such as global economic growth or contraction, change in demand for steel or changes in availability of supply.

#### Provisional Pricing Arrangements

Certain of our U.S. Iron Ore, Asia Pacific Iron Ore and Eastern Canadian Iron Ore customer supply agreements specify provisional price calculations, where the pricing mechanisms generally are based on market pricing, with the final revenue rate to be based on market inputs at a specified point in time in the future, per the terms of the supply agreements. The difference between the provisionally agreed-upon price and the estimated final revenue rate is characterized as a derivative and is required to be accounted for separately once the revenue has been recognized. The derivative instrument is adjusted to fair value through Product revenues each reporting period based upon current market data and forward-looking estimates provided by management until the final revenue rate is determined.

89

At December 31, 2014, we have recorded $11.8 million as derivative liabilities included in *Other current liabilities* in the Statements of Consolidated Financial Position related to our estimate of final sales rate with our U.S. Iron Ore, Asia Pacific Iron Ore and Eastern Canadian Iron Ore customers. These amounts represent the difference between the provisional price agreed upon with our customers based on the supply agreement terms and our estimate of the final sales rate based on the price calculations established in the supply agreements. As a result, we recognized a net $11.8 million decrease, respectively, in *Product revenues* in the Statements of Consolidated Operations for the year ended December 31, 2014 related to these arrangements.

### Customer Supply Agreements

Certain supply agreements with one U.S. Iron Ore customer provide for supplemental revenue or refunds based on the customer's average annual steel pricing at the time the product is consumed in the customer's blast furnace. The supplemental pricing is characterized as a freestanding derivative, which is finalized based on a future price, and is adjusted to fair value as a revenue adjustment each reporting period until the pellets are consumed and the amounts are settled. The fair value of the instrument is determined using an income approach based on an estimate of the annual realized price of hot-rolled steel at the steelmaker's facilities.

At December 31, 2014, we had a derivative asset of $63.2 million, representing the fair value of the pricing factors, based upon the amount of unconsumed tons and an estimated average hot-band steel price related to the period in which the tons are expected to be consumed in the customer's blast furnace at each respective steelmaking facility, subject to final pricing at a future date. This compares with a derivative asset of $55.8 million as of December 31, 2013. As an example, we estimate that a $75 change in the average hot-band steel price realized from the December 31, 2014 estimated price recorded would cause the fair value of the derivative instrument to increase or decrease by approximately $8.8 million, thereby impacting our consolidated revenues by the same amount.

We have not entered into any hedging programs to mitigate the risk of adverse price fluctuations; however, certain of our term supply agreements contained price collars, which typically limit the percentage increase or decrease in prices for our products during any given year.

### Volatile Energy and Fuel Costs

The volatile cost of energy is an important issue affecting our production costs, primarily in relation to our iron ore operations. Our consolidated U.S. Iron Ore mining ventures consumed approximately 20.4 million MMBtu's of natural gas at an average delivered price of $6.31 per MMBtu and 29.3 million gallons of diesel fuel at an average delivered price of $3.11 per gallon during 2014. Consumption of diesel fuel by our Asia Pacific operations was approximately 14.7 million gallons at an average delivered price of $3.19 per gallon for the same period. Our consolidated Eastern Canadian Iron Ore mining ventures consumed approximately 7.6 million gallons of diesel fuel at an average delivered price of $4.03 per gallon during 2014. We would not anticipate significant consumption of fuel at our consolidated Eastern Canadian Iron Ore facilities during 2015 as a result our strategy to execute an exit option for Eastern Canadian Iron Ore operations during 2015. Our CLCC operations consumed approximately 3.4 million gallons of diesel fuel at an average delivered price of $3.49 per gallon during 2014. Our CLCC assets were sold in fourth quarter of 2014 with the sale closing on December 31, 2014.

In the ordinary course of business, there also will be likely increases in prices relative to electrical costs at our U.S. mine sites. Specifically, our Tilden and Empire mines in Michigan have made the decision to return to regulated utility service with WE Energies effective February 1, 2015, which we estimate will result in an increase of approximately $5 per MWh over our average 2014 rates. As the cost of producing electricity increases, the utility companies regularly seek to reclaim those costs from the mine sites, which often results in tariff disputes.

Our strategy to address increasing energy rates includes improving efficiency in energy usage, identifying alternative providers and utilizing the lowest cost alternative fuels. A pilot energy hedging program has been implemented in order to manage the price risk of diesel and natural gas at our U.S. Iron Ore mines. This pilot program only affects the period of January through April of 2015. Based on the results of this pilot program, a more structured hedging program may be implemented in the future. We will continue to monitor relevant energy markets for risk mitigation opportunities and may make additional forward purchases or employ other hedging instruments in the future as warranted and deemed appropriate by management. Assuming we do not enter into further hedging activity in the near term, a 10 percent change in electrical, natural gas and diesel fuel prices would result in a change of approximately $39.5 million in our annual fuel and energy cost based on expected consumption for 2015.

*Foreign Currency Exchange Rate Risk*

We are subject to changes in foreign currency exchange rates primarily as a result of our operations in Australia and Canada, which could impact our financial condition. With respect to Australia, foreign exchange risk arises from our exposure to fluctuations in foreign currency exchange rates because our reporting currency is the U.S. dollar, but the functional currency of our Asia Pacific operations is the Australian dollar. Our Asia Pacific operations receive funds in U.S. currency for their iron ore sales and incur costs in Australian currency. For our Canadian operations, the functional currency is the U.S. dollar; however, most costs for these operations primarily are incurred in the Canadian dollar. The primary objective for the use of foreign exchange rate contracts is to reduce exposure to changes in Australian and U.S. currency exchange rates and Canadian and U.S. currency exchange rates, respectively, and to protect against undue adverse movement in these exchange rates.

At December 31, 2014, we had outstanding Australian foreign currency exchange rate contracts with notional amounts of $220.0 million with varying maturity dates ranging from January 2015 to October 2015 for which we elected hedge accounting. To evaluate the effectiveness of our hedges, we conduct sensitivity analysis. A 10 percent increase in the value of the Australian dollar from the month-end rate would increase the fair value of these contracts to approximately negative $1.6 million, and a 10 percent decrease would reduce the fair value to approximately negative $41.3 million. At December 31, 2014, we had no outstanding Canadian foreign currency exchange rate contracts for which we elected hedge accounting. In the fourth quarter of 2014, all outstanding Canadian foreign exchange rate contracts were de-designated and hedge accounting was discontinued. As a result of discontinued hedge accounting, the instruments are marked to fair value each reporting period through *Cost of goods sold and operating expenses* on the Statements of Consolidated Operations . We do not intend to enter into Canadian foreign exchange rate hedging contracts going forward. Refer to NOTE 13 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES for further discussion of the de-designation of the Canadian foreign currency exchange contracts. In the future, we may enter into additional hedging instruments as needed in order to further hedge our exposure to changes in foreign currency exchange rates.

The following table represents our foreign currency exchange contract position for contracts held as cash flow hedges as of December 31, 2014:

| | | ($ in Millions) | | | |
|---|---|---|---|---|---|
| **Contract Maturity** | | **Notional Amount** | **Weighted Average Exchange Rate** | **Spot Rate** | **Fair Value** |
| Contract Portfolio [1] : | | | | | |
| AUD Contracts expiring in the next 12 months | $ | 220.0 | 0.90 | 0.8175 | $ (21.6) |
| [1] Includes collar options and forward contracts. | | | | | |

Refer to NOTE 13 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES for further information.

*Interest Rate Risk*

Interest payable on our senior notes is at fixed rates. Interest payable under our revolving credit facility is at a variable rate based upon the base rate or the LIBOR rate plus a margin depending on a leverage ratio. As of December 31, 2014, we had no amounts drawn on the revolving credit facility.

The interest rate payable on the $500 million 3.95 percent senior notes due 2018 may be subject to adjustments from time to time if either Moody 's or S&P or, in either case, any substitute rating agency thereof downgrades (or subsequently upgrades) the debt rating assigned to the notes. In no event shall (1) the interest rate for the notes be reduced to below the interest rate payable on the notes on the date of the initial issuance of notes or (2) the total increase in the interest rate on the notes exceed 2.00 percent above the interest rate payable on the notes on the date of the initial issuance of notes. The interest rate payable on the $500 million 3.95 percent senior notes was increased to 5.95 percent based on continued Substitute Rating Agency downgrades in January 2015. The maximum rate increase of 2.00 percent for the interest rate payable on the notes will result in an additional interest expense of $10.0 million per annum.

A004258

*Supply Concentration Risks*

Many of our mines are dependent on one source each of electric power and natural gas. A significant interruption or change in service or rates from our energy suppliers could impact materially our production costs, margins and profitability.

## Outlook

Beginning in 2015, in order to provide more financial transparency to our stakeholders, we will be providing full-year expected revenues-per-ton ranges based on different assumptions of seaborne iron ore prices. We indicated that each different pricing assumption holds all other assumptions constant, including customer mix, as well as industrial commodity prices, freight rates, energy prices, production input costs and/or hot-band steel prices (all factors contained in certain of our supply agreements).

We previously furnished 2015 pricing expectations in a Current Report on Form 8-K filed on November 19, 2014. Due to the significant decline in both hot-band steel and energy prices, we have since lowered our assumptions with respect to these contract inputs. Below are the updated 2015 pricing expectations in a Current Report on Form 8-K filed on February 3, 2015.

| 2015 Full-Year Realized Revenues-Per-Ton Range Summary | | |
|---|---|---|
| Platts IODEX (1) | U.S. Iron Ore (2) | Asia Pacific Iron Ore (3) |
| **$50** | $75 - $80 | $30 - $35 |
| **$55** | $80 - $85 | $35 - $40 |
| **$60** | $80 - $85 | $40 - $45 |
| **$65** | $80 - $85 | $45 - $50 |
| **$70** | $80 - $85 | $50 - $55 |
| **$75** | $80 - $85 | $55 - $60 |
| **$80** | $85 - $90 | $60 - $65 |

**(1)** The Platts IODEX is the benchmark assessment based on a standard specification of iron ore fines with 62 percent iron content (C.F.R. China).

**(2)** U.S. Iron Ore tons are reported in long tons of pellets.

**(3)** Asia Pacific Iron Ore tons are reported in metric tons of lumps and fines, F.O.B. the port.

**U.S. Iron Ore Outlook** (Long Tons)

For 2015, we expect full-year sales and production volume of approximately 22 million tons from our U.S. Iron Ore business. As previously disclosed, we do not plan to export any pellets out of the Great Lakes in 2015.

Our full-year 2015 U.S. Iron Ore cash production cost expectation is $55 - $60 per ton. Our cash cost of goods sold per ton expectation is $60 - $65. This expectation reflects operational improvements including reduced headcount, more efficient maintenance practices and improvements in logistics. Depreciation, depletion and amortization for full-year 2015 is expected to be approximately $5 per ton.

**Asia Pacific Iron Ore Outlook** (Metric Tons, F.O.B. the port)

Our full-year 2015 Asia Pacific Iron Ore expected sales and production volume is approximately 11 million tons. The product mix is expected to be approximately 51 percent lump and 49 percent fines iron ore. This expectation assumes no divestiture of this business in 2015, which may or may not occur.

Based on an average exchange rate of $0.81 U.S. Dollar to Australian Dollar, full-year 2015 Asia Pacific Iron Ore cash production cost per ton is expected to be approximately $40 - $45. Cash cost of goods sold per ton is also expected to be $40 - $45. This expectation reflects operational improvements and a more favorable foreign exchange rate compared to 2014. We indicated that for every $0.01 change in this exchange rate on a full-year basis, our cash cost of goods sold is impacted by approximately $7 million.

We anticipate depreciation, depletion and amortization to be approximately $2 per ton for full-year 2015.

A004259

Table of Contents

**North American Coal Outlook** (Short Tons, F.O.B. the mine)

Our full-year 2015 North American Coal expected sales and production volume is approximately 5.5 million tons of low-volatile metallurgical coal from the two remaining mines, Pinnacle and Oak Grove. This expectation assumes no additional divestiture of this business in 2015, which may or may not occur.

Our full-year 2015 North American Coal revenues-per-ton outlook is $70 - $75. We have approximately 41 percent of our expected 2015 sales volume committed and priced at approximately $77 per short ton at the mine.

Our full-year 2015 North American Coal cash production cost expectation is $65 - $70 per ton. Our cash cost of goods sold per ton expectation is $70 - $75. Full-year 2015 depreciation, depletion and amortization is expected to be approximately $2 per ton.

The following table provides a summary of the 2015 guidance for our three remaining business segments:

| | 2015 Outlook Summary | | |
| --- | --- | --- | --- |
| | U.S. Iron Ore (A) | Asia Pacific Iron Ore (B) | North American Coal (C) |
| Sales volume (million tons) | 22 | 11 | 5.5 |
| Production volume (million tons) | 22 | 11 | 5.5 |
| Cash production cost per ton | $55 - $60 | $40 - $45 | $65 - $70 |
| Cash cost of goods sold per ton | $60 - $65 | $40 - $45 | $70 - $75 |
| DD&A per ton | $5 | $2 | $2 |

(A) U.S. Iron Ore tons are reported in long tons of pellets.
(B) Asia Pacific Iron Ore tons are reported in metric tons of lumps and fines.
(C) North American Coal tons are reported in short tons.

Cash production cost and cash cost of goods sold per ton are non-GAAP financial measures that management uses in evaluating operating performance. The presentation of these measures is not intended to be considered in isolation from, as a substitute for, or as superior to, the financial information prepared and presented in accordance with U.S. GAAP. The presentation of these measures may be different from non-GAAP financial measures used by other companies. Cash production cost per ton is defined as cost of goods sold and operating expenses per ton less depreciation, depletion and amortization; as well as period costs, costs of services and inventory effects per ton. Cash cost per ton is defined as cost of goods sold and operating expenses per ton less depreciation, depletion and amortization per ton.

**SG&A Expenses and Other Expectations**

We are reducing our year-over-year SG&A expenses by approximately $70 million. Full-year 2015 SG&A expenses are expected to be approximately $140 million. The decrease is primarily driven by a reduction in headcount and reduced outside services spending as a result of a smaller global footprint. Cliffs' full-year cash outflow expectation for exploration spending is expected to be less than $5 million.

Consolidated full-year 2015 depreciation, depletion and amortization is expected to be approximately $150 million.

**Capital Budget Update**

We expect our full-year 2015 capital expenditures budget to be $125 - $150 million.

**Recently Issued Accounting Pronouncements**

Refer to NOTE 1 - BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES of the consolidated financial statements for a description of recent accounting pronouncements, including the respective dates of adoption and effects on results of operations and financial condition.

93

Table of Contents

**Critical Accounting Estimates**

Management's discussion and analysis of financial condition and results of operations is based on our consolidated financial statements, which have been prepared in accordance with GAAP. Preparation of financial statements requires management to make assumptions, estimates and judgments that affect the reported amounts of assets, liabilities, revenues, costs and expenses, and the related disclosures of contingencies. Management bases its estimates on various assumptions and historical experience, which are believed to be reasonable; however, due to the inherent nature of estimates, actual results may differ significantly due to changed conditions or assumptions. On a regular basis, management reviews the accounting policies, assumptions, estimates and judgments to ensure that our financial statements are fairly presented in accordance with GAAP. However, because future events and their effects cannot be determined with certainty, actual results could differ from our assumptions and estimates, and such differences could be material. Management believes that the following critical accounting estimates and judgments have a significant impact on our financial statements.

*Revenue Recognition*

*U.S. Iron Ore and Asia Pacific Iron Ore Provisional Pricing Arrangements*

Most of our U.S. Iron Ore long-term supply agreements are comprised of a base price with annual price adjustment factors. The base price is the primary component of the purchase price for each contract. The inflation-indexed price adjustment factors are integral to the iron ore supply contracts and vary based on the agreement, but typically include adjustments based upon changes in benchmark and international pellet prices and changes in specified Producers Price Indices, including those for industrial commodities excluding fuel, cold rolled steel and strip, and fuel and related products. The pricing adjustments generally operate in the same manner, with each factor typically comprising a portion of the price adjustment, although the weighting of each factor varies based upon the specific terms of each agreement. In most cases, these adjustment factors have not been finalized at the time our product is sold. In these cases, we historically have estimated the adjustment factors at each reporting period based upon the best third-party information available. The estimates are then adjusted to actual when the information has been finalized.

The Producer Price Indices remain an estimated component of the sales price throughout the contract year and are estimated each quarter using publicly available forecasts of such indices. The final indices referenced in certain of the U.S. Iron Ore supply contracts typically are not published by the U.S. Department of Labor until the second quarter of the subsequent year. As a result, we record an adjustment for the difference between the fourth quarter estimate and the final price in the following year.

Throughout the year, certain of our Asia Pacific Iron Ore customers have contract arrangements in which pricing settlements are based upon an average benchmark pricing for future periods. Most of the future periods are settled within three months. To the extent the particular pricing settlement period is subsequent to the reporting period, we estimate the final pricing settlement based upon information available. Similar to U.S. Iron Ore, the estimates are then adjusted to actual when the price settlement period elapses.

Historically, provisional pricing arrangement adjustments have not been material as they have represented less than half of one percent of U.S., Eastern Canadian and Asia Pacific Iron Ore's respective revenues for each of the three preceding fiscal years ended December 31, 2014, 2013 and 2012.

*U.S. Iron Ore Customer Supply Agreements*

In addition, certain supply agreements with one U.S. Iron Ore customer include provisions for supplemental revenue or refunds based on the customer's average annual steel pricing for the year that the product is consumed in the customer's blast furnaces. The supplemental pricing is characterized as a freestanding derivative and is required to be accounted for separately once the product is shipped. The derivative instrument, which is finalized based on a future price, is marked to fair value as a revenue adjustment each reporting period until the pellets are consumed and the amounts are settled. The fair value of the instrument is determined using a market approach based on an estimate of the annual realized price of hot rolled steel at the steelmaker's facilities, and takes into consideration current market conditions and nonperformance risk. At December 31, 2014, we had a derivative asset of $63.2 million, representing the fair value of the pricing factors, based upon the amount of unconsumed tons and an estimated average hot band steel price related to the period in which the tons are expected to be consumed in the customer's blast furnace at each respective steelmaking facility, subject to final pricing at a future date. This compares with a derivative asset of $55.8 million as of December 31, 2013, based upon the amount of unconsumed tons and the related estimated average hot band steel price.

94

The customer's average annual price is not known at the time of sale and the actual price is received on a delayed basis at the end of the year, once the average annual price has been finalized. As a result, we estimate the average price and adjust the estimate to actual in the fourth quarter when the information is provided by the customer at the end of each year. Information used in developing the estimate includes such factors as production and pricing information from the customer, current spot prices, third-party analyst forecasts, publications and other industry information. The accuracy of our estimates typically increases as the year progresses based on additional information in the market becoming available and the customer's ability to more accurately determine the average price it will realize for the year. The following represents the historical accuracy of our pricing estimates related to the derivative as well as the impact on revenue resulting from the difference between the estimated price and the actual price for each quarter during 2014, 2013 and 2012 prior to receiving final information from the customer for tons consumed during each year:

| | 2014 | | | 2013 | | | 2012 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Final Price | Estimated Price | Impact on Revenue (in millions) | Final Price | Estimated Price | Impact on Revenue (in millions) | Final Price | Estimated Price | Impact on Revenue (in millions) |
| First Quarter | $651 | $645 | $1.5 | $622 | $630 | ($1.2) | $650 | $698 | ($9.8) |
| Second Quarter | 651 | 650 | 2.7 | 622 | 614 | 3.0 | 650 | 678 | (7.9) |
| Third Quarter | 651 | 653 | (3.4) | 622 | 633 | (2.1) | 650 | 663 | (3.3) |
| Fourth Quarter | 651 | 651 | — | 622 | 622 | — | 650 | 650 | — |

As an example, we estimate that a $75 change in the average hot band steel price realized from the December 31, 2014 estimated price recorded for the unconsumed tons remaining at year end would cause the fair value of the derivative instrument to increase or decrease by approximately $8.8 million, thereby impacting our consolidated revenues by the same amount.

### Mineral Reserves

We regularly evaluate our economic mineral reserves and update them as required in accordance with SEC Industry Guide 7. The estimated mineral reserves could be affected by future industry conditions, geological conditions and ongoing mine planning. Maintenance of effective production capacity of the mineral reserve could require increases in capital and development expenditures. Generally, as mining operations progress, haul lengths and lifts increase. Alternatively, changes in economic conditions or the expected quality of mineral reserves could decrease capacity or mineral reserves. Technological progress could alleviate such factors or increase capacity of mineral reserves.

We use our mineral reserve estimates, combined with our estimated annual production levels, to determine the mine closure dates utilized in recording the fair value liability for asset retirement obligations. Refer to NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS , for further information. Since the liability represents the present value of the expected future obligation, a significant change in mineral reserves or mine lives would have a substantial effect on the recorded obligation. We also utilize economic mineral reserves for evaluating potential impairments of mine assets and in determining maximum useful lives utilized to calculate depreciation and amortization of long-lived mine assets. Increases or decreases in mineral reserves or mine lives could significantly affect these items.

### Asset Retirement Obligations and Environmental Remediation Costs

The accrued mine closure obligations for our active mining operations provide for contractual and legal obligations associated with the eventual closure of the mining operations. Our obligations are determined based on detailed estimates adjusted for factors that a market participant would consider (i.e., inflation, overhead and profit), which are escalated at an assumed rate of inflation to the estimated closure dates, and then discounted using the current credit-adjusted risk-free interest rate. The estimate also incorporates incremental increases in the closure cost estimates and changes in estimates of mine lives. The closure date for each location is determined based on the exhaustion date of the remaining iron ore reserves, which is dependent on our estimate of the economically recoverable mineral reserves. The estimated obligations are particularly sensitive to the impact of changes in mine lives given the difference between the inflation and discount rates. Changes in the base estimates of legal and contractual closure costs due to changes in legal or contractual requirements, available technology, inflation, overhead or profit rates also would have a significant impact on the recorded obligations.

95

A004262

We have a formal policy for environmental protection and restoration. Our obligations for known environmental matters at active and closed mining operations and other sites have been recognized based on estimates of the cost of investigation and remediation at each site. If the obligation can only be estimated as a range of possible amounts, with no specific amount being more likely, the minimum of the range is accrued. Management reviews its environmental remediation sites quarterly to determine if additional cost adjustments or disclosures are required. The characteristics of environmental remediation obligations, where information concerning the nature and extent of clean-up activities is not immediately available and which are subject to changes in regulatory requirements, result in a significant risk of increase to the obligations as they mature. Expected future expenditures are not discounted to present value unless the amount and timing of the cash disbursements can be reasonably estimated. Potential insurance recoveries are not recognized until realized. Refer to NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS, for further information.

### *Income Taxes*

Our income tax expense, deferred tax assets and liabilities and reserves for unrecognized tax benefits reflect management's best assessment of estimated future taxes to be paid. We are subject to income taxes in both the U.S. and numerous foreign jurisdictions. Significant judgments and estimates are required in determining the consolidated income tax expense.

Deferred income taxes arise from temporary differences between tax and financial statement recognition of revenue and expense. In evaluating our ability to recover our deferred tax assets, we consider all available positive and negative evidence, including scheduled reversals of deferred tax liabilities, projected future taxable income, tax planning strategies and recent financial operations. In projecting future taxable income, we begin with historical results adjusted for the results of discontinued operations and changes in accounting policies and incorporate assumptions including the amount of future state, federal and foreign pretax operating income, the reversal of temporary differences, and the implementation of feasible and prudent tax planning strategies. These assumptions require significant judgment about the forecasts of future taxable income and are consistent with the plans and estimates we are using to manage the underlying businesses. In evaluating the objective evidence that historical results provide, we consider three years of cumulative operating income (loss).

At December 31, 2014 and 2013, we had a valuation allowance of $ 2,224.5 million and $864.1 million, respectively, against our deferred tax assets. Our losses in certain locations in recent periods represented sufficient negative evidence to require a full valuation allowance against certain deferred tax assets. Additionally, significant Alternative Minimum Tax credits have been generated in recent years. Sufficient negative evidence suggests that the credits will not be realized in the foreseeable future, and a full valuation allowance has been recorded on the deferred tax asset. We intend to maintain a valuation allowance against the deferred tax assets related to these operating losses, credits and allowances until sufficient positive evidence exists to support the realization of such assets.

Changes in tax laws and rates also could affect recorded deferred tax assets and liabilities in the future. Management is not aware of any such changes that would have a material effect on the Company's results of operations, cash flows or financial position.

The calculation of our tax liabilities involves dealing with uncertainties in the application of complex tax laws and regulations in a multitude of jurisdictions across our global operations.

Accounting for uncertainty in income taxes recognized in the financial statements requires that a tax benefit from an uncertain tax position be recognized when it is more likely than not that the position will be sustained upon examination, including resolutions of any related appeals or litigation processes, based on technical merits.

We recognize tax liabilities in accordance with ASC 740, and we adjust these liabilities when our judgment changes as a result of evaluation of new information not previously available. Due to the complexity of some of these uncertainties, the ultimate resolution may result in payment that is materially different from our current estimate of the tax liabilities. These differences will be reflected as increases or decreases to income tax expense in the period in which they are determined.

### *Valuation of Goodwill*

Goodwill represents the excess purchase price paid over the fair value of the net assets of acquired companies. We assign goodwill arising from acquired companies to the reporting units that are expected to benefit from the synergies of the acquisition. Our reporting units are either at the operating segment level or a component one level below our operating segments that constitutes a business for which management generally reviews production and financial results

96

of that component. Decisions are often made as to capital expenditures, investments and production plans at the component level as part of the ongoing management of the related operating segment. We have determined that our Asia Pacific Iron Ore and Ferroalloys operating segments constitute separate reporting units, that CQIM and our Wabush mine within our Eastern Canadian Iron Ore operating segment constitute reporting units, and that our Northshore mine within our U.S. Iron Ore operating segment constitutes a reporting unit. Goodwill is allocated among and evaluated for impairment at the reporting unit level in the fourth quarter of each year or as circumstances occur that potentially indicate that the carrying amount of these assets may not be recoverable.

We use a two-step process to test goodwill for impairment. In the first step, we generally use a discounted cash flow analysis to determine the fair value of each reporting unit, which considers forecasted cash flows discounted at an estimated weighted average cost of capital. In assessing the valuation of our goodwill, significant assumptions regarding the estimated future cash flows and other factors to determine the fair value of a reporting unit must be made, including among other things, estimates related to long-term price expectations, foreign currency exchange rates, expected capital expenditures and working capital requirements, which are based upon our long-range plan and life of mine estimates. If the discounted cash flow analysis yields a fair value estimate less than the reporting unit's carrying value, we would proceed to step two of the impairment test. In the second step, the implied fair value of the reporting unit's goodwill is determined by allocating the reporting unit's fair value to the assets and liabilities other than goodwill in a manner similar to a purchase price allocation. In performing this allocation of fair value to the assets and liabilities of the reporting unit, we typically utilize third-party valuation firms to support the fair values allocated. The resulting implied fair value of the goodwill that results from the application of this second step is then compared to the carrying amount of the goodwill and, if the carrying amount exceeds the implied fair value, an impairment charge is recorded for the difference. If these estimates were to change in the future as a result of changes in strategy or market conditions, we may be required to record impairment charges for these assets in the period such determination was made.

During the third quarter of 2014, a goodwill impairment charge of $73.5 million was recorded for our Asia Pacific Iron Ore operating segment. The impairment charge was primarily a result of changes in estimates of long-term price forecasts were updated as part of management's long-range planning process.

During the fourth quarter of 2013, a goodwill impairment charge of $80.9 million was recorded for our Cliffs Chromite Ontario and Cliffs Chromite Far North reporting units within our Ferroalloys operating segment. The impairment charge was primarily a result of the decision to indefinitely suspend the Chromite Project and to not allocate significant additional capital for the project given the uncertain timeline and risks associated with the development of necessary infrastructure to bring the project online.

After performing our annual goodwill impairment test in the fourth quarter of 2012, we determined that $997.3 million and $2.7 million, respectively, of goodwill associated with our CQIM and Wabush reporting units, which are both included in the Eastern Canadian Iron Ore segment, was impaired as the carrying value of these reporting units exceeded their fair value.

As of December 31, 2014, our remaining value of goodwill is associated with our U.S. Iron Ore segment. The fair value of our Northshore reporting unit was substantially in excess of our carrying values as identified during our annual goodwill impairment test. The value of goodwill at our Northshore reporting unit totals $2.0 million. No other goodwill remains as of December 31, 2014.

Refer to NOTE 1 - BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES , for further information regarding our policy on goodwill impairment.

### Valuation of Long-Lived Assets

In assessing the recoverability of our long-lived assets, significant assumptions regarding the estimated future cash flows and other factors to determine the fair value of the respective assets must be made, as well as the related estimated useful lives. If these estimates or their related assumptions change in the future as a result of changes in strategy or market conditions, we may be required to record impairment charges for these assets in the period such determination was made.

We monitor conditions that indicate that the carrying value of an asset or asset group may be impaired. In order to determine if assets have been impaired, assets are grouped and tested at the lowest level for which identifiable, independent cash flows are available. An impairment loss exists when projected undiscounted cash flows are less than the carrying value of the assets. The measurement of the impairment loss to be recognized is based on the difference between the fair value and the carrying value of the assets. Fair value can be determined using a market approach, income approach or cost approach. The impairment analysis and fair value determination can result in substantially

97

different outcomes based on critical assumptions and estimates including the quantity and quality of remaining economic ore reserves, future iron ore prices and production costs.

During the third and fourth quarter of 2014, we identified factors that indicate the carrying values of various asset groups may not be recoverable. Primary factors include that estimates of long-term price forecasts were updated as part of management's long-range planning process. Updated estimates of long-term prices for all products, specifically the Platts 62 percent Fe fines spot price, which particularly effects Eastern Canadian Iron Ore and Asia Pacific Iron Ore business segments because their contracts correlate heavily to world market spot pricing, and the benchmark price for premium low-volatile hard coking coal were lower than prior estimates. These estimates were updated based upon current market conditions, macro-economic factors influencing the balance of supply and demand for our products and expectations for future cost and capital expenditure requirements. Additional factors include a new CEO, Lourenco Goncalves, appointed by the Board of Directors in early August 2014 and subsequently identified as the CODM in accordance with ASC 280, *Segment Reporting*. The new CODM views Eastern Canadian Iron Ore, Asia Pacific Iron Ore, North American Coal and Ferroalloys as non-core assets and has communicated plans to evaluate the business units for a change in strategy including possible divestiture. These factors, among other considerations utilized in the individual impairment assessments, indicate that the carrying value of the respective asset groups, which resulted in an impairment of other long-lived assets of $8,956.4 million for the year ended December 31, 2014.

During the fourth quarter of 2013, we continued to experience higher than expected production costs and operational inefficiencies at our Wabush operations within our Eastern Canadian Iron Ore operating segment that have resulted in continued declines in our profitability of that business, which represents an asset group for purposes of testing our long-lived assets for recoverability. Upon completion of an impairment analysis, it was determined the fair value was less than the carrying value of the asset group, which resulted in an impairment of other long-lived assets of $154.6 million at December 31, 2013.

Due to lower than previously expected profits as a result of decreased iron ore pricing expectations and higher than anticipated production costs, we determined that indicators of impairment with respect to certain of our long-lived assets groups existed at December 31, 2012. Our asset groups generally consist of the assets and liabilities of one or more mines, preparation plants and associated reserves for which the lowest level of identifiable cash flows largely are independent of cash flows of other mines, preparation plants and associated reserves. As a result of this assessment, we determined that the cash flows associated with our Eastern Canadian pelletizing operations were not sufficient to support the recoverability of the carrying value of these productive assets. Accordingly, an asset impairment charge of $49.9 million was recorded related to the Wabush mine property, plant and equipment that were reported in our Eastern Canadian Iron Ore operating segment during the fourth quarter of 2012. No impairment charges were identified in connection with our other long-lived asset groups as of December 31, 2012.

Refer to NOTE 1 - BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES , NOTE 4 - PROPERTY, PLANT AND EQUIPMENT and NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS  for further information regarding our policy on asset impairment, detail on our remaining PP&E and mineral rights and non-recurring fair value measurements.

### Employee Retirement Benefit Obligations

We offer defined benefit pension plans, defined contribution pension plans and other postretirement benefit plans, primarily consisting of retiree healthcare benefits, to most employees in North America as part of a total compensation and benefits program. We do not have employee retirement benefit obligations at our Asia Pacific Iron Ore operations. The defined benefit pension plans largely are noncontributory and benefits generally are based on employees' years of service and average earnings for a defined period prior to retirement or a minimum formula.

98

A004265

Following is a summary of our defined benefit pension and OPEB funding and expense for the years 2012 through 2015:

|  | Pension | | OPEB | |
|---|---|---|---|---|
|  | Funding | Expense | Funding | Expense |
| 2012 | $ 67.7 | $ 55.2 | $ 39 | $ 28.1 |
| 2013 | 53.7 | 52.1 | 25.5 | 17.4 |
| **2014** | **60.5** | **31.3** | **7.3** | **(0.7)** |
| 2015 (Estimated) | 36.8 | 23.6 | 6.8 | 6.0 |

Assumptions used in determining the benefit obligations and the value of plan assets for defined benefit pension plans and postretirement benefit plans (primarily retiree healthcare benefits) that we offer are evaluated periodically by management. Critical assumptions, such as the discount rate used to measure the benefit obligations, the expected long-term rate of return on plan assets, the medical care cost trend, and the rate of compensation increase are reviewed annually.

As of December 31, 2014 and 2013, we used the following assumptions:

|  | Pension and Other Benefits | |
|---|---|---|
|  | **2014** | 2013 |
| U.S. plan discount rate | **3.83 %** | 4.57 % |
| Canadian pension plan discount rate | **3.75** | 4.50 |
| Canadian OPEB plan discount rate | **3.75** | 4.75 |
| U.S. rate of compensation increase - Salaried | **3.00** | 4.00 |
| U.S. rate of compensation increase - Hourly | **2.50** | 3.00 |
| Canadian rate of compensation increase | **3.00** | 4.00 |
| U.S. pension plan expected return on plan assets | **8.25** | 8.25 |
| U.S. OPEB plan expected return on plan assets | **7.00** | 7.00 |
| Canadian expected return on plan assets | **7.25** | 7.25 |

The decrease in the discount rates in 2014 was driven by the change in bond yields, which were down approximately 80 basis points compared to the prior year.

Additionally, on December 31, 2014, we adopted the RP-2014 mortality tables projected generationally using scale MP-2014 with blue collar and white collar adjustments made for certain hourly and salaried groups, to determine the expected life of our plan participants, replacing the IRS 2014 prescribed mortality tables for our U.S. plans. For the Canadian plans, we adopted the 2014 Private Sector Canadian Pensioners' Mortality Table for the hourly plans and the 2014 Canadian Pensioners' Mortality Table for the salaried plans, where both tables were projected generationally using scale CPM-B, replacing the UP 1994 table with full projection.

99

Following are sensitivities of potential further changes in these key assumptions on the estimated 2015 pension and OPEB expense and the pension and OPEB benefit obligations as of December 31, 2014:

| | Increase in Expense (In Millions) | | Increase in Benefit Obligation (In Millions) | |
|---|---|---|---|---|
| | Pension | OPEB | Pension | OPEB |
| Decrease discount rate .25 percent | $ 2.3 | $ 0.7 | $ 35.3 | $ 13.6 |
| Decrease return on assets 1 percent | 9.2 | 2.6 | N/A | N/A |
| Increase medical trend rate 1 percent | N/A | 6.4 | N/A | 49.6 |

Changes in actuarial assumptions, including discount rates, employee retirement rates, mortality, compensation levels, plan asset investment performance and healthcare costs, are determined based on analyses of actual and expected factors. Changes in actuarial assumptions and/or investment performance of plan assets may have a significant impact on our financial condition due to the magnitude of our retirement obligations. Refer to NOTE 7 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS in *Item 8. Financial Statements and Supplementary Data* of this Annual Report on Form 10-K for further information.

**Forward-Looking Statements**

This report contains statements that constitute "forward-looking statements" within the meaning of the federal securities laws. As a general matter, forward-looking statements relate to anticipated trends and expectations rather than historical matters. Forward-looking statements are subject to uncertainties and factors relating to Cliffs' operations and business environment that are difficult to predict and may be beyond our control. Such uncertainties and factors may cause actual results to differ materially from those expressed or implied by the forward-looking statements. These statements speak only as of the date of this report, and we undertake no ongoing obligation, other than that imposed by law, to update these statements. Uncertainties and risk factors that could affect Cliffs' future performance and cause results to differ from the forward-looking statements in this report include, but are not limited to:

- our ability to successfully execute an exit option for Bloom Lake mine that minimizes the cash outflows and associated liabilities of our Canadian operations including the CCAA process;

- trends affecting our financial condition, results of operations or future prospects, particularly the continued volatility of iron ore and coal prices;

- our actual levels of capital spending;

- availability of capital and our ability to maintain adequate liquidity and successfully implement our financing plans;

- uncertainty or weaknesses in global economic conditions, including downward pressure on prices, reduced market demand and any slowing of the economic growth rate in China;

- our ability to successfully identify and consummate any strategic investments and complete planned divestitures;

- the outcome of any contractual disputes with our customers, joint venture partners or significant energy, material or service providers or any other litigation or arbitration;

- the ability of our customers and joint venture partners to meet their obligations to us on a timely basis or at all;

- our ability to reach agreement with our iron ore customers regarding any modifications to sales contract provisions;

- the impact of price-adjustment factors on our sales contracts;

- changes in sales volume or mix;

- our actual economic iron ore and coal reserves or reductions in current mineral estimates, including whether any mineralized material qualifies as a reserve;

- the impact of our customers using other methods to produce steel or reducing their steel production;

- events or circumstances that could impair or adversely impact the viability of a mine and the carrying value of associated assets, as well as any resulting impairment charges;

- the results of prefeasibility and feasibility studies in relation to projects;

- impacts of existing and increasing governmental regulation and related costs and liabilities, including failure to receive or maintain required operating and environmental permits, approvals, modifications or other authorization of, or from, any governmental or regulatory entity and costs related to implementing improvements to ensure compliance with regulatory changes;

100

A004267

- our ability to cost-effectively achieve planned production rates or levels;
- uncertainties associated with natural disasters, weather conditions, unanticipated geological conditions, supply or price of energy, equipment failures and other unexpected events;
- adverse changes in currency values, currency exchange rates, interest rates and tax laws;
- our ability to maintain appropriate relations with unions and employees and enter into or renew collective bargaining agreements on satisfactory terms;
- risks related to international operations;
- availability of capital equipment and component parts;
- the potential existence of significant deficiencies or material weakness in our internal control over financial reporting; and
- problems or uncertainties with productivity, tons mined, transportation, mine-closure obligations, environmental liabilities, employee-benefit costs and other risks of the mining industry.

For additional factors affecting the business of Cliffs, refer to *Part I – Item 1A. Risk Factors.* You are urged to carefully consider these risk factors.

**Item 7A.**        *Quantitative and Qualitative Disclosures About Market Risk*

Information regarding our Market Risk is presented under the caption *Market Risks*, which is included in *Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations* and is incorporated by reference and made a part hereof.

Table of Contents

**Item 8.**       *Financial Statements and Supplementary Data*

**Statements of Consolidated Financial Position**

Cliffs Natural Resources Inc. and Subsidiaries

| | | (In Millions) | |
|---|---|---|---|
| | | December 31, | |
| | | **2014** | 2013 |
| ASSETS | | | |
| CURRENT ASSETS | | | |
| Cash and cash equivalents | $ | **290.9** | $ 335.5 |
| Accounts receivable, net | | **205.6** | 270.0 |
| Inventories | | **326.7** | 391.4 |
| Supplies and other inventories | | **195.2** | 216.0 |
| Income tax receivable | | **237.7** | 74.1 |
| Other current assets | | **192.8** | 273.0 |
| TOTAL CURRENT ASSETS | | **1,448.9** | 1,560.0 |
| PROPERTY, PLANT AND EQUIPMENT, NET | | **1,414.9** | 11,153.4 |
| OTHER ASSETS | | | |
| Deferred income taxes | | **156.4** | 41.5 |
| Other non-current assets | | **143.8** | 367.0 |
| TOTAL OTHER ASSETS | | **300.2** | 408.5 |
| TOTAL ASSETS | $ | **3,164.0** | $ 13,121.9 |

(continued)

*The accompanying notes are an integral part of these  consolidated financial statements.*

102

**Statements of Consolidated Financial Position**

Cliffs Natural Resources Inc. and Subsidiaries - (Continued)

| | (In Millions) | |
|---|---|---|
| | December 31, | |
| | **2014** | 2013 |
| LIABILITIES | | |
| CURRENT LIABILITIES | | |
| Accounts payable | $ **272.1** | $ 345.5 |
| Accrued employment costs | **99.5** | 129.0 |
| Income taxes payable | **1.0** | 55.6 |
| State and local taxes payable | **52.5** | 61.7 |
| Current portion of debt | **21.8** | 20.9 |
| Accrued expenses | **255.3** | 206.4 |
| Accrued royalties | **31.2** | 57.3 |
| Current portion of capital leases | **74.5** | 49.0 |
| Other current liabilities | **150.7** | 160.1 |
| TOTAL CURRENT LIABILITIES | **958.6** | 1,085.5 |
| POSTEMPLOYMENT BENEFIT LIABILITIES | | |
| Pensions | **275.4** | 197.5 |
| Other postretirement benefits | **119.8** | 96.5 |
| TOTAL POSTEMPLOYMENT BENEFIT LIABILITIES | **395.2** | 294.0 |
| ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS | **256.0** | 309.7 |
| DEFERRED INCOME TAXES | **51.3** | 1,146.5 |
| LONG-TERM DEBT | **2,962.3** | 3,022.6 |
| OTHER LIABILITIES | **274.9** | 379.3 |
| TOTAL LIABILITIES | **4,898.3** | 6,237.6 |
| COMMITMENTS AND CONTINGENCIES (SEE NOTE 20) | | |
| EQUITY | | |
| CLIFFS SHAREHOLDERS' EQUITY | | |
| Preferred Stock - no par value | | |
| Class A - 3,000,000 shares authorized | | |
| 7% Series A Mandatory Convertible, Class A, no par value and $1,000 per share liquidation preference (See Note 15) | | |
| Issued and Outstanding - 731,223 shares (2013 - 731,250) | **731.3** | 731.3 |
| Class B - 4,000,000 shares authorized | | |
| Common Shares - par value $0.125 per share | | |
| Authorized - 400,000,000 shares (2013 - 400,000,000 shares); | | |
| Issued - 159,546,224 shares (2013 - 159,546,224 shares); | | |
| Outstanding - 153,246,754 shares (2013 - 153,126,291 shares) | **19.8** | 19.8 |
| Capital in excess of par value of shares | **2,309.8** | 2,329.5 |
| Retained earnings (Accumulated deficit) | **(3,960.7)** | 3,407.3 |
| Cost of 6,299,470 common shares in treasury (2013 - 6,419,933 shares) | **(285.7)** | (305.5) |
| Accumulated other comprehensive loss | **(245.8)** | (112.9) |
| TOTAL CLIFFS SHAREHOLDERS' EQUITY (DEFICIT) | **(1,431.3)** | 6,069.5 |
| NONCONTROLLING INTEREST (DEFICIT) | **(303.0)** | 814.8 |
| TOTAL EQUITY (DEFICIT) | **(1,734.3)** | 6,884.3 |
| TOTAL LIABILITIES AND EQUITY (DEFICIT) | $ **3,164.0** | $ 13,121.9 |

*The accompanying notes are an integral part of these consolidated financial statements.*

A004270

Table of Contents

**Statements of Consolidated Operations**

Cliffs Natural Resources Inc. and Subsidiaries

| | (In Millions, Except Per Share Amounts) | | |
|---|---|---|---|
| | Year Ended December 31, | | |
| | **2014** | 2013 | 2012 |
| REVENUES FROM PRODUCT SALES AND SERVICES | | | |
| Product | $ **4,230.8** | $ 5,346.6 | $ 5,520.9 |
| Freight and venture partners' cost reimbursements | **392.9** | 344.8 | 351.8 |
| | **4,623.7** | 5,691.4 | 5,872.7 |
| COST OF GOODS SOLD AND OPERATING EXPENSES | **(4,172.3)** | (4,542.1) | (4,700.6) |
| SALES MARGIN | **451.4** | 1,149.3 | 1,172.1 |
| OTHER OPERATING INCOME (EXPENSE) | | | |
| Selling, general and administrative expenses | **(208.7)** | (231.6) | (282.5) |
| Exploration costs | **(8.8)** | (59.0) | (142.8) |
| Impairment of goodwill and other long-lived assets | **(9,029.9)** | (250.8) | (1,049.9) |
| Gain (loss) on disposal of other assets | **(423.0)** | 16.7 | 1.2 |
| Miscellaneous - net | **(226.3)** | 46.4 | (6.9) |
| | **(9,896.7)** | (478.3) | (1,480.9) |
| OPERATING INCOME (LOSS) | **(9,445.3)** | 671.0 | (308.8) |
| OTHER INCOME (EXPENSE) | | | |
| Interest expense, net | **(185.2)** | (179.1) | (195.6) |
| Other non-operating income (expense) | **26.8** | (2.6) | 2.6 |
| | **(158.4)** | (181.7) | (193.0) |
| INCOME (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES AND EQUITY INCOME (LOSS) FROM VENTURES | **(9,603.7)** | 489.3 | (501.8) |
| INCOME TAX BENEFIT (EXPENSE) | **1,302.0** | (55.1) | (255.9) |
| EQUITY LOSS FROM VENTURES, net of tax | **(9.9)** | (74.4) | (404.8) |
| INCOME (LOSS) FROM CONTINUING OPERATIONS | **(8,311.6)** | 359.8 | (1,162.5) |
| INCOME and GAIN ON SALE FROM DISCONTINUED OPERATIONS, net of tax | **—** | 2.0 | 35.9 |
| NET INCOME (LOSS) | **(8,311.6)** | 361.8 | (1,126.6) |
| LOSS ATTRIBUTABLE TO NONCONTROLLING INTEREST | **1,087.4** | 51.7 | 227.2 |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | $ **(7,224.2)** | $ 413.5 | $ (899.4) |
| PREFERRED STOCK DIVIDENDS | **(51.2)** | (48.7) | — |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS COMMON SHAREHOLDERS | $ **(7,275.4)** | $ 364.8 | $ (899.4) |
| | | | |
| EARNINGS (LOSS) PER COMMON SHARE ATTRIBUTABLE TO CLIFFS SHAREHOLDERS - BASIC | | | |
| Continuing operations | $ **(47.52)** | $ 2.39 | $ (6.57) |
| Discontinued operations | **—** | 0.01 | 0.25 |
| | $ **(47.52)** | $ 2.40 | $ (6.32) |
| EARNINGS (LOSS) PER COMMON SHARE ATTRIBUTABLE TO CLIFFS SHAREHOLDERS - DILUTED | | | |
| Continuing operations | $ **(47.52)** | $ 2.36 | $ (6.57) |
| Discontinued operations | **—** | 0.01 | 0.25 |
| | $ **(47.52)** | $ 2.37 | $ (6.32) |
| AVERAGE NUMBER OF SHARES (IN THOUSANDS) | | | |
| Basic | **153,098** | 151,726 | 142,351 |
| Diluted | **153,098** | 174,323 | 142,351 |

*The accompanying notes are an integral part of these consolidated financial statements.*

A004271

Table of Contents

**Statements of Consolidated Comprehensive Income (Loss)**

Cliffs Natural Resources Inc. and Subsidiaries

| | (In Millions) | | |
|---|---|---|---|
| | **Year Ended December 31,** | | |
| | **2014** | 2013 | 2012 |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | **$ (7,224.2)** | $ 413.5 | $ (899.4) |
| OTHER COMPREHENSIVE INCOME (LOSS) | | | |
| Pension and OPEB liability, net of tax | **(91.0)** | 208.3 | 33.8 |
| Unrealized net gain (loss) on marketable securities, net of tax | **(7.2)** | 3.1 | (0.5) |
| Unrealized net gain (loss) on foreign currency translation | **(42.3)** | (208.6) | 3.8 |
| Unrealized net gain (loss) on derivative financial instruments, net of tax | **2.8** | (29.6) | 7.5 |
| OTHER COMPREHENSIVE INCOME (LOSS) | **(137.7)** | (26.8) | 44.6 |
| OTHER COMPREHENSIVE LOSS (INCOME) ATTRIBUTABLE TO THE NONCONTROLLING INTEREST | **4.8** | (30.5) | (7.6) |
| TOTAL COMPREHENSIVE INCOME (LOSS) ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | **$ (7,357.1)** | $ 356.2 | $ (862.4) |

*The accompanying notes are an integral part of these  consolidated financial statements.*

105

Table of Contents

**Statements of Consolidated Cash Flows**

Cliffs Natural Resources Inc. and Subsidiaries

| | (In Millions) | | |
|---|---|---|---|
| | **Year Ended December 31,** | | |
| | **2014** | 2013 | 2012 |
| OPERATING ACTIVITIES | | | |
| Net income (loss) | $ **(8,311.6)** | $ 361.8 | $ (1,126.6) |
| Adjustments to reconcile net income (loss) to net cash provided (used) by operating activities: | | | |
| Depreciation, depletion and amortization | **504.0** | 593.3 | 525.8 |
| Impairment of goodwill and other long-lived assets | **9,029.9** | 250.8 | 1,049.9 |
| Equity loss in ventures (net of tax) | **9.9** | 74.4 | 404.8 |
| Deferred income taxes | **(1,153.9)** | (138.1) | 127.0 |
| Changes in deferred revenue and below-market sales contracts | **(18.0)** | (52.8) | (24.5) |
| Loss on sale of Cliffs Logan County Coal | **419.6** | — | — |
| Other | **(37.7)** | (3.3) | (40.9) |
| Changes in operating assets and liabilities: | | | |
| Receivables and other assets | **(82.8)** | 138.8 | (74.8) |
| Product inventories | **37.8** | 30.8 | 39.9 |
| Payables and accrued expenses | **(38.3)** | (109.8) | (366.1) |
| Net cash provided by operating activities | **358.9** | 1,145.9 | 514.5 |
| INVESTING ACTIVITIES | | | |
| Purchase of property, plant and equipment | **(284.1)** | (861.6) | (1,127.5) |
| Proceeds from sale of Cliffs Logan County Coal | **155.0** | — | — |
| Proceeds from sale of Sonoma | **—** | — | 152.6 |
| Other investing activities | **25.5** | 50.3 | 13.1 |
| Net cash used in investing activities | **(103.6)** | (811.3) | (961.8) |
| FINANCING ACTIVITIES | | | |
| Net proceeds from issuance of Series A, Mandatory Convertible Preferred Stock, Class A | **—** | 709.4 | — |
| Net proceeds from issuance of common shares | **—** | 285.3 | — |
| Net proceeds from issuance of senior notes | **—** | — | 497.0 |
| Repayment of term loan | **—** | (847.1) | (124.8) |
| Borrowings under credit facilities | **1,219.5** | 670.5 | 1,012.0 |
| Repayment under credit facilities | **(1,219.5)** | (995.5) | (687.0) |
| Proceeds from equipment loans | **—** | 164.8 | — |
| Repayments of equipment loans | **(20.9)** | (3.0) | — |
| Repayment of senior notes | **—** | — | (325.0) |
| Repurchase of debt | **(28.8)** | | |
| Contributions (to)/by joint ventures, net | **(25.7)** | 23.3 | 95.4 |
| Common stock dividends | **(92.5)** | (91.9) | (307.2) |
| Preferred stock dividends | **(51.2)** | (35.7) | — |
| Other financing activities | **(69.2)** | (52.0) | (40.8) |
| Net cash (used in) provided by financing activities | **(288.3)** | (171.9) | 119.6 |
| EFFECT OF EXCHANGE RATE CHANGES ON CASH | **(11.6)** | (22.4) | 1.3 |
| INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | **(44.6)** | 140.3 | (326.4) |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF PERIOD | **335.5** | 195.2 | 521.6 |
| CASH AND CASH EQUIVALENTS AT END OF PERIOD | $ **290.9** | $ 335.5 | $ 195.2 |

*The accompanying notes are an integral part of these consolidated financial statements.*
*See NOTE 17 - CASH FLOW INFORMATION.*

106

Table of Contents

**Statements of Consolidated Changes in Equity**

Cliffs Natural Resources Inc. and Subsidiaries

(In Millions)

| | | | | | Cliffs Shareholders | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Number of Depositary Shares | Depositary Shares | Number of Common Shares | Common Shares | Capital in Excess of Par Value of Shares | Retained Earnings | Common Shares in Treasury | Accumulated Other Comprehensive Income (Loss) | Non-Controlling Interest | Total |
| January 1, 2012 | — | $ — | 142.0 | $ 18.5 | $ 1,770.8 | $ 4,424.3 | $ (336.0) | $ (92.6) | $ 1,254.7 | $ 7,039.7 |
| Comprehensive income | | | | | | | | | | |
| Net income | — | — | — | — | — | (899.4) | — | — | (227.2) | (1,126.6) |
| Other comprehensive income (loss) | — | — | — | — | — | — | — | 37.0 | 7.6 | 44.6 |
| Total comprehensive income (loss) | | | | | | | | | (219.6) | (1,082.0) |
| Purchase of subsidiary shares from noncontrolling interest | — | — | — | — | — | — | — | — | (2.1) | (2.1) |
| Undistributed losses to noncontrolling interest | — | — | — | — | — | — | — | — | 0.4 | 0.4 |
| Capital contribution by noncontrolling interest to subsidiary | — | — | — | — | 1.6 | — | — | — | 102.8 | 104.4 |
| Acquisition of controlling interest | — | — | — | — | — | — | — | — | (8.0) | (8.0) |
| Stock and other incentive plans | — | — | 0.5 | — | 2.3 | — | 13.4 | — | — | 15.7 |
| Common stock dividends ($2.16 per share) | — | — | — | — | — | (307.2) | — | — | — | (307.2) |
| December 31, 2012 | — | $ — | 142.5 | $ 18.5 | $ 1,774.7 | $ 3,217.7 | $ (322.6) | $ (55.6) | $ 1,128.2 | $ 5,760.9 |
| Comprehensive income | | | | | | | | | | |
| Net income | — | — | — | — | — | 413.5 | — | — | (51.7) | 361.8 |
| Other comprehensive income (loss) | — | — | — | — | — | — | — | (57.3) | 30.5 | (26.8) |
| Total comprehensive income (loss) | | | | | | | | | (21.2) | 335.0 |
| Equity offering | — | — | 10.4 | 1.3 | 284.0 | — | — | — | — | 285.3 |
| Capital contribution by noncontrolling interest to subsidiary | — | — | — | — | 0.2 | (0.6) | — | — | 5.6 | 5.2 |
| Acquisition of controlling interest | — | — | — | — | 295.4 | (82.7) | — | — | (314.8) | (102.1) |
| Undistributed losses to noncontrolling interest | — | — | — | — | — | — | — | — | 17.0 | 17.0 |
| Stock and other incentive plans | — | — | 0.3 | — | (2.9) | — | 17.1 | — | — | 14.2 |
| Depositary Shares | 29.3 | 731.3 | — | — | (21.9) | — | — | — | — | 709.4 |
| Common stock dividends ($0.60 per share) | — | — | — | — | — | (91.9) | — | — | — | (91.9) |
| Preferred stock dividends ($1.66 per depositary share) | — | — | — | — | — | (48.7) | — | — | — | (48.7) |
| December 31, 2013 | 29.3 | $ 731.3 | 153.2 | $ 19.8 | $ 2,329.5 | $ 3,407.3 | $ (305.5) | $ (112.9) | $ 814.8 | $ 6,884.3 |
| Comprehensive income | | | | | | | | | | |
| Net income | — | — | — | — | — | (7,224.2) | — | — | (1,087.4) | (8,311.6) |
| Other comprehensive income (loss) | — | — | — | — | — | — | — | (132.9) | (4.8) | (137.7) |
| Total comprehensive income (loss) | | | | | | | | | (1,092.2) | (8,449.3) |
| Capital contribution to noncontrolling interest to subsidiary | — | — | — | — | — | — | — | — | (0.1) | (0.1) |
| Distributions to noncontrolling interest | — | — | — | — | — | — | — | — | (25.5) | (25.5) |
| Stock and other incentive plans | — | — | — | — | (19.7) | — | 19.8 | — | — | 0.1 |
| Common stock dividends ($0.60 per share) | — | — | — | — | — | (92.5) | — | — | — | (92.5) |
| Preferred stock dividends ($1.75 per depositary share) | — | — | — | — | — | (51.3) | — | — | — | (51.3) |
| December 31, 2014 | 29.3 | $ 731.3 | 153.2 | $ 19.8 | $ 2,309.8 | $ (3,960.7) | $ (285.7) | $ (245.8) | $ (303.0) | $ (1,734.3) |

*The accompanying notes are an integral part of these consolidated financial statements.*

107

Table of Contents

**Cliffs Natural Resources Inc. and Subsidiaries**

Notes to Consolidated Financial Statements

**NOTE 1 - BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES**

**Business Summary**

We are an international mining and natural resources company, a major global iron ore producer and a producer of low-volatile metallurgical coal. In the U.S., we operate five iron ore mines in Michigan and Minnesota, and  two low-volatile metallurgical coal operations located in Alabama and West Virginia.  In the fourth quarter of 2014, we sold our CLCC assets, which consisted of two high-volatile metallurgical coal mines and one thermal coal mine. The sale was completed on December 31, 2014. As such, our results include the CLCC results through the day of the sale completion. As of December 31, 2014, our Asia Pacific operations consist solely of our Koolyanobbing iron ore mining complex in Western Australia. We also own two iron ore mines in Eastern Canada. In the first quarter of 2014, Wabush Scully mine in Newfoundland and Labrador was idled and subsequently moved to permanent closure during the fourth quarter. In December 2014, iron ore production at the Bloom Lake mine was suspended and the Bloom Lake mine was placed in ''care-and-maintenance'' mode. Our operations are organized according to product category and geographic location: U.S. Iron Ore, Asia Pacific Iron Ore, North American Coal and Eastern Canadian Iron Ore.

**Significant Accounting Policies**

We consider the following policies to be beneficial in understanding the judgments that are involved in the preparation of our consolidated financial statements and the uncertainties that could impact our financial condition, results of operations and cash flows.

*Use of Estimates*

The preparation of financial statements, in conformity with GAAP, requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The more significant areas requiring the use of management estimates and assumptions related to mineral reserves future realizable cash flow; environmental, reclamation and closure obligations; valuation of long-lived assets and investments; valuation of inventory; valuation of post-employment, post-retirement and other employee benefit liabilities; valuation of tax assets; reserves for contingencies and litigation; and the fair value of derivative instruments. Actual results could differ from estimates. On an ongoing basis, management reviews estimates. Changes in facts and circumstances may alter such estimates and affect results of operations and financial position in future periods.

108

### Basis of Consolidation

The consolidated financial statements include our accounts and the accounts of our wholly owned and majority-owned subsidiaries, including the following operations at December 31, 2014:

| Name | Location | Ownership Interest | Operation | Status of Operations |
|------|----------|-------------------|-----------|---------------------|
| Northshore | Minnesota | 100.0% | Iron Ore | Active |
| United Taconite | Minnesota | 100.0% | Iron Ore | Active |
| Tilden | Michigan | 85.0% | Iron Ore | Active |
| Empire | Michigan | 79.0% | Iron Ore | Active |
| Koolyanobbing | Western Australia | 100.0% | Iron Ore | Active |
| Pinnacle | West Virginia | 100.0% | Coal | Active |
| Oak Grove | Alabama | 100.0% | Coal | Active |
| CLCC | West Virginia | 100.0% | Coal | Assets sold as of December 31, 2014 |
| Wabush | Newfoundland and Labrador/ Québec, Canada | 100.0% | Iron Ore | Permanent closure |
| Bloom Lake | Québec, Canada | 82.8% | Iron Ore | Care-and-maintenance |
| Cliffs Chromite Ontario - Black Label Deposit | Ontario, Canada | 100.0% | Chromite | Suspended |
| Cliffs Chromite Ontario - Black Thor Deposit | Ontario, Canada | 100.0% | Chromite | Suspended |
| Cliffs Chromite Ontario & Cliffs Chromite Far North - Big Daddy Deposit | Ontario, Canada | 70.0% | Chromite | Suspended |

Intercompany transactions and balances are eliminated upon consolidation.

### Noncontrolling Interests

During the fourth quarter of 2013, CQIM's interest in Bloom Lake increased by an aggregate of 7.8 percent after CQIM paid both its own and WISCO's proportionate shares of the cash call for the first half of 2013. As a result of our cash call payments, CQIM was issued a total of 457,556 new Bloom Lake units, increasing our interest to 82.8 percent in Bloom Lake and diluting WISCO's interest to 17.2 percent. The new unit issuance decreased equity attributable to WISCO by $314.8 million for the year ended December 31, 2013 by decreasing WISCO's interest in Bloom Lake's accumulated deficit. We accounted for the increase in ownership as an equity transaction, which resulted in a $314.8 million increase to equity attributable to Cliffs' shareholders.

### Immaterial Error

In connection with our acquisition of Consolidated Thompson in May 2011, the Company acquired a 75 percent controlling interest in Bloom Lake. For financial reporting purposes, the Company fully consolidates Bloom Lake in the accompanying financial statements and allocates a portion of its consolidated results of operations and shareholders' equity, which is reported as *Loss attributable to noncontrolling interest* in the Statements of Consolidated Operations and *Noncontrolling interest* in the Statements of Consolidated Financial Position.

As a result of the application of ASC 805, *Business Combinations*, we allocated the purchase price to the assets, liabilities and noncontrolling interest at the acquisition date of May 11, 2011 based on their fair values. These fair value adjustments were recorded in the opening balance sheet and consolidated results of operations; however, subsequent effects of the amortization of these fair value adjustments were not allocated to the noncontrolling interest.

In accordance with U.S. GAAP, management has quantitatively and qualitatively evaluated the materiality of the error and has determined that the misstatement was immaterial to the interim and annual financial statements previously filed from June 30, 2011 through December 31, 2013. Accordingly, the adjustment was recorded prospectively in the Statements of Consolidated Operations for the period ended December 31, 2013 and in the Statements of Consolidated Financial Position as of December 31, 2013. The adjustment to noncontrolling interest related to Bloom Lake was approximately $45.1 million and resulted in an increase to *Net Income (Loss) Attributable to Cliffs Shareholders* and a

109

Table of Contents

reduction of *Loss attributable to noncontrolling interest* and corresponding decrease to *Noncontrolling interest* in the Statements of Consolidated Financial Position for the year end and as of December 31, 2013. The adjustments also resulted in an increase to basic and diluted earnings per common share of $0.30 and $0.26, respectively, for the year ended December 31, 2013. No other financial statement line items were impacted by this adjustment. The prior period amounts included within the accompanying Consolidated Financial Statements have not been retrospectively adjusted for this impact due to management's materiality assessment as discussed above. The impact of the prospective adjustments in the Statements of Consolidated Operations would have resulted in an increase to basic and diluted earnings per common share of $0.25 and $0.07 for the years ended December 31, 2012 and 2011, respectively.

### Cash Equivalents

Cash and cash equivalents include cash on hand and on deposit as well as all short-term securities held for the primary purpose of general liquidity. We consider investments in highly liquid debt instruments with an original maturity of three months or less from the date of acquisition to be cash equivalents. We routinely monitor and evaluate counterparty credit risk related to the financial institutions by which our short-term investment securities are held.

### Trade Accounts Receivable and Allowance for Doubtful Accounts

Trade accounts receivable are recorded at the invoiced amount and do not bear interest. The allowance for doubtful accounts is our best estimate of the amount of probable credit losses in Cliffs' existing accounts receivable. We establish provisions for losses on accounts receivable when it is probable that all or part of the outstanding balance will not be collected. We regularly review our accounts receivable balances and establish or adjust the allowance as necessary using the specific identification method. The allowance for doubtful accounts was $8.1 million at December 31, 2014 and 2013. There was $9.0 million of bad debt expense for the year ended December 31, 2012. There was no bad debt expense for the years ended December 31, 2014 and 2013.

### Inventories

#### U.S. Iron Ore

U.S. Iron Ore product inventories are stated at the lower of cost or market. Cost of iron ore inventories is determined using the LIFO method.

We had approximately 1.4 million tons and 1.2 million tons of finished goods stored at ports and customer facilities on the lower Great Lakes to service customers at December 31, 2014 and 2013, respectively. We maintain ownership of the inventories until title has transferred to the customer, usually when payment is received. Maintaining ownership of the iron ore products at ports on the lower Great Lakes reduces risk of non-payment by customers.

#### Asia Pacific Iron Ore

Asia Pacific Iron Ore product inventories are stated at the lower of cost or market. Costs of inventories are being valued on a weighted average cost basis. We maintain ownership of the inventories until title has transferred to the customer, which generally is when the product is loaded into the vessel.

#### North American Coal

North American Coal product inventories are stated at the lower of cost or market. Cost of coal inventories is calculated using the weighted average cost. We maintain ownership until coal is loaded into rail cars at the mine for domestic sales and until loaded in the vessels at the terminal for export sales.

#### Eastern Canadian Iron Ore

Iron ore pellet inventories are stated at the lower of cost or market. Cost is determined using the LIFO method. We maintain ownership of the inventories until title has transferred to the customer, which is generally when the product is loaded into the vessel.

Iron ore concentrate inventories are stated at the lower of cost or market. The cost of iron ore concentrate inventories is determined using weighted average cost. We maintain ownership of the inventories until title has transferred to the customer, which generally is when the product is loaded into the vessel.

110

***Supplies and Other Inventories***

Supply inventories include replacement parts, fuel, chemicals and other general supplies, which are expected to be used or consumed in normal operations. Supply inventories also include critical spares. Critical spares are replacement parts for equipment that is critical for the continued operation of the mine or processing facilities.

Supply inventories are stated at the lower of cost or market using average cost, less an allowance for obsolete and surplus items. The allowance for obsolete and surplus items was $68.2 million and $63.4 million at December 31, 2014 and 2013, respectively.

***Derivative Financial Instruments and Hedging Activities***

We are exposed to certain risks related to the ongoing operations of our business, including those caused by changes in commodity prices, interest rates and foreign currency exchange rates. We have established policies and procedures, including the use of certain derivative instruments, to manage such risks.

Derivative financial instruments are recognized as either assets or liabilities in the Statements of Consolidated Financial Position and measured at fair value. On the date a derivative instrument is entered into, we generally designate a qualifying derivative instrument as a hedge of the variability of cash flows to be received or paid related to a recognized asset or liability or forecasted transaction (cash flow hedge). We formally document all relationships between hedging instruments and hedged items, as well as its risk-management objective and strategy for undertaking various hedge transactions. This process includes linking all derivatives that are designated as cash flow hedges to specific firm commitments or forecasted transactions. We also formally assess both at the hedge's inception and on an ongoing basis, whether the derivatives that are used in hedging transactions are highly effective in offsetting changes in cash flows of the related hedged items. When it is determined that a derivative is not highly effective as a hedge or that it has ceased to be a highly effective hedge, we discontinue hedge accounting prospectively and record all future changes in fair value in the period of the instrument's earnings or losses. The policy allows for not more than 75 percent, but not less than 40 percent for up to 12 months and not less than 10 percent for up to 15 months, of forecasted net currency exposures that are probable to occur.

For derivative instruments that have been designated as cash flow hedges, the effective portion of the changes in fair value are recorded in accumulated other comprehensive income (loss) and any portion that is ineffective is recorded in current period earnings or losses. Amounts recorded in accumulated other comprehensive income (loss) are reclassified to earnings or losses in the period the underlying hedged transaction affects earnings or when the underlying hedged transaction is no longer reasonably possible of occurring.

For derivative instruments that have not been designated as cash flow hedges, changes in fair value are recorded in the period of the instrument's earnings or losses.

Refer to NOTE 13 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES for further information.

***Property, Plant and Equipment***

Our properties are stated at the lower of cost less accumulated depreciation or fair value. Depreciation of plant and equipment is computed principally by the straight-line method based on estimated useful lives, not to exceed the mine lives. The Northshore, United Taconite, Empire, Tilden and Wabush operations use the double-declining balance method of depreciation for certain mining equipment. The Asia Pacific Iron Ore operation uses the production output method for certain mining equipment. Depreciation is provided over the following estimated useful lives:

| Asset Class | Basis | Life |
|---|---|---|
| Buildings | Straight line | 45 Years |
| Mining equipment | Straight line/Double declining balance | 3 to 20 Years |
| Processing equipment | Straight line | 10 to 45 Years |
| Electric power facilities | Straight line | 10 to 45 years |
| Land improvements | Straight line | 20 to 45 years |
| Office and information technology | Straight line | 3 to 15 Years |

Depreciation continues to be recognized when operations temporarily are idled.

111

Our Asia Pacific Iron Ore, Bloom Lake, Wabush, and United Taconite operations' interests in iron ore reserves and mineralized materials were valued when acquired using a discounted cash flow method. The fair value was estimated based upon the present value of the expected future cash flows from iron ore operations over the economic lives of the respective mines.

Our North American Coal operation leases coal mining rights from third parties through lease agreements. The lease agreements are for varying terms and extend through the earlier of their lease termination date or until all merchantable and mineable coal has been extracted. Our interest in coal reserves and non-reserve coal was valued when acquired using a discounted cash flow method. The fair value was estimated based upon the present value of the expected future cash flows from coal operations over the life of the reserves acquired.

Refer to NOTE 4 - PROPERTY, PLANT AND EQUIPMENT for further information.

### Capitalized Stripping Costs

During the development phase, stripping costs are capitalized as a part of the depreciable cost of building, developing and constructing a mine. These capitalized costs are amortized over the productive life of the mine using the units of production method. The production phase does not commence until the removal of more than a de minimis amount of saleable mineral material occurs in conjunction with the removal of overburden or waste material for purposes of obtaining access to an ore body. The stripping costs incurred in the production phase of a mine are variable production costs included in the costs of the inventory produced (extracted) during the period that the stripping costs are incurred.

Stripping costs related to expansion of a mining asset of proven and probable reserves are variable production costs that are included in the costs of the inventory produced during the period that the stripping costs are incurred.

### Equity Method Investments

Investments in unconsolidated ventures that we have the ability to exercise significant influence over, but not control, are accounted for under the equity method. The following table presents the detail of our investments in unconsolidated ventures and where those investments are classified in the Statements of Consolidated Financial Position as of December 31, 2014 and December 31, 2013. Parentheses indicate a net liability.

| Investment | Classification | Accounting Method | Ownership Interest | December 31, 2014 | December 31, 2013 |
|---|---|---|---|---|---|
| | | | | (In Millions) | |
| Hibbing | *Other non-current assets* [1] | Equity Method | 23% | $    3.1 | (3.9) |
| Other | *Other non-current assets* | Equity Method | Various | 3.9 | 34.7 |
| | | | | $    7.0 | $    30.8 |

_____

[1] At December 31, 2013, the classification for Hibbing was *Other liabilities*.

During the year ended December 31, 2014, an impairment charge of $21.5 million was recorded related to joint ventures investments and is recognized in *Impairment of goodwill and other long-lived assets* in the Statements of Consolidated Operations .

### Hibbing

Our share of equity income (loss) is eliminated against consolidated product inventory upon production, and against *Cost of goods sold and operating expenses* when sold. This effectively reduces our cost for our share of the mining ventures' production cost, reflecting the cost-based nature of our participation in unconsolidated ventures.

112

A004279

*Amapá*

On December 27, 2012, our Board of Directors authorized the sale of our 30 percent interest in Amapá. Per this original agreement, together with Anglo, we were to sell our respective interest in a 100 percent sale transaction to Zamin. The carrying value of our investment was in excess of the net proceeds expected from the sale, which approximated fair value, resulting in a $365.4 million impairment charge, which was recorded through *Equity loss from ventures, net of tax* in the Statements of Consolidated Operations for the year ended December 31, 2012.

On March 28, 2013, an unknown event caused the Santana port shiploader to collapse into the Amazon River, preventing further ship loading by the mine operator, Anglo. In light of the March 28, 2013 collapse of the Santana port shiploader and subsequent evaluation of the effect that this event had on the carrying value of our investment in Amapá as of June 30, 2013, we recorded an impairment charge of $67.6 million in the second quarter of 2013.

On August 28, 2013, we entered into additional agreements to sell our 30 percent interest in Amapá to Anglo for nominal cash consideration, plus the right to certain contingent deferred consideration upon the two-year anniversary of the closing. The closing was conditional on obtaining certain regulatory approvals and the additional agreement provided Anglo with an option to request that we transfer our interest in Amapá directly to Zamin. Anglo exercised this option and the transfer to Zamin was completed in the fourth quarter of 2013.

*Cockatoo Island*

On July 31, 2012, we entered into a definitive asset sale agreement with our joint venture partner, HWE Cockatoo Pty Ltd., to sell our beneficial interest in the mining tenements and certain infrastructure of Cockatoo Island to Pluton Resources, which was amended on August 31, 2012. On September 7, 2012, the closing date, Pluton Resources paid a nominal sum of AUD $4.00 and assumed ownership of the assets and responsibility for the environmental rehabilitation obligations and other assumed liabilities not inherently attached to the tenements acquired. The rehabilitation obligations and assumed liabilities that are inherently attached to the tenements were transferred to Pluton Resources upon registration by the Department of Mining and Petroleum denoting Pluton Resources as the tenement holder. Upon final settlement of the sale, which was completed during the second quarter of 2013, we extinguished approximately $18.6 million related to the estimated cost of the rehabilitation.

**Goodwill**

Goodwill represents the excess purchase price paid over the fair value of the net assets of acquired companies. We had goodwill of $2.0 million and $74.5 million recorded in the Statements of Consolidated Financial Position at December 31, 2014 and 2013, respectively. In accordance with the provisions of ASC 350, we compare the fair value of the respective reporting unit to its carrying value on an annual basis (or more frequently if necessary as discussed below) to determine if there is potential goodwill impairment. If the fair value of the reporting unit is less than its carrying value, an impairment loss is recorded to the extent that the implied value of the goodwill within the reporting unit is less than the carrying value of its goodwill.

During the third quarter of 2014, a goodwill impairment charge of $73.5 million was recorded for our Asia Pacific Iron Ore reporting unit within the Asia Pacific Iron Ore operating segment. The impairment charge was a result of downward long-term pricing estimates as determined through management's long-range planning process.

After performing our annual goodwill impairment test in the fourth quarter of 2013, we determined that $80.9 million of goodwill associated with our Ferroalloys operating segment was impaired. The impairment charge was primarily a result of the decision made in the fourth quarter of 2013 to indefinitely suspend the Chromite Project and to not allocate additional capital for the project given the uncertain timeline and risks associated with the development of necessary infrastructure to bring the project online.

During the fourth quarter of 2012, upon performing our annual goodwill impairment test, a goodwill impairment charge of $997.3 million was recorded for our CQIM reporting unit within the Eastern Canadian Iron Ore operating segment. The impairment charge for our CQIM reporting unit was driven by the project's lower than anticipated long-term profitability coupled with delays in achieving full operational capacity and higher capital and operating costs. Additionally, the announced delay of the Phase II expansion of the Bloom Lake mine also contributed to the impairment.

Refer to NOTE 12 - GOODWILL AND OTHER INTANGIBLE ASSETS AND LIABILITIES and NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS for further information.

A004280

*Other Intangible Assets and Liabilities*

Other intangible assets are subject to periodic amortization on a straight-line basis over their estimated useful lives as follows:

| Intangible Assets | Basis | Useful Life (years) |
|---|---|---|
| Permits - *Asia Pacific Iron Ore* | Units of production | Life of mine |
| Permits - *All Other* | Straight line | 15 - 40 |
| Utility Contracts | Straight line | 5 |
| Leases - *North American Coal* | Units of production | Life of mine |
| Leases - *All Other* | Straight line | 4.5 - 17.5 |

*Asset Impairment*

*Long-Lived Tangible and Intangible Assets*

We monitor conditions that may affect the carrying value of our long-lived tangible and intangible assets when events and circumstances indicate that the carrying value of the asset groups may not be recoverable. In order to determine if assets have been impaired, assets are grouped and tested at the lowest level for which identifiable, independent cash flows are available ("asset group"). An impairment loss exists when projected undiscounted cash flows are less than the carrying value of the asset group. The measurement of the impairment loss to be recognized is based on the difference between the fair value and the carrying value of the asset group. Fair value can be determined using a market approach, income approach or cost approach.

As a result of these assessments during 2014, we determined that the cash flows associated with our Eastern Canadian Iron Ore, Asia Pacific Iron Ore, North American Coal and Ferroalloys asset groups were not sufficient to support the recoverability of the carrying value of these productive assets. Accordingly, during 2014, we recorded a long-lived tangible asset impairment charge of $8,839.0 million and an intangible asset impairment charge of $15.5 million in our Statements of Consolidated Operations . At December 31, 2013, we determined there were long-lived tangible and intangible asset impairments related to the Wabush operations within our Eastern Canadian Iron Ore operating segment that resulted in impairment charges of $145.1 million and $9.5 million, respectively. At December 31, 2012, we determined there was a long-lived asset impairment related to the Wabush mine's pelletizing operations that resulted in an impairment charge of $49.9 million.

Refer to NOTE 4 - PROPERTY, PLANT AND EQUIPMENT , NOTE 12 - GOODWILL AND OTHER INTANGIBLE ASSETS AND LIABILITIES  and NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS for further information.

*Fair Value Measurements*

*Valuation Hierarchy*

ASC 820 establishes a three-level valuation hierarchy for classification of fair value measurements. The valuation hierarchy is based upon the transparency of inputs to the valuation of an asset or liability as of the measurement date. Inputs refer broadly to the assumptions that market participants would use in pricing an asset or liability. Inputs may be observable or unobservable. Observable inputs are inputs that reflect the assumptions market participants would use in pricing the asset or liability developed based on market data obtained from independent sources. Unobservable inputs are inputs that reflect our own assumptions about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances. The three-tier hierarchy of inputs is summarized below:

- Level 1 — Valuation is based upon quoted prices (unadjusted) for identical assets or liabilities in active markets.

- Level 2 — Valuation is based upon quoted prices for similar assets and liabilities in active markets, or other inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

- Level 3 — Valuation is based upon other unobservable inputs that are significant to the fair value measurement.

114

The classification of assets and liabilities within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement in its entirety. Valuation methodologies used for assets and liabilities measured at fair value are as follows:

*Cash Equivalents*

Where quoted prices are available in an active market, cash equivalents are classified within Level 1 of the valuation hierarchy. Cash equivalents classified in Level 1 at December 31, 2014 and 2013 include money market funds. Valuation of these instruments is determined using a market approach and is based upon unadjusted quoted prices for identical assets in active markets.

*Marketable Securities*

Where quoted prices are available in an active market, marketable securities are classified within Level 1 of the valuation hierarchy. Marketable securities classified in Level 1 at December 31, 2014 and 2013 include available-for-sale securities. The valuation of these instruments is determined using a market approach and is based upon unadjusted quoted prices for identical assets in active markets.

*Derivative Financial Instruments*

Derivative financial instruments valued using financial models that use as their basis readily observable market parameters are classified within Level 2 of the valuation hierarchy. Such derivative financial instruments include substantially all of our foreign currency exchange contracts and derivative financial instruments that are valued based upon published pricing settlements realized by other companies in the industry. Derivative financial instruments that are valued based upon models with significant unobservable market parameters and are normally traded less actively, are classified within Level 3 of the valuation hierarchy.

Refer to NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS  and NOTE 7 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS  for further information.

**Pensions and Other Postretirement Benefits**

We offer defined benefit pension plans, defined contribution pension plans and other postretirement benefit plans, primarily consisting of retiree healthcare benefits, to most employees in North America as part of a total compensation and benefits program. We do not have employee pension or post-retirement benefit obligations at our Asia Pacific Iron Ore operations or our Bloom Lake mine operations within our Eastern Canadian Iron Ore segment.

We recognize the funded or unfunded status of our postretirement benefit obligations on our  December 31, 2014 and 2013 Statements of Consolidated Financial Position based on the difference between the market value of plan assets and the actuarial present value of our retirement obligations on that date, on a plan-by-plan basis. If the plan assets exceed the retirement obligations, the amount of the surplus is recorded as an asset; if the retirement obligations exceed the plan assets, the amount of the underfunded obligations are recorded as a liability. Year-end balance sheet adjustments to postretirement assets and obligations are recorded as *Accumulated other comprehensive loss* .

The actuarial estimates of the PBO and APBO retirement obligations incorporate various assumptions including the discount rates, the rates of increases in compensation, healthcare cost trend rates, mortality, retirement timing and employee turnover.  For the U.S. and Canadian plans, the discount rate is determined based on the prevailing year-end rates for high-grade corporate bonds with a duration matching the expected cash flow timing of the benefit payments from the various plans. The remaining assumptions are based on our estimates of future events by incorporating historical trends and future expectations. The amount of net periodic cost that is recorded in the Statements of Consolidated Operations consists of several components including service cost, interest cost, expected return on plan assets, and amortization of previously unrecognized amounts. Service cost represents the value of the benefits earned in the current year by the participants. Interest cost represents the cost associated with the passage of time. Certain items, such as plan amendments, gains and/or losses resulting from differences between actual and assumed results for demographic and economic factors affecting the obligations and assets of the plans, and changes in other assumptions are subject to deferred recognition for income and expense purposes. The expected return on plan assets is determined utilizing the weighted average of expected returns for plan asset investments in various asset categories based on historical performance, adjusted for current trends. See NOTE 7 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS for further information.

### Asset Retirement Obligations

Asset retirement obligations are recognized when incurred and recorded as liabilities at fair value. The fair value of the liability is determined as the discounted value of the expected future cash flow. The asset retirement obligation is accreted over time through periodic charges to earnings. In addition, the asset retirement cost is capitalized as part of the asset's carrying value and amortized over the life of the related asset. Reclamation costs are adjusted periodically to reflect changes in the estimated present value resulting from the passage of time and revisions to the estimates of either the timing or amount of the reclamation costs. We review, on an annual basis, unless otherwise deemed necessary, the asset retirement obligation at each mine site in accordance with the provisions of ASC 410. We perform an in-depth evaluation of the liability every three years in addition to routine annual assessments.

Future remediation costs for inactive mines are accrued based on management's best estimate at the end of each period of the costs expected to be incurred at a site. Such cost estimates include, where applicable, ongoing maintenance and monitoring costs. Changes in estimates at inactive mines are reflected in earnings in the period an estimate is revised. See NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS for further information.

### Environmental Remediation Costs

We have a formal policy for environmental protection and restoration. Our mining and exploration activities are subject to various laws and regulations governing protection of the environment. We conduct our operations to protect the public health and environment and believe our operations are in compliance with applicable laws and regulations in all material respects. Our environmental liabilities, including obligations for known environmental remediation exposures at active and closed mining operations and other sites, have been recognized based on the estimated cost of investigation and remediation at each site. If the cost only can be estimated as a range of possible amounts with no point in the range being more likely, the minimum of the range is accrued. Future expenditures are not discounted unless the amount and timing of the cash disbursements reasonably can be estimated. It is possible that additional environmental obligations could be incurred, the extent of which cannot be assessed. Potential insurance recoveries have not been reflected in the determination of the liabilities. See NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS for further information.

### Revenue Recognition

*U.S. Iron Ore, Asia Pacific Iron Ore and Eastern Canadian Iron Ore*

We sell our products pursuant to comprehensive supply agreements negotiated and executed with our customers. Revenue is recognized from a sale when persuasive evidence of an arrangement exists, the price is fixed or determinable, the product is delivered in accordance with F.O.B. terms, title and risk of loss have transferred to the customer in accordance with the specified provisions of each supply agreement and collection of the sales price reasonably is assured. Our U.S. Iron Ore, Asia Pacific Iron Ore and Eastern Canadian Iron Ore supply agreements provide that title and risk of loss transfer to the customer either upon loading of the vessel, shipment or, as is the case with some of our U.S. Iron Ore supply agreements, when payment is received. Under certain term supply agreements, we ship the product to ports on the lower Great Lakes or to the customers' facilities prior to the transfer of title. Our rationale for shipping iron ore products to certain customers and retaining title until payment is received for these products is to minimize credit risk exposure.

Iron ore sales are recorded at a sales price specified in the relevant supply agreements resulting in revenue and a receivable at the time of sale. Upon revenue recognition for provisionally priced sales, a freestanding derivative is created for the difference between the sales price used and expected future settlement price. The derivative, which does not qualify for hedge accounting, is adjusted to fair value through *Product revenues* as a revenue adjustment each reporting period based upon current market data and forward-looking estimates determined by management until the final sales price is determined. The principal risks associated with recognition of sales on a provisional basis include iron ore price fluctuations between the date initially recorded and the date of final settlement. For revenue recognition, we estimate the future settlement rate; however, if significant changes in iron ore prices occur between the provisional pricing date and the final settlement date, we might be required to either return a portion of the sales proceeds received or bill for the additional sales proceeds due based on the provisional sales price. Refer to NOTE 13 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES for further information.

In addition, certain supply agreements with one customer include provisions for supplemental revenue or refunds based on the customer's annual steel pricing for the year the product is consumed in the customer's blast furnaces. We account for this provision as a derivative instrument at the time of sale and record this provision at fair value until the year the product is consumed and the amounts are settled as an adjustment to revenue. Refer to NOTE 13 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES for further information.

A004283

Revenue from product sales also includes reimbursement for freight charges paid on behalf of customers and freight costs to move product from the Upper Great Lakes to ports in Québec to use for exports and from the port of Esperance to ports in China, which are included in *Freight and venture partners' cost reimbursements* separate from *Product revenues*. Revenue is recognized for the expected reimbursement of services when the services are performed.

*North American Coal*

We sell our products pursuant to supply agreements negotiated and executed with our customers. Revenue is recognized when persuasive evidence of an arrangement exists, the price is fixed or determinable, the product is delivered in accordance with F.O.B. terms, title and risk of loss have transferred to the customer in accordance with the specified provisions of each supply agreement and collection of the sales price reasonably is assured. Delivery on our coal sales is determined to be complete for revenue recognition purposes when title and risk of loss has passed to the customer in accordance with stated contractual terms and there are no other future obligations related to the shipment. For domestic shipments, title and risk of loss generally passes as the coal is loaded into transport carriers for delivery to the customer. For international shipments, title generally passes at the time coal is loaded onto the shipping vessel. Revenue from product sales in 2014, 2013 and 2012 included reimbursement for freight charges paid to move coal from the mine to port locations of $115.0 million, $85.8 million and $101.0 million, respectively, and is recorded in *Freight and venture partners' cost reimbursements* on the Statements of Consolidated Operations.

**Deferred Revenue**

The terms of one of our U.S. Iron Ore pellet supply agreements required supplemental payments to be paid by the customer during the period 2009 through 2012, with the option to defer a portion of the 2009 monthly amount in exchange for interest payments until the deferred amount was repaid in 2013. Installment amounts received under this arrangement in excess of sales are classified as deferred revenue in the Statements of Consolidated Financial Position upon receipt of payment. Revenue is recognized over the life of the supply agreement, which extends until 2022, in equal annual installments. As of December 31, 2014 and 2013, installment amounts received in excess of sales totaled $102.8 million and $115.6 million, respectively. As of December 31, 2014, deferred revenue of $12.8 million was recorded in *Other current liabilities* and $90.0 million was recorded as long term in *Other liabilities* in the Statements of Consolidated Financial Position. As of December 31, 2013, deferred revenue of $12.8 million was recorded in *Other current liabilities* and $102.8 million was recorded as long term in *Other liabilities* in the Statements of Consolidated Financial Position.

In 2014 and 2013, due to the payment terms and the timing of cash receipts near year-end, cash receipts exceeded shipments. The shipments were completed early in the subsequent years. We considered whether revenue should be recognized on these sales under the "bill and hold" guidance provided by the SEC Staff; however, based upon the assessment performed, revenue recognition on these transactions totaling $29.3 million and $13.5 million, respectively, was deferred on the December 31, 2014 and December 31, 2013 Statements of Consolidated Financial Position.

**Cost of Goods Sold**

*U.S. Iron Ore, Asia Pacific Iron Ore and Eastern Canadian Iron Ore*

*Cost of goods sold and operating expenses* represents all direct and indirect costs and expenses applicable to the sales and revenues of our mining operations. Operating expenses primarily represent the portion of the Tilden mining venture costs for which we do not own; that is, the costs attributable to the share of the mine's production owned by the other joint venture partner in the Tilden mine. The mining venture functions as a captive cost company; it supplies product only to its owners effectively for the cost of production. Accordingly, the noncontrolling interests' revenue amounts are stated at cost of production and are offset by an equal amount included in *Cost of goods sold and operating expenses* resulting in no sales margin reflected for the noncontrolling partner participant. As we are responsible for product fulfillment, we act as a principal in the transaction and, accordingly, record revenue under these arrangements on a gross basis.

117

Table of Contents

The following table is a summary of reimbursements in our U.S. Iron Ore operations for the years ended  December 31, 2014, 2013 and 2012:

| | (In Millions) | | |
|---|---|---|---|
| | Year Ended December 31, | | |
| | **2014** | 2013 | 2012 |
| Reimbursements for: | | | |
| Freight | $ **163.0** | $ 177.3 | $ 142.0 |
| Venture partners' cost | **108.0** | 82.2 | 108.8 |
| Total reimbursements | $ **271.0** | $ 259.5 | $ 250.8 |

In 2014, we began selling a portion of its Asia Pacific Iron Ore product on a CFR basis. As a result, $6.9 million of freight was included in *Cost of goods sold and operating expenses*. There was no freight for the year ended December 31, 2013.

Where we have joint ownership of a mine, our contracts entitle us to receive royalties and/or management fees, which we earn as the pellets are produced.

*North American Coal*

Cost of goods sold and operating expenses represent all direct and indirect costs and expenses applicable to the sales and revenues of our mining operations.

***Repairs and Maintenance***

Repairs, maintenance and replacement of components are expensed as incurred. The cost of major equipment overhauls is capitalized and depreciated over the estimated useful life, which is the period until the next scheduled overhaul, generally five years. All other planned and unplanned repairs and maintenance costs are expensed when incurred.

***Share-Based Compensation***

The fair value of each performance share grant is estimated on the date of grant using a Monte Carlo simulation to forecast relative TSR performance. Consistent with the guidelines of ASC 718, a correlation matrix of historic and projected stock prices was developed for both the Company and its predetermined peer group of mining and metals companies. The fair value assumes that performance goals will be achieved.

The expected term of the grant represents the time from the grant date to the end of the service period for each of the three plan-year agreements. We estimated the volatility of our common shares and that of the peer group of mining and metals companies using daily price intervals for all companies. The risk-free interest rate is the rate at the grant date on zero-coupon government bonds, with a term commensurate with the remaining life of the performance plans.

The fair value of stock options is estimated on the date of grant using a Black-Scholes model using the grant date price of our common shares and option exercise price, and assumptions regarding the option's expected term, the volatility of our common shares, the risk-free interest rate, and the dividend yield over the option's expected term.

Refer to NOTE 8 - STOCK COMPENSATION PLANS for additional information.

***Income Taxes***

Income taxes are based on income for financial reporting purposes, calculated using tax rates by jurisdiction, and reflect a current tax liability or asset for the estimated taxes payable or recoverable on the current year tax return and expected annual changes in deferred taxes. Any interest or penalties on income tax are recognized as a component of income tax expense.

118

We account for income taxes under the asset and liability method, which requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the financial statements. Under this method, deferred tax assets and liabilities are determined based on the differences between the financial statement and tax basis of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. The effect of a change in tax rates on deferred tax assets and liabilities is recognized in income in the period that includes the enactment date.

We record net deferred tax assets to the extent we believe these assets will more likely than not be realized. In making such determination, we consider all available positive and negative evidence, including scheduled reversals of deferred tax liabilities, projected future taxable income, tax planning strategies and recent financial results of operations.

Accounting for uncertainty in income taxes recognized in the financial statements requires that a tax benefit from an uncertain tax position be recognized when it is more likely than not that the position will be sustained upon examination, including resolutions of any related appeals or litigation processes, based on technical merits.

See NOTE 9 - INCOME TAXES for further information.

### Discontinued Operations

On July 10, 2012, we entered into a definitive share and asset sale agreement to sell our 45 percent economic interest in the Sonoma joint venture coal mine located in Queensland, Australia. Upon completion of the transaction on November 12, 2012, we collected approximately AUD $141.0 million in net cash proceeds. The assets sold included our interests in the Sonoma mine along with our ownership of the affiliated washplant. The Sonoma operations previously were included in *Other* within our reportable segments.

In April 2014, the FASB issued ASU 2014-08, *Reporting Discontinued Operations and Disclosures of Disposals of Components of an Entity* , which changes the criteria for reporting discontinued operations and requires additional disclosures about discontinued operations. The standard requires that an entity report as a discontinued operation only a disposal that represents a strategic shift in operations that has a major effect on its operations and financial results. ASU 2014-08 is effective prospectively for new disposals that occur within annual periods beginning on or after December 15, 2014. Early adoption is permitted and we adopted ASU 2014-08 during the three months ended December 31, 2014. Both Wabush and CLCC did not qualify as discontinued operations as determined under the new guidance. Neither the closure of Wabush nor the sale of the CLCC assets was considered a strategic shift in operations that had a major effect on our operations. Refer to NOTE 14 - DISCONTINUED OPERATIONS for further discussion of our adoption of ASU 2014-08.

### Foreign Currency

Our financial statements are prepared with the U.S. dollar as the reporting currency. The functional currency of the Company's Australian subsidiaries is the Australian Dollar. The functional currency of all other international subsidiaries is the U.S. dollar. The financial statements of international subsidiaries are translated into U.S. dollars using the exchange rate at each balance sheet date for assets and liabilities and a weighted average exchange rate for each period for revenues, expenses, gains and losses. Where the local currency is the functional currency, translation adjustments are recorded as *Accumulated other comprehensive loss*. Where the U.S. dollar is the functional currency, translation adjustments are recorded in the Statements of Consolidated Operations. Income taxes generally are not provided for foreign currency translation adjustments.

### Earnings Per Share

We present both basic and diluted earnings per share amounts. Basic earnings per share amounts are calculated by dividing *Net Income (Loss) Attributable to Cliffs Shareholders* less any paid or declared but unpaid dividends on our depositary shares by the weighted average number of common shares outstanding during the period presented. Diluted earnings per share amounts are calculated by dividing *Net Income (Loss) Attributable to Cliffs Shareholders* by the weighted average number of common shares, common share equivalents under stock plans using the treasury stock method and the number of common shares that would be issued under an assumed conversion of our outstanding depositary shares, each representing a 1/40th interest in a share of our Series A Mandatory Convertible Preferred Stock, Class A, under the if-converted method. Our outstanding depositary shares are convertible into common shares based on the volume weighted average of closing prices of our common shares over the 20 consecutive trading day period ending on the third day immediately preceding the end of the reporting period. Common share equivalents are excluded from EPS computations in the periods in which they have an anti-dilutive effect. See NOTE 19 - EARNINGS PER SHARE for further information.

119

A004286

Table of Contents

**Recent Accounting Pronouncements**

*Issued and Not Effective*

In August 2014, the FASB issued ASU 2014-15, *Disclosure of Uncertainties About an Entity's Ability to Continue as a Going Concern* . ASU 2014-15 will explicitly require management to assess an entity's ability to continue as a going concern, and to provide related footnote disclosure in certain circumstances. ASU 2014-15 is intended to define management's responsibility to evaluate whether there is substantial doubt about an entity's ability to continue as a going concern and to provide related footnote disclosures. Specifically, ASU 2014-15 provides a definition of the term "substantial doubt" and requires an assessment for a period of one year after the date that the financial statements are issued (or available to be issued). It also requires certain disclosures when substantial doubt is alleviated as a result of consideration of management's plans and requires an express statement and other disclosures when substantial doubt is not alleviated. The new standard will be effective for all entities in the first annual period ending after December 15, 2016 and for annual periods and interim periods thereafter. Earlier adoption is permitted. We are currently evaluating the impact the adoption of the guidance will have on the Statements of Consolidated Financial Position, Statements of Consolidated Operations  or Statements of Consolidated Cash Flows .

In June 2014, the FASB issued ASU 2014-09, *Revenue from Contracts with Customers*.  The new revenue guidance broadly replaces the revenue guidance provided throughout the Codification.  The core principle of the revenue guidance is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services.  To achieve that core principle, an entity should apply the following steps: (1) identify the contract(s) with a customer, (2) identify the performance obligations in the contract, (3) determine the transaction price, (4) allocate the transaction price to the performance obligations in the contract, and (5) recognize revenue when (or as) the entity satisfies a performance obligation.  The new revenue guidance also requires the capitalization of certain contract acquisition costs.  Reporting entities must provide new disclosures providing qualitative and quantitative information on the nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with customers.  New disclosures also include qualitative and quantitative information on significant judgments, changes in judgments, and contract acquisition assets.  The update is effective for annual periods and interim periods within those annual periods beginning after December 15, 2016 and may be adopted either retrospectively or retrospectively with the cumulative effect.  Earlier adoption is not permitted. We are still evaluating the impact of the updated guidance on the Statements of Consolidated Financial Position , Statements of Consolidated Operations  or Statements of Consolidated Cash Flows.

## NOTE 2 - SEGMENT REPORTING

Our Company's operations are organized and managed according to product category and geographic location: U.S. Iron Ore, Asia Pacific Iron Ore, North American Coal and Eastern Canadian Iron Ore. The U.S. Iron Ore segment is comprised of our interests in five U.S. mines that provide iron ore to the integrated steel industry. The Asia Pacific Iron Ore segment is located in Western Australia and provides iron ore to the seaborne market for Asian steel producers. The North American Coal segment as of December 31, 2014 is comprised of our two low-volatile metallurgical coal operations that provide metallurgical coal primarily to the integrated steel industry. Effective December 31, 2014, we sold our CLCC assets, which consisted of two high-volatile metallurgical coal mines and one thermal coal mine. As such, the results below include the CLCC results through the day of the sale completion. The Eastern Canadian Iron Ore segment is comprised of two Eastern Canadian mines that primarily provided iron ore to the seaborne market for Asian steel producers. Refer to NOTE 21 - SUBSEQUENT EVENTS for further discussion of our Bloom Lake mine, which is in the Eastern Canadian Iron Ore segment. There were no intersegment revenues in 2014 or 2012. Inter-segment revenues for 2013 were eliminated in consolidation.

We have historically evaluated segment performance based on sales margin, defined as revenues less cost of goods sold, and operating expenses identifiable to each segment. Additionally, beginning in the third quarter of 2014, concurrent with the change in control on July 29, 2014, management began to evaluate segment performance based on EBITDA, defined as *Net Income (Loss)* before interest, income taxes, depreciation, depletion and amortization, and Adjusted EBITDA, defined as EBITDA excluding certain items such as impairment charges, impacts of permanently idled, closed or sold facilities, foreign currency remeasurement, severance and other costs associated with the acceleration of vesting and payout of outstanding equity grants due to the majority change in our Board of Directors, litigation judgments and intersegment corporate allocations of SG&A costs. Management uses and believes that investors benefit from referring to these measures in evaluating operating and financial results, as well as in planning, forecasting and analyzing future periods as these financial measures approximate the cash flows associated with the operational earnings.

120

The following tables present a summary of our reportable segments for the years ended  December 31, 2014, 2013 and 2012, including a reconciliation of segment sales margin to *Income (Loss) from Continuing Operations Before Income Taxes and Equity Income (Loss) from Ventures*  and a reconciliation of *Net Income (Loss)* to EBITDA and Adjusted EBITDA:

| | | | | | | (In Millions) | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | **2014** | | | 2013 | | | 2012 | | |
| Revenues from product sales and services: | | | | | | | | | |
| U.S. Iron Ore | **$ 2,506.5** | **54%** | | $ 2,667.9 | 47% | | $ 2,723.3 | 46% | |
| Asia Pacific Iron Ore | **866.7** | **19%** | | 1,224.3 | 22% | | 1,259.3 | 22% | |
| North American Coal | **687.1** | **15%** | | 821.9 | 14% | | 881.1 | 15% | |
| Eastern Canadian Iron Ore | **563.4** | **12%** | | 978.7 | 17% | | 1,008.9 | 17% | |
| Other (including inter-segment revenue eliminations) | **—** | **—%** | | (1.4) | —% | | 0.1 | —% | |
| Total revenues from product sales and services | **$ 4,623.7** | **100%** | | $ 5,691.4 | 100% | | $ 5,872.7 | 100% | |
| | | | | | | | | | |
| Sales margin: | | | | | | | | | |
| U.S. Iron Ore | **$    710.4** | | | $    901.9 | | | $    976.2 | | |
| Asia Pacific Iron Ore | **121.7** | | | 367.1 | | | 311.0 | | |
| North American Coal | **(135.8)** | | | (14.5) | | | (1.8) | | |
| Eastern Canadian Iron Ore | **(244.9)** | | | (103.3) | | | (121.4) | | |
| Other (including inter-segment sales margin eliminations) | **—** | | | (1.9) | | | 8.1 | | |
| Sales margin | **451.4** | | | 1,149.3 | | | 1,172.1 | | |
| Other operating income (expense) | **(9,896.7)** | | | (478.3) | | | (1,480.9) | | |
| Other income (expense) | **(158.4)** | | | (181.7) | | | (193.0) | | |
| Income (loss) from continuing operations before income taxes and equity income (loss) from ventures | **$(9,603.7)** | | | $    489.3 | | | $    (501.8) | | |

121

| | (In Millions) | | |
| --- | --- | --- | --- |
| | **2014** | 2013 | 2012 |
| Net Income (Loss) | $ **(8,311.6)** | $ 361.8 | $ (1,126.6) |
| Less: | | | |
| Interest expense, net | **(185.2)** | (179.1) | (195.6) |
| Income tax benefit (expense) | **1,302.0** | (55.1) | (255.9) |
| Depreciation, depletion and amortization | **(504.0)** | (593.3) | (525.8) |
| EBITDA | $ **(8,924.4)** | $ 1,189.3 | $ (149.3) |
| Less: | | | |
| Impairment of goodwill and other long-lived assets | $ **(9,029.9)** | $ (250.8) | $ (1,049.9) |
| Impairment of equity method investment | **—** | — | (365.4) |
| Loss on sale of Cliffs Logan County Coal | **(419.6)** | — | — |
| Wabush mine impact | **(158.7)** | (72.7) | (30.1) |
| Bloom Lake mine impact | **(137.9)** | 46.5 | 6.4 |
| Foreign exchange remeasurement | **30.7** | 64.0 | (3.2) |
| Proxy contest and change in control costs in SG&A | **(26.6)** | — | — |
| Litigation judgment | **(96.3)** | (9.6) | — |
| Severance in SG&A | **(15.8)** | (16.4) | — |
| Total Adjusted EBITDA | $ **929.7** | $ 1,428.3 | $ 1,292.9 |
| | | | |
| EBITDA: | | | |
| U.S. Iron Ore | $ **805.6** | $ 1,000.1 | $ 1,045.3 |
| Asia Pacific Iron Ore | **(369.8)** | 500.4 | 387.3 |
| North American Coal | **(1,326.8)** | 129.5 | 74.0 |
| Eastern Canadian Iron Ore | **(7,673.9)** | (192.8) | (1,103.3) |
| Other | **(359.5)** | (247.9) | (552.6) |
| Total EBITDA | $ **(8,924.4)** | $ 1,189.3 | $ (149.3) |
| | | | |
| Adjusted EBITDA: | | | |
| U.S. Iron Ore | $ **831.2** | $ 1,030.8 | $ 1,085.6 |
| Asia Pacific Iron Ore | **264.6** | 525.7 | 402.1 |
| North American Coal | **(28.5)** | 154.0 | 106.7 |
| Eastern Canadian Iron Ore | **—** | — | — |
| Other | **(137.6)** | (282.2) | (301.5) |
| Total Adjusted EBITDA | $ **929.7** | $ 1,428.3 | $ 1,292.9 |

122

| | | (In Millions) | | | |
|---|---|---|---|---|---|
| | **2014** | | 2013 | | 2012 |
| Depreciation, depletion and amortization: | | | | | |
| U.S. Iron Ore | $ **107.4** | $ | 120.3 | $ | 100.9 |
| Asia Pacific Iron Ore | **145.9** | | 153.7 | | 151.9 |
| North American Coal | **106.9** | | 128.9 | | 98.2 |
| Eastern Canadian Iron Ore | **135.6** | | 178.5 | | 160.2 |
| Other | **8.2** | | 11.9 | | 14.6 |
| Total depreciation, depletion and amortization | $ **504.0** | $ | 593.3 | $ | 525.8 |
| | | | | | |
| Capital additions[1]: | | | | | |
| U.S. Iron Ore | $ **48.4** | $ | 53.3 | $ | 168.8 |
| Asia Pacific Iron Ore | **10.8** | | 13.0 | | 87.7 |
| North American Coal | **28.8** | | 55.0 | | 144.1 |
| Eastern Canadian Iron Ore | **141.2** | | 625.5 | | 865.2 |
| Other | **6.3** | | 5.5 | | 69.5 |
| Total capital additions | $ **235.5** | $ | 752.3 | $ | 1,335.3 |

[1] Includes capital lease additions and non-cash accruals. Refer to NOTE 17 - CASH FLOW INFORMATION.

A summary of assets by segment is as follows:

| | | (In Millions) | | | |
|---|---|---|---|---|---|
| | **December 31, 2014** | | December 31, 2013 | | December 31, 2012 |
| Assets: | | | | | |
| U.S. Iron Ore | $ **1,598.3** | $ | 1,671.6 | $ | 1,735.1 |
| Asia Pacific Iron Ore | **274.6** | | 1,078.4 | | 1,506.3 |
| North American Coal | **274.2** | | 1,841.8 | | 1,877.8 |
| Eastern Canadian Iron Ore | **305.8** | | 7,915.5 | | 7,605.1 |
| Other | **164.3** | | 455.6 | | 570.9 |
| Total segment assets | **2,617.2** | | 12,962.9 | | 13,295.2 |
| Corporate | **546.8** | | 159.0 | | 279.7 |
| Total assets | $ **3,164.0** | $ | 13,121.9 | $ | 13,574.9 |

123

A004290

Included in the consolidated financial statements are the following amounts relating to geographic location:

|  | (In Millions) | | | | | |
|  | 2014 | | 2013 | | 2012 | |
|---|---|---|---|---|---|---|
| **Revenue** | | | | | | |
| United States | $ | **2,139.4** | $ | 1,857.6 | $ | 2,108.5 |
| China | | **1,049.0** | | 1,909.4 | | 2,008.2 |
| Canada | | **439.1** | | 871.2 | | 728.1 |
| Other countries | | **996.2** | | 1,053.2 | | 1,027.9 |
| Total revenue | $ | **4,623.7** | $ | 5,691.4 | $ | 5,872.7 |
| **Property, Plant and Equipment, Net** | | | | | | |
| United States | $ | **1,093.7** | $ | 2,721.6 | $ | 2,795.3 |
| Australia | | **72.4** | | 751.0 | | 1,042.4 |
| Canada | | **248.8** | | 7,680.8 | | 7,369.6 |
| Total Property, Plant and Equipment, Net | $ | **1,414.9** | $ | 11,153.4 | $ | 11,207.3 |

*Concentrations in Revenue*

In 2014, two customers accounted for more than 10 percent of our consolidated product revenue. In 2013 and 2012, one customer in each year individually accounted for more than 10 percent of our consolidated product revenue. Total revenue from these customers accounted for more than 10 percent of our consolidated product revenues and represents approximately $1.6 billion, $1.0 billion and $0.9 billion of our total consolidated product revenue in 2014, 2013 and 2012, respectively, and is attributable to our U.S. Iron Ore, North American Coal and Eastern Canadian Iron Ore business segments.

The following table represents the percentage of our total revenue contributed by each category of products and services in 2014, 2013, and 2012:

| | 2014 | 2013 | 2012 |
|---|---|---|---|
| **Revenue Category** | | | |
| Iron ore | **78%** | 80% | 81% |
| Coal | **12%** | 13% | 13% |
| Freight and venture partners' cost reimbursements | **10%** | 7% | 6% |
| Total revenue | **100%** | 100% | 100% |

**NOTE 3 - INVENTORIES**

The following table presents the detail of our *Inventories* in the Statements of Consolidated Financial Position as of December 31, 2014 and 2013:

|  | (In Millions) | | | | | | | | | | | |
|  | December 31, 2014 | | | | | | December 31, 2013 | | | | | |
| Segment | Finished Goods | | Work-in Process | | Total Inventory | | Finished Goods | | Work-in Process | | Total Inventory | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| U.S. Iron Ore | $ | **132.1** | $ | **13.5** | $ | **145.6** | $ | 92.1 | $ | 13.0 | $ | 105.1 |
| Asia Pacific Iron Ore | | **26.4** | | **88.1** | | **114.5** | | 39.7 | | 50.6 | | 90.3 |
| North American Coal | | **33.1** | | **17.2** | | **50.3** | | 59.4 | | 23.2 | | 82.6 |
| Eastern Canadian Iron Ore | | **16.3** | | **—** | | **16.3** | | 65.3 | | 48.1 | | 113.4 |
| Total | $ | **207.9** | $ | **118.8** | $ | **326.7** | $ | 256.5 | $ | 134.9 | $ | 391.4 |

124

Table of Contents

*U.S. Iron Ore*

The excess of current cost over LIFO cost of iron ore inventories was $119.0 million and $115.3 million at December 31, 2014 and 2013, respectively. As of December 31, 2014, the product inventory balance for U.S. Iron Ore increased, resulting in a LIFO increment in 2014. The effect of the inventory build was an increase in *Inventories* of $44.8 million in the Statements of Consolidated Financial Position for the year ended December 31, 2014. As of December 31, 2013, the product inventory balance for U.S. Iron Ore declined, resulting in liquidation of a LIFO layer in 2013. The effect of the inventory reduction was a decrease in *Cost of goods sold and operating expenses* of $7.4 million in the Statements of Consolidated Operations for the year ended December 31, 2013.

*North American Coal*

We recorded LCM inventory charges of $44.5 million, $11.1 million and $24.4 million in *Cost of goods sold and operating expenses* in the Statements of Consolidated Operations for the years ended December 31, 2014, 2013 and 2012, respectively, for our North American Coal operations. The charges in 2014 were a result of market pricing declines. The charges in 2013 and 2012 were a result of market pricing declines and costs associated with operational and geological issues.

*Eastern Canadian Iron Ore*

We recorded LCM inventory charges of $38.9 million in *Cost of goods sold and operating expenses* in the Statements of Consolidated Operations for the year ended December 31, 2014, for our Eastern Canadian Iron Ore operations. During 2014, we recorded $10.4 million and $17.5 million of LCM inventory charges related to work-in process inventory and finished goods inventory, respectively, for Bloom Lake. Additionally, we recorded $4.9 million and $6.1 million of LCM inventory charges related to work-in process inventory and finished goods inventory, respectively, for Wabush. The charges at Eastern Canadian Iron Ore were primarily a result of declines in Platts 62 percent Fe fines spot pricing and the increased cost of production. At the end of March 2014, we idled our Wabush Scully mine in Newfoundland and Labrador and began to implement the permanent closure plan for the mine. In December 2014, iron ore production at the Bloom Lake mine was suspended and the Bloom Lake mine was placed in "care-and-maintenance" mode.

For the year ended December 31, 2013, the LCM concentrate and pellet inventory charges recorded were $13.2 million and $11.1 million, respectively, which were recorded in *Cost of goods sold and operating expenses* in the Statements of Consolidated Operations for our Eastern Canadian Iron Ore operations. Additionally, we recorded unsaleable inventory impairment charges of $10.6 million and $7.9 million, respectively, relating to Wabush pellets and concentrate inventory. Both of these charges were recorded in *Cost of goods sold and operating expenses* during 2013 and included in the Statements of Consolidated Operations for the year ended December 31, 2013 for our Eastern Canadian Iron Ore operations.

No LCM inventory adjustments were recorded for the year ended December 31, 2012 within the Eastern Canadian Iron Ore operating segment results.

125

Table of Contents

**NOTE 4 - PROPERTY, PLANT AND EQUIPMENT**

The following table indicates the value of each of the major classes of our consolidated depreciable assets as of December 31, 2014 and 2013:

| | (In Millions) | |
| --- | --- | --- |
| | December 31, | |
| | **2014** | 2013 |
| Land rights and mineral rights | $ **590.2** | $ 7,819.6 |
| Office and information technology | **75.5** | 125.7 |
| Buildings | **65.6** | 255.2 |
| Mining equipment | **732.6** | 1,819.3 |
| Processing equipment | **567.4** | 2,148.6 |
| Electric power facilities | **48.8** | 114.3 |
| Land improvements | **25.5** | 69.3 |
| Other | **60.8** | 227.6 |
| Construction in-progress | **51.3** | 991.3 |
| | **2,217.7** | 13,570.9 |
| Allowance for depreciation and depletion | **(802.8** ) | (2,417.5 ) |
| | $ **1,414.9** | $ 11,153.4 |

We recorded depreciation expense of $320.6 million, $366.9 million and $293.5 million in the Statements of Consolidated Operations for the years ended December 31, 2014, 2013 and 2012, respectively.

At December 31, 2014, there was no accumulated amount of capitalized interest included within construction-in-progress. At December 31, 2013, $31.4 million of capitalized interest was included within construction in-progress, of which $17.4 million was capitalized during 2013.

During the second half of 2014, due to lower than previously expected profits as a result of decreased iron ore pricing expectations and increased costs, we determined that indicators of impairment with respect to certain of our long-lived assets or asset groups existed. Our asset groups generally consist of the assets and liabilities of one or more mines, preparation plants and associated reserves for which the lowest level of identifiable cash flows largely are independent of cash flows of other mines, preparation plants and associated reserves.

As a result of these assessments during 2014, we determined that the future cash flows associated with our Eastern Canadian Iron Ore, Asia Pacific Iron Ore, North American Coal and Ferroalloys asset groups were not sufficient to support the recoverability of the carrying value of these productive assets. Accordingly, during 2014, an other long-lived asset impairment charge of $8,839.0 million was recorded as *Impairment of goodwill and other long-lived assets* in the Statements of Consolidated Operations related to property, plant and equipment. The fair value estimates were calculated using income and market approaches. Refer to NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS for further discussion of these impairments and related fair value estimates.

During the fourth quarter of 2013, we experienced higher than expected production costs and operational inefficiencies at our Wabush operations within our Eastern Canadian Iron Ore operating segment that resulted in continued declines in our profitability of that business, which represented an asset group for purposes of testing our long-lived assets for recoverability. Upon completion of an impairment analysis, it was determined the fair value was less than the carrying value of the asset group, which resulted in an other long-lived asset impairment charge of tangible property, plant and equipment of $140.1 million as *Impairment of goodwill and other long-lived assets* in the Statements of Consolidated Operations for the year ended December 31, 2013. The fair value estimate was calculated using a market approach.

Table of Contents

The net book value of the land rights and mineral rights as of  December 31, 2014 and 2013 is as follows:

|  | (In Millions) | |
|---|---|---|
|  | December 31, | |
|  | 2014 | 2013 |
| Land rights | $ 31.9 | $ 46.3 |
| Mineral rights: | | |
|    Cost | $ 558.3 | $ 7,773.3 |
|    Depletion | (101.3) | (942.6) |
| Net mineral rights | $ 457.0 | $ 6,830.7 |

Accumulated depletion relating to mineral rights, which was recorded using the unit-of-production method, is included in *Cost of goods sold and operating expenses.* We recorded depletion expense of $173.0 million, $206.5 million and $209.8 million in the Statements of Consolidated Operations for the years ended December 31, 2014, 2013 and 2012, respectively. As discussed above, during 2014 we performed impairment assessments with respect to certain of our long-lived assets or asset groups. As a result of these assessments, we recorded an other long-lived asset impairment charge related to mineral rights of $5,772.7 million associated with our Eastern Canadian Iron Ore, Asia Pacific Iron Ore, North American Coal and Ferroalloys asset groups.

## NOTE 5 - DEBT AND CREDIT FACILITIES

The following represents a summary of our long-term debt as of  December 31, 2014 and 2013:

| ($ in Millions) | | | | | | |
|---|---|---|---|---|---|---|
| December 31, 2014 | | | | | | |
| Debt Instrument | Type | Annual Effective Interest Rate | Final Maturity | Total Principal Amount | Total Debt | |
| $700 Million 4.875% 2021 Senior Notes | Fixed | 4.88% | 2021 | $ 690.0 | $ 689.5 | (1) |
| $1.3 Billion Senior Notes: | | | | | | |
|   $500 Million 4.80% 2020 Senior Notes | Fixed | 4.83% | 2020 | 490.0 | 489.4 | (2) |
|   $800 Million 6.25% 2040 Senior Notes | Fixed | 6.34% | 2040 | 800.0 | 790.5 | (3) |
| $400 Million 5.90% 2020 Senior Notes | Fixed | 5.98% | 2020 | 395.0 | 393.7 | (4) |
| $500 Million 3.95% 2018 Senior Notes | Fixed | 5.17% | 2018 | 480.0 | 477.4 | (5) |
| $1.125 Billion Credit Facility: | | | | | | |
|   Revolving Credit Agreement | Variable | 2.94% | 2017 | 1,125.0 | — | (6) |
| Equipment Loans | Fixed | Various | 2020 | 164.8 | 140.8 | |
| Fair Value Adjustment to Interest Rate Hedge | | | | | 2.8 | |
| Total debt | | | | $ 4,144.8 | $ 2,984.1 | |
|   Less current portion | | | | | 21.8 | |
| Long-term debt | | | | | $ 2,962.3 | |

A004294

Table of Contents

($ in Millions)

December 31, 2013

| Debt Instrument | Type | Annual Effective Interest Rate | Final Maturity | Total Face Amount | Total Debt | |
|---|---|---|---|---|---|---|
| $700 Million 4.875% 2021 Senior Notes | Fixed | 4.88% | 2021 | $ 700.0 | $ 699.4 | (1) |
| $1.3 Billion Senior Notes: | | | | | | |
| $500 Million 4.80% 2020 Senior Notes | Fixed | 4.83% | 2020 | 500.0 | 499.2 | (2) |
| $800 Million 6.25% 2040 Senior Notes | Fixed | 6.34% | 2040 | 800.0 | 790.4 | (3) |
| $400 Million 5.90% 2020 Senior Notes | Fixed | 5.98% | 2020 | 400.0 | 398.4 | (4) |
| $500 Million 3.95% 2018 Senior Notes | Fixed | 4.14% | 2018 | 500.0 | 496.5 | (5) |
| $1.75 Billion Credit Facility: | | | | | | |
| Revolving Loan | Variable | 1.64% | 2017 | 1,750.0 | — | (6) |
| Equipment Loans | Fixed | Various | 2020 | 164.8 | 161.7 | |
| Fair Value Adjustment to Interest Rate Hedge | | | | | (2.1) | |
| Total debt | | | | $ 4,814.8 | $ 3,043.5 | |
| Less current portion | | | | | 20.9 | |
| Long-term debt | | | | | $ 3,022.6 | |

(1)    During the fourth quarter of 2014, we purchased $ 10.0 million of outstanding 4.875 percent senior notes that were trading at a discount of 40.5 percent which resulted in a gain on the extinguishment of debt of $4.1 million. As of December 31, 2014, the $700.0 million 4.875 percent senior notes were recorded at a par value of $690.0 million less unamortized discounts of $0.5 million, based on an imputed interest rate of 4.88 percent. As of December 31, 2013, the $700.0 million 4.875 percent senior notes were recorded at a par value of $700.0 million less unamortized discounts of $0.6 million, based on an imputed interest rate of 4.88 percent.

(2)    During the fourth quarter of 2014, we purchased $ 10.0 million of outstanding 4.80 percent senior notes that were trading at a discount of 40.25 percent which resulted in a gain on the extinguishment of debt of $4.0 million. As of December 31, 2014, the $500.0 million 4.80 percent senior notes were recorded at a par value of $490.0 million less unamortized discounts of $0.6 million, based on an imputed interest rate of 4.83 percent. As of December 31, 2013, the $500.0 million 4.80 percent senior notes were recorded at a par value of $500.0 million less unamortized discounts of $0.8 million, based on an imputed interest rate of 4.83 percent.

(3)    As of December 31, 2014 and December 31, 2013, the $800.0 million 6.25 percent senior notes were recorded at par value of $800.0 million less unamortized discounts of $9.5 million and $9.6 million, respectively, based on an imputed interest rate of 6.34 percent.

(4)    During the fourth quarter of 2014, we purchased $ 5.0 million of outstanding 5.90 percent senior notes that were trading at a discount of 38.125 percent which resulted in a gain on the extinguishment of debt of $1.9 million. As of December 31, 2014, the $400.0 million 5.90 percent senior notes were recorded at a par value of $395.0 million less unamortized discounts of $1.3 million, based on an imputed interest rate of 5.98 percent. As of December 31, 2013, the $400.0 million 5.90 percent senior notes were recorded at a par value of $400.0 million less unamortized discounts of $1.6 million, based on an imputed interest rate of 5.98 percent.

(5)    During the fourth quarter of 2014, we purchased $ 20.0 million of outstanding 3.95 percent senior notes that were trading at a discount of 30.875 percent which resulted in a gain on the extinguishment of debt of $6.2 million. As of December 31, 2014, the $500.0 million 3.95 percent senior notes were recorded at a par value of $480.0 million less unamortized discounts of $2.6 million, based on an imputed interest rate of 5.17 percent. As of December 31, 2013, the $500.0 million 3.95 percent senior notes were recorded at a par value of $500.0 million less unamortized discounts of $3.5 million, based on an imputed interest rate of 4.14 percent.

128

A004295

Table of Contents

(6)    As of December 31, 2014 and 2013, no revolving loans were drawn under the credit facility. We had total availability of $1.125 billion and $1.75 billion on our credit facility as of December 31, 2014 and 2013, respectively. Additionally, as of December 31, 2014 and December 31, 2013, the principal amount of letter of credit obligations totaled $149.5 million and $8.4 million, respectively, thereby reducing available borrowing capacity to $1.0 billion and $1.7 billion for each period, respectively.

**Credit Facility**

On October 24, 2014, we amended the revolving credit agreement (Amendment No 5.) to effect the following:

- Reduces the size of the existing facility from $1.25 billion to $1.125 billion.

- Grants a valid and perfected first-priority (subject to certain permitted liens) security interest in certain property and assets of the Company and certain of its subsidiaries, subject to customary exclusions all specified in a security agreement.

- With effect as of September 30, 2014, removes the maximum balance sheet leverage ratio of debt to capitalization of less than 45 percent, which was a covenant introduced in June 2014, and replaces that covenant with a maximum leverage ratio covenant of secured debt to EBITDA that is not to exceed 3.5 times.

- Retains the minimum interest coverage ratio requirement of 3.5 times, and was subsequently reduced to 2.0 times upon completion of certain collateral actions within 60 days of the execution of the amendment. The collateral requirements were satisfied as of December 23, 2014.

- Subjects restricted payments (including the $200 million share repurchase, which was approved in September 2014) and current dividend structure to a $400 million liquidity test.

- Adds limitations regarding acquisitions, investments (including investments in non-wholly owned subsidiaries and joint ventures) and subsidiary debt.

- Eliminates the accounts receivable securitization facility.

- Terminates the ability to have foreign borrowers under the revolving credit agreement.

On September 9, 2014, we amended the revolving credit agreement (Amendment No. 4) to effect the following:

- Permitting a one-time exemption of up to $200 million in share repurchases (consummated in a single transaction or series of related transactions), effective until December 31, 2015. We are not obligated to make any purchases and the program may be suspended or discontinued at any time.

- Reducing the size of the existing unsecured facility from $1.75 billion to $1.25 billion.

- Adding restrictions on the granting of certain pledges and guarantees.

- Adding an obligation to enter into a security agreement, on or before June 30, 2015, to grant security interests to secure obligations under the revolving credit agreement on U.S. receivables and inventory, other than receivables and related property subject to certain existing receivable securitization or other facilities, a pledge of 65 percent of the stock of all material, wholly-owned first-tier foreign subsidiaries and a pledge of all of the stock of all material U.S. subsidiaries, in each case, subject to certain limitations.

All terms of Amendment No. 3 as of June 30, 2014, as discussed below, remained in place and were not changed by Amendment No. 4 as of September 9, 2014.

On June 30, 2014, we amended the revolving credit agreement (Amendment No. 3) to effect the following:

- Replacing the current maximum leverage covenant ratio of debt to earnings of less than 3.5 times with a maximum balance sheet leverage ratio of debt to capitalization of less than 45 percent.

- Resetting the minimum interest coverage ratio from 2.5 to 1.0 to the ratio of 3.5 to 1.0.

- Amending the definition of EBITDA to include certain cash charges related to the Company's Wabush mine and other cash restructuring charges and the definition of net worth to exclude up to $1.0 billion in non-cash impairment charges.

129

A004296

[Table of Contents]

- Modifying the covenants restricting certain investments and acquisitions, the incurrence of certain indebtedness and liens, and the amount of dividends that may be declared or paid and shares that may be repurchased.

On January 22, 2015, we further amended the revolving credit agreement. Refer to NOTE 21 - SUBSEQUENT EVENTS for further information regarding Amendment No. 6.

As of December 31, 2014 and 2013, we were in compliance with all applicable financial covenants related to the revolving credit agreement.

**$500 Million Senior Notes — 2012 Offering**

On December 6, 2012, we completed a $500 million public offering of senior notes at 3.95 percent due January 15, 2018. Interest is fixed and is payable on January 15 and July 15 of each year, beginning on July 15, 2013 until maturity. The senior notes are unsecured obligations and rank equally in right of payment with all our other existing and future unsecured and unsubordinated indebtedness. There are no subsidiary guarantees of the interest and principal amounts. A portion of the net proceeds from the senior notes offering were used on December 28, 2012 to repay $270.0 million and $55.0 million outstanding private placement senior notes in the aggregate and also for the repayment of a portion of the borrowings outstanding under the term loan and the revolving credit facility.

The senior notes may be redeemed any time at our option not less than 30 days nor more than 60 days after prior notice is sent to the holders of the applicable series of notes. The senior notes are redeemable at a redemption price equal to the greater of (1) 100 percent of the principal amount of the notes to be redeemed or (2) the sum of the present values of the remaining scheduled payments of principal and interest on the notes to be redeemed, discounted to the redemption date on a semi-annual basis at the treasury rate plus 50 basis points with respect to the 2018 senior notes, plus, in each case, accrued and unpaid interest to the date of redemption.

In addition, if a change of control triggering event occurs with respect to the senior notes, as defined in the agreement, we will be required to offer to purchase the notes of the applicable series at a purchase price equal to 101 percent of the principal amount, plus accrued and unpaid interest, if any, to the date of purchase.

The terms of the senior notes contain certain customary covenants; however, there are no financial covenants.

*Interest Rate Adjustment Based on Rating Events*

The interest rate payable on the $500.0 million 3.95 percent senior notes may be subject to adjustments from time to time if either Moody's or S&P or, in either case, any Substitute Rating Agency thereof downgrades (or subsequently upgrades) the debt rating assigned to the senior notes. In no event shall (1) the interest rate for the senior notes be reduced to below the interest rate payable on the senior notes on the date of the initial issuance of senior notes or (2) the total increase in the interest rate on the senior notes exceed 2.00 percent above the interest rate payable on the senior notes on the date of the initial issuance of senior notes. During 2014, the interest rate payable on the $500.0 million 3.95 percent senior notes was increased from 3.95 percent ultimately to 5.70 percent based on Substitute Rating Agency downgrades throughout the year.

**$1 Billion Senior Notes — 2011 Offering**

On March 23, 2011 and April 1, 2011, respectively, we completed a $1 billion public offering of senior notes consisting of two tranches: a 10-year tranche of $700 million aggregate principal amount at 4.88 percent senior notes due April 1, 2021, and a 30-year tranche of $300 million aggregate principal amount at 6.25 percent senior notes due October 1, 2040, of which $500 million aggregate principal amount previously was issued during September 2010. Interest is fixed and is payable on April 1 and October 1 of each year, beginning on October 1, 2011, for both series of senior notes until maturity. The senior notes are unsecured obligations and rank equally in right of payment with all our other existing and future unsecured and unsubordinated indebtedness. There are no subsidiary guarantees of the interest and principal amounts. The net proceeds from the senior notes offering were used to fund a portion of the acquisition of Consolidated Thompson and to pay the related fees and expenses.

130

The senior notes may be redeemed any time at our option not less than 30 days nor more than 60 days after prior notice is sent to the holders of the applicable series of notes. The senior notes are redeemable at a redemption price equal to the greater of (1) 100 percent of the principal amount of the notes to be redeemed or (2) the sum of the present values of the remaining scheduled payments of principal and interest on the notes to be redeemed, discounted to the redemption date on a semi-annual basis at the treasury rate plus 25 basis points with respect to the 2021 senior notes and 40 basis points with respect to the 2040 senior notes, plus, in each case, accrued and unpaid interest to the date of redemption. However, if the 2021 senior notes are redeemed on or after the date that is three months prior to their maturity date, the 2021 senior notes will be redeemed at a redemption price equal to 100 percent of the principal amount of the notes to be redeemed plus accrued and unpaid interest to the date of redemption.

In addition, if a change of control triggering event occurs with respect to the senior notes, as defined in the agreement, we will be required to offer to purchase the notes of the applicable series at a purchase price equal to 101 percent of the principal amount, plus accrued and unpaid interest, if any, to the date of purchase.

The terms of the senior notes contain certain customary covenants; however, there are no financial covenants.

**$1 Billion Senior Notes — 2010 Offering**

On September 20, 2010, we completed a $1 billion public offering of senior notes consisting of two tranches: a 10-year tranche of $500 million aggregate principal amount at 4.80 percent due October 1, 2020, and a 30-year tranche of $500 million aggregate principal amount at 6.25 percent due October 1, 2040. Interest is fixed and is payable on April 1 and October 1 of each year, beginning on April 1, 2011, for both series of senior notes until maturity. The senior notes are unsecured obligations and rank equally in right of payment with all of our other existing and future senior unsecured and unsubordinated indebtedness. There are no subsidiary guarantees of the interest and principal amounts.

A portion of the net proceeds from the senior notes offering was used on September 22, 2010 to repay $350 million outstanding under our credit facility. A portion of the net proceeds was also used for general corporate purposes, including funding of capital expenditures and were used to fund a portion of the acquisition of Consolidated Thompson and related expenses.

The senior notes may be redeemed any time at our option not less than 30 days nor more than 60 days after prior notice is sent to the holders of the applicable series of notes. The senior notes are redeemable at a redemption price equal to the greater of (1) 100 percent of the principal amount of the notes to be redeemed or (2) the sum of the present values of the remaining scheduled payments of principal and interest on the notes to be redeemed, discounted to the redemption date on a semi-annual basis at the treasury rate plus 35 basis points with respect to the 2020 senior notes and 40 basis points with respect to the 2040 senior notes, plus, in each case, accrued and unpaid interest to the date of redemption. In addition, if a change of control triggering event occurs with respect to the notes, we will be required to offer to purchase the notes at a purchase price equal to 101 percent of the principal amount, plus accrued and unpaid interest to the date of purchase.

The terms of the senior notes contain certain customary covenants; however, there are no financial covenants.

**$400 Million Senior Notes Offering — 2010 Offering**

On March 17, 2010, we completed a $400 million public offering of senior notes due March 15, 2020. Interest at a fixed rate of 5.90 percent is payable on March 15 and September 15 of each year, beginning on September 15, 2010, until maturity on March 15, 2020. The senior notes are unsecured obligations and rank equally in right of payment with all of our other existing and future senior unsecured and unsubordinated indebtedness. There are no subsidiary guarantees of the interest and principal amounts.

A portion of the net proceeds from the senior notes offering was used on March 31, 2010 to repay our $200 million term loan under our credit facility, as well as to repay on May 27, 2010 our share of Amapá's remaining debt outstanding of $100.8 million. In addition, we used the remainder of the net proceeds to help fund the acquisitions of Spider and CLCC during the third quarter of 2010.

The senior notes may be redeemed any time at our option not less than 30 days nor more than 60 days after prior notice is sent to the holders of the applicable series of notes. The senior notes are redeemable at a redemption price equal to the greater of (1) 100 percent of the principal amount of the notes to be redeemed or (2) the sum of the present values of the remaining scheduled payments of principal and interest on the notes to be redeemed, discounted to the redemption date on a semi-annual basis, plus accrued and unpaid interest to the date of redemption. In addition, if a change of control triggering event occurs, we will be required to offer to purchase the notes at a purchase price equal to 101 percent of the principal amount, plus accrued and unpaid interest to the date of purchase.

A004298

The terms of the senior notes contain certain customary covenants; however, there are no financial covenants.

**Equipment Loans**

During the second half of 2013, we entered into $164.8 million of seven-year installment equipment loans with various interest rates. The loans are secured by equipment from our Eastern Canadian Iron Ore operations as well as a parent guarantee. Proceeds from the borrowings were used for general corporate purposes.

**Short-Term Facilities**

Asia Pacific Iron Ore maintains a bank contingent instrument and cash advance facility. The facility, which is renewable annually at the bank's discretion, provides A$3.0 million ($2.5 million) at December 31, 2014 in credit for contingent instruments, such as performance bonds, and the ability to request a cash advance facility to be provided at the discretion of the bank. The facility limit was reduced from A$30.0 million to A$3.0 million during the fourth quarter of 2014. At December 31, 2013, the facility provided A$30.0 million ($26.8 million) in credit for contingent instruments. As of December 31, 2014, the outstanding bank guarantees under the facility totaled A$1.5 million ($1.2 million), thereby reducing borrowing capacity to A$1.5 million ($1.3 million). As of December 31, 2013, the outstanding bank guarantees under the facility totaled A$23.0 million ($20.5 million), thereby reducing borrowing capacity to A$7.0 million ($6.3 million). We have provided a guarantee of the facility, along with certain of our Australian subsidiaries. The terms of the short-term facility contain certain customary covenants; however, there are no financial covenants.

**Letters of Credit**

We have outstanding letters of credit provided for under the amended revolving credit agreement which totaled $149.5 million and $8.4 million as of December 31, 2014 and December 31, 2013, respectively. Additionally, we issued standby letters of credit with certain financial institutions in addition to the letters of credit provided for under the revolving credit agreement of $48.0 million as of December 31, 2013.

**Debt Maturities**

The following represents a summary of our maturities of debt instruments, excluding borrowings on the amended revolving credit agreement, based on the principal amounts outstanding at December 31, 2014:

|  | (In Millions) |
| --- | --- |
|  | **Maturities of Debt** |
| 2015 | $ 21.8 |
| 2016 | 22.7 |
| 2017 | 23.6 |
| 2018 | 504.6 |
| 2019 | 25.5 |
| 2020 and thereafter | 2,397.6 |
| Total maturities of debt | $ 2,995.8 |

132

A004299

Table of Contents

**NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS**

The following represents the assets and liabilities of the Company measured at fair value at  December 31, 2014 and 2013:

| | (In Millions) | | | |
|---|---|---|---|---|
| | December 31, 2014 | | | |
| Description | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| Assets: | | | | |
| Derivative assets | — | — | 63.2 | 63.2 |
| Available-for-sale marketable securities | 4.3 | — | — | 4.3 |
| Total | $ 4.3 | $ — | $ 63.2 | $ 67.5 |
| Liabilities: | | | | |
| Derivative liabilities | $ — | $ — | $ 11.8 | $ 11.8 |
| Foreign exchange contracts | — | 31.5 | — | 31.5 |
| Total | $ — | $ 31.5 | $ 11.8 | $ 43.3 |

| | (In Millions) | | | |
|---|---|---|---|---|
| | December 31, 2013 | | | |
| Description | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| Assets: | | | | |
| Cash equivalents | $ 85.0 | $ — | $ — | $ 85.0 |
| Derivative assets | — | — | 58.9 | 58.9 |
| Available-for-sale marketable securities | 21.4 | — | — | 21.4 |
| Foreign exchange contracts | — | 0.3 | — | 0.3 |
| Total | $ 106.4 | $ 0.3 | $ 58.9 | $ 165.6 |
| Liabilities: | | | | |
| Derivative liabilities | $ — | $ 2.1 | $ 10.3 | $ 12.4 |
| Foreign exchange contracts | — | 26.9 | — | 26.9 |
| Total | $ — | $ 29.0 | $ 10.3 | $ 39.3 |

Financial assets classified in Level 1 at December 31, 2014 include available-for-sale marketable securities. Financial assets classified in Level 1 at December 31, 2013 include money market funds and available-for-sale marketable securities. The valuation of these instruments is based upon unadjusted quoted prices for identical assets in active markets.

The valuation of financial assets and liabilities classified in Level 2 is determined using a market approach based upon quoted prices for similar assets and liabilities in active markets, or other inputs that are observable. Level 2 securities primarily include derivative financial instruments valued using financial models that use as their basis readily observable market parameters. At December 31, 2014, such derivative financial instruments included our existing foreign currency exchange contracts. At December 31, 2013, such derivative financial instruments included our existing foreign currency exchange contracts and interest rate swaps. The fair value of the foreign currency exchange contracts

133

Table of Contents

is based on forward market prices and represents the estimated amount we would receive or pay to terminate these agreements at the reporting date, taking into account creditworthiness, nonperformance risk and liquidity risks associated with current market conditions.

The derivative assets classified within Level 3 at December 31, 2014 and December 31, 2013 included a freestanding derivative instrument related to certain supply agreements with one of our U.S. Iron Ore customers. The agreements include provisions for supplemental revenue or refunds based on the customer's annual steel pricing at the time the product is consumed in the customer's blast furnaces. We account for this provision as a derivative instrument at the time of sale and adjust this provision to fair value as an adjustment to *Product revenues* each reporting period until the product is consumed and the amounts are settled. The fair value of the instrument is determined using a market approach based on an estimate of the annual realized price of hot-rolled steel at the steelmaker's facilities, and takes into consideration current market conditions and nonperformance risk.

The Level 3 derivative assets and liabilities at December 31, 2014 and December 31, 2013 also consisted of derivatives related to certain provisional pricing arrangements with our U.S. Iron Ore, Asia Pacific Iron Ore and Eastern Canadian Iron Ore customers. These provisional pricing arrangements specify provisional price calculations, where the pricing mechanisms generally are based on market pricing, with the final revenue rate to be based on market inputs at a specified point in time in the future, per the terms of the supply agreements. The difference between the provisionally agreed-upon price and the estimated final revenue rate is characterized as a derivative and is required to be accounted for separately once the revenue has been recognized. The derivative instrument is adjusted to fair value through *Product revenues* each reporting period based upon current market data and forward-looking estimates provided by management until the final revenue rate is determined.

The following table illustrates information about quantitative inputs and assumptions for the derivative assets and derivative liabilities categorized in Level 3 of the fair value hierarchy:

**Qualitative/Quantitative Information About Level 3 Fair Value Measurements**

| ($ in millions) | Fair Value at 12/31/2014 | Balance Sheet Location | Valuation Technique | Unobservable Input | Range or Point Estimate (Weighted Average) |
|---|---|---|---|---|---|
| Provisional Pricing Arrangements | $ 11.8 | *Other current liabilities* | Market Approach | Management's Estimate of 62% Fe | $72 |
| Customer Supply Agreement | $ 63.2 | *Other current assets* | Market Approach | Hot-Rolled Steel Estimate | $590 - $640 ($610) |

The significant unobservable input used in the fair value measurement of the reporting entity's provisional pricing arrangements is management's estimate of 62 percent Fe fines spot price based upon current market data, including historical seasonality and forward-looking estimates determined by management. Significant increases or decreases in this input would result in a significantly higher or lower fair value measurement, respectively.

The significant unobservable input used in the fair value measurement of the reporting entity's customer supply agreements is the future hot-rolled steel price that is estimated based on current market data, analysts' projections, projections provided by the customer and forward-looking estimates determined by management. Significant increases or decreases in this input would result in a significantly higher or lower fair value measurement, respectively.

Table of Contents

We recognize any transfers between levels as of the beginning of the reporting period, including both transfers into and out of levels. There were no transfers between Level 1 and Level 2 of the fair value hierarchy during the years ended December 31, 2014 and 2013. The following tables represent a reconciliation of the changes in fair value of financial instruments measured at fair value on a recurring basis using significant unobservable inputs (Level 3) for the years ended December 31, 2014 and 2013.

|  | (In Millions) | | | |
|  | Derivative Assets (Level 3) | | Derivative Liabilities (Level 3) | |
|  | Year Ended December 31, | | Year Ended December 31, | |
|  | 2014 | 2013 | 2014 | 2013 |
|---|---|---|---|---|
| Beginning balance - January 1 | $ 58.9 | $ 62.4 | $ (10.3) | $ (11.3) |
| Total gains (losses) | | | | |
| Included in earnings | 187.8 | 152.3 | (11.8) | (10.3) |
| Settlements | (183.5) | (155.8) | 10.3 | 11.3 |
| Transfers into Level 3 | — | — | — | — |
| Transfers out of Level 3 | — | — | — | — |
| Ending balance - December 31 | $ 63.2 | $ 58.9 | $ (11.8) | $ (10.3) |
| Total gains (losses) for the period included in earnings attributable to the change in unrealized gains (losses) on assets still held at the reporting date | $ 187.8 | $ 152.3 | $ (11.8) | $ (10.3) |

Gains and losses included in earnings are reported in *Product revenues* in the Statements of Consolidated Operations for the years ended December 31, 2014 and 2013.

The carrying amount for certain financial instruments (e.g. *Accounts receivable, net*, *Accounts payable* and *Accrued expenses*) approximate fair value and, therefore, have been excluded from the table below. A summary of the carrying amount and fair value of other financial instruments at December 31, 2014 and 2013 were as follows:

|  |  | (In Millions) | | | |
|  |  | December 31, 2014 | | December 31, 2013 | |
|  | Classification | Carrying Value | Fair Value | Carrying Value | Fair Value |
|---|---|---|---|---|---|
| Long-term debt: | | | | | |
| Senior notes—$700 million | Level 2 | 689.5 | 367.3 | 699.4 | 718.2 |
| Senior notes—$1.3 billion | Level 2 | 1,279.9 | 704.0 | 1,289.6 | 1,404.9 |
| Senior notes—$400 million | Level 2 | 393.7 | 228.1 | 398.4 | 432.1 |
| Senior notes—$500 million | Level 2 | 477.4 | 312.0 | 496.5 | 523.8 |
| Revolving loan | Level 2 | — | — | — | — |
| Equipment Loan Facilities | Level 2 | 119.0 | 119.0 | 140.8 | 140.8 |
| Fair Value Adjustment to Interest Rate Hedge | Level 2 | 2.8 | 2.8 | (2.1) | (2.1) |
| Total long-term debt | | $ 2,963.3 | $ 1,733.2 | $ 3,022.6 | $ 3,217.7 |

The fair value of long-term debt was determined using quoted market prices or discounted cash flows based upon current borrowing rates. The revolving loan and equipment loan facilities are variable rate interest and approximate fair value. See NOTE 5 - DEBT AND CREDIT FACILITIES for further information.

Table of Contents

*Items Measured at Fair Value on a Non-Recurring Basis*

The following tables present information about the impairment charges on both financial and nonfinancial assets that were measured on a fair value basis at December 31, 2014 and December 31, 2013. The table also indicates the fair value hierarchy of the valuation techniques used to determine such fair value.

| | (In Millions) | | | | |
| --- | --- | --- | --- | --- | --- |
| | Year Ended December 31, 2014 | | | | |
| Description | Quoted Prices in Active Markets for Identical Assets/ Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total | Total Losses |
| **Assets:** | | | | | |
| Goodwill impairment - Asia Pacific Iron Ore reporting unit | $ — | $ — | $ — | $ — | $ 73.5 |
| Other long-lived assets - Property, plant and equipment and Mineral rights: | | | | | |
| Asia Pacific Iron Ore reporting unit | — | — | 72.4 | 72.4 | 526.5 |
| North American Coal reporting unit | | | | | |
| CLCC thermal asset group | — | — | 62.6 | 62.6 | 195.5 |
| Pinnacle asset group | — | — | 30.7 | 30.7 | 394.5 |
| Oak Grove asset group | — | — | 23.4 | 23.4 | 267.5 |
| Eastern Canadian Iron Ore reporting unit | | | | | |
| Bloom Lake asset group | — | — | 187.9 | 187.9 | 7,043.7 |
| Wabush asset group | — | — | 42.7 | 42.7 | 132.6 |
| Ferroalloys reporting unit | — | — | 12.2 | 12.2 | 259.5 |
| Other reporting units | — | — | — | — | 19.2 |
| Other long-lived assets - Intangibles and other long-term assets: | | | | | |
| Asia Pacific Iron Ore reporting unit | — | — | 7.0 | 7.0 | 24.2 |
| Eastern Canadian Iron Ore reporting unit | | | | | |
| Bloom Lake asset group | — | — | — | — | 56.2 |
| Wabush asset group | — | — | — | — | 36.7 |
| Ferroalloys reporting unit | — | — | — | — | 0.3 |
| Investment in ventures impairment - Global Exploration | — | — | — | — | 9.2 |
| | $ — | $ — | $ 438.9 | $ 438.9 | $ 9,039.1 |

*Financial Assets*

During the third quarter of 2014, an impairment charge of $9.2 million to investment in ventures was recorded within our Global Exploration operating segment as a decision was made to abandon the investment during the period.

*Non-Financial Assets*

During the third and fourth quarter of 2014, we identified factors that indicated the carrying values of the asset groups in the chart above may not be recoverable primarily due to long-term price forecasts as part of management's long-range planning process. Updated estimates of long-term prices for all products, specifically the Platts 62 percent Fe fines spot price, which particularly effects Eastern Canadian Iron Ore and Asia Pacific Iron Ore business segments because their contracts correlate heavily to world market spot pricing, and the benchmark price for premium low-volatile hard coking coal were lower than prior estimates. These estimates were updated based upon current market conditions,

136

A004303

Table of Contents

macro-economic factors influencing the balance of supply and demand for our products and expectations for future cost and capital expenditure requirements. Additionally, a new CEO, Lourenco Goncalves, was appointed by the Board of Directors in early August 2014 and subsequently identified as the CODM in accordance with ASC 280, Segment Reporting. The new CODM views Eastern Canadian Iron Ore, Asia Pacific Iron Ore, North American Coal and Ferroalloys as non-core assets and has communicated plans to evaluate the business units for a change in strategy including possible divestiture. These factors, among other considerations utilized in the individual impairment assessments, indicate that the carrying value of the respective asset groups in the chart above and Asia Pacific Iron Ore goodwill may not be recoverable.

During the third quarter of 2014, a goodwill impairment charge of $73.5 million was recorded for our Asia Pacific Iron Ore reporting segment. Based on our review of the fair value hierarchy, the inputs used in these fair value measurements were considered Level 3 inputs.

We also recorded impairment charges to property, plant and equipment, mineral rights, intangible assets and other long-term assets during the second half of 2014 related to our Wabush operation and Bloom Lake operation within our Eastern Canadian Iron Ore operating segment, our Asia Pacific Iron Ore operating segment and our CLCC thermal operation, Oak Grove operation and Pinnacle operation within our North American Coal operating segment, along with impairments charged to reporting units within our *Other* reportable segments. A detailed break out of the impairment charges is shown in the chart above. The recorded impairment charges reduce the related assets to their estimated fair value as we determined that the future cash flows associated with these operations were not sufficient to support the recoverability of the carrying value of these assets. Fair value was determined based on management's best estimate within a range of fair values, which is considered a Level 3 input, and resulted in an asset impairment charge of $8,956.4 million. The Level 3 inputs used to determine fair value included models developed and market inputs obtained by management which provided a range of fair value estimates of property, plant and equipment. Management's models include internally developed long-term future cash flow estimates, capital expenditure and cost estimates, market inputs to determine long-term pricing assumptions, discount rates, and foreign exchange rates.

| | (In Millions) | | | | |
|---|---|---|---|---|---|
| | Year Ended December 31, 2013 | | | | |
| Description | Quoted Prices in Active Markets for Identical Assets/ Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total | Total Losses |
| Assets: | | | | | |
| Goodwill impairment - Ferroalloys reporting unit | $ — | $ — | $ — | $ — | $ 80.9 |
| Other long-lived assets - Property, plant and equipment | — | — | 46.3 | 46.3 | 155.4 |
| Other long-lived assets - Intangibles and long-term deposits | — | — | 1.6 | 1.6 | 14.5 |
| Investment in ventures impairment - Amapá | — | — | — | — | 67.6 |
| Total | $ — | $ — | $ 47.9 | $ 47.9 | $ 318.4 |

*Financial Assets*

In light of the March 28, 2013 collapse of the Santana port shiploader and subsequent evaluation of the effect that this event had on the carrying value of our investment in Amapá as of June 30, 2013, we recorded an impairment charge of $67.6 million in the second quarter of 2013. The sale of Amapá was completed in the fourth quarter of 2013.

A004304

Table of Contents

*Non-Financial Assets*

During the fourth quarter of 2013, a goodwill impairment charge of $80.9 million was recorded for our Cliffs Chromite Ontario and Cliffs Chromite Far North reporting units within our Ferroalloys operating segment. The impairment charge was primarily a result of the decision to indefinitely suspend the Chromite Project and to not allocate additional capital for the project given the uncertain timeline and risks associated with the development of necessary infrastructure to bring the project online. Based on our review of the fair value hierarchy, the inputs used in these fair value measurements were considered Level 3 inputs.

We also recorded an impairment charges to property, plant and equipment during 2013 related to our Wabush operation within our Eastern Canadian Iron Ore operating segment, our Cliffs Chromite Ontario and Cliffs Chromite Far North reporting units within our *Other* reportable segments and certain mineral lands at our Asia Pacific Iron Ore operating segment to reduce the related assets to their estimated fair value as we determined that the cash flows associated with these operations were not sufficient to support the recoverability of the carrying value of these assets. Fair value was determined based on management's estimate of liquidation value, which is considered a Level 3 input, and resulted in a charge of $155.4 million.

## NOTE 7 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS

We offer defined benefit pension plans, defined contribution pension plans and other postretirement benefit plans, primarily consisting of retiree healthcare benefits, to most employees in North America as part of a total compensation and benefits program. We do not have employee retirement benefit obligations at our Asia Pacific Iron Ore operations or our Bloom Lake mine operations within our Eastern Canadian Iron Ore segment. The defined benefit pension plans largely are noncontributory and benefits generally are based on employees' years of service and average earnings for a defined period prior to retirement or a minimum formula.

The labor agreements we have with the USW at our U.S. Iron Ore operations cover approximately  2,200 USW-represented employees at our Empire and Tilden mines in Michigan and our United Taconite and Hibbing mines in Minnesota, or 40.9 percent of our total workforce. The 2012 USW agreement sets temporary monthly postretirement OPEB caps for participants who retire prior to January 1, 2015. These premium maximums will expire at the end of the contract period and revert to increasing premiums based on the terms of the 2004 bargaining agreement. The agreements also provide for an OPEB cap that will limit the amount of contributions that we have to make toward medical insurance coverage for each retiree and spouse of a retiree per calendar year after it goes into effect. The amount of the annual OPEB cap will be based upon the costs we incurred in 2014. The OPEB cap applies to employees who retire on or after January 1, 2015 and will not apply to surviving spouses. In addition, the agreements renewed the lump sum special payments for certain employees retiring in the near future.

In addition, we currently provide various levels of retirement health care and OPEB to most full-time employees who meet certain length of service and age requirements (a portion of which is pursuant to collective bargaining agreements). Most plans require retiree contributions and have deductibles, co-pay requirements and benefit limits. Most bargaining unit plans require retiree contributions and co-pays for major medical and prescription drug coverage. There is an annual limit on our cost for medical coverage under the U.S. salaried plans. The annual limit applies to each covered participant and equals $7,000 for coverage prior to age 65 and $3,000 for coverage after age 65, with the retiree's participation adjusted based on the age at which the retiree's benefits commence. Beginning in 2015, Cliffs is changing the delivery of the post-65 salaried retiree medical benefit program from an employer sponsored plan to the combination of an employer subsidy plan and an individual supplemental Medicare insurance plan purchased through a Medicare exchange. This allows the program to take full advantage of available government subsidies and more efficient pricing in the Medicare market. For participants at our Northshore operation, the annual limit ranges from $4,020 to $4,500 for coverage prior to age 65, and equals  $2,000 for coverage after age 65. Covered participants pay an amount for coverage equal to the excess of (i) the average cost of coverage for all covered participants, over (ii) the participant's individual limit, but in no event will the participant's cost be less than 15.0 percent of the average cost of coverage for all covered participants. For Northshore participants, the minimum participant cost is a fixed dollar amount. We do not provide OPEB for most U.S. salaried employees hired after January 1, 1993. Retiree healthcare coverage is provided through programs administered by insurance companies whose charges are based on benefits paid.

Our North American Coal segment is required under an agreement with the UMWA to contribute to the UMWA 1974 Pension Trust based principally on hours worked by UMWA-represented employees. This agreement covers approximately 800 UMWA-represented employees at our Pinnacle Complex in West Virginia and our Oak Grove mine in Alabama, or 15.2 percent of our total workforce. The multi-employer pension trust provides pension benefits to eligible retirees through a defined benefit plan. The UMWA 1993 Benefit Plan is a defined contribution plan that was created as

138

A004305

the result of negotiations for the NBCWA of 1993. The plan provides healthcare insurance to orphan UMWA retirees who are not eligible to participate in the UMWA Combined Benefit Fund or the 1992 Benefit Fund or whose last employer signed the 1993 or later NBCWA and who subsequently goes out of business. Contributions to the trust were at a rate of $8.16 per hour worked 2014 and at a rate of $8.10 per hour worked for both 2013 and 2012. These amounted to $13.8 million in 2014 and $14.9 million in both 2013 and 2012, respectively. Our Pinnacle and Oak Grove mines are signatories to labor agreements with the UMWA, making them participants in the UMWA 1974 Pension Plan (the "1974 PP"). As of the most recent estimate, Pinnacle and Oak Grove's combined share of this underfunded liability was estimated to be approximately $330 million. If Pinnacle or Oak Grove were to withdraw from the 1974 PP or if a mass withdrawal were to occur, we would become obligated to satisfy our withdrawal liability to the 1974 PP.

In December 2003, The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 was enacted. This act introduced a prescription drug benefit under Medicare Part D as well as a federal subsidy to sponsors of retiree healthcare benefit plans that provide a benefit that at least actuarially is equivalent to Medicare Part D. Our measures of the accumulated postretirement benefit obligation and net periodic postretirement benefit cost as of December 31, 2004 and for periods thereafter reflect amounts associated with the subsidy. We elected to adopt the retroactive transition method for recognizing the cost reduction in 2004.

The shut-down of the Wabush Scully mine on October 31, 2014 and the idling at Bloom Lake as of December 31, 2014 affected employees of both the Wabush Scully mine and Pointe Noire locations, triggering early retirement benefits for those hourly and salaried plan participants who were eligible, and termination of benefits of other participants who were not eligible. Curtailment gains related to these events totaled $7.9 million and were fully recognized in net periodic benefit cost in 2014.

The following table summarizes the annual expense recognized related to the retirement plans for 2014, 2013 and 2012:

| | | | (In Millions) | | | |
|---|---|---|---|---|---|---|
| | | 2014 | | 2013 | | 2012 |
| Defined benefit pension plans | $ | 31.3 | $ | 52.1 | $ | 55.2 |
| Defined contribution pension plans | | 6.3 | | 6.8 | | 6.7 |
| Other postretirement benefits | | (0.7) | | 17.4 | | 28.1 |
| Total | $ | 36.9 | $ | 76.3 | $ | 90.0 |

139

A004306

Table of Contents

The following tables and information provide additional disclosures for our consolidated plans.

**Obligations and Funded Status**

The following tables and information provide additional disclosures for the  December 31, 2014 and 2013:

|  | (In Millions) | | | |
|  | **Pension Benefits** | | **Other Benefits** | |
| **Change in benefit obligations:** | **2014** | 2013 | **2014** | 2013 |
| Benefit obligations — beginning of year | **$ 1,118.0** | $ 1,244.3 | **$ 356.2** | $ 459.8 |
| Service cost (excluding expenses) | **30.8** | 38.9 | **6.7** | 12.3 |
| Interest cost | **49.7** | 45.9 | **16.2** | 17.3 |
| Plan amendments | **—** | 0.8 | **(0.9)** | — |
| Actuarial (gain) loss | **141.6** | (121.8) | **51.9** | (103.3) |
| Benefits paid | **(87.0)** | (72.9) | **(27.4)** | (28.0) |
| Participant contributions | **—** | — | **4.8** | 5.6 |
| Federal subsidy on benefits paid | **—** | — | **0.9** | 0.5 |
| Exchange rate gain | **(18.2)** | (17.2) | **(3.7)** | (8.0) |
| Curtailment gain | **(10.9)** | — | **(8.8)** | — |
| Special termination benefits | **3.4** | — | **—** | — |
| Benefit obligations — end of year | **$ 1,227.4** | $ 1,118.0 | **$ 395.9** | $ 356.2 |
|  |  |  |  |  |
| **Change in plan assets:** |  |  |  |  |
| Fair value of plan assets — beginning of year | **$ 915.3** | $ 838.7 | **$ 251.8** | $ 237.0 |
| Actual return on plan assets | **78.7** | 109.5 | **31.9** | 11.0 |
| Participant contributions | **—** | — | **0.8** | 1.8 |
| Employer contributions | **60.5** | 53.7 | **6.9** | 20.7 |
| Benefits paid | **(87.0)** | (72.9) | **(22.1)** | (18.7) |
| Exchange rate loss | **(17.9)** | (13.7) | **—** | — |
| Fair value of plan assets — end of year | **$ 949.6** | $ 915.3 | **$ 269.3** | $ 251.8 |
|  |  |  |  |  |
| **Funded status at December 31:** |  |  |  |  |
| Fair value of plan assets | **$ 949.6** | $ 915.3 | **$ 269.3** | $ 251.8 |
| Benefit obligations | **(1,227.4)** | (1,118.0) | **(395.9)** | (356.2) |
| Funded status (plan assets less benefit obligations) | **$ (277.8)** | $ (202.7) | **$ (126.6)** | $ (104.4) |
| Amount recognized at December 31 | **$ (277.8)** | $ (202.7) | **$ (126.6)** | $ (104.4) |
|  |  |  |  |  |
| **Amounts recognized in Statements of Financial Position:** |  |  |  |  |
| Current liabilities | **$ (2.4)** | $ (5.2) | **$ (6.8)** | $ (7.9) |
| Noncurrent liabilities | **(275.4)** | (197.5) | **(119.8)** | (96.5) |
| Net amount recognized | **$ (277.8)** | $ (202.7) | **$ (126.6)** | $ (104.4) |
|  |  |  |  |  |
| **Amounts recognized in accumulated other comprehensive income:** |  |  |  |  |
| Net actuarial loss | **$ 341.5** | $ 230.6 | **$ 97.1** | $ 67.0 |
| Prior service cost | **10.6** | 14.9 | **(42.9)** | (45.4) |
| Net amount recognized | **$ 352.1** | $ 245.5 | **$ 54.2** | $ 21.6 |
|  |  |  |  |  |
| **The estimated amounts that will be amortized from accumulated other comprehensive income into net periodic benefit cost in 2015:** |  |  |  |  |
| Net actuarial loss | **$ 22.3** |  | **$ 6.3** |  |
| Prior service cost | **2.4** |  | **(3.7)** |  |
| Net amount recognized | **$ 24.7** |  | **$ 2.6** |  |

140

A004307

**(In Millions)**

**2014**

| | Pension Plans | | | | | Other Benefits | | |
|---|---|---|---|---|---|---|---|---|
| | Salaried | Hourly | Mining | SERP | Total | Salaried | Hourly | Total |
| Fair value of plan assets | $ 366.4 | $ 576.6 | $ 6.6 | $ — | $ 949.6 | $ — | $ 269.3 | $ 269.3 |
| Benefit obligation | (471.4) | (739.2) | (9.2) | (7.6) | (1,227.4) | (54.0) | (341.9) | (395.9) |
| Funded status | $ (105.0) | $ (162.6) | $ (2.6) | $ (7.6) | $ (277.8) | $ (54.0) | $ (72.6) | $ (126.6) |

**2013**

| | Pension Plans | | | | | Other Benefits | | |
|---|---|---|---|---|---|---|---|---|
| | Salaried | Hourly | Mining | SERP | Total | Salaried | Hourly | Total |
| Fair value of plan assets | $ 357.4 | $ 552.7 | $ 5.2 | $ — | $ 915.3 | $ — | $ 251.8 | $ 251.8 |
| Benefit obligation | (427.2) | (674.8) | (6.8) | (9.2) | (1,118.0) | (53.6) | (302.6) | (356.2) |
| Funded status | $ (69.8) | $ (122.1) | $ (1.6) | $ (9.2) | $ (202.7) | $ (53.6) | $ (50.8) | $ (104.4) |

The accumulated benefit obligation for all defined benefit pension plans was $1,204.4 million and $1,091.4 million at December 31, 2014 and 2013, respectively. The increase in the accumulated benefit obligation primarily is a result of a decrease in the discount rates and adoption of the updated RP-2014 mortality tables.

**Components of Net Periodic Benefit Cost**

**(In Millions)**

| | Pension Benefits | | | Other Benefits | | |
|---|---|---|---|---|---|---|
| | 2014 | 2013 | 2012 | 2014 | 2013 | 2012 |
| Service cost | $ 30.8 | $ 38.9 | $ 32.0 | $ 6.7 | $ 12.3 | $ 14.7 |
| Interest cost | 49.7 | 45.9 | 48.4 | 16.2 | 17.3 | 20.6 |
| Expected return on plan assets | (72.3) | (65.6) | (59.5) | (17.1) | (20.1) | (17.7) |
| Amortization: | | | | | | |
|    Net asset | — | — | — | — | — | (3.0) |
|    Prior service costs (credits) | 2.7 | 3.0 | 3.9 | (3.6) | (3.6) | 1.9 |
|    Net actuarial loss | 14.1 | 29.9 | 30.4 | 5.0 | 11.5 | 11.6 |
| Curtailments and settlements | 2.9 | — | — | (7.9) | — | — |
| Special termination benefits | 3.4 | — | — | — | — | — |
| Net periodic benefit cost | $ 31.3 | $ 52.1 | $ 55.2 | $ (0.7) | $ 17.4 | $ 28.1 |
| Curtailment effects | — | — | — | (0.8) | — | — |
| Current year actuarial (gain)/loss | 121.8 | (168.8) | 53.1 | 36.9 | (95.2) | 3.2 |
| Amortization of net loss | (15.5) | (29.9) | (30.4) | (5.0) | (11.5) | (11.6) |
| Current year prior service (credit) cost | (1.5) | 0.8 | 2.8 | (0.9) | — | (58.3) |
| Amortization of prior service (cost) credit | (2.7) | (3.0) | (3.9) | 3.6 | 3.6 | (1.9) |
| Amortization of transition asset | — | — | — | — | — | 3.0 |
| Total recognized in other comprehensive income | $ 102.1 | $ (200.9) | $ 21.6 | $ 33.8 | $ (103.1) | $ (65.6) |
| Total recognized in net periodic cost and other comprehensive income | $ 133.4 | $ (148.8) | $ 76.8 | $ 33.1 | $ (85.7) | $ (37.5) |

**Additional Information**

**(In Millions)**

| | Pension Benefits | | | Other Benefits | | |
|---|---|---|---|---|---|---|
| | 2014 | 2013 | 2012 | 2014 | 2013 | 2012 |
| Effect of change in mine ownership & noncontrolling interest | $ 51.4 | $ 46.5 | $ 54.8 | $ 5.9 | $ 4.8 | $ 8.6 |
| Actual return on plan assets | 78.7 | 109.5 | 92.5 | 31.9 | 11.0 | 26.1 |

A004308

**Assumptions**

For our U.S. pension and other postretirement benefit plans, we used a discount rate as of  December 31, 2014 of 3.83 percent, compared with a discount rate of 4.57 percent as of December 31, 2013. The U.S. discount rates are determined by matching the projected cash flows used to determine the PBO and APBO to a projected yield curve of 715 Aa graded bonds in the 10th to 90th percentiles. These bonds are either noncallable or callable with make-whole provisions. The duration matching produced rates ranging from 3.72 percent to 3.92 percent for our plans. Based upon these results, we selected a December 31, 2014 discount rate of 3.83 percent for our plans. This methodology is consistent with the calculation of the prior-year discount rate.

On December 31, 2014, we adopted the RP-2014 mortality tables projected generationally using scale MP-2014 with blue collar and white collar adjustments made for certain hourly and salaried groups, to determine the expected life of our plan participants, replacing the IRS 2014 prescribed mortality tables for our U.S. plans. The adoption of the new tables resulted in increases to our U.S. plan projected benefit obligations totaling approximately $30.0 million or 4 percent percent for the pension plans and  $20 million or 7 percent for the OPEB plans.

For our Canadian plans, we used a discount rate as of  December 31, 2014 of 3.75 percent for the pension plans and the other postretirement benefit plans. Similar to the U.S. plans, the Canadian discount rates are determined by matching the projected cash flows used to determine the PBO and APBO to a projected yield curve of 285 corporate bonds in the 10th to 90th percentiles. The corporate bonds are either Aa graded, or (for maturities of 10 or more years) A or Aaa graded with an appropriate credit spread adjustment. These bonds are either noncallable or callable with make whole provisions. This methodology is consistent with the calculation of the prior-year discount rate.

On December 31, 2014, we adopted the 2014 Private Sector Canadian Pensioners' Mortality Table for the hourly plans and the 2014 Canadian Pensioners' Mortality Table for the salaried plans, where both tables were projected generationally using scale CPM-B, replacing the UP 1994 table with full projection. The adoption of the new tables resulted in increases to our Canadian plan projected benefit obligations totaling approximately $12 million  or 5 percent for the pension plans and  $3 million or 5 percent for the OPEB plans.

Weighted-average assumptions used to determine benefit obligations at December 31 were:

|  | Pension Benefits | | Other Benefits | |
|---|---|---|---|---|
|  | **2014** | 2013 | **2014** | 2013 |
| U.S. plan discount rate | **3.83%** | 4.57% | **3.83%** | 4.57% |
| Canadian plan discount rate | **3.75** | 4.50 | **3.75** | 4.75 |
| U.S. salaried rate of compensation increase | **3.00** | 4.00 | **3.00** | 4.00 |
| Canadian rate of compensation increase | **3.00** | 4.00 | **N/A** | N/A |
| Hourly rate of compensation increase (ultimate) | **2.50** | 3.00 | **N/A** | N/A |
| U.S. expected return on plan assets | **8.25** | 8.25 | **7.00** | 7.00 |
| Canadian expected return on plan assets | **7.25** | 7.25 | **N/A** | N/A |

142

A004309

Weighted-average assumptions used to determine net benefit cost for the years 2014, 2013 and 2012 were:

| | Pension Benefits | | | Other Benefits | | |
|---|---|---|---|---|---|---|
| | **2014** | 2013 | 2012 | **2014** | 2013 | 2012 |
| U.S. plan discount rate | **4.57 %** | 3.70 % | 4.28 % | **4.57 %** | 3.70 % | 4.28/3.51 % [1] |
| Canadian plan discount rate | **4.50** | 3.75 | 4.00 | **4.75** | 4.00 | 4.25 |
| U.S. expected return on plan assets | **8.25** | 8.25 | 8.25 | **7.00** | 8.25 | 8.25 |
| Canadian expected return on plan assets | **7.25** | 7.25 | 7.25 | **N/A** | N/A | N/A |
| U.S. salaried rate of compensation increase | **4.00** | 4.00 | 4.00 | **4.00** | 4.00 | 4.00 |
| U.S. hourly rate of compensation increase | **3.00** | 4.00 | 4.00 | **4.00** | 4.00 | 4.00 |
| Canadian rate of compensation increase | **4.00** | 4.00 | 4.00 | **4.00** | 4.00 | 4.00 |

───────────

[1] 4.28 percent for the Salaried Plan. For the Hourly Plan, 4.28 percent from January 1, 2012 through October 31, 2012, and 3.51 percent from November 1, 2012 through December 31, 2012.

Assumed health care cost trend rates at December 31 were:

| | 2014 | 2013 |
|---|---|---|
| U.S. plan health care cost trend rate assumed for next year | **7.00 %** | 7.25 % |
| Canadian plan health care cost trend rate assumed for next year | **4.25** | 4.00 |
| Ultimate health care cost trend rate | **5.00** | 5.00 |
| U.S. plan year that the ultimate rate is reached | **2023** | 2023 |
| Canadian plan year that the ultimate rate is reached | **2018** | 2018 |

Assumed health care cost trend rates have a significant effect on the amounts reported for the health care plans. A change of one percentage point in assumed health care cost trend rates would have the following effects:

| | (In Millions) | | |
|---|---|---|---|
| | Increase | | Decrease |
| Effect on total of service and interest cost | $ | 3.4 | $ (2.7) |
| Effect on postretirement benefit obligation | | 49.6 | (39.9 ) |

**Plan Assets**

Our financial objectives with respect to our pension and VEBA plan assets are to fully fund the actuarial accrued liability for each of the plans, to maximize investment returns within reasonable and prudent levels of risk, and to maintain sufficient liquidity to meet benefit obligations on a timely basis.

Our investment objective is to outperform the expected ROA assumption used in the plans' actuarial reports over a full market cycle, which is considered a period during which the U.S. economy experiences the effects of both an upturn and a downturn in the level of economic activity. In general, these periods tend to last between three and five years. The expected ROA takes into account historical returns and estimated future long-term returns based on capital market assumptions applied to the asset allocation strategy. The expected return is net of investment expenses paid by the plans.

The asset allocation strategy is determined through a detailed analysis of assets and liabilities by plan, which defines the overall risk that is acceptable with regard to the expected level and variability of portfolio returns, surplus (assets compared to liabilities), contributions and pension expense.

The asset allocation review process involves simulating the effect of financial market performance for various asset allocation scenarios and factoring in the current funded status and likely future funded status levels by taking into account expected growth or decline in the contributions over time. The modeling is then adjusted by simulating unexpected changes in inflation and interest rates. The process also includes quantifying the effect of investment performance and

143

A004310

simulated changes to future levels of contributions, determining the appropriate asset mix with the highest likelihood of meeting financial objectives and regularly reviewing our asset allocation strategy.

The asset allocation strategy varies by plan. The following table reflects the actual asset allocations for pension and VEBA plan assets as of December 31, 2014 and 2013, as well as the 2015 weighted average target asset allocations as of December 31, 2014. Equity investments include securities in large-cap, mid-cap and small-cap companies located in the U.S. and worldwide. Fixed income investments primarily include corporate bonds and government debt securities. Alternative investments include hedge funds, private equity, structured credit and real estate.

| | Pension Assets | | | VEBA Assets | | |
|---|---|---|---|---|---|---|
| Asset Category | 2015 Target Allocation | Percentage of Plan Assets at December 31, | | 2015 Target Allocation | Percentage of Plan Assets at December 31, | |
| | | 2014 | 2013 | | 2014 | 2013 |
| Equity securities | 48.2% | 48.6% | 51.5% | 8.0% | 8.6% | 10.4% |
| Fixed income | 28.4% | 29.0% | 26.7% | 80.1% | 79.3% | 66.6% |
| Hedge funds | 6.1% | 6.2% | 6.3% | 4.2% | 4.3% | 9.8% |
| Private equity | 5.5% | 3.3% | 3.2% | 2.6% | 2.3% | 2.4% |
| Structured credit | 5.9% | 6.9% | 6.7% | 2.1% | 2.3% | 5.4% |
| Real estate | 5.9% | 5.3% | 4.5% | 3.0% | 3.2% | 5.3% |
| Cash | —% | 0.7% | 1.1% | —% | —% | 0.1% |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

*Pension*

The fair values of our pension plan assets at December 31, 2014 and 2013 by asset category are as follows:

| | (In Millions) | | | |
|---|---|---|---|---|
| | December 31, 2014 | | | |
| Asset Category | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| Equity securities: | | | | |
| U.S. large-cap | $ 248.5 | $ — | $ — | $ 248.5 |
| U.S. small/mid-cap | 55.8 | — | — | 55.8 |
| International | 157.4 | — | — | 157.4 |
| Fixed income | 243.7 | 31.8 | — | 275.5 |
| Hedge funds | — | — | 59.2 | 59.2 |
| Private equity | — | — | 31.2 | 31.2 |
| Structured credit | — | — | 65.4 | 65.4 |
| Real estate | — | — | 50.0 | 50.0 |
| Cash | 6.6 | — | — | 6.6 |
| Total | $ 712.0 | $ 31.8 | $ 205.8 | $ 949.6 |

144

A004311

Table of Contents

| | (In Millions) | | | |
| | December 31, 2013 | | | |
| Asset Category | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
|---|---|---|---|---|
| Equity securities: | | | | |
|    U.S. large-cap | $ 261.5 | $ — | $ — | $ 261.5 |
|    U.S. small/mid-cap | 60.8 | — | — | 60.8 |
|    International | 149.3 | — | — | 149.3 |
| Fixed income | 214.8 | 30.1 | — | 244.9 |
| Hedge funds | — | — | 57.6 | 57.6 |
| Private equity | — | — | 29.1 | 29.1 |
| Structured credit | — | — | 61.0 | 61.0 |
| Real estate | — | — | 40.9 | 40.9 |
| Cash | 10.2 | — | — | 10.2 |
|    Total | $ 696.6 | $ 30.1 | $ 188.6 | $ 915.3 |

Following is a description of the inputs and valuation methodologies used to measure the fair value of our plan assets.

*Equity Securities*

Equity securities classified as Level 1 investments include U.S. large-, small- and mid-cap investments and international equity. These investments are comprised of securities listed on an exchange, market or automated quotation system for which quotations are readily available. The valuation of these securities is determined using a market approach, and is based upon unadjusted quoted prices for identical assets in active markets.

*Fixed Income*

Fixed income securities classified as Level 1 investments include bonds and government debt securities. These investments are comprised of securities listed on an exchange, market or automated quotation system for which quotations are readily available. The valuation of these securities is determined using a market approach, and is based upon unadjusted quoted prices for identical assets in active markets. Also included in Fixed Income is a portfolio of U.S. Treasury STRIPS, which are zero-coupon bearing fixed income securities backed by the full faith and credit of the U.S. government. The securities sell at a discount to par because there are no incremental coupon payments. STRIPS are not issued directly by the Treasury, but rather are created by a financial institution, government securities broker or government securities dealer. Liquidity on the issue varies depending on various market conditions; however, in general the STRIPS market is slightly less liquid than that of the U.S. Treasury Bond market. The STRIPS are priced daily through a bond pricing vendor and are classified as Level 2.

*Hedge Funds*

Hedge funds are alternative investments comprised of direct or indirect investment in offshore hedge funds of funds with an investment objective to achieve an attractive risk-adjusted return with moderate volatility and moderate directional market exposure over a full market cycle. The valuation techniques used to measure fair value attempt to maximize the use of observable inputs and minimize the use of unobservable inputs. Considerable judgment is required to interpret the factors used to develop estimates of fair value. Valuations of the underlying investment funds are obtained and reviewed. The securities that are valued by the funds are interests in the investment funds and not the underlying holdings of such investment funds. Thus, the inputs used to value the investments in each of the underlying funds may differ from the inputs used to value the underlying holdings of such funds.

In determining the fair value of a security, the fund managers may consider any information that is deemed relevant, which may include one or more of the following factors regarding the portfolio security, if appropriate: type of security or asset; cost at the date of purchase; size of holding; last trade price; most recent valuation; fundamental analytical data relating to the investment in the security; nature and duration of any restriction on the disposition of the security; evaluation of the factors that influence the market in which the security is purchased or sold; financial statements of the issuer; discount from market value of unrestricted securities of the same class at the time of purchase; special reports prepared by analysts; information as to any transactions or offers with respect to the security; existence of merger proposals or tender offers affecting the security; price and extent of public trading in similar securities of the issuer or

145

compatible companies and other relevant matters; changes in interest rates; observations from financial institutions; domestic or foreign government actions or pronouncements; other recent events; existence of shelf registration for restricted securities; existence of any undertaking to register the security; and other acceptable methods of valuing portfolio securities.

Hedge fund investments in the SEI Special Situations Fund are valued quarterly and recorded on a one-month lag. For alternative investment values reported on a lag, current market information is reviewed for any material changes in values at the reporting date. Share repurchases for the SEI Special Situations Fund are considered semi-annually subject to notice of 95 days.

*Private Equity Funds*

Private equity funds are alternative investments that represent direct or indirect investments in partnerships, venture funds or a diversified pool of private investment vehicles (fund of funds).

Investment commitments are made in private equity funds of funds based on an asset allocation strategy, and capital calls are made over the life of the funds to fund the commitments. As of December 31, 2014, remaining commitments total $55.5 million for both our pension and other benefits. Of this amount, an additional $45.0 million commitment was executed during the third quarter of 2014 in order to bring the portfolio in line with the target allocation for this asset category. Committed amounts are funded from plan assets when capital calls are made. Investment commitments are not pre-funded in reserve accounts. Refer to the valuation methodologies for equity securities above for further information.

The valuation of investments in private equity funds of funds initially is performed by the underlying fund managers. In determining the fair value, the fund managers may consider any information that is deemed relevant, which may include: type of security or asset; cost at the date of purchase; size of holding; last trade price; most recent valuation; fundamental analytical data relating to the investment in the security; nature and duration of any restriction on the disposition of the security; evaluation of the factors that influence the market in which the security is purchased or sold; financial statements of the issuer; discount from market value of unrestricted securities of the same class at the time of purchase; special reports prepared by analysts; information as to any transactions or offers with respect to the security; existence of merger proposals or tender offers affecting the security; price and extent of public trading in similar securities of the issuer or compatible companies and other relevant matters; changes in interest rates; observations from financial institutions; domestic or foreign government actions or pronouncements; other recent events; existence of shelf registration for restricted securities; existence of any undertaking to register the security; and other acceptable methods of valuing portfolio securities.

The valuations are obtained from the underlying fund managers, and the valuation methodology and process is reviewed for consistent application and adherence to policies. Considerable judgment is required to interpret the factors used to develop estimates of fair value.

Private equity investments are valued quarterly and recorded on a one-quarter lag. For alternative investment values reported on a lag, current market information is reviewed for any material changes in values at the reporting date. Capital distributions for the funds do not occur on a regular frequency. Liquidation of these investments would require sale of the partnership interest.

*Structured Credit*

Structured credit investments are alternative investments comprised of collateralized debt obligations and other structured credit investments that are priced based on valuations provided by independent, third-party pricing agents, if available. Such values generally reflect the last reported sales price if the security is actively traded. The third-party pricing agents may also value structured credit investments at an evaluated bid price by employing methodologies that utilize actual market transactions, broker-supplied valuations, or other methodologies designed to identify the market value of such securities. Such methodologies generally consider such factors as security prices, yields, maturities, call features, ratings and developments relating to specific securities in arriving at valuations. Securities listed on a securities exchange, market or automated quotation system for which quotations are readily available are valued at the last quoted sale price on the primary exchange or market on which they are traded. Debt obligations with remaining maturities of 60 days or less may be valued at amortized cost, which approximates fair value.

Structured credit investments are valued monthly and recorded on a one-month lag. For alternative investment values reported on a lag, current market information is reviewed for any material changes in values at the reporting date. Redemption requests are considered quarterly subject to notice of 90 days.

146

*Real Estate*

The real estate portfolio for the pension plans is an alternative investment comprised of three funds with strategic categories of real estate investments. All real estate holdings are appraised externally at least annually, and appraisals are conducted by reputable, independent appraisal firms that are members of the Appraisal Institute. All external appraisals are performed in accordance with the Uniform Standards of Professional Appraisal Practices. The property valuations and assumptions of each property are reviewed quarterly by the investment advisor and values are adjusted if there has been a significant change in circumstances relating to the property since the last external appraisal. The valuation methodology utilized in determining the fair value is consistent with the best practices prevailing within the real estate appraisal and real estate investment management industries, including the Real Estate Information Standards, and standards promulgated by the National Council of Real Estate Investment Fiduciaries, the National Association of Real Estate Investment Fiduciaries, and the National Association of Real Estate Managers. In addition, the investment advisor may cause additional appraisals to be performed. Two of the funds' fair values are updated monthly, and there is no lag in reported values. Redemption requests for these two funds are considered on a quarterly basis, subject to notice of 45 days.

Effective October 1, 2009, one of the real estate funds began an orderly wind-down. The decision to wind down the fund primarily was driven by real estate market factors that adversely affected the availability of new investor capital. Third-party appraisals of this fund's assets were eliminated; however, internal valuation updates for all assets and liabilities of the fund are prepared quarterly. The fund's asset values are recorded on a one-quarter lag, and current market information is reviewed for any material changes in values at the reporting date. As of December 31, 2014, the fund was largely unwound with no further material distributions expected.

During 2011, a new real estate fund of funds investment was added for the Empire, Tilden, Hibbing and United Taconite VEBA plans as a result of the asset allocation review process. This fund invests in pooled investment vehicles that in turn invest in commercial real estate properties. Valuations are performed quarterly and financial statements are prepared on a semi-annual basis, with annual audited statements. Asset values for this fund are reported with a one-quarter lag and current market information is reviewed for any material changes in values at the reporting date. In most cases, values are based on valuations reported by underlying fund managers or other independent third-party sources, but the fund has discretion to use other valuation methods, subject to compliance with ERISA. Valuations are typically estimates only and subject to upward or downward revision based on each underlying fund's annual audit. Withdrawals are permitted on the last business day of each quarter subject to a 65-day prior written notice.

The following represents the effect of fair value measurements using significant unobservable inputs (Level 3) on changes in plan assets for the years ended December 31, 2014 and 2013:

| | Hedge Funds | Private Equity Funds | Structured Credit Fund | Real Estate | Total |
|---|---|---|---|---|---|
| **(In Millions)** | | | | | |
| **Year Ended December 31, 2014** | | | | | |
| Beginning balance — January 1, 2014 | $ 57.6 | $ 29.1 | $ 61.0 | $ 40.9 | $ 188.6 |
| Actual return on plan assets: | | | | | |
|    Relating to assets still held at the reporting date | 3.1 | 3.2 | 4.4 | 5.2 | 15.9 |
|    Relating to assets sold during the period | (1.5) | 3.0 | — | — | 1.5 |
| Purchases | — | 1.4 | — | 5.4 | 6.8 |
| Sales | — | (5.5) | — | (1.5) | (7.0) |
| Ending balance — December 31, 2014 | $ 59.2 | $ 31.2 | $ 65.4 | $ 50.0 | $ 205.8 |

147

Table of Contents

| (In Millions) | | | | | |
|---|---|---|---|---|---|
| Year Ended December 31, 2013 | | | | | |
| | Hedge Funds | Private Equity Funds | Structured Credit Fund | Real Estate | Total |
| Beginning balance — January 1, 2013 | $ 85.6 | $ 29.3 | $ 56.2 | $ 29.4 | $ 200.5 |
| Actual return on plan assets: | | | | | |
| Relating to assets still held at the reporting date | 4.5 | (2.1) | 33.5 | 5.1 | 41.0 |
| Relating to assets sold during the period | (1.2) | 5.2 | (28.7) | (0.4) | (25.1) |
| Purchases | 66.0 | 14.7 | 27.5 | 36.8 | 145.0 |
| Sales | (97.3) | (18.0) | (27.5) | (30.0) | (172.8) |
| Ending balance — December 31, 2013 | $ 57.6 | $ 29.1 | $ 61.0 | $ 40.9 | $ 188.6 |

*VEBA*

Assets for other benefits include VEBA trusts pursuant to bargaining agreements that are available to fund retired employees' life insurance obligations and medical benefits. The fair values of our other benefit plan assets at December 31, 2014 and 2013 by asset category are as follows:

| | (In Millions) | | | |
|---|---|---|---|---|
| | December 31, 2014 | | | |
| Asset Category | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| Equity securities: | | | | |
| U.S. large-cap | $ 11.6 | $ — | $ — | $ 11.6 |
| U.S. small/mid-cap | 2.9 | — | — | 2.9 |
| International | 8.6 | — | — | 8.6 |
| Fixed income | 174.5 | 39.1 | — | 213.6 |
| Hedge funds | — | — | 11.5 | 11.5 |
| Private equity | — | — | 6.2 | 6.2 |
| Structured credit | — | — | 6.1 | 6.1 |
| Real estate | — | — | 8.7 | 8.7 |
| Cash | 0.1 | — | — | 0.1 |
| Total | $ 197.7 | $ 39.1 | $ 32.5 | $ 269.3 |

148

A004315

Table of Contents

| (In Millions) | | | | |
| December 31, 2013 | | | | |
| Asset Category | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
|---|---|---|---|---|
| Equity securities: | | | | |
|    U.S. large-cap | $ 15.7 | $ — | $ — | $ 15.7 |
|    U.S. small/mid-cap | 2.7 | — | — | 2.7 |
|    International | 7.8 | — | — | 7.8 |
| Fixed income | 134.4 | 33.7 | — | 168.1 |
| Hedge funds | — | — | 24.6 | 24.6 |
| Private equity | — | — | 6.0 | 6.0 |
| Structured credit | — | — | 13.5 | 13.5 |
| Real estate | — | — | 13.2 | 13.2 |
| Cash | 0.2 | — | — | 0.2 |
|    Total | $ 160.8 | $ 33.7 | $ 57.3 | $ 251.8 |

Refer to the pension asset discussion above for further information regarding the inputs and valuation methodologies used to measure the fair value of each respective category of plan assets.

The following represents the effect of fair value measurements using significant unobservable inputs (Level 3) on changes in plan assets for the year ended December 31, 2014 and 2013:

| (In Millions) | | | | | |
| Year Ended December 31, 2014 | | | | | |
| | Hedge Funds | Private Equity Funds | Structured Credit Fund | Real Estate | Total |
|---|---|---|---|---|---|
| Beginning balance — January 1, 2014 | $ 24.6 | $ 6.0 | $ 13.5 | $ 13.2 | $ 57.3 |
| Actual return on plan assets: | | | | | |
|   Relating to assets still held at the reporting date | 0.5 | 1.0 | 0.4 | 0.9 | 2.8 |
|   Relating to assets sold during the period | 0.6 | 0.4 | 0.4 | 0.5 | 1.9 |
| Purchases | — | 0.1 | — | — | 0.1 |
| Sales | (14.2) | (1.3) | (8.2) | (5.9) | (29.6) |
| Ending balance — December 31, 2014 | $ 11.5 | $ 6.2 | $ 6.1 | $ 8.7 | $ 32.5 |

| (In Millions) | | | | | |
| Year Ended December 31, 2013 | | | | | |
| | Hedge Funds | Private Equity Funds | Structured Credit Fund | Real Estate | Total |
|---|---|---|---|---|---|
| Beginning balance — January 1, 2014 | $ 23.2 | $ 6.2 | $ 12.5 | $ 15.9 | $ 57.8 |
| Actual return on plan assets: | | | | | |
|   Relating to assets still held at the reporting date | 2.1 | 0.2 | 2.4 | 2.8 | 7.5 |
|   Relating to assets sold during the period | (0.7) | 0.4 | (1.4) | (0.7) | (2.4) |
| Purchases | 22.5 | 0.3 | 11.0 | 14.2 | 48.0 |
| Sales | (22.5) | (1.1) | (11) | (19.0) | (53.6) |
| Ending balance — December 31, 2014 | $ 24.6 | $ 6.0 | $ 13.5 | $ 13.2 | $ 57.3 |

A004316

**Contributions**

Annual contributions to the pension plans are made within income tax deductibility restrictions in accordance with statutory regulations. In the event of plan termination, the plan sponsors could be required to fund additional shutdown and early retirement obligations that are not included in the pension obligations. The Company currently has no intention to shutdown, terminate or withdraw from any of its employee benefit plans.

| | | (In Millions) | | |
|---|---|---|---|---|
| | | | Other Benefits | |
| Company Contributions | Pension Benefits | VEBA | Direct Payments | Total |
| 2013 | $ 53.7 | $ 14.6 | $ 10.9 | $ 25.5 |
| 2014 | 60.5 | — | 7.3 | 7.3 |
| 2015 (Expected)* | 36.8 | — | 6.8 | 6.8 |

_____

\*        Pursuant to the bargaining agreement, benefits can be paid from VEBA trusts that are at least   70 percent funded (all VEBA trusts are over  70 percent funded  at December 31, 2014). Funding obligations have been suspended as Hibbing's, UTAC's, Tilden's and Empire's share of the value of their respective trust assets have reached 90 percent of their obligation.

VEBA plans are not subject to minimum regulatory funding requirements. Amounts contributed are pursuant to bargaining agreements.

Contributions by participants to the other benefit plans were  $4.8 million for the year ended December 31, 2014 and $5.6 million for the year ended December 31, 2013.

**Estimated Cost for 2015**

For 2015, we estimate net periodic benefit cost as follows:

| | (In Millions) |
|---|---|
| Defined benefit pension plans | $ 23.6 |
| Other postretirement benefits | 6.0 |
| Total | $ 29.6 |

**Estimated Future Benefit Payments**

| | | (In Millions) | | |
|---|---|---|---|---|
| | | Other Benefits | | |
| | Pension Benefits | Gross Company Benefits | Less Medicare Subsidy | Net Company Payments |
| 2015 | $ 89.3 | $ 23.1 | $ 0.9 | $ 22.2 |
| 2016 | 77.7 | 23.0 | 1.0 | 22.0 |
| 2017 | 78.1 | 23.2 | 1.1 | 22.1 |
| 2018 | 79.3 | 23.3 | 1.3 | 22.0 |
| 2019 | 78.6 | 22.9 | 1.4 | 21.5 |
| 2020-2024 | 402.4 | 110.7 | 8.6 | 102.1 |

150

Table of Contents

**Other Potential Benefit Obligations**

While the foregoing reflects our obligation, our total exposure in the event of non-performance is potentially greater. Following is a summary comparison of the total obligation:

|  | (In Millions) | |
| --- | --- | --- |
|  | December 31, 2014 | |
|  | Defined Benefit Pensions | Other Benefits |
| Fair value of plan assets | $ 949.6 | $ 269.3 |
| Benefit obligation | (1,227.4) | (395.9) |
| Underfunded status of plan | $ (277.8) | $ (126.6) |
| Additional shutdown and early retirement benefits | $ (26.7) | $ 40.5 |

## NOTE 8 - STOCK COMPENSATION PLANS

At December 31, 2014, we have two share-based compensation plans, which are described below. The compensation cost that has been charged against income for those plans was $23.7 million, $21.1 million and $20.6 million in 2014, 2013 and 2012, respectively, which primarily was recorded in *Selling, general and administrative expenses* in the Statements of Consolidated Operations. The total income tax benefit recognized in the Statements of Consolidated Operations for share-based compensation arrangements was $8.3 million, $7.4 million and $7.2 million for 2014, 2013 and 2012, respectively.

**Employees' Plans**

The 2012 Equity Plan was approved by our Board of Directors on March 13, 2012 and our shareholders approved it on May 8, 2012, effective as of March 13, 2012. The 2012 Equity Plan replaced the ICE Plan. The maximum number of shares that may be issued under the 2012 Equity Plan is 6.0 million common shares. On February 10, 2014, upon recommendation by the Compensation and Organization Committee, Cliffs' Board of Directors approved and adopted, subject to the approval of Cliffs' shareholders at the 2014 Annual Meeting, the 2012 Amended Equity Plan. The principal reason for amending and restating the 2012 Equity Plan was to increase the number of common shares available for issuance by 5.0 million common shares. This amended plan was approved by Cliffs' shareholders at the 2014 Annual Meeting held on July 29, 2014.

The Compensation and Organization Committee of the Board of Directors approved grants under the 2012 Equity Plan and the 2012 Amended Equity Plan to certain officers and employees for the 2014 to 2016 performance period. Shares granted under the awards during 2014 consisted of 0.8 million performance shares based on TSR, 0.5 million restricted share units, 0.3 million stock options and 0.4 million performance-based restricted stock units, each of which may, or may not, convert into shares based on our shares achieving and maintaining certain milestones above an absolute threshold during the performance period.

At our July 29, 2014 Annual Meeting, the shareholders voted on the election of eleven directors. Thirteen persons were nominated for election to the eleven board positions. On August 6, 2014, the Company received the final report of the inspector of election that confirmed the election of six new directors to our Board of Directors. Such an event constituted a change in control pursuant to our incentive equity plans. As a result of such change in the majority of our directors and pursuant to the terms of the various plans and applicable award agreements, all of the outstanding and unvested equity incentives awarded to participants prior to October 2013 became vested. Accordingly, this resulted in recognizing $11.7 million of additional equity-based compensation expense in the accompanying financial statements, representing the remaining unrecognized compensation expense of the awards. For any equity grants awarded after September 2013, the vesting of all such grants will accelerate and pay out in cash only following a participant's qualifying termination of employment associated with the change in control and if the common shares are not substituted with a replacement award. This potential liability for additional double-trigger payments for share-based compensation in cash will expire entirely in two years.

151

A004318

For the outstanding 2012 Equity Plan and 2012 Amended Equity Plan awards that were issued subsequent to October 2013, each performance share, if earned, entitles the holder to receive common shares or cash within a range between a threshold and maximum number of our common shares, with the actual number of common shares earned dependent upon whether the Company achieves certain objectives and performance goals as established by the Compensation and Organization Committee. The performance share or unit grants vest over a period of three years and are intended to be paid out in common shares or cash in certain circumstances. Performance for the 2014 to 2016 performance periods is measured only on the basis of relative TSR for the period and measured against the constituents of the S&P Metals and Mining ETF Index on the last day of trading of the performance period. The final payouts for the 2014 to 2016 performance period will vary from zero to 200 percent of the original grant. For the outstanding performance-based restricted stock units, the award may be earned and settled based upon certain VWAP performance for the Company's common shares, (Threshold VWAP, Target VWAP, or Maximum VWAP) for any period of ninety (90) consecutive calendar days during a performance period commencing August 7, 2014 and ending December 31, 2017 (the "Performance Period"). The stock options vest in equal thirds on each of December 31, 2015, December 31, 2016 and December 31, 2017 subject to continued employment through each vesting date, and are exercisable cumulatively at a strike price of $13.83 after each vesting date and expire on November 17, 2021. The restricted share units are subject to continued employment, are retention based, will vest at the end of the respective performance period, and are payable in common shares or cash in certain circumstances at a time determined by the Committee at its discretion.

Following is a summary of our performance share award agreements currently outstanding :

| Performance Share Plan Year | Performance Shares Granted | Estimated Forfeitures | Expected to Vest | Grant Date | Performance Period |
|---|---|---|---|---|---|
| 2014 | 400,000 | 40,911 | 359,089 | November 17, 2014 | 8/7/2014 - 12/31/2017 |
| 2014 | 283,530 | 24,380 | 259,150 | July 29, 2014 | 1/1/2014 - 12/31/2016 |
| 2014 | 124,630 | 21,098 | 103,532 | May 12, 2014 | 1/1/2014 - 12/31/2016 |
| 2014 | 385,585 | 120,299 | 265,286 | February 10, 2014 | 1/1/2014 - 12/31/2016 |

**Nonemployee Directors**

At our 2014 annual meeting, the shareholders approved the Directors' Plan which became effective December 1, 2014. The Directors' Plan authorizes us to issue up to 300,000 common shares from time to time to nonemployee Directors. Under the Share Ownership Guidelines in effect for 2014 ("Guidelines"), a Director is required by the end of five years from date of election to hold common shares with a market value of at least  $250,000. The Directors' Plan offers the nonemployee Director the opportunity to defer all or a portion of the awards granted.

The 2008 Directors' Plan in effect for most of 2014 provided for an Annual Equity Grant ("Equity Grant") to be awarded at our annual meeting each year to all nonemployee Directors elected or re-elected by the shareholders and a pro-rata amount was awarded to new directors upon their appointment. The value of the Equity Grant was payable in restricted shares with a three-year vesting period from the date of grant. The closing market price of our common shares on October 16, 2014 was divided into the number of common shares remaining available for issuance under the 2008 Directors' Plan to determine the number of restricted shares awarded as the Equity Grant. In 2014, nonemployee Directors each received Equity Grants valued at $85,000 which was bifurcated into two tranches since the 2008 Director's Plan did not have a sufficient number of shares available for issuance. The first tranche of the 2014 Equity Grant was granted under the 2008 Directors' Plan on October 16, 2014 and valued at $42,500. The second tranche was granted under the Directors' Plan on December 2, 2014 and valued at $42,500.

For the last three years, Equity Grant shares have been awarded to elected or re-elected nonemployee Directors as follows:

| Year of Grant | Unrestricted Equity Grant Shares | Restricted Equity Grant Shares | Deferred Equity Grant Shares |
|---|---|---|---|
| 2012 | 1,498 | 8,988 | 2,996 |
| 2013 | 3,985 | 31,506 | 7,970 |
| 2014 | — | 73,635 | — |

152

A004319

Table of Contents

**Other Information**

The following table summarizes the share-based compensation expense that we recorded for continuing operations in 2014, 2013 and 2012:

| | (In Millions, except per share amounts) | | |
| --- | --- | --- | --- |
| | **2014** | 2013 | 2012 |
| Cost of goods sold and operating expenses | $ **7.8** | $ 6.3 | $ 4.0 |
| Selling, general and administrative expenses | **15.9** | 14.8 | 16.6 |
| Reduction of operating income from continuing operations before income taxes and equity income (loss) from ventures | **23.7** | 21.1 | 20.6 |
| Income tax benefit | **(8.3)** | (7.4) | (7.2) |
| Reduction of net income attributable to Cliffs shareholders | $ **15.4** | $ 13.7 | $ 13.4 |
| Reduction of earnings per share attributable to Cliffs shareholders: | | | |
| Basic | $ **0.10** | $ 0.09 | $ 0.09 |
| Diluted | $ **0.10** | $ 0.08 | $ 0.09 |

*Determination of Fair Value*

The fair value of each grant is estimated on the date of grant using a Monte Carlo simulation to forecast relative TSR performance. A correlation matrix of historic and projected stock prices was developed for both the Company and our predetermined peer group of mining and metals companies. The fair value assumes that performance goals will be achieved.

The expected term of the grant represents the time from the grant date to the end of the service period for each of the three plan-year agreements. We estimate the volatility of our common shares and that of the peer group of mining and metals companies using daily price intervals for all companies. The risk-free interest rate is the rate at the grant date on zero-coupon government bonds, with a term commensurate with the remaining life of the performance period.

The following assumptions were utilized to estimate the fair value for the 2014 performance share grants:

| Grant Date | Grant Date Market Price | Average Expected Term (Years) | Expected Volatility | Risk-Free Interest Rate | Dividend Yield | Fair Value | Fair Value (Percent of Grant Date Market Price) |
| --- | --- | --- | --- | --- | --- | --- | --- |
| February 10, 2014 | $ 20.58 | 2.89 | 54.0% | 0.54% | 2.92% | $ 22.21 | 107.92% |
| May 12, 2014 | $ 17.54 | 2.61 | 54.0% | 0.54% | 2.92% | $ 18.93 | 107.92% |
| July 29, 2014 | $ 17.62 | 2.42 | 51.3% | 0.83% | 3.40% | $ 19.02 | 107.92% |
| November 17, 2014 | $ 10.85 | 3.12 | 52.9% | 1.18% | 4.30% | $ 10.61 | 97.79% |

The fair value of the restricted share units is determined based on the closing price of our common shares on the grant date. The restricted share units granted under either the 2012 Equity Plan or the 2012 Amended Equity Plan generally vest over a period of three years.

153

A004320

Restricted share units, restricted stock awards, deferred stock allocation and performance share activity under our long-term equity plans and Directors' Plans are as follows:

| | 2014 | 2013 | 2012 |
|---|---|---|---|
| | Shares | Shares | Shares |
| Stock options: | | | |
| Outstanding at beginning of year | — | — | — |
| Granted during the year | 250,000 | — | — |
| Vested | — | — | — |
| Forfeited/canceled | — | — | — |
| Outstanding at end of year | 250,000 | — | — |
| Restricted awards: | | | |
| Outstanding and restricted at beginning of year | 586,084 | 393,787 | 425,166 |
| Granted during the year | 531,030 | 396,844 | 151,869 |
| Vested | (423,822) | (118,973) | (161,741) |
| Forfeited/canceled | (170,116) | (85,574) | (21,507) |
| Outstanding and restricted at end of year | 523,176 | 586,084 | 393,787 |
| Performance shares: | | | |
| Outstanding at beginning of year | 1,040,453 | 772,484 | 877,435 |
| Granted during the year[1] | 1,233,685 | 806,271 | 501,346 |
| Issued[2] | (796,624) | (289,054) | (574,518) |
| Forfeited/canceled | (405,138) | (249,248) | (31,779) |
| Outstanding at end of year | 1,072,376 | 1,040,453 | 772,484 |
| Vested or expected to vest as of December 31, 2014 | 1,723,728 | | |
| Directors' retainer and voluntary shares: | | | |
| Outstanding at beginning of year | 7,329 | 2,880 | 2,611 |
| Granted during the year | 2,281 | 8,136 | 1,823 |
| Forfeited/canceled | — | (1,521) | — |
| Vested | (9,610) | (2,166) | (1,554) |
| Outstanding at end of year | — | 7,329 | 2,880 |
| Reserved for future grants or awards at end of year: | | | |
| Employee plans | 6,222,434 | | |
| Directors' plans | 225,955 | | |
| Total | 6,448,389 | | |

---

[1] The shares granted in 2013 and 2012 include 54,051 shares and 191,506 shares, respectively, related to the 23% and 50% payouts associated with the prior-year pool as actual payout exceeded target.

[2] For the year ended December 31, 2014, the shares vesting on December 31, 2013 were valued as of February 10, 2014, and the shares vesting due to the change in a majority of our Board of Directors that triggered the acceleration of vesting and payout of outstanding equity grants under our equity plans on August 6, 2014, were valued as of that date.

For the years ended December 31, 2013 and December 31, 2012, the shares vested on December 31, 2012 and December 31, 2011, respectively, and were valued on February 21, 2013 and February 13, 2012, respectively.

A004321

A summary of our outstanding share-based awards as of  December 31, 2014 is shown below:

| | Shares | Weighted Average Grant Date Fair Value |
|---|---|---|
| Outstanding, beginning of year | 1,633,866 | $40.20 |
| Granted | 2,016,996 | $16.67 |
| Vested | (1,230,056) | $38.48 |
| Forfeited/expired | (575,254) | $24.76 |
| Outstanding, end of year | 1,845,552 | $16.55 |

The total compensation cost related to outstanding awards not yet recognized is  $18.3 million at December 31, 2014. The weighted average remaining period for the awards outstanding at December 31, 2014 is approximately 2.5 years.

**NOTE 9 - INCOME TAXES**

*Income (Loss) from Continuing Operations Before Income Taxes and Equity Income (Loss) from Ventures*  includes the following components:

| | | (In Millions) | |
|---|---|---|---|
| | **2014** | 2013 | 2012 |
| United States | $ (1,884.2) | $ 837.7 | $ 838.6 |
| Foreign | (7,719.5) | (348.4) | (1,340.4) |
| | $ (9,603.7) | $ 489.3 | $ (501.8) |

The components of the provision (benefit) for income taxes on continuing operations consist of the following:

| | | (In Millions) | |
|---|---|---|---|
| | **2014** | 2013 | 2012 |
| Current provision (benefit): | | | |
| United States federal | $ (159.9) | $ 101.3 | $ 71.1 |
| United States state & local | (0.6) | 4.0 | 7.6 |
| Foreign | 17.2 | 87.9 | 50.2 |
| | (143.3) | 193.2 | 128.9 |
| Deferred provision (benefit): | | | |
| United States federal | (258.9) | 23.3 | 221.2 |
| United States state & local | (43.0) | 3.0 | 1.4 |
| Foreign | (856.8) | (164.4) | (95.6) |
| | (1,158.7) | (138.1) | 127.0 |
| Total provision on income (loss) from continuing operations | $ (1,302.0) | $ 55.1 | $ 255.9 |

155

A004322

Table of Contents

Reconciliation of our income tax attributable to continuing operations computed at the U.S. federal statutory rate is as follows:

| | (In Millions) | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2014** | | 2013 | | 2012 | |
| Tax at U.S. statutory rate of 35 percent | **$(3,361.3)** | **35.0 %** | $ 171.3 | 35.0 % | $ (175.6) | 35.0 % |
| Increase (decrease) due to: | | | | | | |
| Foreign exchange remeasurement | **(4.1)** | **—** | (2.6) | (0.5) | 62.3 | (12.4) |
| Non-taxable income related to noncontrolling interests | **290.1** | **(3.0)** | (1.5) | (0.3) | 61.0 | (12.0) |
| Impact of tax law change | **13.0** | **(0.1)** | — | — | (357.1) | 71.2 |
| Percentage depletion in excess of cost depletion | **(87.9)** | **0.9** | (97.6) | (19.9) | (109.1) | 21.7 |
| Impact of foreign operations | **592.0** | **(6.2)** | (10.2) | (2.1) | 65.2 | (13.0) |
| Income not subject to tax | **(46.5)** | **0.5** | (106.6) | (21.8) | (108.0) | 21.5 |
| Goodwill impairment | **22.7** | **(0.2)** | 20.5 | 4.2 | 202.2 | (40.3) |
| State taxes, net | **(43.6)** | **0.5** | 5.6 | 1.1 | 7.3 | (1.5) |
| Settlement of financial guaranty | **(343.3)** | **3.6** | — | — | — | — |
| Manufacturer's deduction | **—** | **—** | (7.9) | (1.6) | (4.7) | 0.9 |
| Valuation allowance | **1,660.6** | **(17.3)** | 73.0 | 14.9 | 634.5 | (126.5) |
| Tax uncertainties | **0.2** | **—** | 19.6 | 5.3 | (14.8) | 2.9 |
| Prior year adjustment in current year | **(10.4)** | **0.1** | (11.4) | (3.6) | (5.7) | 1.1 |
| Other items — net | **16.5** | **(0.2)** | 2.9 | 0.6 | (1.6) | 0.4 |
| Income tax (benefit) expense | **$(1,302.0)** | **13.6 %** | $ 55.1 | 11.3 % | $ 255.9 | (51.0)% |

The components of income taxes for other than continuing operations consisted of the following:

| | (In Millions) | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2014** | | 2013 | | 2012 | |
| Other comprehensive (income) loss: | | | | | | |
| Pension/OPEB liability | $ | **39.8** | $ | 100.0 | $ | 13.8 |
| Mark-to-market adjustments | | **3.6** | | 2.0 | | 1.7 |
| Other | | **(1.1)** | | (12.4) | | 2.6 |
| Total | $ | **42.3** | $ | 89.6 | $ | 18.1 |
| | | | | | | |
| Paid in capital — acquisition of noncontrolling interest | $ | **—** | $ | 102.1 | $ | — |
| Paid in capital — stock based compensation | $ | **(4.8)** | $ | 3.5 | $ | (12.8) |
| Discontinued Operations | $ | **—** | $ | (2.0) | $ | 10.4 |

156

A004323

Significant components of our deferred tax assets and liabilities as of  December 31, 2014 and 2013 are as follows:

| | 2014 | 2013 |
|---|---|---|
| | (In Millions) | |
| **Deferred tax assets:** | | |
| Pensions | $ 108.3 | $ 88.4 |
| MRRT starting base allowance | — | 300.3 |
| Postretirement benefits other than pensions | 63.0 | 58.0 |
| Alternative minimum tax credit carryforwards | 267.7 | 299.2 |
| Investments in ventures | 6.0 | — |
| Asset retirement obligations | 48.9 | 61.7 |
| Operating loss carryforwards | 1,083.5 | 524.4 |
| Product inventories | 32.3 | 16.4 |
| Property, plant and equipment and mineral rights | 901.6 | 56.0 |
| State and local | 41.9 | — |
| Lease liabilities | 14.1 | 31.9 |
| Other liabilities | 153.6 | 138.3 |
| Total deferred tax assets before valuation allowance | 2,720.9 | 1,574.6 |
| Deferred tax asset valuation allowance | (2,224.5) | (864.1) |
| Net deferred tax assets | 496.4 | 710.5 |
| **Deferred tax liabilities:** | | |
| Property, plant and equipment and mineral rights | (20.0) | (1,400.8) |
| Investment in ventures | (198.0) | (196.4) |
| Intangible assets | (7.3) | (33.5) |
| Income tax uncertainties | (49.5) | (48.5) |
| Product inventories | (16.6) | (12.8) |
| Other assets | (80.2) | (93.0) |
| Total deferred tax liabilities | (371.6) | (1,785.0) |
| Net deferred tax assets (liabilities) | $ 124.8 | $ (1,074.5) |

157

[Table of Contents]

The deferred tax amounts are classified in the Statements of Consolidated Financial Position as current or long-term consistently with the underlying asset or liability that generates the basis difference between financial reporting and tax. Following is a summary:

|  | (In Millions) | |
| --- | --- | --- |
|  | 2014 | 2013 |
| Deferred tax assets: | | |
| United States | $ 165.9 | $ 7.2 |
| Foreign | | |
| Current | 2.2 | 29.4 |
| Long-term | 12.0 | 41.5 |
| Total deferred tax assets | 180.1 | 78.1 |
| Deferred tax liabilities: | | |
| United States | — | 175.3 |
| Foreign | | |
| Current | 4.0 | 6.1 |
| Long-term | 51.3 | 971.2 |
| Total deferred tax liabilities | 55.3 | 1,152.6 |
| Net deferred tax assets (liabilities) | $ 124.8 | $ (1,074.5) |

At December 31, 2014 and 2013, we had $267.7 million and $299.2 million, respectively, of gross deferred tax assets related to U.S. alternative minimum tax credits that can be carried forward indefinitely.

We had gross domestic (including states) and foreign net operating loss carryforwards of $1.9 billion, and $6.0 billion, respectively, at December 31, 2014. We had gross state and foreign net operating loss carryforwards at December 31, 2013 of $157.9 million and $3.5 billion, respectively. The U.S. Federal net operating losses will begin to expire in 2035 and state net operating losses will begin to expire in 2019. The foreign net operating losses will begin to expire in 2015. We had foreign tax credit carryforwards of $5.8 million at December 31, 2014 and December 31, 2013. The foreign tax credit carryforwards will begin to expire in 2020. Additionally, there is a net operating loss carryforward of $540.7 million for Alternative Minimum Tax. No benefit has been recorded in the financials for this attribute as ASC 740 does not allow for the recording of deferred taxes under alternative taxing systems. However, the future economic realizable benefit for this attribute is expected to be approximately $108.1 million.

We recorded a $1,361.0 million net increase in the valuation allowance of certain deferred tax assets where management believes that realization of the related deferred tax assets is not more likely than not. Of this amount, a $18.2 million increase relates to ordinary losses of certain state operations for which future utilization is currently uncertain, a $291.0 million decrease relates to the reversal of our valuation allowance on MRRT tax credits due to the repeal of the MRRT legislation, and a $28.6 million decrease relates to the change in available Alternative Minimum Tax credits after carryback of current year losses. A $1,273.2 million increase relates to foreign deferred tax assets that management has determined it is more likely than not that the assets will not be realized. A $402.5 million increase relates to U.S. regular tax net operating losses where it has been determined that the full benefit of these losses will not be realized as we are perpetual Alternative Minimum taxpayers.

At December 31, 2014, we had no cumulative undistributed earnings of foreign subsidiaries included in consolidated retained earnings. At December 31, 2013, cumulative undistributed earnings of foreign subsidiaries included in consolidated retained earnings amounted to $1.2 billion. The change in undistributed earnings resulted from transactions executed during 2014 which triggered the realization of losses with respect to the value in our investment in Cliffs Quebec Iron Mines. Accordingly, no provision has been made for U.S. deferred taxes related to future repatriation of earnings.

A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows:

| | (In Millions) | | |
|---|---|---|---|
| | **2014** | 2013 | 2012 |
| Unrecognized tax benefits balance as of January 1 | $ **74.4** | $ 55.5 | $ 102.1 |
| Increases for tax positions in prior years | **3.4** | 13.6 | 2.7 |
| Increases for tax positions in current year | **2.5** | 5.3 | 11.1 |
| Increase due to foreign exchange | **(0.2)** | — | — |
| Settlements | **(0.5)** | — | (60.4) |
| Lapses in statutes of limitations | **(3.7)** | — | — |
| Other | **(1.2)** | — | — |
| Unrecognized tax benefits balance as of December 31 | $ **74.7** | $ 74.4 | $ 55.5 |

At December 31, 2014 and 2013, we had $74.7 million and $74.4 million, respectively, of unrecognized tax benefits recorded. Of this amount, $25.2 million and $25.9 million were recorded in *Other liabilities* and $49.5 million and $48.5 million were recorded as *Other non-current assets* in the Statements of Consolidated Financial Position for both years. If the $74.7 million were recognized, the full amount would impact the effective tax rate. We do not expect that the amount of unrecognized tax benefits will change significantly within the next twelve months. At December 31, 2014 and 2013, we had $2.1 million and $1.2 million, respectively, of accrued interest and penalties related to the unrecognized tax benefits recorded in *Other liabilities* in the Statements of Consolidated Financial Position.

On July 18, 2013, the FASB issued Accounting Standards Update No. 2013-11. *Presentation of an Unrecognized Tax Benefit When a Net Operating Loss Carryforward, a Similar Tax Loss, or a Tax Credit Carryforward Exists* (ASU 2013-11). ASU 2013-11 requires the netting of unrecognized tax benefits against a deferred tax asset for a loss or other carryforward that would apply in settlement of the uncertain tax positions except where the deferred tax asset or other carryforward are not available for use. The adoption of the pronouncement does not have an impact in the presentation of our financial statement.

Tax years that remain subject to examination are years 2010 and forward for the U.S., 2006 and forward for Canada, and 2007 and forward for Australia.

## NOTE 10 - LEASE OBLIGATIONS

We lease certain mining, production and other equipment under operating and capital leases. The leases are for varying lengths, generally at market interest rates and contain purchase and/or renewal options at the end of the terms. Our operating lease expense was $20.6 million, $29.5 million and $25.8 million for the years ended December 31, 2014, 2013 and 2012, respectively. Capital lease assets were $92.7 million and $404.0 million at December 31, 2014 and 2013, respectively. The value of the capital lease assets in 2014 have decreased due to several factors including impairment charges of $140.4 million on our Asia Pacific Iron Ore, North American Coal and Eastern Canadian Iron Ore operations. Other factors involved are the announced exiting out of Eastern Canadian Iron Ore, additions/deletions of assets, depreciation, etc. Corresponding accumulated amortization of capital leases included in respective allowances for depreciation were $18.1 million and $198.5 million at December 31, 2014 and 2013, respectively.

159

A004326

Table of Contents

Future minimum payments under capital leases and non-cancellable operating leases at December 31, 2014 are as follows:

| | Capital Leases | Operating Leases |
|---|---|---|
| | (In Millions) | |
| 2015 | $ 84.8 | $ 12.0 |
| 2016 | 34.1 | 9.3 |
| 2017 | 26.9 | 8.4 |
| 2018 | 20.4 | 6.8 |
| 2019 | 11.4 | 4.8 |
| 2020 and thereafter | 21.0 | 9.9 |
| Total minimum lease payments | $ 198.6 | $ 51.2 |
| Amounts representing interest | 31.3 | |
| Present value of net minimum lease payments | $ 167.3 (1) | |

(1)    The total is comprised of $74.5 million and $92.8 million classified as *Current portion of capital leases* and *Other liabilities*, respectively, in the Statements of Unaudited Condensed Consolidated Financial Position at December 31, 2014.

160

A004327

Table of Contents

## NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS

We had environmental and mine closure liabilities of $261.2 million and $321.0 million at December 31, 2014 and 2013, respectively. Payments in 2014 and 2013 were $3.1 million and $8.2 million, respectively. The following is a summary of the obligations as of December 31, 2014 and 2013:

| | (In Millions) | |
| --- | --- | --- |
| | December 31, | |
| | **2014** | 2013 |
| Environmental | $      5.5 | $         8.4 |
| Mine closure | | |
| LTVSMC | **22.9** | 22.0 |
| Operating mines: | | |
| U.S. Iron Ore | **120.9** | 152.2 |
| Asia Pacific Iron Ore | **21.5** | 25.5 |
| North American Coal | **33.9** | 34.7 |
| Eastern Canadian Iron Ore | **56.5** | 78.2 |
| Total mine closure | **255.7** | 312.6 |
| Total environmental and mine closure obligations | **261.2** | 321.0 |
| Less current portion | **5.2** | 11.3 |
| Long-term environmental and mine closure obligations | $   256.0 | $      309.7 |

### Environmental

Our mining and exploration activities are subject to various laws and regulations governing the protection of the environment. We conduct our operations to protect the public health and environment and believe our operations are in compliance with applicable laws and regulations in all material respects. Our environmental liabilities of $5.5 million  and $8.4 million  at December 31, 2014  and 2013, respectively, including obligations for known environmental remediation exposures at various active and closed mining operations and other sites, have been recognized based on the estimated cost of investigation and remediation at each site. If the cost only can be estimated as a range of possible amounts with no specific amount being more likely, the minimum of the range is accrued. Future expenditures are not discounted unless the amount and timing of the cash disbursements readily are known. Potential insurance recoveries have not been reflected. Additional environmental obligations could be incurred, the extent of which cannot be assessed.

As discussed in further detail below, the environmental liability recorded at  December 31, 2014  and 2013 primarily is comprised of remediation obligations related to the Rio Tinto mine site in Nevada where we are named as a potentially responsible party.

### *The Rio Tinto Mine Site*

The Rio Tinto Mine Site is a historic underground copper mine located near Mountain City, Nevada, where tailings were placed in Mill Creek; a tributary to the Owyhee River. Site investigation and remediation work is being conducted in accordance with a Consent Order dated September 14, 2001 between the NDEP and the Rio Tinto Working Group composed of the Company, Atlantic Richfield Company, Teck Cominco American Incorporated and E. I. duPont de Nemours and Company. The Consent Order provides for technical review by the U.S. Department of the Interior Bureau of Indian Affairs, the U.S. Fish and Wildlife Service, U.S. Department of Agriculture Forest Service, the NDEP and the Shoshone-Paiute Tribe of the Duck Valley Reservation (collectively, "Rio Tinto Trustees"). In recognition of the potential for an NRD claim, the parties actively pursued a global settlement that would include the EPA and encompass both the remedial action and the NRD issues.

The NDEP published a Record of Decision for the Rio Tinto Mine, which was signed on February 14, 2012 by the NDEP and the EPA. On September 27, 2012, the agencies subsequently issued a proposed Consent Decree, which was lodged with the U.S. District Court for the District of Nevada and opened for 30-day public comment on October 4, 2012. The Consent Decree was subsequently finalized on May 20, 2013. Under the terms of the Consent Decree, the Rio Tinto Working Group has agreed to pay over $29.0 million in cleanup costs and natural resource damages to the site and surrounding area. The Company's share of the total settlement cost, which includes remedial action, insurance and other oversight costs is $12.2 million, of which we have a remaining environmental liability of $2.5 million and $5.3

A004328

Table of Contents

million in the Statements of Consolidated Financial Position as of December 31, 2014 and 2013, respectively, related to this issue.

Under the terms of the Consent Decree, the Rio Tinto Working Group will be responsible for removing mine tailings from Mill Creek, improving the creek to support redband trout and improving water quality in Mill Creek and the East Fork Owyhee River. Previous cleanup projects included filling in old mine shafts, grading and covering leach pads and tailings, and building diversion ditches. NDEP will oversee the cleanup, with input from EPA and monitoring from the nearby Shoshone-Paiute Tribes of Duck Valley.

**Mine Closure**

Our mine closure obligations of $255.7 million and $312.6 million at December 31, 2014 and 2013, respectively, include our five consolidated U.S. operating iron ore mines, our Asia Pacific operating iron ore mine, our two operating North American coal mines, our two Eastern Canadian iron ore mines and a closed operation formerly operating as LTVSMC. Additionally, included in the December 31, 2013 mine closure obligation are the mine closure obligations related to the three mines at our CLCC operations. The CLCC assets were sold during the fourth quarter of 2014. As disclosed, at the end of March 2014, we idled our Wabush Scully mine in Newfoundland and Labrador and in the fourth quarter we began to implement the permanent closure plan for the mine. Additionally, we disclosed in November 2014 that we were pursuing exit options for our Bloom Lake mine and as disclosed in January 2015, active production at Bloom Lake mine has completely ceased and the mine has transitioned to "care-and-maintenance" mode.

Management periodically performs an assessment of the obligation to determine the adequacy of the liability in relation to the closure activities still required at the LTVSMC site. The LTVSMC closure liability was $22.9 million and $22.0 million at December 31, 2014 and 2013, respectively. MPCA is presently working on an NPDES permit reissuance for this facility that could modify the closure liability, but the scale of that change will not be understood until the permit has been drafted and issued.

The accrued closure obligation for our active mining operations provides for contractual and legal obligations associated with the eventual closure of the mining operations. We performed a detailed assessment of our asset retirement obligations related to our active mining locations most recently in 2014, except for Bloom Lake, in accordance with our accounting policy, which requires us to perform an in-depth evaluation of the liability every three years in addition to routine annual assessments. The most recent assessment for Bloom Lake was performed in 2012.

For the assessments performed, we determined the obligations based on detailed estimates adjusted for factors that a market participant would consider (i.e., inflation, overhead and profit) and then discounted the obligation using the current credit-adjusted risk-free interest rate based on the corresponding life of mine. The estimate also incorporates incremental increases in the closure cost estimates and changes in estimates of mine lives. The closure date for each location was determined based on the exhaustion date of the remaining iron ore reserves. The accretion of the liability and amortization of the related asset is recognized over the estimated mine lives for each location.

The following represents a roll forward of our asset retirement obligation liability related to our active mining locations for the years ended December 31, 2014 and 2013:

| | (In Millions) | |
| --- | --- | --- |
| | December 31, | |
| | **2014** | 2013 |
| Asset retirement obligation at beginning of period | $ **290.6** | $ 231.1 |
| Accretion expense | **14.5** | 18.1 |
| Exchange rate changes | **(2.4** ) | (3.4 ) |
| Revision in estimated cash flows | **(65.2** ) | 44.8 |
| Disposal of CLCC Assets | **(4.7** ) | $ — |
| Asset retirement obligation at end of period | $ **232.8** | $ 290.6 |

162

A004329

Table of Contents

The revisions in estimated cash flows recorded during the year ended December 31, 2014 relate primarily to a downward revision of estimated asset retirement costs for one of our U.S. Iron Ore mines associated with required storm water management systems.  The mine life was extended during 2014, effectively converting certain asset retirement costs to capital costs over the remaining life-of-mine.  The reduction in estimated cash flows was also attributable to the mine life for one of the Eastern Canadian Iron Ore mines being shortened by seven years along with a decrease in the inflation rate causing additional downward revisions in estimated cash flows recorded during the year ended December 31, 2014.

For the year ended December 31, 2013, the revisions in estimated cash flows recorded during the year primarily included estimated asset retirement costs for one of our U.S. Iron Ore mines associated with required storm water management systems expected to be implemented subsequent to the closure of the mine, as described above.

## NOTE 12 - GOODWILL AND OTHER INTANGIBLE ASSETS AND LIABILITIES

### Goodwill

Goodwill represents the excess purchase price paid over the fair value of the net assets of acquired companies and is not subject to amortization. We assign goodwill arising from acquired companies to the reporting units that are expected to benefit from the synergies of the acquisition. Our reporting units are either at the operating segment level or a component one level below our operating segments that constitutes a business for which management generally reviews production and financial results of that component. Decisions often are made as to capital expenditures, investments and production plans at the component level as part of the ongoing management of the related operating segment. We have determined that our Asia Pacific Iron Ore and Ferroalloys operating segments constitute separate reporting units, that CQIM and Wabush within our Eastern Canadian Iron Ore operating segment constitute reporting units and that Northshore within our U.S. Iron Ore operating segment constitutes a reporting unit. Goodwill is allocated among and evaluated for impairment at the reporting unit level in the fourth quarter of each year or as circumstances occur that potentially indicate that the carrying amount of these assets may exceed their fair value.

During the third quarter of 2014, a goodwill impairment charge of $73.5 million was recorded for our Asia Pacific Iron Ore reporting segment. The impairment charge was a result of downward long-term pricing estimates as determined through management's long-range planning process.

During the fourth quarter of 2013, upon performing our annual goodwill impairment test, a goodwill impairment charge of  $80.9 million was recorded for our Cliffs Chromite Ontario and Cliffs Chromite Far North reporting units within our Ferroalloys operating segment. The impairment charge was primarily a result of the decision made in the fourth quarter of 2013 to indefinitely suspend the Chromite Project and to not allocate additional capital for the project given the uncertain timeline and risks associated with the development of necessary infrastructure to bring the project online.

Refer to NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS  for further information.

The following table summarizes changes in the carrying amount of goodwill allocated by operating segment for the  years ended December 31, 2014 and December 31, 2013:

| | (In Millions) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | December 31, 2014 | | | | | December 31, 2013 | | | | | |
| | U.S. Iron Ore | Eastern Canadian Iron Ore | Asia Pacific Iron Ore | Other | Total | U.S. Iron Ore | Eastern Canadian Iron Ore | Asia Pacific Iron Ore | Other | Total | |
| Beginning Balance | $ 2.0 | $ — | $ 72.5 | $ — | $ 74.5 | $ 2.0 | $ — | $ 84.5 | $ 80.9 | $ 167.4 | |
| Arising in business combinations | — | — | — | — | — | — | — | — | — | — | |
| Impairment | — | — | (73.5) | — | (73.5) | — | — | — | (80.9) | (80.9) | |
| Impact of foreign currency translation | — | — | 1.0 | — | 1.0 | — | — | (12.0) | — | (12.0) | |
| Ending Balance | $ 2.0 | $ — | $ — | $ — | $ 2.0 | $ 2.0 | $ — | $ 72.5 | $ — | $ 74.5 | |
| Accumulated Goodwill Impairment Loss | $ — | $ (1,000.0) | $ (73.5) | $ (80.9) | $ (1,154.4) | $ — | $ (1,000.0) | $ — | $ (80.9) | $ (1,080.9) | |

163

A004330

**Other Intangible Assets and Liabilities**

Following is a summary of intangible assets and liabilities as of  December 31, 2014 and December 31, 2013:

| | | (In Millions) | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | December 31, 2014 | | | December 31, 2013 | | |
| | Classification | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| **Definite-lived intangible assets:** | | | | | | | |
| Permits | Other non-current assets | $    79.2 | $    (16.5) | $    62.7 | $   127.4 | $    (35.9) | $   91.5 |
| Utility contracts | Other non-current assets | — | — | — | 54.7 | (53.1) | 1.6 |
| Leases | Other non-current assets | — | — | — | 2.4 | (0.1) | 2.3 |
| Total intangible assets | | $    79.2 | $    (16.5) | $    62.7 | $   184.5 | $    (89.1) | $   95.4 |
| Below-market sales contracts | Other current liabilities | $   (23.0) | $    — | $    (23.0) | $   (23.0) | $    — | $   (23.0) |
| Below-market sales contracts | Other liabilities | (205.9) | 182.8 | (23.1) | (205.9) | 159.7 | (46.2) |
| Total below-market sales contracts | | $  (228.9) | $   182.8 | $    (46.1) | $  (228.9) | $   159.7 | $   (69.2) |

Amortization expense relating to intangible assets was  $10.4 million, $19.9 million and $22.5 million for the years ended December 31, 2014, 2013 and 2012, and is recognized in  *Cost of goods sold and operating expenses*  in the Statements of Consolidated Operations . During the year ended December 31, 2014, an impairment charge of $15.5 million was recorded related to the permits intangible asset and is recognized in  *Impairment of goodwill and other long-lived assets*  in the Statements of Consolidated Operations . Additionally, during 2013, an impairment charge of $9.5 million was recorded related to the utility contracts intangible asset and was recognized in *Impairment of goodwill and other long-lived assets* . There was no impairment charge recorded for definite-lived intangible assets in 2012. The estimated amortization expense relating to intangible assets for each of the five succeeding years is as follows:

| | (In Millions) |
| --- | --- |
| | Amount |
| **Year Ending December 31** | |
| 2015 | 4.1 |
| 2016 | 4.2 |
| 2017 | 4.0 |
| 2018 | 3.8 |
| 2019 | 3.5 |
| Total | $      19.6 |

The below-market sales contract is classified as a liability and recognized over the term of the underlying contract, which has a remaining life of approximately two years and expires December 31, 2016. For the years ended December 31, 2014, 2013 and 2012, we recognized $23.1 million, $45.9 million and $46.3 million, respectively, in *Product revenues* related to below-market sales contracts. The following amounts are estimated to be recognized in *Product revenues* for each of the two succeeding fiscal years:

| | (In Millions) |
| --- | --- |
| | Amount |
| **Year Ending December 31** | |
| 2015 | 23.0 |
| 2016 | 23.1 |
| Total | $      46.1 |

Table of Contents

**NOTE 13 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES**

The following table presents the fair value of our derivative instruments and the classification of each in the Statements of Consolidated Financial Position as of December 31, 2014 and December 31, 2013:

| | (In Millions) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Derivative Assets | | | | Derivative Liabilities | | | |
| | December 31, 2014 | | December 31, 2013 | | December 31, 2014 | | December 31, 2013 | |
| Derivative Instrument | Balance Sheet Location | Fair Value | Balance Sheet Location | Fair Value | Balance Sheet Location | Fair Value | Balance Sheet Location | Fair Value |
| Derivatives designated as hedging instruments under ASC 815: | | | | | | | | |
| Interest-Rate Swaps | | $ — | | $ — | Other current liabilities | $ — | | $ 2.1 |
| Foreign Exchange Contracts | Other current assets | — | Other current assets | 0.3 | Other current liabilities | 21.6 | Other current liabilities | 25.8 |
| Total derivatives designated as hedging instruments under ASC 815 | | $ — | | $ 0.3 | | $ 21.6 | | $ 27.9 |
| Derivatives not designated as hedging instruments under ASC 815: | | | | | | | | |
| Foreign Exchange Contracts | | $ — | | $ — | Other current liabilities | $ 9.9 | Other current liabilities | $ 1.1 |
| Customer Supply Agreements | Other current assets | 63.2 | Other current assets | 55.8 | | — | | — |
| Provisional Pricing Arrangements | Other current assets | — | Other current assets | 3.1 | Other current liabilities | 11.8 | Other current liabilities | 10.3 |
| Total derivatives not designated as hedging instruments under ASC 815: | | $ 63.2 | | $ 58.9 | | $ 21.7 | | $ 11.4 |
| Total derivatives | | $ 63.2 | | $ 59.2 | | $ 43.3 | | $ 39.3 |

**Derivatives Designated as Hedging Instruments**

***Cash Flow Hedges***

*Australian and Canadian Dollar Foreign Exchange Contracts*

We are subject to changes in foreign currency exchange rates as a result of our operations in Australia and Canada. With respect to Australia, foreign exchange risk arises from our exposure to fluctuations in foreign currency exchange rates because the functional currency of our Asia Pacific operations is the Australian dollar. Our Asia Pacific operations receive funds in U.S. currency for their iron ore sales. The functional currency of our Canadian operations is the U.S. dollar; however, the production costs for these operations primarily are incurred in the Canadian dollar.

We use foreign currency exchange contracts to hedge our foreign currency exposure for a portion of our U.S. dollar sales receipts in our Australian functional currency entities and our entities with Canadian dollar operating costs. For our Australian operations, U.S. dollars are converted to Australian dollars at the currency exchange rate in effect during the period the transaction occurred. For our Canadian operations, U.S. dollars are converted to Canadian dollars at the exchange rate in effect for the period the operating costs are incurred. The primary objective for the use of these instruments is to reduce exposure to changes in currency exchange rates and to protect against undue adverse movement in these exchange rates. If the instruments qualify for hedge accounting treatment, they are tested for effectiveness at inception and at least once each reporting period. If and when any of our contracts that had qualified for hedge accounting treatment are determined not to be highly effective as hedges, the underlying hedged transaction is no longer likely to occur, or the derivative is terminated, hedge accounting is discontinued.

165

A004332

Table of Contents

As of December 31, 2014, we had outstanding Australian foreign currency exchange contracts with notional amounts of $220.0 million in the form of forward contracts with varying maturity dates ranging from January 2015 to October 2015. We had no Canadian foreign currency exchange contracts that were considered cash flow hedges and that qualified for hedge accounting treatment at December 31, 2014, as during the fourth quarter of 2014 the Canadian foreign currency exchange contracts were de-designated. The de-designation of the Canadian hedge contracts is discussed below. This compares with outstanding Australian and Canadian foreign currency exchange contracts with a notional amount of $323.0 million and $285.9 million, respectively, as of December 31, 2013.

Changes in fair value of highly effective hedges are recorded as a component of *Accumulated other comprehensive loss* in the Statements of Consolidated Financial Position. Any ineffectiveness is recognized immediately in income. As of December 31, 2014 and 2013, there was no material ineffectiveness recorded for foreign exchange contracts that were classified as cash flow hedges. However, Canadian hedge contracts related to the Bloom Lake operations were deemed ineffective during the fourth quarter of 2014 and no longer qualified for hedge accounting treatment. The Canadian hedge contracts de-designated in the fourth quarter of 2014 were all that remained of the Canadian hedge contracts. Canadian hedge contracts associated with the Wabush and Ferroalloys operations were deemed ineffective during the fourth quarter of 2013 and no longer qualified for hedge accounting treatment. All of the hedges designated in the fourth quarter of 2013 settled and were no longer outstanding by June 30, 2014. The de-designated hedges are discussed within the *Derivatives Not Designated as Hedging Instruments* section of this footnote. Amounts recorded as a component of *Accumulated other comprehensive loss* are reclassified into earnings in the same period the forecasted transactions affect earnings. Of the amounts remaining in *Accumulated other comprehensive loss* related to Australian hedge contracts, we estimate that losses of $15.1 million (net of tax), respectively, will be reclassified into earnings within the next 12 months. No amounts remain in *Accumulated other comprehensive loss* related to Canadian hedge contracts.

*Interest Rate Risk Management*

Interest rate risk is managed using a portfolio of variable-rate and fixed-rate debt composed of short-term and long-term instruments, such as U.S. treasury lock agreements and variable-to-fixed interest rate swaps. From time to time, these instruments, which are derivative instruments, are entered into to facilitate the maintenance of the desired ratio of variable-rate to fixed-rate debt.

In the second quarter of 2012, we entered into U.S. treasury lock agreements with a notional value of $200.0 million to hedge the exposure to the possible rise in the interest rate prior to the issuance of the five-year senior notes due 2018 discussed in NOTE 5 - DEBT AND CREDIT FACILITIES . These derivative instruments were designated and qualified as cash flow hedges. The U.S. treasury locks were settled in the fourth quarter of 2012 upon the issuance of $500.0 million principal amount of the senior notes due 2018 for a cumulative after-tax loss of $1.3 million, which was recorded in *Accumulated other comprehensive loss* and is being amortized to *Other non-operating income (expense)* over the life of the senior notes due 2018. Approximately $0.1 million net of tax was recognized in earnings in both 2013 and 2014 and approximately $0.1 million net of tax is expected to be recognized in earnings in 2015.

166

Table of Contents

The following summarizes the effect of our derivatives designated as cash flow hedging instruments, net of tax in *Accumulated other comprehensive loss* in the Statements of Consolidated Operations for the years ended December 31, 2014, 2013 and 2012:

| | | | | (In Millions) | | | | |
|---|---|---|---|---|---|---|---|---|
| Derivatives in Cash Flow Hedging Relationships | Amount of Gain (Loss) Recognized in OCI on Derivative (Effective Portion) | | | Location of Gain (Loss) Reclassified from Accumulated OCI into Earnings (Effective Portion) | Amount of Gain (Loss) Reclassified from Accumulated OCI into Earnings (Effective Portion) | | |
| | Year Ended December 31, | | | | Year Ended December 31, | | |
| | **2014** | 2013 | 2012 | | **2014** | 2013 | 2012 |
| Australian Dollar Foreign Exchange Contracts *(hedge designation)* | **$ (13.9)** | $ (34.7) | $ 20.2 | *Product revenues* | **$ (13.2)** | $ (11.9) | $ 14.8 |
| Canadian Dollar Foreign Exchange Contracts *(hedge designation)* | — | (12.9) | 6.7 | *Cost of goods sold and operating expenses* | — | (8.2) | 3.3 |
| Canadian Dollar Foreign Exchange Contracts *(prior to de-designation)* | **(14.3)** | (4.1) | — | *Cost of goods sold and operating expenses* | **(17.7)** | (1.9) | — |
| Treasury Locks | **—** | — | (1.3) | *Other non-operating income (expense)* | **(0.1)** | (0.1) | — |
| Total | **$ (28.2)** | $ (51.7) | $ 25.6 | | **$ (31.0)** | $ (22.1) | $ 18.1 |

**Derivatives Not Designated as Hedging Instruments**

*Foreign Exchange Contracts*

During the fourth quarter of 2014, we discontinued hedge accounting for Canadian foreign currency exchange contracts for all outstanding contracts associated with Bloom Lake operations as projected future cash flows were no longer considered probable or reasonably possible, but we continued to hold these instruments as economic hedges to manage currency risk. Subsequent to de-designation, no further foreign currency exchange contracts were entered into for the Bloom Lake operations. As of December 31, 2014, the de-designated outstanding foreign exchange rate contracts had a notional amount of $183.0 million in the form of forward contracts with varying maturity dates ranging from January 2015 to September 2015.

The amounts that were previously recorded as a component of *Accumulated other comprehensive loss* prior to de-designation and remaining in *Accumulated other comprehensive loss* as of December 31, 2014 were reclassified to earnings upon the de-designation of the hedges as the hedges would not be effective prospectively due to the projected future cash flows associated with the hedges no longer being considered probable or reasonably possible. We reclassified losses of $7.3 million from *Accumulated other comprehensive loss* related to contracts that had not matured during the year, and recorded the amounts as *Cost of goods sold and operating expenses* on the Statements of Consolidated Operations. A corresponding realized gain or loss will be recognized in each period until settlement of the related economic hedge in 2015. Additionally, for the year ended December 31, 2014, prior to the de-designation of the Bloom Lake hedges, we reclassified losses of $9.9 million from *Accumulated other comprehensive loss* related to contracts that matured during the year, and recorded the amounts as *Cost of goods sold and operating expenses* on the Statements of Consolidated Operations. As of December 31, 2014, no gains or losses remain in *Accumulated other comprehensive loss* related to the Bloom Lake effective cash flow hedge contracts prior to de-designation.

During the fourth quarter of 2013, we discontinued hedge accounting for Canadian foreign currency exchange contracts for all outstanding contracts associated with Wabush and Ferroalloys operations as projected future cash flows were no longer considered probable, but we continued to hold these instruments as economic hedges to manage currency risk. Subsequent to de-designation, no further foreign currency exchange contracts were entered into for the Wabush operation or the Ferroalloys operations. As of December 31, 2014, there were no outstanding de-designated foreign currency exchange rate contracts associated with the Wabush and Ferroalloys operations as all remaining de-designated foreign exchange contracts matured during the second quarter of 2014. This compares with outstanding de-designated foreign currency exchange contracts with a notional amount of $74.8 million as of December 31, 2013.

167

Table of Contents

As a result of discontinued hedge accounting, the Wabush and Ferroalloys instruments were prospectively marked to fair value each reporting period through *Cost of goods sold and operating expenses* on the Statements of Consolidated Operations . For the years ended December 31, 2014, and 2013, the change in fair value of our de-designated foreign currency exchange contracts resulted in net losses of $3.3 million and $0.6 million, respectively. The amounts that were previously recorded as a component of *Accumulated other comprehensive loss* prior to de-designation were reclassified to earnings and a corresponding realized gain or loss was recognized when the forecasted cash flow occurred. For the years ended December 31, 2014, and 2013, we reclassified losses of $0.5 million and $1.9 million, respectively from *Accumulated other comprehensive loss* related to contracts that matured during the year, and recorded the amounts as *Cost of goods sold and operating expenses* on the Statements of Consolidated Operations . All the remaining contracts matured during the second quarter of 2014 and as of the period ended June 30, 2014, no gains or losses remained in *Accumulated other comprehensive loss* related to the effective cash flow hedge contracts prior to de-designation.

### Fair Value Hedges

#### Interest Rate Hedges

Our fixed-to-variable interest rate swap derivative instruments, with a notional amount of $250.0 million , were de-designated and settled during August 2014. Prior to settlement, the derivatives were designated and qualified as fair value hedges. The objective of the hedges was to offset changes in the fair value of our debt instruments associated with fluctuations in the benchmark LIBOR interest rate as part of our risk management strategy.

Prior to de-designation and settlement, when the interest rate swap derivative instruments were designated and qualified as fair-value hedges, the gain or loss on the hedge instrument as well as the offsetting loss or gain on the hedged item attributable to the hedged risk were recognized in net income. We included the gain or loss on the derivative instrument and the offsetting loss or gain on the hedged item in *Other non-operating income (expense)* . The net gains recognized in *Other non-operating income (expense)* for the year ended December 31, 2014 were $0.3 million.

For the year ended December 31, 2013, the fixed-to-variable interest rate swap derivative instruments were designated and qualified as fair-value hedges. The gain or loss on the hedge instrument as well as the offsetting loss or gain on the hedged item attributable to the hedged risk was recognized in net income. We included the gain or loss on the derivative instrument and the offsetting loss or gain on the hedged item in *Other non-operating income (expense)* . The net gain recognized in *Other non-operating income (expense)* for year ended December 31, 2013 was $0.1 million.

### Customer Supply Agreements

Most of our U.S. Iron Ore long-term supply agreements are comprised of a base price with annual price adjustment factors. The base price is the primary component of the purchase price for each contract. The indexed price adjustment factors are integral to the iron ore supply contracts and vary based on the agreement, but typically include adjustments based upon changes in the Platts 62 percent Fe fines spot price and/or international pellet prices and changes in specified Producer Price Indices, including those for all commodities, industrial commodities, energy and steel. The pricing adjustments generally operate in the same manner, with each factor typically comprising a portion of the price adjustment, although the weighting of each factor varies based upon the specific terms of each agreement. In most cases, these adjustment factors have not been finalized at the time our product is sold. In these cases, we historically have estimated the adjustment factors at each reporting period based upon the best third-party information available. The estimates are then adjusted to actual when the information has been finalized. The price adjustment factors have been evaluated to determine if they contain embedded derivatives. The price adjustment factors share the same economic characteristics and risks as the host contract and are integral to the host contract as inflation adjustments; accordingly, they have not been separately valued as derivative instruments.

A certain supply agreement with one U.S. Iron Ore customer provides for supplemental revenue or refunds to the customer based on the customer's average annual steel pricing at the time the product is consumed in the customer's blast furnace. The supplemental pricing is characterized as a freestanding derivative and is required to be accounted for separately once the product is shipped. The derivative instrument, which is finalized based on a future price, is adjusted to fair value as a revenue adjustment each reporting period until the pellets are consumed and the amounts are settled.

We recognized $187.8 million, $149.2 million and $171.4 million as *Product revenues* in the Statements of Consolidated Operations for the years ended December 31, 2014, 2013 and 2012, respectively, related to the supplemental payments. *Other current assets* , representing the fair value of the pricing factors, were $63.2 million and $55.8 million in the December 31, 2014 and December 31, 2013 Statements of Consolidated Financial Position , respectively.

168

Table of Contents

*Provisional Pricing Arrangements*

Certain of our U.S. Iron Ore, Asia Pacific Iron Ore and Eastern Canadian Iron Ore customer supply agreements specify provisional price calculations, where the pricing mechanisms generally are based on market pricing, with the final revenue rate to be based on market inputs at a specified period in time in the future, per the terms of the supply agreements. The difference between the provisionally agreed-upon price and the estimated final revenue rate is characterized as a freestanding derivative and is required to be accounted for separately once the provisional revenue has been recognized. The derivative instrument is adjusted to fair value through *Product revenues* each reporting period based upon current market data and forward-looking estimates provided by management until the final revenue rate is determined. At December 31, 2014 we had no *Other current assets* recorded in the Statements of Consolidated Financial Position related to our estimate of the final revenue rate with any of our customers. At December 31, 2013, we recorded $3.1 million as *Other current assets* in the Statements of Consolidated Financial Position related to our estimate of final revenue rate with our U.S. Iron Ore, Asia Pacific Iron Ore and Eastern Canadian Iron Ore customers. At December 31, 2014 and December 31, 2013, we recorded $11.8 million and $10.3 million, respectively, as *Other current liabilities* in the Statements of Consolidated Financial Position related to our estimate of final revenue rate with our U.S. Iron Ore, Asia Pacific Iron Ore and Eastern Canadian Iron Ore customers. These amounts represent the difference between the provisional price agreed upon with our customers based on the supply agreement terms and our estimate of the final revenue rate based on the price calculations established in the supply agreements. As a result, we recognized a net $11.8 million decrease in *Product revenues* in the Statements of Consolidated Operations for the year ended December 31, 2014 related to these arrangements. This compares with a net $7.2 million decrease and a net $7.8 million decrease in *Product revenues* for the comparable periods in 2013 and 2012.

The following summarizes the effect of our derivatives that are not designated as hedging instruments in the Statements of Consolidated Operations for the years ended December 31, 2014, 2013 and 2012:

| Derivatives Not Designated as Hedging Instruments | Location of Gain (Loss) Recognized in Income on Derivative | Amount of Gain/(Loss) Recognized in Income on Derivative | | |
|---|---|---|---|---|
| | | Year Ended December 31, | | |
| | | **2014** | 2013 | 2012 |
| Foreign Exchange Contracts | *Cost of goods sold and operating expenses* | $ (16.9) | $ (0.6) | $ — |
| Foreign Exchange Contracts | *Other income (expense)* | — | — | 0.3 |
| Foreign Exchange Contracts | *Income and Gain on Sale from Discontinued Operations, net of tax* | — | — | (0.3) |
| Treasury Locks | *Other non-operating income (expense)* | — | — | (0.4) |
| Customer Supply Agreements | *Product revenues* | 187.8 | 149.2 | 171.4 |
| Provisional Pricing Arrangements | *Product revenues* | (11.8) | (7.2) | (7.8) |
| Total | | $ 159.1 | $ 141.4 | $ 163.2 |

(In Millions)

Refer to NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS for additional information.

**NOTE 14 - DISCONTINUED OPERATIONS**

In April 2014, the FASB issued ASU 2014-08, *Reporting Discontinued Operations and Disclosures of Disposals of Components of an Entity* , which changes the criteria for reporting discontinued operations and requires additional disclosures about discontinued operations. The standard requires that an entity report as a discontinued operation only a disposal that represents a strategic shift in operations that has a major effect on its operations and financial results. ASU 2014-08 is effective prospectively for new disposals that occur within annual periods beginning on or after December 15, 2014. Early adoption is permitted and we adopted ASU 2014-08 during the three months ended December 31, 2014. Adoption of the standard had a material impact on our Statements of Consolidated Operations.

169

A004336

Table of Contents

The Wabush mine was idled by the end of the first quarter of 2014 and we subsequently began to commence permanent closure during the fourth quarter of 2014. As part of these closure activities, we terminated the rail transportation agreement and began implementation of the provincial Rehabilitation and Closure Plan that has been approved by the Canadian Department of Natural Resources. As such, the Wabush mine was deemed abandoned as of December 31, 2014 and meets the disposed by other than sale criteria.

On December 31, 2014, we completed the sale of our CLCC assets in West Virginia to Coronado Coal II, LLC, an affiliate of Coronado Coal LLC, for $174.0 million in cash and the assumption of certain liabilities, of which $155.0 million has been collected as of December 31, 2014. We recorded the results of this sale in our fourth quarter earnings as the transaction closed on December 31, 2014. As such, CLCC as of December 31, 2014, meets the disposed of by sale criteria.

As Wabush and CLCC met criteria for discontinued operations, each disposal had to be further evaluated to determine whether the disposal represents a strategic shift that has (or will have) a major effect on our operations and financial results. Wabush and CLCC meet the criteria for discontinued operations as Wabush's closure plan was implemented and CLCC was sold. According to ASU 2014-08, examples of a strategic shift that has (or will have) a major effect on an entity's operations and financial results could include a disposal of a major geographical area, a major line of business, a major equity method investment, or other major parts of an entity. In order to determine if the disposal of CLCC or Wabush had a major effect on our operations and financial results, we used revenues and assets as a key indicator of significance as those are historically key indicators we have used to measure our components against. For both Wabush and CLCC, the associated revenues and assets were determined not to be a significant percentage of our consolidated results as evidenced by the years ended December 31, 2014, 2013 and 2012. Wabush revenues were less than 8 percent of consolidated revenues and less than 4 percent of total assets for the years ended December 31, 2014, 2013 and 2012. CLCC revenues were less than 5 percent of consolidated revenues and less than 8 percent of total assets for the years ended December 31, 2014, 2013 and 2012.

Other key indicators such as sales margin, EBITDA and adjusted EBITDA are not relevant for Wabush as Wabush was idled in the first quarter of 2014 and therefore not operational for the majority of 2014. These other key indicators were also not relevant for CLCC as the coal business makes up a small percentage of our overall financial results, approximately 15 percent of consolidated revenues in 2014, as compared to our iron ore business.

After assessing Wabush and CLCC under the ASU 2014-08 guidance as discussed above, it was determined that Wabush and CLCC do not qualify as discontinued operations as of December 31, 2014. Neither Wabush nor CLCC represent a strategic shift that has or will have a major impact on our operations or financial results.

The amendments in this ASU 2014-08 require us to provide the *Income (Loss) from Continuing Operations Before Income Taxes and Equity Income (Loss) from Ventures* for each individually significant component of an entity that does not qualify for discontinued operations presentation in the financial statements. The *Income (Loss) from Continuing Operations Before Income Taxes and Equity Income (Loss) from Ventures* is to be presented for the component of an entity for the period in which it is disposed of or is classified as held for sale and for all prior periods that are presented in the Statements of Consolidated Operations. As required, the *Income (Loss) from Continuing Operations Before Income Taxes and Equity Income (Loss) from Ventures* for Wabush and CLCC are presented below:

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | | | |
| | **2014** | | 2013 | | 2012 | |
| **INCOME (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES AND EQUITY INCOME (LOSS) FROM VENTURES** | | | | | | |
| **Wabush** | $ | **(345.6)** | $ | (258.6) | $ | (131.8) |
| **CLCC** | $ | **(669.9)** | $ | (55.0) | $ | (41.8) |

The table below sets forth selected financial information related to operating results of our business classified as discontinued operations. While the reclassification of revenues and expenses related to discontinued operations for prior periods has no impact upon previously reported net income, the Statements of Consolidated Operations present the revenues and expenses that were reclassified from the specified line items to discontinued operations. During the fourth quarter of 2012, we sold our 45 percent economic interest in Sonoma. The Sonoma operations previously were included in *Other* within our reportable segments.

170

Table of Contents

The following table presents detail of our operations related to our Sonoma operations in the Statements of Consolidated Operations:

| | (In Millions) | | |
|---|---|---|---|
| | Year Ended December 31, | | |
| | **2014** | 2013 | 2012 |
| **REVENUES FROM PRODUCT SALES AND SERVICES** | | | |
| Product | $ — | $ — | $ 151.6 |
| | | | |
| **GAIN ON SALE FROM DISCONTINUED OPERATIONS, net of tax** | — | — | 38.0 |
| **INCOME (LOSS) FROM DISCONTINUED OPERATIONS, net of tax** | — | 2.0 | (2.1) |
| **INCOME and GAIN ON SALE FROM DISCONTINUED OPERATIONS, net of tax** | $ — | $ 2.0 | $ 35.9 |

*Income and Gain on Sale from Discontinued Operations, net of tax* during the year ended December 31, 2013 relates to additional income tax benefit resulting from the actual tax gain from the sale of Sonoma as included on the 2012 tax return, which was filed during the year ended December 31, 2013.

We recorded a gain of $38.0 million, net of $8.1 million in tax expense in *Income and Gain on Sale from Discontinued Operations, net of tax* in the Statements of Consolidated Operations for the year ended December 31, 2012 related to our sale of the Sonoma operations, which was completed as of November 12, 2012. We recorded a loss from discontinued operations in 2012 of $2.1 million, net of $2.4 million in tax expense.

## NOTE 15 - CAPITAL STOCK

### Depositary Shares

On February 21, 2013, we issued 29.25 million depositary shares, representing an aggregate of 731,250 preferred shares, comprised of the 27.0 million depositary share offering and the exercise of an underwriters' over-allotment option to purchase an additional 2.25 million depositary shares. Each depositary share represents a 1/40th interest in a share of our 7.00 percent Series A Mandatory Convertible Preferred Stock, Class A, without par value ("Preferred Share") at a price of $25 per depositary share for total net proceeds of approximately $709.4 million, after underwriter fees and discounts. Each Preferred Share has an initial liquidation preference of $1,000 per share (equivalent to a $25 liquidation preference per depositary share). When and if declared by our Board of Directors, we will pay cumulative dividends on each Preferred Share at an annual rate of 7.00 percent on the liquidation preference. We will pay declared dividends in cash on February 1, May 1, August 1 and November 1 of each year, commencing on May 1, 2013 and to, and including February 1, 2016. Holders of the depositary shares are entitled to a proportional fractional interest in the rights and preferences of the Preferred Shares, including conversion, dividend, liquidation and voting rights, subject to the provisions of the deposit agreement.

The Preferred Shares may be converted, at the option of the holder, at the minimum conversion rate of 28.1480 of our common shares (equivalent to 0.7037 of our common shares per depositary share) at any time prior to February 1, 2016 or other than during a fundamental change conversion period, subject to anti-dilution adjustments. If not converted prior to that time, each Preferred Share will convert automatically on February 1, 2016 into between 28.1480 and 34.4840 common shares, par value $0.125 per share, subject to anti-dilution adjustments. The number of common shares issuable on conversion will be determined based on the average VWAP per share of our common shares during the 20 trading day period beginning on, and including, the 23 rd scheduled trading day prior to February 1, 2016, subject to customary anti-dilution adjustments. Upon conversion, a minimum of 20.6 million common shares and a maximum of 25.2 million common shares will be issued.

If certain fundamental changes involving the Company occur, holders of the Preferred Shares may convert their shares into a number of common shares at the conversion rate that will be adjusted under certain circumstances, and such holders also will be entitled to a fundamental change dividend make-whole amount. The Preferred Shares are not redeemable.

171

**Common Share Public Offering**

On February 21, 2013, we issued 10.35 million common shares, comprised of the 9.0 million common share offering and the exercise of an underwriters' option to purchase an additional 1.35 million common shares. We received net proceeds of approximately $285.3 million at a closing price of $29.00 per common share.

**Dividends**

On March 20, 2013, our Board of Directors declared a cash dividend of $13.6111 per Preferred Share, which is equivalent to approximately $0.34 per depositary share. The cash dividend was paid on May 1, 2013 to our shareholders of record as of the close of business on April 15, 2013. On May 7, 2013, September 9, 2013, and November 11, 2013, our Board of Directors declared a quarterly cash dividend of $17.50 per Preferred Share, which is equivalent to approximately $0.44 per depositary share. The cash dividend was paid on August 1, 2013, November 1, 2013 and February 3, 2014 to our shareholders of record as of the close of business on July 15, 2013, October 15, 2013 and January 15, 2014, respectively. On February 11, 2014, May 13, 2014, and September 8, 2014, our board of directors declared the quarterly cash dividend of $17.50 per Preferred Share, which is equivalent to approximately $0.44 per depositary share. The cash dividend was paid on May 1, 2014, August 1, 2014 and November 3, 2014, to our Preferred Shareholders of record as of the close of business on April 15, 2014, July 15, 2014, and October 15, 2014, respectively. On November 19, 2014, our Board of Directors declared the quarterly cash dividend of $17.50 per Preferred Share, which is equivalent to approximately $0.44 per depositary share. The cash dividend of $12.8 million was paid on February 2, 2015 to our shareholders of record as of the close of business on January 15, 2015.

On February 11, 2013, our Board of Directors approved a reduction to our quarterly cash dividend rate by 76 percent to $0.15 per share. Our Board of Directors took this step in order to improve the future cash flows available for investment in the Phase II expansion at Bloom Lake, as well as to preserve our investment-grade credit ratings. The decreased dividend of $0.15 per share was paid on March 1, 2013, June 3, 2013, September 3, 2013 and December 2, 2013 to our common shareholders of record as of the close of business on February 22, 2013, May 17, 2013, August 15, 2013 and November 22, 2013, respectively. Additionally, the cash dividend of $0.15 per share was paid on March 3, 2014, June 3, 2014, September 2, 2014 and December 1, 2014 to our common shareholders of record as of close of business on February 21, 2014, May 23, 2014, August 15, 2014 and November 15, 2014.

172

Table of Contents

**NOTE 16 - ACCUMULATED OTHER COMPREHENSIVE INCOME (LOSS)**

The components of *Accumulated other comprehensive income (loss)* within Cliffs shareholders' equity and related tax effects allocated to each are shown below as of December 31, 2014, 2013 and 2012:

| | | (In Millions) | |
|---|---|---|---|
| | Pre-tax Amount | Tax Benefit (Provision) | After-tax Amount |
| **As of December 31, 2012:** | | | |
| Postretirement benefit liability | $ (576.7) | $ 194.0 | $ (382.7) |
| Foreign currency translation adjustments | 316.3 | — | 316.3 |
| Unrealized net gain on derivative financial instruments | 12.4 | (3.7) | 8.7 |
| Unrealized gain on securities | 3.3 | (1.2) | 2.1 |
| | $ (244.7) | $ 189.1 | $ (55.6) |
| **As of December 31, 2013:** | | | |
| Postretirement benefit liability | $ (299.3) | $ 94.4 | $ (204.9) |
| Foreign currency translation adjustments | 106.7 | — | 106.7 |
| Unrealized net gain on derivative financial instruments | (30.0) | 9.1 | (20.9) |
| Unrealized gain on securities | 9.3 | (3.1) | 6.2 |
| | $ (213.3) | $ 100.4 | $ (112.9) |
| **As of December 31, 2014:** | | | |
| **Postretirement benefit liability** | **$ (425.3)** | **$ 134.2** | **$ (291.1)** |
| **Foreign currency translation adjustments** | **64.4** | **—** | **64.4** |
| **Unrealized net loss on derivative financial instruments** | **(25.9)** | **7.8** | **(18.1)** |
| **Unrealized gain on securities** | **(1.3)** | **0.3** | **(1.0)** |
| | **$ (388.1)** | **$ 142.3** | **$ (245.8)** |

A004340

Table of Contents

The following tables reflect the changes in *Accumulated other comprehensive income (loss)* related to Cliffs shareholders' equity for December 31, 2014, 2013 and 2012:

| | Postretirement Benefit Liability, net of tax | Unrealized Net Gain (Loss) on Securities, net of tax | Unrealized Net Gain (Loss) on Foreign Currency Translation | Net Unrealized Gain (Loss) on Derivative Financial Instruments, net of tax | Accumulated Other Comprehensive Income (Loss) |
|---|---|---|---|---|---|
| | | | (In Millions) | | |
| **Balance December 31, 2013** | $ (204.9) | $ 6.2 | $ 106.7 | $ (20.9) | $ (112.9) |
| Other comprehensive income (loss) before reclassifications | (0.4) | 3.8 | 40.5 | (2.3) | 41.6 |
| Net loss (gain) reclassified from accumulated other comprehensive income (loss) | 3.3 | 0.1 | — | 12.8 | 16.2 |
| **Balance March 31, 2014** | $ (202.0) | $ 10.1 | $ 147.2 | $ (10.4) | $ (55.1) |
| Other comprehensive loss before reclassifications | (1.4) | (2.4) | 19.7 | 9.7 | 25.6 |
| Net loss (gain) reclassified from accumulated other comprehensive income (loss) | 4.0 | (1.3) | — | 6.6 | 9.3 |
| **Balance June 30, 2014** | $ (199.4) | $ 6.4 | $ 166.9 | $ 5.9 | $ (20.2) |
| Other comprehensive income (loss) before reclassifications | 3.5 | 1.3 | (65.9) | (20.0) | (81.1) |
| Net loss (gain) reclassified from accumulated other comprehensive income (loss) | 7.6 | (7.1) | — | (0.6) | (0.1) |
| **Balance September 30, 2014** | $ (188.3) | $ 0.6 | $ 101.0 | $ (14.7) | $ (101.4) |
| Other comprehensive income (loss) before reclassifications | $ (98.7) | $ (1.4) | $ (36.6) | $ (15.6) | $ (152.3) |
| Net loss (gain) reclassified from accumulated other comprehensive income (loss) | (4.1) | (0.2) | — | 12.2 | 7.9 |
| **Balance December 31, 2014** | $ (291.1) | $ (1.0) | $ 64.4 | $ (18.1) | $ (245.8) |

174

Table of Contents

| | (In Millions) | | | | |
|---|---|---|---|---|---|
| | Postretirement Benefit Liability, net of tax | Unrealized Net Gain (Loss) on Securities, net of tax | Unrealized Net Gain (Loss) on Foreign Currency Translation | Net Unrealized Gain (Loss) on Derivative Financial Instruments, net of tax | Accumulated Other Comprehensive Income (Loss) |
| Balance December 31, 2012 | $ (382.7) | $ 2.1 | $ 316.3 | $ 8.7 | $ (55.6) |
| Other comprehensive income (loss) before reclassifications | (1.1) | 2.5 | 3.3 | (5.0) | (0.3) |
| Net loss (gain) reclassified from accumulated other comprehensive income (loss) | 6.4 | 0.1 | — | (2.0) | 4.5 |
| Balance March 31, 2013 | $ (377.4) | $ 4.7 | $ 319.6 | $ 1.7 | $ (51.4) |
| Other comprehensive loss before reclassifications | (1.5) | (2.0) | (152.0) | (42.2) | (197.7) |
| Net loss (gain) reclassified from accumulated other comprehensive income (loss) | 8.1 | 3.6 | — | (2.2) | 9.5 |
| Balance June 30, 2013 | $ (370.8) | $ 6.3 | $ 167.6 | $ (42.7) | $ (239.6) |
| Other comprehensive income (loss) before reclassifications | (0.6) | 3.5 | 22.8 | 12.1 | 37.8 |
| Net loss (gain) reclassified from accumulated other comprehensive income (loss) | 6.3 | 0.9 | — | 16.2 | 23.4 |
| Balance September 30, 2013 | $ (365.1) | $ 10.7 | $ 190.4 | $ (14.4) | $ (178.4) |
| Other comprehensive income (loss) before reclassifications | $ 154.5 | $ (4.9) | $ (83.7) | $ (16.6) | $ 49.3 |
| Net loss (gain) reclassified from accumulated other comprehensive income (loss) | $ 5.7 | $ 0.4 | $ — | $ 10.1 | $ 16.2 |
| Balance December 31, 2013 | $ (204.9) | $ 6.2 | $ 106.7 | $ (20.9) | $ (112.9) |

| | (In Millions) | | | | |
|---|---|---|---|---|---|
| | Postretirement Benefit Liability, net of tax | Unrealized Net Gain (Loss) on Securities, net of tax | Unrealized Net Gain on Foreign Currency Translation | Net Unrealized Gain on Derivative Financial Instruments, net of tax | Accumulated Other Comprehensive Income (Loss) |
| Balance December 31, 2011 | $ (408.9) | $ 2.6 | $ 312.5 | $ 1.2 | $ (92.6) |
| Change during 2012 | 26.2 | (0.5) | 3.8 | 7.5 | 37.0 |
| Balance December 31, 2012 | $ (382.7) | $ 2.1 | $ 316.3 | $ 8.7 | $ (55.6) |

A004342

Table of Contents

The following table reflects the details about *Accumulated other comprehensive income (loss)* components related to Cliffs shareholders' equity for the year ended December 31, 2014:

| Details about Accumulated Other Comprehensive Income (Loss) Components | Amount of (Gain)/Loss Reclassified into Income | | Affected Line Item in the Statement of Unaudited Condensed Consolidated Operations |
|---|---|---|---|
| | Year Ended December 31, 2014 | Year Ended December 31, 2013 | |
| Amortization of Pension and Postretirement Benefit Liability: | | | |
| Prior service costs | $ (0.9) | $ (0.6) | (1) |
| Net actuarial loss | 19.1 | 41.4 | (1) |
| Curtailments/Settlements | (5.0) | — | (1) |
| Special termination benefits | 3.4 | — | (1) |
| | 16.6 | 40.8 | Total before taxes |
| | (5.8) | (14.3) | *Income tax benefit (expense)* |
| | $ 10.8 | $ 26.5 | Net of taxes |
| | | | |
| Unrealized gain (loss) on marketable securities: | | | |
| Sale of marketable securities | $ (11.4) | $ (0.2) | *Other non-operating income (expense)* |
| Impairment | (0.5) | 5.3 | *Other non-operating income (expense)* |
| | (11.9) | 5.1 | Total before taxes |
| | 3.4 | (0.1) | *Income tax benefit (expense)* |
| | $ (8.5) | $ 5.0 | Net of taxes |
| | | | |
| Unrealized gain (loss) on derivative financial instruments: | | | |
| Australian dollar foreign exchange contracts | $ 18.9 | $ 17.0 | *Product revenues* |
| Canadian dollar foreign exchange contracts | 26.7 | 15.3 | *Cost of goods sold and operating expenses* |
| | 45.6 | 32.3 | Total before taxes |
| | (14.6) | (10.2) | *Income tax benefit (expense)* |
| | $ 31.0 | $ 22.1 | Net of taxes |
| | | | |
| Total Reclassifications for the Period | $ 33.3 | $ 53.6 | |

(1)    These accumulated other comprehensive income components are included in the net periodic benefit cost recognized for the year ended December 31, 2014 and 2013. See NOTE 7 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS for further information.

176

A004343

Table of Contents

**NOTE 17 - CASH FLOW INFORMATION**

A reconciliation of capital additions to cash paid for capital expenditures for the  years ended December 31, 2014, 2013 and 2012 is as follows:

| | (In Millions) | | |
| --- | --- | --- | --- |
| | Year Ended December 31, | | |
| | **2014** | 2013 | 2012 |
| Capital additions | $ 235.5 | $ 752.3 | $ 1,335.3 |
| Cash paid for capital expenditures | 284.1 | 861.6 | 1,127.5 |
| Difference | $ (48.6) | $ (109.3) | $ 207.8 |
| Non-cash accruals | $ (58.5) | $ (109.3) | 152.5 |
| Capital leases | 9.9 | — | 55.3 |
| Total | $ (48.6) | $ (109.3) | $ 207.8 |

Cash payments for interest and income taxes in  2014, 2013 and 2012 are as follows:

| | (In Millions) | | |
| --- | --- | --- | --- |
| | **2014** | 2013 | 2012 |
| Taxes paid on income | $ 47.3 | $ 153.3 | $ 443.2 |
| Interest paid on debt obligations | 176.5 | 174.4 | 207.5 |

*Non-Cash Financing Activities - Declared Dividends*

On November 19, 2014, our Board of Directors declared the quarterly cash dividend on our Preferred Shares of  $17.50 per share, which is equivalent to approximately $0.44 per depositary share, each representing 1/40 [th] of a Preferred Share. The cash dividend of $12.8 million was paid on February 2, 2015 to our preferred shareholders of record as of the close of business on January 15, 2015.

**NOTE 18 - RELATED PARTIES**

Three of our five U.S. iron ore mines and  one of our two Eastern Canadian iron ore mines are owned with various joint venture partners that are integrated steel producers or their subsidiaries. We are the manager of each of the mines we co-own and rely on our joint venture partners to make their required capital contributions and to pay for their share of the iron ore pellets and concentrate that we produce. The joint venture partners are also our customers. The following is a summary of the mine ownership of these iron ore mines at December 31, 2014:

| Mine | Cliffs Natural Resources | ArcelorMittal | U.S. Steel Canada | WISCO |
| --- | --- | --- | --- | --- |
| Empire | 79.0% | 21.0% | — | — |
| Tilden | 85.0% | — | 15.0% | — |
| Hibbing | 23.0% | 62.3% | 14.7% | — |
| Bloom Lake | 82.8% | — | — | 17.2% |

ArcelorMittal has a unilateral right to put its interest in the Empire mine to us, but has not exercised this right to date.

177

*Product revenues* from related parties were as follows:

|  | (In Millions) | | |
|---|---|---|---|
|  | Year Ended December 31, | | |
|  | **2014** | 2013 | 2012 |
| Product revenues from related parties | $ **1,378.7** | $ 1,664.8 | $ 1,660.8 |
| Total product revenues | **4,230.8** | 5,346.6 | 5,520.9 |
| Related party product revenue as a percent of total product revenue | **32.6%** | 31.1% | 30.1% |

Amounts due from related parties recorded in *Accounts receivable, net* and *Other current assets,* including customer supply agreements and provisional pricing arrangements, were $151.1 million and $132.0 million at December 31, 2014 and 2013, respectively. Amounts due to related parties recorded in *Other current liabilities,* including provisional pricing arrangements and liabilities to related parties, were $13.6 million and $25.1 million at December 31, 2014 and 2013, respectively.

Supply agreements with one of our customers include provisions for supplemental revenue or refunds based on the customer's annual steel pricing for the year the product is consumed in the customer's blast furnace. The supplemental pricing is characterized as an embedded derivative. Refer to NOTE 13 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES for further information.

## NOTE 19 - EARNINGS PER SHARE

The following table summarizes the computation of basic and diluted earnings per share attributable to Cliffs shareholders:

|  | (In Millions, Except Per Share Amounts) | | |
|---|---|---|---|
|  | Year Ended December 31, | | |
|  | **2014** | 2013 | 2012 |
| Net Income (Loss) from Continuing Operations attributable to Cliffs shareholders | $ **(7,224.2)** | $ 411.5 | $ (935.3) |
| Income (Loss) and Gain on Sale from Discontinued Operations, net of tax | **—** | 2.0 | 35.9 |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | $ **(7,224.2)** | $ 413.5 | $ (899.4) |
| PREFERRED STOCK DIVIDENDS | **(51.2)** | (48.7) | — |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS COMMON SHAREHOLDERS | $ **(7,275.4)** | $ 364.8 | $ (899.4) |
| Weighted Average Number of Shares: |  |  |  |
| Basic | **153.1** | 151.7 | 142.4 |
| Depositary Shares | **—** | 0.5 | — |
| Employee Stock Plans | **—** | 22.1 | — |
| Diluted | **153.1** | 174.3 | 142.4 |
| Earnings (loss) per Common Share Attributable to Cliffs Common Shareholders - Basic: |  |  |  |
| Continuing operations | $ **(47.52)** | $ 2.39 | $ (6.57) |
| Discontinued operations | **—** | 0.01 | 0.25 |
|  | $ **(47.52)** | $ 2.40 | $ (6.32) |
| Earnings (loss) per Common Share Attributable to Cliffs Common Shareholders - Diluted: |  |  |  |
| Continuing operations | $ **(47.52)** | $ 2.36 | $ (6.57) |
| Discontinued operations | **—** | 0.01 | 0.25 |
|  | $ **(47.52)** | $ 2.37 | $ (6.32) |

178

The diluted earnings per share calculation excludes 25.2 million depositary shares that were anti-dilutive for the year ended December 31, 2014. Additionally, the diluted earnings per share calculation excludes 0.7 million shares for the year ended December 31, 2014 related to equity plan awards that were anti-dilutive. There was no anti-dilution for the year ended December 31, 2013. For the year ended December 31, 2012, the diluted earnings per share calculation excludes 0.5 million shares related to equity plan awards that were anti-dilutive.

## NOTE 20 - COMMITMENTS AND CONTINGENCIES

### Contingencies

*Litigation*

We are currently a party to various claims and legal proceedings incidental to our operations. If management believes that a loss arising from these matters is probable and can reasonably be estimated, we record the amount of the loss, or the minimum estimated liability when the loss is estimated using a range, and no point within the range is more probable than another. As additional information becomes available, any potential liability related to these matters is assessed and the estimates are revised, if necessary. Based on currently available information, management believes that the ultimate outcome of these matters, individually and in the aggregate, will not have a material effect on our financial position, results of operations or cash flows. However, litigation is subject to inherent uncertainties, and unfavorable rulings could occur. An unfavorable ruling could include monetary damages, additional funding requirements or an injunction. If an unfavorable ruling were to occur, there exists the possibility of a material impact on the financial position and results of operations of the period in which the ruling occurs, or future periods. However, we believe that any pending litigation will not result in a material liability in relation to our consolidated financial statements.

*Environmental Matters*

We had environmental liabilities of $5.5 million and $8.4 million at December 31, 2014 and 2013, respectively, including obligations for known environmental remediation exposures at active and closed mining operations and other sites. These amounts have been recognized based on the estimated cost of investigation and remediation at each site, and include site studies, design and implementation of remediation plans, legal and consulting fees, and post-remediation monitoring and related activities. If the cost can only be estimated as a range of possible amounts with no specific amount being more likely, the minimum of the range is accrued. Future expenditures are not discounted unless the amount and timing of the cash disbursements are readily known. Potential insurance recoveries have not been reflected. Additional environmental obligations could be incurred, the extent of which cannot be assessed. The amount of our ultimate liability with respect to these matters may be affected by several uncertainties, primarily the ultimate cost of required remediation and the extent to which other responsible parties contribute. Refer to NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS for further information.

*Tax Matters*

The calculation of our tax liabilities involves dealing with uncertainties in the application of complex tax regulations. We recognize liabilities for anticipated tax audit issues based on our estimate of whether, and the extent to which, additional taxes will be due. If we ultimately determine that payment of these amounts is unnecessary, we reverse the liability and recognize a tax benefit during the period in which we determine that the liability is no longer necessary. We also recognize tax benefits to the extent that it is more likely than not that our positions will be sustained when challenged by the taxing authorities. To the extent we prevail in matters for which liabilities have been established, or are required to pay amounts in excess of our liabilities, our effective tax rate in a given period could be materially affected. An unfavorable tax settlement would require use of our cash and result in an increase in our effective tax rate in the year of resolution. A favorable tax settlement would be recognized as a reduction in our effective tax rate in the year of resolution. Refer to NOTE 9 - INCOME TAXES for further information.

## NOTE 21 - SUBSEQUENT EVENTS

### Common Share Dividend

On January 26, 2015, we announced that our Board of Directors had decided to eliminate the quarterly dividend of $0.15 per share on our common shares. The decision is applicable to the first quarter of 2015 and all subsequent quarters. The elimination of the common share dividend provides us with additional free cash flow of approximately $92 million annually, which we intend to use for further debt reduction. We see accelerated debt reduction as a more effective means of protecting our shareholders than continuing to pay a common share dividend.

A004346

*Credit Facility*

On January 22, 2015, we amended the revolving credit agreement (Amendment No. 6) to effect the following:

- Reduces the size of the existing facility from $1.125 billion to $900 million at the closing of this amendment with a further reduction to $750 million on May 31, 2015.

- Permits certain of our subsidiaries and joint ventures related to our Canadian operations (collectively, the "Canadian Entities") to enter into a restructuring (the "Canadian Restructuring").

- Permits costs and expenses incurred in connection with the Canadian Restructuring in an amount not to exceed $75 million to be added back to the calculation of EBITDA.

- Adds limitations with respect to investments in the Canadian Entities after the Canadian Restructuring.

- Adds limitations on the guaranty of indebtness of a Canadian Entity by us or our subsidiaries (other than by another Canadian Entity).

- Permits additional liens on the assets of the Canadian Entities.

- Reduces the permitted amount of quarterly dividends on our common shares to not more than $0.01 per share in any fiscal quarter.

- Grants a security interest in our as-extracted collateral and certain of our subsidiaries.

- Excludes certain indebtness and obligations of the Canadian Entities from the representations, covenants and events of default.

The amended facility retains substantial financial flexibility for management to execute our strategy and provides us a consistent source of liquidity.

***Bloom Lake Group CCAA Filing***

As we have previously disclosed, despite our cost-cutting progress at our Bloom Lake mine, we concluded that Phase I alone would not be economically feasible based on our current operating plans and that the mine must be further developed to reduce the overall cash cost of operations. However, also as previously disclosed, we would only develop Phase II of the Bloom Lake mine if we were able to secure new equity partners to share in the capital costs, which we estimated to be approximately $1.2 billion. As the new equity partners were unable to commit within the short timeframe we required, we determined that the Phase II expansion of the Bloom Lake mine was no longer a viable option for us so we shifted our focus to considering available possibilities and executing an exit option for Eastern Canadian Iron Ore operations that minimized the cash outflows and associated liabilities. In December 2014, iron ore production at the Bloom Lake mine was suspended and the Bloom Lake mine was placed in "care-and-maintenance" mode.

On January 27, 2015, we announced that the Bloom Lake Group had commenced restructuring proceedings in Montreal, Québec, under the CCAA. The Bloom Lake Group comprises the Canadian affiliates which own and/or operate the Bloom Lake mine or are subsidiaries of such affiliates.

The decision by the Bloom Lake Group to seek protection under the CCAA was based on a thorough legal and financial analysis of the options available. The Bloom Lake Group was no longer generating any revenues and was not able to meet its obligations as they became due. The initial CCAA order obtained on January 27, 2015 addresses the Bloom Lake Group's immediate liquidity issues by staying creditor claims and permits the Bloom Lake Group to preserve and protect its assets for the benefit of all stakeholders while restructuring and/or sale options are explored.

As part of the CCAA process, the Court has appointed FTI Consulting Canada Inc. as the Monitor. The Monitor's role in the CCAA process is to monitor the activities of the Bloom Lake Group and provide assistance to the Bloom Lake Group and its stakeholders in respect of the CCAA process.

We also filed on February 2, 2015 a Current Report on Form 8-K that provides pro forma financial information reflecting the deconsolidation of the Bloom Lake Group. Additional information regarding the CCAA proceedings are available on the Monitor's website at http://cfcanada.fticonsulting.com/bloomlake.

180

A004347

Table of Contents

**NOTE 22 - QUARTERLY RESULTS OF OPERATIONS (UNAUDITED)**

The sum of quarterly EPS may not equal EPS for the year due to discrete quarterly calculations.

| | (In Millions, Except Per Share Amounts) | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2014 | | | | |
| | Quarters | | | | |
| | First | Second | Third | Fourth | Year |
| Revenues from product sales and services | $ 940.0 | $ 1,100.8 | $ 1,298.2 | $ 1,284.7 | $ 4,623.7 |
| Sales margin | 63.2 | 92.0 | 127.5 | 168.7 | 451.4 |
| Net Income (Loss) from Continuing Operations attributable to Cliffs shareholders | $ (70.3) | $ 10.9 | $ (5,879.6) | $ (1,285.1) | $ (7,224.2) |
| Income from Discontinued Operations | — | — | — | — | — |
| Net Income (Loss) Attributable to Cliffs Shareholders | $ (70.3) | $ 10.9 | $ (5,879.6) | $ (1,285.1) | $ (7,224.2) |
| Preferred Stock Dividends | $ (12.8) | $ (12.8) | $ (12.8) | $ (12.8) | $ (51.2) |
| Net Income (Loss) Attributable to Cliffs Common Shareholders | $ (83.1) | $ (1.9) | $ (5,892.4) | $ (1,297.9) | $ (7,275.4) |
| Earnings per common share attributable to Cliffs common shareholders — Basic: | | | | | |
| Continuing Operations | $ (0.54) | $ (0.01) | $ (38.49) | $ (8.48) | $ (47.52) |
| Discontinued Operations | — | — | — | — | — |
| | $ (0.54) | $ (0.01) | $ (38.49) | $ (8.48) | $ (47.52) |
| Earnings per common share attributable to Cliffs common shareholders — Diluted: | | | | | |
| Continuing Operations | $ (0.54) | $ (0.01) | $ (38.49) | $ (8.48) | $ (47.52) |
| Discontinued Operations | — | — | — | — | — |
| | $ (0.54) | $ (0.01) | $ (38.49) | $ (8.48) | $ (47.52) |

The diluted earnings per share calculation for all quarters of 2014 exclude depositary shares that were anti-dilutive totaling  25.2 million million and equity plan awards ranging between 0.3 million and 0.8 million each quarter that were anti-dilutive.

| | 2013 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Quarters | | | | |
| | First | Second | Third | Fourth | Year |
| Revenues from product sales and services | $ 1,140.5 | $ 1,488.5 | $ 1,546.6 | $ 1,515.8 | $ 5,691.4 |
| Sales margin | 237.9 | 268.2 | 348.7 | 294.5 | 1,149.3 |
| Net Income (Loss) from Continuing Operations attributable to Cliffs shareholders | $ 107.0 | $ 146.0 | $ 115.2 | $ 43.3 | $ 411.5 |
| Income (Loss) and Gain on Sale from Discontinued Operations, net of tax | — | — | 2.0 | — | 2.0 |
| Net Income Attributable to Cliffs Shareholders | $ 107.0 | $ 146.0 | $ 117.2 | $ 43.3 | $ 413.5 |
| Earnings per common share attributable to Cliffs common shareholders — Basic: | | | | | |
| Continuing Operations | $ 0.66 | $ 0.87 | $ 0.67 | $ 0.20 | $ 2.39 |
| Discontinued Operations | — | — | 0.01 | — | 0.01 |
| | $ 0.66 | $ 0.87 | $ 0.68 | $ 0.20 | $ 2.40 |
| Earnings per common share attributable to Cliffs common shareholders — Diluted: | | | | | |
| Continuing Operations | $ 0.66 | $ 0.82 | $ 0.65 | $ 0.20 | $ 2.36 |
| Discontinued Operations | — | — | 0.01 | — | 0.01 |
| | $ 0.66 | $ 0.82 | $ 0.66 | $ 0.20 | $ 2.37 |

181

Table of Contents

The diluted earnings per share calculation for the first and fourth quarters of 2013 exclude depositary shares that were anti-dilutive totaling   12.9 million and 25.2 million, respectively.

**Fourth Quarter Results**

During the fourth quarter of 2014, we recorded impairment charges of $ 1.3 billion primarily related to Bloom Lake and driven mainly by the changes in life-of-mine cash flows due to declining market pricing. Also, during the fourth quarter of 2014, we completed the sale of the CLCC assets for $174.0 million in cash and the assumption of certain liabilities, of which $155.0 million has been collected, and resulted in a loss on the sale of these assets of   $419.6 million. The fourth quarter 2014 results additionally included an income tax benefit of $289.7 million, which includes the benefits related to the impairment charges as well as the recognition of a loss on a financial guaranty and the sale of CLCC assets.

Upon performing our annual goodwill impairment test in the fourth quarter of 2013, a goodwill impairment charge of   $80.9 million million was recorded for our Cliffs Chromite Ontario and Cliffs Chromite Far North reporting units within our Ferroalloys operating segment. We also recorded an other long-lived asset impairment charge of $154.6 million related to our Wabush operations within our Eastern Canadian Iron Ore operating segment to reduce those assets to their estimated fair value as of December 31, 2013. All of these charges impacted *Impairment of goodwill and other long-lived assets* .

As discussed in NOTE 1 - BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES , we recorded an adjustment to correct an immaterial prior period error in the noncontrolling interest related to Bloom Lake. Accordingly, the adjustment was recorded prospectively in the Statements of Consolidated Operations for the period ended December 31, 2013 and in the  Statements of Consolidated Financial Position as of December 31, 2013. The adjustment to noncontrolling interest related to Bloom Lake was approximately $45.1 million and resulted in an increase to *Net Income (Loss) Attributable to Cliffs Shareholders* and a reduction of *Loss attributable to noncontrolling interest* and corresponding decrease to *Noncontrolling interest* in the Statements of Consolidated Financial Position for the three months ended and year ended December 31, 2013. The adjustments also resulted in an increase to basic and diluted earnings per common share of $0.29 for the three months ended December 31, 2013.

Refer to NOTE 12 - GOODWILL AND OTHER INTANGIBLE ASSETS AND LIABILITIES , NOTE 4 - PROPERTY, PLANT AND EQUIPMENT  and NOTE 9 - INCOME TAXES for further information.

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Stockholders of
Cliffs Natural Resources Inc.
Cleveland, Ohio

We have audited the internal control over financial reporting of Cliffs Natural Resources Inc. and subsidiaries (the "Company") as of December 31, 2014, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying *Management's Report on Internal Control Over Financial Reporting.* Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2014, based on the criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements and financial statement schedule as of and for the year ended December 31, 2014 of the Company and our report dated February 25, 2015 expressed an unqualified opinion on those financial statements and financial statement schedule and included an explanatory paragraph regarding a change in accounting for discontinued operations.

*/s/ Deloitte & Touche LLP*

Cleveland, Ohio
February 25, 2015

183

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Stockholders of
Cliffs Natural Resources Inc.
Cleveland, Ohio

We have audited the accompanying statements of consolidated financial position of Cliffs Natural Resources Inc. and subsidiaries (the "Company") as of December 31, 2014 and 2013, and the related statements of consolidated operations, comprehensive income (loss), cash flows, and changes in equity for each of the three years in the period ended December 31, 2014. Our audits also included the financial statement schedule listed in the Index at Item 15. These financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on the financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Cliffs Natural Resources Inc. and subsidiaries as of December 31, 2014 and 2013, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2014, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed in Note 1 to the consolidated financial statements, the Company has changed its method of accounting for discontinued operations in 2014 due to the adoption of Accounting Standards Update 2014-08, *Reporting Discontinued Operations and Disclosures of Disposals of Components of an Entity*.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2014, based on the criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 25, 2015 expressed an unqualified opinion on the Company's internal control over financial reporting.

*/s/ Deloitte & Touche LLP*

Cleveland, Ohio
February 25, 2015

184

Table of Contents

**Item 9.**          ***Changes in and Disagreements With Accountants on Accounting and Financial Disclosure***

    *None.*

**Item 9A.**          ***Controls and Procedures***

    We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our President and Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure based solely on the definition of "disclosure controls and procedures" in Rule 13a-15(e) promulgated under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

    As of the end of the period covered by this report, we carried out an evaluation under the supervision and with the participation of our management, including our President and Chief Executive Officer and our Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures. Based on the foregoing, our President and Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective.

**Management's Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as such term is defined under Rule 13a-15(f) promulgated under the Exchange Act.

Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Company's consolidated financial statements for external purposes in accordance with generally accepted accounting principles.

Internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit the preparation of the consolidated financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with appropriate authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the consolidated financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management conducted an assessment of the Company's internal control over financial reporting as of  December 31, 2014 using the framework specified in *Internal Control - Integrated Framework* (2013), published by the Committee of Sponsoring Organizations of the Treadway Commission. Based on such assessment, management has concluded that the Company's internal control over financial reporting was effective as of December 31, 2014.

The effectiveness of the Company's internal control over financial reporting as of  December 31, 2014 has been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report that appears herein.

February 25, 2015

**Changes in Internal Control Over Financial Reporting**

There have been no changes in our internal control over financial reporting or in other factors that occurred during our last fiscal quarter or our last fiscal year that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B.**          *Other Information*

None.

186

A004353

Table of Contents

**PART III**

**Item 10.**          ***Directors, Executive Officers and Corporate Governance***

The information required to be furnished by this Item will be set forth in our definitive proxy statement for the 2015 Annual Meeting of Shareholders (the "Proxy Statement") under the headings "Board Meetings and Committees - Audit Committee", "Business Ethics Policy", "Independence and Related Party Transactions", "Information Concerning Director Nominees" and "Section 16(a) Beneficial Ownership Reporting Compliance", and is incorporated herein by reference and made a part hereof from the Proxy Statement. The information regarding executive officers required by this Item is set forth in *Part I - Item 1. Business* hereof under the heading "Executive Officers of the Registrant", which information is incorporated herein by reference and made a part hereof.

**Item 11.**          ***Executive Compensation***

The information required to be furnished by this Item will be set forth in our Proxy Statement under the headings "Director Compensation", "Compensation Committee Report", "Compensation Committee Interlocks and Insider Participation" and "Executive Compensation" and is incorporated herein by reference and made a part hereof from the Proxy Statement.

**Item 12.**          ***Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters***

The information required to be furnished by this Item regarding "Securities Authorized for Issuance Under Equity Compensation Plans", "Related Stockholder Matters" and "Security Ownership" will be set forth in the Proxy Statement under the headings "Independence and Related Party Transactions", "Ownership of Equity Securities of the Company" and "Equity Compensation Plan Information", respectively, and is incorporated herein by reference and made part hereof from the Proxy Statement.

**Item 13.**          ***Certain Relationships and Related Transactions, and Director Independence***

The information required to be furnished by this Item will be set forth in the definitive Proxy Statement under the heading "Independence and Related Party Transactions" and is incorporated herein by reference and made a part hereof from the Proxy Statement.

**Item 14.**          ***Principal Accountant Fees and Services***

The information required to be furnished by this Item will be set forth in the Proxy Statement under the heading "Ratification of Independent Registered Public Accounting Firm" and is incorporated herein by reference and made a part hereof from the Proxy Statement.

187

A004354

Table of Contents

**PART IV**

**Item 15.**    *Exhibits and Financial Statement Schedules*

(a)(1) and (2) - List of Financial Statements and Financial Statement Schedules.

The following consolidated financial statements of Cliffs Natural Resources Inc. are included at   *Item 8. Financial Statements and Supplementary Data* above:

- Statements of Consolidated Financial Position -  December 31, 2014 and 2013

- Statements of Consolidated Operations - Years ended  December 31, 2014, 2013 and 2012

- Statements of Consolidated Comprehensive Income - Years ended  December 31, 2014, 2013 and 2012

- Statements of Consolidated Cash Flows - Years ended  December 31, 2014, 2013 and 2012

- Statements of Consolidated Changes in Equity - Years ended  December 31, 2014, 2013 and 2012

- Notes to Consolidated Financial Statements

The following consolidated financial statement schedule of Cliffs Natural Resources Inc. is included herein in Item 15(d) and attached as Exhibit 99(a):

Schedule II - Valuation and Qualifying Accounts

All other schedules for which provision is made in the applicable accounting regulation of the SEC are not required under the related instructions or are inapplicable, and therefore have been omitted.

(3) List of Exhibits - Refer to Exhibit Index on pages 190 - 197, which is incorporated herein by reference.

(c) Exhibits listed in Item 15(a)(3) above are incorporated herein by reference.

(d) The schedule listed above in Item 15(a)(1) and (2) is attached as Exhibit 99(a) and incorporated herein by reference.

188

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

CLIFFS NATURAL RESOURCES INC.

By: /s/ Timothy K. Flanagan

Name: Timothy K. Flanagan

Title: Vice President, Corporate Controller and Chief Accounting Officer

Date: February 25, 2015

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signatures | Title | Date |
|---|---|---|
| /s/ C. L. Goncalves | Chairman, President, Chief Executive Officer and Director | February 25, 2015 |
| C. L. Goncalves | (Principal Executive Officer) | |
| /s/ T. M. Paradie | Executive Vice President & Chief Financial Officer | February 25, 2015 |
| T. M. Paradie | (Principal Financial Officer) | |
| /s/ T. K. Flanagan | Vice President, Corporate Controller & Chief Accounting Officer | February 25, 2015 |
| T. K. Flanagan | (Principal Accounting Officer) | |
| * | Director | February 25, 2015 |
| J. T. Baldwin | | |
| * | Director | February 25, 2015 |
| R. P. Fisher, Jr. | | |
| * | Director | February 25, 2015 |
| S. M. Green | | |
| * | Director | February 25, 2015 |
| J. A. Rutkowski, Jr. | | |
| * | Director | February 25, 2015 |
| J. S. Sawyer | | |
| * | Director | February 25, 2015 |
| M. D. Siegal | | |
| * | Director | February 25, 2015 |
| G. Stoliar | | |
| * | Director | February 25, 2015 |
| D. C. Taylor | | |

* The undersigned, by signing his name hereto, does sign and execute this Annual Report on Form 10-K pursuant to a Power of Attorney executed on behalf of the above-indicated officers and directors of the registrant and filed herewith as Exhibit 24 on behalf of the registrant.

By: /s/ T. M. Paradie

(T. M. Paradie, as Attorney-in-Fact)

189

Table of Contents

**EXHIBIT INDEX**

All documents referenced below have been filed pursuant to the Securities Exchange Act of 1934 by Cliffs Natural Resources Inc., file number 1-09844, unless otherwise indicated.

| Exhibit Number | Exhibit |
|---|---|
| | **Plan of purchase, sale, reorganization, arrangement, liquidation or succession** |
| 2.1 | ***Asset Purchase Agreement, dated as of December 2, 2014, by and among Cliffs Natural Resources Inc., Cliffs Logan County Coal LLC, Toney's Fork Land, LLC, Southern Eagle Land, LLC and Cliffs Logan County Coal Terminals LLC and Coronado Coal II, LLC (filed herewith) |
| 2.2 | ***Amendment to Asset Purchase Agreement, effective as of December 31, 2014, by and among Cliffs Natural Resources Inc., Cliffs Logan County Coal LLC, Toney's Fork Land, LLC, Southern Eagle Land, LLC and Cliffs Logan County Coal Terminals LLC and Coronado Coal II, LLC (filed herewith) |
| | **Articles of Incorporation and By-Laws of Cliffs Natural Resources Inc.** |
| 3.1 | Third Amended Articles of Incorporation of Cliffs (as filed with the Secretary of State of the State of Ohio on May 13, 2013 (filed as Exhibit 3.1 to Cliffs' Form 8-K on May 13, 2013 and incorporated herein by reference) |
| 3.2 | Regulations of Cleveland-Cliffs Inc. (filed as Exhibit 3.2 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| | **Instruments defining rights of security holders, including indentures** |
| 4.1 | Form of Indenture between Cliffs Natural Resources Inc. and U.S. Bank National Association, as trustee, dated March 17, 2010 (filed as Exhibit 4.1 to Cliffs' Form S-3 No. 333-165376 on March 10, 2010 and incorporated herein by reference) |
| 4.2 | Form of 5.90% Notes due 2020 First Supplemental Indenture between Cliffs Natural Resources Inc. and U.S. Bank National Association, as trustee, dated March 17, 2010, including Form of 5.90% Notes due 2020 (filed as Exhibit 4.2 to Cliffs' Form 8-K on March 16, 2010 and incorporated herein by reference) |
| 4.3 | Form of 4.80% Notes due 2020 Second Supplemental Indenture between Cliffs Natural Resources Inc. and U.S. Bank National Association, as trustee, dated September 20, 2010, including Form of 4.80% Notes due 2020 (filed as Exhibit 4.3 to Cliffs' Form 8-K on September 17, 2010 and incorporated herein by reference) |
| 4.4 | Form of 6.25% Notes due 2040 Third Supplemental Indenture between Cliffs Natural Resources Inc. and U.S. Bank National Association, as trustee, dated September 20, 2010, including Form of 6.25% Notes due 2040 (filed as Exhibit 4.4 to Cliffs' Form 8-K on September 17, 2010 and incorporated herein by reference) |
| 4.5 | Form of 4.875% Notes due 2021 Fourth Supplemental Indenture between Cliffs and U.S. Bank National Association, as trustee, dated March 23, 2011, including Form of 4.875% Notes due 2021 (filed as Exhibit 4.1 to Cliffs' Form 8-K on March 23, 2011 and incorporated herein by reference) |
| 4.6 | Fifth Supplemental Indenture between Cliffs and U.S. Bank National Association, as trustee, dated March 31, 2011 (filed as Exhibit 4(b) to Cliffs' Form 10-Q for the period ended June 30, 2011 and incorporated herein by reference) |
| 4.7 | Form of 3.95% Notes due 2018 Sixth Supplemental Indenture between Cliffs and U.S. Bank National Association, as trustee, dated December 13, 2012, including form of 3.95% Notes due 2018 (filed as Exhibit 4.1 to Cliffs' Form 8-K on December 13, 2012 and incorporated herein by reference) |
| 4.8 | Form of Common Share Certificate (filed as Exhibit 4.1 to Cliffs' Form 10-Q for the period ended September 30, 2014 and incorporated herein by reference) |

190

Table of Contents

| | **Material Contracts** |
|---|---|
| 10.1 | * Form of Change in Control Severance Agreement, effective January 1, 2014 (covering existing grants) (filed as Exhibit 10.1 to Cliffs' Form 10-K for the period ended December 31, 2013 and incorporated herein by reference) |
| 10.2 | * Form of Change in Control Severance Agreement (covering newly hired officers) (filed as Exhibit 10.2 to Cliffs' Form 10-K for the period ended December 31, 2013 and incorporated herein by reference) |
| 10.3 | * Form of Change In Control Severance Agreement (covering newly hired officers) (filed as Exhibit 10.4 to Cliffs' Form 8-K/A on September 16, 2014 and incorporated herein by reference) |
| 10.4 | * Cliffs Natural Resources Inc. 2012 Non-Qualified Deferred Compensation Plan (effective January 1, 2012) dated November 8, 2011 (filed as Exhibit 10.1 to Cliffs' Form 8-K on November 8, 2011 and incorporated herein by reference) |
| 10.5 | * Form of Indemnification Agreement between Cliffs Natural Resources Inc. and Directors (filed as Exhibit 10.5 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.6 | * Amended and Restated Cleveland-Cliffs Inc Retirement Plan for Non-Employee Directors effective on July 1, 1995 (filed as Exhibit 10.6 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.7 | * Amendment to Amended and Restated Cleveland-Cliffs Inc Retirement Plan for Non-Employee Directors dated as of January 1, 2001 (filed as Exhibit 10.7 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.8 | * Second Amendment to the Amended and Restated Cleveland-Cliffs Inc Retirement Plan for Non-Employee Directors dated and effective January 14, 2003 (filed as Exhibit 10.8 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.9 | * Cliffs Natural Resources Inc. Nonemployee Directors' Compensation Plan (Amended and Restated as of December 31, 2008) (filed as Exhibit 10(nnn) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.10 | * 2014 Nonemployee Directors' Compensation Plan (filed as Exhibit 10.2 to Cliffs' Form 8-K on August 4, 2014 and incorporated herein by reference) |
| 10.11 | * Trust Agreement No. 1 (Amended and Restated effective June 1, 1997), dated June 12, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to the Cleveland-Cliffs Inc Supplemental Retirement Benefit Plan, Severance Pay Plan for Key Employees and certain executive agreements (filed as Exhibit 10.10 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.12 | * Trust Agreement No. 1 Amendments to Exhibits, effective as of January 1, 2000, by and between Cleveland-Cliffs Inc and KeyBank National Association, as Trustee (filed as Exhibit 10.13 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.13 | * First Amendment to Trust Agreement No. 1, effective September 10, 2002, by and between Cleveland-Cliffs Inc and KeyBank National Association, as Trustee (filed as Exhibit 10.12 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.14 | * Second Amendment to Trust Agreement No. 1 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective December 31, 2008 (filed as Exhibit 10(y) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.15 | * Third Amendment to Trust Agreement No. 1 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as July 28, 2014 (filed herewith) |

191

Table of Contents

| 10.16 | * Amended and Restated Trust Agreement No. 2, effective as of October 15, 2002, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to Executive Agreements and Indemnification Agreements with the Company's Directors and certain Officers, the Company's Severance Pay Plan for Key Employees, and the Retention Plan for Salaried Employees (filed as Exhibit 10.14 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
|---|---|
| 10.17 | * Second Amendment to Amended and Restated Trust Agreement No. 2 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(aa) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.18 | * Third Amendment to Amended and Restated Trust Agreement No. 2 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed herewith) |
| 10.19 | * Trust Agreement No. 5, dated as of October 28, 1987, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to certain deferred compensation agreements (filed as Exhibit 10.16 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.20 | * First Amendment to Trust Agreement No. 5, dated as of May 12, 1989, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.17 to Form 10-K of Cliffs' for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.21 | * Second Amendment to Trust Agreement No. 5, dated as of April 9, 1991, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.18 to Form 10-K of Cliffs' for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.22 | * Third Amendment to Trust Agreement No. 5, dated as of March 9, 1992, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.19 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.23 | * Fourth Amendment to Trust Agreement No. 5, dated November 18, 1994, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.20 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.24 | * Fifth Amendment to Trust Agreement No. 5, dated May 23, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.19 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.25 | *Sixth Amendment to Trust Agreement No. 5 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(hh) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.26 | *Seventh Amendment to Trust Agreement No. 5 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed herewith) |
| 10.27 | * Trust Agreement No. 7, dated as of April 9, 1991, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to the Cleveland-Cliffs Inc Supplemental Retirement Benefit Plan (filed as Exhibit 10.23 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.28 | * First Amendment to Trust Agreement No. 7, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, dated as of March 9, 1992 (filed as Exhibit 10.24 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.29 | * Second Amendment to Trust Agreement No. 7, dated November 18, 1994, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.25 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.30 | * Third Amendment to Trust Agreement No. 7, dated May 23, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.26 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |

Table of Contents

| 10.31 | * Fourth Amendment to Trust Agreement No. 7, dated July 15, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.27 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| --- | --- |
| 10.32 | * Amendment to Exhibits to Trust Agreement No. 7, effective as of January 1, 2000, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.28 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.33 | * Sixth Amendment to Trust Agreement No. 7 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(oo) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.34 | * Seventh Amendment to Trust Agreement No. 7 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed herewith) |
| 10.35 | * Trust Agreement No. 8, dated as of April 9, 1991, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to the Cleveland-Cliffs Inc Retirement Plan for Non-Employee Directors (filed as Exhibit 10.32 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.36 | * First Amendment to Trust Agreement No. 8, dated as of March 9, 1992, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.31 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.37 | * Second Amendment to Trust Agreement No. 8, dated June 12, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.32 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.38 | * Third Amendment to Trust Agreement No. 8 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(ss) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.39 | * Fourth Amendment to Trust Agreement No. 8 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed herewith) |
| 10.40 | * Trust Agreement No. 9, dated as of November 20, 1996, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to the Cleveland-Cliffs Inc Nonemployee Directors' Supplemental Compensation Plan (filed as Exhibit 10.34 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.41 | * First Amendment to Trust Agreement No. 9 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(uu) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.42 | * Second Amendment to Trust Agreement No. 9 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed herewith) |
| 10.43 | * Trust Agreement No. 10, dated as of November 20, 1996, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to the Cleveland-Cliffs Inc Nonemployee Directors' Compensation Plan (filed as Exhibit 10.36 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.44 | *First Amendment to Trust Agreement No. 10 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(ww) to Cliffs' Form 10-K for the period ended February 26, 2009 and incorporated herein by reference) |

Table of Contents

| 10.45 | * Second Amendment to Trust Agreement No. 10 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed herewith) |
|---|---|
| 10.46 | *Letter Agreement of Employment by and between Cliffs Natural Resources Inc. and Gary B. Halverson dated October 23, 2013 (filed as Exhibit 10.50 to Cliffs' Form 10-K for the period ended December 31, 2013 and incorporated herein by reference) |
| 10.47 | *Non-employee Director Phantom Stock Unit Award Agreement, by and between Cliffs and James F. Kirsch dated July 9, 2013 (filed as Exhibit 10.51 to Cliffs' Form 10-K for the period ended December 31, 2013 and incorporated herein by reference) |
| 10.48 | *Letter Agreement between Cliffs Natural Resources Inc. and James Kirsch dated December 4, 2013 (filed as Exhibit 10.52 to Cliffs' Form 10-K for the period ended December 31, 2013 and incorporated herein by reference) |
| 10.49 | *Form of Letter Agreement of Employment between Cliffs Asia Pacific Iron Ore Management Pty Ltd and Australian Executives (filed as Exhibit 10.55 to Cliffs' Form 10-K for the period ended December 31, 2013 and incorporated herein by reference) |
| 10.50 | *Letter Agreement between Cliffs Natural Resources Inc. and William Hart dated October 10, 2013 (filed as Exhibit 10.56 to Cliffs' Form 10-K for the period ended December 31, 2013 and incorporated herein by reference) |
| 10.51 | *Severance Agreement, by and between William S. Hart and Cliffs Natural Resources Inc. and its affiliates, dated March 20, 2014 (filed as Exhibit 10.2 to Cliffs' Form 10-Q for the period ended March 31, 2014 and incorporated herein by reference) |
| 10.52 | *Release by William S. Hart in favor of Cliffs Natural Resources Inc. and its affiliates, dated March 26, 2014 (filed as Exhibit 10.3 to Cliffs' Form 10-Q for the period ended March 31, 2014 and incorporated herein by reference) |
| 10.53 | *Redundancy Letter Agreement, by and between Cliffs Asia Pacific Iron Ore Management PTY LTD and Colin Williams, dated March 21, 2014 (filed as Exhibit 10.1 to Cliffs' Form 10-Q for the period ended June 30, 2014 and incorporated herein by reference) |
| 10.54 | *Severance Agreement and Release, by and between Gary B. Halverson and Cliffs Natural Resources Inc., dated August 22, 2014 (filed herewith) |
| 10.55 | *Letter Agreement, by and between Lourenco Goncalves and Cliffs Natural Resources Inc., signed as of September 11, 2014 (filed as Exhibit 10.1 to Cliffs' Form 8-K/A on September 16, 2014 and incorporated herein by reference) |
| 10.56 | *Cleveland-Cliffs Inc and Subsidiaries Management Performance Incentive Plan Summary, effective January 1, 2004 (filed as Exhibit 10.47 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.57 | *Cliffs Natural Resources Inc. 2012 Executive Management Performance Incentive Plan effective March 13, 2012 (filed as Exhibit 10.3 to Cliffs' Form 8-K on May 14, 2012 and incorporated herein by reference) |
| 10.58 | *Cliffs Natural Resources Inc. 2012 Incentive Equity Plan effective March 13, 2012 (filed as Exhibit 10.1 to Cliffs Form 8-K on May 14, 2012 and incorporated herein by reference) |
| 10.59 | *First Amendment to Cliffs Natural Resources Inc. 2012 Incentive Plan effective September 11, 2012 (filed as Exhibit 10.2 to Cliffs' Form 10-Q for the period ended September 30, 2012 and incorporated herein by reference) |
| 10.60 | *Form of Cliffs Natural Resources Inc. Restricted Share Unit Award Memorandum and Restricted Share Unit Award Agreement under the 2012 Incentive Equity Plan (filed as Exhibit 10.77 to Cliffs' Form 10-K for the period ended December 31, 2013 and incorporated herein by reference) |
| 10.61 | *Form of Cliffs Natural Resources Inc. Restricted Share Unit Award Memorandum (Graduated Vesting 50%) and Restricted Share Unit Award Agreement under the 2012 Incentive Equity Plan (filed as Exhibit 10.78 to Cliffs' Form 10-K for the period ended December 31, 2013 and incorporated herein by reference) |

Table of Contents

| 10.62 | *Form of Cliffs Natural Resources Inc. Restricted Share Unit Award Memorandum (Graduated Vesting 33%) and Restricted Share Unit Award Agreement under the 2012 Incentive Equity Plan (filed as Exhibit 10.79 to Cliffs' Form 10-K for the period ended December 31, 2013 and incorporated herein by reference) |
|---|---|
| 10.63 | *Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan (filed as Exhibit 10.1 to Cliffs' Form 8-K on August 4, 2014 and incorporated herein by reference) |
| 10.64 | *Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Restricted Share Unit Award Memorandum (Graduated Vesting 50% - July 2014 Grant) and Restricted Share Unit Award Agreement (filed herewith) |
| 10.65 | *Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Restricted Share Unit Award Memorandum (3-Year Vesting - July 2014 Grant) and Restricted Share Unit Award Agreement (filed herewith) |
| 10.66 | *Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Performance Share Award Memorandum (3-Year Vesting - July 2014 Grant) and Performance Share Award Agreement (filed herewith) |
| 10.67 | *Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Non-Qualified Stock Option Award Memorandum (2014 Grant) and Stock Option Award Agreement (filed as Exhibit 10.2 to Cliffs' Form 8-K/A on September 16, 2014 and incorporated herein by reference) |
| 10.68 | *Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Performance Unit Award Memorandum (2014 Grant) and Performance Unit Award Agreement (filed as Exhibit 10.3 to Cliffs' Form 8-K/A on September 16, 2014 and incorporated herein by reference) |
| 10.69 | *Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Non-Qualified Stock Option Award Memorandum (3-Year Vesting - January 2015 Grant) and Stock Option Award Agreement (filed herewith) |
| 10.70 | *Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Restricted Share Unit Award Memorandum (Graduated Vesting 33% - January 2015 Grant) and Restricted Share Unit Award Agreement (filed herewith) |
| 10.71 | *Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Performance Share Award Memorandum (3-Year Vesting - January 2015 Grant) and Performance Share Award Agreement (filed herewith) |
| 10.72 | *Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Restricted Share Unit Award Memorandum (Graduated Vesting 33% - February 2015 Grant) and Restricted Share Unit Award Agreement (filed herewith) |
| 10.73 | *Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Performance Share Award Memorandum (3 year Vesting - February 2015 Grant) and Restricted Share Unit Award Agreement (filed herewith) |
| 10.74 | *Cliffs Natural Resources Inc. Supplemental Retirement Benefit Plan (as Amended and Restated effective December 1, 2006) dated December 31, 2008 (filed as Exhibit 10(mmm) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.75 | ** Pellet Sale and Purchase Agreement, dated and effective as of April 10, 2002, by and among The Cleveland-Cliffs Iron Company, Cliffs Mining Company, Northshore Mining Company, Northshore Sales Company, International Steel Group Inc., ISG Cleveland Inc., and ISG Indiana Harbor Inc. (filed as Exhibit 10.84 to Cliffs' Form 10-K for the period ended December 31, 2013 and incorporated herein by reference) |
| 10.76 | ** First Amendment to Pellet Sale and Purchase Agreement, dated and effective December 16, 2004 by and among The Cleveland-Cliffs Iron Company, Cliffs Mining Company, Northshore Mining Company, Cliffs Sales Company (formerly known as Northshore Sales Company), International Steel Group Inc., ISG Cleveland Inc. and ISG Indiana Harbor (filed as Exhibit 10.85 to Cliffs' Form 10-K for the period ended December 31, 2013 and incorporated herein by reference) |

Table of Contents

| 10.77 | ** Pellet Sale and Purchase Agreement, dated and effective as of December 31, 2002 by and among The Cleveland-Cliffs Iron Company, Cliffs Mining Company, and Ispat Inland Inc. (filed as Exhibit 10.86 to Cliffs' Form 10-K for the period ended December 31, 2013 and incorporated herein by reference) |
| --- | --- |
| 10.78 | ** 2011 Omnibus Agreement, dated as of April 8, 2011 and effective as of March 31, 2011, by and among ArcelorMittal USA LLC, as successor in interest to Ispat Inland Inc., ArcelorMittal Cleveland Inc. (formerly known as ISG Cleveland Inc.), ArcelorMittal Indiana Harbor LLC (formerly known as ISG Indiana Harbor Inc.) and Cliffs Natural Resources Inc., The Cleveland-Cliffs Iron Company, Cliffs Mining Company, Northshore Mining Company and Cliffs Sales Company (formerly known as Northshore Sales Company) (filed as Exhibit 10(a) to Cliffs' Form 10-Q for the period ended June 30, 2011 and incorporated herein by reference) |
| 10.79 | **2014 Extension Agreement dated as of February 24, 2014 but effective as of January 1, 2014, among ArcelorMittal USA LLC, Cliffs Natural Resources Inc., The Cleveland-Cliffs Iron Company and Cliffs Mining Company (filed as Exhibit 10.1 to Cliffs' Form 10-Q/A filed on October 8, 2014 for the period ended March 31, 2014 and incorporated herein by reference) |
| 10.80 | Amended and Restated Multicurrency Credit Agreement entered into as of August 11, 2011, among Cliffs, certain foreign subsidiaries of the Company from time to time party thereto, Bank of America, N.A., as Administrative Agent, Swing Line Lender and L/C Issuer, JPMorgan Chase Bank, N.A., as Syndication Agent and L/C Issuer, Merrill Lynch, Pierce, Fenner & Smith Incorporated, J.P. Morgan Securities LLC, Citigroup Global Markets Inc., PNC Capital Markets Inc. and U.S. Bank National Association, as Joint Lead Arrangers and Joint Book Managers, Fifth Third Bank and RBS Citizens, N.A., as Co-Documentation Agents, and the various institutions from time to time party thereto (filed as Exhibit 10(a) to Cliffs' Form 8-K on August 17, 2011 and incorporated herein by reference) |
| 10.81 | Amendment No. 1, dated as of October 16, 2012 to Amended and Restated Multicurrency Credit Agreement (filed as Exhibit 10.1 to Cliffs' Form 8-K on October 19, 2012 and incorporated herein by reference) |
| 10.82 | Amendment No. 2 to the Amended and Restated Multicurrency Credit Agreement dated as of February 8, 2013 (filed as Exhibit 10.92 to Cliffs' Form 10-K for the period ended December 31, 2012 and incorporated herein by reference) |
| 10.83 | Amendment No. 3, dated as of June 30, 2014, to the Amended and Restated Multicurrency Credit Agreement, dated as of August 11, 2011, among Cliffs Natural Resources Inc., the foreign subsidiaries of Cliffs Natural Resources Inc. from time to time party thereto, the lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent (filed as Exhibit 10.1 to Cliffs' Form 8-K on June 30, 2014 and incorporated herein by reference) |
| 10.84 | Amendment No. 4, dated as of September 9, 2014, to the Amended and Restated Multicurrency Credit Agreement, dated as of August 11, 2011, among the Company, the foreign subsidiaries of the Company from time to time party thereto, the lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent (filed as Exhibit 10.1 to Cliffs' Form 8-K on September 12, 2014 and incorporated herein by reference) |
| 10.85 | Amendment No. 5, dated as of October 24, 2014, to the Amended and Restated Multicurrency Credit Agreement, dated as of August 11, 2011, among the Company, the foreign subsidiaries of the Company from time to time party thereto, the lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent (filed as Exhibit 10.2 to Cliffs' Form 10-Q for the period ended on September 30, 2014 and incorporated herein by reference) |
| 10.86 | Amendment No. 6, dated as of January 22, 2015, to the Amended and Restated Multicurrency Credit Agreement, dated as of August 11, 2011, among the Company, the foreign subsidiaries of the Company from time to time party thereto, the lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent (filed herewith) |
| 10.87 | Agreement between Cliffs Natural Resources Inc. and Casablanca Capital LP, dated October 7, 2014 (filed as Exhibit 99.1 to Cliffs' Form 8-K on October 14, 2014 and incorporated herein by reference) |
| 12 | Ratio of Earnings To Combined Fixed Charges And Preferred Stock Dividend Requirements (filed herewith) |

196

Table of Contents

| 21 | Subsidiaries of the Registrant (filed herewith) |
| 23 | Consent of Independent Registered Public Accounting Firm (filed herewith) |
| 24 | Power of Attorney (filed herewith) |
| 31.1 | Certification Pursuant to 15 U.S.C. Section 7241, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, signed and dated by Lourenco Goncalves as of February 25, 2015 (filed herewith) |
| 31.2 | Certification Pursuant to 15 U.S.C. Section 7241, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, signed and dated by Terrance M. Paradie as of February 25, 2015 (filed herewith) |
| 32.1 | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed and dated by Lourenco Goncalves, President and Chief Executive Officer of Cliffs Natural Resources Inc., as of February 25, 2015 (filed herewith) |
| 32.2 | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed and dated by Terrance M. Paradie, Executive Vice President and Chief Financial Officer of Cliffs Natural Resources Inc., as of February 25, 2015 (filed herewith) |
| 95 | Mine Safety Disclosures (filed herewith) |
| 99(a) | Schedule II – Valuation and Qualifying Accounts (filed herewith) |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

---

\*     Indicates management contract or other compensatory arrangement.

\*\*     Confidential treatment requested and/or approved as to certain portions, which portions have been omitted and filed separately with the Securities and Exchange Commission.

\*\*\*     Certain immaterial schedules and exhibits to this exhibit have been omitted pursuant to the provisions of Regulation S-K, Item 601(b)(2). A copy of any of the omitted schedules and exhibits will be furnished to the Securities and Exchange Commission upon request.

A004364

**EXHIBIT 2.1**

**ASSET PURCHASE AGREEMENT**

by and among

**CLIFFS NATURAL RESOURCES INC. (" <u>Parent</u>"),**

**CLIFFS LOGAN COUNTY COAL, LLC (" <u>CLCC</u>"),**

**TONEY'S FORK LAND, LLC (" <u>TFL</u>"),**

**SOUTHERN EAGLE LAND, LLC (" <u>SEL</u>"),**

**CLIFFS LOGAN COUNTY COAL TERMINALS, LLC (" <u>CLCCT</u>")**

and

**CORONADO COAL II, LLC (" <u>Purchaser</u>")**

**Dated as of December 2, 2014**

1

**ASSET PURCHASE AGREEMENT**

**THIS ASSET PURCHASE AGREEMENT** ("Agreement") is dated as of December 2, 2014, and is made and entered into by and among **CLIFFS NATURAL RESOURCES INC.**, an Ohio corporation ("Parent"), **CLIFFS LOGAN COUNTY COAL, LLC**, a Delaware limited liability company (" CLCC"), **TONEY'S FORK LAND, LLC,** a Delaware limited liability company ("TFL"), **SOUTHERN EAGLE LAND, LLC,** a Delaware limited liability company (" SEL"), **CLIFFS LOGAN COUNTY COAL TERMINALS, LLC,** a Delaware limited liability company ("CLCCT" and together with CLCC, TFL and SEL collectively the " Sellers" and individually a "Seller"), and **CORONADO COAL II, LLC,** a Delaware limited liability company ("Purchaser").

WHEREAS, Parent is the ultimate parent entity of Sellers;

WHEREAS, Purchaser desires to purchase from Sellers, and Sellers desires to sell and assign to Purchaser, upon the terms and conditions hereinafter set forth, substantially all of the assets of Sellers;

WHEREAS, concurrently with the execution of this Agreement, and as a condition and inducement to Sellers and Parent to enter into this Agreement, Coronado Coal, LLC, a Delaware limited liability company ("Coronado"), is entering into a limited guarantee in favor of Seller and Parent with respect to the obligations of Purchaser under this Agreement (the "Limited Guarantee"), which Limited Guarantee is attached as Exhibit A; and

WHEREAS, Parent and Sellers believe it is in the best interest of Parent and Sellers to consummate the transactions contemplated in this Agreement

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and agreements set forth below the parties agree as follows:

**DEFINED TERMS**

1 . 1   Basic Terms . For purposes of this ARTICLE 1 and this Agreement, the following definitions shall apply (and capitalized terms used in such definitions have the meanings assigned in ARTICLE 1 or in the introductory paragraphs preceding ARTICLE 1):

1.1.1    "Accounts Receivable" means all of each Seller's rights to receive payments for coal, goods and other products sold that arose from completed bona fide arm's-length transactions occurring on or prior to the Closing Date with respect to the Business or the Assets or from the sale of coal in transit on or prior to the Closing Date.

1.1.2    "Action" means any claim, action, cause of action, demand, lawsuit, arbitration, formal inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

1.1.3    "Active Employee" means any employee of a Seller who is employed in the Business on the Closing Date, including, in each case, those employees (i) who are temporarily absent due to vacation, jury duty, FMLA, pregnancy, parental and bereavement leave, scheduled time off, or illness or injury leave in compliance with the applicable written policies of Sellers or (ii) who are receiving workers' compensation payments as required by Law and have the right to re-employment by Sellers in accordance with applicable Law.

2

1.1.4    "Affiliates" means with respect to a Person, a Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with that Person.

1.1.5    "Assets" means all of each Seller's assets, properties and rights of every kind and nature, whether real, personal, or mixed, tangible or intangible, wherever located and whether now existing or hereafter acquired other than the Excluded Assets and including without limitation: the following:

(a)    all Intellectual Property assets owned by each Seller or, to the extent located on or at the Real Property or used primarily in the Business and licensed from a third party by any Seller (but excluding any Intellectual Property that will be licensed to Purchaser pursuant to the Transition Services Agreement);

(b)    [Intentionally Omitted];

(c)    all revenue generating Contracts and all of each Seller's contract rights and general intangibles arising thereunder, including all Contracts for the sale of coal set forth on Schedule 8.7;

(d)    the Miscellaneous Contracts and all of each Seller's contract rights and general intangibles arising thereunder;

(e)    the Equipment and Fixed Assets and all of each Seller's rights under warranties, indemnities, licenses, and all similar rights against third parties with respect to the Equipment and Fixed Assets;

(f)    the Permits and Licenses and all bonds (to the extent transferable) of each Seller related thereto, and any and all other permits and licenses used in the operation of the Business;

(g)    the Owned Real Property;

(h)    the Leases (including, all prepaid royalties and un-recouped minimum royalties thereunder) subject to the appropriate Consents;

(i)    all outstanding deposits, prepaid revenue (which may appear as deferred revenues on each Seller's financial statements), prepaid expenses and other prepayments (other than with respect to prepayments for insurance policies), and any other sums previously paid by or to each Seller with respect to periods after the Closing Date;

(j)    all personnel records of employees of each Seller who become employed by Purchaser, customer lists, mailing lists and all accounting, sales, pricing, asset maintenance/repair and other data, files, records and reports relating to the Assets, Business or the Assumed Liabilities;

(k)    all non-enterprise software (to the extent assignable to Purchaser) and computer hardware owned by any Seller and in place at the Real Property;

(l)    the right to use all telephone numbers (to the extent assignable) that Sellers use primarily in the conduct of the Business;

(m)    all Accounts Receivable; and

(n)    all rights of any Seller to use haul roads, utility easements and other rights of way and easements used in the operation of the Business.

3

1.1.6    "Assumed Contracts" means the Miscellaneous Contracts, Leases, Contracts set forth in Section 1.1.5(c) and all other Contracts assumed by Purchaser pursuant to the terms of this Agreement.

1.1.7    "Assumed Liabilities" has the meaning set forth in Section 2.2.

1.1.8    "Baisden-Vaughan Lease" means that certain agreement of lease between Katherine Vaughan White et al. and Elkay Mining Company dated June 19, 1978, as amended and assigned.

1.1.9    "Base Purchase Price" has the meaning set forth in Section 2.4.1.

1.1.10    "Basket" has the meaning set forth in Section 11.4.2.

1.1.11    "Business" means the surface and underground coal mines and related operations owned or operated by each Seller.

1.1.12    "Business Confidential Information" has the meaning set forth in Section 14.5.

1.1.13    "Claim Amount" has the meaning set forth in Section 2.8.

1.1.14    "Claim Notice" has the meaning set forth in Section 2.8.

1.1.15    "Closing" has the meaning set forth in Section 4.1.

1.1.16    "Closing Date" has the meaning set forth in Section 4.1.

1.1.17    "Closing Date Working Capital" means an amount equal to the difference between Current Assets and Current Liabilities. If Current Assets exceed Current Liabilities, Closing Date Working Capital shall be a positive number. If Current Liabilities exceed Current Assets, Closing Date Working Capital shall be a negative number. In determining Closing Date Working Capital, Current Assets and Current Liabilities shall be derived solely from the Closing Date Balance Sheet as finally determined pursuant to this Agreement and in accordance with GAAP.

1.1.18    "Coal Act" means the Coal Industry Retiree Health Benefit Act of 1992, all amendments thereto (including but not limited to the Tax Relief and Retiree Health Care Act of 2006), all other statutory provisions codified at Subtitle J, Chapter 99 of the Internal Revenue Code (26 U.S.C. Sections 9701, *et seq*.) and all regulatory or other guidance issued thereunder.

1.1.19    "Coal Inventory" means collectively the Raw Coal and Finished Goods Coal.

1.1.20    "Code" means the Internal Revenue Code of 1986, as amended.

1.1.21    "Company Transaction Expenses" means without duplication and determined as of the close of business on the Closing Date, any fees and expenses payable by any Seller or Parent to any investment banker, broker or similar Person in connection with the Contemplated Transactions, any transaction-related third party expenses that any Seller or Parent incur in connection with the negotiation of this Agreement and the consummation of the Transactions for accounting, legal and tax services and financial advisors and any transaction bonuses, change of control payments, severance payments or other similar payments payable in connection with the Transactions.

1.1.22    "Continuing Employee" means each former employee of any Seller that is actively employed by Purchaser during the period on or after the Closing Date.

4

1.1.23    "Contract" means any agreement, contract, lease, consensual obligation, promise, commitment, or undertaking (whether written or oral and whether express or implied).

1.1.24    "Current Assets" means the following assets of each Seller of the type identified on Schedule 2.5.3 (in the determination of Closing Date Working Capital), which include, without limitation: (a) Coal Inventory, (b) Accounts Receivable, (c) Parts and Supplies Inventory, all as of the close of business on the Closing Date, in each case, without duplication, and as determined in accordance with GAAP.

1.1.25    "Current Liabilities" means the following liabilities of each Seller of the type identified on Schedule 2.5.3 (in the determination of Closing Date Working Capital), which include, without limitation: (a) the accounts payable that are included in the Assumed Liabilities, (b) the reserve or allowance for doubtful accounts, and (c) any property Taxes or other Taxes (including the West Virginia Severance or State Production Tax) related to the Real Property for any Pre-Closing Tax Period that have accrued but not yet been paid and which are included in the Assumed Liabilities, all as of the close of business on the Closing Date, in each case, without duplication, and as determined in accordance with GAAP.

1.1.26    "Disclosure Schedules" means the schedules of exceptions to the representations and warranties of Sellers and Parent set forth in ARTICLE 8.

1.1.27    "Employee Benefit Plan" means any (i) nonqualified deferred compensation or retirement plan or arrangement, (ii) qualified defined contribution retirement plan or arrangement which is an Employee Pension Benefit Plan, (iii) qualified defined benefit retirement plan or arrangement which is an Employee Pension Benefit Plan (including any Multiemployer Plan), or (iv) Employee Welfare Benefit Plan or material fringe benefit plan or other retirement, bonus or incentive plan or program, including, without limitation, any plan, program, policy, contract or arrangement (not including any collective bargaining agreement) providing for bonuses, pensions, deferred pay, stock or stock related awards, severance pay, salary continuation or similar benefits, hospitalization, medical, dental or disability benefits, life insurance or other employee benefits, or compensation, whether or not insured or funded, which is sponsored or maintained by or pursuant to which any Seller or any ERISA Affiliate has any Liability or which constitute an employment or severance agreement or arrangement currently in effect with any employee, officer or director of any Seller or any ERISA Affiliate.

1.1.28    "Employee Pension Benefit Plan" has the meaning set forth in ERISA Section 3(2).

1.1.29    "Employee Welfare Benefit Plan" has the meaning set forth in ERISA Section 3(1).

1.1.30    "Encumbrance" means any security interest, mortgage, easement, encroachment, right of way, lien, charge, pledge, condition, equitable interest, option, right of first refusal, adverse claim or restriction of any kind.

1.1.31    "Environment" means soil, land, surface, subsurface or subsurface strata, surface waters (including navigable waters, ocean waters, streams, ponds, and wetlands), groundwater, drinking water supply, ambient air, plant and animal life, and any other environmental medium or natural resource.

1.1.32    "Environmental Claim" means any claim, Action, or notice by any Person, to the extent directed to or against any Seller or any Affiliates of any Seller, alleging actual or potential Liability for investigatory, cleanup or response action or costs, or natural resource or property damage, or personal injuries, attorney's fees or penalties relating to (i) the presence, or release into the Environment of any Hazardous Materials, or (ii) any violation, or alleged violation, of any Environmental Law.

1.1.33    "Environmental Condition" means the release of Hazardous Materials (i) prior to the Closing Date on or from the Real Property or (ii) on or from any other locations if the Hazardous Material(s) was generated, used, treated, stored, transported or disposed of by or on behalf of the Business or in connection with the Real Property prior to the Closing Date.

5

1.1.34    "Environmental Laws" means any Laws that require or relate to: (i) advising appropriate Governmental Authorities, employees or the public of intended or actual releases of Hazardous Materials, violations of discharge limits or other prohibitions or of the commencements of activities, such as resource extraction or construction, that could have significant impact on the Environment; (ii) preventing or reducing to acceptable levels the release of Hazardous Materials into the Environment; (iii) reducing the quantities, preventing the release or minimizing the hazardous characteristics of wastes that are generated; (iv) protecting the Environment, natural resources, species or the restoration of the Environment or natural resources; (v) reducing to acceptable levels the risks inherent in the transportation of Hazardous Materials or other potentially harmful substances; (vi) cleaning up Hazardous Materials that have been released, preventing the threat of release or paying the costs of such clean up or prevention; (vii) the promotion of safe and healthful working conditions and to reduce occupational safety and health hazards; or (ix) making responsible parties pay private parties, or groups of them, for damages done to their health or the Environment, or permitting self-appointed representatives of the public interest to recover for injuries done to public assets. "Environmental Laws" shall include, without limitation, CERCLA or any successor Laws, the Resource Conservation and Recovery Act, as amended §§ 42 U.S.C. 6901 et seq. ("RCRA") or any successor Laws and the Surface Mining Control and Reclamation Act ("SMCRA") or any successor Laws; the Toxic Substances Control Act, 15 U.S.C. §§2601, et seq. ("TSCA"), the Safe Drinking Water Act, 42 U.S.C. §§300g, et seq., the Clean Water Act, 33 U.S.C. §§1251, et seq., the Hazardous Materials Transportation Act, 49 U.S.C. §§1801, et seq., the Clean Air Act, 42 U.S.C. §§7401 et seq., the Endangered Species Act, 16 U.S.C. §§1501 et seq.; all similar state Laws; and shall further include all applicable Laws relating to pollution or protection of human health or the Environment, relating to emissions, discharges, releases or threatened releases of Hazardous Materials, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials.

1.1.35    "EPA" means the Environmental Protection Agency.

1.1.36    "Equipment and Fixed Assets" means all equipment and other tangible assets owned by any Seller, other than Real Property.

1.1.37    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

1.1.38    "ERISA Affiliate" means each entity which is treated as a single employer with any Seller or Parent under Code Section 414 or Section 4001(14) of ERISA.

1.1.39    "Escrow Agent" means U.S. Bank, NA or any other Person that is mutually acceptable to the Parties.

1.1.40    "Escrow Agreement" means the Escrow Agreement to be entered into at the Closing among Purchaser, Sellers, Parent and the Escrow Agent, which Escrow Agreement shall be in a form and substance reasonably acceptable to the Parties.

1.1.41    "Escrow Amount" means $17,500,000 less the Regulatory Escrow Amount.

1.1.42    "Escrow Fund" has the meaning set forth in Section 2.7.

1.1.43    "Escrow Release Date" has the meaning given in Section 2.8.

1.1.44    "Excluded Assets" means the following assets of each Seller: (i) all cash, cash equivalents and marketable securities; (ii) the corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of any Seller; (iii) all insurance policies and benefits; (iv) all claims for refund of Taxes and other governmental charges of whatever nature; (v) all of each Seller's interest in any Affiliates of that Seller; (vi) all rights, which accrue or will accrue, to Sellers under this Agreement and any other agreement that is contemplated in this

6

Agreement to be delivered at the Closing; (vii) all bank accounts of each Seller; (viii) all Contracts other than the Assumed Contracts; (ix) the Parent Marks and Websites; (x) any accounts receivables from any Affiliate of any Seller that is not a Seller; (xi) all prepayments made for insurance policies; (xii) all enterprise software (including licenses) and computer hardware used in the Business that is not owned by Seller nor located on or at the Real Property; and (xiii) all items listed on Schedule 1.1.44 hereto.

1.1.45    "Excluded Liabilities" has the meaning set forth in Section 2.3.

1.1.46    "Final Tax Allocation Statement" has the meaning set forth in Section 2.4.2.

1.1.47    "Financial Statements" has the meaning assigned to such term in Section 8.4 of this Agreement.

1.1.48    "Finished Goods Coal" means the Tons of stockpiled coal located on properties owned, leased, operated or controlled by or on behalf of any Seller, other than Raw Coal, which are of suitable quality on a standalone or blended basis (with other available existing stockpiled coal) to be sold without processing, with each such Ton being valued in accordance with GAAP.

1.1.49    "Fundamental Reps" means the representations and warranties of Sellers and Parent set forth in Sections 8.1, 8.2, 8.3(i) and (iv), 8.6.1(a) and 8.27 and the representations and warranties of Purchaser set forth in Sections 9.1, 9.2, 9.3 and 9.5.

1.1.50    "GAAP" means generally accepted accounting principles in the United States, consistently applied.

1.1.51    "Governmental Authority" means any nation or federal, national, supranational, state, provincial, municipal, local, special purpose, or similar government, unit of government, or governmental, regulatory or administrative authority or entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, including, without limitation, any government authority, agency, department, board, commission, court, tribunal, judicial or arbitral body or instrumentality of the United States or any State or any municipality of the United States.

1.1.52    "Guarantees" has the meaning set forth in Section 10.13.

1.1.53    "Hazardous Materials" means any substance, material, or waste that is regulated by any Governmental Body, including any material, substance, or waste that is defined or classified as a "hazardous waste," "hazardous material," "hazardous substance," "extremely hazardous waste," "pollutant," "restricted hazardous waste," "contaminant," "toxic waste," "pollutant," or "toxic substance" under any provision of Environmental Law, including, without limitation, petroleum, petroleum products, asbestos, presumed asbestos-containing material or asbestos-containing material, urea formaldehyde, or polychlorinated biphenyls acids, asbestos, PCBs, radon, nuclear materials and natural gas.

1.1.54    "HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

1.1.55    "Independent Accountant" means BDO USA, LLP.

1.1.56    "Indebtedness" means with respect to each Seller and their respective subsidiaries all of the following: (i) Liabilities for borrowed money, (ii) Liabilities evidenced by a bond, note, debenture or similar instrument (including a purchase money obligation, deed of trust or mortgage), (iii) outstanding Liabilities in respect of letters of credit and "swaps" of interest and currency exchange rates (and other interest and currency rate hedging agreements), including any breakage costs, (iv) Liabilities under conditional sale, title retention or other Contracts creating an obligation of any Seller with respect to the deferred purchase price of property (other than customary trade credit), (v) capital leases, (vi) Liabilities with respect to any factoring programs, (vii) for Contracts relating to interest rate protection, swap agreements

7

and collar agreements, (viii) interest, fees, prepayment penalties or premiums and other expenses owed with respect to any indebtedness, Liabilities and/or obligations of the type referred to in clauses (i) through (vii) above (including any such amounts that would be required to pay off any Indebtedness at Closing) and (ix) all obligations of a Seller to guarantee any of the foregoing types of obligations on behalf of any Person. For the avoidance of doubt, the term "Indebtedness" does not include trade account payables of a Seller.

1.1.57    "Indemnified Party" has the meaning set forth in Section 11.5.1.

1.1.58    "Indemnifying Party" has the meaning set forth in Section 11.5.1.

1.1.59    "Initial Tax Allocation Statement" has the meaning set forth in Section 2.4.2.

1.1.60    "Intellectual Property" means, with respect to Sellers, all of the following and similar intangible property and related proprietary rights, interests and protections, however arising, pursuant to the applicable Laws of any jurisdiction throughout the world: (i) trademarks, service marks, trade names, brand names, logos, trade dress and other proprietary indicia of goods and services or the origin thereof, whether registered, unregistered or arising by applicable Laws, and all registrations and applications for registration of such trademarks, including intent-to-use applications, and all issuances, extensions and renewals of such registrations and applications, including any goodwill associated with any of the foregoing; (ii) internet domain names, whether or not trademarks, registered in any generic top level domain by any authorized private registrar or Governmental Authority; (iii) original works of authorship in any medium of expression, whether or not published, all copyrights (whether registered, unregistered or arising by applicable Laws), all registrations and applications for registration of such copyrights, and all issuances, extensions and renewals of such registrations and applications; (iv) confidential information, formulas, designs, devices, technology, know-how, research and development, inventions, methods, processes, compositions and other trade secrets, whether or not patentable; (v) patented and patentable designs and inventions, all design, plant and utility patents, letters patent, utility models, pending patent applications and provisional applications and all issuances, divisions, continuations, continuations-in-part, reissues, extensions, reexaminations and renewals of such patents and applications; and (vi) and all computer programs, whether in source code or object code, other than non-customized or off-the-shelf software, and all documentation including user manuals and other training documentation related to any of the foregoing in the possession of, under the control of, or used by any Seller in connection with the Business.

1.1.61    "Interim Balance Sheet" has the meaning set forth in Section 8.4.

1.1.62    "Interim Balance Sheet Date" has the meaning set forth in Section 8.4.

1.1.63    "Kinder Morgan Contract" means that certain terminal services agreement dated November 30, 2012 between Cliffs Logan County Coal, LLC, Cliffs North American Coal, LLC and Kinder Morgan Operating L.P. "C" (as amended).

1.1.64    "Law" or "Laws" means any law, statute, order, decree, consent decree, judgment, rule, regulation, ordinance or other pronouncement having the effect of law whether in the United States, any other country, or any domestic or foreign state or province, county, city or other political subdivision or of any Governmental Authority, including any local, state or federal regulatory agencies, such as, but not limited to, MSHA, WVOMSHT or WVDEP.

1.1.65    "Leases" means the real property leases, assignments and subleases to which any Seller is a party, together with any and all underground and surface coal reserves, mineral rights, mining rights, surface rights, fixtures and improvements set forth in such leases and subleases.

1.1.66    "Leased Real Property" means all real property and other rights, including all coal reserves or other mineral or gas reserves, leased or subleased by any Seller pursuant to the Leases.

8

1.1.67   "Liabilities" means all existing or future liabilities, debts, obligations, duties, or adverse claims of any Seller of every type and trade, whether matured or unmatured, fixed or contingent, absolute or contingent, known or unknown, accrued or unaccrued, liquidated or unliquidated, direct or indirect, or otherwise in respect of any and all matters or events, including without limitation, those arising under Law, or imposed by any court or arbitrator of any kind, and those arising in connection with coal or other products sold, Contracts, Leases, commitments or undertakings, including all liabilities arising out of or related to the sponsorship of, the responsibility for, contributions to, or any liability in connection with any Employee Benefit Plan maintained or contributed to by or on behalf of any Seller. Without limiting the foregoing, Liabilities shall include any continuation coverage (including any penalties, excise Taxes or interest resulting from the failure to provide continuation coverage) required by Law due to qualifying events, including continuing coverage for each Seller's employees terminated prior to the Closing Date and/or whose employment is terminated in connection with the Transactions, or who were not hired by Purchaser in connection with the Transactions, which occur on or before the Closing Date whether or not said Liabilities are reflected on the books of any Seller.

1.1.68   "Litigation" has the meaning assigned to such term in Section 8.17.1 .

1.1.69   "Loss(es)" means all losses, Liabilities, obligations, damages, deficiencies, expenses, Actions, suits, proceedings, demands, assessments, interest, awards, penalties, fines, costs and expenses of whatever kind (including reasonable attorneys' fees, court costs, expert witness fees, transcript costs and other expenses of litigation, costs of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers) and judgments (at law or in equity) of any nature (but excluding any punitive damages, consequential damages, special damages or exemplary damages except to the extent that a Purchaser Indemnified Party actually pays such amounts to a third party).

1.1.70   "Material Adverse Change" means any effect, change or circumstance that has been, or is reasonably expected to be, individually or collectively, materially adverse to the Business, Assets, Assumed Liabilities or operations of any Seller or the financial condition of Sellers altogether, except the following shall not be deemed to constitute, and shall not be taken into account in determining whether there has been a Material Adverse Change: any adverse change, event, development, or effect arising from or relating to (1) general business or economic conditions; (2) the steel or coal industry generally, including, without limitation, a decline in prices or demand for coal or steel, increases in costs of transportation and raw materials, and labor shortages; (3) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States; (4) financial, banking, or securities markets (including any disruption thereof and any decline in the price of any security or any market index); (5) changes in United States generally accepted accounting principles; or (6) changes in Laws applicable solely to the mining industry as a whole.

1.1.71   "Material Contracts" has the meaning assigned to such term in Section 8.7 .

1.1.72   "Miscellaneous Contracts" means the Contracts listed on Exhibit B.

1.1.73   "MSHA" means the Mine Safety and Health Administration.

1.1.74   "Multiemployer Plan" has the meaning as defined in Section 4001(a)(3) of ERISA.

1.1.75   "Owned Real Property" means that real property which is owned by any Seller, together with all of such Seller's right, title and interest in and to the following, as relates to such real property, and with respect to such real property: (i) all coal reserves or other mineral or gas reserves, (ii) all buildings, structures and improvements located on such real property owned by any Seller, (iii) all improvements, fixtures, mine infrastructure, preparation plant structures and improvements, loadout structures and improvements, rail sidings, machinery, apparatus or equipment affixed to such real property for which any

9

Seller owns or has rights to use, (iv) all rights of way, easements, if any, in or upon such real property owned by any Seller and all right-of-way and other rights and appurtenances belonging or in any way pertaining to such real property owned by any Seller (including the right, title and interest of any Seller in and to any coal reserves, mineral rights, underground and surface coal and mining rights, royalty rights, support rights and waivers, subsidence rights or water rights relating or appurtenant to such real property owned by any Seller), and (v) all strips and gores and any land lying in the bed of any public road, highway or other access way, open or proposed, adjoining such real property owned by any Seller.

1.1.76    "<u>Parent</u>" means Cliffs Natural Resources Inc.

1.1.77    "<u>Parent Marks and Websites</u>" means the trademarks, service marks, trade names, brand names, logos, domain names and websites of Parent or its Affiliates (other than any Seller) which are used in the Business and are set forth on <u>Schedule 1.1.77</u>.

1.1.78    "<u>Parts and Supplies Inventory</u>" means spare parts and supplies of any Seller that are located in any of the warehouse facilities and supply yards that any Seller uses for the Business as of the Closing Date that are useable and not obsolete and valued in accordance with GAAP.

1.1.79    "<u>Party</u>" and "<u>Parties</u>" means the Purchaser, Parent and Sellers, collectively the "Parties," and individually, a "Party".

1.1.80    "<u>Permits</u>" and "<u>Licenses</u>" has the meanings assigned to such terms in Section 8.19.1.

1.1.81    "<u>Permit Operating Agreement</u>" means the Permit Operating Agreement to be entered into at the Closing among Greenbrier Minerals, LLC and Sellers substantially in the form of <u>Exhibit C</u>.

1.1.82    "<u>Permitted Encumbrances</u>" means (i) real estate taxes and assessments both general and special, which are an Encumbrance but are not due and payable or are being contested in good faith at the time of the Closing and are set forth on <u>Schedule 1.1.82</u>; (ii) any Encumbrances consisting of zoning restrictions on the Real Property; (iii) covenants, restrictions, encroachments, rights of way, licenses, and easements and similar Encumbrances on the Real Property imposed by Law or arising in the ordinary course of business that do not materially detract from the value of the affected Real Property or do not materially interfere with the ordinary conduct of the Business of Sellers; (iv) Encumbrances under the terms of the Leases for royalty, payment obligations, and other contractual obligations to the lessors under the Leases, but only to the extent such obligations constitute an Encumbrance not yet payable; (v) Encumbrances imposed by Law and incurred in the ordinary course of business, such as carriers', warehousemens', landlords', and mechanics' liens and other similar liens arising in the ordinary course of business (provided lien statements have not been filed or such Encumbrances are not otherwise perfected); (vi) rights and interests of owners of interests in the surface of any Real Property where a Seller does not own or lease such surface interest; (vii) rights of owners of interests in coal or other minerals (including oil and gas) where a Seller does not own or lease such minerals; and (viii) Encumbrances consisting of rights of others for subjacent or lateral support.

1.1.83    "<u>Person</u>" means any individual, corporation, limited liability company or partnership, general or limited partnership, joint venture, trust, estate, legal person, association, unincorporated organization, labor union, other entity or Governmental Authority.

1.1.84    "<u>Pre-Closing Tax Period</u>" means all Tax periods ending on or before the Closing Date or the portion of any Tax period that includes the Closing Date that relates to the period on and before the Closing Date.

1.1.85    "<u>Purchase Price</u>" has the meaning assigned to it in Section 2.4.1.

1.1.86    "Purchaser" means Coronado Coal II, LLC.

1.1.87    "Purchaser Indemnified Party" has the meaning assigned to such term in Section 11.2.

1.1.88    "Raw Coal" means unprocessed coal severed and located in stockpiles on the Real Property, which requires processing, with each such Ton being valued in accordance with GAAP.

1.1.89    "Regulatory Escrow Amount" means $3,000,000.

1.1.90    "Reference Date" has the meaning assigned to it in Section 8.5.

1.1.91    "Real Property" means the Owned Real Property and Leased Real Property.

1.1.92    "Release" means any spilling, leaking, emitting, discharging, depositing, escaping, leaching, dumping, or other releasing into the Environment, whether intentional or unintentional.

1.1.93    "Seller" and "Sellers" have the meaning as set forth in the first paragraph of this Agreement.

1.1.94    "Seller Indemnified Party" has the meaning assigned to such term in Section 11.3.

1.1.95    "Seller's Knowledge" means the actual knowledge of William McFadden, David Webb, Gary Corns and Mark Nelson and the knowledge of such individuals would have acquired after reasonable diligent inquiry with the relevant executive management level employees of each Seller or their respective Affiliates.

1.1.96    "Target Base Working Capital" means $21,500,000.

1.1.97    "Tax" or "Taxes" means any tax (including any income tax, capital gains tax, value added tax, sales or use tax, real or personal property tax, severance tax, unmined mineral tax, coal severance tax, gift tax, franchise tax, estate tax, production tax, gross receipts tax, license tax, inventory tax, payroll tax, employment tax, excise tax, stamp tax, occupation tax, occupancy tax, premium tax, windfall profits tax, environmental tax, business tax, capital stock tax, franchise tax, profits tax, payroll tax, withholding tax, social security (or similar) tax, unemployment tax, unclaimed property or escheat tax or other assessment, disability tax, Transfer Tax, intangibles tax, registration tax, alternative or add-on minimum tax, goods and services tax, net worth tax, employer health tax, estimated tax and all other taxes of any kind whatsoever), levy, assessment, tariff, duty (including any customs duty), impost, toll, deficiency, charge, levy, impost, assessment, or other fee, and any related charge or amount (including any fine, penalty, interest, or addition to tax), imposed, assessed, or collected by or under the authority of any Governmental Authority or otherwise payable pursuant to any tax-sharing agreement or any other contract relating to the sharing or payment of any such tax, levy, assessment, tariff, duty, deficiency, or fee.

1.1.98    "Tax Return" means any return, declaration, report or other information or statement (including any amendments or attachments thereto) required to be supplied to a Governmental Authority with respect to Taxes.

1.1.99    "Third Party Claim" has the meaning assigned to such term in Section 11.5.1.

1.1.100    "Ton" means 2,000 pounds.

1.1.101    "Transactions" means all the transactions provided for or contemplated by this Agreement.

11

A004375

1.1.102    "Transfer Taxes" means all sales, use, value-added, transfer, deed, deed stamp, recording, privilege, documentary, gains, gross receipts, registration, conveyance, excise, license, stamp, duties or similar Taxes and fees.

1.1.103    "Transition Services Agreement" means the Transition Services Agreement to be entered into at the Closing among Purchaser, Sellers and Parent, which shall be in a form and substance reasonably acceptable to the Parties.

1.1.104    "Unaudited Financial Statements" has the meaning set forth in Section 8.4.

1.1.105    "WARN" means the Worker Adjustment and Retraining Notification Act.

1.1.106    "WVDEP" means the West Virginia Department of Environmental Protection.

1.1.107    "WVOMHST" means the West Virginia Office of Miners Health Safety and Training.

1.1.108    Year-End Financial Statements" has the meaning set forth in Section 8.4.

1.2    Certain Other Defined Terms. In addition to the capitalized terms defined in Section 1.1 and in the introductory paragraphs preceding Section 1.1, certain capitalized terms are defined in other sections of the Agreement and all such terms shall have the meanings assigned to them in this Agreement.

1.3    Interpretation.

1.3.1    When a reference is made in this Agreement to a section, article, paragraph, exhibit, schedule or the like, such reference shall be to a section, article, paragraph, exhibit, schedule or the like contained within this Agreement unless otherwise clearly indicated to the contrary.

1.3.2    Whenever the words "include", "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

1.3.3    The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement.

1.3.4    The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term, and words denoting any gender shall include all genders. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

1.3.5    A reference to any Party to this Agreement or any other agreement or document shall include such Party's permitted successors and assigns.

1.3.6    A reference to any agreement or other document shall be deemed to include all amendments and other modifications thereto that are in effect as of the Closing Date.

1.3.7    A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or re-enactment thereof, any legislative provision substituted therefore and all regulations and statutory instruments issued thereunder or pursuant thereto as of the date of this Agreement, unless otherwise clearly indicated to the contrary.

1.3.8    The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as

12

if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provisions of this Agreement.

1.3.9    To the extent that any disclosure set forth in any particular Disclosure Schedule hereto is applicable to the disclosure required to be made in any other Disclosure Schedule, such disclosure shall for purposes of this Agreement be deemed to be made on all relevant Disclosure Schedules to the extent that such disclosure is reasonably sufficient so that the relevance of such disclosure to such other section would be reasonably apparent on its face to a reader of such disclosure.

1.3.10    Sellers and Parent shall be deemed to comply with any representation or warranty in ARTICLE 8 relating to making available or delivering to Purchaser any document, instrument or agreement if Sellers or Parent load such document, instrument or agreement on to the electronic data room that was used by the Parties for purposes of due diligence review and provides access to Purchaser and its representatives to such document, instrument or agreement after it is posted to such electronic data room.

## ARTICLE 2 SALE AND PURCHASE OF ASSETS

2 . 1    Sale and Transfer of Assets . Subject to the terms and conditions of this Agreement, on the Closing Date and at the Closing provided for in ARTICLE 4, Purchaser shall buy from Sellers, and Sellers shall sell, assign, transfer, convey and deliver to Purchaser (or its designee), free and clear of any Encumbrances other than Permitted Encumbrances, all of each Seller's right, title and interest in, to and under the Assets in accordance with the terms of this Agreement, for the Purchase Price, subject to the adjustments as set forth in this Agreement. It is the intention of the Parties that the Purchaser acquire all assets, properties and rights necessary for the operation of the Business, including, without limitation, all mining, processing, loading, transporting and selling of coal, but excluding the Excluded Assets. If after Closing, it is discovered that certain assets, properties, rights or Permits, including without limitation any Contracts, fractional real property interests, owned, leased or subleased by any Seller or any Affiliate of any Seller or Parent, other than the Excluded Assets, or any Contract to which a Seller is a party and was not an Assumed Contract, were not included in the Assets sold to Purchaser, and such Contracts, assets, properties or rights are needed by Purchaser in the operation of the Business, including without limitation, all mining, processing, loading, transporting, and selling of coal, then, upon the request of Purchaser, each Seller and Parent shall, and each Seller and Parent shall cause their respective Affiliates to, convey or lease or sublease, as applicable and at no additional cost to Purchaser, such Contracts, assets, properties, rights or Permits to the Purchaser; provided however, this obligation shall not include the conveyance or lease or sublease of any Excluded Asset.

2 . 2    Assumed Liabilities. Except for the obligations specifically assumed by Purchaser in this Section 2.2, Purchaser shall not be deemed to have assumed or agreed to be responsible for Liabilities of any Seller, Parent or any of their respective Affiliates, whether or not arising out of the ownership and operation of the Assets or the Business. At the Closing, Purchaser shall assume, become obligated for, and agree to pay and perform when due, only the following Liabilities (collectively, the "Assumed Liabilities"), and no other Liabilities:

2.2.1    all of each Seller's obligations arising after the Closing Date under the Assumed Contracts, other than any obligations arising due to (i) any failure to perform, improper performance, breach of warranty or other breach, default or violation by any Seller on or prior to the Closing Date or (ii) any event or circumstance which occurred or failed to occur on or prior to the Closing Date (other than with respect to the Kinder Morgan Contract and to the extent that any such obligation relates to Purchaser's operation of the Business after the Closing Date for which sub-clause (ii) shall not apply);

2.2.2    all obligations under the Permits, bonds related thereto, and Licenses arising out of or relating to all reclamation and post mining Liabilities related to the Real Property, other than the obligations of any Seller to any violations of any Environmental Law, Permit or License that occurred on or

13

prior to the Closing Date, including those violations disclosed on  Schedule 8.18, and to pay any fines or penalties associated with those violations;

      2.2.3   Seller's accounts payable of the type or category accounted for on  Schedule 2.5.3;

      2.2.4   any property Taxes or other Taxes (including the West Virginia Severance or State Production Tax) related to the Real Property for any Pre-Closing Tax Period that have accrued but not yet been paid and are included as Current Liabilities set forth in the Closing Date Working Capital; and

      2.2.5   all Liabilities of any kind or character resulting from or arising in connection with (i) except to the extent such Liability is an Excluded Liability, Purchaser's use, operation, possession or ownership of or interest in the Assets or (ii) subject to ARTICLE 13, Purchaser's post Closing employment of any of the Continuing Employees but expressly excluding any obligations for wages or benefits which accrued or are attributable to events which occurred prior to Closing, in both cases, following the Closing Date.

    2.3   Excluded Liabilities. Purchaser shall not assume or become liable for, and the Assumed Liabilities shall not include, any Liabilities of any Seller, Parent or any Affiliate of any Seller or Parent, whether or not related to the Assets or the Business, except for the Assumed Liabilities.  The Liabilities of each Seller, Parent and their respective Affiliates not assumed by Purchaser shall be retained by each Seller respectively and are referred to as "Excluded Liabilities". Sellers and Parent shall, and shall cause each of their respective Affiliates to, pay and satisfy in due course all Excluded Liabilities which they are obligated to pay and satisfy. Without limiting the generality of the preceding sentence, the Excluded Liabilities include the following, except to the extent, if any, expressly included in the Assumed Liabilities:

      2.3.1   Company Transaction Expenses;

      2.3.2   any Liabilities relating to or arising out of the Excluded Assets;

      2.3.3   any Liabilities arising out of, in respect of or in connection with the failure by any Seller to comply with any Permit, License, applicable Law or order by any Governmental Authority including without limitation any such obligations or Liabilities arising as a result of any Seller's failure to comply with the terms of any of the Permits, bonds related thereto, Licenses or any Laws as applicable to any Seller's operations on or prior to the Closing Date and all related fines, penalties, fees and associated interest or charges related thereto imposed by any Governmental Authority (including MSHA, WVDEP and the WVOMHST), but excluding all obligations under the Permits, bonds related thereto, and Licenses arising from or relating to all reclamation and post mining Liabilities related to the Real Property that are expressly included in the Assumed Liabilities;

      2.3.4   any Indebtedness;

      2.3.5   any Liabilities for intercompany obligations between a Seller and any Affiliates of any Seller;

      2.3.6   any Liability under the Assumed Contracts arising out of or relating to (i) breaches or defaults thereunder occurring on or prior to the Closing Date or (ii) any event or circumstance which occurred or failed to occur on or prior to the Closing Date (other than with respect to the Kinder Morgan Contract and to the extent that any such Liability relates to Purchaser's operation of the Business after the Closing Date for which sub-clause (ii) shall not apply);

      2.3.7   any Liability related to any accounts payable that are not Assumed Liabilities;

14

2.3.8    any Liability related to or arising from any mining activities or operations conducted by any Seller or any Affiliates of any Seller on any real property now or formerly owned, leased or subleased by any Seller or any Affiliates of any Seller, which is not included in the Assets;

2.3.9    any Liability with respect to any coal or other goods shipped or sold or any service provided by any Seller or its Affiliates, to the extent arising out of or related to events occurring on or prior to Closing, including any such Liability or obligation (i) pursuant to any express or implied representation, warranty, agreement, coal specification undertaking or guarantee made by any Seller, or any Affiliate of any Seller, or alleged to have been made by any Seller or any Affiliate of any Seller, (ii) imposed or asserted to be imposed by operation of Law or (iii) pursuant to any doctrine of product liability;

2.3.10    any Liability with respect to any litigation to the extent arising out of or relating to the operation of the Business or pertaining to the Assets on or prior to Closing, including the Litigation;

2.3.11    any Liability to the extent attributable to (i) any Environmental Condition or (ii) any Environmental Claim or non-compliance with any Environmental Laws, in each case, resulting from any events, acts or omissions occurring or obligations or conditions existing on or before the Closing Date, including but not limited to the violations or matters listed on Schedule 8.6.5 but, excluding all obligations under the Permits, bonds related thereto, and Licenses arising from or relating to all reclamation and post mining Liabilities related to the Real Property that are expressly included in the Assumed Liabilities;

2.3.12    subject to Purchaser's obligations under Section 13.2.2, any Liability that relates to any employee or inactive employee of any Seller arising out of or relating to events occurring on or prior to the Closing Date including any Liability with respect to any notification requirements under the WARN Act or any similar Law, any Liability or obligation under COBRA, severance pay and other Liabilities arising out of such employment and termination of such employment and all accrued compensation, vacation pay, sick pay and other benefits with respect to such employees;

2.3.13    any and all amounts for which any Seller, Parent, any Affiliate of any Parent or Seller or any ERISA Affiliate may be liable (i) with respect to individuals who are not employees of, or otherwise providing services to, the Business; or (ii) subject to Purchaser's obligations under Section 13.2.2, with respect to employees of, or other service providers to, the Business with respect to services performed before the Closing; (iii) under any Employee Benefit Plan or violations of any applicable laws related to Employee Benefit Plans, including, without limitation ERISA and the Coal Act; and (iv) under any National Bituminous Coal Wage Agreement or any other collective bargaining agreement, works council agreement or similar agreement with the United Mine Workers of America to which any Seller, Parent, ERISA Affiliate or any Affiliate of any Seller or Parent is a party, including but not limited to:   (x) any Liability for or related to a complete, partial or mass withdrawal from an Employee Benefit Plan; (y) any Liability for medical or life insurance benefits after retirement or other termination of employment to any employees of any Seller, Parent, any ERISA Affiliate or any Affiliate of any Seller or Parent; and (z) any Liability that any Seller, Parent, any ERISA Affiliate or any Affiliate of any Seller or Parent may have as a "signatory operator," "last signatory operator," "assigned operator," "related person," "successor," "successor in interest," or similar status under the Coal Act.

2.3.14    except as provided in Section 2.2.4, any Liability of any Seller or any of its Affiliates for any Taxes arising out of, attributable to or in respect of the Assets, the Business or otherwise for any Pre-Closing Tax Period or for any other Taxes for which any Seller or any Affiliates of any Seller are obligated to pay; and

2.3.15    any Liability of any Seller or any Affiliates of any Seller for the unpaid Taxes of any Person (other than a Seller) under Treas. Reg. § 1.1502-6 (or any similar provision of state, local, or foreign Law or regulation), as a transferee or successor, by contract, or otherwise.

15

2.4    <u>Purchase Price</u>.

2.4.1    On the terms and subject to the conditions set forth in this Agreement, Purchaser shall, as consideration for the Assets, pay to Sellers the aggregate base purchase price of One Hundred Seventy-five Million Dollars ($175,000,000.00) (the "<u>Base Purchase Price</u>") and assume the Assumed Liabilities. The Base Purchase Price shall be subject to adjustment at and after Closing in accordance with the terms of this Agreement (as adjusted, the "<u>Purchase Price</u>"). The Purchase Price shall be payable at the Closing as follows:

(a)    Purchaser shall deliver the Escrow Amount and Regulatory Escrow Amount (each withheld and credited against the Base Purchase Price) to the Escrow Agent pursuant to the terms and conditions of this Agreement and the Escrow Agreement;

(b)    Purchaser may, but is not required to, pay to each Seller's creditors a portion of the Base Purchase Price, for the benefit of such Seller, to pay off any Indebtedness of such Seller that is required to be paid off in order to release any Encumbrances (other than Permitted Encumbrances) on any Assets or to pay off any capital leases related to any of the Assets; and

(c)    Purchaser shall pay to Sellers the balance of the Base Purchase Price (being the Base Purchase Price, as adjusted pursuant to this Agreement, less the Escrow Amount, Regulatory Escrow Amount and any payments made to each Seller's creditors as set forth above) in cash, by wire transfer of immediately available United States funds to an account or accounts designated by Sellers in written instructions given to Purchaser at least two business days prior to the Closing.

2.4.2    <u>Schedule 2.4.2</u> sets forth the tax allocation statement ("<u>Initial Tax Allocation Statement</u>") to reflect the allocation of the Purchase Price among the Assets for purposes of Section 1060 of the Code as of the Closing Date. Within ninety (90) days after the Closing, Parent and Purchaser agree to adjust the Initial Tax Allocation Statement to reflect all adjustments to the Purchase Price after the Closing Date ("<u>Final Tax Allocation Statement</u>") determined pursuant to Section 2.5. Purchaser and Parent shall each (i) timely file all forms and Tax Returns required to be filed in connection with such Final Tax Allocation Statement, (ii) be bound by such allocation for purposes of determining Taxes, and (iii) take no position, and cause their respective Affiliates to take no position, inconsistent with such allocation on any applicable Tax Return or in any audit or proceeding before any Tax authority. In the event that the allocation set forth on the Final Tax Allocation Statement is disputed by any Tax authority, the Party receiving notice of such dispute shall promptly notify the other Parties hereto concerning the existence and resolution of such dispute. If the Parties cannot agree on the Final Tax Allocation Statement within the ninety (90) day period, the issue(s) in dispute will be submitted to the Independent Accountant for resolution. The determination of the Independent Accountant, acting as experts and not as arbitrators, shall be set forth in a written notice delivered, as promptly as practicable after the issue(s) in dispute have been submitted to the Independent Accountant, to the Purchaser and the Parent by the Independent Accountant and will be final, binding and conclusive on the Parties. The Purchaser and the Parent shall each bear 50% of the fees and expenses of the Independent Accountant for such determination. The Purchaser and the Parent will use all commercially reasonable efforts to cause the Independent Accountant to render its decision as promptly as practicable, including without limitation by promptly complying with all reasonable requests by the Independent Accountant for information, books, records and similar items.

2.5    <u>Adjustment to Purchase Price</u>. All adjustments to the Purchase Price shall be estimated and finally determined as set forth below in this Section 2.5.

2.5.1    <u>Increases in Purchase Price</u>. As provided in this Section 2.5, the Base Purchase Price shall be increased by the amount, if any, by which Closing Date Working Capital is greater than Target Base Working Capital.

16

2.5.2    <u>Decreases in Purchase Price</u>. As provided in this Section 2.5, the Base Purchase Price shall be decreased by the amount, if any, by which Target Base Working Capital is greater than Closing Date Working Capital.

2.5.3    <u>Estimated Purchase Price Adjustments and Closing Payment</u>. At least three business days prior to the anticipated Closing Date, Parent shall deliver to Purchaser a certificate duly executed by an authorized officer of Parent setting forth (i) an estimated consolidated balance sheet of the Business, as of the close of business on the Closing Date, prepared in accordance with GAAP (the "<u>Estimated Closing Date Balance Sheet</u>"), and (ii) based thereon, a good faith, reasonable estimate of the Closing Date Working Capital (the "<u>Estimated Closing Date Working Capital</u>"), together with work papers or other supporting documentation showing the preparation or calculation thereof. The calculation of the Estimated Closing Date Working Capital shall be made in a manner consistent with the illustrative calculation of the Closing Date Working Capital on <u>Schedule 2.5.3</u>, which shows an example of how the Closing Date Working Capital would have been calculated assuming a deemed September 30, 2014 closing.

2.5.4    <u>Adjustments to Base Purchase Price</u>. On the terms and subject to the conditions set forth herein, on the Closing Date, Purchaser shall adjust the amount of the Base Purchase Price that is paid to Sellers as follows:

(a)    Increase the Base Purchase Price by an amount, if any, that is equal to the amount by which Estimated Closing Date Working Capital is greater than Target Base Working Capital; and

(b)    Decrease the Base Purchase Price by an amount, if any that is equal to the amount, if any, by which Target Base Working Capital is greater than Estimated Closing Date Working Capital.

2.5.5    <u>Special Consideration for Accounts Receivable in Calculation of Final Closing Date Working Capital</u>. With respect to the calculation of the Final Closing Date Working Capital, the dollar amount of Accounts Receivables used in determining the Final Closing Date Working Capital shall be adjusted to reflect the actual amount of funds that Purchaser has collected and received from the Accounts Receivable by the 89th day after the Closing Date and the reserve for the allowance of doubtful accounts shall be adjusted to zero. To the extent that one or more Accounts Receivable remain uncollected at such time and are not included as Current Assets in the Final Closing Date Working Capital adjustment, such uncollected Accounts Receivables shall revert back to Sellers, shall be deemed Excluded Assets and, thereafter, Sellers shall be entitled, at its option, to collect and retain any collections from such Accounts Receivable.

2.5.6    <u>Post-Closing Purchase Price Adjustments and Final Payment</u>. Within 90 days after the Closing Date, Purchaser shall prepare and deliver to Parent the following information with respect to Sellers: (i) consolidated balance sheet of the Business, as of the close of business on the Closing Date, prepared in accordance with GAAP (the "<u>Closing Date Balance Sheet</u>"), and (ii) based thereon and the special adjustments set forth in Section 2.5.5, a calculation of the final Closing Date Working Capital (the "<u>Final Closing Date Working Capital</u>") (such delivery, the "<u>Post-Closing Delivery</u>"). The calculation of the Estimated Closing Date Working Capital shall be made in a manner consistent with the illustrative calculation of the Closing Date Working Capital on <u>Schedule 2.5.3</u>. Parent shall have 45 days from the date Purchaser delivers the Post-Closing Delivery to Parent (such period, the "<u>Dispute Period</u>") to notify Purchaser, in writing, as to whether Parent agrees or disagrees with the Post-Closing Delivery, which such notice shall identify in reasonable detail those items and amounts to which Parent objects (such written notice, the "<u>Dispute Notice</u>"). During the Dispute Period, Parent and its accountants shall be permitted to review (during regular business hours and upon reasonable prior notice) the working papers of Purchaser and (where applicable) Purchaser's accountants to the extent relating to the matters set forth in the Post-Closing Delivery, in each case as is reasonably requested in writing by Parent. If Parent fails to deliver a Dispute Notice to Purchaser during the Dispute Period, (Y) the Closing Date Balance Sheet as prepared by Purchaser shall be deemed to have been correctly prepared, and (Z) Purchaser's calculation of Final Closing Date Working Capital shall be

17

deemed to be final and correct and shall be binding upon all Parties. If Parent delivers a Dispute Notice to Purchaser with respect to some, but not all, of the amounts or items included in the Post-Closing Delivery during the Dispute Period, then Parent and Sellers shall be deemed to have agreed with Purchaser's calculations of all amounts set forth in such Post-Closing Delivery that were not disputed in such duly and timely delivered Dispute Notice.

2.5.7    Resolution Period. If Parent delivers a Dispute Notice to Purchaser during the Dispute Period, Parent and Purchaser shall, for a period of 30 days from the date the Dispute Notice is delivered to Purchaser (such period, the "Resolution Period"), negotiate in good faith and use commercially reasonable efforts to amicably resolve the items in dispute. Any items so resolved shall be deemed to be final and correct as so resolved and shall be binding upon each of the Parties hereto.

2.5.8    Dispute Resolution.

(a)    If Parent and Purchaser are unable in good faith to resolve all of the items in dispute during the Resolution Period, then, upon the expiration of the Resolution Period or such earlier date as Purchaser and Parent mutually agree, Purchaser and Parent shall refer the items remaining in dispute in writing to the Independent Accountant and shall deliver to the Independent Accountants, at the time of such referral, the Post-Closing Delivery and the Dispute Notice. The parties shall also furnish the Independent Accountants with such other information and documents as the Independent Accountants may reasonably request in order for them to resolve the items in dispute. Parent and Purchaser shall also, within 20 days of the date the items in dispute are referred to the Independent Accountants, provide the Independent Accountants with a written statement (a "Position Statement") describing in reasonable detail their respective positions on the items in dispute (copies of which will concurrently be delivered to the other party). If any party fails to timely deliver its Position Statement to the Independent Accountants, the Independent Accountants shall resolve the items in dispute solely upon the basis of the information otherwise provided to them. The Independent Accountants shall resolve all disputed items in a written determination to be delivered to Purchaser and Parent within 30 days after such matter is referred to them; provided, however, that any delay in delivering such determination shall not invalidate such determination or deprive the Independent Accountants of jurisdiction to resolve the items in dispute; provided, further, in resolving any disputed item, the Independent Accountants shall adhere to the definitions contained in this Agreement and the practices and other principles referred to therein. In no event shall the Independent Accountants assign a value to Final Closing Date Working Capital that is greater than the highest or less than the lowest calculation thereof proposed by Purchaser in the Post-Closing Delivery and Parent in the Dispute Notice. The decision of the Independent Accountants, acting as experts and not as arbitrators, made in accordance with this Agreement as to the items in dispute shall be final and binding upon the parties hereto and shall not be subject to judicial review. The fees and expenses of the Independent Accountants incurred in the resolution of any items in dispute shall be determined by the Independent Accountants and set forth in its report and shall be allocated and paid by the party whose calculation of the items in dispute is furthest from the Independent Accountant's determination of the items in dispute, with any amounts that are payable by Parent and/or Sellers paid out of the Escrow Amount.

(b)    Within seven days after the final determination of the Closing Date Balance Sheet and the calculation of the Final Closing Date Working Capital (whether through failure of Parent to timely deliver a Dispute Notice, agreement of the Parties, or determination of the Independent Accountants):

i.    if the Final Closing Date Working Capital is greater than the Estimated Closing Date Working Capital, Purchaser shall pay such excess to Sellers in immediately available funds via wire transfer;

18

ii.    if the Final Closing Date Working Capital is less than Estimated Closing Date Working Capital (the absolute value of the difference, the "Deficit Amount"), Purchaser and Parent shall direct the Escrow Agent to pay the Deficit Amount to Purchaser out of the Escrow Amount (including any interest earned thereon). Payments under Sections 2.5.8(b)(i) and (ii) are referred to as the "Final Consideration Payment".

2.5.9    Exclusivity. The dispute resolution procedures set forth in this Section 2.5 are the sole and exclusive means and remedy for determining and calculating Current Assets, Current Liabilities, Closing Date Working Capital, Final Closing Date Working Capital and the components thereof, other than (i) in the event of a breach of a covenant or agreement set forth in this ARTICLE 2 relating thereto, in which case the aggrieved Party shall be entitled to such other rights and remedies as are permitted by this Agreement or (ii) in the event of fraud or willful misconduct, in which case the aggrieved party shall be entitled to such other rights and remedies as are permitted by applicable Law.

2.6    Regulatory Escrow Amount.

2.6.1    The Regulatory Escrow Amount will be used to pay for any Losses related to any Liabilities (including fines, penalties, fees and associated interest or charges related thereto) imposed by any Governmental Authority (including MSHA, WVOMHST, EPA and WVDEP) for citations, orders or other enforcement Actions of any type or kind based on events that occurred on or before the Closing Date and relating to (a) any Permit or (b) any facility owned, controlled or operated by any Seller prior to the Closing Date (including, without limitation, the following facilities with the MSHA Identification numbers assigned thereto: (i) Saunders Preparation Plant 46-02140; (ii) Elk Lick Tipple 46-04315; (iii) Toney Fork Surface Mine 46-09101; (iv) Powellton #1 Mine 46-09217; (v) Lower War Eagle Mine 46-09319; (vi) Elklick Chilton No. 1 Mine 46-09390; and (vii) Dingess-Chilton Mine 46-09280) and all reasonable attorneys' fees and costs incurred by Purchaser in the handling and resolution thereof, whether by settlement, administrative litigation or otherwise (collectively the "Regulatory Costs"). The Regulatory Escrow Amount shall be held by the Escrow Agent until the earlier of the date that all Regulatory Costs are paid or the third anniversary of the Closing Date ("Regulatory Escrow Period").

2.6.2    With respect to any Actions or claims related to any Regulatory Costs ("Regulatory Actions"), Sellers and Parent agree that Purchaser shall control the defense of the Regulatory Actions with counsel that is reasonably acceptable to Parent. Purchaser shall conduct the defense of the Regulatory Actions actively and diligently and Parent and Sellers shall cooperate with Purchaser in such defense and make available to Purchaser, at each Seller's and Parent's expense, all witnesses, pertinent records, materials and information in the possession or under the control of any Seller, Parent or any of their respective Affiliates relating thereto as is reasonably required by Purchaser. Purchaser shall not settle any Regulatory Action without the prior written consent of Parent, which consent shall not be unreasonably delayed or withheld. Purchaser shall be reimbursed out of the Regulatory Escrow Amount for all fees and costs (including attorneys' fees) that Purchaser incurs defending any Regulatory Actions.

2.6.3    From and after the Closing Date, Parent and Purchaser agree to execute and deliver to the Escrow Agent joint written instructions, not more frequently than monthly, unless otherwise agreed between the Parties, for the payment of Regulatory Costs. Following the Closing Date, upon receiving joint written instructions from both Parent and Purchaser that a determination has been made with respect to the amount of a Regulatory Cost, the Escrow Agent shall pay the amount so determined to the payee designated in the joint written instruction. If at any time after the Closing and before Escrow Release Date all Regulatory Costs have been fully satisfied and discharged, the remaining amount of the Regulatory Escrow Amount shall be automatically added to and become a part of the Escrow Amount. In the event that all Regulatory Costs are not fully satisfied and discharged until after the Escrow Release Date, then Parent and Purchaser shall direct the Escrow Agent to pay to Sellers any funds remaining out of the Regulatory Escrow Amount, if any. If, however, at the end of the Regulatory Escrow Period, or at any time prior to that, there are insufficient funds available from the Regulatory Escrow Amount to fully satisfy and discharge any Regulatory Costs, Purchaser shall be entitled to recovery from the Escrow Amount any amounts necessary to fully satisfy and

19

discharge any unpaid Regulatory Costs. Sellers, Parent and Purchaser further agree to execute and deliver such other documents and to do such other acts and things, to effect any release of the Regulatory Escrow Amount as contemplated pursuant to the terms of this Agreement or the Escrow Agreement.

2.7    Escrow Funds. At the Closing, Purchaser shall pay to the Escrow Agent the Escrow Amount and Regulatory Escrow Amount (each, an "Escrow Fund") in cash payable by wire transfer of immediately available United States funds for deposit into an escrow account or escrow accounts (provided if in a single escrow account, for purposes of this Agreement they shall be treated as separate accounts) in accordance with the terms and conditions of the Escrow Agreement. The Escrow Amount shall serve as security for the payment to satisfy any Losses incurred by the Purchaser Indemnified Parties under ARTICLE 11 and to the extent necessary any Regulatory Costs, and shall be held and distributed by the Escrow Agent in accordance with the terms and conditions of this Agreement and the Escrow Agreement and shall be held and distributed by the Escrow Agent in accordance with the terms and conditions of this Agreement and the Escrow Agreement. If, however, there are insufficient funds available from the Escrow Amount to fully satisfy and discharge any Losses incurred by the Purchaser Indemnified Parties, Purchaser Indemnified Parties shall be entitled to recovery from the Regulatory Escrow Amount any amounts necessary to fully satisfy and discharge any such Losses. The Regulatory Escrow Amount shall be used to satisfy any Losses related to the Regulatory Costs as set forth above and shall be held and distributed by the Escrow Agent in accordance with the terms and conditions of this Agreement and the Escrow Agreement.

2.8    Escrow Amount Escrow Release . Subject to the terms and provisions of this Agreement and the Escrow Agreement, the Escrow Agent shall disburse to Sellers no later than 30 days after the first anniversary of the Closing Date the portion of the Escrow Amount in excess of $7,250,000 that remains in the Escrow Fund as of the first anniversary of the Closing Date (the "First Escrow Release Date"), and the Escrow Agent shall disburse to Sellers no later than 30 days after the eighteen (18) month anniversary of the Closing Date the remaining portion of the Escrow Amount (as reduced by any amounts previously disbursed to Purchaser or Sellers (the "Second Escrow Release Date" and together with the First Escrow Release Date, collectively, the " Escrow Release Dates" or individually a "Release Escrow Date"). In the event, however, that either Sellers or Parent has received, on or before an applicable Escrow Release Date, a notice (a "Claim Notice") from the Purchaser that the Escrow Agent may be required to disburse all or a portion of the Escrow Amount (such claimed amount, the "Claim Amount") to the Purchaser pursuant to ARTICLE 11, then the portion of the Escrow Amount subject to such Claim Notice shall continue to be held by the Escrow Agent (and not disbursed to Sellers on any Escrow Release Date) until the Claim Amount with respect thereto has been resolved. As soon as any dispute with respect to such Claim Amount has been resolved in accordance with the terms of the Escrow Agreement, the Escrow Agent shall be instructed to disburse such portion of the Escrow Amount, if any, as is required to be disbursed to Purchaser pursuant to ARTICLE 11 in connection with such Claim Amount, and the Escrow Agent shall disburse any remaining portion of the Claim Amount to Sellers in accordance with this Agreement and the Escrow Agreement, subject to the limitations on disbursements to Sellers set forth in this Section 2.8.

2.9    Unassigned Assets.

2.9.1    Notwithstanding anything to the contrary in this Agreement, to the extent that any Contract, right, interest or asset that would otherwise be an Asset is not capable of being transferred or assigned to Purchaser in connection with the Closing without the consent or waiver of a third party which has not been obtained on or before the Closing Date or such transfer or assignment would result in the breach or violation of any such Contract, right or interest or any applicable Law, Sellers will be deemed not to have assigned or transferred or attempted to assign or transfer, to Purchaser any right, title or interest in or to any such Contract, right, interest or asset (each, an "Unassigned Asset") without first having obtained all necessary Consents and waivers. Sellers and Purchaser shall each use their best efforts to obtain such Consents and waivers as may be necessary to cure such potential breach or violation.

2.9.2    With respect to such Unassigned Assets, Sellers shall (i) provide to Purchaser the benefits thereof and shall promptly pay to Purchaser when received all monies received by Sellers under

20

any Unassigned Asset and the proceeds of or other amounts relating to any Unassigned Assets, (ii) cooperate in any arrangement designed to provide such benefits to Purchaser and (iii) enforce at the request of Purchaser and for the account of Purchaser, any rights of any Seller arising from any such Unassigned Asset (including the right to elect to terminate any Contract that is an Unassigned Asset in accordance with the terms thereof upon the reasonable request of Purchaser).

2.9.3    Purchaser will, at its sole cost and expense, perform the obligations arising under such Unassigned Asset for the benefit of Sellers and the other party or parties thereto.

2.9.4    Notwithstanding any provision in this Section 2.9 to the contrary, Purchaser shall not be deemed to have waived its rights under Section 6.1.3 hereof unless and until Purchaser provides written waivers thereof.

## ARTICLE 3 SEGREGATION AND REMOVAL OF EXCLUDED ASSETS

3.1    Segregation and Removal of Excluded Assets . Within one hundred eighty days (180) days after the Closing Date, Sellers shall segregate and remove from the Real Property all Excluded Assets; provided that, any such items that in the reasonable discretion of Purchaser hampers the Purchaser's operation of the Business after the Closing shall be removed immediately after Parent has received notice from Purchaser of such determination. Notwithstanding the foregoing, any Excluded Assets required by Purchaser to be used in the Business pursuant to the Transition Services Agreement, which items shall be removed at the termination thereof or the earlier replacement of any specific item thereunder by Purchaser. Sellers shall remove such items at each Seller's sole cost and expense in a manner so as not to unreasonably interfere with Purchaser's operations on the Real Property, and Sellers shall bear full liability for any and all claims related to or arising from such Excluded Assets and their removal.

## ARTICLE 4 CLOSING

4.1    Closing. The closing of the Transactions (the "Closing") will take place on the first business day after the satisfaction or waiver of the conditions set forth in ARTICLE 5, ARTICLE 6 and ARTICLE 7 (excluding conditions that, by their nature, cannot be satisfied until the Closing Date, but subject to the fulfillment or waiver of such conditions at the Closing) unless this Agreement has been previously terminated pursuant to its terms or unless another time or date is agreed to in writing by the parties (the actual date of Closing being referred to herein as the "Closing Date"). The parties shall use commercially reasonable efforts to complete the Closing through electronic means of communication to avoid the necessity of a physical Closing. To the extent a physical Closing is required, the Closing shall be held at the offices of Dinsmore & Shohl LLP, 900 Lee Street East, Suite 600, Charleston, WV 25301, unless another place is agreed to in writing by the parties.

4.2    Delivery of Assets and Procedure at Closing . At the Closing, Sellers and Parent shall deliver (or cause to be delivered) to Purchaser certificates of title and all other duly executed documents set forth in this Section 4.2 and in Section 4.5 for transfer of the Assets, thereby transferring to Purchaser good and marketable title to the Assets, free and clear of all Encumbrances except Permitted Encumbrances; provided however there shall be special warranty of title as to the Owned Real Property, free and clear of all Encumbrances created by, through or under any Seller, except Permitted Encumbrances, including:

4.2.1    A bill of sale and assignment and assumption agreement, substantially in the form attached hereto as    Exhibit D;

4.2.2    Lease assignment and assumption agreements to Purchaser for the Leased Real Property in form and substance that is reasonably acceptable to Purchaser and consistent with the terms of this Agreement;

4.2.3    special warranty deeds to Purchaser for the Owned Real Property, in form and substance that is reasonably acceptable to the Parties (the "Special Warranty Deeds ");

21

4.2.4    All documents of title and instruments of conveyance necessary to transfer record and/or beneficial ownership to Purchaser of all automobiles, trucks and trailers owned by any Seller (and any other Assets owned by any Seller which require execution, endorsement and/or delivery of a document in order to vest record or beneficial ownership thereof in Purchaser) which are included in the Assets;

4.2.5    The Escrow Agreement;

4.2.6    Permit Operating Agreement;

4.2.7    The Transition Services Agreement;

4.2.8    By reasonable advance notice, such other deeds, endorsements, assignments and other instruments as, in the reasonable opinion of Purchaser's counsel, are necessary to vest in Purchaser good and marketable title to the Assets, except for special warranty of title as to the Owned Real Property.

4.2.9    Certificates of Good Standing regarding each Seller from the Secretary of State of the State of Delaware and a Certificate of Good Standing regarding Parent from the Secretary of State of Ohio;

4.2.10    a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of each Seller certifying that attached thereto are true and complete copies of all resolutions adopted by the managers and members of each Seller authorizing the execution, delivery and performance of this Agreement, and all other documents, certificates and agreements that are contemplated in this Agreement and the consummation of the Transactions, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby;

4.2.11    a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Parent certifying that attached thereto are true and complete copies of all resolutions adopted by the board of directors of Parent authorizing the execution, delivery and performance of this Agreement, and all other documents, certificates and agreements that are contemplated in this Agreement and the consummation of the Transactions, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby;

4.2.12    A certificate of non-foreign status of each Seller in form reasonably acceptable to Purchaser pursuant to Section 1.1445-2(b)(2) of the U.S. Treasury Regulations under the Code;

4.2.13    The certificate contemplated by 6.1.2;

4.2.14    An owner's affidavit of title covering the Owned Real Property in a form reasonably required by the title insurance company issuing the title insurance policy for the Owned Real Property;

4.2.15    A settlement statement setting forth the disbursement of funds at the Closing; and

4.2.16    All other documents required to be delivered by any Seller or Parent on or prior to the Closing Date pursuant to this Agreement.

4.3    Purchaser's Deliveries at Closing. At the Closing, Purchaser shall deliver (or cause to be delivered) to Sellers and Parent:

4.3.1    A bill of sale and assignment and assumption agreement, substantially in the form attached hereto as   Exhibit D;

22

4.3.2    Lease assignment and assumption agreements to Purchaser for the Leased Real Property in form and substance that is reasonably acceptable to Purchaser and consistent with the terms of this Agreement;

4.3.3    The Special Warranty Deeds to Purchaser for the Owned Real Property;

4.3.4    The Escrow Agreement;

4.3.5    The Permit Operating Agreement;

4.3.6    The Transition Services Agreement;

4.3.7    The portion of the Base Purchase Price payable to Sellers at Closing as determined in accordance with the terms of this Agreement;

4.3.8    The Escrow Amount and Regulatory Escrow Amount payable to the Escrow Agent at Closing as determined in accordance with the terms of this Agreement;

4.3.9    The certificate contemplated by 7.1.2;

4.3.10    A settlement statement setting forth the disbursement of funds at the Closing;

4.3.11    A certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Purchaser certifying that attached thereto are true and complete copies of all resolutions adopted by the managers of Purchaser authorizing the execution, delivery and performance of this Agreement, and all other documents, certificates and agreements that are contemplated in this Agreement and the consummation of the Transactions, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby; and

4.3.12    All other documents required to be delivered by the Purchaser on or prior to the Closing Date pursuant to this Agreement.

4.4    Simultaneous Transactions. All actions taken and transactions consummated at the Closing shall be deemed to have occurred simultaneously, and no such transaction shall be considered consummated unless all are consummated.

4.5    Supplemental Assignments. As reasonably required by Purchaser in order to effectuate the Transaction, each Party shall also execute and deliver at (and after) the Closing such other assignments, bills of sale, certificates of title and other documents, and shall take such other actions, as are necessary or appropriate to transfer the Assets to Purchaser.

**ARTICLE 5 CONDITIONS PRECEDENT TO THE OBLIGATIONS OF BOTH PARTIES**

5.1    The respective obligation of each Party to effect the Closing shall be subject to the satisfaction at or prior to the Closing Date of the following conditions:

5.1.1    Statutes; Court Orders. No statute, rule or regulation shall have been enacted or promulgated by any Governmental Authority which prohibits the consummation of the Transactions; and there shall be no order or injunction of a court of competent jurisdiction precluding consummation of the Transactions; and

5.1.2    Regulatory Approval. All waiting periods (and extensions thereof) under the HSR Act, if any, relating to the transaction contemplated hereby shall have expired or been earlier terminated; and

23

5.1.3    Baisden-Vaughan Lease. The Parties shall have either (a) reached an agreement with the lessor of the Baisden-Vaughan Lease that fully resolves the disputes with such lessor on terms and conditions that are reasonably acceptable to the Parties, or (b) amended this Agreement to remove the Baisden-Vaughan Lease as an Asset (and make it an Excluded Asset) and make a corresponding adjustment to either the Purchase Price or the Target Base Working Capital.

## ARTICLE 6 CONDITIONS PRECEDENT TO THE OBLIGATIONS OF PURCHASER

6.1    All obligations of Purchaser to be discharged under this Agreement at the Closing are subject to the fulfillment, prior to or at the Closing, of each of the following conditions (unless expressly waived in writing by Purchaser at any time at or prior to the Closing):

6.1.1    Government Action. There shall not be threatened or pending any suit, Action or proceeding by any Governmental Authority:

(a)    seeking to prohibit or impose any material limitations on Purchaser's ownership or operation of all or a portion of its businesses or assets or the Assets, or to compel Purchaser to dispose of or hold separate any material portion of the Assets or the business or assets of Purchaser;

(b)    seeking to restrain or prohibit the consummation of the Closing or the performance of any of the other Transactions, or seeking to obtain from Purchaser any damages pertaining to this Agreement or the Transactions;

(c)    seeking to impose limitations on the ability of Purchaser, or rendering Purchaser unable, to accept or pay for or purchase some or all of the Assets or otherwise to consummate the Transactions;

(d)    seeking to impose limitations on the ability of Purchaser effectively to exercise full rights of ownership of the Assets; or

(e)    that is reasonably likely to result, directly or indirectly, in any of the consequences referred to in clauses (a) through (d) above.

6.1.2    Certificate of each Seller's Officers. Sellers shall have delivered to Purchaser at the Closing a certificate signed by an authorized officer of each Seller and Parent, dated the Closing Date, in form and substance reasonably satisfactory to Purchaser, to the effect that, as of the Closing Date (i) that the conditions set forth in Sections 6.1.6 and 6.1.7 have been satisfied and (ii) since the date of this Agreement, there has not occurred any Material Adverse Change (or to Seller's Knowledge any development that is reasonably likely to result in any Material Adverse Change).

6.1.3    Consents Obtained. All Consents and approvals of any Person necessary to the consummation of the Transactions and to the use of the Assets by Purchaser, after Closing without any material interruption, including Consents and approvals listed on Schedule 8.21, but excluding any Consents or approvals from any Governmental Authority required in connection with the transfer of the Permits and bonds related thereto, shall have been obtained and shall be in full force and effect.

6.1.4    Closing Deliveries. Purchaser shall have received all of the deliveries required from Sellers and Parent pursuant to Section 4.2 above.

6.1.5    Material Adverse Change. Since the date of this Agreement, there shall not have occurred any Material Adverse Change (or any development that, insofar as reasonably can be foreseen, is reasonably likely to result in any Material Adverse Change).

24

6.1.6    <u>Representations and Warranties</u>. The representations and warranties of Sellers and Parent contained in this Agreement (other than the Fundamental Reps of Sellers and Parent) shall be true and correct except where the failure to be true and correct would not cause a Material Adverse Change taken as a whole (it being understood that, notwithstanding anything to the contrary contained in this Agreement, for the sole purpose of determining whether there has been a Material Adverse Change as a result of any inaccuracy of a representation or warranty of Sellers and Parent, such representation or warranty shall be read as if it were not qualified by "material" or "Material Adverse Change" or other words of similar import), in each case on the date hereof and on the Closing Date (unless the representations and warranties address matters as of a particular date, in which case they shall remain true and correct in all respects as of such date). The Fundamental Reps of Sellers and Parent contained in this Agreement shall be true and correct in all respects.

6.1.7    <u>Performance of Obligations</u>. Sellers and Parent shall have performed each obligations required to be performed by it under this Agreement prior to the Closing Date in all material respects.

6.1.8    <u>Work Stoppage</u>. There shall be no work stoppage at the Business, and no Seller shall have received notice of any future work stoppage.

6.1.9    <u>Collective Bargaining Agreement</u>. No Seller shall have entered into or permitted the Business to enter into any collective bargaining agreement or other labor agreement with any union or other labor organization.

6.1.10    <u>Release Letters</u>. Purchaser shall have received for each instrument of Indebtedness (and indebtedness of Parent or any of their respective Affiliates), where such indebtedness is secured in whole or in part by any of the Assets, a release letter (collectively, the "<u>Release Letters</u>") from each applicable creditor, in form and substance reasonably acceptable to Purchaser indicating, to the extent that such creditor has an Encumbrance on any of the Assets, shall release an Encumbrance on and agree to execute Uniform Commercial Code termination statements and such other documents or endorsements necessary to release an Encumbrance on the Assets, and that if required by such creditor, the payment of the specific amount that is required by such creditor to release its Encumbrances on the Assets;

6.1.11    <u>Release of Liens and Capital Leases</u>. Sellers shall have obtained a release (or a commitment to release that is reasonably satisfactory to Purchaser) of any and all Encumbrances affecting the Assets (including through the Release Letters) other than the Permitted Encumbrances and Sellers shall have paid off in full all Liabilities under any capital leases that relate to any of the Assets and terminated all such capital leases.

6.1.12    <u>No Damage</u>. There shall not have occurred a loss of or damage to the Assets in the aggregate of over $25,000,000, unless Sellers have replaced the damaged, stolen or lost Assets to the reasonable satisfaction of Purchaser prior to Closing.

6.1.13    <u>COBRA Notices</u>. Sellers shall have supplied proof to Purchaser satisfactory in form and substance to counsel for Purchaser of each Seller's compliance with the provisions of COBRA as they apply to Sellers with respect to the termination of its employees, including any notices required to be distributed to employees of any Seller.

6.1.14    <u>Inventory</u>. The Assets will include at least 30 days of Coal Inventory based upon the projected sales of coal by Sellers or their Affiliates in the 30 day period following the Closing as reasonably determined by Purchaser.

**ARTILCE 7 CONDITIONS PRECEDENT TO THE OBLIGATIONS OF SELLERS AND PARENT**

7.1    All obligations of Sellers and Parent to be discharged under this Agreement at the Closing are subject to the fulfilment, prior to or at the Closing, of each of the following conditions (unless expressly waived in writing by Sellers and Parent at any time at or prior to the Closing):

7.1.1    <u>Government Action</u>. There shall not be threatened or pending any suit, Action or proceeding by any Governmental Authority:

(a)        seeking to restrain or prohibit the consummation of the Closing or the performance of any of the other Transactions, or seeking to obtain from any Seller any damages pertaining to this Agreement or the Transactions that are material;

(b)        seeking to impose limitations on the ability of Purchaser, or rendering Purchaser unable, to accept or pay for or purchase some or all of the Assets or otherwise to consummate the Transactions; or

(c)        that is reasonably likely to result, directly or indirectly, in any of the consequences referred to in clauses (a) or (b) above.

7.1.2    <u>Certificate of Purchaser's Officers</u>. Purchaser shall have delivered to Sellers and Parent at the Closing a certificate signed by an authorized officer of Purchaser, dated the Closing Date, in form and substance reasonably satisfactory to Parent, to the effect that, as of the Closing Date that the conditions set forth in Sections 7.1.3 and 7.1.5 have been satisfied.

7.1.3    <u>Representations and Warranties</u>. The representations and warranties of Purchaser contained in this Agreement (other than the Purchaser's Fundamental Reps) shall be true and correct except where the failure to be true and correct would not cause a material adverse change taken as a whole (it being understood that, notwithstanding anything to the contrary contained in this Agreement, for the sole purpose of determining whether there has been a material adverse change as a result of any inaccuracy of a representation or warranty of Purchaser, such representation or warranty shall be read as if it were not qualified by "material" or "material adverse change" or other words of similar import), in each case on the date hereof and on the Closing Date (unless the representations and warranties address matters as of a particular date, in which case they shall remain true and correct in all respects as of such date). The Fundamental Reps of Purchaser contained in this Agreement shall be true and correct in all respects.

7.1.4    <u>Closing Deliveries</u>. Sellers shall have received all of the deliveries required from Purchaser pursuant to Section 4.3 above.

7.1.5    <u>Performance of Obligations</u>. Purchaser shall have performed each obligation required to be performed by it under this Agreement prior to the Closing Date in all material respects.

7.1.6    <u>Permit Transfer Application</u>. Purchaser shall have provided Sellers with evidence satisfactory to Sellers, in their reasonable discretion, that Purchaser has prepared all necessary transfer applications for all Permits and all bonds related thereto that need to be filed with the appropriate Governmental Authority, including operator assignment applications, all in a form acceptable to the relevant Governmental Authority.

7.1.7    <u>Guarantees</u>. Purchaser shall have caused Parent and its Affiliates, if and to the extent applicable, to be released from the Guarantees; provided, however, that if the release of the Guarantees cannot be obtained, the Guarantees shall remain in effect and Purchaser shall indemnify and hold harmless Parent and each Seller from all Losses and claims arising in under or connection with such Guarantees from and after the Closing Date, pursuant to the terms of Section 11.3.

**ARTICLE 8 REPRESENTATIONS AND WARRANTIES OF SELLERS AND PARENT**

Sellers and Parent, jointly and severally, represent and warrant, that except as set forth in the Disclosure Schedules, the following statements are true and correct as of the date of this Agreement and will be true and correct as of the Closing Date:

8.1    <u>Organization and Status of Sellers</u>. Each Seller is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware. Each Seller is duly qualified and properly authorized to (i) own, operate or lease its properties, (ii) conduct the Business in the places and manner in which such properties are located and such Business is currently conducted, and (iii) perform all of its obligations under the Assumed Contracts, Leases and Permits, including the bonds related thereto. Each Seller has delivered to Purchaser true and correct copies of that Seller's Certificate of Formation (or similar formation documents) and operating agreement, and all amendments thereto.

8.2    <u>Authority</u>. Each Seller and Parent each has full right and authority to execute and deliver this Agreement and any other documents pertaining to the Transactions to which the each of them is a party, to perform its obligations hereunder and to consummate the Transactions. All required action with respect to each Seller and Parent has been taken to approve this Agreement and the Transactions and no other action on the part of any Seller or Parent is necessary to authorize this Agreement. This Agreement has been duly executed and delivered by each Seller and Parent and constitutes the valid and binding obligation of each Seller and Parent, enforceable in accordance with its terms, subject, however, to the effect of, and then only to the extent that enforceability may be limited by, bankruptcy, insolvency, reorganization, moratorium and similar Laws relating to the rights and remedies of creditors, as well as to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law). The execution and delivery of this Agreement, the consummation of the Transactions, and the performance by each Seller and Parent of its obligations under this Agreement in accordance with its terms will not require the approval or consent of, or notice to or filing with, any Governmental Authority, except as related to the HSR Act and as necessary for transfer of the Permits and the bonds related thereto and the designation of Purchaser as operator thereunder pending transfer to Purchaser.

8.3    <u>No Breach</u>. The execution, delivery and performance by each Seller and Parent of this Agreement and any other documents pertaining to the Transactions to which any Seller or Parent is a party do not, and will not, (i) conflict with, violate or breach, or cause a default under, any provision of the certificate of incorporation, bylaws, certificate of formation, operating agreement or other organizational documents of any Seller or Parent or (ii) assuming receipt of the Consents set forth on <u>Schedule 8.21</u>, conflict with, or result in any violation of, or breach under, any Law, rule or regulation, or any judgment, injunction, order, decree, permit or license of any judicial or administrative authority or any arbitrator applicable to any Seller or Parent, (iii) assuming receipt of the Consents set forth on <u>Schedule 8.21</u>, conflict with, result in violation or breach of, or with notice or the passage of time or both, result in a breach by any Seller or Parent, or constitute a default under, or result in the acceleration of or create in any party the right to accelerate, terminate, modify, or cancel any Assumed Contract to which any Seller or Parent is a party or by which any Seller or Parent or any of the Assets may be bound, or (iv) result in the creation or imposition of any Encumbrance, other than a Permitted Encumbrance, upon the Assets under any Contract to which any Seller or Parent or their respective properties may be bound. Assuming receipt of the Consents set forth on <u>Schedule 8.21</u>, neither any Seller nor Parent is a party to any Contract, nor is any Seller or Parent bound by, any judgment, injunction or decree of any Governmental Authority, which in any respect may restrict or interfere with the performance of this Agreement.

8.4    <u>Financial Statements</u>. Sellers or Parent has delivered to Purchaser: (a) unaudited consolidated balance sheets of the Business as at December 31, 2012 and December 31, 2013 and the related unaudited consolidated statements of income, changes in members' equity, and cash flows for each of the two fiscal years ended on such dates, including the notes thereto (collectively, the "<u>Year-End Financial Statements</u>") and (b) an unaudited consolidated balance sheet (the "<u>Interim Balance Sheet</u>") of the Business as at September 30, 2014 (the "<u>Interim Balance Sheet Date</u>"), and the related unaudited consolidated

27

statements of income, changes in members' equity, and cash flows for the nine months then ended (collectively, the "Unaudited Financial Statements", and together with the Year-End Financial Statements the "Financial Statements"). The Financial Statements (i) fairly present, in all material respects, the consolidated financial condition and the results of operations, changes in members' equity, and cash flows of the Business as at the respective dates of, and for the periods referred to in, the Financial Statements, and (ii) were prepared in accordance with GAAP, subject, in the case of the Unaudited Financial Statements, to normal recurring year-end adjustments and the absence of notes (that, if presented, would not differ materially from those included in the Year-End Financial Statements). The Financial Statements reflect the consistent application of GAAP throughout the periods involved, except as disclosed in the notes to the Year-End Financial Statements. No financial statements of any Person other than Sellers are required by GAAP to be included or reflected in the Financial Statements. The Financial Statements were prepared from, and are consistent with, the accounting records of Sellers.

8.5    Ordinary Course of Business. Since September 30, 2014 ("Reference Date"), except as and to the extent described on Schedule 8.5, each Seller has:

8.5.1    continued its Business and conducted its operations and maintained the Assets in the ordinary course of business;

8.5.2    used commercially reasonable efforts to preserve the goodwill of all its suppliers, customers, potential customers, and all others having business relationships with it;

8.5.3    maintained its books, records and accounts relating to the Business in the usual, regular and ordinary manner; and

8.5.4    not taken any action or failed to take any action that if taken (or failed to be taken) after the date of this Agreement would constitute a breach, in any material respect, of the covenants set forth in Section 10.2 regarding continuation of the Business.

8.6    Ownership, Condition and Sufficiency of Assets.

8.6.1    Title to Assets; Encumbrances.

(a)    Except as listed on Schedule 8.6.1(a), each Seller has good and marketable title to all Assets, free and clear of all Encumbrances, other than Permitted Encumbrances.

(b)    Except as listed on Schedule 8.6.1(b), there are no recorded or unrecorded Encumbrances relating to the Owned Real Property other than Permitted Encumbrances, and to Seller's Knowledge, there are no recorded or unrecorded Encumbrances relating to the Leased Real Property other than Permitted Encumbrances.

(c)    The Assets (other than the Excluded Assets) constitute all of the assets, properties and rights necessary for the operation of the Business, including without limitation, all mining, processing, loading, transporting and selling of coal and all reclamation activities.

8.6.2    Owned Real Property. Schedule 8.6.2 sets forth an accurate and complete list, citing to the Deed Book and Page Number of each Seller's source deed, of all Owned Real Property. The property maps attached hereto as Schedule 8.6.2(a) depict in a reasonably accurate manner the location and boundaries of the Owned Real Property. True and complete copies of the following have heretofore been delivered to Purchaser: (i) all deeds, title insurance policies, title insurance commitments, title reports, title opinions, title abstracts, maps and surveys relating to the Real Property which any Seller or any Affiliates of any Seller has in its possession, and (ii) all documents evidencing recorded and unrecorded Encumbrances upon the Real Property which any Seller or any Affiliates of any Seller has in its possession.

28

(a)        Each Seller has the power and right to sell, transfer and convey the Owned Real Property to Purchaser.

(b)        Each Seller has obtained all appropriate certificates of occupancy, Licenses, easements and rights of way, required to use and operate the Owned Real Property in all material respects in the manner in which the Owned Real Property is currently being used and operated in connection with the Business. Neither any Seller nor any Affiliates of any Seller has received notice, of any intention on the part of any issuing authority to cancel, suspend or modify any approvals, Licenses or Permits, and bonds related thereto, relating to the Owned Real Property.

(c)        Except for Taxes not yet delinquent, each Seller has paid all Taxes which that Seller is legally obligated to pay, which are due and owing and which if not paid could constitute an Encumbrance on the Owned Real Property or impose Liability on Purchaser. Neither any Seller nor any Affiliates of any Seller has received notice of or become aware of any proposed special assessment which would adversely affect the Owned Real Property.

(d)        There are no Actions pending or, to Seller's Knowledge, threatened regarding the ownership, use or possession of the Owned Real Property, including subsidence claims, condemnation, expropriation or similar proceedings except as listed in Schedule 8.17.1. Except as set forth on Schedule 8.6.2(d), each Seller's use and operation of the Owned Real Property as currently conducted does not violate, in any material respect, any Laws, and all coal facilities on the Owned Real Property are constructed, occupied and used by each Seller in compliance, in all material respects, with all Laws.

(e)        No Seller is a party to any lease or assignment under which that Seller is a lessor or sublessor with respect to the Owned Real Property, and the Owned Real Property is not made available for use by any third party except as set forth on Schedule 8.6.2(e).

(f)        There are no commitments, obligations or Liabilities with respect to the payment of rents or royalties, including overriding royalties, relating to any of the Owned Real Property.

(g)        Except as set forth on Schedule 8.6.2(g), there are no outstanding options or rights of first refusal to purchase any of the Owned Real Property or any interest therein.

8.6.3    Leases and Leased Real Property . Schedule 8.6.3 contains an accurate and complete list of all the Leases held by any Seller and used by any Seller in the operation of the Business, together with a list of all prepaid royalties and un-recouped minimum royalties for each Lease, and the Leases have not been amended or modified, assigned or subleased except as set forth on such Schedule 8.6.3. To Seller's Knowledge, the property maps attached hereto as Schedule 8.6.3 depict in a reasonably accurate manner the location and boundaries of the Leased Real Property. A true and complete copy of each Lease, including all amendments and exhibits, has heretofore been delivered to Purchaser. Each of the Leases is in full force and effect and constitutes a valid and binding obligation of the Seller that is a party to such Lease and, to Seller's Knowledge, the other party thereto except as enforcement may be limited by bankruptcy, insolvency, moratorium, reorganization, liquidation or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles. The leasehold estate created by each Lease is free and clear of all Encumbrances created by, through or under any Seller or Affiliate of any Seller other than Permitted Encumbrances. Except as disclosed in Schedule 8.6.3, there are no defaults, breaches or uncured violations that could lead to a default by any Seller under any of the Leases and no event has occurred that (whether with or without notice, lapse of time or the happening or occurrence of any other event) would constitute a default, breach or uncured violation that could lead to a default by any Seller under any Lease. To Seller's Knowledge, except as disclosed in Schedule 8.6.3, there are no defaults, breaches or uncured violations that could lead to defaults, by any other party, or to Seller's Knowledge any events, which with notice, the passage of time or both, would constitute such defaults, breaches or violations by any other party under any of the Leases. There are no existing disputes between any Seller and any other party to any of

29

the Leases or any party having rights under or with respect to the Leases that are expected to result in a claim of default, breach, or termination thereof. Sellers have paid all rents, royalties, and other payments due and payable under each Lease, and has otherwise complied with the Leases. Except as set forth on Schedule 8.6.3, no Seller has subleased, assigned or otherwise granted to any Person the right to use or occupy such Leased Real Property or any portion thereof. Within the past four (4) years, no Seller has received any notice that there exists any default, breach, violation, lost coal claim or condition which with the passage of time would constitute a default or lost coal claim on the part of Seller under any Lease, except as set forth in Schedule 8.17.1. No Seller nor any Affiliate of a Seller has received any notice that any lessor or landlord under any Lease will cancel or terminate such Lease, or fail to perform its obligations under such Lease and to Seller's Knowledge, no lessor or landlord under any Lease intends to cancel or terminate such Lease or fail to perform its obligations under such Lease.

(a)        Subject to the Consents described on Schedule 8.21, each Seller has the power and right to assign the Leases to Purchaser.

(b)        Each Seller has obtained all appropriate certificates of occupancy, Licenses, easements and rights of way, including proofs of dedication, required to use and operate the Leased Real Property in the manner in which the Leased Real Property is currently being used and operated. Neither any Seller nor any Affiliates of any Seller has received notice of any intention on the part of the issuing authority to cancel, suspend or modify any approvals, Licenses or Permits, or bonds related thereto, relating to the Leased Real Property.

(c)        There are no Actions pending or, to Seller's Knowledge, threatened, regarding the ownership, use or possession of the Leased Real Property, including subsidence claims, condemnation, expropriation or similar proceedings except as listed in Schedule 8.17.1. Each Seller's use and operation of the Leased Real Property as currently conducted does not violate, in any material respect, any Laws, and all coal facilities on the Leased Real Property are constructed, occupied and used by each Seller in compliance, in all material respects, with all Laws.

(d)        Except as set forth in Schedule 8.6.3, there are no outstanding options or rights of first refusal to purchase or sublease any of the each Seller's interest in the Leases or any interest therein.

(e)        There are no commitments, obligations or Liabilities with respect to the payment of rents or royalties, including overriding royalties, under any Leases or relating to any Leased Real Property that are not otherwise set forth in the Leases.

(f)        All royalties due and payable under the Leases have been paid in full on or before their due dates.

8.6.4    Buildings and Improvements. The buildings, improvements, loadout facilities, structures and other fixtures located on the Real Property, are in good operating condition and state of repair for the purposes for which they are used by each Seller in the operation of the Business, normal wear and tear excepted. No Seller has received notice which states that any Seller is in violation of any applicable building, zoning, subdivision, platting, fire, insurance, safety, health or other applicable Laws, ordinances or regulations in respect of its inventories, supplies, plants or structures, Real Property or the operation of any of the foregoing.

8.6.5    Environmental Matters. Except as set forth on Schedule 8.6.5, solely with respect to the Business and the Assets:

(a)        each Seller is in compliance, in all material respects, with all Environmental Laws;

30

(b)        During the four (4) years preceding the date of this Agreement, no Seller nor any Affiliates of any Seller has received any written communication, whether from a Governmental Authority, citizens group, employee or otherwise, that alleges that any Seller or any Affiliates of any Seller are not in compliance, in all material respects, with any Environmental Laws, except for such written communications that have been resolved in all respects. Sellers have delivered to Purchaser prior to the execution of this Agreement all phase I and phase II environmental site assessments and compliance reviews conducted during the four (4) years preceding the date of this Agreement that are in the possession of any Seller or any Affiliates of any Seller regarding environmental matters pertaining to, or the Environmental Condition of, the Real Property, Business or the compliance (or non-compliance) by any Seller with any Environmental Laws;

(c)        there is no Environmental Claim by any Person that is pending or, to Seller's Knowledge, threatened against any Seller, any Affiliates of Seller or against any Person whose Liability for any Environmental Claim any Seller (or any Affiliates of any Seller) has retained or assumed either contractually or by operation of Law, with respect to the Assets or the Business, nor, to Seller's Knowledge, is there any valid basis for such claim to be brought;

(d)        No Seller has, and to Seller's Knowledge no other Person has, Released, placed, stored, deposited, discharged, buried, dumped or disposed of Hazardous Materials in quantities and concentrations requiring immediate notification of Governmental Authorities and which are not otherwise authorized by Law or Permit, on or beneath the Real Property, or from the Real Property into the Environment, except for inventories of such substances to be used, and wastes generated therefrom, in the ordinary course of business of Sellers and in compliance with Environmental Laws (which inventories and wastes, if any, were and are stored or disposed of in compliance with applicable Environmental Laws and in a manner such that there has been no unpermitted Release of any such Hazardous Materials into the Environment or on the Real Property);

(e)        Except in compliance with a valid Permit listed on Schedule 8.19.1, no Seller has engaged in the treatment, storage, or disposal of Hazardous Materials at or in connection with the Assets or the operation of the Business, or transported or accepted for transport any Hazardous Materials;

(f)        each Seller owns, holds, lawfully uses or possesses and is in compliance, in all material respects, with all Permits and bonds related thereto required under any Environmental Law necessary to conduct the Business as currently conducted; and

(g)        without in any way limiting the generality of the foregoing (i) all on-site and off-site locations where any Seller currently or within the past four (4) years has stored, disposed or arranged for the disposal of Hazardous Materials, other than fuel or lubricants, are specifically identified on Schedule 8.6.5, (ii) all underground storage tanks and above ground storage tanks, and the capacity and contents of such tanks, located on any Real Property are specifically identified on Schedule 8.6.5, (iii) all former underground storage tanks have been removed from the Real Property in compliance with applicable, (iv) all PCBs or items containing PCBs in regulated amounts used or stored on any Real Property are identified on Schedule 8.6.5 and (v) there are no underground injection wells, radioactive materials or septic tanks or waste disposal pits in which process wastewater or any Hazardous Materials have been discharged or disposed, other than the properly permitted waste disposal pits operated in the ordinary course of business in compliance with all Environmental Laws and which are listed on Schedule 8.6.5.

8.6.6    Inventory, Equipment and Fixed Assets.

(a)        Except as disclosed in Schedule 8.6.6, a Seller has good and marketable title to all Equipment and Fixed Assets, free and clear of all Encumbrances other than Permitted Encumbrances. All tangible assets, Equipment and Fixed Assets are in good operating condition and state of repair for the purposes for which they are used by any Seller in the operation of the Business, normal wear and tear excepted.

31

(b)        All of the Coal Inventories of the Business whether reflected in the Financial Statements or otherwise, consist of a quality and quantity usable and salable on a standalone or blended basis in the ordinary and usual course of business. The Coal Inventory is or will be on the Closing Date, in an amount that is normal and customary for the on-going and uninterrupted operation of the Business.

(c)        The Parts and Supplies Inventory is or will be on the Closing Date, maintained at normal and customary levels for the on-going and uninterrupted operation of the Business.

8.6.7    <u>Intellectual Property</u>. A Seller validly owns, is validly licensed under or has legal right to use all registered Intellectual Property set forth in <u>Schedule 8.6.7</u>. The rights of Sellers in the Intellectual Property set forth in <u>Schedule 8.6.7</u> are valid and in good standing, are owned, or licenses thereunder are held, free and clear of all liens and Encumbrances, other than Permitted Encumbrances and is all of the Intellectual Property necessary to operate the Business as currently conducted. No violations are or have been recorded in respect of any Intellectual Property set forth in <u>Schedule 8.6.7</u> and no proceeding is pending or, to Seller's Knowledge, threatened seeking the revocation or limitation of same. To Seller's Knowledge, no Person is infringing upon the rights of any Seller in, or misappropriating the subject matter of, any Intellectual Property and no Person has claimed that any Seller is infringing or misappropriating the Intellectual Property of that Person or the Assets are infringing upon the Intellectual Property of that Person.

8.6.7    <u>No Undisclosed Liabilities</u>. Except as disclosed in <u>Schedule 8.6.8</u>, no Seller has Liabilities of any nature whether or not absolute, accrued, contingent or otherwise, including, without limitation, Liability for unpaid contributions to an Employee Benefit Plan and withdrawal Liability to any such plan, Liability under Environmental Laws, off-site Liability for disposal of Hazardous Materials and/or wastes, or Liability for contamination of property previously owned or leased directly or indirectly by any Seller, or Tax Liabilities due or to become due with respect to any of the Assets or in respect of business transacted by any Seller other than (i) Liabilities set forth in the Financial Statements, (ii) Liabilities that have arisen after the Interim Balance Sheet Date in the ordinary course of business that are not material in the aggregate, (iii) those incurred in connection with this Agreement and (iv) those not required to be reflected in the liabilities column of a balance sheet prepared in accordance with GAAP.

8.7    <u>Contracts</u>. <u>Schedule 8.7</u> contains an accurate and complete list of all revenue generating Contracts of each Seller (and together with the Leases and Miscellaneous Contracts, the "<u>Material Contracts</u>") and the Material Contracts have not been amended, modified, or assigned except as set forth on such <u>Schedule 8.7</u>. Sellers have delivered to Purchaser true and complete copies of all written Material Contracts, as amended to the date hereof and accurate and complete summaries of all oral Material Contracts. Each of the Material Contracts is in full force and effect and constitutes a valid and binding obligation of the applicable Seller and, to Seller's Knowledge, the other party thereto. Except as disclosed in <u>Schedule 8.7</u>, there are no defaults, breaches or uncured violations that could lead to a default by any Seller under any of the Material Contracts. Except as disclosed in <u>Schedule 8.7</u>, there are no events, which with notice, the passage of time or both, would constitute such defaults, breaches or uncured violations that could lead to defaults by any Seller or, to Seller's Knowledge, any other party, under any of the Material Contracts. There are no existing disputes between any Seller and any other party to any of the Material Contracts or any party having rights under or with respect to the Material Contracts. No Seller nor any Affiliates of any Seller has received any notice that any other party to a Material Contract will cancel or terminate such Material Contract, or fail to perform its obligations under such Material Contract and to Seller's Knowledge, no other party to a Material Contract intends to cancel or terminate such Material Contract or fail to perform its obligations under such Material Contract.

32

8.8    Employee Benefit Plan and Related Matters .

8.8.1    Employee Pension Benefit Plans.

(a)    Except as set forth in Schedule 8.8.1(a). No Seller nor any ERISA Affiliate of any Seller sponsors, maintains or has any Liability (actual or contingent) with respect to any Employee Pension Benefit Plan that covers current or former employees, directors or consultants of any Sellers (with respect to the Business).

8.8.2    Employee Benefit Matters.

(a)    Schedule 8.8.2(a) contains a true and complete list of all Employee Benefit Plans that cover current or former employees, directors or consultants of any Seller (with respect to the Business). For any disclosures on Schedule 8.8.2 which are for a: (i) Multiemployer Plan, (ii) a "single-employer plan" within the meaning of Section 4001(a)(15) of ERISA, or (iii) a "multiple employer plan" within the meaning of Section 413(c) of the Code; a notation should be made on the Schedule 8.8.2(a) detailing the type of such Employee Benefit Plan from the listing within this Section 8.8.2(a). Sellers have delivered to Purchaser true, complete and correct copies of each Employee Benefit Plan (or, in the case of any unwritten Employee Benefit Plans, descriptions thereof).

(b)    Except as set forth in Schedule 8.8.2(b) with respect to the Business: (i) each Employee Benefit Plan that is intended to be qualified and exempt from federal income taxes under Sections 401(a) and 501(a) of the Code, respectively, has received a favorable determination letter, opinion letter or advisory letter which it may rely on, from the IRS as to its qualified and exempt status, no such determination letter or opinion letter has been revoked nor has such revocation been threatened by the IRS, and no event has occurred that would adversely affect such Employee Benefit Plan's qualified and exempt status or materially increase its costs, and (ii) each Employee Benefit Plan has been maintained and administered in material compliance with its terms and all applicable Laws, including but not limited to ERISA and the Code.

(c)    As of the date hereof and as of the Closing Date that solely with respect to the Business:

(i)    No Seller nor any ERISA Affiliate of a Seller maintains any voluntary employee benefit associations under Section 501(c)(9) of the Code;

(ii)    No Seller (or any Affiliate of any Seller) provides employee post-retirement medical or health coverage or contribute to or maintain any employee welfare benefit plan which provides for health benefit coverage following termination of employment with respect to employees of any Seller, except as is required by Section 4980B(f) of the Code or other applicable statute, nor has any Seller made any representations, agreements, covenants or commitments to provide such coverage; and

(iii)    With respect to each Employee Benefit Plan listed in Schedule 8.8.2(a), (A) all contributions required to be paid by any Seller or any ERISA Affiliate of a Seller have been timely paid to the applicable Employee Benefit Plan, (B) no Seller nor any ERISA Affiliate of any Seller has incurred any withdrawal liability under Title IV of ERISA which remains unsatisfied, (C) a complete withdrawal from all such Employee Benefit Plans at the Effective Time would not result in any Liability to any Seller, (D) no action has been initiated by the Pension Benefit Guaranty Corporation to terminate any such Employee Benefit Plan or to appoint a trustee for any such Employee Benefit Plan, (E) no such Employee Benefit Plan has failed to satisfy the minimum funding standards of Section 302 of ERISA or Sections 412 or 418(B) of the Code, respectively, or has applied for or obtained a waiver from the IRS of any minimum funding requirement or an extension of any amortization period under Section 412 of the Code or Sections 303 or 304 of ERISA, (F) no such Employee Benefit Plan has been required to file information pursuant to

33

A004397

Section 4010 of ERISA for the current or most recently completed fiscal year, and (G) no "reportable event," as defined in Section 4043 of ERISA, has occurred, or is reasonably expected to occur, with respect to any such Employee Benefit Plan.

        (d)    Parent and Sellers are conducting the sale of the Assets and Business for the purpose of achieving business objectives that are not related in any way to evading or avoiding potential Liability under ERISA or the Coal Act. The sale is an arms' length transaction for which Parent and Sellers are receiving reasonably equivalent value.

8.9    <u>Labor and Employee Relations</u>.

8.9.1    There is no (and never has been any) collective bargaining agreement, works council agreement, other labor union Contract or similar agreement applicable to any Seller with respect to any employee of any Seller and no such agreement or Contract has been requested by any employee or group of employees of any Seller nor has there been any discussion with respect thereto by management of any Seller with any employees of any Seller. No Seller, nor any Affiliate of any Seller, has received any written notification of any unfair labor practice charges or complaints pending before any agency having jurisdiction thereof nor are there any current union representation claims against any Seller involving any of the employees of any Seller. Further, to Seller's Knowledge, no such charges or claims are threatened.

8.9.2    There are no, nor have there been, in the past four (4) years, any union organizing activities or proceedings involving, or any pending petitions for recognition of, a labor union or association as the exclusive bargaining agent for, or where the purpose is to organize, any group or groups of employees of any Seller. There is not currently pending, with regard to any of its facilities, any proceeding before the National Labor Relations Board, wherein any labor organization is seeking representation of any employees of any Seller.

8.9.3    There are no strikes, work stoppages, grievances, work slowdowns or lockouts nor of any threats thereof, by or with respect to any of the employees of any Seller.

8.9.4    With respect to the Business, except as disclosed on <u>Schedule 8.9.4</u>, there exist: (i) no charges of discrimination or lawsuits involving alleged violations of any fair employment Law, wage payment Law, occupational safety and health Law; (ii) no pending or, to Seller's Knowledge, threatened, litigation arising out of employment relationships, or other employment-related Law, whether federal, state or local; and (iii) no pending or, to Seller's Knowledge, threatened litigation arising out of employment relationships, by any applicant, employee or former employee of any Seller or any representative of any such Person or Persons with respect to the Business. No charges or claims involving any of the facilities or employees of any Seller are pending before any administrative agency, local, state or federal, and no lawsuits involving any of such facilities or employees are pending with respect to equal employment opportunity, age discrimination, occupational safety, or any other form of alleged employment practice or unfair labor practice.

8.9.5    Each Seller has complied, in all material respects, with all applicable Laws, rules and regulations relating to employment, including, but without limitation, those relating to wages, hours, concerted activity, non-discrimination, occupational health and safety and the payment and withholding of Taxes, and no Seller has no accrued Liability for any arrears of wages or any Taxes or penalties for failure to comply with any of the foregoing.

8.10    *[Intentionally Omitted]*.

8.11    <u>Employees of Sellers</u>.

8.11.1    <u>Schedule 8.11.1</u> sets forth, with respect to any Active Employee of each Seller, such individual's (i) name, (ii) location, (iii) title, (iv) date of hire, (v) employment status (i.e., full-time, part-time or

A004398

temporary), (vi) current annual base salary or hourly wage compensation as of the date hereof and (vii) any bonuses or other commission reasonably likely to be paid for the current calendar year.

8.11.2    Sellers have delivered to Purchaser true and complete copies of all employment agreements, separation agreements and any other Contracts between any Seller and any of its employees.

8.11.3    Except as set forth on Schedule 8.11.3, to Seller's Knowledge, no employee of any Seller (i) intends to terminate his or her employment with such Seller, (ii) has received an offer to join a business that may be competitive with any Seller's business and (iii) is a party to or bound by any confidentiality agreement, noncompetition agreement or other Contract (with any other Person) that may have an adverse effect on: (A) the performance by such employee of any of his or her duties or responsibilities as an employee of such Seller or (B) the business or operations of any Seller.

8.12    Insurance.

8.12.1    Each Seller, either directly or indirectly through an Affiliate, has maintained with respect to the Business such policies of insurance for its benefit in respect of its operations, properties, assets and Business, including group insurance and any other life, health, disability or other insurance for benefit of employees or their dependents or both, as such Seller determined to be reasonably necessary for such purposes, taking into account the nature and size of its business, and comparable determinations made by similar businesses and all such current insurance policies are set forth on Schedule 8.12.1. Each Seller has paid all premiums due, and has otherwise performed its obligations, under each of its insurance policies.

8.12.2    Schedule 8.12.1 contains an accurate and complete list of all property, casualty, workers' compensation and commercial general liability insurance policies (specifying the type of policy, the insurer, the amount of the coverage and the current policy term) presently maintained by Sellers applicable to their operations, properties, assets and business and all of these policies are still in full force and effect and these policies or policies substantially similar to these policies have been in full force and effect without interruption for the four (4) year period prior to Closing Date. There are no claims related to the Business, the Assets or the Assumed Liabilities pending under any such insurance policies as to which coverage has been questioned, denied or disputed or in respect of which there is an outstanding reservation of rights. Except as occurring in the ordinary course of business, no Seller has received any written notice of cancellation of, a material premium increase with respect to, or material alteration of coverage under, any of such insurance policies. All premiums due on such insurance policies have either been paid or, if not yet due, accrued. All such insurance policies (i) are in full force and effect and enforceable in accordance with their terms; (ii) are provided by carriers who, to Seller's Knowledge, are financially solvent; and (iii) have not been subject to any lapse in coverage. No Seller is in default under, and is in compliance with, in all material respects, all provision contained in any such insurance policy.

8.12.3    Each Seller is and at all times has been in compliance with all Laws relating to its Liabilities and obligations for the payment of workers' compensation benefits and federal and state occupational disease benefits. Schedule 8.12.3 shows a true and complete list, dated as of November 30, 2014 of all pending claims against the Business for any such benefits.

8.13    *[Intentionally Omitted]*

8.14    *[Intentionally Omitted]*

8.15    *[Intentionally Omitted]*

8.16    *[Intentionally Omitted]*

35

8.17    <u>Litigation, Investigations and Claims</u>.

8.17.1    <u>Schedule 8.17.1</u> sets forth a true, complete and correct list of (i) all existing and pending to Seller's Knowledge, threatened litigation, arbitration, judgment, court order, decree, injunction, administrative order, claim (including, without limitation, any claim for withdrawal Liability under any Employee Benefit Plan), dispute or process against or by any Seller or against or related to the Assets or the operation of the Business (collectively "<u>Litigation</u>");

8.17.2    Except as set forth on <u>Schedule 8.17.2</u>, with respect to any Seller, the Assets or the operation of the Business (i) there is no formal investigation, cessation order or notice of violation or other proceeding, administrative or otherwise, (ii) there are no conditions which could reasonably be expected to result in the commencement of any of the foregoing, and (iii) no such formal investigation, cessation order or notice of violation or other proceeding, administrative or otherwise is pending or, to Seller's Knowledge, threatened that, in each case, would prevent or hinder the consummation of the Transactions;

8.17.3    No Seller is in default in respect of any order, writ, injunction, decree or process of any arbitrator or Governmental Authority; and

8.17.4    Except as set forth on <u>Schedule 8.17.1</u>, no Seller nor any Affiliates of any Seller has received notice with respect to an unresolved charge of violation of any provision of any Law or administrative ruling or regulation relating to the Assets or the operation of the Business.

8.18    <u>Laws and Regulations</u>. Each Seller is in compliance, in all material respects, with all Laws, Permits, bonds related thereto, and Licenses relating to the Business and Assets, except as disclosed in <u>Schedule 8.18</u> attached hereto. Except as set forth on <u>Schedule 8.18</u>, no Seller nor any Affiliates of any Seller has received (i) any notification from any Governmental Authority (a) asserting that any Seller is in violation of any of the Laws, Permits or bonds related thereto, or Licenses, or (b) threatening to revoke any Permits or bonds related thereto, or Licenses or (ii) any notice from any Governmental Authority indicating any Permits or bonds related thereto or Licenses being sought or renewed by any Seller will be denied by the applicable Governmental Authority.

8.19    <u>Permits and Surety Bonds; Other Licenses</u>.

8.19.1    <u>Schedule 8.19.1</u> attached hereto is a complete list of (i) all of the mining permits and other permits, approval, clearances and authorizations held by each Seller in the operation of the Business and Assets, together with a description of the permitted property or facility, together with a true and complete list of all pending applications for additional permits or amendments to existing permits which have been submitted to any Governmental Authority or other entity by any Seller applicable to the operation of the Business (all such permits being herein referred to as the "<u>Permits</u>"); (ii) the applicable surety bonds (or similar financial assurances) and the amount of the surety bonds or other financial assurances under the Permits, and (iii) all of the licenses, franchises, certificates, authorizations, approvals, orders, and concessions held by any Seller and used in connection with the operation of the Business, together with a true and complete list of all pending applications for additional licenses franchises, certificates, authorizations, approvals, orders, and concessions or amendments to existing licenses, franchises, certificates, authorizations, approvals, orders, and concessions which have been submitted to any Governmental Authority or other entity by any Seller applicable to the operation of the Business (collectively, herein referred to as the "<u>Licenses</u>"), as amended, supplemented and modified.

8.19.2    The Permits and Licenses constitute all of the governmental permits, licenses, approvals, clearances, authorizations, franchises, certificates, orders and concessions necessary for the current operation of and the current conduct of all aspects of the Business and Assets, and all of the Permits, bonds related thereto, and the Licenses are final, unappealed, valid, in good standing and in full force and effect. Each Seller is in compliance, in all material respects, with the Permits, bonds related thereto, and Licenses. Except as set forth in <u>Schedule 8.19.2</u>, no suspension, revocation or cancellation of any of the

36

Permits, or bonds related thereto, or Licenses is pending or, to Seller's Knowledge, threatened, except with respect to regular periodic expirations and renewals thereof, which renewals Sellers and Parent have no reason to believe will not be granted. No Seller has had any Permits, bonds related thereto, or Licenses, or any applications therefor, appealed, denied, revoked, restricted or suspended and is not currently a party to any proceedings involving the possible appeal, denial, revocation, restriction or suspension of any Permits, bonds related thereto, or Licenses or any of the privileges granted thereunder. No Seller, nor any Affiliate of any Seller, is permit blocked under the provisions of the Applicant Violator System (or any similar system) by any Governmental Authority ("AVS").

8.20    Books and Records. The books, records and accounts of the Business accurately and fairly reflect its transactions and assets and liabilities of the Business.

8.21    Consents. Parent's and Sellers' entering into of this Agreement and the completion of the Transactions do not require the consent, waiver or approval of or notice to (collectively, the "Consents") (i) any lessor, landlord or other third party under any of the Leases, (ii) any party, other than a Seller, under the Assumed Contracts, except for both (i) and (ii) those Consents listed on Schedule 8.21, or (iii) except as may be provided for under the Permit Operating Agreement, any Governmental Authority other than pursuant to the HSR Act. Additionally, Parent's and Sellers' entering into of this Agreement and the consummation of the Transactions will not constitute a default, or trigger any acceleration rights or other rights, under any of the Assumed Contract subject to receipt of the Consents listed on Schedule 8.21.

8.22    Customers. With respect to the Business, Schedule 8.22 sets forth a list of the customers of Sellers by sales revenue for the year 2013 and for the first nine months of 2014. With respect to the current customers to whom Purchaser will be making coal deliveries after Closing: (i) the Accounts Receivable from such customers are current and being paid in accordance with each customer's respective coal supply agreements; and (ii) there are no outstanding quality or quantity adjustments to pricing that will cause a material deduction from, or delay, any payments to be received by Purchaser. No Seller, nor any Affiliates of any Seller, has received any notice (orally or in writing), and has no Knowledge, that any of its customers will cancel, terminate, or fail to perform its obligations under their existing coal supply Contracts.

8.23    Suppliers. With respect to the Business, Schedule 8.23 sets forth a list of the ten (10) largest suppliers of Sellers by dollars for the year 2013 and for the first nine months of 2014. No Seller nor any Affiliates of any Seller have received any notice and has no reason to believe, that any such supplier has ceased, or intends to cease to supply goods or services to any Seller or to otherwise terminate or materially reduce its relationship with any Seller.

8.24    Eminent Domain or Condemnation Proceedings. There are no eminent domain or condemnation proceedings pending or, to Seller's Knowledge, threatened against the Real Property.

8.25    [Intentionally Omitted]

8.26    Taxes.

8.26.1    Filing of Tax Returns. Each Seller has properly prepared and duly and timely filed (in accordance with any extensions duly granted by the appropriate Governmental Authority, if applicable) with the appropriate Governmental Authorities all Tax Returns and reports required to be filed with any Governmental Authority. All such Tax Returns or reports are true, complete and accurate in all respects. No jurisdiction in which Sellers do not file a Tax Return has made a claim that any Seller is required to file a Tax Return in such jurisdiction.

8.26.2    Payment of Taxes. Except for such items as a Seller may be disputing in good faith by proceedings in compliance with applicable Law, each of which is described in Schedule 8.26.2 of the Disclosure Schedules, (i) each Seller has paid all Taxes that have become due with respect to any Taxes for any tax year ending on or before the Closing Date or any partial tax year that includes any period prior

37

to the Closing Date (whether or not shown on any Tax Return) and has properly accrued on its books and records for all of the same that have not yet become due and (ii) no Seller is delinquent in the payment of any Tax. The unpaid Taxes of Sellers (i) did not, as of the date of the Interim Balance Sheet Date, exceed the applicable reserve for Tax liability (rather than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the Interim Balance Sheet and (ii) will not exceed that reserve as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of Sellers in filing Tax Returns.

8.26.3    *No Pending Deficiencies, Delinquencies, Assessments or Audits.* No Seller, nor any Affiliates of any Seller, have received any notice or received any other communication from any Governmental Authority that any Tax deficiency or delinquency has been asserted against Seller that could result in an Encumbrance on any of the Assets. No Seller, nor any trustee, director or officer (or employee responsible for Tax matters) of any Seller expects any authority to assess any additional Taxes for any period for which Tax Returns have been filed. There is no unpaid assessment, proposal for additional Taxes, deficiency or delinquency in the payment of any of the Taxes of any Seller that has been asserted by any Governmental Authority.  Other than routine audits of the consolidated Tax Returns of Parent, none of which are directly targeted at a Seller, the Assets or the Business, no Seller, nor any Affiliate of any Seller, has received notice or received any other communication from any Governmental Authority that a Governmental Authority audit of any Seller is pending or such audit is threatened. The results of any completed audits are properly reflected in the Financial Statements.

8.26.4    *Extension of Limitation Period.* There are no Encumbrances (other than Permitted Encumbrances) for Taxes upon any Assets. No Seller has requested an extension of time within which to file any Tax Return with respect to any taxable period for which a Tax Return has not since been filed. No Seller has granted an extension to any Governmental Authority of the limitation period during which any Tax liability may be assessed or collected.

8.26.5    *Withholding Requirements Satisfied.* All monies required to be withheld by any Seller and/or paid to Governmental Authorities for social security, Medicare, unemployment insurance, and all income, sales, excise, use, and other Taxes have been collected or withheld and/or paid to the respective Governmental Authorities in accordance with applicable Law.

8.26.6    *Section 168 Property.* None of the assets of any Seller are "tax-exempt use property" or "tax-exempt bond financed property" within the meaning of Section 168 of the Code. No Seller is a party to any "long-term contract" within the meaning of Section 460 of the Code.

8.26.7    *Boycotts.* No Seller has at any time participated in or cooperated with any international boycott as defined in Section 999 of the Code.

8.26.8    *[Intentionally Omitted]*

8.26.9    *Pass-through Entities.* No Seller is a party to any joint venture, partnership or other arrangement that is treated as a partnership or as a disregarded or transparent entity for any Tax purpose.

8.26.10    *Taxes Through the Closing Date.* In addition to the foregoing, each Seller shall pay any and all Taxes that may be now or hereafter due with respect to the Assets, the Business or the activities of any Seller through and including the Closing Date, except as set forth in this Agreement. Each Seller specifically acknowledges that it and not Purchaser shall be responsible for any and all such payments and Liabilities, except as otherwise expressly set forth in this Agreement.

8.27    No Brokers. Other than as set forth on Schedule 8.27, all negotiations relative to this Agreement and the Transactions have been conducted and carried out by Sellers and Parent (and their respective Affiliates) directly with Purchaser and without the assistance or intervention of any other Person so as, through action of, or on behalf of, any Seller, to give rise to any valid claim against Purchaser for a

38

finder's fee, broker's fee, commission or other like payment. Except as set forth on Schedule 8.27, no Seller has engaged, retained or contracted with any finder, broker, investment banker or similar Person with respect to the purchase of the Assets or of any part thereof, so as to incur any Liability for a finder's, broker's or similar Person's fee, commission or like payment in connection with the execution of this Agreement or the consummation of the Transactions. Except as set forth on Schedule 8.27, each Seller represents that it does not owe any brokers or finder fees or any other similar type of payment to any Person or entity with respect to relating to the sale of the Assets.

8.28    Disclaimer. EXCEPT AS SET FORTH IN THIS ARTICLE 8, SELLERS AND PARENT MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AND THE ASSETS OF SELLERS AND THE BUSINESS ARE BEING TRANSFERRED "AS IS, WHERE IS" ON THE CLOSING DATE, IN THEIR THEN PRESENT CONDITION. SELLERS AND PURCHASER EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESSED, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, WARRANTY OF FITNESS FOR ANY PARTICULAR PURPOSE, AND WARRANTY ARISING BY USAGE OF TRADE, COURSE OF DEALING, OR COURSE OF PERFORMANCE. In particular, Purchaser acknowledges that, without limiting the foregoing disclaimer, except as expressly set forth in ARTICLE 8, no Person is making or has made any representation or warranty to Purchaser with respect to any oral or written information presented to Purchaser during any management presentation including any question and answer session thereto or any oral or written information provided to Purchaser in the course of its due diligence investigation of Sellers or the Business, the negotiation of this Agreement or in the course of the transactions contemplated hereby.

### ARTICLE 9 REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers and Parent that the following statements are true and correct as of the date of this Agreement and will be true and correct as of the Closing Date:

9.1    Organization and Status of Purchaser. Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware.

9.2    Authority. Purchaser has full right and authority to execute and deliver this Agreement and any other documents pertaining to the Transactions to which Purchaser is a party, to perform its obligations hereunder and to consummate the Transactions. All required corporate action with respect to Purchaser has been taken to approve this Agreement and the Transactions and no other action on the part of Purchaser is necessary to authorize this Agreement. This Agreement has been duly executed and delivered by Purchaser and constitutes the valid and binding obligation of Purchaser, enforceable in accordance with its terms, subject, however, to the effect of, and then only to the extent that enforceability may be limited by, bankruptcy, insolvency, reorganization, moratorium and similar Laws relating to the rights and remedies of creditors, as well as to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law). The execution and delivery of this Agreement, the consummation of the Transactions, and the performance by Purchaser of this Agreement in accordance with its terms shall not require the approval or consent of, or notice to or filing with, any foreign, federal, state, county, local or other governmental or regulatory body, except as necessary for transfer of the Permits and bonds related thereto and the designation of Purchaser as operator thereunder pending transfer to Purchaser.

9.3    No Breach. The execution, delivery and performance by Purchaser of this Agreement and any other documents pertaining to the Transactions to which Purchaser is a party do not, and will not, (i) conflict with, violate or breach, or default under, any provision of the certificate of formation, operating agreement or other organizational documents of Purchaser or (ii)  conflict with, or result in any violation of, or breach under, any Law, rule or regulation, or any judgment, injunction, order, decree, permit or license of any judicial or administrative authority or any arbitrator applicable to Purchaser, (iii) conflict with, result in violation of, breach of, or with notice or the passage of time or both, would result in breach by Purchaser, or constitute a default under, or result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any contract, lease or other agreement to which Purchaser is a party or by which

it or any of its property may be bound, or (iv) result in the creation or imposition of any Encumbrance (other than Encumbrances granted to Purchaser's financing source in connection with Purchaser's financing of the Purchase Price). Purchaser is not a party to any agreement or lease, nor is Purchaser bound by, any judgment, injunction or decree of any court or Governmental Authority, which in any respect may restrict or interfere with the performance of this Agreement.

9.4    Consents. Except with regard to the Permits and any filing required pursuant to the HSR Act, no consent, approval or action of, filing with or notice to, any Governmental Authority or any other person or entity, on the part of Purchaser is required in connection with the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated hereby.

9.5    Brokers. Other than any Person identified in Schedule 9.5, all negotiations relative to this Agreement and the Transactions have been conducted and carried out by Purchaser directly with Sellers and Parent and without the assistance or intervention of any other Person so as, through action of Purchaser, to give rise to any valid claim against any Seller for a finder's fee, broker's fee, commission or other like payment. Except as set forth in Schedule 9.5, Purchaser has not engaged, retained or contracted with any finder, broker or similar Person with respect to the purchase of the Assets or of any part thereof, so as to incur any Liability for a finder's fee, broker's fee, commission or like payment in connection with the execution of this Agreement or the consummation of the Transactions.

9.6    Permitting. Except as set forth on Schedule 9.6, neither Purchaser nor any person or entity that, together with any Affiliate of Purchaser, owns ten percent (10%) or more of the equity interests of Purchaser has been subject to any bond forfeiture, permit suspension or revocation or similar effort or any Proceeding instituted by any Governmental Authority that would prohibit the transfer of the Permits to Purchaser.  Neither Purchaser nor any person or entity "owned or controlled" by Purchaser or any of their respective Affiliates, has been notified by the Federal Office of Surface Mining or the agency of any state administering SMCRA (or any comparable state statute), that it is currently (a) ineligible to receive additional surface mining permits or (b) under investigation to determine whether its eligibility to receive such permits should be revoked, i.e., "permit blocked."  As used in this Section 9.6, "owned or controlled" shall be defined as set forth in 30 C.F.R. Section 773.5 (1991); and "Proceeding" shall mean any action, suit, proceeding, arbitration, investigation or audit, whether or not by any Governmental Authority.

9.7    Ownership and Control File. To the extent required, Purchaser has filed with the applicable Governmental Authorities an ownership and control file necessary to facilitate the timely transfer of the Permits to Purchaser as such timing is contemplated under the terms of this Agreement.

9 . 8    Financing. Purchaser has all funds necessary or will have at Closing (or has fully committed debt financing for all funds necessary) to consummate the Transactions, including, without limitation, (a) all funds necessary for it to pay the Purchase Price at Closing, (b) all funds necessary to pay all fees, expenses and other amounts contemplated to be paid by Purchaser under this Agreement, and (c) the credit capacity sufficient to post new letters of credit and bonds and issue new guaranties, as necessary, in accordance with the terms of this Agreement.

### ARTICLE 10 COVENANTS OF PARTIES

10.1    Access to Information. Between the date of this Agreement and the Closing Date, Sellers shall (i) afford Purchaser and its authorized representatives (including its designated engineers and consultants) reasonable access to the Real Property and all offices, preparation plants, underground mine workings and other facilities of the Business and to all books and records relating to the Business, (ii) permit Purchaser to make such inspections and to make copies of such books and records as it may reasonably require and (iii) furnish Purchaser with such financial and operating data and other information concerning the Business as Purchaser may from time to time reasonably request, including without limitation, evidence of the payment of royalties under the Leases. Purchaser and its authorized representatives shall conduct all such inspections and inquiries in a manner that will minimize disruptions to the business and operations

40

of the Business. Without limitation, Purchaser and Sellers shall, beginning immediately upon the date of this Agreement and continuing until Closing, conduct a joint pre-closing review, audit and investigation to confirm the quantities and quality of Coal Inventory, Parts and Supplies Inventory, the existence and location of the Equipment and Fixed Assets and other quantification and valuation procedures, for the purpose of verifying the same and determining the adjustments to the Base Purchase Price as set forth in Section 2.5.

10.2    Continuation of Business. With respect to the Business, Sellers and Parent shall, and shall cause their respective Affiliates to, from the date of this Agreement through the Closing Date:

10.2.1    carry on the Business in a proper and prudent manner and, except as contemplated in order to consummate the Transactions, in substantially the same manner as it has heretofore and not introduce any material new method of management, operation or accounting, including maintaining all inventories of the Business to the same amounts on average that they have been historically maintained over the last 12 months;

10.2.2    maintain the Assets in as good working order and condition as at present, ordinary wear and tear excepted;

10.2.3    perform all its obligations under the Material Contracts, Leases and other Contracts relating to or affecting the Assets;

10.2.4    keep in full force and effect the current insurance policies that cover Sellers without being in default or failing to give any notice or present any claim thereunder;

10.2.5    use its commercially reasonable efforts to assist Purchaser in hiring the services of the Active Employees of the Business that Purchaser desires to hire;

10.2.6    use its commercially reasonable efforts to maintain and preserve each Seller's business organization intact, maintain each Seller's relationship with its vendors, customers and others having business relations with it, operate and maintain the Business in a sound and prudent manner and not allow any Assumed Contract, Permit, License, franchise, certificate or privilege necessary for the operation of the Business to lapse, terminate or be in default and not to violate any Law, Permit or License. Sellers will timely file all required reports and notices with the applicable Governmental Authorities and will properly and timely pay all bonuses, rentals, royalties, or other payments due and owing with respect to the Assets and the operation of the Business;

10.2.7    notify the Purchaser in writing of any new revenue-generating Contract (including any purchase orders), including the name of the counter-party and the material terms of the new Contract;

10.2.8    with respect to the Business, collect or withhold all amounts required to be collected or withheld by any Seller or any Affiliates of any Seller for income, social security, unemployment, excise, or any other Taxes or assessments and pay to the appropriate Governmental Authorities or set aside in appropriate accounts any such amounts;

10.2.9    not enter into or in any way take steps to enter into any collective bargaining agreement or other labor agreement with any union or other labor organization; and

10.2.10    comply, in all material respects, with all applicable Laws.

10.3    No Changes in Business. Except as permitted herein, Sellers and Parent shall not, and shall cause their respective Affiliates to not:

10.3.1    with respect to the Business, except in the ordinary course of business, enter into any Contract or commitment that will result in the incurrence of any Liability or make any capital expenditures;

41

10.3.2    amend any Assumed Contract in a manner that is materially adverse to the Business provided that, Parent shall provide Purchaser written notice of any such amendments;

10.3.3    sell, assign, lease or otherwise transfer or dispose of any of the Assets except the sale of coal in the ordinary course of business;

10.3.4    merge or consolidate any Seller or agree to merge or consolidate any Seller with or into any other Person;

10.3.5    cause any Seller (or any subsidiary of any Seller) to purchase all or substantially all of the assets of another Person;

10.3.6    cause any Seller (or any subsidiary of any Seller) to purchase the equity interests of any other Person;

10.3.7    enter into or amend any Contract, or enter into any other transaction, directly or indirectly, with any Affiliate other than cash management and treasury transactions in the ordinary course of business;

10.3.8    effect any material change in the conduct of the Business in violation of Section 10.2 above;

10.3.9    take any action or fail to take any action that would make any of the representations and warranties made by Sellers and/or Parent in or pursuant to this Agreement (other than the Fundamental Reps made by Sellers and Parent) incorrect in any material respect as of the Closing Date; or

10.3.10    take any action or fail to take any action that would make any of the Fundamental Reps of Sellers and Parent incorrect in any respect as of the Closing Date.

10.4    Information for Applications. The Parties shall cooperate with each other, their representatives and counsel in the preparation of any documents or other material which may be required by any Governmental Authority in connection with the Transactions.

10.5    Consents and Approvals. Sellers and Parent shall use commercially reasonable efforts, as set forth in this Agreement, to secure all Consents that are necessary to effect the Transactions. Such commercially reasonable efforts shall not require any payment or other consideration from the Parties. Upon the reasonable request of Parent and Sellers, Purchaser shall provide commercially reasonable assistance to Sellers and Parent to effect securing such Consents.

10.6    Interview of Employees. As a means of permitting an orderly transition of the Business, Sellers and Parent will permit Purchaser reasonable access to the employees of any Seller prior to Closing for purposes of completing Purchaser's due diligence.

10.7    Tax Matters. The following provisions shall govern the allocation of responsibility as between the Parties for certain Tax matters following the Closing Date.

10.7.1    Responsibility for Filing Income Tax Returns. With respect to income Taxes, franchise Taxes and other Taxes based on income, the Parties shall each be responsible for the filing of its own Tax Returns and payment of any Taxes imposed on it that arise from the Transactions contemplated by this Agreement or otherwise.

10.7.2    Certain Taxes and Fees. Purchaser shall pay one-half and Parent shall pay one-half of all Transfer Taxes in connection with the sale, conveyance, assignment, transfer and delivery of the Assets to the Purchaser and the consummation of the Transactions contemplated by this Agreement.

Purchaser shall pay one-half and Parent shall pay one-half of all document recording costs and fees incurred in connection with the public filing of the transfer documents associated with the Assets. Purchaser shall pay one-half and Parent shall pay one-half of all filing fees associated with any filing required pursuant to the HSR Act.

10.7.3    Cooperation on Tax Matters. After the Closing, upon reasonable written notice, the Parties shall furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance (to the extent within the control of such Party) relating to the Assets and the Business (including, access to books and records) as is reasonably necessary for the filing of all Tax Returns, and making of any election related to Taxes, the preparation for any audit by any Taxing authority and the prosecution or defense of any Action related to any Tax Return. The Parties shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Assets or the Business. Sellers and Parent shall use commercially reasonable efforts to provide Purchaser with such information that is in each Seller's or Parent's possession and is reasonably requested by Purchaser to identify the jurisdictions in which Tax Returns are required to be filed, or Taxes are required to be paid, and the types of Tax Returns required to be filed, in each case with respect to the Business or the Assets.

10.8    Efforts and Actions to Cause Closing to Occur .

10.8.1    Prior to the Closing, upon the terms and subject to the conditions of this Agreement, the Parties shall use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done and cooperate with each other in order to do, all things necessary, proper or advisable (subject to any applicable Laws) to consummate the Transactions as promptly as practicable including the preparation and filing of all forms, registrations and notices required to be filed to consummate the Transactions and the taking of such actions as are necessary, proper or advisable to obtain any required approvals, authorizations, Consents, orders, Licenses, Permits, bonds related thereto, qualifications, exemptions, waivers, certificates, franchises and registrations by any third party or Governmental Authority. In addition, neither Party hereto shall take any action after the date hereof that could reasonably be expected to materially delay the obtaining of, or result in not obtaining, any permission or Consent from any Governmental Authority or other Person required to be obtained prior to Closing.

10.8.2    Prior to the Closing, each Party shall promptly notify the other, provide any necessary information with respect to, all filings made by such Party with any Governmental Authority in connection with this Agreement and the Transactions. Each Party hereto shall promptly provide the other Party with copies of any written communication received by such Party from any Governmental Authority regarding any of the Transactions. If either Party or an Affiliate thereof receives a request for additional information or documentary material from any such Governmental Authority with respect to any of the Transactions, then such Party shall endeavor in good faith to make, or cause to be made, as soon as reasonably practicable and after notification to the other Parties, an appropriate response in compliance with such request. To the extent that transfers, amendments or modifications of permits (including the Permits and bonds related thereto) are required as a result of the execution of this Agreement or consummation of any of the Transactions, Sellers and Parent shall use commercially reasonable efforts consistent with its obligations set forth in this Agreement to cooperate with Purchaser and provide commercially reasonable assistance as needed to effect such transfers, amendments or modifications.

10.8.3    Sellers and Parent shall use commercially reasonable efforts to obtain, at or prior to the Closing, an unconditional release of any Encumbrance, mortgage or lien other than the Permitted Encumbrances, on the Assets.

10.9    Notification of Certain Matters; Updating of Disclosure Schedules .

10.9.1    Prior to the Closing, Sellers and Parent shall give written notice to Purchaser promptly after becoming aware of (i) the occurrence or non-occurrence of any event whose occurrence or non-occurrence would cause either (a) any representation or warranty made by any Seller or Parent contained

43

in this Agreement (other than the Fundamental Reps) to be untrue or inaccurate in any material respect at any time from the date hereof to the Closing Date or after the Closing Date, (b) any Fundamental Rep made by any Seller or Parent to be untrue or inaccurate in any respect at any time from the date hereof to the Closing Date or after the Closing Date (c) any condition of Purchaser set forth in ARTICLE 6 to be incapable of being satisfied prior to the Closing Date, or (d) any condition set forth in ARTICLE 5 to be incapable of being satisfied prior to the Closing Date, and (ii) any failure of any Seller or Parent to comply with or satisfy any covenant or agreement in any material respect, or any condition to be complied with or satisfied by either of them hereunder.

10.9.2    On or immediately before the Closing Date, Seller and Parent may amend or supplement the Disclosure Schedules to reflect any matter that arises after the date hereof that, if existing or known on the date hereof, would have been required to be disclosed in such Disclosure Schedules; provided, however, that no such supplement or amendment shall have any effect on the satisfaction of Purchaser's condition to closing set forth in Section 6.1.6; provided, however, if the Closing shall occur, then Purchaser (and each other Purchaser Indemnified Party) shall be deemed to have waived any right or claim based upon a breach of a representation or warranty set forth in ARTICLE 8 pursuant to Section 11.2.1 (other than any claim based upon fraud or willful misconduct), with respect to any and all matters disclosed pursuant to any such supplement or amendment of the Disclosure Schedule made by Parent or Seller at or prior to the Closing to the extent that such disclosure complies with the terms of this Agreement.

10.9.3    Prior to the Closing, Purchaser shall give written notice to Sellers promptly after becoming aware of (i) the occurrence or non-occurrence of any event whose occurrence or non-occurrence would cause either (a) any representation or warranty made by Purchaser contained in this Agreement (other than Fundamental Reps) to be untrue or inaccurate in any material respect at any time from the date hereof to the Closing Date or after the Closing Date, (b) any Fundamental Rep made by Purchaser to be untrue or inaccurate in any respect at any time from the date hereof to the Closing Date or after the Closing Date (c) any condition of Sellers set forth in ARTICLE 7 to be incapable of being satisfied prior to the Closing Date, or (d) any condition set forth in ARTICLE 5 to be incapable of being satisfied prior to the Closing Date, and (ii) any failure of Purchaser to comply with or satisfy any covenant or agreement in any material respect, or any condition to be complied with or satisfied by it hereunder.

10.10    Permit Matters. As soon as possible following the Closing, but in no event more than five (5) Business Days after the Closing, Purchaser shall apply with the appropriate Governmental Authority for the transfer of the Permits and all bonds related thereto to Purchaser, including operator assignment filings, and provide copies of all filings therefor to Sellers. From and after the Closing, Purchaser shall diligently pursue the transfer of the Permits and all bonds related thereto to the Purchaser, and Purchaser shall be authorized to operate under the Permits and all bonds related thereto in accordance with applicable Laws and the terms and conditions contained in the Permit Operating Agreement. Sellers and Parent shall diligently provide any cooperation needed to bring about the transfer of the Permits and all bonds related thereto. Purchaser, at all times prior to the transfer of the Permits, and all bonds related thereto, to the Purchaser, shall: (i) comply with all applicable Laws governing, and all conditions and requirements of, or pertaining to, any such Permits and the bonds related thereto that the Purchaser operates under; and (ii) be solely responsible for all incidents of violation, non-compliance, and similar occurrences related to Purchaser's operations under the Permits and the bonds related thereto. Purchaser shall promptly deliver to Sellers written notice of any such incidents or occurrences, which Sellers shall have the right, but not the obligation, to cure (including right of entry onto the applicable Real Property). Each Seller shall have (and the Purchaser grants) all rights of entry onto the Real Property necessary, in each Seller's sole discretion, for such Seller to maintain the Permits prior to transfer. Purchaser shall indemnify Sellers from and against any and all Losses incurred or suffered by any Seller, including, without limitation, any and all demands, causes of actions, lawsuits, complaints and other claims resulting from or arising out of such use of the Permits by Purchaser.

10.11    Records of Business.

10.11.1    For a period of five (5) years after the Closing Date, Sellers and Parent shall maintain at the Parent's principal office originals or copies of all accounting and other files, records, documents and physical data relating to the Assets and the Business (collectively the "Business Records") that are not transferred as part of the Assets, including any schematics, books, manuals, technical information and engineering data and reports, core hole data, environmental assessments, programming information, computerized data, books of account, employment compensation and benefit records, customer lists and files (including customer data relating to sales of coal within the last two (2) years from the Business and current and former customers' credit records), quality records and reports, research records, cost information, pricing data, market surveys, mailing lists, purchase and sale records and correspondence, advertising records, other survey documents, business plans, test results, borings, product specifications, drawings, diagrams, training manuals, maps, reserve studies, personnel files, workers' compensation files, black lung claim files or other files related to the Business. For a period of five (5) years after the Closing Date, Purchaser shall have the right to inspect, review and copy the Business Records, except to the extent Sellers and Parent are prohibited from disclosing such records to Purchaser pursuant to applicable Law or Contract (other than an Assumed Contract).

10.11.2    For a period of five (5) years after the Closing Date, Purchaser shall maintain at Purchaser's principal office originals or copies of all accounting and other files, records, documents and physical data relating to the Assets and the Business (collectively the "Other Records") that are transferred to Purchaser as part of the Assets, including any personnel records of Continuing Employees. For a period of five (5) years after the Closing Date, Seller shall have the right to inspect, review and copy the Other Records for the purposes identified in Section 10.11.3, except to the extent Purchaser is prohibited from disclosing such records to Seller pursuant to applicable Law or Contract (other than an Assumed Contract).

10.11.3    Each of the Parties, as applicable, shall reasonably cooperate as to and to the extent reasonably requested by the other, in the conduct of any audit, litigation or other proceeding to the extent relevant to the Business, the Assets, the Excluded Assets, the Excluded Liabilities or the Continuing Employees.

10.12    Customer Interviews. After the signing of this Agreement and prior to the Closing, Sellers and Parent shall fully cooperate with Purchaser in its efforts to interview certain material customers of Sellers as specified by Purchaser and agreed to by such Seller (and such agreement not to be unreasonably withheld or delayed) including arranging meetings between Purchaser and all such customers. The Parties shall use commercially reasonable efforts to agree upon the timing of and a process by which any such key customer visits shall take place.

10.13    Release of Guarantees. Purchaser shall use commercially reasonable efforts to obtain the (i) releases of the guarantees of Parent and its Affiliates in relation to certain coal sales agreements and coal leases as set forth on Schedule 10.13 (the "Guarantees") and (ii) the consents to novate the Guarantees.

10.14    Sellers' Insurance Policies. Sellers shall be solely responsible for any additional premiums, including associated Taxes and fees that may be due for insurance policies listed in Schedule 8.12.1 following the Closing Date as a result of a premium audit by the insurer or its representatives. Purchaser acknowledges that any premium return, including associated Taxes and fees, as a result of such audits and/or return of pre-paid premium by insurers following termination of insurance for Business by Sellers applicable to the period on or after the Closing Date shall be retained by Sellers for their sole benefit.

10.15    Baisden-Vaughan Lease. With respect to the Baisden-Vaughan Lease, commencing promptly after the date hereof, the Parties shall fully cooperate with each other to obtain a resolution of the dispute with the lessor of the Baisden-Vaughan Lease that is mutually acceptable to the Parties prior to the Closing which, unless the Parties otherwise agree, will include, at a minimum, a consent by such lessor to the assignment of the Baisden-Vaughan Lease to Purchaser and an estoppel certificate from such lessor that there does not exist any defaults under the Baisden-Vaughan Lease and that such lease is still in full force and effect. In the event that the Parties are unable to get a resolution to the dispute with the lessor of

the Baisden-Vaughan Lease that is reasonably acceptable to all Parties, then the Parties shall negotiate in good faith to amend this Agreement to remove the Baisden-Vaughan Lease as an Asset (and make it an Excluded Asset) and make a corresponding adjustment to either the Purchase Price or the Target Base Working Capital.

## ARTICLE 11 INDEMNITIES

11.1    <u>Survival of Representations, Warranties, Covenants and Agreements</u>. All of the representations and warranties contained in this Agreement shall survive the Closing for a period of eighteen (18) months; provided, however, that the Fundamental Reps shall survive indefinitely and the representations and warranties set forth in Sections 8.6.5 (Environmental Matters), and 8.26 (Taxes) shall survive the Closing until ninety (90) days after the date on which the statute of limitations applicable to the matter covered by such representation or warranty expires; provided further, that if written notice of a claim has been given before the expiration of the applicable representations and warranties, then the relevant representations and warranties shall survive as to such claim, until such claim has been finally resolved. All covenants contained this Agreement shall survive the Closing.

11.2    <u>Indemnification by Sellers and Parent</u>. Following the Closing, Sellers and Parent shall jointly and severally indemnify and hold harmless the Purchaser, its Affiliates and their respective officers, directors, managers, employees, agents, direct and indirect equity owners successors and assigns (each a "<u>Purchaser Indemnified Party</u>" and collectively, the "<u>Purchaser Indemnified Parties</u>") from and against any and all Losses, whether or not the possibility of such Losses has been disclosed to any Seller or Parent in advance, or whether or not such Losses could have been reasonably foreseen by any Seller or Parent, arising out of or resulting from:

11.2.1    any inaccuracy in or breach of any representation or warranty of any Seller or Parent contained in this Agreement or in any certificate or instrument delivered by or on behalf of any Seller or Parent pursuant to this Agreement;

11.2.2    any breach of any covenant or agreement made by any Seller or Parent in this Agreement;

11.2.3    all Actions, litigation, arbitration, investigations or other proceedings, administrative or otherwise, now pending or later brought against Purchaser Indemnified Parties to the extent resulting from any condition existing, event occurring, or business conducted by any Seller or any Affiliates of any Seller on or before the Closing Date, including the Litigation;

11.2.4    the Excluded Assets;

11.2.5    the Excluded Liabilities;

11.2.6    (i) unfunded or underfunded pension Liabilities of any Seller, Parent or any of their respective Affiliates and all Liabilities under the pension plans and other Employee Benefit Plans of any Seller, Parent or any of their respective Affiliates, (ii) any severance benefits and termination Liabilities for employees of any Seller and (iii) any other Seller employee-related claims or Actions arising from acts, omissions, circumstances or conditions occurring on or before the Closing Date; and

11.2.7    any business of any Seller or any Affiliates of any Seller other than the Business.

11.3    <u>Indemnification by Purchaser</u>. Following the Closing, Purchaser shall indemnify and hold harmless Sellers and Parent, their respective Affiliates and their respective officers, directors, members, employees, agents, direct and indirect equity owners, successors and assigns (each a "<u>Seller Indemnified Party</u>" and collectively, the "<u>Seller Indemnified Parties</u>") from and against any and all Losses, whether or not

46

the possibility of such Losses has been disclosed to the Purchaser in advance, or whether or not such Losses could have been reasonably foreseen by the Purchaser, arising out of or resulting from:

11.3.1    any inaccuracy in or breach of any representation or warranty of Purchaser contained in this Agreement or in any certificate or instrument delivered by or on behalf of Purchaser pursuant to this Agreement;

11.3.2    any breach of any covenant or agreement made by Purchaser in this Agreement;

11.3.3    the Assumed Liabilities;

11.3.4    the Purchaser's ownership, use or operation of the Assets or the Business after the Closing Date; and

11.3.5    any and all claims made against each Seller's Permits or surety bonds prior to the time the same are transferred to Purchaser for activities (or lack thereof) of the Purchaser following the Closing Date, including any and all reclamation and end of mine obligations that are expressly included in the Assumed Liabilities.

11.4    Limitations on Indemnification. Notwithstanding anything to the contrary contained in this Agreement any indemnification claims shall be limited as follows (other than any indemnification claims or other Actions based upon (i) fraud or wilful misconduct, (ii) a breach of Section 8.26 (Taxes), or (iii) a breach of any Fundamental Reps, which, in each instance, shall not be subject to the limitations set forth in this Section 11.4):

11.4.1    The maximum aggregate amount of indemnifiable Losses arising out of or resulting from the causes enumerated in Section 11.2.1 that may be recovered from Sellers and/or Parent shall not exceed $17,500,000;

11.4.2    The maximum aggregate amount of indemnifiable Losses arising out of or resulting from the causes enumerated in Section 11.3.1 that may be recovered from Purchaser shall not exceed $17,500,000; and

11.4.3    No indemnification by Sellers and Parent with respect to any Loss otherwise payable under Section 11.2.1 and no indemnification by the Purchaser with respect to any Loss otherwise payable under Section 11.3.1, shall in either case be payable until such time as all such indemnifiable Losses shall aggregate to more than $875,000 (the "Basket"), after which time Sellers and Parent, or Purchaser (as the case may be) shall be liable in full for all indemnifiable Losses above $175,000.

Further, notwithstanding anything to the contrary herein, other than any claim based upon fraud or wilful misconduct, all Parties indemnification obligations herein shall not exceed under any circumstances an amount equal to fifty percent (50%) of the Purchase Price.

11.5    Indemnification Procedures.

11.5.1    The obligations and Liabilities of the Parties under this ARTICLE 11 with respect to Losses arising from claims of any third party which are subject to the indemnification provided for in this ARTICLE 11 ("Third Party Claims") shall be governed by the terms and conditions set forth in this Section 11.5. If any Purchaser Indemnified Party or Seller Indemnified Party (each, an "Indemnified Party"), as the case may be, shall receive written notice of any Third Party Claim, the Indemnified Party shall give Sellers and Parent or the Purchaser (each, the "Indemnifying Party"), as the case may be, notice of such Third Party Claim within 20 days after the receipt by the Indemnified Party of such notice; provided, however, that the failure to provide such notice shall not release the Indemnifying Party from any of its respective obligations under this ARTICLE 11 except to the extent that the Indemnifying Party is materially prejudiced by such

47

failure. The notice of claim shall describe in reasonable detail the facts known to the Indemnified Party giving rise to such indemnification claim, and the amount or good faith estimate of the amount arising therefrom.

11.5.2    The Indemnifying Party shall be entitled to assume and control the defense of such Third Party Claim at its expense and through counsel of its choice if it gives written notice of its intention to do so to the Indemnified Party within twenty-five (25) days of the receipt of such notice from the Indemnified Party and the Third Party Claim involves money damages and not an injunction or other equitable relief that could have an adverse effect on the Assets and the Indemnifying Party acknowledges in writing its Liability to the Indemnified Party under this ARTICLE 11 and agrees to indemnify the Indemnified Party in accordance with the terms of this ARTICLE 11; provided, however, in the event that Indemnified Party reasonably determines (i) there exists or is reasonably likely to exist a conflict of interest that would make it inappropriate in the judgment of the Indemnified Party in its reasonable discretion for the same counsel to represent both the Indemnified Party and the Indemnifying Party, (ii) the Third Party Claim seeks an injunction or equitable relief against any Indemnified Party or relates to or arises in connection with any criminal proceeding, or (iii) the Indemnified Party has reasonably determined that the Losses from the Third Party Claim are likely to exceed the limits of the remaining indemnification obligation of the Indemnifying Party under this Agreement, then, in each such instance, the Indemnified Party shall be entitled to assume control of the defense of the Third Party Claim at the expense of the Indemnifying Party. In the event that the Indemnifying Party exercises the right to undertake any such defense against any such Third Party Claim as provided above, the Indemnifying Party shall conduct the defense of the Third Party Claim actively and diligently and the Indemnified Party shall cooperate with the Indemnifying Party in such defense and make available to the Indemnifying Party, at the Indemnifying Party's expense, all witnesses, pertinent records, materials and information in the Indemnified Party's possession or under the Indemnified Party's control relating thereto as is reasonably required by the Indemnifying Party. Similarly, in the event the Indemnified Party is, directly or indirectly, conducting the defense against any such Third Party Claim, the Indemnifying Party shall cooperate with the Indemnified Party in such defense and make available to the Indemnified Party, at the Indemnifying Party's expense, all such witnesses, records, materials and information in the Indemnifying Party's possession or under the Indemnifying Party's control relating thereto as is reasonably required by the Indemnified Party. No such Third Party Claim may be settled by any Party conducting the defense against such claim without the prior written consent of the other Party, which consent shall not be unreasonably delayed or withheld; provided, however, that Parent shall have the right to settle any claim (other than claims for Taxes) for which it is the Indemnifying Party without the prior written consent of any other Party if such settlement provides for a complete and unconditional release of the Indemnified Party, does not include any admission of culpability and involves only the payment of money damages.

11.6    Calculation of Losses. The Parties shall make appropriate adjustments for Tax benefits and insurance coverage actually realized or received in determining Losses for purposes of this ARTICLE 11. All indemnification payments under this ARTICLE 11 shall be deemed adjustments to the Purchase Price.

11.7    Exclusive Remedy. Except as provided in Section 2.4 and Section 2.5 and any Actions for injunctive relief or specific performance as set forth in this Agreement, Actions for a breach of Sections 13.5 or Section 14.5 or any Actions based upon fraud or wilful misconduct, any Action (whether such claim sounds in tort, contract or otherwise and including statutory rights and remedies) based upon, relating to or arising out of this Agreement or the Transactions contemplated by this Agreement or otherwise in respect of the status, operations or ownership of the Assets and the Business on or prior to the Closing Date must be brought by the Parties in accordance with the provisions and applicable limitations of this ARTICLE 11, which shall constitute the sole and exclusive remedy of all Parties, their affiliates, successors and assigns for any such Actions.

11.8    Materiality Scrape. For purposes of this ARTICLE 11 the determination of an inaccuracy in or breach of any representation or warranty made by a Party in this Agreement shall be determined without regard to any materiality, Material Adverse Change or other similar qualification contained in or otherwise applicable to such representation and warranty.

48

11.9   No Duplication of Recovery. In no event shall any Purchaser Indemnified Party have any right to indemnification from Sellers or Parent for Losses relating to any matter to the extent such matter was reserved for and taken into account in finally determining the Final Closing Date Working Capital.

11.10   Escrow Fund. The Escrow Funds, to the extent available, will serve as the initial source of payment from Seller or Parent for indemnification claims by the Purchaser Indemnified Parties.

## ARTICLE 12 TERMINATION

12.1   This Agreement may be terminated or abandoned at any time prior to the Closing Date under any of the following conditions:

12.1.1   By the mutual written consent of the Parties.

12.1.2   By any Party if any Governmental Authority shall have issued an order, decree or ruling or taken any other action (which order, decree, ruling or other action the Parties hereto shall use their reasonable efforts to lift), which permanently restrains, enjoins or otherwise prohibits the acquisition by Purchaser of the Business and/or Assets and such order, decree, ruling or other action shall have become final and non-appealable.

12.1.3   By any Party if the Transactions contemplated hereby have not been consummated by January 31, 2015, provided that, no Party shall be entitled to terminate this Agreement pursuant to this Section 12.1.3 if the breach of this Agreement by such party (or in the case of termination by Sellers or Parent, a breach by any Seller or Parent) has prevented the consummation of the Transactions.

12.1.4   By Sellers or Parent if any Seller or Parent is not in material breach of its obligations under this Agreement, and if Purchaser shall have breached in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach cannot be or has not been cured within thirty (30) days after the giving of written notice by Sellers or Parent to Purchaser specifying such breach.

12.1.5   By Purchaser if Purchaser is not in material breach of any of its obligations under this Agreement, and if any Seller or Parent shall have breached in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement which breach cannot be or has not been cured within thirty (30) days after the giving of written notice by Purchaser to Sellers specifying such breach.

12.2   Effect of Termination.

12.2.1   In the event that this Agreement is terminated pursuant to Section 12.1, all further obligations of the Parties under this Agreement shall terminate without further Liability of either Party to the other; provided, that the obligations of the Parties under this Section 12.2 and ARTICLE 14 shall survive any such termination.

12.2.2   The termination of this Agreement shall not limit or otherwise prejudice any rights or claims that any Party may have, and any Party may pursue all legal remedies to which such Party may be entitled at law or in equity (including specific performance) under this Agreement or otherwise in addition to the remedies set forth above.

49

**ARTICLE 13 OTHER AGREEMENTS**

13.1   Insurance and Disability Claims .

13.1.1   Sellers and their Affiliates and their respective Employee Benefit Plans shall be responsible for medical, dental and vision care services, including the payment of claims incurred on or prior to the Closing Date but not yet reported, rendered to Continuing Employees and eligible dependents on or before the Closing Date, and for life insurance Liabilities incurred with respect to Continuing Employees and eligible dependents on or before the Closing Date. Sellers and Parent shall cause their respective Employee Benefit Plans to provide COBRA continuation, medical, dental and vision coverage on and after the Closing Date to employees of any Seller and their eligible dependents who timely elect COBRA continuation coverage. All disability and accident indemnity events with respect to any employee of any Seller which occurred on or prior to the Closing Date will be the sole responsibility of Sellers, their Affiliates and their respective Employee Benefit Plans.

13.2   Workers' Compensation.

13.2.1   Notwithstanding any other provision in this Agreement, but subject to Section 13.2.2 below, (i) all Liabilities and obligations of any Seller pursuant to workers' compensation Laws and regulations of West Virginia or any other applicable state and arising out of any occupational injury or exposure occurring on or before the Closing Date, shall be and remain the Liabilities and obligations of Sellers, and (ii) any such Liabilities and obligations of Purchaser arising out of any occupational injury or exposure occurring after the Closing Date shall be the Liabilities and obligations of Purchaser.

13.2.2   With respect to workers' compensation claims, from and after the Closing Date, (i) Sellers shall remain solely responsible for all workers' compensation claims of any Continuing Employee to the extent that they relate to an accident that occurred or injury that was identifiably sustained on or prior to the Closing Date, regardless of whether such claims are filed by such Continuing Employee before or after the Closing Date and (ii) Purchaser shall assume and become solely responsible for all other workers' compensation claims of any Continuing Employees (including (a) injuries identifiably sustained by Continuing Employee after the Closing Date that are aggravations or re-injuries of injuries or illnesses that were sustained on or before the Closing Date and (b) treatment after the Closing Date required by Continuing Employee following complete recovery from injuries sustained on or before the Closing Date).

13.2.3   In the event a claim is made against Purchaser with respect to which Purchaser believes is Sellers' responsibility pursuant to the provisions of this Section 13.2, Purchaser shall promptly give written notice thereof to Sellers as soon as the claim is filed but in no event later than twenty (20) days after the claim is filed, so that Sellers will have the opportunity to process and, if appropriate, defend the claim.

13.3   Employees.

13.3.1   No later than two (2) Business Days after signing this Agreement, Sellers shall provide any notice required under the WARN Act to all employees of each Seller.

13.3.2   On or as soon as practicable after the Closing Date (but in no case to exceed five (5) Business Days), subject to Purchaser's standard hiring procedures, Purchaser shall make offers of on-going employment to no less than 80% of the Active Employees of Sellers as of the Closing Date. Any employee offered employment by Purchaser will be required to meet Purchaser's employment requirements.

13.3.3   Sellers shall terminate all of their employees employed in connection with the Business effective as of the Closing Date. Sellers shall be solely responsible for severance pay and other Liabilities arising out of such employment with any Seller and termination of such employment and for all

50

accrued compensation, vacation pay, sick pay and other benefits with respect to such employees whether or not such employees become employees of Purchaser on or after the Closing Date.

13.3.4    Nothing in this Agreement shall be deemed to affect or limit in any way the normal management prerogatives of Purchaser after the Closing Date with respect to the Continuing Employees or create or grant to any Active Employees any third party beneficiary rights or claims of any kind or nature.

13.4    Black Lung Benefits.

13.4.1    Sellers agree to reimburse Purchaser for all Liability imposed on Purchaser for claims of disability due to pneumoconiosis pursuant to the Black Lung Benefits Act, as amended (30 USC § 901, et seq.), the workers' compensation Laws of West Virginia and applicable regulations thereunder or any other Law or regulation with respect to the above, with respect to any Continuing Employee that is not employed by Purchaser for the duration of the statutory period set forth under the Black Lung Benefits Act required for Purchaser to become a responsible operator with respect to such Continuing Employee. In the event a claim is made against Purchaser with respect to which Purchaser believes the provisions of this Section 13.4.1 apply, Purchaser shall promptly give written notice thereof to Sellers.

13.5    Non-Solicitation.

13.5.1    Continuing Employees. In order to protect the legitimate business interests of Purchaser, each Seller and Parent hereby covenants and agrees that, from the Closing Date through the second anniversary of the Closing Date, each Seller and Parent shall not, and each shall cause its respective Affiliates to not, directly or indirectly, request or induce any Continuing Employee to terminate his or her employment with Purchaser or any Affiliates of any Purchaser or hire or employ, without the express written consent of Purchaser, any Continuing Employee.

13.5.2    Remedies. Each Seller and Parent acknowledges and agrees that a breach of the covenants, promises, agreements and obligations set forth in this Section 13.5 would result in material and irreparable injury to Purchaser and its Affiliates for which there is no adequate remedy at law and that it would not be possible to measure damages for such injury precisely. In the event of such a breach or threat thereof, Purchaser shall have the right to seek, in addition to money damages, a temporary restraining order, preliminary injunction or permanent injunction restraining Sellers, Parent and their respective Affiliates from engaging in the activities prohibited by this Section 13.5, or any other relief as may be appropriate in law or equity or required for specific enforcement of the covenants set forth in this Section 13.5. Accordingly, for any breach by any Seller or Parent of the terms, covenants and conditions of this Section 13.5, each Seller and Parent hereby consents to a restraining order and/or an injunction without the posting of bond, in addition to any other legal or equitable rights or remedies Purchaser may have. If any Seller or Parent violates any covenant in this Section 13.5, such covenant shall be automatically extended for a period of time equal to the period of such violation.

13.5.3    Survival. Each Seller acknowledges that these covenants constitute independent covenants that shall survive the Closing and shall not be affected by performance or nonperformance of any other provision of this or any other agreement.

**ARTICLE 14 GENERAL PROVISIONS**

14.1    Notices. All notices, requests, demands, claims, and other communications hereunder shall be in writing and shall be deemed duly given (i) three (3) business days after it is sent by registered or certified mail, return receipt requested, postage prepaid, and addressed to the intended recipient as set forth below, (ii) on the date sent if delivered by e-mail if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient, or (iii) one (1) business day after it is sent for next day delivery by a nationally recognized overnight courier and addressed to the intended recipient as set forth below:

A004415

If to Parent or Seller to:

c/o Cliffs Natural Resources Inc.
200 Public Square, Suite 3300
Cleveland, OH 44114
Attn: James D. Graham, Chief Legal Officer
Phone: (216) 694-5504; Fax: (216) 694-5389
Email: james.graham@cliffsnr.com

Copy to:

Hahn, Loeser & Parks, LLP
200 Public Square, Suite 2800
Cleveland, OH 44114
Attn: Robert Ross
Phone: (216) 274-2430; Fax: (216) 274-2559
Email: rross@hahnlaw.com

If to Purchaser to:

Coronado Coal II, LLC
57 Danbury Road, Suite 201
Wilton, Connecticut 06897
Attention: Gerry Spindler
Facsimile No.: (203) 761-4953
Email: gspindler@coronadocoal.com

Copy to:

Dinsmore & Shohl LLP
215 Don Knotts Blvd., Suite 310
Morgantown, WV 26501
Attn: F. Thomas Rubenstein
Phone: (304) 296-1100; Fax: (304) 296-6116
Email: thomas.rubenstein@dinsmore.com

Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

14.2   Entire Agreement. This Agreement (including the Escrow Agreement and the other documents referred to herein) constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or between the Parties, written or oral, to the extent they are related in any way to the subject matter hereof.

14.3   Amendments and Waivers. No amendment or waiver of any provision of this Agreement shall be valid unless the same shall be in writing and signed by all of the Parties and making specific reference to this Agreement. No waiver by any Party of any inaccuracy in or breach of any representation or warranty hereunder, or of any breach of any covenant hereunder shall be deemed to extend to any prior or subsequent inaccuracy in or breach of any representation or warranty hereunder, or of any breach of any covenant hereunder, or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

14.4   Expenses. Except as otherwise specifically provided herein, each Party to this Agreement shall pay its own expenses (including, without limitation, the fees and expenses of their respective agents,

52

representatives, counsel and accountants) incidental to the preparation and carrying out of this Agreement and the consummation of the Transactions .

14.5    <u>Confidentiality</u>.

14.5.1    Any non-public information furnished by or on behalf of Sellers or Parent or their respective Affiliates to Purchaser, its attorneys, accountants, or other representatives in connection with the Transactions shall be treated as confidential information including any information related to any business operations other than the Business of any of the Affiliates of Seller or Parent shall, at all times, be treated as confidential information (such information, the "<u>Cliffs Confidential Information</u>") and Purchaser shall not disclose the Cliffs Confidential Information for a period of five (5) years; provided, however, that the Cliffs Confidential Information shall not include: (i) information now generally known or readily available to the public or which becomes so known or readily available without the fault of Purchaser or any of its representatives or (ii) information that is independently developed by Purchaser or its Affiliates without reference to or use of the Cliffs Confidential Information. Purchaser further agree to use its commercially reasonable efforts to safeguard such Cliffs Confidential Information and to protect it against disclosure in accordance herewith. In the event Purchaser and/or any of its Affiliates is required by applicable Law to disclose any Cliffs Confidential Information, Purchaser shall promptly notify Seller in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and Purchaser shall cooperate with Seller to preserve the confidentiality of such information consistent with applicable Law at Seller's cost or expense. In the event that the Transactions are not consummated for whatever reason, Purchaser agrees to return to Sellers all written information furnished by Sellers to Purchaser or its attorneys, accountants, or other representatives with respect to the Transactions. Nothing in this Agreement shall alter or modify any of the terms or conditions of any existing confidentiality agreement between the Parties.

14.5.2    Sellers and Parent agree for a period of five (5) years following the Closing (or, with respect to trade secrets, such longer period of time as the trade secret continues) not to disclose or use at any time (and shall cause each of its representatives not to use or disclose at any time) any confidential or proprietary information concerning the Business except to each Seller's representatives in connection with any post-Closing matters hereunder or related to the acquisition by Purchaser of the Assets or any other matters as to which any Seller has retained obligations or Liabilities hereunder, to any taxing authority in connection with Tax matters or otherwise as required by applicable Law (the "<u>Business Confidential Information</u>"); *provided*, however, that Business Confidential Information shall not include: (i) information now generally known or readily available to the public or which becomes so known or readily available without the fault of any Seller or any of its respective representatives or (ii) information that is independently developed by any Seller or its Affiliates without reference to or use of the Business Confidential Information. Each Seller and Parent further agree to use its commercially reasonable efforts to safeguard such Business Confidential Information and to protect it against disclosure in accordance herewith. In the event any Seller, Parent and/or any of their respective Affiliates is required by applicable Law to disclose any Business Confidential Information, Sellers and Parent shall promptly notify Purchaser in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and Sellers and Parent shall cooperate with Purchaser to preserve the confidentiality of such information consistent with applicable Law at Purchaser's cost or expense.

14.6    <u>No Third Party Beneficiaries</u>. This Agreement shall not confer any rights, claim, cause of action, remedy or right of any kind upon any Person other than the Parties and their respective successors and permitted assigns; provided, however, that the provisions in ARTICLE 11 above concerning indemnification are intended for the benefit of the Persons entitled to indemnity thereunder.

14.7    <u>Governing Law; Jurisdiction</u>. This Agreement shall be governed by, and construed in accordance with the Laws of the State of West Virginia without giving effect to any choice or conflict of law provision or rule (whether the State of West Virginia or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of West Virginia. The Parties irrevocably agree with any proceeding arising out of or in connection with this Agreement that may be brought in any state or federal

53

court located in the Southern District of West Virginia and each Party agrees not to assert, by way of motion, defence, or otherwise, in any such proceeding, any claim that it is not subject personally to the jurisdiction of such court that the proceeding is brought in an inconvenient forum, that the venue of the proceeding is improper, or that this Agreement or the subject matter hereof may not be enforced in or by such court, and hereby agrees not to challenge such jurisdiction or venue by reason of any offsets or counterclaims in any such proceeding.

14.8    Section and Other Headings. The section and other headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

14.9    Succession and Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective permitted successors and assigns. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Parties; provided, that Purchaser may assign as collateral any and/or all of its rights under this Agreement by way of security to any banks, holders of debt securities or financial institutions lending money, providing credit or otherwise providing financing to Purchaser or any of its affiliates, including without limitation, in connection with any and all subsequent refinancings; provided further, that no such transfer or assignment shall relieve Purchaser of its obligations hereunder or alter or change any obligation of any other Party hereto.

14.10    Public Disclosures. At all times at or before the Closing, the Parties will not issue or make any reports, statements or releases to the public with respect to this Agreement or the Transactions without the consent of the other, which consent will not be unreasonably withheld, except to the extent that such disclosure is determined in good faith by the disclosing Party to be required by Law or required in order to complete the Transactions; provided that any such required disclosure will only be made, to the extent consistent with Law or to the extent necessary to complete the Transactions, after consultation with the other Parties.

14.11    Risk of Loss.    The risk of Loss or damage or destruction to any of the Assets to be transferred to Purchaser hereunder from fire or other casualty or cause, shall be borne by Sellers at all times prior to the Closing.

14.12    Waiver of Jury Trial. EACH PARTY, KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY, WAIVES ITS RIGHT TO TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY CONTEMPLATED TRANSACTION, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE.

14.13    Remedies Cumulative. The rights and remedies of the Parties are cumulative and not alternative.

14.14    Cooperation. The Parties hereto agree to cooperate with each other in the preparation and prompt and timely filing and/or expeditious prosecution of all necessary applications, briefs, pleadings, documents and supporting data and the taking of all such action and the giving of all such notices as may be required or requested or as may be appropriate in an effort to expedite any governmental or regulatory approval of the transfer of the Assets to Purchaser. Unless otherwise provided herein to the contrary, the Parties shall each bear their own legal fees and other costs and expenses with respect to the filing and prosecution of all such actions.

14.15    Counterparts; Execution. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original for all purposes at Law and in equity, and all of which together shall constitute one and the same document. The execution by any and every Party hereto of a facsimile copy (or counterpart) of this Agreement or a copy (or counterpart) transmitted by facsimile, e-mail or other means of electronic transmission shall likewise be permitted and authorized, and this Agreement shall be

deemed fully executed for all purposes at law or in equity upon the execution hereof of a copy (or counterpart) of this Agreement (whether facsimile, e-mail or otherwise) by every Party hereto.

14.16    Specific Performance. The Parties hereto agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof in the state and federal courts in the Southern District of West Virginia, in addition to any other remedy to which they are entitled at law or in equity.

14.17    Severability. If any provision of this Agreement is or becomes or is deemed invalid, illegal or unenforceable in any jurisdiction, such provision shall be deemed amended to conform to applicable Laws so as to be valid and enforceable or, if it cannot be amended without materially altering the intention of the Parties, it shall be stricken and the remainder of this Agreement shall remain in full force and effect.

14.18    Effective Time. For all purposes of this Agreement and the Transactions, the effective time of the Closing and the consummation of the Transactions shall be 11:59 p.m. Eastern time on the Closing Date.

14.19    Incorporation of Exhibits and Schedules . The Exhibits and Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

14.20    Administration of Accounts. All payments and reimbursements by any third party after the Closing Date in the name of or to any Seller or any Affiliate of any Seller to which Purchaser is entitled in accordance with the provisions of this Agreement and the Transactions contemplated hereby shall be held by Sellers and Parent for the benefit of Purchaser and, within five (5) business days of receipt by any Seller or any Affiliate of any Seller of any such payment or reimbursement, Sellers and Parent shall pay over to Purchaser the amount of such payment or reimbursement without right of set off. All payments and reimbursements by any third party after the Closing Date in the name of or to Purchaser to which any Seller is entitled in accordance with the provisions of this Agreement and the Transactions contemplated hereby shall be held by Purchaser for the benefit of such Seller and, within five (5) business days of receipt by Purchaser of any such payment or reimbursement, Purchaser shall pay over to such Seller the amount of such payment or reimbursement without right of set off.

14.21    Exclusivity. Until such time, if any, as this Agreement is terminated pursuant to ARTICLE 12, Sellers and Parent shall not, and shall cause each of their respective Affiliates to not, directly or indirectly, solicit, initiate, or encourage any inquiries or proposals from, discuss or negotiate with, provide any non-public information to, or consider the merits of any unsolicited inquiries or proposals from, any Person (other than Purchaser) relating to any transaction involving the sale of the Assets, or any of the equity securities of Cliffs West Virginia Coal, Inc., a Delaware corporation ("CWVC") or any Seller, or any merger, consolidation, business combination, or similar transaction involving CWVC or any Seller.

*[Signature Page to Follow]*

55

**IN WITNESS WHEREOF**, the undersigned have executed or caused this Agreement to be executed by their respective officers thereunto duly authorized, each with the intent to be legally bound, as of the date first written above.

SELLERS:

TONEY'S FORK LAND, LLC

By:      /s/ David L. Webb
Name:    David L. Webb
Title:   President

CLIFFS LOGAN COUNTY COAL, LLC

By:      /s/ David L. Webb
Name:    David L. Webb
Title:   President

CLIFFS LOGAN COUNTY COAL
TERMINALS, LLC

By:      /s/ David L. Webb
Name:    David L. Webb
Title:   President

SOUTHERN EAGLE LAND, LLC

By:      /s/ David L. Webb
Name:    David L. Webb
Title:   President

PARENT:
CLIFFS NATURAL RESOURCES INC.

By:      /s/ P. Kelly Tompkins
Name:    P. Kelly Tompkins
Title:   EVP – Business Development

PURCHASER:
CORONADO COAL II LLC

By:      /s/ Garold. R. Spindler
Name:    Garold R. Spindler
Title:   Authorized Representative

**EXHIBIT LIST**

Exhibit A    -    Limited Guarantee

Exhibit B    -    Miscellaneous Contracts

Exhibit C    -    Permit Operating Agreement

Exhibit D    -    Bill of Sale and Assignment and Assumption Agreement

1

EXHIBIT 2.2

## AMENDMENT TO ASSET PURCHASE AGREEMENT

This Amendment (the "Amendment") to the Asset Purchase Agreement is made effective as of December 31, 2014, by and among **CLIFFS NATURAL RESOURCES INC.**, an Ohio corporation ("Parent"), **CLIFFS LOGAN COUNTY COAL, LLC**, a Delaware limited liability company (" CLCC"), **TONEY'S FORK LAND, LLC**, a Delaware limited liability company (" TFL"), **SOUTHERN EAGLE LAND, LLC**, a Delaware limited liability company (" SEL"), **CLIFFS LOGAN COUNTY COAL TERMINALS, LLC**, a Delaware limited liability company (" CLCCT" and together with CLCC, TFL and SEL collectively the " Sellers" and individually a "Seller"), and **CORONADO COAL II,** LLC, a Delaware limited liability company (" Purchaser"). Parent, Sellers and Purchaser are sometimes collectively referred to herein as the "Parties."

A.        The Parties entered into an Asset Purchase Agreement, dated as of December 2, 2014 (the "Purchase Agreement"), pursuant to which Purchaser shall buy from Sellers, and Sellers shall sell, assign, transfer, convey and deliver to Purchaser (or its designee), free and clear of any Encumbrances other than Permitted Encumbrances, all of each Seller's right, title and interest in, to and under the Assets in accordance with the terms of the Purchase Agreement, for the Purchase Price, subject to the adjustments as set forth in the Purchase Agreement. Capitalized terms used but not defined herein will have the meaning given them in the Purchase Agreement.

B.        Subsequent to the date of the Purchase Agreement, Parent and Sellers provided notice to Purchaser, as further identified in    Schedule 8.6.6 of the Amended and Restated Disclosure Schedules to the Purchase Agreement, that, on December 12, 2014, Parent and Sellers became aware that the main Hitachi shovel (the "Shovel") used at the Toney Fork Surface Mine to strip overburden suffered damage to certain of the Shovel's interior structural components.

C.        As a result of the damage to the Shovel, the Parties have agreed to amend the terms of Section 2.4.1 of the Purchase Agreement to reduce, by $1,000,000, the Base Purchase Price so as to compensate, in full, Purchaser for any lost net revenue resulting from the Shovel being inoperative as of the Closing ($650,000) and to compensate Purchaser for a portion of the costs of repair of the Shovel ($350,000) as well as to add a new Section 13.6 to reflect the Parties agreement as to Parent's and Sellers' obligations regarding the payment for repairs to the Shovel and acquisition of the replacement loader after the Closing.

NOW THEREFORE, in accordance with the terms of Section 14.3 of the Purchase Agreement and in consideration of the foregoing and the mutual promises contained herein and intending to be legally bound hereby, the Parties agree as follows:

1.        The first sentence of Section 2.4.1 of the Purchase Agreement hereby is amended to revise the definition of "  Base Purchase Price" from "One Hundred Seventy Five Million Dollars ($175,000,000.00)" to "One Hundred Seventy Four Million Dollars ($174,000,000.00)".

2.      A new Section 13.6 will be added to **Article 13 [Other Agreements]** to read in its entirely as follows:

"13.6    Repair of Shovel; Rental of Loader.

13.6.1    As disclosed in Schedule 8.6.6, Parent and Sellers have made Purchaser aware that the main Hitachi shovel (the " Shovel") used at the Toney Fork Surface Mine to strip overburden suffered damage to certain of the Shovel's interior structural components. The Parties are in the process of engaging outside contractors to repair the Shovel to its functional operating condition prior to suffering such damage.

13.6.2    Parent and Sellers agree to pay directly all the costs and expense necessary (including, without limitation, any such costs and expense attributable to Purchaser's employees, vendors or subcontractors associated directly with such repairs, which Purchaser shall invoice Parent and Sellers monthly with adequate detail) for the repair of the Shovel; provided, however, that such payment shall be limited to the extent and the amount necessary to put the interior structural components of the car body of the Shovel in the same or substantially similar structural and operating working condition as it was immediately prior to the occurrence of the damage which caused the failure (the "Shovel Repair Costs"); provided, further, that the Parties acknowledge and agree that the initial $350,000 of Shovel Repair Costs are being prepaid by Parent and Sellers (as part of the reduction of the Base Purchase Price as provided in the Amendment to the Purchase Agreement). To the extent that Purchaser reasonably believes that the Shovel Repair Costs will exceed $350,000, Purchaser will use commercially reasonable efforts to provide Parent and Sellers advance notice of such additional repair work. To the extent that Purchaser elects to make repairs unrelated to the foregoing or to make other enhancements to the Shovel, the costs and expenses of any such repairs or enhancements shall be the sole responsibility of Purchaser.

13.6.3    Parent and Sellers agree to pay or reimburse Purchaser up to (and in no event in excess of) $107,000 for the rental of the replacement 992 K loader ("Loader Replacement Costs"). Purchaser shall invoice Parent for all actual rental expenses which Purchaser incurs in connection with the Loader Replacement Costs on a monthly basis. Each such invoice shall be accompanied by a statement reasonably itemized, including the names of and containing copies of invoices from any third party with respect to any invoiced Loader Replacement Costs. Any Loader Replacement Costs in excess of such $107,000 amount shall be the sole responsibility of Purchaser.

13.6.4    The Parties agree that the adjustment to the Base Purchase Price provided for in the Amendment and the payments made by Parent and Sellers for the Shovel Repair Costs and Loader Replacement Costs in Sections 13.6.2 and 13.6.3 constitute the sole and exclusive remedy of Purchaser and its affiliates, successors and assigns for any matters relating to the Shovel, the Shovel Repair Costs or the Loader Replacement Costs and, as such, Purchaser hereby waives any and all claims relating to the condition of the Shovel as of the Closing Date."

3.     A new Section 13.7 will be added to **Article 13 [Other Agreements]** to read in its entirely as follows:

"13.7   <u>Parent Board Ratification</u>.

13.7.1   Within thirty (30) business days after the Closing, Parent agrees to deliver to Purchaser a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Parent certifying that attached thereto is a true and complete copy of the resolutions adopted by the board of directors of Parent ratifying the board's authorization of the Transactions."

4.     A new Section 13.8 will be added to **Article 13 [Other Agreements]** to read in its entirely as follows:

"13.8.1   <u>Kinder Morgan Arrangement</u>.

13.8.2   Reference is made to that certain Terminal Services Agreement, dated as of November 30, 2012, as amended by the First Amendment, dated March 31, 2014 (the "<u>KM Contract</u>"), among Cliffs North American Coal LLC, Cliffs Logan County Coal LLC and Kinder Morgan Operating L.P. "C" ("<u>Kinder Morgan</u>"). The Parties acknowledge and agree that, as of the Closing Date, in accordance with Section 2.9.1 above, the KM Contract will be deemed an Unassigned Asset since, as of the Closing Date, the Parties, despite their collective best efforts, have been unable to obtain the formal written consent of Kinder Morgan to the assignment of the KM Contract to Purchaser.

13.8.2   In accordance with the terms of Section 2.9.2, the Parties now desire to undertake an arrangement pursuant to which the benefits of the KM Contract will be provided to Purchaser. To that extent, from and after the Closing, the Parties will continue to use their best efforts to obtain the consent of Kinder Morgan to the assignment of the KM Contract to Purchaser. Notwithstanding anything to the contrary herein or the Transition Services Agreement, Sellers and Parent shall provide at no cost to Purchaser all such commercial services necessary to facilitate the management of the throughput tonnage that is contemplated pursuant to this Section 13.8 and the KM Contract until such time as the KM Contract is assigned to Purchaser or terminated.

13.8.3   In the interim, unless and until such consent is secured on a basis reasonably acceptable to all of the Parties, pursuant to Section 5A(ii) of the KM Contract, subsequent to the Closing, CLCC will grant to Purchaser status as, and Purchaser will be deemed to be, a third party allowed to utilize CLCC's "terminal capacity and storage on the Storage Pad" (the "Coal Delivery Right") such that volumes delivered by Purchaser or its designee and subsequently loaded onto a Vessel (as defined in the KM Contract) shall be deemed to be a delivery by CLCC and will count toward the Guaranteed Annual Tonnage (as defined in the KM Contract). To that extent, the Parties agree to work under such arrangement in accordance with the terms of Sections 2.9.2 and 2.9.3 of the Agreement.

13.8.4   Purchaser shall have the right to subcontract or assign (in whole or in part) its Coal Delivery Right. To the extent that Purchaser subcontracts or assigns its Coal Delivery Right any such volumes that are delivered by such subcontractor or assignee to the terminal and are subsequently loaded onto a Vessel shall be deemed to be a delivery by CLCC and will count toward the Guaranteed Annual Tonnage. In the event that Purchaser notifies CLCC that Purchaser intends to subcontract or assign, in whole or in part, its Coal Delivery Right, CLCC shall either (a) use best efforts to obtain the necessary consent from Kinder Morgan so that such subcontractor or assignee may deliver its coal to the terminal and such tonnage be counted toward the Guaranteed Annual Tonnage once it is subsequently loaded onto a Vessel; or (b) at the request of Purchaser or if CLCC fails to obtain Kinder Morgan's consent

as set forth in clause (a), grant to such subcontractor or assignee the status as, and such subcontractor or assignee will be deemed to be, a third party allowed to utilize CLCC's "terminal capacity and storage on the Storage Pad" such that volumes delivered by such subcontractor or assignee and subsequently loaded onto a Vessel shall be deemed to be a delivery by CLCC and will count toward the Guaranteed Annual Tonnage. Notwithstanding anything to the contrary herein, any payments that a subcontractor or assignee of Purchaser's Coal Delivery Right makes that is related to its use of Purchaser's Coal Delivery Right shall be paid to, and be the property of, Purchaser and CLCC shall have no right to any such payments. In the event that Purchaser obtains a subcontractor or assignee to its Coal Delivery Right that is willing to deliver coal to the terminal and Kinder Morgan refuses to allow such assignor or subcontractor to deliver its coal to the terminal, then any such amounts that such subcontractor or assignee was ready to deliver to the terminal will be credited against Purchaser's obligation with respect to the Guaranteed Annual Tonnage and CLCC shall have the responsibility to pay Kinder Morgan for the portion of the Shortfall Payment (as that term is defined in the KM Contract) that would equal the tonnage that such subcontractor or assignee was ready to deliver or had delivered to the terminal.

13.8.5    Subject to and to the extent of the provisions of Section 13.8 above, Purchaser acknowledges and agrees that to the extent that the Guaranteed Annual Tonnage is not met in any Contract Year (any Shortfall Payment is due) as a result of Purchaser's inability to delivery sufficient tonnage to be loaded onto a Vessel, Purchaser shall be responsible for payment of such Shortfall."

5.        All other terms and conditions of the Purchase Agreement shall remain in full force and effect.

[*Signature Pages Immediately Follows*]

IN WITNESS WHEREOF, each of the Parties has caused this Amendment to be executed as of the date first written above.

SELLERS:

TONEY'S FORK LAND, LLC

By:      /s/ David L. Webb
Name:    David L. Webb
Title:   President

CLIFFS LOGAN COUNTY COAL, LLC

By:      /s/ David L. Webb
Name:    David L. Webb
Title:   President

CLIFFS    LOGAN    COUNTY    COAL
TERMINALS, LLC

By:      /s/ David L. Webb
Name:    David L. Webb
Title:   President

SOUTHERN EAGLE LAND, LLC

By:      /s/ David L. Webb
Name:    David L. Webb
Title:   President

PARENT:
CLIFFS NATURAL RESOURCES INC.

By:      /s/ P. Kelly Tompkins
Name:    P. Kelly Tompkins
Title:   Executive VP Business Development

PURCHASER:
CORONADO COAL II LLC

By:      /s/ Garold. R. Spindler
Name:    Garold R. Spindler
Title:   Authorized Representative

[Signature Page to the Amendment to Asset Purchase Agreement]

A004426

EXHIBIT 10.15

### THIRD AMENDMENT TO TRUST AGREEMENT NO. 1

This Third Amendment to Trust Agreement No. 1 is entered into effective as of July 28, 2014 by and between Cliffs Natural Resources Inc., f/k/a Cleveland-Cliffs Inc., an Ohio corporation (the "Company"), and KeyBank, N.A., the successor in interest to Key Trust Company of Ohio, N.A., a national banking association, as Trustee (the "Trustee"). Capitalized terms not defined herein shall have the meanings assigned to such terms in Trust Agreement No. 1.

### WITNESSETH

WHEREAS, on June 12, 1997 the Company and the Trustee amended and restated Trust Agreement No. 1, effective June 1, 1997;

WHEREAS, Section 12 of Trust Agreement No. 1 provides that such Trust Agreement may be amended by the Company and the Trustee; and

WHEREAS, Section 9(c) of Trust Agreement No. 1 provides that Exhibit A thereto may be amended by the Company by furnishing to the Trustee an amendment thereto.

NOW, THEREFORE, the Company and the Trustee hereby amend Trust Agreement No. 1 to provide as follows:

1.  The first WHEREAS clause is amended to read as follows:

    WHEREAS, Cliffs Natural Resources Inc., f/k/a Cleveland-Cliffs Inc. entered into an agreement, as shown on Exhibit A, with each of the executives (the "Executives") listed (from time to time as provided in Section 9(c) hereof) on Exhibit A hereto (the agreements are referred to herein singularly as an "Agreement" and collectively as the "Agreements");

2.  Exhibit A is amended in its entirety to read as attached hereto.

IN WITNESS WHEREOF, the Company and the Trustee have caused counterparts of this Third Amendment to be executed on this 28th day of July, 2014, each of which shall be an original Amendment.

CLIFFS NATURAL RESOURCES INC.

By:     /s/ James D. Graham
        _____
        Vice President, Chief Legal Officer &
        Secretary
Title:

KEYBANK, N.A., as Trustee

By:     /s/ Lester W. Dryja
        _____
Title:  Vice President

Effective July 28, 2014

**TRUST AGREEMENT NO. 1**

The following Executives have entered into Change in Control Severance Agreements:

| Name | Job Title | Beneficiary |
|---|---|---|
| Halverson, Gary B | President & Chief Executive Officer | Halverson, Frances |
| Boor, William C | Executive Vice President, Corp Development & Chief Strategy Officer, Chief Risk Officer | Boor, Angela A. |
| Fedor, Terry G | Executive Vice President, United States Iron Ore | Fedor, Sheryl Elaine |
| Harapiak, Maurice D | Executive Vice President, Human Resources | |
| Paradie, Terrance M | Executive Vice President & Chief Financial Officer | Paradie, Christine E. |
| Smith, Clifford T | Executive Vice President, Seaborne Iron Ore | Smith, Marianne B. |
| Tompkins, P Kelly | Executive Vice President, External Affairs & President, Global Commercial | Tompkins, Cathy Elaine |
| Webb, David | Executive Vice President, Global Coal | Webb, Brenda J. |
| Mee, Terrence R | Vice President, Global Iron Ore Sales | Mee, Elizabeth |
| Baisden, Steven R | Vice President, Corporate Development & Emerging Business | Baisden, Meredith A. |
| Bittner, Matthew C | Vice President & Treasurer | Bittner, Katharine Williams |
| Cartella, David T | Vice President, Government, Environmental, Safety & Sustainability | Cartella, Kimberly Ann |
| Flanagan, Timothy K | Vice President, Corporate Controller & CAO | Flanagan, Kathleen R. |
| Graham, James D | Vice President & Chief Legal Officer | |
| McFadden, William J | Vice President, Global Coal Sales | McFadden, William |
| Whiteford, Sean M | Vice President, Technical Operations | Whiteford, Lauren Kathleen |
| LaTendresse, Edward | General Manager | LaTendresse, Gayle M. |

**EXHIBIT 10.18**

<u>THIRD AMENDMENT TO AMENDED AND RESTATED TRUST AGREEMENT NO. 2</u>

This Third Amendment to Amended and Restated Trust Agreement No. 2 (as amended and restated October 15, 2002) (the "Agreement") is entered into effective as of July 28, 2014 by and between Cliffs Natural Resources Inc., f/k/a Cleveland-Cliffs Inc., an Ohio corporation (the "Company"), and KeyBank, N.A., the successor in interest to Key Trust Company of Ohio, N.A., a national banking association, as Trustee (the "Trustee"). Capitalized terms not defined herein shall have the meanings assigned to such terms in the Agreement.

WITNESSETH

WHEREAS, effective October 15, 2002 the Company and the Trustee amended and restated Trust Agreement No. 2; and

WHEREAS, Section 9(c) of the Agreement provides that Exhibit A and Exhibit D thereto may be amended by the Company by furnishing to the Trustee any amendments thereto.

NOW, THEREFORE, the Company and the Trustee hereby amend Trust Agreement No. 2 to provide as follows:

1.  Exhibit A is amended in its entirety to read as attached hereto.

2.  Exhibit D is amended in its entirety to read as attached hereto.

IN WITNESS WHEREOF, the Company and the Trustee have caused counterparts of this Third Amendment to be executed on this 28th day of July, 2014, each of which shall be an original Amendment.

CLIFFS NATURAL RESOURCES INC.

By:     /s/ James D. Graham
        Vice President, Chief Legal Officer &
Title:  Secretary

KEYBANK, N.A., as Trustee

By:     /s/ Lester W. Dryja
Title:  Vice President

EXHIBIT A

## AMENDED AND RESTATED TRUST AGREEMENT NO. 2

## EXECUTIVES, OFFICERS AND KEY EMPLOYEES

| Name | First Name | Middle Initial | Last Name | Job Title |
|---|---|---|---|---|
| Halverson, Gary B | Gary | B | Halverson | President & Chief Executive Officer |
| Boor, William C | William | C | Boor | Executive Vice President, Corporate Development & Chief Strategy Officer, Chief Risk Officer |
| Fedor, Terry G | Terry | G | Fedor | Executive Vice President, United States Iron Ore |
| Harapiak, Marurice D | Maurice | D | Harapiak | Executive Vice President, Human Resources |
| Paradie, Terrance M | Terrance | M | Paradie | Executive Vice President & Chief Financial Officer |
| Smith, Clifford T | Clifford | T | Smith | Executive Vice President, Seaborne Iron Ore |
| Tompkins, P Kelly | P | Kelly | Tompkins | Executive Vice President, External Affairs & President, Global Commercial |
| Webb, David | David | | Webb | Executive Vice President, Global Coal |
| Baisden, Steven R | Steven | R | Baisden | Vice President, Corporate Development & Emerging Business |
| Bittner, Matthew C | Matthew | C | Bittner | Vice President & Treasurer |
| Cartella, David T | David | T | Cartella | Vice President, Government, Environmental, Safety & Sustainability |
| Flanagan, Timothy K | Timothy | K | Flanagan | Vice President, Corporate Controller & CAO |
| Graham, James D | James | D | Graham | Vice President & Chief Legal Counsel |
| McFadden, William J | William | J | McFadden | Vice President, Global Coal Sales |
| Mee, Terrence R. | Terrence | R | Mee | Vice President, Global Iron Ore Sales |
| Whiteford, Sean M | Sean | M | Whiteford | Vice President, Technical Operations |
| LaTendresse, Edward M | Edward | M | LaTendresse | General Manager |

**EXHIBIT D**

## AMENDED AND RESTATED TRUST AGREEMENT NO. 2

### DIRECTORS

Gary B. Halverson
Susan M. Cunningham
Barry J. Eldridge
Mark E. Gaumond
Andrés R. Gluski
Susan M. Green
Janice K. Henry
James F. Kirsch
Stephen Johnson
Richard K. Riederer
Timothy W. Sullivan

John S. Brinzo
Ronald C. Cambre
Robert S. Colman
Ranko Cucuz
James D. Ireland III
G. Frank Joklik
E. Bradley Jones
Leslie Lazar Kanuk
Anthony A. Massaro
Francis R. McAllister
M. Thomas Moore
John C. Morley
Stephen B. Oresman
Roger Phillips
Alan Schwartz
Jeptha H. Wade
Alton W. Whitehouse

**EXHIBIT 10.26**

<u>SEVENTH AMENDMENT TO TRUST AGREEMENT NO. 5</u>

This Seventh Amendment to Trust Agreement No. 5 is entered into effective as of July 28, 2014 by and between Cliffs Natural Resources Inc., f/k/a Cleveland-Cliffs Inc., an Ohio corporation (the "Company"), and KeyBank, N.A., the successor in interest to Key Trust Company of Ohio, N.A., a national banking association, as Trustee (the "Trustee"). Capitalized terms not defined herein shall have the meanings assigned to such terms in Trust Agreement No. 5.

WITNESSETH

WHEREAS, on October 28, 1997 the Company and a predecessor in interest to the Trustee entered into Trust Agreement No. 5; and

WHEREAS, Section 9(c) of Trust Agreement No. 5 provides that Exhibit A thereto may be amended by the Company by furnishing to the Trustee an amendment thereto.

NOW, THEREFORE, the Company and the Trustee hereby amend Trust Agreement No. 5 to provide as follows:

1.   Exhibit A is amended in its entirety to read as attached hereto.

IN WITNESS WHEREOF, the Company and the Trustee have caused counterparts of this Seventh Amendment to be executed on this 28th day of July, 2014, each of which shall be an original Amendment.

CLIFFS NATURAL RESOURCES INC.

By:      /s/ James D. Graham
          Vice President, Chief Legal Officer &
Title:    Secretary

KEYBANK, N.A., as Trustee

By:      /s/ Lester W. Dryja
Title:    Vice President

A004432

**EXHIBIT A**

Effective July 28, 2014

**TRUST AGREEMENT NO. 5**

| PLAN 26042: 2012 NON-QUALIFIED DEFERRED COMPENSATION PLAN | Plan 29043: 2005 VOLUNTARY NON-QUALIFIED DEFERRED COMPENSATION PLAN | Plan 29043: 2000 VOLUNTARY NON-QUALIFIED DEFERRED COMPENSATION PLAN |
|---|---|---|
| | **CASH** | |
| ADERHOLD ,RONALD K | ADERHOLD, RONALD K | MARIANI , RONALD |
| CARTELLA ,DAVID T | BAISDEN, STEVEN R | MLINAR , MICHAEL P |
| BOOR ,WILLIAM C | BLAKE ,DAVID B | |
| BARTOLOMUCCI ,JAMES M | BOOR ,WILLIAM C | |
| HUNSINGER-GORENC ,STEPHANE S | BRAKE ,WILLIAM A | |
| MCLAUGHLIN ,MICHAEL P | BRLAS ,LAURIE | |
| TOMPKINS ,PAUL K | LATENDRESSE ,EDWARD M | |
| GILMAN ,JOYCE S | MEE ,TERRENCE R | |
| MCFADDEN ,WILLIAM J | MICHAUD ,JAMES R | |
| NELSON ,MARK D | MLINAR ,MICHAEL P | |
| CHEVERINE ,CAROLYN E | PARADIE ,TERRANCE M | |
| THORNTON ,WILLIAM M | SCHAEDIG ,TIMOTHY H | |
| BAISDEN ,STEVEN R | SIMMONS ,KENNETH D | |
| SIMMONS ,KENNETH D | SMITH ,CLIFFORD T | |
| KIRSCH ,JAMES F | TOMPKINS ,PAUL K | |
| PETRIK ,JASON S | TUOMI ,JOHN N | |
| GRAHAM ,JAMES D | VETOR ,DUKE D | |
| MEE ,TERRENCE R | | |
| TISH ,JOHN G | **SHARES** | |
| CEBULA ,ROBERT C | BARTOLOMUCCI ,JAMES M | |
| FLANAGAN ,TIMOTHY K | BLAKE ,DAVID B | |
| PARADIE ,TERRANCE M | BOOR ,WILLIAM C | |
| FEDOR ,TERRY G | BRAKE ,WILLIAM A | |
| MILLBURG ,LAWRENCE J | BRLAS ,LAURIE | |
| WEBB ,DAVID | CHEVERINE ,CAROLYN E | |
| MICHAUD ,JAMES R | LATENDRESSE ,EDWARD M | |
| CARLSON ,PAUL A | MARIANI ,RONALD | |
| BITTNER ,MATTHEW C | MEE ,TERRENCE R | |
| CROSWELL ,JACK T | MICHAUD ,JAMES R | |
| DORR ,NEIL E | MLINAR ,MICHAEL P | |
| KOCHEVAR ,JAMES M | MORRIS ,MICHAEL J | |
| MORRIS ,MICHAEL J | PARADIE ,TERRANCE M | |
| HOLSTEN ,KENNETH C | SMITH ,CLIFFORD T | |

| **PLAN 26042: 2012 NON-QUALIFIED DEFERRED COMPENSATION PLAN** | **Plan 29043: 2005 VOLUNTARY NON-QUALIFIED DEFERRED COMPENSATION PLAN** | **Plan 29043: 2000 VOLUNTARY NON-QUALIFIED DEFERRED COMPENSATION PLAN** |
|---|---|---|
| | **SHARES (cont.)** | |
| PAVLICH ,KENNETH P | SMITH ,GLENN W | |
| SMITH ,CLIFFORD T | TOMPKINS ,PAUL K | |
| VETOR ,DUKE D | TUOMI ,JOHN N | |
| SILVA ,JAMES P | VETOR ,DUKE D | |
| WHITEFORD ,SEAN M | | |

EXHIBIT 10.34

SEVENTH AMENDMENT TO TRUST AGREEMENT NO. 7

This Seventh Amendment to Trust Agreement No. 7 is entered into effective as of July 28, 2014 by and between Cliffs Natural Resources Inc., f/k/a Cleveland-Cliffs Inc., an Ohio corporation (the "Company"), and KeyBank, N.A., the successor in interest to Key Trust Company of Ohio, N.A., a national banking association, as Trustee (the "Trustee"). Capitalized terms not defined herein shall have the meanings assigned to such terms in Trust Agreement No. 7.

**WITNESSETH**

WHEREAS, on April 9, 1991 the Company and the Trustee entered into Trust Agreement No. 7;

WHEREAS, Section 12 of Trust Agreement No. 7 provides that such Trust Agreement may be amended by the Company and the Trustee; and

WHEREAS, Section 9(c) of Trust Agreement No. 7 provides that Exhibit A thereto may be amended by the Company by furnishing to the Trustee an amendment thereto.

NOW, THEREFORE, the Company and the Trustee hereby amend Trust Agreement No. 7 to provide as follows:

1.   Exhibit A is amended in its entirety to read as attached hereto.

2.   Exhibit B is amended in its entirety to read as attached hereto.

IN WITNESS WHEREOF, the Company and the Trustee have caused counterparts of this Seventh Amendment to be executed on this 28th day of July, 2014, each of which shall be an original Amendment.

CLIFFS NATURAL RESOURCES INC.

By:   /s/ James D. Graham
      Vice President, Chief Legal Officer &
      Secretary
Title:

KEYBANK, N.A., as Trustee

By:   /s/ Lester W. Dryja
Title:   Vice President

**EXHIBIT A**

Effective July 28, 2014

**TRUST AGREEMENT NO. 7**

All Senior Corporate Officers and other full-time salaried employees who have a Management Performance Incentive Plan Pay Band E or above, including:

Baisden, Steven
Bittner, Matthew
Boor, William
Cartella, David
Cebula, Robert
Dorr, Neil
Fedor, Terry
Flanagan, Timothy
Forrester, Traci
Graham, James
Halverson, Gary
Harapiak, Maurice
Kochevar, James
LaTendresse, Edward
Mallett, Marc
McFadden, William
McLaughlin, Michael
Mee, Terrence
Millburg, Lawrence
Miller, William
Nelson, Mark
Paradie, Terrance
Petrik, Jason
Phelps, Richard
Romani, Santi
Smith, Clifford
Tompkins, Paul
Webb, David
Whiteford, Sean

Aderhold, Ronald
Bartolomucci, James
Fink, Richard
Graber, Ronald
Holsten, Kenneth
Hunsinger-Gorenc, Stephanie
Michaud, James
Mlinar, Michael
Morris, Michael
Silva, James
Tretheway, Dolores
Tuomi, John
Vetor, Duke

**EXHIBIT B**

CLIFFS NATURAL RESOURCES INC.
SUPPLEMENTAL RETIREMENT BENEFIT PLAN

(as Amended and Restated Effective December 1, 2006)

TABLE OF CONTENTS

Page

1.    Definitions                                                                                          1
2.    Determination of the Supplemental Pension Plan Benefit                                                3

3.    Payment of the Remaining Supplemental Pension Plan Benefit                                            4
4.    General                                                                                              4
5.    Adoption of Supplemental Retirement Benefit Plan                                                     6
6.    Miscellaneous                                                                                        6
7.    Amendment and Termination                                                                            8
8.    Effective Date                                                                                       9

CLIFFS NATURAL RESOURCES INC.
SUPPLEMENTAL RETIREMENT BENEFIT PLAN
(as Amended and Restated Effective December 1, 2006)

WHEREAS, Cliffs Natural Resources Inc ("Cliffs") and its subsidiary corporations and affiliates have established, or may hereafter establish, one or more qualified retirement plans;

WHEREAS, the qualified retirement plans, pursuant to Sections 401(a) and 415 of the Internal Revenue Code of 1986, as amended, place certain limitations on the amount of contributions that would otherwise be made thereunder for certain participants;

WHEREAS, Cliffs now desires to provide for the contributions which would otherwise have been made for such participants under certain of its qualified retirement plans except for such limitations, in consideration of services performed and to be performed by each such participant for Cliffs and its subsidiaries and affiliates; and

WHEREAS, Cliffs has entered into, and Cliffs and its subsidiary corporations and affiliates may in the future enter into, agreements with certain executives providing for additional service credit and/or other features for purposes of computing retirement benefits, in consideration of services performed and to be performed by such executives for Cliffs and its subsidiaries and affiliates.

NOW, THEREFORE, Cliffs hereby amends and restates and publishes the Supplemental Retirement Benefit Plan heretofore established by it, which shall contain the following terms and conditions:

Definitions    . 1) The following words and phrases when used in this Plan with initial capital letters shall have the following respective meanings, unless the context clearly indicates otherwise. The masculine whenever used in this Plan shall include the feminine.

"Affiliate" shall mean any partnership or joint venture of which any member of the Controlled Group is a partner or venturer and which shall adopt this Plan pursuant to paragraph 5.

"Beneficiary" shall mean such person or persons (natural or otherwise) as may be designated by the Participant as his Beneficiary under this Plan. Such a designation may be made, and may be revoked or changed (without the consent of any previously designated Beneficiary), only by an instrument (in form acceptable to Cliffs) signed by the Participant and may be revoked or changed (without the consent of any previously designated Beneficiary), only by an instrument (in form acceptable to Cliffs) signed by the Participant and filed with Cliffs prior to the Participant's death. In the absence of such a designation and at any other time when there is no existing Beneficiary designated by the Participant to whom payment is to be made pursuant to his designation, his Beneficiary shall be his beneficiary under the Pension Plan. A person designated by a Participant as his Beneficiary who or which ceases to exist shall not be entitled to any part of any payment thereafter to be made to the Participant's Beneficiary unless the Participant's designation specifically provided to the contrary. If two or more persons designated as a Participant's Beneficiary are in existence, the amount of any payment to the Beneficiary under this Plan shall be divided equally among such persons unless the Participant's designation specifically provided to the contrary.

"Code" shall mean the Internal Revenue Code of 1986, as it has been and may be amended from time to time.

"Code Limitations" shall mean the limitations imposed by Sections 401(a) and 415 of the Code, or any successor thereto, on the amount of the benefits which may be payable to a Participant from the Pension Plan.

"Controlled Group" shall mean Cliffs and any corporation in an unbroken chain of corporations beginning with Cliffs, if each of the corporations other than the last corporation in the chain owns or controls, directly or indirectly, stock possessing not less than fifty percent of the total combined voting power of all classes of stock in one of the other corporations.

"Employer(s)" shall mean Cliffs and any other member of the Controlled Group and any Affiliate which shall adopt this Plan pursuant to paragraph 5.

"Participant" shall mean each person (i) who is a participant in the Pension Plan on or after December 1, 2006, (ii) who is a senior corporate officer of Cliffs or a full-time salaried employee of an Employer who has a Management Performance Incentive Plan Pay Band E or above, and (iii) who as a result of participation in this Plan is entitled to a Supplemental Benefit under this Plan. Each person who is as a Participant under this Plan shall be notified in writing of such fact by his Employer, which shall also cause a copy of the Plan to be delivered to such person.

"Pension Plan" shall mean, with respect to any Participant, the defined benefit plan specified on Exhibit A hereto in which he participates.

"Supplemental Agreement" shall mean, with respect to any Participant, an agreement between the Participant and an Employer, and approved by Cliffs if it is not the Employer, which provides for additional service credit and/or other features for purposes of computing retirement benefits.

"Supplemental Benefit" or "Supplemental Pension Plan Benefit" shall mean a retirement benefit determined as provided in paragraph 2.

"Supplemental Retirement Benefit Plan" or "Plan" shall mean this Plan, as the same may hereafter be amended or restated from time to time.

"Termination of Employment" shall mean the "separation from service" for purposes of Section 409A of the Code of any Participant or former Participant from his Employer, generally including the severance of such employee's employment relationship with his Employer for any reason, voluntarily or involuntarily, and with or without cause, including without limitation, quit, discharge, retirement, disability, death, failure to return to active employment at the end of a leave of absence (including military leave, sick leave, or other bona fide leave of absence) or permanent decrease in service to his Employer to a level that is no more than twenty percent (20%) of its prior level, as described below. For this purpose, whether a separation from service has occurred is determined based on whether it is reasonably anticipated that no further services will be performed by such employee after a certain date or that the level of bona fide services the employee will perform after such date (whether as an employee or as an independent contractor) would permanently decrease to no more than twenty percent (20%) of the average level of bona fide services performed (whether as an employee or an independent contractor) over the immediately preceding thirty-six (36) month period (or the full period of services if the employee has been providing services for less than thirty-six (36) months). For purposes of this definition, the term "Employer" shall mean the Employer of the Participant and any other entity that is treated as a single employer with such Employer under Section 414(b) and (c) of the Code, provided that in such Code Sections "50%" shall be used wherever "80%" appears. The preceding rule shall only apply during the periods any such corporation, business organization or member would be so considered under Section 414(b) or 414(c) of the Code. The transfer of an employee from the Employer for whom he provides services to any entity that is an Employer within the meaning of the preceding two sentences (or vice versa) shall not constitute a Termination of Employment for purposes of this Plan.

Determination of the Supplemental Pension Plan Benefit    .    Each Participant or Beneficiary of a deceased Participant whose benefits under the Pension Plan payable or accrued on or after January 1, 1995 are reduced (a) due to the Code Limitations, or (b) due to deferrals of compensation by such Participant under the 2005 Cliffs Natural Resources Inc. Voluntary Non-Qualified Deferred Compensation Plan (the "Deferred Compensation Plan"), and each Participant who has entered into a Supplemental Agreement with his Employer (and, where applicable a Beneficiary of a deceased Participant), shall be entitled to a Supplemental Pension Plan Benefit if he should have a Termination of Employment at a time when he is vested in his benefit under the Pension Plan. The amount of the Supplemental Pension Plan Benefit at any time shall be a monthly retirement benefit equal to the difference between:

(i) the amount of the monthly benefit payable or accrued to the Participant or his Beneficiary under the Pension Plan, determined under the Pension Plan as in effect at such time, but calculated without regard to any reduction in the Participant's compensation pursuant to the Deferred Compensation Plan, and as if the Pension Plan did not contain a provision (including any phase-in or extended wear away provision) implementing the Code Limitations, and after giving effect to the provisions of any Supplemental Agreement, and

(ii) the sum of (X) the amount of the monthly benefit in fact payable or accrued to the Participant or his Beneficiary under the Pension Plan and (Y) the sum of the Supplemental Pension Plan Benefits previously paid out to the Participant.

Payment of the Supplemental Pension Plan Benefit    .

A Participant's (or his Beneficiary's) vested Supplemental Pension Plan Benefit (calculated as provided in paragraph 2) shall be converted, six (6) months after Termination of Employment into a lump sum of equivalent actuarial value. The equivalent actuarial value shall be determined by the actuary selected by Cliffs based on the "Applicable Mortality Table" used from time to time under Section 417(e) of the Code and other factors then in effect for purposes of the Pension Plan.

A Participant's vested Supplemental Pension Plan Benefit shall be distributed to the Participant the first day of the month following six (6) months after Termination of Employment in the form of a lump sum payment. Plan Participants as of December 1, 2006 may elect prior to December 31, 2006 to receive payment of vested Plan benefits in ten (10) annual installments commencing the first day of the month following six (6) months after Termination of Employment by completing a Benefit Payment Election Form. A person who becomes a Participant of the Plan on or after December 1, 2006 has the right to elect payment of his or her vested Supplemental Pension Plan Benefit in ten (10) annual installments commencing the first day of the month following six (6) months after Termination of Employment by completing a Benefit Payment Election Form within thirty (30) days from the day in which the person became eligible to participate in the Plan. The ten (10) annual installments shall be actuarially equivalent to the lump sum payment using the same actuarial assumptions as used in subparagraph A of this paragraph and shall be considered to be a single form of payment.

Notwithstanding subparagraph B of this paragraph, a Participant may elect after the timeframes set forth above to change the form of payment in effect with respect to the Participant's Supplemental Pension Plan Benefit, provided that such new election is made no later than six (6) months prior to his Termination of Employment, may not take effect for twelve (12) months after the election is made and shall result in the deferral of Supplemental Pension Plan Benefit payments for five (5) years from the previously applicable time or commencement date of payment.

A Beneficiary of a Participant shall receive the vested Supplemental Pension Plan Benefit provided in paragraph 2 if the Participant dies prior to his or her Termination of Employment but after he is vested in his accrued benefit under the Pension Plan. Such vested benefit shall be paid in a single lump sum within 60 days following the date of death. If the Participant dies after his or her

Termination of Employment, the Beneficiary shall receive any remaining vested Supplemental Pension Plan Benefit not paid to the Participant at the time of death, which shall be paid within 60 days of death.

General    .

(1) The entire cost of this Supplemental Retirement Benefit Plan shall be paid from the general assets of one or more of the Employers. It is the intent of the Employers to so pay benefits under the Plan as they become due; provided, however, that Cliffs may, in its sole discretion, establish or cause to be established a trust account for any or each Participant pursuant to an agreement, or agreements, with a bank and direct that some or all of a Participant's benefits under the Plan be paid from the general assets of his Employer which are transferred to the custody of such bank to be held by it in such trust account as property of the Employer subject to the claims of the Employer's creditors until such time as benefit payments pursuant to the Plan are made from such assets in accordance with such agreement; and until any such payment is made, neither the Plan nor any Participant or Beneficiary shall have any preferred claim on, or any beneficial ownership interest in, such assets. No liability for the payment of benefits under the Plan shall be imposed upon any officer, director, employee, or stockholder of Cliffs or other Employer. Not

Notwithstanding the provisions of paragraph 4.A.(1), upon the earlier to occur of (a) a Change in Control of Cliffs (for purposes of the Plan the term "Change in Control" shall have the meaning set forth in the Deferred Compensation Plan or any successor thereto) or (b) a declaration by the Board of Directors of Cliffs (the "Board") that a Change in Control is imminent, Cliffs shall promptly, to the extent it has not previously done so, and in any event within five (5) business days, transfer to KeyTrust Company of Ohio, N.A., as trustee ("Trustee") of Trust Agreement No. 7 ("Trust Agreement No. 7") dated April 9, 1991, as amended, between the Trustee and Cliffs, a sum equal to (aa) the present value on the date of the Change in Control (or on such fifth (5th) business day if the Board has declared a Change in Control to be imminent) of the payments to be made to the Participants under this Plan, such present value to be computed using the assumptions and factors used in the Plan, less (bb) the (balance in the Participant's account provided for in Section 7(b) of Trust Agreement No. 7) as of the most recent completed valuation thereof, as certified by the Trustee under Trust Agreement No. 7; provided, however, that if the Trustee does not so certify by the end of the fourth (4th) business day after the earlier of such Change in Control or declaration, then the balance of such account shall be deemed to be zero. Any payments of benefits by the Trustee pursuant to Trust Agreement No. 7 shall, to the extent thereof, satisfy Cliffs' obligation to pay benefits hereunder, it being the intent of Cliffs that assets in such Trust be held, subject to the claims of Cliffs' creditors, to assist Cliffs in meeting its obligation to pay benefits under this Plan. Notwithstanding the foregoing, no transfer of assets to Trust Agreement No. 7 or any other such trust or funding vehicle shall be made if such transfer would violate the terms of Section 409A(b)(2) or (b)(3) of the Code.

No right or interest of a Participant or his Beneficiary under this Supplemental Retirement Benefit Plan shall be anticipated, assigned (either at law or in equity) or alienated by the Participant or his Beneficiary, nor shall any such right or interest be subject to attachment, garnishment, levy, execution or other legal or equitable process or in any manner be liable for or subject to the debts of any Participant or Beneficiary. If any Participant or Beneficiary shall attempt to or shall alienate, sell, transfer, assign, pledge or otherwise encumber his benefits under the Plan or any part thereof, or if by reason of his bankruptcy or other event happening at any time such benefits would devolve upon anyone else or would not be enjoyed by him, then Cliffs may terminate his interest in any such benefit and hold or apply it to or for his benefit or the benefit of his spouse, children or other person or persons in fact dependent upon him, or any of them, in the manner and at the time it otherwise would have been paid under the Plan.

Employment rights shall not be enlarged or affected hereby. The Employers shall continue to have the right to discharge or retire a Participant, with or without cause.

Notwithstanding any other provisions of this Plan to the contrary, if Cliffs determines that any Participant may not qualify as a "management or highly compensated employee" within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or regulations thereunder, Cliffs may determine, in its sole discretion, that such Participant shall cease to be eligible to accrue further benefits under this Plan. The Participant's then accrued Supplemental Benefit shall be held under the Plan to be paid in accordance with Section 3 hereof.

Adoption of Supplemental Retirement Benefit Plan    . Any member of the Controlled Group or any Affiliate which is an employer under the Pension Plan may become an Employer hereunder with the written consent of Cliffs if such member or such Affiliate executes an instrument evidencing its adoption of the Supplemental Retirement Benefit Plan and files a copy thereof with Cliffs. Such instrument of adoption may be subject to such terms and conditions as Cliffs requires or approves.

Miscellaneous    . A. The Plan shall be administered by the plan administrator (the "Administrator"). The Administrator shall have the sole and absolute discretion to interpret the provisions of the Plan (including, without limitation, by supplying omissions from, correcting deficiencies in, or resolving inconsistencies or ambiguities in, the language of the Plan), to make factual findings with respect to any issue arising under the Plan, to determine the rights and status under the Plan of Participants and other persons, to decide disputes arising under the Plan and to make any determinations and findings (including factual findings) with respect to the benefits payable thereunder and the persons entitled thereto as may be required for the purposes of the Plan. In furtherance thereof, but without limiting the foregoing, the Administrator is hereby granted the following specific authorities, which it shall discharge in its sole and absolute discretion in accordance with the terms of the Plan (as interpreted, to the extent necessary, by the Administrator):

(i)    To resolve all questions (including factual questions) arising under the provisions of the Plan as to any individual's entitlement to become a Participant;

(ii)    to determine the amount of benefits, if any, payable to any person under the Plan (including to the extent necessary, making factual findings with respect thereto); and

(iii)    to conduct the review procedures specified in paragraph 6.D.

All decisions of the Administrator as to the facts of any case, and the application thereof to any case, as to the interpretation of any provision of the Plan or its application to any case, and as to any other interpretative matter or other determination or question under the Plan shall be final and binding on all parties affected thereby. The Administrator may, from time to time, employ agents and delegate to them such administrative duties as it sees fit, and may from time to time consult with legal counsel who may be counsel to Cliffs. All elections, notices and directions under the Plan by a Participant shall be made on such forms as the Administrator shall prescribe.

B.    Cliffs shall be the "Administrator" and the "Plan Sponsor" under the Plan for purposes of ERISA.

C.    Except to the extent federal law controls, all questions pertaining to the construction, validity and effect of the provisions hereof shall be determined in accordance with the laws of the State of Ohio.

D.    Whenever there is denied, whether in whole or in part, a claim for benefits under the Plan filed by any person (herein referred to as the "Claimant"), the Administrator shall transmit a written notice of such decision to the Claimant, which notice shall be written in a manner calculated to be understood by the Claimant and shall contain a statement of the specific reasons for the denial of the claim and a statement advising the Claimant that, within 60 days of the date on which he receives

such notice, he may obtain review of such decision in accordance with the procedures hereinafter set forth. Within such 60-day period, the Claimant or his authorized representative may request that the claim denial be reviewed by filing with the Administrator a written request therefor, which request shall contain the following information:

(i)   the date on which the Claimant's request was filed with the Administrator; provided, however, that the date on which the Claimant's request for review was in fact filed with the Administrator shall control in the event that the date of the actual filing is later than the date stated by the Claimant pursuant to this paragraph;

(ii)   the specific portions of the denial of his claim which the Claimant requests the Administrator to review;

(iii)   a statement by the Claimant setting forth the basis upon which he believes the Administrator should reverse the previous denial of his claim for benefits and accept his claim as made; and

(iv)   any written material (offered as exhibits) which the Claimant desires the Administrator to examine in its consideration of his position as stated pursuant to clause (iii) above.

Within 60 days of the date determined pursuant to clause (i) above, the Administrator shall conduct a full and fair review of the decision denying the Claimant's claim for benefits, and shall render a written decision with respect to the claim, written in a manner calculated to be understood by the Claimant, specifying the reasons for its decision and the Plan provisions upon which its decision was based.

E.   Supplemental Pension Plan Benefits shall be subject to applicable withholding and such other deductions as shall at the time of payment be required or appropriate under any Federal, State or Local law.

Amendment and Termination   . 1) Cliffs has reserved and does hereby reserve the right to amend, at any time, any or all of the provisions of the Supplemental Retirement Benefit Plan for all Employers, without the consent of any other Employer or any Participant, Beneficiary or any other person. Any such amendment shall be expressed in an instrument executed by Cliffs and shall become effective as of the date designated in such instrument or, if no such date is specified, on the date of its execution.

B.   Cliffs, on behalf of itself and of each Employer, in its sole discretion, may terminate this Plan at any time and for any reason whatsoever. In the event Cliffs elects to terminate the Plan as provided in this Section, no distribution of Supplemental Pension Plan Benefits or payment of benefits shall occur as a result, except as otherwise provided in an amendment to this Plan, including without limitation an amendment to the Plan for the liquidation and termination of the Plan where:

(i)   the termination and liquidation does not occur proximate to a downturn in the financial health of the Company and Affiliates;

(ii)   the Plan and all arrangements required to be aggregated with the Plan under Section 409A of the Code are terminated and liquidated;

(iii)   no payments, other than those that would be payable under the terms of the Plan and the aggregated arrangements if the termination and liquidation had not occurred, are made within twelve (12) months of the date the Company takes all necessary action to irrevocably terminate and liquidate the Plan;

(iv)    all payments are made within twenty-four (24) months of the date the Company takes all necessary action to irrevocably terminate and liquidate the Plan; and

(v)    the Company or Subsidiaries do not adopt a new arrangement that would be aggregated with any terminated arrangement under Section 409A of the Code, at any time within three (3) years following the date of the date the Company takes all necessary action to irrevocably terminate and liquidate the Plan.

C.    Notwithstanding the foregoing provisions hereof, no amendment or termination of the Supplemental Retirement Benefit Plan shall, without the consent of the Participant, adversely affect the accrued benefit under the Plan of such Participant.

D.    Any other Employer which shall have adopted the Plan may, with the written consent of Cliffs, elect separately to withdraw from the Plan and, subject to subparagraph B above, such withdrawal shall constitute a termination of the Plan as to it, but it shall continue to be an Employer for the purposes hereof as to Participants and Beneficiaries to whom it owes obligations hereunder. Any such withdrawal and termination shall be expressed in an instrument executed by the terminating Employer and shall become effective as of the date designated in such instrument, or if no date is specified, on the date of its execution.

Effective Date   . The amended and restated Supplemental Retirement Benefit Plan shall be effective as of December 1, 2006.

IN WITNESS WHEREOF, Cliffs Natural Resources Inc. pursuant to the order of its Board of Directors, has executed this amended and restated Supplemental Retirement Benefit Plan at Cleveland, Ohio, as of the 31 day of December, 2008.

CLIFFS NATURAL RESOURCES INC.

By:    /s/ W.A. Brake
Title:    EVP Human & Tech. Resources

Exhibit A

Pension Plans

Pension Plan for Salaried Employees of the Cleveland-Cliffs Inc and its Associated Employers

Ore Mining Companies Pension Plan

**EXHIBIT 10.39**

<u>FOURTH AMENDMENT TO TRUST AGREEMENT NO. 8</u>

This Fourth Amendment to Trust Agreement No. 8 is entered into effective as of July 28, 2014 by and between Cliffs Natural Resources Inc., f/k/a Cleveland-Cliffs Inc., an Ohio corporation (the "Company"), and KeyBank, N.A., the successor in interest to Key Trust Company of Ohio, N.A., a national banking association, as Trustee (the "Trustee"). Capitalized terms not defined herein shall have the meanings assigned to such terms in Trust Agreement No. 8.

WITNESSETH

WHEREAS, on April 9, 1991 the Company and the Trustee entered into Trust Agreement No. 8;

WHEREAS, Section 12 of Trust Agreement No. 8 provides that such Trust Agreement may be amended by the Company and the Trustee; and

WHEREAS, Section 9(c) of Trust Agreement No. 8 provides that Exhibit A thereto may be amended by the Company by providing to the Trustee an amendment thereto.

NOW, THEREFORE, the Company and the Trustee hereby amend Trust Agreement No. 8 to provide as follows:

1.  Exhibit A is amended in its entirety to read as attached hereto.

2.  Exhibit B is amended in its entirety to read as attached hereto.

IN WITNESS WHEREOF, the Company and the Trustee have caused counterparts of this Fourth Amendment to be executed on this 28th day of July, 2014, each of which shall be an original Amendment.

CLIFFS NATURAL RESOURCES INC.

By:    /s/ James D. Graham
       Vice President, Chief Legal Officer &
       Secretary
Title:

KEYBANK, N.A., as Trustee

By:    /s/ Lester W. Dryja
Title:  Vice President

**EXHIBIT A**

Effective July 28, 2014

**CLIFFS NATURAL RESOURCES INC.**

**PARTICIPANTS IN RETIREMENT PLAN FOR NON-EMPLOYEE DIRECTORS**

James D. Ireland III (to the extent not already paid under this Plan)

---

**EXHIBIT B**

**Amended and Restated Cleveland-Cliffs Inc**

**Retirement Plan for Non-Employee Directors**

**As Amended**

**AMENDED AND RESTATED CLEVELAND-CLIFFS INC**
**RETIREMENT PLAN FOR NON-EMPLOYEE DIRECTORS**

THIS RETIREMENT PLAN FOR NON-EMPLOYEE DIRECTORS ("Plan") was established effective June 1, 1984 by The Cleveland-Cliffs Iron Company ("Cliffs Iron") and adopted and assumed by Cleveland-Cliffs Inc, an Ohio corporation ("Cleveland-Cliffs" or the "Company"), effective September 1, 1985, amended and restated effective January 1, 1988, amended by First Amendment, dated July 1, 1995, and is amended and restated effective July 1, 1995 to read as follows:

### RECITALS

A. The Board of Directors of the Company (the "Board of Directors") has determined that the Participants (as hereinafter defined) have, individually and collectively, made and may continue to make an essential contribution to the profitability, growth, financial strength and overall guidance of the Company.

B. The Company wishes to provide an incentive to attract and maintain the highest quality of individuals to serve as directors (the "Directors") of the Company.

### Section 1. ESTABLISHMENT OF THE PLAN

1.1 The Plan. The Company, intending that the Participants and Directors shall rely thereon, hereby establishes this Plan.

1.2 Amendments, Etc. The Company shall not amend, suspend or terminate this Plan or any provision hereof, including without limitation this Section 1.2, without the prior approval of a majority of the Directors present at a meeting of the Board of Directors at which a quorum (as defined in the Regulations of the Company) is present. Anything in the Plan to the contrary notwithstanding, and notwithstanding any amendment, suspension or termination (hereinafter in this Section 1.2 collectively referred to as an "Amendment") of the Plan, no right under the Plan of any person who was a Participant or a Director immediately prior to any Amendment shall in any way be amended, modified, compromised, terminated or suspended without the prior written consent of such person. Without such consent, the rights under the Plan of a Participant and Director withholding such consent shall be as set forth in the Plan in the form that the Plan existed on the date such person's rights under the Plan vested as set forth in Section 2.2 (as amended by any Amendment consented to by such person).

### Section 2. PARTICIPANTS

2.1 Participants. Each Director who has never been an employee or officer of the Company or Cliffs Iron and who first serves as a Director before July 1, 1995 (an "Outside Director") shall become a Participant in the Plan upon the completion of five years of continuous service as a Director. For the purposes of determining such five-year period of service, service as a director of Cliffs Iron prior to September 1, 1985 shall be aggregated with service as an Outside Director.

2.2 Vesting. The rights under the Plan of all persons who are Directors as of the date of adoption of the Plan shall vest simultaneously with the adoption of the Plan by the Company, and the rights under the Plan of all persons who become Directors subsequent to the adoption of the Plan shall vest immediately upon their election as Directors; provided, however, that the right of any Director to receive any benefits pursuant to Section 3 of the Plan shall be subject to the qualification of such Director as a Participant hereunder and to the Director's satisfaction of the requirements of Section 3 with respect to benefit entitlement.

2.3 Participation Upon Change of Control. Anything contained herein to the contrary notwithstanding, in the event of a "Change of Control" (as hereinafter defined), each Outside Director shall become a Participant in the Plan. A "Change of Control" shall mean the occurrence of any of the following events:

(a) The Company shall merge into itself, or be merged or consolidated with, another corporation and as a result of such merger or consolidation less than 70% of the outstanding voting securities of the surviving or resulting corporation shall be owned in the aggregate by the former shareholders of the Company as the same shall have existed immediately prior to such merger or consolidation;

(b) The Company shall sell or otherwise transfer all or substantially all of its assets to any other corporation or other legal person, and immediately after such sale or transfer less than 70% of the combined voting power of the outstanding voting securities of such corporation or person is held in the aggregate by the former shareholders of the Company as the same shall have existed immediately prior to such sale or transfer;

(c) A person, within the meaning of Section 3(a)(9) or of Section 13(d)(3) (as in effect on July 1, 1995) of the Securities Exchange Act of 1934, shall become the beneficial owner (as defined in Rule 13d-3 of the Securities and Exchange Commission pursuant to the Securities and Exchange Act of 1934) of 30% or more of the outstanding voting securities of the Company (whether directly or indirectly); or

d) During any period of three consecutive years, individuals who at the beginning of any such period constitute the Board of Directors of the Company cease, for any reason, to constitute at least a majority thereof, unless the election, or the nomination for election by the shareholders of the Company, of each Director first elected during any such period was approved by a vote of at least one-third of the Directors of the Company who are Directors of the Company on the date of the beginning of any such period.

## Section 3. POST-RETIREMENT INCOME

3.1 Post-Retirement Income. Commencing upon a Participant's retirement from the Board of Directors (i) after attaining the normal retirement age for Directors, as established from time to time by the Board of Directors, with at least five years of continuous service as a Director, (ii) because of disability or health reasons, (iii) with the consent of the Board of Directors, or (iv) after a Change of Control (hereinafter collectively referred to as the Participant's "Commencement Date"), the Company will pay quarterly to the Participant an amount equal to the greatest of (v) One Hundred Percent (100%) of the stated quarterly Board of Directors retainer fee for service as an Outside Director which is in effect on the Participant's Commencement Date, (vi) One Hundred Percent (100%) of the stated quarterly Board of Directors retainer fee for service as an Outside Director which is in effect on the day immediately preceding a Change of Control, or (vii) One Hundred Percent (100%) of the stated quarterly Board of Directors retainer fee which is in effect from time to time; provided, however, that if a Participant's Commencement Date is on account of an event described in clause (iv) of this Section 3.1, such amount shall be reduced for any Participant with fewer than five years of continuous service as an Outside Director by Twenty Percent (20%) for each full year of continuous service less than five that such Participant has served as an Outside Director. For purposes of this Section 3.1, when determining the amount of an Outside Director's stated quarterly Board of Directors retainer fee, such retainer fee shall be deemed to include the stock component (if any, and whether restricted or unrestricted) of such fee. The duration of post-retirement income payments described in this Section 3.1 shall be as more fully described in Section 3.2. For purposes of this Section 3.1, the term "retirement" of an Outside Director shall include, following a Change of Control, resignation or the failure of the stockholders of the Company to re-elect such Outside Director.

3.2 Form of Payment. Post-retirement income payable pursuant to Section 3.1 shall be paid to the Participant in cash for such Participant's life in equal quarterly installments, each installment to be paid in advance on the first day of each quarter, beginning with the quarter that begins on the first day of the January, April, July or October coinciding with or next following such Participant's Commencement Date.

(a) Anything contained herein to the contrary notwithstanding, and subject to the provisions of subsection (c) of this Section 3.2, in the event a Participant is married on his Commencement Date, such Participant may elect to have his post-retirement income paid in the form of a "Joint and Survivor Benefit" (as hereinafter defined). For purposes of this Section 3.2, a "Joint and Survivor Benefit" is a reduced post-

retirement income that is payable to the Participant in equal quarterly installments for his life with the provision that, in the event the Participant should predecease his "Surviving Spouse" (as defined in subsection (b) of this Section 3.2), One Hundred Percent (100%) of such reduced post-retirement income shall be paid to his Surviving Spouse in equal quarterly installments for the duration of her life. Quarterly installments of the Joint and Survivor Benefit will be paid as more particularly set forth in the first paragraph of this Section 3.2. The post-retirement income payable to a Participant pursuant to the provisions of this subsection (a) shall be the "Actuarial Equivalent" (as defined in subsection (b) of this Section 3.2) of the post-retirement income described in the first paragraph of this Section 3.2.

(b) For purposes of this Section 3.2, the following terms shall have the following meanings. A Participant's "Surviving Spouse" is the person to whom the Participant is legally married on his Commencement Date. "Actuarial Equivalent" means a payment or series of payments having the same present value as the normal form of benefit distribution described in the first paragraph of this Section 3.2, and calculated based on (i) the mortality table in effect as of the date benefit distribution commences, which mortality table shall be the table prescribed by the Secretary of the Treasury and required for pension plan compliance under the provisions of Section 417(e) of the Internal Revenue Code of 1986, as amended, and regulations promulgated thereunder, and (ii) interest equal to the average annual rate of interest on 30-year Treasury securities for the month prior to the month benefit distribution commences.

(c) Any married Participant may elect to have his post-retirement income paid in the form of a Joint and Survivor Benefit, as more particularly set forth in subsection (a) above, by written notice filed with the Board Affairs Committee of the Board of Directors (the "Committee") at least one year prior to the Participant's Commencement Date. Any such election may be changed by the Participant at any time and for any number of times prior to the Participant's Commencement Date and without the consent of any other person by the Participant filing a later signed written election with the Committee; provided, however, that any election made less than one year prior to the Participant's Commencement Date shall not be valid. A Participant's election of the Joint and Survivor Benefit pursuant to the provisions of this subsection (c) shall become irrevocable when the Participant commences receipt of benefits hereunder. Notwithstanding the foregoing proviso, any election made during the Thirty (30) day period which commences September 1, 1996 shall be a valid election for purposes of this subsection (c).

## Section 4. GENERAL PROVISIONS

4.1 Successors and Binding Agreements. (a) The Company shall require any successor (whether direct or indirect, by purchase, merger, consolidation, reorganization or otherwise) to all or substantially all of the business and/or assets of the Company expressly to assume and to agree to perform this Plan in the same manner and to the same extent the Company would be required to perform if no such succession had taken place. This Plan shall be binding upon and inure to the benefit of the Company and any successor of or to the Company, including without limitation any persons acquiring directly or indirectly all or substantially all of the business and/or assets of the Company whether by sale, merger, consolidation, reorganization or otherwise (and such successor shall thereafter be deemed the "Company" for the purposes of this Agreement), but shall not otherwise be assignable or delegatable by the Company.

(b) This Plan shall inure to the benefit of and be enforceable by each of the Participants or Directors and his respective personal or legal representatives, executors, administrators, successors, heirs, distributees and/or legatees.

(c) Neither the Company nor any Participant or Director hereunder shall assign, transfer or delegate this Plan or any rights or obligations hereunder except as expressly provided in Section 4.1(a). Without limiting the generality of the foregoing, no right or interest under this Plan of a Participant or Director (or any person claiming through or under any of them) shall be assignable and/or transferable in any manner or be subject to alienation, anticipation, sale, pledge, encumbrance or other legal process or in any manner be liable for or subject to the debts or liabilities of any such Participant or Director or designated beneficiary. If any Participant or Director or designated beneficiary shall attempt to or shall transfer, assign, alienate,

anticipate, sell, pledge or otherwise encumber his benefits hereunder or any part thereof, or if by reason of his bankruptcy or other event happening at any time such benefits would devolve upon anyone else or would not be enjoyed by him, then the Company, acting through the Board Affairs Committee of the Board of Directors, in its discretion, may terminate his interest in any such benefit to the extent the Company considers necessary or advisable to prevent or limit the effects of such occurrence. Termination shall be affected by filing a written "termination declaration" with the Plan's records and making reasonable efforts to deliver a copy to the Participant or Director or designated beneficiary (the "Terminated Participant") whose interest is adversely affected.

As long as the Terminated Participant is alive, any benefits affected by the termination shall be retained by the Company and, in the Company's sole and absolute judgment, may be paid to or expended for the benefit of the Terminated Participant, his spouse, his children or any other person or persons in fact dependent upon him in such a manner as the Company shall deem proper. Upon the death of the Terminated Participant, all benefits withheld from him and not paid to others in accordance with the preceding sentence shall be paid to the Terminated Participant's then living descendants, including adopted children, per stirpes, or, if there are none then living, to his estate.

4.2 Notices. For all purposes of this Plan, all communications provided for herein shall be in writing and shall be deemed to have been duly given when delivered or five business days after having been mailed by United States registered or certified mail, return receipt requested, postage prepaid, addressed to the Company (to the attention of the Secretary of the Company) at its principal executive office and to a Participant at his principal residence, or to such other address as any party may have furnished to the other in writing and in accordance herewith, except that notices of change of address shall be effective only upon receipt.

4.3 Governing Law. The validity, interpretation, construction and performance of this Plan shall be governed by the laws of the State of Ohio, without giving effect to the principles of conflict of laws of such State.

4.4 Severability. Each section, subsection and lesser section of this Plan constitutes a separate and distinct undertaking, covenant and/or provision hereof. Whenever possible, each provision of this Plan shall be interpreted in such manner as to be effective and valid under applicable law. In the event that any provision of this Plan shall finally be determined to be unlawful, such provision shall be deemed severed from this Plan, but every other provision of this Plan shall remain in full force and effect, and in substitution for any such provision held unlawful, there shall be substituted a provision of similar import reflecting the original intention of the parties hereto to the extent permissible under law.

4.5 Withholding of Taxes. The Company may withhold from any amounts payable under this Plan all federal, state, city and other taxes as shall be legally required.

4.6 Gender, Number, Etc. As used in this Plan, the singular shall include the plural and the masculine shall include the feminine, and vice versa.

IN WITNESS WHEREOF, this Amended and Restated Plan has been duly adopted by the Company as of July 1, 1995.


CLEVELAND-CLIFFS INC


By   /s/ M.T. Moore
     Chairman and Chief Executive Officer

---

**AMENDMENT TO AMENDED AND RESTATED
CLEVELAND-CLIFFS INC RETIREMENT PLAN
FOR NON-EMPLOYEE DIRECTORS**

The Amended and Restated Cleveland-Cliffs Inc Retirement Plan for Non-Employee Directors, as amended and restated as of July 1, 1995, is hereby amended by adding a new paragraph to the end of Section 3.1 to read as follows:

"Notwithstanding the preceding provisions of this Section 3.1, a Participant who has not attained the normal retirement age for Directors, but who has at least five years of continuous service as a Director, may commence the receipt of his benefit computed under this Section 3.1 on or after attaining the age of 65 (treating the date that he commences as his "Commencement Date"); provided, however, that such benefit shall be actuarially reduced, using assumptions and factors designated by an actuary selected by the Company, to reflect the commencement of such benefit prior to the normal retirement age for Directors."

IN WITNESS WHEREOF, this Amendment has been adopted by the Company as of January 1, 2001.

CLEVELAND-CLIFFS INC

By   /s/ J.S. Brinzo
_____
Chairman and Chief Executive Officer

**SECOND AMENDMENT**
**TO THE**
**AMENDED AND RESTATED CLEVELAND-CLIFFS INC**
**RETIREMENT PLAN FOR NON-EMPLOYEE DIRECTORS**

**RECITALS**

WHEREAS, Cleveland-Cliffs Inc (the "Company") has established the Amended and Restated Cleveland-Cliffs Inc Retirement Plan for Non-Employee Directors (the "Plan") effective as of January 1, 1995; and

WHEREAS, the Company adopted an Amendment to the Plan, dated as of January 1, 2001; and

WHEREAS, Section 1.2 of the Plan provides that the Company may amend, suspend or terminate the Plan with the prior approval of a majority of the Directors present at a meeting of the Board of Directors, at which a "quorum" (as defined in the Regulations of the Company) is present; and

WHEREAS, the Company desires to amend the Plan to provide an offer of an immediate voluntary lump sum cash-out election of the present value of the accrued pension benefit under the Plan to all Participants.

NOW, THEREFORE, by approval of the Board of Directors of the Company, the Plan is hereby amended, effective January 14, 2003 as follows:

1. Section 3 of the Plan is amended to add a new Section 3.2 as follows:

3.2 Lump Sum Payment Election of Post-Retirement Income. Notwithstanding the form of quarterly installment distributions provided in Section 3.1 above, during the period beginning on February 1, 2003 and ending on February 28, 2003 a Participant may voluntarily elect by written notice filed with the Company to receive from the Company payment of such Participant's post-retirement income benefits in a single lump sum. Payment of a Participant's lump sum benefit shall be payable on or about June 30, 2003. Amounts payable under Section 3.1 for purposes of the Participant's distribution shall be converted into a lump sum equivalent actuarial value as of December 31, 2002, (the "Lump Sum Benefit"). The Lump Sum Benefit shall be determined by the Company based on the Pension Benefit Guaranty Corporation interest rate for immediate annuities in effect for December, 2002 and the 2000 Annuity Mortality Table.

2. Effective Date. This Amendment No. 2 shall be effective on January 14, 2003.

IN WITNESS WHEREOF, Cleveland-Cliffs Inc, pursuant to the order of its Board of Directors, has executed this Amendment No. 2 to the Amended and Restated Cleveland-Cliffs Inc Retirement Plan for Non-Employee Directors at Cleveland, Ohio, as of the 14th day of January, 2003.

CLEVELAND-CLIFFS INC

By    /s/ J.S. Brinzo
    Chairman and Chief Executive Officer

**EXHIBIT 10.42**

<u>SECOND AMENDMENT TO TRUST AGREEMENT NO. 9</u>

 This Second Amendment to Trust Agreement No. 9 is entered into effective as of July 28, 2014 by and between Cliffs Natural Resources Inc., f/k/a Cleveland-Cliffs Inc., an Ohio corporation (the "Company"), and KeyBank, N.A., the successor in interest to Key Trust Company of Ohio, N.A., a national banking association, as Trustee (the "Trustee"). Capitalized terms not defined herein shall have the meanings assigned to such terms in Trust Agreement No. 9.

<div align="center">WITNESSETH</div>

 WHEREAS, on November 20, 1996 the Company and the Trustee entered into Trust Agreement No. 9;

 WHEREAS, Sections 1.6 and 9.2 of Trust Agreement No. 9 provide that Exhibits A and B thereto may be amended by the Company by providing to the Trustee amendments thereto; and

 WHEREAS, Section 1.6 provides that not later than the date of any Change of Control, the Company shall specify in an Exhibit C the nature, amounts and timing of the Benefits to which each Trust Beneficiary may become entitled; and

 WHEREAS, Section 11.1 of Trust Agreement No. 9 provides that Trust Agreement No. 9 may be amended by the Company and the Trustee.

 NOW, THEREFORE, the Company and the Trustee hereby amend Trust Agreement No. 9 to provide as follows:

 1. Section 9.2 is amended in its entirety to read as follows:

 "9.2 Amendments to Exhibit A (and directly corresponding amendments to Exhibit B) that modify one or more lists of Directors shall be made only in accordance with Section 1.6. No amendment to Exhibit A (and no amendment to Exhibit B) that would delete a Director may be made on or after the date on which a Change of Control occurs, except with the agreement of the Director or Directors affected by such change."

 2. Section 11.1 is amended in its entirety to read as follows:

 "11.1 This Agreement may be amended at any time and to any extent by a written instrument executed by the Trustee and the Company without the consent of any Trust Beneficiary, provided that the amendment does not adversely affect any Trust Beneficiary, and provided further that no amendment shall have the effect of altering Section 11.2."

 3. Exhibit A is amended in its entirety to read as attached hereto.

 4. Exhibit B is amended in its entirety to read as attached hereto.

 5. A new Exhibit C is added to the end of Trust Agreement No. 9 to read as attached hereto.

---

IN WITNESS WHEREOF, the Company and the Trustee have caused counterparts of this Second Amendment to be executed on this 28th day of July, 2014, each of which shall be an original Amendment.

CLIFFS NATURAL RESOURCES INC.

By: /s/ James D. Graham

Title: Vice President, Chief Legal Officer & Secretary

KEYBANK, N.A., as Trustee

By: /s/ Lester W. Dryja

Title: Vice President

**EXHIBIT A**

Effective July 28, 2014

## CLIFFS NATURAL RESOURCES INC.
### NONEMPLOYEE DIRECTORS' SUPPLEMENTAL COMPENSATION PLAN PARTICIPANTS

To the extent not already paid as of July 28, 2014:

Ronald C. Cambre

James D. Ireland III

Francis R. McAllister

John C. Morley

**NONEMPLOYEE DIRECTORS' SUPPLEMENTAL COMPENSATION PLAN**
**AND THE FIRST AND SECOND AMENDMENTS THERETO**

CLEVELAND-CLIFFS INC
NONEMPLOYEE DIRECTORS' SUPPLEMENTAL COMPENSATION PLAN

WHEREAS, the Board of Directors of Cleveland-Cliffs Inc (the "Board of Directors") has determined that the "Participants" (as defined in Section 2.1) have, individually and collectively, made and may continue to make an essential contribution to the profitability, growth, financial strength and overall guidance of Cleveland-Cliffs Inc (the "Company") and

WHEREAS, the Company desires to provide an incentive to attract and maintain the highest quality of individuals to serve as directors (the "Directors");

NOW, THEREFORE, by approval of the Board of Directors of the Company, the Company hereby establishes the CLEVELAND-CLIFFS INC NONEMPLOYEE DIRECTORS' SUPPLEMENTAL COMPENSATION PLAN (the "Plan") to be effective as of July 1, 1995, which Plan shall contain the following terms and conditions:

ARTICLE I

ESTABLISHMENT OF THE PLAN

1.1 The Plan. The Company, intending that the Participants and Directors shall rely thereon, hereby establishes the Plan.

1.2 Amendment, Suspension or Termination of Plan . The Company shall not amend, suspend or terminate the Plan or any provision hereof, including without limitation this Section 1.2, without the prior approval of a majority of the Directors present at a meeting of the Board of Directors at which a "quorum" (as defined in the Regulations of the Company) is present. Anything contained in the Plan to the contrary notwithstanding, and notwithstanding any amendment, suspension or termination (hereinafter collectively referred to in this Section 1.2 as an "Amendment") of the Plan, no right under the Plan of any person who was a Participant or a Director immediately prior to any Amendment shall in any way be amended, modified, compromised, terminated or suspended without the prior written consent of such person. Without such consent, the rights under the Plan of a Participant and Director withholding such consent shall be as set forth in the Plan in the form that the Plan existed on the date such person's rights under the Plan vested, as set forth in Section 2.2 (as such Section 2.2 may be amended by any Amendment consented to by such person).

ARTICLE II

PARTICIPANTS

2.1 Participants. Each Director who has never been an employee or officer of the Company and who first serves as a Director on or after July 1, 1995 (an "Outside Director") shall become a Participant in the Plan upon the completion of five years of continuous service as a Director.

2.2 Vesting. The rights under the Plan of all persons who are Directors and who first serve as such on or after July 1, 1995 shall vest immediately upon their election as Directors; provided, however, that the right of any Director to receive any benefits pursuant to Article III of the Plan shall be subject to the qualification of such Director as a Participant hereunder and to such Director's satisfaction of the requirements of Article III with respect to benefit entitlement.

2.3 Participation Upon Change of Control. Anything contained herein to the contrary notwithstanding, in the event of a "Change of Control" (as hereinafter defined), each Outside Director shall become a Participant in the Plan. A "Change of Control" shall mean the occurrence of any of the following events:

(a) The Company shall merge into itself, or be merged or consolidated with, another corporation and as a result of such merger or consolidation less than 70% of the outstanding voting securities of the surviving or resulting corporation shall be owned in the aggregate by the former shareholders of the Company as the same shall have existed immediately prior to such merger or consolidation;

(b) The Company shall sell or otherwise transfer all or substantially all of its assets to any other corporation or other legal person, and immediately after such sale or transfer less than 70% of the combined voting power of the outstanding voting securities of such corporation or person is held in the aggregate by the former shareholders of the Company as the same have existed immediately prior to such sale or transfer;

(c) A person, within the meaning of Section 3(a)(9) or of Section 13(d)(3) (as in effect on July 1, 1995) of the Securities Exchange Act of 1934, shall become the beneficial owner (as defined in Rule 13d-3 of the Securities and Exchange Commission pursuant to the Securities and Exchange Act of 1934) of 30% or more of the outstanding voting securities of the Company (whether directly or indirectly); or

(d) During any period of three consecutive years, individuals who at the beginning of any such period constitute the Board of Directors of the Company cease, for any reason, to constitute at least a majority thereof, unless the election, or the nomination for election by the shareholders of the Company, of each Director first elected during any such period was approved by a vote of at least one-third of the Directors of the Company who are Directors of the Company on the date of the beginning of any such period.

ARTICLE III

POST-RETIREMENT INCOME

3.1 Post-Retirement Income. Commencing upon a Participant's retirement from the Board of Directors (i) with at least five years of continuous service as a Director, or (ii) after a Change of Control (hereinafter collectively referred to as the Participant's "Commencement Date"), the Company will pay quarterly to the Participant an amount equal to Fifty Percent (50%) of the stated quarterly Board of Directors retainer fee for service as an Outside Director which is in effect on the Participant's retirement; provided however, that such amount shall only be payable to a Participant during his "Payment Period" (as defined in Section 3.2); provided further, that payment of such amount shall not commence prior to the Participant's 65th birthday, except in the case of disability of the Participant; and, provided further, that if a Participant's Commencement Date is on account of an event described in clause (ii) of this Section 3.1, such amount shall be reduced for any Participant with fewer than five years of continuous service as an Outside Director by Twenty Percent (20%) for each full year of continuous service less than five that such Participant has served as an Outside Director. For purposes of this Section 3.1, when determining the amount of an Outside Director's stated quarterly Board of Directors retainer fee, such retainer fee shall be deemed to include the stock component (if any, and whether restricted or unrestricted) of such fee. The duration of post-retirement income payments described in this Section 3.1 shall be as more fully described in Section 3.2. For purposes of this Section 3.1, the term "retirement" of an Outside Director shall be deemed to include: (i) the failure of the stockholders of the Company to re-elect such Outside Director; provided, however, that the right of any Director to receive benefits pursuant to the provisions of this Article III shall be subject to the Director's satisfaction of the applicable requirements of Article III with respect to benefit entitlement, and (ii) following a Change of Control, resignation or the failure of the stockholders of the Company to re-elect such Outside Director.

3.2 Form of Payment. Post-retirement income payable pursuant to Section 3.1 shall be paid to the Participant for a period equal to his years of continuous service on the Board of Directors (the "Payment Period"). Such post-retirement income shall be paid in cash to the Participant in equal quarterly installments, each installment to be paid in advance on the first day of each quarter, beginning with the quarter that begins on the first day of the January, April, July or October coinciding with or next following such Participant's Commencement Date. In the event a Participant who is married on his Commencement Date dies during his Payment Period and prior to the distribution of all post-retirement income to which he is entitled hereunder, the remaining post-retirement income installment payments shall be paid to his "Surviving Spouse" (as hereinafter defined) for the remainder of the Payment Period or, if earlier, until the death of such Surviving Spouse. For purposes of this Section 3.2, "Surviving Spouse" means the person to whom a Participant is legally married on his Commencement Date. In the event a Participant who is not married on his Commencement Date dies during his Payment Period and prior to the distribution of all post-retirement income to which he is entitled hereunder,. the last payment made hereunder shall be the payment made to the Participant for the quarter during which his death occurs.

ARTICLE IV

GENERAL PROVISIONS

4.1 <u>Successors and Binding Agreements</u>.

(a) The Company shall require any successor (whether direct or indirect, by purchase, merger, consolidation, reorganization or otherwise) to all or substantially all of the business and/or assets of the Company expressly to assume and agree to perform hereunder the Plan in the same manner and to the same extent the Company would be required to perform if no such succession had taken place. The Plan shall be binding upon and inure to the benefit of the Company and any successor of or to the Company, including without limitation any persons acquiring directly or indirectly all or substantially all of the business and/or assets of the Company whether by sale, merger, consolidation, reorganization or otherwise (and such successor shall thereafter be deemed to be the "Company" for purposes of this Plan), but shall not otherwise be assignable or delegatable by the Company.

(b) The Plan shall inure to the benefit of and be enforceable by each of the Participants or Directors and his respective personal or legal representatives, executors, administrators, successors, heirs, distributees and/or legatees.

(c) Neither the Company nor any Participant or Director hereunder shall assign, transfer or delegate the Plan or any rights or obligations hereunder, except as expressly provided in Section 4.1(a). Without limiting the generality of the foregoing, no right or interest under the Plan of a Participant or Director (or of any person claiming under or through any of them) shall be assignable or transferable in any manner or be subject to alienation, anticipation, sale, pledge, encumbrance or other legal process or in any manner be liable for or subject to the debts or liabilities of any such Participant or Director or designated beneficiary. If any Participant or Director or designated beneficiary shall attempt to or shall transfer, assign, alienate, anticipate, sell, pledge or otherwise encumber his benefits hereunder or any part thereof, or if by reason of his bankruptcy or other event occurring at any time such benefits would devolve upon anyone else or would not be enjoyed by him, then the Company, acting through the Board Affairs Committee of the Board of Directors, in its discretion, may terminate his interest in any such benefit to the extent the Company considers it necessary or advisable in order to prevent or limit the effects of such occurrence. Such termination shall be affected by filing a written "termination declaration" with the Plan's records and by making reasonable efforts to deliver a copy of such "termination declaration" to the Participant or Director or designated beneficiary (the "Terminated Participant") whose interest is adversely affected.

As long as the Terminated Participant is alive, any benefits affected by the termination shall be retained by the Company and, in the Company's sole and absolute judgment, may be paid to or expended for the benefit of the Terminated Participant, his spouse, his children or any other person or persons in fact dependent upon him in such a manner as the Company shall deem proper. Upon the death of the Terminated Participant, all benefits withheld from him and not paid to others in accordance with the preceding sentence shall be paid to the Terminated Participant's then living descendants, including adopted children, per stirpes, or, if there are none then living, to his estate.

4.2 <u>Notices</u>. For all purposes of this Plan, all communications provided for herein shall be in writing and shall be deemed to have been duly given when delivered on five business days after having been mailed by United States registered or certified mail, return receipt requested, postage prepaid, addressed to the Company (to the attention of the Secretary of the Company) at its principal executive office and to a Participant at his principal residence, or to such other address as any party may have furnished to the other in writing and in accordance herewith, except that notices of change of address shall be effective only upon receipt.

4.3 <u>Forfeiture of Post-Retirement Income</u>. No post-retirement income shall be paid to any Participant or Surviving Spouse hereunder unless the Participant agrees (i) to be available to the Company in an unpaid advisory capacity on and after his Commencement Date, and (ii) not to engage in any activity adverse to the interests of the Company. In the event the Participant breaches such agreement, no further payments to the Participant or his Surviving Spouse shall be made hereunder. Anything contained herein to the contrary notwithstanding, the provisions of this Section 4.3 shall not apply in the event of a Change of Control.

4.4 <u>Governing Law</u>. The validity, interpretation, construction and performance of this Plan shall be governed by the laws of the State of Ohio, without giving effect to the principles of conflict of laws of such State.

4.5 <u>Severability</u>. Each Section, subsection and lesser section of the Plan constitutes a separate and distinct undertaking, covenant and/or provision hereof. Whenever possible, each provision of the Plan shall be interpreted in such manner as to be effective and valid under applicable law. In the event that any provision of the Plan shall finally be determined to be unlawful, such provision shall be deemed severed from the Plan, but every other provision of the Plan shall remain in full force and effect, and in substitution for any such provision held unlawful, there shall be substituted a provision of similar import reflecting the original intention of the parties hereto to the extent permissible under law.

4.6 <u>Withholding of Taxes</u>. The Company may withhold from any amounts payable under the Plan all federal, state, city and other taxes as shall be legally required.

4.7 <u>Gender and Number</u>. As used in the Plan, the singular shall include the plural and the masculine shall include the feminine, and vice versa, all as required by the context

*   *   *

IN WITNESS WHEREOF, this Plan has been duly adopted by the Company as of July 1, 1995.

CLIFFS-CLIFFS INC

By:    /s/ M. T. Moore
Title:   Chairman and Chief Executive Officer

**FIRST AMENDMENT**

**TO**

**CLEVELAND-CLIFFS INC NONEMPLOYEE DIRECTORS'**

**SUPPLEMENTAL COMPENSATION PLAN**

**RECITALS**

WHEREAS, Cleveland-Cliffs Inc ("Company") established the Cleveland-Cliffs Inc Nonemployee Directors' Supplemental Compensation Plan ("Plan") effective July 1, 1995; and

WHEREAS, Section 1.2 of the Plan provides that the Company may amend, suspend or terminate the Plan with the prior approval of a majority of the Directors present at a meeting of the Board of Directors, at which a "quorum" (as defined in the Regulations of the Company) is present; and

WHEREAS, the Company desires to amend the Plan to freeze the eligibility under the Plan to only those Directors who join the Board of Directors of the Company between July 1, 1995 and December 31, 1998.

NOW, THEREFORE, by approval of the Board of Directors of the Company, the Plan is hereby amended, effective January 1, 1999, as follows:

1.    Section 2.1 of the Plan is hereby amended to read:

      2.1 PARTICIPANTS. Each Director who has never been an employee or officer of the Company and who first serves as a Director on or after July 1, 1995, and before January 1, 1999 (an "Outside Director") shall become a Participant in the Plan upon the completion of five years of continuous service as a Director.

2.    Except as amended by this First Amendment, the Plan shall remain in full force and effect.

IN WITNESS WHEREOF, this Amendment No. 1 has been duly authorized by the Company as of November 10, 1998.

CLIFFS-CLIFFS INC

By:    /s/ J.S. Brinzo

Title:    President and Chief Executive Officer

**SECOND AMENDMENT**

**TO THE**

**AMENDED AND RESTATED CLEVELAND-CLIFFS INC**

**RETIREMENT PLAN FOR NON-EMPLOYEE DIRECTORS**

**RECITALS**

WHEREAS, Cleveland-Cliffs Inc (the "Company") has established the Amended and Restated Cleveland-Cliffs Inc Retirement Plan for Non-Employee Directors (the "Plan") effective as of July 1, 1995; and

WHEREAS, the Company adopted an Amendment to the Plan, dated as of January 1, 2001; and

WHEREAS, Section 1.2 of the Plan provides that the Company may amend, suspend or terminate the Plan with the prior approval of a majority of the Directors present at a meeting of the Board of Directors, at which a "quorum" (as defined in the Regulations of the Company) is present; and

WHEREAS, the Company desires to amend the Plan to provide an offer of an immediate voluntary lump sum cash-out election of the present value of the accrued pension benefit under the Plan to all Participants.

NOW, THEREFORE, by approval of the Board of Directors of the Company, the Plan is hereby amended, effective January 14, 2003 as follows:

1.  Section 3 of the Plan is amended to add a new Section 3.3 as follows:

> 3.3 <u>Lump Sum Payment Election of Post-Retirement Income</u> . Notwithstanding the form of quarterly installment distributions provided in Section 3.1 above, during the period beginning on February 1, 2003 and ending on February 28, 2003 a Participant may voluntarily elect by written notice filed with the Company to receive from the Company payment of such Participant's post-retirement income benefits in a single lump sum. Payment of a Participant's lump sum benefit shall be payable on or about June 30, 2003. Amounts payable under Section 3.1 for purposes of the Participant's distribution shall be converted into a lump sum equivalent actuarial value as of December 31, 2002, (the "Lump Sum Benefit"). The Lump Sum Benefit shall be determined by the Company based on the Pension Benefit Guaranty Corporation interest rate for immediate annuities in effect for December, 2002 and the 2000 Annuity Mortality Table.

2.  <u>Effective Date</u>. This Amendment No. 2 shall be effective on January 14, 2003.

IN WITNESS WHEREOF, Cleveland-Cliffs Inc, pursuant to the order of its Board of Directors, has executed this Amendment No. 2 to the Amended and Restated Cleveland-Cliffs Inc Retirement Plan for Non-Employee Directors at Cleveland, Ohio, as of the 14th day of January, 2003.

CLIFFS-CLIFFS INC

By:   /s/ J.S. Brinzo
Title:   President and Chief Executive Officer

**EXHIBIT C**

[SEE SECTION 1.6 OF THE TRUST AGREEMENT.  NOT LATER THAN THE DATE OF ANY CHANGE OF CONTROL, FOR EACH TRUST BENEFICIARY, SPECIFY "NATURE, AMOUNT AND TIMING OF BENEFITS" TO WHICH EACH IS ENTITLED]

**EXHIBIT 10.45**

<u>SECOND AMENDMENT TO TRUST AGREEMENT NO. 10</u>

This Second Amendment to Trust Agreement No. 10 is entered into effective as of July 28, 2014 by and between Cliffs Natural Resources Inc., f/k/a Cleveland-Cliffs Inc., an Ohio corporation (the "Company"), and KeyBank, N.A., the successor in interest to Key Trust Company of Ohio, N.A., a national banking association, as Trustee (the "Trustee").

WITNESSETH

WHEREAS, on November 20, 1996 the Company and the Trustee entered into Trust Agreement No. 10;

WHEREAS, Sections 1.6 and 9.2 of Trust Agreement No. 10 provide that Exhibits A and B thereto may be amended by the Company by providing to the Trustee amendments thereto; and

WHEREAS, Section 11.1 of Trust Agreement No. 10 provides that Trust Agreement No. 10 may be amended by the Company and the Trustee.

NOW, THEREFORE, the Company and the Trustee hereby amend Trust Agreement No. 10 to provide as follows:

1.   Section 9.2 is amended in its entirety to read as follows:

"9.2 Amendments to Exhibit A (and directly corresponding amendments to Exhibit B) that modify one or more lists of Directors shall be made only in accordance with Section 1.6. No amendment to Exhibit A (and no amendment to Exhibit B) that would delete a Director may be made on or after the date on which a Change of Control occurs, except with the agreement of the Director or Directors affected by such change."

2.   Section 11.1 is amended in its entirety to read as follows:

"11.1 This Agreement may be amended at any time and to any extent by a written instrument executed by the Trustee and the Company without the consent of any Trust Beneficiary, provided that the amendment does not adversely affect any Trust Beneficiary, and provided further that no amendment shall have the effect of altering Section 11.2."

3.   Exhibit A is amended in its entirety to read as attached hereto.

4.   Exhibit B is amended in its entirety to read as attached hereto.

IN WITNESS WHEREOF, the Company and the Trustee have caused counterparts of this Second Amendment to be executed on this 28th day of July, 2014, each of which shall be an original Amendment.

CLIFFS NATURAL RESOURCES INC.

By:     /s/ James D. Graham

Vice President, Chief Legal Officer & Secretary

Title:

KEYBANK, N.A., as Trustee

By:     /s/ Lester W. Dryja

Title:     Vice President

**EXHIBIT A**

Effective July 28, 2014

## CLIFFS NATURAL RESOURCES INC.
### NONEMPLOYEE DIRECTORS' COMPENSATION PLAN PARTICIPANTS

Susan M. Cunningham

Barry J. Eldridge

Mark E. Gaumond

Andres R. Gluski

Janice K. Henry

Steven M. Johnson

James F. Kirsch

Richard K. Riederer

Timothy W. Sullivan

**NONEMPLOYEE DIRECTORS' COMPENSATION PLAN, AS AMENDED AND RESTATED EFFECTIVE DECEMBER 31, 2008**

**CLIFFS NATURAL RESOURCES INC.**
**NONEMPLOYEE DIRECTORS' COMPENSATION PLAN**
**(AS AMENDED aND restated EFFECTIVE DECEMBER 31, 2008)**

### Recitals

WHEREAS, Cliffs Natural Resources Inc. (formerly named Cleveland-Cliffs Inc) ("Company"), with approval of the Company's shareholders on May 14, 1996, established the Cleveland-Cliffs Inc Nonemployee Directors' Compensation Plan ("Plan"), effective July 1, 1996;

WHEREAS, with approval of the Board of Directors of the Company ("Board"), the Plan was amended by the First Amendment to the Plan effective November 12, 1996;

WHEREAS, with the approval of the Board, the Plan was further amended by the Second Amendment to the Plan, effective May 13, 1997;

WHEREAS, with the approval of the Board, the Plan was further amended by the Third Amendment, effective January 1, 1999;

WHEREAS, with the approval of the Board and the shareholders, the Plan was further amended by the Fourth Amendment, effective May 8, 2001;

WHEREAS, with the approval of the Board, the Plan was amended and restated, effective January 1, 2004 and further amended and restated, effective as of January 1, 2005.

WHEREAS, the Company now desires to further amend and restate the Plan; and

WHEREAS, the Board has approved such amendment and restatement, effective December 31, 2008, in accordance with Section 8.2 of the Plan.

### Amendment and Restatement

NOW, THEREFORE, the Plan is amended and restated as follows:

**ARTICLE I.**        **DEFINITIONS**

Whenever the following terms are used in this Plan they shall have the meanings specified below unless the context clearly indicates to the contrary:

(a)        "Account": A Deferred Fee Account and/or a Deferred Share Account, as the context may require.

(b)        "Accounting Date": December 31 of each year and the last day of each calendar quarter.

(c)        "Accounting Period": The quarterly period beginning on the date immediately following an Accounting Date and ending the next following Accounting Date.

(d)        "Administrator": The Board Affairs Committee of the Board or any successor committee designated by the Board.

A004471

(e)      "Annual Equity Grants": The Restricted Shares or Shares awarded annually pursuant to Section 3.1.

(f)      "Beneficiary": The person or persons (natural or otherwise) designated pursuant to Section 7.7.

(g)      "Board": The Board of Directors of the Company.

(h)      "Change in Control": The meaning set forth in Section 3.1(b).

(i)      "Code": The Internal Revenue Code of 1986, as amended.

(j)      "Company": Cliffs Natural Resources Inc. (formerly named Cleveland-Cliffs Inc) or any successor or successors thereto.

(k)      "Declared Rate": The Moody's Corporate Average Bond Yield as adjusted on the first business day of January, April, July and October or such other rate as the Administrator shall determine from time to time.

(l)      "Deferral Commitment": An agreement made by a Director in a Participation Agreement to have all of his or her Annual Equity Grant and/or all or a specified portion of his or her Fees, Required Retainer Shares and/or Voluntary Shares deferred under the Plan for a specified period in the future.

(m)      "Deferral Period": The Plan Year for which a Director has elected to defer all of his or her Annual Equity Grant and/or all or a portion of his or her Fees, Required Retainer Shares and/or Voluntary Shares.

(n)      "Deferred Fees": The Fees credited to a Director's Deferred Fee Account pursuant to Articles IV and V and payable to a Director pursuant to Article VII.

(o)      "Deferred Fee Account": The account maintained on the books of the Company for each Director pursuant to Article V.

(p)      "Deferred Shares": The Annual Equity Grant, Required Retainer Shares and Voluntary Shares credited to a Director's Deferred Share Account pursuant to Articles IV and VI and payable to a Director pursuant to Article VII.

(q)      "Deferred Share Account": The account maintained on the books of the Company for each Director pursuant to Article VI, which is comprised of the Deferred Share Annual Equity Subaccount and the Deferred Share Other Equity Subaccount.

(r)      "Deferred Share Annual Equity Subaccount": The subaccount maintained on the books of the Company pursuant to Article VI for each Director who makes a Deferral Commitment with respect to one or more Annual Equity Grants.

(s)      "Deferred Share Other Equity Subaccount": The subaccount maintained on the books of the Company pursuant to Article VI for each Director who makes a Deferral Commitment with respect to Required Retainer Shares and/or Voluntary Shares.

(t)      "Director": An individual duly elected or chosen as a Director of the Company who is not also an employee of the Company or any of its subsidiaries.

(u)      "Director Share Ownership Guidelines": Guidelines relating to ownership of Shares by Directors as established by the Administrator from time to time.

(v)      "Disability" or "Disabled": A Director shall be deemed to have a "Disability" or be "Disabled" if the Director is (i) unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than 12 months, (ii) by reason of any medically determinable physical or mental impairment which can

be expected to result in death or can be expected to last for a continuous period of not less than 12 months, receiving income replacement benefits for a period of not less than 3 months under an employer-sponsored accident and health plan, or (iii) determined to be totally disabled by the Social Security Administration.

(w)    "Election Filing Date": December 31 of the calendar year next preceding the first day of (i) in the case of dividends deferred under Section 3.1(e) of the Plan, the Plan Year in which Restricted Shares (on which such dividends are declared) are granted (ii) in the case of Fees, the Deferral Period in which the Fees would otherwise be earned (iii) in the case of an Annual Equity Grant, the Deferral Period in which the Restricted Shares or Shares would otherwise be awarded (iv) in the case of Required Retainer Shares and Voluntary Shares, the Deferral Period in which such shares would otherwise be earned.

(x)    "Fair Market Value": With respect to a Share, the last reported closing price for a Share on the New York Stock Exchange (or any appropriate over-the-counter market if the Shares are no longer listed on such Exchange) for a day specified herein for which such fair market value is to be calculated, or if there was no sale of Shares so reported for such day, on the most recently preceding day on which there was such a sale.

(y)    "Fees": The portion of the annual Retainer and other Director compensation payable in cash.

(z)    "Participation Agreement": The agreement submitted by a Director to the Administrator in which a Director may specify an amount of Voluntary Shares, or may elect to defer receipt of all of his Annual Equity Grant and/or all or any portion of his or her Fees, Required Retainer Shares and/or Voluntary Shares for a specified period in the future.

(aa)    "Plan": The Plan set forth in this instrument as it may from time to time be amended.

(ab)    "Plan Year": The 12-month period beginning January 1 and ending December 31.

(ac)    "Prior Plan": The Company's Plan for Deferred Payment of Directors' Fees originally adopted in 1981.

(ad)    "Restricted Shares": Shares automatically awarded pursuant to Section 3.1 as to which neither the substantial risk of forfeiture nor the restrictions on transfer referred to in Section 3.1 hereof have expired.

(ae)    "Retainer": The portion of a Director's annual compensation that is payable without regard to number of Board or committee meetings attended, committee positions or the Lead Director position.

(af)    "Required Retainer Shares": Such number of Shares or dollar value of a Director's Retainer as the Administrator may specify from time to time as the portion of a Director's Retainer required to be paid in Shares, less any amount such Director may have elected to receive in cash pursuant to Section 3.2 (a)(ii).

(ag)    "Rule 16b-3": Rule 16b-3 promulgated under the Securities Exchange Act of 1934 (or any successor rule to the same effect), as in effect from time to time.

(ah)    "Settlement Date": The date which is the earliest to occur of the following: (i) the date of a Director's Termination of Service (including by death); (ii) the date a Director becomes Disabled; (iii) the date of the occurrence of a Change in Control of the Company that constitutes a "change in the ownership or effective control" or a "change in the ownership or substantial portion of the assets" of the Company within the meaning of Section 409A(a)(2)(A)(v) of the Code and Treasury Regulation Section 1.409A-3(i)(5), or any successor provision; or (iv) the date prior to the date of Termination of Service selected by a Director pursuant to a Specified Date Payment Election for distribution of all of his or her Annual Equity Grants and/or all or any portion of his or her Fees, Required Retainer Shares and/or Voluntary Shares deferred during such Deferral Period as provided in Section 7.3.

(ai)    "Shares": The Company's fully paid, non-assessable Common Shares, par value $0.125 per share. Shares may be shares of original issuance or treasury shares or a combination of the foregoing.

---

(aj)        "Specified Employee": A specified employee with respect to the Company (or a controlled group member of the Company) determined pursuant to procedures adopted by the Company in compliance with Section 409A of the Code.

(ak)        "Specified Date Payment Election": The portion of a Participation Agreement completed by a Director that indicates the form of distribution of the Director's Deferred Fee Account, Deferred Share Annual Equity Subaccount, and/or the Deferred Share Other Equity Subaccount that will be deferred until a specified date designated by the Director.

(al)        "Termination of Service": A termination of service with the Company that constitutes a separation from service within the meaning of Treasury Regulation Section 1.409A-1(h).

(am)        "Unforeseeable Emergency": A severe financial hardship to a Director resulting from (i) an illness or accident of the Director or Beneficiary or his or her spouse or dependent (as defined in Section 152(a) of the Code), (ii) loss of the Director's property due to casualty, or (iii) other similar or extraordinary circumstances arising as a result of events beyond the control of the Director.

(an)        "Voluntary Shares": The meaning set forth in Section 3.2(b).

**ARTICLE II.**                    **PURPOSE**

The purpose of this Plan is to provide for the Annual Equity Grant to Directors and for the payment to Directors of a portion of the Retainer earned by them for services as Directors in Shares in order to further align the interests of Directors with the shareholders of the Company and thereby promote the long-term success and growth of the Company. In addition, the Plan is intended to provide Directors with opportunities to invest additional amounts of their compensation payable for services as a Director in Shares and defer receipt of any or all of such compensation.

**ARTICLE III.    ANNUAL EQUITY GRANTS, REQUIRED RETAINER SHARES AND VOLUNTARY SHARES**

1.        <u>Automatic Annual Equity Grants.</u>

(a)        For the year 2008 and subsequent years, unless otherwise determined by the Board, each Director, shall automatically receive each year on the date of the annual meeting, the number of Restricted Shares equal to $75,000 divided by the Fair Market Value of a Share on the date of the annual meeting. Each Director who joins the Board after an annual meeting, shall receive a pro-rated amount of Restricted Shares from the date such Director joins the Board. Notwithstanding the foregoing, any Director who is age 69 years old or older on the date of an annual meeting shall, in lieu of Restricted Shares, receive an equal number of Shares (with no restrictions).

(b)        The Restricted Shares may not be assigned, exchanged, pledged, sold, transferred or otherwise disposed of by a Director, except to the Company, and shall be subject to forfeiture as herein provided until the earliest to occur of the following ("Vesting Event"): (a) the third anniversary of the date of award; (b) a Change in Control (as defined below); (c) death; or (d) Disability. Any purported transfer in violation of the provisions of this paragraph shall be null and void, and the purported transferee shall obtain no rights with respect to such Restricted Shares. For purposes of this Section 3.1, "Change in Control" shall mean the occurrence of any of the following events:

(i)        The acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Exchange Act of 1934, as amended (the "Exchange Act")) (a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 30% or more of the combined voting power of the then outstanding voting stock of the Company; provided, however, that for purposes of this Section 3.1(b)(i) of Article III, the following acquisitions shall not constitute a Change in Control: (A) any issuance of voting stock of the Company directly from the Company that is approved by the Incumbent Board (as defined in Section 3.1(b)(ii) of Article III below), (B) any acquisition by the Company of voting stock of the Company, (C) any acquisition of voting stock of the Company by any employee benefit plan (or related trust) sponsored or maintained by the Company or any subsidiary, or (D) any acquisition

of voting stock of the Company by any Person pursuant to a Business Combination that complies with clauses (A), (B) and (C) of Section 3.1(b)(iii) of Article III, below; or

       (ii)      individuals who, as of the date hereof, constitute the Board (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board; provided, however, that any individual becoming a Director subsequent to the date hereof whose election, or nomination for election by the Company's shareholders, was approved by a vote of at least a majority of the Directors then comprising the Incumbent Board (either by a specific vote or by approval of the proxy statement of the Company in which such person is named as a nominee for director, without objection to such nomination) shall be deemed to have been a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest (within the meaning of Rule 14a-11 of the Exchange Act) with respect to the election or removal of Directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board; or

       (iii)      consummation of a reorganization, merger or consolidation involving the Company, a sale or other disposition of all or substantially all of the assets of the Company, or any other transaction involving the Company (each, a "Business Combination"), unless, in each case, immediately following such Business Combination, (A) all or substantially all of the individuals and entities who were the beneficial owners of voting stock of the Company immediately prior to such Business Combination beneficially own, directly or indirectly, more than 55% of the combined voting power of the then outstanding shares of voting stock of the entity resulting from such Business Combination (including, without limitation, an entity which as a result of such transaction owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries) in substantially the same proportions relative to each other as their ownership, immediately prior to such Business Combination, of the voting stock of the Company, (B) no Person (other than the Company, such entity resulting from such Business Combination, or any employee benefit plan (or related trust) sponsored or maintained by the Company, any subsidiary or such entity resulting from such Business Combination) beneficially owns, directly or indirectly, 30% or more of the combined voting power of the then outstanding shares of voting stock of the entity resulting from such Business Combination, and (C) at least a majority of the members of the Board of Directors of the entity resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement or of the action of the Board providing for such Business Combination; or

       (iv)      approval by the shareholders of the Company of a complete liquidation or dissolution of the Company, except pursuant to a Business Combination that complies with clauses (A), (B) and (C) of Section 3.1(b)(iii) of Article III.

    For purposes of this Section 3.1(b) of Article III, voting stock means securities entitled to vote generally in the election of directors, and subsidiary means an entity in which the Company directly or indirectly beneficially owns 50% or more of the outstanding capital or profits interests or voting stock.

    (c)      All of the Restricted Shares shall be forfeited by a Director who is terminated before a Vesting Event; provided, however, if service as a Director is terminated by the Company owing to removal as a Director without cause before the third anniversary of the date of an award, a portion of the Restricted Shares covered by such award that then remain forfeitable shall become freely transferable and nonforfeitable on a prorated basis (rounded up to the nearest whole Restricted Share) for the number of full months the Director remains on the Board during the three-year period from the date of grant.

    (d)      Unless otherwise directed by the Administrator, all certificates representing Restricted Shares shall be held in custody by the Company until the occurrence of a Vesting Event. As a condition to each award of Restricted Shares, unless otherwise determined by the Administrator, each Director shall have delivered to the Company a stock power, endorsed in blank, relating to the Restricted Shares covered by such award. After the occurrence of a Vesting Event, assuming no event has occurred that would effect a forfeiture of a Director's Restricted Shares, a certificate or certificates evidencing unrestricted ownership of such Shares shall be delivered to the Director.

(e)        With respect to dividends on Restricted Shares:

(i)        A Director may elect, prior to December 31, 2005 or the applicable Election Filing Date for any Plan Year thereafter, that all cash dividends declared with respect to Restricted Shares awarded during such Plan Year shall be deferred and reinvested in additional Common Shares during the period of restriction of such Restricted Shares and which shall be subject to the same restrictions as such Restricted Shares. Such deferral election shall be effective as of the applicable Election Filing Date and shall apply to dividends declared on Restricted Shares granted in the Plan Year following the applicable Election Filing Date and in each subsequent Plan Year unless terminated for a subsequent Plan Year by filing a termination election by the applicable Election Filing Date for such subsequent Plan Year.

(ii)        In addition, any Director who joins the Board on or after January 1 of any Plan Year may make such an election with respect to dividends declared on his or her award of Restricted Shares within 30 days after becoming a Director. Such deferral election shall be effective when filed and shall apply only to dividends declared on Restricted Shares granted during the remainder of such Plan Year and in each subsequent Plan Year unless terminated for a subsequent Plan Year by filing a termination election by the applicable Election Filing Date for such subsequent Plan Year.

(iii)        Once such a deferral election has been terminated, another deferral election may not be made.

(iv)         All such deferred dividends shall be reinvested and held in the Director's name and shall be delivered as additional unrestricted Common Shares on the applicable Vesting Date, subject to vesting as provided in Section 3.1(b) hereof and proration as provided in Section 3.1(c) hereof.

2.        Required Retainer Shares and Voluntary Shares.

(a)        Payment of Retainer.

(i)        Subject to Section 3.2(a)(ii), Section 3.2(b) and Article IV of this Plan, the Retainer established by the Administrator from time to time shall be payable in part as Required Retainer Shares payable on January 1 of the following year, and the balance of such Retainer and all other Fees shall be payable in cash quarterly in advance of each Accounting Period.

(ii)        If a Director meets the Director Share Ownership Guidelines on December 1 of 2004 or any year thereafter, such Director may elect, by the filing of a Participation Agreement or such other form as may be approved by the Administrator by March 29, 2004 or by December 15 of such year, as applicable, to have up to 100% of such Director's Retainer paid by the Company in cash. Such election shall apply to the Director's Retainer for the Plan Year commencing January 1, 2004 or the Plan Year following such election, as applicable.

(b)        Voluntary Shares. Prior to the commencement of any calendar quarter, a Director may elect by the filing of a Participation Agreement to have up to 100% of his or her Fees for such quarter paid by the Company in the form of Voluntary Shares and in lieu of the cash payment. Such Participation Agreement must be filed as a one-time election. Such election, unless subsequently terminated, shall apply to a Director's Fees for the remainder of the current Plan Year and each subsequent Plan Year. Once an election has been terminated another election may not be made.

(c)        Issuance of Shares. On the first business day of each year the Company shall issue (i) to each Director a number of Shares equal to such Director's Required Retainer Shares for each Accounting Period during the prior Plan Year divided by the Fair Market Value per Share on the first day of such Accounting Period and (ii) to each Director who has made an election under Section 3.2(b), a number of Shares for each such Accounting Period equal to the portion of such Director's Fees for such Accounting Period that such Director has elected to receive as Voluntary Shares for such Accounting Period divided by the Fair Market Value per Share on the first day of such Accounting Period (less, in each case, the portion of the Required Retainer Shares and Voluntary Shares the Director elected to defer under Section 4.3). To the extent that the application of the foregoing formula

would result in the issuance of fractional Shares, no fractional Shares shall be issued, but instead, the Company shall maintain two separate non-interest-bearing accounts for each Director, which accounts shall be credited with the amount of any Required Retainer Shares or Voluntary Shares, as the case may be, not convertible into whole Shares, which amounts shall be combined with Required Retainer Shares and Voluntary Shares, respectively, which are paid for the next following Plan Year. When whole Shares are issued by the Company to the Director on January 1, the amounts in such accounts shall be reduced by that amount which (when added to the Required Retainer Shares and Voluntary Shares for such Director for such quarter) results in the issuance of the maximum number of Shares to such Director. The Company shall pay any and all fees and commissions incurred in connection with the payment of Required Retainer Shares and Voluntary Shares to a Director in Shares.

**ARTICLE IV.        DEFERRAL OF FEES, annual equity GRANT, REQUIRED RETAINER SHARES AND VOLUNTARY SHARES**

1.    <u>Deferral of Fees</u>. A Director may elect to defer all or a specified percentage of his or her Fees earned for any Deferral Period by filing a Participation Agreement with the Administrator by the applicable Election Filing Date. Such Deferral Commitment shall be effective as of the applicable Election Filing Date and shall continue to be effective from Deferral Period to Deferral Period until terminated or modified by filing a new Participation Agreement with the Administrator, provided that such new Participation Agreement must be filed by the applicable Election Filing Date for the Deferral Period for which it is to be effective.

2.    <u>Crediting of Deferred Fees</u>. The portion of a Director's Fees that is deferred pursuant to a Deferral Commitment shall be credited promptly following each Plan Year to the Director's Deferred Fee Account as of the date the corresponding non-deferred portion of his or her Fees would have been paid to the Director.

3.    <u>Deferral of Annual Equity Grant</u>. A Director may elect to defer all of his or her Annual Equity Grant (in lieu of receiving Restricted Shares or Shares pursuant to Section 3.1(a)) awarded during any Deferral Period by filing a Participation Agreement with the Administrator by the applicable Election Filing Date. Such Deferral Commitment shall be effective as of the applicable Election Filing Date and shall continue to be effective from Deferral Period to Deferral Period until terminated by filing a new Participation Agreement with the Administrator, provided that such new Participation Agreement must be filed by the applicable Election Filing Date for the Plan Year for which it is to be effective. Once such a Deferral Commitment has been terminated, another Deferral Commitment may not be made. Such Deferred Shares are still subject to forfeiture pursuant to Section 6.5.

4.    <u>Deferral of Required Retainer Shares and Voluntary Shares</u>. A Director may elect to defer and/or all or a specified percentage of his or her Required Retainer Shares and his or her Voluntary Shares earned for any Deferral Period by filing a Participation Agreement with the Administrator by the applicable Election Filing Date. Such Deferral Commitment shall be effective as of the applicable Election Filing Date and shall continue to be effective from Deferral Period to Deferral Period until terminated or modified by filing a new Participation Agreement with the Administrator, provided that such Participation Agreement must be filed by the applicable Election Filing Date for the Deferral Period for which it is to be effective.

5.    <u>Crediting of Deferred Shares</u>. The (i) Director's Annual Equity Grant that is deferred pursuant to a Deferral Commitment shall be credited promptly following each Plan Year to the Director's Deferred Share Annual Equity Subaccount and (ii) the portion of a Director's Required Retainer Shares and/or Voluntary Shares that is deferred pursuant to a Deferral Commitment shall be credited promptly following each Plan Year to the Director's Deferred Share Other Equity Subaccount, in either case as of the date the corresponding non-deferred portion of his or her Annual Equity Grant, Required Retainer Shares, and Voluntary Shares would have been issued to the Director.

**ARTICLE V.        DEFERRED FEE ACCOUNT**

1.    <u>Determination of Deferred Fee Account</u>. On any particular date, a Director's Deferred Fee Account shall consist of the aggregate amount credited thereto pursuant to Section 4.2, plus any interest credited pursuant to Section 5.2, minus the aggregate amount of distributions, if any, made from such Deferred Fee Account.

2.      Crediting of Interest. Each Deferred Fee Account to which Fees have been credited in dollar amounts shall be increased by the amount of interest earned since the immediately preceding Accounting Date. Interest shall be credited at the Declared Rate as of each Accounting Date based on the average daily balance of the Director's Deferred Fee Account since the immediately preceding Accounting Date, but after the Deferred Fee Account has been adjusted for any contributions or distributions to be credited or deducted for such period. Interest for the period prior to the first Accounting Date applicable to a Deferred Fee Account shall be prorated.

3.      Adjustments to Deferred Fee Accounts. Each Director's Deferred Fee Account shall be immediately debited with the amount of any distributions under the Plan to or on behalf of the Director or, in the event of his or her death, his or her Beneficiary.

4.      Statements of Deferred Fee Accounts. As soon as practicable after the end of each Plan Year, a statement shall be furnished to each Director or, in the event of his or her death, to his or her Beneficiary showing the status of his or her Deferred Fee Account as of the end of the Accounting Period, any changes in such Account since the end of the immediately preceding Accounting Period, and such other information as the Administrator shall determine.

5.      Vesting of Deferred Fee Account. A Director shall be 100% vested in his or her Deferred Fee Account at all times.

**ARTICLE VI.**           **DEFERRED SHARE ACCOUNT**

1.      Determination of Deferred Share Account. On any particular date, a Director's Deferred Share Account shall be comprised of the Deferred Share Annual Equity Subaccount and the Deferred Share Other Equity Subaccount which shall consist of the aggregate number of Deferred Shares credited thereto pursuant to Section 4.5, plus any dividend equivalents credited pursuant to Section 6.2, minus the aggregate amount of distributions, if any, made from such Deferred Share Annual Equity Subaccount and Deferred Share Other Equity Subaccount.

2.      Crediting of Dividend Equivalents. Each Deferred Share Annual Equity Subaccount and Deferred Share Other Equity Subaccount shall be credited as of the end of each Accounting Period with additional Deferred Shares equal in value to the amount of cash dividends paid by the Company during such Accounting Period on that number of Shares equivalent to the number of Deferred Shares in such Deferred Share Annual Equity Subaccount and Deferred Share Other Equity Subaccount during such Accounting Period. The dividend equivalents shall be valued by dividing the dollar value of such dividend equivalents by the Fair Market Value on the Accounting Date next following the dividend payment date. Until a Director or his or her Beneficiary receives his or her entire Deferred Share Account, the unpaid balance thereof credited in Deferred Shares shall be credited with dividend equivalents as provided in this Section 6.2.

3.      Adjustments to Deferred Share Accounts. Each Director's Deferred Share Annual Equity Subaccount and Deferred Share Other Equity Subaccount shall be immediately debited with the amount of any distributions under the Plan to or on behalf of the Director or, in the event of his or her death, his or her Beneficiary.

4.      Statements of Deferred Share Accounts. As soon as practicable after the end of each Plan Year, a statement shall be furnished to each Director or, in the event of his or her death, to his or her Beneficiary showing the status of his or her Deferred Share Account as of the end of the Accounting Period, any changes in such Account since the end of the immediately preceding Accounting Period, and such other information as the Administrator shall determine.

5.      Vesting of Deferred Share Account. A Director shall be 100% vested in his or her Deferred Share Other Equity Subaccount at all times and in his or her Deferred Share Annual Equity Subaccount with respect to any Annual Equity Grant received when a Director was 69 years of age or older. A Director shall become 100% vested in his or her Deferred Share Annual Equity Account with respect to each Annual Equity Grant upon the occurrence of a Vesting Event described in Section 3.1(b) (excluding any such Annual Equity Grant made to a Director who was 69 or older on the date of grant of such Annual Equity Grant) and any unvested portion shall be forfeited upon Termination of Service.

**ARTICLE VII.**                    **DISTRIBUTION OF BENEFITS**

1.        <u>Settlement Date</u>. A Director, or in the event of such Director's death, his or her Beneficiary, shall be entitled to all or a portion of the balance in such Director's Deferred Fee Account and Deferred Share Account, as provided in this Article VII, following such Director's Settlement Date or Dates.

2.        <u>Amount to be Distributed</u>.  The amount to which a Director, or in the event of such Director's death, his or her Beneficiary is entitled in accordance with the following provisions of this Article VII shall be based on the Director's adjusted balances in his or her Deferred Fee Account and Deferred Share Other Equity Subaccount and Deferred Share Annual Equity Subaccount determined as of the Accounting Date coincident with or next following his or her Settlement Date or Dates.

3.        <u>In-Service Distribution</u>. A Director may irrevocably elect to receive a pre-termination distribution of all or any specified percentage of his or her vested Deferred Fees credited to his or her Deferred Fee Account or vested Deferred Shares credited to his or her Deferred Share Other Equity Subaccount or Deferred Share Annual Equity Subaccount commencing on a specified date in a Plan Year that begins at least three Plan Years after the date such Fees and Shares otherwise would have been payable pursuant to a Specified Date Payment Election. Such Specified Date Payment Election (i) shall be made in a Participation Agreement filed at the same time he or she files a Deferral Commitment covering such Deferred Fees or Deferred Shares as provided in Sections 4.1, 4.2 or Section 4.4 and (ii) shall contain the Director's irrevocable election to receive such Deferred Fees or Deferred Shares under one of the forms provided in Section 7.4 or Section 7.5. Notwithstanding the foregoing, with respect to Deferred Shares in lieu of an Annual Equity Grant in the form of Restricted Shares for a Director under age 69 at the date of grant, the specified distribution date must be at least three years from the date of grant. In addition, if the Director has made a Specified Date Payment Election with respect to his or her Deferred Fee Account or Deferred Share Annual Equity Subaccount or Deferred Share Other Equity Subaccount pursuant to this Section 7.3 and the Director has made a Deferral Commitment for the Deferral Period immediately prior to the year specified in such Specified Date Payment Election, the time of commencement of distribution of amounts in his or her Deferred Fee Account, Deferred Share Annual Equity Subaccount, or Deferred Share Other Equity Subaccount for that and all future Deferral Periods shall be based on the specified date selected by the Director pursuant to new Specified Date Payment Election filed in connection with the Deferral Commitment for the first of such future Deferral Periods, and, if none, shall be based upon the earliest of the Settlement Dates described in Sections (hh)(i), (ii), and (iii) of Article I.

4.        <u>Time and Form of Distribution -- Deferred Fee Account</u> . Thirty days after the end of the Accounting Period in which a Director's Settlement Date occurs, the Company shall distribute or cause to be distributed, to the Director the balance of the Director's Deferred Fee Account as determined under Section 7.2, under one of the forms provided in this Section 7.4. In the event of a Director's death, the balance of his or her Deferred Fee Account shall be distributed to his or her Beneficiary in a lump sum.

Distribution of a Director's Deferred Fee Account shall be made in one of the following forms as elected by the Director:

(a)        by payment in cash in a single lump sum;

(b)        by payment in cash in not greater than ten annual installments; or

(c)        a combination of (a) and (b) above. The Director shall designate the percentage payable under each option.

The Director's election of the form of distribution of Deferred Fees shall be on a Participation Agreement filed with the Administrator at the same time the Director files a Deferral Commitment covering such Deferred Fees pursuant to Section 4.1 hereof.

The amount of cash to be distributed in each installment shall be equal to the quotient obtained by dividing the Director's Deferred Fee Account balance as of the date of such installment payment by the number of installment payments remaining to be made to or in respect of such Director at the time of calculation.

If a Director fails to make an election in a timely manner as provided in this Section 7.4, distribution shall be made in cash in a single lump sum.

Notwithstanding the foregoing provisions of this Section 7.4, if the Director is a Specified Employee at the time of his or her Termination of Service, payment on account of Termination of Service shall be made or commence on the first business day of the seventh month following such Termination of Service (or, if earlier, the date of death). In the event that the Specified Employee's Deferred Fee Account is payable in installments upon a Termination of Service, the total amount of installment payments to which such Specified Employee would otherwise be entitled during the period from the date of the Director's Termination of Service through the first day of the seventh month following the date of such Termination of Service shall also be paid on the first business day of the seventh month following such Termination of Service (or, if earlier, the date of death).

5.    Time and Form of Distribution -- Deferred Share Account . Thirty days after the end of the Accounting Period in which a Director's Settlement Date occurs, the Company shall distribute or cause to be distributed, to the Director a number of Shares equal to the number of Deferred Shares in the Director's Deferred Share Annual Equity Subaccount and Deferred Share Other Equity Subaccount as determined under Section 7.2, under one of the forms provided in this Section 7.5. In the event of a Director's death, the number of Shares equal to the number of Deferred Shares in his or her Deferred Share Annual Equity Subaccount and Deferred Share Other Equity Subaccount shall be distributed to his or her Beneficiary in a single distribution.

Distribution of a Director's Deferred Share Annual Equity Subaccount and Deferred Share Other Equity Subaccount shall be made in one of the following forms as elected by the Director:

(a)        by payment in Shares or cash in a single distribution;

(b)        by payment in Shares or cash in not greater than ten annual installments; or

(c)        a combination of (a) and (b) above. The Director shall designate the percentage payable under each option.

The Director's election of the form of distribution of Deferred Shares shall be on a Participation Agreement filed with the Administrator at the same time the Director files a Deferral Commitment covering the Annual Equity Grant, Required Retainer Shares or Voluntary Shares comprising such Deferred Shares pursuant to Section 4.3 or 4.4 hereof.

The number of Shares to be distributed in each installment shall be equal to the quotient obtained by dividing the number of Deferred Shares in the Director's Deferred Share Annual Equity Subaccount and Deferred Share Other Equity Subaccount as of the date of such installment payment by the number of installment payments remaining to be made to or in respect of such Director at the time of calculation. Fractional Shares shall be rounded down to the nearest whole Share, and such fractional amount shall be re-credited as a fractional Deferred Share in the Director's Deferred Share Annual Equity Subaccount and/or Deferred Share Other Equity Subaccount.

If a Director elects payment in a single distribution in cash, the amount of the payout shall be equal to the Fair Market Value of the Deferred Shares in the Director's Deferred Share Annual Equity Subaccount and Deferred Share Other Equity Subaccount. on the Settlement Date. If such Director elects payout in installments in cash, an amount equal to the Fair Market Value of the Deferred Shares in the Director's Deferred Share Annual Equity Subaccount and Deferred Share Other Equity Subaccount on the Settlement Date shall be transferred to the Director's Deferred Fee Account pending distribution.

If a Director fails to make an election in a timely manner as provided in this Section 7.5, distribution of the Director's Deferred Share Annual Equity Subaccount and/or Deferred Share Other Equity Subaccount shall be made in Shares in a single distribution.

Notwithstanding the foregoing provisions of this Section 7.5, if the Director is a Specified Employee on the date of his or her Termination of Service, payment on account of Termination of Service shall be made or commence on the first business day of the seventh month following such Termination of Service (or, if earlier, the date of death).

In the event that the Specified Employee's Deferred Share Annual Equity Subaccount or Deferred Share Other Equity Subaccount is payable in installments upon a Termination of Service, the total amount of installment payments to which such Specified Employee would otherwise be entitled during the period from the date of the Director's Termination of Service through the first day of the seventh month following the date of such Termination of Service shall also be paid on the first business day of the seventh month following such Termination of Service (or, if earlier, the date of death).

6.    Special Distributions. Notwithstanding any other provision of this Article VII, with respect to Deferred Fees or Deferred Shares that were earned and vested prior to January 1, 2005, a Director may elect to receive a distribution of part or all of his or her Deferred Fee Account and/or Deferred Share Account attributable to such Deferred Fees or Deferred Shares in one or more distributions if (and only if) the amount in the Director's Deferred Fee Account and/or the number of the Shares in the Director's Deferred Share Account subject to such distribution is reduced by 6%. The remaining 6% of the portion of the electing Director's Deferred Fee Account and/or Deferred Share Account subject to such distribution shall be forfeited. If a Director makes an election under this Section 7.6 during a Plan Year in which he or she is also making deferrals under the deferral portion of the Plan: (i) such election shall be effective as of the last day of the Plan Year in which it is submitted to the Administrator and any distribution made pursuant to such an election shall be made on such day and (ii) such Director shall terminate his or her participation in the deferral portion of the Plan for the two Plan Years following the Plan Year during which the Director's election is effective under this Section 7.6. If a Director makes an election under this Section 7.6 during a Plan Year in which he or she is not making any deferrals under the deferral portion of the Plan: (i) such election shall be effective when it is submitted to the Administrator and any distribution made pursuant to such an election shall be made within sixty days of the date such election is submitted to the Administrator and (ii) such Director shall not be eligible to participate in the deferral portion of the Plan for the two Plan Years following the Plan Year during which the Director's election is effective under this Section 7.6.

7.    Beneficiary Designation. As used in the Plan the term "Beneficiary" means:

(a)    The person last designated as Beneficiary by the Director in writing on a form prescribed by the Administrator;

(b)    If there is no designated Beneficiary or if the person so designated shall not survive the Director, such Director's spouse; or

(c)    If no such designated Beneficiary and no such spouse is living upon the death of a Director, or if all such persons die prior to the distribution of the Director's balance in his or her Deferred Fee Account and Deferred Share Account, then the legal representative of the last survivor of the Director and such persons, or, if the Administrator shall not receive notice of the appointment of any such legal representative within one year after such death, the heirs-at-law of such survivor shall be the Beneficiaries to whom the then remaining balance of such Accounts shall be distributed (in the proportions in which they would inherit his or her intestate personal property).

Any Beneficiary designation may be changed from time to time by the filing of a new form. No notice given under this Section 7.7 shall be effective unless and until the Administrator actually receives such notice.

8.    Facility of Payment. Whenever and as often as any Director or his or her Beneficiary entitled to payments hereunder shall be under a legal disability or, in the sole judgment of the Administrator, shall otherwise be unable to apply such payments to his or her own best interests and advantage, the Administrator in the exercise of its discretion may direct all or any portion of such payments to be made in any one or more of the following ways: (i) directly to him or her; (ii) to his or her legal guardian or conservator; or (iii) to his or her spouse or to any other person, to be expended for his or her benefit; and the decision of the Administrator, shall in each case be final and binding upon all persons in interest.

9.    Elections to Change Time and Form of Distribution . A Director may make an election to change the time of commencement of distribution(s) of his or her Deferred Fee Account or vested Deferred Shares Annual Equity Subaccount or Deferred Shares Other Equity Subaccount, the form of payment of such accounts, or both,

with respect to an amount previously deferred by the Director under a Deferral Commitment if all of the following requirements are met:

(a)    Such election may not take effect until at least twelve months after the date on which the election is made;

(b)    In the case of a election related to a payment other than a payment on account of death, Disability or occurrence of an Unforeseeable Emergency, the first payment under such election shall in all cases be deferred for a period of not less than five years from the date such payment would otherwise have been made (or, in the case of installment payments, which shall be treated as a single payment for purposes of this Section 7.9, five years from the date the first installment payment was scheduled to be paid); and

(c)    Any subsequent election related to a distribution that is to be made at a specified date or pursuant to a fixed schedule pursuant to Sections 7.3 of the Plan must be made not less than twelve months prior to the date the payment was scheduled to be made under the prior election or deemed election (or, in the case of installment payments, which shall be treated as a single payment for purposes of this Section 7.9, twelve months prior to the date the first installment payment was scheduled to be paid).

10.    Unforeseeable Emergency. Notwithstanding any other provision of this Article VII, in the event of an Unforeseeable Emergency and at the request of a Director, accelerated payment shall be made to the Director of all or a part of his or her (i) Deferred Fee Account or (ii) vested Deferred Share Account. Payments of amounts as a result of an Unforeseeable Emergency may not exceed the amount necessary to satisfy such Unforeseeable Emergency plus amounts necessary to pay taxes reasonably anticipated as a result of the distribution(s), after taking into account the extent to which the hardship is or may be relieved through reimbursement or compensation by insurance or otherwise by liquidation of the Director's assets (to the extent the liquidation of such assets would not itself cause severe financial hardship).

## ARTICLE VIII.        ADMINISTRATION, AMENDMENT AND TERMINATION

1.    Administration. The Plan shall be administered by the Administrator. The Administrator shall have such powers as may be necessary to discharge its duties hereunder. The Administrator may, from time to time, employ, appoint or delegate to an agent or agents (who may be an officer or officers of the Company) and delegate to them such administrative duties as it sees fit, and may from time to time consult with legal counsel who may be counsel to the Company. The Administrator shall have no power to add to, subtract from or modify any of the terms of the Plan, or to change or add to any benefits provided under the Plan, or to waive or fail to apply any requirements of eligibility for a benefit under the Plan. No member of the Administrator shall act in respect of his or her own Deferred Fee Account or his or her own Deferred Share Account. All decisions and determinations by the Administrator shall be final and binding on all parties. No member of the Administrator shall be liable for any such action taken or determination made in good faith. All decisions of the Administrator shall be made by the vote of the majority, including actions and writing taken without a meeting. All elections, notices and directions under the Plan by a Director shall be made on such forms as the Administrator shall prescribe.

2.    Amendment and Termination. The Board may alter or amend this Plan from time to time or may terminate it in its entirety; PROVIDED, HOWEVER, that no such action shall, without the consent of a Director, affect the rights in any Shares issued or to be issued to such Director, in any Deferred Shares in a Director's Deferred Share Account or in any amounts in a Director's Deferred Fee Account, and further provided, that, without further approval by the shareholders of the Company no such action shall (a) increase the total number of Shares available for issuance under this Plan specified in Article X or (b) otherwise cause Rule 16b-3 to become inapplicable to this Plan.

## ARTICLE IX.        FINANCING OF BENEFITS

1.    Financing of Benefits. The Shares and benefits payable in cash under the Plan to a Director or, in the event of his or her death, to his or her Beneficiary shall be paid by the Company from its general assets. The right to receive payment of the Shares and benefits payable in cash represents an unfunded, unsecured obligation of the Company. No person entitled to payment under the Plan shall have any claim, right, security

interest or other interest in any fund, trust, account, insurance contract, or asset of the Company which may be responsible for such payment.

2.    <u>Security for Benefits</u>. Notwithstanding the provisions of Section 9.1, nothing in this Plan shall preclude the Company from setting aside Shares or funds in trust ("Trust") pursuant to one or more trust agreements between a trustee and the Company. However, no Director or Beneficiary shall have any secured interest or claim in any assets or property of the Company or the Trust and all Shares or funds contained in the Trust shall remain subject to the claims of the Company's general creditors. Notwithstanding the foregoing, in no event shall any amount of Shares be transferred to Trust if, pursuant to Section 409A(b)(3)(A) of the Code, such amount would, for purposes of Section 83 of the Code, be treated as property transferred in connection with the performance of services.

## ARTICLE X.                SHARES SUBJECT TO PLAN

1.    <u>Shares Subject to Plan</u>. Subject to adjustment as provided in this Plan, the total number of Shares which may be issued under this Plan shall be 800,000 (400,000 of which were approved in 1996 and 400,000 of which were added as of May 8, 2001, in each case after giving effect to interim stock splits).

2.    <u>Adjustments</u>. In the event of any change in the outstanding Shares by reason of (a) any stock dividend, stock split, combination of shares, recapitalization or any other change in the capital structure of the Company, (b) any merger, consolidation, spin-off, split-off, spin-out, split-up, reorganization, partial or complete liquidation or other distribution of assets, issuance of rights or warrants to purchase securities, or (c) any other corporate transaction or event having an effect similar to any of the foregoing, the number and kind of shares specified in Article III, the number or kind of Shares that may be issued under the Plan as specified in Article X and the number of Deferred Shares in a Director's Deferred Share Account shall automatically be adjusted so that the proportionate interest of the Directors shall be maintained as before the occurrence of such event. Such adjustment shall be conclusive and binding for all purposes with respect to the Plan.

## ARTICLE XI.                PRIOR PLANS

1.    <u>1992 Incentive Equity Plan</u>. No further options shall be issued to the Directors under Section 8 of the Company's 1992 Incentive Equity Plan on or after July 1, 1996.

2.    <u>Plan for Deferred Payment of Director's Fees</u>. Effective May 14, 1996, the Prior Plan was discontinued, except that amounts remaining payable to former Directors in the Prior Plan were paid in accordance with its terms.

## ARTICLE XII.                GENERAL PROVISIONS

1.    <u>Interests Not Transferable; Restrictions on Shares and Rights to Shares</u>. No rights to Shares or other benefits payable in cash shall be assigned, pledged, hypothecated or otherwise transferred by a Director or any other person, voluntarily or involuntarily, other than (i) by will or the laws of descent and distribution, or (ii) to the extent permitted by Section 409A, the payment of part or all of an interest under this Plan may be made to an individual other than the Director to the extent necessary to fulfill a "domestic relations order" as defined in Section 414(p)(1)(B) of the Code. No person shall have any right to commute, encumber, pledge or dispose of any other interest herein or right to receive payments hereunder, nor shall such interests or payments be subject to seizure, attachment or garnishment for the payments of any debts, judgments, alimony or separate maintenance obligations or be transferable by operation of law in the event of bankruptcy, insolvency or otherwise, all payments and rights hereunder being expressly declared to be nonassignable and nontransferable.

2.    <u>Governing Law</u>. The provisions of this Plan shall be governed by and construed in accordance with the laws of the State of Ohio.

3.    <u>Withholding Taxes</u>. To the extent that the Company is required to withhold Federal, state or local taxes in connection with any component of a Director's compensation in cash or Shares, and the amounts available to the Company for such withholding are insufficient, it shall be a condition to the receipt of any Shares that the

Director make arrangements satisfactory to the Company for the payment of the balance of such taxes required to be withheld, which arrangement may include relinquishment of the Shares.

      4.    <u>Application of Section 409A of the Code</u>.

      (a)    Notwithstanding any other provision of the Plan, any Deferred Fees or Deferred Shares (and earnings thereon) that qualify for "grandfathered status" under Section 409A of the Code because they were earned and vested prior to January 1, 2005 shall continue to be governed by the law applicable to nonqualified deferred compensation prior to the addition of Section 409A of the Code and shall be subject to the terms and conditions specified in the Plan as in effect immediately prior to such date and shall not be modified by this amendment and restatement of the Plan (other than Section 7.6 hereof).

      (b)    To the extent applicable, it is intended that this Plan comply with the provisions of Section 409A of the Code, so that the income inclusion provisions of Section 409A(a)(1) of the Code do not apply to the Director. The Plan shall be administered in a manner consistent with this intent. Any reference in this Plan to Section 409A of the Code will also include any proposed, temporary or final regulations, or any other guidance, promulgated with respect to such Section by the U.S. Department of the Treasury or the Internal Revenue Service. Notwithstanding any provision of the Plan to the contrary, in light of the uncertainty with respect to the proper application of Section 409A of the Code, the Company reserves the right to make amendments to this Plan as the Company deems necessary or desirable to avoid the imposition of taxes or penalties under Section 409A of the Code.

      (c)    Except as permitted under Section 409A of the Code, any deferred compensation (within the meaning of Section 409A of the Code) payable to a Director or for a Director's benefit under this Plan may not be reduced by, or offset against, any amount owing by a Director to the Company or any of its affiliates.

      5.    <u>Miscellaneous</u>. Headings are given to the sections of this Plan solely as a convenience to facilitate reference. Such headings, numbering and paragraphing shall not in any case be deemed in any way material or relevant to the construction of this Plan or any provisions thereof. The use of the singular shall also include within its meaning the plural, and vice versa.

EXHIBIT 10.54

Execution Copy

**SEVERANCE AGREEMENT AND RELEASE**

**THIS Severance Agreement and Release** ("Agreement") is made between Gary B. Halverson (the "Executive") and Cliffs Natural Resources Inc., an Ohio corporation (the "Company"), as of the date set forth below. The Executive and Company may be referred to as the "Parties".

**WHEREAS**, the Company and the Executive are parties to a Change in Control Severance Agreement, which was executed on October 23, 2013 and which became effective on November 18, 2013 (the "CIC Agreement");

**WHEREAS**, on August 6, 2014, the Company incurred a "Change in Control" as defined in the CIC Agreement;

**WHEREAS**, on August 7, 2014, the Board of Directors of the Company terminated the employment of the Executive without "Cause" (as defined in the CIC Agreement) in connection with the Change in Control;

**WHEREAS**, as a result of such termination of employment, the Executive has become entitled to certain benefits and payments under the CIC Agreement;

**WHEREAS**, under the CIC Agreement, the Executive is required to sign a release in order to receive the Severance Compensation (as defined under the CIC Agreement and outlined below) and to receive other benefits or payments as provided under the CIC Agreement; and

**WHEREAS**, the Parties wish to clarify, interpret, and specify the rights of and payments to the Executive in this Agreement, to embody the release required of the Executive in order to trigger the payments and benefits to be provided under the CIC Agreement to the Executive, and to confirm the continued effectiveness of certain prior agreements between the Parties.

**NOW THEREFORE**, in consideration of the promises and agreements contained herein and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

This Agreement is effective on the date hereof and will continue in effect as provided herein. Capitalized terms that are not defined herein shall have the meanings ascribed to them in the CIC Agreement.

1.      **SEVERANCE PAYMENT**.

Pursuant to the payment terms and structure within Annex A-1 of the CIC Agreement, the Company shall make the following payments to or for the benefit of the Executive:

(a)      An aggregate cash payment in the amount of $7,840,949, less appropriate withholdings. The Company shall pay such amount, net of withholdings, to KeyBank, N.A., as trustee (the "Trustee"), under the Trust Agreement No. 1, amended and restated effective June 1, 1997 and as subsequently amended to date (the "Trust"), by and between the Company and the Trustee. Such payment shall be made to the Trustee in immediately available funds on the first business day after the date hereof, together with notice to the Trustee that such funds are to be held for the benefit of the Executive as a beneficiary under the Trust and paid to the Executive pursuant to the CIC Agreement and this Agreement, in a single lump sum, on the first business day after the end of the

seven-day period referred to in Section 3(f) hereof. This cash payment, before withholdings, is comprised of the sum of:

- 3 years of 2014 Base Pay ($950,000 times 3 = $2,850,000);

- 3 years of Incentive Pay at Target for 2014 ($1,330,000 times 3 = $3,990,000);

- Pro-rated portion of 2014 Incentive Pay at Target for 2014: 219/365 times $1,330,000 = $798,000);

- Accrued but unused 2014 vacation ($30,449);

- Outplacement service (15 % of base pay = $142,500); and

- Financial planning perquisites ($30,000).

(b)    An equity payout of $3,596,590.50, less applicable withholdings, reflective of vested grants and/or awards under the 2012 Incentive Equity Plan, as amended, to be paid within the first three days of the seventh month after the Executive's Separation from Service.

(c)    A lump sum payment of $579,478.80, less applicable withholdings, representing the sum of the present values of the Executive's full accrued benefit under the Cliffs Defined Benefit Pension Plan, the Accrued SRP Payment, and the Non-accrued SRP Payment. Such payment, net of withholdings, shall be made to the Trustee in immediately available funds on the first business day after the date hereof, together with notice to the Trustee that such funds are to be held for the benefit of the Executive as a beneficiary under the Trust and paid to the Executive pursuant to the SRP, in a single lump sum, within the first three days of the seventh month after the Executive's Separation from Service.

2.    **OTHER BENEFITS OR PAYMENTS**.

<u>Health & Welfare Benefits</u>. Pursuant to the provisions of paragraphs (1) through (3) of Annex A to the CIC Agreement, for the duration of the Continuation Period, the Company shall continue to cover the Executive under all of the health and welfare plans in which the Executive was participating on August 7, 2014, all at Company expense. For the sake of clarity, these plans shall include (but are not necessarily limited to) coverages for medical, prescription drug, dental, vision, disability, life insurance, accident insurance, accidental death and dismemberment, and long term care. If and to the extent that any benefit provided herein later cannot be paid or provided under a policy, plan, program or arrangement of the Company, then the Company itself will pay or provide for the payment to the Executive, his dependents and beneficiaries, of such Employee Benefits.

3.    **RELEASE (the "<u>Release</u>")**.

In consideration of the payments to be made and the benefits to be received by the Executive pursuant to this Agreement, and the CIC Agreement, which the Executive acknowledges are in addition to payments and benefits which the Executive would be entitled to receive absent this Agreement and the CIC Agreement (other than severance pay and benefits under any other severance plan, policy, program or arrangement sponsored by Cliffs Natural Resources Inc.), the Executive, for himself and his dependents, successors, assigns, heirs, executors and administrators (and his and their legal representatives of every kind), hereby releases, dismisses, remises and forever discharges Cliffs Natural Resources Inc., its predecessors, parents, subsidiaries, divisions, related or affiliated companies, officers, directors, stockholders, members, executives, heirs, successors, assigns, representatives, agents and counsel (the "<u>Released Parties</u>") from any and all arbitrations, claims, including claims for attorney's fees (other than as

2

provided in the CIC Agreement), demands, damages, suits, proceedings, actions and/or causes of action of any kind and every description, whether known or unknown, which the Executive now has or may have had for, upon, or by reason of any cause whatsoever ("claims"), against the Released Parties, including but not limited to:

(a)    any and all claims arising out of or relating to the Executive's employment by or service with the Company and his termination from the Company other than any claims arising under this Agreement, the CIC Agreement, or under any executive benefit programs or executive compensation programs not specifically addressed in this Agreement or the CIC Agreement;

(b)    any and all claims of discrimination, including but not limited to claims of discrimination on the basis of sex, race, age, national origin, marital status, religion or handicap, including, specifically, but without limiting the generality of the foregoing, any claims under the Age Discrimination in Employment Act, as amended, Title VII of the Civil Rights Act of 1964, as amended, the Americans with Disabilities Act, Ohio Revised Code Section 4101.17 and Ohio Revised Code Chapter 4112, including Sections 4112.02 and 4112.99 thereof; and

(c)    any and all claims of wrongful or unjust discharge or breach of any contract or promise, express or implied.

The Executive hereby gives up any and all rights or claims to be a class representative or otherwise participate in any class action on behalf of any employee benefit plan of the Company or any Subsidiary.

The Executive understands and acknowledges that the Company does not admit any violation of law, liability or invasion of any of his rights and that any such violation, liability or invasion is expressly denied. The consideration provided for this Release is made for the purpose of settling and extinguishing all claims and rights (and every other similar or dissimilar matter) that the Executive ever had or now may have against the Company to the extent provided in this Release. The Executive further agrees and acknowledges that no representations, promises or inducements have been made by the Company other than as appear in the Agreement.

The Executive further agrees and acknowledges that:

The release provided for herein releases claims to and including the date of this Release;

(d)    He has been advised by the Company to consult with legal counsel prior to executing this Release, has had an opportunity to consult with and to be advised by legal counsel of his choice, fully understands the terms of this Release, and enters into this Release freely, voluntarily and intending to be bound;

(e)    He has been given a period of 21 days, commencing on the day after his Separation from Service, to review and consider the terms of this Release, prior to its execution and that he may use as much of the 21 day period as he desires; and

(f)    He may, within seven days after execution, revoke this Release. Revocation shall be made by delivering a written notice of revocation to the Executive Vice President, Human Resources at the Company. For such revocation to be effective, written notice must be actually received by the Executive Vice President, Human Resources at the Company no later than the close of business on the seventh day after the Executive executes this Release. If Executive does exercise his right to revoke this Release, all of the terms and conditions of the Release shall be of no force and effect and the Company shall not have any obligation to make payments or provide benefits to the Executive otherwise required as a result of the Agreement.

3

A004487

The Executive agrees that he will never file a lawsuit or other complaint asserting any claim that is released in this Release.

The Executive waives and releases any claim that he has or may have to reemployment after August 7, 2014.

4.      **OTHER PROVISIONS**.

(a)      <u>Effect of Executive's Death</u>. Should the Executive die before receipt of all payments under this Agreement, the unpaid amounts shall be payable to the Executive's estate or otherwise inure to the benefit of his heirs. If the Executive dies before the end of the Continuation Period, the Employee Benefits shall continue to be made available or paid to the Executive's surviving spouse and dependents for the duration of the Continuation Period.

(b)      <u>Non-Disparagement</u>. The Executive shall not make any negative statements orally or in writing about the Executive's employment with the Company, about the Company or its affiliates or any of its executives or products, to anyone other than to the EEOC or any similar state agency, Executive's immediate family, and the Executive's legal representatives or financial advisors. Nothing herein shall prevent the Executive from testifying truthfully in a legal proceeding or governmental administrative proceeding. The Executive may indicate on employment applications and during interviews that the Executive was employed by the Company, the Executive's duties, length of employment, and compensation. The Company shall not make any negative statements orally or in writing about the Executive's employment with the Company to anyone other than to the EEOC or any similar state agency and the Company's legal representatives and the Company has instructed its senior executives not to make such statements. Nothing herein shall prevent the Company from testifying truthfully in a legal proceeding or governmental administrative proceeding.

(c)      <u>Severability</u>. In the event that one or more provisions of this Agreement is found to be unenforceable for any reason whatsoever, the unenforceable provision or provisions shall be considered to be severable, and the remainder of this Agreement shall continue in full force and effect.

(d)      <u>Binding Effect</u>. This Agreement shall be binding upon and operate to the benefit of the Executive and Released Parties, and their successors and assigns.

(e)      <u>Waiver</u>. No waiver of any of the terms of this Agreement shall constitute a waiver of any other terms, whether or not similar, nor shall any waiver be a continuing waiver. No waiver shall be binding unless executed in writing by the Party making the waiver. The Company or the Executive may waive any provision of this Agreement intended for such Party's benefit, but such waiver shall in no way excuse the other Party from the performance of any of such Party's other obligations under this Agreement.

(f)      <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio, without regard to the principles of conflicts of law, except to the extent those laws are preempted by federal law.

(g)      <u>Subsequent Modifications</u>. The terms of this Agreement may be altered or amended, in whole or in part, only upon the signed written agreement of the Parties.

(h)      <u>Effect on Other Agreements; Indemnification</u>. Notwithstanding the Release by the Executive contained in this Agreement, or anything else to the contrary, the rights and duties of the Parties under the CIC Agreement shall continue and be of full force and effect in accordance with its terms. The Company agrees to indemnify the Executive for actions occurring prior to the Termination Date and in connection with the execution, delivery and performance of this Agreement

A004488

to the same extent as if he were a party to an indemnification agreement with the Company in the form of the indemnification agreement to which the Company is a party with members of its board of directors. Following the Termination Date, Employee shall continue to be covered by any provision for indemnification by the Company in effect on the date of the execution of this Agreement for so long and to the same extent that the Company provides the same or more favorable indemnification to the members of the Company's board of directors or its active senior executives, whichever is more favorable. In addition, the Company shall continue to maintain D&O coverage that covers the Executive to the same extent that it covers the members of the Company's board of directors or its active senior executives, whichever is more favorable. Finally, in the event of a transaction resulting in a Change in Control of the Company subsequent to the date hereof in which the Company is not the surviving entity, the Company shall use its reasonable best efforts to require as part of such transaction that the surviving company provide indemnification and D&O coverage that covers the Executive to the extent described in this paragraph, provided that the Company shall, in any event, use its reasonable best efforts to require that the surviving company provide the Executive with the same indemnification rights and D&O coverage as are provided to the senior executives who remain with the Company following the Change in Control and to the then current and former members of its board of directors, whichever is more favorable.

5.          [signature page
            follows]

5

IN WITNESS WHEREOF, the Executive and the Company have executed and delivered this Agreement and Release on the date set forth below.

EXECUTIVE:

Dated: August 22, 2014                        /s/ Gary B. Halverson

COMPANY:

CLIFFS NATURAL RESOURCES INC.

Dated: August 22, 2014               By:     /s/ James D. Graham
                                     Its:    Vice President, Chief Legal Officer & Secretary

6

A004490

EXHIBIT 10.64

**CLIFFS NATURAL RESOURCES INC.**
**AMENDED AND RESTATED 2012 INCENTIVE EQUITY PLAN**

**RESTRICTED SHARE UNIT AWARD MEMORANDUM**

| | |
|---|---|
| **Employee:** | PARTICIPANT NAME |
| **Date of Grant:** | GRANT DATE |
| **Number of Shares Subject to Award:** | SHARES GRANTED |
| **Vesting Date:** | 50% of the Restricted Share Units covered by this Memorandum and the Award Agreement shall become Vested on each of February 10, 2015 ("First Vesting Date") and February 10, 2016 ("Second Vesting Date"). |

**Additional terms and conditions of your Award are included in the Restricted Share Unit Award Agreement. As a condition to your receipt of Shares, you must log on to Fidelity's website at www.netbenefits.fidelity.com and accept the terms and conditions of this Award within 90 calendar days of your Date of Grant. If you do not accept the terms and conditions of this Award within such time at www.netbenefits.fidelity.com, this Award may be forfeited and immediately terminate.**

**Note:** **Article 2.1 of the Restricted Share Unit Award Agreement contains provisions that restrict your activities. These provisions apply to you and, by accepting this Award, you agree to be bound by these restrictions.**

1

**CLIFFS NATURAL RESOURCES INC.**
**AMENDED AND RESTATED 2012 INCENTIVE EQUITY PLAN**

**Restricted Share Unit Award Agreement**

This Restricted Share Unit Award Agreement (the "Agreement") is between Cliffs Natural Resources Inc., an Ohio corporation (the "Company"), and you, the person named in the Restricted Share Unit Award Memorandum (the "Award Memorandum") who is an employee of the Company or Subsidiary of the Company (the "Participant"). For purposes of this Agreement, "Employer" means the entity (the Company or Subsidiary) that employs Participant on the applicable date. This Agreement is effective as of the Date of Grant set forth in the Award Memorandum.

The Company wishes to award to Participant Restricted Share Units representing the opportunity to earn a number of the Company's common shares, $.125 par value per share (the "Shares"), subject to the terms and conditions set forth in this Agreement, in order to carry out the purpose of the Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan (the "Plan"). All capitalized terms not defined in this Agreement shall have the same meaning as set forth in the Plan. See Article 1 of the Plan for a list of defined terms.

In the event of a conflict between the terms of this Agreement, the Award Memorandum and the terms of the Plan, the terms of the Plan shall govern. In the event of a conflict between the terms of this Agreement and the Award Memorandum, the terms of this Agreement shall govern.

**ARTICLE 1**
**Grant and Terms of Restricted Share Units**

**1.1   Grant of Restricted Share Units**. Pursuant to the Plan, the Company has granted to Participant the number of Restricted Share Units as specified in the Award Memorandum, with dividend equivalents ("Restricted Share Units"), effective as of the Date of Grant.

**1.2   Vesting As Condition of Payment**. The Restricted Share Units covered by this Agreement and these terms and conditions shall only result in the issuance of Shares (or cash or a combination of Shares and cash, as decided by the Committee in its sole discretion) equal in number to the Restricted Share Units to the extent the Participant is "Vested" in the Restricted Share Units on the date the Restricted Share Units are to be paid as specified in Section 1.3. The Restricted Share Units will become Vested as follows:

(a)   Employment Through Vesting Period. The Participant will become Vested in 50% of the Restricted Share Units subject to this Award on each of the First Vesting Date and Second Vesting Date if the Participant remains in the continuous employ of the Company or Subsidiary throughout the period beginning on the Date of Grant and ending on each of the First Vesting Date and Second Vesting Date, respectively, as set forth in the Award Memorandum ("Vesting Period").

(b)   Death or Disability. The Participant will become 100% Vested in all the Restricted Share Units subject to this Award that were not previously Vested if the Participant experiences a termination of employment with the Company because of the Participant's death or Disability during the Vesting Period.

(c)   Change in Control. In the event of a Change in Control (as defined in Section 1.4) during the Vesting Period or otherwise occurring during 2014, the Participant will become Vested in the Restricted Share Units only to the extent provided in Section 1.4.

In the event the Participant otherwise terminates employment (including, but not limited to, by reason of retirement, resignation, or by the Company for or other than for Cause) prior to becoming Vested in the

2

Restricted Share Units, the Participant shall forfeit all rights to any Restricted Share Units that were granted under the Agreement and not Vested on the date of such termination of employment.

**1.3**  **Payment of Restricted Share Units**.

(a)  Payment After the Vesting Period . The Restricted Share Units that become Vested shall be paid within 10 days of the date they become Vested pursuant to Section 1.2.

(b)  General. The Committee, in its sole discretion, may settle the Restricted Share Units in cash or a combination of Shares and cash, in lieu of issuing only Shares. In the event that all or any portion of the Restricted Share Units shall be paid in cash, the cash equivalent of one Restricted Share Unit shall be equal to the Fair Market Value of one Share on the date such Restricted Share Unit became Vested or, if such date is not a trading date, on the first trading day immediately preceding the date on which such Restricted Share Unit became Vested. Notwithstanding the foregoing, no Restricted Share Units granted hereunder may be paid in cash in lieu of Shares to any Participant who is subject to the Cliffs Natural Resources Inc. Directors' and Officers' Share Ownership Guidelines ("Share Ownership Guidelines") unless and until such Participant is either in compliance with, or no longer subject to, such Share Ownership Guidelines; provided, however, that the Committee may withhold Shares to the extent necessary to satisfy income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related item withholding requirements, as described in Section 4.3. In addition, the Committee may restrict 50% of the Shares to be issued in satisfaction of the total Restricted Share Units, before income tax withholding, so that they cannot be sold by Participant unless immediately after such sale the Participant is in compliance with the Share Ownership Guidelines that are applicable to the Participant at the time of sale.

( c )  Payment After Death. Any payment of Restricted Share Units to a deceased Participant shall be paid to the estate of the Participant, unless the Participant files a completed Designation of Death Beneficiary with the Company in accordance with its procedures.

(d)  Payment Obligation. Prior to payment, the Company shall only have an unfunded and unsecured obligation to make payment of Restricted Share Units to the Participant. The Restricted Share Units covered by this Agreement that have not yet been earned, and any interests of the Participant with respect thereto, are not transferable other than pursuant to the laws of descent and distribution, or in accordance with Section 1.3(c).

**1.4**  **Change in Control Vesting**.

(a)  If the Participant remains in the continuous employ of the Company or Subsidiary throughout the period beginning on July 28, 2014 and ending on the date of a Change in Control, the Participant will, upon the Change in Control, become 100% Vested in all the Restricted Share Units subject to the Award that had not become Vested prior to the Change in Control, except to the extent that an award meeting the requirements of Section 1.4(e) (a "Replacement Award") is provided to the Participant in accordance with Section 1.4(e) to replace, adjust or continue the award of Restricted Share Units covered by this Agreement (the "Replaced Award"). If a Replacement Award is provided, references to Restricted Share Units in this Agreement shall be deemed to refer to the Replacement Award after the Change in Control.

(b)  If, upon or after receiving a Replacement Award, the Participant experiences a termination of employment with the Company or Subsidiary of the Company (or any of their successors) (as applicable, the "Successor") by reason of the Participant terminating employment for Good Reason or the Successor terminating Participant's employment other than for Cause, in each case within a period of two years after the Change in Control and during the Vesting Period, the Participant shall become 100% Vested in the Replacement Award upon such termination to the extent not previously Vested.  Such Vested Replacement Award will be paid in accordance with Section 1.3 within 10 days of becoming Vested.

3

(c)    If a Replacement Award is provided, notwithstanding anything in this Agreement to the contrary, any outstanding Restricted Share Units that at the time of the Change in Control are not subject to a "substantial risk of forfeiture" (within the meaning of Section 409A of the Code) will be deemed to be Vested at the time of such Change in Control and will be paid as provided for in Section 1.3(a).

(d)    For purposes of this Agreement, a "<u>Change in Control</u>" means:

(i)    any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>")) (a "<u>Person</u>") becomes the beneficial owner (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 35% or more of either (x) the then-outstanding Shares (the "<u>Outstanding Company Common Stock</u>") or (y) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors (the "<u>Outstanding Company Voting Securities</u>"); provided, however, that, for purposes of this Section 1.4(d)(i), the following acquisitions shall not constitute a Change in Control: (A) any acquisition directly from the Company, (B) any acquisition by the Company, (C) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any Affiliate or (D) any acquisition pursuant to a transaction that complies with Sections 1.4(d)(iii)(A), 1.4(d)(iii)(B) and 1.4(d)(iii)(C), below;

(ii)    individuals who, as of July 28, 2014, constitute the Board of Directors (the "<u>Incumbent Board</u>") cease for any reason to constitute at least a majority of the Board of Directors; provided, however, that any individual becoming a director subsequent to July 28, 2014 whose election, or nomination for election by the Shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual was a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board of Directors;

(iii)    consummation of a reorganization, merger, statutory share exchange or consolidation or similar transaction involving the Company or any of its subsidiaries, a sale or other disposition of all or substantially all of the assets of the Company, or the acquisition of assets or securities of another entity by the Company or any of its subsidiaries (each, a "<u>Business Combination</u>"), in each case unless, following such Business Combination, (A) all or substantially all of the individuals and entities that were the beneficial owners of the Outstanding Company Common Stock and the Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of the then-outstanding shares of common stock (or, for a non-corporate entity, equivalent securities) and the combined voting power of the then-outstanding voting securities entitled to vote generally in the election of directors (or, for a non-corporate entity, equivalent governing body), as the case may be, of the entity resulting from such Business Combination (including, without limitation, an entity that, as a result of such transaction, owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries) in substantially the same proportions as their ownership immediately prior to such Business Combination of the Outstanding Company Common Stock and the Outstanding Company Voting Securities, as the case may be, (B) no Person (excluding any entity resulting from such Business Combination or any employee benefit plan (or related trust) of the Company or such entity resulting from such Business Combination) beneficially owns, directly or indirectly, 35% or more of, respectively, the then-outstanding shares of common stock (or, for a non-corporate entity, equivalent securities) of the entity resulting from such Business Combination or the combined voting power of the then-outstanding voting securities of such entity, except to the extent that such ownership existed prior to the Business Combination, and (C) at least a majority of the members of the board of directors (or, for a non-corporate entity, equivalent governing body) of the entity resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement or of the action of the Board of Directors providing for such Business Combination; or

4

(iv)    approval by the Shareholders of a complete liquidation or dissolution of the Company.

(e)    For purposes of this Agreement, a "Replacement Award" means an award: (i) of the same type (e.g., time-based restricted share units) as the Replaced Award; (ii) that has a value at least equal to the value of the Replaced Award; (iii) that relates to publicly traded equity securities of the Company or its successor in the Change in Control or another entity that is affiliated with the Company or its successor following the Change in Control; (iv) if the Participant holding the Replaced Award is subject to U.S. federal income tax under the Code, the tax consequences of which to such Participant under the Code are not less favorable to such Participant than the tax consequences of the Replaced Award; and (v) the other terms and conditions of which are not less favorable to the Participant holding the Replaced Award than the terms and conditions of the Replaced Award (including the provisions that would apply in the event of a subsequent Change in Control). A Replacement Award may be granted only to the extent it does not result in the Replaced Award or Replacement Award failing to comply with or be exempt from Section 409A of the Code. Without limiting the generality of the foregoing, the Replacement Award may take the form of a continuation of the Replaced Award if the requirements of the two preceding sentences are satisfied. The determination of whether the conditions of this Section 1.4(e) are satisfied will be made by the Committee, as constituted immediately before the Change in Control, in its sole discretion.

(f)    A termination "for Cause" for purposes of Section 1.4 means that, prior to termination of employment, the Participant shall have committed: (i) and been convicted of a criminal violation involving fraud, embezzlement or theft in connection with his or her duties or in the course of his or her employment with the Successor; (ii) intentional wrongful damage to property of the Successor; (iii) intentional wrongful disclosure of secret processes or confidential information of the Successor; or (iv) intentional wrongful engagement in any competitive activity; and any such act shall have been demonstrably and materially harmful to the Successor. For purposes of this definition, no act or failure to act on the part of the Participant shall be deemed "intentional" if it was due primarily to an error in judgment or negligence, but shall be deemed "intentional" only if done or omitted to be done by the Participant not in good faith and without reasonable belief that the Participant's action or omission was in the best interest of the Successor.

(g)    A termination "for Good Reason" shall mean the Participant's termination of employment with the Successor as a result of the initial occurrence, without the Participant's consent, of one or more of the following events:

(i)    a material diminution in the Participant's annual base salary rate as in effect from time to time (" Base Pay");

(ii)    a material diminution in the Participant's authority, duties or responsibilities;

(iii)    a material change in the geographic location at which the Participant must perform services;

(iv)    a reduction in the Participant's opportunity regarding annual bonus, incentive or other payment of compensation, in addition to Base Pay, made or to be made in regard to services rendered in any year or other period pursuant to any bonus, incentive, profit-sharing, performance, discretionary pay or similar agreement, policy, plan, program or arrangement (whether or not funded) of the Successor; and

(v)    any other action or inaction that constitutes a material breach by the Participant's employer of the employment agreement, if any, under which the Participant provides services.

Notwithstanding the foregoing, "Good Reason" shall not be deemed to exist unless: (A) the Participant has provided notice to his or her employer of the existence of one or more of the conditions listed in (i) through

5

(v) above within 90 days after the initial occurrence of such condition or conditions; and (B) such condition or conditions have not been cured by the Participant's employer within 30 days after receipt of such notice.

## ARTICLE 2.
## Other Terms and Conditions

**2.1** __Non-Compete and Confidentiality__.

    (d)   A Participant shall not render services for any organization or engage directly or indirectly in any business that is a competitor of the Company or any Affiliate of the Company, or which organization or business is or plans to become prejudicial to or in conflict with the business interests of the Company or any Affiliate of the Company or distribute any secret or confidential information belonging to the Company or any Affiliate of the Company.

    (e)   Failure to comply with subsection (a) above will cause a Participant to forfeit the right to Restricted Share Units and require the Participant to reimburse the Company for the taxable income received on Restricted Share Units that have been paid out in Shares within the 90-day period preceding the Participant's termination of employment.

## ARTICLE 3.
## Acknowledgements

**3.1** __Acknowledgments__. In accepting the Award, Participant acknowledges, understands and agrees to the following:

    (e)   The Plan is established voluntarily by the Company, it is discretionary in    nature and it may be modified, amended, suspended or terminated by the    Company at any time, to the extent permitted by the Plan;

    (f)   The grant of the Restricted Share Units is voluntary and occasional and does not create any contractual or other right to receive future grants of Restricted Share Units, or benefits in lieu of Restricted Share Units, even if Restricted Share Units have been granted in the past;

    (g)   All decisions with respect to future Restricted Share Units or other grants, if any, will be at the sole discretion of the Company;

    (h)   The Participant's participation in the Plan is voluntary;

    (i)   The Restricted Share Unit Award and Participant's participation in the Plan shall not create a right to employment or be interpreted as forming an employment or services contract with the Company or any Subsidiary and shall not interfere with the ability of the Company, or any Subsidiary, as applicable, to terminate the Participant's employment or service relationship (if any);

    (j)   The future value of the underlying Shares is unknown, indeterminable and cannot be predicted with certainty;

    (k)   No claim or entitlement to compensation or damages shall arise from forfeiture of any Restricted Share Units resulting from the Participant ceasing to provide employment or other services to the Company or a Subsidiary (for any reason whatsoever whether or not later found to be invalid or in breach of employment laws in the jurisdiction where Participant is employed or the terms of Participant's

6

employment agreement, if any), and in consideration of the grant of the Restricted Share Units to which Participant is otherwise not entitled, Participant irrevocably agrees never to institute any claim against the Company or any of its Subsidiaries, and the Participant waives his or her ability, if any, to bring any such claim, and releases the Company and its Subsidiaries from any such claim; if, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by participating in the Plan, Participant shall be deemed irrevocably to have agreed not to pursue such claim and agrees to execute any and all documents necessary to request dismissal or withdrawal of such claim;

(l)　Neither the Plan nor the Restricted Share Units shall be construed to create an employment relationship where any employment relationship did not otherwise already exist;

(m)　The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Participant's participation in the Plan, or the Participant's acquisition or sale of the underlying Shares. The Participant is hereby advised to consult with his or her own personal tax, legal and financial advisors regarding his or her participation in the Plan before taking any action related to the Restricted Share Units;

(n)　The Restricted Share Units and the Shares subject to the Restricted Share　Units, and the income and value of same, are not part of normal or expected compensation for purposes of calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, bonuses, long-service awards, pension or retirement or welfare benefits or similar payments; and

(o)　The Company reserves the right to impose other requirements on participation in the Restricted Share Units and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable in order to comply with local law or other applicable rules or facilitate the administration of the Plan, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

## ARTICLE 4.
### General Provisions

**4.1　Compliance with Law**. The Company shall make reasonable efforts to comply with all applicable federal and state securities laws; provided, however, notwithstanding any other provision of the Agreement and these terms and conditions, the Company shall not be obligated to issue any Shares pursuant to the Agreement and these terms and conditions if the issuance or payment thereof would result in a violation of any such law; provided, however, that the Shares will be issued at the earliest date at which the Company reasonably anticipates that the issuance of the Shares will not cause such violation.

**4.2　Dividend Equivalents**. During the period beginning on the Date of Grant and ending on the date that the Restricted Share Units are paid in accordance with Section 1.3, the Participant will be entitled to dividend equivalents on Restricted Share Units equal to the cash dividend or distribution that would have been paid on the Restricted Share Units had the Restricted Share Units been issued and outstanding Shares on the record date for the dividend or distribution. Such accrued dividend equivalents (a) will vest and become payable upon the same terms and at the same time of settlement as the Restricted Share Units to which they relate, and (b) will be denominated and payable solely in cash.

**4.3　Withholding Taxes**. The provisions of Article 18.3 of the Plan shall apply to the extent that the Company or Subsidiary is required to withhold income tax, social insurance, payroll tax, fringe benefits

7

tax, payment on account or other tax-related items related to Participant's participation in the Plan in connection with the Participant's Restricted Share Units (or dividend equivalents, if any), unless as otherwise specified in the Appendix to this Agreement, including, without limitation, any tax liability associated with the grant or vesting of the Restricted Share Units or sale of the underlying Shares (the "Tax Liability"). These requirements may change from time to time as laws or interpretations change. Regardless of the Company or Subsidiaries' actions in this regard, the Participant hereby acknowledges and agrees that the Tax Liability shall be the Participant's sole responsibility and liability. The Participant acknowledges that the Company's obligation to issue or deliver Shares or pay cash shall be subject to satisfaction of the Tax Liability. Unless otherwise determined by the Committee, withholding obligations shall be satisfied by having the Company or one if its Subsidiaries withhold all or a portion of any Shares that otherwise would be issued or cash payable to the Participant upon settlement of the vested Restricted Share Units; provided that amounts withheld shall not exceed the amount necessary to satisfy the Company's tax withholding obligations. Such withheld Shares shall be valued based on the Fair Market Value as of the date the withholding obligations are satisfied. The Company or one of its Subsidiaries may also satisfy the Tax Liability by deduction from the Participant's wages or other cash compensation paid to the Participant. If the Company does not elect to have withholding obligations satisfied by either withholding Shares, from the cash payable, or by deduction from the Participant's wages or other compensation paid to the Participant, the Participant agrees to pay the Company or Subsidiary the amount of the Tax Liability in cash (or by check) as directed by the Company or Subsidiary.

      **4.4**   **Continuous Employment**. For purposes of this Agreement, the continuous employment of the Participant with the Company shall not be deemed to have been interrupted, and the Participant shall not be deemed to have separated from service with the Company, by reason of the transfer of his employment among the Company or Subsidiaries or an approved leave of absence, unless otherwise indicated in the Plan or if required to comply with Section 409A of the Code.

      **4.5**   **Relation to Other Benefits**. Any economic or other benefit to the Participant under the Agreement and these terms and conditions or the Plan shall not be taken into account in determining any benefits to which the Participant may be entitled under any profit-sharing, retirement or other benefit or compensation plan maintained by the Company or a Subsidiary and shall not affect the amount of any life insurance coverage available to any beneficiary under any life insurance plan covering employees of the Company or Subsidiary.

      **4.6**   **These Terms and Conditions Subject to Plan** . The Restricted Share Units covered under the Agreement and all of the terms and conditions hereof are subject to all of the terms and conditions of the Plan, a copy of which is available upon request.

      **4.7**   **Transferability**. Except as otherwise provided in the Plan, the Restricted Share Units are non-transferable and any attempts to assign, pledge, hypothecate or otherwise alienate or encumber (whether by law or otherwise) any Restricted Share Units shall be null and void.

      **4.8**   **Data Privacy**. Participant hereby explicitly and unambiguously consents to the collection, use and transfer, in electronic or other form, of Participant's personal data as described in this Agreement and any other Restricted Share Unit award materials by and among, as applicable, the Company or Subsidiaries for the exclusive purpose of implementing, administering and managing Participant's participation in the Plan.

      Participant understands that the Company or Subsidiary may hold certain personal information about Participant, including, but not limited to, Participant's name, home address and telephone number, date of birth, social security number or other identification number, salary, nationality, job title, any Shares of or directorships in the Company that are held, details of all Restricted Share Units or any other entitlement to Shares awarded, canceled, exercised, vested, unvested or outstanding in Participant's favor, for the exclusive purpose of implementing, administering and managing the Plan ("Data").

Participant understands that Data will be transferred to the Company's broker, or such other stock plan service provider as may be selected by the Company in the future, which is assisting the Company with the implementation, administration and management of the Plan. Participant understands that the recipients' use of the Data may be located in the United States or elsewhere, and that the recipients' country (e.g., the United States) may have different data privacy laws and protections than Participant's country. Participant understands that if he or she resides outside the United States, he or she may request a list with the names and addresses of any potential recipients of the Data by contacting his or her local human resources representative. Participant authorizes the Company, the Company's broker and any other possible recipients which may assist the Company (presently or in the future) with implementing, administering and managing the Plan to receive, possess, use, retain and transfer the Data, in electronic or other form, for the sole purpose of implementing, administering and managing the Participant's participation in the Plan. Participant understands that Data will be held only as long as is necessary to implement, administer and manage Participant's participation in the Plan. Participant understands if he or she resides outside the United States, he or she may, at any time, view their respective Data, request additional information about the storage and processing of their Data, require any necessary amendments to their Data or refuse or withdraw the consents herein, in any case without cost, by contacting in writing his or her local human resources representative. Further, Participant understands that he or she is providing the consents herein on a purely voluntary basis. If Participant does not consent, or if Participant later seeks to revoke his or her consent, his or her employment status or service and career with the Employer will not be adversely affected; the only adverse consequence of refusing or withdrawing Participant's consent is that the Company would not be able to grant Restricted Share Units or other equity awards or administer or maintain such awards. Therefore, Participant understands that refusing or withdrawing his or her consent may affect Participant's ability to participate in the Plan. For more information on the consequences of Participant's refusal to consent or withdrawal of consent, Participant understands that he or she may contact his or her local human resources representative.

**4.9    Amendments**. This Agreement can be amended at any time by the Committee. Any amendment to the Plan shall be deemed to be an amendment to this Agreement to the extent that the amendment is applicable hereto. Except for amendments necessary to bring this Agreement into compliance with current law including Code Section 409A, no amendment to this Agreement shall materially and adversely affect the rights of the Participant without the Participant's written consent.

**4.10    Severability**. The provisions of this Agreement are severable and if any one or more provisions are determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable.

**4.11    Electronic Delivery**. The Company may, in its sole discretion, decide to deliver any documents related to the Restricted Share Units by electronic means. By accepting this Award of Restricted Share Units, the Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

**4.12    Appendix to Agreement**. Notwithstanding any provisions of this Agreement to the contrary, the Restricted Share Units shall be subject to such special terms and conditions for the Participant's country of residence (and country of employment, if different), as are set forth in the appendix to this Agreement (the "Appendix"). Further, if the Participant transfers residency and/or employment to another country, any special terms and conditions for such country will apply to the Restricted Share Units to the extent the Company determines, in its sole discretion, that the application of such terms and conditions is necessary or advisable in order to comply with local law or to facilitate the operation and administration of the Restricted Share Units and the Plan (or the Company may establish alternative terms and conditions as may be necessary or advisable to accommodate a transfer). In all circumstances, the Appendix shall constitute part of this Agreement.

9

**4.13**    **Headings**. Headings are given to the Articles of this Agreement solely as a convenience to facilitate reference. Such headings shall not be deemed in any way material or relevant to the construction or interpretation of this Agreement or any provision hereof.

**4.14**    **Governing Law**. This Agreement is governed by, and subject to, the laws of the State of Ohio, without regard to the conflict of law provisions, as provided in the Plan.

**4.15**    **Code Section 409A**. To the extent applicable, it is intended that this Agreement and the Plan comply with the provisions of Section 409A of the Code. This Agreement and the Plan shall be administered in a manner consistent with this intent, and any provision that would cause the Agreement or the Plan to fail to satisfy Section 409A of the Code shall have no force and effect until amended to comply with Section 409A of the Code (which amendment may be retroactive to the extent permitted by Section 409A of the Code and may be made by the Company without the consent of Participant). The terms "termination of employment," "terminates employment," and similar words and phrases used in this Agreement mean a "separation from service" within the meaning of Treasury Regulation section 1.409A-1(h).

**[Acceptance Page Contained in Exhibit A]**

10

**Exhibit A**
<u>ELECTRONIC ACCEPTANCE</u>

**Acceptance by Participant**

By selecting the "Accept Grant" box on the website of the Company's administrative agent, the Participant acknowledges acceptance of, and consents to be bound by, the Plan and this Agreement and any other rules, agreements or other terms and conditions incorporated herein by reference.

IF I FAIL TO ACKNOWLEDGE ACCEPTANCE OF THE AWARD WITHIN NINETY (90) DAYS OF THE DATE OF GRANT SET FORTH IN THE AGREEMENT, THE COMPANY MAY DETERMINE THAT THIS AWARD HAS BEEN FORFEITED.

**PARTICIPANT NAME**

Participant Name

**ACCEPTANCE DATE**

Date

**ELECTRONIC SIGNATURE**

Participant Signature

11

**APPENDIX FOR NON-U.S. PARTICIPANTS**
**ADDITIONAL TERMS AND CONDITIONS TO AGREEMENT**

This Appendix includes the following additional terms and conditions that govern the Participant's Restricted Share Unit Award for all Participants that reside and/or work outside of the United States.

**Notifications**

This Appendix also includes notifications regarding exchange controls and other regulatory issues of which the Participant should be aware with respect to the Participant's participation in the Plan. The information herein is based on the securities, exchange control and other laws in effect in the respective countries as of January 2013. Such laws are often complex and change frequently. As a result, the Company strongly recommends that the Participant not rely on the information in this Appendix as the only source of information relating to the consequences of the Participant's participation in the Plan because the information may be out of date at the time that the Restricted Share Units vest, or the Shares are delivered or cash paid in settlement of the Restricted Share Units, or the Participant sells any Shares acquired under the Plan.

In addition, the information contained herein is general in nature and may not apply to the Participant's particular situation, and the Company or its Subsidiaries, nor the Company's stock plan administrator ("Administrator") is in a position to assure the Participant of a particular result. Accordingly, the Participant is advised to seek appropriate professional advice as to how the relevant laws in the Participant's country of residence and/or work may apply to the Participant's situation.

Finally, if the Participant transfers employment after the Date of Grant, or is considered a resident of another country for local law purposes following the Date of Grant, the notifications contained herein may not be applicable to the Participant, and the Administrator shall, in its discretion, determine to what extent the terms and conditions contained herein shall be applicable to the Participant.

**Terms and Conditions Applicable to All Non-U.S. Jurisdictions**

English Language. The Participant acknowledges and agrees that it is the Participant's express intent that this Agreement, the Plan and all other documents, rules, procedures, forms, notices and legal proceedings entered into, given or instituted pursuant to the Restricted Share Unit, be drawn up in English. If the Participant has received this Agreement, the Plan or any other Agreement rules, procedures, forms or documents related to the Restricted Share Unit award translated into a language other than English, and if the meaning of the translated version is different than the English version, the English version will control, unless otherwise provided herein.

Compliance with Laws; Repatriation. The Participant agrees, as a condition of the grant of the Restricted Share Unit award, to repatriate all payments attributable to the Restricted Share Unit and/or cash acquired under the Plan (including, but not limited to, dividends, dividend equivalents (if any), and any proceeds derived from the sale of the Shares acquired pursuant to the Agreement) in accordance with all foreign exchange rules and regulations applicable to the Participant. The Company, Subsidiaries and the Administrator reserve the right to impose other requirements on the Participant's participation in the Plan, on the Restricted Share Units and on any Shares acquired or cash payments made pursuant to the Agreement, to the extent the Company or its Subsidiaries or the Administrator determines it is necessary or advisable in order to comply with local law or to facilitate the administration of the Plan, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing. Finally, the Participant agrees to take any and all actions as may be required to comply with the Participant's personal legal and tax obligations under all laws, rules and regulations applicable to the Participant.

12

Private Placement. The grant of the Restricted Share Units is not intended to be a public offering of securities in the Participant's country of residence and/or employment but instead is intended to be a private placement. As a private placement, the Company has not submitted any registration statement, prospectus or other filings with the local securities authorities (unless otherwise required under local law), and the grant of the Restricted Share Units is not subject to the supervision of the local securities authorities.

Responsibility for Taxes & Withholding . Regardless of any action the Company or any of its Subsidiaries takes with respect to any or all income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related items related to the Participant's participation in the Plan and legally applicable to the Participant ("Tax-Related Items"), the Participant acknowledges that the ultimate liability for all Tax-Related Items is and remains the Participant's responsibility and may exceed the amount actually withheld by the Company or any of its Subsidiaries. The Participant further acknowledges that the Company and/or its Subsidiaries (1) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect to the Restricted Share Units, including, but not limited to, the grant, vesting or settlement of the Restricted Share Units, the issuance of Shares or cash upon settlement of the Restricted Share Units, the subsequent sale of Shares acquired pursuant to such issuance and the receipt of any dividends and/or dividend equivalents (if any); and (2) do not commit to and are under no obligation to structure the terms of any Award to reduce or eliminate Participant's liability for Tax-Related Items or achieve any particular tax result. Further, if the Participant becomes subject to tax in more than one jurisdiction between the Date of Grant and the date of any relevant taxable event, the Participant acknowledges that Company and/or its Subsidiaries may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

Prior to any relevant taxable or tax withholding event, as applicable, the Participant will pay or make adequate arrangements satisfactory to the Company and/or its Subsidiaries to satisfy all Tax-Related Items. In this regard, the Participant authorizes the Company and/or its Subsidiaries, or their respective agents, at their discretion, to satisfy the obligations with regard to all Tax-Related Items by one or a combination of the following:

      (a)    Withholding in Shares to be issued or cash to be paid upon vesting/settlement of the Restricted Share Units; or

      (b)    Withholding from the Participant's wages or other cash compensation paid to the Participant by the Company and/or its Subsidiaries; or

      (c)    Withholding from proceeds of the Shares acquired upon vesting/settlement of the Restricted Share Units either through a voluntary sale or through a mandatory sale arranged by the Company (on the Participant's behalf pursuant to this authorization).

To avoid negative accounting treatment, the Company and/or its Subsidiaries may withhold or account for Tax-Related Items by considering applicable minimum statutory withholding amounts or other applicable withholding rates. If the obligation for Tax-Related Items is satisfied by withholding in Shares, for tax purposes, the Participant is deemed to have been issued the full number of Shares attributable to the vested Restricted Share Units, notwithstanding that a number of Shares are held back solely for the purpose of paying the Tax-Related Items due as a result of any aspect of the Participant's participation in the Plan.

Finally, the Participant shall pay to the Company and/or its Subsidiaries any amount of Tax-Related Items that the Company and/or its Subsidiaries may be required to withhold or account for as a result of the Participant's participation in the Plan that cannot be satisfied by the means previously described. The Company may refuse to issue or deliver the Shares or the proceeds of the sale of Shares, if the Participant fails to comply with the Participant's obligations in connection with the Tax-Related Items.

13

**Terms and Conditions Applicable to Australia**

<u>Securities Law Notice.</u> If the Participant acquires Shares under the Plan and offers such Shares for sale to a person or entity resident in Australia, the offer may be subject to disclosure requirements under Australian law. Participant should obtain legal advice as to his or her disclosure obligations prior to making any such offer.

**Terms and Conditions Applicable to Canada**

<u>Use of English Language</u>. The parties acknowledge that it is their express wish that the present Agreement, as well as all documents, notices and legal proceedings entered into, given or instituted pursuant hereto or relating directly or indirectly hereto, be drawn up in English. Les parties reconnaissent avoir exigé la rédaction en anglais de la présente convention, ainsi que de tous documents exécutés, avis donnés et procédures judiciaires intentées, directement ou indirectement, relativement à ou suite à la présente convention.

<u>Resale Restriction</u>. The Participant is permitted to sell the Shares acquired upon vesting through the designated broker appointed under the Plan, provided the resale of Shares acquired under the Plan takes place outside of Canada through the facilities of the stock exchange on which the Shares are listed. The Shares are currently listed on the New York Stock Exchange.

<u>Termination Date</u>. The Participant ceases to be employed with the Company or its Subsidiaries on the later of (i) the date that is the last day of any statutory notice of termination period applicable to the Participant pursuant to applicable employment standards legislation, and (ii) the date that is designated by the Company or any Subsidiary as the last day of the Participant's employment with the Company or any Subsidiary. The date that the Participant ceases to be employed by the Company or Subsidiary specifically does not mean the date on which any period of reasonable notice that the Company or any Subsidiary may be required at law to provide to the Participant expires.

<u>Restricted Share Units Payable Only in Shares</u>. Notwithstanding any discretion in the Plan or anything to the contrary in the Agreement, the grant of Restricted Share Units does not provide any right for the Participant to receive a cash payment, and the Restricted Share Units (and dividend equivalents) are payable in Shares only.

**Terms and Conditions Applicable to Chile**

<u>Private Placement</u>. In accordance with Circular 99 of 2001, from Chile's Superintendence of Securities, the grant of the Restricted Share Units hereunder is not intended to be a public offering of securities in Chile but instead is intended to be a private placement. As a private placement, the Company has not submitted any registration statement, prospectus or other filings with the local securities authorities, and the Plan is not subject to the supervision of the local securities authorities.

**Terms and Conditions Applicable to China**

<u>Settlement in Cash</u>. Notwithstanding any provision in the Agreement or Plan to the contrary, Restricted Share Units will be settled in the form of a local cash payment unless, at the time of delivery, Share settlement does not trigger the need for any approval from and/or filing with SAFE.

**Terms and Conditions Applicable to Japan**

No country specific terms and conditions for Japan.

14

**EXHIBIT 10.65**

**CLIFFS NATURAL RESOURCES INC.**
**AMENDED AND RESTATED 2012 INCENTIVE EQUITY PLAN**

**RESTRICTED SHARE UNIT AWARD MEMORANDUM**

| | |
|---|---|
| **Employee:** | PARTICIPANT NAME |
| **Date of Grant:** | GRANT DATE |
| **Number of Shares Subject to Award:** | SHARES GRANTED |
| **Vesting Date:** | **December 31, 2016** |

**Additional terms and conditions of your Award are included in the Restricted Share Unit Award Agreement. As a condition to your receipt of Shares, you must log on to Fidelity's website at www.netbenefits.fidelity.com and accept the terms and conditions of this Award within 90 calendar days of your Date of Grant. If you do not accept the terms and conditions of this Award within such time at www.netbenefits.fidelity.com, this Award may be forfeited and immediately terminate.**

**Note: Article 2.1 of the Restricted Share Unit Award Agreement contains provisions that restrict your activities. These provisions apply to you and, by accepting this Award, you agree to be bound by these restrictions.**

1

**CLIFFS NATURAL RESOURCES INC.**
**AMENDED AND RESTATED 2012 INCENTIVE EQUITY PLAN**

**Restricted Share Unit Award Agreement**

This Restricted Share Unit Award Agreement (the "Agreement") is between Cliffs Natural Resources Inc., an Ohio corporation (the "Company"), and you, the person named in the Restricted Share Unit Award Memorandum (the "Award Memorandum") who is an employee of the Company or Subsidiary of the Company (the "Participant"). For purposes of this Agreement, "Employer" means the entity (the Company or Subsidiary) that employs Participant on the applicable date. This Agreement is effective as of the Date of Grant set forth in the Award Memorandum.

The Company wishes to award to Participant Restricted Share Units representing the opportunity to earn a number of the Company's common shares, $.125 par value per share (the "Shares"), subject to the terms and conditions set forth in this Agreement, in order to carry out the purpose of the Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan (the "Plan"). All capitalized terms not defined in this Agreement shall have the same meaning as set forth in the Plan. See Article 1 of the Plan for a list of defined terms.

In the event of a conflict between the terms of this Agreement, the Award Memorandum and the terms of the Plan, the terms of the Plan shall govern. In the event of a conflict between the terms of this Agreement and the Award Memorandum, the terms of this Agreement shall govern.

**Grant and Terms of Restricted Share Units**

**1.1    Grant of Restricted Share Units**. Pursuant to the Plan, the Company has granted to Participant the number of Restricted Share Units as specified in the Award Memorandum, with dividend equivalents ("Restricted Share Units"), effective as of the Date of Grant.

**1.2    Vesting As Condition of Payment**. The Restricted Share Units covered by this Agreement and these terms and conditions shall only result in the issuance of Shares (or cash or a combination of Shares and cash, as decided by the Committee in its sole discretion) equal in number to the Restricted Share Units to the extent the Participant is "Vested" in the Restricted Share Units on the date the Restricted Share Units are to be paid as specified in Section 1.3. The Restricted Share Units will become Vested as follows:

(a)    Employment Through Vesting Period. The Participant will become 100% Vested in all the Restricted Share Units subject to this Award if the Participant remains in the continuous employ of the Company or Subsidiary throughout the period beginning on the Date of Grant and ending on the Vesting Date, as set forth in the Award Memorandum ("Vesting Period").

(b)    Death or Disability. The Participant will become 100% Vested in all the Restricted Share Units subject to this Award if the Participant experiences a termination of employment with the Company because of the Participant's death or Disability during the Vesting Period.

(c)    Retirement or Termination without Cause. If the Participant experiences a termination of employment with the Company because of Retirement or a termination of employment by the Company without Cause during the Vesting Period, the Participant shall become Vested in a prorated number of Restricted Share Units Shares based upon the number of full months the Participant was employed with the Company or a Subsidiary between January 1, 2014 and the date of the Participant's termination of employment compared to the number of full months from January 1, 2014 to December 31, 2016, rounded down to the nearest whole Restricted Share Unit.

2

(d)  Change in Control. In the event of a Change in Control (as defined in Section 1.4) during the Vesting Period or otherwise occurring during 2014, the Participant will become Vested in the Restricted Share Units only to the extent provided in Section 1.4.

In the event the Participant otherwise terminates employment prior to becoming Vested in the Restricted Share Units or the Participant's employment is terminated by the Company for Cause, the Participant shall forfeit all rights to any Restricted Share Units that were granted under the Agreement.

**1.3  Payment of Restricted Share Units**.

(a)  Payment After the Vesting Period. The Restricted Share Units that are Vested as of the Vesting Date shall be paid after the end of the Vesting Period, but in any event no later than 2-½ months after the end of the Vesting Period to the extent they have not been previously paid to the Participant.

(b)  Change in Control. Notwithstanding Section 1.3(a), to the extent any Restricted Share Units are Vested as of a Change in Control, such Vested Restricted Share Units will be paid within 10 days of the Change in Control; provided, however, that if such Change in Control would not qualify as a permissible date of distribution under Section 409A(a)(2)(A) of the Code, and the regulations thereunder, and where Section 409A of the Code applies to such distribution, payment will be made on the date that would have otherwise applied pursuant to this Section 1.3.

(c)  Payment Following a Change in Control. Notwithstanding Section 1.3(a), if, during the two-year period following a Change in Control, the Participant experiences a termination of employment, the Restricted Share Units that are Vested as of the date of such termination of employment shall be paid within 10 days of the termination of employment to the extent they have not been previously paid to the Participant; provided, however, that if such Change in Control would not qualify as a permissible date of distribution under Section 409A(a)(2)(A) of the Code, and the regulations thereunder, and where Section 409A of the Code applies to such distribution, payment will be made on the date that would have otherwise applied pursuant to this Section 1.3. Notwithstanding the foregoing to the contrary, to the extent payment is due within 10 days of the termination of employment, if the Participant on the date of termination of employment is a "specified employee" (within the meaning of Section 409A of the Code determined using the identification methodology selected by the Company from time to time), payment for the Restricted Share Units will be made on the first day of the seventh month after the date of Participant's termination of employment or, if earlier, the date of the Participant's death.

(d)  General. The Committee, in its sole discretion, may settle the Restricted Share Units in cash or a combination of Shares and cash, in lieu of issuing only Shares. In the event that all or any portion of the Restricted Share Units shall be paid in cash, the cash equivalent of one Restricted Share Unit shall be equal to the Fair Market Value of one Share on the last trading day of the Vesting Period or, if earlier, the trading day immediately prior to the payment date. Notwithstanding the foregoing, no Restricted Share Units granted hereunder may be paid in cash in lieu of Shares to any Participant who is subject to the Cliffs Natural Resources Inc. Directors' and Officers' Share Ownership Guidelines ("Share Ownership Guidelines") unless and until such Participant is either in compliance with, or no longer subject to, such Share Ownership Guidelines; provided, however, that the Committee may withhold Shares to the extent necessary to satisfy income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related item withholding requirements, as described in Section 4.3. In addition, the Committee may restrict 50% of the Shares to be issued in satisfaction of the total Restricted Share Units, before income tax withholding, so that they cannot be sold by Participant unless immediately after such sale the Participant is in compliance with the Share Ownership Guidelines that are applicable to the Participant at the time of sale.

3

( e )  Payment After Death. Any payment of Restricted Share Units to a deceased Participant shall be paid to the estate of the Participant, unless the Participant files a completed Designation of Death Beneficiary with the Company in accordance with its procedures.

(f)  Payment Obligation. Prior to payment, the Company shall only have an unfunded and unsecured obligation to make payment of Restricted Share Units to the Participant. The Restricted Share Units covered by this Agreement that have not yet been earned, and any interests of the Participant with respect thereto, are not transferable other than pursuant to the laws of descent and distribution, or in accordance with Section 1.3(e).

**1.4**  **Change in Control Vesting** .

(a)  If the Participant remains in the continuous employ of the Company or Subsidiary throughout the period beginning on July 28, 2014 and ending on the date of a Change in Control, the Participant will become 100% Vested in all the Restricted Share Units subject to the Award upon the Change in Control, except to the extent that an award meeting the requirements of Section 1.4(e) (a "Replacement Award") is provided to the Participant in accordance with Section 1.4(e) to replace, adjust or continue the award of Restricted Share Units covered by this Agreement (the "Replaced Award"). If a Replacement Award is provided, references to Restricted Share Units in this Agreement shall be deemed to refer to the Replacement Award after the Change in Control.

(b)  If, upon or after receiving a Replacement Award, the Participant experiences a termination of employment with the Company or Subsidiary of the Company (or any of their successors) (as applicable, the "Successor") by reason of the Participant terminating employment for Good Reason or the Successor terminating Participant's employment other than for Cause, in each case within a period of two years after the Change in Control and during the Vesting Period, the Participant shall become 100% Vested in the Replacement Award upon such termination.

(c)  If a Replacement Award is provided, notwithstanding anything in this Agreement to the contrary, any outstanding Restricted Share Units that at the time of the Change in Control are not subject to a "substantial risk of forfeiture" (within the meaning of Section 409A of the Code) will be deemed to be Vested at the time of such Change in Control and will be paid as provided for in Section 1.3(b).

(d)  For purposes of this Agreement, a "Change in Control" means:

(i)  any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) (a "Person") becomes the beneficial owner (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 35% or more of either (x) the then-outstanding Shares (the "Outstanding Company Common Stock") or (y) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities"); provided, however, that, for purposes of this Section 1.4(d)(i), the following acquisitions shall not constitute a Change in Control: (A) any acquisition directly from the Company, (B) any acquisition by the Company, (C) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any Affiliate or (D) any acquisition pursuant to a transaction that complies with Sections 1.4(d)(iii)(A), 1.4(d)(iii)(B) and 1.4(d)(iii)(C), below;

(ii)  individuals who, as of July 28, 2014, constitute the Board of Directors (the " Incumbent Board") cease for any reason to constitute at least a majority of the Board of Directors; provided, however, that any individual becoming a director subsequent to July 28, 2014 whose election, or nomination for election by the Shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual was a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board of Directors;

4

(iii)      consummation of a reorganization, merger, statutory share exchange or consolidation or similar transaction involving the Company or any of its subsidiaries, a sale or other disposition of all or substantially all of the assets of the Company, or the acquisition of assets or securities of another entity by the Company or any of its subsidiaries (each, a "Business Combination"), in each case unless, following such Business Combination, (A) all or substantially all of the individuals and entities that were the beneficial owners of the Outstanding Company Common Stock and the Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of the then-outstanding shares of common stock (or, for a non-corporate entity, equivalent securities) and the combined voting power of the then-outstanding voting securities entitled to vote generally in the election of directors (or, for a non-corporate entity, equivalent governing body), as the case may be, of the entity resulting from such Business Combination (including, without limitation, an entity that, as a result of such transaction, owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries) in substantially the same proportions as their ownership immediately prior to such Business Combination of the Outstanding Company Common Stock and the Outstanding Company Voting Securities, as the case may be, (B) no Person (excluding any entity resulting from such Business Combination or any employee benefit plan (or related trust) of the Company or such entity resulting from such Business Combination) beneficially owns, directly or indirectly, 35% or more of, respectively, the then-outstanding shares of common stock (or, for a non-corporate entity, equivalent securities) of the entity resulting from such Business Combination or the combined voting power of the then-outstanding voting securities of such entity, except to the extent that such ownership existed prior to the Business Combination, and (C) at least a majority of the members of the board of directors (or, for a non-corporate entity, equivalent governing body) of the entity resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement or of the action of the Board of Directors providing for such Business Combination; or

(iv)      approval by the Shareholders of a complete liquidation or dissolution of the Company.

(e)      For purposes of this Agreement, a "Replacement Award" means an award: (i) of the same type (e.g., time-based restricted share units) as the Replaced Award; (ii) that has a value at least equal to the value of the Replaced Award; (iii) that relates to publicly traded equity securities of the Company or its successor in the Change in Control or another entity that is affiliated with the Company or its successor following the Change in Control; (iv) if the Participant holding the Replaced Award is subject to U.S. federal income tax under the Code, the tax consequences of which to such Participant under the Code are not less favorable to such Participant than the tax consequences of the Replaced Award; and (v) the other terms and conditions of which are not less favorable to the Participant holding the Replaced Award than the terms and conditions of the Replaced Award (including the provisions that would apply in the event of a subsequent Change in Control). A Replacement Award may be granted only to the extent it does not result in the Replaced Award or Replacement Award failing to comply with or be exempt from Section 409A of the Code. Without limiting the generality of the foregoing, the Replacement Award may take the form of a continuation of the Replaced Award if the requirements of the two preceding sentences are satisfied. The determination of whether the conditions of this Section 1.4(e) are satisfied will be made by the Committee, as constituted immediately before the Change in Control, in its sole discretion.

(f)      A termination "for Cause" for purposes of Section 1.4 means that, prior to termination of employment, the Participant shall have committed: (i) and been convicted of a criminal violation involving fraud, embezzlement or theft in connection with his or her duties or in the course of his or her employment with the Successor; (ii) intentional wrongful damage to property of the Successor; (iii) intentional wrongful disclosure of secret processes or confidential information of the Successor; or (iv) intentional wrongful engagement in any competitive activity; and any such act shall have been demonstrably and materially harmful to the Successor. For purposes of this definition, no act or failure to act on the part of the Participant shall be deemed "intentional" if it was due primarily to an error in judgment or negligence, but shall be deemed

5

"intentional" only if done or omitted to be done by the Participant not in good faith and without reasonable belief that the Participant's action or omission was in the best interest of the Successor.

(g)    A termination "for Good Reason" shall mean the Participant's termination of employment with the Successor as a result of the initial occurrence, without the Participant's consent, of one or more of the following events:

(i)    a material diminution in the Participant's annual base salary rate as in effect from time to time (" Base Pay");

(ii)    a material diminution in the Participant's authority, duties or responsibilities;

(iii)    a material change in the geographic location at which the Participant must perform services;

(iv)    a reduction in the Participant's opportunity regarding annual bonus, incentive or other payment of compensation, in addition to Base Pay, made or to be made in regard to services rendered in any year or other period pursuant to any bonus, incentive, profit-sharing, performance, discretionary pay or similar agreement, policy, plan, program or arrangement (whether or not funded) of the Successor; and

(v)    any other action or inaction that constitutes a material breach by the Participant's employer of the employment agreement, if any, under which the Participant provides services.

Notwithstanding the foregoing, "Good Reason" shall not be deemed to exist unless: (A) the Participant has provided notice to his or her employer of the existence of one or more of the conditions listed in (i) through (v) above within 90 days after the initial occurrence of such condition or conditions; and (B) such condition or conditions have not been cured by the Participant's employer within 30 days after receipt of such notice.

**ARTICLE 2.**
**Other Terms and Conditions**

**2.1    Non-Compete and Confidentiality.**

(a)    A Participant shall not render services for any organization or engage directly or indirectly in any business that is a competitor of the Company or any Affiliate of the Company, or which organization or business is or plans to become prejudicial to or in conflict with the business interests of the Company or any Affiliate of the Company or distribute any secret or confidential information belonging to the Company or any Affiliate of the Company.

(b)    Failure to comply with subsection (a) above will cause a Participant to forfeit the right to Restricted Share Units and require the Participant to reimburse the Company for the taxable income received on Restricted Share Units that have been paid out in Shares within the 90-day period preceding the Participant's termination of employment.

**ARTICLE 3.**
**Acknowledgements**

**3.1    Acknowledgments.** In accepting the Award, Participant acknowledges, understands and agrees to the following:

6

(a)     The Plan is established voluntarily by the Company, it is discretionary in nature and it may be modified, amended, suspended or terminated by the Company at any time, to the extent permitted by the Plan;

(b)     The grant of the Restricted Share Units is voluntary and occasional and does not create any contractual or other right to receive future grants of Restricted Share Units, or benefits in lieu of Restricted Share Units, even if Restricted Share Units have been granted in the past;

(c)     All decisions with respect to future Restricted Share Units or other grants, if any, will be at the sole discretion of the Company;

(d)     The Participant's participation in the Plan is voluntary;

(e)     The Restricted Share Unit Award and Participant's participation in the Plan shall not create a right to employment or be interpreted as forming an employment or services contract with the Company or any Subsidiary and shall not interfere with the ability of the Company, or any Subsidiary, as applicable, to terminate the Participant's employment or service relationship (if any);

(f)     The future value of the underlying Shares is unknown, indeterminable and cannot be predicted with certainty;

(g)     No claim or entitlement to compensation or damages shall arise from forfeiture of any Restricted Share Units resulting from the Participant ceasing to provide employment or other services to the Company or a Subsidiary (for any reason whatsoever whether or not later found to be invalid or in breach of employment laws in the jurisdiction where Participant is employed or the terms of Participant's employment agreement, if any), and in consideration of the grant of the Restricted Share Units to which Participant is otherwise not entitled, Participant irrevocably agrees never to institute any claim against the Company or any of its Subsidiaries, and the Participant waives his or her ability, if any, to bring any such claim, and releases the Company and its Subsidiaries from any such claim; if, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by participating in the Plan, Participant shall be deemed irrevocably to have agreed not to pursue such claim and agrees to execute any and all documents necessary to request dismissal or withdrawal of such claim;

(h)     Neither the Plan nor the Restricted Share Units shall be construed to create an employment relationship where any employment relationship did not otherwise already exist;

(i)     The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Participant's participation in the Plan, or the Participant's acquisition or sale of the underlying Shares. The Participant is hereby advised to consult with his or her own personal tax, legal and financial advisors regarding his or her participation in the Plan before taking any action related to the Restricted Share Units;

(j)     The Restricted Share Units and the Shares subject to the Restricted ShareUnits, and the income and value of same, are not part of normal or expected compensation for purposes of calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, bonuses, long-service awards, pension or retirement or welfare benefits or similar payments; and

(k)     The Company reserves the right to impose other requirements on participation in the Restricted Share Units and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable in order to comply with local law or other

7

applicable rules or facilitate the administration of the Plan, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

## ARTICLE 4.
## General Provisions

**4.1    Compliance with Law**. The Company shall make reasonable efforts to comply with all applicable federal and state securities laws; provided, however, notwithstanding any other provision of the Agreement and these terms and conditions, the Company shall not be obligated to issue any Shares pursuant to the Agreement and these terms and conditions if the issuance or payment thereof would result in a violation of any such law; provided, however, that the Shares will be issued at the earliest date at which the Company reasonably anticipates that the issuance of the Shares will not cause such violation.

**4.2    Dividend Equivalents**. During the period beginning on the Date of Grant and ending on the date that the Restricted Share Units are paid in accordance with Section 1.3, the Participant will be entitled to dividend equivalents on Restricted Share Units equal to the cash dividend or distribution that would have been paid on the Restricted Share Units had the Restricted Share Units been issued and outstanding Shares on the record date for the dividend or distribution. Such accrued dividend equivalents (a) will vest and become payable upon the same terms and at the same time of settlement as the Restricted Share Units to which they relate, and (b) will be denominated and payable solely in cash.

**4.3    Withholding Taxes**. The provisions of Article 18.3 of the Plan shall apply to the extent that the Company or Subsidiary is required to withhold income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related items related to Participant's participation in the Plan in connection with the Participant's Restricted Share Units (or dividend equivalents, if any), unless as otherwise specified in the Appendix to this Agreement, including, without limitation, any tax liability associated with the grant or vesting of the Restricted Share Units or sale of the underlying Shares (the "Tax Liability"). These requirements may change from time to time as laws or interpretations change. Regardless of the Company or Subsidiaries' actions in this regard, the Participant hereby acknowledges and agrees that the Tax Liability shall be the Participant's sole responsibility and liability. The Participant acknowledges that the Company's obligation to issue or deliver Shares or pay cash shall be subject to satisfaction of the Tax Liability. Unless otherwise determined by the Committee, withholding obligations shall be satisfied by having the Company or one if its Subsidiaries withhold all or a portion of any Shares that otherwise would be issued or cash payable to the Participant upon settlement of the vested Restricted Share Units; provided that amounts withheld shall not exceed the amount necessary to satisfy the Company's tax withholding obligations. Such withheld Shares shall be valued based on the Fair Market Value as of the date the withholding obligations are satisfied. The Company or one of its Subsidiaries may also satisfy the Tax Liability by deduction from the Participant's wages or other cash compensation paid to the Participant. If the Company does not elect to have withholding obligations satisfied by either withholding Shares, from the cash payable, or by deduction from the Participant's wages or other compensation paid to the Participant, the Participant agrees to pay the Company or Subsidiary the amount of the Tax Liability in cash (or by check) as directed by the Company or Subsidiary.

**4.4    Continuous Employment**. For purposes of this Agreement, the continuous employment of the Participant with the Company shall not be deemed to have been interrupted, and the Participant shall not be deemed to have separated from service with the Company, by reason of the transfer of his employment among the Company or Subsidiaries or an approved leave of absence, unless otherwise indicated in the Plan or if required to comply with Section 409A of the Code.

**4.5    Relation to Other Benefits**. Any economic or other benefit to the Participant under the Agreement and these terms and conditions or the Plan shall not be taken into account in determining any benefits to which the Participant may be entitled under any profit-sharing, retirement or other benefit or compensation plan maintained by the Company or a Subsidiary and shall not affect the amount of any life

8

insurance coverage available to any beneficiary under any life insurance plan covering employees of the Company or Subsidiary.

**4.6** <u>**These Terms and Conditions Subject to Plan**</u> . The Restricted Share Units covered under the Agreement and all of the terms and conditions hereof are subject to all of the terms and conditions of the Plan, a copy of which is available upon request.

**4.7** <u>**Transferability**</u>. Except as otherwise provided in the Plan, the Restricted Share Units are non-transferable and any attempts to assign, pledge, hypothecate or otherwise alienate or encumber (whether by law or otherwise) any Restricted Share Units shall be null and void.

**4.8** <u>**Data Privacy**</u>. Participant hereby explicitly and unambiguously consents to the collection, use and transfer, in electronic or other form, of Participant's personal data as described in this Agreement and any other Restricted Share Unit award materials by and among, as applicable, the Company or Subsidiaries for the exclusive purpose of implementing, administering and managing Participant's participation in the Plan.

Participant understands that the Company or Subsidiary may hold certain personal information about Participant, including, but not limited to, Participant's name, home address and telephone number, date of birth, social security number or other identification number, salary, nationality, job title, any Shares of or directorships in the Company that are held, details of all Restricted Share Units or any other entitlement to Shares awarded, canceled, exercised, vested, unvested or outstanding in Participant's favor, for the exclusive purpose of implementing, administering and managing the Plan ("<u>Data</u>").

Participant understands that Data will be transferred to the Company's broker, or such other stock plan service provider as may be selected by the Company in the future, which is assisting the Company with the implementation, administration and management of the Plan. Participant understands that the recipients' use of the Data may be located in the United States or elsewhere, and that the recipients' country (e.g., the United States) may have different data privacy laws and protections than Participant's country. Participant understands that if he or she resides outside the United States, he or she may request a list with the names and addresses of any potential recipients of the Data by contacting his or her local human resources representative. Participant authorizes the Company, the Company's broker and any other possible recipients which may assist the Company (presently or in the future) with implementing, administering and managing the Plan to receive, possess, use, retain and transfer the Data, in electronic or other form, for the sole purpose of implementing, administering and managing the Participants' participation in the Plan. Participant understands that Data will be held only as long as is necessary to implement, administer and manage Participant's participation in the Plan. Participant understands if he or she resides outside the United States, he or she may, at any time, view their respective Data, request additional information about the storage and processing of their Data, require any necessary amendments to their Data or refuse or withdraw the consents herein, in any case without cost, by contacting in writing his or her local human resources representative. Further, Participant understands that he or she is providing the consents herein on a purely voluntary basis. If Participant does not consent, or if Participant later seeks to revoke his or her consent, his or her employment status or service and career with the Employer will not be adversely affected; the only adverse consequence of refusing or withdrawing Participant's consent is that the Company would not be able to grant Restricted Share Units or other equity awards or administer or maintain such awards. Therefore, Participant understands that refusing or withdrawing his or her consent may affect Participant's ability to participate in the Plan. For more information on the consequences of Participant's refusal to consent or withdrawal of consent, Participant understands that he or she may contact his or her local human resources representative.

**4.9** <u>**Amendments**</u>. This Agreement can be amended at any time by the Committee. Any amendment to the Plan shall be deemed to be an amendment to this Agreement to the extent that the amendment is applicable hereto. Except for amendments necessary to bring this Agreement into compliance

9

with current law including Code Section 409A, no amendment to this Agreement shall materially and adversely affect the rights of the Participant without the Participant's written consent.

**4.10**    <u>**Severability**</u>. The provisions of this Agreement are severable and if any one or more provisions are determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable.

**4.11**    <u>**Electronic Delivery**</u>. The Company may, in its sole discretion, decide to deliver any documents related to the Restricted Share Units by electronic means. By accepting this Award of Restricted Share Units, the Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

**4.12**    <u>**Appendix to Agreement**</u>. Notwithstanding any provisions of this Agreement to the contrary, the Restricted Share Units shall be subject to such special terms and conditions for the Participant's country of residence (and country of employment, if different), as are set forth in the appendix to this Agreement (the "<u>Appendix</u>"). Further, if the Participant transfers residency and/or employment to another country, any special terms and conditions for such country will apply to the Restricted Share Units to the extent the Company determines, in its sole discretion, that the application of such terms and conditions is necessary or advisable in order to comply with local law or to facilitate the operation and administration of the Restricted Share Units and the Plan (or the Company may establish alternative terms and conditions as may be necessary or advisable to accommodate a transfer). In all circumstances, the Appendix shall constitute part of this Agreement.

**4.13**    <u>**Headings**</u>. Headings are given to the Articles of this Agreement solely as a convenience to facilitate reference. Such headings shall not be deemed in any way material or relevant to the construction or interpretation of this Agreement or any provision hereof.

**4.14**    <u>**Governing Law**</u>. This Agreement is governed by, and subject to, the laws of the State of Ohio, without regard to the conflict of law provisions, as provided in the Plan.

**4.15**    <u>**Code Section 409A**</u>. To the extent applicable, it is intended that this Agreement and the Plan comply with the provisions of Section 409A of the Code. This Agreement and the Plan shall be administered in a manner consistent with this intent, and any provision that would cause the Agreement or the Plan to fail to satisfy Section 409A of the Code shall have no force and effect until amended to comply with Section 409A of the Code (which amendment may be retroactive to the extent permitted by Section 409A of the Code and may be made by the Company without the consent of Participant). The terms "<u>termination of employment</u>," "<u>terminates employment</u>," and similar words and phrases used in this Agreement mean a "separation from service" within the meaning of Treasury Regulation section 1.409A-1(h).

**[Acceptance Page Contained in Exhibit A]**

10

**Exhibit A**
ELECTRONIC ACCEPTANCE

**Acceptance by Participant**

By selecting the "Accept Grant" box on the website of the Company's administrative agent, the Participant acknowledges acceptance of, and consents to be bound by, the Plan and this Agreement and any other rules, agreements or other terms and conditions incorporated herein by reference.

IF I FAIL TO ACKNOWLEDGE ACCEPTANCE OF THE AWARD WITHIN NINETY (90) DAYS OF THE DATE OF GRANT SET FORTH IN THE AGREEMENT, THE COMPANY MAY DETERMINE THAT THIS AWARD HAS BEEN FORFEITED.

**PARTICIPANT NAME**                                    **ACCEPTANCE DATE**
Participant Name                                          Date
**ELECTRONIC SIGNATURE**
Participant Signature

11

**APPENDIX FOR NON-U.S. PARTICIPANTS**
**ADDITIONAL TERMS AND CONDITIONS TO AGREEMENT**

This Appendix includes the following additional terms and conditions that govern the Participant's Restricted Share Unit Award for all Participants that reside and/or work outside of the United States.

**Notifications**

This Appendix also includes notifications regarding exchange controls and other regulatory issues of which the Participant should be aware with respect to the Participant's participation in the Plan. The information herein is based on the securities, exchange control and other laws in effect in the respective countries as of January 2013. Such laws are often complex and change frequently. As a result, the Company strongly recommends that the Participant not rely on the information in this Appendix as the only source of information relating to the consequences of the Participant's participation in the Plan because the information may be out of date at the time that the Restricted Share Units vest, or the Shares are delivered or cash paid in settlement of the Restricted Share Units, or the Participant sells any Shares acquired under the Plan.

In addition, the information contained herein is general in nature and may not apply to the Participant's particular situation, and the Company or its Subsidiaries, nor the Company's stock plan administrator ("Administrator") is in a position to assure the Participant of a particular result. Accordingly, the Participant is advised to seek appropriate professional advice as to how the relevant laws in the Participant's country of residence and/or work may apply to the Participant's situation.

Finally, if the Participant transfers employment after the Date of Grant, or is considered a resident of another country for local law purposes following the Date of Grant, the notifications contained herein may not be applicable to the Participant, and the Administrator shall, in its discretion, determine to what extent the terms and conditions contained herein shall be applicable to the Participant.

**Terms and Conditions Applicable to All Non-U.S. Jurisdictions**

English Language. The Participant acknowledges and agrees that it is the Participant's express intent that this Agreement, the Plan and all other documents, rules, procedures, forms, notices and legal proceedings entered into, given or instituted pursuant to the Restricted Share Unit, be drawn up in English. If the Participant has received this Agreement, the Plan or any other Agreement rules, procedures, forms or documents related to the Restricted Share Unit award translated into a language other than English, and if the meaning of the translated version is different than the English version, the English version will control, unless otherwise provided herein.

Compliance with Laws; Repatriation. The Participant agrees, as a condition of the grant of the Restricted Share Unit award, to repatriate all payments attributable to the Restricted Share Unit and/or cash acquired under the Plan (including, but not limited to, dividends, dividend equivalents (if any), and any proceeds derived from the sale of the Shares acquired pursuant to the Agreement) in accordance with all foreign exchange rules and regulations applicable to the Participant. The Company, Subsidiaries and the Administrator reserve the right to impose other requirements on the Participant's participation in the Plan, on the Restricted Share Units and on any Shares acquired or cash payments made pursuant to the Agreement, to the extent the Company or its Subsidiaries or the Administrator determines it is necessary or advisable in order to comply with local law or to facilitate the administration of the Plan, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing. Finally, the Participant agrees to take any and all actions as may be required to comply with the Participant's personal legal and tax obligations under all laws, rules and regulations applicable to the Participant.

12

<u>Private Placement</u>. The grant of the Restricted Share Units is not intended to be a public offering of securities in the Participant's country of residence and/or employment but instead is intended to be a private placement. As a private placement, the Company has not submitted any registration statement, prospectus or other filings with the local securities authorities (unless otherwise required under local law), and the grant of the Restricted Share Units is not subject to the supervision of the local securities authorities.

<u>Responsibility for Taxes & Withholding</u>. Regardless of any action the Company or any of its Subsidiaries takes with respect to any or all income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related items related to the Participant's participation in the Plan and legally applicable to the Participant ("Tax-Related Items"), the Participant acknowledges that the ultimate liability for all Tax-Related Items is and remains the Participant's responsibility and may exceed the amount actually withheld by the Company or any of its Subsidiaries. The Participant further acknowledges that the Company and/or its Subsidiaries (1) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect to the Restricted Share Units, including, but not limited to, the grant, vesting or settlement of the Restricted Share Units, the issuance of Shares or cash upon settlement of the Restricted Share Units, the subsequent sale of Shares acquired pursuant to such issuance and the receipt of any dividends and/or dividend equivalents (if any); and (2) do not commit to and are under no obligation to structure the terms of any Award to reduce or eliminate Participant's liability for Tax-Related Items or achieve any particular tax result. Further, if the Participant becomes subject to tax in more than one jurisdiction between the Date of Grant and the date of any relevant taxable event, the Participant acknowledges that Company and/or its Subsidiaries may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

Prior to any relevant taxable or tax withholding event, as applicable, the Participant will pay or make adequate arrangements satisfactory to the Company and/or its Subsidiaries to satisfy all Tax-Related Items. In this regard, the Participant authorizes the Company and/or its Subsidiaries, or their respective agents, at their discretion, to satisfy the obligations with regard to all Tax-Related Items by one or a combination of the following:

        (a)        Withholding in Shares to be issued or cash to be paid upon vesting/settlement of the Restricted Share Units; or

        (b)        Withholding from the Participant's wages or other cash compensation paid to the Participant by the Company and/or its Subsidiaries; or

        (c)        Withholding from proceeds of the Shares acquired upon vesting/settlement of the Restricted Share Units either through a voluntary sale or through a mandatory sale arranged by the Company (on the Participant's behalf pursuant to this authorization).

To avoid negative accounting treatment, the Company and/or its Subsidiaries may withhold or account for Tax-Related Items by considering applicable minimum statutory withholding amounts or other applicable withholding rates. If the obligation for Tax-Related Items is satisfied by withholding in Shares, for tax purposes, the Participant is deemed to have been issued the full number of Shares attributable to the vested Restricted Share Units, notwithstanding that a number of Shares are held back solely for the purpose of paying the Tax-Related Items due as a result of any aspect of the Participant's participation in the Plan.

Finally, the Participant shall pay to the Company and/or its Subsidiaries any amount of Tax-Related Items that the Company and/or its Subsidiaries may be required to withhold or account for as a result of the Participant's participation in the Plan that cannot be satisfied by the means previously described. The Company may refuse to issue or deliver the Shares or the proceeds of the sale of Shares, if the Participant fails to comply with the Participant's obligations in connection with the Tax-Related Items.

<div align="center">13</div>

**Terms and Conditions Applicable to Australia**

<u>Securities Law Notice.</u> If the Participant acquires Shares under the Plan and offers such Shares for sale to a person or entity resident in Australia, the offer may be subject to disclosure requirements under Australian law. Participant should obtain legal advice as to his or her disclosure obligations prior to making any such offer.

**Terms and Conditions Applicable to Canada**

<u>Use of English Language</u>. The parties acknowledge that it is their express wish that the present Agreement, as well as all documents, notices and legal proceedings entered into, given or instituted pursuant hereto or relating directly or indirectly hereto, be drawn up in English. Les parties reconnaissent avoir exigé la rédaction en anglais de la présente convention, ainsi que de tous documents exécutés, avis donnés et procédures judiciaires intentées, directement ou indirectement, relativement à ou suite à la présente convention.

<u>Resale Restriction</u>. The Participant is permitted to sell the Shares acquired upon vesting through the designated broker appointed under the Plan, provided the resale of Shares acquired under the Plan takes place outside of Canada through the facilities of the stock exchange on which the Shares are listed. The Shares are currently listed on the New York Stock Exchange.

<u>Termination Date</u>. The Participant ceases to be employed with the Company or its Subsidiaries on the later of (i) the date that is the last day of any statutory notice of termination period applicable to the Participant pursuant to applicable employment standards legislation, and (ii) the date that is designated by the Company or any Subsidiary as the last day of the Participant's employment with the Company or any Subsidiary. The date that the Participant ceases to be employed by the Company or Subsidiary specifically does not mean the date on which any period of reasonable notice that the Company or any Subsidiary may be required at law to provide to the Participant expires.

<u>Restricted Share Units Payable Only in Shares</u>. Notwithstanding any discretion in the Plan or anything to the contrary in the Agreement, the grant of Restricted Share Units does not provide any right for the Participant to receive a cash payment, and the Restricted Share Units (and dividend equivalents) are payable in Shares only.

**Terms and Conditions Applicable to Chile**

<u>Private Placement</u>. In accordance with Circular 99 of 2001, from Chile's Superintendence of Securities, the grant of the Restricted Share Units hereunder is not intended to be a public offering of securities in Chile but instead is intended to be a private placement. As a private placement, the Company has not submitted any registration statement, prospectus or other filings with the local securities authorities, and the Plan is not subject to the supervision of the local securities authorities.

**Terms and Conditions Applicable to China**

<u>Settlement in Cash</u>. Notwithstanding any provision in the Agreement or Plan to the contrary, Restricted Share Units will be settled in the form of a local cash payment unless, at the time of delivery, Share settlement does not trigger the need for any approval from and/or filing with SAFE.

**Terms and Conditions Applicable to Japan**

No country specific terms and conditions for Japan.

14

EXHIBIT 10.66

**CLIFFS NATURAL RESOURCES INC.**
**AMENDED AND RESTATED 2012 INCENTIVE EQUITY PLAN**

**PERFORMANCE SHARE AWARD MEMORANDUM**

| | |
|---|---|
| **Employee:** | PARTICIPANT NAME |
| **Date of Grant:** | GRANT DATE |
| **Number of Shares Subject to Award:** | SHARES GRANTED |
| **Incentive Period:**<br>January 1, 2014 – December 31, 2016 | |
| **Date Vested:** | DECEMBER 31, 2016 |

**Additional terms and conditions of your Award are included in the Performance Share Award Agreement. As a condition to your receipt of Shares, you must log on to Fidelity's website at www.netbenefits.fidelity.com and accept the terms and conditions of this Award within 90 calendar days of your Date of Grant. If you do not accept the terms and conditions of this Award within such time at www.netbenefits.fidelity.com, this Award may be forfeited and immediately terminate.**

**Note: Article 3.1 of the Performance Share Award Agreement contains provisions that restrict your activities. These provisions apply to you and, by accepting this Award, you agree to be bound by these restrictions.**

1

**CLIFFS NATURAL RESOURCES INC.**
**AMENDED AND RESTATED 2012 INCENTIVE EQUITY PLAN**

**Performance Share Award Agreement**

This Performance Share Award Agreement (the "Agreement") is between Cliffs Natural Resources Inc., an Ohio corporation (the "Company"), and you, the person named in the Performance Share Award Memorandum (the "Award Memorandum") who is an employee of the Company or Subsidiary of the Company (the "Participant"). For purposes of this Agreement, "Employer" means the entity (the Company or Subsidiary) that employs Participant on the applicable date. This Agreement is effective as of the Date of Grant set forth in the Award Memorandum.

The Company wishes to award to Participant Performance Shares representing the opportunity to earn a number of the Company's common shares, $.125 par value per share (the "Shares"), subject to the terms and conditions set forth in this Agreement, in order to carry out the purpose of the Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan (the "Plan"). All capitalized terms not defined in this Agreement shall have the same meaning as set forth in the Plan. See Article 1 of the Plan for a list of defined terms.

In the event of a conflict between the terms of this Agreement, the Award Memorandum and the terms of the Plan, the terms of the Plan shall govern. In the event of a conflict between the terms of this Agreement and the Award Memorandum, the terms of this Agreement shall govern.

**ARTICLE 1.**
**Definitions**

All terms used herein with initial capital letters shall have the meanings assigned to them in the Plan and the following additional terms, when used herein with initial capital letters, shall have the following meanings:

1.1   **"Incentive Period"** shall be the time period as set forth in the Award Memorandum.

1.2   **"Market Value Price"** shall mean the latest available closing price of a Share of the Company or the latest available closing price per share of a common share of each of the entities in the Peer Group, as the case may be, on the New York Stock Exchange or other recognized market if the shares do not trade on the New York Stock Exchange at the relevant time.

1.3   **"Peer Group"** shall mean the group of companies, as more particularly set forth on attached Exhibit A, against which the Relative Total Shareholder Return of the Company is measured over the Incentive Period.

1.4   **"Performance Objectives"** shall mean for the Incentive Period the predetermined objectives of the Company with respect to the Relative Total Shareholder Return goal established by the Committee and reported to the Board, as more particularly set forth on attached Exhibit B.

1.5   **"Performance Shares Earned"** shall mean the number of Shares of the Company (or cash equivalent) earned by a Participant, as determined under Section 2.3.

1.6   **"Relative Total Shareholder Return"** shall mean for the Incentive Period the Total Shareholder Return of the Company compared to the Total Shareholder Return of the Peer Group, as more particularly set forth on attached Exhibit C.

2

A004520

**1.7** **"Share Ownership Guidelines"** shall mean the Cliffs Natural Resources Inc. Directors' and Officers' Share Ownership Guidelines, as amended from time to time, which encourage such Directors and Officers to hold a meaningful stake in the Company.

**1.8** **"Total Shareholder Return" or "TSR"** shall mean for the Incentive Period the cumulative return to shareholders of the Company and to the shareholders of each of the entities in the Peer Group during the Incentive Period, measured by the change in Market Value Price per share of a Share of the Company plus dividends (or other distributions, excluding franking credits) reinvested over the Incentive Period and the change in the Market Value Price per share of the common share of each of the entities in the Peer Group plus dividends (or other distributions, excluding franking credits) reinvested over the Incentive Period, determined on the last business day of the Incentive Period compared to a base measured by the average Market Value Price per share of a Share of the Company and of a common share of each of the entities in the Peer Group on the last business day of the year immediately preceding the Incentive Period. Dividends (or other distributions, excluding franking credits) per share are assumed to be reinvested in the applicable stock on the last business day of the quarter during which they are paid at the then Market Value Price per share, resulting in a fractionally higher number of shares owned at the market price.

**ARTICLE 2.**
**Grant and Terms of Performance Shares**

**2.1** **Grant of Performance Shares**. Pursuant to the Plan, the Company has granted to Participant an Award covering the number of Performance Shares as specified in the Award Memorandum, with dividend equivalents ("Performance Shares"), effective as of the Date of Grant.

**2.2** **Issuance of Performance Shares**. The Performance Shares covered by this Agreement and these terms and conditions shall only result in the issuance of Shares (or cash or a combination of Shares and cash, as decided by the Committee in its sole discretion), to the extent such Performance Shares have become Performance Shares Earned, as provided in Section 2.3, on the date the Performance Shares Earned are to be paid as specified in Section 2.4.

**2.3** **Performance Shares Earned**.

(a) Achievement of Company Performance Objective(s). Subject to Sections 2.3(b), 2.3(c), and 2.3(d), the number of Performance Shares Earned, if any, shall be based upon the degree of achievement of the Company Performance Objective(s), all as more particularly set forth in Exhibit B, with actual Performance Shares Earned interpolated between the performance levels shown on Exhibit B, as determined and certified by the Committee as of the end of the Incentive Period. The percentage level of achievement determined for the Company Performance Objective(s) shall be multiplied by the number of Performance Shares to determine the actual number of Performance Shares Earned, rounded down to the nearest whole Performance Share. The calculation as to whether the Company has met or exceeded the Company Performance Objective(s) shall be determined and certified by the Committee in accordance with the Award and these terms and conditions. Notwithstanding any provision to the contrary, in no event shall any Performance Shares become Performance Shares Earned with respect to achievement by the Company in excess of the allowable maximum as established under the Company Performance Objective(s), and except as provided in Sections 2.3(b), 2.3(c), and 2.3(d), no Performance Shares will become Performance Shares Earned unless the Participant remains in the continuous employment of the Company or Subsidiary during the entire Incentive Period.

(b) Death or Disability. If the Participant experiences a termination of employment because of the Participant's death or Disability during the Incentive Period, 100% of the Performance Shares shall become Performance Shares Earned upon such termination, regardless of the actual degree of achievement otherwise calculated in accordance with Section 2.3(a).

3

(c)   Retirement or Termination without Cause . If the Participant experiences a termination of employment because of Retirement or because the Participant is terminated by the Company without Cause during the Incentive Period, the number of Participant's Performance Shares that become Performance Shares Earned will be determined after the end of the Incentive Period under Section 2.3(a) (without regard to the requirement that employment continue until the end of the Incentive Period), prorated based upon the number of full months the Participant was employed with the Company or a Subsidiary between January 1, 20__ and the date of the Participant's termination of employment compared to the number of full months from January 1, 2014 to December 31, 2016 rounded down to the nearest whole Performance Share.

(d)   Change in Control. In the event of a Change in Control (as defined in Section 2.5) during the Incentive Period or otherwise occurring during 2014, the Participant's Performance Shares will become Performance Shares Earned only to the extent provided in Section 2.5.

In the event the Participant otherwise terminates employment prior to becoming entitled to Performance Shares Earned or the Participant's employment is terminated by the Company for Cause, the Participant shall forfeit all rights to any Performance Shares that were granted under the Agreement.

**2.4  Payment of Performance Shares Earned.**

(a)   Payment After Incentive Period . The Performance Shares Earned shall be paid after the end of the Incentive Period and after the determination and certification by the Committee of the level of attainment of the Company Performance Objective(s), but in any event no later than 2-½ months after the end of the Incentive Period to the extent not previously paid to the Participant.

(b)   Change in Control. Notwithstanding Section 2.4(a), to the extent there are any Performance Shares Earned as of a Change in Control, such Performance Shares Earned will be paid within 10 days of the Change in Control; provided, however, that if such Change in Control would not qualify as a permissible date of distribution under Section 409A(a)(2)(A) of the Code, and the regulations thereunder, and where Section 409A of the Code applies to such distribution, payment will be made on the date that would have otherwise applied pursuant to this Section 2.4.

(c)   Payment Following a Change in Control. Notwithstanding Section 2.4(a), if, during the two-year period following a Change in Control, the Participant experiences a termination of employment, the Performance Shares Earned as of the date of such termination of employment shall be paid within 10 days of the termination of employment to the extent they have not been previously paid to the Participant; provided, however, that if such Change in Control would not qualify as a permissible date of distribution under Section 409A(a)(2)(A) of the Code, and the regulations thereunder, and where Section 409A of the Code applies to such distribution, payment will be made on the date that would have otherwise applied pursuant to this Section 2.4. Notwithstanding the foregoing to the contrary, to the extent payment is due within 10 days of the termination of employment, if the Participant on the date of termination of employment is a "specified employee" (within the meaning of Section 409A of the Code determined using the identification methodology selected by the Company from time to time) and the payment is subject to Section 409A of the Code, payment for the Performance Shares Earned will be made on the first day of the seventh month after the date of Participant's termination of employment or, if earlier, the date of the Participant's death.

(d)   General. The Committee, in its sole discretion, may settle the Performance Shares Earned in cash or a combination of Shares and cash, in lieu of issuing only Shares. In the event that all or any portion of the Performance Shares Earned are paid in cash, the cash equivalent of one Performance Share Earned shall be equal to the Fair Market Value of one Share on the last trading day of the Incentive Period or, if earlier, the trading day immediately prior to the payment date. Notwithstanding the foregoing, no Performance Shares granted hereunder may be paid in cash in lieu of Shares to any Participant who is subject to the Share Ownership Guidelines unless and until such Participant is either in compliance with, or no longer subject to, such Share Ownership Guidelines; provided, however, that the Committee may withhold

4

Shares to the extent necessary to satisfy income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related item withholding requirements, as described in Section 5.3. In addition, the Committee may restrict 50% of the Shares to be issued in satisfaction of the total Performance Shares Earned, before income tax withholding, so that they cannot be sold by Participant unless immediately after such sale the Participant is in compliance with the Share Ownership Guidelines that are applicable to the Participant at the time of sale.

(e)    Payments After Death. Any payment of Performance Shares Earned to a deceased Participant shall be paid to the estate of the Participant, unless the Participant files a completed Designation of Death Beneficiary with the Company in accordance with its procedures.

(f)    Payment Obligation. Prior to payment, the Company shall only have an unfunded and unsecured obligation to make payment of Performance Shares Earned to the Participant. The Performance Shares covered by this Agreement that have not yet been earned as Performance Shares Earned, and any interests of the Participant with respect thereto, are not transferable other than pursuant to the laws of descent and distribution, or in accordance with Section 2.4(e).

**2.5    Change in Control Vesting**.

(a)    If the Participant remains in the continuous employ of the Company or Subsidiary throughout the period beginning on July 28, 2014 and ending on the date of the Change in Control, upon the Change in Control, 100% of the Performance Shares shall become Performance Shares Earned, except to the extent that an award meeting the requirements of Section 2.5(e) (a "Replacement Award") is provided to the Participant in accordance with Section 2.5(e) to replace, adjust, or continue the Award of Performance Shares covered by this Agreement (the "Replaced Award"). If a Replacement Award is provided, references to Performance Shares in this Agreement shall be deemed to refer to the Replacement Award after the Change in Control.

(b)    If, upon or after receiving a Replacement Award, the Participant experiences a termination of employment with the Company or Subsidiary (or any of their successors) (as applicable, the "Successor") by reason of the Participant terminating employment for Good Reason or the Successor terminating Participant's employment other than for Cause within a period of two years after the Change in Control and during the Incentive Period, 100% of the Replacement Award will become earned and nonforfeitable upon such termination.

(c)    If a Replacement Award is provided, notwithstanding anything in this Agreement to the contrary, any outstanding Performance Shares that at the time of the Change in Control are not subject to a "substantial risk of forfeiture" (within the meaning of Section 409A of the Code) will be deemed to be Performance Shares Earned at the time of such Change in Control and will be paid as provided for in Section 2.4(b).

(d)    For purposes of this Agreement, a "Change in Control" means:

(i)    any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) (a "Person") becomes the beneficial owner (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 35% or more of either (x) the then-outstanding Shares (the "Outstanding Company Common Stock") or (y) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities"); provided, however, that, for purposes of this Section 2.5(d)(i), the following acquisitions shall not constitute a Change in Control: (A) any acquisition directly from the Company, (B) any acquisition by the Company, (C) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any Affiliate or (D) any acquisition pursuant to a transaction that complies with Sections 2.5(d)(iii)(A), 2.5(d)(iii)(B) and 2.5(d)(iii)(C), below;

5

(ii)    individuals who, as of July 28, 2014, constitute the Board of Directors (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board of Directors; provided, however, that any individual becoming a director subsequent to July 28, 2014 whose election, or nomination for election by the Shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual was a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board of Directors;

(iii)    consummation of a reorganization, merger, statutory share exchange or consolidation or similar transaction involving the Company or any of its subsidiaries, a sale or other disposition of all or substantially all of the assets of the Company, or the acquisition of assets or securities of another entity by the Company or any of its subsidiaries (each, a "Business Combination"), in each case unless, following such Business Combination, (A) all or substantially all of the individuals and entities that were the beneficial owners of the Outstanding Company Common Stock and the Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of the then-outstanding shares of common stock (or, for a non-corporate entity, equivalent securities) and the combined voting power of the then-outstanding voting securities entitled to vote generally in the election of directors (or, for a non-corporate entity, equivalent governing body), as the case may be, of the entity resulting from such Business Combination (including, without limitation, an entity that, as a result of such transaction, owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries) in substantially the same proportions as their ownership immediately prior to such Business Combination of the Outstanding Company Common Stock and the Outstanding Company Voting Securities, as the case may be, (B) no Person (excluding any entity resulting from such Business Combination or any employee benefit plan (or related trust) of the Company or such entity resulting from such Business Combination) beneficially owns, directly or indirectly, 35% or more, respectively, the then-outstanding shares of common stock (or, for a non-corporate entity, equivalent securities) of the entity resulting from such Business Combination or the combined voting power of the then-outstanding voting securities of such entity, except to the extent that such ownership existed prior to the Business Combination, and (C) at least a majority of the members of the board of directors (or, for a non-corporate entity, equivalent governing body) of the entity resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement or of the action of the Board of Directors providing for such Business Combination; or

(iv)    approval by the Shareholders of a complete liquidation or dissolution of the Company.

(e)    For purposes of this Agreement, a "Replacement Award" means an award (i) of the same type (e.g., performance shares) as the Replaced Award, (ii) that has a value at least equal to the value of the Replaced Award, (iii) that relates to publicly traded equity securities of the Company or its successor in the Change in Control or another entity that is affiliated with the Company or its successor following the Change in Control, (iv) if the Participant holding the Replaced Award is subject to U.S. federal income tax under the Code, the tax consequences of which to such Participant under the Code are not less favorable to such Participant than the tax consequences of the Replaced Award, and (v) the other terms and conditions of which are not less favorable to the Participant holding the Replaced Award than the terms and conditions of the Replaced Award (including the provisions that would apply in the event of a subsequent Change in Control). A Replacement Award may be granted only to the extent it does not result in the Replaced Award or Replacement Award failing to comply with or be exempt from Section 409A of the Code. Without limiting the generality of the foregoing, the Replacement Award may take the form of a continuation of the Replaced Award if the requirements of the two preceding sentences are satisfied. The determination of whether the conditions of this Section 2.5(e) are satisfied will be made by the Committee, as constituted immediately before the Change in Control, in its sole discretion.

6

(f)    A termination "for Cause" for purposes of Section 2.5 means that, prior to termination of employment, the Participant shall have committed: (i) and been convicted of a criminal violation involving fraud, embezzlement or theft in connection with his or her duties or in the course of his or her employment with the Successor; (ii) intentional wrongful damage to property of the Successor; (iii) intentional wrongful disclosure of secret processes or confidential information of the Successor; or (iv) intentional wrongful engagement in any competitive activity; and any such act shall have been demonstrably and materially harmful to the Successor. For purposes of this definition, no act or failure to act on the part of the Participant shall be deemed "intentional" if it was due primarily to an error in judgment or negligence, but shall be deemed "intentional" only if done or omitted to be done by the Participant not in good faith and without reasonable belief that the Participant's action or omission was in the best interest of the Successor.

(g)    A termination "for Good Reason" shall mean the Participant's termination of employment with the Successor as a result of the initial occurrence, without the Participant's consent, of one or more of the following events:

(i)    a material diminution in the Participant's annual base salary rate as in effect from time to time (" Base Pay");

(ii)    a material diminution in the Participant's authority, duties or responsibilities;

(iii)    a material change in the geographic location at which the Participant must perform services;

(iv)    a reduction in the Participant's opportunity regarding annual bonus, incentive or other payment of compensation, in addition to Base Pay, made or to be made in regard to services rendered in any year or other period pursuant to any bonus, incentive, profit-sharing, performance, discretionary pay or similar agreement, policy, plan, program or arrangement (whether or not funded) of the Successor; and

(v)    any other action or inaction that constitutes a material breach by the Participant's employer of the employment agreement, if any, under which the Participant provides services.

Notwithstanding the foregoing, "Good Reason" shall not be deemed to exist unless: (A) the Participant has provided notice to his or her employer of the existence of one or more of the conditions listed in (i) through (v) above within 90 days after the initial occurrence of such condition or conditions; and (B) such condition or conditions have not been cured by the Participant's employer within 30 days after receipt of such notice.

**ARTICLE 3.**
**Other Terms and Conditions**

**3.1    Non-Compete and Confidentiality.**

(a)    A Participant shall not render services for any organization or engage directly or indirectly in any business that is a competitor of the Company or any Affiliate of the Company, or which organization or business is or plans to become prejudicial to or in conflict with the business interests of the Company or any Affiliate of the Company or distribute any secret or confidential information belonging to the Company or any Affiliate of the Company.

(b)    Failure to comply with subsection (a) above will cause a Participant to forfeit the right to Performance Shares and require the Participant to reimburse the Company for the taxable income received on Performance Shares that become payable to the Participant.

7

**ARTICLE 4.**
**Acknowledgments**

4.1 <u>Acknowledgments</u>. In accepting the Award, Participant acknowledges, understands and agrees to the following:

(a)      The Plan is established voluntarily by the Company, it is discretionary in nature and it may be modified, amended, suspended or terminated by the Company at any time, to the extent permitted by the Plan;

(b)      The grant of the Performance Shares is voluntary and occasional and does not create any contractual or other right to receive future grants of Performance Shares, or benefits in lieu of Performance Shares, even if Performance Shares have been granted in the past;

(c)      All decisions with respect to future Performance Shares or other grants, if any, will be at the sole discretion of the Company;

(d)      The Participant's participation in the Plan is voluntary;

(e)      The Performance Share award and Participant's participation in the Plan shall not create a right to employment or be interpreted as forming an employment or services contract with the Company or any Subsidiary and shall not interfere with the ability of the Company, or any Subsidiary, as applicable, to terminate the Participant's employment or service relationship (if any);

(f)      The future value of the underlying Shares is unknown, indeterminable and cannot be predicted with certainty;

(g)      No claim or entitlement to compensation or damages shall arise from forfeiture of any Performance Shares resulting from the Participant ceasing to provide employment or other services to the Company or a Subsidiary (for any reason whatsoever whether or not later found to be invalid or in breach of employment laws in the jurisdiction where Participant is employed or the terms of Participant's employment agreement, if any), and in consideration of the grant of the Performance Shares to which Participant is otherwise not entitled, Participant irrevocably agrees never to institute any claim against the Company or any of its Subsidiaries, and the Participant waives his or her ability, if any, to bring any such claim, and releases the Company and its Subsidiaries from any such claim; if, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by participating in the Plan, Participant shall be deemed irrevocably to have agreed not to pursue such claim and agrees to execute any and all documents necessary to request dismissal or withdrawal of such claim;

(h)      Neither the Plan nor the Performance Shares shall be construed to create an employment relationship where any employment relationship did not otherwise already exist;

(i)      The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Participant's participation in the Plan, or the Participant's acquisition or sale of the underlying Shares. The Participant is hereby advised to consult with his or her own personal tax, legal and financial advisors regarding his or her participation in the Plan before taking any action related to the Performance Shares;

(j)      The Performance Shares and the Shares subject to the Performance Shares, and the income and value of same, are not part of normal or expected compensation for purposes of calculating any severance, resignation, termination, redundancy, dismissal, end-of-

8

service payments, bonuses, long-service awards, pension or retirement or welfare benefits or similar payments;

   (k)  The Company reserves the right to impose other requirements on participation in the Performance Shares and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable in order to comply with local law or other applicable rules or facilitate the administration of the Plan, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing; and

   (l)  The Performance Shares and any related benefit or compensation under this Agreement is subject to the Company's Clawback Policy (or any other applicable recoupment, recapture, clawback or recovery policy of the Company as adopted by the Board or the Committee and in effect from time to time), a copy of which is available upon request.

## ARTICLE 5.
### General Provisions

**5.1** **Compliance with Law**. The Company shall make reasonable efforts to comply with all applicable federal and state securities laws; provided, however, notwithstanding any other provision of the Agreement and these terms and conditions, the Company shall not be obligated to issue any Shares pursuant to the Agreement and these terms and conditions if the issuance or payment thereof would result in a violation of any such law; provided further, however, that the Shares will be issued at the earliest date at which the Company reasonably anticipates that the issuance of the Shares will not cause such violation.

**5.2** **Dividend Equivalents**. During the period beginning on the Date of Grant and ending on the date that Performance Shares are paid in accordance with Section 2.4, the Participant will be entitled to dividend equivalents on Performance Shares Earned equal to the cash dividend or distribution that would have been paid on the Performance Shares Earned had the Performance Shares Earned been issued and outstanding Shares on the record date for the dividend or distribution. Such accrued dividend equivalents (a) will vest and become payable upon the same terms and at the same time of settlement as the Performance Shares to which they relate, and (b) will be denominated and payable solely in cash.

**5.3** **Withholding Taxes**. The provisions of Article 18.3 of the Plan shall apply to the extent that the Company or Subsidiary is required to withhold income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related items related to Participant's participation in the Plan in connection with the Participant's Performance Shares (or dividend equivalents, if any), unless as otherwise specified in the Appendix to this Agreement, including, without limitation, any tax liability associated with the grant or vesting of the Performance Shares or sale of the underlying Shares (the "Tax Liability"). These requirements may change from time to time as laws or interpretations change. Regardless of the Company or Subsidiaries' actions in this regard, the Participant hereby acknowledges and agrees that the Tax Liability shall be the Participant's sole responsibility and liability. The Participant acknowledges that the Company's obligation to issue or deliver Shares or pay cash shall be subject to satisfaction of the Tax Liability. Unless otherwise determined by the Committee, withholding obligations shall be satisfied by having the Company or one if its Subsidiaries withhold all or a portion of any Shares that otherwise would be issued or cash payable to the Participant upon settlement of the vested Performance Shares; provided that amounts withheld shall not exceed the amount necessary to satisfy the Company's tax withholding obligations. Such withheld Shares shall be valued based on the Fair Market Value as of the date the withholding obligations are satisfied. The Company or one of its Subsidiaries may also satisfy the Tax Liability by deduction from the Participant's wages or other cash compensation paid to the Participant. If the Company does not elect to have withholding obligations satisfied by either withholding Shares, from the cash payable, or by deduction from the Participant's wages or other compensation paid to the Participant, the Participant agrees to pay the Company or Subsidiary the amount of the Tax Liability in cash (or by check) as directed by the Company or Subsidiary.

A004527

**5.4    Continuous Employment**. For purposes of this Agreement, the continuous employment of the Participant with the Company shall not be deemed to have been interrupted, and the Participant shall not be deemed to have separated from service with the Company, by reason of the transfer of his employment among the Company or Subsidiaries or an approved leave of absence, unless otherwise indicated in the Plan or required to comply with Section 409A of the Code.

**5.5    Relation to Other Benefits**. Any economic or other benefit to the Participant under the Agreement and these terms and conditions or the Plan shall not be taken into account in determining any benefits to which the Participant may be entitled under any profit-sharing, retirement or other benefit or compensation plan maintained by the Company or a Subsidiary and shall not affect the amount of any life insurance coverage available to any beneficiary under any life insurance plan covering employees of the Company or Subsidiary.

**5.6    These Terms and Conditions Subject to Plan** . The Performance Shares covered under the Agreement and all of the terms and conditions hereof are subject to all of the terms and conditions of the Plan, a copy of which is available upon request.

**5.7    Transferability**. Except as otherwise provided in the Plan, the Performance Shares are non-transferable and any attempts to assign, pledge, hypothecate or otherwise alienate or encumber (whether by law or otherwise) any Performance Shares shall be null and void.

**5.8    Data Privacy**. Participant hereby explicitly and unambiguously consents to the collection, use and transfer, in electronic or other form, of Participant's personal data as described in this Agreement and any other Performance Share award materials by and among, as applicable, the Company or Subsidiaries for the exclusive purpose of implementing, administering and managing Participant's participation in the Plan.

Participant understands that the Company or Subsidiary may hold certain personal information about Participant, including, but not limited to, Participant's name, home address and telephone number, date of birth, social security number or other identification number, salary, nationality, job title, any Shares of or directorships in the Company that are held, details of all Performance Shares or any other entitlement to Shares awarded, canceled, exercised, vested, unvested or outstanding in Participant's favor, for the exclusive purpose of implementing, administering and managing the Plan ("Data").

Participant understands that Data will be transferred to the Company's broker, or such other stock plan service provider as may be selected by the Company in the future, which is assisting the Company with the implementation, administration and management of the Plan. Participant understands that the recipients' use of the Data may be located in the United States or elsewhere, and that the recipients' country (e.g., the United States) may have different data privacy laws and protections than Participant's country. Participant understands that if he or she resides outside the United States, he or she may request a list with the names and addresses of any potential recipients of the Data by contacting his or her local human resources representative. Participant authorizes the Company, the Company's broker and any other possible recipients which may assist the Company (presently or in the future) with implementing, administering and managing the Participants' participation in the Plan to receive, possess, use, retain and transfer the Data, in electronic or other form, for the sole purpose of implementing, administering and managing Participant's participation in the Plan. Participant understands that Data will be held only as long as is necessary to implement, administer and manage Participant's participation in the Plan. Participant understands if he or she resides outside the United States, he or she may, at any time, view their respective Data, request additional information about the storage and processing of their Data, require any necessary amendments to their Data or refuse or withdraw the consents herein, in any case without cost, by contacting in writing his or her local human resources representative. Further, Participant understands that he or she is providing the consents herein on a purely voluntary basis. If Participant does not consent, or if Participant later seeks to revoke his or her consent, his or her employment status or service and career with the Employer will not be adversely affected; the

10

only adverse consequence of refusing or withdrawing Participant's consent is that the Company would not be able to grant Performance Shares or other equity awards or administer or maintain such awards. Therefore, Participant understands that refusing or withdrawing his or her consent may affect Participant's ability to participate in the Plan. For more information on the consequences of Participant's refusal to consent or withdrawal of consent, Participant understands that he or she may contact his or her local human resources representative.

**5.9    Amendments**. This Agreement can be amended at any time by the Committee. Any amendment to the Plan shall be deemed to be an amendment to this Agreement to the extent that the amendment is applicable hereto. Except for amendments necessary to bring this Agreement into compliance with current law including Code Section 409A, no amendment to this Agreement shall materially and adversely affect the rights of the Participant without the Participant's written consent.

**5.10    Severability**. The provisions of this Agreement are severable and if any one or more provisions are determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable.

**5.11    Electronic Delivery**. The Company may, in its sole discretion, decide to deliver any documents related to the Performance Shares by electronic means. By accepting this Award of Performance Shares, the Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

**5.12    Appendix to Agreement**. Notwithstanding any provisions of this Agreement to the contrary, the Performance Shares shall be subject to such special terms and conditions for the Participant's country of residence (and country of employment, if different), as are set forth in the appendix to this Agreement (the "Appendix"). Further, if the Participant transfers residency and/or employment to another country, any special terms and conditions for such country will apply to the Performance Shares to the extent the Company determines, in its sole discretion, that the application of such terms and conditions is necessary or advisable in order to comply with local law or to facilitate the operation and administration of the Performance Shares and the Plan (or the Company may establish alternative terms and conditions as may be necessary or advisable to accommodate a transfer). In all circumstances, the Appendix shall constitute part of this Agreement.

**5.13    Headings**. Headings are given to the Articles of this Agreement solely as a convenience to facilitate reference. Such headings shall not be deemed in any way material or relevant to the construction or interpretation of this Agreement or any provision hereof.

**5.14    Governing Law**. This Agreement is governed by, and subject to, the laws of the State of Ohio, without regard to the conflict of law provisions, as provided in the Plan.

**5.15    Code Section 409A**. To the extent applicable, it is intended that this Agreement and the Plan comply with the provisions of Section 409A of the Code. This Agreement and the Plan shall be administered in a manner consistent with this intent, and any provision that would cause the Agreement or the Plan to fail to satisfy Section 409A of the Code shall have no force and effect until amended to comply with Section 409A of the Code (which amendment may be retroactive to the extent permitted by Section 409A of the Code and may be made by the Company without the consent of Participant). The terms "termination of employment," "terminates employment," and similar words and phrases used in this Agreement mean a "separation from service" within the meaning of Treasury Regulation section 1.409A-1(h).

**[Acceptance Page Contained in Exhibit D]**

11

**<u>EXHIBITS</u>**

Exhibit A       Peer Group
Exhibit B       Performance Objectives
Exhibit C       Relative Total Shareholder Return
Exhibit D       Electronic Acceptance

12

A004530

**Exhibit A**

<u>PEER GROUP</u>
(2014 – 2016)

The Peer Group will be the constituents as defined by the SPDR Metals and Mining ETF Index on the last day of trading of the Incentive Period.

The value of the stock of a Peer Group company will be determined in accordance with the following:

1.    If the stock is listed on an exchange in the U.S. or Canada, then the value on such exchange will be used;

2.    Otherwise, if the stock is traded in the U.S. as an American Depositary Receipt ("ADR"), then the value of the ADR will be used; or

3.    Otherwise, the value on the exchange in the country where the company is headquartered will be used.

13

**Exhibit B**

PERFORMANCE OBJECTIVES(2014 – 2016)

The Performance Objective of the Company is based on Relative Total Shareholder Return (share price plus reinvested dividends) over the three-year Incentive Period from January 1, 2014 to December 31, 2016. Achievement of the Relative Total Shareholder Return objective shall be determined by the Total Shareholder Return of the Company relative to that of the Peer Group, interpolating where necessary. Achievement shall be determined against the scale set forth in the table below:

| Performance Factor | Performance Level | | |
| --- | --- | --- | --- |
| | Threshold | Target | Maximum |
| Relative TSR | 35th percentile | 55th percentile | 75th percentile |
| Payout For Relative TSR | 50% | 100% | 200% |

14

A004532

**Exhibit C**

RELATIVE TOTAL SHAREHOLDER RETURN
(2014 – 2016)

Relative Total Shareholder Return for the Incentive Period is calculated as follows:

1.  The Total Shareholder Return as defined in Section 1.8 of these terms and conditions for the Incentive Period for the Company shall be compared to the Total Shareholder Return for each of the entities within the Peer Group for the Incentive Period. The results shall be ranked to determine the Company's Relative Total Shareholder Return percentile ranking compared to the Peer Group.

2.  The Company's Relative Total Shareholder Return for the Incentive Period shall be compared to the Relative Total Shareholder Return Performance target range established for the Incentive Period.

3.  The Relative Total Shareholder Return performance target range has been established for the 2014 - 2016 Incentive Period as follows:

<div align="center">

2014 - 2016
Relative Total Shareholder Return

</div>

| Performance Level | Percentile Ranking |
|---|---|
| Maximum | 75th Percentile |
| Target | 55th Percentile |
| Threshold | 35th Percentile |

15

**Exhibit D**

<u>ELECTRONIC ACCEPTANCE</u>

**Acceptance by Participant**

**By selecting the "Accept Grant" box on the website of the Company's administrative agent, the Participant acknowledges acceptance of, and consents to be bound by, the Plan and this Agreement and any other rules, agreements or other terms and conditions incorporated herein by reference.**

**IF I FAIL TO ACKNOWLEDGE ACCEPTANCE OF THE AWARD WITHIN NINETY (90) DAYS OF THE DATE OF GRANT SET FORTH IN THE AGREEMENT, THE COMPANY MAY DETERMINE THAT THIS AWARD HAS BEEN FORFEITED.**

**PARTICIPANT NAME**                                         **ACCEPTANCE DATE**

**Participant Name**                                               **Date**

**ELECTRONIC SIGNATURE**

**Participant Signature**

16

**APPENDIX FOR NON-U.S. PARTICIPANTS**
**ADDITIONAL TERMS AND CONDITIONS TO AGREEMENT**

This Appendix includes the following additional terms and conditions that govern the Participant's Performance Share Award for all Participants that reside and/or work outside of the United States.

**Notifications**

This Appendix also includes notifications regarding exchange controls and other regulatory issues of which the Participant should be aware with respect to the Participant's participation in the Plan. The information herein is based on the securities, exchange control and other laws in effect in the respective countries as of January 2013. Such laws are often complex and change frequently. As a result, the Company strongly recommends that the Participant not rely on the information in this Appendix as the only source of information relating to the consequences of the Participant's participation in the Plan because the information may be out of date at the time that the Performance Shares vest, or the Shares are delivered or cash paid in settlement of the Performance Shares, or the Participant sells any Shares acquired under the Plan.

In addition, the information contained herein is general in nature and may not apply to the Participant's particular situation, and the Company, its Subsidiaries or Affiliates, nor the Company's stock plan administrator ("Administrator") is in a position to assure the Participant of a particular result. Accordingly, the Participant is advised to seek appropriate professional advice as to how the relevant laws in the Participant's country of residence and/or work may apply to the Participant's situation.

Finally, if the Participant transfers employment after the Date of Grant, or is considered a resident of another country for local law purposes following the Date of Grant, the notifications contained herein may not be applicable to the Participant, and the Administrator shall, in its discretion, determine to what extent the terms and conditions contained herein shall be applicable to the Participant.

**Terms and Conditions Applicable to All Non-U.S. Jurisdictions**

<u>English Language</u>. The Participant acknowledges and agrees that it is the Participant's express intent that this Agreement, the Plan and all other documents, rules, procedures, forms, notices and legal proceedings entered into, given or instituted pursuant to the Performance Share, be drawn up in English. If the Participant has received this Agreement, the Plan or any other Agreement rules, procedures, forms or documents related to the Performance Share award translated into a language other than English, and if the meaning of the translated version is different than the English version, the English version will control, unless otherwise provided herein.

<u>Compliance with Laws; Repatriation</u>. The Participant agrees, as a condition of the grant of the Performance Share award, to repatriate all payments attributable to the Performance Share and/or cash acquired under the Plan (including, but not limited to, dividends, dividend equivalents (if any), and any proceeds derived from the sale of the Shares acquired pursuant to the Agreement) in accordance with all foreign exchange rules and regulations applicable to the Participant. The Company, Subsidiaries, Affiliates and the Administrator reserve the right to impose other requirements on the Participant's participation in the Plan, on the Performance Shares and on any Shares acquired or cash payments made pursuant to the Agreement, to the extent the Company, its Subsidiaries or Affiliates or the Administrator determines it is necessary or advisable in order to comply with local law or to facilitate the administration of the Plan, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing. Finally, the Participant agrees to take any and all actions as may be required to comply with the Participant's personal legal and tax obligations under all laws, rules and regulations applicable to the Participant.

17

Private Placement. The grant of the Performance Shares is not intended to be a public offering of securities in the Participant's country of residence and/or employment but instead is intended to be a private placement. As a private placement, the Company has not submitted any registration statement, prospectus or other filings with the local securities authorities (unless otherwise required under local law), and the grant of the Performance Shares is not subject to the supervision of the local securities authorities.

Responsibility for Taxes & Withholding. Regardless of any action the Company or any of its Subsidiaries or Affiliates takes with respect to any or all income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related items related to the Participant's participation in the Plan and legally applicable to the Participant ("Tax-Related Items"), the Participant acknowledges that the ultimate liability for all Tax-Related Items is and remains the Participant's responsibility and may exceed the amount actually withheld by the Company or any of its Subsidiaries or Affiliates. The Participant further acknowledges that the Company and/or its Subsidiaries or Affiliates (1) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect to the Performance Shares, including, but not limited to, the grant, vesting or settlement of the Performance Shares, the issuance of Shares or cash upon settlement of the Performance Shares, the subsequent sale of Shares acquired pursuant to such issuance and the receipt of any dividends and/or dividend equivalents (if any); and (2) do not commit to and are under no obligation to structure the terms of any Award to reduce or eliminate Participant's liability for Tax-Related Items or achieve any particular tax result. Further, if the Participant becomes subject to tax in more than one jurisdiction between the Date of Grant and the date of any relevant taxable event, the Participant acknowledges that Company and/or its Subsidiaries or Affiliates may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

Prior to any relevant taxable or tax withholding event, as applicable, the Participant will pay or make adequate arrangements satisfactory to the Company and/or its Subsidiaries or Affiliates to satisfy all Tax-Related Items. In this regard, the Participant authorizes the Company and/or its Subsidiaries or Affiliates, or their respective agents, at their discretion, to satisfy the obligations with regard to all Tax-Related Items by one or a combination of the following:

      (a)      Withholding in Shares to be issued or cash to be paid upon vesting/settlement of the Performance Shares; or

      (b)      Withholding from the Participant's wages or other cash compensation paid to the Participant by the Company and/or its Subsidiaries or Affiliates; or

      (c)      Withholding from proceeds of the Shares acquired upon vesting/settlement of the Performance Shares either through a voluntary sale or through a mandatory sale arranged by the Company (on the Participant's behalf pursuant to this authorization).

To avoid negative accounting treatment, the Company and/or its Subsidiaries or Affiliates may withhold or account for Tax-Related Items by considering applicable minimum statutory withholding amounts or other applicable withholding rates. If the obligation for Tax-Related Items is satisfied by withholding in Shares, for tax purposes, the Participant is deemed to have been issued the full number of Shares attributable to the vested Performance Shares, notwithstanding that a number of Shares are held back solely for the purpose of paying the Tax-Related Items due as a result of any aspect of the Participant's participation in the Plan.

Finally, the Participant shall pay to the Company and/or its Subsidiaries or Affiliates any amount of Tax-Related Items that the Company and/or its Subsidiaries or Affiliates may be required to withhold or account for as a result of the Participant's participation in the Plan that cannot be satisfied by the means previously described. The Company may refuse to issue or deliver the Shares or the proceeds of the sale of Shares, if the Participant fails to comply with the Participant's obligations in connection with the Tax-Related Items.

18

**Terms and Conditions Applicable to Australia**

Securities Law Notice. If the Participant acquires Shares under the Plan and offers such Shares for sale to a person or entity resident in Australia, the offer may be subject to disclosure requirements under Australian law. Participant should obtain legal advice as to his or her disclosure obligations prior to making any such offer.

**Terms and Conditions Applicable to Canada**

Use of English Language. The parties acknowledge that it is their express wish that the present Agreement, as well as all documents, notices and legal proceedings entered into, given or instituted pursuant hereto or relating directly or indirectly hereto, be drawn up in English. Les parties reconnaissent avoir exigé la rédaction en anglais de la présente convention, ainsi que de tous documents exécutés, avis donnés et procédures judiciaires intentées, directement ou indirectement, relativement à ou suite à la présente convention.

Resale Restriction. The Participant is permitted to sell the Shares acquired upon vesting through the designated broker appointed under the Plan, provided the resale of Shares acquired under the Plan takes place outside of Canada through the facilities of the stock exchange on which the Shares are listed. The Shares are currently listed on the New York Stock Exchange.

Termination Date. The Participant ceases to be employed with the Company or its Subsidiaries or Affiliates on the later of (i) the date that is the last day of any statutory notice of termination period applicable to the Participant pursuant to applicable employment standards legislation, and (ii) the date that is designated by the Company or any Subsidiary or Affiliate as the last day of the Participant's employment with the Company or any Subsidiary or Affiliate. The date that the Participant ceases to be employed by the Company, Subsidiary or Affiliate specifically does not mean the date on which any period of reasonable notice that the Company or any Subsidiary or Affiliate may be required at law to provide to the Participant expires.

Performance Shares Payable Only in Shares. Notwithstanding any discretion in the Plan or anything to the contrary in the Agreement, the grant of Performance Shares does not provide any right for the Participant to receive a cash payment, and the Performance Shares (and any dividend equivalents) are payable in Shares only.

**Terms and Conditions Applicable to Chile**

Private Placement. In accordance with Circular 99 of 2001, from Chile's Superintendence of Securities, the grant of the Performance Shares hereunder is not intended to be a public offering of securities in Chile but instead is intended to be a private placement. As a private placement, the Company has not submitted any registration statement, prospectus or other filings with the local securities authorities, and the Plan is not subject to the supervision of the local securities authorities.

**Terms and Conditions Applicable to China**

Settlement in Cash. Notwithstanding any provision in the Agreement or Plan to the contrary, Performance Shares will be settled in the form of a local cash payment unless, at the time of delivery, Share settlement does not trigger the need for any approval from and/or filing with SAFE.

**Terms and Conditions Applicable to Japan**

No country specific terms and conditions for Japan.

19

**EXHIBIT 10.69**

**CLIFFS NATURAL RESOURCES INC.**
**AMENDED AND RESTATED 2012 INCENTIVE EQUITY PLAN**

**NON-QUALIFIED STOCK OPTION AWARD MEMORANDUM**

| | |
|---|---|
| **Employee:** | PARTICIPANT NAME |
| **Date of Grant:** | GRANT DATE |
| **Number of Stock Option Shares Subject to Award:** | SHARES GRANTED |
| **Exercise Price per Share:** | $ |
| **Term/Expiration Date:** | January 12, 2025 |
| **Vesting Date:** | December 31, 2017 |
| **Vesting Period:** | January 1, 2015 – December 31, 2017 |

**Additional terms and conditions of your Award are included in the Stock Option Award Agreement. As a condition to your receipt of Stock Options, you must accept the terms and conditions of this Award within 90 calendar days of your Date of Grant. If you do not accept the terms and conditions of this Award within such time, this Award may be forfeited and immediately terminate.**

**Note: Article 2.1 of the Stock Option Award Agreement contains provisions that restrict your activities. These provisions apply to you and, by accepting this Award; you agree to be bound by these restrictions.**

1

A004538

**CLIFFS NATURAL RESOURCES INC.**
**AMENDED AND RESTATED 2012 INCENTIVE EQUITY PLAN**

**Stock Option Award Agreement**

This Stock Option Award Agreement (the "Agreement") is between Cliffs Natural Resources Inc., an Ohio corporation (the "Company"), and you, the person named in the Stock Option Award Memorandum (the "Award Memorandum") who is an employee of the Company or Subsidiary of the Company (the "Participant"). For purposes of this Agreement, "Employer" means the entity (the Company or Subsidiary) that employs the Participant on the applicable date. This Agreement is effective as of the Date of Grant set forth in the Award Memorandum.

The Company wishes to award to the Participant Stock Options representing the opportunity to purchase a number of the Company's common shares, $0.125 par value per share (the "Shares"), subject to the terms and conditions set forth in this Agreement, in order to carry out the purpose of the Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan (the "Plan"). All capitalized terms not defined in this Agreement shall have the same meaning as set forth in the Plan. See Article 1 of the Plan for a list of defined terms.

In the event of a conflict between the terms of this Agreement, the Award Memorandum and the terms of the Plan, the terms of the Plan shall govern. In the event of a conflict between the terms of this Agreement and the Award Memorandum, the terms of this Agreement shall govern.

**ARTICLE 1.**

**Grant and Terms of Stock Options**

**1.1    Grant of Stock Options**. Pursuant to the Plan, the Company has granted to the Participant the number of Non-Qualified Stock Options as specified in the Award Memorandum (the "Stock Options"), effective as of the Date of Grant.

**1.2    Vesting and Exercise of Stock Options**. The Stock Options shall become Vested and exercisable as follows:

( a )    Employment Through the Vesting Date. Subject to Sections 1.2(b) and 1.5, the Stock Options will become Vested and exercisable according to the vesting schedule specified in the Award Memorandum, if the Participant remains in the continuous of employ of the Company or a Subsidiary throughout the period beginning on the Date of Grant and ending on the Vesting Date.

(b)    Termination of Employment. In the event of the Participant's death, Disability or other termination of employment, the exercisability of the Stock Options will be governed by Section 12.1 of the Plan; provided, however, notwithstanding anything in Section 12.1 of the Plan to the contrary, if the Participant's employment is terminated without Cause, but only if within sixty (60) days the Participant signs and does not revoke a general release in a form acceptable to the Company (a "Release"), then the Participant will Vest in a pro rata portion of the Stock Options that would have Vested on the Vesting Date had the Participant not been terminated without Cause, with such pro rata portion equal to the product of (i) the total number of Stock Options subject to this Award, multiplied by (ii) a fraction, the numerator of which is the number of days from the beginning of the Vesting Period to the date on which the Participant's employment terminated, and the denominator of which is the number of days in the Vesting Period.

2

---

(c)    In the event the exercise of the Stock Options following the termination of the Participant's employment would be prohibited at any time solely because the issuance of Shares would violate the registration requirements under the Securities Act of 1933, the Options will terminate on the earlier of (i) the Term/Expiration Date of the Stock Options as set forth in the Award Memorandum or (ii) the expiration of a period of three (3) months after the termination of the Participant's employment during which the exercise of the Stock Options would not be in violation of such registration requirements.

(d)    In no event may the Stock Options be exercised after the Term/Expiration Date of the Stock Options as set forth in the Award Memorandum.

(e)    Vested Stock Options may be exercised in whole or in part at any time during the term of the Stock Options by giving written notice of exercise to the Company specifying the number of Shares to be purchased. The notice must be given by or on behalf of a person entitled to exercise the Stock Options, accompanied by payment in full of the Exercise Price in accordance with Section 1.3, along with any required tax withholding pursuant to Section 18.3 of the Plan. Stock Options may not be exercised for a fraction of a Share.

**1.3    Payment of Exercise Price**. The Exercise Price may be paid:

(a)    in cash in any manner satisfactory to the Committee;

(b)    by tendering (either by actual delivery of Shares or by attestation) previously owned Shares having an aggregate Fair Market Value on the date of exercise equal to the Exercise Price applicable to such Stock Options being exercised;

(c)    by a combination of cash and Shares;

(d)    to the extent permitted by applicable law, from the proceeds of sale through a bank or a broker on the date of exercise of some or all of the Shares to which the exercise relates in whole or in part by delivery (on a form prescribed by the Committee) of an irrevocable direction to a securities broker to sell Shares and delivery of all or a part of the sales proceeds to the Company in payment of the Exercise Price and, if applicable, the amount necessary to satisfy the Company's withholding obligations at the minimum statutory withholding rates, including but not limited to, U.S. federal and state income taxes, payroll taxes and foreign taxes, if applicable;

(e)    by the Company's withholding of Shares otherwise issuable upon exercise of the Stock Options pursuant to a "net exercise" arrangement; or

(f)    by another method permitted by law that assures full and immediate payment of the Exercise Price.

The Committee may withhold its approval for any method of payment for any reason, in its sole discretion, including, but not limited to, concerns that the proposed method of payment will result in adverse financial accounting treatment or adverse tax treatment for the Company.

**1.4    Issuance of Shares**. The Company will issue or cause to be issued such Shares promptly upon exercise of any of the Stock Options without any restrictions other than those described in Section 17.2 of the Plan. No Shares will be issued until full payment has been made. Until the issuance (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company) of the share certificate evidencing such Shares, no right to vote or receive dividends, dividend equivalents or any other rights as a Shareholder will exist with respect to the Shares, notwithstanding the exercise of the Stock Options.

3

**1.5**    <u>Change in Control Vesting</u>.

(a)    If the Participant remains in the continuous employ of the Company or Subsidiary throughout the period beginning on January 1, 2015 and ending on the date of a Change in Control, the Participant will become 100% Vested in all the Stock Options subject to the Award upon the Change in Control and such Stock Options will become fully exercisable for the full term of the award, except to the extent that an award meeting the requirements of Section 1.5(d) (a "<u>Replacement Award</u>") is provided to the Participant in accordance with Section 1.5(d) to replace, adjust or continue the award of Stock Options covered by this Agreement (the "<u>Replaced Award</u>"). If a Replacement Award is provided, references to Stock Options in this Agreement shall be deemed to refer to the Replacement Award after the Change in Control.

(b)    If, upon or after receiving a Replacement Award, the Participant experiences a termination of employment with the Company or Subsidiary of the Company (or any of their successors) (as applicable, the "<u>Successor</u>") by reason of the Participant terminating employment for Good Reason or the Successor terminating the Participant's employment other than for Cause, in each case within a period of two years after the Change in Control and during the Vesting Period, the Participant shall become 100% Vested in the Replacement Award upon such termination, which Replacement Award will become immediately exercisable in full, and the Replacement Award will remain exercisable for the full term of the Replacement Award.

(c)    For purposes of this Agreement, a "<u>Change in Control</u>" means:

(i)    any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>")) (a "<u>Person</u>") becomes the beneficial owner (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 35% or more of either (x) the then-outstanding Shares (the "<u>Outstanding Company Common Stock</u>") or (y) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors (the "<u>Outstanding Company Voting Securities</u>"); provided, however, that, for purposes of this Section 1.4(d)(i), the following acquisitions shall not constitute a Change in Control: (A) any acquisition directly from the Company, (B) any acquisition by the Company, (C) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any Affiliate or (D) any acquisition pursuant to a transaction that complies with Sections 1.5(c)(iii)(A), 1.5(c)(iii)(B) and 1.5(c)(iii)(C), below;

(ii)    individuals who, as of the date hereof, constitute the Board of Directors (the "<u>Incumbent Board</u>") cease for any reason to constitute at least a majority of the Board of Directors; provided, however, that any individual becoming a director subsequent to the date hereof whose election, or nomination for election by the Shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual was a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board of Directors;

(iii)    consummation of a reorganization, merger, statutory share exchange or consolidation or similar transaction involving the Company or any of its subsidiaries, a sale or other disposition of all or substantially all of the assets of the Company, or the acquisition of assets or securities of another entity by the Company or any of its subsidiaries (each, a "<u>Business Combination</u>"), in each case unless, following such Business Combination, (A) all or substantially all of the individuals and entities that were the beneficial owners of the Outstanding Company Common Stock and the Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of the then-outstanding shares of common stock (or, for a non-corporate entity, equivalent securities) and the combined voting power of the then-outstanding voting securities entitled to vote generally in the election of directors (or, for a non-corporate entity, equivalent governing body), as the case may be, of the entity resulting from such Business Combination (including, without limitation, an entity that, as a result of such transaction, owns the Company or all or substantially all of the Company's assets either directly or

4

through one or more subsidiaries) in substantially the same proportions as their ownership immediately prior to such Business Combination of the Outstanding Company Common Stock and the Outstanding Company Voting Securities, as the case may be, (B) no Person (excluding any entity resulting from such Business Combination or any employee benefit plan (or related trust) of the Company or such entity resulting from such Business Combination) beneficially owns, directly or indirectly, 35% or more of, respectively, the then-outstanding shares of common stock (or, for a non-corporate entity, equivalent securities) of the entity resulting from such Business Combination or the combined voting power of the then-outstanding voting securities of such entity, except to the extent that such ownership existed prior to the Business Combination, and (C) at least a majority of the members of the board of directors (or, for a non-corporate entity, equivalent governing body) of the entity resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement or of the action of the Board of Directors providing for such Business Combination; or

(iv)    approval by the Shareholders of a complete liquidation or dissolution of the Company.

(d)    For purposes of this Agreement, a "Replacement Award" means an award: (i) of the same type ( *e.g.*, time-based non-qualified stock options) as the Replaced Award; (ii) that has a value at least equal to the value of the Replaced Award; (iii) that relates to publicly traded equity securities of the Company or its successor in the Change in Control or another entity that is affiliated with the Company or its successor following the Change in Control; (iv) if the Participant holding the Replaced Award is subject to U.S. federal income tax under the Code, the tax consequences of which to such Participant under the Code are not less favorable to such Participant than the tax consequences of the Replaced Award; and (v) the other terms and conditions of which are not less favorable to the Participant holding the Replaced Award than the terms and conditions of the Replaced Award (including the provisions that would apply in the event of a subsequent Change in Control). A Replacement Award may be granted only to the extent it does not result in the Replaced Award or Replacement Award failing to comply with or be exempt from Section 409A of the Code. Without limiting the generality of the foregoing, the Replacement Award may take the form of a continuation of the Replaced Award if the requirements of the two preceding sentences are satisfied. The determination of whether the conditions of this Section 1.5(d) are satisfied will be made by the Committee, as constituted immediately before the Change in Control, in its sole discretion.

(e)    A termination "for Cause" means that, prior to termination of employment, the Participant shall have committed: (i) and been convicted of a criminal violation involving fraud, embezzlement or theft in connection with his or her duties or in the course of his or her employment with the Successor; (ii) intentional wrongful damage to property of the Successor; (iii) intentional wrongful disclosure of secret processes or confidential information of the Successor; or (iv) intentional wrongful engagement in any competitive activity; and any such act shall have been demonstrably and materially harmful to the Successor. For purposes of this definition, no act or failure to act on the part of the Participant shall be deemed "intentional" if it was due primarily to an error in judgment or negligence, but shall be deemed "intentional" only if done or omitted to be done by the Participant not in good faith and without reasonable belief that the Participant's action or omission was in the best interest of the Successor.

(f)    A termination "for Good Reason" means the Participant's termination of employment with the Successor as a result of the initial occurrence, without the Participant's consent, of one or more of the following events:

(i)    a material diminution in the Participant's annual base salary rate as in effect from time to time (" Base Pay");

(ii)    a material diminution in the Participant's authority, duties or responsibilities;

(iii)    a material change in the geographic location at which the Participant must perform services;

5

(iv)    a reduction in the Participant's opportunity regarding annual bonus, incentive or other payment of compensation, in addition to Base Pay, made or to be made in regard to services rendered in any year or other period pursuant to any bonus, incentive, profit-sharing, performance, discretionary pay or similar agreement, policy, plan, program or arrangement (whether or not funded) of the Successor; and

(v)    any other action or inaction that constitutes a material breach by the Participant's employer of the employment agreement, if any, under which the Participant provides services.

Notwithstanding the foregoing, "Good Reason" shall not be deemed to exist unless: (A) the Participant has provided notice to his or her employer of the existence of one or more of the conditions listed in (i) through (v) above within 90 days after the initial occurrence of such condition or conditions; and (B) such condition or conditions have not been cured by the Participant's employer within 30 days after receipt of such notice.

## ARTICLE 2.

### Other Terms and Conditions

**2.1    Non-Compete and Confidentiality.**

(a)    The Participant shall not render services for any organization or engage directly or indirectly in any business that is a competitor of the Company or any Affiliate of the Company, or which organization or business is or plans to become prejudicial to or in conflict with the business interests of the Company or any Affiliate of the Company or distribute any secret or confidential information belonging to the Company or any Affiliate of the Company.

(b)    Failure to comply with subsection (a) above will cause the Participant to forfeit the right to the Stock Options and require the Participant to reimburse the Company for the taxable income received on the exercise of Stock Options within the 90-day period preceding the Participant's termination of employment.

## ARTICLE 3.

### Acknowledgements

**3.1    Acknowledgments.** In accepting the Award, Participant acknowledges, understands and agrees to the following:

(a)    The Plan is established voluntarily by the Company, it is discretionary in nature and it may be modified, amended, suspended or terminated by the Company at any time, to the extent permitted by the Plan;

(b)    The grant of the Stock Options is voluntary and occasional and does not create any contractual or other right to receive future grants of Stock Options, or benefits in lieu of Stock Options, even if Stock Options have been granted in the past;

(c)    All decisions with respect to future Stock Options or other grants, if any, will be at the sole discretion of the Company;

(d)    The Participant's participation in the Plan is voluntary;

6

(e)    The Stock Option Award and the Participant's participation in the Plan shall not create a right to employment or be interpreted as forming an employment or services contract with the Company or any Subsidiary and shall not interfere with the ability of the Company, or any Subsidiary, as applicable, to terminate the Participant's employment or service relationship (if any);

(f)    The future value of the underlying Shares is unknown, indeterminable and cannot be predicted with certainty;

(g)    No claim or entitlement to compensation or damages shall arise from forfeiture of any Stock Options resulting from the Participant ceasing to provide employment or other services to the Company or a Subsidiary (for any reason whatsoever whether or not later found to be invalid or in breach of employment laws in the jurisdiction where the Participant is employed or the terms of the Participant's employment agreement, if any), and in consideration of the grant of the Stock Options to which the Participant is otherwise not entitled, the Participant irrevocably agrees never to institute any claim against the Company or any of its Subsidiaries, and the Participant waives his or her ability, if any, to bring any such claim, and releases the Company and its Subsidiaries from any such claim; if, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by participating in the Plan, the Participant shall be deemed irrevocably to have agreed not to pursue such claim and agrees to execute any and all documents necessary to request dismissal or withdrawal of such claim;

(h)    Neither the Plan nor the Stock Options shall be construed to create an employment relationship where any employment relationship did not otherwise already exist;

(i)    The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Participant's participation in the Plan, or the Participant's acquisition or sale of the underlying Shares. The Participant is hereby advised to consult with his or her own personal tax, legal and financial advisors regarding his or her participation in the Plan before taking any action related to the Stock Options;

(j)    The Stock Options and the Shares underlying the Stock Options, and the income and value of same, are not part of normal or expected compensation for purposes of calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, bonuses, long-service awards, pension or retirement or welfare benefits or similar payments; and

(k)    The Company reserves the right to impose other requirements on participation in the Stock Options and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable in order to comply with local law or other applicable rules or facilitate the administration of the Plan, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

## ARTICLE 4.

### General Provisions

**4.1    Compliance with Law**. The Company shall make reasonable efforts to comply with all applicable federal and state securities laws; provided, however, notwithstanding any other provision of the Agreement and these terms and conditions, the Company shall not be obligated to issue any Shares pursuant to the Agreement and these terms and conditions if the issuance or payment thereof would result in a violation of any such law; provided, however, that the Shares will be issued at the earliest date at which the Company reasonably anticipates that the issuance of the Shares will not cause such violation.

7

**4.2**    **Withholding Taxes** . The provisions of Article 18.3 of the Plan shall apply to the extent that the Company or Subsidiary is required to withhold income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related items related to Participant's participation in the Plan in connection with the Participant's Stock Options, including, without limitation, any tax liability associated with the grant or exercise of the Stock Options or sale of the underlying Shares (the "Tax Liability"). These requirements may change from time to time as laws or interpretations change. Regardless of the Company or Subsidiaries' actions in this regard, the Participant hereby acknowledges and agrees that the Tax Liability shall be the Participant's sole responsibility and liability. The Participant acknowledges that the Company's obligation to issue or deliver Shares shall be subject to satisfaction of the Tax Liability. Unless otherwise determined by the Committee, withholding obligations shall be satisfied by having the Company or one of its Subsidiaries withhold all or a portion of any Shares that otherwise would be issued to the Participant upon exercise of the vested Stock Options; provided that amounts withheld shall not exceed the amount necessary to satisfy the Company's tax withholding obligations. Such withheld Shares shall be valued based on the Fair Market Value as of the date the withholding obligations are satisfied. The Company or one of its Subsidiaries may also satisfy the Tax Liability by deduction from the Participant's wages or other cash compensation paid to the Participant. If the Company does not elect to have withholding obligations satisfied by either withholding Shares or by deduction from the Participant's wages or other compensation paid to the Participant, the Participant agrees to pay the Company or Subsidiary the amount of the Tax Liability in cash (or by check) as directed by the Company or Subsidiary.

**4.3**    **Continuous Employment**. For purposes of this Agreement, the continuous employment of the Participant with the Company shall not be deemed to have been interrupted, and the Participant shall not be deemed to have separated from service with the Company, by reason of the transfer of his employment among the Company or Subsidiaries, service solely as a director of the Company or any Subsidiary or an approved leave of absence, unless otherwise indicated in the Plan or if required to comply with Section 409A of the Code.

**4.4**    **Relation to Other Benefits**. Any economic or other benefit to the Participant under the Agreement and these terms and conditions or the Plan shall not be taken into account in determining any benefits to which the Participant may be entitled under any profit-sharing, retirement or other benefit or compensation plan maintained by the Company or a Subsidiary and shall not affect the amount of any life insurance coverage available to any beneficiary under any life insurance plan covering employees of the Company or Subsidiary.

**4.5**    **These Terms and Conditions Subject to Plan** . The Stock Options covered under the Agreement and all of the terms and conditions hereof are subject to all of the terms and conditions of the Plan, a copy of which is available upon request.

**4.6**    **Transferability**. Except as otherwise provided in the Plan, the Stock Options are non-transferable and any attempts to assign, pledge, hypothecate or otherwise alienate or encumber (whether by law or otherwise) any Stock Options shall be null and void.

**4.7**    **Data Privacy**. The Participant hereby explicitly and unambiguously consents to the collection, use and transfer, in electronic or other form, of the Participant's personal data as described in this Agreement and any other Stock Option award materials by and among, as applicable, the Company or Subsidiaries for the exclusive purpose of implementing, administering and managing the Participant's participation in the Plan.

The Participant understands that the Company or Subsidiary may hold certain personal information about the Participant, including, but not limited to, the Participant's name, home address and telephone number, date of birth, social security number or other identification number, salary, nationality, job title, any Shares of or directorships in the Company that are held, details of all Stock Options or any other entitlement to Shares awarded, canceled, exercised, vested, unvested or outstanding in the Participant's favor, for the exclusive purpose of implementing, administering and managing the Plan ("Data").

8

The Participant understands that Data will be transferred to the Company's broker, or such other stock plan service provider as may be selected by the Company in the future, which is assisting the Company with the implementation, administration and management of the Plan. The Participant understands that the recipients' use of the Data may be located in the United States or elsewhere, and that the recipients' country (*e.g.*, the United States) may have different data privacy laws and protections than the Participant's country. The Participant understands that if he or she resides outside the United States, he or she may request a list with the names and addresses of any potential recipients of the Data by contacting his or her local human resources representative. The Participant authorizes the Company, the Company's broker and any other possible recipients which may assist the Company (presently or in the future) with implementing, administering and managing the Plan to receive, possess, use, retain and transfer the Data, in electronic or other form, for the sole purpose of implementing, administering and managing the Participants' participation in the Plan. The Participant understands that Data will be held only as long as is necessary to implement, administer and manage the Participant's participation in the Plan. The Participant understands if he or she resides outside the United States, he or she may, at any time, view their respective Data, request additional information about the storage and processing of their Data, require any necessary amendments to their Data or refuse or withdraw the consents herein, in any case without cost, by contacting in writing his or her local human resources representative. Further, the Participant understands that he or she is providing the consents herein on a purely voluntary basis. If the Participant does not consent, or if the Participant later seeks to revoke his or her consent, his or her employment status or service and career with the Employer will not be adversely affected; the only adverse consequence of refusing or withdrawing the Participant's consent is that the Company would not be able to grant Stock Options or other equity awards or administer or maintain such awards. Therefore, the Participant understands that refusing or withdrawing his or her consent may affect the Participant's ability to participate in the Plan. For more information on the consequences of the Participant's refusal to consent or withdrawal of consent, the Participant understands that he or she may contact his or her local human resources representative.

**4.8**    **Amendments**. This Agreement can be amended at any time by the Committee. Any amendment to the Plan shall be deemed to be an amendment to this Agreement to the extent the amendment is applicable hereto. Except for amendments necessary to bring this Agreement into compliance with current law including Section 409A of the Code, no amendment to this Agreement shall materially and adversely affect the rights of the Participant without the Participant's written consent.

**4.9**    **Severability**. The provisions of this Agreement are severable and if any one or more provisions are determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable.

**4.10**    **Electronic Delivery**. The Company may, in its sole discretion, decide to deliver any documents related to the Stock Options by electronic means. By accepting this Award of Stock Options, the Participant hereby acknowledges the Company's execution of this Agreement and consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

**4.11**    **Headings**. Headings are given to the Articles of this Agreement solely as a convenience to facilitate reference. Such headings shall not be deemed in any way material or relevant to the construction or interpretation of this Agreement or any provision hereof.

**4.12**    **Governing Law**. This Agreement is governed by, and subject to, the laws of the State of Ohio, without regard to the conflict of law provisions, as provided in the Plan.

**4.13**    **Code Section 409A**. To the extent applicable, it is intended that this Agreement and the Plan comply with, or are exempt from, the provisions of Section 409A of the Code. This Agreement and the Plan shall be administered in a manner consistent with this intent, and any provision that would cause the Agreement or the Plan to fail to satisfy Section 409A of the Code shall have no force and effect until amended to comply with Section 409A of the Code (which amendment may be retroactive to the extent permitted by

9

Section 409A of the Code and may be made by the Company without the consent of the Participant). The terms "termination of employment," "terminates employment," and similar words and phrases used in this Agreement mean a "separation from service" within the meaning of Treasury Regulation section 1.409A-1(h).

**[Acceptance Page Contained in Exhibit A]**

10

**Exhibit A**
**Acceptance by the Participant**

The Participant acknowledges acceptance of, and consents to be bound by, the Plan and this Agreement and any other rules, agreements or other terms and conditions incorporated herein by reference.

IF I FAIL TO ACKNOWLEDGE ACCEPTANCE OF THE AWARD WITHIN NINETY (90) DAYS OF THE DATE OF GRANT SET FORTH IN THE AGREEMENT, THE COMPANY MAY DETERMINE THAT THIS AWARD HAS BEEN FORFEITED.

**PARTICIPANT NAME**                                    **ACCEPTANCE DATE**
Participant Name                                       Date
**ELECTRONIC SIGNATURE**
Participant's Signature

11

EXHIBIT 10.70

**CLIFFS NATURAL RESOURCES INC.**
**AMENDED AND RESTATED 2012 INCENTIVE EQUITY PLAN**

**RESTRICTED SHARE UNIT AWARD MEMORANDUM**

| | |
|---|---|
| **Employee:** | PARTICIPANT NAME |
| **Date of Grant:** | GRANT DATE |
| **Grant Price:** | GRANT PRICE |
| **Number of Shares Subject to Award:** | SHARES GRANTED |
| **Vesting Dates:** | 1/3 of the Restricted Share Units shall Vest on December 31, 2015 |
| | 1/3 of the Restricted Share Units shall Vest on December 31, 2016 |
| | 1/3 of the Restricted Share Units shall Vest on December 31, 2017 (each such Vesting date, a "Vesting Date") |

**Additional terms and conditions of your Award are included in the Restricted Share Unit Award Agreement. As a condition to your receipt of Shares, you must log on to Fidelity's website at www.netbenefits.fidelity.com and accept the terms and conditions of this Award within 90 calendar days of your Date of Grant. If you do not accept the terms and conditions of this Award within such time at www.netbenefits.fidelity.com, this Award may be forfeited and immediately terminate.**

**Note: Article 2.1 of the Restricted Share Unit Award Agreement contains provisions that restrict your activities. These provisions apply to you and, by accepting this Award, you agree to be bound by these restrictions.**

**CLIFFS NATURAL RESOURCES INC.**
**AMENDED AND RESTATED 2012 INCENTIVE EQUITY PLAN**

**Restricted Share Unit Award Agreement**

This Restricted Share Unit Award Agreement (the "Agreement") is between Cliffs Natural Resources Inc., an Ohio corporation (the "Company"), and you, the person named in the Restricted Share Unit Award Memorandum (the "Award Memorandum") who is an employee of the Company or Subsidiary of the Company (the "Participant"). For purposes of this Agreement, "Employer" means the entity (the Company or Subsidiary) that employs the Participant on the applicable date. This Agreement is effective as of the Date of Grant set forth in the Award Memorandum.

The Company wishes to award to the Participant Restricted Share Units representing the opportunity to earn a number of the Company's common shares, $0.125 par value per share (the "Shares"), subject to the terms and conditions set forth in this Agreement, in order to carry out the purpose of the Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan (the "Plan"). All capitalized terms not defined in this Agreement shall have the same meaning as set forth in the Plan. See Article 1 of the Plan for a list of defined terms.

In the event of a conflict between the terms of this Agreement, the Award Memorandum and the terms of the Plan, the terms of the Plan shall govern. In the event of a conflict between the terms of this Agreement and the Award Memorandum, the terms of this Agreement shall govern.

**ARTICLE 1.**
**Grant and Terms of Restricted Share Units**

**1.1    Grant of Restricted Share Units**. Pursuant to the Plan, the Company has granted to Participant the number of Restricted Share Units as specified in the Award Memorandum, with dividend equivalents ("Restricted Share Units"), effective as of the Date of Grant.

**1.2    Vesting As Condition of Payment**. The Restricted Share Units covered by this Agreement and these terms and conditions shall only result in the issuance of Shares (or cash or a combination of Shares and cash, as decided by the Committee in its sole discretion) equal in number to the Restricted Share Units to the extent the Participant is "Vested" in the Restricted Share Units on the date the Restricted Share Units are to be paid as specified in Section 1.3. The Restricted Share Units will become Vested as follows:

(a)    Employment Through Each Vesting Date.  The Participant will become Vested in one-third (1/3) of the Restricted Share Units subject to this Award on each Vesting Date, as set forth in the Award Memorandum, if the Participant remains in the continuous employ of the Company or Subsidiary through each such Vesting Date. The period beginning on the Date of Grant and ending on the final Vesting Date shall be the "Vesting Period."

(b)    Death or Disability.  The Participant will become 100% Vested in the Restricted Share Units subject to this Award that are not otherwise Vested, if the Participant experiences a termination of employment with the Company because of the Participant's death or Disability during the Vesting Period.

(c)    Retirement or Termination without Cause.  If the Participant experiences a termination of employment with the Company because of Retirement or a termination of employment by the Company without Cause during the Vesting Period, the Participant shall additionally become Vested in a prorated number of the Restricted Share Units calculated by multiplying one-third (1/3) of the Restricted Share Units subject to this Award by a fraction, the numerator of which is the number of full months the Participant was employed with the Company or a Subsidiary between the January 1 of the year in which the

2

termination occurred and the date of the Participant's termination of employment, and the denominator of which is 12, rounded down to the nearest whole Restricted Share Unit.

(d) <u>Change in Control</u>. In the event of a Change in Control (as defined in Section 1.4) during the Vesting Period, the Participant will become Vested in the Restricted Share Units that are not otherwise Vested only to the extent provided in Section 1.4.

In the event the Participant otherwise terminates employment prior to becoming Vested in all of the Restricted Share Units or the Participant's employment is terminated by the Company for Cause, the Participant shall forfeit all rights to any Restricted Share Units that were granted under the Agreement and were not Vested at the time of such termination of employment.

**1.3    <u>Payment of Restricted Share Units</u>**.

(a) <u>Payment After a Vesting Date</u>. Subject to Sections 1.3(b) and (d), the Restricted Share Units that are Vested as of each Vesting Date shall be paid within 2-½ months following the applicable Vesting Date.

( b ) <u>Payment After Death</u>. Notwithstanding Section 1.3(a), if the Participant experiences a termination of employment with the Company because of the Participant's death during the Vesting Period, the Vested Restricted Shares Units will be paid within 30 days following the date of termination. Any payment of Restricted Share Units to a deceased Participant shall be paid to the estate of the Participant, unless the Participant files a completed Designation of Death Beneficiary with the Company in accordance with its procedures.

(c) <u>Payment After Disability, Retirement or Termination without Cause</u> . If the Participant experiences a termination of employment with the Company because of the Participant's Disability, Retirement, or a termination of employment by the Company without Cause during the Vesting Period, the Vested Restricted Shares Units shall be paid in accordance with Section 1.3(a).

(d) <u>Change in Control</u>. Notwithstanding Section 1.3(a), to the extent any Restricted Share Units are Vested as of a Change in Control, such Vested Restricted Share Units will be paid within 10 days of the Change in Control; provided, however, that if such Change in Control would not qualify as a permissible date of distribution under Section 409A(a)(2)(A) of the Code, and the regulations thereunder, and where Section 409A of the Code applies to such distribution, payment will be made on the date that would have otherwise applied pursuant to this Section 1.3.

( e ) <u>Payment Following a Change in Control</u>. Notwithstanding Sections 1.2 and 1.3(a), if, during the two-year period following a Change in Control, the Participant experiences a termination of employment, the Restricted Share Units that are Vested as of the date of such termination of employment shall be paid in cash (pursuant to Section 1.4(f)) within 10 days of the termination of employment to the extent they have not been previously paid to the Participant; provided, however, that if such Change in Control would not qualify as a permissible date of distribution under Section 409A(a)(2)(A) of the Code, and the regulations thereunder, and where Section 409A of the Code applies to such distribution, payment will be made on the date that would have otherwise applied pursuant to this Section 1.3. Notwithstanding the foregoing to the contrary, to the extent payment is due within 10 days of the termination of employment, if the Participant on the date of termination of employment is a "<u>specified employee</u>" (within the meaning of Section 409A of the Code determined using the identification methodology selected by the Company from time to time), payment for the Restricted Share Units will be made on the first day of the seventh month after the date of the Participant's termination of employment or, if earlier, the date of the Participant's death.

(f) <u>General</u>. The Committee, in its sole discretion, may settle the Restricted Share Units in cash or a combination of Shares and cash, in lieu of issuing only Shares. In the event that all or

3

any portion of the Restricted Share Units shall be paid in cash, the cash equivalent of one Restricted Share Unit shall be equal to the Fair Market Value of one Share on the last trading day of the Vesting Period or, if earlier, the trading day immediately prior to the payment date. Notwithstanding the foregoing, no Restricted Share Units granted hereunder may be paid in cash in lieu of Shares to any Participant who is subject to the Cliffs Natural Resources Inc. Directors' and Officers' Share Ownership Guidelines ("Share Ownership Guidelines") unless and until such Participant is either in compliance with, or no longer subject to, such Share Ownership Guidelines; provided, however, that the Committee may withhold Shares to the extent necessary to satisfy income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related item withholding requirements, as described in Section 4.3. In addition, the Committee may restrict 50% of the Shares to be issued in satisfaction of the total Restricted Share Units, before income tax withholding, so that they cannot be sold by the Participant unless immediately after such sale the Participant is in compliance with the Share Ownership Guidelines that are applicable to the Participant at the time of sale.

(g)    Payment Obligation. Prior to payment, the Company shall only have an unfunded and unsecured obligation to make payment of Restricted Share Units to the Participant. The Restricted Share Units covered by this Agreement that have not yet been earned, and any interests of the Participant with respect thereto, are not transferable other than pursuant to the laws of descent and distribution, or in accordance with Section 1.3(b).

**1.4    Change in Control Vesting**.

(a)    If the Participant remains in the continuous employ of the Company or Subsidiary through the period beginning on January 1, 2015 and ending on the date of a Change in Control, the Participant will become 100% Vested in the Restricted Share Units not otherwise Vested subject to the Award upon the Change in Control, except to the extent that an award meeting the requirements of Section 1.4(e) (a "Replacement Award") is provided to the Participant in accordance with Section 1.4(e) to replace, adjust or continue the award of Restricted Share Units covered by this Agreement (the "Replaced Award"). If a Replacement Award is provided, references to Restricted Share Units in this Agreement shall be deemed to refer to the Replacement Award after the Change in Control.

(b)    If, upon or after receiving a Replacement Award, the Participant experiences a termination of employment with the Company or Subsidiary of the Company (or any of their successors) (as applicable, the "Successor") by reason of the Participant terminating employment for Good Reason or the Successor terminating the Participant's employment other than for Cause, in each case within a period of two years after the Change in Control and during the Vesting Period, the Participant shall become 100% Vested in the Replacement Award upon such termination.

(c)    If a Replacement Award is provided, notwithstanding anything in this Agreement to the contrary, any outstanding Restricted Share Units that at the time of the Change in Control are not subject to a "substantial risk of forfeiture" (within the meaning of Section 409A of the Code) will be deemed to be Vested at the time of such Change in Control and will be paid as provided for in Section 1.3(b).

(d)    For purposes of this Agreement, a "Change in Control" means:

(i)    any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) (a "Person") becomes the beneficial owner (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 35% or more of either (x) the then-outstanding Shares (the "Outstanding Company Common Stock") or (y) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities"); provided, however, that, for purposes of this Section 1.4(d)(i), the following acquisitions shall not constitute a Change in Control: (A) any acquisition directly from the Company, (B) any acquisition by the Company, (C) any acquisition by any employee benefit

4

plan (or related trust) sponsored or maintained by the Company or any Affiliate or (D) any acquisition pursuant to a transaction that complies with Sections 1.4(d)(iii)(A), 1.4(d)(iii)(B) and 1.4(d)(iii)(C), below;

(ii)    individuals who, as of the date hereof, constitute the Board of Directors (the " Incumbent Board") cease for any reason to constitute at least a majority of the Board of Directors; provided, however, that any individual becoming a director subsequent to the date hereof whose election, or nomination for election by the Shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual was a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board of Directors;

(iii)    consummation of a reorganization, merger, statutory share exchange or consolidation or similar transaction involving the Company or any of its subsidiaries, a sale or other disposition of all or substantially all of the assets of the Company, or the acquisition of assets or securities of another entity by the Company or any of its subsidiaries (each, a "Business Combination"), in each case unless, following such Business Combination, (A) all or substantially all of the individuals and entities that were the beneficial owners of the Outstanding Company Common Stock and the Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of the then-outstanding shares of common stock (or, for a non-corporate entity, equivalent securities) and the combined voting power of the then-outstanding voting securities entitled to vote generally in the election of directors (or, for a non-corporate entity, equivalent governing body), as the case may be, of the entity resulting from such Business Combination (including, without limitation, an entity that, as a result of such transaction, owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries) in substantially the same proportions as their ownership immediately prior to such Business Combination of the Outstanding Company Common Stock and the Outstanding Company Voting Securities, as the case may be, (B) no Person (excluding any entity resulting from such Business Combination or any employee benefit plan (or related trust) of the Company or such entity resulting from such Business Combination) beneficially owns, directly or indirectly, 35% or more of, respectively, the then-outstanding shares of common stock (or, for a non-corporate entity, equivalent securities) of the entity resulting from such Business Combination or the combined voting power of the then-outstanding voting securities of such entity, except to the extent that such ownership existed prior to the Business Combination, and (C) at least a majority of the members of the board of directors (or, for a non-corporate entity, equivalent governing body) of the entity resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement or of the action of the Board of Directors providing for such Business Combination; or

(iv)    approval by the Shareholders of a complete liquidation or dissolution of the Company.

(e)    For purposes of this Agreement, a "Replacement Award" means an award: (i) of the same type (e.g., time-based restricted share units) as the Replaced Award; (ii) that has a value at least equal to the value of the Replaced Award; (iii) that relates to publicly traded equity securities of the Company or its successor in the Change in Control or another entity that is affiliated with the Company or its successor following the Change in Control; (iv) if the Participant holding the Replaced Award is subject to U.S. federal income tax under the Code, the tax consequences of which to such Participant under the Code are not less favorable to such Participant than the tax consequences of the Replaced Award; and (v) the other terms and conditions of which are not less favorable to the Participant holding the Replaced Award than the terms and conditions of the Replaced Award (including the provisions that would apply in the event of a subsequent Change in Control). A Replacement Award may be granted only to the extent it does not result in the Replaced Award or Replacement Award failing to comply with or be exempt from Section 409A of the Code. Without limiting the generality of the foregoing, the Replacement Award may take the form of a continuation of the Replaced Award if the requirements of the two preceding sentences are satisfied. The determination of

5

whether the conditions of this Section 1.4(e) are satisfied will be made by the Committee, as constituted immediately before the Change in Control, in its sole discretion.

(f)    A termination "for Cause" for purposes of Section 1.4 means that, prior to termination of employment, the Participant shall have committed: (i) and been convicted of a criminal violation involving fraud, embezzlement or theft in connection with his or her duties or in the course of his or her employment with the Successor; (ii) intentional wrongful damage to property of the Successor; (iii) intentional wrongful disclosure of secret processes or confidential information of the Successor; or (iv) intentional wrongful engagement in any competitive activity; and any such act shall have been demonstrably and materially harmful to the Successor. For purposes of this definition, no act or failure to act on the part of the Participant shall be deemed "intentional" if it was due primarily to an error in judgment or negligence, but shall be deemed "intentional" only if done or omitted to be done by the Participant not in good faith and without reasonable belief that the Participant's action or omission was in the best interest of the Successor.

(g)    A termination "for Good Reason" shall mean the Participant's termination of employment with the Successor as a result of the initial occurrence, without the Participant's consent, of one or more of the following events:

(i)    a material diminution in the Participant's annual base salary rate as in effect from time to time (" Base Pay");

(ii)    a material diminution in the Participant's authority, duties or responsibilities;

(iii)    a material change in the geographic location at which the Participant must perform services;

(iv)    a reduction in the Participant's opportunity regarding annual bonus, incentive or other payment of compensation, in addition to Base Pay, made or to be made in regard to services rendered in any year or other period pursuant to any bonus, incentive, profit-sharing, performance, discretionary pay or similar agreement, policy, plan, program or arrangement (whether or not funded) of the Successor; and

(v)    any other action or inaction that constitutes a material breach by the Participant's employer of the employment agreement, if any, under which the Participant provides services.

Notwithstanding the foregoing, "Good Reason" shall not be deemed to exist unless: (A) the Participant has provided notice to his or her employer of the existence of one or more of the conditions listed in (i) through (v) above within 90 days after the initial occurrence of such condition or conditions; and (B) such condition or conditions have not been cured by the Participant's employer within 30 days after receipt of such notice.

### ARTICLE 2.
### Other Terms and Conditions

**2.1    Non-Compete and Confidentiality**.

(a)    The Participant shall not render services for any organization or engage directly or indirectly in any business that is a competitor of the Company or any Affiliate of the Company, or which organization or business is or plans to become prejudicial to or in conflict with the business interests of the Company or any Affiliate of the Company or distribute any secret or confidential information belonging to the Company or any Affiliate of the Company.

(b)    Failure to comply with subsection (a) above will cause the Participant to forfeit the right to Restricted Share Units and require the Participant to reimburse the Company for the taxable income

6

received on Restricted Share Units that have been paid out in Shares within the 90-day period preceding the Participant's termination of employment.

## ARTICLE 3.
## Acknowledgments

**3.1** **Acknowledgments**. In accepting the Award, the Participant acknowledges, understands and agrees to the following:

(a)    The Plan is established voluntarily by the Company, it is discretionary in    nature and it may be modified, amended, suspended or terminated by the Company at any time, to the extent permitted by the Plan;

(b)    The grant of the Restricted Share Units is voluntary and occasional and does not create any contractual or other right to receive future grants of Restricted Share Units, or benefits in lieu of Restricted Share Units, even if Restricted Share Units have been granted in the past;

(c)    all decisions with respect to future Restricted Share Units or other grants, if any, will be at the sole discretion of the Company;

(d)    The Participant's participation in the Plan is voluntary; The Restricted Share Unit Award and the Participant's participation in the Plan shall not create a right to employment or be interpreted as forming an employment or services contract with the Company or any Subsidiary and shall not interfere with the ability of the Company, or any Subsidiary, as applicable, to terminate the Participant's employment or service relationship (if any);

(e)    The future value of the underlying Shares is unknown, indeterminable and cannot be predicted with certainty;

(f)    no claim or entitlement to compensation or damages shall arise from forfeiture of any Restricted Share Units resulting from the Participant ceasing to provide employment or other services to the Company or a Subsidiary (for any reason whatsoever whether or not later found to be invalid or in breach of employment laws in the jurisdiction where the Participant is employed or the terms of the Participant's employment agreement, if any), and in consideration of the grant of the Restricted Share Units to which the Participant is otherwise not entitled, the Participant irrevocably agrees never to institute any claim against the Company or any of its Subsidiaries, and the Participant waives his or her ability, if any, to bring any such claim, and releases the Company and its Subsidiaries from any such claim; if, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by participating in the Plan, the Participant shall be deemed irrevocably to have agreed not to pursue such claim and agrees to execute any and all documents necessary to request dismissal or withdrawal of such claim;

(g)    Neither the Plan nor the Restricted Share Units shall be construed to create an employment relationship where any employment relationship did not otherwise already exist;

(h)    The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Participant's participation in the Plan, or the Participant's acquisition or sale of the underlying Shares. The Participant is hereby advised to consult with his or her own personal tax, legal and financial advisors regarding his or her participation in the Plan before taking any action related to the Restricted Share Units;

7

(i)        The Restricted Share Units and the Shares subject to the Restricted Share Units, and the income and value of same, are not part of normal or expected compensation for purposes of calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, bonuses, long-service awards, pension or retirement or welfare benefits or similar payments; and

(j)        The Company reserves the right to impose other requirements on participation in the Restricted Share Units and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable in order to comply with local law or other applicable rules or facilitate the administration of the Plan, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

<div align="center">

**ARTICLE 4.**
**General Provisions**

</div>

**4.1    Compliance with Law**. The Company shall make reasonable efforts to comply with all applicable federal and state securities laws; provided, however, notwithstanding any other provision of the Agreement and these terms and conditions, the Company shall not be obligated to issue any Shares pursuant to the Agreement and these terms and conditions if the issuance or payment thereof would result in a violation of any such law; provided, however, that the Shares will be issued at the earliest date at which the Company reasonably anticipates that the issuance of the Shares will not cause such violation.

**4.2    Dividend Equivalents**. During the period beginning on the Date of Grant and ending on the date that the Restricted Share Units are paid in accordance with Section 1.3, the Participant will be entitled to dividend equivalents on Restricted Share Units equal to the cash dividend or distribution that would have been paid on the Restricted Share Units had the Restricted Share Units been issued and outstanding Shares on the record date for the dividend or distribution. Such accrued dividend equivalents (a) will vest and become payable upon the same terms and at the same time of settlement as the Restricted Share Units to which they relate, and (b) will be denominated and payable solely in cash.

**4.3    Withholding Taxes**. The provisions of Article 18.3 of the Plan shall apply to the extent that the Company or Subsidiary is required to withhold income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related items related to the Participant's participation in the Plan in connection with the Participant's Restricted Share Units (or dividend equivalents, if any), without limitation, any tax liability associated with the grant or vesting of the Restricted Share Units or sale of the underlying Shares (the "Tax Liability"). These requirements may change from time to time as laws or interpretations change. Regardless of the Company or Subsidiaries' actions in this regard, the Participant hereby acknowledges and agrees that the Tax Liability shall be the Participant's sole responsibility and liability. The Participant acknowledges that the Company's obligation to issue or deliver Shares or pay cash shall be subject to satisfaction of the Tax Liability. Unless otherwise determined by the Committee, withholding obligations shall be satisfied by having the Company or one if its Subsidiaries withhold all or a portion of any Shares that otherwise would be issued or cash payable to the Participant upon settlement of the vested Restricted Share Units; provided that amounts withheld shall not exceed the amount necessary to satisfy the Company's tax withholding obligations. Such withheld Shares shall be valued based on the Fair Market Value as of the date the withholding obligations are satisfied. The Company or one of its Subsidiaries may also satisfy the Tax Liability by deduction from the Participant's wages or other cash compensation paid to the Participant. If the Company does not elect to have withholding obligations satisfied by either withholding Shares, from the cash payable, or by deduction from the Participant's wages or other compensation paid to the Participant, the Participant agrees to pay the Company or Subsidiary the amount of the Tax Liability in cash (or by check) as directed by the Company or Subsidiary.

**4.4    Continuous Employment**. For purposes of this Agreement, the continuous employment of the Participant with the Company shall not be deemed to have been interrupted, and the Participant shall

<div align="center">8</div>

not be deemed to have separated from service with the Company, by reason of the transfer of his employment among the Company or Subsidiaries or an approved leave of absence, unless otherwise indicated in the Plan or if required to comply with Section 409A of the Code.

       4.5    __Relation to Other Benefits__. Any economic or other benefit to the Participant under the Agreement and these terms and conditions or the Plan shall not be taken into account in determining any benefits to which the Participant may be entitled under any profit-sharing, retirement or other benefit or compensation plan maintained by the Company or a Subsidiary and shall not affect the amount of any life insurance coverage available to any beneficiary under any life insurance plan covering employees of the Company or Subsidiary.

       4.6    __These Terms and Conditions Subject to Plan__. The Restricted Share Units covered under the Agreement and all of the terms and conditions hereof are subject to all of the terms and conditions of the Plan, a copy of which is available upon request.

       4.7    __Transferability__. Except as otherwise provided in the Plan, the Restricted Share Units are non-transferable and any attempts to assign, pledge, hypothecate or otherwise alienate or encumber (whether by law or otherwise) any Restricted Share Units shall be null and void.

       4.8    __Data Privacy__. The Participant hereby explicitly and unambiguously consents to the collection, use and transfer, in electronic or other form, of the Participant's personal data as described in this Agreement and any other Restricted Share Unit award materials by and among, as applicable, the Company or Subsidiaries for the exclusive purpose of implementing, administering and managing the Participant's participation in the Plan.

       The Participant understands that the Company or Subsidiary may hold certain personal information about the Participant, including, but not limited to, the Participant's name, home address and telephone number, date of birth, social security number or other identification number, salary, nationality, job title, any Shares of or directorships in the Company that are held, details of all Restricted Share Units or any other entitlement to Shares awarded, canceled, exercised, vested, unvested or outstanding in the Participant's favor, for the exclusive purpose of implementing, administering and managing the Plan ("__Data__").

       The Participant understands that Data will be transferred to the Company's broker, or such other stock plan service provider as may be selected by the Company in the future, which is assisting the Company with the implementation, administration and management of the Plan. The Participant understands that the recipients' use of the Data may be located in the United States or elsewhere, and that the recipients' country (e.g., the United States) may have different data privacy laws and protections than the Participant's country. The Participant understands that if he or she resides outside the United States, he or she may request a list with the names and addresses of any potential recipients of the Data by contacting his or her local human resources representative. The Participant authorizes the Company, the Company's broker and any other possible recipients which may assist the Company (presently or in the future) with implementing, administering and managing the Plan to receive, possess, use, retain and transfer the Data, in electronic or other form, for the sole purpose of implementing, administering and managing the Participants' participation in the Plan. The Participant understands that Data will be held only as long as is necessary to implement, administer and manage the Participant's participation in the Plan. The Participant understands if he or she resides outside the United States, he or she may, at any time, view their respective Data, request additional information about the storage and processing of their Data, require any necessary amendments to their Data or refuse or withdraw the consents herein, in any case without cost, by contacting in writing his or her local human resources representative. Further, the Participant understands that he or she is providing the consents herein on a purely voluntary basis. If the Participant does not consent, or if the Participant later seeks to revoke his or her consent, his or her employment status or service and career with the Employer will not be adversely affected; the only adverse consequence of refusing or withdrawing the Participant's consent is that the Company would not be able to grant Restricted Share Units or other equity awards or administer or maintain such awards. Therefore, the Participant understands that refusing or withdrawing his or her consent

may affect the Participant's ability to participate in the Plan. For more information on the consequences of the Participant's refusal to consent or withdrawal of consent, the Participant understands that he or she may contact his or her local human resources representative.

**4.9**    **Amendments**. This Agreement can be amended at any time by the Committee. Any amendment to the Plan shall be deemed to be an amendment to this Agreement to the extent that the amendment is applicable hereto. Except for amendments necessary to bring this Agreement into compliance with current law including Code Section 409A, no amendment to this Agreement shall materially and adversely affect the rights of the Participant without the Participant's written consent.

**4.10**    **Severability**. The provisions of this Agreement are severable and if any one or more provisions are determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable.

**4.11**    **Electronic Delivery**. The Company may, in its sole discretion, decide to deliver any documents related to the Restricted Share Units by electronic means. By accepting this Award of Restricted Share Units, the Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

**4.12**    **Headings**. Headings are given to the Articles of this Agreement solely as a convenience to facilitate reference. Such headings shall not be deemed in any way material or relevant to the construction or interpretation of this Agreement or any provision hereof.

**4.13**    **Governing Law**. This Agreement is governed by, and subject to, the laws of the State of Ohio, without regard to the conflict of law provisions, as provided in the Plan.

**4.14**    **Code Section 409A**. To the extent applicable, it is intended that this Agreement and the Plan comply with the provisions of Section 409A of the Code. This Agreement and the Plan shall be administered in a manner consistent with this intent, and any provision that would cause the Agreement or the Plan to fail to satisfy Section 409A of the Code shall have no force and effect until amended to comply with Section 409A of the Code (which amendment may be retroactive to the extent permitted by Section 409A of the Code and may be made by the Company without the consent of the Participant). The terms "termination of employment," "terminates employment," and similar words and phrases used in this Agreement mean a "separation from service" within the meaning of Treasury Regulation section 1.409A-1(h).

**[Acceptance Page Contained in Exhibit A]**

10

A004558

**Exhibit A**
ELECTRONIC ACCEPTANCE

**Acceptance by the Participant**

By selecting the "Accept Grant" box on the website of the Company's administrative agent, the Participant acknowledges acceptance of, and consents to be bound by, the Plan and this Agreement and any other rules, agreements or other terms and conditions incorporated herein by reference.

IF I FAIL TO ACKNOWLEDGE ACCEPTANCE OF THE AWARD WITHIN NINETY (90) DAYS OF THE DATE OF GRANT SET FORTH IN THE AGREEMENT, THE COMPANY MAY DETERMINE THAT THIS AWARD HAS BEEN FORFEITED.

**PARTICIPANT NAME** | **ACCEPTANCE DATE**
Participant Name | Date

**ELECTRONIC SIGNATURE**
Participant Signature

11

**EXHIBIT 10.71**

**CLIFFS NATURAL RESOURCES INC.**
**AMENDED AND RESTATED 2012 INCENTIVE EQUITY PLAN**

**PERFORMANCE SHARE AWARD MEMORANDUM**

| | |
|---|---|
| **Employee:** | PARTICIPANT NAME |
| **Date of Grant:** | GRANT DATE |
| **Grant Price:** | GRANT PRICE |
| **Number of Shares Subject to Award:** | SHARES GRANTED |
| **Incentive Period:** | January 1, 2015 – December 31, 2017 |
| **Date Vested:** | DECEMBER 31, 2017 |

**Additional terms and conditions of your Award are included in the Performance Share Award Agreement. As a condition to your receipt of Shares, you must log on to Fidelity's website at www.netbenefits.fidelity.com and accept the terms and conditions of this Award within 90 calendar days of your Date of Grant. If you do not accept the terms and conditions of this Award within such time at www.netbenefits.fidelity.com, this Award may be forfeited and immediately terminate.**

**Note: Article 3.1 of the Performance Share Award Agreement contains provisions that restrict your activities. These provisions apply to you and, by accepting this Award, you agree to be bound by these restrictions.**

**CLIFFS NATURAL RESOURCES INC.**
**AMENDED AND RESTATED 2012 INCENTIVE EQUITY PLAN**

**Performance Share Award Agreement**

This Performance Share Award Agreement (the "Agreement") is between Cliffs Natural Resources Inc., an Ohio corporation (the "Company"), and you, the person named in the Performance Share Award Memorandum (the "Award Memorandum") who is an employee of the Company or Subsidiary of the Company (the "Participant"). For purposes of this Agreement, "Employer" means the entity (the Company or Subsidiary) that employs the Participant on the applicable date. This Agreement is effective as of the Date of Grant set forth in the Award Memorandum.

The Company wishes to award to the Participant Performance Shares representing the opportunity to earn a number of the Company's common shares, $0.125 par value per share (the "Shares"), subject to the terms and conditions set forth in this Agreement, in order to carry out the purpose of the Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan (the "Plan"). All capitalized terms not defined in this Agreement shall have the same meaning as set forth in the Plan. See Article 1 of the Plan for a list of defined terms.

In the event of a conflict between the terms of this Agreement, the Award Memorandum and the terms of the Plan, the terms of the Plan shall govern. In the event of a conflict between the terms of this Agreement and the Award Memorandum, the terms of this Agreement shall govern.

**ARTICLE 1.**
**Definitions**

All terms used herein with initial capital letters shall have the meanings assigned to them in the Plan and the following additional terms, when used herein with initial capital letters, shall have the following meanings:

1.1    **"Incentive Period"** shall be the time period as set forth in the Award Memorandum.

1.2    **"Market Value Price"** shall mean the latest available closing price of a Share of the Company or the latest available closing price per share of a common share of each of the entities in the Peer Group, as the case may be, on the New York Stock Exchange or other recognized market if the shares do not trade on the New York Stock Exchange at the relevant time.

1.3    **"Peer Group"** shall mean the group of companies, as more particularly set forth on attached Exhibit A, against which the Relative Total Shareholder Return of the Company is measured over the Incentive Period.

1.4    **"Performance Objectives"** shall mean for the Incentive Period the predetermined objectives of the Company with respect to the Relative Total Shareholder Return goal established by the Committee and reported to the Board, as more particularly set forth on attached Exhibit B.

1.5    **"Performance Shares Earned"** shall mean the number of Shares of the Company (or cash equivalent) earned by a Participant, as determined under Section 2.3.

1.6    **"Relative Total Shareholder Return"** shall mean for the Incentive Period the Total Shareholder Return of the Company compared to the Total Shareholder Return of the Peer Group, as more particularly set forth on attached Exhibit C.

**1.7** **"Share Ownership Guidelines"** shall mean the Cliffs Natural Resources Inc. Directors' and Officers' Share Ownership Guidelines, as amended from time to time, which encourage such Directors and Officers to hold a meaningful stake in the Company.

**1.8** **"Total Shareholder Return" or "TSR"** shall mean for the Incentive Period the cumulative return to shareholders of the Company and to the shareholders of each of the entities in the Peer Group during the Incentive Period, measured by the change in Market Value Price per share of a Share of the Company plus dividends (or other distributions, excluding franking credits) reinvested over the Incentive Period and the change in the Market Value Price per share of the common share of each of the entities in the Peer Group plus dividends (or other distributions, excluding franking credits) reinvested over the Incentive Period, determined on the last business day of the Incentive Period compared to a base measured by the average Market Value Price per share of a Share of the Company and of a common share of each of the entities in the Peer Group on the last business day of the year immediately preceding the Incentive Period. Dividends (or other distributions, excluding franking credits) per share are assumed to be reinvested in the applicable stock on the last business day of the quarter during which they are paid at the then Market Value Price per share, resulting in a fractionally higher number of shares owned at the market price.

<div align="center">

**ARTICLE 2.**
**Grant and Terms of Performance Shares**

</div>

**2.1** **Grant of Performance Shares.** Pursuant to the Plan, the Company has granted to the Participant an Award covering the number of Performance Shares as specified in the Award Memorandum, with dividend equivalents ("Performance Shares"), effective as of the Date of Grant.

**2.2** **Issuance of Performance Shares.** The Performance Shares covered by this Agreement and these terms and conditions shall only result in the issuance of Shares (or cash or a combination of Shares and cash, as decided by the Committee in its sole discretion), to the extent such Performance Shares have become Performance Shares Earned, as provided in Section 2.3, on the date the Performance Shares Earned are to be paid as specified in Section 2.4.

**2.3** **Performance Shares Earned**.

(a)  Achievement of Company Performance Objective(s). Subject to Sections 2.3(b), 2.3(c), and 2.3(d), the number of Performance Shares Earned, if any, shall be based upon the degree of achievement of the Company Performance Objective(s), all as more particularly set forth in Exhibit B, with actual Performance Shares Earned interpolated between the performance levels shown on Exhibit B, as determined and certified by the Committee as of the end of the Incentive Period. The percentage level of achievement determined for the Company Performance Objective(s) shall be multiplied by the number of Performance Shares to determine the actual number of Performance Shares Earned, rounded down to the nearest whole Performance Share. The calculation as to whether the Company has met or exceeded the Company Performance Objective(s) shall be determined and certified by the Committee in accordance with the Award and these terms and conditions. Notwithstanding any provision to the contrary, in no event shall any Performance Shares become Performance Shares Earned with respect to achievement by the Company in excess of the allowable maximum as established under the Company Performance Objective(s), and except as provided in Sections 2.3(b), 2.3(c), and 2.3(d), no Performance Shares will become Performance Shares Earned unless the Participant remains in the continuous employment of the Company or Subsidiary during the entire Incentive Period.

(b)  Death or Disability. If the Participant experiences a termination of employment because of the Participant's death or Disability during the Incentive Period, 100% of the Performance Shares shall become Performance Shares Earned upon such termination, regardless of the actual degree of achievement otherwise calculated in accordance with Section 2.3(a).

(c)   Retirement or Termination without Cause . If the Participant experiences a termination of employment because of Retirement or because the Participant is terminated by the Company without Cause during the Incentive Period, the number of the Participant's Performance Shares that become Performance Shares Earned will be determined after the end of the Incentive Period under Section 2.3(a) (without regard to the requirement that employment continue until the end of the Incentive Period), prorated based upon the number of full months the Participant was employed with the Company or a Subsidiary between January 1, 2015 and the date of the Participant's termination of employment compared to the number of full months from January 1, 2015 to December 31, 2017 rounded down to the nearest whole Performance Share.

( d )   Change in Control. In the event of a Change in Control (as defined in Section 2.5) during the Incentive Period, the Participant's Performance Shares will become Performance Shares Earned only to the extent provided in Section 2.5.

In the event the Participant otherwise terminates employment prior to becoming entitled to Performance Shares Earned or the Participant's employment is terminated by the Company for Cause, the Participant shall forfeit all rights to any Performance Shares that were granted under the Agreement.

**2.4**   **Payment of Performance Shares Earned**.

( a )   Payment After Incentive Period . The Performance Shares Earned shall be paid after the end of the Incentive Period and after the determination and certification by the Committee of the level of attainment of the Company Performance Objective(s), but in any event no later than 2-½ months after the end of the Incentive Period to the extent not previously paid to the Participant.

(b)   Change in Control. Notwithstanding Section 2.4(a), to the extent there are any Performance Shares Earned as of a Change in Control, such Performance Shares Earned will be paid within 10 days of the Change in Control; provided, however, that if such Change in Control would not qualify as a permissible date of distribution under Section 409A(a)(2)(A) of the Code, and the regulations thereunder, and where Section 409A of the Code applies to such distribution, payment will be made on the date that would have otherwise applied pursuant to this Section 2.4.

(c)   Payment Following a Change in Control. Notwithstanding Sections 2.2 and 2.4(a), if, during the two-year period following a Change in Control, the Participant experiences a termination of employment, the Performance Shares Earned as of the date of such termination of employment shall be paid in cash (pursuant to Section 2.4(d)) within 10 days of the termination of employment to the extent they have not been previously paid to the Participant; provided, however, that if such Change in Control would not qualify as a permissible date of distribution under Section 409A(a)(2)(A) of the Code, and the regulations thereunder, and where Section 409A of the Code applies to such distribution, payment will be made on the date that would have otherwise applied pursuant to this Section 2.4. Notwithstanding the foregoing to the contrary, to the extent payment is due within 10 days of the termination of employment, if the Participant on the date of termination of employment is a "specified employee" (within the meaning of Section 409A of the Code determined using the identification methodology selected by the Company from time to time) and the payment is subject to Section 409A of the Code, payment for the Performance Shares Earned will be made on the first day of the seventh month after the date of the Participant's termination of employment or, if earlier, the date of the Participant's death.

(d)   General. The Committee, in its sole discretion, may settle the Performance Shares Earned in cash or a combination of Shares and cash, in lieu of issuing only Shares. In the event that all or any portion of the Performance Shares Earned are paid in cash, the cash equivalent of one Performance Share Earned shall be equal to the Fair Market Value of one Share on the last trading day of the Incentive Period or, if earlier, the trading day immediately prior to the payment date. Notwithstanding the foregoing, no Performance Shares granted hereunder may be paid in cash in lieu of Shares to any Participant who is subject to the Share Ownership Guidelines unless and until such Participant is either in compliance with, or

no longer subject to, such Share Ownership Guidelines; provided, however, that the Committee may withhold Shares to the extent necessary to satisfy income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related item withholding requirements, as described in Section 5.3. In addition, the Committee may restrict 50% of the Shares to be issued in satisfaction of the total Performance Shares Earned, before income tax withholding, so that they cannot be sold by the Participant unless immediately after such sale the Participant is in compliance with the Share Ownership Guidelines that are applicable to the Participant at the time of sale.

(e)    Payments After Death. Any payment of Performance Shares Earned to a deceased Participant shall be paid to the estate of the Participant, unless the Participant files a completed Designation of Death Beneficiary with the Company in accordance with its procedures.

(f)    Payment Obligation. Prior to payment, the Company shall only have an unfunded and unsecured obligation to make payment of Performance Shares Earned to the Participant. The Performance Shares covered by this Agreement that have not yet been earned as Performance Shares Earned, and any interests of the Participant with respect thereto, are not transferable other than pursuant to the laws of descent and distribution, or in accordance with Section 2.4(e).

**2.5    Change in Control Vesting**.

(a)    If the Participant remains in the continuous employ of the Company or Subsidiary throughout the period beginning on January 1, 2015 and ending on the date of the Change in Control, upon the Change in Control, 100% of the Performance Shares shall become Performance Shares Earned, except to the extent that an award meeting the requirements of Section 2.5(e) (a "Replacement Award") is provided to the Participant in accordance with Section 2.5(e) to replace, adjust, or continue the Award of Performance Shares covered by this Agreement (the "Replaced Award"). If a Replacement Award is provided, references to Performance Shares in this Agreement shall be deemed to refer to the Replacement Award after the Change in Control.

(b)    If, upon or after receiving a Replacement Award, the Participant experiences a termination of employment with the Company or Subsidiary of the Company (or any of their successors) (as applicable, the "Successor") by reason of the Participant terminating employment for Good Reason or the Successor terminating the Participant's employment other than for Cause within a period of two years after the Change in Control and during the Incentive Period, 100% of the Replacement Award will become earned and nonforfeitable upon such termination.

(c)    If a Replacement Award is provided, notwithstanding anything in this Agreement to the contrary, any outstanding Performance Shares that at the time of the Change in Control are not subject to a "substantial risk of forfeiture" (within the meaning of Section 409A of the Code) will be deemed to be Performance Shares Earned at the time of such Change in Control and will be paid as provided for in Section 2.4(b).

(d)    For purposes of this Agreement, a "Change in Control" means:

(i)    any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) (a "Person") becomes the beneficial owner (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 35% or more of either (x) the then-outstanding Shares (the "Outstanding Company Common Stock") or (y) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities"); provided, however, that, for purposes of this Section 2.5(d)(i), the following acquisitions shall not constitute a Change in Control: (A) any acquisition directly from the Company, (B) any acquisition by the Company, (C) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any Affiliate or (D) any acquisition pursuant to a transaction that complies with Sections 2.5(d)(iii)(A), 2.5(d)(iii)(B) and 2.5(d)(iii)(C), below;

        (ii)    individuals who, as of the date hereof, constitute the Board of Directors (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board of Directors; provided, however, that any individual becoming a director subsequent to the date hereof whose election, or nomination for election by the Shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual was a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board of Directors;

        (iii)      consummation of a reorganization, merger, statutory share exchange or consolidation or similar transaction involving the Company or any of its subsidiaries, a sale or other disposition of all or substantially all of the assets of the Company, or the acquisition of assets or securities of another entity by the Company or any of its subsidiaries (each, a "Business Combination"), in each case unless, following such Business Combination, (A) all or substantially all of the individuals and entities that were the beneficial owners of the Outstanding Company Common Stock and the Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of the then-outstanding shares of common stock (or, for a non-corporate entity, equivalent securities) and the combined voting power of the then-outstanding voting securities entitled to vote generally in the election of directors (or, for a non-corporate entity, equivalent governing body), as the case may be, of the entity resulting from such Business Combination (including, without limitation, an entity that, as a result of such transaction, owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries) in substantially the same proportions as their ownership immediately prior to such Business Combination of the Outstanding Company Common Stock and the Outstanding Company Voting Securities, as the case may be, (B) no Person (excluding any entity resulting from such Business Combination or any employee benefit plan (or related trust) of the Company or such entity resulting from such Business Combination) beneficially owns, directly or indirectly, 35% or more, respectively, the then-outstanding shares of common stock (or, for a non-corporate entity, equivalent securities) of the entity resulting from such Business Combination or the combined voting power of the then-outstanding voting securities of such entity, except to the extent that such ownership existed prior to the Business Combination, and (C) at least a majority of the members of the board of directors (or, for a non-corporate entity, equivalent governing body) of the entity resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement or of the action of the Board of Directors providing for such Business Combination; or

        (iv)    approval by the Shareholders of a complete liquidation or dissolution of the Company.

        (e)    For purposes of this Agreement, a "Replacement Award" means an award (i) of the same type (e.g., performance shares) as the Replaced Award, (ii) that has a value at least equal to the value of the Replaced Award, (iii) that relates to publicly traded equity securities of the Company or its successor in the Change in Control or another entity that is affiliated with the Company or its successor following the Change in Control, (iv) if the Participant holding the Replaced Award is subject to U.S. federal income tax under the Code, the tax consequences of which to such Participant under the Code are not less favorable to such Participant than the tax consequences of the Replaced Award, and (v) the other terms and conditions of which are not less favorable to the Participant holding the Replaced Award than the terms and conditions of the Replaced Award (including the provisions that would apply in the event of a subsequent Change in Control). A Replacement Award may be granted only to the extent it does not result in the Replaced Award or Replacement Award failing to comply with or be exempt from Section 409A of the Code. Without limiting the generality of the foregoing, the Replacement Award may take the form of a continuation of the Replaced Award if the requirements of the two preceding sentences are satisfied. The determination of whether the conditions of this Section 2.5(e) are satisfied will be made by the Committee, as constituted immediately before the Change in Control, in its sole discretion.

(f)    A termination "<u>for Cause</u>" for purposes of Section 2.5 means that, prior to termination of employment, the Participant shall have committed: (i) and been convicted of a criminal violation involving fraud, embezzlement or theft in connection with his or her duties or in the course of his or her employment with the Successor; (ii) intentional wrongful damage to property of the Successor; (iii) intentional wrongful disclosure of secret processes or confidential information of the Successor; or (iv) intentional wrongful engagement in any competitive activity; and any such act shall have been demonstrably and materially harmful to the Successor. For purposes of this definition, no act or failure to act on the part of the Participant shall be deemed "intentional" if it was due primarily to an error in judgment or negligence, but shall be deemed "intentional" only if done or omitted to be done by the Participant not in good faith and without reasonable belief that the Participant's action or omission was in the best interest of the Successor.

(g)    A termination "<u>for Good Reason</u>" shall mean the Participant's termination of employment with the Successor as a result of the initial occurrence, without the Participant's consent, of one or more of the following events:

(i)    a material diminution in the Participant's annual base salary rate as in effect from time to time ("<u> Base Pay</u>");

(ii)    a material diminution in the Participant's authority, duties or responsibilities;

(iii)    a material change in the geographic location at which the Participant must perform services;

(iv)    a reduction in the Participant's opportunity regarding annual bonus, incentive or other payment of compensation, in addition to Base Pay, made or to be made in regard to services rendered in any year or other period pursuant to any bonus, incentive, profit-sharing, performance, discretionary pay or similar agreement, policy, plan, program or arrangement (whether or not funded) of the Successor; and

(v)    any other action or inaction that constitutes a material breach by the Participant's employer of the employment agreement, if any, under which the Participant provides services.

Notwithstanding the foregoing, "Good Reason" shall not be deemed to exist unless: (A) the Participant has provided notice to his or her employer of the existence of one or more of the conditions listed in (i) through (v) above within 90 days after the initial occurrence of such condition or conditions; and (B) such condition or conditions have not been cured by the Participant's employer within 30 days after receipt of such notice.

**ARTICLE 3.**
**Other Terms and Conditions**

**3.1    <u>Non-Compete and Confidentiality</u>**.

(a)    The Participant shall not render services for any organization or engage directly or indirectly in any business that is a competitor of the Company or any Affiliate of the Company, or which organization or business is or plans to become prejudicial to or in conflict with the business interests of the Company or any Affiliate of the Company or distribute any secret or confidential information belonging to the Company or any Affiliate of the Company.

(b)    Failure to comply with subsection (a) above will cause the Participant to forfeit the right to Performance Shares and require the Participant to reimburse the Company for the taxable income received on Performance Shares that become payable to the Participant.

**ARTICLE 4.**
**Acknowledgments**

**4.1**    **Acknowledgments.** In accepting the Award, the Participant acknowledges, understands and agrees to the following:

(a)    The Plan is established voluntarily by the Company, it is discretionary in nature and it may be modified, amended, suspended or terminated by the Company at any time, to the extent permitted by the Plan;

(b)    The grant of the Performance Shares is voluntary and occasional and does not create any contractual or other right to receive future grants of Performance Shares, or benefits in lieu of Performance Shares, even if Performance Shares have been granted in the past;

(c)    All decisions with respect to future Performance Shares or other grants, if any, will be at the sole discretion of the Company;

(d)    The Participant's participation in the Plan is voluntary;

(e)    The Performance Share award and the Participant's participation in the Plan shall not create a right to employment or be interpreted as forming an employment or services contract with the Company or any Subsidiary and shall not interfere with the ability of the Company, or any Subsidiary, as applicable, to terminate the Participant's employment or service relationship (if any);

(f)    The future value of the underlying Shares is unknown, indeterminable and cannot be predicted with certainty;

(g)    No claim or entitlement to compensation or damages shall arise from forfeiture of any Performance Shares resulting from the Participant ceasing to provide employment or other services to the Company or a Subsidiary (for any reason whatsoever whether or not later found to be invalid or in breach of employment laws in the jurisdiction where the Participant is employed or the terms of the Participant's employment agreement, if any), and in consideration of the grant of the Performance Shares to which the Participant is otherwise not entitled, the Participant irrevocably agrees never to institute any claim against the Company or any of its Subsidiaries, and the Participant waives his or her ability, if any, to bring any such claim, and releases the Company and its Subsidiaries from any such claim; if, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by participating in the Plan, the Participant shall be deemed irrevocably to have agreed not to pursue such claim and agrees to execute any and all documents necessary to request dismissal or withdrawal of such claim;

(h)    Neither the Plan nor the Performance Shares shall be construed to create an employment relationship where any employment relationship did not otherwise already exist;

(i)    The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Participant's participation in the Plan, or the Participant's acquisition or sale of the underlying Shares. The Participant is hereby advised to consult with his or her own personal tax, legal and financial advisors regarding his or her participation in the Plan before taking any action related to the Performance Shares;

(j)    The Performance Shares and the Shares subject to the Performance Shares, and the income and value of same, are not part of normal or expected compensation for purposes of calculating any severance, resignation, termination, redundancy, dismissal, end-of-

service payments, bonuses, long-service awards, pension or retirement or welfare benefits or similar payments;

(k)    The Company reserves the right to impose other requirements on participation in the Performance Shares and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable in order to comply with local law or other applicable rules or facilitate the administration of the Plan, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing; and

(l)    The Performance Shares and any related benefit or compensation under this Agreement is subject to the Company's Clawback Policy (or any other applicable recoupment, recapture, clawback or recovery policy of the Company as adopted by the Board or the Committee and in effect from time to time), a copy of which is available upon request.

<div align="center">

**ARTICLE 5.**
**General Provisions**

</div>

**5.1    Compliance with Law**. The Company shall make reasonable efforts to comply with all applicable federal and state securities laws; provided, however, notwithstanding any other provision of the Agreement and these terms and conditions, the Company shall not be obligated to issue any Shares pursuant to the Agreement and these terms and conditions if the issuance or payment thereof would result in a violation of any such law; provided further, however, that the Shares will be issued at the earliest date at which the Company reasonably anticipates that the issuance of the Shares will not cause such violation.

**5.2    Dividend Equivalents**. During the period beginning on the Date of Grant and ending on the date that Performance Shares are paid in accordance with Section 2.4, the Participant will be entitled to dividend equivalents on Performance Shares Earned equal to the cash dividend or distribution that would have been paid on the Performance Shares Earned had the Performance Shares Earned been issued and outstanding Shares on the record date for the dividend or distribution. Such accrued dividend equivalents (a) will vest and become payable upon the same terms and at the same time of settlement as the Performance Shares to which they relate, and (b) will be denominated and payable solely in cash.

**5.3    Withholding Taxes**. The provisions of Article 18.3 of the Plan shall apply to the extent that the Company or Subsidiary is required to withhold income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related items related to the Participant's participation in the Plan in connection with the Participant's Performance Shares (or dividend equivalents, if any), including, without limitation, any tax liability associated with the grant or vesting of the Performance Shares or sale of the underlying Shares (the "Tax Liability"). These requirements may change from time to time as laws or interpretations change. Regardless of the Company or Subsidiaries' actions in this regard, the Participant hereby acknowledges and agrees that the Tax Liability shall be the Participant's sole responsibility and liability. The Participant acknowledges that the Company's obligation to issue or deliver Shares or pay cash shall be subject to satisfaction of the Tax Liability. Unless otherwise determined by the Committee, withholding obligations shall be satisfied by having the Company or one if its Subsidiaries withhold all or a portion of any Shares that otherwise would be issued or cash payable to the Participant upon settlement of the vested Performance Shares; provided that amounts withheld shall not exceed the amount necessary to satisfy the Company's tax withholding obligations. Such withheld Shares shall be valued based on the Fair Market Value as of the date the withholding obligations are satisfied. The Company or one of its Subsidiaries may also satisfy the Tax Liability by deduction from the Participant's wages or other cash compensation paid to the Participant. If the Company does not elect to have withholding obligations satisfied by either withholding Shares, from the cash payable, or by deduction from the Participant's wages or other compensation paid to the Participant, the Participant agrees to pay the Company or Subsidiary the amount of the Tax Liability in cash (or by check) as directed by the Company or Subsidiary.

**5.4    Continuous Employment**. For purposes of this Agreement, the continuous employment of the Participant with the Company shall not be deemed to have been interrupted, and the Participant shall not be deemed to have separated from service with the Company, by reason of the transfer of his employment among the Company or Subsidiaries or an approved leave of absence, unless otherwise indicated in the Plan or required to comply with Section 409A of the Code.

**5.5    Relation to Other Benefits**. Any economic or other benefit to the Participant under the Agreement and these terms and conditions or the Plan shall not be taken into account in determining any benefits to which the Participant may be entitled under any profit-sharing, retirement or other benefit or compensation plan maintained by the Company or a Subsidiary and shall not affect the amount of any life insurance coverage available to any beneficiary under any life insurance plan covering employees of the Company or Subsidiary.

**5.6    These Terms and Conditions Subject to Plan** . The Performance Shares covered under the Agreement and all of the terms and conditions hereof are subject to all of the terms and conditions of the Plan, a copy of which is available upon request.

**5.7    Transferability**. Except as otherwise provided in the Plan, the Performance Shares are non-transferable and any attempts to assign, pledge, hypothecate or otherwise alienate or encumber (whether by law or otherwise) any Performance Shares shall be null and void.

**5.8    Data Privacy**. The Participant hereby explicitly and unambiguously consents to the collection, use and transfer, in electronic or other form, of the Participant's personal data as described in this Agreement and any other Performance Share award materials by and among, as applicable, the Company or Subsidiaries for the exclusive purpose of implementing, administering and managing the Participant's participation in the Plan.

The Participant understands that the Company or Subsidiary may hold certain personal information about the Participant, including, but not limited to, the Participant's name, home address and telephone number, date of birth, social security number or other identification number, salary, nationality, job title, any Shares of or directorships in the Company that are held, details of all Performance Shares or any other entitlement to Shares awarded, canceled, exercised, vested, unvested or outstanding in the Participant's favor, for the exclusive purpose of implementing, administering and managing the Plan ("Data").

The Participant understands that Data will be transferred to the Company's broker, or such other stock plan service provider as may be selected by the Company in the future, which is assisting the Company with the implementation, administration and management of the Plan. The Participant understands that the recipients' use of the Data may be located in the United States or elsewhere, and that the recipients' country (e.g., the United States) may have different data privacy laws and protections than the Participant's country. The Participant understands that if he or she resides outside the United States, he or she may request a list with the names and addresses of any potential recipients of the Data by contacting his or her local human resources representative. The Participant authorizes the Company, the Company's broker and any other possible recipients which may assist the Company (presently or in the future) with implementing, administering and managing the Plan to receive, possess, use, retain and transfer the Data, in electronic or other form, for the sole purpose of implementing, administering and managing the Participants' participation in the Plan. The Participant understands that Data will be held only as long as is necessary to implement, administer and manage the Participant's participation in the Plan. The Participant understands that if he or she resides outside the United States, he or she may, at any time, view their respective Data, request additional information about the storage and processing of their Data, require any necessary amendments to their Data or refuse or withdraw the consents herein, in any case without cost, by contacting in writing his or her local human resources representative. Further, the Participant understands that he or she is providing the consents herein on a purely voluntary basis. If the Participant does not consent, or if the Participant later seeks to revoke his or her consent, his or her employment status or service and career with the Employer will not be adversely affected; the only adverse consequence of refusing or withdrawing the Participant's consent is

that the Company would not be able to grant Performance Shares or other equity awards or administer or maintain such awards. Therefore, the Participant understands that refusing or withdrawing his or her consent may affect the Participant's ability to participate in the Plan. For more information on the consequences of the Participant's refusal to consent or withdrawal of consent, the Participant understands that he or she may contact his or her local human resources representative.

     **5.9**     <u>**Amendments**</u>. This Agreement can be amended at any time by the Committee. Any amendment to the Plan shall be deemed to be an amendment to this Agreement to the extent that the amendment is applicable hereto. Except for amendments necessary to bring this Agreement into compliance with current law including Code Section 409A, no amendment to this Agreement shall materially and adversely affect the rights of the Participant without the Participant's written consent.

     **5.10**     <u>**Severability**</u>. The provisions of this Agreement are severable and if any one or more provisions are determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable.

     **5.11**     <u>**Electronic Delivery**</u>. The Company may, in its sole discretion, decide to deliver any documents related to the Performance Shares by electronic means. By accepting this Award of Performance Shares, the Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

     **5.12**     <u>**Headings**</u>. Headings are given to the Articles of this Agreement solely as a convenience to facilitate reference. Such headings shall not be deemed in any way material or relevant to the construction or interpretation of this Agreement or any provision hereof.

     **5.13**     <u>**Governing Law**</u>. This Agreement is governed by, and subject to, the laws of the State of Ohio, without regard to the conflict of law provisions, as provided in the Plan.

     **5.14**     <u>**Code Section 409A**</u>. To the extent applicable, it is intended that this Agreement and the Plan comply with the provisions of Section 409A of the Code. This Agreement and the Plan shall be administered in a manner consistent with this intent, and any provision that would cause the Agreement or the Plan to fail to satisfy Section 409A of the Code shall have no force and effect until amended to comply with Section 409A of the Code (which amendment may be retroactive to the extent permitted by Section 409A of the Code and may be made by the Company without the consent of the Participant). The terms "<u>termination of employment</u>," "<u>terminates employment</u>," and similar words and phrases used in this Agreement mean a "separation from service" within the meaning of Treasury Regulation section 1.409A-1(h).

**[Acceptance Page Contained in Exhibit D]**

**<u>EXHIBITS</u>**

Exhibit A      Peer Group
Exhibit B      Performance Objectives
Exhibit C      Relative Total Shareholder Return
Exhibit D      Electronic Acceptance

---

**Exhibit A**

<u>PEER GROUP</u>
(2015 – 2017)

The Peer Group will be the constituents as defined by the SPDR Metals and Mining ETF Index on the last day of trading of the Incentive Period.

The value of the stock of a Peer Group company will be determined in accordance with the following:

1.  If the stock is listed on an exchange in the U.S. or Canada, then the value on such exchange will be used;

2.  Otherwise, if the stock is traded in the U.S. as an American Depositary Receipt ("ADR"), then the value of the ADR will be used; or

3.  Otherwise, the value on the exchange in the country where the company is headquartered will be used.

A004572

**Exhibit B**

<u>PERFORMANCE OBJECTIVES</u>
(2015 – 2017)

The Performance Objective of the Company is based on Relative Total Shareholder Return (share price plus reinvested dividends) over the three-year Incentive Period from January 1, 2015 to December 31, 2017. Achievement of the Relative Total Shareholder Return objective shall be determined by the Total Shareholder Return of the Company relative to that of the Peer Group, interpolating where necessary. Achievement shall be determined against the scale set forth in the table below:

| Performance Factor | Performance Level | | |
| --- | --- | --- | --- |
|  | Threshold | Target | Maximum |
| Relative TSR | 35th percentile | 55th percentile | 75th percentile |
| Payout For Relative TSR | 50% | 100% | 200% |

**Exhibit C**

<u>RELATIVE TOTAL SHAREHOLDER RETURN</u>
(2015 – 2017)

Relative Total Shareholder Return for the Incentive Period is calculated as follows:

1.  The Total Shareholder Return as defined in Section 1.8 of these terms and conditions for the Incentive Period for the Company shall be compared to the Total Shareholder Return for each of the entities within the Peer Group for the Incentive Period. The results shall be ranked to determine the Company's Relative Total Shareholder Return percentile ranking compared to the Peer Group.

2.  The Company's Relative Total Shareholder Return for the Incentive Period shall be compared to the Relative Total Shareholder Return Performance target range established for the Incentive Period.

3.  The Relative Total Shareholder Return performance target range has been established for the 2015 - 2017 Incentive Period as follows:

| <u>Performance Level</u> | 2015 – 2017<br>Relative Total Shareholder Return<br><u>Percentile Ranking</u> |
|---|---|
| Maximum | 75th Percentile |
| Target | 55th Percentile |
| Threshold | 35th Percentile |

A004574

**Exhibit D**

<u>ELECTRONIC ACCEPTANCE</u>

**Acceptance by the Participant**

By selecting the "Accept Grant" box on the website of the Company's administrative agent, the Participant acknowledges acceptance of, and consents to be bound by, the Plan and this Agreement and any other rules, agreements or other terms and conditions incorporated herein by reference.

IF I FAIL TO ACKNOWLEDGE ACCEPTANCE OF THE AWARD WITHIN NINETY (90) DAYS OF THE DATE OF GRANT SET FORTH IN THE AGREEMENT, THE COMPANY MAY DETERMINE THAT THIS AWARD HAS BEEN FORFEITED.

**PARTICIPANT NAME**                                             **ACCEPTANCE DATE**

Participant Name                                                         Date

**ELECTRONIC SIGNATURE**

Participant Signature

**EXHIBIT 10.72**

**CLIFFS NATURAL RESOURCES INC.**
**AMENDED AND RESTATED 2012 INCENTIVE EQUITY PLAN**

**RESTRICTED SHARE UNIT AWARD MEMORANDUM**

| | |
|---|---|
| **Employee:** | **PARTICIPANT NAME** |
| **Date of Grant:** | **GRANT DATE** |
| **Grant Price:** | **GRANT PRICE** |
| **Number of Shares Subject to Award:** | **SHARES GRANTED** |
| **Vesting Dates:** | **1/3 of the Restricted Share Units shall Vest on December 31, 2015** |
| | **1/3 of the Restricted Share Units shall Vest on December 31, 2016** |
| | **1/3 of the Restricted Share Units shall Vest on December 31, 2017 (each such Vesting date, a "Vesting Date")** |

Additional terms and conditions of your Award are included in the Restricted Share Unit Award Agreement. As a condition to your receipt of Shares, you must log on to Fidelity's website at www.netbenefits.fidelity.com and accept the terms and conditions of this Award within 90 calendar days of your Date of Grant. If you do not accept the terms and conditions of this Award within such time at www.netbenefits.fidelity.com, this Award may be forfeited and immediately terminate.

Note: Article 2.1 of the Restricted Share Unit Award Agreement contains provisions that restrict your activities. These provisions apply to you and, by accepting this Award, you agree to be bound by these restrictions.

**CLIFFS NATURAL RESOURCES INC.**
**AMENDED AND RESTATED 2012 INCENTIVE EQUITY PLAN**

**Restricted Share Unit Award Agreement**

This Restricted Share Unit Award Agreement (the "Agreement") is between Cliffs Natural Resources Inc., an Ohio corporation (the "Company"), and you, the person named in the Restricted Share Unit Award Memorandum (the "Award Memorandum") who is an employee of the Company or Subsidiary of the Company (the "Participant"). For purposes of this Agreement, "Employer" means the entity (the Company or Subsidiary) that employs the Participant on the applicable date. This Agreement is effective as of the Date of Grant set forth in the Award Memorandum.

The Company wishes to award to the Participant Restricted Share Units representing the opportunity to earn a number of the Company's common shares, $0.125 par value per share (the "Shares"), subject to the terms and conditions set forth in this Agreement, in order to carry out the purpose of the Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan (the "Plan"). All capitalized terms not defined in this Agreement shall have the same meaning as set forth in the Plan. See Article 1 of the Plan for a list of defined terms.

In the event of a conflict between the terms of this Agreement, the Award Memorandum and the terms of the Plan, the terms of the Plan shall govern. In the event of a conflict between the terms of this Agreement and the Award Memorandum, the terms of this Agreement shall govern.

**ARTICLE 1.**
**Grant and Terms of Restricted Share Units**

**1.1    Grant of Restricted Share Units**. Pursuant to the Plan, the Company has granted to Participant the number of Restricted Share Units as specified in the Award Memorandum, with dividend equivalents ("Restricted Share Units"), effective as of the Date of Grant.

**1.2    Vesting As Condition of Payment**. The Restricted Share Units covered by this Agreement and these terms and conditions shall only result in the issuance of Shares (or cash or a combination of Shares and cash, as decided by the Committee in its sole discretion) equal in number to the Restricted Share Units to the extent the Participant is "Vested" in the Restricted Share Units on the date the Restricted Share Units are to be paid as specified in Section 1.3. The Restricted Share Units will become Vested as follows:

(a)    Employment Through Each Vesting Date. The Participant will become Vested in one-third (1/3) of the Restricted Share Units subject to this Award on each Vesting Date, as set forth in the Award Memorandum, if the Participant remains in the continuous employ of the Company or Subsidiary through each such Vesting Date. The period beginning on the Date of Grant and ending on the final Vesting Date shall be the "Vesting Period."

(b)    Death or Disability.  The Participant will become 100% Vested in the Restricted Share Units subject to this Award that are not otherwise Vested, if the Participant experiences a termination of employment with the Company because of the Participant's death or Disability during the Vesting Period.

( c )    Retirement or Termination without Cause . If the Participant experiences a termination of employment with the Company because of Retirement or a termination of employment by the Company without Cause during the Vesting Period, the Participant shall additionally become Vested in a prorated number of the Restricted Share Units calculated by multiplying one-third (1/3) of the Restricted Share Units subject to this Award by a fraction, the numerator of which is the number of full months the Participant was employed with the Company or a Subsidiary between the January 1 of the year in which the

termination occurred and the date of the Participant's termination of employment, and the denominator of which is 12, rounded down to the nearest whole Restricted Share Unit.

(d)  Change in Control. In the event of a Change in Control (as defined in Section 1.4) during the Vesting Period, the Participant will become Vested in the Restricted Share Units that are not otherwise Vested only to the extent provided in Section 1.4.

In the event the Participant otherwise terminates employment prior to becoming Vested in all of the Restricted Share Units or the Participant's employment is terminated by the Company for Cause, the Participant shall forfeit all rights to any Restricted Share Units that were granted under the Agreement and were not Vested at the time of such termination of employment.

**1.3**  **Payment of Restricted Share Units**.

(a)  Payment After a Vesting Date. Subject to Sections 1.3(b) and (d), the Restricted Share Units that are Vested as of each Vesting Date shall be paid within 2-½ months following the applicable Vesting Date.

(b)  Payment After Death. Notwithstanding Section 1.3(a), if the Participant experiences a termination of employment with the Company because of the Participant's death during the Vesting Period, the Vested Restricted Shares Units will be paid within 30 days following the date of termination. Any payment of Restricted Share Units to a deceased Participant shall be paid to the estate of the Participant, unless the Participant files a completed Designation of Death Beneficiary with the Company in accordance with its procedures.

(c)  Payment After Disability, Retirement or Termination without Cause . If the Participant experiences a termination of employment with the Company because of the Participant's Disability, Retirement, or a termination of employment by the Company without Cause during the Vesting Period, the Vested Restricted Shares Units shall be paid in accordance with Section 1.3(a).

(d)  Change in Control. Notwithstanding Section 1.3(a), to the extent any Restricted Share Units are Vested as of a Change in Control, such Vested Restricted Share Units will be paid within 10 days of the Change in Control; provided, however, that if such Change in Control would not qualify as a permissible date of distribution under Section 409A(a)(2)(A) of the Code, and the regulations thereunder, and where Section 409A of the Code applies to such distribution, payment will be made on the date that would have otherwise applied pursuant to this Section 1.3.

(e)  Payment Following a Change in Control. Notwithstanding Sections 1.2 and 1.3(a), if, during the two-year period following a Change in Control, the Participant experiences a termination of employment, the Restricted Share Units that are Vested as of the date of such termination of employment shall be paid in cash (pursuant to Section 1.4(f)) within 10 days of the termination of employment to the extent they have not been previously paid to the Participant; provided, however, that if such Change in Control would not qualify as a permissible date of distribution under Section 409A(a)(2)(A) of the Code, and the regulations thereunder, and where Section 409A of the Code applies to such distribution, payment will be made on the date that would have otherwise applied pursuant to this Section 1.3. Notwithstanding the foregoing to the contrary, to the extent payment is due within 10 days of the termination of employment, if the Participant on the date of termination of employment is a "specified employee" (within the meaning of Section 409A of the Code determined using the identification methodology selected by the Company from time to time), payment for the Restricted Share Units will be made on the tenth business day of the seventh month after the date of the Participant's termination of employment or, if earlier, the date of the Participant's death.

(f)  General. The Committee, in its sole discretion, may settle the Restricted Share Units in cash or a combination of Shares and cash, in lieu of issuing only Shares. In the event that all or any portion of the Restricted Share Units shall be paid in cash, the cash equivalent of one Restricted Share Unit shall be equal to the Fair Market Value of one Share on the last trading day of the Vesting Period or, if earlier, the trading day immediately prior to the payment date. Notwithstanding the foregoing, no Restricted Share Units granted hereunder may be paid in cash in lieu of Shares to any Participant who is subject to the Cliffs Natural Resources Inc. Directors' and Officers' Share Ownership Guidelines ("Share Ownership Guidelines") unless and until such Participant is either in compliance with, or no longer subject to, such Share Ownership Guidelines; provided, however, that the Committee may withhold Shares to the extent necessary to satisfy income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related item withholding requirements, as described in Section 4.3. In addition, the Committee may restrict 50% of the Shares to be issued in satisfaction of the total Restricted Share Units, before income tax withholding, so that they cannot be sold by the Participant unless immediately after such sale the Participant is in compliance with the Share Ownership Guidelines that are applicable to the Participant at the time of sale.

(g)  Payment Obligation. Prior to payment, the Company shall only have an unfunded and unsecured obligation to make payment of Restricted Share Units to the Participant. The Restricted Share Units covered by this Agreement that have not yet been earned, and any interests of the Participant with respect thereto, are not transferable other than pursuant to the laws of descent and distribution, or in accordance with Section 1.3(b).

**1.4**  **Change in Control Vesting.**

(a)  If the Participant remains in the continuous employ of the Company or Subsidiary through the period beginning on January 1, 2015 and ending on the date of a Change in Control, the Participant will become 100% Vested in the Restricted Share Units not otherwise Vested subject to the Award upon the Change in Control, except to the extent that an award meeting the requirements of Section 1.4(e) (a "Replacement Award") is provided to the Participant in accordance with Section 1.4(e) to replace, adjust or continue the award of Restricted Share Units covered by this Agreement (the "Replaced Award"). If a Replacement Award is provided, references to Restricted Share Units in this Agreement shall be deemed to refer to the Replacement Award after the Change in Control.

(b)  If, upon or after receiving a Replacement Award, the Participant experiences a termination of employment with the Company or Subsidiary of the Company (or any of their successors) (as applicable, the "Successor") by reason of the Participant terminating employment for Good Reason or the Successor terminating the Participant's employment other than for Cause, in each case within a period of two years after the Change in Control and during the Vesting Period, the Participant shall become 100% Vested in the Replacement Award upon such termination.

(c)  If a Replacement Award is provided, notwithstanding anything in this Agreement to the contrary, any outstanding Restricted Share Units that at the time of the Change in Control are not subject to a "substantial risk of forfeiture" (within the meaning of Section 409A of the Code) will be deemed to be Vested at the time of such Change in Control and will be paid as provided for in Section 1.3(b).

(d)  For purposes of this Agreement, a "Change in Control" means:

(i)  any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) (a "Person") becomes the beneficial owner (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 35% or more of either (x) the then-outstanding Shares (the "Outstanding Company Common Stock") or (y) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities"); provided, however, that, for purposes of this Section 1.4(d)(i), the following acquisitions shall not constitute a Change in Control: (A) any acquisition

directly from the Company, (B) any acquisition by the Company, (C) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any Affiliate or (D) any acquisition pursuant to a transaction that complies with Sections 1.4(d)(iii)(A), 1.4(d)(iii)(B) and 1.4(d)(iii)(C), below;

(ii)    individuals who, as of the date hereof, constitute the Board of Directors (the " Incumbent Board") cease for any reason to constitute at least a majority of the Board of Directors; provided, however, that any individual becoming a director subsequent to the date hereof whose election, or nomination for election by the Shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual was a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board of Directors;

(iii)    consummation of a reorganization, merger, statutory share exchange or consolidation or similar transaction involving the Company or any of its subsidiaries, a sale or other disposition of all or substantially all of the assets of the Company, or the acquisition of assets or securities of another entity by the Company or any of its subsidiaries (each, a "Business Combination"), in each case unless, following such Business Combination, (A) all or substantially all of the individuals and entities that were the beneficial owners of the Outstanding Company Common Stock and the Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of the then-outstanding shares of common stock (or, for a non-corporate entity, equivalent securities) and the combined voting power of the then-outstanding voting securities entitled to vote generally in the election of directors (or, for a non-corporate entity, equivalent governing body), as the case may be, of the entity resulting from such Business Combination (including, without limitation, an entity that, as a result of such transaction, owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries) in substantially the same proportions as their ownership immediately prior to such Business Combination of the Outstanding Company Common Stock and the Outstanding Company Voting Securities, as the case may be, (B) no Person (excluding any entity resulting from such Business Combination or any employee benefit plan (or related trust) of the Company or such entity resulting from such Business Combination) beneficially owns, directly or indirectly, 35% or more of, respectively, the then-outstanding shares of common stock (or, for a non-corporate entity, equivalent securities) of the entity resulting from such Business Combination or the combined voting power of the then-outstanding voting securities of such entity, except to the extent that such ownership existed prior to the Business Combination, and (C) at least a majority of the members of the board of directors (or, for a non-corporate entity, equivalent governing body) of the entity resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement or of the action of the Board of Directors providing for such Business Combination; or

(iv)    approval by the Shareholders of a complete liquidation or dissolution of the Company.

(e)    For purposes of this Agreement, a "Replacement Award" means an award: (i) of the same type (e.g., time-based restricted share units) as the Replaced Award; (ii) that has a value at least equal to the value of the Replaced Award; (iii) that relates to publicly traded equity securities of the Company or its successor in the Change in Control or another entity that is affiliated with the Company or its successor following the Change in Control; (iv) if the Participant holding the Replaced Award is subject to U.S. federal income tax under the Code, the tax consequences of which to such Participant under the Code are not less favorable to such Participant than the tax consequences of the Replaced Award; and (v) the other terms and conditions of which are not less favorable to the Participant holding the Replaced Award than the terms and conditions of the Replaced Award (including the provisions that would apply in the event of a subsequent Change in Control). A Replacement Award may be granted only to the extent it does not result in the Replaced Award or Replacement Award failing to comply with or be exempt from Section 409A of the Code. Without limiting the generality of the foregoing, the Replacement Award may take the form of a continuation of the Replaced Award if the requirements of the two preceding sentences are satisfied. The determination of

whether the conditions of this Section 1.4(e) are satisfied will be made by the Committee, as constituted immediately before the Change in Control, in its sole discretion.

(f)    A termination "for Cause" for purposes of Section 1.4 means that, prior to termination of employment, the Participant shall have committed: (i) and been convicted of a criminal violation involving fraud, embezzlement or theft in connection with his or her duties or in the course of his or her employment with the Successor; (ii) intentional wrongful damage to property of the Successor; (iii) intentional wrongful disclosure of secret processes or confidential information of the Successor; or (iv) intentional wrongful engagement in any competitive activity; and any such act shall have been demonstrably and materially harmful to the Successor. For purposes of this definition, no act or failure to act on the part of the Participant shall be deemed "intentional" if it was due primarily to an error in judgment or negligence, but shall be deemed "intentional" only if done or omitted to be done by the Participant not in good faith and without reasonable belief that the Participant's action or omission was in the best interest of the Successor.

(g)    A termination "for Good Reason" shall mean the Participant's termination of employment with the Successor as a result of the initial occurrence, without the Participant's consent, of one or more of the following events:

(i)    a material diminution in the Participant's annual base salary rate as in effect from time to time (" Base Pay");

(ii)    a material diminution in the Participant's authority, duties or responsibilities;

(iii)    a material change in the geographic location at which the Participant must perform services;

(iv)    a reduction in the Participant's opportunity regarding annual bonus, incentive or other payment of compensation, in addition to Base Pay, made or to be made in regard to services rendered in any year or other period pursuant to any bonus, incentive, profit-sharing, performance, discretionary pay or similar agreement, policy, plan, program or arrangement (whether or not funded) of the Successor; and

(v)    any other action or inaction that constitutes a material breach by the Participant's employer of the employment agreement, if any, under which the Participant provides services.

Notwithstanding the foregoing, "Good Reason" shall not be deemed to exist unless: (A) the Participant has provided notice to his or her employer of the existence of one or more of the conditions listed in (i) through (v) above within 90 days after the initial occurrence of such condition or conditions; and (B) such condition or conditions have not been cured by the Participant's employer within 30 days after receipt of such notice.

**ARTICLE 2.**
**Other Terms and Conditions**

**2.1    Non-Compete and Confidentiality**.

(e)    The Participant shall not render services for any organization or engage directly or indirectly in any business that is a competitor of the Company or any Affiliate of the Company, or which organization or business is or plans to become prejudicial to or in conflict with the business interests of the Company or any Affiliate of the Company or distribute any secret or confidential information belonging to the Company or any Affiliate of the Company.

(f)    Failure to comply with subsection (a) above will cause the Participant to forfeit the right to Restricted Share Units and require the Participant to reimburse the Company for the taxable income

received on Restricted Share Units that have been paid out in Shares within the 90-day period preceding the Participant's termination of employment.

**ARTICLE 3.**
**Acknowledgements**

3.1   **Acknowledgments.** In accepting the Award, the Participant acknowledges, understands and agrees to the following:

(a)      The Plan is established voluntarily by the Company, it is discretionary in     nature and it may be modified, amended, suspended or terminated by the Company at any time, to the extent permitted by the Plan;

(b)      The grant of the Restricted Share Units is voluntary and occasional and does not create any contractual or other right to receive future grants of Restricted Share Units, or benefits in lieu of Restricted Share Units, even if Restricted Share Units have been granted in the past;

(c)      All decisions with respect to future Restricted Share Units or other grants, if any, will be at the sole discretion of the Company;

(d)      The Participant's participation in the Plan is voluntary;

(e)      The Restricted Share Unit Award and the Participant's participation in the Plan shall not create a right to employment or be interpreted as forming an employment or services contract with the Company or any Subsidiary and shall not interfere with the ability of the Company, or any Subsidiary, as applicable, to terminate the Participant's employment or service relationship (if any);

(f)      The future value of the underlying Shares is unknown, indeterminable and cannot be predicted with certainty;

(g)      No claim or entitlement to compensation or damages shall arise from forfeiture of any Restricted Share Units resulting from the Participant ceasing to provide employment or other services to the Company or a Subsidiary (for any reason whatsoever whether or not later found to be invalid or in breach of employment laws in the jurisdiction where the Participant is employed or the terms of the Participant's employment agreement, if any), and in consideration of the grant of the Restricted Share Units to which the Participant is otherwise not entitled, the Participant irrevocably agrees never to institute any claim against the Company or any of its Subsidiaries, and the Participant waives his or her ability, if any, to bring any such claim, and releases the Company and its Subsidiaries from any such claim; if, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by participating in the Plan, the Participant shall be deemed irrevocably to have agreed not to pursue such claim and agrees to execute any and all documents necessary to request dismissal or withdrawal of such claim;

(h)      Neither the Plan nor the Restricted Share Units shall be construed to create an employment relationship where any employment relationship did not otherwise already exist;

(i)      The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Participant's participation in the Plan, or the Participant's acquisition or sale of the underlying Shares. The Participant is hereby advised to consult with his or her own personal tax, legal and financial advisors regarding his or her participation in the Plan before taking any action related to the Restricted Share Units;

(j)        The Restricted Share Units and the Shares subject to the Restricted Share Units, and the income and value of same, are not part of normal or expected compensation for purposes of calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, bonuses, long-service awards, pension or retirement or welfare benefits or similar payments; and

(k)        The Company reserves the right to impose other requirements on participation in the Restricted Share Units and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable in order to comply with local law or other applicable rules or facilitate the administration of the Plan, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

## ARTICLE 4.
### General Provisions

**4.1    Compliance with Law**. The Company shall make reasonable efforts to comply with all applicable federal and state securities laws; provided, however, notwithstanding any other provision of the Agreement and these terms and conditions, the Company shall not be obligated to issue any Shares pursuant to the Agreement and these terms and conditions if the issuance or payment thereof would result in a violation of any such law; provided, however, that the Shares will be issued at the earliest date at which the Company reasonably anticipates that the issuance of the Shares will not cause such violation.

**4.2    Dividend Equivalents**. During the period beginning on the Date of Grant and ending on the date that the Restricted Share Units are paid in accordance with Section 1.3, the Participant will be entitled to dividend equivalents on Restricted Share Units equal to the cash dividend or distribution that would have been paid on the Restricted Share Units had the Restricted Share Units been issued and outstanding Shares on the record date for the dividend or distribution. Such accrued dividend equivalents (a) will vest and become payable upon the same terms and at the same time of settlement as the Restricted Share Units to which they relate, and (b) will be denominated and payable solely in cash.

**4.3    Withholding Taxes**. The provisions of Article 18.3 of the Plan shall apply to the extent that the Company or Subsidiary is required to withhold income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related items related to the Participant's participation in the Plan in connection with the Participant's Restricted Share Units (or dividend equivalents, if any), without limitation, any tax liability associated with the grant or vesting of the Restricted Share Units or sale of the underlying Shares (the "Tax Liability"). These requirements may change from time to time as laws or interpretations change. Regardless of the Company or Subsidiaries' actions in this regard, the Participant hereby acknowledges and agrees that the Tax Liability shall be the Participant's sole responsibility and liability. The Participant acknowledges that the Company's obligation to issue or deliver Shares or pay cash shall be subject to satisfaction of the Tax Liability. Unless otherwise determined by the Committee, withholding obligations shall be satisfied by having the Company or one if its Subsidiaries withhold all or a portion of any Shares that otherwise would be issued or cash payable to the Participant upon settlement of the vested Restricted Share Units; provided that amounts withheld shall not exceed the amount necessary to satisfy the Company's tax withholding obligations. Such withheld Shares shall be valued based on the Fair Market Value as of the date the withholding obligations are satisfied. The Company or one of its Subsidiaries may also satisfy the Tax Liability by deduction from the Participant's wages or other cash compensation paid to the Participant. If the Company does not elect to have withholding obligations satisfied by either withholding Shares, from the cash payable, or by deduction from the Participant's wages or other compensation paid to the Participant, the Participant agrees to pay the Company or Subsidiary the amount of the Tax Liability in cash (or by check) as directed by the Company or Subsidiary.

**4.4    Continuous Employment**. For purposes of this Agreement, the continuous employment of the Participant with the Company shall not be deemed to have been interrupted, and the Participant shall

not be deemed to have separated from service with the Company, by reason of the transfer of his employment among the Company or Subsidiaries or an approved leave of absence, unless otherwise indicated in the Plan or if required to comply with Section 409A of the Code.

**4.5**    **Relation to Other Benefits**. Any economic or other benefit to the Participant under the Agreement and these terms and conditions or the Plan shall not be taken into account in determining any benefits to which the Participant may be entitled under any profit-sharing, retirement or other benefit or compensation plan maintained by the Company or a Subsidiary and shall not affect the amount of any life insurance coverage available to any beneficiary under any life insurance plan covering employees of the Company or Subsidiary.

**4.6**    **These Terms and Conditions Subject to Plan** . The Restricted Share Units covered under the Agreement and all of the terms and conditions hereof are subject to all of the terms and conditions of the Plan, a copy of which is available upon request.

**4.7**    **Transferability**. Except as otherwise provided in the Plan, the Restricted Share Units are non-transferable and any attempts to assign, pledge, hypothecate or otherwise alienate or encumber (whether by law or otherwise) any Restricted Share Units shall be null and void.

**4.8**    **Data Privacy**. The Participant hereby explicitly and unambiguously consents to the collection, use and transfer, in electronic or other form, of the Participant's personal data as described in this Agreement and any other Restricted Share Unit award materials by and among, as applicable, the Company or Subsidiaries for the exclusive purpose of implementing, administering and managing the Participant's participation in the Plan.

The Participant understands that the Company or Subsidiary may hold certain personal information about the Participant, including, but not limited to, the Participant's name, home address and telephone number, date of birth, social security number or other identification number, salary, nationality, job title, any Shares of or directorships in the Company that are held, details of all Restricted Share Units or any other entitlement to Shares awarded, canceled, exercised, vested, unvested or outstanding in the Participant's favor, for the exclusive purpose of implementing, administering and managing the Plan ("Data").

The Participant understands that Data will be transferred to the Company's broker, or such other stock plan service provider as may be selected by the Company in the future, which is assisting the Company with the implementation, administration and management of the Plan. The Participant understands that the recipients' use of the Data may be located in the United States or elsewhere, and that the recipients' country (e.g., the United States) may have different data privacy laws and protections than the Participant's country. The Participant understands that if he or she resides outside the United States, he or she may request a list with the names and addresses of any potential recipients of the Data by contacting his or her local human resources representative. The Participant authorizes the Company, the Company's broker and any other possible recipients which may assist the Company (presently or in the future) with implementing, administering and managing the Plan to receive, possess, use, retain and transfer the Data, in electronic or other form, for the sole purpose of implementing, administering and managing the Participants' participation in the Plan. The Participant understands that Data will be held only as long as is necessary to implement, administer and manage the Participant's participation in the Plan. The Participant understands that if he or she resides outside the United States, he or she may, at any time, view their respective Data, request additional information about the storage and processing of their Data, require any necessary amendments to their Data or refuse or withdraw the consents herein, in any case without cost, by contacting in writing his or her local human resources representative. Further, the Participant understands that he or she is providing the consents herein on a purely voluntary basis. If the Participant does not consent, or if the Participant later seeks to revoke his or her consent, his or her employment status or service and career with the Employer will not be adversely affected; the only adverse consequence of refusing or withdrawing the Participant's consent is that the Company would not be able to grant Restricted Share Units or other equity awards or administer or maintain such awards. Therefore, the Participant understands that refusing or withdrawing his or her consent

may affect the Participant's ability to participate in the Plan. For more information on the consequences of the Participant's refusal to consent or withdrawal of consent, the Participant understands that he or she may contact his or her local human resources representative.

**4.9    Amendments**. This Agreement can be amended at any time by the Committee. Any amendment to the Plan shall be deemed to be an amendment to this Agreement to the extent that the amendment is applicable hereto. Except for amendments necessary to bring this Agreement into compliance with current law including Code Section 409A, no amendment to this Agreement shall materially and adversely affect the rights of the Participant without the Participant's written consent.

**4.10    Severability**. The provisions of this Agreement are severable and if any one or more provisions are determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable.

**4.11    Electronic Delivery**. The Company may, in its sole discretion, decide to deliver any documents related to the Restricted Share Units by electronic means. By accepting this Award of Restricted Share Units, the Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

**4.12    Appendix to Agreement**. Notwithstanding any provisions of this Agreement to the contrary, the Restricted Share Units shall be subject to such special terms and conditions for the Participant's country of residence (and country of employment, if different), as are set forth in the appendix to this Agreement (the "Appendix"). Further, if the Participant transfers residency and/or employment to another country, any special terms and conditions for such country will apply to the Restricted Share Units to the extent the Company determines, in its sole discretion, that the application of such terms and conditions is necessary or advisable in order to comply with local law or to facilitate the operation and administration of the Restricted Share Units and the Plan (or the Company may establish alternative terms and conditions as may be necessary or advisable to accommodate a transfer). In all circumstances, the Appendix shall constitute part of this Agreement.

**4.13    Headings**. Headings are given to the Articles of this Agreement solely as a convenience to facilitate reference. Such headings shall not be deemed in any way material or relevant to the construction or interpretation of this Agreement or any provision hereof.

**4.14    Governing Law**. This Agreement is governed by, and subject to, the laws of the State of Ohio, without regard to the conflict of law provisions, as provided in the Plan.

**4.15    Code Section 409A**. To the extent applicable, it is intended that this Agreement and the Plan comply with the provisions of Section 409A of the Code. This Agreement and the Plan shall be administered in a manner consistent with this intent, and any provision that would cause the Agreement or the Plan to fail to satisfy Section 409A of the Code shall have no force and effect until amended to comply with Section 409A of the Code (which amendment may be retroactive to the extent permitted by Section 409A of the Code and may be made by the Company without the consent of the Participant). The terms "termination of employment," "terminates employment," and similar words and phrases used in this Agreement mean a "separation from service" within the meaning of Treasury Regulation section 1.409A-1(h).

**[Acceptance Page Contained in Exhibit A]**

**Exhibit A**
ELECTRONIC ACCEPTANCE

**Acceptance by the Participant**

By selecting the "Accept Grant" box on the website of the Company's administrative agent, the Participant acknowledges acceptance of, and consents to be bound by, the Plan and this Agreement and any other rules, agreements or other terms and conditions incorporated herein by reference.

IF I FAIL TO ACKNOWLEDGE ACCEPTANCE OF THE AWARD WITHIN NINETY (90) DAYS OF THE DATE OF GRANT SET FORTH IN THE AGREEMENT, THE COMPANY MAY DETERMINE THAT THIS AWARD HAS BEEN FORFEITED.

**PARTICIPANT NAME**                                                    **ACCEPTANCE DATE**
Participant Name                                                       Date
**ELECTRONIC SIGNATURE**
Participant Signature

**APPENDIX FOR NON-U.S. PARTICIPANTS**
**ADDITIONAL TERMS AND CONDITIONS TO RESTRICTED SHARE UNIT AWARD AGREEMENT**

**Terms and Conditions**

This Appendix includes the following additional terms and conditions that govern Restricted Share Unit Awards granted to Participants under the Cliffs Natural Resources, Inc. Amended and Restated 2012 Incentive Equity Plan (the "Plan") who reside and/or work outside of the United States in one of the countries listed below. Certain capitalized terms used but not defined in this Appendix have the meanings set forth in the Plan and/or the Restricted Share Unit Award Agreement that relates to a Participant's award. By accepting an award, Participants agree to be bound by the terms and conditions contained in the paragraphs below in addition to the terms of the Plan, the Agreement, and the terms of any other document that may apply to a Participant and a Participant's award.

**Notifications**

This Appendix also includes notifications regarding exchange controls and other regulatory issues of which the Participant should be aware with respect to the Participant's participation in the Plan. The information herein is based on the securities, exchange control and other laws in effect in the respective countries as of January 2015. Such laws are often complex and change frequently. As a result, the Company strongly recommends that the Participant not rely on the information in this Appendix as the only source of information relating to the consequences of the Participant's participation in the Plan because the information may be out of date at the time that the Restricted Share Units vest, or the Shares are delivered or cash paid in settlement of the Restricted Share Units, or the Participant sells any Shares acquired under the Plan.

In addition, the information contained herein is general in nature and may not apply to the Participant's particular situation, and the Company, its Subsidiaries or Affiliates, nor the Company's stock plan administrator ("Administrator") is in a position to assure the Participant of a particular result. Accordingly, the Participant is advised to seek appropriate professional advice as to how the relevant laws in the Participant's country of residence and/or work may apply to the Participant's situation.

Finally, if the Participant transfers employment after the Date of Grant, or is considered a resident of another country for local law purposes following the Date of Grant, the notifications contained herein may not be applicable to the Participant, and the Administrator shall, in its discretion, determine to what extent the terms and conditions contained herein shall be applicable to the Participant.

**Terms and Conditions Applicable to All Non-U.S. Jurisdictions**

<u>English Language</u>. The Participant acknowledges and agrees that it is the Participant's express intent that this Agreement, the Plan and all other documents, rules, procedures, forms, notices and legal proceedings entered into, given or instituted pursuant to the Restricted Share Units, be drawn up in English. If the Participant has received this Agreement, the Plan or any other Agreement rules, procedures, forms or documents related to the Restricted Share Unit award translated into a language other than English, and if the meaning of the translated version is different than the English version, the English version will control, unless otherwise provided herein.

<u>Compliance with Laws; Repatriation</u>. The Participant agrees, as a condition of the grant of the Restricted Share Unit award, to repatriate all payments attributable to the Restricted Share Units and/or cash acquired under the Plan (including, but not limited to, dividends, dividend equivalents (if any), and any proceeds derived from the sale of the Shares acquired pursuant to the Agreement) in accordance with all foreign exchange rules and regulations applicable to the Participant. The Company, Subsidiaries, Affiliates and the Administrator reserve the right to impose other requirements on the Participant's participation in the Plan,

on the Restricted Share Units and on any Shares acquired or cash payments made pursuant to the Agreement, to the extent the Company, its Subsidiaries or Affiliates or the Administrator determines it is necessary or advisable in order to comply with local law or to facilitate the administration of the Plan, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing. Finally, the Participant agrees to take any and all actions as may be required to comply with the Participant's personal legal and tax obligations under all laws, rules and regulations applicable to the Participant.

Private Placement. The grant of the Restricted Share Units is not intended to be a public offering of securities in the Participant's country of residence and/or employment but instead is intended to be a private placement. As a private placement, the Company has not submitted any registration statement, prospectus or other filings with the local securities authorities (unless otherwise required under local law), and the grant of the Restricted Share Units is not subject to the supervision of the local securities authorities.

Responsibility for Taxes & Withholding. Regardless of any action the Company or any of its Subsidiaries or Affiliates takes with respect to any or all income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related items related to the Participant's participation in the Plan and legally applicable to the Participant ("Tax-Related Items"), the Participant acknowledges that the ultimate liability for all Tax-Related Items is and remains the Participant's responsibility and may exceed the amount actually withheld by the Company or any of its Subsidiaries or Affiliates. The Participant further acknowledges that the Company and/or its Subsidiaries or Affiliates (1) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect to the Restricted Share Units, including, but not limited to, the grant, vesting or settlement of the Restricted Share Units, the issuance of Shares or cash upon settlement of the Restricted Share Units, the subsequent sale of Shares acquired pursuant to such issuance and the receipt of any dividends and/or dividend equivalents (if any); and (2) do not commit to and are under no obligation to structure the terms of any Award to reduce or eliminate Participant's liability for Tax-Related Items or achieve any particular tax result. Further, if the Participant becomes subject to tax in more than one jurisdiction between the Date of Grant and the date of any relevant taxable event, the Participant acknowledges that Company and/or its Subsidiaries or Affiliates may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

Prior to any relevant taxable or tax withholding event, as applicable, the Participant will pay or make adequate arrangements satisfactory to the Company and/or its Subsidiaries or Affiliates to satisfy all Tax-Related Items. In this regard, to the extent permitted under applicable law, the Participant authorizes the Company and/or its Subsidiaries or Affiliates, or their respective agents, at their discretion, to satisfy the obligations with regard to all Tax-Related Items by one or a combination of the following:

      (a)      Withholding in Shares to be issued or cash to be paid upon vesting/settlement of the Restricted Share Units; or

      (b)      Withholding from the Participant's wages or other cash compensation paid to the Participant by the Company and/or its Subsidiaries or Affiliates; or

      (c)      Withholding from proceeds of the Shares acquired upon vesting/settlement of the Restricted Share Units either through a voluntary sale or through a mandatory sale arranged by the Company (on the Participant's behalf pursuant to this authorization).

To avoid negative accounting treatment, the Company and/or its Subsidiaries or Affiliates may withhold or account for Tax-Related Items by considering applicable minimum statutory withholding amounts or other applicable withholding rates. If the obligation for Tax-Related Items is satisfied by withholding in Shares, for tax purposes, the Participant is deemed to have been issued the full number of Shares attributable to the vested Restricted Share Units, notwithstanding that a number of Shares are held back solely for the purpose of paying the Tax-Related Items due as a result of any aspect of the Participant's participation in the Plan.

Finally, the Participant shall pay to the Company and/or its Subsidiaries or Affiliates any amount of Tax-Related Items that the Company and/or its Subsidiaries or Affiliates may be required to withhold or account for as a result of the Participant's participation in the Plan that cannot be satisfied by the means previously described. The Company may refuse to issue or deliver the Shares or the proceeds of the sale of Shares, if the Participant fails to comply with the Participant's obligations in connection with the Tax-Related Items.

**Australia**

***Terms and Conditions***

Securities Law Notice. If the Participant acquires Shares under the Plan and offers such Shares for sale to a person or entity resident in Australia, the offer may be subject to disclosure requirements under Australian law. Participant should obtain legal advice as to his or her disclosure obligations prior to making any such offer.

***Notifications***

There are no country-specific notifications.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**China**

***Terms and Conditions***

Settlement in Cash. Notwithstanding any provision in the Agreement or Plan to the contrary,  Restricted Share Units will be settled in the form of a local cash payment unless, at the time of delivery, Share settlement does not trigger the need for any approval from and/or filing with the State Administration of Foreign Exchange (SAFE).

Exchange Control Restriction. The Participant agrees to comply with any other requirements that may be imposed by the Company in the future in order to facilitate compliance with legal requirements in China.

***Notifications***

There are no country-specific notifications.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Japan**

***Terms and Conditions***

Article 2 shall not apply to a grant of Restricted Share Units to a Participant in Japan.

***Notifications***

Exchange Control Information. If a Participant acquires Shares valued at more than ¥100,000,000 in a single transaction, the Participant must file a Securities Acquisition Report with the Ministry of Finance through the Bank of Japan within 20 days of the acquisition of the Shares.

**EXHIBIT 10.73**

**CLIFFS NATURAL RESOURCES INC.**
**AMENDED AND RESTATED 2012 INCENTIVE EQUITY PLAN**

**RESTRICTED SHARE UNIT AWARD MEMORANDUM**

**Employee:**                                    PARTICIPANT NAME

**Date of Grant:**                               GRANT DATE

**Grant Price:**                                 GRANT PRICE

**Number of Shares Subject to Award:**           SHARES GRANTED

**Vesting Dates:**                               1/3 of the Restricted Share Units shall Vest on December 31, 2015

                                                 1/3 of the Restricted Share Units shall Vest on December 31, 2016

                                                 1/3 of the Restricted Share Units shall Vest on December 31, 2017
                                                 (each such Vesting date, a "Vesting Date")

**Additional terms and conditions of your Award are included in the Restricted Share Unit Award Agreement. As a condition to your receipt of Shares, you must log on to Fidelity's website at www.netbenefits.fidelity.com and accept the terms and conditions of this Award within 90 calendar days of your Date of Grant. If you do not accept the terms and conditions of this Award within such time at www.netbenefits.fidelity.com, this Award may be forfeited and immediately terminate.**

**Note: Article 2.1 of the Restricted Share Unit Award Agreement contains provisions that restrict your activities. These provisions apply to you and, by accepting this Award, you agree to be bound by these restrictions.**

**CLIFFS NATURAL RESOURCES INC.**
**AMENDED AND RESTATED 2012 INCENTIVE EQUITY PLAN**

**Restricted Share Unit Award Agreement**

This Restricted Share Unit Award Agreement (the "Agreement") is between Cliffs Natural Resources Inc., an Ohio corporation (the "Company"), and you, the person named in the Restricted Share Unit Award Memorandum (the "Award Memorandum") who is an employee of the Company or Subsidiary of the Company (the "Participant"). For purposes of this Agreement, "Employer" means the entity (the Company or Subsidiary) that employs the Participant on the applicable date. This Agreement is effective as of the Date of Grant set forth in the Award Memorandum.

The Company wishes to award to the Participant Restricted Share Units representing the opportunity to earn a number of the Company's common shares, $0.125 par value per share (the "Shares"), subject to the terms and conditions set forth in this Agreement, in order to carry out the purpose of the Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan (the "Plan"). All capitalized terms not defined in this Agreement shall have the same meaning as set forth in the Plan. See Article 1 of the Plan for a list of defined terms.

In the event of a conflict between the terms of this Agreement, the Award Memorandum and the terms of the Plan, the terms of the Plan shall govern. In the event of a conflict between the terms of this Agreement and the Award Memorandum, the terms of this Agreement shall govern.

**ARTICLE 1.**
**Grant and Terms of Restricted Share Units**

**1.1    Grant of Restricted Share Units**. Pursuant to the Plan, the Company has granted to Participant the number of Restricted Share Units as specified in the Award Memorandum, with dividend equivalents ("Restricted Share Units"), effective as of the Date of Grant.

**1.2    Vesting As Condition of Payment**. The Restricted Share Units covered by this Agreement and these terms and conditions shall only result in the issuance of Shares (or cash or a combination of Shares and cash, as decided by the Committee in its sole discretion) equal in number to the Restricted Share Units to the extent the Participant is "Vested" in the Restricted Share Units on the date the Restricted Share Units are to be paid as specified in Section 1.3. The Restricted Share Units will become Vested as follows:

( a )    Employment Through Each Vesting Date. The Participant will become Vested in one-third (1/3) of the Restricted Share Units subject to this Award on each Vesting Date, as set forth in the Award Memorandum, if the Participant remains in the continuous employ of the Company or Subsidiary through each such Vesting Date. The period beginning on the Date of Grant and ending on the final Vesting Date shall be the "Vesting Period."

( b )    Death or Disability. The Participant will become 100% Vested in the Restricted Share Units subject to this Award that are not otherwise Vested, if the Participant experiences a termination of employment with the Company because of the Participant's death or Disability during the Vesting Period.

( c )    Retirement or Termination without Cause . If the Participant experiences a termination of employment with the Company because of Retirement or a termination of employment by the Company without Cause during the Vesting Period, the Participant shall additionally become Vested in a prorated number of the Restricted Share Units calculated by multiplying one-third (1/3) of the Restricted Share Units subject to this Award by a fraction, the numerator of which is the number of full months the Participant was employed with the Company or a Subsidiary between the January 1 of the year in which the

termination occurred and the date of the Participant's termination of employment, and the denominator of which is 12, rounded down to the nearest whole Restricted Share Unit.

(d)   Change in Control. In the event of a Change in Control (as defined in Section 1.4) during the Vesting Period, the Participant will become Vested in the Restricted Share Units that are not otherwise Vested only to the extent provided in Section 1.4.

In the event the Participant otherwise terminates employment prior to becoming Vested in all of the Restricted Share Units or the Participant's employment is terminated by the Company for Cause, the Participant shall forfeit all rights to any Restricted Share Units that were granted under the Agreement and were not Vested at the time of such termination of employment.

**1.3   Payment of Restricted Share Units**.

(a)   Payment After a Vesting Date. Subject to Sections 1.3(b) and (d), the Restricted Share Units that are Vested as of each Vesting Date shall be paid within 2-½ months following the applicable Vesting Date.

(b)   Payment After Death. Notwithstanding Section 1.3(a), if the Participant experiences a termination of employment with the Company because of the Participant's death during the Vesting Period, the Vested Restricted Shares Units will be paid within 30 days following the date of termination. Any payment of Restricted Share Units to a deceased Participant shall be paid to the estate of the Participant, unless the Participant files a completed Designation of Death Beneficiary with the Company in accordance with its procedures.

(c)   Payment After Disability, Retirement or Termination without Cause  . If the Participant experiences a termination of employment with the Company because of the Participant's Disability, Retirement, or a termination of employment by the Company without Cause during the Vesting Period, the Vested Restricted Shares Units shall be paid in accordance with Section 1.3(a).

(d)   Change in Control. Notwithstanding Section 1.3(a), to the extent any Restricted Share Units are Vested as of a Change in Control, such Vested Restricted Share Units will be paid within 10 days of the Change in Control; provided,  however, that if such Change in Control would not qualify as a permissible date of distribution under Section 409A(a)(2)(A) of the Code, and the regulations thereunder, and where Section 409A of the Code applies to such distribution, payment will be made on the date that would have otherwise applied pursuant to this Section 1.3.

(e)   Payment Following a Change in Control. Notwithstanding Sections 1.2 and 1.3(a), if, during the two-year period following a Change in Control, the Participant experiences a termination of employment, the Restricted Share Units that are Vested as of the date of such termination of employment shall be paid in cash (pursuant to Section 1.4(f)) within 10 days of the termination of employment to the extent they have not been previously paid to the Participant; provided, however, that if such Change in Control would not qualify as a permissible date of distribution under Section 409A(a)(2)(A) of the Code, and the regulations thereunder, and where Section 409A of the Code applies to such distribution, payment will be made on the date that would have otherwise applied pursuant to this Section 1.3. Notwithstanding the foregoing to the contrary, to the extent payment is due within 10 days of the termination of employment, if the Participant on the date of termination of employment is a "specified employee" (within the meaning of Section 409A of the Code determined using the identification methodology selected by the Company from time to time), payment for the Restricted Share Units will be made on the tenth business day of the seventh month after the date of the Participant's termination of employment or, if earlier, the date of the Participant's death.

(f)    <u>General</u>. The Committee, in its sole discretion, may settle the Restricted Share Units in cash or a combination of Shares and cash, in lieu of issuing only Shares. In the event that all or any portion of the Restricted Share Units shall be paid in cash, the cash equivalent of one Restricted Share Unit shall be equal to the Fair Market Value of one Share on the last trading day of the Vesting Period or, if earlier, the trading day immediately prior to the payment date. Notwithstanding the foregoing, no Restricted Share Units granted hereunder may be paid in cash in lieu of Shares to any Participant who is subject to the Cliffs Natural Resources Inc. Directors' and Officers' Share Ownership Guidelines ("<u>Share Ownership Guidelines</u>") unless and until such Participant is either in compliance with, or no longer subject to, such Share Ownership Guidelines; provided, however, that the Committee may withhold Shares to the extent necessary to satisfy income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related item withholding requirements, as described in Section 4.3. In addition, the Committee may restrict 50% of the Shares to be issued in satisfaction of the total Restricted Share Units, before income tax withholding, so that they cannot be sold by the Participant unless immediately after such sale the Participant is in compliance with the Share Ownership Guidelines that are applicable to the Participant at the time of sale.

(g)    <u>Payment Obligation</u>. Prior to payment, the Company shall only have an unfunded and unsecured obligation to make payment of Restricted Share Units to the Participant. The Restricted Share Units covered by this Agreement that have not yet been earned, and any interests of the Participant with respect thereto, are not transferable other than pursuant to the laws of descent and distribution, or in accordance with Section 1.3(b).

**1.4    <u>Change in Control Vesting</u>.**

(a)    If the Participant remains in the continuous employ of the Company or Subsidiary through the period beginning on January 1, 2015 and ending on the date of a Change in Control, the Participant will become 100% Vested in the Restricted Share Units not otherwise Vested subject to the Award upon the Change in Control, except to the extent that an award meeting the requirements of Section 1.4(e) (a "<u>Replacement Award</u>") is provided to the Participant in accordance with Section 1.4(e) to replace, adjust or continue the award of Restricted Share Units covered by this Agreement (the "<u>Replaced Award</u>"). If a Replacement Award is provided, references to Restricted Share Units in this Agreement shall be deemed to refer to the Replacement Award after the Change in Control.

(b)    If, upon or after receiving a Replacement Award, the Participant experiences a termination of employment with the Company or Subsidiary of the Company (or any of their successors) (as applicable, the "<u>Successor</u>") by reason of the Participant terminating employment for Good Reason or the Successor terminating the Participant's employment other than for Cause, in each case within a period of two years after the Change in Control and during the Vesting Period, the Participant shall become 100% Vested in the Replacement Award upon such termination.

(c)    If a Replacement Award is provided, notwithstanding anything in this Agreement to the contrary, any outstanding Restricted Share Units that at the time of the Change in Control are not subject to a "substantial risk of forfeiture" (within the meaning of Section 409A of the Code) will be deemed to be Vested at the time of such Change in Control and will be paid as provided for in Section 1.3(b).

(d)    For purposes of this Agreement, a "<u>Change in Control</u>" means:

(i)    any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>")) (a "<u>Person</u>") becomes the beneficial owner (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 35% or more of either (x) the then-outstanding Shares (the "<u>Outstanding Company Common Stock</u>") or (y) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors (the "<u>Outstanding Company Voting Securities</u>"); provided, however, that, for purposes of this Section 1.4(d)(i), the following acquisitions shall not constitute a Change in Control: (A) any acquisition

directly from the Company, (B) any acquisition by the Company, (C) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any Affiliate or (D) any acquisition pursuant to a transaction that complies with Sections 1.4(d)(iii)(A), 1.4(d)(iii)(B) and 1.4(d)(iii)(C), below;

(ii)    individuals who, as of the date hereof, constitute the Board of Directors (the " Incumbent Board") cease for any reason to constitute at least a majority of the Board of Directors; provided, however, that any individual becoming a director subsequent to the date hereof whose election, or nomination for election by the Shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual was a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board of Directors;

(iii)    consummation of a reorganization, merger, statutory share exchange or consolidation or similar transaction involving the Company or any of its subsidiaries, a sale or other disposition of all or substantially all of the assets of the Company, or the acquisition of assets or securities of another entity by the Company or any of its subsidiaries (each, a "Business Combination"), in each case unless, following such Business Combination, (A) all or substantially all of the individuals and entities that were the beneficial owners of the Outstanding Company Common Stock and the Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of the then-outstanding shares of common stock (or, for a non-corporate entity, equivalent securities) and the combined voting power of the then-outstanding voting securities entitled to vote generally in the election of directors (or, for a non-corporate entity, equivalent governing body), as the case may be, of the entity resulting from such Business Combination (including, without limitation, an entity that, as a result of such transaction, owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries) in substantially the same proportions as their ownership immediately prior to such Business Combination of the Outstanding Company Common Stock and the Outstanding Company Voting Securities, as the case may be, (B) no Person (excluding any entity resulting from such Business Combination or any employee benefit plan (or related trust) of the Company or such entity resulting from such Business Combination) beneficially owns, directly or indirectly, 35% or more of, respectively, the then-outstanding shares of common stock (or, for a non-corporate entity, equivalent securities) of the entity resulting from such Business Combination or the combined voting power of the then-outstanding voting securities of such entity, except to the extent that such ownership existed prior to the Business Combination, and (C) at least a majority of the members of the board of directors (or, for a non-corporate entity, equivalent governing body) of the entity resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement or of the action of the Board of Directors providing for such Business Combination; or

(iv)    approval by the Shareholders of a complete liquidation or dissolution of the Company.

(e)    For purposes of this Agreement, a "Replacement Award" means an award: (i) of the same type (e.g., time-based restricted share units) as the Replaced Award; (ii) that has a value at least equal to the value of the Replaced Award; (iii) that relates to publicly traded equity securities of the Company or its successor in the Change in Control or another entity that is affiliated with the Company or its successor following the Change in Control; (iv) if the Participant holding the Replaced Award is subject to U.S. federal income tax under the Code, the tax consequences of which to such Participant under the Code are not less favorable to such Participant than the tax consequences of the Replaced Award; and (v) the other terms and conditions of which are not less favorable to the Participant holding the Replaced Award than the terms and conditions of the Replaced Award (including the provisions that would apply in the event of a subsequent Change in Control). A Replacement Award may be granted only to the extent it does not result in the Replaced Award or Replacement Award failing to comply with or be exempt from Section 409A of the Code. Without limiting the generality of the foregoing, the Replacement Award may take the form of a continuation of the Replaced Award if the requirements of the two preceding sentences are satisfied. The determination of

whether the conditions of this Section 1.4(e) are satisfied will be made by the Committee, as constituted immediately before the Change in Control, in its sole discretion.

(f)    A termination "for Cause" for purposes of Section 1.4 means that, prior to termination of employment, the Participant shall have committed: (i) and been convicted of a criminal violation involving fraud, embezzlement or theft in connection with his or her duties or in the course of his or her employment with the Successor; (ii) intentional wrongful damage to property of the Successor; (iii) intentional wrongful disclosure of secret processes or confidential information of the Successor; or (iv) intentional wrongful engagement in any competitive activity; and any such act shall have been demonstrably and materially harmful to the Successor. For purposes of this definition, no act or failure to act on the part of the Participant shall be deemed "intentional" if it was due primarily to an error in judgment or negligence, but shall be deemed "intentional" only if done or omitted to be done by the Participant not in good faith and without reasonable belief that the Participant's action or omission was in the best interest of the Successor.

(g)    A termination "for Good Reason" shall mean the Participant's termination of employment with the Successor as a result of the initial occurrence, without the Participant's consent, of one or more of the following events:

(i)    a material diminution in the Participant's annual base salary rate as in effect from time to time (" Base Pay");

(ii)    a material diminution in the Participant's authority, duties or responsibilities;

(iii)    a material change in the geographic location at which the Participant must perform services;

(iv)    a reduction in the Participant's opportunity regarding annual bonus, incentive or other payment of compensation, in addition to Base Pay, made or to be made in regard to services rendered in any year or other period pursuant to any bonus, incentive, profit-sharing, performance, discretionary pay or similar agreement, policy, plan, program or arrangement (whether or not funded) of the Successor; and

(v)    any other action or inaction that constitutes a material breach by the Participant's employer of the employment agreement, if any, under which the Participant provides services.

Notwithstanding the foregoing, "Good Reason" shall not be deemed to exist unless: (A) the Participant has provided notice to his or her employer of the existence of one or more of the conditions listed in (i) through (v) above within 90 days after the initial occurrence of such condition or conditions; and (B) such condition or conditions have not been cured by the Participant's employer within 30 days after receipt of such notice.

**ARTICLE 2.**
**Other Terms and Conditions**

**2.1    Non-Compete and Confidentiality.**

(a)    The Participant shall not render services for any organization or engage directly or indirectly in any business that is a competitor of the Company or any Affiliate of the Company, or which organization or business is or plans to become prejudicial to or in conflict with the business interests of the Company or any Affiliate of the Company or distribute any secret or confidential information belonging to the Company or any Affiliate of the Company.

(b)    Failure to comply with subsection (a) above will cause the Participant to forfeit the right to Restricted Share Units and require the Participant to reimburse the Company for

the taxable income received on Restricted Share Units that have been paid out in Shares within the 90-day period preceding the Participant's termination of employment.

## ARTICLE 3.
## Acknowledgments

**3.1    Acknowledgments.** In accepting the Award, the Participant acknowledges, understands and agrees to the following:

(a)        The Plan is established voluntarily by the Company, it is discretionary in nature and it may be modified, amended, suspended or terminated by the Company at any time, to the extent permitted by the Plan;

(b)        The grant of the Restricted Share Units is voluntary and occasional and does not create any contractual or other right to receive future grants of Restricted Share Units, or benefits in lieu of Restricted Share Units, even if Restricted Share Units have been granted in the past;

(c)        All decisions with respect to future Restricted Share Units or other grants, if any, will be at the sole discretion of the Company;

(d)        The Participant's participation in the Plan is voluntary;

(e)        The Restricted Share Unit Award and the Participant's participation in the Plan shall not create a right to employment or be interpreted as forming an employment or services contract with the Company or any Subsidiary and shall not interfere with the ability of the Company, or any Subsidiary, as applicable, to terminate the Participant's employment or service relationship (if any);

(f)        The future value of the underlying Shares is unknown, indeterminable and cannot be predicted with certainty;

(g)        No claim or entitlement to compensation or damages shall arise from forfeiture of any Restricted Share Units resulting from the Participant ceasing to provide employment or other services to the Company or a Subsidiary (for any reason whatsoever whether or not later found to be invalid or in breach of employment laws in the jurisdiction where the Participant is employed or the terms of the Participant's employment agreement, if any), and in consideration of the grant of the Restricted Share Units to which the Participant is otherwise not entitled, the Participant irrevocably agrees never to institute any claim against the Company or any of its Subsidiaries, and the Participant waives his or her ability, if any, to bring any such claim, and releases the Company and its Subsidiaries from any such claim; if, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by participating in the Plan, the Participant shall be deemed irrevocably to have agreed not to pursue such claim and agrees to execute any and all documents necessary to request dismissal or withdrawal of such claim;

(h)        Neither the Plan nor the Restricted Share Units shall be construed to create an employment relationship where any employment relationship did not otherwise already exist;

(i)        The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Participant's participation in the Plan, or the Participant's acquisition or sale of the underlying Shares. The Participant is hereby advised to

consult with his or her own personal tax, legal and financial advisors regarding his or her participation in the Plan before taking any action related to the Restricted Share Units;

(j)     The Restricted Share Units and the Shares subject to the Restricted Share Units, and the income and value of same, are not part of normal or expected compensation for purposes of calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, bonuses, long-service awards, pension or retirement or welfare benefits or similar payments; and

(k)     The Company reserves the right to impose other requirements on participation in the Restricted Share Units and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable in order to comply with local law or other applicable rules or facilitate the administration of the Plan, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

## ARTICLE 4.
### General Provisions

**4.1    Compliance with Law**. The Company shall make reasonable efforts to comply with all applicable federal and state securities laws; provided, however, notwithstanding any other provision of the Agreement and these terms and conditions, the Company shall not be obligated to issue any Shares pursuant to the Agreement and these terms and conditions if the issuance or payment thereof would result in a violation of any such law; provided, however, that the Shares will be issued at the earliest date at which the Company reasonably anticipates that the issuance of the Shares will not cause such violation.

**4.2    Dividend Equivalents**. During the period beginning on the Date of Grant and ending on the date that the Restricted Share Units are paid in accordance with Section 1.3, the Participant will be entitled to dividend equivalents on Restricted Share Units equal to the cash dividend or distribution that would have been paid on the Restricted Share Units had the Restricted Share Units been issued and outstanding Shares on the record date for the dividend or distribution. Such accrued dividend equivalents (a) will vest and become payable upon the same terms and at the same time of settlement as the Restricted Share Units to which they relate, and (b) will be denominated and payable solely in cash.

**4.3    Withholding Taxes** . The provisions of Article 18.3 of the Plan shall apply to the extent that the Company or Subsidiary is required to withhold income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related items related to the Participant's participation in the Plan in connection with the Participant's Restricted Share Units (or dividend equivalents, if any), without limitation, any tax liability associated with the grant or vesting of the Restricted Share Units or sale of the underlying Shares (the "Tax Liability"). These requirements may change from time to time as laws or interpretations change. Regardless of the Company or Subsidiaries' actions in this regard, the Participant hereby acknowledges and agrees that the Tax Liability shall be the Participant's sole responsibility and liability. The Participant acknowledges that the Company's obligation to issue or deliver Shares or pay cash shall be subject to satisfaction of the Tax Liability. Unless otherwise determined by the Committee, withholding obligations shall be satisfied by having the Company or one if its Subsidiaries withhold all or a portion of any Shares that otherwise would be issued or cash payable to the Participant upon settlement of the vested Restricted Share Units; provided that amounts withheld shall not exceed the amount necessary to satisfy the Company's tax withholding obligations. Such withheld Shares shall be valued based on the Fair Market Value as of the date the withholding obligations are satisfied. The Company or one of its Subsidiaries may also satisfy the Tax Liability by deduction from the Participant's wages or other cash compensation paid to the Participant. If the Company does not elect to have withholding obligations satisfied by either withholding Shares, from the cash payable, or by deduction from the Participant's wages or other compensation paid to the Participant, the Participant agrees to pay the Company or Subsidiary the amount of the Tax Liability in cash (or by check) as directed by the Company or Subsidiary.

**4.4**   **Continuous Employment**. For purposes of this Agreement, the continuous employment of the Participant with the Company shall not be deemed to have been interrupted, and the Participant shall not be deemed to have separated from service with the Company, by reason of the transfer of his employment among the Company or Subsidiaries or an approved leave of absence, unless otherwise indicated in the Plan or if required to comply with Section 409A of the Code.

**4.5**   **Relation to Other Benefits**. Any economic or other benefit to the Participant under the Agreement and these terms and conditions or the Plan shall not be taken into account in determining any benefits to which the Participant may be entitled under any profit-sharing, retirement or other benefit or compensation plan maintained by the Company or a Subsidiary and shall not affect the amount of any life insurance coverage available to any beneficiary under any life insurance plan covering employees of the Company or Subsidiary.

**4.6**   **These Terms and Conditions Subject to Plan** . The Restricted Share Units covered under the Agreement and all of the terms and conditions hereof are subject to all of the terms and conditions of the Plan, a copy of which is available upon request.

**4.7**   **Transferability**. Except as otherwise provided in the Plan, the Restricted Share Units are non-transferable and any attempts to assign, pledge, hypothecate or otherwise alienate or encumber (whether by law or otherwise) any Restricted Share Units shall be null and void.

**4.8**   **Data Privacy**. The Participant hereby explicitly and unambiguously consents to the collection, use and transfer, in electronic or other form, of the Participant's personal data as described in this Agreement and any other Restricted Share Unit award materials by and among, as applicable, the Company or Subsidiaries for the exclusive purpose of implementing, administering and managing the Participant's participation in the Plan.

The Participant understands that the Company or Subsidiary may hold certain personal information about the Participant, including, but not limited to, the Participant's name, home address and telephone number, date of birth, social security number or other identification number, salary, nationality, job title, any Shares of or directorships in the Company that are held, details of all Restricted Share Units or any other entitlement to Shares awarded, canceled, exercised, vested, unvested or outstanding in the Participant's favor, for the exclusive purpose of implementing, administering and managing the Plan ("Data").

The Participant understands that Data will be transferred to the Company's broker, or such other stock plan service provider as may be selected by the Company in the future, which is assisting the Company with the implementation, administration and management of the Plan. The Participant understands that the recipients' use of the Data may be located in the United States or elsewhere, and that the recipients' country (e.g., the United States) may have different data privacy laws and protections than the Participant's country. The Participant understands that if he or she resides outside the United States, he or she may request a list with the names and addresses of any potential recipients of the Data by contacting his or her local human resources representative. The Participant authorizes the Company, the Company's broker and any other possible recipients which may assist the Company (presently or in the future) with implementing, administering and managing the Plan to receive, possess, use, retain and transfer the Data, in electronic or other form, for the sole purpose of implementing, administering and managing the Participant's participation in the Plan. The Participant understands that Data will be held only as long as is necessary to implement, administer and manage the Participant's participation in the Plan. The Participant understands if he or she resides outside the United States, he or she may, at any time, view their respective Data, request additional information about the storage and processing of their Data, require any necessary amendments to their Data or refuse or withdraw the consents herein, in any case without cost, by contacting in writing his or her local human resources representative. Further, the Participant understands that he or she is providing the consents herein on a purely voluntary basis. If the Participant does not consent, or if the Participant later seeks to revoke his or her consent, his or her employment status or service and career with the Employer will not be

A004598

adversely affected; the only adverse consequence of refusing or withdrawing the Participant's consent is that the Company would not be able to grant Restricted Share Units or other equity awards or administer or maintain such awards. Therefore, the Participant understands that refusing or withdrawing his or her consent may affect the Participant's ability to participate in the Plan. For more information on the consequences of the Participant's refusal to consent or withdrawal of consent, the Participant understands that he or she may contact his or her local human resources representative.

**4.9**    **Amendments**. This Agreement can be amended at any time by the Committee. Any amendment to the Plan shall be deemed to be an amendment to this Agreement to the extent that the amendment is applicable hereto. Except for amendments necessary to bring this Agreement into compliance with current law including Code Section 409A, no amendment to this Agreement shall materially and adversely affect the rights of the Participant without the Participant's written consent.

**4.10**    **Severability**. The provisions of this Agreement are severable and if any one or more provisions are determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable.

**4.11**    **Electronic Delivery**. The Company may, in its sole discretion, decide to deliver any documents related to the Restricted Share Units by electronic means. By accepting this Award of Restricted Share Units, the Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

**4.12**    **Appendix to Agreement**. Notwithstanding any provisions of this Agreement to the contrary, the Restricted Share Units shall be subject to such special terms and conditions for the Participant's country of residence (and country of employment, if different), as are set forth in the appendix to this Agreement (the "Appendix"). Further, if the Participant transfers residency and/or employment to another country, any special terms and conditions for such country will apply to the Restricted Share Units to the extent the Company determines, in its sole discretion, that the application of such terms and conditions is necessary or advisable in order to comply with local law or to facilitate the operation and administration of the Restricted Share Units and the Plan (or the Company may establish alternative terms and conditions as may be necessary or advisable to accommodate a transfer). In all circumstances, the Appendix shall constitute part of this Agreement.

**4.13**    **Headings**. Headings are given to the Articles of this Agreement solely as a convenience to facilitate reference. Such headings shall not be deemed in any way material or relevant to the construction or interpretation of this Agreement or any provision hereof.

**4.14**    **Governing Law**. This Agreement is governed by, and subject to, the laws of the State of Ohio, without regard to the conflict of law provisions, as provided in the Plan.

**4.15**    **Code Section 409A**. To the extent applicable, it is intended that this Agreement and the Plan comply with the provisions of Section 409A of the Code. This Agreement and the Plan shall be administered in a manner consistent with this intent, and any provision that would cause the Agreement or the Plan to fail to satisfy Section 409A of the Code shall have no force and effect until amended to comply with Section 409A of the Code (which amendment may be retroactive to the extent permitted by Section 409A of the Code and may be made by the Company without the consent of the Participant). The terms "termination of employment," "terminates employment," and similar words and phrases used in this Agreement mean a "separation from service" within the meaning of Treasury Regulation section 1.409A-1(h).

**[Acceptance Page Contained in Exhibit A]**

**Exhibit A**
ELECTRONIC ACCEPTANCE

**Acceptance by the Participant**

By selecting the "Accept Grant" box on the website of the Company's administrative agent, the Participant acknowledges acceptance of, and consents to be bound by, the Plan and this Agreement and any other rules, agreements or other terms and conditions incorporated herein by reference.

IF I FAIL TO ACKNOWLEDGE ACCEPTANCE OF THE AWARD WITHIN NINETY (90) DAYS OF THE DATE OF GRANT SET FORTH IN THE AGREEMENT, THE COMPANY MAY DETERMINE THAT THIS AWARD HAS BEEN FORFEITED.

**PARTICIPANT NAME**                                           **ACCEPTANCE DATE**
Participant Name                                              Date
**ELECTRONIC SIGNATURE**
Participant Signature

**APPENDIX FOR NON-U.S. PARTICIPANTS**
**ADDITIONAL TERMS AND CONDITIONS TO RESTRICTED SHARE UNIT AWARD AGREEMENT**

**Terms and Conditions**

This Appendix includes the following additional terms and conditions that govern Restricted Share Unit Awards granted to Participants under the Cliffs Natural Resources, Inc. Amended and Restated 2012 Incentive Equity Plan (the "Plan") who reside and/or work outside of the United States in one of the countries listed below. Certain capitalized terms used but not defined in this Appendix have the meanings set forth in the Plan and/or the Restricted Share Unit Award Agreement that relates to a Participant's award. By accepting an award, Participants agree to be bound by the terms and conditions contained in the paragraphs below in addition to the terms of the Plan, the Agreement, and the terms of any other document that may apply to a Participant and a Participant's award.

**Notifications**

This Appendix also includes notifications regarding exchange controls and other regulatory issues of which the Participant should be aware with respect to the Participant's participation in the Plan. The information herein is based on the securities, exchange control and other laws in effect in the respective countries as of January 2015. Such laws are often complex and change frequently. As a result, the Company strongly recommends that the Participant not rely on the information in this Appendix as the only source of information relating to the consequences of the Participant's participation in the Plan because the information may be out of date at the time that the Restricted Share Units vest, or the Shares are delivered or cash paid in settlement of the Restricted Share Units, or the Participant sells any Shares acquired under the Plan.

In addition, the information contained herein is general in nature and may not apply to the Participant's particular situation, and the Company, its Subsidiaries or Affiliates, nor the Company's stock plan administrator ("Administrator") is in a position to assure the Participant of a particular result. Accordingly, the Participant is advised to seek appropriate professional advice as to how the relevant laws in the Participant's country of residence and/or work may apply to the Participant's situation.

Finally, if the Participant transfers employment after the Date of Grant, or is considered a resident of another country for local law purposes following the Date of Grant, the notifications contained herein may not be applicable to the Participant, and the Administrator shall, in its discretion, determine to what extent the terms and conditions contained herein shall be applicable to the Participant.

**Terms and Conditions Applicable to All Non-U.S. Jurisdictions**

<u>English Language</u>. The Participant acknowledges and agrees that it is the Participant's express intent that this Agreement, the Plan and all other documents, rules, procedures, forms, notices and legal proceedings entered into, given or instituted pursuant to the Restricted Share Units, be drawn up in English. If the Participant has received this Agreement, the Plan or any other Agreement rules, procedures, forms or documents related to the Restricted Share Unit award translated into a language other than English, and if the meaning of the translated version is different than the English version, the English version will control, unless otherwise provided herein.

<u>Compliance with Laws; Repatriation</u>. The Participant agrees, as a condition of the grant of the Restricted Share Unit award, to repatriate all payments attributable to the Restricted Share Units and/or cash acquired under the Plan (including, but not limited to, dividends, dividend equivalents (if any), and any proceeds derived from the sale of the Shares acquired pursuant to the Agreement) in accordance with all foreign exchange rules and regulations applicable to the Participant. The Company, Subsidiaries, Affiliates and the Administrator reserve the right to impose other requirements on the Participant's participation in the Plan,

on the Restricted Share Units and on any Shares acquired or cash payments made pursuant to the Agreement, to the extent the Company, its Subsidiaries or Affiliates or the Administrator determines it is necessary or advisable in order to comply with local law or to facilitate the administration of the Plan, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing. Finally, the Participant agrees to take any and all actions as may be required to comply with the Participant's personal legal and tax obligations under all laws, rules and regulations applicable to the Participant.

Private Placement. The grant of the Restricted Share Units is not intended to be a public offering of securities in the Participant's country of residence and/or employment but instead is intended to be a private placement. As a private placement, the Company has not submitted any registration statement, prospectus or other filings with the local securities authorities (unless otherwise required under local law), and the grant of the Restricted Share Units is not subject to the supervision of the local securities authorities.

Responsibility for Taxes & Withholding. Regardless of any action the Company or any of its Subsidiaries or Affiliates takes with respect to any or all income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related items related to the Participant's participation in the Plan and legally applicable to the Participant ("Tax-Related Items"), the Participant acknowledges that the ultimate liability for all Tax-Related Items is and remains the Participant's responsibility and may exceed the amount actually withheld by the Company or any of its Subsidiaries or Affiliates. The Participant further acknowledges that the Company and/or its Subsidiaries or Affiliates (1) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect to the Restricted Share Units, including, but not limited to, the grant, vesting or settlement of the Restricted Share Units, the issuance of Shares or cash upon settlement of the Restricted Share Units, the subsequent sale of Shares acquired pursuant to such issuance and the receipt of any dividends and/or dividend equivalents (if any); and (2) do not commit to and are under no obligation to structure the terms of any Award to reduce or eliminate Participant's liability for Tax-Related Items or achieve any particular tax result. Further, if the Participant becomes subject to tax in more than one jurisdiction between the Date of Grant and the date of any relevant taxable event, the Participant acknowledges that Company and/or its Subsidiaries or Affiliates may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

Prior to any relevant taxable or tax withholding event, as applicable, the Participant will pay or make adequate arrangements satisfactory to the Company and/or its Subsidiaries or Affiliates to satisfy all Tax-Related Items. In this regard, to the extent permitted under applicable law, the Participant authorizes the Company and/or its Subsidiaries or Affiliates, or their respective agents, at their discretion, to satisfy the obligations with regard to all Tax-Related Items by one or a combination of the following:

      (a)    Withholding in Shares to be issued or cash to be paid upon vesting/settlement of the Restricted Share Units; or

      (b)    Withholding from the Participant's wages or other cash compensation paid to the Participant by the Company and/or its Subsidiaries or Affiliates; or

      (c)    Withholding from proceeds of the Shares acquired upon vesting/settlement of the Restricted Share Units either through a voluntary sale or through a mandatory sale arranged by the Company (on the Participant's behalf pursuant to this authorization).

To avoid negative accounting treatment, the Company and/or its Subsidiaries or Affiliates may withhold or account for Tax-Related Items by considering applicable minimum statutory withholding amounts or other applicable withholding rates. If the obligation for Tax-Related Items is satisfied by withholding in Shares, for tax purposes, the Participant is deemed to have been issued the full number of Shares attributable to the vested Restricted Share Units, notwithstanding that a number of Shares are held back solely for the purpose of paying the Tax-Related Items due as a result of any aspect of the Participant's participation in the Plan.

Finally, the Participant shall pay to the Company and/or its Subsidiaries or Affiliates any amount of Tax-Related Items that the Company and/or its Subsidiaries or Affiliates may be required to withhold or account for as a result of the Participant's participation in the Plan that cannot be satisfied by the means previously described. The Company may refuse to issue or deliver the Shares or the proceeds of the sale of Shares, if the Participant fails to comply with the Participant's obligations in connection with the Tax-Related Items.

**Australia**

***Terms and Conditions***

<u>Securities Law Notice</u>. If the Participant acquires Shares under the Plan and offers such Shares for sale to a person or entity resident in Australia, the offer may be subject to disclosure requirements under Australian law. Participant should obtain legal advice as to his or her disclosure obligations prior to making any such offer.

***Notifications***

There are no country-specific notifications.

*****************************************************************************************

**China**

***Terms and Conditions***

<u>Settlement in Cash</u>. Notwithstanding any provision in the Agreement or Plan to the contrary,  Restricted Share Units will be settled in the form of a local cash payment unless, at the time of delivery, Share settlement does not trigger the need for any approval from and/or filing with the State Administration of Foreign Exchange (SAFE)**.**

<u>Exchange Control Restriction</u>. The Participant agrees to comply with any other requirements that may be imposed by the Company in the future in order to facilitate compliance with legal requirements in China.

***Notifications***

There are no country-specific notifications.

*****************************************************************************************
**Japan**

***Terms and Conditions***

Article 2 shall not apply to a grant of Restricted Share Units to a Participant in Japan.

***Notifications***

<u>Exchange Control Information</u>**.** If a Participant acquires Shares valued at more than ¥100,000,000 in a single transaction, the Participant must file a Securities Acquisition Report with the Ministry of Finance through the Bank of Japan within 20 days of the acquisition of the Shares.

EXHIBIT 10.86

*EXECUTION VERSION*

**AMENDMENT NO. 6 TO AMENDED AND RESTATED MULTICURRENCY CREDIT AGREEMENT**

AMENDMENT NO. 6 TO AMENDED AND RESTATED MULTICURRENCY CREDIT AGREEMENT dated as of January 22, 2015 (this " **Amendment**") to the Amended and Restated Multicurrency Credit Agreement dated as of August 11, 2011 (as heretofore amended or modified by Amendment No. 1 to Amended and Restated Multicurrency Credit Agreement, dated October 16, 2012, among the Company, the Administrative Agent, JP Morgan and the Required Lenders party thereto ("**Amendment No. 1**"), Amendment No. 2 to Amended and Restated Multicurrency Credit Agreement, dated February 8, 2013, among the Company, the Administrative Agent, JP Morgan and the Required Lenders party thereto ("**Amendment No. 2**"), Amendment No. 3 to Amended and Restated Multicurrency Credit Agreement, dated June 30, 2014, among the Company, the Administrative Agent, JP Morgan and the Required Lenders party thereto ("**Amendment No. 3**"), Amendment No. 4 to Amended and Restated Multicurrency Credit Agreement, dated September 9, 2014, among the Company, the Administrative Agent, JP Morgan and the Required Lenders party thereto ("**Amendment No. 4**"), Amendment No. 5 to Amended and Restated Multicurrency Credit Agreement, dated October 24, 2014, among the Company, the Administrative Agent, JP Morgan and the Required Lenders party thereto ("**Amendment No. 5**") and Consent, dated as of November 20, 2014 (the " **Consent**"; and together with Amendment No. 1, Amendment No. 2, Amendment No. 3, Amendment No. 4 and Amendment No. 5, the "**Prior Amendments**"), the "**Credit Agreement**") among CLIFFS NATURAL RESOURCES INC. (the " **Company**"), certain Foreign Subsidiaries of the Company from time to time party thereto, various Lenders from time to time party thereto and BANK OF AMERICA, N.A., as Administrative Agent, Swing Line Lender and L/C Issuer (the "**Administrative Agent**"), JPMORGAN CHASE BANK, N.A., as Syndication Agent and L/C Issuer ("**JP Morgan**"), MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, J.P. MORGAN SECURITIES LLC, CITIGROUP GLOBAL MARKETS INC., PNC CAPITAL MARKETS INC. and U.S. BANK NATIONAL ASSOCIATION, as Joint Lead Arrangers and Joint Book Managers, and FIFTH THIRD BANK and CITIZENS BANK, N.A., as Co-Documentation Agents.

W I T N E S S E T H :

WHEREAS, the parties hereto desire to amend the Credit Agreement as set forth below;

NOW, THEREFORE, the parties hereto agree as follows:

Section 1.                     *Defined Terms; References.*  Unless otherwise specifically defined herein, each term used herein that is defined in the Credit Agreement has the meaning assigned to such term in the Credit Agreement. Each reference to "hereof", "hereunder", "herein" and "hereby" and each other similar reference and each reference to "this Agreement" and each other similar reference contained in the Loan Documents shall, after this Amendment becomes effective, refer to the Credit Agreement as amended hereby.

Section 2.                     *Amendments to Credit Agreement.*  Effective on the Sixth Amendment Effective Date (as defined below), (a) the Credit Agreement shall be amended to delete the

1

stricken text (indicated textually in the same manner as the following example: ~~stricken text~~) and to add the double-underlined text (indicated textually in the same manner as the following example: <u>double-underlined text</u>) as set forth in the pages of the Credit Agreement attached as <u>Exhibit A</u> hereto and (b) Schedule 1(a) to the Credit Agreement shall be replaced in its entirety by Schedule 1(a) attached hereto.

Section 3.        *Amendment to Security Agreement.*  Effective on the Sixth Amendment Effective Date, the Security Agreement shall be amended to (x) delete the words "As-extracted collateral and" from clause (D) of the first proviso to Section 3(a) thereof and (y) replace Schedule 1 thereto with Schedule 1 hereto. For purposes of Section 4(b) of the Security Agreement, the references to "each Original Grantor" and "as of the Effective Date" contained therein shall be deemed to be references to "each Grantor that has granted a Lien on any of its assets hereunder as of the Sixth Amendment Effective Date" and "as of the Sixth Amendment Effective Date", respectively.

Section 4.        *Representations of Company.*  The Company represents and warrants that, after giving effect to this Amendment, (i) each of the representations and warranties of the Loan Parties set forth in the Credit Agreement and in the other Loan Documents will be true and correct in all material respects on and as of the Sixth Amendment Effective Date (except to the extent the same expressly relate to an earlier date with respect to which such representations and warranties shall be true and correct in all material respects as to such earlier date) and (ii) no Default or Event of Default will have occurred and be continuing on such date.

Section 5.        *Governing Law.* This Amendment shall be governed by and construed in accordance with the laws of the State of New York.

Section 6.        *Counterparts.* This Amendment may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. Delivery of an executed signature page of this Amendment by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart hereof.

Section 7.        *Effectiveness.* This Amendment shall become effective on the date (" **Sixth Amendment Effective Date**") when the Administrative Agent shall have received:

(a)        from each of the Company, the Guarantors and Lenders comprising the Required Lenders a counterpart hereof signed by such party;

(b)        an amendment fee for the account of each Lender and such other fees as have been heretofore mutually agreed in writing; and

*(c)*        the Company shall have paid all reasonable out-of-pocket expenses of the Administrative Agent invoiced to it at least one Business Day prior to the Sixth Amendment Effectiveness Date.

Section 8.        *Guarantor Acknowledgement, Consent and Ratification*. Each Guarantor (including in its capacity as a Grantor under the Security Agreement) hereby acknowledges that it has reviewed the terms and provisions of the Credit Agreement, the Security Agreement and this Amendment and consents to the Amendment. Each Guarantor hereby confirms that (a) each Loan Document to which it is a party or by which it is otherwise bound will continue to guarantee, to the fullest extent possible in accordance with the Loan Documents, the payment and performance of all "Obligations" under each of the Loan

2

Documents to which it is a party (in each case as such terms are defined in the applicable Loan Document), (b) each of the Loan Documents to which it is a party or by which it is otherwise bound shall continue in full force and effect and that all of its obligations thereunder shall be valid and enforceable and shall not be impaired or limited by the execution or effectiveness of this Amendment and (c) each of the Prior Amendments is hereby ratified in all respects.

Each Guarantor acknowledges and agrees that (i) notwithstanding the conditions to effectiveness set forth in this Amendment, such Guarantor is not required by the terms of the Credit Agreement or any other Loan Document to consent to any amendments or waivers of the Credit Agreement effected pursuant to this Amendment and (ii) nothing in the Credit Agreement, this Amendment or any other Loan Document shall be deemed to require the consent of such Guarantor to any amendments or waivers of the Credit Agreement.

Section 9.        *Release*.  Effective as of the date hereof, the Loan Parties jointly and severally agree to release and hereby do release and discharge, the Administrative Agent (and any sub-agent thereof), each Lender and each L/C Issuer, and each Related Party of any of the foregoing Persons ("Bank Parties") of and from all damages losses, claims, demands, liabilities, obligations, actions and causes of actions whatsoever that each Loan Party has or claims to have against any Bank Party as of the date hereof and whether known or unknown at the time of this release, and of every nature and extent whatsoever on account of or in any way, directly or indirectly, touching, concerning, arising out of or founded upon the Loan Documents, in each case, arising on or before the date hereof.

[*Signature Pages Follow*]

3

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed as of the date first above written.

CLIFFS NATURAL RESOURCES INC.

By:  /s/ Terrance M. Paradie
     Name: Terrance M. Paradie
     Title: Executive Vice President, Chief Financial
     Officer and Treasurer

By:  /s/ James D. Graham
     Name: James D. Graham
     Title: Executive Vice President, Chief Legal
     Officer and Secretary

[SIGNATURE PAGE TO AMENDMENT NO. 6]

**GUARANTORS**

CLIFFS SALES COMPANY
CLIFFS MINNESOTA MINING COMPANY
CLIFFS NORTH AMERICAN COAL LLC
SILVER BAY POWER COMPANY
CLIFFS EMPIRE, INC.
CLIFFS EMPIRE HOLDING, LLC
CLIFFS TIOP, INC.
CLIFFS WEST VIRGINIA COAL INC.
NORTHSHORE MINING COMPANY
OAK GROVE RESOURCES LLC
PINNACLE MINING COMPANY, LLC
UNITED TACONITE LLC
CLIFFS UTAC HOLDING LLC

By:      /s/ Terrance M. Paradie
Name:    Terrance M. Paradie
Title:   Vice President and Treasurer


THE CLEVELAND-CLIFFS IRON COMPANY
CLIFFS TIOP HOLDING, LLC

By:      /s/ Terrance M. Paradie
Name:    Terrance M. Paradie
Title:   Treasurer


CLF PINNOAK LLC

By:      /s/ Terrance M. Paradie
Name:    Terrance M. Paradie
Title:   Senior Vice President, Chief Financial
         Officer and Treasurer


CLIFFS MINING COMPANY
CLIFFS PICKANDS HOLDING, LLC
CLIFFS MINING HOLDING, LLC
CLIFFS MINING HOLDING SUB COMPANY

By:      /s/ Terrance M. Paradie
Name:    Terrance M. Paradie
Title:   Executive Vice President, Chief Financial
         Officer and Treasurer


[SIGNATURE PAGE TO AMENDMENT NO. 6]

BANK OF AMERICA, N.A., as Administrative Agent

By:      /s/ Rosanne Parsill
         Name: Rosanne Parsill
         Title: Vice President

[SIGNATURE PAGE TO AMENDMENT NO. 6]

BANK OF AMERICA, N.A., as a Lender

By:      /s/ James K.G. Campbell
      Name: James K.G. Campbell
      Title: Director

[SIGNATURE PAGE TO AMENDMENT NO. 6]

Citibank, N.A.

By:    /s/ David Jaffe
      Name: David Jaffe
      Title: Vice President

[SIGNATURE PAGE TO AMENDMENT NO. 6]

JPMorgan Chase Bank, N.A.

By:    /s/ Peter S. Predun
       Name: Peter S. Predun
       Title: Executive Director

[SIGNATURE PAGE TO AMENDMENT NO. 6]

PNC BANK NATIONAL ASSOCIATION


By:    /s/ Joseph G. Moran

Name: Joseph G. Moran
Title: Senior Vice President

[SIGNATURE PAGE TO AMENDMENT NO. 6]

U.S. BANK NATIONAL ASSOCIATION


By:    /s/ Mark Irey
       Name: Mark Irey
       Title: Vice President


[SIGNATURE PAGE TO AMENDMENT NO. 6]

CITIZENS BANK, N.A.

By:    /s/ Carl S. Tabacjar, Jr.
          Name: Carl S. Tabacjar, Jr.
          Title: Vice President

*If second signature is needed:*

By:    _____
          Name:
          Title:

[SIGNATURE PAGE TO AMENDMENT NO. 6]

**FIFTH THIRD BANK**, an Ohio banking corporation

By:    /s/ Kevin F. Garvey
        Name: Kevin F. Garvey
        Title: Vice President

*If second signature is needed:*

By:    N/A
        Name:
        Title:

[SIGNATURE PAGE TO AMENDMENT NO. 6]

Mizuho Bank, Ltd.

By:     /s/ Donna DeMagistris
        Name: Donna DeMagistris
        Title: Authorized Signatory

[SIGNATURE PAGE TO AMENDMENT NO. 6]

Bank of Montreal, Chicago Branch

By:    /s/ Yacouba Kane
        Name: Yacouba Kane
        Title: Vice President

*If second signature is needed:*

By:
        Name:
        Title:

[SIGNATURE PAGE TO AMENDMENT NO. 6]

COMMONWEALTH BANK OF AUSTRALIA


By:    /s/ Trent Hazelwood
       Name: Trent Hazelwood
       Title: Senior Associate


[SIGNATURE PAGE TO AMENDMENT NO. 6]

Toronto Dominion (New York) LLC


By:      /s/ Marie Fernandes
         Name: Marie Fernandes
         Title: Authorized Signatory


[SIGNATURE PAGE TO AMENDMENT NO. 6]

Wells Fargo Bank, N.A.,

By:    /s/ Michael J. Thomas
_____
        Name: Michael J. Thomas
        Title: Senior Vice President

*If second signature is needed:*

By:    _____
        Name:
        Title:

[SIGNATURE PAGE TO AMENDMENT NO. 6]

KEYBANK NATIONAL ASSOCIATION


By:      /s/ Suzannah Valdivia
         Name: SUZANNAH VALDIVIA
         Title: VICE PRESIDENT


*If second signature is needed:*



By:
         Name:
         Title:



[SIGNATURE PAGE TO AMENDMENT NO. 6]

A004622

THE HUNTINGTON NATIONAL BANK

By:    /s/ Bruce G. Shearer
        Name: Bruce G. Shearer
        Title: Senior Vice President

*If second signature is needed:*

By:    _____
        Name:
        Title:

[SIGNATURE PAGE TO AMENDMENT NO. 6]

CIBC Inc.

By:    /s/ Dominic Sorresso
           Name: Dominic Sorresso
           Title: Authorized Signatory

*If second signature is needed:*

By:    /s/ Zhen Ma
           Name: Zhen Ma
           Title: Authorized Signatory

[SIGNATURE PAGE TO AMENDMENT NO. 6]

Bank of Tokyo-Mitsubishi UFJ, Ltd., New York Branch


By:    /s/ David Noda
       Name: David Noda
       Title: Managing Director

[SIGNATURE PAGE TO AMENDMENT NO. 6]

CRÉDIT AGRICOLE CORPORATE AND
INVESTMENT BANK


By:    /s/ Blake Wright

Name: /s/ Blake Wright

Title: Managing Director


By:    /s/ James Austin

Name: James Austin

Title: Vice President


[SIGNATURE PAGE TO AMENDMENT NO. 6]

Sumitomo Mitsui Banking Corporation

By:     /s/ James D. Weinstein
        Name: James D. Weinstein
        Title: Managing Director

*If second signature is needed:*

By:
        Name:
        Title:

[SIGNATURE PAGE TO AMENDMENT NO. 6]

Australia and New Zealand Banking Group Limited

By:    /s/ Robert Grillo
        Name: Robert Grillo
        Title: Director

[SIGNATURE PAGE TO AMENDMENT NO. 6]

NATIONAL AUSTRALIA BANK


By:    /s/ James Macdonald
       Name: James Macdonald
       Title: Associate Director


[SIGNATURE PAGE TO AMENDMENT NO. 6]

WESTPAC BANKING CORPORATION

By:    /s/ Richard Yarnold

Name: Richard Yarnold

Title: Senior Relationship Manager Corporate & Institutional Banking

*If second signature is needed:*

By:

Name:

Title:

[SIGNATURE PAGE TO AMENDMENT NO. 6]

MUFG Union Bank, N.A.

By:     /s/ David Noda
      Name: David Noda
      Title: Managing Director

[SIGNATURE PAGE TO AMENDMENT NO. 6]

**Exhibit A**

<div align="right">

**Composite Conformed Copy**
**Reflecting Amendment No. 1 dated as of October 16, 2012,**
**Amendment No. 2 dated as of February 8, 2013,**
**Amendment No. 3 dated as of June 30, 2014**
**Amendment No. 4 dated as of September 9, 2014**
**Amendment No. 5 dated as of October 24, 2014**
**Consent dated as of November 20, 2014**
**Amendment No. 6 dated as of January 22, 2015**

</div>

AMENDED AND RESTATED MULTICURRENCY CREDIT AGREEMENT

Among

CLIFFS NATURAL RESOURCES INC.

CERTAIN FOREIGN SUBSIDIARIES OF THE COMPANY FROM TIME TO TIME PARTY HERETO

VARIOUS LENDERS
FROM TIME TO TIME PARTY HERETO

and

BANK OF AMERICA, N.A.,
as Administrative Agent, Swing Line Lender and L/C Issuer,

JPMORGAN CHASE BANK, N.A.,
as Syndication Agent and L/C Issuer,

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED,
J.P. MORGAN SECURITIES LLC,
CITIGROUP GLOBAL MARKETS INC.,
PNC CAPITAL MARKETS INC.

and

U.S. BANK NATIONAL ASSOCIATION,
as Joint Lead Arrangers and Joint Book Managers,

and

FIFTH THIRD BANK and CITIZENS BANK, N.A.,
as Co-Documentation Agents

DATED AS OF AUGUST 11, 2011

**TABLE OF CONTENTS**

<u>PAGE</u>

ARTICLE 1
DEFINITIONS; INTERPRETATION

Section 1.01. *Definitions*   1
Section 1.02. *Interpretation*   ~~39~~40
Section 1.03. *Change in Accounting Principles*   ~~39~~41
Section 1.04. *Letter of Credit Amounts*   ~~40~~41
Section 1.05. *Exchange Rates; Currency Equivalents*   ~~40~~41
Section 1.06. *Additional Alternative Currencies*   ~~40~~42
Section 1.07. *Change of Currency*   ~~41~~43
Section 1.08. *Rounding*   ~~42~~43
Section 1.09. *Liability of Designated Borrowers*   ~~42~~43
Section 1.10. *Hybrid Securities*   ~~42~~44

ARTICLE 2
THE CREDIT FACILITIES

Section 2.01. *Revolving Credit Facilities*   ~~42~~44
Section 2.02. *Letters of Credit*   ~~44~~45
Section 2.03. *Applicable Interest Rates*   ~~54~~55
Section 2.04. *Manner of Borrowing Loans and Designating Currency and Applicable Interest Rates*   ~~56~~57
Section 2.05. *Minimum Borrowing Amounts; Maximum Eurocurrency Loans*   ~~58~~60
Section 2.06. *Repayment of Loans*   ~~59~~60
Section 2.07. *Prepayments*   ~~59~~60
Section 2.08. *Payments*   ~~60~~61
Section 2.09. *Termination or Reduction of Commitments*   ~~62~~63
Section 2.10. *Swing Line Loans*   ~~62~~63
Section 2.11. *Evidence of Indebtedness*   ~~66~~67
Section 2.12. *Fees*   ~~67~~68
Section 2.13. *Hedge Agreements*   ~~68~~69
Section 2.14. *Designated Borrowers*   ~~68~~69
Section 2.15. *Defaulting Lenders*   ~~69~~70

ARTICLE 3
CONDITIONS PRECEDENT

Section 3.01. *Effectiveness*   ~~71~~72
Section 3.02. *All Credit Extensions*   ~~73~~74

i

ARTICLE 4
THE GUARANTIES

Section 4.01.    *Guaranties*    ~~73~~74
Section 4.02.    *Further
                 Assurances*    ~~74~~75

ARTICLE 5
REPRESENTATIONS AND WARRANTIES

Section 5.01.    *Organization and
                 Qualification*    ~~74~~75
Section 5.02.    *Authority and
                 Enforceability*    ~~74~~75
Section 5.03.    *Financial
                 Reports*    ~~75~~76
Section 5.04.    *No Material Adverse
                 Change*    ~~75~~76
Section 5.05.    *Litigation and Other
                 Controversies*    ~~75~~76
Section 5.06.    *True and Complete Disclosure*    ~~75~~76
Section 5.07.    *Use of Proceeds; Margin
                 Stock*    ~~76~~77
Section 5.08.    *Taxes*    ~~76~~77
Section 5.09.    *ERISA*    ~~76~~77
Section 5.10.    *Subsidiaries*    ~~77~~78
Section 5.11.    *Compliance with
                 Laws*    ~~77~~78
Section 5.12.    *Environmental
                 Matters*    ~~77~~78
Section 5.13.    *Investment
                 Company*    ~~77~~78
Section 5.14.    *Intellectual
                 Property*    ~~77~~78
Section 5.15.    *Good
                 Title*    ~~78~~79
Section 5.16.    *Labor
                 Relations*    ~~78~~79
Section 5.17.    *Capitalization*    ~~78~~79
Section 5.18.    *Other
                 Agreements*    ~~78~~79
Section 5.19.    *Governmental Authority and
                 Licensing*    ~~78~~79
Section 5.20.    *Approvals*    ~~78~~79
Section 5.21.    *Affiliate
                 Transactions*    ~~79~~80
Section 5.22.    *Solvency*    ~~79~~80
Section 5.23.    *Economic
                 Sanctions*    ~~79~~80
Section 5.24.    *No
                 Default*    ~~79~~80
Section 5.25.    *Anti-Corruption
                 Laws*    ~~79~~80
Section 5.26.    *Patriot
                 Act*    ~~79~~80
Section 5.27.    *Collateral
                 Documents*    ~~79~~80

ARTICLE 6
COVENANTS

Section 6.01.    *Information
                 Covenants*    ~~80~~81
Section 6.02.    *Inspections*    ~~82~~83
Section 6.03.    *Maintenance of Property, Insurance, Environmental Matters,
                 Etc*    ~~83~~84
Section 6.04.    *Preservation of
                 Existence*    ~~83~~84
Section 6.05.    *Compliance with
                 Laws*    ~~84~~85
Section 6.06.    *ERISA*    ~~84~~85

ii

Section 6.07.  Payment of Taxes  ~~84~~85
Section 6.08.  Books and Records  ~~84~~85
Section 6.09.  Contracts with Affiliates  ~~85~~86
Section 6.10.  No Changes in Fiscal Year  ~~85~~86
Section 6.11.  Change in the Nature of Business  ~~85~~86
Section 6.12.  Indebtedness  ~~85~~86
Section 6.13.  Liens  ~~87~~88
Section 6.14.  Consolidation, Merger, Sale of Assets, etc  ~~88~~89
Section 6.15.  Restricted Investments Prohibited  ~~90~~91
Section 6.16.  Dividends and Certain Other Restricted Payments  ~~90~~91
Section 6.17.  Economic Sanctions; Anti-Corruption Laws  ~~91~~92
Section 6.18.  Financial Covenants  ~~92~~93
Section 6.19.  Limitation on Assets and Operations of Cliffs Sonoma Entities  ~~92~~93
Section 6.20.  Covenant to Give Security; Further Assurances  ~~92~~93
Section 6.21.  Limitations on Assets and Operations of Specific JV Holdcos  ~~95~~96

ARTICLE 7
EVENTS OF DEFAULT AND REMEDIES

Section 7.01.  Events of Default  ~~95~~96
Section 7.02.  Non-Bankruptcy Defaults  ~~97~~99
Section 7.03.  Bankruptcy Defaults  ~~98~~99
Section 7.04.  Notice of Default  ~~98~~100
Section 7.05.  Expenses  ~~98~~100

ARTICLE 8
CHANGE IN CIRCUMSTANCES AND CONTINGENCIES

Section 8.01.  Funding Indemnity  ~~98~~100
Section 8.02.  Illegality  ~~99~~101
Section 8.03.  Inability to Determine Rates  ~~100~~101
Section 8.04.  Increased Costs; Reserves on Eurocurrency Rate Loans  ~~100~~102
Section 8.05.  Substitution of Lenders  ~~102~~104
Section 8.06.  Discretion of Lender as to Manner of Funding  ~~103~~104

ARTICLE 9
THE ADMINISTRATIVE AGENT

Section 9.01.  Appointment and Authority  ~~103~~104
Section 9.02.  Rights as a Lender  ~~103~~105
Section 9.03.  Exculpatory Provisions  ~~103~~105
Section 9.04.  Reliance by Administrative Agent  ~~104~~106
Section 9.05.  Delegation of Duties  ~~105~~106
Section 9.06.  Resignation of Administrative Agent  ~~105~~106
Section 9.07.  Non-reliance on Administrative Agent and Other Lenders  ~~106~~108
Section 9.08.  No Other Duties, Etc  ~~106~~108

iii

Section 9.09.  *Guaranty Matters*  ~~106~~108
Section 9.10.  *Hedging Liability and Funds Transfer and Deposit Account Liability Arrangements*  ~~107~~109

ARTICLE 10
MISCELLANEOUS

Section 10.01.  *Taxes*  ~~108~~109
Section 10.02.  *No Waiver, Cumulative Remedies*  ~~111~~113
Section 10.03.  *Non-Business Days*  ~~111~~113
Section 10.04.  *Documentary Taxes*  ~~112~~113
Section 10.05.  *Survival of Representations*  ~~112~~113
Section 10.06.  *Survival of Indemnities*  ~~112~~114
Section 10.07.  *Sharing of Payments*  ~~112~~114
Section 10.08.  *Notices; Effectiveness; Electronic Communication*  ~~113~~114
Section 10.09.  *Counterparts*  ~~115~~117
Section 10.10.  *Successors and Assigns*  ~~115~~117
Section 10.11.  *Amendments*  ~~120~~121
Section 10.12.  *Headings*  ~~121~~122
Section 10.13.  *Expenses; Indemnity; Damage Waiver*  ~~121~~122
Section 10.14.  *Set-Off*  ~~123~~124
Section 10.15.  *Payments Set Aside*  ~~123~~125
Section 10.16.  *Treatment of Certain Information; Confidentiality*  ~~124~~125
Section 10.17.  *Entire Agreement*  ~~125~~126
Section 10.18.  *Severability of Provisions*  ~~125~~126
Section 10.19.  *Excess Interest*  ~~125~~127
Section 10.20.  *Construction*  ~~126~~127
Section 10.21.  *USA Patriot Act*  ~~126~~128
Section 10.22.  *Currency*  ~~126~~128
Section 10.23.  *Governing Law; Jurisdiction; Etc*  ~~127~~128
Section 10.24.  *Waiver of Jury Trial*  ~~127~~129
Section 10.25.  *No Advisory or Fiduciary Responsibility*  ~~128~~129
Section 10.26.  *Keepwell*  ~~128~~130
Section 10.27.  *Release of Collateral*  ~~129~~130

ARTICLE 11
COMPANY GUARANTY

Section 11.01.  *The Guaranty*  ~~129~~130
Section 11.02.  *Guaranty Unconditional*  ~~129~~131
Section 11.03.  *Discharge Only upon Payment in Full; Reinstatement In Certain Circumstances*  ~~130~~131
Section 11.04.  *Waiver By The Company*  ~~130~~132
Section 11.05.  *Subrogation*  ~~130~~132
Section 11.06.  *Stay of Acceleration*  ~~130~~132

iv

Exhibit A — Swing Line Loan Notice

Exhibit B — Notice of Borrowing

Exhibit C — Notice of Continuation/Conversion

Exhibit D-1 — Revolving Note

Exhibit D-2 — Swing Note

Exhibit D-3 — Term Note

Exhibit E — Compliance Certificate

Exhibit F — Assignment and Assumption

Exhibit G — Guaranty Agreement

Exhibit H — Designated Borrower Request and Assumption Agreement

Exhibit I — Designated Borrower Notice


Schedule 1(a) — Commitments

Schedule 1(b) — Mandatory Costs

Schedule 1(c) — Existing Letters of Credit

Schedule 2.02 — Scotia Existing Letters of Credit

Schedule 5.3 — Contingent Liabilities

Schedule 5.5 — Litigation

Schedule 5.10(a) — Restricted Subsidiaries

Schedule 5.10(b) — Unrestricted Subsidiaries

Schedule 5.17 — Capitalization

Schedule 5.21 — Affiliate Transactions

Schedule 6.12 — Existing Indebtedness of Non-Guarantor ~~Subsidiares~~ Subsidiaries

Schedule 6.13 — Existing Liens

Schedule 6.15 — Existing Investments

Schedule 6.15(A) — Existing Investments in Non-Joint Ventures

Schedule 6.15(B) — Existing Joint Ventures in the United States

Schedule 10.8 — Administrative Agent's Office; Certain Addresses for Notices

v

"**Alternative Currency**" means (i) each of Australian Dollars, British Pounds, Canadian Dollars, Euros, Japanese Yen, New Zealand Dollars and Swiss Francs and (ii) each other currency (other than U.S. Dollars) that is approved in accordance with **Section 1.06**.

"**Alternative Currency Equivalent**" means, at any time, with respect to any amount denominated in U.S. Dollars, the equivalent amount thereof in the applicable Alternative Currency as determined by the Administrative Agent or the L/C Issuer, as the case may be, at such time on the basis of the Spot Rate (determined in respect of the most recent Revaluation Date) for the purchase of such Alternative Currency with U.S. Dollars.

"**Alternative Currency Loan**" means a Loan denominated in an Alternative Currency. Alternative Currency Loans may be Revolving Loans or Swing Line Loans.

"**Amapa**" means Anglo Ferrous Amapá Mineração Ltda., a company organized under the Laws of Brazil.

"**Amapa Investment**" means, collectively, all Investments by the Company and its Subsidiaries in Amapa.

"**Applicable Adjusted Total Commitments**" is defined in **Section 2.01(a)** hereof.

"**Applicable Margin**" means, with respect to Loans, L/C Borrowings, and the commitment fees and Letter of Credit Fees payable under **Section 2.12** hereof, (a) from the Closing Date until the first Pricing Date, the rates per annum shown opposite Level IV below, and (b) thereafter, from one Pricing Date to the next, the rates per annum determined in accordance with the following schedule:

| Level | Leverage Ratio For Such Pricing Date | Applicable Margin For Base Rate Loans And L/C Borrowings Shall Be: | Applicable Margin For Eurocurrency Loans And Letter Of Credit Fee Shall Be: | Applicable Margin For Commitment Fee Shall Be: |
|---|---|---|---|---|
| I | Less than 1.00 to 1.00 | 0.25% | 1.00% | 0.125% |
| II | Less than 1.50 to 1.00, but greater than or equal to 1.00 to 1.00 | 0.25% | 1.25% | 0.15% |
| III | Less than 2.00 to 1.00, but greater than or equal to 1.50 to 1.00 | 0.50% | 1.50% | 0.175% |
| IV | Less than 2.75 to 1.00, but greater than or equal to 2.00 to 1.00 | 0.75% | 1.75% | 0.20% |
| V | Less than 3.25 to 1.00, but greater than or equal to 2.75 to 1.00 | 1.00% | 2.00% | 0.25% |

3

certificate for such Applicable Period, (ii) the Applicable Margin shall be determined based on the corrected compliance certificate for such Applicable Period, and (iii) the Borrowers shall promptly pay to the Administrative Agent (for the account of the Lenders during the Applicable Period or their successors and assigns) the accrued additional interest owing as a result of such increased Applicable Margin for such Applicable Period. This paragraph shall survive the termination of this Agreement.

"**Applicable Time**" means, with respect to any borrowings and payments in any Alternative Currency, the local time in the place of settlement for such Alternative Currency as may be determined by the Administrative Agent or the L/C Issuer, as the case may be, to be necessary for timely settlement on the relevant date in accordance with normal banking procedures in the place of payment.

"**Applicant Borrower**" has the meaning specified in __Section 2.14__.

"**Application**" means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the L/C Issuer.

"**Approved Fund**" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Arbitration Award**" means that certain arbitration award granted pursuant to Case No. 18209/VRO/AGF/ZF by the ICC International Court of Arbitration in favor of Worldlink Resources Limited against Cliffs Quebec Iron Mining ULC, The Bloom Lake Iron Ore Mine Limited Partnership and Bloom Lake General Partner Limited.

"**Arrangement Agreement**" means that Arrangement Agreement, dated as of January 11, 2011, between the Company and CTIM, as amended, restated, supplemented or otherwise modified from time to time.

"**Arrangers**" means Merrill Lynch, Pierce, Fenner & Smith Incorporated, J.P. Morgan Securities LLC, Citigroup Global Markets Inc., PNC Capital Markets, Inc. and U.S. Bank National Association, in their respective capacities as joint lead arrangers and joint book managers.

"**Arranger Fee Letter**" means the Arranger Fee Letter, dated June 28, 2011, among the Company and the Commitment Parties (as defined therein), as amended by the Co-Arranger Commitment Letter, dated July 14, 2011, among the Company, the Initial Commitment Parties (as defined therein) and the Additional Commitment Parties (as defined therein).

"**Assignee Group**" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

5

"**Canadian Entities**" means (a) Cliffs Quebec Iron Mining ULC (f/k/a Cliffs Quebec Iron Mining Limited), an unlimited liability company organized under the laws of British Columbia, Canada, (b) Wabush Iron Co. Limited, an Ohio corporation, (c) The Bloom Lake Iron Ore Mine Limited Partnership, a limited partnership formed under the laws of Ontario, (d) Bloom Lake General Partner Limited, an Ontario corporation, (e) Wabush Resources Inc., a corporation organized under the laws of Canada, (f) each other Restricted Subsidiary of the Company organized under the laws of Canada or any province thereof, including, for the avoidance of doubt, Wabush Mines, an unincorporated joint venture and Knoll Lake Minerals Limited, a company organized under the laws of Canada and (g) Northern Land Company Limited, a company organized under the laws of Newfoundland & Labrador.

"**Canadian Existing Indebtedness**" means any Indebtedness of the applicable Canadian Entities and the Company under (x) that certain Master Loan and Security Agreement, dated as of September 27, 2013, among Key Equipment Finance Inc., as lender and as administrative agent, The Bloom Lake Iron Ore Mine Limited Partnership, a limited partnership formed under the laws of the Province of Ontario, Wabush Mines, an unincorporated joint venture of Wabush Iron Co. Limited and Wabush Resources Inc., by its managing agent, Cliffs Mining Company and each other person designated as a borrower from time to time pursuant to the terms thereof, and the other Account Documentation referred to in such Master Loan and Security Agreement, including all loan schedules thereto, as the same may be amended, restated, supplemented or otherwise modified from time to time, and (y) the Corporate Guaranty dated September 27, 2013 provided by the Company in respect thereof, as it may be amended, restated, supplemented or otherwise modified from time to time.

"**Canadian Restructuring**" means all or any part of the transaction or event or series of transactions or events described to the Administrative Agent and the Lenders in that certain letter agreement, dated January 22, 2015, addressed to the Administrative Agent and the Lenders and acknowledged by the Administrative Agent, delivered by the Company on January 22, 2015, together with such changes, modifications and supplements thereto that are reasonably acceptable to the Administrative Agent.

"**Canadian Restructuring Commencement Date**" means the earliest date on which any of the transactions or events in the definition of Canadian Restructuring is initiated (it being understood that, in the case of any Canadian Entity, its Canadian Restructuring Commencement Date shall be the earliest date on which any of the transactions or events in the definition of Canadian Restructuring is initiated with respect to such Canadian Entity).

"**Capital Expenditures**" means, with respect to any Person for any period, the aggregate amount of all expenditures (whether paid in cash or accrued as a liability) by such Person during that period for the acquisition or leasing (pursuant to a Capital Lease) of fixed or capital assets or additions to property, plant, or equipment (including replacements and improvements) which should be capitalized on the balance sheet of such Person in accordance with GAAP.

8

shutdown, restructuring or other disposition of the Wabush mine and related facilities and operations in an aggregate amount not to exceed U.S. $100,000,000 (calculated on a cumulative basis for all periods) during the term of this Agreement and (B) additional cash restructuring charges in an aggregate amount not to exceed U.S. $100,000,000 (calculated on a cumulative basis for all periods) during the term of this Agreement and, (vi) costs associated with the issuance of Indebtedness (whether or not consummated) (but excluding any such costs amortized through or otherwise included or to be included in Interest Expense for any period) and (vii) costs and expenses incurred during such period in connection with the Canadian Restructuring in an aggregate amount for all such costs and expenses during the life of this Agreement not to exceed $75,000,000, *minus*, without duplication, (b) the sum of (i) cash payments made during such period in respect of items added to the calculation of Net Income pursuant to clause (a)(iv) above during such period or any previous period, and (ii) non-cash items increasing Net Income for such period; *provided*, *however*, that, solely for the purposes of calculating compliance with  **Section 6.18(a)**, EBITDA for any period shall (x) include the EBITDA for any Person or business unit that has been acquired by the Company or any of its Restricted Subsidiaries for any portion of such period prior to the date of acquisition, and (y) exclude the EBITDA for any Person or business unit that has been disposed of by the Company or any of its Restricted Subsidiaries for the portion of such period after the date of disposition. Notwithstanding the foregoing, for purposes of determining the EBITDA of CTIM for the fiscal quarters ending March 31, 2011, June 30, 2011 and September 30, 2011, such amount shall be calculated for the period from January 1, 2011 through the end of the relevant fiscal quarter then ending, as applicable, and multiplied by 4, 2 and 4/3, respectively.

"**Eligible Assignee**" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, and (d) any other Person (other than a natural person) approved by (i) the Administrative Agent, the Swing Line Lender and the L/C Issuers, and (ii) unless an Event of Default has occurred and is continuing, the Company (each such approval not to be unreasonably withheld or delayed); *provided* that notwithstanding the foregoing, "Eligible Assignee" shall not include the Company or any of the Company's Affiliates or Subsidiaries.

"**EMU**" means the economic and monetary union in accordance with the Treaty of Rome 1957, as amended by the Single European Act 1986, the Maastricht Treaty of 1992 and the Amsterdam Treaty of 1998.

"**EMU Legislation**" means the legislative measures of the European Council for the introduction of, changeover to or operation of a single or unified European currency.

"**Environmental Claim**" means any investigation, notice, violation, demand, allegation, action, suit, injunction, judgment, order, consent decree, penalty, fine, lien, proceeding or claim (whether administrative, judicial or private in nature) arising (a) pursuant to, or in connection with an actual or alleged violation of, or liability under, any Environmental Law, (b) in connection with any Hazardous Material, (c) from any

14

"**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"**Funds Transfer and Deposit Account Liability** " means the liability of the Company or any of its Subsidiaries owing to any Person arising out of (a) the execution or processing of electronic transfers of funds by automatic clearing house transfer, wire transfer or otherwise to or from the deposit accounts of the Company and/or any Subsidiary now or hereafter maintained with any of the Lenders or their Affiliates, (b) the acceptance for deposit or the honoring for payment of any check, draft or other item with respect to any such deposit accounts, and (c) any other deposit, disbursement, and cash management services, including, without limitation, treasury, depository, overdraft, credit or debit card, purchase card, electronic funds transfer, merchant processing services and other cash management arrangements, in each case afforded to the Company or any such Subsidiary by any such Person that, at the time it enters into such arrangement, is a Lender or an Affiliate of a Lender; *provided* that any such liabilities incurred by any Canadian Entity from and after the Canadian Restructuring Commencement Date shall not constitute Funds Transfer and Deposit Account Liability.

"**Funding Date**" is defined in **Section 2.01(c)** hereof.

"**GAAP**" means generally accepted accounting principles as in effect in the United States as set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession), which are applicable to the circumstances as of the date of determination.

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Guarantor**" means each Material Subsidiary (other than Cleveland Cliffs International Holding Company) from time to time party to a Guaranty in accordance with the provisions of **Article 4** hereof. As of the Closing Date, the Guarantors are The Cleveland-Cliffs Iron Company, Cliffs Mining Company, Cliffs Sales Company, Northshore Mining Company, Cliffs Minnesota Mining Company, Cliffs North American Coal LLC, CLF PinnOak LLC, Silver Bay Power Company, Cliffs Empire, Inc., Cliffs TIOP, Inc., Cliffs Logan County Coal, LLC and Cliffs West Virginia Coal Inc.

18

"**Guaranty**" and "**Guaranties**" each is defined in __Section 4.01__ hereof.

"**Hazardous Material**" means (a) any "**hazardous substance**" as defined in CERCLA and (b) any material classified or regulated as " **hazardous**" or "**toxic**" or words of like import pursuant to an Environmental Law.

"**Hedge Agreement**" means any interest rate, currency or commodity swap agreements, cap agreements, collar agreements, floor agreements, exchange agreements, forward contracts, option contracts or similar interest rate or currency or commodity hedging arrangements.

"**Hedging Liability**" means the liability of the Company or any Subsidiary to any Person in respect of (i) any Hedge Agreement existing as of the Fifth Amendment Effective Date between the Company or such Subsidiary, as the case may be, and any such Person that is a Lender or an Affiliate of a Lender on the Fifth Amendment Effective Date and (ii) any Hedge Agreement as the Company or such Subsidiary, as the case may be, may from time to time after the Fifth Amendment Effective Date, enter into with any such Person that, at the time it enters into such Hedge Agreement, is a Lender or an Affiliate of a Lender; *provided* that any such liabilities incurred by any Canadian Entity from and after the Canadian Restructuring Commencement Date shall not constitute Hedging Liability.

"**Honor Date**" is defined in __Section 2.02(c)(i)__ hereof.

"**Hybrid Securities**" means any trust preferred security, deferrable interest subordinated debt security, mandatory convertible debt security or other hybrid debt security issued by the Company or any of its Restricted Subsidiaries (or a trust or other entity formed by the Company or any of its Restricted Subsidiaries) that (a) is accorded at least some equity treatment by S&P and/or Moody's at the time of issuance thereof, (b) if issued by any Loan Party, is expressly subordinate in right of payment to the Obligations, and (c) by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) does not mature (excluding any maturity as the result of an optional redemption by the issuer thereof) and is not mandatorily redeemable or subject to any mandatory repurchase requirement (except for any redemption or mandatory repurchase as the result of a change in control or event of default) at any time prior to the date that is six months after the Termination Date.

"**Indebtedness**" means for any Person (without duplication) (a) all indebtedness of such Person for borrowed money, whether current or funded, or secured or unsecured, (b) all indebtedness for the deferred purchase price of Property or services, (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to Property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of a default are limited to repossession or sale of such Property), (d) all indebtedness secured by a purchase money mortgage or other Lien to secure all or part of the purchase price of Property subject to such mortgage or Lien, (e) all obligations under leases which shall

alternative branch or funding office with respect to its Eurocurrency Loans to reduce any liability of the Company to such Lender under **Section 8.04** hereof or to avoid the unavailability of Eurocurrency Loans under **Section 8.03** hereof, so long as such designation is not disadvantageous to the Lender. Without limitation of the foregoing, any Lender may, at its option, make any Loan available to any Borrower by causing any foreign or domestic branch or Affiliate of such Lender to make such Loan; *provided* that any exercise of such option shall not affect the obligation of such Borrower to repay such Loan in accordance with the terms of this Agreement.

"**Letter of Credit**" means any letter of credit issued hereunder and shall include the Existing Letters of Credit. A Letter of Credit may be a commercial letter of credit or a standby letter of credit; *provided*, that any commercial letter of credit issued hereunder shall provide solely for cash payment upon presentation of a sight draft. Letters of Credit may be issued in Dollars or in an Alternative Currency.

"**Letter of Credit Expiration Date**" means the day that is 270 days after the Termination Date (or, if such day is not a Business Day, the next succeeding Business Day).

"**Letter of Credit Fee**" is defined in **Section 2.12(b)** hereof.

"**Leverage Ratio**" means, on any date, the ratio of Total Funded Debt on such date to EBITDA for the period of four consecutive fiscal quarters most recently ended on or prior to such date.

"**LIBOR**" means, for any Interest Period (x) with respect to a Eurocurrency Loan denominated in U.S. Dollars or in any Alternative Currency other than Canadian Dollars, the rate per annum equal to the London Interbank Offered Rate or a comparable or successor rate which rate is approved by the Administrative Agent, as published on the applicable Bloomberg screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, for deposits in U.S. Dollars or the relevant Alternative Currency (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period and (y) with respect to a Eurocurrency Loan denominated in Canadian Dollars, the rate per annum equal to the Canadian Dealer Offered Rate, or a comparable or successor rate which is approved by the Administrative Agent, as published on the applicable Bloomberg screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time) at or about 10:00 a.m. (Toronto, Ontario time) on the first day of such Interest Period (or such other day as is generally treated as the rate fixing day by market practice in such interbank market, as determined by the Administrative Agent) (or if such day is not a Business Day, then on the immediately preceding Business Day; *provided* that, in each case of clauses (x) and (y), if such rate shall be less than zero, such rate shall be deemed zero for purposes of this Agreement. If such rate is not available at such time for any reason, then the "**Eurocurrency Rate**" for

23

such Interest Period shall be the rate per annum determined by the Administrative Agent to be the rate at which deposits in the relevant currency for delivery on the first day of such Interest Period in Same Day Funds in the approximate amount of the Eurocurrency Loan being made, continued or converted by Bank of America and with a term equivalent to such Interest Period would be offered by Bank of America's London Branch (or other Bank of America branch or Affiliate) to major banks in the London or other offshore interbank market for such currency at their request at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period; *provided* that if such rate shall be less than zero, such rate shall be deemed zero for purposes of this Agreement.

"**Lien**" means any mortgage, lien, security interest, pledge, charge or encumbrance of any kind in respect of any Property, including the interests of a vendor or lessor under any conditional sale, Capital Lease or other title retention arrangement.

"**Liquidity**" means, at any time, the sum of (x) the aggregate amount of unrestricted (other than Liens under the Loan Documents) cash and Cash Equivalents of the Loan Parties at such time plus (y) the aggregate amount of the unused Total Commitments ~~(or, if less, the unused Applicable Adjusted Total Commitments)~~.

"**Loan**" means any Revolving Loan or Swing Line Loan, whether outstanding as a Base Rate Loan or Eurocurrency Loan or otherwise as permitted hereunder, each of which is a "type" of Loan hereunder.

"**Loan Documents**" means this Agreement, the Notes, the Collateral Documents, the Issuer Documents, the Guaranties, the Fee Letters and each other instrument or document to be executed or delivered by the Company or any Restricted Subsidiary hereunder or thereunder or otherwise in connection therewith, other than Hedge Agreements.

"**Loan Party**" means the Company and each Guarantor.

"**Local Currency Swing Line Supplement**" means a written supplement to this Agreement entered into between the Company and the Swing Line Lender, with the written consent of the Administrative Agent.

"**Long-Dated Letter of Credit**" means any Letter of Credit having an expiry date later than the fifth Business Day prior to the Termination Date (but in no event later than the Letter of Credit Expiration Date).

"**Mandatory Cost**" means, with respect to any period, the percentage rate per annum determined in accordance with **Schedule 1(b)**.

"**Material Adverse Effect**" means (a) a material adverse change in, or material adverse effect upon, the operations, business, Property or condition (financial or otherwise) of the Company and its Restricted Subsidiaries taken as a whole; (b) a material impairment of the rights and remedies of the Administrative Agent or any

24

Lender under any Loan Document, or of the ability of the Company or any Restricted Subsidiary to perform its material obligations under any Loan Document to which it is a party; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the Company or any Restricted Subsidiary of any Loan Document to which it is a party; *provided*, however, that in no event shall (x) the Canadian Restructuring or its effect on the Canadian Entities constitute a Material Adverse Effect unless it constitutes a Material Adverse Effect on the Company and its Restricted Subsidiaries (other than the Canadian Entities), taken as a whole, or (y) the failure of any Canadian Entity to repay any intercompany Indebtedness constitute a Material Adverse Effect.

"**Material Foreign Subsidiary**" shall mean and include (i) each Wholly-Owned Subsidiary which is a Foreign Subsidiary, except any Foreign Subsidiary that does not have (together with its Subsidiaries) (a) at the time of determination thereof, consolidated total assets that constitute more than 5% of the consolidated total assets of the Company and its Subsidiaries at such time and (b) consolidated gross revenues for any fiscal year of the Company ending on or after January 1, 2012, that constitute more than 5% of the consolidated gross revenues of the Company and its Subsidiaries during such fiscal year.

"**Material Real Property**" means any Real Property owned or leased by any Loan Party; *provided* that such Material Real Property may exclude (i) any individual parcel with a fair market value (as reasonably determined by the Company and reasonably acceptable to the Administrative Agent) not to exceed $25,000,000; *provided* that such parcel is not necessary to operate the relevant complex or facility associated with such parcel (as reasonably determined by the Company and reasonably acceptable to the Administrative Agent), (ii) any Real Property or interest therein used or held in connection with a mine owned by a joint venture of which a Loan Party is a party, to the extent that the joint venture agreement or other relevant agreement with the relevant joint venture partner prohibits (or requires the consent of a party other than the Company or any of its Subsidiaries with respect to) the creation of a security interest therein and (iii) any leasehold interest in the office headquarters of the Company located at 200 Public Square, Cleveland, Ohio 44114. In addition, the Administrative Agent may agree, in its sole discretion, to exclude from this definition of "Material Real Property" any Building (as defined in the applicable Flood Insurance Laws) or Manufactured (Mobile) Home (as defined in the applicable Flood Insurance Laws). In such event, notwithstanding any provision in this Agreement, any Mortgage, or any other Collateral Document to the contrary, such Building or Manufactured (Mobile) Home shall not be included in this definition of "Material Real Property" and such Building or Manufactured (Mobile) Home shall not be encumbered by any Mortgage.

"**Material Subsidiary**" shall mean and include (i) each Wholly-Owned Subsidiary that is a Domestic Subsidiary, except any Wholly-Owned Subsidiary that is a Domestic Subsidiary and does not have (together with its Subsidiaries) (a) at the time of determination thereof, consolidated total assets that constitute more than 5% (or 10% if the date of determination is prior to January 1, 2012) of the consolidated

25

total assets of the Company and its Subsidiaries at such time and (b) consolidated gross revenues for any fiscal year of the Company ending on or after January 1, 2012, that constitute more than 5% (or 10% for a fiscal year ending on December 31, 2010 or December 31, 2011) of the consolidated gross revenues of the Company and its Subsidiaries during such fiscal year and (ii) each Subsidiary that was an originator under the Permitted Securitization Financing and (iii) each Domestic Subsidiary that the Company has designated to the Administrative Agent in writing as a Material Subsidiary. As of the Fifth Sixth Amendment Effective Date, the Material Subsidiaries are The Cleveland-Cliffs Iron Company, Cliffs Mining Company, Cliffs Sales Company, Northshore Mining Company, Cliffs Minnesota Mining Company, Cliffs North American Coal LLC, CLF PinnOak LLC, Silver Bay Power Company, Cliffs Empire, Inc., Cliffs TIOP, Inc., Cleveland-Cliffs International Holding Company, Cliffs Logan County Coal, LLC, Cliffs West Virginia Coal Inc., Oak Grove Resources LLC, Pinnacle Mining Company, LLC, Southern Eagle Land, LLC, Toney's Fork Land, LLC and Cliffs UTAC Holding LLC, United Taconite LLC, Cliffs TIOP Holding, LLC, Cliffs Empire Holding, LLC, Cliffs Pickands Holding, LLC, Cliffs Mining Holding, LLC and Cliffs Mining Holding Sub Company.

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto.

"**Mortgage**" means a mortgage or deed of trust, deed to secure debt, trust deed or other security document entered into by the owner or lessee, as the case may be, of a Material Real Property in favor of the Administrative Agent for the benefit of the Secured Parties creating a Lien on such Material Real Property, substantially in such form as may be reasonably agreed between the Company and the Administrative Agent.

"**National Flood Insurance Program**" shall mean the program created by the U.S. Congress pursuant to the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973, as revised by the National Flood Insurance Reform Act of 1994, as each may be amended, or any successor statute thereto, that mandates the purchase of flood insurance to cover real property improvements located in Special Flood Hazard Areas in participating communities and provides protection to property owners through a U.S. federal insurance program.

"**Net Income**" means, with reference to any period, the net income (or net loss) of the Company and its Restricted Subsidiaries for such period computed on a consolidated basis in accordance with GAAP; *provided* that (a) there shall be excluded from Net Income (i) the net income (or net loss) of any Person accrued prior to the date it becomes a Restricted Subsidiary of, or has merged into or consolidated with, the Company or another Restricted Subsidiary and (ii) the net income (or net loss) of any Person (other than a Restricted Subsidiary) in which the Company or any of its Restricted Subsidiaries has an equity interest in, except to the extent of the amount of dividends or other distributions actually paid to the Company or any of its Restricted Subsidiaries during such period, and (b) solely for the purposes of calculating compliance with **Section 6.18(a)**, Net Income for any period shall (i) include the net income (or net loss) for any Person or business unit that has been acquired by the Company or any of its Restricted

26

"**Patriot Act**" is defined in **Section 5.26** hereof.

"**PBGC**" means the Pension Benefit Guaranty Corporation or any Person succeeding to any or all of its functions under ERISA.

"**Percentage**" means, with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the Total Commitments represented by such Lender's Commitment at such time, subject to **Section 2.15(a)(iv)**. If the commitment of each Lender to make Loans and the obligation of each L/C Issuer to make L/C Credit Extensions have been terminated pursuant to **Section 8.02** or if the Total Commitments have expired, then the Percentage of each Lender shall be determined based on the Percentage of such Lender most recently in effect, giving effect to any subsequent assignments. The initial Percentage of each Lender is set forth opposite the name of such Lender on **Schedule 1(a)** or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"**Perfection Certificate**" has the meaning assigned to such term in the Security Agreement.

"**Permitted Acquisition**" means any Acquisition with respect to which the following condition is satisfied: after giving effect to the Acquisition, no Default or Event of Default shall exist, including with respect to the covenant contained in **Section 6.18(a)** hereof on a *pro forma* basis.

"**Permitted Investment Amount**" means an amount equal to (a) U.S. $150,000,000 *plus* (b) 20% of positive consolidated Net Income for each fiscal year of the Company commencing with the Company's fiscal year ending December 31, 2006. As of December 31, 2010, the Permitted Investment Amount was equal to U.S. $608,180,000.

"**Permitted Lien**" is defined in **Section 6.13** hereof.

"**Permitted Securitization Financing**" means the sales of accounts receivable, general intangibles and other assets and related rights, and the financing transactions, contemplated by and pursuant to (i) the Purchase and Sale Agreement, dated as of April 22, 2014, among the various originators parties thereto, the Company, as servicer, and CNR Receivables LLC, as buyer, and (ii) the Receivables Purchase Agreement, dated as of April 22, 2014, among CNR Receivables LLC, as seller, the Company, as servicer, Credit Agricole Corporate and Investment Bank, as committed purchaser, purchaser agent and administrator, Atlantic Asset Securitization LLC, as a conduit purchaser, and PNC Bank, National Association, as a committed purchaser, LC banks and a purchaser agent; in each case as amended, supplemented or otherwise modified from time to time;  *provided*, that no such amendment, supplement or other modification shall (x) add any collateral securing, or assets sold into, any such financing; (y) add any obligors or sellers who are not already parties as of the Fourth Amendment Effective Date or (z) increase the aggregate amount of the obligations or the amount available to purchase receivables

29

thereunder above the amount permitted in **Section 6.12(e)** , which financings were paid off and terminated on or about October 24, 2014.

"**Permitted Securitization Financing Payoff**" means the termination of, and repayment in full of all obligations owed under, the Permitted Securitization Financing and delivery to the Administrative Agent of a payoff letter reasonably satisfactory to the Administrative Agent and copies of UCC-3 termination financing statements in form appropriate for filing with respect to such termination.

"**Permitted Transaction Condition**" means, with respect to (i) an Investment made pursuant to clauses (n), (o) or (q) of the definition of "Restricted Investment" or (ii) a Permitted Acquisition, and, in each case, after giving effect to such Investment or Permitted Acquisition, the Company shall be in pro forma compliance with the financial covenants set forth in **Section 6.18** (provided that for purposes of this definition, the levels set forth in **Section 6.18** shall be deemed to be 0.5x tighter than the specified levels).

"**Person**" means any natural person, partnership, corporation, limited liability company, association, trust, unincorporated organization, Governmental Authority or any other entity or organization.

"**Plan**" means any employee pension benefit plan covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code that either (a) is maintained by a member of the Controlled Group for employees of a member of the Controlled Group or (b) is maintained pursuant to a collective bargaining agreement or any other arrangement under which more than one employer makes contributions and to which a member of the Controlled Group is then making or accruing an obligation to make contributions or has within the preceding five plan years made contributions.

"**Platform**" is defined in **Section 6.01** hereof.

"**Portman Limited Facility**" means any credit agreement, multi-option facility, facility agreement, loan agreement or other agreements or instruments entered into from time to time under which the applicable lenders or holders of such instruments have agreed to make loans or otherwise extend credit to Cliffs Natural Resources Holdings Pty Ltd or any Restricted Subsidiary thereof.

"**Principal Property**" means a single manufacturing or processing plant, warehouse distribution facility or office owned or leased by the Company or a Principal Subsidiary which has a net book value in excess of 5% of Consolidated Net Tangible Assets other than a plant, warehouse, office or portion thereof which, in the opinion of the Company's Board of Directors, is not of material importance to the business conducted by the Company and its Subsidiaries as an entirety.

"**Principal Subsidiary**" means a Subsidiary that owns or leases any Principal Property except a Subsidiary (a) that transacts any substantial portion of its business and

<div align="center">30</div>

(h)    Contingent Obligations permitted by **Section 6.12**(h) hereof;

(i)    mergers and consolidations permitted by **Section 6.14** hereof;

(j)    loans and advances to directors, employees and officers of the Company and its Restricted Subsidiaries for *bona fide* business purposes in the ordinary course of business;

(k)    (i) Investments by any Loan Party in or to any other Loan Party, (ii) Investments by any Loan Party in  or to any Canadian Entity  or to any Wholly-Owned Subsidiary that is not a Guarantor, *provided* that (A) the sum of Investments made from and after the Fifth Amendment Effective Date under this clause (ii) shall not exceed an aggregate amount equal to $150,000,000 at any time outstanding (of which the sum, without duplication, of (1) the aggregate amount of Investments made in, to or on behalf of the Canadian Entities from and after the Canadian Restructuring Commencement Date under this clause (ii) and (2) the aggregate amount of payments made by any Loan Party from and after the Sixth Amendment Effective under any "e-payables" program of the Company or any of its Subsidiaries in respect of amounts due to any supplier or vendor of the Canadian Entities, shall not exceed an aggregate amount equal to $100,000,000) and (B) no Investment under this clause (ii) that is in the form of intercompany loans shall be evidenced by a promissory note unless such promissory note is pledged to the Administrative Agent in accordance with the terms of the Security Agreement, (iii) Investments by any Subsidiary that is not a Guarantor in or to any Loan Party, *provided* that any such Investment under this clause (iii) that is in the form of intercompany loans shall be unsecured and subordinated to the Obligations pursuant to the terms of the Intercompany Note (as defined in the Security Agreement) or other document having subordination terms substantially similar to the terms contained in the Intercompany Note or other document having subordination terms substantially similar to the terms contained in the Intercompany Note or otherwise reasonably satisfactory to the Administrative Agent and (iv) Investments between Subsidiaries that are not Guarantors or Investments by any Subsidiary that is not a Guarantor in a Canadian Entity , *provided* that if the Subsidiary making the Investment under this clause (iv) is a Wholly-Owned Subsidiary, the recipient of such Investment shall also be a Wholly-Owned Subsidiary; or a Canadian Entity; *provided, further*, that from and after the Canadian Restructuring Commencement Date, any Investments made pursuant to this clause (k) in or to the Canadian Entities shall be made in the form of intercompany loans that are secured by the assets of the Canadian Entities pursuant to Section 6.13(l);

(l)    Investments in securities of trade creditors or customers in the ordinary course of business that are received (i) in settlement of *bona fide* disputes or pursuant to any plan of reorganization or liquidation or similar arrangement upon the bankruptcy or insolvency of such trade creditors or customers or (ii) in the settlement of debts created in the ordinary course of business;

(m)    Investments in Joint Ventures in the United States existing as of the Fifth Amendment Effective Date and set forth on Schedule 6.15(B) for the purpose of

financing such entities' (i) operating expenses incurred in the ordinary course of business, (ii) reasonable Capital Expenditures and (iii) other reasonable obligations that are accounted for by the Company and its Restricted Subsidiaries as increases in equity in such Joint Ventures;

(n)    Investments in The Bloom Lake Iron Ore Mine Limited Partnership and Wabush Mines joint ventures so long as the Permitted Transaction Condition is satisfied; *provided* that no Investments shall be made pursuant to this clause (n) from and after the Canadian Restructuring Commencement Date;

(o)    so long as the Permitted Transaction Condition is satisfied, Investments of the Company and its Restricted Subsidiaries to make acquisitions of additional mining interests located in the United States or for other strategic or commercial purposes in the United States; *provided* that from and after the Fifth Amendment Effective Date, (i) after giving effect to any such Investment, no Default or Event of Default shall exist, (ii) the aggregate amount of consideration (excluding common equity interests of the Company) paid in respect of such Investments, together with (x) the aggregate amount of consideration paid in connection with an Acquisition made in reliance on clause (d) of the definition of "Restricted Investments" and (y) the aggregate amount of Investments made in reliance on clause (q) of the definition of "Restricted Investments" (excluding, in the case of clauses (x) and (y), the amount of such Acquisitions and Investments made using common equity of the Company), shall not exceed U.S. $200,000,000 from and after the Fifth Amendment Effective Date, and (iii) in the case of any such Investment in excess of U.S. $100,000,000, the Company shall deliver to the Administrative Agent at least 3 Business Days (or such shorter period as may be agreed to by the Administrative Agent) prior to such Investment, a certificate confirming *pro forma* compliance with the Permitted Transaction Condition;

(p)    [reserved]; and

(q)    Investments, not otherwise permitted under clauses (a) - (p), of the Company and its Restricted Subsidiaries so long as the Permitted Transaction Condition is satisfied; *provided* that from and after the Fifth Amendment Effective Date, (i) the aggregate amount of consideration (excluding common equity interests of the Company) paid in respect of such Investments, together with (x) the aggregate amount of consideration paid in connection with an Acquisition made in reliance on clause (d) of the definition of "Restricted Investments" and (y) the aggregate amount of Investments made in reliance on clause (o) of the definition of "Restricted Investments" (excluding, in the case of clauses (x) and (y), the amount of such Acquisitions and Investments made using common equity of the Company), shall not exceed U.S. $200,000,000 from and after the Fifth Amendment Effective Date and (ii) in the case of any such Investment in which the aggregate amount to be invested is greater than U.S. $100,000,000, the Company shall deliver to the Administrative Agent at least 3 Business Days (or such shorter period as may be agreed to by the Administrative Agent) prior to such Investment, a certificate confirming pro forma compliance with the Permitted Transaction Condition;

34

may be, to be customary in the place of disbursement or payment for the settlement of international banking transactions in the relevant Alternative Currency.

"**Sanction(s)**" means any sanction administered or enforced by the United States Government (including without limitation, OFAC), the United Nations Security Council, the European Union, Her Majesty's Treasury or other relevant sanctions authority.

"**Scotia Existing Letters of Credit**" means those letters of credit existing as of the Fifth Amendment Effective Date issued by The Bank of Nova Scotia, New York Agency for the benefit of the Company and its Subsidiaries and as set forth on Schedule 2.02.

"**SEC**" is defined in **Section 6.01(e)** hereof.

"**Secured Obligations**" means the Obligations, the Hedging Liability and the Funds Transfer and Deposit Account Liability;  *provided*, that Secured Obligations shall not include, with respect to any Guarantor, Excluded Swap Obligations of such Guarantor.

"**Secured Parties**" means, collectively, the Lenders, the Administrative Agent, each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to **Section 9.05**, and each other holder of Secured Obligations.

"**Security**" has the same meaning as in Section 2(1) of the Securities Act of 1933, as amended.

"**Security Agreement**" is defined in **Section 6.20(a)** hereof.

"**Senior Secured Debt**" means that portion of Total Funded Debt that is (a) outstanding under this Agreement or the Loan Documents or (b) secured by a Lien on any property or assets of the Company or any of its Restricted Subsidiaries.

"**Senior Secured Leverage Ratio**" means, at any time the same is to be determined, the ratio of (a) Senior Secured Debt to (b) EBITDA of the Company and its Restricted Subsidiaries for the four fiscal quarters of the Company most recently ended.

"**Sixth Amendment Effective Date**" means the date that the conditions precedent to the effectiveness of Amendment No. 6, dated as of January 22, 2015, to this Agreement have been satisfied or waived.

"**Sonoma**" means the unincorporated joint venture formed by QCoal Sonoma Pty Ltd, Watami (Qld) Pty Ltd, CSC Sonoma Pty Ltd, JS Sonoma Pty Ltd and Cliffs Australia Coal Pty Ltd, a Wholly-Owned Subsidiary of the Company, for the purpose of mining and developing a coal mine in Queensland, Australia, including the construction of a washplant by Cliffs Australia Washplant Operations Pty Ltd, an indirectly held Wholly-Owned Subsidiary of the Company.

36

(e)    any interest or title of a lessor under any operating lease;

(f)    easements, rights-of-way, restrictions, and other similar encumbrances against real property incurred in the ordinary course of business which, in the aggregate, are not substantial in amount and which do not materially detract from the value of the Property subject thereto or materially interfere with the ordinary conduct of the business of such Person;

(g)    Liens of or resulting from any judgment or ~~award, the time for the appeal or petition for rehearing of which shall not have expired, or in respect of which such Person shall at any time in good faith be prosecuting an appeal or proceeding for a review and in respect of which a stay of execution pending such appeal or proceeding for review shall have been secured, *provided* that, the aggregate amount of such judgments or awards secured by Liens permitted under this subsection, including interest and penalties thereon, if any, shall not be in excess of U.S. $50,000,000 (except to the extent fully (excluding any deductibles or self-insured retention) covered by insurance pursuant to which the insurer has accepted liability therefor in writing) at any one time outstanding;~~ judgments, writ or writs or warrant or warrants of attachment, or any similar process or processes which do not result in an Event of Default under Section 7.01(g);

(h)    Liens in the nature of royalties, dedications of reserves or similar rights or interests granted, taken subject to or otherwise imposed on properties consistent with normal practices in the iron ore mining industry;

(i)    Liens incurred in the ordinary course of business to secure the performance of tenders, statutory obligations (other than excise taxes), surety, stay, customs and appeal bonds, statutory bonds, bids, leases, government contracts, trade contracts, performance and return of money bonds and other similar obligations (exclusive of obligations for Indebtedness) or arising by virtue of deposits made in the ordinary course of business to security liability for premiums to insurance carriers and/or benefit obligations to claimants;

(j)    leases or subleases of properties, in each case entered into in the ordinary course of business so long as such leases or subleases do not, individually or in the aggregate, (i) interfere in any material respect with the ordinary conduct of the business of the Company and its Restricted Subsidiaries or (ii) materially impair the use (for its intended purposes) or the value of the Property subject thereto;

(k)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business in accordance with the past business practices of such Person, and any products or proceeds thereof to the extent covered by such Liens;

(l)    bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts, in each case granted in the ordinary course of business in favor of the bank or banks with which such

38

accounts are maintained, securing amounts owing to such bank with respect to cash management and operating account arrangements, including those involving pooled accounts and netting arrangements; provided that, unless such Liens are non consensual and arise by operation of Law, in no case shall any such Liens secure (either directly or indirectly) the repayment of any Indebtedness;

(m)    the filing of UCC financing statements in connection with operating leases, consignment of goods or bailment agreements; and

(n)    Liens securing reimbursement obligations with respect to trade or commercial letters of credit that encumber only the documents underlying such letters of credit and any products or proceeds thereof to the extent covered by such Liens.

"**Step 1 Collateral Completion Date**" means the date on which all of the requirements of **Section 6.20(a)** are completed or waived.

"**Step 2 Collateral Completion Date**" means the date on which all of the requirements of **Section 6.20(b)** are completed or waived.

"**S&P**" means Standard & Poor's Ratings Services Group, a division of The McGraw Hill Companies, Inc. and any successor thereto.

"**Subsidiary**" means, as to any particular parent corporation or organization, any other corporation or organization more than 50% of the outstanding Voting Stock of which is at the time directly or indirectly owned by such parent corporation or organization or by any one or more other entities which are themselves subsidiaries of such parent corporation or organization.

"**Swap Counterparty**" means, with respect to any swap with a Lender, any person or entity that is or becomes a party to such swap.

"**Swap Obligation**" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act between any Lender and one or more Swap Counterparties.

"**Swing Line**" means the credit facility for making one or more Swing Line Loans described in  **Section 2.10** hereof.

"**Swing Line Lender**" means Bank of America, in its capacity as provider of Swing Line Loans or any successor swing line lender hereunder.

"**Swing Line Sublimit**" means, collectively, $100,000,000 with the limitations that (i) the aggregate Outstanding Amount of Swing Line Loans denominated in U.S. Dollars shall at no time exceed U.S. $50,000,000, (ii) the aggregate Outstanding Amount of Swing Line Loans denominated in Canadian Dollars shall at no time exceed Cdn. $25,000,000, (iii) the aggregate Outstanding Amount of Swing Line Loans denominated

39

in Australian Dollars shall at no time exceed AUD 25,000,000 and (iv) the aggregate Outstanding Amount of Swing Line Loans denominated in any other Alternative Currency shall be zero; *provided* that the amounts specified in clauses (i) - (iv) may be modified from time to time by agreement between the Company and the Swing Line Lender.

"**Swing Line Loan**" and "**Swing Line Loans**" each is defined in **Section 2.10** hereof.

"**Swing Line Loan Notice**" means a notice of a Borrowing of Swing Line Loans pursuant to **Section 2.10(b)**, which, if in writing, shall be substantially in the form of **Exhibit A** and appropriately completed and signed by a Responsible Officer of the Company.

"**Swing Note**" means a promissory note made by the Company in favor of the Swing Line Lender evidencing Swing Line Loans made by the Swing Line Lender, substantially in the form of **Exhibit D-2**.

"**Swiss Francs**" means the lawful currency of the Swiss Confederation.

"**Syndication Agent**" means JPMorgan Chase Bank, N.A.

"**TARGET Day**" means any day on which the Trans-European Automated Real-time Gross Settlement Express Transfer (TARGET) payment system (or, if such payment system ceases to be operative, such other payment system (if any) determined by the Administrative Agent to be a suitable replacement) is open for the settlement of payments in Euro.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Termination Date**" means October 16, 2017, or such earlier date on which the Commitments are terminated in whole pursuant to **Section 2.09**, **7.02** or **7.03** hereof.

"**Third Amendment Effective Date**" means June 30, 2014.

"**Total Commitments**" means, at any time, the aggregate amount of Commitments, which shall be ~~One Billion One~~ Nine Hundred ~~Twenty-Five~~ Million Dollars (U.S. $~~1,125,000,000~~900,000,000) on the ~~Fifth~~Sixth Amendment Effective Date and which may be increased pursuant to **Section 2.01(b)** hereof or decreased pursuant to **Section 2.09** or other applicable provisions hereof ~~.~~; *provided; however,* that on May 31, 2015, the aggregate amount of Commitments shall be automatically reduced to Seven Hundred Fifty Million Dollars (U.S. $750,000,000), with such reduction being applied pro rata to the outstanding Commitments immediately prior to such reduction.

40

component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.09. *Liability of Designated Borrowers.* The parties intend that this Agreement shall in all circumstances be interpreted to provide that each Designated Borrower is liable only for obligations with respect to Loans or Letters of Credit made to or issued on behalf of such Designated Borrower (including, without limitation, principal and interest on such Loans and reimbursement obligations with respect to such Letters of Credit) and ongoing obligations related thereto under **Articles 2** and 8 hereof, and its pro rata share of otherwise unallocated general fees, reimbursements and charges hereunder and under any other Loan Document.

Section 1.10. *Hybrid Securities.* For purposes of determining Total Funded Debt and Net Worth, Hybrid Securities shall be accorded the same capital treatment as given to such Hybrid Securities by either S&P or Moody's (whichever gives the lower treatment) at the time of issuance thereof; provided, however, that the maximum amount of Hybrid Securities that may be included in Net Worth and excluded from Total Funded Debt shall not at any time exceed 15% of the sum of Total Funded Debt plus Net Worth, in each case including such Hybrid Securities in accordance with their capital treatment by either S&P or Moody's (whichever is used in accordance with this paragraph).

ARTICLE 2
THE CREDIT FACILITIES

Section 2.01. *Revolving Credit Facilities.* (a) *Revolving Loans.* Prior to the Termination Date, each Lender severally and not jointly agrees, subject to the terms and conditions hereof, to make revolving loans (each individually a "**Revolving Loan**" and, collectively, the "**Revolving Loans**") in U.S. Dollars and Alternative Currencies to the Borrowers from time to time in an aggregate outstanding U.S. Dollar Equivalent up to the amount of such Lender's Commitment; *provided*, *however*, that after giving effect to any Borrowing (i) the Total Outstandings shall not exceed the Total Commitments in effect at such time ~~, provided that (A) if the Step 1 Collateral Completion Date has not occurred by the Fifth Amendment Effective Date, the Total Outstandings shall also not exceed U.S. $750,000,000 until the earlier of the Step 1 Collateral Completion Date and the fifteenth (15th) day after the Fifth Amendment Effective Date, (B) if the Step 1 Collateral Completion Date has not occurred by such fifteenth (15th) day, from and after the sixteenth (16th) day after the Fifth Amendment Effective Date, the Total Outstandings shall also not exceed U.S. $500,000,000 until the earlier of the Step 1 Collateral Completion Date and the fifty-ninth (59th) day after the Fifth Amendment Effective Date, (C) if the Step 1 Collateral Completion Date has not occurred by such fifty-ninth (59th) day, from and after the sixtieth (60th) day following the Fifth Amendment Effective Date, the Total Outstandings shall also not exceed U.S. $300,000,000; and (D) each of the amounts in clauses (A), (B) and (C) (each of such amounts, the "**Applicable Adjusted Total Commitments**") shall be reduced by U.S. $110,000,000 if the Permitted~~

46

~~Securitization Financing Payoff has not occurred by such date~~, (ii) the aggregate Outstanding Amount of the Revolving Loans of any Lender, plus such Lender's Percentage of the Outstanding Amount of all L/C Obligations, plus such Lender's Percentage of the Outstanding Amount of all Swing Line Loans shall not exceed such Lender's Commitment, and (iii) the sum of (x) the aggregate Outstanding Amount of Alternative Currency Loans and Letters of Credit denominated in an Alternative Currency and (y) the aggregate Outstanding Amount of Loans denominated in U.S. Dollars made to Designated Borrowers shall not exceed the Foreign Sublimit. Each Borrowing of Revolving Loans shall be made ratably by the Lenders in proportion to their respective Percentages. As provided in **Section 2.04(a)**, and subject to the terms hereof, the Company may elect that each Borrowing of Revolving Loans denominated in U.S. Dollars be either Base Rate Loans or Eurocurrency Loans. All Loans denominated in an Alternative Currency shall be Eurocurrency Loans. Revolving Loans may be repaid and reborrowed before the Termination Date, subject to the terms and conditions hereof.

(b)    *Commitment Increases*. The Company shall be entitled, from time to time, to request that the Total Commitments be increased to an aggregate amount not to exceed Two Billion Dollars (U.S. $2,000,000,000) (such additional Commitments are referred to herein as the "**Additional Commitments**"); *provided* that (i) at the time of giving effect to any such Commitment increase, the conditions specified in **Sections 3.02(a)** and **(b)** would be satisfied if the full amount of the Commitments as increased were borrowed at such time, (ii) any such increase shall be in a minimum amount of U.S. $50,000,000, (iii) no Lender shall be obligated to increase such Lender's Commitment without such Lender's written consent, which may be withheld in such Lender's sole discretion, and (iv) any Person providing any Additional Commitment shall be an Eligible Assignee (if such Person is not already a Lender). In connection with any such increase in the Total Commitments the parties shall execute any documents reasonably requested in connection with or to evidence such increase, including without limitation, an amendment to this Agreement.

(c)    *Adjustments.* On the date ("**Funding Date**") of any increase in the Total Commitments permitted by this Agreement, which date shall be designated by the Administrative Agent, each Lender who has an Additional Commitment shall fund to the Administrative Agent such amounts as may be required to cause each such Lender to hold its Percentage of Revolving Loans based upon the Commitments as of such Funding Date, and the Administrative Agent shall distribute the funds so received to the other Lenders in such amounts as may be required to cause each of them to hold its Percentage of Revolving Loans as of such Funding Date. The Lenders receiving such amounts to be applied to Eurocurrency Loans may demand payment of the breakage costs under **Section 8.01** hereof as though the applicable Borrower had elected to prepay such Eurocurrency Loans on such date and such Borrower shall pay the amount so demanded as provided in **Section 8.01**. The first payment of interest and Letter of Credit Fees received by the Administrative Agent after such Funding Date shall be paid to the Lenders in amounts adjusted to reflect the adjustments of their respective Percentages as of the Funding Date. On the Funding Date each Lender shall be deemed to have either sold or purchased, as applicable, a participating interest in Swing Line Loans, L/C Obligations and L/C

47

association or operating agreement, partnership agreement or other similar document) of the Company or any Restricted Subsidiary, (b) contravene or constitute a default under any covenant, indenture or agreement of or affecting the Company or any Restricted Subsidiary or any of its Property, in each case where such contravention or default, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect or (c) result in the creation or imposition of any Lien on any Property of the Company or any Restricted Subsidiary.

Section 5.03.    *Financial Reports.* The audited consolidated financial statements of the Company and its Restricted Subsidiaries as at December 31, 2013, and the unaudited interim consolidated financial statements of the Company and its Restricted Subsidiaries as at March 31, 2014, for the 3 months then ended, heretofore furnished to the Administrative Agent, fairly and adequately present, in all material respects, the consolidated financial condition of the Company and its Restricted Subsidiaries as at said dates and the consolidated results of their operations and cash flows for the periods then ended in conformity with GAAP applied on a consistent basis. Except as set forth on **Schedule 5.3**, neither the Company nor any Restricted Subsidiary has contingent liabilities or judgments, orders or injunctions against it that are material to it other than as indicated on such financial statements or, with respect to future periods, on the financial statements furnished pursuant to **Section 6.01** hereof.

Section 5.04.    *No Material Adverse Change.* Since December 31, 2013, there has been no change in the condition (financial or otherwise) of the Company and its Restricted Subsidiaries except ~~those occurring in the ordinary course of business, none of which~~ such changes which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 5.05.    *Litigation and Other Controversies.* Except as set forth on **Schedule 5.5** and the Arbitration Award, there is no litigation, arbitration or governmental proceeding pending or, to the knowledge of the Company and its Restricted Subsidiaries, threatened against the Company or any of its Restricted Subsidiaries that could reasonably be expected to have a Material Adverse Effect.

Section 5.06.    *True and Complete Disclosure.* All information furnished by or on behalf of the Company or any of its Restricted Subsidiaries in writing to the Administrative Agent or any Lender for purposes of or in connection with this Agreement, or any transaction contemplated herein, is true and accurate in all material respects and not incomplete by omitting to state any material fact necessary to make such information (taken as a whole) not materially misleading in light of the circumstances under which such information was provided; *provided* that to the extent any such information was based upon or constitutes a forecast or projection, the Company represents only that it acted in good faith and utilized assumptions reasonable at the time made and due care in the preparation of such information, report, financial statement, exhibit or schedule.

Section 5.07.    *Use of Proceeds; Margin Stock.* (a) All proceeds of Loans shall be used by the Company to refinance certain existing indebtedness and for working

80

Section 5.15.    *Good Title.* The Company and its Restricted Subsidiaries have good and marketable title, or valid leasehold interests, to their assets as reflected on the Company's most recent consolidated balance sheet provided to the Administrative Agent, except for sales of assets in the ordinary course of business, subject to no Liens, other than Permitted Liens.

Section 5.16.    *Labor Relations.* Neither the Company nor any of its Restricted Subsidiaries is engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect. There is no strike, labor dispute, slowdown or stoppage pending against the Company or any of its Restricted Subsidiaries or, to the best knowledge of the Company and its Restricted Subsidiaries, threatened against the Company or any of its Restricted Subsidiaries, except such as could not reasonably be expected to have a Material Adverse Effect.

Section 5.17.    *Capitalization.* Except as disclosed on **Schedule 5.17**, as of the Closing Date, all outstanding equity interests of the Company and each Restricted Subsidiary have been duly authorized and validly issued, and are fully paid and nonassessable, and there are no outstanding commitments or other obligations of the Company or any Restricted Subsidiary to issue, and no rights of any Person to acquire, any equity interests in the Company or any Restricted Subsidiary.

Section 5.18.    *Other Agreements.* Neither the Company nor any Restricted Subsidiary is in default under the terms of any covenant, indenture or agreement (other than any covenant, indenture or agreement related to the Canadian Existing Indebtedness) of or affecting the Company, any Restricted Subsidiary or any of their Property, which default if uncured could reasonably be expected to have a Material Adverse Effect.

Section 5.19.    *Governmental Authority and Licensing.* The Company and its Restricted Subsidiaries have received all licenses, permits, and approvals of all Governmental Authorities, if any, necessary to conduct their businesses, in each case where the failure to obtain or maintain the same could reasonably be expected to have a Material Adverse Effect. No investigation or proceeding with respect to any such licenses, permits and approvals that, if adversely determined, could reasonably be expected to result in a Material Adverse Effect is pending or, to the knowledge of the Company and its Restricted Subsidiaries, threatened.

Section 5.20.    *Approvals.* No authorization, consent, license or exemption from, or filing or registration with, any Governmental Authority, nor any approval or consent of any other Person, is or will be necessary to the valid execution, delivery or performance by the Company or any Restricted Subsidiary of any Loan Document, except for such approvals which have been obtained prior to the date of this Agreement and remain in full force and effect.

Section 5.21.    *Affiliate Transactions.* Except in connection with any Investment permitted hereunder or as set forth in **Schedule 5.21** hereof, neither the Company nor any Restricted Subsidiary is a party to any contract or agreement with any of its Affiliates

83

(other than any contract or agreement between the Company and any Domestic Subsidiary which is a Guarantor or between any Domestic Subsidiary which is a Guarantor and any other Domestic Subsidiary which is a Guarantor) on terms and conditions which are less favorable, taken as a whole, to the Company or such Restricted Subsidiary than would be usual and customary in similar contracts or agreements between Persons not affiliated with each other.

Section 5.22.    *Solvency.* The Company and its Restricted Subsidiaries (other than the Canadian Entities from and after the Canadian Restructuring Commencement Date), when taken as a whole, are solvent, able to pay their debts as they become due, and have sufficient capital to carry on their business and all businesses in which they are about to engage.

Section 5.23.    *Economic Sanctions.* Neither the Company, nor any of its Restricted Subsidiaries, nor, to the knowledge of the Company and its Restricted Subsidiaries, any director, officer, employee, agent, affiliate or representative thereof, is an individual or entity currently the subject of any Sanctions, nor is the Company or any Restricted Subsidiary located, organized or resident in a Designated Jurisdiction.

Section 5.24.    *No Default.* No Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

Section 5.25.    *Anti-Corruption Laws*. The Company and its Subsidiaries have conducted their businesses for the past five years in compliance with applicable anti-corruption laws in all material respects and have policies and procedures designed, in the Company's business judgment, to promote and achieve compliance with such laws.

Section 5.26.    *Patriot Act.* The Company and its Restricted Subsidiaries are in compliance, in all material respects, with the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Patriot Act**").

Section 5.27.    *Collateral Documents.* The Collateral Documents, upon their due execution and delivery, will create in favor of the Administrative Agent for the benefit of the Secured Parties a valid and, together with such filings and other actions necessary to perfect and protect the Liens in the Collateral created under and in the manner contemplated by the Collateral Documents and **Section 6.20**, perfected first priority Lien in the Collateral, securing the payment of the Secured Obligations, subject to Liens permitted by the Loan Documents.

ARTICLE 6
COVENANTS

The Company covenants and agrees that, so long as any Loans or Letters of Credit are available to any Borrower hereunder and until all Obligations are paid in full:

84

Section 6.01.    *Information Covenants.* The Company will furnish to the Administrative Agent, with sufficient copies for each Lender:

(a)    *Quarterly Statements.* Within 60 days after the close of each quarterly accounting period in each fiscal year of the Company, a consolidated balance sheet as at the end of such quarterly accounting period and the related consolidated statements of income and retained earnings and of cash flows for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly accounting period, in each case setting forth comparative figures for the related periods in the prior fiscal year, all of which shall be in reasonable detail, prepared by the Company in accordance with GAAP, and certified by the chief financial officer or other officer of the Company acceptable to the Administrative Agent that they fairly present in all material respects in accordance with GAAP the financial condition of the Company and its Restricted Subsidiaries as of the dates indicated and the results of their operations and changes in their cash flows for the periods indicated, subject to normal year end audit adjustments and the absence of footnotes. Any items required to be delivered pursuant to this Section need not to be separately delivered to the Administrative Agent if such items are publicly available through the SEC; provided that such items are filed with the SEC within the time allotted in this Section and, with respect to each such item other than a Form 10-K or a Form 10-Q, the Company furnishes to the Administrative Agent within the time allotted in this **Section 6.01(a)** written or electronic notice of such filing.

(b)    *Annual Statements.* Within 90 days after the close of each fiscal year of the Company, a consolidated balance sheet as of the last day of the fiscal year then ended and the related consolidated statements of income and retained earnings and of cash flows for the fiscal year then ended, and accompanying notes thereto, each in reasonable detail showing in comparative form the figures for the previous fiscal year, accompanied by an unqualified opinion (as to scope and going concern) of a firm of independent public accountants of recognized national standing, selected by the Company and acceptable to the Administrative Agent, to the effect that the consolidated financial statements have been prepared in accordance with GAAP and present fairly in accordance with GAAP the consolidated financial condition of the Company and its Restricted Subsidiaries as of the close of such fiscal year and the results of their operations and cash flows for the fiscal year then ended and that an examination of such accounts in connection with such financial statements has been made in accordance with generally accepted auditing standards. Any items required to be delivered pursuant to this Section need not to be separately delivered to the Administrative Agent if such items are publicly available through the SEC; *provided* that such items are filed with the SEC within the time allotted in this Section and, with respect to each such item other than a Form 10-K or a Form 10-Q, the Company furnishes to the Administrative Agent within the time allotted in this **Section 6.01(a)** written or electronic notice of such filing.

(c)    *Officer's Certificates.* At the time of the delivery of the financial statements provided for in ~~(a)~~**Section 6.01(a)** and **(b)**, except for financial statements delivered pursuant to **Section 6.01(a)** with respect to a fiscal quarter that ends on the same date as

85

Administrative Agent or any Lender, to visit and inspect any Property of the Company or such Restricted Subsidiary, and to examine the books of account of the Company or such Restricted Subsidiary and discuss the affairs, finances and accounts of the Company or such Restricted Subsidiary with its and their officers and independent accountants, all at such reasonable times upon reasonable advance notice as the Administrative Agent or any Lender may request; *provided*, *however*, that prior to the occurrence and continuance of an Event of Default, such visitations and inspections shall be no more frequent than once per fiscal year and shall be at the sole cost and expense of the Administrative Agent or such Lender.

Section 6.03. *Maintenance of Property, Insurance, Environmental Matters, Etc.* (a) The Company will, and will cause each of its Restricted Subsidiaries (other than the Canadian Entities) to, (i) keep its operating property, plant and equipment in good repair, working order and condition, normal wear and tear excepted, and shall from time to time make all needful and proper repairs, renewals, replacements, extensions, additions, betterments and improvements thereto so that at all times such property, plant and equipment are reasonably preserved and maintained and (ii) maintain in full force and effect with financially sound and reputable insurance companies insurance which provides substantially the same (or greater) coverage and against at least such risks as is in accordance with industry practice for operating plant and equipment, and shall furnish to the Administrative Agent upon request full information as to the insurance so carried.

(b) Without limiting the generality of **Section 6.03(a)**, the Company and its Restricted Subsidiaries, except to the extent that the aggregate effect of their failures to do so could not reasonably be expected to have a Material Adverse Effect: (i) shall comply with, and maintain all real property in compliance with, any applicable Environmental Laws; (ii) shall obtain and maintain in full force and effect all governmental approvals required for its operations at or on its properties by any applicable Environmental Laws; (iii) shall cure as soon as reasonably practicable any violation of applicable Environmental Laws with respect to any of its properties; (iv) shall not, and shall not permit any other Person to, own or operate on any of its properties any unauthorized landfill or dump or hazardous waste treatment, storage or disposal facility as defined pursuant to the RCRA, or any comparable state, provincial or territorial law, or any comparable law of any other jurisdiction; and (v) shall not use, generate, transport, treat, store, release or dispose of Hazardous Materials at or on any of the real property except in the ordinary course of its business and in compliance with all Environmental Laws. With respect to any Release of Hazardous Materials, the Company and its Restricted Subsidiaries shall conduct any necessary or required investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other response action necessary to remove, cleanup or abate any material quantity of Hazardous Materials released at or on any of its properties as required by any applicable Environmental Law.

Section 6.04. *Preservation of Existence.* The Company will, and will cause each of its Restricted Subsidiaries (other than the Canadian Entities) to, do or cause to be done, all things necessary to preserve and keep in full force and effect its existence and, except

88

Foreign Subsidiary, GAAP as in effect in any applicable local jurisdiction, consistently applied shall be made of all financial transactions and matters involving the assets and business of the Company or such Restricted Subsidiary, as the case may be; and (b) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Company or such Restricted Subsidiary, as the case may be.

Section 6.09.    *Contracts with Affiliates*. Except in connection with any Investment permitted hereunder or as set forth in   **Schedule 5.21**, the Company shall not, nor shall it permit any of its Restricted Subsidiaries to, enter into any contract, agreement or business arrangement with any of its Affiliates (other than any arrangement between the Company and any Domestic Subsidiary which is a Guarantor or between any Domestic Subsidiary which is a Guarantor and any other Domestic Subsidiary which is a Guarantor) on terms and conditions which are less favorable to the Company or such Restricted Subsidiary than would be usual and customary in similar contracts, agreements or business arrangements between Persons not affiliated with each other.

Section 6.10.    *No Changes in Fiscal Year*. The Company shall not change its fiscal year from its present basis.

Section 6.11.    *Change in the Nature of Business*. The Company shall not, nor shall it permit any of its Restricted Subsidiaries to, engage in any business or activity if as a result the general nature of the business of the Company or any Restricted Subsidiary would be changed in any material respect from the general nature of the business engaged in by it as of the Closing Date; *provided*, *however*, that the foregoing shall not prevent the acquisition by the Company or any of its Restricted Subsidiaries of, or the entry into, any line of business that is related or complementary to the business in which they are engaged on the Closing Date. Notwithstanding anything to the contrary herein, the Company shall not permit Cleveland-Cliffs International Holding Company to (a) own any assets other than equity interests in Foreign Subsidiaries, 0(b) construct, create, incur, assume or suffer to exist any Indebtedness (other than as permitted pursuant to **Section 6.12(b)**), and (c) create, incur or suffer to exist any Lien created for the purpose of securing Indebtedness.

Section 6.12.    *Indebtedness*. The Company will not, nor will it permit any of its Restricted Subsidiaries to, contract, create, incur, assume or suffer to exist any Indebtedness, except:

(a)    the Obligations, Hedging Liability, and Funds Transfer and Deposit Account Liability of the Company and its Restricted Subsidiaries owing to the Administrative Agent and the Lenders (and their Affiliates);

(b)    intercompany Indebtedness among the Company and its Restricted Subsidiaries to the extent permitted by Section 6.15   (other than pursuant to clause (q) of the definition of "Restricted Investments");

90

(c)    0(i) purchase money Indebtedness of the Company and its Restricted Subsidiaries, including any such Indebtedness assumed in connection with a Permitted Acquisition, (ii) Capitalized Lease Obligations of the Company and its Restricted Subsidiaries, including any such obligations assumed in connection with a Permitted Acquisition, and (iii) Indebtedness incurred to finance the acquisition, construction or improvement of any fixed or capital assets ("**Project Indebtedness**"), including any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on such assets before the acquisition thereof, and any refinancings of any such Project Indebtedness; provided that, with respect to Project Indebtedness permitted by clause **(iii)** of this Section, (w) such Project Indebtedness is initially incurred before or within 180 days after such acquisition or the completion of such construction or improvement, (x) such Project Indebtedness shall be secured only by the Property acquired, constructed or improved in connection with the incurrence of such Project Indebtedness, (y) with respect to such Project Indebtedness assumed in connection with a Permitted Acquisition, the amount of such Project Indebtedness shall not exceed 100% of the Total Consideration paid in connection with such Permitted Acquisition and (z) with respect to Project Indebtedness incurred to finance the acquisition of any fixed or capital assets, such Project Indebtedness shall constitute not more than 100% of the aggregate consideration paid with respect to such Property; *provided* that the aggregate amount at any time outstanding of all such Indebtedness incurred pursuant to this clause (c) from and after the Fifth Amendment Effective Date shall not exceed U.S. $100,000,000;

(d)    customer advances for prepayment of ore sales;

(e)    ~~(i) until the date that is 30 days after the Fifth Amendment Effective Date, Indebtedness not to exceed U.S. $110,000,000 in respect of the Permitted Securitization Financing (it being understood and agreed that the Permitted Securitization Financing Payoff shall occur within 30 days of the Fifth Amendment Effective Date and that the Permitted Securitization Financing shall be subject to **Section 2.01** until such payoff occurs) and (ii)~~ AUD 30,000,000 in respect of the Portman Limited Facility;

(f)    Other Hedging Liability to any Person, in all cases incurred in the ordinary course of business and not for speculative purposes;

(g)    Indebtedness in respect of bid, performance, surety, reclamation or other similar bonds or guaranties in the ordinary course of business, or any similar financial assurance obligations under Environmental Laws or worker's compensation Laws or with respect to self insurance obligations, including guarantees or obligations with respect to letters of credit supporting such obligations (in each case other than for an obligation for money borrowed);

(h)    Contingent Obligations in respect of Indebtedness otherwise permitted under this **Section 6.12** (excluding~~, for the avoidance of doubt,~~ (x) guarantees by any Restricted Subsidiary of any obligations of the Company other than pursuant to the Loan Documents and (y) from and after the Sixth Amendment Effective Date, guarantees by

91

the Company or any Restricted Subsidiary (other than any Canadian Entity) of any Indebtedness of a Canadian Entity);

(i)    Indebtedness incurred in connection with any sale/leaseback transaction;  *provided*, that such Indebtedness incurred from and after the Fifth Amendment Effective Date shall be in an aggregate amount not to exceed U.S. $100,000,000 at any time outstanding;

(j)    Indebtedness of Non-Guarantor Subsidiaries (i) listed on Schedule 6.12, or (ii) not otherwise permitted by this Section;  *provided* that the aggregate amount at any time outstanding of all such Indebtedness referenced in this subclause (ii) shall not exceed U.S. $75,000,000; and

(k)    unsecured Indebtedness of the Company and the Guarantors not otherwise permitted by this Section;  *provided* that from and after the Fifth Amendment Effective Date, (i) immediately after giving effect to such Indebtedness, the Company shall be in pro forma compliance with the financial covenant set forth in **Section 6.18(b)**; and (ii) no such Indebtedness in excess of U.S. $25,000,000 shall be incurred unless both the Step 1 Collateral Completion Date and the Step 2 Collateral Completion Date shall have occurred;

(l)    Indebtedness of any Canadian Entity from and after its Canadian Restructuring Commencement Date that is incurred from a third party pursuant to or as required by a court order, judgment, order or ruling by a Governmental Authority or a similar proceeding in connection with the Canadian Restructuring;

*provided* that notwithstanding anything to the contrary set forth in any exception to this  **Section 6.12**, in any case the Company shall not permit any Guarantor to, and no Guarantor shall, create, incur, assume or suffer to exist any guarantee or other credit support in respect of any Bonds.

Section 6.13.    *Liens.* The Company will not, nor will it permit any of its Restricted Subsidiaries to, create, incur or suffer to exist any Lien on any of its Property; *provided* that the foregoing shall not prevent the following (the Liens described below, the " **Permitted Liens**"):

(a)    Standard Permitted Liens;

(b)    Liens on Property of the Company or any Restricted Subsidiary created solely for the purpose of securing Indebtedness permitted by   **Section 6.12(c)** hereof, representing or incurred to finance such Property, provided that, with respect to Indebtedness described in clauses   **(i)** and **(ii)** of such Section, no such Lien shall extend to or cover other Property of the Company or such Restricted Subsidiary other than the respective Property so acquired, and the principal amount of Indebtedness secured by any such Lien shall at no time exceed the purchase price of such Property, as reduced by repayments of principal thereon;

92

(c)   any Lien in existence on the Fifth Amendment Effective Date and set forth on Schedule 6.13, any continuation or extension thereof or any Lien granted as a replacement or substitute therefor; provided that any such continued, extended, replacement or substitute Lien (i) except as permitted by **Section 6.12**, does not secure an aggregate amount of Indebtedness, if any, greater than that secured on the Fifth Amendment Effective Date, and (ii) does not encumber any Property other than the Property subject thereto on the Fifth Amendment Effective Date and any products or proceeds thereof to the extent covered by such Lien;

(d)   Liens in favor of the Administrative Agent on cash collateral provided pursuant to **Section 2.02(g)**;

(e)   Liens on Property of the Company or any Restricted Subsidiary created solely for the purpose of securing Indebtedness permitted by **Section 6.12(i)**; provided that any such Liens attach only to the Property being leased or acquired pursuant to such Indebtedness and do not encumber any other Property (other than any products or proceeds thereof to the extent covered by such Liens);

(f)   Liens solely on any cash earnest money deposits in connection with any letter of intent or purchase agreement entered into in connection with a Permitted Acquisition;

(g)   Liens on cash or Cash Equivalents securing reimbursement obligations with respect to any standby letter of credit entered into in the ordinary course of business;

(h)   Liens solely on the assets of the Cliffs Sonoma Entities in favor of the Cliffs Sonoma Entities' joint venture partners in Sonoma; provided, that such Liens shall secure only amounts owed by Sonoma and the Cliffs Sonoma Entities to such joint venture partners;

(i)   Liens ~~incurred in connection with the Permitted Securitization Financing~~ on assets of a Canadian Entity securing obligations of any Canadian Entity other than Indebtedness for borrowed money;

(j)   other Liens with respect to obligations that do not in the aggregate exceed U.S. $25,000,000 at any time outstanding; ~~and~~

(k)   Liens on the assets of Non-Guarantor Subsidiaries securing Indebtedness of Non-Guarantor Subsidiaries permitted under **Section 6.12(j)**;

(l)   Liens on the assets of the Canadian Entities securing Investments in the form of intercompany loans permitted by clause (k) and clause (n) of the definition of "Restricted Investments"; *provided* that Liens granted by any Canadian Entity in favor of any Loan Party shall be senior to any Lien granted by such Canadian Entity to a Restricted Subsidiary that is not a Loan Party; and

93

(m)    Liens on the assets of the Canadian Entities securing Indebtedness of the Canadian Entities permitted by Section 6.12(l);

*provided* that notwithstanding anything to the contrary set forth in any exception to this **Section 6.13**, in any case the Company shall not, and shall not permit any of its Restricted Subsidiaries to, create, incur or suffer to exist any Lien (A) in reliance on the CNTA Basket, other than pursuant to the Collateral Documents, (B) on Collateral or any property of the type that is or will be required to be pledged pursuant to **Section 6.20**, other than (1) pursuant to the Collateral Documents, (2) consisting of customary restrictions in any agreement to dispose of such property in a transaction permitted by **Section 6.14** and (3) Liens permitted under clause **(i)** of this **Section 6.13** and clauses (c), (g), (h), (k), (m) and (n) of the definition of Standard Permitted Liens or (C) that would require any Bonds to be equally and ratably secured with the obligations secured by such Lien.

Section 6.14.    *Consolidation, Merger, Sale of Assets, etc.* The Company will not, nor will it permit any of its Restricted Subsidiaries to, wind up, liquidate or dissolve its affairs or agree to any merger, amalgamation or consolidation, or convey, sell, lease or otherwise dispose of all or any part of its operating properties, including any disposition as part of any sale leaseback transactions except that this Section shall not prevent:

(a)    the sale and lease of inventory in the ordinary course of business;

(b)    the sale, transfer or other disposition of any tangible personal property that, in the reasonable judgment of the Company or its Restricted Subsidiaries, has become uneconomic, obsolete or worn out;

(c)    the sale, transfer, lease, or other disposition of Property (i) of any Loan Party to another Loan Party, (ii) of any Subsidiary that is not a Loan Party to any Loan Party, (iii) of any Subsidiary that is not a Loan Party to any other Subsidiary that is not a Loan Party, *provided* that if the transferor under this clause (iii) is a Wholly-Owned Subsidiary, the transferee shall also be a Wholly-Owned Subsidiary, and (iv) of any Loan Party to any Wholly-Owned Subsidiary that is not a Loan Party, *provided* that if such transaction under this clause (iv) constitutes an Investment, such transaction is permitted under clause (k) of the definition of "Restricted Investments;

(d)    the merger of any Wholly-Owned Subsidiary with and into the Company or any other Wholly-Owned Subsidiary,    *provided* that, (i) in the case of any merger involving the Company, the Company is the legal entity surviving the merger and (ii) in the case of any merger involving a Domestic Subsidiary which is a Restricted Subsidiary and a Foreign Subsidiary which is a Restricted Subsidiary, such Domestic Subsidiary is the legal entity surviving the merger (*provided*, that in the case of a merger, amalgamation or consolidation between 7261489 Canada Inc. or Wabush Resources Inc. and Wabush Iron Co. Limited, either 7261489 Canada Inc. or Wabush Resources Inc. may be the surviving entity);

94

(e)    ~~[reserved];~~(i) the sale, transfer, lease, or other disposition of Property by any Canadian Entity, in any single transaction or series of related transactions, to a third party buyer or (ii) the wind-up, liquidation, dissolution, merger, amalgamation or consolidation of any Canadian Entity in connection with any sale, transfer, lease, or other disposition made pursuant to clause (e)(i);

(f)    [reserved];

(g)    [reserved];

(h)    any Restricted Subsidiary may dissolve, liquidate or wind up its affairs at any time;  *provided* that such dissolution, liquidation or winding up, as applicable, would not reasonably be expected to result in a Material Adverse Effect;

(i)    licenses or leases of real or personal property in the ordinary course of business so long as such licenses or leases do not individually or in the aggregate interfere in any material respect with the ordinary conduct of the business of the Company and its Restricted Subsidiaries;

(j)    licenses, sublicenses or similar transactions of intellectual property in the ordinary course of business so long as such licenses or sublicenses or similar transactions do not individually or in the aggregate interfere in any material respect with the ordinary conduct of the business of the Company and its Restricted Subsidiaries;

(k)    the sale or other disposition of those Investments permitted by clauses (f), (k), (l) and (p) of the definition of Restricted Investments;

(l)    any merger or consolidation of the Company or any Restricted Subsidiary in connection with a Permitted Acquisition,  *provided* that (i) subject to the following clause (ii), in the case of any merger involving any Wholly Owned Subsidiary which is a Restricted Subsidiary, such Wholly Owned Subsidiary is the legal entity surviving the merger, (ii) in the case of any merger involving the Company, the Company is the legal entity surviving the merger, and (iii) in the case of any merger involving a Foreign Subsidiary which is a Restricted Subsidiary and a Domestic Subsidiary which is a Restricted Subsidiary, such Domestic Subsidiary is the legal entity surviving the merger; and

(m)    the sale, transfer, lease, or other disposition of Property of the Company or any Restricted Subsidiary, in any single transaction or series of related transactions, which are not sales, transfers, leases, or disposition of all or substantially all of the assets of the Company and its Restricted Subsidiaries, taken as a whole; *provided* that (i) the Company shall be in pro forma compliance with  **Section 6.18** hereof and in the case of any sale, lease, transfer or other disposition in excess of U.S. $100,000,000 shall deliver to the Administrative Agent at least 3 Business Days (or such shorter period as may be agreed by the Administrative Agent) prior to any such transaction a certificate confirming such pro forma compliance with **Section 6.18**, (ii) no sale, transfer, lease or other

95

disposition of iron ore assets in the United States or any Equity Interests in Joint Ventures or any other Person holding such iron ore assets in the United States shall be permitted under this clause (m) (other than the sale of the assets or the common stock of Cliffs Erie) and (iii) no sale, transfer, lease or other disposition of Property under this clause (m) shall be permitted if after giving effect thereto, Liens on any then-remaining existing Collateral will have to be released in order for CNTA Covered Indebtedness to be within the CNTA Basket (assuming for purposes of this determination that all such CNTA Covered Indebtedness was incurred at such time);

*provided* that notwithstanding anything to the contrary set forth in any exception to this  **Section 6.14**, in any case (1) the Company shall not, and shall not permit any of its Restricted Subsidiaries to, enter into any sale and leaseback transaction (A) in reliance on the CNTA Basket or (B) that would require any Bonds to be equally and ratably secured with any other obligations and (2) the Company shall not permit any Guarantor to transfer any property or assets (other than cash to the extent otherwise permitted under the terms of this Agreement) to the Company.

Section 6.15.    *Restricted Investments Prohibited.* The Company will not, nor will it permit any of its Restricted Subsidiaries to, have, make or authorize any Restricted Investments.

Section 6.16.    *Dividends and Certain Other Restricted Payments.*

(a)    After the occurrence and during the continuation of a Default or an Event of Default, the Company shall not, nor shall it permit any of its Restricted Subsidiaries to, (i) declare or pay any dividends on or make any other distributions in respect of any class or series of its capital stock or other equity interests (other than a dividend payable solely in stock or other equity interests) or (ii) directly or indirectly purchase, redeem, or otherwise acquire or retire any of its capital stock or other equity interests or any warrants, options, or similar instruments to acquire the same; provided, however, that the foregoing shall not operate to prevent the making of dividends or distributions, (x) by any Restricted Subsidiary of the Company to its parent corporation or (y) previously declared by the Company if at the declaration date such payment was permitted by the foregoing or (iii) prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner (it being understood that payments of regularly scheduled principal, interest and mandatory prepayments shall be permitted) of any Bonds or any unsecured Indebtedness of any Company or any Subsidiary under **Section 6.12(k)** (actions described in this clause (iii), "**Junior Debt Prepayments**").

(b)    In addition to and without limiting the requirements of  **Section 6.16(a)**, (i) the aggregate amount of dividends and distributions referred to in clause **(i)** of **Section 6.16(a)** shall not exceed U.S. $~~0.150~~0.01 per common share in any fiscal quarter and U.S. $0.44 per depositary share in any fiscal quarter and (ii) no purchases, redemptions or other acquisitions or retirements referred to in clause **(ii)** of **Section 6.16(a)** shall be

96

September 30, 2014, permit the Senior Secured Leverage Ratio to be more than 3.50x to 1.00.

    (b)   *Minimum Interest Coverage Ratio*. The Company shall not, as of the last day of each fiscal quarter of the Company, permit the Interest Coverage Ratio at such time to be less than ~~3.50x to 1.00; *provided* that following the Step 2 Collateral Completion Date, the Company shall not, as of the last day of each fiscal quarter of the Company, permit the Interest Coverage Ratio at such time to be less than~~ 2.00x to 1.00.

    Section 6.19.   *Limitation on Assets and Operations of Cliffs Sonoma Entities.* The Company shall not permit the Cliffs Sonoma Entities to own any assets other than in connection with Sonoma and any other assets necessary or incidental thereto, and the Company shall not permit the Cliffs Sonoma Entities to engage in any business or activity other than in connection with Sonoma and any other activities necessary or incidental thereto.

    Section 6.20.   *Covenant to Give Security; Further Assurances* .

    (a)   Within 60 days of the Fifth Amendment Effective Date, the Company shall, and shall cause each other Loan Party to (a) deliver, at the Company's expense, a security agreement, substantially in the form of Exhibit J, and which shall provide among other things that the Obligations secured by Principal Property or Principal Subsidiary Interests (together with any other CNTA Covered Indebtedness) shall not exceed, at any time that any CNTA Covered Indebtedness is incurred, the CNTA Limit at such time so as to not require any Bonds to be equally and ratably secured with the Secured Obligations (as amended, restated, modified or supplemented from time to time pursuant to the terms thereof, the "**Security Agreement**"), duly executed by the Company and each Loan Party, pursuant to which each Loan Party shall grant a valid and perfected first-priority (subject to Permitted Liens) security interest in (1) accounts receivable, equipment, inventory and other personal property of the Loan Parties, in each case in which security interests may be perfected by the filing of a financing statement under the UCC in the central filing office of the state where the applicable Loan Party is located, subject to customary exclusions specified in the Security Agreement, (2) the equity interests owned by any Loan Party in all Material Subsidiaries (other than any Disregarded Domestic Subsidiary) of the Company and (3) the equity interests owned by any Loan Party in all Material Foreign Subsidiaries and all Material Subsidiaries which are Disregarded Domestic Subsidiaries of the Company, limited to 65% of the voting equity interests and 100% of the non-voting interests in such Material Foreign Subsidiaries and such Disregarded Domestic Subsidiaries (in each case, only to the extent that such grant under clause (3) would not give rise to any adverse tax consequence under Section 956 of the Code), together with:

and each other Loan Party, other than Excluded Accounts (as defined in the Security Agreement).

(c)    Within 180 days of the Fifth Amendment Effective Date (subject to up to three 30-day extensions as the Administrative Agent may agree, such agreement not to be unreasonably withheld, delayed or conditioned) in the case of Material Real Property in which a Loan Party owns an interest, the Company shall, and shall cause each Loan Party to, provide, or, in the case of any Material Real Property in which a Loan Party has a leasehold interest where the terms of the lease of such leased real property (or applicable state law, if such lease is silent on the issue) prohibit a mortgage thereof, the Company shall, and cause each Loan Party to, use commercially reasonable efforts to cause the landlord to allow and if so allowed (without, for the avoidance of doubt, subjecting the Loan Parties or their properties to undue burden or expense in relation to the collateral value represent by such real property), shall provide the Administrative Agent with, (aA) a Mortgage for each Material Real Property, duly executed by the appropriate Loan Party, together with evidence that (1) counterparts of the Mortgages have been (i) duly executed, acknowledged and delivered and (ii) properly filed in all filing or recording offices that the Administrative Agent reasonably deems necessary or desirable in accordance with customary practices for real property interests of such type and for such location in order to create a valid first (subject to Permitted Liens) and subsisting Lien on the property described therein in favor of the Administrative Agent for the benefit of the Secured Parties and (2) all filing, documentary, stamp, intangible and recording taxes and fees have been paid, the delivery of a copy of a recorded Mortgage being sufficient evidence to satisfy the requirements of this clause (aA), (bB) with respect to any Building (as defined in the applicable Flood Insurance Laws) or Manufactured (Mobile) Home (as defined in the applicable Flood Insurance Laws) comprising part of a Material Real Property that is a Flood Hazard Property, (1) the Company's written acknowledgement of receipt of written notification from the Administrative Agent as to the fact that such asset is a Flood Hazard Property and as to whether the community in which such Material Real Property is located is participating in a National Flood Insurance Program and (2) evidence of flood insurance in form and substance reasonably satisfactory to the Administrative Agent not to exceed the maximum amount available under the Flood Insurance Laws, (C) in the case of any Material Real Property having as-extracted collateral, the Company shall, and shall cause each applicable Loan Party to, provide the Administrative Agent with financing statements in form appropriate for filing in the appropriate jurisdiction under the applicable Uniform Commercial Code in order to perfect the Liens on such as-extracted collateral created under the Security Agreement (it being agreed for purposes of this clause (C) only that any location for which an as-extracted collateral filing was made in respect of the Permitted Securitization Financing shall be deemed to be a Material Real Property) and (cD) customary opinions of counsel to the Loan Party mortgagor with respect to the extent applicable to the perfection, enforceability, due authorization, execution and delivery of the applicable Mortgages and any related fixture filings in form and substance reasonably satisfactory to the Administrative Agent; *provided*, that such Mortgages, to the extent encumbering a Principal Property, shall provide that the Obligations secured by Principal Property or

100

(c)    default in the observance or performance of any other provision hereof or of any other Loan Document which is not remedied within 30 days after the earlier of (i) the date on which such failure shall first become known to any Responsible Officer or (ii) written notice thereof is given to the Company by the Administrative Agent;

(d)    any representation or warranty made by the Company or any of its Restricted Subsidiaries herein or in any other Loan Document, or in any statement or certificate furnished by it pursuant hereto or thereto, or in connection with any Loan or Letter of Credit made or issued hereunder, proves untrue in any material respect as of the date of the issuance or making thereof;

(e)    any of the Loan Documents shall for any reason not be or shall cease to be in full force and effect or is declared to be null and void, or the Company or any of its Restricted Subsidiaries takes any action for the purpose of terminating, repudiating or rescinding any Loan Document executed by it or any of its obligations thereunder that is not permitted hereunder;

(f)    default shall occur under (i) any Indebtedness  (other than any Canadian Existing Indebtedness)  of the Company or any of its Restricted Subsidiaries aggregating in excess of U.S. $75,000,000, or under any indenture, agreement or other instrument under which the same may be issued, and such default shall continue for a period of time sufficient to permit the acceleration of the maturity of any such Indebtedness (whether or not such maturity is in fact accelerated), or any such Indebtedness shall not be paid when due (whether by demand, lapse of time, acceleration or otherwise) or (ii) any Hedge Agreement of the Company or any Restricted Subsidiary with any Lender or any Affiliate of a Lender other than a Hedge Agreement of any Canadian Entity which is stayed as a result of the Canadian Restructuring;

(g)    any judgment or judgments, writ or writs or warrant or warrants of attachment, or any similar process or processes  , other than in respect of the Arbitration Award or any Canadian Existing Indebtedness, shall be entered or filed against the Company or any of its Restricted Subsidiaries, or against any of its Property, in an aggregate amount in excess of U.S. $75,000,000 (except to the extent fully (excluding any deductibles or self-insured retention) covered by insurance pursuant to which the insurer has accepted liability therefor in writing), and which remains undischarged, unvacated, unbonded or unstayed for a period of 30 days; *provided* that judgments, writs, warrants of attachment, or similar processes of any kind, including from Governmental Authorities against any of the Canadian Entities shall not constitute an Event of Default under this Section 7.01(g);

(h)    the Company or any of its Restricted Subsidiaries, or any member of its Controlled Group, shall fail to pay when due an amount or amounts aggregating in excess of U.S. $25,000,000 which it shall have become liable to pay to the PBGC or to a Plan under Title IV of ERISA; or notice of intent to terminate a Plan or Plans having aggregate Unfunded Vested Liabilities in excess of U.S. $25,000,000 (collectively, a "**Material Plan**") shall be filed under Title IV of ERISA by the Company or any of its Restricted

102

Subsidiaries, or any other member of its Controlled Group, any plan administrator or any combination of the foregoing; or the PBGC shall institute proceedings under Title IV of ERISA to terminate or to cause a trustee to be appointed to administer any Material Plan or a proceeding shall be instituted by a fiduciary of any Material Plan against the Company or any of its Restricted Subsidiaries, or any member of its Controlled Group, to enforce Section 515 or 4219(c)(5) of ERISA and such proceeding shall not have been dismissed within 30 days thereafter; or a condition shall exist by reason of which the PBGC would be entitled to obtain a decree adjudicating that any Material Plan must be terminated;

(i)    any Change of Control shall occur;

(j)    the Company or any of its Restricted Subsidiaries  (other than the Canadian Entities) shall (i) have entered involuntarily against it an order (or the filing of a notice of intention in respect of a case or proceeding in respect thereof) for relief under any Debtor Relief Law, (ii) not pay, or admit in writing its inability to pay, its debts generally as they become due, (iii) make an assignment for the benefit of creditors, (iv) apply for, seek, consent to or acquiesce in, the appointment of a receiver, interim receiver, receiver and manager, custodian, trustee, examiner, liquidator or similar official for it or any substantial part of its Property, (v) institute any proceeding seeking to have entered against it an order for relief under any Debtor Relief Law, to adjudicate it insolvent, or seeking dissolution, winding up, liquidation, reorganization, arrangement, adjustment or composition of it or its debts under any Debtor Relief Law or fail to file an answer or other pleading denying the material allegations of any such proceeding filed against it, (vi) take any corporate action in furtherance of any matter described in parts (i) through (v) above, or (vii) fail to contest in good faith any appointment or proceeding described in **Section 7.01(k)** hereof;

(k)    a custodian, receiver, interim receiver, receiver and manager, trustee, examiner, liquidator or similar official shall be appointed for the Company or any of its Restricted Subsidiaries, or any substantial part of any of its Property, or a proceeding described in **Section 7.01(j)(v)** shall be instituted against the Company or any of its Restricted Subsidiaries, and such appointment continues undischarged or such proceeding continues undismissed or unstayed for a period of 60 days; ~~or~~*provided that any such appointment or proceeding relating to any Canadian Entity shall not constitute an Event of Default under this Section 7.01(k); or*

(l)    any Collateral Document or any material provision thereof shall cease to be in full force or effect (other than pursuant to the terms hereof or thereof or as a result of acts or omissions of the Administrative Agent or any Lender), or any grantor, pledgor or mortgagor thereunder or any Loan Party shall deny or disaffirm in writing any grantor's, pledgor's or mortgagor's obligations under any Collateral Document.

Section 7.02.    *Non-Bankruptcy Defaults.* When any Event of Default other than those described in subsection  **(j)** or **(k)** of **Section 7.01** hereof has occurred and is continuing, the Administrative Agent shall, by written notice to the Company: (a) if so

(e)    *Evidence of Payments*. As soon as practicable after any payment of Indemnified Taxes or Other Taxes by any Loan Party to a Governmental Authority, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)    *Status of Lenders*. Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Company is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Loan Document shall deliver to the Company (with a copy to the Administrative Agent), at the time or times prescribed by applicable law or reasonably requested by the Company or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Law as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if requested by the Company or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Company or the Administrative Agent as will enable the Company or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

(g)    Without limiting the generality of the foregoing, in the event that the Company is resident for tax purposes in the United States:

(i)    any Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Code shall deliver to the Company and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Company or the Administrative Agent), executed originals of Internal Revenue Service form W-9 certifying, to the extent such Lender is legally entitled to do so, that such Lender is exempt from U.S. Federal backup withholding tax;

(ii)    any Foreign Lender shall deliver to the Company and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Company or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(A)    duly completed copies of Internal Revenue Service Form W-8BEN  or W-8BEN-E, as applicable, claiming eligibility for benefits of an income tax treaty to which the United States is a party;

(B)    duly completed copies of Internal Revenue Service Form W-8ECI;

116

(C)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (1) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (2) a "10 percent shareholder" of the Company within the meaning of section 881(c)(3)(B) of the Code, or (3) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable,;

(D)    to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership or participating Lender granting a typical participation), executed originals of Internal Revenue Service Form W-8IMY, accompanied by a Form W-8ECI, W-8BEN or W-8BEN-E, as applicable, U.S. Tax Compliance Certificate, Form W-9, and/or other certification documents from each beneficial owner, as applicable; or

(E)    any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Company to determine the withholding or deduction required to be made;

(iii)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Company and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Company or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Company or the Administrative Agent as may be necessary for the Company and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this **Section 10.01(g)(iii)**, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Without limiting the obligations of the Lenders set forth above regarding delivery of certain forms and documents to establish each Lender's status for U.S. withholding tax purposes, each Lender agrees promptly to deliver to the Administrative Agent or the Company, as the Administrative Agent or the Company shall reasonably request, on or prior to the Closing Date, and in a timely fashion thereafter, such other documents and

117

Exhibit 12

**Ratio of Earnings To Combined Fixed Charges
And Preferred Stock Dividend Requirements
(In Millions)**

| | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2014** | | 2013 | | 2012 | | 2011 | | 2010 |
| Consolidated pretax income (loss) from continuing operations | $ | **(9,603.7)** | $ | 489.3 | $ | (501.8) | $ | 2,190.5 | $ | 1,266.4 |
| Undistributed earnings of non-consolidated affiliates | | **(9.9)** | | (74.4) | | (404.8) | | 9.7 | | 13.5 |
| Amortization of capitalized interest | | **0.3** | | 2.3 | | 3.7 | | 3.6 | | 3.6 |
| Interest expense | | **187.4** | | 184.3 | | 203.1 | | 216.5 | | 70.1 |
| Acceleration of debt issuance costs | | **3.6** | | — | | 0.2 | | — | | — |
| Interest portion of rental expense | | **2.3** | | 2.1 | | 2.8 | | 3.6 | | 4.6 |
| Total Earnings | $ | **(9,420.0)** | $ | 603.6 | $ | (696.8) | $ | 2,423.9 | $ | 1,358.2 |
| Interest expense | $ | **187.4** | $ | 184.3 | $ | 203.1 | $ | 216.5 | $ | 70.1 |
| Acceleration of debt issuance costs | | **3.6** | | — | | 0.2 | | — | | — |
| Interest portion of rental expense | | **2.3** | | 2.1 | | 2.8 | | 3.6 | | 4.6 |
| Preferred Stock dividend requirements | | **51.2** | | 48.7 | | — | | — | | — |
| Fixed Charges Requirements | $ | **244.5** | $ | 235.1 | $ | 206.1 | $ | 220.1 | $ | 74.7 |
| Fixed Charges and Preferred Stock Dividend Requirements | $ | **244.5** | $ | 235.1 | $ | 206.1 | $ | 220.1 | $ | 74.7 |
| RATIO OF EARNINGS TO FIXED CHARGES | | **(B)** | | 2.6 | | (A) | | 11.0 | | 18.2 |
| RATIO OF EARNINGS TO COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDEND REQUIREMENTS | | **(B)** | | 2.6 | | (A) | | 11.0 | | 18.2 |

(A) For the year ended December 31, 2012, there was a deficiency of earnings to cover the fixed charges of $902.9 million.

(B) For the year ended December 31, 2014, there was a deficiency of earnings to cover the fixed charges of $9,664.5 million.

**Exhibit 21**

**SIGNIFICANT SUBSIDIARIES**
**CLIFFS NATURAL RESOURCES INC. AS OF DECEMBER 31, 2014**

| Name | Cliffs' Effective Ownership | Place of Incorporation |
|---|---|---|
| Cleveland-Cliffs International Holding Company | 100% | Delaware, USA |
| Cliffs (Gibraltar) Holdings Limited | 100% | Gibraltar |
| Cliffs (Gibraltar) Holdings Limited Luxembourg S.C.S. | 100% | Luxembourg |
| Cliffs (Gibraltar) Limited | 100% | Gibraltar |
| Cliffs Finance US LLC | 100% | Ohio, USA |
| Cliffs Finance Lux SCS | 100% | Luxembourg |
| Cliffs Minnesota Mining Company | 100% | Delaware, USA |
| Cliffs Natural Resources Luxembourg S.à r.l. | 100% | Luxembourg |
| Cliffs TIOP Holding, LLC | 100% | Delaware, USA |
| Cliffs TIOP, Inc. | 100% | Michigan, USA |
| Cliffs UTAC Holding LLC | 100% | Delaware, USA |
| Northshore Mining Company | 100% | Delaware, USA |
| The Cleveland-Cliffs Iron Company | 100% | Ohio, USA |
| United Taconite LLC | 100% | Delaware, USA |

**Exhibit 23**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in:

Registration Statement No. 333-56661 on Form S-8 (as amended by Post-Effective Amendment No.1) pertaining to the Northshore Mining Company and Silver Bay Power Company Retirement Saving Plan and the related prospectus;

Registration statement No. 333-06049 on Form S-8 pertaining to the Cliffs Natural Resources Inc. Nonemployee Directors' Compensation Plan;

Registration Statement No. 333-30391 on Form S-8 pertaining to the 1992 Incentive Equity Plan (as amended and restated as of May 13, 1997) and the related prospectus;

Registration Statement No. 333-84479 on Form S-8 pertaining to the 1992 Incentive Equity Plan (as amended and restated as of May 11, 1999);

Registration Statement No. 333-64008 on Form S-8 (as amended by Post-Effective Amendment No. 1 and Post-Effective Amendment No. 2) pertaining to the Cliffs Natural Resources Inc. Nonemployee Directors' Compensation Plan (as amended and restated as of January 1, 2004);

Registration Statement No. 333-165021 on Form S-8 pertaining to the 2007 Incentive Equity Plan;

Registration Statement No. 333-172649 on Form S-8 pertaining to the 2007 Incentive Equity Plan (as amended and restated);

Registration Statement No. 333-184620 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2012 Incentive Equity Plan;

Registration Statement No. 333-186617 on Form S-3 pertaining to the registration of an indeterminate number of common shares, preferred stock, depositary shares, warrants and subscription rights as well as an indeterminate amount of debt securities that may from time to time be issued at indeterminate prices;

Registration Statement No. 333-197687 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2012 Incentive Equity Plan (as amended and restated); and

Registration Statement No. 333-197688 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2014 Nonemployee Directors' Compensation Plan.

of our reports relating to the consolidated financial statements and financial statement schedule of Cliffs Natural Resources Inc. and the effectiveness of Cliffs Natural Resources Inc.'s internal control over financial reporting dated February 25, 2015 (which report expresses an unqualified opinion and includes an explanatory paragraph relating to a change in accounting for discontinued operations), appearing in the Annual Report on Form 10-K of Cliffs Natural Resources Inc. for the year ended December 31, 2014.

*/s/ Deloitte & Touche LLP*

Cleveland, Ohio
February 25, 2015

**Exhibit 24**

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that the undersigned Directors and officers of Cliffs Natural Resources Inc., an Ohio corporation ("Company"), hereby constitute and appoint C. Lourenco Goncalves, Terrance M. Paradie, P. Kelly Tompkins, James D. Graham and Timothy K. Flanagan, and each of them, their true and lawful attorney or attorneys-in-fact, with full power of substitution and revocation, for them and in their name, place and stead, to sign on their behalf as a Director or officer of the Company, or both, as the case may be, an Annual Report on Form 10-K pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2014, and to sign any and all amendments to such Annual Report, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorney or attorneys-in-fact, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as they might or could do in person, hereby ratifying and confirming all that said attorney or attorneys-in-fact or any of them or their substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Executed as of the 10th day of February, 2015.

| | |
|---|---|
| /s/ C. L. Goncalves | /s/ D. C. Taylor |
| C. L. Goncalves<br>Chairman, President and Chief Executive Officer | D. C. Taylor, Director |
| /s/ J. T. Baldwin | /s/ R. P. Fisher, Jr. |
| J. T. Baldwin, Director | R. P. Fisher, Jr., Director |
| /s/ S. M. Green | /s/ J. A. Rutkowski, Jr. |
| S. M. Green, Director | J. A. Rutkowski, Jr., Director |
| /s/ J. S. Sawyer | /s/ M. D. Siegal |
| J. S. Sawyer, Director | M. D. Siegal, Director |
| /s/ G. Stoliar | /s/ T. M. Paradie |
| G. Stoliar, Director | T. M. Paradie,<br>Executive Vice President & Chief Financial Officer |
| /s/ T. K. Flanagan | |
| T. K. Flanagan,<br>Vice President, Corporate Controller &<br>Chief Accounting Officer | |

Exhibit 31.1

### CERTIFICATION

I, Lourenco Goncalves, certify that:

1. I have reviewed this annual report on Form 10-K of Cliffs Natural Resources Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 25, 2015        By:  /s/ Lourenco Goncalves

Lourenco Goncalves

Chairman, President and Chief Executive Officer

**Exhibit 31.2**

## CERTIFICATION

I, Terrance M. Paradie, certify that:

1. I have reviewed this annual report on Form 10-K of Cliffs Natural Resources Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:  February 25, 2015         By:  /s/ Terrance M. Paradie
_____

Terrance M. Paradie
Executive Vice President & Chief Financial Officer

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Cliffs Natural Resources Inc. (the "Company") on Form 10-K for the period ended December 31, 2014 as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), I, Lourenco Goncalves, Chairman, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1)    The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)    The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date:    February 25, 2015

By:  /s/ Lourenco Goncalves
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
Lourenco Goncalves
Chairman, President and Chief Executive Officer

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Cliffs Natural Resources Inc. (the "Company") on Form 10-K for the period ended December 31, 2014 as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), I, Terrance M. Paradie, Executive Vice President and Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1)     The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)     The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date:     February 25, 2015

By: /s/ Terrance M. Paradie
Terrance M. Paradie
Executive Vice President & Chief Financial Officer

Exhibit 95

**Mine Safety Disclosures**

The operation of our mines located in the United States is subject to regulation by MSHA under the FMSH Act. MSHA inspects these mines on a regular basis and issues various citations and orders when it believes a violation has occurred under the FMSH Act. We present information below regarding certain mining safety and health citations that MSHA has issued with respect to our mining operations. In evaluating this information, consideration should be given to factors such as: (i) the number of citations and orders will vary depending on the size of the mine; (ii) the number of citations issued will vary from inspector to inspector and mine to mine, and (iii) citations and orders can be contested and appealed and, in that process, are often reduced in severity and amount, and are sometimes dismissed.

Under the Dodd-Frank Act, each operator of a coal or other mine is required to include certain mine safety results within its periodic reports filed with the SEC. As required by the reporting requirements included in §1503(a) of the Dodd-Frank Act, we present the following items regarding certain mining safety and health matters, for the period presented, for each of our mine locations that are covered under the scope of the Dodd-Frank Act:

(A)  The total number of violations of mandatory health or safety standards that could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard under section 104 of the FMSH Act (30 U.S.C. 814) for which the operator received a citation from MSHA;

(B)  The total number of orders issued under section 104(b) of the FMSH Act (30 U.S.C. 814(b));

(C)  The total number of citations and orders for unwarrantable failure of the mine operator to comply with mandatory health or safety standards under section 104(d) of the FMSH Act (30 U.S.C. 814(d));

(D)  The total number of imminent danger orders issued under section 107(a) of the FMSH Act (30 U.S.C. 817(a));

(E)  The total dollar value of proposed assessments from MSHA under the FMSH Act (30 U.S.C. 801 et seq.);

(F)  The total number of mining related fatalities;

(G)  Legal actions pending before Federal Mine Safety and Health Review Commission involving such coal or other mine as of the last day of the period;

(H)  Legal actions initiated before the Federal Mine Safety and Health Review Commission involving such coal or other mine during the period; and

(I)  Legal actions resolved before the Federal Mine Safety and Health Review Commission involving such coal or other mine during the period.

During the year ended December 31, 2014, our U.S. mine locations did not receive any flagrant violations under Section 110(b)(2) of the FMSH Act and no written notices of a pattern of violations, or the potential to have a pattern of such violations, under section 104(e) of the FMSH Act.

Following is a summary of the information listed above for the year ended December 31, 2014:

| Mine Name/ MSHA ID No. | Operation | (A) Section 104 S&S Citations | (B) Section 104(b) Orders | (C) Section 104(d) Orders | (D) Section 107(a) Citations & Orders | (E) Total Dollar Value of MSHA Proposed Assessments (1) | (F) Fatalities | (G) Legal Actions Pending as of Last Day of Period | | (H) Legal Actions Initiated During Period | (I) Legal Actions Resolved During Period |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Pinnacle Mine / 4601816 | Coal | 117 | 1 | — | 2 | $ 443,406 | — | 27 | (2) | 7 | 21 |
| Pinnacle Plant / 4605868 | Coal | 8 | — | — | — | $ 9,001 | — | 1 | (3) | 1 | 2 |
| Green Ridge #1 / 4609030 | Coal | — | — | — | — | $ — | — | — | | — | — |
| Green Ridge #2 / 4609222 | Coal | — | — | — | — | $ — | — | — | | — | 3 |
| Oak Grove / 0100851 | Coal | 119 | 1 | 1 | — | $ 267,027 | — | 65 | (4) | 33 | 33 |
| Concord Plant / 0100329 | Coal | 1 | — | — | — | $ 489 | — | — | | 1 | 1 |
| Dingess-Chilton / 4609280 | Coal | — | — | — | — | $ — | — | 1 | (5) | — | 17 |
| Powellton / 4609217 | Coal | 159 | — | 2 | — | $ 352,928 | — | 14 | (6) | 15 | 29 |
| Saunders Prep / 4602140 | Coal | 9 | — | — | — | $ 562 | — | — | | — | 1 |
| Toney Fork / 4609101 | Coal | 9 | — | — | — | $ 8,019 | — | 3 | (7) | 3 | 4 |
| Elk Lick Tipple / 4604315 | Coal | 4 | — | — | — | $ 262 | — | — | | — | 1 |
| Lower War Eagle / 4609319 | Coal | 97 | — | — | — | $ 158,358 | — | 18 | (8) | 20 | 13 |
| Elk Lick Chilton / 4609390 | Coal | — | — | — | — | $ — | — | — | | — | — |
| Tilden / 2000422 | Iron Ore | 33 | — | 2 | — | $ 211,913 | — | 13 | (9) | 11 | 4 |
| Empire / 2001012 | Iron Ore | 49 | — | — | — | $ 183,981 | — | 11 | (10) | 6 | 1 |
| Northshore Plant / 2100831 | Iron Ore | 20 | — | — | — | $ 382,952 | — | 17 | (11) | 5 | 1 |
| Northshore Mine / 2100209 | Iron Ore | — | — | — | — | $ — | — | — | | — | — |
| Hibbing / 2101600 | Iron Ore | 37 | — | — | — | $ 324,653 | — | 28 | (12) | 41 | 29 |
| United Taconite Plant / 2103404 | Iron Ore | 32 | — | 1 | — | $ 531,351 | — | 16 | (13) | 71 | 69 |
| United Taconite Mine / 2103403 | Iron Ore | 15 | 1 | — | 1 | $ 30,280 | — | 1 | (14) | 2 | 2 |

(1) Amounts included under the heading "Total Dollar Value of MSHA Proposed Assessments" are the total dollar amounts for proposed assessments received from MSHA on or before December 31, 2014.

(2) Included in this number are 9 pending legal actions related to contests of citations and orders referenced in Subpart B of FMSH Act's procedural rules; 17 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules; and 1 pending legal action related to complaints of discharge, discrimination or interference referenced in Subpart E of FMSH Act's procedural rules.

(3) This number consists of 1 pending legal action related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules.

(4) Included in this number are 3 pending legal actions related to contests of citations and orders referenced in Subpart B of FMSH Act's procedural rules; 53 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules; 1 pending legal action related to complaints for compensation referenced in Subpart D of FMSH Act's procedural rules; and 8 appeals of judges' decisions or orders to FMSH Act's procedural rules.

(5) This number consists of 1 pending legal action related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules.

(6) Included in this number are 1 pending legal action related to contests of citations and orders referenced in Subpart B of FMSH Act's procedural rules and 13 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules.

(7) This number consists of 3 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules.

(8) Included in this number are 1 pending legal action related to contests of citations and orders referenced in Subpart B of FMSH Act's procedural rules and 17 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules.

(9) Included in this number are 11 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules and 2 pending legal actions related to complaints of discharge, discrimination or interference referenced in Subpart E of FMSH Act's procedural rules.

(10) Included in this number are 9 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules and 2 pending legal actions related to complaints of discharge, discrimination or interference referenced in Subpart E of FMSH Act's procedural rules.

(11) This number consists of 17 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules.

(12) Included in this number are 16 pending legal actions related to contests of citations and orders referenced in Subpart B of FMSH Act's procedural rules; 7 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural

rules; 1 pending legal action related to complaints of discharge, discrimination or interference referenced in Subpart E of FMSH Act's procedural rules; and 4 appeals of judges' decisions or orders to FMSH Act's procedural rules.

(13)     Included in this number are 13 pending legal actions related to contests of citations and orders referenced in Subpart B of FMSH Act's procedural rules and 3 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules.

(14)     This number consists of 1 pending legal action related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules.

Exhibit 99(a)

**Cliffs Natural Resources Inc. and Subsidiaries**
**Schedule II – Valuation and Qualifying Accounts**
*(Dollars in Millions)*

| Classification | | Balance at Beginning of Year | | Additions | | | | | Balance at End of Year |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Charged to Cost and Expenses | Charged to Other Accounts | Acquisition | Deductions | | |
| Year Ended December 31, 2014: | | | | | | | | | |
| Deferred Tax Valuation Allowance | $ | 864.1 | $ | 1,689.2 | $ (8.6) | $ — | $ 319.6 | $ | 2,225.1 |
| Accounts Receivable Allowance | $ | 8.1 | $ | — | $ — | $ — | $ — | $ | 8.1 |
| Year Ended December 31, 2013: | | | | | | | | | |
| Deferred Tax Valuation Allowance | $ | 858.4 | $ | 86.6 | $ (65.5) | $ — | $ 15.4 | $ | 864.1 |
| Accounts Receivable Allowance | $ | 8.1 | $ | — | $ — | $ — | $ — | $ | 8.1 |
| Year Ended December 31, 2012: | | | | | | | | | |
| Deferred Tax Valuation Allowance | $ | 223.9 | $ | 635.8 | $ — | $ — | $ 1.3 | $ | 858.4 |
| Accounts Receivable Allowance | $ | — | $ | 8.1 | $ — | $ — | $ — | $ | 8.1 |

# EXHIBIT 90

10-K 1 form10-k2015.htm 10-K

<div align="center">

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

# FORM 10-K

</div>

T   Annual Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2015

<div align="center">OR</div>

£   Transition Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the transition period from     to

<div align="center">

**Commission File No. 1-13696**

# AK STEEL HOLDING CORPORATION

(Exact name of registrant as specified in its charter)

</div>

| | |
|---|---|
| **Delaware** | **31-1401455** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **9227 Centre Pointe Drive, West Chester, Ohio** | **45069** |
| (Address of principal executive offices) | (Zip Code) |

<div align="center">

Registrant's telephone number, including area code: **(513) 425-5000**
Securities registered pursuant to Section 12(b) of the Act:

</div>

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| **Common Stock $0.01 Par Value** | **New York Stock Exchange** |

<div align="center">Securities registered pursuant to Section 12(g) of the Act: None</div>

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes T No £

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act. Yes £ No T

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes T No £

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes T No £

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. T

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company.

| | | | |
|---|---|---|---|
| Large accelerated filer | T | Accelerated filer | £ |
| Non-accelerated filer | £ | Smaller reporting company | £ |

Indicate by check mark whether the registrant is a shell company, as defined in Rule 12b-2 of the Securities Exchange Act of 1934. Yes £ No T

Aggregate market value of the registrant's voting stock held by non-affiliates at June 30, 2015: $680,365,760
There were 178,344,667 shares of common stock outstanding as of February 17, 2016.

<div align="center">

**DOCUMENTS INCORPORATED BY REFERENCE**

</div>

The information required to be furnished pursuant to Part III of this Form 10-K will be set forth in, and incorporated by reference from, the registrant's definitive proxy statement for the annual meeting of stockholders (the "2016 Proxy Statement"), which will be filed with the Securities and Exchange Commission not later than 120 days after the end of the fiscal year ended December 31, 2015.

**AK Steel Holding Corporation**
**Table of Contents**

|  |  | **Page** |
|---|---|---|
| ***PART I*** | | |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 5 |
| Item 1B. | Unresolved Staff Comments | 10 |
| Item 2. | Properties | 10 |
| Item 3. | Legal Proceedings | 11 |
| Item 4. | Mine Safety Disclosures | 11 |
| ***PART II*** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 12 |
| Item 6. | Selected Financial Data | 14 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 14 |
| Item 7A. | Quantitative and Qualitative Disclosure about Market Risk | 32 |
| Item 8. | Financial Statements and Supplementary Data | 34 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 84 |
| Item 9A. | Controls and Procedures | 84 |
| Item 9B. | Other Information | 87 |
| ***PART III*** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 87 |
| Item 11. | Executive Compensation | 87 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 87 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 87 |
| Item 14. | Principal Accounting Fees and Services | 87 |
| ***PART IV*** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 89 |
|  | Signatures | 95 |

-i-

*Table of Contents*

(Dollars in millions, except per share and per ton amounts or as otherwise specifically noted)

**PART I**

**Item 1.**       **Business.**

## Operations Overview

AK Steel Holding Corporation ("AK Holding") is a corporation formed under the laws of Delaware in 1993 and is an integrated producer of flat-rolled carbon, stainless and electrical steels and tubular products through its wholly-owned subsidiary, AK Steel Corporation ("AK Steel"). AK Steel is the successor through merger in 1999 to Armco Inc., which was formed in 1900. Unless the context indicates otherwise, references to "we," "us" and "our" refer to AK Holding and its subsidiaries.

We operate eight steelmaking and finishing plants, two coke plants and two tube manufacturing plants across six states—Indiana, Kentucky, Michigan, Ohio, Pennsylvania and West Virginia. These operations produce flat-rolled carbon, specialty stainless and electrical steels that we sell in sheet and strip form, and carbon and stainless steel that we finish into welded steel tubing. We also produce metallurgical coal through our AK Coal Resources, Inc. ("AK Coal") subsidiary. In addition, we operate trading companies in Mexico and Europe that buy and sell steel and steel products and other materials.

In 2014, we acquired Severstal Dearborn, LLC ("Dearborn"). The assets acquired include the integrated steelmaking assets located in Dearborn, Michigan ("Dearborn Works"), the Mountain State Carbon, LLC ("Mountain State Carbon") cokemaking facility located in Follansbee, West Virginia, and interests in joint ventures that process flat-rolled steel products.

## Customers and Markets

We sell flat-rolled carbon steel products, consisting of coated, cold-rolled, and hot-rolled carbon steel products, primarily to automotive manufacturers and their suppliers, as well as to customers in the infrastructure and manufacturing market. The infrastructure and manufacturing market primarily includes electrical transmission, heating, ventilation and air conditioning equipment, and appliances. We also sell carbon steel products to distributors, service centers and converters, who may further process these products before reselling them. Our goal is to carry appropriate inventory levels that will meet our customers' needs, particularly for the "just-in-time" delivery requirements necessary to service the demanding automotive market. During 2015, we began to implement a strategy to target markets for our carbon steel products that deliver higher margins, where possible, and reduce amounts sold into the lower margin carbon steel spot market, which experienced a sharp decline in pricing as a result of a deluge of low-priced imports of foreign steel. As a result, in late 2015 we temporarily idled the blast furnace and steelmaking operations (the "Hot End") at our Ashland Works in Kentucky to improve capacity utilization at our Middletown Works and our Dearborn Works and our overall profitability.

We sell our stainless steel products to manufacturers and their suppliers in the automotive industry, to manufacturers of food handling, chemical processing, pollution control, medical and health equipment, and to distributors and service centers.

For carbon and stainless steels, we target customers who require the highest quality flat-rolled steel with precise "just-in-time" delivery and technical support. Our enhanced product quality and delivery capabilities, as well as our emphasis on collaborative customer technical support and product planning, are critical factors in our ability to serve these markets.

We sell our electrical steel products in the infrastructure and manufacturing market primarily to manufacturers of power transmission and distribution transformers, both for new and replacement installation. We also sell electrical steel products to manufacturers of electrical motors and generators. We target our electrical steel products to customers who desire the highest quality iron-silicon alloys that provide low core loss and high permeability required for more efficient and economical electrical transformers. Our electrical steels are among the most energy efficient in the world. As with customers of our other steel products, we provide our electrical steel customers outstanding technical support and product development assistance.

For our carbon steel, stainless steel and electrical steel products, we intentionally limit our participation in the commodity portions of those markets, where attributes such as high quality, technical support and innovation are less valued and where selling prices and product margins are generally lower.

Because of our focus on shipments to the automotive industry and our decision to ship fewer tons to the spot market, Ford Motor Company and Fiat Chrysler Automobiles accounted for 12% and 11% of our net sales in 2015. No customer accounted for more than 10% of our net sales in 2014 or 2013. The following table presents the percentage of our net sales to each of our markets:

- 1 -

A004691

*Table of Contents*

| Market | 2015 | 2014 | 2013 |
|---|---|---|---|
| Automotive | 60% | 53% | 51% |
| Infrastructure and Manufacturing | 16% | 18% | 20% |
| Distributors and Converters | 24% | 29% | 29% |

We sell our carbon steel products principally to customers in the United States. We sell our electrical and stainless steel products both domestically and internationally. Our customer base is geographically diverse and there is no single country outside the United States where our sales are material compared to our total net sales. We do not have any material long-lived assets located outside the United States. The following shows net sales by geographic area and as a percentage of worldwide net sales:

| Geographic Area | 2015 | | 2014 | | 2013 | |
|---|---|---|---|---|---|---|
| | Net Sales | % | Net Sales | % | Net Sales | % |
| United States | $ 5,837.2 | 87% | $ 5,750.3 | 88% | $ 4,862.4 | 87% |
| Foreign countries | 855.7 | 13% | 755.4 | 12% | 708.0 | 13% |
| Total | $ 6,692.9 | 100% | $ 6,505.7 | 100% | $ 5,570.4 | 100% |

We shipped approximately 81% of our flat-rolled steel products in 2015 to contract customers, with the balance to customers in the spot market at prevailing prices at the time of sale. We have contracts with all of our major automotive and most of our infrastructure and manufacturing market customers. These contracts include prices for each product during contract periods, which are generally one year or less. In 2015, approximately 58% of our shipments to contract customers allowed price adjustments during the contract period. Changes in steel price indices trigger contract price adjustments for about one-fourth of our shipments to contract customers. When adjustments occur, the resulting adjustments typically occur at three- or six-month intervals. In certain circumstances, we adjust contract prices if particular raw material price changes exceed agreed-upon parameters.

The automotive market is an important element of our business and growth strategy and, therefore, North American light vehicle production has a significant impact on our total sales and shipments. In 2015, automotive manufacturers experienced a record year in North America, as light vehicle production was approximately 17.5 million units, representing a 3% increase from the prior year. The improvement in the automotive market and our increased share of that market resulted in increased sales and shipments of our steel in 2015. We remain keenly focused on capturing additional market share in the automotive sector and most automotive manufacturers are predicting a further increase in total North American light vehicle production volumes for 2016.

In 2015, housing starts in the United States reached levels not achieved since 2007. We typically benefit from increasing housing starts since it generally results in increased production by power transmission and distribution transformer manufacturers, to whom we sell electrical steels, and appliance manufacturers, to whom we sell stainless and carbon steels. Although we saw improvements in higher value electrical steel prices and demand during 2015, low prices resulting from the high level of commodity steel imports from foreign producers into the United States resulted in lower shipments to the spot markets. Electrical steel sales and shipments to customers in foreign countries also have been negatively affected by excess global production capacity and what we believe to be preferential trade practices by certain countries that make our products more expensive to sell in that country.

## Raw Materials and Other Inputs

Our steel manufacturing operations require iron ore, coal, coke, chrome, nickel, silicon, manganese, zinc, limestone, and carbon and stainless steel scrap as primary raw materials. We also use large volumes of natural gas, electricity and industrial gases. In addition, in past years we have purchased carbon steel slabs from other steel producers to supplement our production from our own steelmaking facilities. We purchased approximately 126,000 tons of carbon steel slabs in 2015, all of which were purchased in the first quarter of the year. We do not currently anticipate purchasing carbon slabs in 2016.

We typically purchase carbon and stainless steel scrap, natural gas, a substantial portion of our electricity, carbon steel slabs, and most other raw materials at prevailing market prices, which may fluctuate with market supply and demand. However, we make most of our purchases of iron ore, coke, industrial gases and a portion of our electricity at negotiated prices under annual or multi-year agreements with periodic price adjustments. We typically purchase coal under annual fixed-price agreements. Additionally, we may hedge portions of our energy and raw materials purchases to reduce volatility.

We also attempt to reduce the risk of future supply shortages and price volatility in other ways. If multi-year contracts are available in the marketplace, we may use these contracts to secure enough supply to satisfy our key raw material needs. When multi-year contracts

are not available, or are not available on acceptable terms, we enter into annual contracts or make spot purchases to meet the remainder of our raw materials needs. We also regularly evaluate using alternative sources and substitute materials.

- 2-

*Table of Contents*

We believe that we have secured, or will be able to secure, adequate supply sources for our raw materials and energy requirements for 2016 and for at least the next three to five years. However, our raw material suppliers may experience production disruptions, which could create shortages of raw materials in 2016 or beyond.

**Research and Development**

We conduct a broad range of research and development activities aimed at improving existing products and manufacturing processes and developing new products and processes. In recent years, we have increased our focus and spending on new product innovation, with particular focus on advanced high-strength steels ("AHSS") for the automotive market. We produce virtually every grade of AHSS that our customers currently need, but our goal is to develop the next generation of AHSS with even greater strength and formability. We have developed many new steel products and steel processes during our history and have recently reinvigorated our focus on research and innovation. For example, we are implementing new process technology to produce both coated and cold-rolled Next-Generation AHSS on the hot-dip galvanizing line at Dearborn Works, which we expect to complete by late 2016. Our goal is to ship Next-Generation AHSS to our customers by early 2017. We have doubled our investment in research and innovation during the past three years from $13.2 in 2013 to $27.6 in 2015. To accelerate innovation, we are building a new research and innovation center in Middletown, Ohio with completion planned for late 2016. The facility will include pilot lines and feature new operational simulators that replicate critical steel manufacturing operations to allow our researchers, scientists and engineers to continue their leading-edge research, applications engineering, advanced engineering, product development and customer technical services.

**Employees**

At December 31, 2015, we employed approximately 8,500 people, of which approximately 6,300 are represented by labor unions. The labor contracts covering these represented employees expire between 2016 and 2019. See the discussion under *Labor Agreements* in Item 7 for additional information on these agreements.

**Competition**

We compete with domestic and foreign flat-rolled carbon, stainless and electrical steel and tubular product producers (both integrated steel producers and mini-mill producers) and producers of plastics, aluminum and other materials that may be used as a substitute for flat-rolled steels in manufactured products. Mini-mills generally offer a narrower range of products than integrated steel mills, but can have some competitive cost advantages as a result of their different production processes and lower labor costs associated with what are often non-union workforces. Price, quality, on-time delivery, customer service and product innovation are the primary competitive factors in the steel industry and vary in relative importance according to the product category and customer requirements.

Steel producers that sell to the automotive market are facing increasing competition from aluminum manufacturers (and, to a lesser extent, other materials) as automotive manufacturers attempt to develop vehicles that will enable them to satisfy more stringent government-imposed fuel efficiency standards. To address automotive manufacturers' lightweighting needs that the aluminum industry is targeting, we and others in the steel industry continue to develop grades of AHSS that we believe are stronger, less costly, more sustainable, easier to repair and more environmentally friendly than aluminum.

Domestic steel producers, including us, face significant competition from foreign producers. For many reasons, these foreign producers often are able to sell products in the United States at prices substantially lower than domestic producers. Depending on the country of production, these reasons may include generous government subsidies; lower labor, raw material, energy and regulatory costs; less stringent environmental regulations; the maintenance of artificially low exchange rates against the U.S. dollar; and preferential trade practices in their home countries. In recent years, the annual level of imports of foreign steel into the United States also has been increasing and is affected to varying degrees by the relative level of overcapacity of steel production in those countries, the strength of demand for steel outside the United States and the relative strength or weakness of the U.S. dollar against various foreign currencies. In 2014 and 2015, and through the first half of 2015 in particular, the combination of overcapacity and slowing domestic demand in countries such as China resulted in imports of low-priced foreign steel into the United States at levels significantly higher than recent historical periods, resulting in increased downward pressure on the price of flat-rolled steels in the American marketplace. Imports of finished steel into the United States accounted for approximately 29%, 28% and 23% of domestic steel market sales in 2015, 2014 and 2013. We believe that a large amount of the carbon flat-rolled steel imports into the United States are unfairly traded and we have initiated four trade cases in 2015 and 2016 against a number of importers of carbon and stainless steel. See *Trade Cases* in Note 10 to the consolidated financial statements for more information.

We continue to provide pension and healthcare benefits to a great number of our retirees, resulting in a competitive disadvantage compared to certain other domestic integrated steel companies and mini-mills that do not provide such benefits to any or most of their retirees. However, we have taken a number of actions to reduce pension and healthcare benefits costs, including negotiating

- 3-

A004695

Table of Contents

progressive labor agreements that have significantly reduced total employment costs at all of our union-represented facilities, transferring all responsibility for healthcare benefits for various groups of retirees to Voluntary Employee Benefits Association trusts, offering voluntary lump-sum settlements to pension plan participants and lowering retiree benefit costs for salaried employees. These actions have increased our ability to compete in the highly competitive global steel market and we continue to seek opportunities to reduce pension and healthcare benefits costs.

### Environmental

Information about our environmental compliance, remediation and proceedings is included in Note 10 to the consolidated financial statements in Item 8 and is incorporated herein by reference.

### Executive Officers of the Registrant

The following table provides the name, age and principal position of each of our executive officers as of February 17, 2016:

| Name | Age | Position |
| --- | --- | --- |
| Roger K. Newport | 51 | Chief Executive Officer |
| Kirk W. Reich | 47 | President and Chief Operating Officer |
| Joseph C. Alter | 38 | Vice President, General Counsel and Corporate Secretary |
| Stephanie S. Bisselberg | 45 | Vice President, Human Resources |
| Renee S. Filiatraut | 52 | Vice President, Litigation, Labor and External Affairs |
| Gregory A. Hoffbauer | 49 | Vice President, Controller and Chief Accounting Officer |
| Scott M. Lauschke | 46 | Vice President, Sales and Customer Service |
| Eric S. Petersen | 46 | Vice President, Research and Innovation |
| Maurice A. Reed | 53 | Vice President, Engineering, Raw Materials and Energy |
| Jaime Vasquez | 53 | Vice President, Finance and Chief Financial Officer |

*Roger K. Newport* has served as Chief Executive Officer since January 2016. Prior to that Mr. Newport served as Executive Vice President, Finance and Chief Financial Officer since May 2015. Prior to that, Mr. Newport served as Senior Vice President, Finance and Chief Financial Officer since May 2014, as Vice President, Finance and Chief Financial Officer since May 2012 and as Vice President, Business Planning and Development since June 2010. Mr. Newport was named Controller and Chief Accounting Officer in July 2004 and Controller in September 2001. Prior to that, Mr. Newport served in a variety of other capacities since joining us in 1985, including Assistant Treasurer, Investor Relations, Manager—Financial Planning and Analysis, Product Manager, Senior Product Specialist and Senior Auditor.

*Kirk W. Reich* has served as President and Chief Operating Officer since January 2016. Prior to that Mr. Reich served as Executive Vice President, Manufacturing since May 2015. Before assuming that role, Mr. Reich served as Senior Vice President, Manufacturing since May 2014, as Vice President, Procurement and Supply Chain Management since May 2012 and as Vice President, Specialty Steel Operations since June 2010. Mr. Reich was named General Manager, Middletown Works in October 2006. Prior to that, Mr. Reich served in a variety of other capacities since joining us in 1989, including Manager—Mobile Maintenance/Maintenance Technology, General Manager—Mansfield Works, Manager—Processing and Shipping, Technical Manager, Process Manager and Civil Engineer.

*Joseph C. Alter* has served as Vice President, General Counsel and Corporate Secretary since May 2015. Prior to that, Mr. Alter served as Vice President, General Counsel and Chief Compliance Officer since May 2014 and Assistant General Counsel, Corporate and Chief Compliance Officer since December 2012. Mr. Alter became Corporate Counsel and Chief Compliance Officer in May 2011. Before joining us as Corporate Counsel in August 2009, Mr. Alter was Corporate Counsel at Convergys Corporation and, before that, an attorney with the law firm of Keating Muething & Klekamp PLL.

*Stephanie S. Bisselberg* has served as Vice President, Human Resources since April 2013. Prior to that, Ms. Bisselberg served as Assistant General Counsel, Labor from October 2010. She also served as Labor Counsel from January 2005 and Assistant Labor Counsel upon joining us in 2004. Prior to joining us, Ms. Bisselberg was an attorney in the Labor and Employment department of the Cincinnati law firm of Taft, Stettinius and Hollister LLP.

*Renee S. Filiatraut* has served as Vice President, Litigation, Labor and External Affairs since May 2014. Prior to that, Ms. Filiatraut served as Assistant General Counsel, Litigation since December 2012. Before joining us as Litigation Counsel in March 2011, Ms. Filiatraut was a Partner with Thompson Hine LLP from January 1998.

A004696

A004697

*Gregory A. Hoffbauer* has served as Vice President, Controller and Chief Accounting Officer since January 2016. Prior to that, Mr. Hoffbauer served as Controller and Chief Accounting Officer since February 2013. Before joining us as Assistant Controller in January 2011, Mr. Hoffbauer was Director of Accounting with NewPage Corporation. Mr. Hoffbauer also was Controller for Day International, Inc. and served in a number of increasingly responsible accounting and auditing positions for Deloitte & Touche LLP, including Audit Senior Manager.

*Scott Lauschke* has served as Vice President, Sales and Customer Service since February 2015. Before joining us, Mr. Lauschke was Vice President and General Manager of AFGlobal Corporation from July 2013 through November 2014. Before that, Mr. Lauschke served in various roles of increasing responsibility at The Timken Company from May 2000, including General Sales Manager from May 2009 through April 2013.

*Eric S. Petersen* has served as Vice President, Research and Innovation since February 2015. Prior to that, Mr. Petersen was Vice President, Sales and Customer Service since July 2013 as Director, Specialty and International Sales since November 2012 and Director, Research and Innovation since June 2010. He was named Director, Customer Technical Services and Research in March 2007. Prior to that, Mr. Petersen served in a variety of other capacities since joining us in 1991, including General Manager, Quality Assurance; General Manager, Carbon Steel Technology; General Manager, Rockport Works; Manager of various departments at Rockport Works and Middletown Works; Quality Control and Operations Management positions and Associate Process Engineer, Associate Metallurgist and Assistant Metallurgist at Middletown Works.

*Maurice A. Reed* has served as Vice President, Engineering, Raw Materials and Energy since May 2012. Prior to that, Mr. Reed was Director, Engineering and Raw Materials from March 2011. Prior to that, Mr. Reed served in a variety of other capacities since joining us in 1996, including Director of Engineering and Energy from June 2010, General Manager—Engineering, Operations Support and Primary Process Research from March 2009 and General Manager—Engineering from May 2006. Before joining us, Mr. Reed held a number of increasingly responsible engineering technology positions for National Steel Corporation.

*Jaime Vasquez* has served as Vice President, Finance and Chief Financial Officer since January 2016. Before joining us in September 2014 as Director, Finance, Mr. Vasquez held several positions with Carpenter Technology Corporation, including Vice President, Chief Financial Officer for the Performance Engineered Products Group from October 2013; Vice President, Corporate Development from July 2011; President, Asia Pacific from May 2008; and Vice President, Treasurer, and Investor Relations from March 2001.

**Available Information**

We maintain a website at www.aksteel.com. Information about us is available on the website free of charge, including the annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934. Such information is posted to the website as soon as reasonably practicable after submission to the Securities and Exchange Commission. Information on our website is not incorporated by reference into this report.

**Item 1A.        Risk Factors.**

We caution readers that our business activities involve risks and uncertainties that could cause actual results to differ materially from those we currently expect. While the items listed below represent the most significant risks to us, we regularly monitor and report risks to the Board of Directors through a formal Total Enterprise Risk Management program.

**Risk of reduced selling prices, shipments and profits associated with a highly competitive and cyclical industry**. The competitive landscape in the steel industry reflects an improving, but uneven, domestic economy; uncertain, and in some cases, slowing foreign economies; an uneven recovery within certain sectors of the domestic and global economies; continued intense competition from domestic steel competitors; and increased competition from foreign steel competitors, much of which we believe is unfair. These conditions directly impact our pricing. It is impossible to predict whether the domestic and/or global economies or industry sectors of those economies that are key to our sales will continue to improve and generate enough demand to take up more of the existing excess capacity in the steel industry. Also, we cannot know how customers or competitors will react to these and other factors and how their actions could affect market dynamics and sales of, and prices for, our products. Market price and demand for steel are very hard to predict and we could be hurt by decreases in either. In addition, our direct sales to the automotive industry generate approximately 60% of our revenue and we make additional sales to distributors and converters whom, we believe, ultimately resell some of that volume to the automotive market. If automotive demand should decline substantially or we lose market share to competitors, our sales, financial results and cash flows could be severely impacted.

**Risk of increased global steel production and imports**.  An increase in global capacity and new or expanded production capacity in the United States in recent years has caused and continues to cause capacity to exceed demand globally, as well as in our primary

- 5-

A004699

*Table of Contents*

markets in North America, which has and may continue to result in lower prices and shipments of our products. In fact, significant increases in production capacity in the United States by our competitors already have occurred in recent years as new carbon and stainless steelmaking and finishing facilities have begun production. In addition, foreign competitors have substantially increased their production capacity in the last few years, and in some instances appear to have targeted the U.S. market for imports. Also, some foreign economies, such as China, are slowing relative to recent historical norms, resulting in an increased volume of steel products that cannot be consumed by industries in those foreign steel producers' own countries. These and other factors have contributed to a high and growing level of imports of foreign steel into the United States in recent years and create a risk of even greater levels of imports, depending upon foreign market and economic conditions, the value of the U.S. dollar relative to other currencies, and other variables beyond our control. A significant further increase in domestic capacity or foreign imports could adversely affect our sales, financial results and cash flows.

**Risk of changes in the cost of raw materials and energy.**  The price that we pay for energy and key raw materials, such as electricity, natural gas, industrial gases, iron ore, coal and scrap, can fluctuate significantly based on market factors. The prices at which we sell steel will not necessarily change in tandem with changes in our raw material and energy costs. A portion of our shipments are in the spot market, and pricing for these products fluctuates based on prevailing market conditions. The remainder of our shipments are under contracts typically spanning one year or less. Most of those contracts contain fixed prices that do not allow us to pass through changes if there are increases or decreases in raw material and energy costs. Some of our shipments to contract customers are under contracts with variable-pricing mechanisms allowing us to adjust the total sales price based upon changes in specified raw material and energy costs. Those adjustments, however, do not always reflect all of our underlying raw material and energy cost changes. The scope of the adjustment may be limited by the terms of the negotiated language including limitations on when the adjustment occurs. Even under our contracts that contain variable-pricing mechanisms, we typically do not recover all of our underlying raw material and energy cost increases. For shipments made to the spot market, market conditions or timing of sales may not allow us to recover the full amount of an increase in raw material or energy costs. In such circumstances, a significant increase in raw material or energy costs likely would adversely impact our financial results and cash flows. Conversely, in certain circumstances, our financial results and cash flows may suffer when raw material prices decline. This can occur when we lock in the price of a raw material over a set period and the spot market price for the material declines during that period. Because there often is a correlation between the price of finished steel and the raw materials used to make it, a decline in raw material prices may coincide with lower steel prices, compressing our margins. Our need to consume existing inventories may also delay the impact of a change in raw materials prices. New inventory may not be purchased until some portion of the existing inventory is consumed. The impact of this risk is particularly significant for iron ore, coke and scrap because of the volume used. We manage our exposure to the risk of iron ore price increases by hedging a portion of our annual iron ore supply and by entering supply agreements where the IODEX, the global iron ore price index, is only one factor affecting our price of iron ore pellets. Our investment in and development of AK Coal has reduced the risk to us from price increases for metallurgical coal. Although AK Coal is only expected to supply approximately 13% of our coal needs in 2016, we could expand its production relatively quickly if coal prices increase significantly. However, there is a risk that the volume of coal supplied to us by our mining operations will be insufficient if there are delays in development or otherwise, or if the cost of raw materials from these operations are higher than expected or above market prices. If we must acquire iron ore and coal at market prices, these prices are sensitive to global demand and have been volatile in recent years. Future cost increases could be significant for iron ore and coal, as well as certain other raw materials, such as scrap. The impact of significant fluctuations in the price we pay for raw materials can be increased by our "last in, first out" ("LIFO") accounting method for valuing inventories. Using the LIFO method means that we treat the last coil of steel completed as the first one sold, which means that our inventory value can reflect earlier input costs that do not reflect current input costs. The impact of LIFO accounting may be particularly significant in period-to-period comparisons.

**Risk from our significant amount of debt and other obligations.**  On December 31, 2015, we had $2,405.5 of indebtedness (excluding unamortized discount and debt issuance costs) and additional obligations outstanding. We also had pension and other postretirement benefit obligations totaling $1,224.6. No contributions to the master pension trust are required for 2016. Based on current funding projections, contributions to the master pension trust of approximately $50.0 and $75.0 are required for 2017 and 2018, though funding projections in 2017 and beyond could be affected by differences between expected and actual returns on plan assets, actuarial data and assumptions relating to plan participants, the interest rate used to measure the pension obligations and changes to regulatory funding requirements. We can borrow additional amounts under our $1,500.0 revolving credit facility. At December 31, 2015, we had outstanding borrowings of $550.0 from this credit facility and outstanding letters of credit of $72.9, resulting in maximum remaining availability of $877.1 under the credit facility (subject to customary borrowing conditions, including a borrowing base). Borrowing capacity under the credit facility is determined by the value of eligible collateral less outstanding borrowings and letters of credit. At December 31, 2015, borrowing availability under the credit facility was $652.3 based on eligible collateral at that time. Our debt and pension obligations, along with other financial obligations, could have important consequences. For example, it could increase our vulnerability to general adverse economic and industry conditions; require a substantial portion of our cash flows to be dedicated to interest payments, reducing the amount of cash flows available for other purposes, such as working capital, capital expenditures, acquisitions, joint ventures or general corporate purposes; limit our ability to obtain future additional financing; reduce our planning flexibility for, or ability to react to, changes in the our business and the industry; and place us at a competitive disadvantage with competitors who may have less indebtedness and other obligations or greater access to financing.

A004700

A004701

**Risk of severe financial hardship or bankruptcy of one or more of our major customers or key suppliers.** Sales and operations of a majority of our customers are sensitive to general economic conditions, especially as they affect the North American automotive and housing industries. If there is a significant weakening of current economic conditions, whether because of secular or cyclical issues, it could lead to financial difficulties or even bankruptcy filings by our customers. The concentration of customers in a specific industry, such as the automotive industry, may increase our risk because of the likelihood that circumstances may affect multiple customers at the same time. Such financial hardships or bankruptcies will likely harm us. The nature of that impact would likely include lost sales or losses associated with the potential inability to collect all outstanding accounts receivables. Such an event could negatively impact our financial results and cash flows. In addition, many of our key suppliers, particularly those who supply us with critical raw materials for the steelmaking process, have recently faced severe financial challenges or bankruptcy and other suppliers may face such circumstances in the future. For example, the significant decline in commodity prices during 2015 led to increased economic distress and even bankruptcy filings for several of our principal sources of metallurgical coal, as well as one of our key iron ore suppliers, Magnetation LLC. These suppliers facing financial hardship or operating in bankruptcy could experience operational disruption or even face liquidation, which could result in our inability to secure replacement raw materials on a timely basis, or at all, or cause us to incur increased costs to do so. Such events could adversely impact our operations, financial results and cash flows.

**Risk of reduced demand in key product markets due to competition from aluminum or other alternatives to steel.** The automotive market is an important element of our business. Automotive manufacturers are under pressure to meet increasing government-mandated fuel economy standards through 2025. One major automotive company recently elected to substitute aluminum for carbon steel in the body of one of its vehicles, and may increase the use of aluminum in others. Other automotive manufacturers are currently investigating the potential use of aluminum and other alternatives to steels. If demand from one or more of our major automotive customers were to significantly decline because of increased use of aluminum or other competing materials in substitution for steel, it likely would negatively affect our sales, financial results and cash flows.

**Risks of excess inventory of raw materials.** We have certain raw material supply contracts which include minimum annual purchases, subject to exceptions for *force majeure* and other circumstances. If our need for a particular raw material is reduced for an extended period significantly below what we projected at the contract's inception, or what we projected at the time an annual nomination was made under that contract, we could be required to purchase quantities of raw materials that exceed our anticipated annual needs. Our decision to temporarily idle the Ashland Works Hot End increases this risk, as those operations are a major consumer of several key raw materials for which we have take-or-pay obligations, including iron ore and coke. If our existing supply contracts require us to purchase raw materials in quantities beyond our needs, and if we do not succeed in reaching an agreement with a particular raw material supplier to reduce the quantity of raw materials we purchase from that supplier, then we would likely be required to purchase more of a particular raw material in a given year than we need, negatively affecting our financial results, liquidity and cash flows. Changes in our raw material, finished and semi-finished inventory levels and our LIFO method for valuing inventories could increase the negative impact on our financial results.

**Risk of supply chain disruptions or poor quality of raw materials.** Our sales, financial results and cash flows could be adversely affected by transportation, raw material or energy supply disruptions, or poor quality of raw materials, particularly scrap, coal, coke, iron ore and alloys. For example, extreme cold weather conditions in the United States and Canada can impact shipping on the Great Lakes and could disrupt the delivery of iron ore to us and/or increase our costs for iron ore. Such disruptions or quality issues, whether the result of severe financial hardships or bankruptcies of suppliers, natural or man-made disasters, other adverse weather events, or other unforeseen events, could reduce production or increase costs at one or more of our plants and potentially adversely affect customers or markets to which we sell our products. Any such significant disruption or quality issue would adversely affect our sales, financial results and cash flows.

**Risk of production disruption or reduced production levels.** When business conditions permit, we attempt to operate our facilities at production levels at or near capacity. High production levels are important to our financial results because they enable us to spread fixed costs over a greater number of production tons. During 2015, we began to implement a strategy to target markets for our products that deliver higher margins, where possible, and reduce amounts sold into the lower margin spot markets. This strategy relies on our ability to sell higher margin products that overcome the effects of lower production volumes on our fixed costs. If we are unable to implement this strategy successfully, it would adversely affect our sales, financial results and cash flows. Production disruptions could be caused by unanticipated plant outages or equipment failures, particularly under circumstances where we lack adequate redundant facilities, such as our Middletown Works hot mill. In addition, the occurrence of natural or man-made disasters, adverse weather conditions, or similar events could significantly disrupt our operations, negatively impact the operations of other companies or contractors we depend upon, or adversely affect customers or markets who buy our products. Any such significant disruption or reduced level of production would adversely affect our sales, financial results and cash flows.

**Risks associated with our healthcare obligations.** We provide healthcare coverage to our active employees and to a significant portion of our retirees, as well as certain members of their families. We are self-insured for substantially all of our healthcare coverage.

While we have substantially reduced our exposure to rising healthcare costs through cost sharing, cost caps and VEBA trusts, the cost

- 7-

A004703

Table of Contents

of providing such healthcare coverage may be greater on a relative basis for us than for our competitors because they either provide a lesser level of benefits, require that their participants pay more for their benefits, or do not provide coverage to as broad a group of participants (e.g., they do not provide retiree healthcare benefits). In addition, our costs for retiree healthcare obligations could be affected by fluctuations in interest rates or by federal healthcare legislation.

**Risks associated with our pension obligations**. We have a substantial pension obligation that, along with the related pension expense (income) and funding requirements, is directly affected by various changes in assumptions, including the selection of appropriate mortality assumptions and discount rates. These items also are affected by the rate and timing of employee retirements, actual experience compared to actuarial projections and asset returns on the securities markets. Such changes could increase the cost to us of those obligations, which could have a material adverse effect on our results and ability to meet those obligations. In addition, changes in the law for pension funding could also materially adversely affect our costs and ability to meet our pension obligations. Also, under the method of accounting we use for pension obligation reporting, we recognize into our results of operations, as a "corridor" adjustment, any unrecognized actuarial net gains or losses that exceed 10% of the larger of projected benefit obligations or plan assets. These corridor adjustments are driven mainly by changes in assumptions and by events and circumstances beyond our control, primarily changes in interest rates, performance of the financial markets, and mortality and retirement projections. A corridor adjustment, if required after a re-measurement of our pension obligations, historically has been recorded in the fourth quarter of the fiscal year. Corridor adjustments can have a significant negative impact on our financial statements in the year a charge is recorded, although the immediate recognition of the charge in that year has the beneficial effect of reducing the impact of unrealized gains or losses on future years. The recognition of a corridor charge does not have any immediate impact on our cash flows. We also contribute to multiemployer pension plans according to collective bargaining agreements that cover certain union-represented employees. Participating in these multiemployer plans exposes us to potential liabilities if the multiemployer plan is unable to pay its unfunded obligations or we choose to stop participating in the plan.

**Risk of not reaching new labor agreements on a timely basis**. Most of our hourly employees are represented by various labor unions and are covered by collective bargaining agreements with expiration dates between March 2016 and May 2019. Two of those contracts are scheduled to expire in 2016. The labor contract with the United Auto Workers, Local 3462, which represents approximately 330 hourly employees at our Coshocton Works located in Coshocton, Ohio, expires on March 31, 2016. An agreement with the United Auto Workers, Local 3303, which represents approximately 1,240 employees at our Butler Works located in Butler, Pennsylvania, is scheduled to expire on October 1, 2016. We intend to negotiate with these unions to reach new, competitive labor agreements in advance of the current expiration dates. We cannot predict, however, when new, competitive labor agreements with the unions will be reached or what the impact of such agreements will be on our operating costs, operating income and cash flows. There is the potential of work stoppages at these locations in 2016 if we cannot reach timely agreements in contract negotiations before the contract expirations. If work stoppages occur, they could have a material impact on our operations, financial results and cash flows. For labor contracts we have with unions at other locations which expire after 2016, a similar risk applies.

**Risks associated with major litigation, arbitrations, environmental issues and other contingencies**. We have described several significant legal and environmental proceedings in Note 10 to the consolidated financial statements in Item 8. For environmental issues, changes in application or scope of regulations applicable to us could have significant adverse impacts, including requiring capital expenditures to ensure compliance with the regulations, increased difficulty in obtaining future permits or meeting future permit requirements, incurring costs for emission allowances, restriction of production, and higher prices for certain raw materials. One or more of these adverse developments could negatively impact our operations, financial results and cash flows. For litigation, arbitrations and other legal proceedings, it is not possible to predict with certainty the outcome of such matters and we could incur future judgments, fines or penalties or enter into settlements of lawsuits, arbitrations and claims that could have an adverse effect on our business, results of operations and financial condition. In addition, while we maintain insurance coverage for certain claims, we may not be able to obtain insurance on acceptable terms in the future and, if we obtain such insurance, it may not provide adequate coverage against all claims. We establish reserves based on our assessment of contingencies, including contingencies for claims asserted against us in connection with litigation, arbitrations and environmental issues. Adverse developments in litigation, arbitrations, environmental issues or other legal proceedings may affect our assessment and estimates of the loss contingency recorded as a reserve and require us to make payments in excess of our reserves, which could negatively affect our operations, financial results and cash flows.

**Risk associated with regulatory compliance and changes.** Our business and the businesses of our customers and suppliers are subject to a wide variety of government oversight and regulation, including those relating to environmental permitting requirements. The regulations promulgated or adopted by various government agencies, and the interpretations and application of such regulations, are dynamic and constantly evolving. If new regulations arise, the application of existing regulations expands, or the interpretation of applicable regulations changes, we may incur additional costs for compliance, including capital expenditures. For example, the United States Environmental Protection Agency ("EPA") is required to routinely reassess the National Ambient Air Quality Standards ("NAAQS") for criteria pollutants like nitrogen dioxide, sulfur dioxide, lead, ozone and particulate matter. These standards are frequently subject to litigation and revision. Revisions to the NAAQS could require us to make significant capital expenditures to ensure compliance and could make it more difficult for us to obtain required permits in the future. These risks are higher for our

A004704

A004705

*Table of Contents*

facilities that are located in non-attainment areas. For AK Coal, the coal mining industry is subject to numerous and extensive federal, state and local environmental laws and regulations, including laws and regulations related to permitting and licensing requirements, air quality standards, plant and wildlife protection, reclamation and restoration of mining properties, the discharge of materials into the environment, the storage, treatment and disposal of wastes, surface subsidence from underground mining and the effects of mining on groundwater quality and availability. We may also be indirectly affected through regulatory changes that impact our customers or suppliers. Regulatory changes that impact our customers could reduce the quantity of our products they demand or the price of our products that they are willing to pay. Regulatory changes that impact our suppliers could decrease the supply of products or availability of services they sell to us or could increase the price they demand for products or services they sell to us.

**Risks associated with climate change and greenhouse gas emission limitations**. Our operations may become subject to legislation intended to limit climate change or greenhouse gas emissions. It is possible that limitations on greenhouse gas emissions may be imposed in the United States through federally-enacted legislation or regulation. For example, the EPA has issued and/or proposed regulations addressing greenhouse gas emissions, including regulations that will require large sources and suppliers in the United States to report greenhouse gas emissions. In addition, the United States Congress has introduced from time to time legislation aimed at limiting carbon emissions from carbon-intensive business operations. Among other potential material items, such bills could include a system of carbon emission credits issued to certain companies, similar to the European Union's existing "cap and trade" system. It is impossible, however, to forecast the terms of the final regulations and legislation, if any, and the resulting effects on us. Depending upon the terms of any such regulations or legislation, however, we could suffer negative financial impacts because of increased energy, environmental and other costs to comply with the limitations that would be imposed on greenhouse gas emissions. In addition, depending upon whether similar limitations are imposed globally, the regulations and/or legislation could negatively impact our ability to compete with foreign steel companies situated in areas not subject to such limitations. Unless and until all of the terms of such regulation and legislation are known, however, we cannot reasonably or reliably estimate their impact on our financial condition, operating performance or ability to compete.

**Risks associated with financial, credit, capital and banking markets**.  In the ordinary course of business, we seek to access financial, credit, capital and/or banking markets at competitive rates. Currently, we believe we have adequate access to these markets to meet our reasonably anticipated business needs. We both provide to our customers and receive from our suppliers normal trade financing. If access to competitive financial, credit, capital and/or banking markets by us, or our customers or suppliers, is impaired, our operations, financial results and cash flows could be adversely impacted.

**Risk associated with derivative contracts to hedge commodity pricing volatility**. We use cash-settled commodity price swaps and options to reduce pricing volatility for (1) a portion of our raw material and energy purchases and (2) the sale of certain of our commodity steel products (hot roll carbon steel coils). We employ a systematic approach in order to mitigate the risk of potential volatile movements in the price of certain raw materials. This approach is intended to protect us against a sharp rise in the price of raw materials. However, engaging in the use of swaps, options and similar agreements for hedging entails a variety of risks. For example, if the price of an underlying commodity falls below the price at which we hedged the commodity, we will benefit from the lower market price for the commodity purchased, but may not realize the full benefit of the lower commodity price because of the hedged transaction. In certain circumstances we also could be required to provide collateral for a potential derivative liability or close our hedging transaction for the commodity. Additionally, there may be a timing lag (particularly for iron ore) between a decline in the price of a commodity underlying a derivative contract, which could require us to make payments in the short-term to provide collateral or settle the relevant hedging transaction, and the period when we experience the benefits of the lower cost input through physical purchases of the commodity the hedge covers. Further, for derivatives designated as cash-flow hedges, we initially record the effective gains and losses in accumulated other comprehensive income (loss) and reclassify them to earnings in the same period we recognize the effect of the associated hedged transaction. We record all gains or losses from derivatives for which hedge accounting treatment has not been elected or from hedge ineffectiveness to earnings in the period the gain or loss occurs. Changes in the fair value of derivatives for which hedge accounting treatment has not been elected or greater hedge ineffectiveness than we anticipated on cash-flow hedges may result in increased volatility in our reported earnings. Each of these risks related to our hedging transactions could adversely affect our financial results and cash flows.

**Risks related to the potential permanent idling of facilities.** We have embarked on a strategic review of our business, which includes evaluating each of our plants and operating units to assess their viability and strategic benefits. As part of this review, we may idle— whether temporarily or permanently—certain of our existing facilities in order to exit participation in markets where we determine that our returns are not acceptable. For example, in December 2015 we temporarily idled the Ashland Works Hot End in order to mitigate our exposure to the carbon steel spot market. If we decide to permanently idle the Ashland Works Hot End or any other facility, we are likely to incur significant cash expenses, including those relating to labor benefit obligations, take-or-pay supply agreements and accelerated environmental remediation costs, as well as substantial non-cash charges for impairment of those assets and the effects on pension and OPEB liabilities. If we elect to permanently idle material facilities or assets, it could adversely affect our operations, financial results and cash flows.

A004707

**Risk of inability to fully realize benefits of margin enhancement initiatives.** In recent years we have undertaken several significant projects in an effort to lower costs and enhance margins. In addition, we have identified and implemented many initiatives to achieve synergies in connection with our acquisition and integration of Dearborn. These projects and initiatives include efforts to focus production and sales on higher margin products, increase our operating rates and lower our costs. We identified a number of areas for enhancing profitability, including increasing our percentage of contract sales, producing and selling a higher-margin mix of products (including lowering our sales to the carbon steel spot market, which drove our decision to temporarily idle the Ashland Works Hot End) and developing new products that can command higher prices from customers. If one or more of these key cost-savings or margin enhancement projects are unsuccessful, or are significantly less effective in achieving the level and timing of combined cost savings or margin enhancement than we anticipated, or that we do not achieve results as quickly as anticipated, our financial results and cash flows could be adversely impacted.

**Risk of information technology ("IT") security threats and cybercrime.** We rely on IT systems and networks in almost every aspect of our business activities. In addition, we and certain of our third-party data processing providers collect and store sensitive data. We have taken, and intend to continue to take, what we believe are appropriate and reasonable steps to prevent security breaches in our systems and networks. In recent years, however, both the number and sophistication of IT security threats and cybercrimes have increased. These IT security threats and increasingly sophisticated cybercrimes, including advanced persistent attacks, pose a risk to system security and the confidentiality, availability and integrity of our data. A breach in security could expose us to risks of production downtimes and operations disruptions, misuse of information or systems, or the compromising of confidential information, which in turn could adversely affect our reputation, competitive position, business and financial results.

**Item 1B.        Unresolved Staff Comments.**

None.

**Item 2.        Properties.**

We lease a building in West Chester, Ohio, that we use as our corporate headquarters. The initial term of the building lease expires in 2019 and there are two five-year options to extend the lease. We own a research building located in Middletown, Ohio, and are currently constructing a new research and innovation center in Middletown to replace the existing building. We also lease administration buildings located in Dearborn, Michigan.

Our operations consist primarily of eight steelmaking and finishing plants, two coke plants and two tube manufacturing plants across six states—Indiana, Kentucky, Michigan, Ohio, Pennsylvania and West Virginia. We own all of these facilities.

Ashland Works is located in Ashland, Kentucky, and produces carbon steel. It consists of a blast furnace, basic oxygen furnaces and continuous caster for the production of carbon steel and a coating line that helps to complete the finishing operation of material processed at Middletown Works. In December 2015, we temporarily idled the blast furnace, basic oxygen furnaces and continuous caster in response to excess global supply and the increase in low-priced imports into the United States. We elected not to idle the coating line at Ashland Works, which principally finishes steel for the automotive market.

Butler Works is located in Butler, Pennsylvania, and produces stainless, electrical and carbon steel. Melting takes place in a highly-efficient electric arc furnace that feeds an argon-oxygen decarburization unit for the specialty steels. A ladle metallurgy furnace feeds two double-strand continuous casters. Butler Works also includes a hot rolling mill, annealing and pickling units and two fully automated tandem cold rolling mills. It also has various intermediate and finishing operations for both stainless and electrical steels.

Coshocton Works is located in Coshocton, Ohio, and consists of a stainless steel finishing plant containing two Sendzimer mills and two Z-high mills for cold reduction, four annealing and pickling lines, nine bell annealing furnaces, four hydrogen annealing furnaces, two bright annealing lines and other processing equipment, including temper rolling, slitting and packaging facilities.

Dearborn Works is located in Dearborn, Michigan, and was acquired in 2014. The operations include carbon steel melting, casting, hot and cold rolling and finishing operations for carbon steel. It consists of a blast furnace, basic oxygen furnaces, two ladle metallurgy furnaces, a vacuum degasser and two slab casters. Dearborn Works also has a hot rolling mill, a pickle line/tandem cold mill, batch anneal shops, a temper mill and a hot-dip galvanizing line for finishing products.

Mansfield Works is located in Mansfield, Ohio, and produces stainless steel. Operations include a melt shop with two electric arc furnaces, a ladle metallurgy furnace, an argon-oxygen decarburization unit, a thin-slab continuous caster and a hot rolling mill.

- 10 -

A004708

Table of Contents

Middletown Works is located in Middletown, Ohio. It melts carbon and processes carbon and stainless steel. It consists of a coke facility, blast furnace, basic oxygen furnaces and continuous caster for the production of carbon steel. Middletown Works also has a hot rolling mill, cold rolling mill, two pickling lines, four annealing facilities, two temper mills and three coating lines for finishing products.

Rockport Works is located near Rockport, Indiana, and consists of a continuous cold rolling mill, a continuous hot-dip galvanizing and galvannealing line, a continuous carbon and stainless steel pickling line, a continuous stainless steel annealing and pickling line, hydrogen annealing facilities and a temper mill.

Zanesville Works is located in Zanesville, Ohio, and consists of a finishing plant for some of the stainless and electrical steel produced at Butler Works and Mansfield Works and has a Sendzimer cold rolling mill, annealing and pickling lines, high temperature box anneal and other decarburization and coating units.

AK Tube LLC, a subsidiary, has a plant in Walbridge, Ohio, which operates six electric resistance welder tube mills and a slitter. AK Tube also has a plant in Columbus, Indiana, which operates eight electric resistance welder and two laser welder tube mills.

AK Coal, another subsidiary, produces metallurgical coal from reserves in Somerset County, Pennsylvania.

Mountain State Carbon, LLC, a subsidiary, is located in Follansbee, West Virginia. It is a cokemaking facility acquired in 2014 and consists of four batteries with total permitted cokemaking capacity of approximately 700,000 tons per year.

### Item 3.        Legal Proceedings.

Information for this item may be found in Note 10 to the consolidated financial statements in Item 8, which is incorporated herein by reference.

### Item 4.        Mine Safety Disclosures.

The operation of AK Coal's North Fork Mine and Coal Innovations, LLC coal wash plant (collectively, the "AK Coal Operations") are subject to regulation by the Mine Safety and Health Administration ("MSHA") under the Federal Mine Safety and Health Act of 1977, as amended ("Mine Act"). MSHA inspects mining and processing operations, such as the AK Coal Operations, on a regular basis and issues various citations and orders when it believes a violation has occurred under the Mine Act. Exhibit 95.1 to this Annual Report presents citations and orders from MSHA and other regulatory matters required to be disclosed by Section 1503(a) of the Dodd-Frank Wall Street Reform and Consumer Protection Act or otherwise under this Item 4.

- 11-

Table of Contents

## PART II

### Item 5.        Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.

AK Holding's common stock has been listed on the New York Stock Exchange since April 5, 1995 (symbol: AKS). The reported high and low sales prices of the common stock for each quarter are presented below:

|                | 2015 | | 2014 | |
|                | High | Low | High | Low |
|----------------|------|-----|------|-----|
| First Quarter  | $ 6.17 | $ 3.62 | $ 8.24 | $ 5.79 |
| Second Quarter | 5.93 | 3.81 | 7.99 | 5.97 |
| Third Quarter  | 3.93 | 2.05 | 11.37 | 7.98 |
| Fourth Quarter | 3.25 | 1.99 | 8.00 | 5.08 |

As of February 17, 2016, there were 178,344,667 shares of common stock outstanding and held of record by 3,920 stockholders. The closing stock price on February 17, 2016, was $2.57 per share. Because depositories, brokers and other nominees held many of these

shares, the number of record holders is not representative of the number of beneficial holders. There were no unregistered sales of equity securities in the quarter or year ended December 31, 2015.

Although we have elected to suspend our dividend program, no covenant restrictions currently would restrict our ability to declare and pay a dividend to our stockholders. Our $1,500.0 asset-backed revolving credit facility (the "Credit Facility") contains certain restrictive covenants which could, under certain circumstances, restrict the dividend payments, but none of those circumstances currently apply. Under these covenants, dividends are permitted as long as (i) availability exceeds $337.5 or (ii) availability exceeds $262.5 and we meet a fixed charge coverage ratio of one to one as of the most recently ended fiscal quarter. If we cannot meet either of these thresholds, dividend payments would be limited to $12.0 annually. At December 31, 2015, the availability under the Credit Facility significantly exceeded $337.5.

## ISSUER PURCHASES OF EQUITY SECURITIES

| Period | Total Number of Shares Purchased (a) | Average Price Paid Per Share (a) | Total Number of Shares (or Units) Purchased as Part of Publicly Announced Plans or Programs (b) | Approximate Dollar Value of Shares that May Yet be Purchased Under the Plans or Programs (b) |
|---|---|---|---|---|
| October 2015 | 459 | $ 2.86 | — | |
| November 2015 | 2,180 | 2.75 | — | |
| December 2015 | 910 | 2.16 | — | |
| Total | 3,549 | 2.61 | — | $ 125.6 |

(a) During the quarter, we repurchased common stock owned by participants in our restricted stock awards program under the terms of the AK Steel Holding Corporation Stock Incentive Plan. To pay federal, state and local taxes due upon the vesting of the restricted stock, employees may have us withhold shares that have a fair market value equal to the minimum statutory withholding rate that tax authorities could impose on the transaction. We repurchase the withheld shares at the quoted average of the reported high and low sales prices on the day we withhold the shares.

(b) On October 21, 2008, the Board of Directors authorized us to repurchase, from time to time, up to $150.0 of our outstanding equity securities. The Board of Directors' authorization specified no expiration date.

- 12-

A004711

*Table of Contents*

The following graph compares cumulative total stockholder return on AK Holding's common stock for the five-year period from January 1, 2011 through December 31, 2015, with the cumulative total return for the same period of (i) the Standard & Poor's Small Cap 600 Stock Index, and (ii) the New York Stock Exchange Arca Steel Index. These comparisons assume an investment of $100 at the beginning of the period and reinvestment of dividends.



|  | January 1, 2011 | December 31, |  |  |  |  |
|---|---|---|---|---|---|---|
|  |  | 2011 | 2012 | 2013 | 2014 | 2015 |
| AK Holding | $ 100 | $ 50 | $ 28 | $ 50 | $ 36 | $ 14 |
| NYSE Arca Steel | 100 | 66 | 68 | 69 | 49 | 28 |
| S&P 600 Small Cap | 100 | 100 | 115 | 160 | 167 | 162 |

- 13-

*Table of Contents*

**Item 6.    Selected Financial Data.**

A004712

The following selected historical consolidated financial data for each of the five years in the period ended December 31, 2015 are from the audited consolidated financial statements. This data should be read along with the consolidated financial statements presented in Item 8 and *Management's Discussion and Analysis of Financial Condition and Results of Operations* presented in Item 7.

| | 2015 | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|
| | (dollars in millions, except per share and per ton data) | | | | |
| **Statement of Operations Data:** | | | | | |
| Net sales | $ 6,692.9 | $ 6,505.7 | $ 5,570.4 | $ 5,933.7 | $ 6,468.0 |
| Pension/OPEB corridor charge (credit) | 131.2 | 2.0 | — | 157.3 | 268.1 |
| Operating profit (loss) (a) | 86.7 | 139.4 | 135.8 | (128.1) | (201.3) |
| Net income (loss) attributable to AK Steel Holding Corporation (b) | (509.0) | (96.9) | (46.8) | (1,027.3) | (155.6) |
| Basic and diluted earnings (loss) per share (b) | (2.86) | (0.65) | (0.34) | (9.06) | (1.41) |
| **Other Data:** | | | | | |
| Cash dividends declared per common share | $ — | $ — | $ — | $ 0.10 | $ 0.20 |
| Total shipments (in thousands of tons) | 7,089.2 | 6,132.7 | 5,275.9 | 5,431.3 | 5,698.8 |
| Selling price per ton | $ 942 | $ 1,058 | $ 1,056 | $ 1,092 | $ 1,131 |
| **Balance Sheet Data:** | | | | | |
| Cash and cash equivalents | $ 56.6 | $ 70.2 | $ 45.3 | $ 227.0 | $ 42.0 |
| Working capital (c) | 763.6 | 832.8 | 372.2 | 557.1 | (79.2) |
| Total assets (c) | 4,084.4 | 4,828.0 | 3,579.1 | 3,873.7 | 4,439.7 |
| Current portion of long-term debt (d) | — | — | 0.8 | 0.7 | 250.7 |
| Long-term debt (excluding current portion) (c) | 2,354.1 | 2,422.0 | 1,479.6 | 1,381.8 | 639.8 |
| Current portion of pension and other postretirement benefit obligations | 77.7 | 55.6 | 85.9 | 108.6 | 130.0 |
| Pension and other postretirement benefit obligations (excluding current portion) | 1,146.9 | 1,225.3 | 965.4 | 1,661.7 | 1,744.8 |
| Total equity (deficit) (e) | (595.6) | (77.0) | 192.7 | (91.0) | 377.2 |

(a) Under our method of accounting for pensions and other postretirement benefits, we recorded pension corridor charges of $144.3, $2.0, $157.3 and $268.1 in 2015, 2014, 2012 and 2011. In 2015, we also recorded an OPEB corridor credit of $13.1, and a charge for a facility idling of $28.1.

(b) Included in net income (loss) attributable to AK Steel Holding Corporation for 2015 were charges for the impairments of our investments in Magnetation of $256.3, or $1.44 per diluted share, and AFSG of $41.6, or $0.23 per diluted share, and for 2012 was a charge to income tax expense of $865.5, or $7.63 per diluted share, for an increase in the valuation allowance on deferred tax assets.

(c) Balances in 2014, 2013, 2012 and 2011 have been conformed to the 2015 presentation for the classification of deferred tax assets of $67.7, $69.6, $73.2 and $216.5, and debt issuance costs of $30.5, $26.6, $29.4 and $10.2.

(d) Includes borrowings under our revolving credit facility classified as short-term.

(e) As of December 31, 2012, the advances to SunCoke Middletown were classified as noncontrolling interests because of financing activities performed by its parent, SunCoke Energy, Inc. We included this in other non-current liabilities in prior periods.

**Item 7.    Management's Discussion and Analysis of Financial Condition and Results of Operations.**

**Operations Overview**

We operate eight steelmaking and finishing plants, two coke plants and two tube manufacturing plants across six states—Indiana, Kentucky, Michigan, Ohio, Pennsylvania and West Virginia. These operations produce flat-rolled carbon steels, including premium-quality coated, cold-rolled and hot-rolled carbon steel products, and specialty stainless and electrical steels that we sell in sheet and strip form, as well as carbon and stainless steel that we finish into welded steel tubing. We sell these products to our customers in three markets: (i) automotive; (ii) infrastructure and manufacturing; and (iii) distributors and converters markets. We sell carbon steel products principally to domestic customers and electrical and stainless steel products both domestically and internationally. We also produce carbon and stainless steel that we finish into welded steel tubing used in the automotive, large truck, industrial and construction markets. In addition, we operate Mexican and European trading companies that buy and sell steel and steel products and other materials.

A004713

*Table of Contents*

Safety, quality, innovation and productivity are key factors in our business and hallmarks of our success. In 2015, we experienced another year of outstanding safety performance and continued to lead the steel industry in OSHA-recordable safety performance by a wide margin. Our quality focus also continued, establishing several all-time company best records for internal quality performances. We have redoubled our efforts to develop new products and processes, including next-generation Advanced High Strength Steels for the automotive market, new types of corrosion-resistant stainless steels and improved electrical steels to help customers around the world meet higher energy efficiency standards. Finally, our relentless concentration on productivity gains and initiatives to lower operating costs generated enhanced margins in 2015.

## 2015 Financial Results Overview

Our focus on what we can control produced solid operational improvements during a challenging year in the domestic steel industry. As demand from China slowed, global steelmaking overcapacity increased and led steel producers in countries with excess steel production—most notably, China itself—to flood the U.S. market with what we believe are unfairly-traded imports. The imports into the United States caused sharp declines in carbon steel spot market prices during the year. As part of our strategic focus on enhancing margins, we targeted sales of higher-margin value-added carbon, stainless and electrical steel products and intentionally reduced shipments to the carbon steel spot market. Also as part of our margin enhancement efforts, we relentlessly concentrated on reducing operating costs and positioned the blast furnaces and steelmaking operations at our Middletown Works and Dearborn Works for higher operating rates by temporarily idling our blast furnace and steelmaking operations at our Ashland Works at the end of 2015. A charge of $28.1, or $0.16 per diluted share, was recorded in the fourth quarter of 2015 as a result of this temporary facility idling.

Our customer markets improved in 2015. North American light vehicle production was approximately 17.5 million units, a 3% increase from 2014. In addition, housing starts in the United States reached levels not achieved since 2007. These market recoveries improved our sales of carbon and stainless steels into the automotive market and increased selling prices for our electrical steels. However, the global steelmaking overcapacity and the resulting impact from the significant rise in imports in our primary markets in North America had a negative impact on our financial performance in 2015. Thus, despite the strength of our customer markets, our average capacity utilization across all plants decreased to approximately 79% in 2015 compared to approximately 82% in 2014. While we continue to focus our capacity on producing higher-margin value-added steels, our September 2014 acquisition of Dearborn increased the proportion of sales of hot rolled coils and decreased the proportion of sales from value-added shipments from 82% in 2014 to 79% in 2015. We made strides in 2015 to increase the amount of value-added carbon steel shipments from Dearborn Works, but concentrating on higher-margin value-added carbon steels at the Dearborn plant—particularly for automotive customers—continues to be a focus for our business.

Net sales for 2015 increased 3% and shipments increased 16% from 2014, due primarily to the September 2014 acquisition of Dearborn and higher demand from the automotive market. The average selling price for 2015 was $942 per ton, an 11% decrease from the 2014 average selling price of $1,058 per ton resulting primarily from the adverse market effects of a higher level of low-priced imports during 2015. Our per ton cost of products sold for 2015 declined 13% from 2014, principally due to a sharp decline in raw material input costs and our persistent focus on operating costs.

As a result of these business conditions, we reported a net loss of $509.0, or $2.86 per diluted share of common stock, in 2015. These results included charges (i) to write off our investments in Magnetation LLC ("Magnetation") and AFSG Holdings, Inc. ("AFSG"), (ii) for a pension and OPEB net corridor charge, and (iii) for the temporary idling of the Ashland Works Hot End. Excluding these charges, we reported an adjusted net loss of $51.8, or $0.29 per diluted share. We also reported adjusted EBITDA of $393.4, or $55 per ton, representing a 40% increase from 2014 adjusted EBITDA of $280.2, or $46 per ton. Reconciliations for the non-GAAP financial measures are in the *Non-GAAP Financial Measures* section.

During 2015 we also focused on our cash and liquidity, ending the year with $700.2 of total liquidity. Although our overall liquidity declined from the end of 2014, this resulted principally from a decrease in the borrowing base under our asset-backed revolving credit facility. The decrease resulted from lower collateral values related to declines in raw material and steel prices, as well as lower levels of accounts receivable. We reduced borrowings under our credit facility by $55.0 in 2015. In addition, we further lowered our long-term debt by repurchasing a principal amount of $23.8 of our senior unsecured notes for $14.1. Our pension and other postretirement obligations declined by $56.3, primarily as a result of an increase in the discount rates used to determine the present value of the obligations and favorable actuarial experience, partially offset by unfavorable returns on our plan assets.

## Dearborn Acquisition

On September 16, 2014, we acquired Dearborn for a cash purchase price of $690.3, net of cash acquired. The acquisition included integrated steelmaking assets located in Dearborn, Michigan ("Dearborn Works"), the Mountain State Carbon cokemaking facility located in Follansbee, West Virginia, and interests in joint ventures that process flat-rolled steel products.

A004715

*Table of Contents*

Similar to our pre-existing carbon steel operations, Dearborn Works produces hot- and cold-rolled sheet and hot-dip galvanized products, as well as other flat-rolled steel products. Dearborn Works is strategically located in close proximity to many of our customers, and the assets at the steel plant and the other acquired facilities complement our pre-existing carbon steel operations with production capacity that exceeds 2.5 million tons of finished steel per year.

We believe that this transaction enhances and complements our business and operational strategies by positioning our carbon steelmaking operations close to our major northern automotive and other customers, expanding our platform to meet the increasing light-weighting demands of our automotive customers, and enhancing our operational flexibility. In addition to current and expected significant operational and productivity improvements, the acquisition is creating significant purchasing, transportation and overhead cost savings. We originally anticipated annual cost-based synergies in excess of $50.0, with approximately $25.0 expected to be realized in 2015. We achieved synergies of $59.0 in 2015.

Our financial results include the effects of the acquisition and Dearborn's operations for periods after September 16, 2014, affecting comparability to prior periods.

### 2015 Compared to 2014

*Steel Shipments*

Steel shipments in 2015 were 7,089,200 tons, a 16% increase from 2014 shipments of 6,132,700 tons. The increase in overall shipments in 2015 compared to 2014 was principally from the addition of shipments from Dearborn Works following the September 2014 acquisition. As a result of the high level of imports in 2015, we targeted shipments to the automotive market and elected to reduce shipments to the carbon steel spot market. Primarily as a result of a relatively higher proportion of carbon spot market shipments in the Dearborn Works product mix compared to our historical mix, our higher-margin value-added shipments as a percent of total volume shipped decreased from 82.1% in 2014 to 79.3% in 2015. Tons shipped by product category for 2015 and 2014, and as a percent of total shipments, were as follows:

|  | **2015** | | **2014** | |
|---|---|---|---|---|
|  | (tons in thousands) | | | |
| **Value-added Shipments** | | | | |
| Stainless/electrical | 876.2 | 12.4% | 867.9 | 14.1% |
| Coated | 3,340.4 | 47.1% | 2,812.7 | 45.9% |
| Cold-rolled | 1,293.0 | 18.2% | 1,231.1 | 20.1% |
| Tubular | 115.2 | 1.6% | 125.5 | 2.0% |
| Subtotal value-added shipments | 5,624.8 | 79.3% | 5,037.2 | 82.1% |
| **Non Value-added Shipments** | | | | |
| Hot-rolled | 1,273.1 | 18.0% | 949.7 | 15.5% |
| Secondary | 191.3 | 2.7% | 145.8 | 2.4% |
| Subtotal non value-added shipments | 1,464.4 | 20.7% | 1,095.5 | 17.9% |
| Total shipments | 7,089.2 | 100.0% | 6,132.7 | 100.0% |

*Net Sales*

Net sales in 2015 were $6,692.9, a 3% increase from 2014 net sales of $6,505.7. The increase in net sales is primarily due to the addition of net sales from Dearborn Works following the September 2014 acquisition. However, net sales did not increase as much as shipments did from 2014 to 2015, primarily due to sharply reduced market prices driven by global overcapacity and what we believe are unfairly-traded, lower-priced foreign steel imports that flooded the domestic market in 2015. Our average selling price was $942 per net ton in 2015, an 11% decrease from the 2014 average selling price of $1,058 per net ton. Net sales to customers outside the United States were $855.7, or 13% of total sales, for 2015, compared to $755.4, or 12% of total sales, for 2014.

The following table shows the percentage of our net sales to each of our markets:

| Market | 2015 | 2014 |
|---|---|---|
| Automotive | 60% | 53% |

| | | |
|---|---|---|
| Infrastructure and Manufacturing | 16% | 18% |
| Distributors and Converters | 24% | 29% |

- 16-

A004717

*Table of Contents*

*Cost of Products Sold*

Cost of products sold in 2015 was $6,032.0 and remained flat compared to 2014 cost of products sold of $6,007.7. Shipments from Dearborn Works following the September 2014 acquisition increased cost of products sold in 2015. These costs were largely offset by:

- Lower raw material costs for carbon scrap, iron ore pellets, coke and energy in 2015
- Planned outages costs were $50.6 in 2015, significantly lower than planned outages costs of $74.9 in 2014
- LIFO credits were $195.3 in 2015, compared to LIFO credits of $21.0 in 2014
- Extreme winter weather conditions early in 2014 and unplanned maintenance outage costs of $41.2 for incidents at our Ashland Works blast furnace during 2014 negatively affected cost of products sold in 2014

*Selling and Administrative Expense*

Selling and administrative expense increased to $261.9 in 2015 from $247.2 in 2014. The increase was primarily from Dearborn Works selling and administrative costs after the September 2014 acquisition.

*Depreciation Expense*

Depreciation expense increased to $216.0 in 2015 from $201.9 in 2014, primarily because of the additional Dearborn Works depreciation.

*Pension and Other Postretirement Employee Benefit ("OPEB") Expense (Income)*

Pension and OPEB income of $63.0 in 2015 decreased from income of $92.5 in 2014. The decrease in income in 2015 was largely from an increase in the amount of amortization from unrealized actuarial losses.

We incurred a pension corridor charge of $144.3 and an OPEB corridor credit of $13.1 in 2015, and a pension corridor charge of $2.0 in 2014. Although the corridor charge reduces reported operating and net income, it does not affect our cash flows in the current period. However, we expect to ultimately settle the pension obligation in cash. See *Critical Accounting Estimates* for information on our policy for measurement and recognition of corridor charges (credits).

*Charge for Facility Idling*

In the fourth quarter of 2015, we temporarily idled the Ashland Works Hot End. We incurred a $28.1 charge during the quarter, which included $22.2 for supplemental unemployment and other employee benefit costs that we expect to pay in 2016, and $5.9 for equipment idling costs and other costs. Beginning in the first quarter of 2016, we estimate we will incur ongoing costs of approximately $2.0 to $3.0 per month for employees needed to maintain the equipment, utilities and supplier obligations related to the idled Ashland Works operations. We expect that benefits from focused cost reduction measures, higher operating rates at our blast furnaces at the Middletown Works and Dearborn Works, and a better product mix from lower shipments to the carbon steel spot market will more than offset the on-going fixed costs for the idled facility.

*Operating Profit*

Operating profit for 2015 of $86.7 was lower than 2014 operating profit of $139.4. Included in the 2015 operating profit was a $28.1 charge to temporarily idle the Ashland Works Hot End and the net pension/OPEB corridor charge of $131.2. Also included was operating profit from SunCoke Middletown of $62.6 and $63.0 for 2015 and 2014.

*Interest Expense*

Interest expense for 2015 increased to $173.0 from $144.7 in 2014. The year-over-year increase was primarily for indebtedness to finance a portion of the Dearborn purchase price and higher average Credit Facility borrowings outstanding during 2015 as compared to 2014.

*Impairment of Magnetation Investment*

We recognized a non-cash impairment charge of $256.3 for 2015 related to our investment in Magnetation. For further discussion, see the *Magnetation* section below and Note 4 to the consolidated financial statements.

- 17 -

A004718

A004719

Table of Contents

*Impairment of AFSG Investment*

As part of our ongoing strategic review of our business and operations, in the fourth quarter of 2015 we reevaluated our investment in AFSG Holdings, Inc. ("AFSG"), the holding company of our former insurance operations. During the fourth quarter of 2015, AK Steel received a cash distribution of $14.0 from AFSG. After this distribution, we determined that our remaining investment in AFSG is impaired and we recognized a non-cash charge of $41.6 to write off the remaining investment in AFSG.

*Other Income (Expense)*

Other income (expense) was $1.4 of income for 2015 and other expense of $21.1 for 2014. Other income (expense) included our share of Magnetation losses of $16.3 for 2015 and $15.2 for 2014. The Magnetation loss shown is our share of its results of operations for the first quarter of 2015. The results of operations for periods after March 31, 2015, do not include any losses of Magnetation as the basis in the Magnetation investment had been reduced to zero as of March 31, 2015 and we have no further investment commitments to Magnetation. During 2015, we repurchased an aggregate principal amount of $23.8 of the 2021 Notes in private, open market transactions and recognized gains on the repurchases of $9.4. Also affecting the year-to-year change in other income (expense) was $12.6 of costs we incurred in 2014 for committed bridge financing that we arranged but did not use for the Dearborn acquisition.

*Income Taxes*

Income tax expense in 2015 was $63.4 compared to $7.7 in 2014. We adjust our tax valuation allowance on our deferred tax assets for changes in our LIFO reserve, significantly affecting our income tax expense. Therefore, income tax expense increased from 2015 to 2014 principally due to LIFO credits of $195.3 in 2015 as compared to LIFO credits of $21.0 in 2014. In addition, 2015 income tax expense included a non-cash income tax benefit of $13.2 from allocating income tax expense to other comprehensive income.

*Net Income (Loss) and Adjusted Net Income (Loss)*

Net loss attributable to AK Holding in 2015 was $509.0, or $2.86 per diluted share. The net loss in 2015 included a pension corridor charge of $144.3 and an OPEB corridor credit of $13.1, netting to $131.2, or $0.74 per diluted share. Additionally, the net loss in 2015 included an impairment charge for the Magnetation investment of $256.3, or $1.44 per diluted share, and an impairment charge for the AFSG investment of $41.6, or $0.23 per diluted share, and a charge to temporarily idle the Ashland Works Hot End of $28.1, or $0.16 per diluted share. Excluding the above charges, we had an adjusted net loss of $51.8, or $0.29 per diluted share, for 2015.

Net loss attributable to AK Holding in 2014 was $96.9, or $0.65 per diluted share. The net loss in 2014 included a pension corridor charge and OPEB charge of $5.5, or $0.04 per diluted share, and net-of-tax acquisition-related expenses for the Dearborn acquisition of $31.7, or $0.21 per diluted share. Excluding these charges, we had an adjusted net loss of $59.7, or $0.40 per diluted share, for 2014.

*Adjusted EBITDA*

Adjusted EBITDA (as defined below under *Non-GAAP Financial Measures*) was $393.4, or $55 per ton, for 2015, and $280.2, or $46 per ton, for 2014.

## 2014 Compared to 2013

*Steel Shipments*

Steel shipments in 2014 were 6,132,700 tons, up approximately 16% from shipments of 5,275,900 tons in 2013. The increase in overall shipments in 2014 compared to 2013 was principally attributable to the addition of shipments from Dearborn Works and higher shipments of carbon steel to the automotive and infrastructure and manufacturing markets. The benefit of these positive developments was partly offset by a reduction in shipments to the spot market caused by production issues at the Ashland Works blast furnace in 2014. Primarily as a result of a relatively higher proportion of carbon spot market shipments in the Dearborn product mix compared to our historical mix, our higher-margin value-added shipments decreased as a percent of total volume shipped to 82.1% in 2014 compared to 85.9% in 2013. The following table shows tons shipped by product category for 2014 and 2013, and as a percent of total shipments:

| | 2014 | | 2013 | |
|---|---|---|---|---|
| | (tons in thousands) | | | |
| **Value-added Shipments** | | | | |
| Stainless/electrical | 867.9 | 14.1% | 822.1 | 15.6% |
| Coated | 2,812.7 | 45.9% | 2,469.6 | 46.8% |

A004720

| | | | | |
|---|---|---|---|---|
| Cold-rolled | 1,231.1 | 20.1% | 1,115.9 | 21.2% |
| Tubular | 125.5 | 2.0% | 122.2 | 2.3% |
| Subtotal value-added shipments | 5,037.2 | 82.1% | 4,529.8 | 85.9% |
| **Non Value-added Shipments** | | | | |
| Hot-rolled | 949.7 | 15.5% | 643.5 | 12.2% |
| Secondary | 145.8 | 2.4% | 102.6 | 1.9% |
| Subtotal non value-added shipments | 1,095.5 | 17.9% | 746.1 | 14.1% |
| Total shipments | 6,132.7 | 100.0% | 5,275.9 | 100.0% |

*Net Sales*

Net sales in 2014 were $6,505.7, up 17% from net sales of $5,570.4 in 2013. The increase in net sales is primarily due to an increase in shipments year over year. That increase in shipments was primarily due to the addition of shipments from Dearborn Works following the acquisition of Dearborn in September 2014 and higher shipments of carbon steel to the automotive and infrastructure and manufacturing markets. The average selling price was $1,058 per net ton in 2014, about the same as in 2013. Net sales to customers outside the United States were $755.4, or 12% of total sales, for 2014, compared to $708.0, or 13% of total sales, for 2013.

The following table sets forth the percentage of net sales attributable to each market:

| Market | 2014 | 2013 |
|---|---|---|
| Automotive | 53% | 51% |
| Infrastructure and Manufacturing | 18% | 20% |
| Distributors and Converters | 29% | 29% |

- 18-

A004721

Table of Contents

*Cost of Products Sold*

Cost of products sold in 2014 and 2013 was $6,007.7 and $5,107.8. Cost of products sold for 2014 was higher primarily as a result of the Dearborn acquisition and higher shipments. We benefited from lower raw material costs for iron ore, coal and coke in 2014. However, the benefit of these lower raw materials costs was partially offset by the effects of extreme winter weather conditions early in the year and the effect of mark-to-market losses on iron ore derivative contracts. The extreme winter weather conditions caused higher energy costs, primarily for electricity and natural gas, and affected the delivery of iron ore pellets in the second quarter, with additional costs incurred for transportation and operations. We also incurred higher outage and operating costs associated with the planned and unplanned Ashland Works blast furnace outages. The results for 2014 included expenses of $41.2 for costs from the unplanned blast furnace outages that occurred at Ashland Works during the year. The results for 2013 include $22.3 for costs from the unplanned blast furnace outage at Middletown Works. Expenses for planned outages were $74.9 and $28.3 in 2014 and 2013, including $31.0 for the planned outage at Ashland Works in the fourth quarter of 2014. Also, we recorded a LIFO credit of $21.0 in 2014 compared to a LIFO credit of $38.5 in 2013.

*Selling and Administrative Expense*

Selling and administrative expenses increased to $247.2 in 2014 from $205.3 in 2013. The increase was primarily the result of the inclusion of Dearborn selling and administrative costs after the acquisition, transaction expenses of $8.1 for the Dearborn acquisition and $2.6 for severance costs for certain employees of Dearborn.

*Depreciation Expense*

Depreciation expense was $201.9 in 2014 and $190.1 in 2013. The increase was primarily the result of depreciation of $7.1 for the assets acquired in the Dearborn purchase.

*Pension and Other Postretirement Employee Benefit ("OPEB") Expense (Income)*

We recorded pension and OPEB income of $92.5 in 2014 compared to income of $68.6 in 2013. The increase in income in 2014 was largely a result of a decrease in the interest cost on our pension and OPEB obligations, partially offset by an OPEB settlement loss of $3.5 for the Butler Works retirees class action. In addition, we incurred a pre-tax pension corridor charge of $2.0 in 2014, but did not incur a corridor charge in 2013. Under our method of accounting for pension and OPEB plans, we recognize as of the measurement date any unrecognized actuarial gains and losses that exceed 10% of the larger of projected benefit obligations or plan assets (the "corridor"). The corridor charge in 2014 was caused primarily by decreases in the discount rate and changes in mortality assumptions. As a result of new mortality tables issued in October 2014 by the Society of Actuaries, we adopted mortality assumptions in 2014 that significantly increased our pension and postemployment benefit obligations. Our revised mortality assumptions increased the assumed life expectancy of participants in our benefit plans, thereby increasing the total expected benefit payments over a longer time horizon. The adoption of these new mortality assumptions currently has no significant effect on our expected pension contributions over the next several years.

*Operating Profit*

Operating profit for 2014 was $139.4, compared to $135.8 for 2013. Included in 2014 were planned and unplanned outage costs of $72.2 for Ashland Works blast furnace incidents, a pre-tax pension corridor charge of $2.0 and an OPEB settlement loss of $3.5. Also included was operating profit for SunCoke Middletown of $63.0 and $64.3 for 2014 and 2013.

*Interest Expense*

Interest expense for 2014 and 2013 was $144.7 and $127.4. The year-over-year increase was primarily from the issuance of indebtedness to finance a portion of the Dearborn purchase price and higher revolver borrowings outstanding during 2014 as compared to 2013.

*Other Income (Expense)*

Other expense was $21.1 and $1.4 for 2014 and 2013. Other expense includes our share of loss from Magnetation of $15.2 and $4.9 for 2014 and 2013. The increase in our share of loss from Magnetation from the prior year period was due primarily to lower selling prices for concentrate sales, higher costs for energy, and costs from the start-up of the pellet plant and third concentrate plant in 2014. In addition, we incurred $12.6 of costs in the year ended December 31, 2014 for committed bridge financing that was arranged in connection with the acquisition of Dearborn, but which was unused because of our successful financing of the acquisition through debt and common stock offerings.

A004722

- 19-

A004723

*Table of Contents*

*Income Taxes*

In 2014, we recorded an income tax expense of $7.7 compared to an income tax benefit of $10.4 in 2013. Included in the income tax expenses for 2014 are non-cash charges of $8.4 for acquisition-related changes in the value of deferred tax assets.

*Net Income (Loss) and Adjusted Net Income (Loss)*

Our net loss attributable to AK Holding in 2014 was $96.9, or $0.65 per diluted share, compared to $46.8, or $0.34 per diluted share, in 2013. The net loss in 2014 included a pension corridor charge and an OPEB settlement loss that totaled $5.5, or $0.04 per diluted share. The net loss in 2014 also included total Dearborn acquisition-related costs of $31.7, or $0.21 per diluted share. Excluding the pension corridor charge, the OPEB settlement loss and acquisition-related expenses, we had an adjusted net loss of $59.7, or $0.40 per diluted share, for 2014.

*Adjusted EBITDA*

Adjusted EBITDA (as defined below under *Non-GAAP Financial Measures*) was $280.2, or $46 per ton, and $255.0, or $48 per ton, for 2014 and 2013.

**Non-GAAP Financial Measures**

In certain of our disclosures, we have reported adjusted EBITDA and adjusted net income (loss) that exclude the effects of noncontrolling interests, pension and OPEB net corridor charges, impairment charges for our investments in Magnetation and AFSG, charges for temporarily idling facilities and acquisition-related expenses of Dearborn. We believe that reporting adjusted net income (loss) attributable to AK Holding (as a total and on a per share basis) with these items excluded more clearly reflects our current operating results and provides investors with a better understanding of our overall financial performance.

EBITDA is an acronym for earnings before interest, taxes, depreciation and amortization. It is a metric that is sometimes used to compare the results of different companies by removing the effects of different factors that might otherwise make comparisons inaccurate or inappropriate. For purposes of this report, we have made adjustments to EBITDA to exclude the effect of noncontrolling interests, pension and OPEB net corridor charges, impairment charges for our investments in Magnetation and AFSG, charges for temporarily idling facilities and the acquisition-related expenses of Dearborn. The adjusted results, although not financial measures under generally accepted accounting principles in the United States ("GAAP") and not identically applied by other companies, facilitate the ability to analyze our financial results in relation to those of our competitors and to our prior financial performance by excluding items that otherwise would distort the comparison. Adjusted EBITDA and adjusted net income (loss) are not, however, intended as alternative measures of operating results or cash flow from operations as determined in accordance with GAAP and are not necessarily comparable to similarly titled measures used by other companies.

We recognize in our results of operations, as a corridor adjustment, any unrecognized actuarial net gains or losses that exceed 10% of the larger of projected benefit obligations or plan assets. Amounts inside this 10% corridor are amortized over the plan participants' life expectancy. The need for a corridor charge is considered at any remeasurement date, but has historically only been recorded in the fourth quarter at the time of the annual remeasurement. After excluding the corridor charge, the remaining pension and OPEB expenses included in the non-GAAP measure are comparable to the accounting for pension and OPEB expenses on a GAAP basis in the first three quarters of the year and we believe this is useful to investors in analyzing our results on a quarter-to-quarter basis, as well as analyzing our results on a year-to-year basis. As a result of the corridor method of accounting, our subsequent financial results on both a GAAP and a non-GAAP basis do not contain any amortization of prior period actuarial gains or losses that exceeded the corridor threshold because those amounts were immediately recognized as a corridor adjustment in the period incurred. Actuarial net gains and losses occur when actual experience differs from any of the many assumptions used to value the benefit plans, or when the assumptions change, as they may each year when we perform a valuation. The two most significant of those assumptions are the discount rate we use to value projected plan obligations and the rate of return on plan assets. In addition, changes in other actuarial assumptions and the degree by which the unrealized gains or losses are within the corridor threshold before remeasurement will affect the corridor adjustment calculation. The effect of prevailing interest rates on the discount rate as of the December 31 measurement date and actual return on plan assets compared to the expected return will have a significant impact on our year-end liability, corridor adjustment and following year's expense for these benefit plans. For example, the pension/OPEB net corridor charge for 2015 was driven by actuarial losses caused primarily by (i) the net effect of the difference between the expected return on assets of 7.25% ($198.4) and the actual loss on assets of 3.4% ($93.6) (netting to a loss of $292.0), partially offset by (ii) an increase in the discount rate assumption used to determine the current year pension liabilities from 3.82% at December 31, 2014 to 4.15% at December 31, 2015 (an actuarial gain of approximately $96.0) and (iii) changes in mortality assumptions (an actuarial gain of approximately $65.0). Also for example, the pension corridor charge for 2014 was driven by actuarial losses caused primarily by (i) a decrease in the discount rate assumption used

A004724

to determine the current year pension liabilities from 4.53% at December 31, 2013 to 3.82% at December 31, 2014 (an actuarial loss of approximately $219.0) and (ii) changes in mortality assumptions (an actuarial loss of

- 20-

*Table of Contents*

approximately $245.5), partially offset by (iii) the net effect of the difference between the expected return on assets of 7.25% ($202.8) and the actual return on assets of 9.3% ($257.8) (netting to a gain of $55.0). We believe that the corridor method of accounting for pension and other postretirement obligations is rarely used by other publicly traded companies. However, because other companies use different approaches to recognize actuarial gains and losses, our resulting pension expense on a GAAP basis or a non-GAAP basis may not be comparable to other companies' pension expense on a GAAP basis. Although the corridor charge reduces reported operating and net income, it does not affect our cash flows in the current period. However, we expect to ultimately settle the pension obligation in cash.

Neither current shareholders nor potential investors in our securities should rely on adjusted EBITDA or adjusted net income (loss) as a substitute for any GAAP financial measure and we encourage investors and potential investors to review the following reconciliations of net income (loss) attributable to AK Holding to adjusted EBITDA and adjusted net income (loss).

### Reconciliation of Adjusted Net Income (Loss)

| | | 2015 | | 2014 |
|---|---|---|---|---|
| **Reconciliation to Net Income (Loss) Attributable to AK Steel Holding** | | | | |
| Adjusted net income (loss) attributable to AK Steel Holding Corporation | $ | (51.8) | $ | (59.7) |
| Pension and OPEB net corridor charge/settlement loss | | (131.2) | | (5.5) |
| Impairment of Magnetation investment | | (256.3) | | — |
| Impairment of AFSG investment | | (41.6) | | — |
| Charge for facility idling | | (28.1) | | — |
| Acquisition-related expenses (net of tax) | | — | | (31.7) |
| Net income (loss) attributable to AK Steel Holding Corporation, as reported | $ | (509.0) | $ | (96.9) |
| | | | | |
| **Reconciliation to Basic and Diluted Earnings (Loss) per Share** | | | | |
| Adjusted basic and diluted earnings (loss) per share | $ | (0.29) | $ | (0.40) |
| Pension and OPEB net corridor charge/settlement loss | | (0.74) | | (0.04) |
| Impairment of Magnetation investment | | (1.44) | | — |
| Impairment of AFSG investment | | (0.23) | | — |
| Charge for facility idling | | (0.16) | | — |
| Acquisition-related expenses | | — | | (0.21) |
| Basic and diluted earnings (loss) per share, as reported | $ | (2.86) | $ | (0.65) |

- 21 -

A004726

**Reconciliation of Adjusted EBITDA**

| | 2015 | 2014 | 2013 |
|---|---|---|---|
| Net income (loss) attributable to AK Holding | $ (509.0) | $ (96.9) | $ (46.8) |
| Net income attributable to noncontrolling interests | 62.8 | 62.8 | 64.2 |
| Income tax expense (benefit) | 63.4 | 7.7 | (10.4) |
| Interest expense | 173.0 | 144.7 | 127.4 |
| Interest income | (1.3) | (0.7) | (1.1) |
| Depreciation | 216.0 | 201.9 | 190.1 |
| Amortization | 8.4 | 9.1 | 9.9 |
| EBITDA | 13.3 | 328.6 | 333.3 |
| Less: EBITDA of noncontrolling interests (a) | 77.1 | 77.2 | 78.3 |
| Pension and OPEB net corridor charge/settlement loss | 131.2 | 5.5 | — |
| Impairment of Magnetation investment | 256.3 | — | — |
| Impairment of AFSG investment | 41.6 | — | — |
| Charge for facility idling | 28.1 | — | — |
| Acquisition-related expenses | — | 23.3 | — |
| Adjusted EBITDA | $ 393.4 | $ 280.2 | $ 255.0 |
| Adjusted EBITDA per ton | $ 55 | $ 46 | $ 48 |

(a)  The reconciliation of EBITDA of noncontrolling interests to net income attributable to noncontrolling interests is as follows:

| | 2015 | 2014 | 2013 |
|---|---|---|---|
| Net income attributable to noncontrolling interests | $ 62.8 | $ 62.8 | $ 64.2 |
| Depreciation | 14.3 | 14.4 | 14.1 |
| EBITDA of noncontrolling interests | $ 77.1 | $ 77.2 | $ 78.3 |

**Liquidity and Capital Resources**

AK Steel has a $1,500.0 asset-backed revolving credit facility (the "Credit Facility") that expires in March 2019 and is guaranteed by AK Steel's parent company, AK Holding, and by AK Tube LLC and AK Steel Properties, Inc., two 100%-owned subsidiaries of AK Steel. The Credit Facility contains some restrictions, including limitations on, among other things, distributions and dividends, acquisitions and investments, indebtedness, liens and affiliate transactions. Availability is calculated as the lesser of the total commitments under the Credit Facility or eligible collateral after advance rates, less outstanding revolver borrowings and letters of credit. The Credit Facility requires us to maintain a minimum fixed charge coverage ratio of one to one if availability under the Credit Facility is less than $150.0. Our obligations under our Credit Facility are secured by our inventory and accounts receivable, and availability under the Credit Facility fluctuates monthly based on the varying levels of eligible collateral. The Credit Facility provides us with enhanced liquidity and financial and strategic flexibility.

At December 31, 2015, we had total liquidity of $700.2, consisting of $47.9 of cash and cash equivalents and $652.3 of availability under the Credit Facility. At December 31, 2015, our eligible collateral, after application of applicable advance rates, was $1,275.2. At December 31, 2015, we had outstanding borrowings of $550.0 from the Credit Facility, and $72.9 of outstanding letters of credit that further reduced availability. During the year ended December 31, 2015, our borrowings from the Credit Facility ranged from $535.0 to $785.0, with outstanding borrowings averaging $662.9 per day. We expect to use the Credit Facility as necessary to fund requirements for working capital, capital investments and other general corporate purposes. Consolidated cash and cash equivalents of $56.6 at December 31, 2015, includes $8.7 of cash and cash equivalents of consolidated variable interest entities which are not available for our use.

Cash from operations totaled $200.3 for the year ended December 31, 2015. This total included cash generated by SunCoke Middletown of $87.4, which can only be used by SunCoke Middletown for its operations or for distribution to its equity owners. Significant uses of cash included pension contributions of $24.1 and pension and OPEB benefit payments of $61.0. For a more detailed discussion of pension and OPEB benefit payments, see *Employee Benefit Obligations*. Working capital was flat for the year with decreases in accounts receivable mostly offset by an increase in inventory and a decrease in accounts payable. The remaining cash from operations were from normal business activities for the year.

*Investing and Financing Activities*

Cash used by investing activities in 2015 totaled $47.5. This total included $99.0 of capital investments, partially offset from proceeds from the $25.0 sale of our investment in Double Eagle and a $14.0 distribution from AFSG.

Cash used for financing activities in 2015 totaled $166.4. During 2015, we repaid $55.0 of borrowings on the Credit Facility and we repurchased senior unsecured notes with a principal amount of $23.8 for $14.1 resulting in gains of $9.4. We may, from time to time, repurchase additional outstanding notes in the open market on an unsolicited basis, by tender offer, through privately negotiated transactions or otherwise. The total cash used for financing activities also includes $96.3 of payments from SunCoke Middletown to SunCoke.

Our Credit Facility expiring in March 2019 is secured by inventory and accounts receivable and contains restrictions on, among other things, distributions and dividends, acquisitions and investments, indebtedness, liens and affiliated transactions. The Credit Facility requires us to maintain a minimum fixed charge coverage ratio of one to one if availability under the Credit Facility falls below $150.0. Currently, the availability under the Credit Facility significantly exceeds $150.0. We are in compliance with the Credit Facility covenants and, as long as no unexpected adverse events occur, expect that we will remain in compliance for the foreseeable future.

We believe that our current sources of liquidity will be enough to meet our obligations for the foreseeable future. We expect to fund future liquidity requirements for employee benefit plan contributions, scheduled debt maturities, debt redemptions and capital investments with internally-generated cash and other financing sources. If we are unable to fund any of our working capital or planned capital investments with internally-generated cash, we have available our Credit Facility. We also could seek to access the capital markets if we perceive conditions are favorable. The Credit Facility currently is scheduled to expire in March 2019 and any amounts outstanding under it at the time of expiration would need to be repaid or refinanced. Otherwise, we have no scheduled debt maturities until December 2018, when our Secured Notes are due. At December 31, 2015, our eligible collateral, after application of applicable advance rates, was $1,275.2. At December 31, 2015, we had $550.0 of outstanding borrowings from the Credit Facility and $72.9 of outstanding letters of credit further reduced availability. Our forward-looking statements on liquidity are based on currently available information and expectations and, if the information or expectations are inaccurate or conditions deteriorate, there could be a material adverse effect on our liquidity.

For longer-term obligations, we have significant debt maturities and other obligations that will be due in future periods, including possible required cash contributions to our qualified pension plan. For further information, see the *Contractual Obligations* section.

- 22 -

*Table of Contents*

*Restrictions Under Debt Agreements*

The Credit Facility and indentures governing our senior indebtedness and tax-exempt fixed-rate IRBs (collectively, the "Notes") contain restrictions and covenants that may limit our operating flexibility.

The indentures governing the Notes (other than the 5.00% Senior Notes due November 2019 (the "Exchangeable Notes")) include customary restrictions on (a) the incurrence of additional debt by certain of our subsidiaries, (b) the incurrence of certain liens, (c) the amount of sale/leaseback transactions, and (d) our ability to merge or consolidate with other entities or to sell, lease or transfer all or substantially all of our assets to another entity. They also contain customary events of default. In addition, the indenture governing the Secured Notes includes covenants with customary restrictions on the use of proceeds from the sale of collateral. The indenture governing the Exchangeable Notes does not contain any financial or operating covenants or restrictions on the payments of dividends, the incurrence of indebtedness or the issuance or repurchase of securities by us.

The Credit Facility contains customary restrictions, including limitations on, among other things, distributions and dividends, acquisitions and investments, indebtedness, liens and affiliate transactions. In addition, the Credit Facility requires us to maintain a minimum fixed charge coverage ratio of one to one if availability under the Credit Facility is less than $150.0. We do not expect any of these restrictions to affect or limit our ability to conduct our business in the ordinary course.

During the period, we were in compliance with all the terms and conditions of our debt agreements.

*Capital Investments*

A004728

We anticipate 2016 capital investments of $125.0 to $140.0, with approximately $45.0 of those investments targeted to growth, innovation and margin enhancement initiatives. In the near-term, we expect to fund these investments from cash generated from operations or from borrowings from our Credit Facility. In addition to the above amounts, we expect to complete our new $36.0 research and innovation center in 2016, for which most of the cost will be financed through a capital lease. We currently anticipate that our normal, ongoing maintenance capital investments (i.e., excluding strategic investments and non-routine maintenance investments, such as blast furnace re-lines) will be at a similar level over the next few years.

*Employee Benefit Obligations*

We made pension contributions of $24.1 during 2015 to satisfy our required annual pension contributions. Pension benefits under our major pension plan are frozen, but the plan is still significantly underfunded. As a result, we will be required to make contributions to the plan's pension trusts of varying amounts until they are fully funded, and some of these contributions could be substantial. We have no required annual pension contribution for 2016. Based on current actuarial assumptions, we estimate that our required annual pension contributions will be approximately $50.0 and $75.0 for 2017 and 2018. The amount and timing of future required contributions to the pension trust depend on assumptions about future events. The most significant of these assumptions are the future investment performance of the pension funds, actuarial data about plan participants and the interest rate we use to discount benefits to their present value. Required contribution payments are more dependent on plan asset returns than in the past. Because of the variability of factors underlying these assumptions, including the possibility of future pension legislation or increased pension insurance premiums, the reliability of estimated future pension contributions decreases as the length of time until we must make the contribution increases.

We provide healthcare benefits to a significant portion of our employees and retirees. OPEB benefits have been eliminated for new employees and are subject to caps on the share of benefits we pay. Based on the assumptions used to value other postretirement benefits, primarily retiree healthcare and life insurance benefits, annual cash payments for these benefits are expected to be in a range that trends down from $46.5 in 2016 to $12.9 over the next 30 years.

In addition to actions taken in prior years to reduce the growth of benefit obligations, we continue to seek other ways to de-risk our pension and OPEB obligations. During 2014, we provided a voluntary lump-sum settlement offer to terminated vested participants in the pension plan and as a result reduced a portion of the pension obligation. The pension plan paid approximately $105.0 in December 2014 out of the pension trust assets to participants and recognized an actuarial gain of $20.0. Further, we amended the pension plan as of January 1, 2016, to allow new retirees to select a lump-sum payment option.

*Off-Balance Sheet Arrangements*

See discussion under *Magnetation* for information about this equity investee. There were no other material off-balance sheet arrangements as of December 31, 2015.

- 23 -

---

Table of Contents

**Selected Factors that Affect Our Operating Results**

*Iron Ore Pricing*

Iron ore is one of the principal raw materials required for our steel manufacturing operations. We purchased approximately 8.9 million tons of iron ore pellets in 2015 and expect to purchase less in 2016 as a result of the temporary idling of the Ashland Works Hot End. We make most of our purchases of iron ore at negotiated prices under multi-year agreements. For 2016, we expect to purchase most of our iron ore from two suppliers, including Magnetation. Our iron ore agreements have a variable-price mechanism that adjusts the price we pay for iron ore quarterly based on reference to a historical iron ore index referred to as the "IODEX". One of these agreements uses what is commonly referred to in the steel industry as "Vale model" pricing, which is based on the average IODEX for a three-month period ending one month before the start of the quarter to which the price is applied. For example, utilizing the Vale model for the fourth quarter of 2015, we determined the price of iron ore from the IODEX price for the preceding June, July and August period. Other iron ore supply agreements reference both the IODEX and certain other indices to determine the contractual price.

Under our contracts, a change in the IODEX typically affects to varying degrees the price we pay for iron ore. However, there are other factors that also affect the price we pay for iron ore under certain contracts, such as measures of general industrial inflation and steel prices. Thus, the actual impact to us of a change in the IODEX will vary depending on the percentage of the total iron ore we purchase under each contract and how much the IODEX is weighted as a factor for pricing under each contract. The prices we pay for iron ore are less dependent on the IODEX than in prior years as a result of the pricing terms of our current iron ore supply agreements. In addition, the total net price we pay for iron ore is affected by our hedging activities, which are described below.

A004729

When raw material costs increase, we attempt to price our own products to reflect these costs and use variable pricing with some of our contract customers that may allow us to adjust selling prices to reflect changes in the cost of certain raw materials and energy. Many of these customer contracts, however, do not permit an adjustment (upwards or downwards) until the relevant raw material or energy price is outside pre-agreed parameters. In recent contracts over the last few years, the frequency and overall impact of such adjustments have generally decreased. Thus, we are typically unable to recover 100% of our costs in the case of raw material or energy price increases and due to other factors may not be able to benefit to the full extent if input prices decline. For iron ore prices, there are a variety of factors that affect the ultimate impact on us from any increase or decrease. These include the amount of the price change for iron ore, the terms of our agreements with our contract customers, and the extent to which competitive pressures may influence the price of steel we sell into the spot market.

In addition to using other integrated risk strategies, we use derivative contracts to manage price risk because of the inability to control or fully pass through our iron ore costs to customers. We use derivative contracts to reduce our exposure if iron ore costs increase, but these contracts can also reduce the amount of benefit that we receive if iron ore costs decline. Our hedging strategy for our iron ore exposure employs a systematic approach. We hedge a higher proportion of our near-term iron ore exposure and a lower proportion for our longer-term exposure through a combination of swaps and options. As of December 31, 2015, we have hedged 1,950,000 tons and 1,275,000 tons of iron ore purchases for 2016 and 2017. Our hedging activities further reduce our exposure to changes in the IODEX on the total cost we pay for iron ore.

*Automotive Market*

We sell a significant portion of our flat-rolled carbon steel products and stainless steel products to automotive manufacturers, as well as selling to distributors, service centers and converters who in some cases resell the products to the automotive industry. We concentrate our automotive and stainless sales on the automotive market because these customers demand steels that are difficult to make and require the highest quality standards, just-in-time delivery, collaborative technical and customer support, and innovative products. In addition, certain competitors do not have the capability to supply all of the products that we make for our automotive customers, such as steel for exposed automotive applications. As such, these exacting conditions for servicing the automotive market generally enable us to capture greater margins than sales of more commodity types of carbon and stainless steels to other markets. Because the automotive market is an important element of our business and growth strategy, North American light vehicle production has a significant impact on our total sales and shipments. In 2015, the North American automotive industry continued to show improvement over 2014, as light vehicle production topped 17.5 million units, a 3% increase from 2014. The improvement in the automotive market and our increased share of that market boosted our sales and shipments in 2015. A further increase in light vehicle production volumes is projected for 2016 and our goal is to capture higher automotive market share.

There are, however, some potential challenges to increased sales to the automotive industry even if it continues to grow as currently projected. Automotive manufacturers are under pressure to achieve heightened federally mandated fuel economy standards through 2025 (the Corporate Average Fuel Economy, or so-called "CAFE," standards), and they are currently evaluating alternatives to traditional carbon steels, including aluminum and other materials. This could reduce the aggregate volume of steel sold to the automotive industry, and impact our share of that volume. To address this threat, we and the rest of the steel industry have been

- 24-

A004730

Table of Contents

working to create new advanced high-strength steels for vehicle structures, which will enable automotive manufacturers to achieve their desired light-weighting goals without the need to convert to aluminum or other alternatives for the body of the vehicle. We currently produce virtually every grade of coated advanced high-strength steel used today and are developing the next generation of advanced high-strength steels to provide even greater strength and formability.

### Carbon Steel Spot Market

As a strategic initiative, we have taken actions to reduce our sales and shipments of lower-margin carbon steel to the spot market. In recent years, including most of 2015, a significant amount of our sales and shipments of carbon steel were made into the domestic spot market. Generally, sales into the carbon steel spot market are sold at prevailing market prices, which can be highly volatile. Fluctuations in spot market prices have a direct effect on our results and are driven by factors mostly outside our control. In addition, the spot market price fluctuations do not always directly correlate with our raw material and energy costs and consequently we have limited ability to pass through increases in costs to customers absent increases in the market price.

In 2015, pricing for hot-rolled steel dropped over 42% during the year. We believe that this dramatic price decline was principally the result of a large increase in unfairly-traded imports of carbon steel that entered the U.S. supply chain during the second half of 2014 and much of 2015. In addition, we believe that weakness in the oil and gas markets due to the substantial decline in energy prices has caused our competitors to re-direct their production capacity to the carbon steel spot market. In response to the challenges facing the carbon steel spot market, in late 2015 we implemented a strategy to reduce our exposure to that market. The most important action to launch this strategy was our decision to temporarily idle the Ashland Works Hot End, which allowed us to reduce our exposure to lower-margin, commodity steel products.

### Specialty Stainless Steel Market

We focus our stainless steel sales on higher-margin value-added chrome products, particularly for the automotive industry. We have become the premier stainless steel supplier to the automotive market by producing many of the most challenging stainless products at the highest quality levels while supplying customers with collaborative technical support and innovative new offerings. During 2015, the commodity stainless steel market saw a large surge in what we believe are unfairly traded chrome nickel products, causing excess inventories and a decline in pricing. In addition, the commodity chrome nickel market suffered from a precipitous fall in nickel prices. Because of the resulting excess supply and decline in pricing, we lowered our shipments and exposure to this market in 2015 and in 2016 initiated a trade case against Chinese imports of stainless steel.

### Electrical Steel Market

We sell our electrical steel products, which are iron-silicon alloys with unique magnetic properties, primarily to manufacturers of power transmission and distribution transformers and electrical motors and generators in the infrastructure and manufacturing markets. We sell our electrical steel products both domestically and internationally. We focus on the high-end of the electrical steel market, as grain-oriented electrical steel ("GOES") typically allows us to gain a higher margin than grades of non-oriented electrical steel.

Due to increasing European efficiency standards for distribution transformers, international demand for high-permeability grades of GOES improved in 2015. We believe the superior efficiency of our GOES products, particularly TRAN-COR® H DR®, positions us to increase our shipments into international markets that have increased energy efficiency expectations.

The domestic demand for power generation and distribution transformers is affected by construction, specifically housing starts, and in-service replacements that are at the end of their useful lives. Although housing starts in the United States continued to improve in 2015, exceeding 1.1 million units, the demand increases for our GOES products in NAFTA markets were modest. In addition, in January 2016 new higher efficiency standards for distribution transformers went into effect in the United States, which we expect will strengthen domestic demand for our high-permeability grades of GOES products. We continue to be harmed by a high level of imports into the United States that we believe are in violation of United States trade laws. In an effort to address the effects of these unfairly traded imports, we filed antidumping and countervailing duty petitions with the United States Department of Commerce and the United States International Trade Commission in 2013 for GOES products. For a description of ongoing trade cases, see Note 10 to the consolidated financial statements.

- 25-

Table of Contents

### Innovation and Product Development

A004731

Our mission is to be a steel industry leader developing a broad range of product and process technologies. Our customers are already incorporating our automotive advanced high-strength steel grades, such as Dual Phase 780 and 980, which have very high tensile strength with formability for both stamped and roll-formed parts, into their products. Additionally, we have been accelerating introductions and enhancements of innovative new products such as CHROMESHIELD® 22 Stainless Steel, THERMAK® 17 Stainless Steel and ULTRALUME® Press Hardenable Steel. Our CHROMESHIELD 22 is a nickel-free stainless steel that combines exceptional corrosion performance with superior ductility that our customers use principally in appliance and food service equipment, tubing, cookware and heat exchangers. Our THERMAK 17 is a stainless steel product with increased formability, high temperature strength and other benefits that improve automotive exhaust systems' lightweighting. Our ULTRALUME Press Hardenable Steel is an aluminum-silicon alloy coated steel our customers depend on when they require high strength parts with complex geometries. These steels, part of our advanced high-strength steel portfolio, enable automotive manufacturers to reduce vehicle weight while continuing to keep pace with critical safety requirements.

In addition, we continue to develop new and improved electrical steel products for our customers to use for electricity transmission and distribution, as well as stainless steel and other specialty products for automotive and other markets. We believe these strategic initiatives and commitments will enhance our competitive advantage and position in growing customer markets.

*Next-Generation Advanced High Strength Steels ("AHSS")*

We continue to strive to develop new and improved products that exceed our customers' exacting standards, focusing on Next-Generation AHSS to serve future automotive industry needs. Our goal is to ensure that advanced high strength carbon steels reduce the weight of automobile structural body components, while maintaining the strength characteristics that customers value. We want our automotive customers to use our innovative steel products to help achieve vehicle weight savings for ambitious fuel efficiency standards while avoiding the significant capital costs to re-design production facilities that alternative materials require.

Looking ahead, we are focused on introducing one of the first commercially available families of Next-Generation AHSS in the world. We have made significant strides in developing technologies for the next generation of AHSS for the automotive industry. Our planned new technologies will produce significantly improved formability at higher ultimate tensile strength levels, which will provide greater lightweighting opportunities to our automotive customers. We are implementing new process technology to produce both coated and cold-rolled Next-Generation AHSS on the hot-dip galvanizing line at Dearborn Works, which we expect to complete by late 2016. Our goal is to ship Next-Generation AHSS to our customers by early 2017.

*New Research and Innovation Center*

To accelerate innovation, we are building a research and innovation center in Middletown, Ohio. The construction of the 135,000 square foot facility is in progress on a 16-acre site located in the Cincinnati-Dayton growth corridor and will replace our existing research facility. We are designing our new facility to motivate and inspire our approximately 140 researchers, scientists and engineers who will continue their leading-edge research, applications engineering, advanced engineering, product development and customer technical services. The facility will include pilot lines and feature new operational simulators that replicate critical steel manufacturing operations. We are financing the estimated $36.0 project principally through a long-term capital lease and government incentives, allowing us to minimize our upfront project costs and ensure we have the tools to pursue our innovation initiatives.

*Energy and Commodity Hedging*

We enter into derivative transactions in the ordinary course of business to hedge the cost of natural gas, electricity and certain raw materials, including iron ore and zinc, and, to a lesser extent, the market risk associated with the sale of certain of our commodity steel products (hot roll carbon steel coils). We expect changes in the prices paid or received for the related commodities to offset the effect on cash of settling these amounts. In some cases, we may decide not to apply hedge accounting treatment to the derivative transaction. In these cases, we recognize any changes in the value of the derivative instrument in earnings each quarter during the life of the instrument. Thus, while over time we expect the earnings effects of the derivative instrument to offset the change in the price for the related commodity, we may recognize the timing of the change in the value of the derivative transaction before the timing of the related commodity, affecting period comparisons.

*Margin Enhancement Initiatives*

In recent years we have undertaken several significant projects in an effort to lower costs and enhance margins. In addition, we have identified many initiatives to achieve synergies in connection with our acquisition of Dearborn. These projects and initiatives include efforts to increase our operating rates, lower our costs and increase control over certain key raw materials. Other projects and strategic initiatives to increase operating rates and lower our costs include increasing the utilization, yield, efficiency and productivity of facilities, implementing strategic purchasing procurement improvements, controlling maintenance and capital investment spending, producing lower cost metallic burdens and reducing transportation costs. We also identified several other areas for enhancing

A004732

profitability, including increasing our percentage of contract sales, selling a higher-margin mix of products and developing new products that can command higher prices from customers. As part of our move toward selling a higher-margin mix of products, we have reduced our sales to the carbon steel spot market, which drove our decision to temporarily idle the Ashland Works Hot End.

*Potential Impact of Climate Change Legislation*

In 2010, the U.S. Environmental Protection Agency ("EPA") issued a final "tailoring rule" providing new regulations governing major stationary sources of greenhouse gas emissions under the Clean Air Act. Generally, the tailoring rule requires that new or modified sources of high volumes of greenhouse gases must follow heightened permit standards and lower emissions thresholds. The EPA continues to work on further rules on greenhouse gas emissions that would apply more broadly and to lower levels of emission sources. On June 23, 2014, the U.S. Supreme Court partially upheld and partially invalidated the tailoring rule. The decision's impact will often require us to conduct a best available control technology analysis for greenhouse gases for new major projects. However, the tailoring rule will not materially adversely affect us in the near term and we cannot reliably estimate the regulation's long-term impact. However, there are a number of factors that may affect us, including EPA's tailoring rule and other similar regulations, such as the EPA's Clean Power Plant Rule established on August 3, 2015, implications from the proposed "Paris Agreement" arising from the 2015 United Nations Climate Change Conference (which remains subject to Congressional ratification) or similar accords relating to climate change. These and other factors will likely cause us to suffer negative financial impacts over time from increased energy, environmental and other costs needed to comply with the limitations that would be imposed on us directly or indirectly through our suppliers.

In addition, the possibility exists that further limitations on greenhouse gas emissions may be imposed in the United States in the future through some form of federally-enacted legislation or by additional regulations. Bills have been introduced in the United States Congress in recent years that aim to limit carbon emissions over long periods from facilities that emit significant amounts of greenhouse gases. Such bills, if enacted, would apply to the steel industry, in general, and to us, in particular, because producing steel from elemental iron creates carbon dioxide, one of the targeted greenhouse gases. Although we and other steel producers in the United States are actively participating in research and development to develop breakthrough technology for lower-emission steelmaking processes, developing these technologies will take time and nobody can determine their success. To address this need for developin

- 26-

A004733

g new technologies, not just in the steel industry but elsewhere, some of the proposed legislative bills include a system of carbon emission credits, which would be available to certain companies for a period, similar to the European Union's existing "cap and trade" system. Each of these bills is likely to be altered substantially if it moves through the legislative process, making it virtually impossible to forecast the provisions of any final legislation and its effects on us.

If regulation or legislation regulating carbon emissions is enacted, however, it is reasonable to assume that the net financial impact on us will be negative, despite some potential beneficial aspects discussed below. On balance, such regulation or legislation likely would cause us to incur increased energy, environmental and other costs to comply with the limitations that would be imposed on greenhouse gas emissions. For example, additional costs could take the form of new or retrofitted equipment, or the development of new technologies (e.g., sequestration), to try to control or reduce greenhouse gas emissions.

The enactment of climate control legislation or regulation also could have some beneficial impact on us, which may somewhat reduce the adverse effects noted above. For example, to the extent that climate change legislation provides incentives for energy efficiency, up to certain levels, we could benefit from increased sales of our GOES products, which are among the most energy efficient in the world. We sell our electrical steels, which are iron-silicon alloys with unique magnetic properties, primarily to manufacturers of power transmission and distribution transformers and electrical motors and generators. Climate control legislation may enhance our sales of these products in different ways. For instance, if the legislation may promote the use of renewable energy technology, such as wind or solar technology, it could increase demand for our high-efficiency electrical steel products used in power transformers, which are needed to connect these new sources to the electricity grid.

Any effect on us would depend on the final terms of any climate control legislation or regulation enacted. Presently, we are unable to predict with any reasonable degree of accuracy when or even if climate control legislation or regulation will be enacted, or if it is, what its terms and applicability to us will be. As a result, we currently have no reasonable basis on which we can reliably predict or estimate the specific effects any eventually enacted laws may have on us or how we may be able to reduce any negative impacts on our business and operations. In the meantime, the items described above provide some indication of the potential impact on us of climate control legislation or regulation generally. We will continue to monitor the progress of such legislation and/or regulation closely.

*Labor Agreements*

At December 31, 2015, we employed approximately 8,500 people, of which approximately 6,300 are represented by labor unions under various contracts that expire between 2016 and 2019.

On February 5, 2015, members of the United Steelworkers, Local 1190, ratified a four-year labor agreement covering approximately 215 production and maintenance employees at Mountain State Carbon. The new agreement took effect on March 1, 2015, and will expire on March 1, 2019. This is the initial labor agreement with the union at Mountain State Carbon.

On May 8, 2015, members of the United Auto Workers, Local 4104, ratified a four-year labor agreement covering approximately 140 production and maintenance employees at Zanesville Works. The new agreement took effect on May 20, 2015, and will expire on May 31, 2019.

An agreement with the United Auto Workers, Local 3462, which represents approximately 330 employees at Coshocton Works, is scheduled to expire on March 31, 2016. An agreement with the United Auto Workers, Local 3303, which represents approximately 1,240 employees at Butler Works, is scheduled to expire on October 1, 2016.

*Critical Accounting Estimates*

We prepare our financial statements in conformity with accounting principles generally accepted in the United States of America. These principles permit choices among alternatives and require numerous estimates of financial matters. Accounting estimates are based on historical experience and information that is available to us about current events and actions we may take in the future. We believe the accounting principles chosen are appropriate under the circumstances, and that the estimates, judgments and assumptions involved in financial reporting are reasonable. There can be no assurance that actual results will not differ from these estimates. We believe the accounting estimates discussed below represent those accounting estimates requiring the exercise of judgment where a different set of judgments could result in the greatest changes to reported results.

<u>Inventory Costing</u>

We value inventories at the lower of cost or market, and we measure the cost of the majority of inventories on the last in, first out ("LIFO") method. The LIFO method allocates the most recent costs to cost of products sold and, therefore, recognizes into operating results fluctuations in raw material, energy and other inventoriable costs more quickly than other methods. Other inventories, consisting

mostly of foreign inventories and certain raw materials, are measured principally at average cost. We can only make an actual valuation of the inventory under the LIFO method at the end of the year based on inventory levels and costs at that time.

- 27-

A004735

*Table of Contents*

Therefore, interim LIFO calculations are based on our estimates of expected year-end inventory levels and costs. Because these are affected by many factors beyond our control, annual LIFO expense or income may significantly differ from the estimated amounts calculated at interim dates.

### Environmental and Legal Contingencies

We are involved in a number of environmental and other legal proceedings. We record a liability when we determine that litigation has commenced or a claim or assessment has been asserted and, based on available information, it is probable that the outcome of the litigation, claim or assessment, whether by decision or settlement, will be unfavorable and the amount of the liability is reasonably estimable. We measure the liability using available information, including the extent of damage, similar historical situations, our allocable share of the liability and, in the case of environmental liabilities, the need to provide site investigation, remediation and future monitoring and maintenance. We record accruals for probable costs based on a combination of litigation and settlement strategies on a case-by-case basis and, where appropriate, supplement those with incurred-but-not-reported development reserves. However, amounts we record in the financial statements in accordance with accounting principles generally accepted in the United States exclude costs that are not probable or that may not be currently estimable. The ultimate costs of these environmental and legal proceedings may, therefore, be higher than those we have recorded on our financial statements. In addition, changes in assumptions or the effectiveness of our strategies can materially affect results of operations in any future period.

### Pension and OPEB Plans

Accounting for retiree healthcare benefits requires the use of actuarial methods and assumptions, including assumptions about current employees' future retirement dates, the anticipated mortality rate of retirees, the benchmark interest rate used to discount benefits to their present value, anticipated future increases in healthcare costs and our obligations under collective bargaining agreements with respect to healthcare benefits for retirees. Changing any of these assumptions could have a material effect on the calculation of our total obligation for future healthcare benefits.

Actuarial net gains and losses occur when actual experience differs from any of the many assumptions used to value the benefit plans or when the assumptions change, as they may each year when a valuation is performed. The major factors contributing to our actuarial gains and losses are changes in the discount rate used to value plan liabilities as of the measurement date and changes in the expected lives of plan participants. We believe the mortality assumptions selected for determining the expected lives of plan participants are most closely associated with the expected lives of our plan participants. However, selecting other available assumptions would likely increase the plan obligations. In addition, a major factor contributing to actuarial gains and losses for pension plans is the difference between expected and actual returns on plan assets. For OPEB plans, differences in estimated versus actual healthcare costs and changes in assumed healthcare cost trend rates are additional factors generally contributing to actuarial gains and losses. However, we do not expect changes in these OPEB assumptions to have a material effect on us since most of the plans have caps on the share of benefits we pay. In addition to their effect on the funded status of the plans and their potential for corridor adjustments, these factors affect future net periodic benefit expenses. Changes in key assumptions can have a material effect on the amount of benefit obligation and annual expense we record. For example, a 25 basis point decrease in the discount rate would decrease the interest cost component of pension income in 2016 by $4.9. A 25 basis point decrease in the discount rate would have increased the pension obligation at December 31, 2015, by approximately $73.0 and the OPEB obligation by approximately $12.0. A 100 basis point decrease in the expected rate of return on pension plan assets would decrease the projected 2016 pension income by approximately $23.6.

Under our method of accounting for pension and OPEB plans, we recognize into income, as of the measurement date, any unrecognized actuarial net gains or losses that exceed 10% of the larger of projected benefit obligations or plan assets, defined as the corridor. Amounts inside the corridor are amortized over the plan participants' life expectancy. Our method results in faster recognition of actuarial net gains and losses than the minimum amortization method permitted by prevailing accounting standards and used by the vast majority of companies in the United States. Faster recognition under this method also results in the potential for highly volatile and difficult to forecast corridor adjustments.

### Asset Impairment

We have various assets that are subject to impairment testing, including investments, property, plant and equipment and goodwill. If circumstances indicate that an asset has lost value below its carrying amount, we may review the asset for impairment. We evaluate the effect of changes in operations and estimate future cash flows to measure fair value. We use assumptions, such as forecasted growth rates and cost of capital, as part of these analyses and, based on our judgment, can result in different conclusions. We believe using this data is appropriate and consistent with internal projections. The most recent annual goodwill impairment test indicated that the fair value of its relevant reporting unit was in excess of its carrying value. However, our businesses operate in highly cyclical industries and the valuation of these businesses can fluctuate, which may lead to impairment charges in future periods. Fair value is determined using quoted market prices, estimates based on prices of similar assets, or anticipated cash flows discounted at a rate commensurate with risk.

A004736

We consider the need to evaluate long-lived assets for indicators of impairment at least quarterly to determine if events or changes in circumstances indicate the carrying amount of such assets may not be recoverable. We evaluate long-lived assets for impairment based on a collective asset grouping that includes the operations of all facilities. We manage our operations as part of an "integrated process" that allows us to route production to various facilities so that we can maximize financial results and cash flows. As a result of the integrated process and our organization, cash flows are not identifiable to asset groups at a level lower than the consolidated results. If the carrying value of a long-lived asset exceeds its fair value, we determine that an impairment has occurred and we recognize a loss based on the amount that the carrying value exceeds the fair value, less cost to dispose, for assets we plan to sell or abandon. As a result of the temporary idling of the Ashland Works blast furnace and steelmaking operation in 2015, we considered the need for an impairment of the long-lived assets and determined that no impairment was indicated based on the expected temporary nature of the idling.

During the first quarter of 2015, we concluded that our equity interest in Magnetation was impaired and recorded a non-cash impairment charge of $256.3 for the first quarter of 2015 to fully impair the amount of our remaining investment in Magnetation. Magnetation's outstanding indebtedness is non-recourse to AK Steel. We are not required to make any additional capital contributions or other future investments in Magnetation and have not guaranteed any obligations of Magnetation.

As part of the ongoing strategic review of our business and operations, in the fourth quarter of 2015 we reevaluated our investment in AFSG and received a $14.0 cash distribution from AFSG. Following the distribution, we concluded that our investment in AFSG was permanently impaired, and recorded a non-cash impairment charge of $41.6. The activities of these companies were classified as a "runoff". We are under no obligation to support the operations or liabilities of these companies.

**Outlook**

All of the statements in this *Outlook* section are subject to, and qualified by, the information in the *Forward-Looking Statements* section.

Below are certain factors relevant to our first quarter and full-year 2016 outlook. Those factors include the following:

1) We expect reduced margins in 2016 from the renewal of contracts with our automotive customers as we expect selling price declines to be greater than the decline in our costs. We expect a higher percentage of our sales in 2016 to be made under contracts as a result of our decision to reduce certain shipments to the carbon and stainless steel spot markets that have lower sales prices.
2) We anticipate benefiting from reduced input costs for raw materials and energy in 2016 compared to 2015, but the benefit we receive will be mostly offset by reduced LIFO income. We currently do not expect a large LIFO credit in 2016, primarily as a result of our current expectation of more stable raw material prices.
3) We expect our planned major maintenance outages in 2016 will be about the same as 2015. We do not have any major blast furnace maintenance outages planned for 2016.
4) We expect pension and OPEB income of approximately $47.2 in 2016. Our required annual pension plan contribution is zero for 2016.
5) We estimate depreciation expense of approximately $213.0 in 2016, including approximately $14.8 of depreciation associated with our consolidated variable interest entities.
6) We estimate that cash taxes in 2016 will be minimal given our net operating loss carryforward positions.
7) We estimate capital investments of approximately $125.0 to $140.0 in 2016, with approximately $45.0 of these investments targeted to growth, innovation and margin enhancement initiatives. In addition to the above amounts, we expect to complete our new $36.0 research and innovation center in 2016, for which most of the cost will be financed through a capital lease.
8) We expect working capital to be a modest source of cash in 2016 as a result of reduced exposure to the commodity carbon steel spot market.
9) Specifically for the first quarter of 2016, we expect shipments to decline marginally from the fourth quarter of 2015 as continuing strength in automotive is more than offset by an expected decline in shipments to the commodity carbon steel spot market, based on current market conditions. Additionally, for the first quarter of 2016, we estimate our average selling prices to be about the same as the recent fourth quarter, principally resulting from an improvement in sales mix from reduced sales to the carbon spot market, offset by reduced steel market prices.

The foregoing factors are based on our current estimates and may change based on business conditions and other factors. There are many other factors that could significantly affect our 2016 results, including developments in the domestic and global economies, in our business, and in the businesses of our customers and suppliers. Therefore, our outlook may change as a result of those and other factors.

**Contractual Obligations**

In the ordinary course of business, we enter into agreements that obligate us to make legally enforceable future payments. These agreements include those for borrowing money, leasing equipment and purchasing goods and services. The following table summarizes by category expected future cash outflows associated with contractual obligations we have as of December 31, 2015.

| | Payment due by period | | | | |
|---|---|---|---|---|---|
| **Contractual Obligations** | **Less than 1 year** | **1-3 years** | **3-5 years** | **More than 5 years** | **Total** |
| Long-term debt | $        — | $    380.0 | $    1,237.1 | $    788.4 | $    2,405.5 |
| Interest on debt (a) | 152.9 | 303.0 | 185.9 | 77.9 | 719.7 |
| Operating lease obligations | 20.7 | 34.8 | 23.0 | 56.5 | 135.0 |
| Purchase obligations and commitments | 2,445.6 | 3,413.2 | 3,001.2 | 8,148.4 | 17,008.4 |
| Pension and OPEB obligations (b) | 77.7 | 88.6 | 78.9 | 979.4 | 1,224.6 |
| Other non-current liabilities | — | 46.9 | 19.3 | 70.2 | 136.4 |
| Total | $    2,696.9 | $    4,266.5 | $    4,545.4 | $    10,120.8 | $    21,629.6 |

(a)  Amounts include contractual interest payments using the interest rates as of December 31, 2015 applicable to our variable-rate debt and stated fixed interest rates for fixed-rate debt.

(b)  Future cash contributions that we plan to make to our qualified pension trust are not included in the table above. We have no required contribution in 2016. Based on current actuarial assumptions, the estimates for our contributions are approximately $50.0 and $75.0 in 2017 and 2018. Estimates of cash contributions to the pension trust to be made after 2016 are uncertain since a number of variable factors impact defined benefit pension plan contributions and required contributions are becoming increasingly affected by asset returns. Because we expect the pension trust to make pension benefit payments beyond the next five years, the net pension liability is included in the More than 5 years column. We estimate benefit payments, after receipt of Medicare subsidy reimbursements, will be $46.5 for 2016 and we expect them to trend down to $12.9 over the next 30 years. For a more detailed description of these obligations, see the discussion in Note 7 to the consolidated financial statements.

In calculating the amounts for purchase obligations, we identified contracts where we have a legally enforceable obligation to purchase products or services from the vendor or make payments to the vendor for an identifiable period. For each identified contract, we determined our best estimate of payments to be made under the contract assuming (1) the continued operation of existing production facilities, (2) normal business levels, (3) the contract would be adhered to in good faith by both parties throughout its term, (4) prices in the contract and (5) the effect of the Ashland Works temporary idling on these assumptions. Because of changes in the markets we serve, changes in business decisions regarding production levels or unforeseen events, the actual amounts paid under these contracts could differ significantly from the numbers presented above. For example, circumstances could arise which create exceptions to minimum purchase obligations in the contracts. We calculated the purchase obligations in the table above without considering such exceptions.

A number of our purchase contracts specify a minimum volume or price for the products or services covered by the contract. If we were to purchase only the minimums specified, the payments in the table would be reduced. Under "requirements contracts" the quantities of goods or services we are required to purchase may vary depending on our needs, which are dependent on production levels and market conditions at the time. If our business deteriorates or increases, the amount we are required to purchase under such a contract would likely change. Many of our agreements for the purchase of goods and services allow us to terminate the contract without penalty as long as we give 30 to 90 days' notice. Any such termination could reduce the projected payments.

Our consolidated balance sheets contain liabilities for pension and OPEB and other long-term obligations. We calculate the benefit plan liabilities using actuarial assumptions that we believe are reasonable under the circumstances. However, because changes in circumstances can have a significant effect on the liabilities and expenses associated with these plans including, in the case of pensions, pending or future legislation, we cannot reasonably and accurately project payments into the future. While we do include information about these plans in the above table, we also discuss these benefits elsewhere in this *Management's Discussion and Analysis of Financial Condition and Results of Operations* and in the notes to the consolidated financial statements.

The other long-term liabilities on our consolidated balance sheets include accruals for environmental and legal issues, employment-related benefits and insurance, liabilities established with regard to uncertain tax positions, and other accruals. These amounts generally do not arise from contractual negotiations with the parties receiving payment in exchange for goods and services. The ultimate amount and timing of payments are uncertain and, in many cases, depend on future events occurring, such as the filing of a claim or completion of due diligence investigations, settlement negotiations, audit and examinations by taxing authorities, documentation or legal proceedings.

A004739

## Magnetation

We currently have a 49.9% interest in the Magnetation joint venture, which operates iron ore concentrate plants located in Minnesota and an iron ore pelletizing plant in Reynolds, Indiana. Through an offtake agreement, we have the right to purchase, based on a formula that includes a discount to the IODEX, all the pellets the pellet plant produces and an obligation to purchase a portion of those pellets. As discussed below, Magnetation and its subsidiaries remain in bankruptcy after it filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court") on May 5, 2015.

Starting in the third quarter of 2014, Magnetation experienced tight liquidity during several challenges to its business and operations. The significant decline in the IODEX that began in 2014 accelerated in the first quarter of 2015, with substantial declines in the daily IODEX index and futures pricing toward the end of the first quarter of 2015. These iron ore price declines further strained Magnetation's liquidity when it was also experiencing weak sales because of a slower-than-expected ramp-up of its pellet plant operations. Despite Magnetation's efforts to enhance its liquidity, including attempts to raise additional capital from third parties or the equity holders and to reduce costs in late 2014 and early 2015, Magnetation could not overcome its material liquidity challenges.

Beginning in March 2015, Magnetation engaged in confidential discussions with us and certain holders of its debt to consider potentially restructuring Magnetation's capital structure and/or possibly amending the offtake agreement. Ultimately, these parties were unable to reach a mutually-acceptable resolution and, in May 2015, Magnetation and its subsidiaries filed for bankruptcy. Shortly after its filing, Magnetation received debtor-in-possession financing from a group of its secured debtholders and has continued to operate the business. We expect Magnetation will continue to supply us with pellets, at least in the near term. We are unlikely to retain a substantial portion, if any, of our equity interest in Magnetation following Magnetation's bankruptcy, from which it currently expects to emerge in 2016. In September 2015, Magnetation filed under seal a motion with the Bankruptcy Court seeking to assume its offtake agreement with us. Despite the objection that we filed in October 2015, on December 23, 2015, the Bankruptcy Court authorized Magnetation to assume the offtake agreement. Shortly thereafter we appealed the Bankruptcy Court's decision to the U.S. District Court in Minneapolis, Minnesota. Those proceedings are ongoing and are also being conducted under a court seal.

During the first quarter of 2015, we concluded that our equity interest in Magnetation was permanently impaired and recorded a non-cash impairment charge of $256.3 to fully impair our investment carrying value in Magnetation. Magnetation's outstanding indebtedness is non-recourse to us, we are not required to make any additional capital contributions or other future investments in Magnetation and we have not guaranteed any obligations of Magnetation. We do not expect to record any further impact in our financial statements from our equity investment in Magnetation since it is unlikely that we will retain our equity interest following Magnetation's bankruptcy.

We believe that Magnetation intends to continue to supply us with pellets for the immediate future and we expect to continue to purchase pellets from Magnetation according to the offtake agreement. However, it is possible that, during the bankruptcy process, circumstances could develop that would cause Magnetation to request the Bankruptcy Court to terminate the offtake agreement or materially modify it in a way that is unacceptable to us. It also is possible that the bankruptcy process or operational issues could cause Magnetation to experience a disruption in its operations that affects its ability to supply iron ore pellets to us. Any of these circumstances, if they occur, could disrupt the iron ore pellet supply and/or increase costs to us. We purchase pellets from other third-party suppliers and we have discussed the terms of purchasing replacement supply with several third parties. Therefore, we believe that we could replace the Magnetation pellet volume with supply from existing or new third-party suppliers or, if necessary, we also could produce carbon slabs at our Butler Works electric arc furnace if we have a shortage of iron ore pellets. There is a risk, however, that we would be unable to obtain enough replacement pellets or produce an adequate volume of slabs. Such a circumstance could limit our ability to produce steel at desired volumes and/or increase our costs. In any case, we do not expect Magnetation's bankruptcy to disrupt production or otherwise affect steel shipments to our customers.

## New Accounting Pronouncements

The Financial Accounting Standards Board issued Accounting Standards Update No. 2014-09, *Revenue from Contracts with Customers (Topic 606)*, during the second quarter of 2014. Topic 606, as further amended by subsequent Accounting Standard Updates, affects virtually all aspects of an entity's revenue recognition, including determining the measurement of revenue and the timing of when it is recognized for the transfer of goods or services to customers. In July 2015, the Financial Accounting Standards Board approved a one-year deferral of the effective date, which would make Topic 606 effective for annual reporting periods beginning after December 15, 2017. We are currently evaluating the effect of the adoption of Topic 606 on our financial position and results of operations.

The Financial Accounting Standards Board issued Accounting Standards Update No. 2015-02, *Amendments to the Consolidation Analysis* ("ASU 2015-02"), during the first quarter of 2015. ASU 2015-02 changes the analysis that a reporting entity must perform to

determine whether it should consolidate certain types of legal entities. ASU 2015-02 is effective for annual reporting periods

- 30-

A004742

*Table of Contents*

beginning after December 15, 2015, unless early adoption is elected. We are currently evaluating the effect of the adoption of ASU 2015-02 on our financial position and results of operations, but we do not expect the adoption to have a material effect on our consolidated financial statements.

In April 2015 and August 2015, the Financial Accounting Standards Board issued accounting guidance to simplify the presentation of debt issuance costs by requiring that debt issuance costs for a recognized debt liability be presented in the balance sheet as a direct deduction from the carrying amount of that debt liability, consistent with debt discounts. We elected to adopt this guidance for debt issuance costs during 2015 on a retrospective basis. As a result, $24.8 was presented as a reduction of long-term debt as of December 31, 2015, and we reclassified $30.5 from other noncurrent assets to long-term debt as of December 31, 2014 within the consolidated balance sheets.

In November 2015, the Financial Accounting Standards Board issued accounting guidance to simplify the presentation of deferred tax assets and liabilities by requiring that all amounts be presented in the balance sheet as noncurrent assets or liabilities. We elected to adopt this guidance for deferred taxes during 2015 on a retrospective basis. As a result, we reclassified $67.7 from other current assets to noncurrent assets as of December 31, 2014, within the consolidated balance sheets.

**Forward-Looking Statements**

Certain statements we make or incorporate by reference in this Form 10-K, or make in other documents we furnished to or file with the Securities Exchange Commission, as well as in press releases or in oral presentations made by our employees, reflect our estimates and beliefs and are intended to be, and are hereby identified as "forward-looking statements" for purposes of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Words such as "expects," "anticipates," "believes," "intends," "plans," "estimates" and other similar references to future periods typically identify such forward-looking statements. These forward-looking statements reflect our current beliefs and judgments, but are not guarantees of future performance or outcomes. They are

- 31-

A004743

*Table of Contents*

based on a number of assumptions and estimates that are inherently affected by economic, competitive, regulatory, and operational risks, uncertainties and contingencies that are beyond our control, and upon assumptions with respect to future business decisions and conditions that may change. In particular, these include, but are not limited to, statements in the *Outlook* and *Liquidity and Capital Resources* sections and Item 7A, *Quantitative and Qualitative Disclosure about Market Risk*.

We caution readers that such forward-looking statements involve risks and uncertainties that could cause actual results to differ materially from those currently expected. See Item 1A, *Risk Factors* for more information on certain of these risks and uncertainties.

Any forward-looking statement made in this document speaks only as of the date on which it is made. We undertake no obligation to publicly update any forward-looking statement, whether as a result of new information, future developments or otherwise, except as may be required by law.

### Item 7A.        Quantitative and Qualitative Disclosures about Market Risk.

Our primary areas of market risk include changes in (a) interest rates, (b) the prices of raw materials and energy sources and the selling price of certain commodity steel, and (c) foreign currency exchange rates.

### Interest Rate Risk

We manage interest rate risk in our capital structure by issuing variable- and fixed-rate debt and by utilizing our Credit Facility, which is affected by variable interest rates. Our outstanding long-term indebtedness (excluding unamortized debt discount and premium and debt issuance costs) was $2,405.5 and $2,484.3 at December 31, 2015 and 2014. The amount outstanding at December 31, 2015, consisted of $1,829.5 of fixed-rate debt, $26.0 of variable-rate Industrial Revenue Bonds and $550.0 of borrowings from our Credit Facility that bears interest at variable interest rates. An increase in prevailing interest rates would increase interest expense and interest paid for the variable-rate debt, including any outstanding borrowings from the Credit Facility. For example, a 1% increase in interest rates would increase annual interest expense by approximately $5.8 on our outstanding debt at December 31, 2015.

### Commodity Risk

Costs for raw materials and energy have been volatile over the course of the last several years, with iron ore, natural gas and scrap especially volatile. Some customer contracts have a variable-pricing mechanism that allows us to adjust selling prices in response to changes in the cost of certain raw materials and energy. The possible impact of these price adjustments within a contract has generally decreased over the last few years. In the case of stainless steel, changes in costs for nickel, chrome and molybdenum are usually offset by established price surcharges. Therefore, fluctuations in the price of energy (particularly natural gas and electricity), raw materials (such as scrap, purchased slabs, coal, iron ore, zinc and nickel) or other commodities will be, in part, passed on to customers rather than absorbed solely by us.

We have multi-year purchase agreements for certain raw materials with variable-price mechanisms, as well as some annual, fixed price agreements for other raw materials. In some cases, our raw materials contracts enable us to reduce our exposure to fluctuations in raw material costs, but in other instances we may have sales contracts that expose us to an element of market risk. After we negotiate new contracts with customers, our sales prices could increase or decrease. The prices at which we sell steel will not necessarily change in tandem with changes in our raw material costs that follow the variable pricing terms in our raw material purchase contracts. Conversely, our raw material purchase contracts with fixed-price terms may prevent us from reducing our raw material costs to fully offset changes in the prices at which we sell steel. In addition, some of our existing multi-year supply contracts have required minimum purchase quantities. Under adverse economic conditions, those minimums may exceed our needs. Following exceptions for *force majeure* and other circumstances affecting the legal enforceability of the contracts, these minimum purchase requirements could require us to purchase quantities of raw materials that could significantly exceed our anticipated needs. In these circumstances, we would attempt to negotiate agreements for new purchase quantities. There is a risk, however, that we would not be successful in reducing purchase quantities, either through negotiation or litigation. If that occurred, we would likely be required to purchase more of a particular raw material in a particular year than we need, negatively affecting our results of operations and cash flows.

We use cash-settled commodity price swaps and options to hedge the market risk associated with the purchase of certain of our raw materials and energy requirements and the market risk associated with the sale of certain of our commodity steel (hot roll carbon steel coils). We routinely use these hedges for a portion of our natural gas and iron ore requirements and for our zinc, nickel, and electricity requirements. Our hedging strategy is designed to protect us from excessive pricing volatility. However, since we do not typically hedge 100% of our exposure, abnormal price increases in any of these commodity markets might still negatively affect operating costs.

- 32 -

A004744

Table of Contents

For derivatives designated in cash flow hedging relationships, we record the effective portion of the gains and losses from the use of these instruments in accumulated other comprehensive income (loss) on the consolidated balance sheets and recognize the earnings of the associated underlying transaction into net sales or cost of products sold in the same period. At December 31, 2015, accumulated other comprehensive income (loss) included 50.8 in unrealized pre-tax losses for these derivative instruments. All other commodity price swaps and options are marked to market and recognized into net sales or cost of products sold with the offset recognized as an asset or accrued liability. At December 31, 2015, other current assets of $0.5, other noncurrent assets of $0.3, accrued liabilities of $41.2 and other noncurrent liabilities of $9.5 were included on the consolidated balance sheets for the fair value of commodity derivatives. At December 31, 2014, other current assets of $3.6, other noncurrent assets of $1.8, accrued liabilities of $36.2 and other noncurrent liabilities of $5.7 were included on the consolidated balance sheets for the fair value of commodity derivatives.

The following table presents the negative effect on pre-tax income of a hypothetical change in the fair value of derivative instruments outstanding at December 31, 2015, due to an assumed 10% and 25% decrease in the market price of each of the indicated commodities.

| Commodity Derivative | Negative Effect on Pre-tax Income | |
| --- | --- | --- |
| | 10% Decrease | 25% Decrease |
| Natural gas | $ 8.9 | $ 22.2 |
| Nickel | 0.1 | 0.2 |
| Zinc | 4.0 | 10.0 |
| Electricity | 4.5 | 11.3 |
| Iron ore | 3.6 | 8.3 |

Because we structure and use these instruments as hedges, the benefit of lower prices paid for the physical commodity used in the normal production cycle or higher prices received on the sale of product would offset these hypothetical losses. We do not enter into swap or option contracts for trading purposes.

**Foreign Currency Exchange Rate Risk**

A portion of our intercompany receivables that are denominated in foreign currencies are exposed to risks from exchange rate fluctuations. We use forward currency contracts to manage exposures to certain of these currency price fluctuations. At December 31, 2015 and 2014, we had outstanding forward currency contracts with a total contract value of $60.3 and $28.6 for the sale of euros. At December 31, 2015 and 2014, current assets of $1.1 and $1.2 were included on the consolidated balance sheets for the fair value of these contracts. Based on the contracts outstanding at December 31, 2015, a 10% change in the dollar-to-euro exchange rate would result in a pre-tax impact of $6.0 on the value of these contracts on a mark-to-market basis, which would offset the effect of a change in the exchange rate on the underlying receivable.

- 33 -

Table of Contents

**Item 8.        Financial Statements and Supplementary Data.**

**AK Steel Holding Corporation and Subsidiaries
Index to Consolidated Financial Statements**

| | Page |
| --- | --- |
| Management's Responsibility for Consolidated Financial Statements | 35 |
| Reports of Independent Registered Public Accounting Firms | 36 |
| Consolidated Statements of Operations for the Years Ended December 31, 2015, 2014 and 2013 | 37 |
| Consolidated Statements of Comprehensive Income (Loss) for the Years Ended December 31, 2015, 2014 and 2013 | 38 |
| Consolidated Balance Sheets as of December 31, 2015 and 2014 | 39 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2015, 2014 and 2013 | 41 |
| Consolidated Statements of Stockholders' Equity (Deficit) for the Years Ended December 31, 2015, 2014 and 2013 | 42 |
| Notes to Consolidated Financial Statements | 43 |

- 34-

A004746

*Table of Contents*

### MANAGEMENT'S RESPONSIBILITY FOR CONSOLIDATED FINANCIAL STATEMENTS

We prepare our consolidated financial statements in conformity with accounting principles generally accepted in the United States of America. These principles permit choices among alternatives and require numerous estimates of financial matters. We believe the accounting principles chosen are appropriate under the circumstances, and that the estimates, judgments and assumptions involved in our financial reporting are reasonable.

We are responsible for the integrity and objectivity of the financial information presented in our consolidated financial statements. We maintain a system of internal accounting controls designed to provide reasonable assurance that employees comply with stated policies and procedures, that assets are safeguarded and that financial reports are fairly presented. On a regular basis, financial management discusses internal accounting controls and financial reporting matters with our independent registered public accounting firm and our Audit Committee, composed solely of independent outside directors. The independent registered public accounting firm and the Audit Committee also meet privately to discuss and assess our accounting controls and financial reporting.

| | |
|---|---|
| Dated: February 19, 2016 | /s/ Roger K. Newport |
| | Roger K. Newport |
| | Chief Executive Officer and Director |
| | |
| Dated: February 19, 2016 | /s/ Jaime Vasquez |
| | Jaime Vasquez |
| | Vice President, Finance and Chief Financial Officer |

- 35 -

*Table of Contents*

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders of
AK Steel Holding Corporation

We have audited the accompanying consolidated balance sheets of AK Steel Holding Corporation (the "Company") as of December 31, 2015 and 2014, and the related consolidated statements of operations, comprehensive income (loss), stockholders' equity (deficit), and cash flows for each of the three years in the period ended December 31, 2015. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of AK Steel Holding Corporation at December 31, 2015 and 2014, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2015, in conformity with U. S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), AK Steel Holding Corporation's internal control over financial reporting as of December 31, 2015, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), and our report dated February 19, 2016 expressed an unqualified opinion thereon.

/s/ ERNST & YOUNG LLP

A004747

Cincinnati, Ohio
February 19, 2016

- 36-

*Table of Contents*

## AK STEEL HOLDING CORPORATION
## CONSOLIDATED STATEMENTS OF OPERATIONS
### Years Ended December 31, 2015, 2014 and 2013
### (dollars in millions, except per share data)

| | 2015 | 2014 | 2013 |
|---|---|---|---|
| Net sales | $ 6,692.9 | $ 6,505.7 | $ 5,570.4 |
| Cost of products sold (exclusive of items shown separately below) | 6,032.0 | 6,007.7 | 5,107.8 |
| Selling and administrative expenses (exclusive of items shown separately below) | 261.9 | 247.2 | 205.3 |
| Depreciation | 216.0 | 201.9 | 190.1 |
| Pension and OPEB expense (income) (exclusive of corridor charges shown below) | (63.0) | (92.5) | (68.6) |
| Pension and OPEB net corridor charge | 131.2 | 2.0 | — |
| Charge for facility idling | 28.1 | — | — |
| Total operating costs | 6,606.2 | 6,366.3 | 5,434.6 |
| **Operating profit** | 86.7 | 139.4 | 135.8 |
| Interest expense | 173.0 | 144.7 | 127.4 |
| Impairment of Magnetation investment | (256.3) | — | — |
| Impairment of AFSG investment | (41.6) | — | — |
| Other income (expense) | 1.4 | (21.1) | (1.4) |
| **Income (loss) before income taxes** | (382.8) | (26.4) | 7.0 |
| Income tax expense (benefit) | 63.4 | 7.7 | (10.4) |
| **Net income (loss)** | (446.2) | (34.1) | 17.4 |
| Less: Net income attributable to noncontrolling interests | 62.8 | 62.8 | 64.2 |
| **Net income (loss) attributable to AK Steel Holding Corporation** | $ (509.0) | $ (96.9) | $ (46.8) |
| **Basic and diluted earnings per share:** | | | |
| Net income (loss) attributable to AK Steel Holding Corporation common stockholders | $ (2.86) | $ (0.65) | $ (0.34) |

See notes to consolidated financial statements.

- 37-

*Table of Contents*

## AK STEEL HOLDING CORPORATION

A004748

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)**

**Years Ended December 31, 2015, 2014 and 2013**

**(dollars in millions)**

|  | 2015 | 2014 | 2013 |
|---|---|---|---|
| Net income (loss) | $ (446.2) | $ (34.1) | $ 17.4 |
| Other comprehensive income (loss), before tax: |  |  |  |
| Foreign currency translation gain (loss) | (3.1) | (3.7) | 1.2 |
| Cash flow hedges: |  |  |  |
| Gains (losses) arising in period | (64.2) | (51.6) | 3.5 |
| Reclassification of losses (gains) to net income (loss) | 61.4 | 1.1 | (25.2) |
| Unrealized holding gains on securities: |  |  |  |
| Unrealized holding gains (losses) arising in period | — | — | 0.2 |
| Pension and OPEB plans: |  |  |  |
| Prior service credit (cost) arising in period | (7.7) | 10.9 | (6.1) |
| Gains (losses) arising in period | (60.8) | (422.5) | 422.3 |
| Reclassification of prior service cost (credits) included in net income (loss) | (60.2) | (68.9) | (76.2) |
| Reclassification of losses (gains) included in net income (loss) | 165.0 | 6.9 | 25.3 |
| **Other comprehensive income (loss), before tax** | 30.4 | (527.8) | 345.0 |
| Income tax expense in other comprehensive income (loss) | 13.2 | — | 22.7 |
| **Other comprehensive income (loss)** | 17.2 | (527.8) | 322.3 |
| **Comprehensive income (loss)** | (429.0) | (561.9) | 339.7 |
| Less: Comprehensive income attributable to noncontrolling interests | 62.8 | 62.8 | 64.2 |
| **Comprehensive income (loss) attributable to AK Steel Holding Corporation** | $ (491.8) | $ (624.7) | $ 275.5 |

See notes to consolidated financial statements.

- 38 -

Table of Contents

**AK STEEL HOLDING CORPORATION**

**CONSOLIDATED BALANCE SHEETS**

**December 31, 2015 and 2014**

**(dollars in millions, except per share data)**

|  | 2015 | 2014 |
|---|---|---|
| **ASSETS** |  |  |
| **Current assets:** |  |  |
| Cash and cash equivalents | $ 56.6 | $ 70.2 |
| Accounts receivable, net | 444.9 | 644.3 |
| Inventory, net | 1,226.3 | 1,172.1 |
| Other current assets | 78.4 | 71.4 |
| Total current assets | 1,806.2 | 1,958.0 |
| **Property, plant and equipment** | 6,466.0 | 6,388.4 |
| Accumulated depreciation | (4,379.5) | (4,175.2) |
| Property, plant and equipment, net | 2,086.5 | 2,213.2 |
| **Other non-current assets:** |  |  |
| Investments in affiliates | 70.7 | 388.7 |
| Other non-current assets | 121.0 | 268.1 |

A004749

| | | | | |
|---|---|---:|---|---:|
| **TOTAL ASSETS** | | $ 4,084.4 | $ | 4,828.0 |
| **LIABILITIES AND EQUITY (DEFICIT)** | | | | |
| **Current liabilities**: | | | | |
| Accounts payable | $ | 703.4 | $ | 803.1 |
| Accrued liabilities | | 261.5 | | 266.5 |
| Current portion of pension and other postretirement benefit obligations | | 77.7 | | 55.6 |
| Total current liabilities | | 1,042.6 | | 1,125.2 |
| **Non-current liabilities:** | | | | |
| Long-term debt | | 2,354.1 | | 2,422.0 |
| Pension and other postretirement benefit obligations | | 1,146.9 | | 1,225.3 |
| Other non-current liabilities | | 136.4 | | 132.5 |
| **TOTAL LIABILITIES** | | 4,680.0 | | 4,905.0 |
| **Equity (deficit):** | | | | |
| Common stock, authorized 300,000,000 shares of $.01 par value each; issued 178,284,137 and 177,362,600 shares in 2015 and 2014; outstanding 177,893,562 and 177,215,816 shares in 2015 and 2014 | | 1.8 | | 1.8 |
| Additional paid-in capital | | 2,266.8 | | 2,259.1 |
| Treasury stock, common shares at cost, 390,575 and 146,784 shares in 2015 and 2014 | | (2.0) | | (1.0) |
| Accumulated deficit | | (3,057.0) | | (2,548.0) |
| Accumulated other comprehensive loss | | (187.2) | | (204.4) |
| Total stockholders' equity (deficit) | | (977.6) | | (492.5) |
| Noncontrolling interests | | 382.0 | | 415.5 |
| **TOTAL EQUITY (DEFICIT)** | | (595.6) | | (77.0) |
| **TOTAL LIABILITIES AND EQUITY (DEFICIT)** | $ | 4,084.4 | $ | 4,828.0 |

- 39-

*Table of Contents*

The consolidated balance sheets as of December 31, 2015 and 2014, include the following amounts for consolidated variable interest entities, before intercompany eliminations. See Note 15 for more information concerning variable interest entities.

| | | 2015 | | 2014 |
|---|---|---:|---|---:|
| **SunCoke Middletown** | | | | |
| Cash and cash equivalents | $ | 7.6 | $ | 18.2 |
| Inventory, net | | 19.8 | | 29.6 |
| Property, plant and equipment | | 421.5 | | 420.1 |
| Accumulated depreciation | | (57.6) | | (43.3) |
| Accounts payable | | 10.8 | | 10.6 |
| Other assets (liabilities), net | | (0.5) | | (0.3) |
| Noncontrolling interests | | 380.0 | | 413.7 |
| | | | | |
| **Other variable interest entities** | | | | |
| Cash and cash equivalents | $ | 1.1 | $ | 1.0 |
| Property, plant and equipment | | 11.5 | | 11.4 |
| Accumulated depreciation | | (9.4) | | (9.3) |
| Other assets (liabilities), net | | 0.9 | | 0.6 |
| Noncontrolling interests | | 2.0 | | 1.8 |

A004750

See notes to consolidated financial statements.

- 40-

*Table of Contents*

# AK STEEL HOLDING CORPORATION
## CONSOLIDATED STATEMENTS OF CASH FLOWS
### Years Ended December 31, 2015, 2014 and 2013
### (dollars in millions)

| | 2015 | 2014 | 2013 |
|---|---|---|---|
| **Cash flows from operating activities:** | | | |
| Net income (loss) | $ (446.2) | $ (34.1) | $ 17.4 |
| Adjustments to reconcile net income (loss) to cash flows from operating activities: | | | |
| Depreciation | 201.7 | 187.6 | 176.1 |
| Depreciation—SunCoke Middletown | 14.3 | 14.3 | 14.0 |
| Amortization | 21.2 | 20.4 | 19.1 |
| Impairment of Magnetation and AFSG investments | 297.9 | — | — |
| Deferred income taxes | 62.1 | 8.2 | (7.3) |
| Contributions to pension trust | (24.1) | (196.5) | (181.1) |
| Pension and OPEB expense (income) | (63.0) | (92.5) | (68.6) |
| Pension and OPEB net corridor charge | 131.2 | 2.0 | — |
| Contributions to retirees VEBAs | (3.1) | (3.1) | (30.8) |
| Affiliate (earnings) losses and distributions, net | 19.7 | 9.8 | 11.3 |
| Other operating items, net | (4.4) | 6.0 | (1.9) |
| Changes in assets and liabilities, net of effect of acquired business: | | | |
| Accounts receivable | 228.1 | 33.8 | (50.1) |
| Inventories | (53.8) | (223.4) | 22.6 |
| Accounts payable and other current liabilities | (139.7) | 25.2 | 46.7 |
| Charge for facility idling | 28.1 | — | — |
| Other assets | (7.6) | (8.2) | (4.7) |
| Pension obligations | (12.7) | (18.2) | (10.0) |
| Postretirement benefit obligations | (48.3) | (63.9) | (63.4) |
| Other liabilities | (1.1) | 9.8 | 0.5 |
| Net cash flows from operating activities | 200.3 | (322.8) | (110.2) |
| **Cash flows from investing activities:** | | | |
| Capital investments | (99.0) | (81.1) | (63.6) |
| Investments in Magnetation LLC | — | (100.0) | (50.0) |
| Investments in acquired business, net of cash acquired | — | (690.3) | — |
| Proceeds from sale of equity investee | 25.0 | — | — |
| Proceeds from AFSG Holdings, Inc. distribution | 14.0 | — | — |
| Other investing items, net | 12.5 | 13.6 | 15.1 |
| Net cash flows from investing activities | (47.5) | (857.8) | (98.5) |
| **Cash flows from financing activities:** | | | |
| Net borrowings (repayments) under credit facility | (55.0) | 515.0 | 90.0 |
| Proceeds from issuance of long-term debt | — | 427.1 | 31.9 |

A004751

| | | | |
|---|---|---|---|
| Redemption of long-term debt | (14.1) | (0.8) | (27.4) |
| Proceeds from issuance of common stock | — | 345.3 | — |
| Debt issuance costs | — | (15.5) | (3.4) |
| SunCoke Middletown distributions to noncontrolling interest owners | (96.3) | (61.0) | (64.8) |
| Other financing items, net | (1.0) | (4.6) | 0.7 |
| Net cash flows from financing activities | (166.4) | 1,205.5 | 27.0 |
| Net increase (decrease) in cash and cash equivalents | (13.6) | 24.9 | (181.7) |
| Cash and cash equivalents, beginning of year | 70.2 | 45.3 | 227.0 |
| Cash and cash equivalents, end of year | $ 56.6 | $ 70.2 | $ 45.3 |

See notes to consolidated financial statements.

- 41 -

Table of Contents

### AK STEEL HOLDING CORPORATION
### CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)
### Years Ended December 31, 2015, 2014 and 2013
### (dollars in millions)

| | Common Stock | Additional Paid-In-Capital | Treasury Stock | Accumulated Deficit | Accumulated Other Comprehensive Income (Loss) | Noncontrolling Interests | Total |
|---|---|---|---|---|---|---|---|
| December 31, 2012 | $ 1.5 | $ 2,069.7 | $ (173.3) | $ (2,404.3) | $ 1.1 | $ 414.3 | $ (91.0) |
| Net income (loss) | | | | (46.8) | | 64.2 | 17.4 |
| Share-based compensation | | 9.5 | | | | | 9.5 |
| Purchase of treasury stock | | | (0.7) | | | | (0.7) |
| Change in accumulated other comprehensive income (loss) | | | | | 322.3 | | 322.3 |
| Net distributions to noncontrolling interests | | | | | | (64.8) | (64.8) |
| December 31, 2013 | $ 1.5 | $ 2,079.2 | $ (174.0) | $ (2,451.1) | $ 323.4 | $ 413.7 | $ 192.7 |
| Net income (loss) | | | | (96.9) | | 62.8 | (34.1) |
| Issuance of common stock | 0.4 | 344.9 | | | | | 345.3 |
| Retirement of treasury stock | (0.1) | (173.9) | 174.0 | | | | — |
| Share-based compensation | | 8.9 | | | | | 8.9 |
| Purchase of treasury stock | | | (1.0) | | | | (1.0) |
| Change in accumulated other comprehensive income (loss) | | | | | (527.8) | | (527.8) |
| Net distributions to noncontrolling interests | | | | | | (61.0) | (61.0) |
| December 31, 2014 | $ 1.8 | $ 2,259.1 | $ (1.0) | $ (2,548.0) | $ (204.4) | $ 415.5 | $ (77.0) |
| Net income (loss) | | | | (509.0) | | 62.8 | (446.2) |
| Share-based compensation | | 7.7 | | | | | 7.7 |
| Purchase of treasury stock | | | (1.0) | | | | (1.0) |
| Change in accumulated other comprehensive income (loss) | | | | | 17.2 | | 17.2 |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net distributions to noncontrolling interests | | | | | | | | | | (96.3) | | (96.3) |
| December 31, 2015 | $ | 1.8 | $ | 2,266.8 | $ | (2.0) | $ | (3,057.0) | $ | (187.2) | $ | 382.0 | $ (595.6) |

See notes to consolidated financial statements.

- 42-

Table of Contents

**AK STEEL HOLDING CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(dollars in millions, except per share amounts or as otherwise specifically noted)**

## NOTE 1 - Summary of Significant Accounting Policies

*Basis of Presentation:* These financial statements consolidate the operations and accounts of AK Steel Holding Corporation ("AK Holding"), its wholly-owned subsidiary AK Steel Corporation ("AK Steel"), all subsidiaries in which AK Holding has a controlling interest, and two variable interest entities for which AK Steel is the primary beneficiary. Unless the context indicates otherwise, references to "we," "us" and "our" refer to AK Holding and its subsidiaries. We also operate Mexican and European trading companies that buy and sell steel and steel products and other materials. We manage operations on a consolidated, integrated basis so that we can use the most appropriate equipment and facilities for the production of a product, regardless of product line. Therefore, we conclude that we operate in a single business segment. All intercompany transactions and balances have been eliminated.

*Use of Estimates:* The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires the use of estimates and assumptions that affect the amounts reported. We base these estimates on historical experience and information available to us about current events and actions we may take in the future. Estimates and assumptions affect significant items that include the carrying value of long-lived assets, including investments and goodwill; valuation allowances for receivables, inventories and deferred income tax assets; legal and environmental liabilities; workers compensation and asbestos liabilities; share-based compensation; excess cost of operations; and assets and obligations of employee benefit plans. There can be no assurance that actual results will not differ from these estimates.

*Revenue Recognition:* Revenue from sales of products is recognized at the time that title and the risks and rewards of ownership pass, which can be on the date of shipment or the date of receipt by the customer depending on when the terms of customers' arrangements are met, the sales price is fixed or determinable, and collection is reasonably assured. Sales taxes collected from customers are recorded on a net basis with no revenue recognized.

*Cost of Products Sold:* Cost of products sold consists primarily of raw materials, energy costs, supplies consumed in the manufacturing process, manufacturing labor, contract labor and direct overhead expense necessary to manufacture the finished steel product, as well as distribution and warehousing costs. Our share of the income (loss) of investments in associated companies accounted for under the equity method is included in costs of products sold since these operations are integrated with our overall steelmaking operations, except for our share of the income (loss) of Magnetation LLC, which is included in other income (expense).

*Share-Based Compensation:* Compensation costs for stock awards granted under our Stock Incentive Plan are recognized over their vesting period using the straight-line method.

*Legal Fees:* Legal fees associated with litigation and similar proceedings that are not expected to provide a benefit in future periods are generally expensed as incurred. Legal fees associated with activities that are expected to provide a benefit in future periods, such as costs associated with the issuance of debt, are generally capitalized as incurred.

*Income Taxes:* Interest and penalties from uncertain tax positions are included in income tax expense. Deferred tax assets do not include certain amounts that arise from tax deductions from share-based compensation in excess of compensation recognized for financial reporting when net operating loss carryforwards are created. We use tax law ordering to determine when excess tax benefits have been realized.

*Earnings per Share:* Earnings per share is calculated using the "two-class" method. Under the "two-class" method, undistributed earnings are allocated to both common shares and participating securities. We divide the sum of distributed earnings to common stockholders and undistributed earnings allocated to common stockholders by the weighted-average number of common shares

outstanding during the period. The restricted stock granted by AK Holding is entitled to dividends before vesting and meets the criteria of a participating security.

*Cash Equivalents:* Cash equivalents include short-term, highly-liquid investments that are readily convertible to known amounts of cash and have an original maturity of three months or less.

*Inventories:* Inventories are valued at the lower of cost or market. We measure the cost of the majority of inventories on the last-in, first-out (LIFO) method. Other inventories are measured principally at average cost and consist mostly of foreign inventories and certain raw materials.

- 43-

A004754

*Table of Contents*

*Property, Plant and Equipment:* Plant and equipment are depreciated under the straight-line method over their estimated lives. Estimated lives are as follows: land improvements over 20 years, leaseholds over the life of the lease, buildings over 40 years and machinery and equipment over two to 20 years. The estimated weighted-average life of our machinery and equipment is 12 years at the end of the current year. Costs incurred to develop coal mines are capitalized when incurred. We use the units-of-production method utilizing only proven and probable reserves in the depletion base to compute the depletion of coal reserves and mine development costs. We expense costs associated with major maintenance activities at our operating facilities in the period in which they occur.

We review the carrying value of long-lived assets to be held and used and long-lived assets to be disposed of when events and circumstances warrant such a review. If the carrying value of a long-lived asset exceeds its fair value, an impairment has occurred and a loss is recognized based on the amount by which the carrying value exceeds the fair value, less cost to dispose, for assets to be sold or abandoned. We determine fair value by using quoted market prices, estimates based on prices of similar assets or anticipated cash flows discounted at a rate commensurate with risk.

*Investments:* Investments in associated companies are accounted for under the equity method. We review investments for impairment when circumstances indicate that a loss in value below its carrying amount is other than temporary.

*Goodwill:* Goodwill relates to our tubular business. We review goodwill for potential impairment at least annually on October 1 each year and whenever events or circumstances make it more likely than not that impairment may have occurred. Considering operating results and the estimated fair value of the business, the most recent annual goodwill impairment test indicated that the fair value of our tubular business reporting unit was in excess of its carrying value. No goodwill impairment was recorded as a result of the 2015, 2014 and 2013 annual impairment tests.

*Debt Issuance Costs:* Debt issuance costs for the revolving credit facility are included in other non-current assets and all other debt issuance costs reduce the carrying amount of long-term debt.

*Pension and Other Postretirement Benefits:* We recognize, as of the measurement date, any unrecognized actuarial net gains or losses that exceed 10% of the larger of the projected benefit obligations or the plan assets, defined as the "corridor". Amounts inside the corridor are amortized over the plan participants' life expectancy. We determine the expected return on assets using the fair value of plan assets.

*Concentrations of Credit Risk:* We are primarily a producer of carbon, stainless and electrical steels and steel products, which are sold to a number of markets, including automotive, industrial machinery and equipment, construction, power distribution and appliances. Net sales by product line are presented below:

|  | **2015** | **2014** | **2013** |
|---|---|---|---|
| Carbon | $ 4,746.8 | $ 4,423.3 | $ 3,643.4 |
| Stainless and electrical | 1,733.0 | 1,836.5 | 1,705.3 |
| Tubular | 201.3 | 231.4 | 220.7 |
| Other | 11.8 | 14.5 | 1.0 |
| Total | $ 6,692.9 | $ 6,505.7 | $ 5,570.4 |

Percentages of our net sales attributable to various markets are presented below:

|  | **2015** | **2014** | **2013** |
|---|---|---|---|
| Automotive | 60% | 53% | 51% |
| Infrastructure and Manufacturing | 16% | 18% | 20% |
| Distributors and Converters | 24% | 29% | 29% |

We sell domestically to customers located primarily in the Midwestern and Eastern United States and to foreign customers, primarily in Canada, Mexico and Western Europe. Net sales to customers located outside the United States totaled $855.7, $755.4 and $708.0 for 2015, 2014 and 2013. We had two customers that accounted for 12% and 11% of net sales in 2015. No customer accounted for more than 10% of our net sales during 2014 and 2013.

Approximately 65% and 43% of accounts receivable outstanding at December 31, 2015 and 2014, are due from businesses associated with the U.S. automotive industry, including 20% and 14% of receivables due from one automotive customer as of December 31, 2015 and 2014. Except in a few situations where the risk warrants it, collateral is not required on accounts receivable. While we believe our recorded accounts receivable will be collected, in the event of default we would follow normal collection procedures. We maintain an

allowance for doubtful accounts for the loss that would be incurred if a customer is unable to pay amounts due. We determine this allowance based on various factors, including the customer's financial condition and changes in customer payment patterns. We write off accounts receivable against the allowance for doubtful accounts when it is remote that collection will occur.

*Union Contracts:* At December 31, 2015, we employed approximately 8,500 people, of which approximately 6,300 are represented by labor unions under various contracts that expire between 2016 and 2019. On February 5, 2015, members of the United Steelworkers, Local 1190, ratified a labor agreement covering approximately 215 production and maintenance employees at Mountain State Carbon, LLC. The new agreement took effect on March 1, 2015 and will expire on March 1, 2019. This is the initial labor agreement with the union at Mountain State Carbon. On May 8, 2015, members of the United Auto Workers, Local 4104, ratified a labor agreement covering approximately 140 production and maintenance employees at Zanesville Works. The new agreement took effect on May 20, 2015 and will expire on May 31, 2019. An agreement with the United Auto Workers, Local 3462, which represents approximately 330 employees at our Coshocton Works, is scheduled to expire on March 31, 2016. An agreement with the United Auto Workers, Local 3303, which represents approximately 1,240 employees at our Butler Works, is scheduled to expire on October 1, 2016.

*Financial Instruments:* We classify investments in equity securities as available-for-sale and carry them at fair value with unrealized gains and losses, net of tax, reported in other comprehensive income. Realized gains and losses on sales of available-for-sale securities are computed based upon initial cost adjusted for any other-than-temporary declines in fair value. We have no investments that are considered to be trading securities.

We are a party to derivative instruments that are designated and qualify as hedges for accounting purposes. We may also use derivative instruments to which we do not apply hedge accounting treatment. Our objective in using these instruments is to protect earnings and cash flows from fluctuations in the fair value of selected commodities and currencies.

Fluctuations in the price of certain commodities we use in production processes and in the selling price of certain commodity steel (hot roll carbon steel coils) may affect our income and cash flows. We have implemented raw material and energy surcharges for spot market customers and some contract customers. For certain commodities where such exposure exists, we may use cash-settled commodity price swaps, collars and purchase options, with a duration of up to three years, to hedge the price of a portion of our natural gas, iron ore, electricity, aluminum, zinc and nickel requirements or the selling price of hot roll carbon steel coils. We may designate some of these instruments as cash flow hedges and the effective portion of the changes in their fair value and settlements are recorded in accumulated other comprehensive income. Gains and losses are subsequently reclassified from accumulated other comprehensive income and recorded in cost of products sold or net sales in the same period as the earnings recognition of the associated underlying transaction. Other instruments are marked to market and recorded in cost of products sold or net sales with the offset recorded as current assets or accrued liabilities.

In addition, exchange rate fluctuations on monies we receive from European subsidiaries and other customers invoiced in European currencies create cash flow and income statement risks. To reduce these risks, we have entered a series of agreements to sell euros in the future at fixed dollar rates. These forward contracts are entered with durations up to twenty-four months. A typical contract is used as a cash flow hedge for the period that begins when an order is taken and ends when a sale is recognized, at which time it converts into a fair value hedge of a receivable we collect in euros. We do not designate these derivatives as hedges for accounting purposes and we recognize the change in fair value as expense or income in other income (expense).

We formally document all relationships between hedging instruments and hedged items, as well as risk management objectives and strategies for undertaking various hedge transactions. In this documentation, we specifically identify the asset, liability, firm commitment or forecasted transaction that has been designated as a hedged item, and state how the hedging instrument is expected to hedge the risks from that item. We formally measure effectiveness of hedging relationships both at the hedge inception and on an ongoing basis. We discontinue hedge accounting prospectively when we determine that the derivative is no longer effective in offsetting changes in the fair value or cash flows of a hedged item; when the derivative expires or is sold, terminated or exercised; when it is probable that the forecasted transaction will not occur; when a hedged firm commitment no longer meets the definition of a firm commitment; or when we determine that designation of the derivative as a hedge instrument is no longer appropriate. Our derivative contracts contain collateral funding requirements. We have master netting arrangements with counterparties, giving us the right to offset amounts owed under the derivative instruments and the collateral. We do not offset derivative assets and liabilities or collateral on our consolidated balance sheets.

*Asbestos and Environmental Accruals:* For a number of years, we have been remediating sites where hazardous materials may have been released, including sites no longer owned by us. In addition, a number of lawsuits alleging asbestos exposure have been filed and continue to be filed against us. We have established accruals for estimated probable costs from asbestos claim settlements and environmental investigation, monitoring and remediation. If the accruals are not adequate to meet future claims, operating results and cash flows may be negatively affected. Our accruals do not consider the potential for insurance recoveries, for which we have partial

insurance coverage for some future asbestos claims. In addition, some existing insurance policies covering asbestos and environmental contingencies may serve to partially reduce future covered expenditures.

*New Accounting Pronouncements:* The Financial Accounting Standards Board issued Accounting Standards Update No. 2014-09, *Revenue from Contracts with Customers (Topic 606)*, during the second quarter of 2014. Topic 606, as further amended by subsequent Accounting Standard Updates, affects virtually all aspects of an entity's revenue recognition, including determining the measurement of revenue and the timing of when it is recognized for the transfer of goods or services to customers. Topic 606 is effective for annual reporting periods beginning after December 15, 2017. We are currently evaluating the effect of the adoption of Topic 606 on our financial position and results of operations.

The Financial Accounting Standards Board issued Accounting Standards Update No. 2015-02, *Amendments to the Consolidation Analysis* ("ASU 2015-02"), during the first quarter of 2015. ASU 2015-02 changes the analysis that a reporting entity must perform to determine whether it should consolidate certain types of legal entities. ASU 2015-02 is effective for annual reporting periods beginning after December 15, 2015, unless early adoption is elected. We are currently evaluating the effect of the adoption of ASU 2015-02 on our financial position and results of operations, but we do not expect the adoption to have a material effect on our consolidated financial statements.

In April 2015 and August 2015, the Financial Accounting Standards Board issued accounting guidance to simplify the presentation of debt issuance costs by requiring that debt issuance costs from a recognized debt liability be presented in the balance sheet as a direct deduction from the carrying amount of that debt liability, consistent with debt discounts. We elected to early adopt this guidance during 2015 on a retrospective basis. As a result, $24.8 of debt issuance costs was presented as a reduction of long-term debt as of December 31, 2015 and we reclassified $30.5 from other non-current assets to long-term debt as of December 31, 2015.

In November 2015, the Financial Accounting Standards Board issued accounting guidance to simplify the presentation of deferred tax assets and liabilities by requiring that all amounts be presented in the balance sheet as noncurrent assets or liabilities. We elected to early adopt this guidance during 2015 on a retrospective basis. As a result, we reclassified $67.7 from other current assets to other non-current assets as of December 31, 2014.

*Reclassifications:* We reclassified certain prior-year amounts to conform to the current-year presentation.

## NOTE 2 - Supplementary Financial Statement Information

---

### Research and Development Costs

We conduct a broad range of research and development activities aimed at improving existing products and manufacturing processes and developing new products and processes. Research and development costs, which are recorded as cost of products sold when incurred, totaled $27.6, $17.5 and $13.2 in 2015, 2014 and 2013.

### Allowance for Doubtful Accounts

Changes in the allowance for doubtful accounts for the years ended December 31, 2015, 2014 and 2013, are presented below:

|  | 2015 | 2014 | 2013 |
|---|---|---|---|
| Balance at beginning of year | $ 9.0 | $ 8.1 | $ 9.1 |
| Increase (decrease) in allowance | (3.0) | 0.9 | (0.4) |
| Receivables written off | — | — | (0.6) |
| Balance at end of year | $ 6.0 | $ 9.0 | $ 8.1 |

### Inventory, net

Inventories as of December 31, 2015 and 2014, consist of:

|  | 2015 | 2014 |
|---|---|---|
| Finished and semi-finished | $ 996.5 | $ 1,053.4 |
| Raw materials | 410.0 | 494.2 |
| Total cost | 1,406.5 | 1,547.6 |
| Adjustment to state inventories at LIFO value | (180.2) | (375.5) |

A004758

Inventory, net                                                                    $    1,226.3    $    1,172.1

- 45-

A004759

*Table of Contents*

There was no liquidation of LIFO layers in 2015 or 2014. During 2013, liquidation of LIFO layers generated income of $11.9. Changes in the LIFO reserve for the years ended December 31, 2015, 2014 and 2013, are presented below:

|  | 2015 | 2014 | 2013 |
|---|---|---|---|
| Balance at beginning of year | $ 375.5 | $ 396.5 | $ 435.0 |
| Change in reserve | (195.3) | (21.0) | (38.5) |
| Balance at end of year | $ 180.2 | $ 375.5 | $ 396.5 |

*Property, Plant and Equipment*

Property, plant and equipment as of December 31, 2015 and 2014, consist of:

|  | 2015 | 2014 |
|---|---|---|
| Land, land improvements and leaseholds | $ 263.0 | $ 260.7 |
| Buildings | 465.9 | 466.7 |
| Machinery and equipment | 5,628.2 | 5,571.0 |
| Construction in progress | 108.9 | 90.0 |
| Total | 6,466.0 | 6,388.4 |
| Less accumulated depreciation | (4,379.5) | (4,175.2) |
| Property, plant and equipment, net | $ 2,086.5 | $ 2,213.2 |

Interest on capital projects capitalized in 2015, 2014 and 2013 was $2.1, $2.7 and $2.7. Asset retirement obligations were $6.6 and $6.0 at December 31, 2015 and 2014.

*Other Non-current Assets*

Other non-current assets as of December 31, 2015 and 2014, consist of:

|  | 2015 | 2014 |
|---|---|---|
| Investment in AFSG Holdings, Inc. | $ — | $ 55.6 |
| Goodwill | 32.8 | 32.8 |
| Deferred tax assets, non-current | 62.7 | 138.0 |
| Other | 25.5 | 41.7 |
| Other non-current assets | $ 121.0 | $ 268.1 |

Our investment in AFSG Holdings, Inc. ("AFSG") represented the carrying value of our former insurance and finance leasing businesses, which have been largely liquidated. The activities of the remaining operating companies are being "run off". We have no obligation to support the operations or liabilities of these companies. As part of our ongoing strategic review of our business and operations, we re-evaluated our investment in AFSG. During the fourth quarter of 2015, we received a distribution of $14.0 from AFSG. Since the distribution reduced our ability to recover our remaining investment in AFSG after the distribution, we determined our remaining investment in AFSG was impaired and recognized a non-cash charge of $41.6, or $0.23 per diluted share. In the first quarter of 2016, an AFSG subsidiary entered into a stock purchase agreement to sell the remaining non-captive insurance operations, subject to certain customary closing conditions, including regulatory approval.

*Facility Idling*

In the fourth quarter of 2015, we temporarily idled the Ashland Works blast furnace and steelmaking operations. We incurred a $28.1 charge during the quarter, which included $22.2 for supplemental unemployment and other employee benefit costs and $5.9 for equipment idling and other costs. The supplemental unemployment and other employee benefit costs are expected to be paid in 2016 and are recorded as accrued liabilities at December 31, 2015 in the consolidated balance sheet. Beginning in the first quarter of 2016, we estimate we will incur on-going costs of approximately $2.0 to $3.0 per month for employees needed to maintain the equipment, utilities and supplier obligations related to the idled Ashland Works operations.

A004760

*Table of Contents*

**NOTE 3 - Acquisition of Dearborn**

On September 16, 2014, we acquired Severstal Dearborn, LLC ("Dearborn") from Severstal Columbus Holdings, LLC ("Severstal"). The assets acquired from Severstal included the integrated steelmaking assets located in Dearborn, Michigan ("Dearborn Works"), the Mountain State Carbon, LLC ("Mountain State Carbon") cokemaking facility located in Follansbee, West Virginia, and interests in joint ventures that process flat-rolled steel products. The acquisition of Dearborn enhances and complements our business and operational strategies by positioning our carbon steelmaking operations close to our major northern automotive and other customers, expanding our platform to meet the increasing light-weighting demands of our automotive customers, and enhancing our operational flexibility. In addition, we acquired highly modernized and upgraded steelmaking equipment and facilities and the opportunity to achieve significant cost-based synergies. Immediately after the acquisition, Dearborn was merged with and into AK Steel.

The final cash purchase price was $690.3, net of cash acquired. We issued $430.0 of 7.625% Senior Notes due October 2021 at a price of 99.325% of par to pay part of the purchase price. We issued 40.25 million shares of AK Holding common stock at a price of $9.00 per share to pay the balance of the purchase price, to repay a portion of outstanding borrowings under our asset-backed revolving credit facility ("Credit Facility") and for general corporate purposes. For the year ended December 31, 2014, we incurred acquisition costs of $8.1 in selling and administrative expenses, primarily for transaction fees and direct costs, including legal, finance, consulting and other professional fees, and we incurred $12.6 of costs in other income (expense) for committed bridge financing that we arranged but did not use for the Dearborn acquisition. For the year ended December 31, 2014, we incurred severance costs of $2.6 after the acquisition for certain employees of Dearborn in selling and administrative expenses and an income tax charge of $8.4 for changes in the value of deferred tax assets resulting from the acquisition.

During the second quarter of 2015, we sold our 50.0% equity interest in Double Eagle Steel Coating Company ("Double Eagle"), which we acquired as part of the acquisition of Dearborn, for $25.0 in cash. The sale resolved a dispute with the other equity interest holder over the fair market value of our interest in Double Eagle. In July 2015, we received $25.0 from DTE Electric Company ("DTE") to resolve a favorable administrative decision that concluded Dearborn Works had been overcharged for electricity for several years prior to our acquisition of that facility. Both of these matters resolved disputes that existed at the time of our acquisition of Dearborn. The purchase price allocation shown below reflects the updated estimates in value of these matters. Neither the proceeds from our sale of our equity interest in Double Eagle nor the proceeds from DTE had a material impact, individually or in the aggregate, on our results of operations for 2015 or the consolidated balance sheet at December 31, 2015.

A summary of the final purchase price allocation for the fair value of the assets acquired and the obligations assumed at the date of the acquisition is presented below.

| | |
|---|---:|
| Accounts receivable | $    180.6 |
| Inventory | 362.6 |
| Other current assets | 3.6 |
| Property, plant and equipment | 445.5 |
| Investment in affiliates | 72.5 |
|    Total assets acquired | 1,064.8 |
| Accounts payable | (201.4) |
| Accrued liabilities | (32.8) |
| Other postretirement benefit obligations | (128.2) |
| Other non-current liabilities | (12.1) |
|    Total liabilities assumed | (374.5) |
|     Purchase price, net of cash acquired | $    690.3 |

The consolidated financial statements reflect the effects of the acquisition and Dearborn's financial results beginning September 16, 2014. The net sales and operating profit (loss) attributable to Dearborn since the acquisition date and through December 31, 2014 were $567.0 and $12.2, respectively. Assuming the acquisition had been completed at the beginning of 2014, unaudited pro forma net sales and operating profit (loss) for the full year ended December 31, 2014 were $7,942.7 and $(816.2), respectively, including charges for asset impairments of $1,005.1 recorded by Severstal before the acquisition. We included this selected unaudited pro forma consolidated

financial data only for the purpose of illustration. Therefore, it does not necessarily indicate what the operating results would have been if the acquisition had been completed at the beginning of 2014. Moreover, this information does not indicate what our future operating results will be. This information includes net sales and operating profit (loss) attributable to Dearborn following the acquisition.

- 47-

*Table of Contents*

## NOTE 4 - Investments in Affiliates

We have investments in several businesses accounted for using the equity method of accounting. Investees and equity ownership percentages are presented below:

| | Equity Ownership % |
|---|---|
| Combined Metals of Chicago, LLC | 40.0% |
| Delaco Processing, LLC | 49.0% |
| Magnetation LLC | 49.9% |
| Rockport Roll Shop LLC | 50.0% |
| Spartan Steel Coating, LLC | 48.0% |

Cost of products sold includes $6.7, $11.7 and $8.1 in 2015, 2014 and 2013 for our share of income of equity investees other than Magnetation LLC ("Magnetation"). Our share of loss from Magnetation through the first quarter of 2015 is included in other income (expense) and totaled $16.3, $15.2 and $4.9 for 2015, 2014 and 2013. No amounts for Magnetation are included in our results after March 31, 2015, since the investment has been written off. As of December 31, 2015, our carrying cost of our investment in Spartan Steel exceeded our share of the underlying equity in net assets by $13.9. This difference is being amortized and is included in cost of products sold.

Summarized financial statement data for all investees is presented below. The financial results for the acquired joint ventures are only included for the period since the acquisition and the financial results for Magnetation are only included through March 31, 2015, since it is unlikely that we will retain our equity interest as a result of Magnetation's bankruptcy.

| | 2015 | 2014 | 2013 |
|---|---|---|---|
| Revenue | $ 356.4 | $ 386.1 | $ 293.9 |
| Gross profit | 68.3 | 93.2 | 103.7 |
| Net income (loss) | (9.8) | 10.8 | 20.1 |

| | 2015 | 2014 |
|---|---|---|
| Current assets | $ 89.3 | $ 211.8 |
| Noncurrent assets | 66.9 | 879.1 |
| Current liabilities | 14.5 | 157.1 |
| Noncurrent liabilities | 33.8 | 516.6 |

We regularly transact business with these equity investees. Transactions with all equity investees for the years indicated are presented below:

| | 2015 | 2014 | 2013 |
|---|---|---|---|
| Sales to equity investees | $ 61.4 | $ 93.4 | $ 71.6 |
| Purchases from equity investees | 251.0 | 67.7 | 12.5 |

Outstanding receivables and payables with all equity investees as of the end of the year indicated are presented below:

| | 2015 | 2014 |
|---|---|---|
| Accounts receivable from equity investees | $ 0.4 | $ 2.5 |
| Accounts payable to equity investees | 33.1 | 10.9 |

A004762

*Magnetation*

As of March 31, 2015, we concluded that our 49.9% equity interest in Magnetation was fully impaired and recorded a non-cash impairment charge of $256.3 for the quarter ended March 31, 2015. Key factors that affected our conclusion that an other-than-temporary impairment had occurred as of March 31, 2015, included (i) the significant market decline in global iron ore pellet pricing during the first quarter of 2015 and resulting negative cash flow effects on Magnetation's results; (ii) a less favorable longer-term forecast of iron ore prices and resulting cash flow outlook for Magnetation; (iii) the likely loss of our equity interest in Magnetation if it filed for bankruptcy; and (iv) Magnetation's existing capital structure and its inability to raise additional capital from third parties or

- 48 -

*Table of Contents*

the equity holders. Before March 31, 2015, we believed that the fair value of our interest in Magnetation exceeded its carrying amount and that despite near-term temporary pressures on liquidity, long-term cash flow projections of Magnetation were sufficient to allow us to recover our investment in Magnetation. During the quarter ended March 31, 2015, the near-term liquidity issues faced by Magnetation intensified due to a combination of an approximately 20.0% decline in the daily IODEX index and substantially lower IODEX futures pricing toward the end of the quarter, a slower-than-expected ramp-up of its pellet plant operations and resulting lower sales levels, payments due for construction overruns on the pellet and third concentrate plants, and higher-than-expected start-up and operating costs. Although Magnetation accomplished several actions in late 2014 and early 2015 to increase its liquidity, such liquidity enhancements and other cost reduction initiatives did not increase liquidity enough for it to withstand the significant market decline in iron ore pricing during the first quarter of 2015. Based on the outlook for iron ore prices at March 31, 2015, we concluded that prices could remain suppressed for the near future and it raised questions about the ability of Magnetation to operate profitably. In March 2015, Magnetation began discussions with certain debtholders to seek a solution to its liquidity issues. We also participated in those discussions but no acceptable restructuring was agreed upon. On May 5, 2015, Magnetation and its subsidiaries filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Minnesota. Magnetation's outstanding indebtedness is non-recourse to us. We are not required to make any additional capital contributions or other future investments in Magnetation and have not guaranteed any obligations of Magnetation. Because we consider it unlikely that we will retain an equity interest in Magnetation following Magnetation's bankruptcy, we do not expect to record any further impact in our financial statements from our equity investment in Magnetation.

**NOTE 5 - Income Taxes**

We and our subsidiaries file a consolidated federal income tax return that includes all domestic companies owned 80% or more by us and the proportionate share of our interest in equity method investments. State tax returns are filed on a consolidated, combined or separate basis depending on the applicable laws relating to us and our domestic subsidiaries.

Components of income (loss) before income taxes are presented below:

|  | 2015 | 2014 | 2013 |
|---|---|---|---|
| United States | $ (452.1) | $ (94.3) | $ (61.1) |
| Foreign | 6.5 | 5.1 | 3.9 |
| Noncontrolling interests | 62.8 | 62.8 | 64.2 |
| Income (loss) before income taxes | $ (382.8) | $ (26.4) | $ 7.0 |

- 49 -

A004763

Table of Contents

Significant components of deferred tax assets and liabilities at December 31, 2015 and 2014 are presented below:

| | 2015 | 2014 |
|---|---|---|
| Deferred tax assets: | | |
| Net operating and capital loss and tax credit carryforwards | $ 847.3 | $ 778.1 |
| Postretirement benefits | 158.9 | 201.2 |
| Pension benefits | 278.6 | 258.6 |
| Inventories | 139.2 | 152.6 |
| Other assets | 132.8 | 114.2 |
| Valuation allowance | (1,215.5) | (1,000.4) |
| Total deferred tax assets | 341.3 | 504.3 |
| Deferred tax liabilities: | | |
| Depreciable assets | (248.0) | (322.7) |
| Other liabilities | (30.6) | (43.6) |
| Total deferred tax liabilities | (278.6) | (366.3) |
| Net deferred tax assets | $ 62.7 | $ 138.0 |

We regularly evaluate the need for a valuation allowance for deferred tax assets by assessing whether it is more likely than not that we will realize future deferred tax assets. We assess the valuation allowance each reporting period and reflect any additions or adjustments in earnings in the same period. When we assess the need for a valuation allowance, we consider both positive and negative evidence of the likelihood that we will realize deferred tax assets in each jurisdiction. In general, cumulative losses in recent periods provides significant objective negative evidence on our ability to generate future taxable income. As of December 31, 2015 and 2014, we concluded that the negative evidence outweighed the positive evidence and we recorded a valuation allowance for a significant portion of our deferred tax assets. To determine the appropriate valuation allowance, we considered the timing of future reversal of our taxable temporary differences and available tax strategies that, if implemented, would result in realizing deferred tax assets. We identified the potential change from the LIFO inventory accounting method as such a tax-planning strategy. We believe that this strategy is prudent and feasible to use certain federal and state tax loss carryforwards before their expirations. In addition, we believe that the future reversal of our deferred tax liabilities serves as a source of taxable income that supports realizing a portion of our federal and state deferred tax assets. This accounting treatment has no effect on our ability to use the loss carryforwards and tax credits to reduce future cash tax payments. Federal net operating loss carryforwards do not begin to expire until 2023 and substantial amounts of those loss carryforwards have most of their 20-year life remaining before expiration.

Changes in the valuation allowance for the years ended December 31, 2015, 2014 and 2013, are presented below:

| | 2015 | 2014 | 2013 |
|---|---|---|---|
| Balance at beginning of year | $ 1,000.4 | $ 764.1 | $ 873.1 |
| Change in valuation allowance: | | | |
| Included in income tax expense (benefit) | 228.6 | 36.7 | 21.9 |
| Change in deferred assets in other comprehensive income | (13.5) | 199.6 | (130.9) |
| Balance at end of year | $ 1,215.5 | $ 1,000.4 | $ 764.1 |

At December 31, 2015, we had $2,372.3 in federal regular net operating loss carryforwards and $2,672.8 in federal alternative minimum tax ("AMT") net operating loss carryforwards, which will expire between 2023 and 2035. At December 31, 2015, we had unused AMT credit carryforwards of $17.7 and research and development ("R&D") credit carryforwards of $1.2. We may use the loss and credit carryforwards to offset future regular and AMT income tax liabilities. We may carry unused AMT credits forward indefinitely and the R&D credits don't begin to expire until 2027. At December 31, 2015, we had $77.4 in deferred tax assets before considering valuation allowances for state net operating loss carryforwards and tax credit carryforwards, which will expire between 2016 and 2035.

As of December 31, 2015, there were $21.3 of unrecognized deferred tax assets from tax deductions for share-based compensation in excess of compensation recognized for financial reporting when net operating loss carryforwards were created. When we realize the deferred tax assets, we will increase additional paid-in capital.

A004764

We had undistributed earnings of foreign subsidiaries of approximately $38.2 at December 31, 2015. Since we consider these earnings to be permanently invested in our foreign subsidiaries, we did not record deferred taxes for them. If we repatriated the earnings, we estimate that the additional tax expense would be approximately $13.4 before considering the effects on the valuation allowance.

- 50-

A004765

Significant components of income tax expense (benefit) are presented below:

| | 2015 | 2014 | 2013 |
|---|---|---|---|
| Current: | | | |
| Federal | $    — | $    — | $    (3.4) |
| State | 0.2 | (1.1) | 0.2 |
| Foreign | 1.8 | 2.1 | 1.9 |
| Deferred: | | | |
| Federal | 68.8 | 7.7 | 14.0 |
| State | 6.5 | 0.2 | 1.2 |
| Amount allocated to other comprehensive income | (13.2) | — | (22.7) |
| Change in valuation allowance on beginning-of-the-year deferred tax assets | (0.7) | (1.2) | (1.6) |
| Income tax expense (benefit) | $    63.4 | $    7.7 | $    (10.4) |

The reconciliation of income tax on income (loss) before income taxes computed at the U.S. federal statutory tax rates to actual income tax expense (benefit) is presented below:

| | 2015 | 2014 | 2013 |
|---|---|---|---|
| Income tax expense (benefit) at U.S. federal statutory rate | $    (134.0) | $    (9.2) | $    2.4 |
| Income tax expense calculated on noncontrolling interests | (22.0) | (22.0) | (22.5) |
| State and foreign tax expense, net of federal tax | (0.9) | (3.1) | 1.7 |
| Increase in deferred tax asset valuation allowance | 228.6 | 36.7 | 21.9 |
| Amount allocated to other comprehensive income | (13.2) | — | (22.7) |
| Change in accrual for uncertain tax positions | 0.3 | (0.9) | (1.7) |
| Stock compensation in excess of tax deduction | — | 2.0 | 3.1 |
| Expiration of charitable contribution carryforwards | — | — | 2.5 |
| Other permanent differences | 4.6 | 4.2 | 4.9 |
| Income tax expense (benefit) | $    63.4 | $    7.7 | $    (10.4) |

Our federal, state and local tax returns are subject to examination by various taxing authorities. Federal returns for periods beginning in 2012 are open for examination, while certain state and local returns are open for examination for periods beginning in 2007. However, taxing authorities have the ability to adjust net operating loss carryforwards generated in years before these periods. We have not recognized certain tax benefits because of the uncertainty of realizing the entire value of the tax position taken on income tax returns until taxing authorities review them. We have established appropriate income tax accruals, and believe that the outcomes of future federal examinations as well as ongoing and future state and local examinations will not have a material adverse impact on our financial position, results of operations or cash flows. When statutes of limitations expire or taxing authorities resolve uncertain tax positions, we will adjust income tax expense for the unrecognized tax benefits. We have no tax positions for which it is reasonably possible that the total amounts of unrecognized tax benefits will significantly change within twelve months of December 31, 2015.

A reconciliation of the change in unrecognized tax benefits for 2015, 2014 and 2013 is presented below:

| | 2015 | 2014 | 2013 |
|---|---|---|---|
| Balance at beginning of year | $    59.9 | $    53.8 | $    54.0 |
| Increases (decreases) for prior year tax positions | (0.3) | (0.2) | (0.8) |
| Increases (decreases) for current year tax positions | 70.7 | 7.7 | 0.9 |
| (Decreases) from statute lapses | — | (1.4) | (0.3) |
| Balance at end of year | $    130.3 | $    59.9 | $    53.8 |

Included in the balance of unrecognized tax benefits at December 31, 2015 and 2014, are $111.6 and $41.6 of tax benefits that, if recognized, would affect the effective tax rate. Also included in the balance of unrecognized tax benefits at December 31, 2015 and 2014, are $18.7 and $18.4 of tax benefits that, if recognized, would result in adjustments to other tax accounts, primarily deferred taxes.

Table of Contents

**NOTE 6 - Long-term Debt and Other Financing**

Debt balances, including current portions, at December 31, 2015 and 2014, are presented below:

|  | 2015 | 2014 |
|---|---|---|
| Credit Facility | $ 550.0 | $ 605.0 |
| 8.75% Senior Secured Notes due December 2018 | 380.0 | 380.0 |
| 5.00% Exchangeable Senior Notes due November 2019 (effective rate of 10.8%) | 150.0 | 150.0 |
| 7.625% Senior Notes due May 2020 | 529.8 | 529.8 |
| 7.625% Senior Notes due October 2021 | 406.2 | 430.0 |
| 8.375% Senior Notes due April 2022 | 290.2 | 290.2 |
| Industrial Revenue Bonds due 2020 through 2028 | 99.3 | 99.3 |
| Unamortized debt discount/premium and debt issuance costs | (51.4) | (62.3) |
| Total long-term debt | $ 2,354.1 | $ 2,422.0 |

During the period, we were in compliance with all the terms and conditions of our debt agreements.

Maturities of long-term debt, including the amount outstanding on the Credit Facility, for the next five years, at December 31, 2015, are presented below:

| Year | Debt Maturities |
|---|---|
| 2016 | $ — |
| 2017 | — |
| 2018 | 380.0 |
| 2019   (including $550.0 of Credit Facility borrowings) | 700.0 |
| 2020 | 537.1 |

*Credit Facility*

We have a $1,500.0 Credit Facility, which expires in March 2019 and is guaranteed by AK Steel's parent company, AK Holding, and by AK Tube LLC ("AK Tube") and AK Steel Properties, Inc. ("AK Properties"), two 100%-owned subsidiaries of AK Steel. The Credit Facility contains common restrictions, including limitations on, among other things, distributions and dividends, acquisitions and investments, indebtedness, liens and affiliate transactions. The Credit Facility requires that we maintain a minimum fixed charge coverage ratio of one to one if availability under the Credit Facility is less than $150.0. The Credit Facility's current availability significantly exceeds $150.0. Availability is calculated as the lesser of the Credit Facility commitment or our eligible collateral after advance rates, less in either case outstanding borrowings and letters of credit. We secure our Credit Facility obligations with our inventory and accounts receivable, and the Credit Facility's availability fluctuates monthly based on the varying levels of eligible collateral. We do not expect any of these restrictions to affect or limit our ability to conduct business in the ordinary course. The Credit Facility includes a separate "first-in, last-out", or "FILO" tranche, which allows us to use a portion of our eligible collateral at higher advance rates.

At December 31, 2015, our eligible collateral, after application of applicable advance rates, was $1,275.2. As of December 31, 2015, there were outstanding borrowings of $550.0. Availability as of December 31, 2015 was further reduced by $72.9 attributable to outstanding letters of credit, resulting in remaining availability of $652.3. The weighted-average interest rate on the outstanding borrowings at December 31, 2015 and 2014 was 2.1% and 2.2%.

*Senior Secured Notes*

AK Steel has outstanding $380.0 aggregate principal amount of 8.75% Senior Secured Notes due December 2018 (the "Secured Notes"). Substantially all property, plant and equipment of AK Steel are pledged as collateral for the Secured Notes. AK Holding, AK Tube and AK Properties each fully and unconditionally, jointly and severally, guarantees the payment of interest, principal and

premium, if any, on the Secured Notes. The book value of the collateral as of December 31, 2015 was approximately $1.6 billion. The indenture governing the Secured Notes includes covenants with customary restrictions on (a) the incurrence of additional debt by certain subsidiaries, (b) the incurrence of certain liens, (c) the amount of sale/leaseback transactions, (d) the use of proceeds from the

- 52 -

Table of Contents

sale of collateral, and (e) our ability to merge or consolidate with other entities or to sell, lease or transfer all or substantially all of our assets to another entity. The Secured Notes also contain customary events of default. We may redeem the Secured Notes at a price equal to 104.375% of par until December 1, 2016, then at a price of 102.188% until December 1, 2017, and 100.0% thereafter, together with all accrued and unpaid interest to the date of redemption.

*Exchangeable Notes*

AK Steel has $150.0 of outstanding 5.0% Exchangeable Senior Notes due November 2019 (the "Exchangeable Notes"). We may not redeem the Exchangeable Notes before their maturity date. The indenture governing the Exchangeable Notes (the "Exchangeable Notes Indenture") provides noteholders with an exchange right at their option before August 15, 2019, if the closing price of our common stock is greater than or equal to $7.02 per share (130% of the exchange price of the Exchangeable Notes) for at least 20 trading days during the last 30 consecutive trading days of a calendar quarter. On or after August 15, 2019, holders may exchange their Exchangeable Notes at any time. Upon exchange, we will be obligated to (i) pay an amount in cash equal to the aggregate principal amount of the Exchangeable Notes to be exchanged and (ii) at our election, pay cash, deliver shares of AK Holding common stock or a combination for any remaining exchange obligation in excess of the aggregate principal amount of the Exchangeable Notes being exchanged. Holders may exchange their Exchangeable Notes into shares of AK Holding common stock at their option at an initial exchange rate of 185.1852 shares of AK Holding common stock per $1,000 principal amount of Exchangeable Notes. The initial exchange rate is equivalent to a conversion price of approximately $5.40 per share of common stock, which equates to 27.8 million shares to be used to determine the aggregate equity consideration to be delivered upon exchange, which could be adjusted for certain dilutive effects from potential future events. Holders may exchange their Exchangeable Notes before August 15, 2019 only under certain circumstances. The Exchangeable Notes Indenture does not contain any financial or operating covenants or restrict us or our subsidiaries from paying dividends, incurring debt or issuing or repurchasing securities. If we undergo a fundamental change, as defined in Exchangeable Notes Indenture (which, for example, would include various transactions in which we would undergo a change of control), holders may require us to repurchase the Exchangeable Notes in whole or in part for cash at a price equal to par plus any accrued and unpaid interest. In addition, if we undergo a "make-whole fundamental change," as defined in the Exchangeable Notes Indenture, before the maturity date, in addition to requiring us to repurchase the Exchangeable Notes in whole or in part for cash at a price equal to par plus any accrued and unpaid interest, the exchange rate will be increased in certain circumstances for a holder who elects to exchange its notes in connection with the event. Based on the initial exchange rate, the Exchangeable Notes are exchangeable into a maximum of 37.5 million shares of AK Holding common stock. However, we would only deliver the maximum amount of shares if, following a "make-whole fundamental change" described above, we elect to deliver the shares to satisfy the higher exchange rate. Although the Exchangeable Notes were issued at par, for accounting purposes the proceeds received from the issuance of the notes are allocated between debt and equity to reflect the fair value of the exchange option embedded in the notes and the fair value of similar debt without the exchange option. Therefore, we recorded $38.7 of the gross proceeds of the Exchangeable Notes as an increase in additional paid-in capital with the offsetting amount recorded as a debt discount. We are amortizing the debt discount over the term of the Exchangeable Notes using the effective interest method. As of December 31, 2015 and 2014, the remaining unamortized debt discount was $24.9 and $29.9 and the net carrying amount of the Exchangeable Notes was $125.1 and $120.1.

*Senior Unsecured Notes*

AK Steel has outstanding 7.625% Senior Notes due May 2020 (the "2020 Notes"). We may redeem the 2020 Notes at a price equal to 103.813% of par until May 15, 2016, 102.542% thereafter until May 15, 2017, 101.271% thereafter until May 15, 2018, and 100.0% thereafter, together with all accrued and unpaid interest to the date of redemption.

AK Steel has outstanding 7.625% Senior Notes due October 2021 (the "2021 Notes"). The 2021 Notes were issued under a supplemental indenture, which includes covenants and restrictions substantially similar to the existing indentures governing the 7.625% Senior Notes due 2020 and the 8.375% Senior Notes due 2022 and are equal in right of payment to those notes. Before October 1, 2017, we may redeem the 2021 Notes at a price equal to par plus a make-whole premium and all accrued and unpaid interest to the date of redemption. After that date, they are redeemable at 103.813% until October 1, 2018, 101.906% thereafter until October 1, 2019, and 100.0% thereafter, together with all accrued and unpaid interest to the date of redemption.

AK Steel's outstanding 8.375% Senior Notes are due April 2022 (the "2022 Notes"). Before April 1, 2017, we may redeem the 2022 Notes at a price equal to par plus a make-whole premium and all accrued and unpaid interest to the date of redemption. After that date,

A004768

they are redeemable at 104.188% until April 1, 2018, 102.792% thereafter until April 1, 2019, 101.396% thereafter until April 1, 2020, and 100.0% thereafter, together with all accrued and unpaid interest to the date of redemption.

The Exchangeable Notes, the 2020 Notes, the 2021 Notes, the 2022 Notes and the unsecured IRBs discussed below (collectively, the "Senior Unsecured Notes") are equal in right of payment. AK Holding, AK Tube and AK Properties each fully and unconditionally, jointly and severally, guarantees the payment of interest, principal and premium, if any, on the Senior Unsecured Notes. The indentures governing the 2020 Notes, the 2021 Notes, the 2022 Notes and the unsecured IRBs include covenants with customary

- 53 -

*Table of Contents*

restrictions on (a) the incurrence of additional debt by certain subsidiaries, (b) the incurrence of certain liens, (c) the amount of sale/leaseback transactions, and (d) our ability to merge or consolidate with other entities or to sell, lease or transfer all or substantially all of our assets to another entity. The indentures governing the Senior Unsecured Notes also contain customary events of default. The Senior Unsecured Notes rank junior in priority to the Secured Notes to the extent of the value of the assets securing the Secured Notes.

During 2015, we repurchased an aggregate principal amount of $23.8 of the 2021 Notes in private, open market transactions. These repurchases were unsolicited and completed at a discount to the notes' par values. We recognized gains on the repurchases of $9.4 for the year ended December 31, 2015, which is included in other income (expense). We may, from time to time, repurchase additional outstanding notes in the open market on an unsolicited basis, by tender offer, through privately negotiated transactions or otherwise.

During 2013, we repurchased an aggregate principal amount of $20.2 and $9.8 of the 2020 Notes and the 2022 Notes, respectively, in private, open market transactions. These repurchases were unsolicited and completed at a discount to the notes' par values. We recognized a gain on the repurchases of $2.9 for the year ended December 31, 2013, which is included in other income (expense).

*Other Financings*

AK Steel has outstanding $73.3 aggregate principal amount of fixed-rate tax-exempt industrial revenue bonds (the "unsecured IRBs") at December 31, 2015. The weighted-average fixed interest rate of the unsecured IRBs is 6.8%. The unsecured IRBs are unsecured senior debt obligations of AK Steel that are equal in ranking with the other Senior Unsecured Notes. In addition, AK Steel has outstanding $26.0 aggregate principal amount of variable-rate taxable industrial revenue bonds at December 31, 2015, that are backed by letters of credit.

In 1997, the Spencer County (IN) Redevelopment District (the "District") issued $23.0 in taxable tax increment revenue bonds with our construction of Rockport Works. We used the bond issue's proceeds to acquire land and improve the facility. The source of the District's scheduled principal and interest payments through maturity in 2017 is a designated portion of our real and personal property tax payments. We are obligated to pay any deficiency if our annual tax payments are insufficient to enable the District to make principal and interest payments when due. In 2015, we made deficiency payments totaling $1.3. At December 31, 2015, the remaining payments of principal and interest due through the year 2017 total $10.4. We include potential payments due in the coming year under this agreement in our annual property tax accrual.

**NOTE 7 - Pension and Other Postretirement Benefits**

*Summary*

We provide noncontributory pension and various healthcare and life insurance benefits to a significant portion of our employees and retirees. Benefits are provided through defined benefit and defined contribution plans that we administer, as well as multiemployer plans for certain union members. The pension plan is not fully funded. We contributed $24.1 to the pension plan in 2015 and have no required contribution for 2016. Based on current actuarial assumptions, we estimate that our required pension contributions will be approximately $50.0 and $75.0 in 2017 and 2018, though the amounts we will be required to pay are more dependent on plan asset returns than in the past. In July 2015, we paid the final payment of $3.1 to a Voluntary Employees Beneficiary Association ("VEBA") trust for a settlement of other postretirement benefit ("OPEB") obligations with certain retirees from our Zanesville Works. We expect to make OPEB payments, after receipt of Medicare subsidy reimbursements, of approximately $46.5 in 2016.

- 54 -

A004769

*Table of Contents*

*Plan Obligations*

Amounts presented below are calculated based on benefit obligation and asset valuation measurement dates of December 31, 2015 and 2014.

| | Pension Benefits | | Other Benefits | |
| --- | --- | --- | --- | --- |
| | 2015 | 2014 | 2015 | 2014 |
| **Change in benefit obligations:** | | | | |
| Benefit obligations at beginning of year | $ 3,545.2 | $ 3,380.6 | $ 599.3 | $ 479.2 |
| Service cost | 2.2 | 1.7 | 7.1 | 4.9 |
| Interest cost | 130.0 | 146.0 | 22.5 | 21.7 |
| Plan participants' contributions | — | — | 24.9 | 25.4 |
| Actuarial loss (gain) | (147.8) | 432.1 | (83.3) | 45.1 |
| Amendments | 13.3 | 2.0 | (5.6) | (12.8) |
| Dearborn acquisition | — | — | — | 128.2 |
| Contributions to Zanesville retirees' VEBA trust | — | — | (3.1) | (3.1) |
| Benefits paid | (295.1) | (416.6) | (76.5) | (96.6) |
| Medicare subsidy reimbursement received | — | — | 3.3 | 7.3 |
| Foreign currency exchange rate changes | (0.4) | (0.6) | — | — |
| Benefit obligations at end of year | $ 3,247.4 | $ 3,545.2 | $ 488.6 | $ 599.3 |
| | | | | |
| **Change in plan assets:** | | | | |
| Fair value of plan assets at beginning of year | $ 2,863.6 | $ 2,808.5 | $ — | $ — |
| Actual gain (loss) on plan assets | (93.6) | 257.8 | — | — |
| Employer contributions | 36.5 | 213.9 | 48.3 | 63.9 |
| Plan participants' contributions | — | — | 24.9 | 25.4 |
| Benefits paid | (295.1) | (416.6) | (76.5) | (96.6) |
| Medicare subsidy reimbursement received | — | — | 3.3 | 7.3 |
| Fair value of plan assets at end of year | $ 2,511.4 | $ 2,863.6 | $ — | $ — |
| Funded status | $ (736.0) | $ (681.6) | $ (488.6) | $ (599.3) |
| | | | | |
| **Amounts recognized in the consolidated balance sheets:** | | | | |
| Current liabilities | $ (31.2) | $ (2.1) | $ (46.5) | $ (53.5) |
| Noncurrent liabilities | (704.8) | (679.5) | (442.1) | (545.8) |
| Total | $ (736.0) | $ (681.6) | $ (488.6) | $ (599.3) |
| | | | | |
| **Amounts recognized in accumulated other comprehensive income, before tax:** | | | | |
| Actuarial loss (gain) | $ 323.5 | $ 355.7 | $ (48.8) | $ 23.1 |
| Prior service cost (credit) | 25.1 | 16.3 | (199.0) | (258.1) |
| Total | $ 348.6 | $ 372.0 | $ (247.8) | $ (235.0) |

The accumulated benefit obligation for all defined benefit pension plans was $3,222.0 and $3,513.7 at December 31, 2015 and 2014. All our pension plans have an accumulated benefit obligation in excess of plan assets. The amounts included in current liabilities represent only the amounts of our unfunded pension and OPEB benefit plans that we expect to pay in the next year.

During 2015, we updated the major demographic assumptions we use to determine our pension and OPEB obligations after examining the recent experience among the plans' participants. Included in the 2015 actuarial loss (gain) in the table above were actuarial gains of

A004770

approximately $7.0 and $58.0 for the changes in demographic assumptions on pension benefits and other postretirement benefits, respectively.

- 55-

Table of Contents

During 2014, we offered a voluntary lump-sum settlement to terminated vested participants in the pension plan, which reduced a portion of the pension obligation. The pension plan paid approximately $105.0 in December 2014 out of the pension trust assets to participants and recognized an actuarial gain of $20.0.

As a result of new mortality tables issued in October 2014 by the Society of Actuaries, we revised our mortality assumptions in 2014, which significantly increased our pension and OPEB obligations. The new mortality assumptions increased the assumed life expectancy of participants in our benefit plans, increasing the total expected benefit payments over a longer time horizon. Included in the 2014 actuarial loss (gain) in the table above were $233.5 and $12.0 for the change in the mortality tables on pension benefits and other postretirement benefits, respectively. The actuarial loss (gain) for pension benefits also included a $25.8 out-of-period adjustment to reduce the benefit obligation for a correction of census data used in the 2013 financial results. The effects of this adjustment were not material to the financial position or results of operations in any of the periods presented.

Assumptions used to value benefit obligations and determine pension and OPEB expense (income) are presented below:

| | Pension Benefits | | | Other Benefits | | |
|---|---|---|---|---|---|---|
| | 2015 | 2014 | 2013 | 2015 | 2014 | 2013 |
| Assumptions used to determine benefit obligations at December 31: | | | | | | |
| Discount rate | 4.15% | 3.82% | 4.53% | 4.22% | 3.90% | 4.48% |
| Rate of compensation increase | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% |
| Subsequent year healthcare cost trend rate | | | | 7.00% | 7.00% | 7.00% |
| Ultimate healthcare cost trend rate | | | | 4.50% | 4.50% | 4.50% |
| Year ultimate healthcare cost trend rate begins | | | | 2024 | 2020 | 2019 |
| Assumptions used to determine pension and OPEB expense (income) for the year ended December 31: | | | | | | |
| Discount rate | 3.82% | 4.53% | 3.85% | 3.90% | 4.48% | 3.77% |
| Expected return on plan assets | 7.25% | 7.25% | 7.25% | | | |
| Rate of compensation increase | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% |

We determined the discount rate by finding a hypothetical portfolio of individual high-quality corporate bonds available at the measurement date with coupon and principal payments that could satisfy the plans' expected future benefit payments that we use to calculate the projected benefit obligation. The discount rate is the single rate that is equivalent to the average yield on that hypothetical portfolio of bonds.

Assumed healthcare cost trend rates generally have a significant effect on the amounts reported for healthcare plans. However, caps on the share of OPEB obligations that we pay limit the effect of changes in OPEB assumptions. As of December 31, 2015, a one-percentage-point change in the assumed healthcare cost trend rates would have the following effects:

| | One Percentage Point | |
|---|---|---|
| | Increase | Decrease |
| Effect on total service cost and interest cost components | $ 0.1 | $ (0.1) |
| Effect on postretirement benefit obligation | 3.3 | (3.1) |

Estimated future benefit payments to beneficiaries are presented below:

| | Pension Plans | Other Benefits | Medicare Subsidy |
|---|---|---|---|
| 2016 | $ 330.4 | $ 47.9 | $ (1.4) |
| 2017 | 293.0 | 44.8 | (1.4) |
| 2018 | 279.1 | 42.6 | (1.5) |
| 2019 | 272.0 | 40.8 | (1.5) |
| 2020 | 259.0 | 39.0 | (1.5) |
| 2021 through 2025 | 1,159.6 | 171.7 | (9.1) |

A004772

*Table of Contents*

*Plan Assets*

Our investments in the master pension trust primarily include indexed and actively-managed funds. A fiduciary committee sets the target asset mix and monitors asset performance. We determine the master pension trust's projected long-term rate of return based on the asset allocation, the trust's investment policy statement and our long-term capital market return assumptions for the master trust.

We have developed an investment policy which considers liquidity requirements, expected investment return and expected asset risk, as well as standard industry practices. The target asset allocation for the plan assets is 60% equity, 38% fixed income, and 2% cash. Equity investments consist of individual securities and common/collective trusts with equity investment strategies diversified across multiple industry sectors and company market capitalization within specific geographical investment strategies. Fixed income investments consist of individual securities and common/collective trusts, which invest primarily in investment-grade and high-yield corporate bonds and U.S. treasury securities. The common/collective trusts have no unfunded commitments or redemption restrictions. The fixed income investments are diversified by ratings, maturities, industries and other factors. Plan assets contain no significant concentrations of risk from individual securities or industry sectors. The plan has no direct investments in our common stock or fixed income securities.

Plan investments measured at fair value on a recurring basis at December 31, 2015 and 2014, are presented below by level within the fair value hierarchy. Assets and liabilities are classified in their entirety based on the lowest level of input that is significant to the fair value measurement. Activity for Level 3 assets was insignificant for 2015 and 2014. See Note 16 for more information on the determination of fair value.

| | Quoted Prices in Active Markets for Identical Assets (Level 1) | | Significant Other Observable Inputs (Level 2) | | Significant Unobservable Inputs (Level 3) | | Total | |
|---|---|---|---|---|---|---|---|---|
| | 2015 | 2014 | 2015 | 2014 | 2015 | 2014 | 2015 | 2014 |
| Equity Investments: | | | | | | | | |
| U.S. securities | $ 138.4 | $ 199.4 | $ — | $ — | $ — | $ — | $ 138.4 | $ 199.4 |
| U.S. common/collective trusts | — | — | 814.5 | 862.4 | — | — | 814.5 | 862.4 |
| EAFE common/collective trusts | — | — | 261.5 | 272.9 | — | — | 261.5 | 272.9 |
| Emerging market common/collective trusts | — | — | 103.9 | 125.7 | — | — | 103.9 | 125.7 |
| Global investments | — | — | 179.6 | 210.7 | — | — | 179.6 | 210.7 |
| Fixed Income Investments: | | | | | | | | |
| U.S. investment-grade corporate common/collective trusts | — | — | 391.0 | 421.8 | — | — | 391.0 | 421.8 |
| U.S. treasuries common/collective trusts | — | — | 85.3 | 98.4 | — | — | 85.3 | 98.4 |
| Mortgage-backed common/collective trusts | — | — | — | 18.0 | — | — | — | 18.0 |
| Global investments | — | — | 389.7 | 435.4 | — | — | 389.7 | 435.4 |
| U.S. high-yield corporate securities | — | — | 109.7 | 178.4 | — | — | 109.7 | 178.4 |
| Other Investments: | | | | | | | | |
| Private equity funds (a) | — | — | — | — | 0.5 | 0.9 | 0.5 | 0.9 |
| Cash and cash equivalents | 37.3 | 39.6 | — | — | — | — | 37.3 | 39.6 |
| Total | $ 175.7 | $ 239.0 | $ 2,335.2 | $ 2,623.7 | $ 0.5 | $ 0.9 | $ 2,511.4 | $ 2,863.6 |

(a)   Consists of private equity funds that have no remaining capital commitments.

A004774

- 57-

A004775

*Periodic Benefit Costs*

Components of pension and OPEB expense (income) for the years 2015, 2014 and 2013 are presented below:

| | Pension Benefits | | | Other Benefits | | |
|---|---|---|---|---|---|---|
| | 2015 | 2014 | 2013 | 2015 | 2014 | 2013 |
| Components of pension and OPEB expense (income): | | | | | | |
| Service cost | $ 2.2 | $ 1.7 | $ 2.4 | $ 7.1 | $ 4.9 | $ 4.7 |
| Interest cost | 130.0 | 146.0 | 138.8 | 22.5 | 21.7 | 21.0 |
| Expected return on plan assets | (198.4) | (202.8) | (184.5) | — | — | — |
| Amortization of prior service cost (credit) | 4.4 | 4.3 | 3.8 | (64.6) | (73.2) | (80.0) |
| Recognized net actuarial loss (gain): | | | | | | |
| Annual amortization | 31.2 | 2.5 | 23.6 | 1.6 | (1.3) | 2.4 |
| Corridor charge (credit) | 144.3 | 2.0 | — | (13.1) | — | — |
| Settlement (gain) loss | 1.0 | 0.2 | (0.8) | — | 3.5 | — |
| Pension and OPEB expense (income) | $ 114.7 | $ (46.1) | $ (16.7) | $ (46.5) | $ (44.4) | $ (51.9) |

In January 2011, we reached a final settlement agreement (the "Butler Retiree Settlement") of a class action filed on behalf of certain retirees from our Butler Works for our OPEB obligations to such retirees. We agreed to continue to provide company-paid health and life insurance to class members through December 31, 2014, and made combined lump sum payments totaling $91.0 to a VEBA trust and to plaintiffs' counsel, with the final payment made in 2013. Effective January 1, 2015, we transferred to the VEBA trust all OPEB obligations owed to the class members under our applicable health and welfare plans and have no further liability for OPEB benefits after December 31, 2014. For accounting purposes, a settlement of our OPEB obligations occurred when we made the final benefit payments in 2014 and a settlement loss of $3.5 was recorded in 2014.

In December 2012, we reached a final settlement agreement (the "Zanesville Retiree Settlement") of a class action filed on behalf of certain retirees from our Zanesville Works for our OPEB obligations to such retirees. We agreed to continue to provide company-paid health and life insurance to class members through December 31, 2015, and to make combined lump sum payments totaling $10.6 to a VEBA trust and to plaintiffs' counsel over three years. We made the final payment to the Zanesville VEBA trust of $3.1 in 2015. Effective January 1, 2016, we transferred to the VEBA trust all OPEB obligations owed to the class members under our applicable health and welfare plans and have no further liability for OPEB benefits after December 31, 2015.

During 2015, 2014 and 2013, we performed remeasurements of an unfunded supplemental retirement plan and recognized settlement (gains) losses as a result of lump sum benefit payments made to retired participants.

Pension and OPEB expense (income) for the defined benefit pension plans over the next year will include amortization of $27.9 of the unrealized net loss and $5.2 from the prior service cost in accumulated other comprehensive income. Pension and OPEB expense (income) for the other postretirement benefit plans over the next fiscal year will include amortization of $(4.3) of the unrealized net gain and $(60.3) from the prior service credit in accumulated other comprehensive income.

*Defined Contribution Plans*

All employees are eligible to participate in various defined contribution plans. Certain of these plans have features with matching contributions or other company contributions based on our financial results. Total expense from these plans was $14.5, $12.1 and $11.5 in 2015, 2014 and 2013.

*Multiemployer Plans*

We contribute to multiemployer pension plans according to collective bargaining agreements that cover certain union-represented employees. The following risks of participating in these multiemployer plans differ from single employer plans:
- Employer contributions to a multiemployer plan may be used to provide benefits to employees of other participating employers.
- If a participating employer stops contributing to a multiemployer plan, the remaining participating employers may need to assume the unfunded obligations of the plan.

A004776

- If the plan becomes significantly underfunded or is unable to pay its benefits, we may be required to contribute additional amounts in excess of the rate required by the collective bargaining agreements.

- 58-

A004777

Table of Contents

- If we choose to stop participating in a multiemployer plan, we may be required to pay that plan an amount based on the underfunded status of the plan, referred to as a withdrawal liability.

Our participation in these plans for the years ended December 31, 2015, 2014 and 2013, is presented below. We do not provide more than five percent of the total contributions to any multiemployer plan. Forms 5500 are not yet available for plan years ending in 2015.

| Pension Fund | EIN/Pension Plan Number | Pension Protection Act Zone Status (a) | | FIP/RP Status Pending/Implemented (b) | Contributions | | | Surcharge Imposed (c) | Expiration Date of Collective Bargaining Agreement |
|---|---|---|---|---|---|---|---|---|---|
| | | 2015 | 2014 | | 2015 | 2014 | 2013 | | |
| Steelworkers Pension Trust | 23-6648508/499 | Green | Green | No | $ 7.3 | $ 8.1 | $ 7.3 | No | 3/31/2017 to 9/1/2018 (d) |
| IAM National Pension Fund's National Pension Plan | 51-6031295/002 | Green | Green | No | 16.0 | 16.5 | 14.8 | No | 10/1/2016 to 5/31/2019 (e) |
| | | | | | $ 23.3 | $ 24.6 | $ 22.1 | | |

(a) The most recent Pension Protection Act zone status available in 2015 and 2014 is for each plan's year-end at December 31, 2014 and 2013. The plan's actuary certifies the zone status. Generally, plans in the red zone are less than 65% funded, plans in the yellow zone are between 65% and 80% funded, and plans in the green zone are at least 80% funded. The Steelworkers Pension Trust and IAM National Pension Fund's National Pension Plan elected funding relief under section 431(b)(8) of the Internal Revenue Code and section 304(b)(8) of the Employment Retirement Income Security Act of 1974 (ERISA). This election allows those plans' investment losses for the plan year ended December 31, 2008, to be amortized over 29 years for funding purposes.

(b) The "FIP/RP Status Pending/Implemented" column indicates plans for which a financial improvement plan (FIP) or a rehabilitation plan (RP) is either pending or has been implemented, as defined by ERISA.

(c) The surcharge represents an additional required contribution due as a result of the critical funding status of the plan.

(d) We are a party to three collective bargaining agreements (at our Ashland Works, Mansfield Works and at the AK Tube Walbridge plant) that require contributions to the Steelworkers Pension Trust. The labor contract for approximately 300 hourly employees at Mansfield Works expires on March 31, 2017. The labor contract for approximately 85 hourly employees at the AK Tube Walbridge plant expires January 22, 2018. The labor contract for approximately 820 hourly employees at the Ashland Works expires on September 1, 2018.

(e) We are a party to three collective bargaining agreements (at our Butler Works, Middletown Works and Zanesville Works) that require contributions to the IAM National Pension Fund's National Pension Plan. The labor contract for approximately 1,240 hourly employees at Butler Works expires on October 1, 2016. The labor contract for approximately 1,725 hourly employees at Middletown Works expires on March 15, 2018. The labor contract for approximately 140 hourly employees at Zanesville Works expires on May 31, 2019.

## NOTE 8 - Operating Leases

Rental expense was $44.0, $35.7 and $27.0 for 2015, 2014 and 2013. Obligations to make future minimum lease payments at December 31, 2015, are presented below:

| | | |
|---|---|---|
| 2016 | $ | 20.7 |
| 2017 | | 17.9 |
| 2018 | | 16.9 |
| 2019 | | 13.0 |
| 2020 | | 10.0 |
| 2021 and thereafter | | 56.5 |
| Total minimum lease payments | $ | 135.0 |

## NOTE 9 - Commitments

The principal raw materials required for our steel manufacturing operations are iron ore, coal, coke, chrome, nickel, silicon, manganese, zinc, limestone, and carbon and stainless steel scrap. We also use large volumes of natural gas, electricity and industrial gases in our steel manufacturing operations. In addition, we may purchase carbon steel slabs from other steel producers to supplement

A004778

the production from our own steelmaking facilities. We negotiate most of our purchases of iron ore, coal, coke and industrial gases at prices under annual and multi-year agreements. The iron ore agreements typically have a variable-price mechanism by which the price of iron ore is adjusted quarterly, based on reference to a historical iron ore index. We typically make purchases of carbon steel slabs,

- 59-

A004779

*Table of Contents*

carbon and stainless steel scrap, natural gas, a majority of our electricity, and other raw materials at prevailing market prices, which fluctuate with supply and demand. We enter into derivative instruments for some purchases of energy and certain raw materials to hedge some of their price volatility.

Commitments for future capital investments at December 31, 2015, totaled approximately $45.7, all of which we expect to incur in 2016.

We are building a research and innovation center in Middletown, Ohio. The construction of the 135,000 square foot facility is in progress on a 16-acre site located in the Cincinnati-Dayton growth corridor and will replace our existing research facility. We are financing the estimated $36.0 project principally through government incentives and a long-term capital lease with payments beginning when we substantially complete the project, which we believe will be in the fourth quarter of 2016.

## NOTE 10 - Environmental and Legal Contingencies

---

*Environmental Contingencies*

Domestic steel producers, including us, must follow stringent federal, state and local laws and regulations designed to protect human health and the environment. We have spent the following amounts over the past three years for environmental-related capital investments and environmental compliance:

|  | 2015 | 2014 | 2013 |
|---|---|---|---|
| Environmental-related capital investments | $ 7.1 | $ 7.2 | $ 1.6 |
| Environmental compliance costs | 133.2 | 112.4 | 101.1 |

We and our predecessors have been manufacturing steel and related operations since 1900. Although we believe our operating practices have been consistent with prevailing industry standards, hazardous materials may have been released at one or more operating sites or third-party sites in the past, including operating sites that we no longer own. If we reasonably can, we have estimated potential remediation expenditures for those sites where future remediation efforts are probable based on identified conditions, regulatory requirements or contractual obligations arising from the sale of a business or facility. For sites involving government-required investigations, we typically make an estimate of potential remediation expenditures only after the investigation is complete and when we better understand the nature and scope of the remediation. In general, the material factors in these estimates include the costs associated with investigations, delineations, risk assessments, remedial work, governmental response and oversight, site monitoring, and preparation of reports to the appropriate environmental agencies. We recorded the following liabilities for environmental matters on our condensed consolidated balance sheets:

|  | 2015 | 2014 |
|---|---|---|
| Accrued liabilities | $ 5.6 | $ 17.6 |
| Other non-current liabilities | 41.1 | 32.7 |

We cannot predict the ultimate costs for each site with certainty because of the evolving nature of the investigation and remediation process. Rather, to estimate the probable costs, we must make certain assumptions. The most significant of these assumptions is for the nature and scope of the work that will be necessary to investigate and remediate a particular site and the cost of that work. Other significant assumptions include the cleanup technology that will be used, whether and to what extent any other parties will participate in paying the investigation and remediation costs, reimbursement of past response and future oversight costs by governmental agencies, and the reaction of the governing environmental agencies to the proposed work plans. Costs for future investigation and remediation are not discounted to their present value. If we have been able to reasonably estimate future liabilities, we do not believe that there is a reasonable possibility that we will incur a loss or losses that exceed the amounts we accrued for the environmental matters discussed below that would, either individually or in the aggregate, have a material adverse effect on our consolidated financial condition, results of operations or cash flows. However, since we recognize amounts in the consolidated financial statements in accordance with accounting principles generally accepted in the United States that exclude potential losses that are not probable or that may not be currently estimable, the ultimate costs of these environmental proceedings may be higher than the liabilities we currently have recorded in our consolidated financial statements.

Except as we expressly note below, we do not currently anticipate any material effect on our consolidated financial position, results of operations or cash flows as a result of compliance with current environmental regulations. Moreover, because all domestic steel

A004780

producers operate under the same federal environmental regulations, we do not believe that we are more disadvantaged than our domestic competitors by our need to comply with these regulations. Some foreign competitors may benefit from less stringent

- 60-

Table of Contents

environmental requirements in the countries where they produce, resulting in lower compliance costs for them and providing those foreign competitors with a cost advantage on their products.

According to the Resource Conservation and Recovery Act ("RCRA"), which governs the treatment, handling and disposal of hazardous waste, the United States Environmental Protection Agency ("EPA") and authorized state environmental agencies may conduct inspections of RCRA-regulated facilities to identify areas where there have been releases of hazardous waste or hazardous constituents into the environment and may order the facilities to take corrective action to remediate such releases. Environmental regulators may inspect our major steelmaking facilities. While we cannot predict the future actions of these regulators, it is possible that they may identify conditions in future inspections of these facilities which they believe require corrective action.

Under authority from the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), the EPA and state environmental authorities have conducted site investigations at certain of our facilities and other third-party facilities, portions of which previously may have been used for disposal of materials that are currently regulated. The results of these investigations are still pending, and we could be directed to spend funds for remedial activities at the former disposal areas. Because of the uncertain status of these investigations, however, we cannot reliably predict whether or when such spending might be required or their magnitude.

As previously reported, on July 27, 2001, we received a Special Notice Letter from the EPA requesting that we agree to conduct a Remedial Investigation/Feasibility Study ("RI/FS") and enter an administrative order on consent pursuant to Section 122 of CERCLA regarding our former Hamilton Plant located in New Miami, Ohio. The Hamilton Plant ceased operations in 1990, and all of its former structures have been demolished and removed. Although we did not believe that a site-wide RI/FS was necessary or appropriate, in April 2002 we entered a mutually agreed-upon administrative order on consent to perform a RI/FS of the Hamilton Plant site. We submitted the investigation portion of the RI/FS, and we completed a supplemental study in 2014. We currently have accrued $0.7 for the remaining cost of the RI/FS. Until the RI/FS is complete, we cannot reliably estimate the additional costs, if any, we may incur for potentially required remediation of the site or when we may incur them.

As previously reported, on September 30, 1998, our predecessor, Armco Inc., received an order from the EPA under Section 3013 of RCRA requiring it to develop a plan for investigation of eight areas of our Mansfield Works that allegedly could be sources of contamination. A site investigation began in November 2000 and is continuing. We cannot reliably estimate at this time how long it will take to complete this site investigation. We currently have accrued approximately $1.1 for the projected cost of the study. Until the site investigation is complete, we cannot reliably estimate the additional costs, if any, we may incur for potentially required remediation of the site or when we may incur them.

As previously noted, on September 26, 2012, the EPA issued an order under Section 3013 of RCRA requiring us to develop a plan for investigation of four areas at our Ashland Works coke plant. We submitted a Sampling and Analysis Plan ("SAP") to the EPA on October 25, 2012, and revised it most recently on May 29, 2014. The EPA approved it on June 27, 2014. We completed Phase I of the SAP and submitted a report to the EPA on December 23, 2014. We cannot reliably estimate at this time how long it will take to complete the site investigation. We currently have accrued approximately $0.5 for the projected cost of the investigation. Until the site investigation is complete, we cannot reliably estimate the additional costs, if any, we may incur for potentially required remediation of the site or when we may incur them.

As previously reported, on August 3, 2011, September 29, 2011, and June 28, 2012, the EPA issued a Notice of Violations ("NOV") for our Middletown Works coke plant, alleging violations of pushing and combustion stack limits. We are investigating these claims and working with the EPA to attempt to resolve them. We believe we will reach a settlement in this matter, but cannot be certain that a settlement will be reached and cannot reliably estimate at this time how long it will take to reach a settlement or what all of its terms might be. We will vigorously contest any claims which cannot be resolved through a settlement. Until we have reached a settlement with the EPA or the NOV claims are resolved, we cannot reliably estimate the costs, if any, we may incur for potentially required operational changes at the battery or when we may incur them.

As previously reported, on July 15, 2009, we and the Pennsylvania Department of Environmental Protection ("PADEP") entered a Consent Order and Agreement (the "Consent Order") to resolve an alleged unpermitted discharge of wastewater from the closed Hillside Landfill at our former Ambridge Works. Under the terms of the Consent Order, we paid a penalty and also agreed to implement various corrective actions, including an investigation of the area where landfill activities occurred, submission of a plan to collect and treat surface waters and seep discharges, and upon approval from PADEP, implementation of that plan. We have accrued approximately $5.5 for the remedial work required under the approved plan and Consent Order. We submitted a National Pollution Discharge Elimination System ("NPDES") permit application to move to the next phase of the work. We currently estimate that the remaining work will be completed in 2018, though it may be delayed.

As previously reported, on June 29, 2000, the United States filed a complaint on behalf of the EPA against us in the U.S. District Court for the Southern District of Ohio, Case No. C-1-00530, alleging violations of the Clean Air Act, the Clean Water Act and RCRA at our

A004782

Middletown Works. Subsequently, the State of Ohio, the Sierra Club and the National Resources Defense Council intervened. On May

- 61-

Table of Contents

15, 2006, the court entered a Consent Decree in Partial Resolution of Pending Claims (the "Consent Decree"). Under the Consent Decree, we paid a civil penalty and performed a supplemental environmental project to remove ozone-depleting refrigerants from certain equipment. We further agreed to undertake a comprehensive RCRA facility investigation at Middletown Works and, as appropriate, complete a corrective measures study. The Consent Decree required us to implement certain RCRA corrective action interim measures to address polychlorinated biphenyls ("PCBs") in sediments and soils at Dicks Creek and certain other specified surface waters, adjacent floodplain areas and other previously identified geographic areas. We have completed the remedial activity at Dicks Creek, but continue to work on the RCRA facility investigation and certain interim measures. We have accrued approximately $16.2 for the cost of known work required under the Consent Decree for the RCRA facility investigation and remaining interim measures.

As previously reported, on October 17, 2012, the EPA issued an NOV and Notice of Intent to File a Civil Administrative Complaint to our Mansfield Works alleging violations of RCRA primarily for our management of electric arc furnace dust at the facility. We are investigating these claims and working with the EPA to attempt to resolve them. The NOV proposed a civil penalty of approximately $0.3. However, on March 23, 2015, the EPA reduced its penalty demand to $0.1. We believe we will reach a settlement in this matter, but cannot be certain that a settlement will be reached and cannot reliably estimate at this time how long it will take to reach a settlement or what all of its terms might be. We will vigorously contest any claims that a settlement cannot resolve.

As previously reported, on May 12, 2014, the Michigan Department of Environmental Quality ("MDEQ") issued to our Dearborn Works (then a part of Dearborn) an Air Permit to Install No. 182-05C (the "PTI") to increase the emission limits for the blast furnace and other emission sources. The PTI was issued as a correction to a prior permit to install that did not include certain information during the prior permitting process. On July 10, 2014, the South Dearborn Environmental Improvement Association ("SDEIA"), Detroiters Working for Environmental Justice, Original United Citizens of Southwest Detroit and the Sierra Club filed a Claim of Appeal of the PTI in the State of Michigan, Wayne County Circuit, Case No. 14-008887-AA. Appellants and the MDEQ required the intervention of Dearborn (now owned by us) in this action as an additional appellee. The appellants allege multiple deficiencies with the PTI and the permitting process. On October 9, 2014, the appellants filed a Motion for Peremptory Reversal of the MDEQ's decision to issue the PTI. We believe that the MDEQ issued the PTI properly in compliance with applicable law and will vigorously contest this appeal. On October 17, 2014, we filed a motion to dismiss the appeal. Additionally, on December 15, 2014, we filed a motion to dismiss the appeal for lack of jurisdiction. At the conclusion of a hearing on all three motions on February 12, 2015, all three motions were denied. On March 18, 2015, we filed an application for leave to appeal to the Michigan Court of Appeals seeking to overturn the decision of the Circuit Court denying our motion to dismiss for lack of jurisdiction. On August 27, 2015, the Michigan Court of Appeals granted our application for leave to appeal. Until the appeal is resolved, we cannot determine what the ultimate permit limits will be. Until the permit limits are determined and final, we cannot reliably estimate the costs, if any, that we may incur if the appeal causes the permit limits to change, nor can we determine if the costs will be material or when we would incur them.

As previously reported, on August 21, 2014, the SDEIA filed a Complaint under the Michigan Environmental Protection Act ("MEPA") in the State of Michigan, Wayne County Circuit Case No. 14-010875-CE. The plaintiffs allege that the air emissions from our Dearborn Works are impacting the air, water and other natural resources, as well as the public trust in such resources. The plaintiffs are requesting, among other requested relief, that the court assess and determine the sufficiency of the PTI's limitations. On October 15, 2014, the court ordered a stay of the proceedings until a final order is issued in Wayne County Circuit Court Case No. 14-008887-AA (discussed above). When the proceedings resume, we will vigorously contest these claims. Until the claims in this Complaint are resolved, we cannot reliably estimate the costs we may incur, if any, or when we would incur them.

As previously reported, on April 27, 2000, MDEQ issued a RCRA Corrective Action Order No. 111-04-00-07E to Rouge Steel Company and Ford Motor Company for the property that includes our Dearborn Works. The Corrective Action Order has been amended five times. We are a party to the Corrective Action Order as the successor-in-interest to Dearborn, which was the successor-in-interest to Rouge Steel Company. The Corrective Action Order requires the site-wide investigation, and where appropriate, remediation of the facility. The site investigation and remediation is ongoing. We cannot reliably estimate at this time how long it will take to complete this site investigation and remediation. To date, Ford Motor Company has incurred most of the costs of the investigation and remediation due to its prior ownership of the steelmaking operations at Dearborn Works. Until the site investigation is complete, we cannot reliably estimate the additional costs we may incur, if any, for any potentially required remediation of the site or when we may incur them.

As previously reported, on August 29, 2013, the West Virginia Department of Environmental Protection ("WVDEP") issued to Mountain State Carbon a renewal NPDES permit for wastewater discharge from the facility to the Ohio River. The new NPDES permit included numerous new, and more stringent, effluent limitations. On October 7, 2013, Mountain State Carbon appealed the permit to the Environmental Quality Board, Appeal No. 13-25-EQB. On February 10, 2016, we reached a partial settlement with WVDEP and we will vigorously contest the claims that were not resolved. Until the permit limits are determined and final, we cannot reliably estimate the costs that we will incur, if any, if the appeal causes the permit limits to change, or when we may incur the costs.

A004784

- 62-

A004785

*Table of Contents*

In addition to the foregoing matters, we are or may be involved in proceedings with various regulatory authorities that may require us to pay fines, comply with more rigorous standards or other requirements or incur capital and operating expenses for environmental compliance. We believe that the ultimate disposition of the proceedings will not have, individually or in the aggregate, a material adverse effect on our consolidated financial condition, results of operations or cash flows.

*Legal Contingencies*

As previously reported, since 1990 we have been named as a defendant in numerous lawsuits alleging personal injury as a result of exposure to asbestos. The great majority of these lawsuits have been filed on behalf of people who claim to have been exposed to asbestos while visiting the premises of one of our current or former facilities. The majority of asbestos cases pending in which we are a defendant do not include a specific dollar claim for damages. In the cases that do include specific dollar claims for damages, the complaint typically includes a monetary claim for compensatory damages and a separate monetary claim in an equal amount for punitive damages, and does not attempt to allocate the total monetary claim among the various defendants.

The number of asbestos cases pending at December 31, 2015, is presented below:

|  | Asbestos Cases Pending at December 31, 2015 |
| --- | --- |
| Cases with specific dollar claims for damages: |  |
| Claims up to $0.2 | 122 |
| Claims above $0.2 to $5.0 | 5 |
| Claims above $5.0 to $15.0 | 2 |
| Claims above $15.0 to $20.0 | 2 |
| Total claims with specific dollar claims for damages (a) | 131 |
| Cases without a specific dollar claim for damages | 252 |
| Total asbestos cases pending | 383 |

    (a)  Involve a total of 2,331 plaintiffs and 17,116 defendants

In each case, the amount described is per plaintiff against all of the defendants, collectively. Thus, it usually is not possible at the outset of a case to determine the specific dollar amount of a claim against us. In fact, it usually is not even possible at the outset to determine which of the plaintiffs actually will pursue a claim against us. Typically, that can only be determined through written interrogatories or other discovery after a case has been filed. Therefore, in a case involving multiple plaintiffs and multiple defendants, we initially only account for the lawsuit as one claim. After we have determined through discovery whether a particular plaintiff will pursue a claim, we make an appropriate adjustment to statistically account for that specific claim. It has been our experience that only a small percentage of asbestos plaintiffs ultimately identify us as a target defendant from whom they actually seek damages and most of these claims ultimately are either dismissed or settled for a small fraction of the damages initially claimed. Asbestos-related claims information in 2015, 2014 and 2013, is presented below:

|  | 2015 | 2014 | 2013 |
| --- | --- | --- | --- |
| New Claims Filed | 52 | 50 | 42 |
| Pending Claims Disposed Of | 68 | 90 | 39 |
| Total Amount Paid in Settlements | $    1.9 | $    0.7 | $    1.0 |

Since the onset of asbestos claims against us in 1990, five asbestos claims against us have proceeded to trial in four separate cases. All five concluded with a verdict in our favor. We continue to vigorously defend the asbestos claims. Based upon present knowledge, and the factors above, we believe it is unlikely that the resolution in the aggregate of the asbestos claims against us will have a materially adverse effect on our consolidated results of operations, cash flows or financial condition. However, predictions about the outcome of pending litigation, particularly claims alleging asbestos exposure, are subject to substantial uncertainties. These uncertainties include (1) the significantly variable rate at which new claims may be filed, (2) the effect of bankruptcies of other companies currently or historically defending asbestos claims, (3) the litigation process from jurisdiction to jurisdiction and from case to case, (4) the type and severity of the disease each claimant alleged to suffer, and (5) the potential for enactment of legislation affecting asbestos litigation.

As previously reported, in September and October 2008 and again in July 2010, several companies filed purported class actions in the United States District Court for the Northern District of Illinois against nine steel manufacturers, including us. The case numbers for these actions are 08CV5214, 08CV5371, 08CV5468, 08CV5633, 08CV5700, 08CV5942, 08CV6197 and 10CV04236. On December

28, 2010, another action, case number 32,321, was filed in state court in the Circuit Court for Cocke County, Tennessee. The defendants removed the Tennessee case to federal court and in March 2012 it was transferred to the Northern District of Illinois. The

- 63-

A004787

Table of Contents

plaintiffs in the various pending actions are companies which purport to have purchased steel products, directly or indirectly, from one or more of the defendants and they claim to file the actions on behalf of all persons and entities who purchased steel products for delivery or pickup in the United States from any of the named defendants at any time from at least as early as January 2005. The complaints allege that the defendant steel producers have conspired in violation of antitrust laws to restrict output and to fix, raise, stabilize and maintain artificially high prices for steel products in the United States. In March 2014, we reached an agreement with the direct purchaser plaintiffs to tentatively settle the claims asserted against us, subject to certain court approvals below. According to that settlement, we agreed to pay $5.8 to the plaintiff class of direct purchasers in exchange for the members of that class to completely release all claims. We continue to believe that the claims made against us lack any merit, but we elected to enter the settlement to avoid the ongoing expense of defending ourself in this protracted and expensive antitrust litigation. We provided notice of the proposed settlement to members of the settlement class. After several class members received the notice, they elected to opt out of the class settlement. Following a fairness hearing, on October 21, 2014 the Court entered an order and judgment approving the settlement and dismissing all of the direct plaintiffs' claims against us with prejudice as to the settlement class. In the first quarter of 2014, we recorded a charge for the amount of the tentative settlement with the direct purchaser plaintiff class and paid that amount into an escrow account, which has now been disbursed in accordance with the order that approved the settlement. At this time, we do not have adequate information available to determine that a loss is probable or to reliably or accurately estimate the potential loss, if any, with respect to the remaining indirect purchaser plaintiff class members and any direct purchaser class members that have opted out of the class (hereinafter collectively referred to as the "Remaining Plaintiffs"). Because we have been unable to determine that a potential loss in this case with respect to the Remaining Plaintiffs is probable or estimable, we have not recorded an accrual for this matter for them. If our assumptions used to evaluate whether a loss is either probable or estimable with respect to the Remaining Plaintiffs prove to be incorrect or change, we may be required to record a charge for their claims.

As previously reported, on January 20, 2010, ArcelorMittal France and ArcelorMittal Atlantique et Lorraine (collectively "ArcelorMittal") filed an action in the United States District Court for the District of Delaware, Case No. 10-050-SLR against us, Dearborn, and Wheeling-Nisshin Inc., who is indemnified by Dearborn in this action. By virtue of our responsibility as a successor-in-interest to Dearborn and an indemnitor of Wheeling-Nisshin Inc, we now have complete responsibility for the defense of this action. The three named defendants are collectively referred to hereafter as "we" or "us", though the precise claims against each separate defendant may vary. The complaint alleges that we are infringing the claims of U.S. Patent No. 6,296,805 (the "Patent") in making pre-coated cold-rolled boron steel sheet and seeks injunctive relief and unspecified compensatory damages. We filed an answer denying ArcelorMittal's claims and raised various affirmative defenses. We also filed counterclaims against ArcelorMittal for a declaratory judgment that we are not infringing the Patent and that the Patent is invalid. Subsequently, the trial court separated the issues of liability and damages. The case proceeded with a trial to a jury on the issue of liability during the week of January 15, 2011. The jury returned a verdict that we did not infringe the Patent and that the Patent was invalid. Judgment then was entered in our favor. ArcelorMittal filed an appeal with the United States Court of Appeals for the Federal Circuit. On November 30, 2012, the court of appeals issued a decision reversing certain findings related to claim construction and the validity of the Patent and remanded the case to the trial court for further proceedings. On January 30, 2013, ArcelorMittal filed a motion for rehearing with the court of appeals. On March 20, 2013, the court of appeals denied ArcelorMittal's motion for rehearing. The case then was remanded to the trial court for further proceedings. On April 16, 2013, according to a petition previously filed by ArcelorMittal and ArcelorMittal USA LLC, the U.S. Patent and Trademark Office ("PTO") reissued the Patent as U.S. Reissue Patent RE44,153 (the "Reissued Patent"). Also on April 16, 2013, ArcelorMittal filed a second action against us in the United States District Court for the District of Delaware, Case Nos. 1:13-cv-00685 and 1:13-cv-00686 (collectively the "Second Action"). The complaint filed in the Second Action alleges that we are infringing the claims of the Reissued Patent and seeks injunctive relief and unspecified compensatory damages. On April 23, 2013, we filed a motion to dismiss key elements of the complaint filed in the Second Action. In addition, the parties briefed related non-infringement and claims construction issues in the original action. On October 25, 2013, the district court granted summary judgment in our favor, confirming that our product does not infringe the original Patent or the Reissued Patent. The court further ruled that ArcelorMittal's Reissued Patent was invalid due to ArcelorMittal's deliberate violation of a statutory prohibition on broadening a patent through reissue more than two years after the original Patent was granted and that the original Patent had been surrendered when the Reissued Patent was issued and thus is no longer in effect. Final Judgment was entered on October 31, 2013. On November 6, 2013, ArcelorMittal filed a motion to clarify or, in the alternative, to alter or amend the October 31, 2013 judgment. We opposed the motion. On December 5, 2013, the court issued a memorandum and order denying the motion and entered final judgment in our favor, and against ArcelorMittal, specifically ruling that all claims of ArcelorMittal's Reissued Patent are invalid as violative of 35 U.S.C. §251(d). On December 30, 2013, ArcelorMittal filed notices of appeal to the Federal Circuit Court of Appeals. The appeal has been fully briefed and the court of appeals held a hearing on November 4, 2014. On May 12, 2015, the Federal Circuit issued its decision affirming in part and reversing in part the trial court's decision and remanding the case for further proceedings. The Federal Circuit ruled that 23 of the 25 claims of the Reissued Patent were improperly broadened and therefore invalid. However, the Federal Court found that the district court erred in invalidating the remaining two claims and remanded the case for further proceedings before the district court. Following the remand, ArcelorMittal filed a motion in the trial court for leave to amend the Second Action to assert additional patent infringement claims based on another, related patent that the PTO issued on June 10, 2014, No. RE44,940 (Second Reissue Patent). It also filed a motion to dismiss the original action on the grounds that it is now moot in light of the Court of Appeals' last ruling. We opposed both of those

motions. In addition, we filed separate motions for summary judgment in the original action on the grounds of non-infringement and invalidity. A hearing on all motions was held on October 27, 2015. On December 4, 2015, the

- 64-

A004789

district court issued an order granting our motion for summary judgment that both remaining claims of the Reissued Patent are not infringed and are invalid as obvious. The court therefore entered final judgment in favor of the defendants in the original case. In the court's order, the judge also granted ArcelorMittal's motion to file a first amended complaint in the Second Action, alleging we are infringing the claims of the Second Reissue Patent, which we deny. On December 21, 2015, ArcelorMittal filed a notice of appeal from the district court's December 4, 2015, final judgment. On January 20, 2016, we filed a motion to dismiss the amended complaint in the Second Action, or in the alternative, a motion to stay pending a resolution of the appeal in the original case. We intend to continue to contest this matter vigorously. At this time, we have not made a determination that a loss is probable and we do not have adequate information to reliably or accurately estimate potential loss if ArcelorMittal prevails in its appeal in this dispute. Because we have been unable to determine that the potential loss in this case is probable or estimable, we have not recorded an accrual for this matter. If our assumptions used to evaluate whether a loss in this matter is either probable or estimable prove to be incorrect or change, we may be required to record a liability for an adverse outcome.

As previously reported, on June 13, 2013, Cliffs Sales Company ("Cliffs") filed an action in the United States District Court for the Northern District of Ohio, Civil Action No. 1:13 cv 1308, against us pertaining to Dearborn Works. Cliffs claims that we breached a May 21, 2008, Agreement for Sale of Reclaimed Iron Units, as amended (the "Iron Unit Agreement"). Cliffs claims that we breached the Iron Unit Agreement by failing to purchase the required amount of pellets, chips and fines as allegedly required. We filed an answer denying the material allegations of the complaint and asserting several affirmative defenses. In January of 2014, the presiding judge ordered a stay of the proceedings until we completed an arbitration of a separate dispute. That arbitration is now concluded and it is anticipated that the stay of the litigation may be lifted and discovery may re-commence in the near future. We intend to contest this matter vigorously. At this time, we have not made a determination that a loss is probable and do not have adequate information to reliably or accurately estimate our potential loss if Cliffs prevails in this lawsuit. Because we have been unable to determine that a loss is probable or estimable, we have not recorded an accrual. If our assumptions used to evaluate whether a loss in this matter is either probable or estimable prove to be incorrect or change, we may be required to record a liability for an adverse outcome.

*Trade Cases*

Grain-Oriented Electrical Steel

On September 18, 2013, we, along with another domestic producer and the United Steelworkers (collectively, the "Petitioners"), filed trade cases against imports of grain-oriented electrical steel ("GOES") from seven countries. We filed anti-dumping ("AD") petitions against China, the Czech Republic, Germany, Japan, Poland, Russia and South Korea and a countervailing duty ("CVD") petition against China charging that unfairly traded imports of GOES from those seven countries are causing material injury to the domestic industry. The United States Department of Commerce ("DOC") initiated the cases on October 24, 2013. On November 19, 2013, the International Trade Commission ("ITC") made a preliminary determination that there is a reasonable indication that GOES imports caused or threaten to cause material injury. On May 5, 2014, the DOC issued preliminary determinations that imports of GOES from China, the Czech Republic, Germany, Japan, Poland, Russia and South Korea are being dumped in the United States. On July 17, 2014, the DOC issued final dumping determinations for imports of GOES from Germany, Japan and Poland, affirming the preliminary dumping margins for these three countries. As a result of the preliminary dumping determinations on China, the Czech Republic, Russia and South Korea, and the final dumping determinations on Germany, Japan and Poland, importers were required to post cash deposits with U.S. Customs and Border Protection on imports of GOES from these seven countries (in addition to any deposits required by the preliminary affirmative CVD determinations). The DOC also reached affirmative preliminary critical circumstances findings for Poland and Russia. The ITC issued its final determination for imports of GOES from China, the Czech Republic, Germany, Japan, Poland, Russia and South Korea in separate decisions issued on August 27, 2014 and October 23, 2014. In each of these decisions, the ITC determined in a 5-1 vote that the United States steel industry is neither materially injured nor threatened with material injury by those imports. These two ITC decisions nullify the DOC's preliminary assessment of dumping duties on GOES imports from each of the countries in the filed trade petition, as well as a CVD determination for China. On September 16, 2014, the Petitioners filed an appeal of the ITC's August 27, 2014, decision to the Court of International Trade (the "CIT"), and on November 13, 2014, the Petitioners filed an appeal of the ITC's October 23, 2014, decision to the CIT. The CIT consolidated those two appeals into a single appeal. The parties have fully briefed the appeal and are awaiting the decision by the CIT.

Corrosion-Resistant Steel

On June 3, 2015, we, along with five other domestic producers, filed AD and CVD petitions against imports of corrosion-resistant steel ("CORE") from China, India, Italy, South Korea and Taiwan. The petitions allege that unfairly traded imports of CORE from those five countries are causing material injury to the domestic industry. The DOC initiated its investigations on June 24, 2015. On July 16, 2015, the ITC made a unanimous preliminary determination of injury to the domestic industry caused by imports of CORE from all five countries. On October 30, 2015, the DOC determined that China, Italy and South Korea significantly increased their product shipments into the U.S. market before the DOC's preliminary determination of AD and CVD duties. This "critical circumstances" determination

allows the DOC to impose CVD and AD duties retroactively beginning from the date that is approximately 90 days before the respective date of the DOC's preliminary determination of CVD and AD duties. **On November 2,**

- 65-

A004791

*Table of Contents*

2015, the DOC preliminarily determined that imports of CORE from China, India, Italy and South Korea are benefiting from unfair government subsidies and should be subject to CVD duties. The critical circumstances determination allows the DOC to impose CVD duties on imports from China, India and South Korea retroactively from August 4, 2015. On December 23, 2015, the DOC also preliminarily determined that imports of CORE from China, India, Italy and South Korea are being sold at less-than-fair-value and should be subject to AD duties. The critical circumstances determination allows the DOC to impose AD duties on imports from China, India and South Korea retroactively from October 6, 2015. Estimated AD duties resulting from those preliminary determinations by the DOC are generally added to the estimated CVD duties. As a result of these preliminary CVD and AD determinations, importers are required to post cash deposits with the U.S. government on imports of CORE from these countries as presented below:

| Country | Corrosion-Resistant CVD Margins | Corrosion-Resistant AD Margins |
| --- | --- | --- |
| China | 235.66% – 26.26% | 255.8% |
| India | 7.71% – 2.85% | 6.92% – 6.64% |
| Italy | 38.41% – 0.00% | 3.11% – 0.00% |
| South Korea | 1.37% – 0.00% | 3.51% – 2.99% |

For Taiwan, the DOC found no dumping margin and that countervailable government subsidies did not exceed the *de minimus* level of one percent. All preliminary duties remain in effect until the DOC issues final determinations. We expect final determinations of whether there have been dumping, subsidization and injury to occur by the second quarter of 2016.

### Cold-Rolled Steel

On July 28, 2015, we, along with four other domestic producers, filed AD petitions against imports of cold-rolled steel from Brazil, China, India, Japan, the Netherlands, Russia, South Korea and the United Kingdom, as well as CVD petitions against imports of cold-rolled steel from Brazil, China, India, Russia and South Korea. The petitions allege that unfairly traded imports of cold-rolled steel from those eight countries are causing material injury to the domestic industry. The DOC initiated its investigations on August 17, 2015. On September 10, 2015, the ITC made a unanimous preliminary determination of injury to the domestic industry caused by imports of cold-rolled steel from Brazil, China, India, Japan, Russia, South Korea and the United Kingdom. The ITC also determined that imports of cold-roll steel from the Netherlands were "negligible" (i.e., less than 3% of total imports of cold-rolled steel during the preceding twelve-month period), and terminated the investigation of imports from the Netherlands. In addition, in October 2015, we and the other petitioners filed critical circumstances allegations against certain foreign producers of cold-rolled steel asserting that those foreign producers significantly increased their shipments of products into the U.S. market before the DOC's preliminary determination of AD and CVD duties. On December 16, 2015, the DOC preliminarily determined that imports of cold-rolled steel from Brazil, China, India and Russia are benefiting from unfair government subsidies and should be subject to CVD duties. The DOC also preliminarily determined that critical circumstances exist for imports of certain cold-rolled steel from China. As a result of these preliminary CVD determinations, importers are required to post cash deposits with the U.S. government on imports of cold-rolled steel from these countries as presented below:

| Country | Cold-Rolled CVD Margins | Cold-Rolled AD Margins |
| --- | --- | --- |
| Brazil | 7.42% | * |
| China | 227.29% | * |
| India | 4.45% | * |
| Russia | 6.33% – 0.00% | * |

  * To be subsequently determined

The DOC's critical circumstances preliminary determination also allows the DOC to impose CVD duties on certain cold-rolled steel imports from China retroactively from September 22, 2015. For South Korea, the DOC found that countervailable government subsidies did not exceed the *de minimus* level of one percent. The DOC will next make preliminary AD determinations for these four countries and South Korea, along with Japan and the United Kingdom (which were not named in the CVD petitions), on or about February 23, 2016. Affirmative preliminary AD determinations by the DOC will require covered importers to post cash deposits to the U.S. government covering those duties beginning as of the date of the DOC's preliminary determinations. If the DOC makes affirmative preliminary AD determinations for China, as a result its preliminary critical circumstances determination, the DOC also may impose AD retroactively for imports of cold-rolled steel from China beginning 90 days before the preliminary determination. Those preliminary duties would remain in effect until the DOC issues final determinations. We expect the final determinations of whether there have been dumping, subsidization and injury to occur by the third quarter of 2016.

A004792

*Table of Contents*

### Hot-Rolled Steel

On August 11, 2015, we, along with five other domestic producers, filed AD petitions against imports of hot-rolled steel from Australia, Brazil, Japan, the Netherlands, South Korea, Turkey and the United Kingdom, as well as CVD petitions against imports of hot-rolled steel from Brazil, South Korea and Turkey. The petitions allege that unfairly traded imports of hot-rolled steel from those seven countries are causing material injury to the domestic industry. The DOC initiated its investigations on September 1, 2015. On September 24, 2015, the ITC made a unanimous preliminary determination of injury to the domestic industry caused by imports of hot-rolled steel from all seven countries. In addition, in October 2015, we and the other petitioners filed critical circumstances allegations against certain foreign producers of hot-rolled steel asserting that those foreign producers significantly increased their shipments of products into the U.S. market before the DOC's preliminary determination of AD and CVD duties. On December 9, 2015, the DOC preliminarily determined that critical circumstances exist for imports of certain hot-rolled steel from Brazil. On January 11, 2016, the DOC preliminarily determined that imports of hot-rolled steel from Brazil are benefiting from unfair government subsidies and should be subject to CVD duties at the rate of 7.42%. For South Korea and Turkey, the DOC found that countervailable government subsidies did not exceed the *de minimus* level of one percent. As a result of the preliminary CVD determination, importers are required to post cash deposits with the U.S. government on imports of hot-rolled steel from Brazil at the rate of 7.42%. The DOC's critical circumstances preliminary determination also allows the DOC to impose CVD duties on certain hot-rolled steel imports from Brazil retroactively from October 13, 2015. The DOC will next make preliminary AD determinations for all seven countries on or about March 8, 2016. Affirmative preliminary AD determinations by the DOC will require covered importers to post cash deposits to the U.S. government covering those duties beginning as of the date of the DOC's preliminary determinations. If the DOC makes affirmative preliminary AD determinations for Brazil, as a result of its preliminary critical circumstances determination, the DOC also may impose AD retroactively for imports of hot-rolled steel from Brazil beginning approximately 90 days before the preliminary determination. Those preliminary duties would remain in effect until the DOC issues final determinations. We expect final determinations of whether there have been dumping, subsidization and injury to occur by the third quarter of 2016.

### Stainless Steel

On February 12, 2016, we, along with three other domestic producers, filed AD and CVD petitions against imports of stainless steel from China. The petitions allege that unfairly traded imports of stainless steel from China are causing material injury to the domestic industry. The DOC must determine whether to initiate its investigations by March 3, 2016. If the DOC initiates investigations, the ITC will make its preliminary injury determination on or about March 28, 2016 as to whether there is a reasonable indication that stainless steel imports caused or threaten to cause material injury. If the ITC's preliminary determination is affirmative, we expect the DOC to make preliminary determinations about subsidies by the end of the second quarter of 2016 and dumping by the end of the third quarter of 2016, and impose preliminary duties. If the DOC imposes preliminary duties, covered importers would be required to post cash deposits to the U.S. government covering those duties beginning as of the date of the preliminary determination. Those preliminary duties would remain in effect until the DOC issues final determinations. We expect the entire investigation to take approximately one year, with final determinations of whether there have been dumping, subsidization, and injury likely occurring by the first quarter of 2017.

#### Other Contingencies

In addition to the matters we discussed above, there are various pending and potential claims against us and our subsidiaries involving product liability, commercial, employee benefits and other matters arising in the ordinary course of business. Because of the considerable uncertainties which exist for any claim, it is difficult to reliably or accurately estimate what would be the amount of a loss if a claimant prevails. If material assumptions or factual understandings we rely on to evaluate exposure for these contingencies prove to be inaccurate or otherwise change, we may be required to record a liability for an adverse outcome. If, however, we have reasonably evaluated potential future liabilities for all of these contingencies, including those described more specifically above, it is our opinion, unless we otherwise noted, that the ultimate liability from these contingencies, individually and in the aggregate, should not have a material effect on our consolidated financial position, results of operations or cash flows.

## NOTE 11 - Stockholders' Equity

---

*Preferred Stock:* There are 25,000,000 shares of preferred stock authorized; no shares are issued or outstanding.

*Common Stock:* Our common stockholders may receive dividends when and as declared by the Board of Directors out of funds legally available for distribution. The holders have one vote per share in respect of all matters and are not entitled to preemptive rights.

On September 16, 2014, AK Holding issued 40.25 million shares of common stock at $9.00 per share. Net proceeds were $345.3 after underwriting discounts and other fees. AK Holding used the net proceeds to pay a portion of the purchase price for the acquisition of

A004794

Dearborn, to repay a portion of outstanding borrowings under the Credit Facility and for general corporate purposes.

- 67-

A004795

*Table of Contents*

*Dividends:* The instruments governing our outstanding senior debt allow dividend payments. However, our Credit Facility restricts dividend payments. Dividends are permitted if (i) availability under the Credit Facility exceeds $337.5 or (ii) availability exceeds $262.5 and we meet a fixed charge coverage ratio of one to one as of the most recently ended fiscal quarter. If we cannot meet either of these thresholds, dividends would be limited to $12.0 annually. Currently, the availability under the Credit Facility significantly exceeds $337.5. Although we have elected to suspend our dividend program, there currently are no covenants that would restrict our ability to declare and pay a dividend to our stockholders.

*Share Repurchase Program:* In October 2008, the Board of Directors authorized us to repurchase, from time to time, up to $150.0 of our outstanding common stock. We have not made any common stock repurchases under this program in the last three years. As of December 31, 2015, there was $125.6 remaining for repurchase under the Board of Directors' authorization.

## NOTE 12 - Share-based Compensation

AK Holding's Stock Incentive Plan (the "SIP") permits the granting of nonqualified stock option, restricted stock, performance share and/or restricted stock unit ("RSUs") awards to our Directors, officers and other employees. Stockholders have approved an aggregate maximum of 23 million shares issuable under the SIP through December 31, 2019, of which approximately 4 million shares are available for future grant as of December 31, 2015.

Share-based compensation expense for the years ended December 31, 2015, 2014 and 2013, is presented below:

| **Share-based Compensation Expense** | | **2015** | | **2014** | | **2013** |
|---|---|---|---|---|---|---|
| Stock options | $ | 1.7 | $ | 1.7 | $ | 1.5 |
| Restricted stock | | 3.2 | | 3.2 | | 2.9 |
| Restricted stock units issued to Directors | | 0.9 | | 1.1 | | 1.0 |
| Performance shares | | 1.9 | | 2.9 | | 4.1 |
| Pre-tax share-based compensation expense | $ | 7.7 | $ | 8.9 | $ | 9.5 |

*Stock Options*

Stock options have a maximum term of ten years and holders may not exercise them earlier than six months after the grant date or another term the award agreement may specify. Stock options granted to officers and key managers vest and become exercisable in three equal installments on the first, second and third anniversaries of the grant date. The exercise price of each option must equal or exceed the market price of our common stock on the grant date. We have not and do not reprice stock options to lower the exercise price.

We use the Black-Scholes option valuation model to value the nonqualified stock options. We use historical data of stock option exercise behaviors to estimate the expected life that granted options will be outstanding. The risk-free interest rate is based on the Daily Treasury Yield Curve published by the U.S. Treasury on the grant date. The expected volatility is determined by using a blend of historical and implied volatility. The expected dividend yield is based on our historical dividend payments. We estimate that option holders will forfeit 5% of the options.

The following weighted-average assumptions are used in the Black-Scholes option pricing model to estimate the fair value of granted options as of the grant date:

| | | **2015** | | **2014** | | **2013** |
|---|---|---|---|---|---|---|
| Expected volatility | | 67.6% – 75.9% | | 58.3% – 68.2% | | 57.8% – 68.8% |
| Weighted-average volatility | | 69.4% | | 62.6% | | 65.2% |
| Expected term (in years) | | 3.1 – 6.6 | | 3.0 – 6.5 | | 2.9 – 6.4 |
| Risk-free interest rate | | 1.0% – 1.7% | | 0.9% – 2.3% | | 0.4% – 1.1% |
| Dividend yield | | —% | | —% | | —% |
| Weighted-average grant-date fair value per share of granted options | $ | 2.36 | $ | 3.50 | $ | 2.44 |

- 68-

A004796

*Table of Contents*

Option activity for the year ended December 31, 2015, is presented below:

| Stock Options | Shares | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Life (in years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding at December 31, 2014 | 2,696,595 | $ 11.16 | | |
| Granted | 906,700 | 4.08 | | |
| Exercised | (2,733) | 4.59 | | |
| Forfeited and expired | (296,570) | 10.81 | | |
| Outstanding at December 31, 2015 | 3,303,992 | 9.26 | 4.6 | $ — |
| Exercisable at December 31, 2015 | 1,959,959 | 12.33 | 3.3 | — |
| Unvested at December 31, 2015 | 1,344,033 | 4.77 | 6.5 | — |
| Unvested at December 31, 2015 expected to vest | 1,276,831 | 4.77 | 6.5 | — |

The total intrinsic value of stock option awards that holders exercised during the years ended December 31, 2015, 2014 and 2013, was not material in each period. Each exercised option's intrinsic value is the quoted average of the reported high and low sales price on the exercise date. As of December 31, 2015, total unrecognized compensation costs for non-vested stock options were $0.7, which we expect to recognize over a weighted-average period of 1.7 years.

*Restricted Stock*

Restricted stock awards granted to officers and other employees ordinarily vest ratably on the first, second and third anniversaries of the grant. Non-vested restricted stock awards activity for the year ended December 31, 2015, is presented below:

| Restricted Stock Awards | Restricted Shares | Weighted-Average Grant Date Fair Value |
|---|---|---|
| Outstanding at December 31, 2014 | 502,413 | $ 5.97 |
| Granted | 886,060 | 4.06 |
| Vested/restrictions lapsed | (719,955) | 4.90 |
| Canceled | (69,203) | 5.06 |
| Outstanding at December 31, 2015 | 599,315 | 4.54 |

The weighted-average grant date fair value of restricted stock awards granted during the years ended December 31, 2015, 2014 and 2013, was $4.06, $6.66 and $4.43 per share. The total intrinsic value of restricted stock awards that vested (i.e., restrictions lapsed) during the years ended December 31, 2015, 2014 and 2013, was $2.9, $2.9 and $2.1. As of December 31, 2015, total unrecognized compensation costs for non-vested restricted stock awards granted under the SIP were $1.5, which we expect to recognize over a weighted-average period of 1.6 years.

*Restricted Stock Units*

Restricted stock units ("RSUs") represent equity-based compensation granted to Directors. RSU grants vest immediately, but we do not settle them (i.e., pay them) until one year after the grant date, unless a Director elects to defer the settlement. Directors have the option to defer their RSU settlement six months after their Board service is terminated and also may elect to take settlement in a single distribution or in annual installments up to fifteen years.

*Performance Shares*

A004798

Performance shares are granted to officers and key managers. They earn the awards by meeting performance measures over a three-year period. Though a target number of performance shares are awarded on the grant date, the total number of performance shares issued to the participant when they vest is based on two equally-rated metrics: (i) our share performance compared to a prescribed compounded annual growth rate and (ii) our total share return compared to Standard & Poor's MidCap 400 index.

- 69-

A004799

*Table of Contents*

The following weighted-average assumptions are used in a Monte Carlo simulation model to estimate the fair value of performance shares granted:

|  | 2015 | 2014 | 2013 |
|---|---|---|---|
| Company expected volatility | 56.4% | 59.1% | 59.2% |
| S&P's MidCap 400 index expected volatility | 27.0% | 32.4% | 34.7% |
| Risk-free interest rate | 0.9% | 0.9% | 0.4% |
| Dividend yield | —% | —% | —% |
| Weighted-average grant-date fair value per performance share granted | $ 3.09 | $ 6.40 | $ 4.68 |

Non-vested performance share awards activity for the year ended December 31, 2015, is presented below:

| **Performance Share Awards** | Performance Shares | Weighted-Average Grant Date Fair Value |
|---|---|---|
| Outstanding at December 31, 2014 | 978,952 | $ 5.56 |
| Granted | 890,700 | 3.09 |
| Earned | — | — |
| Expired or forfeited | (865,358) | 4.36 |
| Outstanding at December 31, 2015 | 1,004,294 | 4.40 |

As of December 31, 2015, total unrecognized compensation costs for non-vested performance share awards granted under the SIP were $2.1, which we expect to recognize over a weighted-average period of 1.6 years.

- 70-

*Table of Contents*

**NOTE 13 - Comprehensive Income (Loss)**

Other comprehensive income (loss), net of tax, information is presented below:

|  | 2015 | 2014 | 2013 |
|---|---|---|---|
| **Foreign currency translation** |  |  |  |
| Balance at beginning of period | $ 1.0 | $ 4.7 | $ 3.5 |
| Other comprehensive income (loss)—foreign currency translation gain (loss) | (3.1) | (3.7) | 1.2 |
| Balance at end of period | $ (2.1) | $ 1.0 | $ 4.7 |
| **Cash flow hedges** |  |  |  |
| Balance at beginning of period | $ (32.2) | $ 18.3 | $ 31.7 |
| Other comprehensive income (loss): |  |  |  |
| Gains (losses) arising in period | (64.2) | (51.6) | 3.5 |
| Income tax expense | 24.9 | — | 1.3 |
| Gains (losses) arising in period, net of tax | (89.1) | (51.6) | 2.2 |
| Reclassification of losses (gains) to net income (loss): |  |  |  |
| Hot roll carbon steel coil contracts (a) | — | — | (0.4) |
| Other commodity contracts (b) | 61.4 | 1.1 | (24.8) |
| Subtotal | 61.4 | 1.1 | (25.2) |
| Income tax expense (d) | (25.9) | — | (9.6) |

| | | | |
|---|---|---|---|
| Net amount of reclassification of losses (gains) to net income (loss) | 87.3 | 1.1 | (15.6) |
| Total other comprehensive income (loss), net of tax | (1.8) | (50.5) | (13.4) |
| Balance at end of period | $ (34.0) | $ (32.2) | $ 18.3 |

**Unrealized holding gains on securities**

| | | | |
|---|---|---|---|
| Balance at beginning of period | $ 0.4 | $ 0.4 | $ 0.3 |
| Other comprehensive income (loss): | | | |
| Unrealized holding gains (losses) arising in period | — | — | 0.2 |
| Income tax expense | — | — | 0.1 |
| Unrealized holding gains (losses) arising in period, net of tax | — | — | 0.1 |
| Reclassification of gains (losses) to net income (loss)—income tax benefit (d) | 0.4 | — | — |
| Total other comprehensive income (loss), net of tax | (0.4) | — | 0.1 |
| Balance at end of period | $ — | $ 0.4 | $ 0.4 |

**Pension and OPEB plans**

| | | | |
|---|---|---|---|
| Balance at beginning of period | $ (173.6) | $ 300.0 | $ (34.4) |
| Other comprehensive income (loss): | | | |
| Prior service credit (cost) arising in period | (7.7) | 10.9 | (6.1) |
| Gains (losses) arising in period | (60.8) | (422.5) | 422.3 |
| Subtotal | (68.5) | (411.6) | 416.2 |
| Income tax expense (benefit) (d) | (26.0) | — | 50.3 |
| Gains (losses) arising in period, net of tax | (42.5) | (411.6) | 365.9 |
| Reclassification to net income (loss): | | | |
| Prior service costs (credits) (c) | (60.2) | (68.9) | (76.2) |
| Actuarial (gains) losses (c) | 165.0 | 6.9 | 25.3 |
| Subtotal | 104.8 | (62.0) | (50.9) |
| Income tax (expense) benefit (d) | 39.8 | — | (19.4) |
| Amount of reclassification to net income (loss), net of tax | 65.0 | (62.0) | (31.5) |
| Total other comprehensive income (loss), net of tax | 22.5 | (473.6) | 334.4 |
| Balance at end of period | $ (151.1) | $ (173.6) | $ 300.0 |

(a)  Included in net sales
(b)  Included in cost of products sold
(c)  Included in pension and OPEB expense (income)
(d)  Included in income tax expense (benefit)

- 71-

*Table of Contents*

**NOTE 14 - Earnings per Share**

Reconciliation of the numerators and denominators for basic and diluted EPS computations is presented below:

| | **2015** | **2014** | **2013** |
|---|---|---|---|
| Net income (loss) attributable to AK Steel Holding Corporation | $ (509.0) | $ (96.9) | $ (46.8) |
| Less: distributed earnings to common stockholders and holders of certain stock compensation awards | — | — | — |
| Undistributed earnings (loss) | $ (509.0) | $ (96.9) | $ (46.8) |
| | | | |
| Common stockholders earnings—basic and diluted: | | | |
| Distributed earnings to common stockholders | $ — | $ — | $ — |

A004801

| | | | | | |
|---|---|---|---|---|---|
| Undistributed earnings (loss) to common stockholders | | (507.3) | | (96.6) | (46.6) |
| Common stockholders earnings (loss)—basic and diluted | $ | (507.3) | $ (96.6) | $ | (46.6) |

Common shares outstanding (weighted-average shares in millions):

| | | | |
|---|---|---|---|
| Common shares outstanding for basic earnings per share | 177.2 | 148.1 | 135.8 |
| Effect of exchangeable debt | — | — | — |
| Effect of dilutive stock-based compensation | — | — | — |
| Common shares outstanding for diluted earnings per share | 177.2 | 148.1 | 135.8 |

Basic and diluted earnings per share:

| | | | | | |
|---|---|---|---|---|---|
| Distributed earnings | $ | — | $ — | $ | — |
| Undistributed earnings (loss) | | (2.86) | (0.65) | | (0.34) |
| Basic and diluted earnings (loss) per share | $ | (2.86) | $ (0.65) | $ | (0.34) |

| | | | |
|---|---|---|---|
| Potentially issuable common shares (in millions) excluded from earnings per share calculation due to anti-dilutive effect | 3.6 | 9.7 | 2.6 |

## NOTE 15 - Variable Interest Entities

*SunCoke Middletown*

We purchase all the coke and electrical power generated from SunCoke Middletown's plant under long-term supply agreements. SunCoke Middletown is a variable interest entity because we have committed to purchase all the expected production from the facility through at least 2031 and we are the primary beneficiary. Therefore, we consolidate SunCoke Middletown's financial results with our financial results, even though we have no ownership interest in SunCoke Middletown. SunCoke Middletown had income before income taxes of $62.6, $63.0 and $64.3 for the years ended December 31, 2015, 2014 and 2013 that was included in our consolidated income (loss) before income taxes.

*Vicksmetal/Armco Associates*

We indirectly own a 50% interest in Vicksmetal/Armco Associates ("VAA"), a joint venture with Vicksmetal Company, which is owned by Sumitomo Corporation. VAA slits electrical steel primarily for AK Steel, though also for third parties. VAA is a variable interest entity and we are the primary beneficiary. Therefore, we consolidate VAA's financial results with our financial results.

## NOTE 16 - Fair Value Measurements

We measure certain assets and liabilities at fair value. Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability (i.e., the "exit price") in an orderly transaction between market participants at the measurement date. In

- 72-

*Table of Contents*

determining fair value, we use various valuation approaches. The hierarchy of those valuation approaches is broken down into three levels based on the reliability of inputs as follows:

- Level 1 inputs are quoted prices in active markets for identical assets or liabilities that we have the ability to access at the measurement date.

- Level 2 inputs are inputs, other than quoted prices, that are directly or indirectly observable for the asset or liability. Level 2 inputs include model-generated values that rely on inputs either directly observed or readily-derived from available market data sources, such as Bloomberg or other news and data vendors. They include quoted prices for similar assets or liabilities in active markets, inputs other than quoted prices that are observable for the asset or liability (e.g., interest rates and yield curves observable at commonly quoted intervals or current market) and contractual prices for the underlying financial instrument, as well as other relevant economic factors. As a practical expedient, we estimate the value of common/collective trusts by using the net asset value per share multiplied by the number of shares of the trust investment held as of the measurement date. If we have the ability to redeem our investment in the respective alternative investment at the net asset value with no significant restrictions on the redemption at the consolidated balance sheet date, we categorized the alternative investment as a Level 2 measurement in the fair value hierarchy. We generate fair values for our commodity derivative contracts and foreign currency forward contracts from observable futures prices for the respective commodity or currency, from sources such as the New York Mercantile Exchange (NYMEX) or the London Metal Exchange (LME). In cases where the derivative is an option contract (including caps, floors and collars), we adjust our valuations to reflect the counterparty's valuation assumptions. After validating that the counterparty's assumptions for implied volatilities reflect independent source's assumptions, we discount these model-generated future values with discount factors that reflect the counterparty's credit quality. We apply different discount rates to different contracts since the maturities and counterparties differ. As of December 31, 2015, a spread over benchmark rates of less than 1.5% was used for derivatives valued as assets and less than 3.6% for derivatives valued as liabilities. We have estimated the fair value of long-term debt based upon quoted market prices for the same or similar issues or on the current interest rates available to us for debt on similar terms and with similar maturities.

- Level 3 inputs are unobservable inputs for the asset or liability. Unobservable inputs are used to measure fair value to the extent that observable inputs are not available, thereby allowing for situations in which there is little, if any, market activity for the asset or liability at the measurement date. This level of categorization is not applicable to our valuations on a normal recurring basis other than for a portion of our pension assets.

Assets and liabilities measured at fair value on a recurring basis are presented below:

| | 2015 | | | 2014 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Total | Level 1 | Level 2 | Total |
| **Assets measured at fair value** | | | | | | |
| Cash and cash equivalents | $ 56.6 | $ — | $ 56.6 | $ 70.2 | $ — | $ 70.2 |
| Other current assets: | | | | | | |
|    Foreign exchange contracts | — | 1.1 | 1.1 | — | 1.2 | 1.2 |
|    Commodity hedge contracts | — | 0.5 | 0.5 | — | 3.6 | 3.6 |
| Other non-current assets: | | | | | | |
|    Available for sale investments—cash and cash equivalents | — | — | — | 3.3 | — | 3.3 |
|    Commodity hedge contracts | — | 0.3 | 0.3 | — | 1.8 | 1.8 |
| Assets measured at fair value | $ 56.6 | $ 1.9 | $ 58.5 | $ 73.5 | $ 6.6 | $ 80.1 |
| | | | | | | |
| **Liabilities measured at fair value** | | | | | | |
| Accrued liabilities: | | | | | | |
|    Commodity hedge contracts | $ — | $ (41.2) | $ (41.2) | $ — | $ (36.2) | $ (36.2) |
| Other non-current liabilities—commodity hedge contracts | — | (9.5) | (9.5) | — | (5.7) | (5.7) |
| Liabilities measured at fair value | $ — | $ (50.7) | $ (50.7) | $ — | $ (41.9) | $ (41.9) |

**Liabilities measured at other than fair value**

Long-term debt, including current portions:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Fair value | $ | — | $(1,573.3) | $(1,573.3) | $ | — | $(2,478.3) | $(2,478.3) |
| Carrying amount | | — | (2,354.1) | (2,354.1) | | — | (2,422.0) | (2,422.0) |

- 73-

A004804

*Table of Contents*

See Note 7 for information on the fair value of pension plan assets. The carrying amounts of our other financial instruments do not differ materially from their estimated fair values at December 31, 2015 and 2014.

**NOTE 17 - Derivative Instruments and Hedging Activities**

Exchange rate fluctuations affect a portion of intercompany receivables that are denominated in foreign currencies, and we use forward currency contracts to reduce our exposure to certain of these currency price fluctuations. These contracts have not been designated as hedges for accounting purposes and gains or losses are reported in earnings on a current basis in other income (expense).

We are exposed to fluctuations in market prices of raw materials and energy sources, as well as from the effect of market prices on the sale of certain commodity steel (hot roll carbon steel coils). We may use cash-settled commodity price swaps and options (including collars) to hedge the market risk associated with the purchase of certain of our raw materials and energy requirements and the sale of hot roll carbon steel coils. For input commodities, these derivatives are typically used for a portion of our natural gas, nickel, iron ore, aluminum, zinc and electricity requirements. Our hedging strategy is to reduce the effect on earnings from the price volatility of these various commodity exposures. Independent of any hedging activities, price changes in any of these commodity markets could negatively affect operating costs or selling prices.

All commodity derivatives are recognized as an asset or liability at fair value. We record the effective gains and losses for commodity derivatives designated as cash flow hedges of forecasted purchases of raw materials and energy sources in accumulated other comprehensive income (loss) and reclassify them into cost of products sold in the same period we recognize earnings for the associated underlying transaction. We record the effective gains and losses for hot roll carbon steel coils derivatives designated as cash flow hedges of forecasted sales in accumulated other comprehensive income and reclassify them into net sales in the same period we recognize earnings for the associated underlying transaction. We recognize gains and losses on these designated derivatives arising from either hedge ineffectiveness or from components excluded from the assessment of effectiveness in current earnings under cost of products sold or net sales, as appropriate. We record all gains or losses from derivatives for which hedge accounting treatment has not been elected to earnings on a current basis in net sales or cost of products sold. We have provided $17.9 of collateral to counterparties under collateral funding arrangements as of December 31, 2015.

Outstanding commodity price swaps and options and forward foreign exchange contracts as of December 31, 2015 and 2014, are presented below:

| **Commodity** | **2015** | **2014** |
|---|---|---|
| Nickel (in lbs) | 164,800 | 259,300 |
| Natural gas (in MMBTUs) | 36,972,500 | 33,992,500 |
| Zinc (in lbs) | 54,173,800 | 61,800,000 |
| Iron ore (in metric tons) | 2,795,000 | 2,335,000 |
| Electricity (in MWHs) | 1,386,400 | 1,182,800 |
| Hot roll carbon steel coils (in short tons) | — | 15,000 |
| Foreign exchange contracts (in euros) | € 55,500,000 | € 23,675,000 |

The fair value of derivative instruments as of December 31, 2015 and 2014, is presented below:

| **Asset (liability)** | **2015** | **2014** |
|---|---|---|
| Derivatives designated as hedging instruments: | | |
| Other current assets—commodity contracts | $ 0.3 | $ 2.1 |
| Other non-current assets—commodity contracts | 0.3 | 1.8 |
| Accrued liabilities—commodity contracts | (40.9) | (32.0) |
| Other non-current liabilities—commodity contracts | (9.5) | (5.7) |
| Derivatives not designated as hedging instruments: | | |
| Other current assets: | | |
| Foreign exchange contracts | 1.1 | 1.2 |
| Commodity contracts | 0.2 | 1.5 |

A004805

Accrued liabilities:

    Commodity contracts      (0.3)      (4.2)

- 74-

Gains (losses) on derivative instruments for the years ended December 31, 2015, 2014 and 2013, are presented below:

| **Gain (loss)** | **2015** | | **2014** | | **2013** | |
|---|---|---|---|---|---|---|
| Derivatives in cash flow hedging relationships— | | | | | | |
| Commodity contracts: | | | | | | |
| Reclassified from accumulated other comprehensive income into net sales (effective portion) | $ | — | $ | — | $ | 0.4 |
| Reclassified from accumulated other comprehensive income into cost of products sold (effective portion) | | (61.4) | | (1.1) | | 24.8 |
| Recorded in cost of products sold (ineffective portion and amount excluded from effectiveness testing) | | (23.6) | | (0.8) | | 3.3 |
| | | | | | | |
| Derivatives not designated as hedging instruments: | | | | | | |
| Foreign exchange contracts—recognized in other income (expense) | | (0.1) | | 1.9 | | (0.1) |
| Commodity contracts: | | | | | | |
| Recognized in net sales | | 2.2 | | (5.1) | | (3.1) |
| Recognized in cost of products sold | | (2.0) | | (35.0) | | 1.7 |

Gains (losses) before tax expected to be reclassified into cost of products sold within the next twelve months for our existing commodity contracts that qualify for hedge accounting, as well as the period over which we are hedging our exposure to the volatility in future cash flows, are presented below:

| **Commodity Hedge** | **Settlement Dates** | **Gains (losses)** | |
|---|---|---|---|
| Natural gas | January 2016 to December 2017 | $ | (17.1) |
| Electricity | January 2016 to December 2017 | | (1.9) |
| Iron ore | January 2016 to November 2017 | | (7.8) |
| Zinc | January 2016 to December 2017 | | (11.2) |

**NOTE 18 - Supplementary Cash Flow Information**

Net cash paid (received) during the period for interest, net of capitalized interest, and income taxes are presented below:

| | **2015** | | **2014** | | **2013** | |
|---|---|---|---|---|---|---|
| Net cash paid (received) during the period for: | | | | | | |
| Interest, net of capitalized interest | $ | 161.3 | $ | 121.9 | $ | 116.2 |
| Income taxes | | 0.7 | | (0.3) | | 1.2 |

- 75-

A004807

*Table of Contents*

Included in net cash flows from operations was cash provided by SunCoke Middletown of $87.4, $66.4 and $82.6 for the years ended December 31, 2015, 2014 and 2013. Consolidated cash and cash equivalents at December 31, 2015, and 2014, include SunCoke Middletown's cash and cash equivalents of $7.6 and $18.2. SunCoke Middletown's cash and cash equivalents have no compensating balance arrangements or legal restrictions, but is not available for our use.

We had capital investments during the years ended December 31, 2015, 2014 and 2013, that had not been paid as of the end of the respective period. These amounts are included in accounts payable and accrued liabilities and have been excluded from the consolidated statements of cash flows until paid. We also granted restricted stock to certain employees and restricted stock units to directors under the SIP. Non-cash investing and financing activities for the years ended December 31, 2015, 2014 and 2013, are presented below:

|  | 2015 | 2014 | 2013 |
|---|---|---|---|
| Capital investments | $ 37.4 | $ 29.5 | $ 10.2 |
| Issuance of restricted stock and restricted stock units | 4.1 | 4.5 | 3.0 |

## NOTE 19 - Quarterly Information (Unaudited)

Earnings per share for each quarter and the year are calculated individually and may not sum to the total for the year.

|  | 2015 | | | | |
|---|---|---|---|---|---|
|  | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | Year |
| Net sales | $ 1,750.9 | $ 1,689.4 | $ 1,709.9 | $ 1,542.7 | $ 6,692.9 |
| Operating profit (loss) | 33.8 | 7.1 | 80.2 | (34.4) | 86.7 |
| Net income (loss) attributable to AK Holding | (306.3) | (64.0) | 6.7 | (145.4) | (509.0) |
| Basic and diluted earnings (loss) per share | $ (1.72) | $ (0.36) | $ 0.04 | $ (0.82) | $ (2.86) |

|  | 2014 | | | | |
|---|---|---|---|---|---|
|  | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | Year |
| Net sales | $ 1,383.5 | $ 1,530.8 | $ 1,593.8 | $ 1,997.6 | $ 6,505.7 |
| Operating profit (loss) | (35.3) | 36.5 | 63.7 | 74.5 | 139.4 |
| Net income (loss) attributable to AK Holding | (86.1) | (17.1) | (7.2) | 13.5 | (96.9) |
| Basic earnings (loss) per share | $ (0.63) | $ (0.13) | $ (0.05) | $ 0.08 | $ (0.65) |
| Diluted earnings (loss) per share | $ (0.63) | $ (0.13) | $ (0.05) | $ 0.07 | $ (0.65) |

Included in net income attributable to AK Holding in the first quarter and full year of 2015 was an impairment charge of $256.3 for our investment in Magnetation. Included in the fourth quarter and full year of 2015 was an impairment charge of $41.6 for our investment in AFSG, costs of $28.1 for the temporary idling of the Ashland Works blast furnace and steelmaking operations, a pension corridor charge of $144.3 and an OPEB corridor credit of $13.1.

Dearborn's financial results are included in the above amounts beginning September 16, 2014. Included in operating profit (loss) for the fourth quarter and full year of 2014 was a pension corridor charge of $2.0. Included in net income attributable to AK Holding were Dearborn net-of-tax acquisition-related costs of $1.0, $23.6, $7.1 and $31.7 for the second, third and fourth quarters and full year of 2014.

- 76-

*Table of Contents*

## NOTE 20 - Supplementary Guarantor Information

A004808

AK Steel's 8.75% Senior Secured Notes due December 2018, 7.625% Senior Notes due May 2020, 7.625% Senior Notes due October 2021, 8.375% Senior Notes due April 2022 (collectively, the "Senior Notes") and 5.0% Exchangeable Senior Notes due November 2019 (the "Exchangeable Notes") are governed by indentures entered into by AK Holding and its 100%-owned subsidiary, AK Steel. Under the terms of the indentures, AK Holding and the guarantor subsidiaries (AK Steel's 100%-owned subsidiaries, AK Tube and AK Properties) each fully and unconditionally, jointly and severally, guarantee the payment of interest, principal and premium, if any, on each of the notes included in the Senior Notes.

Under the terms of the indenture for the Exchangeable Notes, AK Holding fully and unconditionally, jointly and severally, guarantees the payment of interest, principal and premium, if any, on the notes. AK Holding remains the sole guarantor of the Exchangeable Notes.

We present all investments in subsidiaries in the supplementary guarantor information using the equity method of accounting. Therefore, the net income (loss) of the subsidiaries accounted for using the equity method is in their parents' investment accounts. The principal elimination entries eliminate investments in subsidiaries and inter-company balances and transactions. The following supplementary condensed consolidating financial statements present information about AK Holding, AK Steel, the guarantor subsidiaries of the Senior Notes and the other non-guarantor subsidiaries.

**Condensed Statements of Comprehensive Income (Loss)**

**Year Ended December 31, 2015**

| | AK Holding | AK Steel | Guarantor Subsidiaries of the Senior Notes | Other Non-Guarantor Subsidiaries | Eliminations | Consolidated Company |
|---|---|---|---|---|---|---|
| Net sales | $  — | $ 6,498.2 | $ 250.9 | $ 538.3 | $ (594.5) | $ 6,692.9 |
| Cost of products sold (exclusive of items shown separately below) | — | 5,984.9 | 167.5 | 423.3 | (543.7) | 6,032.0 |
| Selling and administrative expenses (exclusive of items shown separately below) | 4.9 | 270.4 | 10.7 | 25.0 | (49.1) | 261.9 |
| Depreciation | — | 187.7 | 3.6 | 24.7 | — | 216.0 |
| Pension and OPEB expense (income) (exclusive of corridor charges shown below) | — | (63.0) | — | — | — | (63.0) |
| Pension and OPEB net corridor charge | — | 131.2 | — | — | — | 131.2 |
| Charge for facility idling | — | 28.1 | — | — | — | 28.1 |
| Total operating costs | 4.9 | 6,539.3 | 181.8 | 473.0 | (592.8) | 6,606.2 |
| Operating profit (loss) | (4.9) | (41.1) | 69.1 | 65.3 | (1.7) | 86.7 |
| Interest expense | — | 171.0 | — | 2.0 | — | 173.0 |
| Impairment of Magnetation investment | — | — | — | (256.3) | — | (256.3) |
| Impairment of AFSG investment | — | — | — | (41.6) | — | (41.6) |
| Other income (expense) | — | 6.4 | 6.6 | (11.6) | — | 1.4 |
| Income (loss) before income taxes | (4.9) | (205.7) | 75.7 | (246.2) | (1.7) | (382.8) |
| Income tax expense (benefit) | — | 39.6 | 28.7 | (4.2) | (0.7) | 63.4 |
| Equity in net income (loss) of subsidiaries | (504.1) | (258.8) | — | — | 762.9 | — |
| Net income (loss) | (509.0) | (504.1) | 47.0 | (242.0) | 761.9 | (446.2) |
| Less: Net income attributable to noncontrolling interests | — | — | — | 62.8 | — | 62.8 |
| Net income (loss) attributable to AK Steel Holding Corporation | (509.0) | (504.1) | 47.0 | (304.8) | 761.9 | (509.0) |
| Other comprehensive income (loss) | 17.2 | 17.2 | — | (3.1) | (14.1) | 17.2 |
| Comprehensive income (loss) attributable to AK Steel Holding Corporation | $ (491.8) | $ (486.9) | $ 47.0 | $ (307.9) | $ 747.8 | $ (491.8) |

A004809

*Table of Contents*

**Condensed Statements of Comprehensive Income (Loss)**

**Year Ended December 31, 2014**

| | AK Holding | AK Steel | Guarantor Subsidiaries of the Senior Notes | Other Non-Guarantor Subsidiaries | Eliminations | Consolidated Company |
|---|---|---|---|---|---|---|
| Net sales | $ — | $ 6,284.2 | $ 280.7 | $ 599.6 | $ (658.8) | $ 6,505.7 |
| Cost of products sold (exclusive of items shown separately below) | — | 5,937.6 | 199.3 | 484.7 | (613.9) | 6,007.7 |
| Selling and administrative expenses (exclusive of items shown separately below) | 4.6 | 251.0 | 11.3 | 28.3 | (48.0) | 247.2 |
| Depreciation | — | 176.1 | 3.9 | 21.9 | — | 201.9 |
| Pension and OPEB expense (income) | — | (92.5) | — | — | — | (92.5) |
| Pension corridor charge | — | 2.0 | — | — | — | 2.0 |
| Total operating costs | 4.6 | 6,274.2 | 214.5 | 534.9 | (661.9) | 6,366.3 |
| Operating profit (loss) | (4.6) | 10.0 | 66.2 | 64.7 | 3.1 | 139.4 |
| Interest expense | — | 142.1 | — | 2.6 | — | 144.7 |
| Other income (expense) | — | (17.7) | 6.5 | (9.9) | — | (21.1) |
| Income (loss) before income taxes | (4.6) | (149.8) | 72.7 | 52.2 | 3.1 | (26.4) |
| Income tax expense (benefit) | — | (19.2) | 29.1 | (3.4) | 1.2 | 7.7 |
| Equity in net income (loss) of subsidiaries | (92.3) | 38.3 | — | — | 54.0 | — |
| Net income (loss) | (96.9) | (92.3) | 43.6 | 55.6 | 55.9 | (34.1) |
| Less: Net income attributable to noncontrolling interests | — | — | — | 62.8 | — | 62.8 |
| Net income (loss) attributable to AK Steel Holding Corporation | (96.9) | (92.3) | 43.6 | (7.2) | 55.9 | (96.9) |
| Other comprehensive income (loss) | (527.8) | (527.8) | — | (3.7) | 531.5 | (527.8) |
| Comprehensive income (loss) attributable to AK Steel Holding Corporation | $ (624.7) | $ (620.1) | $ 43.6 | $ (10.9) | $ 587.4 | $ (624.7) |

*Table of Contents*

**Condensed Statements of Comprehensive Income (Loss)**

**Year Ended December 31, 2013**

| | AK Holding | AK Steel | Guarantor Subsidiaries of the Senior Notes | Other Non-Guarantor Subsidiaries | Eliminations | Consolidated Company |
|---|---|---|---|---|---|---|
| Net sales | $ — | $ 5,339.3 | $ 261.5 | $ 568.8 | $ (599.2) | $ 5,570.4 |
| Cost of products sold (exclusive of items shown separately below) | — | 5,012.1 | 189.0 | 463.3 | (556.6) | 5,107.8 |
| Selling and administrative expenses (exclusive of items shown separately below) | 4.4 | 205.0 | 10.5 | 26.2 | (40.8) | 205.3 |

A004810

| | AK Holding | AK Steel | Guarantor Subsidiaries of the Senior Notes | Other Non-Guarantor Subsidiaries | Eliminations | Consolidated Company |
|---|---|---|---|---|---|---|
| Depreciation | — | 169.4 | 4.3 | 16.4 | — | 190.1 |
| Pension and OPEB expense (income) | — | (68.6) | — | — | — | (68.6) |
| Total operating costs | 4.4 | 5,317.9 | 203.8 | 505.9 | (597.4) | 5,434.6 |
| Operating profit (loss) | (4.4) | 21.4 | 57.7 | 62.9 | (1.8) | 135.8 |
| Interest expense | — | 125.9 | — | 1.5 | — | 127.4 |
| Other income (expense) | — | (5.9) | 6.1 | (1.6) | — | (1.4) |
| Income (loss) before income taxes | (4.4) | (110.4) | 63.8 | 59.8 | (1.8) | 7.0 |
| Income tax expense (benefit) | — | (27.8) | 20.1 | (2.0) | (0.7) | (10.4) |
| Equity in net income (loss) of subsidiaries | (42.4) | 40.2 | — | — | 2.2 | |
| Net income (loss) | (46.8) | (42.4) | 43.7 | 61.8 | 1.1 | 17.4 |
| Less: Net income attributable to noncontrolling interests | — | — | — | 64.2 | — | 64.2 |
| Net income (loss) attributable to AK Steel Holding Corporation | (46.8) | (42.4) | 43.7 | (2.4) | 1.1 | (46.8) |
| Other comprehensive income (loss) | 322.3 | 322.3 | — | 1.2 | (323.5) | 322.3 |
| Comprehensive income (loss) attributable to AK Steel Holding Corporation | $ 275.5 | $ 279.9 | $ 43.7 | $ (1.2) | $ (322.4) | $ 275.5 |

- 79-

Table of Contents

**Condensed Balance Sheets**
**December 31, 2015**

| | AK Holding | AK Steel | Guarantor Subsidiaries of the Senior Notes | Other Non-Guarantor Subsidiaries | Eliminations | Consolidated Company |
|---|---|---|---|---|---|---|
| ASSETS | | | | | | |
| Current assets: | | | | | | |
| Cash and cash equivalents | $ — | $ 27.0 | $ — | $ 29.6 | $ — | $ 56.6 |
| Accounts receivable, net | — | 411.9 | 23.5 | 32.0 | (22.5) | 444.9 |
| Inventory, net | — | 1,149.6 | 26.1 | 60.6 | (10.0) | 1,226.3 |
| Other current assets | — | 75.6 | 0.3 | 2.5 | — | 78.4 |
| Total current assets | — | 1,664.1 | 49.9 | 124.7 | (32.5) | 1,806.2 |
| Property, plant and equipment | — | 5,763.8 | 103.1 | 599.1 | — | 6,466.0 |
| Accumulated depreciation | — | (4,218.0) | (75.4) | (86.1) | — | (4,379.5) |
| Property, plant and equipment, net | — | 1,545.8 | 27.7 | 513.0 | — | 2,086.5 |
| Other non-current assets: | | | | | | |
| Investment in affiliates | — | 42.6 | — | 28.1 | — | 70.7 |
| Investment in subsidiaries | (3,541.0) | 1,346.0 | — | — | 2,195.0 | — |
| Inter-company accounts | 2,563.4 | (3,600.9) | 1,403.0 | (390.8) | 25.3 | — |
| Other non-current assets | — | 83.0 | 33.0 | 5.0 | — | 121.0 |
| TOTAL ASSETS | $ (977.6) | $ 1,080.6 | $ 1,513.6 | $ 280.0 | $ 2,187.8 | $ 4,084.4 |
| LIABILITIES AND EQUITY (DEFICIT) | | | | | | |
| Current liabilities: | | | | | | |

| | AK Holding | AK Steel | Guarantor Subsidiaries of the Senior Notes | Other Non-Guarantor Subsidiaries | Eliminations | Consolidated Company |
|---|---|---|---|---|---|---|
| Accounts payable | $ — | $ 669.0 | 6.3 | $ 29.1 | (1.0) | $ 703.4 |
| Accrued liabilities | — | 242.3 | 2.8 | 16.4 | — | 261.5 |
| Current portion of pension and other postretirement benefit obligations | — | 77.3 | — | 0.4 | — | 77.7 |
| Total current liabilities | — | 988.6 | 9.1 | 45.9 | (1.0) | 1,042.6 |
| Non-current liabilities: | | | | | | |
| Long-term debt | — | 2,354.1 | — | — | — | 2,354.1 |
| Pension and other postretirement benefit obligations | — | 1,143.6 | — | 3.3 | — | 1,146.9 |
| Other non-current liabilities | — | 135.3 | — | 1.1 | — | 136.4 |
| TOTAL LIABILITIES | — | 4,621.6 | 9.1 | 50.3 | (1.0) | 4,680.0 |
| Equity (deficit): | | | | | | |
| Total stockholders' equity (deficit) | (977.6) | (3,541.0) | 1,504.5 | (152.3) | 2,188.8 | (977.6) |
| Noncontrolling interests | — | — | — | 382.0 | — | 382.0 |
| TOTAL EQUITY (DEFICIT) | (977.6) | (3,541.0) | 1,504.5 | 229.7 | 2,188.8 | (595.6) |
| TOTAL LIABILITIES AND EQUITY (DEFICIT) | $ (977.6) | $ 1,080.6 | $ 1,513.6 | $ 280.0 | $ 2,187.8 | $ 4,084.4 |

- 80-

*Table of Contents*

**Condensed Balance Sheets**

**December 31, 2014**

| | AK Holding | AK Steel | Guarantor Subsidiaries of the Senior Notes | Other Non-Guarantor Subsidiaries | Eliminations | Consolidated Company |
|---|---|---|---|---|---|---|
| ASSETS | | | | | | |
| Current assets: | | | | | | |
| Cash and cash equivalents | $ — | $ 28.5 | $ 0.5 | $ 41.2 | $ — | $ 70.2 |
| Accounts receivable, net | — | 606.2 | 27.6 | 37.3 | (26.8) | 644.3 |
| Inventory, net | — | 1,080.5 | 26.2 | 73.5 | (8.1) | 1,172.1 |
| Other current assets | 0.3 | 67.9 | 0.2 | 3.0 | — | 71.4 |
| Total current assets | 0.3 | 1,783.1 | 54.5 | 155.0 | (34.9) | 1,958.0 |
| Property, plant and equipment | — | 5,695.8 | 97.3 | 595.3 | — | 6,388.4 |
| Accumulated depreciation | — | (4,040.8) | (71.8) | (62.6) | — | (4,175.2) |
| Property, plant and equipment, net | — | 1,655.0 | 25.5 | 532.7 | — | 2,213.2 |
| Other non-current assets: | | | | | | |
| Investment in affiliates | — | 84.5 | — | 304.2 | — | 388.7 |
| Investment in subsidiaries | (2,970.9) | 1,582.4 | — | — | 1,388.5 | — |
| Inter-company accounts | 2,478.1 | (3,420.4) | 1,325.5 | (412.4) | 29.2 | — |
| Other non-current assets | — | 174.4 | 33.0 | 60.7 | — | 268.1 |
| TOTAL ASSETS | $ (492.5) | $ 1,859.0 | $ 1,438.5 | $ 640.2 | $ 1,382.8 | $ 4,828.0 |
| LIABILITIES AND EQUITY (DEFICIT) | | | | | | |
| Current liabilities: | | | | | | |
| Accounts payable | $ — | $ 754.9 | $ 6.9 | $ 42.0 | $ (0.7) | $ 803.1 |

A004812

| | AK Holding | AK Steel | Guarantor Subsidiaries of the Senior Notes | Other Non-Guarantor Subsidiaries | Eliminations | Consolidated Company |
|---|---|---|---|---|---|---|
| Accrued liabilities | — | 244.6 | 3.0 | 18.9 | — | 266.5 |
| Current portion of pension and other postretirement benefit obligations | — | 55.3 | — | 0.3 | — | 55.6 |
| Total current liabilities | — | 1,054.8 | 9.9 | 61.2 | (0.7) | 1,125.2 |
| Non-current liabilities: | | | | | | |
| Long-term debt | — | 2,422.0 | — | — | — | 2,422.0 |
| Pension and other postretirement benefit obligations | — | 1,221.3 | — | 4.0 | — | 1,225.3 |
| Other non-current liabilities | — | 131.8 | — | 0.7 | — | 132.5 |
| TOTAL LIABILITIES | — | 4,829.9 | 9.9 | 65.9 | (0.7) | 4,905.0 |
| Equity (deficit): | | | | | | |
| Total stockholders' equity (deficit) | (492.5) | (2,970.9) | 1,428.6 | 158.8 | 1,383.5 | (492.5) |
| Noncontrolling interests | — | — | — | 415.5 | — | 415.5 |
| TOTAL EQUITY (DEFICIT) | (492.5) | (2,970.9) | 1,428.6 | 574.3 | 1,383.5 | (77.0) |
| TOTAL LIABILITIES AND EQUITY (DEFICIT) | $ (492.5) | $ 1,859.0 | $ 1,438.5 | $ 640.2 | $ 1,382.8 | $ 4,828.0 |

- 81 -

*Table of Contents*

**Condensed Statements of Cash Flows**

**Year Ended December 31, 2015**

| | AK Holding | AK Steel | Guarantor Subsidiaries of the Senior Notes | Other Non-Guarantor Subsidiaries | Eliminations | Consolidated Company |
|---|---|---|---|---|---|---|
| Net cash flows from operating activities | $ (3.7) | $ 49.0 | $ 53.9 | $ 104.8 | $ (3.7) | $ 200.3 |
| Cash flows from investing activities: | | | | | | |
| Capital investments | — | (85.0) | (5.8) | (8.2) | — | (99.0) |
| Proceeds from sale of equity investee | — | 25.0 | — | — | — | 25.0 |
| Proceeds from AFSG Holdings, Inc. distribution | — | — | — | 14.0 | — | 14.0 |
| Other investing items, net | — | 12.5 | — | — | — | 12.5 |
| Net cash flows from investing activities | — | (47.5) | (5.8) | 5.8 | — | (47.5) |
| Cash flows from financing activities: | | | | | | |
| Net borrowings (repayments) under credit facility | — | (55.0) | — | — | — | (55.0) |
| Redemption of long-term debt | — | (14.1) | — | — | — | (14.1) |
| Inter-company activity | 4.7 | 66.1 | (48.6) | (25.9) | 3.7 | — |
| SunCoke Middletown distributions to noncontrolling interest owners | — | — | — | (96.3) | — | (96.3) |
| Other financing items, net | (1.0) | — | — | — | — | (1.0) |
| Net cash flows from financing activities | 3.7 | (3.0) | (48.6) | (122.2) | 3.7 | (166.4) |
| Net increase (decrease) in cash and cash equivalents | — | (1.5) | (0.5) | (11.6) | — | (13.6) |
| Cash and equivalents, beginning of year | — | 28.5 | 0.5 | 41.2 | — | 70.2 |
| Cash and equivalents, end of year | $ — | $ 27.0 | $ — | $ 29.6 | $ — | $ 56.6 |

**Condensed Statements of Cash Flows**

**Year Ended December 31, 2014**

A004813

| | AK Holding | AK Steel | Guarantor Subsidiaries of the Senior Notes | Other Non-Guarantor Subsidiaries | Eliminations | Consolidated Company |
|---|---|---|---|---|---|---|
| Net cash flows from operating activities | $ (3.4) | $ (447.2) | $ 39.2 | $ 91.3 | $ (2.7) | $ (322.8) |
| Cash flows from investing activities: | | | | | | |
| Capital investments | — | (63.1) | (2.8) | (15.2) | — | (81.1) |
| Investments in Magnetation joint venture | — | — | — | (100.0) | — | (100.0) |
| Investments in acquired business, net of cash acquired | — | (690.3) | — | — | — | (690.3) |
| Other investing items, net | — | 13.6 | — | — | — | 13.6 |
| Net cash flows from investing activities | — | (739.8) | (2.8) | (115.2) | — | (857.8) |
| Cash flows from financing activities: | | | | | | |
| Net borrowings (repayments) under credit facility | — | 515.0 | — | — | — | 515.0 |
| Proceeds from issuance of long-term debt | — | 427.1 | — | — | — | 427.1 |
| Redemption of long-term debt | — | (0.8) | — | — | — | (0.8) |
| Proceeds from issuance of common stock | 345.3 | — | — | — | — | 345.3 |
| Debt issuance costs | — | (15.5) | — | — | — | (15.5) |
| Inter-company activity | (341.0) | 272.9 | (35.9) | 101.3 | 2.7 | — |
| SunCoke Middletown distributions to noncontrolling interest owners | — | — | — | (61.0) | — | (61.0) |
| Other financing items, net | (0.9) | — | — | (3.7) | — | (4.6) |
| Net cash flows from financing activities | 3.4 | 1,198.7 | (35.9) | 36.6 | 2.7 | 1,205.5 |
| Net increase (decrease) in cash and cash equivalents | — | 11.7 | 0.5 | 12.7 | — | 24.9 |
| Cash and equivalents, beginning of year | — | 16.8 | — | 28.5 | — | 45.3 |
| Cash and equivalents, end of year | $ — | $ 28.5 | $ 0.5 | $ 41.2 | $ — | $ 70.2 |

- 82 -

Table of Contents

**Condensed Statements of Cash Flows**

**Year Ended December 31, 2013**

| | AK Holding | AK Steel | Guarantor Subsidiaries of the Senior Notes | Other Non-Guarantor Subsidiaries | Eliminations | Consolidated Company |
|---|---|---|---|---|---|---|
| Net cash flows from operating activities | $ (3.5) | $ (251.1) | $ 50.4 | $ 129.6 | $ (35.6) | $ (110.2) |
| Cash flows from investing activities: | | | | | | |
| Capital investments | — | (39.2) | (1.7) | (22.7) | — | (63.6) |
| Investments in acquired businesses | — | — | — | (50.0) | — | (50.0) |
| Other investing items, net | — | 8.5 | 0.3 | 6.3 | — | 15.1 |
| Net cash flows from investing activities | — | (30.7) | (1.4) | (66.4) | — | (98.5) |
| Cash flows from financing activities: | | | | | | |
| Net borrowings (repayments) under credit facility | — | 90.0 | — | — | — | 90.0 |
| Proceeds from issuance of long-term debt | — | 31.9 | — | — | — | 31.9 |
| Redemption of long-term debt | — | (27.4) | — | — | — | (27.4) |
| Debt issuance costs | — | (3.4) | — | — | — | (3.4) |
| Inter-company activity | 4.1 | 3.9 | (49.0) | 5.4 | 35.6 | — |
| SunCoke Middletown distributions to noncontrolling interest owners | — | — | — | (64.8) | — | (64.8) |

A004814

| | | | | | | |
|---|---|---|---|---|---|---|
| Other financing items, net | (0.6) | — | — | 1.3 | — | 0.7 |
| Net cash flows from financing activities | 3.5 | 95.0 | (49.0) | (58.1) | 35.6 | 27.0 |
| Net increase (decrease) in cash and cash equivalents | — | (186.8) | — | 5.1 | — | (181.7) |
| Cash and equivalents, beginning of year | — | 203.6 | — | 23.4 | — | 227.0 |
| Cash and equivalents, end of year | $ — | $ 16.8 | $ — | $ 28.5 | $ — | $ 45.3 |

- 83 -

*Table of Contents*

**Item 9.**          **Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.**

None.

**Item 9A.**          **Controls and Procedures.**

We maintain a system of disclosure controls and procedures that is designed to provide reasonable assurance that information is disclosed and accumulated and communicated to management in a timely fashion. An evaluation of the effectiveness of the design and operation of its disclosure controls and procedures (as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) was performed as of the end of the period covered by this report. This evaluation was performed under the supervision and with the participation of management, including the Chief Executive Officer and Chief Financial Officer. Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective to provide reasonable assurance that information we are required to disclose in the reports that we file or submit under the Exchange Act is accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure and are effective to provide reasonable assurance that such information is recorded, processed, summarized and reported within the time periods specified by the Securities and Exchange Commission's rules and forms.

There has been no change in our internal control over financial reporting during the fourth quarter ended December 31, 2015, that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

Management's Report on Internal Control over Financial Reporting and the Report of Independent Registered Public Accounting Firm are presented on the following pages.

- 84 -

*Table of Contents*

**MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING**

Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) or 15d-15(f) promulgated under the Securities Exchange Act of 1934. Those rules define internal control over financial reporting as a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and include those policies and procedures that:

a)   Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of assets;

b)   Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures are being made only in accordance with authorizations of management and directors; and

c)   Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of assets that could have a material effect on the financial statements.

A004815

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

We assessed the effectiveness of our internal control over financial reporting as of December 31, 2015. In making this assessment, we used the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 Framework).

Based on our assessment and those criteria, we have determined that, as of December 31, 2015, our internal control over financial reporting was effective.

Our independent registered public accounting firm has issued an attestation report on the effectiveness of our internal control over financial reporting, which appears on the following page.

| | |
|---|---|
| Dated:  February 19, 2016 | /s/ Roger K. Newport |
| | Roger K. Newport |
| | Chief Executive Officer and Director |
| | |
| Dated:  February 19, 2016 | /s/ Jaime Vasquez |
| | Jaime Vasquez |
| | Vice President, Finance and Chief Financial Officer |

- 85 -

*Table of Contents*

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders of
AK Steel Holding Corporation

We have audited AK Steel Holding Corporation's internal control over financial reporting as of December 31, 2015, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). AK Steel Holding Corporation's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

A004816

Because of its inherent limitations, internal control over financial reporting may not prevent or detect material misstatements. Also, projections of any evaluation of the effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, AK Steel Holding Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2015, based on the COSO criteria.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the 2015 consolidated financial statements of AK Steel Holding Corporation and our report dated February 19, 2016 expressed an unqualified opinion thereon.

/s/ ERNST & YOUNG LLP

Cincinnati, Ohio
February 19, 2016

- 86-

Table of Contents

**Item 9B.**      **Other Information.**

None.

<div align="center">

**PART III**

</div>

**Item 10.**      **Directors, Executive Officers and Corporate Governance.**

Information with respect to our Executive Officers is set forth in Part I of this Annual Report pursuant to General Instruction G of Form 10-K. The information required to be furnished pursuant to this item with respect to our Directors will be set forth under the caption "Election of Directors" in our proxy statement (the "2016 Proxy Statement") to be furnished to stockholders in connection with the solicitation of proxies by our Board of Directors for use at the 2016 Annual Meeting of Stockholders, and is incorporated herein by reference.

The information required to be furnished pursuant to this item with respect to compliance with Section 16(a) of the Exchange Act will be set forth under the caption "Section 16(a) Beneficial Ownership Reporting Compliance" in the 2016 Proxy Statement, and is incorporated herein by reference.

The information required to be furnished pursuant to this item with respect to the Audit Committee and the Audit Committee financial expert will be set forth under the caption "Committees of the Board of Directors" in the 2016 Proxy Statement, and is incorporated herein by reference.

Information required to be furnished pursuant to this item with respect to and any material changes to the process by which security holders may recommend nominees to the Board of Directors will be set forth under the caption "Stockholder Proposals for the 2016 Annual Meeting and Nominations of Directors" in the 2016 Proxy Statement, and is incorporated herein by reference.

We have adopted a Code of Ethics covering our Chief Executive Officer, Chief Financial Officer, Principal Accounting Officer and other persons performing a similar function; a Code of Business Conduct and Ethics for Directors, Officers and Employees; and Corporate Governance Guidelines. These documents, along with charters of our Audit, Management Development and Compensation, Nominating and Governance, Finance, and Public and Environmental Issues Committees, are posted on our website at www.aksteel.com. Disclosures of amendments to or waivers with regard to the provisions of the Code of Ethics also will be posted on our website.

**Item 11.**      **Executive Compensation.**

The information required to be furnished pursuant to this item will be set forth under the caption "Executive Compensation" and in the Director Compensation Table and its accompanying narrative in the 2016 Proxy Statement, and is incorporated herein by reference.

**Item 12.**      **Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.**

A004817

The information required to be furnished pursuant to this item with respect to compensation plans under which our equity securities are authorized for issuance will be set forth under the caption "Equity Compensation Plan Information" in the 2016 Proxy Statement, and is incorporated herein by reference.

Other information required to be furnished pursuant to this item will be set forth under the caption "Stock Ownership" in the 2016 Proxy Statement, and is incorporated herein by reference.

**Item 13.**          **Certain Relationships and Related Transactions, and Director Independence.**

The information required to be furnished pursuant to this item will be set forth under the captions "Related Person Transactions" and "Board Independence" in the 2016 Proxy Statement, and is incorporated herein by reference.

**Item 14.**          **Principal Accounting Fees and Services.**

The information required to be furnished pursuant to this item will be set forth under the caption "Principal Accounting Firm Fees" in the 2016 Proxy Statement, and is incorporated herein by reference.

- 87-

A004818

*Table of Contents*

## PART IV

- 88-

*Table of Contents*

**Item 15.**          **Exhibits, Financial Statement Schedules.**

*(a)(1) Financial Statements*

The consolidated financial statements of AK Steel Holding Corporation filed as part of this Annual Report are included in Item 8.

*(a)(2)  Financial Statement Schedules*

All financial statement schedules are omitted because they are not applicable or the required information is contained in the applicable financial statements or notes thereto.

*(a)(3)  Exhibits*

The list of exhibits begins on the next page.

- 89-

*Table of Contents*

### INDEX TO EXHIBITS

| Exhibit Number | Description |
| --- | --- |
| 3.1 | Restated Certificate of Incorporation of AK Steel Holding Corporation (incorporated herein by reference to Exhibit 3.1 to AK Steel Holding Corporation's Annual Report on Form 10-K for the year ended December 31, 2014, as filed with the Commission on February 20, 2015). |
| 3.2 | By-laws of AK Steel Holding Corporation, as amended and restated as of May 27, 2010 (incorporated herein by reference to Exhibit 3.2 to AK Steel Holding Corporation's Annual Report on Form 10-K for the year ended December 31, 2010, as filed with the Commission on February 22, 2011). |
| 4.1 | Indenture, dated as of May 11, 2010, among AK Steel Corporation, as issuer, AK Steel Holding Corporation, as guarantor, and U.S. Bank National Association, as trustee (incorporated herein by reference to Exhibit 4.1 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on May 11, 2010). |
| 4.1(a) | First Supplemental Indenture, dated as of May 11, 2010, among AK Steel Corporation, as issuer, AK Steel Holding Corporation, as guarantor, and U.S. Bank National Association, as trustee (incorporated herein by reference to Exhibit 4.2 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on May 11, 2010). |
| 4.1(b) | Second Supplemental Indenture, dated as of March 22, 2012, among AK Steel Corporation, as issuer, AK Steel Holding Corporation, as guarantor, and U.S. Bank, National Association, as trustee (incorporated herein by reference to Exhibit 4.1 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on March 22, 2012). |
| 4.1(c) | Third Supplemental Indenture, dated as of November 20, 2012, among AK Steel Corporation, as issuer, AK Steel Holding Corporation, as guarantor, and U.S. Bank, National Association, as trustee (incorporated herein by reference to Exhibit 4.1 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on November 20, 2012). |

A004819

| 4.1(d) | Fourth Supplemental Indenture, dated as of April 29, 2014, among AK Steel Corporation, AK Steel Holding Corporation, as parent guarantor, AK Tube LLC and AK Steel Properties, Inc., as subsidiary guarantors, and U.S. Bank National Association, as trustee (incorporated herein by reference to Exhibit 4.2 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q, as filed with the Commission on May 2, 2014). |
|---|---|
| 4.1(e) | Fifth Supplemental Indenture, dated as of September 16, 2014, among AK Steel Corporation, as issuer, AK Steel Holding Corporation, as parent guarantor, AK Steel Properties, Inc. and AK Tube LLC, as subsidiary guarantors, and U.S. Bank National Association, as trustee (incorporated herein by reference to Exhibit 4.1 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on September 16, 2014). |
| 4.2 | Indenture, dated as of November 20, 2012, among AK Steel Corporation, as issuer, AK Steel Holding Corporation, as guarantor, and U.S. Bank, National Association, as trustee and collateral agent (incorporated herein by reference to Exhibit 4.2 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on November 20, 2012). |
| 4.2(a) | First Supplemental Indenture dated as of April 29, 2014 among AK Steel Corporation, AK Tube LLC and AK Steel Properties, Inc., as subsidiary guarantors, U.S. Bank National Association, as trustee and as collateral agent (incorporated herein by reference to Exhibit 4.1 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q, as filed with the Commission on May 2, 2014). |
| 10.1+ | Executive Deferred Compensation Plan, as amended and restated as of October 18, 2007 (incorporated herein by reference to Exhibit 10.2 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2007, as filed with the Commission on November 6, 2007). |
| 10.2+ | Directors' Deferred Compensation Plan, as amended and restated as of October 18, 2007 (incorporated herein by reference to Exhibit 10.3 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2007, as filed with the Commission on November 6, 2007). |

- 90-

*Table of Contents*

| Exhibit Number | Description |
|---|---|
| 10.3 | Policy Concerning Severance Agreements with Senior Executives (incorporated herein by reference to Exhibit 99.3 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2003, as filed with the Commission on November 14, 2003). |
| 10.4+ | Annual Management Incentive Plan, as amended and restated as of October 18, 2007 (incorporated herein by reference to Exhibit 10.1 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2008, as filed with the Commission on August 5, 2008). |
| 10.4(a)+ | First Amendment to the Annual Management Incentive Plan, as amended and restated as of October 18, 2007 (incorporated herein by reference to Exhibit 10.4(a) to AK Steel Holding Corporation's Annual Report on Form 10-K for the year ended December 31, 2013, as filed with the Commission on February 21, 2014). |
| 10.4(b)+ | Second Amendment to the Annual Management Incentive Plan, as amended and restated as of October 18, 2007 (incorporated herein by reference to Exhibit 10.1 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2015, as filed with the Commission on May 5, 2015). |
| 10.5+ | Supplemental Thrift Plan, as amended and restated as of October 18, 2007 (incorporated herein by reference to Exhibit 10.5 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2007, as |

A004820

filed with the Commission on November 6, 2007).

| | |
|---|---|
| 10.6+ | Executive Minimum and Supplemental Retirement Plan, as amended and restated as of October 18, 2007 (incorporated herein by reference to Exhibit 10.1 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2007, as filed with the Commission on November 6, 2007). |
| 10.6(a)+ | First Amendment to the Executive Minimum and Supplemental Retirement Plan, as amended and restated as of October 18, 2007 (incorporated herein by reference to Exhibit 10.1 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2008, as filed with the Commission on November 4, 2008). |
| 10.6(b)+ | Second Amendment to the Executive Minimum and Supplemental Retirement Plan, as amended and restated as of October 18, 2007 (incorporated herein by reference to Exhibit 10.4 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2009, as filed with the Commission on November 3, 2009). |
| 10.7+ | Executive Retirement Income Plan adopted March 20, 2014 (incorporated by reference to Exhibit 10.10 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2014, as filed with the Commission on May 2, 2014). |
| 10.8+ | Form of Executive Officer Severance Agreement (incorporated herein by reference to Exhibit 10.2 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on March 26, 2014). |
| 10.9+ | Form of Executive Officer Change of Control Agreement (incorporated herein by reference to Exhibit 10.1 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on March 26, 2014). |
| 10.10+ | Form of Restricted Stock Award for special bonus grants to executive officers and selected key managers of AK Steel (incorporated herein by reference to Exhibit 10.25 to AK Steel Holding Corporation's Annual Report on Form 10-K for the year ended December 31, 2004, as filed with the Commission on March 8, 2005). |
| 10.11+ | Form of the Performance Share Award Agreement for performance-based equity awards to executive officers and key managers of AK Steel (incorporated herein by reference to Exhibit 10.26 to AK Steel Holding Corporation's Annual Report on Form 10-K for the year ended December 31, 2004, as filed with the Commission on March 8, 2005). |

- 91-

*Table of Contents*

| Exhibit Number | Description |
|---|---|
| 10.12+ | AK Steel Holding Corporation Stock Incentive Plan, as amended and restated as of July 23, 2015 (incorporated by reference to Exhibit 10.1 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2015, as filed with the Commission on August 3, 2015). |
| 10.13+ | Long-Term Performance Plan, as amended and restated as of April 12, 2010 (incorporated herein by reference to Annex A to AK Steel Holding Corporation's Proxy Statement for its 2010 Annual Meeting of Stockholders held May 27, 2010, as filed with the Commission on April 12, 2010). |
| 10.14 | Amended and Restated Loan and Security Agreement, dated as of March 17, 2014, among AK Steel, as Borrower, and certain financial institutions as the lenders party thereto (incorporated herein by reference to Exhibit 10.1 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on March 18, 2014). |

A004821

10.14(a)    Joinder to Amended and Restated Loan and Security Agreement dated as of April 29, 2014, among AK Steel Corporation, AK Tube LLC and Bank of America, N.A., as agent for the Lenders (incorporated by reference to Exhibit 10.4 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2014, as filed with the Commission on May 2, 2014).

10.14(b)    First Amendment to Amended and Restated Loan and Security Agreement, dated as of September 16, 2014, among AK Steel Corporation, as Borrower, AK Tube LLC, as Borrowing Base Guarantor, certain financial institutions, as Lenders, and Bank of America, N.A., as agent for the Lenders (incorporated herein by reference to Exhibit 10.1 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on September 17, 2014).

10.15    Amended and Restated Operating Agreement of Magnetation LLC dated as of October 4, 2011 (incorporated herein by reference to Exhibit 10.1 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on October 5, 2011).

10.15(a)    Amendment No. 1, dated April 30, 2013, to Amended and Restated Operating Agreement of Magnetation LLC (incorporated by reference to Exhibit 10.1 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2013, as filed with the Commission on May 3, 2013).

10.16    Air Quality Facilities Loan Agreement dated as of February 1, 2012 between AK Steel Corporation and the Ohio Air Quality Development Authority - $36,000,000 Revenue Refunding Bonds, Series 2012-A (incorporated herein by reference to Exhibit 10.1 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on February 7, 2012).

10.16(a)    Guaranty Agreement dated as of April 29, 2014, by AK Tube LLC and AK Steel Properties, Inc. to Wells Fargo Bank, National Association, as trustee, pertaining to the Ohio Air Quality Development Authority - $36,000,000 Revenue Refunding Bonds, Series 2012-A (incorporated by reference to Exhibit 10.7 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2014, as filed with the Commission on May 2, 2014).

10.17    Loan Agreement dated as of February 1, 2012 between AK Steel Corporation and the City of Rockport, Indiana - $30,000,000 Revenue Refunding Bonds, Series 2012-A (incorporated herein by reference to Exhibit 10.2 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on February 7, 2012).

10.17(a)    Guaranty Agreement dated as of April 29, 2014, by AK Tube LLC and AK Steel Properties, Inc. to Wells Fargo Bank, National Association, as trustee, pertaining to City of Rockport, Indiana - $30,000,000 Revenue Refunding Bonds, Series 2012-A (incorporated by reference to Exhibit 10.8 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2014, as filed with the Commission on May 2, 2014).

10.18    Loan Agreement dated as of February 1, 2012 between AK Steel Corporation and the Butler County Industrial Development Authority - $7,300,000 Revenue Refunding Bonds, Series 2012-A (incorporated herein by reference to Exhibit 10.3 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on February 7, 2012).

*Table of Contents*

| Exhibit Number | Description |
| --- | --- |
| 10.18(a) | Guaranty Agreement dated as of April 29, 2014, by AK Tube LLC and AK Steel Properties, Inc. to Wells Fargo Bank, National Association, as trustee, pertaining to Butler County Industrial Development Authority - $7,300,000 Revenue Refunding Bonds, Series 2012-A (incorporated by reference to Exhibit 10.9 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2014, as filed with the Commission on May 2, 2014). |

10.19          Security Agreement dated as of November 20, 2012, among the AK Steel Corporation and U.S. Bank National Association, as trustee and collateral agent (incorporated herein by reference to Exhibit 10.3 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on November 20, 2012).

10.19(a)          Security Agreement Supplement dated as of April 29, 2014, among AK Steel Corporation, AK Tube LLC, AK Steel Properties, Inc. and U.S. Bank National Association, as trustee and collateral agent (incorporated by reference to Exhibit 10.5 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2014, as filed with the Commission on May 2, 2014).

10.20          Collateral Trust Agreement dated as of November 20, 2012, among AK Steel and U.S. Bank National Association, as trustee and collateral agent (incorporated by reference to Exhibit 10.4 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on November 20, 2012).

10.20(a)          Supplement to Collateral Trust Agreement dated as of April 29, 2014, among AK Steel Corporation, AK Tube LLC, AK Steel Properties, Inc. and U.S. Bank National Association, as trustee and collateral agent (incorporated by reference to Exhibit 10.6 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2014, as filed with the Commission on May 2, 2014).

10.21+          Form of Director and Officer Indemnification Agreement (incorporated by reference to Exhibit 10.1 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2013, as filed with the Commission on November 1, 2013).

10.22          Membership Interest Purchase Agreement, dated July 18, 2014, by and among Severstal Columbus Holdings, LLC, Severstal Dearborn, LLC and AK Steel Corporation (incorporated by reference to Exhibit 2.1 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on July 22, 2014).

*12.1          Statement re: Computation of Ratio of Earnings to Combined Fixed Charges.

*12.2          Statement re: Computation of Ratio of Earnings to Fixed Charges.

*21.1          Subsidiaries of AK Steel Holding Corporation.

*23.1          Consent of Ernst & Young LLP.

*31.1          Section 302 Certification of Chief Executive Officer.

*31.2          Section 302 Certification of Chief Financial Officer.

*32.1          Section 906 Certification of Chief Executive Officer.

*32.2          Section 906 Certification of Chief Financial Officer.

*95.1          Mine Safety Disclosure.

- 93-

*Table of Contents*

A004823

| Exhibit Number | Description |
|---|---|
| *101 | The following financial statements from the Annual Report on Form 10-K of AK Steel Holding Corporation for the year ended December 31, 2015, formatted in Extensible Business Reporting Language (XBRL): (i) the Consolidated Statements of Operations, (ii) the Consolidated Statements of Comprehensive Income (Loss), (iii) the Consolidated Balance Sheets, (iv) the Consolidated Statements of Cash Flows, (iv) the Consolidated Statements of Stockholders' Equity, and (vi) the Notes to Consolidated Financial Statements. |

\* Filed or furnished herewith, as applicable

\+ Management contract or compensatory plan or arrangement

- 94-

*Table of Contents*

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized in West Chester, Ohio, on February 19, 2016.

AK Steel Holding Corporation

(Registrant)

/s/ Jaime Vasquez

Jaime Vasquez

Vice President, Finance and Chief Financial Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below as of February 19, 2016 by the following persons on behalf of the registrant and in the capacities indicated.

| Signature & Title | Signature & Title |
|---|---|
| /s/ Roger K. Newport | /s/ Sheri H. Edison |
| Roger K. Newport | Sheri H. Edison |
| Chief Executive Officer and Director | Director |
| /s/ Jaime Vasquez | /s/ Mark G. Essig |
| Jaime Vasquez | Mark G. Essig |
| Vice President, Finance and Chief Financial Officer | Director |
| /s/ Gregory A. Hoffbauer | /s/ William K. Gerber |
| Gregory A. Hoffbauer | William K. Gerber |
| Vice President, Controller and Chief Accounting Officer | Director |
| /s/ James L. Wainscott | /s/ Robert H. Jenkins |
| James L. Wainscott | Robert H. Jenkins |
| Chairman of the Board | Director |
| /s/ Dr. James A. Thomson | /s/ Gregory B. Kenny |
| Dr. James A. Thomson | Gregory B. Kenny |

A004824

Lead Director                                          Director

/s/ Richard A. Abdoo                                  /s/ Ralph S. Michael, III
Richard A. Abdoo                                      Ralph S. Michael, III
Director                                              Director

/s/ John S. Brinzo                                    /s/ Vicente Wright
John S. Brinzo                                        Vicente Wright
Director                                              Director

/s/ Dennis C. Cuneo
Dennis C. Cuneo
Director

- 95-

A004825

# EXHIBIT 91

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2015

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from _____ to _____.

Commission File Number: 1-8944



## CLIFFS NATURAL RESOURCES INC.
*(Exact Name of Registrant as Specified in Its Charter)*

| Ohio | 34-1464672 |
|---|---|
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(I.R.S. Employer Identification No.)* |
| 200 Public Square, Cleveland, Ohio | 44114-2315 |
| *(Address of Principal Executive Offices)* | *(Zip Code)* |

**Registrant's Telephone Number, Including Area Code: (216) 694-5700**
**Securities registered pursuant to Section 12(b) of the Act:**

| <u>Title of Each Class</u> | <u>Name of Each Exchange on Which Registered</u> |
|---|---|
| Common Shares, par value $0.125 per share | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**
**NONE**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    YES ☐    NO ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    YES ☐    NO ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    YES ☒    NO ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    YES ☒    NO ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.    ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒    Accelerated filer ☐    Non-accelerated filer ☐    Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).    YES ☐    NO ☒

As of June 30, 2015, the aggregate market value of the voting and non-voting common shares held by non-affiliates of the registrant, based on the closing price of $4.33 per share as reported on the New York Stock Exchange — Composite Index, was $653,133,194 (excluded from this figure is the voting stock beneficially owned by the registrant's officers and directors).

The number of shares outstanding of the registrant's common shares, par value $0.125 per share, was 180,111,831 as of February 22, 2016.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's proxy statement for its 2016 annual meeting of shareholders are incorporated by reference into Part III.

Table of Contents

**TABLE OF CONTENTS**

|  |  | Page Number |
|---|---|---|
| **DEFINITIONS** |  | 1 |
| **PART I** |  |  |
| Item 1. | Business | 4 |
|  | Executive Officers of the Registrant | 19 |
| Item 1A. | Risk Factors | 19 |
| Item 1B. | Unresolved Staff Comments | 31 |
| Item 2. | Properties | 32 |
| Item 3. | Legal Proceedings | 38 |
| Item 4. | Mine Safety Disclosures | 42 |
| **PART II** |  |  |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 43 |
| Item 6. | Selected Financial Data | 45 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 48 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 83 |
| Item 8. | Financial Statements and Supplementary Data | 84 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 169 |
| Item 9A. | Controls and Procedures | 169 |
| Item 9B. | Other Information | 170 |
| **PART III** |  |  |
| Item 10. | Directors, Executive Officers and Corporate Governance | 171 |
| Item 11. | Executive Compensation | 171 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 171 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 171 |
| Item 14. | Principal Accountant Fees and Services | 171 |
| **PART IV** |  |  |
| Item 15. | Exhibits and Financial Statement Schedules | 172 |
| **SIGNATURES** |  | 173 |

Table of Contents

## DEFINITIONS

The following abbreviations or acronyms are used in the text. References in this report to the "Company," "we," "us," "our" and "Cliffs" are to Cliffs Natural Resources Inc. and subsidiaries, collectively. References to "A$" or "AUD" refer to Australian currency, "C$" to Canadian currency and "$" to United States currency.

| Abbreviation or acronym | Term |
|---|---|
| ABL Facility | Syndicated Facility Agreement by and among Bank of America, N.A., as Administrative Agent and Australian Security Trustee, the Lenders that are parties hereto, Cliffs Natural Resources Inc., as Parent and a Borrower, and the Subsidiaries of Parent party hereto, as Borrowers dated as of March 30, 2015 |
| Amapá | Anglo Ferrous Amapá Mineração Ltda. and Anglo Ferrous Logística Amapá Ltda. |
| AG | Autogenous Grinding |
| Anglo | Anglo American plc |
| APBO | Accumulated Postretirement Benefit Obligation |
| ArcelorMittal | ArcelorMittal (as the parent company of ArcelorMittal Mines Canada, ArcelorMittal USA and ArcelorMittal Dofasco Inc., as well as, many other subsidiaries) |
| ArcelorMittal USA | ArcelorMittal USA LLC (including many of its North American affiliates, subsidiaries and representatives. References to ArcelorMittal USA comprise all such relationships unless a specific ArcelorMittal USA entity is referenced) |
| ASC | Accounting Standards Codification |
| BAML | Bank of America Merrill Lynch |
| BART | Best Available Retrofit Technology |
| Bloom Lake | The Bloom Lake Iron Ore Mine Limited Partnership |
| Bloom Lake Group | Bloom Lake General Partner Limited and certain of its affiliates, including Cliffs Quebec Iron Mining ULC |
| BNSF | Burlington Northern Santa Fe, LLC |
| Canadian Entities | Collectively, the Bloom Lake Group, Wabush Group and certain other wholly-owned subsidiaries |
| CCAA | Companies' Creditors Arrangement Act (Canada) |
| CFR | Cost and freight |
| CLCC | Cliffs Logan County Coal LLC |
| Clean Water Act | Federal Water Pollution Control Act |
| CN | Canadian National Railway Company |
| $CO_2$ | Carbon Dioxide |
| Cockatoo Island | Cockatoo Island Joint Venture |
| Codification | FASB Accounting Standards Codification |
| CODM | Chief Operating Decision Maker |
| Compensation Committee | Compensation and Organization Committee of Cliffs' Board of Directors |
| Consent Order | Administrative Order by Consent |
| Consolidated Thompson | Consolidated Thompson Iron Mining Limited (now known as Cliffs Québec Iron Mining ULC) |
| CQIM | Cliffs Québec Iron Mining ULC (formerly known as Cliffs Québec Iron Mining Limited) |
| CSAPR | Cross-State Air Pollution Rule |
| DD&A | Depreciation, depletion and amortization |
| DEP | Department of Environmental Protection |
| Directors' Plan | Cliffs Natural Resources Inc. 2014 Nonemployee Directors' Compensation Plan |
| Dodd-Frank Act | Dodd-Frank Wall Street Reform and Consumer Protection Act |
| DR-grade pellets | Direct Reduction pellets |
| EAF | Electric Arc Furnace |
| EBITDA | Earnings before interest, taxes, depreciation and amortization |
| Empire | Empire Iron Mining Partnership |
| EPA | U.S. Environmental Protection Agency |
| EPS | Earnings per share |
| ERM | Enterprise Risk Management |
| Essar | Essar Steel Algoma Inc. |
| Exchange Act | Securities Exchange Act of 1934, as amended |
| FASB | Financial Accounting Standards Board |
| Fe | Iron |
| FeT | Total Iron |
| FIP | Federal Implementation Plan |
| FMSH Act | U.S. Federal Mine Safety and Health Act 1977, as amended |
| GAAP | Accounting principles generally accepted in the United States |

1

Table of Contents

| Abbreviation or acronym | Term |
| --- | --- |
| GHG | Greenhouse gas |
| Hibbing | Hibbing Taconite Company |
| IRS | U.S. Internal Revenue Service |
| Koolyanobbing | Collective term for the operating deposits at Koolyanobbing, Mount Jackson and Windarling |
| LIBOR | London Interbank Offered Rate |
| LIFO | Last-in, first-out |
| LTVSMC | LTV Steel Mining Company |
| MDEQ | Michigan Department of Environmental Quality |
| MISO | Midcontinent Independent System Operator |
| MMBtu | Million British Thermal Units |
| Moody's | Moody's Investors Service, Inc., a subsidiary of Moody's Corporation, and its successors |
| MPCA | Minnesota Pollution Control Agency |
| MPSC | Michigan Public Service Commission |
| MPUC | Minnesota Public Utilities Commission |
| MSHA | U.S. Mine Safety and Health Administration |
| MWh | Megawatts per hour |
| NAAQS | National Ambient Air Quality Standards |
| $NO_2$ | Nitrogen dioxide |
| $NO_x$ | Nitrogen oxide |
| Northshore | Northshore Mining Company |
| NPDES | National Pollutant Discharge Elimination System, authorized by the U.S. Clean Water Act |
| NRD | Natural Resource Damages |
| NSPS | New Source Performance Standards |
| NYSE | New York Stock Exchange |
| Oak Grove | Oak Grove Resources, LLC |
| OCI | Other comprehensive income (loss) |
| OPEB | Other postretirement benefits |
| OPEB cap | Medical premium maximums |
| P&P | Proven and Probable |
| PBO | Projected benefit obligation |
| Pinnacle | Pinnacle Mining Company, LLC |
| Reconciliation Act | Health Care and Education Reconciliation Act |
| ROA | Return on asset |
| RTWG | Rio Tinto Working Group |
| S&P | Standard & Poor's Rating Services, a division of Standard & Poor's Financial Services LLC, a subsidiary of The McGraw-Hill Companies, Inc., and its successors |
| SEC | U.S. Securities and Exchange Commission |
| Seneca | Seneca Coal Resources, LLC |
| Severstal | Severstal Dearborn, LLC |
| Silver Bay Power | Silver Bay Power Company |
| SIP | State Implementation Plan |
| $SO_2$ | Sulfur dioxide |
| Sonoma | Sonoma Coal Project |
| Spider | Spider Resources Inc. (now known as 9129561 Ontario Inc. after the amalgamation of Cliffs Chromite Far North Inc. and Cliffs Chromite Ontario Inc. in April 2015) |
| SSR | System Support Resource |
| STRIPS | Separate Trading of Registered Interest and Principal of Securities |
| Substitute Rating Agency | A "nationally recognized statistical rating organization" within the meaning of Section 3 (a)(62) of the Exchange Act, selected by us (as certified by a certificate of officers confirming the decision of our Board of Directors) as a replacement agency of Moody's or S&P, or both of them, as the case may be |
| Tilden | Tilden Mining Company |
| TMDL | Total Maximum Daily Load |
| TRIR | Total Reportable Incident Rate |
| TSR | Total Shareholder Return |
| United Taconite | United Taconite LLC |

A004830

Table of Contents

| Abbreviation or acronym | Term |
| --- | --- |
| U.S. | United States of America |
| U.S. Steel | United States Steel Corporation |
| USW | United Steelworkers |
| Vale | Companhia Vale do Rio Doce |
| VEBA | Voluntary Employee Benefit Association trusts |
| VWAP | Volume Weighted Average Price |
| Wabush | Wabush Mines Joint Venture |
| Wabush Group | Wabush Iron Co. Limited and Wabush Resources Inc., and certain of its affiliates, including Wabush Mines (an unincorporated joint venture of Wabush Iron Co. Limited and Wabush Resources Inc.), Arnaud Railway Company and Wabush Lake Railway Company |
| WISCO | Wugang Canada Resources Investment Limited, a subsidiary of Wuhan Iron and Steel (Group) Corporation |
| Zamin | Zamin Ferrous Ltd |
| 2008 Director's Plan | Nonemployee Directors' Compensation Plan, as amended and restated 12/31/2008 |
| 2012 Equity Plan | Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan |

3

Table of Contents

PART I

Item 1.        *Business*

**Introduction**

Cliffs Natural Resources Inc. traces its history back to 1847. Today, we are a leading mining and natural resources company in the United States. We are a major supplier of iron ore pellets to the North American steel industry from our mines and pellet plants located in Michigan and Minnesota. Additionally, Cliffs operates an iron ore mining complex in Western Australia. Driven by the core values of safety, social, environmental and capital stewardship, our employees endeavor to provide all stakeholders with operating and financial transparency.

We are organized through a global commercial group responsible for sales and delivery of our products and operations groups responsible for the production of the iron ore that we market. Our continuing operations are organized according to geographic location: U.S. Iron Ore and Asia Pacific Iron Ore.

In the U.S., we currently own or co-own  five iron ore mines in Michigan and Minnesota. We are currently operating the two iron mines in Michigan and one of the three iron ore mines in Minnesota. Two of our three iron ore operations in Minnesota are temporarily idled due to reductions in iron ore pellet nominations from our customers due to the continued oversupply of steel in the U.S. market as a result of record levels of imported steel which stems from excess supply in the global markets. Our Asia Pacific operations consist solely of our Koolyanobbing iron ore mining complex in Western Australia.

Also, for the majority of 2015, we operated two metallurgical coal operations in Alabama and West Virginia. In December 2015, we completed the sale of these operations, which marked our exit from the coal business. As of March 31, 2015, management determined that our North American Coal operating segment met the criteria to be classified as held for sale under *ASC 205, Presentation of Financial Statements* . As such, all current year and historical North American Coal operating segment results are included in our financial statements and classified within discontinued operations. Refer to NOTE 14 - DISCONTINUED OPERATIONS for further discussion of the North American Coal segment discontinued operations.

Additionally, we continue to own two non-operating iron ore mines in Eastern Canada that are currently in restructuring proceedings in Montreal, Quebec, under the CCAA. The CCAA filing related to our Eastern Canadian Iron Ore operations is more fully described below in the Business Segments section and in NOTE 14 - DISCONTINUED OPERATIONS. Financial results prior to the respective deconsolidations of the Bloom Lake and Wabush Groups and subsequent expenses directly associated with the Bloom Lake Group, Wabush Group and certain other wholly-owned subsidiaries (collectively, the "Canadian Entities") are included in our financial statements and classified within discontinued operations.

Unless otherwise noted, discussion of our business and results of operations in this Annual Report on Form 10-K refers to our continuing operations.

*The Company is Focused on our Core U.S. Iron Ore Business*

We continue to execute the strategy that was established in 2014, which focuses on becoming a company fully centered on our U.S. Iron Ore business. We are the market-leading iron ore producer in the U.S., supplying differentiated iron ore pellets under long-term contracts, some of which begin to expire in December 2016, to the largest North American steel producers. Cliffs has the unique advantage of being a low cost producer of iron ore pellets in the U.S. market with significant transportation and logistics advantages to effectively serve the U.S. steel market. Pricing structures contained in and the long-term supply provided by our existing contracts, along with our low-cost operating profile, positions U.S. Iron Ore as our most stable business. We expect to continue to strengthen our U.S. Iron Ore cost operating profile through continuous operational improvements and disciplined capital allocation policies. Strategically, we continue to develop various entry options into the EAF market.  As the EAF steel market continues to grow in the U.S., there is an opportunity for our iron ore to serve this market by providing pellets to the alternative metallics market to produce direct reduced iron pellets, hot briquetted iron and/or  pig iron.  In 2015, we produced and shipped a batch trial of DR-grade pellets, a source of lower silica iron units for the production of direct reduced  iron pellets. In early 2016, we reached a significant milestone with positive results from the successful industrial trial of our DR-grade pellets. While we are still in the early stages of developing our alternative metallic business, we believe this will open up a new opportunity for us to diversify our product mix and add new customers to our U.S. Iron Ore segment beyond the traditional blast furnace clientele.

4

Table of Contents

**Business Segments**

Our Company's continuing operations are organized and managed according to geographic location: U.S. Iron Ore and Asia Pacific Iron Ore.

Segment information reflects our business units, which are organized to meet customer requirements and global competition. We have historically evaluated segment performance based on sales margin, defined as revenues less cost of goods sold, and operating expenses identifiable to each segment. Additionally, beginning in the third quarter of 2014, concurrent with the change in control on July 29, 2014, management began to evaluate segment performance based on EBITDA, defined as net income (loss) before interest, income taxes, depreciation, depletion and amortization, and Adjusted EBITDA, defined as EBITDA excluding certain items such as impairment of goodwill and other long-lived assets, impacts of discontinued operations, extinguishment of debt, severance and contractor termination costs and other costs associated with the change in control, foreign currency remeasurement, certain supplies inventory write-offs, and intersegment corporate allocations of selling, general and administrative costs. Management uses and believes that investors benefit from referring to these measures in evaluating operating and financial results, as well as in planning, forecasting and analyzing future periods as these financial measures approximate the cash flows associated with the operational earnings. Financial information about our segments, including financial information about geographic areas, is included in *Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations* and NOTE 2 - SEGMENT REPORTING included in *Item 8. Financial Statements and Supplementary Data* of this Annual Report on Form 10-K.

*U.S. Iron Ore*

We are a major producer of iron ore pellets, primarily selling production from U.S. Iron Ore to integrated steel companies in the U.S. and Canada. We manage five iron ore mines located in Michigan and Minnesota. In Michigan, we are currently operating the two iron ore mines, Empire mine and Tilden mine. In Minnesota, we are currently operating one iron ore mine, Hibbing mine. The other two iron ore operations in Minnesota, United Taconite mine and Northshore mine, are temporarily idled due to reduced pellet demand from our customers. The idling of United Taconite mine began during August 2015 and the idling of Northshore mine began at the end of November 2015. Both mines are expected to be idled through at least the first quarter of 2016. The U.S.-based mines currently have an annual rated capacity of 32.9 million tons of iron ore pellet production, representing 56 percent of total U.S. pellet production capacity. Based on our equity ownership in these mines, our share of the annual rated production capacity is currently 25.5 million tons, representing 44 percent of total U.S. annual pellet capacity.

The following chart summarizes the estimated annual pellet production capacity and percentage of total U.S. pellet production capacity for each of the respective iron ore producers as of December 31, 2015:

**U.S. Iron Ore Pellet**

| Annual Rated Capacity Tonnage | | |
|---|---|---|
| | Current Estimated Capacity (Tons in Millions) [(1)] | Percent of Total U.S. Capacity |
| All Cliffs' managed mines | 32.9 | 56.3% |
| Other U.S. mines | | |
| U.S. Steel's Minnesota ore operations | | |
| Minnesota Taconite | 14.3 | 24.6 |
| Keewatin Taconite | 5.4 | 9.2 |
| Total U.S. Steel | 19.7 | 33.8 |
| ArcelorMittal USA Minorca mine | 2.8 | 4.8 |
| Magnetation | 3.0 | 5.1 |
| Total other U.S. mines | 25.5 | 43.7 |
| Total U.S. mines | 58.4 | 100.0% |

[(1)] Tons are long tons (2,240 pounds)

Our U.S. iron ore production generally is sold pursuant to long-term supply agreements with various price adjustment provisions. For the year ended December 31, 2015, we produced a total of 26.1 million tons of iron ore pellets, including 19.3 million tons for our account and 6.8 million tons on behalf of steel company partners of the mines.

Table of Contents

We produce various grades of iron ore pellets, including standard and fluxed, for use in our customers' blast furnaces as part of the steelmaking process. Additionally, as the EAF steel market continues to grow in the U.S., there is an opportunity for our iron ore to serve this market by providing pellets to the alternative metallics market to produce direct reduced iron pellets, hot briquetted iron and/or pig iron. In 2015, we produced and shipped a batch trial of DR-grade pellets, a source of lower silica iron units for the production of direct reduced iron pellets. In early 2016, we reached a significant milestone with positive results from the successful industrial trial of our DR-grade pellets. While we are still in the early stages of developing our alternative metallic business, we believe this will open up a new opportunity for us to diversify our product mix and add new customers to our U.S. Iron Ore segment beyond the traditional blast furnace clientele.

The variation in grades of iron ore pellets results from the specific chemical and metallurgical properties of the ores at each mine and whether or not fluxstone is added in the process. Although the grade or grades of pellets currently delivered to each customer are based on that customer's preferences, which depend in part on the characteristics of the customer's blast furnace operation, in many cases our iron ore pellets can be used interchangeably. Industry demand for the various grades of iron ore pellets depends on each customer's preferences and changes from time to time. In the event that a given mine is operating at full capacity, the terms of most of our pellet supply agreements allow some flexibility in providing our customers iron ore pellets from different mines.

Standard pellets require less processing, are generally the least costly pellets to produce and are called "standard" because no ground fluxstone, such as limestone or dolomite, is added to the iron ore concentrate before turning the concentrate into pellets. In the case of fluxed pellets, fluxstone is added to the concentrate, which produces pellets that can perform at higher productivity levels in the customer's specific blast furnace and will minimize the amount of fluxstone the customer may be required to add to the blast furnace.

Each of our U.S. Iron Ore mines is located near the Great Lakes. The majority of our iron ore pellets are transported via railroads to loading ports for shipment via vessel to steelmakers in North America.

Our U.S. Iron Ore sales are influenced by seasonal factors in the first quarter of the year as shipments and sales are restricted by the Army Corp of Engineers due to closure of the Soo Locks and the Welland Canal on the Great Lakes. During the first quarter, we continue to produce our products, but we cannot ship those products via lake vessel until the conditions on the Great Lakes are navigable, which causes our first and second quarter inventory levels to rise. Our limited practice of shipping product to ports on the lower Great Lakes or to customers' facilities prior to the transfer of title has somewhat mitigated the seasonal effect on first and second quarter inventories and sales, as shipment from this point to the customers' operations is not limited by weather-related shipping constraints. At December 31, 2015 and 2014, we had approximately 1.3 million and 1.4 million tons of pellets, respectively, in inventory at lower lakes or customers' facilities.

*U.S. Iron Ore Customers*

Our U.S. Iron Ore revenues primarily are derived from sales of iron ore pellets to the North American integrated steel industry, consisting of three major customers, two of which we currently have supply agreements. During the fourth quarter of 2015, we terminated the long term agreement with our third major customer as a result of the continual material breaches. Refer to the *Essar* section within *Concentration of Customers* below for further information. Generally, we have multi-year supply agreements with our customers. Sales volume under these agreements is largely is dependent on customer requirements, and in many cases, we are the sole supplier of iron ore to the customer. Historically, each agreement has contained a base price that is adjusted annually using one or more adjustment factors. Factors that could result in a price adjustment include spot pricing, measures of general industrial inflation and steel prices. Additionally, certain of our supply agreements have a provision that limits the amount of price increase or decrease in any given year.

During 2015, 2014 and 2013, we sold 17.3 million, 21.8 million and 21.3 million tons of iron ore pellets, respectively, from our share of the production from our U.S. Iron Ore mines. The segment's three major customers together accounted for a total of 93 percent, 86 percent and 78 percent of U.S. Iron Ore product revenues for the years 2015, 2014 and 2013, respectively. Refer to *Concentration of Customers* below for additional information regarding our major customers.

### Asia Pacific Iron Ore

Our Asia Pacific Iron Ore operations are located in Western Australia and consist solely of our wholly owned Koolyanobbing operation.

The Koolyanobbing operations serve the Asian iron ore markets with direct-shipped fines and lump ore. The lump products are fed directly to blast furnaces, while the fines products are used as sinter feed. The variation in the two export product grades reflects the inherent chemical and physical characteristics of the ore bodies mined as well as

6

the supply requirements of our customers. Production in 2015 was 11.7 million metric tons, compared with 11.4 million metric tons in 2014 and 11.1 million metric tons in 2013.

Koolyanobbing is a collective term for the deposits at Koolyanobbing, Mount Jackson and Windarling. There are approximately 70 miles separating the three mining areas. The operations at Windarling have been idled since the beginning of the fourth quarter of 2015 as a result of cost cutting measures. Banded iron formations host the mineralization, which is predominately hematite and goethite. Each deposit is characterized with different chemical and physical attributes and, in order to achieve customer product quality, ore in varying quantities from each deposit must be blended together.

Crushing and blending are undertaken at Koolyanobbing, where the crushing and screening plant is located. Once the blended ore has been crushed and screened into a direct lump and fines shipping product, it is transported by rail approximately 360 miles south to the Port of Esperance, via Kalgoorlie, for shipment to our customers in Asia.

*Asia Pacific Iron Ore Customers*

Asia Pacific Iron Ore's production is under contract with steel companies primarily in China, Japan and Korea. In March 2015, we extended the majority of our supply agreements with steel producers in China, and one steel producer in Japan, for two years. The remaining supply agreements with our China steel clients, as well as clients in Japan and Korea, will currently expire in March 2016, but we anticipate that the majority of these contracts will be renewed for the remainder of 2016 in conjunction with our customers' fiscal year. Pricing for our Asia Pacific Iron Ore Chinese customers consists of shorter-term pricing mechanisms of various durations up to 45 days based on the average of daily spot prices that are generally associated with the time of unloading of each shipment. Pricing with our Japanese and Korean customers is generally consistent with the inputs used with our Chinese customers, but the pricing inputs are fixed before shipment.

During 2015, 2014 and 2013, we sold 11.6 million, 11.5 million and 11.0 million metric tons of iron ore, respectively, from our Western Australia mines. No Asia Pacific Iron Ore customer comprised more than 10 percent of Cliffs consolidated sales in 2015, 2014 or 2013. The segment's five largest customers together accounted for a total of 47 percent, 38 percent and 42 percent of Asia Pacific Iron Ore product revenues for the years 2015, 2014 and 2013, respectively.

### North American Coal

Throughout the majority of 2015, we owned and operated two low-volatile metallurgical coal operations located in Alabama and West Virginia. These low-volatile metallurgical coal operations had a rated capacity of 6.5 million tons of production annually. In the fourth quarter of 2015, we sold these two low-volatile metallurgical coal operations, Pinnacle mine and Oak grove mine, marking our exit from the coal business. The sale was completed on December 22, 2015. In 2015, we sold a total of 4.6 million tons, compared with 7.4 million tons in 2014 and 7.3 million tons in 2013. In the fourth quarter of 2014, we sold our CLCC assets, which consisted of two high-volatile metallurgical coal mines and a thermal coal mine. The sale was completed on December 31, 2014. Sales tons at the CLCC operations were 2.4 million tons and 2.2 million tons for the years ended December 31, 2014 and 2013, respectively, and are included in the sales tons disclosed above.

As of March 31, 2015, management determined that our North American Coal operating segment met the criteria to be classified as held for sale under *ASC 205, Presentation of Financial Statements*. As such, all current year and historical North American Coal operating segment results are included in our financial statements and classified within discontinued operations. Refer to NOTE 14 - DISCONTINUED OPERATIONS for further discussion of the North American Coal segment discontinued operations.

### Eastern Canadian Iron Ore

We continue to own two iron ore mines in Eastern Canada that are currently in restructuring proceedings in Montreal, Quebec, under the CCAA.

As disclosed in the first quarter of 2014, at the end of March 2014, we idled our Wabush Scully mine in Newfoundland and Labrador and in November 2014, we began to implement the permanent closure plan for the mine. The idle and ultimate closure was driven by the unsustainable high cost structure. Additionally, we disclosed in November 2014, that we were pursuing exit options for our Bloom Lake mine. As disclosed in January 2015, active production at the Bloom Lake mine had ceased and the mine had transitioned to "care-and-maintenance" mode. Together, the shutdown of the Wabush Scully mine and the cessation of operations at our Bloom Lake mine represented a complete curtailment of our Eastern Canadian Iron Ore operations.

During 2014 and 2013, we sold 7.2 million and 8.6 million metric tons of iron ore concentrate and pellets, respectively, from our Eastern Canadian Iron Ore mines.

7

Table of Contents

As more fully described in NOTE 14 - DISCONTINUED OPERATIONS , in January 2015, we announced that the Bloom Lake Group commenced restructuring proceedings in Montreal, Quebec under the CCAA. At that time, we had recently suspended Bloom Lake operations and for several months had been exploring options to sell certain of our Canadian assets, among other initiatives. Effective January 27, 2015, following the CCAA filing of the Bloom Lake Group, we deconsolidated the Bloom Lake Group and certain other wholly-owned subsidiaries comprising substantially all of our Canadian operations. Additionally, on May 20, 2015, the Wabush Group commenced restructuring proceedings in Montreal, Quebec under the CCAA which resulted in the deconsolidation of the remaining Wabush Group entities that were not previously deconsolidated. The Wabush Group was no longer generating revenues and was not able to meet its obligations as they came due. As a result of this action, the CCAA protections granted to the Bloom Lake Group were extended to include the Wabush Group to facilitate the reorganization of each of their businesses and operations. Financial results prior to the respective deconsolidations of the Bloom Lake and Wabush Groups and subsequent expenses directly associated with the Canadian Entities are included in our financial statements and classified within discontinued operations.

Refer to NOTE 14 - DISCONTINUED OPERATIONS for further discussion of the Eastern Canadian Iron Ore segment discontinued operations.

**Investments**

*Amapá*

On December 27, 2012, our Board of Directors authorized the sale of our  30 percent interest in Amapá. Per this original agreement, together with Anglo, we were to sell our respective interest in a 100 percent sale transaction to Zamin.

On March 28, 2013, an unknown event caused the Santana port shiploader to collapse into the Amazon River, preventing further ship loading by the mine operator, Anglo.  In light of the Santana port shiploader collapse and subsequent evaluation of the effect that this event had on the carrying value of our investment in Amapá as of June 30, 2013, we recorded an impairment charge of $67.6 million in the second quarter of 2013.

On August 28, 2013, we entered into additional agreements to sell our  30 percent interest in Amapá to Anglo for nominal cash consideration, plus the right to certain contingent deferred consideration upon the two-year anniversary of the closing. However, no contingent deferred consideration was earned upon the two-year anniversary. The closing was conditional on obtaining certain regulatory approvals and the additional agreement provided Anglo with an option to request that we transfer our interest in Amapá directly to Zamin.  Anglo exercised this option and the transfer to Zamin closed in the fourth quarter of 2013. Our interest in Amapá previously was reported as our Latin American iron ore operating segment.

**Applied Technology, Research and Development**

We have been a leader in iron ore mining and process technology for more than 160 years. We operated some of the first mines on Michigan's Marquette Iron Range and pioneered early open-pit and underground mining methods. From the first application of electrical power in Michigan's underground mines to the use of today's sophisticated computers and global positioning satellite systems, we have been a leader in the application of new technology to the centuries-old business of mineral extraction. Today, our engineering and technical staffs are engaged in full-time technical support of our operations and improvement of existing products.

We are a pioneer in iron ore pelletizing with over 60 years of experience. We are able to produce customized pellets to meet each customer's blast furnace specifications, and produce both standard and fluxed pellets. Using our technical expertise and strong market position in the United States to increase our product offering, we have been working on producing DR-grade pellets. In 2015, we produced and shipped a batch trial of DR-grade pellets, a source of lower silica iron units for the production of direct reduced iron pellets. In early 2016, we reached a significant milestone with positive results from the successful industrial trial of our DR-grade pellets.

With state-of-the-art equipment and experienced technical professionals, we remain on the forefront of mining technology. We have an unsurpassed reputation for our pelletizing technology, delivering a world-class quality product to our customers. We are a pioneer in the development of emerging reduction technologies, a leader in the extraction of value from challenging resources and a frontrunner in the implementation of safe and sustainable technology. Our technical experts are dedicated to excellence and deliver superior technical solutions tailored to our customer base.

A004836

Table of Contents

**Concentration of Customers**

In 2015, 2014 and 2013 we had three customers that individually accounted for more than 10 percent of our consolidated product revenue. Product revenue from those customers represented in the chart below totaled approximately $1.3 billion, $1.9 billion and $1.9 billion of our total consolidated product revenue in 2015, 2014 and 2013, respectively, and is attributable to our U.S. Iron Ore business segment. The following represents sales revenue from each of these customers as a percentage of our total consolidated product revenue, as well as the portion of product sales for U.S. Iron Ore that is attributable to each of these customers in 2015, 2014 and 2013, respectively:

| Customer [2] | Percentage of Total Product Revenue [1] | | |
|---|---|---|---|
| | **2015** | 2014 | 2013 |
| ArcelorMittal | **37%** | 29% | 24% |
| AK Steel [3] | **21%** | 20% | 14% |
| Essar [4] | **12%** | 13% | 14% |

[1] Excluding freight and venture partners' cost reimbursements.

[2] Includes subsidiaries.

[3] Effective September 16, 2014, AK Steel completed the acquisition of Severstal North America's integrated steelmaking assets located in Dearborn, Michigan. For comparative purposes, we have combined historical data for all periods presented.

[4] On October 5, 2015, we terminated the long term agreement with Essar.

| Customer [2] | Percentage of U.S. Iron Ore Product Revenue [1] | | |
|---|---|---|---|
| | **2015** | 2014 | 2013 |
| ArcelorMittal | **49%** | 40% | 36% |
| AK Steel [3] | **29%** | 28% | 21% |
| Essar [4] | **15%** | 18% | 21% |

[1] Excluding freight and venture partners' cost reimbursements.

[2] Includes subsidiaries.

[3] Effective September 16, 2014, AK Steel completed the acquisition of Severstal North America's integrated steelmaking assets located in Dearborn, Michigan. For comparative purposes, we have combined historical data for all periods presented.

[4] On October 5, 2015, we terminated the long term agreement with Essar.

***ArcelorMittal USA***

Our pellet supply agreements with ArcelorMittal USA are the basis for supplying pellets to ArcelorMittal USA, which is based on customer requirements, except for the Indiana Harbor East facility, which is based on customer contract obligations. The following table outlines the expiration dates for each of the respective agreements:

| Facility | Agreement Expiration |
|---|---|
| Cleveland Works and Indiana Harbor West facilities | December 2016 |
| Indiana Harbor East facility | January 2017 |

ArcelorMittal USA is a 62.3 percent equity participant in Hibbing, as well as, a 21.0 percent equity partner in Empire with limited rights and obligations.

In 2015, 2014 and 2013, our U.S. Iron Ore pellet sales to ArcelorMittal were 9.7 million, 10.2 million and 9.5 million tons, respectively.

9

### AK Steel

On September 16, 2014, AK Steel announced an acquisition of Severstal North America's integrated steelmaking assets located in Dearborn, Michigan. We had a long-term relationship to supply iron ore pellets to Severstal's steelmaking assets at that location. Upon consummation of the acquisition, the contract was automatically assigned to AK Steel. The combination of sales pursuant to our preexisting sales agreement with AK Steel and the acquisition of the Dearborn facility with its sales agreement accounts for more than 10 percent of our consolidated product revenue in 2015, 2014 and 2013.

On August 29, 2013 we entered into a new agreement with AK Steel to provide iron ore pellets to AK Steel for use in its Middletown, Ohio and Ashland, Kentucky blast furnace facilities. This contract includes minimum and maximum tonnage requirements for each year between 2014 and 2023.

Under the original agreement entered into with Severstal in 2006, we supply all of the Dearborn, Michigan facility's blast furnace pellet requirements through 2022, subject to specified minimum and maximum requirements in certain years. AK Steel was the successor by merger of this contract and it remains in force. In September 2014, we entered into an amendment to the Dearborn contract with AK Steel to document the 2013 base pricing provisions, among other things, which resulted from an arbitration ruling in May 2014.

In 2015, 2014 and 2013, our U.S. Iron Ore pellet sales to AK Steel and the acquired Dearborn facility were 4.3 million, 5.8 million and 4.1 million tons, respectively.

### Essar

Essar Steel Algoma Inc. ("Essar") is a Canadian steelmaker and a subsidiary of Essar Steel Holdings Limited. We had a long term supply agreement under which we were Essar's sole supplier of iron ore pellets through the end of 2016 and were required to deliver a set tonnage for less than Essar's entire requirements through 2024. There were multiple contract disputes that led to us filing a complaint in the Federal District Court in the Northern District of Ohio on January 12, 2015. During the litigation process we asserted additional claims of material breach as a result of Essar's actions during the 2015 calendar year.

On October 5, 2015, Cliffs terminated the long term agreement with Essar as a result of Essar's multiple and material breaches and ceased to supply Essar with pellets. On November 9, 2015, Essar filed for CCAA and Chapter 15 bankruptcy protection. We do not currently supply pellets to Essar and whether we will be required to supply pellets in the future is undetermined at this time. The Canadian Superior Court may require Cliffs to supply Essar under the terms of the agreement or other terms. Essar moved the Canadian CCAA Court to enter an injunction requiring us to supply pellets. We filed a motion to remove the case to Ohio due to the CCAA Court's lack of jurisdiction. On January 25, 2016, the CCAA Court determined that it has jurisdiction over the issue. We remain open to discussing supplying pellets on commercially reasonable terms consistent with a just-in-time iron ore supply arrangement. Our obligation during 2015 was also undetermined and was a claim that was to be determined in the U.S. litigation. We delivered approximately 2.5 million tons in 2015 prior to termination for which we received payment, but of that amount, approximately 860 thousand tons were carryover tons. Pricing under the terminated agreement had been based on a formula that includes international pellet prices.

In 2015, 2014 and 2013, our U.S. Iron Ore pellet sales to Essar were 2.5 million, 3.5 million and 3.4 million tons, respectively.

## Competition

Throughout the world, we compete with major and junior mining companies, as well as metals companies, both of which produce steelmaking raw materials, including iron ore.

### North America

In our U.S. Iron Ore business segment, we primarily sell our product to steel producers with operations in North America. We compete directly with steel companies that own interests in iron ore mines in the United States and/or Canada, including ArcelorMittal and U.S. Steel, and with major iron ore pellet exporters from Eastern Canada and Brazil. Additionally, in 2015, finished steel import market share was a record 29 percent in the U.S., up from 28 percent in 2014. As a result, steel utilization rates in North America were recorded at multi-year lows. The reduced demand for U.S. produced steel negatively affects the demand for iron ore pellets within North America.

10

A004838

A number of factors beyond our control affect the markets in which we sell our iron ore. Continued demand for our iron ore and the prices obtained by us primarily depend on the consumption patterns of the steel industry in the U.S., China and elsewhere around the world, as well as the availability, location, cost of transportation and competing prices.

### Asia Pacific

In our Asia Pacific Iron Ore business segment, we export iron ore products to the Asia Pacific markets, including China, Japan, Korea and Taiwan. In the Asia Pacific marketplace, we compete with major iron ore exporters from Australia, Brazil and South Africa. These include Anglo, BHP Billiton, Fortescue Metals Group Ltd., Rio Tinto plc and Vale, among others.

Competition in steelmaking raw materials is predicated upon the usual competitive factors of price, availability of supply, product quality and performance, service and transportation cost to the consumer of the raw materials.

## Environment

Our mining activities are subject to various laws and regulations governing the protection of the environment. We conduct our operations in a manner that is protective of public health and the environment and believe our operations are in compliance with applicable laws and regulations in all material respects.

Environmental issues and their management continued to be an important focus at each of our operations throughout 2015. In the construction of our facilities and in their operation, substantial costs have been incurred and will continue to be incurred to avoid undue effect on the environment. Our capital expenditures relating to environmental matters totaled approximately $17 million, $33 million and $32 million, in 2015, 2014 and 2013, respectively. Approximately $5 million, $3 million and $5 million of the 2015, 2014 and 2013 capital expenditures, respectively, relating to environmental matters is attributable to the North American Coal operations that were sold during December 2015. Additionally, approximately $22 million and $14 million of the 2014 and 2013 capital expenditures, respectively, relating to environmental matters, but excluding any expenditures relating to the Bloom Lake tailings and water management system, is attributable to the Eastern Canadian Iron Ore operations that are currently in restructuring proceedings under the CCAA. It is estimated that capital expenditures for environmental improvements will total approximately $26 million in 2016 which is related to our U.S. Iron Ore operations for various water treatment, air quality, dust control, selenium management, tailings management and other miscellaneous environmental projects.

### Regulatory Developments

Various governmental bodies continually promulgate new or amended laws and regulations that affect our Company, our customers and our suppliers in many areas, including waste discharge and disposal, the classification of materials and products, air and water discharges and many other environmental, health and safety matters. Although we believe that our environmental policies and practices are sound and do not expect that the application of any current laws or regulations reasonably would be expected to result in a material adverse effect on our business or financial condition, we cannot predict the collective adverse impact of the expanding body of laws and regulations.

Specifically, there are several notable proposed or potential rulemakings or activities that could potentially have a material adverse impact on our facilities in the future depending on their ultimate outcome: Climate Change and GHG Regulation, Regional Haze, $NO_2$ and $SO_2$ National Ambient Air Quality Standards, Cross State Air Pollution Rule, increased administrative and legislative initiatives related to mining activities, Mercury TMDL and Minnesota Taconite Mercury Reduction Strategy's evolving water quality standards for selenium, sulfate and conductivity and scope of the Clean Water Act and definition of "Waters of the United States".

11

*Climate Change and GHG Regulation*

With the complexities and uncertainties associated with the U.S. and global navigation of the climate change issue as a whole, one of our significant risks for the future is mandatory carbon legislation. Policymakers are in the design process of carbon regulation at the state, regional, national and international levels. The current regulatory patchwork of carbon compliance schemes presents a challenge for multi-facility entities to identify their near-term risks. Amplifying the uncertainty, the dynamic forward outlook for carbon regulation presents a challenge to large industrial companies to assess the long-term net impacts of carbon compliance costs on their operations. Our exposure on this issue includes both the direct and indirect financial risks associated with the regulation of GHG emissions, as well as potential physical risks associated with climate change. We are continuing to review the physical risks related to climate change utilizing a formal risk management process. As an energy-intensive business, our GHG emissions inventory captures a broad range of emissions sources, such as iron ore furnaces and kilns, diesel mining equipment and our wholly owned Silver Bay power generation plant, among others. As such, our most significant regulatory risks are: (1) the costs associated with on-site emissions levels (direct impacts), and (2) the costs passed through to us from power generators and distillate fuel suppliers (indirect impacts).

Internationally, mechanisms to reduce emissions are being implemented in various countries, with differing designs and stringency, according to resources, economic structure and politics. We expect that momentum to extend carbon regulation will continue with passage of the "Paris Climate Agreement" to keep global temperature rise to below two degrees Celsius. Continued political attention to issues concerning climate change, the role of human activity in it and potential mitigation through regulation may have a material impact on the company's customer base, operations and financial results in the future.

In the U.S., federal carbon regulation potentially presents a significantly greater impact to our operations. To date, the U.S. Congress has not legislated carbon constraints. In the absence of comprehensive federal carbon legislation, numerous state, regional, and federal regulatory initiatives are under development or are becoming effective, thereby creating a disjointed approach to carbon control. On May 13, 2010, the U.S. EPA promulgated the GHG Tailoring Rule establishing a mechanism for regulating GHG emissions from facilities through the Prevention of Significant Deterioration permitting program under the CAA. Under the GHG Tailoring Rule, as modified by the recent U.S. Supreme Court decision upholding some components of the rule, new projects that increase GHG emissions by a significant amount (generally more than 75,000 tons of $CO_2$ emissions per year) are subject to the PSD requirements, including the installation of best available control technology, if the project also significantly increases emissions of at least one non-GHG regulated criteria pollutant. We do not expect the Tailoring Rule provision to materially adversely affect our business in the near term and we cannot reliably estimate the long term impact of the regulation.

On June 25, 2013, President Obama issued a memorandum directing the EPA to develop carbon emission standards for both new and existing power plants under the Clean Air Act's NSPS. On October 23, 2015, EPA promulgated the "Clean Power Plan" which consists of NSPS regulating carbon dioxide from existing power plants at a level of approximately 32 percent below 2005 levels by 2030. States must submit Clean Power Plan SIPs by September 2016, though extension waivers until 2018 are available. These rules do not affect our Silver Bay combined heat and power generating facility. We anticipate that EPA will continue to work on additional GHG NSPS regulations for other industrial categories, including the iron and steel industry, however we cannot reliably estimate the timing or long term impact of future NSPS regulations.

Due to the EPA's Tailoring Rule and GHG NSPS regulations our business and customer base could suffer negative financial impacts over time as a result of increased energy, environmental and other costs in order to comply with the limitations that would be imposed on greenhouse gas emissions. We believe our exposure can be reduced substantially by numerous factors, including currently contemplated regulatory flexibility mechanisms, such as allowance allocations, fixed process emissions exemptions, offsets and international provisions; emissions reduction opportunities, including energy efficiency, biofuels, fuel flexibility, emerging shale gas, coal mine methane offset reduction; and business opportunities associated with pursuing combined heat and power partnerships and new products, including DRI pellets, fluxed pellets and other technology.

We have worked proactively to develop a comprehensive, enterprise-wide GHG management strategy aimed at considering all significant aspects associated with GHG initiatives to plan effectively for and manage climate change issues, including risks and opportunities as they relate to the environment, stakeholders, including shareholders and the public, legislative and regulatory developments, operations, products and markets.

12

Table of Contents

*Regional Haze*

In June 2005, the EPA finalized amendments to its regional haze rules. The rules require states establish goals and emission reduction strategies for improving visibility in all Class I national parks and wilderness areas. Among the states with Class I areas are Michigan and Minnesota in which we currently own and manage mining operations. The first phase of the regional haze rule (2008-2018) requires analysis and installation of BART on eligible emission sources and incorporation of BART and associated emission limits into SIPs.

Minnesota submitted a regional haze SIP to the EPA on December 30, 2009, and a supplement to the SIP on May 8, 2012. Michigan submitted its regional haze SIP to the EPA on November 5, 2010. During the second quarter of 2012, the EPA also sent information requests to all taconite facilities requesting information on $SO_2$ and NOx emissions and control technology assessments. On June 12, 2012, the EPA approved revisions to the Minnesota SIP addressing regional haze, but also announced it was deferring action on emission limitations that Minnesota intended to represent BART for taconite facilities. On August 15, 2012, the EPA proposed to deny the Michigan and Minnesota taconite SIP BART determinations and simultaneously proposed a separate FIP for taconite facilities. During the comment period for the proposed FIP rule, the taconite industry and other stakeholders developed detailed comments and shared information to address furnace specific case-by-case circumstances. On January 15, 2013, the EPA signed the final FIP for taconite facilities. The final FIP reflects progress toward a more technically and economically feasible regional haze implementation plan and eliminates the need for investing in additional $SO_2$ emission control equipment. However, we remain concerned about the technical and economic feasibility of EPA's BART determination for NOx emissions and we filed a petition for review in the 8th Circuit Court and subsequently received a judicial stay of the FIP which enabled us to conduct a detailed engineering analysis to determine the impact of the regulations on each unique iron ore indurating furnace affected by this rule. The results of this analysis enabled us to reach a settlement with EPA which was incorporated into an amended rule and public noticed in the Federal Register on October 22, 2015. Cost estimates associated with the settlement are reflected in our 5-year capital plan.

*NO$_2$ and SO$_2$ National Ambient Air Quality Standards*

During the first half of 2010, the EPA promulgated rules that require states to use a combination of air quality monitoring and computer modeling to determine areas of each state that are in attainment with new $NO_2$ and $SO_2$ standards and those areas that are not in attainment with such standards. During the third quarter of 2011, the EPA issued guidance to the regulated community on conducting refined air quality dispersion modeling and implementing the new $NO_2$ and $SO_2$ standards. During June 2011, our Minnesota iron ore mining operations received a request from the MPCA to develop modeling and compliance plans by which each facility would demonstrate compliance with the $NO_2$ and $SO_2$ NAAQS pursuant to the Taconite Regional Haze SIP Long Term Strategy (LTS). Compliance with the LTS modeling demonstrations was originally set for June 30, 2017. On August 20, 2015, EPA released its final Data Requirement Rule (DRR) for characterizing $SO_2$ sources under the 2010 1 Hr $SO_2$ NAAQS. Cliffs' operation subject to the $SO_2$ DRR, Northshore Mining, is anticipated to demonstrate compliance with the $SO_2$ DRR without incurring additional capital investment. All of our other operations in Minnesota and Michigan are expected to be in attainment for $NO_2$ and $SO_2$ NAAQS without incurring additional capital investment. Further, Minnesota is expected to remove NAAQS modeling obligations under the LTS in light of reduction in haze emissions associated with pending amendment of the taconite Regional Haze FIP regulations. While we will continue to monitor these developments and assess potential impacts to Cliffs, we do not anticipate further capital investments will be necessary for the pending $NO_2$ and $SO_2$ DRR SIP rulemaking.

*Cross State Air Pollution Rule*

On July 6, 2011, the EPA promulgated the CSAPR, which was intended to be an emissions trading rule for $SO_2$ and NOx. Northshore's Silver Bay Power Plant would have been subject to this rule; however Minnesota elected to follow EPA guidance allowing CSAPR to stand as BART. CSAPR was vacated by the D.C. Circuit Court during the third quarter of 2012. Late in 2014, the Supreme Court re-instated CSAPR with an effective date of January 1, 2015, re-instating the obligations of this rule for Silver Bay Power. In January, 2016, the 8th Circuit Court of Appeals re-affirmed EPA use of CSAPR is equal to or better than BART. Immediate compliance obligations are being met at this time, with the material obligation being procurement of the first year of emissions allowances by March 2016 for the 2015 operating year. Silver Bay Power has installed low NOx burners to reduce emissions that will limit the cost exposure to the emission trading market. The allowance pricing market indicates the annual costs to comply with CSAPR will be less than $0.2 million for 2015 and future allowance prices are anticipated to remain favorable under the existing framework. While we will continue to monitor the availability and pricing of CSAPR allowances and future EPA allocations of CSAPR allowances to Northshore's Silver Bay Power Plant, we do not anticipate exposure to material costs for existing CSAPR obligations and we cannot reasonably estimate the long term impact of CSAPR should EPA reduce the allocations in response to future lower ozone or PM2.5 regulations.

13

A004841

*Mercury TMDL and Minnesota Taconite Mercury Reduction Strategy*

TMDL regulations are contained in the Clean Water Act. As a part of Minnesota's Mercury TMDL Implementation Plan, in cooperation with the MPCA, the taconite industry developed a Taconite Mercury Reduction Strategy and signed a voluntary agreement in 2009 to effectuate its terms. The strategy includes a 75 percent target reduction of mercury air emissions from Minnesota pellet plants collectively by 2025. It recognizes that mercury emission control technology currently does not exist and will be pursued through a research effort. According to the voluntary agreement, any developed technology must meet the "adaptive management criteria" such that the technology must be economically feasible, must not impact pellet quality, and must not cause excessive corrosion in pellet furnaces, associated duct work and existing wet scrubbers on the furnaces.

According to the voluntary agreement, the mines proceeded with medium- and long-term testing of possible technologies. For Cliffs, the requirements in the voluntary agreement apply to the United Taconite and Hibbing facilities. At this time, we are unable to predict the potential impacts of the voluntary Taconite Mercury Reduction Strategy. However, a number of research projects were conducted between 2011 and 2014 as the industry continues to assess options for reduction. While injection of powdered activated carbon into furnace off-gasses for mercury capture in the wet scrubbers showed positive initial results, further testing during 2013 yielded lower overall potential. Alternate technologies are presently being assessed in our ongoing efforts to develop cost effective mercury reduction technologies for our indurating furnaces.

On September 22, 2014, Minnesota promulgated the Mercury Air Emissions Reporting and Reduction Rule mandating mercury air emissions reporting and reduction. The adopted rule expanded applicability to all of our Minnesota operations and requires submitting a mercury reduction plan in 2018 to reduce mercury emissions from all of our Minnesota taconite furnaces by 72 percent by January 2025. The adopted rule does not include all four Adaptive Management Criteria for evaluating mercury reduction, which were agreed upon in the October 2009 Minnesota's Mercury TMDL Implementation Plan.

To date, there is currently no proven technology to cost effectively reduce mercury emissions from taconite furnaces to the target level of 72 percent that would meet all four Adaptive Management Criteria. We remain concerned about the technical and economic feasibility to reduce taconite mercury emissions by 72 percent and are conducting detailed engineering analysis to determine the impact of the regulations on each unique iron ore indurating furnace affected by this rule. The results of this analysis will guide further dialog with the MPCA regarding our implementation of the requirements. Because development of the technology is in the early stages, any impacts to Cliffs are not estimable at this time.

*Selenium Discharge Regulation*

In Michigan, Empire and Tilden have developed compliance strategies to manage selenium according to the permit conditions. Empire and Tilden submitted the first permit required Selenium Storm Water Management Plan to the MDEQ in December 2011; and have updated it annually as required. The Selenium Storm Water Management Plan outlines the activities that will be undertaken to address selenium in storm water discharges from our Michigan operations. A prefeasibility engineering estimate for full scale implementation of the storm water collection and conveyance system by November 2017 is approximately $24 million and is included in the 5-year capital plan. A storm water treatment system for both facilities is anticipated sometime before 2025. The cost of the future treatment systems could be significant, although we are continuing to assess and develop cost effective and sustainable treatment technologies.

Tilden's NPDES permit contains a compliance schedule for selenium with a limit of five µg/l that will be effective as of November 1, 2017, at Tilden's Gribben Tailings Basin outfall. Tilden initiated a prudent and feasible alternatives analysis to further define solutions and cost estimates. An engineering estimate for the selected suite of solutions indicates capital costs will be less than $23 million. In July 2015, the EPA proposed new selenium fish tissue limits and lower lentic and lotic water column concentration criteria which may increase the cost for treatment. We are incorporating this contingency into our planning and treatment technology assessment.

14

*Definition of "Waters of the United States" Under the Clean Water Act*

The EPA and Army Corps of Engineers' promulgated the rule, "Definition of 'Waters of the United States' Under the Clean Water Act," 80 Fed. Reg. 37053 (June 29, 2015), which attempted to add clarity to which waters are jurisdictional under the federal Clean Water Act, and will apply to all Clean Water Act programs, including the Sec. 402 and Sec. 404 permitting programs, Sec. 311 spill prevention program and Sec. 401 state certification process. It is unclear how the federal and state agencies will implement and enforce the final rule, and how the courts will interpret going forward. The regulation may expand EPA's authority under the Clean Water Act to many traditionally unregulated mine features such as mine pits, pit lakes, on site ditches, water retention structures, and tailings basins creating a new burden on our U.S. facilities. This could further be interpreted to add questionable regulatory authority over the groundwater connections between these features and nearby traditionally navigable waters. On October 9, 2015, the U.S. Court of Appeals for the Sixth Circuit issued a nationwide stay of this rule while the jurisdiction and legality of the rule are decided in court. We are actively participating in the rulemaking development and assessing the potential impacts to our operations. Because the rule is being litigated, and until the rule is finally implemented, any impacts to Cliffs are not estimable at this time.

*Minnesota's Proposed Sulfate Wild Rice Water Quality Standard*

The Minnesota Legislature provided $1.5 million in 2011 for a study to gather additional information about the effects of sulfate and other substances on the growth of wild rice, and to support an update to the sulfate wild rice water quality standard originally adopted in 1973 by the MPCA. The MPCA contracted with the University of Minnesota to conduct several research projects as part of this study. Concurrently, the Minnesota Chamber of Commerce contracted an independent lab to conduct companion research on the impacts of sulfate on wild rice. In March 2015, MPCA released a draft proposal for protecting wild rice from sulfate, which included a draft sulfate wild rice water quality standard, a draft list of waters where the standard would apply, and criteria for adding waters to that list. The draft wild rice water quality standard is an equation that utilizes measured sediment parameters to calculate a sulfate limit protective of wild rice. The independent research conducted by the independent lab contracted by the Minnesota Chamber of Commerce does not directly support the validity of the MPCA's proposed approach. The rulemaking has a legislated deadline for completion of January 15, 2018. Due to the proposed standard being based on measured sediment parameters that Cliffs is not in possession of near our operating facilities, and uncertainty regarding which waters the standard will apply to, the impacts of the proposed wild rice water quality standard to Cliffs are not estimable at this time.

*Conductivity*

Conductivity, the measurement of water's ability to conduct electricity, is a surrogate parameter that generally increases as the amount of dissolved minerals in water increases. In 2011, the EPA issued "A Field-Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams" which established a recommended conductivity benchmark of 300 µS/cm for the region. The issuance of a benchmark outside of the established rulemaking process was subsequently the subject of litigation in National Mining Association v. Jackson, 880 F. Supp. 2d 119 (D.D.C. 2012) where the court ruled the benchmark is nothing more than a non-binding suggestion. Three years later in Ohio Valley Environmental Coalition, et al. v. Elk Run Coal Co., et al. , 3:12-cv-00785 (S.D. W. Va.), a judicial decision held that levels of conductivity higher than the EPA's benchmark constituted a violation of the state's narrative water quality standards, were unsupported by science and contrary to decisions previously made by the West Virginia DEP and the West Virginia Supreme Court. In 2015, a group filed a petition with EPA Region 5 alleging that Minnesota was failing to properly implement the state NPDES program; and one of the various allegations asserts that MPCA should be assessing compliance with the state's narrative water quality standard against the EPA's conductivity benchmark for the Central Appalachian region. On December 30, 2015, the EPA provided MPCA a draft of the Protocol for Responding to Issues Related to Permitting and Enforcement which indicates that EPA staff will be reviewing available scientific basis in peer reviewed literature as well as promulgated standards. Since the EPA's review has yet to begin and the forthcoming findings and recommendations, if any, are unknown, the exact nature of the risk to Cliffs is unknown; however, direct application of the 300 µS/cm benchmark to Cliffs' Minnesota-based assets may have a material impact.

For additional information on our environmental matters, refer to *Item 3. Legal Proceedings* and NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS in *Item 8. Financial Statements and Supplementary Data* of this Annual Report on Form 10-K.

A004843

Table of Contents

**Energy**

*Electricity*

The state of Michigan is a deregulated electricity state, which affords our mines the ability to purchase electrical energy supply from various suppliers while continuing to purchase distribution service from the incumbent utility. As of September 1, 2013, our Tilden and Empire mines in Michigan exercised the right to purchase electrical supply from Integrys Energy Services while continuing to purchase distribution service from Wisconsin Electric Power Company. The pricing of electricity in the deregulated market is based on the Midwestern Independent System Operator Day-Ahead price. Beginning on February 1, 2015, we began purchasing our electricity supply from the Wisconsin Electric Power Company in a regulated fashion as we terminated our contract with Integrys Energy Services. As of February 1, 2015, Wisconsin Electric Power Company is the sole supplier of electric power to our Empire and Tilden mines. As of April 24, 2015, the Tilden and Empire mines executed special electricity contracts with Wisconsin Electric Power Company. The term of these contracts is through 2019. Wisconsin Electric Power Company provides 300 megawatts of electricity to Empire and Tilden at special rates that are regulated by the MPSC. The pricing under these contracts is generally fixed except Empire and Tilden are subject to frequent changes in Wisconsin Electric Power Company's power supply adjustment factor. Empire and Tilden may also incur additional liabilities depending on the outcome of various proceedings concerning MISO's revised cost allocation methodology for continued operation of the Presque Isle Power Plant in Michigan. If FERC were to decide to award SSR costs based on a revised cost allocation methodology applied retroactively, this could result in a substantial potential liability to our Empire and Tilden mines.

Electric power for the Hibbing and United Taconite mines is supplied by Minnesota Power. On September 16, 2008, the mines finalized agreements with terms from November 1, 2008 through December 31, 2015. The agreements were approved by the MPUC in 2009. The terms of the agreements included an automatic five-year extension that began January 1, 2016.

Silver Bay Power Company, a wholly owned subsidiary of ours, with a 115 megawatt power plant, provides the majority of Northshore's electrical energy requirements. Silver Bay Power has an interconnection agreement with Minnesota Power for backup power when excess generation is necessary.

Koolyanobbing and its associated satellite mines draw power from independent diesel-fueled power stations and generators. Diesel power generation capacity has been installed at the Koolyanobbing operations.

*Process and Diesel Fuel*

We have a long-term contract providing for the transport of natural gas on the Northern Natural Gas Pipeline for our U.S. Iron Ore operations. At U.S. Iron Ore, the Empire and Tilden mines have the capability of burning natural gas, coal or, to a lesser extent, oil. The Hibbing and Northshore mines have the capability to burn natural gas and oil. The United Taconite mine has the ability to burn coal, natural gas and petroleum coke. Consistent with 2015, we expect during 2016 our U.S. Iron Ore operations will utilize both natural gas and coal to heat furnaces and produce power at our Silver Bay Power facility.

All of our mines utilize diesel fuel mainly for our mobile fleet. Como Oil and Propane supplies diesel fuel to all of our U.S. Iron Ore locations from the Calumet refinery in Superior, Wisconsin. Our U.S. Iron Ore locations are contracted with Como Oil and Propane through the end of 2018.

16

**Employees**

As of December 31, 2015, we had a total of 2,638 employees.

| | **2015** | 2014 | 2013 |
|---|---|---|---|
| **U.S. Iron Ore** [1] | | | |
| Salaried | **509** | 658 | 700 |
| Hourly [3] | **1,813** | 2,705 | 2,825 |
| Total | **2,322** | 3,363 | 3,525 |
| **Asia Pacific Iron Ore** [2] | | | |
| Salaried | **90** | 139 | 177 |
| Hourly | **—** | — | — |
| Total | **90** | 139 | 177 |
| **North American Coal** | | | |
| Salaried | **—** | 237 | 379 |
| Hourly | **—** | 821 | 1,207 |
| Total | **—** | 1,058 | 1,586 |
| **Eastern Canadian Iron Ore** [2] | | | |
| Salaried | **32** | 231 | 407 |
| Hourly | **41** | 320 | 973 |
| Total | **73** | 551 | 1,380 |
| **Corporate & Support Services** | | | |
| Salaried | **153** | 275 | 470 |
| Hourly | **—** | — | — |
| Total | **153** | 275 | 470 |
| **Total** | **2,638** | 5,386 | 7,138 |

[1] Includes our employees and the employees of the U.S. Iron Ore joint ventures.

[2] Excludes contracted mining employees

[3] Excludes the employees on lay-off as a result of the idling of the United Taconite and Northshore mines.

As of December 31, 2015, approximately 81.0 percent of our U.S. Iron Ore hourly employees were covered by collective bargaining agreements. This percentage includes the U.S. Iron Ore hourly employees that are on lay-off and excluded from the table above.

Hourly employees at our Michigan and Minnesota iron ore mining operations, excluding Northshore, are represented by the USW and are covered by labor agreements between the USW and our various operating entities. These labor agreements that cover approximately 2,000 USW-represented employees at our Empire and Tilden mines in Michigan, and our United Taconite and Hibbing mines in Minnesota had an original term of September 1, 2012 through September 30, 2015. We are actively negotiating with the USW for new agreements at those locations and have mutually extended our agreements indefinitely with either party able to terminate upon seven days' written notice. Employees at our Northshore operations are not represented by a union and are not, therefore, covered by a collective bargaining agreement.

Hourly employees at our Eastern Canadian Iron Ore operations also are represented by the USW. The labor agreement with the USW that covers our represented employees at Bloom Lake is effective from September 1, 2013 through August 31, 2016. The labor agreement with the USW that covers our represented employees at our Pointe Noire facility, is effective from March 1, 2014 through February 28, 2020. The costs associated with the Eastern Canadian Iron Ore employees that are shown in the chart above are not included in our consolidated results due to the deconsolidation of our Canadian Entities in 2015. Refer to NOTE 14 - DISCONTINUED OPERATIONS for further discussion of the Canadian Entities.

Hourly employees at our Lake Superior and Ishpeming railroads are represented by seven unions covering approximately 108 employees. The labor agreements that cover these employees reopened for bargaining on December

A004845

Table of Contents

31, 2014 and we are actively bargaining with the seven unions that represent them for successor agreements. These employees negotiate under the Railway Labor Act, which provides that labor agreements remain in force until replaced by a successor agreement. Under the Railway Labor Act work stoppages cannot occur until the parties have engaged in substantial negotiations, have mediated any disputes and have received a release from the National Mediation Board.

Employees at our Asia Pacific Iron Ore, Corporate and Support Services are not represented by a union and are not, therefore, covered by collective bargaining agreements.

### Safety

Safety is our primary core value as we continue toward a zero incident culture at our operating facilities.  We continuously monitor, track and measure our safety performance and make changes where necessary.  Best practices are shared globally to ensure each mine site can embed our policies, procedures and learnings for enhanced workplace safety. We measure progress toward achieving our objective against regularly established benchmarks, including measuring company-wide TRIR. During 2015, our TRIR (including contractors) was 1.71 per 200,000 man-hours worked.

Refer to *Exhibit 95 Mine Safety Disclosures (filed herewith)* for mine safety information required in accordance with Section 1503(a) of the Dodd-Frank Act.

## Available Information

Our headquarters are located at 200 Public Square, Cleveland, Ohio 44114-2315, and our telephone number is (216) 694-5700. We are subject to the reporting requirements of the Exchange Act and its rules and regulations. The Exchange Act requires us to file reports, proxy statements and other information with the SEC. Copies of these reports and other information can be read and copied at:

<div align="center">

SEC Public Reference Room
100 F Street N.E.
Washington, D.C. 20549

</div>

Information on the operation of the Public Reference Room may be obtained by calling the SEC at 1-800-SEC-0330.

The SEC maintains a website that contains reports, proxy statements and other information regarding issuers that file electronically with the SEC. These materials may be obtained electronically by accessing the SEC's home page at *www.sec.gov.*

We use our website, *www.cliffsnaturalresources.com*, as a channel for routine distribution of important information, including news releases, investor presentations and financial information. We also make available, free of charge on our website, our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to these reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act, as soon as reasonably practicable after we electronically file these documents with, or furnish them to, the SEC. In addition, our website allows investors and other interested persons to sign up to receive automatic email alerts when we post news releases and financial information on our website.

We also make available, free of charge on our website, the charters of the Audit Committee, Governance and Nominating Committee and Compensation and Organization Committee as well as the Corporate Governance Guidelines and the Code of Business Conduct & Ethics adopted by our Board of Directors. These documents are available through our investor relations page on our website at *ir.cliffsnaturalresources.com*. The SEC filings are available by selecting "Financial Information" and then "SEC Filings," and corporate governance materials are available by selecting "Corporate Governance" for the Board Committee Charters, operational governance guidelines and the Code of Business Conduct and Ethics.

References to our website or the SEC's website do not constitute incorporation by reference of the information contained on such websites, and such information is not part of this Annual Report on Form 10-K.

Copies of the above-referenced information are also available, free of charge, by calling (216) 694-5700 or upon written request to:

<div align="center">

Cliffs Natural Resources Inc.
Investor Relations
200 Public Square
Cleveland, OH 44114-2315

</div>

<div align="center">18</div>

Table of Contents

**EXECUTIVE OFFICERS OF THE REGISTRANT**

Following are the names, ages and positions of the executive officers of the Company as of   February 24, 2016. Unless otherwise noted, all positions indicated are or were held with Cliffs Natural Resources Inc.

| Name | Age | Position(s) Held |
|------|-----|------------------|
| Lourenco Goncalves | 58 | Chairman of the Board, President and Chief Executive Officer (August 2014 - present); Chairman, President and Chief Executive Officer of Metals USA Holdings Corp., an American manufacturer and processor of steel and other metals (May 2006 - April 2013); President, Chief Executive Officer and a director of Metals USA Inc. (February 2003 - April 2006). |
| Terry G. Fedor | 51 | Executive Vice President, United States Iron Ore (January 2014 - present); Vice President (February 2011 - January 2014); Vice President and General Manager (March 2005 - February 2011) of ArcelorMittal Cleveland, a fully integrated steelmaking facility. |
| James D. Graham | 50 | Executive Vice President (November 2014 - present); Chief Legal Officer (March 2013 - present); Secretary (March 2014 - present); Vice President (January 2011 - October 2014); General Counsel - Global Operations (January 2011 - March 2013); Assistant General Counsel (April 2007 - December 2010). |
| Maurice D. Harapiak | 54 | Executive Vice President, Human Resources (June 2014 - present); Regional Director, Human Resources - Barrick Gold of North America, a gold mining company (November 2011 - June 2014); Senior Director, Human Resources, Capital Projects - Barrick Gold Corporation, a gold mining company (November 2007 - November 2011). |
| Terrence R. Mee | 46 | Executive Vice President, Global Commercial (October 2014 - present); Vice President, Global Iron Ore Sales (February 2014 - October 2014); Senior Vice President, Global Iron Ore Sales (March 2012 - February 2014); Senior Vice President, Global Iron Ore & Metallic Sales (January 2011 - March 2012); Vice President, Sales and Transportation (September 2007 - January 2011). |
| Clifford T. Smith | 56 | Executive Vice President, Business Development (April 2015 - present); Executive Vice President, Seaborne Iron Ore (January 2014 - April 2015); Executive Vice President, Global Operations (July 2013 - January 2014); Executive Vice President, Global Business Development (March 2013 - July 2013); Senior Vice President, Global Business Development (January 2011 - March 2013); Vice President, Latin American Operations(September 2009 - January 2011). |
| P. Kelly Tompkins | 59 | Executive Vice President and Chief Financial Officer (April 2015 - present); Executive Vice President, Business Development (October 2014 - April 2015); Executive Vice President, External Affairs and President, Global Commercial (November 2013 - October 2014); Chief Administrative Officer (July 2013 - November 2013); Executive Vice President, Legal, Government Affairs and Sustainability (May 2010 - July 2013). Chief Legal Officer (January 2011 - January 2013); President, Cliffs China (October 2012 - November 2013). |
| Timothy K. Flanagan | 38 | Vice President, Corporate Controller & Chief Accounting Officer (March 2012 - present); Assistant Controller (February 2010 - March 2012); and Director, Internal Audit (April 2008 - February 2010). |

All executive officers serve at the pleasure of the Board. There are no arrangements or understandings between any executive officer and any other person pursuant to which an executive officer was selected to be an officer of the Company. There is no family relationship between any of our executive officers, or between any of our executive officers and any of our directors.

**Item 1A.**     *Risk Factors*

An investment in our common shares or other securities is subject to risk inherent to our business and our industry. Described below are certain risks and uncertainties, the occurrences of which could have a material adverse effect on us. Before making an investment decision, you should consider carefully all of the risks described below together with the other information included in this report. The risks and uncertainties described below include known material risks that we face currently. Although we have significant risk management policies, practices and procedures aimed to mitigate these risks, uncertainties may nevertheless impair our business operation. This report is qualified in its entirety by these factors.

Our ERM function provides a framework for management's consideration of risk when making strategic, financial, operational and/or project decisions. The framework is based on ISO 31000, an internationally recognized risk

management standard. Management uses a consistent methodology to identify and assess risks, determine and implement risk mitigation actions, and monitor and communicate information about the Company's key risks. Through these processes, we have identified six categories of risk that we are subject to: (I) economic and market, (II) regulatory, (III) financial, (IV) operational, (V) development and sustainability and (VI) human capital. The following risk factors are presented according to these key risk categories.

### I. ECONOMIC AND MARKET RISKS

***The volatility of commodity prices, namely iron ore and steel, affects our ability to generate revenue, maintain stable cash flow and to fund our operations, including growth and expansion projects.***

As a mining company, our profitability is dependent upon the price of the commodities that we sell to our customers and the price of the products our customers sell, namely iron ore and steel prices. The price of iron ore has fluctuated historically and is affected by factors beyond our control, including: steel inventories; international demand for raw materials used in steel production; rates of global economic growth, especially construction and infrastructure activity that requires significant amounts of steel; recession or reduced economic activity in the United States, China, India, Europe and other industrialized or developing countries; uncertainties or weaknesses in global economic conditions such as the sovereign debt crisis in Europe and the U.S. debt ceiling; changes in production capacity of other iron ore suppliers, especially as additional supplies come online or where there is a significant increase in imports of steel into the United States or Europe; weather-related disruptions or natural disasters that may impact the global supply of iron ore; and the proximity, capacity and cost of infrastructure and transportation.

Our earnings, therefore, may fluctuate with the prices of the commodities we sell. To the extent that the prices of iron ore and steel, including the average hot band steel price, subject to a pricing floor, significantly decline for an extended period of time, we may have to revise our operating plans, including curtailing production, reducing operating costs and capital expenditures and discontinuing certain exploration and development programs. We also may have to take impairments on our assets, inventory and/or goodwill. Sustained lower prices also could cause us to further reduce existing reserves if certain reserves no longer can be economically mined or processed at prevailing prices. We may be unable to decrease our costs in an amount sufficient to offset reductions in revenues and may incur losses. These events could have a material adverse effect on us.

***Continued weaknesses in global economic conditions, reduced economic growth in China and oversupply of iron ore and excess steel or imported products could affect adversely our business.***

The world price of iron ore is influenced strongly by global economic conditions, including international demand and supply for iron ore products. In particular, the current level of international demand for raw materials used in steel production is driven largely by industrial growth in China. Continued weaknesses in global economic conditions, including the slowing economic growth rate in China, has resulted, and could in the future result, in decreased demand for our products and, together with oversupply of imported products, has and may continue to lead to decreased prices, resulting in lower revenue levels and decreasing margins, which have in the past and may in the future affect adversely our business and negatively impact our financial results. For example, U.S. Iron Ore's realized revenue decreased 23 percent and 9 percent for the years ended December 31, 2015 and December 31, 2014, respectively, while the Fe fines spot price declined 43 percent and 29 percent over the same periods. We are not able to predict whether the global economic conditions will continue or worsen and the impact it may have on our operations and the industry in general going forward.

In addition, due to lower demand for our products and the decline in the prices for our products, we have incurred, and continue to incur, operating losses. We also have significant capital requirements, including interest payments to service our debt. If we incur significant losses in future periods, we may be unable to continue as a going concern. If we are unable to continue as a going concern, we may consider, among other options, restructuring our debt; however, there can be no assurance that these options will be undertaken and, if so undertaken, whether these efforts will succeed.

20

***Capacity expansions within the mining industry could lead to lower global iron ore prices, impacting our profitability.***

Expected global growth of iron ore demand, particularly from China, has resulted in iron ore suppliers expanding their production capacity. The supply of iron ore has increased due to these expansions. In the current iron ore market, the increases in our competitors' capacity has resulted in excess supply of these commodities, resulting in downward pressure on prices. This decrease in pricing has had, and will continue to have, an adverse impact on our sales, margins and profitability.

***If steelmakers use methods other than blast furnace production to produce steel or use other inputs, or if their blast furnaces shut down or otherwise reduce production, the demand for our current iron ore products may decrease.***

Demand for our iron ore products is determined by the operating rates for the blast furnaces of steel companies. However, not all finished steel is produced by blast furnaces; finished steel also may be produced by other methods that use scrap steel, pig iron, hot briquetted iron and direct reduced iron. North American steel producers also can produce steel using imported iron ore or semi-finished steel products, which eliminates the need for domestic iron ore. Future environmental restrictions on the use of blast furnaces also may reduce our customers' use of their blast furnaces. Maintenance of blast furnaces may require substantial capital expenditures. Our customers may choose not to maintain, or may not have the resources necessary to maintain, their blast furnaces. If our customers use methods to produce steel that do not use iron ore pellets, demand for our current iron ore products will decrease, which would affect adversely our sales, margins and profitability.

***Due to economic conditions and volatility in commodity prices, or otherwise, our customers could approach us about modification of their supply agreements or fail to perform under such agreements. Modifications to our sales agreements or our customers' failures to perform under such agreements, including modifications or failures to perform due to such volatility, could impact adversely our sales, margins, profitability and cash flows.***

Although we have contractual commitments for a majority of sales in our U.S. Iron Ore business for 2016, the uncertainty in global economic conditions may impact adversely the ability of our customers to meet their obligations. As a result of such market volatility, our customers could approach us about modifying their supply agreements or fail to perform under such agreements. Considering our limited base of current and potential customers, any modifications to our sales agreements or customers' failures to perform under such agreements could impact adversely our sales, margins and profitability. For example, effective October 5, 2015, we terminated our long term supply agreement with Essar as a result of Essar's multiple and material breaches under the agreement. On November 9, 2015, Essar filed for CCAA and Chapter 15 bankruptcy protection. The Canadian Superior Court may require Cliffs to supply Essar under the terms of the agreement or other terms. Essar moved the Canadian CCAA Court to enter an injunction requiring us to supply pellets. We filed a motion to remove the case to Ohio due to the CCAA Court's lack of jurisdiction. On January 25, 2016, the CCAA Court determined that it has jurisdiction over the issue. We remain open to discussing supplying pellets on commercially reasonable terms consistent with a just-in-time iron ore supply arrangement. In addition to the termination of our long term supply agreement with Essar, other potential actions by our customers could result in additional contractual disputes and could ultimately require arbitration or litigation, either of which could be time consuming and costly. Other potential actions by our customers could also lead to a failure to renew existing contracts, such as our contracts with ArcelorMittal, which expire in December 2016 and January 2017. Any such disputes and/or failure to renew existing contracts on favorable terms, in particular contracts with ArcelorMittal, with whom we are actively negotiating new contracts, could impact adversely our sales, margins, profitability and cash flows.

## II.  REGULATORY RISKS

***We are subject to extensive governmental regulation, which imposes, and will continue to impose, potential significant costs and liabilities on us. Future laws and regulation or the manner in which they are interpreted and enforced could increase these costs and liabilities or limit our ability to produce iron ore products.***

New laws or regulations, or changes in existing laws or regulations, or the manner of their interpretation or enforcement, could increase our cost of doing business and restrict our ability to operate our business or execute our strategies. This includes, among other things, the possible taxation under U.S. law of certain income from foreign operations, compliance costs and enforcement under the Dodd-Frank Wall Street Reform and Consumer Protection Act, and costs associated with complying with the Patient Protection and Affordable Care Act and the Healthcare and Education Reconciliation Act of 2010 and the regulations promulgated thereunder. In addition, we are subject to various federal, provincial, state and local laws and regulations in each jurisdiction in which we have operations for human health and safety, air quality, water pollution, plant, wetlands, natural resources and wildlife protection, reclamation and restoration of mining properties, the discharge of materials into the environment, the effects that mining has on groundwater quality,

21

A004849

conductivity and availability, and related matters. Numerous governmental permits and approvals are required for our operations. We cannot be certain that we have been or will be at all times in complete compliance with such laws, regulations, permits and approvals. If we violate or fail to comply with these laws, regulations, permits or approvals, we could be fined or otherwise sanctioned by regulators. Compliance with the complex and extensive laws and regulations to which we are subject imposes substantial costs, which we expect will continue to increase over time because of increased regulatory oversight, adoption of increasingly stringent environmental standards, and increased demand for remediation services leading to shortages of equipment, supplies and labor, as well as other factors.

Specifically, there are several notable proposed or recently enacted rulemakings or activities to which we would be subject or that would further regulate and/or tax our customers, namely the North American integrated steel producer customers that may also require us or our customers to reduce or otherwise change operations significantly or incur significant additional costs, depending on their ultimate outcome. These emerging or recently enacted rules and regulations include: numerous air regulations, such as climate change and greenhouse gas regulation, regional haze regulation, NAAQS including but not limited to those for $NO_2$ and $SO_2$, the CSAPR; Minnesota's Mercury Air Emissions Reporting and Reduction Rule, Mercury Total Maximum Daily Load requirements and Taconite Mercury Reduction Strategy, selenium discharge regulation; expansion of federal jurisdictional authority to regulate groundwater, and various other water quality regulations. Such new or more stringent legislation, regulations, interpretations or orders, when enacted, could have a material adverse effect on our business, results of operations, financial condition or profitability.

***Although the numerous regulations, operating permits and our management systems mitigate potential impacts to the environment, our operations may impact inadvertently the environment or cause exposure to hazardous substances, which could result in material liabilities to us.***

Our operations currently use and have used in the past, hazardous materials, and, from time to time, we have generated solid and hazardous waste. We may be subject to claims under federal, provincial, state and local laws and regulations for toxic torts, natural resource damages and other damages as well as for the investigation and clean-up of soil, surface water, sediments, groundwater and other natural resources. Such claims for damages and reclamation may arise out of current or former conditions at sites that we own, lease or operate currently, as well as sites that we or our acquired companies have owned, leased or operated, and at contaminated sites that have always been owned, leased or operated by our joint-venture partners. Our liability for such claims may be joint and several, so that we may be held responsible for more than our share of the contamination or other damages, or even for the entire share. We are subject to a variety of potential liability exposures arising, or otherwise involved in investigation and remediation activities, at certain sites. In addition to currently owned, leased or operated sites, these include sites where we formerly conducted iron ore and/or coal mining or processing or other operations, inactive sites that we currently own, predecessor sites, acquired sites, leased land sites and third-party waste disposal sites. We may be named as a responsible party at other sites in the future and we cannot be certain that the costs associated with these additional sites will not be material.

We also could be subject to litigation for alleged bodily injuries arising from claimed exposure to hazardous substances allegedly used, released, or disposed of by us. In particular, we and certain of our subsidiaries were involved in various claims relating to the exposure of asbestos and silica to seamen who sailed until the mid-1980s on the Great Lakes vessels formerly owned and operated by certain of our subsidiaries. While several hundred of these claims against us had been combined in a multidistrict litigation docket and have since been dismissed and/or settled for non-material amounts, there remains a possibility that similar types of claims could be filed in the future.

Environmental impacts as a result of our operations, including exposures to hazardous substances or wastes associated with our operations, could result in costs and liabilities that could materially and adversely affect our margins, cash flow or profitability.

***We may be unable to obtain and renew permits necessary for our operations or be required to provide additional financial assurance, which could reduce our production, cash flows, profitability and available liquidity. We also could face significant permit and approval requirements that could delay our commencement or continuation of existing or new production operations which, in turn, could affect materially our cash flows, profitability and available liquidity.***

Prior to commencement of mining, we must submit to and obtain approval from the appropriate regulatory authority of plans showing where and how mining and reclamation operations are to occur. These plans must include information such as the location of mining areas, stockpiles, surface waters, haul roads, tailings basins and drainage from mining operations. All requirements imposed by any such authority, may be costly and time-consuming and may delay commencement or continuation of exploration or production operations.

A004850

Table of Contents

Mining companies must obtain numerous permits that impose strict conditions on various environmental and safety matters in connection with iron ore mining. These include permits issued by various federal, state and provincial agencies and regulatory bodies. The permitting rules are complex and may change over time, making our ability to comply with the applicable requirements more difficult or impractical and costly, possibly precluding the continuance of ongoing operations or the development of future mining operations. Interpretations of rules may also change over time and may lead to requirements, such as additional financial assurance, making it more costly to comply. The public, including special interest groups and individuals, have certain rights under various statutes to comment upon, submit objections to, and otherwise engage in the permitting process, including bringing citizens' lawsuits to challenge such permits or mining activities. Accordingly, required permits may not be issued or renewed in a timely fashion (or at all), or permits issued or renewed may be conditioned in a manner that may restrict our ability to efficiently conduct our mining activities, including the requirement for additional financial assurances that we may not be able to provide on commercially reasonable terms or at all and which would further limit our borrowing base under our ABL Facility. Such inefficiencies could reduce our production, cash flows, profitability and available liquidity.

III.    **FINANCIAL RISKS**

***A substantial majority of our sales are made under term supply agreements to a limited number of customers that contain price-adjustment clauses that could affect adversely the stability and profitability of our operations.***

For the twelve months ended December 31, 2015, a majority of our U.S. Iron Ore sales and our Asia Pacific Iron Ore sales were made under term supply agreements to a limited number of customers. More than 72 percent of our revenue is derived from the North American integrated steel industry. For the twelve months ended December 31, 2015, three customers together accounted for more than 93 percent of our U.S. Iron Ore product sales revenues (representing 70 percent of our consolidated revenues). Our Asia Pacific Iron Ore contracts are due to expire at various dates until March 2017 for the majority of our Chinese customers and March 2016 for the remainder of our Chinese customers and our Japanese and Korean customers. As of December 31, 2015, our U.S. Iron Ore contracts had an average remaining duration of approximately three years. Although we have contractual commitments for a majority of sales in our U.S. Iron Ore business for 2016, the uncertainty in global economic conditions may adversely impact the ability of our customers to meet their obligations. For example, of the potential customers in the North American integrated steel industry, two are in reorganization, and certain others have experienced financial difficulties. We cannot be certain that we will be able to renew or replace existing term supply agreements at approximately the same volume levels, prices or with similar profit margins when they expire. A loss of sales to our existing customers could have a substantial negative impact on our sales, margins, cash flows and profitability.

***Our existing and future indebtedness may limit cash flow available to invest in the ongoing needs of our business, which could prevent us from fulfilling our obligations under our senior notes.***

As of December 31, 2015, we had an aggregate principal amount of $2,898.2 million of total debt, $1,084.2 million of which was secured (excluding outstanding letters of credit, $97 million of equipment loans, and $74 million of capital leases), and $285.2 million of cash on our balance sheet. As of December 31, 2015, no loans were drawn under the credit facility and we had total availability of $366.0 million as a result of borrowing base limitations. As of December 31, 2015, the principal amount of letters of credit obligations totaled $186.3 million and foreign exchange hedge obligations totaled $0.5 million, thereby further reducing available borrowing capacity on our credit facility to $179.2 million.

Our substantial level of indebtedness has required us to dedicate a substantial portion of our cash flow from operations to the payment of debt service, reducing the availability of our cash flow to fund working capital, capital expenditures, acquisitions and other general corporate purposes. Moreover, our level of indebtedness could have further consequences, including, increasing our vulnerability to adverse economic or industry conditions, limiting our ability to obtain additional financing to enable us to react to changes in our business, or placing us at a competitive disadvantage compared to businesses in our industry that have less indebtedness.

Our substantial level of indebtedness could limit our ability to obtain additional financing on acceptable terms or at all for working capital, capital expenditures and general corporate purposes. Our liquidity needs could vary significantly and may be affected by general economic conditions, industry trends, performance and many other factors not within our control. If we are unable to generate sufficient cash flow from operations in the future to service our debt, we may be required to refinance all or a portion of our existing debt. However, we may not be able to obtain any such new or additional debt on favorable terms or at all.

Any failure to comply with covenants in the instruments governing our debt could result in an event of default which, if not cured or waived, would have a material adverse effect on us.

A004851

***We may not be able to generate sufficient cash to service all of our debt, and may be forced to take other actions to satisfy our obligations under our debt, which may not be successful.***

Our ability to make scheduled payments on or to refinance our debt obligations, including our senior notes, and to fund planned capital expenditures and expansion efforts and any strategic alliances or acquisitions we may make in the future depends on our ability to generate cash in the future and our financial condition and operating performance, which are subject to prevailing economic and competitive conditions and to certain financial, business and other factors beyond our control. We cannot assure you that we will maintain a level of cash flows from operating activities sufficient to permit us to pay the principal, premium, if any, and interest on our debt, including our senior notes.

If our cash flows and capital resources are insufficient to fund our debt service obligations, we may be forced to reduce or delay investments and capital expenditures, or to sell assets, seek additional capital or restructure or refinance our debt, including our senior notes. Any refinancing of our debt could be at higher interest rates and may require us to comply with more onerous covenants, which could further restrict our business operations. These measures may not be successful and may not permit us to meet our scheduled debt service obligations. If our operating results and available cash are insufficient to meet our debt service obligations, we could face substantial liquidity problems and might be required to dispose of material assets or operations to meet our debt service and other obligations. We may not be able to consummate those dispositions or to obtain the proceeds that we could realize from them, and these proceeds may not be adequate to meet any debt service obligations then due. Further, we may need to refinance all or a portion of our debt on or before maturity, and we may not be able to refinance any of our debt on commercially reasonable terms or at all. Additionally, additional or new financial assurances may be demanded by our vendors or regulatory agencies that we may not be able to provide on commercially reasonable terms or at all.

***Changes in credit ratings issued by nationally recognized statistical rating organizations could affect adversely our cost of financing and the market price of our securities.***

Credit rating agencies could further downgrade our ratings either due to factors specific to our business, a prolonged cyclical downturn in the mining industry, or macroeconomic trends (such as global or regional recessions) and trends in credit and capital markets more generally. The interest rate payable on our senior notes is subject to adjustment in the event of a change in the credit ratings and is currently at the maximum interest rate of 5.95 percent per annum. Any further decline in our credit ratings would likely result in an increase to our cost of financing, limit our access to the capital markets, significantly harm our financial condition and results of operations, hinder our ability to refinance existing indebtedness on acceptable terms and have an adverse effect on the market price of our securities.

***We rely on our joint venture partners in our mines to meet their payment obligations and we are subject to risks involving the acts or omissions of our joint venture partners when we are not the manager of the joint venture.***

We co-own and manage three of our five U.S. Iron Ore mines with various joint venture partners that are integrated steel producers or their subsidiaries, including ArcelorMittal and U.S. Steel. We rely on our joint venture partners to make their required capital contributions and to pay for their share of the iron ore that each joint venture produces. Our U.S. Iron Ore joint venture partners are often also our customers. If one or more of our joint venture partners fail to perform their obligations, the remaining joint venture partners, including ourselves, may be required to assume additional material obligations, including significant capital contribution, pension and postretirement health and life insurance benefit obligations. The premature closure of a mine due to the failure of a joint venture partner to perform its obligations could result in significant fixed mine-closure costs, including severance, employment legacy costs and other employment costs; reclamation and other environmental costs; and the costs of terminating long-term obligations, including energy and transportation contracts and equipment leases. For example, with respect to one of our two Eastern Canadian Iron Ore mines, the Bloom Lake mine, CQIM's joint venture partner did not fully participate in calls for capital contributions, resulting in additional financial burden for CQIM. This additional burden was one of multiple factors in CQIM's decision to file for a stay under CCAA.

We cannot control the actions of our joint venture partners, especially when we have a minority interest in a joint venture. Further, in spite of performing customary due diligence prior to entering into a joint venture, we cannot guarantee full disclosure of prior acts or omissions of the sellers or those with whom we enter into joint ventures. Such risks could have a material adverse effect on the business, results of operations or financial condition of our joint venture interests.

***We may not be able to recover the carrying value when divesting assets or businesses.***

When we divest assets or businesses, we may not be able to recover the carrying value of these assets, which potentially could have a material adverse impact on our results of operations, shareholders' equity and capital structure. Also, if we were to sell a percentage of a business, there are inherent risks of a joint venture relationship as noted in the risk factor above.

24

***Our ability to collect payments from our customers depends on their creditworthiness.***

Our ability to receive payment for products sold and delivered to our customers depends on the creditworthiness of our customers. With respect to our Asia Pacific business unit, payment typically is received as the products are shipped and much of the product is secured by bank letters of credit. By contrast, in our U.S. Iron Ore business unit, generally, we deliver iron ore products to our customers' facilities in advance of payment for those products. Under this practice for our U.S. customers, title and risk of loss with respect to U.S. Iron Ore products does not pass to the customer until payment for the pellets is received; however, there is typically a period of time in which pellets, for which we have reserved title, are within our customers' control. Where we have identified credit risk with certain customers, we have put in place alternate payment terms from time to time.

Consolidations in some of the industries in which our customers operate have created larger customers. These factors have caused some customers to be less profitable and increased our exposure to credit risk. Customers in other countries may be subject to other pressures and uncertainties that may affect their ability to pay, including trade barriers, exchange controls, and local, economic and political conditions. Downturns in the economy and disruptions in the global financial markets in recent years have affected the creditworthiness of our customers from time to time. Some of our customers are highly leveraged. If economic conditions worsen or prolonged global, national or regional economic recession conditions return, it is likely to impact significantly the creditworthiness of our customers and could, in turn, increase the risk we bear on payment default for the credit we provide to our customers and could limit our ability to collect receivables. Failure to receive payment from our customers for products that we have delivered could affect adversely our results of operations, financial condition and liquidity.

***Our operating expenses could increase significantly if the price of electrical power, fuel or other energy sources increases.***

Our mining operations require significant use of energy. Operating expenses at all of our mining locations are sensitive to changes in electricity prices and fuel prices, including diesel fuel and natural gas prices. These items make up approximately 25 to 30 percent in the aggregate of our operating costs in our U.S. Iron Ore locations, for example. Prices for electricity, natural gas and fuel oils can fluctuate widely with availability and demand levels from other users. During periods of peak usage, supplies of energy may be curtailed and we may not be able to purchase them at historical rates. A disruption in the transmission of energy, inadequate energy transmission infrastructure, or the termination of any of our energy supply contracts could interrupt our energy supply and affect adversely our operations. While we have some long-term contracts with electrical suppliers, we are exposed to fluctuations in energy costs that can affect our production costs. As an example, our mines in Minnesota are subject to changes in Minnesota Power's rates, such as rate changes that are reviewed and approved by the state public utilities commission in response to an application filed by Minnesota Power. We also enter into market-based pricing supply contracts for natural gas and diesel fuel for use in our operations. Those contracts expose us to price increases in energy costs, which could cause our profitability to decrease significantly. We are estimating that power rates for our electricity-intensive operations could increase above 2015 levels by up to 9.75 percent by 2020, representing an increase of approximately $6 per MWh by 2020 for our U.S. operations.

In addition, U.S. public utilities are expected to pass through additional capital and operating cost increases related to new or pending U.S. environmental regulations that are expected to require significant capital investment and use of cleaner fuels in the future and which may impact U.S. coal-fired generation capacity. These environmental regulations could force the future closure of the Presque Isle Power Plant in the Upper Peninsula of Michigan which supplies electricity to our mines in Michigan.

Table of Contents

**The availability of capital may be limited.**

We may need to access the capital markets to finance ongoing operations, any development of existing mining properties and our other cash requirements. Our substantial indebtedness could make it more difficult for us to borrow money in the future and may reduce the amount of money available to finance our operations and other business activities and may have other detrimental consequences, including the following: requiring us to dedicate a substantial portion of our cash flow from operations to the payment of principal, premium, if any, and interest on our debt, which will reduce funds available for other purposes; exposing us to the risk of increased interest costs if the underlying interest rates rise on our existing credit facility or other variable rate debt; making it more difficult to obtain surety bonds, letters of credit or other financing, particularly during periods in which credit markets are weak; causing a decline in our credit ratings; limiting our ability to compete with companies that are not as leveraged and that may be better positioned to withstand economic downturns; and limiting our flexibility in planning for, or reacting to, and increasing our vulnerability to, changes in our business, the industry in which we compete and general economic and market conditions. If we further increase our indebtedness, the related risks that we now face, including those described above, could intensify. We cannot predict the general availability or accessibility of capital to finance projects in the future.

**We are subject to a variety of financial market risks.**

Financial market risks include those caused by changes in the value of investments, changes in commodity prices, interest rates and foreign currency exchange rates. We have established policies and procedures to manage such risks; however, certain risks are beyond our control and our efforts to mitigate such risks may not be effective. These factors could have a material adverse effect on our results of operations.

**We are subject to bankruptcy risks relating to our Canadian operations.**

As previously disclosed, the Bloom Lake Group commenced the CCAA process in January 2015 to address the Bloom Lake Group's immediate liquidity issues and to preserve and protect its assets for the benefit of all stakeholders while restructuring and/or sale options are explored. In May 2015, the Wabush Group commenced restructuring proceedings and, as a result, the CCAA protection granted to the Bloom Lake Group has been extended to include the Wabush Group. Certain obligations of the Bloom Lake Group, including equipment loans, are guaranteed by Cliffs. Financial instruments are posted by Cliffs to support certain reclamation obligations of the Wabush Group. It is possible that (a) as part of the CCAA process (i) claims may be asserted by or on behalf of the Bloom Lake Group or the Wabush Group against non-debtor affiliates of the Bloom Lake Group and the Wabush Group and/or (ii) claims of non-debtor affiliates against the Bloom Lake Group or the Wabush Group may be challenged and (b) creditors of the Bloom Lake Group or the Wabush Group may assert claims against non-debtor affiliates of the Bloom Lake Group or the Wabush Group under the guarantees discussed above. While we anticipate the restructuring and/or sale of the Bloom Lake Group and the Wabush Group assets may mitigate these risks, to the extent that any claims are successful or the Bloom Lake Group's obligations guaranteed by Cliffs are not satisfied in full by any such restructuring or sale, Cliffs could be held liable for certain obligations.

**A court or regulatory body could find that we are responsible, in whole or in part, for liabilities we transferred to other entities.**

As part of our strategy to focus on our U.S. iron ore operations we have sold or otherwise disposed of several non-core assets. Some of the transactions under which we sold or otherwise disposed of our non-core assets included provisions transferring certain liabilities to the purchasers or acquirers of those non-core assets. While we believe that all such transfers were completed properly and are legally binding, we may be at risk that some court or regulatory body could disagree and determine that we remain responsible for liabilities we intended to and did transfer.

26

IV.    OPERATIONAL
       RISKS

***Mine closures entail substantial costs. If we close one or more of our mines, our results of operations and financial condition would likely be affected adversely.***

If we close any of our mines, our revenues would be reduced unless we were able to increase production at our other mines, which may not be possible. The closure of a mining operation involves significant fixed closure costs, including accelerated employment legacy costs, severance-related obligations, reclamation and other environmental costs, and the costs of terminating long-term obligations, including customer, energy and transportation contracts and equipment leases. We base our assumptions regarding the life of our mines on detailed studies we perform from time to time, but those studies and assumptions are subject to uncertainties and estimates that may not be accurate. We recognize the costs of reclaiming open pits, stockpiles, tailings ponds, roads and other mining support areas based on the estimated mining life of our property. If we were to significantly reduce the estimated life of any of our mines, the mine-closure costs would be applied to a shorter period of production, which would increase costs per ton produced and could significantly and adversely affect our results of operations and financial condition.

A North American mine permanent closure could accelerate and significantly increase employment legacy costs, including our expense and funding costs for pension and other postretirement benefit obligations. A number of employees would be eligible for immediate retirement under special eligibility rules that apply upon a mine closure. All employees eligible for immediate retirement under the pension plans at the time of the permanent mine closure also could be eligible for postretirement health and life insurance benefits, thereby accelerating our obligation to provide these benefits. Certain mine closures would precipitate a pension closure liability significantly greater than an ongoing pension liability. Finally, a permanent mine closure could trigger severance-related obligations, which can equal up to sixteen weeks of pay per employee in some jurisdictions, depending on length of service. As a result, the closure of one or more of our mines could adversely affect our financial condition and results of operations.

At the end of March 2014, we idled our Wabush Scully mine in Newfoundland and Labrador, and in the fourth quarter of 2014, we began to implement the permanent closure plan for the mine. Additionally, we disclosed in November 2014 that we were pursuing exit options for our Bloom Lake mine and as disclosed in January 2015, active production at Bloom Lake mine completely ceased and the mine transitioned to "care-and-maintenance" mode. To mitigate closure costs in connection with the potential shutdown of the Bloom Lake mine, our Canadian affiliates that operate the mine commenced restructuring proceedings under the CCAA. However, there can be no assurance that we will not have any material obligations in connection with the potential shutdown of the Bloom Lake mine despite the CCAA filing.

***Our sales and competitive position depend on the ability to transport our products to our customers at competitive rates and in a timely manner.***

In our U.S. Iron Ore operations, disruption of the lake and rail transportation services because of weather-related problems, including ice and winter weather conditions on the Great Lakes or St. Lawrence Seaway, climate change, strikes, lock-outs, or other events and lack of alternative transportation sources, could impair our ability to supply iron ore to our customers at competitive rates or in a timely manner and, thus, could adversely affect our sales, margins and profitability. Further, reduced dredging and environmental changes, particularly at Great Lakes ports, could impact negatively our ability to move our iron ore products because lower water levels restrict the tonnage that vessels can haul, resulting in higher freight rates.

Our Asia Pacific Iron Ore operations also are dependent upon rail and port capacity. Disruptions in rail service or availability of dock capacity could similarly impair our ability to supply iron ore to our customers, thereby adversely affecting our sales and profitability. In addition, our Asia Pacific Iron Ore operations are also in direct competition with the major world seaborne exporters of iron ore and our customers face higher transportation costs than most other Australian producers to ship our products to the Asian markets because of the location of our major shipping port on the south coast of Australia. Further, increases in transportation costs, including volatile fuel rates, decreased availability of ocean vessels or changes in such costs relative to transportation costs incurred by our competitors could make our products less competitive, restrict our access to certain markets and have an adverse effect on our sales, margins and profitability.

27

*Natural disasters, weather conditions, disruption of energy, unanticipated geological conditions, equipment failures, and other unexpected events may lead our customers, our suppliers or our facilities to curtail production or shut down operations.*

Operating levels within the mining industry are subject to unexpected conditions and events that are beyond the industry's control. Those events could cause industry members or their suppliers to curtail production or shut down a portion or all of their operations, which could reduce the demand for our iron ore products, and could affect adversely our sales, margins and profitability.

Interruptions in production capabilities inevitably will increase our production costs and reduce our profitability. We do not have meaningful excess capacity for current production needs, and we are not able to quickly increase production or re-start production at one mine to offset an interruption in production at another mine. Additionally, re-start production costs can be even higher if required to be taken during extremely cold weather conditions.

A portion of our production costs are fixed regardless of current operating levels. As noted, our operating levels are subject to conditions beyond our control that can delay deliveries or increase the cost of mining at particular mines for varying lengths of time. These include weather conditions (for example, extreme winter weather, tornadoes, floods, and the lack of availability of process water due to drought) and natural and man-made disasters, pit wall failures, unanticipated geological conditions, including variations in the amount of rock and soil overlying the deposits of iron ore, variations in rock and other natural materials and variations in geologic conditions and ore processing changes.

The manufacturing processes that take place in our mining operations, as well as in our processing facilities, depend on critical pieces of equipment. This equipment may, on occasion, be out of service because of unanticipated failures. In addition, many of our mines and processing facilities have been in operation for several decades, and the equipment is aged. In the future, we may experience additional material plant shutdowns or periods of reduced production because of equipment failures. Further, remediation of any interruption in production capability may require us to make large capital expenditures that could have a negative effect on our profitability and cash flows. Our business interruption insurance would not cover all of the lost revenues associated with equipment failures. Longer-term business disruptions could result in a loss of customers, which adversely could affect our future sales levels and, therefore, our profitability.

Regarding the impact of unexpected events happening to our suppliers, many of our mines are dependent on one source for electric power and for natural gas. A significant interruption in service from our energy suppliers due to terrorism or sabotage, weather conditions, natural disasters, or any other cause can result in substantial losses that may not be fully recoverable, either from our business interruption insurance or responsible third parties.

*We are subject to risks involving operations and sales in multiple countries.*

We supply raw materials to the global integrated steel industry with substantial assets located outside of the U.S. We conduct operations in the U.S. and Australia. As such, we are subject to additional risks beyond those relating to our U.S. operations, such as fluctuations in currency exchange rates; potentially adverse tax consequences due to overlapping or differing tax structures; burdens to comply with multiple and potentially conflicting foreign laws and regulations, including export requirements, tariffs, economic sanctions and other barriers, environmental health and safety requirements, and unexpected changes in any of these laws and regulations; the imposition of duties, tariffs, import and export controls and other trade barriers impacting the seaborne iron ore markets; difficulties in staffing and managing multi-national operations; political and economic instability and disruptions, including terrorist attacks; disadvantages of competing against companies from countries that are not subject to U.S. laws and regulations, including the Foreign Corrupt Practices Act; and uncertainties in the enforcement of legal rights and remedies in multiple jurisdictions. If we are unable to manage successfully the risks associated with operating our global business, these risks could have a material adverse effect on our business, results of operations or financial condition.

*Our profitability could be affected adversely by the failure of outside contractors to perform.*

Asia Pacific Iron Ore uses contractors to handle many of the operational phases of their mining and processing operations and, therefore, we are subject to the performance of outside companies on key production areas. A failure of any of these contractors to perform in a significant way would result in additional costs for us, which also could affect adversely our production rates and results of operations.

*We may not be able to complete divestitures of our non-core assets at acceptable prices or at all.*

As an extension of our re-focused U.S. Iron Ore strategy, we are currently in the process of streamlining our portfolio of non-core assets. Asia Pacific Iron Ore has been identified as a non-core asset and will be considered for monetization. However, we may not be able to sell any non-core assets at sales prices acceptable to us or at all. Gains

28

Table of Contents

or losses on the sales of, or lost operating income from, non-core assets may affect our profitability. Moreover, we may incur asset impairment charges related to divestitures that reduce our profitability. Our divestiture activities may also present financial, managerial and operational risks. Those risks include diversion of management attention from existing businesses, difficulties separating personnel and financial and other systems, adverse effects on existing business relationships with suppliers and customers. Any of these factors could affect our financial condition and results of operations.

### V.    DEVELOPMENT AND SUSTAINABILITY RISKS

***The cost and time to implement a strategic capital project may prove to be greater than originally anticipated.***

We undertake strategic capital projects in order to enhance, expand or upgrade our mines and production capabilities. Our ability to achieve the anticipated volumes of production, revenues or otherwise realize acceptable returns on strategic capital projects that we may undertake is subject to a number of risks, many of which are beyond our control, including a variety of market (such as a volatile pricing environment for iron ore), operational, permitting and labor-related factors. Further, the cost to implement any given strategic capital project ultimately may prove to be greater and may take more time than originally anticipated. Inability to achieve the anticipated results from the implementation of our strategic capital projects, or the incurring of unanticipated implementation costs, penalties or inability to meet contractual obligations could affect adversely our results of operations and future earnings and cash flow generation.

***We continually must replace reserves depleted by production. Exploration activities may not result in additional discoveries.***

Our ability to replenish our ore reserves is important to our long-term viability. Depleted ore reserves must be replaced by further delineation of existing ore bodies or by locating new deposits in order to maintain production levels over the long term. Resource exploration and development are highly speculative in nature. Exploration projects involve many risks, require substantial expenditures and may not result in the discovery of sufficient additional mineral deposits that can be mined profitably. Once a site with mineralization is discovered, it may take several years from the initial phases of drilling until production is possible, during which time the economic feasibility of production may change. Substantial expenditures are required to establish recoverable proven and probable reserves and to construct mining and processing facilities. As a result, there is no assurance that current or future exploration programs will be successful and there is a risk that depletion of reserves will not be offset by discoveries or acquisitions. Given current market conditions, we have curtailed substantially any expenditures related to exploration at or near our mine sites.

***We rely on estimates of our recoverable reserves, which is complex due to geological characteristics of the properties and the number of assumptions made.***

We regularly evaluate our iron ore reserves based on revenues and costs and update them as required in accordance with SEC Industry Guide 7 and historically, the Canadian Institute of Mining, Metallurgy & Petroleum's Definition Standards on Mineral Resources and Mineral Reserves. In addition, our Asia Pacific Iron Ore business segment has published reserves that follow the Joint Ore Reserve Code in Australia, with certain changes to our Western Australian reserve values to make them comply with SEC requirements. There are numerous uncertainties inherent in estimating quantities of reserves of our mines, including many factors beyond our control.

Estimates of reserves and future net cash flows necessarily depend upon a number of variable factors and assumptions, such as production capacity, effects of regulations by governmental agencies, future prices for iron ore, future industry conditions and operating costs, severance and excise taxes, development costs and costs of extraction and reclamation, all of which may vary considerably from actual results. Estimating the quantity and grade of reserves requires us to determine the size, shape and depth of our mineral bodies by analyzing geological data, such as samplings of drill holes. In addition to the geology assumptions of our mines, assumptions are also required to determine the economic feasibility of mining these reserves, including estimates of future commodity prices and demand, the mining methods we use, and the related costs incurred to develop and mine our reserves. For these reasons, estimates of the economically recoverable quantities of mineralized deposits attributable to any particular group of properties, classifications of such reserves based on risk of recovery and estimates of future net cash flows prepared by different engineers or by the same engineers at different times may vary substantially as the criteria change. Estimated ore reserves could be affected by future industry conditions, geological conditions and ongoing mine planning. Actual volume and grade of reserves recovered, production rates, revenues and expenditures with respect to our reserves will likely vary from estimates, and if such variances are material, our sales and profitability could be affected adversely.

[Table of Contents](#)

***Defects in title or loss of any leasehold interests in our properties could limit our ability to mine these properties or result in significant unanticipated costs.***

A portion of our mining operations are conducted on properties we lease, license or as to which we have easements or other possessory interests ("leased properties"). Consistent with industry practice, title to most of these leased properties and mineral rights are not usually verified until we make a commitment to develop a property, which may not occur until after we have obtained necessary permits and completed exploration of the leased property. In some cases, title with respect to leased properties is not verified at all because we instead rely on title information or representations and warranties provided by lessors or grantors. We do not maintain title insurance on our owned or leased properties. A title defect or the loss of any lease, license or easement for any leased property could adversely affect our ability to mine the associated reserves. In addition, from time to time the rights of third parties for competing uses of adjacent, overlying, or underlying lands such as for, roads, easements and public facilities may affect our ability to operate as planned if our title is not superior or arrangements cannot be negotiated.

Any challenge to our title could delay the exploration and development of some reserves, deposits or surface rights, cause us to incur unanticipated costs and could ultimately result in the loss of some or all of our interest in those reserves or surface rights. In the event we lose reserves, deposits or surface rights, we may have to shut down or significantly alter the sequence of our mining operations, which may adversely affect our future production, revenues and cash flows. Additionally, if we lose any leasehold interests relating to any of our pellet plants or loadout facilities, we may need to find an alternative location to process our iron ore and load it for delivery to customers, which could result in significant unanticipated costs. Finally, we could incur significant liability if we inadvertently mine on property we do not own or lease.

***In order to continue to foster growth in our business and maintain stability of our earnings, we must maintain our social license to operate with our stakeholders.***

As a mining company, maintaining a strong reputation and consistent operational and safety history is vital in order to continue to foster growth and maintain stability in our earnings. As sustainability expectations increase and regulatory requirements continue to evolve, maintaining our social license to operate becomes increasingly important. We strive to incorporate social license expectations in our ERM program. Our ability to maintain our reputation and strong operating history could be threatened, including by circumstances outside of our control. If we are not able to respond effectively to these and other challenges to our social license to operate, our reputation could be damaged significantly. Damage to our reputation could affect adversely our operations and ability to foster growth in our Company.

***Estimates and timelines relating to new development and expansion projects are uncertain and we may incur higher costs and lower economic returns than estimated.***

Mine development and expansion projects typically require a number of years and significant expenditures during the development or expansion phase before production is possible. Such projects could experience unexpected problems and delays during development, construction and mine start-up or expansion.

Our decision to develop a project typically is based on the results of feasibility studies, which estimate the anticipated economic returns of a project. The actual project profitability or economic feasibility may differ from such estimates as a result of any of the following factors, among others: changes in tonnage, grades and metallurgical characteristics of ore to be mined and processed; estimated future prices of the relevant ore; changes in customer demand; higher construction and infrastructure costs; the quality of the data on which engineering assumptions were made; higher production costs; adverse geotechnical conditions; availability of adequate labor force; availability and cost of water and power; availability and cost of transportation; fluctuations in inflation and currency exchange rates; availability and terms of financing; delays in obtaining environmental or other government permits or changes in laws and regulations including environmental laws and regulations; weather or severe climate impacts; and potential delays relating to social and community issues.

Our future development activities may not result in the expansion or replacement of current production with new production, or any such new production sites or facilities may be less profitable than currently anticipated, or may not be profitable at all, any of which could have a material adverse effect on our sales, margins and cash flows.

A004858

VI.    HUMAN CAPITAL
       RISKS

***Our profitability could be affected adversely if we fail to maintain satisfactory labor relations.***

Production in our mines is dependent upon the efforts of our employees. We are party to labor agreements with various labor unions that represent employees at our operations. Such labor agreements are negotiated periodically, and, therefore, we are subject to the risk that these agreements may not be able to be renewed on reasonably satisfactory terms. It is difficult to predict what issues may arise as part of the collective bargaining process, and whether negotiations concerning these issues will be successful. Due to union activities or other employee actions, we could experience labor disputes, work stoppages, or other disruptions in our production of iron ore that could affect us adversely. The USW represents all hourly employees at our U.S. Iron Ore and Eastern Canadian Iron Ore operations owned and/or managed by Cliffs or its subsidiary companies except for Northshore. Our labor agreements with the USW at four of our U.S. Iron Ore operations expired on October 1, 2015, and have since been extended indefinitely. We continue to bargain with the USW in good faith with the expectation that we will be able to reach a mutually acceptable long-term extension of our agreements. At this time, we do not anticipate any type of labor disruption but since we are currently unable to estimate when our labor agreements will be finalized, there is an increased possibility of a disruption at our U.S. Iron Ore operations in 2016.

If we enter into a new labor agreement with any union that significantly increases our labor costs relative to our competitors or fail to come to an agreement upon expiry, our ability to compete may be materially and adversely affected.

***We may encounter labor shortages for critical operational positions, which could affect adversely our ability to produce our products.***

We are predicting a long-term shortage of skilled workers for the mining industry and competition for the available workers limits our ability to attract and retain employees. Additionally, at our U.S. mining locations, many of our mining operational employees are approaching retirement age. As these experienced employees retire, we may have difficulty replacing them at competitive wages.

***Our expenditures for post-retirement benefit and pension obligations could be materially higher than we have predicted if our underlying assumptions differ from actual outcomes, there are mine closures, or our joint venture partners fail to perform their obligations that relate to employee pension plans.***

We provide defined benefit pension plans and OPEB to certain eligible union and non-union employees in the United States, including our share of expense and funding obligations with respect to unconsolidated ventures. Our pension expense and our required contributions to our pension plans are affected directly by the value of plan assets, the projected and actual rate of return on plan assets, and the actuarial assumptions we use to measure our defined benefit pension plan obligations, including the rate at which future obligations are discounted.

We cannot predict whether changing market or economic conditions, regulatory changes or other factors will increase our pension expenses or our funding obligations, diverting funds we would otherwise apply to other uses.

We have calculated our unfunded pension and OPEB obligations based on a number of assumptions. If our assumptions do not materialize as expected, cash expenditures and costs that we incur could be materially higher. Moreover, we cannot be certain that regulatory changes will not increase our obligations to provide these or additional benefits. These obligations also may increase substantially in the event of adverse medical cost trends or unexpected rates of early retirement, particularly for bargaining unit retirees.

***We depend on our senior management team and other key employees, and the loss of these employees could adversely affect our business.***

Our success depends in part on our ability to attract and motivate our senior management and key employees. Achieving this objective may be difficult due to a variety of factors, including fluctuations in the global economic and industry conditions, competitors' hiring practices, cost reduction activities, and the effectiveness of our compensation programs. Competition for qualified personnel can be intense. We must continue to recruit, retain, and motivate our senior management and key personnel in order to maintain our business and support our projects. A loss of senior management and key personnel could prevent us from capitalizing on business opportunities, and our operating results could be adversely affected.

Item 1B.      ***Unresolved Staff Comments***

We have no unresolved comments from the SEC.

31

Table of Contents

**Item 2.**  *Properties*

The following map shows the locations of our operations and offices as of  December 31, 2015:



**General Information about the Mines**

All of our iron ore mining operations are open-pit mines. Additional pit development is underway as required by long-range mine plans. At our U.S. Iron Ore and Asia Pacific Iron Ore mines, drilling programs are conducted periodically for the purpose of refining guidance related to ongoing operations.

Geologic models are developed for all mines to define the major ore and waste rock types. Computerized block models for iron ore are constructed that include all relevant geologic and metallurgical data. These are used to generate grade and tonnage estimates, followed by detailed mine design and life of mine operating schedules.

*U.S. Iron Ore*

The following map shows the locations of our U.S. Iron Ore operations as of  December 31, 2015:



We directly or indirectly own and operate interests in  five U.S. Iron Ore mines located in Michigan and Minnesota from which we produced  19.3 million, 22.4 million and 20.3 million tons of iron ore pellets in 2015, 2014 and 2013, respectively, for our account. We produced 6.8 million, 7.3 million and 6.9 million tons, respectively, on behalf of the steel company partners of the mines.

Our U.S. Iron Ore mines produce from deposits located within the Biwabik and Negaunee Iron Formation, which are classified as Lake Superior type iron formations that formed under similar sedimentary conditions in shallow marine basins approximately two billion years ago. Magnetite and hematite are the predominant iron oxide ore minerals present, with lesser amounts of goethite and limonite. Quartz is the predominant waste mineral present, with lesser amounts of

32

Table of Contents

other chiefly iron bearing silicate and carbonate minerals. The ore minerals liberate from the waste minerals upon fine grinding.

| Mine | Cliffs Ownership | Infrastructure | Mineralization | Operating Since | Current Annual Capacity[1,2] | 2015 Production[2,3] | Mineral Owned | Rights Leased |
|---|---|---|---|---|---|---|---|---|
| Empire | 79% | Mine, Concentrator, Pelletizer | Magnetite | 1963 | 5.5 | 3.0 | 53% | 47% |
| Tilden | 85% | Mine, Concentrator, Pelletizer, Railroad | Hematite & Magnetite | 1974 | 8.0 | 7.6 | 100% | —% |
| Hibbing | 23% | Mine, Concentrator, Pelletizer | Magnetite | 1976 | 8.0 | 8.1 | 3% | 97% |
| Northshore | 100% | Mine, Concentrator, Pelletizer, Railroad | Magnetite | 1990 | 6.0 | 4.3 | —% | 100% |
| United Taconite | 100% | Mine, Concentrator, Pelletizer | Magnetite | 1965 | 5.4 | 3.1 | —% | 100% |

[1] Annual capacity is reported on a wet basis in millions of long tons, equivalent to 2,240 pounds.

[2] Figures reported on 100% basis.

[3] 2015 Production from Empire includes 0.8 million long tons tolled to Tilden.

*Empire Mine*

The Empire mine is located on the Marquette Iron Range in Michigan's Upper Peninsula approximately 15 miles southwest of Marquette, Michigan. The Empire mine has produced between 3.0 million and 4.4 million tons of iron ore pellets annually over the past five years, of which between 0.8 million and 2.4 million tons annually over the past five years were tolled to Tilden mine. During 2015, Empire was temporarily idled for a summer shutdown beginning on June 26, 2015. The temporary idle ended during mid-October of 2015. The summer shutdown was required due to lower tolling requirements from Tilden mine, a result of reduced demand from our steel-producing customers.

We own 79 percent of Empire and a subsidiary of ArcelorMittal USA has retained the remaining   21 percent ownership in Empire with limited rights and obligations, which it has a unilateral right to put to us at any time. This right has not been exercised. Each partner takes its share of production pro rata; however, provisions in the partnership agreement allow additional or reduced production to be delivered under certain circumstances. As part of a 2014 extension agreement between us and ArcelorMittal, which amended certain terms of the partnership agreement, certain minimum distributions of the partners' equity amounts are required to be made on a quarterly basis beginning in the first quarter of 2015 and will continue through January 2017. The partnership agreement expires December 31, 2016. We own directly approximately one-half of the remaining ore reserves at the Empire mine and lease them to Empire. A subsidiary of ours leases the balance of the Empire reserves from other owners of such reserves and subleases them to Empire. Operations consist of an open pit truck and shovel mine, a concentrator that utilizes single stage crushing, AG mills, magnetic separation and floatation to produce a magnetite concentrate that is then supplied to the on-site pellet plant.

*Tilden Mine*

The Tilden mine is located on the Marquette Iron Range in Michigan's Upper Peninsula approximately five miles south of Ishpeming, Michigan. Over the past five years, the Tilden mine has produced between 7.5 million and 7.8 million tons of iron ore pellets annually. We own 85 percent of Tilden, with the remaining minority interest owned by a subsidiary of U.S. Steel. Each partner takes its share of production pro rata; however, provisions in the partnership agreement allow additional or reduced production to be delivered under certain circumstances. We own all of the ore reserves at the Tilden mine and lease them to Tilden. Operations consist of an open pit truck and shovel mine, a concentrator that utilizes single stage crushing, AG mills, magnetite separation and floatation to produce hematite and magnetic concentrates that are then supplied to the on-site pellet plant.

The Empire and Tilden mines are located adjacent to each other. The logistical benefits include a consolidated transportation system, more efficient employee and equipment operating schedules, reduction in redundant facilities and workforce and best practices sharing. Two railroads, one of which is wholly owned by us, link the Empire and Tilden

33

A004861

Table of Contents

mines with Lake Michigan at the loading port of Escanaba, Michigan, and with the Lake Superior loading port of Marquette, Michigan.

### Hibbing Mine

The Hibbing mine is located in the center of Minnesota's Mesabi Iron Range and is approximately ten miles north of Hibbing, Minnesota and five miles west of Chisholm, Minnesota. Over the past five years, the Hibbing mine has produced between 7.7 million and 8.1 million tons of iron ore pellets annually. We own 23 percent of Hibbing, a subsidiary of ArcelorMittal has a 62.3 percent interest and a subsidiary of U.S. Steel has a 14.7 percent interest. Each partner takes its share of production pro rata; however, provisions in the joint venture agreement allow additional or reduced production to be delivered under certain circumstances. Mining is conducted on multiple mineral leases having varying expiration dates. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates. Hibbing operations consist of an open pit truck and shovel mine, a concentrator that utilizes single stage crushing, AG mills and magnetic separation to produce a magnetite concentrate, which is then delivered to an on-site pellet plant. From the site, pellets are transported by BNSF rail to a ship loading port at Superior, Wisconsin, operated by BNSF.

### Northshore Mine

The Northshore mine is located in northeastern Minnesota, approximately two miles south of Babbitt, Minnesota, on the northeastern end of the Mesabi Iron Range. Northshore's processing facilities are located in Silver Bay, Minnesota, near Lake Superior. Crude ore is shipped by a wholly owned railroad from the mine to the processing and dock facilities at Silver Bay. Over the past five years, the Northshore mine has produced between 3.9 million and 5.8 million tons of iron ore pellets annually. One of the four furnaces in the Northshore pellet plant was idled in January 2015. We ran a three furnace operation throughout 2015 until the complete idle of Northshore mine in late November 2015. The temporary idle is a result of historic levels of steel imports into the U.S. and reduced demand from our steel-producing customers. Northshore mine is expected to be idled at least through the first quarter of 2016.

The Northshore mine began production under our management and ownership on October 1, 1994. We own 100 percent of the mine. Mining is conducted on multiple mineral leases having varying expiration dates. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates. Northshore operations consist of an open pit truck and shovel mine where two stages of crushing occur before the ore is transported along a wholly owned 47-mile rail line to the plant site in Silver Bay. At the plant site, two additional stages of crushing occur before the ore is sent to the concentrator. The concentrator utilizes rod mills and magnetic separation to produce a magnetite concentrate, which is delivered to the pellet plant located on-site. The plant site has its own ship loading port located on Lake Superior.

### United Taconite Mine

The United Taconite mine is located on Minnesota's Mesabi Iron Range in and around the city of Eveleth, Minnesota. The United Taconite concentrator and pelletizing facilities are located ten miles south of the mine, near the town of Forbes, Minnesota. Over the past five years, the United Taconite mine has produced between 3.1 million and 5.4 million tons of iron ore pellets annually. Currently, United Taconite mine is temporarily idled. The temporary idle began the first week of August 2015 and is a result of historic levels of steel imports into the U.S. and reduced demand from our steel-producing customers. United Taconite mine is expected to be idled at least through the first quarter of 2016.

We own 100 percent of the United Taconite mine. Mining is conducted on multiple mineral leases having varying expiration dates. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates. United Taconite operations consist of an open pit truck and shovel mine where two stages of crushing occur before the ore is transported by rail to the plant site located ten miles to the south. At the plant site an additional stage of crushing occurs before the ore is sent to the concentrator. The concentrator utilizes rod mills and magnetic separation to produce a magnetite concentrate, which is delivered to the pellet plant. From the site, pellets are transported by CN rail to a ship loading port at Duluth, Minnesota, operated by CN.

A004862

Table of Contents

**Asia Pacific Iron Ore**

The following map shows the location of our Asia Pacific Iron Ore operation as of  December 31, 2015:



In Australia, we own and operate the Koolyanobbing operations. We produced 11.7 million metric tons, 11.4 million metric tons and 11.1 million metric tons in 2015, 2014 and 2013, respectively.

The mineralization at the Koolyanobbing operations is predominantly hematite and goethite replacements in greenstone-hosted banded iron formations. Individual deposits tend to be small with complex ore-waste contact relationships. The reserves at the Koolyanobbing operations are derived from 10 separate mineral deposits distributed over a 70 mile operating radius.

| Mine | Cliffs Ownership | Infrastructure | Mineralization | Operating Since | Current Annual Capacity[1] | 2015 Production | Mineral Owned | Rights Leased |
|---|---|---|---|---|---|---|---|---|
| Koolyanobbing | 100% | Mine, Road Haulage, Crushing-Screening Plant | Hematite & Goethite | 1994 | 11.0 | 11.7 | —% | 100% |

[1] Annual capacity is reported on a wet basis in millions of metric tons, equivalent to 2,205 pounds.

*Koolyanobbing*

The Koolyanobbing operations are located 250 miles east of Perth and approximately 30 miles northeast of the town of Southern Cross. Koolyanobbing produces lump and fines iron ore. Mining is conducted on multiple mineral leases having varying expiration dates. Mining leases routinely are renewed as they approach their respective expiration dates. In 2011, a significant permitting milestone was achieved with the granting of regulatory approvals necessary to develop above the water table at Windarling's W1 deposit. In 2013, environmental approvals were obtained for deepening of the Windarling W1 pit and deepening of the Koolyanobbing A/B/C pits. The operations at Windarling have been idled since the beginning of the fourth quarter of 2015 as a result of cost cutting measures.

Over the past five years, the Koolyanobbing operation has produced between 8.2 million and 11.7 million metric tons annually. The expansion project at Koolyanobbing increasing annual capacity to 11 million metric tons was completed in 2012. Ore material can be sourced from nine separate open pit mines and is delivered by typical production trucks or road trains to a crushing and screening facility located at Koolyanobbing. All of the ore from the Koolyanobbing operations is transported by rail to the Port of Esperance, 360 miles to the south, for shipment to Asian customers.

35

A004863

Table of Contents

**North American Coal**

Throughout the majority of 2015, we directly owned and operated two North American coal mining complexes from which we produced a total of 4.3 million tons of coal in 2015. In the fourth quarter of 2015, we sold these two coal mining complexes, Pinnacle mine and Oak Grove mine, marking our exit from the coal business. The sale was completed on December 22, 2015. In 2014 and 2013, we produced 7.5 million and 7.2 million tons of coal, respectively. Prior to December 31, 2014, we also owned a third coal mining complex, CLCC. We no longer own CLCC as the sale of the CLCC assets was completed on December 31, 2014. The production tons above include 2.5 million tons and 2.1 million tons of coal produced by CLCC in 2014 and 2013, respectively. Our coal production at each mine was shipped within the U.S. by rail or barge. Coal for international customers was shipped through the ports of Mobile, Alabama; Norfolk, Virginia; and New Orleans, Louisiana.

As of March 31, 2015, management determined that our North American Coal operating segment met the criteria to be classified as held for sale under *ASC 205, Presentation of Financial Statements* . As such, all current year and historical North American Coal operating segment results are included in our financial statements and classified within discontinued operations. Refer to NOTE 14 - DISCONTINUED OPERATIONS for further discussion of the North American Coal segment discontinued operations.

**Eastern Canadian Iron Ore**

We own interests in two non-operating iron ore mines in the Canadian Provinces of Québec and Newfoundland and Labrador from which we had been producing iron ore concentrate through December 2014 and produced iron ore pellets through June 2013. We produced 6.2 million and 8.7 million metric tons of iron ore product in 2014 and 2013, respectively, from these two mines. In May 2011, we acquired Consolidated Thompson along with its 75 percent interest in the Bloom Lake property. In the fourth quarter of 2013, our interest in Bloom Lake increased by an aggregate of 7.8 percent, bringing our interest to 82.8 percent in the Bloom Lake property.

As more fully described in NOTE 14 - DISCONTINUED OPERATIONS, in January 2015, we announced that the Bloom Lake Group commenced restructuring proceedings in Montreal, Quebec under the CCAA. At that time, we had suspended Bloom Lake operations and for several months had been exploring options to sell certain of our Canadian assets, among other initiatives. Effective January 27, 2015, following the CCAA filing of the Bloom Lake Group, we deconsolidated the Bloom Lake Group and certain other wholly-owned subsidiaries comprising substantially all of our Canadian operations. Additionally, on May 20, 2015, the Wabush Group commenced restructuring proceedings in Montreal, Quebec, under the CCAA which resulted in the deconsolidation of the remaining Wabush Group entities that were not previously deconsolidated. The Wabush Group was no longer generating revenues and was not able to meet its obligations as they came due. As a result of this action, the CCAA protections granted to the Bloom Lake Group were extended to include the Wabush Group to facilitate the reorganization of each of their businesses and operations. Financial results prior to the respective deconsolidations of the Bloom Lake and Wabush Groups and subsequent expenses directly associated with the Canadian Entities are included in our financial statements and classified within discontinued operations.

**Mineral Policy**

We have a corporate policy prescribing internal control and procedures with respect to auditing and estimating of minerals. The procedures contained in the policy include the calculation of mineral estimates at each property by our engineers, geologists and accountants, as well as third-party consultants. Management compiles and reviews the calculations, and once finalized, such information is used to prepare the disclosures for our annual and quarterly reports. The disclosures are reviewed and approved by management, including our chief executive officer and chief financial officer. Additionally, the long-range mine planning and mineral estimates are reviewed annually by our Audit Committee. Furthermore, all changes to mineral estimates, other than those due to production, are adequately documented and submitted to senior operations officers for review and approval. Finally, periodic reviews of long-range mine plans and mineral reserve estimates are conducted at mine staff meetings, senior management meetings and by independent experts.

**Mineral Reserves**

Reserves are defined by SEC Industry Standard Guide 7 as that part of a mineral deposit that could be economically and legally extracted and produced at the time of the reserve determination. All reserves are classified as proven or probable and are supported by life-of-mine plans.

36

Table of Contents

Reserve estimates are based on pricing that does not exceed the three-year trailing average of benchmark prices for iron ore adjusted to our realized price. For the three-year period 2013 to 2015, the average international benchmark price of 62 percent Fe CFR China was $96 per dry metric ton.

We evaluate and analyze mineral reserve estimates in accordance with our mineral policy and SEC requirements. The table below identifies the year in which the latest reserve estimate was completed.

| Property | Date of Latest Economic Reserve Analysis |
|---|---|
| **U.S. Iron Ore** | |
| Empire | 2009 |
| Tilden | 2015 |
| Hibbing | 2015 |
| Northshore | 2015 |
| United Taconite | 2013 |
| **Asia Pacific Iron Ore** | |
| Koolyanobbing | 2013 |

**Iron Ore Reserves**

Ore reserve estimates for our iron ore mines as of  December 31, 2015 were estimated from fully designed open pits developed using three-dimensional modeling techniques. These fully designed pits incorporate design slopes, practical mining shapes and access ramps to assure the accuracy of our reserve estimates. All of our remaining operations reserves have been adjusted net of 2015 production.

37

A004865

Table of Contents

### U.S. Iron Ore

All tonnages reported for our U.S. Iron Ore operating segment are in long tons of 2,240 pounds, have been rounded to the nearest 100,000 and are reported on a 100 percent basis.

**U.S. Iron Ore Mineral Reserves**
**as of December 31, 2015**
**(In Millions of Long Tons)**

| Property | Cliffs Share | Proven | | Probable | | Proven & Probable | | Saleable Product [2,3] | | Previous Year | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Tonnage | % Grade | Tonnage | % Grade | Tonnage | % Grade[5] | Process Recovery[4] | Tonnage | P&P Crude Ore | Saleable Product |
| Empire | 79% | 8.6 | 22.5 | — | — | 8.6 | 22.5 | 37% | 3.2 | 14.6 | 4.7 |
| Tilden Hematite[1] | 85% | 306.1 | 34.7 | 82.7 | 33.9 | 388.8 | 34.6 | 37% | 143.5 | 584.3 | 199.6 |
| Tilden Magnetite | 85% | 0.2 | 27.0 | 0.1 | 25.1 | 0.3 | 26.4 | 33% | 0.1 | 77.7 | 29.5 |
| Total Tilden | 85% | 306.3 | | 82.8 | | 389.1 | | 37% | 143.6 | 662.0 | 229.1 |
| Hibbing | 23% | 238.5 | 19.6 | 24.7 | 19.6 | 263.2 | 19.6 | 26% | 69.7 | 260.2 | 68.0 |
| Northshore | 100% | 260.2 | 25.0 | 557.4 | 24.2 | 817.6 | 24.4 | 32% | 264.3 | 1,036.3 | 351.8 |
| United Taconite | 100% | 400.9 | 23.1 | 65.9 | 22.9 | 466.8 | 23.0 | 33% | 156.2 | 475.1 | 159.2 |
| Totals | | 1,214.5 | | 730.8 | | 1,945.3 | | | 637.0 | 2,448.2 | 812.8 |

[1] Tilden hematite reported grade is percent FeT; all other properties are percent magnetic iron

[2] Saleable product is a standard pellet containing 60 to 66 percent Fe calculated from both proven and probable mineral reserves

[3] Saleable product is reported on a dry basis; shipped products typically contain 1 to 4 percent moisture

[4] Process recovery includes all factors for converting crude ore tonnage to saleable product

[5] Cutoff grades are 15 percent magnetic iron for Hibbing and Empire, 17 percent for United Taconite, 19 percent for Northshore and 20 percent for Tilden. Cutoff for Tilden hematite is 25 percent FeT.

### Asia Pacific Iron Ore

All tonnages reported for our Asia Pacific Iron Ore operating segment are in metric tons of 2,205 pounds, have been rounded to the nearest 100,000 and are reported on a 100 percent basis.

**Asia Pacific Iron Ore Mineral Reserves**
**as of December 31, 2015**
**(In Millions of Metric Tons)[1]**

| Property | Cliffs Share | Proven | | Probable | | Proven & Probable | | Previous Year Total |
|---|---|---|---|---|---|---|---|---|
| | | Tonnage | % Fe | Tonnage | % Fe | Tonnage | % Fe[2] | Tonnage |
| Koolyanobbing | 100% | 4.1 | 56.6 | 45.0 | 60.1 | 49.1 | 59.8 | 60.8 |

[1] Tonnages reported are saleable product reported on a dry basis; shipped products contain approximately 5 percent moisture

[2] Cutoff grade is 54 percent FeT

**Item 3.    Legal Proceedings**

*Alabama Dust Litigation.* At the time of the sale of our Oak Grove mine to Seneca on December 22, 2015, three cases were pending in the Alabama state court system that comprise the Alabama Dust Litigation. Generally, these claims were asserted by nearby homeowners alleging that dust emanating from the Concord Preparation Plant causes damage to their properties. The defense and any liability relating to these lawsuits has been assumed by Seneca as part of the sale. As such, we will not continue to make disclosures relating to this litigation.

*Bloom Lake Investigation.* CQIM, Bloom Lake General Partner Limited and Bloom Lake were investigated by Environment Canada in relation to alleged violations of Section 36(3) of the Fisheries Act that prohibits the deposit of a

38

Table of Contents

deleterious substance in water frequented by fish or in any place where the deleterious substance may enter any such water and Section 40(3) of the Fisheries Act in relation to an alleged failure to comply with a direction of an inspector. The investigation covered several alleged incidents that occurred between April 2011 and December 2014. The Bloom Lake investigation was settled on December 19, 2014, resolving all allegations and included a fine of C$1.5 million and a contribution to the Environmental Damages Fund of C$6.0 million. CQIM, Bloom Lake General Partner Limited and Bloom Lake entered into a Management Directive with Environment Canada which outlines compliance obligations to address these concerns going forward.

*Empire NPDES Permit Enforcement.* Empire received an enforcement letter on December 22, 2015 from the MDEQ alleging exceedances of the selenium effluent limit in 2014 and 2015. The letter invited Empire to resolve the matter via an Administrative Consent Order. Discussions with MDEQ regarding the foregoing alleged exceedances have not been concluded and the resolution of these matters is uncertain at this time. However, it is not anticipated that the Administrative Consent Order obligations will be material to us.

*ERISA Litigation.* On May 14, 2015, a lawsuit was filed in the United States District Court for the Northern District of Ohio captioned Paul Saumer, individually and on behalf of all others similarly situated, v. Cliffs Natural Resources Inc. et al., No. 1:15-CV-00954. This action was purportedly brought on behalf of the Northshore and Silver Bay Power Company Retirement Savings Plan (the "Plan") and certain participants and beneficiaries of the Plan during the class period, defined in the complaint as April 2, 2012 to the present, against Cliffs Natural Resources Inc., its investment committee, Northshore, the Employee Benefits Administration Department of Northshore, and certain current and former officers. Plaintiff amended the complaint to name as defendants additional current and former employees who served on the investment committee. The suit alleges that the defendants breached their duties to the plaintiffs and the Plan in violation of ERISA fiduciary rules by, among other things, continuing to offer and hold Cliffs Natural Resources Inc. stock as a Plan investment option during the class period. The relief sought includes a request for a judgment ordering the defendants to make good to the Plan all losses to the Plan resulting from the alleged breaches of fiduciary duties. The lawsuit has been referred to our insurance carriers. On December 16, 2015, defendants filed a motion to dismiss the lawsuit.

*Essar Litigation.* On January 12, 2015, The Cleveland-Cliffs Iron Company, Northshore Mining Company and Cliffs Mining Company (collectively, the "Cliffs Plaintiffs") filed a complaint against Essar in the U.S. District Court for the Northern District of Ohio, Eastern Division, asserting that Essar breached the parties' Pellet Sale and Purchase Agreement, as amended (the "Pellet Agreement") by, among other things, failing to take delivery of and pay for its nominated ore in 2014, failing to make certain payments under a true up provision, and disclosing confidential information. The complaint also seeks a declaration that Essar is not entitled to receive certain credit payments under the terms of the Pellet Agreement. The Cliffs Plaintiffs seek damages in excess of $90 million. Essar filed an Answer and Counterclaim on February 11, 2015, seeking damages in excess of $160 million for various alleged breaches of the Pellet Agreement, including failure to deliver ore, overcharging for certain deliveries, failure to pay certain credit payments and disclosing confidential information. The parties started the discovery process, with a discovery cutoff date set for October 30, 2015, and a trial date set for December 7, 2015. The parties agreed to attempt mediation of the claims. Two mediation sessions took place on March 7 and April 21, 2015. The mediations were unsuccessful.  The Cliffs Plaintiffs filed a Motion for Partial Summary Judgment on July 31, 2015, which was granted in part on October 8, 2015. With respect to the Cliffs Plaintiffs' claim that Essar had breached by failing to take its 2014 nomination, the Court found that Essar had breached and had failed to take between 500,000 and 700,000 tons of its 2014 nomination. The summary judgment ruling also dismissed Essar's counterclaim that the Cliffs Plaintiffs had overcharged Essar by improperly measuring moisture levels. With respect to this claim, the Court found that there was "no basis" for Essar's claim that the Cliffs Plaintiffs had breached the contract. On October 5, 2015, the Cliffs Plaintiffs terminated the Pellet Agreement because of Essar's continual breach of the Pellet Agreement.  On October 6, 2015, Essar filed motions for temporary restraining order and preliminary injunction. Essar withdrew both motions on October 15, 2015, before any order was entered on either motion.

On November 9, 2015, Essar filed for protection under CCAA in Canada in the Ontario Superior Court of Justice and Chapter 15 bankruptcy protection in the United States in the U.S. District Court for the District of Delaware. As a result of the stay related to Essar's bankruptcy proceedings, the litigation in U.S. District Court for the Northern District of Ohio was dismissed without prejudice stating that either party could reinstate the case upon application, if necessary, when the bankruptcy proceedings have concluded. Essar moved the CCAA Court to determine that the Cliffs Plaintiffs' termination of the Pellet Agreement was invalid and to reinstate the Pellet Agreement. The Cliffs Plaintiffs have objected based upon inappropriate jurisdiction and other grounds. On January 25, 2016, the CCAA Court determined that it has proper jurisdiction and instructed the parties to determine an appropriate procedure to try the facts in front of the CCAA Court. The Cliffs Plaintiffs filed an appeal of the CCAA Court's decision regarding proper jurisdiction on February 8, 2016.

Table of Contents

*Michigan Electricity Matters.* On February 19, 2015, in connection with various proceedings before FERC with respect to certain cost allocations for continued operation of the Presque Isle Power Plant in Marquette, Michigan, FERC issued an order directing MISO to submit a revised methodology for allocating SSR costs that identified the load serving entities that require the operation of SSR units at the power plant for reliability purposes. On September 17, 2015, FERC issued an order conditionally approving MISO's revised allocation methodology. Parties have filed petitions for rehearing on FERC's order as well as protests against MISO's compliance filing submitted pursuant to the order. FERC has deferred its decision on the issue of retroactive refunds until after it has approved MISO's allocation methodology in full. Should FERC award SSR costs based on the revised cost allocation methodology applied retroactively, our current estimate of the potential liability to our Empire and Tilden mines is approximately $17.1 million.  We, however, continue to challenge the imposition of any SSR costs before FERC and the U.S. Court of Appeals for the D.C. Circuit.

*Pinnacle Mine Environmental Litigation.* On June 22, 2010, the West Virginia DEP filed a lawsuit in the Wyoming County Circuit Court against the Pinnacle mine alleging past non-compliance with its NPDES discharge permit. The complaint seeks injunctive relief and penalties. An initial penalty proposal of $1.0 million was offered by the West Virginia DEP in March 2012; however, Pinnacle disagrees with the alleged violations and has met with the DEP to present facts supporting a review and reduction of the proposed penalty. The defense and any liability relating to this lawsuit have been assumed by Seneca as part of the sale. As such, we will not continue to make disclosures relating to this litigation.

*Pointe Noire Investigation.*  Wabush Mines was investigated by Environment Canada in relation to alleged violations of (i) Section 36(3) of the Fisheries Act, which prohibits the deposit of a deleterious substance in water frequented by fish or in any place where the deleterious substance may enter any such water, and (ii) Section 5.1 of the Migratory Bird Convention Act, 1994.  The Québec Ministry of Sustainable Development, Environment, Wildlife and Parks also conducted an investigation into alleged violations of Section 8 of the Hazardous Material Regulation, which prohibits the discharge of a hazardous material to the environment.  The investigations covered events surrounding and leading up to the alleged release of approximately 1,320 gallons of fuel oil into the Bay of Sept-Iles on September 1, 2013.  We cooperated with the investigators and agency response officials. In April 2014, the Québec Ministry of Justice filed a penalty charge related to the incident. The Pointe Noire investigation was settled in December 2014. A fine of C$750,000 and C$61,000 in costs were paid. We are anticipating a report by the Québec Ministry related to their assessment of the cleanup activities performed by Wabush Mines and further direction related to requirements for additional environmental monitoring, if any.

*Putative Class Action Lawsuits.* In May 2014, alleged purchasers of our common shares filed suit in the U.S. District Court for the Northern District of Ohio against us and certain former officers and directors of the Company. The action is captioned <u>Department of the Treasury of the State of New Jersey and Its Division of Investment v. Cliffs Natural Resources Inc., et al.</u>, No. 1:14-CV-1031. As amended, the action asserts violations of the federal securities laws based on alleged false or misleading statements or omissions during the period of March 14, 2012 to March 26, 2013, regarding operations at our Bloom Lake mine in Québec, Canada, and the impact of those operations on our finances and outlook, including sustainability of the dividend, and that the alleged misstatements caused our common shares to trade at artificially inflated prices. The parties have successfully mediated this dispute and reached a settlement in principle, subject to definitive documentation, shareholder notice and court approval. The lawsuit had been referred to our insurance carriers, who will be required to pay the entirety of the $84 million settlement amount, if approved by the court. The court is expected to schedule a settlement approval hearing. The settlement of this lawsuit, if approved, will have no impact on our financial position or operations.

In June 2014, an alleged purchaser of the depositary shares issued by Cliffs in a public offering in February 2013 filed a putative class action, which is captioned <u>Rosenberg v. Cliffs Natural Resources Inc., et al.</u>, and after a round of removal and remand motions, is now pending in the Cuyahoga County , Ohio, Court of Common Pleas, No. CV-14-828140. As amended, the suit asserts claims against us, certain current and former officers and directors of the Company, and several underwriters of the offering, alleging disclosure violations in the offering documents regarding operations at our Bloom Lake mine, the impact of those operations on our finances and outlook, and about the progress of our former exploratory chromite project in Ontario, Canada. The parties successfully mediated this dispute and reached a settlement agreement in principle, subject to definitive documentation, notice to class members and court approval. The settlement provides for a payment to the proposed class of $10 million, which has been deposited into escrow by the insurance carriers. A court hearing, during which the parties will seek court approval of the proposed class action settlement, is scheduled for April 14, 2016.

*Shareholder Derivative Lawsuits.* In June and July 2014, alleged shareholders of Cliffs filed three derivative actions in the Cuyahoga County, Ohio, Court of Common Pleas asserting claims against certain current and former officers and directors of the Company. These actions, captioned <u>Black v. Carrabba, et al.</u>, No. CV-14-827803, <u>Asmussen v. Carrabba, et al.</u>, No. CV-14-829259, and <u>Williams, et al. v. Carrabba, et al.</u>, No. CV-14-829499, allege that the individually named defendants violated their fiduciary duties to the Company by, among other things, disseminating false and

Table of Contents

misleading information regarding operations at our Bloom Lake mine in Québec, Canada, and the impact of those operations on our finances and outlook, including sustainability of the dividend, failing to maintain internal controls, and failing to appropriately oversee and manage the Company. The complaints assert additional claims for unjust enrichment, abuse of control, gross mismanagement, overpayment upon departure of certain executives, and waste of corporate assets. The parties have reached a settlement in principle to settle all three cases, subject to definitive documentation, shareholder notice and court approval. Under the pending settlement, the Company will agree to enact or continue various corporate-governance related measures and to pay plaintiffs' attorneys' fees and expenses. The lawsuit had been referred to our insurance carriers who will pay $775,000 for attorneys' fees and expenses to plaintiffs' lawyers. The settlement of these actions will have no impact on our financial position. Following the announcement of the settlement in principle of these three shareholder derivative cases, an additional derivative shareholder action, captioned Mansour v. Carrabba, et al., No. 16-CV-00390, was filed in the U.S. District Court for the Northern District of Ohio against the same defendants and alleging substantially identical claims. This additional lawsuit has been referred to our insurance carriers.

*The Rio Tinto Mine Site.* The Rio Tinto Mine Site is an historic underground copper mine located near Mountain City, Nevada, where tailings were placed in Mill Creek, a tributary to the Owyhee River. Site investigation and remediation work is being conducted in accordance with a Consent Order dated September 14, 2001, between the Nevada DEP and the RTWG composed of the Company, Atlantic Richfield Company, Teck Cominco American Incorporated and E. I. duPont de Nemours and Company. The Consent Order provides for technical review by the U.S. Department of the Interior Bureau of Indian Affairs, the U.S. Fish and Wildlife Service, U.S. Department of Agriculture Forest Service, the Nevada DEP and the Shoshone-Paiute Tribe of the Duck Valley Reservation (collectively, the "Rio Tinto Trustees"). In recognition of the potential for an NRD claim, the parties actively pursued a global settlement that would include the EPA and encompass both the remedial action and the NRD issues.

The Nevada DEP published a Record of Decision for the Rio Tinto Mine, which was signed on February 14, 2012, by the Nevada DEP and the EPA. On September 27, 2012, the agencies subsequently issued a proposed Consent Decree, which was lodged with the U.S. District Court for the District of Nevada and was finalized on May 20, 2013. Under the terms of the Consent Decree, the RTWG has agreed to pay over $29 million in cleanup costs and natural resource damages to the site and surrounding area. Under the terms of the Consent Decree, the RTWG is responsible for removing mine tailings from Mill Creek, improving the creek to support redband trout, improving water quality in Mill Creek and the East Fork Owyhee River and long term monitoring of the site. Nevada DEP will oversee the cleanup, with input from EPA and monitoring from the Rio Tinto Trustees. The Company's share of the total settlement cost, which includes this remedial action, insurance and other oversight costs, was $12.2 million. As of December 31, 2015, we had completed all required payments related to the Consent Decree.

*Southern Natural Gas Lawsuit.* On July 23, 2014, Southern Natural Gas Company, L.L.C. filed a lawsuit in the Circuit Court of Jefferson County, Alabama (Case No. 68-CV-2014-900533.00) against the Company and others. The suit seeks to prevent coal mining activity underneath a gas pipeline at our Oak Grove property and to require defendants to pay the costs associated with relocating that pipeline. The suit asserts claims for declaratory judgment and nuisance. This lawsuit was pending at the time of the sale of our Oak Grove mine to Seneca. The defense and any liability relating to this lawsuit has been assumed by Seneca as part of the sale, including the obligation to indemnify the Company as a named defendant. As such, we will not continue to make disclosures relating to this litigation.

*Taconite MACT Compliance Review.* EPA Region 5 issued Notices of Violation during the first quarter of 2014 to Empire, Tilden and United Taconite related to alleged historical violations of the Taconite MACT rule and certain elements of the respective state-issued Title V operating permits. While the matter has been referred to the DOJ for enforcement, it is not anticipated currently to have a material impact on our business.

*Worldlink Arbitration.* In October 2011, our wholly owned subsidiary, CQIM, along with Bloom Lake General Partner Limited and The Bloom Lake Iron Ore Mine Limited Partnership, instituted an arbitration claim against the Bloom Lake mine's former customer, Worldlink Resources Limited, for material and/or fundamental breaches of the parties' 2007 offtake agreement for the purchase and sale of iron concentrate produced at the Bloom Lake mine. Our subsidiaries filed the arbitration claim with the International Court of Arbitration of the International Chamber of Commerce pursuant to the dispute resolution provisions of the offtake agreement. Our subsidiaries terminated the offtake agreement with Worldlink in August 2011 due to Worldlink's failure to fulfill its obligations under the agreement and Worldlink's demand to renegotiate the price of the iron ore concentrate in spite of being party to a long-term offtake agreement. Our subsidiaries claimed damages for the breach of the offtake agreement in excess of $85 million and Worldlink counterclaimed for damages in excess of $100 million. In November 2014, the arbitrators decided in favor of Worldlink and awarded it damages in an amount of approximately $71 million as well as approximately $25 million in accrued interest from the date of termination of the offtake agreement in August 2011 and arbitration costs. This judgment has been included in the CCAA filing of the Bloom Lake Group and will be treated as an unsecured claim.

41

Table of Contents

**Item 4.**          *Mine Safety Disclosures*

We are committed to protecting the occupational health and well-being of each of our employees. Safety is one of our core values, and we strive to ensure that safe production is the first priority for all employees. Our internal objective is to achieve zero injuries and incidents across the Company by focusing on proactively identifying needed prevention activities, establishing standards and evaluating performance to mitigate any potential loss to people, equipment, production and the environment. We have implemented intensive employee training that is geared toward maintaining a high level of awareness and knowledge of safety and health issues in the work environment through the development and coordination of requisite information, skills and attitudes. We believe that through these policies, we have developed an effective safety management system.

Under the Dodd-Frank Act, each operator of a coal or other mine is required to include certain mine safety results within its periodic reports filed with the SEC. As required by the reporting requirements included in §1503(a) of the Dodd-Frank Act and Item 104 of Regulation S-K, the required mine safety results regarding certain mining safety and health matters for each of our mine locations that are covered under the scope of the Dodd-Frank Act are included in Exhibit 95 of *Item 15. Exhibits and Financial Statement Schedules* of this Annual Report on Form 10-K.

42

Table of Contents

PART II

**Item 5.**  *Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities*

**Stock Exchange Information**

Our common shares (ticker symbol CLF) are listed on the NYSE.

**Common Share Price Performance and Dividends**

The following table sets forth, for the periods indicated, the high and low sales prices per common share as reported on the NYSE and the dividends declared per common share:

|  | 2015 | | | 2014 | | |
|---|---|---|---|---|---|---|
|  | **High** | **Low** | **Dividends** | High | Low | Dividends |
| First Quarter | $ 9.39 | $ 4.12 | $ — | $ 26.63 | $ 17.40 | $ **0.15** |
| Second Quarter | 6.87 | 4.27 | — | 21.25 | 13.60 | **0.15** |
| Third Quarter | 4.53 | 2.28 | — | 18.41 | 10.19 | **0.15** |
| Fourth Quarter | 3.73 | 1.42 | — | 11.70 | 5.63 | **0.15** |
| Year | 9.39 | 1.42 | $ — | 26.63 | 5.63 | $ **0.60** |

At February 22, 2016, we had 1,274 shareholders of record.

On January 26, 2015, we announced that our Board of Directors had decided to eliminate the quarterly dividend of $0.15 per share on our common shares. The decision was applicable to the first quarter of 2015 and all subsequent quarters.

**Shareholder Return Performance**

The following graph shows changes over the past five-year period in the value of $100 invested in: (1) Cliffs' common shares; (2) S&P 500 Stock Index; (3) S&P Smallcap 600 Index; and (4) S&P Metals and Mining ETF Index. The values of each investment are based on price change plus reinvestment of all dividends reported to shareholders.



43

Table of Contents

|  |  | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| **Cliffs Natural Resources Inc.** | Return % |  | -19.24 | -34.76 | -30.17 | -71.56 | **-77.87** |
|  | Cum $ | 100.00 | 80.76 | 52.69 | 36.79 | 10.46 | **2.32** |
| **S&P 500 Index - Total Returns** | Return % |  | 2.08 | 15.98 | 32.36 | 13.69 | **1.38** |
|  | Cum $ | 100.00 | 102.08 | 118.39 | 156.70 | 178.15 | **180.61** |
| **S&P Smallcap 600 Index** | Return % |  | 0.99 | 16.30 | 41.29 | 5.73 | **-2.00** |
|  | Cum $ | 100.00 | 100.99 | 117.45 | 165.65 | 175.95 | **171.95** |
| **S&P Metals and Mining ETF** | Return % |  | -28.16 | -6.60 | -5.37 | 9.77 | **-50.51** |
|  | Cum $ | 100.00 | 71.84 | 67.10 | 63.50 | 69.70 | **34.49** |

**Issuer Purchases of Equity Securities**

The following table presents information with respect to repurchases by the Company of our common shares during the periods indicated.

### ISSUER PURCHASES OF EQUITY SECURITIES

| Period | Total Number of Shares (or Units) Purchased [1] | Average Price Paid per Share (or Unit) | Total Number of Shares (or Units) Purchased as Part of Publicly Announced Plans or Programs | Maximum Number (or Approximate Dollar Value) of Shares (or Units) that May Yet be Purchased Under the Plans or Programs [2] |
|---|---|---|---|---|
| October 1 - 31, 2015 | — | $ — | — | $200,000,000 |
| November 1 - 30, 2015 | 3,548 | $ 3.24 | — | $200,000,000 |
| December 1 - 31, 2015 | 83,388 | $ 1.58 | — | — |
| **Total** | **86,936** | **$ 1.65** | **—** | **—** |

---

[1] These shares were delivered to us by employees to satisfy tax withholding obligations due upon the vesting or payment of stock awards.

[2] On August 25, 2014, the Board of Directors authorized a share repurchase plan pursuant to which we were permitted to buy back our outstanding common shares in the open market or in private negotiated transactions up to a maximum of $200 million. No shares were purchased through December 31, 2015. The authorization expired on December 31, 2015.

Table of Contents

**Item 6.** *Selected Financial Data*

**Summary of Financial and Other Statistical Data - Cliffs Natural Resources Inc. and Subsidiaries**

| Financial data (in millions, except per share amounts) * | 2015 (g) | 2014 (f) | 2013 (e) | 2012 (c) | 2011 (b) |
|---|---|---|---|---|---|
| Revenue from product sales and services | $ 2,013.3 | $ 3,373.2 | $ 3,890.8 | $ 3,982.7 | $ 4,873.7 |
| Cost of goods sold and operating expenses | (1,776.8) | (2,487.5) | (2,406.4) | (2,438.4) | (2,197.0) |
| Other operating expense | (85.2) | (755.6) | (104.1) | (239.3) | (201.5) |
| Operating income | 151.3 | 130.1 | 1,380.3 | 1,305.0 | 2,475.2 |
| Income from continuing operations | 143.7 | 56.4 | 878.9 | 336.4 | 1,904.1 |
| Loss from discontinued operations, net of tax | (892.1) | (8,368.0) | (517.1) | (1,463.0) | (91.5) |
| Net income (loss) | (748.4) | (8,311.6) | 361.8 | (1,126.6) | 1,812.6 |
| Loss (income) attributable to noncontrolling interest | (0.9) | 1,087.4 | 51.7 | 227.2 | (193.5) |
| Net income (loss) attributable to Cliffs shareholders | (749.3) | (7,224.2) | 413.5 | (899.4) | 1,619.1 |
| Preferred stock dividends | (38.4) | (51.2) | (48.7) | — | — |
| Income (loss) attributable to Cliffs common shareholders | $ (787.7) | $ (7,275.4) | $ 364.8 | $ (899.4) | $ 1,619.1 |
| Earnings (loss) per common share attributable to Cliffs common shareholders - basic | | | | | |
| Continuing operations | $ 0.63 | $ (0.14) | $ 5.37 | $ 2.19 | $ 12.61 |
| Discontinued operations | (5.77) | (47.38) | (2.97) | (8.51) | (1.06) |
| Earnings (loss) per common share attributable to Cliffs common shareholders - basic | $ (5.14) | $ (47.52) | $ 2.40 | $ (6.32) | $ 11.55 |
| Earnings (loss) per common share attributable to Cliffs common shareholders - diluted | | | | | |
| Continuing operations | $ 0.63 | $ (0.14) | $ 4.95 | $ 2.18 | $ 12.53 |
| Discontinued operations | (5.76) | (47.38) | (2.58) | (8.48) | (1.05) |
| Earnings (loss) per common share attributable to Cliffs common shareholders - diluted | $ (5.13) | $ (47.52) | $ 2.37 | $ (6.30) | $ 11.48 |
| Total assets | $ 2,135.5 | $ 3,147.2 | $ 13,102.9 | $ 13,549.6 | $ 14,516.6 |
| Long-term debt obligations (including capital leases) | $ 2,755.6 | $ 2,911.5 | $ 2,968.4 | $ 4,081.7 | $ 3,701.2 |
| Net cash from operating activities | $ 37.9 | $ 358.9 | $ 1,145.9 | $ 514.5 | $ 2,288.0 |
| Distributions to preferred shareholders cash dividends (d) | | | | | |
| - Per depositary share | $ 1.32 | $ 1.76 | $ 1.66 | — | — |
| - Total | $ 38.4 | $ 51.2 | $ 48.7 | — | — |
| Distributions to common shareholders cash dividends (a) | | | | | |
| - Per share | $ — | $ 0.60 | $ 0.60 | $ 2.16 | $ 0.84 |
| - Total | $ — | $ 92.5 | $ 91.9 | $ 307.2 | $ 118.9 |
| Repurchases of common shares | — | — | — | — | $ 289.8 |
| Common shares outstanding - basic (millions) | | | | | |
| - Average for year | 153.2 | 153.1 | 151.7 | 142.4 | 140.2 |
| - At year-end | 153.6 | 153.2 | 153.1 | 142.5 | 142.0 |
| | | | | | |
| **Iron ore production and sales statistics** | | | | | |
| *(tons in millions - U.S. Iron Ore; metric tons in millions - Asia Pacific Iron Ore)* | | | | | |
| Production tonnage - U.S. Iron Ore | 26.1 | 29.7 | 27.2 | 29.5 | 31.0 |
| - Asia Pacific Iron Ore | 11.7 | 11.4 | 11.1 | 11.3 | 8.9 |
| Production tonnage - (Cliffs' share) | | | | | |
| - U.S. Iron Ore | 19.3 | 22.4 | 20.3 | 22.0 | 23.7 |
| Sales tonnage - U.S. Iron Ore | 17.3 | 21.8 | 21.3 | 21.6 | 24.2 |
| - Asia Pacific Iron Ore | 11.6 | 11.5 | 11.0 | 11.7 | 8.6 |

A004873

Table of Contents

\* Management determined as of March 31, 2015, that our North American Coal operating segment met the criteria to be classified as held for sale under *ASC 205, Presentation of Financial Statements*. The North American Coal segment continued to meet the criteria throughout 2015 until we sold our North American Coal operations during the fourth quarter of 2015. As such, all current and historical North American Coal operating segment results are included in our financial statements and classified within discontinued operations.

On January 27, 2015, we announced that the Bloom Lake Group commenced restructuring proceedings (the "Bloom Filing") under the CCAA with the Québec Superior Court (Commercial Division) in Montreal (the "Court"). At that time, the Bloom Lake Group was no longer generating revenues and was not able to meet its obligations as they came due. The Bloom Filing addressed the Bloom Lake Group's immediate liquidity issues and permits the Bloom Lake Group to preserve and protect its assets for the benefit of all stakeholders while restructuring and sale options are explored. As part of the CCAA process, the Court approved the appointment of a Monitor and certain other financial advisors. Additionally, on May 20, 2015, we announced that the Wabush Group commenced restructuring proceedings (the "Wabush Filing") in the Court under the CCAA. As a result of this action, the CCAA protections granted to the Bloom Lake Group were extended to include the Wabush Group to facilitate the reorganization of each of their businesses and operations. The Wabush Group was no longer generating revenues and was not able to meet its obligations as they came due. The inclusion of the Wabush Group in the existing Bloom Filing will facilitate a more comprehensive restructuring and sale process of both the Bloom Lake Group and the Wabush Group which collectively include mine, port and rail assets and will lead to a more effective and streamlined exit from Eastern Canada. The Wabush Filing will also mitigate various legacy related long-term liabilities associated with the Wabush Group. As part of the Wabush Filing, the Court approved the appointment of a Monitor and certain other financial advisors. The Monitor of the Wabush Group is also the Monitor of the Bloom Lake Group. Financial results prior to the respective deconsolidations of the Bloom Lake and Wabush Groups and subsequent expenses directly associated with the Canadian Entities are included in our financial statements and classified within discontinued operations.

On July 10, 2012, we entered into a definitive share and asset sale agreement to sell our 45 percent economic interest in the Sonoma joint venture coal mine located in Queensland, Australia. Additionally, on September 27, 2011, we announced our plans to cease and dispose of the operations at the renewaFUEL biomass production facility in Michigan. On January 4, 2012, we entered into an agreement to sell the renewaFUEL assets to RNFL Acquisition LLC. The results of operations of the Sonoma joint venture and renewaFUEL operations are reflected as discontinued operations in the accompanying consolidated financial statements for all periods presented.

(a) During 2011 we paid quarterly common share dividends of $0.14 per share. The increased 2011 cash dividends were paid on March 1, 2011, and June 1, 2011, to shareholders on record as of February 15, 2011, and April 29, 2011, respectively. On July 12, 2011, our Board of Directors increased the quarterly common share dividend by 100 percent to $0.28 per share. The increased cash dividend was paid on September 1, 2011, December 1, 2011, and March 1, 2012, to our shareholders on record as of the close of business on August 15, 2011, November 18, 2011, and February 15, 2012, respectively. On March 13, 2012, our Board of Directors increased the quarterly common share dividend by 123 percent to $0.625 per share. The increased cash dividend was paid on June 1, 2012, August 31, 2012 and December 3, 2012 to our shareholders on record as of April 27, 2012, August 15, 2012, and November 23, 2012, respectively. On February 11, 2013, our Board of Directors approved a reduction to our quarterly cash dividend rate by 76 percent to $0.15 per share. The decreased dividend of $0.15 per share was paid on March 1, 2013, June 3, 2013, September 3, 2013, and December 2, 2013 to our common shareholders of record as of the close of business on February 22, 2013, May 17, 2013, August 15, 2013, and November 22, 2013, respectively. Additionally, in 2014, the dividend of $0.15 per share was paid on March 3, 2014, June 3, 2014, September 2, 2014 and December 1, 2014 to our common shareholders of record as of the close of business on February 21, 2014, May 23, 2014, August 15, 2014, and November 15, 2014, respectively. On January 26, 2015, we announced that our Board of Directors had decided to eliminate the quarterly dividend of $0.15 per share on our common shares. The decision was applicable to the first quarter of 2015 and all subsequent quarters. The elimination of the common share dividend provides us with additional free cash flow of approximately $92 million annually, which we intend to use for further debt reduction.

(b) On May 12, 2011, we completed our acquisition of Consolidated Thompson by acquiring all of the outstanding common shares of Consolidated Thompson for C$17.25 per share in an all-cash transaction including total debt less cash. Consolidated Thompson was included within the entities under the CCAA filing. As noted above, financial results prior to the respective deconsolidations of the Bloom Lake and Wabush Groups and subsequent expenses directly associated with the Canadian Entities are included in our financial statements and classified within discontinued operations.

In 2011, during our annual goodwill impairment test in the fourth quarter, a goodwill impairment charge of $27.8 million was recorded for our CLCC reporting unit, within the North American Coal operating segment. As noted above, all current and historical North American Coal operating segment results are included in our financial statements and classified within discontinued operations.

(c) Upon performing our annual goodwill impairment test in the fourth quarter of 2012, goodwill impairment charges of $997.3 million and $2.7 million were recorded for our CQIM and Wabush reporting units, respectively, both within the Eastern Canadian Iron Ore operating segment. We also recorded an impairment charge of $49.9 million related to our Eastern Canadian Iron Ore operations to reduce those assets to their estimated fair value as of December 31, 2012, due to the idling of the pelletizing facility at Pointe Noire. All of these charges impacted Other operating expense. The Eastern Canadian Iron Ore operations were included within the entities under the CCAA filing. As noted above, financial results prior to the respective deconsolidations of the Bloom Lake and Wabush Groups and subsequent expenses directly associated with the Canadian Entities are included in our financial statements and classified within discontinued operations.

As a result of the approval for the sale of our 30 percent interest in Amapá, an impairment charge of $365.4 million was recorded through Equity income (loss) from ventures for the year ended December 31, 2012.

(d) On March 20, 2013, our Board of Directors declared a cash dividend of $13.6111 per preferred share, which is equivalent to approximately $0.34 per depositary share. The cash dividend was paid on May 1, 2013, to our preferred shareholders of record as of the close of business on April 15, 2013. On May 7, 2013, September 9, 2013, and November 11, 2013, our Board of Directors declared a quarterly cash dividend of $17.50 per preferred share, which is equivalent to approximately $0.44 per depositary share. The cash dividends were paid on August 1, 2013, November 1, 2013, and February 3, 2014 to our preferred shareholders of record as of the close of business on July 15, 2013, October 15, 2013, and January 15, 2014, respectively. The cash dividend was paid on May 1, 2013 to our preferred shareholders of record as of the close of business on April 15, 2013. On February 11, 2014, May 13, 2014, September 8, 2014, and November 19, 2014, our Board of Directors declared a quarterly cash dividend of $17.50 per preferred share, which is equivalent to approximately $0.44 per depositary share. The cash dividends were paid on May 1, 2014, August 1, 2014, November 3, 2014, and February 2, 2015, to our preferred shareholders of record as of the close of business on April 15, 2014, July 15, 2014, October 15, 2014, and January 15, 2015, respectively. On March 27, 2015, July 1, 2015, and September 10, 2015, our Board of Directors declared the quarterly cash dividend of $17.50 per Preferred Share, which is equivalent to approximately $0.44 per depositary share. The cash dividend was paid on May 1, 2015, August 3, 2015, and November 2, 2015 to our shareholders of record as of the close of business on April 15, 2015, July 15, 2015, and October 15, 2015, respectively.

(e) Upon performing our annual goodwill impairment test in the fourth quarter of 2013, a goodwill impairment charge of $80.9 million was recorded for our Cliffs Chromite Ontario and Cliffs Chromite Far North reporting units within our Ferroalloys operating segment. We also recorded other long-lived asset impairment charges of $169.9 million, of which $154.6 million relates to our Wabush reporting unit within our Eastern Canadian Iron Ore operating segment to reduce those assets to their estimated fair value as of December 31, 2013. These reporting units were included within the entities under the CCAA filing. As noted above, financial results prior to the respective deconsolidations of the Bloom Lake and Wabush Groups and subsequent expenses directly associated with the Canadian Entities are included in our financial statements and classified within discontinued operations.

46

Table of Contents

(f) During 2014, we recorded an impairment of goodwill and other long-lived assets of $73.5 million. The goodwill impairment charge of $73.5 million related to our Asia Pacific Iron Ore reporting unit. There were also other long-lived asset impairment charges of $562.0 million related to our continuing operations including the Asia Pacific Iron Ore operating segment and our Other reportable segments. The other long-lived asset impairment charges which related to our discontinued operations were $8,394.4 million related to our Wabush operation and Bloom Lake operation within our Eastern Canadian Iron Ore operating segment, and our CLCC thermal operation, Oak Grove operation and Pinnacle operation within our North American Coal operating segment, along with impairments charged to reporting units within our Other reportable segments. The impairment charges were primarily a result of changes in life-of-mine cash flows due to declining pricing for both global iron ore and low-volatile metallurgical coal, which impacts our estimate of long-term pricing, along with changes in strategic focus including exploratory phases of possible divestiture of the operations as the new Chief Operating Decision Maker views Eastern Canadian Iron Ore, Asia Pacific Iron Ore, North American Coal and Ferroalloys as non-core assets. The CLCC assets were sold in the fourth quarter of 2014 on December 31, 2014, resulting in a loss on sale of $419.6 million. As noted above, all current and historical North American Coal operating segment results are included in our financial statement and classified within discontinued operations.

(g) On January 27, 2015, we announced that the Bloom Lake Group commenced restructuring proceedings (the "Bloom Filing") under the CCAA with the Québec Superior Court (Commercial Division) in Montreal (the "Court"). Additionally, on May 20, 2015, we announced that the Wabush Group commenced restructuring proceedings (the "Wabush Filing") in the Court under the CCAA. As a result of this action, the CCAA protections granted to the Bloom Lake Group were extended to include the Wabush Group to facilitate the reorganization of each of their businesses and operations.

Consistent with our strategy to extract maximum value from our current assets, on December 22, 2015, we sold our equity interests in all the remaining North American Coal operations to Seneca Coal Resources, LLC ("Seneca"). The sale included Pinnacle mine in West Virginia and Oak Grove mine in Alabama. Additionally, Seneca may pay Cliffs an earn-out of up to $50 million contingent upon the terms of a revenue sharing agreement which extends through the year 2020. As noted above, all current and historical North American Coal operating segment results are included in our financial statement and classified within discontinued operations.

47

Table of Contents

**Item 7.**      *Management's Discussion and Analysis of Financial Condition and Results of Operations*

Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") is designed to provide a reader of our financial statements with a narrative from the perspective of management on our financial condition, results of operations, liquidity and other factors that may affect our future results. The following discussion should be read in conjunction with the Consolidated Financial Statements and related notes that appear elsewhere in this document.

**Industry Overview**

The key driver of our business is demand for steelmaking raw materials from U.S. steelmakers. In 2015, the U.S. produced approximately 79 million metric tons of crude steel or about 5 percent of total global crude steel production. This represents an approximate 10 percent decrease in U.S. crude steel production when compared to 2014. U.S. total steel capacity utilization was approximately 71 percent in 2015, which is an approximate 7 percent decrease from 2014. Additionally, in 2015, China produced approximately 804 million metric tons of crude steel, or approximately 50 percent of total global crude steel production. These figures represent an approximate 2 percent decrease in Chinese crude steel production when compared to 2014. Throughout 2015, global crude steel production decreased about 3 percent compared to 2014.

Throughout 2015, the Platts 62 percent Fe fines spot price has been driven down by a combination of reduced domestic steel demand from China and increased global iron ore production leading to excess supply, as well as mining cost deflation and a sharp fall in Australian and Brazilian currencies versus the U.S. dollar. In 2016, we do not expect to see meaningful improvement in iron ore prices without significant changes to the global iron ore supply-demand picture.

The iron ore supply-demand situation has not only adversely impacted iron ore producers, but also the global steel industry. Currently, the global steel industry is experiencing its worst conditions in over a decade, with prices for products falling even lower than those realized during the most recent recession - the 2008 global financial crisis. We believe that very low cost iron ore has contributed substantially to foreign steel exported out of China and other countries into the U.S. market. As a result of these imports, as well as the continued weakening of the oil and gas sector, domestic pricing for steel has been depressed and in turn, our customers' demand for pellets has fallen. In 2016, we expect these conditions to improve as recently imposed duties on unfairly traded steel should curb the steel imports entering the U.S, and as a result we expect to see domestic steel pricing rising throughout 2016.

The Platts 62 percent Fe fines spot price decreased 37 percent to an average price of $47 per ton for the three months ended December 31, 2015 compared to the respective quarter of 2014. In comparison, the year to date Platts 62 percent Fe fines spot pricing has decreased 43 percent to an average price of $56 per ton during the year ended December 31, 2015. These large decreases in the Platts 62 percent Fe fines spot price were driven by insufficient growth in Chinese demand to absorb the additional seaborne supply. The spot price volatility impacts our realized revenue rates, particularly in our Asia Pacific Iron Ore business segment because its contracts correlate heavily to world market spot pricing and to a lesser extent certain of our U.S. Iron Ore contracts.

As a result of our long-term contracts, for the three months and year ended December 31, 2015 when compared to the comparable prior year, our U.S. Iron Ore revenues experienced a realized revenue rate decrease of 25 percent and 23 percent, respectively, versus the much higher decreases in Platts 62 percent Fe fines spot price. Additionally, the first quarter sales tons for U.S. Iron Ore in both 2015 and 2014 include a substantial amount of carry over tonnage from prior year nominations which are priced based on prior year price formulas.

Our consolidated revenues for the years ended December 31, 2015 and 2014 were $2.0 billion and $3.4 billion, respectively, with net income from continuing operations per diluted share of $0.63 and net loss from continuing operations per diluted share of $0.14, respectively. Net income from continuing operations for the year ended December 31, 2015 was impacted positively by a $392.9 million gain on extinguishment of debt. This was offset by lower sales margin which decreased by $649.2 million for the year ended December 31, 2015 when compared to 2014 primarily driven by lower market pricing for our products and decreased sales volume partially offset by cost cutting measures and favorable foreign exchange rates. Additionally, results for the year ended December 31, 2015 were impacted negatively by the increase in income tax expense of $255.3 million primarily due to the net increase in the valuation allowance on U.S. deferred tax assets, partially offset by the utilization of net operating losses. Net income from continuing operations in 2014 was impacted negatively by $562.0 million of long-lived asset impairment recorded in the second half of 2014 along with $73.5 million of goodwill impairment recorded in the third quarter of 2014.

48

Table of Contents

**Strategy**

*The Company is Focused on our Core U.S. Iron Ore Business*

We continue the strategic shift to a company focused fully on our U.S. Iron Ore business. We are the market-leading iron ore producer in the U.S., supplying differentiated iron ore pellets under long-term contracts, some of which begin to expire at the end of 2016, to the largest North America steel producers. Cliffs has the unique advantage of being a low cost producer of iron ore pellets in the U.S. market. Pricing structures contained in and the long-term supply provided by our existing contracts, along with our low-cost operating profile, positions U.S. Iron Ore as our most stable business. We expect to continue to strengthen our U.S. Iron Ore operating cost profile through continuous operational improvements and disciplined capital allocation policies. Strategically, we continue to develop various entry options into the EAF market. As the EAF steel market continues to grow in the U.S., there is an opportunity for our iron ore to serve this market by providing pellets to the alternative metallics market to produce direct reduced iron pellets, hot briquetted iron and/or pig iron. In 2015, we produced and shipped a batch trial of DR-grade pellets, a source of lower silica iron units for the production of direct reduced  iron pellets. In early 2016, we reached a significant milestone with positive results from the successful industrial trial of our DR-grade pellets. While we are still in the early stages of developing our alternative metallic business, we believe this will open up a new opportunity for us to diversify our product mix and add new customers to our U.S. Iron Ore segment beyond the traditional blast furnace clientele.

*Reviewing All Other Businesses for Either Optimization, Divestiture or Shutdown*

We commenced restructuring proceedings for our Eastern Canadian Iron Ore businesses under the CCAA in the first quarter of 2015. During the second quarter of 2015, the CCAA protection granted to the Bloom Lake Group was extended to include the Wabush Group to facilitate the reorganization of each of their businesses and operations. For more information regarding the status of our divestiture of our Eastern Canadian Iron Ore business, see NOTE 14 - DISCONTINUED OPERATIONS for further information.

On December 22, 2015, we closed the sale of our remaining North American Coal business which included Pinnacle mine in West Virginia and Oak Grove mine in Alabama. The remaining North American Coal business was sold to Seneca Coal Resources, LLC. The sale marked our exit from the coal business and represents another very important step in the implementation of our U.S. Iron Ore pellet-centric, environmentally compliant strategy. Prior to this sale, it was determined by management as of March 31, 2015 that our North American Coal operating segment met the criteria to be classified as held for sale under *ASC 205, Presentation of Financial Statements* . For more information regarding the sale and the held for sale classification of our North American Coal business, see NOTE 14 - DISCONTINUED OPERATIONS for further information.

As an extension of our re-focused U.S. Iron Ore strategy, we continue to consider further divestiture of the Asia Pacific Iron Ore business. We believe the assets from this non-core segment have value and will only consummate a transaction where we believe the consideration fairly and adequately represents such value. Asia Pacific Iron Ore is a well-recognized and reliable supplier to steelmakers in Asia. As we consider selling this business, we will continue to operate Asia Pacific Iron Ore with very low total capital expenditures for the remaining life of mine.

*Maintaining Discipline on Costs and Capital Spending and Improving our Financial Flexibility*

We believe our ability to execute our strategy is dependent on our financial position, balance sheet strength and financial flexibility to manage through current demand for our products and volatility in commodity prices. We have developed a highly disciplined financial and capital expenditure plan with a focus on improving our cost profile and increasing long-term profitability. We resized and streamlined our organization and support functions to better fit our new strategic direction. Our capital allocation plan is focused on strengthening our core U.S. Iron Ore operations to promote greater free cash flow generation.

**Competitive Strengths**

*Resilient U.S. Iron Ore Operations*

Our U.S. Iron Ore segment is the core focus of our business strategy. The U.S. Iron Ore segment is the primary contributor to our consolidated results, generating 76 percent of consolidated revenue and $352 million of consolidated Adjusted EBITDA for the year ended December 31, 2015. U.S. Iron Ore produces differentiated iron ore pellets that are customized for use in customers' blast furnaces as part of the steelmaking process. The grades of pellets currently delivered to each customer are based on that customer's preferences, which depend in part on the characteristics of the customer's blast furnace operation. We believe our long history of supplying customized pellets to the U.S. steel producers has resulted in a co-dependent relationship between us and our customers. This technical and operational co-dependency

has enabled Cliffs to claim a substantial portion of the total U.S. iron ore market. Based on Cliffs' equity ownership in its U.S. mines, Cliffs' share of the annual rated production capacity is 25.5 million tons, representing 44 percent of total U.S. annual pellet capacity. Long-lived assets with an average mine life of approximately 20 years provide the opportunity to maintain our significant market position well into the future.

We believe U.S. Iron Ore is uniquely positioned in the global iron ore market due to its reduced exposure to seaborne iron ore pricing. More than half of U.S. Iron Ore production is sold through long-term contracts that are structured with various formula-based pricing mechanisms that reference seaborne pricing, inflation factors and steel prices and mitigate the impact of any one factor's price volatility on our business. U.S. Iron Ore's realized revenue rate decreased 25 percent and 23 percent for the three months and year ended December 31, 2015, respectively, compared to a 37 percent and 43 percent decline in the Platts 62 percent Fe fines spot price over the same periods.

In addition, we maintain lower costs compared to our competition as a result of our proximity to U.S. steelmaking operations. Our costs are lower as a result of inherent transportation advantages associated with our mine locations near the Great Lakes which allows for transportation via railroads and loading ports. U.S. Iron Ore mines also benefit from on-site pellet production and ore production facilities located a short distance from the mines. These advantages translated to cash production costs in the three months and year ended December 31, 2015 of $45 per ton and $54 per ton, respectively, which included the cost to mine, concentrate and pelletize, certain transportation costs and site administration costs.

### Competitive Asia Pacific Iron Ore Operations

Although our annual production tonnage is substantially less than our competitors in the seaborne market, the Asia Pacific Iron Ore business maintains a competitive position with the major Australian iron ore producers. We produce a product mix of approximately 50 percent lump ore and 50 percent fines, which is a significantly higher lump mix than the major producers in Australia. This lump ore commands a premium in the seaborne market over iron ore fines.

Further, our Asia Pacific Iron Ore segment is a cost competitive producer and requires minimal ongoing sustaining capital expenditures to continue our operations. Cash production costs during the three months and year ended December 31, 2015, were $26 per ton and $31 per ton, respectively. Going forward, we will continue to operate Asia Pacific Iron Ore with a clear bias toward cash optimization.

## Recent Developments

### USW Labor Agreements

Our labor agreements with the USW at our Tilden, Empire, Hibbing and United Taconite mines were scheduled to expire at 12:01 a.m. on October 1, 2015. Prior to the expiration of these agreements, we agreed with the USW to extend these agreements indefinitely. Either party may terminate the agreements by providing the other party with 168 hours (i.e., seven days) notice. We continue to bargain with the USW in good faith with the expectation that we will be able to reach a mutually acceptable long-term extension of our agreements. At this time, we do not anticipate any type of labor disruption as the USW has committed to "continue working under the current terms and conditions of employment until a tentative agreement is reached."

### Pellet Agreement with Essar

On October 6, 2015, we announced that, effective October 5, 2015, we terminated our Pellet Agreement with Essar. Our decision was made as a result of Essar's multiple and material breaches under the agreement. While the agreement has been terminated, we remain open to discussing supplying the Essar steel-making operation in Sault St. Marie or its successor with pellets on commercially reasonable terms consistent with a just-in-time iron ore supply arrangement.

### Northshore

On November 17, 2015, we announced that we would be temporarily idling iron ore pellet production at our Northshore mining operation in Minnesota. The idling was a result of a reduction in iron pellet nominations from our customers. Until our domestic customers' blast furnace capacity utilization rates improve, our existing customer demand can be satisfied from our current pellet inventory. We completed the idling of the Northshore mine by the end of November. Our Northshore mine could be restarted and return to normal operating levels if recently filed and forthcoming trade cases were to result in increased pellet nominations from our customers. Conversely, if increased iron ore pellet demand does not materialize during this period, the idled state of production could be for an extended period of time. Currently, we anticipate that Northshore mine will be idled through the first quarter of 2016. The temporary idling resulted in reductions in force at the Northshore mine.

### North American Coal Operations

On December 22, 2015, we closed the sale of our remaining North American Coal business which included Pinnacle mine in West Virginia and Oak Grove mine in Alabama. Pinnacle mine and Oak Grove mine were sold to Seneca Coal Resources, LLC ("Seneca") and the deal structure was a sale of equity interests of our remaining coal business. Additionally, Seneca may pay Cliffs an earn-out of up to $50 million contingent upon the terms of a revenue sharing plan which extends through the year 2020.

The Pinnacle Complex includes the Pinnacle and Green Ridge mines, which are underground low-volatile metallurgical coal mines. The Pinnacle mine has been in operation since 1969. The Green Ridge mines became operational in 2004. In February 2010, the Green Ridge No. 1 mine was closed permanently due to exhaustion of the economic reserves at the mine. In addition, the Green Ridge No. 2 mine was idled in January 2012. Both facilities share preparation, processing and load-out facilities.

The Oak Grove mine is an underground low-volatile metallurgical coal mine. The mine has been in operation since 1972. Preparation, processing and rail load-out facilities are located on-site.

In 2015, the Pinnacle operations produced 2.4 million tons of metallurgical coal and the Oak Grove operations produced 1.9 million tons of metallurgical coal. In 2014, the Pinnacle operations produced 2.7 million tons of metallurgical coal and the Oak Grove operations produced 2.3 million tons of metallurgical coal.

We recorded a gain on the sale of Pinnacle mine and Oak Grove mine of approximately $9.3 million on a pre-tax basis in the fourth quarter of 2015. The gain is recorded within *Loss from Discontinued Operations, net of tax* on the Statements of Consolidated Operations .

Prior to the sale, it was determined by management as of March 31, 2015 that our North American Coal operating segment met the criteria to be classified as held for sale under *ASC 205, Presentation of Financial Statements* . For more information regarding the sale and the held for sale classification of our North American Coal business, see NOTE 14 - DISCONTINUED OPERATIONS for further information.

### Preferred Stock

In February 2013, we issued 731,250 shares of 7.00% Series A Mandatory Convertible Preferred Stock, Class A ("Series A preferred shares"). Under the terms of the Series A preferred shares, when and if declared by our Board of Directors, holders of the Series A preferred shares are entitled to cumulative dividends at an annual rate of 7.00 percent on the liquidation preference of $1,000 per share. On January 4, 2016, we announced that, under the terms of our Series A preferred shares, the final quarterly dividend otherwise payable upon mandatory conversion of the Series A preferred shares on February 1, 2016, would not be paid in cash. Instead, pursuant to the terms of the Series A preferred shares, the conversion rate was increased such that holders of the Series A preferred shares received additional Cliffs' common shares in lieu of the accrued dividend at the time of the mandatory conversion. In accordance with applicable law, our Board of Directors determined not to declare a dividend payable in cash. The number of our common shares in the aggregate issued in lieu of the dividend was approximately 1.26 million. This resulted in an effective conversion rate of .9052 common shares, rather than .8621 common shares, per depositary share, each representing one-fortieth of a share of Series A preferred shares. Upon conversion on February 1, 2016, an aggregate of 26.5 million common shares were issued, representing 25.2 million common shares issuable upon conversion and 1.3 million that were issued in lieu of a final cash dividend.

### Exchange Offers

On January 27, 2016, we announced the commencement of private offers to exchange (the "Exchange Offers") up to $710 million aggregate principal amount of our newly issued 8.00 percent 1.5 Lien Senior Secured Notes due 2020 (the "New 1.5 Lien Notes") for certain outstanding notes (the "Existing Notes") of Cliffs, upon the terms and subject to the conditions set forth in our confidential offering memorandum dated January 27, 2016. Eligible holders were notified that they must validly tender their Existing Notes on February 9, 2016 (the "Early Tender Date"), in order to be eligible to receive the applicable total exchange consideration which includes an early tender premium. On February 10, 2016, we announced that as of the Early Tender Date, a total of approximately $465.3 million principal amount of Existing Notes had been tendered in the Exchange Offers. We also announced that the Early Tender Date has been extended to February 26, 2016, and that the exchange consideration for the 3.95 percent Senior Notes due 2018 had been increased. Accordingly, all Existing Notes tendered prior to the extended Early Tender Date will be eligible to receive the total exchange consideration. The Exchange Offers will expire at 5:00 p.m., New York City time, on February 26, 2016 and tenders of Existing Notes may no longer be withdrawn after that time, except in certain limited circumstances described in the confidential offering memorandum and related letter of transmittal.

A004879

Table of Contents

**Business Segments**

Our Company's primary continuing operations are organized and managed according to product category and geographic location: U.S. Iron Ore and Asia Pacific Iron Ore. As of March 31, 2015, management determined that our North American Coal operating segment met the criteria to be classified as held for sale under *ASC 205, Presentation of Financial Statements* . As such, all current and historical North American Coal operating segment results are included in our financial statements and classified within discontinued operations. Additionally, as a result of the CCAA filing of the Bloom Lake Group on January 27, 2015 and the Wabush Group on May 20, 2015, we no longer have a controlling interest over the Bloom Lake Group and certain other wholly owned subsidiaries, and we no longer have a controlling interest over the Wabush Group. The Bloom Lake Group, Wabush Group and certain of each of their wholly owned subsidiaries were previously reported as Eastern Canadian Iron Ore and Other reportable segments. As such, we deconsolidated the Bloom Lake Group and certain other wholly-owned subsidiaries as of January 27, 2015. Additionally, as a result of the Wabush Filing on May 20, 2015, we deconsolidated certain Wabush Group wholly-owned subsidiaries effective May 20, 2015. The wholly-owned subsidiaries deconsolidated effective May 20, 2015 are Wabush Group entities that were not deconsolidated as part of the deconsolidation effective January 27, 2015. Financial results prior to the respective deconsolidations of the Bloom Lake and Wabush Groups and subsequent expenses directly associated with the Canadian Entities are included in our financial statements and classified within discontinued operations.

**Results of Operations – Consolidated**

*2015 Compared to 2014*

The following is a summary of our consolidated results of operations for the  years ended December 31, 2015 and 2014:

|  | (In Millions) | | |
|---|---|---|---|
|  | **2015** | 2014 | Variance Favorable/ (Unfavorable) |
| Revenues from product sales and services | $ **2,013.3** | $ 3,373.2 | $ (1,359.9 ) |
| Cost of goods sold and operating expenses | **(1,776.8)** | (2,487.5) | 710.7 |
| Sales margin | $ **236.5** | $ 885.7 | $ (649.2 ) |
| Sales margin % | **11.7%** | 26.3% | (14.6 )% |

*Revenues from Product Sales and Services*

Sales revenue for the year ended December 31, 2015 decreased $1,359.9 million, or 40.3 percent, from 2014. The decrease in sales revenue during 2015 compared to 2014 was primarily attributable to the decrease in market pricing for our products, including a reduction of one customer's full-year hot band steel price. Together these factors negatively impacted revenues by $804.4 million for the year ended December 31, 2015.

Changes in world market pricing impacts our revenues each year. Iron ore revenues decreased $804.4 million in 2015 compared to 2014 primarily due to the decrease in the Platts 62 percent Fe fines spot price, which declined 42.6 percent to an average price of $56 per ton in 2015, and a decrease in one customer's full-year hot band steel price. The decrease in our realized revenue rates during 2015 compared to 2014 was 22.7 percent and 46.4 percent for our U.S. Iron Ore and Asia Pacific Iron Ore operations, respectively. Additionally, there was a decrease in revenues period-over-period as a result of lower iron ore sales volumes of $458.1 million for the year ended December 31, 2015.

Refer to "Results of Operations – Segment Information " for additional information regarding the specific factors that impacted revenue during the period.

*Cost of Goods Sold and Operating Expenses*

Cost of goods sold and operating expenses  for the years ended December 31, 2015 and 2014 were $1,776.8 million and $2,487.5 million, respectively, a decrease of $710.7 million, or 28.6 percent year-over-year.

52

Cost of goods sold and operating expenses for the year ended December 31, 2015 decreased by $335.0 million as operational efficiencies and cost cutting efforts across each of our business units has reduced costs. Also, as a result of favorable foreign exchange rates in 2015 versus 2014, we realized lower costs of $94.6 million. Additionally, there was a decrease in costs period-over-period as a result of lower iron ore sales volumes of $299.1 million for the year ended December 31, 2015. These decreases in cost were partially offset by incrementally higher idle costs of $61.5 million due to the temporary idle of our United Taconite mine which began in the first week of August 2015, the temporary idle of the Empire mine which began on June 26, 2015 and then came back on line during October 2015, and the one idled production line at our Northshore mine during all of 2015 followed by the complete temporary idle of Northshore mine in the end of November 2015.

Refer to "Results of Operations – Segment Information" for additional information regarding the specific factors that impacted our operating results during the period.

### *Other Operating Income (Expense)*

The following is a summary of other operating income (expense) for the years ended December 31, 2015 and 2014:

| | (In Millions) | | |
| --- | --- | --- | --- |
| | **2015** | 2014 | Variance Favorable/ (Unfavorable) |
| Selling, general and administrative expenses | $ (110.0) | $ (154.7) | $ 44.7 |
| Impairment of goodwill and other long-lived assets | (3.3) | (635.5) | 632.2 |
| Miscellaneous - net | 28.1 | 34.6 | (6.5) |
| | $ (85.2) | $ (755.6) | $ 670.4 |

Selling, general and administrative expenses during the year ended December 31, 2015 decreased $44.7 million over 2014. As a result of the reduction of the workforce, we reduced employment costs for the year ended December 31, 2015 by $16.7 million. There were lower severance costs of $14.1 million during the year ended December 31, 2015 versus 2014. Also, the year ended December 31, 2015 was impacted favorably by $7.8 million due to a reduction in outside service spending and $5.6 million due to a reduction in rent and operating lease spending.

Impairment of goodwill and other long-lived assets was $3.3 million and $635.5 million during the years ended December 31, 2015 and 2014, respectively. During the year ended December 31, 2014, we recorded goodwill impairment of $73.5 million related to our Asia Pacific Iron Ore reporting unit. We also recorded other long-lived asset impairment charges of $562.0 million during 2014. The charges were related to our Asia Pacific Iron Ore operating segment, along with impairments charged to reporting units within our *Other* reportable segments. The impairment charges were primarily a result of management determining that the carrying value of the asset groups may not be recoverable primarily due to long-term price forecasts as part of management's long-range planning process. Updated estimates of long-term prices for all products, specifically the Platts 62 percent Fe fines spot price, which particularly effects the Asia Pacific Iron Ore business segment because their contracts correlate heavily to world market spot pricing were lower than prior estimates. These estimates were updated based upon current market conditions, macro-economic factors influencing the balance of supply and demand for our products and expectations for future cost and capital expenditure requirements.

Additionally, a new CEO, Lourenco Goncalves, was appointed by the Board of Directors in early August 2014 and subsequently identified as the CODM in accordance with ASC 280, *Segment Reporting*. The new CODM views Asia Pacific Iron Ore as a non-core asset and continues to evaluate the business unit for a change in strategy including possible divestiture. These factors, among other considerations utilized in the individual impairment assessments, indicate that the carrying value of the respective asset group and Asia Pacific Iron Ore goodwill may not be recoverable. Refer to NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS for further information.

A004881

Table of Contents

The following is a summary of Miscellaneous - net for the year ended December 31, 2015 and 2014:

| | | (In Millions) | | | | |
|---|---|---|---|---|---|---|
| | **2015** | | 2014 | | Variance Favorable/ (Unfavorable) | |
| Foreign exchange remeasurement | $ | **16.3** | $ | 29.0 | $ | (12.7) |
| Insurance recoveries | | **7.6** | | — | | 7.6 |
| Management and royalty fees | | **6.4** | | 10.8 | | (4.4) |
| Gain (loss) on disposal of assets | | **3.4** | | (3.5) | | 6.9 |
| Other | | **(5.6)** | | (1.7) | | (3.9) |
| | $ | **28.1** | $ | 34.6 | $ | (6.5) |

For the year ended December 31, 2015 there was an unfavorable impact of $12.7 million due to the change in foreign exchange re-measurement driven primarily by lower Australian bank account balances that are denominated in U.S. dollars. Also, during 2015 there was an unfavorable impact on Miscellaneous - net due to bad debt expense of $7.1 million that was recorded in the third quarter of 2015 related to one customer.

These unfavorable impacts were partially offset by $7.6 million of insurance recoveries related to the clean-up of the Pointe Noire oil spill that occurred in September 2013. Additionally, net gain on disposal of assets was $3.4 million during the year ended December 31, 2015, compared to a net loss on disposal of assets of $3.5 million in 2014. The net gain on disposal of assets in 2015 was primarily attributable to a $5.0 million gain on the sale of assets and equity related to our Global Exploration Group operations during the fourth quarter of 2015. Results for the Global Exploration Group are reported within our *Other* reportable segments.

### *Other Income (Expense)*

The following is a summary of other income (expense) for the years ended December 31, 2015 and 2014:

| | | (In Millions) | | | | |
|---|---|---|---|---|---|---|
| | **2015** | | 2014 | | Variance Favorable/ (Unfavorable) | |
| Interest expense, net | **(228.5)** | | (176.7) | | (51.8) | |
| Gain on extinguishment of debt | 392.9 | | 16.2 | | 376.7 | |
| Other non-operating income (expense) | (2.6) | | 10.7 | | (13.3) | |
| | $ | **161.8** | $ | (149.8) | $ | 311.6 |

The increase in gain on extinguishment of debt during the year ended December 31, 2015 compared to the comparable prior year is a result of the corporate debt restructuring and debt repurchases of senior notes trading at a discount, as discussed in NOTE 5 - DEBT AND CREDIT FACILITIES.

Interest expense was unfavorably impacted by $94.1 million for the year ended December 31, 2015 as we entered into new credit arrangements during the first quarter of 2015. Additionally, the year ended December 31, 2015 was unfavorably impacted by $11.9 million due to unfavorable interest rates, as discussed in NOTE 5 - DEBT AND CREDIT FACILITIES . The unfavorable impact was offset partially by reduced interest expense of $50.8 million for the year ended December 31, 2015 due to the extinguishment of certain Senior Notes and the revolving credit agreement during the first quarter of 2015, as discussed in NOTE 5 - DEBT AND CREDIT FACILITIES.

Additionally, other non-operating income during the year ended December 31, 2014 included a $7.8 million gain on the sale of marketable securities.

Table of Contents

*Income Taxes*

Our tax rate is affected by permanent items, such as depletion and the relative amount of income we earn in various foreign jurisdictions with tax rates that differ from the U.S. statutory rate. It also is affected by discrete items that may occur in any given period, but are not consistent from period to period. The following represents a summary of our tax provision and corresponding effective rates for the years ended December 31, 2015 and 2014:

| | (In Millions) | | |
|---|---|---|---|
| | **2015** | 2014 | Variance |
| Income tax benefit (expense) | $ (169.3) | $ 86.0 | $ (255.3) |
| Effective tax rate | 54.1 % | 436.5 % | (382.4) % |

A reconciliation of our income tax attributable to continuing operations computed at the U.S. federal statutory rate for the years ended December 31, 2015 and 2014 is as follows:

| | (In Millions) | | | |
|---|---|---|---|---|
| | **2015** | | 2014 | |
| Tax at U.S. statutory rate of 35 percent | $ 109.6 | 35.0 % | $ (6.9) | 35.0 % |
| Increases/(Decreases) due to: | | | | |
| Non-taxable loss (income) related to noncontrolling interests | (3.0) | (1.0) | (9.4) | 47.7 |
| Impact of tax law change | — | — | 13.0 | (66.0) |
| Percentage depletion in excess of cost depletion | (34.9) | (11.1) | (87.9) | 446.2 |
| Impact of foreign operations | (53.9) | (17.2) | 51.4 | (260.9) |
| Income not subject to tax | — | — | (27.7) | 140.6 |
| Goodwill impairment | — | — | 22.7 | (115.2) |
| State taxes, net | 0.2 | 0.1 | (25.4) | 128.9 |
| Settlement of financial guaranty | — | — | (347.1) | 1,761.9 |
| Valuation allowance reversal in current year | (104.6) | (33.4) | 318.3 | (1,615.7) |
| Valuation allowance on future tax benefits recorded in prior years | 165.8 | 52.9 | 15.2 | (77.2) |
| Tax uncertainties | 84.1 | 26.9 | — | — |
| Prior year adjustments made in current year | 5.9 | 1.9 | (6.3) | 32.1 |
| Other items - net | 0.1 | — | 4.1 | (20.9) |
| Provision for income tax benefit and effective income tax rate including discrete items | $ 169.3 | 54.1 % | $ (86.0) | 436.5 % |

Our tax provision for the year ended December 31, 2015 was an expense of $169.3 million and a 54.1 percent effective tax rate compared with a benefit of $86.0 million and an effective tax rate of 436.5 percent for the prior-year. The change in the income tax expense from the prior-year benefit is due primarily to placement of valuation allowances on previously recorded U.S. future tax benefits that management has determined are not recoverable. The impact of foreign operations relates to income in foreign jurisdictions where the statutory rates, ranging from zero percent to 30 percent, differ from the U.S. statutory rate of 35 percent. Other items include depletion as well as the reversal of valuation allowance related to current year realization of tax benefits.

For the year ended December 31, 2014, income not subject to tax includes the tax benefit of non-taxable interest income related to an intercompany note between the U.S. and Canada. This note was restructured on April 27, 2014 and no longer results in an income tax benefit after this date.

See NOTE 9 - INCOME TAXES for further information.

**Loss from Discontinued Operations, net of tax**

*Loss from Discontinued Operations, net of tax* was comprised primarily of the loss on discontinued operations related to our North American Coal operating segment and our Eastern Canadian Iron Ore operations.

55

A004883

As of March 31, 2015, management determined that our North American Coal operating segment met the criteria to be classified as held for sale under *ASC 205, Presentation of Financial Statements* . As such, all current year and historical North American Coal operating segment results are included in our financial statements and classified within discontinued operations. The *Loss from Discontinued Operations, net of tax* related to the North American Coal operating segment was $152.4 million and $1,134.5 million for the years ended December 31, 2015 and 2014, respectively.

In January 2015, we announced that the Bloom Lake Group commenced restructuring proceedings in Montreal, Quebec under the CCAA. At that time, we had suspended Bloom Lake operations and for several months had been exploring options to sell certain of our Canadian assets, among other initiatives. Effective January 27, 2015, following the CCAA filing of the Bloom Lake Group, we deconsolidated the Bloom Lake Group and certain other wholly-owned subsidiaries comprising substantially all of our Canadian operations. Additionally, on May 20, 2015, the Wabush Group commenced restructuring proceedings in Montreal, Quebec under the CCAA which resulted in the deconsolidation of the remaining Wabush Group entities that were not previously deconsolidated. The Wabush Group was no longer generating revenues and was not able to meet its obligations as they came due. As a result of this action, the CCAA protections granted to the Bloom Lake Group were extended to include the Wabush Group to facilitate the reorganization of each of their businesses and operations. Financial results prior to the respective deconsolidations of the Bloom Lake and Wabush Groups and subsequent expenses directly associated with the Canadian Entities are included in our financial statements and classified within discontinued operations. The *Loss from Discontinued Operations, net of tax* related to the deconsolidated Canadian Entities was $739.7 million and $7,233.5 million for the years ended December 31, 2015 and 2014, respectively.

Refer to NOTE 14 - DISCONTINUED OPERATIONS for further information.

*Noncontrolling Interest*

Noncontrolling interest is comprised primarily of our consolidated, but less-than-wholly owned subsidiary at our Empire mining venture and through the CCAA filing on January 27, 2015, the Bloom Lake operations. The net loss attributable to the noncontrolling interest related to Bloom Lake was $7.7 million and $1,113.3 million for the years ended December 31, 2015 and 2014, respectively. The net income attributable to the noncontrolling interest related to the Empire mining venture was $8.6 million and $26.9 million for the years ended December 31, 2015 and 2014, respectively.

## Results of Operations – Consolidated

### 2014 Compared to 2013

The following is a summary of our consolidated results of operations for the years ended December 31, 2014 and 2013:

| | (In Millions) | | |
| | 2014 | 2013 | Variance Favorable/ (Unfavorable) |
|---|---|---|---|
| Revenues from product sales and services | $ 3,373.2 | $ 3,890.8 | $ (517.6) |
| Cost of goods sold and operating expenses | (2,487.5) | (2,406.4) | (81.1) |
| Sales margin | $ 885.7 | $ 1,484.4 | $ (598.7) |
| Sales margin % | 26.3% | 38.2% | (11.9)% |

### Revenues from Product Sales and Services

Sales revenue for the year ended December 31, 2014 decreased $517.6 million, or 13.3 percent, from 2013. The decrease in sales revenue during 2014 compared to 2013 was primarily attributable to the decrease in market pricing for our products, which impacted revenues by $648.4 million for the year ended December 31, 2014. Changes in world market pricing impacts our revenues each year. During 2014, iron ore revenues were impacted primarily by the decrease in the Platts 62 percent Fe fines spot price, which declined 28.5 percent on an average price of $97 per ton, resulting in decreased revenues of $648.4 million. The decrease in our realized revenue rates during 2014 compared to 2013 was 9.5 percent and 32.8 percent for our U.S. Iron Ore and Asia Pacific Iron Ore, respectively. This decrease was partially offset by an increase in revenues period-over-period as a result of higher iron ore sales volumes of 1.0 million tons or $115.6 million for the year ended December 31, 2014.

56

Refer to "Results of Operations – Segment Information" for additional information regarding the specific factors that impacted revenue during the period.

***Cost of Goods Sold and Operating Expenses***

Cost of goods sold and operating expenses for the years ended December 31, 2014 and 2013 were $2,487.5 million and $2,406.4 million, respectively, an increase of $81.1 million, or 3.4 percent, year-over-year.

Cost of goods sold and operating expenses for the year ended December 31, 2014 increased period-over-period primarily as a result of higher iron ore sales volumes of $71.1 million for the year ended December 31, 2014. Additionally, we incurred higher costs at our U.S. Iron Ore operations of $34.4 million primarily due to increased repairs and maintenance along with higher costs related to increased energy rates in early 2014. Partially offsetting these increases was a decrease in idle costs period-over-period of $48.9 million for the year ended December 31, 2014.

Refer to "Results of Operations – Segment Information" for additional information regarding the specific factors that impacted our operating results during the period.

***Other Operating Income (Expense)***

Following is a summary of other operating income (expense) for the years ended December 31, 2014 and 2013:

|  | (In Millions) | | |
|---|---|---|---|
|  | 2014 | 2013 | Variance Favorable/ (Unfavorable) |
| Selling, general and administrative expenses | $ (154.7) | $ (163.8) | $ 9.1 |
| Impairment of goodwill and other long-lived assets | (635.5) | (14.3) | (621.2) |
| Miscellaneous - net | 34.6 | 74.0 | (39.4) |
|  | $ (755.6) | $ (104.1) | $ (651.5) |

Selling, general and administrative expenses during the year ended December 31, 2014 decreased $9.1 million over 2013. The year ended December 31, 2014 was impacted favorably by $22.2 million for employment costs related to cost savings actions and reduced year-over-year expense of $10.5 million related to pension and other postemployment benefits. Offsetting these cost reductions was an increase in costs related to the proxy contest and the change in control of the majority of our Board of Directors. We incurred substantial costs associated with various advisors, including bankers, attorneys and others. Costs associated with these events were approximately $26.2 million for the year ended December 31, 2014.

Impairment of goodwill and other long-lived assets were $635.5 million and $14.3 million during the years ended December 31, 2014 and 2013, respectively. During the year ended December 31, 2014, we recorded goodwill impairment of $73.5 million related to our Asia Pacific Iron Ore reporting unit. We also recorded other long-lived asset impairment charges of $562.0 million during 2014. The charges are related to our Asia Pacific Iron Ore operating segment, along with impairments charged to reporting units within our *Other* reportable segments. The impairment charges were primarily a result of management determining that the carrying value of the asset groups may not be recoverable primarily due to long-term price forecasts as part of management's long-range planning process. Updated estimates of long-term prices for all products, specifically the Platts 62 percent Fe fines spot price, which particularly effects the Asia Pacific Iron Ore business segment because their contracts correlate heavily to world market spot pricing were lower than prior estimates. These estimates were updated based upon current market conditions, macro-economic factors influencing the balance of supply and demand for our products and expectations for future cost and capital expenditure requirements. Additionally, a new CEO, Lourenco Goncalves, was appointed by the Board of Directors in early August 2014 and subsequently identified as the CODM in accordance with ASC 280, *Segment Reporting*. The CODM views Asia Pacific Iron Ore as a non-core asset and continues to evaluate the business unit for a change in strategy including possible divestiture. These factors, among other considerations utilized in the individual impairment assessments, indicate that the carrying value of the respective asset groups and Asia Pacific Iron Ore goodwill may not be recoverable. Refer to NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS for further information.

A004885

Table of Contents

The following is a summary of Miscellaneous - net for the year ended December 31, 2014 and 2013:

| | 2014 | 2013 | Variance Favorable/ (Unfavorable) |
|---|---|---|---|
| | (In Millions) | | |
| Foreign exchange remeasurement | $ 29.0 | $ 53.2 | $ (24.2) |
| Gain (loss) on disposal of assets | (3.5) | 19.4 | (22.9) |
| Exploration costs | (3.0) | (14.3) | 11.3 |
| Management and royalty fees | 10.8 | 12.0 | (1.2) |
| Other | 1.3 | 3.7 | (2.4) |
| | $ 34.6 | $ 74.0 | $ (39.4) |

For the year ended December 31, 2014, there was an unfavorable incremental impact of $24.2 million due to the change in foreign exchange re-measurement on short-term intercompany notes, Australian bank accounts that are denominated in U.S. dollars and certain monetary financial assets and liabilities, which are denominated in something other than the functional currency of the entity.

Net loss on disposal of assets was $3.5 million during the year ended December 31, 2014, compared to a net gain on disposal of assets of $19.4 million in 2013. The net gain on disposal of assets in 2013 was primarily attributable to our final settlement of the sale of our beneficial interest in the mining tenements and certain infrastructure of Cockatoo Island during the second quarter of 2013. Upon final settlement of the sale, we extinguished approximately $18.6 million related to the estimated cost of the rehabilitation. Our 50 percent equity interest in Cockatoo Island was included in our Asia Pacific operations prior to the sale.

Exploration costs decreased by $11.3 million during the year ended December 31, 2014 from 2013, primarily due to decreases in costs at our Global Exploration Group operations. The Global Exploration Group is reported within our Other reportable segments. Our Global Exploration Group had cost decreases of $8.0 million in 2014 over 2013, due to lower overhead and professional services spend. In alignment with our capital allocation strategy, we had minimal levels of exploration spending in 2014 and that has continued into the subsequent years.

***Other Income (Expense)***

Following is a summary of other income (expense) for the years ended  December 31, 2014 and 2013:

| | 2014 | 2013 | Variance Favorable/ (Unfavorable) |
|---|---|---|---|
| | (In Millions) | | |
| Interest expense, net | (176.7) | (186.4) | 9.7 |
| Gain on extinguishment of debt | 16.2 | — | 16.2 |
| Other non-operating income (expense) | 10.7 | (3.0) | 13.7 |
| | $ (149.8) | $ (189.4) | $ 39.6 |

The decrease in interest expense in 2014 compared to 2013 was attributable to reduced interest expense of $7.1 million related to unamortized debt issuance costs being expensed upon our repayment of the balance of the term loan in February 2013 and $7.9 million related to a decrease in borrowings on the revolving credit facility. This decrease was offset partially by additional interest expense related to the change in borrowing capacity of our revolving credit facility which resulted in $3.7 million of unamortized debt issuance costs being expensed as of the effective date of the amendment and increased interest rates on the 3.95 senior notes which resulted in $4.6 million of additional interest expense. Refer to NOTE 5 - DEBT AND CREDIT FACILITIES for further information.

The $16.2 million gain on extinguishment of debt is related to our repurchase of debt in the fourth quarter of 2014. Refer to NOTE 5 - DEBT AND CREDIT FACILITIES for further information.

Table of Contents

Additionally, other non-operating income increased by $13.7 million during the year ended December 31, 2014 in comparison to 2013. Other non-operating income was impacted positively in 2014 by $7.8 million related to the sale of marketable securities as a decision was made to liquidate the asset in 2014.

### *Income Taxes*

Our tax rate is affected by permanent items, such as depletion and the relative amount of income we earn in various foreign jurisdictions with tax rates that differ from the U.S. statutory rate. It also is affected by discrete items that may occur in any given period, but are not consistent from period to period. The following represents a summary of our tax provision and corresponding effective rates for the December 31, 2014 and 2013:

| | (In Millions) | | |
|---|---|---|---|
| | 2014 | 2013 | Variance |
| Income tax benefit (expense) | $    86.0 | $    (237.6) | $    323.6 |
| Effective tax rate | 436.5% | 20.0% | 416.5% |

A reconciliation of our income tax attributable to continuing operations computed at the U.S. federal statutory rate for the years ended December 31, 2014 and 2013 is as follows:

| | (In Millions) | | | |
|---|---|---|---|---|
| | 2014 | | 2013 | |
| Tax at U.S. statutory rate of 35 percent | $    (6.9) | 35.0 % | $    416.8 | 35.0 % |
| Increases/(Decreases) due to: | | | | |
| Non-taxable loss (income) related to noncontrolling interests | (9.4) | 47.7 | (5.4) | (0.5) |
| Impact of tax law change | 13.0 | (66.0) | — | — |
| Percentage depletion in excess of cost depletion | (87.9) | 446.2 | (97.6) | (8.2) |
| Impact of foreign operations | 51.4 | (260.9) | (48.7) | (4.1) |
| Income not subject to tax | (27.7) | 140.6 | (84.7) | (7.1) |
| Goodwill impairment | 22.7 | (115.2) | — | — |
| State taxes, net | (25.4) | 128.9 | 5.6 | 0.5 |
| Settlement of financial guaranty | (347.1) | 1,761.9 | — | — |
| Manufacturer's deduction | — | — | (9.3) | (0.8) |
| Valuation allowance - current year | 318.3 | (1,615.7) | 53.2 | 4.5 |
| Valuation allowance on tax benefits recorded in prior years | 15.2 | (77.2) | — | — |
| Tax uncertainties | — | — | 12.5 | 1.1 |
| Prior year adjustments made in current year | (6.3) | 32.1 | 4.9 | 0.4 |
| Other items - net | 4.1 | (20.9) | (9.7) | (0.8) |
| Provision for income tax benefit and effective income tax rate including discrete items | $    (86.0) | 436.5 % | $    237.6 | 20.0 % |

Our tax provision for the year ended December 31, 2014 was a benefit of $86.0 million and a 436.5 percent effective tax rate compared with an expense of $237.6 million and an effective tax rate of 20.0 percent for the prior-year. The change in the income tax benefit from the prior-year expense is due primarily to the impairment of global long-lived assets offset by valuation allowances on future tax benefits that management has determined are not recoverable and the settlement of a financial guaranty. The impact of foreign operations relates to losses in foreign jurisdictions where the statutory rates, ranging from zero percent to 30 percent, differ from the U.S. statutory rate of 35 percent. Other items include non-deductible goodwill impairment as well as a decrease in the tax benefit from interest income not subject to tax.

59

Table of Contents

For the years ended December 31, 2014 and 2013, income not subject to tax includes the tax benefit of non-taxable interest income related to an intercompany note between the U.S. and Canada. This note was restructured on April 27, 2014 and no longer results in an income tax benefit after this date.

See NOTE 9 - INCOME TAXES for further information.

### Equity Loss from Ventures

Equity loss from ventures for the year ended December 31, 2014 of $9.9 million compares to equity loss from ventures for the year ended December 31, 2013 of $74.4 million. The equity loss from ventures for the year ended December 31, 2014 primarily is comprised of the impairment charge of $9.2 million related to a Global Exploration Group investment. The equity loss from ventures for the year ended December 31, 2013 is comprised of the impairment charge of $67.6 million related to our 30 percent ownership interest in Amapá, the sale of which was approved by the Board of Directors in December 2012. The sale closed in the fourth quarter of 2013.

### Loss from Discontinued Operations, net of tax

*Loss from Discontinued Operations, net of tax* was comprised primarily of the loss on discontinued operations related to our North American Coal operating segment and our Eastern Canadian Iron Ore operations. The *Loss from Discontinued Operations, net of tax* related to the North American Coal operating segment was $1,134.5 million and $9.3 million for the years ended December 31, 2014 and 2013, respectively. The *Loss from Discontinued Operations, net of tax* related to the deconsolidated Canadian Entities was $7,233.5 million and $509.8 million for the years ended December 31, 2014 and 2013, respectively.

Refer to NOTE 14 - DISCONTINUED OPERATIONS for further information.

### Noncontrolling Interest

Noncontrolling interest primarily is comprised of our consolidated, but less-than-wholly owned subsidiary at our Empire mining venture and through the CCAA filing on January 27, 2015, the Bloom Lake operations. The net loss attributable to the noncontrolling interest related to Bloom Lake was $1,113.3 million for the year ended December 31, 2014 compared to net loss attributable to the noncontrolling interest of $66.5 million for the year ended December 31, 2013. The net income attributable to the noncontrolling interest of the Empire mining venture was $26.9 and $20.7 million for the years ended December 31, 2014 and 2013, respectively.

## Results of Operations – Segment Information

We have historically evaluated segment performance based on sales margin, defined as revenues less cost of goods sold, and operating expenses identifiable to each segment. Additionally, beginning in the third quarter of 2014, concurrent with the change in control on July 29, 2014, management began to evaluate segment performance based on EBITDA, defined as net income (loss) before interest, income taxes, depreciation, depletion and amortization, and Adjusted EBITDA, defined as EBITDA excluding certain items such as impairment of goodwill and other long-lived assets, impacts of discontinued operations, extinguishment of debt, severance and contractor termination costs and other costs associated with the change in control, foreign currency remeasurement, certain supplies inventory write-offs, and intersegment corporate allocations of selling, general and administrative costs. Management uses and believes that investors benefit from referring to these measures in evaluating operating and financial results, as well as in planning, forecasting and analyzing future periods as these financial measures approximate the cash flows associated with the operational earnings.

*2015 Compared to 2014*

| | (In Millions) | | | |
|---|---|---|---|---|
| | **2015** | | 2014 | |
| Net Loss | $ | **(748.4)** | $ | (8,311.6) |
| Less: | | | | |
| Interest expense, net | | **(231.4)** | | (185.2) |
| Income tax benefit (expense) | | **(163.3)** | | 1,302.0 |
| Depreciation, depletion and amortization | | **(134.0)** | | (504.0) |
| EBITDA | $ | **(219.7)** | $ | (8,924.4) |
| Less: | | | | |
| Impairment of goodwill and other long-lived assets | $ | **(3.3)** | $ | (635.5) |
| Impact of discontinued operations | | **(892.0)** | | (9,332.5) |
| Gain on extinguishment of debt | | **392.9** | | 16.2 |
| Severance and contractor termination costs | | **(10.2)** | | (23.3) |
| Foreign exchange remeasurement | | **16.3** | | 29.0 |
| Proxy contest and change in control costs in SG&A | | **—** | | (26.6) |
| Supplies inventory write-off | | **(16.3)** | | — |
| Total Adjusted EBITDA | $ | **292.9** | $ | 1,048.3 |
| | | | | |
| EBITDA: | | | | |
| U.S. Iron Ore | $ | **317.6** | $ | 805.6 |
| Asia Pacific Iron Ore | | **35.3** | | (352.9) |
| Other (including discontinued operations) | | **(572.6)** | | (9,377.1) |
| Total EBITDA | $ | **(219.7)** | $ | (8,924.4) |
| | | | | |
| Adjusted EBITDA: | | | | |
| U.S. Iron Ore | $ | **352.1** | $ | 833.5 |
| Asia Pacific Iron Ore | | **32.7** | | 252.9 |
| Other | | **(91.9)** | | (38.1) |
| Total Adjusted EBITDA | $ | **292.9** | $ | 1,048.3 |

EBITDA for the year ended December 31, 2015 increased by $8.7 billion on a consolidated basis from 2014. The period-over-period change was driven primarily by the items detailed above in the EBITDA calculation. Adjusted EBITDA decreased by 755.4 million for the year ended December 31, 2015 from the comparable period in 2014. The decrease was primarily attributable to the lower consolidated sales margin. See further detail below for additional information regarding the specific factors that impacted each reportable segments' sales margin during 2015.

61

Table of Contents

### U.S. Iron Ore

The following is a summary of U.S. Iron Ore results for the years ended December 31, 2015 and 2014:

| | | | | | | | (In Millions) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Changes due to: | | | | |
| | Year Ended December 31, | | | | Revenue and cost rate | | Sales volume | | Idle cost/production volume variance | Freight and reimburse-ment | Total change |
| | 2015 | | 2014 | | | | | | | | |
| Revenues from product sales and services | $ | 1,525.4 | $ | 2,506.5 | $ | (401.9) | $ | (465.4) | $ — | $ (113.8) | $ (981.1) |
| Cost of goods sold and operating expenses | | (1,298.3) | | (1,796.1) | | 140.2 | | 305.3 | (61.5) | 113.8 | 497.8 |
| Sales margin | $ | 227.1 | $ | 710.4 | $ | (261.7) | $ | (160.1) | $ (61.5) | $ — | $ (483.3) |

| Per Ton Information | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2015 | | 2014 | Difference | | Percent change |
| Realized product revenue rate[1] | $ | 79.12 | $ 102.36 | $ | (23.24) | (22.7)% |
| Cash production cost | | 54.35 | 63.83 | | (9.48) | (14.9)% |
| Non-production cash cost | | 5.92 | 1.08 | | 4.84 | 448.1 % |
| Cost of goods sold and operating expense rate[1] (excluding DDA) | | 60.27 | 64.91 | | (4.64) | (7.1)% |
| Depreciation, depletion & amortization | | 5.72 | 4.92 | | 0.80 | 16.3 % |
| Total cost of goods sold and operating expense rate | | 65.99 | 69.83 | | (3.84) | (5.5)% |
| Sales margin | $ | 13.13 | $ 32.53 | $ | (19.40) | (59.6)% |

| | | |
|---|---|---|
| Sales tons[2] (In thousands) | 17,292 | 21,840 |
| Production tons[2] (In thousands) | | |
| Total | 26,138 | 29,733 |
| Cliffs' share of total | 19,317 | 22,431 |

[1] Excludes revenues and expenses related to domestic freight, which are offsetting and have no impact on sales margin. Revenues also exclude venture partner cost reimbursements.

[2] Tons are long tons (2,240 pounds).

Sales margin for U.S. Iron Ore was $227.1 million for the year ended December 31, 2015, compared with the sales margin of $710.4 million for the year ended December 31, 2014. The decline compared to the prior year is attributable to a decrease in revenue of $981.1 million partially offset by a decrease in cost of goods sold and operating expenses of $497.8 million. Sales margin per ton decreased 59.6 percent to $13.13 during the year ended December 31, 2015 compared to 2014.

Revenue decreased by $867.3 million, excluding the decrease of $113.8 million of freight and reimbursements, from the prior year, predominantly due to:

- The average year-to-date realized product revenue rate declined by $23.24 per ton or 22.7 percent to $79.12 per ton in 2015, which resulted in a decrease of $401.9 million. This decline is a result of:

  ◦ Changes in customer pricing negatively affected the realized revenue rate by $9 per ton driven primarily by the reduction in Platts 62 percent Fe fines spot price as well as other indices referenced in customer contracts;

  ◦ Realized revenue rates impacted negatively by $7 per ton primarily as a result of one major customer contract with a pricing mechanism affected by a reduction in their full-year hot band steel pricing; and

62

A004890

Table of Contents

○ Realized revenue rates impacted negatively by $5 per ton related to one major customer contract with a reduced average selling price due to a change in the pricing mechanism as prescribed in the contract which shifted the contract from a fixed rate to a rate impacted by the Platts 62 percent Fe fines spot price, as well as other market rates plus the impact and timing of carryover tons.

• Lower sales volumes of 4,548 thousand tons or $465.4 million due to:

○ A lower nomination in 2015 from one customer due to reduced 2015 demand, reduced demand from a customer due to the idling of its blast furnace beginning in March 2015 and the expiration of a contract with one customer at the end of 2014; and

○ Lower sales to one customer in 2015 due to the termination of a contract in the fourth quarter of the current year.

○ These decreases were partially offset by higher sales to one customer throughout 2015 due to a spot contract with the customer that began in the fourth quarter of 2014.

Cost of goods sold and operating expenses in 2015 decreased $384.0 million, excluding the decrease of $113.8 million of freight and reimbursements from the prior year, predominantly as a result of:

• Lower costs in 2015 in comparison to the prior year primarily driven by the reduction in salaried workforce headcount, along with reduced maintenance and repair costs based on cost reduction initiatives and condition-based monitoring, reduced stripping costs at Tilden and Hibbing based on new mine plans, and the year-over-year reduction in energy rates; and

• Decreased sales volumes, as discussed above, that decreased costs by $305.3 million compared to the prior year.

• Partially offset by increased idle costs of $61.5 million due to the idle of United Taconite mine which began in the first week of August 2015, the idle of the Empire mine which began on June 26 2015 and ended in mid-October 2015, and one idled production line at our Northshore mine during all of 2015, until the complete idle of Northshore mine in the end of November 2015.

*Production*

Cliffs' share of production tons in its U.S. Iron Ore segment decreased by 13.9 percent in 2015 when compared to 2014. Empire mine had a decrease in production of 1,045 thousand tons related to the idling of Empire that began on June 26, 2015 and ended during mid-October of 2015. United Taconite mine had a decrease in production of 1,866 thousand tons during 2015 compared to 2014, primarily due to the idling of United Taconite mine that began the first week of August 2015. There was a decrease in production of 965 thousand tons at the Northshore mine during 2015, as we ran a three furnace operation throughout 2015 until the complete idle of Northshore mine in the end of November 2015. This is compared to 2014 when we ran a two furnace operation at Northshore for the majority of the first quarter and then started up one idled furnace in February and the other in March.

A004891

Table of Contents

*Asia Pacific Iron Ore*

The following is a summary of Asia Pacific Iron Ore results for the years ended December 31, 2015 and 2014:

| | | | (In Millions) | | | | |
|---|---|---|---|---|---|---|---|
| | | | Change due to: | | | | |
| | Year Ended December 31, | | Revenue and cost rate | Sales volume | Exchange rate | Freight and reimburse-ment | Total change |
| | **2015** | 2014 | | | | | |
| Revenues from product sales and services | $ **487.9** | $ 866.7 | $ (402.5) | $ 7.3 | $ (0.3) | $ 16.7 | $ (378.8) |
| Cost of goods sold and operating expenses | **(478.5)** | (745.0) | 194.8 | (6.2) | 94.6 | (16.7) | 266.5 |
| Sales margin | $ **9.4** | $ 121.7 | $ (207.7) | $ 1.1 | $ 94.3 | $ — | $ (112.3) |

| Per Ton Information | Year Ended December 31, | | | |
|---|---|---|---|---|
| | **2015** | 2014 | Difference | Percent change |
| Realized product revenue rate[1] | $ **39.93** | $ 74.56 | $ (34.63) | (46.4)% |
| Cash production cost | **30.82** | 49.29 | (18.47) | (37.5)% |
| Non-production cash cost | **6.13** | 2.07 | 4.06 | 196.1 % |
| Cost of goods sold and operating expense rate[1] (excluding DDA) | **36.95** | 51.36 | (14.41) | (28.1)% |
| Depreciation, depletion & amortization | **2.18** | 12.65 | (10.47) | (82.8)% |
| Total cost of goods sold and operating expense rate | **39.13** | 64.01 | (24.88) | (38.9)% |
| Sales margin | $ **0.80** | $ 10.55 | $ (9.75) | (92.4)% |

| | | |
|---|---|---|
| Sales tons[2] (In thousands) | **11,627** | 11,531 |
| Production tons[2] (In thousands) | **11,722** | 11,352 |

[1] We began selling a portion of our product on a CFR basis in 2014. As such, the information above excludes revenues and expenses related to freight, which are offsetting and have no impact on sales margin.

[2] Metric tons (2,205 pounds).

Sales margin for our Asia Pacific Iron Ore segment decreased to $9.4 million during the year ended December 31, 2015 compared with $121.7 million for the same period in 2014. Sales margin per ton decreased 92.4 percent to $0.80 per ton in 2015 compared to 2014 primarily as a result of decreased pricing as discussed below.

Revenue decreased by $395.5 million during the year ended December 31, 2015 over the prior year, excluding the increase of $16.7 million of freight and reimbursements, primarily as a result of:

- An overall decrease to the average realized revenue rate, which resulted in a decrease of $402.5 million, primarily as a result of a decrease in the Platts 62 percent Fe fines spot price to an average of $56 per ton from $97 per ton in the prior year.

- This decrease is partially offset by the higher sales volume of 11.6 million tons during the year ended December 31, 2015 compared with 11.5 million tons resulting in an increase in revenue of $7.3 million.

Cost of goods sold and operating expenses in the year ended December 31, 2015 decreased $283.2 million, excluding the increase of $16.7 million of freight and reimbursements, compared to 2014 primarily as a result of:

- A reduction in depreciation, amortization and depletion expense of $120.6 million primarily due to the long-lived asset impairments taken during the second half of 2014 and reduced mining costs of $79.4 million mainly due to decreased mining and hauling volumes and increases in productivity related to maintenance, hauling and train loading, and lower headcount; and

- Favorable foreign exchange rate variances of $94.6 million or $8 per metric ton.

64

Table of Contents

- These decreases were offset partially by higher sales volumes, as discussed above, that resulted in increased costs of $6.2 million compared to the prior year.

*Production*

Production at our Asia Pacific Iron Ore segment during the year ended December 31, 2015 remained consistent when compared to 2014 with a slight increase of 370 thousand production tons or 3.3 percent. The increase in production tons compared to the prior year is mainly attributable to increased rail capacity.

### *2014 Compared to 2013*

| | (In Millions) | | |
| --- | --- | --- | --- |
| | 2014 | | 2013 |
| Net Income (Loss) | $ (8,311.6) | $ | 361.8 |
| Less: | | | |
| Interest expense, net | (185.2) | | (179.1) |
| Income tax benefit (expense) | 1,302.0 | | (55.1) |
| Depreciation, depletion and amortization | (504.0) | | (593.3) |
| EBITDA | $ (8,924.4) | $ | 1,189.3 |
| Less: | | | |
| Impairment of goodwill and other long-lived assets | $ (635.5) | $ | (14.3) |
| Impact of discontinued operations | (9,332.5) | | (398.4) |
| Gain on extinguishment of debt | 16.2 | | — |
| Severance and contractor termination costs | (23.3) | | (16.6) |
| Foreign exchange remeasurement | 29.0 | | 53.2 |
| Proxy contest and change in control costs in SG&A | (26.6) | | — |
| Total Adjusted EBITDA | $ 1,048.3 | $ | 1,565.4 |
| | | | |
| EBITDA: | | | |
| U.S. Iron Ore | $ 805.6 | $ | 1,000.1 |
| Asia Pacific Iron Ore | (352.9) | | 543.0 |
| Other (including discontinued operations) | (9,377.1) | | (353.8) |
| Total EBITDA | $ (8,924.4) | $ | 1,189.3 |
| | | | |
| Adjusted EBITDA: | | | |
| U.S. Iron Ore | $ 833.5 | $ | 1,031.8 |
| Asia Pacific Iron Ore | 252.9 | | 513.1 |
| Other | (38.1) | | 20.5 |
| Total Adjusted EBITDA | $ 1,048.3 | $ | 1,565.4 |

EBITDA for the year ended December 31, 2014 decreased by $10.1 billion on a consolidated basis from 2013. The period-over-period change was driven primarily by the items detailed above in the EBITDA calculation. Adjusted EBITDA decreased by $517.1 million for the year ended December 31, 2014 from the comparable period in 2013. The decrease was primarily attributable to the lower consolidated sales margin. See further detail below for additional information regarding the specific factors that impacted each reportable segment's sales margin during 2014.

65

A004893

Table of Contents

### U.S. Iron Ore

Following is a summary of U.S. Iron Ore results for the years ended December 31, 2014 and 2013:

| | (In Millions) | | | | | | |
| | | | Change due to | | | | |
| | Year Ended December 31, | | Revenue and cost rate | Sales volume | Idle cost/Production volume variance | Freight and reimburse-ment | Total change |
| | 2014 | 2013 | | | | | |
| Revenues from product sales and services | $ 2,506.5 | $ 2,667.9 | $ (233.6) | $ 60.8 | $ — | $ 11.4 | $ (161.4) |
| Cost of goods sold and operating expenses | (1,796.1) | (1,766.0) | (34.4) | (33.2) | 48.9 | (11.4) | (30.1) |
| Sales margin | $ 710.4 | $ 901.9 | $ (268.0) | $ 27.6 | $ 48.9 | $ — | $ (191.5) |

| | Year Ended December 31, | | | |
| Per Ton Information | 2014 | 2013 | Difference | Percent change |
| Realized product revenue rate[1] | $ 102.36 | $ 113.08 | $ (10.72) | (9.5)% |
| Cash production cost | 63.83 | 61.95 | 1.88 | 3.0 % |
| Non-production cash cost | 1.08 | 3.13 | (2.05) | (65.5)% |
| Cost of goods sold and operating expenses rate[1] (excluding DDA) | 64.91 | 65.08 | (0.17) | (0.3)% |
| Depreciation, depletion & amortization | 4.92 | 5.65 | (0.73) | (12.9)% |
| Total cost of goods sold and operating expenses rate | 69.83 | 70.73 | (0.90) | (1.3)% |
| Sales margin | $ 32.53 | $ 42.35 | $ (9.82) | (23.2)% |
| | | | | |
| Sales tons [2] (In thousands) | 21,840 | 21,299 | | |
| Production tons [2] (In thousands) | | | | |
|   Total | 29,733 | 27,234 | | |
|   Cliffs' share of total | 22,431 | 20,271 | | |

[1] Excludes revenues and expenses related to domestic freight, which are offsetting and have no impact on sales margin. Revenues also exclude venture partner cost reimbursements.

[2] Tons are long tons (2,240 pounds).

Sales margin for U.S. Iron Ore was $710.4 million for the year ended December 31, 2014, compared with the sales margin of $901.9 million for the year ended December 31, 2013. The decline compared to the prior year is attributable to a decrease in revenue of $161.4 million as well as an increase in cost of goods sold and operating expenses of $30.1 million. Sales margin per ton decreased 23.2 percent to $32.53 during the year ended December 31, 2014 compared to 2013.

Revenue decreased by $172.8 million, excluding the increase of $11.4 million of freight and reimbursements, from the prior year, predominantly due to:

- The average year-to-date realized product revenue rate declined by $10.72 per ton or 9.5 percent to $102.36 per ton in 2014, which resulted in a decrease of $233.6 million. This decline is a result of:

  ◦ Changes in customer pricing negatively affected the realized revenue rate by $6 per ton driven primarily by the period-over-period reduction in Platts 62 percent Fe fines spot price and by new base pricing from an additional contract; and

66

Table of Contents

◦ Realized revenue rates impacted negatively by $5 per ton related to one major customer contract with a reduced average selling price due to a contractual change in the 2014 pricing mechanism.

• Primarily offset by higher sales volumes of 541 thousand tons or $60.8 million due to:

◦ Higher Great Lakes sales due to increased contracted tons in 2014 from two customers due to separate contract extensions/amendments, higher demand from a customer due to the Great Lakes freeze preventing the customer from reaching its self-produced ore, along with increased nominations in 2014 for two major customer contracts.

◦ Partially offset by decreased export sales due to increased 2014 Great Lakes nominations and low market pricing providing a disincentive for spot shipment opportunities along with reduced spot sales that occurred with one customer in the prior-year not recurring for as much tonnage in 2014.

Cost of goods sold and operating expenses in 2014 increased $18.7 million, excluding the increase of $11.4 million of freight and reimbursements from the prior year, predominantly as a result of:

• Higher costs related to increased mobile equipment repairs and increased maintenance and repair costs primarily driven by increased kiln repairs at Empire in 2014 due to the 2016 life-of-mine extension, mill repair at the Hibbing mine, along with higher costs related to increased energy rates in the first quarter of 2014; and

• Increased sales volumes, as discussed above, that increased costs by $33.2 million compared to the prior year.

• Partially offset by lower idle costs of $48.9 million due to restarting the two production lines at our Northshore mine during the first quarter of 2014 that were previously idled in January 2013 and the non-recurrence of the 2013 summer shutdown of the Empire mine in 2014.

*Production*

Cliffs' share of production tons in its U.S. Iron Ore segment increased by 10.7 percent in 2014 when compared to 2013. There was increased production at our Empire mine of 1.3 million tons in 2014 as a result of the non-recurrence of the summer shutdown that occurred in 2013, beginning early in the second quarter and ending in the third quarter. Additionally, there was an increase in production of 1.4 million tons at the Northshore mine during 2014, as we restarted the two idled furnaces in the first quarter of 2014. We had previously idled two of the four furnaces at the Northshore mine in January 2013. These increases were partially offset by decreased production of 260 thousand tons at our United Taconite mine due to extreme weather and unplanned maintenance outages.

67

Table of Contents

*Asia Pacific Iron Ore*

Following is a summary of Asia Pacific Iron Ore results for the years ended December 31, 2014 and 2013:

| | | | | | (In Millions) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | Change due to | | | | | | | | | |
| | 2014 | | 2013 | | Revenue and cost rate | | Sales Volume | | Exchange Rate | | Freight and reimburse-ment | | Total change |
| Revenues from product sales and services | $ | 866.7 | $ | 1,224.3 | $ | (414.8) | $ | 54.8 | $ | (4.5) | $ | 6.9 | $ (357.6) |
| Cost of goods sold and operating expenses | | (745.0) | | (857.2) | | 102.7 | | (37.9) | | 54.3 | | (6.9) | 112.2 |
| Sales margin | $ | 121.7 | $ | 367.1 | $ | (312.1) | $ | 16.9 | $ | 49.8 | $ | — | $ (245.4) |

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| *Per Ton Information* | 2014 | | 2013 | Difference | Percent change |
| Realized product revenue rate | $ | 74.56 | $ 110.87 | $ (36.31) | (32.8)% |
| Cash production cost | | 49.29 | 56.77 | (7.48) | (13.2)% |
| Non-production cash cost | | 2.07 | 6.94 | (4.87) | (70.2)% |
| Cost of goods sold and operating expenses rate (excluding DDA) | | 51.36 | 63.71 | (12.35) | (19.4)% |
| Depreciation, depletion & amortization | | 12.65 | 13.92 | (1.27) | (9.1)% |
| Total cost of goods sold and operating expenses rate | | 64.01 | 77.63 | (13.62) | (17.5)% |
| Sales margin | $ | 10.55 | $ 33.24 | $ (22.69) | (68.3)% |
| | | | | | |
| Sales tons [1] (In thousands) | | 11,531 | 11,043 | | |
| Production tons [1] (In thousands) | | 11,352 | 11,109 | | |

[1] We began selling a portion of our product on a CFR basis in 2014. As such, the information above excludes revenues and expenses related to freight, which are offsetting and have no impact on sales margin.

[2] Metric tons (2,205 pounds).

Sales margin for our Asia Pacific Iron Ore segment decreased to $121.7 million during the year ended December 31, 2014 compared with $367.1 million for the same period in 2013. Sales margin per metric ton decreased 68.3 percent to $10.55 per metric ton in 2014 compared to 2013.

Revenue decreased by $364.5 million during the year ended December 31, 2014 over the prior year, excluding the increase of $6.9 million of freight and reimbursements, primarily as a result of:

- An overall decrease to the average realized revenue rate, which resulted in a decrease of $414.8 million, primarily as a result of a decrease in the Platts 62 percent Fe fines spot price to an average of $97 per ton from $135 per ton in the prior year,

- Partially offset by the higher volume of 11.5 million tons during the year ended December 31, 2014 compared with 11.0 million tons during the prior year due to strong rail deliveries and increased production, resulting in an increase in revenue of $54.8 million.

Cost of goods sold and operating expenses in the year ended December 31, 2014 decreased $119.1 million, excluding the increase of $6.9 million of freight and reimbursements, compared to 2013 primarily as a result of:

- Reduced mining costs of $81.2 million mainly due to lower mining contractor costs primarily resulting from a focus on efficiencies across the operation, lower sales royalties of $23.9 million primarily attributable to the decline in the Platts 62 percent Fe fines spot price, and lower logistics costs of $12.0 million primarily attributable to the finalization of the port dispute. These cost savings are partially offset by an increase in site administration expenses of $9.6 million due to realignment of head count to the sites and severance payments of $1.6 million; and

Table of Contents

- Favorable foreign exchange rate variances of $54.3 million or $5 per metric ton.

- These decreases were offset partially by higher sales volumes, as discussed above, that resulted in increased costs of $37.9 million compared to the prior year.

*Production*

Production at our Asia Pacific Iron Ore segment increased 243 thousand metric tons or 2.2 percent during the year ended December 31, 2014 when compared to 2013. The increase in production tons compared to the prior year is mainly attributable to increased rail capacity as there were less train delays and better loading procedures implemented to get more tons into each wagon.

**Liquidity, Cash Flows and Capital Resources**

Our primary sources of liquidity are cash generated from our operating and financing activities. Our capital allocation process is focused on prioritizing all potential uses of future cash flows. We are focused on the preservation of liquidity in our business through the maximization of cash generation of our operations as well as reducing operating costs, limiting capital investments to regulatory and permission to operate related projects and lowering selling, general and administrative expenses. We also may seek to reduce our debt, including, without limitation, through repurchases or exchanges of our debt securities. We believe these efforts, which have been underway for several quarters and will continue for the foreseeable future, are critical in light of the challenging market conditions arising from the reduced demand for our products and volatility in global commodity prices we experienced during 2015.

Based on our outlook for 2016, which is subject to continued changing demand from steelmakers that utilize our products and volatility in iron ore and domestic steel prices, we expect our anticipated capital expenditures and cash requirements to service our debt obligations during the next 12 months to exceed our estimated operating cash flows. Despite this, we maintain sufficient liquidity through the cash on our balance sheet and the availability provided by our ABL Facility to fund our normal business operations, including the servicing of our debt obligations, and we expect to be able to fund these requirements for the next 12 months.

If we see reduced demand from our customers and/or iron ore or steel prices were to deteriorate further during 2016 we would face further pressure on our available liquidity. If this was the case, we would need to consider the sale of assets, further expense reductions and the possibility of refinancing our existing debt. There is a possibility that these further actions would not be sufficient to maintain adequate levels of available liquidity particularly if industry conditions deteriorated severely.

Refer to "Outlook" for additional guidance regarding expected future results, including projections on pricing, sales volume and production for our various businesses.

The following discussion summarizes the significant activities impacting our cash flows during 2015 as well as those expected to impact our future cash flows over the next 12 months. Refer to the Statements of Consolidated Cash Flows for additional information.

***Operating Activities***

Net cash provided by operating activities decreased to $37.9 million for the year ended December 31, 2015, compared to cash provided by operating activities of $358.9 million for 2014. The decrease in operating cash flows in 2015 was primarily due to lower operating results as previously discussed, which was partially offset by an income tax refund of $211.4 million, mainly related to the U.S. Positively affecting our operating cash flows in 2015 and continuing into 2016 are the decreased costs associated with the temporary idles of United Taconite mine and Northshore mine.

Net cash provided by operating activities decreased to $358.9 million for the year ended December 31, 2014, compared to Net cash provided by operating activities of $1,145.9 million for 2013. The decrease in operating cash flows in 2014 was primarily due to lower operating results as previously discussed.

Throughout 2015, the Platts 62 percent Fe fines spot price has been driven down by a combination of reduced domestic steel demand from China and increased global iron ore production leading to excess supply, as well as mining cost deflation and a sharp fall in Australian and Brazilian currencies versus the U.S. dollar. In 2016, we do not expect to see meaningful improvement in iron ore prices without significant changes to the global iron ore supply-demand picture.

The iron ore supply-demand situation has not only adversely impacted iron ore producers, but also the global steel industry. Currently, the global steel industry is experiencing its worst conditions in over a decade, with prices for products falling even lower than those realized during the most recent recession - the 2008 global financial crisis. We

believe that very low cost iron ore has contributed substantially to foreign steel exported out of China and other countries into the U.S. market. As a result of these imports, as well as the continued weakening of the oil and gas sector, domestic pricing for steel has been depressed and in turn, our customers' demand for pellets has fallen. In 2016, we expect these conditions to improve as recently imposed duties on unfairly traded steel should curb the steel imports entering the U.S, and as a result we expect to see domestic steel pricing rising throughout 2016.

If necessary, our efficient tax structure allows us to repatriate cash from our foreign operations. Our U.S. cash and cash equivalents balance at December 31, 2015 was $213.6 million, or approximately 74.9 percent of our consolidated total cash and cash equivalents balance of $285.2 million.

### Investing Activities

Net cash used in investing activities was $103.2 million for the year ended December 31, 2015, compared with $103.6 million for 2014. We had capital expenditures of $80.8 million and $284.1 million for the years ended December 31, 2015 and 2014, respectively. Offsetting our investments in property, plant and equipment, during 2014, we had cash proceeds from investing activities of $155.0 million from the sale of CLCC.

Net cash used by investing activities was $103.6 million for the year ended December 31, 2014, compared with $811.3 million for 2013. We had capital expenditures of $284.1 million and $861.6 million for the years ended December 31, 2014 and 2013, respectively. Up until the first quarter of 2014, our main capital investment focus was on the construction of the Bloom Lake mine's operations, at which time we placed the Phase II expansion on hold. We subsequently determined that the Phase II expansion of the Bloom Lake mine was no longer a viable option for us and we shifted our focus to considering available possibilities and executing an exit option for Eastern Canadian Iron Ore operations that minimizes the cash outflows and associated liabilities. In December 2014, iron ore production at the Bloom Lake mine was suspended and the Bloom Lake mine was placed in "care-and-maintenance" mode. Prior to Bloom Lake mine entering "care and maintenance" mode, we spent approximately $51 million and approximately $426 million on the ramp-up and expansion projects at the Bloom Lake mine during the years ended December 31, 2014 and 2013, respectively, which predominately relates to work performed in 2013.

Additionally, we spent approximately $81 million, $232 million and $394 million globally on expenditures related to sustaining capital during 2015, 2014 and 2013, respectively. Sustaining capital spend includes infrastructure, mobile equipment, environmental, safety, fixed equipment, product quality and health.

In alignment with our strategy to focus on allocating capital among key priorities related to liquidity management, and business investment, we anticipate total cash used for capital expenditures in 2016 to be approximately $50 million, the vast majority of which relates to our U.S. Iron Ore operations.

### Financing Activities

Net cash provided by financing activities was $61.0 million for the year ended December 31, 2015, compared with net cash used in financing activities of $288.3 million for 2014. Net cash provided by financing activities included the issuance of First Lien Notes, which resulted in proceeds of $503.5 million which were offset partially by the repurchase of senior notes of $225.9 million and debt issuance costs of $33.6 million. Additionally, net cash used by financing activities during 2015 and 2014 included $45.4 million and $20.9 million, respectively, for the repayment of the Canadian equipment loans, and $51.2 million of preferred dividend distributions in each of those periods. On January 4, 2016, we announced that under the terms of our 7.00 percent Series A Mandatory Convertible Preferred Stock, Class A ("Series A preferred stock"), the final quarterly dividend would not be paid in cash. Refer to NOTE 21 - SUBSEQUENT EVENTS for further information. The year ended December 31, 2014 also included common dividend distributions of $92.5 million. On January 26, 2015, we announced that our Board of Directors had decided to eliminate the quarterly dividend of $0.15 per share on our common shares. The decision was applicable to the first quarter of 2015 and all subsequent quarters.

We anticipate that the remaining balance of the Canadian equipment loans that were guaranteed by the Company of approximately $97 million will be re-paid from available cash within the next 12 months and as a result approximately $74 million of letter of credit obligations associated with these guarantees will be released as well. We also had distributions of partnership equity of $40.6 million for the year ended December 31, 2015 and we anticipate approximately $47 million in partnership equity will be distributed within the next 12 months.

Net cash used in financing activities was $288.3 million for the year ended December 31, 2014, compared with net cash used in financing activities of $171.9 million for 2013. For the year ended December 31, 2013, net cash used includes dividend distributions of $127.6 million. In 2013, we had net repayments under our credit facilities of $325.0 million, which was partially offset by cash provided by financing activities of $164.8 million from the Canadian equipment loans. Additionally, we completed public offerings of 29.25 million depositary shares and 10.35 million common shares,

resulting in net proceeds of $709.4 million and $285.3 million, respectively, after underwriting fees and discounts, of which a portion of the net proceeds were used to repay the $847.1 million outstanding under the term loan.

The following represents our future cash commitments and contractual obligations as of  December 31, 2015:

| | | Payments Due by Period [1] (In Millions) | | | |
|---|---|---|---|---|---|
| Contractual Obligations | Total | Less than 1 Year | 1 - 3 Year | 3 - 5 Year | More Than 5 Years |
| Long-term debt | $ 2,898.2 | $ — | $ 311.2 | $ 1,681.7 | $ 905.3 |
| Interest on debt [2] | 1,468.5 | 188.5 | 366.8 | 287.1 | 626.1 |
| Operating lease obligations | 36.8 | 8.4 | 13.7 | 9.7 | 5.0 |
| Capital lease obligations | 92.6 | 24.3 | 40.3 | 19.0 | 9.0 |
| Guarantees and contingent liabilities | 140.2 | 104.3 | 35.9 | — | — |
| Purchase obligations: | | | | | |
| Open purchase orders | 42.0 | 42.0 | — | — | — |
| Minimum "take or pay" purchase commitments [3] | 284.1 | 111.0 | 93.6 | 38.7 | 40.8 |
| Total purchase obligations | 326.1 | 153.0 | 93.6 | 38.7 | 40.8 |
| Other long-term liabilities: | | | | | |
| Pension funding minimums | 300.8 | 1.2 | 53.0 | 64.5 | 182.1 |
| OPEB claim payments | 109.9 | 4.1 | 7.8 | 7.6 | 90.4 |
| Environmental and mine closure obligations | 234.0 | 2.8 | 18.3 | 19.1 | 193.8 |
| Personal injury | 3.8 | 1.6 | 1.6 | 0.4 | 0.2 |
| Total other long-term liabilities | 648.5 | 9.7 | 80.7 | 91.6 | 466.5 |
| Total | $ 5,610.9 | $ 488.2 | $ 942.2 | $ 2,127.8 | $ 2,052.7 |

[1] Includes our consolidated obligations.

[2]    Refer to NOTE 5 - DEBT AND CREDIT FACILITIES of the Consolidated Financial Statements for additional information regarding our debt and related interest rates.

[3]    Includes minimum railroad transportation obligations, minimum electric power demand charges, minimum coal, diesel and natural gas obligations and minimum port facility obligations.

The above table does not reflect $156.2 million of unrecognized tax benefits, which we have recorded for uncertain tax positions as we are unable to determine a reasonable and reliable estimate of the timing of future payments.

Refer to NOTE 20 - COMMITMENTS AND CONTINGENCIES of the Consolidated Financial Statements for additional information regarding our future commitments and obligations.

A004899

Table of Contents

*Capital Resources*

We expect to fund our business obligations from available cash, current and future operations and existing borrowing arrangements. We also may pursue other funding strategies in the capital markets to strengthen our liquidity. The following represents a summary of key liquidity measures as of December 31, 2015 and December 31, 2014:

| | (In Millions) | |
|---|---|---|
| | December 31, 2015 | December 31, 2014 |
| Cash and cash equivalents | $ 285.2 | $ 271.3 |
| Available revolving credit facility [(1)] | $ — | $ 1,125.0 |
| Revolving loans drawn | — | — |
| Available borrowing base on ABL Facility [(2)] | 366.0 | — |
| ABL Facility loans drawn | — | — |
| Letter of credit obligations and other commitments | (186.8) | (149.5) |
| Borrowing capacity available | $ 179.2 | $ 975.5 |

[(1)] On March 30, 2015 we eliminated our revolving credit facility and replaced it with the ABL Facility

[(2)] The ABL Facility has the maximum borrowing base of $550 million, determined by applying customary advance rates to eligible accounts receivable, inventory and certain mobile equipment.

Our primary source of funding is our ABL Facility, which matures on March 30, 2020. We also have cash on hand, generated by the business, which totaled $285.2 million as of December 31, 2015. The combination of cash and availability under the ABL Facility gives us approximately $464.4 million in liquidity entering the first quarter of 2016, which is expected to be used to fund operations, letter of credit obligations, sustaining capital expenditures and other cash commitments for at least the next 12 months. Based on anticipated cash used from financing activities, letters of credit obligations will decrease by approximately $76 million in the next 12 months.

As of December 31, 2015, we were in compliance with the ABL Facility liquidity requirements and, therefore, the springing financial covenant requiring a minimum Fixed Charge Coverage Ratio of 1.0 to 1.0 was not applicable. We believe that the cash on hand and the ABL Facility provide us sufficient liquidity to support our operating, investing and financing activities.

As previously noted, on January 27, 2016, we announced the Exchange Offers up to $710 million aggregate principal amount of our New 1.5 Lien Notes due 2020 for certain Existing Notes of Cliffs, upon the terms and subject to the conditions set forth in our confidential offering memorandum dated January 27, 2016. To the extent that Existing Notes are exchanged, the capability to issue New 1.5 Lien Notes, subject to compliance with the Fixed Charge Coverage Ratio under our ABL Facility for purposes of additional liquidity, is proportionally reduced. Furthermore, the ability to issue these secured notes could be limited by market conditions. If demand for our products and pricing deteriorates further and persists for a continued period of time, we believe our ability to maintain the required Fixed Charge Coverage Ratio of 1.0 to 1.0 could be difficult.

*Off-Balance Sheet Arrangements*

In the normal course of business, we are a party to certain arrangements that are not reflected on our   Statements of Consolidated Financial Position . These arrangements include minimum "take or pay" purchase commitments, such as minimum electric power demand charges, minimum coal, diesel and natural gas purchase commitments, minimum railroad transportation commitments and minimum port facility usage commitments; financial instruments with off-balance sheet risk, such as bank letters of credit and bank guarantees; and operating leases, which primarily relate to equipment and office space.

## Market Risks

We are subject to a variety of risks, including those caused by changes in commodity prices, foreign currency exchange rates and interest rates. We have established policies and procedures to manage such risks; however, certain risks are beyond our control.

### Pricing Risks

#### Commodity Price Risk

Our consolidated revenues include the sale of iron ore pellets, iron ore lump and iron ore fines. Our financial results can vary significantly as a result of fluctuations in the market prices of iron ore. World market prices for these commodities have fluctuated historically and are affected by numerous factors beyond our control. The world market price that most commonly is utilized in our iron ore sales contracts is the Platts 62 percent Fe fines spot rate pricing, which can fluctuate widely due to numerous factors, such as global economic growth or contraction, change in demand for steel or changes in availability of supply.

#### Provisional Pricing Arrangements

Certain of our U.S. Iron Ore and Asia Pacific Iron Ore customer supply agreements specify provisional price calculations, where the pricing mechanisms generally are based on market pricing, with the final revenue rate to be based on market inputs at a specified point in time in the future, per the terms of the supply agreements. The difference between the provisionally agreed-upon price and the estimated final revenue rate is characterized as a derivative and is required to be accounted for separately once the revenue has been recognized. The derivative instrument is adjusted to fair value through *Product revenues* each reporting period based upon current market data and forward-looking estimates provided by management until the final revenue rate is determined.

At December 31, 2015, we recorded $2.0 million as derivative assets included in *Other current assets* and $3.4 million as derivative liabilities included in *Other current liabilities* in the Statements of Consolidated Financial Position related to our estimate of final revenue rate with our U.S. Iron Ore and Asia Pacific Iron Ore customers. These amounts represent the difference between the provisional price agreed upon with our customers based on the supply agreement terms and our estimate of the final sales rate based on the price calculations established in the supply agreements. As a result, we recognized a net $1.4 million decrease, respectively, in *Product revenues* in the Statements of Consolidated Operations for the year ended December 31, 2015 related to these arrangements.

#### Customer Supply Agreements

A certain supply agreement with one U.S. Iron Ore customer provides for supplemental revenue or refunds based on the customer's average annual steel pricing at the time the product is consumed in the customer's blast furnace. The supplemental pricing is characterized as a freestanding derivative, which is finalized based on a future price, and is adjusted to fair value as a revenue adjustment each reporting period until the pellets are consumed and the amounts are settled. The fair value of the instrument is determined using an income approach based on an estimate of the annual realized price of hot-rolled steel at the steelmaker's facilities.

At December 31, 2015, we had derivative assets of $5.8 million, representing the fair value of the pricing factors, based upon the amount of unconsumed tons and an estimated average hot-band steel price related to the period in which the tons are expected to be consumed in the customer's blast furnace at each respective steelmaking facility, subject to final pricing at a future date. This compares with derivative assets of $63.2 million as of December 31, 2014. We estimate that a $75 positive change in the average hot-band steel price realized from the December 31, 2015 estimated price recorded would cause the fair value of the derivative instrument to increase by approximately $51.9 million or a $75 negative change in the average hot-band steel price realized from the December 31, 2015 estimated price recorded would cause the fair value of the derivative instrument to decrease by approximately $44.1 million, thereby impacting our consolidated revenues by the same amount.

We have not entered into any hedging programs to mitigate the risk of adverse price fluctuations; however certain of our term supply agreements contain price collars, which typically limit the percentage increase or decrease in prices for our products during any given year.

#### Volatile Energy and Fuel Costs

The volatile cost of energy is an important issue affecting our production costs, primarily in relation to our iron ore operations. Our consolidated U.S. Iron Ore mining ventures consumed approximately 18.6 million MMBtu's of natural gas at an average delivered price of $3.52 per MMBtu inclusive of the natural gas hedge impact or $3.36 per MMBtu net of the natural gas hedge impact during 2015. Additionally, our consolidated U.S. Iron Ore mining ventures consumed approximately 23.0 million gallons of diesel fuel at an average delivered price of $1.96 per gallon inclusive of the diesel fuel hedge impact or $1.90 per gallon net of the diesel fuel hedge impact during 2015. Consumption of diesel fuel by our Asia Pacific operations was approximately 10.0 million gallons at an average delivered price of $1.86 per gallon for the same period.

73

In the ordinary course of business, there may also be increases in electrical costs at our U.S. mine sites. Specifically, our Tilden and Empire mines in Michigan have entered into large curtailable special contracts with Wisconsin Electric Power Company. Charges under those special contracts are subject to a power supply cost recovery mechanism that is based on variations in the utility's actual fuel and purchase power expenses.

Our strategy to address increasing energy rates includes improving efficiency in energy usage, identifying alternative providers and utilizing the lowest cost alternative fuels. An energy hedging program has been implemented in order to manage the price risk of diesel and natural gas at our U.S. Iron Ore mines during the winter months of 2016. This program affects the period of January through March of 2016. We will continue to monitor relevant energy markets for risk mitigation opportunities and may make additional forward purchases or employ other hedging instruments in the future as warranted and deemed appropriate by management. Assuming we do not enter into further hedging activity in the near term, a 10 percent change in electrical, natural gas and diesel fuel prices would result in a change of approximately $8.8 million in our annual fuel and energy cost based on expected consumption for 2016.

### Foreign Currency Exchange Rate Risk

We are subject to changes in foreign currency exchange rates as a result of our operations in Australia, which could impact our financial condition. With respect to Australia, foreign exchange risk arises from our exposure to fluctuations in foreign currency exchange rates because our reporting currency is the U.S. dollar, but the functional currency of our Asia Pacific operations is the Australian dollar.  Our Asia Pacific operations receive funds in U.S. currency for their iron ore sales and incur costs in Australian currency.

At December 31, 2015, we had no outstanding Australian foreign currency exchange rate contracts for which we elected hedge accounting. Our last outstanding Australian foreign exchange rate contract held as a cash flow hedge matured in September 2015. Due to the uncertainty of 2015 hedge exposures, we have suspended entering into new foreign exchange rate contracts. As discussed in NOTE 1 - BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES, we have waived compliance with our current derivative financial instruments and hedging activities policy through December 31, 2016. In the future, we may enter into additional hedging instruments as needed in order to further hedge our exposure to changes in foreign currency exchange rates. Refer to NOTE 13 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES  for further information.

### Interest Rate Risk

Interest payable on our senior notes is at fixed rates. Interest payable under our ABL Facility is at a variable rate based upon the base rate plus the base rate margin depending on the excess availability. As of December 31, 2015, we had no amounts drawn on the ABL Facility.

The interest rate payable on the $500.0 million senior notes due in 2018 may be subject to adjustments from time to time if either Moody's or S&P or, in either case, any Substitute Rating Agency thereof downgrades (or subsequently upgrades) the debt rating assigned to the notes. In no event shall (1) the interest rate for the notes be reduced to below the interest rate payable on the notes on the date of the initial issuance of notes or (2) the total increase in the interest rate on the notes exceed 2.00 percent above the interest rate payable on the notes on the date of the initial issuance of notes. Throughout 2014, the interest rate payable on the $500.0 million senior notes due in 2018 was increased from 3.95 percent ultimately to 5.70 percent based on Substitute Rating Agency downgrades throughout the year. During the first quarter of 2015, subsequent to a downgrade, the interest rate was further increased to 5.95 percent. This maximum rate increase of 2.00 percent has resulted in an additional interest expense of $6.2 million per annum based upon the $311.2 million principal balance outstanding as of December 31, 2015.

### Supply Concentration Risks

Many of our mines are dependent on one source each of electric power and natural gas. A significant interruption or change in service or rates from our energy suppliers could impact materially our production costs, margins and profitability.

## Outlook

We provide full-year expected revenues-per-ton ranges based on different assumptions of seaborne iron ore prices. We indicated that each different pricing assumption holds all other assumptions constant, including customer mix, as well as industrial commodity prices, freight rates, energy prices, production input costs and/or hot-band steel prices (all factors contained in certain of our supply agreements).

The U.S. Iron Ore table further assumes full-year hot-band steel pricing of approximately $450 per short ton. We note that this estimate is based on our customer's realized prices and not an index or spot market price. In 2015,

74

A004902

the customer's realized price was approximately $40 per ton higher than the U.S. Domestic Midwest Hot Rolled Coil Steel Index. In terms of sensitivity, for every $50 per ton change in the customer's hot-rolled steel prices, our U.S. Iron Ore revenue realizations per ton would be expected to change by $2.25 if steel prices increase, and $1.75 if steel prices decrease.

The table below provides certain Platts IODEX averages for 2016 and the corresponding full-year realization for the U.S. Iron Ore and Asia Pacific Iron Ore segments.

| 2016 Full-Year Realized Revenues-Per-Ton Range Summary | | |
|---|---|---|
| Platts IODEX (1) | U.S. Iron Ore (2) | Asia Pacific Iron Ore (3) |
| $30 | $71 - $73 | $19 - $21 |
| $35 | $71 - $73 | $23 - $25 |
| $40 | $72 - $74 | $28 - $30 |
| $45 | $73 - $75 | $32 - $34 |
| $50 | $74 - $76 | $36 - $38 |
| $55 | $75 - $77 | $40 - $42 |
| $60 | $76 - $78 | $45 - $47 |

(1) The Platts IODEX is the benchmark assessment based on a standard specification of iron ore fines with 62% iron content (C.F.R. China).

(2) U.S. Iron Ore tons are reported in long tons of pellets. This table assumes full-year hot-rolled steel pricing of approximately $450 per short ton, which is based on customer realizations and not a public index.

(3) Asia Pacific Iron Ore tons are reported in metric tons of lump and fines, F.O.B. the port.

**U.S. Iron Ore Outlook** (Long Tons)

For 2016, we expect full-year sales volume of approximately 17.5 million tons from our U.S. Iron Ore business. In order to reduce pellet inventory levels and generate cash flow from working capital, we currently plan to produce approximately 16 million tons of iron ore pellets during 2016.

Our full-year 2016 U.S. Iron Ore cash production cost per ton expectation is $50 - $55. Our cash cost of goods sold per ton expectation is $55 - $60, representing a reduction of $5 from the previously disclosed 2016 cash costs of goods sold per ton expectation of $60 - $65.

We anticipate depreciation, depletion and amortization to be approximately $7 per ton for full-year 2016.

**Labor Update**

We remain in active negotiations with the United Steelworkers and are committed to reaching a fair and equitable agreement. The current contract has been extended by mutual agreement of both parties. The contract extension covers approximately 2,000 USW-represented workers at our Empire and Tilden mines in Michigan, and our United Taconite and Hibbing Taconite mines in Minnesota.

**Asia Pacific Iron Ore Outlook** (Metric Tons, F.O.B. the port)

Our full-year 2016 Asia Pacific Iron Ore expected sales and production volume is approximately 11.5 million tons. The product mix is expected to contain 50 percent lump and 50 percent fines.

Based on a full-year average exchange rate of $0.69 U.S. Dollar to Australian Dollar, we are expecting a full-year 2016 Asia Pacific Iron Ore cash production cost per ton of $25 - $30. Our cash cost of goods sold per ton expectation is expected to be $30 - $35. We indicated that for every $0.01 change in this exchange rate on a full-year basis, our cash cost of goods sold is impacted by approximately $6 million.

We anticipate depreciation, depletion and amortization to be approximately $2 per ton for full-year 2016.

75

Table of Contents

The following table provides a summary of our 2016 guidance for our two business segments:

|  | 2016 Outlook Summary | |
|---|---|---|
|  | U.S. Iron Ore (A) | Asia Pacific Iron Ore (B) |
| Sales volume (million tons) | 17.5 | 11.5 |
| Production volume (million tons) | 16 | 11.5 |
| Cash production cost per ton | $50 - $55 | $25 - $30 |
| Cash cost of goods sold per ton | $55 - $60 | $30 - $35 |
| DD&A per ton | $7 | $2 |

(A) U.S. Iron Ore tons are reported in long tons of pellets.
(B) Asia Pacific Iron Ore tons are reported in metric tons of lump and fines.

## SG&A Expenses and Other Expectations

Full-year 2016 SG&A expenses are expected to be approximately $95 million, a $15 million reduction from the full-year 2015 expense. We also note that of the $95 million expectation, approximately $30 million is considered non-cash.

We expect full-year 2016 interest expense to be approximately $240 million, of which approximately $205 million is cash interest. Consolidated full-year 2016 depreciation, depletion and amortization is expected to be approximately $145 million.

## Capital Budget Update

We expect full-year 2016 capital expenditures to be $50 million, a significant reduction compared to 2015 expenditures of $83 million. The reduction is driven by the divestiture of the remaining coal assets as well as spending discipline exhibited in the U.S. Iron Ore business.

## Recently Issued Accounting Pronouncements

Refer to NOTE 1 - BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES of the consolidated financial statements for a description of recent accounting pronouncements, including the respective dates of adoption and effects on results of operations and financial condition.

## Critical Accounting Estimates

Management's discussion and analysis of financial condition and results of operations is based on our consolidated financial statements, which have been prepared in accordance with GAAP. Preparation of financial statements requires management to make assumptions, estimates and judgments that affect the reported amounts of assets, liabilities, revenues, costs and expenses, and the related disclosures of contingencies. Management bases its estimates on various assumptions and historical experience, which are believed to be reasonable; however, due to the inherent nature of estimates, actual results may differ significantly due to changed conditions or assumptions. On a regular basis, management reviews the accounting policies, assumptions, estimates and judgments to ensure that our financial statements are fairly presented in accordance with GAAP. However, because future events and their effects cannot be determined with certainty, actual results could differ from our assumptions and estimates, and such differences could be material. Management believes that the following critical accounting estimates and judgments have a significant impact on our financial statements.

### *Revenue Recognition*

#### *U.S. Iron Ore and Asia Pacific Iron Ore Provisional Pricing Arrangements*

Most of our U.S. Iron Ore long-term supply agreements are comprised of a base price with annual price adjustment factors. The base price is the primary component of the purchase price for each contract. The inflation-indexed price adjustment factors are integral to the iron ore supply contracts and vary based on the agreement, but typically include adjustments based upon changes in benchmark and international pellet prices and changes in specified Producers Price Indices, including those for industrial commodities excluding fuel, cold rolled steel and strip, and fuel and related products. The pricing adjustments generally operate in the same manner, with each factor typically

comprising a portion of the price adjustment, although the weighting of each factor varies based upon the specific terms of each agreement. In most cases, these adjustment factors have not been finalized at the time our product is sold. In these cases, we historically have estimated the adjustment factors at each reporting period based upon the best third-party information available. The estimates are then adjusted to actual when the information has been finalized.

The Producer Price Indices remain an estimated component of the sales price throughout the contract year and are estimated each quarter using publicly available forecasts of such indices. The final indices referenced in certain of the U.S. Iron Ore supply contracts typically are not published by the U.S. Department of Labor until the second quarter of the subsequent year. As a result, we record an adjustment for the difference between the fourth quarter estimate and the final price in the following year.

Throughout the year, certain of our Asia Pacific Iron Ore customers have contract arrangements in which pricing settlements are based upon an average benchmark pricing for future periods. Most of the future periods are settled within three months. To the extent the particular pricing settlement period is subsequent to the reporting period, we estimate the final pricing settlement based upon information available. Similar to U.S. Iron Ore, the estimates are then adjusted to actual when the price settlement period elapses.

Historically, provisional pricing arrangement adjustments have not been material as they have represented a minor portion of U.S. and Asia Pacific Iron Ore's respective revenues for each of the three preceding fiscal years ended December 31, 2015, 2014 and 2013.

*U.S. Iron Ore Customer Supply Agreements*

In addition, certain supply agreements with one U.S. Iron Ore customer include provisions for supplemental revenue or refunds based on the customer's average annual steel pricing for the year that the product is consumed in the customer's blast furnaces. The supplemental pricing is characterized as a freestanding derivative and is required to be accounted for separately once the product is shipped. The derivative instrument, which is finalized based on a future price, is marked to fair value as a revenue adjustment each reporting period until the pellets are consumed and the amounts are settled. The fair value of the instrument is determined using a market approach based on an estimate of the annual realized price of hot rolled steel at the steelmaker's facilities, and takes into consideration current market conditions and nonperformance risk. At December 31, 2015, we had a derivative asset of $5.8 million, representing the fair value of the pricing factors, based upon the amount of unconsumed tons and an estimated average hot band steel price related to the period in which the tons are expected to be consumed in the customer's blast furnace at each respective steelmaking facility, subject to final pricing at a future date. This compares with a derivative asset of $63.2 million as of December 31, 2014, based upon the amount of unconsumed tons and the related estimated average hot band steel price.

The customer's average annual price is not known at the time of sale and the actual price is received on a delayed basis at the end of the year, once the average annual price has been finalized. As a result, we estimate the average price and adjust the estimate to actual in the fourth quarter when the information is provided by the customer at the end of each year. Information used in developing the estimate includes such factors as production and pricing information from the customer, current spot prices, third-party analyst forecasts, publications and other industry information. The accuracy of our estimates typically increases as the year progresses based on additional information in the market becoming available and the customer's ability to more accurately determine the average price it will realize for the year. The following represents the historical accuracy of our pricing estimates related to the derivative as well as the impact on revenue resulting from the difference between the estimated price and the actual price for each quarter during 2015, 2014 and 2013 prior to receiving final information from the customer for tons consumed during each year:

| | 2015 | | | 2014 | | | 2013 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Final Price | Estimated Price | Impact on Revenue (in millions) | Final Price | Estimated Price | Impact on Revenue (in millions) | Final Price | Estimated Price | Impact on Revenue (in millions) |
| First Quarter | $483 | $563 | ($21.9) | $651 | $645 | $1.5 | $622 | $630 | ($1.2) |
| Second Quarter | 483 | 505 | (9.9) | 651 | 650 | 2.7 | 622 | 614 | 3.0 |
| Third Quarter | 483 | 489 | (7.2) | 651 | 653 | (3.4) | 622 | 633 | (2.1) |
| Fourth Quarter | 483 | 483 | — | 651 | 651 | — | 622 | 622 | — |

77

As an example, we estimate that a $75 positive change in the average hot band steel price realized from the December 31, 2015 estimated price recorded for the unconsumed tons remaining at year end would cause the fair value of the derivative instrument to increase by approximately $51.9 million. Additionally, we estimate that a $75 negative change in the average hot band steel price realized from the December 31, 2015 estimated price recorded for the unconsumed tons remaining at year end would cause the fair value of the derivative instrument to decrease by approximately $44.1 million, thereby impacting our consolidated revenues by the same amount.

### Mineral Reserves

We regularly evaluate our mineral reserves and update them as required in accordance with SEC Industry Guide 7. The estimated mineral reserves could be affected by future industry conditions, geological conditions and ongoing mine planning. Maintenance of effective production capacity of the mineral reserve could require increases in capital and development expenditures. Generally, as mining operations progress, haul lengths and lifts increase. Alternatively, changes in economic conditions or the expected quality of mineral reserves could decrease capacity or mineral reserves. Technological progress could alleviate such factors or increase capacity of mineral reserves.

We use our mineral reserve estimates, combined with our estimated annual production levels, to determine the mine closure dates utilized in recording the fair value liability for asset retirement obligations. Refer to NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS , for further information. Since the liability represents the present value of the expected future obligation, a significant change in mineral reserves or mine lives would have a substantial effect on the recorded obligation. We also utilize mineral reserves for evaluating potential impairments of mine assets and in determining maximum useful lives utilized to calculate depreciation and amortization of long-lived mine assets. Increases or decreases in mineral reserves or mine lives could significantly affect these items.

### Asset Retirement Obligations and Environmental Remediation Costs

The accrued mine closure obligations for our active mining operations provide for contractual and legal obligations associated with the eventual closure of the mining operations. Our obligations are determined based on detailed estimates adjusted for factors that a market participant would consider (i.e., inflation, overhead and profit), which are escalated at an assumed rate of inflation to the estimated closure dates, and then discounted using the current credit-adjusted risk-free interest rate. The estimate also incorporates incremental increases in the closure cost estimates and changes in estimates of mine lives. The closure date for each location is determined based on the exhaustion date of the remaining iron ore reserves, which is dependent on our estimate of mineral reserves. The estimated obligations are particularly sensitive to the impact of changes in mine lives given the difference between the inflation and discount rates. Changes in the base estimates of legal and contractual closure costs due to changes in legal or contractual requirements, available technology, inflation, overhead or profit rates also would have a significant impact on the recorded obligations.

We have a formal policy for environmental protection and restoration. Our obligations for known environmental matters at active and closed mining operations and other sites have been recognized based on estimates of the cost of investigation and remediation at each site. If the obligation can only be estimated as a range of possible amounts, with no specific amount being more likely, the minimum of the range is accrued. Management reviews its environmental remediation sites quarterly to determine if additional cost adjustments or disclosures are required. The characteristics of environmental remediation obligations, where information concerning the nature and extent of clean-up activities is not immediately available and which are subject to changes in regulatory requirements, result in a significant risk of increase to the obligations as they mature. Expected future expenditures are not discounted to present value unless the amount and timing of the cash disbursements can be reasonably estimated. Potential insurance recoveries are not recognized until realized. Refer to NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS, for further information.

### Income Taxes

Our income tax expense, deferred tax assets and liabilities and reserves for unrecognized tax benefits reflect management's best assessment of estimated future taxes to be paid. We are subject to income taxes in both the U.S. and numerous foreign jurisdictions. Significant judgments and estimates are required in determining the consolidated income tax expense.

Deferred income taxes arise from temporary differences between tax and financial statement recognition of revenue and expense. In evaluating our ability to recover our deferred tax assets, we consider all available positive and negative evidence, including scheduled reversals of deferred tax liabilities, projected future taxable income, tax planning strategies and recent financial operations. In projecting future taxable income, we begin with historical results

78

A004906

Table of Contents

adjusted for the results of discontinued operations and changes in accounting policies and incorporate assumptions including the amount of future state, federal and foreign pretax operating income, the reversal of temporary differences, and the implementation of feasible and prudent tax planning strategies. These assumptions require significant judgment about the forecasts of future taxable income and are consistent with the plans and estimates we are using to manage the underlying businesses. In evaluating the objective evidence that historical results provide, we consider three years of cumulative operating income (loss).

At December 31, 2015 and 2014, we had a valuation allowance of $ 3,372.5 million and $1,152.3 million, respectively, against our deferred tax assets. Our losses in certain locations in recent periods represented sufficient negative evidence to require a full valuation allowance against certain deferred tax assets. Additionally, significant Alternative Minimum tax credits have been generated in recent years. Sufficient negative evidence suggests that the credits will not be realized in the foreseeable future, and a full valuation allowance has been recorded on the deferred tax asset. We intend to maintain a valuation allowance against the deferred tax assets related to these operating losses, credits and allowances until sufficient positive evidence exists to support the realization of such assets.

Changes in tax laws and rates also could affect recorded deferred tax assets and liabilities in the future. Management is not aware of any such changes that would have a material effect on the Company's results of operations, cash flows or financial position.

The calculation of our tax liabilities involves dealing with uncertainties in the application of complex tax laws and regulations in a multitude of jurisdictions across our global operations.

Accounting for uncertainty in income taxes recognized in the financial statements requires that a tax benefit from an uncertain tax position be recognized when it is more likely than not that the position will be sustained upon examination, including resolutions of any related appeals or litigation processes, based on technical merits.

We recognize tax liabilities in accordance with ASC 740, *Income Taxes*, and we adjust these liabilities when our judgment changes as a result of evaluation of new information not previously available. Due to the complexity of some of these uncertainties, the ultimate resolution may result in payment that is materially different from our current estimate of the tax liabilities. These differences will be reflected as increases or decreases to income tax expense in the period in which they are determined.

### Valuation of Long-Lived Assets

In assessing the recoverability of our long-lived assets, significant assumptions regarding the estimated future cash flows and other factors to determine the fair value of the respective assets must be made, as well as the related estimated useful lives. If these estimates or their related assumptions change in the future as a result of changes in strategy or market conditions, we may be required to record impairment charges for these assets in the period such determination was made.

We monitor conditions that indicate that the carrying value of an asset or asset group may be impaired. In order to determine if assets have been impaired, assets are grouped and tested at the lowest level for which identifiable, independent cash flows are available. An impairment loss exists when projected undiscounted cash flows are less than the carrying value of the assets. The measurement of the impairment loss to be recognized is based on the difference between the fair value and the carrying value of the assets. Fair value can be determined using a market approach, income approach or cost approach. The impairment analysis and fair value determination can result in substantially different outcomes based on critical assumptions and estimates including the quantity and quality of remaining mineral reserves, future iron ore prices and production costs.

During 2015 and 2014, we identified factors that indicated the carrying values of certain asset groups may not be recoverable. Primary factors included the impact of estimated long-term price forecasts that were updated as part of management's long-range planning process. Updated estimates of long-term prices for all products, specifically the Platts 62 percent Fe fines spot price, which particularly affects the Asia Pacific Iron Ore business segment because their contracts correlate heavily to world market spot pricing, were lower than prior estimates. These estimates were updated based upon current market conditions, macro-economic factors influencing the balance of supply and demand for our products and expectations for future cost and capital expenditure requirements. Additional factors include our CEO, Lourenco Goncalves, appointed by the Board of Directors in early August 2014, and subsequently identified as the CODM in accordance with ASC 280, Segment Reporting. The CODM views Asia Pacific Iron Ore as non-core assets and has communicated plans to evaluate the business unit for a change in strategy including possible divestiture. These factors, among other considerations utilized in the individual impairment assessment, indicate that the carrying value of the respective asset group may not be recoverable, and resulted in an impairment of other long-lived assets

of $562.0 million for the year ended December 31, 2014. Although certain factors indicated that the carrying value of certain asset groups may not be recoverable during 2015, an assessment was performed and no further impairment was indicated.

Refer to NOTE 1 - BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES , NOTE 4 - PROPERTY, PLANT AND EQUIPMENT and NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS  for further information regarding our policy on asset impairment, detail on our remaining PP&E and mineral rights and non-recurring fair value measurements.

### Employee Retirement Benefit Obligations

We offer defined benefit pension plans, defined contribution pension plans and other postretirement benefit plans, primarily consisting of retiree healthcare benefits, to most employees in North America as part of a total compensation and benefits program. We do not have employee retirement benefit obligations at our Asia Pacific Iron Ore operations. The defined benefit pension plans largely are noncontributory and benefits generally are based on employees' years of service and average earnings for a defined period prior to retirement, or a minimum formula.

Following is a summary of our U.S. defined benefit pension and OPEB funding and expense for the years 2013 through 2016:

| | Pension | | | OPEB | | |
| | Funding | | Expense | | Funding | | Expense |
|---|---|---|---|---|---|---|---|
| 2013 | $ | 42.9 | $ | 46.8 | $ | 19.0 | $ | 3.2 |
| 2014 | | 49.6 | | 26.2 | | 5.5 | | (2.5) |
| 2015 | | 35.7 | | 23.9 | | 3.5 | | 4.4 |
| 2016 (Estimated) | | 1.2 | | 16.3 | | 4.1 | | (4.4) |

Assumptions used in determining the benefit obligations and the value of plan assets for defined benefit pension plans and postretirement benefit plans (primarily retiree healthcare benefits) that we offer are evaluated periodically by management. Critical assumptions, such as the discount rate used to measure the benefit obligations, the expected long-term rate of return on plan assets, the medical care cost trend, and the rate of compensation increase are reviewed annually.

80

A004908

Table of Contents

As of December 31, 2015 and 2014, we used the following assumptions:

| | Pension and Other Benefits | |
|---|---|---|
| | 2015 | 2014 |
| U.S. plan discount rate | | |
| Iron Hourly Pension Plan | 4.27 % | 3.83 % |
| Salaried Pension Plan | 4.12 | 3.83 |
| Ore Mining Pension Plan | 4.28 | 3.83 |
| SERP | 4.22 | 3.83 |
| Hourly OPEB Plan | 4.32 | 3.83 |
| Salaried OPEB Plan | 4.22 | 3.83 |
| U.S. rate of compensation increase - Salaried | 3.00 | 3.00 |
| U.S. rate of compensation increase - Hourly | 2.00 | 2.50 |
| U.S. pension plan expected return on plan assets | 8.25 | 8.25 |
| U.S. OPEB plan expected return on plan assets | 7.00 | 7.00 |

The increase in the discount rates in 2015 was driven by the change in bond yields, which were up approximately 40 basis points compared to the prior year.

Additionally, on December 31, 2015, the assumed mortality improvement projection was changed from generational scale MP-2014 to generational scale MP-2015. The healthy mortality assumption remains the RP-2014 mortality tables with blue collar and white collar adjustments made for certain hourly and salaried groups to determine the expected life of our plan participants.

Following are sensitivities of potential further changes in these key assumptions on the estimated 2015 pension and OPEB expense and the pension and OPEB benefit obligations as of December 31, 2015:

| | Increase in Expense (In Millions) | | Increase in Benefit Obligation (In Millions) | |
|---|---|---|---|---|
| | Pension | OPEB | Pension | OPEB |
| Decrease discount rate .25 percent | $ 2.2 | $ 0.6 | $ 25.5 | $ 8.3 |
| Decrease return on assets 1 percent | 6.7 | 2.4 | N/A | N/A |
| Increase medical trend rate 1 percent | N/A | 3.2 | N/A | 27.2 |

Changes in actuarial assumptions, including discount rates, employee retirement rates, mortality, compensation levels, plan asset investment performance and healthcare costs, are determined based on analyses of actual and expected factors. Changes in actuarial assumptions and/or investment performance of plan assets may have a significant impact on our financial condition due to the magnitude of our retirement obligations. Refer to NOTE 7 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS in *Item 8. Financial Statements and Supplementary Data* of this Annual Report on Form 10-K for further information.

81

Table of Contents

**Forward-Looking Statements**

This report contains statements that constitute "forward-looking statements" within the meaning of the federal securities laws. As a general matter, forward-looking statements relate to anticipated trends and expectations rather than historical matters. Forward-looking statements are subject to uncertainties and factors relating to Cliffs' operations and business environment that are difficult to predict and may be beyond our control. Such uncertainties and factors may cause actual results to differ materially from those expressed or implied by the forward-looking statements. These statements speak only as of the date of this report, and we undertake no ongoing obligation, other than that imposed by law, to update these statements. Uncertainties and risk factors that could affect Cliffs' future performance and cause results to differ from the forward-looking statements in this report include, but are not limited to:

- trends affecting our financial condition, results of operations or future prospects, particularly the continued volatility of iron ore prices;
- availability of capital and our ability to maintain adequate liquidity, in particular considering borrowing base reductions from the sale of non-core assets such as North American Coal;
- our level of indebtedness could limit cash flow available to fund working capital, capital expenditures, acquisitions and other general corporate purposes or ongoing needs of our business, which could prevent us from fulfilling our debt obligations;
- our ability to successfully consummate any or all of the senior note exchange offers;
- continued weaknesses in global economic conditions, including downward pressure on prices caused by oversupply or imported products, including the impact of any reduced barriers to trade, recently filed and forthcoming trade cases, reduced market demand and any change to the economic growth rate in China;
- our ability to reach agreement with our iron ore customers regarding any modifications to sales contract provisions, renewals or new arrangements;
- uncertainty relating to restructurings in the steel industry and/or affecting the steel industry;
- our ability to maintain appropriate relations with unions and employees and enter into or renew collective bargaining agreements on satisfactory terms;
- the impact of our customers reducing their steel production or using other methods to produce steel;
- our ability to successfully execute an exit option for our Canadian Entities that minimizes the cash outflows and associated liabilities of such entities, including the CCAA process;
- our ability to successfully identify and consummate any strategic investments and complete planned divestitures;
- our ability to successfully diversify our product mix and add new customers beyond our traditional blast furnace clientele;
- the outcome of any contractual disputes with our customers, joint venture partners or significant energy, material or service providers or any other litigation or arbitration;
- the ability of our customers and joint venture partners to meet their obligations to us on a timely basis or at all;
- the impact of price-adjustment factors on our sales contracts;
- changes in sales volume or mix;
- our actual levels of capital spending;
- our actual economic iron ore reserves or reductions in current mineral estimates, including whether any mineralized material qualifies as a reserve;
- events or circumstances that could impair or adversely impact the viability of a mine and the carrying value of associated assets, as well as any resulting impairment charges;
- the results of prefeasibility and feasibility studies in relation to projects;
- impacts of existing and increasing governmental regulation and related costs and liabilities, including failure to receive or maintain required operating and environmental permits, approvals, modifications or other authorization of, or from, any governmental or regulatory entity and costs related to implementing improvements to ensure compliance with regulatory changes;
- our ability to cost-effectively achieve planned production rates or levels;
- uncertainties associated with natural disasters, weather conditions, unanticipated geological conditions, supply or price of energy, equipment failures and other unexpected events;
- adverse changes in currency values, currency exchange rates, interest rates and tax laws;
- risks related to international operations;
- availability of capital equipment and component parts;

82

Table of Contents

- the potential existence of significant deficiencies or material weakness in our internal control over financial reporting; and
- problems or uncertainties with productivity, tons mined, transportation, mine-closure obligations, environmental liabilities, employee-benefit costs and other risks of the mining industry.

For additional factors affecting the business of Cliffs, refer to *Part I – Item 1A. Risk Factors.* You are urged to carefully consider these risk factors.

**Item 7A.**        ***Quantitative and Qualitative Disclosures About Market Risk***

Information regarding our Market Risk is presented under the caption *Market Risks*, which is included in *Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations* and is incorporated by reference and made a part hereof.

83

Table of Contents

**Item 8.**        *Financial Statements and Supplementary Data*

**Statements of Consolidated Financial Position**

Cliffs Natural Resources Inc. and Subsidiaries

| | | (In Millions) | | |
| --- | --- | --- | --- | --- |
| | | December 31, | | |
| | | **2015** | | 2014 |
| **ASSETS** | | | | |
| CURRENT ASSETS | | | | |
| Cash and cash equivalents | $ | **285.2** | $ | 271.3 |
| Accounts receivable, net | | **40.2** | | 122.7 |
| Inventories | | **329.6** | | 260.1 |
| Supplies and other inventories | | **110.4** | | 118.6 |
| Income tax receivable | | **5.7** | | 217.6 |
| Short-term assets of discontinued operations | | **14.9** | | 326.9 |
| Loans to and accounts receivables from the Canadian Entities | | **72.9** | | 0.4 |
| Insurance coverage receivable | | **93.5** | | — |
| Other current assets | | **30.3** | | 107.7 |
| TOTAL CURRENT ASSETS | | **982.7** | | 1,425.3 |
| PROPERTY, PLANT AND EQUIPMENT, NET | | **1,059.0** | | 1,070.5 |
| OTHER ASSETS | | | | |
| Deferred income taxes | | **—** | | 175.5 |
| Long-term assets of discontinued operations | | **—** | | 383.0 |
| Other non-current assets | | **93.8** | | 92.9 |
| TOTAL OTHER ASSETS | | **93.8** | | 651.4 |
| TOTAL ASSETS | $ | **2,135.5** | $ | 3,147.2 |

(continued)

*The accompanying notes are an integral part of these  consolidated financial statements .*

84

A004912

Table of Contents

**Statements of Consolidated Financial Position**

Cliffs Natural Resources Inc. and Subsidiaries - (Continued)

| | (In Millions) | |
|---|---|---|
| | December 31, | |
| | 2015 | 2014 |
| LIABILITIES | | |
| CURRENT LIABILITIES | | |
| Accounts payable | $ 106.3 | $ 166.1 |
| Accrued employment costs | 53.0 | 73.8 |
| State and local taxes payable | 35.2 | 40.7 |
| Accrued expenses | 85.7 | 99.4 |
| Accrued royalties | 17.3 | 28.5 |
| Short-term liabilities of discontinued operations | 6.9 | 399.4 |
| Guarantees | 96.5 | — |
| Insured loss | 93.5 | — |
| Other current liabilities | 87.3 | 146.6 |
| TOTAL CURRENT LIABILITIES | 581.7 | 954.5 |
| POSTEMPLOYMENT BENEFIT LIABILITIES | | |
| Pensions | 209.7 | 246.0 |
| Other postretirement benefits | 11.3 | 22.3 |
| TOTAL POSTEMPLOYMENT BENEFIT LIABILITIES | 221.0 | 268.3 |
| ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS | 231.2 | 165.6 |
| LONG-TERM DEBT | 2,699.4 | 2,826.5 |
| LONG-TERM LIABILITIES OF DISCONTINUED OPERATIONS | — | 427.5 |
| OTHER LIABILITIES | 213.8 | 239.1 |
| TOTAL LIABILITIES | 3,947.1 | 4,881.5 |
| COMMITMENTS AND CONTINGENCIES (SEE NOTE 20) | | |
| EQUITY | | |
| CLIFFS SHAREHOLDERS' DEFICIT | | |
| Preferred Stock - no par value | | |
| Class A - 3,000,000 shares authorized | | |
| 7% Series A Mandatory Convertible, Class A, no par value and $1,000 per share liquidation preference (See Note 15) | | |
| Issued and Outstanding - 731,223 shares (2014 - 731,223) | 731.3 | 731.3 |
| Class B - 4,000,000 shares authorized | | |
| Common Shares - par value $0.125 per share | | |
| Authorized - 400,000,000 shares (2014 - 400,000,000 shares); | | |
| Issued - 159,546,224 shares (2014 - 159,546,224 shares); | | |
| Outstanding - 153,591,930 shares (2014 - 153,246,754 shares) | 19.8 | 19.8 |
| Capital in excess of par value of shares | 2,298.9 | 2,309.8 |
| Retained deficit | (4,748.4) | (3,960.7) |
| Cost of 5,954,294 common shares in treasury (2014 - 6,299,470 shares) | (265.0) | (285.7) |
| Accumulated other comprehensive loss | (18.0) | (245.8) |
| TOTAL CLIFFS SHAREHOLDERS' DEFICIT | (1,981.4) | (1,431.3) |
| NONCONTROLLING INTEREST (DEFICIT) | 169.8 | (303.0) |
| TOTAL DEFICIT | (1,811.6) | (1,734.3) |
| TOTAL LIABILITIES AND DEFICIT | $ 2,135.5 | $ 3,147.2 |

*The accompanying notes are an integral part of these consolidated financial statements.*

85

A004913

**Statements of Consolidated Operations**

Cliffs Natural Resources Inc. and Subsidiaries

| | | | (In Millions, Except Per Share Amounts) | | | |
|---|---|---|---|---|---|---|
| | | | Year Ended December 31, | | | |
| | | | **2015** | | 2014 | 2013 |
| REVENUES FROM PRODUCT SALES AND SERVICES | | | | | | |
| Product | | $ | **1,832.4** | $ | 3,095.2 | $ | 3,631.8 |
| Freight and venture partners' cost reimbursements | | | **180.9** | | 278.0 | 259.0 |
| | | | **2,013.3** | | 3,373.2 | 3,890.8 |
| COST OF GOODS SOLD AND OPERATING EXPENSES | | | **(1,776.8)** | | (2,487.5) | (2,406.4) |
| SALES MARGIN | | | **236.5** | | 885.7 | 1,484.4 |
| OTHER OPERATING INCOME (EXPENSE) | | | | | | |
| Selling, general and administrative expenses | | | **(110.0)** | | (154.7) | (163.8) |
| Impairment of goodwill and other long-lived assets | | | **(3.3)** | | (635.5) | (14.3) |
| Miscellaneous - net | | | **28.1** | | 34.6 | 74.0 |
| | | | **(85.2)** | | (755.6) | (104.1) |
| OPERATING INCOME | | | **151.3** | | 130.1 | 1,380.3 |
| OTHER INCOME (EXPENSE) | | | | | | |
| Interest expense, net | | | **(228.5)** | | (176.7) | (186.4) |
| Gain on extinguishment of debt | | | **392.9** | | 16.2 | — |
| Other non-operating income (expense) | | | **(2.6)** | | 10.7 | (3.0) |
| | | | **161.8** | | (149.8) | (189.4) |
| INCOME (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES AND EQUITY LOSS FROM VENTURES | | | **313.1** | | (19.7) | 1,190.9 |
| INCOME TAX BENEFIT (EXPENSE) | | | **(169.3)** | | 86.0 | (237.6) |
| EQUITY LOSS FROM VENTURES, net of tax | | | **(0.1)** | | (9.9) | (74.4) |
| INCOME FROM CONTINUING OPERATIONS | | | **143.7** | | 56.4 | 878.9 |
| LOSS FROM DISCONTINUED OPERATIONS, net of tax | | | **(892.1)** | | (8,368.0) | (517.1) |
| NET INCOME (LOSS) | | | **(748.4)** | | (8,311.6) | 361.8 |
| LOSS (INCOME) ATTRIBUTABLE TO NONCONTROLLING INTEREST | | | | | | |
| (Year Ended December 31, 2015 - Loss of $7.7 million related to Discontinued Operations, Year Ended December 31, 2014 - Loss of $1,113.3 million and Year Ended December 31, 2013 - Loss of $66.5 million related to Discontinued Operations) | | | **(0.9)** | | 1,087.4 | 51.7 |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | | $ | **(749.3)** | $ | (7,224.2) | $ | 413.5 |
| PREFERRED STOCK DIVIDENDS | | | **(38.4)** | | (51.2) | (48.7) |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS COMMON SHAREHOLDERS | | $ | **(787.7)** | $ | (7,275.4) | $ | 364.8 |
| | | | | | | |
| EARNINGS (LOSS) PER COMMON SHARE ATTRIBUTABLE TO CLIFFS SHAREHOLDERS - BASIC | | | | | | |
| Continuing operations | | $ | **0.63** | $ | (0.14) | $ | 5.37 |
| Discontinued operations | | | **(5.77)** | | (47.38) | (2.97) |
| | | $ | **(5.14)** | $ | (47.52) | $ | 2.40 |
| EARNINGS (LOSS) PER COMMON SHARE ATTRIBUTABLE TO CLIFFS SHAREHOLDERS - DILUTED | | | | | | |
| Continuing operations | | $ | **0.63** | $ | (0.14) | $ | 4.95 |
| Discontinued operations | | | **(5.76)** | | (47.38) | (2.58) |
| | | $ | **(5.13)** | $ | (47.52) | $ | 2.37 |
| AVERAGE NUMBER OF SHARES (IN THOUSANDS) | | | | | | |
| Basic | | | **153,230** | | 153,098 | 151,726 |
| Diluted | | | **153,605** | | 153,098 | 174,323 |
| CASH DIVIDENDS DECLARED PER DEPOSITARY SHARE | | $ | **1.32** | $ | 1.76 | $ | 1.66 |
| CASH DIVIDENDS DECLARED PER COMMON SHARE | | $ | **—** | $ | 0.60 | $ | 0.60 |

*The accompanying notes are an integral part of these consolidated financial statements.*

Table of Contents

**Statements of Consolidated Comprehensive Income (Loss)**

Cliffs Natural Resources Inc. and Subsidiaries

| | (In Millions) | | |
|---|---|---|---|
| | Year Ended December 31, | | |
| | **2015** | 2014 | 2013 |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | $ **(749.3)** | $ (7,224.2) | $ 413.5 |
| OTHER COMPREHENSIVE INCOME (LOSS) | | | |
| Pension and OPEB liability, net of tax | **45.2** | (91.0) | 208.3 |
| Unrealized net gain (loss) on marketable securities, net of tax | **1.7** | (7.2) | 3.1 |
| Unrealized net gain (loss) on foreign currency translation | **155.6** | (42.3) | (208.6) |
| Unrealized net gain (loss) on derivative financial instruments, net of tax | **20.7** | 2.8 | (29.6) |
| OTHER COMPREHENSIVE INCOME (LOSS) | **223.2** | (137.7) | (26.8) |
| OTHER COMPREHENSIVE LOSS (INCOME) ATTRIBUTABLE TO THE NONCONTROLLING INTEREST | **4.6** | 4.8 | (30.5) |
| TOTAL COMPREHENSIVE INCOME (LOSS) ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | $ **(521.5)** | $ (7,357.1) | $ 356.2 |

*The accompanying notes are an integral part of these  consolidated financial statements.*

87

Table of Contents

**Statements of Consolidated Cash Flows**

Cliffs Natural Resources Inc. and Subsidiaries

| | | (In Millions) | | |
|---|---|---|---|---|
| | | Year Ended December 31, | | |
| | **2015** | 2014 | 2013 | |
| OPERATING ACTIVITIES | | | | |
| Net income (loss) | $ **(748.4)** | $ (8,311.6) | $ 361.8 | |
| Adjustments to reconcile net income (loss) to net cash provided (used) by operating activities: | | | | |
| Depreciation, depletion and amortization | **134.0** | 504.0 | 593.3 | |
| Impairment of goodwill and other long-lived assets | **76.6** | 9,029.9 | 250.8 | |
| Equity loss in ventures (net of tax) | **(0.1)** | 9.9 | 74.4 | |
| Deferred income taxes | **159.8** | (1,153.9) | (138.1) | |
| Changes in deferred revenue and below-market sales contracts | **(42.6)** | (18.0) | (52.8) | |
| Gain on extinguishment of debt | **(392.9)** | (16.2) | — | |
| Loss on deconsolidation, net of cash deconsolidated | **668.3** | — | — | |
| Loss (gain) on sale of North American Coal mines | **(9.3)** | 419.6 | — | |
| Other | **113.1** | (21.5) | (3.3) | |
| Changes in operating assets and liabilities: | | | | |
| Receivables and other assets | **369.1** | (82.8) | 138.8 | |
| Product inventories | **(62.0)** | 37.8 | 30.8 | |
| Payables and accrued expenses | **(227.7)** | (38.3) | (109.8) | |
| Net cash provided by operating activities | **37.9** | 358.9 | 1,145.9 | |
| INVESTING ACTIVITIES | | | | |
| Purchase of property, plant and equipment | **(80.8)** | (284.1) | (861.6) | |
| Investments in DIP and prepetition financing | **(14.0)** | — | — | |
| Proceeds (uses) from sale of North American Coal mines | **(15.2)** | 155.0 | — | |
| Other investing activities | **6.8** | 25.5 | 50.3 | |
| Net cash used in investing activities | **(103.2)** | (103.6) | (811.3) | |
| FINANCING ACTIVITIES | | | | |
| Net proceeds from issuance of Series A, Mandatory Convertible Preferred Stock, Class A | **—** | — | 709.4 | |
| Net proceeds from issuance of common shares | **—** | — | 285.3 | |
| Proceeds from first lien notes offering | **503.5** | — | — | |
| Debt issuance costs | **(33.6)** | (9.0) | — | |
| Repayment of term loan | **—** | — | (847.1) | |
| Borrowings under credit facilities | **309.8** | 1,219.5 | 670.5 | |
| Repayment under credit facilities | **(309.8)** | (1,219.5) | (995.5) | |
| Proceeds from equipment loans | **—** | — | 164.8 | |
| Repayments of equipment loans | **(45.4)** | (20.9) | (3.0) | |
| Repurchase of debt | **(225.9)** | (28.8) | — | |
| Contributions (to)/by joint ventures, net | **0.1** | (25.7) | 23.3 | |
| Distributions of partnership equity | **(40.6)** | — | — | |
| Common stock dividends | **—** | (92.5) | (91.9) | |
| Preferred stock dividends | **(51.2)** | (51.2) | (35.7) | |
| Other financing activities | **(45.9)** | (60.2) | (52.0) | |
| Net cash provided by (used in) financing activities | **61.0** | (288.3) | (171.9) | |
| EFFECT OF EXCHANGE RATE CHANGES ON CASH | **(1.4)** | (11.6) | (22.4) | |
| INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | **(5.7)** | (44.6) | 140.3 | |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF PERIOD | **290.9** | 335.5 | 195.2 | |
| CASH AND CASH EQUIVALENTS AT END OF PERIOD | $ **285.2** | $ 290.9 | $ 335.5 | |

*The accompanying notes are an integral part of these consolidated financial statements.*
*See NOTE 17 - CASH FLOW INFORMATION.*

88

Table of Contents

**Statements of Consolidated Changes in Equity**

Cliffs Natural Resources Inc. and Subsidiaries

(In Millions)

| | Cliffs Shareholders | | | | | | | | Non-Controlling Interest | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number of Depositary Shares | Depositary Shares | Number of Common Shares | Common Shares | Capital in Excess of Par Value of Shares | Retained Earnings | Common Shares in Treasury | Accumulated Other Comprehensive Income (Loss) | | |
| January 1, 2013 | — | $ — | 142.5 | $ 18.5 | $ 1,774.7 | $ 3,217.7 | $ (322.6) | $ (55.6) | $ 1,128.2 | $ 5,760.9 |
| Comprehensive income | | | | | | | | | | |
| Net income (loss) | — | — | — | — | — | 413.5 | — | — | (51.7) | 361.8 |
| Other comprehensive income (loss) | — | — | — | — | — | — | — | (57.3) | 30.5 | (26.8) |
| Total comprehensive income (loss) | | | | | | | | | (21.2) | 335.0 |
| Equity offering | — | — | 10.4 | 1.3 | 284.0 | — | — | — | — | 285.3 |
| Capital contribution by noncontrolling interest to subsidiary | — | — | — | — | 0.2 | (0.6) | — | — | 5.6 | 5.2 |
| Acquisition of controlling interest | — | — | — | — | 295.4 | (82.7) | — | — | (314.8) | (102.1) |
| Undistributed losses to noncontrolling interest | — | — | — | — | — | — | — | — | 17.0 | 17.0 |
| Stock and other incentive plans | — | — | 0.3 | — | (2.9) | — | 17.1 | — | — | 14.2 |
| Depositary Shares | 29.3 | 731.3 | — | — | (21.9) | — | — | — | — | 709.4 |
| Common stock dividends ($.60 per share) | — | — | — | — | — | (91.9) | — | — | — | (91.9) |
| Preferred stock dividends ($1.66 per depositary share) | — | — | — | — | — | (48.7) | — | — | — | (48.7) |
| December 31, 2013 | 29.3 | $ 731.3 | 153.2 | $ 19.8 | $ 2,329.5 | $ 3,407.3 | $ (305.5) | $ (112.9) | $ 814.8 | $ 6,884.3 |
| Comprehensive income | | | | | | | | | | |
| Net loss | — | — | — | — | — | (7,224.2) | — | — | (1,087.4) | (8,311.6) |
| Other comprehensive income (loss) | — | — | — | — | — | — | — | (132.9) | (4.8) | (137.7) |
| Total comprehensive income (loss) | | | | | | | | | (1,092.2) | (8,449.3) |
| Capital contribution to noncontrolling interest to subsidiary | — | — | — | — | — | — | — | — | (0.1) | (0.1) |
| Distributions to noncontrolling interest | — | — | — | — | — | — | — | — | (25.5) | (25.5) |
| Stock and other incentive plans | — | — | — | — | (19.7) | — | 19.8 | — | — | 0.1 |
| Common stock dividends ($0.60 per share) | — | — | — | — | — | (92.5) | — | — | — | (92.5) |
| Preferred stock dividends ($1.76 per depositary share) | — | — | — | — | — | (51.3) | — | — | — | (51.3) |
| December 31, 2014 | 29.3 | $ 731.3 | 153.2 | $ 19.8 | $ 2,309.8 | $ (3,960.7) | $ (285.7) | $ (245.8) | $ (303.0) | $ (1,734.3) |
| Comprehensive income | | | | | | | | | | |
| Net income (loss) | — | — | — | — | — | (749.3) | — | — | 0.9 | (748.4) |
| Other comprehensive income (loss) | — | — | — | — | — | — | — | 227.8 | (4.6) | 223.2 |
| Total comprehensive income (loss) | | | | | | | | | (3.7) | (525.2) |
| Capital contribution to noncontrolling interest to subsidiary | — | — | — | — | — | — | — | — | 0.2 | 0.2 |
| Distributions to noncontrolling interest | — | — | — | — | — | — | — | — | (0.2) | (0.2) |
| Distributions of partnership equity | — | — | — | — | — | — | — | — | (51.7) | (51.7) |
| Effect of deconsolidation | — | — | — | — | — | — | — | — | 528.0 | 528.0 |
| Stock and other incentive plans | — | — | 0.3 | — | (10.9) | — | 20.7 | — | — | 9.8 |
| Preferred stock dividends ($1.32 per depositary share) | — | — | — | — | — | (38.4) | — | — | — | (38.4) |
| December 31, 2015 | 29.3 | $ 731.3 | 153.5 | $ 19.8 | $ 2,298.9 | $ (4,748.4) | $ (265.0) | $ (18.0) | $ 169.8 | $ (1,811.6) |

*The accompanying notes are an integral part of these  consolidated financial statements .*

89

A004917

Table of Contents

**Cliffs Natural Resources Inc. and Subsidiaries**

Notes to Consolidated Financial Statements

**NOTE 1 - BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES**

**Business Summary**

We are a leading mining and natural resources company in the United States. We are a major supplier of iron ore pellets to the North American steel industry from our five iron ore mines and pellet plants located in Michigan and Minnesota. Additionally, Cliffs operates an iron ore mining complex in Western Australia. Our continuing operations are organized according to geography: U.S. Iron Ore and Asia Pacific Iron Ore.

As more fully described in NOTE 14 - DISCONTINUED OPERATIONS, in January 2015, we announced that the Bloom Lake Group commenced restructuring proceedings in Montreal, Quebec under the CCAA. At that time, we had suspended Bloom Lake operations and for several months had been exploring options to sell certain of our Canadian assets, among other initiatives. Effective January 27, 2015, following the CCAA filing of the Bloom Lake Group, we deconsolidated the Bloom Lake Group and certain other wholly-owned subsidiaries comprising substantially all of our Canadian operations. Additionally, on May 20, 2015, the Wabush Group commenced restructuring proceedings in Montreal, Quebec under the CCAA which resulted in the deconsolidation of the remaining Wabush Group entities that were not previously deconsolidated. The Wabush Group was no longer generating revenues and was not able to meet its obligations as they came due. As a result of this action, the CCAA protections granted to the Bloom Lake Group were extended to include the Wabush Group to facilitate the reorganization of each of their businesses and operations. Financial results prior to the respective deconsolidations of the Bloom Lake and Wabush Groups and subsequent expenses directly associated with the Canadian Entities are included in our financial statements and classified within discontinued operations.

Also, for the majority of 2015, we operated two metallurgical coal operations in Alabama and West Virginia. In December 2015, we completed the sale of these two metallurgical coal operations, which marked our exit from the coal business. As of March 31, 2015, management determined that our North American Coal operating segment met the criteria to be classified as held for sale under *ASC 205, Presentation of Financial Statements*. As such, all current year and historical North American Coal operating segment results are included in our financial statements and classified within discontinued operations. Refer to NOTE 14 - DISCONTINUED OPERATIONS for further discussion of the North American Coal segment discontinued operations.

**Significant Accounting Policies**

We consider the following policies to be beneficial in understanding the judgments that are involved in the preparation of our consolidated financial statements and the uncertainties that could impact our financial condition, results of operations and cash flows.

*Use of Estimates*

The preparation of financial statements, in conformity with GAAP, requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The more significant areas requiring the use of management estimates and assumptions related to mineral reserves future realizable cash flow; environmental, reclamation and closure obligations; valuation of long-lived assets and investments; valuation of inventory; valuation of post-employment, post-retirement and other employee benefit liabilities; valuation of tax assets; reserves for contingencies and litigation; and the fair value of derivative instruments. Actual results could differ from estimates. On an ongoing basis, management reviews estimates. Changes in facts and circumstances may alter such estimates and affect the results of operations and financial position in future periods.

90

*Basis of Consolidation*

The consolidated financial statements include our accounts and the accounts of our wholly owned and majority-owned subsidiaries, including the following operations at December 31, 2015:

| Name | Location | Ownership Interest | Operation | Status of Operations |
|------|----------|--------------------|-----------|----------------------|
| Northshore | Minnesota | 100.0% | Iron Ore | Active |
| United Taconite | Minnesota | 100.0% | Iron Ore | Active |
| Tilden | Michigan | 85.0% | Iron Ore | Active |
| Empire | Michigan | 79.0% | Iron Ore | Active |
| Koolyanobbing | Western Australia | 100.0% | Iron Ore | Active |

Intercompany transactions and balances are eliminated upon consolidation.

*Equity Method Investments*

Investments in unconsolidated ventures that we have the ability to exercise significant influence over, but not control, are accounted for under the equity method. The following table presents the detail of our investments in unconsolidated ventures and where those investments are classified in the Statements of Consolidated Financial Position as of December 31, 2015 and December 31, 2014. Parentheses indicate a net liability.

| | | | | (In Millions) | |
|---|---|---|---|---|---|
| Investment | Classification | Accounting Method | Ownership Interest | December 31, 2015 | December 31, 2014 |
| Hibbing | *Other liabilities* [1] | Equity Method | 23% | $ (2.4) | $ 3.1 |
| Other [2] | *Other non-current assets* | Equity Method | Various | — | 1.0 |
| | | | | $ (2.4) | $ 4.1 |

_____

[1]  At December 31, 2014, the classification for Hibbing was *Other non-current assets.*

[2]  At December 31, 2015, no Other equity method investments remain.

*Hibbing*

Our share of equity income (loss) is eliminated against consolidated product inventory upon production, and against *Cost of goods sold and operating expenses* when sold. This effectively reduces our cost for our share of the mining ventures' production cost, reflecting the cost-based nature of our participation in unconsolidated ventures.

*Amapá*

On March 28, 2013, an unknown event caused the Santana port shiploader to collapse into the Amazon River, preventing further ship loading by the mine operator, Anglo. In light of the March 28, 2013 collapse of the Santana port shiploader and subsequent evaluation of the effect that this event had on the carrying value of our investment in Amapá as of June 30, 2013, we recorded an impairment charge of $67.6 million in the second quarter of 2013.

On August 28, 2013, we entered into additional agreements to sell our 30 percent interest in Amapá to Anglo for nominal cash consideration, plus the right to certain contingent deferred consideration upon the two-year anniversary of the closing. However, no contingent deferred consideration was earned upon the two-year anniversary. The closing was conditional on obtaining certain regulatory approvals and the additional agreement provided Anglo with an option to request that we transfer our interest in Amapá directly to Zamin. Anglo exercised this option and the transfer to Zamin was completed in the fourth quarter of 2013.

*Noncontrolling Interests*

During the fourth quarter of 2013, CQIM's interest in Bloom Lake increased by an aggregate of 7.8 percent after CQIM paid both its own and WISCO's proportionate shares of the cash call for the first half of 2013. As a result of our cash call payments, CQIM was issued a total of 457,556 new Bloom Lake units, increasing our interest to 82.8 percent

91

A004919

Table of Contents

in Bloom Lake and diluting WISCO's interest to 17.2 percent. The new unit issuance decreased equity attributable to WISCO by $314.8 million for the year ended December 31, 2013 by decreasing WISCO's interest in Bloom Lake's accumulated deficit. We accounted for the increase in ownership as an equity transaction, which resulted in a $314.8 million increase to equity attributable to Cliffs' shareholders. As discussed above, as of January 27, 2015, we deconsolidated the Bloom Lake Group following the CCAA filing. Financial results prior to the deconsolidation of the Bloom Lake Group and subsequent expenses directly associated with the Canadian Entities are included in our financial statements. See NOTE 14 - DISCONTINUED OPERATIONS for further information.

### Cash Equivalents

Cash and cash equivalents include cash on hand and on deposit as well as all short-term securities held for the primary purpose of general liquidity. We consider investments in highly liquid debt instruments with an original maturity of three months or less from the date of acquisition to be cash equivalents. We routinely monitor and evaluate counterparty credit risk related to the financial institutions by which our short-term investment securities are held.

### Trade Accounts Receivable and Allowance for Doubtful Accounts

Trade accounts receivable are recorded at the invoiced amount and do not bear interest. The allowance for doubtful accounts is our best estimate of the amount of probable credit losses in Cliffs' existing accounts receivable. We establish provisions for losses on accounts receivable when it is probable that all or part of the outstanding balance will not be collected. We regularly review our accounts receivable balances and establish or adjust the allowance as necessary using the specific identification method. The allowance for doubtful accounts was $7.1 million at December 31, 2015. There was no allowance for doubtful accounts at December 31, 2014. There was bad debt expense of $7.1 million for the year ended December 31, 2015. There was no bad debt expense for the years ended December 31, 2014 and 2013.

### Inventories

#### U.S. Iron Ore

U.S. Iron Ore product inventories are stated at the lower of cost or market. Cost of iron ore inventories is determined using the LIFO method.

We had approximately 1.3 million tons and 1.4 million tons of finished goods stored at ports and customer facilities on the lower Great Lakes to service customers at December 31, 2015 and 2014, respectively. We maintain ownership of the inventories until title has transferred to the customer, usually when payment is received. Maintaining ownership of the iron ore products at ports on the lower Great Lakes reduces risk of non-payment by customers.

#### Asia Pacific Iron Ore

Asia Pacific Iron Ore product inventories are stated at the lower of cost or market. Costs of inventories are being valued on a weighted average cost basis. We maintain ownership of the inventories until title has transferred to the customer, which generally is when the product is loaded into the vessel.

### Supplies and Other Inventories

Supply inventories include replacement parts, fuel, chemicals and other general supplies, which are expected to be used or consumed in normal operations. Supply inventories also include critical spares. Critical spares are replacement parts for equipment that is critical for the continued operation of the mine or processing facilities.

Supply inventories are stated at the lower of cost or market using average cost, less an allowance for obsolete and surplus items. The allowance for obsolete and surplus items was $31.8 million and $16.0 million at December 31, 2015 and 2014, respectively.

### Derivative Financial Instruments and Hedging Activities

We are exposed to certain risks related to the ongoing operations of our business, including those caused by changes in commodity prices, interest rates and foreign currency exchange rates. We have established policies and procedures, including the use of certain derivative instruments, to manage such risks, if deemed necessary.

92

A004920

Table of Contents

Derivative financial instruments are recognized as either assets or liabilities in the Statements of Consolidated Financial Position and measured at fair value. On the date a derivative instrument is entered into, we generally designate a qualifying derivative instrument as a hedge of the variability of cash flows to be received or paid related to a recognized asset or liability or forecasted transaction (cash flow hedge). We formally document all relationships between hedging instruments and hedged items, as well as its risk-management objective and strategy for undertaking various hedge transactions. This process includes linking all derivatives that are designated as cash flow hedges to specific firm commitments or forecasted transactions. We also formally assess both at the hedge's inception and on an ongoing basis, whether the derivatives that are used in hedging transactions are highly effective in offsetting changes in cash flows of the related hedged items. When it is determined that a derivative is not highly effective as a hedge or that it has ceased to be a highly effective hedge, we discontinue hedge accounting prospectively and record all future changes in fair value in the period of the instrument's earnings or losses.

For derivative instruments that have been designated as cash flow hedges, the effective portion of the changes in fair value are recorded in accumulated other comprehensive income (loss) and any portion that is ineffective is recorded in current period earnings or losses. Amounts recorded in accumulated other comprehensive income (loss) are reclassified to earnings or losses in the period the underlying hedged transaction affects earnings or when the underlying hedged transaction is no longer reasonably possible of occurring.

For derivative instruments that have not been designated as cash flow hedges, changes in fair value are recorded in the period of the instrument's earnings or losses.

According to our global hedge policy, the policy allows for hedging not more than 75 percent, but not less than 40 percent for up to 12 months and not less than 10 percent for up to 15 months, of forecasted net currency exposures that are probable to occur. Full hedge compliance under the policy has been waived through December 31, 2016. The waiver was a result of the evaluation of the potential risk of being over hedged and the uncertainty of the 2015 and 2016 currency exposures. During 2015, we did not enter into any new foreign currency exchange contracts to hedge our foreign currency exposure and we do not expect to enter into any during 2016. In the future, we may enter into additional hedging instruments as needed in order to further hedge our exposure to changes in foreign currency exchange rates.

Refer to NOTE 13 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES for further information.

### Property, Plant and Equipment

Our properties are stated at the lower of cost less accumulated depreciation or fair value. Depreciation of plant and equipment is computed principally by the straight-line method based on estimated useful lives, not to exceed the mine lives. The Northshore, United Taconite, Empire and Tilden operations use the double-declining balance method of depreciation for certain mining equipment. The Asia Pacific Iron Ore operation uses the production output method for certain mining equipment. Depreciation is provided over the following estimated useful lives:

| Asset Class | Basis | Life |
|---|---|---|
| Buildings | Straight line | 45 Years |
| Mining equipment | Straight line/Double declining balance | 3 to 20 Years |
| Processing equipment | Straight line | 10 to 45 Years |
| Electric power facilities | Straight line | 10 to 45 years |
| Land improvements | Straight line | 20 to 45 years |
| Office and information technology | Straight line | 3 to 15 Years |

Depreciation continues to be recognized when operations are idled temporarily.

Refer to NOTE 4 - PROPERTY, PLANT AND EQUIPMENT for further information.

### Capitalized Stripping Costs

During the development phase, stripping costs are capitalized as a part of the depreciable cost of building, developing and constructing a mine. These capitalized costs are amortized over the productive life of the mine using the units of production method. The production phase does not commence until the removal of more than a de minimis amount of saleable mineral material occurs in conjunction with the removal of overburden or waste material for purposes of obtaining access to an ore body. The stripping costs incurred in the production phase of a mine are variable production costs included in the costs of the inventory produced (extracted) during the period that the stripping costs are incurred.

Table of Contents

Stripping costs related to expansion of a mining asset of proven and probable reserves are variable production costs that are included in the costs of the inventory produced during the period that the stripping costs are incurred.

### Other Intangible Assets and Liabilities

Other intangible assets are subject to periodic amortization on a straight-line basis over their estimated useful lives as follows:

| Intangible Assets | Basis | Useful Life (years) |
|---|---|---|
| Permits - *Asia Pacific Iron Ore* | Units of production | Life of mine |
| Permits - *USIO* | Straight line | 28 |

### Asset Impairment

#### Long-Lived Tangible and Intangible Assets

We monitor conditions that may affect the carrying value of our long-lived tangible and intangible assets when events and circumstances indicate that the carrying value of the asset groups may not be recoverable. In order to determine if assets have been impaired, assets are grouped and tested at the lowest level for which identifiable, independent cash flows are available ("asset group"). An impairment loss exists when projected undiscounted cash flows are less than the carrying value of the asset group. The measurement of the impairment loss to be recognized is based on the difference between the fair value and the carrying value of the asset group. Fair value can be determined using a market approach, income approach or cost approach.

As a result of these assessments during 2015, we recorded no material impairment charges related to long-lived tangible or intangible assets at our continuing operations. During 2014, we recorded a long-lived tangible asset impairment charge of $537.8 million and an intangible asset impairment charge of $13.8 million in our Statements of Consolidated Operations related to our continuing operations. There were no long-lived tangible or intangible asset impairments during 2013 related to our continuing operations.

Refer to NOTE 4 - PROPERTY, PLANT AND EQUIPMENT , NOTE 12 - GOODWILL AND OTHER INTANGIBLE ASSETS AND LIABILITIES  and NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS for further information.

### Fair Value Measurements

#### Valuation Hierarchy

ASC 820, *Fair Value Measurements and Disclosures*, establishes a three-level valuation hierarchy for classification of fair value measurements. The valuation hierarchy is based upon the transparency of inputs to the valuation of an asset or liability as of the measurement date. Inputs refer broadly to the assumptions that market participants would use in pricing an asset or liability. Inputs may be observable or unobservable. Observable inputs are inputs that reflect the assumptions market participants would use in pricing the asset or liability developed based on market data obtained from independent sources. Unobservable inputs are inputs that reflect our own views about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances. The three-tier hierarchy of inputs is summarized below:

• Level 1 — Valuation is based upon quoted prices (unadjusted) for identical assets or liabilities in active markets.

• Level 2 — Valuation is based upon quoted prices for similar assets and liabilities in active markets, or other inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

• Level 3 — Valuation is based upon other unobservable inputs that are significant to the fair value measurement.

The classification of assets and liabilities within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement in its entirety. Valuation methodologies used for assets and liabilities measured at fair value are as follows:

94

*Cash Equivalents*

Where quoted prices are available in an active market, cash equivalents are classified within Level 1 of the valuation hierarchy. Cash equivalents classified in Level 1 at December 31, 2015 and 2014 include money market funds. Valuation of these instruments is determined using a market approach and is based upon unadjusted quoted prices for identical assets in active markets.

*Derivative Financial Instruments*

Derivative financial instruments valued using financial models that use as their basis readily observable market parameters are classified within Level 2 of the valuation hierarchy. Such derivative financial instruments include substantially all of our foreign currency exchange contracts and derivative financial instruments that are valued based upon published pricing settlements realized by other companies in the industry. Derivative financial instruments that are valued based upon models with significant unobservable market parameters and are normally traded less actively, are classified within Level 3 of the valuation hierarchy.

Refer to NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS  and NOTE 7 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS  for further information.

**Pensions and Other Postretirement Benefits**

We offer defined benefit pension plans, defined contribution pension plans and other postretirement benefit plans, primarily consisting of retiree healthcare benefits, to most employees in North America as part of a total compensation and benefits program. We do not have employee pension or post-retirement benefit obligations at our Asia Pacific Iron Ore operations.

We recognize the funded or unfunded status of our postretirement benefit obligations on our  December 31, 2015 and 2014 Statements of Consolidated Financial Position based on the difference between the market value of plan assets and the actuarial present value of our retirement obligations on that date, on a plan-by-plan basis. If the plan assets exceed the retirement obligations, the amount of the surplus is recorded as an asset; if the retirement obligations exceed the plan assets, the amount of the underfunded obligations are recorded as a liability. Year-end balance sheet adjustments to postretirement assets and obligations are recorded as *Accumulated other comprehensive loss* .

The actuarial estimates of the PBO and APBO retirement obligations incorporate various assumptions including the discount rates, the rates of increases in compensation, healthcare cost trend rates, mortality, retirement timing and employee turnover. The discount rate is determined based on the prevailing year-end rates for high-grade corporate bonds with a duration matching the expected cash flow timing of the benefit payments from the various plans. The remaining assumptions are based on our estimates of future events by incorporating historical trends and future expectations. The amount of net periodic cost that is recorded in the Statements of Consolidated Operations consists of several components including service cost, interest cost, expected return on plan assets, and amortization of previously unrecognized amounts. Service cost represents the value of the benefits earned in the current year by the participants. Interest cost represents the cost associated with the passage of time. Certain items, such as plan amendments, gains and/or losses resulting from differences between actual and assumed results for demographic and economic factors affecting the obligations and assets of the plans, and changes in other assumptions are subject to deferred recognition for income and expense purposes. The expected return on plan assets is determined utilizing the weighted average of expected returns for plan asset investments in various asset categories based on historical performance, adjusted for current trends. See NOTE 7 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS for further information.

**Asset Retirement Obligations**

Asset retirement obligations are recognized when incurred and recorded as liabilities at fair value. The fair value of the liability is determined as the discounted value of the expected future cash flow. The asset retirement obligation is accreted over time through periodic charges to earnings. In addition, the asset retirement cost is capitalized as part of the asset's carrying value and amortized over the life of the related asset. Reclamation costs are adjusted periodically to reflect changes in the estimated present value resulting from the passage of time and revisions to the estimates of either the timing or amount of the reclamation costs. We review, on an annual basis, unless otherwise deemed necessary, the asset retirement obligation at each mine site in accordance with the provisions of ASC 410, *Asset Retirement and Environmental Obligations* . We perform an in-depth evaluation of the liability every three years in addition to routine annual assessments.

95

Future remediation costs for inactive mines are accrued based on management's best estimate at the end of each period of the costs expected to be incurred at a site. Such cost estimates include, where applicable, ongoing maintenance and monitoring costs. Changes in estimates at inactive mines are reflected in earnings in the period an estimate is revised. See NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS for further information.

*Environmental Remediation Costs*

We have a formal policy for environmental protection and restoration. Our mining and exploration activities are subject to various laws and regulations governing protection of the environment. We conduct our operations to protect the public health and environment and believe our operations are in compliance with applicable laws and regulations in all material respects. Our environmental liabilities, including obligations for known environmental remediation exposures at active and closed mining operations and other sites, have been recognized based on the estimated cost of investigation and remediation at each site. If the cost only can be estimated as a range of possible amounts with no point in the range being more likely, the minimum of the range is accrued. Future expenditures are not discounted unless the amount and timing of the cash disbursements reasonably can be estimated. It is possible that additional environmental obligations could be incurred, the extent of which cannot be assessed. Potential insurance recoveries have not been reflected in the determination of the liabilities. See NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS for further information.

*Revenue Recognition*

We sell our products pursuant to comprehensive supply agreements negotiated and executed with our customers. Revenue is recognized from a sale when persuasive evidence of an arrangement exists, the price is fixed or determinable, the product is delivered in accordance with F.O.B. terms, title and risk of loss have transferred to the customer in accordance with the specified provisions of each supply agreement and collection of the sales price reasonably is assured. Our U.S. Iron Ore and Asia Pacific Iron Ore supply agreements provide that title and risk of loss transfer to the customer either upon loading of the vessel, shipment or, as is the case with some of our U.S. Iron Ore supply agreements, when payment is received. Under certain term supply agreements, we ship the product to ports on the lower Great Lakes or to the customers' facilities prior to the transfer of title. Our rationale for shipping iron ore products to certain customers and retaining title until payment is received for these products is to minimize credit risk exposure.

Iron ore sales are recorded at a sales price specified in the relevant supply agreements resulting in revenue and a receivable at the time of sale. Upon revenue recognition for provisionally priced sales, a freestanding derivative is created for the difference between the sales price used and expected future settlement price. The derivative, which does not qualify for hedge accounting, is adjusted to fair value through *Product revenues* as a revenue adjustment each reporting period based upon current market data and forward-looking estimates determined by management until the final sales price is determined. The principal risks associated with recognition of sales on a provisional basis include iron ore price fluctuations between the date initially recorded and the date of final settlement. For revenue recognition, we estimate the future settlement rate; however, if significant changes in iron ore prices occur between the provisional pricing date and the final settlement date, we might be required to either return a portion of the sales proceeds received or bill for the additional sales proceeds due based on the provisional sales price. Refer to NOTE 13 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES for further information.

In addition, certain supply agreements with one customer include provisions for supplemental revenue or refunds based on the customer's annual steel pricing for the year the product is consumed in the customer's blast furnaces. We account for this provision as a free standing derivative instrument at the time of sale and record this provision at fair value until the year the product is consumed and the amounts are settled as an adjustment to revenue. Refer to NOTE 13 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES for further information.

Revenue from product sales also includes reimbursement for freight charges paid on behalf of customers and freight costs to move product from the port of Esperance to ports in China, which are included in *Freight and venture partners' cost reimbursements* separate from *Product revenues*. Revenue is recognized for the expected reimbursement of services when the services are performed.

### Deferred Revenue

The terms of one of our U.S. Iron Ore pellet supply agreements required supplemental payments to be paid by the customer during the period 2009 through 2012, with the option to defer a portion of the 2009 monthly amount in exchange for interest payments until the deferred amount was repaid in 2013. Installment amounts received under this arrangement in excess of sales are classified as deferred revenue in the Statements of Consolidated Financial Position upon receipt of payment. Revenue is recognized over the life of the supply agreement, which extends until 2022, in equal annual installments. As of December 31, 2015 and 2014, installment amounts received in excess of sales totaled $89.9 million and $102.8 million, respectively. As of December 31, 2015, deferred revenue of $12.8 million was recorded in *Other current liabilities* and $77.1 million was recorded as long term in *Other liabilities* in the Statements of Consolidated Financial Position. As of December 31, 2014, deferred revenue of $12.8 million was recorded in *Other current liabilities* and $90.0 million was recorded as long term in *Other liabilities* in the Statements of Consolidated Financial Position.

In 2014, due to the payment terms and the timing of cash receipts near year-end, cash receipts exceeded shipments. The shipments were completed early in the subsequent years. We considered whether revenue should be recognized on these sales under the "bill and hold" guidance provided by the SEC Staff; however, based upon the assessment performed, revenue recognition on these transactions totaling $29.3 million was deferred on the December 31, 2014 Statements of Consolidated Financial Position.

### Cost of Goods Sold

*Cost of goods sold and operating expenses* represents all direct and indirect costs and expenses applicable to the sales and revenues of our mining operations. Operating expenses primarily represent the portion of the Tilden mining venture costs for which we do not own; that is, the costs attributable to the share of the mine's production owned by the other joint venture partner in the Tilden mine. The mining venture functions as a captive cost company; it supplies product only to its owners effectively for the cost of production. Accordingly, the noncontrolling interests' revenue amounts are stated at cost of production and are offset by an equal amount included in *Cost of goods sold and operating expenses* resulting in no sales margin reflected for the noncontrolling partner participant. As we are responsible for product fulfillment, we act as a principal in the transaction and, accordingly, record revenue under these arrangements on a gross basis.

The following table is a summary of reimbursements in our U.S. Iron Ore operations for the years ended December 31, 2015, 2014 and 2013:

| | (In Millions) | | |
|---|---|---|---|
| | Year Ended December 31, | | |
| | **2015** | 2014 | 2013 |
| Reimbursements for: | | | |
| Freight | $ **105.3** | $ 163.0 | $ 177.3 |
| Venture partners' cost | **52.0** | 108.0 | 82.2 |
| Total reimbursements | $ **157.3** | $ 271.0 | $ 259.5 |

In 2014, we began selling a portion of our Asia Pacific Iron Ore product on a CFR basis. As a result, $23.6 million and $6.9 million of freight was included in *Cost of goods sold and operating expenses* for the years ended December 31, 2015 and 2014, respectively. There was no freight for the year ended December 31, 2013.

Where we have joint ownership of a mine, our contracts entitle us to receive royalties and/or management fees, which we earn as the pellets are produced.

### Repairs and Maintenance

Repairs, maintenance and replacement of components are expensed as incurred. The cost of major equipment overhauls is capitalized and depreciated over the estimated useful life, which is the period until the next scheduled overhaul, generally five years. All other planned and unplanned repairs and maintenance costs are expensed when incurred.

A004925

*Share-Based Compensation*

The fair value of each performance share grant is estimated on the date of grant using a Monte Carlo simulation to forecast relative TSR performance. Consistent with the guidelines of ASC 718, *Stock Compensation*, a correlation matrix of historic and projected stock prices was developed for both the Company and its predetermined peer group of mining and metals companies. The fair value assumes that performance goals will be achieved.

The expected term of the grant represents the time from the grant date to the end of the service period for each of the three plan-year agreements. We estimated the volatility of our common shares and that of the peer group of mining and metals companies using daily price intervals for all companies. The risk-free interest rate is the rate at the grant date on zero-coupon government bonds, with a term commensurate with the remaining life of the performance plans.

The fair value of stock options is estimated on the date of grant using a Black-Scholes model using the grant date price of our common shares and option exercise price, and assumptions regarding the option's expected term, the volatility of our common shares, the risk-free interest rate, and the dividend yield over the option's expected term.

Upon vesting of share-based compensation awards, we issue shares from treasury stock before issuing new shares.

Refer to NOTE 8 - STOCK COMPENSATION PLANS for additional information.

*Income Taxes*

Income taxes are based on income for financial reporting purposes, calculated using tax rates by jurisdiction, and reflect a current tax liability or asset for the estimated taxes payable or recoverable on the current year tax return and expected annual changes in deferred taxes. Any interest or penalties on income tax are recognized as a component of income tax expense.

We account for income taxes under the asset and liability method, which requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the financial statements. Under this method, deferred tax assets and liabilities are determined based on the differences between the financial statement and tax basis of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. The effect of a change in tax rates on deferred tax assets and liabilities is recognized in income in the period that includes the enactment date.

We record net deferred tax assets to the extent we believe these assets will more likely than not be realized. In making such determination, we consider all available positive and negative evidence, including scheduled reversals of deferred tax liabilities, projected future taxable income, tax planning strategies and recent financial results of operations.

Accounting for uncertainty in income taxes recognized in the financial statements requires that a tax benefit from an uncertain tax position be recognized when it is more likely than not that the position will be sustained upon examination, including resolutions of any related appeals or litigation processes, based on technical merits.

See NOTE 9 - INCOME TAXES for further information.

*Discontinued Operations*

In April 2014, the FASB issued ASU 2014-08, *Reporting Discontinued Operations and Disclosures of Disposals of Components of an Entity* , which changes the criteria for reporting discontinued operations and requires additional disclosures about discontinued operations. The standard requires that an entity report as a discontinued operation only a disposal that represents a strategic shift in operations that has a major effect on its operations and financial results. ASU 2014-08 is effective prospectively for new disposals that occur within annual periods beginning on or after December 15, 2014. Early adoption was permitted and we adopted ASU 2014-08 during the three months ended December 31, 2014.

98

*North American Coal Operations*

As we execute our strategy to focus on strengthening our U.S. Iron Ore operations, management determined as of March 31, 2015 that our North American Coal operating segment met the criteria to be classified as held for sale under *ASC 205, Presentation of Financial Statements* and continued to meet the criteria throughout 2015. In December 2015, we completed the sale of our remaining two metallurgical coal operations, Oak Grove and Pinnacle mines, which marked our exit from the coal business. Our plan to sell the Oak Grove and Pinnacle mine assets represented a strategic shift in our business. For this reason, our previously reported North American Coal operating segment results for all periods, prior to the March 31, 2015 held for sale determination, are classified as discontinued operations. Additionally, the results for the remainder of 2015 were reported as discontinued operations. This also includes our CLCC assets, which were sold during the fourth quarter of 2014. Refer to NOTE 14 - DISCONTINUED OPERATIONS for further discussion of our discontinued operations.

*Canadian Operations*

As more fully described in NOTE 14 - DISCONTINUED OPERATIONS, in January 2015, we announced that the Bloom Lake Group commenced restructuring proceedings in Montreal, Quebec under the CCAA. At that time, we had suspended Bloom Lake operations and for several months had been exploring options to sell certain of our Canadian assets, among other initiatives. Effective January 27, 2015, following the CCAA filing of the Bloom Lake Group, we deconsolidated the Bloom Lake Group and certain other wholly-owned subsidiaries comprising substantially all of our Canadian operations. Additionally, on May 20, 2015, the Wabush Group commenced restructuring proceedings in Montreal, Quebec under the CCAA which resulted in the deconsolidation of the remaining Wabush Group entities that were not previously deconsolidated. The Wabush Group was no longer generating revenues and was not able to meet its obligations as they came due. As a result of this action, the CCAA protections granted to the Bloom Lake Group were extended to include the Wabush Group to facilitate the reorganization of each of their businesses and operations. Our Canadian exit represents a strategic shift in our business. For this reason, our previously reported Eastern Canadian Iron Ore and Ferroalloys operating segment results for all periods prior to the respective deconsolidations as well as costs to exit are classified as discontinued operations.

**Foreign Currency**

Our financial statements are prepared with the U.S. dollar as the reporting currency. The functional currency of our Australian subsidiaries is the Australian dollar. The functional currency of all other international subsidiaries is the U.S. dollar. The financial statements of international subsidiaries are translated into U.S. dollars using the exchange rate at each balance sheet date for assets and liabilities and a weighted average exchange rate for each period for revenues, expenses, gains and losses. Where the local currency is the functional currency, translation adjustments are recorded as *Accumulated other comprehensive loss*. Income taxes generally are not provided for foreign currency translation adjustments. To the extent that monetary assets and liabilities, inclusive of intercompany notes, are recorded in a currency other than the functional currency, these amounts are remeasured each reporting period, with the resulting gain or loss being recorded in the Statements of Consolidated Operations . Transaction gains and losses resulting from remeasurement of short-term intercompany loans are included in *Miscellaneous - net* in our Statements of Consolidated Operations . For the year ended December 31, 2015, net gains of $16.3 million related to the impact of transaction gains and losses resulting from remeasurement. Of these amounts, for the year ended December 31, 2015, gains of $11.5 million and $1.5 million resulted from remeasurement of short-term intercompany loans and cash and cash equivalents, respectively. For the year ended December 31, 2014, net gains of $29.0 million related to the impact of transaction gains and losses resulting from remeasurement. Of these amounts, for the year ended December 31, 2014, gains of $19.7 million and $10.6 million, resulted from remeasurement of short-term intercompany loans and cash and cash equivalents, respectively. For the year ended December 31, 2013, net gains of $53.2 million related to the impact of transaction gains and losses resulting from remeasurement. Of these amounts, for the year ended December 31, 2013, gains of $33.0 million and $20.4 million, resulted from remeasurement of short-term intercompany loans and cash and cash equivalents, respectively.

**Earnings Per Share**

We present both basic and diluted earnings per share amounts for continuing operations and discontinued operations. Basic earnings per share amounts are calculated by dividing *Net Income (Loss) from Continuing Operations Attributable to Cliffs Shareholders* less any paid or declared but unpaid dividends on our depositary shares by the weighted average number of common shares outstanding during the period presented. Diluted earnings per share amounts are calculated by dividing *Net Income (Loss) from Continuing Operations Attributable to Cliffs Shareholders* by the weighted average number of common shares, common share equivalents under stock plans using the treasury stock method and the number of common shares that would be issued under an assumed conversion of our outstanding depositary shares,

99

Table of Contents

each representing a 1/40th interest in a share of our Series A Mandatory Convertible Preferred Stock, Class A, under the if-converted method. Our outstanding depositary shares are convertible into common shares based on the volume weighted average of closing prices of our common shares over the 20 consecutive trading day period ending on the third day immediately preceding the end of the reporting period. Common share equivalents are excluded from EPS computations in the periods in which they have an anti-dilutive effect. See NOTE 19 - EARNINGS PER SHARE for further information.

### Recent Accounting Pronouncements

#### Issued and Not Effective

In July 2015, the FASB issued ASU 2015-11, *Simplifying the Measurement of Inventory*, which specifies that an entity should measure inventory at the lower of cost and net realizable value. Net realizable value is the estimated selling price in the ordinary course of business, less reasonably predictable costs of completion, disposal and transportation. The new standard does not apply to inventory that is measured using LIFO; therefore, it is not applicable to our U.S. Iron Ore inventory values, but does apply to our Asia Pacific Iron Ore inventories which are valued using the average cost method. The update is effective for financial statement periods beginning after December 15, 2016, including interim periods within those fiscal years. The amendments in ASU 2015-11 should be applied prospectively with earlier application permitted as of the beginning of an interim or annual reporting period. We do not expect the adoption of this pronouncement to have an impact on our financial statements and related disclosures.

In August 2014, the FASB issued ASU 2014-15, *Disclosure of Uncertainties About an Entity's Ability to Continue as a Going Concern* . ASU 2014-15 will explicitly require management to assess an entity's ability to continue as a going concern, and to provide related footnote disclosure in certain circumstances. ASU 2014-15 is intended to define management's responsibility to evaluate whether there is substantial doubt about an entity's ability to continue as a going concern and to provide related footnote disclosures. Specifically, ASU 2014-15 provides a definition of the term "substantial doubt" and requires an assessment for a period of one year after the date that the financial statements are issued (or available to be issued). It also requires certain disclosures when substantial doubt is alleviated as a result of consideration of management's plans and requires an express statement and other disclosures when substantial doubt is not alleviated. The new standard will be effective for all entities in the first annual period ending after December 15, 2016 and for annual periods and interim periods thereafter. Earlier adoption is permitted. We are currently evaluating the impact the adoption of the guidance will have on the Statements of Consolidated Financial Position, Statements of Consolidated Operations or Statements of Consolidated Cash Flows .

In May 2014, the FASB issued ASU 2014-09, *Revenues from Contracts with Customers.* The new revenue guidance broadly replaces the revenue guidance provided throughout the Codification. The core principle of the revenue guidance is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. To achieve that core principle, an entity should apply the following steps: (1) identify the contract(s) with a customer, (2) identify the performance obligations in the contract, (3) determine the transaction price, (4) allocate the transaction price to the performance obligations in the contract, and (5) recognize revenue when (or as) the entity satisfies a performance obligation. The new revenue guidance also requires the capitalization of certain contract acquisition costs. Reporting entities must prepare new disclosures providing qualitative and quantitative information on the nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with customers. New disclosures also include qualitative and quantitative information on significant judgments, changes in judgments, and contract acquisition assets. At issuance, ASU 2014-09 was effective starting in 2017 for calendar-year public entities, and interim periods within that year. In August 2015, the FASB issued ASU 2015-14, *Revenue from Contracts with Customers: Deferral of the Effective Date,* which defers the adoption of ASU 2014-09 to annual reporting periods beginning after December 15, 2017, including interim reporting periods within that reporting period. Earlier application is permitted only as of annual reporting periods beginning after December 15, 2016, including interim reporting periods within that reporting period. We are still evaluating the impact of the updated guidance on the Statements of Consolidated Financial Position, Statements of Consolidated Operations or Statements of Consolidated Cash Flows .

*Issued and Adopted*

In October 2015, the FASB issued ASU 2015-17, *Balance Sheet Classification of Deferred Taxes*. This update simplifies the presentation of deferred income taxes, by requiring that deferred tax liabilities and assets be classified as non-current in a classified statement of financial position. This update is effective for financial statements issued for annual periods beginning after December 15, 2016, and interim periods within those annual periods; however, early adoption is permitted. This guidance can also be applied either prospectively to all deferred tax liabilities and assets or retrospectively to all periods presented. We adopted the guidance during the period ended December 31, 2015 and have applied this amended accounting guidance to our deferred tax liabilities and assets for all periods presented. The adoption of ASU 2015-17 did not have an impact on our Statements of Consolidated Operations or Statements of Consolidated Cash Flows. The impact of the adoption of the guidance resulted in any current deferred tax assets or liabilities being reclassified to non-current deferred tax assets or liabilities on the Statements of Consolidated Financial Position. The current deferred tax assets were $23.7 million at December 31, 2014. The current deferred tax liabilities were $4.0 million at December 31, 2014.

In April 2015, the FASB issued ASU 2015-03, *Simplifying the Presentation of Debt Issuance Costs*, which requires that debt issuance costs related to a recognized debt liability be presented in the balance sheet as a direct deduction from the carrying amount of that debt liability, consistent with debt discounts. This ASU requires retrospective adoption and will be effective for us beginning in our first quarter of 2016. Early adoption is permitted. We adopted the guidance at December 31, 2015. The new guidance was applied retrospectively for reporting periods ending on or before December 31, 2015. The adoption of ASU 2015-03 did not have an impact on our Statements of Consolidated Operations or Statements of Consolidated Cash Flows. The impact of the adoption of the guidance resulted in reclassification of the unamortized debt issuance costs on the Statements of Consolidated Financial Position from *Other non-current assets* to *Long-term debt*. The unamortized debt issuance costs were $29.1 million and $16.8 million at December 31, 2015 and December 31, 2014, respectively.

**NOTE 2 - SEGMENT REPORTING**

Our continuing operations are organized and managed according to geographic location: U.S. Iron Ore and Asia Pacific Iron Ore. The U.S. Iron Ore segment is comprised of our interests in five U.S. mines that provide iron ore to the integrated steel industry. The Asia Pacific Iron Ore segment is located in Western Australia and provides iron ore to the seaborne market for Asian steel producers. There were no intersegment product revenues in 2015 or 2014. Inter-segment revenues for 2013 were eliminated in consolidation.

We have historically evaluated segment performance based on sales margin, defined as revenues less cost of goods sold, and operating expenses identifiable to each segment. Additionally, beginning in the third quarter of 2014, concurrent with the change in control on July 29, 2014, management began to evaluate segment performance based on EBITDA, defined as net income (loss) before interest, income taxes, depreciation, depletion and amortization, and Adjusted EBITDA, defined as EBITDA excluding certain items such as impairment of goodwill and other long-lived assets, impacts of discontinued operations, extinguishment of debt, severance and contractor termination costs and other costs associated with the change in control, foreign currency remeasurement, certain supplies inventory write-offs, and intersegment corporate allocations of selling, general and administrative costs. Management believes that investors benefit from referring to these measures in evaluating operating and financial results, as well as in planning, forecasting and analyzing future periods as these financial measures approximate the cash flows associated with the operational earnings.

The following tables present a summary of our reportable segments for the years ended  December 31, 2015, 2014 and 2013, including a reconciliation of segment sales margin to *Income (Loss) from Continuing Operations Before Income Taxes and Equity Loss from Ventures*  and a reconciliation of *Net Income (Loss)* to EBITDA and Adjusted EBITDA:

| | | | | (In Millions) | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2015** | | | 2014 | | | 2013 | | |
| Revenues from product sales and services: | | | | | | | | | |
| U.S. Iron Ore | $ | **1,525.4** | **76%** | $ | 2,506.5 | 74% | $ | 2,667.9 | 69% |
| Asia Pacific Iron Ore | | **487.9** | **24%** | | 866.7 | 26% | | 1,224.3 | 31% |
| Other (including inter-segment revenue eliminations) | | **—** | **—%** | | — | —% | | (1.4) | —% |
| Total revenues from product sales and services | $ | **2,013.3** | **100%** | $ | 3,373.2 | 100% | $ | 3,890.8 | 100% |
| | | | | | | | | | |
| Sales margin: | | | | | | | | | |
| U.S. Iron Ore | $ | **227.1** | | $ | 710.4 | | $ | 901.9 | |
| Asia Pacific Iron Ore | | **9.4** | | | 121.7 | | | 367.1 | |
| Eliminations with discontinued operations | | **—** | | | 53.6 | | | 217.3 | |
| Other (including inter-segment sales margin eliminations) | | **—** | | | — | | | (1.9) | |
| Sales margin | | **236.5** | | | 885.7 | | | 1,484.4 | |
| Other operating income (expense) | | **(85.2)** | | | (755.6) | | | (104.1) | |
| Other income (expense) | | **161.8** | | | (149.8) | | | (189.4) | |
| Income (Loss) from Continuing Operations Before Income Taxes and Equity Loss from Ventures | $ | **313.1** | | $ | (19.7) | | $ | 1,190.9 | |

102

Table of Contents

| | (In Millions) | | |
|---|---|---|---|
| | **2015** | 2014 | 2013 |
| Net Income (Loss) | $ (748.4) | $ (8,311.6) | $ 361.8 |
| Less: | | | |
| Interest expense, net | (231.4) | (185.2) | (179.1) |
| Income tax benefit (expense) | (163.3) | 1,302.0 | (55.1) |
| Depreciation, depletion and amortization | (134.0) | (504.0) | (593.3) |
| EBITDA | $ (219.7) | $ (8,924.4) | $ 1,189.3 |
| Less: | | | |
| Impairment of goodwill and other long-lived assets | $ (3.3) | $ (635.5) | $ (14.3) |
| Impact of discontinued operations | (892.0) | (9,332.5) | (398.4) |
| Gain on extinguishment of debt | 392.9 | 16.2 | — |
| Severance and contractor termination costs | (10.2) | (23.3) | (16.6) |
| Foreign exchange remeasurement | 16.3 | 29.0 | 53.2 |
| Proxy contest and change in control in SG&A | — | (26.6) | — |
| Supplies inventory write-off | (16.3) | — | — |
| Total Adjusted EBITDA | $ 292.9 | $ 1,048.3 | $ 1,565.4 |
| | | | |
| EBITDA: | | | |
| U.S. Iron Ore | $ 317.6 | $ 805.6 | $ 1,000.1 |
| Asia Pacific Iron Ore | 35.3 | (352.9) | 543.0 |
| Other (including discontinued operations) | (572.6) | (9,377.1) | (353.8) |
| Total EBITDA | $ (219.7) | $ (8,924.4) | $ 1,189.3 |
| | | | |
| Adjusted EBITDA: | | | |
| U.S. Iron Ore | $ 352.1 | $ 833.5 | $ 1,031.8 |
| Asia Pacific Iron Ore | 32.7 | 252.9 | 513.1 |
| Other | (91.9) | (38.1) | 20.5 |
| Total Adjusted EBITDA | $ 292.9 | $ 1,048.3 | $ 1,565.4 |

| | (In Millions) | | |
|---|---|---|---|
| | **2015** | 2014 | 2013 |
| Depreciation, depletion and amortization: | | | |
| U.S. Iron Ore | $ 98.9 | $ 107.4 | $ 120.3 |
| Asia Pacific Iron Ore | 25.3 | 145.9 | 153.7 |
| Other | 6.6 | 7.7 | 10.8 |
| Total depreciation, depletion and amortization | $ 130.8 | $ 261.0 | $ 284.8 |
| | | | |
| Capital additions [1]: | | | |
| U.S. Iron Ore | $ 58.2 | $ 48.4 | $ 53.3 |
| Asia Pacific Iron Ore | 5.4 | 10.8 | 13.0 |
| Other | 8.6 | 6.3 | 4.5 |
| Total capital additions | $ 72.2 | $ 65.5 | $ 70.8 |

[1] Includes capital lease additions and non-cash accruals. Refer to NOTE 17 - CASH FLOW INFORMATION.

103

A004931

Table of Contents

A summary of assets by segment is as follows:

| | (In Millions) | | |
|---|---|---|---|
| | December 31, 2015 | December 31, 2014 | December 31, 2013 |
| Assets: | | | |
| U.S. Iron Ore | $ 1,476.4 | $ 1,464.9 | $ 1,537.9 |
| Asia Pacific Iron Ore | 202.5 | 306.2 | 1,176.8 |
| Total segment assets | 1,678.9 | 1,771.1 | 2,714.7 |
| Corporate | 441.7 | 666.2 | 204.2 |
| Assets of Discontinued Operations | 14.9 | 709.9 | 10,184.0 |
| Total assets | $ 2,135.5 | $ 3,147.2 | $ 13,102.9 |

Included in the consolidated financial statements are the following amounts relating to geographic location:

| | (In Millions) | | |
|---|---|---|---|
| | 2015 | 2014 | 2013 |
| Revenue | | | |
| United States | $ 1,206.4 | $ 1,923.2 | $ 1,543.9 |
| China | 370.8 | 662.7 | 1,165.3 |
| Canada | 282.4 | 430.5 | 758.5 |
| Other countries | 153.7 | 356.8 | 423.1 |
| Total revenue | $ 2,013.3 | $ 3,373.2 | $ 3,890.8 |
| Property, Plant and Equipment, Net | | | |
| United States | $ 1,012.7 | $ 998.1 | $ 1,120.6 |
| Australia | 46.3 | 72.4 | 750.2 |
| Total Property, Plant and Equipment, Net | $ 1,059.0 | $ 1,070.5 | $ 1,870.8 |

**Concentrations in Revenue**

In 2015, 2014 and 2013 three customers accounted for more than 10 percent of our consolidated product revenue. Total product revenue from these customers represents approximately $1.3 billion, $1.9 billion and $1.9 billion of our total consolidated product revenue in 2015, 2014 and 2013, respectively, and is attributable to our U.S. Iron Ore business segment.

The following table represents the percentage of our total revenue contributed by each category of products and services in 2015, 2014, and 2013:

| | 2015 | 2014 | 2013 |
|---|---|---|---|
| Revenue Category | | | |
| Iron ore | 91% | 92% | 93% |
| Freight and venture partners' cost reimbursements | 9% | 8% | 7% |
| Total revenue | 100% | 100% | 100% |

104

A004932

Table of Contents

**NOTE 3 - INVENTORIES**

The following table presents the detail of our *Inventories* in the Statements of Consolidated Financial Position as of December 31, 2015 and 2014:

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| | December 31, 2015 | | | December 31, 2014 | | |
| Segment | Finished Goods | Work-in Process | Total Inventory | Finished Goods | Work-in Process | Total Inventory |
| U.S. Iron Ore | $ 252.3 | $ 11.7 | $ 264.0 | $ 132.1 | $ 13.5 | $ 145.6 |
| Asia Pacific Iron Ore | 20.8 | 44.8 | 65.6 | 26.4 | 88.1 | 114.5 |
| Total | $ 273.1 | $ 56.5 | $ 329.6 | $ 158.5 | $ 101.6 | $ 260.1 |

Asia Pacific Iron Ore had long-term work-in-process stockpiles of $6.8 million classified as *Other non-current assets* in the Statements of Consolidated Financial Position at December 31, 2015. There were no long-term work-in-process stockpiles as of December 31, 2014.

*U.S. Iron Ore*

The excess of current cost over LIFO cost of iron ore inventories was $87.8 million and $119.0 million at December 31, 2015 and 2014, respectively. As of December 31, 2015, the product inventory balance for U.S. Iron Ore increased, resulting in a LIFO increment in 2015. The effect of the inventory build was an increase in *Inventories* of $118.8 million in the Statements of Consolidated Financial Position for the year ended December 31, 2015. As of December 31, 2014, the product inventory balance for U.S. Iron Ore increased, resulting in a LIFO increment in 2014. The effect of the inventory build was an increase in *Inventories* of $44.8 million in the Statements of Consolidated Financial Position for the year ended December 31, 2014.

**NOTE 4 - PROPERTY, PLANT AND EQUIPMENT**

The following table indicates the value of each of the major classes of our consolidated depreciable assets as of December 31, 2015 and 2014:

| | (In Millions) | |
|---|---|---|
| | December 31, | |
| | 2015 | 2014 |
| Land rights and mineral rights | $ 500.5 | $ 500.5 |
| Office and information technology | 71.0 | 73.7 |
| Buildings | 60.4 | 59.8 |
| Mining equipment | 594.0 | 585.1 |
| Processing equipment | 516.8 | 510.2 |
| Electric power facilities | 46.4 | 46.8 |
| Land improvements | 24.8 | 24.7 |
| Asset retirement obligation | 87.9 | 26.5 |
| Other | 28.2 | 28.5 |
| Construction in-progress | 40.3 | 14.4 |
| | 1,970.3 | 1,870.2 |
| Allowance for depreciation and depletion | (911.3) | (799.7) |
| | $ 1,059.0 | $ 1,070.5 |

We recorded depreciation expense of $119.2 million, $173.0 million and $191.5 million in the Statements of Consolidated Operations for the years ended December 31, 2015, 2014 and 2013, respectively.

During the second half of 2014, due to lower than previously expected profits as a result of decreased iron ore pricing expectations and increased costs, we determined that indicators of impairment with respect to certain of our long-lived assets or asset groups existed. Our asset groups generally consist of the assets and liabilities of one or more

105

Table of Contents

mines, preparation plants and associated reserves for which the lowest level of identifiable cash flows largely are independent of cash flows of other mines, preparation plants and associated reserves.

As a result of these assessments during 2014, we determined that the future cash flows associated with our Asia Pacific Iron Ore asset group and other asset groups were not sufficient to support the recoverability of the carrying value of these productive assets. Accordingly, during 2014, an other long-lived asset impairment charge of $537.8 million was recorded as *Impairment of goodwill and other long-lived assets* in the Statements of Consolidated Operations related to property, plant and equipment. The fair value estimates were calculated using income and market approaches. Refer to NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS for further discussion of these impairments and related fair value estimates.

Although certain factors indicated that the carrying value of certain asset groups may not be recoverable during 2015, an assessment was performed and no further impairment was indicated for the year ended December 31, 2015.

The net book value of the land rights and mineral rights as of December 31, 2015 and 2014 is as follows:

|  | (In Millions) | | | |
|---|---|---|---|---|
|  | December 31, | | | |
|  | **2015** | | 2014 | |
| Land rights | $ | **11.6** | $ | 11.6 |
| Mineral rights: | | | | |
| Cost | $ | **488.9** | $ | 488.9 |
| Depletion | | **(108.4)** | | (101.0) |
| Net mineral rights | $ | **380.5** | $ | 387.9 |

Accumulated depletion relating to mineral rights, which was recorded using the unit-of-production method, is included in *Cost of goods sold and operating expenses.* We recorded depletion expense of $7.4 million, $79.6 million and $84.9 million in the Statements of Consolidated Operations for the years ended December 31, 2015, 2014 and 2013, respectively. As discussed above, during 2014 we performed impairment assessments with respect to certain of our long-lived assets or asset groups. As a result of these assessments, we recorded an other long-lived asset impairment charge related to mineral rights of $297.2 million associated primarily with our Asia Pacific Iron Ore asset group.

## NOTE 5 - DEBT AND CREDIT FACILITIES

The following represents a summary of our long-term debt as of December 31, 2015 and 2014:

| ($ in Millions) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| December 31, 2015 | | | | | | | | |
| Debt Instrument | Type | Annual Effective Interest Rate | Final Maturity | Total Principal Amount | | Total Debt | | |
| $700 Million 4.875% 2021 Senior Notes | **Fixed** | **4.89%** | **2021** | $ | **412.5** | $ | **410.6** | (1) |
| $1.3 Billion Senior Notes: | | | | | | | | |
| $500 Million 4.80% 2020 Senior Notes | **Fixed** | **4.83%** | **2020** | | **306.7** | | **305.2** | (2) |
| $800 Million 6.25% 2040 Senior Notes | **Fixed** | **6.34%** | **2040** | | **492.8** | | **482.7** | (3) |
| $400 Million 5.90% 2020 Senior Notes | **Fixed** | **5.98%** | **2020** | | **290.8** | | **288.9** | (4) |
| $500 Million 3.95% 2018 Senior Notes | **Fixed** | **6.30%** | **2018** | | **311.2** | | **309.1** | (5) |
| $540 Million 8.25% 2020 First Lien Notes | **Fixed** | **9.97%** | **2020** | | **540.0** | | **497.4** | (6) |
| $544.2 Million 7.75% 2020 Second Lien Notes | **Fixed** | **15.55%** | **2020** | | **544.2** | | **403.2** | (7) |
| $550 Million ABL Facility: | | | | | | | | |
| ABL Facility | **Variable** | **N/A** | **2020** | | **550.0** | | **—** | (8) |
| Fair Value Adjustment to Interest Rate Hedge | | | | | | | **2.3** | |
| Total debt | | | | $ | **3,448.2** | $ | **2,699.4** | |

A004934

Table of Contents

($ in Millions)

December 31, 2014

| Debt Instrument | Type | Annual Effective Interest Rate | Final Maturity | Total Face Amount | Total Debt | |
|---|---|---|---|---|---|---|
| $700 Million 4.875% 2021 Senior Notes | Fixed | 4.89% | 2021 | $ 690.0 | $ 686.0 | (1) |
| $1.3 Billion Senior Notes: | | | | | | |
| $500 Million 4.80% 2020 Senior Notes | Fixed | 4.83% | 2020 | 490.0 | 487.2 | (2) |
| $800 Million 6.25% 2040 Senior Notes | Fixed | 6.34% | 2040 | 800.0 | 783.3 | (3) |
| $400 Million 5.90% 2020 Senior Notes | Fixed | 5.98% | 2020 | 395.0 | 391.9 | (4) |
| $500 Million 3.95% 2018 Senior Notes | Fixed | 5.17% | 2018 | 480.0 | 475.3 | (5) |
| $1.125 Billion Credit Facility: | | | | | | |
| Revolving Credit Agreement | Variable | 2.94% | 2017 | 1,125.0 | — | (9) |
| Fair Value Adjustment to Interest Rate Hedge | | | | | 2.8 | |
| Long-term debt | | | | $ 3,980.0 | $ 2,826.5 | |

_____

(1)     During the third quarter of 2015, we purchased $10.7 million of outstanding 4.875 percent senior notes that were trading at 50.0 percent of par which resulted in a gain on extinguishment of $5.3 million. In addition, during the first quarter of 2015, we purchased $58.3 million of outstanding 4.875 percent senior notes that were trading at 52.0 percent of par, which resulted in a gain on extinguishment of $20.0 million. Also during the first quarter, on March 27, 2015, we exchanged as part of a tender offer $208.5 million of the 4.875 percent senior notes for $170.3 million of the 7.75 percent second lien notes at a discount of $46.0 million based on an imputed interest rate of 15.55 percent, resulting in a gain on extinguishment of $83.1 million, net of amounts expensed for unamortized original issue discount and deferred origination fees.

During the fourth quarter of 2014, we purchased $10.0 million of outstanding 4.875 percent senior notes that were trading at a discount of 40.5 percent which resulted in a gain on the extinguishment of debt of $4.1 million.

As of December 31, 2015, the $700.0 million 4.875 percent senior notes were recorded at a par value of $412.5 million less debt issuance costs of $1.7 million and unamortized discounts of $0.2 million, based on an imputed interest rate of 4.89 percent. As of December 31, 2014, the $700.0 million 4.875 percent senior notes were recorded at a par value of $690.0 million less debt issuance costs of $3.5 million and unamortized discounts of $0.5 million, based on an imputed interest rate of 4.89 percent.

(2)     During the third quarter of 2015, we purchased $1.8 million of outstanding 4.80 percent senior notes that were trading at 50.0 percent of par, which resulted in a gain on extinguishment of $0.9 million. In addition, during the first quarter of 2015, we purchased $43.8 million of outstanding 4.80 percent senior notes that were trading at 54.3 percent of par, which resulted in a gain on extinguishment of $15.6 million. Also during the first quarter, on March 27, 2015, we exchanged as part of a tender offer $137.8 million of the 4.80 percent senior notes for $112.9 million of the 7.75 percent second lien notes at a discount of $30.5 million based on an imputed interest rate of 15.55 percent, resulting in a gain on extinguishment of $54.6 million, net of amounts expensed for unamortized original issue discount and deferred origination fees.

During the fourth quarter of 2014, we purchased $10.0 million of outstanding 4.80 percent senior notes that were trading at a discount of 40.25 percent which resulted in a gain on the extinguishment of debt of $4.0 million.

As of December 31, 2015, the $500.0 million 4.80 percent senior notes were recorded at a par value of $306.7 million less debt issuance costs of $1.1 million and unamortized discounts of $0.4 million, based on an imputed interest rate of 4.83 percent. As of December 31, 2014, the $500.0 million 4.80 percent senior notes were recorded at a par value of $490.0 million less debt issuance costs of $2.2 million and unamortized discounts of $0.6 million, based on an imputed interest rate of 4.83 percent.

A004935

Table of Contents

(3)   During the first quarter of 2015, we purchased $45.9 million of outstanding 6.25 percent senior notes that were trading at 52.5 percent of par, which resulted in a gain on extinguishment of $15.0 million. Also during the first quarter, on March 27, 2015, we exchanged as part of a tender offer $261.3 million of the 6.25 percent senior notes for $203.5 million of the 7.75 percent second lien notes at a discount of $55.0 million based on an imputed interest rate of 15.55 percent, resulting in a gain on extinguishment of $107.3 million, net of amounts expensed for unamortized original issue discount and deferred origination fees.

As of December 31, 2015, the $800.0 million 6.25 percent senior notes were recorded at par value of $492.8 million less debt issuance costs of $4.3 million and unamortized discounts of $5.8 million, based on an imputed interest rate of 6.34 percent. As of December 31, 2014, the $800.0 million 6.25 percent senior notes were recorded at par value of $800.0 million less debt issuance costs of $7.2 million and unamortized discounts of $9.5 million, based on an imputed interest rate of 6.34 percent.

(4)   During the third quarter of 2015, we purchased $36.0 million of outstanding 5.90 percent senior notes that were trading at 50.0 percent of par, which resulted in a gain on extinguishment of $18.0 million. In addition, during the first quarter of 2015, we purchased $1.3 million of outstanding 5.90 percent senior notes that were trading at 58.0 percent of par, which resulted in a gain on extinguishment of $0.3 million. Also during the first quarter, on March 27, 2015, we exchanged as part of a tender offer $67.0 million of the 5.90 percent senior notes for $57.5 million of the 7.75 percent second lien notes at a discount of $15.5 million based on an imputed interest rate of 15.55 percent, resulting in a gain on extinguishment of $24.5 million, net of amounts expensed for unamortized original issue discount and deferred origination fees.

During the fourth quarter of 2014, we purchased $5.0 million of outstanding 5.90 percent senior notes that were trading at a discount of 38.125 percent which resulted in a gain on the extinguishment of debt of $1.9 million.

As of December 31, 2015, the $400.0 million 5.90 percent senior notes were recorded at a par value of $290.8 million less debt issuance costs of $1.1 million and unamortized discounts of $0.8 million, based on an imputed interest rate of 5.98 percent. As of December 31, 2014, the $400.0 million 5.90 percent senior notes were recorded at a par value of $395.0 million less debt issuance costs of $1.8 million and unamortized discounts of $1.3 million, based on an imputed interest rate of 5.98 percent.

(5)   During the third quarter, on August 28, 2015, we purchased for cash as part of a tender offer, $124.8 million of the 3.95 percent senior notes for $68.6 million, resulting in a gain on extinguishment of $54.9 million, net of amounts expensed for reacquisition costs, unamortized original issue discount and deferred origination fees. In addition, during the first quarter of 2015, we purchased $44.0 million of outstanding 3.95 percent senior notes that were trading at 77.5 percent of par, which resulted in a gain on the extinguishment of debt of $7.1 million.

During the fourth quarter of 2014, we purchased $20.0 million of outstanding 3.95 percent senior notes that were trading at a discount of 30.875 percent which resulted in a gain on the extinguishment of debt of $6.2 million.

As of December 31, 2015, the $500.0 million 3.95 percent senior notes were recorded at a par value of $311.2 million less debt issuance cost of $0.9 million and unamortized discounts of $1.2 million, based on an imputed interest rate of 6.30 percent. As of December 31, 2014, the $500.0 million 3.95 percent senior notes were recorded at a par value of $480.0 million less debt issuance costs of $2.1 million and unamortized discounts of $2.6 million, based on an imputed interest rate of 5.17 percent.

(6)   As of December 31, 2015, the $540.0 million 8.25 percent first lien notes were recorded at a par value of $540.0 million less debt issuance costs of $10.5 million and unamortized discounts of $32.1 million, based on an imputed interest rate of 9.97 percent.

(7)   As of December 31, 2015, the $544.2 million 7.75 percent second lien notes were recorded at a par value of $544.2 million less debt issuance costs of $9.5 million and unamortized discounts of $131.5 million, based on an imputed interest rate of 15.55 percent. See NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS for further discussion of unamortized discount as a result of the exchange offers.

(8)   As of December 31, 2015, no loans were drawn under the $550.0 million ABL Facility and we had total availability of $366.0 million as a result of borrowing base limitations. As of December 31, 2015, the principal amount of letter of credit obligations totaled $186.3 million and commodity hedge obligations totaled $0.5 million, thereby further reducing available borrowing capacity on our ABL Facility to $179.2 million.

A004936

(9)    As of December 31, 2014, we had no revolving loans drawn under the revolving credit agreement, which had total availability of $ 1.125 billion as of December 31, 2014. As of December 31, 2014, the principal amount of letter of credit obligations totaled $149.5 million, thereby reducing available borrowing capacity to $975.5 million.

**Revolving Credit Facility**

As of March 30, 2015, we eliminated the revolving credit agreement which was last amended on January 22, 2015 (Amendment No. 6). The revolving credit agreement was replaced with our ABL Facility.

As of December 31, 2014, we were in compliance with all applicable financial covenants related to the revolving credit agreement.

**ABL Facility**

On March 30, 2015, we entered into a new senior secured asset-based revolving credit facility with various financial institutions. The ABL Facility will mature upon the earlier of March 30, 2020 or 60 days prior to the maturity of the New First Lien Notes (as defined below) and certain other material debt, and provides for up to $550.0 million in borrowings, comprised of (i) a $450.0 million U.S. tranche, including a $250.0 million sublimit for the issuance of letters of credit and a $100.0 million sublimit for U.S. swingline loans, and (ii) a $100.0 million Australian tranche, including a $50.0 million sublimit for the issuance of letters of credit and a $20.0 million sublimit for Australian swingline loans. Availability under both the U.S. tranche and Australian tranche of the ABL Facility is limited to an eligible U.S. borrowing base and Australian borrowing base, as applicable, determined by applying customary advance rates to eligible accounts receivable, inventory and certain mobile equipment.

The ABL Facility and certain bank products and hedge obligations are guaranteed by us and certain of our existing wholly-owned U.S. and Australian subsidiaries and are required to be guaranteed by certain of our future U.S. and Australian subsidiaries; provided, however, that the obligations of any U.S. entity will not be guaranteed by any Australian entity. Amounts outstanding under the ABL Facility will be secured by (i) a first-priority security interest in the ABL Collateral (as defined herein), including, in the case of the Australian tranche only, ABL Collateral owned by a borrower or guarantor that is organized under the laws of Australia, and (ii) a third-priority security interest in the Notes Collateral (as defined herein). The priority of the security interests in the ABL Collateral and the Notes Collateral of the lenders under the ABL Facility and the holders of the First Lien Notes are set forth in intercreditor provisions contained in an ABL intercreditor agreement.

The ABL Collateral generally consists of the following assets: accounts receivable and other rights to payment, inventory, as-extracted collateral, investment property, certain general intangibles and commercial tort claims, certain mobile equipment, commodities accounts, deposit accounts, securities accounts and other related assets and proceeds and products of each of the foregoing.

Borrowings under the ABL Facility bear interest, at our option, at a base rate, an Australian base rate or, if certain conditions are met, a LIBOR rate, in each case plus an applicable margin. The base rate is equal to the greater of the federal funds rate plus ½ of 1 percent, the LIBOR rate based on a one-month interest period plus 1 percent and the floating rate announced by BAML as its "prime rate." The Australian base rate is equal to the LIBOR rate as of 11:00 a.m. on the first business day of each month for a one-month period. The LIBOR rate is a per annum fixed rate equal to LIBOR with respect to the applicable interest period and amount of LIBOR rate loan requested.

The ABL Facility contains customary representations and warranties and affirmative and negative covenants including, among others, covenants regarding the maintenance of certain financial ratios if certain conditions are triggered, covenants relating to financial reporting, covenants relating to the payment of dividends on, or purchase or redemption of our capital stock, covenants relating to the incurrence or prepayment of certain debt, covenants relating to the incurrence of liens or encumbrances, compliance with laws, transactions with affiliates, mergers and sales of all or substantially all of our assets and limitations on changes in the nature of our business.

The ABL Facility provides for customary events of default, including, among other things, the event of nonpayment of principal, interest, fees, or other amounts, a representation or warranty proving to have been materially incorrect when made, failure to perform or observe certain covenants within a specified period of time, a cross-default to certain material indebtedness, the bankruptcy or insolvency of the Company and certain of its subsidiaries, monetary judgment defaults of a specified amount, invalidity of any loan documentation, a change of control of the Company, and ERISA defaults resulting in liability of a specified amount. In the event of a default by us (beyond any applicable grace or cure period, if any), the administrative agent may and, at the direction of the requisite number of lenders, shall declare all amounts owing under the ABL Facility immediately due and payable, terminate such lenders' commitments to make loans under the ABL Facility and/or exercise any and all remedies and other rights under the ABL Facility. For certain defaults related

109

Table of Contents

to insolvency and receivership, the commitments of the lenders will be automatically terminated and all outstanding loans and other amounts will become immediately due and payable.

As of December 31, 2015, we were in compliance with the ABL Facility liquidity requirements and, therefore, the springing financial covenant requiring a minimum fixed charge coverage ratio of 1.0 to 1.0 was not applicable.

**$540 Million 8.25 percent 2020 Senior Secured First Lien Notes - 2015 Offering**

On March 30, 2015, we entered into an indenture among the Company, the guarantors party thereto and U.S. Bank National Association, as trustee and notes collateral agent, relating to our issuance of $540 million aggregate principal amount of 8.25 percent Senior First Lien Notes due 2020 (the "First Lien Notes"). The First Lien Notes were sold on March 30, 2015 in a private transaction exempt from the registration requirements of the Securities Act.

The First Lien Notes bear interest at a rate of 8.25 percent per annum. Interest on the First Liens Notes is payable semi-annually in arrears on March 31 and September 30 of each year, commencing on September 30, 2015. The First Lien Notes mature on March 31, 2020 and are secured senior obligations of the Company.

The First Lien Notes are jointly and severally and fully and unconditionally guaranteed on a senior secured basis by substantially all of our material U.S. subsidiaries and are secured (subject in each case to certain exceptions and permitted liens) by (i) a first-priority lien on substantially all of our U.S. assets, other than the ABL Collateral (the "Notes Collateral"), and (ii) a second-priority lien on the U.S. ABL Collateral, which is junior to a first-priority lien for the benefit of the lenders under the ABL Facility. The First Lien Notes and guarantees are general senior obligations of the Company and the applicable guarantor; are effectively senior to all of our unsecured indebtedness, to the extent of the value of the collateral; together with other obligations secured equally and ratably with the First Lien Notes, are effectively (i) senior to our existing and future ABL obligations, to the extent and value of the Notes Collateral and (ii) senior to our obligations under the Second Lien Notes, to the extent and value of the collateral; are effectively subordinated to (i) our existing and future ABL obligations, to the extent and value of the ABL Collateral, and (ii) any existing or future indebtedness that is secured by liens on assets that do not constitute a part of the collateral, to the extent of the value of such assets; will rank equally in right of payment with all existing and future senior indebtedness, and any guarantees thereof; will rank equally in priority as to the Notes Collateral with any future debt secured equally and ratably with the First Lien Notes incurred after March 30, 2015; rank senior in right of payment to all existing and future subordinated indebtedness; and structurally subordinated to all existing and future indebtedness and other liabilities of our subsidiaries that do not guarantee the First Lien Notes. The relative priority of the liens securing our First Lien Notes obligations and Second Lien Notes obligations compared to the liens securing our obligations under the ABL Facility and certain other matters relating to the administration of security interests are set forth in intercreditor agreements.

The terms of the First Lien Notes are governed by the First Lien Notes indenture. The First Lien Notes indenture contains customary covenants that, among other things, limit our ability to incur secured indebtedness, create liens on principal property and the capital stock or debt of a subsidiary that owns a principal property, use proceeds of dispositions of collateral, enter into sale and leaseback transactions, merge or consolidate with another company, and transfer or sell all or substantially all of our assets. Upon the occurrence of a "change of control triggering event," as defined in the indenture, we are required to offer to repurchase the First Lien Notes at 101 percent of the aggregate principal amount thereof, plus any accrued and unpaid interest, if any, to, but excluding, the repurchase date.

We may redeem any of the First Lien Notes beginning on March 31, 2018. The initial redemption price is 108.25 percent of their principal amount, plus accrued and unpaid interest, if any, to, but excluding, the redemption date. The redemption price will decline after 2018 and will be 100 percent of their principal amount, plus accrued interest, beginning on June 30, 2019. We may also redeem some or all of the First Lien Notes at any time and from time to time prior to March 31, 2018 at a price equal to 100 percent of the principal amount thereof plus a "make-whole" premium, plus accrued and unpaid interest, if any, to, but excluding, the redemption date. In addition, at any time and from time to time on or prior to March 31, 2018, we may redeem in the aggregate up to 35 percent of the original aggregate principal amount of the First Lien Notes (calculated after giving effect to any issuance of additional First Lien Notes) with the net cash proceeds of certain equity offerings, at a redemption price of 108.25 percent, plus accrued and unpaid interest, if any, to, but excluding, the redemption date, so long as at least 65 percent of the original aggregate principal amount of the First Lien Notes (calculated after giving effect to any issuance of additional First Lien Notes) issued under the First Lien Notes indenture remain outstanding after each such redemption.

The First Lien Notes indenture contains customary events of default, including failure to make required payments, failure to comply with certain agreements or covenants, failure to pay or acceleration of certain other indebtedness, certain events of bankruptcy and insolvency, and failure to pay certain judgments. An event of default under the First Lien indenture will allow either the trustee or the holders of at least 25 percent in aggregate principal amount of the then-

110

outstanding First Lien Notes issued under such indenture to accelerate, or in certain cases, will automatically cause the acceleration of the amounts due under the First Lien Notes.

**$544 Million 7.75 percent 2020 Senior Secured Second Lien Notes - 2015 Offering**

On March 30, 2015, we also entered into an indenture among the Company, the guarantors and U.S. Bank National Association, as trustee and notes collateral agent, relating to our issuance of $544.2 million aggregate principal amount of 7.75 percent second lien senior secured notes due 2020 (the "Second Lien Notes"). The Second Lien Notes were issued on March 30, 2015 in exchange offers for certain of our existing senior notes.

The Second Lien Notes bear interest at a rate of 7.75 percent per annum. Interest on the Second Lien Notes is payable semi-annually in arrears on March 31 and September 30 of each year, commencing on September 30, 2015. The Second Lien Notes mature on March 31, 2020 and are secured senior obligations of the Company.

The Second Lien Notes have substantially similar terms to those of the First Lien Notes except with respect to their priority security interest in the collateral. The Second Lien Notes are jointly and severally and fully and unconditionally guaranteed on a senior secured basis by substantially all of our material U.S. subsidiaries and are secured (subject in each case to certain exceptions and permitted liens) by (i) a second-priority lien (junior to the First Lien Notes) on substantially all of our U.S. assets, other than the ABL Collateral, and (ii) a third-priority lien (junior to the ABL Facility and the First Lien Notes) on the U.S. ABL Collateral.

The Company may redeem any of the Second Lien Notes beginning on March 31, 2017. The initial redemption price is 103.875 percent of their principal amount, plus accrued and unpaid interest, if any, to, but excluding, the redemption date. The redemption price will decline each year after March 31, 2017 and will be 100 percent of their principal amount, plus accrued interest, beginning on March 31, 2019. The Company may also redeem some or all of the Second Lien Notes at any time and from time to time prior to March 31, 2017 at a price equal to 100 percent of the principal amount thereof plus a "make-whole" premium, plus accrued and unpaid interest, if any, to, but excluding, the redemption date. In addition, at any time and from time to time on or prior to March 31, 2017, the Company may redeem in the aggregate up to 35 percent of the original aggregate principal amount of the Second Lien Notes (calculated after giving effect to any issuance of additional Second Lien Notes) with the net cash proceeds of certain equity offerings, at a redemption price of 107.75 percent, plus accrued and unpaid interest, if any, to, but excluding, the redemption date, so long as at least 65 percent of the original aggregate principal amount of the Second Lien Notes (calculated after giving effect to any issuance of additional Second Lien Notes) issued under the Second Lien Notes Indenture remain outstanding after each such redemption.

**$500 Million Senior Notes — 2012 Offering**

On December 6, 2012, we completed a $500 million public offering of senior notes at 3.95 percent due January 15, 2018. Interest is fixed and is payable on January 15 and July 15 of each year, beginning on July 15, 2013 until maturity. The senior notes are unsecured obligations and rank equally in right of payment with all our other existing and future unsecured and unsubordinated indebtedness. There are no subsidiary guarantees of the interest and principal amounts.

The senior notes may be redeemed any time at our option not less than 30 days nor more than 60 days after prior notice is sent to the holders of the applicable series of notes. The senior notes are redeemable at a redemption price equal to the greater of (1) 100 percent of the principal amount of the notes to be redeemed or (2) the sum of the present values of the remaining scheduled payments of principal and interest on the notes to be redeemed, discounted to the redemption date on a semi-annual basis at the treasury rate plus 50 basis points with respect to the 2018 senior notes, plus, in each case, accrued and unpaid interest to the date of redemption.

In addition, if a change of control triggering event occurs with respect to the senior notes, as defined in the agreement, we will be required to offer to purchase the notes of the applicable series at a purchase price equal to 101 percent of the principal amount, plus accrued and unpaid interest, if any, to the date of purchase.

The terms of the senior notes contain certain customary covenants; however, there are no financial covenants.

*Interest Rate Adjustment Based on Rating Events*

The interest rate payable on the $500.0 million 3.95 percent senior notes may be subject to adjustments from time to time if either Moody's or S&P or, in either case, any Substitute Rating Agency thereof downgrades (or subsequently upgrades) the debt rating assigned to the senior notes. In no event shall (1) the interest rate for the senior notes be reduced to below the interest rate payable on the senior notes on the date of the initial issuance of senior notes or (2) the total increase in the interest rate on the senior notes exceed 2.00 percent above the interest rate payable on the

111

Table of Contents

senior notes on the date of the initial issuance of senior notes. During 2014, the interest rate payable on the $500.0 million 3.95 percent senior notes was increased from 3.95 percent ultimately to 5.70 percent based on Substitute Rating Agency downgrades throughout the year. During the first quarter of 2015, subsequent to a downgrade, the interest rate was further increased and is currently at the maximum interest rate of 5.95 percent per annum.

**$1 Billion Senior Notes — 2011 Offering**

On March 23, 2011 and April 1, 2011, respectively, we completed a  $1 billion public offering of senior notes consisting of two tranches: a 10-year tranche of $700 million aggregate principal amount at 4.88 percent senior notes due April 1, 2021, and a 30-year tranche of  $300 million aggregate principal amount at 6.25 percent senior notes due October 1, 2040, of which  $500 million aggregate principal amount previously was issued during September 2010. Interest is fixed and is payable on April 1 and October 1 of each year, beginning on October 1, 2011, for both series of senior notes until maturity.  The senior notes are unsecured obligations and rank equally in right of payment with all our other existing and future unsecured and unsubordinated indebtedness. There are no subsidiary guarantees of the interest and principal amounts. The net proceeds from the senior notes offering were used to fund a portion of the acquisition of Consolidated Thompson and to pay the related fees and expenses.

The senior notes may be redeemed any time at our option not less than  30 days nor more than 60 days after prior notice is sent to the holders of the applicable series of notes. The senior notes are redeemable at a redemption price equal to the greater of (1) 100 percent of the principal amount of the notes to be redeemed or (2) the sum of the present values of the remaining scheduled payments of principal and interest on the notes to be redeemed, discounted to the redemption date on a semi-annual basis at the treasury rate plus 25 basis points with respect to the 2021 senior notes and 40 basis points with respect to the 2040 senior notes, plus, in each case, accrued and unpaid interest to the date of redemption. However, if the 2021 senior notes are redeemed on or after the date that is three months prior to their maturity date, the 2021 senior notes will be redeemed at a redemption price equal to  100 percent of the principal amount of the notes to be redeemed plus accrued and unpaid interest to the date of redemption.

In addition, if a change of control triggering event occurs with respect to the senior notes, as defined in the agreement, we will be required to offer to purchase the notes of the applicable series at a purchase price equal to 101 percent of the principal amount, plus accrued and unpaid interest, if any, to the date of purchase.

The terms of the senior notes contain certain customary covenants; however, there are no financial covenants.

**$1 Billion Senior Notes — 2010 Offering**

On September 20, 2010, we completed a $1 billion public offering of senior notes consisting of two tranches: a 10-year tranche of  $500 million aggregate principal amount at 4.80 percent due October 1, 2020, and a 30-year tranche of  $500 million aggregate principal amount at 6.25 percent due October 1, 2040. Interest is fixed and is payable on April 1 and October 1 of each year, beginning on April 1, 2011, for both series of senior notes until maturity. The senior notes are unsecured obligations and rank equally in right of payment with all of our other existing and future senior unsecured and unsubordinated indebtedness. There are no subsidiary guarantees of the interest and principal amounts.

A portion of the net proceeds from the senior notes offering was used on September 22, 2010 to repay  $350 million outstanding under our credit facility. A portion of the net proceeds was also used for general corporate purposes, including funding of capital expenditures and were used to fund a portion of the acquisition of Consolidated Thompson and related expenses.

The senior notes may be redeemed any time at our option not less than  30 days nor more than 60 days after prior notice is sent to the holders of the applicable series of notes. The senior notes are redeemable at a redemption price equal to the greater of (1) 100 percent of the principal amount of the notes to be redeemed or (2) the sum of the present values of the remaining scheduled payments of principal and interest on the notes to be redeemed, discounted to the redemption date on a semi-annual basis at the treasury rate plus 35 basis points with respect to the 2020 senior notes and 40 basis points with respect to the 2040 senior notes, plus, in each case, accrued and unpaid interest to the date of redemption. In addition, if a change of control triggering event occurs with respect to the notes, we will be required to offer to purchase the notes at a purchase price equal to 101 percent of the principal amount, plus accrued and unpaid interest to the date of purchase.

The terms of the senior notes contain certain customary covenants; however, there are no financial covenants.

112

Table of Contents

**$400 Million Senior Notes Offering — 2010 Offering**

On March 17, 2010, we completed a $400 million public offering of senior notes due March 15, 2020. Interest at a fixed rate of 5.90 percent is payable on March 15 and September 15 of each year, beginning on September 15, 2010, until maturity on March 15, 2020. The senior notes are unsecured obligations and rank equally in right of payment with all of our other existing and future senior unsecured and unsubordinated indebtedness. There are no subsidiary guarantees of the interest and principal amounts.

A portion of the net proceeds from the senior notes offering was used on March 31, 2010 to repay our $200 million term loan under our credit facility, as well as to repay on May 27, 2010 our share of Amapá's remaining debt outstanding of $100.8 million. In addition, we used the remainder of the net proceeds to help fund the acquisitions of Spider and CLCC during the third quarter of 2010.

The senior notes may be redeemed any time at our option not less than 30 days nor more than 60 days after prior notice is sent to the holders of the applicable series of notes. The senior notes are redeemable at a redemption price equal to the greater of (1) 100 percent of the principal amount of the notes to be redeemed or (2) the sum of the present values of the remaining scheduled payments of principal and interest on the notes to be redeemed, discounted to the redemption date on a semi-annual basis, plus accrued and unpaid interest to the date of redemption. In addition, if a change of control triggering event occurs, we will be required to offer to purchase the notes at a purchase price equal to 101 percent of the principal amount, plus accrued and unpaid interest to the date of purchase.

The terms of the senior notes contain certain customary covenants; however, there are no financial covenants.

**Letters of Credit**

We issued standby letters of credit with certain financial institutions in order to support business obligations including, but not limited to, workers compensation and environmental obligations. As of December 31, 2015 and December 31, 2014, these letter of credit obligations totaled $186.3 million and $149.5 million, respectively.

**Debt Maturities**

The following represents a summary of our maturities of debt instruments, excluding borrowings on the ABL Facility, based on the principal amounts outstanding at December 31, 2015:

|  | (In Millions) |
|---|---|
|  | Maturities of Debt |
| 2016 | $ — |
| 2017 | — |
| 2018 | 311.2 |
| 2019 | — |
| 2020 | 1,681.7 |
| 2021 and thereafter | 905.3 |
| Total maturities of debt | $ 2,898.2 |

113

Table of Contents

**NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS**

The following represents the assets and liabilities of the Company measured at fair value at  December 31, 2015 and 2014:

| | (In Millions) | | | |
| | December 31, 2015 | | | |
| Description | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
|---|---|---|---|---|
| Assets: | | | | |
| Cash equivalents | $ 30.0 | $ — | $ — | $ 30.0 |
| Derivative assets | — | — | 7.8 | 7.8 |
| Total | $ 30.0 | $ — | $ 7.8 | $ 37.8 |
| Liabilities: | | | | |
| Derivative liabilities | $ — | $ 0.6 | $ 3.4 | $ 4.0 |
| Total | $ — | $ 0.6 | $ 3.4 | $ 4.0 |

| | (In Millions) | | | |
| | December 31, 2014 | | | |
| Description | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
|---|---|---|---|---|
| Assets: | | | | |
| Derivative assets | $ — | $ — | $ 63.2 | $ 63.2 |
| Available-for-sale marketable securities | 4.3 | — | — | 4.3 |
| Total | $ 4.3 | $ — | $ 63.2 | $ 67.5 |
| Liabilities: | | | | |
| Derivative liabilities | $ — | $ — | $ 9.5 | $ 9.5 |
| Foreign exchange contracts | — | 31.5 | — | 31.5 |
| Total | $ — | $ 31.5 | $ 9.5 | $ 41.0 |

Financial assets classified in Level 1 at  December 31, 2015 include money market funds. Financial assets classified in Level 1 at December 31, 2014 include available-for-sale marketable securities. The valuation of these instruments is based upon unadjusted quoted prices for identical assets in active markets.

The valuation of financial assets and liabilities classified in Level 2 is determined using a market approach based upon quoted prices for similar assets and liabilities in active markets, or other inputs that are observable. Level 2 securities primarily include derivative financial instruments valued using financial models that use as their basis readily observable market parameters. At December 31, 2015, such derivative financial instruments included our commodity hedge contracts. The fair value of the commodity hedge contracts is based on forward market prices and represents the estimated amount we would receive or pay to terminate these agreements at the reporting date, taking into account creditworthiness, nonperformance risk and liquidity risks associated with current market conditions. At December 31, 2014, such derivative financial instruments included our foreign currency exchange contracts. The fair value of the foreign currency exchange contracts was based on forward market prices and represented the estimated amount we would receive or pay to terminate these agreements at the reporting date, taking into account creditworthiness, nonperformance risk and liquidity risks associated with current market conditions.

114

Table of Contents

The derivative assets classified within Level 3 at December 31, 2015 and December 31, 2014 primarily relate to a freestanding derivative instrument related to certain supply agreements with one of our U.S. Iron Ore customers. The agreements include provisions for supplemental revenue or refunds based on the customer's annual steel pricing at the time the product is consumed in the customer's blast furnaces. We account for this provision as a derivative instrument at the time of sale and adjust this provision to fair value as an adjustment to *Product revenues* each reporting period until the product is consumed and the amounts are settled. The fair value of the instrument is determined using a market approach based on an estimate of the annual realized price of hot-rolled steel at the steelmaker's facilities, and takes into consideration current market conditions and nonperformance risk.

The Level 3 derivative assets and liabilities at December 31, 2015 and December 31, 2014 also consisted of derivatives related to certain provisional pricing arrangements with our U.S. Iron Ore and Asia Pacific Iron Ore customers. These provisional pricing arrangements specify provisional price calculations, where the pricing mechanisms generally are based on market pricing, with the final revenue rate to be based on market inputs at a specified point in time in the future, per the terms of the supply agreements. The difference between the estimated final revenue at the date of sale and the estimated final revenue rate is characterized as a derivative and is required to be accounted for separately once the revenue has been recognized. The derivative instrument is adjusted to fair value through *Product revenues* each reporting period based upon current market data and forward-looking estimates provided by management until the final revenue rate is determined.

The following table illustrates information about quantitative inputs and assumptions for the derivative assets and derivative liabilities categorized in Level 3 of the fair value hierarchy:

**Qualitative/Quantitative Information About Level 3 Fair Value Measurements**

| ($ in millions) | Fair Value at 12/31/2015 | | Balance Sheet Location | Valuation Technique | Unobservable Input | Range or Point Estimate (Weighted Average) |
|---|---|---|---|---|---|---|
| Provisional Pricing Arrangements | $ | 2.0 | *Other current assets* | Market Approach | Management's Estimate of 62% Fe | $43 |
| | $ | 3.4 | *Other current liabilities* | | | |
| Customer Supply Agreement | $ | 5.8 | *Other current assets* | Market Approach | Hot-Rolled Steel Estimate | $415 - $450 ($430) |

The significant unobservable input used in the fair value measurement of the reporting entity's provisional pricing arrangements is management's estimate of 62 percent Fe fines spot price based upon current market data, including historical seasonality and forward-looking estimates determined by management. Significant increases or decreases in this input would result in a significantly higher or lower fair value measurement, respectively.

The significant unobservable input used in the fair value measurement of the reporting entity's customer supply agreements is the future hot-rolled steel price that is estimated based on current market data, analysts' projections, projections provided by the customer and forward-looking estimates determined by management. Significant increases or decreases in this input would result in a significantly higher or lower fair value measurement, respectively.

115

A004943

Table of Contents

We recognize any transfers between levels as of the beginning of the reporting period, including both transfers into and out of levels. There were no transfers between Level 1 and Level 2 of the fair value hierarchy during the years ended December 31, 2015 and 2014. The following tables represent a reconciliation of the changes in fair value of financial instruments measured at fair value on a recurring basis using significant unobservable inputs (Level 3) for the years ended December 31, 2015 and 2014.

| | (In Millions) | | | |
|---|---|---|---|---|
| | Derivative Assets (Level 3) | | Derivative Liabilities (Level 3) | |
| | Year Ended December 31, | | Year Ended December 31, | |
| | **2015** | 2014 | **2015** | 2014 |
| Beginning balance - January 1 | $ **63.2** | $ 57.7 | $ **(9.5)** | $ (1.0) |
| Total gains (losses) | | | | |
| Included in earnings | **35.1** | 187.8 | **(61.0)** | (9.5) |
| Settlements | **(90.5)** | (182.3) | **67.1** | 1.0 |
| Transfers into Level 3 | **—** | — | **—** | — |
| Transfers out of Level 3 | **—** | — | **—** | — |
| Ending balance - December 31 | $ **7.8** | $ 63.2 | $ **(3.4)** | $ (9.5) |
| Total gains (losses) for the period included in earnings attributable to the change in unrealized gains (losses) on assets still held at the reporting date | $ **29.1** | $ 187.8 | $ **(3.4)** | $ (9.5) |

Gains and losses included in earnings are reported in *Product revenues* in the Statements of Consolidated Operations for the years ended December 31, 2015 and 2014.

The carrying amount for certain financial instruments (e.g. *Accounts receivable, net*, *Accounts payable* and *Accrued expenses*) approximate fair value and, therefore, have been excluded from the table below. A summary of the carrying amount and fair value of other financial instruments at December 31, 2015 and 2014 were as follows:

| | | (In Millions) | | | |
|---|---|---|---|---|---|
| | | December 31, 2015 | | December 31, 2014 | |
| | Classification | Carrying Value | Fair Value | Carrying Value | Fair Value |
| Long-term debt: | | | | | |
| Senior Notes—$700 million | Level 1 | $ **410.6** | $ **69.4** | $ 686.0 | $ 367.3 |
| Senior Notes—$1.3 billion | Level 1 | **787.9** | **137.4** | 1,270.5 | 704.0 |
| Senior Notes—$400 million | Level 1 | **288.9** | **52.8** | 391.9 | 228.1 |
| Senior Notes—$500 million | Level 1 | **309.1** | **87.1** | 475.3 | 312.0 |
| Senior First Lien Notes—$540 million | Level 1 | **497.4** | **414.5** | — | — |
| Senior Second Lien Notes—$544.2 million | Level 1 | **403.2** | **134.7** | — | — |
| ABL Facility | Level 2 | **—** | **—** | — | — |
| Fair Value Adjustment to Interest Rate Hedge | Level 2 | **2.3** | **2.3** | 2.8 | 2.8 |
| Total long-term debt | | $ **2,699.4** | $ **898.2** | $ 2,826.5 | $ 1,614.2 |

The fair value of long-term debt was determined using quoted market prices or discounted cash flows based upon current borrowing rates. The revolving loan and equipment loan facilities are variable rate interest and approximate fair value. See NOTE 5 - DEBT AND CREDIT FACILITIES for further information.

116

Table of Contents

*Items Measured at Fair Value on a Non-Recurring Basis*

The following tables present information about the impairment charges on both financial and nonfinancial assets and liabilities that were measured on a fair value basis at March 31, 2015 and December 31, 2014. There were no financial and non-financial assets and liabilities that were measured on a non-recurring fair value basis at December 31, 2015. The tables also indicate the fair value hierarchy of the valuation techniques used to determine such fair value.

| | (In Millions) | | | | |
| | March 31, 2015 | | | | |
| Description | Quoted Prices in Active Markets for Identical Assets/ Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total | Total Gains |
|---|---|---|---|---|---|
| Liabilities: | | | | | |
| $544.2 Million 7.75% 2020 Second Lien Notes | $ — | $ 397.2 | $ — | $ 397.2 | $ 269.5 |
| | $ — | $ 397.2 | $ — | $ 397.2 | $ 269.5 |

The $544.2 million 7.75 percent Second Lien Notes issued in the exchange offers were recorded as an extinguishment of debt as the change in debt terms was considered substantial. As such, the newly issued Second Lien Senior Notes were recorded at fair value at the issuance date. In order to determine the fair value of the Second Lien Senior Notes on the date of the exchange, we utilized the median bid-ask spread obtained from various investment banks for the exchange date. The bid-ask spread is indicative of the fair value of the notes on the exchange date. The 27.0 percent discount equated to a discount of $147.0 million on the issue value of $544.2 million, or an estimated fair value of $397.2 million.

| | (In Millions) | | | | |
| | Year Ended December 31, 2014 | | | | |
| Description | Quoted Prices in Active Markets for Identical Assets/ Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total | Total Losses |
|---|---|---|---|---|---|
| Assets: | | | | | |
| Goodwill impairment - Asia Pacific Iron Ore reporting unit | $ — | $ — | $ — | $ — | $ 73.5 |
| Other long-lived assets - Property, plant and equipment and Mineral rights: | | | | | |
| Asia Pacific Iron Ore reporting unit | — | — | 72.4 | 72.4 | 526.5 |
| Other reporting units | — | — | — | — | 11.3 |
| Other long-lived assets - Intangibles and other long-term assets: | | | | | |
| Asia Pacific Iron Ore reporting unit | — | — | 7.0 | 7.0 | 24.2 |
| Investment in ventures impairment - Global Exploration | — | — | — | — | 9.2 |
| | $ — | $ — | $ 79.4 | $ 79.4 | $ 644.7 |

*Financial Assets*

During the third quarter of 2014, an impairment charge of $9.2 million to investment in ventures was recorded within our Global Exploration operating segment as a decision was made to abandon the investment during the period.

117

A004945

Table of Contents

*Non-Financial Assets*

During the third and fourth quarter of 2014, we identified factors that indicated the carrying values of the asset groups in the chart above may not be recoverable primarily due to long-term price forecasts as part of management's long-range planning process. Updated estimates of long-term prices for all products, specifically the Platts 62 percent Fe fines spot price were lower than prior estimates. This especially affects the Asia Pacific Iron Ore business segment because their contracts correlate heavily to world market spot pricing, which were updated based upon current market conditions, macro-economic factors influencing the balance of supply and demand for our products and expectations for future cost and capital expenditure requirements.

Additionally, our CEO, Lourenco Goncalves, was appointed by the Board of Directors in early August 2014 and was subsequently identified as the CODM in accordance with ASC 280, *Segment Reporting*. Our CODM views Asia Pacific Iron Ore as a non-core asset and has communicated plans to evaluate the business unit for a change in strategy including possible divestiture. These factors, among other considerations utilized in the individual impairment assessments, indicate that the carrying value of the respective asset groups in the chart above and Asia Pacific Iron Ore goodwill may not be recoverable.

During the third quarter of 2014, a goodwill impairment charge of $73.5 million was recorded for our Asia Pacific Iron Ore reporting segment. Based on our review of the fair value hierarchy, the inputs used in these fair value measurements were considered Level 3 inputs.

We also recorded impairment charges to property, plant and equipment, mineral rights, intangible assets and other long-term assets during the second half of 2014 related to our Asia Pacific Iron Ore operating segment, along with impairments charged to reporting units within our *Other* reportable segments. A detailed break out of the impairment charges is shown in the chart above. The recorded impairment charges reduce the related assets to their estimated fair value as we determined that the future cash flows associated with these operations were not sufficient to support the recoverability of the carrying value of these assets. Fair value was determined based on management's best estimate within a range of fair values, which is considered a Level 3 input, and resulted in an asset impairment charge of $562.0 million. The Level 3 inputs used to determine fair value included models developed and market inputs obtained by management which provided a range of fair value estimates of property, plant and equipment. Management's models include internally developed long-term future cash flow estimates, capital expenditure and cost estimates, market inputs to determine long-term pricing assumptions, discount rates, and foreign exchange rates.

## NOTE 7 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS

We offer defined benefit pension plans, defined contribution pension plans and other postretirement benefit plans, primarily consisting of retiree healthcare benefits, to most employees in the United States as part of a total compensation and benefits program. We do not have employee retirement benefit obligations at our Asia Pacific Iron Ore operations. The defined benefit pension plans largely are noncontributory and benefits generally are based on employees' years of service and average earnings for a defined period prior to retirement or a minimum formula.

The labor agreements we have with the USW at our U.S. Iron Ore operations cover approximately 2,000 USW-represented employees at our Empire and Tilden mines in Michigan and our United Taconite and Hibbing mines in Minnesota, or 81.0 percent of our total U.S. Iron Ore hourly workforce. This percentage includes the U.S. Iron Ore hourly employees that are on lay-off.

We offer retiree medical coverage to hourly retirees of our USW-represented mines. The 2012 USW agreement set temporary maximum monthly medical premiums for participants who retired prior to January 1, 2015. These premium maximums expired on December 31, 2015 and reverted to increasing premiums based on the terms of the 2012 bargaining agreement. The agreements also provide for an OPEB cap that limits the amount of contributions that we have to make toward retiree medical insurance coverage for each retiree and spouse of a retiree per calendar year who retired on or after January 1, 2015. The amount of the annual OPEB cap is based upon the gross plan costs we incurred in 2014. The OPEB cap applies to employees who retired on or after January 1, 2015 and does not apply to surviving spouses.

In addition, we currently provide various levels of retirement health care and OPEB to some full-time employees who meet certain length of service and age requirements (a portion of which is pursuant to collective bargaining agreements). Most plans require retiree contributions and have deductibles, co-pay requirements and benefit limits. Most bargaining unit plans require retiree contributions and co-pays for major medical and prescription drug coverage. There is a cap on our cost for medical coverage under the salaried plans. The annual limit applies to each covered participant and equals $7,000 for coverage prior to age 65, with the retiree's participation adjusted based on the age at which the retiree's benefits commence. Beginning in 2015, Cliffs changed the delivery of the post-65 salaried retiree

118

Table of Contents

medical benefit program, including salaried retirees from our Northshore operation, from an employer sponsored plan to the combination of an employer subsidy plan and an individual supplemental Medicare insurance plan purchased through a Medicare exchange. This allows the program to take full advantage of available government subsidies and more efficient pricing in the Medicare market. For participants at our Northshore operation, the annual limit ranges from $4,020 to $4,500 for coverage prior to age 65. Covered participants pay an amount for coverage equal to the excess of (i) the average cost of coverage for all covered participants, over (ii) the participant's individual limit, but in no event will the participant's cost be less than 15.0 percent of the average cost of coverage for all covered participants. For Northshore participants, the minimum participant cost is a fixed dollar amount. We do not provide OPEB for most salaried employees hired after January 1, 1993. Retiree healthcare coverage is provided through programs administered by insurance companies whose charges are based on benefits paid.

In December 2003, The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 was enacted. This act introduced a prescription drug benefit under Medicare Part D as well as a federal subsidy to sponsors of retiree healthcare benefit plans that provide a benefit that at least actuarially is equivalent to Medicare Part D. Our measures of the accumulated postretirement benefit obligation and net periodic postretirement benefit cost as of December 31, 2004 and for periods thereafter reflect amounts associated with the subsidy. We elected to adopt the retroactive transition method for recognizing the cost reduction in 2004.

The Pinnacle and Oak Grove mines were sold in December 2015, and the liabilities representing vested benefits at the time of the sale remained with Cliffs. The sale triggered a curtailment event for the Salaried Pension Plan. Liabilities for other postretirement benefits were transferred as part of the sale, and associated adjustments were made to the *Accumulated other comprehensive loss* balances as they pertained to Pinnacle and Oak Grove participants in the Hourly OPEB plan. Accordingly, all amounts shown below include retained obligations of vested employees of the North American Coal mines.  Further, all disclosures presented include the annual expense, contributions and obligations associated with the retained vested benefits of these participants.

The following table summarizes the annual expense recognized related to the retirement plans for  2015, 2014 and 2013:

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| | **2015** | | 2014 | | 2013 | |
| Defined benefit pension plans | $ | **23.9** | $ | 26.2 | $ | 46.8 |
| Defined contribution pension plans | | **3.6** | | 4.4 | | 5.0 |
| Other postretirement benefits | | **4.4** | | (2.5) | | 3.2 |
| Total | $ | **31.9** | $ | 28.1 | $ | 55.0 |

119

A004947

Table of Contents

The following tables and information provide additional disclosures for our consolidated plans.

**Obligations and Funded Status**

The following tables and information provide additional disclosures for the periods ending December 31, 2015 and 2014:

| | | | | (In Millions) | | | |
|---|---|---|---|---|---|---|---|
| | Pension Benefits | | | | Other Benefits | | |
| **Change in benefit obligations:** | **2015** | | 2014 | | **2015** | | 2014 |
| Benefit obligations — beginning of year | $ | **998.0** | $ 891.2 | $ | **295.8** | $ | 265.1 |
| Service cost (excluding expenses) | | **22.7** | 26.1 | | **1.9** | | 1.9 |
| Interest cost | | **37.7** | 40.2 | | **11.5** | | 11.9 |
| Plan amendments | | **—** | — | | **—** | | (0.9) |
| Actuarial (gain) loss | | **(67.7)** | 113.4 | | **(27.0)** | | 37.4 |
| Benefits paid | | **(78.7)** | (71.4) | | **(20.6)** | | (25.3) |
| Participant contributions | | **—** | — | | **4.0** | | 4.8 |
| Federal subsidy on benefits paid | | **—** | — | | **0.4** | | 0.9 |
| Curtailment gain | | **(1.2)** | (1.5) | | **—** | | — |
| Benefit obligations — end of year | $ | **910.8** | $ 998.0 | $ | **266.0** | $ | 295.8 |
| | | | | | | | |
| **Change in plan assets:** | | | | | | | |
| Fair value of plan assets — beginning of year | $ | **749.8** | $ 712.5 | $ | **269.3** | $ | 251.8 |
| Actual return on plan assets | | **(6.4)** | 59.1 | | **(3.9)** | | 31.9 |
| Participant contributions | | **—** | — | | **0.4** | | 0.8 |
| Employer contributions | | **35.7** | 49.6 | | **1.3** | | 5.2 |
| Asset transfers | | **0.2** | — | | **—** | | — |
| Benefits paid | | **(78.7)** | (71.4) | | **(16.5)** | | (20.4) |
| Fair value of plan assets — end of year | $ | **700.6** | $ 749.8 | $ | **250.6** | $ | 269.3 |
| | | | | | | | |
| **Funded status at December 31:** | | | | | | | |
| Fair value of plan assets | $ | **700.6** | $ 749.8 | $ | **250.6** | $ | 269.3 |
| Benefit obligations | | **(910.8)** | (998.0) | | **(266.0)** | | (295.8) |
| Funded status (plan assets less benefit obligations) | $ | **(210.2)** | $ (248.2) | $ | **(15.4)** | $ | (26.5) |
| Amount recognized at December 31 | $ | **(210.2)** | $ (248.2) | $ | **(15.4)** | $ | (26.5) |
| | | | | | | | |
| **Amounts recognized in Statements of Financial Position:** | | | | | | | |
| Current liabilities | $ | **(0.5)** | $ (2.2) | $ | **(4.1)** | $ | (4.2) |
| Noncurrent liabilities | | **(209.7)** | (246.0) | | **(11.3)** | | (22.3) |
| Net amount recognized | $ | **(210.2)** | $ (248.2) | $ | **(15.4)** | $ | (26.5) |
| | | | | | | | |
| **Amounts recognized in accumulated other comprehensive loss:** | | | | | | | |
| Net actuarial loss | $ | **290.9** | $ 311.8 | $ | **91.5** | $ | 99.3 |
| Prior service cost (credit) | | **7.5** | 9.8 | | **(39.5)** | | (42.9) |
| Net amount recognized | $ | **298.4** | $ 321.6 | $ | **52.0** | $ | 56.4 |
| | | | | | | | |
| **The estimated amounts that will be amortized from accumulated other comprehensive loss into net periodic benefit cost in 2016:** | | | | | | | |
| Net actuarial loss | $ | **21.1** | | $ | **5.5** | | |
| Prior service cost | | **2.2** | | | **(3.7)** | | |
| Net amount recognized | $ | **23.3** | | $ | **1.8** | | |

120

**(In Millions)**

**2015**

| | Pension Plans | | | | | Other Benefits | | |
|---|---|---|---|---|---|---|---|---|
| | Salaried | Hourly | Mining | SERP | Total | Salaried | Hourly | Total |
| Fair value of plan assets | $ 258.3 | $ 436.7 | $ 5.6 | $ — | $ 700.6 | $ — | $ 250.6 | $ 250.6 |
| Benefit obligation | (340.0) | (558.6) | (8.6) | (3.6) | (910.8) | (38.2) | (227.8) | (266.0) |
| Funded status | $ (81.7) | $ (121.9) | $ (3.0) | $ (3.6) | $ (210.2) | $ (38.2) | $ 22.8 | $ (15.4) |

**2014**

| | Pension Plans | | | | | Other Benefits | | |
|---|---|---|---|---|---|---|---|---|
| | Salaried | Hourly | Mining | SERP | Total | Salaried | Hourly | Total |
| Fair value of plan assets | $ 288.3 | $ 454.9 | $ 6.6 | $ — | $ 749.8 | $ — | $ 269.3 | $ 269.3 |
| Benefit obligation | (379.2) | (603.9) | (9.2) | (5.7) | (998.0) | (41.6) | (254.2) | (295.8) |
| Funded status | $ (90.9) | $ (149.0) | $ (2.6) | $ (5.7) | $ (248.2) | $ (41.6) | $ 15.1 | $ (26.5) |

The accumulated benefit obligation for all defined benefit pension plans was $898.9 million and $980.6 million at December 31, 2015 and 2014, respectively. The decrease in the accumulated benefit obligation primarily is a result of an increase in the discount rates.

**Components of Net Periodic Benefit Cost**

**(In Millions)**

| | Pension Benefits | | | Other Benefits | | |
|---|---|---|---|---|---|---|
| | 2015 | 2014 | 2013 | 2015 | 2014 | 2013 |
| Service cost | $ 22.7 | $ 26.1 | $ 32.9 | $ 6.4 | $ 1.8 | $ 4.0 |
| Interest cost | 37.7 | 40.3 | 36.4 | 13.4 | 11.9 | 12.6 |
| Expected return on plan assets | (59.8) | (58.1) | (52.3) | (18.3) | (17.1) | (20.0) |
| Amortization: | | | | | | |
|     Prior service costs (credits) | 2.3 | 2.5 | 2.8 | (3.7) | (3.6) | (3.6) |
|     Net actuarial loss | 20.8 | 14.0 | 27.0 | 6.6 | 4.5 | 10.2 |
| Curtailments and settlements | 0.2 | 1.4 | — | — | — | — |
| Net periodic benefit cost | $ 23.9 | $ 26.2 | $ 46.8 | $ 4.4 | $ (2.5) | $ 3.2 |
| Curtailment effects | (1.2) | — | — | — | — | — |
| Current year actuarial (gain)/loss | (0.7) | 109.7 | (128.0) | 0.2 | 22.2 | (68.6) |
| Amortization of net loss | (21.0) | (15.4) | (27.0) | (6.6) | (4.5) | (10.2) |
| Current year prior service (credit) cost | — | — | 0.8 | — | (0.9) | — |
| Amortization of prior service (cost) credit | (2.3) | (2.5) | (2.8) | 3.7 | 3.6 | 3.6 |
| Total recognized in other comprehensive income | $ (25.2) | $ 91.8 | $ (157.0) | $ (2.7) | $ 20.4 | $ (75.2) |
| Total recognized in net periodic cost and other comprehensive income | $ (1.3) | $ 118.0 | $ (110.2) | $ 1.7 | $ 17.9 | $ (72.0) |

**Additional Information**

**(In Millions)**

| | Pension Benefits | | | Other Benefits | | |
|---|---|---|---|---|---|---|
| | 2015 | 2014 | 2013 | 2015 | 2014 | 2013 |
| Effect of change in mine ownership & noncontrolling interest | $ 48.4 | $ 51.2 | $ 46.3 | $ 5.5 | $ 5.9 | $ 4.8 |
| Actual return on plan assets | (6.4) | 59.1 | 80.3 | (3.9) | 31.9 | 11.0 |

121

A004949

Table of Contents

**Assumptions**

The discount rate for determining PBO is determined individually for each plan. For our pension and other postretirement benefit plans, we used a discount rate as of December 31, 2015 of 4.27 percent for Iron Hourly, 4.12 percent for Salaried, 4.28 percent for Ore Mining and 4.22 percent for SERP, and 4.22 percent for Salaried OPEB, and 4.32 percent for Hourly OPEB, compared with a discount rate of 3.83 percent as of December 31, 2014. The discount rates are determined by matching the projected cash flows used to determine the PBO and APBO to a projected yield curve of 688 Aa graded bonds in the 40th to 90th percentiles. These bonds are either noncallable or callable with make-whole provisions. For the year ended December 31, 2014, bonds in the 10th to 90th percentile were utilized. The portion of the increases in discount rates due to market conditions resulted in decreases to our plan projected benefit obligations of approximately $31.5 million and $13.6 million for the pension and other postretirement benefit plans, respectively. In addition, the portion of the increases in discount rates due to the change to the 40th to 90th percentiles measurement resulted in decreases to our plan projected benefit obligations of approximately $8.3 million and $2.7 million for the pension and other postretirement benefit plans, respectively.

On December 31, 2015, the assumed mortality improvement projection was changed from generational scale MP-2014 to generational scale MP-2015. The healthy mortality assumption remains the RP-2014 mortality tables with blue collar adjustments for the Iron Hourly and Hourly PRW plans, with white collar adjustments for the SERP and Salaried PRW Plan, and without collar adjustments for the Salaried and Ore Mining. The adoption of the new projection scale resulted in decreases to our projected benefit obligations totaling approximately $15.1 million or 1.5 percent for the pension plans and $7.9 million or 2 percent for the OPEB plans.

The rates of retirement and termination for certain groups were also updated as a result of a recent experience review .

Weighted-average assumptions used to determine benefit obligations at December 31 were:

| | Pension Benefits | | | | Other Benefits | | | |
|---|---|---|---|---|---|---|---|---|
| | **2015** | | 2014 | | **2015** | | 2014 | |
| Discount rate | | | | | | | | |
| Iron Hourly Pension Plan | **4.27** | **%** | 3.83 | % | **N/A** | **%** | N/A | % |
| Salaried Pension Plan | **4.12** | | 3.83 | | **N/A** | | N/A | |
| Ore Mining Pension Plan | **4.28** | | 3.83 | | **N/A** | | N/A | |
| SERP | **4.22** | | 3.83 | | **N/A** | | N/A | |
| Hourly OPEB Plan | **N/A** | | N/A | | **4.32** | | 3.83 | |
| Salaried OPEB Plan | **N/A** | | N/A | | **4.22** | | 3.83 | |
| Salaried rate of compensation increase | **3.00** | | 3.00 | | **3.00** | | 3.00 | |
| Hourly rate of compensation increase (ultimate) | **2.00** | | 2.50 | | **N/A** | | N/A | |

Weighted-average assumptions used to determine net benefit cost for the years 2015, 2014 and 2013 were:

| | Pension Benefits | | | Other Benefits | | |
|---|---|---|---|---|---|---|
| | **2015** | 2014 | 2013 | **2015** | 2014 | 2013 |
| Discount rate | **3.83** % | 4.57 % | 3.70 % | **3.83** % | 4.57 % | 3.70 % |
| Expected return on plan assets | **8.25** | 8.25 | 8.25 | **7.00** | 7.00 | 8.25 |
| Salaried rate of compensation increase | **3.00** | 4.00 | 4.00 | **3.00** | 4.00 | 4.00 |
| Hourly rate of compensation increase | **2.50** | 3.00 | 4.00 | **N/A** | N/A | N/A |

122

Table of Contents

Assumed health care cost trend rates at December 31 were:

| | 2015 | 2014 |
|---|---|---|
| Health care cost trend rate assumed for next year | 6.75 % | 7.00 % |
| Ultimate health care cost trend rate | 5.00 | 5.00 |
| Year that the ultimate rate is reached | 2023 | 2023 |

Assumed health care cost trend rates have a significant effect on the amounts reported for the health care plans. A change of one percentage point in assumed health care cost trend rates would have the following effects:

| | (In Millions) | | | |
|---|---|---|---|---|
| | Increase | | Decrease | |
| Effect on total of service and interest cost | $ | 3.4 | $ | (2.6) |
| Effect on postretirement benefit obligation | | 27.2 | | (22.6) |

**Plan Assets**

Our financial objectives with respect to our pension and VEBA plan assets are to fully fund the actuarial accrued liability for each of the plans, to maximize investment returns within reasonable and prudent levels of risk, and to maintain sufficient liquidity to meet benefit obligations on a timely basis.

Our investment objective is to outperform the expected ROA assumption used in the plans' actuarial reports over the life of the plans. The expected ROA takes into account historical returns and estimated future long-term returns based on capital market assumptions applied to the asset allocation strategy. The expected return is net of investment expenses paid by the plans. In addition, investment performance is monitored on a quarterly basis by benchmarking to various indices and metrics for the one-, three- and five-year periods.

The asset allocation strategy is determined through a detailed analysis of assets and liabilities by plan, which defines the overall risk that is acceptable with regard to the expected level and variability of portfolio returns, surplus (assets compared to liabilities), contributions and pension expense.

The asset allocation review process involves simulating capital market behaviors including global asset class performance, inflation and interest rates in order to evaluate various asset allocation scenarios and determine the asset mix with the highest likelihood of meeting financial objectives. The process includes factoring in the current funded status and likely future funded status levels of the plans by taking into account expected growth or decline in the contributions over time.

The asset allocation strategy varies by plan. The following table reflects the actual asset allocations for pension and VEBA plan assets as of December 31, 2015 and 2014, as well as the 2016 weighted average target asset allocations as of December 31, 2015. Equity investments include securities in large-cap, mid-cap and small-cap companies located in the U.S. and worldwide. Fixed income investments primarily include corporate bonds and government debt securities. Alternative investments include hedge funds, private equity, structured credit and real estate.

| | Pension Assets | | | VEBA Assets | | |
|---|---|---|---|---|---|---|
| | 2016 Target Allocation | Percentage of Plan Assets at December 31, | | 2016 Target Allocation | Percentage of Plan Assets at December 31, | |
| Asset Category | | 2015 | 2014 | | 2015 | 2014 |
| Equity securities | 45.0% | 44.0% | 45.6% | 8.0% | 8.8% | 8.6% |
| Fixed income | 28.0% | 27.7% | 28.7% | 80.1% | 78.2% | 79.3% |
| Hedge funds | 5.0% | 5.8% | 5.5% | 4.2% | 4.5% | 4.3% |
| Private equity | 7.0% | 4.7% | 4.2% | 2.6% | 2.2% | 2.3% |
| Structured credit | 7.5% | 8.9% | 8.7% | 2.1% | 2.3% | 2.3% |
| Real estate | 7.5% | 8.2% | 6.7% | 3.0% | 4.0% | 3.2% |
| Cash | —% | 0.7% | 0.6% | —% | —% | —% |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

123

Table of Contents

*Pension*

The fair values of our pension plan assets at  December 31, 2015 and 2014 by asset category are as follows:

| | (In Millions) | | | |
| | December 31, 2015 | | | |
| Asset Category | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
|---|---|---|---|---|
| Equity securities: | | | | |
| U.S. large-cap | $ 150.5 | $ — | $ — | $ 150.5 |
| U.S. small/mid-cap | 40.6 | — | — | 40.6 |
| International | 116.8 | — | — | 116.8 |
| Fixed income | 166.3 | 27.9 | — | 194.2 |
| Hedge funds | — | — | 40.7 | 40.7 |
| Private equity | — | — | 33.1 | 33.1 |
| Structured credit | — | — | 62.1 | 62.1 |
| Real estate | — | — | 57.5 | 57.5 |
| Cash | 5.1 | — | — | 5.1 |
| Total | $ 479.3 | $ 27.9 | $ 193.4 | $ 700.6 |

| | (In Millions) | | | |
| | December 31, 2014 | | | |
| Asset Category | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant  Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
|---|---|---|---|---|
| Equity securities: | | | | |
| U.S. large-cap | $ 168.4 | $ — | $ — | $ 168.4 |
| U.S. small/mid-cap | 45.9 | — | — | 45.9 |
| International | 127.7 | — | — | 127.7 |
| Fixed income | 183.1 | 31.8 | — | 214.9 |
| Hedge funds | — | — | 41.5 | 41.5 |
| Private equity | — | — | 31.2 | 31.2 |
| Structured credit | — | — | 65.4 | 65.4 |
| Real estate | — | — | 50.0 | 50.0 |
| Cash | 4.8 | — | — | 4.8 |
| Total | $ 529.9 | $ 31.8 | $ 188.1 | $ 749.8 |

Following is a description of the inputs and valuation methodologies used to measure the fair value of our plan assets.

*Equity Securities*

Equity securities classified as Level 1 investments include U.S. large-, small- and mid-cap investments and international equity. These investments are comprised of securities listed on an exchange, market or automated quotation system for which quotations are readily available. The valuation of these securities is determined using a market approach, and is based upon unadjusted quoted prices for identical assets in active markets.

124

A004952

*Fixed Income*

Fixed income securities classified as Level 1 investments include bonds and government debt securities. These investments are comprised of securities listed on an exchange, market or automated quotation system for which quotations are readily available. The valuation of these securities is determined using a market approach, and is based upon unadjusted quoted prices for identical assets in active markets. Also included in Fixed Income is a portfolio of U.S. Treasury STRIPS, which are zero-coupon bearing fixed income securities backed by the full faith and credit of the U.S. government. The securities sell at a discount to par because there are no incremental coupon payments. STRIPS are not issued directly by the Treasury, but rather are created by a financial institution, government securities broker or government securities dealer. Liquidity on the issue varies depending on various market conditions; however, in general the STRIPS market is slightly less liquid than that of the U.S. Treasury Bond market. The STRIPS are priced daily through a bond pricing vendor and are classified as Level 2.

*Hedge Funds*

Hedge funds are alternative investments comprised of direct or indirect investment in offshore hedge funds with an investment objective to achieve an attractive risk-adjusted return with moderate volatility and moderate directional market exposure over a full market cycle. The valuation techniques used to measure fair value attempt to maximize the use of observable inputs and minimize the use of unobservable inputs. Considerable judgment is required to interpret the factors used to develop estimates of fair value. Valuations of the underlying investment funds are obtained and reviewed. The securities that are valued by the funds are interests in the investment funds and not the underlying holdings of such investment funds. Thus, the inputs used to value the investments in each of the underlying funds may differ from the inputs used to value the underlying holdings of such funds.

In determining the fair value of a security, the fund managers may consider any information that is deemed relevant, which may include one or more of the following factors regarding the portfolio security, if appropriate: type of security or asset; cost at the date of purchase; size of holding; last trade price; most recent valuation; fundamental analytical data relating to the investment in the security; nature and duration of any restriction on the disposition of the security; evaluation of the factors that influence the market in which the security is purchased or sold; financial statements of the issuer; discount from market value of unrestricted securities of the same class at the time of purchase; special reports prepared by analysts; information as to any transactions or offers with respect to the security; existence of merger proposals or tender offers affecting the security; price and extent of public trading in similar securities of the issuer or compatible companies and other relevant matters; changes in interest rates; observations from financial institutions; domestic or foreign government actions or pronouncements; other recent events; existence of shelf registration for restricted securities; existence of any undertaking to register the security; and other acceptable methods of valuing portfolio securities.

*Private Equity Funds*

Private equity funds are alternative investments that represent direct or indirect investments in partnerships, venture funds or a diversified pool of private investment vehicles (fund of funds).

Investment commitments are made in private equity funds based on an asset allocation strategy, and capital calls are made over the life of the funds to fund the commitments. As of December 31, 2015, remaining commitments total $48.1 million for both our pension and other benefits. Committed amounts are funded from plan assets when capital calls are made. Investment commitments are not pre-funded in reserve accounts. Refer to the valuation methodologies for equity securities above for further information.

The valuation of investments in private equity funds initially is performed by the underlying fund managers. In determining the fair value, the fund managers may consider any information that is deemed relevant, which may include: type of security or asset; cost at the date of purchase; size of holding; last trade price; most recent valuation; fundamental analytical data relating to the investment in the security; nature and duration of any restriction on the disposition of the security; evaluation of the factors that influence the market in which the security is purchased or sold; financial statements of the issuer; discount from market value of unrestricted securities of the same class at the time of purchase; special reports prepared by analysts; information as to any transactions or offers with respect to the security; existence of merger proposals or tender offers affecting the security; price and extent of public trading in similar securities of the issuer or compatible companies and other relevant matters; changes in interest rates; observations from financial institutions; domestic or foreign government actions or pronouncements; other recent events; existence of shelf registration for restricted securities; existence of any undertaking to register the security; and other acceptable methods of valuing portfolio securities.

125

The valuations are obtained from the underlying fund managers, and the valuation methodology and process is reviewed for consistent application and adherence to policies. Considerable judgment is required to interpret the factors used to develop estimates of fair value.

Private equity investments are valued quarterly and recorded on a one-quarter lag. For alternative investment values reported on a lag, current market information is reviewed for any material changes in values at the reporting date. Capital distributions for the funds do not occur on a regular frequency. Liquidation of these investments would require sale of the partnership interest.

*Structured Credit*

Structured credit investments are alternative investments comprised of collateralized debt obligations and other structured credit investments that are priced based on valuations provided by independent, third-party pricing agents, if available. Such values generally reflect the last reported sales price if the security is actively traded. The third-party pricing agents may also value structured credit investments at an evaluated bid price by employing methodologies that utilize actual market transactions, broker-supplied valuations, or other methodologies designed to identify the market value of such securities. Such methodologies generally consider such factors as security prices, yields, maturities, call features, ratings and developments relating to specific securities in arriving at valuations. Securities listed on a securities exchange, market or automated quotation system for which quotations are readily available are valued at the last quoted sale price on the primary exchange or market on which they are traded. Debt obligations with remaining maturities of 60 days or less may be valued at amortized cost, which approximates fair value.

Structured credit investments are valued monthly and recorded on a one-month lag. For alternative investment values reported on a lag, current market information is reviewed for any material changes in values at the reporting date. Historically, redemption requests have been considered quarterly, subject to notice of 90 days, although the advisor is currently only requiring notice of 65 days. During the fourth quarter of 2015, a redemption request for tender of $8 million was executed in order to bring the portfolio more in line with the target allocation for this asset category. The tender was effective as of December 31, 2015, with the funds targeted for distribution during the first quarter of 2016.

*Real Estate*

The real estate portfolio for the pension plans is an alternative investment primarily comprised of two funds with strategic categories of real estate investments. All real estate holdings are appraised externally at least annually, and appraisals are conducted by reputable, independent appraisal firms that are members of the Appraisal Institute. All external appraisals are performed in accordance with the Uniform Standards of Professional Appraisal Practices. The property valuations and assumptions of each property are reviewed quarterly by the investment advisor and values are adjusted if there has been a significant change in circumstances relating to the property since the last external appraisal. The valuation methodology utilized in determining the fair value is consistent with the best practices prevailing within the real estate appraisal and real estate investment management industries, including the Real Estate Information Standards, and standards promulgated by the National Council of Real Estate Investment Fiduciaries, the National Association of Real Estate Investment Fiduciaries, and the National Association of Real Estate Managers. In addition, the investment advisor may cause additional appraisals to be performed. Two of the funds' fair values are updated monthly, and there is no lag in reported values. Redemption requests for these two funds are considered on a quarterly basis, subject to notice of 45 days.

During 2011, a new real estate fund of funds investment was added for the Empire, Tilden, Hibbing and United Taconite VEBA plans as a result of the asset allocation review process. This fund invests in pooled investment vehicles that in turn invest in commercial real estate properties. Valuations are performed quarterly and financial statements are prepared on a semi-annual basis, with annual audited statements. Asset values for this fund are reported with a one-quarter lag and current market information is reviewed for any material changes in values at the reporting date. In most cases, values are based on valuations reported by underlying fund managers or other independent third-party sources, but the fund has discretion to use other valuation methods, subject to compliance with ERISA. Valuations are typically estimates and subject to upward or downward revision based on each underlying fund's annual audit. Withdrawals are permitted on the last business day of each quarter subject to a 65-day prior written notice.

Table of Contents

The following represents the effect of fair value measurements using significant unobservable inputs (Level 3) on changes in plan assets for the years ended December 31, 2015 and 2014:

| | | | | (In Millions) | |
| --- | --- | --- | --- | --- | --- |
| | | | Year Ended December 31, 2015 | | |
| | Hedge Funds | Private Equity Funds | Structured Credit Fund | Real Estate | Total |
| Beginning balance — January 1, 2015 | $ 41.5 | $ 31.2 | $ 65.4 | $ 50.0 | $ 188.1 |
| Actual return on plan assets: | | | | | |
| Relating to assets still held at the reporting date | (0.8) | 1.5 | (3.3) | 8.1 | 5.5 |
| Relating to assets sold during the period | — | 2.5 | — | — | 2.5 |
| Purchases | — | 5.7 | — | — | 5.7 |
| Sales | — | (7.8) | — | (0.6) | (8.4) |
| Ending balance — December 31, 2015 | $ 40.7 | $ 33.1 | $ 62.1 | $ 57.5 | $ 193.4 |

| | | | | (In Millions) | |
| --- | --- | --- | --- | --- | --- |
| | | | Year Ended December 31, 2014 | | |
| | Hedge Funds | Private Equity Funds | Structured Credit Fund | Real Estate | Total |
| Beginning balance — January 1, 2014 | $ 38.8 | $ 29.1 | $ 61.0 | $ 40.9 | $ 169.8 |
| Actual return on plan assets: | | | | | |
| Relating to assets still held at the reporting date | 2.7 | 3.2 | 4.4 | 5.2 | 15.5 |
| Relating to assets sold during the period | — | 3.0 | — | — | 3.0 |
| Purchases | — | 1.4 | — | 5.4 | 6.8 |
| Sales | — | (5.5) | — | (1.5) | (7.0) |
| Ending balance — December 31, 2014 | $ 41.5 | $ 31.2 | $ 65.4 | $ 50.0 | $ 188.1 |

*VEBA*

Assets for other benefits include VEBA trusts pursuant to bargaining agreements that are available to fund retired employees' life insurance obligations and medical benefits. The fair values of our other benefit plan assets at December 31, 2015 and 2014 by asset category are as follows:

| | | | | (In Millions) | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | December 31, 2015 | | | |
| Asset Category | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | | Significant Other Observable Inputs (Level 2) | | Significant Unobservable Inputs (Level 3) | | Total |
| Equity securities: | | | | | | | |
| U.S. large-cap | $ 11.1 | $ | — | $ | — | $ | 11.1 |
| U.S. small/mid-cap | 2.8 | | — | | — | | 2.8 |
| International | 8.2 | | — | | — | | 8.2 |
| Fixed income | 158.1 | | 37.9 | | — | | 196.0 |
| Hedge funds | — | | — | | 11.2 | | 11.2 |
| Private equity | — | | — | | 5.5 | | 5.5 |
| Structured credit | — | | — | | 5.8 | | 5.8 |
| Real estate | — | | — | | 10.0 | | 10.0 |
| Cash | — | | — | | — | | — |
| Total | $ 180.2 | $ | 37.9 | $ | 32.5 | $ | 250.6 |

127

A004955

Table of Contents

| Asset Category | (In Millions) | | | |
| --- | --- | --- | --- | --- |
| | December 31, 2014 | | | |
| | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| Equity securities: | | | | |
| U.S. large-cap | $ 11.6 | $ — | $ — | $ 11.6 |
| U.S. small/mid-cap | 2.9 | — | — | 2.9 |
| International | 8.6 | — | — | 8.6 |
| Fixed income | 174.5 | 39.1 | — | 213.6 |
| Hedge funds | — | — | 11.5 | 11.5 |
| Private equity | — | — | 6.2 | 6.2 |
| Structured credit | — | — | 6.1 | 6.1 |
| Real estate | — | — | 8.7 | 8.7 |
| Cash | 0.1 | — | — | 0.1 |
| Total | $ 197.7 | $ 39.1 | $ 32.5 | $ 269.3 |

Refer to the pension asset discussion above for further information regarding the inputs and valuation methodologies used to measure the fair value of each respective category of plan assets.

The following represents the effect of fair value measurements using significant unobservable inputs (Level 3) on changes in plan assets for the year ended December 31, 2015 and 2014:

| | (In Millions) | | | | |
| --- | --- | --- | --- | --- | --- |
| | Year Ended December 31, 2015 | | | | |
| | Hedge Funds | Private Equity Funds | Structured Credit Fund | Real Estate | Total |
| Beginning balance — January 1, 2015 | $ 11.5 | $ 6.2 | $ 6.1 | $ 8.7 | $ 32.5 |
| Actual return on plan assets: | | | | | |
| Relating to assets still held at the reporting date | (0.3) | 0.3 | (0.3) | 1.3 | 1.0 |
| Relating to assets sold during the period | — | 0.4 | — | — | 0.4 |
| Purchases | — | 0.1 | — | — | 0.1 |
| Sales | — | (1.5) | — | — | (1.5) |
| Ending balance — December 31, 2015 | $ 11.2 | $ 5.5 | $ 5.8 | $ 10.0 | $ 32.5 |

| | (In Millions) | | | | |
| --- | --- | --- | --- | --- | --- |
| | Year Ended December 31, 2014 | | | | |
| | Hedge Funds | Private Equity Funds | Structured Credit Fund | Real Estate | Total |
| Beginning balance — January 1, 2014 | $ 24.6 | $ 6.0 | $ 13.5 | $ 13.2 | $ 57.3 |
| Actual return on plan assets: | | | | | |
| Relating to assets still held at the reporting date | 0.5 | 1.0 | 0.4 | 0.9 | 2.8 |
| Relating to assets sold during the period | 0.6 | 0.4 | 0.4 | 0.5 | 1.9 |
| Purchases | — | 0.1 | — | — | 0.1 |
| Sales | (14.2) | (1.3) | (8.2) | (5.9) | (29.6) |
| Ending balance — December 31, 2014 | $ 11.5 | $ 6.2 | $ 6.1 | $ 8.7 | $ 32.5 |

128

Table of Contents

**Contributions**

Annual contributions to the pension plans are made within income tax deductibility restrictions in accordance with statutory regulations. In the event of plan termination, the plan sponsors could be required to fund additional shutdown and early retirement obligations that are not included in the pension obligations. The Company currently has no intention to shutdown, terminate or withdraw from any of its employee benefit plans.

| | | | (In Millions) | | |
|---|---|---|---|---|---|
| | | | Other Benefits | | |
| Company Contributions | Pension Benefits | VEBA | Direct Payments | Total | |
| 2014 | $ 49.6 | $ — | $ 5.5 | $ 5.5 | |
| 2015 | 35.7 | — | 3.5 | 3.5 | |
| 2016 (Expected)[1] | 1.2 | — | 4.1 | 4.1 | |

[1] Pursuant to the bargaining agreement, benefits can be paid from VEBA trusts that are at least 70 percent funded (all VEBA trusts are over 70 percent funded at December 31, 2015). Funding obligations have been suspended as Hibbing's, UTAC's, Tilden's and Empire's share of the value of their respective trust assets have reached 90 percent of their obligation.

VEBA plans are not subject to minimum regulatory funding requirements. Amounts contributed are pursuant to bargaining agreements.

Contributions by participants to the other benefit plans were $4.0 million for the year ended December 31, 2015 and $4.8 million for the year ended December 31, 2014.

**Estimated Cost for 2016**

For 2016, we estimate net periodic benefit cost as follows:

| | (In Millions) |
|---|---|
| Defined benefit pension plans | $ 16.3 |
| Other postretirement benefits | (4.4) |
| Total | $ 11.9 |

**Estimated Future Benefit Payments**

| | | (In Millions) | | |
|---|---|---|---|---|
| | | Other Benefits | | |
| | Pension Benefits | Gross Company Benefits | Less Medicare Subsidy | Net Company Payments |
| 2016 | $ 74.6 | $ 18.2 | $ 0.8 | $ 17.4 |
| 2017 | 63.4 | 18.3 | 0.9 | 17.4 |
| 2018 | 63.0 | 18.3 | 1.0 | 17.3 |
| 2019 | 62.4 | 18.1 | 1.1 | 17.0 |
| 2020 | 62.4 | 17.7 | 1.2 | 16.5 |
| 2021-2025 | 306.8 | 84.7 | 6.9 | 77.8 |

129

Table of Contents

**Other Potential Benefit Obligations**

While the foregoing reflects our obligation, our total exposure in the event of non-performance is potentially greater. Following is a summary comparison of the total obligation:

| | (In Millions) | |
| --- | --- | --- |
| | December 31, 2015 | |
| | Defined Benefit Pensions | Other Benefits |
| Fair value of plan assets | $ 700.6 | $ 250.6 |
| Benefit obligation | (910.8) | (266.0) |
| Underfunded status of plan | $ (210.2) | $ (15.4) |
| Additional shutdown and early retirement benefits | $ (23.2) | $ (3.2) |

**NOTE 8 - STOCK COMPENSATION PLANS**

At December 31, 2015, we have outstanding awards under two share-based compensation plans, which are described below. The compensation cost that has been charged against income for those plans was $13.9 million, $21.5 million and $19.1 million in 2015, 2014 and 2013, respectively, which primarily was recorded in *Selling, general and administrative expenses* in the Statements of Consolidated Operations. The total income tax benefit recognized in the Statements of Consolidated Operations for share-based compensation arrangements was $7.5 million and $6.7 million for 2014 and 2013, respectively. There was no income tax benefit recognized for the year ended December 31, 2015, due to the full valuation allowance.

**Employees' Plans**

The 2015 Equity Plan was approved by our Board of Directors on March 26, 2015 and by our shareholders on May 19, 2015. The 2015 Equity Plan replaced the 2012 Amended Equity Plan. The maximum number of shares that may be issued under the 2015 Equity Plan is 12.9 million common shares. No additional grants were issued from the 2012 Amended Equity Plan after the date of approval of the 2015 Equity Plan; however, all awards previously granted under the 2012 Amended Equity Plan will continue in full force and effect in accordance with the terms of outstanding awards.

During the third quarter of 2015, the Compensation Committee approved grants under the 2015 Equity Plan of 1.5 million restricted share units to certain officers and employees with a grant date of September 10, 2015. The restricted share units granted under this award are subject to continued employment through the vesting date of December 15, 2017.

During the first quarter of 2015, the Compensation Committee approved grants under the 2012 Amended Equity Plan to certain officers and employees for the 2015 to 2017 performance period. Shares granted under the awards consisted of 0.9 million performance shares, 0.9 million restricted share units and 0.4 million stock options.

On February 10, 2014, upon recommendation by the Compensation Committee, our Board of Directors approved and adopted, subject to the approval of our shareholders at the 2014 Annual Meeting, the 2012 Amended Equity Plan. The principal reason for amending and restating the 2012 Equity Plan was to increase the number of common shares available for issuance by 5.0 million common shares. This amended plan was approved by our shareholders at the 2014 Annual Meeting held on July 29, 2014.

Subsequent to our 2014 Annual Meeting of Shareholders, where shareholders elected six new directors, our board changed substantially. Such an event constituted a change in control pursuant to our incentive equity plans and applicable award agreements. As a result, all of the outstanding and unvested equity incentives awarded to participants prior to October 2013 became vested. Accordingly, this resulted in recognizing $11.7 million of additional equity-based compensation expense in the accompanying financial statements, representing the remaining unrecognized compensation expense of the awards. For any equity grants awarded after September 2013, the vesting of all such grants will accelerate and pay out in cash only following a participant's qualifying termination of employment associated with the change in control and if the common shares are not substituted with a replacement award. This potential liability for additional double-trigger payments for share-based compensation in cash will expire on August 6, 2016.

130

*Performance Shares*

The outstanding performance share or unit grants vest over a period of three years and are intended to be paid out in common shares or cash in certain circumstances. Performance is measured on the basis of relative TSR for the period and measured against the constituents of the S&P Metals and Mining ETF Index on the last day of trading of the relevant performance period. The final payouts for the outstanding performance period grants will vary from zero to 200 percent of the original grant depending on whether and to what extent the Company achieves certain objectives and performance goals as established by the Compensation Committee.

Following is a summary of our performance share award agreements currently outstanding :

| Performance Share Plan Year | Performance Shares Granted | Estimated Forfeitures | Expected to Vest | Grant Date | Performance Period |
|---|---|---|---|---|---|
| 2015 | 410,105 | 111,877 | 298,228 | February 9, 2015 | 1/1/2015 - 12/31/2017 |
| 2015 | 464,470 | 96,149 | 368,321 | January 12, 2015 | 1/1/2015 - 12/31/2017 |
| 2014 | 400,000 | 27,774 | 372,226 | November 17, 2014 | 8/7/2014 - 12/31/2017 |
| 2014 | 199,450 | 32,653 | 166,797 | July 29, 2014 | 1/1/2014 - 12/31/2016 |
| 2014 | 106,120 | 16,351 | 89,769 | May 12, 2014 | 1/1/2014 - 12/31/2016 |
| 2014 | 230,265 | 142,017 | 88,248 | February 10, 2014 | 1/1/2014 - 12/31/2016 |

*Performance-Based Restricted Stock Units*

For the outstanding performance-based restricted stock units, the award may be earned and settled based upon certain VWAP performance for the Company's common shares, (Threshold VWAP, Target VWAP, or Maximum VWAP) for any period of ninety (90) consecutive calendar days during a performance period commencing August 7, 2014 and ending December 31, 2017.

*Restricted Share Units*

The outstanding restricted share units are subject to continued employment, are retention based, will vest in equal thirds on each of December 31, 2015, December 31, 2016 and December 31, 2017, and are payable in common shares or cash in certain circumstances at a time determined by the Compensation Committee at its discretion.

*Stock Options*

The stock options that were granted during the first quarter of 2015 vest on December 31, 2017, subject to continued employment through the vesting date, are exercisable at a strike price of $7.70 after the vesting date and expire on January 12, 2025. The stock options that were granted on November 17, 2014 vest in equal thirds on each of December 31, 2015, December 31, 2016 and December 31, 2017 subject to continued employment through each vesting date, and are exercisable cumulatively at a strike price of $13.83 after each vesting date and expire on November 17, 2021 .

*Employee Stock Purchase Plan*

On March 26, 2015, upon recommendation by the Compensation Committee, our Board of Directors approved and adopted, subject to the approval of Cliffs' shareholders at the 2015 Annual Meeting, the Cliffs Natural Resources Inc. 2015 Employee Stock Purchase Plan. This plan was approved by our shareholders at the 2015 Annual Meeting held May 19, 2015. 10 million common shares have been registered for issuance under this plan and zero common shares have been purchased. We sought shareholder approval of this plan for the purpose of qualifying the reserved common shares for special tax treatment under Section 423 of the Internal Revenue Code of 1986, as amended.

**Nonemployee Directors**

*Equity Grants*

During 2015 our nonemployee directors were entitled to receive restricted share awards under the Directors' Plan. For 2015, nonemployee directors were granted a number of restricted shares, with a value equal to $85,000, based on the closing price of our common shares on May 19, 2015, the date of the Company's 2015 annual meeting of shareholders, subject to any deferral election and pursuant to the terms of the Directors' Plan and an award agreement, effective on May 19, 2015.

131

A004959

At our 2014 annual meeting, the shareholders approved the Directors' Plan which became effective December 1, 2014. The Directors' Plan authorizes us to issue up to 300,000 common shares from time to time to nonemployee Directors. Under the Share Ownership Guidelines in effect for 2015 ("Guidelines"), a Director is required by the end of five years from date of election to hold common shares with a market value of at least $250,000. The Directors' Plan offers the nonemployee Director the opportunity to defer all or a portion of the awards granted.

Directors receive dividends, if any, on their restricted share awards and may elect that all cash dividends with respect to restricted shares be deferred and reinvested in additional common shares. Those additional common shares are subject to the same restrictions as the underlying award. Cash dividends not subject to a deferral election will be paid to the director without restriction.

The 2008 Directors' Plan in effect for most of 2014 provided for an Annual Equity Grant ("Equity Grant") to be awarded at our annual meeting each year to all nonemployee Directors elected or re-elected by the shareholders and a pro-rata amount was awarded to new directors upon their appointment. The value of the Equity Grant was payable in restricted shares with a three-year vesting period from the date of grant. The closing market price of our common shares on October 16, 2014 was divided into the number of common shares remaining available for issuance under the 2008 Directors' Plan to determine the number of restricted shares awarded as the Equity Grant. In 2014, nonemployee Directors each received Equity Grants valued at $85,000 which was bifurcated into two tranches since the 2008 Director's Plan did not have a sufficient number of shares available for issuance. The first tranche of the 2014 Equity Grant was granted under the 2008 Directors' Plan on October 16, 2014 and valued at $42,500. The second tranche was granted under the Directors' Plan on December 2, 2014 and valued at $42,500.

For the last three years, Equity Grant shares have been awarded to elected or re-elected nonemployee Directors as follows:

| Year of Grant | Unrestricted Equity Grant Shares | Restricted Equity Grant Shares | Deferred Equity Grant Shares |
|---|---|---|---|
| 2013 | 3,985 | 31,506 | 7,970 |
| 2014 | — | 73,635 | — |
| 2015 | — | 109,408 | 25,248 |

Starting in July, 2015, the Governance and Nominating Committee recommended, and the Board adopted, a Nonemployee Director Retainer Share Election Program pursuant to which nonemployee directors may elect to receive all or any portion of their annual retainer and any other fees earned in cash in Cliffs' common shares. Election is voluntary and irrevocable for the applicable election period and shares issued under this program must be held for six months from the issuance date. The number of shares received each quarter are calculated by dividing the value of the quarterly cash retainer amount by the closing market price of the date of payment.

132

Table of Contents

**Other Information**

The following table summarizes the share-based compensation expense that we recorded for continuing operations in 2015, 2014 and 2013:

| | (In Millions, except per share amounts) | | |
| --- | --- | --- | --- |
| | **2015** | 2014 | 2013 |
| Cost of goods sold and operating expenses | $ 4.0 | $ 5.6 | $ 4.9 |
| Selling, general and administrative expenses | 9.9 | 15.9 | 14.2 |
| Reduction of operating income (loss) from continuing operations before income taxes and equity loss from ventures | 13.9 | 21.5 | 19.1 |
| Income tax benefit [1] | — | (7.5) | (6.7) |
| Reduction of net income attributable to Cliffs shareholders | $ 13.9 | $ 14.0 | $ 12.4 |
| Reduction of earnings per share attributable to Cliffs shareholders: | | | |
| Basic | $ 0.09 | $ 0.09 | $ 0.08 |
| Diluted | $ 0.09 | $ 0.09 | $ 0.07 |

---

[1]    No income tax benefit for the year ended December 31, 2015, due to the full valuation allowance.

### *Determination of Fair Value*

*Performance Shares*

The fair value of each performance share grant is estimated on the date of grant using a Monte Carlo simulation to forecast relative TSR performance. A correlation matrix of historic and projected stock prices was developed for both the Company and our predetermined peer group of mining and metals companies. The fair value assumes that performance goals will be achieved.

The expected term of the grant represents the time from the grant date to the end of the service period for each of the three plan-year agreements. We estimate the volatility of our common shares and that of the peer group of mining and metals companies using daily price intervals for all companies. The risk-free interest rate is the rate at the grant date on zero-coupon government bonds, with a term commensurate with the remaining life of the performance period.

The following assumptions were utilized to estimate the fair value for the 2015 performance share grants:

| Grant Date | Grant Date Market Price | Average Expected Term (Years) | Expected Volatility | Risk-Free Interest Rate | Dividend Yield | Fair Value | Fair Value (Percent of Grant Date Market Price) |
| --- | --- | --- | --- | --- | --- | --- | --- |
| January 12, 2015 | $ 7.70 | 2.97 | 58.3% | 0.91% | —% | $ 11.56 | 150.13% |
| February 9, 2015 | $ 6.57 | 2.89 | 58.3% | 0.87% | —% | $ 9.86 | 150.13% |

*Stock Options*

The fair value of each stock option grant is estimated on the date of grant using a Black-Scholes valuation model. The expected term of the option grant is determined using the simplified method. We estimate the volatility of our common shares using historical stock prices with consistent frequency over the most recent historical period equal to the option's expected term. The risk-free interest rate is the rate at the grant date on zero-coupon government bonds, with a term commensurate with the expected term.

133

A004961

Table of Contents

The following assumptions were utilized to estimate the fair value for the stock options granted in 2015:

| Grant Date | Grant Date Market Price | Average Expected Term (Years) | Expected Volatility | Risk-Free Interest Rate | Dividend Yield | Fair Value |
|---|---|---|---|---|---|---|
| January 12, 2015 | $ 7.70 | 6.47 | 75.3% | 1.60% | —% | $ 5.23 |

*Restricted Share Units*

The fair value of the restricted share units is determined based on the closing price of our common shares on the grant date. The restricted share units granted under the 2015 Equity Plan vest over 27 months. The restricted share units granted under either the 2012 Equity Plan or the 2012 Amended Equity Plan generally vest over a period of three years.

134

Table of Contents

Stock option, restricted share awards and performance share activity under our long-term equity plans and Directors' Plans are as follows:

| | **2015** | 2014 | 2013 |
|---|---|---|---|
| | **Shares** | Shares | Shares |
| Stock options: | | | |
| Outstanding at beginning of year | **250,000** | — | — |
| Granted during the year | **412,710** | 250,000 | — |
| Vested | **—** | — | — |
| Forfeited/canceled | **(55,221)** | — | — |
| Outstanding at end of year | **607,489** | 250,000 | — |
| Restricted awards: | | | |
| Outstanding and restricted at beginning of year | **523,176** | 586,084 | 393,787 |
| Granted during the year | **2,482,415** | 531,030 | 396,844 |
| Vested | **(477,157)** | (423,822) | (118,973) |
| Forfeited/canceled | **(190,364)** | (170,116) | (85,574) |
| Outstanding and restricted at end of year | **2,338,070** | 523,176 | 586,084 |
| Performance shares: | | | |
| Outstanding at beginning of year | **1,072,376** | 1,040,453 | 772,484 |
| Granted during the year[1] | **874,575** | 1,233,685 | 806,271 |
| Issued [2] | **(242,920)** | (796,624) | (289,054) |
| Forfeited/canceled | **(207,542)** | (405,138) | (249,248) |
| Outstanding at end of year | **1,496,489** | 1,072,376 | 1,040,453 |
| Vested or expected to vest as of December 31, 2015 | **3,934,901** | | |
| Directors' retainer and voluntary shares: | | | |
| Outstanding at beginning of year | **—** | 7,329 | 2,880 |
| Granted during the year | **—** | 2,281 | 8,136 |
| Forfeited/canceled | **—** | — | (1,521) |
| Vested | **—** | (9,610) | (2,166) |
| Outstanding at end of year | **—** | — | 7,329 |
| Reserved for future grants or awards at end of year: | | | |
| Employee plans | **11,917,635** | | |
| Directors' plans | **91,299** | | |
| Total | **12,008,934** | | |

[1]   The shares granted in 2013 include 54,051 shares related to the 23% payout associated with the prior-year pool as actual payout exceeded target.

[2]   For the year ended December 31, 2015, the shares vesting due to the change in control were paid out in cash, at target, and valued as of the respective participants' termination dates. For the year ended December 31, 2014, the shares vesting on December 31, 2013 were valued as of February 10, 2014, and the shares vesting due to the change in a majority of our Board of Directors that triggered the acceleration of vesting and payout of outstanding equity grants under our equity plans on August 6, 2014 were paid out in cash, at target, and valued as of that date. For the year ended December 31, 2013, the shares vested on December 31, 2012 were valued as of February 21, 2013.

A004963

Table of Contents

A summary of our outstanding share-based awards as of  December 31, 2015 is shown below:

| | Shares | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Outstanding, beginning of year | 1,845,552 | $ | 16.55 |
| Granted | 3,769,700 | $ | 6.78 |
| Vested | (720,077) | $ | 16.15 |
| Forfeited/expired | (453,127) | $ | 10.50 |
| Outstanding, end of year | 4,442,048 | $ | 8.93 |

A summary of our stock option grants vested or expected to vest as of  December 31, 2015 is shown below:

| | Shares | Weighted-Average Exercise Price | | Aggregate Intrinsic Value | | Weighted-Average Remaining Contractual Term (Years) |
|---|---|---|---|---|---|---|
| Expected to vest | 490,902 | $ | 9.67 | $ | — | 7.90 |
| Exercisable | 83,334 | $ | 13.83 | $ | — | 5.88 |

The total compensation cost related to outstanding awards not yet recognized is  $23.5 million at December 31, 2015. The weighted average remaining period for the awards outstanding at December 31, 2015 is approximately 2.6 years.

## NOTE 9 - INCOME TAXES

*Income (Loss) from Continuing Operations Before Income Taxes and Equity Loss from Ventures*  includes the following components:

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| | **2015** | | 2014 | | 2013 | |
| United States | $ | 314.2 | $ | (447.5) | $ | 840.8 |
| Foreign | | (1.1) | | 427.8 | | 350.1 |
| | $ | 313.1 | $ | (19.7) | $ | 1,190.9 |

The components of the provision (benefit) for income taxes on continuing operations consist of the following:

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| | **2015** | | 2014 | | 2013 | |
| Current provision (benefit): | | | | | | |
| United States federal | $ | 8.2 | $ | (125.2) | $ | 110.4 |
| United States state & local | | 0.3 | | (0.6) | | 4.0 |
| Foreign | | 0.9 | | 11.7 | | 94.8 |
| | | 9.4 | | (114.1) | | 209.2 |
| Deferred provision (benefit): | | | | | | |
| United States federal | | 165.8 | | 20.4 | | 35.0 |
| United States state & local | | — | | (24.9) | | 3.0 |
| Foreign | | (5.9) | | 32.6 | | (9.6) |
| | | 159.9 | | 28.1 | | 28.4 |
| Total provision on income (loss) from continuing operations | $ | 169.3 | $ | (86.0) | $ | 237.6 |

136

A004964

Table of Contents

Reconciliation of our income tax attributable to continuing operations computed at the U.S. federal statutory rate is as follows:

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| | **2015** | | 2014 | | 2013 | |
| Tax at U.S. statutory rate of 35 percent | $ **109.6** | **35.0 %** | $ (6.9) | 35.0 % | $ 416.8 | 35.0 % |
| Increase (decrease) due to: | | | | | | |
| Non-taxable income related to noncontrolling interests | **(3.0)** | **(1.0)** | (9.4) | 47.7 | (5.4) | (0.5) |
| Impact of tax law change | **—** | **—** | 13.0 | (66.0) | — | — |
| Percentage depletion in excess of cost depletion | **(34.9)** | **(11.1)** | (87.9) | 446.2 | (97.6) | (8.2) |
| Impact of foreign operations | **(53.9)** | **(17.2)** | 51.4 | (260.9) | (48.7) | (4.1) |
| Income not subject to tax | **—** | **—** | (27.7) | 140.6 | (84.7) | (7.1) |
| Goodwill impairment | **—** | **—** | 22.7 | (115.2) | — | — |
| State taxes, net | **0.2** | **0.1** | (25.4) | 128.9 | 5.6 | 0.5 |
| Settlement of financial guaranty | **—** | **—** | (347.1) | 1,761.9 | — | — |
| Valuation allowance - current year | **(104.6)** | **(33.4)** | 318.3 | (1,615.7) | 53.2 | 4.5 |
| Valuation allowance on tax benefits - prior | **165.8** | **52.9** | 15.2 | (77.2) | — | — |
| Tax uncertainties | **84.1** | **26.9** | — | — | 12.5 | 1.1 |
| Prior year adjustment in current year | **5.9** | **1.9** | (6.3) | 32.1 | 4.9 | 0.4 |
| Other items — net | **0.1** | **—** | 4.1 | (20.9) | (19.0) | (1.6) |
| Income tax (benefit) expense | $ **169.3** | **54.1 %** | $ (86.0) | 436.5 % | $ 237.6 | 20.0 % |

The components of income taxes for other than continuing operations consisted of the following:

| | (In Millions) | | |
|---|---|---|---|
| | **2015** | 2014 | 2013 |
| Other comprehensive (income) loss: | | | |
| Pension/OPEB liability | $ **—** | $ 37.1 | $ 83.2 |
| Mark-to-market adjustments | **0.3** | 3.6 | 1.8 |
| Other | **5.9** | 0.2 | (9.8) |
| Total | $ **6.2** | $ 40.9 | $ 75.2 |
| | | | |
| Paid in capital — stock based compensation | $ **—** | $ (4.8) | $ 3.5 |
| Discontinued Operations | $ **(6.0)** | $ (1,216.0) | $ (184.5) |

137

A004965

Table of Contents

Significant components of our deferred tax assets and liabilities as of December 31, 2015 and 2014 are as follows:

| | (In Millions) | |
| --- | --- | --- |
| | 2015 | 2014 |
| Deferred tax assets: | | |
| Pensions | $ 106.6 | $ 99.5 |
| Postretirement benefits other than pensions | 36.5 | 50.4 |
| Alternative minimum tax credit carryforwards | 218.7 | 219.1 |
| Investments in ventures | 4.9 | — |
| Asset retirement obligations | 5.3 | 29.4 |
| Operating loss carryforwards | 2,791.6 | 679.0 |
| Product inventories | 57.2 | 25.6 |
| Property, plant and equipment and mineral rights | 189.8 | 337.8 |
| State and local | 59.9 | 41.9 |
| Lease liabilities | 18.3 | 14.1 |
| Other liabilities | 148.9 | 95.6 |
| Total deferred tax assets before valuation allowance | 3,637.7 | 1,592.4 |
| Deferred tax asset valuation allowance | (3,372.5) | (1,152.3) |
| Net deferred tax assets | 265.2 | 440.1 |
| Deferred tax liabilities: | | |
| Property, plant and equipment and mineral rights | (35.5) | — |
| Investment in ventures | (206.6) | (198.0) |
| Intangible assets | (1.5) | (7.3) |
| Product inventories | (2.5) | (3.1) |
| Other assets | (19.1) | (65.9) |
| Total deferred tax liabilities | (265.2) | (274.3) |
| Net deferred tax assets (liabilities) | $ — | $ 165.8 |

Following is a summary of the deferred tax amounts as reported in the Statements of Consolidated Financial Position:

| | (In Millions) | |
| --- | --- | --- |
| | 2015 | 2014 |
| Deferred tax assets: | | |
| United States | $ — | $ 165.8 |
| Foreign | — | 9.7 |
| Total deferred tax assets | — | 175.5 |
| Deferred tax liabilities: | | |
| United States | — | — |
| Foreign | — | 9.7 |
| Total deferred tax liabilities | — | 9.7 |
| Net deferred tax assets (liabilities) | $ — | $ 165.8 |

At December 31, 2015 and 2014, we had $218.7 million and $219.1 million, respectively, of gross deferred tax assets related to U.S. alternative minimum tax credits that can be carried forward indefinitely.

We had gross domestic (including states) and foreign net operating loss carryforwards, inclusive of discontinued operations, of $3.9 billion, and $11.1 billion, respectively, at December 31, 2015. We had gross domestic and foreign net operating loss carryforwards at December 31, 2014 of $1.9 billion and $4.5 billion, respectively. The U.S. Federal

Table of Contents

net operating losses will begin to expire in 2035 and state net operating losses will begin to expire in 2019. The foreign net operating losses will begin to expire in 2022. We had foreign tax credit carryforwards of $5.8 million at December 31, 2015 and $5.8 million at December 31, 2014. The foreign tax credit carryforwards will begin to expire in 2020. Additionally, there is a net operating loss carryforward, inclusive of discontinued operations, of $1.6 billion for Alternative Minimum Tax. No benefit has been recorded in the financials for this attribute as ASC 740, *Income Taxes*, does not allow for the recording of deferred taxes under alternative taxing systems.

We recorded a $2.2 billion net increase in the valuation allowance of certain deferred tax assets where management believes that realization of the related deferred tax assets is not more likely than not. Of this amount, a $165.8 million increase was recorded through continuing operations and relates to domestic deferred tax assets recorded in prior years for which future utilization is currently uncertain. A $111.5 million decrease, also recorded through continuing operations, relates to the reversal of deferred tax assets due to current year operating activities. The remainder of the $2.2 billion increase relates primarily to foreign deferred tax assets that were generated through discontinued operations in which it is more likely than not that the assets will not be realized.

At December 31, 2015 and 2014, we had no cumulative undistributed earnings of foreign subsidiaries included in consolidated retained earnings. Accordingly, no provision has been made for U.S. deferred taxes related to future repatriation of earnings.

A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows:

| | | (In Millions) | | | | |
|---|---|---|---|---|---|---|
| | **2015** | | 2014 | | 2013 | |
| Unrecognized tax benefits balance as of January 1 | $ | **72.6** | $ | 71.8 | $ | 53.5 |
| Increases for tax positions in prior years | | **6.7** | | — | | 13.0 |
| Increases for tax positions in current year | | **78.5** | | 5.9 | | 5.3 |
| Increase due to foreign exchange | | **—** | | (0.2) | | — |
| Settlements | | **(1.1)** | | — | | — |
| Lapses in statutes of limitations | | **(0.5)** | | (3.7) | | — |
| Other | | **—** | | (1.2) | | — |
| Unrecognized tax benefits balance as of December 31 | $ | **156.2** | $ | 72.6 | $ | 71.8 |

At December 31, 2015 and 2014, we had $156.2 million and $72.6 million, respectively, of unrecognized tax benefits recorded. Of this amount, $21.5 million and $23.2 million were recorded in *Other liabilities* and $134.7 million and $49.4 million were recorded as *Other non-current assets* in the Statements of Consolidated Financial Position for both years. If the $156.2 million were recognized, only $21.5 million would impact the effective tax rate. We do not expect that the amount of unrecognized tax benefits will change significantly within the next twelve months. At December 31, 2015 and 2014, we had $2.1 million and $1.6 million, respectively, of accrued interest and penalties related to the unrecognized tax benefits recorded in *Other liabilities* in the Statements of Consolidated Financial Position.

On July 18, 2013, the FASB issued Accounting Standards Update No. 2013-11. *Presentation of an Unrecognized Tax Benefit When a Net Operating Loss Carryforward, a Similar Tax Loss, or a Tax Credit Carryforward Exists* (ASU 2013-11). ASU 2013-11 requires the netting of unrecognized tax benefits against a deferred tax asset for a loss or other carryforward that would apply in settlement of the uncertain tax positions except where the deferred tax asset or other carryforward are not available for use. The adoption of the pronouncement does not have an impact in the presentation of our financial statement.

Tax years that remain subject to examination are years 2010 and forward for the U.S. and 2011 and forward for Australia.

## NOTE 10 - LEASE OBLIGATIONS

We lease certain mining, production and other equipment under operating and capital leases. The leases are for varying lengths, generally at market interest rates and contain purchase and/or renewal options at the end of the terms. Our operating lease expense was $12.0 million, $17.8 million and $23.6 million for the years ended December 31, 2015, 2014 and 2013, respectively. Capital lease assets were $32.5 million and $72.7 million at December 31, 2015 and 2014, respectively. In 2014 we had impairment charges of $64.0 million on our capital lease assets at our Asia Pacific Iron Ore operations. Corresponding accumulated amortization of capital leases included in respective allowances for depreciation were $8.7 million and $14.9 million at December 31, 2015 and 2014, respectively.

A004967

Table of Contents

Future minimum payments under capital leases and non-cancellable operating leases at  December 31, 2015 are as follows:

|  | Capital Leases | Operating Leases |
|---|---|---|
| | (In Millions) | |
| 2016 | $ 24.3 | $ 8.4 |
| 2017 | 22.3 | 7.2 |
| 2018 | 18.0 | 6.5 |
| 2019 | 10.0 | 4.8 |
| 2020 | 9.0 | 4.9 |
| 2021 and thereafter | 9.0 | 5.0 |
| Total minimum lease payments | $ 92.6 | $ 36.8 |
| Amounts representing interest | 18.5 | |
| Present value of net minimum lease payments | $ 74.1 [1] | |

[1]    The total is comprised of $17.9 million and $56.2 million classified as *Other current liabilities* and *Other liabilities*, respectively, in the Statements of Consolidated Financial Position at December 31, 2015.

140

Table of Contents

## NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS

We had environmental and mine closure liabilities of $234.0 million and $170.8 million at December 31, 2015 and 2014, respectively. Payments in 2015 and 2014 were $2.6 million and $3.1 million, respectively. The following is a summary of the obligations as of December 31, 2015 and 2014:

| | (In Millions) | |
|---|---|---|
| | December 31, | |
| | **2015** | 2014 |
| Environmental | $ 3.6 | $ 5.5 |
| Mine closure | | |
|   LTVSMC | 24.1 | 22.9 |
|   Operating mines: | | |
|     U.S. Iron Ore | 189.9 | 120.9 |
|     Asia Pacific Iron Ore | 16.4 | 21.5 |
|   Total mine closure | 230.4 | 165.3 |
|   Total environmental and mine closure obligations | 234.0 | 170.8 |
|   Less current portion | 2.8 | 5.2 |
|   Long-term environmental and mine closure obligations | $ 231.2 | $ 165.6 |

## Environmental

Our mining and exploration activities are subject to various laws and regulations governing the protection of the environment. We conduct our operations to protect the public health and environment and believe our operations are in compliance with applicable laws and regulations in all material respects. Our environmental liabilities of $3.6 million and $5.5 million at December 31, 2015 and 2014, respectively, including obligations for known environmental remediation exposures at various active and closed mining operations and other sites, have been recognized based on the estimated cost of investigation and remediation at each site. If the cost only can be estimated as a range of possible amounts with no specific amount being more likely, the minimum of the range is accrued. Future expenditures are not discounted unless the amount and timing of the cash disbursements readily are known. Potential insurance recoveries have not been reflected. Additional environmental obligations could be incurred, the extent of which cannot be assessed.

### The Rio Tinto Mine Site

The Rio Tinto Mine Site is a historic underground copper mine located near Mountain City, Nevada, where tailings were placed in Mill Creek; a tributary to the Owyhee River. Site investigation and remediation work is being conducted in accordance with a Consent Order dated September 14, 2001 between the Nevada DEP and the RTWG composed of the Company, Atlantic Richfield Company, Teck Cominco American Incorporated and E. I. duPont de Nemours and Company. The Consent Order provides for technical review by the Rio Tinto Trustees. In recognition of the potential for an NRD claim, the parties actively pursued a global settlement that included the EPA and encompass both the remedial action and the NRD issues.

The Nevada DEP published a Record of Decision for the Rio Tinto Mine, which was signed on February 14, 2012 by the Nevada DEP and the EPA. On September 27, 2012, the agencies subsequently issued a proposed Consent Decree, which was lodged with the U.S. District Court for the District of Nevada and subsequently finalized on May 20, 2013. Under the terms of the Consent Decree, the RTWG has agreed to pay over $29.0 million in cleanup costs and natural resource damages to the site and surrounding area. The Company's share of the total settlement cost, which includes remedial action, insurance and other oversight costs was $12.2 million. As of December 31, 2015, we have no remaining required payments related to the Consent Decree compared to as of December 31, 2014, when we had $2.5 million in the Statements of Consolidated Financial Position related to this issue.

### Mine Closure

Our mine closure obligations of $230.4 million and $165.3 million at December 31, 2015 and 2014, respectively, include our five consolidated U.S. operating iron ore mines, our Asia Pacific operating iron ore mine and a closed operation formerly operating as LTVSMC.

Management periodically performs an assessment of the obligation to determine the adequacy of the liability in

141

Table of Contents

relation to the closure activities still required at the LTVSMC site. The LTVSMC closure liability was $24.1 million and $22.9 million at December 31, 2015 and 2014, respectively. MPCA is presently working on an NPDES permit reissuance for this facility that could modify the closure liability, but the scale of that change will not be understood until the permit has been drafted and issued.

The accrued closure obligation for our active mining operations provides for contractual and legal obligations associated with the eventual closure of the mining operations. We performed a detailed assessment of our asset retirement obligations related to our active mining locations most recently in 2014 in accordance with our accounting policy, which requires us to perform an in-depth evaluation of the liability every three years in addition to routine annual assessments.

For the assessments performed, we determined the obligations based on detailed estimates adjusted for factors that a market participant would consider (i.e., inflation, overhead and profit) and then discounted the obligation using the current credit-adjusted risk-free interest rate based on the corresponding life of mine. The estimate also incorporates incremental increases in the closure cost estimates and changes in estimates of mine lives. The closure date for each location was determined based on the exhaustion date of the remaining iron ore reserves. The accretion of the liability and amortization of the related asset is recognized over the estimated mine lives for each location.

The following represents a roll forward of our asset retirement obligation liability related to our active mining locations for the years ended December 31, 2015 and 2014:

| | (In Millions) | |
|---|---|---|
| | December 31, | |
| | **2015** | 2014 |
| Asset retirement obligation at beginning of period | $ 142.4 | $ 177.6 |
| Accretion expense | 6.5 | 5.7 |
| Exchange rate changes | (1.1) | (2.4) |
| Revision in estimated cash flows | 58.5 | (38.5 ) |
| Asset retirement obligation at end of period | $ 206.3 | $ 142.4 |

The revisions in estimated cash flows recorded during the year ended December 31, 2015 relate primarily to revisions in the timing of the estimated cash flows and the technology associated with required storm water management systems expected to be implemented subsequent to the indefinite idling of one of our U.S. Iron Ore mines.

For the year ended December 31, 2014, the revisions in estimated cash flows recorded during the year primarily included a downward revision of estimated asset retirement costs for one of our U.S. Iron Ore mines associated with required storm water management systems. The mine life was extended during 2014, effectively converting certain asset retirement costs to capital costs over the remaining life-of-mine.

## NOTE 12 - GOODWILL AND OTHER INTANGIBLE ASSETS AND LIABILITIES

### Goodwill

Goodwill represents the excess purchase price paid over the fair value of the net assets of acquired companies and is not subject to amortization. We assign goodwill arising from acquired companies to the reporting units that are expected to benefit from the synergies of the acquisition. Our reporting units are either at the operating segment level or a component one level below our operating segments that constitutes a business for which management generally reviews production and financial results of that component. Decisions often are made as to capital expenditures, investments and production plans at the component level as part of the ongoing management of the related operating segment. We have determined that our Asia Pacific Iron Ore operating segment constitutes a separate reporting unit and that Northshore within our U.S. Iron Ore operating segment constitutes a reporting unit. Goodwill is allocated among and evaluated for impairment at the reporting unit level in the fourth quarter of each year or as circumstances occur that potentially indicate that the carrying amount of these assets may exceed their fair value.

During the third quarter of 2014, a goodwill impairment charge of $73.5 million was recorded for our Asia Pacific Iron Ore reporting segment. The impairment charge was a result of downward long-term pricing estimates as determined through management's long-range planning process.

Refer to NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS  for further information.

142

The following table summarizes changes in the carrying amount of goodwill allocated by operating segment for the years ended December 31, 2015 and December 31, 2014:

| | | | | | (In Millions) | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **December 31, 2015** | | | | | December 31, 2014 | | | |
| | **U.S. Iron Ore** | | **Asia Pacific Iron Ore** | | **Total** | | U.S. Iron Ore | Asia Pacific Iron Ore | Total |
| Beginning Balance | $ | 2.0 | $ | — | $ | 2.0 | $ 2.0 | $ 72.5 | $ 74.5 |
| Impairment | | — | | — | | — | — | (73.5) | (73.5) |
| Impact of foreign currency translation | | — | | — | | — | — | 1.0 | 1.0 |
| Ending Balance | $ | 2.0 | $ | — | $ | 2.0 | $ 2.0 | $ — | $ 2.0 |
| Accumulated goodwill impairment loss | $ | — | $ | (73.5) | $ | (73.5) | $ — | $ (73.5) | $ (73.5) |

**Other Intangible Assets and Liabilities**

Following is a summary of intangible assets and liabilities as of December 31, 2015 and December 31, 2014:

| | | | | | (In Millions) | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | **December 31, 2015** | | | | | December 31, 2014 | | |
| | **Classification** | **Gross Carrying Amount** | | **Accumulated Amortization** | | **Net Carrying Amount** | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Definite-lived intangible assets: | | | | | | | | | |
| Permits | *Other non-current assets* | $ 78.4 | $ | (20.2) | $ | 58.2 | $ 79.2 | $ (16.5) | $ 62.7 |
| Total intangible assets | | $ 78.4 | $ | (20.2) | $ | 58.2 | $ 79.2 | $ (16.5) | $ 62.7 |
| Below-market sales contracts | *Other current liabilities* | $ (23.1) | $ | — | $ | (23.1) | $ (23.0) | $ — | $ (23.0) |
| Below-market sales contracts | *Other liabilities* | (205.8) | | 205.8 | | — | (205.9) | 182.8 | (23.1) |
| Total below-market sales contracts | | $ (228.9) | $ | 205.8 | $ | (23.1) | $ (228.9) | $ 182.8 | $ (46.1) |

Amortization expense relating to intangible assets was $4.2 million, $8.4 million and $8.4 million for the years ended December 31, 2015, 2014 and 2013, and is recognized in *Cost of goods sold and operating expenses* in the Statements of Consolidated Operations. During the year ended December 31, 2014, an impairment charge of $13.8 million was recorded related to the permits intangible asset and is recognized in *Impairment of goodwill and other long-lived assets* in the Statements of Consolidated Operations. There were no impairment charges recorded for definite-lived intangible assets in 2015 or 2013. The estimated amortization expense relating to intangible assets for each of the five succeeding years is as follows:

| | (In Millions) |
|---|---|
| | **Amount** |
| Year Ending December 31 | |
| 2016 | 3.8 |
| 2017 | 4.3 |
| 2018 | 4.1 |
| 2019 | 3.5 |
| 2020 | 2.5 |
| Total | $ 18.2 |

The below-market sales contract is classified as a liability and recognized over the term of the underlying contract, which has a remaining life of approximately one year and expires December 31, 2016. For the years ended December 31, 2015, 2014 and 2013, we recognized $23.1 million, $23.1 million and $26.9 million, respectively, in *Product revenues* related to below-market sales contracts. We estimate that $23.1 million will be recognized in *Product revenues* for the succeeding fiscal year.

A004971

Table of Contents

**NOTE 13 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES**

The following table presents the fair value of our derivative instruments and the classification of each in the Statements of Consolidated Financial Position as of December 31, 2015 and December 31, 2014:

| | Derivative Assets | | | | Derivative Liabilities | | | |
| | December 31, 2015 | | December 31, 2014 | | December 31, 2015 | | December 31, 2014 | |
| Derivative Instrument | Balance Sheet Location | Fair Value | Balance Sheet Location | Fair Value | Balance Sheet Location | Fair Value | Balance Sheet Location | Fair Value |
|---|---|---|---|---|---|---|---|---|
| Derivatives designated as hedging instruments under ASC 815: | | | | | | | | |
| Foreign Exchange Contracts | | — | | — | | — | Other current liabilities | 21.6 |
| Total derivatives designated as hedging instruments under ASC 815 | | $ — | | $ — | | $ — | | $ 21.6 |
| Derivatives not designated as hedging instruments under ASC 815: | | | | | | | | |
| Foreign Exchange Contracts | | $ — | | $ — | | $ — | Other current liabilities | $ 9.9 |
| Commodity Contracts | | — | | — | Other current liabilities | 0.6 | | — |
| Customer Supply Agreements | Other current assets | 5.8 | Other current assets | 63.2 | | — | | — |
| Provisional Pricing Arrangements | Other current assets | 2.0 | | — | Other current liabilities | 3.4 | Other current liabilities | 9.5 |
| Total derivatives not designated as hedging instruments under ASC 815: | | $ 7.8 | | $ 63.2 | | $ 4.0 | | $ 19.4 |
| Total derivatives | | $ 7.8 | | $ 63.2 | | $ 4.0 | | $ 41.0 |

**Derivatives Designated as Hedging Instruments**

***Cash Flow Hedges***

*Australian Foreign Exchange Contracts*

We are subject to changes in foreign currency exchange rates as a result of our operations in Australia. With respect to Australia, foreign exchange risk arises from our exposure to fluctuations in foreign currency exchange rates because the functional currency of our Asia Pacific operations is the Australian dollar. Our Asia Pacific operations receive funds in U.S. currency for their iron ore sales.

We were using foreign currency exchange contracts to hedge our foreign currency exposure for a portion of our U.S. dollar sales receipts in our Australian functional currency entities. For our Australian operations, U.S. dollars were converted to Australian dollars at the currency exchange rate in effect during the period the transaction occurred. The primary objective for the use of these instruments was to reduce exposure to changes in currency exchange rates and to protect against undue adverse movement in these exchange rates. These instruments qualify for hedge accounting treatment and are tested for effectiveness at inception and at least once each reporting period. If and when any of our hedge contracts are determined not to be highly effective as hedges, the underlying hedged transaction is no longer likely to occur, or the derivative is terminated, hedge accounting is discontinued. As discussed in NOTE 1 - BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES , we suspended entering into new foreign exchange rate contracts and we have waived compliance with our current derivative financial instruments and hedging activities policy through December 31, 2016.

144

A004972

Table of Contents

As of December 31, 2015, we had no outstanding Australian foreign currency exchange contracts. This compares with outstanding Australian foreign currency exchange contracts with a notional amount of $220.0 million as of December 31, 2014.

Changes in fair value of highly effective hedges are recorded as a component of *Accumulated other comprehensive loss* in the Statements of Consolidated Financial Position. Any ineffectiveness is recognized immediately in income. As of December 31, 2015 and 2014, there was no material ineffectiveness recorded for foreign exchange contracts that were classified as cash flow hedges. However, certain Australian hedge contracts were de-designated during the first quarter of 2015 and no longer qualified for hedge accounting treatment. All of these de-designated hedges were settled and were no longer outstanding by March 31, 2015. The de-designated hedges are discussed within the *Derivatives Not Designated as Hedging Instruments* section of this footnote. Amounts recorded as a component of *Accumulated other comprehensive loss* are reclassified into earnings in the same period the forecasted transactions affect earnings. As of December 31, 2015, no amounts remain in *Accumulated other comprehensive loss* related to the designated Australian hedge contracts as the last forecasted transaction occured in October 2015.

*Interest Rate Risk Management*

Interest rate risk is managed using a portfolio of variable-rate and fixed-rate debt composed of short-term and long-term instruments, such as U.S. treasury lock agreements and variable-to-fixed interest rate swaps. From time to time, these instruments, which are derivative instruments, are entered into to facilitate the maintenance of the desired ratio of variable-rate to fixed-rate debt.

In the second quarter of 2012, we entered into U.S. treasury lock agreements with a notional value of $200.0 million to hedge the exposure to the possible rise in the interest rate prior to the issuance of the five-year senior notes due 2018 discussed in NOTE 5 - DEBT AND CREDIT FACILITIES . These derivative instruments were designated and qualified as cash flow hedges. The U.S. treasury locks were settled in the fourth quarter of 2012 upon the issuance of $500.0 million principal amount of the senior notes due 2018 for a cumulative after-tax loss of $1.3 million, which was recorded in *Accumulated other comprehensive loss* and is being amortized to *Other non-operating income (expense)* over the life of the senior notes due 2018. Approximately $0.1 million net of tax was recognized in earnings in both 2014 and 2015 and approximately $0.1 million net of tax is expected to be recognized in earnings in 2016.

The following summarizes the effect of our derivatives designated as cash flow hedging instruments, net of tax in *Accumulated other comprehensive loss* in the Statements of Consolidated Operations for the years ended December 31, 2015, 2014 and 2013:

| | Amount of Gain (Loss) Recognized in OCI on Derivative (Effective Portion) | | | Location of Gain (Loss) Reclassified from Accumulated OCI into Earnings (Effective Portion) | Amount of Gain (Loss) Reclassified from Accumulated OCI into Earnings (Effective Portion) | | |
|---|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | | Year Ended December 31, | | |
| Derivatives in Cash Flow Hedging Relationships | 2015 | 2014 | 2013 | | 2015 | 2014 | 2013 |
| Australian Dollar Foreign Exchange Contracts *(hedge designation)* | $ (2.0) | $ (13.9) | $ (34.7) | *Product revenues* | $ (7.4) | $ (13.2) | $ (11.9) |
| Australian Dollar Foreign Exchange Contracts *(prior to de-designation)* | (4.5) | — | — | *Product revenues* | (11.3) | — | — |
| Canadian Dollar Foreign Exchange Contracts *(hedge designation)* | — | — | (12.9) | *Cost of goods sold and operating expenses* | — | — | (8.2) |
| Canadian Dollar Foreign Exchange Contracts *(prior to de-designation)* | — | (14.3) | (4.1) | *Cost of goods sold and operating expenses* | — | (17.7) | (1.9) |
| Treasury Locks | — | — | — | *Other non-operating income (expense)* | (0.1) | (0.1) | (0.1) |
| Total | $ (6.5) | $ (28.2) | $ (51.7) | | $ (18.8) | $ (31.0) | $ (22.1) |

145

A004973

Table of Contents

**Derivatives Not Designated as Hedging Instruments**

***Foreign Exchange Contracts***

During the first quarter of 2015, in connection with our refinancing initiatives, we discontinued hedge accounting and early-settled certain of our Australian foreign currency exchange contracts associated with Asia Pacific Iron Ore operations. Subsequent to de-designation, no further foreign currency exchange rate contracts were entered into for the Asia Pacific Iron Ore operations. The amounts that were previously recorded as a component of *Accumulated other comprehensive loss* prior to de-designation and remaining in *Accumulated other comprehensive loss* as of de-designation were reclassified to earnings and a corresponding realized loss was recognized when the forecasted cash flow occurred. For the year ended December 31, 2015, we reclassified losses of $12.6 million from *Accumulated other comprehensive loss* and recorded the amounts as *Product revenues* in the Statements of Consolidated Operations upon the occurrence of the forecasted cash flows associated with each de-designated and early-settled contract. For the year ended December 31, 2015, prior to the de-designation of the Asia Pacific Iron Ore hedges at the end of the first quarter of 2015, we reclassified losses of $6.3 million from *Accumulated other comprehensive loss* related to contracts that matured during the year, and recorded the amounts as *Product revenues* in the Statements of Consolidated Operations. As of December 31, 2015, no gains or losses remain in *Accumulated other comprehensive loss* related to the effective cash flow hedge contracts prior to de-designation and early-settlement.

During the fourth quarter of 2014, we discontinued hedge accounting for Canadian foreign currency exchange contracts for all outstanding contracts associated with Bloom Lake operations as projected future cash flows were no longer considered probable or reasonably possible, but we continued to hold these instruments as economic hedges to manage currency risk. Our parent company held the Canadian foreign currency exchange contracts and the contracts were unaffected by Bloom Lake General Partner Limited and certain of its affiliates filing under the CCAA on January 27, 2015. Subsequent to de-designation, no further foreign currency exchange contracts were entered into for the Bloom Lake operations. As of December 31, 2015 no de-designated foreign exchange rate contracts remained outstanding. All outstanding Canadian de-designated foreign exchange rate contracts settled by the end of September 2015. As of December 31, 2014,the de-designated outstanding foreign exchange rate contracts had a notional amount of $183.0 million in the form of forward contracts.

The amounts that were previously recorded as a component of *Accumulated other comprehensive loss* prior to de-designation and remaining in *Accumulated other comprehensive loss* as of December 31, 2014 were reclassified to earnings upon the de-designation of the hedges as the hedges would not be effective prospectively due to the projected future cash flows associated with the hedges no longer being considered probable or reasonably possible. We reclassified losses of $7.3 million from *Accumulated other comprehensive loss* related to contracts that had not matured during the year, and recorded the amounts as *Cost of goods sold and operating expenses* on the Statements of Consolidated Operations . A corresponding realized gain or loss was recognized in each period until settlement of the related economic hedge during 2015. For the year ended December 31, 2015, the change in fair value of these de-designated foreign currency exchange contracts resulted in net losses of $3.6 million.

We previously discontinued hedge accounting for Canadian foreign currency exchange contracts for all outstanding contracts associated with the Wabush operation and the Ferroalloys operating segment as projected future cash flows were no longer considered probable, but we continued to hold these instruments as economic hedges to manage currency risk. Subsequent to de-designation, no further foreign currency exchange contracts were entered into for the Wabush operation or the Ferroalloys operating segment. As of December 31, 2015 and 2014, there were no outstanding de-designated foreign currency exchange rate contracts as all remaining de-designated foreign exchange contracts matured during the second quarter of 2014.

Prior to the maturation of the contracts and as a result of discontinued hedge accounting, the instruments were prospectively adjusted to fair value each reporting period through *Cost of goods sold and operating expenses* in the Statements of Consolidated Operations . For the years ended December 31, 2014 and 2013, the change in fair value of our de-designated foreign currency exchange contracts resulted in net losses of $3.3 million and $0.6 million, respectively. The amounts that were previously recorded as a component of *Accumulated other comprehensive loss* prior to de-designation were reclassified to earnings and a corresponding realized gain or loss was recognized when the forecasted cash flow occurred. For the years ended December 31, 2014 and 2013, we reclassified losses of $0.5 million and $1.9 million, respectively, from *Accumulated other comprehensive loss* related to contracts that matured during the year, and recorded the amounts as *Cost of goods sold and operating expenses* in the Statements of Consolidated Operations . All the remaining contracts matured during the second quarter of 2014 and as of the period ended June 30, 2014, no gains or losses remained in *Accumulated other comprehensive loss* related to the effective cash flow hedge contracts prior to de-designation.

146

Table of Contents

***Fair Value Hedges***

*Interest Rate Hedges*

Our fixed-to-variable interest rate swap derivative instruments, with a notional amount of $250.0 million, were de-designated and settled during August 2014. Prior to settlement, the derivatives were designated and qualified as fair value hedges. The objective of the hedges was to offset changes in the fair value of our debt instruments associated with fluctuations in the benchmark LIBOR interest rate as part of our risk management strategy.

Prior to de-designation and settlement, when the interest rate swap derivative instruments were designated and qualified as fair-value hedges, the gain or loss on the hedge instrument as well as the offsetting loss or gain on the hedged item attributable to the hedged risk were recognized in net income. We included the gain or loss on the derivative instrument and the offsetting loss or gain on the hedged item in *Other non-operating income (expense)*. The net gains recognized in *Other non-operating income (expense)* for the year ended December 31, 2014 were $0.3 million.

For the year ended December 31, 2013, the fixed-to-variable interest rate swap derivative instruments were designated and qualified as fair-value hedges. The gain or loss on the hedge instrument as well as the offsetting loss or gain on the hedged item attributable to the hedged risk was recognized in net income. We included the gain or loss on the derivative instrument and the offsetting loss or gain on the hedged item in *Other non-operating income (expense)*. The net gain recognized in *Other non-operating income (expense)* for year ended December 31, 2013 was $0.1 million.

***Customer Supply Agreements***

Most of our U.S. Iron Ore long-term supply agreements are comprised of a base price with annual price adjustment factors. The base price is the primary component of the purchase price for each contract. The indexed price adjustment factors are integral to the iron ore supply contracts and vary based on the agreement, but typically include adjustments based upon changes in the Platts 62 percent Fe fines spot price and/or international pellet prices and changes in specified Producer Price Indices, including those for industrial commodities, energy and steel. The pricing adjustments generally operate in the same manner, with each factor typically comprising a portion of the price adjustment, although the weighting of each factor varies based upon the specific terms of each agreement. In most cases, these adjustment factors have not been finalized at the time our product is sold. In these cases, we historically have estimated the adjustment factors at each reporting period based upon the best third-party information available. The estimates are then adjusted to actual when the information has been finalized. The price adjustment factors have been evaluated to determine if they contain embedded derivatives. The price adjustment factors share the same economic characteristics and risks as the host contract and are integral to the host contract as inflation adjustments; accordingly, they have not been separately valued as derivative instruments. Certain of our term supply agreements contain price collars, which typically limit the percentage increase or decrease in prices for our products during any given year.

A certain supply agreement with one U.S. Iron Ore customer provides for supplemental revenue or refunds to the customer based on the customer's average annual steel pricing at the time the product is consumed in the customer's blast furnace. The supplemental pricing is characterized as a freestanding derivative and is required to be accounted for separately once the product is shipped. The derivative instrument, which is finalized based on a future price, is adjusted to fair value as a revenue adjustment each reporting period until the pellets are consumed and the amounts are settled.

We recognized $27.1 million, $187.8 million and $149.2 million as *Product revenues* in the Statements of Consolidated Operations for the years ended December 31, 2015, 2014 and 2013, respectively, related to the supplemental payments. *Other current assets*, representing the fair value of the pricing factors, were $5.8 million and $63.2 million in the December 31, 2015 and December 31, 2014 Statements of Consolidated Financial Position, respectively.

***Provisional Pricing Arrangements***

Certain of our U.S. Iron Ore and Asia Pacific Iron Ore customer supply agreements specify provisional price calculations, where the pricing mechanisms generally are based on market pricing, with the final revenue rate to be based on market inputs at a specified period in time in the future, per the terms of the supply agreements. U.S. Iron Ore sales revenue is primarily recognized when cash is received. For U.S. Iron Ore sales, the difference between the provisionally agreed-upon price and the estimated final revenue rate is characterized as a freestanding derivative and must be accounted for separately once the provisional revenue has been recognized. Asia Pacific Iron Ore sales revenue is recorded initially at the provisionally agreed-upon price with the pricing provision embedded in the receivable. The pricing provision is an embedded derivative that must be bifurcated and accounted for separately from the receivable. Subsequently, the derivative instruments for both U.S. Iron Ore and Asia Pacific Iron Ore are adjusted to fair value through

147

Table of Contents

*Product revenues* each reporting period based upon current market data and forward-looking estimates provided by management until the final revenue rate is determined. At December 31, 2015 we recorded $2.0 million as *Other current assets* in the Statements of Consolidated Financial Position related to our estimate of the final revenue rate with any of our customers. At December 31, 2014, we recorded no *Other current assets* in the Statements of Consolidated Financial Position related to our estimate of the final revenue rate with any of our customers. At December 31, 2015 and December 31, 2014, we recorded $3.4 million and $9.5 million, respectively, as *Other current liabilities* in the Statements of Consolidated Financial Position related to our estimate of final revenue rate with our U.S. Iron Ore and Asia Pacific Iron Ore customers. These amounts represent the difference between the provisional price agreed upon with our customers based on the supply agreement terms and our estimate of the final revenue rate based on the price calculations established in the supply agreements. As a result, we recognized a net $1.4 million decrease in *Product revenues* in the Statements of Consolidated Operations for the year ended December 31, 2015 related to these arrangements. This compares with a net $9.5 million decrease and a net $7.5 million decrease in *Product revenues* for the comparable periods in 2014 and 2013.

The following summarizes the effect of our derivatives that are not designated as hedging instruments in the Statements of Consolidated Operations for the years ended December 31, 2015, 2014 and 2013:

| | | Amount of Gain/(Loss) Recognized in Income on Derivative | | |
|---|---|---|---|---|
| | | (In Millions) | | |
| **Derivatives Not Designated as Hedging Instruments** | **Location of Gain (Loss) Recognized in Income on Derivative** | **Year Ended December 31,** | | |
| | | **2015** | 2014 | 2013 |
| Foreign Exchange Contracts | *Other non-operating income (expense)* [1] | $ (3.6) | $ (16.9) | $ (0.6) |
| Foreign Exchange Contracts | *Product revenues* | (12.6) | — | — |
| Commodity Contracts | *Cost of goods sold and operating expenses* | (4.0) | — | — |
| Customer Supply Agreements | *Product revenues* | 27.1 | 187.8 | 149.2 |
| Provisional Pricing Arrangements | *Product revenues* | (1.4) | (9.5) | (7.5) |
| Total | | $ 5.5 | $ 161.4 | $ 141.1 |

---

[1]   At December 31, 2014 and 2013, the location of the Gain (Loss) Recognized in Income on Derivative for Foreign Exchange Contracts was *Cost of goods sold and operating expenses.*

Refer to NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS for additional information.

**NOTE 14 - DISCONTINUED OPERATIONS**

The information below sets forth selected financial information related to operating results of our businesses classified as discontinued operations. While the reclassification of revenues and expenses related to discontinued operations from prior periods have no impact upon previously reported net income, the Statements of Consolidated Operations present the revenues and expenses that were reclassified from the specified line items to discontinued operations and the Statements of Consolidated Financial Position present the assets and liabilities that were reclassified from the specified line items to assets and liabilities of discontinued operations.

The chart below provides an asset group breakout for each financial statement line impacted by discontinued operations.

(In Millions)

| | | North American Coal | Canadian Operations — Eastern Canadian Iron Ore | Other | Total Canadian Operations | Total of Discontinued Operations |
|---|---|---|---|---|---|---|
| **Statements of Consolidated Operations** | | | | | | |
| Loss from Discontinued Operations, net of tax | **YTD December 31, 2015** | $ (152.4) | $ (638.7) | $ (101.0) | $ (739.7) | $ (892.1) |
| Loss from Discontinued Operations, net of tax | YTD December 31, 2014 | $ (1,134.5) | $ (6,952.9) | $ (280.6) | $ (7,233.5) | $ (8,368.0) |
| Loss from Discontinued Operations, net of tax [(1)] | YTD December 31, 2013 | $ (9.3) | $ (370.4) | $ (139.4) | $ (509.8) | $ (519.1) |
| **Statements of Consolidated Financial Position** | | | | | | |
| Short-term assets of discontinued operations | **As of December 31, 2015** | $ 14.9 | $ — | $ — | $ — | $ 14.9 |
| Long-term assets of discontinued operations | **As of December 31, 2015** | $ — | $ — | $ — | $ — | $ — |
| Short-term liabilities of discontinued operations | **As of December 31, 2015** | $ 6.9 | $ — | $ — | $ — | $ 6.9 |
| Long-term liabilities of discontinued operations | **As of December 31, 2015** | $ — | $ — | $ — | $ — | $ — |
| Short-term assets of discontinued operations | As of December 31, 2014 | $ 140.1 | $ 183.5 | $ 3.3 | $ 186.8 | $ 326.9 |
| Long-term assets of discontinued operations | As of December 31, 2014 | $ 113.3 | $ 256.0 | $ 13.7 | $ 269.7 | $ 383.0 |
| Short-term liabilities of discontinued operations | As of December 31, 2014 | $ 80.1 | $ 316.3 | $ 3.0 | $ 319.3 | $ 399.4 |
| Long-term liabilities of discontinued operations | As of December 31, 2014 | $ 117.3 | $ 304.6 | $ 5.6 | $ 310.2 | $ 427.5 |
| **Non-Cash Operating and Investing Activities** | | | | | | |
| Depreciation, depletion and amortization: | **YTD December 31, 2015** | $ 3.2 | $ — | $ — | $ — | $ 3.2 |
| Purchase of property, plant and equipment | **YTD December 31, 2015** | $ 15.9 | $ — | $ — | $ — | $ 15.9 |
| Impairment of goodwill and other long-lived assets | **YTD December 31, 2015** | $ 73.4 | $ — | $ — | $ — | $ 73.4 |
| Depreciation, depletion and amortization: | YTD December 31, 2014 | $ 106.9 | $ 135.6 | $ 0.5 | $ 136.1 | $ 243.0 |
| Purchase of property, plant and equipment | YTD December 31, 2014 | $ 29.9 | $ 190.3 | $ — | $ 190.3 | $ 220.2 |
| Impairment of goodwill and other long-lived assets | YTD December 31, 2014 | $ 857.5 | $ 7,269.2 | $ 267.6 | $ 7,536.8 | $ 8,394.3 |
| Depreciation, depletion and amortization: | YTD December 31, 2013 | $ 128.9 | $ 178.6 | $ 1.0 | $ 179.6 | $ 308.5 |
| Purchase of property, plant and equipment | YTD December 31, 2013 | $ 64.1 | $ 718.3 | $ 1.0 | $ 719.3 | $ 783.4 |
| Impairment of goodwill and other long-lived assets | YTD December 31, 2013 | $ — | $ 154.6 | $ 81.8 | $ 236.4 | $ 236.4 |

---

[(1)]   Loss from Discontinued Operations, net of tax during the year end December 31, 2013 also includes an additional income tax benefit of $2.0 million resulting from the actual tax gain from the Sale of Sonoma as included in the 2012 tax return, which was filed during the year ended December 31, 2013. During the fourth quarter of 2012, we sold our 45 percent economic interest in Sonoma. The Sonoma operations previously were included in *Other* within our reportable segments.

Table of Contents

### North American Coal Operations

#### Background

As we continue to execute our strategy which focuses on strengthening our U.S. Iron Ore operations, management determined as of March 31, 2015 that our North American Coal operating segment met the criteria to be classified as held for sale under *ASC 205, Presentation of Financial Statements*. The North American Coal segment continued to meet the criteria throughout 2015 until we sold our held for sale North American Coal operations during the fourth quarter of 2015. As such, all current and historical North American Coal operating segment results are included in our financial statements and classified within discontinued operations.

In the first quarter of 2015, as part of the held for sale classification assigned to North American Coal, an impairment of $73.4 million was recorded. The impairment charge was to reduce the assets to their estimated fair value which was determined based on potential sales scenarios. No further impairment was recorded in 2015.

Consistent with our strategy to extract maximum value from our current assets, we sold all the remaining North American Coal operations during the fourth quarter of 2015. On December 22, 2015, we closed the sale of our remaining North American Coal business which included Pinnacle mine in West Virginia and Oak Grove mine in Alabama. Pinnacle mine and Oak Grove mine were sold to Seneca and the deal structure was a sale of equity interests of our remaining coal business. Additionally, Seneca may pay Cliffs an earn-out of up to $50 million contingent upon the terms of a revenue sharing agreement which extends through the year 2020. However, we have not recorded a gain contingency in relation to this earn-out. We recorded the results of this sale in our fourth quarter earnings within *Loss from Discontinued Operations, net of tax* as the transaction closed on December 22, 2015.

On December 31, 2014, we completed the sale of our CLCC assets in West Virginia to Coronado Coal II, LLC, an affiliate of Coronado Coal LLC, for $174.0 million in cash and the assumption of certain liabilities, of which $155.0 million was collected as of December 31, 2014. We recorded the results of this sale in our fourth quarter earnings within *Loss from Discontinued Operations, net of tax* as the transaction closed on December 31, 2014.

#### Loss on Discontinued Operations

Our planned sale of the Oak Grove and Pinnacle mine assets represented a strategic shift in our business. For that reason, our previously reported North American Coal operating segment results for all periods, prior to the March 31, 2015 held for sale determination, are classified as discontinued operations. On December 22, 2015, we completed the sale of the Oak Grove and Pinnacle mines, which marked our exit from the coal business. Historic results also include our CLCC assets, which were sold during the fourth quarter of 2014.

| | (In Millions) | | |
|---|---|---|---|
| | Twelve Months Ended December 31, | | |
| **Loss from Discontinued Operations** | **2015** | 2014 | 2013 |
| Revenues from product sales and services | $ **392.9** | $ 687.1 | $ 821.9 |
| Cost of goods sold and operating expenses | **(449.2)** | (822.9) | (836.4) |
| Sales margin | **(56.3)** | (135.8) | (14.5) |
| Other operating (expense)/income | **(30.4)** | (20.8) | 13.8 |
| Gain (loss) on sale of coal mines | **9.3** | (419.6) | — |
| Other expense | **(1.8)** | (3.0) | (2.4) |
| Loss from discontinued operations before income taxes | **(79.2)** | (579.2) | (3.1) |
| Impairment of long-lived assets | **(73.4)** | (857.5) | — |
| Income tax benefit (expense) | **0.2** | 302.2 | (6.2) |
| Loss from discontinued operations, net of tax | $ **(152.4)** | $ (1,134.5) | $ (9.3) |

*Items Measured at Fair Value on a Non-Recurring Basis*

The following table presents information about the impairment charge on non-financial assets that was measured on a fair value basis at March 31, 2015 for the North American Coal operations. There were no financial and non-financial assets and liabilities that were measured on a non-recurring fair value basis at December 31, 2015 for the North American Coal operations. The table also indicates the fair value hierarchy of the valuation techniques used to determine such fair value.

| | (In Millions) | | | | |
|---|---|---|---|---|---|
| | March 31, 2015 | | | | |
| Description | Quoted Prices in Active Markets for Identical Assets/ Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total | Total Losses |
| **Assets:** | | | | | |
| Other long-lived assets - Property, plant and equipment and Mineral rights: North American Coal operating unit | $        — | $        — | $        20.4 | $   20.4 | $   73.4 |
| | $        — | $        — | $        20.4 | $   20.4 | $   73.4 |

In the first quarter of 2015, as part of the held for sale classification assigned to North American Coal, an impairment charge of $73.4 million was recorded. The impairment charge was to reduce the assets to their estimated fair value which was determined based on potential sales scenarios. We determined the fair value and recoverability of our North American Coal operating segment by comparing the estimated fair value of the underlying assets and liabilities to the estimated sales price of the operating segment held for sale. No further impairment was recorded in 2015.

*Recorded Assets and Liabilities*

| | (In Millions) | |
|---|---|---|
| *Assets and Liabilities of Discontinued Operations* [1] | December 31, 2015 | December 31, 2014 |
| Accounts receivable, net | $        — | $   44.8 |
| Inventories | — | 50.3 |
| Supplies and other inventories | — | 28.2 |
| Other current assets | 14.9 | 16.8 |
| Property, plant and equipment, net | — | 94.7 |
| Other non-current assets | — | 18.6 |
|     Total assets of discontinued operations | $   14.9 | $   253.4 |
| | | |
| Accounts payable | $        — | $   22.4 |
| Accrued liabilities | — | 27.9 |
| Other current liabilities | 6.9 | 29.8 |
| Pension and postemployment benefit liabilities | — | 47.1 |
| Environmental and mine closure obligations | — | 33.9 |
| Other liabilities | — | 36.3 |
|     Total liabilities of discontinued operations | $   6.9 | $   197.4 |

_____

[1] At December 31, 2015, we also recorded $7.8 million of contingent liabilities associated with our exit from the coal business. These contingent liabilities are recorded on our parent company.

151

A004979

Table of Contents

As part of the CLCC asset sale during the fourth quarter of 2014, there was an amount placed in escrow to cover decreases in working capital, indemnity obligations and regulatory liabilities. The amount held in escrow was $14.9 million and $17.5 million at December 31, 2015, and 2014, respectively and recorded within *Short-term assets of discontinued operations* and *Long-term assets of discontinued operations*, respectively, on the Statements of Consolidated Financial Position.

### Income Taxes

We have recognized a tax benefit of $0.2 million and $302.2 million for the years ended December 31, 2015 and 2014, respectively, in *Loss from Discontinued Operations, net of tax*, related to a loss on our North American Coal investments. The benefit for the year ended December 31, 2014 is primarily the result of the impairment of long-lived assets in the third quarter of 2014. We recognized a tax expense of $6.2 million for the year ended December 31, 2013 in *Loss from Discontinued Operations, net of tax*, related to the impact of the North American Coal losses on the AMT credit and associated valuation allowance.

## Canadian Operations

### Background

On November 30, 2013, we suspended indefinitely our Chromite Project in Northern Ontario. The Chromite Project remained suspended throughout 2014 and until final sale in 2015. Our Wabush Scully iron ore mine in Newfoundland and Labrador was idled by the end of the first quarter of 2014 and subsequently began to commence permanent closure in the fourth quarter of 2014. During 2014, we also limited exploration spending on the Labrador Trough South property in Québec. In November 2014, we announced that we were pursuing exit options for our Eastern Canadian Iron Ore operations. In December 2014, iron ore production at the Bloom Lake mine was suspended and the Bloom Lake mine was placed in "care-and-maintenance" mode. Together, the suspension of exploration efforts, shutdown of the Wabush Scully mine and the cessation of operations at our Bloom Lake mine represent a complete curtailment of our Canadian operations.

On January 27, 2015, we announced the Bloom Filing under the CCAA with the Québec Court in Montreal. At that time, the Bloom Lake Group was no longer generating revenues and was not able to meet its obligations as they came due. The Bloom Filing addressed the Bloom Lake Group's immediate liquidity issues and permits the Bloom Lake Group to preserve and protect its assets for the benefit of all stakeholders while restructuring and sale options are explored. As part of the CCAA process, the Court approved the appointment of a Monitor and certain other financial advisors.

Additionally, on May 20, 2015, we announced the Wabush Filing in the Court under the CCAA. As a result of this action, the CCAA protections granted to the Bloom Lake Group were extended to include the Wabush Group to facilitate the reorganization of each of their businesses and operations. The Wabush Group was no longer generating revenues and was not able to meet its obligations as they came due. The inclusion of the Wabush Group in the existing Bloom Filing facilitates a more comprehensive restructuring and sale process of both the Bloom Lake Group and the Wabush Group which collectively include mine, port and rail assets and leads to a more effective and streamlined exit from Eastern Canada. The Wabush Filing also mitigates various legacy related long-term liabilities associated with the Wabush Group. As part of the Wabush Filing, the Court approved the appointment of a Monitor and certain other financial advisors. The Monitor of the Wabush Group is also the Monitor of the Bloom Lake Group.

As a result of the Bloom Filing on January 27, 2015, we no longer have a controlling interest in the Bloom Lake Group. For that reason, we deconsolidated the Bloom Lake Group and certain other wholly-owned subsidiaries effective January 27, 2015, which resulted in a pretax impairment loss on deconsolidation and other charges, totaling $818.7 million that was recorded in the first quarter of 2015. The pretax loss on deconsolidation includes the derecognition of the carrying amounts of the Bloom Lake Group and certain other wholly-owned subsidiaries assets, liabilities and accumulated other comprehensive loss and the recording of our remaining interests at fair value.

As a result of the Wabush Filing, we deconsolidated certain Wabush Group wholly-owned subsidiaries effective May 20, 2015. The certain wholly-owned subsidiaries that were deconsolidated effective May 20, 2015 are Wabush Group entities that were not deconsolidated as part of the deconsolidation effective January 27, 2015 as discussed previously in this section. This deconsolidation, effective May 20, 2015, resulted in a pretax gain on deconsolidation and other charges, totaling $134.7 million. The pretax gain on deconsolidation includes the derecognition of the carrying amounts of these certain deconsolidated Wabush Group wholly-owned subsidiaries' assets, liabilities and accumulated other comprehensive loss and the adjustment of our remaining interests in the Canadian Entities to fair value.

152

Subsequent to each of the deconsolidations discussed above, we utilized the cost method to account for our investment in the Canadian Entities, which has been reflected as zero in our Statements of Consolidated Financial Position as of December 31, 2015 based on the estimated fair value of the Canadian Entities' net assets. Loans to and accounts receivable from the Canadian Entities are recorded at an estimated fair value of $72.9 million classified as *Loans to and accounts receivables from the Canadian Entities* in the Statements of Consolidated Financial Position as of December 31, 2015.

*Loss on Discontinued Operations*

Our Canadian exit represents a strategic shift in our business. For this reason, our previously reported Eastern Canadian Iron Ore and Ferroalloys operating segment results for all periods prior to the respective deconsolidations, as well as costs to exit, are classified as discontinued operations.

| | (In Millions) | | |
|---|---|---|---|
| | **Twelve Months Ended December 31,** | | |
| **Loss from Discontinued Operations** | **2015** | 2014 | 2013 |
| Revenues from product sales and services | $ 11.3 | $ 563.5 | $ 978.7 |
| Cost of goods sold and operating expenses | (11.1) | (808.4) | (1,082.0) |
| Eliminations with continuing operations | — | (53.6) | (217.3) |
| Sales margin | 0.2 | (298.5) | (320.6) |
| Other operating (expense)/income | (33.8) | (306.3) | (151.5) |
| Other expense | (1.0) | (5.6) | 10.0 |
| Loss from discontinued operations before income taxes | (34.6) | (610.4) | (462.1) |
| Loss from deconsolidation | (710.9) | — | — |
| Impairment of long-lived assets | — | (7,536.8) | (236.4) |
| Income tax benefit | 5.8 | 913.7 | 188.7 |
| Loss from discontinued operations, net of tax | $ (739.7) | $ (7,233.5) | $ (509.8) |

Canadian Entities loss from deconsolidation totaled $710.9 million for the twelve months ended December 31, 2015 and included the following:

| | (In Millions) | | |
|---|---|---|---|
| | **Twelve Months Ended December 31,** | | |
| | **2015** | | |
| Investment impairment on deconsolidation [1] | $ | | (507.8) |
| Guarantees and contingent liabilities | | | (203.1) |
| Total loss from deconsolidation | $ | | (710.9) |

[1] Includes the adjustment to fair value of our remaining interest in the Canadian Entities.

As a result of the deconsolidation, we recorded accrued expenses for the estimated probable loss related to claims that may be asserted against us, primarily under guarantees of certain debt arrangements and leases for a loss on deconsolidation of $203.1 million, for the twelve months ended December 31, 2015.

*Investments in the Canadian Entities*

Cliffs continues to indirectly own a majority of the interest in the Canadian Entities but has deconsolidated those entities because Cliffs no longer has a controlling interest as a result of the Bloom Filing and the Wabush Filing. At the respective dates of deconsolidation, January 27, 2015 or May 20, 2015 and subsequently at each reporting period, we adjusted our investment in the Canadian Entities to fair value with a corresponding charge to *Loss from Discontinued Operations, net of tax.* As the estimated amount of the Canadian Entities' liabilities exceeded the estimated fair value of the assets available for distribution to its creditors, the fair value of Cliffs' equity investment is approximately zero.

153

A004981

*Amounts Receivable from the Canadian Entities*

Prior to the deconsolidations, various Cliffs wholly-owned entities made loans to the Canadian Entities for the purpose of funding its operations and had accounts receivable generated in the ordinary course of business. The loans, corresponding interest and the accounts receivable were considered intercompany transactions and eliminated in our consolidated financial statements. Additionally, we procured funding subsequent to the deconsolidation through a debtor-in-possession credit facility (the "DIP financing"). Since the deconsolidations, the loans, associated interest and accounts receivable are considered related party transactions and have been recognized in our consolidated financial statements at their estimated fair value of $72.9 million classified as *Other current assets* in the Statements of Consolidated Financial Position at December 31, 2015.

*Guarantees and Contingent Liabilities*

Certain liabilities, consisting primarily of equipment loans and environmental obligations of the Canadian Entities, were secured through corporate guarantees and standby letters of credit. As of December 31, 2015, we have liabilities of $96.5 million and $35.9 million in our consolidated results, classified as *Guarantees* and *Other liabilities,* respectively, in the Statements of Consolidated Financial Position .

*Contingencies*

The recorded expenses include an accrual for the estimated probable loss related to claims that may be asserted against us, primarily under guarantees of certain debt arrangements and leases. The beneficiaries of those guarantees may seek damages or other related relief as a result of our exit from Canada. Our probable loss estimate is based on the expectation that claims will be asserted against us and negotiated settlements will be reached, and not on any determination that it is probable we would be found liable were these claims to be litigated. Our estimates involve significant judgment. Our estimates are based on currently available information, an assessment of the validity of certain claims and estimated payments by the Canadian Entities. We are not able to reasonably estimate a range of possible losses in excess of the accrual because there are significant factual and legal issues to be resolved. We believe that it is reasonably possible that future changes to our estimates of loss and the ultimate amount paid on these claims could be material to our results of operations in future periods. Any such losses would be reported in discontinued operations.

*Items Measured at Fair Value on a Non-Recurring Basis*

The following table presents information about the financial assets and liabilities that were measured on a fair value basis at  December 31, 2015 for the Canadian Operations. The table also indicates the fair value hierarchy of the valuation techniques used to determine such fair value.

| | (In Millions) | | | | |
| --- | --- | --- | --- | --- | --- |
| | **December 31, 2015** | | | | |
| **Description** | **Quoted Prices in Active Markets for Identical Assets/ Liabilities (Level 1)** | **Significant Other Observable Inputs (Level 2)** | **Significant Unobservable Inputs (Level 3)** | **Total** | **Total Losses** |
| **Assets:** | | | | | |
| Loans to and accounts receivables from the Canadian Entities | $        — | $        — | $      72.9 | $    72.9 | $    507.8 |
| **Liabilities:** | | | | | |
| Guarantees and contingent liabilities | $        — | $        — | $    132.4 | $   132.4 | $    203.1 |

We determined the fair value and recoverability of our Canadian investments by comparing the estimated fair value of the remaining underlying assets of the Canadian Entities to remaining estimated liabilities. We recorded the guarantees and contingent liabilities at book value which best approximated fair value.

Outstanding liabilities include accounts payable and other liabilities, forward commitments, unsubordinated related party payables, lease liabilities and other potential claims. Potential claims include an accrual for the estimated probable loss related to claims that may be asserted against the Bloom Lake Group and Wabush Group under certain contracts. Claimants may seek damages or other related relief as a result of the Canadian Entities' exit from Canada. Based on our estimates, the fair value of liabilities exceeds the fair value of assets.

154

To assess the fair value and recoverability of the amounts receivable from the Canadian Entities, we estimated the fair value of the underlying net assets of the Canadian Entities available for distribution to their creditors in relation to the estimated creditor claims and the priority of those claims.

Our estimates involve significant judgment and are based on currently available information, an assessment of the validity of certain claims and estimated payments made by the Canadian Entities. Our ultimate recovery is subject to the final liquidation value of the Canadian Entities. Further, the final liquidation value and ultimate recovery of the creditors of the Canadian Entities, including Cliffs Natural Resources and various subsidiaries, may impact our estimates of contingent liability exposure described previously.

*Pre-Petition Financing*

Prior to the Wabush Filing on May 20, 2015, a secured credit facility (the "Pre-Petition financing") was put into place to provide support to the Wabush Group for ongoing business activities until the DIP financing was in place. As of December 31, 2015, there was a total of $7.2 million drawn and outstanding under the Pre-Petition financing funded by Wabush Iron Co. Limited's parent company, Cliffs Mining Company.  The Pre-Petition financing amount of $7.2 million is included within the *Loans to and accounts receivables from the Canadian Entities* of $72.9 million. The Pre-Petition financing is secured by certain equipment of the Wabush Group.

*DIP Financing*

In connection with the Wabush Filing on May 20, 2015, the Court approved the DIP financing to the Wabush Group, which provides for borrowings under the facility up to $10.0 million. As of December 31, 2015, there was $6.8 million drawn and outstanding under the DIP financing funded by Wabush Iron Co. Limited's parent company, Cliffs Mining Company. At December 31, 2015, the DIP financing is included within *Loans to and accounts receivables from the Canadian Entities* on the Statements of Consolidated Financial Position . The DIP financing is secured by a court order over the assets of the Wabush Group.

*Recorded Assets and Liabilities*

|  | (In Millions) |
|---|---|
| *Assets and Liabilities of Discontinued Operations* | December 31, 2014 |
| Cash and cash equivalents | $        19.7 |
| Accounts receivable, net | 37.9 |
| Inventories | 16.3 |
| Supplies and other inventories | 48.5 |
| Income tax receivable | 20.1 |
| Other current assets | 44.3 |
| Property, plant and equipment, net | 249.8 |
| Other non-current assets | 19.9 |
| Total Assets | $      456.5 |
| | |
| Accounts payable | $        83.6 |
| Accrued expenses | 200.0 |
| Other current liabilities | 35.7 |
| Pension and postemployment benefit liabilities | 79.8 |
| Environmental and mine closure obligations | 56.5 |
| Other liabilities | 173.9 |
| Total Liabilities | $      629.5 |

155

Table of Contents

*Income Taxes*

We recognized a tax benefit of $5.8 million and $913.7 million for the years ended December 31, 2015 and 2014, respectively, in *Loss from Discontinued Operations, net of tax*. The benefit for the year ended December 31, 2014 was the result of the impairment of long-lived assets in the third quarter of 2014 offset by the placement of a valuation allowance against the Canadian operations net deferred tax assets. Canadian deferred tax assets relating to both historical and current year net operating losses were included in our equity investment in the Canadian Subsidiaries that has been reduced to zero. We recognized a tax benefit of $188.7 million for the year ended December 31, 2013 in *Loss from Discontinued Operations, net of tax* related to losses in our Canadian operations.

## NOTE 15 - CAPITAL STOCK

### Preferred Shares

On February 21, 2013, we issued 29.25 million depositary shares, representing an aggregate of 731,250 preferred shares, comprised of the 27.0 million depositary share offering and the exercise of an underwriters' over-allotment option to purchase an additional 2.25 million depositary shares. Each depositary share represents a 1/40th interest in a share of our 7.00 percent Series A Mandatory Convertible Preferred Stock, Class A, without par value ("Series A preferred share") at a price of $25 per depositary share for total net proceeds of approximately $709.4 million, after underwriter fees and discounts. Each Series A preferred share has an initial liquidation preference of $1,000 per share (equivalent to a $25 liquidation preference per depositary share). Pursuant to the terms of the Series A preferred shares, unless earlier converted at the option of the holder, each Series A preferred share automatically converted into common shares on February 1, 2016. When and if declared by our Board of Directors, we paid cumulative dividends on each Series A preferred share at an annual rate of 7.00 percent on the liquidation preference. We declared dividends in cash on February 1, May 1, August 1 and November 1 of each year, commencing on May 1, 2013. Upon determination by our Board of Directors, the final quarterly dividend was not paid in cash, but instead, pursuant to the terms of the Series A preferred shares, the conversion rate was increased such that holders of the Series A preferred shares received additional common shares in lieu of the accrued dividend at the time of the mandatory conversion on February 1, 2016. The number of common shares in the aggregate that were issued in lieu of the final dividend was 1.3 million based on an effective conversion rate of 0.9052 common shares, rather than 0.8621 common shares, per depositary share, e ach representing a 1/40th interest in a Series A preferred share.

Prior to the mandatory conversion, holders of the depositary shares were entitled to a proportional fractional interest in the rights and preferences of the Series A preferred shares, including conversion, dividend, liquidation and voting rights, subject to the provisions of the deposit agreement. The Series A preferred shares were convertible, at the option of the holder, at the minimum conversion rate of 28.1480 of our common shares (equivalent to 0.7037 of our common shares per depositary share) at any time prior to February 1, 2016 or other than during a fundamental change conversion period, subject to anti-dilution adjustments. If not converted prior to that time, each Series A preferred share converted automatically on February 1, 2016 into between 28.1480 and 34.4840 common shares, par value $0.125 per share, subject to anti-dilution adjustments. The number of common shares issued on conversion was determined based on the average VWAP per share of our common shares during the 20 trading day period beginning on, and including, the 23 rd scheduled trading day prior to February 1, 2016, subject to customary anti-dilution adjustments. Upon conversion on February 1, 2016, an aggregate of 26.5 million common shares were issued, representing 25.2 million common shares issuable upon conversion and 1.3 million that were issued in lieu of a final cash dividend.

### Common Share Public Offering

On February 21, 2013, we issued 10.35 million common shares, comprised of the 9.0 million common share offering and the exercise of an underwriters' option to purchase an additional 1.35 million common shares. We received net proceeds of approximately $285.3 million at a closing price of $29.00 per common share.

156

**Dividends**

On March 27, 2015, July 1, 2015 and September 10, 2015, our Board of Directors declared the quarterly cash dividend of $17.50 per Preferred Share, which is equivalent to approximately $0.44 per depositary share. The cash dividend was paid on May 1, 2015, August 3, 2015 and November 2, 2015 to our shareholders of record as of the close of business on April 15, 2015, July 15, 2015 and October 15, 2015, respectively.

On February 11, 2014, May 13, 2014, September 8, 2014 and November 19, 2014, our Board of Directors declared the quarterly cash dividend of $17.50 per Preferred Share, which is equivalent to approximately $ 0.44 per depositary share. The cash dividend was paid on May 1, 2014, August 1, 2014, November 3, 2014 and February 2, 2015, to our Preferred Shareholders of record as of the close of business on April 15, 2014, July 15, 2014, October 15, 2014 and January 15, 2015, respectively.

On February 11, 2013, our Board of Directors approved a reduction to our quarterly cash dividend rate by 76 percent to $0.15 per share. Our Board of Directors took this step in order to provide us with additional free cash flow as well as to preserve our investment-grade credit ratings. The cash dividend of $0.15 per share was paid on March 3, 2014, June 3, 2014, September 2, 2014 and December 1, 2014 to our common shareholders of record as of close of business on February 21, 2014, May 23, 2014, August 15, 2014 and November 15, 2014.

On January 26, 2015, we announced that our Board of Directors had decided to eliminate the quarterly dividend of $0.15 per share on our common shares. The decision was applicable to the first quarter of 2015 and all subsequent quarters.

## NOTE 16 - ACCUMULATED OTHER COMPREHENSIVE INCOME (LOSS)

The components of *Accumulated other comprehensive loss* within Cliffs shareholders' deficit and related tax effects allocated to each are shown below as of December 31, 2015, 2014 and 2013:

| | (In Millions) | | |
|---|---|---|---|
| | Pre-tax Amount | Tax Benefit (Provision) | After-tax Amount |
| **As of December 31, 2013:** | | | |
| Postretirement benefit liability | $ (299.3) | $ 94.4 | $ (204.9) |
| Foreign currency translation adjustments | 106.7 | — | 106.7 |
| Unrealized net loss on derivative financial instruments | (30.0) | 9.1 | (20.9) |
| Unrealized gain on securities | 9.3 | (3.1) | 6.2 |
| | $ (213.3) | $ 100.4 | $ (112.9) |
| **As of December 31, 2014:** | | | |
| Postretirement benefit liability | $ (425.3) | $ 134.2 | $ (291.1) |
| Foreign currency translation adjustments | 64.4 | — | 64.4 |
| Unrealized net loss on derivative financial instruments | (25.9) | 7.8 | (18.1) |
| Unrealized gain on securities | (1.3) | 0.3 | (1.0) |
| | $ (388.1) | $ 142.3 | $ (245.8) |
| **As of December 31, 2015:** | | | |
| **Postretirement benefit liability** | **$ (364.8)** | **$ 123.4** | **$ (241.4)** |
| **Foreign currency translation adjustments** | **220.7** | **—** | **220.7** |
| **Unrealized net gain on derivative financial instruments** | **2.2** | **0.4** | **2.6** |
| **Unrealized gain on securities** | **0.1** | **—** | **0.1** |
| | **$ (141.8)** | **$ 123.8** | **$ (18.0)** |

The following tables reflect the changes in *Accumulated other comprehensive income (loss)* related to Cliffs shareholders' equity for December 31, 2015, 2014 and 2013:

|  | (In Millions) | | | | |
|---|---|---|---|---|---|
|  | Postretirement Benefit Liability, net of tax | Unrealized Net Gain (Loss) on Securities, net of tax | Unrealized Net Gain (Loss) on Foreign Currency Translation | Net Unrealized Gain (Loss) on Derivative Financial Instruments, net of tax | Accumulated Other Comprehensive Income (Loss) |
| Balance December 31, 2014 | $ (291.1) | $ (1.0) | $ 64.4 | $ (18.1) | $ (245.8) |
| Other comprehensive income (loss) before reclassifications | 9.1 | 5.4 | (26.4) | 1.9 | (10.0) |
| Net loss (gain) reclassified from accumulated other comprehensive income (loss) | 40.6 | (4.3) | 182.7 | 18.8 | 237.8 |
| Balance December 31, 2015 | $ (241.4) | $ 0.1 | $ 220.7 | $ 2.6 | $ (18.0) |

|  | (In Millions) | | | | |
|---|---|---|---|---|---|
|  | Postretirement Benefit Liability, net of tax | Unrealized Net Gain (Loss) on Securities, net of tax | Unrealized Net Gain (Loss) on Foreign Currency Translation | Net Unrealized Gain (Loss) on Derivative Financial Instruments, net of tax | Accumulated Other Comprehensive Income (Loss) |
| Balance December 31, 2013 | $ (204.9) | $ 6.2 | $ 106.7 | $ (20.9) | $ (112.9) |
| Other comprehensive income (loss) before reclassifications | (97.0) | 1.3 | (42.3) | (28.2) | (166.2) |
| Net loss (gain) reclassified from accumulated other comprehensive income (loss) | 10.8 | (8.5) | — | 31.0 | 33.3 |
| Balance December 31, 2014 | $ (291.1) | $ (1.0) | $ 64.4 | $ (18.1) | $ (245.8) |

|  | (In Millions) | | | | |
|---|---|---|---|---|---|
|  | Postretirement Benefit Liability, net of tax | Unrealized Net Gain (Loss) on Securities, net of tax | Unrealized Net Gain (Loss) on Foreign Currency Translation | Net Unrealized Gain (Loss) on Derivative Financial Instruments, net of tax | Accumulated Other Comprehensive Income (Loss) |
| Balance December 31, 2012 | $ (382.7) | $ 2.1 | $ 316.3 | $ 8.7 | $ (55.6) |
| Other comprehensive income (loss) before reclassifications | 151.3 | (0.9) | (209.6) | (51.7) | (110.9) |
| Net loss (gain) reclassified from accumulated other comprehensive income (loss) | 26.5 | 5.0 | — | 22.1 | 53.6 |
| Balance December 31, 2013 | $ (204.9) | $ 6.2 | $ 106.7 | $ (20.9) | $ (112.9) |

158

A004986

The following table reflects the details about *Accumulated other comprehensive income (loss)* components related to Cliffs shareholders' equity for the year ended December 31, 2015:

| Details about Accumulated Other Comprehensive Income (Loss) Components | Amount of (Gain)/Loss Reclassified into Income (In Millions) | | | Affected Line Item in the Statement of Consolidated Operations |
|---|---|---|---|---|
| | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Year Ended December 31, 2013 | |
| Amortization of Pension and Postretirement Benefit Liability: | | | | |
| Prior service costs [1] | $ (1.4) | $ (1.1) | $ (0.8) | |
| Net actuarial loss [1] | 27.4 | 18.5 | 37.2 | |
| Curtailments/Settlements [1] | 0.2 | 1.4 | — | |
| Effect of deconsolidation [2] | 15.1 | — | — | *Loss from Discontinued Operations, net of tax* |
| | 41.3 | 18.8 | 36.4 | Total before taxes |
| | (0.7) | (5.8) | (14.3) | *Income tax benefit (expense)* |
| | $ 40.6 | $ 13.0 | $ 22.1 | Net of taxes |
| | | | | |
| Unrealized gain (loss) on marketable securities: | | | | |
| Sale of marketable securities | $ (2.6) | $ (11.4) | $ (0.2) | *Other non-operating income (expense)* |
| Impairment | (2.0) | (0.5) | 5.3 | *Other non-operating income (expense)* |
| | (4.6) | (11.9) | 5.1 | Total before taxes |
| | 0.3 | 3.4 | (0.1) | *Income tax benefit (expense)* |
| | $ (4.3) | $ (8.5) | $ 5.0 | Net of taxes |
| | | | | |
| Unrealized gain (loss) on foreign currency translation: | | | | |
| Effect of deconsolidation [3] | $ 182.7 | $ — | $ — | *Loss from Discontinued Operations, net of tax* |
| | — | — | — | *Income tax benefit (expense)* |
| | $ 182.7 | $ — | $ — | Net of taxes |
| | | | | |
| Unrealized gain (loss) on derivative financial instruments: | | | | |
| Australian dollar foreign exchange contracts | $ 26.9 | $ 18.9 | $ 17.0 | *Product revenues* |
| Canadian dollar foreign exchange contracts | — | 26.7 | 15.3 | *Cost of goods sold and operating expenses* |
| | 26.9 | 45.6 | 32.3 | Total before taxes |
| | (8.1) | (14.6) | (10.2) | *Income tax benefit (expense)* |
| | $ 18.8 | $ 31.0 | $ 22.1 | Net of taxes |
| | | | | |
| Total Reclassifications for the Period | $ 237.8 | $ 35.5 | $ 49.2 | |

[1]   These accumulated other comprehensive income components are included in the computation of net periodic benefit cost. See NOTE 7 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS for further information.

[2]   Represents Canadian postretirement benefit liabilities that were deconsolidated. See NOTE 14 - DISCONTINUED OPERATIONS for further information.

[3]   Represents Canadian accumulated currency translation adjustments that were deconsolidated. See NOTE 14 - DISCONTINUED OPERATIONS for further information.

159

Table of Contents

## NOTE 17 - CASH FLOW INFORMATION

A reconciliation of capital additions to cash paid for capital expenditures for the years ended December 31, 2015, 2014 and 2013 is as follows:

|  | (In Millions) | | |
|---|---|---|---|
|  | Year Ended December 31, | | |
|  | **2015** | 2014 | 2013 |
| Capital additions [1] | $ 96.7 | $ 235.5 | $ 752.3 |
| Cash paid for capital expenditures | 80.8 | 284.1 | 861.6 |
| Difference | $ 15.9 | $ (48.6) | $ (109.3) |
| Changes in non-cash accruals | $ 14.4 | $ (58.5) | $ (109.3) |
| Capital leases | 1.5 | 9.9 | — |
| Total | $ 15.9 | $ (48.6) | $ (109.3) |

_____

[1]  Includes capital additions of $72.2 million and $24.5 million related to continuing operations and discontinued operations, respectively, for the year ended December 31, 2015. Includes capital additions of $65.5 million and $170.0 million related to continuing operations and discontinued operations, respectively, for the year ended December 31, 2014. Includes capital additions of $70.8 million and $681.5 million related to continuing operations and discontinued operations, respectively, for the year ended December 31, 2013.

Cash payments for interest and income taxes in 2015, 2014 and 2013 are as follows:

|  | (In Millions) | | |
|---|---|---|---|
|  | **2015** | 2014 | 2013 |
| Taxes paid on income [1] | $ 5.0 | $ 47.3 | $ 153.3 |
| Income tax refunds [2] | 211.4 | 54.7 | 49.4 |
| Interest paid on debt obligations [3] | 185.6 | 176.5 | 174.4 |

_____

[1]  Includes taxes paid on income that relate to the deconsolidated Canadian Entities for the years ended December 31, 2013 of $3.7 million.

[2]  Includes income tax refunds that relate to the deconsolidated Canadian Entities for the years ended December 31, 2014 and 2013 of $47.8 million and $20.8 million, respectively.

[3]  Includes interest paid on the corporate guarantees of the equipment loans that relate to discontinued operations for the years ended December 31, 2015, 2014 and 2013 of $4.8 million, $6.1 million and $1.0 million, respectively.

## NOTE 18 - RELATED PARTIES

Three of our five U.S. iron ore mines are owned with various joint venture partners that are integrated steel producers or their subsidiaries. We are the manager of each of the mines we co-own and rely on our joint venture partners to make their required capital contributions and to pay for their share of the iron ore pellets that we produce. One or more of the joint venture partners are also our customers. The following is a summary of the mine ownership of these iron ore mines at December 31, 2015:

| **Mine** | **Cliffs Natural Resources** | **ArcelorMittal** | **U.S. Steel** |
|---|---|---|---|
| Empire | 79.0% | 21.0% | — |
| Tilden | 85.0% | — | 15.0% |
| Hibbing | 23.0% | 62.3% | 14.7% |

160

Table of Contents

ArcelorMittal has a unilateral right to put its interest in the Empire mine to us, but has not exercised this right to date. Furthermore, as part of a 2014 extension agreement between us and ArcelorMittal, which amended certain terms of the Empire partnership agreement, certain minimum distributions of the partners' equity amounts are required to be made on a quarterly basis beginning in the first quarter of 2015 and will continue through January 2017.  During the year ended December 31, 2015, we recorded distributions of $51.7 million to ArcelorMittal under this agreement of which $40.6 million was paid as of December 31, 2015.

*Product revenues* from related parties were as follows:

| | (In Millions) | | |
|---|---|---|---|
| | Year Ended December 31, | | |
| | **2015** | 2014 | 2013 |
| Product revenues from related parties | $ **671.1** | $ 1,011.4 | $ 1,038.8 |
| Total product revenues | **1,832.4** | 3,095.2 | 3,631.8 |
| Related party product revenue as a percent of total product revenue | **36.6%** | 32.7% | 28.6% |

Amounts due from related parties recorded in *Accounts receivable, net* and *Other current assets,* including trade accounts receivable, a customer supply agreement and provisional pricing arrangements, were $15.8 million and $127.6 million at December 31, 2015 and 2014, respectively. Amounts due to related parties recorded in *Other current liabilities,* including provisional pricing arrangements and liabilities to related parties, were $14.5 million and $11.8 million at December 31, 2015 and 2014, respectively.

A supply agreement with one of our customers includes provisions for supplemental revenue or refunds based on the customer's annual steel pricing for the year the product is consumed in the customer's blast furnace. The supplemental pricing is characterized as a freestanding derivative. Refer to NOTE 13 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES for further information.

Table of Contents

**NOTE 19 - EARNINGS PER SHARE**

The following table summarizes the computation of basic and diluted earnings per share attributable to Cliffs shareholders:

| | (In Millions, Except Per Share Amounts) | | |
| --- | --- | --- | --- |
| | Year Ended December 31, | | |
| | **2015** | 2014 | 2013 |
| Income from Continuing Operations | $    **143.7** | $     56.4 | $    878.9 |
| Income from Continuing Operations Attributable to Noncontrolling Interest | **(8.6)** | (25.9 ) | (14.8 ) |
| Net Income from Continuing Operations attributable to Cliffs shareholders | $    **135.1** | $     30.5 | $    864.1 |
| Loss from Discontinued Operations, net of tax | **(884.4)** | (7,254.7 ) | (450.6 ) |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | $    **(749.3)** | $ (7,224.2 ) | $    413.5 |
| PREFERRED STOCK DIVIDENDS | **(38.4)** | (51.2 ) | (48.7 ) |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS COMMON SHAREHOLDERS | $    **(787.7)** | $ (7,275.4 ) | $    364.8 |
| Weighted Average Number of Shares: | | | |
| Basic | **153.2** | 153.1 | 151.7 |
| Depositary Shares | **—** | — | 22.1 |
| Employee Stock Plans | **0.4** | — | 0.5 |
| Diluted | **153.6** | 153.1 | 174.3 |
| Earnings (loss) per Common Share Attributable to Cliffs Common Shareholders - Basic: | | | |
| Continuing operations | $    **0.63** | $    (0.14 ) | $    5.37 |
| Discontinued operations | **(5.77)** | (47.38 ) | (2.97 ) |
| | $    **(5.14)** | $ (47.52 ) | $    2.40 |
| Earnings (loss) per Common Share Attributable to Cliffs Common Shareholders - Diluted: | | | |
| Continuing operations | $    **0.63** | $    (0.14 ) | $    4.95 |
| Discontinued operations | **(5.76)** | (47.38 ) | (2.58 ) |
| | $    **(5.13)** | $ (47.52 ) | $    2.37 |

The diluted earnings per share calculation excludes 25.3 million and 25.2 million depositary shares that were anti-dilutive for the years ended December 31, 2015 and 2014, respectively. Additionally, the year ended December 31, 2014 diluted earnings per share calculation also excludes 0.7 million of equity plan awards. There was no anti-dilution for the year ended December 31, 2013.

162

A004990

Table of Contents

**NOTE 20 - COMMITMENTS AND CONTINGENCIES**

**Contingencies**

*Litigation*

We are currently a party to various claims and legal proceedings incidental to our operations. If management believes that a loss arising from these matters is probable and can reasonably be estimated, we record the amount of the loss, or the minimum estimated liability when the loss is estimated using a range, and no point within the range is more probable than another. As additional information becomes available, any potential liability related to these matters is assessed and the estimates are revised, if necessary. Based on currently available information, management believes that the ultimate outcome of these matters, individually and in the aggregate, will not have a material effect on our financial position, results of operations or cash flows. However, litigation is subject to inherent uncertainties, and unfavorable rulings could occur. An unfavorable ruling could include monetary damages, additional funding requirements or an injunction. If an unfavorable ruling were to occur, there exists the possibility of a material impact on the financial position and results of operations of the period in which the ruling occurs, or future periods. However, we do not believe that any pending litigation, not covered by insurance, will result in a material liability in relation to our consolidated financial statements . Currently, we have an insurance coverage receivable to cover settlement of the following putative class action and derivative shareholder lawsuits:

In May 2014, alleged purchasers of our common shares filed suit in the U.S. District Court for the Northern District of Ohio against us and certain former officers and directors of the Company. The action is captioned Department of the Treasury of the State of New Jersey and Its Division of Investment v. Cliffs Natural Resources Inc., et al., No. 1:14-CV-1031. As amended, the action asserts violations of the federal securities laws based on alleged false or misleading statements or omissions during the period of March 14, 2012 to March 26, 2013, regarding operations at our Bloom Lake mine in Québec, Canada, and the impact of those operations on our finances and outlook, including sustainability of the dividend, and that the alleged misstatements caused our common shares to trade at artificially inflated prices. The parties have successfully mediated this dispute and reached a settlement in principle, subject to definitive documentation, shareholder notice and court approval. The lawsuit had been referred to our insurance carriers, who will be required to pay the entirety of the $84 million settlement amount, if approved by the court. The court is expected to schedule a settlement approval hearing.

In June 2014, an alleged purchaser of the depositary shares issued by Cliffs in a public offering in February 2013 filed a putative class action, which is captioned Rosenberg v. Cliffs Natural Resources Inc., et al. , and after a round of removal and remand motions, is now pending in the Cuyahoga County, Ohio, Court of Common Pleas, No. CV-14-828140. As amended, the suit asserts claims against us, certain current and former officers and directors of the Company, and several underwriters of the offering, alleging disclosure violations in the offering documents regarding operations at our Bloom Lake mine, the impact of those operations on our finances and outlook, and about the progress of our former exploratory chromite project in Ontario, Canada. The parties successfully mediated this dispute and reached a settlement agreement in principle, subject to definitive documentation, notice to class members and court approval. The settlement provides for a payment to the proposed class of $10 million, which has been deposited into escrow by the insurance carriers. A court hearing, during which the parties will seek court approval of the proposed class action settlement, is scheduled for April 14, 2016.

In June and July 2014, alleged shareholders of Cliffs filed three derivative actions in the Cuyahoga County, Ohio, Court of Common Pleas asserting claims against certain current and former officers and directors of the Company. These actions, captioned Black v. Carrabba, et al. , No. CV-14-827803, Asmussen v. Carrabba, et al. , No. CV-14-829259, and Williams, et al. v. Carrabba, et al. , No. CV-14-829499, allege that the individually named defendants violated their fiduciary duties to the Company by, among other things, disseminating false and misleading information regarding operations at our Bloom Lake mine in Québec, Canada, and the impact of those operations on our finances and outlook, including sustainability of the dividend, failing to maintain internal controls, and failing to appropriately oversee and manage the Company. The complaints assert additional claims for unjust enrichment, abuse of control, gross mismanagement, overpayment upon departure of certain executives, and waste of corporate assets. The parties have reached a settlement in principle to settle all three cases, subject to definitive documentation, shareholder notice and court approval. Under the pending settlement, the Company will agree to enact or continue various corporate-governance related measures and to pay plaintiffs' attorneys' fees and expenses. The lawsuit had been referred to our insurance carriers who will pay $775,000 for attorneys' fees and expenses to plaintiffs' lawyers. The settlement of these actions will have no impact on our financial position. Following the announcement of the settlement in principle of these three shareholder derivative cases, an additional derivative shareholder action, captioned Mansour v. Carrabba, et al. , No. 16-CV-00390, was filed in the U.S. District Court for the Northern District of Ohio against the same defendants and alleging substantially identical claims. This additional lawsuit has been referred to our insurance carriers.

163

Table of Contents

*Environmental Matters*

We had environmental liabilities of $3.6 million and $5.5 million at December 31, 2015 and 2014, respectively, including obligations for known environmental remediation exposures at active and closed mining operations and other sites. These amounts have been recognized based on the estimated cost of investigation and remediation at each site, and include site studies, design and implementation of remediation plans, legal and consulting fees, and post-remediation monitoring and related activities. If the cost can only be estimated as a range of possible amounts with no specific amount being more likely, the minimum of the range is accrued. Future expenditures are not discounted unless the amount and timing of the cash disbursements are readily known. Potential insurance recoveries have not been reflected. Additional environmental obligations could be incurred, the extent of which cannot be assessed. The amount of our ultimate liability with respect to these matters may be affected by several uncertainties, primarily the ultimate cost of required remediation and the extent to which other responsible parties contribute. Refer to NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS for further information.

*Tax Matters*

The calculation of our tax liabilities involves dealing with uncertainties in the application of complex tax regulations. We recognize liabilities for anticipated tax audit issues based on our estimate of whether, and the extent to which, additional taxes will be due. If we ultimately determine that payment of these amounts is unnecessary, we reverse the liability and recognize a tax benefit during the period in which we determine that the liability is no longer necessary. We also recognize tax benefits to the extent that it is more likely than not that our positions will be sustained when challenged by the taxing authorities. To the extent we prevail in matters for which liabilities have been established, or are required to pay amounts in excess of our liabilities, our effective tax rate in a given period could be materially affected. An unfavorable tax settlement would require use of our cash and result in an increase in our effective tax rate in the year of resolution. A favorable tax settlement would be recognized as a reduction in our effective tax rate in the year of resolution. Refer to NOTE 9 - INCOME TAXES for further information.

**NOTE 21 - SUBSEQUENT EVENTS**

### Preferred Shares

On January 4, 2016, we announced that under the terms of our 7.00 percent Series A Mandatory Convertible Preferred Stock, Class A ("Series A preferred shares"), the final quarterly dividend would not be paid in cash. Instead, pursuant to the terms of the Series A preferred shares, the conversion rate was increased such that holders of the Series A preferred shares received additional common shares in lieu of the accrued dividend at the time of the mandatory conversion of the Series A preferred shares on February 1, 2016. In accordance with applicable law, our Board of Directors determined not to declare a dividend payable in cash. The number of our common shares in the aggregate issued in lieu of the dividend was approximately 1.3 million. This resulted in an effective conversion rate of 0.9052 common shares, rather than 0.8621 common shares, per depositary share, each representing 1/40 th of a share of Series A preferred shares. Upon conversion on February 1, 2016, an aggregate of 26.5 million common shares were issued, representing 25.2 million common shares issuable upon conversion and 1.3 million that were issued in lieu of a final cash dividend.

### Exchange Offers

On January 27, 2016, we announced the Exchange Offers for up to $710 million aggregate principal amount of our New 1.5 Lien Notes for certain Existing Notes of Cliffs, upon the terms and subject to the conditions set forth in our confidential offering memorandum dated January 27, 2016. Eligible holders were notified that they must validly tender their Existing Notes on February 9, 2016, the Early Tender Date, in order to be eligible to receive the applicable total exchange consideration, which includes an early tender premium. On February 10, 2016, we announced that as of the Early Tender Date, a total of approximately $465.3 million principal amount of Existing Notes had been tendered in the Exchange Offers. We also announced that the Early Tender Date has been extended to February 26, 2016, and that the exchange consideration for the 3.95 percent Senior Notes due 2018 had been increased. Accordingly, all Existing Notes tendered prior to the extended Early Tender Date will be eligible to receive the total exchange consideration. The Exchange Offers will expire at 5:00 p.m., New York City time, on February 26, 2016, and tenders of Existing Notes may no longer be withdrawn after that time, except in certain limited circumstances described in the offering memorandum and related letter of transmittal.

Table of Contents

**NOTE 22 - QUARTERLY RESULTS OF OPERATIONS (UNAUDITED)**

The sum of quarterly EPS may not equal EPS for the year due to discrete quarterly calculations.

| | | | | | (In Millions, Except Per Share Amounts) | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | 2015 | | | | |
| | | | | | | Quarters | | | | |
| | | First | | Second | | Third | | Fourth | | Year |
| Revenues from product sales and services | $ | 446.0 | $ | 498.1 | $ | 593.2 | $ | 476.0 | $ | 2,013.3 |
| Sales margin | | 80.8 | | 57.3 | | 55.1 | | 43.3 | | 236.5 |
| Income (Loss) from Continuing Operations | $ | 166.8 | $ | (38.2) | $ | 49.9 | $ | (34.8) | $ | 143.7 |
| Loss (Income) from Continuing Operations attributable to Noncontrolling Interest | | 1.9 | | (5.0) | | 4.6 | | (2.4) | | (8.6) |
| Net Income (Loss) from Continuing Operations attributable to Cliffs shareholders | | 168.7 | | (43.2) | | 54.5 | | (37.2) | | 135.1 |
| Loss from Discontinued Operations, net of tax | | (928.5) | | 103.4 | | (43.9) | | (23.1) | | (884.4) |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | | (759.8) | | 60.2 | | 10.6 | | (60.3) | | (749.3) |
| PREFERRED STOCK DIVIDENDS | | (12.8) | | — | | (25.6) | | — | | (38.4) |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS COMMON SHAREHOLDERS | $ | (772.6) | $ | 60.2 | $ | (15.0) | $ | (60.3) | $ | (787.7) |
| Earnings per common share attributable to Cliffs common shareholders — Basic: | | | | | | | | | | |
| Continuing Operations | $ | 1.02 | $ | (0.28) | $ | 0.19 | $ | (0.24) | $ | 0.63 |
| Discontinued Operations | | (6.06) | | 0.67 | | (0.29) | | (0.15) | | (5.77) |
| | $ | (5.04) | $ | 0.39 | $ | (0.10) | $ | (0.39) | $ | (5.14) |
| Earnings per common share attributable to Cliffs common shareholders — Diluted: | | | | | | | | | | |
| Continuing Operations | $ | 0.94 | $ | (0.28) | $ | 0.19 | $ | (0.24) | $ | 0.63 |
| Discontinued Operations | | (5.20) | | 0.67 | | (0.29) | | (0.15) | | (5.76) |
| | $ | (4.26) | $ | 0.39 | $ | (0.10) | $ | (0.39) | $ | (5.13) |

The diluted earnings per share calculation for the second, third and fourth quarter of 2015 exclude depositary shares that were anti-dilutive ranging between 25.2 million and 25.6 million and equity plan awards ranging between 0.1 million and 0.3 million that were anti-dilutive. There was no anti-dilution in the first quarter of 2015.

Table of Contents

|  | (In Millions, Except Per Share Amounts) | | | | |
|  | 2014 | | | | |
|  | Quarters | | | | |
|  | First | Second | Third | Fourth | Year |
| Revenues from product sales and services | $ 615.5 | $ 747.7 | $ 979.7 | $ 1,030.3 | $ 3,373.2 |
| Sales margin | 190.0 | 183.5 | 256.2 | 256.0 | 885.7 |
| Income (Loss) from Continuing Operations | $ 69.7 | $ 90.9 | $ (274.2) | $ 170.0 | $ 56.4 |
| Loss (Income) from Continuing Operations attributable to Noncontrolling Interest | 0.4 | (3.6) | (2.5) | (3.4) | (25.9) |
| Net Income (Loss) from Continuing Operations attributable to Cliffs shareholders | $ 70.1 | $ 87.3 | $ (276.7) | $ 166.6 | $ 30.5 |
| Loss from Discontinued Operations, net of tax | (140.4) | (76.4) | (5,602.9) | (1,451.8) | (7,254.7) |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | $ (70.3) | $ 10.9 | $ (5,879.6) | $ (1,285.2) | $ (7,224.2) |
| PREFERRED STOCK DIVIDENDS | (12.8) | (12.8) | (12.8) | (12.8) | (51.2) |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS COMMON SHAREHOLDERS | (83.1) | (1.9) | (5,892.4) | (1,298.0) | (7,275.4) |
| Earnings per common share attributable to Cliffs common shareholders — Basic: | | | | | |
| Continuing Operations | $ 0.37 | $ 0.49 | $ (1.89) | $ 1.00 | $ (0.14) |
| Discontinued Operations | (0.92) | (0.50) | (36.60) | (9.48) | (47.38) |
|  | $ (0.55) | $ (0.01) | $ (38.49) | $ (8.48) | $ (47.52) |
| Earnings per common share attributable to Cliffs common shareholders — Diluted: | | | | | |
| Continuing Operations | $ 0.37 | $ 0.48 | $ (1.89) | $ 0.94 | $ (0.14) |
| Discontinued Operations | (0.91) | (0.50) | (36.60) | (8.13) | (47.38) |
|  | $ (0.54) | $ (0.02) | $ (38.49) | $ (7.19) | $ (47.52) |

The diluted earnings per share calculation for the first, second and third quarters of 2014 exclude depositary shares that were anti-dilutive totaling 25.2 million. Additionally, the third quarter of 2014 diluted earnings per share calculation also excludes 0.5 million of equity plan awards. There was no anti-dilution for the fourth quarter of 2014.

**Fourth Quarter Results**

Consistent with our strategy to extract maximum value from our current assets, we sold all the remaining North American Coal operations during the fourth quarter of 2015. On December 22, 2015, we closed the sale of our remaining North American Coal business, which included Pinnacle mine in West Virginia and Oak Grove mine in Alabama. Pinnacle mine and Oak Grove mine were sold to Seneca and the deal structure was a sale of equity interests of our remaining coal business. Additionally, Seneca may pay Cliffs an earn-out of up to $50 million contingent upon the terms of a revenue sharing agreement which extends through the year 2020. We recorded the results of this sale in our fourth quarter earnings within *Loss from Discontinued Operations, net of tax* as the transaction closed on December 22, 2015.

During the fourth quarter of 2014, we recorded impairment charges for our continuing operations of $256.9 million primarily related to Asia Pacific Iron Ore and driven mainly by the changes in life-of-mine cash flows due to declining market pricing. There was also an additional $1.0 billion of impairment charges recorded during the fourth quarter of 2014 in *Loss from Discontinued Operations, net of tax* primarily related to Bloom Lake. Also, during the fourth quarter of 2014, we completed the sale of the CLCC assets for $174.0 million in cash and the assumption of certain liabilities, of which $155.0 million has been collected, and resulted in a loss on the sale of these assets of $419.6 million. We recorded the results of this sale in our 2014 fourth quarter earnings within *Loss from Discontinued Operations, net of tax* as historical North American Coal results are classified as discontinued operations. The fourth quarter 2014 results additionally included an income tax benefit of $207.3 million, which includes the benefits related to the continuing operations impairment charges.

166

A004994

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Shareholders of
Cliffs Natural Resources Inc.
Cleveland, Ohio

We have audited the accompanying statements of consolidated financial position of Cliffs Natural Resources Inc. and subsidiaries (the "Company") as of December 31, 2015 and 2014, and the related statements of consolidated operations, comprehensive income (loss), cash flows, and changes in equity for each of the three years in the period ended December 31, 2015. Our audits also included the financial statement schedule listed in the Index at Item 15. These financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on the financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Cliffs Natural Resources Inc. and subsidiaries as of December 31, 2015 and 2014, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2015, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2015, based on the criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 24, 2016 expressed an unqualified opinion on the Company's internal control over financial reporting.

*/s/ Deloitte & Touche LLP*

Cleveland, Ohio
February 24, 2016

167

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Shareholders of
Cliffs Natural Resources Inc.
Cleveland, Ohio

We have audited the internal control over financial reporting of Cliffs Natural Resources Inc. and subsidiaries (the "Company") as of December 31, 2015, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying *Management's Report on Internal Control Over Financial Reporting.* Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2015, based on the criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements and financial statement schedule as of and for the year ended December 31, 2015 of the Company and our report dated February 24, 2016 expressed an unqualified opinion on those financial statements and financial statement schedule.

*/s/ Deloitte & Touche LLP*

Cleveland, Ohio
February 24, 2016

168

Table of Contents

**Item 9.**    *Changes in and Disagreements With Accountants on Accounting and Financial Disclosure*

*None.*


**Item 9A.**    *Controls and Procedures*

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our President and Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure based solely on the definition of "disclosure controls and procedures" in Rule 13a-15(e) promulgated under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

As of the end of the period covered by this report, we carried out an evaluation under the supervision and with the participation of our management, including our President and Chief Executive Officer and our Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures. Based on the foregoing, our President and Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective.

**Management's Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as such term is defined under Rule 13a-15(f) promulgated under the Exchange Act.

Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Company's consolidated financial statements for external purposes in accordance with generally accepted accounting principles.

Internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit the preparation of the consolidated financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with appropriate authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the consolidated financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management conducted an assessment of the Company's internal control over financial reporting as of December 31, 2015 using the framework specified in *Internal Control - Integrated Framework* (2013), published by the Committee of Sponsoring Organizations of the Treadway Commission. Based on such assessment, management has concluded that the Company's internal control over financial reporting was effective as of December 31, 2015.

The effectiveness of the Company's internal control over financial reporting as of December 31, 2015 has been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report that appears herein.

February 24, 2016

**Changes in Internal Control Over Financial Reporting**

There have been no changes in our internal control over financial reporting or in other factors that occurred during our last fiscal quarter or our last fiscal year that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B.**        ***Other Information***

None.

170

Table of Contents

**PART III**

**Item 10.**        ***Directors, Executive Officers and Corporate Governance***

The information required to be furnished by this Item will be set forth in our definitive proxy statement for the 2016 Annual Meeting of Shareholders (the "Proxy Statement") under the headings "Board Meetings and Committees - Audit Committee", "Business Ethics Policy", "Independence and Related Party Transactions", "Information Concerning Director Nominees" and "Section 16(a) Beneficial Ownership Reporting Compliance", and is incorporated herein by reference and made a part hereof from the Proxy Statement. The information regarding executive officers required by this Item is set forth in *Part I - Item 1. Business* hereof under the heading "Executive Officers of the Registrant", which information is incorporated herein by reference and made a part hereof.

**Item 11.**        ***Executive Compensation***

The information required to be furnished by this Item will be set forth in our Proxy Statement under the headings "Director Compensation", "Compensation Committee Report", "Compensation Committee Interlocks and Insider Participation" and "Executive Compensation" and is incorporated herein by reference and made a part hereof from the Proxy Statement.

**Item 12.**        ***Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters***

The information required to be furnished by this Item regarding "Securities Authorized for Issuance Under Equity Compensation Plans", "Related Stockholder Matters" and "Security Ownership" will be set forth in the Proxy Statement under the headings "Independence and Related Party Transactions", "Ownership of Equity Securities of the Company" and "Equity Compensation Plan Information", respectively, and is incorporated herein by reference and made part hereof from the Proxy Statement.

**Item 13.**        ***Certain Relationships and Related Transactions, and Director Independence***

The information required to be furnished by this Item will be set forth in the definitive Proxy Statement under the heading "Independence and Related Party Transactions" and is incorporated herein by reference and made a part hereof from the Proxy Statement.

**Item 14.**        ***Principal Accountant Fees and Services***

The information required to be furnished by this Item will be set forth in the Proxy Statement under the heading "Ratification of Independent Registered Public Accounting Firm" and is incorporated herein by reference and made a part hereof from the Proxy Statement.

171

Table of Contents

**PART IV**

**Item 15.**        *Exhibits and Financial Statement Schedules*

(a)(1) and (2) - List of Financial Statements and Financial Statement Schedules.

The following consolidated financial statements of Cliffs Natural Resources Inc. are included at   *Item 8. Financial Statements and Supplementary Data* above:

- •        Statements of Consolidated Financial Position -  December 31, 2015 and 2014

- •        Statements of Consolidated Operations - Years ended  December 31, 2015, 2014 and 2013

- •        Statements of Consolidated Comprehensive Income - Years ended  December 31, 2015, 2014 and 2013

- •        Statements of Consolidated Cash Flows - Years ended  December 31, 2015, 2014 and 2013

- •        Statements of Consolidated Changes in Equity - Years ended  December 31, 2015, 2014 and 2013

- •        Notes to Consolidated Financial Statements

The following consolidated financial statement schedule of Cliffs Natural Resources Inc. is included herein in Item 15(d) and attached as Exhibit 99(a):

Schedule II - Valuation and Qualifying Accounts

All other schedules for which provision is made in the applicable accounting regulation of the SEC are not required under the related instructions or are inapplicable, and therefore have been omitted.

(3) List of Exhibits - Refer to Exhibit Index on pages 174 - 180, which is incorporated herein by reference.

(c) Exhibits listed in Item 15(a)(3) above are incorporated herein by reference.

(d) The schedule listed above in Item 15(a)(1) and (2) is attached as Exhibit 99(a) and incorporated herein by reference.

172

Table of Contents

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

CLIFFS NATURAL RESOURCES INC.

By:     /s/ Timothy K. Flanagan
        Name:     Timothy K. Flanagan
        Title:     Vice President, Corporate
                   Controller and Chief Accounting Officer

Date:     February 24, 2016

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signatures | Title | Date |
|---|---|---|
| /s/ C. L. Goncalves<br>C. L. Goncalves | Chairman, President, Chief Executive Officer and Director (Principal Executive Officer) | February 24, 2016 |
| /s/ P. K. Tompkins<br>P. K. Tompkins | Executive Vice President & Chief Financial Officer (Principal Financial Officer) | February 24, 2016 |
| /s/ T. K. Flanagan<br>T. K. Flanagan | Vice President, Corporate Controller & Chief Accounting Officer (Principal Accounting Officer) | February 24, 2016 |
| *<br>J. T. Baldwin | Director | February 24, 2016 |
| *<br>R. P. Fisher, Jr. | Director | February 24, 2016 |
| *<br>S. M. Green | Director | February 24, 2016 |
| *<br>J. A. Rutkowski, Jr. | Director | February 24, 2016 |
| *<br>J. S. Sawyer | Director | February 24, 2016 |
| *<br>M. D. Siegal | Director | February 24, 2016 |
| *<br>G. Stoliar | Director | February 24, 2016 |
| *<br>D. C. Taylor | Director | February 24, 2016 |

* The undersigned, by signing his name hereto, does sign and execute this Annual Report on Form 10-K pursuant to a Power of Attorney executed on behalf of the above-indicated officers and directors of the registrant and filed herewith as Exhibit 24 on behalf of the registrant.

By: /s/ P. K. Tompkins

(P. K. Tompkins, as Attorney-in-Fact)

173

A005001

Table of Contents

**EXHIBIT INDEX**

All documents referenced below have been filed pursuant to the Securities Exchange Act of 1934 by Cliffs Natural Resources Inc., file number 1-09844, unless otherwise indicated.

| Exhibit Number | Exhibit |
|---|---|
| | **Plan of purchase, sale, reorganization, arrangement, liquidation or succession** |
| 2.1 | ***Asset Purchase Agreement, dated as of December 2, 2014, by and among Cliffs Natural Resources Inc., Cliffs Logan County Coal LLC, Toney's Fork Land, LLC, Southern Eagle Land, LLC and Cliffs Logan County Coal Terminals LLC and Coronado Coal II, LLC (filed as Exhibit 2.1 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 2.2 | ***Amendment to Asset Purchase Agreement, effective as of December 31, 2014, by and among Cliffs Natural Resources Inc., Cliffs Logan County Coal LLC, Toney's Fork Land, LLC, Southern Eagle Land, LLC and Cliffs Logan County Coal Terminals LLC and Coronado Coal II, LLC (filed as Exhibit 2.2 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 2.3 | ***Unit Purchase Agreement, dated as of December 22, 2015, by and among Cliffs Natural Resources Inc., CLF PinnOak LLC and Seneca Coal Resources, LLC (filed herewith) |
| | **Articles of Incorporation and By-Laws of Cliffs Natural Resources Inc.** |
| 3.1 | Third Amended Articles of Incorporation of Cliffs (as filed with the Secretary of State of the State of Ohio on May 13, 2013 (filed as Exhibit 3.1 to Cliffs' Form 8-K on May 13, 2013 and incorporated herein by reference) |
| 3.2 | Regulations of Cleveland-Cliffs Inc. (filed as Exhibit 3.2 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| | **Instruments defining rights of security holders, including indentures** |
| 4.1 | Form of Indenture between Cliffs Natural Resources Inc. and U.S. Bank National Association, as trustee, dated March 17, 2010 (filed as Exhibit 4.1 to Cliffs' Form S-3 No. 333-165376 on March 10, 2010 and incorporated herein by reference) |
| 4.2 | Form of 5.90% Notes due 2020 First Supplemental Indenture between Cliffs Natural Resources Inc. and U.S. Bank National Association, as trustee, dated March 17, 2010, including Form of 5.90% Notes due 2020 (filed as Exhibit 4.2 to Cliffs' Form 8-K on March 16, 2010 and incorporated herein by reference) |
| 4.3 | Form of 4.80% Notes due 2020 Second Supplemental Indenture between Cliffs Natural Resources Inc. and U.S. Bank National Association, as trustee, dated September 20, 2010, including Form of 4.80% Notes due 2020 (filed as Exhibit 4.3 to Cliffs' Form 8-K on September 17, 2010 and incorporated herein by reference) |
| 4.4 | Form of 6.25% Notes due 2040 Third Supplemental Indenture between Cliffs Natural Resources Inc. and U.S. Bank National Association, as trustee, dated September 20, 2010, including Form of 6.25% Notes due 2040 (filed as Exhibit 4.4 to Cliffs' Form 8-K on September 17, 2010 and incorporated herein by reference) |
| 4.5 | Form of 4.875% Notes due 2021 Fourth Supplemental Indenture between Cliffs and U.S. Bank National Association, as trustee, dated March 23, 2011, including Form of 4.875% Notes due 2021 (filed as Exhibit 4.1 to Cliffs' Form 8-K on March 23, 2011 and incorporated herein by reference) |
| 4.6 | Fifth Supplemental Indenture between Cliffs and U.S. Bank National Association, as trustee, dated March 31, 2011 (filed as Exhibit 4(b) to Cliffs' Form 10-Q for the period ended June 30, 2011 and incorporated herein by reference) |
| 4.7 | Form of 3.95% Notes due 2018 Sixth Supplemental Indenture between Cliffs and U.S. Bank National Association, as trustee, dated December 13, 2012, including form of 3.95% Notes due 2018 (filed as Exhibit 4.1 to Cliffs' Form 8-K on December 13, 2012 and incorporated herein by reference) |
| 4.8 | Indenture between Cliffs Natural Resources Inc., the guarantors parties thereto, and U.S. Bank National Association, as trustee and notes collateral agent, dated March 30, 2015, including Form of 8.250% Senior Secured Notes due 2020 (filed as Exhibit 4.1 to Cliffs' Form 10-Q for the period ended March 31, 2015 and incorporated herein by reference) |

174

Table of Contents

| 4.9 | Indenture between Cliffs Natural Resources Inc., the guarantors parties thereto, and U.S. Bank National Association, as trustee and notes collateral agent, dated March 30, 2015, including Form of 7.75% Second Lien Senior Secured Notes due 2020 (filed as Exhibit 4.2 to Cliffs' Form 10-Q for the period ended March 31, 2015 and incorporated herein by reference) |
| --- | --- |
| 4.10 | Form of Common Share Certificate (filed as Exhibit 4.1 to Cliffs' Form 10-Q for the period ended September 30, 2014 and incorporated herein by reference) |
| | **Material Contracts** |
| 10.1 | * Form of Change in Control Severance Agreement, effective January 1, 2014 (covering existing grants) (filed as Exhibit 10.1 to Cliffs' Form 10-K for the period ended December 31, 2013 and incorporated herein by reference) |
| 10.2 | * Form of Change in Control Severance Agreement (covering newly hired officers) (filed as Exhibit 10.4 to Cliffs' Form 8-K/A on September 16, 2014 and incorporated herein by reference) |
| 10.3 | * Form of 2015 Change in Control Severance Agreement (filed as Exhibit 10.3 to Cliffs' 10-Q for the period ended March 31, 2015 and incorporated herein by reference) |
| 10.4 | * Cliffs Natural Resources Inc. 2012 Non-Qualified Deferred Compensation Plan (effective January 1, 2012) dated November 8, 2011 (filed as Exhibit 10.1 to Cliffs' Form 8-K on November 8, 2011 and incorporated herein by reference) |
| 10.5 | * Form of Indemnification Agreement between Cliffs Natural Resources Inc. and Directors (filed as Exhibit 10.5 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.6 | * Cliffs Natural Resources Inc. Nonemployee Directors' Compensation Plan (Amended and Restated as of December 31, 2008) (filed as Exhibit 10(nnn) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.7 | * 2014 Nonemployee Directors' Compensation Plan (filed as Exhibit 10.2 to Cliffs' Form 8-K on August 4, 2014 and incorporated herein by reference) |
| 10.8 | * Trust Agreement No. 1 (Amended and Restated effective June 1, 1997), dated June 12, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to the Cleveland-Cliffs Inc Supplemental Retirement Benefit Plan, Severance Pay Plan for Key Employees and certain executive agreements (filed as Exhibit 10.10 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.9 | * Trust Agreement No. 1 Amendments to Exhibits, effective as of January 1, 2000, by and between Cleveland-Cliffs Inc and KeyBank National Association, as Trustee (filed as Exhibit 10.11 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.10 | * First Amendment to Trust Agreement No. 1, effective September 10, 2002, by and between Cleveland-Cliffs Inc and KeyBank National Association, as Trustee (filed as Exhibit 10.12 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.11 | * Second Amendment to Trust Agreement No. 1 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(y) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.12 | * Third Amendment to Trust Agreement No. 1 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as July 28, 2014 (filed as Exhibit 10.15 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.13 | * Amended and Restated Trust Agreement No. 2, effective as of October 15, 2002, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to Executive Agreements and Indemnification Agreements with the Company's Directors and certain Officers, the Company's Severance Pay Plan for Key Employees, and the Retention Plan for Salaried Employees (filed as Exhibit 10.14 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.14 | * Second Amendment to Amended and Restated Trust Agreement No. 2 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(aa) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.15 | * Third Amendment to Amended and Restated Trust Agreement No. 2 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.18 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |

175

Table of Contents

| 10.16 | * Trust Agreement No. 5, dated as of October 28, 1987, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to certain deferred compensation agreements (filed as Exhibit 10.16 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
|---|---|
| 10.17 | * First Amendment to Trust Agreement No. 5, dated as of May 12, 1989, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.17 to Form 10-K of Cliffs' for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.18 | * Second Amendment to Trust Agreement No. 5, dated as of April 9, 1991, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.18 to Form 10-K of Cliffs' for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.19 | * Third Amendment to Trust Agreement No. 5, dated as of March 9, 1992, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.19 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.20 | * Fourth Amendment to Trust Agreement No. 5, dated November 18, 1994, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.20 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.21 | * Fifth Amendment to Trust Agreement No. 5, dated May 23, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.19 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.22 | *Sixth Amendment to Trust Agreement No. 5 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(hh) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.23 | *Seventh Amendment to Trust Agreement No. 5 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.26 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.24 | * Trust Agreement No. 7, dated as of April 9, 1991, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to the Cleveland-Cliffs Inc Supplemental Retirement Benefit Plan (filed as Exhibit 10.23 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.25 | * First Amendment to Trust Agreement No. 7, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, dated as of March 9, 1992 (filed as Exhibit 10.24 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.26 | * Second Amendment to Trust Agreement No. 7, dated November 18, 1994, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.25 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.27 | * Third Amendment to Trust Agreement No. 7, dated May 23, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.26 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.28 | * Fourth Amendment to Trust Agreement No. 7, dated July 15, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.27 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.29 | * Amendment to Exhibits to Trust Agreement No. 7, effective as of January 1, 2000, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.28 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.30 | * Sixth Amendment to Trust Agreement No. 7 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(oo) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.31 | * Seventh Amendment to Trust Agreement No. 7 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.34 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.32 | * Termination and Fifth Amendment to Trust Agreement No. 8 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of October 28, 2015 (filed herewith) |

176

A005004

Table of Contents

| 10.33 | * Termination and Third Amendment to Trust Agreement No. 9 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of October 28, 2015 (filed herewith) |
|---|---|
| 10.34 | * Trust Agreement No. 10, dated as of November 20, 1996, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to the Cleveland-Cliffs Inc Nonemployee Directors' Compensation Plan (filed as Exhibit 10.36 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.35 | *First Amendment to Trust Agreement No. 10 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(ww) to Cliffs' Form 10-K for the period ended February 26, 2009 and incorporated herein by reference) |
| 10.36 | * Second Amendment to Trust Agreement No. 10 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.45 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.37 | *Severance Agreement and Release, by and between Terrance M. Paradie and Cliffs Natural Resources Inc., dated April 14, 2015 (filed as Exhibit 10.4 to Cliffs' Form 10-Q for the period ended March 31, 2015 and incorporated herein by reference) |
| 10.38 | *Severance Agreement and Release, by and between David Webb and Cliffs Natural Resources Inc., dated October 31, 2015 (filed herewith) |
| 10.39 | *Letter Agreement, by and between Lourenco Goncalves and Cliffs Natural Resources Inc., signed as of September 11, 2014 (filed as Exhibit 10.1 to Cliffs' Form 8-K/A on September 16, 2014 and incorporated herein by reference) |
| 10.40 | *Cleveland-Cliffs Inc and Subsidiaries Management Performance Incentive Plan Summary, effective January 1, 2004 (filed as Exhibit 10.47 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.41 | *Cliffs Natural Resources Inc. 2012 Executive Management Performance Incentive Plan effective March 13, 2012 (filed as Exhibit 10.3 to Cliffs' Form 8-K on May 14, 2012 and incorporated herein by reference) |
| 10.42 | *Cliffs Natural Resources Inc. 2012 Incentive Equity Plan effective March 13, 2012 (filed as Exhibit 10.1 to Cliffs Form 8-K on May 14, 2012 and incorporated herein by reference) |
| 10.43 | *First Amendment to Cliffs Natural Resources Inc. 2012 Incentive Plan effective September 11, 2012 (filed as Exhibit 10.2 to Cliffs' Form 10-Q for the period ended September 30, 2012 and incorporated herein by reference) |
| 10.44 | *Form of Cliffs Natural Resources Inc. Restricted Share Unit Award Memorandum and Restricted Share Unit Award Agreement under the 2012 Incentive Equity Plan (filed as Exhibit 10.77 to Cliffs' Form 10-K for the period ended December 31, 2013 and incorporated herein by reference) |
| 10.45 | *Form of Cliffs Natural Resources Inc. Restricted Share Unit Award Memorandum (Graduated Vesting 50%) and Restricted Share Unit Award Agreement under the 2012 Incentive Equity Plan (filed as Exhibit 10.78 to Cliffs' Form 10-K for the period ended December 31, 2013 and incorporated herein by reference) |
| 10.46 | *Form of Cliffs Natural Resources Inc. Restricted Share Unit Award Memorandum (Graduated Vesting 33%) and Restricted Share Unit Award Agreement under the 2012 Incentive Equity Plan (filed as Exhibit 10.79 to Cliffs' Form 10-K for the period ended December 31, 2013 and incorporated herein by reference) |
| 10.47 | *Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan (filed as Exhibit 10.1 to Cliffs' Form 8-K on August 4, 2014 and incorporated herein by reference) |
| 10.48 | *Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Restricted Share Unit Award Memorandum (Graduated Vesting 50% - July 2014 Grant) and Restricted Share Unit Award Agreement (filed as Exhibit 10.64 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.49 | *Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Restricted Share Unit Award Memorandum (3-Year Vesting - July 2014 Grant) and Restricted Share Unit Award Agreement (filed as Exhibit 10.65 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.50 | *Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Performance Share Award Memorandum (3-Year Vesting - July 2014 Grant) and Performance Share Award Agreement (filed as Exhibit 10.66 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |

Table of Contents

| 10.51 | *Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Non-Qualified Stock Option Award Memorandum (2014 Grant) and Stock Option Award Agreement (filed as Exhibit 10.2 to Cliffs' Form 8-K/A on September 16, 2014 and incorporated herein by reference) |
|---|---|
| 10.52 | *Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Performance Unit Award Memorandum (2014 Grant) and Performance Unit Award Agreement (filed as Exhibit 10.3 to Cliffs' Form 8-K/A on September 16, 2014 and incorporated herein by reference) |
| 10.53 | *Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Non-Qualified Stock Option Award Memorandum (3-Year Vesting - January 2015 Grant) and Stock Option Award Agreement (filed as Exhibit 10.69 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.54 | *Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Restricted Share Unit Award Memorandum (Graduated Vesting 33% - January 2015 Grant) and Restricted Share Unit Award Agreement (filed as Exhibit 10.70 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.55 | *Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Performance Share Award Memorandum (3-Year Vesting - January 2015 Grant) and Performance Share Award Agreement (filed as Exhibit 10.71 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.56 | *Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Restricted Share Unit Award Memorandum (Graduated Vesting 33% - February 2015 Grant) and Restricted Share Unit Award Agreement (filed as Exhibit 10.72 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.57 | *Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Performance Share Award Memorandum (3 year Vesting - February 2015 Grant) and Restricted Share Unit Award Agreement (filed as Exhibit 10.73 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.58 | *Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan (filed as Exhibit 10.1 to Cliffs' Form 8-K on May 21, 2015 and incorporated herein by reference) |
| 10.59 | *Form of Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan Restricted Stock Unit Award Memorandum (Vesting on December 15, 2017) and Restricted Stock Unit Award Agreement (filed as Exhibit 10.1 to Cliffs' Form 10-Q for the period ended September 30, 2015 and incorporated herein by reference) |
| 10.60 | *Form of Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan Cash Retention Award Memorandum (Vesting February 2017) and Cash Retention Award Agreement (filed as Exhibit 10.2 to Cliffs' Form 10-Q for the period ended September 30, 2015 and incorporated herein by reference) |
| 10.61 | *Form of Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan Restricted Stock Unit Award Memorandum (Vesting May 2018) and Restricted Stock Unit Award Agreement (filed herewith) |
| 10.62 | *Cliffs Natural Resources Inc. Supplemental Retirement Benefit Plan (as Amended and Restated effective December 1, 2006) dated December 31, 2008 (filed as Exhibit 10(mmm) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.63 | *Cliffs Natural Resources Inc. 2015 Employee Stock Purchase Plan (filed as Exhibit 4.4 to Cliffs' Registration Statement on Form S-8 on August 20, 2015 and incorporated herein by reference) |
| 10.64 | ** Pellet Sale and Purchase Agreement, dated and effective as of April 10, 2002, by and among The Cleveland-Cliffs Iron Company, Cliffs Mining Company, Northshore Mining Company, Northshore Sales Company, International Steel Group Inc., ISG Cleveland Inc., and ISG Indiana Harbor Inc. (filed as Exhibit 10.84 to Cliffs' Form 10-K for the period ended December 31, 2013 and incorporated herein by reference) |
| 10.65 | ** First Amendment to Pellet Sale and Purchase Agreement, dated and effective December 16, 2004 by and among The Cleveland-Cliffs Iron Company, Cliffs Mining Company, Northshore Mining Company, Cliffs Sales Company (formerly known as Northshore Sales Company), International Steel Group Inc., ISG Cleveland Inc. and ISG Indiana Harbor (filed as Exhibit 10.85 to Cliffs' Form 10-K for the period ended December 31, 2013 and incorporated herein by reference) |

178

Table of Contents

| 10.66 | ** Pellet Sale and Purchase Agreement, dated and effective as of December 31, 2002 by and among The Cleveland-Cliffs Iron Company, Cliffs Mining Company, and Ispat Inland Inc. (filed as Exhibit 10.86 to Cliffs' Form 10-K for the period ended December 31, 2013 and incorporated herein by reference) |
|---|---|
| 10.67 | ** 2011 Omnibus Agreement, dated as of April 8, 2011 and effective as of March 31, 2011, by and among ArcelorMittal USA LLC, as successor in interest to Ispat Inland Inc., ArcelorMittal Cleveland Inc. (formerly known as ISG Cleveland Inc.), ArcelorMittal Indiana Harbor LLC (formerly known as ISG Indiana Harbor Inc.) and Cliffs Natural Resources Inc., The Cleveland-Cliffs Iron Company, Cliffs Mining Company, Northshore Mining Company and Cliffs Sales Company (formerly known as Northshore Sales Company) (filed as Exhibit 10(a) to Cliffs' Form 10-Q for the period ended June 30, 2011 and incorporated herein by reference) |
| 10.68 | **2014 Extension Agreement dated as of February 24, 2014 but effective as of January 1, 2014, among ArcelorMittal USA LLC, Cliffs Natural Resources Inc., The Cleveland-Cliffs Iron Company and Cliffs Mining Company (filed as Exhibit 10.1 to Cliffs' Form 10-Q/A filed on October 8, 2014 for the period ended March 31, 2014 and incorporated herein by reference) |
| 10.69 | Amended and Restated Multicurrency Credit Agreement entered into as of August 11, 2011, among Cliffs, certain foreign subsidiaries of the Company from time to time party thereto, Bank of America, N.A., as Administrative Agent, Swing Line Lender and L/C Issuer, JPMorgan Chase Bank, N.A., as Syndication Agent and L/C Issuer, Merrill Lynch, Pierce, Fenner & Smith Incorporated, J.P. Morgan Securities LLC, Citigroup Global Markets Inc., PNC Capital Markets Inc. and U.S. Bank National Association, as Joint Lead Arrangers and Joint Book Managers, Fifth Third Bank and RBS Citizens, N.A., as Co-Documentation Agents, and the various institutions from time to time party thereto (filed as Exhibit 10(a) to Cliffs' Form 8-K on August 17, 2011 and incorporated herein by reference) |
| 10.70 | Amendment No. 1, dated as of October 16, 2012 to Amended and Restated Multicurrency Credit Agreement (filed as Exhibit 10.1 to Cliffs' Form 8-K on October 19, 2012 and incorporated herein by reference) |
| 10.71 | Amendment No. 2 to the Amended and Restated Multicurrency Credit Agreement dated as of February 8, 2013 (filed as Exhibit 10.92 to Cliffs' Form 10-K for the period ended December 31, 2012 and incorporated herein by reference) |
| 10.72 | Amendment No. 3, dated as of June 30, 2014, to the Amended and Restated Multicurrency Credit Agreement, dated as of August 11, 2011, among Cliffs Natural Resources Inc., the foreign subsidiaries of Cliffs Natural Resources Inc. from time to time party thereto, the lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent (filed as Exhibit 10.1 to Cliffs' Form 8-K on June 30, 2014 and incorporated herein by reference) |
| 10.73 | Amendment No. 4, dated as of September 9, 2014, to the Amended and Restated Multicurrency Credit Agreement, dated as of August 11, 2011, among the Company, the foreign subsidiaries of the Company from time to time party thereto, the lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent (filed as Exhibit 10.1 to Cliffs' Form 8-K on September 12, 2014 and incorporated herein by reference) |
| 10.74 | Amendment No. 5, dated as of October 24, 2014, to the Amended and Restated Multicurrency Credit Agreement, dated as of August 11, 2011, among the Company, the foreign subsidiaries of the Company from time to time party thereto, the lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent (filed as Exhibit 10.2 to Cliffs' Form 10-Q for the period ended on September 30, 2014 and incorporated herein by reference) |
| 10.75 | Amendment No. 6, dated as of January 22, 2015, to the Amended and Restated Multicurrency Credit Agreement, dated as of August 11, 2011, among the Company, the foreign subsidiaries of the Company from time to time party thereto, the lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent (filed as Exhibit 10.86 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.76 | Syndicated Facility Agreement, dated as of March 30, 2015, by and among Bank of America, N.A., as Administrative Agent and Australian Security Trustee, the Lenders that are Parties hereto, as the Lenders, Cliffs Natural Resources Inc., as Parent and a Borrower, and the Subsidiaries of Parent Party hereto, as Borrowers (filed as Exhibit 10.2 to Cliffs' Form 10-Q for the period ended March 31, 2015 and incorporated herein by reference) |
| 10.77 | Agreement between Cliffs Natural Resources Inc. and Casablanca Capital LP, dated October 7, 2014 (filed as Exhibit 99.1 to Cliffs' Form 8-K on October 14, 2014 and incorporated herein by reference) |
| 12 | Ratio of Earnings To Combined Fixed Charges And Preferred Stock Dividend Requirements (filed herewith) |
| 21 | Subsidiaries of the Registrant (filed herewith) |

179

| | |
|---|---|
| 23 | Consent of Independent Registered Public Accounting Firm (filed herewith) |
| 24 | Power of Attorney (filed herewith) |
| 31.1 | Certification Pursuant to 15 U.S.C. Section 7241, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, signed and dated by Lourenco Goncalves as of February 24, 2016 (filed herewith) |
| 31.2 | Certification Pursuant to 15 U.S.C. Section 7241, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, signed and dated by P. Kelly Tompkins as of February 24, 2016 (filed herewith) |
| 32.1 | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed and dated by Lourenco Goncalves, Chairman, President and Chief Executive Officer of Cliffs Natural Resources Inc., as of February 24, 2016 (filed herewith) |
| 32.2 | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed and dated by P. Kelly Tompkins, Executive Vice President and Chief Financial Officer of Cliffs Natural Resources Inc., as of February 24, 2016 (filed herewith) |
| 95 | Mine Safety Disclosures (filed herewith) |
| 99(a) | Schedule II – Valuation and Qualifying Accounts (filed herewith) |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

_____

\*       Indicates management contract or other compensatory arrangement.

\*\*      Confidential treatment requested and/or approved as to certain portions, which portions have been omitted and filed separately with the Securities and Exchange Commission.

\*\*\*     Certain immaterial schedules and exhibits to this exhibit have been omitted pursuant to the provisions of Regulation S-K, Item 601(b)(2). A copy of any of the omitted schedules and exhibits will be furnished to the Securities and Exchange Commission upon request.

180

**EXHIBIT 2.3**

**UNIT PURCHASE AGREEMENT**

by and among

**CLIFFS NATURAL RESOURCES INC.,**

**CLF PINNOAK LLC**

and

**SENECA COAL RESOURCES, LLC**

Dated as of and effective as of December 22, 2015

---

**TABLE OF CONTENTS**

Page

Article I. DEFINITIONS                                                                                          1
    Section 1.1         Certain Defined Terms                                                  1
    Section 1.2         Index of Other Defined Terms                                    5
    Section 1.3         Interpretation                                                         7
Article II. PURCHASE AND SALE; CONSIDERATION; CLOSING                               7
    Section 2.1         Purchase and Sale                                                   7
    Section 2.2         Consideration                                                          7
    Section 2.3         Adjustments to Consideration                                   8
    Section 2.4         Allocation of Consideration                                      9
    Section 2.5         Closing                                                                  9
Article III. REPRESENTATIONS AND WARRANTIES RELATING TO PARENT AND SELLER     10
    Section 3.1         Organization and Authority                                     10
    Section 3.2         No Conflict                                                           10
    Section 3.3         Consents and Approvals                                        10
    Section 3.4         Ownership of the Units                                         10
    Section 3.5         Legal Proceedings                                               10
    Section 3.6         Permitting                                                            10
Article IV. REPRESENTATIONS AND WARRANTIES RELATING TO CNAC AND ITS SUBSIDIARIES     11
    Section 4.1         Organization and Authority                                     11
    Section 4.2         Subsidiaries                                                         11
    Section 4.3         No Conflict                                                           11
    Section 4.4         Capitalization                                                       11
    Section 4.5         Financial Statements and Condition; No Undisclosed Liabilities; Absence of Certain Facts or Events     12
    Section 4.6         Absence of Litigation                                           12
    Section 4.7         Compliance with Laws                                          12
    Section 4.8         Material Contracts                                               13
    Section 4.9         Real Property                                                       13
    Section 4.10        Personal Property                                               14
    Section 4.11        Intellectual Property                                            15
    Section 4.12        Environmental                                                      15
    Section 4.13        Employee Benefit Plans                                        16
    Section 4.14        Labor Matters                                                     18
    Section 4.15        Taxes                                                                 18
    Section 4.16        Transactions with Affiliates                                    18
    Section 4.17        Brokers                                                               18
    Section 4.18        Insurance                                                           19
    Section 4.19        Inventories                                                         19
    Section 4.20        Indebtedness                                                      19
    Section 4.21        Accounts Receivable                                            19
    Section 4.22        Bank Accounts                                                    19
    Section 4.23        Ownership of Mines                                             19
Article V. REPRESENTATIONS AND WARRANTIES RELATING TO PURCHASER     19

i

| | | |
|---|---|---|
| Section 5.1 | Organization and Authority | 19 |
| Section 5.2 | No Conflict | 20 |
| Section 5.3 | Consents and Approvals | 20 |
| Section 5.4 | Legal Proceedings | 20 |
| Section 5.5 | Purchase for Investment | 20 |
| Section 5.6 | Permitting | 20 |
| Section 5.7 | Brokers | 20 |
| Section 5.8 | Due Diligence; Reliance on Experts | 20 |
| Article VI. ADDITIONAL AGREEMENTS | | 21 |
| Section 6.1 | Access to Information | 21 |
| Section 6.2 | Confidentiality Agreement Termination | 21 |
| Section 6.3 | Consents and Related Matters | 21 |
| Section 6.4 | Employee Matters | 21 |
| Section 6.5 | Tax Matters; Straddle Period | 22 |
| Section 6.6 | Public Announcements | 23 |
| Section 6.7 | Labor Agreement | 23 |
| Section 6.8 | Further Action | 24 |
| Section 6.9 | Tax Treatment | 25 |
| Section 6.10 | U.S. Steel Notifications | 25 |
| Section 6.11 | Release and Replacement of Bonds | 25 |
| Section 6.12 | Dismissal from Certain Pending Actions | 25 |
| Section 6.13 | Proceeds from Sale of Lucchini Account Receivable | 25 |
| Section 6.14 | Escrow Agent Expenses | 25 |
| Section 6.15 | No Disparagement | 25 |
| Section 6.16 | Deposits | 25 |
| Section 6.17 | Use of Cliffs Name | 25 |
| Section 6.18 | Equity Certificates | 26 |
| Section 6.19 | Release of Guarantees | 26 |
| Article VII. CLOSING DELIVERABLES | | 26 |
| Section 7.1 | Closing Deliverables | 26 |
| Article VIII. SURVIVAL AND INDEMNIFICATION | | 27 |
| Section 8.1 | Survival | 27 |
| | | 27 |
| Section 8.2 | Indemnification by Parent and Seller | |
| Section 8.3 | Indemnification by Purchaser | 28 |
| Section 8.4 | Limits on Indemnification | 28 |
| Section 8.5 | Notice of Loss; Claims | 28 |
| Section 8.6 | Nature of Payments | 30 |
| Section 8.7 | Exclusive Remedy | 30 |
| Article IX. MISCELLANEOUS | | 30 |
| Section 9.1 | Expenses | 30 |
| Section 9.2 | Notices | 30 |
| Section 9.3 | Headings | 31 |
| Section 9.4 | Severability | 31 |
| Section 9.5 | Entire Agreement | 31 |
| Section 9.6 | Assignment | 31 |
| Section 9.7 | No Third-Party Beneficiaries | 32 |
| Section 9.8 | Amendment | 32 |

| | | |
|---|---|---|
| Section 9.9 | Specific Performance | 32 |
| Section 9.10 | Governing Law; Submission to Jurisdiction | 32 |
| Section 9.11 | Waiver of Jury Trial | 32 |
| Section 9.12 | Counterparts | 32 |
| Section 9.13 | Waiver | 32 |

**Sections of Disclosure Schedule (purely for reference):**

| Section | Description |
|---|---|
| 1.1(a) | Farming and Residential Leases |
| 1.1(b) | Knowledge of Parent |
| 3.3 | Consents and Approvals |
| 4.1 | Organization and Authority |
| 4.2(a) | Subsidiaries: Name and Jurisdiction of Formation |
| 4.2(b) | Subsidiaries: Jurisdictions of Foreign Qualification |
| 4.3 | No Conflict (Parent and Seller) |
| 4.4 | Capitalization |
| 4.5(c) | Absences of Certain Facts or Events |
| 4.5(d) | No Undisclosed Liabilities |
| 4.6 | Absence of Litigation |
| 4.7 | Compliance with Laws |
| 4.8 | Material Contracts |
| 4.9(a) | Real Property: Leased Real Property |
| 4.9(b)(i) | Real Property: Owned Real Property |
| 4.9(b)(ii) | Real Property: Owned Real Property Exceptions for Access |
| 4.9(b)(iii) | Real Property: Owned Real Property Exceptions for Occupancy |
| 4.10 | Personal Property |
| 4.11(a) | Intellectual Property: Ownership |
| 4.11(b) | Intellectual Property: Listing |
| 4.11(c) | Intellectual Property: Parent Marks and Websites |
| 4.12(a)(i) | Environmental: Compliance with Environmental Laws |
| 4.12(a)(ii) | Environmental: Environmental Authorizations |
| 4.12(b) | Environmental: Notices |
| 4.12(c) | Environmental: Governmental Orders |
| 4.12(d) | Environmental: Hazardous Material Release |
| 4.12(f) | Environmental: Hazardous Material Presence |
| 4.12(g) | Environmental: Hazardous Material Disposition |
| 4.13(a) | Employee Benefit Plans: Listing |
| 4.13(d) | Employee Benefit Plans: Multiemployer Plan |
| 4.13(e) | Employee Benefit Plans: Multiemployer Pension Plan |
| 4.13(i) | Employee Benefit Plans: Proceedings |
| 4.13(j) | Employee Benefit Plans: Change of Control |
| 4.13(l) | Employee Benefit Plans: Severance |
| 4.14(a) | Labor Matters: Collective Bargaining Agreements |
| 4.14(b) | Labor Matters: Compliance with Laws |
| 4.15(a) | Taxes: Tax Returns |
| 4.15(b) | Taxes: Payments |
| 4.15(c) | Taxes: Audits |
| 4.16 | Transactions with Affiliates |

iii

A005012

| | |
|---|---|
| 4.17 | Brokers |
| 4.18 | Insurance |
| 4.19 | Inventories |
| 4.20 | Indebtedness |
| 4.21(a) | Accounts Receivable |
| 4.21(b) | Accounts Receivable |
| 4.22 | Bank Accounts |
| 6.10(a) | U.S. Steel Notifications: Employees |
| 6.10(b) | U.S. Steel Notifications: Notices |
| 6.11(a) | Bonds |
| 6.13 | Proceeds from Sale of Lucchini Account Receivable |
| 7.1(f) | Director and Officer Resignations |
| 7.1(h) | Required Consents |
| 7.1(i) | Remaining Liens |

iv

A005013

## UNIT PURCHASE AGREEMENT

This UNIT PURCHASE AGREEMENT, dated as of and effective as of December 22, 2015 (this " Agreement"), is made and entered into by and among Cliffs Natural Resources Inc., an Ohio corporation ("Parent"), CLF PinnOak LLC, a Delaware limited liability company (" Seller"), and Seneca Coal Resources, LLC, a Delaware limited liability company ("Purchaser").

### RECITALS:

A.    Parent is the ultimate parent entity of Seller and will benefit from the consummation of the transactions contemplated by this Agreement.

B.    Seller is the record and beneficial owner of all of the outstanding equity interests (the " Units") of Cliffs North American Coal LLC, a Delaware limited liability company ("CNAC").

C.    CNAC is the record and beneficial owner of all of the outstanding equity interests of each of (i) Pinnacle Mining Company, LLC, a Delaware limited liability company ("PMC"), (ii) Pinnacle Land Company, LLC, a Delaware limited liability company (" PLC"), (iii) Oak Grove Resources, LLC, a Delaware limited liability company ("OGR"), (iv) Oak Grove Land Company, LLC, a Delaware limited liability company (" OGLC"), and (v) Beard Pinnacle, LLC, an Oklahoma limited liability company ("Beard Pinnacle" and, collectively with PMC, PLC, OGR and OGLC, the " Companies").

D.    Seller desires to sell, and Purchaser desires to purchase, the Units on the terms and subject to the conditions set forth in this Agreement.

E.    Parent and Seller believe it is in the best interest of Parent and Seller to consummate the transactions contemplated by this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

ARTICLE I.
DEFINITIONS

Section 1.1    Certain Defined Terms. As used in this Agreement, the following terms shall have the following meanings:

"1974 UMWA Pension Plan" means the United Mine Workers of America 1974 Pension Plan.

"Action" means any claim, action, suit, arbitration, inquiry, proceeding or investigation by or before any Governmental Authority.

"Affiliate" means, with respect to any specified Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such specified Person. For purposes of this definition, "control" means, as to any Person, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and the term "controlled" shall have a correlative meaning.

"Bill of Sale" means a bill of sale to be executed by Seller on the Closing Date in a form reasonably acceptable to Purchaser and Parent.

"Bonds" means any financial assurances, including third party guarantees, as set forth on  Section 6.11(a) of the Disclosure Schedule  provided to any (i) third party or (ii) Governmental Authority, in either case with respect to the operation of the Business.

"<u>Business</u>" means the mining, processing, preparation and selling of coal from the surface and underground coal mines and related operations owned or operated by CNAC and its Subsidiaries.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday or other day on which banks are required or authorized by Law to be closed in The City of New York.

"<u>Change of Control</u>" means, as to any Person, the occurrence of any of the following events: (i) the acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Exchange Act) of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 40% or more of the combined voting power of the then outstanding voting stock of such Person; (ii) consummation of a reorganization, merger or consolidation involving such Person, a sale or other disposition of all or substantially all of the assets or business of such Person, or any other similar transaction involving such Person (each, a "<u>Business Combination</u>"), unless, in each case, immediately following such Business Combination, (A) all or substantially all of the individuals and entities who were the beneficial owners of voting stock of such Person immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of the combined voting power of the then outstanding shares of voting stock of the entity resulting from such Business Combination (including an entity that as a result of such transaction owns such Person or all or substantially all of such Person's assets either directly or through one or more subsidiaries) in substantially the same proportions relative to each other as their ownership, immediately prior to such Business Combination, of the voting stock of such Person, (B) no individual, entity or group (other than such Person, such entity resulting from such Business Combination, or any employee benefit plan (or related trust) sponsored or maintained by such Person, any subsidiary of such Person or such entity resulting from such Business Combination) beneficially owns, directly or indirectly, 40% or more of the combined voting power of the then outstanding shares of voting stock of the entity resulting from such Business Combination, and (C) a majority of the members of the board of directors (or equivalent) of the entity resulting from such Business Combination were members of the board of directors (or equivalent) of such Person at the time of the execution of the initial agreement or of the action of the board of directors (or equivalent) of such Person providing for such Business Combination; or (iii) a complete liquidation or dissolution of such Person, except pursuant to a Business Combination that complies with clauses (A), (B) and (C) of clause (ii) above. For purposes of this definition, voting stock means securities (whether described as stock or otherwise) entitled to vote generally in the election of directors (or equivalent).

"<u>Cleanup</u>" means all actions required to: (i) cleanup, remove, treat or remediate Hazardous Materials in the indoor or outdoor environment; (ii) prevent the Release of Hazardous Materials so that they do not migrate, endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (iii) perform pre-remedial studies and investigations and post-remedial monitoring and care; or (iv) respond to any government requests for information or documents in any way relating to cleanup, removal, treatment or remediation or potential cleanup, removal, treatment or remediation of Hazardous Materials in the indoor or outdoor environment.

"<u>Closing Date</u>" means the date hereof.

"<u>Coal Inventories</u>" means, collectively, the Raw Coal and the Finished Goods Coal.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"<u>Contract</u>" means any oral or written note, bond, contract, lease or other agreement.

"<u>Disclosure Schedule</u>" means the disclosure schedule executed by Parent and Seller and delivered to Purchaser on the date hereof.

"<u>Environmental Claim</u>" means any claim, action, cause of action, investigation, request for information, notice of violation or other notice (written or oral) by any Person alleging potential liability (including potential liability for investigatory costs, Cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries or penalties) arising out of, based on or resulting from (i) the presence, manufacture, generation, processing, distribution, use, treatment, storage, disposal, transport, recycling, reclaiming, handling or Release into the indoor or outdoor environment of any Hazardous Material in, on, beneath or from any property currently owned, operated or leased by CNAC or any of its Subsidiaries or (ii) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law on or prior to the Closing Date by CNAC or any of its Subsidiaries.

"Environmental Law" means any Law currently in effect and relating to the regulation or protection of human health, safety or the indoor or outdoor environment or to emissions, discharges, Releases or threatened Releases, or otherwise relating to the manufacture, generation, processing, distribution, use, treatment, storage, disposal, transport, recycling, reclaiming or other handling of Hazardous Materials.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"Escrow Account" means the account established pursuant to the Escrow Agreement.

"Escrow Agent" means Delaware Trust Company.

"Escrow Agreement" means the agreement dated as of the date hereof among Parent, Seller, Purchaser and the Escrow Agent in respect of certain monies to be deposited with the Escrow Agent pursuant to the Override Right Agreement.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Existing Title Insurance Policies" means all title insurance policies insuring (i) the surface title, fee title or mineral title, as applicable, with respect to the Owned Real Property and (ii) the leasehold title to the Leased Real Property.

"Farming and Residential Leases" means leases and license agreements pursuant to which CNAC or one of its Subsidiaries leases or licenses portions of the Owned Real Property to third parties for residential and/or farming purposes and that are set forth in Section 1.1(a) of the Disclosure Schedule.

"Finished Goods Coal" means the Tons of stockpiled coal located on properties owned, leased, operated or controlled by or on behalf of the Business or held by other Persons on behalf of the Companies or their Affiliates, other than Raw Coal, which are of suitable quality on a standalone or blended basis (with other available existing stockpiled coal) to be sold without further processing.

"GAAP" means United States generally accepted accounting principles as applied consistent with past practice.

"Governmental Authority" means any United States federal, state or local or any non-United States government, governmental, regulatory or administrative authority, agency or commission or court, tribunal or judicial or arbitral body.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Hazardous Material" means: (i) any petroleum or petroleum products, flammable explosives, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation and transformers or other equipment that contain dielectric fluid containing levels of polychlorinated biphenyls; (ii) any chemicals or other materials or substances that are now defined as or included in the definition of "hazardous substance", "hazardous waste", "hazardous material", "extremely hazardous substance", "restricted hazardous waste", "toxic substance", "pollutant", "contaminant" or words of similar import under any Environmental Law; and (iii) any other chemical or other material or substance, exposure to which is now prohibited, limited or regulated by any Governmental Authority under any Environmental Law.

"Indebtedness" of any Person means all obligations of such Person, without duplication, (i) for borrowed money and (ii) in the nature of guarantees of the obligations described in clause (i) of any other Person.

"Indemnified Party" means a Purchaser Indemnified Party or a Seller Indemnified Party.

"Indemnifying Party" means a Purchaser Indemnifying Party or a Seller Indemnifying Party.

"Independent Accounting Firm" means BDO USA, LLC; provided, that if such Person is unavailable, then such Person instead shall be a mutually acceptable nationally or regionally recognized firm of independent certified public accountants that has not provided material services to either Parent or Purchaser or their respective Affiliates in the

A005016

preceding three years or, if no such firm is available and willing to serve, then a mutually acceptable expert in public accounting, in each case, upon which Parent and Purchaser shall have agreed.

"Intellectual Property" means: (i) trademarks, service marks, trade names, Internet domain names, designs, logos, slogans and general intangibles of like nature, together with goodwill, registrations and applications relating to the foregoing; (ii) patents and copyrights (including registrations and applications for any of the foregoing); and (iii) software, confidential information, technology, know-how, inventions, processes, formulae, algorithms, models and methodologies.

"Knowledge of Parent" means the actual knowledge of the individuals set forth in Section 1.1(b) of the Disclosure Schedule , in each case after reasonable inquiry of management of CNAC and its Subsidiaries.

"Law" means any United States federal, state or local or non-United States statute, law, ordinance, regulation, rule, code, Governmental Order or other requirement of law.

"Liabilities" means, as to any Person, all debts, liabilities and obligations, direct, indirect, absolute or contingent, of such Person, whether accrued, vested or otherwise, whether in contract, tort, strict liability or otherwise.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, security interest, encumbrance, charge, adverse claim, title defect or lien of any kind.

"Material Adverse Effect" means any fact, condition, change or event that would, or could reasonably be expected to, individually or in the aggregate, materially and adversely affect (a) the results of operations or financial condition of the Business, taken as a whole, or (b) the ability of CNAC and its Subsidiaries to operate the Business immediately after the Closing in the manner operated immediately prior to the Closing; provided, however, that none of the following shall be deemed in themselves (either alone or in combination) to constitute, and none of the following shall be taken into account in determining whether there has been, a Material Adverse Effect so long as none of the following have a disproportionate effect on the Business: (i) any fact, condition, change or event that (A) arises out of or relates to a deterioration in general economic conditions or in the industry in which the Business operates generally, including a decline in prices or demand for coal or steel, increases in costs of transportation and raw materials, and labor shortages, or (B) is generally applicable to the United States economy or securities markets or the world economy or international securities markets; (ii) any fact, condition, change or event that arises out of or relates to any act of terrorism or war (whether or not declared); (iii) any fact, condition, change or event that arises out of or relates directly to the consummation of the transactions contemplated hereby; and (iv) any fact, condition, change or event that arises out of or relates to any change in accounting requirements or principles imposed upon the Business by Law or GAAP or any change in applicable Law or the interpretation thereof.

"Override Right Agreement" means the agreement dated as of the date hereof among Parent, Seller and Purchaser pursuant to which Purchaser shall be obligated (subject to the terms thereof) to make quarterly payments for the calendar quarters in the years 2016 through 2020.

"Parent Marks and Websites" means the trademarks, service marks, trade names, brand names, logos, domain names and websites of Parent and its Affiliates (other than CNAC and its Subsidiaries) that are used in the Business.

"Permitted Liens" means the following: (i) Liens for Taxes, assessments or other governmental charges or levies that are not yet due or payable or that are being contested in good faith by appropriate proceedings; (ii) statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, materialmen and repairmen; (iii) Liens incurred or deposits made in the ordinary course of the business in connection with workers' compensation, unemployment insurance or other types of social security; (iv) Liens referenced in Schedule B of the Existing Insurance Policies; (v) Liens of a type that would appear on a Schedule B of a title insurance policy that are Liens customarily applying to real property (such as ordinary course utility easements) that were not referenced in Schedule B of the Existing Title Insurance Policies only because updated versions of such Existing Title Insurance Policies were not procured as of the date hereof; and (vi) defects of title, easements, rights-of-way and restrictions that do not, individually or in the aggregate, materially interfere with the ordinary conduct of the Business as presently conducted; provided, in each case, that such Permitted Liens neither individually nor in the aggregate have had, and would not reasonably be expected to have, a Material Adverse Effect on the operation of the Business as currently conducted.

"Person" means any natural person, general or limited partnership, corporation, limited liability company, firm, association or other legal entity.

"Raw Coal" means unprocessed coal severed and located in stockpiles on the Real Property, which requires processing.

"Real Property" means, collectively, the Leased Real Property and the Owned Real Property.

"Release" means any release, spill, emission, discharge, leaking, pumping, injection, deposit, disposal, dispersal, leaching or migration into the indoor or outdoor environment (including ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property, including the movement of Hazardous Materials through or in the air, soil, surface water, groundwater or property.

"Representatives" means, as to any Person, its members, managers, directors, officers, employees, affiliates, representatives (including financial advisors, attorneys and accountants), agents and potential sources of financing.

"Specified Current Assets" means the sum of "trade accounts receivables - net" plus "other current assets" of CNAC and its Subsidiaries as of the Closing Date, in each case, without duplication, determined in accordance with GAAP consistently applied in accordance with past practices, where each of "trade accounts receivables - net" and "other current assets" definitionally corresponds to such line items on the consolidating statement of financial position of CNAC as of September 30, 2015 provided by Parent to Purchaser prior to November 18, 2015.

"Specified Current Liabilities" means the difference of "current liabilities" less "payables to associated companies" of CNAC and its Subsidiaries as of the Closing Date, in each case, without duplication, determined in accordance with GAAP consistently applied in accordance with past practices, where each of "current liabilities" and "payables to associated companies" definitionally corresponds to such line items on the consolidating statement of financial position of CNAC as of September 30, 2015 provided by Parent to Purchaser prior to November 18, 2015.

"Subsidiary" means, with respect to any specified Person, any Person with respect to which such specified Person, directly or indirectly, owns or controls (i) more than 50% of the capital stock or other equity interests of such Person or (ii) capital stock or other equity interests representing more than 50% of the general voting power under ordinary circumstances of such Person, including any specified Person with the power to elect a majority of the board of directors (or equivalent) of such Person or with the power to direct the business and policies of such Person. Each of the Companies is a Subsidiary of CNAC.

"Tax" or "Taxes" means any and all income, excise, gross receipts, ad valorem, sales, use, employment, franchise, profits, gains, property, transfer, severance, production, payroll or intangibles taxes, together with any interest, penalties, additions to tax and additional amounts imposed by any Tax authority with respect thereto.

"Tax Returns" means all returns and reports (including elections, declarations, amendments, schedules, information returns or attachments thereto) required to be supplied to a Tax authority relating to Taxes.

"Ton" means 2,000 pounds.

"WARN Act" means the Worker Adjustment and Retraining Notification Act, as amended.

Section 1.2    Index of Other Defined Terms. Each of the terms set forth below shall have the respective meaning ascribed thereto in the following sections:

| Term | Section |
| --- | --- |
| Agreement | Preamble |
| Base Receivables | 2.3(e) |
| Beard Pinnacle | Recitals |
| Business Combination | 1.1 |
| | (in definition of Change of Control) |
| Claim Notice | 8.5(a) |
| Closing | 2.5 |
| CNAC | Recitals |

Collected Receivables                        2.3(e)
Companies                                    Recitals
Consideration                                2.2
Cut-Off Date                                 8.5(a)
Delaware Courts                              9.10
Dispute Notice                               2.3(b)
Dispute Period                               2.3(b)
Employee Plan                                4.13(a)
Employment and Labor Laws                    4.14(b)
Environmental Authorizations                 4.12(a)
ERISA Affiliate                              4.13(a)
Financial Statements                         4.5(a)
Guarantees                                   6.19
Interested Party                             4.16
Interim Balance Sheet                        4.5(b)
Interim Financial Statements                 4.5(b)
Leased Real Property                         4.9(a)
Leases                                       4.9(a)
Loss                                         8.2
Losses                                       8.2
Lucchini Receivable                          6.13
Multiemployer Pension Plan                   4.13(e)
OGLC                                         Recitals
OGR                                          Recitals
Owned Real Property                          4.9(b)
Parent                                       Preamble
Pending Actions                              6.12
PLC                                          Recitals
PMC                                          Recitals
Position Statement                           2.3(d)
Pre-Closing Period                           6.5(b)
Purchaser                                    Preamble
Purchaser Calculation                        2.3(b)
Purchaser Indemnified Party                  8.2
Purchaser Indemnifying Party                 8.3
Resolution Period                            2.3(c)
Seller                                       Preamble
Seller Indemnified Party                     8.3
Seller Indemnifying Party                    8.2
Signatory Companies                          6.7(a)
Specified Net Current Asset Difference       2.3(a)
Straddle Period                              6.5(b)
Tax Claim                                    6.5(f)
Third Party Claim                            8.5(a)
Transfer Taxes                               6.5(a)
Units                                        Recitals

6

Section 1.3   <u>Interpretation</u>.

(a)       Words in the singular shall be deemed to include the plural and vice versa, and words of one gender shall be held to include the other genders as the context requires.

(b)       The terms "hereof", "herein", "hereunder" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Article and Section references are to Articles and Sections of this Agreement unless otherwise specified.

(c)       The word "including" and words of similar import when used in this Agreement shall mean "including without limitation" unless otherwise specified.

(d)       Provisions shall apply, when appropriate, to successive events and transactions.

(e)       The word "will" shall be construed to have the same meaning and effect as the word "shall".

(f)       Except as otherwise expressly provided herein, all references to "dollars", "$" or dollar amounts shall be deemed references to the lawful currency of the United States of America.

(g)       Whenever the context may require, reference to any Person includes such Person's successors and assigns but only if such successors and assigns are not prohibited by this Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

(h)       Whenever the context may require, reference to any party means a party to this Agreement.

(i)       Whenever the context may require, reference to any Contract means such Contract as amended, restated, reformed, supplemented or otherwise modified and in effect from time to time in accordance with the terms thereof, as well as to all addenda, amendments, annexes, exhibits and schedules thereto.

(j)       Reference to any Law or section or other provision thereof means that Law or section or other provision thereof from time to time in effect and constituting the substantive amendment, codification, modification, reenactment or replacement of such Law or section or other provision thereof.

(k)       Whenever the context may require, the word "or" is used in the inclusive sense of "and/or".

(l)       Whenever the context may require, with respect to the determination of any period of time, "from" means "from and including" and "to" or "until" means "to but excluding".

(m)       Unless otherwise specified herein, all accounting terms used herein shall be interpreted and all accounting determinations hereunder shall be made in accordance with GAAP.


ARTICLE II.
PURCHASE AND SALE; CONSIDERATION; CLOSING


Section 2.1   <u>Purchase and Sale</u>. On the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, all of the right, title and interest of Seller in and to the Units, free and clear of all Liens.


Section 2.2   <u>Consideration</u>. Purchaser shall, as consideration for the Units, subject to adjustment after Closing in accordance with the terms of   <u>Section 2.3</u>, (a) assume the Liabilities of CNAC and the Companies and (b) enter into the Override Right Agreement in favor of Seller (as so adjusted, the "Consideration").

7

Section 2.3    <u>Adjustments to Consideration</u>. All adjustments to the Consideration shall be determined and (if applicable) paid as set forth in this    <u>Section 2.3</u>.

      (a)      The Consideration shall be increased by the amount, if any, by which the Specified Current Assets are greater than the Specified Current Liabilities (such excess amount, if any, the "<u>Specified Net Current Asset Difference</u>").

      (b)      Within 90 days after the Closing Date, Purchaser shall prepare and deliver to Parent Purchaser's calculation of the Specified Current Assets and the Specified Current Liabilities (such delivery, the "<u>Purchaser Calculation</u>"). Without limiting any other obligation of Parent or Seller under this Agreement, Parent and Seller will make available or cause to be made available to Purchaser and its Representatives upon reasonable notice and at reasonable times all personnel and information necessary to assist Purchaser and its Representatives in connection with the preparation of the Purchaser Calculation. Parent shall have 45 days from the date Purchaser delivers the Purchaser Calculation to Parent (such period, the "<u>Dispute Period</u>") to notify Purchaser, in writing, as to whether Parent agrees or disagrees with the Purchaser Calculation, which such notice shall identify in reasonable detail those items and amounts to which Parent objects, the reasons therefor and Parent's proposed calculation of the Specified Current Assets and the Specified Current Liabilities and the portion, if any, of the Purchaser Calculation that Parent does not dispute (such written notice, the "<u>Dispute Notice</u>"). During the Dispute Period, Parent and its accountants shall be permitted to review (during regular business hours and upon reasonable prior notice) the working papers of Purchaser and (where applicable) Purchaser's accountants to the extent relating to the matters set forth in the Purchaser Calculation, in each case as is reasonably requested in writing by Parent. If Parent fails to deliver a Dispute Notice to Purchaser during the Dispute Period, Purchaser's calculation of the Specified Current Assets and the Specified Current Liabilities shall be deemed to be final and correct and shall be binding upon all parties. If Parent delivers a Dispute Notice to Purchaser with respect to some, but not all, of the amounts or items included in the Purchaser Calculation during the Dispute Period, then Parent shall be deemed to have agreed with Purchaser's calculations of all amounts set forth in such Purchaser Calculation that were not disputed in such duly and timely delivered Dispute Notice.

      (c)      If Parent delivers a Dispute Notice to Purchaser during the Dispute Period, Parent and Purchaser shall, for a period of 30 days from the date the Dispute Notice is delivered to Purchaser (such period, the "<u>Resolution Period</u>"), negotiate in good faith and use commercially reasonable efforts to amicably resolve the items in dispute. Any items so resolved shall be deemed to be final and correct as so resolved and shall be binding upon each of the parties hereto.

      (d)      If Parent and Purchaser are unable in good faith to resolve all of the items in dispute during the Resolution Period, then, upon the expiration of the Resolution Period or such earlier date as Purchaser and Parent mutually agree, either Purchaser or Parent may refer the items remaining in dispute in writing to the Independent Accounting Firm and shall deliver to the Independent Accounting Firm, at the time of such referral, the Purchaser Calculation and the Dispute Notice. Within five Business Days after referral of the matter to the Independent Accounting Firm, Purchaser and Parent shall agree on the procedures to be followed by the Independent Accounting Firm (including procedures with regard to presentation of evidence). Such procedures shall not alter the accounting policies, practices and principles to be applied to the calculation of the Specified Current Assets and the Specified Current Liabilities, which will be those required by this Agreement. If Purchaser and Parent are unable to agree upon such procedures before the end of five Business Days after referral of the dispute to the Independent Accounting Firm, the Independent Accounting Firm shall establish such procedures giving due regard to the intention of Purchaser and Parent to resolve disputes as quickly, efficiently and inexpensively as possible, which procedures may be, but need not be, those proposed by Purchaser or Parent. The parties shall also furnish the Independent Accounting Firm with such other information and documents as the Independent Accounting Firm may reasonably request in order for it to resolve the items in dispute. Parent and Purchaser shall also, within 20 days of the date the items in dispute are referred to the Independent Accounting Firm, provide the Independent Accounting Firm with a written statement (a "<u>Position Statement</u>") describing in reasonable detail their respective positions on the items in dispute (copies of which will be provided by the Independent Accounting Firm to the other party after such time, if any, that both parties have delivered a Position Statement to the Independent Accounting Firm). If any party fails to timely deliver its Position Statement to the Independent Accounting Firm, the Independent Accounting Firm shall resolve the items in dispute solely upon the basis of the information otherwise provided to it. The Independent Accounting Firm shall resolve all disputed items in a written determination to be delivered to Purchaser and Parent within 30 days after such matter is referred to it; <u>provided</u>, <u>however</u>, that any delay in delivering such determination shall not invalidate such determination or deprive the Independent Accounting Firm of jurisdiction to resolve the items in dispute; <u>provided</u>, <u>further</u>, that, in resolving any disputed item, the Independent

8

Accounting Firm shall adhere to the definitions contained in this Agreement and the practices and other principles referred to herein. In no event shall the Independent Accounting Firm assign a value to the Specified Net Current Asset Difference that is greater than the highest or less than the lowest calculation thereof proposed by Purchaser in the Purchaser Calculation and Parent in the Dispute Notice. The decision of the Independent Accounting Firm, acting as an expert and not as an arbitrator, shall be final and binding upon the parties hereto and shall not be subject to judicial review. The fees and expenses of the Independent Accounting Firm shall be borne by Parent, on the one hand, and Purchaser, on the other hand, in equal portions, unless the Independent Accounting Firm decides, based on its determination with respect to the reasonableness of the respective positions of the parties, that the fees and expenses shall be borne in unequal proportions.

(e)     Within seven days after the final determination of the Specified Current Assets and the Specified Current Liabilities and the calculation of any Specified Net Current Asset Difference (whether through failure of Parent to timely deliver a Dispute Notice, agreement of the parties or determination of the Independent Accounting Firm), if there is a positive Specified Net Current Asset Difference, then Purchaser shall pay such Specified Net Current Asset Difference to Seller in immediately available funds via wire transfer (in which case there shall be an immediate upward adjustment of the Consideration in such amount); provided, however, that Purchaser shall pay any portion of such Specified Net Current Asset Difference (i) not earlier than the final determination of such Specified Net Current Asset Difference, (ii) only after such time that CNAC and its Subsidiaries have received payment of trade accounts receivable of CNAC and its Subsidiaries reflected in the Specified Current Assets up to the dollar amount whereby the Specified Net Current Asset Difference would have been zero (such dollar amount, the "Base Receivables") and (iii) once the threshold in Section 2.3(e)(ii) is met, only as and when (and to the extent) CNAC and its Subsidiaries have received payment of trade accounts receivable of CNAC and its Subsidiaries reflected in the Specified Current Assets in an amount exceeding the Base Receivables (such amount exceeding the Base Receivables, the "Collected Receivables"). In order to effectuate the payment of any Specified Net Current Asset Difference, Purchaser agrees (A) to use efforts to collect such Collected Receivables that are not materially less than the efforts it otherwise employs to collect the Base Receivables or other trade accounts receivable of the Business, (B) that, with respect to any amounts collected by CNAC and its Subsidiaries from any payor that has trade accounts receivable reflected in the Specified Current Assets, for purposes of this Section 2.3, such amounts shall, unless otherwise expressly provided by the payor, be attributable to the Specified Current Assets prior to being attributed to any trade accounts receivable that are not Specified Current Assets, (C) to remit to Seller, on a weekly basis commencing the week following the final determination of any Specified Net Current Asset Difference, the amount of the Base Receivables and the Collected Receivables, and (D) to provide to Seller, concurrent with any such remittance of Collected Receivables, a list setting forth in respect of such Collected Receivables (x) the payor of each portion of such Collected Receivables and (y) the amount of Collected Receivables paid by each such payor.

(f)     The dispute resolution procedures set forth in this Section 2.3 are the sole and exclusive means and remedy for determining and calculating the Specified Current Assets, the Specified Current Liabilities and any Specified Net Current Asset Difference and the components thereof, other than in the event of fraud or willful misconduct, in which case the aggrieved party shall be entitled to such other rights and remedies as are permitted by applicable Law.

Section 2.4   Allocation of Consideration. Purchaser and Parent shall mutually agree in good faith upon an allocation of the Consideration and other consideration (including any Liabilities treated as assumed for Tax purposes), if any, among the assets of CNAC and its Subsidiaries in accordance with the U.S. Treasury regulations promulgated under Section 1060 of the Code; provided, however, that if Purchaser and Parent are unable to agree upon such allocation within 30 days after the final determination of the Consideration pursuant to Section 2.3, such allocation shall be determined by the Independent Accounting Firm, with such determination being binding on the parties hereto, in which case the costs, fees and expenses of the Independent Accounting Firm in connection therewith shall be borne equally by Purchaser and Parent. Parent and Purchaser shall act in accordance with the allocation determined pursuant to this Section 2.4, whether through mutual agreement or determination by the Independent Accounting Firm, in the preparation and filing of any Tax Return and in all communications with any Governmental Authority relating to Taxes.

Section 2.5   Closing. The closing of the transactions contemplated hereby (the "Closing") will take place effective as of the close of business on the Closing Date (New York City time) on the date hereof. At the Closing, there shall be delivered to Seller and Purchaser, as applicable, the documents to be delivered pursuant to Article VII.

9

ARTICLE III.
REPRESENTATIONS AND WARRANTIES RELATING TO PARENT AND SELLER

Each of Parent and Seller, jointly and severally, represents and warrants to Purchaser as follows:

Section 3.1 <u>Organization and Authority</u>. Each of Parent and Seller is a corporation or limited liability company, respectively, duly incorporated or formed, respectively, validly existing and in good standing under the Laws of the State of Ohio or the State of Delaware, respectively. Each of Parent and Seller has the full legal right and power and all authority required by Law to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. This Agreement has been duly authorized, executed and delivered by or on behalf of Parent and Seller, and (assuming due authorization, execution and delivery by Purchaser) this Agreement constitutes the legal, valid and binding obligation of each of Parent and Seller, enforceable against each in accordance with its terms, subject to the effect of any applicable bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or similar Laws affecting creditors' rights generally and subject, as to enforceability, to the effect of general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 3.2 <u>No Conflict</u>. Assuming all consents, approvals, authorizations and other actions described in <u>Section 3.3</u> have been obtained, and except as may result from any facts or circumstances relating solely to Purchaser, the execution and delivery of and performance of obligations under this Agreement by each of Parent and Seller and the consummation by each of Parent and Seller of the transactions contemplated hereby do not and will not violate or conflict with the organizational documents of Parent or Seller or any Law applicable to Parent or Seller, except for any such violations or conflicts of any Law as would not materially delay the ability of Parent or Seller to perform its respective material obligations under this Agreement or consummate the transactions contemplated hereby.

Section 3.3 <u>Consents and Approvals</u>. Except as set forth in <u>Section 3.3 of the Disclosure Schedule</u>, the execution and delivery of this Agreement by each of Parent and Seller do not, and the performance by each of Parent and Seller of its obligations hereunder will not, require any consent, approval, authorization or other action by, or filing with or notification to, any Governmental Authority or other Person, except (a) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not prevent Parent or Seller from performing any of its respective material obligations under this Agreement or consummating the transactions contemplated hereby or (b) as may be necessary as a result of any facts or circumstances relating solely to Purchaser.

Section 3.4 <u>Ownership of the Units</u>. Seller is the lawful owner of the Units. Upon the consummation of the transactions contemplated hereby, Purchaser will acquire title to the Units being sold by Seller, free and clear of all Liens. The Units are uncertificated.

Section 3.5 <u>Legal Proceedings</u>. There are no Actions pending or, to the Knowledge of Parent, threatened against, relating to or affecting Parent or Seller that would reasonably be expected to result in the issuance of a Governmental Order restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated hereby.

Section 3.6 <u>Permitting</u>. None of Parent, Seller, CNAC, any Subsidiary of CNAC or any Person that, together with any Affiliate of Parent, Seller, CNAC or any Subsidiary of CNAC, owns 10% or more of the equity interests of Parent, Seller, CNAC or any Subsidiary of CNAC has been subject to any bond forfeiture, permit suspension or revocation instituted by any Governmental Authority that would prohibit the transfer of any Environmental Authorizations to Purchaser. None of Parent, Seller, CNAC, any Subsidiary of CNAC or any Person "owned or controlled" by Parent, Seller, CNAC, any Subsidiary of CNAC has been notified by the Federal Office of Surface Mining or the agency of any state administering the Surface Mining Control and Reclamation Act (or any comparable state statute) that it is currently (a) ineligible to receive additional surface mining permits or (b) under investigation to determine whether its eligibility to receive such permits should be revoked, i.e., "permit blocked".

10

ARTICLE IV.
REPRESENTATIONS AND WARRANTIES RELATING TO CNAC AND ITS SUBSIDIARIES

Each of Parent and Seller, jointly and severally, represents and warrants to Purchaser as follows:

Section 4.1   Organization and Authority . CNAC is a limited liability company duly formed, validly existing and in good standing under the Laws of the State of Delaware and has full liability company power and authority to conduct its business as and to the extent now conducted and to own, use and lease its assets and properties. CNAC is duly qualified, licensed or admitted to do business and is in good standing in those jurisdictions set forth in Section 4.1 of the Disclosure Schedule, which are the only jurisdictions in which the ownership, use or leasing of its assets and properties, or the conduct or nature of its business, makes such qualification, licensing or admission necessary, except for those jurisdictions in which the failure by CNAC to be so qualified, licensed or admitted and in good standing would not have a Material Adverse Effect.

Section 4.2   Subsidiaries. Each Subsidiary of CNAC and each such Subsidiary's jurisdiction of formation is set forth in   Section 4.2(a) of the Disclosure Schedule. Each Subsidiary of CNAC is a limited liability company duly formed, validly existing and in good standing under the Laws of its jurisdiction of formation and has full limited liability company power and authority to conduct its business as and to the extent now conducted and to own, use and lease its assets and properties. Each Subsidiary of CNAC is duly qualified, licensed or admitted to do business and is in good standing in those jurisdictions set forth in Section 4.2(b) of the Disclosure Schedule , which are the only jurisdictions in which the ownership, use or leasing of its assets and properties, or the conduct or nature of its business, makes such qualification, licensing or admission necessary, except for those jurisdictions in which the failure by such Subsidiary to be so qualified, licensed or admitted and in good standing would not have a Material Adverse Effect. All of the outstanding equity interests or other voting securities of each Subsidiary of CNAC are owned directly by CNAC free and clear of all Liens. Other than the Companies, CNAC does not own, directly or indirectly, any equity interest in any Person, nor is CNAC a partner or member of any partnership, limited liability company or joint venture. Beard Pinnacle's assets were sold in 2008 such that the operations of Beard Pinnacle have ceased and it no longer is a going concern.

Section 4.3   No Conflict. Assuming all consents, approvals, authorizations and other actions described in   Section 3.3 have been obtained, and except as set forth in Section 4.3 of the Disclosure Schedule  or as may result from any facts or circumstances relating solely to Purchaser, the execution and delivery of and performance of obligations under this Agreement by each of Parent and Seller and the consummation by each of Parent and Seller of the transactions contemplated hereby do not and will not (a) violate or conflict with the certificate of formation (or equivalent) or limited liability company agreement (or equivalent) of CNAC or any Subsidiary of CNAC, (b) violate or conflict with any Law applicable to CNAC or any Subsidiary of CNAC or (c) result in any material breach of, or constitute a material default (or event that with the giving of notice or lapse of time, or both, would become a material default) under, or give to any Person any rights of termination, amendment, acceleration or cancellation of, or result in the creation of any Lien (other than a Permitted Lien) on any of the assets or properties of CNAC or any Subsidiary of CNAC pursuant to, any Contract to which CNAC or any Subsidiary of CNAC is a party or by which any of their respective assets or properties are bound.

Section 4.4   Capitalization. Section 4.4 of the Disclosure Schedule  sets forth the entire authorized equity interests of CNAC and the total percentage of issued and outstanding limited liability company units, all of which are owned, of record and beneficially, by Seller. The Units are validly issued, fully paid and nonassessable, and none of the Units are subject to any preemptive rights. There are no outstanding options, warrants, calls, rights or other Contracts or instruments of any character (including any member, limited liability company or operating agreement, buy-sell agreement or other similar agreement) requiring, and there are no securities of CNAC outstanding that upon conversion or exchange would require, the issuance, sale or transfer of any additional membership interests, units or other equity securities of CNAC or other securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase membership interests, units or other equity securities of CNAC. None of the Units were issued, or, since issuance, have been transferred, in violation of Law or Contract, including any preemptive right, right of first refusal or other similar right of any Person. There are no restrictions on the transfer of the Units as contemplated in this Agreement.

11

Section 4.5    <u>Financial Statements and Condition; No Undisclosed Liabilities; Absence of Certain Facts or Events</u>.

(a)    Prior to the execution of this Agreement, Parent has made available to Purchaser copies of the unaudited consolidated balance sheets of the Business as of December 31, 2014 and 2013 and the related unaudited consolidated statements of income for the years then ended (the "<u>Financial Statements</u>"). Except as set forth in the notes thereto, the Financial Statements have been prepared in accordance with GAAP consistently applied throughout the periods indicated and present fairly, in all material respects, the consolidated financial position (and changes in financial position, if any) of the Business as of the dates and for the periods referred to therein, all in accordance with GAAP.

(b)    Prior to the execution of this Agreement, Parent has made available to Purchaser copies of the unaudited consolidated balance sheet of the Business as of November 30, 2015 (the "<u>Interim Balance Sheet</u>") and the related unaudited consolidated statements of income for the eleven-month period then ended (the "<u>Interim Financial Statements</u>"). Subject to normal (as to type and amount) year-end adjustments and the absence of disclosure normally made in footnotes, the Interim Financial Statements have been prepared in accordance with GAAP consistently applied throughout the periods indicated and present fairly, in all material respects, the consolidated financial position (and changes in financial position, if any) of the Business as of the date and for the period referred to therein, all in accordance with GAAP.

(c)    Except as set forth in <u>Section 4.5(c) of the Disclosure Schedule</u> and except for the execution and delivery of this Agreement and the transactions to take place pursuant hereto on or prior to the Closing Date, since September 30, 2015, the Business has been operated in all material respects in the ordinary course and there has not been any Material Adverse Effect.

(d)    Except as set forth in <u>Section 4.5(d) of the Disclosure Schedule</u> or in the Interim Financial Statements, neither CNAC nor any of its Subsidiaries had at the date of the Interim Financial Statements, or since that date has incurred, any Liabilities of any nature, whether absolute, accrued, contingent or otherwise and whether due or to become due, except Liabilities:

(i)    that are accrued or reserved against in the Interim Financial Statements or reflected in the notes thereto;

(ii)    that were incurred after the date of the Interim Financial Statements in the ordinary course of business;

(iii)    that have been fully discharged or paid before the date of this Agreement; or

(iv)    that, in the aggregate, would not have a Material Adverse Effect.

Section 4.6    <u>Absence of Litigation</u>. Except as set forth in <u>Section 4.6 of the Disclosure Schedule</u>, as of the date hereof, (a) there are no Actions pending or, to the Knowledge of Parent, threatened against CNAC or any Subsidiary of CNAC or any of their respective assets or properties that would have a Material Adverse Effect or would prevent Parent or Seller from consummating the transactions contemplated hereby and (b) none of CNAC, any Subsidiary of CNAC or any of their respective assets or properties are subject to any outstanding Governmental Order. None of the Actions or Governmental Orders set forth in <u>Section 4.6 of the Disclosure Schedule</u> are reasonably likely to prevent Parent or Seller from consummating the transactions contemplated hereby.

Section 4.7    <u>Compliance with Laws</u>. Except as set forth in <u>Section 4.7 of the Disclosure Schedule</u> or for Environmental Laws (which are addressed in <u>Section 4.12</u>) or for Employment and Labor Laws (which are addressed in <u>Section 4.14</u>), the Business is currently being operated in compliance in all material respects with all currently applicable Laws that apply to the Business, and no written or oral notice, charge, claim, Action or assertion has been received by Parent, Seller, CNAC or any Subsidiary of CNAC or, to the Knowledge of Parent, has been filed, commenced or threatened against CNAC or any Subsidiary of CNAC alleging any violation of any of the foregoing, in each case except (a) for citations issued by the Mine Safety and Health Administration or any similar state regulatory agency that can be reasonably abated without material cost or expense to CNAC or any of its Subsidiaries in the ordinary course

12

of CNAC's and its Subsidiaries' continuing operations or (b) for violations the existence of which would not have a Material Adverse Effect.

Section 4.8   Material Contracts.

(a)    Section 4.8 of the Disclosure Schedule contains a list of each of the following Contracts (other than the Leases) to which CNAC or a Subsidiary of CNAC is a party:

(i)    all Contracts (other than the Employee Plans) providing for a commitment of employment or consultation services;

(ii)    all Contracts with any Person containing any provision or covenant prohibiting or limiting the ability of CNAC or a Subsidiary of CNAC to engage in any business activity or compete with any Person or prohibiting or limiting the ability of any Person to compete with CNAC or a Subsidiary of CNAC (other than restrictions on other parties pursuant to agreements pertaining to Business Combinations or acquisitions);

(iii)    all partnership, joint venture, shareholders' or other similar Contracts with any Person;

(iv)    all Contracts relating to Indebtedness of CNAC or a Subsidiary of CNAC;

(v)    all Contracts granting any right of first refusal or right of first offer or similar right or that materially limit or purport to materially limit the ability of CNAC or any Subsidiary of CNAC to own, operate, sell, transfer, pledge or otherwise dispose of the properties or assets of its business;

(vi)    all material Contracts providing for the indemnification by CNAC or any Subsidiary of CNAC of any Person in connection with the Business;

(vii)    all Contracts providing for any payments by CNAC or any Subsidiary of CNAC that are conditioned, in whole or in part, on a Change of Control of CNAC or any of its Subsidiaries or transactions of the type contemplated hereby;

(viii)    any collective bargaining agreement;

(ix)    any employment agreement with, or any agreement or arrangement that contains any guaranteed compensation, equity commitments, commission or other production bonuses, severance pay or post-employment liabilities or obligations (other than as required by Law) to, any current or former employees, non-employee directors or officers or other Persons that have performed or are performing consulting or other independent contractor services for CNAC or any Subsidiary of CNAC;

(x)    any Contract with an Interested Party; and

(xi)    all other Contracts (other than the Employee Plans) that require the payment pursuant to the terms of any such Contract by or to CNAC or a Subsidiary of CNAC of more than $1,000,000.

(b)    Each Contract required to be disclosed in Section 4.8 of the Disclosure Schedule is in full force and effect and constitutes a legal, valid and binding agreement, enforceable, in all material respects, in accordance with its terms, of CNAC or the applicable Subsidiary and, to the Knowledge of Parent, of each other party thereto, other than Contracts that have expired by their terms. Neither CNAC nor the applicable Subsidiary nor, to the Knowledge of Parent, any other party to such Contract is in violation or breach of or default under any such Contract (or with notice or lapse of time, or both, would be in violation or breach of or default under any such Contract), the effect of which would have a Material Adverse Effect.

Section 4.9   Real Property.

(a)    Section 4.9(a) of the Disclosure Schedule contains a true and complete list of all of the leases, licenses, subleases, agreements containing easements or subsidence rights in favor of CNAC or any of its Subsidiaries,

13

and all other similar occupancy agreements, including all amendments or other modifications thereto (collectively, the " Leases"), pursuant to which CNAC or any of its Subsidiaries leases, licenses, subleases or otherwise occupies real property (such real property, collectively, the "Leased Real Property"). The Leased Real Property is the only real property leased, subleased, licensed or otherwise occupied by CNAC or any of its Subsidiaries that is used in connection with the Business, other than the Owned Real Property and any real property occupied or otherwise used by CNAC or any of its Subsidiaries pursuant to appurtenant easements and similar rights that constitute Permitted Liens. CNAC or the applicable Subsidiary has a good and valid leasehold interest in all of the Leased Real Property, free and clear of any Liens (other than Permitted Liens). The Leases are in full force and effect. Neither CNAC nor the applicable Subsidiary nor, to the Knowledge of Parent, any other party to any Lease is in material default under the Leases. To the Knowledge of Parent, no event has occurred that, with notice or lapse of time, or both, would constitute a material breach or default by CNAC or such Subsidiary or any other party to any Lease under any of the Leases. Parent has made available to Purchaser or its Representatives copies of the Leases and all certificates of occupancy, title reports, title insurance policies, preliminary mining title opinions, surveys and similar documents with respect to the Leased Real Property that are in the possession of Parent, Seller, CNAC or any of the Subsidiaries of CNAC, and the copies of the Leases made available by Parent are true, correct and complete in all material respects. Neither the use of the Leased Real Property by CNAC or the applicable Subsidiary nor, to the Knowledge of Parent, the Leased Real Property itself contravenes or violates any building, zoning, administrative, occupational safety and health or other applicable Law in any material respect.

(b)　　Section 4.9(b)(i) of the Disclosure Schedule contains a true and complete list of all real property owned by CNAC or any of its Subsidiaries (the "Owned Real Property"). Except as set forth in Section 4.9(b)(ii) of the Disclosure Schedule, reasonable access to that portion of the Owned Real Property on which CNAC or any of its Subsidiaries are currently conducting mining, processing or reclamation operations is available through publicly dedicated streets or a validly existing easement, which access is consistent with past practice. Except as would not have a Material Adverse Effect, CNAC or the applicable Subsidiary has good and valid title to all of the Owned Real Property, free and clear of any Liens (other than Permitted Liens). None of the Owned Real Property, or the use thereof, contravenes or violates any building, zoning, administrative, occupational safety and health or other applicable Law in any material respect. Parent has made available to Purchaser or its Representatives copies of all deeds, leases, mortgages, deeds of trust, certificates of occupancy, title insurance policies (including the Existing Title Insurance Policies), title reports, surveys and documents evidencing recorded and unrecorded easements, rights-of-way and similar restrictions and rights (and all amendments thereto) with respect to the Owned Real Property, to the extent the same are in the possession of Parent, Seller, CNAC or a Subsidiary of CNAC. Other than the Farming and Residential Leases and other than as set forth in Section 4.9(b)(iii) of the Disclosure Schedule, neither CNAC nor any of its Subsidiaries is a party to any lease, license, sublease, agreement containing easements or subsidence rights in favor of CNAC or any of its Subsidiaries or similar occupancy agreement under which it leases, licenses, subleases or otherwise makes any of the Owned Real Property available for occupancy by any third party (other than an Affiliate). All of the Farming and Residential Leases are terminable by CNAC or the applicable Subsidiary without cost to CNAC or such Subsidiary upon not more than 90 days' prior notice.

(c)　　CNAC and its Subsidiaries, as applicable, have obtained all easements and rights of way required to use and operate the Owned Real Property and the Leased Real Property in all material respects in connection with the Business and to comply with applicable Law (other than any non-compliance that would not have a Material Adverse Effect). Neither CNAC nor any Subsidiary of CNAC is in material default under any document evidencing such easement or right of way and, to the Knowledge of Parent, (i) all such documents are in full force and effect, (ii) the other party to each such document is not in material default thereunder and (iii) no event has occurred that, with notice or lapse of time, or both, would constitute a material breach or default by CNAC or such Subsidiary or the other party under any such document.

(d)　　Parent has made available to Purchaser or its Representatives all studies relating to the coal reserves associated with the Business's mines that were prepared by, or at the request of, and that are in the possession of, Parent, Seller, CNAC or any of CNAC's Subsidiaries. Neither Parent nor Seller makes any representation or warranty with respect to the accuracy or completeness of any such study.

Section 4.10　Personal Property. Except as set forth in Section 4.10 of the Disclosure Schedule, CNAC and its Subsidiaries own, have a valid leasehold interest in or have the legal right to use all of the tangible personal property necessary to carry on the Business as currently conducted, free and clear of all Liens (other than Permitted Liens) in all material respects. Except as set forth in Section 4.5(c) of the Disclosure Schedule and Section 4.10 of the Disclosure Schedule, all of the tangible personal property of CNAC and its Subsidiaries (other than Coal Inventories, which are

14

addressed in Section 4.19) are in a good state of maintenance, operating condition and repair, ordinary wear and tear excepted, and, to the extent necessary, are being used or are useful in accordance with the current operating plan of the Business. Except as set forth in Section 4.10 of the Disclosure Schedule, all tangible personal property of CNAC and its Subsidiaries are in the possession of CNAC and its Subsidiaries.

Section 4.11    Intellectual Property. Section 4.11(a) of the Disclosure Schedule contains a true and complete list of all Intellectual Property owned by CNAC or any of its Subsidiaries that is material to the Business. There are no pending or, to the Knowledge of Parent, threatened claims of which Parent, Seller, CNAC or a Subsidiary of CNAC has been given written notice by any Person against its use of such Intellectual Property. CNAC and its Subsidiaries have such ownership of or such rights by license, lease or other agreement to the Intellectual Property as set forth in Section 4.11(b) of the Disclosure Schedule as are necessary to conduct the Business as currently conducted. CNAC and its Subsidiaries own and have good and exclusive title to each item of such Intellectual Property owned by it, free and clear of any Liens, except for Permitted Liens. None of the Intellectual Property is subject to any Action or Governmental Order restricting in a material respect the use, transfer or licensing thereof by CNAC or any of its Subsidiaries or affecting in a material respect the validity, use or enforceability of such Intellectual Property. The Parent Marks and Websites set forth in Section 4.11(c) of the Disclosure Schedule will not be included in the Intellectual Property owned by CNAC or any of its Subsidiaries following the Closing.

Section 4.12    Environmental.

(a)        Except as set forth in Section 4.12(a)(i) of the Disclosure Schedule or for matters that have been fully resolved, each of CNAC, the Subsidiaries of CNAC and, to the Knowledge of Parent, their respective predecessors are, and at all times since August 1, 2007 have been, in compliance in all material respects with all applicable Environmental Laws (which compliance includes the possession by CNAC, each Subsidiary of CNAC and their respective predecessors of all permits, approvals, consents, licenses, waivers and other governmental authorizations required under applicable Environmental Laws ("Environmental Authorizations") and compliance with the terms and conditions thereof). The Environmental Authorizations are set forth in Section 4.12(a)(ii) of the Disclosure Schedule. None of Parent, Seller, CNAC or any Subsidiary of CNAC has received any communication (written or oral), whether from a Governmental Authority, citizens group, employee or otherwise, alleging that the Business is or was not in such compliance.

(b)        Except as set forth in Section 4.12(b) of the Disclosure Schedule, none of Parent, Seller, CNAC or any of the Subsidiaries of CNAC has received notice of an Environmental Claim, other than any such Environmental Claim that has been fully resolved with no further liability to CNAC or any of its Subsidiaries.

(c)        Except as set forth in Section 4.12(c) of the Disclosure Schedule, neither CNAC nor any of its Subsidiaries is subject to any pending or existing Governmental Order, settlement, schedule of compliance or other restriction arising under any Environmental Law.

(d)        Except as set forth in Section 4.12(d) of the Disclosure Schedule, neither CNAC nor any Subsidiary of CNAC has placed, stored, deposited, discharged, Released, buried, dumped or disposed of Hazardous Materials at, on or beneath any property that is owned or operated by CNAC or any Subsidiary of CNAC, except for inventories of such substances to be used, and wastes generated therefrom, in the ordinary course of business and in accordance with applicable Environmental Laws or as would not be expected to require any reporting, assessment, Cleanup, response or other remedial action under any Environmental Law or to pay for the cost of any such action pursuant to any Environmental Law.

(e)        Parent has delivered or otherwise made available for inspection to Purchaser (i) copies and results of any material reports, studies, analyses, tests or monitoring possessed or initiated by Parent, Seller, CNAC or any Subsidiary of CNAC or any of their Affiliates pertaining to Hazardous Materials in, on, beneath or adjacent to any property currently owned, operated or leased by CNAC or any of its Subsidiaries or regarding compliance with applicable Environmental Laws by CNAC and each Subsidiary of CNAC and (ii) copies of all material Environmental Authorizations issued to CNAC and each of its Subsidiaries within the past five years.

(f)        Except as set forth in Section 4.12(f) of the Disclosure Schedule, without in any way limiting the generality of the foregoing, to the Knowledge of Parent, any properties owned or operated by CNAC or any of its Subsidiaries do not contain any: underground storage tanks or related piping; asbestos or asbestos-containing material;

15

polychlorinated biphenyls; underground injection wells; radioactive materials; surface impoundments; landfills; sumps; or septic tanks or waste disposal pits in which any Hazardous Materials have been discharged, buried, incinerated, deposited, placed or disposed.

(g)     Except as set forth in Section 4.12(g) of the Disclosure Schedule, neither CNAC nor any of its Subsidiaries has sent any Hazardous Material to a site that, pursuant to any Environmental Law, has been placed or, to the Knowledge of Parent, proposed for placement on the National Priorities List or any similar state list or is subject to a Governmental Order from any Governmental Authority to take "removal", "response", "corrective" or other Cleanup action or to pay for the cost of any such action at the site under any Environmental Law.

Section 4.13    Employee Benefit Plans. As it relates to the Business:

(a)     Section 4.13(a) of the Disclosure Schedule sets forth a true and complete list of all the following: (i) each "employee benefit plan", as such term is defined in Section 3(3) of ERISA, that CNAC, any Subsidiary of CNAC or any entity that is treated as a single employer under Section 414 of the Code or Section 4001 of ERISA with CNAC or any Subsidiary of CNAC (an "ERISA Affiliate") currently sponsors or maintains; and (ii) each other plan, program, policy, Contract or arrangement (not including any collective bargaining agreement) providing for bonuses, pensions, deferred pay, stock or stock related awards, severance pay, salary continuation or similar benefits, hospitalization, medical, dental or disability benefits, life insurance or other employee benefits, or compensation, whether or not insured or funded, that is sponsored or maintained by or pursuant to which CNAC, any Subsidiary of CNAC or any ERISA Affiliate has any liability or that constitutes an employment or severance agreement or arrangement currently in effect with any employee, officer or director of CNAC, any Subsidiary of CNAC or any ERISA Affiliate, but not including any Multiemployer Pension Plan (each, an "Employee Plan").

(b)     Each Employee Plan has been established, operated, funded and maintained in all material respects in accordance with its terms and the terms of any collective bargaining agreement, if applicable, and in compliance in all material respects with applicable Laws and the rules and regulations thereunder, including ERISA and the Code.

(c)     None of CNAC, any Subsidiary of CNAC, any ERISA Affiliate or any of their respective current or former directors, officers, Employee Plan fiduciaries, employees or any other Persons has engaged directly or indirectly in any "prohibited transaction", as such term is defined in Section 4975 of the Code or Section 406 of ERISA, with respect to which CNAC, any Subsidiary of CNAC or any ERISA Affiliate has or could have any liability. All contributions, insurance premiums and other payments required to be made to the Employee Plans (or to any Person pursuant to the terms thereof) have been made or paid in a timely fashion. None of CNAC, any Subsidiary of CNAC or any ERISA Affiliate has any liability with respect to any Employee Plan, or any other benefit or compensation plan, program, policy, Contract or arrangement, other than for contributions, payments or benefits due in the ordinary course or other ordinary course expenses under the Employee Plans currently sponsored by CNAC, its Subsidiaries and the ERISA Affiliates. Except for any collective bargaining agreements or employment Contracts, CNAC, its Subsidiaries and the ERISA Affiliates have retained the right to unilaterally amend or terminate each Employee Plan currently sponsored by them to the fullest extent permitted by Law.

(d)     Except as set forth in Section 4.13(d) of the Disclosure Schedule, CNAC, its Subsidiaries and the ERISA Affiliates are not required, nor have they or any one of them ever been required, to contribute with regard to a "multiemployer plan" as defined under Section 3(37)(A) or 4001(a)(3) of ERISA or Section 414(f) of the Code. CNAC, its Subsidiaries and the ERISA Affiliates have timely made all contributions required under Law or Contract to any multiemployer plan.

(e)     Except as set forth in Section 4.13(e) of the Disclosure Schedule, CNAC, its Subsidiaries and the ERISA Affiliates are not required, nor have they or any one of them ever been required, to contribute with regard to a "multiemployer pension plan" as defined under Section 3(37) of ERISA or a plan described in Section 4063(a) of ERISA (the "Multiemployer Pension Plan"). No surety bonds or escrow accounts were required to be posted by CNAC, its Subsidiaries and the ERISA Affiliates to meet the requirements of Section 4204(a)(1)(B) of ERISA or under the terms of any multiemployer pension plan in connection with any complete or partial withdrawal (as described in Sections 4204 and 4205 of ERISA) resulting from the transactions effectuated pursuant to that certain Asset Purchase Agreement by and among CNAC Resources, LLC, U.S. Steel Mining Company, LLC, USS Coal Sales, LLC and United States Steel Corporation dated as of May 23, 2003.

16

(f)        None of CNAC, any Subsidiary of CNAC or any ERISA Affiliate has made or suffered a "complete withdrawal" or a "partial withdrawal", as defined respectively in Sections 4203 and 4205 of ERISA, and no event has occurred that presents a risk of such withdrawal.

(g)        Except for the Multiemployer Pension Plan, no Employee Plan is subject to Title IV of ERISA.

(h)        Each Employee Plan that is intended to meet the requirements of a qualified plan under Section 401(a) of the Code has received a favorable determination letter or opinion letter from the Internal Revenue Service that such Employee Plan is so qualified, and nothing has occurred that would reasonably be expected to adversely affect the qualified status of such Employee Plan. All such Employee Plans have been timely amended to meet the requirements of the Code and applicable regulations and guidance issued thereunder. In all material respects, all of the Employee Plans and any related trusts currently satisfy, and for all prior periods have satisfied, in form and operation, all requirements for any Tax-favored treatment intended for such plan or trust or applicable to plans or trusts of its type, including, as applicable, Sections 105, 106, 125, 401(a), 401(k) and 501 of the Code.

(i)        Except as set forth in Section 4.13(i) of the Disclosure Schedule, there are no Actions, suits, hearings, audits, arbitrations, inquiries, investigations or other proceedings or any events for such (other than routine claims for benefits) pending or, to the Knowledge of Parent, threatened with respect to any Employee Plan.

(j)        Except as set forth in Section 4.13(j) of the Disclosure Schedule, none of the Employee Plans (i) provides for the payment of separation, severance, termination, Change of Control or similar benefits, (ii) promises or provides retiree medical or life insurance benefits to any current or former employee, officer or director of CNAC, any Subsidiary of CNAC or any ERISA Affiliate or otherwise provides life insurance or medical or health benefits to persons who are not current employees or their dependents, except as required by Part 6 of Title I of ERISA or any similar state law, (iii) requires any payment or accelerated vesting as a result of the transactions contemplated by this Agreement or (iv) is subject to Section 409A of the Code.

(k)        With respect to each Employee Plan, Seller has provided or made available to Purchaser true and complete copies, where applicable, of (i) the current plan document and all amendments thereto, (ii) the annual report on Form 5500 for the most recent two years, (iii) the most recent summary plan description, (iv) the most recent Internal Revenue Service determination letter, (v) all material Contracts, arrangements or agreements related to each Employee Plan and (vi) all material correspondence received from any governmental agency with respect to an Employee Plan.

(l)        Except as set forth in Section 4.13(l) of the Disclosure Schedule, the consummation of the transactions contemplated by this Agreement will not (i) entitle any employee to severance pay, unemployment compensation or any other payment, except as expressly provided in this Agreement, or (ii) accelerate the time of payment or vesting or increase the amount of compensation due any employee.

(m)        No prior payment of any amount, nor any payment due or to become due in connection with the transactions contemplated by this Agreement, by CNAC or any Subsidiary of CNAC or any ERISA Affiliate is or shall be an "excess parachute payment" under Section 280G of the Code.

(n)        CNAC, each Subsidiary of CNAC and each ERISA Affiliate are in compliance in all material respects with the requirements of Parts 6 and 7, Subtitle B of Title I of ERISA.

(o)        With respect to each Employee Plan that is (or but for an exemption could be) subject to Section 409A of the Code, such plan has been maintained and administered in good faith compliance with the requirements of Section 409A of the Code and the guidance promulgated thereunder.

(p)        To the Knowledge of Parent, the Memorandum of Understanding Regarding Eligibility for Retiree Health Care between U.S. Steel Mining Company, LLC and the United Mine Workers of America, International Union, dated as of May 6, 2003, and the related Agreement between the International Union, United Mine Workers of America, and United States Steel Corporation, dated May 6, 2003, each remain in full force and effect, and the transactions contemplated by this Agreement will not alter their full force and effectiveness.

17

Section 4.14  Labor Matters.

(a)        Except as set forth in <u>Section 4.14(a) of the Disclosure Schedule</u>, as of the date hereof: (i) neither CNAC nor any Subsidiary of CNAC is party to, or bound by, any collective bargaining or other labor union agreement applicable to employees, and no collective bargaining agreement is presently being negotiated by CNAC or a Subsidiary of CNAC; (ii) from August 1, 2007 to the date hereof, there has been no actual or, to the Knowledge of Parent, threatened material labor dispute, material grievance, material arbitration, strike, work stoppage, slowdown or lockout involving CNAC or any Subsidiary of CNAC; (iii) from August 1, 2007 to the date hereof, to the Knowledge of Parent, there has been no labor union organizing activities with respect to any employees of CNAC and each Subsidiary of CNAC; (iv) there is no material charge or complaint against CNAC or any Subsidiary of CNAC before the National Labor Relations Board or any comparable state agency currently pending or threatened in a writing addressed to CNAC or such Subsidiary; and (v) from August 1, 2007 to the date hereof, there has been no "mass layoff" or "plant closing" as defined by the WARN Act with respect to CNAC and each Subsidiary of CNAC.

(b)        Except as set forth in <u>Section 4.14(b) of the Disclosure Schedule</u>, each of CNAC and its Subsidiaries currently are in material compliance with all Laws relating to the employment of personnel, including all such Laws relating to wages, hours, the WARN Act, collective bargaining, discrimination, civil rights, safety and health, mine safety and workers' compensation (collectively, the "<u>Employment and Labor Laws</u>"), in each case except for citations issued by the Mine Safety and Health Administration or any similar state regulatory agency that can be reasonably abated without material cost or expense to CNAC or any of its Subsidiaries in the ordinary course of CNAC's and its Subsidiaries' continuing operations.

Section 4.15  Taxes. Except as set forth in <u>Section 4.15(a) of the Disclosure Schedule</u>, CNAC and its Subsidiaries, as applicable, have timely filed all Tax Returns required to be filed by them, and all such Tax Returns are complete and correct in all material respects. Except as set forth in <u>Section 4.15(b) of the Disclosure Schedule</u>, all Taxes of CNAC and its Subsidiaries shown on any such Tax Returns have been paid, other than Taxes that are not yet due or that, if due, are not delinquent or are being contested in good faith by appropriate proceedings or have not been finally determined None of Parent, Seller, CNAC or any Subsidiary of CNAC has received any written notice of deficiency from a Governmental Authority for any Tax against CNAC or any of its Subsidiaries that has not been finally and conclusively resolved. None of Parent, Seller, CNAC or any of the Subsidiaries of CNAC is a "foreign person" within the meaning of Section 1445 of the Code. Except as set forth in <u>Section 4.15(c) of the Disclosure Schedule</u>, there are no Tax claims, audits or proceedings pending or, to the Knowledge of Parent, threatened in connection with CNAC or any of its Subsidiaries or with respect to which CNAC or any of its Subsidiaries could have any Liability. There are not currently in force any waivers or agreements binding upon CNAC or any of its Subsidiaries for the extension of time for the assessment or payment of any Tax. CNAC and each Subsidiary of CNAC, as applicable, has properly withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, creditor or other third party with respect to the Business. None of the assets of the Business are subject to any Liens due to Taxes (other than Taxes not yet due and payable). No written claim has been received by, or communicated in writing to, Parent, Seller, CNAC or any of the Subsidiaries of CNAC from a Taxing authority in a jurisdiction where CNAC or any Subsidiary of CNAC does not file Tax Returns contending that CNAC or any such Subsidiary is or may be subject to Tax in such jurisdiction. Each of CNAC and its Subsidiaries is, and at all times since August 1, 2007 has been, treated as a disregarded or transparent entity for certain federal Tax purposes.

Section 4.16  Transactions with Affiliates. Except as set forth in <u>Section 4.16 of the Disclosure Schedule</u>, none of Parent, Seller, any Affiliate of Parent or Seller, any officer, director or employee of Parent or Seller or any Affiliate of CNAC or any Subsidiary of CNAC (an "<u>Interested Party</u>") is a party to any Contract or transaction with CNAC or any of its Subsidiaries (except for employment arrangements of CNAC or any Subsidiary of CNAC for compensation or employee benefits for services performed and except for the provision of corporate overhead, cash management or procurement services provided by Parent or an Affiliate of Parent for the benefit of the Business) or has any interest in any property or asset of CNAC or a Subsidiary of CNAC.

Section 4.17  Brokers. Except as set forth in <u>Section 4.17 of the Disclosure Schedule</u>, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Parent, Seller, CNAC or any of its Subsidiaries. Parent is solely responsible for the fees and expenses of Deutsche Bank.

18

Section 4.18    Insurance. Section 4.18 of the Disclosure Schedule contains a true and complete list of all insurance policies carried by or covering CNAC and its Subsidiaries with respect to their businesses, assets and properties, together with, in respect of each such policy, the name of the insurer, the policy number, the type of policy and the amount of coverage. True and complete summaries of each such policy have previously been made available to Purchaser. All such policies are in full force and effect (except for policies that by their terms are expired and will be replaced in the ordinary course of business), and no notice of cancellation has been received with respect to any such policy. All premiums with respect to such policies covering all periods up to and including the Closing Date have been paid.

Section 4.19    Inventories. Except as set forth in Section 4.19 of the Disclosure Schedule, all of the Coal Inventories of the Business, whether reflected in the Financial Statements or otherwise, consist, in all material respects, of a good quality and quantity usable and salable in the ordinary and usual course of business. Except as set forth in Section 4.19 of the Disclosure Schedule, all of the Coal Inventories of the Business are in the possession of CNAC and its Subsidiaries.

Section 4.20    Indebtedness. Except as set forth in Section 4.20 of the Disclosure Schedule, none of CNAC or any of its Subsidiaries has any Indebtedness.

Section 4.21    Accounts Receivable. Except as set forth in Section 4.21(a) of the Disclosure Schedule, all the accounts receivable of CNAC and its Subsidiaries, whether reflected on the Interim Balance Sheet or otherwise, (a) represent actual, valid obligations incurred by the applicable account debtors owing to CNAC and its Subsidiaries, (b) have arisen from bona fide transactions in the ordinary course of business, (c) are adequately reserved and properly stated on the books and records of CNAC and its Subsidiaries in accordance with GAAP and (d) except as set forth in Schedule 4.21(b) of the Disclosure Schedule, have terms of payment and age consistent with the historical practice of the Business. Each of CNAC and its Subsidiaries has good and marketable title to the such accounts receivable, free and clear of all Liens. None of the accounts receivable of CNAC and its Subsidiaries are factored or subject to any setoff or counterclaim, and CNAC and its Subsidiaries have written off all uncollectible accounts receivable.

Section 4.22    Bank Accounts. Section 4.22 of the Disclosure Schedule sets forth a true, correct and complete list of all bank and savings accounts, certificates of deposit and safe deposit boxes of CNAC and its Subsidiaries and those Persons authorized to sign thereon.

Section 4.23    Ownership of Mines. The Companies collectively own the mines commonly known as the Pinnacle mine in Wyoming County, West Virginia and the Oak Grove mine in Jefferson County, Alabama.

ARTICLE V.
REPRESENTATIONS AND WARRANTIES RELATING TO PURCHASER

Purchaser represents and warrants to Parent and Seller as follows:

Section 5.1    Organization and Authority. Purchaser is a limited liability company duly formed, validly existing and in good standing under the Laws of the State of Delaware. Purchaser has the full legal right and power and all authority required by Law to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. This Agreement has been duly authorized, executed and delivered by or on behalf of Purchaser, and (assuming due authorization, execution and delivery by Parent and Seller) this Agreement constitutes the legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, subject to the effect of any applicable bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or similar Laws affecting creditors' rights generally and subject, as to enforceability, to the effect of general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 5.2    No Conflict. Assuming all consents, approvals, authorizations and other actions described in  Section 5.3 have been obtained, and except as may result from any facts or circumstances relating solely to Parent or Seller, the execution and delivery of and performance of obligations under this Agreement by Purchaser and the consummation by Purchaser of the transactions contemplated hereby do not and will not violate or conflict with the organizational documents of Purchaser or any Law applicable to Purchaser, except for any such violations or conflicts of any Law as would not materially delay the ability of Purchaser to perform its material obligations under this Agreement or consummate the transactions contemplated hereby.

Section  5.3    Consents and Approvals . The execution and delivery of this Agreement by Purchaser do not, and the performance by Purchaser of its obligations hereunder will not, require any consent, approval, authorization or other action by, or filing with or notification to, any Governmental Authority or other Person, except (a) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not prevent Purchaser from performing any of its material obligations under this Agreement or (b) as may be necessary as a result of any facts or circumstances relating solely to Parent or Seller.

Section  5.4    Legal Proceedings. There are no Actions pending or, to the actual knowledge of the executive officers of Purchaser after reasonable inquiry, threatened against, relating to or affecting Purchaser that would reasonably be expected to result in the issuance of a Governmental Order restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated hereby.

Section 5.5    Purchase for Investment. The Units will be acquired by Purchaser (or, if applicable, its permitted assignee pursuant to  Section 9.6) for its own account for the purpose of investment, it being understood that the right to dispose of such Units shall be entirely within the discretion of Purchaser (or such assignee, as the case may be).

Section  5.6    Permitting. Neither Purchaser nor any Person that, together with any Affiliate of Purchaser, owns 10% or more of the equity interests of Purchaser has been subject to any bond forfeiture, permit suspension or revocation instituted by any Governmental Authority that would prohibit the transfer of any Environmental Authorizations to Purchaser. Neither Purchaser nor any Person "owned or controlled" by Purchaser has been notified by the Federal Office of Surface Mining or the agency of any state administering the Surface Mining Control and Reclamation Act (or any comparable state statute) that it is currently (a) ineligible to receive additional surface mining permits or (b) under investigation to determine whether its eligibility to receive such permits should be revoked, i.e., "permit blocked".

Section  5.7    Brokers. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Purchaser.

Section 5.8    Due Diligence; Reliance on Experts .

(a)    Purchaser acknowledges and agrees that it has made its own inquiry and investigation into, and, based thereon, has formed an independent judgment concerning, the Business, and, in connection with such inquiries and investigations, Purchaser has relied on its own financial, legal and other experts and advisors in arriving at Purchaser's decision to execute, deliver and consummate this Agreement and the transactions contemplated hereby. Purchaser is not relying on any representations and warranties of Parent or Seller (including any reserve estimates, projections or information) except as expressly set forth in Article III and Article IV.

(b)    In connection with Purchaser's investigation of the Business, Purchaser has received from Parent certain estimates, projections and other forecasts for the Business and certain plan and budget information. Purchaser acknowledges that there are uncertainties inherent in attempting to make such estimates, projections, forecasts, plans and budgets, that Purchaser is familiar with such uncertainties and that Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections, forecasts, plans and budgets so furnished to it. For the avoidance of doubt, neither Parent nor Seller makes any representation or warranty with respect to any estimates, projections, forecasts, plans or budgets referred to in this Section 5.8(b).

20

ARTICLE VI.
ADDITIONAL AGREEMENTS

Section 6.1 <u>Access to Information</u>. For a period of three years after the Closing, Purchaser shall (a) retain the books and records of CNAC and the Companies relating to the Business that relate to periods ending on or prior to the Closing Date and (b) upon reasonable notice, afford the Representatives of Parent reasonable access (including the right to make, at Parent's expense, photocopies) for reasonable and necessary business purposes, during normal business hours, to such books and records.

Section 6.2 <u>Confidentiality Agreement Termination</u>. The Confidentiality Agreement dated as of November 3, 2015 between Parent and Thomas M. Clarke and the obligations of the parties thereunder are hereby terminated, other than with respect to any Confidential Information (as defined therein) of Parent that does not relate to the Business.

Section 6.3 <u>Consents and Related Matters</u>. Upon the terms and subject to the conditions set forth in this Agreement, each party hereto shall use its respective commercially reasonable efforts promptly: (a) to take, or to cause to be taken, all actions, and to do, or to cause to be done, and to assist and cooperate with the other parties hereto in doing, all things necessary, proper or advisable under applicable Law or otherwise, to consummate and make effective the transactions contemplated by this Agreement; (b) to obtain from any Governmental Authority or third parties any actions, non-actions, clearances, waivers, consents, approvals, authorizations, permits or orders required to be obtained by any party hereto or any of their respective Affiliates in connection with the authorization, execution and delivery of and performance of obligations under this Agreement and the consummation of the transactions contemplated hereby; and (c) furnish all information required for any application or other filing to be made pursuant to any applicable Law or any applicable regulations of any Governmental Authority in connection with the transactions contemplated by this Agreement and to supply promptly any additional information and documentary material that may be requested in connection with such filings or applications.

Section 6.4 <u>Employee Matters</u>.

(a)      From and after the Closing Date until the one-year anniversary of the Closing Date, Purchaser shall cause each employee of CNAC and its Subsidiaries (to the extent each such employee continues to be employed by Purchaser, CNAC or any Subsidiary of CNAC following the Closing) who is not covered by a collective bargaining agreement as of the Closing Date to be given full credit for all service with CNAC or any Subsidiary of CNAC (and any predecessor entity, to the extent CNAC or a Subsidiary of CNAC gives service credit for service with such predecessor entity) before the Closing Date for purposes of eligibility and vesting under any employee benefit plans or arrangements of Purchaser or any of its Affiliates (other than CNAC or any Subsidiary of CNAC) in which such employee participates on or after the Closing Date, to the same extent such service is recognized by CNAC or any of its Affiliates immediately prior to the Closing Date (except to the extent that the crediting of such service would result in duplication of benefits). In the event that such an employee shall participate in any employee welfare benefit plans of Purchaser or its Affiliates (other than CNAC or any Subsidiary of CNAC) in the calendar year containing the Closing Date and such participation commences other than at the expiration of the plan year under the corresponding welfare benefit plan maintained for such employee by CNAC or any Affiliate of CNAC immediately prior to such participation, Purchaser shall, or shall cause its Affiliates (other than CNAC or any Subsidiary of CNAC) to, (i) waive all limitations as to pre-existing condition exclusions and waiting periods with respect to such employee under such employee welfare benefit plans of Purchaser or its Affiliates, other than to the extent limitations or waiting periods that are already in effect with respect to such employee under such corresponding welfare benefit plan maintained for such employee by CNAC or any Affiliate of CNAC immediately prior to such participation have not been satisfied as of such participation date, and (ii) provide each such employee with credit for any co-insurance and deductibles paid in the calendar year of the Closing prior to such participation date in satisfying any deductible or out-of-pocket requirements under such employee welfare benefit plans of Purchaser or its Affiliates.

(b)      Commencing January 1, 2016, and continuing through at least December 31, 2016, Purchaser shall provide, or to cause to be provided, to each employee of CNAC and its Subsidiaries (to the extent each such employee continues to be employed by Purchaser, CNAC or any Subsidiary of CNAC following the Closing) who is not covered by a collective bargaining agreement as of the Closing Date, employee benefit and compensation programs

21

that are no less favorable than those provided to such employees immediately prior to the Closing Date (except for the "Pension Plan for Employees of Cliffs Natural Resources Inc. and its Associated Employers" described in <u>Section 6.4(c)</u>).

(c)        Effective as of the Closing Date, the active participation of each employee of CNAC and its Subsidiaries who is not covered by a collective bargaining agreement as of the Closing Date in the "Pension Plan for Employees of Cliffs Natural Resources Inc. and its Associated Employers" will cease and otherwise terminate, and each such employee will have the options provided to such employee as provided and set forth in such "Pension Plan for Employees of Cliffs Natural Resources Inc. and its Associated Employers".

(d)        Notwithstanding the foregoing, Parent will continue to provide medical, dental, vision and prescription drug coverages under its existing Employee Plans through December 31, 2015; <u>provided</u>, <u>however</u>, that Purchaser agrees (i) that it is solely responsible for any and all claims made under any such Parent Employee Plan after the Closing Date and (ii) to reimburse, in full, Parent for any claims paid by Parent. To that end, Purchaser agrees to reimburse Parent within five (5) Business Days after Parent's delivery to Purchaser of evidence of each such claim paid under the Parent Employee Plans per sub-clause (i) above.

(e)        Nothing herein shall require Purchaser to continue employment of any employee for any period of time or, except as otherwise specifically provided in this <u>Section 6.4</u>, on any specific terms or conditions after the Closing.

Section 6.5    <u>Tax Matters; Straddle Period</u>.

(a)        Purchaser and Parent agree to share equally the payment of all sales, use, value added, documentary, stamp, gross receipts, registration, transfer, conveyance, excise, recording, license and other similar taxes and fees arising out of or in connection with or attributable to the transactions effected pursuant to this Agreement ("<u>Transfer Taxes</u>"). Parent shall prepare and in a timely manner file all Tax Returns in respect of Transfer Taxes. The parties hereto shall reasonably cooperate with each other in attempting to minimize Transfer Taxes.

(b)        Purchaser shall prepare and file, or cause to be prepared and filed, all Tax Returns for each of CNAC and the Companies for all periods ending after the Closing Date, which Tax Returns shall be consistent with past practice. In the case of Tax Returns for periods starting on or before the Closing Date and ending after the Closing Date (a "<u>Straddle Period</u>"), Purchaser shall provide Parent with an opportunity to review and comment on such Tax Returns no less than 30 days prior to the due date thereof. Purchaser shall make, or cause to be made, any changes to such Tax Returns reasonably requested by Parent so long as none of such changes result in any additional Taxes to Purchaser, CNAC or any of the Companies. Parent shall prepare and file, or cause to be prepared and filed, all Tax Returns required to be filed by CNAC and its Subsidiaries for all periods ending on or before the Closing Date (a "<u>Pre-Closing Period</u>"). As soon as practicable, but in any event within 15 days after Parent's or Purchaser's request, as the case may be, Purchaser shall deliver to Parent, or Parent shall deliver to Purchaser, as the case may be, such information and other data relating to the Tax Returns and Taxes of CNAC and its Subsidiaries, and shall provide such other assistance as may reasonably be requested, to cause the completion and filing of all Tax Returns or to respond to audits by any taxing authorities with respect to any Tax Returns or taxable periods or to otherwise enable Parent or Purchaser to satisfy their accounting or Tax requirements.

(c)        In the case of Taxes that are payable with respect to a taxable period that begins before and ends after the Closing Date, the portion of any such Taxes that are attributable to a Pre-Closing Period shall be:

(i)        in the case of Taxes (A) based upon, or related to, income, receipts, profits, wages, capital or net worth, (B) imposed in connection with the sale, transfer or assignment of property or (C) required to be withheld, deemed to be the amount that would be payable if the taxable year ended with the Closing Date; and

(ii)        in the case of all other Taxes, deemed to be the amount of such Taxes for the entire period multiplied by a fraction, the numerator of which is the number of days in the period ending on the Closing Date and the denominator of which is the number of days in the entire period.

(d)        Notwithstanding anything else in this Agreement to the contrary, in the event Purchaser, CNAC or any Subsidiary of CNAC undertakes one or more corporate actions or similar actions (including any transfer of ownership interests or any merger or recapitalization) or makes after the Closing any election on or effective as of the

22

Closing Date involving (directly or indirectly) CNAC or any Subsidiary of CNAC, such transactions shall be deemed to have occurred on the day immediately following the Closing Date for all purposes, and no Taxes resulting therefrom shall be borne by Parent or Seller. In no event shall any Taxes resulting from any amendment or restatement of the governing documents of CNAC or the Companies made after the Closing Date be borne directly or indirectly by Parent or Seller. Purchaser agrees that Parent and Seller are to have no liability for any Tax resulting from any action of Purchaser, CNAC or any Company (from and after the Closing).

(e)        After the Closing, without the prior written consent of Parent, which consent shall not be unreasonably withheld, conditioned or delayed, neither CNAC nor any Company shall (and Purchaser shall not permit CNAC or any Company to), to the extent it may affect or relate to Parent or Seller, make, change or rescind any Tax election, amend any Tax Return, take any position on any Tax Return, take any other action, omit to take any action or enter into any other transaction that would have the effect of increasing the Tax Liability or reducing any Tax asset of CNAC or any Company in respect of any Pre-Closing Period or portion of any Straddle Period allocable to a Pre-Closing Period.

(f)        After the Closing, Purchaser shall give written notice to Parent of the receipt of any written notice by Purchaser, CNAC or any Company that involves any assessment of Taxes, notice of Tax deficiency, adjustment of Taxes, audit or examination of any Tax Returns or the assertion of any claim or the commencement of any litigation relating to the Taxes or Tax Returns of CNAC or any Company in respect of any Pre-Closing Period or Straddle Period (a "Tax Claim"). At Parent's discretion, Parent shall, at its own cost, have the right to control the contest or resolution of any such Tax Claim insofar as the Tax Claim relates to the Pre-Closing Period or the portion of any Straddle Period allocable to a Pre-Closing Period.

(g)        Any Tax refunds (including all interest thereon) for any Pre-Closing Period or Straddle Period (to the extent allocable to a Pre-Closing Period) that are received by CNAC or any Company after the Closing and any credits or other items derived from any Pre-Closing Period or Straddle Period (to the extent allocable to a Pre-Closing Period) that reduce Purchaser's, CNAC's or any Company's Tax Liability for any period shall be for the account of Parent, and Purchaser shall (and Purchaser shall cause CNAC or any Company, as applicable, to) pay over to Parent any such refund or the amount of any such credit or other item within 30 days after such receipt or reduction in Tax Liability (as appropriate); provided, however, that Purchaser shall in any event have the right to use any net operating loss carryforwards (to the extent that such net operating losses constitute an attribute of Purchaser after the Closing Date).

(h)        After the Closing Date, the parties hereto shall provide each other with such cooperation and information relating to the Business as such other parties may reasonably request in writing in (i) filing any Tax Return or amended Tax Return or claim for Tax refund, (ii) determining any Tax Liability or right to refund of Taxes, (iii) conducting or defending any Action in respect of Taxes, (iv) preparing any related tax forms (including Forms K-1) or (v) effectuating the terms of this Agreement. The parties hereto shall retain all Tax Returns, schedules and work papers, and all material documents relating thereto with respect to the Business, until the expiration of the applicable statute of limitation (and, to the extent notified by any party hereto to the others, as applicable, any extensions thereof) with respect to the Tax periods to which such Tax Returns and other documents relate and, unless such Tax Returns and other documents are offered and delivered to the other parties hereto, as applicable, until the final determination of any Tax in respect of such periods. Notwithstanding the foregoing, no party hereto shall be unreasonably required to prepare any document, or determine any information, not then in its possession in response to a request under this Section 6.5(h).

Section 6.6    Public Announcements. Any press releases, public announcements or other disclosures regarding the transactions contemplated hereby shall be made only with the mutual consent of Parent and Purchaser, except as required by Law or by a stock exchange or automated quotation system, in which case the party hereto required to make the release, announcement or disclosure shall allow the other parties hereto reasonable time to comment on such release, announcement or disclosure in advance of such release, announcement or disclosure.

Section 6.7    Labor Agreement.

(a)        Purchaser acknowledges that PMC, PLC, OGR and OGLC (the "Signatory Companies") are signatory to collective bargaining agreements with the United Mine Workers of America (the "Wage Agreements") as disclosed on Section 4.14(a) of the Disclosure Schedule (as any such Wage Agreement shall be amended, restated, reformed, supplemented or otherwise modified from time to time). Purchaser agrees that the Signatory Companies

23

will, on and after the Closing Date, comply with all of the terms of the Wage Agreements, including the obligation to contribute to the 1974 UMWA Pension Plan, in accordance with the terms of the Wage Agreements. In the event that any of the Signatory Companies withdraws from the 1974 UMWA Pension Plan at any time on or after the Closing Date, Purchaser and the Signatory Companies will be solely responsible for satisfaction of any withdrawal liability due to the 1974 UMWA Pension Plan pursuant to ERISA and for timely making any and all periodic or other payments of withdrawal liability required by Law, and none of Purchaser, any of the Signatory Companies or any Affiliate of or related to the Signatory Companies shall have any claim against Parent or Seller for payment of all or any portion of any withdrawal liability assessed against Purchaser, any of the Signatory Companies or any Affiliate thereof to Purchaser; provided, however, that this does not relieve or waive any obligations of Parent or Seller under their express representations, warranties and covenants in this Agreement or any breach by Parent or Seller thereof.

(b)        In the event of complete or partial withdrawal from the 1974 UMWA Pension Plan by Purchaser takes place after the Closing Date, Purchaser shall pay or cause the Signatory Companies to pay each installment of withdrawal liability applicable to the Signatory Companies on or after the Closing Date prior to the due date of each such payment and shall provide Parent with notice of each installment payment. In the event of any breach by Purchaser of any of its obligations under this Section 6.7(b), Parent shall have the right to seek injunctive relief or to take any action necessary to prevent or cure any actual or threatened default by Purchaser.


Section 6.8    Further Action.

(a)        For a period of 12 months from and after the Closing Date, each of the parties hereto shall (i) execute and deliver such documents and other papers, (ii) furnish or cause to be furnished to each other and their Representatives access (including the ability to make copies), during normal business hours, to such information and assistance relating to the Business (to the extent within the control of such party or any of its Affiliates), provided that any such assistance shall be furnished in such manner as to minimize disruptions to the continuing business of Parent and Seller, only to the extent Parent or Seller have personnel reasonably available to them to perform such assistance, and that any out-of-pocket costs attributable to such assistance shall be borne by Purchaser, and (iii) take such further actions, in each case as may be reasonably required to carry out the provisions of this Agreement and give effect to the transactions contemplated hereby, including as is reasonably necessary for financial reporting, Tax and accounting matters and for defense or prosecution of any Actions.

(b)        Without limitation of the foregoing, to the extent Purchaser's payroll service provider is unable to timely provide its usual payroll services (including remission of pay and furnishing of year-end tax-related documentation (such as Forms W-2) to employees), solely for the period following the Closing Date through December 31, 2015, Parent and Seller shall (i) cooperate with Purchaser to cause such payroll service provider to provide such services using, if necessary, the payroll systems in use for the Business prior to Closing, (ii) fund the payroll (including, for the avoidance of doubt, accrued vacation) (and provide evidence of such funding to Purchaser), and (iii) if necessary, cause customary information to be inputted into such payroll systems to effectuate such usual payroll services; provided, however, that Purchaser acknowledges and agrees to reimburse Parent $2,000,000 of such payroll funding paid per sub-clause (ii) no later than December 31, 2016. The Parties further agree that neither Parent nor Seller shall be required to provide any payroll services or funding after December 31, 2015.

(c)        In addition to the requirements set forth in Section 6.1 above, upon reasonable advance written notice from Parent, Purchaser agrees, and agrees to cause CNAC and the Subsidiaries, as applicable, to make site personnel (in particular the local accountants and controllers) available to Parent for a reasonable period, not to exceed six (6) months, following the Closing Date in order to provide information to Parent and Seller to assist in closing out Parent's and Seller's books.

(d)        With respect to that certain Storage and Handling Agreement, dated July 1, 2010, between CNAC and IC Railmarine Terminal Co. (as assigned to Raven Energy, LLC on June 15, 2011), as disclosed in Sections 4.8(vi) and (xi) of the Disclosure Schedule , notwithstanding anything to the contrary herein, Parent agrees to pay, on behalf of CNAC, upon the written request of Purchaser, up to a maximum of $2,206,250, any liquidated damages assessed in connection with and pursuant to Section 4.1(a) of such Storage and Handling Agreement; provided, that to the extent that Purchaser shall confirm in writing at any time that such maximum amount shall be irrevocably reduced (without payment of the amount of such reduction by Parent), then Purchaser shall be entitled to apply the amount of such reduction on a dollar-for-dollar basis against Purchaser's payment obligation pursuant to the proviso to Section 6.8(b). To accomplish the foregoing, promptly upon Parent's receipt of such invoice, whether directly or from Purchaser

24

or CNAC if received by them (in which event, Purchaser shall or shall cause CNAC to forward such invoice to Parent), Parent will pay the invoice when due in accordance with its terms.

Section 6.9   Tax Treatment. The parties hereto hereby acknowledge and agree that for Tax purposes the purchase of Units pursuant to this Agreement will be treated as the direct taxable purchase by Purchaser of the assets of CNAC and the Companies from Seller.

Section 6.10   U.S. Steel Notifications. With respect to those employees listed in Section 6.10(a) of the Disclosure Schedule, from and after the Closing Date, as each such listed employee retires, Purchaser agrees, in a timely manner, to notify U.S. Steel Corporation of such retirement, which notice will be sent in accordance with the instructions provided in Section 6.10(b) of the Disclosure Schedule.

Section 6.11   Release and Replacement of Bonds. Purchaser shall (i) file replacement surety bonds with the applicable Governmental Authority and cause the release of Parent's Bonds within 45 days from the Closing Date or (ii) obtain assignments of such Bonds to Purchaser, in either case with the reasonable assistance of Parent and Seller. Purchaser shall reimburse Parent for (x) the pro rata portion of the annual premiums and (y) the monthly letter of credit interest charges, in each case related to the Bonds, starting from the date that is 45 days after the Closing Date and ending at such time that Purchaser obtains the release and replacement or assignment of the Bonds.

Section 6.12   Dismissal from Certain Pending Actions. From and after the Closing, Purchaser agrees to cooperate with Parent, at Parent's expense, to cause Parent and any Affiliate of Parent (other than CNAC or a Subsidiary of CNAC) to be dismissed as a party to any Action for which CNAC or a Subsidiary of CNAC is, or Purchaser as of the Closing becomes, responsible, including all Actions set forth in Section 4.6 of the Disclosure Schedule (without giving effect for this purpose to any portions of Section 4.6 of the Disclosure Schedule that cross-reference other sections of the Disclosure Schedule) (such Actions set forth in Section 4.6 of the Disclosure Schedule (without giving effect for this purpose to any portions of Section 4.6 of the Disclosure Schedule that cross-reference other sections of the Disclosure Schedule) being the "Pending Actions").

Section 6.13   Proceeds from Sale of Lucchini Account Receivable. With respect to the account receivable disclosed in Section 6.13 of the Disclosure Schedule (the "Lucchini Receivable"), to the extent that, after the Closing Date, any proceeds are received by Purchaser, CNAC or a Company relating to the sale, prior to the Closing, of the Lucchini Receivable, such recipient agrees to forward to Parent, promptly after such receipt of the same, any and all payments received in respect of the Lucchini Receivable (which Lucchini Receivable, the parties hereto agree, will not be included in the calculation of the Specified Current Assets, since it is fully reserved for in the Financial Statements).

Section 6.14   Escrow Agent Expenses. The fees and expenses of the Escrow Agent shall be paid by Purchaser.

Section 6.15   No Disparagement. After the Closing Date, (a) neither Parent nor Seller will disparage the Business, CNAC, any Company or Purchaser or any of their respective equity owners or Representatives and (b) Purchaser will not disparage Parent, Seller or any of their respective Affiliates (other than CNAC or any Subsidiaries of CNAC) or Representatives.

Section 6.16   Deposits. For the avoidance of doubt, Purchaser will retain all deposits of CNAC and its Subsidiaries for utilities and other purchased goods and services.

Section 6.17   Use of Cliffs Name. After the Closing, neither Purchaser nor CNAC shall, directly or indirectly, use or do business, allow any of its respective Affiliates to use or do business or assist any third party in using or doing business under the name "Cliffs" or any derivations thereof (or any other names confusingly similar to such names),

25

provided that CNAC shall be able to continue to use "Cliffs" in its legal name and shall be permitted to exhaust any existing supplies of marketing, packaging and similar materials for a reasonable period of time following the Closing not to exceed 30 calendar days, after which time Purchaser shall cause CNAC to change CNAC's legal name with the Secretary of State of the State of Delaware.

Section 6.18   Equity Certificates. Within five Business Days following the Closing, Parent and Seller shall deliver or cause to be delivered to Purchaser any and all certificates evidencing CNAC's 100% equity ownership interest in the Subsidiaries of CNAC.

Section 6.19   Release of Guarantees. Purchaser shall use commercially reasonable efforts promptly after the Closing to obtain releases of the guarantees (or similar arrangements) of Parent, Seller and their Affiliates (other than CNAC and its Subsidiaries) that (a) are set forth in Section 4.8(iv) of the Disclosure Schedule (for the avoidance of doubt, not including any such guarantees (or similar arrangements) relating to Parent's bank debt as provided to U.S. Bank National Association or Bank of America, N.A.) or (b) are otherwise are identified in writing from time to time after the Closing Date to Purchaser by Parent (collectively, the "Guarantees"). With respect to any Guarantee identified by Parent pursuant to sub-clause (b), promptly following such notice thereof to Purchaser, Purchaser shall use commercially reasonable efforts to obtain a release of such Guarantee. For the avoidance of doubt, "commercially reasonable efforts" for purposes of this Section 6.19 shall not require the payment of any out-of-pocket costs or expenses or payment of consideration to any party from which any such release is sought.

ARTICLE VII.
CLOSING DELIVERABLES

Section 7.1   Closing Deliverables. At the Closing:

(a)      Parent and Seller shall execute and deliver to Purchaser the Disclosure Schedule.

(b)      Seller shall execute and deliver to Purchaser the Bill of Sale.

(c)      Parent, Seller, Purchaser and the Escrow Agent shall execute and deliver the Escrow Agreement.

(d)      Parent, Seller and Purchaser shall execute and deliver the Override Right Agreement.

(e)      Parent shall execute and deliver to Purchaser certifications that neither Parent nor Seller is a foreign person in accordance with Section 1445 of the Code.

(f)      Parent shall deliver to Purchaser resignations of each of the directors and officers of CNAC and the Subsidiaries of CNAC set forth in Section 7.1(f) of the Disclosure Schedule.

(g)      Parent shall deliver to Purchaser evidence reasonably satisfactory to Purchaser that any and all (i) Tax sharing, allocation, compensation or similar Contracts that include one or more of CNAC or any Subsidiary of CNAC, on the one hand, and any other Person or Persons, on the other hand, and (ii) powers of attorney relating to Tax matters concerning CNAC or any Subsidiary of CNAC, have been terminated.

(h)      Parent shall deliver to Purchaser evidence reasonably satisfactory to Purchaser that the notices, consents and approvals set forth in Section 7.1(h) of the Disclosure Schedule have been secured.

(i)      Parent shall deliver to Purchaser evidence reasonably satisfactory to Purchaser that any Liens, other than the Permitted Liens and the Liens set forth in Section 7.1(i) of the Disclosure Schedule, on the assets of the Business have been released.

(j)      Parent shall deliver to Purchaser evidence reasonably satisfactory to Purchaser that, as of the Closing Date, CNAC and its Subsidiaries have (i) at least $25,000,000 of supplies and other inventories (not

26

including coal inventories), (ii) at least $19,000,000 of trade accounts receivables that are not subject to any Liens, (iii) no more than $16,500,000 of accounts payable and (iv) no Indebtedness owing to any other Person.

(k)    Parent shall deliver to Purchaser evidence reasonably satisfactory to Purchaser that (i) all Indebtedness owed to CNAC or any Subsidiary of CNAC by Parent or Seller or any Affiliate of Parent or Seller (other than CNAC or any Subsidiary of CNAC) has been paid in full and (ii) all other intercompany agreements and arrangements (including any intercompany payables or receivables) between CNAC or any Subsidiary of CNAC, on the one hand, and Parent or Seller or any Affiliate of Parent or Seller (other than CNAC or any Subsidiary of CNAC), on the other hand, have been settled and terminated.

(l)    Parent shall deliver to Purchaser evidence reasonably satisfactory to Purchaser that all Taxes of CNAC and its Subsidiaries due and payable on or prior to Closing have been paid.

(m)    Parent shall deliver or cause to be delivered to Purchaser copies certified by the Secretary (or equivalent) of each of CNAC and each Subsidiary of CNAC that its respective certificate of formation (or equivalent) and limited liability company agreement (or equivalent) (it being acknowledged that Beard Pinnacle does not have a limited liability company agreement (or equivalent)) attached thereto are true, correct and complete and in full force and effect as of the Closing Date.

(n)    Parent shall deliver or cause to be delivered to Purchaser the company seal, equity transfer ledgers and minute books of each of CNAC and each Subsidiary of CNAC and originals or copies of all other books and records of each of CNAC and each Subsidiary of CNAC (or evidence satisfactory to Purchaser that CNAC and its Subsidiaries will be in the possession of such books and records at the Closing).

(o)    Parent shall deliver or cause to be delivered a good standing certificate (or equivalent) of each of Parent, Seller, CNAC and each Subsidiary of CNAC dated no more than five Business Days prior to the Closing Date.

ARTICLE VIII.
SURVIVAL AND INDEMNIFICATION

Section 8.1    Survival. The representations and warranties contained in Article IV and Article V shall survive until 18 months after the Closing; provided, however, that the representations and warranties contained in Section 4.1, Section 4.2, Section 4.3(a), Section 4.3(b), Section 4.4, Section 4.12, Section 4.13, Section 4.15, Section 4.17, Section 5.1 and Section 5.7 and the representations and warranties as to title to assets in Section 4.9 and Section 4.10 shall survive in accordance with the applicable statute of limitations; provided, further, however, that if written notice of a claim has been given before the expiration of the applicable representations and warranties, then the relevant representations and warranties shall survive as to such claim, until such claim has been finally resolved. The representations and warranties contained in Article III shall survive in perpetuity. Any covenant or agreement that contemplates or may involve actions to be taken or obligations in effect after the Closing shall survive in accordance with its respective terms.

Section 8.2    Indemnification by Parent and Seller. Purchaser and its Affiliates, successors and assigns (each, a " Purchaser Indemnified Party") shall, solely to the extent provided herein, be indemnified and held harmless by Parent and Seller (collectively, the "Seller Indemnifying Party"), jointly and severally, for and against any and all losses, damages, claims and judgments, including attorney's fees (both those incurred in connection with the defense or prosecution of the indemnifiable claim and those incurred in connection with the enforcement of this provision), actually suffered or incurred by them (each, a "Loss" and collectively, "Losses"), arising out of or resulting from:

(a)    the breach of any representation or warranty made by Parent or Seller contained in this Agreement, determined in each case without regard to qualification by Material Adverse Effect or materiality or similar exceptions or qualifications;

(b)    the breach of any covenant or agreement of Parent or Seller contained in this Agreement;

27

(c)        any foreign, federal, state or local income Taxes imposed on or payable by CNAC or any of its Subsidiaries for any Pre-Closing Period (or portion of any Straddle Period allocable to a Pre-Closing Period under Section 6.5(c));

(d)        any claims of any broker, finder or other Person acting in a similar capacity on behalf of Parent, Seller or any of their respective Affiliates in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Parent, Seller or any of their respective Affiliates; and

(e)        any and all Actions incident to any of the foregoing or such indemnification.

Section   8.3    Indemnification by Purchaser. Parent and Seller and their respective Affiliates (other than CNAC and the Subsidiaries of CNAC), successors and assigns (each, a "Seller Indemnified Party") shall, solely to the extent provided herein, be indemnified and held harmless by Purchaser (a "Purchaser Indemnifying Party") for and against any and all Losses arising out of or resulting from:

(a)        the breach of any representation or warranty made by Purchaser contained in this Agreement, determined in each case without regard to qualification by Material Adverse Effect or materiality or similar exceptions or qualifications;

(b)        the breach of any covenant or agreement of Purchaser contained in this Agreement;

(c)        any of the Pending Actions (but which, for the avoidance of doubt, shall not impact or offset any obligations pursuant to the Override Right Agreement or the Escrow Agreement);

(d)        the Bonds as provided for in Section 6.11 and the Guarantees as provided for in Section 6.19 (notwithstanding whether any such Bonds or Guarantees are released and replaced or remain in effect after the Closing Date);

(e)        any claims of any broker, finder or other Person acting in a similar capacity on behalf of Purchaser or any of its Affiliates in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Purchaser or any of its Affiliates; and

(f)        any and all Actions incident to any of the foregoing or such indemnification.

Section 8.4    Limits on Indemnification. Notwithstanding anything to the contrary contained in this Agreement, except for claims based on fraud, which shall not be subject to the limitations in this Section 8.4:

(a)        no amount of indemnity shall be payable as a result of any claim in respect of a Loss arising under  Section 8.2(a) or Section 8.3(a) unless the Purchaser Indemnified Party or the Seller Indemnified Party, as the case may be, has given the Seller Indemnifying Party or the Purchaser Indemnifying Party, as the case may be, a Claim Notice with respect to such claim prior to the applicable Cut-Off Date; and

(b)        the sole source of funds for the payment of any claims against the Seller Indemnifying Party pursuant to this  Article VIII shall be payments (if any) made or to be made to the Escrow Account (and available after disbursement of monies from the Escrow Account for any matters set forth in the Escrow Agreement other than obligations covered by this Article VIII), which payments (if any) derive from the Override Right Agreement (and, accordingly, the Seller Indemnifying Party shall not be required to make any payments pursuant to this Article VIII in excess of the amounts (if any) provided by the Escrow Account via the Override Right Agreement (and available after disbursement of monies from the Escrow Account for any matters set forth in the Escrow Agreement other than obligations covered by this Article VIII)).

Section 8.5    Notice of Loss; Claims.

(a)        An Indemnified Party shall promptly, and in any event within 30 calendar days, or, in the case of any Third Party Claim, within ten calendar days, after the Indemnified Party has in good faith determined that an

28

event has occurred that would be reasonably expected to give rise to a right of indemnification under this   Article VIII, notify the Indemnifying Party in writing of the matter that the Indemnified Party has in good faith determined gives rise or is reasonably expected to give rise to such right of indemnification under this Agreement (including a pending or threatened claim or demand asserted by a third party against the Indemnified Party, such claim being a "Third Party Claim"), stating the amount of the Loss, if known, and method of computation thereof, describing in reasonable detail the facts and circumstances with respect to such matter and containing a reference to the provisions of this Agreement in respect of which such right of indemnification is claimed or arises (a "Claim Notice"); provided, however, that the failure to provide such notice shall not release the Indemnifying Party from any of its obligations under this   Article VIII except to the extent that the Indemnifying Party is prejudiced by such failure. Anything in this Article VIII to the contrary notwithstanding, notices for claims in respect of a breach of a representation or warranty must be delivered before the expiration of the survival period, if any, for such representation or warranty as specified in Section 8.1 (the "Cut-Off Date").

(b)        At any time after the receipt of a Claim Notice from an Indemnified Party pursuant to   Section 8.5(a) regarding a Third Party Claim, the Indemnifying Party shall be entitled to assume and control the defense of such Third Party Claim with all expenses to be paid by the Indemnifying Party and through counsel of its choice (provided that such counsel is not reasonably objected to by the Indemnifying Party) if it gives notice of its intention to do so to the Indemnified Party and the proceeding or claim involves money damages and not an injunction or other equitable relief that could have an adverse effect on the Business; provided, however, that the Indemnifying Party shall reimburse the Indemnified Party's expenses incurred in the defense of such Third Party Claim prior to the date (if any) the Indemnifying Party ultimately does assume such defense; provided, further, that if (i) there exists or is reasonably likely to exist a conflict of interest that would make it inappropriate in the reasonable judgment of the Indemnified Party for the same counsel to represent both the Indemnified Party and the Indemnifying Party or (ii) the Indemnifying Party fails to provide reasonable assurance to the Indemnified Party of the Indemnifying Party's financial capacity to defend such Third Party Claim and provide indemnification with respect to such Third Party Claim, then the Indemnified Party shall be entitled to retain its own counsel, at the expense of the Indemnifying Party. If the Indemnifying Party exercises the right to undertake any such defense against any such Third Party Claim as provided above, the Indemnified Party shall cooperate with the Indemnifying Party in such defense. Whether or not the Indemnifying Party has exercised such right, the Indemnified Party shall make available to the Indemnifying Party, at the Indemnifying Party's expense, all witnesses, pertinent records, materials and information in the Indemnified Party's possession or under the Indemnified Party's control relating thereto as is reasonably requested by the Indemnifying Party; provided, however, that any access to employees shall be conducted in such a manner as not to interfere unreasonably with the operations of the business of the Indemnified Party and its Affiliates. Similarly, in the event the Indemnified Party is, directly or indirectly, conducting the defense against any such Third Party Claim, the Indemnifying Party shall cooperate with the Indemnified Party in such defense and make available to the Indemnified Party, at the Indemnifying Party's expense, all such witnesses, records, materials and information in the Indemnifying Party's possession or under the Indemnifying Party's control relating thereto as is reasonably required by the Indemnified Party; and in such event, the Indemnified Party shall consult with, and give due consideration to the advice of, the Indemnifying Party as may be reasonably requested by the Indemnifying Party regarding the defense of such Third Party Claim. Notwithstanding any other provision in this Article VIII, the Indemnifying Party shall not have the obligation to indemnify any Loss with respect to a Third Party Claim for which the Indemnified Party is conducting the defense if the Indemnified Party has failed to consult with the Indemnifying Party after the Indemnifying Party has requested, in writing, such consultation regarding such Third Party Claim. If the Indemnifying Party assumes the defense in accordance with this Section 8.5(b), the Indemnified Party shall have the right to participate in the defense thereof and to employ counsel (not reasonably objected to by the Indemnifying Party), at its own expense, separate from the counsel employed by the Indemnifying Party, it being understood that the Indemnifying Party shall control such defense. Whether or not the Indemnifying Party shall have assumed the defense of a Third Party Claim, neither the Indemnifying Party nor the Indemnified Party shall admit any Liability with respect to, or compromise, discharge or settle, such Third Party Claim without the other's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed); provided, that, if the Indemnifying Party assumes the defense of such Third Party Claim, no such consent shall be required if (A) there is no finding or admission of any violation of Laws or any violation of the rights of any Person, (B) the sole relief provided is monetary damages that are paid in full by the Indemnifying Party and (C) the Indemnified Party shall have no Liability with respect to any compromise or settlement of such Third Party Claims effected without its consent. If notice is given to an Indemnifying Party of the assertion of any Third Party Claim and the Indemnifying Party does not, within 20 Business Days after the Indemnified Party's notice is given, give notice to the Indemnified Party of its election to assume the defense of such Third Party Claim, the Indemnifying Party will be bound by any determination made in such Third Party Claim or any compromise or settlement effected by the Indemnified Party.

29

(c)　　　　At any time after the receipt of a Claim Notice from an Indemnified Party pursuant to Section 8.5(a) regarding a non-Third Party Claim, the Indemnifying Party shall have 30 Business Days from the date of receipt of such Claim Notice in which to either pay the amount of the non-Third Party Claim or give written notice of its intent to dispute the non-Third Party Claim, in which case the Indemnifying Party and the Indemnified Party shall then be required to negotiate in good faith for a period not to exceed 15 Business Days to attempt to resolve the non-Third Party Claim. If the non-Third Party Claim is not disputed in a timely fashion as set forth above, the non-Third Party Claim shall be immediately due and payable upon expiration of the 30 Business Day notice period. If the non-Third Party Claim is timely disputed but not resolved within the 15 Business Day negotiation period, the non-Third Party Claim shall be resolved pursuant to Section 9.10.

Section 8.6　　Nature of Payments. Any indemnity payments made under this Article VIII shall be treated for Tax purposes as an adjustment of the Consideration.

Section 8.7　　Exclusive Remedy. Except in the case of fraud and except as provided in Section 2.3 and Section 2.4 and any Actions for injunctive relief or specific performance as set forth in this Agreement, any Action (whether such claim sounds in tort, contract or otherwise and including statutory rights and remedies) based upon, relating to or arising out of this Agreement must be brought by the parties hereto in accordance with the indemnification provisions and applicable limitations of this Article VIII, which shall constitute the sole and exclusive remedy of all parties hereto and their Affiliates, successors and assigns for any such Actions.

ARTICLE IX.
MISCELLANEOUS

Section 9.1　　Expenses. Except as may be otherwise specified herein, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

Section 9.2　　Notices. All notices, requests, demands, claims and other communications hereunder will be in writing. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) three Business Days after it is sent by registered or certified mail, return receipt requested, postage prepaid, (ii) one Business Day after it is sent for next day delivery by a nationally recognized overnight courier or (iii) at the time of delivery if personally delivered or if transmitted via facsimile (with confirmation of receipt), in each case addressed to the intended recipient as set forth below:

30

(a) if to Purchaser:

> Seneca Coal Resources, LLC
> 15 Appledore Lane
> P.O. Box 87
> Natural Bridge, Virginia 24578
> Attention: Thomas M. Clarke
>
> with a copy to:
>
> Pillsbury Winthrop Shaw Pittman LLP
> 1540 Broadway
> New York, New York 10036-4039
> Attention: David S. Baxter
> Facsimile: 212-858-1500

(b) if to Parent or Seller:

> c/o Cliffs Natural Resources Inc.
> 200 Public Square, Suite 3300
> Cleveland, Ohio 44114
> Attention: James D. Graham, Chief Legal Officer
> Facsimile: 216-694-6509
>
> with a copy to:
>
> Hahn, Loeser & Parks LLP
> 200 Public Square, Suite 2800
> Cleveland, Ohio 44114
> Attention: Robert Ross Facsimile: 216-274-2559

Section 9.3  Headings. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.4  Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party hereto. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 9.5  Entire Agreement. This Agreement and the documents referred to in  Article VII constitute the entire agreement of the parties hereto with respect to the subject matter hereof and supersede all prior agreements and undertakings, both written and oral, between or among the parties hereto with respect to the subject matter hereof.

Section 9.6  Assignment. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written consent of the other parties hereto, except that Purchaser may, without such prior written consent, at any time, (a) transfer or assign its rights, interests or obligations under this Agreement to one or more of its Affiliates, provided that, in the case of assignment of obligations, any such Affiliate agrees in writing to be bound by all of the terms, conditions and provisions herein, but no such assignment shall relieve Purchaser of its obligations hereunder, and (b) grant a security interest in its rights under this Agreement to its lender or lenders, if any, as security for Purchaser's obligations to any such lender or lenders (and any such lender or lenders may exercise their rights and remedies with respect to such security interest). Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties and their respective permitted successors and assigns.

31

Section 9.7   No Third Party Beneficiaries. Except as expressly provided herein (including Article VIII), (a) this Agreement is for the sole benefit of the parties hereto and their permitted successors and assigns and (b) nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 9.8   Amendment. This Agreement may not be amended or modified except by an instrument in writing signed by each of Parent, Seller and Purchaser specifically referencing this Agreement.

Section 9.9   Specific Performance. The parties hereto agree that irreparable damage would occur in the event any provision of this Agreement was not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or equity, without the necessity of demonstrating the inadequacy of money damages.

Section 9.10   Governing Law; Submission to Jurisdiction. This Agreement shall be governed by and construed in accordance with the Laws of the State of New York applicable to Contracts to be made and performed entirely therein without giving effect to the principles of conflicts of law thereof or of any other jurisdiction. Each of the parties hereto hereby (a) expressly and irrevocably submits to the exclusive personal jurisdiction of the United States District Court for the District of Delaware and to the jurisdiction of any other competent court of the State of Delaware located in New Castle County (collectively, the "Delaware Courts"), preserving, however, all rights of removal to such federal court under 28 U.S.C. 1441 in connection with all disputes arising out of or in connection with this Agreement or the transactions contemplated hereby and (b) agrees not to commence any litigation relating thereto except in such courts. If the aforementioned courts do not have subject matter jurisdiction, then such proceeding shall be brought in any other state or federal court located in the State of Delaware, preserving, however, all rights of removal to such federal court under 28 U.S.C. 1441. Each party hereto hereby waives the right to any other jurisdiction or venue for any litigation arising out of or in connection with this Agreement or the transactions contemplated hereby to which any of them may be entitled by reason of its present or future domicile. Notwithstanding the foregoing, each of the parties hereto agrees that each of the other parties hereto shall have the right to bring any action or proceeding for enforcement of a judgment entered by the Delaware Courts in any other court or jurisdiction. Each of the parties hereto further agrees that service of any notice, process, summons or other document to such party's respective address listed herein in one of the manners set forth in Section 9.2 shall be deemed in every respect effective service of process in any such Action.

Section 9.11   Waiver of Jury Trial. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF ANY PARTY HERETO IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT THEREOF.

Section   9.12   Counterparts. This Agreement may be executed in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by electronic transmission (including email) shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 9.13   Waiver. The rights and remedies of the parties to this Agreement are cumulative and not alternative. Any of the terms or conditions of this Agreement that may be lawfully waived may be waived in writing at any time by each party hereto that is entitled to the benefits thereof. Any waiver of any of the provisions of this Agreement by any party hereto, including the waiver of any failure of another party hereto to comply with any of its covenants, obligations or agreements herein contained, shall be binding only if set forth in an instrument in writing signed on behalf of such waiving party. No failure or delay to enforce any provision of this Agreement or in exercising any power, privilege or right under this Agreement shall be deemed to or shall constitute a waiver thereof nor in any way affect the validity of this Agreement or any part hereof or the right of any party hereto thereafter to enforce each and every such provision, and no waiver of any of the provisions of this Agreement shall be deemed to or shall constitute a waiver of any other

32

provision hereof (whether or not similar) nor shall such waiver constitute a continuing waiver. No waiver of any of the provisions of this Agreement shall be held to be a waiver of any subsequent breach or non-compliance.

{Signature Page Follows}

33

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers or other authorized persons thereunto duly authorized.

**CLIFFS NATURAL RESOURCES INC.**

By:    /s/ James D. Graham
         Name: James D. Graham
         Title: Executive Vice President, Chief Legal Officer and Secretary

**CLF PINNOAK LLC**

By:    /s/ Clifford T. Smith
         Name: Clifford T. Smith
         Title: President

**SENECA COAL RESOURCES, LLC**

By:    /s/ Thomas M. Clarke
         Name: Thomas M. Clarke
         Title: Treasurer

{Signature page to Unit Purchase Agreement}

**EXHIBIT 10.32**

<u>FIFTH AMENDMENT TO TRUST AGREEMENT NO. 8</u>

This Fifth Amendment to Trust Agreement No. 8 is entered into effective as of October 28, 2015 by and between Cliffs Natural Resources Inc., f/k/a Cleveland-Cliffs Inc., an Ohio corporation (the "Company"), and KeyBank National Association, the successor in interest to Key Trust Company of Ohio, N.A., a national banking association, as Trustee (the "Trustee"). Capitalized terms not defined herein shall have the meanings assigned to such terms in Trust Agreement No. 8.

WITNESSETH

WHEREAS, on April 9, 1991 the Company and the Trustee entered into Trust Agreement No. 8;

WHEREAS, Section 12 of Trust Agreement No. 8 provides that such Trust Agreement may be amended by the Company and the Trustee;

WHEREAS, Section 9(c) of Trust Agreement No. 8 provides that Exhibit A thereto may be amended by the Company by providing to the Trustee an amendment thereto;

WHEREAS, Section 12(b) of Trust Agreement No. 8 provides that the Trust shall terminate on the date on which the Trust no longer contains any assets, or, if earlier, the date on which each Director is entitled to no further payments thereunder;

WHEREAS, Section 12(c) of Trust Agreement No. 8 provides that any assets remaining in the Trust shall be returned to the Company; and

NOW, THEREFORE, the Company and the Trustee hereby amend Trust Agreement No. 8 to provide as follows:

1.    Exhibit A is amended in its entirety to read as attached hereto, to clarify that no Director is entitled to further payments under the Trust Agreement No. 8.

2.    In accordance with Section 12(b) of Trust Agreement No. 8, the Trust is hereby terminated.

3.    In accordance with Section 12(c) any assets remaining in the Trust shall be returned to the Company.

IN WITNESS WHEREOF, the Company and the Trustee have caused counterparts of this Fifth Amendment to be executed on this 24 th day of November, 2015, each of which shall be an original Amendment.

CLIFFS NATURAL RESOURCES INC.

By:   /s/ James D. Graham
Title:  Executive Vice President, Chief Legal Officer and
       Secretary

KEYBANK NATIONAL ASSOCIATION, AS TRUSTEE

By:   /s/ Lester Dryja
Title:  Vice President

By:   /s/ Thor Haraldsson
Title:  Senior Vice President

A005049

**EXHIBIT A**

Effective October 28, 2015

**CLIFFS NATURAL RESOURCES INC.**
**PARTICIPANTS IN RETIREMENT PLAN FOR NON-EMPLOYEE DIRECTORS**

No Participants

**EXHIBIT 10.33**

<u>THIRD AMENDMENT TO TRUST AGREEMENT NO. 9</u>

This Third Amendment to Trust Agreement No. 9 is entered into effective as of October 28, 2015 by and between Cliffs Natural Resources Inc., f/k/a Cleveland-Cliffs Inc., an Ohio corporation (the "Company"), and KeyBank National Association, the successor in interest to Key Trust Company of Ohio, N.A., a national banking association, as Trustee (the "Trustee"). Capitalized terms not defined herein shall have the meanings assigned to such terms in Trust Agreement No. 9.

WITNESSETH

WHEREAS, on November 20, 1996 the Company and the Trustee entered into Trust Agreement No. 9;

WHEREAS, Sections 1.6 and 9.2 of Trust Agreement No. 9 provide that Exhibit A thereto may be amended by the Company by providing to the Trustee amendments thereto; and

WHEREAS, Section 11.1 of Trust Agreement No. 9 provides that Trust Agreement No. 9 may be amended at any time and to any extent by a written instrument executed by the Trustee and the Company without the consent of any Trust Beneficiary, provided that the amendment does not adversely affect any Trust Beneficiary, and provided further that no amendment shall have the effect of altering Section 11.2; and

WHEREAS, Section 11.2 of Trust Agreement No. 9 provides that the Trust shall terminate on or after the fifth anniversary of the date of a Change of Control upon the earliest to occur of (i) a joint determination by the Trustee and the Directors made on or after the fifth anniversary of the date of a Change of Control that no Trust Beneficiary is or will be entitled to any further payment of Benefits or (ii) such time as the Trustee shall have received consents from all of the Directors to the termination of Trust Agreement No. 9.

WHEREAS, it has been determined that there exists no Trust Beneficiary who is or will be entitled to any further payment of Benefits and no Directors from whom to seek consent to terminate the Trust so only the Trustee need consent; and

NOW, THEREFORE, the Company and the Trustee hereby amend Trust Agreement No. 9 to provide as follows:

1.    Exhibit A is amended in its entirety to read as attached hereto, to clarify that no Trust Beneficiary is or will be entitled to any further payment of Benefits.

2.    In accordance with Section 11.2 of the Trust, the Trust is hereby terminated.

3.    In accordance with Section 11.3 any assets remaining in the Trust, less all payments, expenses, taxes and other charges under Trust Agreement No. 9 as of the date of termination shall be returned to the Company.

IN WITNESS WHEREOF, the Company and the Trustee have caused counterparts of this Third Amendment to be executed on this 24 th day of November, 2015, each of which shall be an original Amendment.

CLIFFS NATURAL RESOURCES INC.

By:    /s/ James D. Graham
Title:    Executive Vice President, Chief Legal Officer and
        Secretary

KEYBANK NATIONAL ASSOCIATION, AS TRUSTEE

By:    /s/ Lester Dryja
Title:    Vice President

By:    /s/ Thor Haraldsson
Title:    Senior Vice President

**EXHIBIT A**

Effective October 28, 2015

**CLIFFS NATURAL RESOURCES INC.**
**NONEMPLOYEE DIRECTORS' SUPPLEMENTAL COMPENSATION PLAN PARTICIPANTS**

No Participants or Trust Beneficiaries

**EXHIBIT 10.38**

SEVERANCE AGREEMENT AND RELEASE

**THIS Severance Agreement and Release** ("Agreement") is made between David Webb (the "Executive") and Cliffs Natural Resources Inc., an Ohio corporation (the "Company"), as of the date set forth below. The Executive and Company may be referred to as the "Parties".

**WHEREAS**, the Company and the Executive are parties to a Change in Control Severance Agreement, which was executed on January 24, 2014 and which became effective on January 1, 2014 (the "CIC Agreement");

**WHEREAS**, on August 6, 2014, the Company incurred a "Change in Control" as defined in the CIC Agreement;

**WHEREAS**, on October 31, 2015, the Company terminated the employment of the Executive without "Cause" (as defined in the CIC Agreement) in connection with the Change in Control;

**WHEREAS**, as a result of such termination of employment, the Executive has become entitled to certain benefits and payments under the CIC Agreement;

**WHEREAS**, under the CIC Agreement, the Executive is required to sign a release in order to receive the Severance Compensation (as defined under the CIC Agreement and outlined below) and to receive other benefits or payments as provided under the CIC Agreement; and

**WHEREAS**, the Parties wish to clarify, interpret, and specify the rights of and payments to the Executive in this Agreement, to embody the release required of the Executive in order to trigger the payments and benefits to be provided under the CIC Agreement to the Executive, and to confirm the continued effectiveness of certain prior agreements between the Parties.

**NOW THEREFORE**, in consideration of the promises and agreements contained herein and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

This Agreement is effective on the date hereof and will continue in effect as provided herein. Capitalized terms that are not defined herein shall have the meanings ascribed to them in the CIC Agreement.

1.    **SEVERANCE PAYMENT**.

Pursuant to the payment terms and structure within Annex A of the CIC Agreement, the Company shall make the following payments to or for the benefit of the Executive:

(a)    An aggregate cash payment in the amount of $1,543,992 less appropriate withholdings

- 2 years of 2015 Base Pay ($402,000 * 2 = $804,000);

- 2 years of Incentive Pay at Target for 2015 ($321,600 *2 = $643,200);

- Accrued but unused 2015 vacation ($16,492);

- Financial planning perquisites ($20,000).

- Outplacement service (15 % of base pay = $60,300); and

(b)    Payment of equity under Executives 2014-2016 LTI Grant which was made to Executive on February 10, 2014. Executive shall receive $96,902 reflective of an equity payout inclusive of accrued dividends less applicable withholdings, reflective of vested grants and/or awards under the 2012 Incentive Equity Plan, as amended, to be paid immediately within the first three days of the seventh month after the Executive's Separation from Service.

(c)        Payment of shares under the Executives 2015-2017 LTI Grant made to Executive on January 12, 2015. Payment shall be paid through the issuance of prorated Restricted Stock Units (RSU's) totaling 7,620 shall be paid in shares within the first three days of the seventh month after the Executive's Separation from Service. Executive shall also retain prorated Performance Shares (PS's) totaling 7,620. If Performance share metrics are met and performance shares are paid they shall be paid to Executive in February of 2018.

(d)        Payment of shares under the Executives 2014 retention grant made to the Executive on July 29, 2014. Remaining 50% of grant (12,270 RSU's) shall be paid through the issuance of shares, less applicable withholdings, within the first three days of the seventh month after the Executive's Separation from Service. At the time of payment, the Company shall also pay to the Executive, in cash, the amount of any dividend equivalents to which he is entitled under the award agreement.

A lump sum payment, less applicable withholdings, representing the sum of the present values of the Executive's full accrued benefit under the Accrued SERP Payment and the Non-accrued SERP Payment. Amount shall be paid to the Executive pursuant to the SERP, in a single lump sum, within the first three days of the seventh month after the Executive's Separation from Service. The amount of this lump sum payment is currently estimated to be $238,562.59. However, such amount will be increased or decreased, as applicable, depending on the interest crediting rate for the period. At the time of payment, the Company will provide Executive with the final calculation made by the Company's actuary of the lump sum payment

2.      **OTHER        BENEFITS        OR        PAYMENTS**.

<u>Health & Welfare Benefits</u>. Pursuant to the provisions of paragraphs (1) through (3) of Annex A to the CIC Agreement, for the duration of the Continuation Period, the Company shall continue to cover the Executive under all of the health and welfare plans in which the Executive was participating on October 31, 2015, all at Company expense.

3.      **RELEASE (the "<u>Release</u>")**.

In consideration of the payments to be made and the benefits to be received by the Executive pursuant to this Agreement, and the CIC Agreement, which the Executive acknowledges are in addition to payments and benefits which the Executive would be entitled to receive absent this Agreement and the CIC Agreement (other than severance pay and benefits under any other severance plan, policy, program or arrangement sponsored by Cliffs Natural Resources Inc.), the Executive, for himself and his dependents, successors, assigns, heirs, executors and administrators (and his and their legal representatives of every kind), hereby releases, dismisses, remises and forever discharges Cliffs Natural Resources Inc., its predecessors, parents, subsidiaries, divisions, related or affiliated companies, officers, directors, stockholders, members, executives, heirs, successors, assigns, representatives, agents and counsel (the "<u>Released Parties</u>") from any and all arbitrations, claims, including claims for attorney's fees (other than as provided in the CIC Agreement), demands, damages, suits, proceedings, actions and/or causes of action of any kind and every description, whether known or unknown, which the Executive now has or may have had for, upon, or by reason of any cause whatsoever ("claims"), against the Released Parties, including but not limited to:

(a)        any and all claims arising out of or relating to the Executive's employment by or service with the Company and his termination from the Company other than any claims arising under this Agreement, the CIC Agreement, or under any executive benefit programs or executive compensation programs not specifically addressed in this Agreement or the CIC Agreement;

(b)        any and all claims of discrimination, including but not limited to claims of discrimination on the basis of sex, race, age, national origin, marital status, religion or handicap, including, specifically, but without limiting the generality of the foregoing, any claims under the Age Discrimination in Employment Act, as amended, Title VII of the Civil Rights Act of 1964, as amended, the Americans with Disabilities Act, Ohio Revised Code Section 4101.17 and Ohio Revised Code Chapter 4112, including Sections 4112.02 and 4112.99 thereof; and

(c)        any and all claims of wrongful or unjust discharge or breach of any contract or promise, express or implied.

The Executive hereby gives up any and all rights or claims to be a class representative or otherwise participate in any class action on behalf of any employee benefit plan of the Company or any Subsidiary.

The Executive understands and acknowledges that the Company does not admit any violation of law, liability or invasion of any of his rights and that any such violation, liability or invasion is expressly denied. The consideration provided for this Release is made for the purpose of settling and extinguishing all claims and rights (and every other similar or dissimilar matter) that the Executive ever had or now may have against the Company to the extent provided in this Release. The Executive further agrees and acknowledges that no representations, promises or inducements have been made by the Company other than as appear in the Agreement.

The Executive further agrees and acknowledges that:

The release provided for herein releases claims to and including the date of this Release;

(d)    He has been advised by the Company to consult with legal counsel prior to executing this Release, has had an opportunity to consult with and to be advised by legal counsel of his choice, fully understands the terms of this Release, and enters into this Release freely, voluntarily and intending to be bound;

(e)    He has been given a period of 21 days, commencing on the day after his Separation from Service, to review and consider the terms of this Release, prior to its execution and that he may use as much of the 21 day period as he desires; and

(f)    He may, within seven days after execution, revoke this Release. Revocation shall be made by delivering a written notice of revocation to the Executive Vice President, Human Resources at the Company. For such revocation to be effective, written notice must be actually received by the Executive Vice President, Human Resources at the Company no later than the close of business on the seventh day after the Executive executes this Release. If Executive does exercise his right to revoke this Release, all of the terms and conditions of the Release shall be of no force and effect and the Company shall not have any obligation to make payments or provide benefits to the Executive otherwise required as a result of the Agreement.

The Executive agrees that he will never file a lawsuit or other complaint asserting any claim that is released in this Release.

The Executive waives and releases any claim that he has or may have to reemployment after October 31, 2015.

4.    **OTHER PROVISIONS**.

(a)    Effect of Executive's Death . Should the Executive die before receipt of all payments under this Agreement, the unpaid amounts shall be payable to the Executive's estate or otherwise inure to the benefit of his heirs. If the Executive dies before the end of the Continuation Period, the Employee Benefits shall continue to be made available or paid to the Executive's surviving spouse and dependents for the duration of the Continuation Period.

(b)    Non-Disparagement. The Executive shall not make any negative statements orally or in writing about the Executive's employment with the Company, about the Company or its affiliates or any of its executives or products, to anyone other than to the EEOC or any similar state agency, Executive's immediate family, and the Executive's legal representatives or financial advisors. Nothing herein shall prevent the Executive from testifying truthfully in a legal proceeding or governmental administrative proceeding. The Executive may indicate on employment applications and during interviews that the Executive was employed by the Company, the Executive's duties, length of employment, and compensation. The Company shall not make any negative statements orally or in writing about the Executive's employment with the Company to anyone other than to the EEOC or any similar state agency and the Company's legal representatives and the Company has instructed its senior executives not to make such statements. Nothing herein shall prevent the Company from testifying truthfully in a legal proceeding or governmental administrative proceeding.

(c)    Severability. In the event that one or more provisions of this Agreement is found to be unenforceable for any reason whatsoever, the unenforceable provision or provisions shall be considered to be severable, and the remainder of this Agreement shall continue in full force and effect.

(d)      Binding Effect. This Agreement shall be binding upon and operate to the benefit of the Executive and Released Parties, and their successors and assigns.

(e)      Waiver. No waiver of any of the terms of this Agreement shall constitute a waiver of any other terms, whether or not similar, nor shall any waiver be a continuing waiver. No waiver shall be binding unless executed in writing by the Party making the waiver. The Company or the Executive may waive any provision of this Agreement intended for such Party's benefit, but such waiver shall in no way excuse the other Party from the performance of any of such Party's other obligations under this Agreement.

(f)      Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio, without regard to the principles of conflicts of law, except to the extent those laws are preempted by federal law.

(g)      Subsequent Modifications. The terms of this Agreement may be altered or amended, in whole or in part, only upon the signed written agreement of the Parties.

(h)      Effect on Other Agreements; Indemnification. Notwithstanding the Release by the Executive contained in this Agreement, or anything else to the contrary, the rights and duties of the Parties under the CIC Agreement shall continue and be of full force and effect in accordance with its terms. The Company agrees to indemnify the Executive for actions occurring prior to the Termination Date and in connection with the execution, delivery and performance of this Agreement to the same extent as if he were a party to an indemnification agreement with the Company in the form of the indemnification agreement to which the Company is a party with members of its board of directors. Following the Termination Date, Employee shall continue to be covered by any provision for indemnification by the Company in effect on the date of the execution of this Agreement for so long and to the same extent that the Company provides the same or more favorable indemnification to the members of the Company's board of directors or its active senior executives, whichever is more favorable. In addition, the Company shall continue to maintain D&O coverage that covers the Executive to the same extent that it covers the members of the Company's board of directors or its active senior executives, whichever is more favorable. Finally, in the event of a transaction resulting in a Change in Control of the Company subsequent to the date hereof in which the Company is not the surviving entity, the Company shall use its reasonable best efforts to require as part of such transaction that the surviving company provide indemnification and D&O coverage that covers the Executive to the extent described in this paragraph, provided that the Company shall, in any event, use its reasonable best efforts to require that the surviving company provide the Executive with the same indemnification rights and D&O coverage as are provided to the senior executives who remain with the Company following the Change in Control and to the then current and former members of its board of directors, whichever is more favorable.

[signature page follows]

Dated: November 9, 2015

EXECUTIVE:

/s/ David L. Webb
_____


Dated: November 9, 2015

COMPANY:

CLIFFS NATURAL RESOURCES INC.

By:    /s/ Maurice D. Harapiak
_____

Its:    EVP Human Resources
_____

EXHIBIT 10.61

**CLIFFS NATURAL RESOURCES INC.**
**2015 EQUITY AND INCENTIVE COMPENSATION PLAN**

**RESTRICTED STOCK UNIT AWARD MEMORANDUM**

**Employee:**                                                    PARTICIPANT NAME
**Date of Grant:**                                              GRANT DATE
**Number of Common Shares Subject to Award:**    SHARES GRANTED
**Vesting Date:**                                               MAY 26, 2018

Additional terms and conditions of your award are included in the Restricted Stock Unit Award Agreement. As a condition to your receipt of this award, you must log on to Fidelity's website at **www.netbenefits.fidelity.com** and accept the terms and conditions of this award within 90 calendar days of your Date of Grant. If you do not accept the terms and conditions of this award within such time at www.netbenefits.fidelity.com, this award may be forfeited and immediately terminate.

**Note:** Article 2.1 of the Restricted Stock Unit Award Agreement contains provisions that restrict your activities. These provisions apply to you and, by accepting this award, you agree to be bound by these restrictions.

**CLIFFS NATURAL RESOURCES INC.**
**2015 EQUITY AND INCENTIVE COMPENSATION PLAN**

**Restricted Stock Unit Award Agreement**

This Restricted Stock Unit Award Agreement (this "Agreement") is between Cliffs Natural Resources Inc., an Ohio corporation (the "Company"), and you, the person named in the Restricted Stock Unit Award Memorandum (the "Award Memorandum") who is an employee of the Company or a Subsidiary of the Company (the "Participant"). For purposes of this Agreement, "Employer" means the entity (the Company or Subsidiary) that employs the Participant on the applicable date. This Agreement is effective as of the Date of Grant set forth in the Award Memorandum.

The Company wishes to award to the Participant Restricted Stock Units representing the opportunity to earn a number of Common Shares, subject to the terms and conditions set forth in this Agreement, in order to carry out the purpose of the Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan (the "Plan"). All capitalized terms not defined in this Agreement shall have the same meaning as set forth in the Plan. See Section 2 of the Plan for a list of certain defined terms.

In the event of a conflict between the terms of this Agreement, the Award Memorandum and the terms of the Plan, the terms of the Plan shall govern. In the event of a conflict between the terms of this Agreement and the Award Memorandum, the terms of this Agreement shall govern.

**ARTICLE 1.**
**Grant and Terms of Restricted Stock Units**

**1.1    Grant of Restricted Stock Units**. Pursuant to the Plan, the Company has granted to the Participant the number of Restricted Stock Units as specified in the Award Memorandum, with dividend equivalents ("Restricted Stock Units"), effective as of the Date of Grant.

**1.2    Vesting As Condition of Payment**. The Restricted Stock Units evidenced by this Agreement and these terms and conditions shall only result in the issuance of Common Shares (or cash or a combination of Common Shares and cash, as decided by the Committee in its sole discretion) equal in number to the Restricted Stock Units to the extent the Participant is "Vested" in the Restricted Stock Units on the date the Restricted Stock Units are to be paid as specified in Section 1.4. The Restricted Stock Units will become Vested as follows:

(a)    Employment Through Vesting Period. The Participant will become 100% Vested in all the Restricted Stock Units subject to this award if the Participant remains in the continuous employ of the Company or a Subsidiary throughout the period beginning on the Date of Grant and ending on the Vesting Date, as set forth in the Award Memorandum ("Vesting Period").

(b)    Death or Disability. The Participant will become 100% Vested in all the Restricted Stock Units evidenced by this Agreement if the Participant experiences a termination of employment with the Company because of the Participant's death or Disability (as defined herein) during the Vesting Period.

(c)    Retirement or Termination without Cause. If the Participant experiences a termination of employment with the Company because of Retirement (as defined herein) or a termination of employment by the Company without Cause (as defined herein) during the Vesting Period, the Participant shall become Vested in a prorated number of Restricted Stock Units equal to the product of the number of Restricted Stock Units subject to this award, multiplied by a fraction, the numerator of which is the number of full months the Participant was employed with the Company or a Subsidiary between the Date of Grant and the date of the Participant's termination of employment, and the denominator of which is 36, rounded down to the nearest whole Restricted Stock Unit.

(d)    Change in Control. In the event a Change in Control occurs during the Vesting Period, the Participant will become Vested in the Restricted Stock Units only to the extent provided in Section 1.3.

In the event the Participant otherwise terminates employment prior to becoming Vested in the Restricted Stock Units or the Participant's employment is terminated by the Company for Cause, the Participant shall forfeit all rights to any Restricted Stock Units evidenced by this Agreement.

**1.3**  **Change in Control Vesting**.

(a)  If the Participant remains in the continuous employ of the Company or a Subsidiary throughout the period beginning on the Date of Grant and ending on the date of a Change in Control, the Participant will become 100% Vested in all the Restricted Stock Units evidenced by this Agreement upon the Change in Control, except to the extent that an award meeting the requirements of Section 1.3(f) (a "Replacement Award") is provided to the Participant in accordance with Section 1.3(f) to replace, adjust or continue the award of Restricted Stock Units covered by this Agreement (the "Replaced Award"). If a Replacement Award is provided, references to Restricted Stock Units in this Agreement shall be deemed to refer to the Replacement Award after the Change in Control.

(b)  If, upon or after receiving a Replacement Award, the Participant experiences a termination of employment with the Company or a Subsidiary of the Company (or any of their successors) (as applicable, the "Successor") by reason of the Participant terminating employment for Good Reason or the Successor terminating Participant's employment other than for Cause, in each case within a period of two years after the Change in Control and during the Vesting Period, the Participant shall become 100% Vested in the Replacement Award upon such termination.

(c)  If a Replacement Award is provided, notwithstanding anything in this Agreement to the contrary, any outstanding Restricted Stock Units that at the time of the Change in Control are not subject to a "substantial risk of forfeiture" (within the meaning of Section 409A of the Code) will be deemed to be Vested at the time of such Change in Control and will be paid as provided for in Section 1.4(c).

(d)  For purposes of this Agreement, "Disability" shall mean a medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than 12 months and that results in the Participant: (i) being unable to engage in any substantial gainful activity; or (ii) receiving income replacement benefits for a period of not less than three months under an accident or health plan covering employees of the Company.

(e)  For purposes of this Agreement, "Retirement" means (i) retirement from active employment with the Company or a Subsidiary on or after the age of 65 or (ii) the Participant's retirement from active employment with the Company or a Subsidiary on and after the attainment of any of the following: (A) at least age 55 and at least 5 years of vesting service under the terms of the Company-sponsored pension plan then applicable to the Participant, if any, with additional service, if any, as may be recognized by the Committee in its sole discretion; (B) at least age 55 and at least 15 years of Continuous Service; or (C) at least 30 years of Continuous Service. For this purpose, "Continuous Service" shall be determined pursuant to Part A of the Pension Plan for Employees of Cliffs Natural Resources Inc. and Its Associated Employers, and if the Participant is not a participant in a Company-sponsored pension plan, such Participant's years of vesting service shall be determined under the rules of Part A of the Pension Plan for Employees of Cliffs Natural Resources Inc. and Its Associated Employers.

(f)  For purposes of this Agreement, a "Replacement Award" means an award: (i) of the same type (e.g., time-based restricted stock units) as the Replaced Award; (ii) that has a value at least equal to the value of the Replaced Award; (iii) that relates to publicly traded equity securities of the Company or its successor in the Change in Control or another entity that is affiliated with the Company or its successor following the Change in Control; (iv) if the Participant holding the Replaced Award is subject to U.S. federal income tax under the Code, the tax consequences of which to such Participant under the Code are not less favorable to such Participant than the tax consequences of the Replaced Award; and (v) the other terms and conditions of which are not less favorable to the Participant holding the Replaced Award than the terms and conditions of the Replaced Award (including the provisions that would apply in the event of a subsequent Change in Control). A Replacement Award may be granted only to the extent it does not result in the Replaced Award or Replacement Award failing to comply with or be exempt from Section 409A of the Code. Without limiting the generality of the foregoing, the Replacement Award may take the form of a continuation of the Replaced Award if the requirements of the two preceding sentences are satisfied. The determination of whether the conditions of this Section 1.3(f) are satisfied will be made by the Committee, as constituted immediately before the Change in Control, in its sole discretion.

(g)  For purposes of this Agreement, a termination for "Cause" shall mean that, prior to termination of employment, the Participant shall have committed: (i) and been convicted of a criminal violation involving fraud, embezzlement or theft in connection with his or her duties or in the course of his or her employment with the Company or any Affiliate (or the Successor, if applicable); (ii) intentional wrongful damage to property of

the Company or any Affiliate (or the Successor, if applicable); (iii) intentional wrongful disclosure of secret processes or confidential information of the Company or any Affiliate (or the Successor, if applicable); or (iv) intentional wrongful engagement in any competitive activity; and any such act shall have been demonstrably and materially harmful to the Company or any Affiliate (or the Successor, if applicable). For purposes of this Agreement, no act or failure to act on the part of the Participant shall be deemed "intentional" if it was due primarily to an error in judgment or negligence, but shall be deemed "intentional" only if done or omitted to be done by the Participant not in good faith and without reasonable belief that the Participant's action or omission was in the best interest of the Company or an Affiliate (or the Successor, if applicable).

(h)    A termination "_for Good Reason_" shall mean the Participant's termination of employment with the Successor as a result of the initial occurrence, without the Participant's consent, of one or more of the following events:

(i)    a material diminution in the Participant's annual base salary rate as in effect from time to time (" _Base Pay_");

a material diminution in the Participant's authority, duties or responsibilities;

(ii)    a material change in the geographic location at which the Participant must perform services;

(iii)    a reduction in the Participant's opportunity regarding annual bonus, incentive or other payment of compensation, in addition to Base Pay, made or to be made in regard to services rendered in any year or other period pursuant to any bonus, incentive, profit-sharing, performance, discretionary pay or similar agreement, policy, plan, program or arrangement (whether or not funded) of the Successor; and

(iv)    any other action or inaction that constitutes a material breach by the Participant's employer of the employment agreement, if any, under which the Participant provides services.

Notwithstanding the foregoing, "Good Reason" shall not be deemed to exist unless: (A) the Participant has provided notice to his or her employer of the existence of one or more of the conditions listed in (i) through (v) above within 90 days after the initial occurrence of such condition or conditions; and (B) such condition or conditions have not been cured by the Participant's employer within 30 days after receipt of such notice.

**1.4    Payment of Restricted Stock Units**.

(a)    _Payment After the Vesting Period_. Subject to Sections 1.4(b) and (c), the Restricted Stock Units that are Vested as of the Vesting Date shall be paid after the end of the Vesting Period, but in any event no later than 2-½ months after the end of the Vesting Period to the extent they have not been previously paid to the Participant.

(b)    _Payment After Death, Disability, Retirement or Termination Without Cause_. Notwithstanding Section 1.4(a), if the Participant experiences a termination of employment with the Company because of the Participant's death, Disability, or Retirement, or a termination of employment by the Company without Cause during the Vesting Period, the Vested Restricted Stock Units will be paid within 30 days following the date of such termination. Any payment of Restricted Stock Units to a deceased Participant shall be paid to the estate of the Participant, unless the Participant files a completed Designation of Death Beneficiary with the Company in accordance with its procedures.

(c)    _Change in Control_. Notwithstanding Section 1.4(a) and Section 1.4(b), to the extent any Restricted Stock Units are Vested as of a Change in Control, such Vested Restricted Stock Units will be paid within 10 days of the Change in Control; _provided_, _however_, that if such Change in Control would not qualify as a permissible date of distribution under Section 409A(a)(2)(A) of the Code, and the regulations thereunder, and where Section 409A of the Code applies to such distribution, payment will be made on the date that would have otherwise applied pursuant to this Section 1.4.

(d)    _Payment Following a Change in Control_. Notwithstanding Section 1.2 and 1.4(a), if, during the two-year period following a Change in Control, the Participant experiences a qualifying termination of employment (as described in Section 1.3(b)), the Restricted Stock Units that are Vested as of the date of such termination of employment shall be paid within 10 days of such termination of employment to the extent they have not been previously paid to the Participant; _provided_, _however_, that if such Change in Control would not qualify

as a permissible date of distribution under Section 409A(a)(2)(A) of the Code, and the regulations thereunder, and where Section 409A of the Code applies to such distribution, payment will be made on the date that would have otherwise applied pursuant to this Section 1.4. Notwithstanding the foregoing to the contrary, to the extent payment is due within 10 days of the termination of employment, if the Participant on the date of such termination of employment is a "specified employee" (within the meaning of Section 409A of the Code determined using the identification methodology selected by the Company from time to time), payment for the Restricted Stock Units will be made on the first day of the seventh month after the date of Participant's termination of employment or, if earlier, the date of the Participant's death.

(e)   General. The Committee, in its sole discretion, may settle the Restricted Stock Units in cash or a combination of Common Shares and cash, in lieu of issuing only Common Shares. In the event that all or any portion of the Restricted Stock Units shall be paid in cash, the cash equivalent of one Restricted Stock Unit shall be equal to the Market Value per Share on the last trading day of the Vesting Period or, if earlier, the trading day immediately prior to the payment date. Notwithstanding the foregoing, no Restricted Stock Units granted hereunder may be paid in cash in lieu of Common Shares to any Participant who is subject to the Cliffs Natural Resources Inc. Directors' and Officers' Share Ownership Guidelines ("Share Ownership Guidelines") unless and until such Participant is either in compliance with, or no longer subject to, such Share Ownership Guidelines; provided, however, that the Committee may withhold Common Shares to the extent necessary to satisfy income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related item withholding requirements, as described in Section 4.3. In addition, the Committee may restrict 50% of the Common Shares to be issued in satisfaction of the total Restricted Stock Units, before income tax withholding, so that they cannot be sold by the Participant unless immediately after such sale the Participant is in compliance with the Share Ownership Guidelines that are applicable to the Participant at the time of sale.

(f)   Payment Obligation. Prior to payment, the Company shall only have an unfunded and unsecured obligation to make payment of Restricted Stock Units to the Participant. The Restricted Stock Units evidenced by this Agreement that have not yet been earned, and any interests of the Participant with respect thereto, are not transferable other than pursuant to the laws of descent and distribution, or in accordance with Section 1.4(b).

(g)   No Shareholder Rights. The Participant shall have no rights of ownership in the Common Shares underlying the Restricted Stock Units and no right to vote the Common Shares underlying the Restricted Stock Units until the date on which the Common Shares underlying the Restricted Stock Units are issued or transferred to the Participant pursuant to this Section 1.4.

<div align="center">

**ARTICLE 2.**
**Other Terms and Conditions**

</div>

**2.1   Non-Compete and Confidentiality**.

(a)   A Participant shall not render services for any organization or engage directly or indirectly in any business that is a competitor of the Company or any Affiliate of the Company, or which organization or business is or plans to become prejudicial to or in conflict with the business interests of the Company or any Affiliate of the Company or distribute any secret or confidential information belonging to the Company or any Affiliate of the Company.

(b)   Failure to comply with Section 2.1(a) above will cause a Participant to forfeit the right to Restricted Stock Units and require the Participant to reimburse the Company for the taxable income received on Restricted Stock Units that have been paid out in Common Shares within the 90-day period preceding the Participant's termination of employment.

<div align="center">

**ARTICLE 3.**
**Acknowledgments**

</div>

**3.1   Acknowledgments**. In accepting the award, the Participant acknowledges, understands and agrees to the following:

(a)     The Plan is established voluntarily by the Company, it is discretionary in nature and it may be modified, amended, suspended or terminated by the Company at any time, to the extent permitted by the Plan;

(b)     The grant of the Restricted Stock Units is voluntary and occasional and does not create any contractual or other right to receive future grants of Restricted Stock Units, or benefits in lieu of Restricted Stock Units, even if Restricted Stock Units have been granted in the past;

(c)     All decisions with respect to future Restricted Stock Units or other grants, if any, will be at the sole discretion of the Company;

(d)     The Participant's participation in the Plan is voluntary;

(e)     The Restricted Stock Unit Award and the Participant's participation in the Plan shall not create a right to employment or be interpreted as forming an employment or services contract with the Company or any Subsidiary and shall not interfere with the ability of the Company, or any Subsidiary, as applicable, to terminate the Participant's employment or service relationship (if any);

(f)     The future value of the underlying Common Shares is unknown, indeterminable and cannot be predicted with certainty;

(g)     No claim or entitlement to compensation or damages shall arise from forfeiture of any Restricted Stock Units resulting from the Participant ceasing to provide employment or other services to the Company or a Subsidiary (for any reason whatsoever whether or not later found to be invalid or in breach of employment laws in the jurisdiction where Participant is employed or the terms of the Participant's employment agreement, if any), and in consideration of the grant of the Restricted Stock Units to which the Participant is otherwise not entitled, the Participant irrevocably agrees never to institute any claim against the Company or any of its Subsidiaries, and the Participant waives his or her ability, if any, to bring any such claim, and releases the Company and its Subsidiaries from any such claim; if, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by participating in the Plan, the Participant shall be deemed irrevocably to have agreed not to pursue such claim and agrees to execute any and all documents necessary to request dismissal or withdrawal of such claim;

(h)     Neither the Plan nor the Restricted Stock Units shall be construed to create an employment relationship where any employment relationship did not otherwise already exist;

(i)     The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Participant's participation in the Plan, or the Participant's acquisition or sale of the underlying Common Shares. The Participant is hereby advised to consult with his or her own personal tax, legal and financial advisors regarding his or her participation in the Plan before taking any action related to the Restricted Stock Units;

(j)     The Restricted Stock Units and the Common Shares subject to the Restricted Stock Units, and the income and value of same, are not part of normal or expected compensation for purposes of calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, bonuses, long-service awards, pension or retirement or welfare benefits or similar payments; and

(k)     The Company reserves the right to impose other requirements on participation in the Restricted Stock Units and on any Common Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable in order to comply with local law or other applicable rules or facilitate the administration of the Plan, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

**ARTICLE 4.**
**General Provisions**

**4.1  Compliance with Law**. The Company shall make reasonable efforts to comply with all applicable federal and state securities laws; provided, however, notwithstanding any other provision of the Agreement and these terms and conditions, the Company shall not be obligated to issue any Common Shares pursuant to the Agreement and these terms and conditions if the issuance or payment thereof would result in a violation of any such law; provided, however, that the Common Shares will be issued at the earliest date at which the Company reasonably anticipates that the issuance of the Common Shares will not cause such violation.

**4.2   Dividend Equivalents**. During the period beginning on the Date of Grant and ending on the date that the Restricted Stock Units are paid in accordance with Section 1.4, the Participant will be entitled to dividend equivalents on Restricted Stock Units equal to the cash dividend or distribution that would have been paid on the Restricted Stock Units had the Restricted Stock Units been issued and outstanding Common Shares on the record date for the dividend or distribution. Such accrued dividend equivalents (a) will vest and become payable upon the same terms and at the same time of settlement as the Restricted Stock Units to which they relate, and (b) will be denominated and payable solely in cash.

**4.3   Withholding Taxes**. To the extent that the Company is required to withhold federal, state, local or foreign taxes in connection with any payment made or benefit realized by the Participant under this Agreement, and the amounts available to the Company for such withholding are insufficient, it will be a condition to the receipt of such payment or the realization of such benefit that the Participant make arrangements satisfactory to the Company for payment of the balance of such taxes required to be withheld, which arrangements (in the discretion of the Committee) may include relinquishment of a portion of such benefit. If the Participant's benefit is to be received in the form of Common Shares, and the Participant fails to make arrangements for the payment of tax, then, unless otherwise determined by the Committee, the Company will withhold Common Shares having a value equal to the amount required to be withheld. Notwithstanding the foregoing, when the Participant is required to pay the Company an amount required to be withheld under applicable income and employment tax laws, the Participant may elect, unless otherwise determined by the Committee, to satisfy the obligation, in whole or in part, by having withheld, from the shares required to be delivered to the Participant, Common Shares having a value equal to the amount required to be withheld or by delivering to the Company other Common Shares held by the Participant. The shares used for tax withholding will be valued at an amount equal to the fair market value on the date the benefit is to be included in the Participant's income. In no event will the market value of the Common Shares to be withheld and delivered pursuant to this Section to satisfy applicable withholding taxes in connection with the benefit exceed the minimum amount of taxes required to be withheld.

**4.4   Continuous Employment**. For purposes of this Agreement, the continuous employment of the Participant with the Company shall not be deemed to have been interrupted, and the Participant shall not be deemed to have separated from service with the Company, by reason of the transfer of his employment among the Company or Subsidiaries or an approved leave of absence, unless otherwise indicated in the Plan or if required to comply with Section 409A of the Code.

**4.5   Relation to Other Benefits**. Any economic or other benefit to the Participant under the Agreement and these terms and conditions or the Plan shall not be taken into account in determining any benefits to which the Participant may be entitled under any profit-sharing, retirement or other benefit or compensation plan maintained by the Company or a Subsidiary and shall not affect the amount of any life insurance coverage available to any beneficiary under any life insurance plan covering employees of the Company or Subsidiary.

**4.6   Adjustments**. Restricted Stock Units evidenced by this Agreement are subject to adjustment as provided in Section 11 of the Plan.

**4.7   These Terms and Conditions Subject to Plan**. The Restricted Stock Units covered under the Agreement and all of the terms and conditions hereof are subject to all of the terms and conditions of the Plan, a copy of which is available upon request.

**4.8   Transferability**. Except as otherwise provided in the Plan, the Restricted Stock Units are non-transferable and any attempts to assign, pledge, hypothecate or otherwise alienate or encumber (whether by law or otherwise) any Restricted Stock Units shall be null and void.

**4.9   Data Privacy**. The Participant hereby explicitly and unambiguously consents to the collection, use and transfer, in electronic or other form, of the Participant's personal data as described in this Agreement and any other Restricted Stock Unit award materials by and among, as applicable, the Company or Subsidiaries for the exclusive purpose of implementing, administering and managing the Participant's participation in the Plan.

The Participant understands that the Company or Subsidiary may hold certain personal information about the Participant, including, but not limited to, the Participant's name, home address and telephone number, date of birth, social security number or other identification number, salary, nationality, job title, any Common Shares of or directorships in the Company that are held, details of all Restricted Stock Units or any other entitlement to Common Shares awarded, canceled, exercised, vested, unvested or outstanding in the Participant's favor, for the exclusive purpose of implementing, administering and managing the Plan ("Data").

The Participant understands that Data will be transferred to the Company's broker, or such other stock plan service provider as may be selected by the Company in the future, which is assisting the Company with the implementation, administration and management of the Plan. The Participant understands that the recipients' use of the Data may be located in the United States or elsewhere, and that the recipients' country (e.g., the United States) may have different data privacy laws and protections than the Participant's country. The Participant understands that if he or she resides outside the United States, he or she may request a list with the names and addresses of any potential recipients of the Data by contacting his or her local human resources representative. The Participant authorizes the Company, the Company's broker and any other possible recipients which may assist the Company (presently or in the future) with implementing, administering and managing the Plan to receive, possess, use, retain and transfer the Data, in electronic or other form, for the sole purpose of implementing, administering and managing the Participant's participation in the Plan. The Participant understands that Data will be held only as long as is necessary to implement, administer and manage the Participant's participation in the Plan. The Participant understands if he or she resides outside the United States, he or she may, at any time, view their respective Data, request additional information about the storage and processing of their Data, require any necessary amendments to their Data or refuse or withdraw the consents herein, in any case without cost, by contacting in writing his or her local human resources representative. Further, the Participant understands that he or she is providing the consents herein on a purely voluntary basis. If the Participant does not consent, or if the Participant later seeks to revoke his or her consent, his or her employment status or service and career with the Employer will not be adversely affected; the only adverse consequence of refusing or withdrawing the Participant's consent is that the Company would not be able to grant Restricted Stock Units or other equity awards or administer or maintain such awards. Therefore, the Participant understands that refusing or withdrawing his or her consent may affect the Participant's ability to participate in the Plan. For more information on the consequences of the Participant's refusal to consent or withdrawal of consent, the Participant understands that he or she may contact his or her local human resources representative.

4.10    <u>Amendments</u>. This Agreement can be amended at any time by the Committee. Any amendment to the Plan shall be deemed to be an amendment to this Agreement to the extent that the amendment is applicable hereto. Except for amendments necessary to bring this Agreement into compliance with current law including Section 409A of the Code, no amendment to this Agreement shall materially and adversely affect the rights of the Participant without the Participant's written consent.

4.11    <u>Severability</u>. The provisions of this Agreement are severable and if any one or more provisions are determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable.

4.12    <u>Electronic Delivery</u>. The Company may, in its sole discretion, decide to deliver any documents related to the Restricted Stock Units by electronic means. By accepting this award of Restricted Stock Units, the Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

4.13    <u>Headings</u>. Headings are given to the articles or sections of this Agreement solely as a convenience to facilitate reference. Such headings shall not be deemed in any way material or relevant to the construction or interpretation of this Agreement or any provision hereof.

4.14    <u>Governing Law</u>. This Agreement is governed by and construed in accordance with the internal substantive laws of the State of Ohio.

4.15    <u>Section 409A of the Code</u>. To the extent applicable, it is intended that this Agreement and the Plan comply with the provisions of Section 409A of the Code. This Agreement and the Plan shall be administered in a manner consistent with this intent, and any provision that would cause the Agreement or the Plan to fail to satisfy Section 409A of the Code shall have no force and effect until amended to comply with Section 409A of the Code (which amendment may be retroactive to the extent permitted by Section 409A of the Code and may be made by the Company without the consent of the Participant). The terms "<u>termination of employment</u>," "<u>terminates employment</u>," and similar words and phrases used in this Agreement mean a "separation from service" within the meaning of Treasury Regulation section 1.409A-1(h).

**[Acceptance Page Contained in Exhibit A]**

**Exhibit A**

<u>ELECTRONIC ACCEPTANCE</u>

**Acceptance by the Participant**

**By selecting the "Accept Grant" box on the website of the Company's administrative agent, the Participant acknowledges acceptance of, and consents to be bound by, the Plan and this Agreement and any other rules, agreements or other terms and conditions incorporated herein by reference.**

**IF I FAIL TO ACKNOWLEDGE ACCEPTANCE OF THE AWARD WITHIN NINETY (90) DAYS OF THE DATE OF GRANT SET FORTH IN THE AGREEMENT, THE COMPANY MAY DETERMINE THAT THIS AWARD HAS BEEN FORFEITED.**

PARTICIPANT NAME                                    ACCEPTANCE DATE
**Participant Name**                                    **Date**
ELECTRONIC SIGNATURE
**Participant Signature**

Exhibit 12

**Ratio of Earnings To Combined Fixed Charges**
**And Preferred Stock Dividend Requirements**
**(In Millions)**

| | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2015** | | 2014 | | 2013 | | 2012 | | 2011 |
| Consolidated pretax income (loss) from continuing operations | $ | **313.1** | $ | (19.7) | $ | 1,190.9 | $ | 1,105.4 | $ | 2,370.3 |
| Undistributed earnings of non-consolidated affiliates | | **(0.1)** | | (9.9) | | (74.4) | | (404.8) | | 9.7 |
| Amortization of capitalized interest | | **0.3** | | 0.3 | | 2.3 | | 3.7 | | 3.6 |
| Interest expense | | **230.0** | | 178.3 | | 189.9 | | 208.8 | | 210.1 |
| Acceleration of debt issuance costs | | **11.3** | | 3.6 | | — | | 0.2 | | — |
| Interest portion of rental expense | | **0.9** | | 2.3 | | 2.1 | | 2.8 | | 3.6 |
| Total Earnings | $ | **555.5** | $ | 154.9 | $ | 1,310.8 | $ | 916.1 | $ | 2,597.3 |
| Interest expense | $ | **230.0** | $ | 178.3 | $ | 189.9 | $ | 208.8 | $ | 210.1 |
| Acceleration of debt issuance costs | | **11.3** | | 3.6 | | — | | 0.2 | | — |
| Interest portion of rental expense | | **0.9** | | 2.3 | | 2.1 | | 2.8 | | 3.6 |
| Preferred Stock dividend requirements | | **38.4** | | 51.2 | | 48.7 | | | | |
| | | | | | | | | | |
| Fixed Charges Requirements | $ | **280.6** | $ | 235.4 | $ | 240.7 | $ | 211.8 | $ | 213.7 |
| | | | | | | | | | |
| Fixed Charges and Preferred Stock Dividend Requirements | $ | **280.6** | $ | 235.4 | $ | 240.7 | $ | 211.8 | $ | 213.7 |
| | | | | | | | | | |
| RATIO OF EARNINGS TO FIXED CHARGES | | **2.0** | | (A) | | 5.4 | | 4.3 | | 12.2 |
| RATIO OF EARNINGS TO COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDEND REQUIREMENTS | | **2.0** | | (A) | | 5.4 | | 4.3 | | 12.2 |

(A) For the year ended December 31, 2014, there was a deficiency of earnings to cover the fixed charges of $235.4 million.

Exhibit 21

**SIGNIFICANT SUBSIDIARIES**
**CLIFFS NATURAL RESOURCES INC. AS OF DECEMBER 31, 2015**

| Name | Cliffs' Effective Ownership | Place of Incorporation |
|---|---|---|
| Cleveland-Cliffs International Holding Company | 100% | Delaware, USA |
| Cliffs Finance US LLC | 100% | Ohio, USA |
| Cliffs Finance Lux SCS | 100% | Luxembourg |
| Cliffs (Gibraltar) Holdings Limited | 100% | Gibraltar |
| Cliffs (Gibraltar) Holdings Limited Luxembourg S.C.S. | 100% | Luxembourg |
| Cliffs (Gibraltar) Limited | 100% | Gibraltar |
| Cliffs Mining Company | 100% | Delaware, USA |
| Cliffs Minnesota Mining Company | 100% | Delaware, USA |
| Cliffs Natural Resources Pty Ltd. | 100% | WA Australia |
| Cliffs Natural Resources Holdings Pty Ltd. | 100% | WA Australia |
| Cliffs Natural Resources Luxembourg S.a.r.l | 100% | Luxembourg |
| Cliffs TIOP Holding, LLC | 100% | Delaware, USA |
| Cliffs TIOP, Inc. | 100% | Michigan, USA |
| Cliffs UTAC Holding LLC | 100% | Delaware, USA |
| The Cleveland-Cliffs Iron Company | 100% | Ohio, USA |
| Tilden Mining Company L.C. | 85% | Michigan, USA |

**Exhibit 23**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in:

Registration Statement No. 333-56661 on Form S-8 (as amended by Post-Effective Amendment No.1) pertaining to the Northshore Mining Company and Silver Bay Power Company Retirement Savings Plan and the related prospectus;

Registration statement No. 333-06049 on Form S-8 pertaining to the Cliffs Natural Resources Inc. Nonemployee Directors' Compensation Plan;

Registration Statement No. 333-64008 on Form S-8 (as amended by Post-Effective Amendment No.1 and Post-Effective Amendment No.2) pertaining to the Cliffs Natural Resources Inc. Nonemployee Directors' Compensation Plan (as amended and restated as of January 1, 2004);

Registration Statement No. 333-184620 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2012 Incentive Equity Plan;

Registration Statement No. 333-197687 on Form S-8 pertaining to the Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan;

Registration Statement No. 333-197688 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2014 Nonemployee Directors' Compensation Plan;

Registration Statement No. 333-204369 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan; and

Registration Statement No. 333-206487 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2015 Employee Stock Purchase Plan.

of our reports relating to the consolidated financial statements and financial statement schedule of Cliffs Natural Resources Inc. and the effectiveness of Cliffs Natural Resources Inc.'s internal control over financial reporting dated February 24, 2016 appearing in the Annual Report on Form 10-K of Cliffs Natural Resources Inc. for the year ended December 31, 2015.

/s/ *Deloitte & Touche LLP*

Cleveland, Ohio
February 24, 2016

Exhibit 24

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that the undersigned Directors and officers of Cliffs Natural Resources Inc., an Ohio corporation ("Company"), hereby constitute and appoint C. Lourenco Goncalves, P. Kelly Tompkins, James D. Graham and Timothy K. Flanagan, and each of them, their true and lawful attorney or attorneys-in-fact, with full power of substitution and revocation, for them and in their name, place and stead, to sign on their behalf as a Director or officer of the Company, or both, as the case may be, an Annual Report on Form 10-K pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2015, and to sign any and all amendments to such Annual Report, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorney or attorneys-in-fact, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as they might or could do in person, hereby ratifying and confirming all that said attorney or attorneys-in-fact or any of them or their substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Executed as of the 11th day of February, 2016.

| | |
|---|---|
| /s/ C. L. Goncalves | /s/ D. C. Taylor |
| C. L. Goncalves<br>Chairman, President and Chief Executive Officer | D. C. Taylor, Director |
| /s/ J. T. Baldwin | /s/ R. P. Fisher, Jr. |
| J. T. Baldwin, Director | R. P. Fisher, Jr., Director |
| /s/ S. M. Green | /s/ J. A. Rutkowski, Jr. |
| S. M. Green, Director | J. A. Rutkowski, Jr., Director |
| /s/ J. S. Sawyer | /s/ M. D. Siegal |
| J. S. Sawyer, Director | M. D. Siegal, Director |
| /s/ G. Stoliar | /s/ P. K. Tompkins |
| G. Stoliar, Director | P. K. Tompkins,<br>Executive Vice President & Chief Financial Officer |
| /s/ T. K. Flanagan | |
| T. K. Flanagan,<br>Vice President, Corporate Controller &<br>Chief Accounting Officer | |

**Exhibit 31.1**

**CERTIFICATION**

I, Lourenco Goncalves, certify that:

1.      I have reviewed this annual report on Form 10-K of Cliffs Natural Resources Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)), for the registrant and have:

   (a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected or is reasonably likely to materially affect the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.


Date:    February 24, 2016                      By:    /s/ Lourenco Goncalves
                                                       Lourenco Goncalves
                                                       Chairman, President and Chief Executive Officer

**Exhibit 31.2**

**CERTIFICATION**

I, P. Kelly Tompkins, certify that:

1.      I have reviewed this annual report on Form 10-K of Cliffs Natural Resources Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)), for the registrant and have:

(a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected or is reasonably likely to materially affect the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    February 24, 2016            By:      /s/ P. Kelly Tompkins

_____

P. Kelly Tompkins
Executive Vice President & Chief Financial Officer

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Cliffs Natural Resources Inc. (the "Company") on Form 10-K for the period ended   December 31, 2015, as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), I, Lourenco Goncalves, Chairman, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1)     The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)     The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date:     February 24, 2016

By:  /s/ Lourenco Goncalves
Lourenco Goncalves
Chairman, President and Chief Executive Officer

Exhibit 32.2

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Cliffs Natural Resources Inc. (the "Company") on Form 10-K for the period ended   December 31, 2015, as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), I, P. Kelly Tompkins, Executive Vice President & Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1)     The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)     The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date:     February 24, 2016

By: /s/ P. Kelly Tompkins
P. Kelly Tompkins
Executive Vice President & Chief Financial Officer

Exhibit 95

**Mine Safety Disclosures**

The operation of our mines located in the United States is subject to regulation by MSHA under the FMSH Act. MSHA inspects these mines on a regular basis and issues various citations and orders when it believes a violation has occurred under the FMSH Act. We present information below regarding certain mining safety and health citations that MSHA has issued with respect to our mining operations. In evaluating this information, consideration should be given to factors such as: (i) the number of citations and orders will vary depending on the size of the mine; (ii) the number of citations issued will vary from inspector to inspector and mine to mine, and (iii) citations and orders can be contested and appealed and, in that process, are often reduced in severity and amount, and are sometimes dismissed.

Under the Dodd-Frank Act, each operator of a coal or other mine is required to include certain mine safety results within its periodic reports filed with the SEC. As required by the reporting requirements included in §1503(a) of the Dodd-Frank Act, we present the following items regarding certain mining safety and health matters, for the period presented, for each of our mine locations that are covered under the scope of the Dodd-Frank Act:

(A)   The total number of violations of mandatory health or safety standards that could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard under section 104 of the FMSH Act (30 U.S.C. 814) for which the operator received a citation from MSHA;

(B)   The total number of orders issued under section 104(b) of the FMSH Act (30 U.S.C. 814(b));

(C)   The total number of citations and orders for unwarrantable failure of the mine operator to comply with mandatory health or safety standards under section 104(d) of the FMSH Act (30 U.S.C. 814(d));

(D)   The total number of imminent danger orders issued under section 107(a) of the FMSH Act (30 U.S.C. 817(a));

(E)   The total dollar value of proposed assessments from MSHA under the FMSH Act (30 U.S.C. 801 et seq.);

(F)   Legal actions pending before the Federal Mine Safety and Health Review Commission involving such coal or other mine as of the last day of the period;

(G)   Legal actions initiated before the Federal Mine Safety and Health Review Commission involving such coal or other mine during the period; and

(H)   Legal actions resolved before the Federal Mine Safety and Health Review Commission involving such coal or other mine during the period.

During the year ended December 31, 2015, our U.S. mine locations did not receive any flagrant violations under Section 110(b)(2) of the FMSH Act and no written notices of a pattern of violations, or the potential to have a pattern of such violations, under section 104(e) of the FMSH Act. In addition, there were no mining-related fatalities at any of our U.S. mine locations during this same period.

Following is a summary of the information listed above for the year ended December 31, 2015:

| Mine Name/ MSHA ID No. | Operation | (A) Section 104 S&S Citations | (B) Section 104(b) Orders | (C) Section 104(d) Orders | (D) Section 107(a) Citations & Orders | (E) Total Dollar Value of MSHA Proposed Assessments (1) | (F) Legal Actions Pending as of Last Day of Period | (G) Legal Actions Initiated During Period | (H) Legal Actions Resolved During Period |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Year Ended December 31, 2015 | | | |
| Pinnacle Mine / 4601816 | Coal | 87 | 2 | — | — | $ 369,276 | 6 (2) | 5 | 1 |
| Pinnacle Plant / 4605868 | Coal | 3 | — | — | — | $ 4,776 | — | — | — |
| Green Ridge #1 / 4609030 | Coal | — | — | — | — | | — | — | — |
| Green Ridge #2 / 4609222 | Coal | — | — | — | — | | — | — | — |
| Oak Grove / 0100851 | Coal | 90 | — | — | — | $ 188,984 | 28 (3) | 5 | 4 |
| Concord Plant / 0100329 | Coal | — | — | — | — | $ 1,000 | — | — | — |
| Tilden / 2000422 | Iron Ore | 93 | — | 2 | — | $ 410,178 | 10 (4) | 1 | 3 |
| Empire / 2001012 | Iron Ore | 52 | — | — | — | $ 83,529 | 10 (5) | 1 | 4 |
| Northshore Plant / 2100831 | Iron Ore | 13 | — | — | — | $ 153,991 | 15 (6) | 4 | 10 |
| Northshore Mine / 2100209 | Iron Ore | 2 | — | — | 1 | $ 4,897 | — | — | — |
| Hibbing / 2101600 | Iron Ore | 28 | — | — | — | $ 331,643 | 23 (7) | 43 | 46 |
| United Taconite Plant / 2103404 | Iron Ore | 23 | — | — | — | $ 451,255 | — | 4 | 16 |
| United Taconite Mine / 2103403 | Iron Ore | 7 | — | 2 | — | $ 157,247 | 8 (8) | 8 | 2 |

(1)  Amounts included under the heading "Total Dollar Value of MSHA Proposed Assessments" are the total dollar amounts for proposed assessments received from MSHA on or before December 31, 2015.

(2)  This number consists of 6 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules.

(3)  This number consists of 25 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules, 2 pending legal actions related to contests of citations and orders referenced in Subpart B of FMSH Act's procedural rules and 1 appeal of judges' decisions or orders to the Federal Mine Safety and Health Review Commission referenced in Subpart H of FMSH Act's procedural rules.

(4)  This number consists of 8 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules, 1 appeal of judges' decisions or orders to the Federal Mine Safety and Health Review Commission referenced in Subpart H of FMSH Act's procedural rules, and 1 pending legal action related to complaints of discharge, discrimination, or interference referenced in Subpart E of FMSH Act's procedural rules.

(5)  This number consists of 9 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules and 1 pending legal action related to complaints of discharge, discrimination or interference referenced in Subpart E of FMSH Act's procedural rules.

(6)  This number consists of 15 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules.

(7)  This number consists of 2 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules, 17 pending legal actions related to contests of citations and orders referenced in Subpart B of FMSH Act's procedural rules, and 4 appeals of judges' decisions or orders to the Federal Mine Safety and Health Review Commission referenced in Subpart H of FMSH Act's procedural rules.

(8)  This number consists of 2 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules, 2 pending legal actions related to complaints of discharge, discrimination, or interference referenced in Subpart E of FMSH Act's procedural rules, and 4 pending legal actions related to contests of citations and orders referenced in Subpart B of FMSH Act's procedural rules.

Exhibit 99(a)

**Cliffs Natural Resources Inc. and Subsidiaries**
**Schedule II – Valuation and Qualifying Accounts**
*(Dollars in Millions)*

| Classification | Balance at Beginning of Year | Additions | | Acquisition | Deductions | Balance at End of Year |
|---|---|---|---|---|---|---|
| | | Charged to Cost and Expenses | Charged to Other Accounts | | | |
| Year Ended December 31, 2015: | | | | | | |
| Deferred Tax Valuation Allowance | $ 1,152.3 | $ 54.3 | $ 2,165.9 | $ — | $ — | $ 3,372.5 |
| Accounts Receivable Allowance | $ — | $ 7.1 | $ — | $ — | $ — | $ 7.1 |
| Year Ended December 31, 2014: | | | | | | |
| Deferred Tax Valuation Allowance | $ 849.6 | $ 634.9 | $ (12.6) | $ — | $ 319.6 | $ 1,152.3 |
| Accounts Receivable Allowance | $ — | $ — | $ — | $ — | $ — | $ — |
| Year Ended December 31, 2013: | | | | | | |
| Deferred Tax Valuation Allowance | $ 858.4 | $ 72.1 | $ (65.5) | $ — | $ 15.4 | $ 849.6 |
| Accounts Receivable Allowance | $ — | $ — | $ — | $ — | $ — | $ — |

# EXHIBIT 92

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2016

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from _____ to _____.

Commission File Number: 1-8944

## CLIFFS NATURAL RESOURCES INC.
*(Exact Name of Registrant as Specified in Its Charter)*

| Ohio | 34-1464672 |
|---|---|
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(I.R.S. Employer Identification No.)* |
| 200 Public Square, Suite 3300, Cleveland, Ohio | 44114-2315 |
| *(Address of Principal Executive Offices)* | *(Zip Code)* |

Registrant's Telephone Number, Including Area Code: (216) 694-5700
Securities registered pursuant to Section 12(b) of the Act:

| **Title of Each Class** | **Name of Each Exchange on Which Registered** |
|---|---|
| Common Shares, par value $0.125 per share | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:
**NONE**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.          YES ☐          NO ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.          YES ☐          NO ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.          YES ☒          NO ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).          YES ☒          NO ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.          ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒          Accelerated filer ☐          Non-accelerated filer ☐          Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).          YES ☐          NO ☒

As of June 30, 2016, the aggregate market value of the voting and non-voting common shares held by non-affiliates of the registrant, based on the closing price of $5.67 per share as reported on the New York Stock Exchange — Composite Index, was $1,068,236,979 (excluded from this figure is the voting stock beneficially owned by the registrant's officers and directors).

The number of shares outstanding of the registrant's common shares, par value $0.125 per share, was 233,074,091 as of February 6, 2017.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's proxy statement for its 2017 annual meeting of shareholders are incorporated by reference into Part III.

**TABLE OF CONTENTS**

|  |  | **Page Number** |
|---|---|---|
| **DEFINITIONS** |  | 1 |
| **PART I** |  |  |
| Item 1. | Business | 4 |
|  | Executive Officers of the Registrant | 18 |
| Item 1A. | Risk Factors | 18 |
| Item 1B. | Unresolved Staff Comments | 31 |
| Item 2. | Properties | 32 |
| Item 3. | Legal Proceedings | 37 |
| Item 4. | Mine Safety Disclosures | 38 |
| **PART II** |  |  |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 39 |
| Item 6. | Selected Financial Data | 42 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 45 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 80 |
| Item 8. | Financial Statements and Supplementary Data | 81 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 157 |
| Item 9A. | Controls and Procedures | 157 |
| Item 9B. | Other Information | 158 |
| **PART III** |  |  |
| Item 10. | Directors, Executive Officers and Corporate Governance | 159 |
| Item 11. | Executive Compensation | 159 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 159 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 159 |
| Item 14. | Principal Accountant Fees and Services | 159 |
| **PART IV** |  |  |
| Item 15. | Exhibits and Financial Statement Schedules | 160 |
| **SIGNATURES** |  | 161 |

Table of Contents

## DEFINITIONS

The following abbreviations or acronyms are used in the text. References in this report to the "Company," "we," "us," "our" and "Cliffs" are to Cliffs Natural Resources Inc. and subsidiaries, collectively. References to "A$" or "AUD" refer to Australian currency, "C$" to Canadian currency and "$" to United States currency.

| Abbreviation or acronym | Term |
|---|---|
| ABL Facility | Syndicated Facility Agreement by and among Bank of America, N.A., as Administrative Agent and Australian Security Trustee, the Lenders that are parties hereto, Cliffs Natural Resources Inc., as Parent and a Borrower, and the Subsidiaries of Parent party hereto, as Borrowers dated as of March 30, 2015, as amended |
| AG | Autogenous Grinding |
| Algoma | Essar Steel Algoma Inc. |
| APBO | Accumulated Postretirement Benefit Obligation |
| ArcelorMittal | ArcelorMittal (as the parent company of ArcelorMittal Mines Canada, ArcelorMittal USA and ArcelorMittal Dofasco Inc., as well as, many other subsidiaries) |
| ArcelorMittal USA | ArcelorMittal USA LLC (including many of its United States affiliates, subsidiaries and representatives. References to ArcelorMittal USA comprise all such relationships unless a specific ArcelorMittal USA entity is referenced) |
| ALJ | Administrative Law Judge |
| ASC | Accounting Standards Codification |
| ASU | Accounting Standards Updates |
| BAML | Bank of America Merrill Lynch |
| BART | Best Available Retrofit Technology |
| Bloom Lake | The Bloom Lake Iron Ore Mine Limited Partnership |
| Bloom Lake Group | Bloom Lake General Partner Limited and certain of its affiliates, including Cliffs Quebec Iron Mining ULC |
| BNSF | Burlington Northern Santa Fe, LLC |
| Canadian Entities | Bloom Lake Group, Wabush Group and certain other wholly-owned subsidiaries |
| CCAA | Companies' Creditors Arrangement Act (Canada) |
| CERCLA | Comprehensive Environmental Response, Compensation and Liability Act of 1980 |
| CFR | Cost and freight |
| CLCC | Cliffs Logan County Coal LLC |
| Clean Water Act | Federal Water Pollution Control Act |
| CN | Canadian National Railway Company |
| $CO_2$ | Carbon Dioxide |
| Codification | FASB Accounting Standards Codification |
| CODM | Chief Operating Decision Maker |
| Compensation Committee | Compensation and Organization Committee of Cliffs' Board of Directors |
| Consent Order | Administrative Order by Consent |
| CQIM | Cliffs Québec Iron Mining ULC (formerly known as Cliffs Québec Iron Mining Limited) |
| CSAPR | Cross-State Air Pollution Rule |
| Directors' Plan | Cliffs Natural Resources Inc. 2014 Nonemployee Directors' Compensation Plan |
| Dodd-Frank Act | Dodd-Frank Wall Street Reform and Consumer Protection Act |
| DR-grade pellets | Direct Reduction pellets |
| EAF | Electric Arc Furnace |
| EBITDA | Earnings before interest, taxes, depreciation and amortization |
| Empire | Empire Iron Mining Partnership |
| EPA | U.S. Environmental Protection Agency |
| EPS | Earnings per share |
| ERM | Enterprise Risk Management |
| Exchange Act | Securities Exchange Act of 1934, as amended |
| FASB | Financial Accounting Standards Board |
| Fe | Iron |
| FERC | Federal Energy Regulatory Commission |
| FeT | Total Iron |
| FIP | Federal Implementation Plan |
| FMSH Act | U.S. Federal Mine Safety and Health Act 1977, as amended |
| GAAP | Accounting principles generally accepted in the U.S. |
| GHG | Greenhouse gas |
| Hibbing | Hibbing Taconite Company, an unincorporated joint venture |

1

| Abbreviation or acronym | Term |
| --- | --- |
| Koolyanobbing | Collective term for the operating deposits at Koolyanobbing, Mount Jackson and Windarling |
| LIBOR | London Interbank Offered Rate |
| LIFO | Last-in, first-out |
| LS&I | Lake Superior & Ishpeming Railroad Company |
| LTVSMC | LTV Steel Mining Company |
| MDEQ | Michigan Department of Environmental Quality |
| MISO | Midcontinent Independent System Operator, Inc. |
| MMBtu | Million British Thermal Units |
| MPCA | Minnesota Pollution Control Agency |
| MPSC | Michigan Public Service Commission |
| MPUC | Minnesota Public Utilities Commission |
| MSHA | U.S. Mine Safety and Health Administration |
| Monitor | FTI Consulting Canada Inc. |
| MWh | Megawatts per hour |
| NAAQS | National Ambient Air Quality Standards |
| $NO_2$ | Nitrogen dioxide |
| $NO_x$ | Nitrogen oxide |
| Northshore | Northshore Mining Company |
| NPDES | National Pollutant Discharge Elimination System, authorized by the U.S. Clean Water Act |
| NSPS | New Source Performance Standards |
| NYSE | New York Stock Exchange |
| Oak Grove | Oak Grove Resources, LLC |
| OPEB | Other postretirement employment benefits |
| OPEB cap | Medical premium maximums |
| P&P | Proven and Probable |
| PBO | Projected benefit obligation |
| Pinnacle | Pinnacle Mining Company, LLC |
| Platts 62% Price | Platts IODEX 62% Fe Fines Spot Price |
| Preferred Share | 7.00% Series A Mandatory Convertible Preferred Stock, Class A, without par value |
| ROA | Return on asset |
| S&P | Standard & Poor's Rating Services, a division of Standard & Poor's Financial Services LLC, a subsidiary of The McGraw-Hill Companies, Inc., and its successors |
| SEC | U.S. Securities and Exchange Commission |
| SG&A | Selling, general and administrative |
| Seneca | Seneca Coal Resources, LLC |
| Severstal | Severstal Dearborn, LLC |
| Silver Bay Power | Silver Bay Power Company |
| SIP | State Implementation Plan |
| $SO_2$ | Sulfur dioxide |
| Sonoma | Sonoma Coal Project |
| SSR | System Support Resource |
| STRIPS | Separate Trading of Registered Interest and Principal of Securities |
| Tilden | Tilden Mining Company L.C. |
| TDR | Troubled Debt Restructuring |
| TMDL | Total Maximum Daily Load |
| TRIR | Total Reportable Incident Rate |
| TSR | Total Shareholder Return |
| United Taconite | United Taconite LLC |
| U.S. | United States of America |
| U.S. Steel | United States Steel Corporation |
| USW | United Steelworkers |
| VEBA | Voluntary Employee Benefit Association trusts |
| VWAP | Volume Weighted Average Price |
| Wabush | Wabush Mines Joint Venture |

2

A005083

| Abbreviation or acronym | Term |
| --- | --- |
| Wabush Group | Wabush Iron Co. Limited and Wabush Resources Inc., and certain of their affiliates, including Wabush Mines (an unincorporated joint venture of Wabush Iron Co. Limited and Wabush Resources Inc.), Arnaud Railway Company and Wabush Lake Railway Company |
| 2012 Equity Plan | Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan |
| 2015 Equity Plan | Cliffs Natural Resources Inc. 2015 Equity & Incentive Compensation Plan |

3

Table of Contents

**PART I**

**Item 1.**    *Business*

**Introduction**

Cliffs Natural Resources Inc. is a leading mining and natural resources company. Founded in 1847, we are recognized as the largest and oldest independent iron ore mining company in the United States. We are a major supplier of iron ore pellets to the North American steel industry from our mines and pellet plants located in Michigan and Minnesota. Additionally, we operate an iron ore mining complex in Western Australia. Driven by the core values of safety, social, environmental and capital stewardship, our employees endeavor to provide all stakeholders with operating and financial transparency.

We are organized through a global commercial group responsible for sales and delivery of our products and operations groups responsible for the production of the iron ore that we market. Our continuing operations are organized according to geographic location: U.S. Iron Ore and Asia Pacific Iron Ore.

In the U.S., we currently own or co-own four operational iron ore mines plus one indefinitely idled mine. We are currently operating one iron ore mine in Michigan and three iron ore mines in Minnesota. All four mines are currently operating at or near full capacity. The Empire mine located in Michigan was indefinitely idled beginning on August 3, 2016. We plan to continue shipping Empire's remaining inventory of pellets into 2017. Our Asia Pacific operations consist solely of our Koolyanobbing iron ore mining complex in Western Australia, which is currently operating at or near full capacity.

**We are Focused on our Core U.S. Iron Ore Business**

We are the market-leading iron ore producer in the U.S., supplying differentiated iron ore pellets under long-term contracts to the largest North American steel producers. We have the unique advantage of being a low cost producer of iron ore pellets in the U.S. market with significant transportation and logistics advantages to serve the U.S. steel market effectively. Pricing structures contained in and the long-term supply nature of our existing contracts, along with our low-cost operating profile, position our U.S. Iron Ore business segment as a strong cash flow generator in most commodity pricing environments. Since instituting our core strategy of focusing on this business, we have achieved significant accomplishments including providing volume certainty by signing a new, ten-year supply agreement with our largest customer, substantially reducing operating costs by making various operational improvements, and developing alternate iron unit strategies to provide opportunities to enter into the EAF steel production market.

As the implementation of this strategy has strengthened the business, we have put additional emphasis on the continued improvement of our balance sheet via reduction of long-term debt. Since the 2014 initiation of our transition strategy, we have reduced the principal of our long-term debt by 21% using various liability management strategies. Given the cyclical nature of our business, we feel that further reduction of our long-term debt will improve the strength of our balance sheet and provide us increased financial flexibility to enable us to manage through any commodity environment, and we continue to seek the best opportunities to accomplish this.

**Business Segments**

Our Company's continuing operations are organized and managed according to geographic location: U.S. Iron Ore and Asia Pacific Iron Ore.

Segment information reflects our business units, which are organized to meet customer requirements and global competition.  Financial information about our segments, including financial information about geographic areas, is included in *Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations* and NOTE 2 - SEGMENT REPORTING included in *Item 8. Financial Statements and Supplementary Data* of this Annual Report on Form 10-K.

4

*U.S. Iron Ore*

We are a major producer of iron ore pellets, primarily selling production from U.S. Iron Ore to integrated steel companies in the U.S., Canada and Mexico. We operate four iron ore mines located in Michigan and Minnesota. In Michigan, we are operating the Tilden mine. In Minnesota, we are operating the Northshore, United Taconite and Hibbing mines. The Empire mine located in Michigan, which historically had annual rated capacity of 5.5 million long tons, was indefinitely idled beginning on August 3, 2016. The U.S.-based mines currently have an annual rated capacity of 27.4 million long tons of iron ore pellet production, representing 55% of total U.S. pellet production capacity. Based on our equity ownership in these mines, our share of the annual rated production capacity is currently 20.0 million long tons, representing 40% of total U.S. annual pellet capacity.

The following chart summarizes the estimated annual pellet production capacity and percentage of total U.S. pellet production capacity for each of the respective iron ore producers as of December 31, 2016:

### U.S. Iron Ore Pellet

| | Annual Rated Capacity Tonnage | |
|---|---|---|
| | Current Estimated Capacity (Tons in Millions)[1,2] | Percent of Total U.S. Capacity |
| All Cliffs' managed mines | 27.4 | 54.9 % |
| Other U.S. mines | | |
| U.S. Steel's Minnesota ore operations | | |
| Minnesota Taconite | 14.3 | 28.7 |
| Keewatin Taconite | 5.4 | 10.8 |
| Total U.S. Steel | 19.7 | 39.5 |
| ArcelorMittal USA Minorca mine | 2.8 | 5.6 |
| Total other U.S. mines | 22.5 | 45.1 |
| Total U.S. mines | 49.9 | 100.0 % |

[1] Tons are long tons (2,240 pounds)

[2] Empire mine was excluded from the estimated capacity calculation as it is indefinitely idled

Our U.S. Iron Ore production generally is sold pursuant to long-term supply agreements with various price adjustment provisions. For the year ended December 31, 2016, we produced a total of 23.4 million long tons of iron ore pellets, including 2.8 million long tons from our indefinitely-idled Empire mine. The 2016 U.S. Iron Ore production includes 16.0 million long tons for our account and 7.4 million long tons on behalf of steel company partners of the mines.

We produce various grades of iron ore pellets, including standard, fluxed and DR-grade, for use in our customers' operations as part of the steelmaking process. The variation in grades of iron ore pellets results from the specific chemical and metallurgical properties of the ores at each mine, the end user's steelmaking process and whether or not fluxstone is added in the process. Although the grade or grades of pellets currently delivered to each customer are based on that customer's preferences, which depend in part on the characteristics of the customer's steelmaking operation, in many cases our iron ore pellets can be used interchangeably. Standard pellets require less processing, are generally the least costly pellets to produce and are called "standard" because no ground fluxstone, such as limestone or dolomite, is added to the iron ore concentrate before turning the concentrate into pellets. In the case of fluxed pellets, fluxstone is added to the concentrate, which produces pellets that can perform at higher productivity levels in the customer's specific blast furnace and will minimize the amount of fluxstone the customer may be required to add to the blast furnace. DR-grade pellets require processing to make an iron unit that contains higher iron and lower silica content than a standard pellet. Unlike standard or fluxed pellets, DR-grade pellets are fed into a direct reduced iron facility, which then are converted as the raw material for an EAF producer.

Additionally, as the EAF steel market continues to grow in the U.S., there is an opportunity for our iron ore to serve this market by providing pellets to the alternative metallics market to produce direct reduced iron, hot briquetted iron and/or pig iron. In 2016 and 2015, we produced and shipped industrial trials of low silica DR-grade pellets, which were successfully processed in a customer's EAF to obtain a high-quality direct reduced iron product. While we are still in the early stages of developing our alternative metallics business, we believe this will open up a new opportunity

A005086

for us to diversify our product mix and add new customers to our U.S. Iron Ore segment beyond the traditional blast furnace clientele.

Each of our U.S. Iron Ore mines is located near the Great Lakes. The majority of our iron ore pellets are transported via railroads to loading ports for shipment via vessel to steelmakers in North America.

Our U.S. Iron Ore sales are influenced by seasonal factors in the first half of the year as shipments and sales are restricted by the Army Corp of Engineers due to closure of the Soo Locks and the Welland Canal on the Great Lakes because of winter weather. During the first quarter, we continue to produce our products, but we cannot ship most of those products via lake vessel until the conditions on the Great Lakes are navigable, which causes our first and second quarter inventory levels to rise. Our limited practice of shipping product to ports on the lower Great Lakes or to customers' facilities prior to the transfer of title has somewhat mitigated the seasonal effect on first and second quarter inventories and sales, as shipment from this point to the customers' operations is not limited by weather-related shipping constraints. At December 31, 2016 and 2015, we had approximately 1.5 million and 1.3 million long tons of pellets, respectively, in inventory at lower lakes or customers' facilities.

*U.S. Iron Ore Customers*

Our U.S. Iron Ore revenues primarily are derived from sales of iron ore pellets to the North American integrated steel industry, consisting primarily of three major customers. Generally, we have multi-year supply agreements with our customers. Sales volume under these agreements largely is dependent on customer requirements, and in certain cases, we are the sole supplier of iron ore to the customer. Historically, each agreement has contained a base price that is adjusted annually using one or more adjustment factors. Factors that could result in a price adjustment include spot iron ore pricing, measures of general industrial inflation and steel prices.

During 2016, 2015 and 2014, we sold 18.2 million, 17.3 million and 21.8 million long tons of iron ore product, respectively, from our share of the production from our U.S. Iron Ore mines. Refer to *Concentration of Customers* below for additional information regarding our major customers.

**Asia Pacific Iron Ore**

Our Asia Pacific Iron Ore operations are located in Western Australia and consist solely of our wholly owned Koolyanobbing operation.

The Koolyanobbing operations serve the Asian iron ore markets with direct-shipped fines and lump ore. The lump products are fed directly to blast furnaces, while the fines products are used as sinter feed. The variation in the two export product grades reflects the inherent chemical and physical characteristics of the ore bodies mined as well as the supply requirements of our customers. During 2016, 2015 and 2014, we produced 11.8 million , 11.7 million and 11.4 million metric tons, respectively.

Koolyanobbing is a collective term for the ore deposits at Koolyanobbing, Mount Jackson and Windarling. There are approximately 70 miles separating the three mining areas. Banded iron formations host the mineralization, which is predominately hematite and goethite. Each deposit is characterized with different chemical and physical attributes and, in order to achieve customer product quality, ore in varying quantities from each deposit must be blended together.

Crushing and blending are undertaken at Koolyanobbing, where the crushing and screening plant is located. Once the blended ore has been crushed and screened into a direct lump and fines shipping product, it is transported by rail approximately 360 miles south to the Port of Esperance, via Kalgoorlie, for shipment to our customers in Asia.

*Asia Pacific Iron Ore Customers*

Asia Pacific Iron Ore's production is under contract with steel companies primarily in China, Japan and South Korea. In March 2015, we extended the majority of our supply agreements with steel producers in China for two years. These contracts will currently expire in March 2017, but we anticipate that the majority of these contracts will be renewed for an additional 12 months. Our supply agreement with our client in South Korea was recently extended and will expire in December 2017. Our supply agreements with our customers in Japan currently expire in March 2017, but we anticipate these contracts also will be renewed for an additional 12 months. Pricing for our Asia Pacific Iron Ore Chinese customers consists of shorter-term pricing mechanisms of various durations up to three months based on the average of daily spot prices that are generally associated with the time of unloading of each shipment.  Pricing with our Japanese and South Korean customers is generally consistent with the inputs used with our Chinese customers, but the pricing inputs are fixed before shipment.

6

Table of Contents

During 2016, 2015 and 2014, we sold 11.6 million, 11.6 million and 11.5 million metric tons of iron ore, respectively, from our Western Australia mines. No Asia Pacific Iron Ore customer comprised more than 10% of Cliffs consolidated sales in 2016, 2015 or 2014. The segment's five largest customers together accounted for a total of 56%, 47% and 38% of Asia Pacific Iron Ore product revenues for the years 2016, 2015 and 2014, respectively.

### Discontinued Operations

#### North American Coal

Throughout the majority of 2015, we owned and operated two low-volatile metallurgical coal operations located in Alabama and West Virginia. These low-volatile metallurgical coal operations had a rated capacity of 6.5 million short tons of production annually. On December 22, 2015, we sold these two low-volatile metallurgical coal operations, Pinnacle mine and Oak Grove mine, marking our exit from the coal business. Historically, we sold 4.6 million short tons in 2015 and 7.4 million short tons in 2014. On December 31, 2014, we sold our CLCC assets, which consisted of two high-volatile metallurgical coal mines and a thermal coal mine. Sales tons at the CLCC operations were 2.4 million short tons for the year ended December 31, 2014, and is included in the sales tons disclosed above.

As of March 31, 2015, management determined that our North American Coal operating segment met the criteria to be classified as held for sale under *ASC 205, Presentation of Financial Statements* . As such, all current and historical North American Coal operating segment results are included in our financial statements and classified within discontinued operations. Refer to NOTE 14 - DISCONTINUED OPERATIONS for further discussion of the North American Coal segment discontinued operations.

#### Eastern Canadian Iron Ore

Prior to late March 2014, we operated two iron ore mines in Eastern Canada, the Bloom Lake mine and the Wabush Scully mine. In late March 2014, we idled our Wabush Scully mine in Newfoundland and Labrador and in November 2014, we began to implement the permanent closure plan for the mine. The idle and ultimate closure was driven by the unsustainable high-cost structure. In January 2015, we ceased active production at the Bloom Lake mine and the mine transitioned to "care-and-maintenance" mode. Together, the shutdown of the Wabush Scully mine and the cessation of operations at our Bloom Lake mine represented a complete curtailment of our Eastern Canadian Iron Ore operations.

During 2014, we sold 7.2 million metric tons of iron ore concentrate and pellets, from our Eastern Canadian Iron Ore mines.

As more fully described in NOTE 14 - DISCONTINUED OPERATIONS, in January 2015, we announced that the Bloom Lake Group commenced restructuring proceedings under the CCAA in Montreal, Quebec. Additionally, on May 20, 2015, the Wabush Group commenced restructuring proceedings under the CCAA in Montreal, Quebec and the CCAA protections granted to the Bloom Lake Group were extended to include the Wabush Group to facilitate the reorganization of each of their businesses and operations. Following each respective CCAA filing we deconsolidated the Bloom Lake Group and certain other wholly-owned subsidiaries and the Wabush Group entities, comprising substantially all of our Canadian operations. Financial results prior to the respective deconsolidations of the Bloom Lake and Wabush Groups and subsequent expenses directly associated with the Canadian Entities are included in our financial statements and classified within discontinued operations. Port and rail assets and the Bloom Lake mine were sold during 2016 under the CCAA proceedings. Refer to NOTE 14 - DISCONTINUED OPERATIONS for further discussion of the Eastern Canadian Iron Ore segment discontinued operations and the status of the CCAA proceedings.

Unless otherwise noted, discussion of our business and results of operations in this Annual Report on Form 10-K refers to our continuing operations.

## Applied Technology, Research and Development

We have been a leader in iron ore mining and process technology since inception and have been in operation for 170 years. We operated some of the first mines on Michigan's Marquette Iron Range and pioneered early open-pit and underground mining methods. From the first application of electrical power in Michigan's underground mines to the use of today's sophisticated computers and global positioning satellite systems, we have been a leader in the application of new technology to the centuries-old business of mineral extraction. Today, our engineering and technical staffs are engaged in full-time technical support of our operations, improvement of existing products and development of new products.

We are a pioneer in iron ore pelletizing with over 60 years of experience. We are able to produce customized pellets to meet each customer's blast furnace specifications, and produce both standard and fluxed pellets. Using our technical expertise and strong market position in the United States to increase our product offering, we have been working on producing DR-grade pellets. In 2016 and 2015, we produced and shipped industrial trials of low silica DR-grade pellets, which were successfully processed in a customer's EAF to obtain a high-quality direct reduced iron product.

With our experienced technical professionals and unsurpassed reputation for our pelletizing technology, we continue to deliver a world-class quality product to our customers. We are a pioneer in the development of emerging reduction technologies, a leader in the extraction of value from challenging resources and a front runner in the implementation of safe and sustainable technology. Our technical experts are dedicated to excellence and deliver superior technical solutions tailored to our customer base.

**Concentration of Customers**

In 2016, two customers individually accounted for more than 10% of our consolidated product revenue and in 2015 and 2014 three customers individually accounted for more than 10% of our consolidated product revenue. Product revenue from those customers represented in the chart below totaled $1.1 billion, $1.3 billion and $1.9 billion of our total consolidated product revenue in 2016, 2015 and 2014, respectively, and is attributable to our U.S. Iron Ore business segment. The following represents sales revenue from each of these customers as a percentage of our total consolidated product revenue, as well as the portion of product sales for U.S. Iron Ore that is attributable to each of these customers in 2016, 2015 and 2014, respectively:

| Customer[1] | Percentage of Total Product Revenue | | | Percentage of U.S. Iron Ore Product Revenue | | |
|---|---|---|---|---|---|---|
| | **2016** | 2015 | 2014 | **2016** | 2015 | 2014 |
| ArcelorMittal | **37%** | 37% | 29% | **51%** | 49% | 40% |
| AK Steel[2] | **19%** | 21% | 20% | **27%** | 29% | 28% |
| Algoma[3] | **4%** | 12% | 13% | **5%** | 15% | 18% |

[1] Includes subsidiaries.

[2] Effective September 16, 2014, AK Steel completed the acquisition of Severstal North America's integrated steelmaking assets located in Dearborn, Michigan. For comparative purposes, we have combined historical data for all periods presented.

[3] On October 5, 2015, we terminated the long-term agreement with Algoma; however, we entered into certain short-term contracts with Algoma throughout 2016. On May 16, 2016, we reinstated our agreement with Algoma, which took effect in January 2017.

*ArcelorMittal*

Our pellet supply agreements with ArcelorMittal USA are the basis for supplying pellets to ArcelorMittal USA, which are based on customer requirements, except for the Indiana Harbor East facility, which is based on customer contract obligations. The legacy agreements with ArcelorMittal USA were set to expire at the end of December 2016 and January 2017. The parties executed a new long-term agreement, which became effective October 31, 2016, for the sale and delivery of ArcelorMittal USA's annual tonnage requirements which fall within a specific range of volume ("AM Pellet Sale Agreement"). The AM Pellet Sale Agreement expires at the end of December 2026.

ArcelorMittal USA is a 62.3% equity participant in Hibbing and a 21.0% equity partner in Empire with limited rights and obligations.

In 2016, 2015 and 2014, our U.S. Iron Ore pellet sales to ArcelorMittal were 9.7 million, 9.7 million and 10.2 million long tons, respectively.

*AK Steel*

On September 16, 2014, AK Steel announced an acquisition of Severstal North America's integrated steelmaking assets located in Dearborn, Michigan. We had a long-term relationship to supply iron ore pellets to that location. Upon consummation of the acquisition, the contract was automatically assigned to AK Steel. The combination of sales pursuant to our pre-existing sales agreement with AK Steel and the acquisition of the Dearborn facility with its sales agreement accounts for more than 10% of our consolidated product revenue in 2016, 2015 and 2014.

A005089

On August 29, 2013, we entered into a new agreement with AK Steel to provide iron ore pellets to AK Steel for use in its Middletown, Ohio and Ashland, Kentucky blast furnace facilities. This contract includes minimum and maximum tonnage requirements for each year between 2014 and 2023.

Under the original agreement entered into with Severstal in 2006, we supply all of the Dearborn, Michigan facility's blast furnace pellet requirements through 2022, subject to specified minimum and maximum requirements in certain years. AK Steel was the successor by merger of this contract and it remains in force. In September 2014, we entered into an amendment to the Dearborn contract with AK Steel to document the 2013 base pricing provisions, among other things, which resulted from an arbitration ruling in May 2014.

In 2016, 2015 and 2014, our U.S. Iron Ore pellet sales to AK Steel and the acquired Dearborn facility were 4.5 million, 4.3 million and 5.8 million long tons, respectively.

### Algoma

Algoma is a Canadian steelmaker and a subsidiary of Essar Steel Holdings Limited. We have a long-term supply agreement under which we were Algoma's sole supplier of iron ore pellets through the end of 2016 and are required to deliver a set tonnage for less than Algoma's entire requirements through 2024. There were multiple contract disputes that led to us filing a complaint in the Federal District Court in the Northern District of Ohio on January 12, 2015. During the litigation process, we asserted additional claims of material breach as a result of Algoma's actions during 2015.

Cliffs and Algoma settled the dispute after Algoma filed for CCAA protection in the Canadian Superior Court of Ontario. Under the terms of the settlement, Algoma has agreed to assume the long-term supply agreement, and has entered into a separate agreement to purchase additional tonnage from Cliffs beginning 2017 through and including December 2020.

In 2016, 2015 and 2014, our U.S. Iron Ore pellet sales to Algoma were 1.2 million, 2.5 million and 3.5 million long tons, respectively.

## Competition

Throughout the world, we compete with major and junior mining companies, as well as steel companies, both of which produce steelmaking raw materials, including iron ore.

### North America

In our U.S. Iron Ore business segment, we primarily sell our product to steel producers with operations in North America. We compete directly with steel companies that own interests in iron ore mines in the United States and/or Canada, including ArcelorMittal and U.S. Steel, and with major iron ore pellet exporters from Eastern Canada and Brazil. In 2016, finished steel import market share was 26% in the U.S., down from 29% in 2015. As a result, steel prices in North America improved, driving more demand for iron ore pellets.

A number of factors beyond our control affect the markets in which we sell our iron ore. Continued demand for our iron ore and the prices obtained by us primarily depend on the consumption patterns of the steel industry in the U.S., China and elsewhere around the world, as well as the availability, location, cost of transportation and competing prices.

### Asia Pacific

In our Asia Pacific Iron Ore business segment, we export iron ore products to the Asia Pacific markets, including China, Japan, and South Korea.  In the Asia Pacific marketplace, we compete with major iron ore exporters primarily from Australia and Brazil. These include BHP Billiton, Fortescue Metals Group Ltd., Rio Tinto plc and Vale SA, among others.

Competition in steelmaking raw materials is predicated upon the usual competitive factors of price, availability of supply, product quality and performance, service and transportation cost to the consumer of the raw materials.

## Environment

Our mining activities are subject to various laws and regulations governing the protection of the environment. We conduct our operations in a manner that is protective of public health and the environment and believe our operations are in compliance with applicable laws and regulations in all material respects.

A005090

Environmental issues and their management continued to be an important focus at each of our operations throughout 2016. In the construction of our facilities and in their operation, substantial costs have been incurred and will continue to be incurred to avoid undue effect on the environment. Our capital expenditures relating to environmental matters totaled approximately $15 million, $17 million and $33 million, in 2016, 2015 and 2014, respectively. Approximately $5 million and $3 million of the 2015 and 2014 capital expenditures, respectively, relating to environmental matters was attributable to the North American Coal operations that were sold during December 2015. Additionally, approximately $22 million of the 2014 capital expenditures relating to environmental matters was attributable to the Eastern Canadian Iron Ore operations, which are classified within discontinued operations. It is estimated that capital expenditures for environmental improvements will total approximately $25 million in 2017, which is related to our U.S. Iron Ore operations for selenium management and various water treatment, air quality, dust control, tailings management and other miscellaneous environmental projects.

### Regulatory Developments

Various governmental bodies continually promulgate new or amended laws and regulations that affect our Company, our customers and our suppliers in many areas, including waste discharge and disposal, the classification of materials and products, air and water discharges and many other environmental, health and safety matters. Although we believe that our environmental policies and practices are sound and do not expect that the application of any current laws or regulations reasonably would be expected to result in a material adverse effect on our business or financial condition, we cannot predict the collective adverse impact of the expanding body of laws and regulations.

Specifically, there are several notable proposed or potential rulemakings or activities that could have a material adverse impact on our facilities in the future depending on their ultimate outcome: Climate Change and GHG Regulation; Regional Haze, $NO_2$ and $SO_2$ National Ambient Air Quality Standards; Cross State Air Pollution Rule, increased administrative and legislative initiatives related to financial assurance obligations for CERCLA, mining and reclamation obligations; Minnesota's Mercury TMDL and associated rules governing mercury air emission reductions; evolving water quality standards for selenium, sulfate and conductivity; and scope of the Clean Water Act and the definition of "Waters of the United States".

### Climate Change and GHG Regulation

With the complexities and uncertainties associated with the U.S. and global navigation of the climate change issue as a whole, one of our significant risks for the future is mandatory carbon pricing obligations. Policymakers are in the design process of carbon regulation at the state, regional, national and international levels. The current regulatory patchwork of carbon compliance schemes presents a challenge for multi-facility entities to identify their near-term risks. Amplifying the uncertainty, the dynamic forward outlook for carbon pricing obligations presents a challenge to large industrial companies to assess the long-term net impacts of carbon compliance costs on their operations. Our exposure on this issue includes both the direct and indirect financial risks associated with the regulation of GHG emissions, as well as potential physical risks associated with climate change. We are continuing to review the physical risks related to climate change utilizing our formal ERM process. As an energy-intensive business, our GHG emissions inventory includes a broad range of emissions sources, such as iron ore furnaces and kilns, diesel mining equipment and our wholly owned Silver Bay power generation plant, among others. As such, our most significant regulatory risks are: (1) the costs associated with on-site emissions levels (direct impacts), and (2) indirect costs passed through to us from power generators and distillate fuel suppliers (indirect impacts).

Internationally, mechanisms to reduce emissions are being implemented in various countries, with differing designs and stringency, according to resources, economic structure and politics. We expect that momentum to extend carbon regulation will continue with implementation of the Paris climate agreement that was adopted in 2015, the aim of which is to keep the increase in global average temperature to below two degrees Celsius. Continued political attention to issues concerning climate change, the role of human activity in it and potential mitigation through regulation may have a material impact on our customer base, operations and financial results in the future.

In the U.S., federal carbon regulation potentially presents a significantly greater impact to our operations. To date, the U.S. Congress has not legislated carbon constraints. In the absence of comprehensive federal carbon legislation, numerous state, regional, and federal regulatory initiatives are under development or are becoming effective, thereby creating a disjointed approach to carbon control. In May 2010, the EPA promulgated the GHG Tailoring Rule establishing a mechanism for regulating GHG emissions from facilities through the Prevention of Significant Deterioration (PSD) permitting program under the Clean Air Act. Under the GHG Tailoring Rule, as modified by a 2014 U.S. Supreme Court decision upholding some components of the rule, new projects that increase GHG emissions by a significant amount (generally more than 75,000 long tons of $CO_2$ emissions per year) are subject to the PSD requirements, including

10

the installation of best available control technology, if the project also significantly increases emissions of at least one non-GHG regulated criteria pollutant. We do not expect the Tailoring Rule provision to have a material adverse effect on our business in the near term and we cannot reliably estimate the long-term impact of the regulation.

In June 2013, President Obama issued a memorandum directing EPA to develop carbon emission standards for both new and existing power plants under the Clean Air Act's NSPS. In October 2015, EPA promulgated the "Clean Power Plan" which consists of NSPS regulating carbon dioxide from existing power plants at a level of approximately 32% below 2005 levels by 2030. The Clean Power Plan directed states to submit SIPs to EPA by September 2016, but a U.S. Supreme Court stay of the rule in February 2016, deferred submittal of SIPs indefinitely. The Clean Power Plan does not regulate combined head and power generating facilities such as at Northshore's Silver Bay Power. We anticipate that EPA will continue to work on additional GHG NSPS regulations for other industrial categories, including the iron and steel industry; however we cannot reliably estimate the timing or long-term impact of future NSPS regulations.

Due to the EPA's Tailoring Rule and GHG NSPS regulations, our business and customer base could suffer negative financial impacts over time as a result of increased energy, environmental and other costs to comply with the limitations that would be imposed on greenhouse gas emissions. We believe our exposure can be reduced substantially by numerous factors, including currently contemplated regulatory flexibility mechanisms, such as allowance allocations, fixed process emissions exemptions, offsets and international provisions; emissions reduction opportunities, including energy efficiency, biofuels, fuel flexibility, emerging shale gas, coal mine methane offset reduction; and business opportunities associated with pursuing combined heat and power partnerships and new products, including DR-grade pellets, fluxed pellets and other efficiency-improving technologies.

We have worked proactively to develop a comprehensive, enterprise-wide GHG management strategy aimed at considering all significant aspects associated with GHG initiatives to plan effectively for and manage climate change issues, including risks and opportunities as they relate to the environment; stakeholders, including shareholders and the public; legislative and regulatory developments; operations; products and markets.

*Regional Haze*

In June 2005, the EPA finalized amendments to its regional haze rules. The rules require states to establish goals and emission reduction strategies for improving visibility in all Class I national parks and wilderness areas. Among the states with Class I areas are Michigan and Minnesota in which we currently own and manage mining operations. The first phase of the regional haze rule (2008-2018) requires analysis and installation of BART on eligible emission sources and incorporation of BART and associated emission limits into SIPs.

In place of Minnesota's and Michigan's Regional Haze SIP for taconite furnaces, the EPA promulgated a Taconite Regional Haze FIP in February 2013. We, along with other stakeholders, petitioned the Eighth Circuit Court of Appeals for a review of the FIP, and in May 2013, we filed a joint motion for stay of the 2013 FIP, which was granted in June 2013. We, along with the other stakeholders, reached a settlement agreement with EPA to resolve certain items in the 2013 FIP. The settlement agreement, which was published in the Federal Register in January 2015 and fully executed in April 2015, prompted EPA to grant partial reconsideration of the 2013 FIP in July 2015. Subsequently, EPA published a FIP revision final rule to implement components of the settlement agreement in April 2016, with an effective date of May 12, 2016. We believe the 2016 Regional Haze FIP reflects progress toward a more technically and economically feasible regional haze implementation plan. In November 2016, the Eighth Circuit Court of Appeals terminated the June 2013 stay and extended the deadlines in the original 2013 FIP by one day for each day the court's stay was in place. Cost estimates associated with implementation of the 2013 and 2016 FIPs are reflected in our five-year capital plan.

Due to inconsistencies in language describing the procedures for calculating NOx emission limits between the settlement agreement and the 2016 FIP final rule, we jointly filed a Petition for Reconsideration and Petition for Judicial Review in June 2016. We have been working toward a settlement agreement with EPA to resolve the outstanding issue with the emission limit calculation method and anticipate resolution of the issue in 2017.

11

*NO$_2$ and SO$_2$ National Ambient Air Quality Standards*

During the first half of 2010, the EPA promulgated rules that required each state to use a combination of air quality monitoring and computer modeling to determine each state's attainment classification status against new NO$_2$ and SO$_2$ NAAQS. During the third quarter of 2011, the EPA issued guidance to the regulated community on conducting refined air quality dispersion modeling and implementing the new NO$_2$ and SO$_2$ standards. In 2012, Minnesota issued Administrative Orders requiring taconite facilities to conduct modeling to demonstrate compliance with the NO$_2$ and SO$_2$ NAAQS pursuant to the Taconite Regional Haze SIP Long Term Strategy (LTS). Compliance with the LTS modeling demonstrations was originally set for June 30, 2017. Minnesota is expected to remove NAAQS modeling obligations under the LTS in light of reduction in haze emissions associated with the pending amendment of the taconite Regional Haze FIP regulations.

All of our operations in Minnesota and Michigan are expected to be in attainment for NO$_2$ and SO$_2$ NAAQS without incurring additional capital investment. While we will continue to monitor these developments and assess potential impacts to Cliffs, we do not anticipate further capital investments will be necessary to address NO$_2$ and SO$_2$ NAAQS requirements.

*Cross State Air Pollution Rule*

In July 2011, the EPA promulgated the CSAPR, which was intended to address interstate transport of regional haze causing pollutants (NOx and SO$_2$) via emission limits and trading mechanisms. Northshore's Silver Bay Power plant is subject to CSAPR. Complying with CSAPR simultaneously satisfies related regional haze BART obligations because EPA has determined that CSAPR yields greater progress toward attaining EPA's regional haze goals than would application of BART. The Eighth Circuit Court of Appeals re-affirmed that EPA's use of CSAPR is equal to or better than BART in its March 2016 decision. Silver Bay Power's CSAPR compliance obligations are met via a combination of fuel management, installation of lower NOx burners, and purchase of NOx and SO$_2$ allowances from the emission trading market. NOx and SO$_2$ allowance prices continue to decline and the estimated cost to purchase NOx and SO$_2$ allowances currently is less than $5,000.

Future NOx and SO$_2$ emission allowances allocated to Silver Bay Power will decrease and long-term allowance prices are expected to increase. We continue to monitor the availability and pricing of CSAPR allowances and future EPA allocations of CSAPR allowances to our Silver Bay Power plant, but at this time, we do not anticipate exposure to material costs for future CSAPR obligations. At this time, we cannot reasonably estimate the long-term cost impact of CSAPR should EPA significantly reduce overall allowance allocations in response to future lower ozone or particulate matter 2.5 regulations.

*Mercury TMDL and Minnesota Taconite Mercury Reduction Strategy*

TMDL regulations are contained in the Clean Water Act. As a part of Minnesota's Mercury TMDL Implementation Plan, in cooperation with the MPCA, the taconite industry developed a Taconite Mercury Reduction Strategy and signed a voluntary agreement in 2009 to effectuate its terms. The strategy includes a 75% target reduction of mercury air emissions from Minnesota pellet plants collectively by 2025. It recognizes that mercury emission control technology currently does not exist and will be pursued through a research effort. According to the voluntary agreement, any developed technology must meet the "adaptive management criteria" such that the technology must be economically feasible, must not impact pellet quality, and must not cause excessive corrosion in pellet furnaces, associated duct work and existing wet scrubbers on the furnaces.

According to the voluntary agreement, the mines proceeded with medium- and long-term testing of possible technologies. For us, the requirements in the voluntary agreement apply to the United Taconite and Hibbing facilities. At this time, we are unable to predict the potential impacts of the voluntary Taconite Mercury Reduction Strategy. However, a number of research projects were conducted between 2011 and 2014 as the industry continued to assess options for reduction. While injection of powdered activated carbon into furnace off-gasses for mercury capture in the wet scrubbers showed positive initial results, further testing during 2013 yielded lower overall potential. Alternate technologies are presently being assessed in our ongoing efforts to develop cost effective mercury reduction technologies for our indurating furnaces.

In September 2014, Minnesota promulgated the Mercury Air Emissions Reporting and Reduction Rule mandating mercury air emissions reporting and reduction. The adopted rule expanded applicability to all of our Minnesota operations and requires submitting a mercury reduction plan in 2018 to reduce mercury emissions from all of our Minnesota taconite furnaces by 72% by January 2025. The adopted rule does not include explicitly all four Adaptive

A005093

Management Criteria for evaluating mercury reduction, which were agreed upon in the October 2009 Minnesota's Mercury TMDL Implementation Plan.

To date, there is currently no proven technology to cost effectively reduce mercury emissions from taconite furnaces to the target level of 72% that would meet all four Adaptive Management Criteria. We remain concerned about the technical and economic feasibility to reduce taconite mercury emissions by 72% without impacting existing operations or other environmental permit obligations and are conducting detailed engineering analysis to determine the impact of the regulations on each unique iron ore indurating furnace affected by this rule. The results of this analysis will guide further dialog with the MPCA regarding our implementation of the requirements. Because development of the technology is in the early stages, any impacts to us are not estimable at this time.

*Selenium Discharge Regulation*

In Michigan, Empire and Tilden have developed compliance strategies to manage selenium according to the permit conditions. Empire and Tilden submitted the first permit required Selenium Storm Water Management Plan to the MDEQ in December 2011, and have updated it annually as required. The Selenium Storm Water Management Plans have outlined the activities that will be undertaken to address selenium in storm water discharges from our Michigan operations including an assessment of potential impacts to surface and groundwater. The remaining budget for full scale implementation of the storm water collection and conveyance system by November 2017 is approximately $9 million. A storm water treatment system for both facilities is anticipated sometime before 2028. The cost of the future treatment systems could be significant, although we are continuing to assess and develop cost effective and sustainable treatment technologies.

Tilden's NPDES permit contains a compliance schedule for selenium with a limit of five μg/l that will be effective as of November 1, 2017, at Tilden's Gribben Tailings Basin outfall. Tilden has budgeted $7 million for 2017 for infrastructure necessary to meet the selenium effluent limit. In July 2016, the EPA published new selenium fish tissue limits and lower lentic and lotic water column concentration criteria, which may someday increase the cost for treatment should MDEQ adopt these new standards in lieu of the existing limits established under the Great Lakes Initiative. Accordingly, we cannot reasonably estimate the timing or long-term impact of the water quality criteria to our business.

*Definition of "Waters of the United States" Under the Clean Water Act*

In June 2015, the EPA and Army Corps of Engineers promulgated the rule, "Definition of 'Waters of the United States' Under the Clean Water Act," which attempted to add clarity to which waters are jurisdictional under the federal Clean Water Act, and will apply to all Clean Water Act programs, including certain permitting programs, spill prevention program and a state certification process.  It is unclear how the federal and state agencies will implement and enforce the final rule, and how the courts will interpret it going forward. The regulation may expand EPA's authority under the Clean Water Act to many traditionally unregulated mine features such as mine pits, pit lakes, on site ditches, water retention structures, and tailings basins creating a new burden on our U.S. facilities.  This could be further interpreted to add questionable regulatory authority over the groundwater connections between these features and nearby traditionally navigable waters.  In October 2015, the U.S. Court of Appeals for the Sixth Circuit issued a nationwide stay of this rule while the jurisdiction and legality of the rule are decided in court. In January 2017, the U.S. Supreme Court granted certiorari to reconsider the Sixth Circuit's decision that it has jurisdiction to hear challenges. We are actively participating in the rulemaking development and assessing the potential impacts to our operations. Because the rule is being litigated, and until the rule is finally implemented, any impacts to us are not estimable at this time.

*Minnesota's Proposed Sulfate Wild Rice Water Quality Standard*

The Minnesota Legislature provided $1.5 million in 2011 for a study to gather additional information about the effects of sulfate and other substances on the growth of wild rice, and to support an update to the sulfate wild rice water quality standard originally adopted in 1973 by the MPCA. The MPCA contracted with the University of Minnesota to conduct several research projects as part of this study. Concurrently, the Minnesota Chamber of Commerce contracted an independent lab to conduct companion research on the impacts of sulfate on wild rice. In July 2016, MPCA released a draft proposal for protecting wild rice from sulfate, which included a draft sulfate wild rice water quality standard, a draft list of waters where the standard would apply, and criteria for adding waters to that list. The draft wild rice water quality standard is an equation that utilizes measured sediment parameters to calculate a sulfate limit protective of wild rice. The independent research conducted by the independent lab contracted by the Minnesota Chamber of Commerce does not directly support the validity of the MPCA's proposed approach. The rulemaking has a legislated deadline for completion of January 15, 2018. Due to the proposed standard being based on measured sediment parameters and

13

uncertainty regarding to which waters the standard will apply, the impacts of the proposed wild rice water quality standard to Cliffs are not estimable at this time.

*Conductivity*

Conductivity, the measurement of water's ability to conduct electricity, is a surrogate parameter that generally increases as the amount of dissolved minerals in water increases. In 2011, the EPA issued *A Field-Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams,* which established a recommended conductivity benchmark of 300 μS/cm for the region. The issuance of a benchmark outside of the established rulemaking process was subsequently the subject of litigation in 2012 where the court ruled the benchmark is nothing more than a non-binding suggestion. Three years later in Ohio Valley Environmental Coalition, et al. v. Elk Run Coal Co., et al., 3:12-cv-00785 (S.D. W. Va.), a judicial decision held that levels of conductivity higher than the EPA's benchmark constituted a violation of the state's narrative water quality standards, were unsupported by science and contrary to decisions previously made by the West Virginia Department of Environmental Protection and the West Virginia Supreme Court. In 2015, a group filed a petition with EPA Region 5 alleging that Minnesota was failing to implement properly the state NPDES program, and one of the various allegations asserts that MPCA should be assessing compliance with the state's narrative water quality standard against the EPA's conductivity benchmark for the Central Appalachian region. On December 30, 2015, the EPA provided MPCA a draft of the *Protocol for Responding to Issues Related to Permitting and Enforcement* which indicates that EPA staff will be reviewing available scientific basis in peer reviewed literature as well as promulgated standards. In February 2016, EPA's Office of Research and Development endorsed use of the Field-Based Conductivity Benchmark in northeast Minnesota indicating that a value of 320 μS/cm was appropriate to protect aquatic life. On December 23, 2016, EPA issued a notice soliciting public comments on its draft document, *Field-Based Methods for Developing Aquatic Life Criteria for Specific Conductivity* (SC). According to EPA, once this document is final, states and authorized tribes located in any region of the country may use the methods to develop field-based SC criteria for adoption into water quality standards. Adoption of this methodology is not certain due to significant concerns with respect to the scientific validity of the proposed method which is now under intense review by scientists working for various trade associations. Because the outcome of the Region 5 Petition and proposed *Field-Based Methods for Developing Aquatic Life Criteria for Specific Conductivity* is only draft guidance at this time, the exact nature and certainty of the potential risk to Cliffs cannot be predicted; however, direct application of the 320 μS/cm benchmark to Cliffs' Minnesota-based assets may have a material adverse impact if the conductivity benchmark is applied to our NPDES permits.

*CERCLA 108(b)*

In December 2016, EPA published a proposed amendment to CERCLA section 108(b) which is focused on developing financial assurance for managing hazardous substances in the hardrock mining industry. The proposed rule will undergo a comment period and EPA has a court-mandated deadline for publication of the final rule by December 1, 2017. The rule requires subject facilities to calculate their level of financial responsibility based on a formula included in the rule, secure an instrument or otherwise self-assure for the calculated amount, demonstrate to EPA the proof of the security, and maintain the security until EPA releases facilities from the CERCLA 108(b) regulations. The iron mining industry is aware of several errors upon which EPA drafted the rule, including a mistaken reliance on reporting data from a wholly different industry sector (iron and steel toxic release inventory reporting). We will participate in industry-wide comments that address this and other errors and seek to exempt iron ore mining from CERCLA 108(b) applicability. With only a draft rule at this time, the final impacts of this rule to Cliffs are unknown; however, an obligation to secure and maintain financial assurance across all of our U.S. Iron Ore facilities could have a material adverse impact to our business.

## Energy

### Electricity

As of February 1, 2015, Wisconsin Electric Power Company is the sole supplier of electric power to our Tilden mine. As of April 24, 2015, the Tilden mine executed a special electricity contract with Wisconsin Electric Power Company. The term of the contract is through 2019. Wisconsin Electric Power Company provides 170 megawatts of electricity to Tilden at special rates that are regulated by the MPSC. The pricing under these contracts is generally fixed except Tilden is subject to frequent changes in Wisconsin Electric Power Company's power supply adjustment factor. On August 12, 2016, Tilden executed a new 20-year special contract with Wisconsin Electric that is anticipated to start on January 1, 2020. This special contract is still pending approval at the MPSC. Tilden and Empire may also incur additional liabilities depending on the outcome of various proceedings concerning MISO's revised cost allocation methodology for continued operation of the Presque Isle Power Plant in Michigan. If FERC were to decide to award SSR costs based

Table of Contents

on a revised cost allocation methodology applied retroactively, this could result in a substantial potential liability to our Tilden mine and our indefinitely-idled Empire mine. As of December 31, 2016, this potential liability of $13.6 million is included in our Statements of Consolidated Financial Position  as part of *Other current liabilities*. Refer to NOTE 20 - COMMITMENTS AND CONTINGENCIES for further discussion of the Michigan Electricity Matters.

Minnesota Power supplies electric power to the Hibbing and United Taconite mines. On September 16, 2008, Hibbing finalized an agreement with terms from November 1, 2008 through December 31, 2015. The agreement was approved by the MPUC in 2009. The terms of the agreement included an automatic five-year extension that began January 1, 2016. The United Taconite mine executed a new ten-year agreement with Minnesota Power that also included the Babbitt Mine. This agreement was finalized on May 22, 2016 and was approved by the MPUC on November 9, 2016.

Silver Bay Power, a wholly owned subsidiary of ours with a 115 megawatt power plant, provides the majority of Northshore's electrical energy requirements. Silver Bay Power has an interconnection agreement with Minnesota Power for backup power when excess generation is necessary. On May 22, 2016, Silver Bay Power entered into an agreement with Minnesota Power to purchase roughly half of Northshore's electricity needs from Minnesota Power through 2019. On January 1, 2020, Silver Bay Power will purchase 100% of the electricity requirements of Northshore from Minnesota Power and Silver Bay Power plans to idle both of its generating units except under certain circumstances.

Koolyanobbing and its associated satellite mine deposits draw power from independent diesel-fueled power stations and generators. Diesel power generation capacity has been installed at the Koolyanobbing operations.

### Process and Diesel Fuel

We have a long-term contract providing for the transport of natural gas on the Northern Natural Gas Pipeline for our U.S. Iron Ore operations. The Tilden mine has the capability of burning natural gas, coal or, to a lesser extent, oil. The Hibbing and Northshore mines have the capability to burn natural gas and oil. The United Taconite mine has the ability to burn coal, natural gas and petroleum coke. Consistent with 2016, we expect during 2017 our U.S. Iron Ore operations will utilize both natural gas and coal to heat furnaces and produce power at our Silver Bay Power facility.

All of our mines utilize diesel fuel mainly for our mobile fleet. Thompson Gas supplies diesel to all of our U.S. Iron Ore locations from the Calumet refinery in Superior, Wisconsin. Our U.S. Iron Ore locations are contracted with Como Oil and Propane through the end of 2018.

15

**Employees**

As of December 31, 2016, we had a total of 2,927 employees.

| | 2016 | 2015 | 2014 |
|---|---|---|---|
| **U.S. Iron Ore**[1] | | | |
| Salaried | 523 | 509 | 658 |
| Hourly[3] | 2,178 | 1,813 | 2,705 |
| Total | 2,701 | 2,322 | 3,363 |
| **Asia Pacific Iron Ore**[2] | | | |
| Salaried | 82 | 90 | 139 |
| Hourly | — | — | — |
| Total | 82 | 90 | 139 |
| **Discontinued Operations**[2] | | | |
| Salaried | 4 | 32 | 468 |
| Hourly | — | 41 | 1,141 |
| Total | 4 | 73 | 1,609 |
| **Corporate & Support Services** | | | |
| Salaried | 140 | 153 | 275 |
| Hourly | — | — | — |
| Total | 140 | 153 | 275 |
| **Total** | 2,927 | 2,638 | 5,386 |

[1] Includes our employees and the employees of the U.S. Iron Ore joint ventures.

[2] Excludes contracted mining employees.

[3] Excludes employees considered on lay-off status as a result of an indefinite or temporary idle. As of December 31, 2016, this would include those impacted by the indefinite idling of the Empire mine, and as of December 31, 2015, this would include those impacted by the temporary idlings of the United Taconite and Northshore mines.

As of December 31, 2016, approximately 80% of our active U.S. Iron Ore hourly employees were covered by collective bargaining agreements.

Hourly employees at our Michigan and Minnesota iron ore mining operations, excluding Northshore, are represented by the USW and are covered by labor agreements between the USW and our various operating entities. These labor agreements that cover approximately 2,000 active USW-represented employees at our Empire and Tilden mines in Michigan, and our United Taconite and Hibbing mines in Minnesota are valid through September 30, 2018. Employees at our Northshore operations are not represented by a union and are not, therefore, covered by a collective bargaining agreement.

Hourly employees at our LS&I railroads are represented by seven unions covering approximately 100 employees. The labor agreements that cover these employees reopened for bargaining on December 31, 2014 and we are actively bargaining for successor agreements. These employees negotiate under the Railway Labor Act, which provides that labor agreements remain in force until replaced by a successor agreement. Under the Railway Labor Act work stoppages cannot occur until the parties have engaged in substantial negotiations, have mediated any disputes and have received a release from the National Mediation Board.

Employees at our Asia Pacific Iron Ore, Corporate and Support Services are not represented by a union and are not, therefore, covered by collective bargaining agreements.

16

Table of Contents

***Safety***

Safety is our primary core value as we continue toward a zero incident culture at all of our facilities. We continuously monitor, measure, and track our safety performance and make improvements where necessary. Best practices are shared globally to ensure each mine site can effectively administer our policies, procedures and learnings for enhanced workplace safety. Progress toward achieving our objectives is measured against established benchmarks, including our company-wide TRIR. During 2016, our TRIR (including contractors) was 1.41 per 200,000 man-hours worked.

Refer to *Exhibit 95 Mine Safety Disclosures (filed herewith)* for mine safety information required in accordance with Section 1503(a) of the Dodd-Frank Act.

**Available Information**

Our headquarters are located at 200 Public Square, Suite 3300, Cleveland, Ohio 44114-2315, and our telephone number is (216) 694-5700. We are subject to the reporting requirements of the Exchange Act and its rules and regulations. The Exchange Act requires us to file reports, proxy statements and other information with the SEC. Copies of these reports and other information can be read and copied at:

SEC Public Reference Room
100 F Street N.E.
Washington, D.C. 20549

Information on the operation of the Public Reference Room may be obtained by calling the SEC at 1-800-SEC-0330.

The SEC maintains a website that contains reports, proxy statements and other information regarding issuers that file electronically with the SEC. These materials may be obtained electronically by accessing the SEC's home page at *www.sec.gov.*

We use our website, *www.cliffsnaturalresources.com*, as a channel for routine distribution of important information, including news releases, investor presentations and financial information. We also make available, free of charge on our website, our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to these reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act, as soon as reasonably practicable after we electronically file these documents with, or furnish them to, the SEC. In addition, our website allows investors and other interested persons to sign up to receive automatic email alerts when we post news releases and financial information on our website.

We also make available, free of charge on our website, the charters of the Audit Committee, Governance and Nominating Committee and Compensation and Organization Committee as well as the Corporate Governance Guidelines and the Code of Business Conduct and Ethics adopted by our Board of Directors. These documents are available through our investor relations page on our website at *ir.cliffsnaturalresources.com*. The SEC filings are available by selecting "Financial Information" and then "SEC Filings," and corporate governance materials are available by selecting "Corporate Governance" for the Board Committee Charters, operational governance guidelines and the Code of Business Conduct and Ethics.

References to our website or the SEC's website do not constitute incorporation by reference of the information contained on such websites, and such information is not part of this Annual Report on Form 10-K.

Copies of the above-referenced information are also available, free of charge, by calling (216) 694-5700 or upon written request to:

Cliffs Natural Resources Inc.
Investor Relations
200 Public Square, Suite 3300
Cleveland, OH 44114-2315

17

Table of Contents

**EXECUTIVE OFFICERS OF THE REGISTRANT**

Following are the names, ages and positions of the executive officers of the Company as of  February 9, 2017. Unless otherwise noted, all positions indicated are or were held with Cliffs Natural Resources Inc.

| Name | Age | Position(s) Held |
|------|-----|------------------|
| Lourenco Goncalves | 59 | Chairman, President and Chief Executive Officer (August 2014 - present); Chairman, President and Chief Executive Officer of Metals USA Holdings Corp., an American manufacturer and processor of steel and other metals (May 2006 - April 2013); and President, Chief Executive Officer and a director of Metals USA Inc. (February 2003 - April 2006). |
| P. Kelly Tompkins | 60 | Executive Vice President & Chief Operating Officer (January 2017 - present); Executive Vice President and Chief Financial Officer (April 2015 - December 2016); Executive Vice President, Business Development (October 2014 - April 2015); Executive Vice President, External Affairs and President, Global Commercial (November 2013 - October 2014); Chief Administrative Officer (July 2013 - November 2013); Executive Vice President, Legal, Government Affairs and Sustainability (May 2010 - July 2013); Chief Legal Officer (January 2011 - January 2013); and President, Cliffs China (October 2012 - November 2013). |
| Terry G. Fedor | 52 | Executive Vice President, U.S. Iron Ore (January 2014 - present); and Vice President, U.S. Iron Ore Operations (February 2011 - January 2014). |
| Timothy K. Flanagan | 39 | Executive Vice President, Chief Financial Officer & Treasurer (January 2017 - present); Vice President, Corporate Controller and Chief Accounting Officer (March 2012 - December 2016); Treasurer (March 2016 - present); and Assistant Controller (February 2010 - March 2012). |
| James D. Graham | 51 | Executive Vice President (November 2014 - present); Chief Legal Officer (March 2013 - present); Secretary (March 2014 - present); Vice President (January 2011 - October 2014); and General Counsel - Global Operations (January 2011 - March 2013). |
| Maurice D. Harapiak | 55 | Executive Vice President, Human Resources (June 2014 - present); Regional Director, Human Resources - Barrick Gold of North America, a gold mining company (November 2011 - June 2014); and Senior Director, Human Resources, Capital Projects - Barrick Gold Corporation, a gold mining company (November 2007 - November 2011). |
| Terrence R. Mee | 47 | Executive Vice President, Global Commercial (October 2014 - present); Vice President, Global Iron Ore Sales (February 2014 - October 2014); Senior Vice President, Global Iron Ore Sales (March 2012 - February 2014); and Senior Vice President, Global Iron Ore and Metallic Sales (January 2011 - March 2012). |
| Clifford T. Smith | 57 | Executive Vice President, Business Development (April 2015 - present); Executive Vice President, Seaborne Iron Ore (January 2014 - April 2015); Executive Vice President, Global Operations (July 2013 - January 2014); Executive Vice President, Global Business Development (March 2013 - July 2013); and Senior Vice President, Global Business Development (January 2011 - March 2013). |

All executive officers serve at the pleasure of the Board. There are no arrangements or understandings between any executive officer and any other person pursuant to which an executive officer was selected to be an officer of the Company. There is no family relationship between any of our executive officers, or between any of our executive officers and any of our directors.

**Item 1A.**     *Risk Factors*

An investment in our common shares or other securities is subject to risk inherent to our business and our industry. Described below are certain risks and uncertainties, the occurrences of which could have a material adverse effect on us. Before making an investment decision, you should consider carefully all of the risks described below together with the other information included in this report. The risks and uncertainties described below include known material risks that we face currently. Although we have significant risk management policies, practices and procedures aimed to mitigate these risks, uncertainties may nevertheless impair our business operation. This report is qualified in its entirety by these factors.

Our ERM function provides a framework for management's consideration of risk when making strategic, financial, operational and/or project decisions. The framework is based on ISO 31000, an internationally recognized risk management standard. Management uses a consistent methodology to identify and assess risks, determine and

implement risk mitigation actions, and monitor and communicate information about the Company's key risks. Through these processes, we have identified six categories of risk that we are subject to: (I) economic and market, (II) regulatory, (III) financial, (IV) operational, (V) development and sustainability and (VI) human capital. The following risk factors are presented according to these key risk categories.

## I. ECONOMIC AND MARKET RISKS

***The volatility of commodity prices, namely iron ore and steel, affects our ability to generate revenue, maintain stable cash flow and fund our operations, including growth and expansion projects.***

As a mining company, our profitability is dependent upon the price of the commodities that we sell to our customers and the price of the products our customers sell, namely iron ore and steel prices. The price of iron ore has fluctuated significantly in the past and is affected by factors beyond our control, including: steel inventories; international demand for raw materials used in steel production; rates of global economic growth, especially construction and infrastructure activity that requires significant amounts of steel; changes in the levels of economic activity in the U.S., China, India, Europe and other industrialized or developing countries; uncertainties or weaknesses in global economic conditions such as the U.S. debt ceiling; changes in production capacity of other iron ore suppliers, especially as additional supplies come online or where there is a significant increase in imports of steel into the U.S. or Europe; changes in trade laws; weather-related disruptions or natural disasters that may impact the global supply of iron ore; and the proximity, capacity and cost of infrastructure and transportation.

Our earnings, therefore, may fluctuate with the prices of the commodities we sell. To the extent that the prices of iron ore and steel, including the average hot-rolled coil price, significantly decline for an extended period of time, we may have to revise our operating plans, including curtailing production, reducing operating costs and capital expenditures and discontinuing certain exploration and development programs. We also may have to take impairments on our long-lived assets and/or inventory. Sustained lower prices also could cause us to further reduce existing reserves if certain reserves no longer can be economically mined or processed at prevailing prices. We may be unable to decrease our costs in an amount sufficient to offset reductions in revenues and may incur losses. These events could have a material adverse effect on us.

***Uncertainty or weaknesses in global economic conditions, reduced economic growth in China and oversupply of iron ore and excess steel or imported products could affect adversely our business.***

The world price of iron ore is influenced strongly by global economic conditions, including international demand and supply for iron ore products. In particular, the current level of international demand for raw materials used in steel production is driven largely by industrial growth in China. Uncertainties or weaknesses in global economic conditions, including the slowing economic growth rate in China, has resulted, and could in the future result, in decreased demand for our products and, together with oversupply of imported products, has and may continue to lead to decreased prices, resulting in lower revenue levels and decreasing margins, which have in the past and may in the future affect adversely our business and negatively impact our financial results. For example, U.S. Iron Ore's realized revenue rate per long ton decreased 4% and 23% for the years ended December 31, 2016 and December 31, 2015, respectively, compared to a 5% increase and 43% decline in the Platts 62% Price over the same periods. We are not able to predict whether the global economic conditions will improve or worsen and the impact it may have on our operations and the industry in general going forward.

We also have significant capital requirements, including interest payments to service our debt. If we incur significant losses in future periods, we may be unable to continue as a going concern. If we are unable to continue as a going concern, we may consider, among other options, further restructuring our debt; however, there can be no assurance that these options will be undertaken and, if so undertaken, whether these efforts will succeed.

***Capacity expansions and limited rationalization of supply capacity within the mining industry could lead to lower or more volatile global iron ore prices, impacting our profitability.***

Global growth of iron ore demand, particularly from China, resulted in iron ore suppliers expanding their production capacity over the past few years. The supply of iron ore increased due to these expansions. The increases in our competitors' capacity along with actual reduced demand resulted in excess supply of iron ore, which caused downward pressure on prices. The limited rationalization of supply capacity has led to volatile pricing which can have an adverse impact on our sales, margins and profitability. We do not have control over corporate strategies implemented by other iron ore producers that may result in volatility of global iron ore prices.

19

A005100

[Table of Contents](#)

***If steelmakers use methods other than blast furnace production to produce steel or use other inputs, or if their blast furnaces shut down or otherwise reduce production, the demand for our current iron ore products may decrease.***

Demand for our iron ore products is determined by the operating rates for the blast furnaces of steel companies. However, not all finished steel is produced by blast furnaces; finished steel also may be produced by other methods that use scrap steel, pig iron, hot briquetted iron and direct reduced iron. North American steel producers also can produce steel using imported iron ore, semi-finished steel products or other lighter-weight steel alternatives, which eliminates the need for domestic iron ore. Future environmental restrictions on the use of blast furnaces also may reduce our customers' use of their blast furnaces. Maintenance of blast furnaces may require substantial capital expenditures and may cause prolonged outages, which may reduce demand for our pellets. Our customers may choose not to maintain, or may not have the resources necessary to maintain, their blast furnaces. If our customers use methods to produce steel that do not use iron ore pellets, demand for our current iron ore products will decrease, which would affect adversely our sales, margins, profitability and cash flows.

***Due to economic conditions and volatility in commodity prices, or otherwise, our customers could approach us about modification of their supply agreements or fail to perform under such agreements, which could impact adversely our sales, margins, profitability and cash flows.***

Although we have long-term contractual commitments for a majority of the sales in our U.S. Iron Ore business, the uncertainty in global economic conditions may impact adversely the ability of our customers to meet their obligations. As a result of such market volatility, our customers could approach us about modifying their supply agreements or fail to perform under such agreements. Considering our limited base of current and potential customers, any modifications to our sales agreements or customers' failures to perform under such agreements could impact adversely our sales, margins, profitability and cash flows. For example, of the potential customers in the North American integrated steel industry, two are in reorganization proceedings, and certain others have experienced financial difficulties. A loss of sales to our existing customers could have a substantial negative impact on our sales, margins, profitability and cash flows. Other potential actions by our customers could result in additional contractual disputes and could ultimately require arbitration or litigation, either of which could be time consuming and costly. Any such disputes and/or failure to renew existing contracts on favorable terms could impact adversely our sales, margins, profitability and cash flows.

## II.  REGULATORY RISKS

***We are subject to extensive governmental regulation, which imposes, and will continue to impose, potential significant costs and liabilities on us. Future laws and regulations or the manner in which they are interpreted and enforced could increase these costs and liabilities or limit our ability to produce iron ore products.***

New laws or regulations, or changes in existing laws or regulations, or the manner of their interpretation or enforcement, particularly in light of the new presidential administration, could increase our cost of doing business and restrict our ability to operate our business or execute our strategies. This includes, among other things, the possible taxation under U.S. law of certain income from foreign operations, compliance costs and enforcement under the Dodd-Frank Act, and costs associated with complying with the Patient Protection and Affordable Care Act and the Healthcare and Education Reconciliation Act of 2010 and the regulations promulgated thereunder and any replacement or amendments thereof. In addition, we are subject to various federal, provincial, state and local laws and regulations in each jurisdiction in which we have operations for human health and safety, air quality, water pollution, plant, wetlands, natural resources and wildlife protection, reclamation and restoration of mining properties, the discharge of materials into the environment, the effects that mining has on groundwater quality, conductivity and availability, and related matters. Numerous governmental permits and approvals are required for our operations.

We cannot be certain that we have been or will be at all times in complete compliance with such laws, regulations, permits and approvals. If we violate or fail to comply with these laws, regulations, permits or approvals, we could be fined or otherwise sanctioned by regulators. Compliance with the complex and extensive laws and regulations to which we are subject imposes substantial costs, which we expect will continue to increase over time because of increased regulatory oversight, adoption of increasingly stringent environmental standards, and increased demand for remediation services leading to shortages of equipment, supplies and labor, as well as other factors.

Specifically, there are several notable proposed or recently enacted rulemakings or activities to which we would be subject or that would further regulate and/or tax our customers, namely the North American integrated steel producer customers, that may also require us or our customers to reduce or otherwise change operations significantly or incur significant additional costs, depending on their ultimate outcome. These emerging or recently enacted rules, regulations and policy guidance include: CERCLA financial assurance, numerous air regulations, such as climate change and greenhouse gas regulation, regional haze regulation, NAAQS including but not limited to those for $NO_2$ and $SO_2$, the

20

Table of Contents

CSAPR; Minnesota's Mercury Air Emissions Reporting and Reduction Rule, Mercury Total Maximum Daily Load requirements and Taconite Mercury Reduction Strategy, selenium discharge regulation; conductivity water quality standards for aquatic life; expansion of federal jurisdictional authority to regulate groundwater, and various other water quality regulations. Such new or more stringent legislation, regulations, interpretations or orders, when enacted, could have a material adverse effect on our business, results of operations, financial condition or profitability.

***Although the numerous regulations, operating permits and our management systems mitigate potential impacts to the environment, our operations inadvertently may impact the environment or cause exposure to hazardous substances, which could result in material liabilities to us.***

Our operations currently use and have used in the past, hazardous materials, and, from time to time, we have generated solid and hazardous waste. We have been, and may in the future be, subject to claims under federal, provincial, state and local laws and regulations for toxic torts, natural resource damages and other damages as well as for the investigation and clean-up of soil, surface water, sediments, groundwater and other natural resources and reclamation of properties. Such claims for damages and reclamation may arise out of current or former conditions at sites that we own, lease or operate currently, as well as sites that we or our acquired companies have owned, leased or operated, and at contaminated sites that have been owned, leased or operated by our joint venture partners. Our liability for these claims may be strict, and/or joint and several, such that we may be held responsible for more than our share of the contamination or other damages, or even for the entire share regardless of fault. We are subject to a variety of potential liability exposures arising, or otherwise involved in investigation and remediation activities, at certain sites. In addition to sites currently owned, leased or operated, these include sites where we formerly conducted iron ore and/or coal mining or processing or other operations, inactive sites that we currently own, predecessor sites, acquired sites, leased land sites and third-party waste disposal sites. We may be named as a responsible party at other sites in the future and we cannot be certain that the costs associated with these additional sites will not be material.

We also could be subject to litigation for alleged bodily injuries arising from claimed exposure to hazardous substances allegedly used, released, or disposed of by us. In particular, we and certain of our subsidiaries were involved in various claims relating to the exposure of asbestos and silica to seamen who sailed until the mid-1980s on the Great Lakes vessels formerly owned and operated by certain of our subsidiaries. While several hundred of these claims against us had been combined in a multidistrict litigation docket and have since been dismissed and/or settled for non-material amounts, there remains a possibility that similar types of claims could be filed in the future.

Environmental impacts as a result of our operations, including exposures to hazardous substances or wastes associated with our operations, could result in costs and liabilities that could materially and adversely affect our margins, cash flow or profitability.

***We may be unable to obtain and renew permits necessary for our operations or be required to provide additional financial assurance, which could reduce our production, cash flows, profitability and available liquidity. We also could face significant permit and approval requirements that could delay our commencement or continuation of existing or new production operations which, in turn, could affect materially our cash flows, profitability and available liquidity.***

Prior to commencement of mining, we must submit to and obtain approval from the appropriate regulatory authority of plans showing where and how mining and reclamation operations are to occur. These plans must include information such as the location of mining areas, stockpiles, surface waters, haul roads, tailings basins and drainage from mining operations. All requirements imposed by any such authority may be costly and time-consuming and may delay commencement or continuation of exploration or production operations.

Mining companies must obtain numerous permits that impose strict conditions on various environmental and safety matters in connection with iron ore mining. These include permits issued by various federal, state and provincial agencies and regulatory bodies. The permitting rules are complex and may change over time, making our ability to comply with the applicable requirements more difficult or impractical and costly, possibly precluding the continuance of ongoing operations or the development of future mining operations. Interpretations of rules may also change over time and may lead to requirements, such as additional financial assurance, making it more costly to comply. The public, including special interest groups and individuals, have certain rights under various statutes to comment upon, submit objections to, and otherwise engage in the permitting process, including bringing citizens' lawsuits to challenge such permits or mining activities. Accordingly, required permits may not be issued or renewed in a timely fashion (or at all), or permits issued or renewed may be conditioned in a manner that may restrict our ability to conduct our mining activities efficiently, including the requirement for additional financial assurances that we may not be able to provide on commercially reasonable terms or at all and which would further limit our borrowing base under our ABL Facility. Such inefficiencies could reduce our production, cash flows, profitability and available liquidity.

III.    **FINANCIAL RISKS**

***A substantial majority of our sales are made under supply agreements with limited duration to a low number of customers that contain price-adjustment clauses that could affect adversely the stability and profitability of our operations.***

A majority of our U.S. Iron Ore sales and our Asia Pacific Iron Ore sales are made under supply agreements with specified durations to a limited number of customers. For the year ended December 31, 2016, more than 71% of our product revenue was derived from the North American integrated steel industry. For the year ended December 31, 2016, three customers together accounted for 83% of our U.S. Iron Ore product sales revenues (representing 60% of our consolidated revenues). Our Asia Pacific Iron Ore contracts with customers in China and Japan currently expire in March 2017 and our one South Korean customer contract expires in December 2017. In May 2016, we agreed to a new contract with ArcelorMittal through 2026. This extended our average remaining duration of our U.S. Iron Ore contracts from three years to approximately seven years. Pricing under our new contract with ArcelorMittal will be adjusted by the price of hot-rolled coil steel in the U.S. domestic market, and iron ore and general inflation indices. As a result of this pricing construct and the pricing constructs contained in our existing customer contracts and those anticipated in future periods, our financial results will have increased sensitivity to changes in iron ore and steel prices.

***Our existing and future indebtedness may limit cash flow available to invest in the ongoing needs of our business, which could prevent us from fulfilling our obligations under our senior notes and ABL Facility.***

As of December 31, 2016, we had an aggregate principal amount of $2,258.8 million of long-term debt, $1,188.6 million of which was secured (excluding $106.0 million of outstanding letters of credit and $55.8 million of capital leases), and $323.4 million of cash on our balance sheet. As of December 31, 2016, no loans were drawn under the ABL Facility and we had total availability of $333.0 million as a result of borrowing base limitations. As of December 31, 2016, the principal amount of letters of credit obligations and other commitments totaled $106.0 million, thereby further reducing available borrowing capacity on our ABL Facility to $227.0 million.

Although we reduced the principal balance of our outstanding debt by $639.4 million and our annual interest expense by $28.0 million during 2016, our substantial level of indebtedness has required us to dedicate a significant portion of our cash flow from operations to the payment of debt service, reducing the availability of our cash flow to fund capital expenditures, acquisitions or strategic development initiatives, and other general corporate purposes. Moreover, our level of indebtedness could have further consequences, including, increasing our vulnerability to adverse economic or industry conditions, limiting our ability to obtain additional financing in the future to enable us to react to changes in our business, or placing us at a competitive disadvantage compared to businesses in our industry that have less indebtedness.

Our substantial level of indebtedness could limit our ability to obtain additional financing on acceptable terms or at all for working capital, capital expenditures, acquisitions or strategic development initiatives, and general corporate purposes. Our liquidity needs could vary significantly and may be affected by general economic conditions, industry trends, performance and many other factors not within our control. If we are unable to generate sufficient cash flow from operations in the future to service our debt, we may be required to refinance all or a portion of our existing debt. However, we may not be able to obtain any such new or additional debt on favorable terms or at all.

Any failure to comply with covenants in the instruments governing our debt could result in an event of default which, if not cured or waived, would have a material adverse effect on us.

***We may not be able to generate sufficient cash to service all of our debt, and may be forced to take other actions to satisfy our obligations under our debt, which may not be successful.***

Our ability to make scheduled payments on or to refinance our debt obligations depends on our ability to generate cash in the future and our financial condition and operating performance, which are subject to prevailing economic and competitive conditions and to certain financial, business and other factors beyond our control. We cannot assure you that we will maintain a level of cash flows from operating activities sufficient to permit us to pay the principal, premium, if any, and interest on our debt.

If our cash flows and capital resources are insufficient to fund our debt service obligations, we may be forced to reduce or delay investments and capital expenditures, or to sell assets, seek additional capital, including additional secured or unsecured debt, or restructure or refinance our debt. Any refinancing of our debt could be at higher interest rates and may require us to comply with more onerous covenants, which could further restrict our business operations. These measures may not be successful and may not permit us to meet our scheduled debt service obligations.

If our operating results and available cash are insufficient to meet our debt service obligations, we could face substantial liquidity problems and might be required to dispose of material assets or operations to meet our debt service and other obligations. We may not be able to consummate those dispositions or recover the carrying value of these assets or obtain the proceeds that we could realize from them, and these proceeds may not be adequate to meet any debt service obligations then due. Further, we may need to refinance all or a portion of our debt on or before maturity, and we may not be able to refinance any of our debt on commercially reasonable terms or at all. Furthermore, additional or new financial assurances may be demanded by our vendors or regulatory agencies that we may not be able to provide on commercially reasonable terms or at all.

Any of these examples potentially could have a material adverse impact on our results of operations, profitability, shareholders' equity and capital structure. Also, if we were to sell a percentage of a business, there are inherent risks of a joint venture relationship as noted in the risk factor below.

***We rely on our joint venture partners in our mines to meet their payment obligations and we are subject to risks involving the acts or omissions of our joint venture partners.***

We co-own and manage two of our four operating U.S. Iron Ore mines and our indefinitely-idled Empire mine with various joint venture partners that are integrated steel producers or their subsidiaries, including ArcelorMittal and U.S. Steel. We rely on our joint venture partners to make their required capital contributions and to pay for their share of the iron ore that each joint venture produces. Our U.S. Iron Ore joint venture partners are often also our customers. If one or more of our joint venture partners fail to perform their obligations, the remaining joint venture partners, including ourselves, may be required to assume additional material obligations, including significant capital contribution, costs of environmental remediation, pension and postretirement health and life insurance benefit obligations. For example, a premature closure of a mine due to the failure of a joint venture partner to perform its obligations could result in significant fixed mine-closure costs, including severance, employment legacy costs and other employment costs; reclamation and other environmental costs; and the costs of terminating long-term obligations, including energy and transportation contracts and equipment leases.

We cannot control the actions of our joint venture partners, especially when we have a minority interest in a joint venture. Further, in spite of performing customary due diligence prior to entering into a joint venture, we cannot guarantee full disclosure of prior acts or omissions of the sellers or those with whom we enter into joint ventures. Such risks could have a material adverse effect on the business, results of operations or financial condition of our joint venture interests.

***Our ability to collect payments from our customers depends on their creditworthiness.***

Our ability to receive payment for products sold and delivered to our customers depends on the creditworthiness of our customers. With respect to our Asia Pacific business unit, payment typically is received as the products are shipped and much of the product is secured by bank letters of credit. By contrast, in our U.S. Iron Ore business unit, generally, we deliver iron ore products to our customers' facilities in advance of payment for those products. Under this practice for our U.S. customers, title and risk of loss with respect to U.S. Iron Ore products does not pass to the customer until payment for the pellets is received; however, there is typically a period of time in which pellets, for which we have reserved title, are within our customers' control. Where we have identified credit risk with certain customers, we have put in place alternate payment terms from time to time.

Consolidations in some of the industries in which our customers operate have created larger customers. These factors have caused some customers to be less profitable and increased our exposure to credit risk. Customers in other countries may be subject to other pressures and uncertainties that may affect their ability to pay, including trade barriers, exchange controls, and local, economic and political conditions. Downturns in the economy and disruptions in the global financial markets in recent years have affected the creditworthiness of our customers from time to time. Some of our customers are highly leveraged. If economic conditions worsen or prolonged global, national or regional economic recession conditions return, it is likely to impact significantly the creditworthiness of our customers and could, in turn, increase the risk we bear on payment default for the credit we provide to our customers and could limit our ability to collect receivables. Failure to receive payment from our customers for products that we have delivered could affect adversely our results of operations, financial condition and liquidity.

23

***Our operating expenses could increase significantly if the price of electrical power, fuel or other energy sources increases.***

Our mining operations require significant use of energy. Operating expenses at all of our mining locations are sensitive to changes in electricity prices and fuel prices, including diesel fuel and natural gas prices. These items make up approximately 25% to 30% in the aggregate of our operating costs in our U.S. Iron Ore locations, for example. Prices for electricity, natural gas and fuel oils can fluctuate widely with availability and demand levels from other users. During periods of peak usage, supplies of energy may be curtailed and we may not be able to purchase them at historical rates. A disruption in the transmission of energy, inadequate energy transmission infrastructure, or the termination of any of our energy supply contracts could interrupt our energy supply and affect adversely our operations. While we have some long-term contracts with electrical suppliers, we are exposed to fluctuations in energy costs that can affect our production costs. As an example, our mines in Minnesota are subject to changes in Minnesota Power's rates, such as rate changes that are reviewed and approved by the state public utilities commission in response to an application filed by Minnesota Power. We also enter into market-based pricing supply contracts for natural gas and diesel fuel for use in our operations. Those contracts expose us to price increases in energy costs, which could cause our profitability to decrease significantly. We are estimating that power rates for our electricity-intensive operations could increase above 2016 levels by up to 15% by 2021, representing an increase of approximately $9 per MWh by 2021 for our U.S. operations.

In addition, U.S. public utilities are expected to pass through additional capital and operating cost increases to their customers related to new or pending U.S. environmental regulations that are expected to require significant capital investment and use of cleaner fuels in the future and which may impact U.S. coal-fired generation capacity. Our mines in Michigan rely on electricity supplied from the Presque Isle Power Plant, which is coal-fired. In 2016, we entered into a twenty-year power purchase agreement that contemplates the capital investment by the power company to construct two natural gas power plants in Michigan. Should the power company fail to build the new power plants or experience significant construction delays, we may be subject to increased operational risk from continued reliance on the existing power plant or increased costs in pursuing alternatives, which could also decrease our profitability.

***The availability of capital may be limited.***

We may need to access the capital markets to finance ongoing operations, any acquisitions, development of existing mining properties and our other cash requirements. Our existing indebtedness could make it more difficult for us to borrow money in the future and may reduce the amount of money available to finance our operations and other business activities and may have other detrimental consequences, including the following: requiring us to dedicate a substantial portion of our cash flow from operations to the payment of principal, premium, if any, and interest on our debt, which will reduce funds available for other purposes; exposing us to the risk of increased interest costs if the underlying interest rates rise on our existing ABL Facility; making it more difficult to obtain surety bonds, letters of credit or other financing, particularly during periods in which credit markets are weak; causing a change in our credit ratings; limiting our ability to compete with companies that are not as leveraged and that may be better positioned to withstand economic downturns; and limiting our flexibility in planning for, or reacting to, and increasing our vulnerability to, changes in our business, the industry in which we compete and general economic and market conditions. If we further increase our indebtedness, the related risks that we now face, including those described above, could intensify. We cannot predict the general availability or accessibility of capital to finance projects or acquisitions in the future.

***We are subject to a variety of financial market risks.***

Financial market risks include those caused by changes in the value of investments, changes in commodity prices, interest rates and foreign currency exchange rates. We have established policies and procedures to manage such risks; however, certain risks are beyond our control and our efforts to mitigate such risks may not be effective. These factors could have a material adverse effect on our results of operations.

A005105

***We are subject to bankruptcy or insolvency risks relating to our former Canadian operations.***

As previously disclosed, the Bloom Lake Group commenced the CCAA process in January 2015 to address the Bloom Lake Group's immediate liquidity issues and to preserve and protect its assets for the benefit of all stakeholders while restructuring and/or sale options were explored. In May 2015, the Wabush Group commenced restructuring proceedings and, as a result, the CCAA protection granted to the Bloom Lake Group has been extended to include the Wabush Group. Financial instruments are posted by Cliffs to support certain reclamation obligations of the Wabush Group. It is possible that (a) as part of the CCAA process (i) claims may be asserted by or on behalf of the Bloom Lake Group or the Wabush Group or by their respective representatives against non-debtor affiliates of the Bloom Lake Group and the Wabush Group and/or (ii) claims of non-debtor affiliates against the Bloom Lake Group or the Wabush Group may be challenged and (b) creditors of the Wabush Group may assert claims which may impact adversely non-debtor affiliates of the Wabush Group, including in relation to the financial instruments discussed above. While we anticipate the restructuring and/or sale of the Bloom Lake Group and the Wabush Group assets may mitigate these risks, to the extent that any claims are successful, Cliffs could be held liable for certain claims or be limited in the amount of recovery for intercompany claims.

***A court or regulatory body could find that we are responsible, in whole or in part, for liabilities we transferred to third party purchasers.***

As part of our strategy to focus on our U.S. Iron Ore operations, we have sold or otherwise disposed of several non-core assets, such as our North American Coal assets. Some of the transactions under which we sold or otherwise disposed of our non-core assets included provisions transferring certain liabilities to the purchasers or acquirers of those non-core assets. While we believe that all such transfers were completed properly and are legally binding, if the purchaser fails to fulfill its obligations, we may be at risk that some court or regulatory body could disagree and determine that we remain responsible for liabilities we intended to and did transfer.

***Changes in credit ratings issued by nationally recognized statistical rating organizations could adversely affect our cost of financing and the market price of our securities.***

Credit rating agencies could downgrade our ratings either due to factors specific to our business, a prolonged cyclical downturn in the mining industry, or macroeconomic trends (such as global or regional recessions) and trends in credit and capital markets more generally. Any decline in our credit ratings may result in an increase to our cost of financing and limit our access to the capital markets, which would harm our financial condition and results of operations, hinder our ability to refinance existing indebtedness on acceptable terms, have an adverse effect on the market price of our securities and may affect adversely the terms under which we purchase goods and services.

IV.    OPERATIONAL
       RISKS

***We incur certain costs when production capacity is idled, including increased costs to resume production at idled facilities and costs to idle facilities.***

Our decisions concerning which mines to operate and at what capacity levels are made based upon our customers' orders for products, the quality of and cost to mine and process the remaining ore body, as well as the capabilities and cost performance of our mines. During depressed market conditions, we may concentrate production at certain mines and not operate others in response to customer demand and as a result we will incur idle facility costs. In 2016, two of our Minnesota mines were temporarily idled for a portion of the year and we indefinitely idled the Empire mine in Michigan in August.

When we restart idled facilities, we incur certain costs to replenish inventories, prepare the previously idled facilities for operation, perform the required repair and maintenance activities and prepare employees to return to work safely and to resume production responsibilities. The amount of any such costs can be material, depending on a variety of factors, such as the period of idle time, necessary repairs and available employees, and is difficult to project.

Faced with overcapacity in the iron ore market, we may seek to rationalize assets through asset sales, temporary shutdowns, indefinite idles or closures of facilities.

A005106

***Mine closures entail substantial costs. If we prematurely close one or more of our mines, our results of operations and financial condition would likely be affected adversely.***

If we prematurely close any of our mines, our revenues would be reduced unless we were able to increase production at our other mines, which may not be possible. The closure of a mining operation involves significant fixed closure costs, including accelerated employment legacy costs, severance-related obligations, reclamation and other environmental costs, and the costs of terminating long-term obligations, including customer, energy and transportation contracts and equipment leases. We base our assumptions regarding the life of our mines on detailed studies we perform from time to time, but those studies and assumptions are subject to uncertainties and estimates that may not be accurate. We recognize the costs of reclaiming open pits, stockpiles, tailings ponds, roads and other mining support areas based on the estimated mining life of our property. If we were to significantly reduce the estimated life of any of our mines, the mine-closure costs would be applied to a shorter period of production, which would increase costs per ton produced and could significantly and adversely affect our results of operations and financial condition.

A North American mine permanent closure could accelerate and significantly increase employment legacy costs, including our expense and funding costs for pension and other postretirement benefit obligations. A number of employees would be eligible for immediate retirement under special eligibility rules that apply upon a mine closure. All employees eligible for immediate retirement under the pension plans at the time of the permanent mine closure also could be eligible for postretirement health and life insurance benefits, thereby accelerating our obligation to provide these benefits. Certain mine closures would precipitate a pension closure liability significantly greater than an ongoing operation liability. Finally, a permanent mine closure could trigger severance-related obligations, which can equal up to sixteen weeks of pay per employee in some jurisdictions, depending on length of service. As a result, the closure of one or more of our mines could adversely affect our financial condition and results of operations.

At the end of March 2014, we idled our Wabush Scully mine in Newfoundland and Labrador, and in the fourth quarter of 2014, we began to implement the permanent closure plan for the mine. In May 2015, we announced the Wabush Filing under the CCAA. The Wabush Filing is expected to mitigate various legacy related long-term liabilities associated with the Wabush Group. However, there can be no assurance that we will not have any material obligations in connection with the permanent closure of the Wabush Scully mine.

***Our sales and competitive position depend on the ability to transport our products to our customers at competitive rates and in a timely manner.***

In our U.S. Iron Ore operations, disruption of the lake and rail transportation services because of weather-related problems, including ice and winter weather conditions on the Great Lakes or St. Lawrence Seaway, climate change, strikes, lock-outs, or other events and lack of alternative transportation options, could impair our ability to supply iron ore to our customers at competitive rates or in a timely manner and, thus, could adversely affect our sales, margins and profitability. Further, reduced dredging and environmental changes, particularly at Great Lakes ports, could impact negatively our ability to move our iron ore products because lower water levels restrict the tonnage that vessels can haul, resulting in higher freight rates.

Our Asia Pacific Iron Ore operations also are dependent upon rail and port capacity. Disruptions in rail service or availability of dock capacity could similarly impair our ability to supply iron ore to our customers, thereby adversely affecting our sales and profitability. In addition, our Asia Pacific Iron Ore operations are also in direct competition with the major world seaborne exporters of iron ore and our customers face higher transportation costs than most other Australian producers to ship our products to the Asian markets because of the location of our major shipping port on the southwest coast of Australia. Further, increases in transportation costs, including volatile fuel rates, decreased availability of ocean vessels or changes in such costs relative to transportation costs incurred by our competitors could make our products less competitive, restrict our access to certain markets and have an adverse effect on our sales, margins and profitability.

***Natural disasters, weather conditions, disruption of energy, unanticipated geological conditions, equipment failures, and other unexpected events may lead our customers, our suppliers or our facilities to curtail production or shut down operations.***

Operating levels within the mining industry are subject to unexpected conditions and events that are beyond the industry's control. Those events could cause industry members or their suppliers to curtail production or shut down a portion or all of their operations, which could reduce the demand for our iron ore products, and could affect adversely our sales, margins and profitability.

Interruptions in production capabilities inevitably will increase our production costs and reduce our profitability. We do not have meaningful excess capacity for current production needs, and we are not able to quickly increase

Table of Contents

production or re-start production at one mine to offset an interruption in production at another mine. Additionally, re-start production costs can be even higher if required to be taken during extremely cold weather conditions.

A portion of our production costs are fixed regardless of current operating levels. As noted, our operating levels are subject to conditions beyond our control that can delay deliveries or increase the cost of mining at particular mines for varying lengths of time. These include weather conditions (for example, extreme winter weather, tornadoes, floods, and the lack of availability of process water due to drought) and natural and man-made disasters, tailings dam failures, pit wall failures, unanticipated geological conditions, including variations in the amount of rock and soil overlying the deposits of iron ore, variations in rock and other natural materials and variations in geologic conditions and ore processing changes.

The manufacturing processes that take place in our mining operations, as well as in our processing facilities, depend on critical pieces of equipment. This equipment may, on occasion, be out of service because of unanticipated failures. In addition, all of our mines and processing facilities have been in operation for several decades, and the equipment is aged. In the future, we may experience additional material plant shutdowns or periods of reduced production because of equipment failures. Further, remediation of any interruption in production capability may require us to make large capital expenditures that could have a negative effect on our profitability and cash flows. Our business interruption insurance would not cover all of the lost revenues associated with equipment failures. Longer-term business disruptions could result in a loss of customers, which adversely could affect our future sales levels and, therefore, our profitability.

Regarding the impact of unexpected events happening to our suppliers, many of our mines are dependent on one source for electric power and for natural gas. A significant interruption in service from our energy suppliers due to terrorism or sabotage, weather conditions, natural disasters, or any other cause can result in substantial losses that may not be fully recoverable, either from our business interruption insurance or responsible third parties.

***We may not have adequate insurance coverage for some business risks.***

As noted above, our operations are generally subject to a number of hazards and risks, which could result in damage to, or destruction of, equipment, properties or facilities. The insurance that we maintain to address risks that are typical in our business may not provide adequate coverage. Insurance against some risks, such as liabilities for environmental pollution, tailings basin breaches, or certain hazards or interruption of certain business activities, may not be available at an economically reasonable cost, or at all. Even if available, we may self-insure where we determine it is most cost-effective to do so. As a result, accidents or other negative developments involving our mining, production or transportation activities could have a material adverse effect on our operations.

***Failures in our information technology systems may interfere with the normal functioning of our business.***

We rely on information technology ("IT") systems for the operations of many of our business processes. Failures of our IT systems, whether caused maliciously or inadvertently, may result in the disruption of our business processes, or in the unauthorized release of sensitive, confidential or otherwise protected information or result in the corruption of data. Though we have controls in place, we cannot provide assurance that a cyber-attack will not occur.

***We are subject to risks involving operations and sales in multiple countries.***

We supply raw materials to the global integrated steel industry with substantial assets located outside of the U.S. We conduct operations in the U.S. and Australia. As such, we are subject to additional risks beyond those relating to our U.S. operations, such as fluctuations in currency exchange rates; potentially adverse tax consequences due to overlapping or differing tax structures; burdens to comply with multiple and potentially conflicting foreign laws and regulations, including export requirements, tariffs, economic sanctions and other barriers, environmental health and safety requirements, and unexpected changes in any of these laws and regulations; the imposition of duties, tariffs, import and export controls and other trade barriers impacting the seaborne iron ore markets; difficulties in staffing and managing multi-national operations; political and economic instability and disruptions, including terrorist attacks; disadvantages of competing against companies from countries that are not subject to U.S. laws and regulations, including the Foreign Corrupt Practices Act; and uncertainties in the enforcement of legal rights and remedies in multiple jurisdictions.

With the finalization of the Organization for Economic Cooperation and Development's, or OECD's, Base Erosion and Profit Shifting study, referred to as the Actions, many OECD countries have acknowledged their intent to implement the Actions and update their local tax regulations. The extent (if any) to which countries in which we operate adopt and implement the Actions could affect our effective tax rate and our future results from non-U.S. operations.

Compliance with the laws and regulations described above or with other applicable foreign, federal, state, provincial and local laws and regulations currently in effect or that may be adopted in the future could expose us to additional risks. If we are unable to manage successfully the risks associated with operating our global business, these risks could have a material adverse effect on our business, results of operations or financial condition.

***Our profitability could be affected adversely by the failure of outside contractors to perform.***

Asia Pacific Iron Ore uses contractors to handle many of the operational phases of its mining and processing operations and, therefore, we are subject to the performance of outside companies on key production areas. We use contractors to help complete certain capital projects, such as development of the Mustang pellet, and a contractor's failure to perform could affect adversely our sales and our ability to fulfill customer requirements. A failure of any of these contractors to perform in a significant way would result in additional costs for us, which also could affect adversely our production rates and results of operations.

## V.    DEVELOPMENT    AND    SUSTAINABILITY RISKS

***The cost and time to implement a strategic capital project may prove to be greater than originally anticipated.***

We undertake strategic capital projects in order to enhance, expand or upgrade our mines and production capabilities. Our ability to achieve the anticipated volumes of production, revenues or otherwise realize acceptable returns on strategic capital projects that we may undertake is subject to a number of risks, many of which are beyond our control, including a variety of market (such as a volatile pricing environment for iron ore), operational, permitting and labor-related factors. Further, the cost to implement any given strategic capital project ultimately may prove to be greater and may take more time than originally anticipated. Inability to achieve the anticipated results from the implementation of our strategic capital projects, or the incurring of unanticipated implementation costs, penalties or inability to meet contractual obligations could affect adversely our results of operations and future earnings and cash flow generation.

***We continually must replace reserves depleted by production. Exploration activities may not result in additional discoveries.***

Our ability to replenish our ore reserves is important to our long-term viability. Depleted ore reserves must be replaced by further delineation of existing ore bodies or by locating new deposits in order to maintain production levels over the long term. Resource exploration and development are highly speculative in nature. Exploration projects involve many risks, require substantial expenditures and may not result in the discovery of sufficient additional mineral deposits that can be mined profitably. Once a site with mineralization is discovered, it may take several years from the initial phases of drilling until production is possible, during which time the economic feasibility of production may change. Substantial expenditures are required to establish recoverable proven and probable reserves and to construct mining and processing facilities. As a result, there is no assurance that current or future exploration programs will be successful and there is a risk that depletion of reserves will not be offset by discoveries or acquisitions. Given recent market conditions, we significantly curtailed expenditures related to exploration at or near our mine sites in the U.S. and Australia.

***We rely on estimates of our recoverable reserves, which is complex due to geological characteristics of the properties and the number of assumptions made.***

We regularly evaluate our iron ore reserves based on revenues and costs and update them as required in accordance with SEC Industry Guide 7 and, historically, the Canadian Institute of Mining, Metallurgy & Petroleum's Definition Standards on Mineral Resources and Mineral Reserves. In addition, our Asia Pacific Iron Ore business segment has published reserves that follow the Joint Ore Reserve Code in Australia, with certain changes to our Western Australian reserve values to make them comply with SEC requirements. There are numerous uncertainties inherent in estimating quantities of reserves of our mines, including many factors beyond our control.

Estimates of reserves and future net cash flows necessarily depend upon a number of variable factors and assumptions, such as production capacity, effects of regulations by governmental agencies, future prices for iron ore, future industry conditions and operating costs, severance and excise taxes, development costs and costs of extraction and reclamation, all of which may vary considerably from actual results. Estimating the quantity and grade of reserves requires us to determine the size, shape and depth of our mineral bodies by analyzing geological data, such as samplings of drill holes. In addition to the geology assumptions of our mines, assumptions are also required to determine the economic feasibility of mining these reserves, including estimates of future commodity prices and demand, the mining methods we use, and the related costs incurred to develop and mine our reserves. For these reasons, estimates of the economically recoverable quantities of mineralized deposits attributable to any particular group of properties, classifications of such reserves based on risk of recovery and estimates of future net cash flows prepared by different engineers or by the same engineers at different times may vary substantially as the criteria change. Estimated ore

28

reserves could be affected by future industry conditions, future changes in the SEC's mining property disclosure requirements, geological conditions and ongoing mine planning. Actual volume and grade of reserves recovered, production rates, revenues and expenditures with respect to our reserves will likely vary from estimates, and if such variances are material, our sales and profitability could be affected adversely.

***Defects in title or loss of any leasehold interests in our properties could limit our ability to mine these properties or result in significant unanticipated costs.***

A portion of our mining operations are conducted on properties we lease, license or as to which we have easements or other possessory interests, which we refer to as "leased properties". Consistent with industry practice, title to most of these leased properties and mineral rights are not usually verified until we make a commitment to develop a property, which may not occur until after we have obtained necessary permits and completed exploration of the leased property. In some cases, title with respect to leased properties is not verified at all because we instead rely on title information or representations and warranties provided by lessors or grantors. We do not maintain title insurance on our owned or leased properties. A title defect or the loss of any lease, license or easement for any leased property could affect adversely our ability to mine any associated reserves. In addition, from time to time the rights of third parties for competing uses of adjacent, overlying, or underlying lands such as for roads, easements and public facilities may affect our ability to operate as planned if our title is not superior or arrangements cannot be negotiated.

Any challenge to our title could delay the exploration and development of some reserves, deposits or surface rights, cause us to incur unanticipated costs and could ultimately result in the loss of some or all of our interest in those reserves or surface rights. In the event we lose reserves, deposits or surface rights, we may have to shut down or significantly alter the sequence of our mining operations, which may affect adversely our future production, revenues and cash flows. Additionally, if we lose any leasehold interests relating to any of our pellet plants or loadout facilities, we may need to find an alternative location to process our iron ore and load it for delivery to customers, which could result in significant unanticipated costs. Finally, we could incur significant liability if we inadvertently mine on property we do not own or lease.

***In order to continue to foster growth in our business and maintain stability of our earnings, we must maintain our social license to operate with our stakeholders.***

As a mining company, maintaining a strong reputation and consistent operational and safety history is vital in order to continue to foster growth and maintain stability in our earnings. As sustainability expectations increase and regulatory requirements continue to evolve, maintaining our social license to operate becomes increasingly important. We incorporate social license expectations in our ERM program. Our ability to maintain our reputation and strong operating history could be threatened, including by circumstances outside of our control, such as disasters caused or suffered by other mining companies. If we are not able to respond effectively to these and other challenges to our social license to operate, our reputation could be damaged significantly. Damage to our reputation could affect adversely our operations and ability to foster growth in our company.

***Estimates and timelines relating to new development projects are uncertain and we may incur higher costs and lower economic returns than estimated.***

Mining industry development projects typically require a number of years and significant expenditures before production is possible. Such projects could experience unexpected problems and delays during development, construction and start-up.

Our decision to develop a project typically is based on the results of feasibility studies, which estimate the anticipated economic returns of a project. The actual project profitability or economic feasibility may differ from such estimates as a result of any of the following factors, among others: changes in tonnage, grades and metallurgical characteristics of ore or other raw materials to be mined and processed; estimated future prices of the relevant product; changes in customer demand; higher construction and infrastructure costs; the quality of the data on which engineering assumptions were made; higher production costs; adverse geotechnical conditions; availability of adequate labor force; availability and cost of water and energy; availability and cost of transportation; fluctuations in inflation and currency exchange rates; availability and terms of financing; delays in obtaining environmental or other government permits or changes in laws and regulations including environmental laws and regulations; weather or severe climate impacts; and potential delays relating to social and community issues.

*Our ability to realize the benefits of any potential acquisitions is uncertain.*

Should we determine to pursue any acquisitions, the success of the same is subject to risks and uncertainties, including our ability to realize operating efficiencies expected from an acquisition; the size or quality of the mineral potential; delays in realizing the benefits of an acquisition; difficulties in retaining key employees, customers or suppliers of the acquired business; the risks associated with the assumption of contingent or undisclosed liabilities of acquisition targets; the impact of changes to our allocation of purchase price; and the ability to generate future cash flows or the availability of financing.

Moreover, any acquisition opportunities we pursue could affect materially our liquidity and capital resources and may require us to incur indebtedness, seek equity capital or both. Future acquisitions could also result in us assuming more long-term liabilities relative to the value of the acquired assets than we may have assumed in previous acquisitions.

VI.   **HUMAN CAPITAL RISKS**

*Our profitability could be affected adversely if we fail to maintain satisfactory labor relations.*

Production in our mines is dependent upon the efforts of our employees. We are party to labor agreements with various labor unions that represent employees at our operations. Such labor agreements are negotiated periodically, and, therefore, we are subject to the risk that these agreements may not be able to be renewed on reasonably satisfactory terms. It is difficult to predict what issues may arise as part of the collective bargaining process, and whether negotiations concerning these issues will be successful. Due to union activities or other employee actions, we could experience labor disputes, work stoppages, or other disruptions in our production of iron ore that could affect us adversely. The USW represents all labor employees at our U.S. Iron Ore operations owned and/or managed by Cliffs or its subsidiary companies except for Northshore. Our labor agreements with the USW at four of our U.S. Iron Ore operations were ratified in September 2016 and extend for a three-year term, effective as of October 1, 2015.

If we enter into a new labor agreement with any union that significantly increases our labor costs relative to our competitors or fail to come to an agreement upon expiry, our ability to compete may be materially and adversely affected.

*We may encounter labor shortages for critical operational positions, which could affect adversely our ability to produce our products.*

We are predicting a long-term shortage of skilled workers for the mining industry and competition for the available workers limits our ability to attract and retain employees. Additionally, at our U.S. mining locations, many of our mining operational employees are approaching retirement age. As these experienced employees retire, we may have difficulty replacing them at competitive wages.

*Our expenditures for post-retirement benefit and pension obligations could be materially higher than we have predicted if our underlying assumptions differ from actual outcomes, there are mine closures, or our joint venture partners fail to perform their obligations that relate to employee pension plans.*

We provide defined benefit pension plans and OPEB to certain eligible union and non-union employees in the U.S., including our share of expense and funding obligations with respect to unconsolidated ventures. Our pension expense and our required contributions to our pension plans are affected directly by the value of plan assets, the projected and actual rate of return on plan assets, and the actuarial assumptions we use to measure our defined benefit pension plan obligations, including the rate at which future obligations are discounted.

We cannot predict whether changing market or economic conditions, regulatory changes or other factors will increase our pension expenses or our funding obligations, diverting funds we would otherwise apply to other uses.

We have calculated our unfunded pension and OPEB obligations based on a number of assumptions. If our assumptions do not materialize as expected, cash expenditures and costs that we incur could be materially higher. Moreover, we cannot be certain that regulatory changes will not increase our obligations to provide these or additional benefits. These obligations also may increase substantially in the event of adverse medical cost trends or unexpected rates of early retirement, particularly for bargaining unit retirees.

30

***We depend on our senior management team and other key employees, and the loss of these employees could adversely affect our business.***

Our success depends in part on our ability to attract and motivate our senior management and key employees. Achieving this objective may be difficult due to a variety of factors, including fluctuations in the global economic and industry conditions, competitors' hiring practices, cost reduction activities, and the effectiveness of our compensation programs. Competition for qualified personnel can be intense. We must continue to recruit, retain, and motivate our senior management and key personnel in order to maintain our business and support our projects. A loss of senior management and key personnel could prevent us from capitalizing on business opportunities, and our operating results could be adversely affected.

**Item 1B.**          ***Unresolved Staff Comments***

We have no unresolved comments from the SEC.

31

A005112

Table of Contents

**Item 2.**    *Properties*

The following map shows the locations of our operations and offices as of  December 31, 2016:



**General Information about the Mines**

All of our iron ore mining operations are open-pit mines. Additional pit development is underway as required by long-range mine plans. At our U.S. Iron Ore and Asia Pacific Iron Ore mines, drilling programs are conducted periodically to collect modeling data and for refining ongoing operations.

Geologic models are developed for all mines to define the major ore and waste rock types. Computerized block models for iron ore are constructed that include all relevant geologic and metallurgical data. These are used to generate grade and tonnage estimates, followed by detailed mine design and life of mine operating schedules.

*U.S. Iron Ore*

The following map shows the locations of our U.S. Iron Ore operations as of  December 31, 2016:



We currently own or co-own four operating iron ore mines and one indefinitely idled mine in Michigan and Minnesota from which we produced   16.0 million, 19.3 million and 22.4 million long tons of iron ore pellets in 2016, 2015 and 2014, respectively, for our account. We produced 7.4 million, 6.8 million and 7.3 million long tons, respectively, on behalf of the steel company partners of the mines.

32

Our U.S. Iron Ore mines produce from deposits located within the Biwabik and Negaunee Iron Formation, which are classified as Lake Superior type iron formations that formed under similar sedimentary conditions in shallow marine basins approximately two billion years ago. Magnetite and hematite are the predominant iron oxide ore minerals present, with lesser amounts of goethite and limonite. Quartz is the predominant waste mineral present, with lesser amounts of other chiefly iron bearing silicate and carbonate minerals. The ore minerals liberate from the waste minerals upon fine grinding.

| Mine | Cliffs Ownership | Infrastructure | Mineralization | Operating Since | Current Annual Capacity[1,2] | 2016 Production[1,2] | Mineral Owned | Rights Leased |
|---|---|---|---|---|---|---|---|---|
| Empire[3] | 79% | Mine, Concentrator, Pelletizer | Magnetite | 1963 | * | 2.8 | 53% | 47% |
| Tilden | 85% | Mine, Concentrator, Pelletizer, Railroad | Hematite & Magnetite | 1974 | 8.0 | 7.6 | 100% | —% |
| Hibbing | 23% | Mine, Concentrator, Pelletizer | Magnetite | 1976 | 8.0 | 8.2 | 3% | 97% |
| Northshore | 100% | Mine, Concentrator, Pelletizer, Railroad | Magnetite | 1990 | 6.0 | 3.2 | —% | 100% |
| United Taconite | 100% | Mine, Concentrator, Pelletizer | Magnetite | 1965 | 5.4 | 1.5 | —% | 100% |

[1] Reported on a wet basis in millions of long tons, equivalent to 2,240 pounds.

[2] Figures reported on 100% basis.

[3] Empire was indefinitely idled beginning on August 3, 2016.

* Historically, Empire had an annual capacity of 5.5 million long tons; currently indefinitely idled.

*Empire Mine*

The Empire mine is located on the Marquette Iron Range in Michigan's Upper Peninsula approximately 15 miles southwest of Marquette, Michigan. The Empire mine has produced between 2.8 million and 4.3 million long tons of iron ore pellets annually over the past five years. Of the total long tons of iron ore pellets produced by Empire from 2012 to 2015, between 0.8 million and 2.4 million long tons were tolled to Tilden mine annually. Empire did not toll tons to Tilden during 2016. Empire was indefinitely idled beginning on August 3, 2016. We plan to continue shipping Empire's remaining pellet inventory into 2017.

We own 79% of Empire and a subsidiary of ArcelorMittal USA has the remaining   21% ownership in Empire with limited rights and obligations, which it has a unilateral right to put to us at any time. This right has not been exercised. Prior to the indefinite idle, each partner took its share of production pro rata; however, provisions in the partnership agreement allowed additional or reduced production to be delivered under certain circumstances. As part of a 2014 extension agreement between us and ArcelorMittal, which amended certain terms of the partnership agreement, certain minimum distributions of the partners' equity amounts are required to be made on a quarterly basis beginning in the first quarter of 2015 and continued through January 2017. The partnership dissolved on December 31, 2016 and the partners are in discussion regarding distribution of the remaining assets and/or equity interest, if any, in the partnership. Prior to the indefinite idle, operations consisted of an open pit truck and shovel mine, a concentrator that utilizes single stage crushing, AG mills, magnetic separation and floatation to produce a magnetite concentrate that is then supplied to the on-site pellet plant. From the site, pellets were transported by CN rail to a ship loading port at Escanaba, Michigan, operated by CN.

*Tilden Mine*

The Tilden mine is located on the Marquette Iron Range in Michigan's Upper Peninsula approximately five miles south of Ishpeming, Michigan. Over the past five years, the Tilden mine has produced between 7.5 million and 7.6 million long tons of iron ore pellets annually. We own 85% of Tilden, with the remaining minority interest owned by a subsidiary of U.S. Steel. Each partner takes its share of production pro rata; however, provisions in the partnership agreement allow additional or reduced production to be delivered under certain circumstances. We own all of the ore reserves at the Tilden mine and lease them to Tilden. Operations consist of an open pit truck and shovel mine, a concentrator that utilizes single stage crushing, AG mills, magnetite separation and floatation to produce hematite and magnetic concentrates that are then supplied to the on-site pellet plant. From the site, pellets are transported by Cliffs' LS&I rail to a ship loading port at Marquette, Michigan, operated by Cliffs' LS&I.

*Hibbing Mine*

The Hibbing mine is located in the center of Minnesota's Mesabi Iron Range and is approximately ten miles north of Hibbing, Minnesota and five miles west of Chisholm, Minnesota. Over the past five years, the Hibbing mine has produced between 7.7 million and 8.2 million long tons of iron ore pellets annually. We own 23% of Hibbing, a subsidiary of ArcelorMittal has a 62.3% interest and a subsidiary of U.S. Steel has a 14.7% interest. Each partner takes its share of production pro rata; however, provisions in the joint venture agreement allow additional or reduced production to be delivered under certain circumstances. Mining is conducted on multiple mineral leases having varying expiration dates. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates. Hibbing operations consist of an open pit truck and shovel mine, a concentrator that utilizes single stage crushing, AG mills and magnetic separation to produce a magnetite concentrate, which is then delivered to an on-site pellet plant. From the site, pellets are transported by BNSF rail to a ship loading port at Superior, Wisconsin, operated by BNSF.

*Northshore Mine*

The Northshore mine is located in northeastern Minnesota, approximately two miles south of Babbitt, Minnesota, on the northeastern end of the Mesabi Iron Range. Northshore's processing facilities are located in Silver Bay, Minnesota, near Lake Superior. Over the past five years, the Northshore mine has produced between 3.2 million and 5.3 million long tons of iron ore pellets annually. One of the four furnaces in the Northshore pellet plant was idled in January 2015. We ran a three furnace operation throughout 2015 until the complete idle of Northshore mine in late November 2015 through May 2016. We restarted all four furnaces in May 2016. The temporary idle was a result of historic levels of steel imports into the U.S. and reduced demand from our steel-producing customers.

The Northshore mine began production under our management and ownership on October 1, 1994. We own 100% of the mine. Mining is conducted on multiple mineral leases having varying expiration dates. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates. Northshore operations consist of an open pit truck and shovel mine where two stages of crushing occur before the ore is transported along a wholly owned 47-mile rail line to the plant site in Silver Bay. At the plant site, two additional stages of crushing occur before the ore is sent to the concentrator. The concentrator utilizes rod mills and magnetic separation to produce a magnetite concentrate, which is delivered to the pellet plant located on-site. The plant site has its own ship loading port located on Lake Superior.

*United Taconite Mine*

The United Taconite mine is located on Minnesota's Mesabi Iron Range in and around the city of Eveleth, Minnesota. The United Taconite concentrator and pelletizing facilities are located ten miles south of the mine, near the town of Forbes, Minnesota. Over the past five years, the United Taconite mine has produced between 1.5 million and 5.4 million long tons of iron ore pellets annually. United Taconite was temporarily idled beginning the first week of August 2015. We restarted the United Taconite operation during August 2016. The temporary idle was a result of historic levels of steel imports into the U.S. and reduced demand from our steel-producing customers.

We own 100% of the United Taconite mine. Mining is conducted on multiple mineral leases having varying expiration dates. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates. United Taconite operations consist of an open pit truck and shovel mine where two stages of crushing occur before the ore is transported by rail, operated by CN, to the plant site. At the plant site an additional stage of crushing occurs before the ore is sent to the concentrator. The concentrator utilizes rod mills and magnetic separation to produce a magnetite concentrate, which is delivered to the pellet plant. From the site, pellets are transported by CN rail to a ship loading port at Duluth, Minnesota, operated by CN.

34

Table of Contents
Case 17-51210-CTG    Doc 867    Filed 11/17/23    Page 962 of 2524

**Asia Pacific Iron Ore**

The following map shows the location of our Asia Pacific Iron Ore operation as of  December 31, 2016:



In Australia, we own and operate the Koolyanobbing operations. We produced 11.8 million, 11.7 million and 11.4 million metric tons of iron ore products in 2016, 2015 and 2014, respectively.

The mineralization at the Koolyanobbing operations is predominantly hematite and goethite replacements in greenstone-hosted banded iron formations. Individual deposits tend to be small with complex ore-waste contact relationships. The reserves at the Koolyanobbing operations are derived from 10 separate mineral deposits distributed over a 70 mile operating radius.

| Mine | Cliffs Ownership | Infrastructure | Mineralization | Operating Since | Current Annual Capacity[1] | 2016 Production[1] | Mineral Owned | Rights Leased |
|------|-----------------|----------------|----------------|-----------------|----------------------------|--------------------|---------------|---------------|
| Koolyanobbing | 100% | Mine, Road Haulage, Crushing-Screening Plant | Hematite & Goethite | 1994 | 11.0 | 11.8 | —% | 100% |

[1] Reported on a wet basis in millions of metric tons, equivalent to 2,205 pounds.

*Koolyanobbing*

The Koolyanobbing operations are located 250 miles east of Perth and approximately 30 miles northeast of the town of Southern Cross. Koolyanobbing produces lump and fines iron ore. Mining is conducted on multiple mineral leases having varying expiration dates. Mining leases routinely are renewed as they approach their respective expiration dates.

Over the past five years, the Koolyanobbing operation has produced between 10.7 million and 11.8 million metric tons of iron ore products annually. During 2016, ore material was sourced from eight separate open pit mines and was delivered by typical production trucks or road trains to a crushing and screening facility located at Koolyanobbing. All of the ore from the Koolyanobbing operations is transported by rail to the Port of Esperance, 360 miles to the south, for shipment to Asian customers.

**Mineral Policy**

We have a corporate policy prescribing internal controls and procedures with respect to auditing and estimating of minerals. The procedures contained in the policy include the calculation of mineral estimates at each property by our engineers, geologists and accountants, as well as third-party consultants. Management compiles and reviews the calculations, and once finalized, such information is used to prepare the disclosures for our annual and quarterly reports. The disclosures are reviewed and approved by management, including our chief executive officer and chief financial officer. Additionally, the long-range mine planning and mineral estimates are reviewed annually by our Audit Committee. Furthermore, all changes to mineral estimates, other than those due to production, are adequately documented and submitted to senior operations officers for review and approval. Finally, periodic reviews of long-range mine plans and mineral reserve estimates are conducted at mine staff meetings, senior management meetings and by independent experts.

**Mineral Reserves**

Reserves are defined by SEC Industry Standard Guide 7 as that part of a mineral deposit that could be economically and legally extracted and produced at the time of the reserve determination. All reserves are classified as proven or probable and are supported by life-of-mine plans.

Reserve estimates are based on pricing that does not exceed the three-year trailing average index price of iron ore adjusted to our realized price. For the three-year period 2014 to 2016, the average international index price of Platts 62% Fe CFR China was $70 per dry metric ton.

We evaluate and analyze mineral reserve estimates in accordance with our mineral policy and SEC requirements. The table below identifies the year in which the latest reserve estimate was completed.

| Property | Date of Latest Economic Reserve Analysis |
|---|---|
| **U.S. Iron Ore** | |
| Tilden | 2015 |
| Hibbing | 2015 |
| Northshore | 2015 |
| United Taconite | 2016 |
| **Asia Pacific Iron Ore** | |
| Koolyanobbing | 2013 |

Ore reserve estimates for our iron ore mines as of  December 31, 2016 were estimated from fully designed open pits developed using three-dimensional modeling techniques. These fully designed pits incorporate design slopes, practical mining shapes and access ramps to assure the accuracy of our reserve estimates. A new reserve estimate was completed for our United Taconite operation in 2016. All other operations' reserves have been adjusted net of 2016 production.

Table of Contents

### U.S. Iron Ore

All tonnages reported for our U.S. Iron Ore operating segment are in long tons of 2,240 pounds, have been rounded to the nearest 100,000 and are reported on a 100% basis.

**U.S. Iron Ore Mineral Reserves**
**as of December 31, 2016**
**(In Millions of Long Tons)**

| Property | Cliffs Share | Proven | | Probable | | Proven & Probable | | Saleable Product[2,3] | | Previous Year | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Tonnage | % Grade | Tonnage | % Grade | Tonnage | % Grade[5] | Process Recovery[4] | Tonnage | P&P Crude Ore | Saleable Product |
| Empire | —% | — | — | — | — | — | — | —% | — | 8.6 | 3.2 |
| Tilden[1] | 85% | 285.1 | 34.7 | 82.7 | 33.9 | 367.8 | 34.5 | 37% | 136.3 | 389.1 | 143.6 |
| Hibbing | 23% | 208.3 | 19.5 | 24.7 | 19.6 | 233.0 | 19.5 | 27% | 61.7 | 263.2 | 69.7 |
| Northshore | 100% | 250.6 | 24.9 | 557.4 | 24.2 | 808.0 | 24.4 | 32% | 261.1 | 817.6 | 264.3 |
| United Taconite | 100% | 427.3 | 22.6 | 415.5 | 21.9 | 842.8 | 22.3 | 32% | 269.3 | 466.8 | 156.2 |
| **Totals** | | **1,171.3** | | **1,080.3** | | **2,251.6** | | | **728.4** | **1,945.3** | **637.0** |

[1] Tilden hematite reported grade is percent FeT; all other properties are percent magnetic iron

[2] Saleable product is a standard pellet containing 60% to 66% Fe calculated from both proven and probable mineral reserves

[3] Saleable product is reported on a dry basis; shipped products typically contain 1% to 4% moisture

[4] Process recovery includes all factors for converting crude ore tonnage to saleable product

[5] Cutoff grades are 15% magnetic iron for Hibbing and Empire, 17% for United Taconite, 19% for Northshore. Cutoff for Tilden hematite is 25% FeT

A new economic reserve estimate was completed for United Taconite in 2016. Based on this analysis, saleable product reserves increased by 115 million long tons as a result of an updated life-of-mine plan and production schedule that now include previously developed mine areas south of our current operations commonly referred to as the South Pit. This area had previously been considered as mineralized material until an economically scheduled mine plan was developed.

### Asia Pacific Iron Ore

All tonnages reported for our Asia Pacific Iron Ore operating segment are in metric tons of 2,205 pounds, have been rounded to the nearest 100,000 and are reported on a 100% basis.

**Asia Pacific Iron Ore Mineral Reserves**
**as of December 31, 2016**
**(In Millions of Metric Tons)[1]**

| Property | Cliffs Share | Proven | | Probable | | Proven & Probable | | Previous Year Total |
|---|---|---|---|---|---|---|---|---|
| | | Tonnage | % Fe | Tonnage | % Fe | Tonnage | % Fe[2] | Tonnage |
| Koolyanobbing | 100% | 1.7 | 57.2 | 41.0 | 59.6 | 42.7 | 59.5 | 49.1 |

[1] Tonnages reported are saleable product reported on a dry basis; shipped products contain approximately 5% moisture

[2] Cutoff grade is 54% FeT

**Item 3.    Legal Proceedings**

*Empire NPDES Permit Enforcement.* Empire received an enforcement letter on December 22, 2015 from the MDEQ alleging exceedances of the selenium effluent limit in 2014 and 2015. The alleged exceedances were resolved through an Administrative Consent Order which included payment of a civil penalty of $95,000.

*ERISA Litigation.* On May 14, 2015, a lawsuit was filed in the U.S. District Court for the Northern District of Ohio captioned Paul Saumer, individually and on behalf of all others similarly situated, v. Cliffs Natural Resources Inc. et al.,

No. 1:15-CV-00954. This action was purportedly brought on behalf of the Northshore and Silver Bay Power Company Retirement Savings Plan (the "Plan") and certain participants and beneficiaries of the Plan during the class period, defined in the complaint as April 2, 2012 to the present, against Cliffs Natural Resources Inc., its investment committee, Northshore, the Employee Benefits Administration Department of Northshore, and certain current and former officers. Plaintiff amended the complaint to name as defendants additional current and former employees who served on the investment committee. The suit alleges that the defendants breached their duties to the plaintiffs and the Plan in violation of ERISA fiduciary rules by, among other things, continuing to offer and hold Cliffs Natural Resources Inc. stock as a Plan investment option during the class period. The relief sought includes a request for a judgment ordering the defendants to make good to the Plan all losses to the Plan resulting from the alleged breaches of fiduciary duties. The lawsuit has been referred to our insurance carriers. On April 1, 2016, the Court granted defendants' motion to dismiss the lawsuit. Plaintiff filed an appeal, which is currently pending in the Sixth Circuit Court of Appeals.

*Exchange Offer Litigation.* On March 14, 2016, a putative class action was filed in the U.S. District Court for the Southern District of New York captioned Waxman et al. v. Cliffs Natural Resources Inc. , No. 1:16-cv-01899. Generally, the lawsuit alleges that the exchange offers for certain of our existing senior notes announced on January 27, 2016 violated the Trust Indenture Act of 1939 (the "TIA") and breached the indentures governing the senior notes subject to the exchange offers because the exchange offers were offered only to certain noteholders that were qualified institutional buyers ("QIBs") and not to non-QIBs. The suit seeks class certification with respect to non-QIB noteholders of the 5.90% Senior Notes due 2020 and the 6.25% Senior Notes due 2040 (collectively, the "Class Notes"), which QIBs were permitted to exchange for newly-issued 1.5 Lien Notes. Plaintiffs allege that the exchange offers had the effect of subordinating their Class Notes to those of the QIBs who elected to exchange their notes and also impaired the Plaintiffs' rights to receive payment of the principal and interest under the Class Notes and to institute suit to compel such payment. In addition to alleged violation of the TIA and breach of contract, Plaintiffs seek unspecified damages for breach of the implied covenant of good faith and fair dealing and unjust enrichment, and also seek declaratory judgment that the exchange offers are null and void. On May 16, 2016, we filed a motion to dismiss this lawsuit, which was granted on December 6, 2016.

*Michigan Electricity Matters.* See NOTE 20 - COMMITMENTS AND CONTINGENCIES included in *Item 8. Financial Statements and Supplementary Data* of this Annual Report on Form 10-K for a description of the FERC proceedings to determine, among other things, allocation of SSR costs, whether retroactive surcharges are permissible and the total amount of SSR compensation, all of which is currently subject to appeal. Such description is incorporated by reference into this Item 3.

*Taconite MACT Compliance Review.* EPA Region 5 issued Notices of Violation during the first quarter of 2014 to Empire, Tilden and United Taconite related to alleged historical violations of the Taconite MACT and certain elements of the respective state-issued Title V operating permits. Where not already resolved, the facilities continue to implement actions that limit or completely eliminate any future exposures. EPA has proposed, and Cliffs has agreed to, a tolling agreement which targets a completion of the enforcement action by June 2017. EPA is in the process of drafting final orders but has not yet indicated the scale of any penalty or additional injunctive relief that may be required as part of a final resolution. While the matter has been referred to the DOJ for enforcement, it is not anticipated currently to have a material adverse impact on our business.

### Item 4.        *Mine Safety Disclosures*

We are committed to protecting the occupational health and well-being of each of our employees. Safety is one of our core values, and we strive to ensure that safe production is the first priority for all employees. Our internal objective is to achieve zero injuries and incidents across the Company by focusing on proactively identifying needed prevention activities, establishing standards and evaluating performance to mitigate any potential loss to people, equipment, production and the environment. We have implemented intensive employee training that is geared toward maintaining a high level of awareness and knowledge of safety and health issues in the work environment through the development and coordination of requisite information, skills and attitudes. We believe that through these policies, we have developed an effective safety management system.

Under the Dodd-Frank Act, each operator of a coal or other mine is required to include certain mine safety results within its periodic reports filed with the SEC. As required by the reporting requirements included in §1503(a) of the Dodd-Frank Act and Item 104 of Regulation S-K, the required mine safety results regarding certain mining safety and health matters for each of our mine locations that are covered under the scope of the Dodd-Frank Act are included in Exhibit 95 of *Item 15. Exhibits and Financial Statement Schedules* of this Annual Report on Form 10-K.

Table of Contents

**PART II**

Item 5.    ***Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities***

**Stock Exchange Information**

Our common shares (ticker symbol CLF) are listed on the NYSE.

**Common Share Price Performance and Dividends**

The following table sets forth, for the periods indicated, the high and low sales prices per common share as reported on the NYSE:

|  | 2016 | | 2015 | |
|---|---|---|---|---|
|  | **High** | **Low** | High | Low |
| First Quarter | $    3.75 | $    1.20 | $    9.39 | $    4.12 |
| Second Quarter | 5.83 | 2.77 | 6.87 | 4.27 |
| Third Quarter | 8.45 | 5.19 | 4.53 | 2.28 |
| Fourth Quarter | 10.90 | 4.91 | 3.73 | 1.42 |
| Year | 10.90 | 1.20 | 9.39 | 1.42 |

At February 6, 2017, we had 1,240 shareholders of record.

We did not declare or pay any cash dividends on our common shares during the years ended December 31, 2016 or 2015. We do not anticipate paying any cash dividends on our common shares in the near future. Any determination to pay dividends on our common shares in the future will be at the discretion of our Board of Directors and dependent upon then-existing conditions, including our operating results and financial condition, capital requirements, contractual restrictions, business prospects and other factors that our Board of Directors may deem relevant. Additionally, the agreement governing our ABL Facility contains, and agreements governing any of our future debt may contain, covenants and other restrictions that, in certain circumstances, could limit the level of dividends that we are able to pay on our common shares. There can be no assurance that we will pay a dividend in the future.

39

Table of Contents

**Shareholder Return Performance**

The following graph shows changes over the past five-year period in the value of $100 invested in: (1) Cliffs' common shares; (2) S&P 500 Stock Index; (3) S&P Smallcap 600 Index; and (4) S&P Metals and Mining ETF Index. The values of each investment are based on price change plus reinvestment of all dividends reported to shareholders, based on monthly granularity.



Comparison of 5 Year Cumulative Total Return
Assumes Initial Investment of $100
December 2016

|  |  | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| **Cliffs Natural Resources Inc.** | Return % |  | -34.76 | -30.17 | -71.56 | -77.87 | **432.32** |
|  | Cum $ | 100.00 | 65.24 | 45.56 | 12.96 | 2.87 | **15.26** |
| **S&P 500 Index - Total Returns** | Return % |  | 15.98 | 32.36 | 13.69 | 1.38 | **11.93** |
|  | Cum $ | 100.00 | 115.98 | 153.51 | 174.52 | 176.93 | **198.04** |
| **S&P Smallcap 600 Index** | Return % |  | 16.30 | 41.29 | 5.73 | -2.00 | **26.43** |
|  | Cum $ | 100.00 | 116.00 | 164.32 | 173.74 | 170.26 | **215.26** |
| **S&P Metals and Mining ETF** | Return % |  | -6.60 | -5.37 | 9.77 | -50.51 | **105.99** |
|  | Cum $ | 100.00 | 93.40 | 88.38 | 97.02 | 48.01 | **98.90** |

40

A005121

Table of Contents

**Issuer Purchases of Equity Securities**

The following table presents information with respect to repurchases by us of our common shares during the periods indicated.

**ISSUER PURCHASES OF EQUITY SECURITIES**

| Period | Total Number of Shares (or Units) Purchased[1] | Average Price Paid per Share (or Unit) | Total Number of Shares (or Units) Purchased as Part of Publicly Announced Plans or Programs | Maximum Number (or Approximate Dollar Value) of Shares (or Units) that May Yet be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| October 1 - 31, 2016 | 1,282 | $ 5.85 | — | — |
| November 1 - 30, 2016 | — | $ — | | |
| December 1 - 31, 2016 | 31,090 | $ 8.41 | — | — |
| **Total** | **32,372** | **$ 8.31** | **—** | **—** |

[1] These shares were delivered to us to satisfy tax withholding obligations due upon the vesting or payment of stock awards.

### *Debt-for-Equity Exchanges*

On December 22, 2016, we entered into a privately negotiated exchange agreement whereby we issued an aggregate of 0.4 million common shares in exchange for $3.8 million aggregate principal amount of our 4.875% senior notes due 2021. Accordingly, we recognized a gain of $0.2 million in *Gain on extinguishment/restructuring of debt* in the Statements of Consolidated Operations for the three months ended December 31, 2016.

On November 18, 2016, we entered into privately negotiated exchange agreements whereby we issued an aggregate of 1.9 million common shares in exchange for $3.0 million aggregate principal amount of our 4.80% senior notes due 2020 and $12.5 million aggregate principal amount of our 4.875% senior notes due 2021. Accordingly, we recognized a gain of $1.5 million in *Gain on extinguishment/restructuring of debt* in the Statements of Consolidated Operations for the three months ended December 31, 2016.

These debt-for-equity exchanges together represented less than 1% of our outstanding common shares. The issuances of the common shares in exchange for our senior notes due 2020 and 2021 were made in reliance on the exemption from registration provided in Section 3(a)(9) of the Securities Act.

41

Table of Contents

**Item 6.**    *Selected Financial Data*

**Summary of Financial and Other Statistical Data - Cliffs Natural Resources Inc. and Subsidiaries**

| Financial data (in millions, except per share amounts) * | 2016 (a) | 2015 (b) | 2014 (c) | 2013 (d) | 2012 (e) |
|---|---|---|---|---|---|
| Revenue from product sales and services | $ 2,109.0 | $ 2,013.3 | $ 3,373.2 | $ 3,890.8 | $ 3,982.7 |
| Cost of goods sold and operating expenses | (1,719.7) | (1,776.8) | (2,487.5) | (2,406.4) | (2,438.4) |
| Other operating expense | (148.5) | (85.2) | (755.6) | (104.1) | (239.3) |
| Operating income | 240.8 | 151.3 | 130.1 | 1,380.3 | 1,305 |
| Income from continuing operations | 219.2 | 143.7 | 56.4 | 878.9 | 336.4 |
| Loss from discontinued operations, net of tax | (19.9) | (892.1) | (8,368.0) | (517.1) | (1,463.0) |
| Net income (loss) | 199.3 | (748.4) | (8,311.6) | 361.8 | (1,126.6) |
| Loss (income) attributable to noncontrolling interest | (25.2) | (0.9) | 1,087.4 | 51.7 | 227.2 |
| Net income (loss) attributable to Cliffs shareholders | 174.1 | (749.3) | (7,224.2) | 413.5 | (899.4) |
| Preferred stock dividends | — | (38.4) | (51.2) | (48.7) | — |
| Income (loss) attributable to Cliffs common shareholders | $ 174.1 | $ (787.7) | $ (7,275.4) | $ 364.8 | $ (899.4) |
| Earnings (loss) per common share attributable to Cliffs common shareholders - basic | | | | | |
| Continuing operations | $ 0.98 | $ 0.63 | $ (0.14) | $ 5.37 | $ 2.19 |
| Discontinued operations | (0.10) | (5.77) | (47.38) | (2.97) | (8.51) |
| Earnings (loss) per common share attributable to Cliffs common shareholders - basic | $ 0.88 | $ (5.14) | $ (47.52) | $ 2.40 | $ (6.32) |
| Earnings (loss) per common share attributable to Cliffs common shareholders - diluted | | | | | |
| Continuing operations | $ 0.97 | $ 0.63 | $ (0.14) | $ 4.95 | $ 2.18 |
| Discontinued operations | (0.10) | (5.76) | (47.38) | (2.58) | (8.48) |
| Earnings (loss) per common share attributable to Cliffs common shareholders - diluted | $ 0.87 | $ (5.13) | $ (47.52) | $ 2.37 | $ (6.30) |
| Total assets | $ 1,923.9 | $ 2,135.5 | $ 3,147.2 | $ 13,102.9 | $ 13,549.6 |
| Long-term debt obligations (including capital leases) | $ 2,213.5 | $ 2,755.6 | $ 2,911.5 | $ 2,968.4 | $ 4,081.7 |
| Net cash provided by operating activities | $ 303.0 | $ 37.9 | $ 358.9 | $ 1,145.9 | $ 514.5 |
| Net cash used in investing activities | $ (57.9) | $ (103.2) | $ (103.6) | $ (811.3) | $ (961.8) |
| Net cash provided by (used in) financing activities | $ (206.4) | $ 61.0 | $ (288.3) | $ (171.9) | $ (119.6) |
| Distributions to preferred shareholders cash dividends (f) | | | | | |
| - Per depositary share | $ — | $ 1.32 | $ 1.76 | $ 1.66 | $ — |
| - Total | $ — | $ 38.4 | $ 51.2 | $ 48.7 | $ — |
| Distributions to common shareholders cash dividends (g) | | | | | |
| - Per share | $ — | $ — | $ 0.60 | $ 0.60 | $ 2.16 |
| - Total | $ — | $ — | $ 92.5 | $ 91.9 | $ 307.2 |
| Repurchases of common shares | — | — | — | — | — |
| Common shares outstanding - basic (millions) | | | | | |
| - Average for year | 197.7 | 153.2 | 153.1 | 151.7 | 142.4 |
| - At year-end | 233.1 | 153.6 | 153.2 | 153.1 | 142.5 |
| | | | | | |
| **Iron ore production and sales statistics** | | | | | |
| *(long tons in millions - U.S. Iron Ore; metric tons in millions - Asia Pacific Iron Ore)* | | | | | |
| Production tonnage - U.S. Iron Ore | 23.4 | 26.1 | 29.7 | 27.2 | 29.5 |
| - U.S. Iron Ore (Cliffs' share) | 16.0 | 19.3 | 22.4 | 20.3 | 22.0 |
| - Asia Pacific Iron Ore | 11.8 | 11.7 | 11.4 | 11.1 | 11.3 |
| Sales tonnage - U.S. Iron Ore | 18.2 | 17.3 | 21.8 | 21.3 | 21.6 |
| - Asia Pacific Iron Ore | 11.6 | 11.6 | 11.5 | 11.0 | 11.7 |

42

\* Management determined as of March 31, 2015, that our North American Coal operating segment met the criteria to be classified as held for sale under ASC 205, Presentation of Financial Statements. The North American Coal segment continued to meet the criteria throughout 2015 until we sold our North American Coal operations during the fourth quarter of 2015. As such, all current and historical North American Coal operating segment results are included in our financial statements and classified within discontinued operations. On January 27, 2015, we announced that the Bloom Lake Group commenced restructuring proceedings (the "Bloom Filing") under the CCAA with the Québec Superior Court (Commercial Division) in Montreal (the "Court"). At that time, the Bloom Lake Group was no longer generating revenues and was not able to meet its obligations as they came due. The Bloom Filing addressed the Bloom Lake Group's immediate liquidity issues and permits the Bloom Lake Group to preserve and protect its assets for the benefit of all stakeholders while restructuring and sale options are explored. As part of the CCAA process, the Court approved the appointment of a Monitor and certain other financial advisors. Additionally, on May 20, 2015, we announced that the Wabush Group commenced restructuring proceedings (the "Wabush Filing") with the Court under the CCAA. As a result of this action, the CCAA protections granted to the Bloom Lake Group were extended to include the Wabush Group to facilitate the reorganization of each of their businesses and operations. The Wabush Group was no longer generating revenues and was not able to meet its obligations as they came due. The inclusion of the Wabush Group in the existing Bloom Filing facilitated a more comprehensive restructuring and sale process of both the Bloom Lake Group and the Wabush Group which collectively included mine, port and rail assets. As part of the Wabush Filing, the Court approved the appointment of a Monitor and certain other financial advisors. The Monitor of the Wabush Group is also the Monitor of the Bloom Lake Group. Financial results prior to the respective deconsolidations of the Bloom Lake and Wabush Groups and subsequent expenses directly associated with the Canadian Entities are included in our financial statements and classified within discontinued operations.

(a) During 2016, we recorded a net gain of $166.3 million related to debt restructuring activities that occurred throughout the year including the issuance of $218.5 million aggregate principal of 1.5 Lien Senior Notes due 2020 in exchange for $512.2 of our existing senior notes, the issuance of an aggregate of 8.2 million shares in exchange for $56.9 million aggregate principal of our existing senior notes and a loss on the full redemption of our $283.6 million outstanding 2018 senior notes at a total redemption price of $301.0 million. We also issued 44.4 million common shares in an underwritten public offering. We received net proceeds of approximately $287.6 million at a public offering price of $6.75 per common share.

(b) On January 27, 2015, we announced the Bloom Filing with the Court under the CCAA. Additionally, on May 20, 2015, we announced the Wabush Filing with the Court under the CCAA. As a result of this action, the CCAA protections granted to the Bloom Lake Group were extended to include the Wabush Group to facilitate the reorganization of each of their businesses and operations. Consistent with our strategy to extract maximum value from our current assets, on December 22, 2015, we sold our equity interests in all the remaining North American Coal operations to Seneca. The sale included the Pinnacle mine in West Virginia and the Oak Grove mine in Alabama. Additionally, Seneca may pay Cliffs an earn-out of up to $50 million contingent upon the terms of a revenue sharing agreement, which extends through the year 2020. As noted above, all current and historical North American Coal operating segment results are included in our financial statements and classified within discontinued operations.

(c) During 2014, we recorded an impairment of goodwill and other long-lived assets of $73.5 million. The goodwill impairment charge of $73.5 million related to our Asia Pacific Iron Ore reporting unit. There were also other long-lived asset impairment charges of $562.0 million related to our continuing operations including the Asia Pacific Iron Ore operating segment and our Other reportable segments. The other long-lived asset impairment charges which related to our discontinued operations were $8,394.4 million related to our Wabush operation and Bloom Lake operation within our Eastern Canadian Iron Ore operating segment, and our CLCC thermal operation, Oak Grove operation and Pinnacle operation within our North American Coal operating segment, along with impairments charged to reporting units within our Other reportable segments. The impairment charges were primarily a result of changes in life-of-mine cash flows due to declining pricing for both global iron ore and low-volatile metallurgical coal, which impacts our estimate of long-term pricing, along with changes in strategic focus including exploratory phases of possible divestiture of the operations as the new CODM viewed Eastern Canadian Iron Ore, Asia Pacific Iron Ore, North American Coal and Ferroalloys as non-core assets. The CLCC assets were sold in the fourth quarter of 2014 on December 31, 2014, resulting in a loss on sale of $419.6 million. As noted above, all current and historical North American Coal operating segment results are included in our financial statements and classified within discontinued operations.

(d) Upon performing our annual goodwill impairment test in the fourth quarter of 2013, a goodwill impairment charge of $80.9 million was recorded for our Cliffs Chromite Ontario and Cliffs Chromite Far North reporting units within our Ferroalloys operating segment. We also recorded other long-lived asset impairment charges of $169.9 million, of which $154.6 million relates to our Wabush reporting unit within our Eastern Canadian Iron Ore operating segment to reduce those assets to their estimated fair value as of December 31, 2013. These reporting units were included within the entities under the CCAA filing. As noted above, financial results prior to the respective deconsolidations of the Bloom Lake and Wabush Groups and subsequent expenses directly associated with the Canadian Entities are included in our financial statements and classified within discontinued operations.

(e) Upon performing our annual goodwill impairment test in the fourth quarter of 2012, goodwill impairment charges of $997.3 million and $2.7 million were recorded for our CQIM and Wabush reporting units, respectively, both within the Eastern Canadian Iron Ore operating segment. We also recorded an impairment charge of $49.9 million related to our Eastern Canadian Iron Ore operations to reduce those assets to their estimated fair value as of December 31, 2012, due to the idling of the pelletizing facility at Pointe Noire. The Eastern Canadian Iron Ore operations were included within the entities under the Bloom Filing and Wabush Filing. As noted above, financial results prior to the respective deconsolidations of the Bloom Lake and Wabush Groups and subsequent expenses directly associated with the Canadian Entities are included in our financial statements and classified within discontinued operations. On July 10, 2012, we entered into a definitive share and asset sale agreement to sell our 45% economic interest in the Sonoma joint venture coal mine located in Queensland, Australia. On January 4, 2012, we entered into an agreement to sell the renewaFUEL assets to RNFL Acquisition LLC. The results of operations of the Sonoma joint venture and renewaFUEL operations are reflected as discontinued operations in the accompanying consolidated financial statements for all periods presented.

(f) On March 20, 2013, our Board of Directors declared a cash dividend of $13.6111 per Preferred Share, which is equivalent to approximately $0.34 per depositary share. The cash dividend was paid on May 1, 2013, to our Preferred Shareholders of record as of the close of business on April 15, 2013. On May 7, 2013, September 9, 2013, and November 11, 2013, our Board of Directors declared a quarterly cash dividend of $17.50 per Preferred Share, which is equivalent to approximately $0.44 per depositary share. The cash dividends were paid on August 1, 2013, November 1, 2013, and February 3, 2014 to our Preferred Shareholders of record as of the close of business on July 15, 2013, October 15, 2013, and January 15, 2014, respectively. On February 11, 2014, May 13, 2014, September 8, 2014, and November 19, 2014, our Board of Directors declared a quarterly cash dividend of $17.50 per Preferred Share, which is equivalent to approximately $0.44 per depositary share. The cash dividends were paid on May 1, 2014, August 1, 2014, November 3, 2014, and February 2, 2015, to our Preferred Shareholders of record as of the close of business on April 15, 2014, July 15, 2014, October 15, 2014, and January 15, 2015, respectively. On March 27, 2015, July 1, 2015, and September 10, 2015, our Board of Directors declared the quarterly cash dividend of $17.50 per Preferred Share, which is equivalent to approximately $0.44 per depositary share. The cash dividend was paid on May 1, 2015, August 3, 2015, and November 2, 2015 to our shareholders of record as of the close of business on April 15, 2015, July 15, 2015, and October 15, 2015, respectively. On January 4, 2016, we announced that our Board of Directors determined the final quarterly dividend of our Preferred Shares would not be paid in cash, but instead, pursuant to the terms of the Preferred Shares, the conversion rate was increased such that holders of the Preferred Shares received additional common shares in lieu of the accrued dividend at the time of the mandatory conversion of the Preferred Shares on February 1, 2016. The number of our common shares in the aggregate issued in lieu of the dividend was 1.3 million. This resulted in an effective conversion rate of 0.9052 common shares, rather than 0.8621 common shares, per depositary share, each representing 1/40th of a Preferred Share. Upon conversion on February 1, 2016, an aggregate of 26.5 million common shares were issued, representing 25.2 million common shares issuable upon conversion and 1.3 million that were issued in lieu of a final cash dividend.

43

(g) On February 11, 2013, our Board of Directors approved a reduction to our quarterly cash dividend rate by 76% to $0.15 per share. The decreased dividend of $0.15 per share was paid on March 1, 2013, June 3, 2013, September 3, 2013, and December 2, 2013 to our common shareholders of record as of the close of business on February 22, 2013, May 17, 2013, August 15, 2013, and November 22, 2013, respectively. Additionally, in 2014, the dividend of $0.15 per share was paid on March 3, 2014, June 3, 2014, September 2, 2014 and December 1, 2014 to our common shareholders of record as of the close of business on February 21, 2014, May 23, 2014, August 15, 2014, and November 15, 2014, respectively. On January 26, 2015, we announced that our Board of Directors had decided to eliminate the quarterly dividend of $0.15 per share on our common shares. The decision was applicable to the first quarter of 2015 and all subsequent quarters.

44

Table of Contents

**Item 7.**        ***Management's Discussion and Analysis of Financial Condition and Results of Operations***

Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") is designed to provide a reader of our financial statements with a narrative from the perspective of management on our financial condition, results of operations, liquidity and other factors that may affect our future results. The following discussion should be read in conjunction with the Consolidated Financial Statements and related notes that appear elsewhere in this document.

## Industry Overview

The key driver of our business is demand for steelmaking raw materials from U.S. steelmakers. In 2016, the U.S. produced approximately 79 million metric tons of crude steel or about 5% of total global crude steel production. This is consistent when compared to U.S. crude steel production in 2015. U.S. total steel capacity utilization was 71% in 2016, which is an approximate 1% decrease from 2015. Additionally, in 2016, China produced approximately 808 million metric tons of crude steel, or approximately 50% of total global crude steel production. These figures represent an approximate 1% increase in Chinese crude steel production when compared to 2015. Throughout 2016, global crude steel production increased about 1% compared to 2015.

During 2016, the Platts 62% Price showed resiliency and outperformed the levels seen in 2015. We believe this is the result of improved sentiment about steel demand in China and signs of high-cost capacity closures as well as more disciplined approach to supply instituted by the major iron ore producers, most notably Rio Tinto. Furthermore, major supply additions from both Brazil and Australia anticipated to come online this year have experienced difficulties ramping up and completion dates have been further delayed. We believe the new management teams at the major iron ore producers will continue this disciplined supply approach through 2017, which could help maintain or even improve these current price levels.

The Platts 62% Price increased 52% to an average price of $70.76 per metric ton for the three months ended December 31, 2016 compared to the three months ended December 31, 2015. In comparison, the full-year Platts 62% Price has increased 5% to an average price of $58.45 per metric ton during the year ended December 31, 2016. The spot price volatility impacts our realized revenue rates, particularly in our Asia Pacific Iron Ore business segment because its contracts correlate heavily to the Platts 62% Price and to a lesser extent, our U.S. Iron Ore contracts.

Alongside the rally in global iron ore prices, the prices for hot-rolled coil, another important metric in our price realizations in the U.S., also improved. We believe this is the result of trade cases, which has substantially curbed the amount of unfairly traded steel imports entering the U.S. In 2017, we believe the market will remain healthy as the new U.S. administration has placed emphasis on the enforcement of unfairly traded steel as well as repairing the infrastructure in the U.S., which should support demand for domestic steel. Also, steel inventory levels remain low compared to previous years, which should help support pricing.

Our consolidated revenues for the years ended December 31, 2016 and 2015 were $2.1 billion and $2.0 billion, respectively, with net income from continuing operations per diluted share of $0.97 and $0.63, respectively. Net income from continuing operations for the years ended December 31, 2016 and December 31, 2015 were impacted positively as a result of gains on extinguishment/restructuring of debt of $166.3 million and $392.9 million, respectively. Additionally, results for the year ended December 31, 2015 were impacted negatively by income tax expense primarily due to the placement of a valuation allowance against U.S. deferred tax assets.

## Strategy

### *We are Focused on our Core U.S. Iron Ore Business*

In 2014, we established a strategy centering the Company around our U.S. Iron Ore business. We are the market-leading iron ore producer in the U.S., supplying differentiated iron ore pellets under long-term contracts to the largest North American steel producers. We have the unique advantage of being a low cost producer of iron ore pellets in the U.S. market with significant transportation and logistics advantages to serve the U.S. steel market effectively. Pricing structures contained in and the long-term supply provided by our existing contracts, along with our low-cost operating profile, positions U.S. Iron Ore as a strong cash flow generator in most commodity pricing environments. Since instituting our core strategy of focusing on this business, we have achieved significant accomplishments including providing volume certainty by signing a new ten-year supply agreement with our largest customer; substantially reducing operating costs by making various operational improvements; and developing alternate iron unit strategies to provide opportunities to enter into the EAF end market.

45

*Optimized, Divested or Shutdown All Non-Core Business Segments*

Given the current and projected constructive iron ore pricing market, we are focused on optimizing the remaining ore reserve base of our Asia Pacific Iron Ore business. Asia Pacific Iron Ore is a well-recognized and reliable supplier to steelmakers in Asia. We will continue to operate Asia Pacific Iron Ore with very low total capital expenditures for the remaining life of the mine.

We commenced restructuring proceedings for our Eastern Canadian Iron Ore businesses under the CCAA in the first quarter of 2015. During the second quarter of 2015, the CCAA protection granted to the Bloom Lake Group was extended to include the Wabush Group to facilitate the reorganization of each of their businesses and operations. As of December 31, 2016, CCAA proceedings are still ongoing and the Monitor is evaluating all claims into the estate. Currently, there is uncertainty as to the amount of the distribution that will be made to the creditors of the estate, including, if any to Cliffs, and whether Cliffs could be held liable for claims that may be asserted by or on behalf of the Bloom Lake Group or the Wabush Group or by their respective representatives against non-debtor affiliates of the Bloom Lake Group and the Wabush Group. For more information regarding the status of our divestiture of our Eastern Canadian Iron Ore business, see NOTE 14 - DISCONTINUED OPERATIONS.

On December 22, 2015, we closed the sale of our remaining North American Coal business, which included the Pinnacle mine in West Virginia and the Oak Grove mine in Alabama, to Seneca. The sale marked our exit from the coal business and represents another very important step in the implementation of our U.S. Iron Ore pellet-centric strategy. Prior to this sale, it was determined by management as of March 31, 2015 that our North American Coal operating segment met the criteria to be classified as held for sale under *ASC 205, Presentation of Financial Statements* . For more information regarding the sale and the held for sale classification of our North American Coal business, see NOTE 14 - DISCONTINUED OPERATIONS.

*Maintaining Discipline on Costs and Capital Spending and Improving our Financial Flexibility*

We believe our ability to execute our strategy is dependent on our improving financial position, balance sheet strength and financial flexibility, which will enable us to manage through the inherent cyclical demand for our products and volatility in commodity prices. We have developed a highly disciplined financial and capital expenditure plan with a focus on improving our cost profile and increasing long-term profitability. Our streamlined organization and support functions are well aligned to best serve our strategic direction. Our capital allocation plan is focused on strengthening our core U.S. Iron Ore operations to promote greater free cash flow generation.

As the implementation of our strategy has strengthened the business, we have put additional emphasis on the continued improvement of our balance sheet via continued reduction of long-term debt. Since the 2014 initiation of our transition strategy, we have reduced the principal of our long-term debt by 21% using various liability management strategies. Given the cyclical nature of our business, we feel that further reduction of our long-term debt will put us in an optimal position to manage through any commodity environment, and we continue to seek the best opportunities to accomplish this.

## Competitive Strengths

*Resilient U.S. Iron Ore Operations*

Our U.S. Iron Ore segment is the core focus of our business strategy. The U.S. Iron Ore segment is the primary contributor to our consolidated results, generating 74% of consolidated revenue and $359.6 million of consolidated Adjusted EBITDA for the year ended December 31, 2016. U.S. Iron Ore produces differentiated iron ore pellets that are customized for use in customers' blast furnaces as part of the steelmaking process. The grades of pellets currently delivered to each customer are based on that customer's preferences, which depend in part on the characteristics of the customer's blast furnace operation. We believe our long history of supplying customized pellets to the U.S. steel producers has resulted in a co-dependent relationship between us and our customers. This technical and operational co-dependency has enabled us to claim a substantial portion of the total U.S. iron ore market. Based on Cliffs' equity ownership in its U.S. mines, Cliffs' share of the annual rated production capacity is 20.0 million long tons, representing 40% of total U.S. annual pellet capacity. Long-lived assets with an average mine life of approximately 30 years provide the opportunity to maintain our significant market position well into the future.

More than half of U.S. Iron Ore production is sold through long-term contracts that are structured with various formula-based pricing mechanisms that reference seaborne pricing, inflation factors and steel prices and mitigate the impact of any one factor's price volatility on our business.

46

Table of Contents

In addition, we maintain lower costs compared to our competition as a result of our proximity to U.S. steelmaking operations. Our costs are lower as a result of inherent transportation advantages associated with our mine locations near the Great Lakes which allows for transportation via railroads and loading ports. U.S. Iron Ore mines also benefit from on-site pellet production and ore production facilities located a short distance from the mines.

### Competitive Asia Pacific Iron Ore Operations

Although our annual production tonnage is substantially less than our competitors in the seaborne market, the Asia Pacific Iron Ore business maintains a competitive position with the major Australian iron ore producers. We produce a product mix of approximately 50% lump ore and 50% fines, which is a significantly higher lump mix than the major producers in Australia. This lump ore typically commands a premium in the seaborne market over iron ore fines.

Further, our Asia Pacific Iron Ore segment is a cost competitive producer and requires minimal ongoing sustaining capital expenditures to continue our operations. Going forward, we will continue to operate Asia Pacific Iron Ore with a clear bias toward cash optimization.

## Recent Developments

### Changes to our Board of Directors

On October 27, 2016, we appointed Eric M. Rychel to our Board of Directors. Mr. Rychel is Executive Vice President, Chief Financial Officer and Treasurer of Aleris Corporation, a privately held company that is a global leader in aluminum rolled products. He joined Aleris in 2012 and presently leads the global finance activities for the organization. Mr. Rychel joined the Audit Committee of our Board. With the addition of Mr. Rychel, our Board of Directors is now comprised of ten members, of which nine are independent. In addition to Mr. Rychel's appointment to the Audit Committee, we made other changes to our Board Committee assignments. Michael Siegal, who is a current member of our Board of Directors, has been appointed to the Audit Committee. Additionally, Gabriel Stoliar has stepped down from the Audit Committee and has been appointed as a member of the Compensation Committee.

### Executive Leadership Promotions

On December 14, 2016, our Board of Directors elected P. Kelly Tompkins as the Executive Vice President & Chief Operating Officer, effective January 1, 2017. Mr. Tompkins most recently was the Executive Vice President and Chief Financial Officer, a position he held since April 2015. He previously served as Executive Vice President, Business Development from October 2014 to April 2015, Executive Vice President, External Affairs and President, Global Commercial from November 2013 to October 2014, Chief Administrative Officer from July 2013 to November 2013, Executive Vice President, Legal, Government Affairs and Sustainability from May 2010 to July 2013, Chief Legal Officer from January 2011 to January 2013 and President, Cliffs China from October 2012 to November 2013. In addition, on December 14, 2016, our Board of Directors elected Timothy K. Flanagan to assume the duties of Executive Vice President, Chief Financial Officer & Treasurer , effective January 1, 2017. Mr. Flanagan has held several positions since April 2008, most recently serving as Vice President, Corporate Controller & Chief Accounting Officer since March 2012. He was Assistant Controller from February 2010 to March 2012, and Director, Internal Audit from April 2008 to February 2010.

## Business Segments

The Company's primary continuing operations are organized and managed according to product category and geographic location: U.S. Iron Ore and Asia Pacific Iron Ore. As of March 31, 2015, management determined that our North American Coal operating segment met the criteria to be classified as held for sale under *ASC 205, Presentation of Financial Statements* . As such, all current and historical North American Coal operating segment results are included in our financial statements and classified within discontinued operations. Additionally, as a result of the CCAA filing of the Bloom Lake Group on January 27, 2015 and the Wabush Group on May 20, 2015, we no longer have a controlling interest over the Bloom Lake Group and certain other wholly-owned subsidiaries, and we no longer have a controlling interest over the Wabush Group. The Bloom Lake Group, Wabush Group and certain of each of their wholly-owned subsidiaries were previously reported as Eastern Canadian Iron Ore and Other reportable segments. As such, we deconsolidated the Bloom Lake Group and certain other wholly-owned subsidiaries as of January 27, 2015. Additionally, as a result of the Wabush Filing on May 20, 2015, we deconsolidated certain Wabush Group wholly-owned subsidiaries effective May 20, 2015. The wholly-owned subsidiaries deconsolidated effective May 20, 2015 are Wabush Group entities that were not deconsolidated as part of the deconsolidation effective January 27, 2015. Financial results prior to the respective deconsolidations of the Bloom Lake and Wabush Groups and subsequent expenses directly associated with the Canadian Entities are included in our financial statements and classified within discontinued operations.

47

Table of Contents

**Results of Operations – Consolidated**

*2016 Compared to 2015*

The following is a summary of our consolidated results of operations for the years ended December 31, 2016 and 2015:

| | (In Millions) | | |
| --- | --- | --- | --- |
| | **2016** | 2015 | Variance Favorable/ (Unfavorable) |
| Revenues from product sales and services | $  **2,109.0** | $  2,013.3 | $  95.7 |
| Cost of goods sold and operating expenses | **(1,719.7)** | (1,776.8) | 57.1 |
| Sales margin | $  **389.3** | $  236.5 | $  152.8 |
| Sales margin % | **18.5%** | 11.7% | 6.8 % |

*Revenues from Product Sales and Services*

Sales revenue for the year ended December 31, 2016 increased $95.7 million, or 4.8%, from 2015, which primarily was driven by higher sales volume from our U.S. Iron Ore Operations of 932 thousand long tons equating to an increase in revenue of $73.5 million and higher pricing from our Asia Pacific Iron Ore Operations for an increase of $69.2 million. The increase in volume mainly was attributable to additional nominated tons from short-term contracts. Higher pricing and revenue rates were driven by an increase in the Platts 62% Price and a hedging impact in 2015 that was not repeated in 2016, for increased revenue of $32.7 million and $29.3 million, respectively. These positive movements were partially offset from lower pricing from our U.S. Iron Ore Operations for a decrease of $62.0 million. Lower pricing primarily was driven by the negative inflation of certain price indices and the impact of net lower overall contracted pricing terms for two short-term customer contracts that were based on fixed negotiated rates compared to the prior-year period, which was based on a different method.

Refer to "Results of Operations – Segment Information" for additional information regarding the specific factors that impacted revenue during the period.

*Cost of Goods Sold and Operating Expenses*

Cost of goods sold and operating expenses for the years ended December 31, 2016 and 2015 were $1,719.7 million and $1,776.8 million, respectively, a decrease of $57.1 million, or 3.2% year-over-year.

Cost of goods sold and operating expenses for the year ended December 31, 2016 decreased as a result of operational efficiencies and cost-cutting efforts across each of our business units, which reduced costs by $114.5 million. Additionally, lower idle costs and favorable foreign exchange rates decreased costs by $7.8 million and $5.5 million, respectively, compared to the year ended December 31, 2015. These decreases in cost were offset partially by higher iron ore sales volumes resulting in higher expense of $56.0 million compared to the year ended December 31, 2015.

Refer to "Results of Operations – Segment Information" for additional information regarding the specific factors that impacted our operating results during the period.

*Other Operating Income (Expense)*

The following is a summary of other operating income (expense) for the years ended December 31, 2016 and 2015:

| | (In Millions) | | |
| --- | --- | --- | --- |
| | **2016** | 2015 | Variance Favorable/ (Unfavorable) |
| Selling, general and administrative expenses | $  **(117.8)** | $  (110.0) | $  (7.8) |
| Impairment of goodwill and other long-lived assets | **—** | (3.3) | 3.3 |
| Miscellaneous - net | **(30.7)** | 28.1 | (58.8) |
| | $  **(148.5)** | $  (85.2) | $  (63.3) |

48

Selling, general and administrative expenses during the year ended December 31, 2016 increased $7.8 million over 2015. The increase for the year ended December 31, 2016 compared to the prior year was driven by an increase in employment costs of $8.1 million primarily due to incentive compensation and an increase in expenses of $2.1 million related to a lease abandonment of a corporate office space. These increases were partially offset by a $3.9 million decrease in IT service costs and legal fees.

The following is a summary of Miscellaneous - net for the years ended December 31, 2016 and 2015:

| | (In Millions) | | |
|---|---|---|---|
| | **2016** | 2015 | Variance Favorable/ (Unfavorable) |
| Foreign exchange remeasurement | $ **(16.8)** | $ 16.3 | $ (33.1) |
| Michigan Electricity Matters accrual | **(12.4)** | — | (12.4) |
| Management and royalty fees | **9.0** | 6.4 | 2.6 |
| Empire idle costs | **(8.2)** | — | (8.2) |
| Gain (loss) on disposal of assets | **(4.8)** | 3.4 | (8.2) |
| Other | **2.5** | 2.0 | 0.5 |
| | $ **(30.7)** | $ 28.1 | $ (58.8) |

For the year ended December 31, 2016, there was an incrementally unfavorable impact of $33.1 million driven by the change in foreign exchange remeasurement of short-term intercompany loans that are denominated in currency that is not the functional currency of the entity that holds the loans.

*Other Income (Expense)*

The following is a summary of other income (expense) for the years ended December 31, 2016 and 2015:

| | (In Millions) | | |
|---|---|---|---|
| | **2016** | 2015 | Variance Favorable/ (Unfavorable) |
| Interest expense, net | **(200.5)** | (228.5) | 28.0 |
| Gain on extinguishment/restructuring of debt | **166.3** | 392.9 | (226.6) |
| Other non-operating income (expense) | **0.4** | (2.6) | 3.0 |
| | $ **(33.8)** | $ 161.8 | $ (195.6) |

The gain on extinguishment/restructuring of debt for the year ended December 31, 2016 was $166.3 million, primarily related to the issuance of 1.5 Lien Notes on March 2, 2016 compared to $392.9 million related to the corporate debt restructuring that occurred during the year ended December 31, 2015.

Interest expense for the year ended December 31, 2016 was lower by $20.8 million versus the year ended December 31, 2015 as a result of the debt restructuring activities that occurred during 2016. These debt extinguishments and restructurings resulted in a net reduction of the outstanding principal balance of our senior notes. Additionally, there was a favorable impact of $5.8 million due to the reduction of equipment loan interest and capital lease interest for the year ended December 31, 2016 compared to the prior year.

Refer to NOTE 5 - DEBT AND CREDIT FACILITIES for further discussion.

49

Table of Contents

*Income Taxes*

Our tax rate is affected by permanent items, such as depletion and the relative amount of income we earn in various foreign jurisdictions with tax rates that differ from the U.S. statutory rate. It also is affected by discrete items that may occur in any given period, but are not consistent from period to period. The following represents a summary of our tax provision and corresponding effective rates for the years ended December 31, 2016 and 2015:

| | | (In Millions) | | | |
|---|---|---|---|---|---|
| | **2016** | | 2015 | | Variance |
| Income tax benefit (expense) | $ **12.2** | $ | (169.3) | $ | 181.5 |
| Effective tax rate | **(5.9)**% | | 54.1% | | (60.0)% |

A reconciliation of our income tax attributable to continuing operations computed at the U.S. federal statutory rate for the years ended December 31, 2016 and 2015 is as follows:

| | | (In Millions) | | |
|---|---|---|---|---|
| | **2016** | | 2015 | |
| Tax at U.S. statutory rate of 35% | $ **72.5** | **35.0** % | $ 109.6 | 35.0 % |
| Increase (decrease) due to: | | | | |
| Impact of tax law change | **149.1** | **72.0** | — | — |
| Valuation allowance build/(reversal) on tax benefits recorded in prior years | **(142.6)** | **(68.9)** | 165.8 | 52.9 |
| Tax uncertainties | **(11.3)** | **(5.5)** | 84.1 | 26.9 |
| Valuation allowance build/(reversal) in current year | **93.9** | **45.4** | (104.6) | (33.4) |
| Prior year adjustments in current year | **(11.8)** | **(5.7)** | 5.9 | 1.9 |
| Worthless stock deduction | **(73.4)** | **(35.5)** | — | — |
| Impact of foreign operations | **(42.7)** | **(20.6)** | (53.9) | (17.2) |
| Percentage depletion in excess of cost depletion | **(36.1)** | **(17.4)** | (34.9) | (11.1) |
| Non-taxable income related to noncontrolling interests | **(8.8)** | **(4.2)** | (3.0) | (1.0) |
| State taxes, net | **0.4** | **0.2** | 0.2 | 0.1 |
| Other items — net | **(1.4)** | **(0.7)** | 0.1 | — |
| Provision for income tax (benefit) expense and effective income tax rate including discrete items | $ **(12.2)** | **(5.9)**% | $ 169.3 | 54.1 % |

Our tax provision for the year ended December 31, 2016 was a benefit of $12.2 million and a negative 5.9% effective tax rate compared with an expense of $169.3 million and an effective tax rate of 54.1% for the prior year. The change to an income tax benefit from the prior year expense is due to the prior year recording of valuation allowances against existing deferred tax assets, a worthless stock deduction in the current year and the settlement of unrecognized tax benefits. The impact of tax law change relates to the enacted statutory rate reduction in Luxembourg that decreased the deferred tax assets by $149.1 million and was fully offset by a decrease in valuation allowance. The impact of foreign operations relates to income in foreign jurisdictions where the statutory rates, ranging from 0% to 30%, differ from the U.S statutory rate of 35%.

See NOTE 9 - INCOME TAXES for further information.

***Loss from Discontinued Operations, net of tax***

*Loss from Discontinued Operations, net of tax* was comprised primarily of the loss on discontinued operations related to our North American Coal operating segment and our Eastern Canadian Iron Ore operations. During the year ended December 31, 2016, we recorded a loss from discontinued operations of $19.9 million, net of tax, attributable to a net loss from a change in estimate to our *Loans to and accounts receivable from the Canadian Entities* of $17.5 million in the Statements of Consolidated Financial Position and a net loss of $2.4 million from certain disputes related to the sale of our North American Coal segment.

50

As of March 31, 2015, management determined that our North American Coal operating segment met the criteria to be classified as held for sale under *ASC 205, Presentation of Financial Statements* . As such, all 2016 and historical North American Coal operating segment results are included in our financial statements and classified within discontinued operations. The *Loss from Discontinued Operations, net of tax* related to the North American Coal operating segment was $2.4 million, $152.4 million and $1,134.5 million for the years ended December 31, 2016, 2015 and 2014, respectively.

In January 2015, we announced that the Bloom Lake Group commenced restructuring proceedings in Montreal, Quebec under the CCAA. At that time, we had suspended Bloom Lake operations and for several months had been exploring options to sell certain of our Canadian assets, among other initiatives. Effective January 27, 2015, following the CCAA filing of the Bloom Lake Group, we deconsolidated the Bloom Lake Group and certain other wholly-owned subsidiaries comprising substantially all of our Canadian operations. Additionally, on May 20, 2015, the Wabush Group commenced restructuring proceedings in Montreal, Quebec under the CCAA which resulted in the deconsolidation of the remaining Wabush Group entities that were not previously deconsolidated. The Wabush Group was no longer generating revenues and was not able to meet its obligations as they came due. As a result of this action, the CCAA protections granted to the Bloom Lake Group were extended to include the Wabush Group to facilitate the reorganization of each of their businesses and operations. As of December 31, 2016, the majority of assets available to the estate have been liquidated. The CCAA proceedings are still ongoing and the Monitor is evaluating all claims into the estate including our related party claims. Currently, there is uncertainty as to the amount of the distribution that will be made to the creditors of the estate, including, if any to Cliffs, and whether Cliffs could be held liable for claims that may be asserted by or on behalf of the Bloom Lake Group or the Wabush Group or by their respective representatives against non-debtor affiliates of the Bloom Lake Group and the Wabush Group. Financial results prior to the respective deconsolidations of the Bloom Lake and Wabush Groups and subsequent expenses directly associated with the Canadian Entities are included in our financial statements and classified within discontinued operations. The *Loss from Discontinued Operations, net of tax* related to the deconsolidated Canadian Entities was $17.5 million, $739.7 million and $7,233.5 million for the years ended December 31, 2016, 2015 and 2014, respectively.

Refer to NOTE 14 - DISCONTINUED OPERATIONS for further information.

### Noncontrolling Interest

Noncontrolling interest is comprised primarily of the 21% noncontrolling interest in the consolidated, but less-than-wholly owned subsidiary at our Empire mining venture and through the CCAA filing on January 27, 2015, the 17.2% noncontrolling interest in the Bloom Lake operations. The net income attributable to the noncontrolling interest related to the Empire mining venture was $25.2 million and $8.6 million for the years ended December 31, 2016 and 2015, respectively. The net loss attributable to the noncontrolling interest related to Bloom Lake was $7.7 million for the year ended December 31, 2015. There was no gain or loss attributable to the noncontrolling interest related to Bloom Lake for the year ended December 31, 2016.

## Results of Operations – Consolidated

### 2015 Compared to 2014

The following is a summary of our consolidated results of operations for the years ended  December 31, 2015 and 2014:

|  | (In Millions) | | |
| --- | --- | --- | --- |
|  | 2015 | 2014 | Variance Favorable/ (Unfavorable) |
| Revenues from product sales and services | $    2,013.3 | $    3,373.2 | $    (1,359.9 ) |
| Cost of goods sold and operating expenses | (1,776.8 ) | (2,487.5 ) | 710.7 |
| Sales margin | $    236.5 | $    885.7 | $    (649.2 ) |
| Sales margin % | 11.7 % | 26.3 % | (14.6 )% |

### Revenues from Product Sales and Services

Sales revenue for the year ended December 31, 2015 decreased $1,359.9 million, or 40.3%, from 2014. The decrease in sales revenue during 2015 compared to 2014 was primarily attributable to the decrease in market pricing for our products, including a reduction of one customer's full-year hot-rolled coil price. Together these factors negatively impacted revenues by $804.4 million for the year ended December 31, 2015.

51

Changes in world market pricing impacts our revenues each year. Iron ore revenues decreased $804.4 million in 2015 compared to 2014 primarily due to the decrease in the Platts 62% Price, which declined 42.6% to an average price of $56 per metric ton in 2015, and a decrease in one customer's full-year hot-rolled coil price. The decrease in our realized revenue rates during 2015 compared to 2014 was 22.7% and 46.4% for our U.S. Iron Ore and Asia Pacific Iron Ore operations, respectively. Additionally, there was a decrease in revenues period-over-period as a result of lower iron ore sales volumes of $458.1 million for the year ended December 31, 2015.

Refer to "Results of Operations – Segment Information" for additional information regarding the specific factors that impacted revenue during the period.

### Cost of Goods Sold and Operating Expenses

Cost of goods sold and operating expenses for the years ended December 31, 2015 and 2014 were $1,776.8 million and $2,487.5 million, respectively, a decrease of $710.7 million, or 28.6%, year-over-year.

Cost of goods sold and operating expenses for the year ended December 31, 2015 decreased by $335.0 million as operational efficiencies and cost cutting efforts across each of our business units has reduced costs. Also, as a result of favorable foreign exchange rates in 2015 versus 2014, we realized lower costs of $94.6 million. Additionally, there was a decrease in costs period-over-period as a result of lower iron ore sales volumes of $299.1 million for the year ended December 31, 2015. These decreases in cost were partially offset by incrementally higher idle costs of $61.5 million due to the temporary idle of our United Taconite mine, which began in the first week of August 2015, the temporary idle of the Empire mine which began on June 26, 2015 and then came back on line during October 2015, and the one idled production line at our Northshore mine during all of 2015 followed by the complete temporary idle of Northshore mine in the end of November 2015.

Refer to "Results of Operations – Segment Information" for additional information regarding the specific factors that impacted our operating results during the period.

### Other Operating Income (Expense)

The following is a summary of other operating income (expense) for the years ended December 31, 2015 and 2014:

|  | (In Millions) | | |
|---|---|---|---|
|  | 2015 | 2014 | Variance Favorable/ (Unfavorable) |
| Selling, general and administrative expenses | $ (110.0) | $ (154.7) | $ 44.7 |
| Impairment of goodwill and other long-lived assets | (3.3) | (635.5) | 632.2 |
| Miscellaneous - net | 28.1 | 34.6 | (6.5) |
|  | $ (85.2) | $ (755.6) | $ 670.4 |

Selling, general and administrative expenses during the year ended December 31, 2015 decreased $44.7 million over 2014. As a result of the reduction of the workforce, we reduced employment costs for the year ended December 31, 2015 by $16.7 million. There were lower severance costs of $14.1 million during the year ended December 31, 2015 versus 2014. Also, the year ended December 31, 2015 was impacted favorably by $7.8 million due to a reduction in outside service spending and $5.6 million due to a reduction in rent and operating lease spending.

Impairment of goodwill and other long-lived assets was $3.3 million and $635.5 million during the years ended December 31, 2015 and 2014, respectively. During the year ended December 31, 2014, we recorded goodwill impairment of $73.5 million related to our Asia Pacific Iron Ore reporting unit. We also recorded other long-lived asset impairment charges of $562.0 million during 2014. The charges were related to our Asia Pacific Iron Ore operating segment, along with impairments charged to reporting units within our *Other* reportable segments. The impairment charges were primarily a result of management determining that the carrying value of the asset groups may not be recoverable primarily due to long-term price forecasts as part of management's long-range planning process. Updated estimates of long-term prices for all products, specifically the Platts 62% Price, which particularly effects the Asia Pacific Iron Ore business segment because their contracts correlate heavily to world market spot pricing, were lower than prior estimates. These estimates were updated based upon current market conditions, macro-economic factors influencing the balance of supply and demand for our products and expectations for future cost and capital expenditure requirements.

52

A005133

Additionally, our CEO, Lourenco Goncalves, was newly appointed by the Board of Directors in early August 2014, and subsequently identified as the CODM in accordance with ASC 280, *Segment Reporting*. At that time, the new CODM viewed Asia Pacific Iron Ore as a non-core asset and evaluated the business unit for a change in strategy including possible divestiture or operational depletion of the ore reserves. These factors, among other considerations utilized in the individual impairment assessments, indicate that the carrying value of the respective asset group and Asia Pacific Iron Ore goodwill may not be recoverable.

The following is a summary of Miscellaneous - net for the year ended December 31, 2015 and 2014:

| | (In Millions) | | |
| | 2015 | 2014 | Variance Favorable/ (Unfavorable) |
|---|---|---|---|
| Foreign exchange remeasurement | $ 16.3 | $ 29.0 | $ (12.7) |
| Management and royalty fees | 6.4 | 10.8 | (4.4) |
| Gain (loss) on disposal of assets | 3.4 | (3.5) | 6.9 |
| Other | 2.0 | (1.7) | 3.7 |
| | $ 28.1 | $ 34.6 | $ (6.5) |

For the year ended December 31, 2015, there was an incrementally unfavorable impact of $12.7 million due to the change in foreign exchange remeasurement driven primarily by lower Australian bank account balances that are denominated in U.S. dollars and short-term intercompany loans that are denominated in currency that is not the functional currency of the entity that holds the loans.

***Other Income (Expense)***

The following is a summary of other income (expense) for the years ended December 31, 2015 and 2014:

| | (In Millions) | | |
| | 2015 | 2014 | Variance Favorable/ (Unfavorable) |
|---|---|---|---|
| Interest expense, net | (228.5) | (176.7) | (51.8) |
| Gain on extinguishment/restructuring of debt | 392.9 | 16.2 | 376.7 |
| Other non-operating income (expense) | (2.6) | 10.7 | (13.3) |
| | $ 161.8 | $ (149.8) | $ 311.6 |

The increase in gain on extinguishment of debt during the year ended December 31, 2015 compared to the comparable prior year is a result of the corporate debt restructuring and debt repurchases of senior notes trading at a discount, as discussed in NOTE 5 - DEBT AND CREDIT FACILITIES.

Interest expense was unfavorably impacted by $94.1 million for the year ended December 31, 2015 as we entered into new credit arrangements during the first quarter of 2015. Additionally, the year ended December 31, 2015 was unfavorably impacted by $11.9 million due to unfavorable interest rates, as discussed in NOTE 5 - DEBT AND CREDIT FACILITIES . The unfavorable impact was offset partially by reduced interest expense of $50.8 million for the year ended December 31, 2015 due to the extinguishment of certain senior notes and the revolving credit agreement during the first quarter of 2015, as discussed in NOTE 5 - DEBT AND CREDIT FACILITIES.

Additionally, other non-operating income during the year ended December 31, 2014 included a $7.8 million gain on the sale of marketable securities.

*Income Taxes*

Our tax rate is affected by permanent items, such as depletion and the relative amount of income we earn in various foreign jurisdictions with tax rates that differ from the U.S. statutory rate. It also is affected by discrete items that may occur in any given period, but are not consistent from period to period. The following represents a summary of our tax provision and corresponding effective rates for the years ended December 31, 2015 and 2014:

| | | (In Millions) | | | |
|---|---|---|---|---|---|
| | | 2015 | 2014 | | Variance |
| Income tax benefit (expense) | $ | (169.3) | $  86.0 | $ | (255.3) |
| Effective tax rate | | 54.1% | 436.5% | | (382.4)% |

A reconciliation of our income tax attributable to continuing operations computed at the U.S. federal statutory rate for the years ended December 31, 2015 and 2014 is as follows:

| | | (In Millions) | | | |
|---|---|---|---|---|---|
| | | 2015 | | 2014 | |
| Tax at U.S. statutory rate of 35% | $ | 109.6 | 35.0 % | $  (6.9) | 35.0 % |
| Increases/(Decreases) due to: | | | | | |
| Non-taxable loss (income) related to noncontrolling interests | | (3.0) | (1.0) | (9.4) | 47.7 |
| Impact of tax law change | | — | — | 13.0 | (66.0) |
| Percentage depletion in excess of cost depletion | | (34.9) | (11.1) | (87.9) | 446.2 |
| Impact of foreign operations | | (53.9) | (17.2) | 51.4 | (260.9) |
| Income not subject to tax | | — | — | (27.7) | 140.6 |
| Goodwill impairment | | — | — | 22.7 | (115.2) |
| State taxes, net | | 0.2 | 0.1 | (25.4) | 128.9 |
| Settlement of financial guaranty | | — | — | (347.1) | 1,761.9 |
| Valuation allowance reversal in current year | | (104.6) | (33.4) | 318.3 | (1,615.7) |
| Valuation allowance on future tax benefits recorded in prior years | | 165.8 | 52.9 | 15.2 | (77.2) |
| Tax uncertainties | | 84.1 | 26.9 | — | — |
| Prior year adjustments made in current year | | 5.9 | 1.9 | (6.3) | 32.1 |
| Other items - net | | 0.1 | — | 4.1 | (20.9) |
| Provision for income tax (benefit)/expense and effective income tax rate including discrete items | $ | 169.3 | 54.1 % | $  (86.0) | 436.5 % |

Our tax provision for the year ended December 31, 2015 was an expense of $169.3 million and a 54.1% effective tax rate compared with a benefit of $86.0 million and an effective tax rate of 436.5% for the prior year. The change in the income tax expense from the prior-year benefit is due primarily to placement of valuation allowances on previously recorded U.S. future tax benefits that management has determined are not recoverable. The impact of foreign operations relates to income in foreign jurisdictions where the statutory rates, ranging from 0% to 30%, differ from the U.S. statutory rate of 35%. Other items include depletion as well as the reversal of valuation allowance related to current year realization of tax benefits.

For the year ended December 31, 2014, income not subject to tax includes the tax benefit of non-taxable interest income related to an intercompany note between the U.S. and Canada. This note was restructured on April 27, 2014 and no longer results in an income tax benefit after this date.

See NOTE 9 - INCOME TAXES for further information.

54

***Loss from Discontinued Operations, net of tax***

*Loss from Discontinued Operations, net of tax* was comprised primarily of the loss on discontinued operations related to our North American Coal operating segment and our Eastern Canadian Iron Ore operations.

The *Loss from Discontinued Operations, net of tax* related to the North American Coal operating segment was  $152.4 million and $1,134.5 million for the years ended December 31, 2015 and 2014, respectively.

The *Loss from Discontinued Operations, net of tax* related to the deconsolidated Canadian Entities was $739.7 million and $7,233.5 million for the years ended December 31, 2015 and 2014, respectively.

Refer to NOTE 14 - DISCONTINUED OPERATIONS for further information.

***Noncontrolling Interest***

Noncontrolling interest is comprised primarily of the 21% noncontrolling interest in the consolidated, but less-than-wholly owned subsidiary at our Empire mining venture and through the CCAA filing on January 27, 2015, the 17.2% noncontrolling interest in the Bloom Lake operations. The net loss attributable to the noncontrolling interest related to Bloom Lake was $7.7 million and $1,113.3 million for the years ended December 31, 2015 and 2014, respectively. The net income attributable to the noncontrolling interest related to the Empire mining venture was $8.6 million and $26.9 million for the years ended December 31, 2015 and 2014, respectively.

**Results of Operations – Segment Information**

We have historically evaluated segment performance based on sales margin, defined as revenues less cost of goods sold and operating expenses identifiable to each segment. Additionally, we evaluate segment performance based on EBITDA, defined as net income (loss) before interest, income taxes, depreciation, depletion and amortization, and Adjusted EBITDA, defined as EBITDA excluding certain items such as extinguishment/restructuring of debt, impacts of discontinued operations, foreign currency remeasurement, severance and contractor termination costs, certain supplies inventory write-offs, impairment of goodwill and other long-lived assets and other costs associated with the proxy contest and change in control. These measures allow management and investors to focus on our ability to service our debt, as well as illustrate how the business and each operating segment is performing.  Additionally, EBITDA and Adjusted EBITDA assist management and investors in their analysis and forecasting as these measures approximate the cash flows associated with operational earnings.

A005136

*2016 Compared to 2015*

| | (In Millions) | | | |
|---|---:|---:|---:|---:|
| | **2016** | | 2015 | |
| Net Income (Loss) | $ | **199.3** | $ | (748.4) |
| Less: | | | | |
| Interest expense, net | | **(200.5)** | | (231.4) |
| Income tax benefit (expense) | | **12.2** | | (163.3) |
| Depreciation, depletion and amortization | | **(115.4)** | | (134.0) |
| Total EBITDA | $ | **503.0** | $ | (219.7) |
| Less: | | | | |
| Gain on extinguishment of debt | $ | **166.3** | $ | 392.9 |
| Impact of discontinued operations | | **(19.9)** | | (892.0) |
| Foreign exchange remeasurement | | **(16.8)** | | 16.3 |
| Severance and contractor termination costs | | **(0.1)** | | (10.2) |
| Supplies inventory write-off | | **—** | | (16.3) |
| Impairment of goodwill and other long-lived assets | | **—** | | (3.3) |
| Total Adjusted EBITDA | $ | **373.5** | $ | 292.9 |
| | | | | |
| EBITDA: | | | | |
| U.S. Iron Ore | $ | **342.4** | $ | 317.6 |
| Asia Pacific Iron Ore | | **128.3** | | 35.3 |
| Other (including discontinued operations) | | **32.3** | | (572.6) |
| Total EBITDA | $ | **503.0** | $ | (219.7) |
| | | | | |
| Adjusted EBITDA: | | | | |
| U.S. Iron Ore | $ | **359.6** | $ | 352.1 |
| Asia Pacific Iron Ore | | **132.9** | | 32.7 |
| Other | | **(119.0)** | | (91.9) |
| Total Adjusted EBITDA | $ | **373.5** | $ | 292.9 |

EBITDA for the year ended December 31, 2016 increased by $722.7 million on a consolidated basis from 2015. The period-over-period change primarily was driven by the impact of our discontinued operations during the year ended December 31, 2015. Adjusted EBITDA increased by $80.6 million for the year ended December 31, 2016 from the comparable period in 2015. The period-over-period change is a result of operational efficiencies and cost-cutting efforts across each of our business units. See further detail below for additional information regarding the specific factors that impacted each reportable segment's sales margin during 2016.

56

A005137

Table of Contents

### *U.S. Iron Ore*

The following is a summary of U.S. Iron Ore results for the years ended December 31, 2016 and 2015:

| | | | | | (In Millions) | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Changes due to: | | | |
| | Year Ended December 31, | | | Revenue and cost rate | Sales volume | Idle cost/production volume variance | Freight and reimburse-ment | Total change |
| | **2016** | 2015 | | | | | | |
| Revenues from product sales and services | $ **1,554.5** | $ 1,525.4 | $ | (62.0) | $ 73.5 | $ — | $ 17.6 | $ 29.1 |
| Cost of goods sold and operating expenses | **(1,278.8)** | (1,298.3) | | 84.7 | (55.4) | 7.8 | (17.6) | 19.5 |
| Sales margin | $ **275.7** | $ 227.1 | $ | 22.7 | $ 18.1 | $ 7.8 | $ — | $ 48.6 |

| *Per Long Sales Ton Information* | Year Ended December 31, | | Difference | Percent change |
|---|---|---|---|---|
| | **2016** | 2015 | | |
| Realized product revenue rate[1] | $ **75.71** | $ 79.12 | $ (3.41) | (4.3)% |
| Cash cost of goods sold and operating expense rate[1,2] | **55.97** | 60.27 | (4.30) | (7.1)% |
| Depreciation, depletion & amortization | **4.61** | 5.72 | (1.11) | (19.4)% |
| Total cost of goods sold and operating expense rate | **60.58** | 65.99 | (5.41) | (8.2)% |
| Sales margin | $ **15.13** | $ 13.13 | $ 2.00 | 15.2 % |

| | | |
|---|---|---|
| Sales tons[3] (In thousands) | **18,224** | 17,292 |
| Production tons[3] (In thousands) | | |
| Total | **23,416** | 26,138 |
| Cliffs' share of total | **15,982** | 19,317 |

[1] Excludes revenues and expenses related to domestic freight, which are offsetting and have no impact on sales margin. Revenues and expenses also exclude venture partner cost reimbursements.

[2] Cash cost of goods sold and operating expense rate is a non-GAAP financial measure. See "Non-GAAP Reconciliation" for reconciliation in dollars back to our consolidated financial statements.

[3] Tons are long tons (2,240 pounds).

Sales margin for U.S. Iron Ore was $275.7 million for the year ended December 31, 2016, compared with $227.1 million for the year ended December 31, 2015. The increase compared to the prior year is attributable to an increase in revenue of $29.1 million in addition to a decrease in cost of goods sold and operating expenses of $19.5 million. Sales margin increased 15.2% to $15.13 per long ton during the year ended December 31, 2016 compared to 2015.

Revenue increased by $11.5 million, excluding the increase of $17.6 million of freight and reimbursements, from the prior year, predominantly due to:

- Higher sales volumes of 0.9 million long tons, which resulted in increased revenues of $73.5 million due to:

  ◦ Additional short-term contracts in 2016 with two customers, one of which we made no sales to in 2015, providing additional sales volume of 2.4 million long tons.

  ◦ This increase was offset partially by a 1.3 million net reduction in long tons from the termination of a customer contract in the fourth quarter of the prior year that was reinstated in June 2016, to begin in 2017, and nominations on short-term contracts made with the customer in the interim.

- The average year-to-date realized product revenue rate declined by $3.41 per long ton or 4.3% to $75.71 per long ton in the year ended December 31, 2016, which resulted in a decrease of $62.0 million, compared to the prior-year period. The decline is a result of:

57

◦ Changes in customer pricing negatively affected the realized revenue rate by $2 per long ton or $32 million driven primarily by the negative inflation of certain price indices;

◦ An unfavorable variance of $30 million or $2 per long ton due to overall net lower contracted pricing terms for two short-term customer contracts that were based on fixed negotiated rates compared to the prior-year period which was based on a different method; and

◦ An unfavorable change of $17 million or $1 per long ton resulting from various price adjustments, unfavorable customer mix and net of increased service revenue.

◦ These decreases were offset partially by an increase in realized revenue rates of $1 per long ton or $17 million as a result of one major customer contract with a pricing mechanism tied to the full-year estimate of their hot-rolled coil pricing. The increase in revenue is primarily due to the hot-rolled coil estimate increasing in 2016 from the beginning of the year, compared to 2015 when the estimate was revised lower.

Cost of goods sold and operating expenses decreased $37.1 million or $2.04 per long ton, excluding the decrease of $17.6 million of freight and reimbursements from the prior year, predominantly as a result of:

• Lower maintenance and repair costs resulting from cost reduction initiatives and condition based monitoring and Empire's indefinite idle, which began in August 2016 of $28 million or $2 per long ton;

• A year-over-year reduction in energy rates for natural gas and diesel, which lowered costs by $16 million or $1 per long ton and a reduction of employment costs of $12 million or $1 per long ton;

• Various one-time adjustments totaling $28 million or $2 per long ton impacted the year ended December 31, 2016 compared to the previous year, including a positive asset retirement obligation adjustment for a life of mine extension during 2016 of $9 million or $1 per long ton, and a supplies inventory adjustment that occurred in 2015 that was not repeated in 2016 of $15 million or $1 per long ton.

• These decreases were offset partially by increased sales volume as discussed above that increased costs by $55 million or $3 per long ton, in addition to an unfavorable impact from LIFO liquidation of $9 million or $1 per long ton, compared to the prior-year period.

*Production*

Cliffs' share of production tons in its U.S. Iron Ore segment decreased by approximately 3.3 million long tons or 17.3% in 2016 when compared to 2015. The decrease in production volumes primarily is attributable to the idled mining facilities. Our United Taconite operation was idled from August 2015, until it was restarted again in August 2016. As a result, our United Taconite operation was in full production for one-third of the year versus operating at full production for two-thirds of the prior year causing a decrease in production volume of 1.5 million long tons. Secondly, our Northshore mining operations were fully idled, including all four furnaces from November 2015 until May 2016, compared to running a three furnace operation for most of 2015 until the full idle began in November 2015, reducing production by 1.0 million long tons during 2016.

58

Table of Contents

*Asia Pacific Iron Ore*

The following is a summary of Asia Pacific Iron Ore results for the years ended  December 31, 2016 and 2015:

| | | | | | (In Millions) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Change due to: | | | | |
| | **Year Ended December 31,** | | Revenue and cost rate | | Sales volume | | Exchange rate | | Freight and reimburse-ment | Total change |
| | **2016** | 2015 | | | | | | | | |
| Revenues from product sales and services | $ 554.5 | $ 487.9 | $ 69.2 | | $ 0.7 | | $ (0.4) | | $ (2.9) | $ 66.6 |
| Cost of goods sold and operating expenses | (440.9) | (478.5) | 29.8 | | (0.6) | | 5.5 | | 2.9 | 37.6 |
| Sales margin | $ 113.6 | $ 9.4 | $ 99.0 | | $ 0.1 | | $ 5.1 | | $ — | $ 104.2 |

| *Per Metric Sales Ton Information* | **Year Ended December 31,** | | Difference | Percent change |
|---|---|---|---|---|
| | **2016** | 2015 | | |
| Realized product revenue rate[1] | $ 45.85 | $ 39.93 | $ 5.92 | 14.8 % |
| Cash cost of goods sold and operating expense rate[1,2] | 33.94 | 36.95 | (3.01) | (8.1)% |
| Depreciation, depletion & amortization | 2.16 | 2.18 | (0.02) | (0.9)% |
| Total cost of goods sold and operating expense rate | 36.10 | 39.13 | (3.03) | (7.7)% |
| Sales margin | $ 9.75 | $ 0.80 | $ 8.95 | 1,118.8 % |
| | | | | |
| Sales tons[3] (In thousands) | 11,642 | 11,627 | | |
| Production tons[3] (In thousands) | 11,839 | 11,722 | | |

[1] The information above excludes revenues and expenses related to freight, which are offsetting and have no impact on sales margin.

[2] Cash cost of goods sold and operating expense rate is a non-GAAP financial measure. See "Non-GAAP Reconciliation" for reconciliation in dollars back to our consolidated financial statements.

[3] Metric tons (2,205 pounds).

Sales margin for our Asia Pacific Iron Ore segment increased to  $113.6 million during the year ended December 31, 2016 compared with $9.4 million for 2015. The increase compared to the prior year primarily is attributable to higher revenue of  $66.6 million and lower cost of goods sold and operating expenses of $37.6 million. Sales margin per metric ton increased 1,118.8% to $9.75 per metric ton in 2016 compared to 2015.

Revenue increased by $69.5 million during the year ended December 31, 2016 over the prior year, excluding the decrease of  $2.9 million of freight and reimbursements, primarily as a result of:

- The average year-to-date realized product revenue rate increased $5.92 per metric ton or 14.8% to $45.85 per metric ton during the year ended December 31, 2016, compared to the previous year, which resulted in an increase of  $68.8 million, including the impact of foreign exchange. This increase is a result of:

  ◦ An increase in the Platts 62% Price positively affected the realized revenue rate by $3 per metric ton or $33 million; and

  ◦ A favorable variance of $3 per metric ton or $29 million due to the suspension in 2015 of the hedging program that protected against volatility in exchange rates. This did not occur in 2016.

Cost of goods sold and operating expenses decreased  $34.7 million or $2.98 per metric ton, in the year ended  December 31, 2016 over the prior-year period, excluding the decrease of $2.9 million of freight and reimbursements, primarily as a result of:

59

Table of Contents

- Reduced administration and employment costs of $16 million or $1 per metric ton, due to lower headcount and contractor fees;

- A reduction in mining costs of $12 million or $1 per metric ton, due to mining efficiencies gained from our revised mine plan, including a reduction in the required mined tons to meet our desired yields;

- Lower transportation costs of $11 million or $1 per metric ton, due to decreased hauling volumes and reduced freight costs as a result of the revised mine plan; and

- Favorable foreign exchange rate variances of $6 million or $1 per metric ton.

- Partially offset by increased crushing costs due to increased maintenance activities and our use of a third-party mobile crushing unit and increased royalties, which were driven by higher gross revenues, for $9 million or $1 per metric ton.

*Production*

Production volume at our Asia Pacific Iron Ore mining complex during the year ended  December 31, 2016 remained consistent with 2015, increasing 117 thousand metric tons or 1.0%. The increase in production tons compared to the prior year is mainly attributable to increased crusher feed productivity and the use of third-party mobile crusher support.

60

Table of Contents

*2015 Compared to 2014*

| | (In Millions) | |
|---|---|---|
| | 2015 | 2014 |
| Net Loss | $ (748.4) | $ (8,311.6) |
| Less: | | |
| Interest expense, net | (231.4) | (185.2) |
| Income tax benefit (expense) | (163.3) | 1,302.0 |
| Depreciation, depletion and amortization | (134.0) | (504.0) |
| EBITDA | $ (219.7) | $ (8,924.4) |
| Less: | | |
| Gain on extinguishment of debt | $ 392.9 | $ 16.2 |
| Impact of discontinued operations | (892.0) | (9,332.5) |
| Foreign exchange remeasurement | 16.3 | 29.0 |
| Severance and contractor termination costs | (10.2) | (23.3) |
| Supplies inventory write-off | (16.3) | — |
| Impairment of goodwill and other long-lived assets | (3.3) | (635.5) |
| Proxy contest and change in control costs in SG&A | — | (26.6) |
| Total Adjusted EBITDA | $ 292.9 | $ 1,048.3 |
| | | |
| EBITDA: | | |
| U.S. Iron Ore | $ 317.6 | $ 805.6 |
| Asia Pacific Iron Ore | 35.3 | (352.9) |
| Other (including discontinued operations) | (572.6) | (9,377.1) |
| Total EBITDA | $ (219.7) | $ (8,924.4) |
| | | |
| Adjusted EBITDA: | | |
| U.S. Iron Ore | $ 352.1 | $ 833.5 |
| Asia Pacific Iron Ore | 32.7 | 252.9 |
| Other | (91.9) | (38.1) |
| Total Adjusted EBITDA | $ 292.9 | $ 1,048.3 |

EBITDA for the year ended December 31, 2015 increased by $8.7 billion on a consolidated basis from 2014. The period-over-period change was driven primarily by the items detailed above in the EBITDA calculation. Adjusted EBITDA decreased by $755.4 million for the year ended December 31, 2015 from 2014. The decrease was primarily attributable to the lower consolidated sales margin. See further detail below for additional information regarding the specific factors that impacted each reportable segment's sales margin during 2015.

61

A005142

Table of Contents

### *U.S. Iron Ore*

The following is a summary of U.S. Iron Ore results for the years ended December 31, 2015 and 2014:

| | (In Millions) | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | Change due to | | | | |
| | Year Ended December 31, | | Revenue and cost rate | Sales volume | Idle cost/Production volume variance | Freight and reimburse-ment | Total change |
| | 2015 | 2014 | | | | | |
| Revenues from product sales and services | $ 1,525.4 | $ 2,506.5 | $ (401.9) | $ (465.4) | $ — | $ (113.8) | $ (981.1) |
| Cost of goods sold and operating expenses | (1,298.3) | (1,796.1) | 140.2 | 305.3 | (61.5) | 113.8 | 497.8 |
| Sales margin | $ 227.1 | $ 710.4 | $ (261.7) | $ (160.1) | $ (61.5) | $ — | $ (483.3) |

| *Per Long Sales Ton Information* | Year Ended December 31, | | Difference | Percent change |
|---|---|---|---|---|
| | 2015 | 2014 | | |
| Realized product revenue rate[1] | $ 79.12 | $ 102.36 | $ (23.24) | (22.7)% |
| Cash cost of goods sold and operating expense rate[1,2] | 60.27 | 64.91 | (4.64) | (7.1)% |
| Depreciation, depletion & amortization | 5.72 | 4.92 | 0.80 | 16.3 % |
| Total cost of goods sold and operating expenses rate | 65.99 | 69.83 | (3.84) | (5.5)% |
| Sales margin | $ 13.13 | $ 32.53 | $ (19.40) | (59.6)% |

| | | |
|---|---|---|
| Sales tons[3] (In thousands) | 17,292 | 21,840 |
| Production tons[3] (In thousands) | | |
| Total | 26,138 | 29,733 |
| Cliffs' share of total | 19,317 | 22,431 |

[1] Excludes revenues and expenses related to domestic freight, which are offsetting and have no impact on sales margin. Revenues and expenses also exclude venture partner cost reimbursements.

[2] Cash cost of goods sold and operating expense rate is a non-GAAP financial measure. See *"Non-GAAP Reconciliation"* for reconciliation in dollars back to our consolidated financial statements.

[3] Tons are long tons (2,240 pounds).

Sales margin for U.S. Iron Ore was $227.1 million for the year ended December 31, 2015, compared with the sales margin of $710.4 million for the year ended December 31, 2014. The decline compared to the prior year is attributable to a decrease in revenue of $981.1 million partially offset by a decrease in cost of goods sold and operating expenses of $497.8 million. Sales margin decreased 59.6% to $13.13 per long ton during the year ended December 31, 2015 compared to 2014.

Revenue decreased by $867.3 million, excluding the decrease of $113.8 million of freight and reimbursements, from the prior year, predominantly due to:

• The average year-to-date realized product revenue rate declined by $23.24 per long ton or 22.7% to $79.12 per long ton in 2015, which resulted in a decrease of $401.9 million. This decline is a result of:

◦ Changes in customer pricing negatively affected the realized revenue rate by $9 per long ton driven primarily by the reduction in Platts 62% Price as well as other indices referenced in customer contracts;

◦ Realized revenue rates impacted negatively by $7 per long ton primarily as a result of one major customer contract with a pricing mechanism affected by a reduction in their full-year hot-rolled coil pricing; and

Table of Contents

◦ Realized revenue rates impacted negatively by $5 per long ton related to one major customer contract with a reduced average selling price due to a change in the pricing mechanism as prescribed in the contract which shifted the contract from a fixed rate to a rate impacted by the Platts 62% Price, as well as other market rates plus the impact and timing of carryover tons.

• Lower sales volumes of 4,548 thousand long tons or $465.4 million due to:

◦ A lower nomination in 2015 from one customer due to reduced 2015 demand, reduced demand from a customer due to the idling of its blast furnace beginning in March 2015 and the expiration of a contract with one customer at the end of 2014; and

◦ Lower sales to one customer in 2015 due to the termination of a contract in the fourth quarter of the current year.

◦ These decreases were partially offset by higher sales to one customer throughout 2015 due to a spot contract with the customer that began in the fourth quarter of 2014.

Cost of goods sold and operating expenses in 2015 decreased $384.0 million, excluding the decrease of $113.8 million of freight and reimbursements from the prior year, predominantly as a result of:

• Lower costs in 2015 in comparison to the prior year primarily driven by the reduction in salaried workforce headcount, along with reduced maintenance and repair costs based on cost reduction initiatives and condition-based monitoring, reduced stripping costs at Tilden and Hibbing based on new mine plans, and the year-over-year reduction in energy rates; and

• Decreased sales volumes, as discussed above, that decreased costs by $305.3 million compared to the prior year.

• Partially offset by increased idle costs of $61.5 million due to the idle of United Taconite mine which began in the first week of August 2015, the idle of the Empire mine which began on June 26, 2015 and ended in mid-October 2015, and one idled production line at our Northshore mine during all of 2015, until the complete idle of Northshore mine in the end of November 2015.

*Production*

Cliffs' share of production tons in its U.S. Iron Ore segment decreased by 13.9% in 2015 when compared to 2014. Empire mine had a decrease in production of 1,045 thousand long tons related to the idling of Empire that began on June 26, 2015 and ended during mid-October of 2015. United Taconite mine had a decrease in production of 1,866 thousand long tons during 2015 compared to 2014, primarily due to the idling of United Taconite mine that began the first week of August 2015. There was a decrease in production of 965 thousand long tons at the Northshore mine during 2015, as we ran a three furnace operation throughout 2015 until the complete idle of Northshore mine in the end of November 2015. This is compared to 2014 when we ran a two furnace operation at Northshore for the majority of the first quarter and then started up one idled furnace in February and the other in March.

63

Table of Contents

*Asia Pacific Iron Ore*

The following is a summary of Asia Pacific Iron Ore results for the years ended December 31, 2015 and 2014:

| | | | | (In Millions) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Change due to | | | | | | | | |
| | Year Ended December 31, | | | Revenue and cost rate | | Sales Volume | | Exchange Rate | | Freight and reimburse-ment | | Total change | | |
| | 2015 | | 2014 | | | | | | | | | | | |
| Revenues from product sales and services | $ | 487.9 | $ | 866.7 | $ | (402.5) | $ | 7.3 | $ | (0.3) | $ | 16.7 | $ | (378.8) |
| Cost of goods sold and operating expenses | | (478.5) | | (745.0) | | 194.8 | | (6.2) | | 94.6 | | (16.7) | | 266.5 |
| Sales margin | $ | 9.4 | $ | 121.7 | $ | (207.7) | $ | 1.1 | $ | 94.3 | $ | — | $ | (112.3) |

| Per Metric Sales Ton Information | Year Ended December 31, | | | Difference | | Percent change | |
|---|---|---|---|---|---|---|---|
| | 2015 | | 2014 | | | | |
| Realized product revenue rate[1] | $ | 39.93 | $ | 74.56 | $ | (34.63) | (46.4)% |
| Cash cost of goods sold and operating expense rate[1,2] | | 36.95 | | 51.36 | | (14.41) | (28.1)% |
| Depreciation, depletion & amortization | | 2.18 | | 12.65 | | (10.47) | (82.8)% |
| Total cost of goods sold and operating expenses rate | | 39.13 | | 64.01 | | (24.88) | (38.9)% |
| Sales margin | $ | 0.80 | $ | 10.55 | $ | (9.75) | (92.4)% |

| | | | |
|---|---|---|---|
| Sales tons[3] (In thousands) | | 11,627 | 11,531 |
| Production tons[3] (In thousands) | | 11,722 | 11,352 |

[1] We began selling a portion of our product on a CFR basis in 2014. As such, the information above excludes revenues and expenses related to freight, which are offsetting and have no impact on sales margin.

[2] Cash cost of goods sold and operating expense rate is a non-GAAP financial measure. See "Non-GAAP Reconciliation" for reconciliation in dollars back to our consolidated financial statements.

[3] Metric tons (2,205 pounds).

Sales margin for our Asia Pacific Iron Ore segment decreased to $9.4 million during the year ended December 31, 2015 compared with $121.7 million for 2014. Sales margin per metric ton decreased 92.4% to $0.80 per metric ton in 2015 compared to 2014 primarily as a result of decreased pricing as described below.

Revenue decreased by $395.5 million during the year ended December 31, 2015 over the prior year, excluding the increase of $16.7 million of freight and reimbursements, primarily as a result of:

- An overall decrease to the average realized revenue rate, which resulted in a decrease of $402.5 million, primarily as a result of a decrease in the Platts 62% Price to an average of $56 per metric ton from $97 per metric ton in the prior year.

- This decrease is partially offset by the higher sales volume of 11.6 million metric tons during the year ended December 31, 2015 compared with 11.5 million metric tons resulting in an increase of $7.3 million.

Cost of goods sold and operating expenses in the year ended December 31, 2015 decreased $283.2 million, excluding the increase of $16.7 million of freight and reimbursements, compared to 2014 primarily as a result of:

- A reduction in depreciation, amortization and depletion expense of $120.6 million primarily due to the long-lived asset impairments taken during the second half of 2014 and reduced mining costs of $79.4 million mainly due to decreased mining and hauling volumes and increases in productivity related to maintenance, hauling and train loading, and lower headcount; and

- Favorable foreign exchange rate variances of $94.6 million or $8 per metric ton.

64

Table of Contents

- These decreases were offset partially by higher sales volumes, as discussed above, that resulted in increased costs of $6.2 million compared to the prior year.

*Production*

Production at our Asia Pacific Iron Ore segment during the year ended December 31, 2015 remained consistent when compared to 2014 with a slight increase in production of 370 thousand metric tons or 3.3%. The increase in production tons compared to the prior year is mainly attributable to increased rail capacity.

## Liquidity, Cash Flows and Capital Resources

Our primary sources of liquidity are cash generated from our operating and financing activities. Our capital allocation process is focused on improving the strength of our balance sheet and creating financial flexibility to manage through the inherent cyclical demand for our products and volatility in commodity prices. We are focused on the preservation of liquidity in our business through the maximization of cash generation of our operations as well as reducing operating costs, limiting capital investments to those required to meet the current business plan, including regulatory and permission-to-operate related projects, and managing SG&A expenses. During the year ended December 31, 2016, we issued common shares in an underwritten public offering, which provided net proceeds of $287.4 million that we used to fully redeem our senior notes due 2018. As demonstrated in prior periods, we will continue to seek additional opportunities to reduce our debt, including, without limitation, through further repurchases or exchange of our debt securities, including in exchange for our common shares, and with the proceeds from equity issuances. Additionally, we may seek to refinance our existing debt, including refinancing our secured debt with unsecured debt. Despite the improving conditions we experienced during 2016, we believe these efforts, which have been ongoing and will continue for the foreseeable future, remain a priority.

Based on our outlook for the next 12 months, which is subject to continued changing demand from steel makers that utilize our products and volatility in iron ore and domestic steel prices, we expect to generate cash from operations sufficient to meet our anticipated capital expenditures and cash requirements to service our debt obligations. Furthermore, we maintain incremental liquidity through the cash on our balance sheet and the availability provided by our ABL Facility.

Despite the constructive market conditions that exist today, if we were to experience reduced demand from our customers and/or iron ore or steel prices deteriorate significantly, we would face pressure on our available liquidity. If this was the case, we would need to consider the sale of assets, further expense reductions and the possibility of accessing the capital markets, which could include issuing the remaining capacity under our senior secured notes. There is a possibility that these further actions would not be sufficient to maintain adequate levels of available liquidity particularly if industry conditions deteriorated severely.

Refer to "Outlook" for additional guidance regarding expected future results, including projections on pricing, sales volume and production.

The following discussion summarizes the significant activities impacting our cash flows during 2016 as well as those expected to impact our future cash flows over the next 12 months. Refer to the Statements of Consolidated Cash Flows for additional information.

### *Operating Activities*

Net cash provided by operating activities increased to $303.0 million for the year ended December 31, 2016, compared to net cash provided by operating activities of $37.9 million for 2015. The increase in operating cash flows in 2016 was primarily due to the better operating results previously discussed related to both the U.S. Iron Ore and Asia Pacific Iron Ore operating segments, and improved cash flows from working capital. The working capital improvement in 2016 versus 2015 was driven by aggressively reducing inventory levels partially offset by the prior-year income tax refund discussed below. Sales volume outpaced production volume in 2016, while in 2015, production volume was higher than sales volume.

Net cash provided by operating activities decreased to $37.9 million for the year ended December 31, 2015, compared to net cash provided by operating activities of $358.9 million for 2014. The decrease in operating cash flows in 2015 was primarily due to lower operating results as previously discussed, which was partially offset by an income tax refund of $211.4 million, mainly related to our U.S. federal income tax. Positively affecting our operating cash flows in 2015 and continuing into 2016 are the decreased costs associated with the temporary idles of United Taconite mine and Northshore mine.

During 2016, the Platts 62% Price showed resiliency and outperformed the levels seen in 2015. We believe this is the result of improved sentiment about steel demand in China and signs of high-cost capacity closures as well as more

65

disciplined approach to supply instituted by the major iron ore producers, most notably Rio Tinto. Furthermore, major supply additions from both Brazil and Australia anticipated to come online in 2016 have experienced difficulties ramping up and completion dates have been further delayed. We believe the new management teams at the major iron ore producers will continue this disciplined supply approach through 2017, which could help maintain or even improve these current price levels.

We believe we have sufficient capital resources for the next 12 months to support our operations and other financial obligations through cash generated from operations and our financing arrangements augmented by our efficient tax structure that allows us to repatriate cash from our foreign operations, if necessary. Our U.S. cash and cash equivalents balance at December 31, 2016 was $287.1 million, or 89% of our consolidated total cash and cash equivalents balance of $323.4 million.

### Investing Activities

Net cash used in investing activities was $57.9 million for the year ended December 31, 2016, compared with $103.2 million for 2015. We had capital expenditures of $69.1 million and $80.8 million for the years ended December 31, 2016 and 2015, respectively. Offsetting our investments in property, plant and equipment, during 2016, we had cash proceeds from investing activities of $8.3 million, primarily from the collection of a debtor-in-possession credit facility (the "DIP financing").

Net cash used by investing activities was $103.2 million for the year ended December 31, 2015, compared with $103.6 million for 2014. We had capital expenditures of $80.8 million and $284.1 million for the years ended December 31, 2015 and 2014, respectively. Offsetting our investments in property, plant and equipment, during 2014, we had cash proceeds from investing activities of $155.0 million from the sale of CLCC.

We spent approximately $43 million, $81 million and $232 million globally on expenditures related to sustaining capital during 2016, 2015 and 2014, respectively. Sustaining capital spend includes infrastructure, mobile equipment, environmental, safety, fixed equipment, product quality and health. Additionally, during 2016 we spent approximately $27 million on our capital project to produce a specialized, super-flux pellet called "Mustang" at United Taconite in order to meet a customer's pellet specification requirements.

In alignment with our strategy to focus on allocating capital among key priorities related to liquidity management, and business investment, we anticipate total cash used for capital expenditures in 2017 to be approximately $105 million, the vast majority of which relates to our U.S. Iron Ore operations. Included within this estimate, we expect to spend an additional $40 million in 2017 in order to complete the Mustang project.

### Financing Activities

Net cash used in financing activities was $206.4 million for the year ended December 31, 2016, compared with net cash provided by financing activities of $61.0 million for 2015. Net cash used by financing activities included the redemption of all of our outstanding senior notes due 2018 for $305.4 million, which was offset partially by net proceeds from the issuance of common shares of $287.4 million. Additionally, we paid off the remaining balance of certain of our equipment loans, which resulted in cash outflows of $95.6 million. We made further cash outflows related to financing activities attributable to agreed-upon early distributions of partnership equity of $59.9 million during the year ended December 31, 2016 and paid the last such scheduled early distribution of partnership equity of approximately $8.7 million in January 2017. The partners are in discussion regarding distribution of the remaining assets and/or equity interest, if any, in the partnership.

Net cash provided by financing activities was $61.0 million for the year ended December 31, 2015, compared with net cash used in financing activities of $288.3 million for 2014. Net cash provided by financing activities included the issuance of First Lien Notes, which resulted in proceeds of $503.5 million that were offset partially by the repurchase of senior notes of $225.9 million and debt issuance costs of $33.6 million. Additionally, net cash used by financing activities during 2015 and 2014 included $45.4 million and $20.9 million, respectively, for the repayment of the Canadian equipment loans, and $51.2 million of preferred dividend distributions in each of those periods. On January 4, 2016, we announced that under the terms of our Preferred Shares, the final quarterly dividend would not be paid in cash. The year ended December 31, 2014 also included common dividend distributions of $92.5 million. On January 26, 2015, we announced that our Board of Directors had decided to eliminate the quarterly dividend of $0.15 per share on our common shares. The decision was applicable to the first quarter of 2015 and all subsequent quarters.

Table of Contents

The following represents our future cash commitments and contractual obligations as of  December 31, 2016:

| Contractual Obligations | Total | Payments Due by Period[1] (In Millions) | | | |
| | | Less than 1 Year | 1 - 3 Years | 3 - 5 Years | More than 5 Years |
|---|---|---|---|---|---|
| Long-term debt | $ 2,258.8 | $ — | $ — | $ 1,960.4 | $ 298.4 |
| Interest on debt[2] | 950.1 | 153.8 | 307.6 | 134.4 | 354.3 |
| Operating lease obligations | 21.4 | 6.9 | 8.6 | 5.9 | — |
| Capital lease obligations | 67.8 | 22.0 | 27.8 | 17.3 | 0.7 |
| Guarantees and contingent liabilities | 39.3 | 2.3 | 37.0 | — | — |
| Purchase obligations: | | | | | |
| Open purchase orders | 73.4 | 73.4 | — | — | — |
| Minimum "take or pay" purchase commitments [3] | 524.5 | 98.6 | 159.9 | 149.9 | 116.1 |
| Total purchase obligations | 597.9 | 172.0 | 159.9 | 149.9 | 116.1 |
| Other long-term liabilities: | | | | | |
| Pension funding minimums | 335.2 | 24.5 | 65.6 | 63.4 | 181.7 |
| OPEB claim payments | 110.3 | 4.1 | 7.9 | 7.6 | 90.7 |
| Environmental and mine closure obligations | 206.8 | 13.2 | 1.2 | 15.1 | 177.3 |
| Personal injury | 6.7 | 2.6 | 2.4 | 0.6 | 1.1 |
| Total other long-term liabilities | 659.0 | 44.4 | 77.1 | 86.7 | 450.8 |
| Total | $ 4,594.3 | $ 401.4 | $ 618.0 | $ 2,354.6 | $ 1,220.3 |

[1] Includes our consolidated obligations.

[2] Refer to NOTE 5 - DEBT AND CREDIT FACILITIES of the Consolidated Financial Statements for additional information regarding our debt and related interest rates.

[3] Includes minimum railroad transportation obligations, minimum electric power demand charges, minimum coal, diesel and natural gas obligations and minimum port facility obligations.

The above table does not reflect $30.7 million of unrecognized tax benefits, which we have recorded for uncertain tax positions as we are unable to determine a reasonable and reliable estimate of the timing of future payments.

Refer to NOTE 20 - COMMITMENTS AND CONTINGENCIES of the Consolidated Financial Statements for additional information regarding our future commitments and obligations.

A005148

*Capital Resources*

We expect to fund our business obligations from available cash, current and future operations and existing borrowing arrangements. We also may pursue other funding strategies in the capital markets to strengthen our liquidity. The following represents a summary of key liquidity measures as of December 31, 2016 and December 31, 2015:

| | (In Millions) | |
| --- | --- | --- |
| | December 31, 2016 | December 31, 2015 |
| Cash and cash equivalents | $ 323.4 | $ 285.2 |
| Available borrowing base on ABL Facility [1] | 333.0 | 366.0 |
| ABL Facility loans drawn | — | — |
| Letter of credit obligations and other commitments | (106.0) | (186.8) |
| Borrowing capacity available | $ 227.0 | $ 179.2 |

[1] The ABL Facility has the maximum borrowing base of $550 million, determined by applying customary advance rates to eligible accounts receivable, inventory and certain mobile equipment.

Our primary source of external funding is our ABL Facility, which matures on March 30, 2020. We also have cash on hand, generated by the business, which totaled $323.4 million as of December 31, 2016. The combination of cash and availability under the ABL Facility gives us approximately $550.4 million in liquidity entering the first quarter of 2017, which is expected to be used to fund operations, letter of credit obligations, sustaining capital expenditures and other cash commitments for at least the next 12 months. Based on expected reductions in underlying obligations, letters of credit obligations are expected to decrease by approximately $21 million in the next 12 months.

As of December 31, 2016, we were in compliance with the ABL Facility liquidity requirements and, therefore, the springing financial covenant requiring a minimum Fixed Charge Coverage Ratio of 1.0 to 1.0 was not applicable. We believe that the cash on hand and the ABL Facility provide us sufficient liquidity to support our operating, investing and financing activities.

Although we believe that our cash on hand and availability under our ABL Facility provide us sufficient liquidity to support our operating and investing activities, we have the capability to issue additional 1.5 Lien Notes and additional Second Lien Notes, both subject to compliance with the Fixed Charge Coverage Ratio and other applicable covenants under our ABL Facility.

Consistent with our stated strategy, we intend from time to time to seek to retire or purchase our outstanding senior notes with cash on hand, borrowings from existing credit sources or new debt financings and/or exchanges for debt or equity securities, in open market purchases, privately negotiated transactions or otherwise. Such repurchases, if any, will depend on prevailing market conditions, our liquidity requirements, contractual restrictions and other factors, and the amounts involved may be material.

*Off-Balance Sheet Arrangements*

In the normal course of business, we are a party to certain arrangements that are not reflected on our    Statements of Consolidated Financial Position . These arrangements include minimum "take or pay" purchase commitments, such as minimum electric power demand charges, minimum coal, diesel and natural gas purchase commitments, minimum railroad transportation commitments and minimum port facility usage commitments; financial instruments with off-balance sheet risk, such as bank letters of credit and bank guarantees; and operating leases, which primarily relate to equipment and office space.

## Market Risks

We are subject to a variety of risks, including those caused by changes in commodity prices, foreign currency exchange rates and interest rates. We have established policies and procedures to manage such risks; however, certain risks are beyond our control.

A005149

### Pricing Risks

#### Commodity Price Risk

Our consolidated revenues include the sale of iron ore pellets, iron ore lump and iron ore fines. Our financial results can vary significantly as a result of fluctuations in the market prices of iron ore and hot-rolled coil. World market prices for these commodities have fluctuated historically and are affected by numerous factors beyond our control. The world market price that most commonly is utilized in our iron ore sales contracts is the Platts 62% Price, which can fluctuate widely due to numerous factors, such as global economic growth or contraction, change in demand for steel or changes in availability of supply. The other important metric in our price realizations in the U.S. is the prices for hot-rolled coil, which can fluctuate due to similar factors.

#### Provisional Pricing Arrangements

Certain of our U.S. Iron Ore and Asia Pacific Iron Ore customer supply agreements specify provisional price calculations, where the pricing mechanisms generally are based on market pricing, with the final revenue rate to be based on market inputs at a specified point in time in the future, per the terms of the supply agreements. At December 31, 2016, we had derivative assets and liabilities of $10.3 million and $0.5 million, respectively, reflected as part of our U.S. Iron Ore and Asia Pacific Iron Ore segment revenue, representing the fair value of the provisional price calculations. We estimate that a positive or negative $10 change in the Platts 62% Price from the December 31, 2016 estimated price recorded would cause the fair value of the derivative instrument to increase or decrease by approximately $8 million, respectively, for our Asia Pacific Iron Ore segment. Additionally, for our U.S. Iron Ore segment, one customer's supply agreement has a pricing mechanism based on 2017 hot rolled coil index pricing in addition to the Platts 62% Price. In this case, a $75 positive or negative change in the hot rolled coil index pricing would cause the fair value of the derivative instrument to increase or decrease by approximately $3 million, respectively, thereby impacting our consolidated revenues by the same amount.

We have not entered into any hedging programs to mitigate the risk of adverse price fluctuations; however, most of our Asia Pacific Iron Ore supply agreements are short-term in nature and therefore do not expose us to long-term risk.

#### Customer Supply Agreements

A certain supply agreement with one U.S. Iron Ore customer provides for supplemental revenue or refunds based on the customer's average annual hot-rolled coil steel pricing at the time the product is consumed in the customer's blast furnace. In the new contract which commences in 2017, this supplemental revenue and refund data source changes from the customer's average annual steel price to an indexed hot-rolled coil price. At December 31, 2016, we had derivative assets of $21.3 million, representing the fair value of the pricing factors, based upon the amount of unconsumed long tons and an estimated average hot-rolled coil price related to the period in which the long tons are expected to be consumed in the customer's blast furnace at each respective steelmaking facility, subject to final pricing at a future date. We estimate that a $75 positive or negative change in the customer's average hot-rolled coil price realized from the December 31, 2016 estimated price recorded would cause the fair value of the derivative instrument to increase or decrease by approximately $9 million, thereby impacting our consolidated revenues by the same amount.

We have not entered into any hedging programs to mitigate the risk of adverse price fluctuations; however certain of our term supply agreements contain price collars, which typically limit the percentage increase or decrease in prices for our products during any given year.

#### Volatile Energy and Fuel Costs

The volatile cost of energy is an important issue affecting our production costs, primarily in relation to our iron ore operations. Our consolidated U.S. Iron Ore mining ventures consumed approximately 17.8 million MMBtu's of natural gas at an average delivered price of $3.03 per MMBtu excluding the natural gas hedge impact or $3.04 per MMBtu net of the natural gas hedge impact during 2016. Additionally, our consolidated U.S. Iron Ore mining ventures consumed approximately 20.5 million gallons of diesel fuel at an average delivered price of $1.64 per gallon excluding the diesel fuel hedge impact or $1.61 per gallon net of the diesel fuel hedge impact during 2016. Consumption of diesel fuel by our Asia Pacific operations was approximately 9.9 million gallons at an average delivered price of $1.59 per gallon for the same period.

In the ordinary course of business, there may also be increases in electrical costs at our U.S. mine sites. Specifically, our Tilden mine in Michigan has entered into large curtailable special contracts with Wisconsin Electric Power Company. Charges under those special contracts are subject to a power supply cost recovery mechanism that is based on variations in the utility's actual fuel and purchase power expenses.

Table of Contents

Our strategy to address increasing natural gas and diesel rates includes improving efficiency in energy usage, identifying alternative providers and utilizing the lowest cost alternative fuels. An energy hedging program was implemented in order to manage the price risk of diesel and natural gas at our U.S. Iron Ore mines during the first quarter of 2016 and was replicated for the first quarter of 2017. We will continue to monitor relevant energy markets for risk mitigation opportunities and may make additional forward purchases or employ other hedging instruments in the future as warranted and deemed appropriate by management. In the near term, a 10% change in natural gas and diesel fuel prices would result in a change of approximately $10.6 million in our annual fuel and energy cost based on expected consumption for 2017. However, due to our regulated electrical contracts with our suppliers, we have a reduced risk compared to market based electricity rates.

### Valuation of Other Long-Lived Assets

Long-lived assets are reviewed for impairment upon the occurrence of events or changes in circumstances that would indicate that the carrying value of the assets may not be recoverable. Such indicators may include, among others: a significant decline in expected future cash flows; a sustained, significant decline in market pricing; a significant adverse change in legal or environmental factors or in the business climate; changes in estimates of our recoverable reserves; unanticipated competition; and slower growth or production rates. Any adverse change in these factors could have a significant impact on the recoverability of our long-lived assets and could have a material impact on our consolidated statements of operations and statement of financial position.

### Foreign Currency Exchange Rate Risk

We are subject to changes in foreign currency exchange rates as a result of our operations in Australia, which could impact our financial condition. With respect to Australia, foreign exchange currency risk arises from our exposure to fluctuations in foreign currency exchange rates because our reporting currency is the U.S. dollar, but the functional currency of our Asia Pacific operations is the Australian dollar.  Our Asia Pacific operations receive funds in U.S. currency for their iron ore sales and incur costs in Australian dollars.

We have not entered into any hedging programs to mitigate the risk of adverse currency fluctuations. Our last outstanding Australian foreign exchange rate contract held as a cash flow hedge matured in October 2015. We have suspended entering into new foreign exchange rate contracts through 2017 as we have waived compliance with our current derivative financial instruments and hedging activities policy through December 31, 2017. In the future, we may enter into additional hedging instruments as needed in order to further hedge our exposure to changes in foreign currency exchange rates.

### Interest Rate Risk

Interest payable on our senior notes is at fixed rates. Interest payable under our ABL Facility is at a variable rate based upon the base rate plus the base rate margin depending on the excess availability. As of December 31, 2016, we had no amounts drawn on the ABL Facility.

### Supply Concentration Risks

Many of our mines are dependent on one source each of electric power and natural gas. A significant interruption or change in service or rates from our energy suppliers could impact materially our production costs, margins and profitability.

## Outlook

In 2017, we expect to generate $510 million of net income and $850 million of adjusted EBITDA (See   *Non-GAAP Reconciliation - EBITDA and Adjusted EBITDA Outlook* below for reconciliation.) This expectation is based on the assumption that iron and steel prices will average levels consistent with the full month of January throughout 2017. In future quarters, we anticipate continuing to update 2017 net income and adjusted EBITDA guidance.

## Segment Outlook

Consistent with the SEC's recent guidance on the presentation of non-GAAP financial measures, we will be taking a more robust approach to reconciling our non-GAAP measures. We will begin providing guidance for cost of goods sold and operating expense rate including freight and venture partner's cost reimbursements, which have offsetting amounts in revenue and have no impact on sales margin. In the 2017 outlook summary below, a reconciliation to cash costs of goods sold and operating expense rate is provided for our two business segments, consistent with how guidance was previously shown.

| Per Sales Ton Information | 2017 Outlook Summary | |
|---|---|---|
| | U.S. Iron Ore (A) | Asia Pacific Iron Ore (B) |
| Cost of goods sold and operating expense rate | $70 - $75 | $37 - $42 |
| Less: | | |
| Freight and venture partner's cost reimbursements expense rate (C) | $11 | $2 |
| Depreciation, depletion & amortization rate | $4 | $1 |
| Cash cost of goods sold and operating expense rate | $55 - $60 | $34 - $39 |
| | | |
| Sales volume (million tons) | 19.0 | 11.5 |
| Production volume (million tons) | 19.0 | 11.5 |

(A) U.S. Iron Ore tons are reported in long tons of pellets.

(B) Asia Pacific Iron Ore tons are reported in metric tons of lump and fines.

(C) The freight and venture partners' cost reimbursements have offsetting amounts in revenue and have no impact on sales margin.

**U.S. Iron Ore Outlook** (Long Tons)

As previously disclosed, for 2017, we expect full-year sales and production volumes of approximately 19 million long tons from our U.S. Iron Ore business. This compares to 18.2 million long tons of sales and 16.0 million long tons of production in 2016.

Our full-year 2017 U.S. Iron Ore cash cost of goods sold and operating expense expectation is $55 - $60 per long ton, which compares to $56 per long ton for the full-year 2016.

**Asia Pacific Iron Ore Outlook** (Metric Tons, F.O.B. the port)

Our full-year 2017 Asia Pacific Iron Ore expected sales and production volume is approximately 11.5 million tons. The product mix is expected to contain 50 percent lump ore and 50 percent fines.

Based on a full-year average exchange rate of $0.75 U.S. Dollar to Australian Dollar, our full-year 2017 cash cost of goods sold and operating expense expectation is $34 - $39 per metric ton, which compares to $34 per metric ton for the full-year 2016.

**SG&A Expenses and Other Expectations**

Full-year 2017 SG&A expenses are expected to be approximately $100 million, an $18 million reduction from the full-year 2016 expense. We also note that of the $100 million expectation, approximately $25 million is considered non-cash.

Our full-year 2017 interest expense is expected to be approximately $175 million, compared to $201 million recorded in 2016. Consolidated full-year 2017 depreciation, depletion and amortization is expected to be approximately $100 million.

**Capital Budget Update**

We expect full-year 2017 capital expenditures to be $105 million, which includes approximately $40 million related to the completion of the Mustang Project at the United Taconite mine.

71

A005152

**Non-GAAP Reconciliation - EBITDA and Adjusted EBITDA Outlook**

In addition to the consolidated financial statements presented in accordance with U.S. GAAP, we have presented EBITDA and adjusted EBITDA on both a consolidated basis and on a segment basis, which are non-GAAP financial measures that management uses in evaluating operating performance. The presentation of these measures is not intended to be considered in isolation from, as a substitute for, or as superior to, the financial information prepared and presented in accordance with U.S. GAAP.  The presentation of these measures may be different from non-GAAP financial measures used by other companies. A reconciliation of these consolidated measures to their most directly comparable GAAP measures is provided in the table below.

|  | (In Millions) |
|---|---|
|  | Year Ending December 31, |
|  | 2017 |
| Net Income (Loss) | $          510.0 |
| Less: | |
| Interest expense, net | (175.0) |
| Income tax benefit (expense) | (65.0) |
| Depreciation, depletion and amortization | (100.0) |
| EBITDA | $          850.0 |
|  | |
| Less: | |
| Adjustments* | $              — |
| Adjusted EBITDA | $          850.0 |

*Adjustments to EBITDA are unpredictable by nature and thus cannot be forecasted.

**Recently Issued Accounting Pronouncements**

Refer  to NOTE 1 - BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES  of the consolidated financial statements for a description of recent accounting pronouncements, including the respective dates of adoption and effects on results of operations and financial condition.

**Critical Accounting Estimates**

Management's discussion and analysis of financial condition and results of operations is based on our consolidated financial statements, which have been prepared in accordance with GAAP.  Preparation of financial statements requires management to make assumptions, estimates and judgments that affect the reported amounts of assets, liabilities, revenues, costs and expenses, and the related disclosures of contingencies. Management bases its estimates on various assumptions and historical experience, which are believed to be reasonable; however, due to the inherent nature of estimates, actual results may differ significantly due to changed conditions or assumptions. On a regular basis, management reviews the accounting policies, assumptions, estimates and judgments to ensure that our financial statements are fairly presented in accordance with GAAP. However, because future events and their effects cannot be determined with certainty, actual results could differ from our assumptions and estimates, and such differences could be material. Management believes that the following critical accounting estimates and judgments have a significant impact on our financial statements.

*Revenue Recognition*

*U.S. Iron Ore and Asia Pacific Iron Ore Provisional Pricing Arrangements*

Most of our U.S. Iron Ore long-term supply agreements are comprised of a base price with annual price adjustment factors. The base price is the primary component of the purchase price for each contract. The inflation-indexed price adjustment factors are integral to the iron ore supply contracts and vary based on the agreement, but typically include adjustments based upon changes in the Platts 62% Price, along with pellet premiums, published Platts international indexed freight rates and changes in specified Producer Price Indices, including those for industrial commodities, energy and steel. The pricing adjustments generally operate in the same manner, with each factor typically

72

A005153

comprising a portion of the price adjustment, although the weighting of each factor varies based upon the specific terms of each agreement. In most cases, these adjustment factors have not been finalized at the time our product is sold. In these cases, we estimate the adjustment factors at each reporting period based upon the best third-party information available. The estimates are then adjusted to actual when the information has been finalized.

The Producer Price Indices remain an estimated component of the sales price throughout the contract year and are estimated each quarter using publicly available forecasts of such indices. The final indices referenced in certain of the U.S. Iron Ore supply contracts typically are not published by the U.S. Department of Labor until the second quarter of the subsequent year. As a result, we record an adjustment for the difference between the fourth quarter estimate and the final price in the following year.

Throughout the year, certain of our Asia Pacific Iron Ore customers have contractual arrangements in which pricing settlements are based upon an average index price for future periods. Most of the future periods are settled within three months. To the extent the particular pricing settlement period is subsequent to the reporting period, we estimate the final pricing settlement based upon information available. Similar to U.S. Iron Ore, the estimates are then adjusted to actual when the price settlement period elapses.

Historically, provisional pricing arrangement adjustments have not been material as they have represented a minor portion of U.S. and Asia Pacific Iron Ore's respective revenues for each of the fiscal years ended December 31, 2016, 2015 and 2014.

*U.S. Iron Ore Customer Supply Agreements*

In addition, certain supply agreements with one U.S. Iron Ore customer include provisions for supplemental revenue or refunds based on the customer's average annual steel pricing for the year that the product is consumed in the customer's blast furnaces. The supplemental pricing is characterized as a freestanding derivative and is required to be accounted for separately once the product is shipped. The derivative instrument, which is finalized based on a future price, is marked to fair value as a revenue adjustment each reporting period until the pellets are consumed and the amounts are settled. The fair value of the instrument is determined using a market approach based on an estimate of the annual realized price of hot-rolled coil at the steelmaker's facilities, and takes into consideration current market conditions and nonperformance risk. At December 31, 2016, we had a derivative asset of $21.3 million, representing the fair value of the pricing factors, based upon the amount of unconsumed long tons and an estimated average hot-rolled coil price related to the period in which the iron ore are expected to be consumed in the customer's blast furnace at each respective steelmaking facility, subject to final pricing at a future date. This compares with a derivative asset of $5.8 million as of December 31, 2015, based upon the amount of unconsumed iron ore and the related estimated average hot-rolled coil price.

The customer's average annual price is not known at the time of sale and the actual price is received on a delayed basis at the end of the year, once the average annual price has been finalized. As a result, we estimate the average price and adjust the estimate to actual in the fourth quarter when the information is provided by the customer at the end of each year. Information used in developing the estimate includes such factors as production and preliminary pricing information from the customer, current spot prices, third-party analyst forecasts, publications and other industry information. The accuracy of our estimates typically increases as the year progresses based on additional information in the market becoming available and the customer's ability to more accurately determine the average price it will realize for the year. The following represents the historical accuracy of our pricing estimates related to the derivative as well as the impact on revenue resulting from the difference between the estimated price and the actual price for each quarter during 2016, 2015 and 2014 prior to receiving final information from the customer for long tons consumed during each year:

| | 2016 | | | 2015 | | | 2014 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Final Price | Estimated Price | Impact on Revenue (in millions) | Final Price | Estimated Price | Impact on Revenue (in millions) | Final Price | Estimated Price | Impact on Revenue (in millions) |
| First Quarter | $450 | $426 | $1.0 | $487 | $563 | ($7.1) | $654 | $646 | $1.1 |
| Second Quarter | 450 | 479 | (4.9) | 487 | 504 | (2.9) | 654 | 651 | 0.6 |
| Third Quarter | 450 | 468 | (5.8) | 487 | 489 | (0.5) | 654 | 653 | (0.5) |
| Fourth Quarter | 450 | 450 | — | 487 | 487 | — | 654 | 654 | — |

73

As an example, we estimate that a  $75 positive or negative change in the average hot-rolled coil price realized from the  December 31, 2016 estimated price recorded for the unconsumed long tons remaining at year end would cause the fair value of the derivative instrument to increase or decrease by approximately $9.0 million, respectively, thereby impacting our consolidated revenues by the same amount.

### Mineral Reserves

We regularly evaluate our mineral reserves and update them as required in accordance with SEC Industry Guide 7. The estimated mineral reserves could be affected by future industry conditions, geological conditions and ongoing mine planning. Maintenance of effective production capacity of the mineral reserve could require increases in capital and development expenditures. Generally, as mining operations progress, haul lengths and lifts increase. Alternatively, changes in economic conditions or the expected quality of mineral reserves could decrease capacity of mineral reserves. Technological progress could alleviate such factors or increase capacity of mineral reserves.

We use our mineral reserve estimates, combined with our estimated annual production levels, to determine the mine closure dates utilized in recording the fair value liability for asset retirement obligations. Refer to NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS , for further information. Since the liability represents the present value of the expected future obligation, a significant change in mineral reserves or mine lives would have a substantial effect on the recorded obligation. We also utilize mineral reserves for evaluating potential impairments of mine assets and in determining maximum useful lives utilized to calculate depreciation and amortization of long-lived mine assets. Increases or decreases in mineral reserves or mine lives could significantly affect these items.

### Valuation of Long-Lived Assets

In assessing the recoverability of our long-lived assets, significant assumptions regarding the estimated future cash flows and other factors to determine the fair value of the respective assets must be made, as well as the related estimated useful lives. If these estimates or their related assumptions change in the future as a result of changes in strategy or market conditions, we may be required to record impairment charges for these assets in the period such determination was made.

We monitor conditions that indicate that the carrying value of an asset or asset group may be impaired. In order to determine if assets have been impaired, assets are grouped and tested at the lowest level for which identifiable, independent cash flows are available. An impairment loss exists when projected undiscounted cash flows are less than the carrying value of the assets. The measurement of the impairment loss to be recognized is based on the difference between the fair value and the carrying value of the assets. Fair value can be determined using a market approach, income approach or cost approach. The impairment analysis and fair value determination can result in substantially different outcomes based on critical assumptions and estimates including the quantity and quality of remaining mineral reserves, future iron ore prices and production costs.

During the year ended December 31, 2016, there were no impairment indicators present, as a result no impairment assessments were required. During 2015, we identified factors that indicated the carrying values of certain asset groups may not be recoverable. Primary factors included the impact of estimated long-term price forecasts that were updated as part of management's long-range planning process. Updated estimates of long-term prices for all products, specifically the Platts 62% Price, which particularly affects the Asia Pacific Iron Ore business segment because their contracts correlate heavily to world market spot pricing, were lower than prior estimates. These estimates were updated based upon current market conditions, macro-economic factors influencing the balance of supply and demand for our products and expectations for future cost and capital expenditure requirements. Although certain factors indicated that the carrying value of certain asset groups may not be recoverable during 2015, an assessment was performed and no further impairment was indicated.

Refer to NOTE 1 - BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES , NOTE 4 - PROPERTY, PLANT AND EQUIPMENT and NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS  for further information regarding our policy on asset impairment, detail on our remaining PP&E and mineral rights and non-recurring fair value measurements.

### Investments In and Receivables From Canadian Entities

We determined the fair value and recoverability of our Canadian investments by comparing the estimated fair value of the underlying assets of the Canadian Entities to estimated liabilities. We estimated the fair value of major asset classes by using actual liquidation values through December 31, 2016 less estimated cost to sell. Outstanding

74

liabilities include accounts payable and other liabilities, forward commitments, unsubordinated related party payables, lease liabilities, and other potential claims. Potential claims include an accrual for the estimated probable loss related to claims that may be asserted against the Canadian Entities under certain contracts. Based on our estimates, the fair value of liabilities exceeds the fair value of assets. To assess the fair value and recoverability of amounts receivable from the Canadian Entities, we estimated the fair value of the underlying net assets of the Canadian Entities available for distribution to their creditors in relation to the estimated creditor claims and the priority of those claims. Our estimates involve significant judgment and are based on currently available information, an assessment of the validity of certain claims, and estimated payments by the Canadian Entities. Our ultimate recovery, if any, is subject to the final liquidation value of the Canadian Entities and the distribution of the net proceeds as determined by the Canadian Court and may vary significantly from our current estimates. See NOTE 14 - DISCONTINUED OPERATIONS for further information.

### Asset Retirement Obligations and Environmental Remediation Costs

The accrued mine closure obligations for our active mining operations provide for contractual and legal obligations associated with the eventual closure of the mining operations. Our obligations are determined based on detailed estimates adjusted for factors that a market participant would consider (i.e., inflation, overhead and profit), which are escalated at an assumed rate of inflation to the estimated closure dates, and then discounted using the current credit-adjusted risk-free interest rate. The estimate also incorporates incremental increases in the closure cost estimates and changes in estimates of mine lives. The closure date for each location is determined based on the exhaustion date of the remaining iron ore reserves, which is dependent on our estimate of mineral reserves. The estimated obligations are particularly sensitive to the impact of changes in mine lives given the difference between the inflation and discount rates. Changes in the base estimates of legal and contractual closure costs due to changes in legal or contractual requirements, available technology, inflation, overhead or profit rates also would have a significant impact on the recorded obligations.

We have a formal policy for environmental protection and restoration. Our obligations for known environmental matters at active and closed mining operations and other sites have been recognized based on estimates of the cost of investigation and remediation at each site. If the obligation can only be estimated as a range of possible amounts, with no specific amount being more likely, the minimum of the range is accrued. Management reviews its environmental remediation sites quarterly to determine if additional cost adjustments or disclosures are required. The characteristics of environmental remediation obligations, where information concerning the nature and extent of clean-up activities is not immediately available and which are subject to changes in regulatory requirements, result in a significant risk of increase to the obligations as they mature. Expected future expenditures are not discounted to present value unless the amount and timing of the cash disbursements can be reasonably estimated. Potential insurance recoveries are not recognized until realized. Refer to NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS, for further information.

### Income Taxes

Our income tax expense, deferred tax assets and liabilities and reserves for unrecognized tax benefits reflect management's best assessment of estimated future taxes to be paid. We are subject to income taxes in the U.S. and various foreign jurisdictions. Significant judgments and estimates are required in determining the consolidated income tax expense.

Deferred income taxes arise from temporary differences between tax and financial statement recognition of revenue and expense. In evaluating our ability to recover our deferred tax assets, we consider all available positive and negative evidence, including scheduled reversals of deferred tax liabilities, projected future taxable income, tax planning strategies and recent financial operations. In projecting future taxable income, we begin with historical results adjusted for the results of discontinued operations and changes in accounting policies and incorporate assumptions including the amount of future state, federal and foreign pretax operating income, the reversal of temporary differences, and the implementation of feasible and prudent tax planning strategies. These assumptions require significant judgment about the forecasts of future taxable income and are consistent with the plans and estimates we are using to manage the underlying businesses. In evaluating the objective evidence that historical results provide, we consider three years of cumulative operating income (loss).

At December 31, 2016 and 2015, we had a valuation allowance of  $3,334.8 million and $3,372.5 million, respectively, against our deferred tax assets. Our losses in certain locations in recent periods represented sufficient negative evidence to require a full valuation allowance against certain deferred tax assets. Additionally, significant Alternative Minimum Tax credits have been generated in recent years.  Sufficient negative evidence suggests that the credits will not be realized in the foreseeable future, and a full valuation allowance has been recorded on the deferred

A005156

Table of Contents

tax asset. We intend to maintain a valuation allowance against the deferred tax assets related to these operating losses, credits and allowances until sufficient positive evidence exists to support the realization of such assets.

Changes in tax laws and rates also could affect recorded deferred tax assets and liabilities in the future. In the year ended December 31, 2016 Luxembourg enacted a statutory rate reduction which decreased the deferred tax assets and related valuation allowance by $149.1 million. Management is not aware of any other changes that would have a material effect on the Company's results of operations, cash flows or financial position.

The calculation of our tax liabilities involves dealing with uncertainties in the application of complex tax laws and regulations in various jurisdictions across our global operations.

Accounting for uncertainty in income taxes recognized in the financial statements requires that a tax benefit from an uncertain tax position be recognized when it is more likely than not that the position will be sustained upon examination, including resolutions of any related appeals or litigation processes, based on technical merits.

We recognize tax liabilities in accordance with ASC 740, *Income Taxes*, and we adjust these liabilities when our judgment changes as a result of evaluation of new information not previously available. Due to the complexity of some of these uncertainties, the ultimate resolution may result in payment that is materially different from our current estimate of the tax liabilities. These differences will be reflected as increases or decreases to income tax expense in the period in which they are determined.

### *Employee Retirement Benefit Obligations*

We offer defined benefit pension plans, defined contribution pension plans and other postretirement benefit plans, primarily consisting of retiree healthcare benefits, to most employees in North America as part of a total compensation and benefits program. We do not have employee retirement benefit obligations at our Asia Pacific Iron Ore operations. The defined benefit pension plans largely are noncontributory and benefits generally are based on employees' years of service and average earnings for a defined period prior to retirement, or a minimum formula.

Following is a summary of our U.S. defined benefit pension and OPEB funding and expense for the years 2014 through 2017:

|  | Pension | | OPEB | |
|---|---|---|---|---|
|  | Funding | Expense | Funding | Expense |
| 2014 | $     49.6 | $     26.2 | $     5.5 | $     (2.5) |
| 2015 | 35.7 | 23.9 | 3.5 | 4.4 |
| **2016** | **1.2** | **16.5** | **1.1** | **(4.0)** |
| 2017 (Estimated) | 24.5 | 18.6 | 4.1 | (5.3) |

Assumptions used in determining the benefit obligations and the value of plan assets for defined benefit pension plans and postretirement benefit plans (primarily retiree healthcare benefits) that we offer are evaluated periodically by management. Critical assumptions, such as the discount rate used to measure the benefit obligations, the expected long-term rate of return on plan assets, the medical care cost trend, and the rate of compensation increase are reviewed annually.

76

As of December 31, 2016 and 2015, we used the following assumptions:

| | Pension and Other Benefits | |
| --- | --- | --- |
| | 2016 | 2015 |
| U.S. plan discount rate | | |
| Iron Hourly Pension Plan | 4.02 % | 4.27 % |
| Salaried Pension Plan | 3.92 | 4.12 |
| Ore Mining Pension Plan | 4.04 | 4.28 |
| SERP | 3.90 | 4.22 |
| Hourly OPEB Plan | 4.02 | 4.32 |
| Salaried OPEB Plan | 3.99 | 4.22 |
| U.S. rate of compensation increase - Salaried | 3.00 | 3.00 |
| U.S. rate of compensation increase - Hourly | 2.00 | 2.00 |
| U.S. pension plan expected return on plan assets | 8.25 | 8.25 |
| U.S. OPEB plan expected return on plan assets | 7.00 | 7.00 |

The decrease in the discount rates in 2016 was driven by the change in bond yields, which were down approximately 25 basis points compared to the prior year.

Additionally, on December 31, 2016, the assumed mortality improvement projection was changed from generational scale MP-2015 to generational scale MP-2016. The healthy mortality assumption remains the RP-2014 mortality tables with blue collar and white collar adjustments made for certain hourly and salaried groups to determine the expected life of our plan participants.

Following are sensitivities of potential further changes in these key assumptions on the estimated 2017 pension and OPEB expense and the pension and OPEB benefit obligations as of December 31, 2016:

| | Increase in Expense (In Millions) | | Increase in Benefit Obligation (In Millions) | |
| --- | --- | --- | --- | --- |
| | Pension | OPEB | Pension | OPEB |
| Decrease discount rate 0.25% | $ 1.3 | $ 0.2 | $ 25.0 | $ 7.4 |
| Decrease return on assets 1.00% | 6.6 | 2.5 | N/A | N/A |
| Increase medical trend rate 1.00% | N/A | 2.9 | N/A | 23.4 |

Changes in actuarial assumptions, including discount rates, employee retirement rates, mortality, compensation levels, plan asset investment performance and healthcare costs, are determined based on analyses of actual and expected factors. Changes in actuarial assumptions and/or investment performance of plan assets may have a significant impact on our financial condition due to the magnitude of our retirement obligations. Refer to NOTE 7 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS in *Item 8. Financial Statements and Supplementary Data* of this Annual Report on Form 10-K for further information.

Table of Contents

**Forward-Looking Statements**

This report contains statements that constitute "forward-looking statements" within the meaning of the federal securities laws. As a general matter, forward-looking statements relate to anticipated trends and expectations rather than historical matters. Forward-looking statements are subject to uncertainties and factors relating to Cliffs' operations and business environment that are difficult to predict and may be beyond our control. Such uncertainties and factors may cause actual results to differ materially from those expressed or implied by the forward-looking statements. These statements speak only as of the date of this report, and we undertake no ongoing obligation, other than that imposed by law, to update these statements. Uncertainties and risk factors that could affect Cliffs' future performance and cause results to differ from the forward-looking statements in this report include, but are not limited to:

- uncertainty and weaknesses in global economic conditions, including downward pressure on prices caused by oversupply or imported products, the impact of any reduced barriers to trade, the outcomes of recently filed and forthcoming trade cases, reduced market demand and any change to the economic growth rate in China;

- continued volatility of iron ore and steel prices and other trends, including the supply approach of the major iron ore producers, affecting our financial condition, results of operations or future prospects, specifically the impact of price-adjustment factors on our sales contracts;

- our level of indebtedness could limit cash flow available to fund working capital, capital expenditures, acquisitions and other general corporate purposes or ongoing needs of our business;

- availability of capital and our ability to maintain adequate liquidity;

- our ability to successfully conclude the CCAA process in a manner that minimizes cash outflows and associated liabilities;

- the impact of our customers reducing their steel production due to increased market share of steel produced using other methods or lighter-weight steel alternatives;

- uncertainty relating to restructurings in the steel industry and/or affecting the steel industry;

- the outcome of any contractual disputes with our customers, joint venture partners or significant energy, material or service providers or any other litigation or arbitration;

- the ability of our customers and joint venture partners to meet their obligations to us on a timely basis or at all;

- problems or uncertainties with productivity, tons mined, transportation, mine-closure obligations, environmental liabilities, employee-benefit costs and other risks of the mining industry;

- our ability to reach agreement with our customers regarding any modifications to sales contract provisions, renewals or new arrangements;

- our actual levels of capital spending;

- our ability to successfully diversify our product mix and add new customers beyond our traditional blast furnace clientele;

- our actual economic iron ore reserves or reductions in current mineral estimates, including whether any mineralized material qualifies as a reserve;

- our ability to cost-effectively achieve planned production rates or levels;

- our ability to successfully identify and consummate any strategic investments or development projects;

- changes in sales volume or mix;

- events or circumstances that could impair or adversely impact the viability of a mine and the carrying value of associated assets, as well as any resulting impairment charges;

- our ability to maintain appropriate relations with unions and employees;

78

A005159

- impacts of existing and increasing governmental regulation and related costs and liabilities, including failure to receive or maintain required operating and environmental permits, approvals, modifications or other authorization of, or from, any governmental or regulatory entity and costs related to implementing improvements to ensure compliance with regulatory changes;

- uncertainties associated with natural disasters, weather conditions, unanticipated geological conditions, supply or price of energy, equipment failures and other unexpected events;

- adverse changes in currency values, currency exchange rates, interest rates and tax laws;

- risks related to international operations; and

- the potential existence of significant deficiencies or material weakness in our internal control over financial reporting.

 For additional factors affecting the business of Cliffs, refer to *Part I – Item 1A. Risk Factors.* You are urged to carefully consider these risk factors.

*Non-GAAP Reconciliation*

 We present cash cost of goods sold and operating expense rate per long/metric ton, which is a non-GAAP financial measure that management uses in evaluating operating performance. We believe our presentation of non-GAAP cash cost of goods sold and operating expenses is useful to investors because it excludes depreciation, depletion and amortization, which are non-cash, and freight and joint venture partners' cost reimbursements, which have no impact on sales margin, thus providing a more accurate view of the cash outflows related to the sale of iron ore. The presentation of this measure is not intended to be considered in isolation from, as a substitute for, or as superior to, the financial information prepared and presented in accordance with GAAP. The presentation of this measure may be different from non-GAAP financial measures used by other companies. Below is a reconciliation in dollars of this non-GAAP financial measure to our consolidated financial statements for the years ended December 31, 2016 and 2015.

| | (In Millions) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | | Year Ended December 31, | | | |
| | 2016 | | | | 2015 | | | |
| | U.S. Iron Ore | | Asia Pacific Iron Ore | | Total | U.S. Iron Ore | Asia Pacific Iron Ore | Total |
| Cost of goods sold and operating expenses | $ | (1,278.8) | $ | (440.9) | $ (1,719.7) | $ (1,298.3) | $ (478.5) | $ (1,776.8) |
| Less: | | | | | | | | |
| Freight and reimbursements | | (174.8) | | (20.7) | (195.5) | (157.3) | (23.6) | (180.9) |
| Depreciation, depletion & amortization | | (84.0) | | (25.1) | (109.1) | (98.9) | (25.3) | (124.2) |
| Cash cost of goods sold and operating expenses | $ | (1,020.0) | $ | (395.1) | $ (1,415.1) | $ (1,042.1) | $ (429.6) | $ (1,471.7) |

Below is a reconciliation in dollars of this non-GAAP measure to our consolidated financial statements for the years ended December 31, 2015 and 2014.

| | | | | (In Millions) | | | | |
|---|---|---|---|---|---|---|---|---|
| | Year Ended December 31, 2015 | | | Year Ended December 31, 2014 | | | | |
| | U.S. Iron Ore | Asia Pacific Iron Ore | Total | U.S. Iron Ore | Asia Pacific Iron Ore | Other | Total | |
| Cost of goods sold and operating expenses | $ (1,298.3) | $ (478.5) | $ (1,776.8) | $ (1,796.1) | $ (745.0) | 53.6 | $ (2,487.5) | |
| Less: | | | | | | | | |
| Freight and reimbursements | (157.3) | (23.6) | (180.9) | (271.0) | (6.9) | — | (277.9) | |
| Depreciation, depletion & amortization | (98.9) | (25.3) | (124.2) | (107.4) | (145.9) | — | (253.3) | |
| Elimination with discontinued operations | — | — | — | — | — | 53.6 | 53.6 | |
| Cash cost of goods sold and operating expenses | $ (1,042.1) | $ (429.6) | $ (1,471.7) | $ (1,417.7) | $ (592.2) | $ — | $ (2,009.9) | |

**Item 7A.**    ***Quantitative and Qualitative Disclosures About Market Risk***

Information regarding our Market Risk is presented under the caption *Market Risks*, which is included in *Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations* and is incorporated by reference and made a part hereof.

80

Table of Contents

**Item 8.**     *Financial Statements and Supplementary Data*

**Statements of Consolidated Financial Position**

Cliffs Natural Resources Inc. and Subsidiaries

| | (In Millions) | |
| --- | --- | --- |
| | December 31, | |
| | **2016** | 2015 |
| ASSETS | | |
| CURRENT ASSETS | | |
| Cash and cash equivalents | $ **323.4** | $ 285.2 |
| Accounts receivable, net | **128.7** | 40.2 |
| Inventories | **178.4** | 329.6 |
| Supplies and other inventories | **91.4** | 110.4 |
| Loans to and accounts receivables from the Canadian Entities | **48.6** | 72.9 |
| Insurance coverage receivable | **—** | 93.5 |
| Other current assets | **54.1** | 50.9 |
| TOTAL CURRENT ASSETS | **824.6** | 982.7 |
| PROPERTY, PLANT AND EQUIPMENT, NET | **984.4** | 1,059.0 |
| OTHER NON-CURRENT ASSETS | **114.9** | 93.8 |
| TOTAL ASSETS | $ **1,923.9** | $ 2,135.5 |

(continued)

*The accompanying notes are an integral part of these  consolidated financial statements .*

81

Table of Contents

**Statements of Consolidated Financial Position**

Cliffs Natural Resources Inc. and Subsidiaries - (Continued)

| | | (In Millions) | |
|---|---|---|---|
| | | December 31, | |
| | | **2016** | 2015 |
| **LIABILITIES** | | | |
| CURRENT LIABILITIES | | | |
| Accounts payable | $ | **107.6** | $ 106.3 |
| Accrued employment costs | | **56.1** | 53.0 |
| State and local taxes payable | | **28.3** | 35.2 |
| Accrued expenses | | **41.1** | 32.4 |
| Accrued interest | | **40.2** | 53.3 |
| Accrued royalties | | **26.2** | 17.3 |
| Guarantees | | **0.2** | 96.5 |
| Insured loss | | **—** | 93.5 |
| Other current liabilities | | **91.4** | 94.2 |
| TOTAL CURRENT LIABILITIES | | **391.1** | 581.7 |
| POSTEMPLOYMENT BENEFIT LIABILITIES | | | |
| Pensions | | **245.7** | 209.7 |
| Other postretirement benefits | | **34.8** | 11.3 |
| TOTAL POSTEMPLOYMENT BENEFIT LIABILITIES | | **280.5** | 221.0 |
| ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS | | **193.9** | 231.2 |
| LONG-TERM DEBT | | **2,175.1** | 2,699.4 |
| OTHER LIABILITIES | | **213.8** | 213.8 |
| TOTAL LIABILITIES | | **3,254.4** | 3,947.1 |
| COMMITMENTS AND CONTINGENCIES (SEE NOTE 20) | | | |
| EQUITY | | | |
| CLIFFS SHAREHOLDERS' DEFICIT | | | |
| Preferred Stock - no par value | | | |
| Class A - 3,000,000 shares authorized | | | |
| 7% Series A Mandatory Convertible, Class A, no par value and $1,000 per share liquidation preference (See Note 15) | | | |
| Issued and Outstanding - none issued (2015 - 731,223 shares) | | **—** | 731.3 |
| Class B - 4,000,000 shares authorized | | | |
| Common Shares - par value $0.125 per share | | | |
| Authorized - 400,000,000 shares (2015 - 400,000,000 shares); | | | |
| Issued - 238,636,794 shares (2015 - 159,546,224 shares); | | | |
| Outstanding - 233,074,091 shares (2015 - 153,591,930 shares) | | **29.8** | 19.8 |
| Capital in excess of par value of shares | | **3,347.0** | 2,298.9 |
| Retained deficit | | **(4,574.3)** | (4,748.4) |
| Cost of 5,562,703 common shares in treasury (2015 - 5,954,294 shares) | | **(245.5)** | (265.0) |
| Accumulated other comprehensive loss | | **(21.3)** | (18.0) |
| TOTAL CLIFFS SHAREHOLDERS' DEFICIT | | **(1,464.3)** | (1,981.4) |
| NONCONTROLLING INTEREST | | **133.8** | 169.8 |
| TOTAL DEFICIT | | **(1,330.5)** | (1,811.6) |
| TOTAL LIABILITIES AND DEFICIT | $ | **1,923.9** | $ 2,135.5 |

*The accompanying notes are an integral part of these consolidated financial statements.*

82

A005163

Table of Contents

**Statements of Consolidated Operations**

Cliffs Natural Resources Inc. and Subsidiaries

| | | (In Millions, Except Per Share Amounts) | | |
|---|---|---|---|---|
| | | Year Ended December 31, | | |
| | | **2016** | 2015 | 2014 |
| REVENUES FROM PRODUCT SALES AND SERVICES | | | | |
| Product | $ | **1,913.5** | $ 1,832.4 | $ 3,095.2 |
| Freight and venture partners' cost reimbursements | | **195.5** | 180.9 | 278.0 |
| | | **2,109.0** | 2,013.3 | 3,373.2 |
| COST OF GOODS SOLD AND OPERATING EXPENSES | | **(1,719.7)** | (1,776.8) | (2,487.5) |
| SALES MARGIN | | **389.3** | 236.5 | 885.7 |
| OTHER OPERATING INCOME (EXPENSE) | | | | |
| Selling, general and administrative expenses | | **(117.8)** | (110.0) | (154.7) |
| Impairment of goodwill and other long-lived assets | | **—** | (3.3) | (635.5) |
| Miscellaneous - net | | **(30.7)** | 28.1 | 34.6 |
| | | **(148.5)** | (85.2) | (755.6) |
| OPERATING INCOME | | **240.8** | 151.3 | 130.1 |
| OTHER INCOME (EXPENSE) | | | | |
| Interest expense, net | | **(200.5)** | (228.5) | (176.7) |
| Gain on extinguishment/restructuring of debt | | **166.3** | 392.9 | 16.2 |
| Other non-operating income (expense) | | **0.4** | (2.6) | 10.7 |
| | | **(33.8)** | 161.8 | (149.8) |
| INCOME (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES AND EQUITY LOSS FROM VENTURES | | **207.0** | 313.1 | (19.7) |
| INCOME TAX BENEFIT (EXPENSE) | | **12.2** | (169.3) | 86.0 |
| EQUITY LOSS FROM VENTURES, net of tax | | **—** | (0.1) | (9.9) |
| INCOME FROM CONTINUING OPERATIONS | | **219.2** | 143.7 | 56.4 |
| LOSS FROM DISCONTINUED OPERATIONS, net of tax | | **(19.9)** | (892.1) | (8,368.0) |
| NET INCOME (LOSS) | | **199.3** | (748.4) | (8,311.6) |
| LOSS (INCOME) ATTRIBUTABLE TO NONCONTROLLING INTEREST | | | | |
| (Year Ended December 31, 2016 - No loss related to Discontinued Operations, Year Ended December 31, 2015 - Loss of $7.7 million and Year Ended December 31, 2014 - Loss of $1,113.3 million related to Discontinued Operations) | | **(25.2)** | (0.9) | 1,087.4 |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | $ | **174.1** | $ (749.3) | $ (7,224.2) |
| PREFERRED STOCK DIVIDENDS | | **—** | (38.4) | (51.2) |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS COMMON SHAREHOLDERS | $ | **174.1** | $ (787.7) | $ (7,275.4) |
| | | | | |
| EARNINGS (LOSS) PER COMMON SHARE ATTRIBUTABLE TO CLIFFS SHAREHOLDERS - BASIC | | | | |
| Continuing operations | $ | **0.98** | $ 0.63 | $ (0.14) |
| Discontinued operations | | **(0.10)** | (5.77) | (47.38) |
| | $ | **0.88** | $ (5.14) | $ (47.52) |
| EARNINGS (LOSS) PER COMMON SHARE ATTRIBUTABLE TO CLIFFS SHAREHOLDERS - DILUTED | | | | |
| Continuing operations | $ | **0.97** | $ 0.63 | $ (0.14) |
| Discontinued operations | | **(0.10)** | (5.76) | (47.38) |
| | $ | **0.87** | $ (5.13) | $ (47.52) |
| AVERAGE NUMBER OF SHARES (IN THOUSANDS) | | | | |
| Basic | | **197,659** | 153,230 | 153,098 |
| Diluted | | **200,145** | 153,605 | 153,098 |

*The accompanying notes are an integral part of these consolidated financial statements.*

83

Table of Contents

**Statements of Consolidated Comprehensive Income (Loss)**

Cliffs Natural Resources Inc. and Subsidiaries

| | (In Millions) | | |
|---|---|---|---|
| | **Year Ended December 31,** | | |
| | **2016** | 2015 | 2014 |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | $ **174.1** | $ (749.3) | $ (7,224.2) |
| OTHER COMPREHENSIVE INCOME (LOSS) | | | |
| Pension and OPEB liability, net of tax | **(19.8)** | 45.2 | (91.0) |
| Unrealized net gain (loss) on marketable securities, net of tax | **—** | 1.7 | (7.2) |
| Unrealized net gain (loss) on foreign currency translation | **18.6** | 155.6 | (42.3) |
| Unrealized net gain (loss) on derivative financial instruments, net of tax | **(2.6)** | 20.7 | 2.8 |
| OTHER COMPREHENSIVE INCOME (LOSS) | **(3.8)** | 223.2 | (137.7) |
| OTHER COMPREHENSIVE LOSS ATTRIBUTABLE TO THE NONCONTROLLING INTEREST | **0.5** | 4.6 | 4.8 |
| TOTAL COMPREHENSIVE INCOME (LOSS) ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | $ **170.8** | $ (521.5) | $ (7,357.1) |

*The accompanying notes are an integral part of these  consolidated financial statements.*

84

Table of Contents

**Statements of Consolidated Cash Flows**

Cliffs Natural Resources Inc. and Subsidiaries

|  | | (In Millions) | | |
|---|---|---|---|---|
|  | | Year Ended December 31, | | |
|  | | **2016** | 2015 | 2014 |
| OPERATING ACTIVITIES | | | | |
| Net income (loss) | $ | **199.3** | $ (748.4) | $ (8,311.6) |
| Adjustments to reconcile net income (loss) to net cash provided (used) by operating activities: | | | | |
| Depreciation, depletion and amortization | | **115.4** | 134.0 | 504.0 |
| Impairment of goodwill and other long-lived assets | | **—** | 76.6 | 9,029.9 |
| Deferred income taxes | | **—** | 159.8 | (1,153.9) |
| Changes in deferred revenue and below-market sales contracts | | **(20.5)** | (42.6) | (18.0) |
| Gain on extinguishment/restructuring of debt | | **(166.3)** | (392.9) | (16.2) |
| Loss on deconsolidation, net of cash deconsolidated | | **17.5** | 668.3 | — |
| Loss (gain) on sale of North American Coal mines | | **(2.1)** | (9.3) | 419.6 |
| Other | | **32.6** | 113.0 | (11.6) |
| Changes in operating assets and liabilities: | | | | |
| Receivables and other assets | | **43.2** | 369.1 | (82.8) |
| Product inventories | | **157.8** | (62.0) | 37.8 |
| Payables and accrued expenses | | **(73.9)** | (227.7) | (38.3) |
| Net cash provided by operating activities | | **303.0** | 37.9 | 358.9 |
| INVESTING ACTIVITIES | | | | |
| Purchase of property, plant and equipment | | **(69.1)** | (80.8) | (284.1) |
| Investments in DIP and pre-petition financing | | **(1.5)** | (14.0) | — |
| Proceeds from DIP and pre-petition financing | | **8.3** | — | — |
| Proceeds (uses) from sale of North American Coal mines | | **3.6** | (15.2) | 155.0 |
| Other investing activities | | **0.8** | 6.8 | 25.5 |
| Net cash used in investing activities | | **(57.9)** | (103.2) | (103.6) |
| FINANCING ACTIVITIES | | | | |
| Net proceeds from issuance of common shares | | **287.4** | — | — |
| Proceeds from first lien notes offering | | **—** | 503.5 | — |
| Debt issuance costs | | **(5.2)** | (33.6) | (9.0) |
| Borrowings under credit facilities | | **105.0** | 309.8 | 1,219.5 |
| Repayment under credit facilities | | **(105.0)** | (309.8) | (1,219.5) |
| Repayments of equipment loans | | **(95.6)** | (45.4) | (20.9) |
| Repurchase of debt | | **(305.4)** | (225.9) | (28.8) |
| Contributions (to)/by joint ventures, net | | **(3.2)** | 0.1 | (25.7) |
| Distributions of partnership equity | | **(59.9)** | (40.6) | — |
| Common stock dividends | | **—** | — | (92.5) |
| Preferred stock dividends | | **—** | (51.2) | (51.2) |
| Other financing activities | | **(24.5)** | (45.9) | (60.2) |
| Net cash provided (used) by financing activities | | **(206.4)** | 61.0 | (288.3) |
| EFFECT OF EXCHANGE RATE CHANGES ON CASH | | **(0.5)** | (1.4) | (11.6) |
| INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | | **38.2** | (5.7) | (44.6) |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF YEAR | | **285.2** | 290.9 | 335.5 |
| CASH AND CASH EQUIVALENTS AT END OF YEAR | $ | **323.4** | $ 285.2 | $ 290.9 |

*The accompanying notes are an integral part of these  consolidated financial statements.*
*See NOTE 17 - CASH FLOW INFORMATION.*

85

Table of Contents

**Statements of Consolidated Changes in Equity**

Cliffs Natural Resources Inc. and Subsidiaries

(In Millions)

| | Cliffs Shareholders | | | | | | | | Non-Controlling Interest | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number of Depositary Shares | Depositary Shares | Number of Common Shares | Common Shares | Capital in Excess of Par Value of Shares | Retained Earnings | Common Shares in Treasury | Accumulated Other Comprehensive Income (Loss) | | |
| January 1, 2014 | 29.3 | $ 731.3 | 153.2 | $ 19.8 | $ 2,329.5 | $ 3,407.3 | $ (305.5) | $ (112.9) | $ 814.8 | $ 6,884.3 |
| Comprehensive income (loss) | | | | | | | | | | |
| Net loss | — | — | — | — | — | (7,224.2) | — | — | (1,087.4) | (8,311.6) |
| Other comprehensive loss | — | — | — | — | — | — | — | (132.9) | (4.8) | (137.7) |
| Total comprehensive loss | | | | | | | | | (1,092.2) | (8,449.3) |
| Capital contribution by noncontrolling interest to subsidiary | — | — | — | — | — | — | — | — | (0.1) | (0.1) |
| Distributions to noncontrolling interest | — | — | — | — | — | — | — | — | (25.5) | (25.5) |
| Stock and other incentive plans | — | — | — | — | (19.7) | — | 19.8 | — | — | 0.1 |
| Common stock dividends ($.60 per share) | — | — | — | — | — | (92.5) | — | — | — | (92.5) |
| Preferred Share dividends ($1.76 per depositary share) | — | — | — | — | — | (51.3) | — | — | — | (51.3) |
| December 31, 2014 | 29.3 | $ 731.3 | 153.2 | $ 19.8 | $ 2,309.8 | (3,960.7) | $ (285.7) | $ (245.8) | $ (303.0) | $ (1,734.3) |
| Comprehensive income (loss) | | | | | | | | | | |
| Net income (loss) | — | — | — | — | — | (749.3) | — | — | 0.9 | (748.4) |
| Other comprehensive income (loss) | — | — | — | — | — | — | — | 227.8 | (4.6) | 223.2 |
| Total comprehensive loss | | | | | | | | | (3.7) | (525.2) |
| Capital contribution to noncontrolling interest to subsidiary | — | — | — | — | — | — | — | — | 0.2 | 0.2 |
| Distributions to noncontrolling interest | — | — | — | — | — | — | — | — | (0.2) | (0.2) |
| Distributions of partnership equity | — | — | — | — | — | — | — | — | (51.7) | (51.7) |
| Effect of deconsolidation | — | — | — | — | — | — | — | — | 528.2 | 528.2 |
| Stock and other incentive plans | — | — | 0.3 | — | (10.9) | — | 20.7 | — | — | 9.8 |
| Preferred Share dividends ($1.32 per depositary share) | — | — | — | — | — | (38.4) | — | — | — | (38.4) |
| December 31, 2015 | 29.3 | $ 731.3 | 153.5 | $ 19.8 | $ 2,298.9 | (4,748.4) | $ (265.0) | $ (18.0) | $ 169.8 | $ (1,811.6) |
| Comprehensive income (loss) | | | | | | | | | | |
| Net income | — | — | — | — | — | 174.1 | — | — | 25.2 | 199.3 |
| Other comprehensive loss | — | — | — | — | — | — | — | (3.3) | (0.5) | (3.8) |
| Total comprehensive income | | | | | | | | | 24.7 | 195.5 |
| Preferred Share conversion | (29.3) | (731.3) | 26.5 | 3.5 | 727.8 | — | — | — | — | — |
| Equity offering | — | — | 44.4 | 5.5 | 281.9 | — | — | — | — | 287.4 |
| Debt exchanges | — | — | 8.2 | 1.0 | 44.2 | — | — | — | — | 45.2 |
| Distributions to noncontrolling interest | — | — | — | — | — | — | — | — | (3.2) | (3.2) |
| Distributions of partnership equity | — | — | — | — | — | — | — | — | (57.5) | (57.5) |
| Stock and other incentive plans | — | — | 0.5 | — | (5.8) | — | 19.5 | — | — | 13.7 |
| December 31, 2016 | — | $ — | 233.1 | $ 29.8 | $ 3,347.0 | (4,574.3) | $ (245.5) | $ (21.3) | 133.8 | $ (1,330.5) |

*The accompanying notes are an integral part of these consolidated financial statements.*

A005167

Table of Contents

**Cliffs Natural Resources Inc. and Subsidiaries**

Notes to Consolidated Financial Statements

### NOTE 1 - BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES

**Nature of Business**

We are a leading mining and natural resources company in the U.S. We are a major supplier of iron ore pellets to the North American steel industry from our mines and pellet plants located in Michigan and Minnesota. We also operate the Koolyanobbing iron ore mining complex in Western Australia, which provides iron ore to the seaborne market for Asian steel producers.

**Significant Accounting Policies**

We consider the following policies to be beneficial in understanding the judgments that are involved in the preparation of our consolidated financial statements and the uncertainties that could impact our financial condition, results of operations and cash flows.

*Use of Estimates*

The preparation of financial statements, in conformity with GAAP, requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The more significant areas requiring the use of management estimates and assumptions related to mineral reserves future realizable cash flow; environmental, reclamation and closure obligations; valuation of long-lived assets; valuation of inventory; valuation of post-employment, post-retirement and other employee benefit liabilities; valuation of tax assets; reserves for contingencies and litigation; the fair value of derivative instruments; and the fair value of loans to and accounts receivable from Canadian entities. Actual results could differ from estimates. On an ongoing basis, management reviews estimates. Changes in facts and circumstances may alter such estimates and affect the results of operations and financial position in future periods.

*Basis of Consolidation*

The consolidated financial statements include our accounts and the accounts of our wholly owned and majority-owned subsidiaries, including the following operations at December 31, 2016:

| Name | Location | Ownership Interest | Operation | Status of Operations |
|------|----------|-------------------|-----------|---------------------|
| Northshore | Minnesota | 100.0% | Iron Ore | Active |
| United Taconite | Minnesota | 100.0% | Iron Ore | Active |
| Tilden | Michigan | 85.0% | Iron Ore | Active |
| Empire | Michigan | 79.0% | Iron Ore | Indefinitely Idled |
| Koolyanobbing | Western Australia | 100.0% | Iron Ore | Active |

Intercompany transactions and balances are eliminated upon consolidation.

*Equity Method Investments*

Investments in unconsolidated ventures that we have the ability to exercise significant influence over, but not control, are accounted for under the equity method.

*Hibbing*

Our 23% ownership interest in Hibbing is recorded as an equity method investment. As of December 31, 2016 and December 31, 2015, our investment in Hibbing was $8.7 million and $2.4 million, respectively, classified in *Other liabilities* in the Statements of Consolidated Financial Position.

Our share of equity income (loss) is eliminated against consolidated product inventory upon production, and against *Cost of goods sold and operating expenses* when sold. This effectively reduces our cost for our share of the mining ventures' production cost, reflecting the cost-based nature of our participation in unconsolidated ventures.

87

*Noncontrolling Interests*

Noncontrolling interest is primarily comprised of the 21% noncontrolling interest in the consolidated, but less-than-wholly-owned subsidiary at our Empire mining venture and through the CCAA filing on January 27, 2015, the 17.2% noncontrolling interest in the Bloom Lake operations. Financial results prior to the deconsolidation of the Bloom Lake Group and subsequent expenses directly associated with the Canadian Entities are included in our financial statements. The net loss and income attributable to the noncontrolling interest of the Empire mining venture was $25.2 million and $8.6 million for the years ended December 31, 2016 and December 31, 2015, respectively. There was no net income or loss attributable to the noncontrolling interest related to Bloom Lake for the year ended December 31, 2016. This compares with a net loss attributable to the noncontrolling interest related to Bloom Lake of $7.7 million for the year ended December 31, 2015. See NOTE 14 - DISCONTINUED OPERATIONS for further information.

*Cash Equivalents*

Cash and cash equivalents include cash on hand and on deposit as well as all short-term securities held for the primary purpose of general liquidity. We consider investments in highly liquid debt instruments with an original maturity of three months or less from the date of acquisition to be cash equivalents. We routinely monitor and evaluate counterparty credit risk related to the financial institutions by which our short-term investment securities are held.

*Trade Accounts Receivable and Allowance for Doubtful Accounts*

Trade accounts receivable are recorded at the invoiced amount and do not bear interest. The allowance for doubtful accounts is our best estimate of the amount of probable credit losses in our existing accounts receivable. We establish provisions for losses on accounts receivable when it is probable that all or part of the outstanding balance will not be collected. We regularly review our accounts receivable balances and establish or adjust the allowance as necessary using the specific identification method. The allowance for doubtful accounts was zero and $7.1 million at December 31, 2016 and 2015, respectively. There was no bad debt expense for the years ended December 31, 2016 and 2014. There was $7.1 million bad debt expense for the year ended December 31, 2015.

*Inventories*

*U.S. Iron Ore*

U.S. Iron Ore product inventories are stated at the lower of cost or market. Cost of iron ore inventories is determined using the LIFO method.

We had approximately 1.5 million long tons and 1.3 million long tons of finished goods stored at ports and customer facilities on the lower Great Lakes to service customers at December 31, 2016 and 2015, respectively. We maintain ownership of the inventories until title has transferred to the customer, usually when payment is received. Maintaining ownership of the iron ore products at ports on the lower Great Lakes reduces risk of non-payment by customers.

*Asia Pacific Iron Ore*

Asia Pacific Iron Ore product inventories are stated at the lower of cost or market. Costs of iron ore inventories are being valued on a weighted average cost basis. We maintain ownership of the inventories until title has transferred to the customer, which generally is when the product is loaded into the vessel.

*Supplies and Other Inventories*

Supply inventories include replacement parts, fuel, chemicals and other general supplies, which are expected to be used or consumed in normal operations. Supply inventories also include critical spares. Critical spares are replacement parts for equipment that is critical for the continued operation of the mine or processing facilities.

Supply inventories are stated at the lower of cost or market using average cost, less an allowance for obsolete and surplus items. The allowance for obsolete and surplus items was $14.0 million and $31.8 million at December 31, 2016 and 2015, respectively. The decrease in the allowance for obsolete and surplus items during the year ended December 31, 2016, was primarily a result of the disposal of Empire's supplies inventory of approximately $17.4 million that was fully reserved for as of the previous year end.

***Derivative Financial Instruments and Hedging Activities***

We are exposed to certain risks related to the ongoing operations of our business, including those caused by changes in commodity prices, interest rates and foreign currency exchange rates. We have established policies and procedures, including the use of certain derivative instruments, to manage such risks, if deemed necessary.

Derivative financial instruments are recognized as either assets or liabilities in the  Statements of Consolidated Financial Position  and measured at fair value. For derivative instruments that have not been designated as cash flow hedges, changes in fair value are recorded in the period of the instrument's earnings or losses.

Refer to NOTE 13 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES  for further information.

***Property, Plant and Equipment***

Our properties are stated at the lower of cost less accumulated depreciation or fair value. Depreciation of plant and equipment is computed principally by the straight-line method based on estimated useful lives, not to exceed the mine lives. The U.S. Iron Ore operations use the double-declining balance method of depreciation for certain mining equipment. The Asia Pacific Iron Ore operation uses the production output method for certain mining equipment. Depreciation is provided over the following estimated useful lives:

| Asset Class | Basis | Life |
|---|---|---|
| Office and information technology | Straight line | 3 to 15 Years |
| Buildings | Straight line | 45 Years |
| Mining equipment | Straight line/Double declining balance | 3 to 20 Years |
| Processing equipment | Straight line | 10 to 45 Years |
| Electric power facilities | Straight line | 10 to 45 years |
| Land improvements | Straight line | 20 to 45 years |
| Asset retirement obligation | Straight line | Life of mine |

Depreciation continues to be recognized when operations are idled temporarily.

Refer to NOTE 4 - PROPERTY, PLANT AND EQUIPMENT  for further information.

***Capitalized Stripping Costs***

During the development phase, stripping costs are capitalized as a part of the depreciable cost of building, developing and constructing a mine. These capitalized costs are amortized over the productive life of the mine using the units of production method. The production phase does not commence until the removal of more than a de minimis amount of saleable mineral material occurs in conjunction with the removal of overburden or waste material for purposes of obtaining access to an ore body. The stripping costs incurred in the production phase of a mine are variable production costs included in the costs of the inventory produced (extracted) during the period that the stripping costs are incurred.

Stripping costs related to expansion of a mining asset of proven and probable reserves are variable production costs that are included in the costs of the inventory produced during the period that the stripping costs are incurred.

***Other Intangible Assets and Liabilities***

Other intangible assets are subject to periodic amortization on a straight-line basis over their estimated useful lives as follows:

| Intangible Assets | Basis | Useful Life (years) |
|---|---|---|
| Permits - *Asia Pacific Iron Ore* | Units of production | Life of mine |
| Permits - *USIO* | Straight line | Life of mine |

89

### Asset Impairment

#### Long-Lived Tangible and Intangible Assets

We monitor conditions that may affect the carrying value of our long-lived tangible and intangible assets when events and circumstances indicate that the carrying value of the asset groups may not be recoverable. In order to determine if assets have been impaired, assets are grouped and tested at the lowest level for which identifiable, independent cash flows are available ("asset group"). An impairment loss exists when projected undiscounted cash flows are less than the carrying value of the asset group. The measurement of the impairment loss to be recognized is based on the difference between the fair value and the carrying value of the asset group. Fair value can be determined using a market approach, income approach or cost approach.

During the year ended December 31, 2016, there were no impairment indicators present; as a result no impairment assessments were required. As a result of the 2015 assessments, there were no material impairment charges related to long-lived tangible or intangible assets at our continuing operations. During 2014, we recorded a long-lived tangible asset impairment charge of $537.8 million and an intangible asset impairment charge of $13.8 million in our Statements of Consolidated Operations related to our continuing operations.

Refer to NOTE 4 - PROPERTY, PLANT AND EQUIPMENT , NOTE 12 - GOODWILL AND OTHER INTANGIBLE ASSETS AND LIABILITIES  and NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS for further information.

### Fair Value Measurements

#### Valuation Hierarchy

ASC 820, *Fair Value Measurements and Disclosures* , establishes a three-level valuation hierarchy for classification of fair value measurements. The valuation hierarchy is based upon the transparency of inputs to the valuation of an asset or liability as of the measurement date. Inputs refer broadly to the assumptions that market participants would use in pricing an asset or liability. Inputs may be observable or unobservable. Observable inputs are inputs that reflect the assumptions market participants would use in pricing the asset or liability developed based on market data obtained from independent sources. Unobservable inputs are inputs that reflect our own views about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances. The three-tier hierarchy of inputs is summarized below:

- Level 1 — Valuation is based upon quoted prices (unadjusted) for identical assets or liabilities in active markets.

- Level 2 — Valuation is based upon quoted prices for similar assets and liabilities in active markets, or other inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

- Level 3 — Valuation is based upon other unobservable inputs that are significant to the fair value measurement.

The classification of assets and liabilities within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement in its entirety. Valuation methodologies used for assets and liabilities measured at fair value are as follows:

#### Cash Equivalents

Where quoted prices are available in an active market, cash equivalents are classified within Level 1 of the valuation hierarchy. Cash equivalents classified in Level 1 at December 31, 2016 and 2015 include money market funds. Valuation of these instruments is determined using a market approach and is based upon unadjusted quoted prices for identical assets in active markets.

#### Derivative Financial Instruments

Derivative financial instruments valued using financial models that use as their basis readily observable market parameters are classified within Level 2 of the valuation hierarchy. Such derivative financial instruments include our commodity hedge and foreign currency exchange contracts. Derivative financial instruments that are valued based upon models with significant unobservable market parameters and are normally traded less actively, are classified within Level 3 of the valuation hierarchy.

Refer to NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS  and NOTE 7 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS  for further information.

### Pensions and Other Postretirement Benefits

We offer defined benefit pension plans, defined contribution pension plans and other postretirement benefit plans, primarily consisting of retiree healthcare benefits, to most employees in North America as part of a total compensation and benefits program. We do not have employee pension or post-retirement benefit obligations at our Asia Pacific Iron Ore operations.

We recognize the funded or unfunded status of our postretirement benefit obligations on our December 31, 2016 and 2015 Statements of Consolidated Financial Position based on the difference between the market value of plan assets and the actuarial present value of our retirement obligations on that date, on a plan-by-plan basis. If the plan assets exceed the retirement obligations, the amount of the surplus is recorded as an asset; if the retirement obligations exceed the plan assets, the amount of the underfunded obligations are recorded as a liability. Year-end balance sheet adjustments to postretirement assets and obligations are recorded as *Accumulated other comprehensive loss*.

The actuarial estimates of the PBO and APBO incorporate various assumptions including the discount rates, the rates of increases in compensation, healthcare cost trend rates, mortality, retirement timing and employee turnover. The discount rate is determined based on the prevailing year-end rates for high-grade corporate bonds with a duration matching the expected cash flow timing of the benefit payments from the various plans. The remaining assumptions are based on our estimates of future events by incorporating historical trends and future expectations. The amount of net periodic cost that is recorded in the Statements of Consolidated Operations consists of several components including service cost, interest cost, expected return on plan assets, and amortization of previously unrecognized amounts. Service cost represents the value of the benefits earned in the current year by the participants. Interest cost represents the cost associated with the passage of time. Certain items, such as plan amendments, gains and/or losses resulting from differences between actual and assumed results for demographic and economic factors affecting the obligations and assets of the plans, and changes in other assumptions are subject to deferred recognition for income and expense purposes. The expected return on plan assets is determined utilizing the weighted average of expected returns for plan asset investments in various asset categories based on historical performance, adjusted for current trends. See NOTE 7 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS for further information.

### Asset Retirement Obligations

Asset retirement obligations are recognized when incurred and recorded as liabilities at fair value. The fair value of the liability is determined as the discounted value of the expected future cash flow. The asset retirement obligation is accreted over time through periodic charges to earnings. In addition, the asset retirement cost is capitalized and amortized over the life of the related asset. Reclamation costs are adjusted periodically to reflect changes in the estimated present value resulting from the passage of time and revisions to the estimates of either the timing or amount of the reclamation costs. We review, on an annual basis, unless otherwise deemed necessary, the asset retirement obligation at each mine site in accordance with the provisions of ASC 410, *Asset Retirement and Environmental Obligations*. We perform an in-depth evaluation of the liability every three years in addition to routine annual assessments.

Future reclamation costs for inactive mines are accrued based on management's best estimate at the end of each period of the costs expected to be incurred at a site. Such cost estimates include, where applicable, ongoing maintenance and monitoring costs. Changes in estimates at inactive mines are reflected in earnings in the period an estimate is revised. See NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS for further information.

### Environmental Remediation Costs

We have a formal policy for environmental protection and restoration. Our mining and exploration activities are subject to various laws and regulations governing protection of the environment. We conduct our operations to protect the public health and environment and believe our operations are in compliance with applicable laws and regulations in all material respects. Our environmental liabilities, including obligations for known environmental remediation exposures at active and closed mining operations and other sites, have been recognized based on the estimated cost of investigation and remediation at each site. If the cost only can be estimated as a range of possible amounts with no point in the range being more likely, the minimum of the range is accrued. Future expenditures are not discounted unless the amount and timing of the cash disbursements reasonably can be estimated. It is possible that additional environmental obligations could be incurred, the extent of which cannot be assessed. Potential insurance recoveries have not been reflected in the determination of the liabilities. See NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS for further information.

Table of Contents

### Revenue Recognition

We sell our products pursuant to comprehensive supply agreements negotiated and executed with our customers. Revenue is recognized from a sale when persuasive evidence of an arrangement exists, the price is fixed or determinable, the product is delivered in accordance with F.O.B. terms, title and risk of loss have transferred to the customer in accordance with the specified provisions of each supply agreement and collection of the sales price reasonably is assured. Our U.S. Iron Ore and Asia Pacific Iron Ore supply agreements provide that title and risk of loss transfer to the customer either upon loading of the vessel, shipment or, as is the case with some of our U.S. Iron Ore supply agreements, when payment is received. Under certain term supply agreements, we ship the product to ports on the lower Great Lakes or to the customers' facilities prior to the transfer of title. Our rationale for shipping iron ore products to certain customers and retaining title until payment is received for these products is to minimize credit risk exposure.

Sales are recorded at a sales price specified in the relevant supply agreements resulting in revenue and a receivable at the time of sale. Upon revenue recognition for provisionally priced sales, a freestanding derivative is created for the difference between the sales price used and expected future settlement price. The derivative, which does not qualify for hedge accounting, is adjusted to fair value through *Product revenues* as a revenue adjustment each reporting period based upon current market data and forward-looking estimates determined by management until the final sales price is determined. The principal risks associated with recognition of sales on a provisional basis include iron ore price fluctuations between the date initially recorded and the date of final settlement. For revenue recognition, we estimate the future settlement rate; however, if significant changes in iron ore prices occur between the provisional pricing date and the final settlement date, we might be required to either return a portion of the sales proceeds received or bill for the additional sales proceeds due based on the provisional sales price. Refer to NOTE 13 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES for further information.

In addition, certain supply agreements with one customer include provisions for supplemental revenue or refunds based on the customer's annual steel pricing for the year the product is consumed in the customer's blast furnaces. We account for this provision as a free standing derivative instrument at the time of sale and record this provision at fair value until the year the product is consumed and the amounts are settled as an adjustment to revenue. Refer to NOTE 13 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES for further information.

Revenue from product sales and services also includes reimbursement for freight charges associated with domestic freight and venture partner cost reimbursements for the U.S. Iron Ore operations and freight associated with CFR based shipments paid on behalf of customers for the Asia Pacific Iron Ore operations. These are included in *Freight and venture partners' cost reimbursements* separate from *Product revenues*. Revenue is recognized for the expected reimbursement of services when the services are performed.

### Deferred Revenue

The terms of one of our U.S. Iron Ore pellet supply agreements required supplemental payments to be paid by the customer during the period 2009 through 2012, with the option to defer a portion of the 2009 monthly amount in exchange for interest payments until the deferred amount was repaid in 2013. Installment amounts received under this arrangement in excess of sales were classified as deferred revenue in the Statements of Consolidated Financial Position upon receipt of payment. Revenue is recognized over the life of the supply agreement, which extends until 2022, in equal annual installments. As of December 31, 2016 and 2015, installment amounts received in excess of sales totaled $77.1 million and $89.9 million, respectively. As of December 31, 2016, deferred revenue of $16.4 million was recorded in *Other current liabilities* and $64.2 million was recorded as long-term in *Other liabilities* in the Statements of Consolidated Financial Position. As of December 31, 2015, deferred revenue of $12.8 million was recorded in *Other current liabilities* and $77.1 million was recorded as long-term in *Other liabilities* in the Statements of Consolidated Financial Position .

In 2016 and 2014, due to the payment terms and the timing of cash receipts near year-end, cash receipts exceeded shipments for certain customers. The shipments were completed early in the subsequent years. We considered whether revenue should be recognized on these sales under the "bill and hold" guidance provided by the SEC Staff; however, based upon the assessment performed, revenue recognition on these transactions totaling $3.4 million and $29.3 million were deferred on the Statements of Consolidated Financial Position for the years ended December 31, 2016 and 2014, respectively.

*Cost of Goods Sold*

*Cost of goods sold and operating expenses* represents all direct and indirect costs and expenses applicable to the sales of our mining operations. Operating expenses primarily represent the portion of the Tilden mining venture costs for which we do not own; that is, the costs attributable to the share of the mine's production owned by the other joint venture partner in the Tilden mine. The mining venture functions as a captive cost company; it supplies product only to its owners effectively for the cost of production. Accordingly, the noncontrolling interests' revenue amounts are stated at cost of production and are offset by an equal amount included in *Cost of goods sold and operating expenses* resulting in no sales margin reflected for the noncontrolling partner participant. As we are responsible for product fulfillment, we act as a principal in the transaction and, accordingly, record revenue under these arrangements on a gross basis.

The following table is a summary of reimbursements in our U.S. Iron Ore operations for the years ended December 31, 2016, 2015 and 2014:

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | | | |
| | **2016** | | 2015 | | 2014 | |
| Reimbursements for: | | | | | | |
| Freight | $ | **106.8** | $ | 105.3 | $ | 163.0 |
| Venture partners' cost | | **68.0** | | 52.0 | | 108.0 |
| Total reimbursements | $ | **174.8** | $ | 157.3 | $ | 271.0 |

In 2014, we began selling a portion of our Asia Pacific Iron Ore product on a CFR basis. As a result, $20.7 million, $23.6 million and $6.9 million of freight was included in *Cost of goods sold and operating expenses* for the years ended December 31, 2016, 2015 and 2014, respectively.

Where we have joint ownership of a mine, our contracts entitle us to receive royalties and/or management fees, which we earn as the pellets are produced.

**Repairs and Maintenance**

Repairs, maintenance and replacement of components are expensed as incurred. The cost of major equipment overhauls is capitalized and depreciated over the estimated useful life, which is the period until the next scheduled overhaul, generally five years. All other planned and unplanned repairs and maintenance costs are expensed when incurred.

**Share-Based Compensation**

The fair value of each performance share grant is estimated on the date of grant using a Monte Carlo simulation to forecast relative TSR performance. Consistent with the guidelines of ASC 718, *Stock Compensation*, a correlation matrix of historic and projected stock prices was developed for both the Company and its predetermined peer group of mining and metals companies. The fair value assumes that performance goals will be achieved.

The expected term of the grant represents the time from the grant date to the end of the service period for each of the three plan-year agreements. We estimated the volatility of our common shares and that of the peer group of mining and metals companies using daily price intervals for all companies. The risk-free interest rate is the rate at the grant date on zero-coupon government bonds, with a term commensurate with the remaining life of the performance plans.

The fair value of stock options is estimated on the date of grant using a Black-Scholes model using the grant date price of our common shares and option exercise price, and assumptions regarding the option's expected term, the volatility of our common shares, the risk-free interest rate, and the dividend yield over the option's expected term.

Upon vesting of share-based compensation awards, we issue shares from treasury shares before issuing new shares.

Refer to NOTE 8 - STOCK COMPENSATION PLANS for additional information.

### Income Taxes

Income taxes are based on income for financial reporting purposes, calculated using tax rates by jurisdiction, and reflect a current tax liability or asset for the estimated taxes payable or recoverable on the current year tax return and expected annual changes in deferred taxes. Any interest or penalties on income tax are recognized as a component of income tax expense.

We account for income taxes under the asset and liability method, which requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the financial statements. Under this method, deferred tax assets and liabilities are determined based on the differences between the financial statement and tax basis of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. The effect of a change in tax rates on deferred tax assets and liabilities is recognized in income in the period that includes the enactment date.

We record net deferred tax assets to the extent we believe these assets will more likely than not be realized. In making such determination, we consider all available positive and negative evidence, including scheduled reversals of deferred tax liabilities, projected future taxable income, tax planning strategies and recent financial results of operations.

Accounting for uncertainty in income taxes recognized in the financial statements requires that a tax benefit from an uncertain tax position be recognized when it is more likely than not that the position will be sustained upon examination, including resolutions of any related appeals or litigation processes, based on technical merits.

See NOTE 9 - INCOME TAXES for further information.

### Discontinued Operations

In April 2014, the FASB issued ASU 2014-08, *Reporting Discontinued Operations and Disclosures of Disposals of Components of an Entity* , which changes the criteria for reporting discontinued operations and requires additional disclosures about discontinued operations. The standard requires that an entity report as a discontinued operation only a disposal that represents a strategic shift in operations that has a major effect on its operations and financial results. ASU 2014-08 is effective prospectively for new disposals that occur within annual periods beginning on or after December 15, 2014. Early adoption was permitted and we adopted ASU 2014-08 during the year ended December 31, 2014.

#### North American Coal Operations

As we executed our strategy to focus on strengthening our U.S. Iron Ore operations, management determined as of March 31, 2015 that our North American Coal operating segment met the criteria to be classified as held for sale under *ASC 205, Presentation of Financial Statements* and continued to meet the criteria throughout 2015. In December 2015, we completed the sale of our remaining two metallurgical coal operations, Oak Grove and Pinnacle mines, which marked our exit from the coal business. Our plan to sell the Oak Grove and Pinnacle mine assets represented a strategic shift in our business. For this reason, our previously reported North American Coal operating segment results for all periods, prior to the March 31, 2015 held for sale determination, as well as costs to exit are classified as discontinued operations. Refer to NOTE 14 - DISCONTINUED OPERATIONS for further discussion of our discontinued operations.

#### Canadian Operations

As more fully described in NOTE 14 - DISCONTINUED OPERATIONS, in January 2015, we announced that the Bloom Lake Group commenced restructuring proceedings in Montreal, Quebec under the CCAA. At that time, we had suspended Bloom Lake operations and for several months had been exploring options to sell certain of our Canadian assets, among other initiatives. Effective January 27, 2015, following the CCAA filing of the Bloom Lake Group, we deconsolidated the Bloom Lake Group and certain other wholly-owned subsidiaries comprising substantially all of our Canadian operations. Additionally, on May 20, 2015, the Wabush Group commenced restructuring proceedings in Montreal, Quebec under the CCAA which resulted in the deconsolidation of the remaining Wabush Group entities that were not previously deconsolidated. The Wabush Group was no longer generating revenues and was not able to meet its obligations as they came due. As a result of this action, the CCAA protections granted to the Bloom Lake Group were extended to include the Wabush Group to facilitate the reorganization of each of their businesses and operations. Our Canadian exit represents a strategic shift in our business. For this reason, our previously reported Eastern Canadian Iron Ore and Ferroalloys operating segment results for all periods prior to the respective deconsolidations as well as costs to exit are classified as discontinued operations.

94

*Foreign Currency*

Our financial statements are prepared with the U.S. dollar as the reporting currency. The functional currency of our Australian subsidiaries is the Australian dollar. The functional currency of all other international subsidiaries is the U.S. dollar. The financial statements of international subsidiaries are translated into U.S. dollars using the exchange rate at each balance sheet date for assets and liabilities and a weighted average exchange rate for each period for revenues, expenses, gains and losses. Where the local currency is the functional currency, translation adjustments are recorded as *Accumulated other comprehensive loss*. Income taxes generally are not provided for foreign currency translation adjustments. To the extent that monetary assets and liabilities, inclusive of short-term and certain long-term intercompany loans, are recorded in a currency other than the functional currency, these amounts are remeasured each reporting period, with the resulting gain or loss being recorded in the Statements of Consolidated Operations . Transaction gains and losses resulting from remeasurement of intercompany loans are included in *Miscellaneous - net* in our Statements of Consolidated Operations .

The following represents the net gain related to impact of transaction gains and losses resulting from remeasurement for the years ended December 31, 2016, 2015 and 2014:

| | | (In Millions) | | | |
|---|---|---|---|---|---|
| | **2016** | | 2015 | | 2014 |
| Remeasurement of intercompany loans | $ | **(16.6 )** | $ 11.5 | $ | 19.7 |
| Remeasurement of cash and cash equivalents | | **(1.0)** | 1.5 | | 10.6 |
| Other remeasurement | | **0.8** | 3.3 | | (1.3) |
| Net gain (loss) related to impact of transaction gains and losses resulting from remeasurement | | **(16.8 )** | 16.3 | | 29.0 |

*Earnings Per Share*

We present both basic and diluted earnings per share amounts for continuing operations and discontinued operations. Basic earnings per share amounts are calculated by dividing *Net Income (Loss) from Continuing Operations Attributable to Cliffs Shareholders* less any paid or declared but unpaid dividends on our depositary shares by the weighted average number of common shares outstanding during the period presented. Diluted earnings per share amounts are calculated by dividing *Net Income (Loss) from Continuing Operations Attributable to Cliffs Shareholders* by the weighted average number of common shares, common share equivalents under stock plans using the treasury stock method and the number of common shares that would be issued under an assumed conversion of our outstanding depositary shares, each representing a 1/40th interest in a share of our Series A Mandatory Convertible Preferred Stock, Class A, under the if-converted method. We currently do not have any outstanding depositary shares. Historically, when we have had outstanding depositary shares, they were convertible into common shares based on the volume weighted average of closing prices of our common shares over the 20 consecutive trading day period ending on the third day immediately preceding the end of that reporting period. Common share equivalents are excluded from EPS computations in the periods in which they have an anti-dilutive effect. See NOTE 19 - EARNINGS PER SHARE for further information.

**Recent Accounting Pronouncements**

*Issued and Adopted*

In August 2016, the FASB issued ASU 2016-15, *Statement of Cash Flows (Topic 230) Classification of Certain Cash Receipts and Cash Payment* s. The new standard addresses eight specific changes to how cash receipts and cash payments are presented and classified in the statement of cash flows. The guidance is effective for interim and annual reporting periods beginning after December 15, 2017, and early adoption is permitted. We have adopted the guidance for the period ended December 31, 2016 and have applied this amended accounting guidance to the Statements of Consolidated Cash Flows for all periods presented. The adoption of ASU 2016-15 did not have an impact on prior results reported in the Statements of Consolidated Cash Flows .

95

In August 2014, the FASB issued ASU 2014-15, *Disclosure of Uncertainties About an Entity's Ability to Continue as a Going Concern* . ASU 2014-15 explicitly requires management to assess an entity's ability to continue as a going concern, and to provide related footnote disclosure in certain circumstances. ASU 2014-15 is intended to define management's responsibility to evaluate whether there is substantial doubt about an entity's ability to continue as a going concern and to provide related footnote disclosures. Specifically, ASU 2014-15 provides a definition of the term "substantial doubt" and requires an assessment for a period of one year after the date that the financial statements are issued (or available to be issued). It also requires certain disclosures when substantial doubt is alleviated as a result of consideration of management's plans and requires an express statement and other disclosures when substantial doubt is not alleviated. The new standard is effective for all entities in the first annual period ending after December 15, 2016 and for annual periods and interim periods thereafter. We have adopted the guidance for the year ended December 31, 2016. The adoption of ASU 2014-15 did not impact our disclosures in 2016.

In October 2015, the FASB issued ASU 2015-17, *Balance Sheet Classification of Deferred Taxes.* This update simplifies the presentation of deferred income taxes, by requiring that deferred tax liabilities and assets be classified as non-current in a classified statement of financial position. This update is effective for financial statements issued for annual periods beginning after December 15, 2016, and interim periods within those annual periods; however, early adoption was permitted. This guidance can also be applied either prospectively to all deferred tax liabilities and assets or retrospectively to all periods presented. We adopted the guidance during the year ended December 31, 2015 and have applied this amended accounting guidance to our deferred tax liabilities and assets for all periods presented. The adoption of ASU 2015-17 did not have an impact on our Statements of Consolidated Operations or Statements of Consolidated Cash Flows . The impact of the adoption of the guidance resulted in any current deferred tax assets or liabilities being reclassified to non-current deferred tax assets or liabilities on the Statements of Consolidated Financial Position .

### Issued and Not Effective

In February 2016, the FASB issued ASU No. 2016-02, *Leases*. The new standard requires lessees to recognize a right-of-use asset and a lease liability on the balance sheet for all leases with the exception of short-term leases. For lessees, leases will continue to be classified as either operating or finance leases in the income statement. Lessor accounting is similar to the current model but updated to align with certain changes to the lessee model. The effective date of the new standard for public companies is for fiscal years beginning after December 15, 2018 and interim periods within those fiscal years. Early adoption is permitted. The new standard must be adopted using a modified retrospective transition and requires application of the new guidance at the beginning of the earliest comparative period presented. We are currently evaluating the effect that the updated standard will have on our consolidated financial statements and related disclosures.

In May 2014, the FASB issued ASU 2014-09, *Revenues from Contracts with Customers*. The new revenue guidance broadly replaces the revenue guidance provided throughout the Codification. The core principle of the revenue guidance is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. To achieve that core principle, an entity should apply the following steps: (1) identify the contract(s) with a customer, (2) identify the performance obligations in the contract, (3) determine the transaction price, (4) allocate the transaction price to the performance obligations in the contract, and (5) recognize revenue when (or as) the entity satisfies a performance obligation. The new revenue guidance also requires the capitalization of certain contract acquisition costs. Reporting entities must prepare new disclosures providing qualitative and quantitative information on the nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with customers. New disclosures also include qualitative and quantitative information on significant judgments, changes in judgments, and contract acquisition assets. At issuance, ASU 2014-09 was effective starting in 2017 for calendar-year public entities, and interim periods within that year. In August 2015, the FASB issued ASU 2015-14, *Revenue from Contracts with Customers: Deferral of the Effective Date,* which defers the adoption of ASU 2014-09 to annual reporting periods beginning after December 15, 2017, including interim reporting periods within that reporting period. Earlier application is permitted only as of annual reporting periods beginning after December 15, 2016, including interim reporting periods within that reporting period. During the fourth quarter of 2016, we completed the initial evaluation of the new standard and the related assessment and review of a representative sample of existing revenue contracts with our customers. We determined, on a preliminary basis, that although the timing and pattern of revenue recognition may change, the amount of revenue recognized during the year should remain substantially the same. We anticipate utilizing the full retrospective transition method. The primary impact of the adoption on our consolidated financial statements will be the additional required disclosures around revenue recognition in the notes to the consolidated financial statements.

Table of Contents

**NOTE 2 - SEGMENT REPORTING**

Our continuing operations are organized and managed according to geographic location: U.S. Iron Ore and Asia Pacific Iron Ore. Our U.S. Iron Ore segment is a major supplier of iron ore pellets to the North American steel industry from our mines and pellet plants located in Michigan and Minnesota. The Asia Pacific Iron Ore segment is located in Western Australia and provides iron ore to the seaborne market for Asian steel producers. There were no intersegment product revenues in 2016, 2015 or 2014.

We have historically evaluated segment performance based on sales margin, defined as revenues less cost of goods sold and operating expenses identifiable to each segment. Additionally, we evaluate segment performance based on EBITDA, defined as net income (loss) before interest, income taxes, depreciation, depletion and amortization, and Adjusted EBITDA, defined as EBITDA excluding certain items such as extinguishment/restructuring of debt, impacts of discontinued operations, foreign currency remeasurement, severance and contractor termination costs, certain supplies inventory write-offs, impairment of goodwill and other long-lived assets and other costs associated with the proxy contest and change in control. These measures allow management and investors to focus on our ability to service our debt, as well as illustrate how the business and each operating segment is performing. Additionally, EBITDA and Adjusted EBITDA assist management and investors in their analysis and forecasting as these measures approximate the cash flows associated with operational earnings.

The following tables present a summary of our reportable segments for the years ended December 31, 2016, 2015 and 2014, including a reconciliation of segment sales margin to *Income (Loss) from Continuing Operations Before Income Taxes and Equity Loss from Ventures* and a reconciliation of *Net Income (Loss)* to EBITDA and Adjusted EBITDA:

| | | (In Millions) | | | | | |
|---|---|---|---|---|---|---|---|
| | **2016** | | 2015 | | 2014 | |
| Revenues from product sales and services: | | | | | | |
| U.S. Iron Ore | $ **1,554.5** | **74%** | $ 1,525.4 | 76% | $ 2,506.5 | 74% |
| Asia Pacific Iron Ore | **554.5** | **26%** | 487.9 | 24% | 866.7 | 26% |
| Total revenues from product sales and services | $ **2,109.0** | **100%** | $ 2,013.3 | 100% | $ 3,373.2 | 100% |
| | | | | | | |
| Sales margin: | | | | | | |
| U.S. Iron Ore | $ **275.7** | | $ 227.1 | | $ 710.4 | |
| Asia Pacific Iron Ore | **113.6** | | 9.4 | | 121.7 | |
| Eliminations with discontinued operations | **—** | | — | | 53.6 | |
| Sales margin | **389.3** | | 236.5 | | 885.7 | |
| Other operating expense | **(148.5)** | | (85.2) | | (755.6) | |
| Other income (expense) | **(33.8)** | | 161.8 | | (149.8) | |
| Income (loss) from continuing operations before income taxes and equity loss from ventures | $ **207.0** | | $ 313.1 | | $ (19.7) | |

97

| | | 2016 | | 2015 | | 2014 |
|---|---|---|---|---|---|---|
| | | | | **(In Millions)** | | |
| Net income (loss) | $ | **199.3** | $ | (748.4) | $ | (8,311.6) |
| Less: | | | | | | |
| Interest expense, net | | **(200.5)** | | (231.4) | | (185.2) |
| Income tax benefit (expense) | | **12.2** | | (163.3) | | 1,302.0 |
| Depreciation, depletion and amortization | | **(115.4)** | | (134.0) | | (504.0) |
| Total EBITDA | $ | **503.0** | $ | (219.7) | $ | (8,924.4) |
| Less: | | | | | | |
| Gain on extinguishment/restructuring of debt | $ | **166.3** | $ | 392.9 | $ | 16.2 |
| Impact of discontinued operations | | **(19.9)** | | (892.0) | | (9,332.5) |
| Foreign exchange remeasurement | | **(16.8)** | | 16.3 | | 29.0 |
| Severance and contractor termination costs | | **(0.1)** | | (10.2) | | (23.3) |
| Supplies inventory write-off | | **—** | | (16.3) | | — |
| Impairment of goodwill and other long-lived assets | | **—** | | (3.3) | | (635.5) |
| Proxy contest and change in control in SG&A | | **—** | | — | | (26.6) |
| Total Adjusted EBITDA | $ | **373.5** | $ | 292.9 | $ | 1,048.3 |
| | | | | | | |
| EBITDA: | | | | | | |
| U.S. Iron Ore | $ | **342.4** | $ | 317.6 | $ | 805.6 |
| Asia Pacific Iron Ore | | **128.3** | | 35.3 | | (352.9) |
| Other (including discontinued operations) | | **32.3** | | (572.6) | | (9,377.1) |
| Total EBITDA | $ | **503.0** | $ | (219.7) | $ | (8,924.4) |
| | | | | | | |
| Adjusted EBITDA: | | | | | | |
| U.S. Iron Ore | $ | **359.6** | $ | 352.1 | $ | 833.5 |
| Asia Pacific Iron Ore | | **132.9** | | 32.7 | | 252.9 |
| Other | | **(119.0)** | | (91.9) | | (38.1) |
| Total Adjusted EBITDA | $ | **373.5** | $ | 292.9 | $ | 1,048.3 |

A005179

Table of Contents

| | (In Millions) | | |
|---|---|---|---|
| Depreciation, depletion and amortization: | **2016** | 2015 | 2014 |
| U.S. Iron Ore | $ **84.0** | $ 98.9 | $ 107.4 |
| Asia Pacific Iron Ore | **25.1** | 25.3 | 145.9 |
| Other | **6.3** | 6.6 | 7.7 |
| Total depreciation, depletion and amortization | $ **115.4** | $ 130.8 | $ 261.0 |
| | | | |
| Capital additions[1]: | | | |
| U.S. Iron Ore | $ **62.2** | $ 58.2 | $ 48.4 |
| Asia Pacific Iron Ore | **0.2** | 5.4 | 10.8 |
| Other | **6.1** | 8.6 | 6.3 |
| Total capital additions | $ **68.5** | $ 72.2 | $ 65.5 |

[1] Includes capital lease additions and non-cash accruals. Refer to NOTE 17 - CASH FLOW INFORMATION.

A summary of assets by segment is as follows:

| | (In Millions) | | |
|---|---|---|---|
| | **December 31, 2016** | December 31, 2015 | December 31, 2014 |
| Assets: | | | |
| U.S. Iron Ore | $ **1,372.5** | $ 1,476.4 | $ 1,464.9 |
| Asia Pacific Iron Ore | **155.1** | 202.5 | 306.2 |
| Total segment assets | **1,527.6** | 1,678.9 | 1,771.1 |
| Corporate | **396.3** | 441.7 | 666.2 |
| Assets of Discontinued Operations | **—** | 14.9 | 709.9 |
| Total assets | $ **1,923.9** | $ 2,135.5 | $ 3,147.2 |

Included in the consolidated financial statements are the following amounts relating to geographic location:

| | (In Millions) | | |
|---|---|---|---|
| | **2016** | 2015 | 2014 |
| Revenue | | | |
| United States | $ **1,236.2** | $ 1,206.4 | $ 1,923.2 |
| China | **452.5** | 370.8 | 662.7 |
| Canada | **267.1** | 282.4 | 430.5 |
| Other countries | **153.2** | 153.7 | 356.8 |
| Total revenue | $ **2,109.0** | $ 2,013.3 | $ 3,373.2 |
| Property, Plant and Equipment, Net | | | |
| United States | $ **961.0** | $ 1,012.7 | $ 998.1 |
| Australia | **23.4** | 46.3 | 72.4 |
| Total Property, Plant and Equipment, Net | $ **984.4** | $ 1,059.0 | $ 1,070.5 |

***Concentrations in Revenue***

In 2016, two customers individually accounted for more than 10% of our consolidated product revenue and in 2015 and 2014, three customers individually accounted for more than 10% of our consolidated product revenue. Total product revenue from these customers represents approximately $1.1 billion, $1.3 billion and $1.9 billion of our total consolidated product revenue in 2016, 2015 and 2014, respectively, and is attributable to our U.S. Iron Ore business segment.

99

Table of Contents

The following table represents the percentage of our total revenue contributed by each category of products and services in  2016, 2015 and 2014:

| Revenue category | 2016 | 2015 | 2014 |
|---|---|---|---|
| Product | 91% | 91% | 92% |
| Freight and venture partners' cost reimbursements | 9% | 9% | 8% |
| Total revenue | 100% | 100% | 100% |

**NOTE 3 - INVENTORIES**

The following table presents the detail of our *Inventories* in the Statements of Consolidated Financial Position as of December 31, 2016 and 2015:

| | (In Millions) | | | | | | |
|---|---|---|---|---|---|---|---|
| | **December 31, 2016** | | | December 31, 2015 | | | |
| Segment | **Finished Goods** | **Work-in Process** | **Total Inventory** | Finished Goods | Work-in Process | Total Inventory |
| U.S. Iron Ore | $ **124.4** | $ **12.6** | $ **137.0** | $ 252.3 | $ 11.7 | $ 264.0 |
| Asia Pacific Iron Ore | **23.6** | **17.8** | **41.4** | 20.8 | 44.8 | 65.6 |
| Total | $ **148.0** | $ **30.4** | $ **178.4** | $ 273.1 | $ 56.5 | $ 329.6 |

Asia Pacific Iron Ore had  no long-term work-in-process stockpiles at  December 31, 2016. There were $6.8 million long-term work-in-process stockpiles classified as *Other non-current assets* in the Statements of Consolidated Financial Position  as of  December 31, 2015.

*U.S. Iron Ore*

The excess of current cost over LIFO cost of iron ore inventories was  $78.5 million and $87.8 million at December 31, 2016 and 2015, respectively. As of December 31, 2016, the product inventory balance for U.S. Iron Ore declined, resulting in the liquidation of a LIFO layer in 2016. The effect of the inventory reduction was an increase in *Cost of goods sold and operating expenses*  of $8.8 million in the Statements of Consolidated Operations  for the year ended December 31, 2016. As of December 31, 2015, the product inventory balance for U.S. Iron Ore increased, resulting in a LIFO increment in  2015. The effect of the inventory build was an increase in *Inventories* of $118.8 million  in the Statements of Consolidated Financial Position  for the year ended December 31, 2015.

100

Table of Contents

**NOTE 4 - PROPERTY, PLANT AND EQUIPMENT**

The following table indicates the value of each of the major classes of our consolidated depreciable assets as of  December 31, 2016 and 2015:

| | (In Millions) | |
| --- | --- | --- |
| | December 31, | |
| | 2016 | 2015 |
| Land rights and mineral rights | $ 500.5 | $ 500.5 |
| Office and information technology | 65.1 | 71.0 |
| Buildings | 67.9 | 60.4 |
| Mining equipment | 592.2 | 594.0 |
| Processing equipment | 552.0 | 516.8 |
| Electric power facilities | 49.4 | 46.4 |
| Land improvements | 23.5 | 24.8 |
| Asset retirement obligation | 19.8 | 87.9 |
| Other | 28.1 | 28.2 |
| Construction in-progress | 42.8 | 40.3 |
| | 1,941.3 | 1,970.3 |
| Allowance for depreciation and depletion | (956.9) | (911.3) |
| | $ 984.4 | $ 1,059.0 |

We recorded depreciation expense of $106.8 million, $119.2 million and $173.0 million in the Statements of Consolidated Operations for the years ended December 31, 2016, 2015 and 2014, respectively.

For the year ended December 31, 2016, there were no factors present that indicated the carrying value of certain asset groups would not be recoverable; therefore, there were no impairments during 2016. Our asset groups consist of the assets and liabilities of our mines and associated reserves. The lowest level of identifiable cash flows largely are at the U.S. Iron Ore and Asia Pacific Iron Ore segment levels.

For the year ended December 31, 2015, although certain factors indicated that the carrying value of certain asset groups may not be recoverable, an assessment was performed and no further impairment was indicated.

During the second half of 2014, due to lower than previously expected profits as a result of decreased iron ore pricing expectations and increased costs, we determined that indicators of impairment with respect to certain of our long-lived assets or asset groups existed. As a result of these assessments during 2014, we determined that the future cash flows associated with our Asia Pacific Iron Ore asset group and other asset groups were not sufficient to support the recoverability of the carrying value of these productive assets. Accordingly, during 2014, an other long-lived asset impairment charge of $537.8 million was recorded as *Impairment of goodwill and other long-lived assets* in the Statements of Consolidated Operations related to property, plant and equipment. The fair value estimates were calculated using income and market approaches.

101

Table of Contents

The net book value of the land rights and mineral rights as of  December 31, 2016 and 2015 is as follows:

|  | (In Millions) | |
|---|---|---|
|  | December 31, | |
|  | **2016** | 2015 |
| Land rights | $ 11.6 | $ 11.6 |
| Mineral rights: | | |
|     Cost | $ 488.9 | $ 488.9 |
|     Depletion | (112.2) | (108.4) |
| Net mineral rights | $ 376.7 | $ 380.5 |

Accumulated depletion relating to mineral rights, which was recorded using the unit-of-production method, is included in *Cost of goods sold and operating expenses.* We recorded depletion expense of $3.8 million, $7.4 million and $79.6 million in the Statements of Consolidated Operations for the years ended December 31, 2016, 2015 and 2014, respectively. As discussed above, during 2014 we performed impairment assessments with respect to certain of our long-lived assets or asset groups. As a result of these assessments, we recorded another long-lived asset impairment charge related to mineral rights of $297.2 million associated with our Asia Pacific Iron Ore asset group.

### NOTE 5 - DEBT AND CREDIT FACILITIES

The following represents a summary of our long-term debt as of  December 31, 2016 and 2015:

| ($ in Millions) | | | | | |
|---|---|---|---|---|---|
| **December 31, 2016** | | | | | |
| **Debt Instrument** | **Annual Effective Interest Rate** | **Total Principal Amount** | **Debt Issuance Costs** | **Undiscounted Interest/(Unamortized Discounts)** | **Total Debt** |
| Secured Notes | | | | | |
|   $540 Million 8.25% 2020 First Lien Notes | 9.97% | $ 540.0 | $ (8.0) | $ (25.7) | $ 506.3 |
|   $218.5 Million 8.00% 2020 1.5 Lien Notes | N/A | 218.5 | — | 65.7 | 284.2 |
|   $544.2 Million 7.75% 2020 Second Lien Notes | 15.55% | 430.1 | (5.8) | (85.2) | 339.1 |
| Unsecured Notes | | | | | |
|   $400 Million 5.90% 2020 Senior Notes | 5.98% | 225.6 | (0.6) | (0.5) | 224.5 |
|   $500 Million 4.80% 2020 Senior Notes | 4.83% | 236.8 | (0.7) | (0.2) | 235.9 |
|   $700 Million 4.875% 2021 Senior Notes | 4.89% | 309.4 | (1.0) | (0.2) | 308.2 |
|   $800 Million 6.25% 2040 Senior Notes | 6.34% | 298.4 | (2.5) | (3.4) | 292.5 |
| ABL Facility | N/A | 550.0 | N/A | N/A | — |
| Fair Value Adjustment to Interest Rate Hedge | | | | | 1.9 |
| Total debt | | | | | $ 2,192.6 |
|   Less current portion | | | | | 17.5 |
| Long-term debt | | | | | $ 2,175.1 |

102

($ in Millions)

| Debt Instrument | Annual Effective Interest Rate | Total Principal Amount | Debt Issuance Costs | Undiscounted Interest/(Unamortized Discounts) | Total Debt |
|---|---|---|---|---|---|
| **December 31, 2015** | | | | | |
| Secured Notes | | | | | |
| $540 Million 8.25% 2020 First Lien Notes | 9.97% | $    540.0 | $    (10.5) | $    (32.1) | $    497.4 |
| $544.2 Million 7.75% 2020 Second Lien Notes | 15.55% | 544.2 | (9.5) | (131.5) | 403.2 |
| Unsecured Notes | | | | | |
| $500 Million 3.95% 2018 Senior Notes | 6.30% | 311.2 | (0.9) | (1.2) | 309.1 |
| $400 Million 5.90% 2020 Senior Notes | 5.98% | 290.8 | (1.1) | (0.8) | 288.9 |
| $500 Million 4.80% 2020 Senior Notes | 4.83% | 306.7 | (1.1) | (0.4) | 305.2 |
| $700 Million 4.875% 2021 Senior Notes | 4.89% | 412.5 | (1.7) | (0.2) | 410.6 |
| $800 Million 6.25% 2040 Senior Notes | 6.34% | 492.8 | (4.3) | (5.8) | 482.7 |
| ABL Facility | N/A | 550.0 | N/A | N/A | — |
| Fair Value Adjustment to Interest Rate Hedge | | | | | 2.3 |
| Long-term debt | | | | | $    2,699.4 |

**Senior Secured Notes**

Our First Lien Notes bear interest at a rate of 8.25% per annum. Interest on the First Lien Notes is payable semi-annually in arrears on March 31 and September 30 of each year, commencing on September 30, 2015. The First Lien Notes mature on March 31, 2020 and are secured senior obligations of the Company.

Our 1.5 Lien Notes bear interest at a rate of 8.00% per annum. Interest on the 1.5 Lien Notes is payable semi-annually in arrears on March 31 and September 30 of each year, commencing on September 30, 2016. The 1.5 Lien Notes mature on September 30, 2020 and are secured senior obligations of the Company.

Our Second Lien Notes bear interest at a rate of 7.75% per annum. Interest on the Second Lien Notes is payable semi-annually in arrears on March 31 and September 30 of each year, commencing on September 30, 2015. The Second Lien Notes mature on March 31, 2020 and are secured senior obligations of the Company.

The First Lien Notes are jointly and severally and fully and unconditionally guaranteed on a senior secured basis by substantially all of our material U.S. subsidiaries and are secured (subject in each case to certain exceptions and permitted liens) by (i) a first-priority lien on substantially all of our U.S. assets, other than the ABL Collateral (the "Notes Collateral"), and (ii) a second-priority lien on the U.S. ABL Collateral (as defined below), which is junior to a first-priority lien for the benefit of the lenders under the ABL Facility. The First Lien Notes and guarantees are general senior obligations of the Company and the applicable guarantor; are effectively senior to all of our unsecured indebtedness, to the extent of the value of the collateral; together with other obligations secured equally and ratably with the First Lien Notes, are effectively (i) senior to our existing and future ABL obligations, to the extent and value of the Notes Collateral and (ii) senior to our obligations under the Second Lien Notes, to the extent and value of the collateral; are effectively subordinated to (i) our existing and future ABL obligations, to the extent and value of the ABL Collateral, and (ii) any existing or future indebtedness that is secured by liens on assets that do not constitute a part of the collateral, to the extent of the value of such assets; will rank equally in right of payment with all existing and future senior indebtedness, and any guarantees thereof; will rank equally in priority as to the Notes Collateral with any future debt secured equally and ratably with the First Lien Notes incurred after March 30, 2015; rank senior in right of payment to all existing and future subordinated indebtedness; and structurally subordinated to all existing and future indebtedness and other liabilities of our subsidiaries that do not guarantee the First Lien Notes. The relative priority of the liens securing our First Lien Notes obligations, 1.5 Lien Notes obligations and Second Lien Notes obligations compared to the liens securing our obligations under the ABL Facility and certain other matters relating to the administration of security interests are set forth in intercreditor agreements.

The 1.5 and Second Lien Notes have substantially similar terms to those of the First Lien Notes except with respect to their priority security interest in the collateral. The 1.5 Lien Notes are jointly and severally and fully and unconditionally guaranteed on a senior secured basis by substantially all of our material U.S. subsidiaries and are secured (subject in each case to certain exceptions and permitted liens) on (i) a junior first-priority basis by substantially all of our U.S. assets, other than the ABL Collateral, and (ii) a junior second-priority basis by our ABL Collateral, which secures

103

Table of Contents

our ABL obligations on a first-priority basis, the First Lien Notes obligations on a senior second-priority basis and the Second Lien Notes obligations on a third-priority basis. The Second Lien Notes are jointly and severally and fully and unconditionally guaranteed on a senior secured basis by substantially all of our material U.S. subsidiaries and are secured (subject in each case to certain exceptions and permitted liens) by (i) a second-priority lien (junior to the First Lien Notes) on substantially all of our U.S. assets, other than the ABL Collateral, and (ii) a third-priority lien (junior to the ABL Facility and the First Lien Notes) on the U.S. ABL Collateral.

The terms of the secured notes are governed by the secured notes indentures. The secured notes indentures contain customary covenants that, among other things, limit our ability to incur certain secured indebtedness, create liens on principal property and the capital stock or debt of a subsidiary that owns a principal property, use proceeds of dispositions of collateral, enter into certain sale and leaseback transactions, merge or consolidate with another company and transfer or sell all or substantially all of our assets. Upon the occurrence of a "change of control triggering event," as defined in the secured notes indentures, we are required to offer to repurchase the secured notes at 101% of the aggregate principal amount thereof, plus any accrued and unpaid interest, if any, to, but excluding, the repurchase date.

The secured notes indentures contain customary events of default, including failure to make required payments, failure to comply with certain agreements or covenants, failure to pay or acceleration of certain other indebtedness, certain events of bankruptcy and insolvency and failure to pay certain judgments. An event of default under the secured notes indentures will allow either the trustee or the holders of at least 25% in aggregate principal amount of the then-outstanding applicable series of secured notes issued under the applicable indenture to accelerate, or in certain cases, will automatically cause the acceleration of, the amounts due under such series of secured notes.

The following is a summary of redemption prices for each of our secured senior notes:

| | First Lien Notes | | 1.5 Lien Notes | | Second Lien Notes | |
|---|---|---|---|---|---|---|
| | Percent of Principal | Period | Percent of Principal | Period | Percent of Principal | Period |
| Early redemption[1,2] | 100.00 % | Prior to March 31, 2018 | 100.00 % | Prior to September 30, 2017 | 100.00 % | Prior to March 31, 2017 |
| Initial redemption[1] | 108.25 | Beginning on March 31, 2018 | 104.00 | Beginning on September 30, 2017 | 103.875 | Beginning on March 31, 2017 |
| Secondary redemption[1] | 100.00 | Beginning on June 30, 2019 | 100.00 | Beginning on September 30, 2019 | 100.00 | Beginning on March 31, 2019 |

[1] Plus accrued and unpaid interest, if any, up to but excluding the redemption date.

[2] Plus a "make-whole" premium. In addition, we may redeem in the aggregate up to 35% of the original aggregate principal amount (calculated after giving effect to any issuance of additional notes) with the net cash proceeds from certain equity offerings at a redemption price of 108.25%, 108.00% and 107.75% for the First, 1.5 and Second Lien Notes, respectively, so long as at least 65% of the original aggregate principal amount of the notes (calculated after giving effect to any issuance of additional notes) issued remain outstanding after each such redemption.

**Unsecured Senior Notes**

Our 3.95% senior notes were redeemed in whole on September 16, 2016 at a total redemption price of $301.0 million, which included $283.6 million outstanding aggregate principal. As a result, we recorded a $19.9 million pre-tax loss on full retirement of long-term debt in the third quarter of 2016, which consisted of debt redemption premiums of $17.4 million and expenses of $2.5 million related to the write-off of unamortized debt issuance costs, unamortized bond discount and deferred losses on interest rate swaps. The loss was recorded against the *Gain on extinguishment/restructuring of debt* in the Statements of Consolidated Operations for the year ended December 31, 2016.

Our 5.90% senior notes are due March 15, 2020. Interest is payable on March 15 and September 15 of each year until maturity.

Our 4.80% senior notes are due October 1, 2020. Interest is payable on April 1 and October 1 of each year until maturity.

Our 4.875% senior notes are due April 1, 2021. Interest is payable on April 1 and October 1 of each year until maturity.

Table of Contents

Our 6.25% senior notes are due October 1, 2040. Interest is payable on April 1 and October 1 of each year until maturity.

The senior notes are unsecured obligations and rank equally in right of payment with all our other existing and future unsecured and unsubordinated indebtedness. There are no subsidiary guarantees of the interest and principal amounts.

The senior notes may be redeemed any time at our option not less than 30 days nor more than 60 days after prior notice is sent to the holders of the applicable series of notes. The senior notes are redeemable at a redemption price equal to the greater of (1) 100% of the principal amount of the notes to be redeemed or (2) the sum of the present values of the remaining scheduled payments of principal and interest on the notes to be redeemed, discounted to the redemption date on a semi-annual basis at the treasury rate plus 50 basis points with respect to the 2018 senior notes, 35 basis points with respect to the 2020 senior notes, 25 basis points with respect to the 2021 senior notes and 40 basis points with respect to the 2040 senior notes, plus, in each case, accrued and unpaid interest to the date of redemption. However, if the 2021 senior notes are redeemed on or after the date that is three months prior to their maturity date, the 2021 senior notes will be redeemed at a redemption price equal to 100% of the principal amount of the notes to be redeemed plus accrued and unpaid interest to the date of redemption.

In addition, if a change of control triggering event occurs with respect to the senior notes, as defined in the agreement, we will be required to offer to purchase the notes of the applicable series at a purchase price equal to 101% of the principal amount, plus accrued and unpaid interest, if any, to the date of purchase.

The terms of the senior notes contain certain customary covenants; however, there are no financial covenants.

**ABL Facility**

On March 30, 2015, we entered into a new senior secured asset-based revolving credit facility with various financial institutions. The ABL Facility will mature upon the earlier of March 30, 2020 or 60 days prior to the maturity of the First Lien Notes and certain other material debt, and provides for up to $550.0 million in borrowings, comprised of (i) a $450.0 million U.S. tranche, including a $250.0 million sublimit for the issuance of letters of credit and a $100.0 million sublimit for U.S. swingline loans, and (ii) a $100.0 million Australian tranche, including a $50.0 million sublimit for the issuance of letters of credit and a $20.0 million sublimit for Australian swingline loans. Availability under both the U.S. tranche and Australian tranche of the ABL Facility is limited to an eligible U.S. borrowing base and Australian borrowing base, as applicable, determined by applying customary advance rates to eligible accounts receivable, inventory and certain mobile equipment.

The ABL Facility and certain bank products and hedge obligations are guaranteed by us and certain of our existing wholly-owned U.S. and Australian subsidiaries and are required to be guaranteed by certain of our future U.S. and Australian subsidiaries; provided, however, that the obligations of any U.S. entity will not be guaranteed by any Australian entity. Amounts outstanding under the ABL Facility will be secured by (i) a first-priority security interest in the ABL Collateral, including, in the case of the Australian tranche only, ABL Collateral owned by a borrower or guarantor that is organized under the laws of Australia, and (ii) a third-priority security interest in the Notes Collateral (as defined herein). The priority of the security interests in the ABL Collateral and the Notes Collateral of the lenders under the ABL Facility and the holders of the First Lien Notes are set forth in intercreditor provisions contained in an ABL intercreditor agreement.

The ABL Collateral generally consists of the following assets: accounts receivable and other rights to payment, inventory, as-extracted collateral, investment property, certain general intangibles and commercial tort claims, certain mobile equipment, commodities accounts, deposit accounts, securities accounts and other related assets and proceeds and products of each of the foregoing.

Borrowings under the ABL Facility bear interest, at our option, at a base rate, an Australian base rate or, if certain conditions are met, a LIBOR rate, in each case plus an applicable margin. The base rate is equal to the greater of the federal funds rate plus ½ of 1%, the LIBOR rate based on a one-month interest period plus 1% and the floating rate announced by BAML as its "prime rate." The Australian base rate is equal to the LIBOR rate as of 11:00 a.m. on the first business day of each month for a one-month period. The LIBOR rate is a per annum fixed rate equal to LIBOR with respect to the applicable interest period and amount of LIBOR rate loan requested.

The ABL Facility contains customary representations and warranties and affirmative and negative covenants including, among others, covenants regarding the maintenance of certain financial ratios if certain conditions are triggered, covenants relating to financial reporting, covenants relating to the payment of dividends on, or purchase or redemption of our capital stock, covenants relating to the incurrence or prepayment of certain debt, covenants relating to the incurrence

Table of Contents

of liens or encumbrances, compliance with laws, transactions with affiliates, mergers and sales of all or substantially all of our assets and limitations on changes in the nature of our business.

The ABL Facility provides for customary events of default, including, among other things, the event of nonpayment of principal, interest, fees, or other amounts, a representation or warranty proving to have been materially incorrect when made, failure to perform or observe certain covenants within a specified period of time, a cross-default to certain material indebtedness, the bankruptcy or insolvency of the Company and certain of its subsidiaries, monetary judgment defaults of a specified amount, invalidity of any loan documentation, a change of control of the Company, and ERISA defaults resulting in liability of a specified amount. In the event of a default by us (beyond any applicable grace or cure period, if any), the administrative agent may and, at the direction of the requisite number of lenders, shall declare all amounts owing under the ABL Facility immediately due and payable, terminate such lenders' commitments to make loans under the ABL Facility and/or exercise any and all remedies and other rights under the ABL Facility. For certain defaults related to insolvency and receivership, the commitments of the lenders will be automatically terminated and all outstanding loans and other amounts will become immediately due and payable.

As of December 31, 2016, we were in compliance with the ABL Facility liquidity requirements and, therefore, the springing financial covenant requiring a minimum fixed charge coverage ratio of 1.0 to 1.0 was not applicable.

As of December 31, 2016, no loans were drawn under the ABL Facility and we had total availability of $333.0 million as a result of borrowing base limitations. As of December 31, 2016, the principal amount of letter of credit obligations totaled $106.0 million, thereby further reducing available borrowing capacity on our ABL Facility to $227.0 million.

As of December 31, 2015, no loans were drawn under the ABL Facility and we had total availability of $366.0 million as a result of borrowing base limitations. As of December 31, 2015, the principal amount of letter of credit obligations totaled $186.3 million and commodity hedge obligations totaled $0.5 million, thereby further reducing available borrowing capacity to $179.2 million.

**Letters of Credit**

We issued standby letters of credit with certain financial institutions in order to support business obligations including, but not limited to, workers compensation and environmental obligations. As of December 31, 2016 and December 31, 2015, these letter of credit obligations totaled $106.0 million and $186.3 million, respectively.

**Debt Extinguishments/Restructurings**

*1.5 Lien Notes Exchange*

On March 2, 2016, we entered into an indenture among the Company, the guarantors party thereto and U.S. Bank National Association, as trustee and notes collateral agent, relating to our issuance of $218.5 million aggregate principal amount of 8.00% 1.5 Lien Senior Secured Notes due 2020 (the "1.5 Lien Notes"). The 1.5 Lien Notes were issued in exchange offers for certain of our existing senior notes.

We accounted for the 1.5 Lien Notes exchange as a TDR. For an exchange classified as TDR, if the future undiscounted cash flows of the newly issued debt are less than the net carrying value of the original debt, the carrying value of the newly issued debt is adjusted to the future undiscounted cash flow amount, a gain is recorded for the difference and no future interest expense is recorded. All future interest payments on the newly issued debt reduce the carrying value. Accordingly, we recognized a gain of $174.3 million in the *Gain on extinguishment/restructuring of debt* in the Statements of Consolidated Operations for the year ended December 31, 2016. As a result, our reported interest expense will be less than the contractual interest payments throughout the term of the 1.5 Lien Notes. Debt issuance costs incurred of $5.2 million related to the notes exchange were expensed and were included in the *Gain on extinguishment/restructuring of debt* in the Statements of Consolidated Operations for the year ended December 31, 2016. As of December 31, 2016, $17.5 million of the undiscounted interest is recorded as current and classified as *Other current liabilities* in the Statements of Consolidated Financial Position.

Table of Contents

The following is a summary of the debt exchanged for our $218.5 million 1.5 Lien Notes:

**($ In Millions)**

| | Debt Extinguished | 1.5 Lien Amount Issued | Carrying Value[1] | Gain on Restructuring[2] |
|---|---|---|---|---|
| $544.2 Million 7.75% 2020 Second Lien Notes | $ 114.1 | $ 57.0 | $ 77.5 | $ 6.9 |
| $500 Million 3.95% 2018 Senior Notes | 17.6 | 11.4 | 15.5 | 1.8 |
| $400 Million 5.90% 2020 Senior Notes | 65.1 | 26.0 | 35.4 | 28.3 |
| $500 Million 4.80% 2020 Senior Notes | 44.7 | 17.9 | 24.4 | 19.5 |
| $700 Million 4.875% 2021 Senior Notes | 76.3 | 30.5 | 41.5 | 33.3 |
| $800 Million 6.25% 2040 Senior Notes | 194.4 | 75.7 | 103.0 | 84.5 |
| | $ 512.2 | $ 218.5 | $ 297.3 | $ 174.3 |

[1] Includes undiscounted interest payments

[2] Net of amounts expensed for unamortized original issue discount and deferred origination fees

*Second Lien Notes Exchange*

On March 30, 2015, we also entered into an indenture among the Company, the guarantors and U.S. Bank National Association, as trustee and notes collateral agent, relating to our issuance of $544.2 million aggregate principal amount of 7.75% second lien senior secured notes due 2020 (the "Second Lien Notes"). The Second Lien Notes were issued in exchange offers for certain of our existing senior notes.

The following is a summary of the debt exchanged for our $544.2 million Second Lien Notes:

**($ In Millions)**

| | Debt Extinguished | Second Lien Notes Amount Issued | Carrying Value[1] | Gain on Restructuring[2] |
|---|---|---|---|---|
| $400 Million 5.90% 2020 Senior Notes | $ 67.0 | $ 57.5 | $ 42.0 | $ 24.5 |
| $500 Million 4.80% 2020 Senior Notes | 137.8 | 112.9 | 82.4 | 54.6 |
| $700 Million 4.875% 2021 Senior Notes | 208.5 | 170.3 | 124.3 | 83.1 |
| $800 Million 6.25% 2040 Senior Notes | 261.3 | 203.5 | 148.5 | 107.3 |
| | $ 674.6 | $ 544.2 | $ 397.2 | $ 269.5 |

[1] Includes unamortized discounts

[2] Net of amounts expensed for unamortized original issue discount and deferred origination fees

*Debt-for-Equity Exchanges*

During the year ended December 31, 2016, we entered into a series of privately negotiated exchange agreements whereby we issued an aggregate of 8.2 million common shares in exchange for $10.0 million aggregate principal amount of our 3.95% senior notes due 2018, $20.1 million aggregate principal amount of our 4.80% senior notes due 2020 and $26.8 million aggregate principal amount of our 4.875% senior notes due 2021. There were no exchanges that represented more than 1% of our outstanding common shares during any quarter. Accordingly, we recognized a gain of $11.3 million in *Gain on extinguishment/restructuring of debt* in the Statements of Consolidated Operations for the year ended December 31, 2016.

*Other Debt Redemptions*

During the year ended December 31, 2016, we purchased with cash $5.0 million of our outstanding 4.80% senior notes, which resulted in a gain on extinguishment of $0.6 million.

107

Table of Contents

During the year ended December 31, 2015, we purchased with cash $168.8 million of outstanding 3.95% senior notes, $69.0 million of outstanding 4.875% senior notes, $45.9 million of outstanding 6.25% senior notes, $45.6 million of outstanding 4.80% senior notes, and $37.3 million of outstanding 5.90% senior notes, which resulted in a gain on the extinguishment of debt of $137.1 million. In addition, during 2015, we replaced the revolving credit agreement with our ABL Facility, which resulted in a loss on extinguishment of $13.7 million.

**Debt Maturities**

The following represents a summary of our maturities of debt instruments, excluding borrowings on the ABL Facility, based on the principal amounts outstanding at December 31, 2016:

|  | (In Millions) |
|---|---|
|  | **Maturities of Debt** |
| 2017 | $  — |
| 2018 | — |
| 2019 | — |
| 2020 | 1,651.0 |
| 2021 | 309.4 |
| 2022 and thereafter | 298.4 |
| Total maturities of debt | $  2,258.8 |

108

A005189

Table of Contents

**NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS**

The following represents the assets and liabilities of the Company measured at fair value at  December 31, 2016 and 2015:

| | (In Millions) | | | |
| --- | --- | --- | --- | --- |
| | December 31, 2016 | | | |
| Description | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| Assets: | | | | |
| Cash equivalents | $ 177.0 | $ — | $ — | $ 177.0 |
| Derivative assets | — | 1.5 | 31.6 | 33.1 |
| Total | $ 177.0 | $ 1.5 | $ 31.6 | $ 210.1 |
| Liabilities: | | | | |
| Derivative liabilities | $ — | $ — | $ 0.5 | $ 0.5 |
| Total | $ — | $ — | $ 0.5 | $ 0.5 |

| | (In Millions) | | | |
| --- | --- | --- | --- | --- |
| | December 31, 2015 | | | |
| Description | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| Assets: | | | | |
| Cash equivalents | $ 30.0 | $ — | $ — | $ 30.0 |
| Derivative assets | — | — | 7.8 | 7.8 |
| Total | $ 30.0 | $ — | $ 7.8 | $ 37.8 |
| Liabilities: | | | | |
| Derivative liabilities | $ — | $ 0.6 | $ 3.4 | $ 4.0 |
| Total | $ — | $ 0.6 | $ 3.4 | $ 4.0 |

109

Table of Contents

Financial assets classified in Level 1 as of December 31, 2016 and December 31, 2015, include money market funds, which are included in *Cash and cash equivalents*. The valuation of these instruments is based upon unadjusted quoted prices for identical assets in active markets.

The valuation of financial assets and liabilities classified in Level 2 is determined using a market approach based upon quoted prices for similar assets and liabilities in active markets, or other inputs that are observable. At December 31, 2016 and December 31, 2015, such derivative financial instruments included our commodity hedge contracts.

The derivative financial assets classified within Level 3 at December 31, 2016 and December 31, 2015 primarily relate to a freestanding derivative instrument related to certain supply agreements with one of our U.S. Iron Ore customers. The agreements include provisions for supplemental revenue or refunds based on the customer's annual steel pricing at the time the product is consumed in the customer's blast furnaces. We account for this provision as a derivative instrument at the time of sale and adjust this provision to fair value as an adjustment to *Product revenues* each reporting period until the product is consumed and the amounts are settled. The fair value of the instrument is determined using a market approach based on an estimate of the annual realized price of hot-rolled coil at the steelmaker's facilities, and takes into consideration current market conditions and nonperformance risk.

The Level 3 derivative assets and liabilities also consisted of derivatives related to certain provisional pricing arrangements with our U.S. Iron Ore and Asia Pacific Iron Ore customers at December 31, 2016 and December 31, 2015. These provisional pricing arrangements specify provisional price calculations, where the pricing mechanisms generally are based on market pricing, with the final revenue rate to be based on market inputs at a specified point in time in the future, per the terms of the supply agreements. The difference between the estimated final revenue at the date of sale and the estimated final revenue rate is characterized as a derivative and is required to be accounted for separately once the revenue has been recognized. The derivative instrument is adjusted to fair value through *Product revenues* each reporting period based upon current market data and forward-looking estimates provided by management until the final revenue rate is determined.

The following table illustrates information about quantitative inputs and assumptions for the derivative assets and derivative liabilities categorized in Level 3 of the fair value hierarchy:

**Qualitative/Quantitative Information About Level 3 Fair Value Measurements**

| ($ in millions) | Fair Value at December 31, 2016 | Balance Sheet Location | Valuation Technique | Unobservable Input | Range or Point Estimate (Weighted Average) |
|---|---|---|---|---|---|
| Provisional Pricing Arrangements | $ 10.3 | *Other current assets* | | Management's Estimate of Platts 62% Price | $80 |
| | $ 0.5 | *Other current liabilities* | Market Approach | | |
| Customer Supply Agreement | $ 21.3 | *Other current assets* | Market Approach | Hot-Rolled Coil Estimate | $505 - $620 ($555) |

The significant unobservable inputs used in the fair value measurement of the reporting entity's provisional pricing arrangements are management's estimates of Platts 62% Price based upon current market data, index pricing, and the customer's average annual steel pricing for hot rolled coil, each of which include forward-looking estimates determined by management. Significant increases or decreases in these inputs would result in a significantly higher or lower fair value measurement, respectively.

The significant unobservable input used in the fair value measurement of the reporting entity's customer supply agreement is the future hot-rolled coil price that is estimated based on current market data, analysts' projections, projections provided by the customer and forward-looking estimates determined by management. Significant increases or decreases in this input would result in a significantly higher or lower fair value measurement, respectively.

We recognize any transfers between levels as of the beginning of the reporting period, including both transfers into and out of levels. There were no transfers between Level 1 and Level 2 of the fair value hierarchy during the years ended December 31, 2016 and 2015. The following tables represent a reconciliation of the changes in fair value of financial instruments measured at fair value on a recurring basis using significant unobservable inputs (Level 3) for the years ended December 31, 2016 and 2015.

110

Table of Contents

| | (In Millions) | | | | | | |
|---|---|---|---|---|---|---|---|
| | Derivative Assets (Level 3) | | | | Derivative Liabilities (Level 3) | | |
| | Year Ended December 31, | | | | Year Ended December 31, | | |
| | **2016** | | 2015 | | **2016** | | 2015 |
| Beginning balance - January 1 | $ | **7.8** | $ | 63.2 | $ | **(3.4)** | $ (9.5) |
| Total gains (losses) | | | | | | | |
| Included in earnings | | **103.8** | | 35.1 | | **(14.1)** | (61.0) |
| Settlements | | **(80.0)** | | (90.5) | | **17.0** | 67.1 |
| Transfers into Level 3 | | **—** | | — | | **—** | — |
| Transfers out of Level 3 | | **—** | | — | | **—** | — |
| Ending balance - December 31 | $ | **31.6** | $ | 7.8 | $ | **(0.5)** | $ (3.4) |
| Total gains (losses) for the period included in earnings attributable to the change in unrealized gains (losses) on assets still held at the reporting date | $ | **23.7** | $ | 29.1 | $ | **(0.5)** | $ (3.4) |

Gains and losses included in earnings are reported in *Product revenues* in the Statements of Consolidated Operations for the years ended December 31, 2016 and 2015.

The carrying amount for certain financial instruments (e.g. *Accounts receivable, net*, *Accounts payable* and *Accrued expenses*) approximate fair value and, therefore, have been excluded from the table below. A summary of the carrying amount and fair value of other financial instruments at December 31, 2016 and 2015 were as follows:

| | | (In Millions) | | | | |
|---|---|---|---|---|---|---|
| | | December 31, 2016 | | | December 31, 2015 | |
| | Classification | **Carrying Value** | **Fair Value** | | Carrying Value | Fair Value |
| Long-term debt: | | | | | | |
| Secured Notes | | | | | | |
| Senior First Lien Notes—$540 million | Level 1 | $ **506.3** | $ **595.0** | $ | 497.4 | $ 414.5 |
| 1.5 Senior Lien Notes—$218 million | Level 2 | **284.2** | **229.5** | | — | — |
| Senior Second Lien Notes—$544.2 million | Level 1 | **339.1** | **439.7** | | 403.2 | 134.7 |
| Unsecured Notes | | | | | | |
| Senior Notes—$400 million | Level 1 | **224.5** | **219.6** | | 288.9 | 52.8 |
| Senior Notes—$1.3 billion | Level 1 | **528.4** | **455.8** | | 787.9 | 137.4 |
| Senior Notes—$700 million | Level 1 | **308.2** | **283.1** | | 410.6 | 69.4 |
| Senior Notes—$500 million | Level 1 | **—** | **—** | | 309.1 | 87.1 |
| ABL Facility | Level 2 | **—** | **—** | | — | — |
| Fair Value Adjustment to Interest Rate Hedge | Level 2 | **1.9** | **1.9** | | 2.3 | 2.3 |
| Total long-term debt | | $ **2,192.6** | $ **2,224.6** | $ | 2,699.4 | $ 898.2 |

The fair value of long-term debt was determined using quoted market prices or discounted cash flows based upon current borrowing rates.

*Items Measured at Fair Value on a Non-Recurring Basis*

There were no financial and non-financial assets and liabilities that were measured on a non-recurring fair value basis at December 31, 2016 and 2015.

111

Table of Contents

**NOTE 7 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS**

We offer defined benefit pension plans, defined contribution pension plans and other postretirement benefit plans, primarily consisting of retiree healthcare benefits, to most employees in the U.S. as part of a total compensation and benefits program. We do not have employee retirement benefit obligations at our Asia Pacific Iron Ore operations. The defined benefit pension plans largely are noncontributory and benefits generally are based on employees' years of service and average earnings for a defined period prior to retirement or a minimum formula.

Approximately 80.0% of our total U.S. Iron Ore hourly workforce is represented by the USW.

We offer retiree medical coverage to hourly retirees of our USW-represented mines. The 2015 USW agreement set fixed monthly medical premiums for participants who retired prior to January 1, 2015. These fixed premiums will expire on December 31, 2018 and revert to increasing premiums based a cost-sharing formula. The agreements also provide for an OPEB cap that limits the amount of contributions that we have to make toward retiree medical insurance coverage for each retiree and spouse of a retiree per calendar year who retired on or after January 1, 2015.  The amount of the annual OPEB cap is based upon the gross plan costs we incurred in 2014. The OPEB cap applies to employees who retired on or after January 1, 2015 and does not apply to surviving spouses.

The 2015 USW agreement also eliminates retiree medical coverage for USW-represented employees hired after September 1, 2016. In lieu of retiree medical coverage, USW-represented employees hired after September 1, 2016 will receive a 401(k) contribution of $0.50 per hour worked to a restricted Retiree Health Care Account.

In addition, we currently provide various levels of retirement health care and OPEB to some full-time employees who meet certain length of service and age requirements (a portion of which is pursuant to collective bargaining agreements). Most plans require retiree contributions and have deductibles, co-pay requirements and benefit limits. Most bargaining unit plans require retiree contributions and co-pays for major medical and prescription drug coverage. There is a cap on our cost for medical coverage under the salaried plans. The annual limit applies to each covered participant and equals $7,000 for coverage prior to age 65, with the retiree's participation adjusted based on the age at which the retiree's benefits commence. Beginning in 2015, we changed the delivery of the post-65 salaried retiree medical benefit program, including salaried retirees from our Northshore operation, from an employer sponsored plan to the combination of an employer subsidy plan and an individual supplemental Medicare insurance plan purchased through a Medicare exchange. This allows the program to take full advantage of available government subsidies and more efficient pricing in the Medicare market. For participants at our Northshore operation, the annual limit ranges from $4,020 to $4,500 for coverage prior to age 65. Covered participants pay an amount for coverage equal to the excess of (i) the average cost of coverage for all covered participants, over (ii) the participant's individual limit, but in no event will the participant's cost be less than 15.0% of the average cost of coverage for all covered participants. For Northshore participants, the minimum participant cost is a fixed dollar amount. We do not provide OPEB for most salaried employees hired after January 1, 1993. Retiree healthcare coverage is provided through programs administered by insurance companies whose charges are based on benefits paid.

The Pinnacle and Oak Grove mines were sold in December 2015, and the liabilities representing vested salaried pension benefits at the time of the sale remained with Cliffs. The sale triggered a curtailment event for the Salaried Pension Plan. Liabilities for other postretirement benefits were transferred as part of the sale, and associated adjustments were made to the *Accumulated other comprehensive loss* balances as they pertained to Pinnacle and Oak Grove participants in the Hourly OPEB plan. Accordingly, all amounts shown below include retained obligations of vested employees of the North American Coal mines.  Further, all disclosures presented include the annual expense, contributions and obligations associated with the retained vested benefits of these participants.

The following table summarizes the annual expense (income) recognized related to the retirement plans for  2016, 2015 and 2014:

| | | (In Millions) | | | | |
|---|---|---|---|---|---|---|
| | | **2016** | | 2015 | | 2014 |
| Defined benefit pension plans | $ | **16.5** | $ | 23.9 | $ | 26.2 |
| Defined contribution pension plans | | **2.8** | | 3.6 | | 4.4 |
| Other postretirement benefits | | **(4.0)** | | 4.4 | | (2.5) |
| Total | $ | **15.3** | $ | 31.9 | $ | 28.1 |

112

**Obligations and Funded Status**

The following tables and information provide additional disclosures for the years ending December 31, 2016 and 2015:

| | | (In Millions) | | |
|---|---|---|---|---|
| | **Pension Benefits** | | **Other Benefits** | |
| **Change in benefit obligations:** | **2016** | 2015 | **2016** | 2015 |
| Benefit obligations — beginning of year | $ 910.8 | $ 998.0 | $ 266.0 | $ 295.8 |
| Service cost (excluding expenses) | 17.6 | 22.7 | 1.7 | 1.9 |
| Interest cost | 30.3 | 37.7 | 9.1 | 11.5 |
| Plan amendments | 5.7 | — | 9.8 | |
| Actuarial (gain) loss | 38.1 | (67.7) | (7.2) | (27.0) |
| Benefits paid | (70.9) | (78.7) | (21.3) | (20.6) |
| Participant contributions | — | — | 6.0 | 4.0 |
| Federal subsidy on benefits paid | — | — | 0.5 | 0.4 |
| Curtailment gain | — | (1.2) | — | — |
| Benefit obligations — end of year | $ 931.6 | $ 910.8 | $ 264.6 | $ 266.0 |
| | | | | |
| **Change in plan assets:** | | | | |
| Fair value of plan assets — beginning of year | $ 700.6 | $ 749.8 | $ 250.6 | $ 269.3 |
| Actual return on plan assets | 54.8 | (6.4) | 16.0 | (3.9) |
| Participant contributions | — | — | 0.5 | 0.4 |
| Employer contributions | 1.2 | 35.7 | 1.7 | 1.3 |
| Asset transfers | 0.1 | 0.2 | — | — |
| Benefits paid | (70.9) | (78.7) | (15.8) | (16.5) |
| Fair value of plan assets — end of year | $ 685.8 | $ 700.6 | $ 253.0 | $ 250.6 |
| | | | | |
| **Funded status at December 31:** | | | | |
| Fair value of plan assets | $ 685.8 | $ 700.6 | $ 253.0 | $ 250.6 |
| Benefit obligations | (931.6) | (910.8) | (264.6) | (266.0) |
| Funded status (plan assets less benefit obligations) | $ (245.8) | $ (210.2) | $ (11.6) | $ (15.4) |
| Amount recognized at December 31 | $ (245.8) | $ (210.2) | $ (11.6) | $ (15.4) |
| | | | | |
| **Amounts recognized in Statements of Financial Position:** | | | | |
| Noncurrent assets | $ — | $ — | $ 27.3 | $ — |
| Current liabilities | (0.1) | (0.5) | (4.1) | (4.1) |
| Noncurrent liabilities | (245.7) | (209.7) | (34.8) | (11.3) |
| Total amount recognized | $ (245.8) | $ (210.2) | $ (11.6) | $ (15.4) |
| | | | | |
| **Amounts recognized in accumulated other comprehensive loss:** | | | | |
| Net actuarial loss | 315.9 | 290.9 | 87.0 | 91.5 |
| Prior service cost (credit) | 11.0 | 7.5 | (26.9) | (39.5) |
| Net amount recognized | $ 326.9 | $ 298.4 | $ 60.1 | $ 52.0 |
| | | | | |
| **The estimated amounts that will be amortized from accumulated other comprehensive loss into net periodic benefit cost in 2017:** | | | | |
| Net actuarial loss | $ 21.1 | | $ 5.0 | |
| Prior service cost (credit) | 2.6 | | (3.0) | |
| Net amount recognized | $ 23.7 | | $ 2.0 | |

113

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | (In Millions) | | | | | | | |
| | 2016 | | | | | | | |
| | Pension Plans | | | | | Other Benefits | | |
| | Salaried | Hourly | Mining | SERP | Total | Salaried | Hourly | Total |
| Fair value of plan assets | $ 242.9 | $ 436.9 | $ 6.0 | $ — | $ 685.8 | $ — | $ 253.0 | $ 253.0 |
| Benefit obligation | (351.9) | (565.6) | (10.0) | (4.1) | (931.6) | (37.6) | (227.0) | (264.6) |
| Funded status | $ (109.0) | $ (128.7) | $ (4.0) | $ (4.1) | $ (245.8) | $ (37.6) | $ 26.0 | $ (11.6) |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2015 | | | | | | | |
| | Pension Plans | | | | | Other Benefits | | |
| | Salaried | Hourly | Mining | SERP | Total | Salaried | Hourly | Total |
| Fair value of plan assets | $ 258.3 | $ 436.7 | $ 5.6 | $ — | $ 700.6 | $ — | $ 250.6 | $ 250.6 |
| Benefit obligation | (340.0) | (558.6) | (8.6) | (3.6) | (910.8) | (38.2) | (227.8) | (266.0) |
| Funded status | $ (81.7) | $ (121.9) | $ (3.0) | $ (3.6) | $ (210.2) | $ (38.2) | $ 22.8 | $ (15.4) |

The accumulated benefit obligation for all defined benefit pension plans was $922.0 million and $898.9 million at December 31, 2016 and 2015, respectively. The increase in the accumulated benefit obligation primarily is a result of a decrease in the discount rates.

**Components of Net Periodic Benefit Cost**

| | | | | | | |
|---|---|---|---|---|---|---|
| | (In Millions) | | | | | |
| | Pension Benefits | | | Other Benefits | | |
| | 2016 | 2015 | 2014 | 2016 | 2015 | 2014 |
| Service cost | $ 17.6 | $ 22.7 | $ 26.1 | $ 1.7 | $ 6.4 | $ 1.8 |
| Interest cost | 30.3 | 37.7 | 40.3 | 9.1 | 13.4 | 11.9 |
| Expected return on plan assets | (54.7) | (59.8) | (58.1) | (17.1) | (18.3) | (17.1) |
| Amortization: | | | | | | |
|    Prior service costs (credits) | 2.2 | 2.3 | 2.5 | (3.7) | (3.7) | (3.6) |
|    Net actuarial loss | 21.1 | 20.8 | 14.0 | 6.0 | 6.6 | 4.5 |
| Curtailments and settlements | — | 0.2 | 1.4 | — | — | — |
| Net periodic benefit cost (credit) | $ 16.5 | $ 23.9 | $ 26.2 | $ (4.0) | $ 4.4 | $ (2.5) |
| Curtailment effects | — | (1.2) | — | — | — | — |
| Current year actuarial (gain)/loss | 37.8 | (0.7) | 109.7 | (8.1) | 0.2 | 22.2 |
| Amortization of net loss | (21.1) | (21.0) | (15.4) | (6.0) | (6.6) | (4.5) |
| Current year prior service (credit) cost | 5.7 | — | — | 9.8 | — | (0.9) |
| Amortization of prior service (cost) credit | (2.2) | (2.3) | (2.5) | 3.7 | 3.7 | 3.6 |
| Total recognized in other comprehensive income (loss) | $ 20.2 | $ (25.2) | $ 91.8 | $ (0.6) | $ (2.7) | $ 20.4 |
| Total recognized in net periodic cost and other comprehensive income (loss) | $ 36.7 | $ (1.3) | $ 118.0 | $ (4.6) | $ 1.7 | $ 17.9 |

**Additional Information**

| | | | | | | |
|---|---|---|---|---|---|---|
| | (In Millions) | | | | | |
| | Pension Benefits | | | Other Benefits | | |
| | 2016 | 2015 | 2014 | 2016 | 2015 | 2014 |
| Effect of change in mine ownership & noncontrolling interest | $ 14.2 | $ 48.4 | $ 51.2 | $ 5.9 | $ 5.5 | $ 5.9 |
| Actual return on plan assets | 54.8 | (6.4) | 59.1 | 16.0 | (3.9) | 31.9 |

114

A005195

Table of Contents

**Assumptions**

The discount rate for determining PBO is determined individually for each plan as noted in the assumption chart below. The discount rates are determined by matching the projected cash flows used to determine the PBO and APBO to a projected yield curve of 696 Aa graded bonds in the 40th to 90th percentiles. These bonds are either noncallable or callable with make-whole provisions. The decreases in discount rates due to market conditions resulted in increases of $22.0 million and $8.6 million for the pension and other postretirement benefit plans, respectively, to the plans PBO.

Effective January 1, 2016, we changed the approach used to calculate the service and interest components of net periodic benefit cost. Previously, we calculated the service and interest components utilizing a single weighted-average discount rate derived from the yield curve used to measure the PBO. We have elected an alternative approach that utilizes a full yield curve approach in the estimation of these components by applying the specific spot rates along the yield curve used in the determination of the benefit obligation to their underlying projected cash flows. The change resulted in a decrease to our net periodic benefit cost of $8.2 million and $1.8 million for our pension plans and OPEB plans, respectively for the year ended December 31, 2016.

On December 31, 2016, the assumed mortality improvement projection was changed from generational scale MP-2015 to generational scale MP-2016. The healthy mortality assumption remains the RP-2014 mortality tables with blue collar adjustments for the Iron Hourly and Hourly PRW plans, with white collar adjustments for the SERP and Salaried PRW Plan, and without collar adjustments for the Salaried and Ore Mining. The adoption of the new projection scale resulted in decreases to our PBO totaling approximately $13.1 million or 1.4% for the pension plans and $4.9 million or 1.8% for the OPEB plans.

Weighted-average assumptions used to determine benefit obligations at December 31 were:

| | Pension Benefits | | | | Other Benefits | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | **2016** | | 2015 | | **2016** | | 2015 | |
| Discount rate | | | | | | | | |
| Iron Hourly Pension Plan | **4.02** | **%** | 4.27 | % | **N/A** | **%** | N/A | % |
| Salaried Pension Plan | **3.92** | | 4.12 | | **N/A** | | N/A | |
| Ore Mining Pension Plan | **4.04** | | 4.28 | | **N/A** | | N/A | |
| SERP | **3.90** | | 4.22 | | **N/A** | | N/A | |
| Hourly OPEB Plan | **N/A** | | N/A | | **4.02** | | 4.32 | |
| Salaried OPEB Plan | **N/A** | | N/A | | **3.99** | | 4.22 | |
| Salaried rate of compensation increase | **3.00** | | 3.00 | | **3.00** | | 3.00 | |
| Hourly rate of compensation increase | **2.00** | | 2.00 | | **N/A** | | N/A | |

115

Weighted-average assumptions used to determine net benefit cost for the years  2016, 2015 and 2014 were:

| | Pension Benefits | | | Other Benefits | | |
|---|---|---|---|---|---|---|
| | **2016** | 2015 | 2014 | **2016** | 2015 | 2014 |
| Obligation Discount Rate | | | | | | |
| Iron Hourly Pension Plan | **4.27 %** | 3.83 % | 4.57 % | **N/A %** | N/A % | N/A % |
| Salaried Pension Plan | **4.13** | 3.83 | 4.57 | **N/A** | N/A | N/A |
| Ore Mining Pension Plan | **4.28** | 3.83 | 4.57 | **N/A** | N/A | N/A |
| SERP | **4.01** | 3.83 | 4.57 | **N/A** | N/A | N/A |
| Hourly OPEB Plan | **N/A** | N/A | N/A | **4.32** | 3.83 | 4.57 |
| Salaried OPEB Plan | **N/A** | N/A | N/A | **4.22** | 3.83 | 4.57 |
| Service Cost Discount Rate | | | | | | |
| Iron Hourly Pension Plan | **4.66** | 3.83 | 4.57 | **N/A** | N/A | N/A |
| Salaried Pension Plan | **4.14** | 3.83 | 4.57 | **N/A** | N/A | N/A |
| Ore Mining Pension Plan | **4.60** | 3.83 | 4.57 | **N/A** | N/A | N/A |
| SERP | **3.87** | 3.83 | 4.57 | **N/A** | N/A | N/A |
| Hourly OPEB Plan | **N/A** | N/A | N/A | **4.56** | 3.83 | 4.57 |
| Salaried OPEB Plan | **N/A** | N/A | N/A | **4.63** | 3.83 | 4.57 |
| Interest Cost Discount Rate | | | | | | |
| Iron Hourly Pension Plan | **3.46** | 3.83 | 4.57 | **N/A** | N/A | N/A |
| Salaried Pension Plan | **3.21** | 3.83 | 4.57 | **N/A** | N/A | N/A |
| Ore Mining Pension Plan | **3.48** | 3.83 | 4.57 | **N/A** | N/A | N/A |
| SERP | **3.30** | 3.83 | 4.57 | **N/A** | N/A | N/A |
| Hourly OPEB Plan | **N/A** | N/A | N/A | **3.48** | 3.83 | 4.57 |
| Salaried OPEB Plan | **N/A** | N/A | N/A | **3.31** | 3.83 | 4.57 |
| | | | | | | |
| Expected return on plan assets | **8.25** | 8.25 | 8.25 | **7.00** | 7.00 | 7.00 |
| Salaried rate of compensation increase | **3.00** | 3.00 | 4.00 | **3.00** | 3.00 | 4.00 |
| Hourly rate of compensation increase | **2.00** | 2.50 | 3.00 | **N/A** | N/A | N/A |

Assumed health care cost trend rates at December 31 were:

| | **2016** | 2015 |
|---|---|---|
| Health care cost trend rate assumed for next year | **6.50 %** | 6.75 % |
| Ultimate health care cost trend rate | **5.00** | 5.00 |
| Year that the ultimate rate is reached | **2023** | 2023 |

Assumed health care cost trend rates have a significant effect on the amounts reported for the health care plans. A change of one percentage point in assumed health care cost trend rates would have the following effects:

| | (In Millions) | |
|---|---|---|
| | Increase | Decrease |
| Effect on total of service and interest cost | $    1.3 | $    (1.0) |
| Effect on postretirement benefit obligation | 23.4 | (19.6) |

**Plan Assets**

Our financial objectives with respect to our pension and VEBA plan assets are to fully fund the actuarial accrued liability for each of the plans, to maximize investment returns within reasonable and prudent levels of risk, and to maintain sufficient liquidity to meet benefit obligations on a timely basis.

116

Our investment objective is to outperform the expected ROA assumption used in the plans' actuarial reports over the life of the plans. The expected ROA takes into account historical returns and estimated future long-term returns based on capital market assumptions applied to the asset allocation strategy. The expected return is net of investment expenses paid by the plans. In addition, investment performance is monitored on a quarterly basis by benchmarking to various indices and metrics for the one-, three- and five-year periods.

The asset allocation strategy is determined through a detailed analysis of assets and liabilities by plan, which defines the overall risk that is acceptable with regard to the expected level and variability of portfolio returns, surplus (assets compared to liabilities), contributions and pension expense.

The asset allocation review process involves simulating capital market behaviors including global asset class performance, inflation and interest rates in order to evaluate various asset allocation scenarios and determine the asset mix with the highest likelihood of meeting financial objectives. The process includes factoring in the current funded status and likely future funded status levels of the plans by taking into account expected growth or decline in the contributions over time.

The asset allocation strategy varies by plan. The following table reflects the actual asset allocations for pension and VEBA plan assets as of December 31, 2016 and 2015, as well as the 2017 weighted average target asset allocations as of December 31, 2016. Equity investments include securities in large-cap, mid-cap and small-cap companies located in the U.S. and worldwide. Fixed income investments primarily include corporate bonds and government debt securities. Alternative investments include hedge funds, private equity, structured credit and real estate.

| | Pension Assets | | | VEBA Assets | | |
|---|---|---|---|---|---|---|
| | 2017 Target Allocation | Percentage of Plan Assets at December 31, | | 2017 Target Allocation | Percentage of Plan Assets at December 31, | |
| Asset Category | | 2016 | 2015 | | 2016 | 2015 |
| Equity securities | 45.0% | 43.2% | 44.0% | 8.0% | 8.4% | 8.8% |
| Fixed income | 28.0% | 26.4% | 27.7% | 80.1% | 78.3% | 78.2% |
| Hedge funds | 5.0% | 5.9% | 5.8% | 4.2% | 4.4% | 4.5% |
| Private equity | 7.0% | 5.3% | 4.7% | 2.6% | 1.7% | 2.2% |
| Structured credit | 7.5% | 9.3% | 8.9% | 2.1% | 2.7% | 2.3% |
| Real estate | 7.5% | 9.0% | 8.2% | 3.0% | 4.4% | 4.0% |
| Cash | —% | 0.9% | 0.7% | —% | 0.1% | —% |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

A005198

*Pension*

The fair values of our pension plan assets at December 31, 2016 and 2015 by asset category are as follows:

| | (In Millions) | | | |
| --- | --- | --- | --- | --- |
| | December 31, 2016 | | | |
| Asset Category | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| Equity securities: | | | | |
| U.S. large-cap | $ 144.7 | $ — | $ — | $ 144.7 |
| U.S. small/mid-cap | 39.9 | — | — | 39.9 |
| International | 111.8 | — | — | 111.8 |
| Fixed income | 157.5 | 23.7 | — | 181.2 |
| Hedge funds | — | — | 40.6 | 40.6 |
| Private equity | — | — | 36.1 | 36.1 |
| Structured credit | — | — | 63.8 | 63.8 |
| Real estate | — | — | 61.9 | 61.9 |
| Cash | 5.8 | — | — | 5.8 |
| Total | $ 459.7 | $ 23.7 | $ 202.4 | $ 685.8 |

| | (In Millions) | | | |
| --- | --- | --- | --- | --- |
| | December 31, 2015 | | | |
| Asset Category | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| Equity securities: | | | | |
| U.S. large-cap | $ 150.5 | $ — | $ — | $ 150.5 |
| U.S. small/mid-cap | 40.6 | — | — | 40.6 |
| International | 116.8 | — | — | 116.8 |
| Fixed income | 166.3 | 27.9 | — | 194.2 |
| Hedge funds | — | — | 40.7 | 40.7 |
| Private equity | — | — | 33.1 | 33.1 |
| Structured credit | — | — | 62.1 | 62.1 |
| Real estate | — | — | 57.5 | 57.5 |
| Cash | 5.1 | — | — | 5.1 |
| Total | $ 479.3 | $ 27.9 | $ 193.4 | $ 700.6 |

Following is a description of the inputs and valuation methodologies used to measure the fair value of our plan assets.

*Equity Securities*

Equity securities classified as Level 1 investments include U.S. large-, small- and mid-cap investments and international equity. These investments are comprised of securities listed on an exchange, market or automated quotation system for which quotations are readily available. The valuation of these securities is determined using a market approach, and is based upon unadjusted quoted prices for identical assets in active markets.

118

*Fixed Income*

Fixed income securities classified as Level 1 investments include bonds and government debt securities. These investments are comprised of securities listed on an exchange, market or automated quotation system for which quotations are readily available. The valuation of these securities is determined using a market approach, and is based upon unadjusted quoted prices for identical assets in active markets. Also included in Fixed Income is a portfolio of U.S. Treasury STRIPS, which are zero-coupon bearing fixed income securities backed by the full faith and credit of the U.S. government. The securities sell at a discount to par because there are no incremental coupon payments. STRIPS are not issued directly by the Treasury, but rather are created by a financial institution, government securities broker or government securities dealer. Liquidity on the issue varies depending on various market conditions; however, in general the STRIPS market is slightly less liquid than that of the U.S. Treasury Bond market. The STRIPS are priced daily through a bond pricing vendor and are classified as Level 2.

*Hedge Funds*

Hedge funds are alternative investments comprised of direct or indirect investment in offshore hedge funds with an investment objective to achieve an attractive risk-adjusted return with moderate volatility and moderate directional market exposure over a full market cycle. The valuation techniques used to measure fair value attempt to maximize the use of observable inputs and minimize the use of unobservable inputs. Considerable judgment is required to interpret the factors used to develop estimates of fair value. Valuations of the underlying investment funds are obtained and reviewed. The securities that are valued by the funds are interests in the investment funds and not the underlying holdings of such investment funds. Thus, the inputs used to value the investments in each of the underlying funds may differ from the inputs used to value the underlying holdings of such funds. During the fourth quarter of 2016, a total redemption request for a tender of 100% of the position was executed and is to be reinvested into another fund within this asset category. The tender was effective as of December 31, 2016, with the funds targeted for distribution and reinvestment during the first quarter of 2017.

In determining the fair value of a security, the fund managers may consider any information that is deemed relevant, which may include one or more of the following factors regarding the portfolio security, if appropriate: type of security or asset; cost at the date of purchase; size of holding; last trade price; most recent valuation; fundamental analytical data relating to the investment in the security; nature and duration of any restriction on the disposition of the security; evaluation of the factors that influence the market in which the security is purchased or sold; financial statements of the issuer; discount from market value of unrestricted securities of the same class at the time of purchase; special reports prepared by analysts; information as to any transactions or offers with respect to the security; existence of merger proposals or tender offers affecting the security; price and extent of public trading in similar securities of the issuer or compatible companies and other relevant matters; changes in interest rates; observations from financial institutions; domestic or foreign government actions or pronouncements; other recent events; existence of shelf registration for restricted securities; existence of any undertaking to register the security; and other acceptable methods of valuing portfolio securities.

*Private Equity Funds*

Private equity funds are alternative investments that represent direct or indirect investments in partnerships, venture funds or a diversified pool of private investment vehicles (fund of funds).

Investment commitments are made in private equity funds based on an asset allocation strategy, and capital calls are made over the life of the funds to fund the commitments. As of December 31, 2016, remaining commitments total $37.9 million for both our pension and other benefits. Committed amounts are funded from plan assets when capital calls are made. Investment commitments are not pre-funded in reserve accounts.

The valuation of investments in private equity funds initially is performed by the underlying fund managers. In determining the fair value, the fund managers may consider any information that is deemed relevant, which may include: type of security or asset; cost at the date of purchase; size of holding; last trade price; most recent valuation; fundamental analytical data relating to the investment in the security; nature and duration of any restriction on the disposition of the security; evaluation of the factors that influence the market in which the security is purchased or sold; financial statements of the issuer; discount from market value of unrestricted securities of the same class at the time of purchase; special reports prepared by analysts; information as to any transactions or offers with respect to the security; existence of merger proposals or tender offers affecting the security; price and extent of public trading in similar securities of the issuer or compatible companies and other relevant matters; changes in interest rates; observations from financial institutions; domestic or foreign government actions or pronouncements; other recent events; existence of shelf registration for restricted securities; existence of any undertaking to register the security; and other acceptable methods of valuing portfolio securities.

Table of Contents

The valuations are obtained from the underlying fund managers, and the valuation methodology and process is reviewed for consistent application and adherence to policies. Considerable judgment is required to interpret the factors used to develop estimates of fair value.

Private equity investments are valued quarterly and recorded on a one-quarter lag. For alternative investment values reported on a lag, current market information is reviewed for any material changes in values at the reporting date. Capital distributions for the funds do not occur on a regular frequency. Liquidation of these investments would require sale of the partnership interest.

*Structured Credit*

Structured credit investments are alternative investments comprised of collateralized debt obligations and other structured credit investments that are priced based on valuations provided by independent, third-party pricing agents, if available. Such values generally reflect the last reported sales price if the security is actively traded. The third-party pricing agents may also value structured credit investments at an evaluated bid price by employing methodologies that utilize actual market transactions, broker-supplied valuations, or other methodologies designed to identify the market value of such securities. Such methodologies generally consider such factors as security prices, yields, maturities, call features, ratings and developments relating to specific securities in arriving at valuations. Securities listed on a securities exchange, market or automated quotation system for which quotations are readily available are valued at the last quoted sale price on the primary exchange or market on which they are traded. Debt obligations with remaining maturities of 60 days or less may be valued at amortized cost, which approximates fair value.

Structured credit investments are valued monthly and recorded on a one-month lag. For alternative investment values reported on a lag, current market information is reviewed for any material changes in values at the reporting date. Historically, redemption requests have been considered quarterly, subject to notice of 90 days, although the advisor is currently only requiring notice of 65 days.

*Real Estate*

The real estate portfolio for the pension plans is an alternative investment primarily comprised of two funds with strategic categories of real estate investments. All real estate holdings are appraised externally at least annually, and appraisals are conducted by reputable, independent appraisal firms that are members of the Appraisal Institute. All external appraisals are performed in accordance with the Uniform Standards of Professional Appraisal Practices. The property valuations and assumptions of each property are reviewed quarterly by the investment advisor and values are adjusted if there has been a significant change in circumstances relating to the property since the last external appraisal. The valuation methodology utilized in determining the fair value is consistent with the best practices prevailing within the real estate appraisal and real estate investment management industries, including the Real Estate Information Standards, and standards promulgated by the National Council of Real Estate Investment Fiduciaries, the National Association of Real Estate Investment Fiduciaries, and the National Association of Real Estate Managers. In addition, the investment advisor may cause additional appraisals to be performed. Two of the funds' fair values are updated monthly, and there is no lag in reported values. Redemption requests for these two funds are considered on a quarterly basis, subject to notice of 45 days. During the fourth quarter of 2016, a notice of full redemption request for a tender of 100% of one fund position was executed and is to be invested into the other fund. The redemption was included in the fourth quarter queue and the funds are targeted for distribution and reinvestment during the first quarter of 2017.

The real estate fund of funds investment for the Empire, Tilden, Hibbing and United Taconite VEBA plans invests in pooled investment vehicles that in turn invest in commercial real estate properties. Valuations are performed quarterly and financial statements are prepared on a semi-annual basis, with annual audited statements. Asset values for this fund are reported with a one-quarter lag and current market information is reviewed for any material changes in values at the reporting date. In most cases, values are based on valuations reported by underlying fund managers or other independent third-party sources, but the fund has discretion to use other valuation methods, subject to compliance with ERISA. Valuations are typically estimates and subject to upward or downward revision based on each underlying fund's annual audit. Withdrawals are permitted on the last business day of each quarter subject to a 65-day prior written notice.

120

The following represents the effect of fair value measurements using significant unobservable inputs (Level 3) on changes in plan assets for the   years ended December 31, 2016 and  2015:

|  | (In Millions) | | | | |
| --- | --- | --- | --- | --- | --- |
|  | Year Ended December 31, 2016 | | | | |
|  | Hedge Funds | Private Equity Funds | Structured Credit Fund | Real Estate | Total |
| Beginning balance — January 1, 2016 | $ 40.7 | $ 33.1 | $ 62.1 | $ 57.5 | $ 193.4 |
| Actual return on plan assets: | | | | | |
| Relating to assets still held at the reporting date | (0.1) | (2.7) | 10.0 | 5.1 | 12.3 |
| Relating to assets sold during the period | — | 3.7 | (0.3) | (0.1) | 3.3 |
| Purchases | — | 8.0 | — | — | 8.0 |
| Sales | — | (6.0) | (8.0) | (0.6) | (14.6) |
| Ending balance — December 31, 2016 | $ 40.6 | $ 36.1 | $ 63.8 | $ 61.9 | $ 202.4 |

|  | (In Millions) | | | | |
| --- | --- | --- | --- | --- | --- |
|  | Year Ended December 31, 2015 | | | | |
|  | Hedge Funds | Private Equity Funds | Structured Credit Fund | Real Estate | Total |
| Beginning balance — January 1, 2015 | $ 41.5 | $ 31.2 | $ 65.4 | $ 50.0 | $ 188.1 |
| Actual return on plan assets: | | | | | |
| Relating to assets still held at the reporting date | (0.8) | 1.5 | (3.3) | 8.1 | 5.5 |
| Relating to assets sold during the period | — | 2.5 | — | — | 2.5 |
| Purchases | — | 5.7 | — | — | 5.7 |
| Sales | — | (7.8) | — | (0.6) | (8.4) |
| Ending balance — December 31, 2015 | $ 40.7 | $ 33.1 | $ 62.1 | $ 57.5 | $ 193.4 |

*VEBA*

Assets for other benefits include VEBA trusts pursuant to bargaining agreements that are available to fund retired employees' life insurance obligations and medical benefits. The fair values of our other benefit plan assets at December 31, 2016 and 2015 by asset category are as follows:

|  | (In Millions) | | | |
| --- | --- | --- | --- | --- |
|  | December 31, 2016 | | | |
| Asset Category | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| Equity securities: | | | | |
| U.S. large-cap | $ 10.6 | $ — | $ — | $ 10.6 |
| U.S. small/mid-cap | 2.7 | — | — | 2.7 |
| International | 8.1 | — | — | 8.1 |
| Fixed income | 162.0 | 35.9 | — | 197.9 |
| Hedge funds | — | — | 11.2 | 11.2 |
| Private equity | — | — | 4.3 | 4.3 |
| Structured credit | — | — | 6.9 | 6.9 |
| Real estate | — | — | 11.1 | 11.1 |
| Cash | 0.2 | — | — | 0.2 |
| Total | $ 183.6 | $ 35.9 | $ 33.5 | $ 253.0 |

121

Table of Contents

| Asset Category | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
|---|---|---|---|---|
| Equity securities: | | | | |
| U.S. large-cap | $ 11.1 | $ — | $ — | $ 11.1 |
| U.S. small/mid-cap | 2.8 | — | — | 2.8 |
| International | 8.2 | — | — | 8.2 |
| Fixed income | 158.1 | 37.9 | — | 196.0 |
| Hedge funds | — | — | 11.2 | 11.2 |
| Private equity | — | — | 5.5 | 5.5 |
| Structured credit | — | — | 5.8 | 5.8 |
| Real estate | — | — | 10.0 | 10.0 |
| Cash | — | — | — | — |
| Total | $ 180.2 | $ 37.9 | $ 32.5 | $ 250.6 |

*(In Millions) — December 31, 2015*

Refer to the pension asset discussion above for further information regarding the inputs and valuation methodologies used to measure the fair value of each respective category of plan assets.

The following represents the effect of fair value measurements using significant unobservable inputs (Level 3) on changes in plan assets for the year ended December 31, 2016 and 2015:

*(In Millions) — Year Ended December 31, 2016*

| | Hedge Funds | Private Equity Funds | Structured Credit Fund | Real Estate | Total |
|---|---|---|---|---|---|
| Beginning balance — January 1, 2016 | $ 11.2 | $ 5.5 | $ 5.8 | $ 10.0 | $ 32.5 |
| Actual return on plan assets: | | | | | |
| Relating to assets still held at the reporting date | — | (0.3) | 1.1 | 1.1 | 1.9 |
| Relating to assets sold during the period | — | 0.1 | — | — | 0.1 |
| Purchases | — | — | — | — | — |
| Sales | — | (1.0) | — | — | (1.0) |
| Ending balance — December 31, 2016 | $ 11.2 | $ 4.3 | $ 6.9 | $ 11.1 | $ 33.5 |

*(In Millions) — Year Ended December 31, 2015*

| | Hedge Funds | Private Equity Funds | Structured Credit Fund | Real Estate | Total |
|---|---|---|---|---|---|
| Beginning balance — January 1, 2015 | $ 11.5 | $ 6.2 | $ 6.1 | $ 8.7 | $ 32.5 |
| Actual return on plan assets: | | | | | |
| Relating to assets still held at the reporting date | (0.3) | 0.3 | (0.3) | 1.3 | 1.0 |
| Relating to assets sold during the period | — | 0.4 | — | — | 0.4 |
| Purchases | — | 0.1 | — | — | 0.1 |
| Sales | — | (1.5) | — | — | (1.5) |
| Ending balance — December 31, 2015 | $ 11.2 | $ 5.5 | $ 5.8 | $ 10.0 | $ 32.5 |

122

**Contributions**

Annual contributions to the pension plans are made within income tax deductibility restrictions in accordance with statutory regulations. In the event of plan termination, the plan sponsors could be required to fund additional shutdown and early retirement obligations that are not included in the pension obligations. The Company currently has no intention to shutdown, terminate or withdraw from any of its employee benefit plans.

| | | (In Millions) | | |
|---|---|---|---|---|
| | | | Other Benefits | |
| Company Contributions | Pension Benefits | VEBA | Direct Payments | Total |
| 2015 | $ 35.7 | $ — | $ 3.5 | $ 3.5 |
| 2016 | 1.2 | — | 1.1 | 1.1 |
| 2017 (Expected)[1] | 24.5 | — | 4.1 | 4.1 |

[1] Pursuant to the bargaining agreement, benefits can be paid from VEBA trusts that are at least 70% funded (all VEBA trusts are over 70% funded at December 31, 2016). Funding obligations have been suspended as Hibbing's, UTAC's, Tilden's and Empire's share of the value of their respective trust assets have reached 90% of their obligation.

VEBA plans are not subject to minimum regulatory funding requirements. Amounts contributed are pursuant to bargaining agreements.

Contributions by participants to the other benefit plans were $6.0 million for the year ended December 31, 2016 and $4.0 million for the year ended December 31, 2015.

**Estimated Cost for 2017**

For 2017, we estimate net periodic benefit cost as follows:

| | (In Millions) |
|---|---|
| Defined benefit pension plans | $ 18.6 |
| Other postretirement benefits | (5.3) |
| Total | $ 13.3 |

**Estimated Future Benefit Payments**

| | | (In Millions) | | |
|---|---|---|---|---|
| | | Other Benefits | | |
| | Pension Benefits | Gross Company Benefits | Less Medicare Subsidy | Net Company Payments |
| 2017 | $ 77.3 | $ 19.7 | $ 0.6 | $ 19.1 |
| 2018 | 64.8 | 20.0 | 0.7 | 19.3 |
| 2019 | 63.3 | 19.1 | 0.8 | 18.3 |
| 2020 | 63.0 | 18.4 | 0.9 | 17.5 |
| 2021 | 62.4 | 17.6 | 0.9 | 16.7 |
| 2022-2026 | 308.0 | 81.8 | 5.2 | 76.6 |

123

Table of Contents

**Other Potential Benefit Obligations**

While the foregoing reflects our obligation, our total exposure in the event of non-performance is potentially greater. Following is a summary comparison of the total obligation:

| | (In Millions) | |
|---|---|---|
| | **December 31, 2016** | |
| | **Defined Benefit Pensions** | **Other Benefits** |
| Fair value of plan assets | $ 685.8 | $ 253.0 |
| Benefit obligation | (931.6) | (264.6) |
| Underfunded status of plan | $ (245.8) | $ (11.6) |
| Additional shutdown and early retirement benefits | $ 22.1 | $ 2.2 |

**NOTE 8 - STOCK COMPENSATION PLANS**

We have outstanding awards under two share-based compensation plans, which are described below. The compensation cost that has been charged against income for those plans was $14.2 million, $13.9 million and $21.5 million in 2016, 2015 and 2014, respectively, which primarily was recorded in *Selling, general and administrative expenses* in the Statements of Consolidated Operations. The total income tax benefit recognized in the Statements of Consolidated Operations for share-based compensation arrangements was $7.5 million for 2014. There was no income tax benefit recognized for the year ended December 31, 2016 and 2015, due to the full valuation allowance.

**Employees' Plans**

The 2015 Equity Plan was approved by our Board of Directors on March 26, 2015 and by our shareholders on May 19, 2015. The 2015 Equity Plan replaced the 2012 Equity Plan. The maximum number of shares that may be issued under the 2015 Equity Plan is 12.9 million common shares. No additional grants were issued from the 2012 Amended Equity Plan after the date of approval of the 2015 Equity Plan; however, all awards previously granted under the 2012 Amended Equity Plan will continue in full force and effect in accordance with the terms of outstanding awards.

During the first quarter of 2016, the Compensation and Organization Committee of the Board of Directors approved grants under the 2015 Equity Plan of 3.4 million restricted share units to certain officers and employees with a grant date of February 23, 2016. The restricted share units granted under this award are subject to continued employment through the vesting date of December 31, 2018.

During the third quarter of 2015, the Compensation Committee approved grants under the 2015 Equity Plan of 1.5 million restricted share units to certain officers and employees with a grant date of September 10, 2015. The restricted share units granted under this award are subject to continued employment through the vesting date of December 15, 2017.

During the first quarter of 2015, the Compensation Committee approved grants under the 2012 Equity Plan to certain officers and employees for the 2015 to 2017 performance period. Shares granted under the awards consisted of 0.9 million performance shares, 0.9 million restricted share units and 0.4 million stock options.

On February 10, 2014, upon recommendation by the Compensation Committee, our Board of Directors approved and adopted, subject to the approval of our shareholders at the 2014 Annual Meeting, the 2012 Equity Plan. The principal reason for amending and restating the 2012 Equity Plan was to increase the number of common shares available for issuance by 5.0 million common shares. This amended plan was approved by our shareholders at the 2014 Annual Meeting held on July 29, 2014.

124

Subsequent to our 2014 Annual Meeting of Shareholders, where shareholders elected six new directors, our board changed substantially. Such an event constituted a change in control pursuant to our incentive equity plans and applicable award agreements. As a result, all of the outstanding and unvested equity incentives awarded to participants prior to October 2013 became vested. Accordingly, this resulted in recognizing $11.7 million of additional equity-based compensation expense in the accompanying financial statements, representing the remaining unrecognized compensation expense of the awards. For any equity grants awarded after September 2013, the vesting of all such grants was accelerated and paid in cash following each participant's qualifying termination of employment associated with the change in control and as long as the common shares were not substituted with a replacement award. This liability for additional double-trigger payments for share-based compensation in cash expired on August 6, 2016.

*Performance Shares*

The outstanding performance share or unit grants vest over a period of three years and are intended to be paid out in common shares or cash in certain circumstances. Performance is measured on the basis of relative TSR for the period and measured against the constituents of the S&P Metals and Mining ETF Index at the beginning of the relevant performance period. The final payouts for the outstanding performance period grants will vary from 0% to 200% of the original grant depending on whether and to what extent the Company achieves certain objectives and performance goals as established by the Compensation Committee.

Following is a summary of our performance share award agreements currently outstanding :

| Performance Share Plan Year | Performance Shares Granted | Estimated Forfeitures | Expected to Vest | Grant Date | Performance Period |
|---|---|---|---|---|---|
| 2015 | 410,105 | 157,979 | 252,126 | February 9, 2015 | 1/1/2015 - 12/31/2017 |
| 2015 | 464,470 | 82,636 | 381,834 | January 12, 2015 | 1/1/2015 - 12/31/2017 |
| 2014[1] | 188,510 | 188,510 | — | July 29, 2014 | 1/1/2014 - 12/31/2016 |
| 2014[1] | 80,560 | 80,560 | — | May 12, 2014 | 1/1/2014 - 12/31/2016 |
| 2014[1] | 230,265 | 230,265 | — | February 10, 2014 | 1/1/2014 - 12/31/2016 |

[1] The performance shares granted in 2014 will have a payout of 0% of the original grant based on the final performance evaluation versus the performance goals that were established in the grants.

*Performance-Based Restricted Stock Units*

For the outstanding 400,000 performance-based restricted stock units that were granted on November 17, 2014, the award may be earned and settled based upon certain VWAP performance for the Company's common shares, (Threshold VWAP, Target VWAP, or Maximum VWAP) for any period of ninety (90) consecutive calendar days during a performance period commencing August 7, 2014 and ending December 31, 2017.

*Restricted Share Units*

All of the outstanding restricted share units are subject to continued employment, are retention based, and are payable in common shares or cash in certain circumstances at a time determined by the Compensation Committee at its discretion. The outstanding restricted share units that were granted in 2015, with the exception of the 2015 special retention awards that have a 27 months vesting period, have or will vest in equal thirds on each of December 31, 2016, December 31, 2017 and December 31, 2018. The outstanding restricted share units that were granted in 2016, cliff vest in three years on December 31, 2019.

*Stock Options*

The stock options that were granted during the first quarter of 2015 vest on December 31, 2017, subject to continued employment through the vesting date, are exercisable at a strike price of $7.70 after the vesting date and expire on January 12, 2025. The stock options that were granted on November 17, 2014 vest in equal thirds on each of December 31, 2015, December 31, 2016 and December 31, 2017 subject to continued employment through each vesting date, and are exercisable cumulatively at a strike price of $13.83 after each vesting date and expire on November 17, 2021.

125

*Employee Stock Purchase Plan*

On March 26, 2015, upon recommendation by the Compensation Committee, our Board of Directors approved and adopted, subject to the approval of Cliffs' shareholders at the 2015 Annual Meeting, the Cliffs Natural Resources Inc. 2015 Employee Stock Purchase Plan. This plan was approved by our shareholders at the 2015 Annual Meeting held May 19, 2015. 10 million common shares have been reserved for issuance under this plan; however, as of December 31, 2016, this program has not been made active and no common shares have been purchased. We sought shareholder approval of this plan for the purpose of qualifying the reserved common shares for special tax treatment under Section 423 of the Internal Revenue Code of 1986, as amended.

**Nonemployee Directors**

*Equity Grants*

During 2016, our nonemployee directors were entitled to receive restricted share awards under the Directors' Plan. For 2016, nonemployee directors were granted a number of restricted shares, with a value equal to $85,000, based on the closing price of our common shares on April 27, 2016, the date of the 2016 Annual Meeting, subject to any deferral election and pursuant to the terms of the Directors' Plan and an award agreement, effective on April 27, 2016.

For the last three years, Equity Grant shares have been awarded to elected or re-elected nonemployee Directors as follows:

| Year of Grant | Restricted Equity Grant Shares | Deferred Equity Grant Shares |
|---|---|---|
| 2014 | 73,635 | — |
| 2015 | 109,408 | 25,248 |
| 2016 | 135,038 | 29,583 |

Starting in July, 2015, the Governance and Nominating Committee recommended, and the Board adopted, a Nonemployee Director Retainer Share Election Program pursuant to which nonemployee directors may elect to receive all or any portion of their annual retainer and any other fees earned in cash in Cliffs' common shares. Election is voluntary and irrevocable for the applicable election period and shares issued under this program must be held for six months from the issuance date. The number of shares received each quarter are calculated by dividing the value of the quarterly cash retainer amount by the closing market price of the date of payment.

A005207

Table of Contents

**Other Information**

The following table summarizes the share-based compensation expense that we recorded for continuing operations in 2016, 2015 and 2014:

| | (In Millions, except per share amounts) | | |
| --- | --- | --- | --- |
| | **2016** | 2015 | 2014 |
| Cost of goods sold and operating expenses | $ 2.1 | $ 4.0 | $ 5.6 |
| Selling, general and administrative expenses | 12.1 | 9.9 | 15.9 |
| Reduction of operating income from continuing operations before income taxes and equity loss from ventures | 14.2 | 13.9 | 21.5 |
| Income tax benefit[1] | — | — | (7.5) |
| Reduction of net income attributable to Cliffs shareholders | $ 14.2 | $ 13.9 | $ 14.0 |
| Reduction of earnings per share attributable to Cliffs shareholders: | | | |
| Basic | $ 0.07 | $ 0.09 | $ 0.09 |
| Diluted | $ 0.07 | $ 0.09 | $ 0.09 |

[1] No income tax benefit for the year ended December 31, 2016 and December 31, 2015, due to the full valuation allowance.

*Determination of Fair Value*

*Performance Shares*

The fair value of each performance share grant is estimated on the date of grant using a Monte Carlo simulation to forecast relative TSR performance. A correlation matrix of historical and projected stock prices was developed for both the Company and our predetermined peer group of mining and metals companies. The fair value assumes that performance goals will be achieved.

The expected term of the grant represents the time from the grant date to the end of the service period for each of the three plan-year agreements. We estimate the volatility of our common shares and that of the peer group of mining and metals companies using daily price intervals for all companies. The risk-free interest rate is the rate at the grant date on zero-coupon government bonds, with a term commensurate with the remaining life of the performance period.

No performance shares were granted in 2016, therefore no fair value analysis was required.

*Stock Options*

The fair value of each stock option grant is estimated on the date of grant using a Black-Scholes valuation model. The expected term of the option grant is determined using the simplified method. We estimate the volatility of our common shares using historical stock prices with consistent frequency over the most recent historical period equal to the option's expected term. The risk-free interest rate is the rate at the grant date on zero-coupon government bonds, with a term commensurate with the expected term.

No stock options were granted in 2016, therefore no fair value analysis was required.

*Restricted Share Units*

The fair value of the restricted share units is determined based on the closing price of our common shares on the grant date.

127

Table of Contents

Stock option, restricted share awards and performance share activity under our long-term equity plans and Directors' Plans are as follows:

| | 2016 | 2015 | 2014 |
|---|---|---|---|
| | **Shares** | Shares | Shares |
| Stock options: | | | |
| Outstanding at beginning of year | **607,489** | 250,000 | — |
| Granted during the year | **—** | 412,710 | 250,000 |
| Forfeited/canceled | **(7,619)** | (55,221) | — |
| Outstanding at end of year | **599,870** | 607,489 | 250,000 |
| Restricted awards: | | | |
| Outstanding and restricted at beginning of year | **2,338,070** | 523,176 | 586,084 |
| Granted during the year | **3,571,337** | 2,482,415 | 531,030 |
| Vested | **(271,988)** | (477,157) | (423,822) |
| Forfeited/canceled | **(175,636)** | (190,364) | (170,116) |
| Outstanding and restricted at end of year | **5,461,783** | 2,338,070 | 523,176 |
| Performance shares: | | | |
| Outstanding at beginning of year | **1,496,489** | 1,072,376 | 1,040,453 |
| Granted during the year | **—** | 874,575 | 1,233,685 |
| Issued[1] | **(59,260)** | (242,920) | (796,624) |
| Forfeited/canceled | **(68,760)** | (207,542) | (405,138) |
| Outstanding at end of year | **1,368,469** | 1,496,489 | 1,072,376 |
| Vested or expected to vest as of December 31, 2016 | **6,716,979** | | |
| Directors' retainer and voluntary shares: | | | |
| Outstanding at beginning of year | **—** | — | 7,329 |
| Granted during the year | **—** | — | 2,281 |
| Vested | **—** | — | (9,610) |
| Outstanding at end of year | **—** | — | — |
| Reserved for future grants or awards at end of year: | | | |
| Employee plans | **6,514,038** | | |
| Directors' plans | **676,678** | | |
| Total | **7,190,716** | | |

[1] The performance shares granted in 2014 will have a payout of 0% of the original grant based on the final performance evaluation versus the performance goals that were established in the grants. These shares are not included in this number because they expire and will be ultimately forfeited in February 2017. For the year ended December 31, 2015, the shares vesting due to the change in control were paid out in cash, at target, and valued as of the respective participants' termination dates. For the year ended December 31, 2014, the shares vesting on December 31, 2013 were valued as of February 10, 2014, and the shares vesting due to the change in a majority of our Board of Directors that triggered the acceleration of vesting and payout of outstanding equity grants under our equity plans on August 6, 2014 were paid out in cash, at target, and valued as of that date.

128

A summary of our outstanding share-based awards as of  December 31, 2016 is shown below:

| | Shares | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Outstanding, beginning of year | 4,442,048 | $ | 8.93 |
| Granted | 3,571,337 | $ | 1.93 |
| Vested | (331,248) | $ | 11.25 |
| Forfeited/expired | (252,015) | $ | 5.90 |
| Outstanding, end of year | 7,430,122 | $ | 5.55 |

A summary of our stock option grants vested or expected to vest as of  December 31, 2016 is shown below:

| | Shares | Weighted-Average Exercise Price | Aggregate Intrinsic Value | Weighted-Average Remaining Contractual Term (Years) |
|---|---|---|---|---|
| Expected to vest | 417,914 | $ 8.88 | $ 239,640 | 7.43 |
| Exercisable | 166,667 | $ 13.83 | — | 4.88 |

The total compensation cost related to outstanding awards not yet recognized is  $14.7 million at December 31, 2016. The weighted average remaining period for the awards outstanding at December 31, 2016 is approximately 1.8 years.

## NOTE 9 - INCOME TAXES

*Income (Loss) from Continuing Operations Before Income Taxes and Equity Loss from Ventures*  includes the following components:

| | (In Millions) | | |
|---|---|---|---|
| | **2016** | 2015 | 2014 |
| United States | $ **124.9** | $ 314.2 | $ (447.5) |
| Foreign | **82.1** | (1.1) | 427.8 |
| | $ **207.0** | $ 313.1 | $ (19.7) |

The components of the provision (benefit) for income taxes on continuing operations consist of the following:

| | (In Millions) | | |
|---|---|---|---|
| | **2016** | 2015 | 2014 |
| Current provision (benefit): | | | |
| United States federal | $ **(11.1)** | $ 8.2 | $ (125.2) |
| United States state & local | **(0.5)** | 0.3 | (0.6) |
| Foreign | **(0.1)** | 0.9 | 11.7 |
| | **(11.7)** | 9.4 | (114.1) |
| Deferred provision (benefit): | | | |
| United States federal | **(0.5)** | 165.8 | 20.4 |
| United States state & local | **—** | — | (24.9) |
| Foreign | **—** | (5.9) | 32.6 |
| | **(0.5)** | 159.9 | 28.1 |
| Total provision (benefit) on income (loss) from continuing operations | $ **(12.2)** | $ 169.3 | $ (86.0) |

129

Reconciliation of our income tax attributable to continuing operations computed at the U.S. federal statutory rate is as follows:

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| | 2016 | | 2015 | | 2014 | |
| Tax at U.S. statutory rate of 35% | $ 72.5 | 35.0 % | $ 109.6 | 35.0 % | $ (6.9) | 35.0 % |
| Increase (decrease) due to: | | | | | | |
| Impact of tax law change | 149.1 | 72.0 | — | — | 13.0 | (66.0) |
| Valuation allowance build/(reversal) on tax benefits recorded in prior years | (142.6) | (68.9) | 165.8 | 52.9 | 15.2 | (77.2) |
| Tax uncertainties | (11.3) | (5.5) | 84.1 | 26.9 | — | — |
| Valuation allowance build/(reversal) in current year | 93.9 | 45.4 | (104.6) | (33.4) | 318.3 | (1,615.7) |
| Prior year adjustments in current year | (11.8) | (5.7) | 5.9 | 1.9 | (6.3) | 32.1 |
| Worthless stock deduction | (73.4) | (35.5) | — | — | — | — |
| Impact of foreign operations | (42.7) | (20.6) | (53.9) | (17.2) | 51.4 | (260.9) |
| Percentage depletion in excess of cost depletion | (36.1) | (17.4) | (34.9) | (11.1) | (87.9) | 446.2 |
| Non-taxable income related to noncontrolling interests | (8.8) | (4.2) | (3.0) | (1.0) | (9.4) | 47.7 |
| State taxes, net | 0.4 | 0.2 | 0.2 | 0.1 | (25.4) | 128.9 |
| Settlement of financial guaranty | — | — | — | — | (347.1) | 1,761.9 |
| Income not subject to tax | — | — | — | — | (27.7) | 140.6 |
| Goodwill impairment | — | — | — | — | 22.7 | (115.2) |
| Other items — net | (1.4) | (0.7) | 0.1 | — | 4.1 | (20.9) |
| Provision for income tax (benefit) expense and effective income tax rate including discrete items | $ (12.2) | (5.9)% | $ 169.3 | 54.1 % | $ (86.0) | 436.5 % |

The components of income taxes for other than continuing operations consisted of the following:

| | (In Millions) | | | |
|---|---|---|---|---|
| | 2016 | 2015 | 2014 | |
| Other comprehensive (income) loss: | | | | |
| Pension/OPEB liability | $ — | $ — | $ | 37.1 |
| Mark-to-market adjustments | — | 0.3 | | 3.6 |
| Other | 0.5 | 5.9 | | 0.2 |
| Total | $ 0.5 | $ 6.2 | $ | 40.9 |
| | | | | |
| Paid in capital — stock based compensation | $ — | $ — | $ | (4.8) |
| Discontinued Operations | $ — | $ (6.0) | $ | (1,216.0) |

130

A005211

Significant components of our deferred tax assets and liabilities as of December 31, 2016 and 2015 are as follows:

| | (In Millions) | |
| --- | --- | --- |
| | **2016** | 2015 |
| **Deferred tax assets:** | | |
| Pensions | $ **114.6** | $ 106.6 |
| Postretirement benefits other than pensions | **35.2** | 36.5 |
| Alternative minimum tax credit carryforwards | **251.2** | 218.7 |
| Deferred income | **44.5** | 57.2 |
| Financial instruments | **71.3** | — |
| Investments in ventures | **—** | 4.9 |
| Asset retirement obligations | **22.3** | 5.3 |
| Operating loss carryforwards | **2,699.7** | 2,791.6 |
| Property, plant and equipment and mineral rights | **181.2** | 189.8 |
| State and local | **59.2** | 59.9 |
| Lease liabilities | **12.9** | 18.3 |
| Other liabilities | **108.3** | 148.9 |
| Total deferred tax assets before valuation allowance | **3,600.4** | 3,637.7 |
| Deferred tax asset valuation allowance | **(3,334.8** ) | (3,372.5 ) |
| Net deferred tax assets | **265.6** | 265.2 |
| **Deferred tax liabilities:** | | |
| Property, plant and equipment and mineral rights | **(34.0** ) | (35.5 ) |
| Investment in ventures | **(203.1** ) | (206.6 ) |
| Intangible assets | **(1.0** ) | (1.5 ) |
| Product inventories | **(3.4** ) | (2.5 ) |
| Other assets | **(24.1** ) | (19.1 ) |
| Total deferred tax liabilities | **(265.6** ) | (265.2 ) |
| Net deferred tax assets (liabilities) | $ **—** | $ — |

At December 31, 2016 and 2015, we had $251.2 million and $218.7 million, respectively, of gross deferred tax assets related to U.S. alternative minimum tax credits that can be carried forward indefinitely.

We had gross domestic (including states) and foreign net operating loss carryforwards, inclusive of discontinued operations, of $3.7 billion and $6.9 billion, respectively, at December 31, 2016. We had gross domestic and foreign net operating loss carryforwards at December 31, 2015 of $3.9 billion and $11.1 billion, respectively. The U.S. Federal net operating losses will begin to expire in 2035 and state net operating losses will begin to expire in 2019. The foreign net operating losses can be carried forward indefinitely. We had foreign tax credit carryforwards of $5.8 million at December 31, 2016 and December 31, 2015. The foreign tax credit carryforwards will begin to expire in 2020. Additionally, there is a net operating loss carryforward, inclusive of discontinued operations, of $1.4 billion for Alternative Minimum Tax. No benefit has been recorded in the financials for this attribute as ASC 740, *Income Taxes*, does not allow for the recording of deferred taxes under alternative taxing systems.

We recorded a $37.7 million net decrease in the valuation allowance of certain deferred tax assets. Of this amount, a $149.1 million decrease was due to the change in the Luxembourg statutory rate and a $33.1 million decrease resulted from prior year adjustments due to a change in estimate of the 2015 net operating loss. Offsetting increases to the valuation allowance included a $104.9 million increase related to the recording of deferred tax assets due to current year operating activities and a $39.6 million increase related to the close of audits.

At December 31, 2016 and 2015, we had no cumulative undistributed earnings of foreign subsidiaries included in consolidated retained earnings. Accordingly, no provision has been made for U.S. deferred taxes related to future repatriation of earnings.

131

A005212

A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows:

|  | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
|  | **2016** | | 2015 | | 2014 | |
| Unrecognized tax benefits balance as of January 1 | $ | **156.2** | $ | 72.6 | $ | 71.8 |
| Increases/(decreases) for tax positions in prior years |  | **(61.0)** |  | 6.7 |  | — |
| Increases for tax positions in current year |  | **0.2** |  | 78.5 |  | 5.9 |
| Decrease due to foreign exchange |  | **—** |  | — |  | (0.2) |
| Settlements |  | **(64.7)** |  | (1.1) |  | — |
| Lapses in statutes of limitations |  | **—** |  | (0.5) |  | (3.7) |
| Other |  | **—** |  | — |  | (1.2) |
| Unrecognized tax benefits balance as of December 31 | $ | **30.7** | $ | 156.2 | $ | 72.6 |

At December 31, 2016 and 2015, we had $30.7 million and $156.2 million, respectively, of unrecognized tax benefits recorded. Of this amount, $8.3 million and $21.5 million, respectively, were recorded in *Other liabilities* and $22.4 million and $134.7 million, respectively, were recorded as *Other non-current assets* in the Statements of Consolidated Financial Position for both years. If the $30.7 million were recognized, only $8.3 million would impact the effective tax rate. We do not expect that the amount of unrecognized benefits will change significantly within the next 12 months. At December 31, 2016 and 2015, we had $0.8 million and $2.1 million, respectively, of accrued interest and penalties related to the unrecognized tax benefits recorded in *Other liabilities* in the Statements of Consolidated Financial Position.

Tax years 2012 and forward remain subject to examination for the U.S. and Australia. Tax years 2008 and forward remain subject to examination for Canada.

## NOTE 10 - LEASE OBLIGATIONS

We lease certain mining, production and other equipment under operating and capital leases. The leases are for varying lengths, generally at market interest rates and contain purchase and/or renewal options at the end of the terms. Our operating lease expense was $7.6 million, $12.0 million and $17.8 million for the years ended December 31, 2016, 2015 and 2014, respectively. Capital lease assets were $29.3 million and $32.5 million at December 31, 2016 and 2015, respectively. Corresponding accumulated amortization of capital leases included in respective allowances for depreciation were $13.1 million and $8.7 million at December 31, 2016 and 2015, respectively.

Future minimum payments under capital leases and non-cancellable operating leases at December 31, 2016 are as follows:

|  | (In Millions) | | | |
|---|---|---|---|---|
|  | Capital Leases | | Operating Leases | |
| 2017 | $ | 22.0 | $ | 6.9 |
| 2018 |  | 17.9 |  | 5.6 |
| 2019 |  | 9.9 |  | 3.0 |
| 2020 |  | 9.0 |  | 2.9 |
| 2021 |  | 8.3 |  | 3.0 |
| 2022 and thereafter |  | 0.7 |  | — |
| Total minimum lease payments | $ | 67.8 | $ | 21.4 |
| Amounts representing interest |  | 12.0 |  |  |
| Present value of net minimum lease payments [1] | $ | 55.8 |  |  |

[1] The total is comprised of $17.4 million and $38.4 million classified as Other current liabilities and Other liabilities, respectively, in the Statements of Consolidated Financial Position at December 31, 2016.

132

A005213

Table of Contents

**NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS**

We had environmental and mine closure liabilities of $206.8 million and $234.0 million at December 31, 2016 and 2015, respectively. Payments in 2016 and 2015 were $2.4 million and $2.6 million, respectively. The following is a summary of the obligations as of December 31, 2016 and 2015:

| | (In Millions) | |
| --- | --- | --- |
| | December 31, | |
| | **2016** | 2015 |
| Environmental | $ **2.8** | $ 3.6 |
| Mine closure | | |
| U.S. Iron Ore[1] | **187.8** | 214.0 |
| Asia Pacific Iron Ore | **16.2** | 16.4 |
| Total mine closure | **204.0** | 230.4 |
| Total environmental and mine closure obligations | **206.8** | 234.0 |
| Less current portion | **12.9** | 2.8 |
| Long-term environmental and mine closure obligations | $ **193.9** | $ 231.2 |

[1] U.S. Iron Ore includes our active operating mines, our indefinitely idled Empire mine and a closed mine formerly operating as LTVSMC.

**Environmental**

Our mining and exploration activities are subject to various laws and regulations governing the protection of the environment. We conduct our operations to protect the public health and environment and believe our operations are in compliance with applicable laws and regulations in all material respects. Our environmental liabilities of $2.8 million and $3.6 million at December 31, 2016 and 2015, respectively, including obligations for known environmental remediation exposures at various active and closed mining operations and other sites, have been recognized based on the estimated cost of investigation and remediation at each site. If the cost can only be estimated as a range of possible amounts with no specific amount being more likely, the minimum of the range is accrued. Future expenditures are not discounted unless the amount and timing of the cash disbursements readily are known. Potential insurance recoveries have not been reflected. Additional environmental obligations could be incurred, the extent of which cannot be assessed.

**Mine Closure**

Our mine closure obligations of $204.0 million and $230.4 million at December 31, 2016 and 2015, respectively, include our U.S. Iron Ore mines and our Asia Pacific Iron Ore mine.

The accrued closure obligation for our mining operations provides for contractual and legal obligations associated with the eventual closure of the mining operations. We performed a detailed assessment of our asset retirement obligations related to our active mining locations most recently in 2014 in accordance with our accounting policy, which requires us to perform an in-depth evaluation of the liability every three years in addition to routine annual assessments.

Management periodically performs an assessment of the obligation to determine the adequacy of the liability in relation to the closure activities still required at the LTVSMC site. The LTVSMC closure liability was $25.5 million and $24.1 million at December 31, 2016 and 2015, respectively. We are anticipating MPCA to reissue the NPDES permits for this facility in the future that could modify the closure liability, but the scale of that change will not be understood until reissuance of the permits.

For the assessments performed, we determined the obligations based on detailed estimates adjusted for factors that a market participant would consider (i.e., inflation, overhead and profit) and then discounted the obligation using the current credit-adjusted risk-free interest rate based on the corresponding life of mine. The estimate also incorporates incremental increases in the closure cost estimates and changes in estimates of mine lives. The closure date for each location was determined based on the exhaustion date of the remaining iron ore reserves. The accretion of the liability and amortization of the related asset is recognized over the estimated mine lives for each location.

133

The following represents a roll forward of our asset retirement obligation liability for the years ended December 31, 2016 and 2015:

| | (In Millions) | | | |
| --- | --- | --- | --- | --- |
| | December 31, | | | |
| | **2016** | | 2015 | |
| Asset retirement obligation at beginning of period | $ | **230.4** | $ | 165.3 |
| Accretion expense | | **14.0** | | 7.7 |
| Remediation payments | | **(2.2)** | | — |
| Exchange rate changes | | **(0.2)** | | (1.1) |
| Revision in estimated cash flows | | **(38.0)** | | 58.5 |
| Asset retirement obligation at end of period | $ | **204.0** | $ | 230.4 |

The revisions in estimated cash flows recorded during the year ended December 31, 2016 relate primarily to revisions in the timing of the estimated cash flows related to two of our U.S. mines. The Empire mine asset retirement obligation was reduced $29.6 million as a result of the further refinement of the timing of cash flows and a downward revision of estimated asset retirement costs related to technology associated with required storm water management systems expected to be implemented. Additionally, during 2016, a new economic reserve estimate was completed for United Taconite, increasing salable product reserves by 115 million long tons and consequently significantly increasing the life-of-mine plan, resulting in a $9.2 million decrease in the asset retirement obligation.

The revisions in estimated cash flows recorded during the year ended December 31, 2015 related primarily to revisions in the timing of the estimated cash flows and the technology associated with required storm water management systems expected to be implemented subsequent to the indefinite idling of the Empire mine, which resulted in an increase in the asset retirement obligation of $45.2 million.

## NOTE 12 - GOODWILL AND OTHER INTANGIBLE ASSETS AND LIABILITIES

### Goodwill

Goodwill represents the excess purchase price paid over the fair value of the net assets of acquired companies and is not subject to amortization. We assign goodwill arising from acquired companies to the reporting units that are expected to benefit from the synergies of the acquisition. Our reporting units are either at the operating segment level or a component one level below our operating segments that constitutes a business for which management generally reviews production and financial results of that component. Decisions often are made as to capital expenditures, investments and production plans at the component level as part of the ongoing management of the related operating segment. We have determined that our Asia Pacific Iron Ore operating segment constitutes a separate reporting unit and that Northshore within our U.S. Iron Ore operating segment constitutes a reporting unit. Goodwill is allocated among and evaluated for impairment at the reporting unit level in the fourth quarter of each year or as circumstances occur that potentially indicate that the carrying amount of these assets may exceed their fair value.

For the years ended December 31, 2016 and 2015, there were no goodwill impairment charges. During the third quarter of 2014, a goodwill impairment charge of $73.5 million was recorded for our Asia Pacific Iron Ore reporting segment. The impairment charge was a result of downward long-term pricing estimates as determined through management's long-range planning process.

The carrying amount of goodwill for the years ended December 31, 2016 and December 31, 2015 was $2.0 million and related to our U.S. Iron Ore operating segment.

134

A005215

Table of Contents

**Other Intangible Assets and Liabilities**

Following is a summary of intangible assets and liabilities as of December 31, 2016 and December 31, 2015:

| | | (In Millions) | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | December 31, 2016 | | | December 31, 2015 | | |
| | Classification | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Definite-lived intangible assets: | | | | | | | |
| Permits | *Other non-current assets* | $ 78.4 | $ (24.6) | $ 53.8 | $ 78.4 | $ (20.2) | $ 58.2 |
| Total intangible assets | | $ 78.4 | $ (24.6) | $ 53.8 | $ 78.4 | $ (20.2) | $ 58.2 |
| Below-market sales contracts | *Other current liabilities* | $ — | $ — | $ — | $ (23.1) | $ — | $ (23.1) |
| Below-market sales contracts | *Other liabilities* | — | — | — | (205.8) | 205.8 | — |
| Total below-market sales contracts | | $ — | $ — | $ — | $ (228.9) | $ 205.8 | $ (23.1) |

Amortization expense relating to intangible assets was $4.8 million, $4.2 million and $8.4 million for the years ended December 31, 2016, 2015 and 2014, respectively, and is recognized in *Cost of goods sold and operating expenses* in the Statements of Consolidated Operations . During the year ended December 31, 2014, an impairment charge of $13.8 million was recorded related to the permits intangible asset and is recognized in *Impairment of goodwill and other long-lived assets* in the Statements of Consolidated Operations . There were no impairment charges recorded for definite-lived intangible assets in 2016 or 2015. The estimated amortization expense relating to intangible assets for each of the five succeeding years is as follows:

| | (In Millions) |
| --- | --- |
| | Amount |
| Year Ending December 31 | |
| 2017 | 1.9 |
| 2018 | 1.9 |
| 2019 | 2.0 |
| 2020 | 1.6 |
| 2021 | 1.0 |
| Total | $ 8.4 |

The below-market sales contract was historically classified as a liability and was recognized over the term of the underlying contract, which expired December 31, 2016. As a result, there will be no future impact to *Product revenues* for the succeeding fiscal years relating to this contract. For the years ended December 31, 2016, 2015 and 2014, we recognized $23.1 million per year in *Product revenues* related to below-market sales contracts.

A005216

Table of Contents

**NOTE 13 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES**

The following table presents the fair value of our derivative instruments and the classification of each in the  Statements of Consolidated Financial Position as of December 31, 2016 and December 31, 2015:

| | Derivative Assets | | | | Derivative Liabilities | | | |
|---|---|---|---|---|---|---|---|---|
| | **December 31, 2016** | | December 31, 2015 | | **December 31, 2016** | | December 31, 2015 | |
| Derivative Instrument | **Balance Sheet Location** | **Fair Value** | Balance Sheet Location | Fair Value | **Balance Sheet Location** | **Fair Value** | Balance Sheet Location | Fair Value |
| Customer Supply Agreements | *Other current assets* | 21.3 | *Other current assets* | 5.8 | | — | | — |
| Provisional Pricing Arrangements | *Other current assets* | 10.3 | *Other current assets* | 2.0 | *Other current liabilities* | 0.5 | *Other current liabilities* | 3.4 |
| Commodity Contracts | *Other current assets* | 1.5 | | — | | — | *Other current liabilities* | 0.6 |
| Total derivatives not designated as hedging instruments under ASC 815: | | $  33.1 | | $  7.8 | | $  0.5 | | $  4.0 |

**Derivatives Not Designated as Hedging Instruments**

*Customer Supply Agreements*

Most of our U.S. Iron Ore long-term supply agreements are comprised of a base price with annual price adjustment factors. The base price is the primary component of the purchase price for each contract. The indexed price adjustment factors are integral to the iron ore supply contracts and vary based on the agreement, but typically include adjustments based upon changes in the Platts 62% Price, along with pellet premiums, published Platts international indexed freight rates and changes in specified Producer Price Indices, including those for industrial commodities, energy and steel. The pricing adjustments generally operate in the same manner, with each factor typically comprising a portion of the price adjustment, although the weighting of each factor varies based upon the specific terms of each agreement. In most cases, these adjustment factors have not been finalized at the time our product is sold. In these cases, we historically have estimated the adjustment factors at each reporting period based upon the best third-party information available. The estimates are then adjusted to actual when the information has been finalized. The price adjustment factors have been evaluated to determine if they contain embedded derivatives. The price adjustment factors share the same economic characteristics and risks as the host contract and are integral to the host contract as inflation adjustments; accordingly, they have not been separately valued as derivative instruments.

A certain supply agreement with one U.S. Iron Ore customer provides for supplemental revenue or refunds to the customer based on the customer's average annual steel pricing at the time the product is consumed in the customer's blast furnace. The supplemental pricing is characterized as a freestanding derivative and is required to be accounted for separately once the product is shipped. The derivative instrument, which is finalized based on a future price, is adjusted to fair value as a revenue adjustment each reporting period until the pellets are consumed and the amounts are settled.

We recognized $41.7 million, $27.1 million and $187.8 million as *Product revenues* in the Statements of Consolidated Operations  for the years ended December 31, 2016, 2015 and 2014, respectively, related to the supplemental payments. The fair value of the pricing factors were $21.3 million and $5.8 million in *Other current assets* in the December 31, 2016 and December 31, 2015 Statements of Consolidated Financial Position , respectively.

*Provisional Pricing Arrangements*

Certain of our U.S. Iron Ore and Asia Pacific Iron Ore customer supply agreements specify provisional price calculations, where the pricing mechanisms generally are based on market pricing, with the final revenue rate to be based on market inputs at a specified period in time in the future, per the terms of the supply agreements. U.S. Iron Ore

A005217

Table of Contents

sales revenue is primarily recognized when cash is received.  For U.S. Iron Ore sales, the difference between the provisionally agreed-upon price and the estimated final revenue rate is characterized as a freestanding derivative and must be accounted for separately once the provisional revenue has been recognized.  Asia Pacific Iron Ore sales revenue is recorded initially at the provisionally agreed-upon price with the pricing provision embedded in the receivable.  The pricing provision is an embedded derivative that must be bifurcated and accounted for separately from the receivable.  Subsequently, the derivative instruments for both U.S. Iron Ore and Asia Pacific Iron Ore are adjusted to fair value through *Product revenues* each reporting period based upon current market data and forward-looking estimates provided by management until the final revenue rate is determined. A t December 31, 2016 and December 31, 2015, we recorded $10.3 million and $2.0 million, respectively, as *Other current assets* in the Statements of Consolidated Financial Position related to our estimate of the final revenue rate with any of our customers. At December 31, 2016 and December 31, 2015, we recorded $0.5 million and $3.4 million, respectively, as *Other current liabilities* in the Statements of Consolidated Financial Position  related to our estimate of final revenue rate with our U.S. Iron Ore and Asia Pacific Iron Ore customers. These amounts represent the difference between the provisional price agreed upon with our customers based on the supply agreement terms and our estimate of the final revenue rate based on the price calculations established in the supply agreements. We recognized a net $49.0 million increase in *Product revenues* in the Statements of Consolidated Operations  for the year ended December 31, 2016 related to these arrangements. This compares with a net $1.4 million decrease and a net $9.5 million decrease in *Product revenues* for the comparable periods in 2015 and 2014.

The following summarizes the effect of our derivatives that are not designated as hedging instruments in the  Statements of Consolidated Operations  for the years ended December 31, 2016, 2015 and 2014:

| | | (In Millions) | | |
|---|---|---|---|---|
| **Derivatives Not Designated as Hedging Instruments** | **Location of Gain (Loss) Recognized in Income on Derivative** | **Amount of Gain/(Loss) Recognized in Income on Derivative** | | |
| | | **Year Ended December 31,** | | |
| | | **2016** | 2015 | 2014 |
| Customer Supply Agreements | *Product revenues* | $ 41.7 | $ 27.1 | $ 187.8 |
| Provisional Pricing Arrangements | *Product revenues* | 49.0 | (1.4) | (9.5) |
| Foreign Exchange Contracts | *Other non-operating income (expense)* | — | (3.6) | — |
| Foreign Exchange Contracts | *Product revenues* | — | (12.6) | — |
| Commodity Contracts | *Cost of goods sold and operating expenses* | 1.9 | (4.0) | — |
| Total | | $ 92.6 | $ 5.5 | $ 178.3 |

Refer to NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS  for additional information.

## NOTE 14 - DISCONTINUED OPERATIONS

The information below sets forth selected financial information related to operating results of our businesses classified as discontinued operations. While the reclassification of revenues and expenses related to discontinued operations from prior periods have no impact upon previously reported net income, the Statements of Consolidated Operations  present the revenues and expenses that were reclassified from the specified line items to discontinued operations.

The chart below provides an asset group breakout for each financial statement line impacted by discontinued operations.

(In Millions)

| | | North American Coal | Eastern Canadian Iron Ore | Other | Total Canadian Operations | Total of Discontinued Operations |
|---|---|---|---|---|---|---|
| | | | **Canadian Operations** | | | |
| **Statements of Consolidated Operations** | | | | | | |
| Loss from Discontinued Operations, net of tax | **YTD December 31, 2016** | $ **(2.4)** | $ **(17.5)** | $ **—** | $ **(17.5)** | $ **(19.9)** |
| Loss from Discontinued Operations, net of tax | YTD December 31, 2015 | $ (152.4) | $ (638.7) | $ (101.0) | $ (739.7) | $ (892.1) |
| Loss from Discontinued Operations, net of tax | YTD December 31, 2014 | $ (1,134.5) | $ (6,952.9) | $ (280.6) | $ (7,233.5) | $ (8,368.0) |
| | | | | | | |
| **Statements of Consolidated Financial Position** | | | | | | |
| Other current liabilities | **As of December 31, 2016** | $ **6.0** | $ **—** | $ **—** | $ **—** | $ **6.0** |
| Other current assets | As of December 31, 2015 | $ 14.9 | $ — | $ — | $ — | $ 14.9 |
| Other current liabilities | As of December 31, 2015 | $ 6.9 | $ — | $ — | $ — | $ 6.9 |
| | | | | | | |
| **Non-Cash Operating and Investing Activities** | | | | | | |
| Depreciation, depletion and amortization | YTD December 31, 2015 | $ 3.2 | $ — | $ — | $ — | $ 3.2 |
| Purchase of property, plant and equipment | YTD December 31, 2015 | $ 15.9 | $ — | $ — | $ — | $ 15.9 |
| Impairment of goodwill and other long-lived assets | YTD December 31, 2015 | $ 73.4 | $ — | $ — | $ — | $ 73.4 |
| Depreciation, depletion and amortization | YTD December 31, 2014 | $ 106.9 | $ 135.6 | $ 0.5 | $ 136.1 | $ 243.0 |
| Purchase of property, plant and equipment | YTD December 31, 2014 | $ 29.9 | $ 190.3 | $ — | $ 190.3 | $ 220.2 |
| Impairment of goodwill and other long-lived assets | YTD December 31, 2014 | $ 857.5 | $ 7,269.2 | $ 267.6 | $ 7,536.8 | $ 8,394.3 |

***North American Coal Operations***

*Background*

As of March 31, 2015, management determined that our North American Coal operating segment met the criteria to be classified as held for sale under *ASC 205, Presentation of Financial Statements.* The North American Coal segment continued to meet the criteria throughout 2015 until we sold our held for sale North American Coal operations during the fourth quarter of 2015. As such, all current and historical North American Coal operating segment results are included in our financial statements and classified within discontinued operations.

In the first quarter of 2015, as part of the held for sale classification assigned to North American Coal, an impairment of $73.4 million was recorded. The impairment charge was to reduce the assets to their estimated fair value which was determined based on potential sales scenarios. No further impairment was recorded in 2015.

We sold all the remaining North American Coal operations during the fourth quarter of 2015. On December 22, 2015, we closed the sale of our remaining North American Coal business, which included Pinnacle mine in West Virginia and Oak Grove mine in Alabama. Pinnacle mine and Oak Grove mine were sold to Seneca and the deal structure was a sale of equity interests of our remaining coal business. Additionally, Seneca may pay Cliffs an earn-out of up to $50 million contingent upon the terms of a revenue sharing agreement which extends through the year 2020. However, we have not recorded a gain contingency in relation to this earn-out. We recorded the results of this sale within *Loss from Discontinued Operations, net of tax* for the year ended December 31, 2015.

138

A005219

On December 31, 2014, we completed the sale of our CLCC assets in West Virginia to Coronado Coal II, LLC, an affiliate of Coronado Coal LLC, for $174.0 million in cash and the assumption of certain liabilities, of which $155.0 million was collected as of December 31, 2014. We recorded the results of this sale in our fourth quarter earnings within *Loss from Discontinued Operations, net of tax* as the transaction closed on December 31, 2014.

*Loss on Discontinued Operations*

The sale of our Oak Grove and Pinnacle mines on December 22, 2015 completed a strategic shift in our business. Our previously reported North American Coal operating segment results for all periods, prior to the March 31, 2015 held for sale determination, are classified as discontinued operations. Historical results also include our CLCC assets, which were sold during the fourth quarter of 2014.

| | (In Millions) | | |
|---|---|---|---|
| | Year Ended December 31, | | |
| ***Loss from Discontinued Operations*** | **2016** | 2015 | 2014 |
| Revenues from product sales and services | $       — | $    392.9 | $    687.1 |
| Cost of goods sold and operating expenses | — | (449.2) | (822.9) |
| Sales margin | — | (56.3) | (135.8) |
| Other operating expense | **(4.5)** | (30.4) | (20.8) |
| Gain (loss) on sale of coal mines | **2.1** | 9.3 | (419.6) |
| Other expense | — | (1.8) | (3.0) |
| Loss from discontinued operations before income taxes | **(2.4)** | (79.2) | (579.2) |
| Impairment of long-lived assets | — | (73.4) | (857.5) |
| Income tax benefit | — | 0.2 | 302.2 |
| Loss from discontinued operations, net of tax | $    **(2.4)** | $   (152.4) | $  (1,134.5) |

*Items Measured at Fair Value on a Non-Recurring Basis*

The following table presents information about the impairment charge on non-financial assets that was measured on a fair value basis at March 31, 2015 for the North American Coal operations. There were no financial and non-financial assets and liabilities that were measured on a non-recurring fair value basis at December 31, 2016 for the North American Coal operations. The table also indicates the fair value hierarchy of the valuation techniques used to determine such fair value.

| | (In Millions) | | | | |
|---|---|---|---|---|---|
| | March 31, 2015 | | | | |
| Description | Quoted Prices in Active Markets for Identical Assets/ Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total | Total Losses |
| Assets: | | | | | |
| Other long-lived assets - Property, plant and equipment and Mineral rights: North American Coal operating unit | $       — | $       — | $    20.4 | $    20.4 | $    73.4 |
| | $       — | $       — | $    20.4 | $    20.4 | $    73.4 |

In the first quarter of 2015, as part of the held for sale classification assigned to North American Coal, an impairment charge of $73.4 million was recorded. The impairment charge was to reduce the assets to their estimated fair value which was determined based on potential sales scenarios. We determined the fair value and recoverability of our North American Coal operating segment by comparing the estimated fair value of the underlying assets and liabilities to the estimated sales price of the operating segment held for sale. No further impairment was recorded in 2015.

139

A005220

Table of Contents

*Recorded Assets and Liabilities*

| | (In Millions) | |
|---|---|---|
| ***Assets and Liabilities of Discontinued Operations [1]*** | **December 31, 2016** | December 31, 2015 |
| Other current assets | $ — | $ 14.9 |
| Total assets of discontinued operations | $ — | $ 14.9 |
| | | |
| Accrued liabilities | $ 1.1 | $ — |
| Other current liabilities | 4.9 | 6.9 |
| Total liabilities of discontinued operations | $ 6.0 | $ 6.9 |

[1] At December 31, 2016 and 2015, we also recorded $2.1 million and $7.8 million, respectively, of contingent liabilities associated with our exit from the coal business recorded on our parent company.

As part of the CLCC asset sale during the fourth quarter of 2014, there was an amount placed in escrow to cover decreases in working capital, indemnity obligations and regulatory liabilities. During the year ended December 31, 2016, $10.3 million was released to us from escrow. There was no amount held in escrow at December 31, 2016 and $14.9 million at December 31, 2015 recorded within *Other current assets* on the Statements of Consolidated Financial Position.

*Income Taxes*

We have recognized no tax expense or benefit for the year ended December 31, 2016 in *Loss from Discontinued Operations, net of tax*, related to our North American Coal investments. For the years ended December 31, 2015 and 2014, we have recognized a tax benefit of $0.2 million and $302.2 million, respectively, in *Loss from Discontinued Operations, net of tax*, related to a loss on our North American Coal investments. The benefit for the year ended December 31, 2014 is primarily the result of the impairment of long-lived assets in the third quarter of 2014.

**Canadian Operations**

*Background*

On November 30, 2013, we suspended indefinitely our Chromite Project in Northern Ontario. The Chromite Project remained suspended throughout 2014 and until final sale in 2015. Our Wabush Scully iron ore mine in Newfoundland and Labrador was idled by the end of the first quarter of 2014 and subsequently began to commence permanent closure in the fourth quarter of 2014. During 2014, we also limited exploration spending on the Labrador Trough South property in Québec. In November 2014, we announced that we were pursuing exit options for our Eastern Canadian Iron Ore operations. In December 2014, iron ore production at the Bloom Lake mine was suspended and the Bloom Lake mine was placed in "care-and-maintenance" mode. Together, the suspension of exploration efforts, shutdown of the Wabush Scully mine and the cessation of operations at our Bloom Lake mine represented a complete curtailment of our Canadian operations.

On January 27, 2015, we announced the Bloom Filing under the CCAA with the Québec Court in Montreal. At that time, the Bloom Lake Group was no longer generating revenues and was not able to meet its obligations as they came due. The Bloom Filing addressed the Bloom Lake Group's immediate liquidity issues and permitted the Bloom Lake Group to preserve and protect its assets for the benefit of all stakeholders while restructuring and sale options are explored. As part of the CCAA process, the Court approved the appointment of a Monitor and certain other financial advisors.

Additionally, on May 20, 2015, we announced the Wabush Filing with the Court under the CCAA. As a result of this action, the CCAA protections granted to the Bloom Lake Group were extended to include the Wabush Group to facilitate the reorganization of each of their businesses and operations. The Wabush Group was no longer generating revenues and was not able to meet its obligations as they came due. The inclusion of the Wabush Group in the existing Bloom Filing facilitated a more comprehensive restructuring and sale process of both the Bloom Lake Group and the Wabush Group, which collectively included mine, port and rail assets. The Wabush Filing also mitigates various legacy related long-term liabilities associated with the Wabush Group. As part of the Wabush Filing, the Court approved the appointment of a Monitor and certain other financial advisors. The Monitor of the Wabush Group is also the Monitor of the Bloom Lake Group.

As a result of the Bloom Filing on January 27, 2015, we no longer have a controlling interest in the Bloom Lake Group. For that reason, we deconsolidated the Bloom Lake Group and certain other wholly-owned subsidiaries effective

Table of Contents

January 27, 2015, which resulted in a pretax impairment loss on deconsolidation and other charges, totaling $818.7 million that was recorded in the first quarter of 2015. The pretax loss on deconsolidation includes the derecognition of the carrying amounts of the Bloom Lake Group and certain other wholly-owned subsidiaries' assets, liabilities and accumulated other comprehensive loss and the recording of our remaining interests at fair value.

As a result of the Wabush Filing, we deconsolidated certain Wabush Group wholly-owned subsidiaries effective May 20, 2015. The certain wholly-owned subsidiaries that were deconsolidated effective May 20, 2015 are Wabush Group entities that were not deconsolidated as part of the deconsolidation effective January 27, 2015 as discussed previously in this section. This deconsolidation, effective May 20, 2015, resulted in a pretax gain on deconsolidation and other charges, totaling $134.7 million. The pretax gain on deconsolidation includes the derecognition of the carrying amounts of these certain deconsolidated Wabush Group wholly-owned subsidiaries' assets, liabilities and accumulated other comprehensive loss and the adjustment of our remaining interests in the Canadian Entities to fair value.

Subsequent to each of the deconsolidations discussed above, we utilized the cost method to account for our investment in the Canadian Entities, which has been reflected as zero in our Statements of Consolidated Financial Position as of December 31, 2016 and 2015 based on the estimated fair value of the Canadian Entities' net assets. Loans to and accounts receivable from the Canadian Entities are recorded at an estimated fair value of $48.6 million and $72.9 million classified as *Loans to and accounts receivables from the Canadian Entities* in the Statements of Consolidated Financial Position as of December 31, 2016 and 2015, respectively. The *Loans to and accounts receivables from the Canadian Entities* balance reflects our current estimate. We continue to update the estimate as the CCAA proceedings progress. The December 31, 2016 balance reflects recent developments, including finalized liquidation values for completed asset sales and updates for the expected allocation of proceeds for those sales, updates for ongoing costs incurred by the estate that will be held back from the final distribution, and the repayment of the DIP financing.

*Status of CCAA Proceedings*

On March 8, 2016, certain of the Canadian Entities completed the sale of their port and rail assets located in Pointe-Noire, Quebec to Societe Ferroviaire et Portuaire de Pointe-Noire S.E.C., an affiliate of Investissement Quebec, for C$66.75 million in cash and the assumption of certain liabilities.

On April 11, 2016, certain of the Canadian Entities completed the sale of the Bloom Lake mine and Labrador Trough South mineral claims located in Quebec, as well as certain rail assets located in Newfoundland & Labrador, to Quebec Iron Ore Inc., an affiliate of Champion Iron Mines Limited, for C$10.5 million in cash and the assumption of certain liabilities.

As of December 31, 2016, the majority of assets available to the estate have been liquidated. The CCAA proceedings are still ongoing and the Monitor is evaluating all claims into the estate including our related party claims. Currently, there is uncertainty as to the amount of the distribution that will be made to the creditors of the estate, including, if any to Cliffs, and whether Cliffs could be held liable for claims that may be asserted by or on behalf of the Bloom Lake Group or the Wabush Group or by their respective representatives against non-debtor affiliates of the Bloom Lake Group and the Wabush Group.

After repayment of the DIP financing, payment of sales expenses, taxes and the costs of the CCAA proceedings to date, the net proceeds from these and certain other divestitures by the Canadian Entities are currently being held by the Monitor, on behalf of the Canadian Entities, to fund the accrued and ongoing costs of the CCAA proceedings and for eventual distribution to creditors of the Canadian Entities pending further order of the Montreal Court.

*Loss on Discontinued Operations*

Our Canadian exit represents a strategic shift in our business. For this reason, our previously reported Eastern Canadian Iron Ore and Ferroalloys operating segment results for all periods prior to the respective deconsolidations, as well as costs to exit, are classified as discontinued operations.

Table of Contents

| | (In Millions) | | |
| | Year Ended December 31, | | |
| ***Loss from Discontinued Operations*** | **2016** | 2015 | 2014 |
|---|---|---|---|
| Revenues from product sales and services | $ — | $ 11.3 | $ 563.5 |
| Cost of goods sold and operating expenses | — | (11.1) | (808.4) |
| Eliminations with continuing operations | — | — | (53.6) |
| Sales margin | — | 0.2 | (298.5) |
| Other operating expense | — | (33.8) | (306.3) |
| Other expense | — | (1.0) | (5.6) |
| Loss from discontinued operations before income taxes | — | (34.6) | (610.4) |
| Loss from deconsolidation | **(17.5)** | (710.9) | — |
| Impairment of long-lived assets | — | — | (7,536.8) |
| Income tax benefit | — | 5.8 | 913.7 |
| Loss from discontinued operations, net of tax | **$ (17.5)** | $ (739.7) | $ (7,233.5) |

Canadian Entities loss from deconsolidation totaled  $17.5 million and $710.9 million for the year ended December 31, 2016 and 2015, respectively and included the following:

| | (In Millions) | | |
| | Year Ended December 31, | | Year Ended December 31, |
| | **2016** | | 2015 |
|---|---|---|---|
| Investment impairment on deconsolidation[1] | **$ (17.5)** | $ | (507.8) |
| Guarantees and contingent liabilities | — | | (203.1) |
| Total loss from deconsolidation | **$ (17.5)** | $ | (710.9) |

[1] Includes the adjustment to fair value of our remaining interest in the Canadian Entities.

We have no gain or loss from deconsolidation attributable to contingent liabilities for the year ended  December 31, 2016 compared to a loss of  $203.1 million for the year ended December 31, 2015. As a result of the deconsolidation, we recorded accrued expenses for the estimated probable loss related to claims that may be asserted against us, primarily under guarantees of certain debt arrangements and leases for a loss on deconsolidation of $203.1 million, for the year ended December 31, 2015.

*Investments in the Canadian Entities*

We continue to indirectly own a majority of the interest in the Canadian Entities but have deconsolidated those entities because we no longer have a controlling interest as a result of the Bloom Filing and the Wabush Filing. At the respective dates of deconsolidation, January 27, 2015 or May 20, 2015 and subsequently at each reporting period, we adjusted our investment in the Canadian Entities to fair value with a corresponding charge to *Loss from Discontinued Operations, net of tax*. As the estimated amount of the Canadian Entities' liabilities exceeded the estimated fair value of the assets available for distribution to its creditors, the fair value of Cliffs' equity investment is approximately zero.

*Amounts Receivable from the Canadian Entities*

Prior to the deconsolidations, various Cliffs wholly-owned entities made loans to the Canadian Entities for the purpose of funding its operations and had accounts receivable generated in the ordinary course of business. The loans, corresponding interest and the accounts receivable were considered intercompany transactions and eliminated in our consolidated financial statements. Additionally, we procured funding subsequent to the deconsolidation through the DIP financing. Since the deconsolidations, the loans, associated interest and accounts receivable are considered related party transactions and have been recognized in our consolidated financial statements at their estimated fair value of $48.6 million and $72.9 million classified as *Loans to and accounts receivables from the Canadian Entities* in the Statements of Consolidated Financial Position at December 31, 2016 and 2015, respectively.

142

A005223

*Guarantees and Contingent Liabilities*

Certain liabilities, consisting primarily of equipment loans and environmental obligations of the Canadian Entities, were secured through corporate guarantees and standby letters of credit. As of December 31, 2016, we have liabilities of $0.2 million and $37.0 million, respectively, in our consolidated results, classified as *Guarantees* and *Other liabilities* in the Statements of Consolidated Financial Position . As of December 31, 2015, we have liabilities of $96.5 million and $35.9 million, respectively, in our consolidated results, classified as *Guarantees* and *Other liabilities* in the Statements of Consolidated Financial Position .

*Contingencies*

The recorded expenses include an accrual for the estimated probable loss related to claims that may be asserted against us. Our estimates involve significant judgment. Our estimates are based on currently available information, an assessment of the validity of certain claims and estimated payments by the Canadian Entities. We are not able to reasonably estimate a range of possible losses in excess of the accrual because there are significant factual and legal issues to be resolved. We believe that it is reasonably possible that future changes to our estimates of loss and the ultimate amount paid on these claims could be material to our results of operations in future periods. Any such losses would be reported in discontinued operations.

*Items Measured at Fair Value on a Non-Recurring Basis*

The following table presents information about the financial assets and liabilities that were measured on a fair value basis at December 31, 2016 and 2015 for the Canadian Entities. The table also indicates the fair value hierarchy of the valuation techniques used to determine such fair value.

| | **(In Millions)** | | | | |
| --- | --- | --- | --- | --- | --- |
| | **December 31, 2016** | | | | |
| **Description** | **Quoted Prices in Active Markets for Identical Assets/ Liabilities (Level 1)** | **Significant Other Observable Inputs (Level 2)** | **Significant Unobservable Inputs (Level 3)** | **Total** | **Total Losses** |
| Assets: | | | | | |
| Loans to and accounts receivables from the Canadian Entities | $ — | $ — | $ 48.6 | $ 48.6 | $ 17.5 |
| Liabilities: | | | | | |
| Guarantees and contingent liabilities | $ — | $ — | $ 37.2 | $ 37.2 | $ — |

| | (In Millions) | | | | |
| --- | --- | --- | --- | --- | --- |
| | December 31, 2015 | | | | |
| Description | Quoted Prices in Active Markets for Identical Assets/ Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total | Total Losses |
| Assets: | | | | | |
| Loans to and accounts receivables from the Canadian Entities | $ — | $ — | $ 72.9 | $ 72.9 | $ 507.8 |
| Liabilities: | | | | | |
| Guarantees and contingent liabilities | $ — | $ — | $ 132.4 | $ 132.4 | $ 203.1 |

We determined the fair value and recoverability of our Canadian investments by comparing the estimated fair value of the remaining underlying assets of the Canadian Entities to remaining estimated liabilities. We recorded the guarantees and contingent liabilities at book value, which best approximated fair value.

Outstanding liabilities include accounts payable and other liabilities, forward commitments, unsubordinated related party payables, lease liabilities and other potential claims. Potential claims include an accrual for the estimated

143

A005224

probable loss related to claims that may be asserted against the Bloom Lake Group and Wabush Group under certain contracts. Claimants may seek damages or other related relief as a result of the Canadian Entities' exit from Canada. Based on our estimates, the fair value of liabilities exceeds the fair value of assets.

To assess the fair value and recoverability of the amounts receivable from the Canadian Entities, we estimated the fair value of the underlying net assets of the Canadian Entities available for distribution to their creditors in relation to the estimated creditor claims and the priority of those claims.

Our estimates involve significant judgment and are based on currently available information, an assessment of the validity of certain claims and estimated payments made by the Canadian Entities. Our ultimate recovery is subject to the final liquidation value of the Canadian Entities. Further, the final liquidation value and ultimate recovery of the creditors of the Canadian Entities, including, if any, to Cliffs and various subsidiaries, may impact our estimates of contingent liability exposure described previously.

*Pre-Petition Financing*

Prior to the Wabush Filing on May 20, 2015, a secured credit facility (the "Pre-Petition financing") was put into place to provide support to the Wabush Group for ongoing business activities until the DIP financing was in place. There was a total of $7.2 million drawn and outstanding under the Pre-Petition financing funded by Wabush Iron Co. Limited's parent company, Cliffs Mining Company as of December 31, 2016 and 2015.  Our estimated recovery of the Pre-Petition financing is included within the *Loans to and accounts receivables from the Canadian Entities*  of $48.6 million. The Pre-Petition financing is secured by certain equipment of the Wabush Group.

*DIP Financing*

In connection with the Wabush Filing on May 20, 2015, the Montreal Court approved an agreement to provide the DIP financing to the Wabush Group, which provided for borrowings under the facility up to $10.0 million. As of December 31, 2015, there was $6.8 million drawn and outstanding under the DIP financing funded by Wabush Iron Co. Limited's parent company, Cliffs Mining Company.  During the three months ended March 31, 2016, the Wabush Group made an additional draw of $1.5 million. We subsequently received a repayment of $8.3 million and as a result, there was  no outstanding balance due under the DIP financing arrangement from Wabush Iron Co. Limited's parent company, Cliffs Mining Company as of December 31, 2016.

*Income Taxes*

We have recognized no tax expense or benefit for the year ended December 31, 2016 in  *Loss from Discontinued Operations, net of tax*, related to our Canadian investments. For the years ended December 31, 2015 and 2014, we recognized a tax benefit of $5.8 million and $913.7 million, respectively, in  *Loss from Discontinued Operations, net of tax.* The benefit for the year ended December 31, 2014 was the result of the impairment of long-lived assets in the third quarter of 2014 offset by the placement of a valuation allowance against the Canadian operations net deferred tax assets.

## NOTE 15 - CAPITAL STOCK

**Preferred Shares Conversion to Common Shares**

On January 4, 2016, we announced that our Board of Directors determined the final quarterly dividend of our Preferred Shares would not be paid in cash, but instead, pursuant to the terms of the Preferred Shares, the conversion rate was increased such that holders of the Preferred Shares received additional common shares in lieu of the accrued dividend at the time of the mandatory conversion on February 1, 2016. The number of common shares in the aggregate that were issued in lieu of the final dividend was 1.3 million. This resulted in an effective conversion rate of 0.9052 common shares, rather than 0.8621 common shares, per depositary share, e ach representing a 1/40th of a Preferred Share.

144

Table of Contents

Prior to the mandatory conversion, holders of the depositary shares were entitled to a proportional fractional interest in the rights and preferences of the Series A preferred shares, including conversion, dividend, liquidation and voting rights, subject to the provisions of the deposit agreement. The Series A preferred shares were convertible, at the option of the holder, at the minimum conversion rate of 28.1480 of our common shares (equivalent to 0.7037 of our common shares per depositary share) at any time prior to February 1, 2016 or other than during a fundamental change conversion period, subject to anti-dilution adjustments. If not converted prior to that time, each Series A preferred share converted automatically on February 1, 2016 into between 28.1480 and 34.4840 common shares, par value $0.125 per share, subject to anti-dilution adjustments. The number of common shares issued on conversion was determined based on the average VWAP per share of our common shares during the 20 trading day period beginning on, and including, the 23rd scheduled trading day prior to February 1, 2016, subject to customary anti-dilution adjustments. Upon conversion on February 1, 2016, an aggregate of 26.5 million common shares were issued, representing 25.2 million common shares issuable upon conversion and 1.3 million that were issued in lieu of a final cash dividend.

**Dividends**

On March 27, 2015, July 1, 2015 and September 10, 2015, our Board of Directors declared the quarterly cash dividend of $17.50 per Preferred Share, which is equivalent to approximately $0.44 per depositary share. The cash dividend was paid on May 1, 2015, August 3, 2015 and November 2, 2015 to our shareholders of record as of the close of business on April 15, 2015, July 15, 2015 and October 15, 2015, respectively.

On February 11, 2014, May 13, 2014, September 8, 2014 and November 19, 2014, our Board of Directors declared the quarterly cash dividend of $17.50 per Preferred Share, which is equivalent to approximately $ 0.44 per depositary share. The cash dividend was paid on May 1, 2014, August 1, 2014, November 3, 2014 and February 2, 2015, to our Preferred Shareholders of record as of the close of business on April 15, 2014, July 15, 2014, October 15, 2014 and January 15, 2015, respectively.

On February 11, 2013, our Board of Directors approved a reduction to our quarterly cash dividend rate by 76% to $0.15 per share. The cash dividend of $0.15 per share was paid on March 3, 2014, June 3, 2014, September 2, 2014 and December 1, 2014 to our common shareholders of record as of close of business on February 21, 2014, May 23, 2014, August 15, 2014 and November 15, 2014.

On January 26, 2015, we announced that our Board of Directors had decided to eliminate the quarterly dividend of $0.15 per share on our common shares. The decision was applicable to the first quarter of 2015 and all subsequent quarters.

**Debt-for-Equity Exchanges**

During the year ended December 31, 2016, we entered into a series of privately negotiated exchange agreements whereby we issued an aggregate of 8.2 million common shares in exchange for $10.0 million aggregate principal amount of our 3.95% senior notes due 2018, $20.1 million aggregate principal amount of our 4.80% senior notes due 2020 and $26.8 million aggregate principal amount of our 4.875% senior notes due 2021. There were no exchanges that represented more than 1% of our outstanding common shares during any quarter. Accordingly, we recognized a gain of $11.3 million in *Gain on extinguishment/restructuring of debt* in the Statements of Consolidated Operations for the year ended December 31, 2016. The issuances of the common shares in exchange for our senior notes due 2018, 2020 and 2021 were made in reliance on the exemption from registration provided in Section 3(a)(9) of the Securities Act.

**Common Share Public Offering**

On August 10, 2016, we issued 44.4 million common shares in an underwritten public offering. We received net proceeds of approximately $287.6 million at a public offering price of $6.75 per common share. The proceeds from the issuance of our common shares were used to fully redeem our senior notes due 2018.

A005226

Table of Contents

## NOTE 16 - ACCUMULATED OTHER COMPREHENSIVE INCOME (LOSS)

The components of *Accumulated other comprehensive loss* within Cliffs shareholders' deficit and related tax effects allocated to each are shown below as of December 31, 2016, 2015 and 2014:

| | | (In Millions) | |
|---|---|---|---|
| | Pre-tax Amount | Tax Benefit (Provision) | After-tax Amount |
| **As of December 31, 2014:** | | | |
| Postretirement benefit liability | $ (425.3) | $ 134.2 | $ (291.1) |
| Foreign currency translation adjustments | 64.4 | — | 64.4 |
| Unrealized net loss on derivative financial instruments | (25.9) | 7.8 | (18.1) |
| Unrealized gain (loss) on securities | (1.3) | 0.3 | (1.0) |
| | $ (388.1) | $ 142.3 | $ (245.8) |
| **As of December 31, 2015:** | | | |
| Postretirement benefit liability | $ (364.8) | $ 123.4 | $ (241.4) |
| Foreign currency translation adjustments | 220.7 | — | 220.7 |
| Unrealized net gain on derivative financial instruments | 2.2 | 0.4 | 2.6 |
| Unrealized gain on securities | 0.1 | — | 0.1 |
| | $ (141.8) | $ 123.8 | $ (18.0) |
| **As of December 31, 2016:** | | | |
| **Postretirement benefit liability** | $ (384.0) | $ 123.4 | $ (260.6) |
| **Foreign currency translation adjustments** | 239.3 | | 239.3 |
| | $ (144.7) | $ 123.4 | $ (21.3) |

146

The following tables reflect the changes in *Accumulated other comprehensive loss* related to Cliffs shareholders' equity for December 31, 2016, 2015 and 2014:

| | Postretirement Benefit Liability, net of tax | Unrealized Net Gain (Loss) on Securities, net of tax | Unrealized Net Gain (Loss) on Foreign Currency Translation | Net Unrealized Gain (Loss) on Derivative Financial Instruments, net of tax | Accumulated Other Comprehensive Income (Loss) |
|---|---|---|---|---|---|
| | | | (In Millions) | | |
| Balance December 31, 2015 | $ (241.4) | $ 0.1 | $ 220.7 | $ 2.6 | $ (18.0) |
| Other comprehensive income (loss) before reclassifications | (44.8) | (0.1) | 18.4 | (3.3) | (29.8) |
| Net loss reclassified from accumulated other comprehensive income (loss) | 25.6 | — | 0.2 | 0.7 | 26.5 |
| Balance December 31, 2016 | $ (260.6) | $ — | $ 239.3 | $ — | $ (21.3) |

| | Postretirement Benefit Liability, net of tax | Unrealized Net Gain (Loss) on Securities, net of tax | Unrealized Net Gain (Loss) on Foreign Currency Translation | Net Unrealized Gain (Loss) on Derivative Financial Instruments, net of tax | Accumulated Other Comprehensive Income (Loss) |
|---|---|---|---|---|---|
| | | | (In Millions) | | |
| Balance December 31, 2014 | $ (291.1) | $ (1.0) | $ 64.4 | $ (18.1) | $ (245.8) |
| Other comprehensive income (loss) before reclassifications | 9.1 | 5.4 | (26.4) | 1.9 | (10.0) |
| Net loss (gain) reclassified from accumulated other comprehensive income (loss) | 40.6 | (4.3) | 182.7 | 18.8 | 237.8 |
| Balance December 31, 2015 | $ (241.4) | $ 0.1 | $ 220.7 | $ 2.6 | $ (18.0) |

| | Postretirement Benefit Liability, net of tax | Unrealized Net Gain (Loss) on Securities, net of tax | Unrealized Net Gain (Loss) on Foreign Currency Translation | Net Unrealized Gain (Loss) on Derivative Financial Instruments, net of tax | Accumulated Other Comprehensive Income (Loss) |
|---|---|---|---|---|---|
| | | | (In Millions) | | |
| Balance December 31, 2013 | $ (204.9) | $ 6.2 | $ 106.7 | $ (20.9) | $ (112.9) |
| Other comprehensive income (loss) before reclassifications | (97.0) | 1.3 | (42.3) | (28.2) | (166.2) |
| Net loss (gain) reclassified from accumulated other comprehensive income (loss) | 10.8 | (8.5) | — | 31.0 | 33.3 |
| Balance December 31, 2014 | $ (291.1) | $ (1.0) | $ 64.4 | $ (18.1) | $ (245.8) |

147

A005228

The following table reflects the details about *Accumulated other comprehensive loss* components related to Cliffs shareholders' equity for the years ended December 31, 2016, 2015 and 2014:

| Details about Accumulated Other Comprehensive Income (Loss) Components | Amount of (Gain)/Loss Reclassified into Income (In Millions) | | | Affected Line Item in the Statement of Consolidated Operations |
|---|---|---|---|---|
| | Year Ended December 31, 2016 | Year Ended December 31, 2015 | Year Ended December 31, 2014 | |
| **Amortization of Pension and Postretirement Benefit Liability:** | | | | |
| Prior service costs[1] | $ (1.5) | $ (1.4) | $ (1.1) | |
| Net actuarial loss[1] | 27.1 | 27.4 | 18.5 | |
| Curtailments/Settlements[1] | — | 0.2 | 1.4 | |
| Effect of deconsolidation[2] | — | 15.1 | — | *Loss from Discontinued Operations, net of tax* |
| | 25.6 | 41.3 | 18.8 | Total before taxes |
| | — | (0.7) | (5.8) | *Income tax benefit (expense)* |
| | $ 25.6 | $ 40.6 | $ 13.0 | Net of taxes |
| | | | | |
| **Unrealized loss on marketable securities:** | | | | |
| Sale of marketable securities | $ — | $ (2.6) | $ (11.4) | *Other non-operating income (expense)* |
| Impairment | — | (2.0) | (0.5) | *Other non-operating income (expense)* |
| | — | (4.6) | (11.9) | Total before taxes |
| | — | 0.3 | 3.4 | *Income tax benefit (expense)* |
| | $ — | $ (4.3) | $ (8.5) | Net of taxes |
| | | | | |
| **Unrealized gain on foreign currency translation:** | | | | |
| Dissolution of entity | $ 0.2 | $ — | $ — | *Other non-operating income (expense)* |
| Effect of deconsolidation[3] | — | 182.7 | — | *Loss from Discontinued Operations, net of tax* |
| | $ 0.2 | $ 182.7 | $ — | Net of taxes |
| | | | | |
| **Unrealized gain on derivative financial instruments:** | | | | |
| Treasury lock | $ 1.2 | $ — | $ — | *Gain on extinguishment/restructuring of debt* |
| Australian dollar foreign exchange contracts | — | 26.9 | 18.9 | *Product revenues* |
| Canadian dollar foreign exchange contracts | — | — | 26.7 | *Cost of goods sold and operating expenses* |
| | 1.2 | 26.9 | 45.6 | Total before taxes |
| | (0.5) | (8.1) | (14.6) | *Income tax benefit (expense)* |
| | $ 0.7 | $ 18.8 | $ 31.0 | Net of taxes |
| | | | | |
| **Total Reclassifications for the Period** | $ 26.5 | $ 237.8 | $ 35.5 | |

[1] These accumulated other comprehensive income components are included in the computation of net periodic benefit cost. See NOTE 7 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS for further information.

[2] Represents Canadian postretirement benefit liabilities that were deconsolidated. See NOTE 14 - DISCONTINUED OPERATIONS for further information.

[3] Represents Canadian accumulated currency translation adjustments that were deconsolidated. See NOTE 14 - DISCONTINUED OPERATIONS for further information.

A005229

**NOTE 17 - CASH FLOW INFORMATION**

A reconciliation of capital additions to cash paid for capital expenditures for the  years ended December 31, 2016, 2015 and 2014 is as follows:

| | (In Millions) | | |
|---|---|---|---|
| | Year Ended December 31, | | |
| | **2016** | 2015 | 2014 |
| Capital additions[1] | $ **68.5** | $ 96.7 | $ 235.5 |
| Cash paid for capital expenditures | **69.1** | 80.8 | 284.1 |
| Difference | $ **(0.6)** | $ 15.9 | $ (48.6) |
| Non-cash accruals | $ **(0.6)** | $ 14.4 | $ (58.5) |
| Capital leases | **—** | 1.5 | 9.9 |
| Total | $ **(0.6)** | $ 15.9 | $ (48.6) |

[1] Includes capital additions of $68.5 million related to continuing operations for the year ended December 31, 2016. Includes capital additions of $72.2 million and $24.5 million related to continuing operations and discontinued operations, respectively, for the year ended December 31, 2015. Includes capital additions of $65.5 million and $170.0 million related to continuing operations and discontinued operations, respectively, for the year ended December 31, 2014.

Cash payments for interest and income taxes in  2016, 2015 and 2014 are as follows:

| | (In Millions) | | |
|---|---|---|---|
| | **2016** | 2015 | 2014 |
| Taxes paid on income | $ **6.0** | $ 5.0 | $ 47.3 |
| Income tax refunds[1] | **5.4** | 211.4 | 54.7 |
| Interest paid on debt obligations[2] | **184.0** | 185.6 | 176.5 |

[1] Includes income tax refunds that relate to the deconsolidated Canadian Entities for the year ended December 31, 2014 of $47.8 million.

[2] Includes interest paid on the corporate guarantees of the equipment loans that relate to discontinued operations for the years ended December 31, 2016, 2015 and 2014 of $1.4 million, $4.8 million and $6.1 million, respectively.

**NOTE 18 - RELATED PARTIES**

Two of our four operating U.S. iron ore mines and our indefinitely-idled Empire mine are owned with various joint venture partners that are integrated steel producers or their subsidiaries. We are the manager of each of the mines we co-own and rely on our joint venture partners to make their required capital contributions and to pay for their share of the iron ore pellets that we produce. One or more of the joint venture partners are also our customers. The following is a summary of the mine ownership of these iron ore mines at December 31, 2016:

| Mine | Cliffs Natural Resources | ArcelorMittal | U.S. Steel |
|---|---|---|---|
| Empire | 79.0 % | 21.0 % | — |
| Tilden | 85.0 % | — | 15.0 % |
| Hibbing | 23.0 % | 62.3 % | 14.7 % |

ArcelorMittal has a unilateral right to put its interest in the Empire mine to us, but has not exercised this right to date. Furthermore, as part of a 2014 extension agreement between us and ArcelorMittal, which amended certain terms of the Empire partnership agreement, certain minimum distributions of the partners' equity amounts were required to be made on a quarterly basis beginning in the first quarter of 2015 and continued through January 2017.  The partnership dissolved on December 31, 2016 and the partners are in discussion regarding distribution of the remaining assets and/or equity interest, if any, in the partnership. During the year ended December 31, 2016, we recorded distributions of $57.5 million to ArcelorMittal under this agreement, of which  $48.8 million was paid as of  December 31, 2016. During

149

A005230

the year ended December 31, 2015, we recorded distributions of $51.7 million under this agreement, of which $40.6 million was paid as of December 31, 2015.

*Product revenues* from related parties were as follows:

| | (In Millions) | | |
| --- | --- | --- | --- |
| | Year Ended December 31, | | |
| | **2016** | 2015 | 2014 |
| Product revenues from related parties | $ **830.1** | $ 671.1 | $ 1,011.4 |
| Total product revenues | **1,913.5** | 1,832.4 | 3,095.2 |
| Related party product revenue as a percent of total product revenue | **43.4%** | 36.6% | 32.7% |

Amounts due from related parties recorded in *Accounts receivable, net* and *Other current assets,* including trade accounts receivable, a customer supply agreement and provisional pricing arrangements, were $73.8 million and $15.8 million at December 31, 2016 and 2015, respectively. Amounts due to related parties recorded in *Other current liabilities,* including provisional pricing arrangements and liabilities to related parties, were $8.7 million and $14.5 million at December 31, 2016 and 2015, respectively.

A supply agreement with one of our customers includes provisions for supplemental revenue or refunds based on the customer's annual steel pricing for the year the product is consumed in the customer's blast furnace. The supplemental pricing is characterized as a freestanding derivative. Refer to NOTE 13 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES for further information.

150

Table of Contents

**NOTE 19 - EARNINGS PER SHARE**

The following table summarizes the computation of basic and diluted earnings per share attributable to Cliffs shareholders:

| | (In Millions, Except Per Share Amounts) | | | | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | | | |
| | **2016** | | 2015 | | 2014 | |
| Income from Continuing Operations | $ | **219.2** | $ | 143.7 | $ | 56.4 |
| Income from Continuing Operations Attributable to Noncontrolling Interest | | **(25.2)** | | (8.6) | | (25.9) |
| Net Income from Continuing Operations attributable to Cliffs shareholders | $ | **194.0** | $ | 135.1 | $ | 30.5 |
| Loss from Discontinued Operations, net of tax | | **(19.9)** | | (884.4) | | (7,254.7) |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | $ | **174.1** | $ | (749.3) | $ | (7,224.2) |
| PREFERRED STOCK DIVIDENDS | | **—** | | (38.4) | | (51.2) |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS COMMON SHAREHOLDERS | $ | **174.1** | $ | (787.7) | $ | (7,275.4) |
| Weighted Average Number of Shares: | | | | | | |
| Basic | | **197.7** | | 153.2 | | 153.1 |
| Employee Stock Plans | | **2.4** | | 0.4 | | — |
| Diluted | | **200.1** | | 153.6 | | 153.1 |
| Earnings (loss) per Common Share Attributable to Cliffs Common Shareholders - Basic: | | | | | | |
| Continuing operations | $ | **0.98** | $ | 0.63 | $ | (0.14) |
| Discontinued operations | | **(0.10)** | | (5.77) | | (47.38) |
| | $ | **0.88** | $ | (5.14) | $ | (47.52) |
| Earnings (loss) per Common Share Attributable to Cliffs Common Shareholders - Diluted: | | | | | | |
| Continuing operations | $ | **0.97** | $ | 0.63 | $ | (0.14) |
| Discontinued operations | | **(0.10)** | | (5.76) | | (47.38) |
| | $ | **0.87** | $ | (5.13) | $ | (47.52) |

The diluted earnings per share calculation excludes 25.3 million and 25.2 million depositary shares that were anti-dilutive for the year ended December 31, 2015 and 2014, respectively. Additionally, the diluted earnings per share calculation also excludes 0.7 million of equity plan awards that were anti-dilutive for the year ended December 31, 2014.

**NOTE 20 - COMMITMENTS AND CONTINGENCIES**

**Contingencies**

*Litigation*

We are currently a party to various claims and legal proceedings incidental to our operations. If management believes that a loss arising from these matters is probable and can reasonably be estimated, we record the amount of the loss, or the minimum estimated liability when the loss is estimated using a range, and no point within the range is more probable than another. As additional information becomes available, any potential liability related to these matters is assessed and the estimates are revised, if necessary. Based on currently available information, management believes that the ultimate outcome of these matters, individually and in the aggregate, will not have a material effect on our financial position, results of operations or cash flows. However, litigation is subject to inherent uncertainties, and unfavorable rulings could occur. An unfavorable ruling could include monetary damages, additional funding requirements or an injunction. If an unfavorable ruling were to occur, there exists the possibility of a material impact on the financial position and results of operations of the period in which the ruling occurs, or future periods. However, we do not believe that any pending litigation, not covered by insurance, will result in a material liability in relation to our consolidated financial statements .

*Michigan Electricity Matters.* On February 19, 2015, in connection with various proceedings before FERC with respect to certain cost allocations for continued operation of the Presque Isle Power Plant in Marquette, Michigan, FERC issued an order directing MISO to submit a revised methodology for allocating SSR costs that identified the load serving entities that require the operation of SSR units at the power plant for reliability purposes. On September 17, 2015, FERC issued an order conditionally approving MISO's revised allocation methodology. On September 22, 2016, FERC denied requests for rehearing of the February 19 order, rejecting arguments that FERC did not have the authority to order refunds in a cost allocation case and to impose retroactive surcharges to effectuate such refunds. FERC, however, suspended any refunds and surcharges pending its review of a July 25, 2016 ALJ initial decision on the appropriate amount of SSR compensation. Should FERC award SSR costs based on retroactive surcharges and the amount of SSR compensation not be adjusted, our current estimate of the potential liability to the Empire and Tilden mines is approximately $13.6 million, based on MISO's June 14, 2016 refund report (as revised in MISO's July 20, 2016 errata refund report) for the Escanaba, White Pine and Presque Isle SSRs. As of December 31, 2016, this potential liability of $13.6 million is included in our Statements of Consolidated Financial Position as part of *Other current liabilities*. On November 8, 2016, Tilden and Empire, along with various Michigan-aligned parties, filed petitions for review of FERC's order regarding allocation and non-cost SSR issues with the U.S. Court of Appeals for the D.C. Circuit. We will continue to vigorously challenge both the amount of the SSR compensation and the imposition of any SSR costs before FERC and the U.S. Court of Appeals for the D.C. Circuit.

*Environmental Matters*

We had environmental liabilities of $2.8 million and $3.6 million at December 31, 2016 and 2015, respectively, including obligations for known environmental remediation exposures at active and closed mining operations and other sites. These amounts have been recognized based on the estimated cost of investigation and remediation at each site, and include site studies, design and implementation of remediation plans, legal and consulting fees, and post-remediation monitoring and related activities. If the cost can only be estimated as a range of possible amounts with no specific amount being more likely, the minimum of the range is accrued. Future expenditures are not discounted unless the amount and timing of the cash disbursements are readily known. Potential insurance recoveries have not been reflected. Additional environmental obligations could be incurred, the extent of which cannot be assessed. The amount of our ultimate liability with respect to these matters may be affected by several uncertainties, primarily the ultimate cost of required remediation and the extent to which other responsible parties contribute. Refer to NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS for further information.

*Tax Matters*

The calculation of our tax liabilities involves dealing with uncertainties in the application of complex tax regulations. We recognize liabilities for anticipated tax audit issues based on our estimate of whether, and the extent to which, additional taxes will be due. If we ultimately determine that payment of these amounts is unnecessary, we reverse the liability and recognize a tax benefit during the period in which we determine that the liability is no longer necessary. We also recognize tax benefits to the extent that it is more likely than not that our positions will be sustained when challenged by the taxing authorities. To the extent we prevail in matters for which liabilities have been established, or are required to pay amounts in excess of our liabilities, our effective tax rate in a given period could be materially affected. An unfavorable tax settlement would require use of our cash and result in an increase in our effective tax rate in the year of resolution. A favorable tax settlement would be recognized as a reduction in our effective tax rate in the year of resolution. Refer to NOTE 9 - INCOME TAXES for further information.

## NOTE 21 - SUBSEQUENT EVENTS

We have evaluated subsequent events through the date of financial issuance.

A005233

Table of Contents

**NOTE 22 - QUARTERLY RESULTS OF OPERATIONS (UNAUDITED)**

The sum of quarterly EPS may not equal EPS for the year due to discrete quarterly calculations.

| | | | (In Millions, Except Per Share Amounts) | | |
| --- | --- | --- | --- | --- | --- |
| | | | 2016 | | |
| | | | Quarters | | |
| | First | Second | Third | Fourth | Year |
| Revenues from product sales and services | $ 305.5 | $ 496.2 | $ 553.3 | $ 754.0 | $ 2,109.0 |
| Sales margin | 30.9 | 91.5 | 85.4 | 181.5 | 389.3 |
| Income (Loss) from Continuing Operations | $ 114.3 | $ 29.9 | $ (25.1) | $ 100.1 | $ 219.2 |
| Loss (Income) from Continuing Operations attributable to Noncontrolling Interest | (8.8) | (16.7) | 2.0 | (1.7) | (25.2) |
| Net Income (Loss) from Continuing Operations attributable to Cliffs shareholders | 105.5 | 13.2 | (23.1) | 98.4 | 194.0 |
| Income (Loss) from Discontinued Operations, net of tax | 2.5 | (0.4) | (2.7) | (19.3) | (19.9) |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS COMMON SHAREHOLDERS | $ 108.0 | $ 12.8 | $ (25.8) | $ 79.1 | $ 174.1 |
| Earnings (loss) per common share attributable to Cliffs common shareholders — Basic: | | | | | |
| Continuing Operations | $ 0.61 | $ 0.07 | $ (0.11) | $ 0.43 | $ 0.98 |
| Discontinued Operations | 0.01 | — | (0.01) | (0.08) | (0.10) |
| | $ 0.62 | $ 0.07 | $ (0.12) | $ 0.35 | $ 0.88 |
| Earnings (loss) per common share attributable to Cliffs common shareholders — Diluted: | | | | | |
| Continuing Operations | $ 0.61 | $ 0.07 | $ (0.11) | $ 0.42 | $ 0.97 |
| Discontinued Operations | 0.01 | — | (0.01) | (0.08) | (0.10) |
| | $ 0.62 | $ 0.07 | $ (0.12) | $ 0.34 | $ 0.87 |

The diluted earnings per share calculation for the third quarter of 2016 exclude equity plan awards of 3.0 million that were anti-dilutive. There was no anti-dilution in the first, second or fourth quarter of 2016.

| | First | Second | Third | Fourth | Year |
|---|---|---|---|---|---|
| | | (In Millions, Except Per Share Amounts) | | | |
| | | 2015 | | | |
| | | Quarters | | | |
| Revenues from product sales and services | $ 446.0 | $ 498.1 | $ 593.2 | $ 476.0 | $ 2,013.3 |
| Sales margin | 80.8 | 57.3 | 55.1 | 43.3 | 236.5 |
| Income (Loss) from Continuing Operations | $ 166.8 | $ (38.2) | $ 49.9 | $ (34.8) | $ 143.7 |
| Loss (Income) from Continuing Operations attributable to Noncontrolling Interest | 1.9 | (5.0) | 4.6 | (2.4) | (8.6) |
| Net Income (Loss) from Continuing Operations attributable to Cliffs shareholders | $ 168.7 | $ (43.2) | $ 54.5 | $ (37.2) | $ 135.1 |
| Income (Loss) from Discontinued Operations, net of tax | (928.5) | 103.4 | (43.9) | (23.1) | (884.4) |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | $ (759.8) | $ 60.2 | $ 10.6 | $ (60.3) | $ (749.3) |
| PREFERRED STOCK DIVIDENDS | (12.8) | — | (25.6) | — | (38.4) |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS COMMON SHAREHOLDERS | (772.6) | 60.2 | (15.0) | (60.3) | (787.7) |
| Earnings (loss) per common share attributable to Cliffs common shareholders — Basic: | | | | | |
| Continuing Operations | $ 1.02 | $ (0.28) | $ 0.19 | $ (0.24) | $ 0.63 |
| Discontinued Operations | (6.06) | 0.67 | (0.29) | (0.15) | (5.77) |
| | $ (5.04) | $ 0.39 | $ (0.10) | $ (0.39) | $ (5.14) |
| Earnings (loss) per common share attributable to Cliffs common shareholders — Diluted: | | | | | |
| Continuing Operations | $ 0.94 | $ (0.28) | $ 0.19 | $ (0.24) | $ 0.63 |
| Discontinued Operations | (5.20) | 0.67 | (0.29) | (0.15) | (5.76) |
| | $ (4.26) | $ 0.39 | $ (0.10) | $ (0.39) | $ (5.13) |

The diluted earnings per share calculation for the second, third and fourth quarter of 2015 exclude depositary shares that were anti-dilutive ranging between 25.2 million and 25.6 million and equity plan awards ranging between 0.1 million and 0.3 million that were anti-dilutive. There was no anti-dilution in the first quarter of 2015.

A005235

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Shareholders of
Cliffs Natural Resources Inc.
Cleveland, Ohio

We have audited the accompanying statements of consolidated financial position of Cliffs Natural Resources Inc. and subsidiaries (the "Company") as of December 31, 2016 and 2015, and the related statements of consolidated operations, comprehensive income (loss), cash flows, and changes in equity for each of the three years in the period ended December 31, 2016. Our audits also included the financial statement schedule listed in the Index at Item 15. These financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on the financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Cliffs Natural Resources Inc. and subsidiaries as of December 31, 2016 and 2015, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2016, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2016, based on the criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 9, 2017 expressed an unqualified opinion on the Company's internal control over financial reporting.

*/s/ DELOITTE & TOUCHE LLP*

Cleveland, Ohio
February 9, 2017

155

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Shareholders of
Cliffs Natural Resources Inc.
Cleveland, Ohio

We have audited the internal control over financial reporting of Cliffs Natural Resources Inc. and subsidiaries (the "Company") as of December 31, 2016, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying *Management's Report on Internal Control Over Financial Reporting.* Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2016, based on the criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements and financial statement schedule as of and for the year ended December 31, 2016 of the Company and our report dated February 9, 2017 expressed an unqualified opinion on those financial statements and financial statement schedule.

*/s/ DELOITTE & TOUCHE LLP*

Cleveland, Ohio
February 9, 2017

156

Table of Contents

**Item 9.**         *Changes in and Disagreements With Accountants on Accounting and Financial Disclosure*

    *None.*

**Item 9A.**         *Controls and Procedures*

    We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our President and Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure based solely on the definition of "disclosure controls and procedures" in Rule 13a-15(e) promulgated under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

    As of the end of the period covered by this report, we carried out an evaluation under the supervision and with the participation of our management, including our President and Chief Executive Officer and our Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures. Based on the foregoing, our President and Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective.

**Management's Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as such term is defined under Rule 13a-15(f) promulgated under the Exchange Act.

Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Company's consolidated financial statements for external purposes in accordance with generally accepted accounting principles.

Internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit the preparation of the consolidated financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with appropriate authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the consolidated financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management conducted an assessment of the Company's internal control over financial reporting as of  December 31, 2016 using the framework specified in *Internal Control - Integrated Framework* (2013), published by the Committee of Sponsoring Organizations of the Treadway Commission. Based on such assessment, management has concluded that the Company's internal control over financial reporting was effective as of December 31, 2016.

The effectiveness of the Company's internal control over financial reporting as of  December 31, 2016 has been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report that appears herein.

February 9, 2017

**Changes in Internal Control Over Financial Reporting**

There have been no changes in our internal control over financial reporting or in other factors that occurred during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B.**      *Other Information*

*None.*

158

Table of Contents

**PART III**

**Item 10.**      ***Directors, Executive Officers and Corporate Governance***

The information required to be furnished by this Item will be set forth in our definitive proxy statement for the 2017 Annual Meeting of Shareholders (the "Proxy Statement") under the headings "Board Meetings and Committees - Audit Committee", "Business Ethics Policy", "Independence and Related Party Transactions", "Information Concerning Director Nominees" and "Section 16(a) Beneficial Ownership Reporting Compliance", and is incorporated herein by reference and made a part hereof from the Proxy Statement. The information regarding executive officers required by this Item is set forth in *Part I - Item 1. Business* hereof under the heading "Executive Officers of the Registrant", which information is incorporated herein by reference and made a part hereof.

**Item 11.**      ***Executive Compensation***

The information required to be furnished by this Item will be set forth in our Proxy Statement under the headings "Director Compensation", "Compensation Committee Report", "Compensation Committee Interlocks and Insider Participation" and "Executive Compensation" and is incorporated herein by reference and made a part hereof from the Proxy Statement.

**Item 12.**      ***Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters***

The information required to be furnished by this Item regarding "Securities Authorized for Issuance Under Equity Compensation Plans", "Related Stockholder Matters" and "Security Ownership" will be set forth in the Proxy Statement under the headings "Independence and Related Party Transactions", "Ownership of Equity Securities of the Company" and "Equity Compensation Plan Information", respectively, and is incorporated herein by reference and made part hereof from the Proxy Statement.

**Item 13.**      ***Certain Relationships and Related Transactions, and Director Independence***

The information required to be furnished by this Item will be set forth in the Proxy Statement under the heading "Independence and Related Party Transactions" and is incorporated herein by reference and made a part hereof from the Proxy Statement.

**Item 14.**      ***Principal Accountant Fees and Services***

The information required to be furnished by this Item will be set forth in the Proxy Statement under the heading "Ratification of Independent Registered Public Accounting Firm" and is incorporated herein by reference and made a part hereof from the Proxy Statement.

159

Table of Contents

**PART IV**

**Item 15.**     ***Exhibits and Financial Statement Schedules***

(a)(1) and (2) - List of Financial Statements and Financial Statement Schedules.

The following consolidated financial statements of Cliffs Natural Resources Inc. are included at  *Item 8. Financial Statements and Supplementary Data* above:

- Statements of Consolidated Financial Position -  December 31, 2016 and 2015

- Statements of Consolidated Operations - Years ended  December 31, 2016, 2015 and 2014

- Statements of Consolidated Comprehensive Income (Loss) - Years ended  December 31, 2016, 2015 and 2014

- Statements of Consolidated Cash Flows - Years ended  December 31, 2016, 2015 and 2014

- Statements of Consolidated Changes in Equity - Years ended  December 31, 2016, 2015 and 2014

- Notes to Consolidated Financial Statements

The following consolidated financial statement schedule of Cliffs Natural Resources Inc. is included herein in Item 15(d) and attached as Exhibit 99(a):

Schedule II - Valuation and Qualifying Accounts

All other schedules for which provision is made in the applicable accounting regulation of the SEC are not required under the related instructions or are inapplicable, and therefore have been omitted.

(3) List of Exhibits - Refer to Exhibit Index on pages 162 - 167, which is incorporated herein by reference.

(c) Exhibits listed in Item 15(a)(3) above are incorporated herein by reference.

(d) The schedule listed above in Item 15(a)(1) and (2) is attached as Exhibit 99(a) and incorporated herein by reference.

160

Table of Contents

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

CLIFFS NATURAL RESOURCES INC.

By:   /s/ Timothy K. Flanagan
      Name:    Timothy K. Flanagan
      Title:     Executive Vice President, Chief Financial Officer &
                  Treasurer

Date:  February 9, 2017

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signatures | Title | Date |
|---|---|---|
| /s/ C. L. Goncalves<br>C. L. Goncalves | Chairman, President and<br>Chief Executive Officer<br>(Principal Executive Officer) | February 9, 2017 |
| /s/ T. K. Flanagan<br>T. K. Flanagan | Executive Vice President,<br>Chief Financial Officer & Treasurer<br>(Principal Financial Officer and<br>Principal Accounting Officer) | February 9, 2017 |
| *<br>J. T. Baldwin | Director | February 9, 2017 |
| *<br>R. P. Fisher, Jr. | Director | February 9, 2017 |
| *<br>S. M. Green | Director | February 9, 2017 |
| *<br>J. A. Rutkowski, Jr. | Director | February 9, 2017 |
| *<br>E. M. Rychel | Director | February 9, 2017 |
| *<br>J. S. Sawyer | Director | February 9, 2017 |
| *<br>M. D. Siegal | Director | February 9, 2017 |
| *<br>G. Stoliar | Director | February 9, 2017 |
| *<br>D. C. Taylor | Director | February 9, 2017 |

* The undersigned, by signing his name hereto, does sign and execute this Annual Report on Form 10-K pursuant to a Power of Attorney executed on behalf of the above-indicated officers and directors of the registrant and filed herewith as Exhibit 24 on behalf of the registrant.

By:  /s/ T. K. Flanagan
      (T. K. Flanagan, as Attorney-in-Fact)

161

Table of Contents

## EXHIBIT INDEX

All documents referenced below have been filed pursuant to the Securities Exchange Act of 1934 by Cliffs   Natural Resources Inc., file number 1-09844, unless otherwise indicated.

| Exhibit Number | Exhibit |
|---|---|
| | **Plan of purchase, sale, reorganization, arrangement, liquidation or succession** |
| 2.1 | ***Asset Purchase Agreement, dated as of December 2, 2014, by and among Cliffs Natural Resources Inc., Cliffs Logan County Coal LLC, Toney's Fork Land, LLC, Southern Eagle Land, LLC and Cliffs Logan County Coal Terminals LLC and Coronado Coal II, LLC (filed as Exhibit 2.1 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 2.2 | ***Amendment to Asset Purchase Agreement, effective as of December 31, 2014, by and among Cliffs Natural Resources Inc., Cliffs Logan County Coal LLC, Toney's Fork Land, LLC, Southern Eagle Land, LLC and Cliffs Logan County Coal Terminals LLC and Coronado Coal II, LLC (filed as Exhibit 2.2 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 2.3 | ***Unit Purchase Agreement, dated as of December 22, 2015, by and among Cliffs Natural Resources Inc., CLF PinnOak LLC and Seneca Coal Resources, LLC (filed as Exhibit 2.3 to Cliffs' Form 10-K for the period ended December 31, 2015 and incorporated herein by reference) |
| | **Articles of Incorporation and By-Laws of Cliffs Natural Resources Inc.** |
| 3.1 | Third Amended Articles of Incorporation of Cliffs (as filed with the Secretary of State of the State of Ohio on May 13, 2013 (filed as Exhibit 3.1 to Cliffs' Form 8-K on May 13, 2013 and incorporated herein by reference) |
| 3.2 | Regulations of Cleveland-Cliffs Inc (filed as Exhibit 3.2 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| | **Instruments defining rights of security holders, including indentures** |
| 4.1 | Indenture between Cliffs Natural Resources Inc. and U.S. Bank National Association, as trustee, dated March 17, 2010 (filed as Exhibit 4.3 to Cliffs' Registration Statement on Form S-3 No. 333-186617 on February 12, 2013 and incorporated herein by reference) |
| 4.2 | Form of 5.90% Notes due 2020 First Supplemental Indenture between Cliffs Natural Resources Inc. and U.S. Bank National Association, as trustee, dated March 17, 2010, including Form of 5.90% Notes due 2020 (filed as Exhibit 4.2 to Cliffs' Form 8-K on March 16, 2010 and incorporated herein by reference) |
| 4.3 | Form of 4.80% Notes due 2020 Second Supplemental Indenture between Cliffs Natural Resources Inc. and U.S. Bank National Association, as trustee, dated September 20, 2010, including Form of 4.80% Notes due 2020 (filed as Exhibit 4.3 to Cliffs' Form 8-K on September 17, 2010 and incorporated herein by reference) |
| 4.4 | Form of 6.25% Notes due 2040 Third Supplemental Indenture between Cliffs Natural Resources Inc. and U.S. Bank National Association, as trustee, dated September 20, 2010, including Form of 6.25% Notes due 2040 (filed as Exhibit 4.4 to Cliffs' Form 8-K on September 17, 2010 and incorporated herein by reference) |
| 4.5 | Form of 4.875% Notes due 2021 Fourth Supplemental Indenture between Cliffs and U.S. Bank National Association, as trustee, dated March 23, 2011, including Form of 4.875% Notes due 2021 (filed as Exhibit 4.1 to Cliffs' Form 8-K on March 23, 2011 and incorporated herein by reference) |
| 4.6 | Fifth Supplemental Indenture between Cliffs and U.S. Bank National Association, as trustee, dated March 23, 2011 (filed as Exhibit 4(b) to Cliffs' Form 10-Q for the period ended June 30, 2011 and incorporated herein by reference) |
| 4.7 | Form of 3.95% Notes due 2018 Sixth Supplemental Indenture between Cliffs and U.S. Bank National Association, as trustee, dated December 13, 2012, including form of 3.95% Notes due 2018 (filed as Exhibit 4.1 to Cliffs' Form 8-K on December 13, 2012 and incorporated herein by reference) |
| 4.8 | Indenture between Cliffs Natural Resources Inc., the guarantors parties thereto, and U.S. Bank National Association, as trustee and notes collateral agent, dated March 30, 2015, including Form of 8.250% Senior Secured Notes due 2020 (filed as Exhibit 4.1 to Cliffs' Form 10-Q for the period ended March 31, 2015 and incorporated herein by reference) |
| 4.9 | Indenture between Cliffs Natural Resources Inc., the guarantors parties thereto, and U.S. Bank National Association, as trustee and notes collateral agent, dated March 30, 2015, including Form of 7.75% Second Lien Senior Secured Notes due 2020 (filed as Exhibit 4.2 to Cliffs' Form 10-Q for the period ended March 31, 2015 and incorporated herein by reference) |
| 4.10 | Indenture between Cliffs Natural Resources Inc., the guarantors parties thereto, and U.S. Bank National Association, as trustee and notes collateral agent, dated March 2, 2016, including Form of 8.00% 1.5 Lien Senior Secured Notes due 2020 (filed as Exhibit 4.1 to Cliffs' Form 10-Q for the period ended March 31, 2016 and incorporated herein by reference) |
| 4.11 | Form of Common Share Certificate (filed as Exhibit 4.1 to Cliffs' Form 10-Q for the period ended September 30, 2014 and incorporated herein by reference) |

Table of Contents

**Material contracts**

| | |
|---|---|
| 10.1 | * Form of Change in Control Severance Agreement (covering newly hired officers) (filed as Exhibit 10.4 to Cliffs' Form 8-K/A on September 16, 2014 and incorporated herein by reference) |
| 10.2 | * Form of 2016 Change in Control Severance Agreement (filed as Exhibit 10.1 to Cliffs' 10-Q for the period ended September 30, 2016 and incorporated herein by reference) |
| 10.3 | * Cliffs Natural Resources Inc. 2012 Non-Qualified Deferred Compensation Plan (effective January 1, 2012) dated November 8, 2011 (filed as Exhibit 10.1 to Cliffs' Form 8-K on November 8, 2011 and incorporated herein by reference) |
| 10.4 | * Form of Indemnification Agreement between Cliffs Natural Resources Inc. and Directors (filed as Exhibit 10.5 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.5 | * Cliffs Natural Resources Inc. Nonemployee Directors' Compensation Plan (Amended and Restated as of December 31, 2008) (filed as Exhibit 10(nnn) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.6 | * Cliffs Natural Resources Inc. Amended and Restated 2014 Nonemployee Directors' Compensation Plan (filed as Exhibit 10.1 to Cliffs' Form 8-K on May 2, 2016 and incorporated herein by reference) |
| 10.7 | * Trust Agreement No. 1 (Amended and Restated effective June 1, 1997), dated June 12, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to the Cleveland-Cliffs Inc Supplemental Retirement Benefit Plan, Severance Pay Plan for Key Employees and certain executive agreements (filed as Exhibit 10.10 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.8 | * Trust Agreement No. 1 Amendments to Exhibits, effective as of January 1, 2000, by and between Cleveland-Cliffs Inc and KeyBank National Association, as Trustee (filed as Exhibit 10.11 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.9 | * First Amendment to Trust Agreement No. 1, effective September 10, 2002, by and between Cleveland-Cliffs Inc and KeyBank National Association, as Trustee (filed as Exhibit 10.12 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.10 | * Second Amendment to Trust Agreement No. 1 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(y) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.11 | * Third Amendment to Trust Agreement No. 1 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as July 28, 2014 (filed as Exhibit 10.15 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.12 | * Amended and Restated Trust Agreement No. 2, effective as of October 15, 2002, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to Executive Agreements and Indemnification Agreements with the Company's Directors and certain Officers, the Company's Severance Pay Plan for Key Employees, and the Retention Plan for Salaried Employees (filed as Exhibit 10.14 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.13 | * Second Amendment to Amended and Restated Trust Agreement No. 2 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(aa) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.14 | * Third Amendment to Amended and Restated Trust Agreement No. 2 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.18 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.15 | * Trust Agreement No. 5, dated as of October 28, 1987, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to certain deferred compensation agreements (filed as Exhibit 10.16 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.16 | * First Amendment to Trust Agreement No. 5, dated as of May 12, 1989, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.17 to Form 10-K of Cliffs' for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.17 | * Second Amendment to Trust Agreement No. 5, dated as of April 9, 1991, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.18 to Form 10-K of Cliffs' for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.18 | * Third Amendment to Trust Agreement No. 5, dated as of March 9, 1992, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.19 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.19 | * Fourth Amendment to Trust Agreement No. 5, dated November 18, 1994, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.20 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |

163

A005244

Table of Contents

| 10.20 | * Fifth Amendment to Trust Agreement No. 5, dated May 23, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.19 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.21 | *Sixth Amendment to Trust Agreement No. 5 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(hh) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.22 | *Seventh Amendment to Trust Agreement No. 5 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.26 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.23 | * Trust Agreement No. 7, dated as of April 9, 1991, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to the Cleveland-Cliffs Inc Supplemental Retirement Benefit Plan (filed as Exhibit 10.23 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.24 | * First Amendment to Trust Agreement No. 7, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, dated as of March 9, 1992 (filed as Exhibit 10.24 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.25 | * Second Amendment to Trust Agreement No. 7, dated November 18, 1994, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.25 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.26 | * Third Amendment to Trust Agreement No. 7, dated May 23, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.26 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.27 | * Fourth Amendment to Trust Agreement No. 7, dated July 15, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.27 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.28 | * Amendment to Exhibits to Trust Agreement No. 7, effective as of January 1, 2000, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.28 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.29 | * Sixth Amendment to Trust Agreement No. 7 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(oo) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.30 | * Seventh Amendment to Trust Agreement No. 7 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.34 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.31 | * Trust Agreement No. 10, dated as of November 20, 1996, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to the Cleveland-Cliffs Inc Nonemployee Directors' Compensation Plan (filed as Exhibit 10.36 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.32 | *First Amendment to Trust Agreement No. 10 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(ww) to Cliffs' Form 10-K for the period ended February 26, 2009 and incorporated herein by reference) |
| 10.33 | * Second Amendment to Trust Agreement No. 10 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.45 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.34 | * Letter Agreement, by and between Lourenco Goncalves and Cliffs Natural Resources Inc., signed as of September 11, 2014 (filed as Exhibit 10.1 to Cliffs' Form 8-K/A on September 16, 2014 and incorporated herein by reference) |
| 10.35 | * Cleveland-Cliffs Inc and Subsidiaries Management Performance Incentive Plan Summary, effective January 1, 2004 (filed as Exhibit 10.47 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.36 | * Cliffs Natural Resources Inc. 2012 Executive Management Performance Incentive Plan effective March 13, 2012 (filed as Exhibit 10.3 to Cliffs' Form 8-K on May 14, 2012 and incorporated herein by reference) |
| 10.37 | * Cliffs Natural Resources Inc. 2012 Incentive Equity Plan effective March 13, 2012 (filed as Exhibit 10.1 to Cliffs Form 8-K on May 14, 2012 and incorporated herein by reference) |

164

Table of Contents

| 10.38 | * First Amendment to Cliffs Natural Resources Inc. 2012 Incentive Plan effective September 11, 2012 (filed as Exhibit 10.2 to Cliffs' Form 10-Q for the period ended September 30, 2012 and incorporated herein by reference) |
| 10.39 | * Form of Cliffs Natural Resources Inc. Restricted Share Unit Award Memorandum and Restricted Share Unit Award Agreement under the 2012 Incentive Equity Plan (filed as Exhibit 10.77 to Cliffs' Form 10-K for the period ended December 31, 2013 and incorporated herein by reference) |
| 10.40 | * Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan (filed as Exhibit 10.1 to Cliffs' Form 8-K on August 4, 2014 and incorporated herein by reference) |
| 10.41 | * Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Restricted Share Unit Award Memorandum (Graduated Vesting 50% - July 2014 Grant) and Restricted Share Unit Award Agreement (filed as Exhibit 10.64 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.42 | * Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Restricted Share Unit Award Memorandum (3-Year Vesting – July 2014 Grant) and Restricted Share Unit Award Agreement (filed as Exhibit 10.65 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.43 | * Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Performance Share Award Memorandum (3-Year Vesting – July 2014 Grant) and Performance Share Award Agreement (filed as Exhibit 10.66 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.44 | * Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Non-Qualified Stock Option Award Memorandum (2014 Grant) and Stock Option Award Agreement (filed as Exhibit 10.2 to Cliffs' Form 8-K/A on September 16, 2014 and incorporated herein by reference) |
| 10.45 | * Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Performance Unit Award Memorandum (2014 Grant) and Performance Unit Award Agreement (filed as Exhibit 10.3 to Cliffs' Form 8-K/A on September 16, 2014 and incorporated herein by reference) |
| 10.46 | * Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Non-Qualified Stock Option Award Memorandum (3-Year Vesting – January 2015 Grant) and Stock Option Award Agreement (filed as Exhibit 10.69 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.47 | * Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Restricted Share Unit Award Memorandum (Graduated Vesting 33% - January 2015 Grant) and Restricted Share Unit Award Agreement (filed as Exhibit 10.70 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.48 | * Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Performance Share Award Memorandum (3-Year Vesting – January 2015 Grant) and Performance Share Award Agreement (filed as Exhibit 10.71 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.49 | * Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Restricted Share Unit Award Memorandum (Graduated Vesting 33% - February 2015 Grant) and Restricted Share Unit Award Agreement (filed as Exhibit 10.72 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.50 | * Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Performance Share Award Memorandum (3 year Vesting – February 2015 Grant) and Restricted Share Unit Award Agreement (filed as Exhibit 10.73 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.51 | * Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan (filed as Exhibit 10.1 to Cliffs' Form 8-K on May 21, 2015 and incorporated herein by reference) |
| 10.52 | * Form of Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan Restricted Stock Unit Award Memorandum (Vesting on December 15, 2017) and Restricted Stock Unit Award Agreement (filed as Exhibit 10.1 to Cliffs' Form 10-Q for the period ended September 30, 2015 and incorporated herein by reference) |
| 10.53 | * Form of Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan Cash Retention Award Memorandum (Vesting February 2017) and Cash Retention Award Agreement (filed as Exhibit 10.2 to Cliffs' Form 10-Q for the period ended September 30, 2015 and incorporated herein by reference) |
| 10.54 | * Form of Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan Restricted Stock Unit Award Memorandum (Vesting May 2018) and Restricted Stock Unit Award Agreement (filed as Exhibit 10.61 to Cliffs' Form 10-K for the period ended December 31, 2015 and incorporated herein by reference) |
| 10.55 | * Form of Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan Restricted Stock Unit Award Memorandum (Vesting December 31, 2018) and Restricted Stock Unit Award Agreement (filed as Exhibit 10.1 to Cliffs' Form 10-Q for the period ended March 31, 2016 and incorporated herein by reference) |

Table of Contents

| 10.56 | * Form of Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan Cash Incentive Award Memorandum (TSR) (Vesting December 31, 2018) and Cash Incentive Award Agreement (TSR) (filed as Exhibit 10.2 to Cliffs' Form 10-Q for the period ended March 31, 2016 and incorporated herein by reference) |
| 10.57 | * Form of Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan Cash Incentive Award Memorandum (EBITDA) (January 1, 20XX - December 31, 20XX) and Cash Incentive Award Agreement (EBITDA) (filed as Exhibit 10.3 to Cliffs' Form 10-Q for the period ended March 31, 2016 and incorporated herein by reference) |
| 10.58 | * Cliffs Natural Resources Inc. Supplemental Retirement Benefit Plan (as Amended and Restated effective December 1, 2006) dated December 31, 2008 (filed as Exhibit 10(mmm) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.59 | * Cliffs Natural Resources Inc. 2015 Employee Stock Purchase Plan (filed as Exhibit 4.4 to Cliffs' Registration Statement on Form S-8 on August 20, 2015 and incorporated herein by reference) |
| 10.60 | ** Pellet Sale and Purchase Agreement, dated and effective as of April 10, 2002, by and among The Cleveland-Cliffs Iron Company, Cliffs Mining Company, Northshore Mining Company, Northshore Sales Company, International Steel Group Inc., ISG Cleveland Inc., and ISG Indiana Harbor Inc. (filed as Exhibit 10.84 to Cliffs' Form 10-K for the period ended December 31, 2013 and incorporated herein by reference) |
| 10.61 | ** First Amendment to Pellet Sale and Purchase Agreement, dated and effective December 16, 2004 by and among The Cleveland-Cliffs Iron Company, Cliffs Mining Company, Northshore Mining Company, Cliffs Sales Company (formerly known as Northshore Sales Company), International Steel Group Inc., ISG Cleveland Inc. and ISG Indiana Harbor (filed as Exhibit 10.85 to Cliffs' Form 10-K for the period ended December 31, 2013 and incorporated herein by reference) |
| 10.62 | ** 2011 Omnibus Agreement, dated as of April 8, 2011 and effective as of March 31, 2011, by and among ArcelorMittal USA LLC, as successor in interest to Ispat Inland Inc., ArcelorMittal Cleveland Inc. (formerly known as ISG Cleveland Inc.), ArcelorMittal Indiana Harbor LLC (formerly known as ISG Indiana Harbor Inc.) and Cliffs Natural Resources Inc., The Cleveland-Cliffs Iron Company, Cliffs Mining Company, Northshore Mining Company and Cliffs Sales Company (formerly known as Northshore Sales Company) (filed as Exhibit 10(a) to Cliffs' Form 10-Q for the period ended June 30, 2011 and incorporated herein by reference) |
| 10.63 | ** Pellet Sale and Purchase Agreement, effective as of October 31, 2016, by and among Cliffs Natural Resources Inc., The Cleveland-Cliffs Iron Company and Cliffs Mining Company and ArcelorMittal USA LLC (filed as Exhibit 10.72 to Cliffs' Registration Statement on Form S-1/A No. 333-212054 on August 4, 2016 and incorporated herein by reference) |
| 10.64 | Syndicated Facility Agreement, dated as of March 30, 2015, by and among Bank of America, N.A., as Administrative Agent and Australian Security Trustee, the Lenders that are Parties hereto, as the Lenders, Cliffs Natural Resources Inc., as Parent and a Borrower, and the Subsidiaries of Parent Party hereto, as Borrowers (filed as Exhibit 10.2 to Cliffs' Form 10-Q for the period ended March 31, 2015 and incorporated herein by reference) |
| 10.65 | First Amendment to Syndicated Facility Agreement, dated as of June 17, 2016, to that certain Syndicated Facility Agreement, dated as of March 30, 2015, by and among Bank of America, N.A., as Administrative Agent and Australian Security Trustee, the Lenders that are Parties hereto, as the Lenders, Cliffs Natural Resources Inc., as Parent and a Borrower, and the Subsidiaries of Parent Party hereto, as Borrowers (filed as Exhibit 10.3 to Cliffs' Form 10-Q for the period ended June 30, 2016 and incorporated herein by reference) |
| 12 | Ratio of Earnings To Combined Fixed Charges And Preferred Stock Dividend Requirements (filed herewith) |
| 21 | Subsidiaries of the Registrant (filed herewith) |
| 23 | Consent of Independent Registered Public Accounting Firm (filed herewith) |
| 24 | Power of Attorney (filed herewith) |
| 31.1 | Certification Pursuant to 15 U.S.C. Section 7241, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, signed and dated by Lourenco Goncalves as of February 9, 2017 (filed herewith) |
| 31.2 | Certification Pursuant to 15 U.S.C. Section 7241, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, signed and dated by Timothy K. Flanagan as of February 9, 2017 (filed herewith) |
| 32.1 | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed and dated by Lourenco Goncalves, Chairman, President and Chief Executive Officer of Cliffs Natural Resources Inc., as of February 9, 2017 (filed herewith) |
| 32.2 | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed and dated by Timothy K. Flanagan, Executive Vice President, Chief Financial Officer and Treasurer of Cliffs Natural Resources Inc., as of February 9, 2017 (filed herewith) |
| 95 | Mine Safety Disclosures (filed herewith) |
| 99(a) | Schedule II – Valuation and Qualifying Accounts (filed herewith) |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |

Table of Contents

| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

_____

\*       Indicates management contract or other compensatory arrangement.

\*\*      Confidential treatment requested and/or approved as to certain portions, which portions have been omitted and filed separately with the Securities and Exchange Commission.

\*\*\*     Certain immaterial schedules and exhibits to this exhibit have been omitted pursuant to the provisions of Regulation S-K, Item 601(b)(2). A copy of any of the omitted schedules and exhibits will be furnished to the Securities and Exchange Commission upon request.

167

<div align="right"><strong>Exhibit 12</strong></div>

**Ratio of Earnings To Combined Fixed Charges**
**And Preferred Stock Dividend Requirements**
**(In Millions)**

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2016** | 2015 | 2014 | 2013 | 2012 |
| Consolidated pretax income (loss) from continuing operations | $ **207.0** | $ 313.1 | $ (19.7) | $ 1,190.9 | $ 1,105.4 |
| Undistributed earnings of non-consolidated affiliates | — | (0.1) | (9.9) | (74.4) | (404.8) |
| Amortization of capitalized interest | **0.1** | 0.3 | 0.3 | 2.3 | 3.7 |
| Interest expense | **201.1** | 230.0 | 178.3 | 189.9 | 208.8 |
| Acceleration of debt issuance costs | **35.6** | 11.3 | 3.6 | — | 0.2 |
| Interest portion of rental expense | **0.3** | 0.9 | 2.3 | 2.1 | 2.8 |
| Total Earnings | $ **444.1** | $ 555.5 | $ 154.9 | $ 1,310.8 | $ 916.1 |
| Interest expense | $ **201.1** | $ 230.0 | $ 178.3 | $ 189.9 | $ 208.8 |
| Acceleration of debt issuance costs | **35.6** | 11.3 | 3.6 | — | 0.2 |
| Interest portion of rental expense | **0.3** | 0.9 | 2.3 | 2.1 | 2.8 |
| Preferred Stock dividend requirements | — | 38.4 | 51.2 | 48.7 | — |
| Fixed Charges Requirements | $ **237.0** | $ 280.6 | $ 235.4 | $ 240.7 | $ 211.8 |
| Fixed Charges and Preferred Stock Dividend Requirements | $ **237.0** | $ 280.6 | $ 235.4 | $ 240.7 | $ 211.8 |
| RATIO OF EARNINGS TO FIXED CHARGES | **1.9** | 2.0 | (A) | 5.4 | 4.3 |
| RATIO OF EARNINGS TO COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDEND REQUIREMENTS | **1.9** | 2.0 | (A) | 5.4 | 4.3 |

(A) For the year ended December 31, 2014, there was a deficiency of earnings to cover the fixed charges of $235.4 million.

Exhibit 21

**SIGNIFICANT SUBSIDIARIES**
**CLIFFS NATURAL RESOURCES INC. AS OF DECEMBER 31, 2016**

| Name | Cliffs' Effective Ownership | Place of Incorporation |
|---|---|---|
| Cleveland-Cliffs International Holding Company | 100% | Delaware, USA |
| Cliffs Finance US LLC | 100% | Ohio, USA |
| Cliffs Finance Lux SCS | 100% | Luxembourg |
| Cliffs (Gibraltar) Holdings Limited | 100% | Gibraltar |
| Cliffs (Gibraltar) Holdings Limited Luxembourg S.C.S. | 100% | Luxembourg |
| Cliffs (Gibraltar) Limited | 100% | Gibraltar |
| Cliffs Mining Company | 100% | Delaware, USA |
| Cliffs Minnesota Mining Company | 100% | Delaware, USA |
| Cliffs Natural Resources Pty Ltd. | 100% | WA Australia |
| Cliffs Natural Resources Holdings Pty Ltd. | 100% | WA Australia |
| Cliffs Natural Resources Luxembourg S.a.r.l | 100% | Luxembourg |
| Cliffs TIOP Holding, LLC | 100% | Delaware, USA |
| Cliffs TIOP, Inc. | 100% | Michigan, USA |
| Cliffs UTAC Holding LLC | 100% | Delaware, USA |
| The Cleveland-Cliffs Iron Company | 100% | Ohio, USA |
| Tilden Mining Company L.C. | 85% | Michigan, USA |
| Cliffs Empire, Inc. | 100% | Michigan, USA |
| Cliffs Empire Holding, LLC | 100% | Michigan, USA |
| Lake Superior & Ishpeming Railroad Company | 100% | Michigan, USA |
| Northshore Mining Company | 100% | Michigan, USA |

**Exhibit 23**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in:

Registration Statement No. 333-56661 on Form S-8 (as amended by Post-Effective Amendment No.1) pertaining to the Northshore Mining Company and Silver Bay Power Company Retirement Savings Plan and the related prospectus;

Registration Statement No. 333-64008 on Form S-8 (as amended by Post-Effective Amendment No.1 and Post-Effective Amendment No.2) pertaining to the Cliffs Natural Resources Inc. Nonemployee Directors' Compensation Plan (as amended and restated as of January 1, 2004);

Registration Statement No. 333-184620 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2012 Incentive Equity Plan;

Registration Statement No. 333-197687 on Form S-8 pertaining to the Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan;

Registration Statement No. 333-197688 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2014 Nonemployee Directors' Compensation Plan;

Registration Statement No. 333-204369 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan;

Registration Statement No. 333-206487 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2015 Employee Stock Purchase Plan; and

Registration Statement No. 333-210954 on Form S-8 pertaining to the Cliffs Natural Resources Inc. Amended and Restated 2014 Nonemployee Directors' Compensation Plan.

of our reports dated February 9, 2017, relating to the consolidated financial statements and financial statement schedule of Cliffs Natural Resources Inc., and the effectiveness of Cliffs Natural Resources Inc.'s internal control over financial reporting, appearing in this Annual Report on Form 10-K of Cliffs Natural Resources Inc. for the year ended December 31, 2016.

*/s/ DELOITTE & TOUCHE LLP*

Cleveland, Ohio
February 9, 2017

Exhibit 24

**POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS, that the undersigned Directors and officers of Cliffs Natural Resources Inc., an Ohio corporation ("Company"), hereby constitute and appoint C. Lourenco Goncalves, P. Kelly Tompkins, James D. Graham and Timothy K. Flanagan, and each of them, their true and lawful attorney or attorneys-in-fact, with full power of substitution and revocation, for them and in their name, place and stead, to sign on their behalf as a Director or officer of the Company, or both, as the case may be, an Annual Report on Form 10-K pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2016, and to sign any and all amendments to such Annual Report, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorney or attorneys-in-fact, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as they might or could do in person, hereby ratifying and confirming all that said attorney or attorneys-in-fact or any of them or their substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Executed as of the 8th day of February, 2017.

| | |
|---|---|
| /s/ C. L. Goncalves | /s/ T. K. Flanagan |
| C. L. Goncalves, | T. K. Flanagan, |
| Chairman, President and Chief Executive Officer | Executive Vice President, Chief Financial Officer & Treasurer |
| /s/ J. T. Baldwin | /s/ R. P. Fisher, Jr. |
| J. T. Baldwin, Director | R. P. Fisher, Jr., Director |
| /s/ S. M. Green | /s/ J. A. Rutkowski, Jr. |
| S. M. Green, Director | J. A. Rutkowski, Jr., Director |
| /s/ E. M. Rychel | /s/ J. S. Sawyer |
| E. M. Rychel, Director | J. S. Sawyer, Director |
| /s/ M. D. Siegal | /s/ G. Stoliar |
| M. D. Siegal, Director | G. Stoliar, Director |
| /s/ D. C. Taylor | |
| D. C. Taylor, Director | |

**Exhibit 31.1**

**CERTIFICATION**

I, Lourenco Goncalves, certify that:

1.    I have reviewed this annual report on Form 10-K of Cliffs Natural Resources Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)), for the registrant and have:

   (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected or is reasonably likely to materially affect the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

   Date:    February 9, 2017              By:    /s/ Lourenco Goncalves
                                                 Lourenco Goncalves
                                                 Chairman, President and Chief Executive Officer

Exhibit 31.2

**CERTIFICATION**

I, Timothy K. Flanagan, certify that:

1.    I have reviewed this annual report on Form 10-K of Cliffs Natural Resources Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)), for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected or is reasonably likely to materially affect the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    February 9, 2017          By:    /s/ Timothy K. Flanagan
                                          Timothy K. Flanagan
                                          Executive Vice President, Chief Financial Officer & Treasurer

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Cliffs Natural Resources Inc. (the "Company") on Form 10-K for the period ended   December 31, 2016, as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), I, Lourenco Goncalves, Chairman, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1)      The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)      The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date:       February 9, 2017

By:   /s/ Lourenco Goncalves
       Lourenco Goncalves
       Chairman, President and Chief Executive Officer

Exhibit 32.2

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Cliffs Natural Resources Inc. (the "Company") on Form 10-K for the period ended   December 31, 2016, as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), I,Timothy K. Flanagan, Executive Vice President, Chief Financial Officer & Treasurer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1)     The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)     The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date:      February 9, 2017

By: /s/ Timothy K. Flanagan
Timothy K. Flanagan
Executive Vice President, Chief Financial Officer & Treasurer

Exhibit 95

**Mine Safety Disclosures**

The operation of our mines located in the United States is subject to regulation by MSHA under the FMSH Act. MSHA inspects these mines on a regular basis and issues various citations and orders when it believes a violation has occurred under the FMSH Act. We present information below regarding certain mining safety and health citations that MSHA has issued with respect to our mining operations. In evaluating this information, consideration should be given to factors such as: (i) the number of citations and orders will vary depending on the size of the mine; (ii) the number of citations issued will vary from inspector to inspector and mine to mine, and (iii) citations and orders can be contested and appealed and, in that process, are often reduced in severity and amount, and are sometimes dismissed.

Under the Dodd-Frank Act, each operator of a coal or other mine is required to include certain mine safety results within its periodic reports filed with the SEC. As required by the reporting requirements included in §1503(a) of the Dodd-Frank Act, we present the following items regarding certain mining safety and health matters, for the period presented, for each of our mine locations that are covered under the scope of the Dodd-Frank Act:

(A)   The total number of violations of mandatory health or safety standards that could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard under section 104 of the FMSH Act (30 U.S.C. 814) for which the operator received a citation from MSHA;

(B)   The total number of orders issued under section 104(b) of the FMSH Act (30 U.S.C. 814(b));

(C)   The total number of citations and orders for unwarrantable failure of the mine operator to comply with mandatory health or safety standards under section 104(d) of the FMSH Act (30 U.S.C. 814(d));

(D)   The total number of imminent danger orders issued under section 107(a) of the FMSH Act (30 U.S.C. 817(a));

(E)   The total dollar value of proposed assessments from MSHA under the FMSH Act (30 U.S.C. 801 et seq.);

(F)   Legal actions pending before the Federal Mine Safety and Health Review Commission involving such coal or other mine as of the last day of the period;

(G)   Legal actions initiated before the Federal Mine Safety and Health Review Commission involving such coal or other mine during the period; and

(H)   Legal actions resolved before the Federal Mine Safety and Health Review Commission involving such coal or other mine during the period.

During the year ended December 31, 2016, our U.S. mine locations did not receive any flagrant violations under Section 110(b)(2) of the FMSH Act and no written notices of a pattern of violations, or the potential to have a pattern of such violations, under section 104(e) of the FMSH Act. In addition, there were no mining-related fatalities at any of our U.S. mine locations during this same period.

Following is a summary of the information listed above for the  year ended December 31, 2016:

| Mine Name/ MSHA ID No. | Operation | (A) Section 104 S&S Citations | (B) Section 104(b) Orders | (C) Section 104(d) Orders | (D) Section 107(a) Citations & Orders | (E) Total Dollar Value of MSHA Proposed Assessments (1) | (F) Legal Actions Pending as of Last Day of Period | | (G) Legal Actions Initiated During Period | (H) Legal Actions Resolved During Period |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Year Ended December 31, 2016 | | | | |
| Tilden / 2000422 | Iron Ore | 63 | 1 | 14 | — | $ 560,419 | 25 | (2) | 18 | 3 |
| Empire / 2001012 | Iron Ore | 29 | — | — | — | $ 283,089 | 11 | (3) | 5 | 3 |
| Northshore Plant / 2100831 | Iron Ore | 10 | — | 2 | — | $ 84,613 | 7 | (4) | 2 | 6 |
| Northshore Mine / 2100209 | Iron Ore | 5 | — | — | — | $ 747 | — | | — | — |
| Hibbing / 2101600 | Iron Ore | 21 | — | 1 | 1 | $ 322,569 | 5 | (5) | 11 | 28 |
| United Taconite Plant / 2103404 | Iron Ore | 9 | — | — | — | $ 104,203 | 2 | (6) | 2 | — |
| United Taconite Mine / 2103403 | Iron Ore | 5 | — | — | — | $ 1,268 | 7 | (7) | — | 7 |

(1)    Amounts included under the heading "Total Dollar Value of MSHA Proposed Assessments" are the total dollar amounts for proposed assessments received from MSHA on or before December 31, 2016.

(2)    This number consists of 14 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules, 9 pending legal actions related to contests of citations and orders referenced in Subpart B of FMSH Act's procedural rules, 1 appeal of judges' decisions or orders to the Federal Mine Safety and Health Review Commission referenced in Subpart H of FMSH Act's procedural rules, and 1 pending legal action related to complaints of discharge, discrimination, or interference referenced in Subpart E of FMSH Act's procedural rules.

(3)    This number consists of 10 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules, and 1 pending legal action related to complaints of discharge, discrimination, or interference referenced in Subpart E of FMSH Act's procedural rules.

(4)    This number consists of 7 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules.

(5)    This number consists of 4 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules, and 1 pending legal action related to contests of citations and orders referenced in Subpart B of FMSH Act's procedural rules.

(6)    This number consists of 2 pending legal actions related to contests of citations and orders referenced in Subpart B of FMSH Act's procedural rules.

(7)    This number consists of 4 pending legal actions related to contests of citations and orders referenced in Subpart B of FMSH Act's procedural rules, 2 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules, and 1 pending legal action related to complaints of discharge, discrimination, or interference referenced in Subpart E of FMSH Act's procedural rules.

Exhibit 99(a)

**Cliffs Natural Resources Inc. and Subsidiaries**
**Schedule II – Valuation and Qualifying Accounts**
*(Dollars in Millions)*

| Classification | | Balance at Beginning of Year | | Charged to Cost and Expenses | | Charged to Other Accounts | | Acquisition | | Deductions | | Balance at End of Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | **Additions** | | | | | | | | |
| Year Ended December 31, 2016: | | | | | | | | | | | | |
| Deferred Tax Valuation Allowance | $ | 3,372.5 | $ | (40.6) | $ | 5.1 | $ | — | $ | 2.2 | $ | 3,334.8 |
| Accounts Receivable Allowance | $ | 7.1 | $ | — | $ | (7.1) | $ | — | $ | — | $ | — |
| Year Ended December 31, 2015: | | | | | | | | | | | | |
| Deferred Tax Valuation Allowance | $ | 1,152.3 | $ | 54.3 | $ | 2,165.9 | $ | — | $ | — | $ | 3,372.5 |
| Accounts Receivable Allowance | $ | — | $ | 7.1 | $ | — | $ | — | $ | — | $ | 7.1 |
| Year Ended December 31, 2014: | | | | | | | | | | | | |
| Deferred Tax Valuation Allowance | $ | 849.6 | $ | 634.9 | $ | (12.6) | $ | — | $ | 319.6 | $ | 1,152.3 |
| Accounts Receivable Allowance | $ | — | $ | — | $ | — | $ | — | $ | — | $ | — |

# EXHIBIT 93

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2017

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____.

Commission File Number: 1-8944

### CLIFFS

## CLEVELAND-CLIFFS INC.

*(Exact Name of Registrant as Specified in Its Charter)*

| Ohio | 34-1464672 |
|---|---|
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(I.R.S. Employer Identification No.)* |
| 200 Public Square, Suite 3300, Cleveland, Ohio | 44114-2315 |
| *(Address of Principal Executive Offices)* | *(Zip Code)* |

Registrant's Telephone Number, Including Area Code: (216) 694-5700

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Shares, par value $0.125 per share | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: NONE**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.     YES ☒     NO ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.     YES ☐     NO ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.     YES ☒     NO ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).     YES ☒     NO ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.     ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒     Accelerated filer ☐     Non-accelerated filer ☐     Smaller reporting company ☐     Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).     YES ☐     NO ☒

As of June 30, 2017, the aggregate market value of the voting and non-voting common shares held by non-affiliates of the registrant, based on the closing price of $6.92 per share as reported on the New York Stock Exchange — Composite Index, was $2,039,925,087 (excluded from this figure is the voting stock beneficially owned by the registrant's officers and directors).

The number of shares outstanding of the registrant's common shares, par value $0.125 per share, was 297,400,968 as of February 12, 2018.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's proxy statement for its 2018 annual meeting of shareholders are incorporated by reference into Part III.

**TABLE OF CONTENTS**

|  |  | **Page Number** |
|---|---|---|
| **DEFINITIONS** | | 1 |
| **PART I** | | |
| Item 1. | Business | 3 |
| | Executive Officers of the Registrant | 16 |
| Item 1A. | Risk Factors | 17 |
| Item 1B. | Unresolved Staff Comments | 30 |
| Item 2. | Properties | 31 |
| Item 3. | Legal Proceedings | 36 |
| Item 4. | Mine Safety Disclosures | 38 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 39 |
| Item 6. | Selected Financial Data | 42 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 45 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 79 |
| Item 8. | Financial Statements and Supplementary Data | 80 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 166 |
| Item 9A. | Controls and Procedures | 166 |
| Item 9B. | Other Information | 167 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 168 |
| Item 11. | Executive Compensation | 168 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 168 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 168 |
| Item 14. | Principal Accountant Fees and Services | 168 |
| **PART IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 169 |
| Item 16. | Form 10-K Summary | 175 |
| **SIGNATURES** | | 175 |

Table of Contents

## DEFINITIONS

The following abbreviations or acronyms are used in the text. References in this report to the "Company," "we," "us," "our" and "Cliffs" are to Cleveland-Cliffs Inc. and subsidiaries, collectively. References to "A$" or "AUD" refer to Australian currency, "C$" to Canadian currency and "$" to United States currency.

| Abbreviation or acronym | Term |
|---|---|
| ABL Facility | Syndicated Facility Agreement by and among Bank of America, N.A., as Administrative Agent and Australian Security Trustee, the Lenders that are parties hereto, Cleveland-Cliffs Inc., as Parent and a Borrower, and the Subsidiaries of Parent party hereto, as Borrowers dated as of March 30, 2015, as amended |
| Adjusted EBITDA | EBITDA excluding certain items such as extinguishment/restructuring of debt, impacts of discontinued operations, foreign currency exchange remeasurement, severance and contractor termination costs, certain supplies inventory write-offs, impairment of other long-lived assets and intersegment corporate allocations of SG&A costs |
| AG | Autogenous Grinding |
| AK Steel | AK Steel Corporation (including its facilities in Ashland, Ohio, Middletown, Ohio and Dearborn, Michigan) |
| Algoma | Essar Steel Algoma Inc. |
| Amended 2015 Equity Plan | Cliffs Natural Resources Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan |
| APBO | Accumulated Postretirement Benefit Obligation |
| ArcelorMittal | ArcelorMittal (as the parent company of ArcelorMittal Mines Canada, ArcelorMittal USA and ArcelorMittal Dofasco GP, as well as, many other subsidiaries) |
| ArcelorMittal USA | ArcelorMittal USA LLC (including many of its United States affiliates, subsidiaries and representatives. References to ArcelorMittal USA comprise all such relationships unless a specific ArcelorMittal USA entity is referenced) |
| ALJ | Administrative Law Judge |
| AMT | Alternative Minimum Tax |
| ASC | Accounting Standards Codification |
| ASU | Accounting Standards Updates |
| Bloom Lake | The Bloom Lake Iron Ore Mine Limited Partnership |
| Bloom Lake Group | Bloom Lake General Partner Limited and certain of its affiliates, including Cliffs Quebec Iron Mining ULC |
| BNSF | Burlington Northern Santa Fe, LLC |
| Canadian Entities | Bloom Lake Group, Wabush Group and certain other wholly-owned subsidiaries |
| CCAA | Companies' Creditors Arrangement Act (Canada) |
| CERCLA | Comprehensive Environmental Response, Compensation and Liability Act of 1980 |
| CFR | Cost and freight |
| CLCC | Cliffs Logan County Coal LLC |
| Clean Water Act | Federal Water Pollution Control Act |
| CN | Canadian National Railway Company |
| $CO_2$ | Carbon Dioxide |
| Codification | FASB Accounting Standards Codification |
| Compensation Committee | Compensation and Organization Committee of Cliffs' Board of Directors |
| CPP | Clean Power Plan |
| Directors' Plan | Cliffs Natural Resources Inc. Amended and Restated 2014 Nonemployee Directors' Compensation Plan |
| Dodd-Frank Act | Dodd-Frank Wall Street Reform and Consumer Protection Act |
| DR-grade pellets | Direct Reduction pellets |
| EAF | Electric Arc Furnace |
| EBITDA | Earnings before interest, taxes, depreciation and amortization |
| Empire | Empire Iron Mining Partnership |
| EPA | U.S. Environmental Protection Agency |
| EPS | Earnings per share |
| ERM | Enterprise Risk Management |
| Exchange Act | Securities Exchange Act of 1934, as amended |
| FASB | Financial Accounting Standards Board |
| Fe | Iron |
| FERC | Federal Energy Regulatory Commission |
| FeT | Total Iron |
| FIP | Federal Implementation Plan |
| FMSH Act | U.S. Federal Mine Safety and Health Act 1977, as amended |
| GAAP | Accounting principles generally accepted in the U.S. |
| GHG | Greenhouse gas |

A005263

Table of Contents

| Abbreviation or acronym | Term |
|---|---|
| HBI | Hot Briquetted Iron |
| Hibbing | Hibbing Taconite Company, an unincorporated joint venture |
| Koolyanobbing | Collective term for the operating deposits at Koolyanobbing, Mount Jackson and Windarling |
| LIBOR | London Interbank Offered Rate |
| LIFO | Last-in, first-out |
| Long ton | 2,240 pounds |
| LS&I | Lake Superior & Ishpeming Railroad Company |
| LTVSMC | LTV Steel Mining Company |
| Metric ton | 2,205 pounds |
| MISO | Midcontinent Independent System Operator, Inc. |
| MMBtu | Million British Thermal Units |
| MPCA | Minnesota Pollution Control Agency |
| MPSC | Michigan Public Service Commission |
| Monitor | FTI Consulting Canada Inc. |
| NAAQS | National Ambient Air Quality Standards |
| Net ton | 2,000 pounds |
| $NO_2$ | Nitrogen dioxide |
| $NO_x$ | Nitrogen oxide |
| Northshore | Northshore Mining Company |
| NPDES | National Pollutant Discharge Elimination System, authorized by the U.S. Clean Water Act |
| NYSE | New York Stock Exchange |
| Oak Grove | Oak Grove Resources, LLC |
| OPEB | Other postretirement employment benefits |
| OPEB cap | Medical premium maximums |
| PBO | Projected benefit obligation |
| Pinnacle | Pinnacle Mining Company, LLC |
| Platts 62% Price | Platts IODEX 62% Fe Fines Spot Price |
| Preferred Share | 7.00% Series A Mandatory Convertible Preferred Stock, Class A, without par value |
| ROA | Return on asset |
| S&P | Standard & Poor's Rating Services, a division of Standard & Poor's Financial Services LLC, a subsidiary of The McGraw-Hill Companies, Inc., and its successors |
| SEC | U.S. Securities and Exchange Commission |
| SG&A | Selling, general and administrative |
| Seneca | Seneca Coal Resources, LLC |
| Silver Bay Power | Silver Bay Power Company |
| SIP | State Implementation Plan |
| $SO_2$ | Sulfur dioxide |
| SSR | System Support Resource |
| STRIPS | Separate Trading of Registered Interest and Principal of Securities |
| Tilden | Tilden Mining Company L.C. |
| TMDL | Total Maximum Daily Load |
| TSR | Total Shareholder Return |
| United Taconite | United Taconite LLC |
| U.S. | United States of America |
| U.S. Steel | United States Steel Corporation and all subsidiaries |
| USW | United Steelworkers |
| VEBA | Voluntary Employee Benefit Association trusts |
| VWAP | Volume Weighted Average Price |
| Wabush | Wabush Mines Joint Venture |
| Wabush Group | Wabush Iron Co. Limited and Wabush Resources Inc., and certain of their affiliates, including Wabush Mines (an unincorporated joint venture of Wabush Iron Co. Limited and Wabush Resources Inc.), Arnaud Railway Company and Wabush Lake Railway Company |
| 2012 Equity Plan | Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan |
| 2015 Equity Plan | Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan |

2

A005264

Table of Contents

**PART I**

**Item 1.**        *Business*

**Introduction**

Founded in 1847, Cleveland-Cliffs Inc. is the largest and oldest independent iron ore mining company in the United States. We are a major supplier of iron ore pellets to the North American steel industry from our mines and pellet plants located in Michigan and Minnesota. Additionally, we operate an iron ore mining complex in Western Australia. By 2020, we expect to be the sole producer of HBI in the Great Lakes region with the development of our first production plant in Toledo, Ohio. Driven by the core values of safety, social, environmental and capital stewardship, our employees endeavor to provide all stakeholders with operating and financial transparency.

We are organized through a global commercial group responsible for sales and delivery of our products and operations groups responsible for the production of the iron ore that we market. Our continuing operations are organized according to geographic location: U.S. Iron Ore and Asia Pacific Iron Ore.

In the U.S., we currently own or co-own four operational iron ore mines plus one indefinitely idled mine. We are currently operating one iron ore mine in Michigan and three iron ore mines in Minnesota. All four mines are currently operating at or near full capacity. The Empire mine located in Michigan was indefinitely idled beginning in August 2016. Our Asia Pacific operations consist solely of our Koolyanobbing iron ore mining complex in Western Australia. Koolyanobbing is currently operating at a level appropriate for the current price discounting environment for low-grade iron ore products containing less than 62% Fe, and we expect mining operations to cease during 2018.

### We are Focused on Protecting our Core U.S. Iron Ore Business

We are the market-leading iron ore producer in the U.S., supplying differentiated iron ore pellets under long-term contracts to major North American blast furnace steel producers. We have the unique advantage of being a low-cost, high-quality producer of iron ore pellets in the Great Lakes market with significant transportation and logistics advantages to serve the Great Lakes steel market effectively. The pricing structure and long-term nature of our existing contracts, along with our low-cost operating profile, position U.S. Iron Ore as a strong cash flow generator in most commodity pricing environments. Since instituting our strategy in 2014 of focusing on this core business, we have achieved significant accomplishments, including providing volume certainty by signing a ten-year supply agreement with our largest customer; substantially reducing operating costs by making operational improvements; and developing new pellet products to meet ever-evolving market demands.

We recognize the importance of our strength in the U.S. Iron Ore business, and our top strategic priority is to protect and enhance our market position. This involves continuing to deliver high-quality, custom-made pellets that allow our customers to remain competitive in the quality, production efficiency, and environmental friendliness of their steel products. Protecting the core business also involves continually evaluating opportunities to expand both our production capacity and ore reserve life. In 2017, we achieved key accomplishments toward these goals by acquiring the remaining minority stake in our Tilden and Empire mines as well as additional real estate interests in Minnesota.

### Expanding our Customer Base

While we hold a strong market position in supplying iron ore to Great Lakes blast furnaces, we cannot ignore the ongoing shift of steelmaking share in the U.S. away from our core blast furnace customers to EAF steelmakers. Over the past 25 years, the market share of EAFs has nearly doubled. However, as EAFs have moved to higher value steel products, they require more high-quality iron ore-based metallics instead of scrap as raw material feedstock. As a result of this trend, one of our top strategic priorities is to become a critical supplier of the EAF market by providing these specialized metallics. In June 2017, we announced the planned construction of an HBI production plant in Toledo, Ohio. HBI is a specialized high-quality iron alternative to scrap that, when used as a feedstock, allows the EAF to produce more valuable grades of steel. We expect our HBI to partially replace the over 3 million metric tons of ore-based metallics that are imported into the Great Lakes every year from Russia, Ukraine, Brazil and Venezuela.

Our Toledo plant is expected to produce HBI at a rate of 1.6 million metric tons per year when brought to production in 2020. We expect that this will create additional demand for our DR-grade pellets of 2.5 million long tons. Not only does this production plant create another outlet for our high-margin pellets, but it also presents an attractive economic opportunity for us. As the only producer of DR-grade pellets in the Great Lakes and with access to abundant, low-cost natural gas, we will be in a unique position to serve clients in the region. In addition, the Toledo site is in close proximity to over 20 EAFs, giving us a natural competitive freight advantage over import competitors.

3

Table of Contents

**Business Segments**

Our Company's continuing operations are organized and managed according to geographic location: U.S. Iron Ore and Asia Pacific Iron Ore.

Segment information reflects our business units, which are organized to meet customer requirements and global competition.  Financial information about our segments, including financial information about geographic areas, is included in *Management's Discussion and Analysis of Financial Condition and Results of Operations* and NOTE 2 - SEGMENT REPORTING.

### *U.S. Iron Ore*

We are a major producer of iron ore pellets, primarily selling production from U.S. Iron Ore to integrated steel companies in the U.S. and Canada. We operate four iron ore mines: the Tilden mine in Michigan and the Northshore, United Taconite and Hibbing mines in Minnesota. The U.S.-based mines currently have an annual rated capacity of 27.4 million long tons of iron ore pellet production, representing  55% of total U.S. pellet production capacity. Based on our equity ownership in these mines, our share of the annual rated production capacity is currently 21.2 million long tons, representing 42% of total U.S. annual pellet capacity. The Empire mine located in Michigan, which historically had annual rated capacity of 5.5 million long tons, was indefinitely idled beginning in August 2016. During 2017, we acquired the remaining noncontrolling interest of the Empire and Tilden mines from ArcelorMittal and U.S. Steel, respectively.

The following chart summarizes the estimated annual pellet production capacity and percentage of total U.S. pellet production capacity for each of the respective iron ore producers as of December 31, 2017:

**U.S. Iron Ore Pellet**

**Annual Rated Capacity Tonnage**

|  | Current Estimated Capacity (Long Tons in Millions)[1] | Percent of Total U.S. Capacity |
|---|---|---|
| All Cliffs' managed mines | 27.4 | 54.9 % |
| Other U.S. mines | | |
| U.S. Steel's Minnesota ore operations | | |
| Minnesota Taconite | 14.3 | 28.7 |
| Keewatin Taconite | 5.4 | 10.8 |
| Total U.S. Steel | 19.7 | 39.5 |
| ArcelorMittal USA Minorca mine | 2.8 | 5.6 |
| Total other U.S. mines | 22.5 | 45.1 |
| Total U.S. mines | 49.9 | 100.0 % |

[1] Empire mine was excluded from the estimated capacity calculation as it is indefinitely idled.

Our U.S. Iron Ore production generally is sold pursuant to long-term supply agreements with various price adjustment provisions. For the year ended December 31, 2017, we produced a total of 25.5 million long tons of iron ore pellets. The 2017 U.S. Iron Ore production included 18.8 million long tons for our account and 6.7 million long tons on behalf of current and previous steel company partners of the mines. During 2016 and 2015, we produced a total of  23.4 million and 26.1 million long tons, respectively.

We produce various grades of iron ore pellets, including standard, fluxed and DR-grade,  for use in our customers' operations as part of the steelmaking process. The variation in grades of iron ore pellets results from the specific chemical and metallurgical properties of the ores at each mine, the requirements of end user's steelmaking process and whether or not fluxstone is added in the process. Although the grade or grades of pellets currently delivered to each customer are based on that customer's preferences, which depend in part on the characteristics of the customer's steelmaking operation, in certain cases our iron ore pellets can be used interchangeably. Standard pellets require less processing, are generally the least costly pellets to produce and are called "standard" because no ground fluxstone, such as limestone or dolomite, is added to the iron ore concentrate before turning the concentrate into pellets. In the case of fluxed pellets, fluxstone is added to the concentrate, which produces pellets that can perform at higher productivity levels in the customer's specific blast furnace and will minimize the amount of fluxstone the customer may be required

4

to add to the blast furnace. DR-grade pellets require additional processing to make a pellet that contains higher iron and lower silica content than a standard pellet. Unlike standard or fluxed pellets, DR-grade pellets are fed into a direct reduced iron facility, which then are converted into DRI or HBI, a high-quality raw material used to feed an EAF.

Additionally, as the EAF steel market continues to grow in the U.S., there is an opportunity for our iron ore to serve this market by providing pellets to the alternative metallics market to produce DRI, HBI and/or pig iron. In 2016 and 2017, we produced and shipped industrial trials of low-silica DR-grade pellets, which were successfully processed in two customers' DRI reactors to produce a high-quality DRI product. By 2020, we expect to sell these low-silica DR-grade pellets to our own HBI facility in Toledo, Ohio.

Each of our U.S. Iron Ore mines is located near the Great Lakes. The majority of our iron ore pellets are transported via railroads to loading ports for shipment via vessel to blast furnace steelmakers in North America.

Our U.S. Iron Ore sales are influenced by seasonal factors in the first half of the year as shipments and sales are restricted due to closure of the Soo Locks and the Welland Canal on the Great Lakes because of winter weather. During the first quarter, we continue to produce our products, but we cannot ship most of those products via lake vessel until the conditions on the Great Lakes are navigable, which causes our first and second quarter inventory levels to rise. Our limited practice of shipping product to ports on the lower Great Lakes or to customers' facilities prior to the transfer of title has somewhat mitigated the seasonal effect on first and second quarter inventories and sales under our current accounting policies, as shipment from this point to the customers' operations is not limited by weather-related shipping constraints. At December 31, 2017 and 2016, we had 1.5 million long tons of pellets in inventory in the lower Great Lakes or at customers' facilities.

Upon adoption of ASC 606 on January 1, 2018, the timing and pattern of revenue recognition will change for our U.S. Iron Ore segment. Due to the closure of the Soo Locks and the Welland Canal during the winter months, our revenues will be lower than historical levels during the first quarter and higher than historical levels during the remaining three quarters in future years. However, the total amount of revenue recognized during the year should remain substantially the same as under current GAAP. There will not be a material change in the pattern or timing of revenue recognition for Asia Pacific Iron Ore.

*U.S. Iron Ore Customers*

Our U.S. Iron Ore revenues primarily are derived from sales of iron ore pellets to the North American integrated steel industry, consisting primarily of three major customers. Generally, we have multi-year supply agreements with our customers. Sales volume under these agreements largely is dependent on customer requirements, and in certain cases, we are the sole supplier of iron ore to the customer. Historically, each agreement has contained a base price that is adjusted annually using one or more adjustment factors. Factors that could result in a price adjustment include changes in the Platts 62% Price, along with pellet premiums, published Platts international indexed freight rates and changes in specified Producer Price Indices, including those for industrial commodities, fuel and steel.

During 2017, 2016 and 2015, we sold 18.7 million, 18.2 million and 17.3 million long tons of iron ore product, respectively, from our share of production from our U.S. Iron Ore mines. Refer to *Concentration of Customers* below for additional information regarding our major customers.

**Asia Pacific Iron Ore**

Our Asia Pacific Iron Ore operations are located in Western Australia and consist solely of our wholly-owned Koolyanobbing operation.

The Koolyanobbing operation serves the Asian iron ore markets with direct-shipped fines and lump ore. The lump products are fed directly to blast furnaces, while the fines products are used as sinter feed. The variation in the two export product grades reflects the inherent chemical and physical characteristics of the ore bodies mined as well as the supply requirements of our customers. During 2017, 2016 and 2015, we produced 10.1 million, 11.8 million and 11.7 million metric tons, respectively.

Koolyanobbing is a collective term for the ore deposits at Koolyanobbing, Mount Jackson and Windarling. There are approximately 70 miles separating the three mining areas. Banded iron formations host the mineralization, which is predominately hematite and goethite. Each deposit is characterized with different chemical and physical attributes and, in order to achieve customer product quality, ore in varying quantities from each deposit must be blended together.

5

[Table of Contents]

Crushing and blending are undertaken at Koolyanobbing, where the crushing and screening plant is located. Once the blended ore has been crushed and screened into a direct lump and fines shipping product, it is transported by rail approximately 360 miles south to the Port of Esperance, via Kalgoorlie, for shipment to our customers in Asia.

*Asia Pacific Iron Ore Customers*

Asia Pacific Iron Ore's production is under contract with steel companies primarily in China, Japan and South Korea. In March 2017, we extended the majority of our supply agreements with steel producers in China for one year. These contracts will expire in March 2018, and we will only renew contracts if it can be done in an economically viable manner. Our supply agreement with our client in South Korea expired in December 2017. We renewed that agreement for 2018; however, it is at a lower committed quantity than our previous agreement. Our supply agreements with our customers in Japan expire in March 2018. These contracts could be renewed for additional volume. Pricing for our Asia Pacific Iron Ore Chinese customers consists of shorter-term pricing mechanisms of various durations up to three months based on the average of daily spot prices that are generally associated with the time of unloading of each shipment. Pricing with our Japanese and South Korean customers is generally similar to the inputs used with our Chinese customers, but the pricing inputs are fixed before shipment.

During 2017, 2016 and 2015, we sold 9.8 million, 11.6 million and 11.6 million metric tons of iron ore, respectively, from our Koolyanobbing operation. No Asia Pacific Iron Ore customer comprised more than 10% of our consolidated sales in 2017, 2016 or 2015. The segment's five largest customers together accounted for a total of 57%, 56% and 47% of Asia Pacific Iron Ore product revenues for the years  2017, 2016 and 2015, respectively.

### Discontinued Operations

Prior to late March 2014, we operated two iron ore mines in Eastern Canada, the Bloom Lake mine and the Wabush Scully mine. In late March 2014, we idled our Wabush Scully mine in Newfoundland and Labrador and in November 2014, we began to implement the permanent closure plan for the mine. The idle and ultimate closure are driven by the unsustainable high-cost structure. In January 2015, we ceased active production at the Bloom Lake mine and the mine transitioned to "care-and-maintenance" mode. Together, the shutdown of the Wabush Scully mine and the cessation of operations at our Bloom Lake mine represented a complete curtailment of our Eastern Canadian Iron Ore operations.

Restructuring proceedings with respect to the Bloom Lake Group were commenced under the CCAA in the first quarter of 2015. During the second quarter of 2015, the CCAA protection granted to the Bloom Lake Group was extended to include the Wabush Group to facilitate the reorganization of each of their businesses and operations. As of December 31, 2017, CCAA proceedings are still ongoing. The Monitor appointed by the court in the CCAA proceedings for the Bloom Lake Group and the Wabush Group has conducted a claims process pursuant to which creditors have filed claims against the Bloom Lake Group and the Wabush Group. The Monitor is reviewing all claims filed as part of this claims process. Currently, there is uncertainty as to the amount of the distribution that will be made to the creditors of the Bloom Lake Group and the Wabush Group, including, if any, to us, and whether we could be held liable for claims that may be asserted by or on behalf of the Bloom Lake Group or the Wabush Group or by their respective representatives against non-debtor affiliates of the Bloom Lake Group and the Wabush Group. During 2017, we became aware that it was probable the Monitor will assert a preference claim against us and/or certain of our affiliates. Given that it is probable the claim will be asserted by the Monitor, we have recorded an estimated liability of $55.6 million, which includes the value of our related-party claims against the Bloom Lake Group and the Wabush Group. Should the Monitor proceed to assert the claim, we believe the Monitor will demand an amount in excess of the value of our related-party claims against the estate. Thus, it is possible that a change in the estimated liability may occur in the future. We deny liability for any amount and will vigorously defend such claim.

Financial results prior to the respective deconsolidations of the Bloom Lake and Wabush Groups and subsequent expenses directly associated with the Canadian Entities are included in our financial statements and classified within discontinued operations. Refer to NOTE 14 - DISCONTINUED OPERATIONS for further discussion of the Eastern Canadian Iron Ore segment discontinued operations and the status of the CCAA proceedings.

Unless otherwise noted, discussion of our business and results of operations in this Annual Report on Form 10-K refers to our continuing operations.

## Applied Technology, Research and Development

We have been a leader in iron ore mining and process technology since inception and have been in operation for over 170 years.  We operated some of the first mines on Michigan's Marquette Iron Range and pioneered early

open-pit and underground mining methods. From the first application of electrical power in Michigan's underground mines to the use of today's sophisticated computers and global positioning satellite systems, we have been a leader in the application of new technology to the centuries-old business of mineral extraction. Today, our engineering and technical staffs are engaged in full-time technical support of our operations, improvement of existing products and development of new products.

We are a pioneer in iron ore pelletizing with over 60 years of experience. We are able to produce customized pellets to meet each customer's blast furnace specifications and produce both standard and fluxed pellets. Using our technical expertise and strong market position in the United States to increase our product offering, we have started producing DR-grade pellets. In 2017 and 2016, we shipped low silica DR-grade pellets, which were successfully processed in multiple DRI reactors to produce a high-quality direct reduced iron product.

With our experienced technical professionals and unsurpassed reputation for our pelletizing technology, we continue to deliver a world-class quality product to our customers. We are a pioneer in the development of emerging reduction technologies, a leader in the extraction of value from challenging resources and a front runner in the implementation of safe and sustainable technology. Our technical experts are dedicated to excellence and deliver superior technical solutions tailored to our customer base. We will continue to use this pioneering mentality in the development of our HBI facility in Toledo, Ohio. Similar to the market shift to pellets over 60 years ago, we recognize the need to serve the growing EAF market.

**Concentration of Customers**

In 2017 and 2016, two customers individually accounted for more than 10% of our consolidated product revenue and in 2015, three customers individually accounted for more than 10% of our consolidated product revenue. Product revenue from those customers represented in the chart below totaled $1.3 billion, $1.1 billion and $1.3 billion of our total consolidated product revenue in 2017, 2016 and 2015, respectively, and is attributable to our U.S. Iron Ore business segment. The following represents sales revenue from each of these customers as a percentage of our total consolidated product revenue, as well as the portion of product sales for U.S. Iron Ore that is attributable to each of these customers for those years:

| Customer[1] | Percentage of Total Product Revenue | | | Percentage of U.S. Iron Ore Product Revenue | | |
|---|---|---|---|---|---|---|
| | **2017** | 2016 | 2015 | **2017** | 2016 | 2015 |
| ArcelorMittal | **38%** | 37% | 37% | **48%** | 51% | 49% |
| AK Steel | **23%** | 19% | 21% | **29%** | 27% | 29% |
| Algoma[2] | **9%** | 4% | 12% | **11%** | 5% | 15% |

[1] Includes subsidiaries.

[2] On October 5, 2015, we terminated the long-term agreement with Algoma; however, we entered into certain short-term contracts with Algoma throughout 2016. On May 16, 2016, we reinstated our agreement with Algoma, which took effect in January 2017.

***ArcelorMittal***

Historically, our pellet supply agreements with ArcelorMittal USA were based on customer requirements, except for the Indiana Harbor East facility, which is based on customer contract obligations. The legacy agreements with ArcelorMittal USA expired at the end of December 2016 and January 2017. The parties executed a new long-term agreement, which became effective October 31, 2016, for the sale and delivery of ArcelorMittal USA's annual tonnage requirements that fall within a specific range of volume. This latest agreement expires at the end of December 2026.

ArcelorMittal USA is a 62.3% equity participant in Hibbing. During 2017, we acquired the 21% ownership interest of ArcelorMittal USA in Empire as part of an agreement to distribute the noncontrolling interest net assets of the mine.

In 2017, 2016 and 2015, our U.S. Iron Ore pellet sales to ArcelorMittal were 8.4 million, 9.7 million and 9.7 million long tons, respectively.

7

### AK Steel

In August 2013, we entered into a new agreement with AK Steel to provide iron ore pellets to AK Steel for use in its Middletown, Ohio and Ashland, Kentucky blast furnace facilities. This contract includes minimum and maximum tonnage requirements for each year between 2014 and 2023.

In 2015 we entered into an amended and restated agreement with AK Steel after it acquired Severstal Dearborn, LLC, under which we supply all of the Dearborn, Michigan facility's blast furnace pellet requirements through 2022, subject to specified minimum and maximum requirements in certain years.

In 2017, 2016 and 2015, our U.S. Iron Ore pellet sales to AK Steel were 5.6 million, 4.5 million and 4.3 million long tons, respectively.

### Algoma

Algoma is a Canadian steelmaker whose common shares are owned by Essar Steel Holdings Limited. We had a long-term supply agreement under which we were Algoma's sole supplier of iron ore pellets through the end of 2016. Under the terms of a 2016 settlement and through Algoma's CCAA proceedings, Algoma agreed to assume the long-term supply agreement that runs through 2024. Additionally, we entered into agreements with Algoma to purchase from us incremental tonnage that equates to Algoma's 2015 through 2017 annual iron ore pellet consumption. These agreements began in 2017 and 2018 and run through December 2020.

In 2017, 2016 and 2015, our U.S. Iron Ore pellet sales to Algoma were 2.5 million, 1.2 million and 2.5 million long tons, respectively.

## Competition

Throughout the world, we compete with major and junior mining companies, as well as steel companies, both of which produce steelmaking raw materials, including iron ore.

### North America

In our U.S. Iron Ore business segment, we primarily sell our product to steel producers with operations in North America. We compete directly with steel companies that own interests in iron ore mines in the United States and/or Canada, including ArcelorMittal and U.S. Steel, and with major iron ore pellet exporters from Eastern Canada and Brazil.

A number of factors beyond our control affect the markets in which we sell our iron ore. Continued demand for our iron ore and the prices obtained by us primarily depend on the consumption patterns of the steel industry in the U.S., China and elsewhere around the world, as well as the availability, location, cost of transportation and competing prices.

### Asia Pacific

In our Asia Pacific Iron Ore business segment, we export iron ore products to the Asia Pacific markets, including China, Japan, and South Korea. In the Asia Pacific marketplace, we compete with major iron ore exporters primarily from Australia and Brazil. These include BHP Billiton, Fortescue Metals Group Ltd., Rio Tinto plc and Vale SA, among others.

Competition in steelmaking raw materials is predicated upon the usual competitive factors of price, availability of supply, product quality and performance, service and transportation cost to the consumer of the raw materials.

## Environment

Our mining activities are subject to various laws and regulations governing the protection of the environment. We conduct our operations in a manner that is protective of public health and the environment and believe our operations are in compliance with applicable laws and regulations in all material respects.

Environmental issues and their management continued to be an important focus at each of our operations throughout  2017. In the construction of our facilities and in their operation, substantial costs have been incurred and will continue to be incurred to comply with regulatory requirements and avoid undue effect on the environment. Our capital expenditures relating to environmental matters totaled approximately $21 million, $15 million and $17 million, in 2017, 2016 and 2015, respectively. Approximately $5 million of the 2015 capital expenditures relating to environmental matters was attributable to the North American Coal operations that were sold during December 2015. It is estimated

Table of Contents

that capital expenditures for environmental improvements will total approximately $11 million in 2018, which is related to our U.S. Iron Ore operations for various water treatment, air quality, dust control, tailings management, selenium management and other miscellaneous environmental projects.

### Regulatory Developments

Various governmental bodies continually promulgate new or amended laws and regulations that affect us, our customers and our suppliers in many areas, including waste discharge and disposal, the classification of materials and products, air and water discharges and many other environmental, health and safety matters. Although we believe that our environmental policies and practices are sound and do not expect that the application of any current laws or regulations reasonably would be expected to result in a material adverse effect on our business or financial condition, we cannot predict the collective adverse impact of the expanding body of laws and regulations.

Specifically, there are several notable proposed or potential rulemakings or activities that could have a material adverse impact on our facilities in the future depending on their ultimate outcome: Minnesota's proposed amendments to the sulfate wild rice water quality standard; evolving water quality standards for sulfate, selenium, and conductivity; scope of the Clean Water Act and the definition of "Waters of the United States"; Minnesota's Mercury TMDL and associated rules governing mercury air emission reductions; Climate Change and GHG Regulation; Regional Haze FIP Rule; $NO_2$ and $SO_2$ NAAQS; and increased administrative and legislative initiatives related to financial assurance obligations for CERCLA, mining and reclamation obligations.

### Minnesota's Proposed Amendments to the Sulfate Wild Rice Water Quality Standard

The Minnesota Legislature provided $1.5 million in 2011 for a study to gather additional information about the effects of sulfate and other substances on the growth of wild rice and to support an update to the sulfate wild rice water quality standard originally adopted in 1973 by the MPCA. The MPCA contracted with the University of Minnesota to conduct several research projects as part of this study. Concurrently, the Minnesota Chamber of Commerce contracted an independent lab to conduct companion research on the impacts of sulfate on wild rice. In August 2017, MPCA released proposed amendments of the sulfate water quality standard applicable to wild rice and identification of wild rice waters, which included a proposed sulfate wild rice water quality standard, a proposed list of waters where the standard would apply, and criteria for adding waters to that list. The proposed wild rice water quality standard is an equation that utilizes measured sediment parameters to calculate a sulfate water quality standard protective of wild rice unique to each water body where the standard applies. The independent research conducted by the independent lab contracted by the Minnesota Chamber of Commerce does not directly support the validity of the MPCA's proposed approach. On January 11, 2018, the proposed rule was substantially disapproved by an ALJ and included a recommendation for MPCA to retain the existing 10 mg/L sulfate standard until MPCA addresses concerns identified in the ALJ report. These findings are not binding on the MPCA. The rulemaking has a legislated deadline for completion of January 15, 2019. Due to the proposed standard being based on measured sediment parameters, uncertainty regarding to which waters the standard will apply, and the non-binding disapproval from the ALJ, the impact of the proposed wild rice water quality standard to us is not estimable at this time but it could have an adverse material impact if we are required to significantly reduce sulfate in our discharges.

### Conductivity

Conductivity, the measurement of water's ability to conduct electricity, is a surrogate parameter that generally increases as the amount of dissolved minerals in water increases. In 2011, the EPA issued *A Field-Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams,* which established a recommended conductivity benchmark of 300 µS/cm for the region. The issuance of a benchmark outside of the established rulemaking process was subsequently the subject of litigation in 2012 where the court ruled the benchmark is nothing more than a non-binding suggestion. Three years later in <u>Ohio Valley Environmental Coalition, et al. v. Elk Run Coal Co., et al.</u>, 3:12-cv-00785 (S.D. W. Va.), a judicial decision held that levels of conductivity higher than the EPA's benchmark constituted a violation of the state's narrative water quality standards, were unsupported by science and contrary to decisions previously made by the West Virginia Department of Environmental Protection and the West Virginia Supreme Court. In 2015, a group filed a petition with EPA Region 5 alleging that Minnesota was failing to implement properly the state NPDES program, and one of the various allegations asserts that MPCA should be assessing compliance with the state's narrative water quality standard against the EPA's conductivity benchmark for the Central Appalachian region. On December 30, 2015, the EPA provided MPCA a draft of the *Protocol for Responding to Issues Related to Permitting and Enforcement* which indicates that EPA staff will be reviewing available scientific basis in peer reviewed literature as well as promulgated standards. In February 2016, EPA's Office of Research and Development endorsed use of the Field-Based Conductivity Benchmark in northeast Minnesota indicating that a value of 320 µS/cm was appropriate to protect aquatic life. On

9

Table of Contents

December 23, 2016, EPA issued a notice soliciting public comments on its draft document, *Field-Based Methods for Developing Aquatic Life Criteria for Specific Conductivity*. According to EPA, once this document is final, states and authorized tribes located in any region of the country may use the methods to develop field-based specific conductivity criteria for adoption into water quality standards. In April 2017, comments were submitted by our trade associations providing objective evidence indicating the draft methodology was scientifically flawed and unfit for promulgation. Adoption of this methodology is not certain due to significant concerns with respect to the scientific validity of the proposed method which is now under intense review by scientists working for various trade associations. Because the outcome of the Region 5 Petition is uncertain and the proposed *Field-Based Methods for Developing Aquatic Life Criteria for Specific Conductivity* is only draft guidance at this time, the exact nature and certainty of the potential risk to us cannot be predicted; however, direct application of the 320 μS/cm benchmark to our Minnesota-based assets may have a material adverse impact if the conductivity benchmark is applied to our NPDES permits.

*Definition of "Waters of the United States" Under the Clean Water Act*

In June 2015, the EPA and Army Corps of Engineers promulgated the rule, "Definition of 'Waters of the United States' Under the Clean Water Act," which attempted to add clarity to which waters are jurisdictional under the federal Clean Water Act, and will apply to all Clean Water Act programs, including certain permitting programs, spill prevention programs and a state certification process. It is unclear how the federal and state agencies will implement and enforce the final rule, and how the courts will interpret it going forward. The regulation may expand EPA's authority under the Clean Water Act to many traditionally unregulated mine features such as mine pits, pit lakes, on-site ditches, water retention structures, and tailings basins creating a new burden on our U.S. facilities. This could be further interpreted to add questionable regulatory authority over the groundwater connections between these features and nearby traditionally navigable waters. In October 2015, the U.S. Court of Appeals for the Sixth Circuit issued a nationwide stay of this rule while the jurisdiction and legality of the rule are decided in court. In January 2017, the U.S. Supreme Court granted certiorari to reconsider the Sixth Circuit's decision that it has jurisdiction to hear challenges. We are actively participating in the rulemaking development and assessing the potential impacts to our operations. Any impacts to us are not estimable at this time as the rule is being litigated, and the impacts will not be known until the rule is finally implemented.

The "Executive Order on Restoring the Rule of Law, Federalism, and Economic Growth by Reviewing the 'Waters of the United States' Rule" ("Executive Order") was signed by the President on February 28, 2017. This Executive Order instructs EPA and the Army Corps of Engineers to review the Clean Water Rule and "publish for notice and comment a proposed rule rescinding or revising the rule." The Executive Order further directs that they "shall consider interpreting the term 'navigable waters'" in a manner "consistent with Justice Scalia's opinion" in *Rapanos v. United States (2006)*. The EPA and Army Corps of Engineers are in the process of conducting rulemaking, soliciting comments, and holding public meetings in accordance with the Executive Order. Any impacts to us are not estimable at this time as the EPA and Army Corps of Engineers have only begun to implement the Executive Order.

*Selenium Discharge Management*

In Michigan, Empire and Tilden have implemented compliance plans to manage selenium according to the permit conditions. Empire and Tilden submitted the first permit-required Selenium Storm Water Management Plan to the Michigan Department of Environmental Quality ("MDEQ") in December 2011 and have updated it annually as required. The Selenium Storm Water Management Plans have outlined the activities that have been undertaken to address selenium in storm water discharges from our Michigan operations including an assessment of potential impacts to surface and groundwater. The remaining infrastructure needed for implementation of the storm water collection and conveyance system was completed in 2017 and cost approximately $8 million. A storm water treatment system for both facilities is anticipated sometime before 2028. The cost of the future treatment systems could be significant, although we are continuing to assess and develop cost effective and sustainable treatment technologies.

Tilden's NPDES permit contains a compliance schedule for selenium with a final effluent limit of 5.1 μg/l that became effective as of November 1, 2017, at Tilden's Gribben Tailings Basin outfall. Tilden's 2017 expenditures totaled approximately $3 million for infrastructure necessary to meet the selenium effluent limit.

In July 2016, the EPA published new selenium fish tissue limits and lower lentic and lotic water column concentration criteria, which may someday increase the cost for treatment should MDEQ adopt these new standards in lieu of the existing limits established under the Great Lakes Initiative. Accordingly, we cannot reasonably estimate the timing or long-term impact of the water quality criteria to our business.

10

*Mercury TMDL and Minnesota Taconite Mercury Reduction Strategy*

Since the 1990's the taconite industry has voluntarily reduced and removed mercury products and supported development of mercury emission reduction technology. While TMDL regulations are contained in the Clean Water Act, in 2007, Minnesota developed a Statewide Mercury TMDL which set an objective for 93% mercury air emission reductions from 1990 levels for sources within Minnesota. The State of Minnesota has acknowledged that approximately 90% of the mercury entering the state's airshed is from other national and international sources.

In September 2014, Minnesota promulgated the Mercury Air Emissions Reporting and Reduction Rule mandating mercury air emissions reporting and reductions from certain sources. The rule is applicable to all of our Minnesota operations and requires submittal of a Mercury Reduction Plan to reduce mercury emissions from taconite furnaces by 72% by January 2025. The Mercury Reduction Plans must be submitted by December 31, 2018. One of the main tenets agreed upon for evaluating potential mercury reduction technologies during TMDL implementation and 2014 rule development proceedings was that the selected technology would meet the following "Adaptive Management Criteria": the technology must be technically feasible; must be economically feasible; must not impact pellet quality; and must not cause excessive corrosion in pellet furnaces, associated duct work and existing wet scrubbers on the furnaces. However, the final 2014 rule does not explicitly include all four Adaptive Management Criteria for evaluating mercury reduction technologies, which were agreed upon in Minnesota's October 2009 Mercury TMDL Implementation Plan.

There is currently no proven technology to cost effectively reduce mercury emissions from taconite furnaces to the target level of 72% that would meet all four Adaptive Management Criteria. We remain concerned about the technical and economic feasibility to reduce taconite mercury emissions by 72% without impacting existing operations or other environmental permit obligations. We are in the process of conducting detailed engineering analysis and potential technology testing to determine the impact of the regulations on each unique taconite furnace affected by this rule. The results of this analysis will guide further dialogue with the MPCA regarding development of the 2018 Mercury Reduction Plans. Potential impacts to us are not estimable at this time as the development of potential mercury reduction technology remains in its early stages.

*Climate Change and GHG Regulation*

With the complexities and uncertainties associated with the U.S. and global navigation of the climate change issue as a whole, one of our potentially significant risks for the future is mandatory carbon pricing obligations. Policymakers are in the design process of carbon regulation at the state, regional, national and international levels. The current regulatory patchwork of carbon compliance schemes presents a challenge for multi-facility entities to identify their near-term risks. Amplifying the uncertainty, the dynamic forward outlook for carbon pricing obligations presents a challenge to large industrial companies to assess the long-term net impacts of carbon compliance costs on their operations. Our exposure on this issue includes both the direct and indirect financial risks associated with the regulation of GHG emissions, as well as potential physical risks associated with climate change. We are continuing to review the physical risks related to climate change utilizing our formal ERM process. As an energy-intensive business, our GHG emissions inventory includes a broad range of emissions sources, such as iron ore furnaces and kilns, diesel mining equipment and our wholly owned Silver Bay power generation plant, among others. As such, our most significant regulatory risks are: (1) the costs associated with on-site emissions levels (direct impacts), and (2) indirect costs passed through to us from electrical and fuel suppliers (indirect impacts).

Internationally, mechanisms to reduce emissions are being implemented in various countries, with differing designs and stringency, according to resources, economic structure and politics. We expect that momentum to extend carbon regulation will continue with implementation of the Paris climate agreement that was adopted in 2015, the aim of which is to keep the increase in global average temperature to below two degrees Celsius. Continued political attention to issues concerning climate change, the role of human activity in it and potential mitigation through regulation may have a material impact on our customer base, operations and financial results in the future.

In the U.S., federal carbon regulation potentially presents a significantly greater impact to our operations. To date, the U.S. Congress has not legislated carbon constraints. In the absence of comprehensive federal carbon legislation, numerous state, regional, and federal regulatory initiatives are under development or are becoming effective, thereby creating a disjointed approach to GHG control and potential carbon pricing impacts. In May 2010, the EPA promulgated the GHG Tailoring Rule establishing a mechanism for regulating GHG emissions from facilities through the Prevention of Significant Deterioration permitting program under the Clean Air Act. Under the GHG Tailoring Rule, as modified by a 2014 U.S. Supreme Court decision upholding some components of the rule, new projects that increase GHG emissions by a significant amount (generally more than 75,000 long tons of $CO_2$ emissions per year) and significantly increase emissions of at least one non-GHG criteria pollutant are subject to the Prevention of Significant

11

Table of Contents

Deterioration requirements, including the installation of best available control technology. We do not expect the Tailoring Rule provision to have a material adverse effect on our business in the near term and we cannot reliably estimate the long-term impact of the regulation.

In June 2013, President Obama issued a memorandum directing EPA to develop carbon emission standards for both new and existing power plants under the Clean Air Act's New Source Performance Standards ("NSPS"). In October 2015, EPA promulgated a CPP which consists of NSPS regulating carbon dioxide from existing power plants at a level of approximately 32% below 2005 levels by 2030. The CPP would not regulate combined heat and power generating facilities such as at Northshore's Silver Bay Power. The CPP directed states to submit SIPs to EPA by September 2016, but on February 9, 2016, the U.S. Supreme Court stayed the CPP immediately halting implementation. In March 2017, President Trump signed the Energy Independence Executive Order which called for, among other things, a review of the CPP and, if appropriate, reconsideration proceedings to suspend, revise, or rescind the rule. On the same day, Administrator Pruitt signed a notice indicating EPA's intent to review and, if appropriate, to propose to revise or rescind the CPP. The U.S. Court of Appeals for the D.C. Circuit has been holding CPP litigation in abeyance since April 2017. On October 10, 2017, following a review as directed by President Trump's Energy Independence Executive Order, the EPA proposed a rule to repeal the CPP and accepted comments on the proposed rule until January 16, 2018. The ultimate outcome of these carbon emission standards is not expected in the near term.

Due to the EPA's Tailoring Rule and potential patchwork state or regional carbon restriction schemes, our business and customer base could suffer negative financial impacts over time as a result of increased energy, environmental and other costs to comply with the limitations that would be imposed on GHG emissions. We believe our exposure can be reduced substantially by numerous factors, including currently contemplated regulatory flexibility mechanisms, such as allowance allocations, fixed process emissions exemptions, offsets and international provisions; emissions reduction opportunities, including energy efficiency, biofuels, fuel flexibility, emerging shale gas, coal mine methane offset reduction; and business opportunities associated with pursuing combined heat and power partnerships and new products, including DR-grade pellets, fluxed pellets and other efficiency-improving technologies.

We have worked proactively to develop a comprehensive, enterprise-wide GHG management strategy aimed at considering all significant aspects associated with GHG initiatives to plan effectively for and manage climate change issues, including risks and opportunities as they relate to the environment; stakeholders, including shareholders and the public; legislative and regulatory developments; operations; products and markets.

*Regional Haze FIP Rule*

In June 2005, the EPA finalized amendments to its regional haze rules. The rules require states to establish goals and emission reduction strategies for improving visibility in all Class I national parks and wilderness areas to natural background levels by 2064. Among the states with Class I areas are Michigan and Minnesota, in which we currently own and manage mining operations. The first phase of the regional haze rule required analysis and installation of Best Available Retrofit Technology ("BART") on eligible emission sources and incorporation of BART and associated emission limits into SIPs.

EPA disapproved Minnesota's and Michigan's SIPs for taconite furnaces and instead promulgated a Taconite Regional Haze FIP in February 2013. We, along with other stakeholders, petitioned the Eighth Circuit Court of Appeals for a review of the FIP, and in May 2013, we filed a joint motion for stay of the 2013 FIP, which was granted in June 2013. We, along with the other stakeholders, reached a settlement agreement with EPA to resolve certain items in the 2013 FIP. The settlement agreement, which was published in the Federal Register in January 2015 and fully executed in April 2015, prompted EPA to grant partial reconsideration of the 2013 FIP in July 2015. Subsequently, EPA published a FIP revision final rule to implement components of the settlement agreement in April 2016, with an effective date of May 12, 2016. We believe the 2016 Regional Haze FIP reflects progress toward a more technically and economically feasible regional haze implementation plan. In November 2016, the Eighth Circuit Court of Appeals terminated the June 2013 stay and extended the deadlines in the original 2013 FIP. Cost estimates associated with implementation of the 2013 and 2016 FIPs are reflected in our five-year capital plan.

Due to inconsistencies in language describing the procedures for calculating $NO_x$ emission limits between the settlement agreement and the 2016 FIP final rule, we jointly filed a Petition for Reconsideration and Petition for Judicial Review in June 2016. We have been working toward a settlement agreement with EPA to resolve the outstanding issue with the emission limit calculation method and anticipate resolution of the issue in 2018. The outcome of this proceeding is not expected to have a material adverse impact to the business.

Table of Contents

*$NO_2$ and $SO_2$ NAAQS*

During the first half of 2010, EPA promulgated rules that required each state to use a combination of air quality monitoring and computer modeling to determine each state's attainment classification status against new one-hour $NO_2$ and $SO_2$ NAAQS. During the third quarter of 2011, the EPA issued guidance to the regulated community on conducting refined air quality dispersion modeling and implementing the new $NO_2$ and $SO_2$ standards. In 2012, Minnesota issued Administrative Orders ("AOs") requiring taconite facilities to conduct modeling to demonstrate compliance with the $NO_2$ and $SO_2$ NAAQS pursuant to the Taconite Regional Haze SIP Long Term Strategy ("LTS"). Compliance with the LTS modeling demonstrations was originally set for June 30, 2017, but Minnesota has not advanced work on its 2012 AOs and is expected to remove NAAQS modeling obligations under the LTS in light of reduction in haze emissions associated with implementation of the taconite Regional Haze FIP regulations.

All of our operations in Minnesota and Michigan are expected to be in attainment for $NO_2$ and $SO_2$ NAAQS without incurring additional capital investment. While we will continue to monitor these developments and assess potential impacts, we do not anticipate further capital investments will be necessary to address $NO_2$ and $SO_2$ NAAQS requirements at this time.

*CERCLA 108(b)*

In December 2016, EPA published a proposed amendment to CERCLA section 108(b) which is focused on developing financial assurance for managing hazardous substances in the hardrock mining industry. EPA had a court-mandated deadline for publication of the final rule by December 1, 2017. The proposed rule would have required hardrock mining facilities to calculate their level of financial responsibility based on a formula included in the rule, secure an instrument or otherwise self-insure for the calculated amount, demonstrate to EPA the proof of the security, and maintain the security until EPA releases facilities from the CERCLA 108(b) regulations. The iron mining industry notified EPA of several errors upon which EPA drafted the rule, including a mistaken reliance on reporting data from a wholly different industry sector (iron and steel toxic release inventory reporting). We also participated in developing industry specific and national trade association comments and advocating directly with EPA and the White House Office of Management & Budget to address this and other errors with goals of exempting iron ore mining from CERCLA 108(b) applicability and correcting other deficiencies with the proposed rule. On December 1, 2017 EPA signed a federal register notice of EPA's decision not to issue final regulations for financial responsibility requirements for the hardrock mining industry under section 108(b) of CERCLA because EPA determined that the risks associated with these facilities' operations are addressed by existing federal and state programs and regulations and modern industry practices.

**Energy**

***Electricity***

As of February 2015, Wisconsin Electric Power Company is the sole supplier of electric power to our Tilden mine. During April 2015, the Tilden mine executed a special electricity contract with Wisconsin Electric Power Company. The term of the contract is through 2019. Wisconsin Electric Power Company provides 170 megawatts of electricity to Tilden at special rates that are regulated by the MPSC. The pricing under these contracts is generally fixed except Tilden is subject to frequent changes in Wisconsin Electric Power Company's power supply adjustment factor. During August 2016, Tilden executed a new 20-year special contract with Wisconsin Electric that is anticipated to start on January 1, 2020.

Tilden and Empire may also incur additional liabilities depending on the outcome of various proceedings concerning MISO's revised cost allocation methodology for continued operation of the Presque Isle Power Plant in Michigan. If FERC's award of SSR costs based on a revised cost allocation methodology applied retroactively is affirmed by the U.S. Court of Appeals for the District of Columbia Circuit, this could result in a cash payment of $12.3 million related to our Tilden mine and our indefinitely-idled Empire mine. As of December 31, 2017, this liability is included in our Statements of Consolidated Financial Position as part of *Accrued expenses*. Refer to NOTE 20 - COMMITMENTS AND CONTINGENCIES for further discussion of the Michigan Electricity Matters.

Minnesota Power supplies electric power to the Hibbing and United Taconite mines. During September 2008, Hibbing finalized an agreement with terms from November 2008 through December 2015. The agreement was approved by the Minnesota Public Utilities Commission ("MPUC") in 2009. The terms of the agreement included an automatic five-year extension that began January 2016. The United Taconite mine executed a new ten-year agreement with Minnesota Power that also included the Babbitt Mine. This agreement was finalized in May 2016 and was approved by the MPUC in November 2016.

13

Silver Bay Power, a wholly-owned subsidiary with a 115 megawatt power plant, is able to provide the majority of Northshore's electrical energy requirements. Silver Bay Power has an interconnection agreement with Minnesota Power for backup power when excess generation is necessary. In May 2016, Silver Bay Power entered into an agreement with Minnesota Power to purchase roughly half of Northshore's electricity needs from Minnesota Power through 2019. On January 1, 2020, Silver Bay Power will purchase 100% of the electricity requirements of Northshore from Minnesota Power and Silver Bay Power plans to idle both of its generating units except under certain circumstances.

Koolyanobbing and its associated satellite mine deposits draw power from independent diesel-fueled power stations and generators. Diesel power generation capacity has been installed at the Koolyanobbing operations.

### Process and Diesel Fuel

We have a long-term contract providing for the transport of natural gas on the Northern Natural Gas Pipeline for our U.S. Iron Ore operations. Tilden has the capability of burning natural gas, coal or, to a lesser extent, oil. Hibbing and Northshore have the capability to burn natural gas and oil. United Taconite has the ability to burn coal, natural gas and petroleum coke. Consistent with 2017, we expect during 2018 our U.S. Iron Ore operations will utilize both natural gas and coal to heat furnaces and produce power at our Silver Bay Power facility.

All of our mines utilize diesel fuel mainly for our mobile fleet. Thompson Gas supplies diesel fuel to all of our U.S. Iron Ore locations from the Husky refinery in Superior, Wisconsin. Our U.S. Iron Ore locations are contracted with Thompson Gas through the end of 2018.

## Employees

As of December 31, 2017, we had a total of 2,938 employees.

|  | **2017** | 2016 | 2015 |
|---|---|---|---|
| U.S. Iron Ore - Salaried[1] | **537** | 523 | 509 |
| U.S. Iron Ore - Hourly[1,3] | **2,171** | 2,178 | 1,813 |
| Asia Pacific Iron Ore - Salaried[2] | **78** | 82 | 90 |
| Discontinued Operations - Salaried[2] | **—** | 4 | 32 |
| Discontinued Operations - Hourly[2] | **—** | — | 41 |
| Corporate & Support Services - Salaried[4] | **152** | 140 | 153 |
| Total | **2,938** | 2,927 | 2,638 |

[1] Includes our employees and the employees of the U.S. Iron Ore joint venture.

[2] Excludes contracted mining employees.

[3] Excludes employees considered on lay-off status as a result of an indefinite or temporary idle.

[4] Includes employees of our HBI project.

Hourly employees at our Michigan and Minnesota iron ore mining operations, excluding Northshore, are represented by the USW and are covered by labor agreements between the USW and our various operating entities. These labor agreements that cover approximately 1,800 active USW-represented employees at our Empire and Tilden mines in Michigan, and our United Taconite and Hibbing mines in Minnesota are valid through September 30, 2018. Employees at our Northshore operations are not represented by a union and are not, therefore, covered by a collective bargaining agreement.

Hourly employees at our LS&I railroads are represented by seven unions covering approximately 100 employees. The labor agreements that cover these employees reopened for bargaining on December 31, 2014 and we are actively bargaining for successor agreements. These employees negotiate under the Railway Labor Act, which provides that labor agreements remain in force until replaced by a successor agreement. Under the Railway Labor Act work stoppages cannot occur until the parties have engaged in substantial negotiations, have mediated any disputes and have received a release from the National Mediation Board.

Salaried employees at our U.S. Iron Ore, Asia Pacific Iron Ore, Corporate and Support Services are not represented by a union and are not, therefore, covered by collective bargaining agreements.

A005276

Table of Contents

*Safety*

Safety is our primary core value as we continue toward a zero injury culture at all of our facilities.  We continuously monitor, measure and track our safety performance and make frequent improvements to affect change.  Best practices and incident learnings are shared globally to ensure each mine site can effectively administer our policies and procedures for enhanced workplace safety. Progress toward achieving our objectives is accomplished through a focus on proactive initiatives and results measured against established industry and company benchmarks, including our company-wide Total Reportable Incident Rate ("TRIR"). During 2017, our TRIR (including contractors) was 1.32 per 200,000 man-hours worked.

Refer to *Exhibit 95 Mine Safety Disclosures (filed herewith)* for mine safety information required in accordance with Section 1503(a) of the Dodd-Frank Act.

**Available Information**

Our headquarters are located at 200 Public Square, Suite 3300, Cleveland, Ohio 44114-2315, and our telephone number is (216) 694-5700. We are subject to the reporting requirements of the Exchange Act and its rules and regulations. The Exchange Act requires us to file reports, proxy statements and other information with the SEC. Copies of these reports and other information can be read and copied at:

SEC Public Reference Room
100 F Street N.E.
Washington, D.C. 20549

Information on the operation of the Public Reference Room may be obtained by calling the SEC at 1-800-SEC-0330.

The SEC maintains a website that contains reports, proxy statements and other information regarding issuers that file electronically with the SEC. These materials may be obtained electronically by accessing the SEC's home page at *www.sec.gov.*

We use our website, *www.clevelandcliffs.com*, as a channel for routine distribution of important information, including news releases, investor presentations and financial information. We also make available, free of charge on our website, our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to these reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act, as soon as reasonably practicable after we electronically file these documents with, or furnish them to, the SEC. In addition, our website allows investors and other interested persons to sign up to receive automatic email alerts when we post news releases and financial information on our website.

We also make available, free of charge on our website, the charters of the Audit Committee, Governance and Nominating Committee and Compensation and Organization Committee as well as the Corporate Governance Guidelines and the Code of Business Conduct and Ethics adopted by our Board of Directors. These documents are available through our investor relations page on our website at *www.clevelandcliffs.com*. The SEC filings are available by selecting "Financial Information" and then "SEC Filings," and corporate governance materials are available by selecting "Corporate Governance" for the Board Committee Charters, operational governance guidelines and the Code of Business Conduct and Ethics.

References to our website or the SEC's website do not constitute incorporation by reference of the information contained on such websites, and such information is not part of this Annual Report on Form 10-K.

Copies of the above-referenced information are also available, free of charge, by calling (216) 694-5700 or upon written request to:

Cleveland-Cliffs Inc.
Investor Relations
200 Public Square, Suite 3300
Cleveland, OH 44114-2315

15

Table of Contents

**EXECUTIVE OFFICERS OF THE REGISTRANT**

Following are the names, ages and positions of the executive officers of the Company as of  February 14, 2018. Unless otherwise noted, all positions indicated are or were held with Cleveland-Cliffs Inc.

| Name | Age | Position(s) Held |
|------|-----|------------------|
| Lourenco Goncalves | 60 | Chairman, President and Chief Executive Officer (August 2014 - present); and Chairman, President and Chief Executive Officer of Metals USA Holdings Corp., an American manufacturer and processor of steel and other metals (May 2006 - April 2013). |
| Terry G. Fedor | 53 | Executive Vice President, U.S. Iron Ore (January 2014 - present); and Vice President, U.S. Iron Ore Operations (February 2011 - January 2014). |
| Timothy K. Flanagan | 40 | Executive Vice President, Chief Financial Officer (January 2017 - present); Treasurer (March 2016 - December 2017); Vice President, Corporate Controller and Chief Accounting Officer (March 2012 - December 2016); and Assistant Controller (February 2010 - March 2012). |
| James D. Graham | 52 | Executive Vice President (November 2014 - present); Chief Legal Officer (March 2013 - present); Secretary (March 2014 - present); Vice President (January 2011 - October 2014); and General Counsel - Global Operations (January 2011 - March 2013). |
| Maurice D. Harapiak | 56 | Executive Vice President, Human Resources (March 2014 - present); Chief Administration Officer (January 2018 - present); and Regional Director, Human Resources - Barrick Gold of North America, a gold mining company (November 2011 - March 2014). |
| Terrence R. Mee | 48 | Executive Vice President, Global Commercial (October 2014 - present); Vice President, Global Iron Ore Sales (February 2014 - October 2014); Senior Vice President, Global Iron Ore Sales (March 2012 - February 2014); and Senior Vice President, Global Iron Ore and Metallic Sales (January 2011 - March 2012). |
| Clifford T. Smith | 58 | Executive Vice President, Business Development (April 2015 - present); Executive Vice President, Seaborne Iron Ore (January 2014 - April 2015); Executive Vice President, Global Operations (July 2013 - January 2014); Executive Vice President, Global Business Development (March 2013 - July 2013); and Senior Vice President, Global Business Development (January 2011 - March 2013). |
| R. Christopher Cebula | 47 | Vice President, Corporate Controller & Chief Accounting Officer (February 2017 - present); Senior Director, Corporate Financial Planning & Analysis (April 2013 - February 2017); Senior Director, Enterprise Risk Management (April 2010 - March 2013). |

All executive officers serve at the pleasure of the Board. There are no arrangements or understandings between any executive officer and any other person pursuant to which an executive officer was selected to be an officer of the Company. There is no family relationship between any of our executive officers, or between any of our executive officers and any of our directors.

16

Table of Contents

**Item 1A.**      *Risk Factors*

An investment in our common shares or other securities is subject to risk inherent to our business and our industry. Described below are certain risks and uncertainties, the occurrences of which could have a material adverse effect on us. Before making an investment decision, you should consider carefully all of the risks described below together with the other information included in this report. The risks and uncertainties described below include known material risks that we face currently. Although we have extensive risk management policies, practices and procedures aimed to mitigate these risks, uncertainties may nevertheless impair our business operation. This report is qualified in its entirety by these factors.

Our ERM function provides a framework for management's consideration of risk when making strategic, financial, operational and/or project decisions. The framework is based on ISO 31000, an internationally recognized risk management standard. Management uses a consistent methodology to identify and assess risks, determine and implement risk mitigation actions, and monitor and communicate information about the Company's key risks. Through these processes, we have identified six categories of risk that we are subject to: (I) economic and market, (II) regulatory, (III) financial, (IV) operational, (V) development and sustainability and (VI) human capital. The following risk factors are presented according to these key risk categories.

## I.  ECONOMIC AND MARKET RISKS

*The volatility of commodity prices, namely iron ore and steel, affects our ability to generate revenue, maintain stable cash flow and fund our operations, including growth and expansion projects.*

As a mining company, our profitability is dependent upon the price of the commodities that we sell to our customers and the price of the products our customers sell, namely iron ore and steel prices. The price of iron ore has fluctuated significantly in the past and is affected by factors beyond our control, including: steel inventories; international demand for raw materials used in steel production; rates of global economic growth, especially construction and infrastructure activity that requires significant amounts of steel; changes in the levels of economic activity in the U.S., China, India, Europe and other industrialized or developing countries; uncertainties or weaknesses in global economic conditions such as the U.S. debt ceiling; changes in production capacity of other iron ore suppliers, especially as additional supply comes online or where there is a significant increase in imports of steel into the U.S. or Europe; changes in trade laws; weather-related disruptions or natural disasters that may impact the global supply of iron ore; and the proximity, capacity and cost of infrastructure and transportation.

Our earnings, therefore, may fluctuate with the prices of the commodities we sell. To the extent that the prices of iron ore and steel, including the average hot-rolled coil steel price, significantly decline for an extended period of time, we may have to revise our operating plans, including curtailing production, reducing operating costs and capital expenditures and discontinuing certain exploration and development programs. We also may have to take impairments on our long-lived assets and/or inventory. Sustained lower prices also could cause us to further reduce existing reserves if certain reserves no longer can be economically mined or processed at prevailing prices. We may be unable to decrease our costs in an amount sufficient to offset reductions in revenues and may incur losses. These events could have a material adverse effect on us.

*Uncertainty or weaknesses in global economic conditions, reduced economic growth in China and oversupply of iron ore and excess steel or imported products could affect adversely our business.*

The world price of iron ore is influenced strongly by global economic conditions, including international demand and supply for iron ore products. In particular, the current level of international demand for raw materials used in steel production is driven largely by industrial growth in China. Uncertainties or weaknesses in global economic conditions, including the slowing economic growth rate in China, has resulted, and could in the future result, in decreased demand for our products and, together with oversupply of imported products, has and may continue to lead to decreased prices, resulting in lower revenue levels and decreasing margins, which have in the past and may in the future affect adversely our business and negatively impact our financial results. We are not able to predict whether the global economic conditions will improve or worsen and the impact it may have on our operations and the industry in general going forward.

17

A005279

Table of Contents

***Capacity expansions and limited rationalization of supply capacity within the mining industry could lead to lower or more volatile global iron ore prices, impacting our profitability.***

Global growth of iron ore demand, particularly from China, resulted in iron ore suppliers expanding their production capacity over the past few years. The supply of iron ore increased due to these expansions. The previous increases in our competitors' capacity along with actual reduced demand resulted in excess supply of iron ore continue to cause downward pressure on prices. The limited rationalization of supply capacity has led to volatile pricing which can have an adverse impact on our sales, margins and profitability. We do not have control over corporate strategies implemented by other iron ore producers that may result in volatility of global iron ore prices.

***If steelmakers use methods other than blast furnace production to produce steel or use other inputs, or if their blast furnaces shut down or otherwise reduce production, the demand for our current iron ore products may decrease.***

Demand for our iron ore products in North America is determined by the operating rates for the blast furnaces of steel companies. However, not all finished steel is produced by blast furnaces; finished steel also may be produced by other methods that use scrap steel, pig iron, hot briquetted iron and direct reduced iron. North American steel producers also can produce steel using imported iron ore, semi-finished steel products or other lighter-weight steel alternatives, which eliminates the need for domestic iron ore. Future environmental restrictions on the use of blast furnaces in North America also may reduce our customers' use of their blast furnaces. Maintenance of blast furnaces may require substantial capital expenditures and may cause prolonged outages, which may reduce demand for our pellets. Our customers may choose not to maintain, or may not have the resources necessary to maintain, their blast furnaces. If our customers use methods to produce steel that do not use iron ore pellets or if environmental or maintenance issues occur, demand for our current iron ore products will decrease, which would affect adversely our sales, margins, profitability and cash flows.

***Due to economic conditions and volatility in commodity prices, or otherwise, our customers could approach us about modification of their supply agreements or fail to perform under such agreements, which could impact adversely our sales, margins, profitability and cash flows.***

Although we have long-term contractual commitments for a majority of the sales in our U.S. Iron Ore business, uncertainty in global economic conditions may impact adversely the ability of our customers to meet their obligations. As a result of such market volatility, our customers could approach us about modifying their supply agreements or fail to perform under such agreements. Considering our limited base of current and potential customers, any modifications to our sales agreements or customers' failures to perform under such agreements could impact adversely our sales, margins, profitability and cash flows. For example, of the potential customers in the North American integrated steel industry, one is in reorganization proceedings, and certain others have experienced financial difficulties. A loss of sales to our existing customers could have a substantial negative impact on our sales, margins, profitability and cash flows. Other potential actions by our customers could result in additional contractual disputes and could ultimately require arbitration or litigation, either of which could be time consuming and costly. Any such disputes and/or failure to renew existing contracts on favorable terms could impact adversely our sales, margins, profitability and cash flows.

## II.    REGULATORY RISKS

***We are subject to extensive governmental regulation, which imposes, and will continue to impose, potential significant costs and liabilities on us. Future laws and regulations or the manner in which they are interpreted and enforced could increase these costs and liabilities or limit our ability to produce iron ore products.***

New laws or regulations, or changes in existing laws or regulations, or the manner of their interpretation or enforcement, could increase our cost of doing business and restrict our ability to operate our business or execute our strategies. This includes, among other things, the possible taxation under U.S. law of certain income from foreign operations, compliance costs and enforcement under the Dodd-Frank Act, and costs associated with complying with the Patient Protection and Affordable Care Act and the Healthcare and Education Reconciliation Act of 2010 and the regulations promulgated thereunder and any replacement or amendments thereof. In addition, we are subject to various federal, provincial, state and local laws and regulations in each jurisdiction in which we have operations for human health and safety, air quality, water pollution, plant, wetlands, natural resources and wildlife protection, reclamation and restoration of mining properties, the discharge of materials into the environment, the effects that mining has on groundwater quality, conductivity and availability, and related matters. Numerous governmental permits and approvals are required for our operations.

We cannot be certain that we have been or will be at all times in complete compliance with such laws, regulations, permits and approvals. If we violate or fail to comply with these laws, regulations, permits or approvals, we could be fined or otherwise sanctioned by regulators. Compliance with the complex and extensive laws and regulations to which

Table of Contents

we are subject imposes substantial costs, which could increase over time because of increased regulatory oversight, adoption of increasingly stringent environmental standards, and increased demand for remediation services leading to shortages of equipment, supplies and labor, as well as other factors.

Specifically, there are several notable proposed or recently enacted rulemakings or activities to which we would be subject or that would further regulate and/or tax our customers, namely the North American integrated steel producer customers, that may also require us or our customers to reduce or otherwise change operations significantly or incur significant additional costs, depending on their ultimate outcome. These emerging or recently enacted rules, regulations and policy guidance include, but are not limited to: trade regulations, such as possible changes to the North American Free Trade Agreement; numerous air regulations, such as climate change and greenhouse gas regulation, NAAQS including but not limited to those for $NO_2$ and $SO_2$, and Minnesota's Mercury Air Emissions Reporting and Reduction Rule; Mercury Total Maximum Daily Load requirements and Taconite Mercury Reduction Strategy; selenium discharge regulation; conductivity water quality standards for aquatic life; expansion of federal jurisdictional authority to regulate groundwater and various other water quality regulations. Such new or more stringent legislation, regulations, interpretations or orders, when enacted and enforced, could have a material adverse effect on our business, results of operations, financial condition or profitability.

***Although the numerous regulations, operating permits and our management systems mitigate potential impacts to the environment, our operations inadvertently may impact the environment or cause exposure to hazardous substances, which could result in material liabilities to us.***

Our operations currently use and have used in the past, hazardous materials, and, from time to time, we have generated solid and hazardous waste. We have been, and may in the future be, subject to claims under federal, provincial, state and local laws and regulations for toxic torts, natural resource damages and other damages as well as for the investigation and clean-up of soil, surface water, sediments, groundwater and other natural resources and reclamation of properties. Such claims for damages and reclamation may arise out of current or former conditions at sites that we own, lease or operate currently, as well as sites that we or our acquired companies have owned, leased or operated, and at contaminated sites that have been owned, leased or operated by our joint venture partners. Our liability for these claims may be strict, and/or joint and several, such that we may be held responsible for more than our share of the contamination or other damages, or even for the entire share regardless of fault. We are subject to a variety of potential liability exposures arising, or otherwise involved in investigation and remediation activities, at certain sites. In addition to sites currently owned, leased or operated, these include sites where we formerly conducted iron ore and/or coal mining or processing or other operations, inactive sites that we currently own, predecessor sites, acquired sites, leased land sites and third-party waste disposal sites. We may be named as a responsible party at other sites in the future and we cannot be certain that the costs associated with these additional sites will not be material.

We also could be subject to litigation for alleged bodily injuries arising from claimed exposure to hazardous substances allegedly used, released, or disposed of by us. In particular, we and certain of our subsidiaries were involved in various claims relating to the exposure of asbestos and silica to seamen who sailed until the mid-1980s on the Great Lakes vessels formerly owned and operated by certain of our subsidiaries. While several hundred of these claims against us had been combined in a multidistrict litigation docket and have since been dismissed and/or settled for non-material amounts, there remains a possibility that similar types of claims could be filed in the future.

Environmental impacts as a result of our operations, including exposures to hazardous substances or wastes associated with our operations, could result in costs and liabilities that could materially and adversely affect our margins, cash flow or profitability.

***We may be unable to obtain and/or renew permits necessary for our operations or be required to provide additional financial assurance, which could reduce our production, cash flows, profitability and available liquidity. We also could face significant permit and approval requirements that could delay our commencement or continuation of new or existing production operations which, in turn, could affect materially our cash flows, profitability and available liquidity.***

Prior to commencement of mining, we must submit to and obtain approval from the appropriate regulatory authority of plans showing where and how mining and reclamation operations are to occur. These plans must include information such as the location of mining areas, stockpiles, surface waters, haul roads, tailings basins and drainage from mining operations. All requirements imposed by any such authority may be costly and time-consuming and may delay commencement or continuation of exploration or production operations.

19

Mining companies must obtain numerous permits that impose strict conditions on various environmental and safety matters in connection with iron ore mining. These include permits issued by various federal, state and local agencies and regulatory bodies. The permitting rules are complex and may change over time, making our ability to comply with the applicable requirements more difficult or impractical and costly, possibly precluding the continuance of ongoing operations or the development of future mining operations. Interpretations of rules may also change over time and may lead to requirements, such as additional financial assurance, making it more costly to comply. The public, including special interest groups and individuals, have certain rights under various statutes to comment upon, submit objections to, and otherwise engage in the permitting process, including bringing citizens' lawsuits to challenge such permits or mining activities. Accordingly, required permits may not be issued or renewed in a timely fashion (or at all), or permits issued or renewed may be conditioned in a manner that may restrict our ability to conduct our mining and production activities efficiently, including the requirement for additional financial assurances that we may not be able to provide on commercially reasonable terms or at all and which would further limit our borrowing base under our ABL Facility. Such inefficiencies could reduce our production, cash flows, profitability and available liquidity.

### III.    FINANCIAL RISKS

***A substantial majority of our sales are made under supply agreements with specified duration to a low number of customers that contain price-adjustment clauses that could affect adversely the stability and profitability of our operations.***

A majority of our U.S. Iron Ore sales and our Asia Pacific Iron Ore sales are made under supply agreements with specified durations to a limited number of customers. For the year ended December 31, 2017, approximately 74% of our revenues from product sales and services was derived from the North American integrated steel industry and three customers together accounted for 88% of our U.S. Iron Ore product sales revenues (representing 70% of our consolidated revenues). Our legacy agreements with ArcelorMittal USA expired at the end of December 2016 and January 2017. The parties executed a long-term agreement, which became effective October 31, 2016 and expires at the end of December 2026. Our average remaining duration of our U.S. Iron Ore contracts as of December 31, 2017 is approximately seven years. Pricing under our contract with ArcelorMittal is adjusted by the price of hot-rolled coil steel in the U.S. domestic market, and iron ore and general inflation indices. As a result of this and other pricing constructs contained in our customer contracts and those anticipated in future periods, our financial results have increased sensitivity to changes in iron ore and steel prices. Our Asia Pacific Iron Ore annually-negotiated contracts are with steel companies primarily in China, Japan and South Korea. In March 2017, we extended the majority of our supply agreements with steel producers in China for one year. These contracts will expire in March 2018, and we will only renew it if it can be done in an economically viable manner. Our supply agreement with our client in South Korea expired in December 2017. We renewed that agreement for 2018; however, it is at a lower committed quantity than our previous agreement. Our supply agreements with our customers in Japan expire in March 2018. These contracts could be renewed for an additional term. Pricing for our Asia Pacific Iron Ore Chinese customers consists of shorter-term pricing mechanisms of various durations up to three months based on the average of daily spot prices that are generally associated with the time of unloading of each shipment. Pricing with our Japanese and South Korean customers is generally similar to the inputs used with our Chinese customers, but the pricing inputs are fixed before shipment.

***Our existing and future indebtedness may limit cash flow available to invest in the ongoing needs of our business, which could prevent us from fulfilling our obligations under our senior notes and ABL Facility.***

As of December 31, 2017, we had an aggregate principal amount of  $2,439.4 million of long-term debt, $400.0 million of which was secured (excluding $46.5 million of outstanding letters of credit and  $47.8 million of capital leases), and  $1,007.7 million of cash on our balance sheet. As of December 31, 2017, no loans were drawn under the ABL Facility and we had total availability of $273.2 million as a result of borrowing base limitations. As of December 31, 2017, the principal amount of letters of credit obligations and other commitments totaled $46.5 million, thereby further reducing available borrowing capacity on our ABL Facility to $226.7 million.

Our substantial level of indebtedness requires us to dedicate a significant portion of our cash flow from operations to the payment of debt service, reducing the availability of our cash flow to fund capital expenditures, acquisitions or strategic development initiatives, and other general corporate purposes. Moreover, our level of indebtedness could have further consequences, including, increasing our vulnerability to adverse economic or industry conditions, limiting our ability to obtain additional financing in the future to enable us to react to changes in our business, or placing us at a competitive disadvantage compared to businesses in our industry that have less indebtedness.

Our substantial level of indebtedness could limit our ability to obtain additional financing on acceptable terms or at all for working capital, capital expenditures, acquisitions or strategic development initiatives, and general corporate purposes. Our liquidity needs could vary significantly and may be affected by general economic conditions, industry

A005282

trends, performance and many other factors not within our control. If we are unable to generate sufficient cash flow from operations in the future to service our debt, we may be required to refinance all or a portion of our existing debt. Although we were successful in financing our HBI project, we may not be able to obtain any such new or additional debt on favorable terms or at all.

Any failure to comply with covenants in the instruments governing our debt could result in an event of default which, if not cured or waived, would have a material adverse effect on us.

***We may not be able to generate sufficient cash to service all of our debt, and may be forced to take other actions to satisfy our obligations under our debt, which may not be successful.***

Our ability to make scheduled payments on or to refinance our debt obligations depends on our ability to generate cash in the future and our financial condition and operating performance, which are subject to prevailing economic and competitive conditions and to certain financial, business and other factors beyond our control. We cannot assure you that we will maintain a level of cash flows from operating activities sufficient to permit us to pay the principal, premium, if any, and interest on our debt.

We also have significant capital requirements, including interest payments to service our debt. If we incur significant losses in future periods, we may be unable to continue as a going concern. If we are unable to continue as a going concern, we may consider, among other options, restructuring our debt; however, there can be no assurance that these options will be undertaken and, if so undertaken, whether these efforts will succeed.

If our cash flows and capital resources are insufficient to fund our debt service obligations, we may be forced to reduce or delay investments and capital expenditures, or to sell assets, seek additional capital, including additional secured or unsecured debt, or restructure or refinance our debt. Any refinancing of our debt could be at higher interest rates and may require us to comply with more onerous covenants, making it more difficult to obtain surety bonds, letters of credit or other financing, particularly during periods in which credit markets are weak; causing a change in our credit ratings; limiting our ability to compete with companies that are not as leveraged and that may be better positioned to withstand economic downturns; and limiting our flexibility in planning for, or reacting to, and increasing our vulnerability to, changes in our business, the industry in which we compete and general economic and market conditions. These measures may not be successful and may not permit us to meet our scheduled debt service obligations.

If our operating results and available cash are insufficient to meet our debt service obligations, we could face substantial liquidity problems and might be required to dispose of material assets or operations to meet our debt service and other obligations. We may not be able to consummate those dispositions or recover the carrying value of those assets or obtain the proceeds that we could realize from them, and these proceeds may not be adequate to meet any debt service obligations then due. Further, we may need to refinance all or a portion of our debt on or before maturity, and we may not be able to refinance any of our debt on commercially reasonable terms or at all. Furthermore, additional or new financial assurances may be demanded by our vendors or regulatory agencies that we may not be able to provide on commercially reasonable terms or at all.

Any of these examples potentially could have a material adverse impact on our results of operations, profitability, shareholders' equity and capital structure. Also, if we are to sell a percentage of a business, there are inherent risks relating to joint venture relationships, as noted in the risk factor below.

***We rely on our joint venture partners to meet their payment obligations and we are subject to risks involving the acts or omissions of our joint venture partners.***

We co-own and manage one of our four operating U.S. Iron Ore mines with ArcelorMittal and U.S. Steel. We rely on our joint venture partners to make their required capital contributions and to pay for their share of the iron ore produced. One of our U.S. Iron Ore joint venture partners is also our customer. If one or both of our joint venture partners fail to perform their obligations, the remaining joint venture partners, including ourselves, may be required to assume additional material obligations, including significant capital contribution, costs of environmental remediation, pension and postretirement health and life insurance benefit obligations. For example, a premature closure of a mine due to the failure of a joint venture partner to perform its obligations could result in significant fixed mine-closure costs, including severance, employment legacy costs and other employment costs; reclamation and other environmental costs; and the costs of terminating long-term obligations, including energy and transportation contracts and equipment leases.

A005283

We cannot control the actions of our joint venture partners because we have a minority interest in such joint venture. Further, in spite of performing customary due diligence prior to entering into a joint venture, we cannot guarantee full disclosure of prior acts or omissions of the sellers or those with whom we may in the future enter into joint ventures. Such risks could have a material adverse effect on the business, results of operations or financial condition of our existing or future joint venture interests.

**Our ability to collect payments from our customers depends on their creditworthiness.**

Our ability to receive payment for products sold and delivered to our customers depends on the creditworthiness of our customers. With respect to our Asia Pacific business unit, payment typically is received as the products are shipped and much of the product is secured by bank letters of credit. By contrast, in our U.S. Iron Ore business unit, generally, we deliver iron ore products to our customers' facilities in advance of payment for those products. Under this practice for our U.S. customers, title and risk of loss with respect to U.S. Iron Ore products does not pass to the customer until payment for the pellets is received; however, there is typically a period of time in which pellets, for which we have reserved title, are within our customers' control. Where we have identified credit risk with certain customers, we have put in place alternate payment terms from time to time.

Consolidation in some of the industries in which our customers operate have created larger customers. These factors have caused some customers to be less profitable and increased our exposure to credit risk. Customers in other countries may be subject to other pressures and uncertainties that may affect their ability to pay, including trade barriers, exchange controls, and local, economic and political conditions. Downturns in the economy and disruptions in the global financial markets have affected the creditworthiness of our customers from time to time. Some of our customers are highly leveraged. If economic conditions worsen or prolonged global, national or regional economic recession conditions return, it is likely to impact significantly the creditworthiness of our customers and could, in turn, increase the risk we bear on payment default for the credit we provide to our customers and could limit our ability to collect receivables. Failure to receive payment from our customers for products that we have delivered could affect adversely our results of operations, financial condition and liquidity.

**Our operating expenses could increase significantly if the price of electrical power, fuel or other energy sources increases.**

Our mining operations require significant use of energy. Energy expenses, which make up approximately 20% to 25% in the aggregate of our operating costs in our U.S. Iron Ore locations, are sensitive to changes in electricity prices and fuel prices, including diesel fuel and natural gas prices. Prices for electricity, natural gas and fuel oils can fluctuate widely with availability and demand levels from other users. During periods of peak usage, supplies of energy may be curtailed and we may not be able to purchase them at historical rates. A disruption in the transmission of energy, inadequate energy transmission infrastructure, or the termination of any of our energy supply contracts could interrupt our energy supply and affect adversely our operations. While we have some long-term contracts with electrical suppliers, we are exposed to fluctuations in energy costs that can affect our production costs. As an example, our mines in Minnesota are subject to changes in Minnesota Power's rates, such as periodic rate changes that are reviewed and approved by the state public utilities commission in response to an application filed by Minnesota Power. We also enter into market-based pricing supply contracts for natural gas and diesel fuel for use in our operations. Those contracts expose us to price increases in energy costs, which could cause our profitability to decrease significantly.

In addition, U.S. public utilities are expected to pass through additional capital and operating cost increases to their customers related to new or pending U.S. environmental regulations that are expected to require significant capital investment and use of cleaner fuels in the future and which may impact U.S. coal-fired generation capacity. Our mines in Michigan rely on electricity supplied from the Presque Isle Power Plant, which is coal-fired. In 2016, we entered into a twenty-year power purchase agreement that contemplates the capital investment by the power company to construct two natural gas power plants in Michigan. Should the power company fail to build the new power plants or experience significant construction delays, we may be subject to increased operational risk from continued reliance on the existing power plant or increased costs in pursuing alternatives, which could also decrease our profitability.

**We are subject to a variety of financial market risks.**

Financial market risks include those caused by changes in the value of investments, changes in commodity prices, interest rates and foreign currency exchange rates. We have established policies and procedures to manage such risks; however, certain risks are beyond our control and our efforts to mitigate such risks may not be effective. These factors could have a material adverse effect on our results of operations.

22

*We are subject to bankruptcy or insolvency risks relating to our former Canadian operations.*

As previously disclosed, the Bloom Lake Group commenced restructuring proceedings under the CCAA in January 2015 to address the Bloom Lake Group's immediate liquidity issues and to preserve and protect its assets for the benefit of all stakeholders while restructuring and/or sale options were explored. In May 2015, the Wabush Group also commenced restructuring proceedings under the CCAA. It is possible that (a) as part of the CCAA process (i) claims may be asserted by or on behalf of the Bloom Lake Group or the Wabush Group or by their respective representatives against us and/or non-debtor affiliates of the Bloom Lake Group and the Wabush Group and/or (ii) our claims and non-debtor affiliate claims against the Bloom Lake Group or the Wabush Group may be challenged; and (b) creditors of the Bloom Lake Group, the Wabush Group or their respective representatives may assert claims which may impact adversely non-debtor affiliates of the Bloom Lake Group and the Wabush Group. While we anticipate the proceeds of the sale of the Bloom Lake Group and the Wabush Group assets may mitigate these risks, to the extent that any such claims are successful, we could be held liable for certain claims or be limited in the amount of recovery on account of its claims against the Bloom Lake Group and the Wabush Group.

*A court or regulatory body could find that we are responsible, in whole or in part, for liabilities we transferred to third party purchasers.*

As part of our strategy to focus on our U.S. Iron Ore operations, we have sold or otherwise disposed of several non-core assets, such as our North American Coal assets. Some of the transactions under which we sold or otherwise disposed of our non-core assets included provisions transferring certain liabilities to the purchasers or acquirers of those non-core assets. While we believe that all such transfers were completed properly and are legally binding, if the purchaser fails to fulfill its obligations, we may be at risk that some court or regulatory body could disagree and determine that we remain responsible for liabilities we intended to and did transfer.

*Changes in credit ratings issued by nationally recognized statistical rating organizations could adversely affect our cost of financing and the market price of our securities.*

Credit rating agencies could downgrade our ratings either due to factors specific to our business, a prolonged cyclical downturn in the mining industry, or macroeconomic trends (such as global or regional recessions) and trends in credit and capital markets more generally. Any decline in our credit ratings may result in an increase to our cost of future financing and limit our access to the capital markets, which would harm our financial condition and results of operations, hinder our ability to refinance existing indebtedness on acceptable terms, have an adverse effect on the market price of our securities and may affect adversely the terms under which we purchase goods and services.

*Our actual operating results may differ significantly from our guidance.*

From time to time, we release guidance, including that set forth under "Management's Discussion and Analysis of Financial Condition and Results of Operations-Outlook" in our Annual Reports on Form 10-K and our Quarterly Reports on Form 10-Q, regarding our future performance. This guidance, which consists of forward-looking statements, is prepared by our management and is qualified by, and subject to, the assumptions and the other information included in our Annual Reports on Form 10-K and our Quarterly Reports on Form 10-Q. Our guidance is not prepared with a view toward compliance with published guidelines of the American Institute of Certified Public Accountants, and neither our independent registered public accounting firm nor any other independent or outside party compiles or examines the guidance and, accordingly, no such person expresses any opinion or any other form of assurance with respect thereto.

Guidance is based upon a number of assumptions and estimates that, while presented with numerical specificity, are inherently subject to business, economic and competitive uncertainties and contingencies, many of which are beyond our control and are based upon specific assumptions with respect to future business decisions, some of which will change. The principal reason that we release such data is to provide a basis for our management to discuss our business outlook with analysts and investors. We do not accept any responsibility for any projections or reports published by any such persons.

Guidance is necessarily speculative in nature, and it can be expected that some or all of the assumptions of the guidance furnished by us will not materialize or will vary significantly from actual results. Accordingly, our guidance is only an estimate of what management believes is realizable as of the date of release. Actual results will vary from the guidance. Investors should also recognize that the reliability of any forecasted financial data diminishes the farther in the future that the data is forecast. In light of the foregoing, investors are urged to put the guidance in context and not to place undue reliance on it.

23

Any failure to successfully implement our operating strategy or the occurrence of any of the events or circumstances set forth in our Annual Reports on Form 10-K or our Quarterly Reports on Form 10-Q could result in actual operating results being different than the guidance, and such differences may be adverse and material.

## IV.    OPERATIONAL RISKS

***We incur certain costs when production capacity is idled, including increased costs to resume production at idled facilities and costs to idle facilities.***

Our decisions concerning which mines to operate and at what capacity levels are made based upon our customers' orders for products, the quality of and cost to mine and process the remaining ore body, as well as the capabilities and cost performance of our mines. During depressed market conditions, we may concentrate production at certain mines and not operate others in response to customer demand and as a result we will incur idle facility costs. In 2016, two of our Minnesota mines were temporarily idled for a portion of the year, and we indefinitely idled the Empire mine in Michigan in August 2016.

When we restart idled facilities, we incur certain costs to replenish inventories, prepare the previously idled facilities for operation, perform the required repair and maintenance activities and prepare employees to return to work safely and to resume production responsibilities. The amount of any such costs can be material, depending on a variety of factors, such as the period of idle time, necessary repairs and available employees, and is difficult to project.

Faced with overcapacity in the iron ore market, we may seek to rationalize assets through asset sales, temporary shutdowns, indefinite idles or closures of facilities.

***Mine closures entail substantial costs. If we prematurely close one or more of our mines, our results of operations and financial condition would likely be affected adversely.***

If we prematurely close any of our mines, our revenues would be reduced unless we were able to increase production at our other mines, which may not be possible. The closure of a mining operation involves significant fixed closure costs, including accelerated employment legacy costs, severance-related obligations, reclamation and other environmental costs, and the costs of terminating long-term obligations, including customer, energy and transportation contracts and equipment leases. A review of these types of potential costs is currently underway with respect to our Asia Pacific Iron Ore operations. We base our assumptions regarding the life of our mines on detailed studies we perform from time to time, but those studies and assumptions are subject to uncertainties and estimates that may not be accurate. We recognize the costs of reclaiming open pits, stockpiles, tailings ponds, roads and other mining support areas based on the estimated mining life of our property. If we were to significantly reduce the estimated life of any of our mines, the mine-closure costs would be applied to a shorter period of production, which would increase costs per ton produced and could significantly and adversely affect our results of operations and financial condition.

A U.S. mine permanent closure could accelerate and significantly increase employment legacy costs, including our expense and funding costs for pension and other postretirement benefit obligations. A number of employees would be eligible for immediate retirement under special eligibility rules that apply upon a mine closure. All employees eligible for immediate retirement under the pension plans at the time of the permanent mine closure also could be eligible for postretirement health and life insurance benefits, thereby accelerating our obligation to provide these benefits. Certain mine closures would precipitate a pension closure liability significantly greater than an ongoing operation liability. Finally, a permanent mine closure could trigger severance-related obligations, which can equal up to sixteen weeks of pay per employee in some jurisdictions, depending on length of service. As a result, the closure of one or more of our mines could affect adversely our financial condition and results of operations.

***Our sales and competitive position depend on the ability to transport our products to our customers at competitive rates and in a timely manner.***

In our U.S. Iron Ore operations, disruption of the lake and rail transportation services because of weather-related problems, including ice and winter weather conditions on the Great Lakes or St. Lawrence Seaway, climate change, strikes, lock-outs, or other events and lack of alternative transportation options, could impair our ability to supply iron ore to our customers at competitive rates or in a timely manner and, thus, could adversely affect our sales, margins and profitability. Further, reduced dredging and environmental changes, particularly at Great Lakes ports, could impact negatively our ability to move our iron ore products because lower water levels restrict the tonnage that vessels can haul, resulting in higher freight rates.

24

Table of Contents

Our Asia Pacific Iron Ore operations also are dependent upon rail and port capacity. Disruptions in rail service or availability of dock capacity could similarly impair our ability to supply iron ore to our customers, thereby adversely affecting our sales and profitability. In addition, our Asia Pacific Iron Ore operations are also in direct competition with the major world seaborne exporters of iron ore and our customers face higher transportation costs than the customers of most other Australian producers to ship our products to the Asian markets because of the location of our major shipping port on the southwest coast of Australia. Further, increases in transportation costs, including volatile fuel rates, decreased availability of ocean vessels or changes in such costs relative to transportation costs incurred by our competitors could make our products less competitive, restrict our access to certain markets and have an adverse effect on our sales, margins and profitability.

***Natural disasters, weather conditions, disruption of energy, unanticipated geological conditions, equipment failures, and other unexpected events may lead our customers, our suppliers or our facilities to curtail production or shut down operations.***

Operating levels within the mining industry are subject to unexpected conditions and events that are beyond the industry's control. Those events could cause industry members or their suppliers to curtail production or shut down a portion or all of their operations, which could reduce the demand for our iron ore products, and could affect adversely our sales, margins and profitability.

Interruptions in production capabilities inevitably will increase our production costs and reduce our profitability. We do not have meaningful excess capacity for current production needs, and we are not able to quickly increase production or re-start production at one mine to offset an interruption in production at another mine. Additionally, re-start production costs can be even higher if required to be taken during extremely cold weather conditions.

A portion of our production costs are fixed regardless of current operating levels. As noted, our operating levels are subject to conditions beyond our control that can delay deliveries or increase the cost of mining at particular mines for varying lengths of time. These include weather conditions (for example, extreme winter weather, tornadoes, floods, and the lack of availability of process water due to drought) and natural and man-made disasters, tailings dam failures, pit wall failures, unanticipated geological conditions, including variations in the amount of rock and soil overlying the deposits of iron ore, variations in rock and other natural materials and variations in geologic conditions and ore processing changes.

The manufacturing processes that take place in our mining operations, as well as in our processing facilities, depend on critical pieces of equipment. This equipment may, on occasion, be out of service because of unanticipated failures. In addition, all of our mines and processing facilities have been in operation for several decades, and the equipment is aged. In the future, we may experience additional material plant shutdowns or periods of reduced production because of equipment failures. Further, remediation of any interruption in production capability may require us to make large capital expenditures that could have a negative effect on our profitability and cash flows. Our business interruption insurance would not cover all of the lost revenues associated with equipment failures. Longer-term business disruptions could result in a loss of customers, which adversely could affect our future sales levels and, therefore, our profitability.

Regarding the impact of unexpected events happening to our suppliers, many of our mines are dependent on one source for electric power and for natural gas. A significant interruption in service from our energy suppliers due to terrorism or sabotage, weather conditions, natural disasters, or any other cause can result in substantial losses that may not be fully recoverable, either from our business interruption insurance or responsible third parties.

***We may not have adequate insurance coverage for some business risks.***

As noted above, our operations are generally subject to a number of hazards and risks, which could result in damage to, or destruction of, equipment, properties or facilities. The insurance that we maintain to address risks that are typical in our business may not provide adequate coverage. Insurance against some risks, such as liabilities for environmental pollution, tailings basin breaches, or certain hazards or interruption of certain business activities, may not be available at an economically reasonable cost, or at all. Even if available, we may self-insure where we determine it is most cost-effective to do so. As a result, accidents or other negative developments involving our mining, production or transportation activities could have a material adverse effect on our operations.

A005287

***A disruption in, or failure of our information technology systems, including those related to cybersecurity, could adversely affect our business operations and financial performance.***

We rely on the accuracy, capacity and security of our information technology ("IT") systems for the operations of many of our business processes and to comply with regulatory, legal, and tax requirements. While we maintain some of our critical information technology systems, we are also dependent on third parties to provide important IT services relating to, among other things, human resources, electronic communications and certain finance functions. Despite the security measures that we have implemented, including those related to cybersecurity, our systems could be breached or damaged by computer viruses, natural or man-made incidents or disasters or unauthorized physical or electronic access. Though we have controls in place, we cannot provide assurance that a cyber-attack will not occur. Furthermore, we may have little or no oversight with respect to security measures employed by third-party service providers, which may ultimately prove to be ineffective at countering threats. Failures of our IT systems, whether caused maliciously or inadvertently, may result in the disruption of our business processes, or in the unauthorized release of sensitive, confidential or otherwise protected information or result in the corruption of data, which could adversely affect our business operations and financial performance. In addition, we may be required to incur significant costs to protect against and, if required, remediate the damage caused by such disruptions or system failures in the future.

***We are subject to risks involving operations and sales in multiple countries.***

We supply raw materials to the global integrated steel industry with substantial assets located outside of the U.S. We conduct operations in the U.S. and Australia. As such, we are subject to additional risks beyond those relating to our U.S. operations, such as fluctuations in currency exchange rates; potentially adverse tax consequences due to overlapping or differing tax structures; burdens to comply with multiple and potentially conflicting foreign laws and regulations, including export requirements, tariffs, economic sanctions and other barriers, environmental health and safety requirements, and unexpected changes in any of these laws and regulations; the imposition of duties, tariffs, import and export controls and other trade barriers impacting the seaborne iron ore markets; difficulties in staffing and managing multi-national operations; political and economic instability and disruptions, including terrorist attacks; disadvantages of competing against companies from countries that are not subject to U.S. laws and regulations, including the Foreign Corrupt Practices Act; and uncertainties in the enforcement of legal rights and remedies in multiple jurisdictions.

With the finalization of the Organization for Economic Cooperation and Development's ("OECD"), Base Erosion and Profit Shifting study, referred to as the Actions, many OECD countries have acknowledged their intent to implement the Actions and update their local tax regulations. The extent (if any) to which countries in which we operate adopt and implement the Actions could affect our effective tax rate and our future results from non-U.S. operations.

Compliance with the laws and regulations described above or with other applicable foreign, federal, state, provincial and local laws and regulations currently in effect or that may be adopted in the future could expose us to additional risks. If we are unable to manage successfully the risks associated with operating our global business, these risks could have a material adverse effect on our business, results of operations or financial condition.

***Our profitability could be affected adversely by the failure of outside contractors and/or suppliers to perform.***

Asia Pacific Iron Ore uses contractors to handle many of the operational phases of its mining and processing operations and, therefore, we are subject to the performance of outside companies on key production areas. We use contractors to help complete certain capital projects, such as upgrades to our existing U.S. Iron Ore facilities, and a contractor's or supplier's failure to perform could affect adversely our production, sales, and our ability to fulfill customer requirements. Such failure to perform in a significant way would result in additional costs for us, which also could affect adversely our production rates, sales and results of operations.

## V.  DEVELOPMENT AND SUSTAINABILITY RISKS

***The cost and time to implement a strategic capital project may prove to be greater than originally anticipated.***

We undertake strategic capital projects, such as the HBI project, in order to enhance, expand or upgrade our mines, production capabilities and diversify our customer base. Our ability to achieve the anticipated volumes of production, revenues or otherwise realize acceptable returns on strategic capital projects that we may undertake is subject to a number of risks, many of which are beyond our control, including a variety of market (such as a volatile pricing environment for iron ore), operational, permitting and labor-related factors. Further, the cost to implement any given strategic capital project ultimately may prove to be greater and may take more time than originally anticipated. Inability to achieve the anticipated results from the implementation of our strategic capital projects, or the incurring of

26

unanticipated implementation costs, penalties or inability to meet contractual obligations could affect adversely our results of operations and future earnings and cash flow generation.

***We continually must replace reserves depleted by production. Exploration activities may not result in additional discoveries.***

Our ability to replenish our ore reserves is important to our long-term viability. Depleted ore reserves must be replaced by further delineation of existing ore bodies or by locating new deposits in order to maintain production levels over the long term. For example, in 2017 we made investments in our Tilden and Empire mines and in land in Minnesota to provide future potential ore reserves. Resource exploration and development are highly speculative in nature. Exploration projects involve many risks, require substantial expenditures and may not result in the discovery of sufficient additional mineral deposits that can be mined profitably. Once a site with mineralization is discovered, it may take several years from the initial phases of drilling until production is possible, during which time the economic feasibility of production may change. Substantial expenditures are required to establish recoverable proven and probable reserves and to construct mining and processing facilities. As a result, there is no assurance that current or future exploration programs will be successful and there is a risk that depletion of reserves will not be offset by discoveries or acquisitions.

***We rely on estimates of our recoverable reserves, which is complex due to geological characteristics of the properties and the number of assumptions made.***

We regularly evaluate our U.S. Iron Ore reserves based on revenues and costs and update them as required in accordance with SEC Industry Guide 7. Our Asia Pacific Iron Ore business segment has published reserves that follow the Joint Ore Reserve Code in Australia, with certain changes to our Western Australian reserve values to make them comply with SEC requirements. There are numerous uncertainties inherent in estimating quantities of reserves of our mines, including many factors beyond our control.

Estimates of reserves and future net cash flows necessarily depend upon a number of variable factors and assumptions, such as production capacity, effects of regulations by governmental agencies, future prices for iron ore, future industry conditions and operating costs, severance and excise taxes, development costs and costs of extraction and reclamation, all of which may vary considerably from actual results. Estimating the quantity and grade of reserves requires us to determine the size, shape and depth of our mineral bodies by analyzing geological data, such as samplings of drill holes. In addition to the geology assumptions of our mines, assumptions are also required to determine the economic feasibility of mining these reserves, including estimates of future commodity prices and demand, the mining methods we use, and the related costs incurred to develop and mine our reserves. For these reasons, estimates of the economically recoverable quantities of mineralized deposits attributable to any particular group of properties, classifications of such reserves based on risk of recovery and estimates of future net cash flows prepared by different engineers or by the same engineers at different times may vary substantially as the criteria change. Estimated ore reserves could be affected by future industry conditions, future changes in the SEC's mining property disclosure requirements, geological conditions and ongoing mine planning. Actual volume and grade of reserves recovered, production rates, revenues and expenditures with respect to our reserves will likely vary from estimates, and if such variances are material, our sales and profitability could be affected adversely.

***Defects in title or loss of any leasehold interests in our properties could limit our ability to mine these properties or result in significant unanticipated costs.***

A portion of our mining operations are conducted on properties we lease, license or as to which we have easements or other possessory interests, which we refer to as "leased properties." Consistent with industry practice, title to most of these leased properties and mineral rights are not usually verified until we make a commitment to develop a property, which may not occur until after we have obtained necessary permits and completed exploration of the leased property. In some cases, title with respect to leased properties is not verified at all because we instead rely on title information or representations and warranties provided by lessors or grantors. We do not maintain title insurance on our owned or leased mining properties. A title defect or the loss of any lease, license or easement for any leased mining property could affect adversely our ability to mine any associated reserves. In addition, from time to time the rights of third parties for competing uses of adjacent, overlying, or underlying lands such as for roads, easements and public facilities may affect our ability to operate as planned if our title is not superior or arrangements cannot be negotiated.

Any challenge to our title could delay the exploration and development of some reserves, deposits or surface rights, cause us to incur unanticipated costs and could ultimately result in the loss of some or all of our interest in those reserves or surface rights. In the event we lose reserves, deposits or surface rights, we may have to shut down or significantly alter the sequence of our mining operations, which may affect adversely our future production, revenues and cash flows. Additionally, if we lose any leasehold interests relating to any of our pellet plants or loadout facilities, we may need to find an alternative location to process our iron ore and load it for delivery to customers, which could

27

result in significant unanticipated costs. Finally, we could incur significant liability if we inadvertently mine on property we do not own or lease.

***In order to continue to foster growth in our business and maintain stability of our earnings, we must maintain our social license to operate with our stakeholders.***

As a mining company, maintaining a strong reputation and consistent operational and safety history is vital in order to continue to foster growth and maintain stability in our earnings. As sustainability expectations increase and regulatory requirements continue to evolve, maintaining our social license to operate becomes increasingly important. We incorporate social license expectations in our ERM program. Our ability to maintain our reputation and strong operating history could be threatened, including by circumstances outside of our control, such as disasters caused or suffered by other mining companies. If we are not able to respond effectively to these and other challenges to our social license to operate, our reputation could be damaged significantly. Damage to our reputation could affect adversely our operations and ability to foster growth in our company.

***Estimates and timelines relating to new development projects are uncertain and we may incur higher costs and lower economic returns than estimated.***

Mining industry development projects typically require a number of years and significant expenditures before production is possible. Such projects could experience unexpected problems and delays during development, construction and start-up.

Our decision to develop a project typically is based on the results of feasibility studies, which estimate the anticipated economic returns of a project. The actual project profitability or economic feasibility may differ from such estimates as a result of any of the following factors, among others: changes in tonnage, grades and metallurgical characteristics of ore or other raw materials to be mined and processed; estimated future prices of the relevant product; changes in customer demand; higher construction and infrastructure costs; the quality of the data on which engineering assumptions were made; higher production costs; adverse geotechnical conditions; availability of adequate labor force; availability and cost of water and energy; availability and cost of transportation; fluctuations in inflation and currency exchange rates; availability and terms of financing; delays in obtaining environmental or other government permits or changes in laws and regulations including environmental laws and regulations; weather or severe climate impacts; and potential delays relating to social and community issues.

***The production of hot briquetted iron is a capital-intensive business and our ongoing efforts with respect to our HBI project will require the commitment of substantial resources. Any unanticipated costs or delays associated with our HBI project could have a material adverse effect on our financial condition or results of operations.***

Our ongoing efforts with respect to our HBI project require the commitment of substantial resources for operating expenses and capital expenditures. We currently expect to incur total capital expenditures through 2020 on the HBI project of approximately $700 million on the development of the HBI production plant in Toledo, Ohio and $80 million for upgrades at the Northshore plant to enable it to produce significantly increased levels of DR-grade pellets that could be used as feedstock for the HBI production plant and/or sold commercially. Each of these estimates are exclusive of construction-related contingencies and capitalized interest. Our estimated expenses may increase as personnel and equipment associated with advancing development and commercial production are added. The progress of our HBI project and the amounts and timing of expenditures will depend in part on the following:

•       receiving and maintaining required federal, state and local permits;

•       completing infrastructure and construction work and the completion of commissioning and integration of all of the systems comprising our HBI production plant;

•       negotiating sales contracts for our planned production;

•       the execution of any joint venture agreements or similar arrangements with strategic partners; and

•       other factors, many of which are beyond our control.

Most of these activities require significant lead times and must be advanced concurrently.

Any unanticipated costs or other delays associated with our HBI project could have a material adverse effect on our financial condition or results of operations and could require us to seek additional capital, which may not be available on commercially acceptable terms or at all.

28

*Our ability to realize the benefits of any potential acquisitions is uncertain.*

Should we determine to pursue any acquisitions, the success of the same is subject to risks and uncertainties, including our ability to realize operating efficiencies expected from an acquisition; the size or quality of the mineral potential; delays in realizing the benefits of an acquisition; difficulties in retaining key employees, customers or suppliers of the acquired business; the risks associated with the assumption of contingent or undisclosed liabilities of acquisition targets; the impact of changes to our allocation of purchase price; and the ability to generate future cash flows or the availability of financing.

Moreover, any acquisition opportunities we pursue could affect materially our liquidity and capital resources and may require us to incur indebtedness, seek equity capital or both. Future acquisitions could also result in us assuming more long-term liabilities relative to the value of the acquired assets than we may have assumed in previous acquisitions.

## VI.    HUMAN    CAPITAL RISKS

*Our profitability could be affected adversely if we fail to maintain satisfactory labor relations.*

Production in our mines is dependent upon the efforts of our employees. We are party to labor agreements with various labor unions that represent employees at our operations. Such labor agreements are negotiated periodically, and, therefore, we are subject to the risk that these agreements may not be able to be renewed on reasonably satisfactory terms. It is difficult to predict what issues may arise as part of the collective bargaining process, and whether negotiations concerning these issues will be successful. Due to union activities or other employee actions, we could experience labor disputes, work stoppages, or other disruptions in our production of iron ore that could affect us adversely. The USW represents all labor employees at our U.S. Iron Ore operations owned and/or managed by Cliffs or its subsidiary companies except for Northshore. Our labor agreements with the USW at four of our U.S. Iron Ore operations were ratified in September 2016 and extend for a three-year term, effective as of October 1, 2015.

If we enter into a new labor agreement with any union that significantly increases our labor costs relative to our competitors or fail to come to an agreement upon expiry, our ability to compete may be materially and adversely affected.

*We may encounter labor shortages for critical operational positions, which could affect adversely our ability to produce our products.*

We are predicting a long-term shortage of skilled workers for the mining industry and competition for the available workers limits our ability to attract and retain employees. Additionally, at our U.S. mining locations, many of our mining operational employees are approaching retirement age. As these experienced employees retire, we may have difficulty replacing them at competitive wages.

*Our expenditures for post-retirement benefit and pension obligations could be materially higher than we have predicted if our underlying assumptions differ from actual outcomes, there are mine closures, or our joint venture partners fail to perform their obligations that relate to employee pension plans.*

We provide defined benefit pension plans and OPEB to certain eligible union and non-union employees in the U.S., including our share of expense and funding obligations with respect to our unconsolidated joint venture. Our pension and OPEB expenses and our required contributions to our pension and OPEB plans are affected directly by the value of plan assets, the projected and actual rate of return on plan assets, and the actuarial assumptions we use to measure our defined benefit pension plan obligations, including the rate at which future obligations are discounted.

We cannot predict whether changing market or economic conditions, regulatory changes or other factors will increase our pension and OPEB expenses or our funding obligations, diverting funds we would otherwise apply to other uses.

We have calculated our unfunded pension and OPEB obligations based on a number of assumptions, including our joint venture partners satisfying their funding obligations. If our assumptions do not materialize as expected, cash expenditures and costs that we incur could be materially higher. Moreover, we cannot be certain that regulatory changes will not increase our obligations to provide these or additional benefits. These obligations also may increase substantially in the event of adverse medical cost trends or unexpected rates of early retirement, particularly for bargaining unit retirees.

A005291

Table of Contents

***We depend on our senior management team and other key employees, and the loss of these employees could adversely affect our business.***

Our success depends in part on our ability to attract and motivate our senior management and key employees. Achieving this objective may be difficult due to a variety of factors, including fluctuations in the global economic and industry conditions, competitors' hiring practices, cost reduction activities, and the effectiveness of our compensation programs. Competition for qualified personnel can be intense. We must continue to recruit, retain, and motivate our senior management and key personnel in order to maintain our business and support our projects. A loss of senior management and key personnel could prevent us from capitalizing on business opportunities, and our operating results could be adversely affected.

**Item 1B.**      ***Unresolved Staff Comments***

We have no unresolved comments from the SEC.

Table of Contents

**Item 2.** *Properties*

The following map shows the locations of our operations and offices as of  December 31, 2017:



**General Information about the Mines**

All of our iron ore mining operations are open-pit mines. Additional pit development is underway as required by long-range mine plans. At our U.S. Iron Ore and Asia Pacific Iron Ore mines, drilling programs are conducted periodically to collect modeling data and for refining ongoing operations.

Geologic models are developed for all mines to define the major ore and waste rock types. Computerized block models for iron ore are constructed that include all relevant geologic and metallurgical data. These are used to generate grade and tonnage estimates, followed by detailed mine design and life of mine operating schedules.

*U.S. Iron Ore*

The following map shows the locations of our U.S. Iron Ore operations:



We currently own or co-own four operating iron ore mines in Michigan and Minnesota, as well as one indefinitely idled mine in Michigan. We produced 18.8 million, 16.0 million and 19.3 million long tons of iron ore pellets in 2017, 2016 and 2015, respectively, at those mines for our account. We produced 6.7 million, 7.4 million and 6.8 million long tons, respectively, on behalf of current and previous steel company partners of the mines.

31

A005293

Our U.S. Iron Ore mines produce from deposits located within the Biwabik and Negaunee Iron Formation, which are classified as Lake Superior type iron formations that formed under similar sedimentary conditions in shallow marine basins approximately two billion years ago. Magnetite and hematite are the predominant iron oxide ore minerals present, with lesser amounts of goethite and limonite. Quartz is the predominant waste mineral present, with lesser amounts of other chiefly iron bearing silicate and carbonate minerals. The ore minerals liberate from the waste minerals upon fine grinding.

| Mine | Cliffs Ownership | Infrastructure | Mineralization | Operating Since | Current Annual Capacity[1,2] | 2017 Production[1,2] | Mineral Owned | Rights Leased |
|---|---|---|---|---|---|---|---|---|
| Empire[3,4] | 100% | Mine, Concentrator, Pelletizer | Magnetite | 1963 | * | — | 53% | 47% |
| Tilden[4] | 100% | Mine, Concentrator, Pelletizer, Railroad | Hematite & Magnetite | 1974 | 8.0 | 7.7 | 100% | —% |
| Hibbing | 23% | Mine, Concentrator, Pelletizer | Magnetite | 1976 | 8.0 | 7.7 | 3% | 97% |
| Northshore | 100% | Mine, Concentrator, Pelletizer, Railroad | Magnetite | 1990 | 6.0 | 5.3 | —% | 100% |
| United Taconite | 100% | Mine, Concentrator, Pelletizer | Magnetite | 1965 | 5.4 | 4.8 | —% | 100% |

[1] Reported on a wet basis in millions of long tons, equivalent to 2,240 pounds.

[2] Figures reported on 100% basis.

[3] Empire was indefinitely idled beginning on August 3, 2016.

[4] During 2017, our ownership interest in Tilden and Empire increased to 100%.

* Historically, Empire had an annual capacity of 5.5 million long tons; currently indefinitely idled.

### Empire Mine

The Empire mine is located on the Marquette Iron Range in Michigan's Upper Peninsula approximately 15 miles southwest of Marquette, Michigan. As a result of the indefinite idle that began in August 2016, the Empire mine had no production in 2017 compared to its highest annual production over the last five years of 4.3 million long tons of iron ore pellets.

During 2017, our ownership interest in Empire increased to 100% as we reached an agreement to distribute the noncontrolling interest net assets to ArcelorMittal, in exchange for its interest in Empire. Prior to the indefinite idle, each partner took its share of production pro rata; however, provisions in the partnership agreement allowed additional or reduced production to be delivered under certain circumstances. Prior to the indefinite idle, operations consisted of an open pit truck and shovel mine, a concentrator that utilizes single stage crushing, AG mills, magnetic separation and floatation to produce a magnetite concentrate that was then supplied to the on-site pellet plant. From the site, pellets were transported by CN rail to a ship loading port at Escanaba, Michigan, operated by CN.

### Tilden Mine

The Tilden mine is located on the Marquette Iron Range in Michigan's Upper Peninsula approximately five miles south of Ishpeming, Michigan. Over the past five years, the Tilden mine has produced between 7.5 million and 7.7 million long tons of iron ore pellets annually. During 2017, we acquired the remaining 15% equity interest in Tilden owned by U.S. Steel. With the closing of this transaction, we now have 100% ownership of the mine. We own all of the ore reserves at the Tilden mine. Operations consist of an open pit truck and shovel mine, a concentrator that utilizes single stage crushing, AG mills, magnetite separation and floatation to produce hematite and magnetite concentrates that are then supplied to the on-site pellet plant. From the site, pellets are transported by our LS&I rail to a ship loading port at Marquette, Michigan, operated by LS&I.

A005294

*Hibbing Mine*

The Hibbing mine is located in the center of Minnesota's Mesabi Iron Range and is approximately ten miles north of Hibbing, Minnesota, and five miles west of Chisholm, Minnesota. Over the past five years, the Hibbing mine has produced between 7.7 million and 8.2 million long tons of iron ore pellets annually. We own 23% of Hibbing, a subsidiary of ArcelorMittal has a  62.3% interest and a subsidiary of U.S. Steel has a  14.7% interest. Each partner takes its share of production pro rata; however, provisions in the joint venture agreement allow additional or reduced production to be delivered under certain circumstances. Mining is conducted on multiple mineral leases having varying expiration dates. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates. Hibbing operations consist of an open pit truck and shovel mine, a concentrator that utilizes single stage crushing, AG mills and magnetic separation to produce a magnetite concentrate, which is then delivered to an on-site pellet plant. From the site, pellets are transported by BNSF rail to a ship loading port at Superior, Wisconsin, operated by BNSF.

*Northshore Mine*

The Northshore mine is located in northeastern Minnesota, approximately two miles south of Babbitt, Minnesota, on the northeastern end of the Mesabi Iron Range. Northshore's processing facilities are located in Silver Bay, Minnesota, near Lake Superior. Over the past five years, the Northshore mine has produced between 3.2 million and 5.3 million long tons of iron ore pellets annually. We ran a three furnace operation throughout 2015 until the complete idle of the Northshore mine in late November 2015 through May 2016. We restarted all four furnaces in May 2016. The temporary idle was a result of historic levels of steel imports into the U.S. and reduced demand from our steel-producing customers. Throughout 2017 the Northshore mine was substantially at full production levels.

The Northshore mine began production under our management and ownership in October 1994. We own 100% of the mine. Mining is conducted on multiple mineral leases having varying expiration dates. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates. Northshore operations consist of an open pit truck and shovel mine where two stages of crushing occur before the ore is transported along a wholly owned 47-mile rail line to the plant site in Silver Bay. At the plant site, two additional stages of crushing occur before the ore is sent to the concentrator. The concentrator utilizes rod mills and magnetic separation to produce a magnetite concentrate, which is delivered to the pellet plant located on-site. The plant site has its own ship loading port located on Lake Superior.

*United Taconite Mine*

The United Taconite mine is located on Minnesota's Mesabi Iron Range in and around the city of Eveleth, Minnesota. The United Taconite concentrator and pelletizing facilities are located ten miles south of the mine, near the town of Forbes, Minnesota. Over the past five years, the United Taconite mine has produced between 1.5 million and 5.2 million long tons of iron ore pellets annually. United Taconite was temporarily idled beginning in August 2015. We restarted the United Taconite operation in August 2016. The temporary idle was a result of historic levels of steel imports into the U.S. and reduced demand from our steel-producing customers. Throughout 2017 the United Taconite mine was substantially at full production levels.

We own 100% of the United Taconite mine. Mining is conducted on multiple mineral leases having varying expiration dates. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates. United Taconite operations consist of an open pit truck and shovel mine where two stages of crushing occur before the ore is transported by rail, operated by CN, to the plant site. At the plant site an additional stage of crushing occurs before the ore is sent to the concentrator. The concentrator utilizes rod mills and magnetic separation to produce a magnetite concentrate, which is delivered to the pellet plant. From the site, pellets are transported by CN rail to a ship loading port at Duluth, Minnesota, operated by CN.

33

**Asia Pacific Iron Ore**

The following map shows the location of our Asia Pacific Iron Ore operation:



In Australia, we own and operate the Koolyanobbing operations. We produced 10.1 million, 11.8 million and 11.7 million metric tons of iron ore products in 2017, 2016 and 2015, respectively.

The mineralization at the Koolyanobbing operations is predominantly hematite and goethite replacements in greenstone-hosted banded iron formations. Individual deposits tend to be small with complex ore-waste contact relationships. The reserves at the Koolyanobbing operations are derived from 10 separate mineral deposits distributed over a 70 mile operating radius.

| Mine | Cliffs Ownership | Infrastructure | Mineralization | Operating Since | Current Annual Capacity[1] | 2017 Production[1] | Mineral Owned | Rights Leased |
|------|------------------|----------------|----------------|-----------------|---------------------------|--------------------|----------------|---------------|
| Koolyanobbing | 100% | Mine, Road Haulage, Crushing-Screening Plant | Hematite & Goethite | 1994 | 11.0 | 10.1 | —% | 100% |

[1] Reported on a wet basis in millions of metric tons, equivalent to 2,205 pounds.

*Koolyanobbing*

The Koolyanobbing operations are located 250 miles east of Perth and approximately 30 miles northeast of the town of Southern Cross. Koolyanobbing produces lump and fines iron ore. Mining is conducted on multiple mineral leases having varying expiration dates. Mining leases routinely are renewed as they approach their respective expiration dates.

Over the past five years, the Koolyanobbing operation has produced between 10.1 million and 11.8 million metric tons of iron ore products annually. During 2017, ore material was sourced from ten separate open pit mines and was delivered by typical production trucks or road trains to a crushing and screening facility located at Koolyanobbing. All of the ore from the Koolyanobbing operations is transported by rail to the Port of Esperance, 360 miles to the south, for shipment to Asian customers.

A005296

**Mineral Policy**

We have a corporate policy prescribing internal controls and procedures with respect to auditing and estimating of minerals. The procedures contained in the policy include the calculation of mineral estimates at each property by our engineers, geologists and accountants, as well as third-party consultants. Management compiles and reviews the calculations, and once finalized, such information is used to prepare the disclosures for our annual and quarterly reports. The disclosures are reviewed and approved by management, including our chief executive officer and chief financial officer. Additionally, the long-range mine planning and mineral estimates are reviewed annually by our Audit Committee. Furthermore, all changes to mineral estimates, other than those due to production, are adequately documented and submitted to senior operations officers for review and approval. Finally, periodic reviews of long-range mine plans and mineral reserve estimates are conducted at mine staff meetings, senior management meetings and by independent experts.

**Mineral Reserves**

Reserves are defined by SEC Industry Standard Guide 7 as that part of a mineral deposit that could be economically and legally extracted and produced at the time of the reserve determination. All reserves are classified as proven or probable and are supported by life-of-mine plans.

Reserve estimates are based on pricing that does not exceed the three-year trailing average index price of iron ore adjusted to our realized price. We evaluate and analyze mineral reserve estimates in accordance with our mineral policy and SEC requirements. The table below identifies the year in which the latest reserve estimate was completed.

| Property | Date of Latest Economic Reserve Analysis |
|---|---|
| **U.S. Iron Ore** | |
| Tilden | 2015 |
| Hibbing | 2015 |
| Northshore | 2015 |
| United Taconite | 2016 |
| **Asia Pacific Iron Ore** | |
| Koolyanobbing | 2013 |

Ore reserve estimates for our iron ore mines as of  December 31, 2017 were estimated from fully designed open pits developed using three-dimensional modeling techniques. These fully designed pits incorporate design slopes, practical mining shapes and access ramps to assure the accuracy of our reserve estimates. With the life of mine of the Koolyanobbing complex nearing an end, we are only reporting reserves at Asia Pacific Iron Ore that are planned to be extracted. All operations' reserves have been adjusted net of 2017 production.

A005297

Table of Contents

### U.S. Iron Ore

All tonnages reported for our U.S. Iron Ore operating segment are in long tons of 2,240 pounds, have been rounded to the nearest 100,000 and are reported on a 100% basis.

**U.S. Iron Ore Mineral Reserves**
**as of December 31, 2017**
**(In Millions of Long Tons)**

| Property | Cliffs Share | Proven | | Probable | | Proven & Probable | | Saleable Product[2,3] | | Previous Year | |
| | | Tonnage | % Grade | Tonnage | % Grade | Tonnage | % Grade[5] | Process Recovery[4] | Tonnage | Proven & Probable Crude Ore | Saleable Product |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Tilden[1] | 100% | 263.6 | 34.7 | 82.7 | 33.9 | 346.3 | 34.5 | 37% | 129.2 | 367.8 | 136.3 |
| Hibbing | 23% | 154.0 | 19.6 | 24.7 | 19.6 | 178.7 | 19.6 | 26% | 47.2 | 233.0 | 61.7 |
| Northshore | 100% | 235.8 | 24.9 | 557.4 | 24.2 | 793.2 | 24.4 | 32% | 255.9 | 808.0 | 261.1 |
| United Taconite | 100% | 413.6 | 22.6 | 415.5 | 21.9 | 829.1 | 22.2 | 32% | 264.6 | 842.8 | 269.3 |
| **Totals** | | **1,067.0** | | **1,080.3** | | **2,147.3** | | | **696.9** | **2,251.6** | **728.4** |

[1] Tilden hematite reported grade is percent FeT; all other properties are percent magnetic iron. During 2017, our ownership interest in Tilden increased to 100%.

[2] Saleable product is a standard pellet containing 60% to 66% Fe calculated from both proven and probable mineral reserves.

[3] Saleable product is reported on a dry basis; shipped products typically contain 1% to 4% moisture.

[4] Process recovery includes all factors for converting crude ore tonnage to saleable product.

[5] Cutoff grades are 15% magnetic iron for Hibbing, 17% for United Taconite, 19% for Northshore. Cutoff for Tilden hematite is 25% FeT.

### Asia Pacific Iron Ore

All tonnages reported for our Asia Pacific Iron Ore operating segment are in metric tons of 2,205 pounds, have been rounded to the nearest 100,000 and are reported on a 100% basis.

**Asia Pacific Iron Ore Mineral Reserves**
**as of December 31, 2017**
**(In Millions of Metric Tons)[1]**

| Property | Cliffs Share | Proven | | Probable | | Proven & Probable | | Previous Year Total |
| | | Tonnage | % Fe | Tonnage[3] | % Fe | Tonnage | % Fe[2] | Tonnage |
|---|---|---|---|---|---|---|---|---|
| Koolyanobbing | 100% | 1.7 | 56.5 | 8.0 | 59.6 | 9.7 | 59.1 | 42.7 |

[1] Tonnages reported are saleable product reported on a dry basis; shipped products contain approximately 5% moisture.

[2] Cutoff grade is 54% FeT.

[3] Tonnage decreased due to low grade pellet discount increase which reduced the amount of economic tonnage available.

### Item 3.    Legal Proceedings

*Bluestone Litigation*. On April 7, 2017, the Company was served with an Amended Complaint adding Cliffs, among others, as a defendant to a lawsuit brought by Bluestone Coal Corporation and Double-Bonus Mining Company against Pinnacle Mining Company, LLC and Target Drilling, Inc. in the U.S. District Court for the Southern District of West Virginia. The Amended Complaint alleges that the defendants deviated from plans authorized by plaintiffs and U.S. Mine Safety and Health Administration in the drilling of a borehole in 2013 and 2014 at the Pinnacle mine and through an inactive portion of plaintiffs' mine. Plaintiffs further allege negligence and trespass in the drilling of the borehole and claim compensatory and punitive damages due to flooding. Cliffs denies it has any liability in connection with plaintiffs' claims and intends to vigorously defend the lawsuit.

36

*CCAA Proceedings.* Refer to NOTE 20 - COMMITMENTS AND CONTINGENCIES for a description of the CCAA Proceedings underway with respect to the Bloom Lake Group and the Wabush Group. Such description is incorporated by reference into this Item 3.

*ERISA Litigation.* On May 14, 2015, a lawsuit was filed in the U.S. District Court for the Northern District of Ohio captioned Paul Saumer, individually and on behalf of all others similarly situated, v. Cleveland-Cliffs Inc., et al., No. 1:15-CV-00954. This action was purportedly brought on behalf of the Northshore and Silver Bay Power Company Retirement Savings Plan (the "Plan") and certain participants and beneficiaries of the Plan during the class period, defined in the complaint as April 2, 2012 to the present, against Cleveland-Cliffs Inc., its investment committee, Northshore, the Employee Benefits Administration Department of Northshore, and certain current and former officers. Plaintiff amended the complaint to name as defendants additional current and former employees who served on the investment committee. The suit alleged that the defendants breached their duties to the plaintiffs and the Plan in violation of ERISA fiduciary rules by, among other things, continuing to offer and hold Cleveland-Cliffs Inc. stock as a Plan investment option during the class period. The relief sought included a request for a judgment ordering the defendants to make good to the Plan all losses to the Plan resulting from the alleged breaches of fiduciary duties. On April 1, 2016, the Court granted defendants' motion to dismiss the lawsuit, which dismissal the Sixth Circuit Court of Appeals affirmed on April 1, 2017. All deadlines for further appeals have passed and this matter is closed.

*Exchange Offer Litigation.* On March 14, 2016, a putative class action was filed in the U.S. District Court for the Southern District of New York captioned Waxman, et al. v. Cleveland-Cliffs Inc. , No. 1:16-cv-01899. Generally, the lawsuit alleged that the exchange offers for certain of our existing senior notes announced on January 27, 2016 violated the Trust Indenture Act of 1939 (the "TIA") and breached the indentures governing the senior notes subject to the exchange offers because the exchange offers were offered only to certain noteholders that were qualified institutional buyers ("QIBs") and not to non-QIBs. The suit sought class certification with respect to non-QIB noteholders of the 5.90% 2020 Senior Notes and the 6.25% 2040 Senior Notes (collectively, the "Class Notes"), which QIBs were permitted to exchange for newly-issued 1.5 Lien Notes. Plaintiffs alleged that the exchange offers had the effect of subordinating their Class Notes to those of the QIBs who elected to exchange their notes and also impaired the Plaintiffs' rights to receive payment of the principal and interest under the Class Notes and to institute suit to compel such payment. In addition to alleged violation of the TIA and breach of contract, Plaintiffs sought unspecified damages for breach of the implied covenant of good faith and fair dealing and unjust enrichment, and also sought declaratory judgment that the exchange offers were null and void. On May 16, 2016, we filed a motion to dismiss this lawsuit, which was granted on December 6, 2016. All deadlines for further appeals have passed and this matter is closed.

*Mesabi Metallics Adversary Proceeding.* On September 7, 2017, Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) filed a complaint against Cleveland-Cliffs Inc. in the *Essar Steel Minnesota LLC and ESML Holdings Inc.* bankruptcy proceeding that is pending in the United States Bankruptcy Court, District of Delaware. Mesabi Metallics alleges tortious interference with its contractual rights and business relations involving certain vendors, suppliers and contractors, violations of federal and Minnesota antitrust laws through monopolization, attempted monopolization and restraint of trade, violation of the automatic stay, and civil conspiracy with unnamed defendants. Mesabi Metallics amended the complaint to add additional defendants Cleveland-Cliffs Minnesota Land Development Company ("Cliffs Minnesota Land") and Glacier Park Iron Ore Properties LLC ("GPIOP") and has asserted various claims relating to Cliffs Minnesota Land's acquisition of a combination of GPIOP's undivided and whole fee interests as well as mineral and surface leases, a portion of which were formerly leased by GPIOP to Mesabi Metallics. The amended complaint also includes claims related to avoidance and recovery of unauthorized post-petition transfers, claims disallowance, civil contempt and civil conspiracy. Mesabi Metallics seeks, among other things, unspecified damages, declaratory judgment, and injunctive relief. We believe the claims are unmeritorious and intend to vigorously defend the lawsuit.

*Michigan Electricity Matters.* See NOTE 20 - COMMITMENTS AND CONTINGENCIES for a description of the FERC proceedings to determine, among other things, allocation of SSR costs, whether retroactive surcharges are permissible and the total amount of SSR compensation, all of which are currently subject to appeal. Such description is incorporated by reference into this Item 3.

*Taconite MACT Compliance Review.* EPA Region 5 issued Notices of Violation during the first quarter of 2014 to Empire, Tilden and United Taconite related to alleged historical violations of the Taconite MACT rule and certain elements of the respective state-issued Title V operating permits. For issues not already resolved, the facilities continue to implement actions that mitigate any future exposures. EPA has proposed, and Cliffs has agreed to, a tolling agreement which targeted a completion of the enforcement action by June 6, 2018. Based on current information, Cliffs anticipates the final settlement for alleged exceedances at United Taconite to be resolved by consent decree with a total penalty of no more than \$0.3 million to be comprised of a combination of cash penalty and a supplemental environmental project. EPA has not yet shared draft settlement documents for Empire or Tilden, but Cliffs anticipates receiving them early in 2018. This enforcement matter is not anticipated currently to have a material adverse impact on our business.

37

*Wabush Pensioners Matter.* A complaint time-stamped May 31, 2017 was filed in the Supreme Court of Newfoundland and Labrador, Trial Division (General) captioned <u>Johnson, et al. v. Cliffs Mining Company, et al.</u> against Cliffs Natural Resources Inc., Cliffs Mining Company, and certain former and current officers, directors and employees, on behalf of all non-union employees and retirees of Wabush Mines, seeking, among other things, various declarations and damages relating to the "Contributory Salaried Plan for Salaried Employees of Wabush Mines, Cliffs Mining Company, Managing Agent, Arnaud Railway Company and Wabush Lake Railway Company, Limited". A separate complaint captioned <u>Skinner, et al. v. Cliffs Mining Company, et al.</u> was apparently filed on or about June 23, 2017 in the same court against the same defendants alleging substantially the same allegations on behalf of certain USW union employees and retirees of Wabush Mines, seeking similar relief. We object to the validity of these claims and will vigorously defend as necessary.

**Item 4.**          ***Mine Safety Disclosures***

We are committed to protecting the occupational health and well-being of each of our employees. Safety is one of our core values, and we strive to ensure that safe production is the first priority for all employees. Our internal objective is to achieve zero injuries and incidents across the Company by focusing on proactively identifying needed prevention activities, establishing standards and evaluating performance to mitigate any potential loss to people, equipment, production and the environment. We have implemented intensive employee training that is geared toward maintaining a high level of awareness and knowledge of safety and health issues in the work environment through the development and coordination of requisite information, skills and attitudes. We believe that through these policies, we have developed an effective safety management system.

Under the Dodd-Frank Act, each operator of a coal or other mine is required to include certain mine safety results within its periodic reports filed with the SEC. As required by the reporting requirements included in §1503(a) of the Dodd-Frank Act and Item 104 of Regulation S-K, the required mine safety results regarding certain mining safety and health matters for each of our mine locations that are covered under the scope of the Dodd-Frank Act are included in Exhibit 95 of *Item 15. Exhibits and Financial Statement Schedules* of this Annual Report on Form 10-K.

A005300

Table of Contents

**PART II**

Item 5.       *Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities*

**Stock Exchange Information**

Our common shares (ticker symbol CLF) are listed on the NYSE.

**Common Share Price Performance and Dividends**

The following table sets forth, for the periods indicated, the high and low sales prices per common share as reported on the NYSE:

|  | 2017 | | 2016 | |
|---|---|---|---|---|
|  | High | Low | High | Low |
| First Quarter | $ 12.37 | $ 7.70 | $ 3.75 | $ 1.20 |
| Second Quarter | 9.06 | 5.56 | 5.83 | 2.77 |
| Third Quarter | 8.77 | 6.45 | 8.45 | 5.19 |
| Fourth Quarter | 7.73 | 5.60 | 10.90 | 4.91 |
| Year | 12.37 | 5.56 | 10.90 | 1.20 |

At February 12, 2018, we had 1,210 shareholders of record.

We did not declare or pay any cash dividends on our common shares during the years ended December 31, 2017 or 2016. Any determination to pay dividends on our common shares in the future will be at the discretion of our Board of Directors and dependent upon then-existing conditions, including our operating results and financial condition, capital requirements, contractual restrictions, business prospects and other factors that our Board of Directors may deem relevant. Additionally, the agreement governing our ABL Facility contains, and agreements governing any of our future debt may contain, covenants and other restrictions that, in certain circumstances, could limit the level of dividends that we are able to pay on our common shares. There can be no assurance that we will pay a dividend in the future.

39

A005301

**Shareholder Return Performance**

The following graph shows changes over the past five-year period in the value of $100 invested in: (1) Cliffs' common shares; (2) S&P 500 Stock Index; (3) S&P Total Market Index; and (4) S&P Metals and Mining Select Industry Index. The values of each investment are based on price change plus reinvestment of all dividends reported to shareholders, based on monthly granularity.



|  |  | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|
| **Cleveland-Cliffs Inc.** | Return % | — | (30.17) | (71.56) | (77.87) | 432.28 | **(14.27)** |
|  | Cum $ | 100.00 | 69.83 | 19.86 | 4.39 | 23.39 | **20.06** |
| **S&P 500 Index - Total Returns** | Return % | — | 32.36 | 13.65 | 1.38 | 11.93 | **21.80** |
|  | Cum $ | 100.00 | 132.36 | 150.43 | 152.50 | 170.70 | **207.91** |
| **S&P Total Market Index** | Return % | — | 33.37 | 12.43 | 0.46 | 12.62 | **21.13** |
|  | Cum $ | 100.00 | 133.37 | 149.95 | 150.64 | 169.65 | **205.49** |
| **S&P Metals and Mining** | Return % | — | (5.35) | (25.63) | (50.76) | 105.09 | **20.61** |
|  | Cum $ | 100.00 | 94.65 | 70.39 | 34.66 | 71.09 | **85.74** |

A005302

Table of Contents

**Issuer Purchases of Equity Securities**

The following table presents information with respect to repurchases by us of our common shares during the periods indicated:

### ISSUER PURCHASES OF EQUITY SECURITIES

| Period | Total Number of Shares (or Units) Purchased[1] | Average Price Paid per Share (or Unit) | Total Number of Shares (or Units) Purchased as Part of Publicly Announced Plans or Programs | Maximum Number (or Approximate Dollar Value) of Shares (or Units) that May Yet be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| October 1 - 31, 2017 | 1,259 | $ 7.15 | — | — |
| November 1 - 30, 2017 | — | $ — | | |
| December 1 - 31, 2017 | 735,387 | $ 6.71 | — | — |
| **Total** | **736,646** | **$ 6.71** | **—** | **—** |

[1] These shares were delivered to us to satisfy tax withholding obligations due upon the vesting or payment of stock awards.

41

Table of Contents

**Item 6.**    *Selected Financial Data*

**Summary of Financial and Other Statistical Data - Cleveland-Cliffs Inc. and Subsidiaries**

| Financial data (in millions, except per share amounts) * | 2017 (a) | 2016 (b) | 2015 (c) | 2014 (d) | 2013 (e) |
|---|---|---|---|---|---|
| Revenue from product sales and services | $ 2,330.2 | $ 2,109.0 | $ 2,013.3 | $ 3,373.2 | $ 3,890.8 |
| Cost of goods sold and operating expenses | (1,828.5) | (1,719.7) | (1,776.8) | (2,487.5) | (2,406.4) |
| Other operating expense | (78.1) | (148.5) | (85.2) | (755.6) | (104.1) |
| Operating income | 423.6 | 240.8 | 151.3 | 130.1 | 1,380.3 |
| Income from continuing operations | 381.8 | 219.2 | 143.7 | 56.4 | 878.9 |
| Loss from discontinued operations, net of tax | (18.7) | (19.9) | (892.1) | (8,368.0) | (517.1) |
| Net income (loss) | 363.1 | 199.3 | (748.4) | (8,311.6) | 361.8 |
| Loss (income) attributable to noncontrolling interest | 3.9 | (25.2) | (0.9) | 1,087.4 | 51.7 |
| Net income (loss) attributable to Cliffs shareholders | 367.0 | 174.1 | (749.3) | (7,224.2) | 413.5 |
| Preferred stock dividends | — | — | (38.4) | (51.2) | (48.7) |
| Income (loss) attributable to Cliffs common shareholders | $ 367.0 | $ 174.1 | $ (787.7) | $ (7,275.4) | $ 364.8 |
| Earnings (loss) per common share attributable to Cliffs common shareholders - basic | | | | | |
| Continuing operations | $ 1.34 | $ 0.98 | $ 0.63 | $ (0.14) | $ 5.37 |
| Discontinued operations | (0.06) | (0.10) | (5.77) | (47.38) | (2.97) |
| Earnings (loss) per common share attributable to Cliffs common shareholders - basic | $ 1.28 | $ 0.88 | $ (5.14) | $ (47.52) | $ 2.40 |
| Earnings (loss) per common share attributable to Cliffs common shareholders - diluted | | | | | |
| Continuing operations | $ 1.32 | $ 0.97 | $ 0.63 | $ (0.14) | $ 4.95 |
| Discontinued operations | (0.06) | (0.10) | (5.76) | (47.38) | (2.58) |
| Earnings (loss) per common share attributable to Cliffs common shareholders - diluted | $ 1.26 | $ 0.87 | $ (5.13) | $ (47.52) | $ 2.37 |
| Total assets | $ 2,953.4 | $ 1,923.9 | $ 2,135.5 | $ 3,147.2 | $ 13,102.9 |
| Long-term debt obligations (including capital leases) | $ 2,335.1 | $ 2,213.5 | $ 2,755.6 | $ 2,911.5 | $ 2,968.4 |
| Net cash provided by operating activities | $ 338.1 | $ 303.0 | $ 37.9 | $ 358.9 | $ 1,145.9 |
| Net cash used in investing activities | $ (156.0) | $ (57.9) | $ (103.2) | $ (103.6) | $ (811.3) |
| Net cash provided by (used in) financing activities | $ 498.9 | $ (206.4) | $ 61.0 | $ (288.3) | $ (171.9) |
| Distributions to preferred shareholders cash dividends (f) | | | | | |
| - Per depositary share | $ — | $ — | 1.32 | 1.76 | 1.66 |
| - Total | $ — | $ — | 38.4 | 51.2 | 48.7 |
| Distributions to common shareholders cash dividends (g) | | | | | |
| - Per share | $ — | $ — | $ — | $ 0.60 | $ 0.60 |
| - Total | $ — | $ — | $ — | 92.5 | 91.9 |
| Common shares outstanding - basic (millions) | | | | | |
| - Average for year | 288.4 | 197.7 | 153.2 | 153.1 | 151.7 |
| - At year-end | 297.4 | 233.1 | 153.6 | 153.2 | 153.1 |
| **Iron ore production and sales statistics** | | | | | |
| *(long tons in millions - U.S. Iron Ore; metric tons in millions - Asia Pacific Iron Ore)* | | | | | |
| Production tonnage - U.S. Iron Ore | 25.5 | 23.4 | 26.1 | 29.7 | 27.2 |
| - U.S. Iron Ore (Cliffs' share) | 18.8 | 16.0 | 19.3 | 22.4 | 20.3 |
| - Asia Pacific Iron Ore | 10.1 | 11.8 | 11.7 | 11.4 | 11.1 |
| Sales tonnage - U.S. Iron Ore | 18.7 | 18.2 | 17.3 | 21.8 | 21.3 |
| - Asia Pacific Iron Ore | 9.8 | 11.6 | 11.6 | 11.5 | 11.0 |

42

* Management determined as of March 31, 2015, that our North American Coal operating segment met the criteria to be classified as held for sale under *ASC 205, Presentation of Financial Statements*. The North American Coal segment continued to meet the criteria throughout 2015 until we sold our North American Coal operations during the fourth quarter of 2015. As such, all current and historical North American Coal operating segment results are included in our financial statements and classified within discontinued operations. On January 27, 2015, we announced that Bloom Lake General Partner Limited and certain of its affiliates, including Cliffs Quebec Iron Mining ULC, which we refer to collectively as the Bloom Lake Group, commenced restructuring proceedings, in Montreal, Quebec under the CCAA to address the Bloom Lake Group's immediate liquidity issues and to preserve and protect its assets for the benefit of all stakeholders while restructuring and/or sale options were explored. At that time, the Bloom Lake Group was no longer generating revenues and was not able to meet its obligations as they came due. As part of the CCAA process, the court approved the appointment of a Monitor and certain other financial advisors. Additionally, on May 20, 2015, the Wabush Iron Co. Limited and Wabush Resources Inc., and certain of their affiliates, including Wabush Mines (an unincorporated joint venture of Wabush Iron Co. Limited and Wabush Resources Inc.), Arnaud Railway Company and Wabush Lake Railway Company, which we refer to collectively as the Wabush Group, commenced restructuring proceedings in Montreal, Quebec under the CCAA. The Wabush Group was no longer generating revenues and was not able to meet its obligations as they came due. As a result of this action, the protection granted to the Bloom Lake Group was extended to include the Wabush Group to facilitate the reorganization of each of their businesses and operations. The Monitor appointed by the court in the CCAA proceeding for the Bloom Lake Group has also been appointed by the court as the Monitor in the CCAA proceeding for the Wabush Group. Financial results prior to the respective deconsolidations of the Bloom Lake and Wabush Groups and subsequent expenses directly associated with the Bloom Lake and Wabush Groups and certain other wholly-owned Canadian subsidiaries are included in our financial statements and classified within discontinued operations.

(a) During 2017, we issued 63.25 million common shares in an underwritten public offering. We received net proceeds of $661.3 million at a public offering price of $10.75 per common share. The net proceeds from the issuance of our common shares and the net proceeds from the issuance of $1.075 billion 5.75% 2025 Senior Notes were used to redeem in full all of our outstanding 8.25% 2020 First Lien Notes, 8.00% 2020 1.5 Lien Notes and 7.75% 2020 Second Lien Notes. Additionally, through tender offers, we purchased certain of our 5.90% 2020 Senior Notes, our 4.80% 2020 Senior Notes and our 4.875% 2021 Senior Notes. The aggregate principal amount outstanding of debt redeemed was $1.611 billion, which resulted in a loss on extinguishment of $165.4 million. During 2017, our ownership interest in Empire increased to 100% as we reached an agreement to distribute the noncontrolling interest net assets of $132.7 million to ArcelorMittal, in exchange for its interest in Empire. We also acquired the remaining 15% equity interest in Tilden Mining Company L.C. owned by United States Steel Corporation for $105.0 million. Prior to the end of the year Public Law 115–97, commonly known as the "Tax Cuts and Jobs Act", was signed into law and among other items repeals the corporate AMT and will reduce the federal corporate tax rate to 21% for tax years beginning January 1, 2018. Along with the repeal of AMT, Public Law 115–97 provides that existing AMT credit carryovers are refundable beginning with the filing of the calendar year 2018 tax return. We have $235.3 million of AMT credit carryovers that are expected to be fully refunded between 2019 and 2022.

(b) During 2016, we recorded a net gain of $166.3 million related to debt restructuring activities that occurred throughout the year, including the issuance of $218.5 million aggregate principal of 8.00% 2020 1.5 Lien Notes in exchange for $512.2 of our existing senior notes, the issuance of an aggregate of 8.2 million common shares in exchange for $56.9 million aggregate principal amount of our existing senior notes and a loss on the redemption of the full $283.6 million outstanding of our 3.95% 2018 Senior Notes at a total redemption price of $301.0 million. We also issued 44.4 million common shares in an underwritten public offering. We received net proceeds of $287.6 million at a public offering price of $6.75 per common share.

(c) On January 27, 2015, we announced the Bloom Lake Group commenced restructuring proceedings in Montreal, Quebec under the CCAA. Additionally, on May 20, 2015, the Wabush Group commenced restructuring proceedings in Montreal, Quebec under the CCAA. As a result of this action, the CCAA protections granted to the Bloom Lake Group were extended to include the Wabush Group to facilitate the reorganization of each of their businesses and operations. Consistent with our strategy to extract maximum value from our current assets, on December 22, 2015, we sold our remaining interest in all the remaining North American Coal operations to Seneca. The sale included the Pinnacle mine in West Virginia and the Oak Grove mine in Alabama. Additionally, Seneca may pay Cliffs an earn-out of up to $50 million contingent upon the terms of a revenue sharing agreement, which extends through the year 2020. As noted above, all current and historical North American Coal operating segment results are included in our financial statements and classified within discontinued operations.

(d) During 2014, we recorded an impairment of goodwill and other long-lived assets of $635.5 million. The goodwill impairment charge of $73.5 million related to our Asia Pacific Iron Ore reporting unit. There were also other long-lived asset impairment charges of $562.0 million related to our continuing operations including the Asia Pacific Iron Ore operating segment and our Other reportable segments. The other long-lived asset impairment charges which related to our discontinued operations were $8,394.4 million related to our Wabush operation and Bloom Lake operation within our Eastern Canadian Iron Ore operating segment, and our CLCC thermal operation, Oak Grove operation and Pinnacle operation within our North American Coal operating segment, along with impairments charged to reporting units within our other reportable segments. The impairment charges were primarily a result of changes in life-of-mine cash flows due to declining pricing for both global iron ore and low-volatile metallurgical coal, which impacts our estimate of long-term pricing, along with changes in strategic focus including exploratory phases of possible divestiture of the operations as the new Chief Operating Decision Maker viewed Eastern Canadian Iron Ore, Asia Pacific Iron Ore, North American Coal and Ferroalloys as non-core assets. The CLCC assets were sold in the fourth quarter of 2014 on December 31, 2014, resulting in a loss on sale of $419.6 million. As noted above, all current and historical North American Coal operating segment results are included in our financial statements and classified within discontinued operations.

(e) Upon performing our annual goodwill impairment test in the fourth quarter of 2013, a goodwill impairment charge of $80.9 million was recorded for our Cliffs Chromite Ontario and Cliffs Chromite Far North reporting units within our Ferroalloys operating segment. We also recorded other long-lived asset impairment charges of $169.9 million, of which $154.6 million relates to our Wabush reporting unit within our Eastern Canadian Iron Ore operating segment to reduce those assets to their estimated fair value as of December 31, 2013. These reporting units were included within the entities under the CCAA filing. As noted above, financial results prior to the respective deconsolidations of the Bloom Lake and Wabush Groups and subsequent expenses directly associated with the Canadian Entities are included in our financial statements and classified within discontinued operations.

(f) On March 20, 2013, our Board of Directors declared a cash dividend of $13.6111 per preferred share, which is equivalent to $0.34 per depositary share. The cash dividend was paid on May 1, 2013, to our preferred shareholders of record as of the close of business on April 15, 2013. On May 7, 2013, September 9, 2013, and November 11, 2013, our Board of Directors declared a quarterly cash dividend of $17.50 per preferred share, which is equivalent to $0.44 per depositary share. The cash dividends were paid on August 1, 2013, November 1, 2013, and February 3, 2014 to our preferred shareholders of record as of the close of business on July 15, 2013, October 15, 2013, and January 15, 2014, respectively. On February 11, 2014, May 13, 2014, September 8, 2014, and November 19, 2014, our Board of Directors declared a quarterly cash dividend of $17.50 per preferred share, which is equivalent to $0.44 per depositary share. The cash dividends were paid on May 1, 2014, August 1, 2014, November 3, 2014, and February 2, 2015, to our preferred shareholders of record as of the close of business on April 15, 2014, July 15, 2014, October 15, 2014, and January 15, 2015, respectively. On April 27, 2015, July 1, 2015, and September 10, 2015, our Board of Directors declared the quarterly cash dividend of $17.50 per preferred share, which is equivalent to $0.44 per depositary share. The cash dividend was paid on May 1, 2015, August 3, 2015, and November 2, 2015 to our shareholders of record as of the close of business on April 15, 2015, July 15, 2015, and October 15, 2015, respectively. On January 4, 2016, we announced that our Board of Directors determined the final quarterly dividend of our preferred shares would not be paid in cash, but instead, pursuant to the terms of the preferred shares, the conversion rate was increased such that holders of the preferred shares received additional common shares in lieu of the accrued dividend at the time of the mandatory conversion of the preferred shares on February 1, 2016. The number of our common shares in the aggregate issued in lieu of the dividend was 1.3 million. This resulted in an effective conversion rate of 0.9052 common shares, rather than 0.8621 common shares, per depositary share, each representing 1/40th of a preferred share. Upon conversion on February 1, 2016, an aggregate of 26.5 million common shares were issued, representing 25.2 million common shares issuable upon conversion and 1.3 million that were issued in lieu of a final cash dividend.

43

(g) On February 11, 2013, our Board of Directors approved a reduction to our quarterly cash dividend rate by 76% to $0.15 per share. The decreased dividend of $0.15 per share was paid on March 1, 2013, June 3, 2013, September 3, 2013, and December 2, 2013 to our common shareholders of record as of the close of business on February 22, 2013, May 17, 2013, August 15, 2013, and November 22, 2013, respectively. Additionally, in 2014, the dividend of $0.15 per share was paid on March 3, 2014, June 3, 2014, September 2, 2014 and December 1, 2014 to our common shareholders of record as of the close of business on February 21, 2014, May 23, 2014, August 15, 2014, and November 15, 2014, respectively. On January 26, 2015, we announced that our Board of Directors had decided to eliminate the quarterly dividend of $0.15 per share on our common shares. The decision was applicable to the first quarter of 2015 and all subsequent quarters.

A005306

Table of Contents

**Item 7.**        *Management's Discussion and Analysis of Financial Condition and Results of Operations*

Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") is designed to provide a reader of our financial statements with a narrative from the perspective of management on our financial condition, results of operations, liquidity and other factors that may affect our future results. The following discussion should be read in conjunction with the consolidated financial statements and related notes that appear elsewhere in this document.

**Industry Overview**

The key driver of our business is demand for steelmaking raw materials from U.S. steelmakers. During 2017, the U.S. produced approximately 82 million metric tons of crude steel, which is up 4% when compared to 2016, or about 5% of total global crude steel production. U.S. total steel capacity utilization was approximately 74% during 2017, which is an approximate 3% increase from 2016. Additionally, during 2017, China produced approximately 832 million metric tons of crude steel, or approximately 50% of total global crude steel production. These figures represent an approximate 6% increase in Chinese crude steel production when compared to 2016. Throughout 2017, global crude steel production increased about 5% compared to 2016.

The Platts 62% Price increased 22% to an average price of $71 per metric ton for the year ended  December 31, 2017 compared to 2016. Volatility in the iron ore price impacts our realized revenue rates at each of our segments to varying extents, but our revenue realizations are not fully correlated. Pricing mechanisms in our U.S. Iron Ore contracts reference this metric, but build in reasonable protection from swings in volatility. Asia Pacific Iron Ore revenue rates do not see a full correlation to the Platts 62% Price due to the discounts on the lower iron content of the ore sold there.

We recognize the volatility of iron ore supply-demand dynamics and that changes in behaviors of the major iron ore producers and/or Chinese steelmakers could either lift or put pressure on iron ore prices in the near term. During 2017, we were generally pleased with both the signs of supply discipline from the major iron ore mining companies and record levels of Chinese steel production. We expect the healthy dynamics to continue through at least the beginning of 2018.

We have also noticed vastly improved demand for higher grade iron ore products, typically those of benchmark grade (62% iron content) and above, as Chinese mills put more emphasis on the productive and environmentally friendly nature of these ores. Assuming the margins at Chinese mills remain strong and the government continues to crack down on pollution, we believe that the mills will favor benchmark quality ore, placing additional pricing pressure on lower quality ore. This flight to quality has also manifested itself in increased pellet premiums throughout the world during 2017. The Atlantic Basin pellet premium, another important pricing factor in our U.S. Iron Ore contracts, averaged $45 per metric ton in 2017, a 42% increase compared to 2016. We believe this market will remain tight during 2018, thus supporting multi-year high premiums for pellet products.

The price for domestic hot-rolled coil steel, which is an important attribute in the calculation of supplemental revenue in one of our customer supply agreements, averaged $620 per net ton in 2017, 18% higher compared to last year. Despite the decrease in U.S. automobile demand this year, the domestic price environment has recovered due to supply-side discipline and improved U.S. manufacturing output. In addition, steel market reform in China has kept foreign steel prices high, thus making imports of hot-rolled coil steel into the U.S. less attractive. As a result, we remain positive on our outlook for this market.

Our consolidated revenues were $2.3 billion and $2.1 billion for the years ended December 31, 2017 and 2016, respectively, with net income from continuing operations per diluted share of $1.32 and $0.97, respectively. Net income from continuing operations for 2017 was positively impacted by an income tax benefit of $252.4 million primarily as a result of tax reform legislation. In addition, sales margin increased by $112.4 million in the year ended December 31, 2017 when compared to 2016, primarily driven by the increase in revenue from higher overall average realized product revenue rates and higher sales volumes at our U.S. Iron Ore operations. Net income from continuing operations was negatively impacted as a result of losses on extinguishment of debt of $165.4 million in the year ended December 31, 2017, while the year ended  December 31, 2016 was positively impacted as a result of gains on extinguishment/restructuring of debt of $166.3 million.

45

[Table of Contents]

**Strategy**

### *We are Focused on Protecting our Core U.S. Iron Ore Business*

We are the market-leading iron ore producer in the U.S., supplying differentiated iron ore pellets under long-term contracts to major North American blast furnace steel producers. We have the unique advantage of being a low-cost, high-quality producer of iron ore pellets in the Great Lakes market with significant transportation and logistics advantages to serve the Great Lakes steel market effectively. The pricing structure and long-term nature of our existing contracts, along with our low-cost operating profile, position U.S. Iron Ore as a strong cash flow generator in most commodity pricing environments. Since instituting our strategy in 2014 of focusing on this core business, we have achieved significant accomplishments, including providing volume certainty by signing a ten-year supply agreement with our largest customer; substantially reducing operating costs by making operational improvements; and developing new pellet products to meet ever-evolving market demands.

We recognize the importance of our strength in the U.S. Iron Ore business, and our top strategic priority is to protect and enhance our market position. This involves continuing to deliver high-quality, custom-made pellets that allow our customers to remain competitive in the quality, production efficiency, and environmental friendliness of their steel products. Protecting the core business also involves continually evaluating opportunities to expand both our production capacity and ore reserve life. In 2017, we achieved key accomplishments toward these goals by acquiring the remaining minority stake in our Tilden and Empire mines as well as additional real estate interests in Minnesota.

### *Expanding our Customer Base*

While we hold a strong market position in supplying iron ore to Great Lakes blast furnaces, we cannot ignore the ongoing shift of steelmaking share in the U.S. away from our core blast furnace customers to EAF steelmakers. Over the past 25 years, the market share of EAFs has nearly doubled. However, as EAFs have moved to higher value steel products, they require more high-quality iron ore-based metallics instead of scrap as raw material feedstock. As a result of this trend, one of our top strategic priorities is to become a critical supplier of the EAF market by providing these specialized metallics. In June 2017, we announced the planned construction of an HBI production plant in Toledo, Ohio. HBI is a specialized high-quality iron alternative to scrap that, when used as a feedstock, allows the EAF to produce more valuable grades of steel. We expect our HBI to partially replace the over 3 million metric tons of ore-based metallics that are imported into the Great Lakes every year from Russia, Ukraine, Brazil and Venezuela.

Our Toledo plant is expected to produce HBI at a rate of 1.6 million metric tons per year when brought to production in 2020. We expect that this will create additional demand for our DR-grade pellets of 2.5 million long tons. Not only does this production plant create another outlet for our high-margin pellets, but it also presents an attractive economic opportunity for us. As the only producer of DR-grade pellets in the Great Lakes and with access to abundant, low-cost natural gas, we will be in a unique position to serve clients in the region. In addition, the Toledo site is in close proximity to over 20 EAFs, giving us a natural competitive freight advantage over import competitors.

### *Optimized, Divested or Shut Down All Non-Core Business Segments*

Given the current price discounting environment for low-grade iron ore products containing less than 62% Fe, we are focused on optimizing the remaining ore reserve base of our Asia Pacific Iron Ore business. We will continue to operate Asia Pacific Iron Ore with very low total capital expenditures until we cease mining operations, which we expect to occur at some point during 2018.

Restructuring proceedings were commenced under the CCAA for the Bloom Lake Group, part of our Eastern Canadian Iron Ore businesses, in the first quarter of 2015. During the second quarter of 2015, the CCAA protection granted to the Bloom Lake Group was extended to include the Wabush Group to facilitate the reorganization of each of their businesses and operations. As of December 31, 2017, CCAA proceedings are still ongoing. The Monitor appointed by the court in the CCAA proceedings for the Bloom Lake Group and the Wabush Group has conducted a claims process pursuant to which creditors have filed claims against the Bloom Lake Group and the Wabush Group. The Monitor is reviewing all claims filed as part of this claims process. Currently, there is uncertainty as to the amount of the distribution that will be made to the creditors of the Bloom Lake Group and the Wabush Group, including, if any, to us, and whether we could be held liable for claims that may be asserted by or on behalf of the Bloom Lake Group or the Wabush Group or by their respective representatives against non-debtor affiliates of the Bloom Lake Group and the Wabush Group. During 2017, we became aware that it was probable the Monitor will assert a preference claim against us and/or certain of our affiliates. Given that it is probable the claim will be asserted by the Monitor, we have recorded an estimated liability of $55.6 million, which includes the value of our related-party claims against the Bloom Lake Group and the Wabush Group. Should the Monitor proceed to assert the claim, we believe the Monitor will demand an amount in excess of the

46

Table of Contents

value of our related-party claims against the Bloom Lake Group and the Wabush Group. Thus, it is possible that a change in the estimated liability may occur in the future. We deny liability for any amount and will vigorously defend such claim.

On December 22, 2015, we closed the sale of our remaining North American Coal business, which included the Pinnacle mine in West Virginia and the Oak Grove mine in Alabama, to Seneca. The sale marked our exit from the coal business and represented another very important step in the implementation of our U.S. Iron Ore pellet-centric strategy. Prior to this sale, it was determined by management as of March 31, 2015 that our North American Coal operating segment met the criteria to be classified as held for sale under *ASC 205, Presentation of Financial Statements* .

### *Maintaining Discipline on Costs and Capital Spending and Improving our Financial Flexibility*

We believe our ability to execute our strategy is dependent on our improving financial position, balance sheet strength and financial flexibility, which will enable us to manage through the inherent cyclical demand for our products and volatility in commodity prices. Our streamlined organization and support functions are well-aligned to best serve our strategic direction. Our capital allocation plan is focused on strengthening and protecting our core U.S. Iron Ore operations and expanding our customer base.

As the implementation of our strategy has strengthened the business, we have put additional emphasis on the continued improvement of our balance sheet via continued reduction of long-term debt. Since the middle of 2014, we have reduced the principal of our debt by 15% and decreased our average cost of debt to 5% by using various liability management strategies consistent with our capital allocation priorities and our stated objective of improving the strength of our balance sheet and simplifying the capital structure. Given the cyclical nature of our business, we will continue to be opportunistic in managing our balance sheet and capital structure, which will put us in an optimal position to manage through any commodity environment, and we continue to seek the best opportunities to accomplish this.

## Competitive Strengths

### *Resilient U.S. Iron Ore Operations*

The U.S. Iron Ore segment is the primary contributor to our consolidated results, generating  $1,866.0 million of consolidated revenue and  $559.4 million of consolidated Adjusted EBITDA for the year ended December 31, 2017. U.S. Iron Ore produces differentiated iron ore pellets that are customized for use in customers' blast furnaces as part of the steelmaking process. The grades of pellets currently delivered to each customer are based on that customer's preferences, which depend in part on the characteristics of the customer's blast furnace operation. We believe our long history of supplying customized pellets to the U.S. steel producers has resulted in a co-dependent relationship between us and our customers. This technical and operational co-dependency has enabled us to claim a substantial portion of the total U.S. iron ore market. Based on our equity ownership in our U.S. mines, our share of the annual rated production capacity is 21.2 million long tons, representing 42% of total U.S. annual pellet capacity. Long-lived assets with an average mine life of approximately 30 years provide the opportunity to maintain our significant market position well into the future.

We believe U.S. Iron Ore is uniquely positioned in the global iron ore market due to its muted exposure to seaborne iron ore pricing. More than half of U.S. Iron Ore production is sold through long-term contracts that are structured with various formula-based pricing mechanisms that reference spot iron ore pricing, domestic steel prices, and Atlantic-based pellet premiums, among other items, and mitigate the impact of any one factor's price volatility on our business.

In addition, we maintain a freight advantage compared to our competition as a result of our proximity to U.S. steelmaking operations. The Great Lakes market is largely isolated and difficult to enter. Our costs are lower as a result of inherent transportation advantages associated with our mine locations near the Great Lakes, which allows for transportation via railroads and loading ports. U.S. Iron Ore mines also benefit from on-site pellet production and ore production facilities located a short distance from the mines.

## Recent Developments

On December 22, 2017, President Trump signed into law "Public Law 115–97", commonly known as the "Tax Cuts and Jobs Act", which, among other things, repeals the corporate AMT and will reduce the federal corporate tax rate to 21% for tax years beginning January 1, 2018.  Along with the repeal of AMT, Public Law 115–97 provides that existing AMT credit carryovers are refundable beginning with the filing of the calendar year 2018 tax return. We have $235.3 million of AMT credit carryovers that are expected to be fully refunded between 2019 and 2022. The tax reform legislation is a comprehensive bill containing several other provisions, such as limitations on the deductibility of interest expense and certain executive compensation, that are not expected to have a material effect on us due to our large net operating loss position, our ability to access the historic losses with no limitations as described in Public Law 115–97, and our full

47

Table of Contents

valuation allowance position. The ultimate impact of the tax reform legislation may differ from our current estimates due to changes in the interpretations and assumptions made as well as additional regulatory guidance that may be issued.

During the fourth quarter of 2017, we completed an acquisition of certain real estate interests located in Itasca County west of Nashwauk, Minnesota from Glacier Park Iron Ore Properties LLC. The interests include a combination of undivided and whole fee interests as well as mineral and surface leases, all lying within the Biwabik Iron Formation. The acreage acquired is approximately 553 acres and the acreage being leased is approximately 3,215 acres.

We completed an issuance of $400.0 million aggregate principal amount of 4.875% 2024 Senior Secured Notes in a private transaction exempt from the registration requirements of the Securities Act on December 19, 2017. In addition, we issued $316.25 million aggregate principal amount of 1.50% 2025 Convertible Senior Notes. We intend to use the net proceeds from these offerings to fund a substantial portion of our HBI project in Toledo, Ohio, for upgrades at the Northshore plant to enable it to produce significantly increased levels of DR-grade pellets that could be used as feedstock for the HBI production plant and/or sold commercially and general corporate purposes.

## Business Segments

The Company's primary continuing operations are organized and managed according to product category and geographic location: U.S. Iron Ore and Asia Pacific Iron Ore.

## Results of Operations – Consolidated

### 2017 Compared to 2016

On January 25, 2018, we furnished a Current Report on Form 8-K to the SEC that included a news release issued that same day announcing the fourth-quarter and full-year financial results for the period ended December 31, 2017, which was furnished as Exhibit 99.1 thereto (the Earnings Release). The Earnings Release reported: (a) net income attributable to Cliffs shareholders of $317.8 million and $374.9 million; (b) earnings per common share attributable to Cliffs shareholders - diluted of $1.05 and $1.28; and (c) Adjusted EBITDA of $129.2 million and $512.8 million, each for the three and twelve months ended December 31, 2017. The Statements of Consolidated Operations and accompanying notes in this Annual Report on Form 10-K reports (a) net income attributable to Cliffs shareholders of $309.9 million and $367.0 million; (b) earnings per common share attributable to Cliffs shareholders - diluted of $1.03 and $1.26; and (c) Adjusted EBITDA of $121.3 million and $504.9 million, each for the three and twelve months ended December 31, 2017. Subsequent to the Earnings Release, we determined that the ARO liability recorded at Asia Pacific Iron Ore did not adequately reflect that expected costs to be incurred at the end of mine life. Accordingly, we recorded an entry to fully reflect the estimated ARO cost.

The following is a summary of our consolidated results of operations for the years ended December 31, 2017 and 2016:

| | (In Millions) | | |
|---|---|---|---|
| | **2017** | 2016 | Variance Favorable/ (Unfavorable) |
| Revenues from product sales and services | $ 2,330.2 | $ 2,109.0 | $ 221.2 |
| Cost of goods sold and operating expenses | (1,828.5) | (1,719.7) | (108.8) |
| Sales margin | $ 501.7 | $ 389.3 | $ 112.4 |
| Sales margin % | 21.5% | 18.5% | 3.0% |

### Revenues from Product Sales and Services

Revenues from product sales and services increased by $175.7 million or 9.2%, excluding the increase in freight and reimbursements of $45.5 million, for the year ended December 31, 2017 compared to the prior year, which was driven by an increase in realized revenue rate of 16.3% or $228.2 million and increased iron ore sales volumes of 0.5 million long tons or $36.7 million from our U.S. Iron Ore operations compared to the prior year. These increases were offset partially by the decrease in sales volume of 1.8 million metric tons or $81.0 million and a decrease in realized revenue rate of 1.2% or $4.9 million from our Asia Pacific Iron Ore operations compared to the prior year.

Refer to "Results of Operations – Segment Information" for additional information regarding the specific factors that impacted revenue during the period.

48

Table of Contents

*Cost of Goods Sold and Operating Expenses*

 *Cost of goods sold and operating expenses* increased by $63.3 million or 4.2%, excluding the increase in freight and reimbursements of $45.5 million, for the year ended December 31, 2017 compared to the prior year, which was primarily due to increased production cost rates across all operations that resulted in increased costs of $157.0 million and increased sales volumes from our U.S. Iron Ore operations that resulted in $18.4 million of additional costs. These increases were offset partially by incrementally lower idle costs in our U.S. Iron Ore operations of $54.7 million and lower iron ore sales volumes from our Asia Pacific Iron Ore operations for the year ended December 31, 2017 compared to the prior year that resulted in lower costs of $69.3 million.

 Refer to "Results of Operations – Segment Information" for additional information regarding the specific factors that impacted our operating results during the period.

 *Other Operating Income (Expense)*

 The following is a summary of *Other operating income (expense)* for the years ended December 31, 2017 and 2016:

| | (In Millions) | | |
| --- | --- | --- | --- |
| | **2017** | 2016 | Variance Favorable/ (Unfavorable) |
| Selling, general and administrative expenses | $ **(105.8)** | $ (117.8) | $ 12.0 |
| Miscellaneous - net | **27.7** | (30.7 ) | 58.4 |
| | $ **(78.1)** | $ (148.5 ) | $ 70.4 |

 *Selling, general and administrative expenses* during the year ended December 31, 2017 decreased $12.0 million over 2016. The favorable variance for the year ended December 31, 2017 was driven by a $4.1 million decrease in incentive compensation and $3.5 million of union signing bonuses in 2016, which were not repeated in the 2017. In addition, external services costs, excluding costs for early stage HBI project spending, decreased by $5.4 million for the year ended December 31, 2017 compared to the prior year. These favorable variances were offset partially by early-stage HBI project spending of $2.3 million.

 The following is a summary of *Miscellaneous - net* for the years ended December 31, 2017 and 2016:

| | (In Millions) | | |
| --- | --- | --- | --- |
| | **2017** | 2016 | Variance Favorable/ (Unfavorable) |
| Foreign exchange remeasurement | $ **11.4** | $ (16.8 ) | $ 28.2 |
| Michigan Electricity Matters accrual | **1.3** | (12.4 ) | 13.7 |
| Management and royalty fees | **5.1** | 9.0 | (3.9) |
| Empire idle costs | **5.0** | (8.2 ) | 13.2 |
| Gain (loss) on disposal of assets | **0.9** | (4.8 ) | 5.7 |
| Other | **4.0** | 2.5 | 1.5 |
| | $ **27.7** | $ (30.7 ) | $ 58.4 |

 For the year ended December 31, 2017, there was an incrementally favorable impact of $28.2 million driven by the change in foreign exchange remeasurement of short-term intercompany loans that are denominated in currency that is not the functional currency of the entity that holds the loans. There was an incrementally favorable impact of $13.2 million in Empire mine idle costs driven primarily by an asset retirement obligation adjustment. In addition, there was an incrementally favorable consolidated impact of $13.7 million related to the FERC ruling on the Michigan Electricity Matters that was recorded in the third quarter of 2016 and adjusted in the fourth quarter of 2017.

Table of Contents

*Other Income (Expense)*

The following is a summary of *Other income (expense)* for the years ended December 31, 2017 and 2016:

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| | **2017** | | 2016 | | Variance Favorable/ (Unfavorable) | |
| Interest expense, net | $ | **(132.0)** | $ | (200.5) | $ | 68.5 |
| Gain (loss) on extinguishment/restructuring of debt | | **(165.4)** | | 166.3 | | (331.7) |
| Other non-operating income | | **3.2** | | 0.4 | | 2.8 |
| | $ | **(294.2)** | $ | (33.8) | $ | (260.4) |

The loss on extinguishment/restructuring of debt for the year ended December 31, 2017 of $165.4 million was related to the repurchase of certain of our unsecured senior notes and the redemption in full of certain of our then-outstanding secured notes. This compares to a gain of $166.3 million for the year ended December 31, 2016, primarily related to the issuance of our 8.00% 2020 1.5 Lien Notes through an exchange offer on March 2, 2016.

*Interest expense, net* for the year ended December 31, 2017, had a favorable variance of $68.5 million versus the prior year, predominantly as a result of the debt restructuring activities that occurred throughout 2017. These debt restructurings resulted in a reduction of our effective interest rate to 5.8% and extended our debt maturities.

Refer to NOTE 5 - DEBT AND CREDIT FACILITIES for further discussion.

**Income Taxes**

Our tax rate is affected by permanent items, such as depletion and the relative amount of income we earn in various foreign jurisdictions with tax rates that differ from the U.S. statutory rate. It also is affected by discrete items that may occur in any given period, but are not consistent from period to period. The following represents a summary of our tax provision and corresponding effective rates for the years ended December 31, 2017 and 2016:

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| | **2017** | | 2016 | | Variance | |
| Income tax benefit | $ | **252.4** | $ | 12.2 | $ | 240.2 |
| Effective tax rate | | **(195.0)%** | | (5.9)% | | (189.1)% |

50

A reconciliation of our income tax attributable to continuing operations compared to the U.S. federal statutory rate for the years ended December 31, 2017 and 2016 is as follows:

| | \(In Millions\) | | | |
|---|---|---|---|---|
| | **2017** | | 2016 | |
| Tax at U.S. statutory rate of 35% | $ 45.3 | 35.0 % | $ 72.5 | 35.0 % |
| Increase (decrease) due to: | | | | |
| Impact of tax law change - remeasurement of deferred taxes | 407.5 | 314.8 | 149.1 | 72.0 |
| Prior year adjustments in current year | (1.1) | (0.8) | (11.8) | (5.7) |
| Valuation allowance build (reversal) | | | | |
| Tax law change - remeasurement of deferred taxes | (407.5) | (314.8) | (149.1) | (72.0) |
| Current year activity | (471.7) | (364.4) | 93.9 | 45.4 |
| Repeal of AMT | (235.3) | (181.7) | — | — |
| Prior year adjustments in current year | (3.0) | (2.4) | 6.5 | 3.1 |
| Tax uncertainties | (1.4) | (1.1) | (11.3) | (5.5) |
| Worthless stock deduction | — | — | (73.4) | (35.5) |
| Impact of foreign operations | 475.4 | 367.2 | (42.7) | (20.6) |
| Percentage depletion in excess of cost depletion | (61.6) | (47.6) | (36.1) | (17.4) |
| Non-taxable loss (income) related to noncontrolling interests | 1.3 | 1.0 | (8.8) | (4.2) |
| State taxes, net | (0.1) | — | 0.4 | 0.2 |
| Other items, net | (0.2) | (0.2) | (1.4) | (0.7) |
| Provision for income tax benefit and effective income tax rate including discrete items | $ (252.4) | (195.0)% | $ (12.2) | (5.9)% |

Our tax provision for the year ended December 31, 2017 was a benefit of $252.4 million and a negative 195.0% effective tax rate compared with a benefit of $12.2 million and an effective tax rate of negative 5.9% for the prior year. The increase in income tax benefit from the prior year is primarily due to the repeal of AMT through U.S. income tax reform legislation. The impact of tax law change due to remeasurement of deferred taxes primarily relates to the statutory rate reduction in the U.S. that decreased the deferred tax assets by $334.1 million and the Luxembourg rate reduction that decreased the deferred tax assets by $73.4 million. Both of these asset reductions were fully offset by a decrease in valuation allowance. The impact of foreign operations relates to income and losses in foreign jurisdictions where the statutory rates, ranging from 0% to 30%, differ from the U.S. statutory rate of 35%.

See NOTE 9 - INCOME TAXES for further information.

***Loss from Discontinued Operations, net of tax***

During the year ended December 31, 2017, the Wabush Scully Mine was sold as part of the ongoing CCAA proceedings for the Wabush Group, which resulted in a net gain of $31.4 million within *Loss from Discontinued Operations, net of tax* . During the year ended December 31, 2017, we recorded a net loss from discontinued operations, net of tax, of $18.7 million, primarily due to recording an estimated liability of $55.6 million related to the probable assertion of a preference claim against the Company which is classified as *Contingent claims* in the Statements of Consolidated Financial Position , partially offset by the gain discussed above. We recorded a loss from discontinued operations of $19.9 million for the year ended December 31, 2016.

Refer to NOTE 14 - DISCONTINUED OPERATIONS for further information.

***Noncontrolling Interest***

During 2017, our ownership interest in Empire increased to 100% as we reached an agreement to distribute the noncontrolling interest net assets of $132.7 million to ArcelorMittal, in exchange for its interest in Empire. The agreement had no direct impact on the *Loss (income) attributable to noncontrolling interest* in the Statements of Consolidated Operations . However, for the year ended December 31, 2017, the Empire mine was indefinitely idled resulting in a loss attributable to the noncontrolling interest of $3.9 million. In comparison, during the year ended December 31, 2016, the Empire mine was operating and had income of $25.2 million attributable to the noncontrolling interest.

Table of Contents

**Results of Operations – Consolidated**

### *2016 Compared to 2015*

The following is a summary of our consolidated results of operations for the years ended  December 31, 2016 and 2015:

| | (In Millions) | | |
| --- | --- | --- | --- |
| | 2016 | 2015 | Variance Favorable/ (Unfavorable) |
| Revenues from product sales and services | $      2,109.0 | $      2,013.3 | $      95.7 |
| Cost of goods sold and operating expenses | (1,719.7) | (1,776.8) | 57.1 |
| Sales margin | $      389.3 | $      236.5 | $      152.8 |
| Sales margin % | 18.5% | 11.7% | 6.8% |

### *Revenues from Product Sales and Services*

*Revenues from product sales and services* for the year ended December 31, 2016 increased $95.7 million, or 4.8%, from 2015, which primarily was driven by higher sales volume from our U.S. Iron Ore operations of 932 thousand long tons equating to an increase in revenue of $73.5 million and higher pricing from our Asia Pacific Iron Ore operations for an increase of $69.2 million. The increase in volume mainly was attributable to additional nominated tons from short-term contracts. Higher pricing and revenue rates were driven by an increase in the Platts 62% Price and a hedging impact in 2015 that was not repeated in 2016, for increased revenue of $32.7 million and $29.3 million, respectively. These positive movements were partially offset from lower pricing from our U.S. Iron Ore operations for a decrease of $62.0 million. Lower pricing primarily was driven by the negative inflation of certain price indices and the impact of net lower overall contracted pricing terms for two short-term customer contracts that were based on fixed negotiated rates compared to the prior year, which was based on a different method.

Refer to "Results of Operations – Segment Information" for additional information regarding the specific factors that impacted revenue during the period.

### *Cost of Goods Sold and Operating Expenses*

*Cost of goods sold and operating expenses* for the years ended December 31, 2016 and 2015 were $1,719.7 million and $1,776.8 million, respectively, a decrease of $57.1 million, or 3.2%, year-over-year.

*Cost of goods sold and operating expenses* for the year ended December 31, 2016 decreased as a result of operational efficiencies and cost-cutting efforts across each of our business units, which reduced costs by $114.5 million. Additionally, lower idle costs and favorable foreign exchange rates decreased costs by $7.8 million and $5.5 million, respectively, compared to the year ended December 31, 2015. These decreases in cost were offset partially by higher iron ore sales volumes resulting in higher expense of $56.0 million compared to the year ended December 31, 2015.

Refer to "Results of Operations – Segment Information" for additional information regarding the specific factors that impacted our operating results during the period.

### *Other Operating Income (Expense)*

The following is a summary of *Other operating income (expense)* for the years ended  December 31, 2016 and 2015:

| | (In Millions) | | |
| --- | --- | --- | --- |
| | 2016 | 2015 | Variance Favorable/ (Unfavorable) |
| Selling, general and administrative expenses | $      (117.8) | $      (110.0) | $      (7.8) |
| Miscellaneous - net | (30.7) | 24.8 | (55.5) |
| | $      (148.5) | $      (85.2) | $      (63.3) |

52

*Selling, general and administrative expenses* during the year ended December 31, 2016 increased $7.8 million over 2015. The increase for the year ended December 31, 2016 compared to the prior year was driven by an increase in employment costs of $8.1 million primarily due to incentive compensation and an increase in expenses of $2.1 million related to a lease abandonment of a corporate office space. These increases were partially offset by a $3.9 million decrease in IT service costs and legal fees.

The following is a summary of *Miscellaneous - net* for the years ended December 31, 2016 and 2015:

| | (In Millions) | | |
|---|---|---|---|
| | 2016 | 2015 | Variance Favorable/ (Unfavorable) |
| Foreign exchange remeasurement | $ (16.8) | $ 16.3 | $ (33.1) |
| Michigan Electricity Matters accrual | (12.4) | — | (12.4) |
| Management and royalty fees | 9.0 | 6.4 | 2.6 |
| Empire idle costs | (8.2) | — | (8.2) |
| Gain (loss) on disposal of assets | (4.8) | 3.4 | (8.2) |
| Other | 2.5 | (1.3) | 3.8 |
| | $ (30.7) | $ 24.8 | $ (55.5) |

For the year ended December 31, 2016, there was an incrementally unfavorable impact of $33.1 million driven by the change in foreign exchange remeasurement of short-term intercompany loans that are denominated in currency that is not the functional currency of the entity that holds the loans.

**Other Income (Expense)**

The following is a summary of *Other income (expense)* for the years ended December 31, 2016 and 2015:

| | (In Millions) | | |
|---|---|---|---|
| | 2016 | 2015 | Variance Favorable/ (Unfavorable) |
| Interest expense, net | $ (200.5) | $ (228.5) | $ 28.0 |
| Gain on extinguishment/restructuring of debt | 166.3 | 392.9 | (226.6) |
| Other non-operating income (expense) | 0.4 | (2.6) | 3.0 |
| | $ (33.8) | $ 161.8 | $ (195.6) |

The gain on extinguishment/restructuring of debt for the year ended December 31, 2016 was $166.3 million, primarily related to the issuance of 8.00% 2020 1.5 Lien Notes on March 2, 2016 compared to $392.9 million related to the corporate debt restructuring that occurred during the year ended December 31, 2015.

*Interest expense, net* for the year ended December 31, 2016 was lower by $20.8 million versus the year ended December 31, 2015 as a result of the debt restructuring activities that occurred during 2016. These debt extinguishments and restructurings resulted in a net reduction of the outstanding principal balance of our senior notes. Additionally, there was a favorable impact of $5.8 million due to the reduction of equipment loan interest and capital lease interest for the year ended December 31, 2016 compared to the prior year.

Refer to NOTE 5 - DEBT AND CREDIT FACILITIES for further discussion.

Table of Contents

*Income Taxes*

Our tax rate is affected by permanent items, such as depletion and the relative amount of income we earn in various foreign jurisdictions with tax rates that differ from the U.S. statutory rate. It also is affected by discrete items that may occur in any given period, but are not consistent from period to period. The following represents a summary of our tax provision and corresponding effective rates for the years ended December 31, 2016 and 2015:

|  | | (In Millions) | | | |
| --- | --- | --- | --- | --- | --- |
|  | | 2016 | | 2015 | Variance |
| Income tax benefit (expense) | $ | 12.2 | $ (169.3) | $ | 181.5 |
| Effective tax rate | | (5.9)% | 54.1% | | (60.0)% |

A reconciliation of our income tax attributable to continuing operations computed at the U.S. federal statutory rate for the years ended December 31, 2016 and 2015 is as follows:

|  | | (In Millions) | | | |
| --- | --- | --- | --- | --- | --- |
|  | | 2016 | | 2015 | |
| Tax at U.S. statutory rate of 35% | $ | 72.5 | 35.0 % | $ 109.6 | 35.0 % |
| Increase (decrease) due to: | | | | | |
| Impact of tax law change - remeasurement of deferred taxes | | 149.1 | 72.0 | — | — |
| Prior year adjustments in current year | | (11.8) | (5.7) | 5.9 | 1.9 |
| Valuation allowance build (reversal) | | | | | |
| Tax law change - remeasurement of deferred taxes | | (149.1) | (72.0) | — | — |
| Current year activity | | 93.9 | 45.4 | (104.6) | (33.4) |
| Repeal of AMT | | — | — | — | — |
| Prior year adjustments in current year | | 6.5 | 3.1 | 165.8 | 52.9 |
| Tax uncertainties | | (11.3) | (5.5) | 84.1 | 26.9 |
| Worthless stock deduction | | (73.4) | (35.5) | — | — |
| Impact of foreign operations | | (42.7) | (20.6) | (53.9) | (17.2) |
| Percentage depletion in excess of cost depletion | | (36.1) | (17.4) | (34.9) | (11.1) |
| Non-taxable income related to noncontrolling interests | | (8.8) | (4.2) | (3.0) | (1.0) |
| State taxes, net | | 0.4 | 0.2 | 0.2 | 0.1 |
| Other items, net | | (1.4) | (0.7) | 0.1 | — |
| Provision for income tax (benefit) expense and effective income tax rate including discrete items | $ | (12.2) | (5.9)% | $ 169.3 | 54.1 % |

Our tax provision for the year ended December 31, 2016 was a benefit of $12.2 million and a negative 5.9% effective tax rate compared with an expense of $169.3 million and an effective tax rate of 54.1% for the prior year. The change to an income tax benefit from the prior year expense is due to the prior year recording of valuation allowances against existing deferred tax assets, a worthless stock deduction in the current year and the settlement of unrecognized tax benefits. The impact of tax law change relates to the enacted statutory rate reduction in Luxembourg that decreased the deferred tax assets by $149.1 million and was fully offset by a decrease in valuation allowance. The impact of foreign operations relates to income in foreign jurisdictions where the statutory rates, ranging from 0% to 30%, differ from the U.S statutory rate of 35%.

See NOTE 9 - INCOME TAXES for further information.

54

### Loss from Discontinued Operations, net of tax

*Loss from Discontinued Operations, net of tax* was comprised primarily of the loss on discontinued operations related to our North American Coal operating segment and our Eastern Canadian Iron Ore operations. During the year ended December 31, 2016, we recorded a loss from discontinued operations of $19.9 million, net of tax, attributable to a net loss from a change in estimate to our *Loans to and accounts receivable from the Canadian Entities* of $17.5 million in the Statements of Consolidated Financial Position and a net loss of $2.4 million from certain disputes related to the sale of our North American Coal segment.

As of March 31, 2015, management determined that our North American Coal operating segment met the criteria to be classified as held for sale under *ASC 205, Presentation of Financial Statements*. As such, all 2016 and historical North American Coal operating segment results are included in our financial statements and classified within discontinued operations. The *Loss from Discontinued Operations, net of tax* related to the North American Coal operating segment was $2.4 million and $152.4 million for the years ended December 31, 2016 and 2015, respectively.

In January 2015, we announced that the Bloom Lake Group commenced restructuring proceedings in Montreal, Quebec under the CCAA. At that time, we had suspended Bloom Lake operations and for several months had been exploring options to sell certain of our Canadian assets, among other initiatives. Effective January 27, 2015, following the commencement of CCAA proceedings for the Bloom Lake Group, we deconsolidated the Bloom Lake Group and certain other wholly-owned subsidiaries comprising substantially all of our Canadian operations. Additionally, on May 20, 2015, the Wabush Group commenced restructuring proceedings in Montreal, Quebec under the CCAA which resulted in the deconsolidation of the remaining Wabush Group entities that were not previously deconsolidated. The Wabush Group was no longer generating revenues and was not able to meet its obligations as they came due. As a result of this action, the CCAA protection granted to the Bloom Lake Group was extended to include the Wabush Group to facilitate the reorganization of each of their businesses and operations. Financial results prior to the respective deconsolidations of the Bloom Lake and Wabush Groups and subsequent expenses directly associated with the Canadian Entities are included in our financial statements and classified within discontinued operations. The *Loss from Discontinued Operations, net of tax* related to the deconsolidated Canadian Entities was $17.5 million and $739.7 million for the years ended December 31, 2016 and 2015, respectively.

Refer to NOTE 14 - DISCONTINUED OPERATIONS for further information.

### Noncontrolling Interest

Noncontrolling interest was comprised primarily of the 21% noncontrolling interest in the consolidated, but less-than-wholly owned subsidiary at our Empire mining venture based on our ownership as of December 31, 2016 and 2015, and through the CCAA filing on January 27, 2015, the 17.2% noncontrolling interest in the Bloom Lake operations. The net income attributable to the noncontrolling interest related to the Empire mining venture was $25.2 million and $8.6 million for the years ended December 31, 2016 and 2015, respectively. The net loss attributable to the noncontrolling interest related to Bloom Lake was $7.7 million for the year ended December 31, 2015. There was no gain or loss attributable to the noncontrolling interest related to Bloom Lake for the year ended December 31, 2016.

## Results of Operations – Segment Information

We evaluate segment performance based on sales margin, defined as revenues less cost of goods sold and operating expenses identifiable to each segment. Additionally, we evaluate performance on a segment basis, as well as a consolidated basis, based on EBITDA and Adjusted EBITDA. These measures allow management and investors to focus on our ability to service our debt as well as illustrate how the business and each operating segment are performing.  Additionally, EBITDA and Adjusted EBITDA assist management and investors in their analysis and forecasting as these measures approximate the cash flows associated with operational earnings.

A005317

Table of Contents

*2017 Compared to 2016*

|  | (In Millions) | | | |
|---|---|---|---|---|
|  | **2017** | | 2016 | |
| Net Income | $ | **363.1** | $ | 199.3 |
| Less: | | | | |
| Interest expense, net | | **(132.0)** | | (200.5) |
| Income tax benefit | | **252.4** | | 12.2 |
| Depreciation, depletion and amortization | | **(87.7)** | | (115.4) |
| Total EBITDA | $ | **330.4** | $ | 503.0 |
| Less: | | | | |
| Gain (loss) on extinguishment of debt | $ | **(165.4)** | $ | 166.3 |
| Impact of discontinued operations | | **(18.7)** | | (19.9) |
| Foreign exchange remeasurement | | **11.4** | | (16.8) |
| Severance and contractor termination costs | | **—** | | (0.1) |
| Supplies inventory adjustment | | **(1.8)** | | — |
| Total Adjusted EBITDA | $ | **504.9** | $ | 373.5 |
|  | | | | |
| EBITDA: | | | | |
| U.S. Iron Ore | $ | **534.9** | $ | 342.4 |
| Asia Pacific Iron Ore | | **40.7** | | 128.3 |
| Other (including discontinued operations) | | **(245.2)** | | 32.3 |
| Total EBITDA | $ | **330.4** | $ | 503.0 |
|  | | | | |
| Adjusted EBITDA: | | | | |
| U.S. Iron Ore | $ | **559.4** | $ | 359.6 |
| Asia Pacific Iron Ore | | **50.4** | | 132.9 |
| Other | | **(104.9)** | | (119.0) |
| Total Adjusted EBITDA | $ | **504.9** | $ | 373.5 |

EBITDA for the year ended December 31, 2017 decreased by $172.6 million on a consolidated basis from 2016. The unfavorable variance in EBITDA for the year ended December 31, 2017 was driven primarily by an incrementally negative impact of $331.7 million related to debt extinguishment/restructuring activities compared to the prior year, partially offset by an increase in sales margin of $112.4 million compared to the prior year.

Adjusted EBITDA increased by $131.4 million for the year ended December 31, 2017 from the comparable period in 2016. The increase primarily was attributable to higher consolidated sales margin of $112.4 million for the year ended December 31, 2017, compared to the prior year. Refer to further detail below for additional information regarding the specific factors that impacted each reportable segment's sales margin during the 2017 and 2016.

56

Table of Contents

### U.S. Iron Ore

The following is a summary of U.S. Iron Ore results for the years ended December 31, 2017 and 2016:

| | | | | | | (In Millions) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Changes due to: | | | | | | | | | |
| | | Year Ended December 31, | | | Revenue and cost rate | | Sales volume | | Idle cost/production volume variance | | Freight and reimburse-ment | | Total change | |
| | | 2017 | | 2016 | | | | | | | | | | | |
| Revenues from product sales and services | $ | 1,866.0 | $ | 1,554.5 | $ | 228.2 | $ | 36.7 | $ | — | $ | 46.6 | $ | 311.5 | |
| Cost of goods sold and operating expenses | | (1,400.6) | | (1,278.8) | | (111.5) | | (18.4) | | 54.7 | | (46.6) | | (121.8) | |
| Sales margin | $ | 465.4 | $ | 275.7 | $ | 116.7 | $ | 18.3 | $ | 54.7 | $ | — | $ | 189.7 | |

| | | Year Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Per Long Sales Ton Information | | 2017 | | 2016 | | Difference | | Percent change |
| Realized product revenue rate[1] | $ | 88.03 | $ | 75.71 | $ | 12.32 | | 16.3 % |
| Cash cost of goods sold and operating expense rate[1,2] | | 59.55 | | 55.97 | | 3.58 | | 6.4 % |
| Depreciation, depletion & amortization | | 3.56 | | 4.61 | | (1.05) | | (22.8)% |
| Total cost of goods sold and operating expense rate | | 63.11 | | 60.58 | | 2.53 | | 4.2 % |
| Sales margin | $ | 24.92 | $ | 15.13 | $ | 9.79 | | 64.7 % |
| | | | | | | | | |
| Sales tons[3] (In thousands) | | 18,683 | | 18,224 | | | | |
| Production tons[3] (In thousands) | | | | | | | | |
| Total | | 25,542 | | 23,416 | | | | |
| Cliffs' share of total | | 18,776 | | 15,982 | | | | |

[1] Excludes revenues and expenses related to domestic freight, which are offsetting and have no impact on sales margin. Revenues and expenses also exclude venture partner cost reimbursements.

[2] Cash cost of goods sold and operating expense rate is a non-GAAP financial measure. Refer to "Non-GAAP Reconciliation" for reconciliation in dollars back to our consolidated financial statements.

[3] Tons are long tons.

Sales margin for U.S. Iron Ore was $465.4 million for the year ended December 31, 2017, compared with $275.7 million for the year ended December 31, 2016. Sales margin per long ton increased 64.7% to $24.92 per long ton during the year ended December 31, 2017 compared to 2016.

Revenue increased by $264.9 million during the year ended December 31, 2017, compared to 2016, excluding the freight and reimbursements increase of $46.6 million, predominantly due to:

- An increase in the average year-to-date realized product revenue rate of $12.32 per long ton or 16.3% during the year ended December 31, 2017, compared to 2016, which resulted in an increase of $228.2 million. This is predominantly due to:

  ◦ An increase in Platts 62% Price, which positively affected the realized revenue rate by $9 per long ton or $176 million;

  ◦ An increase in the average annual daily market price and customer pricing for hot-rolled coil steel, which positively affected the realized revenue rate by $5 per long ton or $100 million; and

  ◦ Higher pellet premiums, which positively affected the realized revenue rate by $5 per long ton or $94 million.

  ◦ These increases were offset partially by changes in customer and contract mix and carryover pricing impacts, which negatively affected the realized revenue rate by $5 per long ton or $84 million; and

A005319

◦ Higher index freight rates, a component in some of our contract pricing formulas, which negatively affected the realized revenue rate by $3 per long ton or $63 million.

• Higher sales volumes of 0.5 million long tons during the year ended December 31, 2017, which resulted in increased revenues of $36.7 million due to:

◦ Increased demand from a customer, providing additional sales volume of 1.8 million long tons, compared to the prior year when the customer had sufficient inventory due to the idle of one of its facilities and additional suppliers;

◦ Increased demand from a customer, providing additional sales volume of 1.3 million long tons, resulting from the fourth quarter 2015 termination of its contract causing a nine-month gap in sales to that customer; and

◦ An increase in exports to Asia in order to offset a fourth quarter reduction in domestic nomination from a major customer and fewer domestic spot contracts, providing additional sales volume of 0.9 million long tons compared to 2016.

◦ These increases were offset partially by 2.8 million long tons that were sold in 2016 on separate spot contracts with two customers and were not renewed; and

◦ Decreased sales to a customer due to timing of payments and a lower 2017 nomination, resulting in a decrease in sales volume of 0.8 million long tons.

Cost of goods sold and operating expenses increased $75.2 million during the year ended December 31, 2017, compared to 2016, excluding the freight and reimbursements increase of $46.6 million, predominantly as a result of:

• Higher spending on repairs and maintenance of $44 million or $2 per long ton, higher profit sharing and benefit costs of $35 million or $2 per long ton, and higher energy rates for natural gas, diesel and electricity of $23 million or $1 per long ton; and

• Increased sales volumes as discussed above which resulted in increased costs of $18 million period-over-period.

• These increases were offset partially by decreased idle costs of $55 million or $3 per long ton due to the idle of the United Taconite and Northshore mines during the prior year.

*Production*

Our share of production in our U.S. Iron Ore segment increased by 17.5% during the year ended December 31, 2017 when compared to 2016. The increase in production volume primarily is attributable to all active mining facilities fully operating in 2017 compared to the various idled operations during 2016. United Taconite was fully operating during the year ended December 31, 2017, adding an incremental 3.3 million long tons of production, compared to the previous year's production levels as a result of being idled until it was restarted again in August 2016. Secondly, Northshore added incremental tonnage of 2.1 million long tons during the year ended December 31, 2017, when it was substantially at full production, compared to its previous year's production tonnage when it was fully idled for the first four months of 2016. These production gains were offset partially by the indefinite idle of the Empire mine in August 2016, lowering production by 2.8 million long tons, compared to the prior year when the mine was operating.

58

A005320

Table of Contents

*Asia Pacific Iron Ore*

The following is a summary of Asia Pacific Iron Ore results for the years ended December 31, 2017 and 2016:

|  | (In Millions) | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | | | | Change due to: | | | | | | | | | |
|  | Year Ended December 31, | | | | Revenue and cost rate | | Sales volume | | Exchange rate | | Freight and reimburse-ment | | Total change | |
|  | 2017 | | 2016 | | | | | | | | | | | |
| Revenues from product sales and services | $ | 464.2 | $ | 554.5 | $ | (4.9) | $ | (81.0) | $ | (3.3) | $ | (1.1) | $ | (90.3) |
| Cost of goods sold and operating expenses |  | (427.9) |  | (440.9) |  | (45.5) |  | 69.3 |  | (11.9) |  | 1.1 |  | 13.0 |
| Sales margin | $ | 36.3 | $ | 113.6 | $ | (50.4) | $ | (11.7) | $ | (15.2) | $ | — | $ | (77.3) |

| *Per Metric Sales Ton Information* | Year Ended December 31, | | | | Difference | | Percent change | |
|---|---|---|---|---|---|---|---|---|
|  | 2017 | | 2016 | | | | | |
| Realized product revenue rate[1] | $ | 45.31 | $ | 45.85 | $ | (0.54) | (1.2) | % |
| Cash cost of goods sold and operating expense rate[,2] |  | 40.15 |  | 33.94 |  | 6.21 | 18.3 | % |
| Depreciation, depletion & amortization |  | 1.46 |  | 2.16 |  | (0.70) | (32.4) | % |
| Total cost of goods sold and operating expense rate |  | 41.61 |  | 36.10 |  | 5.51 | 15.3 | % |
| Sales margin | $ | 3.70 | $ | 9.75 | $ | (6.05) | (62.1) | % |

| Sales tons[3] (In thousands) | 9,812 | 11,642 |
|---|---|---|
| Production tons[3] (In thousands) | 10,113 | 11,839 |

[1] The information above excludes revenues and expenses related to freight, which are offsetting and have no impact on sales margin.

[2] Cash cost of goods sold and operating expense rate is a non-GAAP financial measure. Refer to "Non-GAAP Reconciliation" for reconciliation in dollars back to our consolidated financial statements.

[3] Tons are metric tons.

Sales margin for our Asia Pacific Iron Ore segment decreased to $36.3 million during the year ended December 31, 2017, compared with $113.6 million for 2016. Sales margin per metric ton decreased 62.1% to $3.70 per metric ton in 2017, compared to 2016.

Revenue decreased by $89.2 million during the year ended December 31, 2017, compared to 2016, excluding the freight reimbursements decrease of $1.1 million, predominantly due to:

- Decreased sales volume of 1.8 million metric tons, or 15.7%, to 9.8 million metric tons. The decrease in tons sold was primarily driven by lower production, as discussed below, and unfavorable market conditions which limited the economic value on short-term contract sales and resulted in decreased revenue of $81.0 million.

- A decrease in the average year-to-date realized product revenue rate of $0.54 per metric ton or 1.2%, which resulted in a decrease of $8 million, including the impact of foreign exchange. This increase is predominantly a result of:

  ◦ A decrease in revenue rate of $10 per metric ton or $95 million due to price and quality adjustments to meet market competition and to compensate for varying quality ores and a reduction in iron content; and

  ◦ Higher average Western Australia to China freight rates, which unfavorably affected the revenue rate by $3 per metric ton or $26 million.

  ◦ This decrease was offset partially by an increase in the Platts 62% Price, which positively affected the realized revenue rate by $12 per metric ton or $120 million.

59

A005321

Cost of goods sold and operating expenses decreased $11.9 million during the year ended December 31, 2017, compared to 2016, excluding the freight and reimbursements decrease of $1.1 million, predominantly as a result of:

- A decrease in sales volume of 1.8 million metric tons, which decreased costs by $69.3 million.

- This decrease was offset partially by an increase in production costs of $37.6 million or $4 per metric ton, predominantly due to increased mining costs driven by a higher strip ratio, increased administrative costs and higher rail and port rates;

- An unfavorable asset retirement obligation adjustment of $7.9 million or $1 per long ton driven by an increase in expected costs to be incurred at the end of life of mine; and

- Unfavorable foreign exchange rate variances of $11.9 million or $1 per metric ton.

*Production*

Production volume at our Asia Pacific Iron Ore mining complex decreased by 14.6% or 1.7 million metric tons during the year ended December 31, 2017, compared to 2016, driven by operational decisions to reflect current market conditions and quality ore availability.

60

---

Table of Contents

*2016 Compared to 2015*

| | (In Millions) | | |
| --- | --- | --- | --- |
| | 2016 | | 2015 |
| Net Income (Loss) | $ | 199.3 | $ (748.4) |
| Less: | | | |
| Interest expense, net | | (200.5) | (231.4) |
| Income tax benefit (expense) | | 12.2 | (163.3) |
| Depreciation, depletion and amortization | | (115.4) | (134.0) |
| EBITDA | $ | 503.0 | $ (219.7) |
| Less: | | | |
| Gain on extinguishment/restructuring of debt | $ | 166.3 | $ 392.9 |
| Impact of discontinued operations | | (19.9) | (892.0) |
| Foreign exchange remeasurement | | (16.8) | 16.3 |
| Severance and contractor termination costs | | (0.1) | (10.2) |
| Supplies inventory write-off | | — | (16.3) |
| Impairment of other long-lived assets | | — | (3.3) |
| Total Adjusted EBITDA | $ | 373.5 | $ 292.9 |
| | | | |
| EBITDA: | | | |
| U.S. Iron Ore | $ | 342.4 | $ 317.6 |
| Asia Pacific Iron Ore | | 128.3 | 35.3 |
| Other (including discontinued operations) | | 32.3 | (572.6) |
| Total EBITDA | $ | 503.0 | $ (219.7) |
| | | | |
| Adjusted EBITDA: | | | |
| U.S. Iron Ore | $ | 359.6 | $ 352.1 |
| Asia Pacific Iron Ore | | 132.9 | 32.7 |
| Other | | (119.0) | (91.9) |
| Total Adjusted EBITDA | $ | 373.5 | $ 292.9 |

EBITDA for the year ended December 31, 2016 increased by $722.7 million on a consolidated basis from 2015. The period-over-period change primarily was driven by the impact of our discontinued operations during the year ended December 31, 2015. Adjusted EBITDA increased by $80.6 million for the year ended December 31, 2016 from 2015. The period-over-period change is a result of operational efficiencies and cost-cutting efforts across each of our business units. See further detail below for additional information regarding the specific factors that impacted each reportable segment's sales margin during 2016.

61

Table of Contents

***U.S. Iron Ore***

The following is a summary of U.S. Iron Ore results for the years ended December 31, 2016 and 2015:

| | (In Millions) | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Change due to | | | | | | | | |
| | Year Ended December 31, | | | | Revenue and cost rate | | Sales volume | | Idle cost/production volume variance | | Freight and reimburse-ment | | Total change | | |
| | 2016 | | 2015 | | | | | | | | | | | | |
| Revenues from product sales and services | $ | 1,554.5 | $ | 1,525.4 | $ | (62.0) | $ | 73.5 | $ | — | $ | 17.6 | $ | 29.1 | |
| Cost of goods sold and operating expenses | | (1,278.8) | | (1,298.3) | | 84.7 | | (55.4) | | 7.8 | | (17.6) | | 19.5 | |
| Sales margin | $ | 275.7 | $ | 227.1 | $ | 22.7 | $ | 18.1 | $ | 7.8 | $ | — | $ | 48.6 | |

| | Year Ended December 31, | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| *Per Long Sales Ton Information* | 2016 | | 2015 | | Difference | | Percent change | |
| Realized product revenue rate[1] | $ | 75.71 | $ | 79.12 | $ | (3.41) | | (4.3)% |
| Cash cost of goods sold and operating expense rate[,2] | | 55.97 | | 60.27 | | (4.30) | | (7.1)% |
| Depreciation, depletion & amortization | | 4.61 | | 5.72 | | (1.11) | | (19.4)% |
| Total cost of goods sold and operating expenses rate | | 60.58 | | 65.99 | | (5.41) | | (8.2)% |
| Sales margin | $ | 15.13 | $ | 13.13 | $ | 2.00 | | 15.2 % |

| | 2016 | 2015 |
|---|---|---|
| Sales tons[3] (In thousands) | 18,224 | 17,292 |
| Production tons[3] (In thousands) | | |
| Total | 23,416 | 26,138 |
| Cliffs' share of total | 15,982 | 19,317 |

[1] Excludes revenues and expenses related to domestic freight, which are offsetting and have no impact on sales margin. Revenues and expenses also exclude venture partner cost reimbursements.

[2] Cash cost of goods sold and operating expense rate is a non-GAAP financial measure. See *"Non-GAAP Reconciliation"* for reconciliation in dollars back to our consolidated financial statements.

[3] Tons are long tons (2,240 pounds).

Sales margin for U.S. Iron Ore was $275.7 million for the year ended December 31, 2016, compared with $227.1 million for the year ended December 31, 2015. The increase compared to the prior year is attributable to an increase in revenue of $29.1 million in addition to a decrease in cost of goods sold and operating expenses of $19.5 million. Sales margin increased 15.2% to $15.13 per long ton during the year ended December 31, 2016 compared to 2015.

Revenue increased by $11.5 million, excluding the increase of $17.6 million of freight and reimbursements, from the prior year, predominantly due to:

- Higher sales volumes of 0.9 million long tons, which resulted in increased revenues of $73.5 million due to:

  ◦ Additional short-term contracts in 2016 with two customers, one which we made no sales to in 2015, providing additional sales volume of 2.4 million long tons.

  ◦ This increase was offset partially by a 1.3 million net reduction in long tons from the termination of a customer contract in the fourth quarter of the prior year that was reinstated in June 2016, to begin in 2017, and nominations on short-term contracts made with the customer in the interim.

Table of Contents

- The average year-to-date realized product revenue rate declined by $3.41 per long ton or 4.3% to $75.71 per long ton in the year ended December 31, 2016, which resulted in a decrease of $62.0 million, compared to the prior year. The decline is a result of:

  ◦ Changes in customer pricing negatively affected the realized revenue rate by $2 per long ton or $32 million driven primarily by the negative inflation of certain price indices;

  ◦ An unfavorable variance of $30 million or $2 per long ton due to overall net lower contracted pricing terms for two short-term customer contracts that were based on fixed negotiated rates compared to the prior-year which was based on a different method; and

  ◦ An unfavorable change of $17 million or $1 per long ton resulting from various price adjustments, unfavorable customer mix and net of increased service revenue.

  ◦ These decreases were offset partially by an increase in realized revenue rates of $1 per long ton or $17 million as a result of one major customer contract with a pricing mechanism tied to the full-year estimate of their hot-rolled coil steel pricing. The increase in revenue is primarily due to the hot-rolled coil steel estimate increasing in 2016 from the beginning of the year, compared to 2015 when the estimate was revised lower.

Cost of goods sold and operating expenses decreased $37.1 million or $2.04 per long ton, excluding the decrease of $17.6 million of freight and reimbursements from the prior year, predominantly as a result of:

- Lower maintenance and repair costs resulting from cost reduction initiatives and condition based monitoring and Empire's indefinite idle, which began in August 2016 of $28 million of $2 per long ton;

- A year-over-year reduction in energy rates for natural gas and diesel, which lowered costs by $16 million or $1 per long ton and a reduction of employment costs of $12 million or $1 per long ton; and

- Various one-time adjustments totaling $28 million or $2 per long ton impacted the year ended December 31, 2016 compared to the previous year, including a positive asset retirement obligation adjustment for a life of mine extension during 2016 of $9 million or $1 per long ton, and a supplies inventory adjustment that occurred in 2015 that was not repeated in 2016 of $15 million or $1 per long ton.

- These decreases were offset partially by increased sales volume as discussed above that increased costs by $55 million or $3 per long ton, in addition to an unfavorable impact from LIFO liquidation of $9 million or $1 per long ton, compared to the prior year.

*Production*

Our share of production tons in our U.S. Iron Ore segment decreased by 3.3 million long tons or 17.3% when compared to 2015. The decrease in production volumes primarily is attributable to the idled mining facilities. Our United Taconite operation was idled in August 2015, until it was restarted again in August 2016. As a result, our United Taconite operation was in full production for one-third of the year versus operating at full production for two-thirds of the prior year causing a decrease in production volume of 1.5 million long tons. Secondly, our Northshore mining operations were fully idled, including all four furnaces from November 2015 until May 2016, compared to running a three furnace operation for most of 2015 until the full idle began in November 2015, reducing production by 1.0 million long tons during 2016.

63

Table of Contents

*Asia Pacific Iron Ore*

The following is a summary of Asia Pacific Iron Ore results for the years ended December 31, 2016 and 2015:

| | | | | | (In Millions) | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | Change due to | | | | | |
| | Year Ended December 31, | | | Revenue and cost rate | | Sales volume | | Exchange rate | | Freight and reimburse-ment | Total change |
| | 2016 | | 2015 | | | | | | | | |
| Revenues from product sales and services | $ | 554.5 | $ 487.9 | $ | 69.2 | $ | 0.7 | $ | (0.4) | $ (2.9) | $ 66.6 |
| Cost of goods sold and operating expenses | | (440.9) | (478.5) | | 29.8 | | (0.6) | | 5.5 | 2.9 | 37.6 |
| Sales margin | $ | 113.6 | $ 9.4 | $ | 99.0 | $ | 0.1 | $ | 5.1 | $ — | $ 104.2 |

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| | | Year Ended December 31, | | | |
| *Per Metric Sales Ton Information* | | 2016 | 2015 | Difference | Percent change |
| Realized product revenue rate[1] | $ | 45.85 | $ 39.93 | $ 5.92 | 14.8 % |
| Cash cost of goods sold and operating expense rate[1,2] | | 33.94 | 36.95 | (3.01) | (8.1)% |
| Depreciation, depletion & amortization | | 2.16 | 2.18 | (0.02) | (0.9)% |
| Total cost of goods sold and operating expenses rate | | 36.10 | 39.13 | (3.03) | (7.7)% |
| Sales margin | $ | 9.75 | $ 0.80 | $ 8.95 | 1,118.8 % |

| | | | |
| --- | --- | --- | --- |
| Sales tons[3] (In thousands) | | 11,642 | 11,627 |
| Production tons[3] (In thousands) | | 11,839 | 11,722 |

[1] The information above excludes revenues and expenses related to freight, which are offsetting and have no impact on sales margin.

[2] Cash cost of goods sold and operating expense rate is a non-GAAP financial measure. See "Non-GAAP Reconciliation" for reconciliation in dollars back to our consolidated financial statements.

[3] Metric tons (2,205 pounds).

Sales margin for our Asia Pacific Iron Ore segment increased to $113.6 million during the year ended December 31, 2016 compared with $9.4 million for 2015. The increase compared to the prior year primarily is attributable to higher revenue of $66.6 million and lower cost of goods sold and operating expenses of $37.6 million. Sales margin per metric ton increased 1,118.8% to $9.75 per metric ton in 2016 compared to 2015.

Revenue increased by $69.5 million during the year ended December 31, 2016 over the prior year, excluding the decrease of $2.9 million of freight and reimbursements, primarily as a result of:

• The average year-to-date realized product revenue rate increased $5.92 per metric ton or 14.8% to $45.85 per metric ton, which resulted in an increase of $68.8 million, including the impact of foreign exchange. This increase is a result of:

◦ An increase in the Platts 62% Price positively affected the realized revenue rate by $3 per metric ton or $33 million; and

◦ A favorable variance of $3 per metric ton or $29 million due to the suspension in 2015 of the hedging program that protected against volatility in exchange rates. This did not occur in 2016.

Cost of goods sold and operating expenses decreased $34.7 million or $2.98 per metric ton, in the year ended December 31, 2016 over the prior year, excluding the decrease of $2.9 million of freight and reimbursements, primarily as a result of:

• Reduced administration and employment costs of $16 million or $1 per metric ton, due to lower headcount and contractor fees;

Table of Contents

- A reduction in mining costs of $12 million or $1 per metric ton, due to mining efficiencies gained from our revised mine plan, including a reduction in the required mined tons to meet our desired yields;

- Lower transportation costs of $11 million or $1 per metric ton, due to decreased hauling volumes and reduced freight costs as a result of the revised mine plan; and

- Favorable foreign exchange rate variances of $6 million or $1 per metric ton.

- Partially offset by increased crushing costs due to increased maintenance activities and our use of a third-party mobile crushing until and increased royalties, which were driven by higher gross revenues, for $9 million or $1 per metric ton.

*Production*

Production volume at our Asia Pacific Iron Ore segment during the year ended  December 31, 2016  remained consistent with 2015, increasing 117 thousand metric tons or 1.0%. The increase in production tons compared to the prior year is mainly attributable to increased crusher feed productivity and the use of third-party mobile crusher support.

## Liquidity, Cash Flows and Capital Resources

Our primary sources of liquidity are *Cash and cash equivalents* and cash generated from our operating and financing activities. Our capital allocation decision-making process is focused on improving the strength of our balance sheet and creating financial flexibility to manage through the inherent cyclical demand for our products and volatility in commodity prices. We are focused on the preservation of liquidity in our business through maximizing the cash generation of our operations as well as reducing operating costs, aligning capital investments with our strategic priorities and the requirements of our business plan, including regulatory and permission-to-operate related projects, and managing SG&A expenses.

During 2017, we took action consistent with our capital allocation priorities and our stated objective of improving the strength of our balance sheet, improving our financial flexibility and executing on opportunities that will allow us to increase our long-term profitability. Through the issuance of common shares in an underwritten public offering resulting in net proceeds of $661.3 million and two debt offerings for an aggregate principal amount of $1.075 billion, we extinguished $1.611 billion of our existing debt, thereby reducing our average interest rate and extending our debt maturities. In concurrent debt offerings we sold $400.0 million aggregate principal amount of senior secured notes and $316.25 million aggregate principal amount of convertible notes resulting in net proceeds of $697.5 million that we intend to use to fund a substantial portion of our HBI project in Toledo, Ohio, for upgrades at the Northshore plant to enable it to produce significantly increased levels of DR-grade pellets that could be used as feedstock for the HBI production plant and/or sold commercially and general corporate purposes.

Based on our outlook for the next 12 months, which is subject to continued changing demand from steelmakers that utilize our products and volatility in iron ore and domestic steel prices, we expect to generate cash from operations sufficient to meet the needs of our existing operations and to service our debt obligations.

Refer to "Outlook" for additional guidance regarding expected future results, including projections on pricing, sales volume and production.

The following discussion summarizes the significant activities impacting our cash flows during 2017 and comparative years as well as those expected to impact our future cash flows over the next 12 months. Refer to the Statements of Consolidated Cash Flows  for additional information.

### Operating Activities

Net cash provided by operating activities was $338.1 million and $303.0 million for the years ended December 31, 2017 and 2016, respectively. The increase in cash provided by operating activities during 2017 was primarily due to the improved operating results previously discussed related to our U.S. Iron Ore operating segment offset partially by cash outflows for working capital. The working capital change in 2017 versus 2016 was primarily driven by the repeal of corporate AMT as a result of tax reform, which impacted our taxes receivable, and the timing of inventory and accounts receivable movements.

A005327

Driving the increase in our taxes receivable is Public Law 115–97, commonly known as the "Tax Cuts and Jobs Act", which among other things, repeals the corporate AMT and will reduce the federal corporate tax rate to 21% for tax years beginning January 1, 2018. Along with the repeal of AMT, Public Law 115–97 provides that existing AMT credit carryovers are refundable beginning with the filing of the calendar year 2018 tax return. We have $235.3 million of AMT credit carryovers that are expected to be fully refunded between 2019 and 2022.

Net cash provided by operating activities  increased to $303.0 million for the year ended December 31, 2016, compared to net cash provided by operating activities of $37.9 million for 2015. The increase in operating cash flows in 2016 was primarily due to better operating results previously discussed related to both the U.S. Iron Ore and Asia Pacific Iron Ore operating segments, and improved cash flows from working capital. The working capital improvement in 2016 versus 2015 was driven by aggressively reducing inventory levels partially offset by the prior-year income tax refund. Sales volume outpaced production volume in 2016, while in 2015, production volume was higher than sales volume.

Our U.S. cash and cash equivalents balance at  December 31, 2017 was $952.1 million, or 94% of our consolidated total cash and cash equivalents balance of $1,007.7 million.

### Investing Activities

Net cash used by investing activities  was $156.0 million  for the year ended December 31, 2017, compared with $57.9 million for the year ended December 31, 2016. We had capital expenditures of $151.7 million and $69.1 million for the years ended December 31, 2017 and 2016, respectively. The 2017 capital expenditures include sustaining capital spend, early-stage work on our HBI project and the acquisition of certain real estate interests located in Itasca County west of Nashwauk, Minnesota.

Net cash used in investing activities was $57.9 million for the year ended December 31, 2016 compared with  $103.2 million for 2015. We had capital expenditures of $69.1 million and $80.8 million for the years ended December 31, 2016 and 2015, respectively. Offsetting our investments in property, plant and equipment, during 2016, we had cash proceeds from investing activities of $8.3 million, primarily from the collection of a debtor-in-possession credit facility (the "DIP financing").

We spent approximately $48 million, $43 million and $81 million globally on expenditures related to sustaining capital during 2017, 2016 and 2015, respectively. Sustaining capital spend includes infrastructure, mobile equipment, environmental, safety, fixed equipment, product quality and health. Additionally, during the year ended December 31, 2017, we spent approximately $43 million on our capital project to produce a specialized, super-flux pellet called "Mustang" at United Taconite in order to meet a customer's pellet specification requirements. We have spent a total of approximately $74 million on this project and expect remaining payments of less than $1 million.

In alignment with our strategy to prioritize our capital allocation between liquidity management and business investment, we anticipate total cash used for capital expenditures, excluding amounts attributable to construction-related contingencies and capitalized interest, during 2018 to be approximately $385 million, the vast majority of which relates to our U.S. operations. Included within this estimate is approximately $250 million related to development of the HBI production plant in Toledo, Ohio and $50 million for upgrades at the Northshore plant to enable it to produce significantly increased levels of DR-grade pellets that could be sold commercially or used as feedstock for the HBI production plant. In total, we expect to spend approximately $700 million on the HBI production plant and $80 million on the Northshore upgrades, exclusive of construction-related contingencies and capitalized interest, through 2020.

### Financing Activities

Net cash provided by financing activities was $498.9 million  for the year ended December 31, 2017, compared with net cash used by financing activities of $206.4 million for 2016. Sources of cash from financing activities during 2017 included a common share offering, generating net proceeds of $661.3 million, and the issuance of $1.075 billion 5.75% 2025 Senior Notes, which provided further net proceeds of $1.046 billion. We also had an issuance of $400.0 million 4.875% 2024 Senior Secured Notes and an issuance of $316.25 million 1.5% 2025 Convertible Senior Notes, generating net proceeds of $697.5 million.

Uses of cash from financing activities during 2017 included the redemption of various tranches of secured and unsecured debt. We redeemed in full all of our outstanding $540 million 8.25% 2020 First Lien Notes, $218.5 million 8.00% 2020 1.5 Lien Notes and $544.2 million 7.75% 2020 Second Lien Notes and purchased certain other outstanding senior notes through tender offers and redemptions. The total aggregate principal amount of debt redeemed and purchased, including premiums, during 2017 was $1.721 billion.

Additionally, we finalized an agreement to distribute the net assets of the noncontrolling interest in Empire to

66

ArcelorMittal in exchange for its interest in Empire and made the first distribution of $44.2 million. The remaining annual installments of $44.2 million each are due in August 2018 and August 2019. We also acquired the remaining 15% equity interest in Tilden owned by U.S. Steel for $105.0 million.

Net cash used by financing activities was $206.4 million for the year ended December 31, 2016, compared with net cash provided by financing activities of $61.0 million for 2015. Net cash used by financing activities included the redemption of all of our outstanding 3.95% 2018 Senior Notes for $305.4 million, which was offset partially by net proceeds from the issuance of common shares of $287.4 million. Additionally, we paid the remaining balance of certain of our equipment loans, which resulted in cash outflows of $95.6 million. Further, we had cash outflows attributable to agreed-upon early distributions of partnership equity of $59.9 million during the year ended December 31, 2016 and paid the last such scheduled early distribution of partnership equity of $8.7 million in January 2017.

The following represents our future cash commitments and contractual obligations as of  December 31, 2017:

| Contractual Obligations | Total | | Less than 1 Year | | 1 - 3 Years | | 3 - 5 Years | | More than 5 Years |
|---|---|---|---|---|---|---|---|---|---|
| | | | | **Payments Due by Period (In Millions)** | | | | | |
| Long-term debt[1] | $ | 2,439.4 | $ | — | $ | 211.3 | $ | 138.4 | $ | 2,089.7 |
| Interest on debt[1] | | 1,098.9 | | 123.4 | | 242.5 | | 212.8 | | 520.2 |
| Operating lease obligations | | 19.6 | | 4.9 | | 3.6 | | 3.6 | | 7.5 |
| Capital lease obligations | | 56.6 | | 20.8 | | 23.2 | | 12.6 | | — |
| Contingent claims | | 55.6 | | 55.6 | | — | | — | | — |
| Partnership distribution payable | | 88.4 | | 44.2 | | 44.2 | | — | | — |
| Purchase obligations: | | | | | | | | | |
| Open purchase orders | | 71.6 | | 64.0 | | 7.5 | | 0.1 | | — |
| Minimum "take or pay" purchase commitments[2] | | 472.4 | | 86.0 | | 181.2 | | 69.1 | | 136.1 |
| Total purchase obligations | | 544.0 | | 150.0 | | 188.7 | | 69.2 | | 136.1 |
| Other long-term liabilities: | | | | | | | | | |
| Pension funding minimums | | 280.1 | | 27.7 | | 56.7 | | 57.2 | | 138.5 |
| OPEB claim payments | | 105.4 | | 4.0 | | 7.6 | | 7.3 | | 86.5 |
| Environmental and mine closure obligations | | 200.1 | | 3.6 | | 33.8 | | 4.8 | | 157.9 |
| Total other long-term liabilities | | 585.6 | | 35.3 | | 98.1 | | 69.3 | | 382.9 |
| Total | $ | 4,888.1 | $ | 434.2 | $ | 811.6 | $ | 505.9 | $ | 3,136.4 |

[1] Refer to NOTE 5 - DEBT AND CREDIT FACILITIES for additional information regarding our debt and related interest rates.

[2] Includes minimum railroad transportation obligations, minimum electric power demand charges, minimum coal, diesel and natural gas obligations and minimum port facility obligations.

The above table does not reflect $6.1 million of unrecognized tax benefits, which we have recorded for uncertain tax positions, as we are unable to determine a reasonable and reliable estimate of the timing of future payments.

Refer to NOTE 20 - COMMITMENTS AND CONTINGENCIES for additional information regarding our future commitments and obligations.

A005329

***Capital Resources***

We expect to fund our business obligations from available cash, current and future operations and existing borrowing arrangements. We also may pursue other funding strategies in the capital markets to strengthen our liquidity. The following represents a summary of key liquidity measures as of December 31, 2017 and 2016:

| | (In Millions) | |
| --- | --- | --- |
| | December 31, 2017 | December 31, 2016 |
| Cash and cash equivalents | $ 1,007.7 | $ 323.4 |
| | | |
| Available borrowing base on ABL Facility [1] | $ 273.2 | $ 333.0 |
| ABL Facility loans drawn | — | — |
| Letter of credit obligations and other commitments | (46.5) | (106.0) |
| Borrowing capacity available | $ 226.7 | $ 227.0 |

[1] The ABL Facility has the maximum borrowing base of $550 million, determined by applying customary advance rates to eligible accounts receivable, inventory and certain mobile equipment.

Our primary sources of funding are cash and cash equivalents, which totaled $1,007.7 million as of December 31, 2017, cash generated by our business, availability under the ABL Facility and other financing activities. Cash and cash equivalents include cash on hand and on deposit as well as all short-term securities held for the primary purpose of general liquidity. The combination of cash and availability under the ABL Facility gives us $1,234.4 million in liquidity entering the first quarter of 2018, which is expected to be adequate to fund operations, letter of credit obligations, sustaining and expansion capital expenditures and other cash commitments for at least the next 12 months.

As of December 31, 2017, we were in compliance with the ABL Facility liquidity requirements and, therefore, the springing financial covenant requiring a minimum Fixed Charge Coverage Ratio of 1.0 to 1.0 was not applicable. We believe that the cash on hand and the ABL Facility provide us sufficient liquidity to support our operating, investing and financing activities. We have the capability to issue additional unsecured notes and, subject to the limitations set forth in our existing debt indentures, additional secured indebtedness, if we elect to access the debt capital markets. However, available capacity of these notes could be limited by market conditions.

Consistent with our stated strategy, we intend from time to time to seek to retire or purchase our outstanding senior notes with cash on hand, borrowings from existing credit sources or new debt financings and/or exchanges for debt or equity securities, in open market purchases, privately negotiated transactions or otherwise. Such repurchases, if any, will depend on prevailing market conditions, our liquidity requirements, contractual restrictions and other factors, and the amounts involved may be material.

***Off-Balance Sheet Arrangements***

In the normal course of business, we are a party to certain arrangements that are not reflected on our   Statements of Consolidated Financial Position . These arrangements include minimum "take or pay" purchase commitments, such as minimum electric power demand charges, minimum coal, diesel and natural gas purchase commitments, minimum railroad transportation commitments and minimum port facility usage commitments; financial instruments with off-balance sheet risk, such as bank letters of credit and bank guarantees; and operating leases, which primarily relate to equipment and office space.

## Market Risks

We are subject to a variety of risks, including those caused by changes in commodity prices, foreign currency exchange rates and interest rates. We have established policies and procedures to manage such risks; however, certain risks are beyond our control.

***Pricing Risks***

*Commodity Price Risk*

Our consolidated revenues include the sale of iron ore pellets, iron ore lump and iron ore fines. Our financial results can vary significantly as a result of fluctuations in the market prices of iron ore and hot-rolled coil steel. World market prices for these commodities have fluctuated historically and are affected by numerous factors beyond our control.

A005330

The world market price that most commonly is utilized in our iron ore sales contracts is the Platts 62% Price, which can fluctuate widely due to numerous factors, such as global economic growth or contraction, change in demand for steel or changes in availability of supply. The other important metric in our price realizations in the U.S. is the prices for hot-rolled coil steel, which can fluctuate due to similar factors.

*Provisional Pricing Arrangements*

Certain of our U.S. Iron Ore and Asia Pacific Iron Ore customer supply agreements specify provisional price calculations, where the pricing mechanisms generally are based on market pricing, with the final revenue rate to be based on market inputs at a specified point in time in the future, per the terms of the supply agreements. At December 31, 2017, we had derivative assets and liabilities of $1.5 million and $2.4 million, respectively, reflected as part of our U.S. Iron Ore and Asia Pacific Iron Ore segment revenue, representing the fair value of the provisional price calculations. We estimate that a positive or negative $10 change in the Platts 62% Price from the December 31, 2017 estimated price recorded would cause a corresponding increase or decrease in the fair value of the derivative instrument of approximately $5 million and $4 million for our U.S. Iron Ore and Asia Pacific Iron Ore segments, respectively.

We have not entered into any hedging programs to mitigate the risk of adverse price fluctuations; however, most of our Asia Pacific Iron Ore supply agreements are short-term in nature and therefore do not expose us to long-term risk.

*Customer Supply Agreements*

Certain supply agreements with one U.S. Iron Ore customer provide for supplemental revenue or refunds based on the average annual daily market price for hot-rolled coil steel at the time the product is consumed in the customer's blast furnaces. In the new contract which commenced in 2017, this supplemental revenue and refund data source changes from the customer's average annual steel price to an average annual daily market price for hot-rolled coil steel. At December 31, 2017, we had derivative assets of $37.9 million, representing the fair value of the pricing factors, based upon the amount of unconsumed long tons and an estimated average hot-rolled coil steel price related to the period in which the iron ore is expected to be consumed in the customer's blast furnaces, subject to final pricing at a future date. We estimate that a $75 positive or negative change in the average daily market price for hot-rolled coil steel realized from the December 31, 2017 estimated price recorded would cause the fair value of the derivative instrument to increase or decrease by approximately $15 million, respectively, thereby impacting our consolidated revenues by the same amount. We have not entered into any hedging programs to mitigate the risk of adverse price fluctuations.

**Volatile Energy and Fuel Costs**

The volatile cost of energy is an important factor affecting the production costs at our iron ore operations. Our consolidated U.S. Iron Ore operations consumed 17.3 million MMBtu's of natural gas at an average delivered price of $3.75 per MMBtu, excluding the natural gas hedge impact, or $3.80 per MMBtu net of the natural gas hedge impact during 2017. Additionally, our consolidated U.S. Iron Ore operations consumed 22.3 million gallons of diesel fuel at an average delivered price of $1.87 per gallon, excluding the diesel fuel hedge impact, or $1.88 per gallon net of the diesel fuel hedge impact during 2017. Consumption of diesel fuel by our Asia Pacific operations was 11.2 million gallons at an average delivered price of $1.73 per gallon for the same period.

In the ordinary course of business, there may also be increases in prices relative to electricity costs at our U.S. mine sites. Specifically, our Tilden mine in Michigan has entered into large curtailable special contracts with Wisconsin Electric Power Company. Charges under those special contracts are subject to a power supply cost recovery mechanism that is based on variations in the utility's actual fuel and purchase power expenses.

Our strategy to address volatile natural gas and diesel rates includes improving efficiency in energy usage, identifying alternative providers and utilizing the lowest cost alternative fuels. A full-year hedging program was implemented during the fourth quarter of 2017 in order to manage the price risk of diesel and natural gas at our U.S. Iron Ore mines. We will continue to monitor relevant energy markets for risk mitigation opportunities and may make additional forward purchases or employ other hedging instruments in the future as warranted and deemed appropriate by management. In the near term, a 10% change from our current average year-to-date natural gas and diesel fuel prices would result in a change of approximately $11 million in our annual fuel and energy cost based on expected consumption for 2018.

**Valuation of Other Long-Lived Assets**

Long-lived assets are reviewed for impairment upon the occurrence of events or changes in circumstances that would indicate that the carrying value of the assets may not be recoverable. Such indicators may include, among others: a significant decline in expected future cash flows; a sustained, significant decline in market pricing; a significant adverse

change in legal or environmental factors or in the business climate; changes in estimates of our recoverable reserves; unanticipated competition; and slower growth or production rates. Any adverse change in these factors could have a significant impact on the recoverability of our long-lived assets and could have a material impact on our consolidated statements of operations and statement of financial position.

A comparison of each asset group's carrying value to the estimated undiscounted future cash flows expected to result from the use of the assets, including cost of disposition, is used to determine if an asset is recoverable. Projected future cash flows reflect management's best estimates of economic and market conditions over the projected period, including growth rates in revenues and costs, estimates of future expected changes in operating margins and capital expenditures. If the carrying value of the asset group is higher than its undiscounted future cash flows, the asset group is measured at fair value and the difference is recorded as a reduction to the long-lived assets. We estimate fair value using a market approach, an income approach or a cost approach. As of December 31, 2017, there were no indicators present indicative of potential impairment or the inability to recover the value of our long-lived assets at our U.S. Iron Ore operations. As of December 31, 2017, there were certain indicators present indicative of potential impairment or the inability to recover the value of our long-lived assets at our Asia Pacific Iron Ore operations; however, the carrying value of our long-lived assets are at or below the liquidation fair value.

### Foreign Currency Exchange Rate Risk

We are subject to changes in foreign currency exchange rates as a result of our operations in Australia, which could impact our financial condition. With respect to Australia, foreign exchange currency risk arises from our exposure to fluctuations in foreign currency exchange rates because our reporting currency is the U.S. dollar, but the functional currency of our Asia Pacific operations is the Australian dollar. Our Asia Pacific operations receive funds in U.S. currency for their iron ore sales and incur costs in Australian currency. We estimate that if the average Australian dollar to U.S. dollar exchange rate during the year ended December 31, 2018 was $0.05 higher or lower than the average exchange rate for the year ended December 31, 2017, our forecasted cash cost of goods sold and operating expense would increase or decrease by approximately $26 million, respectively, for our Asia Pacific Iron Ore segment.

We have not entered into any hedging programs to mitigate the risk of adverse currency fluctuations. We have suspended entering into new foreign exchange rate contracts as we have indefinitely deferred the program. In the future, we may enter into additional hedging instruments as needed in order to further hedge our exposure to changes in foreign currency exchange rates.

### Interest Rate Risk

Interest payable on our senior notes is at fixed rates. Interest payable under our ABL Facility is at a variable rate based upon the base rate plus the base rate margin depending on the excess availability. As of December 31, 2017, we had no amounts drawn on the ABL Facility.

During 2017, we issued the 5.75% 2025 Senior Notes in private transactions exempt from the registration requirements of the Securities Act. Pursuant to the registration rights agreement executed as part of the issuances, we agreed to file a registration statement with the SEC with respect to a registered offer to exchange the 5.75% 2025 Senior Notes for publicly registered notes within 365 days of the issue date. If we fail to satisfy our obligations under the registration rights agreement, we will be required to pay additional interest to the holders of the 5.75% 2025 Senior Notes under certain circumstances. In the event of a registration default, the interest rate will be increased by 0.25% per annum during the 90-day period immediately following the occurrence of any registration default, and such rate shall increase by 0.25% per annum at the end of each subsequent 90-day period until all registration defaults have been cured, up to a maximum additional interest rate of 1.00% per annum.

### Supply Concentration Risks

Many of our mines are dependent on one source each of electric power and natural gas. A significant interruption or change in service or rates from our energy suppliers could impact materially our production costs, margins and profitability.

## Outlook

## Segment Outlook

After evaluating current and anticipated future market conditions in connection with the remaining iron ore reserves at Asia Pacific Iron Ore, including quality and the current market price for the ore, we have decided to accelerate the projected time frame for the planned closure of mining operations in Australia, which will more than likely occur in 2018. Accordingly, we will no longer provide guidance related to this business segment.

| Per Long Ton Information | 2018 Outlook Summary |
|---|---|
| | U.S. Iron Ore |
| Revenues from product sales and services [1] | $97 - $102 |
| | |
| Cost of goods sold and operating expense rate | $69 - $74 |
| Less: | |
|    Freight expense rate [2] | $7 |
|    Depreciation, depletion & amortization rate | $4 |
| Cash cost of goods sold and operating expense rate | $58 - $63 |
| | |
| Sales volume (million long tons) | 20 |
| Production volume (million long tons) | 20 |

[1] This expectation is based on the assumption that iron ore prices, steel prices, and pellet premiums will average for the remainder of 2018 their respective year-to-date averages.

[2] Freight has an offsetting amount in revenue and has no impact on sales margin.

**U.S. Iron Ore Outlook** (Long Tons)

Based on the assumption that iron ore prices, steel prices, and pellet premiums will average for the remainder of 2018 their respective year-to-date averages, we would realize U.S. Iron Ore revenue rates in the range of $97 to $102 per long ton.

As previously disclosed, for 2018 we expect full-year sales and production volumes of approximately 20 million long tons from our U.S. Iron Ore business. This compares to 18.7 million long tons of sales and 18.8 million long tons of production in 2017.

Our full-year 2018 U.S. Iron Ore cash cost of goods sold and operating expense expectation is $58 - $63 per long ton, which compares to $60 per long ton for the full-year 2017.

**SG&A Expenses and Other Expectations**

Full-year 2018 SG&A expenses are expected to be approximately $115 million. We also note that of the $115 million expectation, approximately $20 million is considered non-cash. The increase compared to 2017 is partially attributable to a required accounting change related to the reclassification of certain Pension/OPEB components.

Our full-year 2018 interest expense is expected to be approximately $130 million, compared to $132 million recorded in 2017. Consolidated full-year 2018 depreciation, depletion and amortization is expected to be approximately $100 million, incurred ratably throughout the year.

**Capital Expenditures**

Our 2018 capital spending expectations are:

- Approximately $85 million in sustaining capital.

- Approximately $250 million toward the HBI project in Toledo, OH (fully funded with the December 2017 debt offerings).

- Approximately $50 million toward the upgrade of the Northshore mine to produce up to 3.5 million long tons of DR-grade pellets a year.

**Recently Issued Accounting Pronouncements**

Refer to NOTE 1 - BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES of the consolidated financial statements for a description of recent accounting pronouncements, including the respective dates of adoption and effects on results of operations and financial condition.

A005333

**Critical Accounting Estimates**

Management's discussion and analysis of financial condition and results of operations is based on our consolidated financial statements, which have been prepared in accordance with GAAP. Preparation of financial statements requires management to make assumptions, estimates and judgments that affect the reported amounts of assets, liabilities, revenues, costs and expenses, and the related disclosures of contingencies. Management bases its estimates on various assumptions and historical experience, which are believed to be reasonable; however, due to the inherent nature of estimates, actual results may differ significantly due to changed conditions or assumptions. On a regular basis, management reviews the accounting policies, assumptions, estimates and judgments to ensure that our financial statements are fairly presented in accordance with GAAP. However, because future events and their effects cannot be determined with certainty, actual results could differ from our assumptions and estimates, and such differences could be material. Management believes that the following critical accounting estimates and judgments have a significant impact on our financial statements.

*Revenue Recognition*

*U.S. Iron Ore and Asia Pacific Iron Ore Provisional Pricing Arrangements*

Most of our U.S. Iron Ore long-term supply agreements are comprised of a base price with annual price adjustment factors. The base price is the primary component of the purchase price for each contract. The inflation-indexed price adjustment factors are integral to the iron ore supply contracts and vary based on the agreement, but typically include adjustments based upon changes in the Platts 62% Price, along with pellet premiums, published Platts international indexed freight rates and changes in specified Producer Price Indices, including those for industrial commodities, energy and steel. The pricing adjustments generally operate in the same manner, with each factor typically comprising a portion of the price adjustment, although the weighting of each factor varies based upon the specific terms of each agreement. In most cases, these adjustment factors have not been finalized at the time our product is sold. In these cases, we estimate the adjustment factors at each reporting period based upon the best third-party information available. The estimates are then adjusted to actual when the information has been finalized.

The Producer Price Indices remain an estimated component of the sales price throughout the contract year and are estimated each quarter using publicly available forecasts of such indices. The final indices referenced in certain of the U.S. Iron Ore supply contracts typically are not published by the U.S. Department of Labor until the second quarter of the subsequent year. As a result, we record an adjustment for the difference between the fourth quarter estimate and the final price in the following year.

Throughout the year, certain of our Asia Pacific Iron Ore customers have contractual arrangements in which pricing settlements are based upon an average index price for future periods. Most of the future periods are settled within three months. To the extent the particular pricing settlement period is subsequent to the reporting period, we estimate the final pricing settlement based upon information available. Similar to U.S. Iron Ore, the estimates are then adjusted to actual when the price settlement period elapses.

Provisional pricing arrangement adjustments have not been material to U.S. and Asia Pacific Iron Ore's respective revenues for each of the fiscal years ended December 31, 2017, 2016 and 2015.

*U.S. Iron Ore Customer Supply Agreements*

Certain supply agreements with one U.S. Iron Ore customer include provisions for supplemental revenue or refunds based on the average annual daily market price for hot-rolled coil steel for the year that the product is consumed in the customer's blast furnaces. The supplemental pricing is characterized as a freestanding derivative and is required to be accounted for separately once the product is shipped. The derivative instrument, which is finalized based on a future price, is marked to fair value as a revenue adjustment each reporting period until the pellets are consumed and the amounts are settled. The fair value of the instrument is determined using a market approach based on an estimate of the average annual daily market price for hot-rolled coil steel, and takes into consideration current market conditions and nonperformance risk. At December 31, 2017, we had a derivative asset of $37.9 million, representing the fair value of the pricing factors, based upon the amount of unconsumed long tons and an estimated average annual daily hot-rolled coil steel price related to the period in which the iron ore are expected to be consumed in the customer's blast furnace at each respective steelmaking facility, subject to final pricing at a future date.

The accuracy of our estimates typically increases as the year progresses based on additional information in the market becoming available. The supplemental revenue adjustments have not been material to U.S. Iron Ore's product revenues for the year ended December 31, 2017.

### Mineral Reserves

We regularly evaluate our mineral reserves and update them as required in accordance with SEC Industry Guide 7. The estimated mineral reserves could be affected by future industry conditions, geological conditions and ongoing mine planning. Maintenance of effective production capacity of the mineral reserve could require increases in capital and development expenditures. Generally, as mining operations progress, haul lengths and lifts increase. Alternatively, changes in economic conditions or the expected quality of mineral reserves could decrease capacity of mineral reserves. Technological progress could alleviate such factors or increase capacity of mineral reserves.

We use our mineral reserve estimates, combined with our estimated annual production levels, to determine the mine closure dates utilized in recording the fair value liability for asset retirement obligations for our active operating mines. Refer to NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS, for further information. Since the liability represents the present value of the expected future obligation, a significant change in mineral reserves or mine lives could have a substantial effect on the recorded obligation. We also utilize mineral reserves for evaluating potential impairments of mine assets and in determining maximum useful lives utilized to calculate depreciation and amortization of long-lived mine assets. Increases or decreases in mineral reserves or mine lives could significantly affect these items.

### Valuation of Long-Lived Assets

In assessing the recoverability of our long-lived assets, significant assumptions regarding the estimated future cash flows and other factors to determine the fair value of the respective assets must be made, as well as the related estimated useful lives. If these estimates or their related assumptions change in the future as a result of changes in strategy or market conditions, we may be required to record impairment charges for these assets in the period such determination was made.

We monitor conditions that indicate that the carrying value of an asset or asset group may be impaired. In order to determine if assets have been impaired, assets are grouped and tested at the lowest level for which identifiable, independent cash flows are available. An impairment loss exists when projected undiscounted cash flows are less than the carrying value of the asset group. The measurement of the impairment loss to be recognized is based on the difference between the fair value and the carrying value of the asset group. Fair value can be determined using a market approach, income approach or cost approach. The impairment analysis and fair value determination can result in substantially different outcomes based on critical assumptions and estimates including the quantity and quality of remaining mineral reserves, future iron ore prices and production costs.

As a result of these assessments during 2017 and 2015, no material impairment charges were recorded related to long-lived tangible or intangible assets at our continuing operations. During 2016, there were no impairment indicators present; as a result, no impairment assessments were required.

Refer to NOTE 1 - BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES , NOTE 4 - PROPERTY, PLANT AND EQUIPMENT and NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS  for further information regarding our policy on asset impairment, detail on our remaining PP&E and mineral rights and non-recurring fair value measurements.

### Investments In and Receivables From Canadian Entities and Contingent Claims

We determined the fair value and recoverability of our Canadian investments by comparing the estimated fair value of the underlying assets of the Canadian Entities to estimated liabilities. We estimated the fair value of major asset classes by using actual liquidation values through December 31, 2017  less estimated cost to sell. Outstanding liabilities include accounts payable and other liabilities, forward commitments, unsubordinated related party payables, lease liabilities, and other potential claims. Potential claims include an accrual for the estimated probable loss related to claims that may be asserted against the Canadian Entities under certain contracts. Based on our estimates, the fair value of liabilities exceeds the fair value of assets. To assess the fair value and recoverability of amounts receivable from the Canadian Entities, we estimated the fair value of the underlying net assets of the Canadian Entities available for distribution to their creditors in relation to the estimated creditor claims and the priority of those claims. Additionally, given that it is probable a preference claim will be asserted against us and/or certain of our affiliates, we recorded an estimated liability as a contingent claim. To assess the fair value of the contingent claim, we estimated the value by

73

Table of Contents

utilizing the approximate value of our related-party claims against the Bloom Lake Group and the Wabush Group. Our estimates involve significant judgment and are based on currently available information, an assessment of the validity of certain claims, and estimated payments by the Canadian Entities. Our ultimate recovery, if any, is subject to the final liquidation value of the Canadian Entities and the distribution of the net proceeds as determined by the Canadian Court and may vary significantly from our current estimates. See NOTE 14 - DISCONTINUED OPERATIONS for further information.

### Asset Retirement Obligations and Environmental Remediation Costs

The accrued mine closure obligations for our active mining operations provide for contractual and legal obligations associated with the eventual closure of the mining operations. We perform an in-depth evaluation of the liability every three years in addition to our routine annual assessments. In 2017, we employed a third-party specialist to assist in the evaluation. Our obligations are determined based on detailed estimates adjusted for factors that a market participant would consider (i.e., inflation, overhead and profit), which are escalated at an assumed rate of inflation to the estimated closure dates, and then discounted using the current credit-adjusted risk-free interest rate. The estimate also incorporates incremental increases in the closure cost estimates and changes in estimates of mine lives. The closure date for each location is determined based on the exhaustion date of the remaining iron ore reserves, which is dependent on our estimate of mineral reserves. The estimated obligations are particularly sensitive to the impact of changes in mine lives given the difference between the inflation and discount rates. Changes in the base estimates of legal and contractual closure costs due to changes in legal or contractual requirements, available technology, inflation, overhead or profit rates also could have a significant impact on the recorded obligations.

We have a formal policy for environmental protection and remediation. Our obligations for known environmental matters at active and closed mining operations and other sites have been recognized based on estimates of the cost of investigation and remediation at each site. If the obligation can only be estimated as a range of possible amounts, with no specific amount being more likely, the minimum of the range is accrued. Management reviews its environmental remediation sites quarterly to determine if additional cost adjustments or disclosures are required. The characteristics of environmental remediation obligations, where information concerning the nature and extent of clean-up activities is not immediately available and which are subject to changes in regulatory requirements, result in a significant risk of increase to the obligations as they mature. Expected future expenditures are not discounted to present value unless the amount and timing of the cash disbursements can be reasonably estimated. Potential insurance recoveries are not recognized until realized. Refer to NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS, for further information.

### Income Taxes

Our income tax expense, deferred tax assets and liabilities and reserves for unrecognized tax benefits reflect management's best assessment of estimated future taxes to be paid. We are subject to income taxes in the U.S. and various foreign jurisdictions. Significant judgments and estimates are required in determining the consolidated income tax expense.

Deferred income taxes arise from temporary differences between tax and financial statement recognition of revenue and expense. In evaluating our ability to recover our deferred tax assets, we consider all available positive and negative evidence, including scheduled reversals of deferred tax liabilities, projected future taxable income, tax planning strategies and recent financial operations. In projecting future taxable income, we begin with historical results adjusted for the results of discontinued operations and changes in accounting policies and incorporate assumptions including the amount of future state, federal and foreign pretax operating income, the reversal of temporary differences, and the implementation of feasible and prudent tax planning strategies. These assumptions require significant judgment about the forecasts of future taxable income and are consistent with the plans and estimates we are using to manage the underlying businesses. In evaluating the objective evidence that historical results provide, we consider three years of cumulative operating income (loss).

At December 31, 2017 and 2016, we had a valuation allowance of $2,238.5 million and $3,334.8 million, respectively, against our deferred tax assets. Our losses in certain locations in recent periods represented sufficient negative evidence to require a full valuation allowance against certain deferred tax assets. We intend to maintain a valuation allowance against the deferred tax assets related to these operating losses, until sufficient positive evidence exists to support the realization of such assets.

Changes in tax laws and rates also could affect recorded deferred tax assets and liabilities in the future. In 2017, both the U.S. and Luxembourg reduced the statutory rate; this decreased the deferred tax assets and related valuation allowance by $407.5 million. The U.S. tax legislation also repealed the corporate AMT which resulted in a

74

Table of Contents

reversal of the valuation allowance related to the AMT credits and generated a $235.3 million long-term *Income tax receivable*, which will be refunded between the years 2019 through 2022.

The calculation of our tax liabilities involves dealing with uncertainties in the application of complex tax laws and regulations in various jurisdictions across our global operations. The ultimate impact of the U.S. income tax reform legislation may differ from our current estimates due to changes in the interpretations and assumptions made as well as additional regulatory guidance that may be issued.

Accounting for uncertainty in income taxes recognized in the financial statements requires that a tax benefit from an uncertain tax position be recognized when it is more likely than not that the position will be sustained upon examination, including resolutions of any related appeals or litigation processes, based on technical merits.

We recognize tax liabilities in accordance with ASC 740, *Income Taxes*, and we adjust these liabilities when our judgment changes as a result of evaluation of new information not previously available. Due to the complexity of some of these uncertainties, the ultimate resolution may result in payment that is materially different from our current estimate of the tax liabilities. These differences will be reflected as increases or decreases to income tax expense in the period in which they are determined. Refer to NOTE 9 - INCOME TAXES, for further information.

### Employee Retirement Benefit Obligations

We offer defined benefit pension plans, defined contribution pension plans and other postretirement benefit plans, primarily consisting of retiree healthcare benefits, to most employees in North America as part of a total compensation and benefits program. We do not have employee retirement benefit obligations at our Asia Pacific Iron Ore operations. The defined benefit pension plans largely are noncontributory and benefits generally are based on employees' years of service and average earnings for a defined period prior to retirement, or a minimum formula.

Following is a summary of our U.S. defined benefit pension and OPEB funding and expense for the years 2015 through 2018:

| | Pension | | OPEB | |
| | Funding | Expense | Funding | Expense (Benefit) |
|---|---|---|---|---|
| 2015 | $ 35.7 | $ 23.9 | $ 3.5 | $ 4.4 |
| 2016 | 1.2 | 16.5 | 1.1 | (4.0) |
| 2017 | 24.4 | 18.0 | 2.1 | (6.1) |
| 2018 (Estimated) | 27.7 | 12.3 | 4.0 | (6.2) |

Assumptions used in determining the benefit obligations and the value of plan assets for defined benefit pension plans and postretirement benefit plans (primarily retiree healthcare benefits) that we offer are evaluated periodically by management. Critical assumptions, such as the discount rate used to measure the benefit obligations, the expected long-term rate of return on plan assets, the medical care cost trend, and the rate of compensation increase are reviewed annually.

75

As of December 31, 2017 and 2016, we used the following assumptions:

| | Pension and Other Benefits | |
| --- | --- | --- |
| | 2017 | 2016 |
| U.S. plan discount rate | | |
| Iron Hourly Pension Plan | 3.60 % | 4.02 % |
| Salaried Pension Plan | 3.52 | 3.92 |
| Ore Mining Pension Plan | 3.61 | 4.04 |
| SERP | 3.50 | 3.90 |
| Hourly OPEB Plan | 3.60 | 4.02 |
| Salaried OPEB Plan | 3.57 | 3.99 |
| U.S. rate of compensation increase - Salaried | 3.00 | 3.00 |
| U.S. rate of compensation increase - Hourly | 2.00 | 2.00 |
| U.S. pension plan expected return on plan assets | 8.25 | 8.25 |
| U.S. OPEB plan expected return on plan assets | 7.00 | 7.00 |
| Health care cost trend rate assumed for next year | 7.00 | 6.50 |
| Ultimate health care cost trend rate | 5.00 | 5.00 |
| Year that the ultimate rate is reached | 2026 | 2023 |

The decrease in the discount rates in 2017 was driven by the change in corporate bond yields, which were down approximately 40 basis points compared to the prior year.

Additionally, on December 31, 2017, the assumed mortality improvement projection was changed from generational scale MP-2016 to generational scale MP-2017. The healthy mortality assumption remains the RP-2014 mortality tables with blue collar and white collar adjustments made for certain hourly and salaried groups to determine the expected life of our plan participants.

Following are sensitivities of potential further changes in these key assumptions on the estimated 2018 pension and OPEB expense and the pension and OPEB benefit obligations as of December 31, 2017:

| | Increase in Expense (In Millions) | | Increase in Benefit Obligation (In Millions) | |
| --- | --- | --- | --- | --- |
| | Pension | OPEB | Pension | OPEB |
| Decrease discount rate 0.25% | $ 1.7 | $ 0.3 | $ 27.9 | $ 7.6 |
| Decrease return on assets 1.00% | 7.3 | 2.6 | N/A | N/A |
| Increase medical trend rate 1.00% | N/A | 2.5 | N/A | 21.2 |

Changes in actuarial assumptions, including discount rates, employee retirement rates, mortality, compensation levels, plan asset investment performance and healthcare costs, are determined based on analyses of actual and expected factors. Changes in actuarial assumptions and/or investment performance of plan assets may have a significant impact on our financial condition due to the magnitude of our retirement obligations. Refer to NOTE 7 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS, for further information.

76

Table of Contents

**Forward-Looking Statements**

This report contains statements that constitute "forward-looking statements" within the meaning of the federal securities laws. As a general matter, forward-looking statements relate to anticipated trends and expectations rather than historical matters. Forward-looking statements are subject to uncertainties and factors relating to Cliffs' operations and business environment that are difficult to predict and may be beyond our control. Such uncertainties and factors may cause actual results to differ materially from those expressed or implied by the forward-looking statements. These statements speak only as of the date of this report, and we undertake no ongoing obligation, other than that imposed by law, to update these statements. Uncertainties and risk factors that could affect Cliffs' future performance and cause results to differ from the forward-looking statements in this report include, but are not limited to:

- uncertainty and weaknesses in global economic conditions, including downward pressure on prices caused by oversupply or imported products, the impact of barriers to trade, the outcomes of trade cases, reduced market demand and any change to the economic growth rate in China;

- continued volatility of iron ore and steel prices and other trends, including the supply approach of the major iron ore producers, affecting our financial condition, results of operations or future prospects—specifically, the impact of price-adjustment factors on our sales contracts;

- our ability to successfully diversify our product mix and add new customers beyond our traditional blast furnace clientele, specifically successful completion of our HBI production plant;

- our level of indebtedness could limit cash flow available to fund working capital, capital expenditures, acquisitions and other general corporate purposes or ongoing needs of our business;

- availability of capital and our ability to maintain adequate liquidity;

- risks related to former and current international operations, including our ability to successfully conclude the CCAA process in Canada and plan for the end of mine life in Australia in a manner that minimizes cash outflows and associated liabilities;

- our actual economic iron ore reserves or changes in current mineral estimates, including whether any mineralized material qualifies as a reserve;

- the impact of our customers reducing their steel production due to increased market share of steel produced using other methods or lighter-weight steel alternatives;

- the ability of our customers, joint venture partners and significant suppliers and service providers to meet their obligations to us on a timely basis or at all;

- the outcome of any litigation or arbitration, including any contractual disputes with our customers, joint venture partners or significant energy, material or service providers;

- our ability to maintain satisfactory relations with unions and employees;

- impacts of existing and increasing governmental regulation and related costs and liabilities, including failure to receive or maintain required operating and environmental permits, approvals, modifications or other authorization of, or from, any governmental or regulatory entity and costs related to implementing improvements to ensure compliance with regulatory changes;

- problems or uncertainties with productivity, tons mined, transportation, capital spending, mine-closure obligations, environmental liabilities, employee-benefit costs and other risks of the mining industry;

- our ability to cost-effectively achieve planned production rates or levels, including at our HBI production plant;

- our ability to successfully identify and consummate any strategic investments or development projects, including our HBI production plant;

- changes in sales volume or mix;

- our ability to reach agreement with our customers regarding any modifications to sales contract provisions, renewals or new arrangements;

77

- events or circumstances that could impair or adversely impact the viability of a mine and the carrying value of associated assets, as well as any resulting impairment charges;

- uncertainties associated with natural disasters, weather conditions, unanticipated geological conditions, supply or price of energy, equipment failures and other unexpected events;

- adverse changes in currency values, currency exchange rates, interest rates and tax laws;

- uncertainty relating to restructurings in the steel industry and/or affecting the steel industry; and

- the potential existence of significant deficiencies or material weaknesses in our internal control over financial reporting .

 For additional factors affecting the business of Cliffs, refer to *Part I – Item 1A. Risk Factors.* You are urged to carefully consider these risk factors.

*Non-GAAP Reconciliation*

We present cash cost of goods sold and operating expense rate per long/metric ton, which is a non-GAAP financial measure that management uses in evaluating operating performance. We believe our presentation of non-GAAP cash cost of goods sold and operating expenses is useful to investors because it excludes depreciation, depletion and amortization, which are non-cash, and freight and joint venture partners' cost reimbursements, which have no impact on sales margin, thus providing a more accurate view of the cash outflows related to the sale of iron ore. The presentation of this measure is not intended to be considered in isolation from, as a substitute for, or as superior to, the financial information prepared and presented in accordance with GAAP. The presentation of this measure may be different from non-GAAP financial measures used by other companies. Below is a reconciliation in dollars of this non-GAAP financial measure to our consolidated financial statements for the years ended December 31, 2017 and 2016:

| | (In Millions) | | | | | | |
|---|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | Year Ended December 31, | | | |
| | 2017 | | | 2016 | | | |
| | U.S. Iron Ore | Asia Pacific Iron Ore | Total | U.S. Iron Ore | Asia Pacific Iron Ore | Total | |
| Cost of goods sold and operating expenses | $ (1,400.6) | $ (427.9) | $ (1,828.5) | $ (1,278.8) | $ (440.9) | $ (1,719.7) | |
| Less: | | | | | | | |
| Freight and reimbursements | (221.4) | (19.6) | (241.0) | (174.8) | (20.7) | (195.5) | |
| Depreciation, depletion & amortization | (66.6) | (14.3) | (80.9) | (84.0) | (25.1) | (109.1) | |
| Cash cost of goods sold and operating expenses | $ (1,112.6) | $ (394.0) | $ (1,506.6) | $ (1,020.0) | $ (395.1) | $ (1,415.1) | |

 Below is a reconciliation in dollars of this non-GAAP measure to our consolidated financial statements for the years ended December 31, 2016 and 2015:

| | (In Millions) | | | | | | |
|---|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | Year Ended December 31, | | | |
| | 2016 | | | 2015 | | | |
| | U.S. Iron Ore | Asia Pacific Iron Ore | Total | U.S. Iron Ore | Asia Pacific Iron Ore | Total | |
| Cost of goods sold and operating expenses | $ (1,278.8) | $ (440.9) | $ (1,719.7) | $ (1,298.3) | $ (478.5) | $ (1,776.8) | |
| Less: | | | | | | | |
| Freight and reimbursements | (174.8) | (20.7) | (195.5) | (157.3) | (23.6) | (180.9) | |
| Depreciation, depletion & amortization | (84.0) | (25.1) | (109.1) | (98.9) | (25.3) | (124.2) | |
| Cash cost of goods sold and operating expenses | $ (1,020.0) | $ (395.1) | $ (1,415.1) | $ (1,042.1) | $ (429.6) | $ (1,471.7) | |

Table of Contents

**Item 7A.**     ***Quantitative and Qualitative Disclosures About Market Risk***

　　Information regarding our Market Risk is presented under the caption  *Market Risks*, which is included in *Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations* and is incorporated by reference and made a part hereof.

79

Table of Contents

**Item 8.**          *Financial Statements and Supplementary Data*

**Statements of Consolidated Financial Position**

Cleveland-Cliffs Inc. and Subsidiaries

|  | (In Millions) | |
|---|---|---|
|  | December 31, | |
|  | **2017** | 2016 |
| ASSETS | | |
| CURRENT ASSETS | | |
| Cash and cash equivalents | $ **1,007.7** | $ 323.4 |
| Accounts receivable, net | **140.6** | 128.7 |
| Inventories | **183.4** | 178.4 |
| Supplies and other inventories | **93.9** | 91.4 |
| Derivative assets | **39.4** | 33.1 |
| Loans to and accounts receivables from the Canadian Entities | **51.6** | 48.6 |
| Other current assets | **28.0** | 21.0 |
| TOTAL CURRENT ASSETS | **1,544.6** | 824.6 |
| PROPERTY, PLANT AND EQUIPMENT, NET | **1,051.0** | 984.4 |
| Income tax receivable | **235.3** | — |
| Other non-current assets | **122.5** | 114.9 |
| TOTAL ASSETS | $ **2,953.4** | $ 1,923.9 |

(continued)

*The accompanying notes are an integral part of these  consolidated financial statements.*

80

**Statements of Consolidated Financial Position**

Cleveland-Cliffs Inc. and Subsidiaries - (Continued)

| | (In Millions) | |
| --- | --- | --- |
| | December 31, | |
| | **2017** | 2016 |
| LIABILITIES | | |
| CURRENT LIABILITIES | | |
| Accounts payable | $ **127.7** | $ 107.6 |
| Accrued employment costs | **56.1** | 56.1 |
| State and local taxes payable | **30.2** | 28.3 |
| Accrued expenses | **33.7** | 41.1 |
| Accrued interest | **31.4** | 40.2 |
| Accrued royalties | **17.3** | 26.2 |
| Contingent claims | **55.6** | — |
| Partnership distribution payable | **44.2** | 8.7 |
| Other current liabilities | **56.0** | 82.9 |
| TOTAL CURRENT LIABILITIES | **452.2** | 391.1 |
| POSTEMPLOYMENT BENEFIT LIABILITIES | | |
| Pensions | **222.8** | 245.7 |
| Other postretirement benefits | **34.9** | 34.8 |
| TOTAL POSTEMPLOYMENT BENEFIT LIABILITIES | **257.7** | 280.5 |
| ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS | **196.5** | 193.9 |
| LONG-TERM DEBT | **2,304.2** | 2,175.1 |
| OTHER LIABILITIES | **186.9** | 213.8 |
| TOTAL LIABILITIES | **3,397.5** | 3,254.4 |
| COMMITMENTS AND CONTINGENCIES (SEE NOTE 20) | | |
| EQUITY | | |
| CLIFFS SHAREHOLDERS' DEFICIT | | |
| Preferred Stock - no par value | | |
| Class A - 3,000,000 shares authorized | | |
| Class B - 4,000,000 shares authorized | | |
| Common Shares - par value $0.125 per share | | |
| Authorized - 600,000,000 shares (2016 - 400,000,000 shares); | | |
| Issued - 301,886,794 shares (2016 - 238,636,794 shares); | | |
| Outstanding - 297,400,968 shares (2016 - 233,074,091 shares) | **37.7** | 29.8 |
| Capital in excess of par value of shares | **3,933.9** | 3,347.0 |
| Retained deficit | **(4,207.3)** | (4,574.3) |
| Cost of 4,485,826 common shares in treasury (2016 - 5,562,703 shares) | **(169.6)** | (245.5) |
| Accumulated other comprehensive loss | **(39.0)** | (21.3) |
| TOTAL CLIFFS SHAREHOLDERS' DEFICIT | **(444.3)** | (1,464.3) |
| NONCONTROLLING INTEREST | **0.2** | 133.8 |
| TOTAL DEFICIT | **(444.1)** | (1,330.5) |
| TOTAL LIABILITIES AND DEFICIT | $ **2,953.4** | $ 1,923.9 |

*The accompanying notes are an integral part of these consolidated financial statements.*

A005343

Table of Contents

**Statements of Consolidated Operations**

Cleveland-Cliffs Inc. and Subsidiaries

| | | | | | | (In Millions, Except Per Share Amounts) | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Year Ended December 31, | | |
| | | | **2017** | | 2016 | | 2015 | |
| REVENUES FROM PRODUCT SALES AND SERVICES | | | | | | | | |
| Product | $ | **2,089.2** | $ | 1,913.5 | $ | 1,832.4 | | |
| Freight and venture partners' cost reimbursements | | **241.0** | | 195.5 | | 180.9 | | |
| | | **2,330.2** | | 2,109.0 | | 2,013.3 | | |
| COST OF GOODS SOLD AND OPERATING EXPENSES | | **(1,828.5)** | | (1,719.7) | | (1,776.8) | | |
| SALES MARGIN | | **501.7** | | 389.3 | | 236.5 | | |
| OTHER OPERATING INCOME (EXPENSE) | | | | | | | | |
| Selling, general and administrative expenses | | **(105.8)** | | (117.8) | | (110.0) | | |
| Miscellaneous - net | | **27.7** | | (30.7) | | 24.8 | | |
| | | **(78.1)** | | (148.5) | | (85.2) | | |
| OPERATING INCOME | | **423.6** | | 240.8 | | 151.3 | | |
| OTHER INCOME (EXPENSE) | | | | | | | | |
| Interest expense, net | | **(132.0)** | | (200.5) | | (228.5) | | |
| Gain (loss) on extinguishment/restructuring of debt | | **(165.4)** | | 166.3 | | 392.9 | | |
| Other non-operating income (expense) | | **3.2** | | 0.4 | | (2.6) | | |
| | | **(294.2)** | | (33.8) | | 161.8 | | |
| INCOME FROM CONTINUING OPERATIONS BEFORE INCOME TAXES AND EQUITY LOSS FROM VENTURES | | **129.4** | | 207.0 | | 313.1 | | |
| INCOME TAX BENEFIT (EXPENSE) | | **252.4** | | 12.2 | | (169.3) | | |
| EQUITY LOSS FROM VENTURES, net of tax | | **—** | | — | | (0.1) | | |
| INCOME FROM CONTINUING OPERATIONS | | **381.8** | | 219.2 | | 143.7 | | |
| LOSS FROM DISCONTINUED OPERATIONS, net of tax | | **(18.7)** | | (19.9) | | (892.1) | | |
| NET INCOME (LOSS) | | **363.1** | | 199.3 | | (748.4) | | |
| LOSS (INCOME) ATTRIBUTABLE TO NONCONTROLLING INTEREST | | | | | | | | |
| (Year Ended December 31, 2017 and 2016 - No loss related to Discontinued Operations and Year Ended December 31, 2015 - Loss of $7.7 million) | | **3.9** | | (25.2) | | (0.9) | | |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | $ | **367.0** | $ | 174.1 | $ | (749.3) | | |
| PREFERRED STOCK DIVIDENDS | | **—** | | — | | (38.4) | | |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS COMMON SHAREHOLDERS | $ | **367.0** | $ | 174.1 | $ | (787.7) | | |
| | | | | | | | | |
| EARNINGS (LOSS) PER COMMON SHARE ATTRIBUTABLE TO CLIFFS SHAREHOLDERS - BASIC | | | | | | | | |
| Continuing operations | $ | **1.34** | $ | 0.98 | $ | 0.63 | | |
| Discontinued operations | | **(0.06)** | | (0.10) | | (5.77) | | |
| | $ | **1.28** | $ | 0.88 | $ | (5.14) | | |
| EARNINGS (LOSS) PER COMMON SHARE ATTRIBUTABLE TO CLIFFS SHAREHOLDERS - DILUTED | | | | | | | | |
| Continuing operations | $ | **1.32** | $ | 0.97 | $ | 0.63 | | |
| Discontinued operations | | **(0.06)** | | (0.10) | | (5.76) | | |
| | $ | **1.26** | $ | 0.87 | $ | (5.13) | | |
| | | | | | | | | |
| AVERAGE NUMBER OF SHARES (IN THOUSANDS) | | | | | | | | |
| Basic | | **288,435** | | 197,659 | | 153,230 | | |
| Diluted | | **292,961** | | 200,145 | | 153,605 | | |

*The accompanying notes are an integral part of these consolidated financial statements.*

82

A005344

Table of Contents

**Statements of Consolidated Comprehensive Income (Loss)**

Cleveland-Cliffs Inc. and Subsidiaries

| | (In Millions) | | |
|---|---|---|---|
| | Year Ended December 31, | | |
| | **2017** | 2016 | 2015 |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | $    **367.0** | $    174.1 | $    (749.3) |
| OTHER COMPREHENSIVE INCOME (LOSS) | | | |
| Pension and OPEB liability, net of tax | **11.5** | (19.8) | 45.2 |
| Unrealized net gain on marketable securities, net of tax | **—** | — | 1.7 |
| Unrealized net gain (loss) on foreign currency translation | **(13.9)** | 18.6 | 155.6 |
| Unrealized net gain (loss) on derivative financial instruments, net of tax | **(0.5)** | (2.6) | 20.7 |
| OTHER COMPREHENSIVE INCOME (LOSS) | **(2.9)** | (3.8) | 223.2 |
| OTHER COMPREHENSIVE LOSS (INCOME) ATTRIBUTABLE TO THE NONCONTROLLING INTEREST | **(1.1)** | 0.5 | 4.6 |
| TOTAL COMPREHENSIVE INCOME (LOSS) ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | $    **363.0** | $    170.8 | $    (521.5) |

*The accompanying notes are an integral part of these  consolidated financial statements*.

83

Table of Contents

**Statements of Consolidated Cash Flows**

Cleveland-Cliffs Inc. and Subsidiaries

|  | (In Millions) | | |
|---|---|---|---|
|  | Year Ended December 31, | | |
|  | **2017** | 2016 | 2015 |
| OPERATING ACTIVITIES |  |  |  |
| Net income (loss) | $ **363.1** | $ 199.3 | $ (748.4) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: |  |  |  |
| Depreciation, depletion and amortization | **87.7** | 115.4 | 134.0 |
| Impairment of long-lived assets | **—** | — | 76.6 |
| Deferred income taxes | **—** | — | 159.8 |
| Loss (gain) on extinguishment/restructuring of debt | **165.4** | (166.3) | (392.9) |
| Loss on deconsolidation, net of cash deconsolidated | **20.2** | 17.5 | 668.3 |
| Other | **21.2** | 10.0 | 61.1 |
| Changes in operating assets and liabilities: |  |  |  |
| Receivables and other assets | **(248.7)** | 43.2 | 369.1 |
| Product inventories | **(1.8)** | 157.8 | (62.0) |
| Payables and accrued expenses | **(69.0)** | (73.9) | (227.7) |
| Net cash provided by operating activities | **338.1** | 303.0 | 37.9 |
| INVESTING ACTIVITIES |  |  |  |
| Purchase of property, plant and equipment | **(151.7)** | (69.1) | (80.8) |
| Other investing activities | **(4.3)** | 11.2 | (22.4) |
| Net cash used by investing activities | **(156.0)** | (57.9) | (103.2) |
| FINANCING ACTIVITIES |  |  |  |
| Net proceeds from issuance of common shares | **661.3** | 287.4 | — |
| Proceeds from issuance of debt | **1,771.5** | — | 503.5 |
| Debt issuance costs | **(28.6)** | (5.2) | (33.6) |
| Borrowings under credit facilities | **—** | 105.0 | 309.8 |
| Repayment under credit facilities | **—** | (105.0) | (309.8) |
| Repayments of equipment loans | **—** | (95.6) | (45.4) |
| Repurchase of debt | **(1,720.7)** | (305.4) | (225.9) |
| Acquisition of noncontrolling interest | **(105.0)** | — | — |
| Distributions of partnership equity | **(52.9)** | (59.9) | (40.6) |
| Preferred stock dividends | **—** | — | (51.2) |
| Other financing activities | **(26.7)** | (27.7) | (45.8) |
| Net cash provided (used) by financing activities | **498.9** | (206.4) | 61.0 |
| EFFECT OF EXCHANGE RATE CHANGES ON CASH | **3.3** | (0.5) | (1.4) |
| INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | **684.3** | 38.2 | (5.7) |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF YEAR | **323.4** | 285.2 | 290.9 |
| CASH AND CASH EQUIVALENTS AT END OF YEAR | $ **1,007.7** | $ 323.4 | $ 285.2 |

*The accompanying notes are an integral part of these  consolidated financial statements.*
*See NOTE 17 - CASH FLOW INFORMATION.*

84

Table of Contents

**Statements of Consolidated Changes in Equity**

Cleveland-Cliffs Inc. and Subsidiaries

(In Millions)

| | Cliffs Shareholders | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Number of Depositary Shares | Depositary Shares | Number of Common Shares | Common Shares | Capital in Excess of Par Value of Shares | Retained Earnings | Common Shares in Treasury | Accumulated Other Comprehensive Income (Loss) | Non-Controlling Interest | Total |
| January 1, 2015 | 29.3 | $ 731.3 | 153.2 | $ 19.8 | $ 2,309.8 | $ (3,960.7) | $ (285.7) | $ (245.8) | $ (303.0) | $ (1,734.3) |
| Comprehensive income (loss) | | | | | | | | | | |
| Net income (loss) | — | — | — | — | — | (749.3) | — | — | 0.9 | (748.4) |
| Other comprehensive income (loss) | — | — | — | — | — | — | — | 227.8 | (4.6) | 223.2 |
| Total comprehensive loss | | | | | | | | | (3.7) | (525.2) |
| Capital contribution by noncontrolling interest to subsidiary | — | — | — | — | — | — | — | — | 0.2 | 0.2 |
| Distributions to noncontrolling interest | — | — | — | — | — | — | — | — | (0.2) | (0.2) |
| Distributions of partnership equity | — | — | — | — | — | — | — | — | (51.7) | (51.7) |
| Effect of deconsolidation | — | — | — | — | — | — | — | — | 528.2 | 528.2 |
| Stock and other incentive plans | — | — | 0.3 | — | (10.9) | — | 20.7 | — | — | 9.8 |
| Preferred Share dividends ($1.32 per depositary share) | — | — | — | — | — | (38.4) | — | — | — | (38.4) |
| December 31, 2015 | 29.3 | $ 731.3 | 153.5 | $ 19.8 | $ 2,298.9 | $ (4,748.4) | $ (265.0) | $ (18.0) | $ 169.8 | $ (1,811.6) |
| Comprehensive income (loss) | | | | | | | | | | |
| Net income | — | — | — | — | — | 174.1 | — | — | 25.2 | 199.3 |
| Other comprehensive loss | — | — | — | — | — | — | — | (3.3) | (0.5) | (3.8) |
| Total comprehensive income | | | | | | | | | 24.7 | 195.5 |
| Preferred Share conversion | (29.3) | (731.3) | 26.5 | 3.5 | 727.8 | — | — | — | — | — |
| Equity offering | — | — | 44.4 | 5.5 | 281.9 | — | — | — | — | 287.4 |
| Debt exchanges | — | — | 8.2 | 1.0 | 44.2 | — | — | — | — | 45.2 |
| Distributions to noncontrolling interest | — | — | — | — | — | — | — | — | (3.2) | (3.2) |
| Distributions of partnership equity | — | — | — | — | — | — | — | — | (57.5) | (57.5) |
| Stock and other incentive plans | — | — | 0.5 | — | (5.8) | — | 19.5 | — | — | 13.7 |
| December 31, 2016 | — | $ — | 233.1 | $ 29.8 | $ 3,347.0 | $ (4,574.3) | $ (245.5) | $ (21.3) | $ 133.8 | $ (1,330.5) |
| Comprehensive income (loss) | | | | | | | | | | |
| Net income (loss) | — | — | — | — | — | 367.0 | — | — | (3.9) | 363.1 |
| Other comprehensive income (loss) | — | — | — | — | — | — | — | (4.0) | 1.1 | (2.9) |
| Total comprehensive income (loss) | | | | | | | | | (2.8) | 360.2 |
| Issuance of convertible debt | — | — | — | — | 83.4 | — | — | — | — | 83.4 |
| Equity offering | — | — | 63.3 | 7.9 | 653.4 | — | — | — | — | 661.3 |
| Acquisition of noncontrolling interest | — | — | — | — | (70.2) | — | — | (18.9) | (15.9) | (105.0) |
| Distribution of partnership equity | — | — | — | — | (17.3) | — | — | 5.2 | (116.7) | (128.8) |
| Capital contributions by noncontrolling interest to subsidiary | — | — | — | — | — | — | — | — | 1.8 | 1.8 |
| Stock and other incentive plans | — | — | 1.0 | — | (62.4) | — | 75.9 | — | — | 13.5 |
| December 31, 2017 | — | $ — | 297.4 | $ 37.7 | $ 3,933.9 | $ (4,207.3) | $ (169.6) | $ (39.0) | $ 0.2 | $ (444.1) |

*The accompanying notes are an integral part of these consolidated financial statements.*

85

Table of Contents

**Cleveland-Cliffs Inc. and Subsidiaries**

Notes to Consolidated Financial Statements

**NOTE 1 - BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES**

**Nature of Business**

Founded in 1847, we are the largest and oldest independent iron ore mining company in the United States. We are a major supplier of iron ore pellets to the North American steel industry from our mines and pellet plants located in Michigan and Minnesota. Additionally, we operate an iron ore mining complex in Western Australia. By 2020, we expect to be the sole producer of HBI in the Great Lakes region with the development of our first production plant in Toledo, Ohio.

**Significant Accounting Policies**

We consider the following policies to be beneficial in understanding the judgments that are involved in the preparation of our consolidated financial statements and the uncertainties that could impact our financial condition, results of operations and cash flows.

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The more significant areas requiring the use of management estimates and assumptions relate to mineral reserves future realizable cash flow; environmental, reclamation and closure obligations; valuation of long-lived assets; valuation of inventory; valuation of post-employment, post-retirement and other employee benefit liabilities; valuation of tax assets; reserves for contingencies and litigation; the fair value of derivative instruments; and the fair value of loans to and accounts receivable from Canadian entities. Actual results could differ from estimates. On an ongoing basis, management reviews estimates. Changes in facts and circumstances may alter such estimates and affect the results of operations and financial position in future periods.

*Basis of Consolidation*

The consolidated financial statements include our accounts and the accounts of our wholly owned and majority-owned subsidiaries, including the following operations at December 31, 2017:

| Name | Location | Ownership Interest | Operation | Status of Operations |
|---|---|---|---|---|
| Northshore | Minnesota | 100.0% | Iron Ore | Active |
| United Taconite | Minnesota | 100.0% | Iron Ore | Active |
| Tilden[1] | Michigan | 100.0% | Iron Ore | Active |
| Empire[1] | Michigan | 100.0% | Iron Ore | Indefinitely Idled |
| Koolyanobbing | Western Australia | 100.0% | Iron Ore | Active |

[1] During 2017, our ownership interest in Tilden and Empire changed. Refer to the *Noncontrolling Interests* section below for additional information.

Intercompany transactions and balances are eliminated upon consolidation.

86

*Equity Method Investments*

Investments in unconsolidated ventures that we have the ability to exercise significant influence over, but not control, are accounted for under the equity method.

Our 23% ownership interest in Hibbing is recorded as an equity method investment. As of December 31, 2017 and 2016, our investment in Hibbing was $11.0 million and $8.7 million, respectively, classified in *Other liabilities* in the Statements of Consolidated Financial Position .

Our share of equity income (loss) is eliminated against consolidated product inventory upon production, and against   *Cost of goods sold and operating expenses* when sold. This effectively reduces our cost for our share of the mining ventures' production cost, reflecting the cost-based nature of our participation in unconsolidated ventures.

*Noncontrolling Interests*

During 2017, our ownership interest in Empire increased to  100% as we reached an agreement to distribute the noncontrolling interest net assets of $132.7 million to ArcelorMittal, in exchange for its interest in Empire.  The parties agreed that the net assets were to be distributed in three installments of $44.2 million each, the first of which was paid upon the execution of the agreement and the remaining distributions are due in August 2018 and August 2019.  Upon payment of the first installment, we assumed ArcelorMittal's 21% interest and have reflected this ownership percentage change in our consolidated financial statements. We accounted for the increase in ownership as an equity transaction, which resulted in a net $12.1 million decrease in equity attributable to Cliffs' shareholders and a $116.7 million decrease in *Noncontrolling interest*. The net loss and income attributable to the noncontrolling interest of the Empire mining venture was $3.9 million and $25.2 million for the years ended December 31, 2017 and 2016, respectively.

During 2017, we also acquired the remaining  15% equity interest in Tilden owned by U.S. Steel for  $105.0 million. With the closing of this transaction, we now have 100% ownership of the mine. We accounted for the increase in ownership as an equity transaction, which resulted in an $89.1 million decrease in equity attributable to Cliffs' shareholders and a $15.9 million decrease in *Noncontrolling interest* .

Noncontrolling interest is also comprised of the  17.2% noncontrolling interest in the Bloom Lake operations, through the CCAA filing on January 27, 2015. Financial results prior to the deconsolidation of the Bloom Lake Group and subsequent expenses directly associated with the Canadian Entities are included in our financial statements. There was no net income or loss attributable to the noncontrolling interest related to Bloom Lake for the years ended December 31, 2017 and 2016. See NOTE 14 - DISCONTINUED OPERATIONS for further information.

*Cash Equivalents*

Cash and cash equivalents include cash on hand and on deposit as well as all short-term securities held for the primary purpose of general liquidity. We consider investments in highly liquid debt instruments with an original maturity of three months or less from the date of acquisition and longer maturities when funds can be withdrawn in three months or less without a significant penalty to be cash equivalents. We routinely monitor and evaluate counterparty credit risk related to the financial institutions in which our short-term investment securities are held.

*Trade Accounts Receivable and Allowance for Doubtful Accounts*

Trade accounts receivable are recorded at the invoiced amount and do not bear interest. The allowance for doubtful accounts is our best estimate of the amount of probable credit losses in our existing accounts receivable. We establish provisions for losses on accounts receivable when it is probable that all or part of the outstanding balance will not be collected. We regularly review our accounts receivable balances and establish or adjust the allowance as necessary using the specific identification method. There was no allowance for doubtful accounts at December 31, 2017 and 2016 and no bad debt expense for the years ended December 31, 2017 and 2016. There was $7.1 million bad debt expense for the year ended December 31, 2015.

*Inventories*

*U.S. Iron Ore*

U.S. Iron Ore product inventories are stated at the lower of cost or market. Cost of iron ore inventories is determined using the LIFO method.

87

A005349

We had 1.5 million long tons of finished goods stored at ports and customer facilities on the lower Great Lakes to service customers at    December 31, 2017 and 2016. We maintain ownership of the inventories until title has transferred to the customer, usually when payment is received. Maintaining ownership of the iron ore products at ports on the lower Great Lakes reduces risk of non-payment by customers.

*Asia Pacific Iron Ore*

Asia Pacific Iron Ore product inventories are stated at the lower of cost or net realizable value. Iron ore inventories are valued on a weighted average cost basis. We maintain ownership of the inventories until title has transferred to the customer, which generally is when the product is loaded into the vessel.

### Supplies and Other Inventories

Supply inventories include replacement parts, fuel, chemicals and other general supplies, which are expected to be used or consumed in normal operations. Supply inventories also include critical spares. Critical spares are replacement parts for equipment that is critical for the continued operation of the mine or processing facilities.

Supply inventories are stated at the lower of cost or net realizable value using average cost, less an allowance for obsolete and surplus items. The allowance for obsolete and surplus items was $16.0 million and $14.0 million at December 31, 2017 and 2016, respectively.

### Derivative Financial Instruments and Hedging Activities

We are exposed to certain risks related to the ongoing operations of our business, including those caused by changes in commodity prices, interest rates and foreign currency exchange rates. We have established policies and procedures, including the use of certain derivative instruments, to manage such risks, if deemed necessary.

Derivative financial instruments are recognized as either assets or liabilities in the    Statements of Consolidated Financial Position  and measured at fair value. On the date a derivative instrument is entered into, we designate a qualifying derivative instrument as a hedge of the variability of cash flows to be received or paid related to a forecasted transaction (cash flow hedge). We formally document all relationships between hedging instruments and hedged items, as well as our risk-management objective and strategy for undertaking various hedge transactions. This process includes linking all derivatives that are designated as cash flow hedges to specific firm commitments or forecasted transactions. We also formally assess both at the hedge's inception and on an ongoing basis, whether the derivatives that are used in hedging transactions are highly effective in offsetting changes in cash flows of the related hedged items. When it is determined that a derivative is not highly effective as a hedge or that it has ceased to be a highly effective hedge, we discontinue hedge accounting prospectively and record all future changes in fair value in the period of the instrument's earnings or losses.

For derivative instruments that have been designated as cash flow hedges, the changes in fair value are recorded in    *Accumulated other comprehensive loss.* Amounts recorded in *Accumulated other comprehensive loss*  are reclassified to earnings or losses in the period the underlying hedged transaction affects earnings or when the underlying hedged transaction is no longer reasonably possible of occurring.

For derivative instruments that have not been designated as cash flow hedges, changes in fair value are recorded in the period of the instrument's earnings or losses.

Refer to *Revenue Recognition*  below for discussion of derivatives recorded as a result of pricing terms in our sales contracts.

Refer to NOTE 13 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES  for further information.

88

*Property, Plant and Equipment*

Our properties are stated at the lower of cost less accumulated depreciation or fair value. Depreciation of plant and equipment is computed principally by the straight-line method based on estimated useful lives, not to exceed the mine lives. Depreciation continues to be recognized when operations are idled temporarily. The U.S. Iron Ore operations use the double-declining balance method of depreciation for certain mining equipment. The Asia Pacific Iron Ore operation uses the production output method for certain mining equipment. Depreciation is provided over the following estimated useful lives:

| Asset Class | Basis | Life |
|---|---|---|
| Office and information technology | Straight line | 3 to 15 Years |
| Buildings | Straight line | 45 Years |
| Mining equipment | Straight line/Double declining balance | 3 to 20 Years |
| Processing equipment | Straight line | 10 to 45 Years |
| Electric power facilities | Straight line | 10 to 45 years |
| Land improvements | Straight line | 20 to 45 years |
| Asset retirement obligation | Straight line | Life of mine |

Refer to NOTE 4 - PROPERTY, PLANT AND EQUIPMENT for further information.

*Capitalized Stripping Costs*

During the development phase, stripping costs are capitalized as a part of the depreciable cost of building, developing and constructing a mine. These capitalized costs are amortized over the productive life of the mine using the units of production method. The production phase does not commence until the removal of more than a de minimis amount of saleable mineral material occurs in conjunction with the removal of overburden or waste material for purposes of obtaining access to an ore body. The stripping costs incurred in the production phase of a mine are variable production costs included in the costs of the inventory produced (extracted) during the period that the stripping costs are incurred.

Stripping costs related to expansion of a mining asset of proven and probable reserves are variable production costs that are included in the costs of the inventory produced during the period that the stripping costs are incurred.

*Other Intangible Assets and Liabilities*

Other intangible assets are subject to periodic amortization over their estimated useful lives as follows:

| Intangible Assets | Basis | Useful Life |
|---|---|---|
| Permits - *Asia Pacific Iron Ore* | Units of production | Life of mine |
| Permits - *USIO* | Straight line | Life of mine |

*Asset Impairment*

Long-Lived Tangible and Intangible Assets

We monitor conditions that may affect the carrying value of our long-lived tangible and intangible assets when events and circumstances indicate that the carrying value of the asset groups may not be recoverable. In order to determine if assets have been impaired, assets are grouped and tested at the lowest level for which identifiable, independent cash flows are available ("asset group"). An impairment loss exists when projected undiscounted cash flows are less than the carrying value of the asset group. The measurement of the impairment loss to be recognized is based on the difference between the fair value and the carrying value of the asset group. Fair value can be determined using a market approach, income approach or cost approach.

For the years ended December 31, 2017 and 2015, although certain factors indicated that the carrying value of certain asset groups may not be recoverable, an assessment for the potential impairment was performed and an impairment adjustment was not required. During 2016, there were no impairment indicators present; as a result, no impairment assessments were required.

Refer to NOTE 4 - PROPERTY, PLANT AND EQUIPMENT , NOTE 12 - GOODWILL AND OTHER INTANGIBLE ASSETS  and NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS for further information.

*Fair Value Measurements*

*Valuation Hierarchy*

ASC 820, *Fair Value Measurements and Disclosures*, establishes a three-level valuation hierarchy for classification of fair value measurements. The valuation hierarchy is based upon the transparency of inputs to the valuation of an asset or liability as of the measurement date. Inputs refer broadly to the assumptions that market participants would use in pricing an asset or liability. Inputs may be observable or unobservable. Observable inputs are inputs that reflect the assumptions market participants would use in pricing the asset or liability developed based on market data obtained from independent sources. Unobservable inputs are inputs that reflect our own views about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances. The three-tier hierarchy of inputs is summarized below:

- Level 1 — Valuation is based upon quoted prices (unadjusted) for identical assets or liabilities in active markets.

- Level 2 — Valuation is based upon quoted prices for similar assets and liabilities in active markets, or other inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

- Level 3 — Valuation is based upon other unobservable inputs that are significant to the fair value measurement.

The classification of assets and liabilities within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement in its entirety. Valuation methodologies used for assets and liabilities measured at fair value are as follows:

*Cash Equivalents*

Where quoted prices are available in an active market, cash equivalents are classified within Level 1 of the valuation hierarchy. Cash equivalents classified in Level 1 include money market funds and treasury bonds. Valuation of these instruments is determined using a market approach and is based upon unadjusted quoted prices for identical assets in active markets. Cash equivalents classified in Level 2 include commercial paper and certificates of deposit. Valuation of these instruments is determined using financial models that use as their basis readily observable market parameters.

*Derivative Financial Instruments*

Derivative financial instruments valued using financial models that use as their basis readily observable market parameters are classified within Level 2 of the valuation hierarchy. Such derivative financial instruments include our commodity hedging instruments. Derivative financial instruments that are valued based upon models with significant unobservable market parameters and are normally traded less actively, are classified within Level 3 of the valuation hierarchy.

Refer to NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS  and NOTE 7 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS  for further information.

**Pensions and Other Postretirement Benefits**

We offer defined benefit pension plans, defined contribution pension plans and other postretirement benefit plans, primarily consisting of retiree healthcare benefits, to most employees in North America as part of a total compensation and benefits program. We do not have employee pension or post-retirement benefit obligations at our Asia Pacific Iron Ore operations.

We recognize the funded or unfunded status of our postretirement benefit obligations on our  December 31, 2017 and 2016 Statements of Consolidated Financial Position based on the difference between the market value of plan assets and the actuarial present value of our retirement obligations on that date, on a plan-by-plan basis. If the plan assets exceed the retirement obligations, the amount of the surplus is recorded as an asset; if the retirement obligations exceed the plan assets, the amount of the underfunded obligations is recorded as a liability. Year-end balance sheet adjustments to postretirement assets and obligations are recorded as *Accumulated other comprehensive loss* in the Statements of Consolidated Financial Position .

90

The actuarial estimates of the PBO and APBO incorporate various assumptions including the discount rates, the rates of increases in compensation, healthcare cost trend rates, mortality, retirement timing and employee turnover. The discount rate is determined based on the prevailing year-end rates for high-grade corporate bonds with a duration matching the expected cash flow timing of the benefit payments from the various plans. The remaining assumptions are based on our estimates of future events by incorporating historical trends and future expectations. The amount of net periodic cost that is recorded in the Statements of Consolidated Operations consists of several components including service cost, interest cost, expected return on plan assets, and amortization of previously unrecognized amounts. Service cost represents the value of the benefits earned in the current year by the participants. Interest cost represents the cost associated with the passage of time. Certain items, such as plan amendments, gains and/or losses resulting from differences between actual and assumed results for demographic and economic factors affecting the obligations and assets of the plans, and changes in other assumptions are subject to deferred recognition for income and expense purposes. The expected return on plan assets is determined utilizing the weighted average of expected returns for plan asset investments in various asset categories based on historical performance, adjusted for current trends. See NOTE 7 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS for further information.

### Asset Retirement Obligations

Asset retirement obligations are recognized when incurred and recorded as liabilities at fair value. The fair value of the liability is determined as the discounted value of the expected future cash flows. The asset retirement obligation is accreted over time through periodic charges to earnings. In addition, the asset retirement cost is capitalized and amortized over the life of the related asset. Reclamation costs are adjusted periodically to reflect changes in the estimated present value resulting from the passage of time and revisions to the estimates of either the timing or amount of the reclamation costs. We review, on an annual basis, unless otherwise deemed necessary, the asset retirement obligation at each mine site in accordance with the provisions of ASC 410, *Asset Retirement and Environmental Obligations*. We perform an in-depth evaluation of the liability every three years in addition to our routine annual assessments. In 2017, we employed a third-party specialist to assist in the evaluation.

Future reclamation costs for inactive mines are accrued based on management's best estimate at the end of each period of the costs expected to be incurred at a site. Such cost estimates include, where applicable, ongoing maintenance and monitoring costs. Changes in estimates at inactive mines are reflected in earnings in the period an estimate is revised. See NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS for further information.

### Environmental Remediation Costs

We have a formal policy for environmental protection and restoration. Our mining and exploration activities are subject to various laws and regulations governing protection of the environment. We conduct our operations to protect the public health and environment and believe our operations are in compliance with applicable laws and regulations in all material respects. Our environmental liabilities, including obligations for known environmental remediation exposures at active and closed mining operations and other sites, have been recognized based on the estimated cost of investigation and remediation at each site. If the cost can only be estimated as a range of possible amounts with no point in the range being more likely, the minimum of the range is accrued. Future expenditures are not discounted unless the amount and timing of the cash disbursements reasonably can be estimated. It is possible that additional environmental obligations could be incurred, the extent of which cannot be assessed. Potential insurance recoveries have not been reflected in the determination of the liabilities. See NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS for further information.

### Revenue Recognition

We sell our products pursuant to comprehensive supply agreements negotiated and executed with our customers. Revenue is recognized from a sale when persuasive evidence of an arrangement exists, the price is fixed or determinable, the product is delivered in accordance with shipping terms, title and risk of loss have transferred to the customer in accordance with the specified provisions of each supply agreement and collection of the sales price reasonably is assured. Our U.S. Iron Ore and Asia Pacific Iron Ore supply agreements provide that title and risk of loss transfer to the customer either upon loading of the vessel, shipment or, as is the case with some of our U.S. Iron Ore supply agreements, when payment is received. Under certain supply agreements, we ship the product to ports on the lower Great Lakes or to the customers' facilities prior to the transfer of title. Our rationale for shipping iron ore products to certain customers and retaining title until payment is received for these products is to minimize credit risk exposure.

Sales are recorded at a sales price specified in the relevant supply agreements resulting in revenue and a receivable at the time of sale. The majority of our contracts have pricing mechanisms that require price estimation at the time of delivery with price finalization at a future period. Upon revenue recognition for provisionally priced sales, a derivative is created for the difference between the sales price used and expected future settlement price. The derivative is adjusted to fair value through *Product revenues* as a revenue adjustment each reporting period based upon current market data and forward-looking estimates determined by management until the final sales price is determined. The principal risks associated with recognition of sales on a provisional basis include iron ore price, index pellet premiums and index freight fluctuations between the date initially recorded and the date of final settlement. For revenue recognition, we estimate the future settlement rate; however, if significant changes in inputs occur between the provisional pricing date and the final settlement date, we might be required to either return a portion of the sales proceeds received or bill for the additional sales proceeds due based on the provisional sales price. Refer to NOTE 13 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES  for further information.

In addition, certain supply agreements with one customer include provisions for supplemental revenue or refunds based on the customer's average annual steel pricing or an average annual daily market price for hot-rolled coil steel the year the product is consumed in the customer's blast furnaces. We account for this provision as a free standing derivative instrument at the time of sale and record this provision at fair value until the year the product is consumed and the amounts are settled as an adjustment to *Product revenues*. Refer to NOTE 13 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES  for further information.

Revenue from product sales and services also includes reimbursement for freight charges associated with domestic freight and venture partner cost reimbursements for the U.S. Iron Ore operations and freight associated with CFR based shipments paid on behalf of customers for the Asia Pacific Iron Ore operations. These are included in *Freight and venture partners' cost reimbursements* separate from *Product revenues*. Revenue is recognized for the expected reimbursement of services when the services are performed.

### Deferred Revenue

The terms of one of our U.S. Iron Ore pellet supply agreements required supplemental payments to be paid by the customer during the period 2009 through 2012, with the option to defer a portion of the 2009 monthly amount in exchange for interest payments until the deferred amount was repaid in 2013. Installment amounts received under this arrangement in excess of sales were classified as deferred revenue in the Statements of Consolidated Financial Position upon receipt of payment. Revenue is recognized over the life of the supply agreement, which extends until 2022, in equal annual installments. As of December 31, 2017 and 2016, installment amounts received in excess of sales totaled  $64.2 million and $77.1 million, respectively. As of December 31, 2017, deferred revenue of $12.8 million was recorded in *Other current liabilities* and $51.4 million was recorded as long-term in *Other liabilities* in the Statements of Consolidated Financial Position, related to this agreement.  As of December 31, 2016, deferred revenue of $12.8 million was recorded in *Other current liabilities* and $64.3 million was recorded as long-term in *Other liabilities* in the Statements of Consolidated Financial Position , related to this agreement.

In 2017 and 2016, due to the payment terms and the timing of cash receipts near year-end, cash receipts exceeded shipments for certain customers. Revenue recognition on these transactions totaling $9.6 million and $3.4 million was deferred on the Statements of Consolidated Financial Position  for the years ended December 31, 2017 and 2016, respectively.

### Cost of Goods Sold

*Cost of goods sold and operating expenses*  represents all direct and indirect costs and expenses applicable to the sales from our mining operations. Operating expenses primarily represent the portion of the Tilden mining venture costs prior to our 100% ownership; that is, the costs attributable to the share of the mine's production owned by the other joint venture partner in the Tilden mine until we acquired the remaining 15% noncontrolling interest during 2017. The mining venture functioned as a captive cost company, supplying product only to its owners effectively for the cost of production. Accordingly, the noncontrolling interests' revenue amounts are stated at cost of production and are offset by an equal amount included in *Cost of goods sold and operating expenses*  resulting in no sales margin reflected for the noncontrolling partner participant. As we were responsible for product fulfillment under the venture, we acted as a principal in the transaction and, accordingly, recorded revenue under these arrangements on a gross basis.

92

A005354

Table of Contents

In some circumstances, as requested by the customer, we will coordinate and ship our product via vessel directly to the port nearest to the customer's blast furnace. In this type of contract, the customer will pay one amount inclusive of both product and freight. We recognize revenue for both product revenue and the amount reimbursed for the vessel freight to the final port. We separate these revenue types in the Statements of Consolidated Operations . Accordingly, the revenue we record for freight is offset by an equal amount included in *Cost of goods sold and operating expenses* for costs we incur for that freight, resulting in no impact on sales margin.

The following table is a summary of reimbursements in our U.S. Iron Ore operations for the years ended December 31, 2017, 2016 and 2015:

|  | (In Millions) | | |
|---|---|---|---|
|  | Year Ended December 31, | | |
|  | **2017** | 2016 | 2015 |
| Reimbursements for: | | | |
| Freight | $ **166.7** | $ 106.8 | $ 105.3 |
| Venture partners' cost | **54.7** | 68.0 | 52.0 |
| Total reimbursements | $ **221.4** | $ 174.8 | $ 157.3 |

We sell a portion of our Asia Pacific Iron Ore product on a CFR basis. As a result, $19.6 million, $20.7 million and $23.6 million of freight was included in *Cost of goods sold and operating expenses* for the years ended December 31, 2017, 2016 and 2015, respectively.

Where we have joint ownership of a mine, such as Hibbing and up to the point at which we purchased the remaining interest in Tilden, our contracts entitle us to receive management fees or royalties, which we earn as the pellets are produced.

### Repairs and Maintenance

Repairs, maintenance and replacement of components are expensed as incurred. The cost of major equipment overhauls is capitalized and depreciated over the estimated useful life, which is the period until the next scheduled overhaul, generally five years. All other planned and unplanned repairs and maintenance costs are expensed when incurred.

### Share-Based Compensation

The fair value of each performance share grant is estimated on the date of grant using a Monte Carlo simulation to forecast relative TSR performance. Consistent with the guidelines of ASC 718, *Stock Compensation*, a correlation matrix of historic and projected stock prices was developed for both the Company and its predetermined peer group of mining and metals companies. The fair value assumes that performance goals will be achieved.

The expected term of the grant represents the time from the grant date to the end of the service period for each of the three plan-year agreements. We estimated the volatility of our common shares and that of the peer group of mining and metals companies using daily price intervals for all companies. The risk-free interest rate is the rate at the grant date on zero-coupon government bonds, with a term commensurate with the remaining life of the performance plans.

The fair value of stock options is estimated on the date of grant using a Black-Scholes model using the grant date price of our common shares and option exercise price, and assumptions regarding the option's expected term, the volatility of our common shares, the risk-free interest rate, and the dividend yield over the option's expected term.

Upon vesting of share-based compensation awards, we issue shares from treasury shares before issuing new shares. Forfeitures are recognized when they occur.

Refer to NOTE 8 - STOCK COMPENSATION PLANS for additional information.

### Income Taxes

Income taxes are based on income for financial reporting purposes, calculated using tax rates by jurisdiction, and reflect a current tax liability or asset for the estimated taxes payable or recoverable on the current year tax return and expected annual changes in deferred taxes. Any interest or penalties on income tax are recognized as a component of income tax expense.

We account for income taxes under the asset and liability method, which requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the financial statements. Under this method, deferred tax assets and liabilities are determined based on the differences between the financial statement and tax basis of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. The effect of a change in tax rates on deferred tax assets and liabilities is recognized in income in the period that includes the enactment date.

We record net deferred tax assets to the extent we believe these assets will more likely than not be realized. In making such determination, we consider all available positive and negative evidence, including scheduled reversals of deferred tax liabilities, projected future taxable income, tax planning strategies and recent financial results of operations.

Accounting for uncertainty in income taxes recognized in the financial statements requires that a tax benefit from an uncertain tax position be recognized when it is more likely than not that the position will be sustained upon examination, including resolutions of any related appeals or litigation processes, based on technical merits.

See NOTE 9 - INCOME TAXES for further information.

### Discontinued Operations

*North American Coal Operations*

As we executed our strategy to focus on strengthening our U.S. Iron Ore operations, management determined as of March 31, 2015 that our North American Coal operating segment met the criteria to be classified as held for sale under *ASC 205, Presentation of Financial Statements* and continued to meet the criteria throughout 2015. In December 2015, we completed the sale of our remaining two metallurgical coal operations, Oak Grove and Pinnacle mines, which marked our exit from the coal business. Our plan to sell the Oak Grove and Pinnacle mine assets represented a strategic shift in our business. For this reason, our previously reported North American Coal operating segment results for all periods, prior to the March 31, 2015 held for sale determination, as well as costs to exit are classified as discontinued operations. Refer to NOTE 14 - DISCONTINUED OPERATIONS for further discussion of our discontinued operations.

*Canadian Operations*

As more fully described in NOTE 14 - DISCONTINUED OPERATIONS, in January 2015, we announced that the Bloom Lake Group commenced restructuring proceedings in Montreal, Quebec under the CCAA. At that time, we had suspended Bloom Lake operations and for several months had been exploring options to sell certain of our Canadian assets, among other initiatives. Effective January 27, 2015, following the commencement of CCAA proceedings for the Bloom Lake Group, we deconsolidated the Bloom Lake Group and certain other wholly-owned subsidiaries comprising substantially all of our Canadian operations. Additionally, on May 20, 2015, the Wabush Group commenced restructuring proceedings in Montreal, Quebec under the CCAA which resulted in the deconsolidation of the remaining Wabush Group entities that were not previously deconsolidated. The Wabush Group was no longer generating revenues and was not able to meet its obligations as they came due. As a result of this action, the CCAA protection granted to the Bloom Lake Group was extended to include the Wabush Group to facilitate the reorganization of each of their businesses and operations. Our Canadian exit represents a strategic shift in our business. For this reason, our previously reported Eastern Canadian Iron Ore and Ferroalloys operating segment results for all periods prior to the respective deconsolidations as well as costs to exit are classified as discontinued operations.

### Foreign Currency

Our financial statements are prepared with the U.S. dollar as the reporting currency. The functional currency of our Australian subsidiaries is the Australian dollar. The functional currency of all other international subsidiaries is the U.S. dollar. The financial statements of international subsidiaries are translated into U.S. dollars using the exchange rate at each balance sheet date for assets and liabilities and a weighted average exchange rate for each period for revenues, expenses, gains and losses. Where the local currency is the functional currency, translation adjustments are recorded as *Accumulated other comprehensive loss*. Income taxes generally are not provided for foreign currency translation adjustments. To the extent that monetary assets and liabilities, inclusive of short-term and certain long-term intercompany loans, are recorded in a currency other than the functional currency, these amounts are remeasured each reporting period, with the resulting gain or loss being recorded in the Statements of Consolidated Operations . Transaction gains and losses resulting from remeasurement of intercompany loans are included in *Miscellaneous - net* in our Statements of Consolidated Operations .

A005356

Table of Contents

The following represents the net gain (loss) related to impact of transaction gains and losses resulting from remeasurement for the  years ended December 31, 2017, 2016 and 2015:

| | | (In Millions) | | | |
|---|---|---|---|---|---|
| | **2017** | | 2016 | | 2015 |
| Remeasurement of intercompany loans | $ | **16.6** | $ (16.6) | $ | 11.5 |
| Remeasurement of cash and cash equivalents | | **(2.5)** | (1.0) | | 1.5 |
| Other remeasurement | | **(2.7)** | 0.8 | | 3.3 |
| Net gain (loss) related to impact of transaction gains and losses resulting from remeasurement | $ | **11.4** | $ (16.8) | $ | 16.3 |

### Earnings Per Share

We present both basic and diluted earnings per share amounts for continuing operations and discontinued operations. Basic earnings per share amounts are calculated by dividing *Net income (loss) attributable to Cliffs shareholders*  less any paid or declared but unpaid dividends on our depositary shares by the weighted average number of common shares outstanding during the period presented. Diluted earnings per share amounts are calculated by dividing *Net income (loss) attributable to Cliffs shareholders* by the weighted average number of common shares, common share equivalents under stock plans using the treasury stock method and the number of common shares that would be issued under an assumed conversion of our outstanding depositary shares, each representing a 1/40th interest in a share of our Series A Mandatory Convertible Preferred Stock, Class A, under the if-converted method.  We currently do not have any outstanding depositary shares. Historically, when we have had outstanding depositary shares, they were convertible into common shares based on the volume weighted average of closing prices of our common shares over the 20 consecutive trading day period ending on the third day immediately preceding the end of that reporting period.

Holders of the 1.50% 2025 Convertible Senior Notes may convert their notes during any quarter between April 1, 2018 and July 15, 2024 where our share price exceeds 130% of the conversion price for 20 trading days during a 30 trading day period. Holders of the 1.50% 2025 Convertible Senior Notes may also convert their notes during any quarter between April 1, 2018 and July 15, 2024 during the five business day period after any five consecutive trading day period in which the trading price per $1,000 principal amount of notes, for each trading day of the measurement period was less than  98% of the product of the last reported sale price of our common shares and the conversion price on each such trading day. If our common shares rise in value above the conversion price, diluted EPS will be calculated based on the treasury-stock method with the number of dilutive shares being calculated based on the difference in the average share price and the conversion price. Common share equivalents are excluded from EPS computations in the periods in which they have an anti-dilutive effect. See NOTE 19 - EARNINGS PER SHARE  for further information.

### Recent Accounting Pronouncements

#### Issued and Adopted

In August 2017, the FASB issued ASU No. 2017-12,  *Derivatives and Hedging (Topic 815): Targeted Improvements to Accounting for Hedging Activities.*  The new standard simplifies hedge accounting through changes to both designation and measurement requirements.  For hedges that qualify as highly effective, the new standard eliminates the requirement to separately measure and record hedge ineffectiveness resulting in better alignment between the presentation of the effects of the hedging instrument and the hedged item in the financial statements.  We elected to early adopt ASU No. 2017-12 for the year ended December 31, 2017. The adoption of this standard required retrospective adoption, but did not impact prior-period financial results.

#### Issued and Not Effective

In May 2014, the FASB issued ASU No. 2014-09,  *Revenues from Contracts with Customers (Topic 606)* . The new revenue guidance broadly replaces the revenue guidance provided throughout the Codification. The core principle of the revenue guidance is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. Reporting entities must prepare new disclosures providing qualitative and quantitative information on the nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with customers. New disclosures also include qualitative and quantitative information on significant judgments, changes in judgments, and contract acquisition assets. We will adopt the standard on its effective date of January 1, 2018 using the modified retrospective transition method. As of December 31, 2017, we have completed the evaluation of the new standard and the related review and assessment of all existing contracts with our customers. Under Topic 606, revenue will generally

95

be recognized upon delivery for our U.S. Iron Ore customers, which in most cases is earlier than under the previous guidance. As an example, for certain iron ore shipments where revenue is deferred currently as title does not transfer until payment is received, under Topic 606, we will recognize revenue when control transfers, generally upon delivery. Due to the closure of the Soo Locks and the Welland Canal during the winter months, our revenues will be lower than historical levels during the first quarter and higher than historical levels during the remaining three quarters in future years. However, the total amount of revenue recognized during the year should remain substantially the same as under current GAAP. We do not anticipate any significant changes in the timing and pattern of revenue recognition for our Asia Pacific Iron Ore contracts. In addition to the timing impacts, we anticipate the primary impact on a full-year basis of the adoption on our consolidated financial statements will be the additional required disclosures around revenue recognition in the notes to the consolidated financial statements. As a result of the adoption of the new standard on January 1, 2018, we expect to record a cumulative transition adjustment of between $30 million and $35 million to *Retained deficit* in our Statements of Consolidated Financial Position related to shipments made in 2017 that would have been recognized as revenue in 2018 under the previous accounting guidance.

In March 2017, the FASB issued ASU No. 2017-07, *Compensation - Retirement Benefits (Topic 715): Improving the Presentation of Net Periodic Pension Cost and Net Periodic Postretirement Benefit Cost*. The new standard requires the service cost component of pension and other postretirement benefit expenses to be included in the same line item as other compensation costs arising from services rendered by employees, with the other components of net benefit cost to be presented in the income statement separately from the service cost component and outside a subtotal of income from operations. The guidance is effective for fiscal years beginning after December 15, 2017. The adoption of ASU No. 2017-07 in the first quarter of 2018 will impact the Statements of Consolidated Operations by changing our classification of the components of pension and OPEB costs; however, it will not impact our *Net Income (Loss)*. The following represents the estimated impact from the adoption of ASU No. 2017-07 for the year ended December 31, 2017:

| | ($ in Millions) | | | | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, 2017 | | | | | |
| | | | Estimate | | | |
| **Financial Statement Line Impacted** | **As Reported** | | **Adoption of ASU No. 2017-07** | | **As Adjusted** | |
| Cost of goods sold and operating expenses | $ | (1,828.5) | $ | 2.4 | $ | (1,826.1) |
| Selling, general and administrative expenses | $ | (105.8) | $ | (7.7) | $ | (113.5) |
| Miscellaneous - net | $ | 27.7 | $ | (1.7) | $ | 26.0 |
| Operating income | $ | 423.6 | $ | (7.0) | $ | 416.6 |
| Other non-operating income | $ | 3.2 | $ | 7.0 | $ | 10.2 |
| Net Income | $ | 363.1 | $ | — | $ | 363.1 |

In February 2016, the FASB issued ASU No. 2016-02, *Leases (Topic 842)*. The new standard requires lessees to recognize a right-of-use asset and a lease liability on the balance sheet for all leases except for short-term leases. For lessees, leases will continue to be classified as either operating or finance leases in the income statement. We plan to adopt the standard on its effective date of January 1, 2019. The new standard must be adopted using a modified retrospective approach and requires application of the new guidance at the beginning of the earliest comparative period presented. We are currently finalizing our implementation plan, compiling an inventory of existing leases and evaluating the effect the updated standard will have on our consolidated financial statements and related disclosures.

## NOTE 2 - SEGMENT REPORTING

Our continuing operations are organized and managed according to geographic location: U.S. Iron Ore and Asia Pacific Iron Ore. Our U.S. Iron Ore segment is a major supplier of iron ore pellets to the North American steel industry from our mines and pellet plants located in Michigan and Minnesota. The Asia Pacific Iron Ore segment is located in Western Australia and provides iron ore to the seaborne market for Asian steel producers. There were no intersegment product revenues in 2017, 2016 or 2015.

We evaluate segment performance based on sales margin, defined as revenues less cost of goods sold and operating expenses identifiable to each segment. Additionally, we evaluate performance on a segment basis, as well as a consolidated basis, based on EBITDA and Adjusted EBITDA. These measures allow management and investors to focus on our ability to service our debt as well as illustrate how the business and each operating segment are performing.

Additionally, EBITDA and Adjusted EBITDA assist management and investors in their analysis and forecasting as these measures approximate the cash flows associated with operational earnings.

The following tables present a summary of our reportable segments for the years ended December 31, 2017, 2016 and 2015, including a reconciliation of segment sales margin to *Income from continuing operations before income taxes and equity loss from ventures* and a reconciliation of *Net Income (Loss)* to EBITDA and Adjusted EBITDA:

| | | (In Millions) | | | | |
|---|---|---|---|---|---|---|
| | **2017** | | 2016 | | 2015 | |
| Revenues from product sales and services: | | | | | | |
| U.S. Iron Ore | $ **1,866.0** | **80%** | $ 1,554.5 | 74% | $ 1,525.4 | 76% |
| Asia Pacific Iron Ore | **464.2** | **20%** | 554.5 | 26% | 487.9 | 24% |
| Total revenues from product sales and services | $ **2,330.2** | **100%** | $ 2,109.0 | 100% | $ 2,013.3 | 100% |
| | | | | | | |
| Sales margin: | | | | | | |
| U.S. Iron Ore | $ **465.4** | | $ 275.7 | | $ 227.1 | |
| Asia Pacific Iron Ore | **36.3** | | 113.6 | | 9.4 | |
| Sales margin | **501.7** | | 389.3 | | 236.5 | |
| Other operating expense | **(78.1)** | | (148.5) | | (85.2) | |
| Other income (expense) | **(294.2)** | | (33.8) | | 161.8 | |
| Income from continuing operations before income taxes and equity loss from ventures | $ **129.4** | | $ 207.0 | | $ 313.1 | |

97

A005359

| | | 2017 | | 2016 | | 2015 |
|---|---|---|---|---|---|---|
| | | **(In Millions)** | | | | |
| Net income (loss) | $ | **363.1** | $ | 199.3 | $ | (748.4 ) |
| Less: | | | | | | |
| Interest expense, net | | **(132.0 )** | | (200.5 ) | | (231.4 ) |
| Income tax benefit (expense) | | **252.4** | | 12.2 | | (163.3 ) |
| Depreciation, depletion and amortization | | **(87.7 )** | | (115.4 ) | | (134.0 ) |
| Total EBITDA | $ | **330.4** | $ | 503.0 | $ | (219.7 ) |
| Less: | | | | | | |
| Gain (loss) on extinguishment/restructuring of debt | $ | **(165.4 )** | $ | 166.3 | $ | 392.9 |
| Impact of discontinued operations | | **(18.7 )** | | (19.9 ) | | (892.0 ) |
| Foreign exchange remeasurement | | **11.4** | | (16.8 ) | | 16.3 |
| Severance and contractor termination costs | | **—** | | (0.1 ) | | (10.2 ) |
| Supplies inventory adjustment | | **(1.8 )** | | — | | (16.3 ) |
| Impairment of other long-lived assets | | **—** | | — | | (3.3 ) |
| Total Adjusted EBITDA | $ | **504.9** | $ | 373.5 | $ | 292.9 |
| | | | | | | |
| EBITDA: | | | | | | |
| U.S. Iron Ore | $ | **534.9** | $ | 342.4 | $ | 317.6 |
| Asia Pacific Iron Ore | | **40.7** | | 128.3 | | 35.3 |
| Other (including discontinued operations) | | **(245.2 )** | | 32.3 | | (572.6 ) |
| Total EBITDA | $ | **330.4** | $ | 503.0 | $ | (219.7 ) |
| | | | | | | |
| Adjusted EBITDA: | | | | | | |
| U.S. Iron Ore | $ | **559.4** | $ | 359.6 | $ | 352.1 |
| Asia Pacific Iron Ore | | **50.4** | | 132.9 | | 32.7 |
| Other | | **(104.9 )** | | (119.0 ) | | (91.9 ) |
| Total Adjusted EBITDA | $ | **504.9** | $ | 373.5 | $ | 292.9 |

A005360

Table of Contents

|  | (In Millions) | | |
|---|---|---|---|
|  | **2017** | 2016 | 2015 |
| **Depreciation, depletion and amortization:** | | | |
| U.S. Iron Ore | $ **66.6** | $ 84.0 | $ 98.9 |
| Asia Pacific Iron Ore | **14.3** | 25.1 | 25.3 |
| Other | **6.8** | 6.3 | 6.6 |
| Total depreciation, depletion and amortization | $ **87.7** | $ 115.4 | $ 130.8 |
| | | | |
| **Capital additions[1]:** | | | |
| U.S. Iron Ore | $ **136.8** | $ 62.2 | $ 58.2 |
| Asia Pacific Iron Ore | **2.8** | 0.2 | 5.4 |
| Other[2] | **16.4** | 6.1 | 8.6 |
| Total capital additions | $ **156.0** | $ 68.5 | $ 72.2 |

[1] Includes capital lease additions and non-cash accruals. Refer to NOTE 17 - CASH FLOW INFORMATION.

[2] Includes spend related to our HBI project.

A summary of assets by segment is as follows:

|  | (In Millions) | | |
|---|---|---|---|
|  | **December 31, 2017** | December 31, 2016 | December 31, 2015 |
| **Assets:** | | | |
| U.S. Iron Ore | $ **1,500.6** | $ 1,372.5 | $ 1,476.4 |
| Asia Pacific Iron Ore | **138.8** | 155.1 | 202.5 |
| Total segment assets | **1,639.4** | 1,527.6 | 1,678.9 |
| Corporate | **1,314.0** | 396.3 | 441.7 |
| Assets of discontinued operations | **—** | — | 14.9 |
| Total assets | $ **2,953.4** | $ 1,923.9 | $ 2,135.5 |

Included in the consolidated financial statements are the following amounts relating to geographic location:

|  | (In Millions) | | |
|---|---|---|---|
|  | **2017** | 2016 | 2015 |
| **Revenues from product sales and services** | | | |
| United States | $ **1,504.5** | $ 1,236.2 | $ 1,206.4 |
| China | **364.7** | 452.5 | 370.8 |
| Canada | **206.2** | 267.1 | 282.4 |
| Other countries | **254.8** | 153.2 | 153.7 |
| Total revenues from product sales and services | $ **2,330.2** | $ 2,109.0 | $ 2,013.3 |
| **Property, Plant and Equipment, Net** | | | |
| United States | $ **1,033.8** | $ 961.0 | $ 1,012.7 |
| Australia | **17.2** | 23.4 | 46.3 |
| Total Property, Plant and Equipment, Net | $ **1,051.0** | $ 984.4 | $ 1,059.0 |

*Concentrations in Revenue*

In 2017 and 2016, two customers individually accounted for more than 10% of our consolidated product revenue and in 2015, three customers individually accounted for more than 10% of our consolidated product revenue. Total product revenue from these customers represents  $1.3 billion, $1.1 billion and $1.3 billion of our total consolidated product revenue in  2017, 2016 and 2015, respectively, and is attributable to our U.S. Iron Ore business segment.

A005361

Table of Contents

The following table represents the percentage of our total *Revenues from product sales and services* contributed by each category of products and services in 2017, 2016 and 2015:

| Revenue category | 2017 | 2016 | 2015 |
|---|---|---|---|
| Product | 90% | 91% | 91% |
| Freight and venture partners' cost reimbursements | 10% | 9% | 9% |
| Total revenues from product sales and services | 100% | 100% | 100% |

**NOTE 3 - INVENTORIES**

The following table presents the detail of our *Inventories* in the Statements of Consolidated Financial Position as of December 31, 2017 and 2016:

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| | December 31, 2017 | | | December 31, 2016 | | |
| Segment | Finished Goods | Work-in Process | Total Inventory | Finished Goods | Work-in Process | Total Inventory |
| U.S. Iron Ore | $ 127.1 | $ 11.3 | $ 138.4 | $ 124.4 | $ 12.6 | $ 137.0 |
| Asia Pacific Iron Ore | 33.3 | 11.7 | 45.0 | 23.6 | 17.8 | 41.4 |
| Total | $ 160.4 | $ 23.0 | $ 183.4 | $ 148.0 | $ 30.4 | $ 178.4 |

*U.S. Iron Ore*

The excess of current cost over LIFO cost of iron ore inventories was $96.2 million and $78.5 million at December 31, 2017 and 2016, respectively. As of December 31, 2017, the product inventory balance for U.S. Iron Ore increased, resulting in a LIFO increment in 2017. The effect of the inventory build was an increase in *Inventories* of $6.2 million in the Statements of Consolidated Financial Position for the year ended December 31, 2017. As of December 31, 2016, the product inventory balance for U.S. Iron Ore declined, resulting in the liquidation of a LIFO layer in 2016. The effect of the inventory reduction was an increase in *Cost of goods sold and operating expenses* of $8.8 million in the Statements of Consolidated Financial Position for the year ended December 31, 2016.

*Asia Pacific Iron Ore*

We recorded a lower of cost or net realizable value inventory charge of $1.8 million related to work-in process inventory in *Cost of goods sold and operating expenses* in the Statements of Consolidated Operations for the year ended December 31, 2017. The charge was predominantly a result of the decline in our realized revenue rate as well as the additional production and transportation costs required to be incurred in order for our work-in process inventory to be ready for sale. There were no LCM inventory adjustments recorded for the year ended December 31, 2016.

A005362

Table of Contents

**NOTE 4 - PROPERTY, PLANT AND EQUIPMENT**

The following table indicates the carrying value of each of the major classes of our consolidated depreciable assets as of  December 31, 2017 and 2016:

| | (In Millions) | |
| --- | --- | --- |
| | December 31, | |
| | **2017** | 2016 |
| Land rights and mineral rights | $ **549.6** | $ 500.5 |
| Office and information technology | **66.3** | 65.1 |
| Buildings | **86.8** | 67.9 |
| Mining equipment | **594.4** | 592.2 |
| Processing equipment | **617.0** | 552.0 |
| Electric power facilities | **57.0** | 49.4 |
| Land improvements | **23.7** | 23.5 |
| Asset retirement obligation | **19.2** | 19.8 |
| Other | **30.3** | 28.1 |
| Construction in-progress | **35.1** | 42.8 |
| | **2,079.4** | 1,941.3 |
| Allowance for depreciation and depletion | **(1,028.4)** | (956.9) |
| | $ **1,051.0** | $ 984.4 |

We recorded depreciation expense of $78.8 million, $106.8 million and $119.2 million in the Statements of Consolidated Operations  for the years ended December 31, 2017, 2016 and 2015, respectively.

Our asset groups consist of the assets and liabilities of our mines and associated reserves. The lowest level of identifiable cash flows largely is at the U.S. Iron Ore and Asia Pacific Iron Ore segment levels. For the years ended December 31, 2017 and 2015, although certain factors indicated that the carrying value of certain asset groups may not be recoverable, an assessment for the potential impairment was performed and an impairment adjustment was not required. For the year ended December 31, 2016, there were no factors present that indicated the carrying value of certain asset groups would not be recoverable; therefore, additional impairment assessments were not required.

The net book value of the land rights and mineral rights as of  December 31, 2017 and 2016 is as follows:

| | (In Millions) | |
| --- | --- | --- |
| | December 31, | |
| | **2017** | 2016 |
| Land rights | $ **12.4** | $ 11.6 |
| Mineral rights: | | |
| Cost | $ **537.2** | $ 488.9 |
| Depletion | **(119.1)** | (112.2) |
| Net mineral rights | $ **418.1** | $ 376.7 |

Accumulated depletion relating to mineral rights, which was recorded using the unit-of-production method, is included in  *Cost of goods sold and operating expenses.* We recorded depletion expense of $6.8 million, $3.8 million and $7.4 million in the Statements of Consolidated Operations  for the years ended December 31, 2017, 2016 and 2015, respectively.

101

Table of Contents

## NOTE 5 - DEBT AND CREDIT FACILITIES

The following represents a summary of our long-term debt as of December 31, 2017 and 2016:

| ($ in Millions) | | | | | |
|---|---|---|---|---|---|
| **December 31, 2017** | | | | | |
| **Debt Instrument** | **Annual Effective Interest Rate** | **Total Principal Amount** | **Debt Issuance Costs** | **Unamortized Discounts** | **Total Debt** |
| **Senior Secured Notes** | | | | | |
| $400 Million 4.875% 2024 Senior Notes | **5.00%** | $ **400.0** | $ **(7.1)** | $ **(2.6)** | $ **390.3** |
| **Unsecured Notes** | | | | | |
| $400 Million 5.90% 2020 Senior Notes | **5.98%** | **88.9** | **(0.2)** | **(0.1)** | **88.6** |
| $500 Million 4.80% 2020 Senior Notes | **4.83%** | **122.4** | **(0.3)** | **(0.1)** | **122.0** |
| $700 Million 4.875% 2021 Senior Notes | **4.89%** | **138.4** | **(0.3)** | **(0.1)** | **138.0** |
| $316.25 Million 1.50% 2025 Convertible Senior Notes | **6.26%** | **316.3** | **(6.6)** | **(85.6)** | **224.1** |
| $1.075 Billion 5.75% 2025 Senior Notes | **6.01%** | **1,075.0** | **(11.3)** | **(16.5)** | **1,047.2** |
| $800 Million 6.25% 2040 Senior Notes | **6.34%** | **298.4** | **(2.4)** | **(3.4)** | **292.6** |
| ABL Facility | **N/A** | **550.0** | **N/A** | **N/A** | **—** |
| Fair Value Adjustment to Interest Rate Hedge | | | | | **1.4** |
| Long-term debt | | | | | $ **2,304.2** |

| ($ in Millions) | | | | | |
|---|---|---|---|---|---|
| December 31, 2016 | | | | | |
| Debt Instrument | Annual Effective Interest Rate | Total Principal Amount | Debt Issuance Costs | Undiscounted Interest/(Unamortized Discounts) | Total Debt |
| Senior Secured Notes | | | | | |
| $540 Million 8.25% 2020 First Lien Notes | 9.97% | $ 540.0 | $ (8.0) | $ (25.7) | $ 506.3 |
| $218.5 Million 8.00% 2020 1.5 Lien Notes | N/A | 218.5 | — | 65.7 | 284.2 |
| $544.2 Million 7.75% 2020 Second Lien Notes | 15.55% | 430.1 | (5.8) | (85.2) | 339.1 |
| Unsecured Notes | | | | | |
| $400 Million 5.90% 2020 Senior Notes | 5.98% | 225.6 | (0.6) | (0.5) | 224.5 |
| $500 Million 4.80% 2020 Senior Notes | 4.83% | 236.8 | (0.7) | (0.2) | 235.9 |
| $700 Million 4.875% 2021 Senior Notes | 4.89% | 309.4 | (1.0) | (0.2) | 308.2 |
| $800 Million 6.25% 2040 Senior Notes | 6.34% | 298.4 | (2.5) | (3.4) | 292.5 |
| ABL Facility | N/A | 550.0 | N/A | N/A | — |
| Fair Value Adjustment to Interest Rate Hedge | | | | | 1.9 |
| Long-term debt | | | | | $ 2,192.6 |
| Less current portion | | | | | 17.5 |
| Long-term debt | | | | | $ 2,175.1 |

**$1.075 Billion 5.75% 2025 Senior Notes - 2017 Offering**

On February 27, 2017, we entered into an indenture among the Company, the guarantors party thereto and U.S. Bank National Association, as trustee, relating to the issuance of $500 million aggregate principal amount of 5.75% 2025 Senior Notes. On August 7, 2017, we issued an additional $575 million aggregate principal amount of our 5.75% 2025 Senior Notes. The second tranche was issued at 97.0% of face value. The 5.75% 2025 Senior Notes were issued in private transactions exempt from the registration requirements of the Securities Act. Pursuant to the registration rights

agreement executed as part of the offerings, we agreed to file a registration statement with the SEC with respect to a registered offer to exchange the 5.75% 2025 Senior Notes for publicly registered notes within 365 days of the closing date, with all significant terms and conditions remaining the same.

The 5.75% 2025 Senior Notes bear interest at a rate of 5.75% per annum, which is payable semi-annually in arrears on March 1 and September 1 of each year, which commenced on September 1, 2017. The 5.75% 2025 Senior Notes mature on March 1, 2025.

The 5.75% 2025 Senior Notes are general unsecured senior obligations and rank equally in right of payment with all of our existing and future senior unsecured indebtedness and rank senior in right of payment to all of our existing and future subordinated indebtedness. The 5.75% 2025 Senior Notes are effectively subordinated to our existing or future secured indebtedness to the extent of the value of the assets securing such indebtedness. The 5.75% 2025 Senior Notes are guaranteed on a senior unsecured basis by our material direct and indirect wholly-owned domestic subsidiaries and, therefore, are structurally senior to any of our existing and future indebtedness that is not guaranteed by such guarantors and are structurally subordinated to all existing and future indebtedness and other liabilities of our subsidiaries that do not guarantee the 5.75% 2025 Senior Notes.

The terms of the 5.75% 2025 Senior Notes are governed by an indenture, which contains customary covenants that, among other things, limit our and our subsidiaries' ability to create liens on property that secure indebtedness, enter into sale and leaseback transactions and merge, consolidate or amalgamate with another company. Upon the occurrence of a "change of control triggering event," as defined in the indenture, we are required to offer to repurchase the 5.75% 2025 Senior Notes at 101% of the aggregate principal amount thereof, plus any accrued and unpaid interest, if any, to, but excluding, the repurchase date.

We may redeem the 5.75% 2025 Senior Notes, in whole or in part, on or after March 1, 2020, at the redemption prices set forth in the indenture, plus accrued and unpaid interest, if any, to, but not including, the date of redemption, and prior to March 1, 2020, at a redemption price equal to 100% of the principal amount thereof plus a "make-whole" premium set forth in the indenture, plus accrued and unpaid interest, if any, to, but not including, the date of redemption. We may also redeem up to 35% of the aggregate principal amount of the 5.75% 2025 Senior Notes on or prior to March 1, 2020 at a redemption price equal to 105.75% of the principal amount thereof, plus accrued and unpaid interest, if any, to, but not including, the date of redemption with the net cash proceeds of one or more equity offerings.

The 5.75% 2025 Senior Notes indenture contains customary events of default, including failure to make required payments, failure to comply with certain agreements or covenants, failure to pay or acceleration of certain other indebtedness, certain events of bankruptcy and insolvency and failure to pay certain judgments. An event of default under the indenture will allow either the trustee or the holders of at least 25% in aggregate principal amount of the then-outstanding notes issued under the indenture to accelerate, or in certain cases, will automatically cause the acceleration of, the amounts due under the 5.75% 2025 Senior Notes.

Debt issuance costs of $12.4 million were incurred related to the offering of the 5.75% 2025 Senior Notes, $11.3 million of which is included in *Long-term debt* in the Statements of Consolidated Financial Position as of December 31, 2017.

**$400 Million 4.875% 2024 Senior Secured Notes - 2017 Offering**

On December 19, 2017, we entered into an indenture among the Company, the guarantors party thereto and U.S. Bank National Association, as trustee and first lien notes collateral agent, relating to the issuance of $400 million aggregate principal amount of 4.875% 2024 Senior Secured Notes at 99.347% of face value. The 4.875% 2024 Senior Secured Notes were issued in a private transaction exempt from the registration requirements of the Securities Act. The 4.875% 2024 Senior Secured Notes have not been, and will not be, registered under the Securities Act and may not be offered or sold in the United States absent registration or an applicable exemption from the registration requirements of the Securities Act.

The 4.875% 2024 Senior Secured Notes bear interest at a rate of 4.875% per annum, which is payable semi-annually in arrears on January 15 and July 15 of each year, commencing on July 15, 2018. The 4.875% 2024 Senior Secured Notes mature on January 15, 2024 and are secured senior obligations of the Company.

The 4.875% 2024 Senior Secured Notes are jointly and severally and fully and unconditionally guaranteed on a senior secured basis by substantially all of our material domestic subsidiaries and will be secured (subject in each case to certain exceptions and permitted liens) by (i) a first-priority lien on substantially all of our assets and the assets of the Guarantors (other than accounts receivable and other rights to payment, inventory, as-extracted collateral, certain investment property, certain general intangibles and commercial tort claims, certain mobile equipment, commodities

103

accounts, deposit accounts, securities accounts and other related assets and proceeds and products of each of the foregoing (collectively, the " *ABL Collateral*")), and (ii) a second-priority lien on the ABL Collateral, which is junior to a first-priority lien for the benefit of the lenders under the Company's senior secured asset-based credit facility.

The terms of the 4.875% 2024 Senior Secured Notes are governed by the Secured Notes Indenture. The Secured Notes Indenture contains customary covenants that, among other things, limit our and our subsidiaries' ability to create certain liens on property that secure indebtedness, use proceeds of dispositions of collateral, enter into sale and leaseback transactions, merge or consolidate with another company, and transfer or sell all or substantially all of our assets. Upon the occurrence of a "change of control triggering event," as defined in the Secured Notes Indenture, we are required to offer to repurchase the 4.875% 2024 Senior Secured Notes at 101% of the aggregate principal amount thereof, plus any accrued and unpaid interest, if any, to, but excluding, the repurchase date.

We may redeem any of the Secured Notes beginning on January 15, 2021. The initial redemption price is 102.438% of their principal amount, plus accrued and unpaid interest, if any, to, but excluding, the redemption date. The redemption price will decline each year after January 15, 2021 and will be 100% of their principal amount, plus accrued interest, beginning on January 15, 2023. We may also redeem some or all of the 4.875% 2024 Senior Secured Notes at any time and from time to time prior to January 15, 2021 at a price equal to 100% of the principal amount thereof plus a "make-whole" premium, plus accrued and unpaid interest, if any, to, but excluding, the redemption date. We may also redeem up to 10% of the original aggregate principal amount of the 4.875% 2024 Senior Secured Notes (calculated after giving effect to any issuance of additional 4.875% 2024 Senior Secured Notes) per year prior to January 15, 2021 at a redemption price equal to 103% of the principal amount thereof, plus accrued and unpaid interest, if any, to, but excluding, the redemption date.

In addition, at any time and from time to time on or prior to January 15, 2021, we may redeem in the aggregate up to 35% of the original aggregate principal amount of the Secured Notes (calculated after giving effect to any issuance of additional 4.875% 2024 Senior Secured Notes) with the net cash proceeds of certain equity offerings, at a redemption price of 104.875%, plus accrued and unpaid interest, if any, to, but excluding, the redemption date, so long as at least 65% of the original aggregate principal amount of the 4.875% 2024 Senior Secured Notes (calculated after giving effect to any issuance of additional 4.875% 2024 Senior Secured Notes) issued under the Secured Notes Indenture remain outstanding after each such redemption.

The Secured Notes Indenture contains customary events of default, including failure to make required payments, failure to comply with certain agreements or covenants, failure to pay or acceleration of certain other indebtedness, certain events of bankruptcy and insolvency, and failure to pay certain judgments. An event of default under the Secured Notes Indenture will allow either the Trustee or the holders of at least 25% in aggregate principal amount of the then-outstanding 4.875% 2024 Senior Secured Notes to accelerate, or in certain cases, will automatically cause the acceleration of, the amounts due under the 4.875% 2024 Senior Secured Notes.

Debt issuance costs of $7.1 million were incurred related to the offering of the 4.875% 2024 Senior Secured Notes and are included in *Long-term debt* in the Statements of Consolidated Financial Position as of December 31, 2017.

**$316.25 Million 1.50% 2025 Convertible Senior Notes - 2017 Offering**

On December 19, 2017, we issued $316.25 million aggregate principal amount of 1.50% 2025 Convertible Senior Notes. The 1.50% 2025 Convertible Senior Notes bear interest at a rate of 1.50% per year, payable semiannually in arrears on January 15 and July 15 of each year, beginning on July 15, 2018. The 1.50% 2025 Convertible Senior Notes mature on January 15, 2025.

Holders may convert their 1.50% 2025 Convertible Senior Notes at their option at any time prior to the close of business on the business day immediately preceding July 15, 2024, only under the following circumstances: (1) during any calendar quarter commencing after the calendar quarter ending on March 31, 2018 (and only during such calendar quarter), if the last reported sale price of our common shares, par value $0.125 per share, for at least 20 trading days (whether or not consecutive) during a period of 30 consecutive trading days ending on the last trading day of the immediately preceding calendar quarter is greater than or equal to 130% of the conversion price on each applicable trading day; (2) during the five-business day period after any five-consecutive trading day period (the "measurement period") in which the trading price (as defined below) per $1,000 amount of 1.50% 2025 Convertible Senior Notes for each trading day of the measurement period was less than 98% of the product of the last reported sale price of our common shares and the conversion rate on each such trading day; (3) if we call the notes for redemption, at any time prior to the close of business on the scheduled trading day immediately preceding the redemption date; or (4) upon the occurrence of specified corporate events. On or after July 15, 2024 until the close of business on the second scheduled trading day immediately preceding the maturity date, holders may convert their 1.50% 2025 Convertible Senior Notes

104

at any time, regardless of the foregoing circumstances. Upon conversion, we will pay or deliver, as the case may be, cash, common shares or a combination of cash and common shares, at our election.

The conversion rate will initially be 122.4365 common shares per $1,000 principal amount of 1.50% 2025 Convertible Senior Notes (equivalent to an initial conversion price of $8.17 per common share). The conversion rate will be subject to adjustment in some circumstances but will not be adjusted for any accrued and unpaid interest. In addition, following certain corporate events that occur prior to the maturity date, or if we deliver a notice of redemption, we will, in certain circumstances, increase the conversion rate for a holder who elects to convert its 1.50% 2025 Convertible Senior Notes in connection with such a corporate event or notice of redemption, as the case may be.

We may not redeem the 1.50% 2025 Convertible Senior Notes prior to January 15, 2022. We may redeem all or any portion of the 1.50% 2025 Convertible Senior Notes, for cash at our option on or after January 15, 2022 if the last reported sale price of our common shares has been at least 130% of the conversion price then in effect for at least 20 trading days (whether or not consecutive) during any 30-consecutive trading day period (including the last trading day of such period) ending on, and including, the trading day immediately preceding the date on which we provide notice of redemption at a redemption price equal to 100% of the principal amount of the 1.50% 2025 Convertible Senior Notes to be redeemed, plus accrued and unpaid interest to, but excluding, the redemption date. No sinking fund is provided for the 1.50% 2025 Convertible Senior Notes.

It is our current intent to settle conversions through combination settlement with a specified dollar amount per $1,000 principal amount of notes of $1,000. Our ability to settle conversions through combination settlement and cash settlement will be subject to restrictions in the agreement governing our ABL Facility and may be subject to restrictions in agreements governing our future debt.

If we undergo a fundamental change as defined in the indenture, holders may require us to repurchase for cash all or any portion of their 1.50% 2025 Convertible Senior Notes at a fundamental change repurchase price equal to 100% of the principal amount of the 1.50% 2025 Convertible Senior Notes to be repurchased, plus accrued and unpaid interest to, but excluding, the fundamental change repurchase date.

The 1.50% 2025 Convertible Senior Notes are senior unsecured obligations and rank senior in right of payment to any of our indebtedness that is expressly subordinated in right of payment to the 1.50% 2025 Convertible Senior Notes; equal in right of payment to any of our unsecured indebtedness that is not so subordinated; effectively junior in right of payment to any of our secured indebtedness to the extent of the value of the assets securing such indebtedness; and structurally junior to all indebtedness and other liabilities (including trade payables) of our subsidiaries.

In accounting for the issuance of the notes, we separated the 1.50% 2025 Convertible Senior Notes into liability and equity components. The carrying amount of the liability component was calculated by measuring the fair value of similar liabilities that do not have associated convertible features. The carrying amount of the equity component of $85.9 million representing the conversion option was determined by deducting the fair value of the liability component from the par value of the notes. The difference represents the debt discount that is amortized to interest expense over the term of the notes. The equity component is not remeasured as long as it continues to qualify for equity classification.

We allocated the total debt issuance costs incurred to the notes on a prorated basis using the aggregate principal balance. In accounting for the debt issuance costs related to the notes, we allocated the total amount of issuance costs incurred to liability and equity components. The issuance costs attributable to the equity component was netted against the equity component in *Capital in excess of par value of shares* for a net amount of $83.4 million. Debt issuance costs of $9.1 million were incurred related to the offering of the Secured Notes, $6.6 million of which are included in *Long-term debt* and $2.5 million of which are included in *Capital in excess of par value of shares* in the Statements of Consolidated Financial Position as of December 31, 2017.

## Other Outstanding Unsecured Senior Notes

The following represents a summary of our unsecured senior notes' maturity and interest payable due dates:

| Debt Instrument | Maturity | Interest Payable (until maturity) |
|---|---|---|
| $400 Million 5.90% 2020 Senior Notes | March 15, 2020 | March 15 and September 15 |
| $500 Million 4.80% 2020 Senior Notes | October 1, 2020 | April 1 and October 1 |
| $700 Million 4.875% 2021 Senior Notes | April 1, 2021 | April 1 and October 1 |
| $800 Million 6.25% 2040 Senior Notes | October 1, 2040 | April 1 and October 1 |

105

The senior notes are unsecured obligations and rank equally in right of payment with all our other existing and future unsecured and unsubordinated indebtedness. There are no subsidiary guarantees of the interest and principal amounts.

The senior notes may be redeemed any time at our option not less than 30 days nor more than 60 days after prior notice is sent to the holders of the applicable series of notes. The senior notes are redeemable at a redemption price equal to the greater of (1) 100% of the principal amount of the notes to be redeemed or (2) the sum of the present values of the remaining scheduled payments of principal and interest on the notes to be redeemed, discounted to the redemption date on a semi-annual basis at the treasury rate plus 35 basis points with respect to the 5.90% 2020 Senior Notes and 4.80% 2020 Senior Notes, 25 basis points with respect to the 4.875% 2021 Senior Notes and 40 basis points with respect to the 6.25% 2040 Senior Notes, plus, in each case, accrued and unpaid interest to the date of redemption. However, if the 4.875% 2021 Senior Notes are redeemed on or after the date that is three months prior to their maturity date, the 4.875% 2021 Senior Notes will be redeemed at a redemption price equal to 100% of the principal amount of the notes to be redeemed plus accrued and unpaid interest to the date of redemption.

In addition, if a change of control triggering event occurs with respect to the senior notes, as defined in the agreement, we will be required to offer to purchase the notes of the applicable series at a purchase price equal to 101% of the principal amount, plus accrued and unpaid interest, if any, to the date of purchase.

The terms of the senior notes contain certain customary covenants; however, there are no financial covenants.

**Debt Extinguishments - 2017**

During the year ended December 31, 2017, we issued 63.25 million common shares in an underwritten public offering. We received net proceeds of $661.3 million at a public offering price of $10.75 per common share. The net proceeds from the issuance of our common shares and the net proceeds from the issuance of $1.075 billion 5.75% 2025 Senior Notes were used to redeem in full all of our outstanding 8.25% 2020 First Lien Notes, 8.00% 2020 1.5 Lien Notes and 7.75% 2020 Second Lien Notes. Additionally, through tender offers, we purchased certain of our 5.90% 2020 Senior Notes, our 4.80% 2020 Senior Notes and our 4.875% 2021 Senior Notes. The aggregate principal amount outstanding of debt redeemed was $1.611 billion, which resulted in a loss on extinguishment of $165.4 million.

The following is a summary of the debt extinguished during the year ended December 31, 2017 and the respective gain (loss) on extinguishment for the year ended December 31, 2017:

| (In Millions) | | | | |
|---|---|---|---|---|
| | Year Ended December 31, 2017 | | | |
| | Debt Extinguished | | Gain (Loss) on Extinguishment[1] | |
| Secured Notes | | | | |
| $540 Million 8.25% 2020 First Lien Notes | $ | 540.0 | $ | (93.5) |
| $218.5 Million 8.00% 2020 1.5 Lien Notes | | 218.5 | | 45.1 |
| $544.2 Million 7.75% 2020 Second Lien Notes | | 430.1 | | (104.5) |
| Unsecured Notes | | | | |
| $400 Million 5.90% 2020 Senior Notes | | 136.7 | | (7.8) |
| $500 Million 4.80% 2020 Senior Notes | | 114.4 | | (1.9) |
| $700 Million 4.875% 2021 Senior Notes | | 171.0 | | (2.8) |
| | $ | 1,610.7 | $ | (165.4) |

[1] This includes premiums paid related to the redemption of our notes of $110.0 million.

**Debt Extinguishments/Restructuring - 2016**

*8.00% 2020 1.5 Lien Notes Exchange*

On March 2, 2016, we entered into an indenture among the Company, the guarantors party thereto and U.S. Bank National Association, as trustee and notes collateral agent, relating to our issuance of $218.5 million aggregate principal amount of 8.00% 2020 1.5 Lien Notes. The 8.00% 2020 1.5 Lien Notes were issued in exchange offers for certain of our existing senior notes.

106

A005368

We accounted for the 8.00% 2020 1.5 Lien Notes exchange as a troubled debt restructuring. For an exchange classified as a troubled debt restructuring, if the future undiscounted cash flows of the newly issued debt are less than the net carrying value of the original debt, the carrying value of the newly issued debt is adjusted to the future undiscounted cash flow amount, a gain is recorded for the difference and no future interest expense is recorded. All future interest payments on the newly issued debt reduce the carrying value. Accordingly, we recognized a gain of $174.3 million in the *Gain (loss) on extinguishment/restructuring of debt* in the Statements of Consolidated Operations for the year ended December 31, 2016. Debt issuance costs incurred of $5.2 million related to the notes exchange were expensed and were included in the *Gain (loss) on extinguishment/restructuring of debt* in the Statements of Consolidated Operations for the year ended December 31, 2016. As of December 31, 2016, $17.5 million of the undiscounted interest was recorded as current and classified as *Other current liabilities* in the Statements of Consolidated Financial Position.

The following is a summary of the debt exchanged for our $218.5 million 8.00% 2020 1.5 Lien Notes:

| ($ In Millions) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Debt Extinguished | | 1.5 Lien Amount Issued | | Carrying Value[1] | | Gain on Restructuring[2] | |
| $544.2 Million 7.75% 2020 Second Lien Notes | $ | 114.1 | $ | 57.0 | $ | 77.5 | $ | 6.9 |
| $500 Million 3.95% 2018 Senior Notes | | 17.6 | | 11.4 | | 15.5 | | 1.8 |
| $400 Million 5.90% 2020 Senior Notes | | 65.1 | | 26.0 | | 35.4 | | 28.3 |
| $500 Million 4.80% 2020 Senior Notes | | 44.7 | | 17.9 | | 24.4 | | 19.5 |
| $700 Million 4.875% 2021 Senior Notes | | 76.3 | | 30.5 | | 41.5 | | 33.3 |
| $800 Million 6.25% 2040 Senior Notes | | 194.4 | | 75.7 | | 103.0 | | 84.5 |
| | $ | 512.2 | $ | 218.5 | $ | 297.3 | $ | 174.3 |

[1] Includes undiscounted interest payments

[2] Net of amounts expensed for unamortized original issue discount and deferred origination fees

*Debt-for-Equity Exchanges*

During the year ended December 31, 2016, we entered into a series of privately negotiated exchange agreements whereby we issued an aggregate of 8.2 million common shares in exchange for $10.0 million aggregate principal amount of our 3.95% 2018 Senior Notes, $20.1 million aggregate principal amount of our 4.80% 2020 Senior Notes and $26.8 million aggregate principal amount of our 4.875% 2021 Senior Notes. There were no exchanges that represented more than 1% of our outstanding common shares during any quarter. Accordingly, we recognized a gain of $11.3 million in *Gain (loss) on extinguishment/restructuring of debt* in the Statements of Consolidated Operations for the year ended December 31, 2016.

*Other Debt Redemptions*

Our 3.95% 2018 Senior Notes were redeemed in whole on September 16, 2016 at a total redemption price of $301.0 million, which included $283.6 million outstanding aggregate principal. As a result, we recorded a $19.9 million pre-tax loss on full retirement of long-term debt in the third quarter of 2016, which consisted of debt redemption premiums of $17.4 million and expenses of $2.5 million related to the write-off of unamortized debt issuance costs, unamortized bond discount and deferred losses on interest rate swaps. The loss was recorded against the *Gain (loss) on extinguishment/restructuring of debt* in the Statements of Consolidated Operations for the year ended December 31, 2016.

During the year ended December 31, 2016, we purchased with cash $5.0 million of our outstanding 4.80% 2020 Senior Notes, which resulted in a gain on extinguishment of $0.6 million.

107

A005369

**Debt Maturities**

The following represents a summary of our maturities of debt instruments, excluding borrowings on the ABL Facility, based on the principal amounts outstanding at December 31, 2017:

|  | (In Millions) |
| --- | --- |
|  | Maturities of Debt |
| 2018 | $ — |
| 2019 | — |
| 2020 | 211.3 |
| 2021 | 138.4 |
| 2022 | — |
| 2023 and thereafter | 2,089.7 |
| Total maturities of debt | $ 2,439.4 |

**ABL Facility**

On March 30, 2015, we entered into a senior secured asset-based revolving credit facility with various financial institutions. The ABL Facility will mature upon the earlier of March 30, 2020 or 60 days prior to the maturity of the First Lien Notes and certain other material debt, and provides for up to $550.0 million in borrowings, comprised of (i) a $450.0 million U.S. tranche, including a $250.0 million sublimit for the issuance of letters of credit and a $100.0 million sublimit for U.S. swingline loans, and (ii) a $100.0 million Australian tranche, including a $50.0 million sublimit for the issuance of letters of credit and a $20.0 million sublimit for Australian swingline loans. Availability under both the U.S. tranche and Australian tranche of the ABL Facility is limited to an eligible U.S. borrowing base and Australian borrowing base, as applicable, determined by applying customary advance rates to eligible accounts receivable, inventory and certain mobile equipment.

The ABL Facility and certain bank products and hedge obligations are guaranteed by us and certain of our existing wholly-owned U.S. and Australian subsidiaries and are required to be guaranteed by certain of our future U.S. and Australian subsidiaries; provided, however, that the obligations of any U.S. entity will not be guaranteed by any Australian entity. Amounts outstanding under the ABL Facility will be secured by (i) a first-priority security interest in the ABL Collateral, including, in the case of the Australian tranche only, ABL Collateral owned by a borrower or guarantor that is organized under the laws of Australia, and (ii) a third-priority security interest in the Notes Collateral (as defined herein). The priority of the security interests in the ABL Collateral and the Notes Collateral of the lenders under the ABL Facility and the holders of the First Lien Notes are set forth in intercreditor provisions contained in an ABL intercreditor agreement.

The ABL Collateral generally consists of the following assets: accounts receivable and other rights to payment, inventory, as-extracted collateral, investment property, certain general intangibles and commercial tort claims, certain mobile equipment, commodities accounts, deposit accounts, securities accounts and other related assets and proceeds and products of each of the foregoing.

Borrowings under the ABL Facility bear interest, at our option, at a base rate, an Australian base rate or, if certain conditions are met, a LIBOR rate, in each case plus an applicable margin. The base rate is equal to the greater of the federal funds rate plus ½ of 1%, the LIBOR rate based on a one-month interest period plus 1% and the floating rate announced by Bank of America Merrill Lynch as its "prime rate." The Australian base rate is equal to the LIBOR rate as of 11:00 a.m. on the first business day of each month for a one-month period. The LIBOR rate is a per annum fixed rate equal to LIBOR with respect to the applicable interest period and amount of LIBOR rate loan requested.

The ABL Facility contains customary representations and warranties and affirmative and negative covenants including, among others, covenants regarding the maintenance of certain financial ratios if certain conditions are triggered, covenants relating to financial reporting, covenants relating to the payment of dividends on, or purchase or redemption of our capital stock, covenants relating to the incurrence or prepayment of certain debt, covenants relating to the incurrence of liens or encumbrances, compliance with laws, transactions with affiliates, mergers and sales of all or substantially all of our assets and limitations on changes in the nature of our business.

The ABL Facility provides for customary events of default, including, among other things, the event of nonpayment of principal, interest, fees, or other amounts, a representation or warranty proving to have been materially incorrect when made, failure to perform or observe certain covenants within a specified period of time, a cross-default to certain material

108

indebtedness, the bankruptcy or insolvency of the Company and certain of its subsidiaries, monetary judgment defaults of a specified amount, invalidity of any loan documentation, a change of control of the Company, and ERISA defaults resulting in liability of a specified amount. In the event of a default by us (beyond any applicable grace or cure period, if any), the administrative agent may and, at the direction of the requisite number of lenders, shall declare all amounts owing under the ABL Facility immediately due and payable, terminate such lenders' commitments to make loans under the ABL Facility and/or exercise any and all remedies and other rights under the ABL Facility. For certain defaults related to insolvency and receivership, the commitments of the lenders will be automatically terminated and all outstanding loans and other amounts will become immediately due and payable.

As of December 31, 2017 and 2016, we were in compliance with the ABL Facility liquidity requirements and, therefore, the springing financial covenant requiring a minimum fixed charge coverage ratio of 1.0 to 1.0 was not applicable.

As of December 31, 2017, no loans were drawn under the ABL Facility and we had total availability of $273.2 million as a result of borrowing base limitations. As of December 31, 2017, the principal amount of letter of credit obligations totaled $46.5 million, thereby further reducing available borrowing capacity on our ABL Facility to $226.7 million.

As of December 31, 2016, no loans were drawn under the ABL Facility and we had total availability of $333.0 million as a result of borrowing base limitations. As of December 31, 2016, the principal amount of letter of credit obligations totaled $106.0 million, thereby further reducing available borrowing capacity to $227.0 million.

**Letters of Credit**

We issued standby letters of credit with certain financial institutions in order to support business obligations including, but not limited to, workers compensation and environmental obligations. As of December 31, 2017 and 2016, these letter of credit obligations totaled $46.5 million and 106.0 million, respectively.

<div align="center">109</div>

Table of Contents

**NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS**

The following represents the assets and liabilities of the Company measured at fair value at  December 31, 2017 and 2016:

| Description | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | | Significant Other Observable Inputs (Level 2) | | Significant Unobservable Inputs (Level 3) | | Total | |
|---|---|---|---|---|---|---|---|---|
| | | | **December 31, 2017** | | (In Millions) | | | |
| Assets: | | | | | | | | |
| Cash equivalents | $ | 66.3 | $ | 550.6 | $ | — | $ | 616.9 |
| Derivative assets | | — | | — | | 39.4 | | 39.4 |
| Total | $ | 66.3 | $ | 550.6 | $ | 39.4 | $ | 656.3 |
| Liabilities: | | | | | | | | |
| Derivative liabilities | $ | — | $ | 0.3 | $ | 2.4 | $ | 2.7 |
| Total | $ | — | $ | 0.3 | $ | 2.4 | $ | 2.7 |

| Description | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | | Significant Other Observable Inputs (Level 2) | | Significant Unobservable Inputs (Level 3) | | Total | |
|---|---|---|---|---|---|---|---|---|
| | | | **December 31, 2016** | | (In Millions) | | | |
| Assets: | | | | | | | | |
| Cash equivalents | $ | 177.0 | $ | — | $ | — | $ | 177.0 |
| Derivative assets | | — | | 1.5 | | 31.6 | | 33.1 |
| Total | $ | 177.0 | $ | 1.5 | $ | 31.6 | $ | 210.1 |
| Liabilities: | | | | | | | | |
| Derivative liabilities | $ | — | $ | — | $ | 0.5 | $ | 0.5 |
| Total | $ | — | $ | — | $ | 0.5 | $ | 0.5 |

Financial assets classified in Level 1 as of  December 31, 2017, include money market funds and treasury bonds of  $66.3 million. Financial assets classified in Level 1 as of December 31, 2016, include money market funds of $177.0 million. The valuation of these instruments is based upon unadjusted quoted prices for identical assets in active markets.

The valuation of financial assets and liabilities classified in Level 2 is determined using a market approach based upon quoted prices for similar assets and liabilities in active markets, or other inputs that are observable. Level 2 assets included $550.6 million of commercial paper and certificates of deposit at December 31, 2017 and $1.5 million of commodity hedge contracts at  December 31, 2016. Level 2 liabilities included $0.3 million of commodity hedge contracts at December 31, 2017.

The Level 3 assets and liabilities include derivative assets that consist of freestanding derivative instruments related to certain supply agreements with one of our U.S. Iron Ore customers and derivative assets and liabilities related to certain provisional pricing arrangements with our U.S. Iron Ore and Asia Pacific Iron Ore customers.

The supply agreements included in our Level 3 assets include provisions for supplemental revenue or refunds based on the average annual daily market price for hot-rolled coil steel at the time the product is consumed in the customer's blast furnaces. We account for these provisions as derivative instruments at the time of sale and adjust these provisions to fair value as an adjustment to *Product revenues* each reporting period until the product is consumed and the amounts are settled. The fair value of the instruments are determined using a market approach based on the estimate of the average annual daily market price for hot-rolled coil steel. In the new contract that commenced in 2017,

110

Table of Contents

this supplemental revenue and refund data source changed from the customer's average annual steel price to an average annual daily market price for hot-rolled coil steel for one of our supply agreements. This estimate takes into consideration current market conditions and nonperformance risk. We had assets of $37.9 million and $21.3 million at December 31, 2017 and 2016, respectively, related to supply agreements.

The provisional pricing arrangements included in our Level 3 assets/liabilities specify provisional price calculations, where the pricing mechanisms generally are based on market pricing, with the final revenue rate to be based on market inputs at a specified point in time in the future, per the terms of the supply agreements. The difference between the estimated final revenue at the date of sale and the estimated final revenue rate at the measurement date is characterized as a derivative and is required to be accounted for separately once the revenue has been recognized. The derivative instrument is adjusted to fair value through *Product revenues* each reporting period based upon current market data and forward-looking estimates provided by management until the final revenue rate is determined. We had assets of $1.5 million and $10.3 million at December 31, 2017 and 2016, respectively, related to provisional pricing arrangements. In addition, we had liabilities of $2.4 million and $0.5 million related to provisional pricing arrangements at December 31, 2017 and 2016, respectively.

The following table illustrates information about quantitative inputs and assumptions for the derivative assets and derivative liabilities categorized in Level 3 of the fair value hierarchy:

### Qualitative/Quantitative Information About Level 3 Fair Value Measurements

| ($ in millions) | Fair Value at December 31, 2017 | | Balance Sheet Location | Valuation Technique | Unobservable Input | Range or Point Estimate (Weighted Average) |
|---|---|---|---|---|---|---|
| Customer Supply Agreement | $ | 37.9 | *Derivative assets* | Market Approach | Management's Estimate of Market Hot-Rolled Coil Steel per net ton | $655 |
| Provisional Pricing Arrangements | $ | 1.5 | *Derivative assets* | Market Approach | Management's Estimate of Platts 62% Price per dry metric ton | $72 - $74 ($72) |
| Provisional Pricing Arrangements | $ | 2.4 | *Other current liabilities* | Market Approach | Management's Estimate of Platts 62% Price per dry metric ton | $72 - $74 ($72) |

The significant unobservable input used in the fair value measurement of our customer supply agreement is an estimate determined by management including the forward-looking estimate for the average annual daily market price for hot-rolled coil steel.

The significant unobservable inputs used in the fair value measurement of our provisional pricing arrangements are management's estimates of Platts 62% Price based upon current market data and index pricing, of which includes forward-looking estimates determined by management.

111

We recognize any transfers between levels as of the beginning of the reporting period, including both transfers into and out of levels. There were no transfers between Level 1 and Level 2 and no transfers into or out of Level 3 of the fair value hierarchy during the years ended December 31, 2017 and 2016. The following tables represent a reconciliation of the changes in fair value of financial instruments measured at fair value on a recurring basis using significant unobservable inputs (Level 3) for the years ended December 31, 2017 and 2016:

| | (In Millions) | | | |
|---|---|---|---|---|
| | Derivative Assets (Level 3) | | Derivative Liabilities (Level 3) | |
| | Year Ended December 31, | | Year Ended December 31, | |
| | **2017** | 2016 | **2017** | 2016 |
| Beginning balance - January 1 | $ **31.6** | $ 7.8 | $ **(0.5)** | $ (3.4) |
| Total gains (losses) | | | | |
|   Included in earnings | **195.8** | 103.8 | **(91.1)** | (14.1) |
|   Settlements | **(188.0)** | (80.0) | **89.2** | 17.0 |
| Ending balance - December 31 | $ **39.4** | $ 31.6 | $ **(2.4)** | $ (0.5) |
| Total gains (losses) for the period included in earnings attributable to the change in unrealized gains (losses) on assets still held at the reporting date | $ **39.4** | $ 23.7 | $ **(2.4)** | $ (0.5) |

Gains and losses included in earnings are reported in *Product revenues* in the Statements of Consolidated Operations for the years ended December 31, 2017 and 2016.

The carrying amount for certain financial instruments (e.g. *Accounts receivable, net*, *Accounts payable* and *Accrued expenses*) approximate fair value and, therefore, has been excluded from the table below. A summary of the carrying amount and fair value of other financial instruments at December 31, 2017 and 2016 is as follows:

| | | (In Millions) | | | |
|---|---|---|---|---|---|
| | | December 31, 2017 | | December 31, 2016 | |
| | Classification | Carrying Value | Fair Value | Carrying Value | Fair Value |
| Long-term debt: | | | | | |
|   Secured Notes | | | | | |
|     $400 Million 4.875% 2024 Senior Notes | Level 1 | $ **390.3** | $ **398.0** | $ — | $ — |
|     $540 Million 8.25% 2020 First Lien Notes | Level 1 | **—** | **—** | 506.3 | 595.0 |
|     $218.5 Million 8.00% 2020 1.5 Lien Notes | Level 2 | **—** | **—** | 284.2 | 229.5 |
|     $544.2 Million 7.75% 2020 Second Lien Notes | Level 1 | **—** | **—** | 339.1 | 439.7 |
|   Unsecured Notes | | | | | |
|     $400 Million 5.90% 2020 Senior Notes | Level 1 | **88.6** | **88.0** | 224.5 | 219.6 |
|     $500 Million 4.80% 2020 Senior Notes | Level 1 | **122.0** | **118.8** | 235.9 | 221.1 |
|     $700 Million 4.875% 2021 Senior Notes | Level 1 | **138.0** | **130.8** | 308.2 | 283.1 |
|     $316.25 Million 1.50% 2025 Convertible Senior Notes | Level 1 | **224.1** | **352.9** | — | — |
|     $1.075 Billion 5.75% 2025 Senior Notes | Level 1 | **1,047.2** | **1,029.3** | — | — |
|     $800 Million 6.25% 2040 Senior Notes | Level 1 | **292.6** | **227.1** | 292.5 | 234.7 |
|   ABL Facility | Level 2 | **—** | **—** | — | — |
|   Fair Value Adjustment to Interest Rate Hedge | Level 2 | **1.4** | **1.4** | 1.9 | 1.9 |
|   Total long-term debt | | $ **2,304.2** | $ **2,346.3** | $ 2,192.6 | $ 2,224.6 |

112

A005374

Table of Contents

The fair value of long-term debt was determined using quoted market prices or discounted cash flows based upon current borrowing rates.

## NOTE 7 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS

We offer defined benefit pension plans, defined contribution pension plans and other postretirement benefit plans, primarily consisting of retiree healthcare benefits, to most employees in the U.S. as part of a total compensation and benefits program. The defined benefit pension plans largely are noncontributory and benefits generally are based on employees' years of service and average earnings for a defined period prior to retirement or a minimum formula. We do not have employee retirement benefit obligations at our Asia Pacific Iron Ore operations.

We offer retiree medical coverage to hourly retirees of our USW-represented mines. The 2015 USW agreement set fixed monthly medical premiums for participants who retired prior to January 1, 2015. These fixed premiums will expire on December 31, 2018 and revert to increasing premiums based a cost-sharing formula. The agreements also provide for an OPEB cap that limits the amount of contributions that we have to make toward retiree medical insurance coverage for each retiree and spouse of a retiree per calendar year who retired on or after January 1, 2015.  The amount of the annual OPEB cap is based upon the gross plan costs we incurred in 2014. The OPEB cap does not apply to surviving spouses.

The 2015 USW agreement also eliminates retiree medical coverage for USW-represented employees hired after September 1, 2016. In lieu of retiree medical coverage, USW-represented employees hired after September 1, 2016 will receive a 401(k) contribution of $0.50 per hour worked to a restricted Retiree Health Care Account.

In addition, we currently provide various levels of retirement health care and OPEB to some full-time employees who meet certain length of service and age requirements (a portion of which is pursuant to collective bargaining agreements). Most plans require retiree contributions and have deductibles, co-pay requirements and benefit limits. Most bargaining unit plans require retiree contributions and co-pays for major medical and prescription drug coverage. There is a cap on our cost for medical coverage under the salaried plans. The annual limit applies to each covered participant and equals $7,000 for coverage prior to age 65, with the retiree's participation adjusted based on the age at which the retiree's benefits commence. Beginning in 2015, we changed the delivery of the post-65 salaried retiree medical benefit program, including salaried retirees from our Northshore operation, from an employer sponsored plan to the combination of an employer subsidy plan and an individual supplemental Medicare insurance plan purchased through a Medicare exchange. This allows the program to take full advantage of available government subsidies and more efficient pricing in the Medicare market. For participants at our Northshore operation, the annual limit ranges from $4,020 to $4,500 for coverage prior to age 65. Covered participants pay an amount for coverage equal to the excess of (i) the average cost of coverage for all covered participants, over (ii) the participant's individual limit, but in no event will the participant's cost be less than 15.0% of the average cost of coverage for all covered participants. For Northshore participants, the minimum participant cost is a fixed dollar amount. We do not provide OPEB for most salaried employees hired after January 1, 1993. Retiree healthcare coverage is provided through programs administered by insurance companies whose charges are based on benefits paid.

The Pinnacle and Oak Grove mines were sold in December 2015, and the liabilities representing vested salaried pension benefits at the time of the sale remained with Cliffs. The sale triggered a curtailment event for the Salaried Pension Plan. Liabilities for other postretirement benefits were transferred as part of the sale, and associated adjustments were made to the *Accumulated other comprehensive loss* balances as they pertained to Pinnacle and Oak Grove participants in the Hourly OPEB plan. Accordingly, all amounts shown below include retained obligations of vested employees of the North American Coal mines.  Further, all disclosures presented include the annual expense, contributions and obligations associated with the retained vested benefits of these participants.

The following table summarizes the annual expense (income) recognized related to the retirement plans for  2017, 2016 and 2015:

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| | **2017** | | 2016 | | 2015 | |
| Defined benefit pension plans | $ | **18.0** | $ | 16.5 | $ | 23.9 |
| Defined contribution pension plans | | **2.9** | | 2.8 | | 3.6 |
| Other postretirement benefits | | **(6.1)** | | (4.0) | | 4.4 |
| Total | $ | **14.8** | $ | 15.3 | $ | 31.9 |

113

**Obligations and Funded Status**

The following tables and information provide additional disclosures for the years ending December 31, 2017 and  2016:

| | | | | (In Millions) | | | |
|---|---|---|---|---|---|---|---|
| | Pension Benefits | | | | Other Benefits | | |
| **Change in benefit obligations:** | **2017** | | 2016 | | **2017** | | 2016 |
| Benefit obligations — beginning of year | $ | **931.6** | $ | 910.8 | $ | **264.6** | $ | 266.0 |
| Service cost (excluding expenses) | | **17.1** | | 17.6 | | **1.8** | | 1.7 |
| Interest cost | | **30.5** | | 30.3 | | **8.3** | | 9.1 |
| Plan amendments | | **—** | | 5.7 | | **—** | | 9.8 |
| Actuarial (gain) loss | | **54.6** | | 38.1 | | **7.4** | | (7.2) |
| Benefits paid | | **(60.7)** | | (70.9) | | **(21.4)** | | (21.3) |
| Participant contributions | | **—** | | — | | **4.6** | | 6.0 |
| Federal subsidy on benefits paid | | **—** | | — | | **0.6** | | 0.5 |
| Benefit obligations — end of year | $ | **973.1** | $ | 931.6 | $ | **265.9** | $ | 264.6 |
| | | | | | | | |
| **Change in plan assets:** | | | | | | | |
| Fair value of plan assets — beginning of year | $ | **685.8** | $ | 700.6 | $ | **253.0** | $ | 250.6 |
| Actual return on plan assets | | **100.2** | | 54.8 | | **24.2** | | 16.0 |
| Participant contributions | | **—** | | — | | **0.3** | | 0.5 |
| Employer contributions | | **24.4** | | 1.2 | | **1.7** | | 1.7 |
| Asset transfers | | **0.1** | | 0.1 | | **—** | | — |
| Benefits paid | | **(60.7)** | | (70.9) | | **(16.7)** | | (15.8) |
| Fair value of plan assets — end of year | $ | **749.8** | $ | 685.8 | $ | **262.5** | $ | 253.0 |
| | | | | | | | |
| **Funded status at December 31:** | | | | | | | |
| Fair value of plan assets | $ | **749.8** | $ | 685.8 | $ | **262.5** | $ | 253.0 |
| Benefit obligations | | **(973.1)** | | (931.6) | | **(265.9)** | | (264.6) |
| Amount recognized at December 31 | $ | **(223.3)** | $ | (245.8) | $ | **(3.4)** | $ | (11.6) |
| | | | | | | | |
| **Amounts recognized in Statements of Financial Position:** | | | | | | | |
| Noncurrent assets | $ | **—** | $ | — | $ | **35.4** | $ | 27.3 |
| Current liabilities | | **(0.5)** | | (0.1) | | **(3.9)** | | (4.1) |
| Noncurrent liabilities | | **(222.8)** | | (245.7) | | **(34.9)** | | (34.8) |
| Total amount recognized | $ | **(223.3)** | $ | (245.8) | $ | **(3.4)** | $ | (11.6) |
| | | | | | | | |
| **Amounts recognized in accumulated other comprehensive loss:** | | | | | | | |
| Net actuarial loss | $ | **318.7** | $ | 315.9 | $ | **88.3** | $ | 87.0 |
| Prior service cost (credit) | | **8.8** | | 11.0 | | **(25.6)** | | (26.9) |
| Net amount recognized | $ | **327.5** | $ | 326.9 | $ | **62.7** | $ | 60.1 |
| | | | | | | | |
| **The estimated amounts that will be amortized from accumulated other comprehensive loss into net periodic benefit cost in 2018:** | | | | | | | |
| Net actuarial loss | $ | **21.1** | | | $ | **4.9** | | |
| Prior service cost (credit) | | **2.2** | | | | **(3.0)** | | |
| Net amount recognized | $ | **23.3** | | | $ | **1.9** | | |

114

| | (In Millions) | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | **2017** | | | | | | | |
| | **Pension Plans** | | | | | **Other Benefits** | | |
| | **Salaried** | **Hourly** | **Mining** | **SERP** | **Total** | **Salaried** | **Hourly** | **Total** |
| Fair value of plan assets | $ 269.4 | $ 473.0 | $ 7.4 | $ — | $ 749.8 | $ — | $ 262.5 | $ 262.5 |
| Benefit obligation | (368.0) | (590.0) | (10.3) | (4.8) | (973.1) | (37.7) | (228.2) | (265.9) |
| Funded status | $ (98.6) | $ (117.0) | $ (2.9) | $ (4.8) | $ (223.3) | $ (37.7) | $ 34.3 | $ (3.4) |

| | 2016 | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Pension Plans | | | | | Other Benefits | | |
| | Salaried | Hourly | Mining | SERP | Total | Salaried | Hourly | Total |
| Fair value of plan assets | $ 242.9 | $ 436.9 | $ 6.0 | $ — | $ 685.8 | $ — | $ 253.0 | $ 253.0 |
| Benefit obligation | (351.9) | (565.6) | (10.0) | (4.1) | (931.6) | (37.6) | (227.0) | (264.6) |
| Funded status | $ (109.0) | $ (128.7) | $ (4.0) | $ (4.1) | $ (245.8) | $ (37.6) | $ 26.0 | $ (11.6) |

The accumulated benefit obligation for all defined benefit pension plans was $963.0 million and $922.0 million at December 31, 2017 and 2016, respectively. The increase in the accumulated benefit obligation primarily is a result of a decrease in the discount rates.

**Components of Net Periodic Benefit Cost**

| | (In Millions) | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **Pension Benefits** | | | **Other Benefits** | | |
| | **2017** | 2016 | 2015 | **2017** | 2016 | 2015 |
| Service cost | $ 17.1 | $ 17.6 | $ 22.7 | $ 1.8 | $ 1.7 | $ 6.4 |
| Interest cost | 30.5 | 30.3 | 37.7 | 8.3 | 9.1 | 13.4 |
| Expected return on plan assets | (54.5) | (54.7) | (59.8) | (17.7) | (17.1) | (18.3) |
| Amortization: | | | | | | |
|     Prior service costs (credits) | 2.6 | 2.2 | 2.3 | (3.0) | (3.7) | (3.7) |
|     Net actuarial loss | 22.3 | 21.1 | 20.8 | 4.5 | 6.0 | 6.6 |
| Curtailments and settlements | — | — | 0.2 | — | — | — |
| Net periodic benefit cost (credit) | $ 18.0 | $ 16.5 | $ 23.9 | $ (6.1) | $ (4.0) | $ 4.4 |
| Curtailment effects | — | — | (1.2) | — | — | — |
| Current year actuarial loss (gain) | 9.3 | 37.8 | (0.7) | 1.2 | (8.1) | 0.2 |
| Amortization of net loss | (22.3) | (21.1) | (21.0) | (4.5) | (6.0) | (6.6) |
| Current year prior service cost | — | 5.7 | — | — | 9.8 | — |
| Amortization of prior service credit (cost) | (2.6) | (2.2) | (2.3) | 3.0 | 3.7 | 3.7 |
| Total recognized in other comprehensive income (loss) | $ (15.6) | $ 20.2 | $ (25.2) | $ (0.3) | $ (0.6) | $ (2.7) |
| Total recognized in net periodic cost and other comprehensive income (loss) | $ 2.4 | $ 36.7 | $ (1.3) | $ (6.4) | $ (4.6) | $ 1.7 |

**Assumptions**

The discount rate for determining PBO is determined individually for each plan as noted in the assumption chart below. The discount rates are determined by matching the projected cash flows used to determine the PBO and APBO to a projected yield curve of 623 Aa graded bonds in the 40th to 90th percentiles. These bonds are either noncallable or callable with make-whole provisions. The decreases in discount rates due to market conditions resulted in increases of $46.1 million and $12.6 million for the pension and other postretirement benefit plans, respectively, to the plans PBO.

115

A005377

Table of Contents

Effective January 1, 2016, we changed the approach used to calculate the service and interest components of net periodic benefit cost. Previously, we calculated the service and interest components utilizing a single weighted-average discount rate derived from the yield curve used to measure the PBO. We have elected an alternative approach that utilizes a full yield curve approach in the estimation of these components by applying the specific spot rates along the yield curve used in the determination of the benefit obligation to their underlying projected cash flows. The change resulted in a decrease to our net periodic benefit cost of $8.2 million and $1.8 million for our pension plans and OPEB plans, respectively for the year ended December 31, 2016.

On December 31, 2017, the assumed mortality improvement projection was changed from generational scale MP-2016 to generational scale MP-2017. The healthy mortality assumption remains the RP-2014 mortality tables with blue collar adjustments for the Iron Hourly and Hourly PRW plans, with white collar adjustments for the SERP and Salaried PRW Plan, and without collar adjustments for the Salaried and Ore Mining. The adoption of the new projection scale resulted in decreases to our PBO totaling $6.1 million or 0.6% for the pension plans and $1.9 million or 0.7% for the OPEB plans.

On December 31, 2016, the assumed mortality improvement projection was changed from generational scale MP-2015 to generational scale MP-2016. The healthy mortality assumption remains the RP-2014 mortality tables with blue collar adjustments for the Iron Hourly and Hourly PRW plans, with white collar adjustments for the SERP and Salaried PRW Plan, and without collar adjustments for the Salaried and Ore Mining. The adoption of the new projection scale resulted in decreases to our PBO totaling $13.1 million or 1.4% for the pension plans and $4.9 million or 1.8% for the OPEB plans.

Weighted-average assumptions used to determine benefit obligations at December 31 were:

| | Pension Benefits | | | | Other Benefits | | | |
|---|---|---|---|---|---|---|---|---|
| | 2017 | | 2016 | | 2017 | | 2016 | |
| Discount rate | | | | | | | | |
| Iron Hourly Pension Plan | 3.60 | % | 4.02 | % | N/A | % | N/A | % |
| Salaried Pension Plan | 3.52 | | 3.92 | | N/A | | N/A | |
| Ore Mining Pension Plan | 3.61 | | 4.04 | | N/A | | N/A | |
| SERP | 3.50 | | 3.90 | | N/A | | N/A | |
| Hourly OPEB Plan | N/A | | N/A | | 3.60 | | 4.02 | |
| Salaried OPEB Plan | N/A | | N/A | | 3.57 | | 3.99 | |
| Salaried rate of compensation increase | 3.00 | | 3.00 | | 3.00 | | 3.00 | |
| Hourly rate of compensation increase | 2.00 | | 2.00 | | N/A | | N/A | |

116

A005378

Table of Contents

Weighted-average assumptions used to determine net benefit cost for the years  2017, 2016 and 2015 were:

| | Pension Benefits | | | Other Benefits | | |
|---|---|---|---|---|---|---|
| | **2017** | 2016 | 2015 | **2017** | 2016 | 2015 |
| Obligation Discount Rate | | | | | | |
| Iron Hourly Pension Plan | **4.02 %** | 4.27 % | 3.83 % | **N/A %** | N/A % | N/A % |
| Salaried Pension Plan | **3.91** | 4.13 | 3.83 | **N/A** | N/A | N/A |
| Ore Mining Pension Plan | **4.04** | 4.28 | 3.83 | **N/A** | N/A | N/A |
| SERP | **3.90** | 4.01 | 3.83 | **N/A** | N/A | N/A |
| Hourly OPEB Plan | **N/A** | N/A | N/A | **4.03** | 4.32 | 3.83 |
| Salaried OPEB Plan | **N/A** | N/A | N/A | **3.98** | 4.22 | 3.83 |
| Service Cost Discount Rate | | | | | | |
| Iron Hourly Pension Plan | **4.30** | 4.66 | 3.83 | **N/A** | N/A | N/A |
| Salaried Pension Plan | **3.93** | 4.14 | 3.83 | **N/A** | N/A | N/A |
| Ore Mining Pension Plan | **4.27** | 4.60 | 3.83 | **N/A** | N/A | N/A |
| SERP | **3.69** | 3.87 | 3.83 | **N/A** | N/A | N/A |
| Hourly OPEB Plan | **N/A** | N/A | N/A | **4.23** | 4.56 | 3.83 |
| Salaried OPEB Plan | **N/A** | N/A | N/A | **4.30** | 4.63 | 3.83 |
| Interest Cost Discount Rate | | | | | | |
| Iron Hourly Pension Plan | **3.38** | 3.46 | 3.83 | **N/A** | N/A | N/A |
| Salaried Pension Plan | **3.21** | 3.21 | 3.83 | **N/A** | N/A | N/A |
| Ore Mining Pension Plan | **3.41** | 3.48 | 3.83 | **N/A** | N/A | N/A |
| SERP | **3.36** | 3.30 | 3.83 | **N/A** | N/A | N/A |
| Hourly OPEB Plan | **N/A** | N/A | N/A | **3.24** | 3.48 | 3.83 |
| Salaried OPEB Plan | **N/A** | N/A | N/A | **3.28** | 3.31 | 3.83 |
| | | | | | | |
| Expected return on plan assets | **8.25** | 8.25 | 8.25 | **7.00** | 7.00 | 7.00 |
| Salaried rate of compensation increase | **3.00** | 3.00 | 3.00 | **3.00** | 3.00 | 3.00 |
| Hourly rate of compensation increase | **2.00** | 2.00 | 2.50 | **N/A** | N/A | N/A |

Assumed health care cost trend rates at December 31 were:

| | **2017** | 2016 |
|---|---|---|
| Health care cost trend rate assumed for next year | **7.00 %** | 6.50 % |
| Ultimate health care cost trend rate | **5.00** | 5.00 |
| Year that the ultimate rate is reached | **2026** | 2023 |

Assumed health care cost trend rates have a significant effect on the amounts reported for the health care plans. A change of one percentage point in assumed health care cost trend rates would have the following effects:

| | (In Millions) | |
|---|---|---|
| | Increase | Decrease |
| Effect on total of service and interest cost | $    1.0 | $    (0.8) |
| Effect on postretirement benefit obligation | 21.2 | (17.6) |

**Plan Assets**

Our financial objectives with respect to our pension and VEBA plan assets are to fully fund the actuarial accrued liability for each of the plans, to maximize investment returns within reasonable and prudent levels of risk, and to maintain sufficient liquidity to meet benefit obligations on a timely basis.

117

Our investment objective is to outperform the expected ROA assumption used in the plans' actuarial reports over the life of the plans. The expected ROA takes into account historical returns and estimated future long-term returns based on capital market assumptions applied to the asset allocation strategy. The expected return is net of investment expenses paid by the plans. In addition, investment performance is monitored on a quarterly basis by benchmarking to various indices and metrics for the one-, three- and five-year periods.

The asset allocation strategy is determined through a detailed analysis of assets and liabilities by plan, which defines the overall risk that is acceptable with regard to the expected level and variability of portfolio returns, surplus (assets compared to liabilities), contributions and pension expense.

The asset allocation review process involves simulating capital market behaviors including global asset class performance, inflation and interest rates in order to evaluate various asset allocation scenarios and determine the asset mix with the highest likelihood of meeting financial objectives. The process includes factoring in the current funded status and likely future funded status levels of the plans by taking into account expected growth or decline in the contributions over time.

The asset allocation strategy varies by plan. The following table reflects the actual asset allocations for pension and VEBA plan assets as of December 31, 2017 and 2016, as well as the 2018 weighted average target asset allocations. Equity investments include securities in large-cap, mid-cap and small-cap companies located in the U.S. and worldwide. Fixed income investments primarily include corporate bonds and government debt securities. Alternative investments include hedge funds, private equity, structured credit and real estate.

| | Pension Assets | | | VEBA Assets | | |
|---|---|---|---|---|---|---|
| | 2018 Target Allocation | Percentage of Plan Assets at December 31, | | 2018 Target Allocation | Percentage of Plan Assets at December 31, | |
| Asset Category | | 2017 | 2016 | | 2017 | 2016 |
| Equity securities | 45.0% | 43.6% | 43.2% | 8.0% | 8.7% | 8.4% |
| Fixed income | 28.0% | 27.0% | 26.4% | 80.0% | 77.7% | 78.3% |
| Hedge funds | 5.0% | 5.0% | 5.9% | 4.0% | 4.4% | 4.4% |
| Private equity | 7.0% | 5.3% | 5.3% | 3.0% | 1.5% | 1.7% |
| Structured credit | 7.5% | 9.7% | 9.3% | 2.0% | 3.0% | 2.7% |
| Real estate | 7.5% | 8.7% | 9.0% | 3.0% | 4.6% | 4.4% |
| Cash | —% | 0.7% | 0.9% | —% | 0.1% | 0.1% |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

A005380

*Pension*

The fair values of our pension plan assets at December 31, 2017 and 2016 by asset category are as follows:

| | (In Millions) | | | |
|---|---|---|---|---|
| | December 31, 2017 | | | |
| Asset Category | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| Equity securities: | | | | |
| U.S. large-cap | $ 130.1 | $ — | $ — | $ 130.1 |
| U.S. small/mid-cap | 35.5 | — | — | 35.5 |
| International | 160.9 | — | — | 160.9 |
| Fixed income | 173.6 | 28.8 | — | 202.4 |
| Hedge funds | — | — | 37.4 | 37.4 |
| Private equity | — | — | 39.8 | 39.8 |
| Structured credit | — | — | 72.9 | 72.9 |
| Real estate | — | — | 65.5 | 65.5 |
| Cash | 5.3 | — | — | 5.3 |
| Total | $ 505.4 | $ 28.8 | $ 215.6 | $ 749.8 |

| | (In Millions) | | | |
|---|---|---|---|---|
| | December 31, 2016 | | | |
| Asset Category | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| Equity securities: | | | | |
| U.S. large-cap | $ 144.7 | $ — | $ — | $ 144.7 |
| U.S. small/mid-cap | 39.9 | — | — | 39.9 |
| International | 111.8 | — | — | 111.8 |
| Fixed income | 157.5 | 23.7 | — | 181.2 |
| Hedge funds | — | — | 40.6 | 40.6 |
| Private equity | — | — | 36.1 | 36.1 |
| Structured credit | — | — | 63.8 | 63.8 |
| Real estate | — | — | 61.9 | 61.9 |
| Cash | 5.8 | — | — | 5.8 |
| Total | $ 459.7 | $ 23.7 | $ 202.4 | $ 685.8 |

Following is a description of the inputs and valuation methodologies used to measure the fair value of our plan assets.

*Equity Securities*

Equity securities classified as Level 1 investments include U.S. large-, small- and mid-cap investments and international equity. These investments are comprised of securities listed on an exchange, market or automated quotation system for which quotations are readily available. The valuation of these securities is determined using a market approach, and is based upon unadjusted quoted prices for identical assets in active markets.

119

A005381

Table of Contents

*Fixed Income*

Fixed income securities classified as Level 1 investments include bonds and government debt securities. These investments are comprised of securities listed on an exchange, market or automated quotation system for which quotations are readily available. The valuation of these securities is determined using a market approach, and is based upon unadjusted quoted prices for identical assets in active markets. Also included in Fixed Income is a portfolio of U.S. Treasury STRIPS, which are zero-coupon bearing fixed income securities backed by the full faith and credit of the U.S. government. The securities sell at a discount to par because there are no incremental coupon payments. STRIPS are not issued directly by the Treasury, but rather are created by a financial institution, government securities broker or government securities dealer. Liquidity on the issue varies depending on various market conditions; however, in general the STRIPS market is slightly less liquid than that of the U.S. Treasury Bond market. The STRIPS are priced daily through a bond pricing vendor and are classified as Level 2.

*Hedge Funds*

Hedge funds are alternative investments comprised of direct or indirect investment in offshore hedge funds with an investment objective to achieve equity-like returns with one half the volatility of equities and moderate correlation. The valuation techniques used to measure fair value attempt to maximize the use of observable inputs and minimize the use of unobservable inputs. Considerable judgment is required to interpret the factors used to develop estimates of fair value. Valuations of the underlying investment funds are obtained and reviewed. The securities that are valued by the funds are interests in the investment funds and not the underlying holdings of such investment funds. Thus, the inputs used to value the investments in each of the underlying funds may differ from the inputs used to value the underlying holdings of such funds.

In determining the fair value of a security, the fund managers may consider any information that is deemed relevant, which may include one or more of the following factors regarding the portfolio security, if appropriate: type of security or asset; cost at the date of purchase; size of holding; last trade price; most recent valuation; fundamental analytical data relating to the investment in the security; nature and duration of any restriction on the disposition of the security; evaluation of the factors that influence the market in which the security is purchased or sold; financial statements of the issuer; discount from market value of unrestricted securities of the same class at the time of purchase; special reports prepared by analysts; information as to any transactions or offers with respect to the security; existence of merger proposals or tender offers affecting the security; price and extent of public trading in similar securities of the issuer or compatible companies and other relevant matters; changes in interest rates; observations from financial institutions; domestic or foreign government actions or pronouncements; other recent events; existence of shelf registration for restricted securities; existence of any undertaking to register the security; and other acceptable methods of valuing portfolio securities.

*Private Equity Funds*

Private equity funds are alternative investments that represent direct or indirect investments in partnerships, venture funds or a diversified pool of private investment vehicles (fund of funds).

Investment commitments are made in private equity funds based on an asset allocation strategy, and capital calls are made over the life of the funds to fund the commitments. As of December 31, 2017, remaining commitments total $52.7 million for both our pension and other benefits. Committed amounts are funded from plan assets when capital calls are made. Investment commitments are not pre-funded in reserve accounts.

The valuation of investments in private equity funds initially is performed by the underlying fund managers. In determining the fair value, the fund managers may consider any information that is deemed relevant, which may include: type of security or asset; cost at the date of purchase; size of holding; last trade price; most recent valuation; fundamental analytical data relating to the investment in the security; nature and duration of any restriction on the disposition of the security; evaluation of the factors that influence the market in which the security is purchased or sold; financial statements of the issuer; discount from market value of unrestricted securities of the same class at the time of purchase; special reports prepared by analysts; information as to any transactions or offers with respect to the security; existence of merger proposals or tender offers affecting the security; price and extent of public trading in similar securities of the issuer or compatible companies and other relevant matters; changes in interest rates; observations from financial institutions; domestic or foreign government actions or pronouncements; other recent events; existence of shelf registration for restricted securities; existence of any undertaking to register the security; and other acceptable methods of valuing portfolio securities.

Table of Contents

The valuations are obtained from the underlying fund managers, and the valuation methodology and process is reviewed for consistent application and adherence to policies. Considerable judgment is required to interpret the factors used to develop estimates of fair value.

Private equity investments are valued quarterly and recorded on a one-quarter lag. For alternative investment values reported on a lag, current market information is reviewed for any material changes in values at the reporting date. Capital distributions for the funds do not occur on a regular frequency. Liquidation of these investments would require sale of the partnership interest.

*Structured Credit*

Structured credit investments are alternative investments comprised of collateralized debt obligations and other structured credit investments that are priced based on valuations provided by independent, third-party pricing agents, if available. Such values generally reflect the last reported sales price if the security is actively traded. The third-party pricing agents may also value structured credit investments at an evaluated bid price by employing methodologies that utilize actual market transactions, broker-supplied valuations, or other methodologies designed to identify the market value of such securities. Such methodologies generally consider such factors as security prices, yields, maturities, call features, ratings and developments relating to specific securities in arriving at valuations. Securities listed on a securities exchange, market or automated quotation system for which quotations are readily available are valued at the last quoted sale price on the primary exchange or market on which they are traded. Debt obligations with remaining maturities of 60 days or less may be valued at amortized cost, which approximates fair value.

Structured credit investments are valued monthly and recorded on a one-month lag. For alternative investment values reported on a lag, current market information is reviewed for any material changes in values at the reporting date. Historically, redemption requests have been considered quarterly, subject to notice of 90 days, although the advisor is currently only requiring notice of 65 days.

*Real Estate*

The real estate portfolio for the pension plans is an alternative investment primarily comprised of two funds with strategic categories of real estate investments. All real estate holdings are appraised externally at least annually, and appraisals are conducted by reputable, independent appraisal firms that are members of the Appraisal Institute. All external appraisals are performed in accordance with the Uniform Standards of Professional Appraisal Practices. The property valuations and assumptions about each property are reviewed quarterly by the investment advisor and values are adjusted if there has been a significant change in circumstances relating to the property since the last external appraisal. The valuation methodology utilized in determining the fair value is consistent with the best practices prevailing within the real estate appraisal and real estate investment management industries, including the Real Estate Information Standards, and standards promulgated by the National Council of Real Estate Investment Fiduciaries, the National Association of Real Estate Investment Fiduciaries, and the National Association of Real Estate Managers. In addition, the investment advisor may cause additional appraisals to be performed. One of the fund's fair value is updated monthly, and there is no lag in reported value. Redemption requests are considered on a quarterly basis, subject to notice of 45 days.

The real estate fund of funds investment for the Empire, Tilden, Hibbing and United Taconite VEBA plans invests in pooled investment vehicles that in turn invest in commercial real estate properties. Valuations are performed quarterly and financial statements are prepared on a semi-annual basis, with annual audited statements. Asset values for this fund are reported with a one-quarter lag and current market information is reviewed for any material changes in values at the reporting date. In most cases, values are based on valuations reported by underlying fund managers or other independent third-party sources, but the fund has discretion to use other valuation methods, subject to compliance with ERISA. Valuations are typically estimates and subject to upward or downward revision based on each underlying fund's annual audit. Withdrawals are permitted on the last business day of each quarter subject to a 65-day prior written notice.

The following represents the effect of fair value measurements using significant unobservable inputs (Level 3) on changes in plan assets for the years ended December 31, 2017 and 2016:

| | (In Millions) | | | | |
| | Year Ended December 31, 2017 | | | | |
| | Hedge Funds | Private Equity Funds | Structured Credit Fund | Real Estate | Total |
|---|---|---|---|---|---|
| Beginning balance — January 1, 2017 | $ 40.6 | $ 36.1 | $ 63.8 | $ 61.9 | $ 202.4 |
| Actual return on plan assets: | | | | | |
| Relating to assets still held at the reporting date | 2.5 | 0.3 | 9.1 | 4.2 | 16.1 |
| Relating to assets sold during the period | 0.4 | 4.5 | — | (0.1) | 4.8 |
| Purchases | 39.0 | 4.5 | — | 14.4 | 57.9 |
| Sales | (45.1) | (5.6) | — | (14.9) | (65.6) |
| Ending balance — December 31, 2017 | $ 37.4 | $ 39.8 | $ 72.9 | $ 65.5 | $ 215.6 |

| | (In Millions) | | | | |
| | Year Ended December 31, 2016 | | | | |
| | Hedge Funds | Private Equity Funds | Structured Credit Fund | Real Estate | Total |
|---|---|---|---|---|---|
| Beginning balance — January 1, 2016 | $ 40.7 | $ 33.1 | $ 62.1 | $ 57.5 | $ 193.4 |
| Actual return on plan assets: | | | | | |
| Relating to assets still held at the reporting date | (0.1) | (2.7) | 10.0 | 5.1 | 12.3 |
| Relating to assets sold during the period | — | 3.7 | (0.3) | (0.1) | 3.3 |
| Purchases | — | 8.0 | — | — | 8.0 |
| Sales | — | (6.0) | (8.0) | (0.6) | (14.6) |
| Ending balance — December 31, 2016 | $ 40.6 | $ 36.1 | $ 63.8 | $ 61.9 | $ 202.4 |

*VEBA*

Assets for other benefits include VEBA trusts pursuant to bargaining agreements that are available to fund retired employees' life insurance obligations and medical benefits. The fair value of our other benefit plan assets at December 31, 2017 and 2016 by asset category are as follows:

| | (In Millions) | | | |
| | December 31, 2017 | | | |
| Asset Category | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
|---|---|---|---|---|
| Equity securities: | | | | |
| U.S. large-cap | $ 11.4 | $ — | $ — | $ 11.4 |
| U.S. small/mid-cap | 2.8 | — | — | 2.8 |
| International | 8.8 | — | — | 8.8 |
| Fixed income | 164.1 | 40.0 | — | 204.1 |
| Hedge funds | — | — | 11.4 | 11.4 |
| Private equity | — | — | 3.9 | 3.9 |
| Structured credit | — | — | 7.9 | 7.9 |
| Real estate | — | — | 12.0 | 12.0 |
| Cash | 0.2 | — | — | 0.2 |
| Total | $ 187.3 | $ 40.0 | $ 35.2 | $ 262.5 |

122

A005384

Table of Contents

(In Millions)

December 31, 2016

| Asset Category | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | | Significant Other Observable Inputs (Level 2) | | Significant Unobservable Inputs (Level 3) | | Total | |
|---|---|---|---|---|---|---|---|---|
| Equity securities: | | | | | | | | |
| U.S. large-cap | $ | 10.6 | $ | — | $ | — | $ | 10.6 |
| U.S. small/mid-cap | | 2.7 | | — | | — | | 2.7 |
| International | | 8.1 | | — | | — | | 8.1 |
| Fixed income | | 162.0 | | 35.9 | | — | | 197.9 |
| Hedge funds | | — | | — | | 11.2 | | 11.2 |
| Private equity | | — | | — | | 4.3 | | 4.3 |
| Structured credit | | — | | — | | 6.9 | | 6.9 |
| Real estate | | — | | — | | 11.1 | | 11.1 |
| Cash | | 0.2 | | — | | — | | 0.2 |
| Total | $ | 183.6 | $ | 35.9 | $ | 33.5 | $ | 253.0 |

Refer to the pension asset discussion above for further information regarding the inputs and valuation methodologies used to measure the fair value of each respective category of plan assets.

The following represents the effect of fair value measurements using significant unobservable inputs (Level 3) on changes in plan assets for the year ended December 31, 2017 and 2016:

(In Millions)

Year Ended December 31, 2017

| | Hedge Funds | | Private Equity Funds | | Structured Credit Fund | | Real Estate | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Beginning balance — January 1, 2017 | $ | 11.2 | $ | 4.3 | $ | 6.9 | $ | 11.1 | $ | 33.5 |
| Actual return on plan assets: | | | | | | | | | | |
| Relating to assets still held at the reporting date | | 0.8 | | 0.9 | | 2.0 | | 3.4 | | 7.1 |
| Relating to assets sold during the period | | — | | (0.4) | | (1.0) | | (2.5) | | (3.9) |
| Purchases | | 17.1 | | 1.8 | | 2.1 | | 3.0 | | 24.0 |
| Sales | | (17.7) | | (2.7) | | (2.1) | | (3.0) | | (25.5) |
| Ending balance — December 31, 2017 | $ | 11.4 | $ | 3.9 | $ | 7.9 | $ | 12.0 | $ | 35.2 |

(In Millions)

Year Ended December 31, 2016

| | Hedge Funds | | Private Equity Funds | | Structured Credit Fund | | Real Estate | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Beginning balance — January 1, 2016 | $ | 11.2 | $ | 5.5 | $ | 5.8 | $ | 10.0 | $ | 32.5 |
| Actual return on plan assets: | | | | | | | | | | |
| Relating to assets still held at the reporting date | | — | | (0.3) | | 1.1 | | 1.1 | | 1.9 |
| Relating to assets sold during the period | | — | | 0.1 | | — | | — | | 0.1 |
| Purchases | | — | | — | | — | | — | | — |
| Sales | | — | | (1.0) | | — | | — | | (1.0) |
| Ending balance — December 31, 2016 | $ | 11.2 | $ | 4.3 | $ | 6.9 | $ | 11.1 | $ | 33.5 |

123

A005385

**Contributions**

Annual contributions to the pension plans are made within income tax deductibility restrictions in accordance with statutory regulations. In the event of plan termination, the plan sponsors could be required to fund additional shutdown and early retirement obligations that are not included in the pension obligations. Costs for early termination for pensions and other benefits are estimated to be $22.5 million and $0.8 million, respectively. The Company currently has no intention to shutdown, terminate or withdraw from any of its employee benefit plans.

| | | (In Millions) | | |
| | | Other Benefits | | |
| Company Contributions | Pension Benefits | VEBA | Direct Payments | Total |
|---|---|---|---|---|
| 2016 | $ 1.2 | $ — | $ 1.1 | $ 1.1 |
| 2017 | 24.4 | — | 2.1 | 2.1 |
| 2018 (Expected)[1] | 27.8 | — | 4.0 | 4.0 |

[1] Pursuant to the bargaining agreement, benefits can be paid from VEBA trusts that are at least 70% funded (all VEBA trusts are over 70% funded at December 31, 2017). Funding obligations have been suspended as Hibbing's, UTAC's, Tilden's and Empire's share of the value of their respective trust assets have reached 90% of their obligation.

VEBA plans are not subject to minimum regulatory funding requirements. Amounts contributed are pursuant to bargaining agreements.

Contributions by participants to the other benefit plans were $4.6 million for the year ended December 31, 2017 and $6.0 million for the year ended December 31, 2016.

**Estimated Cost for 2018**

For 2018, we estimate net periodic benefit cost as follows:

| | (In Millions) |
|---|---|
| Defined benefit pension plans | $ 12.3 |
| Other postretirement benefits | (6.2) |
| Total | $ 6.1 |

**Estimated Future Benefit Payments**

| | | (In Millions) | | |
| | | Other Benefits | | |
| | Pension Benefits | Gross Company Benefits | Less Medicare Subsidy | Net Benefit Payments |
|---|---|---|---|---|
| 2018 | $ 69.6 | $ 18.9 | $ (0.7) | $ 18.2 |
| 2019 | 66.7 | 18.0 | (0.8) | 17.2 |
| 2020 | 66.0 | 17.4 | (0.9) | 16.5 |
| 2021 | 65.1 | 16.9 | (1.0) | 15.9 |
| 2022 | 65.2 | 16.7 | (1.1) | 15.6 |
| 2023-2027 | 310.5 | 81.5 | (6.6) | 74.9 |

124

A005386

Table of Contents

## NOTE 8 - STOCK COMPENSATION PLANS

At December 31, 2017, we have outstanding awards under two share-based compensation plans, which are described below. The compensation cost that has been charged against income for those plans was $18.7 million, $14.2 million and $13.9 million in 2017, 2016 and 2015, respectively, which primarily was recorded in *Selling, general and administrative expenses* in the Statements of Consolidated Operations. There was no income tax benefit recognized for the years ended December 31, 2017, 2016 and 2015, due to the full valuation allowance.

**Employees' Plans**

The Amended 2015 Equity Plan was approved by our Board of Directors on February 21, 2017 and by our shareholders on April 25, 2017. The Amended 2015 Equity Plan increased the maximum number of shares that may be issued by 15.0 million common shares. The 2015 Equity Plan was approved by our Board of Directors on March 26, 2015 and by our shareholders on May 19, 2015. The 2015 Equity Plan replaced the 2012 Equity Plan, and allowed for a maximum of 12.9 million common shares to be issued. No additional grants were issued from the 2012 Equity Plan after the date of approval of the 2015 Equity Plan; however, all awards previously granted under the 2012 Amended Equity Plan will continue in full force and effect in accordance with the terms of outstanding awards.

Following is a summary of approved grants by the Compensation Committee :

| Grant Year | Vesting Date | Plan | Restricted Stock Granted | Performance Shares Granted | Stock Options Granted |
|---|---|---|---|---|---|
| 2017 | 12/31/2019 | Amended 2015 Equity Plan | 532,358 | 249,106 | — |
| 2017 | 12/31/2019 | 2015 Equity Plan | 553,725 | 553,725 | — |
| 2016 | 12/31/2018 | 2015 Equity Plan | 3,406,716 | — | — |
| 2015 | 12/15/2017 | 2015 Equity Plan | 1,473,184 | — | — |
| 2015 | 12/31/2017 | 2012 Equity Plan | 874,575 | 874,575 | 412,710 |

*Performance Shares*

The outstanding performance share or unit grants vest over a period of three years and are intended to be paid out in common shares or cash in certain circumstances. Performance is measured on the basis of relative TSR for the period and measured against the constituents of the S&P Metals and Mining ETF Index at the beginning of the relevant performance period. The final payouts for the outstanding performance period grants will vary from 0% to 200% of the original grant depending on whether and to what extent the Company achieves certain objectives and performance goals as established by the Compensation Committee.

Following is a summary of our performance share award agreements currently outstanding :

| Performance Share Plan Year | Performance Shares Granted | Forfeitures to Date | Expected to Vest | Grant Date | Performance Period |
|---|---|---|---|---|---|
| 2017 | 249,106 | — | 249,106 | June 26, 2017 | 5/31/2017 - 12/31/2019 |
| 2017 | 553,725 | 5,192 | 548,533 | February 21, 2017 | 1/1/2017 - 12/31/2019 |
| 2015[1] | 410,105 | 155,235 | 254,870 | February 9, 2015 | 1/1/2015 - 12/31/2017 |
| 2015[1] | 464,470 | 68,667 | 395,803 | January 12, 2015 | 1/1/2015 - 12/31/2017 |

[1] The performance shares granted in 2015 will have a payout of 75.3% of the original grant based on the final performance evaluation versus the performance goals that were established in the grants.

*Performance-Based Restricted Stock Units*

For the outstanding 400,000 performance-based restricted stock units that were granted on November 17, 2014, the award may be earned and settled based upon certain VWAP performance for the Company's common shares, (Threshold VWAP, Target VWAP, or Maximum VWAP) for any period of ninety (90) consecutive calendar days during a performance period commencing August 7, 2014 and ending December 31, 2017. The performance-based restricted stock units will not have a payout based on the final performance evaluation versus the performance goals that were established in the grants.

125

*Restricted Stock Units*

All of the outstanding restricted stock units are subject to continued employment, are retention based, and are payable in common shares or cash in certain circumstances at a time determined by the Compensation Committee at its discretion. The outstanding restricted stock units that were granted in 2016, cliff vest in three years on December 31, 2018 and the outstanding restricted stock units that were granted in 2017, cliff vest in three years on December 31, 2019.

*Stock Options*

The 412,710 stock options that were granted during the first quarter of 2015 vested on December 31, 2017, are exercisable at a strike price of   $7.70 after the vesting date and expire on January 12, 2025. The 187,160 stock options that were granted in the fourth quarter of 2014 vested in equal thirds on each of December 31, 2015, 2016 and 2017 and are exercisable at a strike price of $13.83 and expire on November 17, 2021. As of December 31, 2017, 599,870 shares are exercisable with a weighted average price of $10.25.

*Employee Stock Purchase Plan*

On March 26, 2015, upon recommendation by the Compensation Committee, our Board of Directors approved and adopted, subject to the approval of Cliffs' shareholders at the 2015 Annual Meeting, the Cliffs Natural Resources Inc. 2015 Employee Stock Purchase Plan. This plan was approved by our shareholders at the 2015 Annual Meeting held May 19, 2015. 10 million common shares have been reserved for issuance under this plan; however, as of December 31, 2017, this program has not been made active and no common shares have been purchased. We sought shareholder approval of this plan for the purpose of qualifying the reserved common shares for special tax treatment under Section 423 of the Internal Revenue Code of 1986, as amended.

**Nonemployee Directors**

*Equity Grants*

Our nonemployee directors are entitled to receive restricted share awards under the Directors' Plan. For 2017, 2016 and 2015, nonemployee directors were granted a specified number of restricted shares, with a value equal to $100,000, $85,000 and $85,000, respectively. The amount of shares is based on the closing price of our common shares on the date of the Annual Meeting. The awards are subject to any deferral election and pursuant to the terms of the Directors' Plan and an award agreement.

For the last three years, Equity Grant shares have been awarded to elected or re-elected nonemployee Directors as follows:

| Year of Grant | Restricted Equity Grant Shares | Deferred Equity Grant Shares |
|---|---|---|
| 2015 | 109,408 | 25,248 |
| 2016 | 135,038 | 29,583 |
| 2017 | 93,359 | 17,289 |

126

A005388

Table of Contents

**Other Information**

The following table summarizes the share-based compensation expense that we recorded for continuing operations in  2017, 2016 and 2015:

|  | (In Millions, except per share amounts) | | |
|---|---|---|---|
|  | **2017** | 2016 | 2015 |
| Cost of goods sold and operating expenses | $    2.3 | $    2.1 | $    4.0 |
| Selling, general and administrative expenses | 16.4 | 12.1 | 9.9 |
| Reduction of operating income from continuing operations before income taxes and equity loss from ventures | 18.7 | 14.2 | 13.9 |
| Income tax benefit[1] | — | — | — |
| Reduction of net income attributable to Cliffs shareholders | $    18.7 | $    14.2 | $    13.9 |
| Reduction of earnings per share attributable to Cliffs shareholders: |  |  |  |
| Basic | $    0.06 | $    0.07 | $    0.09 |
| Diluted | $    0.06 | $    0.07 | $    0.09 |

[1] No income tax benefit due to the full valuation allowance.

*Determination of Fair Value*

*Performance Shares*

The fair value of each performance share grant is estimated on the date of grant using a Monte Carlo simulation to forecast relative TSR performance. A correlation matrix of historical and projected stock prices was developed for both the Company and our predetermined peer group of mining and metals companies. The fair value assumes that performance goals will be achieved.

The expected term of the grant represents the time from the grant date to the end of the service period for each of the  three plan-year agreements. We estimate the volatility of our common shares and that of the peer group of mining and metals companies using daily price intervals for all companies. The risk-free interest rate is the rate at the grant date on zero-coupon government bonds, with a term commensurate with the remaining life of the performance period.

Performance shares were granted in February and June 2017. A fair value analysis was required for each of these grants and the fair value was determined to be $19.69 and $10.74, respectively.

*Stock Options*

The fair value of each stock option grant is estimated on the date of grant using a Black-Scholes valuation model. The expected term of the option grant is determined using the simplified method. We estimate the volatility of our common shares using historical stock prices with consistent frequency over the most recent historical period equal to the option's expected term. The risk-free interest rate is the rate at the grant date on zero-coupon government bonds, with a term commensurate with the expected term.

No stock options were granted in  2017, therefore no fair value analysis was required.

*Restricted Stock Units*

The fair value of the restricted stock units is determined based on the closing price of our common shares on the grant date.

127

A005389

Table of Contents

Stock option, restricted stock awards and performance share activity under our long-term equity plans and Directors' Plans are as follows:

| | 2017 | 2016 | 2015 |
|---|---|---|---|
| | Shares | Shares | Shares |
| **Stock options:** | | | |
| Outstanding at beginning of year | 599,870 | 607,489 | 250,000 |
| Granted during the year | — | — | 412,710 |
| Forfeited/canceled | — | (7,619) | (55,221) |
| Outstanding at end of year | 599,870 | 599,870 | 607,489 |
| **Restricted awards:** | | | |
| Outstanding and restricted at beginning of year | 5,461,783 | 2,338,070 | 523,176 |
| Granted during the year | 1,196,731 | 3,571,337 | 2,482,415 |
| Vested | (1,813,315) | (271,988) | (477,157) |
| Forfeited/canceled | (68,716) | (175,636) | (190,364) |
| Outstanding and restricted at end of year | 4,776,483 | 5,461,783 | 2,338,070 |
| **Performance shares:** | | | |
| Outstanding at beginning of year | 1,368,469 | 1,496,489 | 1,072,376 |
| Granted during the year | 802,831 | — | 874,575 |
| Issued[1] | — | (59,260) | (242,920) |
| Forfeited/canceled | (322,988) | (68,760) | (207,542) |
| Outstanding at end of year | 1,848,312 | 1,368,469 | 1,496,489 |
| Vested or expected to vest as of December 31, 2017[2] | 7,224,665 | | |
| **Directors' retainer and voluntary shares:** | | | |
| Outstanding at beginning of year | — | — | — |
| Granted during the year | 25,476 | — | — |
| Vested | (25,476) | — | — |
| Outstanding at end of year | — | — | — |
| **Reserved for future grants or awards at end of year:** | | | |
| Employee plans | 16,606,386 | | |
| Directors' plans | 612,266 | | |
| Total | 17,218,652 | | |

[1] For the year ended December 31, 2015, the shares vesting due to the change in control were paid out in cash, at target, and valued as of the respective participants' termination dates.

[2] With the adoption of ASU 2016-09, we assume all shares are expected to vest and none will forfeit.

A summary of our outstanding share-based awards as of  December 31, 2017 is shown below:

| | Shares | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Outstanding, beginning of year | 7,430,122 | $ | 5.55 |
| Granted | 1,999,562 | $ | 12.19 |
| Vested | (1,813,315) | $ | 5.52 |
| Forfeited/expired | (391,704) | $ | 12.84 |
| Outstanding, end of year | 7,224,665 | $ | 6.79 |

The total compensation cost related to outstanding awards not yet recognized is  $20.1 million at December 31, 2017. The weighted average remaining period for the awards outstanding at December 31, 2017 is approximately 1.5 years.

128

A005390

Table of Contents

**NOTE 9 - INCOME TAXES**

*Income from continuing operations before income taxes and equity loss from ventures* includes the following components:

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| | **2017** | | 2016 | | 2015 | |
| United States | $ | **90.7** | $ | 124.9 | $ | 314.2 |
| Foreign | | **38.7** | | 82.1 | | (1.1) |
| | $ | **129.4** | $ | 207.0 | $ | 313.1 |

The components of the provision (benefit) for income taxes on continuing operations consist of the following:

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| | **2017** | | 2016 | | 2015 | |
| Current provision (benefit): | | | | | | |
| United States federal | $ | **(252.6)** | $ | (11.1) | $ | 8.2 |
| United States state & local | | **(0.1)** | | (0.5) | | 0.3 |
| Foreign | | **0.3** | | (0.1) | | 0.9 |
| | | **(252.4)** | | (11.7) | | 9.4 |
| Deferred provision (benefit): | | | | | | |
| United States federal | | **—** | | (0.5) | | 165.8 |
| Foreign | | **—** | | — | | (5.9) |
| | | **—** | | (0.5) | | 159.9 |
| Total provision (benefit) on income from continuing operations | $ | **(252.4)** | $ | (12.2) | $ | 169.3 |

129

[Table of Contents](#)

Reconciliation of our income tax attributable to continuing operations computed at the U.S. federal statutory rate is as follows:

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| | **2017** | | 2016 | | 2015 | |
| Tax at U.S. statutory rate of 35% | $ **45.3** | **35.0 %** | $ 72.5 | 35.0 % | $ 109.6 | 35.0 % |
| Increase (decrease) due to: | | | | | | |
| Impact of tax law change - remeasurement of deferred taxes | **407.5** | **314.8** | 149.1 | 72.0 | — | — |
| Prior year adjustments in current year | **(1.1)** | **(0.8)** | (11.8) | (5.7) | 5.9 | 1.9 |
| Valuation allowance build (reversal) | | | | | | |
| Tax law change - remeasurement of deferred taxes | **(407.5)** | **(314.8)** | (149.1) | (72.0) | — | — |
| Current year activity | **(471.7)** | **(364.4)** | 93.9 | 45.4 | (104.6) | (33.4) |
| Repeal of AMT | **(235.3)** | **(181.7)** | — | — | — | — |
| Prior year adjustments in current year | **(3.0)** | **(2.4)** | 6.5 | 3.1 | 165.8 | 52.9 |
| Tax uncertainties | **(1.4)** | **(1.1)** | (11.3) | (5.5) | 84.1 | 26.9 |
| Worthless stock deduction | **—** | **—** | (73.4) | (35.5) | — | — |
| Impact of foreign operations | **475.4** | **367.2** | (42.7) | (20.6) | (53.9) | (17.2) |
| Percentage depletion in excess of cost depletion | **(61.6)** | **(47.6)** | (36.1) | (17.4) | (34.9) | (11.1) |
| Non-taxable loss (income) related to noncontrolling interests | **1.3** | **1.0** | (8.8) | (4.2) | (3.0) | (1.0) |
| State taxes, net | **(0.1)** | **—** | 0.4 | 0.2 | 0.2 | 0.1 |
| Other items, net | **(0.2)** | **(0.2)** | (1.4) | (0.7) | 0.1 | — |
| Provision for income tax (benefit) expense and effective income tax rate including discrete items | $ **(252.4)** | **(195.0)%** | $ (12.2) | (5.9)% | $ 169.3 | 54.1 % |

The components of income taxes for other than continuing operations consisted of the following:

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| | **2017** | | 2016 | | 2015 | |
| Other comprehensive (income) loss: | | | | | | |
| Postretirement benefit liability | $ | **—** | $ | — | $ | 5.9 |
| Mark-to-market adjustments | | **—** | | — | | 0.3 |
| Other | | **—** | | 0.5 | | — |
| Total | $ | **—** | $ | 0.5 | $ | 6.2 |
| | | | | | | |
| Discontinued Operations | $ | **—** | $ | — | $ | (6.0) |

130

A005392

Table of Contents

Significant components of our deferred tax assets and liabilities as of December 31, 2017 and 2016 are as follows:

| | (In Millions) | |
| --- | --- | --- |
| | 2017 | 2016 |
| **Deferred tax assets:** | | |
| Pensions | $ 76.3 | $ 114.6 |
| Postretirement benefits other than pensions | 25.6 | 35.2 |
| Alternative minimum tax credit carryforwards | — | 251.2 |
| Deferred income | 24.2 | 44.5 |
| Intangible assets | 12.2 | — |
| Financial instruments | — | 71.3 |
| Asset retirement obligations | 9.9 | 22.3 |
| Operating loss carryforwards | 2,368.1 | 2,699.7 |
| Property, plant and equipment and mineral rights | 188.2 | 181.2 |
| State and local | 74.2 | 59.2 |
| Lease liabilities | 9.6 | 12.9 |
| Other liabilities | 100.4 | 108.3 |
| Total deferred tax assets before valuation allowance | 2,888.7 | 3,600.4 |
| Deferred tax asset valuation allowance | (2,238.5) | (3,334.8) |
| Net deferred tax assets | 650.2 | 265.6 |
| **Deferred tax liabilities:** | | |
| Property, plant and equipment and mineral rights | (1.5) | (34.0) |
| Investment in ventures | (137.5) | (203.1) |
| Intangible assets | — | (1.0) |
| Product inventories | (3.8) | (3.4) |
| Intercompany notes | (465.7) | — |
| Other assets | (41.7) | (24.1) |
| Total deferred tax liabilities | (650.2) | (265.6) |
| Net deferred tax assets (liabilities) | $ — | $ — |

At December 31, 2017, we had no gross deferred tax asset related to U.S. AMT credits compared to $251.2 million at December 31, 2016. This deferred tax asset is now recorded as an income tax receivable as a result of the recently enacted income tax legislation allowing the credits to be refunded between the years 2019 through 2022.

We had gross domestic (including states) and foreign net operating loss carryforwards, inclusive of discontinued operations, of $4.2 billion and $7.2 billion, respectively, at December 31, 2017. We had gross domestic and foreign net operating loss carryforwards at December 31, 2016 of $3.7 billion and $6.9 billion, respectively. The U.S. Federal net operating losses will begin to expire in 2035 and state net operating losses will begin to expire in 2019. The foreign net operating losses can be carried forward indefinitely. We had foreign tax credit carryforwards of $5.8 million at December 31, 2017 and 2016. The foreign tax credit carryforwards will begin to expire in 2020.

We recorded a $1,096.3 million net decrease in the valuation allowance of certain deferred tax assets. Of this amount, a $465.7 million decrease relates to impairment income on Luxembourg intercompany notes, a $407.5 million decrease relates to the reversal of deferred tax assets due to the change in the U.S. and Luxembourg statutory rates, a $235.3 million decrease relates to the repeal of AMT as a result of U.S. income tax reform and the remainder relates to current year activity.

At December 31, 2017 and 2016, we had no cumulative undistributed earnings of foreign subsidiaries included in consolidated retained earnings. Accordingly, no provision has been made for U.S. deferred taxes related to future repatriation of earnings.

A005393

A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows:

| | | (In Millions) | | |
|---|---|---|---|---|
| | | **2017** | 2016 | 2015 |
| Unrecognized tax benefits balance as of January 1 | $ | **30.7** | $ 156.2 | $ 72.6 |
| Increase (decrease) for tax positions in prior years | | **(2.8)** | (61.0) | 6.7 |
| Increase for tax positions in current year | | **4.5** | 0.2 | 78.5 |
| Decrease due to foreign exchange | | **—** | — | — |
| Settlements | | **1.0** | (64.7) | (1.1) |
| Lapses in statutes of limitations | | **—** | — | (0.5) |
| Other | | **0.1** | — | — |
| Unrecognized tax benefits balance as of December 31 | $ | **33.5** | $ 30.7 | $ 156.2 |

At December 31, 2017 and 2016, we had $33.5 million and $30.7 million, respectively, of unrecognized tax benefits recorded. Of this amount, $6.1 million and $8.3 million, respectively, were recorded in *Other liabilities* and $27.4 million and $22.4 million, respectively, were recorded as *Other non-current assets* in the Statements of Consolidated Financial Position for both years. If the $33.5 million were recognized, only $6.1 million would impact the effective tax rate. We do not expect that the amount of unrecognized benefits will change significantly within the next 12 months. At December 31, 2017 and 2016, we had $2.1 million and $0.8 million, respectively, of accrued interest and penalties related to the unrecognized tax benefits recorded in *Other liabilities* in the Statements of Consolidated Financial Position.

Tax years 2015 and forward remain subject to examination for the U.S. and tax years 2013 and forward for Australia. Tax years 2008 and forward remain subject to examination for Canada.

## NOTE 10 - LEASE OBLIGATIONS

We lease certain mining, production and other equipment under operating and capital leases. The leases are for varying lengths, generally at market interest rates and contain purchase and/or renewal options at the end of the terms. Our operating lease expense was $7.1 million, $7.6 million and $12.0 million for the years ended December 31, 2017, 2016 and 2015, respectively. Capital lease assets were $37.4 million and $29.3 million at December 31, 2017 and 2016, respectively. Corresponding accumulated amortization of capital leases included in respective allowances for depreciation were $21.0 million and $13.1 million at December 31, 2017 and 2016, respectively.

Future minimum payments under capital leases and non-cancellable operating leases at  December 31, 2017 are as follows:

| | (In Millions) | | | |
|---|---|---|---|---|
| | Capital Leases | | Operating Leases | |
| 2018 | $ | 20.8 | $ | 4.9 |
| 2019 | | 12.1 | | 1.8 |
| 2020 | | 11.1 | | 1.8 |
| 2021 | | 10.5 | | 1.8 |
| 2022 | | 2.1 | | 1.8 |
| 2023 and thereafter | | — | | 7.5 |
| Total minimum lease payments | $ | 56.6 | $ | 19.6 |
| Amounts representing interest | | 8.8 | | |
| Present value of net minimum lease payments [1] | $ | 47.8 | | |

[1] The total is comprised of $16.9 million and $30.9 million classified as Other current liabilities and Other liabilities, respectively, in the Statements of Consolidated Financial Position at December 31, 2017.

A005394

**NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS**

We had environmental and mine closure liabilities of $200.1 million and $206.8 million at December 31, 2017 and 2016, respectively. The following is a summary of the obligations as of December 31, 2017 and 2016:

| | (In Millions) | |
|---|---|---|
| | December 31, | |
| | **2017** | 2016 |
| Environmental | $ **2.9** | $ 2.8 |
| Mine closure | | |
| U.S. Iron Ore[1] | **168.4** | 187.8 |
| Asia Pacific Iron Ore | **28.8** | 16.2 |
| Total mine closure | **197.2** | 204.0 |
| Total environmental and mine closure obligations | **200.1** | 206.8 |
| Less current portion | **3.6** | 12.9 |
| Long-term environmental and mine closure obligations | $ **196.5** | $ 193.9 |

[1] U.S. Iron Ore includes our active operating mines, our indefinitely idled Empire mine and a closed mine formerly operating as LTVSMC.

**Environmental**

Our mining and exploration activities are subject to various laws and regulations governing the protection of the environment. We conduct our operations to protect the public health and environment and believe our operations are in compliance with applicable laws and regulations in all material respects. Our environmental liabilities of $2.9 million and $2.8 million at December 31, 2017 and 2016, respectively, including obligations for known environmental remediation exposures at various active and closed mining operations and other sites, have been recognized based on the estimated cost of investigation and remediation at each site. If the cost can only be estimated as a range of possible amounts with no specific amount being more likely, the minimum of the range is accrued. Future expenditures are not discounted unless the amount and timing of the cash disbursements are readily known. Potential insurance recoveries have not been reflected. Additional environmental obligations could be incurred, the extent of which cannot be assessed.

**Mine Closure**

Our mine closure obligations of $197.2 million and $204.0 million at December 31, 2017 and 2016, respectively, include our U.S. Iron Ore mines and our Asia Pacific Iron Ore mine.

The accrued closure obligation for our mining operations provides for contractual and legal obligations associated with the eventual closure of the mining operations. We performed a detailed assessment of our asset retirement obligations related to our active mining locations most recently in 2017 in accordance with our accounting policy, which requires us to perform an in-depth evaluation of the liability every three years in addition to routine annual assessments. In 2017, we employed a third-party specialist to assist in the evaluation.

Management periodically performs an assessment of the obligation to determine the adequacy of the liability in relation to the closure activities still required at the LTVSMC site, most recently performed in detail during 2017. The LTVSMC closure liability was $28.6 million and $25.5 million at December 31, 2017 and 2016, respectively. We are anticipating MPCA to reissue the NPDES permits for this facility in the future that could modify the closure liability, but the scale of that change will not be understood until reissuance of the permits.

For the assessments performed, we determined the obligations based on detailed estimates adjusted for factors that a market participant would consider (i.e., inflation, overhead and profit) and then discounted the obligation using the current credit-adjusted risk-free interest rate based on the corresponding life of mine. The estimate also incorporates incremental increases in the closure cost estimates and changes in estimates of mine lives. The closure date for each of our active operating U.S. Iron Ore mines was determined based on the exhaustion date of the remaining iron ore reserves. The closure date and expected timing of the capital requirements to meet our obligations for our Asia Pacific Iron Ore mine, and our other indefinitely idled or closed mines, is determined based on the unique circumstances of each property. The accretion of the liability and amortization of the related asset is recognized over the estimated mine lives for each location.

133

Table of Contents

The following represents a roll forward of our asset retirement obligation liability for the years ended December 31, 2017 and 2016:

| | (In Millions) | |
|---|---|---|
| | December 31, | |
| | **2017** | 2016 |
| Asset retirement obligation at beginning of year | $ **204.0** | $ 230.4 |
| Accretion expense | **14.9** | 14.0 |
| Remediation payments | **(5.6)** | (2.2) |
| Exchange rate changes | **1.5** | (0.2) |
| Revision in estimated cash flows | **(17.6)** | (38.0) |
| Asset retirement obligation at end of year | $ **197.2** | $ 204.0 |

The revision in estimated cash flows recorded during the year ended December 31, 2017 relate primarily to updates to our estimates resulting from our three-year in-depth review of our asset retirement obligations for each of our U.S. mines. The primary driver of the decrease in estimated cash flows was the Empire mine, as the asset retirement obligation was reduced $26.2 million as a result of the refinement of the cash flows required for reclamation, remediation and structural removal. Prior estimates were based on RS Means (a common costing methodology used in the construction and demolition industry) costing data while the current estimate was compiled using a more detailed cost build-up approach. The overall decrease in estimated cash flows for our U.S. Iron Ore mines was offset partially by an increase in costs of $10.1 million relating to the refinement of expected costs to be incurred at the end of life of mine at our Asia Pacific Iron Ore operations.

The revision in estimated cash flows recorded during the year ended December 31, 2016 relate primarily to revisions in the timing of the estimated cash flows at two of our U.S. mines. The Empire mine asset retirement obligation was reduced $29.6 million as a result of the further refinement of the timing of cash flows and a downward revision of estimated cost of required storm water management systems expected to be implemented. Additionally, during 2016, a new economic reserve estimate was completed for United Taconite, increasing salable product reserves by 115 million long tons and consequently significantly increasing the life-of-mine plan, resulting in a $9.2 million decrease in the asset retirement obligation.

## NOTE 12 - GOODWILL AND OTHER INTANGIBLE ASSETS

### Goodwill

The carrying amount of goodwill for the years ended December 31, 2017 and 2016 was $2.0 million and related to our U.S. Iron Ore operating segment.

### Other Intangible Assets

Following is a summary of the definite-lived intangible assets as of December 31, 2017 and 2016:

| | | (In Millions) | | | | | |
|---|---|---|---|---|---|---|---|
| | | December 31, 2017 | | | December 31, 2016 | | |
| | Classification | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Permits | *Other non-current assets* | $ **78.8** | $ **(26.5)** | $ **52.3** | $ 78.4 | $ (24.6) | $ 53.8 |

Amortization expense relating to other intangible assets was $2.1 million, $4.8 million and $4.2 million for the years ended December 31, 2017, 2016 and 2015, respectively, and is recognized in *Cost of goods sold and operating expenses* in the Statements of Consolidated Operations. Amortization expense of other intangible assets is expected to continue to be immaterial going forward.

134

A005396

Table of Contents

**NOTE 13 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES**

The following table presents the fair value of our derivative instruments and the classification of each in the Statements of Consolidated Financial Position as of December 31, 2017 and 2016:

| | (In Millions) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Derivative Assets | | | | Derivative Liabilities | | | |
| | December 31, 2017 | | December 31, 2016 | | December 31, 2017 | | December 31, 2016 | |
| Derivative Instrument | Balance Sheet Location | Fair Value | Balance Sheet Location | Fair Value | Balance Sheet Location | Fair Value | Balance Sheet Location | Fair Value |
| Derivatives designated as hedging instruments under ASC 815: | | | | | | | | |
| Commodity Contracts | | $ — | | $ — | Other current liabilities | $ 0.3 | | $ — |
| Derivatives not designated as hedging instruments under ASC 815: | | | | | | | | |
| Customer Supply Agreements | Derivative assets | $ 37.9 | Derivative assets | $ 21.3 | | $ — | | $ — |
| Provisional Pricing Arrangements | Derivative assets | 1.5 | Derivative assets | 10.3 | Other current liabilities | 2.4 | Other current liabilities | 0.5 |
| Commodity Contracts | | — | Derivative assets | 1.5 | | — | | — |
| Total derivatives not designated as hedging instruments under ASC 815: | | $ 39.4 | | $ 33.1 | | $ 2.4 | | $ 0.5 |
| Total derivatives | | $ 39.4 | | $ 33.1 | | $ 2.7 | | $ 0.5 |

**Derivatives Designated as Hedging Instruments**

***Cash Flow Hedges***

As of December 31, 2017, we had outstanding natural gas hedge contracts for a notional amount of 3.5 million MMBtu in the form of forward contracts with varying maturity dates ranging from January 2018 to November 2018. We had no natural gas hedge contracts as of December 31, 2016 that qualified for hedge accounting. Changes in fair value of highly effective hedges are recorded as a component of *Accumulated other comprehensive loss* in the Statements of Consolidated Financial Position. During the year ended December 31, 2017, we recorded an unrealized loss of $0.5 million in *Other comprehensive income (loss)* for changes in the fair value of these instruments. As of December 31, 2017 no amounts have been reclassified from *Accumulated other comprehensive loss* into earnings.

135

Table of Contents

**Derivatives Not Designated as Hedging Instruments**

### Customer Supply Agreements

Most of our U.S. Iron Ore long-term supply agreements are comprised of a base price with annual price adjustment factors. The base price is the primary component of the purchase price for each contract. The indexed price adjustment factors are integral to the iron ore supply contracts and vary based on the agreement, but typically include adjustments based upon changes in the Platts 62% Price, along with pellet premiums, published Platts international indexed freight rates and changes in specified Producer Price Indices, including those for industrial commodities, fuel and steel. The pricing adjustments generally operate in the same manner, with each factor typically comprising a portion of the price adjustment, although the weighting of each factor varies based upon the specific terms of each agreement. In most cases, these adjustment factors have not been finalized at the time our product is sold. In these cases, we historically have estimated the adjustment factors at each reporting period based upon the best third-party information available. The estimates are then adjusted to actual when the information has been finalized. The price adjustment factors have been evaluated to determine if they contain embedded derivatives. The price adjustment factors share the same economic characteristics and risks as the host contract and are integral to the host contract as inflation adjustments; accordingly, they have not been separately valued as derivative instruments.

Certain supply agreements with one U.S. Iron Ore customer provide for supplemental revenue or refunds to the customer based on the customer's average annual steel pricing or based on the average annual daily steel market price for hot-rolled coil steel at the time the product is consumed in the customer's blast furnace. In the new contract which commenced in 2017, this supplemental revenue and refund data source changes from the customer's average annual steel price to an average annual daily market price for hot-rolled coil steel. The supplemental pricing is characterized as a freestanding derivative and is required to be accounted for separately once the product is shipped. The derivative instrument, which is finalized based on a future price, is adjusted to fair value as a revenue adjustment each reporting period until the pellets are consumed and the amounts are settled.

We recognized $163.3 million, $41.7 million and $27.1 million as *Product revenues* in the Statements of Consolidated Operations for the years ended December 31, 2017, 2016 and 2015, respectively, related to the supplemental payments. *Derivative assets*, representing the fair value of the supplemental revenue, were $37.9 million and $21.3 million as of December 31, 2017 and 2016, respectively, in the Statements of Consolidated Financial Position.

### Provisional Pricing Arrangements

Certain of our U.S. Iron Ore and Asia Pacific Iron Ore customer supply agreements specify provisional price calculations, where the pricing mechanisms generally are based on market pricing, with the final revenue rate based on certain market inputs at a specified period in time in the future, per the terms of the supply agreements. Market inputs are tied to indexed price adjustment factors that are integral to the iron ore supply contracts and vary based on the agreement. The pricing mechanisms typically include adjustments based upon changes in the Platts 62% Price, along with pellet premiums, published Platts international indexed freight rates and changes in specified Producer Price Indices, including those for industrial commodities, fuel and steel. The pricing adjustments generally operate in the same manner, with each factor typically comprising a portion of the price adjustment, although the weighting of each factor varies based upon the specific terms of each agreement.

U.S. Iron Ore sales revenue is primarily recognized when cash is received. For U.S. Iron Ore sales, the difference between the provisionally agreed-upon price and the estimated final revenue rate is characterized as a freestanding derivative and must be accounted for separately once the provisional revenue has been recognized. Asia Pacific Iron Ore sales revenue is recorded initially at the provisionally agreed-upon price with the pricing provision embedded in the receivable. The pricing provision is not clearly and closely related to the economic characteristics of the host receivable; therefore, the pricing provision is an embedded derivative that must be bifurcated and accounted for separately from the receivable. Subsequently, the derivative instruments for both U.S. Iron Ore and Asia Pacific Iron Ore are adjusted to fair value through *Product revenues* each reporting period based upon current market data and forward-looking estimates provided by management until the final revenue rate is determined.

At December 31, 2017, we recorded $1.5 million as *Derivative assets* and $2.4 million as derivative liabilities classified as *Other current liabilities* related to our estimate of the final revenue rate for our U.S. Iron Ore and Asia Pacific Iron Ore customers in the Statements of Consolidated Financial Position. At December 31, 2016, we recorded $10.3 million as *Derivative assets* and $0.5 million as derivative liabilities classified as *Other current liabilities* related to our estimate of the final revenue rate with our U.S. Iron Ore and Asia Pacific Iron Ore customers in the Statements of Consolidated Financial Position. These amounts represent the difference between the provisional price agreed upon with our customers based on the supply agreement terms and our estimate of the final revenue rate based on the price calculations established in the supply agreements. We recognized a net decrease of $58.6 million in *Product revenues*

in the Statements of Consolidated Operations  for the year ended December 31, 2017 related to these arrangements. This compares with a net increase of $49.0 million and net decrease of $1.4 million in *Product revenues* for the comparable periods in  2016 and 2015, respectively.

The following summarizes the effect of our derivatives that are not designated as hedging instruments in the   Statements of Consolidated Operations  for the years ended December 31, 2017, 2016 and 2015:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **(In Millions)** | | | | | | | | |
| **Derivatives Not Designated as Hedging Instruments** | **Location of Gain (Loss) Recognized in Income on Derivative** | | | | | | | |
| | | | | **Year Ended December 31,** | | | | |
| | | | **2017** | | 2016 | | 2015 | |
| Customer Supply Agreements | *Product revenues* | $ | **163.3** | $ | 41.7 | $ | 27.1 | |
| Provisional Pricing Arrangements | *Product revenues* | | **(58.6)** | | 49.0 | | (1.4) | |
| Foreign Exchange Contracts | *Other non-operating income (expense)* | | **—** | | — | | (3.6) | |
| Foreign Exchange Contracts | *Product revenues* | | **—** | | — | | (12.6) | |
| Commodity Contracts | *Cost of goods sold and operating expenses* | | **—** | | 1.9 | | (4.0) | |
| Total | | $ | **104.7** | $ | 92.6 | $ | 5.5 | |

Refer to NOTE 6 - FAIR VALUE OF FINANCIAL INSTRUMENTS  for additional information.

**NOTE 14 - DISCONTINUED OPERATIONS**

The information below sets forth selected financial information related to operating results of our businesses classified as discontinued operations. While the reclassification of revenues and expenses related to discontinued operations from prior periods have no impact upon previously reported net income, the Statements of Consolidated Operations  present the revenues and expenses that were reclassified from the specified line items to discontinued operations.

137

The chart below provides an asset group breakout for each financial statement line impacted by discontinued operations:

| (In Millions) | | North American Coal | Canadian Operations | | | Total Canadian Operations | Total Discontinued Operations |
|---|---|---|---|---|---|---|---|
| | | | Eastern Canadian Iron Ore | Other | | | |
| **Statements of Consolidated Operations** | | | | | | | |
| Gain (Loss) from Discontinued Operations, net of tax | **YTD December 31, 2017** | $ 2.6 | $ (21.3) | $ — | $ (21.3) | $ (18.7) | |
| Loss from Discontinued Operations, net of tax | YTD December 31, 2016 | $ (2.4) | $ (17.5) | $ — | $ (17.5) | $ (19.9) | |
| Loss from Discontinued Operations, net of tax | YTD December 31, 2015 | $ (152.4) | $ (638.7) | $ (101.0) | $ (739.7) | $ (892.1) | |
| | | | | | | | |
| **Statements of Consolidated Financial Position** | | | | | | | |
| | | | | | | | |
| Other current liabilities | **As of December 31, 2017** | $ 3.2 | $ — | $ — | $ — | $ 3.2 | |
| Other current liabilities | As of December 31, 2016 | $ 6.0 | $ — | $ — | $ — | $ 6.0 | |
| | | | | | | | |
| **Non-Cash Operating and Investing Activities** | | | | | | | |
| | | | | | | | |
| Depreciation, depletion and amortization | YTD December 31, 2015 | $ 3.2 | $ — | $ — | $ — | $ 3.2 | |
| Purchase of property, plant and equipment | YTD December 31, 2015 | $ 15.9 | $ — | $ — | $ — | $ 15.9 | |
| Impairment of long-lived assets | YTD December 31, 2015 | $ 73.4 | $ — | $ — | $ — | $ 73.4 | |

### North American Coal Operations

*Background*

As of March 31, 2015, management determined that our North American Coal operating segment met the criteria to be classified as held for sale under *ASC 205, Presentation of Financial Statements.* The North American Coal segment continued to meet the criteria throughout 2015 until we sold our North American Coal operations during the fourth quarter of 2015. As such, all current and historical North American Coal operating segment results are classified as discontinued operations in our financial statements. Historical results also include our CLCC assets, which were sold during the fourth quarter of 2014.

In the first quarter of 2015, as part of the held for sale classification assigned to North American Coal, an impairment of $73.4 million was recorded. The impairment charge was to reduce the assets to their estimated fair value which was determined based on potential sales scenarios. No further impairment was recorded in 2015.

On December 22, 2015, we completed a strategic shift in our business by closing the sale of our remaining North American Coal business, which included Pinnacle mine in West Virginia and Oak Grove mine in Alabama. Pinnacle mine and Oak Grove mine were sold to Seneca and the deal structure was a sale of equity interests of our remaining coal business. Additionally, Seneca may pay us an earn-out of up to $50 million contingent upon the terms of a revenue sharing agreement which extends through the year 2020. However, we have not recorded a gain contingency in relation to this earn-out. We recorded the results of this sale within *Loss from Discontinued Operations, net of tax* for the year ended December 31, 2015.

138

A005400

Table of Contents

| | (In Millions) | | |
| | Year Ended December 31, | | |
| *Loss from Discontinued Operations* | **2017** | 2016 | 2015 |
|---|---|---|---|
| Revenues from product sales and services | $ — | $ — | $ 392.9 |
| Cost of goods sold and operating expenses | — | — | (449.2) |
| Sales margin | — | — | (56.3) |
| Other operating income (expense) | 0.5 | (4.5) | (30.4) |
| Gain on sale of coal mines | 2.1 | 2.1 | 9.3 |
| Other expense | — | — | (1.8) |
| Gain (loss) from discontinued operations before income taxes | 2.6 | (2.4) | (79.2) |
| Impairment of long-lived assets | — | — | (73.4) |
| Income tax benefit | — | — | 0.2 |
| Gain (loss) from discontinued operations, net of tax | $ 2.6 | $ (2.4) | $ (152.4) |

*Items Measured at Fair Value on a Non-Recurring Basis*

The following table presents information about the impairment charge on non-financial assets that was measured on a fair value basis at March 31, 2015 for the North American Coal operations. There were no financial and non-financial assets and liabilities that were measured on a non-recurring fair value basis at December 31, 2017 and 2016 for the North American Coal operations. The table also indicates the fair value hierarchy of the valuation techniques used to determine such fair value:

| | (In Millions) | | | | |
| | March 31, 2015 | | | | |
| Description | Quoted Prices in Active Markets for Identical Assets/ Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total | Total Losses |
|---|---|---|---|---|---|
| Assets: | | | | | |
| Other long-lived assets - Property, plant and equipment and Mineral rights: North American Coal operating unit | $ — | $ — | $ 20.4 | $ 20.4 | $ 73.4 |
| | $ — | $ — | $ 20.4 | $ 20.4 | $ 73.4 |

In the first quarter of 2015, as part of the held for sale classification assigned to North American Coal, an impairment charge of $73.4 million was recorded. The impairment charge was to reduce the assets to their estimated fair value which was determined based on potential sales scenarios. We determined the fair value and recoverability of our North American Coal operating segment by comparing the estimated fair value of the underlying assets and liabilities to the estimated sales price of the operating segment held for sale. No further impairment was recorded in 2015.

139

A005401

*Recorded Assets and Liabilities*

| | (In Millions) | |
|---|---|---|
| ***Assets and Liabilities of Discontinued Operations*** [1] | **December 31, 2017** | December 31, 2016 |
| Accrued liabilities | $ — | $ 1.1 |
| Other current liabilities | 3.2 | 4.9 |
| Total liabilities of discontinued operations | $ 3.2 | $ 6.0 |

[1] At December 31, 2017, we had no contingent liabilities associated with our exit from the coal business recorded on our parent company compared to $2.1 million at December 31, 2016.

As part of the CLCC asset sale during the fourth quarter of 2014, there was an amount placed in escrow to cover decreases in working capital, indemnity obligations and regulatory liabilities. During the year ended December 31, 2016, the final distribution of $10.3 million was released to us from escrow.

*Income Taxes*

We recognized no tax expense or benefit for the years ended December 31, 2017 and 2016 in *Loss from Discontinued Operations, net of tax*, related to our North American Coal investments. For the year ended December 31, 2015, we recognized a tax benefit of $0.2 million in *Loss from Discontinued Operations, net of tax*, related to a loss on our North American Coal investments.

**Canadian Operations**

*Background*

On January 27, 2015, we announced that the Bloom Lake Group commenced restructuring proceedings in Montreal, Quebec under the CCAA to address the Bloom Lake Group's immediate liquidity issues and to preserve and protect its assets for the benefit of all stakeholders while restructuring and/or sale options were explored. At that time, the Bloom Lake Group was no longer generating revenues and was not able to meet its obligations as they came due. As part of the CCAA process, the Court approved the appointment of a Monitor and certain other financial advisors.

Additionally, on May 20, 2015, the Wabush Group commenced restructuring proceedings in Montreal, Quebec under the CCAA. The Wabush Group was no longer generating revenues and was not able to meet its obligations as they came due. As a result of this action, the CCAA protection granted to the Bloom Lake Group was extended to include the Wabush Group to facilitate the reorganization of each of their businesses and operations. The Monitor appointed by the court in the CCAA proceeding for the Bloom Lake Group has also been appointed by the court as the Monitor in the CCAA proceeding for the Wabush Group.

As a result of the commencement of CCAA proceedings for the Bloom Lake Group on January 27, 2015, we no longer have a controlling interest in the Bloom Lake Group. For that reason, we deconsolidated the Bloom Lake Group and certain other wholly-owned subsidiaries effective January 27, 2015, which resulted in a pretax impairment loss on deconsolidation and other charges totaling $818.7 million that was recorded in the first quarter of 2015. The pretax loss on deconsolidation includes the derecognition of the carrying amounts of the Bloom Lake Group and certain other wholly-owned subsidiaries' assets, liabilities and accumulated other comprehensive losses and the recording of our remaining interests at fair value.

As a result of the commencement of CCAA proceedings for the Wabush Group on May 20, 2015, we deconsolidated certain Wabush Group wholly-owned subsidiaries effective May 20, 2015. The wholly-owned subsidiaries that were deconsolidated effective May 20, 2015 are Wabush Group entities that were not deconsolidated as part of the deconsolidation effective January 27, 2015 as discussed previously in this section. This deconsolidation, effective May 20, 2015, resulted in a pretax gain on deconsolidation and other charges, totaling $134.7 million. The pretax gain on deconsolidation includes the derecognition of the carrying amounts of these certain deconsolidated Wabush Group wholly-owned subsidiaries' assets, liabilities and accumulated other comprehensive losses and the adjustment of our remaining interests in the Canadian Entities to fair value.

Subsequent to each of the deconsolidations discussed above, we utilized the cost method to account for our investment in the Canadian Entities, which has been reflected as zero in our Statements of Consolidated Financial Position as of December 31, 2017 and 2016 based on the estimated fair value of the Canadian Entities' net assets. Loans to and accounts receivable from the Canadian Entities are recorded at an estimated fair value of $51.6 million and $48.6 million classified as *Loans to and accounts receivables from the Canadian Entities* in the Statements of

140

Consolidated Financial Position as of December 31, 2017 and 2016, respectively. The *Loans to and accounts receivables from the Canadian Entities* balance reflects our current estimate. We continue to update the estimate as the CCAA proceedings progress. The December 31, 2017 balance reflects developments since the January 27, 2015 and May 20, 2015 CCAA filings, including finalized liquidation values for completed asset sales and updates for the expected allocation of proceeds for those sales, updates for ongoing costs incurred by the various estates that will be held back from the final distribution to creditors of the Bloom Lake Group and the Wabush Group and the repayment of DIP financing.

*Status of CCAA Proceedings*

As of December 31, 2017, CCAA proceedings are ongoing and the majority of the assets of each of the Bloom Lake Group and the Wabush Group have been liquidated. The net proceeds of sale of the assets of the Bloom Lake Group and the Wabush Group are currently being held by the Monitor. Certain of these funds will be utilized to fund the accrued and ongoing costs of the CCAA proceedings. The Monitor has conducted a claims process pursuant to which creditors, including the Company and its affiliates, have filed claims against the Bloom Lake Group and the Wabush Group. The Monitor is reviewing all claims filed as part of this claims process. Currently, there is uncertainty as to the amount of the distribution that will be made to the creditors of the Bloom Lake Group and the Wabush Group, including, if any, to us, and whether we could be held liable for claims that may be asserted by or on behalf of the Bloom Lake Group or the Wabush Group or by their respective representatives against non-debtor affiliates of the Bloom Lake Group and the Wabush Group.

During 2017, we became aware that it was probable the Monitor will assert a preference claim against us and/or certain of our affiliates. Given that it is probable the claim will be asserted by the Monitor, we have recorded an estimated liability of $55.6 million, which includes the value of our related-party claims against the Bloom Lake Group and the Wabush Group. Should the Monitor proceed to assert the claim, we believe the Monitor will demand an amount in excess of the value of our related-party claims against the Bloom Lake Group and the Wabush Group. Thus, it is possible that a change in the estimated liability may occur in the future. We deny liability for any amount and will vigorously defend such claim. Refer to the *Guarantees and Contingent Liabilities* section below for additional information.

During 2017, the Wabush Scully Mine was sold as part of the ongoing CCAA proceedings for the Wabush Group. As part of the sale, the environmental remediation obligations were conveyed to the buyer and we were released from our guarantees. Refer to the *Guarantees and Contingent Liabilities* section below for additional information.

*Loss on Discontinued Operations*

Our Canadian exit represents a strategic shift in our business. For this reason, our previously reported Eastern Canadian Iron Ore and Ferroalloys operating segment results for all periods prior to the respective deconsolidations, as well as costs to exit, are classified as discontinued operations.

| | (In Millions) | | |
| | Year Ended December 31, | | |
| ***Loss from Discontinued Operations*** | **2017** | 2016 | 2015 |
|---|---|---|---|
| Revenues from product sales and services | $ — | $ — | $ 11.3 |
| Cost of goods sold and operating expenses | — | — | (11.1) |
| Sales margin | — | — | 0.2 |
| Other operating expense | — | — | (33.8) |
| Other expense | — | — | (1.0) |
| Loss from discontinued operations before income taxes | — | — | (34.6) |
| Loss from deconsolidation | **(21.3)** | (17.5) | (710.9) |
| Income tax benefit | — | — | 5.8 |
| Loss from discontinued operations, net of tax | $ **(21.3)** | $ (17.5) | $ (739.7) |

141

Canadian Entities loss from deconsolidation totaled $21.3 million and $17.5 million for the year ended December 31, 2017 and 2016, respectively and included the following:

| | | (In Millions) | |
|---|---|---|---|
| | Year Ended December 31, | Year Ended December 31, | Year Ended December 31, |
| | **2017** | 2016 | 2015 |
| Investment impairment on deconsolidation[1] | $         3.0 | $         (17.5) | $         (507.8) |
| Guarantees and contingent liabilities | (24.3) | — | (203.1) |
| Total loss from deconsolidation | $         (21.3) | $         (17.5) | $         (710.9) |

[1] Includes the adjustment to fair value of our remaining interest in the Canadian Entities.

*Investments in the Canadian Entities*

We continue to indirectly own a majority of the interest in the Canadian Entities but have deconsolidated those entities because we no longer have a controlling interest as a result of the CCAA proceedings commenced with respect to the Bloom Lake Group and the Wabush Group. At the respective dates of deconsolidation, January 27, 2015 and May 20, 2015 and subsequently at each reporting period, we adjusted our investment in the Canadian Entities to fair value with a corresponding charge to *Loss from Discontinued Operations, net of tax*. As the estimated amount of the Canadian Entities' liabilities exceeded the estimated fair value of the assets available for distribution to their creditors, the fair value of our equity investment is approximately zero.

*Amounts Receivable from the Canadian Entities*

Prior to the deconsolidations, certain of our wholly-owned subsidiaries made loans to the Canadian Entities for the purpose of funding their operations and had accounts receivable generated in the ordinary course of business. The loans, corresponding interest and the accounts receivable were considered intercompany transactions and eliminated in our consolidated financial statements. Since the deconsolidations, the loans, associated interest and accounts receivable are considered related party transactions and have been recognized in our consolidated financial statements at their estimated fair value of $51.6 million and $48.6 million classified as *Loans to and accounts receivables from the Canadian Entities* in the Statements of Consolidated Financial Position at December 31, 2017 and 2016, respectively.

*Pre-Petition Financing*

Prior to the commencement of CCAA proceedings for the Wabush Group on May 20, 2015, a secured credit facility (the "Pre-Petition financing") was made available by Cliffs Mining Company to provide support to the Wabush Group for ongoing business activities. As of December 31, 2017 and 2016, the amount outstanding under the Pre-Petition financing was $7.2 million. Our estimated recovery of the Pre-Petition financing is included within the *Loans to and accounts receivables from the Canadian Entities* of $51.6 million. The Pre-Petition financing is secured by the proceeds of certain assets of the Wabush Group.

*Guarantees and Contingent Liabilities*

During 2017, we became aware that it was probable the Monitor will assert a preference claim against the Company and/or certain of its affiliates. Given that it is probable the claim will be asserted by the Monitor, we have recorded an estimated liability of $55.6 million, which includes the value of our related-party claims against the Bloom Lake Group and the Wabush Group, classified as *Contingent claims* in the Statements of Consolidated Financial Position as of December 31, 2017 and included within *Loss from Discontinued Operations, net of tax* in the Statements of Consolidated Operations for the year ended December 31, 2017. Should the Monitor proceed to assert the claim, we believe the Monitor will demand an amount in excess of the value of our related-party claims against the Bloom Lake Group and the Wabush Group. Thus, it is possible that a change in the estimated liability may occur in the future. We deny liability for any amount and will vigorously defend such claim.

We previously recorded liabilities of $37.2 million related to guarantees for certain environmental obligations of the Canadian Entities, classified as *Other liabilities* in the Statements of Consolidated Financial Position as of December 31, 2016. During 2017, the Wabush Scully Mine was sold as part of the ongoing CCAA proceedings for the Wabush Group. As part of this transaction, we were required to fund the buyer's financial assurance shortfall of $7.7 million in order to complete the conveyance of the environmental remediation obligations to the buyer, which released us from our guarantees and resulted in a net gain of $31.4 million included in *Loss from Discontinued Operations, net*

Table of Contents

*of tax* in the Statements of Consolidated Operations . Refer to the *Items Measured at Fair Value on a Non-Recurring Basis* section below for additional information.

Items Measured at Fair Value on a Non-Recurring Basis

The following table presents information about the financial assets and liabilities that were measured on a fair value basis at December 31, 2017 and 2016 for the Canadian Entities. The table also indicates the fair value hierarchy of the valuation techniques used to determine such fair value:

| | (In Millions) | | | | |
| --- | --- | --- | --- | --- | --- |
| | December 31, 2017 | | | | |
| Description | Quoted Prices in Active Markets for Identical Assets/ Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total | Gains |
| **Assets:** | | | | | |
| Loans to and accounts receivables from the Canadian Entities | $ — | $ — | $ 51.6 | $ 51.6 | $ 3.0 |
| **Liabilities:** | | | | | |
| Guarantees and contingent liabilities | $ — | $ — | $ — | $ — | $ 31.4 |

| | (In Millions) | | | | |
| --- | --- | --- | --- | --- | --- |
| | December 31, 2016 | | | | |
| Description | Quoted Prices in Active Markets for Identical Assets/ Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total | Losses |
| **Assets:** | | | | | |
| Loans to and accounts receivables from the Canadian Entities | $ — | $ — | $ 48.6 | $ 48.6 | $ 17.5 |
| **Liabilities:** | | | | | |
| Guarantees and contingent liabilities | $ — | $ — | $ 37.2 | $ 37.2 | $ — |

To assess the fair value and recoverability of the accounts receivable from the Canadian Entities, we estimated the fair value of the underlying net assets of the Canadian Entities available for distribution to their creditors in relation to the estimated creditor claims and the priority of those claims. These underlying amounts are denominated primarily in Canadian dollars and are remeasured on a quarterly basis.

We determined the fair value and recoverability of our Canadian investments by comparing the estimated fair value of the remaining underlying assets of the Canadian Entities to remaining estimated liabilities. We recorded the Canadian denominated guarantees at book value, which best approximated fair value.

Our estimates involve significant judgment and are based on currently available information, an assessment of the validity of certain claims and estimated payments made by the Canadian Entities. Our ultimate recovery is subject to the final liquidation value of the Canadian Entities. Further, the final liquidation value and ultimate recovery of the creditors of the Canadian Entities, including, if any, to Cliffs and various subsidiaries, may impact our estimates of contingent liability exposure described previously.

Income Taxes

We have recognized no tax expense or benefit for the years ended December 31, 2017 and 2016 in *Loss from Discontinued Operations, net of tax*, related to our Canadian investments. For the year ended December 31, 2015, we recognized a tax benefit of $5.8 million in *Loss from Discontinued Operations, net of tax.*

143

A005405

Table of Contents

**NOTE 15 - CAPITAL STOCK**

**Common Share Public Offering**

On February 9, 2017, we issued 63.25 million common shares in an underwritten public offering at a public offering price of $10.75 per common share. We received net proceeds of $661.3 million. The net proceeds from the issuance of our common shares and our issuance of $500 million aggregate principal amount of 5.75% 2025 Senior Notes were used to redeem in full all of our outstanding 8.00% 2020 1.5 Lien Notes and 7.75% 2020 Second Lien Notes. The aggregate principal amount outstanding of debt redeemed was $648.6 million. Additionally, through tender offers, we purchased $422.2 million in aggregate principal amount of debt, excluding unamortized discounts and deferred charges, of our 5.90% 2020 Senior Notes, our 4.80% 2020 Senior Notes and our 4.875% 2021 Senior Notes. In addition, we redeemed $35.6 million aggregate principal amount of the 8.25% 2020 First Lien Notes with the remaining net proceeds from our common share offering.

On August 10, 2016, we issued 44.4 million common shares in an underwritten public offering at a public offering price of $6.75 per common share. We received net proceeds of $287.6 million. The net proceeds from the issuance of our common shares were used to fully redeem our 3.95% 2018 Senior Notes.

**Preferred Shares Conversion to Common Shares**

On January 4, 2016, we announced that our Board of Directors determined the final quarterly dividend of our Preferred Shares would not be paid in cash, but instead, pursuant to the terms of the Preferred Shares, the conversion rate was increased such that holders of the Preferred Shares received additional common shares in lieu of the accrued dividend at the time of the mandatory conversion on February 1, 2016. The number of common shares in the aggregate that were issued in lieu of the final dividend was 1.3 million. This resulted in an effective conversion rate of 0.9052 common shares, rather than 0.8621 common shares, per depositary share, e ach representing a 1/40th of a Preferred Share.

Prior to the mandatory conversion, holders of the depositary shares were entitled to a proportional fractional interest in the rights and preferences of the Series A preferred shares, including conversion, dividend, liquidation and voting rights, subject to the provisions of the deposit agreement. The Series A preferred shares were convertible, at the option of the holder, at the minimum conversion rate of 28.1480 of our common shares (equivalent to 0.7037 of our common shares per depositary share) at any time prior to February 1, 2016 or other than during a fundamental change conversion period, subject to anti-dilution adjustments. If not converted prior to that time, each Series A preferred share converted automatically on February 1, 2016 into between 28.1480 and 34.4840 common shares, par value $0.125 per share, subject to anti-dilution adjustments. The number of common shares issued on conversion was determined based on the average VWAP per share of our common shares during the 20 trading day period beginning on, and including, the 23 rd scheduled trading day prior to February 1, 2016, subject to customary anti-dilution adjustments. Upon conversion on February 1, 2016, an aggregate of 26.5 million common shares were issued, representing 25.2 million common shares issuable upon conversion and 1.3 million that were issued in lieu of a final cash dividend.

**Dividends**

On November 19, 2014, March 27, 2015, July 1, 2015 and September 10, 2015, our Board of Directors declared the quarterly cash dividend of $17.50 per Preferred Share, which is equivalent to $0.44 per depositary share. The cash dividend was paid on February 2, 2015, May 1, 2015, August 3, 2015 and November 2, 2015 to our shareholders of record as of the close of business on January 15, 2015, April 15, 2015, July 15, 2015 and October 15, 2015, respectively.

**Debt-for-Equity Exchanges**

During the year ended December 31, 2016, we entered into a series of privately negotiated exchange agreements whereby we issued an aggregate of 8.2 million common shares in exchange for $10.0 million aggregate principal amount of our 3.95% 2018 Senior Notes, $20.1 million aggregate principal amount of our 4.80% 2020 Senior Notes and $26.8 million aggregate principal amount of our 4.875% 2021 Senior Notes. There were no exchanges that represented more than 1% of our outstanding common shares during any quarter. Accordingly, we recognized a gain of $11.3 million in *Gain (loss) on extinguishment/restructuring of debt* in the Statements of Consolidated Operations for the year ended December 31, 2016. The issuances of the common shares in exchange for our senior notes due 2018, 2020 and 2021 were made in reliance on the exemption from registration provided in Section 3(a)(9) of the Securities Act.

144

Table of Contents

**NOTE 16 - ACCUMULATED OTHER COMPREHENSIVE INCOME (LOSS)**

The components of *Accumulated other comprehensive loss* within Cliffs shareholders' deficit and related tax effects allocated to each are shown below as of December 31, 2017, 2016 and 2015:

| | (In Millions) | | |
|---|---|---|---|
| | Pre-tax Amount | Tax Benefit | After-tax Amount |
| **As of December 31, 2017:** | | | |
| **Postretirement benefit liability** | $ (387.3) | $ 123.4 | $ (263.9) |
| **Foreign currency translation adjustments** | 225.4 | — | 225.4 |
| **Unrealized net loss on derivative financial instruments** | (0.5) | — | (0.5) |
| | $ (162.4) | $ 123.4 | $ (39.0) |
| As of December 31, 2016: | | | |
| Postretirement benefit liability | $ (384.0) | $ 123.4 | $ (260.6) |
| Foreign currency translation adjustments | 239.3 | — | 239.3 |
| | $ (144.7) | $ 123.4 | $ (21.3) |
| As of December 31, 2015: | | | |
| Postretirement benefit liability | $ (364.8) | $ 123.4 | $ (241.4) |
| Foreign currency translation adjustments | 220.7 | — | 220.7 |
| Unrealized net gain on derivative financial instruments | 2.2 | 0.4 | 2.6 |
| Unrealized gain on securities | 0.1 | — | 0.1 |
| | $ (141.8) | $ 123.8 | $ (18.0) |

145

Table of Contents

The following tables reflect the changes in *Accumulated other comprehensive loss* related to Cliffs shareholders' equity for  December 31, 2017, 2016 and 2015:

| | Postretirement Benefit Liability, net of tax | Unrealized Net Gain (Loss) on Foreign Currency Translation | Net Unrealized Loss on Derivative Financial Instruments, net of tax | Accumulated Other Comprehensive Income (Loss) |
|---|---|---|---|---|
| | | | (In Millions) | |
| **Balance December 31, 2016** | $ (260.6) | $ 239.3 | $ — | $ (21.3) |
| Other comprehensive loss before reclassifications | (29.8) | (13.9) | (0.5) | (44.2) |
| Net loss reclassified from accumulated other comprehensive income (loss) | 26.5 | — | — | 26.5 |
| **Balance December 31, 2017** | $ (263.9) | $ 225.4 | $ (0.5) | $ (39.0) |

| | Postretirement Benefit Liability, net of tax | Unrealized Net Gain (Loss) on Securities, net of tax | Unrealized Net Gain (Loss) on Foreign Currency Translation | Net Unrealized Gain (Loss) on Derivative Financial Instruments, net of tax | Accumulated Other Comprehensive Income (Loss) |
|---|---|---|---|---|---|
| | | | (In Millions) | | |
| Balance December 31, 2015 | $ (241.4) | $ 0.1 | $ 220.7 | $ 2.6 | $ (18.0) |
| Other comprehensive income (loss) before reclassifications | (44.8) | (0.1) | 18.4 | (3.3) | (29.8) |
| Net loss reclassified from accumulated other comprehensive income (loss) | 25.6 | — | 0.2 | 0.7 | 26.5 |
| Balance December 31, 2016 | $ (260.6) | $ — | $ 239.3 | $ — | $ (21.3) |

| | Postretirement Benefit Liability, net of tax | Unrealized Net Gain (Loss) on Securities, net of tax | Unrealized Net Gain (Loss) on Foreign Currency Translation | Net Unrealized Gain (Loss) on Derivative Financial Instruments, net of tax | Accumulated Other Comprehensive Income (Loss) |
|---|---|---|---|---|---|
| | | | (In Millions) | | |
| Balance December 31, 2014 | $ (291.1) | $ (1.0) | $ 64.4 | $ (18.1) | $ (245.8) |
| Other comprehensive income (loss) before reclassifications | 9.1 | 5.4 | (26.4) | 1.9 | (10.0) |
| Net loss (gain) reclassified from accumulated other comprehensive income (loss) | 40.6 | (4.3) | 182.7 | 18.8 | 237.8 |
| Balance December 31, 2015 | $ (241.4) | $ 0.1 | $ 220.7 | $ 2.6 | $ (18.0) |

146

A005408

Table of Contents

The following table reflects the details about *Accumulated other comprehensive loss* components related to Cliffs shareholders' equity for the years ended December 31, 2017, 2016 and 2015:

**(In Millions)**

| Details about Accumulated Other Comprehensive Income (Loss) Components | Amount of (Gain)/Loss Reclassified into Income | | | Affected Line Item in the Statement of Consolidated Operations |
|---|---|---|---|---|
| | Year Ended December 31, 2017 | Year Ended December 31, 2016 | Year Ended December 31, 2015 | |
| Amortization of Pension and Postretirement Benefit Liability: | | | | |
| Prior service costs[1] | $ (0.4) | $ (1.5) | $ (1.4) | |
| Net actuarial loss[1] | 26.9 | 27.1 | 27.4 | |
| Curtailments/Settlements[1] | — | — | 0.2 | |
| Effect of deconsolidation[2] | — | — | 15.1 | *Loss from Discontinued Operations, net of tax* |
| | 26.5 | 25.6 | 41.3 | Total before taxes |
| | — | — | (0.7) | *Income tax benefit (expense)* |
| | $ 26.5 | $ 25.6 | $ 40.6 | Net of taxes |
| | | | | |
| Unrealized loss on marketable securities: | | | | |
| Sale of marketable securities | $ — | $ — | $ (2.6) | *Other non-operating income (expense)* |
| Impairment | — | — | (2.0) | *Other non-operating income (expense)* |
| | — | — | (4.6) | Total before taxes |
| | — | — | 0.3 | *Income tax benefit (expense)* |
| | $ — | $ — | $ (4.3) | Net of taxes |
| | | | | |
| Unrealized gain on foreign currency translation: | | | | |
| Dissolution of entity | $ — | $ 0.2 | $ — | *Other non-operating income (expense)* |
| Effect of deconsolidation[3] | — | — | 182.7 | *Loss from Discontinued Operations, net of tax* |
| | $ — | $ 0.2 | $ 182.7 | Net of taxes |
| | | | | |
| Unrealized gain on derivative financial instruments: | | | | |
| Treasury lock | $ — | $ 1.2 | $ — | *Gain (loss) on extinguishment/restructuring of debt* |
| Australian dollar foreign exchange contracts | — | — | 26.9 | *Product revenues* |
| | — | 1.2 | 26.9 | Total before taxes |
| | — | (0.5) | (8.1) | *Income tax benefit (expense)* |
| | $ — | $ 0.7 | $ 18.8 | Net of taxes |
| | | | | |
| Total Reclassifications for the Period | $ 26.5 | $ 26.5 | $ 237.8 | |

[1] These accumulated other comprehensive income components are included in the computation of net periodic benefit cost. See NOTE 7 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS for further information.

[2] Represents Canadian postretirement benefit liabilities that were deconsolidated. See NOTE 14 - DISCONTINUED OPERATIONS for further information.

[3] Represents Canadian accumulated currency translation adjustments that were deconsolidated. See NOTE 14 - DISCONTINUED OPERATIONS for further information.

A005409

Table of Contents

**NOTE 17 - CASH FLOW INFORMATION**

A reconciliation of capital additions to cash paid for capital expenditures for the  years ended December 31, 2017, 2016 and 2015 is as follows:

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | | | |
| | **2017** | | 2016 | | 2015 | |
| Capital additions[1] | $ | **156.0** | $ | 68.5 | $ | 96.7 |
| Less: | | | | | | |
| Non-cash accruals | $ | **(2.2)** | $ | (0.6) | $ | 14.4 |
| Capital leases | | **6.5** | | — | | 1.5 |
| Cash paid for capital expenditures | $ | **151.7** | $ | 69.1 | $ | 80.8 |

[1] Includes capital additions of $72.2 million and $24.5 million related to continuing operations and discontinued operations, respectively, for the year ended December 31, 2015.

Cash payments for interest and income taxes in  2017, 2016 and 2015 are as follows:

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| | **2017** | | 2016 | | 2015 | |
| Taxes paid on income | $ | **1.7** | $ | 6.0 | $ | 5.0 |
| Income tax refunds | $ | **(7.8)** | $ | (5.4) | $ | (211.4) |
| Interest paid on debt obligations[1] | $ | **139.0** | $ | 184.0 | $ | 185.6 |

[1] Includes interest paid on the corporate guarantees of the equipment loans that relate to discontinued operations for the years ended December 31, 2016 and 2015 of $1.4 million and $4.8 million, respectively.

**NOTE 18 - RELATED PARTIES**

One of our four operating U.S. iron ore mines is a co-owned joint venture with companies that are integrated steel producers or their subsidiaries. We are the manager of such co-owned mine and rely on our joint venture partners to make their required capital contributions and to pay for their share of the iron ore pellets that we produce. Our joint venture partners are also our customers. The following is a summary of the mine ownership of the co-owned iron ore mine at December 31, 2017:

| **Mine** | **Cleveland-Cliffs Inc.** | **ArcelorMittal** | **U.S. Steel** |
|---|---|---|---|
| Hibbing | 23.0% | 62.3% | 14.7% |

During 2017, our ownership interest in Empire increased to  100% as we reached an agreement to distribute the noncontrolling interest net assets of $132.7 million to ArcelorMittal, in exchange for its interest in Empire. The net assets were agreed to be distributed in three installments of $44.2 million each, the first of which was paid upon the execution of the agreement and the remaining distributions are due in August 2018 and August 2019. The remaining two outstanding installments are reflected in *Partnership distribution payable* and *Other liabilities* in the Statements of Consolidated Financial Position as of December 31, 2017. We accounted for the increase in ownership as an equity transaction, which resulted in a $12.1 million decrease in equity attributable to Cliffs' shareholders and a $116.7 million decrease in *Noncontrolling interest*.

As part of a 2014 extension agreement between us and ArcelorMittal, which amended certain terms of the Empire partnership agreement, distributions of the partners' equity amounts were required to be made on a quarterly basis beginning in the first quarter of 2015. These equity distributions were made through the termination of the partnership agreement on December 31, 2016. We paid $8.7 million in January 2017 related to 2016 distributions. During the year ended December 31, 2016, we recorded distributions of $57.5 million to ArcelorMittal under this agreement, of which  $48.8 million was paid as of December 31, 2016. During the year ended December 31, 2015, we recorded distributions

148

of $51.7 million under this agreement, of which $40.6 million was paid as of December 31, 2015 and $11.1 million was paid in January 2016.

During 2017, we also acquired the remaining 15% equity interest in Tilden for $105.0 million. With the closing of this transaction, we now have 100% ownership of the mine. We accounted for the increase in ownership as an equity transaction, which resulted in an $89.1 million decrease in equity attributable to Cliffs' shareholders and a $15.9 million decrease in *Noncontrolling interest*.

*Product revenues* from related parties were as follows:

| | (In Millions) | | |
|---|---|---|---|
| | **Year Ended December 31,** | | |
| | **2017** | 2016 | 2015 |
| Product revenues from related parties | $ **806.7** | $ 830.1 | $ 671.1 |
| Total product revenues | **2,089.2** | 1,913.5 | 1,832.4 |
| Related party product revenue as a percent of total product revenue | **38.6%** | 43.4% | 36.6% |

The following table presents the classification of related party assets and liabilities in the Statements of Consolidated Financial Position as of December 31, 2017 and 2016:

| | (In Millions) | | |
|---|---|---|---|
| | **Balance Sheet Location** | **December 31, 2017** | December 31, 2016 |
| Amounts due from related parties | *Accounts receivable, net* | $ **68.1** | $ 46.9 |
| Customer supply agreements and provisional pricing agreements | *Derivative assets* | **37.9** | 26.8 |
| Amounts due to related parties | *Partnership distribution payable* | **(44.2)** | (8.7) |
| Amounts due to related parties | *Other current liabilities* | **(12.3)** | — |
| Amounts due to related parties | *Other liabilities* | **(41.4)** | — |
| Net amounts due from related parties | | $ **8.1** | $ 65.0 |

Certain supply agreements with one U.S. Iron Ore customer provide for supplemental revenue or refunds to the customer based on the customer's average annual steel pricing or based on the average annual daily market price for hot-rolled coil steel at the time the product is consumed in the customer's blast furnace. The supplemental pricing is characterized as a freestanding derivative. Refer to NOTE 13 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES for further information.

A005411

Table of Contents

**NOTE 19 - EARNINGS PER SHARE**

The following table summarizes the computation of basic and diluted earnings (loss) per share:

| | (In Millions, Except Per Share Amounts) | | |
| --- | --- | --- | --- |
| | Year Ended December 31, | | |
| | **2017** | 2016 | 2015 |
| Income from Continuing Operations | $ **381.8** | $ 219.2 | $ 143.7 |
| Loss (Income) from Continuing Operations attributable to Noncontrolling Interest | **3.9** | (25.2) | (8.6) |
| Net Income from Continuing Operations attributable to Cliffs shareholders | $ **385.7** | $ 194.0 | $ 135.1 |
| Loss from Discontinued Operations, net of tax | **(18.7)** | (19.9) | (884.4) |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | $ **367.0** | $ 174.1 | $ (749.3) |
| PREFERRED STOCK DIVIDENDS | **—** | — | (38.4) |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS COMMON SHAREHOLDERS | $ **367.0** | $ 174.1 | $ (787.7) |
| Weighted Average Number of Shares: | | | |
| Basic | **288.4** | 197.7 | 153.2 |
| Employee Stock Plans | **4.6** | 2.4 | 0.4 |
| Diluted | **293.0** | 200.1 | 153.6 |
| Earnings (Loss) per Common Share Attributable to Cliffs Common Shareholders - Basic: | | | |
| Continuing operations | $ **1.34** | $ 0.98 | $ 0.63 |
| Discontinued operations | **(0.06)** | (0.10) | (5.77) |
| | $ **1.28** | $ 0.88 | $ (5.14) |
| Earnings (Loss) per Common Share Attributable to Cliffs Common Shareholders - Diluted: | | | |
| Continuing operations | $ **1.32** | $ 0.97 | $ 0.63 |
| Discontinued operations | **(0.06)** | (0.10) | (5.76) |
| | $ **1.26** | $ 0.87 | $ (5.13) |

The common share equivalents for the $316.25 million 1.50% 2025 Convertible Senior Notes that were issued in the fourth quarter of 2017 were not included in the computation of diluted earnings per common share as we have the ability and intent, both currently and in the future, to settle these in cash. The diluted earnings per share calculation excludes 25.3 million depositary shares that were anti-dilutive for the year ended December 31, 2015. Refer to NOTE 5 - DEBT AND CREDIT FACILITIES for further information.

Table of Contents

**NOTE 20 - COMMITMENTS AND CONTINGENCIES**

**Contingencies**

*Litigation*

We are currently the subject of, or party to, various claims and legal proceedings incidental to our operations. If management believes that a loss arising from these matters is probable and can reasonably be estimated, we record the amount of the loss or the minimum estimated liability when the loss is estimated using a range, and no point within the range is more probable than another. As additional information becomes available, any potential liability related to these matters is assessed and the estimates are revised, if necessary. Based on currently available information, management believes that the ultimate outcome of these matters, individually and in the aggregate, will not have a material effect on our financial position, results of operations or cash flows. However, these claims and legal proceedings are subject to inherent uncertainties and unfavorable rulings could occur. An unfavorable ruling could include monetary damages, additional funding requirements or an injunction. If an unfavorable ruling were to occur, there exists the possibility of a material impact on the financial position and results of operations for the period in which the ruling occurs or future periods. However, we do not believe that any pending claims or legal proceedings will result in a material liability in relation to our consolidated financial statements.

Currently, we have recorded a liability in the Statements of Consolidated Financial Position related to the following legal matters:

*Michigan Electricity Matters.* On February 19, 2015, in connection with various proceedings before FERC with respect to certain cost allocations for continued operation of the Presque Isle Power Plant in Marquette, Michigan, FERC issued an order directing MISO to submit a revised methodology for allocating SSR costs that identified the load serving entities that require the operation of SSR units at the power plant for reliability purposes. On September 17, 2015, FERC issued an order conditionally approving MISO's revised allocation methodology. On September 22, 2016, FERC denied requests for rehearing of the February 19 order, rejecting arguments that FERC did not have the authority to order refunds in a cost allocation case and to impose retroactive surcharges to effectuate such refunds. FERC, however, suspended any refunds and surcharges pending its review of a July 25, 2016 ALJ initial decision on the appropriate amount of SSR compensation. On November 8, 2016, Tilden and Empire, along with various Michigan-aligned parties, filed petitions for review of FERC's order regarding allocation and non-cost SSR issues with the U.S. Court of Appeals for the D.C. Circuit. On January 27, 2017, Tilden, Empire and other appellants filed a motion to terminate further abeyance of briefing so that cost allocation issues could be heard at the Court of Appeals, which motion was granted on April 4, 2017. Should retroactive surcharges be permitted, our current estimate of the potential liability to the Empire and Tilden mines is $12.3 million, based on FERC's October 19, 2017 Order reviewing the July 25, 2016 ALJ initial decision. We will continue to vigorously challenge the retroactive imposition of any SSR costs before the U.S. Court of Appeals for the D.C. Circuit. As of December 31, 2017 and December 31, 2016, $12.3 million and $13.6 million, respectively, is included in our Statements of Consolidated Financial Position as part of *Accrued expenses*.

*CCAA Proceedings*

Effective January 27, 2015, following the commencement of CCAA proceedings for the Bloom Lake Group, we deconsolidated the Bloom Lake Group and certain other wholly-owned subsidiaries comprising substantially all of our Canadian operations. Additionally, on May 20, 2015, the Wabush Group commenced CCAA proceedings which resulted in the deconsolidation of the remaining Wabush Group entities that were not previously deconsolidated. As a result of this action, the CCAA protection granted to the Bloom Lake Group was extended to include the Wabush Group to facilitate the reorganization of each of their businesses and operations.

Prior to the deconsolidations, certain of our wholly-owned subsidiaries made loans to the Canadian Entities for the purpose of funding their operations and has accounts receivable generated in the ordinary course of business. The loans, corresponding interest and the accounts receivable were considered intercompany transactions and eliminated in our consolidated financial statements. Since the deconsolidations, the loans, associated interest and accounts receivable are considered related party transactions and have been recognized in our consolidated financial statements at their estimated fair value of $51.6 million and $48.6 million classified as *Loans to and accounts receivables from the Canadian Entities* in the Statements of Consolidated Financial Position at December 31, 2017 and 2016, respectively.

As of December 31, 2017, CCAA proceedings are ongoing and the majority of the assets of each of the Bloom Lake Group and the Wabush Group have been liquidated. The Monitor appointed by the court in the CCAA proceedings for the Bloom Lake Group and the Wabush Group has conducted a claims process pursuant to which creditors have filed claims against the Bloom Lake Group and the Wabush Group. The Monitor is reviewing all claims filed as part of this claims process. Currently, there is uncertainty as to the amount of the distribution that will be made to the creditors

of the Bloom Lake Group and the Wabush Group, including, if any, to us, and whether we could be held liable for claims that may be asserted by or on behalf of the Bloom Lake Group or the Wabush Group or by their respective representatives against non-debtor affiliates of the Bloom Lake Group and the Wabush Group.

The net proceeds of sale of the assets of the Bloom Lake Group and the Wabush Group are currently being held by the Monitor. Certain of these funds will be utilized to fund the accrued and ongoing costs of the CCAA proceedings and the remaining funds will be available for distribution to the creditors of the Bloom Lake Group and the Wabush Group.

During 2017, we became aware that it was probable the Monitor will assert a preference claim against the Company and/or certain of its affiliates. Given that it is probable the claim will be asserted by the Monitor, we have recorded an estimated liability of $55.6 million, which includes the value of our related-party claims against the Bloom Lake Group and the Wabush Group, classified as *Contingent claims* in the Statements of Consolidated Financial Position as of December 31, 2017 and included within *Loss from Discontinued Operations, net of tax* in the Statements of Consolidated Operations for the year ended December 31, 2017. Should the Monitor proceed to assert the claim, we believe the Monitor will demand an amount in excess of the value of our related-party claims against the Bloom Lake Group and the Wabush Group. Thus, it is possible that a change in the estimated liability may occur in the future. We deny liability for any amount and will vigorously defend such claim.

We previously recorded liabilities of $37.2 million related to guarantees for certain environmental obligations of the Canadian Entities, classified as *Other liabilities* in the Statements of Consolidated Financial Position as of December 31, 2016. During 2017, the Wabush Scully Mine was sold as part of the ongoing CCAA proceedings for the Wabush Group. As part of this transaction, we were required to fund the buyer's financial assurance shortfall of $7.7 million in order to complete the conveyance of the environmental remediation obligations to the buyer, which released us from our guarantees and resulted in a net gain of $31.4 million included in *Loss from Discontinued Operations, net of tax* in the Statements of Consolidated Operations.

*Environmental Matters*

We had environmental liabilities of $2.9 million and $2.8 million at December 31, 2017 and 2016, respectively, including obligations for known environmental remediation exposures at active and closed mining operations and other sites. These amounts have been recognized based on the estimated cost of investigation and remediation at each site, and include site studies, design and implementation of remediation plans, legal and consulting fees, and post-remediation monitoring and related activities. Future expenditures are not discounted unless the amount and timing of the cash disbursements are readily known. Potential insurance recoveries have not been reflected. Additional environmental obligations could be incurred, the extent of which cannot be assessed. The amount of our ultimate liability with respect to these matters may be affected by several uncertainties, primarily the ultimate cost of required remediation and the extent to which other responsible parties contribute. Refer to NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS for further information.

*Tax Matters*

The calculation of our tax liabilities involves dealing with uncertainties in the application of complex tax regulations. We recognize liabilities for anticipated tax audit issues based on our estimate of whether, and the extent to which, additional taxes will be due. If we ultimately determine that payment of these amounts is unnecessary, we reverse the liability and recognize a tax benefit during the period in which we determine that the liability is no longer necessary. We also recognize tax benefits to the extent that it is more likely than not that our positions will be sustained when challenged by the taxing authorities. To the extent we prevail in matters for which liabilities have been established, or are required to pay amounts in excess of our liabilities, our effective tax rate in a given period could be materially affected. An unfavorable tax settlement would require use of our cash and result in an increase in our effective tax rate in the year of resolution. A favorable tax settlement would be recognized as a reduction in our effective tax rate in the year of resolution. Refer to NOTE 9 - INCOME TAXES for further information.

## NOTE 21 - SUBSEQUENT EVENTS

We have evaluated subsequent events through the date of financial issuance.

A005414

Table of Contents

**NOTE 22 - QUARTERLY RESULTS OF OPERATIONS (UNAUDITED)**

The sum of quarterly EPS may not equal EPS for the year due to discrete quarterly calculations.

| | (In Millions, Except Per Share Amounts) | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2017 | | | | |
| | Quarters | | | | |
| | First | Second | Third | Fourth | Year |
| Revenues from product sales and services | $ 461.6 | $ 569.3 | $ 698.4 | $ 600.9 | $ 2,330.2 |
| Sales margin | 95.7 | 145.1 | 160.2 | 100.7 | 501.7 |
| Income (Loss) from Continuing Operations | $ (30.3) | $ 76.5 | $ 20.6 | $ 315.0 | $ 381.8 |
| Loss from Continuing Operations attributable to Noncontrolling Interest | 1.7 | 1.7 | 0.5 | — | 3.9 |
| Net Income (Loss) from Continuing Operations attributable to Cliffs shareholders | (28.6) | 78.2 | 21.1 | 315.0 | 385.7 |
| Income (Loss) from Discontinued Operations, net of tax | 0.5 | (46.4) | 32.3 | (5.1) | (18.7) |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | $ (28.1) | $ 31.8 | $ 53.4 | $ 309.9 | $ 367.0 |
| Earnings (Loss) per Common Share Attributable to Cliffs Common Shareholders - Basic: | | | | | |
| Continuing Operations | $ (0.11) | $ 0.26 | $ 0.07 | $ 1.06 | $ 1.34 |
| Discontinued Operations | — | (0.16) | 0.11 | (0.02) | (0.06) |
| | $ (0.11) | $ 0.10 | $ 0.18 | $ 1.04 | $ 1.28 |
| Earnings (Loss) per Common Share Attributable to Cliffs Common Shareholders - Diluted: | | | | | |
| Continuing Operations | $ (0.11) | $ 0.26 | $ 0.07 | $ 1.05 | $ 1.32 |
| Discontinued Operations | — | (0.15) | 0.11 | (0.02) | (0.06) |
| | $ (0.11) | $ 0.11 | $ 0.18 | $ 1.03 | $ 1.26 |

The diluted earnings per share calculation for the first quarter of 2017 excludes equity plan awards of 4.6 million that were anti-dilutive. There was no anti-dilution in the second, third or fourth quarter of 2017.

153

| | First | Second | Third | Fourth | Year |
|---|---|---|---|---|---|
| | (In Millions, Except Per Share Amounts) | | | | |
| | 2016 | | | | |
| | Quarters | | | | |
| | First | Second | Third | Fourth | Year |
| Revenues from product sales and services | $ 305.5 | $ 496.2 | $ 553.3 | $ 754.0 | $ 2,109.0 |
| Sales margin | 30.9 | 91.5 | 85.4 | 181.5 | 389.3 |
| Income (Loss) from Continuing Operations | $ 114.3 | $ 29.9 | $ (25.1) | $ 100.1 | $ 219.2 |
| Loss (Income) from Continuing Operations attributable to Noncontrolling Interest | (8.8) | (16.7) | 2.0 | (1.7) | (25.2) |
| Net Income (Loss) from Continuing Operations attributable to Cliffs shareholders | $ 105.5 | $ 13.2 | $ (23.1) | $ 98.4 | $ 194.0 |
| Income (Loss) from Discontinued Operations, net of tax | 2.5 | (0.4) | (2.7) | (19.3) | (19.9) |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS COMMON SHAREHOLDERS | $ 108.0 | $ 12.8 | $ (25.8) | $ 79.1 | $ 174.1 |
| Earnings (Loss) per Common Share Attributable to Cliffs Common Shareholders - Basic: | | | | | |
| Continuing Operations | $ 0.61 | $ 0.07 | $ (0.11) | $ 0.43 | $ 0.98 |
| Discontinued Operations | 0.01 | — | (0.01) | (0.08) | (0.10) |
| | $ 0.62 | $ 0.07 | $ (0.12) | $ 0.35 | $ 0.88 |
| Earnings (Loss) per Common Share Attributable to Cliffs Common Shareholders - Diluted: | | | | | |
| Continuing Operations | $ 0.61 | $ 0.07 | $ (0.11) | $ 0.42 | $ 0.97 |
| Discontinued Operations | 0.01 | — | (0.01) | (0.08) | (0.10) |
| | $ 0.62 | $ 0.07 | $ (0.12) | $ 0.34 | $ 0.87 |

The diluted earnings per share calculation for the third quarter of 2016 excludes equity plan awards of 3.0 million that were anti-dilutive. There was no anti-dilution in the first, second or fourth quarter of 2016.

154

A005416

Table of Contents

**NOTE 23 - SUPPLEMENTARY GUARANTOR INFORMATION**

The accompanying condensed consolidating financial information has been prepared and presented pursuant to SEC Regulation S-X, Rule 3-10, "Financial Statements of Guarantors and Issuers of Guaranteed Securities Registered or Being Registered." Certain of our subsidiaries have guaranteed the obligations under the $1.075 billion 5.75% 2025 Senior Notes issued by Cleveland-Cliffs Inc. See NOTE 5 - DEBT AND CREDIT FACILITIES for further information.

The following presents the condensed consolidating financial information for: (i) the Parent Company and the Issuer of the guaranteed obligations (Cleveland-Cliffs Inc.); (ii) the Guarantor subsidiaries, on a combined basis; (iii) the non-guarantor subsidiaries, on a combined basis; (iv) consolidating eliminations; and (v) Cleveland-Cliffs Inc. and Subsidiaries on a consolidated basis. Each Guarantor subsidiary is 100% owned by the Parent Company as of December 31, 2017. The condensed consolidating financial information is presented as if the Guarantor structure at December 31, 2017 existed for all years presented. As a result, the Guarantor subsidiaries within the condensed consolidating financial information as of December 31, 2017 and 2016 and for the years ended December 31, 2017, 2016 and 2015 include results of subsidiaries that were previously less than wholly-owned and were historically non-guarantors until 100% ownership was obtained.

Each of the Guarantor subsidiaries fully and unconditionally guarantee, on a joint and several basis, the obligations of Cleveland-Cliffs Inc. under the $1.075 billion 5.75% 2025 Senior Notes. The guarantee of a Guarantor subsidiary will be automatically and unconditionally released and discharged, and such Guarantor subsidiary's obligations under the guarantee and the related indenture governing the $1.075 billion 5.75% 2025 Senior Notes (the "Indenture") will be automatically and unconditionally released and discharged, upon:

(a) any sale, exchange, transfer or disposition of such Guarantor subsidiary (by merger, consolidation, or the sale of) or the capital stock of such Guarantor subsidiary after which the applicable Guarantor subsidiary is no longer a subsidiary of the Company or the sale of all or substantially all of such Guarantor subsidiary's assets (other than by lease);

(b) upon designation of any Guarantor subsidiary as an "excluded subsidiary" (as defined in the Indenture); and

(c) upon defeasance or satisfaction and discharge of the Indenture.

Each entity in the consolidating financial information follows the same accounting policies as described in the consolidated financial statements. The accompanying condensed consolidating financial information has been presented on the equity method of accounting for all periods presented. Under this method, investments in subsidiaries are recorded at cost and adjusted for the subsidiaries' cumulative results of operations, capital contributions and distributions, and other changes in equity. Elimination entries include consolidating and eliminating entries for investments in subsidiaries, and intra-entity activity and balances.

155

**Condensed Consolidating Statement of Financial Position**
**As of December 31, 2017**
**(In Millions)**

| | Cleveland-Cliffs Inc. | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **CURRENT ASSETS** | | | | | |
| Cash and cash equivalents | $ 948.9 | $ 2.1 | $ 56.7 | $ — | $ 1,007.7 |
| Accounts receivable, net | 4.5 | 102.9 | 33.9 | (0.7) | 140.6 |
| Inventories | — | 138.4 | 45.0 | — | 183.4 |
| Supplies and other inventories | — | 88.8 | 5.1 | — | 93.9 |
| Derivative assets | — | 37.9 | 1.5 | — | 39.4 |
| Loans to and accounts receivables from the Canadian Entities | 44.7 | 6.9 | — | — | 51.6 |
| Other current assets | 16.4 | 7.5 | 4.1 | — | 28.0 |
| TOTAL CURRENT ASSETS | 1,014.5 | 384.5 | 146.3 | (0.7) | 1,544.6 |
| PROPERTY, PLANT AND EQUIPMENT, NET | 17.5 | 959.0 | 74.5 | — | 1,051.0 |
| INCOME TAX RECEIVABLE | 235.3 | — | — | — | 235.3 |
| INVESTMENT IN SUBSIDIARIES | 1,024.3 | 29.9 | — | (1,054.2) | — |
| LONG-TERM INTERCOMPANY NOTES | — | — | 242.0 | (242.0) | — |
| OTHER NON-CURRENT ASSETS | 7.8 | 93.0 | 21.7 | — | 122.5 |
| TOTAL ASSETS | $ 2,299.4 | $ 1,466.4 | $ 484.5 | $ (1,296.9) | $ 2,953.4 |
| **LIABILITIES** | | | | | |
| **CURRENT LIABILITIES** | | | | | |
| Accounts payable | $ 7.1 | $ 89.7 | $ 31.6 | $ (0.7) | $ 127.7 |
| Accrued employment costs | 13.7 | 38.9 | 3.5 | — | 56.1 |
| State and local taxes payable | — | 30.0 | 0.2 | — | 30.2 |
| Accrued expenses | 5.3 | 13.2 | 15.2 | — | 33.7 |
| Accrued interest | 31.4 | — | — | — | 31.4 |
| Accrued royalties | — | 7.8 | 9.5 | — | 17.3 |
| Contingent claims | 55.6 | — | — | — | 55.6 |
| Partnership distribution payable | — | 44.2 | — | — | 44.2 |
| Other current liabilities | 2.1 | 33.5 | 20.4 | — | 56.0 |
| TOTAL CURRENT LIABILITIES | 115.2 | 257.3 | 80.4 | (0.7) | 452.2 |
| POSTEMPLOYMENT BENEFIT LIABILITIES | | | | | |
| Pensions | 59.2 | 403.6 | (240.0) | — | 222.8 |
| Other postretirement benefits | 7.2 | 27.0 | 0.7 | — | 34.9 |
| TOTAL POSTEMPLOYMENT BENEFIT LIABILITIES | 66.4 | 430.6 | (239.3) | — | 257.7 |
| ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS | — | 140.6 | 55.9 | — | 196.5 |
| LONG-TERM DEBT | 2,304.2 | — | — | — | 2,304.2 |
| LONG-TERM INTERCOMPANY NOTES | 242.0 | — | — | (242.0) | — |
| OTHER LIABILITIES | 15.7 | 147.2 | 24.0 | — | 186.9 |
| TOTAL LIABILITIES | 2,743.5 | 975.7 | (79.0) | (242.7) | 3,397.5 |
| COMMITMENTS AND CONTINGENCIES | | | | | |
| **EQUITY** | | | | | |
| TOTAL CLIFFS SHAREHOLDERS' DEFICIT | (444.1) | 490.7 | 563.3 | (1,054.2) | (444.3) |
| NONCONTROLLING INTEREST | — | — | 0.2 | — | 0.2 |
| TOTAL DEFICIT | (444.1) | 490.7 | 563.5 | (1,054.2) | (444.1) |
| TOTAL LIABILITIES AND DEFICIT | $ 2,299.4 | $ 1,466.4 | $ 484.5 | $ (1,296.9) | $ 2,953.4 |

156

### Condensed Consolidating Statement of Financial Position
### As of December 31, 2016
### (In Millions)

| | Cleveland-Cliffs Inc. | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **CURRENT ASSETS** | | | | | |
| Cash and cash equivalents | $ 283.4 | $ 2.5 | $ 37.5 | $ — | $ 323.4 |
| Accounts receivable, net | 4.5 | 59.3 | 65.7 | (0.8) | 128.7 |
| Inventories | — | 137.0 | 41.4 | — | 178.4 |
| Supplies and other inventories | — | 86.4 | 5.0 | — | 91.4 |
| Derivative assets | — | 31.7 | 1.4 | — | 33.1 |
| Loans to and accounts receivables from the Canadian Entities | 41.7 | 6.9 | — | — | 48.6 |
| Other current assets | 8.6 | 8.2 | 4.2 | — | 21.0 |
| TOTAL CURRENT ASSETS | 338.2 | 332.0 | 155.2 | (0.8) | 824.6 |
| PROPERTY, PLANT AND EQUIPMENT, NET | 21.4 | 937.7 | 25.3 | — | 984.4 |
| INVESTMENT IN SUBSIDIARIES | 882.4 | 24.6 | — | (907.0) | — |
| LONG-TERM INTERCOMPANY NOTES | — | — | 197.0 | (197.0) | — |
| OTHER NON-CURRENT ASSETS | 11.0 | 94.1 | 9.8 | — | 114.9 |
| TOTAL ASSETS | $ 1,253.0 | $ 1,388.4 | $ 387.3 | $ (1,104.8) | $ 1,923.9 |
| **LIABILITIES** | | | | | |
| **CURRENT LIABILITIES** | | | | | |
| Accounts payable | $ 1.6 | $ 92.6 | $ 14.2 | $ (0.8) | $ 107.6 |
| Accrued employment costs | 15.6 | 34.6 | 5.9 | — | 56.1 |
| State and local taxes payable | — | 28.1 | 0.2 | — | 28.3 |
| Accrued expenses | 7.6 | 14.4 | 19.1 | — | 41.1 |
| Accrued interest | 40.2 | — | — | — | 40.2 |
| Accrued royalties | — | 13.0 | 13.2 | — | 26.2 |
| Partnership distribution payable | — | 8.7 | — | — | 8.7 |
| Other current liabilities | 23.0 | 35.3 | 24.6 | — | 82.9 |
| TOTAL CURRENT LIABILITIES | 88.0 | 226.7 | 77.2 | (0.8) | 391.1 |
| **POSTEMPLOYMENT BENEFIT LIABILITIES** | | | | | |
| Pensions | 56.9 | 397.4 | (208.6) | — | 245.7 |
| Other postretirement benefits | 7.6 | 26.5 | 0.7 | — | 34.8 |
| TOTAL POSTEMPLOYMENT BENEFIT LIABILITIES | 64.5 | 423.9 | (207.9) | — | 280.5 |
| ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS | — | 153.9 | 40.0 | — | 193.9 |
| LONG-TERM DEBT | 2,175.1 | — | — | — | 2,175.1 |
| LONG-TERM INTERCOMPANY NOTES | 197.0 | — | — | (197.0) | — |
| OTHER LIABILITIES | 58.9 | 118.8 | 36.1 | — | 213.8 |
| TOTAL LIABILITIES | 2,583.5 | 923.3 | (54.6) | (197.8) | 3,254.4 |
| **COMMITMENTS AND CONTINGENCIES** | | | | | |
| **EQUITY** | | | | | |
| TOTAL CLIFFS SHAREHOLDERS' DEFICIT | (1,330.5) | 331.5 | 441.7 | (907.0) | (1,464.3) |
| NONCONTROLLING INTEREST | — | 133.6 | 0.2 | — | 133.8 |
| TOTAL DEFICIT | (1,330.5) | 465.1 | 441.9 | (907.0) | (1,330.5) |
| TOTAL LIABILITIES AND DEFICIT | $ 1,253.0 | $ 1,388.4 | $ 387.3 | $ (1,104.8) | $ 1,923.9 |

157

A005419

Condensed Consolidating Statement of Operations and Comprehensive Income (Loss)
For the Year Ended December 31, 2017
(In Millions)

| | Cleveland-Cliffs Inc. | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **REVENUES FROM PRODUCT SALES AND SERVICES** | | | | | |
| Product | $ — | $ 1,644.6 | $ 444.6 | $ — | $ 2,089.2 |
| Freight and venture partners' cost reimbursements | — | 221.4 | 19.6 | — | 241.0 |
| | — | 1,866.0 | 464.2 | — | 2,330.2 |
| **COST OF GOODS SOLD AND OPERATING EXPENSES** | — | (1,400.6) | (427.9) | — | (1,828.5) |
| SALES MARGIN | — | 465.4 | 36.3 | — | 501.7 |
| **OTHER OPERATING INCOME (EXPENSE)** | | | | | |
| Selling, general and administrative expenses | (81.4) | (24.7) | 0.3 | — | (105.8) |
| Miscellaneous - net | (2.2) | 12.3 | 17.6 | — | 27.7 |
| | (83.6) | (12.4) | 17.9 | — | (78.1) |
| OPERATING INCOME (LOSS) | (83.6) | 453.0 | 54.2 | — | 423.6 |
| **OTHER INCOME (EXPENSE)** | | | | | |
| Interest expense, net | (126.8) | (1.0) | (4.2) | — | (132.0) |
| Loss on extinguishment/restructuring of debt | (165.4) | — | — | — | (165.4) |
| Other non-operating income | 0.1 | 3.1 | — | — | 3.2 |
| | (292.1) | 2.1 | (4.2) | — | (294.2) |
| **INCOME (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES** | (375.7) | 455.1 | 50.0 | — | 129.4 |
| **INCOME TAX BENEFIT (EXPENSE)** | 251.4 | 1.3 | (0.3) | — | 252.4 |
| **EQUITY IN INCOME OF SUBSIDIARIES** | 512.6 | 11.8 | — | (524.4) | — |
| **INCOME FROM CONTINUING OPERATIONS** | 388.3 | 468.2 | 49.7 | (524.4) | 381.8 |
| **LOSS (INCOME) FROM DISCONTINUED OPERATIONS, net of tax** | (21.3) | 1.7 | 0.9 | — | (18.7) |
| **NET INCOME** | 367.0 | 469.9 | 50.6 | (524.4) | 363.1 |
| **LOSS ATTRIBUTABLE TO NONCONTROLLING INTEREST** | — | 3.9 | — | — | 3.9 |
| **NET INCOME ATTRIBUTABLE TO CLIFFS SHAREHOLDERS** | $ 367.0 | $ 473.8 | $ 50.6 | $ (524.4) | $ 367.0 |
| **OTHER COMPREHENSIVE INCOME (LOSS)** | (4.0) | 12.8 | (5.2) | (7.6) | (4.0) |
| **TOTAL COMPREHENSIVE INCOME ATTRIBUTABLE TO CLIFFS SHAREHOLDERS** | $ 363.0 | $ 486.6 | $ 45.4 | $ (532.0) | $ 363.0 |

158

**Condensed Consolidating Statement of Operations and Comprehensive Income (Loss)**
**For the Year Ended December 31, 2016**
**(In Millions)**

| | Cleveland-Cliffs Inc. | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUES FROM PRODUCT SALES AND SERVICES | | | | | |
| Product | $ — | $ 1,379.6 | $ 533.9 | $ — | $ 1,913.5 |
| Freight and venture partners' cost reimbursements | — | 174.9 | 20.6 | — | 195.5 |
| | — | 1,554.5 | 554.5 | — | 2,109.0 |
| COST OF GOODS SOLD AND OPERATING EXPENSES | — | (1,278.8) | (440.9) | — | (1,719.7) |
| SALES MARGIN | — | 275.7 | 113.6 | | 389.3 |
| OTHER OPERATING INCOME (EXPENSE) | | | | | |
| Selling, general and administrative expenses | (97.9) | (20.8) | 0.9 | — | (117.8) |
| Miscellaneous - net | (5.6) | (10.8) | (14.3) | — | (30.7) |
| | (103.5) | (31.6) | (13.4) | — | (148.5) |
| OPERATING INCOME (LOSS) | (103.5) | 244.1 | 100.2 | — | 240.8 |
| OTHER INCOME (EXPENSE) | | | | | |
| Interest expense, net | (195.0) | 0.6 | (6.1) | — | (200.5) |
| Gain on extinguishment/restructuring of debt | 166.3 | — | — | — | 166.3 |
| Other non-operating income (expense) | (0.5) | 0.4 | 0.5 | — | 0.4 |
| | (29.2) | 1.0 | (5.6) | — | (33.8) |
| INCOME (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES | (132.7) | 245.1 | 94.6 | — | 207.0 |
| INCOME TAX BENEFIT | 4.3 | 3.0 | 4.9 | — | 12.2 |
| EQUITY IN INCOME OF SUBSIDIARIES | 319.6 | 13.7 | — | (333.3) | — |
| INCOME FROM CONTINUING OPERATIONS | 191.2 | 261.8 | 99.5 | (333.3) | 219.2 |
| INCOME (LOSS) FROM DISCONTINUED OPERATIONS, net of tax | (17.1) | 2.6 | (5.4) | — | (19.9) |
| NET INCOME | 174.1 | 264.4 | 94.1 | (333.3) | 199.3 |
| INCOME ATTRIBUTABLE TO NONCONTROLLING INTEREST | — | (25.2) | — | — | (25.2) |
| NET INCOME ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | $ 174.1 | $ 239.2 | $ 94.1 | $ (333.3) | $ 174.1 |
| OTHER COMPREHENSIVE INCOME (LOSS) | (3.3) | (20.7) | 13.8 | 6.9 | (3.3) |
| TOTAL COMPREHENSIVE INCOME ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | $ 170.8 | $ 218.5 | $ 107.9 | $ (326.4) | $ 170.8 |

159

**Condensed Consolidating Statement of Operations and Comprehensive Income (Loss)**
**For the Year Ended December 31, 2015**
**(In Millions)**

| | Cleveland-Cliffs Inc. | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUES FROM PRODUCT SALES AND SERVICES | | | | | |
| Product | $ — | $ 1,368.1 | $ 464.3 | $ — | $ 1,832.4 |
| Freight and venture partners' cost reimbursements | — | 157.3 | 23.6 | — | 180.9 |
| | — | 1,525.4 | 487.9 | — | 2,013.3 |
| COST OF GOODS SOLD AND OPERATING EXPENSES | — | (1,298.3) | (478.5) | — | (1,776.8) |
| SALES MARGIN | — | 227.1 | 9.4 | | 236.5 |
| OTHER OPERATING INCOME (EXPENSE) | | | | | |
| Selling, general and administrative expenses | (88.5) | (21.2) | (0.3) | — | (110.0) |
| Miscellaneous - net | 7.7 | (3.0) | 20.1 | — | 24.8 |
| | (80.8) | (24.2) | 19.8 | — | (85.2) |
| OPERATING INCOME (LOSS) | (80.8) | 202.9 | 29.2 | — | 151.3 |
| OTHER INCOME (EXPENSE) | | | | | |
| Interest expense, net | (221.4) | (0.1) | (7.0) | — | (228.5) |
| Gain on extinguishment/restructuring of debt | 392.9 | — | — | — | 392.9 |
| Other non-operating income (expense) | (114.6) | 1.2 | 110.8 | — | (2.6) |
| | 56.9 | 1.1 | 103.8 | — | 161.8 |
| INCOME (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES AND EQUITY LOSS FROM VENTURES | (23.9) | 204.0 | 133.0 | — | 313.1 |
| INCOME TAX BENEFIT (EXPENSE) | (19.1) | (176.3) | 26.1 | — | (169.3) |
| EQUITY IN INCOME (LOSS) OF SUBSIDIARIES | (501.2) | 12.9 | — | 488.3 | — |
| EQUITY LOSS FROM VENTURES, net of tax | — | — | (0.1) | — | (0.1) |
| INCOME (LOSS) FROM CONTINUING OPERATIONS | (544.2) | 40.6 | 159.0 | 488.3 | 143.7 |
| INCOME (LOSS) FROM DISCONTINUED OPERATIONS, net of tax | (205.1) | (762.2) | 75.2 | — | (892.1) |
| NET INCOME (LOSS) | (749.3) | (721.6) | 234.2 | 488.3 | (748.4) |
| LOSS (INCOME) ATTRIBUTABLE TO NONCONTROLLING INTEREST | — | (8.6) | 7.7 | | (0.9) |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | $ (749.3) | $ (730.2) | $ 241.9 | $ 488.3 | $ (749.3) |
| PREFERRED STOCK DIVIDENDS | (38.4) | — | — | — | (38.4) |
| NET INCOME (LOSS) ATTRIBUTABLE TO CLIFFS COMMON SHAREHOLDERS | $ (787.7) | $ (730.2) | $ 241.9 | $ 488.3 | $ (787.7) |
| OTHER COMPREHENSIVE INCOME | 266.2 | 20.0 | 176.4 | (196.4) | 266.2 |
| TOTAL COMPREHENSIVE (LOSS) INCOME ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | $ (521.5) | $ (710.2) | $ 418.3 | $ 291.9 | $ (521.5) |

160

**Condensed Consolidating Statement of Cash Flows**
**For the Year Ended December 31, 2017**
**(In Millions)**

| | Cleveland-Cliffs Inc. | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net cash provided (used) by operating activities | $ (166.8) | $ 430.4 | $ 74.5 | $ — | $ 338.1 |
| INVESTING ACTIVITIES | | | | | |
| Purchase of property, plant and equipment | (3.4) | (80.6) | (67.7) | — | (151.7) |
| Intercompany investing | 225.7 | (7.4) | (45.0) | (173.3) | — |
| Other investing activities | (7.7) | 3.4 | — | — | (4.3) |
| Net cash provided (used) in investing activities | 214.6 | (84.6) | (112.7) | (173.3) | (156.0) |
| FINANCING ACTIVITIES | | | | | |
| Net proceeds from issuance of common shares | 661.3 | — | — | — | 661.3 |
| Proceeds from issuance of debt | 1,771.5 | — | — | — | 1,771.5 |
| Debt issuance costs | (28.6) | — | — | — | (28.6) |
| Repurchase of debt | (1,720.7) | — | — | — | (1,720.7) |
| Acquisition of noncontrolling interest | (105.0) | — | — | — | (105.0) |
| Distributions of partnership equity | — | (52.9) | — | — | (52.9) |
| Intercompany financing | 45.0 | (288.8) | 70.5 | 173.3 | — |
| Other financing activities | (5.8) | (4.5) | (16.4) | — | (26.7) |
| Net cash provided (used) by financing activities | 617.7 | (346.2) | 54.1 | 173.3 | 498.9 |
| EFFECT OF EXCHANGE RATE CHANGES ON CASH | — | — | 3.3 | — | 3.3 |
| INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 665.5 | (0.4) | 19.2 | — | 684.3 |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF YEAR | 283.4 | 2.5 | 37.5 | — | 323.4 |
| CASH AND CASH EQUIVALENTS AT END OF YEAR | $ 948.9 | $ 2.1 | $ 56.7 | $ — | $ 1,007.7 |

161

Table of Contents

**Condensed Consolidating Statement of Cash Flows**
**For the Year Ended December 31, 2016**
**(In Millions)**

| | Cleveland-Cliffs Inc. | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net cash provided (used) by operating activities | $ (275.7) | $ 462.9 | $ 115.8 | $ — | $ 303.0 |
| INVESTING ACTIVITIES | | | | | |
| Purchase of property, plant and equipment | (6.2) | (60.0) | (2.9) | — | (69.1) |
| Intercompany investing | 356.6 | (3.3) | (117.0) | (236.3) | — |
| Other investing activities | 0.4 | 10.8 | — | — | 11.2 |
| Net cash provided (used) by investing activities | 350.8 | (52.5) | (119.9) | (236.3) | (57.9) |
| FINANCING ACTIVITIES | | | | | |
| Net proceeds from issuance of common shares | 287.4 | — | — | — | 287.4 |
| Debt issuance costs | (5.2) | — | — | — | (5.2) |
| Borrowings under credit facilities | 105.0 | — | — | — | 105.0 |
| Repayments under credit facilities | (105.0) | — | — | — | (105.0) |
| Repayments on equipment loans | (95.6) | — | — | — | (95.6) |
| Repurchase of debt | (305.4) | — | — | — | (305.4) |
| Distributions of partnership equity | — | (59.9) | — | — | (59.9) |
| Intercompany financing | 117.0 | (339.9) | (13.4) | 236.3 | — |
| Other financing activities | (0.6) | (9.9) | (17.2) | — | (27.7) |
| Net cash used by financing activities | (2.4) | (409.7) | (30.6) | 236.3 | (206.4) |
| EFFECT OF EXCHANGE RATE CHANGES ON CASH | — | — | (0.5) | — | (0.5) |
| INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 72.7 | 0.7 | (35.2) | — | 38.2 |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF YEAR | 210.7 | 1.8 | 72.7 | — | 285.2 |
| CASH AND CASH EQUIVALENTS AT END OF YEAR | $ 283.4 | $ 2.5 | $ 37.5 | $ — | $ 323.4 |

162

A005424

**Condensed Consolidating Statement of Cash Flows**
**For the Year Ended December 31, 2015**
**(In Millions)**

| | Cleveland-Cliffs Inc. | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net cash provided (used) by operating activities | $ 65.6 | $ (23.7) | $ (4.0) | $ — | $ 37.9 |
| INVESTING ACTIVITIES | | | | | |
| Purchase of property, plant and equipment | (6.9) | (68.2) | (5.7) | — | (80.8) |
| Intercompany investments | (205.8) | (2.9) | (80.0) | 288.7 | — |
| Other investing activities | — | (27.6) | 5.2 | — | (22.4) |
| Net cash used by investing activities | (212.7) | (98.7) | (80.5) | 288.7 | (103.2) |
| FINANCING ACTIVITIES | | | | | |
| Proceeds from issuance of debt | 503.5 | — | — | — | 503.5 |
| Debt issuance costs | (33.6) | — | — | — | (33.6) |
| Borrowings under credit facilities | 296.8 | — | 13.0 | — | 309.8 |
| Repayments on credit facilities | (296.8) | — | (13.0) | — | (309.8) |
| Repayments on equipment loans | (43.6) | — | (1.8) | — | (45.4) |
| Repurchase of debt | (225.9) | — | — | — | (225.9) |
| Distributions of partnership equity | — | (40.6) | — | — | (40.6) |
| Preferred stock dividends | (51.2) | — | — | — | (51.2) |
| Intercompany financing | 80.0 | 188.5 | 20.2 | (288.7) | — |
| Other financing activities | (5.0) | (25.0) | (15.8) | — | (45.8) |
| Net cash provided by financing activities | 224.2 | 122.9 | 2.6 | (288.7) | 61.0 |
| EFFECT OF EXCHANGE RATE CHANGES ON CASH | — | — | (1.4) | — | (1.4) |
| INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 77.1 | 0.5 | (83.3) | — | (5.7) |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF YEAR | 133.6 | 1.3 | 156.0 | — | 290.9 |
| CASH AND CASH EQUIVALENTS AT END OF YEAR | $ 210.7 | $ 1.8 | $ 72.7 | $ — | $ 285.2 |

A005425

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Shareholders of
Cleveland-Cliffs Inc.

**Opinion on the Financial Statements**

We have audited the accompanying statements of consolidated financial position of Cleveland-Cliffs Inc. (formerly Cliffs Natural Resources Inc.) and subsidiaries (the "Company") as of December 31, 2017 and 2016, the related statements of consolidated operations, comprehensive income (loss), cash flows, and changes in equity, for each of the three years in the period ended December 31, 2017, and the related notes and the financial schedule listed in the Index at Item 15 (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2017 and 2016, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2017, in conformity with accounting principles generally accepted in the United States of America.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2017, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 14, 2018, expressed an unqualified opinion on the Company's internal control over financial reporting.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

*/s/ DELOITTE & TOUCHE LLP*

Cleveland, Ohio
February 14, 2018

We have served as the Company's auditor since 2004.

164

Case 17-51210-CTG    Doc 867    Filed 11/17/23    Page 1273 of 2524

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Shareholders of
Cleveland-Cliffs Inc.

**Opinion on Internal Control over Financial Reporting**

We have audited the internal control over financial reporting of Cleveland-Cliffs Inc. and subsidiaries (the "Company") as of December 31, 2017, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2017, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by COSO.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated financial statements and financial statement schedule as of and for the year ended December 31, 2017, of the Company and our report dated February 14, 2018, expressed an unqualified opinion on those financial statements and financial statement schedule.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying *Management's Report on Internal Control Over Financial Reporting*. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

*/s/ DELOITTE & TOUCHE LLP*

Cleveland, Ohio
February 14, 2018

Table of Contents

**Item 9.**       *Changes in and Disagreements With Accountants on Accounting and Financial Disclosure*

     *None.*

**Item 9A.**       *Controls and Procedures*

     We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our President and Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure based solely on the definition of "disclosure controls and procedures" in Rule 13a-15(e) promulgated under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

     As of the end of the period covered by this report, we carried out an evaluation under the supervision and with the participation of our management, including our President and Chief Executive Officer and our Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures. Based on the foregoing, our President and Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective.

166

**Management's Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as such term is defined under Rule 13a-15(f) promulgated under the Exchange Act.

Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Company's consolidated financial statements for external purposes in accordance with generally accepted accounting principles.

Internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit the preparation of the consolidated financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with appropriate authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the consolidated financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management conducted an assessment of the Company's internal control over financial reporting as of December 31, 2017 using the framework specified in *Internal Control - Integrated Framework* (2013), published by the Committee of Sponsoring Organizations of the Treadway Commission. Based on such assessment, management has concluded that the Company's internal control over financial reporting was effective as of December 31, 2017.

The effectiveness of the Company's internal control over financial reporting as of December 31, 2017 has been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report that appears herein.

February 14, 2018

**Changes in Internal Control Over Financial Reporting**

There have been no changes in our internal control over financial reporting or in other factors that occurred during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B.**        *Other Information*

None.

167

A005429

**PART III**

**Item 10.    *Directors, Executive Officers and Corporate Governance***

The information required to be furnished by this Item will be set forth in our definitive proxy statement for the 2018 Annual Meeting of Shareholders (the "Proxy Statement") under the headings "Board Meetings and Committees - Audit Committee", "Code of Business Conduct and Ethics", "Independence and Related Party Transactions", "Information Concerning Director Nominees" and "Section 16(a) Beneficial Ownership Reporting Compliance", and is incorporated herein by reference and made a part hereof from the Proxy Statement. The information regarding executive officers required by this Item is set forth in *Part I - Item 1. Business* hereof under the heading "Executive Officers of the Registrant", which information is incorporated herein by reference and made a part hereof.

**Item 11.    *Executive Compensation***

The information required to be furnished by this Item will be set forth in our Proxy Statement under the headings "Director Compensation", "Compensation Committee Report", "Compensation Committee Interlocks and Insider Participation" and "Executive Compensation" and is incorporated herein by reference and made a part hereof from the Proxy Statement.

**Item 12.    *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters***

The information required to be furnished by this Item regarding "Securities Authorized for Issuance Under Equity Compensation Plans", "Related Stockholder Matters" and "Security Ownership" will be set forth in the Proxy Statement under the headings "Independence and Related Party Transactions", "Ownership of Equity Securities of the Company" and "Equity Compensation Plan Information", respectively, and is incorporated herein by reference and made part hereof from the Proxy Statement.

**Item 13.    *Certain Relationships and Related Transactions, and Director Independence***

The information required to be furnished by this Item will be set forth in the Proxy Statement under the heading "Independence and Related Party Transactions" and is incorporated herein by reference and made a part hereof from the Proxy Statement.

**Item 14.    *Principal Accountant Fees and Services***

The information required to be furnished by this Item will be set forth in the Proxy Statement under the heading "Ratification of Independent Registered Public Accounting Firm" and is incorporated herein by reference and made a part hereof from the Proxy Statement.

168

Table of Contents

**PART IV**

**Item 15.**    ***Exhibits and Financial Statement Schedules***

(a)(1) and (2) - List of Financial Statements and Financial Statement Schedules.

The following consolidated financial statements of Cleveland-Cliffs Inc. are included at  *Item 8. Financial Statements and Supplementary Data*  above:

•    Statements of Consolidated Financial Position - December 31, 2017 and 2016

•    Statements of Consolidated Operations  - Years ended  December 31, 2017, 2016 and 2015

•    Statements of Consolidated Comprehensive Income (Loss)  - Years ended December 31, 2017, 2016 and 2015

•    Statements of Consolidated Cash Flows  - Years ended  December 31, 2017, 2016 and 2015

•    Statements of Consolidated Changes in Equity  - Years ended  December 31, 2017, 2016 and 2015

•    Notes to Consolidated Financial Statements

The following consolidated financial statement schedule of Cleveland-Cliffs Inc. is included herein in Item 15(d) and attached as   Exhibit 99(a):

Schedule II - Valuation and Qualifying Accounts

All other schedules for which provision is made in the applicable accounting regulation of the SEC are not required under the related instructions or are inapplicable, and therefore have been omitted.

(3) List of Exhibits

All documents referenced below have been filed pursuant to the Securities Exchange Act of 1934 by Cleveland-Cliffs Inc., file number 1-09844, unless otherwise indicated.

| Exhibit Number | Exhibit |
|---|---|
| | **Plan of purchase, sale, reorganization, arrangement, liquidation or succession** |
| 2.1 | ***Unit Purchase Agreement, dated as of December 22, 2015, by and among Cliffs Natural Resources Inc., CLF PinnOak LLC and Seneca Coal Resources, LLC (filed as Exhibit 2.3 to Cliffs' Form 10-K for the period ended December 31, 2015 and incorporated herein by reference) |
| | **Articles of Incorporation and By-Laws of Cleveland-Cliffs Inc.** |
| 3.1 | Third Amended Articles of Incorporation of Cliffs (as filed with the Secretary of State of the State of Ohio on May 13, 2013 (filed as Exhibit 3.1 to Cliffs' Form 8-K on May 13, 2013 and incorporated herein by reference) |
| 3.2 | Certificate of Amendment to Third Amended Articles of Incorporation of Cliffs (as filed with the Secretary of State of the State of Ohio on April 26, 2017 (filed as Exhibit 3.1 to Cliffs' Form 8-K on April 27, 2017 and incorporated herein by reference) |
| 3.3 | Certificate of Amendment to Third Amended Articles of Incorporation of Cliffs, as amended (as filed with the Secretary of State of the State of Ohio on August 15, 2017 (filed as Exhibit 3.1 to Cliffs' Form 8-K on August 17, 2017 and incorporated herein by reference) |
| 3.4 | Regulations of Cliffs (filed as Exhibit 3.2 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| | **Instruments defining rights of security holders, including indentures** |
| 4.1 | Indenture between Cliffs Natural Resources Inc. and U.S. Bank National Association, as trustee, dated March 17, 2010 (filed as Exhibit 4.3 to Cliffs' Registration Statement on Form S-3 No. 333-186617 on February 12, 2013 and incorporated herein by reference) |
| 4.2 | Form of 5.90% Notes due 2020 First Supplemental Indenture between Cliffs Natural Resources Inc. and U.S. Bank National Association, as trustee, dated March 17, 2010, including Form of 5.90% Notes due 2020 (filed as Exhibit 4.2 to Cliffs' Form 8-K on March 16, 2010 and incorporated herein by reference) |

169

Table of Contents

| 4.3 | Form of 4.80% Notes due 2020 Second Supplemental Indenture between Cliffs Natural Resources Inc. and U.S. Bank National Association, as trustee, dated September 20, 2010, including Form of 4.80% Notes due 2020 (filed as Exhibit 4.3 to Cliffs' Form 8-K on September 17, 2010 and incorporated herein by reference) |
|---|---|
| 4.4 | Form of 6.25% Notes due 2040 Third Supplemental Indenture between Cliffs Natural Resources Inc. and U.S. Bank National Association, as trustee, dated September 20, 2010, including Form of 6.25% Notes due 2040 (filed as Exhibit 4.4 to Cliffs' Form 8-K on September 17, 2010 and incorporated herein by reference) |
| 4.5 | Form of 4.875% Notes due 2021 Fourth Supplemental Indenture between Cliffs Natural Resources Inc. and U.S. Bank National Association, as trustee, dated March 23, 2011, including Form of 4.875% Notes due 2021 (filed as Exhibit 4.1 to Cliffs' Form 8-K on March 23, 2011 and incorporated herein by reference) |
| 4.6 | Fifth Supplemental Indenture between Cliffs Natural Resources Inc. and U.S. Bank National Association, as trustee, dated March 31, 2011 (filed as Exhibit 4(b) to Cliffs' Form 10-Q for the period ended June 30, 2011 and incorporated herein by reference) |
| 4.7 | Seventh Supplemental Indenture between Cliffs Natural Resources Inc. and U.S. Bank National Association, as trustee, dated May 7, 2013 (as filed as Exhibit 4.1 to Cliffs' Form 10-Q for the period ended June 30, 2013 and incorporated herein by reference) |
| 4.8 | Eighth Supplemental Indenture, dated as of December 19, 2017, by and between Cleveland-Cliffs Inc. and U.S. Bank National Association, as trustee, including Form of 1.50% Convertible Senior Notes due 2025 (filed as Exhibit 4.2 to Cliffs' Form 8-K on December 19, 2017 and incorporated herein by reference) |
| 4.9 | Indenture, dated as of February 27, 2017, among Cliffs Natural Resources Inc. (n/k/a Cleveland-Cliffs Inc.), the Guarantors party thereto and U.S. Bank National Association, as trustee, including Form of 5.75% Senior Notes due 2025 (filed as Exhibit 4.1 to Cliffs' Form 8-K on August 7, 2017 and incorporated herein by reference) |
| 4.10 | First Supplemental Indenture, dated as of August 7, 2017, among Cliffs Natural Resources Inc. (n/k/a Cleveland-Cliffs Inc.), the Guarantors party thereto and U.S. Bank National Association, as trustee, including Form of 5.75% Senior Notes due 2025 (filed as Exhibit 4.2 to Cliffs' Form 8-K filed on August 7, 2017 and incorporated herein by reference) |
| 4.11 | Second Supplemental Indenture, dated as of September 29, 2017, among Cliffs Empire II Inc. and Empire Iron Mining Partnership, as additional guarantors, Cleveland-Cliffs Inc., the Guarantors party thereto and U.S. Bank National Association, as trustee (filed herewith) |
| 4.12 | Third Supplemental Indenture, dated as of October 27, 2017, among Cliffs TIOP II, LLC, Marquette Range Coal Service Company and Tilden Mining Company L.C., as additional guarantors thereto, Cleveland-Cliffs Inc., the Guarantors party thereto and U.S. Bank National Association, as trustee (filed herewith) |
| 4.13 | Indenture, dated as of December 19, 2017, by and among Cleveland-Cliffs Inc., the guarantors party thereto and U.S. Bank National Association, as trustee and first lien notes collateral agent, including Form of 4.875% Senior Secured Notes due 2024 (filed as Exhibit 4.1 to Cliffs' Form 8-K filed on December 19, 2017 and incorporated herein by reference) |
| 4.14 | Registration Rights Agreement, dated as of February 27,2017, by and among Cliffs Natural Resources Inc. (n/k/a Cleveland-Cliffs Inc.), the Guarantors party thereto and Merrill Lynch, Pierce, Fenner & Smith Incorporated, as representative of the several initial purchasers (filed as Exhibit 4.2 to Cliffs' Form 10-Q for the period ended March 31, 2017 and incorporated herein by reference) |
| 4.15 | Joinder to Registration Rights Agreement, dated as of August 7,2017, by and among Cliffs Natural Resources Inc. (n/k/a Cleveland-Cliffs Inc.), the Guarantors party thereto and Credit Suisse Securities (USA) LLC, as representative of the several initial purchasers (filed as Exhibit 4.3 to Cliffs' Form 8-K on August 7, 2017 and incorporated herein by reference) |
| 4.16 | Form of Common Share Certificate (filed as Exhibit 4.4 to Cliffs' Form 10-Q for the period ended September 30, 2017 and incorporated herein by reference) |
| | **Material contracts** |
| 10.1 | Syndicated Facility Agreement, dated as of March 30, 2015, by and among Bank of America, N.A., as Administrative Agent and Australian Security Trustee, the Lenders that are Parties hereto, as the Lenders, Cliffs Natural Resources Inc., as Parent and a Borrower, and the Subsidiaries of Parent Party hereto, as Borrowers (filed as Exhibit 10.2 to Cliffs' Form 10-Q for the period ended March 31, 2015 and incorporated herein by reference) |
| 10.2 | First Amendment to Syndicated Facility Agreement, dated as of June 17, 2016, to that certain Syndicated Facility Agreement, dated as of March 30, 2015, by and among Bank of America, N.A., as Administrative Agent and Australian Security Trustee, the Lenders that are Parties hereto, as the Lenders, Cleveland-Cliffs Inc., as Parent and a Borrower, and the Subsidiaries of Parent Party hereto, as Borrowers (filed as Exhibit 10.3 to Cliffs' Form 10-Q for the period ended June 30, 2016 and incorporated herein by reference) |
| 10.3 | * Form of Change in Control Severance Agreement (covering newly hired officers) (filed as Exhibit 10.4 to Cliffs' Form 8-K/A on September 16, 2014 and incorporated herein by reference) |

A005432

Table of Contents

| 10.4 | * Form of 2016 Change in Control Severance Agreement (filed as Exhibit 10.1 to Cliffs' 10-Q for the period ended September 30, 2016 and incorporated herein by reference) |
|---|---|
| 10.5 | * Cleveland-Cliffs Inc. 2012 Non-Qualified Deferred Compensation Plan (effective January 1, 2012) dated November 8, 2011 (filed as Exhibit 10.1 to Cliffs' Form 8-K on November 8, 2011 and incorporated herein by reference) |
| 10.6 | * Form of Indemnification Agreement between Cliffs Natural Resources Inc. and Directors (filed as Exhibit 10.5 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.7 | * Cliffs Natural Resources Inc. Nonemployee Directors' Compensation Plan (Amended and Restated as of December 31, 2008) (filed as Exhibit 10(nnn) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.8 | * Cliffs Natural Resources Inc. Amended and Restated 2014 Nonemployee Directors' Compensation Plan (filed as Exhibit 10.1 to Cliffs' Form 8-K on May 2, 2016 and incorporated herein by reference) |
| 10.9 | * Trust Agreement No. 1 (Amended and Restated effective June 1, 1997), dated June 12, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to the Cleveland-Cliffs Inc Supplemental Retirement Benefit Plan, Severance Pay Plan for Key Employees and certain executive agreements (filed as Exhibit 10.10 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.10 | * Trust Agreement No. 1 Amendments to Exhibits, effective as of January 1, 2000, by and between Cleveland-Cliffs Inc and KeyBank National Association, as Trustee (filed as Exhibit 10.11 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.11 | * First Amendment to Trust Agreement No. 1, effective September 10, 2002, by and between Cleveland-Cliffs Inc and KeyBank National Association, as Trustee (filed as Exhibit 10.12 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.12 | * Second Amendment to Trust Agreement No. 1 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(y) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.13 | * Third Amendment to Trust Agreement No. 1 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.15 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.14 | * Amended and Restated Trust Agreement No. 2, effective as of October 15, 2002, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to Executive Agreements and Indemnification Agreements with the Company's Directors and certain Officers, the Company's Severance Pay Plan for Key Employees, and the Retention Plan for Salaried Employees (filed as Exhibit 10.14 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.15 | * Second Amendment to Amended and Restated Trust Agreement No. 2 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(aa) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.16 | * Third Amendment to Amended and Restated Trust Agreement No. 2 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.18 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.17 | * Trust Agreement No. 5, dated as of October 28, 1987, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to certain deferred compensation agreements (filed as Exhibit 10.16 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.18 | * First Amendment to Trust Agreement No. 5, dated as of May 12, 1989, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.17 to Form 10-K of Cliffs' for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.19 | * Second Amendment to Trust Agreement No. 5, dated as of April 9, 1991, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.18 to Form 10-K of Cliffs' for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.20 | * Third Amendment to Trust Agreement No. 5, dated as of March 9, 1992, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.19 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.21 | * Fourth Amendment to Trust Agreement No. 5, dated November 18, 1994, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.20 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.22 | * Fifth Amendment to Trust Agreement No. 5, dated May 23, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.19 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |

171

A005433

Table of Contents

| 10.23 | *Sixth Amendment to Trust Agreement No. 5 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(hh) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| --- | --- |
| 10.24 | *Seventh Amendment to Trust Agreement No. 5 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.26 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.25 | * Trust Agreement No. 7, dated as of April 9, 1991, by and between Cliffs Natural Resources Inc and KeyBank National Association, Trustee, with respect to the Cleveland-Cliffs Inc Supplemental Retirement Benefit Plan (filed as Exhibit 10.23 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.26 | * First Amendment to Trust Agreement No. 7, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, dated as of March 9, 1992 (filed as Exhibit 10.24 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.27 | * Second Amendment to Trust Agreement No. 7, dated November 18, 1994, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.25 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.28 | * Third Amendment to Trust Agreement No. 7, dated May 23, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.26 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.29 | * Fourth Amendment to Trust Agreement No. 7, dated July 15, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.27 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.30 | * Amendment to Exhibits to Trust Agreement No. 7, effective as of January 1, 2000, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.28 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.31 | * Sixth Amendment to Trust Agreement No. 7 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(oo) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.32 | * Seventh Amendment to Trust Agreement No. 7 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.34 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.33 | * Trust Agreement No. 10, dated as of November 20, 1996, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to the Cleveland-Cliffs Inc Nonemployee Directors' Compensation Plan (filed as Exhibit 10.36 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.34 | *First Amendment to Trust Agreement No. 10 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(ww) to Cliffs' Form 10-K for the period ended February 26, 2009 and incorporated herein by reference) |
| 10.35 | * Second Amendment to Trust Agreement No. 10 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.45 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.36 | *Severance Agreement and Release, by and between P. Kelly Tompkins and Cleveland-Cliffs Inc., effective December 31, 2017 (filed herewith) |
| 10.37 | * Letter Agreement, by and between Lourenco Goncalves and Cliffs Natural Resources Inc., signed as of September 11, 2014 (filed as Exhibit 10.1 to Cliffs' Form 8-K/A on September 16, 2014 and incorporated herein by reference) |
| 10.38 | * Cleveland-Cliffs Inc and Subsidiaries Management Performance Incentive Plan Summary, effective January 1, 2004 (filed as Exhibit 10.47 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.39 | * Cliffs Natural Resources Inc. 2012 Executive Management Performance Incentive Plan effective March 13, 2012 (filed as Exhibit 10.3 to Cliffs' Form 8-K on May 14, 2012 and incorporated herein by reference) |
| 10.40 | * Cliffs Natural Resources Inc. 2017 Executive Management Performance Incentive Plan effective January 1, 2017 (filed as Exhibit 10.2 to Cliffs' Form 8-K on April 27, 2017 and incorporated herein by reference) |
| 10.41 | * Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan (filed as Exhibit 10.1 to Cliffs' Form 8-K on August 4, 2014 and incorporated herein by reference) |

172

A005434

Table of Contents

| 10.42 | * Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Non-Qualified Stock Option Award Memorandum (2014 Grant) and Stock Option Award Agreement (filed as Exhibit 10.2 to Cliffs' Form 8-K/A on September 16, 2014 and incorporated herein by reference) |
|---|---|
| 10.43 | * Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Performance Unit Award Memorandum (2014 Grant) and Performance Unit Award Agreement (filed as Exhibit 10.3 to Cliffs' Form 8-K/A on September 16, 2014 and incorporated herein by reference) |
| 10.44 | * Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Non-Qualified Stock Option Award Memorandum (3-Year Vesting – January 2015 Grant) and Stock Option Award Agreement (filed as Exhibit 10.69 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.45 | * Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Performance Share Award Memorandum (3-Year Vesting – January 2015 Grant) and Performance Share Award Agreement (filed as Exhibit 10.71 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.46 | * Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Performance Share Award Memorandum (3 year Vesting – February 2015 Grant) and Restricted Share Unit Award Agreement (filed as Exhibit 10.73 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.47 | * Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan (filed as Exhibit 10.1 to Cliffs' Form 8-K on May 21, 2015 and incorporated herein by reference) |
| 10.48 | * Form of Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan Restricted Stock Unit Award Memorandum (Vesting May 2018) and Restricted Stock Unit Award Agreement (filed as Exhibit 10.61 to Cliffs' Form 10-K for the period ended December 31, 2015 and incorporated herein by reference) |
| 10.49 | * Form of Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan Restricted Stock Unit Award Memorandum (Vesting December 31, 2018) and Restricted Stock Unit Award Agreement (filed as Exhibit 10.1 to Cliffs' Form 10-Q for the period ended March 31, 2016 and incorporated herein by reference) |
| 10.50 | * Form of Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan Cash Incentive Award Memorandum (TSR) (Vesting December 31, 2018) and Cash Incentive Award Agreement (TSR) (filed as Exhibit 10.2 to Cliffs' Form 10-Q for the period ended March 31, 2016 and incorporated herein by reference) |
| 10.51 | * Form of Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan Cash Incentive Award Memorandum (EBITDA) (January 1, 20XX - December 31, 20XX) and Cash Incentive Award Agreement (EBITDA) (filed as Exhibit 10.3 to Cliffs' Form 10-Q for the period ended March 31, 2016 and incorporated herein by reference) |
| 10.52 | * Form of Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan, as Amended, Performance Share Award Memorandum and Performance Share Award Agreement (filed as Exhibit 10.3 to Cliffs' Form 10-Q for the period ended June 30, 2017 and incorporated herein by reference) |
| 10.53 | * Cliffs Natural Resources Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan (filed as Exhibit 10.1 to Cliffs' Form 8-K on April 27, 2017 and incorporated herein by reference) |
| 10.54 | * Form of Cliffs Natural Resources Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan Performance Share Award Memorandum and Performance Share Award Agreement (filed as Exhibit 10.4 to Cliffs' Form 10-Q for the period ended June 30, 2017 and incorporated herein by reference) |
| 10.55 | * Form of Cliffs Natural Resources Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan Restricted Stock Unit Award Memorandum and Restricted Stock Unit Award Agreement (filed as Exhibit 10.5 to Cliffs' Form 10-Q for the period ended June 30, 2017 and incorporated herein by reference) |
| 10.56 | * Cliffs Natural Resources Inc. Supplemental Retirement Benefit Plan (as Amended and Restated effective December 1, 2006) dated December 31, 2008 (filed as Exhibit 10(mmm) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.57 | * Cliffs Natural Resources Inc. 2015 Employee Stock Purchase Plan (filed as Exhibit 4.4 to Cliffs' Registration Statement on Form S-8 on August 20, 2015 and incorporated herein by reference) |
| 10.58 | ** Pellet Sale and Purchase Agreement, effective as of October 31, 2016, by and among Cliffs Natural Resources Inc., The Cleveland-Cliffs Iron Company and Cliffs Mining Company and ArcelorMittal USA LLC (filed as Exhibit 10.72 to Cliffs' Registration Statement on Form S-1/A No. 333-212054 on August 4, 2016 and incorporated herein by reference) |
| 10.59 | ** Amended and Restated Pellet Sale and Purchase Agreement, effective as of December 31, 2015, by and among The Cleveland-Cliffs Iron Company, Cliffs Mining Company and AK Steel Corporation (filed herewith) |
| 12 | Ratio of Earnings To Combined Fixed Charges And Preferred Stock Dividend Requirements (filed herewith) |
| 21 | Subsidiaries of the Registrant (filed herewith) |
| 23 | Consent of Independent Registered Public Accounting Firm (filed herewith) |
| 24 | Power of Attorney (filed herewith) |

173

| 31.1 | Certification Pursuant to 15 U.S.C. Section 7241, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, signed and dated by Lourenco Goncalves as of February 14, 2018 (filed herewith) |
| 31.2 | Certification Pursuant to 15 U.S.C. Section 7241, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, signed and dated by Timothy K. Flanagan as of February 14, 2018 (filed herewith) |
| 32.1 | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed and dated by Lourenco Goncalves, Chairman, President and Chief Executive Officer of Cleveland-Cliffs Inc., as of February 14, 2018 (filed herewith) |
| 32.2 | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed and dated by Timothy K. Flanagan, Executive Vice President, Chief Financial Officer of Cleveland-Cliffs Inc., as of February 14, 2018 (filed herewith) |
| 95 | Mine Safety Disclosures (filed herewith) |
| 99(a) | Schedule II – Valuation and Qualifying Accounts (filed herewith) |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

---

\*      Indicates management contract or other compensatory arrangement.

\*\*      Confidential treatment requested and/or approved as to certain portions, which portions have been omitted and filed separately with the Securities and Exchange Commission.

\*\*\*      Certain immaterial schedules and exhibits to this exhibit have been omitted pursuant to the provisions of Regulation S-K, Item 601(b)(2). A copy of any of the omitted schedules and exhibits will be furnished to the Securities and Exchange Commission upon request.

(c) Exhibits listed in Item 15(a)(3) above are incorporated herein by reference.

(d) The schedule listed above in Item 15(a)(1) and (2) is attached as  Exhibit 99(a) and incorporated herein by reference.

174

Table of Contents

**Item 16.**    *Form 10-K Summary*

*None.*

### SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

CLEVELAND-CLIFFS INC.

By:    /s/ R. C. Cebula

Name:    R. Christopher Cebula

Title:    Vice President, Corporate Controller &
Chief Accounting Officer

Date:    February 14, 2018

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signatures | Title | Date |
|---|---|---|
| /s/ C. L. Goncalves<br>C. L. Goncalves | Chairman, President and<br>Chief Executive Officer<br>(Principal Executive Officer) | February 14, 2018 |
| /s/ T. K. Flanagan<br>T. K. Flanagan | Executive Vice President,<br>Chief Financial Officer<br>(Principal Financial Officer) | February 14, 2018 |
| /s/ R. C. Cebula<br>R. C. Cebula | Vice President, Corporate Controller &<br>Chief Accounting Officer<br>(Principal Accounting Officer) | February 14, 2018 |
| *<br>J. T. Baldwin | Director | February 14, 2018 |
| *<br>R. P. Fisher, Jr. | Director | February 14, 2018 |
| *<br>S. M. Green | Director | February 14, 2018 |
| *<br>J. A. Rutkowski, Jr. | Director | February 14, 2018 |
| *<br>E. M. Rychel | Director | February 14, 2018 |
| *<br>M. D. Siegal | Director | February 14, 2018 |
| *<br>G. Stoliar | Director | February 14, 2018 |
| *<br>D. C. Taylor | Director | February 14, 2018 |

* The undersigned, by signing his name hereto, does sign and execute this Annual Report on Form 10-K pursuant to a Power of Attorney executed on behalf of the above-indicated officers and directors of the registrant and filed herewith as Exhibit 24 on behalf of the registrant.

By:    /s/ T. K. Flanagan

(T. K. Flanagan, as Attorney-in-Fact)

**EXHIBIT 4.11**

## SECOND SUPPLEMENTAL INDENTURE

### 5.75% SENIOR NOTES DUE 2025

This Supplemental Indenture, dated as of September 29, 2017 (this "**Supplemental Indenture**" or "**Guarantee**"), among Cliffs Empire II Inc. and Empire Iron Mining Partnership (the "**Additional Guarantors**"), Cleveland-Cliffs Inc. (f/k/a Cliffs Natural Resources Inc.) (together with its successors and assigns, the "**Company**"), and U.S. Bank National Association, as Trustee (the "**Trustee**") under the Indenture referred to below.

WITNESSETH:

WHEREAS, the Company, the Guarantors and the Trustee have heretofore executed and delivered an Indenture, dated as of February 27, 2017, as amended by that certain First Supplemental Indenture, dated as of August 7, 2017 (as so amended and as further amended, supplemented, waived or otherwise modified, the "**Indenture**"), providing for the issuance of an aggregate principal amount of $1,075,000,000 of 5.75% Senior Notes due 2025 of the Company (the "**Notes**");

WHEREAS, Section 3.08 of the Indenture provides that, after the Issue Date, the Company is required to cause certain direct or indirect Subsidiaries of the Company to execute and deliver to the Trustee a supplemental indenture pursuant to which such Subsidiary will unconditionally guarantee, on a joint and several basis with the other Guarantors, the full and prompt payment of the principal of, premium, if any, and interest on the Notes on a secured basis; and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee and the Company are authorized to execute and deliver this Supplemental Indenture to amend or supplement the Indenture, without the consent of any Holder;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Additional Guarantors, the Company and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

ARTICLE 1
Definitions

Section 1.01 *Defined Terms*.

As used in this Supplemental Indenture, terms defined in the Indenture or in the preamble or recital hereto are used herein as therein defined. The words "herein," "hereof" and "hereby" and other words of similar import used in this Supplemental Indenture refer to this Supplemental Indenture as a whole and not to any particular section hereof.

ARTICLE 2
Agreement to be Bound; Guarantee

Section 2.01 *Agreement to be Bound*. The Additional Guarantors hereby become parties to the Indenture as Guarantors and as such will have all of the rights and be subject to all of the obligations and agreements of a Guarantor under the Indenture. The Additional Guarantors agree to be bound by all of the provisions of the Indenture applicable to an Additional Guarantor and to perform all of the obligations and agreements of a Guarantor under the Indenture.

Section 2.02 *Guarantee*. The Additional Guarantors agree, on a joint and several basis with all the existing Guarantors, to fully, unconditionally and irrevocably Guarantee to each Holder of the Notes and the Trustee the Obligations pursuant to Article 10 of the Indenture on a secured basis.

ARTICLE 3
Miscellaneous

Section 3.01 *Notices*. All notices and other communications to the Additional Guarantors shall be given as provided in the Indenture to the Additional Guarantors, at their addresses set forth below, with a copy to the Company as provided in the Indenture for notices to the Company.

Cliffs Empire II Inc.
c/o   Cleveland-Cliffs Inc.
   200 Public Square, Suite 3300
   Cleveland, Ohio 44114
   Attention:   James Graham, Executive Vice President,
        Chief Legal Officer & Secretary

Empire Iron Mining Partnership
c/o   Cleveland-Cliffs Inc.
   200 Public Square, Suite 3300
   Cleveland, Ohio 44114
   Attention:   James Graham, Executive Vice President,
        Chief Legal Officer & Secretary

Section 3.02 *Parties*. Nothing expressed or mentioned herein is intended or shall be construed to give any Person, firm or corporation, other than the Holders and the Trustee, any legal or equitable right, remedy or claim under or in respect of this Supplemental Indenture or the Indenture or any provision herein or therein contained.

Section 3.03 *Governing Law*. This Supplemental Indenture shall be governed by, and construed in accordance with, the laws of the State of New York.

Section 3.04 *Severability Clause*. In case any provision in this Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

Section 3.05 *Ratification of Indenture; Supplemental Indentures Part of Indenture*. Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby. The Trustee shall not be responsible for and makes no representation or warranty as to the validity, execution, or sufficiency of this Supplemental Indenture or with respect to the recitals contained herein, all of which recitals are made solely by the other parties hereto.

Section 3.06 *Counterparts*. The parties hereto may sign one or more copies of this Supplemental Indenture in counterparts, all of which together shall constitute one and the same agreement.

Section 3.07 *Headings*. The headings of the Articles and the sections in this Guarantee are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof.

Section 3.08 *Execution, Delivery and Validity*. The Company and Additional Guarantors each represent and warrant to the Trustee that this Supplemental Indenture has been duly and validly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, receivership, administration, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

CLIFFS EMPIRE II INC., as a Guarantor

By:  /s/ Timothy K. Flanagan
     Name: Timothy K. Flanagan
     Title: Treasurer

EMPIRE IRON MINING PARTNERSHIP, as a Guarantor
By: The Cleveland-Cliffs Iron Company, as its manager

By:  /s/ Timothy K. Flanagan
     Name: Timothy K. Flanagan
     Title: Executive Vice President, Chief Financial Officer and Treasurer

CLEVELAND-CLIFFS INC.

By:  /s/ Timothy K. Flanagan
     Name: Timothy K. Flanagan
     Title: Executive Vice President, Chief Financial Officer and Treasurer

U.S. BANK NATIONAL ASSOCIATION, as Trustee

By:  /s/ Elizabeth A. Thuning
     Name: Elizabeth A. Thuning
     Title: Vice President

*[Signature Page to Second Supplemental Indenture]*

**EXHIBIT 4.12**

**THIRD SUPPLEMENTAL INDENTURE**

**5.75% SENIOR NOTES DUE 2025**

This Supplemental Indenture, dated as of October 27, 2017 (this " **Supplemental Indenture**" or "**Guarantee**"), among Cliffs TIOP II, LLC, Marquette Range Coal Service Company and Tilden Mining Company L.C. (the "**Additional Guarantors**"), Cleveland-Cliffs Inc. (f/k/a Cliffs Natural Resources Inc.) (together with its successors and assigns, the "**Company**"), and U.S. Bank National Association, as Trustee (the " **Trustee**") under the Indenture referred to below.

WITNESSETH:

WHEREAS, the Company, the Guarantors party thereto and the Trustee have heretofore executed and delivered an Indenture, dated as of February 27, 2017, as supplemented by that certain First Supplemental Indenture, dated as of August 7, 2017, among the Company, the Guarantors party thereto, and the Trustee, and that certain Second Supplemental Indenture, dated as of September 29, 2017, among the Company, the Guarantors party thereto, and the Trustee (as so supplemented, the "**Indenture**"), providing for the issuance of an aggregate principal amount of $1,075,000,000 of 5.75% Senior Notes due 2025 of the Company (the "**Notes**");

WHEREAS, Section 3.08 of the Indenture provides that, after the Issue Date, the Company is required to cause certain direct or indirect Subsidiaries of the Company to execute and deliver to the Trustee a supplemental indenture pursuant to which such Subsidiary will unconditionally guarantee, on a joint and several basis with the other Guarantors, the full and prompt payment of the principal of, premium, if any, and interest on the Notes on a secured basis; and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee and the Company are authorized to execute and deliver this Supplemental Indenture to amend or supplement the Indenture, without the consent of any Holder;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Additional Guarantors, the Company and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

ARTICLE 1
Definitions

Section 1.01 *Defined Terms*.

As used in this Supplemental Indenture, terms defined in the Indenture or in the preamble or recital hereto are used herein as therein defined. The words "herein," "hereof" and "hereby" and other words of similar import used in this Supplemental Indenture refer to this Supplemental Indenture as a whole and not to any particular section hereof.

ARTICLE 2
Agreement to be Bound; Guarantee

Section 2.01 *Agreement to be Bound*. The Additional Guarantors hereby become parties to the Indenture as Guarantors and as such will have all of the rights and be subject to all of the obligations and agreements of a Guarantor under the Indenture. The Additional Guarantors agree to be bound by all of the provisions of the Indenture applicable to an Additional Guarantor and to perform all of the obligations and agreements of a Guarantor under the Indenture.

Section 2.02 *Guarantee*. The Additional Guarantors agree, on a joint and several basis with all the existing Guarantors, to fully, unconditionally and irrevocably Guarantee to each Holder of the Notes and the Trustee the Obligations pursuant to Article 10 of the Indenture on a secured basis.

ARTICLE 3
Miscellaneous

Section 3.01 *Notices.* All notices and other communications to the Additional Guarantors shall be given as provided in the Indenture to the Additional Guarantors, at their addresses set forth below, with a copy to the Company as provided in the Indenture for notices to the Company.

Cliffs TIOP II, LLC
c/o   Cleveland-Cliffs Inc.
    200 Public Square, Suite 3300
    Cleveland, Ohio 44114
    Attention:   James Graham, Executive Vice President,
            Chief Legal Officer & Secretary

Marquette Range Coal Service Company
c/o   Cleveland-Cliffs Inc.
    200 Public Square, Suite 3300
    Cleveland, Ohio 44114
    Attention:   James Graham, Executive Vice President,
            Chief Legal Officer & Secretary

Tilden Mining Company L.C.
c/o   Cleveland-Cliffs Inc.
    200 Public Square, Suite 3300
    Cleveland, Ohio 44114
    Attention:   James Graham, Executive Vice President,
            Chief Legal Officer & Secretary

Section 3.02 *Parties.* Nothing expressed or mentioned herein is intended or shall be construed to give any Person, firm or corporation, other than the Holders and the Trustee, any legal or equitable right, remedy or claim under or in respect of this Supplemental Indenture or the Indenture or any provision herein or therein contained.

Section 3.03 *Governing Law.* This Supplemental Indenture shall be governed by, and construed in accordance with, the laws of the State of New York.

Section 3.04 *Severability Clause.* In case any provision in this Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

Section 3.05 *Ratification of Indenture; Supplemental Indentures Part of Indenture.* Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby. The Trustee shall not be responsible for and makes no representation or warranty as to the validity, execution, or sufficiency of this Supplemental Indenture or with respect to the recitals contained herein, all of which recitals are made solely by the other parties hereto.

Section 3.06 *Counterparts.* The parties hereto may sign one or more copies of this Supplemental Indenture in counterparts, all of which together shall constitute one and the same agreement.

Section 3.07 *Headings.* The headings of the Articles and the sections in this Guarantee are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof.

Section 3.08 *Execution, Delivery and Validity.* The Company and Additional Guarantors each represent and warrant to the Trustee that this Supplemental Indenture has been duly and validly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, receivership, administration, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

CLIFFS TIOP II LLC, as a Guarantor

By:    /s/ Timothy K. Flanagan
       Name: Timothy K. Flanagan
       Title: Treasurer

MARQUETTE RANGE COAL SERVICE COMPANY,
as a Guarantor

By:    /s/ Timothy K. Flanagan
       Name: Timothy K. Flanagan
       Title: Treasurer

TILDEN MINING COMPANY L.C., as a Guarantor
By: The Cleveland-Cliffs Iron Company, as its manager

By:    /s/ Timothy K. Flanagan
       Name: Timothy K. Flanagan
       Title: Executive Vice President, Chief Financial Officer and Treasurer

CLEVELAND-CLIFFS INC.

By:    /s/ Timothy K. Flanagan
       Name: Timothy K. Flanagan
       Title: Executive Vice President, Chief Financial Officer and Treasurer

U.S. BANK NATIONAL ASSOCIATION, as Trustee

By:    /s/ Elizabeth A. Thuning
       Name: Elizabeth A. Thuning
       Title: Vice President

*[Signature Page to Third Supplemental Indenture]*

**EXHIBIT 10.36**

<u>SEVERANCE AGREEMENT</u>

**Before signing this Severance Agreement, You are advised to consult with an attorney prior to executing this Agreement. Your signature must be notarized.**

This Severance Agreement (the "Agreement") is entered into knowingly and voluntarily by and between P. Kelly Tompkins ("Employee") and Cleveland-Cliffs Inc. and its affiliates identified in Section III.A., below (collectively the "Company"). Employee and the Company may be collectively referred to as the "Parties."

<u>RECITALS</u>

A.    Employee has decided to voluntarily retire and terminate his employment with the Company as its Executive Vice President-Chief Operations Officer and the Company has decided to accept Employee's voluntary termination of employment effective December 31, 2017 (the "Retirement Date").

B.    The Company agrees to pay Employee all wages and other compensation earned through the Retirement Date.

C.    Employee and the Company desire to establish the terms for an amicable separation of Employee's employment on the Retirement Date, to facilitate an appropriate transition of Employee's responsibilities to the Company and to settle fully and finally any and all differences between them which have arisen, or may arise, out of the employment relationship and/or the termination of that relationship.

D.    The Company desires to offer Employee the payments and benefits described herein in connection with Employee's termination of employment.

E.    Receipt of the payments and benefits described herein requires: (1) execution and notarization; (2) delivery to the Company; and (3) non-revocation of both this Agreement and the attached Release, all within the time frames specified in Section V of the Release.

<u>AGREEMENT</u>

**I.   TERMINATION, SEVERANCE PAYMENTS AND BENEFITS**

A.    On the Retirement Date, Employee's employment with the Company shall cease, he shall cease to be the Executive Vice President - Chief Operating Officer of the Company, and he shall resign from any other positions that he then holds with the Company as of the Retirement Date. Employee further agrees to execute any further documents required to effectuate such resignations as may be requested by the Company. As of the Retirement Date, Employee shall be released from his duties with the Company and cease to have any authority to conduct business on behalf of the Company.

B.    Subject to Section I.C., Employee shall receive the following payments and benefits (collectively, the "Payments") if Employee (i) signs, notarizes and delivers this Agreement; (ii) signs, notarizes and delivers the attached Release no earlier than the calendar day following the Retirement Date and no later than the day after the end of the time period described in Section V.A. of the Release; and (ii) does not revoke the Release prior to the "Effective Date" (as defined in Section V.D. of the Release):

1.    A lump sum cash payment equal to Seventy Thousand Dollars ($70,000), paid, less appropriate federal, State of Ohio and local withholdings and deductions, in a lump sum within fifteen (15) days after the Effective Date (the "Payment Date").

2.    Employee shall continue to be covered by any provision for indemnification by the Company in effect on the date of the execution of this Agreement for so long as it provides such indemnification for its active senior executives. In addition, the Company shall continue to maintain D&O coverage that covers past executives to the same extent that it covers present executives. Finally, in the event of a change in control in which the Company is not the survivor, the Company shall use its reasonable

best efforts to require as part of such transaction that the surviving company provide indemnification and D&O coverage that covers the past executives of the Company.

3.   Employee shall receive continued tax support services through April 30, 2018, including assistance with the filing of Employee's 2017 tax return.

C.   Should Employee breach any of the covenants contained in Sections VI (relating to the covenant of confidentiality), VIII (relating to covenant to cooperate with the Company), X (relating to the covenant not to disparage the Company), and XI (relating to the covenant not to solicit employees) of this Agreement, Employee shall be required to return the Payments already received under this Agreement in excess of one (1) week Base Pay within seven (7) days of demand by the Company, and shall receive no further Payments this Agreement.

D.   Subject to Section I.C., should Employee die prior to receipt of the Payments set forth in Section I.B., then the Payments will be payable to Employee's estate or otherwise inure to the benefit of his/her heirs.

E.   The term "Base Pay" shall mean Employee's rate of annual base salary in effect as of the Retirement Date. Base Pay does not include pension contributions made by the Company, welfare or other fringe benefits paid for by the Company, expense reimbursements, overtime pay, bonuses, commissions, incentive pay, or any other special compensation.

## II.   REPRESENTATIONS AND WARRANTIES

Employee understands, acknowledges and agrees that:

- Employee has the sole right and exclusive authority to execute this Agreement.
- The Company and the Plan are not obligated to pay, and will not pay, to Employee any Payment until the Release has become effective.
- Employee signs this Agreement knowingly and voluntarily, in order to induce Company to provide the Payments.
- Employee has not sold, assigned, transferred, conveyed or otherwise disposed of any of the claims, demands, obligations or causes of action referred to in this Agreement.
- No other person or entity has an interest in the claims, demands, obligations or causes of action referred to in this Agreement.
- The Payments that Employee will receive in exchange for signing this Agreement and the Release are in addition to anything of value to which Employee is already entitled.
- The Payments provided for in this Agreement are the only consideration that Employee ever will receive from the Company or any Released Parties (as defined below) for any and all claims, demands, obligations or causes of action released in this Agreement or the Release.
- This Agreement and its terms shall not be construed as an admission of any liability whatsoever on the part of the Company or any other Released Parties described in this Agreement, by which/whom any liability is and always has been expressly denied.
- As of the date of execution of this Agreement, Employee has not filed any administrative charges or lawsuits arising out of or relating to his employment with the Company or the separation of that employment.
- As of the date of execution of this Agreement, Employee has no work-related injury and is medically stationary with no impairment of earning capacity.

## III.   RELEASE

A.   Employee, for himself, and his marital community (if any), agents, heirs, executors, administrators, and assigns, hereby knowingly and voluntarily fully releases and forever discharges from any and all agreements, debts, claims, demands, actions, judgments, causes of action, and liabilities of every kind or nature, known or unknown, that Employee, individually or as a member of a class, ever had or now has, the following (referred to as the "Released Parties"):

- Cleveland-Cliffs Inc.
- Cliffs Natural Resources Inc.;
- Northshore Mining Company;
- Silver Bay Power Company;

2

- Tilden Mining Company LC;
- Empire Iron Mining Partnership;
- Cliffs Mining Company;
- Hibbing Taconite Company Joint Venture;
- United Taconite LLC;
- The Cleveland-Cliffs Iron Company;
- Cliffs Mining Services Company;
- Lake Superior & Ishpeming Railroad Company;
- Cliffs International Management Company LLC;
- Cliffs Sales Company;
- Cliffs Natural Resources Exploration Ltda.;
- Cliffs Natural Resources Pty Ltd;
- All affiliates of Cleveland-Cliffs Inc. not already listed above, including any corporation or other entity which is controlled by or under common control with Cleveland-Cliffs Inc., or which is in the same affiliated service group or otherwise required to be aggregated with Cleveland-Cliffs Inc. under Sections 414 or 1563 of the Internal Revenue Code;
- All current or former owners, officers, directors, shareholders, members, employees, managers, agents, attorneys, partners and insurers of the above entities; and
- The predecessors, successors, and assigns of the above entities and individuals and the spouses, children, and family members of the individuals.

B.    Without limiting the generality of this Agreement, Employee acknowledges and agrees that this release is intended to bar every claim, demand, and cause of action, including without limitation any and all claims arising under:

- The federal Civil Rights Acts of 1866, 1871, 1964 and 1991 and all similar state civil rights statutes;
- The Employee Retirement Income Security Act of 1974;
- The Fair Labor Standards Act;
- The Rehabilitation Act of 1973;
- The Occupational Safety and Health Act;
- The Mine Safety and Health Act;
- The Health Insurance Portability and Accountability Act;
- The Age Discrimination in Employment Act;
- The Older Workers Benefit Protection Act;
- The Americans with Disabilities Act;
- The National Labor Relations Act;
- The Family and Medical Leave Act;
- The Equal Pay Act;
- The Worker Adjustment and Retraining Notification Act;
- The Lilly Ledbetter Fair Pay Act;
- The Ohio Civil Rights Act;
- State wage payment statutes;
- State wage and hour statutes;
- State employment statutes;
- Any statutes regarding the making and enforcing of contracts;
- Any whistleblower statute; and
- All similar provisions under all other federal, state and local laws.

C.    Without limiting the generality of this Agreement, Employee further acknowledges and agrees that this release is intended to bar all equitable claims and all common law claims, including without limitation claims of or for:

- Breach of an express or an implied contract;
- Breach of the covenant of good faith and fair dealing;
- Unpaid wages, salary, commissions, vacation or other employee benefits;
- Unjust enrichment;
- Negligent or intentional interference with contractual relations;
- Negligent or intentional interference with prospective economic relations;
- Estoppel;

3

- Fraud;
- Negligence;
- Negligent or intentional misrepresentation;
- Personal injury;
- Slander;
- Libel;
- Defamation;
- False light;
- Injurious falsehood;
- Invasion of privacy;
- Wrongful discharge;
- Failure to hire;
- Retaliatory discharge;
- Constructive discharge;
- Negligent or intentional infliction of emotional distress;
- Negligent hiring, supervision or retention;
- Loss of consortium; and
- Any claims that may relate to drug and/or alcohol testing.

D.    **Employee further understands, acknowledges and agrees that this Agreement is a general release, and that Employee further waives and assumes the risk of any and all claims which exist as of this date, including those of which Employee does not know or suspect to exist, whether through ignorance, oversight, error, negligence, or otherwise, and which, if known, would materially affect Employee's decision to sign this Agreement.**

E.    Without limiting the generality of the releases provided for above, Employee expressly waives and releases any right, claim or entitlement to any payments or benefits under any agreement entered into by and between the Company and Employee that provides for the provision of any severance payments or benefits upon the termination of his employment by the Company beyond what is expressly provided for in this Agreement, including without limitation that certain Change in Control Severance Agreement between the Parties (the "CIC Agreement").  The Parties further agree that the CIC Agreement is hereby terminated effective December 31, 2017 in its entirety notwithstanding any survivorship provisions of the CIC Agreement.

F.    Without limiting the generality of the Release provided for above, Employee expressly waives treatment as an active employee and shall be treated as a Retiree under the terms of the various outstanding Agreements.

G.    Employee further understands, acknowledges and agrees that this Agreement waives any right Employee has to recover damages in any lawsuit brought by Employee as well as in any lawsuit brought on his behalf by any other person or entity, including without limitation by the Equal Employment Opportunity Commission (EEOC) or any similar state agency. Employee is not, however, waiving the right to file a charge with the EEOC or any similar state agency.

H.    This Agreement shall not be interpreted to release or require the release of the Company or the Released Parties from any:

- Claims for Payments under this Agreement;
  or
- Claims for benefits under any pension plan of the Company;
  or
- Claims arising out of acts or practices which occur after the execution of this Agreement.

## IV.    REPRESENTATION OF UNDERSTANDING OF RELEASE

Employee acknowledges that Employee has had the opportunity to consult an attorney of Employee's own choosing before entering into this Agreement. Employee represents and warrants that Employee has read all of the terms of this Agreement; and that Employee fully understands and voluntarily accepts these terms. Employee further acknowledges and agrees that Employee has been given a reasonable period of time within which to consider this Agreement.

4

## V.   FEDERAL AGE DISCRIMINATION CLAIMS

Employee understands and agrees that a waiver of claims under the Age Discrimination in Employment Act, as amended by the Older Workers Benefit Protection Act, (29 U.S.C. 621, et seq.) (the "ADEA") is not effective unless it is "knowing and voluntary," and that the ADEA imposes certain minimum requirements for a waiver to be knowing and voluntary. Employee acknowledges and agrees that Employee is knowingly and voluntarily giving up any rights or claims for relief Employee may have under the ADEA regarding the Company's conduct or the conduct of any Released Parties. However, Employee acknowledges and agrees that Employee is not giving up the right to challenge the validity of this Agreement under the ADEA.

## VI.   CONFIDENTIAL    INFORMATION    AND COVENANTS

A.   The Parties agree that this Agreement is confidential and agree not to disclose its terms to anyone other than, in the case of Employee, his spouse, attorney, or financial/tax advisor and, in the case of the Company, its officers, directors, or employees who need to know in order to execute the various provisions of this Agreement. However, the Parties agree that this Agreement may be disclosed if required to do so by a Court of competent jurisdiction.

B.   The Parties agree not to make any public statement regarding the termination of Employee's employment without first obtaining the written consent of the other Party. However, the Company shall be permitted to submit any filings required by the Securities and Exchange Commission regarding Employee's departure.

C.   Employee represents that, during Employee's employment with the Company, Employee has not breached any confidentiality agreement to which Employee is a party. Employee further represents and warrants that Employee will continue to abide by the terms of any confidentiality agreement applicable to Employee after the Retirement Date.

## VII.   RETURN OF COMPANY PROPERTY

A.   Employee agrees to return to the Company all originals and copies of the Company's property, documents and information in Employee's possession, regardless of the form on which such information has been maintained or stored, including without limitation, computer disks, tapes or other forms of electronic storage, Company credit cards (including telephone credit cards), tools, equipment, keys, identification, software, computer access codes, disks and instructional manuals, Company issued IPhone and all other property prepared by, or for, or belonging to the Company. Employee further agrees that he will not retain any documents or other property belonging to Company.

B.   By signing this Agreement, Employee affirms that Employee either (1) has no Company property remaining in his possession or control or, (2) Employee has provided the Company a list of IT devices and the amount he will tender for each item.

## VIII.   COOPERATION

Employee shall cooperate with the Company in effecting a smooth transition, and shall timely provide such information as the Company may reasonably request regarding operations and information within Employee's knowledge while Employee was employed by the Company. Employee shall cooperate with the Company regarding litigation in which he is a witness, named defendant or decision maker while serving in his role as an Executive Officer of the Company. Company shall pay and/or reimburse Employee for all reasonable out-of-pocket expenses should cooperation in a judicial matter or investigation be required. Additionally, should cooperation require legal preparation of Employee, such legal fees shall be paid for by the Company. Should Employee select counsel his own, he shall first seek approval from the General Counsel of the Company.

## IX.   RE-EMPLOYMENT

Employee hereby forever gives up, waives and releases any right to be hired, employed, recalled or reinstated by the Company or any affiliate of the Company.

## X.   NON-DISPARAGEMENT

A.   Employee shall not voluntarily make any negative statements orally or in writing about Employee's employment with the Company, about the Company or its affiliates or any of its employees or products, to anyone

5

other than to the EEOC or any similar state agency, Employee's immediate family, and Employee's legal representatives or financial advisors. Nothing herein shall prevent Employee from testifying truthfully in a legal proceeding or governmental administrative proceeding. Employee may indicate on employment applications that Employee was employed by the Company, Employee's duties, length of employment, and salary.

B.    The Company's officers and directors shall not voluntarily make any negative statements orally or in writing about Employee or about Employee's employment with the Company to anyone other than to the EEOC or any similar state agency and the Company's legal representatives. Nothing herein shall prevent the Company's officers and directors from testifying truthfully in a legal proceeding or governmental administrative proceeding.

## XI.    NON-SOLICITATION

Employee agrees that, during his period of employment and the period beginning on his Retirement Date and ending twelve (12) months following the Retirement Date, Employee shall not directly or indirectly contact, approach or solicit for the purpose of offering employment to, or directly or indirectly actually hire, any person employed by the Company or its affiliates (or who was employed by the Company or its affiliates during the six (6) month period immediately prior to such solicitation or hire), without the prior written consent of the Company.

## XII.    SEVERABILITY

In the event that any provision(s) of this Agreement is found to be unenforceable for any reason whatsoever, the unenforceable provision shall be considered to be severable, and the remainder of this Agreement shall continue in full force and effect.

## XIII.    BINDING EFFECT

This Agreement shall be binding upon and operate to the benefit of Employee, the Company, the Released Parties, and their successors and assigns.

## XIV.    WAIVER

No waiver of any of the terms of this Agreement shall constitute a waiver of any other terms, whether or not similar, nor shall any waiver be a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver. The Company or Employee may waive any provision of this Agreement intended for its/his/her benefit, but such waiver shall in no way excuse the other from the performance of any of its/his/her other obligations under this Agreement.

## XV.    GOVERNING LAW

This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio, without regard to the principles of conflicts of law, except to the extent those laws are preempted by federal law.

## XVI.    SUBSEQUENT MODIFICATIONS

The terms of this Agreement may be altered or amended, in whole or in part, only upon the signed written agreement of all Parties to this Agreement. No oral agreement may modify any term of this Agreement.

## XVII.    ENTIRE AGREEMENT

This Agreement constitutes the sole and entire agreement of the Parties with respect to the subject matter hereof, and supersedes any and all prior and contemporaneous agreements, promises, representations, negotiations, and understandings of the Parties, whether written or oral. There are no agreements of any nature whatsoever among the parties except as expressly stated herein.

## XVIII.    ATTORNEYS' FEES AND COSTS

This Section XVIII shall not apply to any litigation arising out of a challenge to the validity of this Agreement under the ADEA, or any litigation in which the validity of this Agreement under the ADEA is an issue. In the event of

6

litigation arising out of any other alleged breach of this Agreement, the prevailing party shall be entitled to an award of its reasonable attorneys' fees and costs.

**XIX.    SECTION 409A**

    The Parties acknowledge that Employee shall incur a "separation from service," within the meaning of Section 409A of the Code ("Section 409A"), no later than the Retirement Date. Notwithstanding anything in this Agreement to the contrary, if Employee is considered a "specified employee" (as defined in Section 409A), any amounts paid or provided under this Agreement shall, to the extent necessary in order to avoid the imposition of a penalty tax on Employee under Section 409A, be delayed for six months after Employee's "separation from service" within the meaning of Section 409A, and the accumulated amounts shall be paid in a lump sum within ten (10) calendar days after the end of the six (6)-month period. If Employee dies during the six-month postponement period prior to the payment of such accumulated amounts, the payments which are deferred on account of Section 409A shall be paid to the personal representative of Employee's estate within 60 calendar days after the date of Employee's death. For purposes of this Agreement, each amount to be paid or benefit to be provided to Employee pursuant to this Agreement shall be construed as a separate identified payment for purposes of Section 409A. All reimbursements and in-kind benefits provided under this Agreement shall be made or provided in accordance with the requirements of Section 409A to the extent applicable, including, where applicable, the requirement that (i) any reimbursement is for expenses incurred during the period of time specified in this Agreement, (ii) the amount of expenses eligible for reimbursement, or in-kind benefits provided, during a calendar year may not affect the expenses eligible for reimbursement, or in kind benefits to be provided, in any other calendar year, (iii) the reimbursement of an eligible expense will be made no later than the last calendar day of the calendar year following the year in which the expense is incurred, and (iv) the right to reimbursement or in kind benefits is not subject to liquidation or exchange for another benefit.

CLEVELAND-CLIFFS INC.

/s/ Maurice D. Harapiak

Executive Vice President, Human Resources

Date: 21 Nov 2017

/s/ P. Kelly Tompkins

P. Kelly Tompkins

STATE OF OHIO                    )
                                       ) SS.
COUNTY OF CUYAHOGA         )

    On this 21st day of November, 2017, before me personally appeared P. Kelly Tompkins, to me known to be the person described in and who executed this Severance Agreement and acknowledged that he executed the same as his free act and deed.

    IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

/s/ Jason S. Veloso

Notary Public

My Commission Expires:         N/A

7

## RELEASE

**Before signing this Release (the "Release"), you are advised to consult with an attorney. Your signature must be notarized.**

This Release is entered into knowingly and voluntarily on the date specified on the signature page hereto by P. Kelly Tompkins ("Employee"), in favor of Cleveland-Cliffs Inc. and its affiliates identified in Section II.A below (collectively, the "Company").

## RECITALS

A.      Employee and the Company previously entered into that certain Severance Agreement (the "Severance Agreement").

B.      Employee's employment as the Executive Vice President-Chief Operations Officer of the Company terminated effective as of December 31, 2017 (the "Retirement Date").

C.      Employee is entitled to certain "Payments" (as each such term is defined in the Severance Agreement) subject to, among other things, Employee's execution and non-revocation of this Release.

D.      Employee and the Company desire to settle fully and finally any and all differences between them which have arisen, or may arise, out of the employment relationship and/or the termination of that relationship in the future.

## AGREEMENT

### I.   REPRESENTATIONS AND WARRANTIES

Employee understands, acknowledges and agrees that:

- •      Employee has the sole right and exclusive authority to execute this Release.
- •      The Company and the Plan are not obligated to pay, and will not pay, to Employee any Payment until this Release has become effective.
- •      Employee signs this Release knowingly and voluntarily, in order to induce Company to provide the Payments.
- •      Employee has not sold, assigned, transferred, conveyed or otherwise disposed of any of the claims, demands, obligations or causes of action referred to in this Release.
- •      No other person or entity has an interest in the claims, demands, obligations or causes of action referred to in this Release.
- •      The Payments that Employee will receive in exchange for signing this Release are in addition to anything of value to which Employee is already entitled.
- •      The Payments provided for in the Agreement are the only consideration that Employee ever will receive from the Company or any Released Parties (as defined below) for any and all claims, demands, obligations or causes of action released in this Release.
- •      This Release and its terms shall not be construed as an admission of any liability whatsoever on the part of the Company or any other Released Parties described in this Release, by which/whom any liability is and always has been expressly denied.
- •      As of the date of execution of this Release, Employee has not filed any administrative charges or lawsuits arising out of or relating to his employment with the Company or the separation of that employment.
- •      As of the date of execution of this Release, Employee has no work-related injury and is medically stationary with no impairment of earning capacity.

### II.   RELEASE

A.   Employee, for himself, and his marital community (if any), agents, heirs, executors, administrators, and assigns, hereby knowingly and voluntarily fully releases and forever discharges from any and all agreements, debts, claims, demands, actions, judgments, causes of action, and liabilities of every kind or nature, known or unknown,

8

that Employee, individually or as a member of a class, ever had or now has, the following (referred to as the "Released Parties"):

- Cleveland-Cliffs Inc.
- Cliffs Natural Resources Inc.;
- Northshore Mining Company;
- Silver Bay Power Company;
- Tilden Mining Company LC;
- Empire Iron Mining Partnership;
- Cliffs Mining Company;
- Hibbing Taconite Company Joint Venture;
- United Taconite LLC;
- The Cleveland-Cliffs Iron Company;
- Cliffs Mining Services Company;
- Lake Superior & Ishpeming Railroad Company;
- Cliffs International Management Company LLC;
- Cliffs Sales Company;
- Cliffs Natural Resources Exploration Ltda.;
- Cliffs Natural Resources Pty Ltd;
- All affiliates of Cleveland-Cliffs Inc. not already listed above, including any corporation or other entity which is controlled by or under common control with Cleveland-Cliffs Inc., or which is in the same affiliated service group or otherwise required to be aggregated with Cleveland-Cliffs Inc. under Sections 414 or 1563 of the Internal Revenue Code;
- All current or former owners, officers, directors, shareholders, members, employees, managers, agents, attorneys, partners and insurers of the above entities; and
- The predecessors, successors, and assigns of the above entities and individuals and the spouses, children, and family members of the individuals.

B.    Without limiting the generality of this Release, Employee acknowledges and agrees that this Release is intended to bar every claim, demand, and cause of action, including without limitation any and all claims arising under:

- The federal Civil Rights Acts of 1866, 1871, 1964 and 1991 and all similar state civil rights statutes;
- The Employee Retirement Income Security Act of 1974;
- The Fair Labor Standards Act;
- The Rehabilitation Act of 1973;
- The Occupational Safety and Health Act;
- The Mine Safety and Health Act;
- The Health Insurance Portability and Accountability Act;
- The Age Discrimination in Employment Act;
- The Older Workers Benefit Protection Act;
- The Americans with Disabilities Act;
- The National Labor Relations Act;
- The Family and Medical Leave Act;
- The Equal Pay Act;
- The Worker Adjustment and Retraining Notification Act;
- The Lilly Ledbetter Fair Pay Act;
- The Ohio Civil Rights Act;
- State wage payment statutes;
- State wage and hour statutes;
- State employment statutes;
- Any statutes regarding the making and enforcing of contracts;
- Any whistleblower statute; and
- All similar provisions under all other federal, state and local laws.

C.    Without limiting the generality of this Release, Employee further acknowledges and agrees that this Release is intended to bar all equitable claims and all common law claims, including without limitation claims of or for:

- Breach of an express or an implied contract;

9

A005452

- Breach of the covenant of good faith and fair dealing;
- Unpaid wages, salary, commissions, vacation or other employee benefits;
- Unjust enrichment;
- Negligent or intentional interference with contractual relations;
- Negligent or intentional interference with prospective economic relations;
- Estoppel;
- Fraud;
- Negligence;
- Negligent or intentional misrepresentation;
- Personal injury;
- Slander;
- Libel;
- Defamation;
- False light;
- Injurious falsehood;
- Invasion of privacy;
- Wrongful discharge;
- Failure to hire;
- Retaliatory discharge;
- Constructive discharge;
- Negligent or intentional infliction of emotional distress;
- Negligent hiring, supervision or retention;
- Loss of consortium; and
- Any claims that may relate to drug and/or alcohol testing.

D. **Employee further understands, acknowledges and agrees that this Release is a general release, and that Employee further waives and assumes the risk of any and all claims which exist as of this date, including those of which Employee does not know or suspect to exist, whether through ignorance, oversight, error, negligence, or otherwise, and which, if known, would materially affect Employee's decision to sign this Release.**

E. Without limiting the generality of the Release provided for above, Employee expressly waives and releases any right, claim or entitlement to any payments or benefits under any agreement entered into by and between the Company and Employee that provides for the provision of any severance payments or benefits upon the termination of his employment by the Company beyond what is expressly provided for in this Agreement, including without limitation that certain Change in Control Severance Agreement between the Parties (the "CIC Agreement"). The Parties further agree that the CIC Agreement is hereby terminated effective December 31, 2017 in its entirety notwithstanding any survivorship provisions of the CIC Agreement.

F. Without limiting the generality of the Release provided for above, Employee expressly waives and releases any right to treatment as an active employee and shall be treated as a Retiree under the terms of the various outstanding Agreements.

G. Employee further understands, acknowledges and agrees that this Release waives any right Employee has to recover damages in any lawsuit brought by Employee as well as in any lawsuit brought on his behalf by any other person or entity, including without limitation by the Equal Employment Opportunity Commission (EEOC) or any similar state agency. Employee is not, however, waiving the right to file a charge with the EEOC or any similar state agency.

H. This Release shall not be interpreted to release or require the release of the Company or the Released Parties from any:

- Claims for Payments under the Agreement;
  or
- Claims for benefits under any pension plan of the Company;
  or
- Claims arising out of acts or practices which occur after the execution of this Release.

10

## III.   REPRESENTATION OF UNDERSTANDING OF RELEASE

Employee acknowledges that Employee has had the opportunity to consult an attorney of Employee's own choosing before entering into this Release. Employee represents and warrants that Employee has read all of the terms of this Release; and that Employee fully understands and voluntarily accepts these terms. Employee further acknowledges and agrees that Employee has been given a reasonable period of time within which to consider this Release.

## IV.   FEDERAL AGE DISCRIMINATION CLAIMS

Employee understands and agrees that a waiver of claims under the Age Discrimination in Employment Act, as amended by the Older Workers Benefit Protection Act, (29 U.S.C. 621, et seq.) (the "ADEA") is not effective unless it is "knowing and voluntary," and that the ADEA imposes certain minimum requirements for a waiver to be knowing and voluntary. Employee acknowledges and agrees that Employee is knowingly and voluntarily giving up any rights or claims for relief Employee may have under the ADEA regarding the Company's conduct or the conduct of any Released Parties. However, Employee acknowledges and agrees that Employee is not giving up the right to challenge the validity of this Release under the ADEA.

## V.   TIME TO CONSIDER AND CANCEL RELEASE; EFFECTIVE DATE

A.   Employee acknowledges and agrees that he has been given a period of at least twenty-one (21) calendar days from the receipt of this Release to decide whether to sign it and is advised to consult with an attorney before doing so. Employee is not to sign this Release unless Employee understands its provisions and is doing so voluntarily.

B.   This Release shall be signed and notarized no earlier than the calendar day following Employee's Retirement Date, but no later than twenty-one (21) calendar days following the Employee's Retirement Date. Further, this Release shall be delivered to (or postmarked for delivery to) Kurt Holland, Director of Compensation and Benefits, Cleveland-Cliffs Inc., 200 Public Square, Suite 3300, Cleveland, Ohio 44114, no later than twenty-one (21) calendar days after Employee's Retirement Date.

C.   After Employee has signed this Release, Employee has seven (7) calendar days to change his mind and notify the Company in writing that Employee has canceled this Release. If Employee so cancels this Release, this Release will be null and void, and will have no force or effect. Written notice of a cancellation of this Release must actually be received by the Company at the following address and must be postmarked within the time frame described above in order to be effective: Kurt Holland, Director of Compensation and Benefits, Cleveland-Cliffs Inc., 200 Public Square, Suite 3300, Cleveland, Ohio 44114

D.   If Employee (1) signs, notarizes and delivers this Release within the time frames and in accordance with the provisions of Section VI.B; and (2) does not cancel or revoke the Release within the time frames and in accordance with the provisions of Section VI.C, this Release shall become effective on the eighth calendar day after Employee signed it (the "Effective Date").

E.   Employee understands that if he revokes this Release, it shall not be effective or enforceable and Employee will not become a Participant in the Plan and will not receive any Payments.

## VI.   SEVERABILITY

In the event that any provision(s) of this Release is found to be unenforceable for any reason whatsoever, the unenforceable provision shall be considered to be severable, and the remainder of this Release shall continue in full force and effect.

## VII.   BINDING EFFECT

This Release shall be binding upon and operate to the benefit of Employee, the Company, the Released Parties, and their successors and assigns.

11

## VIII.  WAIVER

No waiver of any of the terms of this Release shall constitute a waiver of any other terms, whether or not similar, nor shall any waiver be a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver. The Company or Employee may waive any provision of this Release intended for its/his/her benefit, but such waiver shall in no way excuse the other from the performance of any of its/his/her other obligations under this Release.

## IX.  GOVERNING LAW

This Release shall be governed by and construed in accordance with the laws of the State of Ohio, without regard to the principles of conflicts of law, except to the extent those laws are preempted by federal law.

## X.  SUBSEQUENT MODIFICATIONS

The terms of this Release may be altered or amended, in whole or in part, only upon the signed written agreement of all Parties to this Release. No oral agreement may modify any term of this Release.

## XI.  ENTIRE AGREEMENT

This Release constitutes the sole and entire agreement of the Parties with respect to the subject matter hereof, and supersedes any and all prior and contemporaneous agreements, promises, representations, negotiations, and understandings of the Parties, whether written or oral. There are no agreements of any nature whatsoever among the parties except as expressly stated herein.

## XII.  ATTORNEYS' FEES AND COSTS

This Section XII shall not apply to any litigation arising out of a challenge to the validity of this Release under the ADEA, or any litigation in which the validity of this Release under the ADEA is an issue.  In the event of litigation arising out of any other alleged breach of this Release, the prevailing party shall be entitled to an award of its reasonable attorneys' fees and costs.

## XIII.  SECTION 409A

The Parties acknowledge that Employee shall incur a "separation from service," within the meaning of Section 409A of the Code ("Section 409A"), no later than the Retirement Date. Notwithstanding anything in this Release to the contrary, if Employee is considered a "specified employee" (as defined in Section 409A), any amounts paid or provided under this Release shall, to the extent necessary in order to avoid the imposition of a penalty tax on Employee under Section 409A, be delayed for six months after Employee's "separation from service" within the meaning of Section 409A, and the accumulated amounts shall be paid in a lump sum within ten (10) calendar days after the end of the six (6)-month period. If Employee dies during the six-month postponement period prior to the payment of such accumulated amounts, the payments which are deferred on account of Section 409A shall be paid to the personal representative of Employee's estate within 60 calendar days after the date of Employee's death. For purposes of this Release, each amount to be paid or benefit to be provided to Employee pursuant to this Release shall be construed as a separate identified payment for purposes of Section 409A. All reimbursements and in-kind benefits provided under this Release shall be made or provided in accordance with the requirements of Section 409A to the extent applicable, including, where applicable, the requirement that (i) any reimbursement is for expenses incurred during the period of time specified in this Release, (ii) the amount of expenses eligible for reimbursement, or in-kind benefits provided, during a calendar year may not affect the expenses eligible for reimbursement, or in kind benefits to be provided, in any other calendar year, (iii) the reimbursement of an eligible expense will be made no later than the last calendar day of the calendar year following the year in which the expense is incurred, and (iv) the right to reimbursement or in kind benefits is not subject to liquidation or exchange for another benefit.

12

CLEVELAND-CLIFFS INC.

/s/ Maurice D. Harapiak

Maurice D. Harapiak
Executive Vice President, Human Resources


Date: 21 Nov 2017

/s/ P. Kelly Tompkins

P. Kelly Tompkins


STATE OF OHIO                                )
                                             ) SS.
COUNTY OF CUYAHOGA                           )


On this 21st day of November, 2017, before me personally appeared P. Kelly Tompkins, to me known to be the person described in and who executed this Release and acknowledged that he executed the same as his free act and deed.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.


/s/ Jason S. Veloso

Notary Public

My Commission Expires:          N/A

13

CLEVELAND-CLIFFS INC. HAS REQUESTED THAT THE OMITTED PORTIONS OF THIS DOCUMENT, WHICH ARE INDICATED BY ASTERISKS, BE ACCORDED CONFIDENTIAL TREATMENT PURSUANT TO RULE 24b-2 UNDER THE SECURITIES EXCHANGE ACT OF 1934

**EXHIBIT 10.59**

## AMENDED AND RESTATED PELLET SALE AND PURCHASE AGREEMENT

This Amended and Restated Pellet Sale and Purchase Agreement (the "Agreement"), entered into, dated and effective as of December 31, 2015 (the "Effective Date"), by and among The Cleveland-Cliffs Iron Company, an Ohio corporation ("CCIC"), Cliffs Mining Company, a Delaware corporation ("Mining") ("CCIC" and "Mining" being collectively referred to herein as "Cliffs") and AK Steel Corporation, a Delaware corporation ("AK Steel"). AK Steel and Cliffs may singularly be referred to as Party and collectively Parties.

### RECITALS

WHEREAS, Cliffs, Cliffs Sales Company and AK Steel are parties to that certain Pellet Sale, Purchase and Trade Agreement dated January 1, 2006, as amended (the "Original Contract"), pursuant to which Cliffs and Cliffs Sales Company provide AK Steel with iron ore pellets in connection with AK Steel's steel manufacturing and processing activities in Dearborn Michigan ("AK Dearborn"); and

WHEREAS, Cliffs Sales Company has merged into Mining; and

WHEREAS, there have been six amendments and term sheets amending the Original Contract and a change in ownership interest since the time the Original Contract was executed; and

WHEREAS, the Parties desire to conform all the amendments and term sheets into one comprehensive document that correctly sets forth the relationship between the Parties.

NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth, the Parties agree as follows:

**Section 1. - Definitions**.

The terms quoted in the above parentheses of the first introductory paragraph of this Agreement and the WHEREAS clauses, other terms quoted throughout this Agreement, and the terms defined below in this Section 1 shall have the meanings assigned to them for purposes of this Agreement.

(a).  The word "ton", as used herein, shall mean a gross ton of 2,240 pounds avoirdupois natural weight.

CLEVELAND-CLIFFS INC. HAS REQUESTED THAT THE OMITTED PORTIONS OF THIS DOCUMENT, WHICH ARE INDICATED BY ASTERISKS, BE ACCORDED CONFIDENTIAL TREATMENT PURSUANT TO RULE 24b-2 UNDER THE SECURITIES EXCHANGE ACT OF 1934

(b).    The word "pellets", as used herein, shall mean a product obtained by pelletizing iron ore or iron ore concentrates, suitable for iron making in blast furnaces.

(c).    The words "Tilden Flux Pellets", as used herein, shall mean pellets to which have been added sufficient quantities of limestone and dolomite so as to increase the percentage of *** content of the pellet to a minimum of *** and the percentage of *** content of the pellet to a minimum of *** (unless such specifications are changed pursuant to Section 4), such pellets being those currently produced at the Tilden Mining Company L.C. ("Tilden"), located in National, Michigan.

(d).    The words "iron unit", as used herein, shall mean one percent (1%) iron contained in a ton.

(e).    The word "year", as used herein, shall mean a calendar year.

**Section 2. - Sale and Purchase.**

(a).    Cliffs shall sell and by these presents does sell and shall deliver to AK Steel, the tonnages and grades of Tilden Flux Pellets or other mutually agreed pellets (the Tilden Flux Pellets and any other mutually agreed pellets collectively referred to herein as "Cliffs Pellets") on the terms and conditions as hereinafter provided. AK Steel shall purchase and by these presents does purchase and shall receive and pay for such tonnages and grades of Cliffs Pellets on the terms and conditions as hereinafter provided.

**Section 3. - Tonnage/Iron Units.**

(a).    During the term of this Agreement, Cliffs shall sell to AK Steel and AK Steel shall purchase from Cliffs *** AK Steel's annual iron ore pellet tonnage *** at AK Dearborn such *** being *** to AK Dearborn's *** iron ore pellet tonnage ***, based on AK Dearborn's operating configuration as of the Effective Date of this Agreement, for consumption in AK Dearborn's iron and steelmaking facilities in any year ("AK Steel's Annual Pellet Tonnage Requirements").

(b).    For the years 2015 through and including ***, Cliffs shall supply to AK Steel and AK Steel shall purchase from Cliffs AK Steel's Annual Pellet Tonnage Requirements at AK Dearborn, with a minimum annual supply and purchase obligation of *** million tons.

CLEVELAND-CLIFFS INC. HAS REQUESTED THAT THE OMITTED PORTIONS OF THIS DOCUMENT, WHICH ARE INDICATED BY ASTERISKS, BE ACCORDED CONFIDENTIAL TREATMENT PURSUANT TO RULE 24b-2 UNDER THE SECURITIES EXCHANGE ACT OF 1934

### Section 4. - Notification and Nomination.

(a).    With respect to the tonnage of Cliffs Pellets to be purchased by AK Steel for the year 2015 through and including *** (and during any years after *** in the event the Agreement is extended pursuant to Section 16), on or before October 1 of the prior year thereto, AK Steel shall notify Cliffs in writing of the preliminary total number of tons which AK Steel shall purchase from Cliffs for AK Steel Dearborn.

(b).    With respect to the preliminary tonnage nominations as provided for in Section 4(a) above, on or before April 1 of the then current year, AK Steel may, by written notification to Cliffs, adjust its preliminary tonnage nominations by not more than ***, up or down. If, by April 1 of the then current year, AK Steel shall have adjusted its preliminary tonnage nominations, then such adjusted tonnage nominations shall be deemed their final tonnage nominations for such year, and AK Steel shall be obligated to purchase such tonnage in accordance with such final tonnage nominations.

(c).    If, however, AK Steel has not adjusted its preliminary tonnage nomination as provided for above, then on or before June 1 of the then current year, AK Steel may, by written notification to Cliffs, adjust its preliminary tonnage nominations by not more than ***, up or down. Such adjusted tonnage nominations shall be deemed to be AK Steel's final tonnage nominations for such year, and AK Steel shall be obligated to purchase such tonnage with Cliffs in accordance with such final tonnage nominations.

(d).    If no adjustment is made on or before June 1, then the preliminary tonnage nomination, as provided above, shall be deemed to be AK Steel's final tonnage nominations for such year, and AK Steel shall be obligated to purchase such tonnages with Cliffs in accordance with such preliminary tonnage nominations.

### Section 5. - Price and Adjustments.

(a).    Base Price. The 2014 price for Cliffs Pellets was $*** per iron unit F.O.B. Upper Lake Docks (as defined below).

(b).    Adjustment to Price. The price for the Cliffs Pellets shall be adjusted upward or downward as the case may be by the annual percentage change in four adjustment factors ("Price Adjustment"). In order to determine the Price Adjustment to be paid for the Cliffs Pellets for each contract year, the price per iron unit for the relevant contract year shall be increased or decreased by an amount equal to the sum of the adjustment factors (i), (ii), (iii) and (iv) below:

CLEVELAND-CLIFFS INC. HAS REQUESTED THAT THE OMITTED PORTIONS OF THIS DOCUMENT, WHICH ARE INDICATED BY ASTERISKS, BE ACCORDED CONFIDENTIAL TREATMENT PURSUANT TO RULE 24b-2 UNDER THE SECURITIES EXCHANGE ACT OF 1934

(i).    Twenty-five percent (25%) of the amount obtained by multiplying the as then adjusted price per iron unit for Cliffs Pellets for the year in determination by a fraction (as converted to a decimal) determined by, using the year to year percentage change in the *** ("***") for such year ("Year X") calculated as follows:

$$*** {}_{Year\ X} = *** {}_{Year\ (X-1)} * (*** Price {}_{Year\ X} / *** Price {}_{Year\ (X-1)})$$

Where

$*** Price {}_{Year\ (X-1)}$ = Average Quarterly Price for the year prior to the year of shipping

$*** Price {}_{Year\ X}$ = Average Quarterly Price for the year of shipping

**Quarterly Price** = *** Fe - Freight Credit + Pellet Premium

**\*\*\* Fe** is the daily average price for a three month period that ends one (1) month before the beginning of the new quarter (i.e. September, October, and November 2014 for the quarter beginning January 1, 2015, etc.).

The Pellet Premium shall be a fixed price of $*** per dry metric ton ($*** per dry gross ton).

Freight Credit shall be based on the *** daily average freight price for the three month period that ends one (1) month before the beginning of the new quarter (i.e. September, October, and November 2014 for the quarter beginning January 1, 2015).

(A)    If for any reason the *** Fe is not published, then the *** shall be substituted with the following formula. Such formula shall be adjusted on a quarterly basis:

(1)    Average *** Substitute ("***${}_{Year\ X}$"), as defined below (collectively "Y").

$$*** {}_{Year\ X} = *** {}_{Year\ (X-1)} * (*** Pellet Price {}_{Year\ X} / *** Pellet Price {}_{Year\ (X-1)})$$

*** Pellet Price is the average annual pellet price per metric ton published by *** in its press release reporting on such year's financial performance, in US dollars.

(2)    The sum of X and Y shall equal the current year's ***, or put arithmetically:

CLEVELAND-CLIFFS INC. HAS REQUESTED THAT THE OMITTED PORTIONS OF THIS DOCUMENT, WHICH ARE INDICATED BY ASTERISKS, BE ACCORDED CONFIDENTIAL TREATMENT PURSUANT TO RULE 24b-2 UNDER THE SECURITIES EXCHANGE ACT OF 1934

X + Y = Current Year's ***.

In the event there is no *** for the previous year, than the previous year's *** shall be substituted in the mechanism herein:

$$\text{***}_{\text{Year X}} = \text{***}_{(x-1)} * (\text{*** Pellet Price}_{\text{Year X}} / \text{*** Pellet Price}_{\text{Year (X-1)}})$$

(B)    For the year 2015, and for each year thereafter through and including the year ***, if either Cliffs or AK Steel determines that the *** Fe is not recognized as a common industry recognized international market price index for iron ore used to determine supply contract prices then either party may request a negotiation to define another method to determine an international market price for iron ore and a substitute for the *** Fe. The Parties have seventy-five (75) days upon written notice sent by initiating party to the other party to mutually define and agree on a new recognized international market price for iron ore. The parties may extend the negotiation period upon mutual written consent. If agreement is not reached during the negotiation period with applicable extensions then the arbitration language in the Current Agreement shall govern.

Plus;

(ii) twenty-five percent (25%) of the amount obtained by multiplying the as then adjusted price per iron unit for Cliffs Pellets for the year in determination by the fraction (as converted to a decimal) determined by,

(y)    dividing the numerator, which is the amount by which the Producer Price Index ("PPI") - ***, published by the United States Department of Labor (the "PPI ****") for the calendar year in determination changes (up or down) from the immediately preceding calendar years PPI ***;

(z)    by the denominator, which is the immediately preceding calendar year's PPI ***;

Plus;

(iii) twenty-five percent (25%) of the amount obtained by multiplying the as then adjusted price per iron unit for Cliffs Pellets for the year in determination by the fraction (as converted to decimal) determined by

CLEVELAND-CLIFFS INC. HAS REQUESTED THAT THE OMITTED PORTIONS OF THIS DOCUMENT, WHICH ARE INDICATED BY ASTERISKS, BE ACCORDED CONFIDENTIAL TREATMENT PURSUANT TO RULE 24b-2 UNDER THE SECURITIES EXCHANGE ACT OF 1934

(y)    dividing the numerator, which is the amount by which the PPI - ***, published by the United States Department of Labor (the "PPI ****") for the calendar year in determination changes (up or down) from the immediately preceding calendar years PPI ***;

(z)    by the denominator, which is the immediately preceding calendar year's PPI ***;

Plus;

(iv) twenty-five percent (25%) of the amount obtained by multiplying the as then adjusted price per iron unit for Cliffs Pellets for the year in determination by the fraction (as converted to decimal) determined by

(y)    dividing the numerator, which is the amount by which the PPI - ***, published by the United States Department of Labor (the "PPI ****") for the calendar year in determination changes (up or down) from the immediately preceding calendar years PPI ***;

(z)    by the denominator, which is the immediately preceding calendar year's PPI ***.

An example of the calculation of the adjustment under this Section 5(b) is included as  Exhibit I  to this Agreement.

(c).  Timing of Price Adjustments And True-Ups. Price Adjustments may require true-up payments ("True-Ups") based upon estimated and actual changes in the published pricing factors and indices specified in Section 5(b), at intervals set forth below.

(i) Price Adjustments. Price Adjustments shall be made as follows, and each Price Adjustment shall have prospective effect until the next Price Adjustment:

(A) Initial Adjustment. On or before December 15, Cliffs shall calculate and communicate to AK Steel in writing the Adjusted Price effective January 1 of the succeeding year ("Initial Adjustment"). The Initial Adjustment shall be calculated utilizing (1) the *** ("****") for September, October and November as compared to the *** for the immediately preceding *** Year; and (2) the PPIs for the succeeding year as compared to the PPIs for the current year.

(B) March 15 Adjustment. On or before March 15, Cliffs shall calculate and communicate to AK Steel in writing the Adjusted Price effective April 1 (the "March 15 Adjustment"). The March 15 Adjustment shall

CLEVELAND-CLIFFS INC. HAS REQUESTED THAT THE OMITTED PORTIONS OF THIS DOCUMENT, WHICH ARE INDICATED BY ASTERISKS, BE ACCORDED CONFIDENTIAL TREATMENT PURSUANT TO RULE 24b-2 UNDER THE SECURITIES EXCHANGE ACT OF 1934

be calculated utilizing (1) the *** for the immediately preceding months of September through February, as compared to the *** for the immediately preceding *** Year; and (2) the PPIs for the current year as compared to the PPIs for the immediately preceding year.

(C) June 15 Adjustment. On or before June 15, Cliffs shall calculate and communicate to AK Steel in writing the Adjusted Price effective July 1 (the "June 15 Adjustment"). The June 15 Adjustment shall be calculated utilizing (1) the *** for the immediately preceding months of September through May, as compared to the *** for the immediately preceding *** Year; and (2) the PPIs for the current year as compared to the PPIs for the immediately preceding year .

(D) September 10 Adjustment. On or before September 15, Cliffs shall calculate and communicate to AK Steel in writing the Adjusted Price effective from August 1 through the remainder of the calendar year (the "September 15 Adjustment"). The September 15 Adjustment shall be calculated utilizing (1) the *** for the immediately preceding *** Year, as compared to the *** for the prior *** Year; and (2) the PPIs for the current year as compared to the PPIs for the immediately preceding year.

(ii). True Ups. There shall be two true ups resulting from the publishing of final data for any calendar year: (A) the *** True Up; and (B) the PPI True Up.

(A) *** True Up. The *** True Up shall be based on retroactive application of the Adjusted Price determined by the September 10 Adjustment to all calendar year-to-date shipments of Cliffs Pellets. Cliffs shall calculate and deliver to AK Steel an invoice stating whether such calculation results in a debit or credit to AK Steel ("*** True Up Invoice"). The *** True Up Invoice shall be delivered on or before September 15 each year. Any amounts due to or from AK Steel as a result of the *** True Up Invoice shall be due and payable on or before September 30 of the then current year.

(B) PPI True Up. Typically in May of each year, the United States Department of Labor publishes the final PPIs for the immediately preceding calendar year. Within 15 days of publication of such final PPIs (regardless of when such publication actually occurs), Cliffs shall calculate the final Adjusted Price for the immediately preceding year and reconcile the final Adjusted Price with the price paid by AK Steel for all Cliffs Pellets purchased during the immediately preceding calendar year, and deliver to AK Steel an invoice stating whether such calculation

CLEVELAND-CLIFFS INC. HAS REQUESTED THAT THE OMITTED PORTIONS OF THIS DOCUMENT, WHICH ARE INDICATED BY ASTERISKS, BE ACCORDED CONFIDENTIAL TREATMENT PURSUANT TO RULE 24b-2 UNDER THE SECURITIES EXCHANGE ACT OF 1934

results in a debit or credit to AK Steel ("PPI True Up Invoice"). Any amounts due to or from AK Steel as a result of the PPI True Up Invoice shall be due and payable fifteen (15) days after receipt by AK Steel of such PPI True Up Invoice.

(iii)    Basis of PPIs. Prior to the publication of final PPIs, the most recent estimated annual PPIs published by Global Insights (or such other reputable publisher of PPI forecasts as is mutually agreed upon by the parties in writing) shall be used to calculate the Price Adjustments and *** True Up.

(iv)    No Interest on True Up Amounts. *** True Up Invoice payments and PPI True Up Invoice payments are not due and payable before the dates prescribed above. As a result, interest shall not accrue on any *** True Up Invoice or PPI True Up Invoice.

## Section 6. - Delivery, Credit and Payment.

(a).    For all cargoes of Cliffs Pellets shipped to AK Steel beginning as of the date hereof, Cliffs shall retain title to the cargoes of Cliffs Pellets so shipped until AK Steel makes payment for the Cliffs Pellets. AK Steel shall pay Cliffs for each cargo of Cliffs Pellets shipped during the month by wire transfer to Cliffs on the first business day after the 14th day of the month following loading of Cliffs Pellets at the Port of Marquette, located in Marquette, Michigan, or other appropriate ore dock in the case of ("Upper Lake Docks"). Title to the Cliffs Pellets for each such cargo of Cliffs Pellets shipped shall pass to AK Steel simultaneously with receipt of payment by Cliffs for each such cargo.

(b).    In the event AK Steel shall fail to make prompt payment, Cliffs, in addition to all other remedies available to it in law or in equity, shall have the right, but not the obligation, to withhold further performance by it under this Agreement until all claims it may have against AK Steel under this Agreement are fully satisfied.

## Section 7. - Grant of Security Interest.

(a).    AK Steel acknowledges and agrees that it is the intent of the parties that title to the Cliffs Pellets shall pass to AK Steel solely upon *** in accordance with the terms of this Agreement. However, to secure the payment and performance of all obligations of AK Steel due to Cliffs pursuant to this Agreement, AK Steel hereby grants, pledges and assigns to Cliffs a purchase money security interest ("PMSI") in all of AK Steel's right, title and interest in and to the Cliffs Pellets to the extent that AK Steel takes possession of any Cliffs Pellets in any fashion prior to making payment as required under this Agreement as well as the proceeds of any of the Cliffs Pellets, including the proceeds of any insurance related thereto (collectively, the "Collateral").

(b).    Upon delivery of any of the Collateral to AK Steel by Cliffs, the Collateral shall be located at the addresses set forth on Attachment A hereto.  AK Steel will deliver written notice to Cliffs at least thirty (30) days prior to any change in the locations of any of the Collateral.

(c).    The PMSI granted to Cliffs that attaches to a specific shipment of inventory shall automatically terminate upon the date of Cliffs' receipt from AK Steel of payment in full for said shipment (the "PMSI Termination Date"). Prior to the applicable PMSI Termination Date, the Collateral will at all times be free and clear of any lien, security interest, mortgage, charge or encumbrance created by or through AK Steel or any of its affiliates that is senior to the security interest granted to Cliffs pursuant to this Agreement.

(d).    AK Steel hereby authorizes Cliffs to file UCC financing statements and any amendments, modifications or continuation statements thereto, as Cliffs, in its sole discretion, deems necessary or advisable to perfect its security interest in the Cliffs Pellets granted hereunder, that describes the Collateral and to include any information required for the sufficiency or filing office acceptance of any such financing statements, amendments, modifications or continuation statements. AK Steel covenants and agrees to (i) provide promptly any information requested by Cliffs for inclusion on such financing statements, amendments, modifications or continuation statements and to provide prompt notice of any change in such information and (ii) to take such further actions and duly execute and deliver such further documentation as Cliffs may request in order to fully protect its security interest in the Cliffs Pellets granted hereunder.

(e).    Prior to the applicable PMSI Termination Date, AK Steel will keep and preserve the Collateral in a commercially reasonable manner and will not use, sell or offer to sell, pledge or encumber, process, destroy or consume the Collateral.

(f).    AK Steel and Cliffs acknowledge that in the event of a default hereunder by AK Steel, Cliffs will have all the rights and remedies afforded a secured party under the Uniform Commercial Code as adopted in the State of Ohio with respect to the Collateral.

**Section 8. - Analyses.**

The Cliffs Pellets delivered hereunder will be sampled and analyzed by mine technicians or such independent chemists as may be mutually agreed upon, and said analyses shall be final and the weighted average of all such

analyses of each grade of Cliffs Pellets delivered hereunder shall constitute the basis of settlement hereunder for such grade of Cliffs Pellets. The cost of sampling and analyzing by independent chemists, if requested by any party, shall be borne by the party requesting such sampling and analyzing.

### Section 9. - Quality.

Cliffs Pellets, when loaded for shipment, will be consistent with the typical specifications and analysis limits set forth on  Exhibit II. Both parties acknowledge the need for defining measurement of product characteristic capabilities and quality system requirements. The basis for agreement will be the use of statistical calculation of capabilities and a quality system based on ISO 9001:2000 requirements.

### Section 10. - Shipments.

Within thirty (30) days prior to the first shipment of Cliffs Pellets of each year, Cliffs and AK Steel will establish a schedule of shipments for the Cliffs Pellets for such year, which schedule may be changed during such year by mutual agreement. In the event Cliffs and AK Steel are unable to agree upon a shipping schedule, the Cliffs Pellets will be available for shipment in approximately equal amounts over the nine month period of April through December of each year during the term of this Agreement and shipment and delivery shall be made in accordance with such availability.

### Section 11. - Weights.

Vessel bill of lading weight determined by certified railroad scale weights, certified belt scale weights or certified bin scale weights in accordance with the procedures in effect from time to time at each of the loading ports shall be accepted by the parties as finally determining the amounts of the Cliffs Pellets delivered to AK Steel pursuant to this Agreement.

### Section 12. - Employment of Vessels or Railroad Cars.

AK Steel shall assume the obligation for arranging, providing and paying for the appropriate vessels for the transportation of all of the Cliffs Pellets delivered by Cliffs to AK Steel.

**Section 13. - Warranties.**

**THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, WHICH EXTEND BEYOND THE PROVISIONS OF THIS AGREEMENT, INCLUDING ANY WARRANTIES OF MRECHANTABILITY OR FITNESS FOR INTENDED PURPOSE.** All claims for substantial variance in quality of the Cliffs Pellets, as described herein, shall be deemed waived unless made in writing delivered to Cliffs within the thirty (30) calendar days after completion of discharge at port of discharge. No claim will be entertained after the Cliffs Pellets have been consumed. Each party shall afford the other party prompt and reasonable opportunity to inspect the Cliffs Pellets as to which any claim is made as above stated. The Cliffs Pellets shall not be returned without prior written consent of Cliffs. In no event shall Cliffs be liable for AK Steel's cost of processing, lost profits, injury to good will or any other special or consequential damages.

**Section 14. - Force Majeure.**

Neither party hereto shall be liable for damages resulting from failure to produce, deliver or accept and pay for all or any of the Cliffs Pellets, as described herein, if and to the extent that such production, delivery or acceptance would be contrary to or would constitute a violation of any regulation, order or requirement of a recognized governmental body or agency, or if such failure is caused by or results directly or indirectly from acts of God, war, insurrections, interference by foreign powers, strikes, hindrances, labor disputes, labor shortages, fires, floods, embargoes, accidents, acts of terrorism, or uncontrollable delays at the mines, steel plant, on the railroads or docks or in transit, shortage of transportation facilities, disasters of navigation, or other causes, similar or dissimilar, if such other causes are beyond the control of the party charged with a failure to deliver or to accept and pay for the Cliffs Pellets. A party claiming a force majeure shall give the other party prompt notice of the force majeure, including the particulars thereof and, insofar as known, the probable extent and duration of the force majeure. To the extent a force majeure is claimed hereunder by a party hereto, such shall relieve the other party from fulfilling its corresponding agreement hereunder to the party claiming such force majeure, but only for the period and to the extent of the claimed force majeure, unless otherwise mutually agreed, to by the parties. The party that is subject to a force majeure shall use commercially reasonable efforts to cure or remove the force majeure event as promptly as possible to resume performance of its obligations under this Agreement.

---

CLEVELAND-CLIFFS INC. HAS REQUESTED THAT THE OMITTED PORTIONS BY THIS DOCUMENT, WHICH ARE INDICATED BY ASTERISKS, BE ACCORDED CONFIDENTIAL TREATMENT PURSUANT TO RULE 24b-2 UNDER THE SECURITIES EXCHANGE ACT OF 1934

**Section 15. - Notices.**

All notices, consents, reports and other documents authorized and required to be given pursuant to this Agreement shall be given in writing and either personally served on an officer of the parties hereto to whom it is given or mailed, postage prepaid, or sent by electronic mail addressed as follows:

> If to Cliffs:
>> Cliffs Mining Company
>> 200 Public Square, Suite 3300
>> Cleveland, Ohio 44114
>> Attention: Executive Vice President, Global Commercial
>> Terrence.mee@cliffsnr.com
>> cc: Assistant General Counsel Commercial
>> susanne.dickerson@cliffsnr.com
>
> If to AK Steel:
>> AK Steel Corporation
>> 9227 Centre Pointe Drive
>> West Chester, OH 45069
>> Attn: General Manager, Raw Materials Purchasing
>> stephen.taylor@aksteel.com
>> cc: Vice President - Engineering, Raw Materials & Energy
>> mo.reed@aksteel.com

provided, however, that any party may change the address to which notices or other communications to it shall be sent by giving to the other party written notice of such change, in which case notices and other communications to the party giving the notice of the change of address shall not be deemed to have been sufficiently given or delivered unless addressed to it at the new address as stated in said notice.

**Section 16. - Term.**

The initial term of this Agreement shall commence as of the Effective Date and continue in effect until ***. The Agreement shall continue annually from and after *** for the obligation of AK Steel to purchase from Cliffs and Cliffs to sell to AK Steel all of AK Steel's Annual Pellet Tonnage Requirements pursuant to Section 3(a) above.

If either party desires to terminate this Agreement at the end of the initial term, or any year following ***, then such party shall deliver in writing notice to the other party no less than eighteen (18) months prior to the end of either (i) the initial term or (ii) *** of any year after *** (e.g. to terminate the Agreement at the end of the initial term notice must be received by *** or if for end of contract year *** then such notice must be received ***).

**Section 17. - Amendment.**

This Agreement may not be modified or amended except by an instrument in writing signed by the parties hereto.

**Section 18. - Merger, Transfer and Assignment.**

(a).    AK Steel shall not merge, consolidate or reorganize with any person, partnership, corporation or other entity unless the surviving or resulting person, partnership, corporation or other entity assumes in writing all of AK Steel's obligations under this Agreement. Any obligations required to be assumed by a surviving or resulting person, partnership, corporation or entity in accordance with this Section 18(b) shall be limited to the AK Steel obligations under this Agreement. AK Steel shall not sell or transfer all or substantially all of its business to any other person, partnership, corporation, joint venture or other entity ("AK Steel Transferee") unless the AK Steel Transferee assumes in writing all of AK Steel's obligations under this Agreement.

(b).    Cliffs shall not merge, consolidate or reorganize with any person, partnership, corporation or other entity unless the surviving or resulting person, partnership, corporation or other entity assumes in writing all of Cliffs' obligations under this Agreement. Cliffs shall not sell or transfer all or substantially all of its iron ore business to any other person, partnership, corporation, joint venture or other entity ("Cliffs Transferee") unless the Cliffs Transferee assumes in writing all of Cliffs' obligations under this Agreement.

(c).    All the covenants, stipulations and agreements herein contained shall inure to the benefit of and bind the parties hereto and their respective successors, transferees and permitted assigns, and any of the latter's subsequent successors, transferees and permitted assigns.

**Section 19. - Waiver.**

No waiver of any of the terms of this Agreement shall be valid unless in writing. No waiver of any breach of any provision hereof or default under any provisions hereof shall be deemed a waiver of any subsequent breach or default of any kind whatsoever.

**Section 20. - Confidentiality**

(a).    Cliffs and AK Steel acknowledge that this Agreement contains certain pricing, adjustment and term provisions which are confidential, proprietary or of a sensitive commercial nature and which would put Cliffs or AK Steel at a competitive disadvantage if disclosed to the public (the "Confidential Information"). Cliffs and AK Steel agree that all provisions of this Agreement shall be kept confidential and, without the prior written consent of the other party, shall not be disclosed to any party not a party to this Agreement except as required by law or governmental or judicial order and except that disclosure of the existence of this Agreement shall not be precluded by this Section 20.

(b).    If either party is required by law or governmental or judicial order or receives legal process or court or agency directive requesting or requiring disclosure of any of the Confidential Information contained in this Agreement, such party will promptly notify the other party prior to disclosure to permit such party to seek a protective order or take other appropriate action to preserve the confidentiality of such Confidential Information. If either party determines to file this Agreement with the Securities and Exchange Commission ("Commission") or any other federal, state or local governmental or regulatory authority, or with any stock exchange or similar body, such determining party will use its best efforts to obtain confidential treatment of such Confidential Information pursuant to any applicable rule, regulation or procedure of the Commission and any applicable rule, regulation or procedure relating to confidential filings made with any such other authority or exchange. If the Commission (or any such other authority or exchange) denies such party's request for confidential treatment of such Confidential Information, such party will use its best efforts to obtain confidential treatment of the portions thereof that the other party designates. Each party will allow the other party to participate in seeking to obtain such confidential treatment for Confidential Information.

**Section 21. - Governing Law.**

This Agreement shall in all respects, including matters of construction, validity and performance, be governed by and be construed in accordance with the laws of the State of Ohio, excluding its choice of law principles.

**Section 22. - Representations and Warranties**.

(a).    AK Steel represents and warrants to Cliffs that (i) the execution and delivery of this Agreement by AK Steel and the performance of its obligations hereunder have been duly authorized by all requisite corporate action, (ii) neither the execution and delivery of this Agreement, nor the performance of its obligations hereunder by AK Steel

shall, or after the lapse of time or giving of notice shall, conflict with, violate or result in a breach of, or constitute a default under the certificate of incorporation or bylaws of AK Steel or any law, statute, rule or regulation applicable to it, or conflict with, violate or result in a breach of or constitute a default under the material agreement to which it is a party or by which it or any of its properties is bound, or any judgment, order, award or decree to which AK Steel is a party or by which it is bound, or require any approval, consent, authorization or other action by any court, governmental authority or regulatory body or any creditor of AK Steel or any other person or entity, and (iii) this Agreement constitutes a valid and binding obligation of AK Steel and is enforceable against AK Steel in accordance with its terms.

(b).    Cliffs represents and warrants to AK Steel that: (i) the execution and delivery of this Agreement by Cliffs and the performance of its obligations hereunder have been duly authorized by all requisite corporate actions, (ii) neither the execution and delivery of this Agreement nor the performance of its obligations hereunder by Cliffs shall, or after the lapse of time or giving of notice shall, conflict with, violate or result in a breach of, or constitute a default under the certificate of incorporation or bylaws of Cliffs or any law, statute, rule or regulation applicable to it, or conflict with, violate or result in the breach of or constitute a default under any material agreement to which it is a party or by which it or any of its properties is bound, or any judgment, order, award or decree to which Cliffs is a party or by which it is bound, or require any approval, consent, authorization or other action by any court, governmental authority or regulatory body or any creditor of Cliffs or any other person or entity, and (iii) this Agreement constitutes a valid and binding obligation of Cliffs and is enforceable against Cliffs in accordance with its terms.

**Section 23. - Counterparts.**

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**Section 24. - Arbitration.**

(a).    Upon notice by either party to the other, all disputes, claims, questions or disagreements arising out or relating to this Agreement or breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration administered by the American Arbitration Association in accordance with the provisions of its Commercial Arbitration Rules, modified as follows:

(i).     The place of arbitration shall be Cleveland, Ohio;

(ii).     Unless the parties consent in writing to a lesser number, the arbitration proceedings shall be conducted before a panel of three neutral arbitrators, one to be appointed by Cliffs, one to be appointed by AK Steel, and third to be selected by the two arbitrators. None of the arbitrators shall be an employee, officer, director or consultant of, or of a direct competitor of, AK Steel or Cliffs;

(iii).     Either party may apply to the arbitrators seeking injunctive relief until the arbitration award is rendered or the controversy is otherwise resolved. Either party also may, without waiving any remedy under this Agreement, seek from any court having jurisdiction any interim or provisional relief that is necessary to protect the rights or property of that party, pending the establishment of the arbitral tribunal (or pending the arbitral tribunal's determination of the merits of the controversy);

(iv).     Consistent with the expedited nature of arbitration, each party will, upon the written request of the other party, promptly provide the other with copies of documents on which the producing party may rely or otherwise which may be relevant in support of or in opposition to any claim or defense; any dispute regarding discovery, or the relevance or scope thereof, shall be determined by the arbitrators, which determination shall be conclusive; and all discovery shall be completed within 45 days following the appointment of the arbitrators;

(v).     In connection any arbitration arising out of this Agreement, the arbitrators shall have no authority to alter, amend, or modify any of the terms and conditions of this Agreement, and further, the arbitrators may not enter any award that alters, amends or modifies terms or conditions of this Agreement in any form or manner;

(vi).     The arbitration shall be "Baseball Style" wherein each party shall submit to the arbitrators and exchange with each other in advance of the hearing their last, best offers. The arbitrators shall be limited to awarding only one or the other of the two figures submitted;

(vii).     The award or decision shall be made within nine months of the filing of the notice of intention to arbitrate, and the arbitrators shall agree to comply with this schedule before accepting appointment; *provided, however*, that this time limit may be extended by written agreement signed by both parties or by the arbitrators, if necessary; and

(viii).   In connection with any arbitration related to this Agreement, each party shall be responsible for its own costs and expenses, and the parties will equally split the cost of conducting the arbitration itself.

(b).   The judgment of the arbitrators shall be final and binding on the parties, and judgment upon the award rendered by the arbitrators may be entered and enforced by any court of the United States or any state thereof.

**Section 25. - Entire Agreement**

This agreement, the Recitals and the Exhibits attached to this Agreement (all of which shall be deemed to be incorporated into the Agreement and made a part hereof) set forth the entire understanding of the parties with respect to the subject matter hereof and supersede all prior agreements, understandings or letters of intent among any of the parties hereto with respect to AK Dearborn.

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the date first written above.

CLIFFS MINING COMPANY

By:     /s/ Terrence R. Mee
Name:  Terrence R. Mee
Title:   Sr. Vice President

AK STEEL CORPORATION

By:     /s/ Maurice Reed
Name:  Maurice Reed
Title:   VP Engineering, Raw Materials & Energy

THE CLEVELAND-CLIFFS IRON COMPANY

By:     /s/ Terrence R. Mee
Name:  Terrence R. Mee
Title:   Vice President

CLEVELAND-CLIFFS INC. HAS REQUESTED THAT THE OMITTED PORTIONS OF THIS DOCUMENT, WHICH ARE INDICATED BY ASTERISKS, BE ACCORDED CONFIDENTIAL TREATMENT PURSUANT TO RULE 24b-2 UNDER THE SECURITIES EXCHANGE ACT OF 1934

EXHIBIT I

CLIFFS MINING COMPANY

AK STEEL CORPORATION

EXAMPLE OF ANNUAL PELLET PRICE CALCULATION

**2015 PELLET PRICE CALCUTION**

(Some values are estimated for illustrative purposes only.)

| QUARTERLY PRICE | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 |
|---|---|---|---|---|
| *** | *** | *** | *** | *** |
| Freight Credit | *** | *** | *** | *** |
| Pellet Premium | *** | *** | *** | *** |
| **Quarterly Price** | *** | *** | *** | *** |

| *** (AVERAGE QUARTERLY PRICE) | 2015 |
|---|---|
| *** | *** |
| Freight Credit | *** |
| Pellet Premium | *** |
| *** | *** |

***

*** 2015 = *** 2014 * (*** 2015 / *** 2014)

***

**PRICE ADJUSTMENT**

2014 Base Price per iron unit F.O.B. Port of Marquette (A)          ***

|  | (B) | (C) | (D) = (C) - (B) | (E) = (D) / (B) | (F) = (E) * (A) | (G) | (H) = (F) * (G) |
|---|---|---|---|---|---|---|---|
|  | 2014 | 2015 | Change | % Change | Price Adj. | Weight | Adjustment |
| *** | *** | *** | *** | *** | *** | 25% | *** |
| PPI - *** | *** | *** | *** | *** | *** | 25% | *** |
| PPI - *** | *** | *** | *** | *** | *** | 25% | *** |
| PPI - *** | *** | *** | *** | *** | *** | 25% | *** |
| **Total Price Adjustment** |  |  |  |  |  |  | *** |

| | |
|---|---|
| Base Price per iron unit F.O.B. Port of Marquette from Prior Year | *** |
| Total Price Adjustment | *** |
| **2015 Final Price per iron unit F.O.B. Port of Marquette** | *** |

CLEVELAND-CLIFFS INC. HAS REQUESTED THAT THE OMITTED PORTIONS OF THIS DOCUMENT, WHICH ARE INDICATED BY ASTERISKS, BE ACCORDED CONFIDENTIAL TREATMENT PURSUANT TO RULE 24b-2 UNDER THE SECURITIES EXCHANGE ACT OF 1934

EXHIBIT II

CLIFFS MINING COMPANY

AK STEEL CORPORATION

PELLET TYPICAL ANALYSIS AS LOADED TO VESSEL FOR SHIPMENT

| | Report Frequency | TILDEN HEMATITE | | | TILDEN MAGNETITE | | |
|---|---|---|---|---|---|---|---|
| | | Typical | Minimum | Maximum | Typical | Minimum | Maximum |
| **Moisture** | V | *** | | | *** | | |
| **A. DRY CHEMICAL ANALYSIS** | | | | | | | |
| Fe | V | 61.5 | *** | | 61.3 | *** | |
| SiO2 | V | *** | *** | *** | *** | *** | *** |
| Al2O3 | V | *** | | | *** | | |
| CaO | V | *** | *** | *** | *** | *** | *** |
| MgO | V | *** | *** | *** | *** | *** | *** |
| Mn | V | *** | | | *** | | |
| Phos | V | *** | | *** | *** | | *** |
| Na2O | Q | *** | | | *** | | |
| K2O | Q | *** | | | *** | | |
| **B. SIZING, Wt. %** | | | | | | | |
| % + 1/2" | V | *** | | *** | *** | | *** |
| % - 1/2" x + 3/8" | V | *** | *** | | *** | *** | |
| % - 3/8" x + 1/4" | V | *** | | | | | |
| % - 1/4" | V | *** | | *** | *** | | *** |
| **C. TUMBLE TEST** | | | | | | | |
| % + 1/4" before tumble | V | *** | *** | | *** | | |
| % + 1/4" after tumble | V | *** | *** | | *** | *** | |
| Q Index | V | *** | | | *** | | |
| Tumble Index - 28 mesh | V | *** | | | *** | | |
| **D. COMPRESSION TEST** | | | | | | | |
| Minus 1/2" by plus 3/8" | V | *** | *** | | *** | *** | |

LETTER "V" DENOTES THAT ANALYSIS TO BE PROVIDED ON EACH VESSEL SHIPMENT OF PELLETS

LETTER "Q" DENOTES THAT ANALYSIS TO BE PROVIDED ON A COMPOSITE SAMPLE OF QUARTERLY VESSEL SHIPMENTS

**Exhibit 12**

**Ratio of Earnings To Combined Fixed Charges**
**And Preferred Stock Dividend Requirements**
**(In Millions)**

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2017** | 2016 | 2015 | 2014 | 2013 |
| Consolidated pretax income (loss) from continuing operations | $ **129.4** | $ 207.0 | $ 313.1 | $ (19.7) | $ 1,190.9 |
| Undistributed earnings of non-consolidated affiliates | — | — | (0.1) | (9.9) | (74.4) |
| Amortization of capitalized interest | — | 0.1 | 0.3 | 0.3 | 2.3 |
| Interest expense | **135.2** | 201.1 | 230.0 | 178.3 | 189.9 |
| Acceleration of debt issuance costs | **116.3** | 35.6 | 11.3 | 3.6 | — |
| Interest portion of rental expense | **0.2** | 0.3 | 0.9 | 2.3 | 2.1 |
| Total Earnings | $ **381.1** | $ 444.1 | $ 555.5 | $ 154.9 | $ 1,310.8 |
| Interest expense | $ **135.2** | $ 201.1 | $ 230.0 | $ 178.3 | $ 189.9 |
| Acceleration of debt issuance costs | **116.3** | 35.6 | 11.3 | 3.6 | — |
| Interest portion of rental expense | **0.2** | 0.3 | 0.9 | 2.3 | 2.1 |
| Preferred Stock dividend requirements | — | — | 38.4 | 51.2 | 48.7 |
| Fixed Charges Requirements | $ **251.7** | $ 237.0 | $ 280.6 | $ 235.4 | $ 240.7 |
| Fixed Charges and Preferred Stock Dividend Requirements | $ **251.7** | $ 237.0 | $ 280.6 | $ 235.4 | $ 240.7 |
| RATIO OF EARNINGS TO FIXED CHARGES | **1.5** | 1.9 | 2.0 | (A) | 5.4 |
| RATIO OF EARNINGS TO COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDEND REQUIREMENTS | **1.5** | 1.9 | 2.0 | (A) | 5.4 |

(A) For the year ended December 31, 2014, there was a deficiency of earnings to cover the fixed charges of $235.4 million.

Exhibit 21

**SIGNIFICANT SUBSIDIARIES**
**CLEVELAND-CLIFFS INC. AS OF DECEMBER 31, 2017**

| Name | Cliffs' Effective Ownership | Place of Incorporation |
|---|---|---|
| Cleveland-Cliffs International Holding Company | 100% | Delaware, USA |
| Cleveland-Cliffs Ore Corporation | 100% | Ohio, USA |
| Cliffs Finance US LLC | 100% | Ohio, USA |
| Cliffs Finance Lux SCS | 100% | Luxembourg |
| Cliffs (Gibraltar) Holdings Limited | 100% | Gibraltar |
| Cliffs (Gibraltar) Holdings Limited Luxembourg S.C.S. | 100% | Luxembourg |
| Cliffs (Gibraltar) Limited | 100% | Gibraltar |
| Cliffs Mining Company | 100% | Delaware, USA |
| Cliffs Minnesota Mining Company | 100% | Delaware, USA |
| Cliffs Natural Resources Pty Ltd. | 100% | WA Australia |
| Cliffs Natural Resources Holdings Pty Ltd. | 100% | WA Australia |
| Cliffs Natural Resources Luxembourg S.a.r.l | 100% | Luxembourg |
| Cliffs TIOP Holding, LLC | 100% | Delaware, USA |
| Cliffs TIOP, Inc. | 100% | Michigan, USA |
| Cliffs TIOP II, LLC | 100% | Ohio, USA |
| Cliffs UTAC Holding LLC | 100% | Delaware, USA |
| The Cleveland-Cliffs Iron Company | 100% | Ohio, USA |
| Tilden Mining Company L.C. | 100% | Michigan, USA |
| Lake Superior & Ishpeming Railroad Company | 100% | Michigan, USA |
| Cliffs PinnOak LLC | 100% | Ohio, USA |
| Cliffs Marquette, Inc. | 100% | Michigan, USA |
| Marquette Iron Mining Partnership | 100% | Michigan, USA |
| Northshore Mining Company | 100% | Michigan, USA |
| Pickands Hibbing Corporation | 100% | Minnesota, USA |
| Cliffs Pickands Holding, LLC | 100% | Delaware, USA |

**Exhibit 23**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in:

Registration Statement No. 333-215980 on Form S-3 pertaining to the registration of an indeterminate number of common shares, preferred stock, depositary shares, warrants and subscription rights as well as an indeterminate amount of debt securities that may from time to time be issued at indeterminate prices;

Registration Statement No. 333-56661 on Form S-8 (as amended by Post-Effective Amendment No.1) pertaining to the Northshore Mining Company and Silver Bay Power Company Retirement Savings Plan and the related prospectus;

Registration Statement No. 333-64008 on Form S-8 (as amended by Post-Effective Amendment No.1 and Post-Effective Amendment No.2) pertaining to the Cliffs Natural Resources Inc. Nonemployee Directors' Compensation Plan (as amended and restated as of January 1, 2005);

Registration Statement No. 333-184620 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2012 Incentive Equity Plan;

Registration Statement No. 333-197687 on Form S-8 pertaining to the Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan;

Registration Statement No. 333-197688 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2014 Nonemployee Directors' Compensation Plan;

Registration Statement No. 333-204369 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan;

Registration Statement No. 333-206487 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2015 Employee Stock Purchase Plan;

Registration Statement No. 333-210954 on Form S-8 pertaining to the Cliffs Natural Resources Inc. Amended and Restated 2014 Nonemployee Directors' Compensation Plan; and

Registration Statement No. 333-217506 on Form S-8 pertaining to the Cliffs Natural Resources Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan.

of our reports dated February 14, 2018, relating to the consolidated financial statements and financial statement schedule of Cleveland-Cliffs Inc., and the effectiveness of Cleveland-Cliffs Inc.'s internal control over financial reporting, appearing in this Annual Report on Form 10-K of Cleveland-Cliffs Inc. for the year ended December 31, 2017.

*/s/ DELOITTE & TOUCHE LLP*

Cleveland, Ohio
February 14, 2018

Exhibit 24

**POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS, that the undersigned Directors and officers of Cleveland-Cliffs Inc., an Ohio corporation ("Company"), hereby constitute and appoint C. Lourenco Goncalves, Timothy K. Flanagan, James D. Graham and R. Christopher Cebula, and each of them, their true and lawful attorney or attorneys-in-fact, with full power of substitution and revocation, for them and in their name, place and stead, to sign on their behalf as a Director or officer of the Company, or both, as the case may be, an Annual Report on Form 10-K pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2017, and to sign any and all amendments to such Annual Report, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorney or attorneys-in-fact, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as they might or could do in person, hereby ratifying and confirming all that said attorney or attorneys-in-fact or any of them or their substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Executed as of the 6th day of February, 2018.

| | |
|---|---|
| /s/ C. L. Goncalves | /s/ T. K. Flanagan |
| C. L. Goncalves, | T. K. Flanagan, |
| Chairman, President and Chief Executive Officer | Executive Vice President, Chief Financial Officer |
| /s/ R. C. Cebula | /s/ J. T. Baldwin |
| R. C. Cebula, | J. T. Baldwin, Director |
| Vice President, Corporate Controller & Chief Accounting Officer | |
| /s/ R. P. Fisher, Jr. | /s/ S. M. Green |
| R. P. Fisher, Jr., Director | S. M. Green, Director |
| /s/ J. A. Rutkowski, Jr. | /s/ E. M. Rychel |
| J. A. Rutkowski, Jr., Director | E. M. Rychel, Director |
| /s/ M. D. Siegal | /s/ G. Stoliar |
| M. D. Siegal, Director | G. Stoliar, Director |
| /s/ D. C. Taylor | |
| D. C. Taylor, Director | |

Exhibit 31.1

**CERTIFICATION**

I, Lourenco Goncalves, certify that:

1.    I have reviewed this annual report on Form 10-K of Cleveland-Cliffs Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)), for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected or is reasonably likely to materially affect the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    February 14, 2018          By:    /s/ Lourenco Goncalves
_____
Lourenco Goncalves

Chairman, President and Chief Executive Officer

Exhibit 31.2

**CERTIFICATION**

I, Timothy K. Flanagan, certify that:

1.   I have reviewed this annual report on Form 10-K of Cleveland-Cliffs Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)), for the registrant and have:

   (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected or is reasonably likely to materially affect the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:   February 14, 2018        By:    /s/ Timothy K. Flanagan
                                         _____
                                         Timothy K. Flanagan
                                         Executive Vice President, Chief Financial Officer

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Cleveland-Cliffs Inc. (the "Company") on Form 10-K for the period ended   December 31, 2017 , as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), I, Lourenco Goncalves, Chairman, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1)      The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)      The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date:      February 14, 2018

By:   /s/ Lourenco Goncalves
Lourenco Goncalves
Chairman, President and Chief Executive Officer

Exhibit 32.2

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Cleveland-Cliffs Inc. (the "Company") on Form 10-K for the period ended   December 31, 2017, as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), I, Timothy K. Flanagan, Executive Vice President, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1)    The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)    The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date:    February 14, 2018

By:  /s/ Timothy K. Flanagan
Timothy K. Flanagan
Executive Vice President, Chief Financial Officer

**Exhibit 95**

**Mine Safety Disclosures**

The operation of our mines located in the United States is subject to regulation by MSHA under the FMSH Act. MSHA inspects these mines on a regular basis and issues various citations and orders when it believes a violation has occurred under the FMSH Act. We present information below regarding certain mining safety and health citations that MSHA has issued with respect to our mining operations. In evaluating this information, consideration should be given to factors such as: (i) the number of citations and orders will vary depending on the size of the mine; (ii) the number of citations issued will vary from inspector to inspector and mine to mine, and (iii) citations and orders can be contested and appealed and, in that process, are often reduced in severity and amount, and are sometimes dismissed.

Under the Dodd-Frank Act, each operator of a coal or other mine is required to include certain mine safety results within its periodic reports filed with the SEC. As required by the reporting requirements included in §1503(a) of the Dodd-Frank Act, we present the following items regarding certain mining safety and health matters, for the period presented, for each of our mine locations that are covered under the scope of the Dodd-Frank Act:

(A)   The total number of violations of mandatory health or safety standards that could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard under section 104 of the FMSH Act (30 U.S.C. 814) for which the operator received a citation from MSHA;

(B)   The total number of orders issued under section 104(b) of the FMSH Act (30 U.S.C. 814(b));

(C)   The total number of citations and orders for unwarrantable failure of the mine operator to comply with mandatory health or safety standards under section 104(d) of the FMSH Act (30 U.S.C. 814(d));

(D)   The total number of imminent danger orders issued under section 107(a) of the FMSH Act (30 U.S.C. 817(a));

(E)   The total dollar value of proposed assessments from MSHA under the FMSH Act (30 U.S.C. 801 et seq.);

(F)   Legal actions pending before the Federal Mine Safety and Health Review Commission involving such coal or other mine as of the last day of the period;

(G)   Legal actions initiated before the Federal Mine Safety and Health Review Commission involving such coal or other mine during the period; and

(H)   Legal actions resolved before the Federal Mine Safety and Health Review Commission involving such coal or other mine during the period.

During the year ended December 31, 2017, our U.S. mine locations did not receive any flagrant violations under Section 110(b)(2) of the FMSH Act, no orders issued under Section 104(b) of the FMSH Act, and no written notices of a pattern of violations, or the potential to have a pattern of such violations, under section 104(e) of the FMSH Act. In addition, there were no mining-related fatalities at any of our U.S. mine locations during this same period.

Following is a summary of the information listed above for the year ended December 31, 2017:

| Mine Name/ MSHA ID No. | Operation | (A) Section 104 S&S Citations | (B) Section 104(b) Orders | (C) Section 104(d) Orders | (D) Section 107(a) Citations & Orders | (E) Total Dollar Value of MSHA Proposed Assessments (1) | (F) Legal Actions Pending as of Last Day of Period | | (G) Legal Actions Initiated During Period | (H) Legal Actions Resolved During Period |
|---|---|---|---|---|---|---|---|---|---|---|
| Tilden / 2000422 | Iron Ore | 61 | — | 1 | — | $ 445,212 | 29 | (2) | 15 | 32 |
| Empire / 2001012 | Iron Ore | — | — | — | — | $ — | — | | — | 8 |
| Northshore Plant / 2100831 | Iron Ore | 15 | — | — | — | $ 20,352 | 7 | (3) | 7 | 12 |
| Northshore Mine / 2100209 | Iron Ore | 1 | — | — | — | $ 2,151 | — | | — | — |
| Hibbing / 2101600 | Iron Ore | 14 | — | — | 1 | $ 108,155 | — | | 5 | 5 |
| United Taconite Plant / 2103404 | Iron Ore | 14 | — | — | — | $ 107,985 | — | | 5 | 7 |
| United Taconite Mine / 2103403 | Iron Ore | 2 | — | — | — | $ 10,658 | — | | 1 | 1 |

(1)  Amounts included under the heading "Total Dollar Value of MSHA Proposed Assessments" are the total dollar amounts for proposed assessments received from MSHA on or before December 31, 2017.

(2)  This number consists of 17 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules, 10 pending legal actions related to contests of citations and orders referenced in Subpart B of FMSH Act's procedural rules, and 2 pending legal actions related to complaints of discharge, discrimination, or interference referenced in Subpart E of FMSH Act's procedural rules.

(3)  This number consists of 7 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules.

Exhibit 99(a)

**Cleveland-Cliffs Inc. and Subsidiaries**
**Schedule II – Valuation and Qualifying Accounts**
**(Dollars in Millions)**

| Classification | | Balance at Beginning of Year | | Charged to Cost and Expenses | | Charged to Other Accounts | | Acquisition | | Deductions | | Balance at End of Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | **Additions** | | | | | | | | |
| Year Ended December 31, 2017: | | | | | | | | | | | | |
| Deferred Tax Valuation Allowance | $ | 3,334.8 | $ | (1,104.3) | $ | (9.8) | $ | 17.8 | $ | | — | $ | 2,238.5 |
| Year Ended December 31, 2016: | | | | | | | | | | | | |
| Deferred Tax Valuation Allowance | $ | 3,372.5 | $ | (40.6) | $ | 5.1 | $ | — | $ | 2.2 | $ | 3,334.8 |
| Accounts Receivable Allowance | $ | 7.1 | $ | — | $ | (7.1) | $ | — | $ | — | $ | — |
| Year Ended December 31, 2015: | | | | | | | | | | | | |
| Deferred Tax Valuation Allowance | $ | 1,152.3 | $ | 54.3 | $ | 2,165.9 | $ | — | $ | — | $ | 3,372.5 |
| Accounts Receivable Allowance | $ | — | $ | 7.1 | $ | — | $ | — | $ | — | $ | 7.1 |

# EXHIBIT 94

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2018

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission File Number: 1-8944

**CLIFFS**

## CLEVELAND-CLIFFS INC.
*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| Ohio | 34-1464672 |
| *State or other jurisdiction of incorporation or organization* | *(I.R.S. Employer Identification No.)* |
| 200 Public Square, Suite 3300, Cleveland, Ohio | 44114-2315 |
| *(Address of principal executive offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code: (216) 694-5700**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Shares, par value $0.125 per share | New York Stock Exchange |

**Securities registered pursuant to section 12(g) of the Act: NONE**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.     YES ☒     NO ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.     YES ☐     NO ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.     YES ☒     NO ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).     YES ☒     NO ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.     ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒     Accelerated filer ☐     Non-accelerated filer ☐     Smaller reporting company ☐     Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).     YES ☐     NO ☒

As of June 29, 2018, the aggregate market value of the voting and non-voting common shares held by non-affiliates of the registrant, based on the closing price of $8.43 per share as reported on the New York Stock Exchange — Composite Index, was $2,487,099,883 (excluded from this figure are the voting shares beneficially owned by the registrant's officers and directors).

The number of shares outstanding of the registrant's common shares, par value $0.125 per share, was 292,607,474 as of February 5, 2019.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's proxy statement for its 2019 annual meeting of shareholders are incorporated by reference into Part III.

Table of Contents

**TABLE OF CONTENTS**

|  |  | __Page Number__ |
|---|---|---|
| **DEFINITIONS** |  | 1 |
| **PART I** |  |  |
| Item 1. | Business | 4 |
|  | Executive Officers of the Registrant | 18 |
| Item 1A. | Risk Factors | 19 |
| Item 1B. | Unresolved Staff Comments | 31 |
| Item 2. | Properties | 32 |
| Item 3. | Legal Proceedings | 36 |
| Item 4. | Mine Safety Disclosures | 38 |
| **PART II** |  |  |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 39 |
| Item 6. | Selected Financial Data | 42 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 43 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 70 |
| Item 8. | Financial Statements and Supplementary Data | 71 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 151 |
| Item 9A. | Controls and Procedures | 151 |
| Item 9B. | Other Information | 152 |
| **PART III** |  |  |
| Item 10. | Directors, Executive Officers and Corporate Governance | 153 |
| Item 11. | Executive Compensation | 153 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 153 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 153 |
| Item 14. | Principal Accountant Fees and Services | 153 |
| **PART IV** |  |  |
| Item 15. | Exhibits and Financial Statement Schedules | 154 |
| Item 16. | Form 10-K Summary | 160 |
| **SIGNATURES** |  | 161 |

Table of Contents

## DEFINITIONS

The following abbreviations or acronyms are used in the text. References in this report to the "Company," "we," "us," "our" and "Cliffs" are to Cleveland-Cliffs Inc. and subsidiaries, collectively. References to "A$" or "AUD" refer to Australian currency, "C$" to Canadian currency and "$" to United States currency.

| Abbreviation or acronym | Term |
|---|---|
| A&R 2015 Equity Plan | Cliffs Natural Resources Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan |
| ABL Facility | Amended and Restated Syndicated Facility Agreement by and among Bank of America, N.A., as Administrative Agent and Australian Security Trustee, the Lenders that are parties hereto, as the Lenders, Cleveland-Cliffs Inc., as Parent and a Borrower, and the Subsidiaries of Parent party hereto, as Borrowers dated as of March 30, 2015, and Amended and Restated as of February 28, 2018 |
| Adjusted EBITDA | EBITDA excluding certain items such as extinguishment/restructuring of debt, impacts of discontinued operations, foreign currency exchange remeasurement, impairment of other long-lived assets and intersegment corporate allocations of SG&A costs |
| AG | Autogenous Grinding |
| AK Steel | AK Steel Corporation (including its facilities in Ashland, Kentucky, Middletown, Ohio and Dearborn, Michigan) |
| Algoma | Algoma Steel Inc. (previously, Essar Steel Algoma Inc.) |
| Amended 2015 Equity Plan | Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan, as amended |
| APBO | Accumulated Postretirement Benefit Obligation |
| ArcelorMittal | ArcelorMittal (as the parent company of ArcelorMittal Mines Canada, ArcelorMittal USA and ArcelorMittal Dofasco GP, as well as, many other subsidiaries) |
| ArcelorMittal USA | ArcelorMittal USA LLC (including many of its United States affiliates, subsidiaries and representatives. References to ArcelorMittal USA comprise all such relationships unless a specific ArcelorMittal USA entity is referenced) |
| ALJ | Administrative Law Judge |
| AMT | Alternative Minimum Tax |
| ASC | Accounting Standards Codification |
| ASU | Accounting Standards Updates |
| Atlantic Basin pellet premium | Platts Atlantic Blast Furnace 65% Fe pellet premium |
| Bloom Lake | The Bloom Lake Iron Ore Mine Limited Partnership |
| Bloom Lake Group | Bloom Lake General Partner Limited and certain of its affiliates, including Cliffs Quebec Iron Mining ULC |
| BNSF | Burlington Northern Santa Fe, LLC |
| Canadian Entities | Bloom Lake Group, Wabush Group and certain other wholly-owned subsidiaries |
| CCAA | Companies' Creditors Arrangement Act (Canada) |
| CERCLA | Comprehensive Environmental Response, Compensation and Liability Act of 1980 |
| CFR | Cost and freight |
| CLCC | Cliffs Logan County Coal LLC |
| Clean Water Act | Federal Water Pollution Control Act |
| CN | Canadian National Railway Company |
| $CO_2$ | Carbon Dioxide |
| Compensation Committee | Compensation and Organization Committee of the Board of Directors |
| CPP | Clean Power Plan |
| Directors' Plan | Cliffs Natural Resources Inc. Amended and Restated 2014 Nonemployee Directors' Compensation Plan |
| Dodd-Frank Act | Dodd-Frank Wall Street Reform and Consumer Protection Act |
| DR-grade | Direct Reduction-grade |
| EAF | Electric Arc Furnace |
| EBITDA | Earnings before interest, taxes, depreciation and amortization |
| Empire | Empire Iron Mining Partnership |
| EPA | U.S. Environmental Protection Agency |
| EPS | Earnings per share |
| ERM | Enterprise Risk Management |
| Exchange Act | Securities Exchange Act of 1934, as amended |
| FASB | Financial Accounting Standards Board |
| Fe | Iron |
| FERC | Federal Energy Regulatory Commission |
| FeT | Total Iron |
| FIP | Federal Implementation Plan |
| FMSH Act | U.S. Federal Mine Safety and Health Act 1977, as amended |

1

A005490

| Abbreviation or acronym | Term |
|---|---|
| GAAP | Accounting principles generally accepted in the United States |
| GHG | Greenhouse gas |
| HBI | Hot Briquetted Iron |
| Hibbing | Hibbing Taconite Company, an unincorporated joint venture |
| IRC | Internal Revenue Code |
| IRS | Internal Revenue Service |
| Koolyanobbing | Collective term for the operating deposits at Koolyanobbing, Mount Jackson and Windarling |
| LIBOR | London Interbank Offered Rate |
| LIFO | Last-in, first-out |
| Long ton | 2,240 pounds |
| LS&I | Lake Superior & Ishpeming Railroad Company |
| LTVSMC | LTV Steel Mining Company |
| Metric ton | 2,205 pounds |
| MMBtu | Million British Thermal Units |
| MPCA | Minnesota Pollution Control Agency |
| MPSC | Michigan Public Service Commission |
| MPUC | Minnesota Public Utilities Commission |
| MSHA | U.S. Mine Safety and Health Administration |
| Monitor | FTI Consulting Canada Inc. |
| NAAQS | National Ambient Air Quality Standards |
| Net ton | 2,000 pounds |
| $NO_2$ | Nitrogen dioxide |
| $NO_x$ | Nitrogen oxide |
| Northshore | Northshore Mining Company |
| NPDES | National Pollutant Discharge Elimination System, authorized by the U.S. Clean Water Act |
| NYSE | New York Stock Exchange |
| OPEB | Other postretirement employment benefits |
| OPEB cap | Medical premium maximums |
| PBO | Projected benefit obligation |
| Pinnacle | Pinnacle Mining Company, LLC |
| Platts 62% Price | Platts IODEX 62% Fe Fines CFR North China |
| Preferred Share | 7.00% Series A Mandatory Convertible Preferred Stock, Class A, without par value |
| S&P | Standard & Poor's Rating Services, a division of Standard & Poor's Financial Services LLC, a subsidiary of The McGraw-Hill Companies, Inc., and its successors |
| SEC | U.S. Securities and Exchange Commission |
| SG&A | Selling, general and administrative |
| Securities Act | Securities Act of 1933, as amended |
| Seneca | Seneca Coal Resources, LLC |
| Silver Bay Power | Silver Bay Power Company |
| SIP | State Implementation Plan |
| $SO_2$ | Sulfur dioxide |
| STRIPS | Separate Trading of Registered Interest and Principal of Securities |
| Tilden | Tilden Mining Company L.C. |
| TMDL | Total Maximum Daily Load |
| Topic 606 | ASC Topic 606, Revenue from Contracts with Customers |
| Topic 815 | ASC Topic 815, Derivatives and Hedging |
| TRIR | Total Recordable Incident Rate |
| TSR | Total Shareholder Return |
| United Taconite | United Taconite LLC |
| U.S. | United States of America |
| U.S. Steel | U.S. Steel Corporation and all subsidiaries |
| USW | United Steelworkers |
| VEBA | Voluntary Employee Benefit Association trusts |
| VWAP | Volume Weighted Average Price |

2

| Abbreviation or acronym | Term |
| --- | --- |
| Wabush | Wabush Mines Joint Venture |
| Wabush Group | Wabush Iron Co. Limited and Wabush Resources Inc., and certain of their affiliates, including Wabush Mines (an unincorporated joint venture of Wabush Iron Co. Limited and Wabush Resources Inc.), Arnaud Railway Company and Wabush Lake Railway Company |
| WEPC | Wisconsin Electric Power Company |
| 2012 Equity Plan | Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan |
| 2015 Equity Plan | Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan |

3

Table of Contents

**PART I**

**Item 1.**        *Business*

**Introduction**

Founded in 1847, Cleveland-Cliffs Inc. is the largest and oldest independent iron ore mining company in the United States. We are a major supplier of iron ore pellets to the North American steel industry from our mines and pellet plants located in Michigan and Minnesota. By 2020, we expect to be the sole producer of HBI in the Great Lakes region with the development of our first production plant in Toledo, Ohio. Driven by the core values of safety, social, environmental and capital stewardship, our employees endeavor to provide all stakeholders with operating and financial transparency.

In alignment with our strategic goals, we have become a North America-centric business and have updated the names of our operating segments. We are now organized according to our differentiated products. We have two reportable segments – the Mining and Pelletizing segment (formerly known as U.S. Iron Ore) and the Metallics segment.

In our Mining and Pelletizing segment, we currently own or co-own four operational iron ore mines plus one indefinitely idled mine. We are currently operating one iron ore mine in Michigan and three iron ore mines in Minnesota, and all four mines are currently operating at or near full capacity. The Empire mine located in Michigan was indefinitely idled beginning in August 2016. In our Metallics segment, we are currently constructing an HBI production plant in Toledo, Ohio. We expect to complete construction and begin production in 2020.

### We are Focused on Protecting our Core Mining and Pelletizing Business

We are the market-leading iron ore producer in the U.S., supplying differentiated iron ore pellets under long-term contracts to major North American blast furnace steel producers. We have the unique advantage of being a low-cost, high-quality, iron ore pellet producer with significant transportation and logistics advantages to serve the Great Lakes steel market effectively. The pricing structure and long-term nature of our existing contracts, along with our low-cost operating profile, position our Mining and Pelletizing segment as a strong cash flow generator in most commodity pricing environments. Since instituting our strategy in 2014 of focusing on this core business, we have achieved significant accomplishments, including providing accelerating profitability growth each year since 2015, maximizing commercial leverage in pricing and securing sales volume certainty by signing multiple new supply agreements with steelmakers throughout the Great Lakes region, improving operating reliability by making operational improvements, realizing more predictability in cash flows, embracing the global push toward environmental stewardship and developing new pellet products to meet ever-evolving market demands.

We recognize the importance of our strong position in the North American blast furnace steel industry, and our top priority is to protect and enhance the market position of our Mining and Pelletizing business. This involves continuing to deliver high-quality, custom-made pellets that allow our customers to remain competitive in the quality, production efficiency, and environmental friendliness of their steel products. Protecting the core business also involves continually evaluating opportunities to expand both our production capacity and reserve life. In 2017, we achieved key accomplishments toward these goals by acquiring the remaining minority stake in our Tilden and Empire mines as well as additional real estate interests in Minnesota. In 2018, we began supplying pellets under two new customer supply agreements in the Great Lakes region. In addition, we executed the efficient exit of our Asia Pacific Iron Ore business, officially completing the divestiture of the Company's non-core assets.

### Expanding our Customer Base and Product Offering

While we hold a strong market position in supplying iron ore to Great Lakes blast furnaces, we cannot ignore the ongoing shift of steelmaking share in the U.S. away from our core blast furnace customers to EAF steelmakers. Over the past 25 years, the market share of EAFs has nearly doubled. However, as EAFs have moved to higher-value steel products, they require more high-quality iron ore-based metallics instead of lower-grade scrap as raw material feedstock. As a result of this trend, one of our top strategic priorities is to become a critical supplier of the EAF market by providing these specialized metallics. HBI is a specialized high-quality iron alternative to scrap and pig iron that, when used as a feedstock, allows the EAF to produce more valuable grades of steel. In June 2017, we announced the planned construction of an HBI production plant in Toledo, Ohio. Over the past 18 months, we have made significant progress on the construction of this plant. Based on current market analysis, greater-than-expected customer demand and expansion opportunities identified during the construction process, we are increasing the expected productive capacity of the Toledo HBI production plant from 1.6 million to 1.9 million metric tons per year. Accordingly, we now estimate the construction cost to be approximately $830 million, exclusive of construction-related contingencies and

4

Table of Contents

capitalized interest, which increase partially relates to the expanded capacity. We expect that the HBI production plant, once operational, will consume approximately 2.8 million long tons of our DR-grade pellets per year.

We expect our HBI to partially replace the over 3 million metric tons of ore-based metallics that are imported into the Great Lakes region every year from Russia, Ukraine, Brazil and Venezuela, as well as the nearly 20 million metric tons of scrap used in the Great Lakes area every year. The Toledo site is in close proximity to over 20 EAFs, giving us a natural competitive freight advantage over import competitors. Not only does this production plant create another outlet for our high-margin pellets, but it also presents an attractive economic opportunity for us. As the only producer of DR-grade pellets in the Great Lakes region and with access to abundant, low-cost natural gas, we will be in a unique position to serve clients in the area and grow our customer base.

## Segments

Operating segments are defined as components of an enterprise for which separate financial information is available that is evaluated regularly by the chief operating decision maker, or decision-making group, to decide how to allocate resources and to assess performance. In alignment with our strategic goals, our Company's continuing operations are organized and managed in two business units according to our differentiated products. The former 'U.S. Iron Ore' segment is now 'Mining and Pelletizing.' In addition, the Toledo HBI business will be categorized under the segment 'Metallics.' Until operational, expenses reported in the Metallics segment will be limited to administrative costs. Each of our business units qualifies as an operating segment with its results regularly reviewed by our chief operating decision maker. Our chief operating decision maker is our Chief Executive Officer. As of December 31, 2018, the Mining and Pelletizing segment and the Metallics segment are both reportable segments in accordance with ASC Topic 280, Segment Reporting.

Financial information about our segments is included in *Management's Discussion and Analysis of Financial Condition and Results of Operations* and NOTE 3 - SEGMENT REPORTING.

### *Mining and Pelletizing Segment*

We are a major producer of iron ore pellets, primarily selling production from our Mining and Pelletizing segment to integrated steel companies in the U.S. and Canada. We operate four iron ore mines: the Tilden mine in Michigan and the Northshore, United Taconite and Hibbing mines in Minnesota. These mines currently have an annual rated capacity of 27.4 million long tons of iron ore pellet production, representing 55% of total U.S. pellet production capacity. Based on our equity ownership in these mines, our share of the annual rated production capacity is currently 21.2 million long tons, representing 42% of total U.S. annual pellet capacity. The Empire mine located in Michigan, which historically had annual rated capacity of 5.5 million long tons, was indefinitely idled beginning in August 2016. During 2017, we acquired the remaining noncontrolling interest of the Empire and Tilden mines from ArcelorMittal and U.S. Steel, respectively. We are the manager of the Hibbing mine and rely on our joint venture partners to make their required capital contributions and to pay for their share of the iron ore pellets that we produce. In 2018, we tendered our resignation as the mine manager of the Hibbing mine and plan to transition this role to the majority owner in August 2019.

The following chart summarizes the estimated annual pellet production capacity and percentage of total U.S. pellet production capacity for each of the respective iron ore producers as of December 31, 2018:

5

**U.S. Pellet**

**Annual Rated Capacity Tonnage**

| | Current Estimated Capacity (Long Tons in Millions) [1] | Percent of Total U.S. Capacity |
|---|---|---|
| All Cliffs' managed mines | 27.4 | 54.8 % |
| Other U.S. mines | | |
| U.S. Steel's Minnesota ore operations | | |
| Minnesota Taconite | 14.3 | 28.6 |
| Keewatin Taconite | 5.4 | 10.8 |
| Total U.S. Steel | 19.7 | 39.4 |
| ArcelorMittal USA Minorca mine | 2.9 | 5.8 |
| Total other U.S. mines | 22.6 | 45.2 |
| Total U.S. mines | 50.0 | 100.0 % |

[1] Empire mine was excluded from the estimated capacity calculation as it is indefinitely idled.

Our Mining and Pelletizing segment production generally is sold pursuant to long-term supply agreements. For the year ended December 31, 2018, we produced a total of 26.3 million long tons of iron ore pellets. The 2018 production included 20.3 million long tons for our account and 6.0 million long tons on behalf of our steel company partners associated with the Hibbing mine. During 2017 and 2016, we produced a total of 25.5 million and 23.4 million long tons, respectively.

We produce various grades of iron ore pellets, including standard, fluxed and DR-grade, for use in our customers' operations as part of the steelmaking process. The variation in grade of iron ore pellets results from the specific chemical and metallurgical properties of the ores at each mine, the requirements of end user's steelmaking process and whether or not fluxstone is added in the process. Although the grade or grades of pellets currently delivered to each customer are based on that customer's preferences, which depend in part on the characteristics of the customer's steelmaking operation, in certain cases our iron ore pellets can be used interchangeably. Standard pellets require less processing, are generally the least costly pellets to produce and are called "standard" because no ground fluxstone, such as limestone or dolomite, is added to the iron concentrate before turning the concentrate into pellets. In the case of fluxed pellets, fluxstone is added to the concentrate, which produces pellets that can perform at higher productivity levels in the customer's specific blast furnace and will minimize the amount of fluxstone the customer may be required to add to the blast furnace. DR-grade pellets require additional processing to make a pellet that contains higher iron and lower silica content than a standard pellet. Unlike standard or fluxed pellets, DR-grade pellets are produced to be fed into a direct reduced iron facility, which then are converted into DRI or HBI, a high-quality raw material used in an EAF.

Additionally, as the EAF steel market continues to grow in the U.S., there is an opportunity for our iron ore to serve this market by providing pellets to the alternative metallics market to produce DRI, HBI and/or pig iron. We have produced and shipped industrial trials of low-silica DR-grade pellets, which were successfully processed in two customers' DRI reactors to produce a high-quality DRI product. By 2020, we expect to sell these low-silica DR-grade pellets to our own Metallics business unit, which includes the HBI facility in Toledo, Ohio.

Each of our Mining and Pelletizing segment mines is located near the Great Lakes. The majority of our iron ore pellets are transported via railroads to loading ports for shipment via vessel to blast furnace steelmakers in North America.

Upon adoption of ASC 606 on January 1, 2018, the timing and pattern of revenue recognition changed for our Mining and Pelletizing segment. The change in timing of revenue recognition, combined with the normal seasonal closure of the Soo Locks and the Welland Canal during the winter months, influenced our revenues to lower than historical levels during the first quarter and higher than historical levels during the remaining three quarters in 2018. We expect this pattern to continue in future years. However, we expect the total amount of revenue recognized during the year to remain substantially the same as under historical GAAP. During the first quarter, we continue to produce our products, but we cannot ship most of those products via lake vessel until the conditions on the Great Lakes are navigable, which causes our first and second quarter inventory levels to rise. Our limited practice of shipping product to ports on the lower Great Lakes or to customers' facilities prior to the transfer of control has somewhat mitigated the seasonal effect on first and second quarter inventories, as shipment from this point to the customers' operations is not limited by weather-related shipping constraints. As of December 31, 2018, under the new accounting standard, we had

6

Table of Contents

finished goods of 0.8 million long tons in transit or stored at the Port of Toledo to service customers, for which revenue had yet to be recognized. As of December 31, 2017, under the previous accounting standard, we had finished goods of 1.5 million long tons stored at ports and customer facilities on the lower Great Lakes to service customers for which revenue had yet to be recognized. Refer to NOTE 1 - BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES and NOTE 2 - NEW ACCOUNTING STANDARDS for further discussion on revenue recognition.

*Mining and Pelletizing Customers*

Our Mining and Pelletizing segment revenues primarily are derived from sales of iron ore pellets to the North American integrated steel industry, consisting primarily of three major customers. Generally, we have multi-year supply agreements with our customers. Sales volume under these agreements largely is dependent on customer requirements, and in certain cases, we are the sole supplier of iron ore to the customer. Most agreements contain a base price that is adjusted annually using one or more adjustment factors. Factors that could result in price adjustments under our contracts include changes in the Platts 62% Price, hot-rolled coil steel price, the Atlantic Basin pellet premium, published Platts international indexed freight rates and changes in specified Producer Price Indices, including those for industrial commodities, fuel and steel.

During 2018, 2017 and 2016, we sold 20.6 million, 18.7 million and 18.2 million long tons of iron ore product, respectively, from our share of production from our Mining and Pelletizing segment mines. Refer to *Concentration of Customers* below for additional information regarding our major customers.

**Metallics Segment**

In June 2017, we announced the planned construction of an HBI production plant in Toledo, Ohio. HBI is a specialized high-quality iron alternative to scrap that, when used as a feedstock, allows an EAF to produce more valuable grades of steel. We expect our HBI to partially replace the over 3 million metric tons of ore-based metallics that are imported into the Great Lakes region every year from Russia, Ukraine, Brazil and Venezuela, as well as nearly 20 million metric tons of scrap used in the Great Lakes area every year.

Over the past 18 months, we have made significant progress on the construction of this plant. Based on current market analysis, greater-than-expected customer demand and expansion opportunities identified during the construction process, we are increasing the expected productive capacity of the Toledo HBI production plant from 1.6 million to 1.9 million metric tons per year. We expect that the HBI production plant, once operational, will consume approximately 2.8 million long tons of DR-grade pellets per year from our Mining and Pelletizing segment.

**Discontinued Operations**

Unless otherwise noted, discussion of our business and results of operations in this Annual Report on Form 10-K refers to our continuing operations.

*Asia Pacific Iron Ore Operations*

During 2018, we sold all of the assets of our Asia Pacific Iron Ore business through a series of sales to third parties. As a result of our planned exit, management determined that our Asia Pacific Iron Ore operating segment met the criteria to be classified as held for sale and a discontinued operation under *ASC Topic 205, Presentation of Financial Statements* . As such, all current and historical Asia Pacific Iron Ore operating segment results are classified within discontinued operations.

Historically, the Asia Pacific Iron Ore operations served the Asian iron ore markets with direct-shipped fines and lump ore. During 2018, 2017 and 2016, we produced 2.7 million, 10.1 million and 11.8 million metric tons, respectively, from our Asia Pacific Iron Ore operation. During 2018, 2017 and 2016, we sold 3.9 million, 9.8 million and 11.6 million metric tons of iron ore, respectively, from our Asia Pacific Iron Ore operation.

Refer to NOTE 13 - DISCONTINUED OPERATIONS for further discussion of the Asia Pacific Iron Ore segment.

*Canadian Operations*

During March 2018, we agreed to terms of a plan of compromise or arrangement in the CCAA proceedings with the Bloom Lake Group, the Wabush Group and the Monitor. By order of the Québec Superior Court of Justice (Commercial Division) (the "Court") dated April 20, 2018, the Bloom Lake Group and the Wabush Group were authorized to file a joint plan of compromise and arrangement dated April 16, 2018 (the "Original Plan"). Following discussions with various stakeholder groups, the Bloom Lake Group and the Wabush Group were authorized by the Court to amend

7

the Original Plan and to file an amended and restated joint plan of compromise and arrangement dated May 16, 2018 (as same may be further amended from time to time, the "Amended Plan"). The Amended Plan was approved by the required majorities of each unsecured creditor class and was sanctioned by the Court by order dated June 29, 2018 (the "Sanction Order"). Further amendments to address the manner in which certain distributions under the Amended Plan would be effected were presented to the Court on July 30, 2018. Finally, on July 31, 2018, the conditions precedent to the implementation of the Amended Plan were satisfied and the Amended Plan was implemented.

Under the terms of the Amended Plan, we and certain of our wholly-owned subsidiaries made a C$19.0 million cash contribution to the Wabush Group pension plans and agreed to contribute into the CCAA estate any remaining distributions or payments we may be entitled to receive as creditors of the Bloom Lake Group and the Wabush Group for distribution to other creditors. The Original Plan did not resolve certain employee claims asserted against us and certain of our affiliates outside of the CCAA proceedings. The Amended Plan resolved these employee claims, all claims by the Bloom Lake Group, the Wabush Group and their respective creditors against us as well as all of our claims against the Bloom Lake Group and the Wabush Group.

Financial results prior to the respective deconsolidations of the Bloom Lake and Wabush Groups and subsequent expenses directly associated with the Canadian Entities are classified within discontinued operations. Refer to NOTE 13 - DISCONTINUED OPERATIONS for further discussion of the Eastern Canadian Iron Ore segment.

**Applied Technology, Research and Development**

We have been a leader in iron ore mining and processing technology since inception and have been in operation for over 170 years. We operated some of the first mines on Michigan's Marquette Iron Range and pioneered early open-pit and underground mining methods. From the first application of electrical power in Michigan's underground mines to the use of today's sophisticated computers and global positioning satellite systems, we have been a leader in the application of new technology to the centuries-old business of mineral extraction. Today, our engineering and technical staffs are engaged in full-time technical support of our operations, improvement of existing products and development of new products.

We are also a pioneer in iron ore pelletizing with over 60 years of experience. We are able to produce customized, environmentally friendly pellets to meet each customer's blast furnace specifications and produce both standard and fluxed pellets. Using our technical expertise and strong market position in the United States to increase our product offering, we have started producing DR-grade pellets. In recent years, we shipped low silica DR-grade pellets, which were successfully processed in multiple DRI reactors to produce a high-quality direct reduced iron product.

With our experienced technical professionals and unsurpassed reputation for our pelletizing technology, we continue to deliver a world-class quality product to our customers. We are a pioneer in the development of emerging reduction technologies, a leader in the extraction of value from challenging resources and a front-runner in the implementation of safe and sustainable technology. Our technical experts are dedicated to excellence and deliver superior technical solutions tailored to our customer base. We are also devoted to promoting environmental sustainability in our industry, primarily evidenced with the development of our HBI facility in Toledo, Ohio. Similar to the market shift to pellets over 60 years ago, we recognize the need to serve the growing EAF market and the need for less pollutive methods of steelmaking. We expect our introduction of HBI to the Great Lakes EAF market will be notable in the evolution of the steel industry.

Table of Contents

**Concentration of Customers**

In 2018 and 2017, three customers individually accounted for more than 10% of our consolidated product revenue and in 2016, two customers individually accounted for more than 10% of our consolidated product revenue. Product revenue from those customers totaled $2.1 billion, $1.5 billion and $1.1 billion of our total consolidated product revenue in 2018, 2017 and 2016, respectively. The following represents sales revenue attributable to each of these customers as a percentage of total product sales for those years:

| Customer[1] | Percentage Product Revenue | | |
| --- | --- | --- | --- |
| | **2018** | 2017 | 2016 |
| ArcelorMittal | **57%** | 48% | 51% |
| AK Steel | **25%** | 29% | 27% |
| Algoma[2] | **13%** | 11% | 5% |

[1] Includes subsidiaries.

[2] On October 5, 2015, we terminated the long-term agreement with Algoma; however, we entered into certain short-term contracts with Algoma throughout 2016. On May 16, 2016, we reinstated our agreement with Algoma, which took effect in January 2017.

*ArcelorMittal*

Historically, and still today, our pellet supply agreements with ArcelorMittal USA were based on customer requirements, except for the Indiana Harbor East facility, which is based on customer contract obligations. The legacy agreements with ArcelorMittal USA expired at the end of December 2016 and January 2017. The parties executed a new long-term agreement, which became effective October 31, 2016, for the sale and delivery of ArcelorMittal USA's annual tonnage requirements that fall within a specific range of volume. This latest agreement expires at the end of December 2026. Additionally, in 2018 we entered into an agreement with ArcelorMittal Dofasco to sell and deliver a portion of its annual pellet consumption requirements.

ArcelorMittal USA is a 62.3% equity participant in Hibbing. During 2017, we acquired the 21% ownership interest of ArcelorMittal USA in Empire as part of an agreement to distribute the noncontrolling interest net assets of the mine.

In 2018, 2017 and 2016, our Mining and Pelletizing segment pellet sales to ArcelorMittal were 10.1 million, 8.4 million and 9.7 million long tons, respectively.

*AK Steel*

In August 2013, we entered into a new agreement with AK Steel to provide iron ore pellets to AK Steel for use in its Middletown, Ohio and Ashland, Kentucky blast furnace facilities. This contract includes minimum and maximum tonnage requirements for each year between 2014 and 2023. In 2018, through contract amendments, we added tonnage with AK Steel above the maximum tonnage requirements specific to the 2018 contract year.

In 2015, we entered into an amended and restated agreement with AK Steel after it acquired Severstal Dearborn, LLC, under which we supply all of the Dearborn, Michigan facility's blast furnace pellet requirements through 2022, subject to specified minimum and maximum requirements in certain years.

In 2018, 2017 and 2016, our Mining and Pelletizing segment pellet sales to AK Steel were 5.8 million, 5.6 million and 4.5 million long tons, respectively.

9

*Algoma*

Algoma is a Canadian steelmaker whose common shares were owned by Essar Steel Holdings Limited. Essar Steel Algoma Inc. initiated CCAA proceedings in 2016. In November 2018, substantially all of the assets of Essar Steel Algoma Inc. were acquired by the emerging company, Algoma Steel Inc. We had a long-term supply agreement under which we were Algoma's sole supplier of iron ore pellets through the end of 2016, and would continue to provide a portion of its pellet needs through 2024. Under the terms of a 2016 settlement reinstatement agreement approved by the CCAA court, Algoma agreed to assume the long-term supply agreement. Additionally, Algoma entered into agreements with us wherein we sell additional incremental tonnage that equates to Algoma's 2016 through 2020 annual iron ore pellet consumption. These agreements began in 2016, 2017 and 2018 and run through December 2020. Algoma assumed these contracts in the CCAA proceedings at the completion of the sale of assets forming the new entity.

In 2018, 2017 and 2016, our Mining and Pelletizing segment pellet sales to Algoma were 3.5 million, 2.5 million and 1.2 million long tons, respectively.

## Competition

In our Mining and Pelletizing business segment, we primarily sell our product to steel producers with operations in North America. We compete directly with steel companies that own interests in iron ore mines in the United States and/or Canada, including U.S. Steel, and with major iron ore pellet exporters from Eastern Canada and Brazil.

A number of factors beyond our control affect the markets in which we sell our iron ore. Continued demand for our iron ore and the prices obtained by us primarily depend on the consumption patterns of the steel industry in the U.S., China and elsewhere around the world, as well as the availability, location, cost of transportation and competing prices.

## Environment

Our mining activities are subject to various laws and regulations governing the protection of the environment. We conduct our operations in a manner that is protective of public health and the environment and believe our operations are in compliance with applicable laws and regulations in all material respects.

Environmental issues and their management continued to be an important focus at each of our operations throughout  2018. In the construction and operation of our facilities, substantial costs have been and will continue to be incurred to comply with regulatory requirements and avoid undue effect on the environment. Our capital expenditures relating to environmental matters totaled approximately $10 million, $21 million and $15 million, in 2018, 2017 and 2016, respectively. It is estimated that capital expenditures for environmental improvements will total approximately $10 million in 2019, for various water treatment, air quality, dust control, tailings management, selenium management and other miscellaneous environmental projects in our Mining and Pelletizing segment.

*Regulatory Developments*

Various governmental bodies continually promulgate new or amended laws and regulations that affect us, our customers and our suppliers in many areas, including waste discharge and disposal, the classification of materials and products, air and water discharges and many other environmental, health and safety matters. Although we believe that our environmental policies and practices are sound and do not expect that the application of any current laws, regulations or permits reasonably would be expected to result in a material adverse effect on our business or financial condition, we cannot predict the collective adverse impact of the expanding body of laws and regulations.

Specifically, there are several notable proposed or potential rulemakings or activities that could have a material adverse impact on our facilities in the future depending on their ultimate outcome: Minnesota's potential revisions to the sulfate wild rice water quality standard; evolving water quality standards for selenium and conductivity; scope of the Clean Water Act and the definition of "Waters of the United States"; Minnesota's Mercury TMDL and associated rules governing mercury air emission reductions; Climate Change and GHG Regulation; Regional Haze FIP Rule; $NO_2$ and $SO_2$ NAAQS; and increased administrative and legislative initiatives related to financial assurance obligations for CERCLA, mining and reclamation obligations.

*Minnesota's Withdrawal of Proposed Amendments to the Sulfate Wild Rice Water Quality Standard*

The Minnesota Legislature provided $1.5 million in 2011 for a study to gather additional information about the effects of sulfate and other substances on the growth of wild rice and to support an update to the sulfate wild rice water

10

Table of Contents

quality standard originally adopted in 1973 by the MPCA. In August 2017, MPCA released proposed amendments of the sulfate water quality standard, which included a proposed sulfate wild rice water quality standard, a proposed list of waters where the standard would apply, and criteria for adding waters to that list. In January 2018, the proposed rule was substantially disapproved by an ALJ. The MPCA filed a request for reconsideration after changes were made to the proposed rule and it was disapproved again in April 2018. That same month the MPCA formally withdrew the proposed rule. Following two vetoed sulfate wild rice water quality standard-related bills, the Minnesota Governor established a Wild Rice Task Force by Executive Order in May 2018 that is charged with providing recommendations to the Governor's Office on wild rice restoration and regulation. Currently, the water quality standard that has not been enforced in decades remains; and may be unenforceable because the water bodies to which the existing standard applies have never been identified specifically in rule, nor are there criteria for identifying them. For these reasons, the impact of the proposed wild rice water quality standard to us is not estimable at this time, but it could have an adverse material impact if we are required to significantly reduce sulfate in our discharges.

*Conductivity*

Conductivity, the measurement of water's ability to conduct electricity, is a surrogate parameter that generally increases as the amount of dissolved minerals in water increases. In 2011, the EPA issued *A Field-Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams,* which established a recommended conductivity benchmark of 300 µS/cm for the region. The issuance of a benchmark outside of the established rulemaking process was subsequently the subject of litigation in 2012 where the court ruled the benchmark is nothing more than a non-binding suggestion. Three years later in <u>Ohio Valley Environmental Coalition, et al. v. Elk Run Coal Co., et al.</u>, 3:12-cv-00785 (S.D. W. Va.), a judicial decision held that levels of conductivity higher than the EPA's benchmark constituted a violation of the state's narrative water quality standards, and were unsupported by science and contrary to decisions previously made by the West Virginia Department of Environmental Protection and the West Virginia Supreme Court. In 2015, a group filed a petition with EPA Region 5 alleging that Minnesota was failing to implement properly the state NPDES program, and one of the various allegations asserted that MPCA should be assessing compliance with the state's narrative water quality standard against the EPA's conductivity benchmark for the Central Appalachian region. In December 2015, the EPA provided MPCA a draft of the *Protocol for Responding to Issues Related to Permitting and Enforcement* which indicated that EPA staff would review available scientific basis in peer-reviewed literature as well as promulgated standards. In February 2016, EPA's Office of Research and Development endorsed use of the Field-Based Conductivity Benchmark in northeast Minnesota indicating that a value of 320 µS/cm was appropriate to protect aquatic life. In December 2016, EPA issued a notice soliciting public comments on its draft document, *Field-Based Methods for Developing Aquatic Life Criteria for Specific Conductivity*. According to EPA, once this document is final, states and authorized tribes located in any region of the country may use the methods to develop field-based specific conductivity criteria for adoption into water quality standards. In April 2017, comments were submitted by our trade associations providing objective evidence indicating the draft methodology was scientifically flawed and unfit for promulgation. Adoption of this methodology is not certain due to significant concerns with respect to the scientific validity of the proposed method, which is now under intense review by scientists working for various trade associations. Because the outcome of the Region 5 Petition is uncertain and the proposed *Field-Based Methods for Developing Aquatic Life Criteria for Specific Conductivity* is only draft guidance at this time, the exact nature and certainty of the potential risk to us cannot be predicted; however, direct application of the 320 µS/cm benchmark to our Minnesota-based assets may have a material adverse impact if the conductivity benchmark is applied to our NPDES permits.

*Definition of "Waters of the United States" Under the Clean Water Act*

In June 2015, the EPA and Army Corps of Engineers promulgated the rule, "Definition of 'Waters of the United States' Under the Clean Water Act," which attempted to add clarity to which waters are jurisdictional under the federal Clean Water Act; and applied to all Clean Water Act programs, including certain permitting programs, spill prevention programs and a state certification process. It has remained unclear how the federal and state agencies will implement and enforce this final rule, and the rule has been stayed in several states. The regulation may expand EPA's authority under the Clean Water Act to many traditionally unregulated mine features such as mine pits, pit lakes, on-site ditches, water retention structures, and tailings basins creating a new burden on our facilities. This could be further interpreted to add questionable regulatory authority over the groundwater connections between these features and nearby traditionally navigable waters.

11

Table of Contents

The "Executive Order on Restoring the Rule of Law, Federalism, and Economic Growth by Reviewing the 'Waters of the United States' Rule" ("Executive Order") was signed by the President in February 2017. This Executive Order instructs EPA and the Army Corps of Engineers to review the Clean Water Rule and "publish for notice and comment a proposed rule rescinding or revising the rule." Accordingly, EPA and Army Corps of Engineers signed in December 2018 a proposed *Revised Definition of "Waters of the United States"* rule. The proposed rule will have a sixty-day comment period after publication in the Federal Register. The rule as proposed is not expected to have a material negative impact to our business. We are actively participating in the rulemaking and will continue assessing the potential impacts to our operations.

*Selenium Discharge Regulation*

In Michigan, Empire and Tilden have implemented compliance plans to manage selenium according to the permit conditions. Empire and Tilden submitted the first permit-required Selenium Storm Water Management Plan to the Michigan Department of Environmental Quality ("MDEQ") in December 2011 and have updated it annually as required. The Selenium Storm Water Management Plans have outlined the activities that have been undertaken to address selenium in storm water discharges from our Michigan operations including an assessment of potential impacts to surface and groundwater. The remaining infrastructure needed for implementation of the storm water collection and conveyance system will likely be completed in 2020. A storm water treatment system for both facilities is anticipated sometime before 2028. As of December 31, 2018, included within our Empire asset retirement obligation is a discounted liability of approximately $85 million, which includes the estimated costs associated with the construction of Empire's portion of the required infrastructure and expected future operating costs of the treatment facilities. Additionally, included within our Tilden future capital plan is approximately $25 million for the construction of Tilden's portion of the required infrastructure. We are continuing to assess and develop cost effective and sustainable treatment technologies.

In July 2016, the EPA published new selenium fish tissue limits and lower lentic and lotic water column concentration criteria, which may someday increase the cost for treatment should MDEQ adopt these new standards in lieu of the existing limits established under the Great Lakes Initiative. Accordingly, we cannot reasonably estimate the timing or long-term impact of the water quality criteria to our business.

*Mercury TMDL and Minnesota Taconite Mercury Reduction Strategy*

Since the 1990's the taconite industry has voluntarily reduced and removed mercury products and supported development of mercury emission reduction technology. While TMDL regulations are contained in the Clean Water Act, Minnesota developed in 2007 a Statewide Mercury TMDL which set an objective for 93% mercury air emission reductions from 1990 levels for sources within Minnesota. The State of Minnesota has acknowledged that approximately 90% of the mercury entering the state's airshed is from other national and international sources.

In September 2014, Minnesota promulgated the Mercury Air Emissions Reporting and Reduction Rules mandating mercury air emissions reporting and reductions from certain sources, including taconite facilities. The rule is applicable to all of our Minnesota operations and required submittal of a Mercury Reduction Plan to the MPCA by the end of 2018 with plan implementation requirements becoming effective on January 1, 2025. In the Mercury Reduction Plan, facilities must evaluate if available control technologies can technically achieve a 72% mercury reduction rate. If available control technologies cannot technically achieve a 72% mercury reduction rate, the facilities must propose alternative mercury reduction measures. One of the main tenets agreed upon for evaluating potential mercury reduction technologies during TMDL implementation and 2014 rule development proceedings was that the selected technology must meet the following "Adaptive Management Criteria": the technology must be technically feasible; must be economically feasible; must not impact pellet quality; and must not cause excessive corrosion in the indurating furnaces or air pollution control equipment. The Mercury Reduction Plans for Cliffs' Minnesota facilities were submitted to the MPCA in December 2018 and are currently being reviewed by the MPCA.

There is currently no proven technology to cost effectively reduce mercury emissions from taconite furnaces to the target level of 72% while satisfying all four Adaptive Management Criteria. The Mercury Reduction Plans that were submitted to MPCA include documentation that describes the results of detailed engineering analysis and research testing on potential technologies to support this determination. The results of this analysis will guide further dialogue with the MPCA. Potential impacts to us are not estimable at this time because the submitted Mercury Reduction Plans are currently being reviewed by MPCA.

12

*Climate Change and GHG Regulation*

With the complexities and uncertainties associated with the U.S. and global navigation of the climate change issue as a whole, one of our potentially significant risks for the future is mandatory carbon pricing obligations. Policymakers are in the design process of carbon regulation at the state, regional, national and international levels. The current regulatory patchwork of carbon compliance schemes presents a challenge for multi-facility entities to identify their near-term risks. Amplifying the uncertainty, the dynamic forward outlook for carbon pricing obligations presents a challenge to large industrial companies to assess the long-term net impacts of carbon compliance costs on their operations. Our exposure on this issue includes both the direct and indirect financial risks associated with the regulation of GHG emissions, as well as potential physical risks associated with climate change adaption. We are continuing to review the physical risks related to climate change utilizing our formal ERM process. As an energy-intensive business, our GHG emissions inventory includes a broad range of emissions sources, such as iron ore furnaces and kilns, diesel mining equipment and our wholly owned Silver Bay power generation plant, among others. As such, our most significant regulatory risks are: (1) the costs associated with on-site emissions levels (direct impacts), and (2) indirect costs passed through to us from electrical and fuel suppliers (indirect impacts).

Internationally, mechanisms to reduce emissions are being implemented in various countries, with differing designs and stringency, according to resources, economic structure and politics. We expect that momentum to extend carbon regulation will continue with implementation of the Paris climate agreement that was adopted in 2015, the aim of which is to keep the increase in global average temperature to below two degrees Celsius. Continued political attention to issues concerning climate change, the role of human activity in it and potential mitigation through regulation may have a material impact on our customer base, operations and financial results in the future.

In the U.S., future federal and/or state carbon regulation potentially presents a significantly greater impact to our operations. To date, the U.S. Congress has not legislated carbon constraints. In the absence of comprehensive federal carbon legislation, numerous state, regional, and federal regulatory initiatives are under development or are becoming effective, thereby creating a disjointed approach to GHG control and potential carbon pricing impacts. In May 2010, the EPA promulgated the GHG Tailoring Rule establishing a mechanism for regulating GHG emissions from facilities through the Prevention of Significant Deterioration permitting program under the Clean Air Act. Under the GHG Tailoring Rule, as modified by a 2014 U.S. Supreme Court decision upholding some components of the rule, new projects that increase GHG emissions by a significant amount (generally more than 75,000 long tons of $CO_2$ emissions per year) and significantly increase emissions of at least one non-GHG criteria pollutant are subject to the Prevention of Significant Deterioration requirements, including the installation of best available control technology. We do not expect the Tailoring Rule provision to have a material adverse effect on our business in the near term and we cannot reliably estimate the long-term impact of the regulation.

In June 2013, President Obama issued a memorandum directing EPA to develop carbon emission standards for both new and existing power plants under the Clean Air Act's New Source Performance Standards ("NSPS"). In October 2015, EPA promulgated a CPP which consists of NSPS regulating carbon dioxide from existing power plants at a level of approximately 32% below 2005 levels by 2030. The CPP would not regulate combined heat and power generating facilities such as at Northshore's Silver Bay Power. The CPP directed states to submit SIPs to EPA by September 2016, but during February 2016, the U.S. Supreme Court stayed the CPP immediately halting implementation. In March 2017, President Trump signed the Energy Independence Executive Order which called for, among other things, a review of the CPP and, if appropriate, reconsideration proceedings to suspend, revise, or rescind the rule. On the same day, Administrator Pruitt signed a notice indicating EPA's intent to review and, if appropriate, to propose to revise or rescind the CPP. The U.S. Court of Appeals for the D.C. Circuit has been holding CPP litigation in abeyance since April 2017. During October 2017, following a review as directed by President Trump's Energy Independence Executive Order, the EPA proposed a rule to repeal the CPP and accepted comments on the proposed rule until mid-January 2018. The ultimate outcome of these carbon emission standards is not expected in the near term.

Due to the EPA's Tailoring Rule and potential patchwork state or regional carbon restriction schemes, our business and customer base could suffer negative financial impacts over time as a result of increased energy, environmental and other costs to comply with the limitations that would be imposed on GHG emissions. We believe our exposure can be reduced substantially by numerous factors, including currently contemplated regulatory flexibility mechanisms, such as allowance allocations, fixed process emissions exemptions, offsets and international provisions; emissions reduction opportunities, including energy efficiency, biofuels and fuel flexibility; and business opportunities associated with pursuing combined heat and power partnerships and new products, including DR-grade pellets, fluxed pellets and other efficiency-improving technologies.

13

We have worked proactively to develop a comprehensive, enterprise-wide GHG management strategy aimed at considering all significant aspects associated with GHG initiatives to plan effectively for and manage climate change issues, including risks and opportunities as they relate to the environment; stakeholders, including shareholders and the public; legislative and regulatory developments; operations; products and markets.

*Regional Haze FIP Rule*

In June 2005, the EPA finalized amendments to its regional haze rules. The rules require states to establish goals and emission reduction strategies for improving visibility in all Class I national parks and wilderness areas to natural background levels by 2064. Among the states with Class I areas are Michigan and Minnesota, in which we currently own and manage mining operations. The first phase of the regional haze rule required analysis and installation of Best Available Retrofit Technology ("BART") on eligible emission sources and incorporation of BART and associated emission limits into SIPs.

EPA disapproved Minnesota's and Michigan's SIPs for taconite furnaces and instead promulgated a Taconite Regional Haze FIP in February 2013. We, along with other stakeholders, petitioned the Eighth Circuit Court of Appeals for a review of the FIP, and in May 2013, we filed a joint motion for stay of the 2013 FIP, which was granted in June 2013. We, along with the other stakeholders, reached a settlement agreement with EPA to resolve certain items in the 2013 FIP. The settlement agreement, which was published in the Federal Register in January 2015 and fully executed in April 2015, prompted EPA to grant partial reconsideration of the 2013 FIP in July 2015. Subsequently, EPA published a FIP revision final rule to implement components of the settlement agreement in April 2016, with an effective date of May 12, 2016. We believe the 2016 Regional Haze FIP reflects progress toward a more technically and economically feasible regional haze implementation plan. In November 2016, the Eighth Circuit Court of Appeals terminated the June 2013 stay and extended the deadlines in the original 2013 FIP. Cost estimates associated with implementation of the 2013 and 2016 FIPs are reflected in our five-year capital plan.

Due to inconsistencies in language describing the procedures for calculating $NO_x$ emission limits between the settlement agreement and the 2016 FIP final rule, we jointly filed a Petition for Reconsideration and Petition for Judicial Review in June 2016. We have been working toward a settlement agreement with EPA to resolve the outstanding issue with the emission limit calculation method and anticipate resolution of the issue in 2019. The outcome of this proceeding is not expected to have a material adverse impact to the business.

*$NO_2$ and $SO_2$ NAAQS*

During the first half of 2010, EPA promulgated rules that required each state to use a combination of air quality monitoring and computer modeling to determine each state's attainment classification status against new one-hour $NO_2$ and $SO_2$ NAAQS. During the third quarter of 2011, the EPA issued guidance to the regulated community on conducting refined air quality dispersion modeling and implementing the new $NO_2$ and $SO_2$ standards. In 2012, Minnesota issued Administrative Orders ("AOs") requiring taconite facilities to conduct modeling to demonstrate compliance with the $NO_2$ and $SO_2$ NAAQS pursuant to the Taconite Regional Haze SIP Long Term Strategy ("LTS"). Compliance with the LTS modeling demonstrations was originally set for June 2017, but Minnesota has not advanced work on its 2012 AOs and is expected to remove NAAQS modeling obligations under the LTS in light of reduction in haze emissions associated with implementation of the taconite Regional Haze FIP regulations.

All of our operations in Minnesota and Michigan are expected to be in attainment for $NO_2$ and $SO_2$ NAAQS without incurring additional capital investment. While we will continue to monitor these developments and assess potential impacts, we do not anticipate further capital investments will be necessary to address $NO_2$ and $SO_2$ NAAQS requirements at this time.

14

*CERCLA 108(b)*

In December 2016, EPA published a proposed amendment to CERCLA section 108(b) which is focused on developing financial assurance for managing hazardous substances in the hardrock mining industry. EPA had a court-mandated deadline for publication of the final rule by December 1, 2017. The proposed rule would have required hardrock mining facilities to calculate their level of financial responsibility based on a formula included in the rule, secure an instrument or otherwise self-insure for the calculated amount, demonstrate to EPA the proof of the security, and maintain the security until EPA releases facilities from the CERCLA 108(b) regulations. The iron mining industry notified EPA of several errors upon which EPA drafted the rule, including a mistaken reliance on reporting data from a wholly different industry sector (iron and steel toxic release inventory reporting). We also participated in developing industry specific and national trade association comments and advocating directly with EPA and the White House Office of Management & Budget to address this and other errors with goals of exempting iron ore mining from CERCLA 108(b) applicability and correcting other deficiencies with the proposed rule. On December 1, 2017 EPA signed a federal register notice of EPA's decision not to issue final regulations for financial responsibility requirements for the hardrock mining industry under section 108(b) of CERCLA because EPA determined that the risks associated with these facilities' operations are addressed by existing federal and state programs and regulations and modern industry practices. In 2018, several environmental groups filed a challenge to EPA's decision to not issue a final rule. This challenge is anticipated to be decided by the courts during 2019. Cliffs is participating as part of the industry intervenor party via representation through the American Iron and Steel Institute and will continue to participate in and monitor the challenge as it proceeds.

## Energy

### *Electricity*

WEPC is the sole supplier of electric power to our Tilden mine. During April 2015, the Tilden mine executed a special electricity contract with WEPC. The term of the contract is through 2019. WEPC provides 170 megawatts of electricity to Tilden at special rates that are regulated by the MPSC. The pricing under this contract is generally fixed except Tilden is subject to frequent changes in WEPC's power supply adjustment factor. During August 2016, Tilden executed a new 20-year special contract with WEPC that is anticipated to start on June 1, 2019 and would replace the previous special contract.

Minnesota Power supplies electric power to the Hibbing and United Taconite mines. During September 2008, Hibbing finalized an agreement with terms from November 2008 through December 2015. The agreement was approved by the MPUC in 2009. The terms of the agreement included an automatic five-year extension that began January 2016. The United Taconite mine executed a new ten-year agreement with Minnesota Power that also included Northshore's Babbitt Mine. This agreement was finalized in May 2016 and was approved by the MPUC in November 2016.

Silver Bay Power, a wholly-owned subsidiary with a 115 megawatt power plant, is able to provide the majority of Northshore's electrical energy requirements. Silver Bay Power has an interconnection agreement with Minnesota Power for backup power when excess generation is necessary. In May 2016, Silver Bay Power entered into an agreement with Minnesota Power to purchase roughly half of Northshore's electricity needs from Minnesota Power through 2019. Beginning January 1, 2020, Silver Bay Power will purchase 100% of the electricity requirements of Northshore from Minnesota Power and Silver Bay Power plans to idle both of its generating units except under certain circumstances.

### *Process and Diesel Fuel*

We have a long-term contract providing for the transport of natural gas on the Northern Natural Gas Pipeline for our Mining and Pelletizing segment operations. Tilden has the capability of burning natural gas, coal or, to a lesser extent, oil. Hibbing and Northshore have the capability to burn natural gas and oil. United Taconite has the ability to burn coal, natural gas and petroleum coke. Consistent with 2018, we expect that during 2019 our Mining and Pelletizing segment operations will utilize both natural gas and coal to heat furnaces and produce power at our Silver Bay Power facility.

All of our mines utilize diesel fuel mainly for our mobile fleet. Thompson Gas supplies diesel fuel to all of our Mining and Pelletizing segment locations from various refineries in the Midwest. Our contracts with Thompson Gas expired at the end of 2018, and the parties are negotiating extensions on these supply agreements.

15

A005504

**Employees**

As of December 31, 2018, we had a total of 2,926 employees.

| | 2018 | 2017 | 2016 |
|---|---|---|---|
| Mining and Pelletizing segment - Salaried [1] | 514 | 503 | 485 |
| Mining and Pelletizing segment - Hourly [1,3] | 2,208 | 2,182 | 2,189 |
| Metallics segment - Salaried | 26 | 6 | — |
| Discontinued Operations - Salaried [2] | 2 | 79 | 86 |
| Corporate & Support Services - Salaried | 176 | 168 | 167 |
| Total | 2,926 | 2,938 | 2,927 |

[1] Includes our employees and our employees of the joint venture contained within our Mining and Pelletizing segment.

[2] Excludes contracted mining employees.

[3] Excludes employees considered on lay-off status as a result of an indefinite or temporary idle.

Hourly employees at our Michigan and Minnesota iron ore mining operations, excluding Northshore, are represented by the USW and are covered by labor agreements between the USW and our various operating entities. These labor agreements cover approximately 1,800 active USW-represented employees at our Empire and Tilden mines in Michigan, and our United Taconite and Hibbing mines in Minnesota and are valid through September 30, 2022. Employees at our Northshore operations are not represented by a union and are not, therefore, covered by a collective bargaining agreement.

Hourly employees at our LS&I railroads in Michigan are represented by seven unions covering approximately 100 employees. These labor agreements are covered by the Railway Labor Act and are subject to reopening for bargaining in 2020.

Salaried employees at our Mining and Pelletizing segment, Metallics segment, Corporate and Support Services are not represented by a union and are not, therefore, covered by collective bargaining agreements.

**Safety**

Safety is our primary core value as we continue toward a zero injury culture at all of our facilities. We constantly monitor, measure and track our safety performance and make continuous improvements to affect change. Best practices and incident learnings are shared globally to ensure each mine site can effectively administer our policies and procedures for enhanced workplace safety. Progress toward achieving our objectives is accomplished through a focus on proactive sustainability initiatives, and results are measured against established industry and company benchmarks, including our company-wide Total Reportable Incident Rate ("TRIR"). During 2018, our TRIR (including contractors) was 1.20 per 200,000 man-hours worked.

Refer to *Exhibit 95 Mine Safety Disclosures (filed herewith)* for mine safety information required in accordance with Section 1503(a) of the Dodd-Frank Act.

A005505

Table of Contents

**Available Information**

Our headquarters are located at 200 Public Square, Suite 3300, Cleveland, Ohio 44114-2315, and our telephone number is (216) 694-5700. We are subject to the reporting requirements of the Exchange Act and its rules and regulations. The Exchange Act requires us to file reports, proxy statements and other information with the SEC.

The SEC maintains a website that contains reports, proxy statements and other information regarding issuers that file electronically with the SEC. These materials may be obtained electronically by accessing the SEC's home page at *www.sec.gov.*

We use our website, *www.clevelandcliffs.com*, as a channel for routine distribution of important information, including news releases, investor presentations and financial information. We also make available, free of charge on our website, our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to these reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act, as soon as reasonably practicable after we electronically file these documents with, or furnish them to, the SEC. In addition, our website allows investors and other interested persons to sign up to receive automatic email alerts when we post news releases and financial information on our website.

We also make available, free of charge on our website, the charters of the Audit Committee, Governance and Nominating Committee and Compensation and Organization Committee as well as the Corporate Governance Guidelines and the Code of Business Conduct and Ethics adopted by our Board of Directors. These documents are available through our investor relations page on our website at *www.clevelandcliffs.com*. The SEC filings are available by selecting "Financial Information" and then "SEC Filings," and corporate governance materials are available by selecting "Corporate Governance" for the Board Committee Charters, operational governance guidelines and the Code of Business Conduct and Ethics.

References to our website or the SEC's website do not constitute incorporation by reference of the information contained on such websites, and such information is not part of this Annual Report on Form 10-K.

Copies of the above-referenced information are also available, free of charge, by calling (216) 694-5700 or upon written request to:

Cleveland-Cliffs Inc.
Investor Relations
200 Public Square, Suite 3300
Cleveland, OH 44114-2315

17

Table of Contents

**EXECUTIVE OFFICERS OF THE REGISTRANT**

Following are the names, ages and positions of the executive officers of the Company as of  February 8, 2019. Unless otherwise noted, all positions indicated are or were held with Cleveland-Cliffs Inc.

| Name | Age | Position(s) Held |
|------|-----|------------------|
| Lourenco Goncalves | 61 | Chairman, President and Chief Executive Officer (August 2014 – present); and Chairman, President and Chief Executive Officer of Metals USA Holdings Corp., an American manufacturer and processor of steel and other metals (May 2006 – April 2013). |
| Clifford T. Smith | 59 | Executive Vice President, Chief Operating Officer (January 2019 – present); Executive Vice President, Business Development (April 2015 – December 2018); and Executive Vice President, Seaborne Iron Ore (January 2014 – April 2015). |
| Terry G. Fedor | 54 | Executive Vice President, U.S. Iron Ore (January 2014 – present); and Vice  President, U.S. Iron Ore Operations (February 2011 – January 2014). |
| Timothy K. Flanagan | 41 | Executive Vice President, Chief Financial Officer (January 2017 – present); Treasurer (March 2016  – December 2017); and Vice President, Corporate Controller and Chief Accounting Officer (March 2012 – December 2016). |
| James D. Graham | 53 | Executive Vice President (November 2014 – present); Chief Legal Officer (March 2013 – present); Secretary (March 2014 – present); and Vice President (January 2011 – October 2014). |
| Maurice D. Harapiak | 57 | Executive Vice President, Human Resources (March 2014 – present); Chief Administration Officer (January 2018 – present); and Regional Director, Human Resources - Barrick Gold of North America, a gold mining company (November 2011 – March 2014). |
| Terrence R. Mee | 49 | Executive Vice President, Global Commercial (October 2014 - present); and Vice President, Global Iron Ore Sales (February 2014 – October 2014). |
| R. Christopher Cebula | 48 | Vice President, Corporate Controller & Chief Accounting Officer (February 2017  – present); and Senior Director, Corporate Financial Planning & Analysis (April 2013 – February 2017). |

All executive officers serve at the pleasure of the Board. There are no arrangements or understandings between any executive officer and any other person pursuant to which an executive officer was selected to be an officer of the Company. There is no family relationship between any of our executive officers, or between any of our executive officers and any of our directors.

18

Table of Contents

**Item 1A.**          *Risk Factors*

An investment in our common shares or other securities is subject to risk inherent to our business and our industry. Described below are certain risks and uncertainties, the occurrences of which could have a material adverse effect on us. Before making an investment decision, you should consider carefully all of the risks described below together with the other information included in this report. The risks and uncertainties described below include known material risks that we face currently. Although we have extensive risk management policies, practices and procedures aimed to mitigate these risks, uncertainties may nevertheless impair our business operation. This report is qualified in its entirety by these factors.

Our ERM function provides a framework for management's consideration of risk when making strategic, financial, operational and/or project decisions. The framework is based on ISO 31000, an internationally recognized risk management standard. Management uses a consistent methodology to identify and assess risks, determine and implement risk mitigation actions, and monitor and communicate information about the Company's key risks. Through these processes, we have identified six categories of risk that we are subject to: (I) economic and market, (II) regulatory, (III) financial, (IV) operational, (V) development and sustainability and (VI) human capital. The following risk factors are presented according to these key risk categories.

**I.   ECONOMIC   AND   MARKET RISKS**

***Uncertainty or weaknesses in global economic conditions, reduced economic growth in China and oversupply of iron ore and excess steel or imported products could affect adversely our business.***

The world price of iron ore is influenced strongly by global economic conditions, including international demand and supply for iron ore products. In particular, the current level of international demand for raw materials used in steel production is driven largely by industrial growth in China. Uncertainties or weaknesses in global economic conditions, including the slowing economic growth rate in China, has resulted, and could in the future result, in decreased demand for our products and, together with oversupply of imported products, has and may continue to lead to decreased prices, resulting in lower revenue levels and decreasing margins, which have in the past and may in the future affect adversely our business and negatively impact our financial results. We are not able to predict whether the global economic conditions will improve or worsen and the impact it may have on our operations and the industry in general going forward.

***The volatility of commodity prices, namely iron ore and steel, affects our ability to generate revenue, maintain stable cash flow and fund our operations, including growth and expansion projects.***

As a mining company, our profitability is dependent upon the price of the commodities that we sell to our customers and the price of the products our customers sell, namely iron ore and steel prices. The prices of iron ore and steel have fluctuated significantly in the past and is affected by factors beyond our control, including: steel inventories; changes in the productive capacity of U.S. domestic steel producers; international demand for raw materials used in steel production; rates of global economic growth, especially construction and infrastructure activity that requires significant amounts of steel; changes in the levels of economic activity in the U.S., China, India, Europe and other industrialized or developing countries; changes in China's emissions policies and environmental compliance enforcement practices; uncertainties or weaknesses in global economic conditions such as the U.S. debt ceiling; changes in production capacity of other iron ore suppliers, especially as additional supply comes online or where there is a significant increase in imports of steel into the U.S. or Europe; changes in trade laws; imposition or termination of duties, tariffs, import and export controls and other trade barriers impacting the iron ore markets; weather-related disruptions or natural disasters that may impact the global supply of iron ore; and the proximity, capacity and cost of infrastructure and transportation.

Our earnings, therefore, may fluctuate with the prices of the commodities we sell and of the products our customers sell. To the extent that the prices of iron ore and steel, including the average iron ore pellet premiums and hot-rolled coil steel price, significantly decline for an extended period of time, we may have to revise our operating plans, including curtailing production, reducing operating costs and capital expenditures and discontinuing certain exploration and development programs. We also may have to take impairments on our long-lived assets and/or inventory. Sustained lower prices also could cause us to further reduce existing reserves if certain reserves no longer can be economically mined or processed at prevailing prices. We may be unable to decrease our costs in an amount sufficient to offset reductions in revenues and may incur losses. These events could have a material adverse effect on us.

19

Table of Contents

*If steelmakers use methods other than blast furnace production to produce steel or use other inputs, or if their blast furnaces shut down or otherwise reduce production, the demand for our current iron ore products may decrease.*

Demand for our iron ore products in North America is determined by the operating rates for the blast furnaces of steel companies. However, not all finished steel is produced by blast furnaces; finished steel also may be produced by other methods that use scrap steel, pig iron, HBI and direct reduced iron. North American steel producers also can produce steel using imported iron ore, semi-finished steel products or other lighter-weight steel alternatives, which eliminates the need for domestic iron ore. Future environmental restrictions on the use of blast furnaces in North America also may reduce our customers' use of their blast furnaces. Maintenance of blast furnaces may require substantial capital expenditures and may cause prolonged outages, which may reduce demand for our pellets. Our customers may choose not to maintain, or may not have the resources necessary to maintain, their blast furnaces. If our customers use methods to produce steel that do not use iron ore pellets or if environmental or maintenance issues occur, demand for our current iron ore products may decrease, which could affect adversely our sales, margins, profitability and cash flows, which we anticipate will be somewhat mitigated by our production of HBI.

*Due to economic conditions and volatility in commodity prices, or otherwise, our customers could approach us about modification of their supply agreements or fail to perform under such agreements, which could impact adversely our sales, margins, profitability and cash flows.*

Although we have long-term contractual commitments for a majority of our sales, uncertainty in global economic conditions may impact adversely the ability of our customers to meet their obligations. As a result of such market volatility, our customers could approach us about modifying their supply agreements or fail to perform under such agreements. Considering our limited base of current and potential customers, any modifications to our sales agreements or customers' failures to perform under such agreements could impact adversely our sales, margins, profitability and cash flows. For example, of the potential customers in the North American integrated steel industry, one is in the final stages of reorganization proceedings, and certain others have experienced financial difficulties. A loss of sales to our existing customers could have a substantial negative impact on our sales, margins, profitability and cash flows. Other potential actions by our customers could result in additional contractual disputes and could ultimately require arbitration or litigation, either of which could be time consuming and costly. Any such disputes and/or failure to renew existing contracts on favorable terms could impact adversely our sales, margins, profitability and cash flows.

*Capacity expansions and limited rationalization of supply capacity within the mining industry could lead to lower or more volatile global iron ore prices, impacting our profitability.*

Global growth of iron ore demand, particularly from China, resulted in iron ore suppliers expanding their production capacity over the past few years. The supply of iron ore increased due to these expansions. In the past, increases in production capacity along with actual reduced demand resulted in excess supply of iron ore and caused downward pressure on prices. A return to supply capacity expansions could lead to pricing pressure which can have an adverse impact on our sales, margins and profitability. We do not have control over corporate strategies implemented by other iron ore producers that may result in volatility of global iron ore prices.

## II.  REGULATORY RISKS

*We are subject to extensive governmental regulation, which imposes, and will continue to impose, potential significant costs and liabilities on us. Future laws and regulations or the manner in which they are interpreted and enforced could increase these costs and liabilities or limit our ability to produce iron ore products.*

New laws or regulations, or changes in existing laws or regulations, or the manner of their interpretation or enforcement, could increase our cost of doing business and restrict our ability to operate our business or execute our strategies. This includes, among other things, changes in the interpretation of MSHA regulations, such as workplace exam rules or safety around mobile equipment, the possible taxation under U.S. law of certain income from discontinued foreign operations, compliance costs and enforcement under the Dodd-Frank Act, and uncertainty surrounding the Patient Protection and Affordable Care Act and costs associated with the Healthcare and Education Reconciliation Act of 2010 and the regulations promulgated under these Acts and any replacement or amendments thereof. In addition, we are subject to various federal, state and local laws and regulations in each jurisdiction in which we have operations for human health and safety, air quality, water pollution, plant, wetlands, natural resources and wildlife protection, reclamation and restoration of mining properties, the discharge of materials into the environment, the effects that mining has on groundwater quality, conductivity and availability, and related matters. Numerous governmental permits and approvals are required for our operations.

20

We cannot be certain that we have been or will be at all times in complete compliance with such laws, regulations, permits and approvals. If we violate or fail to comply with these laws, regulations, permits or approvals, we could be fined or otherwise sanctioned by regulators. Compliance with the complex and extensive laws and regulations to which we are subject imposes substantial costs, which could increase over time because of increased regulatory oversight, adoption of increasingly stringent environmental standards, and increased demand for remediation services leading to shortages of equipment, supplies and labor, as well as other factors.

Specifically, there are several notable proposed or recently enacted rulemakings or activities to which we would be subject or that would further regulate and/or tax our customers, namely the North American integrated steel producer customers, that may also require us or our customers to reduce or otherwise change operations significantly or incur significant additional costs, depending on their ultimate outcome. These emerging or recently enacted rules, regulations and policy guidance include, but are not limited to: trade regulations, such as the United States-Mexico-Canada Agreement and/or other trade agreements, treaties or policies; Minnesota's potential revisions to the sulfate wild rice water quality standard; evolving water quality standards for selenium, and conductivity; scope of the Clean Water Act and the definition of "Waters of the United States"; Minnesota's Mercury TMDL and associated rules governing mercury air emission reductions; Climate Change and GHG Regulation; Regional Haze FIP Rule; $NO_2$ and $SO_2$ NAAQS; and increased administrative and legislative initiatives related to financial assurance obligations for CERCLA, mining and reclamation obligations. Such new or more stringent legislation, regulations, interpretations or orders, when enacted and enforced, could have a material adverse effect on our business, results of operations, financial condition or profitability.

***Although the numerous regulations, operating permits and our management systems mitigate potential impacts to the environment, our operations inadvertently may impact the environment or cause exposure to hazardous substances, which could result in material liabilities to us.***

Our operations currently use and have used in the past, hazardous materials, and, from time to time, we have generated solid and hazardous waste. We have been, and may in the future be, subject to claims under federal, state and local laws and regulations for toxic torts, natural resource damages and other damages as well as for the investigation and clean-up of soil, surface water, sediments, groundwater and other natural resources and reclamation of properties. Such claims for damages and reclamation may arise out of current or former conditions at sites that we own, lease or operate currently, as well as sites that we or our acquired companies have owned, leased or operated, and at contaminated sites that have been owned, leased or operated by our joint venture partners. Our liability for these claims may be strict, and/or joint and several, such that we may be held responsible for more than our share of the contamination or other damages, or even for the entire share regardless of fault. We are subject to a variety of potential liability exposures arising, or otherwise involved in investigation and remediation activities, at certain sites. In addition to sites currently owned, leased or operated, these include sites where we formerly conducted iron ore and/or coal mining or processing or other operations, inactive sites that we currently own, predecessor sites, acquired sites, leased land sites and third-party waste disposal sites. We may be named as a responsible party at other sites in the future and we cannot be certain that the costs associated with these additional sites will not be material.

We also could be subject to litigation for alleged bodily injuries arising from claimed exposure to hazardous substances allegedly used, released, or disposed of by us. In particular, we and certain of our subsidiaries were involved in various claims relating to the exposure of asbestos and silica to seamen who sailed until the mid-1980s on the Great Lakes vessels formerly owned and operated by certain of our subsidiaries. While several hundred of these claims against us had been combined in a multidistrict litigation docket and have since been dismissed and/or settled for non-material amounts, there remains a possibility that similar types of claims could be filed in the future.

Environmental impacts as a result of our operations, including exposures to hazardous substances or wastes associated with our operations, could result in costs and liabilities that could materially and adversely affect our margins, cash flow or profitability.

***We may be unable to obtain and/or renew permits necessary for our operations or be required to provide additional financial assurance, which could reduce our production, cash flows, profitability and available liquidity. We also could face significant permit and approval requirements that could delay our commencement or continuation of new or existing production operations which, in turn, could affect materially our profitability and available liquidity.***

Prior to commencement of mining, we must submit to and obtain approval from the appropriate regulatory authority of plans showing where and how mining and reclamation operations are to occur. These plans must include information such as the location of mining areas, stockpiles, surface waters, haul roads, tailings basins and drainage

21

from mining operations. All requirements imposed by any such authority may be costly and time-consuming and may delay commencement or continuation of exploration or production operations.

Mining companies must obtain numerous permits that impose strict conditions on various environmental and safety matters in connection with iron ore mining and production. These include permits issued by various federal, state and local agencies and regulatory bodies. The permitting rules are complex and may change over time, making our ability to comply with the applicable requirements more difficult or impractical and costly, possibly precluding the continuance of ongoing operations or the development of future mining operations. Interpretations of rules may also change over time and may lead to requirements, such as additional financial assurance, making it more costly to comply. The public, including special interest groups and individuals, have certain rights under various statutes to comment upon, submit objections to, and otherwise engage in the permitting process, including bringing citizens' lawsuits to challenge such permits or mining activities. Accordingly, required permits may not be issued or renewed in a timely fashion (or at all), or permits issued or renewed may be conditioned in a manner that may restrict our ability to conduct our mining and production activities efficiently, including the requirement for additional financial assurances that we may not be able to provide on commercially reasonable terms or at all and which would further limit our borrowing base under our ABL Facility. Such inefficiencies could reduce our production, cash flows, profitability and available liquidity.

III.    FINANCIAL
        RISKS

*A substantial majority of our sales are made under supply agreements with specified duration to a low number of customers that contain price-adjustment clauses that could affect adversely the stability and profitability of our operations.*

A majority of our Mining and Pelletizing sales are made under supply agreements with specified durations to a limited number of customers. For the year ended December 31, 2018, approximately 97% of our revenues from product sales and services was derived from the North American integrated steel industry and three customers together accounted for 95% of our Mining and Pelletizing product sales revenues. Our average remaining duration of our Mining and Pelletizing contracts as of December 31, 2018 is approximately six years. Pricing under our customer contracts is adjusted by certain factors including the price of hot-rolled coil steel in the U.S. domestic market, benchmark world prices for iron ore, pellets and freight, and general inflation indices. As a result of this and other pricing constructs contained in our customer contracts and those anticipated in future periods, our financial results have increased sensitivity to changes in iron ore and steel prices.

*Our existing and future indebtedness may limit cash flow available to invest in the ongoing needs of our business, which could prevent us from fulfilling our obligations under our senior notes and ABL Facility.*

As of December 31, 2018, we had an aggregate principal amount of  $2,212.0 million of long-term debt, $400.0 million of which was secured (excluding $55.0 million of outstanding letters of credit and $16.4 million of capital leases), and  $823.2 million of cash on our balance sheet. As of December 31, 2018, no loans were drawn under the ABL Facility and we had total availability of $323.7 million as a result of borrowing base limitations. As of December 31, 2018, the principal amount of letters of credit obligations and other commitments totaled $55.0 million, thereby further reducing available borrowing capacity on our ABL Facility to $268.7 million.

Our existing level of indebtedness requires us to dedicate a portion of our cash flow from operations to the payment of debt service, reducing the availability of our cash flow to fund capital expenditures, acquisitions or strategic development initiatives, and other general corporate purposes. Moreover, our level of indebtedness could have further consequences, including, increasing our vulnerability to adverse economic or industry conditions, limiting our ability to obtain additional financing in the future to enable us to react to changes in our business, or placing us at a competitive disadvantage compared to businesses in our industry that have less indebtedness.

Our indebtedness could limit our ability to obtain additional financing on acceptable terms or at all for working capital, capital expenditures, acquisitions or strategic development initiatives, and general corporate purposes. Our liquidity needs could vary significantly and may be affected by general economic conditions, industry trends, performance and many other factors not within our control. If we are unable to generate sufficient cash flow from operations in the future to service our debt, we may be required to refinance all or a portion of our existing debt. Although we were successful in financing our HBI project, we may not be able to obtain any such new or additional debt on favorable terms or at all.

Any failure to comply with covenants in the instruments governing our debt could result in an event of default which, if not cured or waived, would have a material adverse effect on us.

22

***We may not be able to generate sufficient cash to service all of our debt, and may be forced to take other actions to satisfy our obligations under our debt, which may not be successful.***

Our ability to make scheduled payments on or to refinance our debt obligations depends on our ability to generate cash in the future and our financial condition and operating performance, which are subject to prevailing economic and competitive conditions and to certain financial, business and other factors beyond our control. We cannot assure you that we will maintain a level of cash flows from operating activities sufficient to permit us to pay the principal, premium, if any, and interest on our debt.

We also have significant capital requirements, including interest payments to service our debt. If we incur significant losses in future periods, we may be unable to continue as a going concern. If we are unable to continue as a going concern, we may consider, among other options, restructuring our debt; however, there can be no assurance that these options will be undertaken and, if so undertaken, whether these efforts will succeed.

If our cash flows and capital resources are insufficient to fund our debt service obligations, we may be forced to reduce or delay investments and capital expenditures, or to sell assets, seek additional capital, including additional secured or unsecured debt, or restructure or refinance our debt. Any refinancing of our debt could be at higher interest rates and may require us to comply with more onerous covenants, making it more difficult to obtain surety bonds, letters of credit or other financing, particularly during periods in which credit markets are weak; causing a change in our credit ratings; limiting our ability to compete with companies that are not as leveraged and that may be better positioned to withstand economic downturns; and limiting our flexibility in planning for, or reacting to, and increasing our vulnerability to, changes in our business, the industry in which we compete and general economic and market conditions. These measures may not be successful and may not permit us to meet our scheduled debt service obligations.

If our operating results and available cash are insufficient to meet our debt service obligations, we could face substantial liquidity problems and might be required to dispose of material assets or operations to meet our debt service and other obligations. We may not be able to consummate those dispositions or recover the carrying value of these assets or obtain the proceeds that we could realize from them, and these proceeds may not be adequate to meet any debt service obligations then due. Further, we may need to refinance all or a portion of our debt on or before maturity, and we may not be able to refinance any of our debt on commercially reasonable terms or at all. Furthermore, additional or new financial assurances may be demanded by our vendors or regulatory agencies that we may not be able to provide on commercially reasonable terms or at all.

Any of these examples potentially could have a material adverse impact on our results of operations, profitability, shareholders' equity and capital structure.

***A court or regulatory body could find that we are responsible, in whole or in part, for liabilities we transferred to third party purchasers.***

As part of our strategy to protect our core Mining and Pelletizing operations, we have sold or otherwise disposed of several non-core assets, such as our North American Coal assets. Some of the transactions under which we sold or otherwise disposed of our non-core assets included provisions transferring certain liabilities to the purchasers or acquirers of those non-core assets. While we believe that all such transfers were completed properly and are legally binding, if the purchaser fails to fulfill its obligations, we may be at risk that some court or regulatory body could disagree and determine that we remain responsible for liabilities we intended to and did transfer.

***Our ability to collect payments from our customers depends on their creditworthiness.***

Our ability to receive payment for products sold and delivered to our customers depends on the creditworthiness of our customers. Generally, we deliver our Mining and Pelletizing products to our customers' facilities in advance of payment for those products. Under this practice for most of our customers, title and risk of loss with respect to Mining and Pelletizing products does not pass to the customer until payment for the pellets is received; however, there is typically a period of time in which pellets, for which we have reserved title, are within our customers' control. Where we have identified credit risk with certain customers, we have put in place alternate payment terms from time to time.

23

Customers outside of the U.S. may be subject to pressures and uncertainties that may affect their ability to pay, including trade barriers, exchange controls, and local, economic and political conditions. Downturns in the economy and disruptions in the global financial markets have affected the creditworthiness of our customers from time to time. Some of our customers are highly leveraged. If economic conditions worsen or prolonged global, national or regional economic recession conditions return, it is likely to impact significantly the creditworthiness of our customers and could, in turn, increase the risk we bear on payment default for the credit we provide to our customers and could limit our ability to collect receivables. Failure to receive payment from our customers for products that we have delivered could affect adversely our results of operations, financial condition and liquidity.

***Our operating expenses could increase significantly if the price of electrical power, fuel or other energy sources increases.***

Our mining operations require significant use of energy. Energy expenses, which make up approximately 20% to 25% in the aggregate of our operating costs in our Mining and Pelletizing locations, are sensitive to changes in electricity prices and fuel prices, including diesel fuel and natural gas prices. Prices for electricity, natural gas and fuel oils can fluctuate widely with availability and demand levels from other users. During periods of peak usage, supplies of energy may be curtailed and we may not be able to purchase them at historical rates. A disruption in the transmission of energy, inadequate energy transmission infrastructure, or the termination of any of our energy supply contracts could interrupt our energy supply and affect adversely our operations. While we have some long-term contracts with electrical suppliers, we are exposed to fluctuations in energy costs that can affect our production costs. As an example, our mines in Minnesota are subject to changes in Minnesota Power's rates, such as periodic rate changes that are reviewed and approved by the state public utilities commission in response to an application filed by Minnesota Power. We also enter into market-based pricing supply contracts for natural gas and diesel fuel for use in our operations. Those contracts expose us to price increases in energy costs, which could cause our profitability to decrease significantly. In addition, U.S. public utilities may pass through additional capital and operating cost increases to their customers related to new or pending U.S. environmental regulations that may require significant capital investment and use of cleaner fuels in the future and which may impact U.S. coal-fired generation capacity.

***We are subject to a variety of financial market risks.***

Financial market risks include those caused by changes in the value of investments, changes in commodity prices, interest rates and foreign currency exchange rates. We have established policies and procedures to manage such risks; however, certain risks are beyond our control and our efforts to mitigate such risks may not be effective. These factors could have a material adverse effect on our results of operations.

***Changes in credit ratings issued by nationally recognized statistical rating organizations could adversely affect our cost of financing and the market price of our securities.***

Credit rating agencies could downgrade our ratings either due to factors specific to our business, a prolonged cyclical downturn in the mining or steel industry, or macroeconomic trends (such as global or regional recessions) and trends in credit and capital markets more generally. Any decline in our credit ratings may result in an increase to our cost of future financing and limit our access to the capital markets, which would harm our financial condition and results of operations, hinder our ability to refinance existing indebtedness on acceptable terms, have an adverse effect on the market price of our securities and may affect adversely the terms under which we purchase goods and services.

***Our actual operating results may differ significantly from our guidance.***

From time to time, we release guidance, including that set forth under "Management's Discussion and Analysis of Financial Condition and Results of Operations-Outlook" in our Annual Reports on Form 10-K and our Quarterly Reports on Form 10-Q, regarding our future performance. This guidance, which consists of forward-looking statements, is prepared by our management and is qualified by, and subject to, the assumptions and the other information included in our Annual Reports on Form 10-K and our Quarterly Reports on Form 10-Q. Our guidance is not prepared with a view toward compliance with published guidelines of the American Institute of Certified Public Accountants, and neither our independent registered public accounting firm nor any other independent or outside party compiles or examines the guidance and, accordingly, no such person expresses any opinion or any other form of assurance with respect thereto.

Guidance is based upon a number of assumptions and estimates that, while presented with numerical specificity, are inherently subject to business, economic and competitive uncertainties and contingencies, many of which are beyond our control and are based upon specific assumptions with respect to future business decisions, some of which will change. The principal reason that we release such data is to provide a basis for our management to discuss our business outlook with analysts and investors. We do not accept any responsibility for any projections or reports published by any such persons.

Guidance is necessarily speculative in nature, and it can be expected that some or all of the assumptions of the guidance furnished by us will not materialize or will vary significantly from actual results. Accordingly, our guidance is only an estimate of what management believes is realizable as of the date of release. Actual results will vary from the guidance. Investors should also recognize that the reliability of any forecasted financial data diminishes the further in the future that the data are forecast. In light of the foregoing, investors are urged to put the guidance in context and not to place undue reliance on it.

Any failure to successfully implement our operating strategy or the occurrence of any of the events or circumstances set forth in our Annual Reports on Form 10-K or our Quarterly Reports on Form 10-Q could result in actual operating results being different than the guidance, and such differences may be adverse and material.

***We rely on our joint venture partners to meet their payment obligations and we are subject to risks involving the acts or omissions of our joint venture partners.***

We co-own and manage one of our four operating Mining and Pelletizing mines with ArcelorMittal and U.S. Steel. We rely on our joint venture partners to make their required capital contributions and to pay for their share of the iron ore produced. One of our Mining and Pelletizing joint venture partners is also our customer. If one or both of our joint venture partners fail to perform their obligations, the remaining joint venture partners, including ourselves, may be required to assume additional material obligations, including significant capital contribution, costs of environmental remediation, pension and postretirement health and life insurance benefit obligations. For example, a premature closure of a mine due to the failure of a joint venture partner to perform its obligations could result in significant fixed mine-closure costs, including severance, employment legacy costs and other employment costs; reclamation and other environmental costs; and the costs of terminating long-term obligations, including energy and transportation contracts and equipment leases.

We cannot control the actions of our joint venture partners because we have a minority interest in such joint venture. Further, in spite of performing customary due diligence prior to entering into a joint venture, we cannot guarantee full disclosure of prior acts or omissions of the sellers or those with whom we may in the future enter into joint ventures. Such risks could have a material adverse effect on the business, results of operations or financial condition of our existing or future joint venture interests.

***Our assets as of December 31, 2018 include a deferred tax asset, the full value of which we may not be able to realize.***

We recognize deferred tax assets and liabilities based on differences between the financial statement carrying amounts and the tax basis of assets and liabilities. At December 31, 2018, the net deferred tax asset was approximately $464.8 million, primarily related to U.S. net operating loss carryforwards. We regularly review our deferred tax assets for recoverability based on our history of earnings, expectations for future earnings and expected timing of reversals of temporary differences. Realization of deferred tax assets ultimately depends on the existence of sufficient taxable income. We believe the recorded net deferred tax asset at December 31, 2018 is fully realizable based on our expected future earnings. However, our assumptions and estimates are inherently subject to business, economic and competitive uncertainties and contingencies, many of which are beyond our control and some of which may change. As a result, we could ultimately lose a portion of our deferred tax asset related to net operating loss carryforwards due to expiration, which could have a material adverse effect on our results of operations and cash flows.

***Holders of our common shares may not receive dividends on the common shares.***

Holders of our common shares are entitled to receive only such dividends as our Board of Directors may declare out of funds legally available for such payments. We are incorporated in Ohio and governed by the Ohio General Corporation Law, which allows a corporation to pay dividends, in general, in an amount that cannot exceed its surplus, as determined under Ohio law. Our ability to pay dividends will be subject to our future earnings, capital requirements and financial condition, as well as our compliance with covenants and financial ratios related to existing or future indebtedness, business prospects and other factors that our Board may deem relevant. Additionally, our ABL Facility contains, and agreements governing any of our future debt may contain, covenants and other restrictions that, in certain circumstances, could limit the level of dividends that we are able to pay on our common shares. Although we recently have declared cash dividends on our common shares, we are not required to declare cash dividends on our common shares and our Board of Directors may reduce, defer or eliminate our common share dividend in the future.

IV.    OPERATIONAL
        RISKS

***Mine closures entail substantial costs. If we prematurely close one or more of our mines, our results of operations and financial condition would likely be affected adversely.***

If we prematurely close any of our mines, our revenues would be reduced unless we were able to increase production at our other mines, which may not be possible. The closure of a mining operation involves significant fixed closure costs, including accelerated employment legacy costs, severance-related obligations, reclamation and other environmental costs, and the costs of terminating long-term obligations, including customer, energy and transportation contracts and equipment leases. We base our assumptions regarding the life of our mines on detailed studies we perform from time to time, but those studies and assumptions are subject to uncertainties and estimates that may not be accurate. We recognize the costs of reclaiming open pits, stockpiles, tailings ponds, roads and other mining support areas based on the estimated mining life of our property. If we were to significantly reduce the estimated life of any of our mines, the mine-closure costs would be applied to a shorter period of production, which would increase costs per ton produced and could significantly and adversely affect our results of operations and financial condition.

A mine permanent closure could accelerate and significantly increase employment legacy costs, including our expense and funding costs for pension and other postretirement benefit obligations. A number of employees would be eligible for immediate retirement under special eligibility rules that apply upon a mine closure. All employees eligible for immediate retirement under the pension plans at the time of the permanent mine closure also could be eligible for postretirement health and life insurance benefits, thereby accelerating our obligation to provide these benefits. Certain mine closures would precipitate a pension closure liability significantly greater than an ongoing operation liability and may trigger certain severance liability obligations.

***Our sales and competitive position depend on the ability to transport our products to our customers at competitive rates and in a timely manner.***

In our Mining and Pelletizing operations, disruption of the lake and rail transportation services because of weather-related problems, including ice and winter weather conditions on the Great Lakes or St. Lawrence Seaway, climate change, strikes, lock-outs, or other events and lack of alternative transportation options, could impair our ability to supply iron ore to our customers at competitive rates or in a timely manner and, thus, could adversely affect our sales, margins and profitability. Further, reduced dredging and environmental changes, particularly at Great Lakes ports, could impact negatively our ability to move our iron ore products because lower water levels restrict the tonnage that vessels can haul, resulting in higher freight rates.

***Natural disasters, weather conditions, disruption of energy, unanticipated geological conditions, equipment failures, and other unexpected events may lead our customers, our suppliers or our facilities to curtail production or shut down operations.***

Operating levels within the mining industry are subject to unexpected conditions and events that are beyond the industry's control. Those events could cause industry members or their suppliers to curtail production or shut down a portion or all of their operations, which could reduce the demand for our iron ore products, and could affect adversely our sales, margins and profitability.

Interruptions in production capabilities inevitably will increase our production costs and reduce our profitability. We do not have meaningful excess capacity for current production needs, and we are not able to quickly increase production or restart production at one mine to offset an interruption in production at another mine. Additionally, restart production costs can be even higher if required to be taken during extremely cold weather conditions.

A portion of our production costs are fixed regardless of current operating levels. As noted, our operating levels are subject to conditions beyond our control that can delay deliveries or increase the cost of mining at particular mines for varying lengths of time. These include weather conditions (for example, extreme winter weather, tornadoes, floods, and the lack of availability of process water due to drought) and natural and man-made disasters, tailings dam failures, pit wall failures, unanticipated geological conditions, including variations in the amount of rock and soil overlying the deposits of iron ore, variations in rock and other natural materials and variations in geologic conditions and ore processing changes.

The manufacturing processes that take place in our mining operations, as well as in our processing facilities, depend on critical pieces of equipment. This equipment may, on occasion, be out of service because of unanticipated failures. In addition, all of our mines and processing facilities have been in operation for several decades, and the equipment is aged. In the future, we may experience additional material plant shutdowns or periods of reduced production because of equipment failures. Further, remediation of any interruption in production capability may require us to make

large capital expenditures that could have a negative effect on our profitability and cash flows. Our business interruption insurance would not cover all of the lost revenues associated with equipment failures. Longer-term business disruptions could result in a loss of customers, which adversely could affect our future sales levels and, therefore, our profitability.

Regarding the impact of unexpected events happening to our suppliers, many of our mines are dependent on one source for electric power and for natural gas. A significant interruption in service from our energy suppliers due to terrorism or sabotage, weather conditions, natural disasters, or any other cause can result in substantial losses that may not be fully recoverable, either from our business interruption insurance or responsible third parties.

***We incur certain costs when production capacity is idled, including increased costs to resume production at idled facilities and costs to idle facilities.***

Our decisions concerning which mines to operate and at what capacity levels are made based upon our customers' orders for products, the quality of and cost to mine and process the remaining ore body, as well as the capabilities and cost performance of our mines. During depressed market conditions, we may concentrate production at certain mines and not operate others in response to customer demand and as a result we will incur idle facility costs. In 2016, two of our Minnesota mines were temporarily idled for a portion of the year, and we indefinitely idled the Empire mine in Michigan in August 2016.

When we restart idled facilities, we incur certain costs to replenish inventories, prepare the previously idled facilities for operation, perform the required repair and maintenance activities and prepare employees to return to work safely and to resume production responsibilities. The amount of any such costs can be material, depending on a variety of factors, such as the period of idle time, necessary repairs and available employees, and is difficult to project.

If faced with overcapacity in the iron ore market, we may seek to rationalize assets through asset sales, temporary shutdowns, indefinite idles or closures of facilities.

***We may not have adequate insurance coverage for some business risks.***

As noted above, our operations are generally subject to a number of hazards and risks, which could result in damage to, or destruction of, equipment, properties or facilities. The insurance that we maintain to address risks that are typical in our business may not provide adequate coverage. Insurance against some risks, such as liabilities for environmental pollution, tailings basin breaches, or certain hazards or interruption of certain business activities, may not be available at an economically reasonable cost, or at all. Even if available, we may self-insure where we determine it is most cost-effective to do so. As a result, accidents or other negative developments involving our mining, production or transportation activities could have a material adverse effect on our operations.

***A disruption in, or failure of our information technology systems, including those related to cybersecurity, could adversely affect our business operations and financial performance.***

We rely on the accuracy, capacity and security of our information technology ("IT") systems for the operations of many of our business processes and to comply with regulatory, legal, and tax requirements. While we maintain some of our critical information technology systems, we are also dependent on third parties to provide important IT services relating to, among other things, operational technology at our facilities, human resources, electronic communications and certain finance functions. Despite the security measures that we have implemented, including those related to cybersecurity, our systems could be breached or damaged by computer viruses, natural or man-made incidents or disasters or unauthorized physical or electronic access. Though we have controls in place, we cannot provide assurance that a cyber-attack will not occur. Furthermore, we may have little or no oversight with respect to security measures employed by third-party service providers, which may ultimately prove to be ineffective at countering threats. Failures of our IT systems, whether caused maliciously or inadvertently, may result in the disruption of our business processes, or in the unauthorized release of sensitive, confidential or otherwise protected information or result in the corruption of data, which could adversely affect our business operations and financial performance. In addition, we may be required to incur significant costs to protect against and, if required, remediate the damage caused by such disruptions or system failures in the future.

***Our profitability could be affected adversely by the failure of outside contractors and/or suppliers to perform.***

We rely on outside companies to provide key services, including the design and construction of our HBI facility in Toledo, Ohio. Additionally, we use contractors to help complete certain capital projects, such as upgrades to our existing Mining and Pelletizing facilities. A contractor's or supplier's failure to perform could affect adversely our production, sales, and our ability to fulfill customer requirements. Such failure to perform in a significant way would result in additional costs for us, which also could affect adversely our production rates, sales and results of operations.

27

### V.    DEVELOPMENT    AND    SUSTAINABILITY RISKS

***The cost and time to implement a strategic capital project may prove to be greater than originally anticipated.***

We undertake strategic capital projects, such as the HBI project, in order to enhance, expand or upgrade our mines and production capabilities or diversify our customer base. Our ability to achieve the anticipated production volumes, revenues or otherwise realize acceptable returns on strategic capital projects that we may undertake is subject to a number of risks, many of which are beyond our control, including a variety of market (such as a volatile pricing environment for iron ore), operational, permitting and labor-related factors. Further, the cost to implement any given strategic capital project ultimately may prove to be greater and may take more time than originally anticipated. Inability to achieve the anticipated results from the implementation of our strategic capital projects, the incurring of unanticipated implementation costs or penalties or the inability to meet contractual obligations could affect adversely our results of operations and future earnings and cash flow generation.

***We continually must replace reserves depleted by production. Exploration activities may not result in additional discoveries.***

Our ability to replenish our ore reserves is important to our long-term viability. Depleted ore reserves must be replaced by further delineation of existing ore bodies or by locating new deposits in order to maintain production levels over the long term. For example, in 2017 we made investments in our Tilden and Empire mines and in land in Minnesota to provide future potential ore reserves. Based on the economic reserve analysis performed during 2018, we revised the mine plan for Northshore to add ore reserves and extend mine life. Resource exploration and development are highly speculative in nature. Exploration projects involve many risks, require substantial expenditures and may not result in the discovery of sufficient additional mineral deposits that can be mined profitably. Once a site with mineralization is discovered, it may take several years from the initial phases of drilling until production is possible, during which time the economic feasibility of production may change. Substantial expenditures are required to establish recoverable proven and probable reserves and to construct mining and processing facilities. As a result, there is no assurance that current or future exploration programs will be successful and there is a risk that depletion of reserves will not be offset by discoveries or acquisitions.

***We rely on estimates of our recoverable reserves, which is complex due to geological characteristics of the properties and the number of assumptions made.***

We regularly evaluate our iron ore reserves based on revenues and costs and update them as required in accordance with SEC Industry Guide 7 and will update, to the extent we are not already compliant, to comply with the SEC's Final Rule 13-10570, Modernization of Property Disclosures for Mining Registrants, which rescinds Industry Guide 7. Estimates of reserves and future net cash flows necessarily depend upon a number of variable factors and assumptions, some of which are beyond our control, such as production capacity, effects of regulations by governmental agencies, future prices for iron ore, future industry conditions and operating costs, severance and excise taxes, development costs and costs of extraction and reclamation, all of which may vary considerably from actual results. Estimating the quantity and grade of reserves requires us to determine the size, shape and depth of our mineral bodies by analyzing geological data, such as samplings of drill holes. In addition to the geology assumptions regarding our mines, assumptions are also required to determine the economic feasibility of mining these reserves, including estimates of future commodity prices and demand, the mining methods we use, and the related costs incurred to develop and mine our reserves. For these reasons, estimates of the economically recoverable quantities of mineralized deposits attributable to any particular group of properties, classifications of such reserves based on risk of recovery and estimates of future net cash flows prepared by different engineers or by the same engineers at different times may vary substantially as the criteria change. Estimated ore reserves could be affected by future industry conditions, future changes in the SEC's mining property disclosure requirements, geological conditions and ongoing mine planning. Actual volume and grade of reserves recovered, production rates, revenues and expenditures with respect to our reserves will likely vary from estimates, and if such variances are material, our sales and profitability could be affected adversely.

***Defects in title or loss of any leasehold interests in our properties could limit our ability to mine these properties or result in significant unanticipated costs.***

A portion of our mining operations are conducted on properties we lease, license or as to which we have easements or other possessory interests, which we refer to as "leased properties." Consistent with industry practice, title to most of these leased properties and mineral rights are not usually verified until we make a commitment to develop a property, which may not occur until after we have obtained necessary permits and completed exploration of the leased property. In some cases, title with respect to leased properties is not verified at all because we instead rely on title information or representations and warranties provided by lessors or grantors. We do not maintain title insurance on our owned or leased mining properties. A title defect or the loss of any lease, license or easement for any leased mining property

Table of Contents

could affect adversely our ability to mine any associated reserves. In addition, from time to time the rights of third parties for competing uses of adjacent, overlying, or underlying lands such as for roads, easements and public facilities may affect our ability to operate as planned if our title is not superior or arrangements cannot be negotiated.

Any challenge to our title could delay the exploration and development of some reserves, deposits or surface rights, cause us to incur unanticipated costs and could ultimately result in the loss of some or all of our interest in those reserves or surface rights. In the event we lose reserves, deposits or surface rights, we may have to shut down or significantly alter the sequence of our mining operations, which may affect adversely our future production, revenues and cash flows. Additionally, if we lose any leasehold interests relating to any of our pellet plants or loadout facilities, we may need to find an alternative location to process our iron ore and load it for delivery to customers, which could result in significant unanticipated costs. Finally, we could incur significant liability if we inadvertently mine on property we do not own or lease.

***In order to continue to foster growth in our business and maintain stability of our earnings, we must maintain our social license to operate with our stakeholders.***

As a mining company, maintaining a strong reputation and consistent operational and safety history is vital in order to continue to foster growth and maintain stability in our earnings. As sustainability expectations increase and regulatory requirements continue to evolve, maintaining our social license to operate becomes increasingly important. We incorporate social license expectations in our ERM program. Our ability to maintain our reputation and strong operating history could be threatened, including by circumstances outside of our control, such as disasters caused or suffered by other mining companies. If we are not able to respond effectively to these and other challenges to our social license to operate, our reputation could be damaged significantly. Damage to our reputation could affect adversely our operations and ability to foster growth in our company.

***Estimates and timelines relating to new development projects are uncertain and we may incur higher costs and lower economic returns than estimated.***

Mining industry development projects typically require a number of years and significant expenditures before production is possible. Such projects could experience unexpected problems and delays during development, construction and start-up.

Our decision to develop a project typically is based on the results of feasibility studies, which estimate the anticipated economic returns of a project. The actual project profitability or economic feasibility may differ from such estimates as a result of any of the following factors, among others: changes in tonnage, grades and metallurgical characteristics of ore or other raw materials to be mined and processed; estimated future prices of the relevant product; changes in customer demand; higher construction and infrastructure costs; the quality of the data on which engineering assumptions were made; higher production costs; adverse geotechnical conditions; availability of adequate labor force; availability and cost of water and energy; availability and cost of transportation; fluctuations in inflation and currency exchange rates; availability and terms of financing; delays in obtaining environmental or other government permits or changes in laws and regulations including environmental laws and regulations; weather or severe climate impacts; and potential delays relating to social and community issues.

29

Table of Contents

***Our HBI project will require the commitment of substantial resources. Any unanticipated costs or delays associated with our HBI project could have a material adverse effect on our financial condition or results of operations.***

Our ongoing efforts with respect to our HBI project require the commitment of substantial capital expenditures. We currently expect to incur capital expenditures through 2020 on the HBI project of approximately $830 million on the development of the HBI production plant in Toledo, Ohio, of which $180 million has already been incurred, and $90 million for upgrades at the Northshore plant to enable it to produce significantly increased levels of DR-grade pellets that could be used as feedstock for the HBI production plant and/or sold commercially. Each of these estimates are exclusive of construction-related contingencies and capitalized interest. Our estimated expenses may increase as personnel and equipment associated with advancing development and commercial production are added. The progress of our HBI project and the amounts and timing of expenditures will depend in part on the following:

- receiving and maintaining required federal, state and local permits;

- completing infrastructure and construction work and the completion of commissioning and integration of all of the systems comprising our HBI production plant;

- negotiating sales contracts for our planned production; and

- other factors, many of which are beyond our control.

Most of these activities require significant lead times and must be advanced concurrently.

Any unanticipated costs or delays associated with our HBI project could have a material adverse effect on our financial condition or results of operations and could require us to seek additional capital, which may not be available on commercially acceptable terms or at all.

***Our ability to realize the benefits of any potential acquisitions is uncertain.***

Should we determine to pursue any acquisitions, the success of the same is subject to risks and uncertainties, including our ability to realize operating efficiencies expected from an acquisition; the size or quality of the mineral potential; delays in realizing the benefits of an acquisition; difficulties in retaining key employees, customers or suppliers of the acquired business; the risks associated with the assumption of contingent or undisclosed liabilities of acquisition targets; the impact of changes to our allocation of purchase price; and the ability to generate future cash flows or the availability of financing.

Moreover, any acquisition opportunities we pursue could affect materially our liquidity and capital resources and may require us to incur indebtedness, seek equity capital or both. Future acquisitions could also result in us assuming more long-term liabilities relative to the value of the acquired assets than we may have assumed in previous acquisitions.

## VI.  HUMAN CAPITAL RISKS

***Our profitability could be affected adversely if we fail to maintain satisfactory labor relations.***

Production in our mines is dependent upon the efforts of our employees. We are party to labor agreements with various labor unions that represent employees at our operations. Such labor agreements are negotiated periodically, and, therefore, we are subject to the risk that these agreements may not be able to be renewed on reasonably satisfactory terms. It is difficult to predict what issues may arise as part of the collective bargaining process, and whether negotiations concerning these issues will be successful. Due to union activities or other employee actions, we could experience labor disputes, work stoppages, or other disruptions in our production of iron ore that could affect us adversely. The USW represents all labor employees at our Mining and Pelletizing operations owned and/or managed by Cliffs or its subsidiary companies except for Northshore. Our labor agreements with the USW at four of our Mining and Pelletizing operations were ratified in October 2018 and extended for a four-year term, effective as of October 1, 2018.

If we enter into a new labor agreement with any union that significantly increases our labor costs relative to our competitors or fail to come to an agreement upon expiry, our ability to compete may be materially and adversely affected.

***We may encounter labor shortages for critical operational positions, which could affect adversely our ability to produce our products.***

We are predicting a long-term shortage of skilled workers for the mining industry and competition for the available workers limits our ability to attract and retain employees as well as engage third-party contractors. As our experienced employees retire, we may have difficulty replacing them at competitive wages.

30

***Our expenditures for post-retirement benefit and pension obligations could be materially higher than we have predicted if our underlying assumptions differ from actual outcomes, there are mine closures, or our joint venture partners fail to perform their obligations that relate to employee pension plans.***

We provide defined benefit pension plans and OPEB to certain eligible union and non-union employees, including our share of expense and funding obligations with respect to our unconsolidated joint venture. Our pension and OPEB expenses and our required contributions to our pension and OPEB plans are affected directly by the value of plan assets, the projected and actual rate of return on plan assets, and the actuarial assumptions we use to measure our defined benefit pension plan obligations, including the rate at which future obligations are discounted.

We cannot predict whether changing market or economic conditions, regulatory changes or other factors will increase our pension and OPEB expenses or our funding obligations, diverting funds we would otherwise apply to other uses.

We have calculated our unfunded pension and OPEB obligations based on a number of assumptions, including our joint venture partners satisfying their funding obligations. If our assumptions do not materialize as expected, cash expenditures and costs that we incur could be materially higher. Moreover, we cannot be certain that regulatory changes will not increase our obligations to provide these or additional benefits. These obligations also may increase substantially in the event of adverse medical cost trends or unexpected rates of early retirement, particularly for bargaining unit retirees.

***We depend on our senior management team and other key employees, and the loss of these employees could adversely affect our business.***

Our success depends in part on our ability to attract and motivate our senior management and key employees. Achieving this objective may be difficult due to a variety of factors, including fluctuations in the global economic and industry conditions, competitors' hiring practices, cost reduction activities, and the effectiveness of our compensation programs. Competition for qualified personnel can be intense. We must continue to recruit, retain, and motivate our senior management and key personnel in order to maintain our business and support our projects. A loss of senior management and key personnel could prevent us from capitalizing on business opportunities, and our operating results could be adversely affected.

**Item 1B.**        ***Unresolved Staff Comments***

We have no unresolved comments from the SEC.

31

Table of Contents

**Item 2.** *Properties*

The following map shows the locations of our operations and offices as of  December 31, 2018:



**General Information about the Mines**

All of our iron ore mining operations are open-pit mines. Additional pit development is underway as required by long-range mine plans. Drilling programs are conducted periodically to collect modeling data and for refining ongoing operations.

Geologic models are developed for all mines to define the major ore and waste rock types. Computerized block models for iron ore are constructed that include all relevant geologic and metallurgical data. These are used to generate grade and tonnage estimates, followed by detailed mine design and life of mine operating schedules.

*Mining and Pelletizing*

The following map shows the locations of our Mining and Pelletizing segment operations:



We currently own or co-own four operating iron ore mines in Michigan and Minnesota, as well as one indefinitely idled mine in Michigan. We produced 20.3 million, 18.8 million and 16.0 million long tons of iron ore pellets in 2018, 2017 and 2016, respectively, at those mines for our account. We produced 6.0 million, 6.7 million and 7.4 million long tons, respectively, on behalf of current and previous steel company partners of the mines.

32

A005521

Table of Contents

Our Mining and Pelletizing segment mines produce from deposits located within the Biwabik and Negaunee Iron Formation, which are classified as Lake Superior type iron formations that formed under similar sedimentary conditions in shallow marine basins approximately two billion years ago. Magnetite and hematite are the predominant iron oxide ore minerals present, with lesser amounts of goethite and limonite. Quartz is the predominant waste mineral present, with lesser amounts of other chiefly iron bearing silicate and carbonate minerals. The ore minerals liberate from the waste minerals upon fine grinding.

| Mine | Cliffs Ownership | Infrastructure | Mineralization | Operating Since | Current Annual Capacity[1,2] | 2018 Production[1,2] | Mineral Owned | Rights Leased |
|---|---|---|---|---|---|---|---|---|
| Empire[3,4] | 100% | Mine, Concentrator, Pelletizer | Magnetite | 1963 | * | — | 53% | 47% |
| Tilden[4] | 100% | Mine, Concentrator, Pelletizer, Railroad | Hematite & Magnetite | 1974 | 8.0 | 7.7 | 100% | —% |
| Northshore | 100% | Mine, Concentrator, Pelletizer, Railroad | Magnetite | 1990 | 6.0 | 5.6 | —% | 100% |
| United Taconite | 100% | Mine, Concentrator, Pelletizer | Magnetite | 1965 | 5.4 | 5.2 | —% | 100% |
| Hibbing | 23% | Mine, Concentrator, Pelletizer | Magnetite | 1976 | 8.0 | 7.8 | 3% | 97% |

[1] Reported on a wet basis in millions of long tons, equivalent to 2,240 pounds.

[2] Figures reported on 100% basis.

[3] Empire was indefinitely idled beginning August 2016.

[4] During 2017, our ownership interest in Tilden and Empire increased to 100%.

* Historically, Empire had an annual capacity of 5.5 million long tons; currently indefinitely idled.

*Empire Mine*

The Empire mine is located on the Marquette Iron Range in Michigan's Upper Peninsula approximately 15 miles southwest of Marquette, Michigan. The Empire mine has had no production since the indefinite idle began in August 2016, compared to historically having an annual capacity of 5.5 million long tons of iron ore pellets.

During 2017, our ownership interest in Empire increased to 100% as we reached an agreement to distribute the noncontrolling interest net assets to ArcelorMittal, in exchange for its interest in Empire. Prior to the indefinite idle, operations consisted of an open pit truck and shovel mine, a concentrator that utilizes single stage crushing, AG mills, magnetic separation and floatation to produce a magnetite concentrate that was then supplied to the on-site pellet plant. From the site, pellets were transported by CN rail to a ship loading port at Escanaba, Michigan, operated by CN.

*Tilden Mine*

The Tilden mine is located on the Marquette Iron Range in Michigan's Upper Peninsula approximately five miles south of Ishpeming, Michigan. Over the past five years, the Tilden mine has produced between 7.6 million and 7.7 million long tons of iron ore pellets annually. During 2017, we acquired the remaining 15% equity interest in Tilden owned by U.S. Steel. With the closing of this transaction, we now have 100% ownership of the mine. We own all of the ore reserves at the Tilden mine. Operations consist of an open pit truck and shovel mine, a concentrator that utilizes single stage crushing, AG mills, magnetite separation and floatation to produce hematite and magnetite concentrates that are then supplied to the on-site pellet plant. From the site, pellets are transported by our LS&I rail to a ship loading port at Marquette, Michigan, operated by LS&I.

33

Table of Contents

*Northshore Mine*

The Northshore mine is located in northeastern Minnesota, approximately two miles south of Babbitt, Minnesota, on the northeastern end of the Mesabi Iron Range. Northshore's processing facilities are located in Silver Bay, Minnesota, near Lake Superior. Over the past five years, the Northshore mine has produced between 3.2 million and 5.6 million long tons of iron ore pellets annually. The Northshore mine was idled from January through May 2016. The temporary idle was a result of historic levels of steel imports into the U.S. and reduced demand from our steel-producing customers. In 2018, we began our low silica capital upgrade to produce DR-grade pellets on a commercial scale while maintaining overall production capacity of the Northshore processing facility. We expect to complete the project in 2019. Once complete, we will be able to produce 3.5 million long tons of DR-grade pellets. Throughout 2018 and 2017 the Northshore mine was substantially at full production levels.

The Northshore mine began production under our management and ownership in October 1994. We own 100% of the mine. Mining is conducted on multiple mineral leases having varying expiration dates. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates. Northshore operations consist of an open pit truck and shovel mine where two stages of crushing occur before the ore is transported along a wholly owned 47-mile rail line to the plant site in Silver Bay. At the plant site, two additional stages of crushing occur before the ore is sent to the concentrator. The concentrator utilizes rod mills and magnetic separation to produce a magnetite concentrate, which is delivered to the pellet plant located on-site. The plant site has its own ship loading port located on Lake Superior.

*United Taconite Mine*

The United Taconite mine is located on Minnesota's Mesabi Iron Range in and around the city of Eveleth, Minnesota. The United Taconite concentrator and pelletizing facilities are located ten miles south of the mine, near the town of Forbes, Minnesota. Over the past five years, the United Taconite mine has produced between 1.5 million and 5.2 million long tons of iron ore pellets annually. The United Taconite mine was temporarily idled from January through August 2016. The temporary idle was a result of historic levels of steel imports into the U.S. and reduced demand from our steel-producing customers. Throughout 2018 and 2017 the United Taconite mine was substantially at full production levels.

We own 100% of the United Taconite mine. Mining is conducted on multiple mineral leases having varying expiration dates. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates. United Taconite operations consist of an open pit truck and shovel mine where two stages of crushing occur before the ore is transported by rail, operated by CN, to the plant site. At the plant site an additional stage of crushing occurs before the ore is sent to the concentrator. The concentrator utilizes rod mills and magnetic separation to produce a magnetite concentrate, which is delivered to the pellet plant. From the site, pellets are transported by CN rail to a ship loading port at Duluth, Minnesota, operated by CN.

*Hibbing Mine*

The Hibbing mine is located in the center of Minnesota's Mesabi Iron Range and is approximately ten miles north of Hibbing, Minnesota, and five miles west of Chisholm, Minnesota. We are the manager of the Hibbing mine and rely on our joint venture partners to make their required capital contributions and to pay for their share of the iron ore pellets that we produce. In 2018, we tendered our resignation as the mine manager of the Hibbing mine and plan to transition this role to the majority owner in August 2019. Over the past five years, the Hibbing mine has produced between 7.7 million and 8.2 million long tons of iron ore pellets annually. We own 23% of Hibbing, a subsidiary of ArcelorMittal has a 62.3% interest and a subsidiary of U.S. Steel has a 14.7% interest. Each partner takes its share of production pro rata; however, provisions in the joint venture agreement allow additional or reduced production to be delivered under certain circumstances. Mining is conducted on multiple mineral leases having varying expiration dates. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates. Hibbing operations consist of an open pit truck and shovel mine, a concentrator that utilizes single stage crushing, AG mills and magnetic separation to produce a magnetite concentrate, which is then delivered to an on-site pellet plant. From the site, pellets are transported by BNSF rail to a ship loading port at Superior, Wisconsin, operated by BNSF.

34

A005523

Table of Contents

*Asia Pacific Iron Ore*

In January 2018, we announced that we would accelerate the time frame for the planned closure of our Asia Pacific Iron Ore mining operations in Australia. In April 2018, we committed to a course of action leading to the permanent closure of our Asia Pacific Iron Ore mining operations and, as planned, completed our final shipment in June 2018. Factors considered in this decision included increasingly discounted prices for lower-iron-content ore and the quality of the remaining iron ore reserves.

During 2018, we sold all of the assets of our Asia Pacific Iron Ore business through a series of sales to third parties. As a result of our planned exit, management determined that our Asia Pacific Iron Ore operating segment met the criteria to be classified as held for sale and a discontinued operation under *ASC Topic 205, Presentation of Financial Statements* . As such, all current and historical Asia Pacific Iron Ore operating segment results are classified within discontinued operations.

Over the past five years, the Koolyanobbing operation produced between 2.7 million and 11.8 million metric tons of iron ore products annually. Ore material was sourced from various separate open pit mines and was delivered by typical production trucks or road trains to a crushing and screening facility located at Koolyanobbing. All of the ore from the Koolyanobbing operations was transported by rail to the Port of Esperance, 360 miles to the south, for shipment to Asian customers.

Refer to NOTE 13 - DISCONTINUED OPERATIONS for further discussion of the Asia Pacific Iron Ore segment.

**General Information about our HBI Production Plant**

The brownfield site selected for our HBI production plant is near the Port of Toledo, in northwestern Ohio, approximately 120 miles from our corporate headquarters in Cleveland, Ohio. We are leasing the property on which the plant is being constructed. Our Toledo plant is expected to produce HBI, a specialized high quality iron alternative to scrap and pig iron, at a rate of 1.9 million metric tons per year when brought to production. Our Toledo site is located in close proximity to future EAF customers in the Great Lakes region. In addition, the Toledo site is near an existing dock, has rail access and heavy haul roads for construction and operation logistics.

**Mineral Policy**

We have a corporate policy prescribing internal controls and procedures with respect to auditing and estimating of minerals. The procedures contained in the policy include the calculation of mineral estimates at each property by our engineers, geologists and accountants, as well as third-party consultants. Management compiles and reviews the calculations, and once finalized, such information is used to prepare the disclosures for our annual and quarterly reports. The disclosures are reviewed and approved by management, including our chief executive officer and chief financial officer. Additionally, the long-range mine planning and mineral estimates are reviewed annually by our Audit Committee. Furthermore, all changes to mineral estimates, other than those due to production, are adequately documented and submitted to senior operations officers for review and approval. Finally, periodic reviews of long-range mine plans and mineral reserve estimates are conducted at mine staff meetings, senior management meetings and by independent experts.

**Mineral Reserves**

Reserves are defined by SEC Industry Standard Guide 7 as that part of a mineral deposit that could be economically and legally extracted and produced at the time of the reserve determination. All reserves are classified as proven or probable and are supported by life-of-mine plans.

Reserve estimates are based on pricing that does not exceed the three-year trailing average index price of iron ore adjusted to our realized price. We evaluate and analyze mineral reserve estimates in accordance with our mineral policy and SEC requirements. The table below identifies the year in which the latest reserve estimate was completed.

35

**Mining and Pelletizing**

| Property | Date of Latest Economic Reserve Analysis |
|---|---|
| Tilden | 2015 |
| Northshore | 2018 |
| United Taconite | 2016 |
| Hibbing | 2015 |

Ore reserve estimates for our iron ore mines as of  December 31, 2018 were estimated from fully designed open pits developed using three-dimensional modeling techniques. These fully designed pits incorporate design slopes, practical mining shapes and access ramps to assure the accuracy of our reserve estimates. All operations' reserves have been adjusted net of production through 2018.

All tonnages reported for our Mining and Pelletizing operating segment are in long tons of 2,240 pounds and are reported on a 100% basis.

**Mining and Pelletizing Mineral Reserves**
**as of December 31, 2018**
**(In Millions of Long Tons)**

| Property | Cliffs Share | Proven | | Probable | | Proven & Probable | | Saleable Product[2,3] | | Previous Year | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Tonnage | % Grade | Tonnage | % Grade | Tonnage | % Grade[5] | Process Recovery[4] | Tonnage | Proven & Probable Crude Ore | Saleable Product |
| Tilden[1] | 100% | 241.7 | 34.6 | 82.7 | 33.9 | 324.4 | 34.4 | 38% | 122.1 | 346.3 | 129.2 |
| Northshore | 100% | 299.5 | 25.3 | 535.6 | 23.7 | 835.1 | 24.3 | 32% | 270.1 | 793.2 | 255.9 |
| United Taconite | 100% | 398.9 | 22.5 | 415.5 | 21.9 | 814.4 | 22.2 | 32% | 259.5 | 829.1 | 264.6 |
| Hibbing | 23% | 125.1 | 19.7 | 24.7 | 19.6 | 149.8 | 19.7 | 27% | 39.7 | 178.7 | 47.2 |
| **Totals** | | **1,065.2** | | **1,058.5** | | **2,123.7** | | | **691.4** | **2,147.3** | **696.9** |

[1] Tilden hematite reported grade is percent FeT; all other properties are percent magnetic iron.

[2] Saleable product is a standard pellet containing 60% to 66% Fe calculated from both proven and probable mineral reserves.

[3] Saleable product is reported on a dry basis; shipped products typically contain 1% to 4% moisture.

[4] Process recovery includes all factors for converting crude ore tonnage to saleable product.

[5] Cutoff grades are 15% magnetic iron for Hibbing, 17% for United Taconite, 19% for Northshore and 20% for Tilden. Cutoff for Tilden hematite is 25% FeT.

Item 3.        *Legal Proceedings*

*Bluestone Litigation*. On April 7, 2017, the Company was served with an Amended Complaint adding Cliffs, among others, as a defendant to a lawsuit brought by Bluestone Coal Corporation and Double-Bonus Mining Company against Pinnacle Mining Company, LLC and Target Drilling, Inc. in the U.S. District Court for the Southern District of West Virginia.  The Amended Complaint alleges that the defendants deviated from plans authorized by plaintiffs and MSHA in the drilling of a borehole in 2013 and 2014 at the Pinnacle mine and through an inactive portion of plaintiffs' mine. Plaintiffs further allege negligence and trespass in the drilling of the borehole and claim compensatory and punitive damages due to flooding. On October 3, 2018, the parties reached a settlement in full. We do not believe that our portion of the agreed-upon amount will have a material adverse impact on our business. The Court entered an order dismissing the case with prejudice subject to reopening on good cause shown within 90 days. However, on October 14, 2018, Mission Coal Company, LLC and ten of its affiliates, including Pinnacle Mining Company, LLC, filed a petition in the U.S. Bankruptcy Court for the Northern District of Alabama for relief under Chapter 11 of Title 11 of the U.S. Bankruptcy Code. We are reviewing this bankruptcy petition but do not believe it will have a material adverse effect on our settlement. In light of the Mission Coal bankruptcy, the Court granted plaintiffs' motion to extend the deadline for potentially reopening the Bluestone case on good cause shown for an additional 120 days.

Table of Contents

*CCAA Proceedings.* Refer to NOTE 13 - DISCONTINUED OPERATIONS for a description of the CCAA proceedings with respect to the Bloom Lake Group and the Wabush Group. Such description is incorporated by reference into this Item 3.

*Mesabi Metallics Adversary Proceeding.* On September 7, 2017, Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) ("Mesabi Metallics") filed a complaint against Cleveland-Cliffs Inc. in the *Essar Steel Minnesota LLC and ESML Holdings Inc.* bankruptcy proceeding that is pending in the United States Bankruptcy Court, District of Delaware. Mesabi Metallics alleges tortious interference with its contractual rights and business relations involving certain vendors, suppliers and contractors, violations of federal and Minnesota antitrust laws through monopolization, attempted monopolization and restraint of trade, violation of the automatic stay, and civil conspiracy with unnamed Doe defendants. Mesabi Metallics amended its complaint to add additional defendants, including, among others, our subsidiary, Cleveland-Cliffs Minnesota Land Development Company LLC ("Cliffs Minnesota Land"), and to add additional claims, including avoidance and recovery of unauthorized post-petition transfers of real estate interests, claims disallowance, civil contempt and declaratory relief. Mesabi Metallics seeks, among other things, unspecified damages and injunctive relief. Cliffs and Cliffs Minnesota Land filed counterclaims against Mesabi Metallics, Chippewa Capital Partners ("Chippewa"), and Thomas M. Clarke ("Clarke") for tortious interference and civil conspiracy, as well as additional claims against Chippewa and Clarke for aiding and abetting tortious interference, for which we seek, among other things, damages and injunctive relief. Our counterclaim against Clarke for libel was dismissed on jurisdictional grounds. The parties filed various dispositive motions on certain of the claims, including a motion for partial summary judgment to settle a dispute over real estate transactions between Cliffs Minnesota Land and Glacier Park Iron Ore Properties LLC ("GPIOP"). A ruling in favor of Cliffs, Cliffs Minnesota Land and GPIOP was issued on July 23, 2018, finding that Mesabi's leases had terminated and upholding Cliffs' and Cliffs Minnesota Land's purchase and lease of the contested real estate interests. Mesabi Metallics filed a Motion for Leave to File an Interlocutory Appeal, which is fully briefed. The parties have filed additional motions for partial summary judgment and motions to dismiss with respect to other pending claims and counterclaims. We believe the claims asserted against us are unmeritorious and intend to continue to vigorously defend any remaining claims in the lawsuit.

*Seneca Coal Resources Litigation.* We are a plaintiff in a lawsuit we filed against Seneca Coal Resources, LLC and others on December 20, 2016, alleging, among other things, breach of the Unit Purchase Agreement ("UPA") dated December 22, 2015, wherein Seneca purchased certain of our coal properties. That dispute, which we amended to include claims of fraudulent transfers and violations of the Racketeer Influenced and Corrupt Organizations provisions of the Organized Crime Control Act of 1970 against individual defendants, including Clarke, is currently being litigated in Delaware Superior Court. On July 2, 2018, Seneca filed suit against us, a subsidiary of ours, and certain of our employees, in the Delaware Chancery Court, alleging that we failed to disclose certain liabilities in connection with the UPA and seeking monetary damages or, alternatively, reformation of the UPA. The lawsuit filed in Chancery Court asserts identical claims to those that Seneca filed as counterclaims in Delaware Superior Court on the same day, and the two cases will proceed as one consolidated matter in the Superior Court. We have filed motions to dismiss certain claims against us and to dismiss all claims against our employees individually. We believe the claims Seneca has asserted are unmeritorious and intend to vigorously pursue this lawsuit and defend against the related counterclaims. On October 14, 2018, Mission Coal Company, LLC and ten of its affiliates, including Seneca and certain of our former coal properties, filed a petition in the U.S. Bankruptcy Court for the Northern District of Alabama for relief under Chapter 11 of Title 11 of the U.S. Bankruptcy Code. On December 4, 2018, the Court entered an order staying all proceedings in this litigation due to Mission Coal Company's bankruptcy filing.

*Taconite MACT Compliance Review.* EPA Region 5 issued Notices of Violation during the first quarter of 2014 to Empire, Tilden and United Taconite related to alleged historical violations of the Taconite MACT rule and certain elements of their respective state-issued Title V operating permits dating back to 2010. EPA proposed, and we agreed to, a tolling agreement which targeted a completion of the enforcement action by March of 2019. Based on current information, we anticipate the final settlement for alleged exceedances at United Taconite to be resolved by consent decree with a civil cash penalty of less than $0.1 million and a supplemental environmental project. We anticipate the final settlement for alleged exceedances at Tilden and Empire to be resolved by consent decree with a total penalty of no more than $0.2 million and $0.1 million, respectively, to be comprised of a combination of cash penalty and a potential supplemental environmental project. This enforcement matter is not anticipated currently to have a material adverse impact on our business.

Table of Contents

**Item 4.**  *Mine Safety Disclosures*

We are committed to protecting the occupational health and well-being of each of our employees. Safety is one of our core values, and we strive to ensure that safe production is the first priority for all employees. Our internal objective is to achieve zero injuries and incidents across the Company by focusing on proactively identifying needed prevention activities, establishing standards and evaluating performance to mitigate any potential loss to people, equipment, production and the environment. We have implemented intensive employee training that is geared toward maintaining a high level of awareness and knowledge of safety and health issues in the work environment through the development and coordination of requisite information, skills and attitudes. We believe that through these policies, we have developed an effective safety management system.

Under the Dodd-Frank Act, each operator of a coal or other mine is required to include certain mine safety results within its periodic reports filed with the SEC. As required by the reporting requirements included in §1503(a) of the Dodd-Frank Act and Item 104 of Regulation S-K, the required mine safety results regarding certain mining safety and health matters for each of our mine locations that are covered under the scope of the Dodd-Frank Act are included in Exhibit 95 of *Item 15. Exhibits and Financial Statement Schedules* of this Annual Report on Form 10-K.

38

Table of Contents

**PART II**

Item 5.        *Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities*

**Stock Exchange Information**

Our common shares (ticker symbol CLF) are listed on the NYSE.

**Holders**

At February 5, 2019, we had  1,153 shareholders of record.

**Dividends**

On October 18, 2018, the Board of Directors declared a quarterly cash dividend on our common shares of $0.05 per share. The cash dividend was paid on January 15, 2019, to shareholders of record as of the close of business on January 4, 2019. The Board of Directors determined that the cash dividend may be paid out of capital surplus. Any determination to pay dividends on our common shares in the future will be at the discretion of our Board of Directors and dependent upon then-existing conditions, including our operating results and financial condition, capital requirements, contractual restrictions, business prospects and other factors that our Board of Directors may deem relevant. Additionally, our ABL Facility contains, and agreements governing any of our future debt may contain, covenants and other restrictions that, in certain circumstances, could limit the level of dividends that we are able to pay on our common shares. There can be no assurance that we will pay a dividend in the future.

39

**Shareholder Return Performance**

The following graph shows changes over the past five-year period in the value of $100 invested in: (1) Cliffs' common shares; (2) S&P 500 Stock Index; (3) S&P Total Market Index; and (4) S&P Metals and Mining Select Industry Index. The values of each investment are based on price change plus reinvestment of all dividends reported to shareholders, based on monthly granularity.



|  |  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|
| **Cleveland-Cliffs Inc.** | Return % | — | (71.56) | (77.87) | 432.28 | (14.27) | **6.66** |
|  | Cum $ | 100.00 | 28.44 | 6.29 | 33.50 | 28.72 | **30.63** |
| **S&P 500 Index - Total Returns** | Return % | — | 13.65 | 1.38 | 11.93 | 21.80 | **(4.39)** |
|  | Cum $ | 100.00 | 113.65 | 115.22 | 128.96 | 157.08 | **150.18** |
| **S&P Total Market Index** | Return % | — | (25.63) | (50.76) | 105.09 | 20.61 | **(26.76)** |
|  | Cum $ | 100.00 | 74.37 | 36.62 | 75.10 | 90.58 | **66.34** |
| **S&P Metals and Mining** | Return % | — | 12.43 | 0.46 | 12.62 | 21.13 | **(5.30)** |
|  | Cum $ | 100.00 | 112.43 | 112.95 | 127.20 | 154.08 | **145.91** |

40

A005529

**Issuer Purchases of Equity Securities**

The following table presents information with respect to repurchases by us of our common shares during the periods indicated:

### ISSUER PURCHASES OF EQUITY SECURITIES

| Period | Total Number of Shares (or Units) Purchased[1] | Average Price Paid per Share (or Unit) | Total Number of Shares (or Units) Purchased as Part of Publicly Announced Plans or Programs | Maximum Number (or Approximate Dollar Value) of Shares (or Units) that May Yet be Purchased Under the Plans or Programs[2] |
|---|---|---|---|---|
| October 1 - 31, 2018 | 739 | $ 12.34 | — | $ — |
| November 1 - 30, 2018 | 500,000 | $ 8.83 | 500,000 | $ 195,583,300 |
| December 1 - 31, 2018 | 4,907,210 | $ 8.75 | 4,907,210 | $ 152,650,610 |
| **Total** | **5,407,949** | **$ 8.76** | **5,407,210** | — |

[1] Includes 739 shares that were delivered to us in October 2018 to satisfy tax withholding obligations due upon the vesting or payment of stock awards.

[2] On November 26, 2018, we announced a new share repurchase program which was authorized by the Board of Directors, pursuant to which we may buy back our outstanding common shares in the open market or in private negotiated transactions up to a maximum of $200 million dollars. The program may be executed through open-market purchases, including through Rule 10b5-1 agreements, or privately negotiated transactions. The authorization is effective until December 31, 2019.

41

Table of Contents

**Item 6.**        *Selected Financial Data*

**Summary of Financial and Other Statistical Data - Cleveland-Cliffs Inc. and Subsidiaries**

| Financial data (in millions, except per share amounts) | 2018 (a) | 2017 (b) | 2016 (c) | 2015 (d) | 2014 (e) |
|---|---|---|---|---|---|
| Revenue from product sales and services | $ 2,332.4 | $ 1,866.0 | $ 1,554.5 | $ 1,525.4 | $ 2,506.5 |
| Income from continuing operations | $ 1,039.9 | $ 360.6 | $ 122.6 | $ 134.3 | $ 607.5 |
| Income (loss) from discontinued operations, net of tax * | $ 88.2 | $ 2.5 | $ 76.7 | $ (882.7) | $ (8,919.1) |
| Earnings (loss) per common share attributable to Cliffs common shareholders - basic | | | | | |
| Continuing operations | $ 3.50 | $ 1.27 | $ 0.49 | $ 0.57 | $ 3.46 |
| Discontinued operations * | 0.30 | 0.01 | 0.39 | (5.71) | (50.98) |
| Earnings (loss) per common share attributable to Cliffs common shareholders - basic | $ 3.80 | $ 1.28 | $ 0.88 | $ (5.14) | $ (47.52) |
| Earnings (loss) per common share attributable to Cliffs common shareholders - diluted | | | | | |
| Continuing operations | $ 3.42 | $ 1.25 | $ 0.49 | $ 0.57 | $ 3.46 |
| Discontinued operations * | 0.29 | 0.01 | 0.38 | (5.70) | (50.98) |
| Earnings (loss) per common share attributable to Cliffs common shareholders - diluted | $ 3.71 | $ 1.26 | $ 0.87 | $ (5.13) | $ (47.52) |
| | | | | | |
| Total assets | $ 3,529.6 | $ 2,953.4 | $ 1,923.9 | $ 2,135.5 | $ 3,147.2 |
| Long-term debt obligations (including capital leases) | $ 2,104.5 | $ 2,311.8 | $ 2,178.6 | $ 2,704.1 | $ 2,834.6 |
| | | | | | |
| Cash dividends declared to preferred shareholders | | | | | |
| - Per depositary share | $ — | $ — | $ — | $ 1.32 | $ 1.76 |
| - Total | $ — | $ — | $ — | 38.4 | 51.2 |
| Cash dividends declared to common shareholders | | | | | |
| - Per share | $ 0.05 | $ — | $ — | $ — | $ 0.60 |
| - Total | $ 15.0 | $ — | $ — | $ — | 92.5 |

Note: This information should be read in conjunction with Management's Discussion and Analysis of Financial Condition and Results of Operations and the Financial Statements and Supplementary Data.

(*) Refer to NOTE 13 - DISCONTINUED OPERATIONS, for information regarding discontinued operations.

(a) On January 1, 2018, we adopted Topic 606 and applied it to all contracts that were not completed using the modified retrospective method. We recognized the cumulative effect of initially applying Topic 606 as an adjustment of $34.0 million to the opening balance of *Retained deficit*. The comparative period information has not been retrospectively revised and continues to be reported under the accounting standards in effect for those periods. Refer to NOTE 2 - NEW ACCOUNTING STANDARDS for information regarding the adoption of Topic 606. Additionally, refer to NOTE 10 - INCOME TAXES for information regarding the reversal of certain deferred tax valuation allowances.

(b) Refer to NOTE 6 - DEBT AND CREDIT FACILITIES for information regarding debt issuances and extinguishments, NOTE 14 - CAPITAL STOCK for information regarding a common share issuance and NOTE 10 - INCOME TAXES for information regarding the financial impact of Public Law 115–97, commonly known as the "Tax Cuts and Jobs Act".

(c) During 2016, we recorded a net gain of $166.3 million related to debt restructuring activities that occurred throughout the year, including the issuance of $218.5 million aggregate principal of 8.00% 2020 1.5 Lien Notes in exchange for $512.2 million of our existing senior notes, the issuance of an aggregate of 8.2 million common shares in exchange for $56.9 million aggregate principal amount of our existing senior notes and a loss on the redemption of the full $283.6 million outstanding of our 3.95% 2018 Senior Notes at a total redemption price of $301.0 million. We also issued 44.4 million common shares in an underwritten public offering. We received net proceeds of $287.6 million at a public offering price of $6.75 per common share.

(d) During 2015, our Eastern Canada Iron Ore segment commenced restructuring proceedings in Montreal, Quebec under the CCAA. As a result of these proceedings, the Canadian entities were deconsolidated and all financial results were classified within discontinued operations. During 2015, our North American Coal operating segment continued to meet the criteria to be classified as held for sale under *ASC Topic 205, Presentation of Financial Statements*, until the operations were sold during the fourth quarter, and as a result, all financial results were classified within discontinued operations. Refer to NOTE 13 - DISCONTINUED OPERATIONS, for information regarding discontinued operations.

(e) During 2014, we recorded an impairment of other long-lived assets of $11.2 million related to our continuing operations. We also recorded goodwill and other long-lived asset impairment charges related to our discontinued operations of $9,018.7 million. The impairment charges were primarily a result of changes in life-of-mine cash flows due to declining pricing for both global iron ore and low-volatile metallurgical coal, along with changes in strategic focus of the divestiture of the Eastern Canadian Iron Ore, Asia Pacific Iron Ore, North American Coal and Ferroalloys operations. The CLCC assets were sold in the fourth quarter of 2014 on December 31, 2014, resulting in a loss on sale of $419.6 million. Refer to NOTE 13 - DISCONTINUED OPERATIONS, for information regarding discontinued operations. For the year ended December 31, 2014, we had a loss attributable to noncontrolling interest of $1,087.4 million, of which, $1,114.3 million related to discontinued operations.

42

A005531

Table of Contents

**Item 7.**        *Management's Discussion and Analysis of Financial Condition and Results of Operations*

Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") is designed to provide a reader of our financial statements with a narrative from the perspective of management on our financial condition, results of operations, liquidity and other factors that may affect our future results. The following discussion should be read in conjunction with the consolidated financial statements and related notes that appear elsewhere in this document.

**Industry Overview**

The key driver of our business is demand for steelmaking raw materials from U.S. steelmakers. During 2018, the U.S. produced approximately 87 million metric tons of crude steel, which is up 6% when compared to 2017, or about 5% of total global crude steel production. U.S. total steel capacity utilization was approximately 78% during 2018, which is an approximate 6% increase from 2017. Throughout 2018, global crude steel production increased about 5% compared to 2017, driven by an approximate 7% increase in Chinese crude steel production.

The Platts 62% Price decreased 3% to an average price of $69 per metric ton for the year ended   December 31, 2018 compared to 2017. Volatility in the iron ore price impacts our realized revenue rates, but the price of iron ore and our revenue realizations are not fully correlated. Pricing mechanisms in our contracts reference the Platts 62% Price, but our prices are somewhat protected from potential volatility given that it is just one of many inputs used in contract pricing formulas. While iron ore pricing over the past year has remained relatively stable, we recognize that a change in behavior of the major iron ore producers and/or Chinese steelmakers could either lift or put pressure on iron ore prices in the near term. During 2018, the main trend that emerged was the more selective iron ore buying behavior among Chinese mills, which caused significant divergence in pricing for different grades of ores, but kept the Platts 62% Price at its most stable levels since daily pricing was introduced a decade ago. This intensified focus on iron ore quality is driven primarily by both a greater emphasis on environmentally friendly steelmaking and enhanced productivity (as less efficient mills have been shut down).

The Atlantic Basin pellet premium, another important pricing factor in our contracts, averaged $59 per metric ton for the year ended   December 31, 2018, a 30% increase compared to 2017. We believe the supply-demand dynamics of this market will continue to be favorable for us. Heightened demand for iron ore pellets is a result of rapidly increasing global demand for the most productive and environmentally friendly feedstock. Iron ore pellets remain scarce in the international market and new capacity is unlikely to come online in the near term due to the time and expense required to do so. We believe this scarcity will support and likely increase these high premiums for pellet products in the foreseeable future.

The price for domestic hot-rolled coil steel, which is an important attribute in the calculation of supplemental revenue in a customer's supply agreement, averaged $827 per net ton for the year ended December 31, 2018, 33% higher than last year. The price of steel was impacted positively in 2018 by healthy U.S. manufacturing activity and inflation on major steel input costs, and the U.S. government's implementation of a 25% tariff on steel imports from many of its major trade counterparts. Because the United States is the largest importer of steel in the world, we believe these tariffs not only alleviate some national security concerns, but will also keep the prices for domestic hot-rolled coil steel elevated above historical averages for as long as they remain in place. As such, we remain positive on our outlook for the domestic steel market.

Our consolidated revenues were $2.3 billion and $1.9 billion for the years ended December 31, 2018 and 2017, respectively, with net income from continuing operations per diluted share of $3.42 and $1.25, respectively. Net income from continuing operations for 2018 was positively impacted by an income tax benefit of $475.2 million, primarily due to release of the valuation allowance in the U.S. This compares to an income tax benefit in 2017 of $252.4 million, primarily due to the enactment of Public Law 115–97. Sales margin increased by $342.0 million during 2018 when compared to 2017, primarily driven by the increase in revenue from higher average realized product revenue rates and higher sales volumes. During 2018, we had a loss on extinguishment of debt of $6.8 million compared to a loss of $165.4 million during the prior year. In addition, during 2018 we had a gain from discontinued operations, net of tax of $88.2 million, primarily attributable to our exit from Australia compared to a gain of   $2.5 million from discontinued operations, net of tax, during 2017.

43

**Strategy**

*We are Focused on Protecting our Core Mining and Pelletizing Segment Business*

We are the market-leading iron ore producer in the U.S., supplying differentiated iron ore pellets under long-term contracts to major North American blast furnace steel producers. We have the unique advantage of being a low-cost, high-quality, iron ore pellet producer with significant transportation and logistics advantages to serve the Great Lakes steel market effectively. The pricing structure and long-term nature of our existing contracts, along with our low-cost operating profile, position our Mining and Pelletizing segment as a strong cash flow generator in most commodity pricing environments. Since instituting our strategy in 2014 of focusing on this core business, we have achieved significant accomplishments, including providing accelerating profitability growth each year since 2015, maximizing commercial leverage in pricing and securing sales volume certainty by signing multiple new supply agreements with steelmakers throughout the Great Lakes region, improving operating reliability by making operational improvements, realizing more predictability in cash flows, embracing the global push toward environmental stewardship and developing new pellet products to meet ever-evolving market demands.

We recognize the importance of our strong position in the North American blast furnace steel industry, and our top priority is to protect and enhance the market position of our Mining and Pelletizing business. This involves continuing to deliver high-quality, custom-made pellets that allow our customers to remain competitive in the quality, production efficiency, and environmental friendliness of their steel products. Protecting the core business also involves continually evaluating opportunities to expand both our production capacity and ore reserve life. In 2017, we achieved key accomplishments toward these goals by acquiring the remaining minority stake in our Tilden and Empire mines as well as additional real estate interests in Minnesota. In 2018, we began supplying pellets under two new customer supply agreements in the Great Lakes region. In addition, we executed the efficient exit of our Asia Pacific Iron Ore business, officially completing the divestiture of the Company's non-core assets.

*Expanding our Customer Base*

While we hold a strong market position in supplying iron ore to Great Lakes blast furnaces, we cannot ignore the ongoing shift of steelmaking share in the U.S. away from our core blast furnace customers to EAF steelmakers. Over the past 25 years, the market share of EAFs has nearly doubled. However, as EAFs have moved to higher-value steel products, they require more high-quality iron ore-based metallics instead of lower-grade scrap as raw material feedstock. As a result of this trend, one of our top strategic priorities is to become a critical supplier of the EAF market by providing these specialized metallics. HBI is a specialized high-quality iron alternative to scrap and pig iron that, when used as a feedstock, allows the EAF to produce more valuable grades of steel. In June 2017, we announced the planned construction of an HBI production plant in Toledo, Ohio. Over the past 18 months, we have made significant progress on the construction of this plant. Based on current market analysis, greater-than-expected customer demand and expansion opportunities identified during the construction process, we are increasing the expected productive capacity of the Toledo HBI production plant from 1.6 million to 1.9 million metric tons per year. Accordingly, we now estimate the construction cost to be approximately $830 million, exclusive of construction-related contingencies and capitalized interest, which increase partially relates to the expanded capacity. We expect that the HBI production plant, once operational, will consume approximately 2.8 million long tons of our DR-grade pellets per year.

We expect our HBI to partially replace the over 3 million metric tons of ore-based metallics that are imported into the Great Lakes region every year from Russia, Ukraine, Brazil and Venezuela, as well as the nearly 20 million metric tons of scrap used in the Great Lakes area every year. The Toledo site is in close proximity to over 20 EAFs, giving us a natural competitive freight advantage over import competitors. Not only does this production plant create another outlet for our high-margin pellets, but it also presents an attractive economic opportunity for us. As the only producer of DR-grade pellets in the Great Lakes region and with access to abundant, low-cost natural gas, we will be in a unique position to serve clients in the area and grow our customer base.

*Maintaining Discipline on Costs and Capital Allocation*

We believe our ability to execute our strategy is dependent on maintaining our financial position, balance sheet strength and financial flexibility, which will enable us to manage through the inherent cyclical demand for our products and volatility in commodity prices. Our streamlined organization and support functions are well-aligned with our strategic direction. Our capital allocation plan is focused on strengthening and protecting our core Mining and Pelletizing segment operations and expanding our customer base through our Metallics segment, as well as returning excess capital to shareholders while maintaining manageable leverage through volatile commodity cycles.

As the implementation of our strategy has strengthened the business, we have put additional emphasis on the continued improvement of our balance sheet via continued reduction of long-term debt. Since 2015, we have reduced

44

Table of Contents

our annual interest expense by 46%, or approximately $100 million, by using various liability management strategies consistent with our capital allocation priorities and our stated objective of improving the strength of our balance sheet and simplifying the capital structure. Given the cyclical nature of our business, we will continue to be opportunistic in managing our balance sheet and capital structure, which should put us in an optimal position to manage through any commodity environment, and we continue to seek the best opportunities to accomplish this.

**Competitive Strengths**

*Resilient Mining and Pelletizing Segment Operations*

Our Mining and Pelletizing segment is the primary contributor to our consolidated results, generating $2,332.4 million of consolidated revenue, $809.6 million of sales margin and $875.3 million of consolidated Adjusted EBITDA for the year ended December 31, 2018. Our Mining and Pelletizing segment produces differentiated iron ore pellets that are customized for use in customers' blast furnaces as part of the steelmaking process. The grades of pellets currently delivered to each customer are based on that customer's preferences, which depend in part on the characteristics of the customer's blast furnace operations. We believe our long history of supplying customized pellets to the U.S. steel producers has resulted in a co-dependent relationship between us and our customers. This technical and operational co-dependency has enabled us to claim a substantial portion of the total Mining and Pelletizing segment market. Based on our equity ownership in our U.S. mines, our share of the annual rated production capacity is 21.2 million long tons, representing 42% of total U.S. annual pellet capacity. Long-lived assets with an average mine life of approximately 30 years provide the opportunity to maintain our significant market position well into the future.

We believe our Mining and Pelletizing segment is uniquely positioned in the global iron ore market due to its insulated position within the Great Lakes region and balanced exposure to market volatility due to contract pricing structures. Most of our Mining and Pelletizing segment production is sold through long-term contracts that are structured with various formula-based pricing mechanisms that reference spot iron ore pricing, domestic steel prices, and Atlantic Basin pellet premiums, among other items, and mitigate the impact of any one factor's price volatility on our business.

We maintain a freight advantage compared to our competition as a result of our proximity to U.S. steelmaking operations. The Great Lakes market is largely isolated and expensive to enter from the seaborne market. Our costs are lower as a result of inherent transportation advantages associated with our mine locations near the Great Lakes, which allows for transportation via railroads and loading ports.

**Recent Developments**

*Changes to our Board of Directors*

On January 28, 2019, we appointed M. Ann Harlan and Janet L. Miller to our Board of Directors. Ms. Harlan will join the Audit Committee and Ms. Miller will join the Governance and Nominating Committee of our Board. With the addition of Ms. Harlan and Ms. Miller, our Board of Directors is now comprised of eleven members, of which ten are independent directors. Also, in order to re-balance responsibilities among its Board members, we announced other changes to the Committee assignments. Susan Green has been appointed to the Strategy Committee; Michael Siegal has stepped down from the Audit Committee; Gabriel Stoliar has stepped down from the Governance and Nominating Committee; and Robert Fisher, Jr. has stepped down from the Strategy Committee.

*Executive Leadership Promotion*

On December 11, 2018, our Board of Directors elected Clifford T. Smith, as our Executive Vice President, Chief Operating Officer, effective January 1, 2019. Mr. Smith most recently was the Executive Vice President, Business Development, a position he held since April 2015. He previously served as Executive Vice President, Seaborne Iron Ore (October 2014 - April 2015) and Executive Vice President, Global Operations (July 2013 - January 2014).

*Share Repurchase Program*

On November 26, 2018, we announced that our Board of Directors authorized a program to repurchase outstanding common shares in the open market or in privately negotiated transactions, up to a maximum of $200 million. We are not obligated to make any purchases and the program may be suspended or discontinued at any time. During 2018, we repurchased 5.4 million common shares at a cost of approximately $47.5 million in aggregate, including commissions and fees, or an average price of approximately $8.78 per share. As of December 31, 2018, there was approximately $152.7 million remaining under the authorization. The share repurchase program is effective until December 31, 2019.

[Table of Contents]

## Business Segments

In alignment with our strategic goals, our Company's continuing operations are organized and managed in two business units according to our differentiated products. The former 'U.S. Iron Ore' segment is now 'Mining and Pelletizing.' Our Mining and Pelletizing segment is a major supplier of iron ore pellets to the North American steel industry from our mines and pellet plants located in Michigan and Minnesota. In addition, the Toledo HBI business will be categorized under the segment 'Metallics.' In our Metallics segment, we are currently constructing an HBI production plant in Toledo, Ohio. We expect to complete construction and begin production in 2020. Until the HBI plant is operational, expenses reported in the Metallics segment will be limited to administrative costs.

### 2018 Compared to 2017

#### Results of Operations

The following is a summary of the Mining and Pelletizing segment results:

| | | (In Millions) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Changes due to: | | | | | | | |
| | Year Ended December 31, | | | | Revenue and cost rate | | Sales volume | | Freight and reimbursement | | Total change | |
| | 2018 | | 2017 | | | | | | | | | |
| Revenues from product sales and services | $ | 2,332.4 | $ | 1,866.0 | $ | 364.3 | $ | 163.5 | $ | (61.4) | $ | 466.4 |
| Cost of goods sold and operating expenses | | (1,522.8) | | (1,398.4) | | (68.4) | | (117.4) | | 61.4 | | (124.4) |
| Sales margin | $ | 809.6 | $ | 467.6 | $ | 295.9 | $ | 46.1 | $ | — | $ | 342.0 |

| | Year Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| Per Long Sales Ton Information | 2018 | | 2017 | | Difference | | Percent change |
| Realized product revenue rate[1] | $ | 105.64 | $ | 88.03 | $ | 17.61 | 20.0 % |
| Cash cost of goods sold and operating expense rate[,2] | | 62.95 | | 59.43 | | 3.52 | 5.9 % |
| Depreciation, depletion & amortization | | 3.32 | | 3.56 | | (0.24) | (6.7)% |
| Total cost of goods sold and operating expense rate | | 66.27 | | 62.99 | | 3.28 | 5.2 % |
| Sales margin | $ | 39.37 | $ | 25.04 | $ | 14.33 | 57.2 % |

| | | | |
|---|---|---|---|
| Sales tons[3] (In thousands) | 20,563 | | 18,683 |
| Production tons[3] (In thousands) | | | |
| Total | 26,336 | | 25,542 |
| Cliffs' share of total | 20,329 | | 18,776 |

[1] Excludes revenues and expenses related to domestic freight, which are offsetting and have no impact on sales margin. Revenues and expenses also exclude venture partner cost reimbursements.

[2] Cash cost of goods sold and operating expense rate is a non-GAAP financial measure. Refer to "Non-GAAP Reconciliation" for reconciliation in dollars back to our consolidated financial statements.

[3] Tons are long tons.

Sales margin for the Mining and Pelletizing segment was $809.6 million for the year ended December 31, 2018, compared with $467.6 million for the year ended December 31, 2017. Sales margin per long ton increased 57.2% to $39.37 per long ton during the year ended December 31, 2018 compared to 2017.

Revenue increased by $527.8 million during the year ended December 31, 2018, compared to 2017, excluding the freight and reimbursements decrease of $61.4 million, predominantly due to:

- An increase in the average year-to-date realized product revenue rate of $17.61 per long ton or 20.0% during the year ended December 31, 2018, compared to 2017, which resulted in an increase of $364.3 million. This is predominantly due to:

46

◦ An increase in the average annual daily market price for hot-rolled coil steel, which positively affected the realized revenue rate by $10 per long ton or $215 million during 2018;

◦ Higher pellet premiums, which positively affected the realized revenue rate by $7 per long ton or $141 million; and

◦ Changes in customer and contract mix, which positively affected the realized revenue rate by $3 per long ton or $70 million.

◦ These increases were offset partially by:

▪ An increase in index freight rates, a component in most of our contract pricing formulas, which negatively affected the realized revenue rate by $3 per long ton or $53 million; and

▪ Lower full-year Platts 62% Price, compared to the prior-year, which negatively affected the realized revenue rate by $1 per long ton or $30 million.

• Higher sales volumes of 1.9 million long tons, which resulted in increased revenues of $163.5 million, predominantly due to increased demand from two customers resulting in two additional contracts that started during the current year.

Cost of goods sold and operating expenses increased $185.8 million during the year ended December 31, 2018, compared to 2017, excluding the freight and reimbursements decrease of $61.4 million, predominantly as a result of:

• An increase in sales volume of 1.9 million long tons, which resulted in increased costs of $117 million period-over-period; and

• Unfavorable change in the full-year cost driven by higher employment-related and profit sharing costs of $35 million or $2 per long ton, increased royalties of $19 million or $1 per long ton and increased maintenance and fuel costs of $19 million or $1 per long ton.

*Production*

Our share of production increased by 8.3% during the year ended December 31, 2018 when compared to 2017. The increase in production volume primarily is attributable to incremental tonnage of 0.8 million long tons as a result of the increase in Tilden ownership to 100% in the third quarter of 2017, 0.4 million long tons at United Taconite as a result of increased operating time and productivity in 2018 compared to 2017 when the Mustang capital project was underway, and 0.3 million long tons at Northshore due to lower production during the prior-year comparable period as a result of longer scheduled annual maintenance shut-downs and an additional furnace idle to support the production of low silica pellets.

### *Other Operating Income (Expense)*

The following is a summary of *Other operating income (expense)*:

|  | (In Millions) | | |
|---|---|---|---|
|  | **2018** | 2017 | Variance Favorable/ (Unfavorable) |
| Selling, general and administrative expenses | $ **(116.8)** | $ (102.9) | $ (13.9) |
| Miscellaneous - net | **(19.6)** | 25.5 | (45.1) |
|  | $ **(136.4)** | $ (77.4) | $ (59.0) |

*Selling, general and administrative expenses* during the year ended December 31, 2018 increased $13.9 million compared to 2017. The unfavorable variance for the year ended December 31, 2018 was primarily driven by an increase in employment-related costs, including approximately $6 million related to signing bonuses that were part of the new USW labor agreement signed in 2018 and higher incentive compensation compared to 2017.

47

Table of Contents

The following is a summary of *Miscellaneous - net*:

| | 2018 | 2017 | Variance Favorable/ (Unfavorable) |
|---|---|---|---|
| | | **(In Millions)** | |
| Empire idle costs | $ (24.1) | $ 5.0 | $ (29.1) |
| Foreign exchange remeasurement | (0.9) | 13.9 | (14.8) |
| Management and royalty fees | 1.0 | 5.1 | (4.1) |
| Impairment of long-lived assets | (1.1) | — | (1.1) |
| Other | 5.5 | 1.5 | 4.0 |
| | $ (19.6) | $ 25.5 | $ (45.1) |

*Miscellaneous - net* during the year ended December 31, 2018 increased $45.1 million compared to 2017. There was a year over year unfavorable impact of $29.1 million in Empire mine idle costs primarily impacted by the reduction to the asset retirement obligation liability during 2017. During 2017, there was a decrease in the obligation of $26.2 million as a result of the refinement of the cash flows required for reclamation, remediation and structural removal. Refer to NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS for further information regarding changes in the asset retirement obligation.

For the year ended December 31, 2017, there was an incrementally favorable impact of $14.8 million driven by the change in foreign exchange remeasurement of short-term intercompany loans that were denominated in currency that was not the functional currency of the entity that holds the loans.

*Other Expense*

The following is a summary of *Other expense*:

| | 2018 | 2017 | Variance Favorable/ (Unfavorable) |
|---|---|---|---|
| | | **(In Millions)** | |
| Interest expense, net | $ (118.9) | $ (126.8) | $ 7.9 |
| Loss on extinguishment of debt | (6.8) | (165.4) | 158.6 |
| Other non-operating income | | | |
| Net periodic benefit costs other than service cost component | 14.0 | 7.0 | 7.0 |
| Other | 3.2 | 3.2 | — |
| | $ (108.5) | $ (282.0) | $ 173.5 |

*Interest expense, net* for the year ended December 31, 2018, was $7.9 million lower than 2017, predominantly due to interest that was capitalized related to the HBI production plant and upgrades at the Northshore plant.

The loss on extinguishment of debt for the year ended December 31, 2018 of $6.8 million was related to the redemption in full of our outstanding 4.80% 2020 Senior Notes and 5.90% 2020 Senior Notes and the repurchase of certain of our other senior notes. This compares to a loss of $165.4 million for the year ended December 31, 2017, primarily related to the redemption in full of all of our outstanding First Lien Notes, 1.5 Lien Notes and Second Lien Notes and the repurchase of certain of our other senior notes.

Refer to NOTE 6 - DEBT AND CREDIT FACILITIES for further discussion.

48

*Income Taxes*

Our tax rate is affected by permanent items, such as depletion and the relative amount of income we earn in various foreign jurisdictions with tax rates that differ from the U.S. statutory rate. It also is affected by discrete items that may occur in any given period, but are not consistent from period to period. The following represents a summary of our tax provision and corresponding effective rates:

| | | | (In Millions) | | | |
|---|---|---|---|---|---|---|
| | | **2018** | | 2017 | | Variance |
| Income tax benefit | $ | **475.2** | $ | 252.4 | $ | 222.8 |
| Effective tax rate | | **(84.1)%** | | (233.3)% | | 149.2% |

A reconciliation of our income tax attributable to continuing operations compared to the U.S. federal statutory rate is as follows:

| | | | (In Millions) | | | |
|---|---|---|---|---|---|---|
| | | **2018** | | 2017 | | |
| Tax at U.S. statutory rate | $ | **118.6** | **21.0 %** | $ | 37.9 | 35.0 % |
| Increase (decrease) due to: | | | | | | |
| Percentage depletion in excess of cost depletion | | **(54.6)** | **(9.7)** | | (61.6) | (56.9) |
| Impact of tax law change - remeasurement of deferred taxes | | **—** | **—** | | 407.5 | 376.6 |
| Dissolution of Luxembourg entities | | **161.7** | **28.6** | | — | — |
| Prior year adjustments in current year | | **(1.0)** | **(0.2)** | | (1.1) | (1.0) |
| Valuation allowance reversal | | | | | | |
| Tax law change - remeasurement of deferred taxes | | **—** | **—** | | (407.5) | (376.6) |
| Current year activity | | **(80.6)** | **(14.3)** | | (466.3) | (431.0) |
| Release of U.S. valuation allowance | | **(460.5)** | **(81.5)** | | — | — |
| Repeal of AMT | | **—** | **—** | | (235.3) | (217.5) |
| Dissolution of Luxembourg entities | | **(161.7)** | **(28.6)** | | — | — |
| Prior year adjustments in current year | | **1.0** | **0.2** | | (3.5) | (3.2) |
| Tax uncertainties | | **(1.3)** | **(0.2)** | | (1.4) | (1.3) |
| Impact of foreign operations | | **0.1** | **—** | | 477.9 | 441.7 |
| Other items, net | | **3.1** | **0.6** | | 1.0 | 0.9 |
| Provision for income tax benefit and effective income tax rate including discrete items | $ | **(475.2)** | **(84.1)%** | $ | (252.4) | (233.3)% |

Our tax provision for the year ended December 31, 2018 was a benefit of $475.2 million and an effective tax rate of negative 84.1% compared with a benefit of $252.4 million and an effective tax rate of negative 233.3% for the prior year. The increase in income tax benefit from the prior year is primarily due to release of the valuation allowance in the U.S. of $460.5 million in the fourth quarter of 2018. Additionally, during 2018, a legal entity reduction initiative was completed resulting in the dissolution of two Luxembourg entities, both of which held net operating loss deferred tax assets. This asset reduction resulted in an expense of $161.7 million which was fully offset by a decrease in valuation allowance. In December of 2017 a benefit of $235.3 million was recorded as a result of the repeal of AMT in the 2017 U.S. income tax reform legislation. Additionally, the Impact of tax law change - remeasurement of deferred taxes for the year ended December 31, 2017 primarily relates to the statutory rate reduction in the U.S. that decreased the deferred tax assets by $334.1 million and the Luxembourg rate reduction that decreased the deferred tax assets by $73.4 million. Both of these asset reductions were fully offset by a decrease in valuation allowance. The impact of foreign operations relates to income and losses in foreign jurisdictions where the statutory rates, ranging from 0% to 26.01%, differ from the U.S. statutory rate of 21% and 35% for the years ended December 31, 2018 and December 31, 2017, respectively.

See NOTE 10 - INCOME TAXES for further information.

49

*Income from discontinued operations, net of tax*

During the year ended December 31, 2018, we recorded income of $88.2 million within *Income from discontinued operations, net of tax* . For the year ended December 31, 2018, net income attributable to Asia Pacific Iron Ore was  $118.3 million. As a result of the liquidation of substantially all of the Australian subsidiaries' net assets, the historical changes in foreign currency translation recorded in *Accumulated other comprehensive loss*  in the Statements of Consolidated Financial Position of $228.1 million was reclassified and recognized as a gain in  *Income from discontinued operations, net of tax* , which was partially offset by operating losses and exit costs at Asia Pacific Iron Ore and the settlement of the CCAA proceedings.  We recorded *Income from discontinued operations, net of tax* of $2.5 million for the year ended  December 31, 2017. Refer to NOTE 13 - DISCONTINUED OPERATIONS for further information.

**EBITDA and Adjusted EBITDA**

We evaluate performance based on EBITDA and Adjusted EBITDA, which are non-GAAP measures. These measures allow management and investors to focus on our ability to service our debt as well as illustrate how the business is performing.  Additionally, EBITDA and Adjusted EBITDA assist management and investors in their analysis and forecasting as these measures approximate the cash flows associated with operational earnings.

| | (In Millions) | | | |
|---|---|---|---|---|
| | | 2018 | | 2017 |
| Net income | $ | 1,128.1 | $ | 363.1 |
| Less: | | | | |
| Interest expense, net | | (121.3) | | (132.0) |
| Income tax benefit | | 460.3 | | 252.4 |
| Depreciation, depletion and amortization | | (89.0) | | (87.7) |
|    Total EBITDA | $ | 878.1 | $ | 330.4 |
| Less: | | | | |
| Loss on extinguishment of debt | $ | (6.8) | $ | (165.4) |
| Impact of discontinued operations | | 120.6 | | 22.0 |
| Foreign exchange remeasurement | | (0.9) | | 13.9 |
| Impairment of other long-lived assets | | (1.1) | | — |
|    Total Adjusted EBITDA | $ | 766.3 | $ | 459.9 |
| | | | | |
| EBITDA: | | | | |
|    Mining and Pelletizing | $ | 852.9 | $ | 534.9 |
|    Metallics | | (3.3) | | (0.4) |
|    Other (including discontinued operations) | | 28.5 | | (204.1) |
|    Total EBITDA | $ | 878.1 | $ | 330.4 |
| | | | | |
| Adjusted EBITDA: | | | | |
|    Mining and Pelletizing | $ | 875.3 | $ | 559.4 |
|    Metallics | | (3.3) | | (0.4) |
|    Other | | (105.7) | | (99.1) |
|    Total Adjusted EBITDA | $ | 766.3 | $ | 459.9 |

    EBITDA for the year ended December 31, 2018 increased by $547.7 million on a consolidated basis from 2017. The favorable variance in EBITDA for the year ended December 31, 2018 was primarily due to an increase in sales margin of $342.0 million and a favorable impact from discontinued operations of $98.6 million compared to the prior-year period. The favorable impact from discontinued operations is primarily due to the historical changes in foreign currency translation that were previously recorded in *Accumulated other comprehensive loss* totaling $228.1 million, which were reclassified and recognized in *Income from discontinued operations, net of tax.* The favorable impact from reclassification of historical foreign currency translation changes was partially offset by operating losses and exit costs at Asia Pacific Iron Ore and the settlement of the CCAA proceedings. Refer to NOTE 13 - DISCONTINUED OPERATIONS for further information.

    Adjusted EBITDA increased by $306.4 million for the year ended December 31, 2018 from the comparable period in 2017. The increase primarily was attributable to higher consolidated sales margin of $342.0 million for the year ended December 31, 2018, compared to the prior year.

Table of Contents

*2017 Compared to 2016*

### Results of Operations

The following is a summary of the Mining and Pelletizing segment results:

| | | | | Change due to | | | | |
|---|---|---|---|---|---|---|---|---|
| (In Millions) | Year Ended December 31, | | Revenue and cost rate | Sales volume | Idle cost/production volume variance | Freight and reimburse-ment | Total change | |
| | 2017 | 2016 | | | | | | |
| Revenues from product sales and services | $ 1,866.0 | $ 1,554.5 | $ 228.2 | $ 36.7 | $ — | $ 46.6 | $ 311.5 | |
| Cost of goods sold and operating expenses | (1,398.4) | (1,274.4) | (113.7) | (18.4) | 54.7 | (46.6) | (124.0) | |
| Sales margin | $ 467.6 | $ 280.1 | $ 114.5 | $ 18.3 | $ 54.7 | $ — | $ 187.5 | |

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| *Per Long Sales Ton Information* | 2017 | 2016 | Difference | Percent change |
| Realized product revenue rate[1] | $ 88.03 | $ 75.71 | $ 12.32 | 16.3 % |
| Cash cost of goods sold and operating expense rate[1,2] | 59.43 | 55.73 | 3.70 | 6.6 % |
| Depreciation, depletion & amortization | 3.56 | 4.61 | (1.05) | (22.8)% |
| Total cost of goods sold and operating expenses rate | 62.99 | 60.34 | 2.65 | 4.4 % |
| Sales margin | $ 25.04 | $ 15.37 | $ 9.67 | 62.9 % |

| | | |
|---|---|---|
| Sales tons[3] (In thousands) | 18,683 | 18,224 |
| Production tons[3] (In thousands) | | |
| Total | 25,542 | 23,416 |
| Cliffs' share of total | 18,776 | 15,982 |

[1] Excludes revenues and expenses related to domestic freight, which are offsetting and have no impact on sales margin. Revenues and expenses also exclude venture partner cost reimbursements.

[2] Cash cost of goods sold and operating expense rate is a non-GAAP financial measure. See *"Non-GAAP Reconciliation"* for reconciliation in dollars back to our consolidated financial statements.

[3] Tons are long tons (2,240 pounds).

Sales margin for the Mining and Pelletizing segment was $467.6 million for the year ended December 31, 2017, compared with $280.1 million for the year ended December 31, 2016. Sales margin increased 62.9% to $25.04 per long ton during the year ended December 31, 2017 compared to 2016.

Revenue increased by $264.9 million during the year ended December 31, 2017, compared to 2016, excluding the freight and reimbursements increase of $46.6 million, predominantly due to:

• An increase in the average year-to-date realized product revenue rate of $12.32 per long ton or 16.3% during the year ended December 31, 2017, compared to 2016, which resulted in an increase of $228.2 million. This is predominantly due to:

◦ An increase in Platts 62% Price, which positively affected the realized revenue rate by $9 per long ton or $176 million;

◦ An increase in the average annual daily market price and customer pricing for hot-rolled coil steel, which positively affected the realized revenue rate by $5 per long ton or $100 million; and

◦ Higher pellet premiums, which positively affected the realized revenue rate by $5 per long ton or $94 million.

52

Table of Contents

- ◦ These increases were offset partially by changes in customer and contract mix and carryover pricing impacts, which negatively affected the realized revenue rate by $5 per long ton or $84 million; and

- ◦ Higher index freight rates, a component in some of our contract pricing formulas, which negatively affected the realized revenue rate by $3 per long ton or $63 million.

- • Higher sales volumes of 0.5 million long tons during the year ended December 31, 2017, which resulted in increased revenues of $36.7 million due to:

  - ◦ Increased demand from a customer, providing additional sales volume of 1.8 million long tons, compared to the prior year when the customer had sufficient inventory due to the idle of one of its facilities and additional suppliers;

  - ◦ Increased demand from a customer, providing additional sales volume of 1.3 million long tons, resulting from the fourth quarter 2015 termination of its contract causing a nine-month gap in sales to that customer; and

  - ◦ An increase in exports to Asia in order to offset a fourth quarter reduction in domestic nomination from a major customer and fewer domestic spot contracts, providing additional sales volume of 0.9 million long tons compared to 2016.

  - ◦ These increases were offset partially by 2.8 million long tons that were sold in 2016 on separate spot contracts with two customers and were not renewed; and

  - ◦ Decreased sales to a customer due to timing of payments and a lower 2017 nomination, resulting in a decrease in sales volume of 0.8 million long tons.

Cost of goods sold and operating expenses increased $77.4 million during the year ended December 31, 2017 compared to 2016, excluding the freight and reimbursements increase of $46.6 million, predominantly as a result of:

- • Higher spending on repairs and maintenance of $44 million or $2 per long ton, higher profit sharing and benefit costs of $35 million or $2 per long ton, and higher energy rates for natural gas, diesel and electricity of $23 million or $1 per long ton; and

- • Increased sales volumes as discussed above which resulted in increased costs of $18 million period-over-period.

- • These increases were offset partially by decreased idle costs of $55 million or $3 per long ton due to the idle of the United Taconite and Northshore mines during the prior year.

*Production*

Our share of production in our Mining and Pelletizing segment increased by 17.5% during the year ended December 31, 2017 when compared to 2016. The increase in production volume primarily is attributable to all active mining facilities fully operating in 2017 compared to the various idled operations during 2016. United Taconite was fully operating during the year ended December 31, 2017, adding an incremental 3.3 million long tons of production, compared to the previous year's production levels as a result of being idled for the first seven months of 2016. Secondly, Northshore added incremental tonnage of 2.1 million long tons during the year ended December 31, 2017, when it was substantially at full production, compared to its previous year's production tonnage when it was fully idled for the first four months of 2016. These production gains were offset partially by the indefinite idle of the Empire mine in August 2016, lowering production by 2.8 million long tons, compared to the prior year when the mine was operating.

53

Table of Contents

*Other Operating Income (Expense)*

The following is a summary of *Other operating income (expense)*:

| | (In Millions) | | |
|---|---|---|---|
| | 2017 | 2016 | Variance Favorable/ (Unfavorable) |
| Selling, general and administrative expenses | $ (102.9) | $ (115.8) | $ 12.9 |
| Miscellaneous - net | 25.5 | (33.6) | 59.1 |
| | $ (77.4) | $ (149.4) | $ 72.0 |

*Selling, general and administrative expenses* during the year ended December 31, 2017 decreased $12.9 million over 2016. The favorable variance for the year ended December 31, 2017 was driven by a $3.3 million decrease in incentive compensation and $3.5 million of union signing bonuses in 2016, that were not repeated in 2017. In addition, external services costs, excluding costs for early stage HBI project spending, decreased by $5.4 million for the year ended December 31, 2017 compared to the prior year. These favorable variances were offset partially by early-stage HBI project spending of $2.3 million.

The following is a summary of *Miscellaneous - net*:

| | (In Millions) | | |
|---|---|---|---|
| | 2017 | 2016 | Variance Favorable/ (Unfavorable) |
| Foreign exchange remeasurement | $ 13.9 | $ (17.8) | $ 31.7 |
| Michigan Electricity Matters accrual | 1.3 | (12.4) | 13.7 |
| Management and royalty fees | 5.1 | 9.0 | (3.9) |
| Empire idle costs | 5.0 | (8.2) | 13.2 |
| Gain (loss) on disposal of assets | 0.9 | (4.9) | 5.8 |
| Other | (0.7) | 0.7 | (1.4) |
| | $ 25.5 | $ (33.6) | $ 59.1 |

For the year ended December 31, 2017, there was an incrementally favorable impact of $31.7 million driven by the change in foreign exchange remeasurement of short-term intercompany loans that are denominated in currency that is not the functional currency of the entity that holds the loans. There was an incrementally favorable impact of $13.7 million related to the FERC ruling on the proceedings regarding cost allocations for continued operation of the Presque Isle power plant in Michigan (referred to above as the Michigan Electricity Matters) that was recorded in the third quarter of 2016 and adjusted in the fourth quarter of 2017. In addition, there was an incrementally favorable impact of $13.2 million in Empire mine idle costs driven primarily by an asset retirement obligation adjustment.

*Other Income (Expense)*

The following is a summary of *Other expense*:

| | (In Millions) | | |
|---|---|---|---|
| | 2017 | 2016 | Variance Favorable/ (Unfavorable) |
| Interest expense, net | $ (126.8) | $ (193.9) | $ 67.1 |
| Gain (loss) on extinguishment/restructuring of debt | (165.4) | 166.3 | (331.7) |
| Other non-operating income | 10.2 | 7.3 | 2.9 |
| | $ (282.0) | $ (20.3) | $ (261.7) |

The loss on extinguishment/restructuring of debt for the year ended December 31, 2017 of $165.4 million was related to the repurchase of certain of our unsecured senior notes and the redemption in full of our then-outstanding

54

A005543

Table of Contents

secured notes. This compares to a gain of $166.3 million for the year ended December 31, 2016, primarily related to the issuance of our 8.00% 2020 1.5 Lien Notes through an exchange offer on March 2, 2016.

Interest expense, net for the year ended December 31, 2017 had a favorable variance of $67.1 million versus the prior year, predominantly as a result of the debt restructuring activities that occurred throughout 2017. These debt restructurings resulted in a reduction of our effective interest rate to 5.8% and extended our debt maturities.

Refer to NOTE 6 - DEBT AND CREDIT FACILITIES for further discussion.

**Income Taxes**

Our tax rate is affected by permanent items, such as depletion and the relative amount of income we earn in various foreign jurisdictions with tax rates that differ from the U.S. statutory rate. It also is affected by discrete items that may occur in any given period, but are not consistent from period to period. The following represents a summary of our tax provision and corresponding effective rates:

| | | (In Millions) | | | |
|---|---|---|---|---|---|
| | | 2017 | 2016 | | Variance |
| Income tax benefit | $ | 252.4 | $ 12.2 | $ | 240.2 |
| Effective tax rate | | (233.3)% | (11.1)% | | (222.2)% |

A reconciliation of our income tax attributable to continuing operations computed at the U.S. federal statutory rate is as follows:

| | | (In Millions) | | | |
|---|---|---|---|---|---|
| | | 2017 | | 2016 | |
| Tax at U.S. statutory rate | $ | 37.9 | 35.0 % | $ 38.6 | 35.0 % |
| Increase (decrease) due to: | | | | | |
| Impact of tax law change - remeasurement of deferred taxes | | 407.5 | 376.6 | 149.1 | 135.1 |
| Prior year adjustments in current year | | (1.1) | (1.0) | (11.8) | (10.7) |
| Valuation allowance build (reversal): | | | | | |
| Tax law change - remeasurement of deferred taxes | | (407.5) | (376.6) | (149.1) | (135.1) |
| Current year activity | | (466.3) | (431.0) | 122.9 | 111.3 |
| Repeal of AMT | | (235.3) | (217.5) | — | — |
| Prior year adjustments in current year | | (3.5) | (3.2) | 9.3 | 8.4 |
| Tax uncertainties | | (1.4) | (1.3) | (11.3) | (10.2) |
| Worthless stock deduction | | — | — | (73.4) | (66.5) |
| Impact of foreign operations | | 477.9 | 441.7 | (40.6) | (36.8) |
| Percentage depletion in excess of cost depletion | | (61.6) | (56.9) | (36.1) | (32.7) |
| Other items, net | | 1.0 | 0.9 | (9.8) | (8.9) |
| Provision for income tax benefit and effective income tax rate including discrete items | $ | (252.4) | (233.3)% | $ (12.2) | (11.1)% |

Our tax provision for the year ended December 31, 2017 was a benefit of $252.4 million and a negative 233.3% effective tax rate compared with a benefit of $12.2 million and an effective tax rate of negative 11.1% for the prior year. The increase in income tax benefit from the prior year is primarily due to the repeal of AMT through U.S. income tax reform legislation. The impact of tax law change due to remeasurement of deferred taxes primarily relates to the statutory rate reduction in the U.S. that decreased the deferred tax assets by $334.1 million and the Luxembourg rate reduction that decreased the deferred tax assets by $73.4 million. Both of these asset reductions were fully offset by a decrease in valuation allowance. The impact of foreign operations relates to income and losses in foreign jurisdictions where the statutory rates, ranging from 0% to 30%, differ from the U.S. statutory rate of 35%.

See NOTE 10 - INCOME TAXES for further information.

55

Table of Contents

*Income from discontinued operations, net of tax*

For the year ended December 31, 2017, we recorded *Income from discontinued operations, net of tax* of $2.5 million. During 2017, the Wabush Scully Mine was sold as part of the ongoing CCAA proceedings for the Wabush Group, which resulted in a net gain of $31.4 million. The gain was offset by an estimated liability of $55.6 million, which was established based on the probable assertion of a preference claim against the Company and was classified as *Contingent claims* in the Statements of Consolidated Financial Position . Additionally, for the year ended December 31, 2017, we recorded income of $21.2 million within *Income from discontinued operations, net of tax* relating to our Asia Pacific Iron Ore operations.

For the year ended December 31, 2016 we recorded a gain from discontinued operations of $76.7 million, which was attributable to income generated by our Asia Pacific Iron Ore operations of $96.6 million, offset partially by a loss related to our North American Coal and Eastern Canadian Iron Ore operations.

Refer to NOTE 13 - DISCONTINUED OPERATIONS for further information.

*Noncontrolling Interest*

During 2017, our ownership interest in Empire increased to 100% as we reached an agreement to distribute the noncontrolling interest net assets of $132.7 million to ArcelorMittal, in exchange for its interest in Empire. The agreement had no direct impact on the *Loss (income) attributable to noncontrolling interest* in the Statements of Consolidated Operations . However, for the year ended December 31, 2017, the Empire mine was indefinitely idled resulting in a loss attributable to the noncontrolling interest of $3.9 million. In comparison, during the year ended December 31, 2016, the Empire mine was operating and had income of $25.2 million attributable to the noncontrolling interest.

## EBITDA and Adjusted EBITDA

We evaluate performance based on EBITDA and Adjusted EBITDA, which are non-GAAP measures. These measures allow management and investors to focus on our ability to service our debt as well as illustrate how the business is performing. Additionally, EBITDA and Adjusted EBITDA assist management and investors in their analysis and forecasting as these measures approximate the cash flows associated with operational earnings.

56

| | 2017 | 2016 |
|---|---|---|
| | (In Millions) | |
| Net income | $ 363.1 | $ 199.3 |
| Less: | | |
| Interest expense, net | (132.0) | (200.5) |
| Income tax benefit | 252.4 | 12.2 |
| Depreciation, depletion and amortization | (87.7) | (115.4) |
| EBITDA | $ 330.4 | $ 503.0 |
| Less: | | |
| Gain (loss) on extinguishment/restructuring of debt | $ (165.4) | $ 166.3 |
| Impact of discontinued operations | 22.0 | 108.4 |
| Foreign exchange remeasurement | 13.9 | (17.8) |
| Total Adjusted EBITDA | $ 459.9 | $ 246.1 |
| | | |
| EBITDA: | | |
| Mining and Pelletizing | $ 534.9 | $ 342.4 |
| Metallics | (0.4) | — |
| Corporate and Other (including discontinued operations) | (204.1) | 160.6 |
| Total EBITDA | $ 330.4 | $ 503.0 |
| | | |
| Adjusted EBITDA: | | |
| Mining and Pelletizing | $ 559.4 | $ 359.6 |
| Metallics | (0.4) | — |
| Corporate and Other | (99.1) | (113.5) |
| Total Adjusted EBITDA | $ 459.9 | $ 246.1 |

EBITDA for the year ended December 31, 2017 decreased by $172.6 million on a consolidated basis from 2016. The unfavorable variance in EBITDA for the year ended December 31, 2017 was driven primarily by an incrementally negative impact of $331.7 million related to debt extinguishment/restructuring activities compared to the prior year partially offset by an increase in sales margin of $187.5 million compared to the prior year.

Adjusted EBITDA increased by $213.8 million for the year ended December 31, 2017 from the comparable period in 2016. The increase primarily was attributable to higher consolidated sales margin of $187.5 million for the year ended December 17, 2017, compared to the prior year.

**Liquidity, Cash Flows and Capital Resources**

Our primary sources of liquidity are *Cash and cash equivalents* and cash generated from our operating and financing activities. Our capital allocation decision-making process is focused on returning capital to shareholders while maintaining the strength of our balance sheet and creating financial flexibility to manage through the inherent cyclical demand for our products and volatility in commodity prices. We are focused on maximizing the cash generation of our operations as well as reducing operating costs, aligning capital investments with our strategic priorities and the requirements of our business plan, including regulatory and permission-to-operate related projects.

During 2018, we took action consistent with our capital allocation priorities of returning capital to shareholders, maintaining the strength of our balance sheet, improving our financial flexibility and executing on opportunities that will allow us to increase our long-term profitability. We have remained focused on protecting our business based on our actions to allocate capital to both sustaining our existing operations and our two major capital projects: the HBI plant in Toledo, Ohio and the upgrade to the Northshore plant to replace up to 3.5 million long tons of blast furnace pellet production with DR-grade pellet production. Additionally, we executed a strategy to mitigate our costs as we exited the Asia Pacific Iron Ore operations, including the sale of all remaining assets of the operations, and took additional steps to reduce our long-term debt and extend our maturities by extinguishing $227.4 million of our existing debt.

A005546

Based on our outlook for the next 12 months, which is subject to continued changing demand from steelmakers that utilize our products and volatility in iron ore and domestic steel prices, we expect to generate cash from operations sufficient to meet the needs of our existing operations, service our debt obligations and fund our dividends.

Refer to "Outlook" for additional guidance regarding expected future results, including projections on pricing, sales volume and production.

The following discussion summarizes the significant activities that impacted our cash flows during 2018 and comparative years as well as those expected to impact our future cash flows over the next 12 months. Refer to the Statements of Consolidated Cash Flows for additional information.

### Operating Activities

Net cash provided by operating activities was $478.5 million and $338.1 million for the years ended December 31, 2018 and 2017, respectively. The incremental increase in cash provided by operating activities during 2018 was primarily due to the improved operating results previously discussed related to our Mining and Pelletizing operating segment, offset partially by year-over-year changes in cash used by our discontinued operations.

Net cash provided by operating activities increased to $338.1 million for the year ended December 31, 2017, compared to net cash provided by operating activities of $303.0 million for 2016. The increase in cash provided by operating activities during 2017 was primarily due to the improved operating results previously discussed related to our Mining and Pelletizing operating segment offset partially by cash outflows for working capital. The working capital change in 2017 versus 2016 was primarily driven by the repeal of corporate AMT as a result of tax reform, which impacted our taxes receivable, and the timing of inventory and accounts receivable movements.

Driving the increase in our taxes receivable is Public Law 115–97, commonly known as the "Tax Cuts and Jobs Act", which among other things, repealed the corporate AMT and reduced the federal corporate tax rate to 21% for tax years beginning January 1, 2018. Along with the repeal of AMT, Public Law 115–97 provides that existing AMT credit carryovers are refundable beginning with the filing of the calendar year 2018 tax return. As of December 31, 2018, we have AMT credit carryovers of $117.3 million in *Income tax receivable, current* and $117.3 million in *Income tax receivable, non-current*, which are expected to be fully refunded between the years 2019 and 2022.

Our U.S. cash and cash equivalents balance at December 31, 2018 was $821.6 million, or 99.8% of our consolidated total cash and cash equivalents balance of $823.2 million. Additionally, we had a cash balance at December 31, 2018 of $12.4 million classified as part of *Current assets of discontinued operations* in the Statements of Consolidated Financial Position, which will be utilized to support our exit from Australia.

### Investing Activities

Net cash used by investing activities was $273.1 million for the year ended December 31, 2018, compared to $156.0 million for the year ended December 31, 2017. We had capital expenditures of approximately $296 million and $152 million for the years ended December 31, 2018 and 2017, respectively. The 2018 capital expenditures include the continued development of our HBI project, sustaining capital spend and the upgrades at Northshore Mine.

Net cash used in investing activities was $156.0 million for the year ended December 31, 2017 compared to $57.9 million for 2016. We had capital expenditures of approximately $152 million and $69 million for the years ended December 31, 2017 and 2016, respectively. The 2017 capital expenditures include sustaining capital spend, early-stage work on our HBI project and the acquisition of certain real estate interests located in Itasca County west of Nashwauk, Minnesota.

We spent approximately $69 million, $91 million and $69 million globally on expenditures related to sustaining capital during 2018, 2017 and 2016, respectively. Sustaining capital spend includes infrastructure, mobile equipment, environmental, safety and health, fixed equipment and product quality. Additionally, during the year ended December 31, 2018, we had cash outflows, including deposits, of approximately $180 million on the development of the HBI production plant in Toledo, Ohio and approximately $50 million on the upgrades at Northshore Mine.

We anticipate total cash used for capital expenditures, excluding amounts attributable to construction-related contingencies and capitalized interest, during the next twelve months to be approximately $535 million. Included within this estimate is approximately $70 million for sustaining capital, $425 million related to the HBI production plant in Toledo, Ohio and approximately $40 million for upgrades at the Northshore plant to enable it to produce significantly increased levels of DR-grade pellets that could be sold commercially or used as feedstock for the HBI production plant. We expect to spend approximately $830 million on the HBI production plant and $90 million on the Northshore upgrades, exclusive of construction-related contingencies and capitalized interest, through 2020.

Table of Contents

*Financing Activities*

Net cash used by financing activities was $375.2 million for the year ended December 31, 2018, compared with net cash provided by financing activities of $498.9 million for 2017. Uses of cash from financing activities during 2018 included the redemption of various tranches of unsecured debt. We redeemed in full all of our outstanding $400 million 5.90% 2020 Senior Notes and $500 million 4.80% 2020 Senior Notes and purchased certain other outstanding senior notes. The total aggregate principal amount of debt redeemed and purchased, including premiums, during 2018 was $234.5 million.

Additionally, on November 26, 2018, we announced that our Board of Directors authorized a program to repurchase outstanding common shares in the open market or in privately negotiated transactions, up to a maximum of $200 million. We are not obligated to make any purchase and the program may be suspended or discontinued at any time. During 2018, we repurchased 5.4 million common shares at a cost of approximately $47.5 million in aggregate, including commissions and fees, or an average price of approximately $8.78 per share. As of December 31, 2018, there was approximately $152.7 million remaining under the authorization. The share repurchase program is active until December 31, 2019.

Other uses of cash for financing activities during 2018 included cash payments of $44.2 million for the second of three installments related to an agreement to distribute the net assets of the noncontrolling interest in Empire in exchange for the remaining interest in Empire and $44.0 million for repayment of lease liabilities.

Net cash provided by financing activities was $498.9 million for the year ended December 31, 2017, compared with net cash used by financing activities of $206.4 million for 2016. Sources of cash from financing activities during 2017 included a common share offering, generating net proceeds of $661.3 million, and the issuance of $1.075 billion 5.75% 2025 Senior Notes, which provided further net proceeds of $1.046 billion. We also had an issuance of $400.0 million 4.875% 2024 Senior Secured Notes and an issuance of $316.25 million 1.5% 2025 Convertible Senior Notes, generating net proceeds of $697.5 million.

Uses of cash from financing activities during 2017 included the redemption of various tranches of secured and unsecured debt. We redeemed in full all of our outstanding $540 million 8.25% 2020 First Lien Notes, $218.5 million 8.00% 2020 1.5 Lien Notes and $544.2 million 7.75% 2020 Second Lien Notes and purchased certain other outstanding senior notes through tender offers and redemptions. The total aggregate principal amount of debt redeemed and purchased, including premiums, during 2017 was $1.721 billion. Additionally, we finalized an agreement to distribute the net assets of the noncontrolling interest in Empire to ArcelorMittal in exchange for its interest in Empire and made the first distribution of $44.2 million, as previously discussed. We also acquired the remaining 15% equity interest in Tilden owned by U.S. Steel for $105.0 million.

59

The following represents our future cash commitments and contractual obligations as of December 31, 2018:

| | | Payments Due by Period (In Millions) | | | |
|---|---|---|---|---|---|
| | Total | Less than 1 Year | 1 - 3 Years | 3 - 5 Years | More than 5 Years |
| Long-term debt | $ 2,212.0 | $ — | $ 124.0 | $ — | $ 2,088.0 |
| Interest on debt[1] | 964.6 | 110.6 | 218.3 | 209.2 | 426.5 |
| Operating lease obligations | 19.6 | 4.0 | 5.8 | 3.8 | 6.0 |
| Capital lease obligations | 18.5 | 4.2 | 7.8 | 5.4 | 1.1 |
| Partnership distribution payable | 44.2 | 44.2 | — | — | — |
| Purchase obligations: | | | | | |
| Open purchase orders | 89.5 | 89.5 | — | — | — |
| HBI production plant[2] | 650.0 | 425.0 | 225.0 | — | — |
| Minimum "take or pay" purchase commitments [3] | 711.8 | 85.8 | 152.7 | 108.4 | 364.9 |
| Total purchase obligations | 1,451.3 | 600.3 | 377.7 | 108.4 | 364.9 |
| Other long-term liabilities: | | | | | |
| Pension funding minimums | 365.1 | 15.9 | 79.2 | 118.8 | 151.2 |
| OPEB claim payments | 93.3 | 3.5 | 6.8 | 6.6 | 76.4 |
| Environmental and mine closure obligations | 174.9 | 2.9 | 46.9 | 4.3 | 120.8 |
| Total other long-term liabilities | 633.3 | 22.3 | 132.9 | 129.7 | 348.4 |
| Total | $ 5,343.5 | $ 785.6 | $ 866.5 | $ 456.5 | $ 3,234.9 |

[1] Refer to NOTE 6 - DEBT AND CREDIT FACILITIES for additional information regarding our debt and related interest rates.

[2] Includes purchase obligations and contracted amounts of approximately $400 million.

[3] Includes minimum railroad transportation obligations, minimum electric power demand charges, minimum coal, diesel and natural gas obligations and minimum port facility obligations.

The above table does not reflect $4.2 million of unrecognized tax benefits, which we have recorded for uncertain tax positions, as we are unable to determine a reasonable and reliable estimate of the timing of future payments.

Refer to NOTE 19 - COMMITMENTS AND CONTINGENCIES for additional information regarding our future commitments and obligations.

60

### Capital Resources

We expect to fund our business obligations from available cash, current and future operations and existing borrowing arrangements. We also may pursue other funding strategies in the capital markets to strengthen our liquidity, extend debt maturities and/or fund strategic initiatives. The following represents a summary of key liquidity measures:

| | (In Millions) | |
| --- | --- | --- |
| | December 31, 2018 | December 31, 2017 |
| Cash and cash equivalents | $ 823.2 | $ 978.3 |
| | | |
| Available borrowing base on ABL Facility [1] | $ 323.7 | $ 273.2 |
| ABL Facility loans drawn | — | — |
| Letter of credit obligations and other commitments | (55.0 ) | (46.5 ) |
| Borrowing capacity available | $ 268.7 | $ 226.7 |

[1] The ABL Facility has a maximum borrowing base of $450 million, determined by applying customary advance rates to eligible accounts receivable, inventory and certain mobile equipment.

Our primary sources of funding are cash and cash equivalents, which totaled $823.2 million as of December 31, 2018, cash generated by our business, availability under the ABL Facility and other financing activities. Cash and cash equivalents include cash on hand and on deposit as well as all short-term securities held for the primary purpose of general liquidity. The combination of cash and availability under the ABL Facility gives us $1,091.9 million in liquidity entering the first quarter of 2019, which is expected to be adequate to fund operations, letter of credit obligations, sustaining and expansion capital expenditures and other cash commitments for at least the next 12 months.

As of December 31, 2018, we were in compliance with the ABL Facility liquidity requirements and, therefore, the springing financial covenant requiring a minimum Fixed Charge Coverage Ratio of 1.0 to 1.0 was not applicable. We believe that the cash on hand and the ABL Facility provide us sufficient liquidity to support our operating, investing and financing activities. We have the capability to issue additional unsecured notes and, subject to the limitations set forth in our existing debt indentures, additional secured indebtedness, if we elect to access the debt capital markets. However, available capacity of these notes could be limited by market conditions.

Consistent with our stated strategy, we intend from time to time to seek to retire or purchase our outstanding senior notes with cash on hand, borrowings from existing credit sources or new debt financings and/or exchanges for debt or equity securities, in open market purchases, privately negotiated transactions or otherwise. Such repurchases, if any, will depend on prevailing market conditions, our liquidity requirements, contractual restrictions and other factors, and the amounts involved may be material.

### Off-Balance Sheet Arrangements

In the normal course of business, we are a party to certain arrangements that are not reflected on our Statements of Consolidated Financial Position . These arrangements include minimum "take or pay" purchase commitments, such as minimum electric power demand charges, minimum coal, diesel and natural gas purchase commitments, minimum railroad transportation commitments and minimum port facility usage commitments; financial instruments with off-balance sheet risk, such as bank letters of credit and bank guarantees; and operating leases, which primarily relate to equipment and office space.

## Market Risks

We are subject to a variety of risks, including those caused by changes in commodity prices, foreign currency exchange rates and interest rates. We have established policies and procedures to manage such risks; however, certain risks are beyond our control.

### Pricing Risks

#### Commodity Price Risk

Our consolidated revenues include the sale of a single product, iron ore pellets, in the North American market. Our financial results can vary significantly as a result of fluctuations in the market prices of iron ore, hot-rolled coil steel and iron ore pellet premiums. World market prices for these commodities have fluctuated historically and are affected

Table of Contents

by numerous factors beyond our control. The world market price that is most commonly utilized in our iron ore sales contracts is the Platts 62% Price, which can fluctuate widely due to numerous factors, such as global economic growth or contraction, change in demand for steel or changes in availability of supply.

*Customer Supply Agreement*

A supply agreement with one customer provides for supplemental revenue or refunds based on the average annual daily market price for hot-rolled coil steel at the time the iron ore product is consumed in the customer's blast furnaces. At December 31, 2018, we had derivative assets of $89.3 million, representing the fair value of the pricing factors, based upon the amount of unconsumed long tons and an estimated average hot-rolled coil steel price for the period in which the iron ore is expected to be consumed in the customer's blast furnaces, subject to final pricing at a future date. We estimate that a $75 positive or negative change in the average daily market price for hot-rolled coil steel realized from the December 31, 2018 estimated price recorded would cause the fair value of the derivative instrument to increase or decrease by approximately $27 million, respectively, thereby impacting our consolidated revenues by the same amount. We have not entered into any hedging programs to mitigate the risk of adverse price fluctuations.

**Volatile Energy and Fuel Costs**

The volatile cost of energy is an important factor affecting the production costs at our iron ore operations. Our consolidated Mining and Pelletizing segment operations consumed 15 million MMBtu of natural gas at an average delivered price of $3.77 per MMBtu, excluding the natural gas hedge impact, or $3.65 per MMBtu net of the natural gas hedge impact during 2018. Additionally, our consolidated Mining and Pelletizing segment operations consumed 17 million gallons of diesel fuel at an average delivered price of $2.37 per gallon during 2018.

Our strategy to address volatile natural gas and diesel rates includes improving efficiency in energy usage, identifying alternative providers and utilizing the lowest cost alternative fuels. A full-year hedging program was implemented during the fourth quarter of 2017 in order to manage the price risk of natural gas at our Mining and Pelletizing segment mines. Additionally, during the third quarter of 2018, we began entering into forward hedge contracts to manage our 2019 price of diesel fuel at our Mining and Pelletizing segment mines. We will continue to monitor relevant energy markets for risk mitigation opportunities and may make additional forward purchases or employ other hedging instruments in the future as warranted and deemed appropriate by management. In the near term, a 10% change from our 2018 average natural gas and diesel fuel prices would result in a change of approximately $11 million in our annual fuel and energy cost based on expected consumption for 2019.

In the ordinary course of business, there may also be increases in prices relative to electricity costs at our mine sites. Specifically, Tilden has entered into large curtailable special contracts with Wisconsin Electric Power Company. Charges under those special contracts are subject to a power supply cost recovery mechanism that is based on variations in the utility's actual fuel and purchase power expenses.

**Valuation of Other Long-Lived Assets**

Long-lived assets are reviewed for impairment upon the occurrence of events or changes in circumstances that would indicate that the carrying value of the assets may not be recoverable. Such indicators may include, among others: a significant decline in expected future cash flows; a sustained, significant decline in market pricing; a significant adverse change in legal or environmental factors or in the business climate; changes in estimates of our recoverable reserves; unanticipated competition; and slower growth or production rates. Any adverse change in these factors could have a significant impact on the recoverability of our long-lived assets and could have a material impact on our consolidated statements of operations and statement of financial position.

A comparison of each asset group's carrying value to the estimated undiscounted net future cash flows expected to result from the use of the assets, including cost of disposition, is used to determine if an asset is recoverable. Projected future cash flows reflect management's best estimates of economic and market conditions over the projected period, including growth rates in revenues and costs, estimates of future expected changes in operating margins and capital expenditures. If the carrying value of the asset group is higher than its undiscounted net future cash flows, the asset group is measured at fair value and the difference is recorded as a reduction to the long-lived assets. We estimate fair value using a market approach, an income approach or a cost approach. As of December 31, 2018, no impairment factors were present that would indicate that the carrying value of our asset groups may not be recoverable; as a result, no impairment assessment was required.

Table of Contents

*Interest Rate Risk*

Interest payable on our senior notes is at fixed rates. Interest payable under our ABL Facility is at a variable rate based upon the base rate plus the base rate margin depending on the excess availability. As of December 31, 2018, we had no amounts drawn on the ABL Facility.

*Supply Concentration Risks*

Many of our mines are dependent on one source each of electric power and natural gas. A significant interruption or change in service or rates from our energy suppliers could impact materially our production costs, margins and profitability.

**Outlook**

| | 2019 Outlook Summary |
| --- | --- |
| *Per Long Ton Information* | **Mining and Pelletizing** |
| Cost of goods sold and operating expense rate | $73 - $78 |
| Less: | |
| Freight expense rate[1] | $7 |
| Depreciation, depletion & amortization rate | $4 |
| Cash cost of goods sold and operating expense rate | $62 - $67 |
| | |
| Sales volume (million long tons) | 20.0 |
| Production volume (million long tons) | 20.0 |

[1] Freight has an offsetting amount in revenue and has no impact on sales margin.

**Mining and Pelletizing Outlook** (Long Tons)

Based on the assumption that iron ore prices of $76 per metric ton, steel prices of $694 per short ton, and pellet premiums of $67.50 per metric ton will average for the remainder of 2019 their respective January averages, we would realize Mining and Pelletizing revenue rates in the range of $102 to $107 per long ton. Performing the same analysis using spot prices as of February 7, 2019, namely an iron ore price of $90.50 per metric ton, a steel price of $683 per short ton, and a pellet premium of $67.50 per metric ton, we would expect to realize Mining and Pelletizing revenue rates in the range of $111 to $116 per long ton for the full-year 2019.

For 2019, we expect full-year sales and production volumes of our productive capacity of approximately 20 million long tons. Our full-year 2019 Mining and Pelletizing cash cost of goods sold and operating expense expectation is $62 to $67 per long ton.

**SG&A Expenses and Other Expectations**

Full-year 2019 SG&A expenses are expected to be approximately $120 million. We note that of the $120 million expectation, approximately $20 million is considered non-cash.

Our full-year 2019 interest expense is expected to be approximately $100 million, compared to $119 million recorded in 2018. We expect approximately $20 million in cash interest related to the HBI project to be capitalized, compared to $6 million that was capitalized in 2018.

Our 2019 effective tax rate is expected to be approximately 10%. However, due to our net operating loss position, our cash tax payments are expected to be zero.

Additionally, we also expect to receive approximately $117 million in cash tax refunds during the third quarter of 2019.

Consolidated full-year 2019 depreciation, depletion and amortization is expected to be approximately $85 million, incurred ratably throughout the year.

Table of Contents

**Capital Expenditures**

Our 2019 capital spending expectations are:

- Approximately $425 million toward the HBI project in Toledo, OH;

- Approximately $70 million in sustaining capital;

- Approximately $40 million toward the completion of the upgrade at the Northshore mine; and

- Approximately $20 million in capitalized interest.

Based on current market analysis, greater-than-expected customer demand and expansion opportunities explored during the HBI construction process, we are increasing the productive capacity of our Toledo HBI facility from 1.6 million metric tons to 1.9 million metric tons per year.

**Recently Issued Accounting Pronouncements**

Refer to NOTE 2 - NEW ACCOUNTING STANDARDS of the consolidated financial statements for a description of recent accounting pronouncements, including the respective dates of adoption and effects on results of operations and financial condition.

**Critical Accounting Estimates**

Management's discussion and analysis of financial condition and results of operations is based on our consolidated financial statements, which have been prepared in accordance with GAAP. Preparation of financial statements requires management to make assumptions, estimates and judgments that affect the reported amounts of assets, liabilities, revenues, costs and expenses, and the related disclosures of contingencies. Management bases its estimates on various assumptions and historical experience, which are believed to be reasonable; however, due to the inherent nature of estimates, actual results may differ significantly due to changed conditions or assumptions. On a regular basis, management reviews the accounting policies, assumptions, estimates and judgments to ensure that our financial statements are fairly presented in accordance with GAAP. However, because future events and their effects cannot be determined with certainty, actual results could differ from our assumptions and estimates, and such differences could be material. Management believes that the following critical accounting estimates and judgments have a significant impact on our financial statements.

*Revenue Recognition*

*Customer Supply Agreement*

A supply agreement with one customer provides for supplemental revenue or refunds to the customer based on the average annual daily steel market price for hot-rolled coil steel in the year the iron ore product is consumed in the customer's blast furnace. The supplemental pricing is characterized as a freestanding derivative and is required to be accounted for separately once control transfers to the customer. The derivative instrument, which is finalized based on a future price, is adjusted to fair value as a revenue adjustment each reporting period until the pellets are consumed and the amounts are settled.

The fair value of the instrument is determined using a market approach based on an estimate of the average annual daily market price for hot-rolled coil steel, and takes into consideration current market conditions and nonperformance risk. At December 31, 2018, we had a derivative asset of $89.3 million, representing the fair value of the pricing factors, based upon the amount of unconsumed long tons and an estimated average annual daily hot-rolled coil steel price related to the period in which the iron ore is expected to be consumed in the customer's blast furnace at each respective steelmaking facility, subject to final pricing at a future date. We recognized net derivative revenue of $425.8 million in *Product revenues* in the Statements of Consolidated Operations for the year ended December 31, 2018

The accuracy of our estimates typically increases as the year progresses based on additional information in the market becoming available. Our estimates for supplemental revenue adjustments have been materially correct related to the Mining and Pelletizing segment's product revenues for the year ended December 31, 2018 and 2017.

64

*Mineral Reserves*

We regularly evaluate our mineral reserves and update them as required in accordance with SEC Industry Guide 7. The estimated mineral reserves could be affected by future industry conditions, geological conditions and ongoing mine planning. Additional capital and development expenditures may be required to maintain effective production capacity. Generally, as mining operations progress, haul distances increase. Alternatively, changes in economic conditions or the expected quality of mineral reserves could decrease capacity of mineral reserves. Technological progress could alleviate such factors or increase capacity of mineral reserves.

We use our mineral reserve estimates, combined with our estimated annual production levels, to determine the mine closure dates utilized in recording the fair value liability for asset retirement obligations for our active operating mines. Refer to NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS, for further information. Since the liability represents the present value of the expected future obligation, a significant change in mineral reserves or mine lives could have a substantial effect on the recorded obligation. We also utilize mineral reserves for evaluating potential impairments of mine asset groups and in determining maximum useful lives utilized to calculate depreciation and amortization of long-lived mine assets. Increases or decreases in mineral reserves or mine lives could significantly affect these items.

*Valuation of Long-Lived Assets*

In assessing the recoverability of our long-lived asset groups, significant assumptions regarding the estimated future cash flows and other factors to determine the fair value of the respective assets must be made, as well as the related estimated useful lives. If these estimates or their related assumptions change in the future as a result of changes in strategy or market conditions, we may be required to record impairment charges for these assets in the period such determination was made.

We monitor conditions that indicate that the carrying value of an asset or asset group may be impaired. In order to determine if assets have been impaired, assets are grouped and tested at the lowest level for which identifiable, independent cash flows are available. An impairment loss exists when projected undiscounted net cash flows are less than the carrying value of the asset group. The measurement of the impairment loss to be recognized is based on the difference between the fair value and the carrying value of the asset group. Fair value can be determined using a market approach, income approach or cost approach. The impairment analysis and fair value determination can result in substantially different outcomes based on changes in critical assumptions and estimates, including the quantity and quality of remaining mineral reserves, future iron ore prices and production costs.

During 2018, 2017 and 2016 there were no impairment indicators present at our continuing operations; as a result, no impairment assessments were required.

Refer to NOTE 1 - BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES  for further information regarding our policy on asset impairment.

*Asset Retirement Obligations and Environmental Remediation Costs*

The accrued mine closure obligations for our active mining operations provide for contractual and legal obligations associated with the eventual closure of the mining operations. We perform an in-depth evaluation of the liability every three years in addition to our routine annual assessments. In 2017, we employed a third-party specialist to assist in the evaluation. Our obligations are determined based on detailed estimates adjusted for factors that a market participant would consider (e.g., inflation, overhead and profit), which are escalated at an assumed rate of inflation to the estimated closure dates, and then discounted using the current credit-adjusted risk-free interest rate. The estimate also incorporates incremental increases in the closure cost estimates and changes in estimates of mine lives. The closure date for each location is determined based on the exhaustion date of the remaining iron ore reserves, which is dependent on our estimate of mineral reserves. The estimated obligations are particularly sensitive to the impact of changes in mine lives given the difference between the inflation and discount rates. Changes in the base estimates of legal and contractual closure costs due to changes in legal or contractual requirements, available technology, inflation, overhead or profit rates also could have a significant impact on the recorded obligations.

We have a formal policy for environmental protection and remediation. Our obligations for known environmental matters at active and closed mining operations and other sites have been recognized based on estimates of the cost of investigation and remediation at each site. If the obligation can only be estimated as a range of possible amounts, with no specific amount being more likely, the minimum of the range is accrued. Management reviews its environmental remediation sites quarterly to determine if additional cost adjustments or disclosures are required. The characteristics

Table of Contents

of environmental remediation obligations, where information concerning the nature and extent of clean-up activities is not immediately available and which are subject to changes in regulatory requirements, result in a significant risk of increase to the obligations as they mature. Expected future expenditures are not discounted to present value unless the amount and timing of the cash disbursements can be reasonably estimated. Potential insurance recoveries are not recognized until realized. Refer to NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS, for further information.

*Income Taxes*

Our income tax expense, deferred tax assets and liabilities and reserves for unrecognized tax benefits reflect management's best assessment of estimated future taxes to be paid. We are subject to income taxes in the U.S. and various foreign jurisdictions. Significant judgments and estimates are required in determining the consolidated income tax expense.

Deferred income taxes arise from temporary differences between tax and financial statement recognition of revenue and expense. In evaluating our ability to recover our deferred tax assets, we consider all available positive and negative evidence, including scheduled reversals of deferred tax liabilities, projected future taxable income, tax planning strategies and recent financial operations. In projecting future taxable income, we begin with historical results adjusted for the results of discontinued operations and changes in accounting policies and incorporate assumptions including the amount of future state, federal and foreign pretax operating income, the reversal of temporary differences, and the implementation of feasible and prudent tax planning strategies. These assumptions require significant judgment about the forecasts of future taxable income and are consistent with the plans and estimates we are using to manage the underlying businesses.

At December 31, 2018 and 2017, we had a total valuation allowance of $1,287.3 million and $1,983.1 million, respectively, against our deferred tax assets. Of this amount, $44.1 million and $593.8 million relate to the U.S. deferred tax assets at December 31, 2018 and 2017, respectively and $1,243.2 million and $1,389.3 million relate to foreign deferred tax assets, respectively.

As of December 31, 2018, our U.S. operations emerged from a three-year cumulative loss position. As the significant negative evidence of cumulative losses has been eliminated, we undertook an evaluation of the continuing need for a valuation allowance on the U.S. deferred tax assets, the majority of which relates to the U.S. tax net operating losses.

In completing our evaluation of whether a valuation allowance was still needed, we considered all available positive and negative evidence. Positive evidence considered included the emergence from the three-year cumulative loss position, our long-term customer contracts with minimum tonnage requirements, the global scarcity of iron ore pellets, near term forecasts of strong profitability and the recently revised IRC Section 163(j) interest deduction limitation. Negative evidence included the overall size of the deferred tax asset with limited carryforward and no carryback opportunity, the finite nature of the iron ore resources we mine, the uncertainty of steel tariffs that positively impacted our revenue rates in 2018 and the various market signs that the U.S. economy may be nearing the end of the current expansion.

We also considered that future realization of the deferred tax assets depends on the existence of sufficient taxable income of the appropriate character during the carryforward period. In considering sources of taxable income, we identified that a portion of the deferred tax assets would be utilized by existing taxable temporary differences reversing in the same periods as existing deductible temporary differences. In addition, we determined that carryback opportunities and tax planning strategies do not exist as potential sources of future taxable income. Lastly, forecasting future taxable income was considered, but is challenging in a cyclical industry such as ours as it relies heavily on the accuracy of key assumptions, particularly about key pricing benchmarks.

Because historical information is verifiable and more objective than forecast information and due to the cyclicality of the industry, we developed an estimate of future income based on our historical earnings through the most recent industry cycle. We adjusted historical earnings for certain non-recurring items as well as to be reflective of the current corporate structure by eliminating the impact of discontinued operations and extinguished debt ("core earnings"). Additionally, we adjusted core earnings to reflect the impact of the recently revised IRC Section 163(j) interest deduction limitation as well as permanent tax adjustments. The IRC Section 163(j) limitation will limit our interest deduction, particularly in down years in the industry cycle, resulting in higher taxable income.

Based on the core earnings analysis, the Company's average annual book taxable income through the business cycle is in excess of the estimated $109.0 million average annual taxable income required to fully utilize the deferred

66

Table of Contents

tax assets within the 19 year carryforward period. We ascribed significant weight in our assessment to the core earnings analysis and the resulting projection of taxable income through the industry cycle. Based on the weight of this positive evidence, and after considering the other available positive and negative evidence, we determined that it was appropriate to release all of the valuation allowance related to U.S. federal deferred tax assets at December 31, 2018 as it is more likely than not that the entire deferred tax asset will be realized before the end of the carryforward period. We also released the state valuation allowance except for the valuation allowance recorded on deferred tax assets related to state net operating losses in jurisdictions where we no longer operate and the losses will not be utilized. The valuation allowance related to foreign tax credits will be retained as the credits will expire prior to utilization.

Our losses in Luxembourg in recent periods represent sufficient negative evidence to require a full valuation allowance against the deferred tax assets in that jurisdiction. We intend to maintain a valuation allowance against the deferred tax assets related to these operating losses, until sufficient positive evidence exists to support the realization of such assets.

Changes in tax laws and rates also could affect recorded deferred tax assets and liabilities in the future. In 2017, both the U.S. and Luxembourg reduced the statutory rate; this decreased the deferred tax assets and related valuation allowance by $407.5 million. The U.S. tax legislation also repealed the corporate AMT which resulted in a reversal of the valuation allowance related to the AMT credits and an income tax benefit of $234.6 million for the year ended December 31, 2017. At December 31, 2018, we have recorded an *Income tax receivable, current* of $117.3 million and an *Income tax receivable, non-current* of $117.3 million, which represents the AMT credits to be refunded in 2019 through 2022. These receivables represent the full amount of refundable AMT credits as the IRS has confirmed they will not be subject to sequestration. We had recorded a $15 million reserve against the AMT credit receivable during the first quarter of 2018, based on preliminary guidance from the IRS. Near year-end, the IRS issued final guidance that AMT credit refunds would not be subject to sequestration and we reversed the previously recorded reserve. There was no net impact on the full year 2018.

The calculation of our tax liabilities involves dealing with uncertainties in the application of complex tax laws and regulations in various jurisdictions across our global operations. The ultimate impact of the U.S. income tax reform legislation may differ from our current estimates due to changes in the interpretations and assumptions made as well as additional regulatory guidance that may be issued.

Accounting for uncertainty in income taxes recognized in the financial statements requires that a tax benefit from an uncertain tax position be recognized when it is more likely than not that the position will be sustained upon examination, including resolutions of any related appeals or litigation processes, based on technical merits.

We recognize tax liabilities in accordance with *ASC 740, Income Taxes*, and we adjust these liabilities when our judgment changes because of evaluation of new information not previously available. Due to the complexity of some of these uncertainties, the ultimate resolution may result in payment that is materially different from our current estimate of the tax liabilities. These differences will be reflected as increases or decreases to income tax expense in the period in which they are determined. Refer to NOTE 10 - INCOME TAXES, for further information.

### Employee Retirement Benefit Obligations

We offer defined benefit pension plans, defined contribution pension plans and other postretirement benefit plans, primarily consisting of retiree healthcare benefits, to most employees in North America as part of a total compensation and benefits program. The defined benefit pension plans largely are noncontributory and benefits generally are based on employees' years of service and average earnings for a defined period prior to retirement, or a minimum formula.

Following is a summary of our U.S. defined benefit pension and OPEB funding and expense:

| | Pension | | | OPEB | | |
|---|---|---|---|---|---|---|
| | Funding | | Expense | | Funding | | Expense (Benefit) |
| 2016 | $ | 1.2 | $ | 16.5 | $ | 1.1 | $ | (4.0) |
| 2017 | $ | 24.4 | $ | 18.0 | $ | 2.1 | $ | (6.1) |
| 2018 | $ | 27.6 | $ | 12.7 | $ | 3.8 | $ | (5.9) |
| 2019 (Estimated) | $ | 15.9 | $ | 21.5 | $ | 3.5 | $ | (2.8) |

Assumptions used in determining the benefit obligations and the value of plan assets for defined benefit pension plans and postretirement benefit plans (primarily retiree healthcare benefits) that we offer are evaluated periodically by management. Critical assumptions, such as the discount rate used to measure the benefit obligations, the expected long-term rate of return on plan assets, the medical care cost trend, and the rate of compensation increase are reviewed annually.

As of December 31, 2018 and 2017, we used the following assumptions:

| | Pension and Other Benefits | |
|---|---|---|
| | 2018 | 2017 |
| Plan discount rates: | | |
| Iron Hourly Pension Plan | 4.31 % | 3.60 % |
| Salaried Pension Plan | 4.21 | 3.52 |
| Ore Mining Pension Plan | 4.33 | 3.61 |
| SERP | 4.22 | 3.50 |
| Hourly OPEB Plan | 4.29 | 3.60 |
| Salaried OPEB Plan | 4.27 | 3.57 |
| Rate of compensation increase - Salaried | 3.00 | 3.00 |
| Rate of compensation increase - Hourly | 2.00 | 2.00 |
| Pension plan expected return on plan assets | 8.25 | 8.25 |
| OPEB plan expected return on plan assets | 7.00 | 7.00 |
| Health care cost trend rate assumed for next year | 6.75 | 7.00 |
| Ultimate health care cost trend rate | 5.00 | 5.00 |
| Year that the ultimate rate is reached | 2026 | 2026 |

The increase in the discount rates in 2018 was driven by the change in corporate bond yields, which were up approximately 70 basis points compared to the prior year.

Additionally, on December 31, 2018, the assumed mortality improvement projection was changed from generational scale MP-2017 to generational scale MP-2018. The healthy mortality assumption remains the RP-2014 mortality tables with blue collar and white collar adjustments made for certain hourly and salaried groups to determine the expected life of our plan participants.

68

A005557

Following are sensitivities of potential further changes in these key assumptions on the estimated 2019 pension and OPEB expense and the pension and OPEB benefit obligations as of December 31, 2018:

| | Increase in Expense (In Millions) | | | | Increase in Benefit Obligation (In Millions) | | | |
| | Pension | | OPEB | | Pension | | OPEB | |
|---|---|---|---|---|---|---|---|---|
| Decrease discount rate 0.25% | $ | 1.6 | $ | 0.2 | $ | 25.0 | $ | 6.6 |
| Decrease return on assets 1.00% | $ | 6.6 | $ | 2.4 | N/A | | N/A | |

Changes in actuarial assumptions, including discount rates, employee retirement rates, mortality, compensation levels, plan asset investment performance and healthcare costs, are determined based on analyses of actual and expected factors. Changes in actuarial assumptions and/or investment performance of plan assets may have a significant impact on our financial condition due to the magnitude of our retirement obligations. Refer to NOTE 8 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS, for further information.

**Forward-Looking Statements**

This report contains statements that constitute "forward-looking statements" within the meaning of the federal securities laws. As a general matter, forward-looking statements relate to anticipated trends and expectations rather than historical matters. Forward-looking statements are subject to uncertainties and factors relating to Cliffs' operations and business environment that are difficult to predict and may be beyond our control. Such uncertainties and factors may cause actual results to differ materially from those expressed or implied by the forward-looking statements. These statements speak only as of the date of this report, and we undertake no ongoing obligation, other than that imposed by law, to update these statements. Uncertainties and risk factors that could affect Cliffs' future performance and cause results to differ from the forward-looking statements in this report include, but are not limited to:

- uncertainty and weaknesses in global economic conditions, including downward pressure on prices caused by oversupply or imported products, reduced market demand and risks related to U.S. government actions with respect to Section 232 of the Trade Expansion Act (as amended by the Trade Act of 1974), the United States-Mexico-Canada Agreement and/or other trade agreements, treaties or policies;

- continued volatility of iron ore and steel prices and other trends, which may impact the price-adjustment calculations under our sales contracts;

- our ability to successfully diversify our product mix and add new customers beyond our traditional blast furnace clientele;

- our ability to cost-effectively achieve planned production rates or levels, including at our HBI plant;

- our ability to successfully identify and consummate any strategic investments or development projects, including our HBI plant;

- the impact of our customers reducing their steel production due to increased market share of steel produced using other methods or lighter-weight steel alternatives;

- our actual economic iron ore reserves or reductions in current mineral estimates, including whether any mineralized material qualifies as a reserve;

- the outcome of any contractual disputes with our customers, joint venture partners or significant energy, material or service providers or any other litigation or arbitration;

- problems or uncertainties with sales volume or mix, productivity, tons mined, transportation, mine-closure obligations, environmental liabilities, employee-benefit costs and other risks of the mining industry;

- impacts of existing and increasing governmental regulation and related costs and liabilities, including failure to receive or maintain required operating and environmental permits, approvals, modifications or other authorization of, or from, any governmental or regulatory entity and costs related to implementing improvements to ensure compliance with regulatory changes;

69

A005558

- our ability to maintain adequate liquidity, our level of indebtedness and the availability of capital could limit cash flow available to fund working capital, planned capital expenditures, acquisitions and other general corporate purposes or ongoing needs of our business;

- our ability to continue to pay cash dividends, and the amount and timing of any cash dividends;

- availability of capital and our ability to maintain adequate liquidity;

- our ability to maintain appropriate relations with unions and employees;

- the ability of our customers, joint venture partners and third party service providers to meet their obligations to us on a timely basis or at all;

- events or circumstances that could impair or adversely impact the viability of a mine and the carrying value of associated assets, as well as any resulting impairment charges;

- uncertainties associated with natural disasters, weather conditions, unanticipated geological conditions, supply or price of energy, equipment failures and other unexpected events;

- adverse changes in interest rates and tax laws; and

- the potential existence of significant deficiencies or material weakness in our internal control over financial reporting  .

   For additional factors affecting the business of Cliffs, refer to  *Part I – Item 1A. Risk Factors*. You are urged to carefully consider these risk factors.

*Non-GAAP Reconciliation*

   We present cash cost of goods sold and operating expense rate per long ton, which is a non-GAAP financial measure that management uses in evaluating operating performance. We believe our presentation of non-GAAP cash cost of goods sold and operating expenses is useful to investors because it excludes depreciation, depletion and amortization, which are non-cash, and freight and joint venture partners' cost reimbursements, which have no impact on sales margin, thus providing a more accurate view of the cash outflows related to the sale of iron ore. The presentation of this measure is not intended to be considered in isolation from, as a substitute for, or as superior to, the financial information prepared and presented in accordance with GAAP. The presentation of this measure may be different from non-GAAP financial measures used by other companies. Below is a reconciliation in dollars of this non-GAAP financial measure to our consolidated financial statements.

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | | | |
| | **2018** | | 2017 | | 2016 | |
| Cost of goods sold and operating expenses | $ | **(1,522.8 )** | $ | (1,398.4 ) | $ | (1,274.4 ) |
| Less: | | | | | | |
| Freight and reimbursements | | **(160.1 )** | | (221.4 ) | | (174.8 ) |
| Depreciation, depletion & amortization | | **(68.2 )** | | (66.6 ) | | (84.0 ) |
| Cash cost of goods sold and operating expenses | $ | **(1,294.5 )** | $ | (1,110.4 ) | $ | (1,015.6 ) |

**Item 7A.**     *Quantitative and Qualitative Disclosures About Market Risk*

   Information regarding our Market Risk is presented under the caption  *Market Risks*, which is included in  *Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations* and is incorporated by reference and made a part hereof.

Table of Contents

**Item 8.**        *Financial Statements and Supplementary Data*

**Statements of Consolidated Financial Position**

Cleveland-Cliffs Inc. and Subsidiaries

| | (In Millions) | |
| --- | --- | --- |
| | December 31, | |
| | **2018** | 2017 |
| **ASSETS** | | |
| CURRENT ASSETS | | |
| Cash and cash equivalents | $ **823.2** | $ 978.3 |
| Accounts receivable, net | **226.7** | 106.7 |
| Inventories | **87.9** | 138.4 |
| Supplies and other inventories | **93.2** | 88.8 |
| Derivative assets | **91.5** | 37.9 |
| Income tax receivable, current | **117.3** | 13.3 |
| Loans to and accounts receivables from the Canadian Entities | **—** | 51.6 |
| Current assets of discontinued operations | **12.4** | 118.5 |
| Other current assets | **27.4** | 11.1 |
| TOTAL CURRENT ASSETS | **1,479.6** | 1,544.6 |
| PROPERTY, PLANT AND EQUIPMENT, NET | **1,286.0** | 1,033.8 |
| OTHER ASSETS | | |
| Deposits for property, plant and equipment | **83.0** | 17.8 |
| Income tax receivable, non-current | **121.3** | 235.3 |
| Deferred income taxes | **464.8** | — |
| Non-current assets of discontinued operations | **—** | 20.3 |
| Other non-current assets | **94.9** | 101.6 |
| TOTAL OTHER ASSETS | **764.0** | 375.0 |
| TOTAL ASSETS | $ **3,529.6** | $ 2,953.4 |

(continued)

*The accompanying notes are an integral part of these  consolidated financial statements.*

71

Table of Contents

**Statements of Consolidated Financial Position**

Cleveland-Cliffs Inc. and Subsidiaries - (Continued)

|  | (In Millions) | |
|---|---|---|
|  | December 31, | |
|  | **2018** | 2017 |
| LIABILITIES |  |  |
| CURRENT LIABILITIES |  |  |
| Accounts payable | $ **186.8** | $ 99.5 |
| Accrued employment costs | **74.0** | 52.7 |
| State and local taxes payable | **35.5** | 30.2 |
| Accrued interest | **38.4** | 31.4 |
| Contingent claims | **—** | 55.6 |
| Partnership distribution payable | **43.5** | 44.2 |
| Current liabilities of discontinued operations | **6.7** | 75.0 |
| Other current liabilities | **83.3** | 63.6 |
| TOTAL CURRENT LIABILITIES | **468.2** | 452.2 |
| POSTEMPLOYMENT BENEFIT LIABILITIES |  |  |
| Pensions | **218.4** | 222.8 |
| Other postretirement benefits | **30.3** | 34.9 |
| TOTAL POSTEMPLOYMENT BENEFIT LIABILITIES | **248.7** | 257.7 |
| ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS | **172.0** | 167.7 |
| LONG-TERM DEBT | **2,092.9** | 2,304.2 |
| NON-CURRENT LIABILITIES OF DISCONTINUED OPERATIONS | **8.3** | 52.2 |
| OTHER LIABILITIES | **115.3** | 163.5 |
| TOTAL LIABILITIES | **3,105.4** | 3,397.5 |
| COMMITMENTS AND CONTINGENCIES (SEE NOTE 19) |  |  |
| EQUITY |  |  |
| CLIFFS SHAREHOLDERS' EQUITY (DEFICIT) |  |  |
| Preferred Stock - no par value |  |  |
| Class A - 3,000,000 shares authorized |  |  |
| Class B - 4,000,000 shares authorized |  |  |
| Common Shares - par value $0.125 per share |  |  |
| Authorized - 600,000,000 shares (2017 - 600,000,000 shares); |  |  |
| Issued - 301,886,794 shares (2017 - 301,886,794 shares); |  |  |
| Outstanding - 292,611,569 shares (2017 - 297,400,968 shares) | **37.7** | 37.7 |
| Capital in excess of par value of shares | **3,916.7** | 3,933.9 |
| Retained deficit | **(3,060.2)** | (4,207.3) |
| Cost of 9,275,225 common shares in treasury (2017 - 4,485,826 shares) | **(186.1)** | (169.6) |
| Accumulated other comprehensive loss | **(283.9)** | (39.0) |
| TOTAL CLIFFS SHAREHOLDERS' EQUITY (DEFICIT) | **424.2** | (444.3) |
| NONCONTROLLING INTEREST | **—** | 0.2 |
| TOTAL EQUITY (DEFICIT) | **424.2** | (444.1) |
| TOTAL LIABILITIES AND EQUITY (DEFICIT) | $ **3,529.6** | $ 2,953.4 |

*The accompanying notes are an integral part of these consolidated financial statements.*

Table of Contents

**Statements of Consolidated Operations**

Cleveland-Cliffs Inc. and Subsidiaries

| | (In Millions, Except Per Share Amounts) | | |
|---|---|---|---|
| | Year Ended December 31, | | |
| | **2018** | 2017 | 2016 |
| REVENUES FROM PRODUCT SALES AND SERVICES | | | |
| Product | $ **2,172.3** | $ 1,644.6 | $ 1,379.7 |
| Freight and venture partners' cost reimbursements | **160.1** | 221.4 | 174.8 |
| | **2,332.4** | 1,866.0 | 1,554.5 |
| COST OF GOODS SOLD AND OPERATING EXPENSES | **(1,522.8)** | (1,398.4) | (1,274.4) |
| SALES MARGIN | **809.6** | 467.6 | 280.1 |
| OTHER OPERATING INCOME (EXPENSE) | | | |
| Selling, general and administrative expenses | **(116.8)** | (102.9) | (115.8) |
| Miscellaneous - net | **(19.6)** | 25.5 | (33.6) |
| | **(136.4)** | (77.4) | (149.4) |
| OPERATING INCOME | **673.2** | 390.2 | 130.7 |
| OTHER INCOME (EXPENSE) | | | |
| Interest expense, net | **(118.9)** | (126.8) | (193.9) |
| Gain (loss) on extinguishment/restructuring of debt | **(6.8)** | (165.4) | 166.3 |
| Other non-operating income | **17.2** | 10.2 | 7.3 |
| | **(108.5)** | (282.0) | (20.3) |
| INCOME FROM CONTINUING OPERATIONS BEFORE INCOME TAXES | **564.7** | 108.2 | 110.4 |
| INCOME TAX BENEFIT | **475.2** | 252.4 | 12.2 |
| INCOME FROM CONTINUING OPERATIONS | **1,039.9** | 360.6 | 122.6 |
| INCOME FROM DISCONTINUED OPERATIONS, net of tax | **88.2** | 2.5 | 76.7 |
| NET INCOME | **1,128.1** | 363.1 | 199.3 |
| LOSS (INCOME) ATTRIBUTABLE TO NONCONTROLLING INTEREST | **—** | 3.9 | (25.2) |
| NET INCOME ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | $ **1,128.1** | $ 367.0 | $ 174.1 |
| | | | |
| EARNINGS PER COMMON SHARE ATTRIBUTABLE TO CLIFFS SHAREHOLDERS - BASIC | | | |
| Continuing operations | $ **3.50** | $ 1.27 | $ 0.49 |
| Discontinued operations | **0.30** | 0.01 | 0.39 |
| | $ **3.80** | $ 1.28 | $ 0.88 |
| EARNINGS PER COMMON SHARE ATTRIBUTABLE TO CLIFFS SHAREHOLDERS - DILUTED | | | |
| Continuing operations | $ **3.42** | $ 1.25 | $ 0.49 |
| Discontinued operations | **0.29** | 0.01 | 0.38 |
| | $ **3.71** | $ 1.26 | $ 0.87 |
| AVERAGE NUMBER OF SHARES (IN THOUSANDS) | | | |
| Basic | **297,176** | 288,435 | 197,659 |
| Diluted | **304,141** | 292,961 | 200,145 |

*The accompanying notes are an integral part of these consolidated financial statements.*

73

Table of Contents

**Statements of Consolidated Comprehensive Income**

Cleveland-Cliffs Inc. and Subsidiaries

| | (In Millions) | | |
|---|---|---|---|
| | Year Ended December 31, | | |
| | **2018** | 2017 | 2016 |
| NET INCOME ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | $   **1,128.1** | $   367.0 | $   174.1 |
| OTHER COMPREHENSIVE INCOME (LOSS) | | | |
| Changes in pension and other post-retirement benefits, net of tax | **(17.2)** | 11.5 | (19.8) |
| Changes in foreign currency translation | **(225.4)** | (13.9) | 18.6 |
| Changes in derivative financial instruments, net of tax | **(2.3)** | (0.5) | (2.6) |
| OTHER COMPREHENSIVE LOSS | **(244.9)** | (2.9) | (3.8) |
| OTHER COMPREHENSIVE LOSS (INCOME) ATTRIBUTABLE TO THE NONCONTROLLING INTEREST | **—** | (1.1) | 0.5 |
| TOTAL COMPREHENSIVE INCOME ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | $   **883.2** | $   363.0 | $   170.8 |

*The accompanying notes are an integral part of these  consolidated financial statements.*

74

A005563

Table of Contents

**Statements of Consolidated Cash Flows**

Cleveland-Cliffs Inc. and Subsidiaries

| | (In Millions) | | |
| --- | --- | --- | --- |
| | Year Ended December 31, | | |
| | **2018** | 2017 | 2016 |
| OPERATING ACTIVITIES | | | |
| Net income | $ **1,128.1** | $ 363.1 | $ 199.3 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation, depletion and amortization | **89.0** | 87.7 | 115.4 |
| Deferred income taxes | **(460.5)** | — | — |
| Loss (gain) on extinguishment of debt | **6.8** | 165.4 | (166.3) |
| Loss on deconsolidation | **—** | 20.2 | 17.5 |
| Gain on derivatives | **(110.2)** | (4.1) | (30.1) |
| Gain on foreign currency translation | **(228.1)** | — | — |
| Other | **20.7** | 25.3 | 40.1 |
| Changes in operating assets and liabilities: | | | |
| Receivables and other assets | **52.3** | (248.7) | 43.2 |
| Inventories | **42.9** | (1.8) | 157.8 |
| Payables, accrued expenses and other liabilities | **(62.5)** | (69.0) | (73.9) |
| Net cash provided by operating activities | **478.5** | 338.1 | 303.0 |
| INVESTING ACTIVITIES | | | |
| Purchase of property, plant and equipment | **(208.6)** | (134.9) | (61.7) |
| Deposits for property, plant and equipment | **(87.5)** | (16.8) | (7.4) |
| Other investing activities | **23.0** | (4.3) | 11.2 |
| Net cash used by investing activities | **(273.1)** | (156.0) | (57.9) |
| FINANCING ACTIVITIES | | | |
| Net proceeds from issuance of common shares | **—** | 661.3 | 287.4 |
| Repurchase of common shares | **(47.5)** | — | — |
| Proceeds from issuance of debt | **—** | 1,771.5 | — |
| Debt issuance costs | **(1.5)** | (28.6) | (5.2) |
| Borrowings under credit facilities | **—** | — | 105.0 |
| Repayment under credit facilities | **—** | — | (105.0) |
| Repayments of equipment loans | **—** | — | (95.6) |
| Repurchase of debt | **(234.5)** | (1,720.7) | (305.4) |
| Acquisition of noncontrolling interest | **—** | (105.0) | — |
| Distributions of partnership equity | **(44.2)** | (52.9) | (59.9) |
| Other financing activities | **(47.5)** | (26.7) | (27.7) |
| Net cash provided (used) by financing activities | **(375.2)** | 498.9 | (206.4) |
| EFFECT OF EXCHANGE RATE CHANGES ON CASH | **(2.3)** | 3.3 | (0.5) |
| INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS, INCLUDING CASH CLASSIFIED WITHIN CURRENT ASSETS OF DISCONTINUED OPERATIONS | **(172.1)** | 684.3 | 38.2 |
| LESS: INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS CLASSIFIED WITHIN CURRENT ASSETS OF DISCONTINUED OPERATIONS | **(17.0)** | 18.8 | (35.3) |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | **(155.1)** | 665.5 | 73.5 |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF YEAR | **978.3** | 312.8 | 239.3 |
| CASH AND CASH EQUIVALENTS AT END OF YEAR | $ **823.2** | $ 978.3 | $ 312.8 |

*The accompanying notes are an integral part of these consolidated financial statements.*
*See NOTE 16 - CASH FLOW INFORMATION.*

A005564

Table of Contents

**Statements of Consolidated Changes in Equity**

Cleveland-Cliffs Inc. and Subsidiaries

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | (In Millions) | | | | | | | | | |
| | | | | | Cliffs Shareholders | | | | | |
| | Number of Depositary Shares | Depositary Shares | Number of Common Shares Outstanding | Common Shares | Capital in Excess of Par Value of Shares | Retained Earnings | Common Shares in Treasury | Accumulated Other Comprehensive Loss | Non-Controlling Interest | Total |
| January 1, 2016 | 29.3 | $ 731.3 | 153.5 | $ 19.8 | $ 2,298.9 | $ (4,748.4) | $ (265.0) | $ (18.0) | $ 169.8 | $ (1,811.6) |
| Comprehensive income (loss) | | | | | | | | | | |
| Net income | — | — | — | — | — | 174.1 | — | — | 25.2 | 199.3 |
| Other comprehensive loss | — | — | — | — | — | — | — | (3.3) | (0.5) | (3.8) |
| Total comprehensive income | | | | | | | | | 24.7 | 195.5 |
| Preferred Share conversion | (29.3) | (731.3) | 26.5 | 3.5 | 727.8 | — | — | — | — | — |
| Equity offering | — | — | 44.4 | 5.5 | 281.9 | — | — | — | — | 287.4 |
| Debt exchanges | — | — | 8.2 | 1.0 | 44.2 | — | — | — | — | 45.2 |
| Distributions to noncontrolling interest | — | — | — | — | — | — | — | — | (3.2) | (3.2) |
| Distributions of partnership equity | — | — | — | — | — | — | — | — | (57.5) | (57.5) |
| Stock and other incentive plans | — | — | 0.5 | — | (5.8) | — | 19.5 | — | — | 13.7 |
| December 31, 2016 | — | $ — | 233.1 | $ 29.8 | $ 3,347.0 | $ (4,574.3) | $ (245.5) | $ (21.3) | $ 133.8 | $ (1,330.5) |
| Comprehensive income (loss) | | | | | | | | | | |
| Net income (loss) | — | — | — | — | — | 367.0 | — | — | (3.9) | 363.1 |
| Other comprehensive income (loss) | — | — | — | — | — | — | — | (4.0) | 1.1 | (2.9) |
| Total comprehensive income (loss) | | | | | | | | | (2.8) | 360.2 |
| Issuance of convertible debt | — | — | — | — | 83.4 | — | — | — | — | 83.4 |
| Equity offering | — | — | 63.3 | 7.9 | 653.4 | — | — | — | — | 661.3 |
| Acquisition of noncontrolling interest | — | — | — | — | (70.2) | — | — | (18.9) | (15.9) | (105.0) |
| Distribution of partnership equity | — | — | — | — | (17.3) | — | — | 5.2 | (116.7) | (128.8) |
| Capital contributions by noncontrolling interest to subsidiary | — | — | — | — | — | — | — | — | 1.8 | 1.8 |
| Stock and other incentive plans | — | — | 1.0 | — | (62.4) | — | 75.9 | — | — | 13.5 |
| December 31, 2017 | — | $ — | 297.4 | $ 37.7 | $ 3,933.9 | $ (4,207.3) | $ (169.6) | $ (39.0) | $ 0.2 | $ (444.1) |
| Adoption of accounting standard | — | — | — | — | — | 34.0 | — | — | — | 34.0 |
| Comprehensive income (loss) | | | | | | | | | | |
| Net income | — | — | — | — | — | 1,128.1 | — | — | — | 1,128.1 |
| Other comprehensive loss | — | — | — | — | — | — | — | (244.9) | — | (244.9) |
| Total comprehensive income | | | | | | | | | — | 883.2 |
| Distributions to noncontrolling interest | — | — | — | — | — | — | — | — | (0.2) | (0.2) |
| Stock and other incentive plans | — | — | 0.6 | — | (17.2) | — | 31.0 | — | — | 13.8 |
| Common stock repurchases | — | — | (5.4) | — | — | — | (47.5) | — | — | (47.5) |
| Common stock dividends ($0.05 per share) | — | — | — | — | — | (15.0) | — | — | — | (15.0) |
| December 31, 2018 | — | $ — | 292.6 | $ 37.7 | $ 3,916.7 | $ (3,060.2) | $ (186.1) | $ (283.9) | $ — | $ 424.2 |

*The accompanying notes are an integral part of these consolidated financial statements.*

A005565

Table of Contents

**Cleveland-Cliffs Inc. and Subsidiaries**

Notes to Consolidated Financial Statements

## NOTE 1 - BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES

**Nature of Business**

Founded in 1847, Cleveland-Cliffs Inc. is the largest and oldest independent iron ore mining company in the United States. We are a major supplier of iron ore pellets to the North American steel industry from our mines and pellet plants located in Michigan and Minnesota. We are currently constructing an HBI production plant in Toledo, Ohio. We expect to complete construction and begin production in 2020.

In January 2018, we announced that we would accelerate the time frame for the planned closure of our Asia Pacific Iron Ore mining operations in Australia. In April 2018, we committed to a course of action leading to the permanent closure of our Asia Pacific Iron Ore mining operations and, as planned, completed our final shipment in June 2018. Factors considered in this decision included increasingly discounted prices for lower-iron-content ore and the quality of the remaining iron ore reserves.

During 2018, we sold all of the assets of our Asia Pacific Iron Ore business through a series of sales to third parties. As a result of our planned exit, management determined that our Asia Pacific Iron Ore operating segment met the criteria to be classified as held for sale and a discontinued operation under *ASC Topic 205, Presentation of Financial Statements* . As such, all current and historical Asia Pacific Iron Ore operating segment results are classified within discontinued operations. Refer to NOTE 13 - DISCONTINUED OPERATIONS for further information.

In alignment with our strategic goals, we have become a North America-centric business and have updated the names of our operating segments. We are now organized according to our differentiated products. We have two reportable segments – the Mining and Pelletizing segment (formerly known as U.S. Iron Ore) and the Metallics segment. Unless otherwise noted, discussion of our business and results of operations in this Annual Report on Form 10-K refers to our continuing operations.

**Significant Accounting Policies**

We consider the following policies to be beneficial in understanding the judgments involved in the preparation of our consolidated financial statements and the uncertainties that could impact our financial condition, results of operations and cash flows.

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The more significant areas requiring the use of management estimates and assumptions relate to mineral reserves future realizable cash flow; environmental, reclamation and closure obligations; valuation of long-lived assets, inventory, tax assets and post-employment, post-retirement and other employee benefit liabilities; reserves for contingencies and litigation; and the fair value of derivative instruments. Actual results could differ from estimates. Management reviews its estimates on an ongoing basis. Changes in facts and circumstances may alter such estimates and affect the results of operations and financial position in future periods.

*Basis of Consolidation*

The consolidated financial statements include our accounts and the accounts of our wholly owned subsidiaries, including the following iron ore operations at December 31, 2018:

| Name | Location | Status of Operations |
|---|---|---|
| Northshore | Minnesota | Active |
| United Taconite | Minnesota | Active |
| Tilden | Michigan | Active |
| Empire | Michigan | Indefinitely Idled |

Intercompany transactions and balances are eliminated upon consolidation.

77

### Equity Method Investments

Investments in unconsolidated ventures that we have the ability to exercise significant influence over, but not control, are accounted for under the equity method.

Our 23% ownership interest in Hibbing is recorded as an equity method investment. As of December 31, 2018 and 2017, our investment in Hibbing was $15.4 million and $11.0 million, respectively, classified in *Other liabilities* in the Statements of Consolidated Financial Position .

Our share of equity income (loss) is eliminated against consolidated product inventory upon production, and against   *Cost of goods sold and operating expenses* when sold. This effectively reduces our cost for our share of the mining ventures' production cost, reflecting the cost-based nature of our participation in unconsolidated ventures.

### Noncontrolling Interests

During 2017, our ownership interest in Empire increased to  100% as we reached an agreement to distribute the noncontrolling interest net assets of $132.7 million to ArcelorMittal, in exchange for its interest in Empire.  The parties agreed that the net assets were to be distributed in three installments of $44.2 million each, the first of which was paid upon the execution of the agreement, the second of which was paid in August 2018 and the final of which is due August 2019. Upon payment of the first installment, we assumed ArcelorMittal's 21% interest and reflected the ownership percentage change in our consolidated financial statements. During the year ended December 31, 2017, we accounted for the increase in ownership as an equity transaction, which resulted in a net $12.1 million decrease in equity attributable to Cliffs' shareholders and a  $116.7 million decrease in *Noncontrolling interest* . The net loss and income attributable to the noncontrolling interest of the Empire mining venture was $3.9 million and $25.2 million for the years ended  December 31, 2017 and 2016, respectively.

During 2017, we also acquired the remaining  15% equity interest in Tilden owned by U.S. Steel for  $105.0 million. With the closing of this transaction, we now have 100% ownership of the mine. During the year ended December 31, 2017, we accounted for the increase in ownership as an equity transaction, which resulted in an $89.1 million decrease in equity attributable to Cliffs' shareholders and a  $15.9 million decrease in *Noncontrolling interest* .

### Cash and Cash Equivalents

Cash and cash equivalents include cash on hand and on deposit as well as all short-term securities held for the primary purpose of general liquidity. We consider investments in highly liquid debt instruments with an original maturity of three months or less from the date of acquisition and longer maturities when funds can be withdrawn in three months or less without a significant penalty to be cash equivalents. We routinely monitor and evaluate counterparty credit risk related to the financial institutions in which our short-term investment securities are held.

### Trade Accounts Receivable and Allowance for Doubtful Accounts

Trade accounts receivable are recorded at the point control transfers and represents the amount of consideration we expect to receive in exchange for transferred goods and do not bear interest. The allowance for doubtful accounts is our best estimate of the amount of probable credit losses in our existing accounts  receivable. We establish provisions for losses on accounts receivable when it is probable that all or part of the outstanding balance will not be collected. We regularly review our accounts receivable balances and establish or adjust the allowance as necessary using the specific identification method. There was no allowance for doubtful accounts at December 31, 2018 and 2017 and no bad debt expense for the years ended  December 31, 2018, 2017 and 2016.

### Inventories

The Mining and Pelletizing segment product inventories are stated at the lower of cost or market. Cost of iron ore inventories is determined using the LIFO method.

### Supplies and Other Inventories

Supply inventories include replacement parts, fuel, chemicals and other general supplies, which are expected to be used or consumed in normal operations. Supply inventories also include critical spares. Critical spares are replacement parts for equipment that is critical for the continued operation of the mine or processing facilities.

Supply inventories are stated at the lower of cost or net realizable value using average cost, less an allowance for obsolete and surplus items. The allowance for obsolete and surplus items was $12.6 million at December 31, 2018 and 2017.

78

Table of Contents

***Derivative Financial Instruments and Hedging Activities***

We are exposed to certain risks related to the ongoing operations of our business, including those caused by changes in commodity prices and energy rates. We have established policies and procedures, including the use of certain derivative instruments, to manage such risks, if deemed necessary.

Derivative financial instruments are recognized as either assets or liabilities in the Statements of Consolidated Financial Position and measured at fair value. On the date a qualifying hedging instrument is executed, we designate the hedging instrument as a hedge of the variability of cash flows to be received or paid related to a forecasted transaction (cash flow hedge). We formally document all relationships between hedging instruments and hedged items, as well as our risk-management objective and strategy for undertaking various hedge transactions. This process includes linking all derivatives that are designated as cash flow hedges to specific firm commitments or forecasted transactions. We also formally assess, both at the hedge's inception and on an ongoing basis, whether the derivatives that are used in hedging transactions are highly effective in offsetting changes in cash flows of the related hedged items. When it is determined that a derivative is not highly effective as a hedge or that it has ceased to be a highly effective hedge, we discontinue hedge accounting prospectively and record all future changes in fair value in the period of the instrument's earnings or losses.

For derivative instruments that have been designated as cash flow hedges, the changes in fair value are recorded in *Accumulated other comprehensive loss*. Amounts recorded in *Accumulated other comprehensive loss* are reclassified to earnings or losses in the period the underlying hedged transaction affects earnings or when the underlying hedged transaction is no longer reasonably possible of occurring.

For derivative instruments that have not been designated as cash flow hedges, such as provisional pricing arrangements and supplemental revenue or refunds contained within a customer supply agreement, changes in fair value are recorded in the period of the instrument's earnings or losses.

Refer to *Revenue Recognition* below for discussion of derivatives recorded as a result of pricing terms in our sales contracts. Additionally, refer to NOTE 12 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES for further information.

***Property, Plant and Equipment***

Our properties are stated at the lower of cost less accumulated depreciation or fair value. Depreciation of plant and equipment is computed principally by the straight-line method based on estimated useful lives, not to exceed the mine lives. Depreciation continues to be recognized when operations are idled temporarily. We use the double-declining balance method of depreciation for certain mining equipment. Depreciation and depletion is provided over the following estimated useful lives:

| Asset Class | Basis | Life |
|---|---|---|
| Office and information technology | Straight line | 3 to 15 years |
| Buildings | Straight line | 45 years |
| Mining equipment | Straight line/Double declining balance | 3 to 20 years |
| Processing equipment | Straight line | 10 to 45 years |
| Electric power facilities | Straight line | 10 to 45 years |
| Land improvements | Straight line | 20 to 45 years |
| Asset retirement obligation | Straight line | Life of mine |
| Mineral rights | Units of production | Life of mine |

Refer to NOTE 5 - PROPERTY, PLANT AND EQUIPMENT for further information.

***Capitalized Stripping Costs***

During the development phase, stripping costs are capitalized as a part of the depreciable cost of building, developing and constructing a mine. These capitalized costs are amortized over the productive life of the mine using the units of production method. The production phase does not commence until the removal of more than a de minimis amount of saleable mineral material occurs in conjunction with the removal of overburden or waste material for purposes of obtaining access to an ore body. The stripping costs incurred in the production phase of a mine are variable production costs included in the costs of the inventory produced (extracted) during the period that the stripping costs are incurred.

79

Stripping costs related to expansion of a mining asset of proven and probable reserves are variable production costs that are included in the costs of the inventory produced during the period that the stripping costs are incurred.

### Other Intangible Assets

Our mine permits are subject to periodic amortization on a straight line basis over their estimated useful life, which corresponds with the life of mine.

### Asset Impairment

We monitor conditions that may affect the carrying value of our long-lived tangible and intangible assets when events and circumstances indicate that the carrying value of the asset groups may not be recoverable. In order to determine if assets have been impaired, assets are grouped and tested at the lowest level for which identifiable, independent cash flows are available ("asset group"). An impairment loss exists when projected net undiscounted cash flows are less than the carrying value of the asset group. The measurement of the impairment loss to be recognized is based on the difference between the fair value and the carrying value of the asset group. Fair value can be determined using a market approach, income approach or cost approach.

For the years ended December 31, 2018, 2017 and 2016, no impairment factors were present that would indicate the carrying value of any of our asset groups may not be recoverable; as a result, no impairment assessments were required.

### Fair Value Measurements

*ASC Topic 820, Fair Value Measurements and Disclosures* , establishes a three-level valuation hierarchy for classification of fair value measurements. The valuation hierarchy is based upon the transparency of inputs to the valuation of an asset or liability as of the measurement date. Inputs refer broadly to the assumptions that market participants would use in pricing an asset or liability. Inputs may be observable or unobservable. Observable inputs are inputs that reflect the assumptions market participants would use in pricing the asset or liability developed based on market data obtained from independent sources. Unobservable inputs are inputs that reflect our own views about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances. The three-tier hierarchy of inputs is summarized below:

- Level 1 — Valuation is based upon quoted prices (unadjusted) for identical assets or liabilities in active markets.

- Level 2 — Valuation is based upon quoted prices for similar assets and liabilities in active markets, or other inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

- Level 3 — Valuation is based upon other unobservable inputs that are significant to the fair value measurement.

The classification of assets and liabilities within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement in its entirety.

Refer to NOTE 7 - FAIR VALUE OF FINANCIAL INSTRUMENTS  and NOTE 8 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS  for further information.

### Pensions and Other Postretirement Benefits

We offer defined benefit pension plans, defined contribution pension plans and other postretirement benefit plans, primarily consisting of retiree healthcare benefits, to most employees in the United States as part of a total compensation and benefits program.

We recognize the funded or unfunded status of our postretirement benefit obligations on our  December 31, 2018 and 2017 Statements of Consolidated Financial Position based on the difference between the market value of plan assets and the actuarial present value of our retirement obligations on that date, on a plan-by-plan basis. If the plan assets exceed the postretirement benefit obligations, the amount of the surplus is recorded as an asset; if the postretirement benefit obligations exceed the plan assets, the amount of the underfunded obligations is recorded as a liability. Year-end balance sheet adjustments to postretirement assets and obligations are recorded as *Accumulated other comprehensive loss* in the Statements of Consolidated Financial Position .

80

The actuarial estimates of the PBO and APBO incorporate various assumptions including the discount rates, the rates of increases in compensation, healthcare cost trend rates, mortality, retirement timing and employee turnover. The discount rate is determined based on the prevailing year-end rates for high-grade corporate bonds with a duration matching the expected cash flow timing of the benefit payments from the various plans. The remaining assumptions are based on our estimates of future events by incorporating historical trends and future expectations. The amount of net periodic cost that is recorded in the Statements of Consolidated Operations consists of several components including service cost, interest cost, expected return on plan assets, and amortization of previously unrecognized amounts. Service cost represents the value of the benefits earned in the current year by the participants. Interest cost represents the cost associated with the passage of time. Certain items, such as plan amendments, gains and/or losses resulting from differences between actual and assumed results for demographic and economic factors affecting the obligations and assets of the plans, and changes in other assumptions are subject to deferred recognition for income and expense purposes. The expected return on plan assets is determined utilizing the weighted average of expected returns for plan asset investments in various asset categories based on historical performance, adjusted for current trends. Service costs are classified within *Cost of goods sold and operating expenses, Selling, general and administrative expenses* and *Miscellaneous - net* while the interest cost, expected return on assets, amortization of prior service costs/credits, net actuarial gain/loss, and other costs are classified within *Other non-operating income*.

Refer to NOTE 2 - NEW ACCOUNTING STANDARDS and NOTE 8 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS for further information.

### *Asset Retirement Obligations*

Asset retirement obligations are recognized when incurred and recorded as liabilities at fair value. The fair value of the liability is determined as the discounted value of the expected future cash flows. The asset retirement obligation is accreted over time through periodic charges to earnings. In addition, the asset retirement cost is capitalized and amortized over the life of the related asset. Reclamation costs are adjusted periodically to reflect changes in the estimated present value resulting from the passage of time and revisions to the estimates of either the timing or amount of the reclamation costs. We review, on an annual basis, unless otherwise deemed necessary, the asset retirement obligation at each mine site in accordance with the provisions of *ASC Topic 410, Asset Retirement and Environmental Obligations*. We perform an in-depth evaluation of the liability every three years in addition to our routine annual assessments.

Future reclamation costs for inactive mines are accrued based on management's best estimate at the end of each period of the costs expected to be incurred at a site. Such cost estimates include, where applicable, ongoing maintenance and monitoring costs. Changes in estimates at inactive mines are reflected in earnings in the period an estimate is revised. See NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS for further information.

### *Environmental Remediation Costs*

We have a formal policy for environmental protection and restoration. Our mining and exploration activities are subject to various laws and regulations governing protection of the environment. We conduct our operations to protect the public health and environment and believe our operations are in compliance with applicable laws and regulations in all material respects. Our environmental liabilities, including obligations for known environmental remediation exposures at active and closed mining operations and other sites, have been recognized based on the estimated cost of investigation and remediation at each site. If the cost can only be estimated as a range of possible amounts with no point in the range being more likely, the minimum of the range is accrued. Future expenditures are not discounted unless the amount and timing of the cash disbursements reasonably can be estimated. It is possible that additional environmental obligations could be incurred, the extent of which cannot be assessed. Potential insurance recoveries have not been reflected in the determination of the liabilities. See NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS for further information.

### *Revenue Recognition - Pre-Adoption of Topic 606*

Prior to the adoption of Topic 606, revenue was recognized from a sale when persuasive evidence of an arrangement existed, the price was fixed or determinable, the product was delivered in accordance with shipping terms, title and risk of loss were transferred to the customer in accordance with the specified provisions of each supply agreement and collection of the sales price reasonably was assured. Our supply agreements provide that title and risk of loss transfer to the customer either upon loading of the vessel, shipment or when payment is received. Under certain supply agreements, we ship the product to ports on the lower Great Lakes or to the customers' facilities prior to the transfer of title. Our rationale for shipping iron ore products to certain customers and retaining title until payment is received for these products is to minimize credit risk exposure.

Table of Contents

Sales were recorded at a sales price specified in the relevant supply agreements resulting in revenue and a receivable at the time of sale. The majority of our contracts have pricing mechanisms that require price estimation at the time of delivery with price finalization at a future period. Upon revenue recognition the derivative was adjusted to fair value through *Product revenues* as a revenue adjustment each reporting period based upon current market data and forward-looking estimates determined by management until the final sales price was determined. The principal risks associated with recognition of sales on a provisional basis include Platts 62% Price, Atlantic Basin pellet premium and index freight fluctuations between the date initially recorded and the date of final settlement. For revenue recognition, we estimated the future settlement rate; however, if significant changes in inputs occurred between the provisional pricing date and the final settlement date, we were required to either return a portion of the sales proceeds received or bill for the additional sales proceeds due based on the provisional sales price.

### Revenue Recognition - Post-Adoption of Topic 606

We sell a single product, iron ore pellets, in the North American market. With the adoption of Topic 606 as of January 1, 2018, revenue is recognized generally when iron ore is delivered to our customers. Revenue is measured at the point that control transfers and represents the amount of consideration we expect to receive in exchange for transferring goods. We offer standard payment terms to our customers, generally requiring settlement within 30 days. Refer to NOTE 2 - NEW ACCOUNTING STANDARDS for further information.

We enter into supply contracts of varying lengths to provide customers iron ore pellets to use in their blast furnaces. Blast furnaces run continuously with a constant feed of iron ore and once shut down, cannot easily be restarted. As a result, we ship iron ore in large quantities for storage and use by customers at a later date. Customers do not simultaneously receive and consume the benefits of the iron ore. Based on our assessment of the factors that indicate the pattern of satisfaction, we transfer control of the iron ore at a point in time upon shipment or delivery of the product. The customer is able to direct the use of, and obtain substantially all of the benefits from, the product at the time the product is delivered.

Most of our customer supply agreements specify a provisional price, which is used for initial billing and cash collection. Revenue recorded in accordance with Topic 606 is calculated using the expected revenue rate at the point when control transfers. The final settlement includes market inputs for a specified period of time, which may vary by customer, but typically include one or more of the following: Platts 62% Price, Atlantic Basin pellet premiums, Platts international indexed freight rates and changes in specified Producer Price Indices, including industrial commodities, energy and steel. Changes in the expected revenue rate from the date control transfers through final settlement of contract terms is recorded in accordance with Topic 815. Refer to NOTE 12 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES for further information on how our estimated and final revenue rates are determined.

A supply agreement with a customer provides for supplemental revenue or refunds based on the average annual daily market price for hot-rolled coil steel in the year the iron ore is consumed in the customer's blast furnaces. As control transfers prior to consumption, the supplemental revenue is recorded in accordance with Topic 815. Refer to NOTE 12 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES   for further information on supplemental revenue or refunds.

Included within *Revenues from product sales and services* is derivative revenue related to Topic 815 of  $422.6 million, $120.6 million and $55.9 million for the years ended December 31, 2018, 2017 and 2016, respectively.

As of December 31, 2018, under the new accounting standard, we had finished goods of  0.8 million long tons in transit or stored at the Port of Toledo to service customers, for which revenue had yet to be recognized. Under the previous accounting standard, we did not recognize revenue and related cost of goods sold until title transferred to the customer, usually when payment was received. As of December 31, 2017, under the previous accounting standard, we had finished goods of 1.5 million long tons stored at ports and customer facilities on the lower Great Lakes to service customers, for which revenue had yet to be recognized.

### Practical expedients and exemptions

We have elected to treat all shipping and handling costs as fulfillment costs because a significant portion of these costs are incurred prior to control transfer.

We have various long-term sales contracts with minimum purchase and supply requirement provisions that extend beyond the current reporting period. The portion of our transaction price for these contracts that is allocated entirely to wholly unsatisfied performance obligations is based on market prices that have not yet been determined and therefore is variable in nature. As such, we have not disclosed the value of unsatisfied performance obligations pursuant to the practical expedient.

82

Table of Contents

*Deferred Revenue*

The table below summarizes our deferred revenue balances:

| | Deferred Revenue (Current)[1] | | | Deferred Revenue (Long-Term) | | |
|---|---|---|---|---|---|---|
| (In Millions) | Year Ended December 31, | | | Year Ended December 31, | | |
| | **2018** | | 2017 | **2018** | | 2017 |
| Opening balance as of January 1 | $ | **23.8** | $ 16.2 | $ | **51.4** | $ 64.3 |
| Closing balance as of December 31 | | **21.0** | 22.4 | | **38.5** | 51.4 |
| Increase (Decrease) | $ | **(2.8)** | $ 6.2 | $ | **(12.9)** | $ (12.9) |

[1] The opening balance for the year ended December 31, 2018 includes a $1.4 million adjustment from the December 31, 2017 balance due to the adoption of Topic 606.

The terms of one of our pellet supply agreements required supplemental payments to be paid by the customer during the period 2009 through 2012. Installment amounts received under this arrangement in excess of sales were classified as *Other current liabilities* and *Other liabilities* in the Statements of Consolidated Financial Position upon receipt of payment. Revenue is recognized over the life of the supply agreement, which extends until 2022, in equal annual installments. As of December 31, 2018 and December 31, 2017, installment amounts received in excess of sales totaled $51.3 million and $64.2 million, respectively, related to this agreement. As of December 31, 2018, and December 31, 2017, deferred revenue of $12.8 million was recorded in *Other current liabilities* and $38.5 million and $51.4 million, respectively, was recorded as long-term in *Other liabilities* in the Statements of Consolidated Financial Position, related to this agreement.

Due to the payment terms and the timing of cash receipts near a period end, cash receipts can exceed deliveries for certain customers. Revenue recognized on these transactions totaling $8.2 million and $9.6 million was deferred and included in *Other current liabilities* in the Statements of Consolidated Financial Position as of December 31, 2018 and December 31, 2017, respectively.

*Cost of Goods Sold*

*Cost of goods sold and operating expenses* represents all direct and indirect costs and expenses applicable to the sales from our mining operations.

In some circumstances, as requested by the customer, we will coordinate and ship our product via vessel directly to the port nearest to the customer's blast furnace. In this type of contract, the customer will pay one amount inclusive of both product and freight. We recognize revenue for both product revenue and the amount reimbursed for the vessel freight to the final port. We separate these revenue types in the Statements of Consolidated Operations. Accordingly, the revenue we record for freight is offset by an equal amount included in *Cost of goods sold and operating expenses* for costs we incur for that freight, resulting in no impact on sales margin.

Operating expenses represented the portion of the Tilden mining venture costs prior to our 100% ownership; that is, the costs attributable to the share of the mine's production owned by the other joint venture partner in the Tilden mine until we acquired the remaining 15% noncontrolling interest during 2017. The mining venture functioned as a captive cost company, supplying product only to its owners effectively for the cost of production. Accordingly, the noncontrolling interests' revenue amounts were stated at cost of production and were offset by an equal amount included in *Cost of goods sold and operating expenses* resulting in no sales margin reflected for the noncontrolling partner participant. As we were responsible for product fulfillment under the venture, we acted as a principal in the transaction and, accordingly, recorded revenue under these arrangements on a gross basis.

A005572

Table of Contents

The following table is a summary of reimbursements in our operations:

|  | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
|  | Year Ended December 31, | | | | | |
|  | **2018** | | 2017 | | 2016 | |
| Reimbursements for: | | | | | | |
| Freight | $ | **160.1** | $ | 166.7 | $ | 106.8 |
| Venture partners' cost | | **—** | | 54.7 | | 68.0 |
| Total reimbursements | $ | **160.1** | $ | 221.4 | $ | 174.8 |

Where we have joint ownership of a mine, such as Hibbing and up to the point at which we purchased the remaining interest in Tilden, our contracts entitle us to receive management fees or royalties, which we earn as the pellets are produced.

### Repairs and Maintenance

Repairs, maintenance and replacement of components are expensed as incurred. The cost of major equipment overhauls is capitalized and depreciated over the estimated useful life, which is the period until the next scheduled overhaul, generally five years. All other planned and unplanned repairs and maintenance costs are expensed when incurred.

### Share-Based Compensation

The fair value of each performance share grant is estimated on the date of grant using a Monte Carlo simulation to forecast relative TSR performance. A correlation matrix of historic and projected stock prices was developed for both the Company and its predetermined peer group of mining and metals companies. The fair value assumes that objective will be achieved. The expected term of the grant represents the time from the grant date to the end of the service period. We estimate the volatility of our common shares and that of the peer group of mining and metals companies using daily price intervals for all companies. The risk-free interest rate is the rate at the grant date on zero-coupon government bonds, with a term commensurate with the remaining performance period.

The fair value of the restricted stock units is determined based on the closing price of our common shares on the grant date.

Upon vesting of share-based compensation awards, we issue shares from treasury shares before issuing new shares. Forfeitures are recognized when they occur.

The fair value of stock options is estimated on the date of grant using a Black-Scholes model using the grant date price of our common shares and option exercise price, and assumptions regarding the option's expected term, the volatility of our common shares, the risk-free interest rate, and the dividend yield over the option's expected term.

Refer to NOTE 9 - STOCK COMPENSATION PLANS for additional information.

### Income Taxes

Income taxes are based on income for financial reporting purposes, calculated using tax rates by jurisdiction, and reflect a current tax liability or asset for the estimated taxes payable or recoverable on the current year tax return and expected annual changes in deferred taxes. Any interest or penalties on income tax are recognized as a component of *Income tax benefit*.

We account for income taxes under the asset and liability method, which requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the financial statements. Under this method, deferred tax assets and liabilities are determined based on the differences between the financial statement and tax basis of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. The effect of a change in tax rates on deferred tax assets and liabilities is recognized within *Net income* in the period that includes the enactment date.

We record net deferred tax assets to the extent we believe these assets will more likely than not be realized. In making such determination, we consider all available positive and negative evidence, including scheduled reversals of deferred tax liabilities, projected future taxable income, tax planning strategies and recent financial results of operations.

84

A005573

Table of Contents

Accounting for uncertainty in income taxes recognized in the financial statements requires that a tax benefit from an uncertain tax position be recognized when it is more likely than not that the position will be sustained upon examination, including resolutions of any related appeals or litigation processes, based on technical merits.

See NOTE 10 - INCOME TAXES for further information.

**Discontinued Operations**

*Asia Pacific Iron Ore Operations*

In January 2018, we announced that we would accelerate the time frame for the planned closure of our Asia Pacific Iron Ore mining operations in Australia. In April 2018, we committed to a course of action leading to the permanent closure of our Asia Pacific Iron Ore mining operations and, as planned, completed our final shipment in June 2018. Factors considered in this decision included increasingly discounted prices for lower-iron-content ore and the quality of the remaining iron ore reserves.

As a result of our planned exit, management determined that our Asia Pacific Iron Ore operating segment met the criteria to be classified as held for sale and a discontinued operation under *ASC Topic 205, Presentation of Financial Statements* . As such, all current and historical Asia Pacific Iron Ore operating segment results are classified within discontinued operations. Refer to NOTE 13 - DISCONTINUED OPERATIONS for further discussion of the Asia Pacific Iron Ore segment discontinued operations.

*Canadian Operations*

As more fully described in NOTE 13 - DISCONTINUED OPERATIONS, in January 2015, we announced that the Bloom Lake Group commenced restructuring proceedings in Montreal, Quebec under the CCAA. At that time, we had suspended Bloom Lake operations and for several months had been exploring options to sell certain of our Canadian assets, among other initiatives. Effective January 27, 2015, following the commencement of CCAA proceedings for the Bloom Lake Group, we deconsolidated the Bloom Lake Group and certain other wholly-owned subsidiaries comprising substantially all of our Canadian operations. Additionally, on May 20, 2015, the Wabush Group commenced restructuring proceedings in Montreal, Quebec under the CCAA which resulted in the deconsolidation of the remaining Wabush Group entities that were not previously deconsolidated. The Wabush Group was no longer generating revenues and was not able to meet its obligations as they came due. As a result of this action, the CCAA protection granted to the Bloom Lake Group was extended to include the Wabush Group to facilitate the reorganization of each of their businesses and operations. Our Canadian exit represented a strategic shift in our business. For this reason, all Eastern Canadian Iron Ore and Ferroalloys costs to exit are classified as discontinued operations.

**Foreign Currency**

Our financial statements are prepared with the U.S. dollar as the reporting currency. Historically, the functional currency of our Australian subsidiaries was the Australian dollar. Concurrent with the sale of assets to Mineral Resources Limited in August 2018, management determined that there were significant changes in economic factors related to our Australian subsidiaries. The change in economic factors was a result of the sale and conveyance of substantially all assets and liabilities of our Australian subsidiaries to third parties, representing a significant change in operations. As such, the functional currency for the Australian subsidiaries changed from the Australian dollar to the U.S. dollar and all remaining Australian denominated monetary balances will be remeasured prospectively through the Statements of Consolidated Operations .

In addition, as a result of the liquidation of substantially all of the Australian subsidiaries' assets, the historical impact of foreign currency translation recorded in *Accumulated other comprehensive loss* in the Statements of Consolidated Financial Position of $228.1 million was reclassified and recognized as a gain in *Income from discontinued operations, net of tax* in the Statements of Consolidated Operations . Refer to NOTE 13 - DISCONTINUED OPERATIONS for further information regarding our Australian subsidiaries.

The functional currency of all other subsidiaries is the U.S. dollar. To the extent that monetary assets and liabilities, including short-term intercompany loans, are recorded in a currency other than the functional currency, these amounts are remeasured each reporting period, with the resulting gain or loss being recorded in the Statements of Consolidated Operations . Transaction gains and losses resulting from remeasurement of intercompany loans are included in *Miscellaneous - net* in our Statements of Consolidated Operations .

A005574

Table of Contents

The following represents the net gain (loss) related to impact of transaction gains and losses from continuing operations resulting from remeasurement:

| | (In Millions) | | |
|---|---|---|---|
| | **2018** | 2017 | 2016 |
| Remeasurement of intercompany loans | $ (0.7) | $ 16.6 | $ (16.6) |
| Other remeasurement | (0.2) | (2.7) | (1.2) |
| Total | $ (0.9) | $ 13.9 | $ (17.8) |

### Earnings Per Share

We present both basic and diluted earnings per share amounts for continuing operations and discontinued operations. Total basic earnings per share amounts are calculated by dividing *Net income attributable to Cliffs shareholders* by the weighted average number of common shares outstanding during the period presented. Total diluted earnings per share amounts are calculated by dividing *Net income attributable to Cliffs shareholders* by the weighted average number of common shares, common share equivalents under stock plans using the treasury-stock method and the calculated common share equivalents in excess of the conversion rate related to our 2025 Convertible Senior Notes using the treasury-stock method. Common share equivalents are excluded from EPS computations in the periods in which they have an anti-dilutive effect.

Holders of the 2025 Convertible Senior Notes may convert their notes during any quarter between April 1, 2018 and July 15, 2024 where our share price exceeds 130% of the conversion price for 20 trading days during a 30 trading day period. Holders of the 2025 Convertible Senior Notes may also convert their notes during any quarter between April 1, 2018 and July 15, 2024 during the five business day period after any five consecutive trading day period in which the trading price per $1,000 principal amount of notes, for each trading day of the measurement period was less than 98% of the product of the last reported sale price of our common shares and the conversion price on each such trading day. If our common shares rise in value above the conversion price, diluted EPS will be calculated based on the treasury-stock method with the number of dilutive shares being calculated based on the difference in the average share price and the conversion price.

See NOTE 18 - EARNINGS PER SHARE for further information.

## NOTE 2 - NEW ACCOUNTING STANDARDS

### Issued and Adopted

*ASC Topic 606, Revenue from Contracts with Customers (Topic 606).* On January 1, 2018, we adopted Topic 606 and applied it to all contracts that were not completed using the modified retrospective method. We recognized the cumulative effect of initially applying Topic 606 as an adjustment of $34.0 million to the opening balance of *Retained deficit*. The comparative period information has not been retrospectively revised and continues to be reported under the accounting standards in effect for those periods. On a prospective basis, we do not expect that the adoption of Topic 606 will have a material impact to our annual net income.

Under Topic 606, revenue is generally recognized upon delivery to our customers, which is earlier than under the previous guidance. As an example, for certain iron ore shipments where revenue was previously recognized upon title transfer when payment was received, we will now recognize revenue when control transfers, which is generally upon delivery. While we continue to retain title until we receive payment in many cases, we determined upon review of our customer contracts that the preponderance of control indicators pass to our customers' favor when we deliver our products; thus, we generally concluded that control transfers at that point. As a result of the adoption of Topic 606 and vessel deliveries not occurring during the winter months because of the closure of the Soo Locks and the Welland Canal, our revenues and net income will be relatively lower than historical levels during the first quarter of each year and relatively higher than historical levels during the remaining three quarters in 2018 and future years. However, the total amount of revenue recognized during the year should remain substantially the same as under previous accounting standards, assuming revenue rates and volumes are consistent between years.

86

A005575

The cumulative effect of the changes made to our consolidated January 1, 2018 balance sheet for the adoption of Topic 606 were as follows:

| | Balance at December 31, 2017 | Adjustments due to Topic 606 | Balance at January 1, 2018 |
|---|---|---|---|
| | (In Millions) | | |
| ASSETS | | | |
| CURRENT ASSETS | | | |
| Cash and cash equivalents | $    978.3 | $    — | $    978.3 |
| Accounts receivable, net | 106.7 | 76.6 | 183.3 |
| Inventories | 138.4 | (51.4 ) | 87.0 |
| Supplies and other inventories | 88.8 | — | 88.8 |
| Derivative assets | 37.9 | 11.6 | 49.5 |
| Income tax receivable, current | 13.3 | — | 13.3 |
| Loans to and accounts receivables from the Canadian Entities | 51.6 | — | 51.6 |
| Current assets of discontinued operations | 118.5 | — | 118.5 |
| Other current assets | 11.1 | — | 11.1 |
| TOTAL CURRENT ASSETS | 1,544.6 | 36.8 | 1,581.4 |
| PROPERTY, PLANT AND EQUIPMENT, NET | 1,033.8 | — | 1,033.8 |
| OTHER ASSETS | | | |
| Deposits for property, plant and equipment | 17.8 | — | 17.8 |
| Income tax receivable, non-current | 235.3 | — | 235.3 |
| Non-current assets of discontinued operations | 20.3 | — | 20.3 |
| Other non-current assets | 101.6 | — | 101.6 |
| TOTAL OTHER ASSETS | 375.0 | — | 375.0 |
| TOTAL ASSETS | $    2,953.4 | $    36.8 | $    2,990.2 |
| | | | |
| LIABILITIES | | | |
| CURRENT LIABILITIES | | | |
| Accounts payable | $    99.5 | $    1.4 | $    100.9 |
| Accrued employment costs | 52.7 | — | 52.7 |
| State and local taxes payable | 30.2 | — | 30.2 |
| Accrued interest | 31.4 | — | 31.4 |
| Contingent claims | 55.6 | — | 55.6 |
| Partnership distribution payable | 44.2 | — | 44.2 |
| Current liabilities of discontinued operations | 75.0 | — | 75.0 |
| Other current liabilities | 63.6 | 1.4 | 65.0 |
| TOTAL CURRENT LIABILITIES | 452.2 | 2.8 | 455.0 |
| PENSION AND POSTEMPLOYMENT BENEFIT LIABILITIES | 257.7 | — | 257.7 |
| ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS | 167.7 | — | 167.7 |
| LONG-TERM DEBT | 2,304.2 | — | 2,304.2 |
| NON-CURRENT LIABILITIES OF DISCONTINUED OPERATIONS | 52.2 | — | 52.2 |
| OTHER LIABILITIES | 163.5 | — | 163.5 |
| TOTAL LIABILITIES | 3,397.5 | 2.8 | 3,400.3 |
| EQUITY | | | |
| CLIFFS SHAREHOLDERS' EQUITY (DEFICIT) | (444.3 ) | 34.0 | (410.3 ) |
| NONCONTROLLING INTEREST | 0.2 | — | 0.2 |
| TOTAL EQUITY (DEFICIT) | (444.1 ) | 34.0 | (410.1 ) |
| TOTAL LIABILITIES AND EQUITY (DEFICIT) | $    2,953.4 | $    36.8 | $    2,990.2 |

87

A005576

The impact of adoption on our Statements of Consolidated Operations and Statements of Consolidated Financial Position is as follows:

| | As Reported | Balances without Adoption of Topic 606 | Effect of Change |
|---|---|---|---|
| | | ($ in Millions) | |
| | | Year Ended December 31, 2018 | |
| REVENUES FROM PRODUCT SALES AND SERVICES | | | |
| Product | $ 2,172.3 | $ 2,108.1 | $ 64.2 |
| Freight and venture partners' cost reimbursements | 160.1 | 156.2 | 3.9 |
| | 2,332.4 | 2,264.3 | 68.1 |
| COST OF GOODS SOLD AND OPERATING EXPENSES | (1,522.8) | (1,513.2) | (9.6) |
| SALES MARGIN | 809.6 | 751.1 | 58.5 |
| OTHER OPERATING INCOME (EXPENSE) | | | |
| Selling, general and administrative expenses | (116.8) | (116.8) | — |
| Miscellaneous - net | (19.6) | (19.6) | — |
| | (136.4) | (136.4) | — |
| OPERATING INCOME | 673.2 | 614.7 | 58.5 |
| OTHER INCOME (EXPENSE) | | | |
| Interest expense, net | (118.9) | (118.9) | — |
| Loss on extinguishment of debt | (6.8) | (6.8) | — |
| Other non-operating income | 17.2 | 17.2 | — |
| | (108.5) | (108.5) | — |
| INCOME FROM CONTINUING OPERATIONS BEFORE INCOME TAXES | 564.7 | 506.2 | 58.5 |
| INCOME TAX BENEFIT | 475.2 | 487.5 | (12.3) |
| INCOME FROM CONTINUING OPERATIONS | 1,039.9 | 993.7 | 46.2 |
| INCOME FROM DISCONTINUED OPERATIONS, net of tax | 88.2 | 88.2 | — |
| NET INCOME ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | $ 1,128.1 | $ 1,081.9 | $ 46.2 |
| EARNINGS PER COMMON SHARE ATTRIBUTABLE TO CLIFFS SHAREHOLDERS - BASIC | | | |
| Continuing operations | $ 3.50 | $ 3.34 | $ 0.16 |
| Discontinued operations | 0.30 | 0.30 | — |
| | $ 3.80 | $ 3.64 | $ 0.16 |
| EARNINGS PER COMMON SHARE ATTRIBUTABLE TO CLIFFS SHAREHOLDERS - DILUTED | | | |
| Continuing operations | $ 3.42 | $ 3.27 | $ 0.15 |
| Discontinued operations | 0.29 | 0.29 | — |
| | $ 3.71 | $ 3.56 | $ 0.15 |
| AVERAGE NUMBER OF SHARES (IN THOUSANDS) | | | |
| Basic | 297,176 | 297,176 | |
| Diluted | 304,141 | 304,141 | |

The increased revenue recognized under Topic 606 is due to higher tons shipped and a higher realized revenue rate in December 2018 versus December 2017. Under the previous accounting standard, December 2017 shipments would have been recognized as 2018 sales due to the fact that title and risk of loss does not transfer until payment is received from our customers.

A005577

Table of Contents

| | As Reported | Balances without Adoption of Topic 606 | Effect of Change |
|---|---|---|---|
| | **(In Millions)** | | |
| | **December 31, 2018** | | |
| **ASSETS** | | | |
| CURRENT ASSETS | | | |
| Cash and cash equivalents | $ 823.2 | $ 823.2 | $ — |
| Accounts receivable, net | 226.7 | 108.7 | 118.0 |
| Inventories | 87.9 | 141.3 | (53.4 ) |
| Supplies and other inventories | 93.2 | 93.2 | — |
| Derivative assets | 91.5 | 60.7 | 30.8 |
| Income tax receivable, current | 117.3 | 117.3 | — |
| Current assets of discontinued operations | 12.4 | 12.4 | — |
| Other current assets | 27.4 | 27.4 | — |
| TOTAL CURRENT ASSETS | 1,479.6 | 1,384.2 | 95.4 |
| PROPERTY, PLANT AND EQUIPMENT, NET | 1,286.0 | 1,286.0 | — |
| OTHER ASSETS | | | |
| Deposits for property, plant and equipment | 83.0 | 83.0 | — |
| Income tax receivable, non-current | 121.3 | 121.3 | — |
| Deferred income taxes | 464.8 | 477.1 | (12.3 ) |
| Other non-current assets | 94.9 | 94.9 | — |
| TOTAL OTHER ASSETS | 764.0 | 776.3 | (12.3 ) |
| TOTAL ASSETS | $ 3,529.6 | $ 3,446.5 | $ 83.1 |
| | | | |
| **LIABILITIES** | | | |
| CURRENT LIABILITIES | | | |
| Accounts payable | $ 186.8 | $ 184.9 | $ 1.9 |
| Accrued employment costs | 74.0 | 74.0 | — |
| State and local taxes payable | 35.5 | 35.5 | — |
| Accrued interest | 38.4 | 38.4 | — |
| Partnership distribution payable | 43.5 | 43.5 | — |
| Current liabilities of discontinued operations | 6.7 | 6.7 | — |
| Other current liabilities | 83.3 | 83.7 | (0.4 ) |
| TOTAL CURRENT LIABILITIES | 468.2 | 466.7 | 1.5 |
| PENSION AND POSTEMPLOYMENT BENEFIT LIABILITIES | 248.7 | 248.7 | — |
| ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS | 172.0 | 172.0 | — |
| LONG-TERM DEBT | 2,092.9 | 2,092.9 | — |
| NON-CURRENT LIABILITIES OF DISCONTINUED OPERATIONS | 8.3 | 8.3 | — |
| OTHER LIABILITIES | 115.3 | 115.3 | — |
| TOTAL LIABILITIES | 3,105.4 | 3,103.9 | 1.5 |
| **EQUITY** | | | |
| CLIFFS SHAREHOLDERS' EQUITY | 424.2 | 342.6 | 81.6 |
| TOTAL LIABILITIES AND EQUITY | $ 3,529.6 | $ 3,446.5 | $ 83.1 |

The adoption of Topic 606 did not have an impact on net cash flows in our Statements of Consolidated Cash Flows.

*ASU 2017-07, Retirement Benefits - Improving the Presentation of Net Periodic Pension Cost and Net Periodic Postretirement Benefit Cost* . On January 1, 2018, we adopted the amendments to *ASC Topic 715, Compensation - Retirement Benefits* regarding the presentation of net periodic pension and postretirement benefit costs. We

89

Table of Contents

retrospectively adopted the presentation of service cost separate from the other components of net periodic costs. The interest cost, expected return on assets, amortization of prior service costs, net remeasurement, and other costs have been reclassified from *Cost of goods sold and operating expenses*, *Selling, general and administrative expenses* and *Miscellaneous - net* to *Other non-operating income*. We elected to apply the practical expedient, which allows us to reclassify amounts disclosed previously in our pension and other postretirement benefits footnote as the basis for applying retrospective presentation for comparative periods. On a prospective basis, only service costs will be included in amounts capitalized in inventory or property, plant, and equipment.

The effect of the retrospective presentation change related to the net periodic cost of our defined benefit pension and other postretirement employee benefits plans on our Statements of Consolidated Operations was as follows:

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (In Millions) | | | | | | |
| | | Year Ended December 31, 2017 | | | | | Year Ended December 31, 2016 | | | | |
| | As Adjusted | | Without Adoption of ASU 2017-07 | | Effect of Change | | As Adjusted | | Without Adoption of ASU 2017-07 | | Effect of Change |
| Cost of goods sold and operating expenses | $ | (1,398.4) | $ | (1,400.7) | $ | 2.3 | $ | (1,274.4) | $ | (1,278.7) | $ | 4.3 |
| Selling, general and administrative expenses | $ | (102.9) | $ | (95.1) | $ | (7.8) | $ | (115.8) | $ | (106.3) | $ | (9.5) |
| Miscellaneous - net | $ | 25.5 | $ | 27.0 | $ | (1.5) | $ | (33.6) | $ | (32.0) | $ | (1.6) |
| Operating income | $ | 390.2 | $ | 397.2 | $ | (7.0) | $ | 130.7 | $ | 137.5 | $ | (6.8) |
| Other non-operating income | $ | 10.2 | $ | 3.2 | $ | 7.0 | $ | 7.3 | $ | 0.5 | $ | 6.8 |
| Net income | $ | 363.1 | $ | 363.1 | $ | — | $ | 199.3 | $ | 199.3 | $ | — |

In August 2018, the FASB issued *ASU No. 2018-14, Defined Benefit Plans (Topic 715-20) - Changes to the Disclosure Requirements for Defined Benefit Plans*. Certain of the existing required disclosures were modified for clarification or removed and additional disclosures were added. We elected to early adopt ASU No. 2018-14 for the year ended December 31, 2018. The effect of the adoption is an overall reduction in our annual disclosures related to defined benefit plans. The adoption of this standard required retrospective adoption, but did not impact prior-period financial results.

In August 2018, the FASB issued *ASU No. 2018-13, Fair Value Measurement (Topic 820) - Changes to the Disclosure Requirements for Fair Value Measurement*. The new standard removes or modifies certain existing disclosure requirements and adds additional disclosure requirements related to fair value measurement. We elected to early adopt ASU No. 2018-13 for the year ended December 31, 2018. The affect of the adoption is an overall reduction in our quarterly and annual disclosures related to fair value measurement.

***Issued and Not Effective***

In February 2016, the FASB issued ASU No. 2016-02, *Leases (Topic 842)*. The new standard requires lessees to recognize a right-of-use asset and a lease liability on the balance sheet for all leases except for short-term leases. For lessees, leases will be classified as either operating or finance leases in the Statements of Consolidated Operations. We adopted this standard on its effective date of January 1, 2019 using the optional alternative approach, which requires application of the new guidance at the beginning of the standard's effective date. We have compiled an inventory of our existing leases and have finalized our implementation plan. Based on our analysis, the updated standard will not have a material effect on our consolidated financial statements.

**NOTE 3 - SEGMENT REPORTING**

In alignment with our strategic goals, our Company's continuing operations are organized and managed in two business units according to our differentiated products. The former 'U.S. Iron Ore' segment is now 'Mining and Pelletizing.' Our Mining and Pelletizing segment is a major supplier of iron ore pellets to the North American steel industry from our mines and pellet plants located in Michigan and Minnesota. In addition, the Toledo HBI business will be categorized under the segment 'Metallics.' In our Metallics segment, we are currently constructing an HBI production plant in Toledo, Ohio. We expect to complete construction and begin production in 2020.

We evaluate performance based on sales margin, defined as revenues less cost of goods sold and operating expenses identifiable to each segment. Additionally, we evaluate performance on a segment basis, as well as a consolidated basis, based on EBITDA and Adjusted EBITDA. These measures allow management and investors to

focus on our ability to service our debt as well as illustrate how the business is performing. Additionally, EBITDA and Adjusted EBITDA assist management and investors in their analysis and forecasting as these measures approximate the cash flows associated with operational earnings.

The following tables present a summary of our reportable segments, including a reconciliation of segment sales margin to *Income from continuing operations before income taxes* and a reconciliation of *Net income* to EBITDA and Adjusted EBITDA:

| | 2018 | 2017 | 2016 |
|---|---|---|---|
| Revenues from product sales and services: | | | |
| Mining and Pelletizing | $ 2,332.4 | $ 1,866.0 | $ 1,554.5 |
| | | | |
| Sales margin: | | | |
| Mining and Pelletizing | $ 809.6 | $ 467.6 | $ 280.1 |
| Other operating expense | (136.4) | (77.4) | (149.4) |
| Other expense | (108.5) | (282.0) | (20.3) |
| Income from continuing operations before income taxes | $ 564.7 | $ 108.2 | $ 110.4 |

| | (In Millions) | | |
|---|---|---|---|
| | 2018 | 2017 | 2016 |
| Net income | $ 1,128.1 | $ 363.1 | $ 199.3 |
| Less: | | | |
| Interest expense, net | (121.3) | (132.0) | (200.5) |
| Income tax benefit | 460.3 | 252.4 | 12.2 |
| Depreciation, depletion and amortization | (89.0) | (87.7) | (115.4) |
| Total EBITDA | $ 878.1 | $ 330.4 | $ 503.0 |
| Less: | | | |
| Gain (loss) on extinguishment/restructuring of debt | $ (6.8) | $ (165.4) | $ 166.3 |
| Impact of discontinued operations | 120.6 | 22.0 | 108.4 |
| Foreign exchange remeasurement | (0.9) | 13.9 | (17.8) |
| Impairment of long-lived assets | (1.1) | — | — |
| Total Adjusted EBITDA | $ 766.3 | $ 459.9 | $ 246.1 |
| | | | |
| EBITDA: | | | |
| Mining and Pelletizing | $ 852.9 | $ 534.9 | $ 342.4 |
| Metallics | (3.3) | (0.4) | — |
| Corporate and Other[1] | 28.5 | (204.1) | 160.6 |
| Total EBITDA | $ 878.1 | $ 330.4 | $ 503.0 |
| | | | |
| Adjusted EBITDA: | | | |
| Mining and Pelletizing | $ 875.3 | $ 559.4 | $ 359.6 |
| Metallics | (3.3) | (0.4) | — |
| Corporate | (105.7) | (99.1) | (113.5) |
| Total Adjusted EBITDA | $ 766.3 | $ 459.9 | $ 246.1 |

[1] Corporate and Other includes activity from discontinued operations.

91

A005580

| | | (In Millions) | | | |
|---|---|---|---|---|---|
| | **2018** | | 2017 | | 2016 |
| Depreciation, depletion and amortization: | | | | | |
| Mining and Pelletizing | $ | **68.2** | $ | 66.6 | $ | 84.0 |
| Corporate | | **5.6** | | 6.8 | | 6.3 |
| Total depreciation, depletion and amortization | $ | **73.8** | $ | 73.4 | $ | 90.3 |
| | | | | | | |
| Capital additions[1]: | | | | | |
| Mining and Pelletizing | $ | **145.0** | $ | 136.8 | $ | 62.2 |
| Metallics | | **248.1** | | 13.7 | | — |
| Corporate and Other | | **1.6** | | 2.7 | | 6.1 |
| Total capital additions | $ | **394.7** | $ | 153.2 | $ | 68.3 |

[1] Includes capital lease additions and non-cash accruals. Refer to NOTE 16 - CASH FLOW INFORMATION.

A summary of assets by segment is as follows:

| | | (In Millions) | | |
|---|---|---|---|---|
| | **December 31, 2018** | | December 31, 2017 | December 31, 2016 |
| Assets: | | | | |
| Mining and Pelletizing | $ | **1,694.1** | $ 1,500.6 | $ 1,372.5 |
| Metallics | | **265.9** | 13.4 | — |
| Total segment assets | | **1,960.0** | 1,514.0 | 1,372.5 |
| Corporate | | **1,557.2** | 1,300.6 | 396.3 |
| Assets of discontinued operations | | **12.4** | 138.8 | 155.1 |
| Total assets | $ | **3,529.6** | $ 2,953.4 | $ 1,923.9 |

Included in the consolidated financial statements are the following amounts relating to geographic location:

| | | (In Millions) | | | |
|---|---|---|---|---|---|
| | **2018** | | 2017 | | 2016 |
| Revenues from product sales and services: | | | | | |
| United States | $ | **1,847.3** | $ | 1,504.5 | $ | 1,236.2 |
| Canada | | **395.1** | | 206.2 | | 267.1 |
| Other countries | | **90.0** | | 155.3 | | 51.2 |
| Total revenues from product sales and services | $ | **2,332.4** | $ | 1,866.0 | $ | 1,554.5 |
| Property, plant and equipment, net: | | | | | |
| United States | $ | **1,286.0** | $ | 1,033.8 | $ | 961.0 |

***Concentrations in Revenue***

In 2018 and 2017, three customers individually accounted for more than 10% of our consolidated product revenue and in 2016, two customers individually accounted for more than 10% of our consolidated product revenue. Total product revenue from those customers represents $2.1 billion, $1.5 billion and $1.1 billion of our total consolidated product revenue in 2018, 2017 and 2016, respectively.

92

A005581

The following table represents the percentage of our total *Revenues from product sales and services* contributed by each category of products and services:

| Revenue category: | 2018 | 2017 | 2016 |
|---|---|---|---|
| Product | 93% | 88% | 89% |
| Freight and venture partners' cost reimbursements | 7% | 12% | 11% |
| Total revenues from product sales and services | 100% | 100% | 100% |

## NOTE 4 - INVENTORIES

The following table presents the detail of our *Inventories* in the Statements of Consolidated Financial Position :

| | (In Millions) | |
|---|---|---|
| | December 31, | |
| | 2018 | 2017 |
| Finished Goods | $ 77.8 | $ 127.1 |
| Work-in-Process | 10.1 | 11.3 |
| Total Inventories | $ 87.9 | $ 138.4 |

The excess of current cost over LIFO cost of iron ore inventories was $95.6 million and $96.2 million at December 31, 2018 and 2017, respectively. As of December 31, 2018, the product inventory balance for the Mining and Pelletizing segment declined, resulting in the liquidation of a LIFO layer in 2018. The effect of the inventory reduction was a decrease in *Cost of goods sold and operating expenses* of $0.2 million in the Statements of Consolidated Operations for the year ended December 31, 2018. As of December 31, 2017, the product inventory balance for the Mining and Pelletizing segment increased, resulting in a LIFO increment in 2017. The effect of the inventory build was an increase in *Inventories* of $6.2 million in the Statements of Consolidated Financial Position for the year ended December 31, 2017.

## NOTE 5 - PROPERTY, PLANT AND EQUIPMENT

The following table indicates the carrying value of each of the major classes of our consolidated depreciable assets:

| | (In Millions) | |
|---|---|---|
| | December 31, | |
| | 2018 | 2017 |
| Land rights and mineral rights | $ 549.6 | $ 549.6 |
| Office and information technology | 70.0 | 65.8 |
| Buildings | 87.2 | 85.2 |
| Mining equipment | 548.5 | 533.9 |
| Processing equipment | 645.8 | 610.9 |
| Electric power facilities | 58.7 | 56.9 |
| Land improvements | 23.8 | 23.7 |
| Asset retirement obligation | 14.8 | 16.9 |
| Other | 25.2 | 25.2 |
| Construction-in-progress | 284.8 | 32.6 |
| | 2,308.4 | 2,000.7 |
| Allowance for depreciation and depletion | (1,022.4) | (966.9) |
| | $ 1,286.0 | $ 1,033.8 |

We recorded depreciation expense of $65.6 million, $65.8 million and $84.0 million in the Statements of Consolidated Operations for the years ended December 31, 2018, 2017 and 2016, respectively.

We recorded capitalized interest of $6.5 million into construction-in-progress during the year ended December 31, 2018.

The net book value of the land rights and mineral rights is as follows :

| | (In Millions) | | | |
|---|---|---|---|---|
| | December 31, | | | |
| | **2018** | | 2017 | |
| Land rights | $ | **12.4** | $ | 12.4 |
| Mineral rights: | | | | |
| Cost | $ | **537.2** | $ | 537.2 |
| Depletion | | **(126.5)** | | (119.1) |
| Net mineral rights | $ | **410.7** | $ | 418.1 |

We recorded depletion expense of $7.4 million, $6.8 million and $3.8 million in the Statements of Consolidated Operations for the years ended December 31, 2018, 2017 and 2016, respectively.

## NOTE 6 - DEBT AND CREDIT FACILITIES

The following represents a summary of our long-term debt:

| | (In Millions) | | | | |
|---|---|---|---|---|---|
| | December 31, 2018 | | | | |
| Debt Instrument | Annual Effective Interest Rate | Total Principal Amount | Debt Issuance Costs | Unamortized Discounts | Total Debt |
| Senior Secured Notes: | | | | | |
| $400 Million 4.875% 2024 Senior Notes | **5.00%** | $ **400.0** | $ **(5.7)** | $ **(2.2)** | $ **392.1** |
| Unsecured Notes: | | | | | |
| $700 Million 4.875% 2021 Senior Notes | **4.89%** | **124.0** | **(0.2)** | **—** | **123.8** |
| $316.25 Million 1.50% 2025 Convertible Senior Notes | **6.26%** | **316.3** | **(5.5)** | **(75.6)** | **235.2** |
| $1.075 Billion 5.75% 2025 Senior Notes | **6.01%** | **1,073.3** | **(9.9)** | **(14.6)** | **1,048.8** |
| $800 Million 6.25% 2040 Senior Notes | **6.34%** | **298.4** | **(2.3)** | **(3.3)** | **292.8** |
| ABL Facility | **N/A** | **450.0** | **N/A** | **N/A** | **—** |
| Fair Value Adjustment to Interest Rate Hedge | | | | | **0.2** |
| Long-term debt | | | | | $ **2,092.9** |

94

A005583

(In Millions)

| Debt Instrument | Annual Effective Interest Rate | Total Principal Amount | Debt Issuance Costs | Unamortized Discounts | Total Debt |
|---|---|---|---|---|---|
| | | | December 31, 2017 | | |
| Senior Secured Notes: | | | | | |
| $400 Million 4.875% 2024 Senior Notes | 5.00% | $ 400.0 | $ (7.1) | $ (2.6) | $ 390.3 |
| Unsecured Notes: | | | | | |
| $400 Million 5.90% 2020 Senior Notes | 5.98% | 88.9 | (0.2) | (0.1) | 88.6 |
| $500 Million 4.80% 2020 Senior Notes | 4.83% | 122.4 | (0.3) | (0.1) | 122.0 |
| $700 Million 4.875% 2021 Senior Notes | 4.89% | 138.4 | (0.3) | (0.1) | 138.0 |
| $316.25 Million 1.50% 2025 Convertible Senior Notes | 6.26% | 316.3 | (6.6) | (85.6) | 224.1 |
| $1.075 Billion 5.75% 2025 Senior Notes | 6.01% | 1,075.0 | (11.3) | (16.5) | 1,047.2 |
| $800 Million 6.25% 2040 Senior Notes | 6.34% | 298.4 | (2.4) | (3.4) | 292.6 |
| ABL Facility | N/A | 550.0 | N/A | N/A | — |
| Fair Value Adjustment to Interest Rate Hedge | | | | | 1.4 |
| Long-term debt | | | | | $ 2,304.2 |

**Outstanding Senior Secured Notes**

Our Senior Secured Notes bear interest at a rate of 4.875% per annum, which is payable semi-annually in arrears on January 15 and July 15 of each year. The Senior Secured Notes mature on January 15, 2024 and are secured senior obligations of the Company.

Our Senior Secured Notes are jointly and severally and fully and unconditionally guaranteed on a senior secured basis by substantially all of our material domestic subsidiaries and are secured (subject in each case to certain exceptions and permitted liens) by (i) a first-priority lien on substantially all of our assets and the assets of the guarantors, and (ii) a second-priority lien on the ABL Collateral (as defined below), which is junior to a first-priority lien for the benefit of the lenders under our ABL Facility.

The terms of the Senior Secured Notes contain certain covenants; however, there are no financial covenants. Upon the occurrence of a change of control triggering event, as defined in the indenture, we will be required to offer to purchase the notes of the applicable series at a purchase price equal to 101% of the principal amount, plus accrued and unpaid interest, if any, to, but not including, the date of purchase.

The following is a summary of redemption prices for our 2024 Senior Secured Notes:

| Redemption Period[1] | Redemption Price | Restricted Amount |
|---|---|---|
| Prior to January 15, 2021 - using proceeds of equity issuance [2] | 104.875 % | Up to 35% of original aggregate principal |
| Prior to January 15, 2021 [2] | 100.000 | |
| Prior to January 15, 2021 | 103.000 | Up to 10% of original aggregate principal |
| Beginning on January 15, 2021 | 102.438 | |
| Beginning on January 15, 2022 | 101.219 | |
| Beginning on January 15, 2023 | 100.000 | |

[1] Plus accrued and unpaid interest, if any, up to but excluding the redemption date.

[2] Plus a "make-whole" premium.

A005584

Table of Contents

**Outstanding Unsecured Senior Notes**

The following represents a summary of our unsecured senior notes' maturity and interest payable due dates:

| Debt Instrument | Maturity | Interest Payable (until maturity) |
|---|---|---|
| $700 Million 4.875% 2021 Senior Notes | April 1, 2021 | April 1 and October 1 |
| $1.075 Billion 5.75% 2025 Senior Notes | March 1, 2025 | March 1 and September 1 |
| $800 Million 6.25% 2040 Senior Notes | October 1, 2040 | April 1 and October 1 |

The senior notes are unsecured obligations and rank equally in right of payment with all our other existing and future unsecured and unsubordinated indebtedness. There are no subsidiary guarantees of the interest and principal amounts for the 2021 Senior Notes and the 2040 Senior Notes. The 2025 Senior Notes are guaranteed on a senior unsecured basis by our material direct and indirect wholly-owned domestic subsidiaries and, therefore, are structurally senior to any of our existing and future indebtedness that is not guaranteed by such guarantors and are structurally subordinated to all existing and future indebtedness and other liabilities of our subsidiaries that do not guarantee the 2025 Senior Notes.

The 2021 Senior Notes and the 2040 Senior Notes may be redeemed any time at our option not less than 30 days nor more than 60 days after prior notice is sent to the holders of the applicable series of notes. The 2021 Senior Notes and the 2040 Senior Notes are redeemable at a redemption price equal to the greater of (1) 100% of the principal amount of the notes to be redeemed or (2) the sum of the present values of the remaining scheduled payments of principal and interest on the notes to be redeemed, discounted to the redemption date on a semi-annual basis at the treasury rate plus 25 basis points with respect to the 2021 Senior Notes and 40 basis points with respect to the 2040 Senior Notes, plus, in each case, accrued and unpaid interest to, but not including, the date of redemption. However, if the 2021 Senior Notes are redeemed on or after the date that is three months prior to their maturity date, the 2021 Senior Notes will be redeemed at a redemption price equal to 100% of the principal amount of the notes to be redeemed plus accrued and unpaid interest to, but not including, the date of redemption.

We may redeem the 2025 Senior Notes, in whole or in part, on or after March 1, 2020, at the redemption prices set forth in the indenture, plus accrued and unpaid interest, if any, to, but not including, the date of redemption, and prior to March 1, 2020, at a redemption price equal to 100% of the principal amount thereof plus a "make-whole" premium set forth in the indenture, plus accrued and unpaid interest, if any, to, but not including, the date of redemption. We may also redeem up to 35% of the aggregate principal amount of the 2025 Senior Notes on or prior to March 1, 2020 at a redemption price equal to 105.75% of the principal amount thereof, plus accrued and unpaid interest, if any, to, but not including, the date of redemption with the net cash proceeds of one or more equity offerings.

In addition, if a change of control triggering event, as defined in the applicable indenture, occurs with respect to the unsecured notes, we will be required to offer to purchase the notes of the applicable series at a purchase price equal to 101% of the principal amount, plus accrued and unpaid interest, if any, to, but not including, the date of purchase.

The terms of the unsecured notes contain certain customary covenants; however, there are no financial covenants.

**$316.25 Million 1.50% 2025 Convertible Senior Notes**

The 2025 Convertible Notes bear interest at a rate of 1.50% per year, payable semiannually in arrears on January 15 and July 15 of each year. The 2025 Convertible Notes mature on January 15, 2025. The 2025 Convertible Notes are senior unsecured obligations and rank senior in right of payment to any of our indebtedness that is expressly subordinated in right of payment to the 2025 Convertible Notes; equal in right of payment to any of our unsecured indebtedness that is not so subordinated; effectively junior in right of payment to any of our secured indebtedness to the extent of the value of the assets securing such indebtedness; and structurally junior to all indebtedness and other liabilities (including trade payables) of our subsidiaries. The terms of the 2025 Convertible Notes contain certain customary covenants; however, there are no financial covenants.

Holders may convert their 2025 Convertible Notes at their option at any time prior to the close of business on the business day immediately preceding July 15, 2024, only under the following circumstances: (1) during any calendar quarter commencing after the calendar quarter ending on March 31, 2018, if the last reported sale price of our common shares, par value $0.125 per share, for at least 20 trading days (whether or not consecutive) during a period of 30 consecutive trading days ending on the last trading day of the immediately preceding calendar quarter is greater than or equal to 130% of the conversion price on each applicable trading day; (2) during the five-business day period after

96

any five-consecutive trading day period (the "measurement period") in which the trading price per $1,000 principal amount of 2025 Convertible Notes for each trading day of the measurement period was less than 98% of the product of the last reported sale price of our common shares and the conversion rate on each such trading day; (3) if we call the notes for redemption, at any time prior to the close of business on the scheduled trading day immediately preceding the redemption date; or (4) upon the occurrence of specified corporate events. On or after July 15, 2024 until the close of business on the second scheduled trading day immediately preceding the maturity date, holders may convert their 2025 Convertible Notes at any time, regardless of the foregoing circumstances. Upon conversion, we will pay or deliver, as the case may be, cash, common shares or a combination of cash and common shares, at our election.

The conversion rate is 122.4365 common shares per $1,000 principal amount of 2025 Convertible Notes (equivalent to an initial conversion price of $8.17 per common share). The conversion rate will be subject to adjustment in some circumstances but will not be adjusted for any accrued and unpaid interest. In addition, following certain corporate events that occur prior to the maturity date, or if we deliver a notice of redemption, we will, in certain circumstances, increase the conversion rate for a holder who elects to convert its 2025 Convertible Notes in connection with such a corporate event or notice of redemption, as the case may be.

We may not redeem the 2025 Convertible Notes prior to January 15, 2022. We may redeem all or any portion of the 2025 Convertible Notes, for cash at our option on or after January 15, 2022 if the last reported sale price of our common shares has been at least 130% of the conversion price then in effect for at least 20 trading days (whether or not consecutive) during any 30-consecutive trading day period (including the last trading day of such period) ending on, and including, the trading day immediately preceding the date on which we provide notice of redemption at a redemption price equal to 100% of the principal amount of the 2025 Convertible Notes to be redeemed, plus accrued and unpaid interest to, but excluding, the redemption date.

It is our current intent to settle conversions through combination settlement.  Our ability to settle conversions through combination settlement and cash settlement will be subject to restrictions in the agreement governing our ABL Facility and may be subject to restrictions in agreements governing our future debt.

If we undergo a fundamental change as defined in the indenture, holders may require us to repurchase for cash all or any portion of their 2025 Convertible Notes at a fundamental change repurchase price equal to 100% of the principal amount of the 2025 Convertible Notes to be repurchased, plus accrued and unpaid interest to, but excluding, the fundamental change repurchase date.

In accounting for the issuance of the notes, we separated the 2025 Convertible Notes into liability and equity components. The carrying amount of the liability component was calculated by measuring the fair value of similar liabilities that did not have associated convertible features. The carrying amount of the equity component of $85.9 million representing the conversion option was determined by deducting the fair value of the liability component from the par value of the notes. The difference represents the debt discount that is amortized to interest expense over the term of the notes. The equity component is not remeasured as long as it continues to qualify for equity classification.

**Debt Extinguishment - 2018**

During the year ended December 31, 2018, we redeemed in full all of our outstanding 5.90% 2020 Senior Notes and 4.80% 2020 Senior Notes with cash on hand. Additionally, we purchased certain of our 4.875% 2021 Senior Notes and 2025 Senior Notes.

Table of Contents

The following is a summary of the debt extinguished and the respective gain (loss) on extinguishment:

| (In Millions) | | |
|---|---|---|
| | Year Ended December 31, 2018 | |
| | Debt Extinguished | Gain (Loss) on Extinguishment[1] |
| Unsecured Notes: | | |
| $400 Million 5.90% 2020 Senior Notes | $ 88.9 | $ (3.3) |
| $500 Million 4.80% 2020 Senior Notes | 122.4 | (3.7) |
| $700 Million 4.875% 2021 Senior Notes | 14.4 | 0.1 |
| $1.075 Billion 5.75% 2025 Senior Notes | 1.7 | 0.1 |
| | $ 227.4 | $ (6.8) |

[1] This includes premiums paid related to the redemption of our notes of $7.1 million.

**Debt Extinguishment - 2017**

During the year ended December 31, 2017, we issued 63.25 million common shares in an underwritten public offering. We received net proceeds of $661.3 million at a public offering price of $10.75 per common share. The net proceeds from the issuance of our common shares and the net proceeds from the issuance of $1.075 billion 2025 Senior Notes were used to redeem in full all of our outstanding 8.25% 2020 First Lien Notes, 8.00% 2020 1.5 Lien Notes and 7.75% 2020 Second Lien Notes. Additionally, through tender offers, we purchased certain of our 5.90% 2020 Senior Notes, our 4.80% 2020 Senior Notes and our 4.875% 2021 Senior Notes.

The following is a summary of the debt extinguished and the respective gain (loss) on extinguishment:

| (In Millions) | | |
|---|---|---|
| | Year Ended December 31, 2017 | |
| | Debt Extinguished | Gain (Loss) on Extinguishment[1] |
| Secured Notes: | | |
| $540 Million 8.25% 2020 First Lien Notes | $ 540.0 | $ (93.5) |
| $218.5 Million 8.00% 2020 1.5 Lien Notes | 218.5 | 45.1 |
| $544.2 Million 7.75% 2020 Second Lien Notes | 430.1 | (104.5) |
| Unsecured Notes: | | |
| $400 Million 5.90% 2020 Senior Notes | 136.7 | (7.8) |
| $500 Million 4.80% 2020 Senior Notes | 114.4 | (1.9) |
| $700 Million 4.875% 2021 Senior Notes | 171.0 | (2.8) |
| | $ 1,610.7 | $ (165.4) |

[1] This includes premiums paid related to the redemption of our notes of $110.0 million.

**Debt Extinguishment/Restructuring - 2016**

*8.00% 2020 1.5 Lien Notes Exchange*

On March 2, 2016, we entered into an indenture among the Company, the guarantors party thereto and U.S. Bank National Association, as trustee and notes collateral agent, relating to our issuance of $218.5 million aggregate principal amount of 8.00% 2020 1.5 Lien Notes. The 8.00% 2020 1.5 Lien Notes were issued in exchange offers for certain of our existing senior notes.

We accounted for the 8.00% 2020 1.5 Lien Notes exchange as a troubled debt restructuring. For an exchange classified as a troubled debt restructuring, if the future undiscounted cash flows of the newly issued debt are less than the net carrying value of the original debt, the carrying value of the newly issued debt is adjusted to the future undiscounted

98

Table of Contents

cash flow amount, a gain is recorded for the difference and no future interest expense is recorded. All future interest payments on the newly issued debt reduce the carrying value.  Accordingly, we recognized a gain of $174.3 million in the *Gain (loss) on extinguishment/restructuring of debt* in the Statements of Consolidated Operations for the year ended December 31, 2016.

The following is a summary of the debt exchanged for our $218.5 million 8.00% 2020 1.5 Lien Notes:

| (In Millions) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Debt Extinguished | | 1.5 Lien Amount Issued | | Carrying Value[1] | | Gain on Restructuring[2] |
| $544.2 Million 7.75% 2020 Second Lien Notes | $ | 114.1 | $ | 57.0 | $ | 77.5 | $ 6.9 |
| $500 Million 3.95% 2018 Senior Notes | | 17.6 | | 11.4 | | 15.5 | 1.8 |
| $400 Million 5.90% 2020 Senior Notes | | 65.1 | | 26.0 | | 35.4 | 28.3 |
| $500 Million 4.80% 2020 Senior Notes | | 44.7 | | 17.9 | | 24.4 | 19.5 |
| $700 Million 4.875% 2021 Senior Notes | | 76.3 | | 30.5 | | 41.5 | 33.3 |
| $800 Million 6.25% 2040 Senior Notes | | 194.4 | | 75.7 | | 103.0 | 84.5 |
| | $ | 512.2 | $ | 218.5 | $ | 297.3 | $ 174.3 |

[1] Includes undiscounted interest payments

[2] Net of amounts expensed for unamortized original issue discount and deferred origination fees

*Debt-for-Equity Exchanges*

During the year ended December 31, 2016, we entered into a series of privately negotiated exchange agreements whereby we issued an aggregate of 8.2 million common shares in exchange for $10.0 million aggregate principal amount of our 3.95% 2018 Senior Notes, $20.1 million aggregate principal amount of our 4.80% 2020 Senior Notes and $26.8 million aggregate principal amount of our 4.875% 2021 Senior Notes. There were no exchanges that represented more than 1% of our outstanding common shares during any quarter. Accordingly, we recognized a gain of $11.3 million  in *Gain (loss) on extinguishment/restructuring of debt* in the Statements of Consolidated Operations for the year ended December 31, 2016.

*Other Debt Repurchases*

Our 3.95% 2018 Senior Notes were redeemed in whole on September 16, 2016 at a total redemption price of  $301.0 million, which included $283.6 million outstanding aggregate principal. As a result, we recorded a $19.9 million pre-tax loss on full retirement of long-term debt in the third quarter of 2016, which consisted of debt redemption premiums of $17.4 million and expenses of $2.5 million related to the write-off of unamortized debt issuance costs, unamortized bond discount and deferred losses on interest rate swaps. The loss was recorded against the *Gain (loss) on extinguishment/restructuring of debt* in the Statements of Consolidated Operations for the year ended December 31, 2016.

During the year ended December 31, 2016, we purchased with cash  $5.0 million of our outstanding  4.80% 2020 Senior Notes, which resulted in a gain on extinguishment of $0.6 million.

**Debt Maturities**

The following represents a summary of our debt instrument maturities based on the principal amounts outstanding at December 31, 2018:

|  | (In Millions) |
| --- | ---: |
|  | **Maturities of Debt** |
| 2019 | $ — |
| 2020 | — |
| 2021 | 124.0 |
| 2022 | — |
| 2023 | — |
| 2024 and thereafter | 2,088.0 |
| Total maturities of debt | $ 2,212.0 |

**ABL Facility**

On February 28, 2018, we entered into an amended and restated senior secured asset-based revolving credit facility with various financial institutions. The ABL Facility amends and restates our prior $550.0 million Syndicated Facility Agreement, dated as of March 30, 2015. The ABL Facility will mature upon the earlier of February 28, 2023 or 60 days prior to the maturity of certain other material debt and provides for up to $450.0 million in borrowings, comprised of (i) a $400.0 million U.S. tranche, including a $248.8 million sublimit for the issuance of letters of credit and a $100.0 million sublimit for U.S. swingline loans, and (ii) at the time of closing, a $50.0 million Australian tranche, including a $24.4 million sublimit for the issuance of letters of credit and a $20.0 million sublimit for Australian swingline loans. On June 19, 2018, the Australian tranche was terminated and reallocated to the U.S. tranche, resulting in a $450.0 million allocation to the U.S. tranche, including a $273.2 million sublimit for the issuance of letters of credit and a $120.0 million sublimit for swingline loans. Availability under the U.S. tranche of the ABL Facility is limited to an eligible U.S. borrowing base, as applicable, determined by applying customary advance rates to eligible accounts receivable, inventory and certain mobile equipment.

The ABL Facility and certain bank products and hedge obligations are guaranteed by us and certain of our existing wholly-owned U.S. subsidiaries and are required to be guaranteed by certain of our future U.S. subsidiaries. Amounts outstanding under the ABL Facility are secured by (i) a first-priority security interest in the accounts receivable and other rights to payment, inventory, as-extracted collateral, certain investment property, deposit accounts, securities accounts, certain general intangibles and commercial tort claims, certain mobile equipment, commodities accounts, deposit accounts, securities accounts and other related assets of ours, the other borrowers and the guarantors, and proceeds and products of each of the foregoing (collectively, the "ABL Collateral") and (ii) a second-priority security interest in substantially all of our assets and the assets of the other borrowers and the guarantors other than the ABL Collateral.

Borrowings under the ABL Facility bear interest, at our option, at a base rate or, if certain conditions are met, a LIBOR rate, in each case plus an applicable margin. The base rate is equal to the greater of the federal funds rate plus 0.5%, the LIBOR rate based on a one-month interest period plus 1% and the floating rate announced by Bank of America Merrill Lynch as its "prime rate" and 1%. The LIBOR rate is a per annum fixed rate equal to LIBOR with respect to the applicable interest period and amount of LIBOR rate loan requested.

The ABL Facility contains customary representations and warranties and affirmative and negative covenants including, among others, covenants regarding the maintenance of certain financial ratios if certain conditions are triggered, covenants relating to financial reporting, covenants relating to the payment of dividends on, or purchase or redemption of, our capital stock, covenants relating to the incurrence or prepayment of certain debt, covenants relating to the incurrence of liens or encumbrances, covenants relating to compliance with laws, covenants relating to transactions with affiliates, covenants relating to mergers and sales of all or substantially all of our assets and limitations on changes in the nature of our business.

The ABL Facility provides for customary events of default, including, among other things, the event of nonpayment of principal, interest, fees, or other amounts, a representation or warranty proving to have been materially incorrect when made, failure to perform or observe certain covenants within a specified period of time, a cross-default to certain material indebtedness, the bankruptcy or insolvency of the Company and certain of its subsidiaries, monetary judgment defaults of a specified amount, invalidity of any loan documentation, a change of control of the Company, and ERISA defaults

resulting in liability of a specified amount. If an event of default exists (beyond any applicable grace or cure period, if any), the administrative agent may and, at the direction of the requisite number of lenders, shall declare all amounts owing under the ABL Facility immediately due and payable, terminate such lenders' commitments to make loans under the ABL Facility and/or exercise any and all remedies and other rights under the ABL Facility. For certain events of default related to insolvency and receivership, the commitments of the lenders will be automatically terminated and all outstanding loans and other amounts will become immediately due and payable.

As of December 31, 2018 and 2017, we were in compliance with the ABL Facility liquidity requirements and, therefore, the springing financial covenant requiring a minimum fixed charge coverage ratio of 1.0 to 1.0 was not applicable.

The following represents a summary of our borrowing capacity under the ABL Facility:

| | (In Millions) | | | |
|---|---|---|---|---|
| | December 31, 2018 | | December 31, 2017 | |
| Available borrowing base on ABL Facility [1] | $ | 323.7 | $ | 273.2 |
| Letter of credit obligations and other commitments [2] | | (55.0 ) | | (46.5 ) |
| Borrowing capacity available [3] | $ | 268.7 | $ | 226.7 |

[1] The ABL Facility has a maximum borrowing base of $450 million, determined by applying customary advance rates to eligible accounts receivable, inventory and certain mobile equipment.

[2] We issued standby letters of credit with certain financial institutions in order to support business obligations including, but not limited to, workers compensation, environmental obligations and a Metallics energy supply agreement.

[3] As of December 31, 2018 and 2017 we had no loans drawn under the ABL Facility.

Table of Contents

**NOTE 7 - FAIR VALUE OF FINANCIAL INSTRUMENTS**

The following represents the assets and liabilities measured at fair value:

| | (In Millions) | | | |
|---|---|---|---|---|
| | December 31, 2018 | | | |
| | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| **Assets:** | | | | |
| Cash equivalents | $ 0.8 | $ 542.6 | $ — | $ 543.4 |
| Derivative assets | — | 0.1 | 91.4 | 91.5 |
| Total | $ 0.8 | $ 542.7 | $ 91.4 | $ 634.9 |
| **Liabilities:** | | | | |
| Derivative liabilities | $ — | $ 3.7 | $ — | $ 3.7 |
| Total | $ — | $ 3.7 | $ — | $ 3.7 |

| | (In Millions) | | | |
|---|---|---|---|---|
| | December 31, 2017 | | | |
| | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| **Assets:** | | | | |
| Cash equivalents | $ 66.3 | $ 550.6 | $ — | $ 616.9 |
| Derivative assets | — | — | 37.9 | 37.9 |
| Total | $ 66.3 | $ 550.6 | $ 37.9 | $ 654.8 |
| **Liabilities:** | | | | |
| Derivative liabilities | $ — | $ 0.3 | $ 1.7 | $ 2.0 |
| Total | $ — | $ 0.3 | $ 1.7 | $ 2.0 |

Financial assets classified in Level 1 included money market funds at December 31, 2018 and money market funds and treasury bonds at December 31, 2017. The valuation of these instruments is based upon unadjusted quoted prices for identical assets in active markets.

The valuation of financial assets and liabilities classified in Level 2 is determined using a market approach based upon quoted prices for similar assets and liabilities in active markets, or other inputs that are observable. Level 2 assets included commercial paper, certificates of deposit and commodity hedge contracts at December 31, 2018 and commercial paper and certificates of deposits at December 31, 2017. Level 2 liabilities included commodity hedge contracts at December 31, 2018 and 2017.

The Level 3 assets and liabilities include derivative assets that consist of freestanding derivative instruments related to a certain supply agreement and derivative assets and liabilities related to certain provisional pricing arrangements with our customers.

The supply agreement included in our Level 3 assets contain provisions for supplemental revenue or refunds based on the average annual daily market price for hot-rolled coil steel in the year the iron ore product is consumed in the customer's blast furnaces. We account for these provisions as derivative instruments at the time of sale and adjust the derivative instruments to fair value through *Product revenues* each reporting period until the product is consumed and the amounts are settled. We had assets of $89.3 million and $37.9 million at December 31, 2018 and 2017, respectively, related to this supply agreement.

The provisional pricing arrangements included in our Level 3 assets/liabilities specify provisional price calculations, where the pricing mechanisms generally are based on market pricing, with the final revenue rate to be based on market inputs at a specified point in time in the future, per the terms of the supply agreements. The difference between the estimated final revenue rate at the date of sale and the estimated final revenue rate at the measurement date is characterized as a derivative and is required to be accounted for separately once the revenue has been recognized. The derivative instruments are adjusted to fair value through *Product revenues* each reporting period based upon current market data and forward-looking estimates provided by management until the final revenue rates are determined. We had assets of $2.1 million at December 31, 2018 compared to liabilities of $1.7 million related to provisional pricing arrangements at December 31, 2017.

The following table illustrates information about quantitative inputs and assumptions for the derivative assets and derivative liabilities categorized in Level 3 of the fair value hierarchy:

### Qualitative/Quantitative Information About Level 3 Fair Value Measurements

| | Fair Value at December 31, 2018 (In Millions) | Balance Sheet Location | Valuation Technique | Unobservable Input | Point Estimate |
|---|---|---|---|---|---|
| Customer supply agreement | $89.3 | *Derivative assets* | Market Approach | Management's Estimate of Market Hot-Rolled Coil Steel per net ton | $750 |
| Provisional pricing arrangements | $2.1 | *Derivative assets* | Market Approach | Management's Estimate of Platts 62% Price per dry metric ton | $68 |

The significant unobservable input used in the fair value measurement of our customer supply agreement is a forward-looking estimate of the average annual daily market price for hot-rolled coil steel determined by management.

The significant unobservable inputs used in the fair value measurement of our provisional pricing arrangements are management's estimates of Platts 62% Price based upon current market data and index pricing, of which includes forward-looking estimates determined by management.

The following tables represent a reconciliation of the changes in fair value of financial instruments measured at fair value on a recurring basis using significant unobservable inputs (Level 3):

| | Derivative Assets[1] (Level 3) | | Derivative Liabilities (Level 3) | |
|---|---|---|---|---|
| | Year Ended December 31, | | Year Ended December 31, | |
| | **2018** | 2017 | **2018** | 2017 |
| Beginning balance - January 1 | **$ 49.5** | $ 30.1 | **$ (1.7)** | $ — |
| Total gains (losses) | | | | |
| Included in earnings | **428.7** | 176.2 | **(6.1)** | (55.6) |
| Settlements | **(386.8)** | (168.4) | **7.8** | 53.9 |
| Ending balance - December 31 | **$ 91.4** | $ 37.9 | **$ —** | $ (1.7) |
| Total gains (losses) for the period included in earnings attributable to the change in unrealized gains (losses) on assets still held at the reporting date | **$ 91.4** | $ 37.9 | **$ —** | $ (1.7) |

[1] Beginning balance as of January 1, 2018 includes an $11.6 million adjustment for adoption of Topic 606.

103

The carrying values of certain financial instruments (e.g. *Accounts receivable, net*, *Accounts payable* and *Other current liabilities*) approximate fair value and, therefore, have been excluded from the table below. A summary of the carrying value and fair value of other financial instruments were as follows:

| | | (In Millions) | | | |
| | | December 31, 2018 | | December 31, 2017 | |
| | Classification | Carrying Value | Fair Value | Carrying Value | Fair Value |
|---|---|---|---|---|---|
| Long-term debt: | | | | | |
| Secured Notes: | | | | | |
| $400 Million 4.875% 2024 Senior Notes | Level 1 | $ 392.1 | $ 370.2 | $ 390.3 | $ 398.0 |
| Unsecured Notes: | | | | | |
| $400 Million 5.90% 2020 Senior Notes | Level 1 | — | — | 88.6 | 88.0 |
| $500 Million 4.80% 2020 Senior Notes | Level 1 | — | — | 122.0 | 118.8 |
| $700 Million 4.875% 2021 Senior Notes | Level 1 | 123.8 | 122.3 | 138.0 | 130.8 |
| $316.25 Million 1.50% 2025 Convertible Senior Notes | Level 1 | 235.2 | 352.4 | 224.1 | 352.9 |
| $1.075 Billion 5.75% 2025 Senior Notes | Level 1 | 1,048.8 | 962.0 | 1,047.2 | 1,029.3 |
| $800 Million 6.25% 2040 Senior Notes | Level 1 | 292.8 | 232.8 | 292.6 | 227.1 |
| ABL Facility | Level 2 | — | — | — | — |
| Fair Value Adjustment to Interest Rate Hedge | Level 2 | 0.2 | 0.2 | 1.4 | 1.4 |
| Total long-term debt | | $ 2,092.9 | $ 2,039.9 | $ 2,304.2 | $ 2,346.3 |

The fair value of long-term debt was determined using quoted market prices.

## NOTE 8 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS

We offer defined benefit pension plans, defined contribution pension plans and OPEB plans, primarily consisting of retiree healthcare benefits, to most employees as part of a total compensation and benefits program. The defined benefit pension plans are noncontributory and benefits generally are based on a minimum formula or employees' years of service and average earnings for a defined period prior to retirement.

We offer retiree medical coverage to hourly retirees of our USW-represented mines. A new four-year agreement with the USW was entered into on October 12, 2018, and is retroactively effective from October 1, 2018 through September 30, 2022. The 2018 USW agreement established the set fixed monthly medical premiums for participants who retired prior to January 1, 2015. These fixed premiums will expire on December 31, 2020 and revert to increasing premiums based a cost-sharing formula thereafter. The agreement also provides for an OPEB cap that limits the amount of contributions that we have to make toward retiree medical insurance coverage for each retiree and spouse of a retiree per calendar year who retired on or after January 1, 2015. The amount of the annual OPEB cap is based upon the gross plan costs we incurred in 2014. The OPEB cap does not apply to surviving spouses. In lieu of retiree medical coverage, USW-represented employees hired after September 1, 2016 receive a 401(k) contribution of $0.50 per hour worked to a restricted Retiree Health Care Account. Beginning January 1, 2019, the hourly contribution rate increased to $0.60 per hour worked.

In addition, we currently provide various levels of retirement health care and OPEB to some full-time employees who meet certain length of service and age requirements (a portion of which is pursuant to collective bargaining agreements). Most plans require retiree contributions and have deductibles, co-pay requirements and benefit limits. Most bargaining unit plans require retiree contributions and co-pays for medical and prescription drug coverage. There is a cap on our cost for medical coverage under the salaried plans. The annual limit applies to each covered participant and equals $7,000 for coverage prior to age 65, with the retiree's participation adjusted based on the age at which the retiree's benefits commence. We do not provide OPEB for most salaried employees hired after January 1, 1993. Retiree healthcare coverage is provided through programs administered by insurance companies whose charges are based on benefits paid.

A005593

Table of Contents

The following table summarizes the annual expense (income) recognized related to the retirement plans:

| | | (In Millions) | |
|---|---|---|---|
| | 2018 | 2017 | 2016 |
| Defined benefit pension plans | $ 12.7 | $ 18.0 | $ 16.5 |
| Defined contribution pension plans | 3.1 | 2.9 | 2.8 |
| Other postretirement benefits | (5.9) | (6.1) | (4.0) |
| Total | $ 9.9 | $ 14.8 | $ 15.3 |

**Obligations and Funded Status**

The following tables and information provide additional disclosures:

| | | (In Millions) | | |
|---|---|---|---|---|
| | Pension Benefits | | Other Benefits | |
| | 2018 | 2017 | 2018 | 2017 |
| **Change in benefit obligations:** | | | | |
| Benefit obligations — beginning of year | $ 973.1 | $ 931.6 | $ 265.9 | $ 264.6 |
| Service cost (excluding expenses) | 18.7 | 17.1 | 2.2 | 1.8 |
| Interest cost | 30.3 | 30.5 | 8.3 | 8.3 |
| Plan amendments | 2.2 | — | 12.8 | — |
| Curtailment gain | (0.9) | — | — | — |
| Actuarial (gain) loss | (57.0) | 54.6 | (29.4) | 7.4 |
| Benefits paid | (60.7) | (60.7) | (24.4) | (21.4) |
| Participant contributions | — | — | 5.6 | 4.6 |
| Federal subsidy on benefits paid | — | — | 0.9 | 0.6 |
| Benefit obligations — end of year | $ 905.7 | $ 973.1 | $ 241.9 | $ 265.9 |
| | | | | |
| **Change in plan assets:** | | | | |
| Fair value of plan assets — beginning of year | $ 749.8 | $ 685.8 | $ 262.5 | $ 253.0 |
| Actual return on plan assets | (29.6) | 100.2 | (8.2) | 24.2 |
| Participant contributions | — | — | 0.5 | 0.3 |
| Employer contributions | 27.6 | 24.4 | 3.0 | 1.7 |
| Asset transfers | 0.1 | 0.1 | — | — |
| Benefits paid | (60.7) | (60.7) | (17.6) | (16.7) |
| Fair value of plan assets — end of year | $ 687.2 | $ 749.8 | $ 240.2 | $ 262.5 |
| | | | | |
| **Funded status at December 31:** | | | | |
| Fair value of plan assets | $ 687.2 | $ 749.8 | $ 240.2 | $ 262.5 |
| Benefit obligations | (905.7) | (973.1) | (241.9) | (265.9) |
| Amount recognized at December 31 | $ (218.5) | $ (223.3) | $ (1.7) | $ (3.4) |
| | | | | |
| **Amounts recognized in Statements of Financial Position:** | | | | |
| Non-current assets | $ — | $ — | $ 32.1 | $ 35.4 |
| Current liabilities | (0.1) | (0.5) | (3.5) | (3.9) |
| Non-current liabilities | (218.4) | (222.8) | (30.3) | (34.9) |
| Total amount recognized | $ (218.5) | $ (223.3) | $ (1.7) | $ (3.4) |
| | | | | |
| **Amounts recognized in accumulated other comprehensive loss:** | | | | |
| Net actuarial loss | $ 330.1 | $ 318.7 | $ 82.1 | $ 88.3 |
| Prior service cost (credit) | 8.5 | 8.8 | (9.9) | (25.6) |
| Net amount recognized | $ 338.6 | $ 327.5 | $ 72.2 | $ 62.7 |

105

**(In Millions)**

**2018**

| | Pension Plans | | | | | Other Benefits | | |
|---|---|---|---|---|---|---|---|---|
| | Salaried | Hourly | Mining | SERP | Total | Salaried | Hourly | Total |
| Fair value of plan assets | $ 249.8 | $ 429.4 | $ 8.0 | $ — | $ 687.2 | $ — | $ 240.2 | $ 240.2 |
| Benefit obligation | (340.8) | (548.9) | (10.7) | (5.3) | (905.7) | (32.9) | (209.0) | (241.9) |
| Funded status | $ (91.0) | $ (119.5) | $ (2.7) | $ (5.3) | $ (218.5) | $ (32.9) | $ 31.2 | $ (1.7) |

**2017**

| | Pension Plans | | | | | Other Benefits | | |
|---|---|---|---|---|---|---|---|---|
| | Salaried | Hourly | Mining | SERP | Total | Salaried | Hourly | Total |
| Fair value of plan assets | $ 269.4 | $ 473.0 | $ 7.4 | $ — | $ 749.8 | $ — | $ 262.5 | $ 262.5 |
| Benefit obligation | (368.0) | (590.0) | (10.3) | (4.8) | (973.1) | (37.7) | (228.2) | (265.9) |
| Funded status | $ (98.6) | $ (117.0) | $ (2.9) | $ (4.8) | $ (223.3) | $ (37.7) | $ 34.3 | $ (3.4) |

The pension and OPEB plans in 2018 experienced a net actuarial gain of $57.0 million and $29.4 million, respectively. The increase in discount rates due to market conditions was the primary driver, which resulted in gains of $75.7 million and $19.0 million for the pension and OPEB plans, respectively. The net gain was offset partially by losses of $21.7 million for the pensions plans and $2.3 million for the OPEB plans relating to demographic experience. The adoption of the new projection scale resulted in gains totaling $3.0 million for the pension plans and $0.8 million for the OPEB plans. Additionally, an update to the assumed per capita cost of medical benefits resulted in a gain of $11.9 million for the OPEB plans.

The pension and OPEB plans in 2017 experienced a net actuarial loss of $54.6 million and $7.4 million, respectively. The decrease in discount rates due to market conditions was the primary driver, which resulted in losses of $46.1 million and $12.6 million for the pension and OPEB plans, respectively. The adoption of the new projection scale resulted in gains totaling $6.1 million for the pension plans and $1.9 million for the OPEB plans.

The accumulated benefit obligation for all defined benefit pension plans was $896.8 million and $963.0 million at December 31, 2018 and 2017, respectively.

106

Table of Contents

**Components of Net Periodic Benefit Cost**

| | | (In Millions) | | | | |
| | Pension Benefits | | | Other Benefits | | |
| | **2018** | 2017 | 2016 | **2018** | 2017 | 2016 |
|---|---|---|---|---|---|---|
| Service cost | $ **18.7** | $ 17.1 | $ 17.6 | $ **2.2** | $ 1.8 | $ 1.7 |
| Interest cost | **30.3** | 30.5 | 30.3 | **8.3** | 8.3 | 9.1 |
| Expected return on plan assets | **(60.0)** | (54.5) | (54.7) | **(18.4)** | (17.7) | (17.1) |
| Amortization: | | | | | | |
| Prior service costs (credits) | **2.2** | 2.6 | 2.2 | **(3.0)** | (3.0) | (3.7) |
| Net actuarial loss | **21.2** | 22.3 | 21.1 | **5.0** | 4.5 | 6.0 |
| Curtailments | **0.3** | — | — | **—** | — | — |
| Net periodic benefit cost (credit) | $ **12.7** | $ 18.0 | $ 16.5 | $ **(5.9)** | $ (6.1) | $ (4.0) |
| Curtailment effects | **(0.3)** | — | — | **—** | — | — |
| Current year actuarial loss (gain) | **31.6** | 9.3 | 37.8 | **(2.9)** | 1.2 | (8.1) |
| Amortization of net loss | **(21.2)** | (22.3) | (21.1) | **(5.0)** | (4.5) | (6.0) |
| Current year prior service cost | **2.2** | — | 5.7 | **12.8** | — | 9.8 |
| Amortization of prior service credit (cost) | **(2.2)** | (2.6) | (2.2) | **3.0** | 3.0 | 3.7 |
| Total recognized in other comprehensive income (loss) | $ **10.1** | $ (15.6) | $ 20.2 | $ **7.9** | $ (0.3) | $ (0.6) |
| Total recognized in net periodic cost and other comprehensive income (loss) | $ **22.8** | $ 2.4 | $ 36.7 | $ **2.0** | $ (6.4) | $ (4.6) |

**Assumptions**

The discount rate for determining PBO is determined individually for each plan as noted in the assumption chart below. The discount rates are determined by matching the projected cash flows used to determine the PBO and APBO to a projected yield curve of 1,101 Aa graded bonds in the 40th to 90th percentiles. These bonds are either noncallable or callable with make-whole provisions.

On December 31, 2018, the assumed mortality improvement projection was changed from generational scale MP-2017 to generational scale MP-2018. The healthy mortality assumption remains the RP-2014 mortality tables with blue collar adjustments for the Iron Hourly Pension and Hourly OPEB plans, with white collar adjustments for the the Salaried OPEB Plan, and without adjustments for the Salaried and Ore Mining Pension Plans. On December 31, 2017, the assumed mortality improvement projection was changed from generational scale MP-2016 to generational scale MP-2017.

Weighted-average assumptions used to determine benefit obligations at December 31 were:

| | Pension Benefits | | | | Other Benefits | | | |
| | **2018** | | 2017 | | **2018** | | 2017 | |
|---|---|---|---|---|---|---|---|---|
| Discount rate: | | | | | | | | |
| Iron Hourly Pension Plan | **4.31** | **%** | 3.60 | % | **N/A** | **%** | N/A | % |
| Salaried Pension Plan | **4.21** | | 3.52 | | **N/A** | | N/A | |
| Ore Mining Pension Plan | **4.33** | | 3.61 | | **N/A** | | N/A | |
| Supplemental Executive Retirement Plan | **4.22** | | 3.50 | | **N/A** | | N/A | |
| Hourly OPEB Plan | **N/A** | | N/A | | **4.29** | | 3.60 | |
| Salaried OPEB Plan | **N/A** | | N/A | | **4.27** | | 3.57 | |
| Salaried rate of compensation increase | **3.00** | | 3.00 | | **3.00** | | 3.00 | |
| Hourly rate of compensation increase | **2.00** | | 2.00 | | **N/A** | | N/A | |

107

A005596

Table of Contents

Weighted-average assumptions used to determine net benefit cost were:

| | Pension Benefits | | | Other Benefits | | |
|---|---|---|---|---|---|---|
| | **2018** | 2017 | 2016 | **2018** | 2017 | 2016 |
| Obligation Discount Rate: | | | | | | |
| Iron Hourly Pension Plan | **3.61 %** | 4.02 % | 4.27 % | **N/A %** | N/A % | N/A % |
| Salaried Pension Plan | **3.52** | 3.91 | 4.13 | **N/A** | N/A | N/A |
| Ore Mining Pension Plan | **3.61** | 4.04 | 4.28 | **N/A** | N/A | N/A |
| Supplemental Executive Retirement Plan | **3.54** | 3.90 | 4.01 | **N/A** | N/A | N/A |
| Hourly OPEB Plan | **N/A** | N/A | N/A | **3.60** | 4.03 | 4.32 |
| Salaried OPEB Plan | **N/A** | N/A | N/A | **3.57** | 3.98 | 4.22 |
| Service Cost Discount Rate: | | | | | | |
| Iron Hourly Pension Plan | **3.76** | 4.30 | 4.66 | **N/A** | N/A | N/A |
| Salaried Pension Plan | **3.53** | 3.93 | 4.14 | **N/A** | N/A | N/A |
| Ore Mining Pension Plan | **3.75** | 4.27 | 4.60 | **N/A** | N/A | N/A |
| Supplemental Executive Retirement Plan | **3.43** | 3.69 | 3.87 | **N/A** | N/A | N/A |
| Hourly OPEB Plan | **N/A** | N/A | N/A | **3.73** | 4.23 | 4.56 |
| Salaried OPEB Plan | **N/A** | N/A | N/A | **3.76** | 4.30 | 4.63 |
| Interest Cost Discount Rate: | | | | | | |
| Iron Hourly Pension Plan | **3.21** | 3.38 | 3.46 | **N/A** | N/A | N/A |
| Salaried Pension Plan | **3.08** | 3.21 | 3.21 | **N/A** | N/A | N/A |
| Ore Mining Pension Plan | **3.22** | 3.41 | 3.48 | **N/A** | N/A | N/A |
| Supplemental Executive Retirement Plan | **3.16** | 3.36 | 3.30 | **N/A** | N/A | N/A |
| Hourly OPEB Plan | **N/A** | N/A | N/A | **3.10** | 3.24 | 3.48 |
| Salaried OPEB Plan | **N/A** | N/A | N/A | **3.15** | 3.28 | 3.31 |
| | | | | | | |
| Expected return on plan assets | **8.25** | 8.25 | 8.25 | **7.00** | 7.00 | 7.00 |
| Salaried rate of compensation increase | **3.00** | 3.00 | 3.00 | **3.00** | 3.00 | 3.00 |
| Hourly rate of compensation increase | **2.00** | 2.00 | 2.00 | **N/A** | N/A | N/A |

Assumed health care cost trend rates at December 31 were:

| | **2018** | 2017 |
|---|---|---|
| Health care cost trend rate assumed for next year | **6.75 %** | 7.00 % |
| Ultimate health care cost trend rate | **5.00** | 5.00 |
| Year that the ultimate rate is reached | **2026** | 2026 |

**Plan Assets**

Our financial objectives with respect to our pension and VEBA plan assets are to fully fund the actuarial accrued liability for each of the plans, to maximize investment returns within reasonable and prudent levels of risk, and to maintain sufficient liquidity to meet benefit obligations on a timely basis.

Our investment objective is to outperform the expected return on assets assumption used in the plans' actuarial reports over the life of the plans. The expected return on assets takes into account historical returns and estimated future long-term returns based on capital market assumptions applied to the asset allocation strategy. The expected return is net of investment expenses paid by the plans. In addition, investment performance is monitored on a quarterly basis by benchmarking to various indices and metrics for the one-, three- and five-year periods.

The asset allocation strategy is determined through a detailed analysis of assets and liabilities by plan, which defines the overall risk that is acceptable with regard to the expected level and variability of portfolio returns, surplus (assets compared to liabilities), contributions and pension expense.

Table of Contents

The asset allocation review process involves simulating capital market behaviors including global asset class performance, inflation and interest rates in order to evaluate various asset allocation scenarios and determine the asset mix with the highest likelihood of meeting financial objectives. The process includes factoring in the current funded status and likely future funded status levels of the plans by taking into account expected growth or decline in the contributions over time.

The asset allocation strategy varies by plan. The following table reflects the actual asset allocations for pension and VEBA plan assets as of December 31, 2018 and 2017, as well as the 2019 weighted average target asset allocations. Equity investments include securities in large-cap, mid-cap and small-cap companies located in the U.S. and worldwide. Fixed income investments primarily include corporate bonds and government debt securities.

| | Pension Assets | | | VEBA Assets | | |
| | 2019 Target Allocation | Percentage of Plan Assets at December 31, | | 2019 Target Allocation | Percentage of Plan Assets at December 31, | |
| Asset Category | | 2018 | 2017 | | 2018 | 2017 |
|---|---|---|---|---|---|---|
| Equity securities | 45.0% | **38.9%** | 43.6% | 8.0% | **8.1%** | 8.7% |
| Fixed income | 28.0% | **26.0%** | 27.0% | 80.0% | **77.0%** | 77.7% |
| Hedge funds | 5.0% | **5.4%** | 5.0% | 4.0% | **4.7%** | 4.4% |
| Private equity | 7.0% | **6.2%** | 5.3% | 3.0% | **1.2%** | 1.5% |
| Structured credit | 7.5% | **11.4%** | 9.7% | 2.0% | **3.5%** | 3.0% |
| Real estate | 7.5% | **10.3%** | 8.7% | 3.0% | **5.4%** | 4.6% |
| Cash | —% | **1.8%** | 0.7% | —% | **0.1%** | 0.1% |
| Total | 100.0% | **100.0%** | 100.0% | 100.0% | **100.0%** | 100.0% |

Following is a description of the inputs and valuation methodologies used to measure the fair value of our plan assets.

*Equity Securities*

Equity securities classified as Level 1 investments include U.S. large-, small- and mid-cap investments and international equities. These investments are comprised of securities listed on an exchange, market or automated quotation system for which quotations are readily available. The valuation of these securities is determined using a market approach and is based upon unadjusted quoted prices for identical assets in active markets.

*Fixed Income*

Fixed income securities classified as Level 1 investments include bonds and government debt securities. These investments are comprised of securities listed on an exchange, market or automated quotation system for which quotations are readily available. The valuation of these securities is determined using a market approach and is based upon unadjusted quoted prices for identical assets in active markets. Also included in Fixed income is a portfolio of U.S. Treasury STRIPS, which are zero-coupon bearing fixed income securities backed by the full faith and credit of the U.S. government. The securities sell at a discount to par because there are no incremental coupon payments. STRIPS are not issued directly by the Treasury but rather are created by a financial institution, government securities broker or government securities dealer. Liquidity on the issue varies depending on various market conditions; however, in general the STRIPS market is slightly less liquid than that of the U.S. Treasury Bond market. The STRIPS are priced daily through a bond pricing vendor and are classified as Level 2.

*Hedge Funds*

Hedge funds are alternative investments comprised of direct or indirect investment in offshore hedge funds with an investment objective to achieve equity-like returns with one half the volatility of equities and moderate correlation. The valuation techniques used to measure fair value attempt to maximize the use of observable inputs and minimize the use of unobservable inputs. Considerable judgment is required to interpret the factors used to develop estimates of fair value. Valuations of the underlying investment funds are obtained and reviewed. The securities that are valued by the funds are interests in the investment funds and not the underlying holdings of such investment funds. Thus, the inputs used to value the investments in each of the underlying funds may differ from the inputs used to value the underlying holdings of such funds. Hedge funds are valued monthly and recorded on a one-month lag.

109

Table of Contents

*Private Equity Funds*

Private equity funds are alternative investments that represent direct or indirect investments in partnerships, venture funds or a diversified pool of private investment vehicles (fund of funds).

Investment commitments are made in private equity funds based on an asset allocation strategy, and capital calls are made over the life of the funds to fund the commitments. As of December 31, 2018, remaining commitments total $44.2 million for both our pension and OPEB plans. Committed amounts are funded from plan assets when capital calls are made. Investment commitments are not pre-funded in reserve accounts.

Private equity investments are valued quarterly and recorded on a one-quarter lag. For alternative investment values reported on a lag, current market information is reviewed for any material changes in values at the reporting date. Capital distributions for the funds do not occur on a regular frequency. Liquidation of these investments would require sale of the partnership interest.

*Structured Credit*

Structured credit investments are alternative investments comprised of collateralized debt obligations and other structured credit investments that are priced based on valuations provided by independent, third-party pricing agents, if available. Such values generally reflect the last reported sales price if the security is actively traded. The third-party pricing agents may also value structured credit investments at an evaluated bid price by employing methodologies that utilize actual market transactions, broker-supplied valuations or other methodologies designed to identify the market value of such securities.

Structured credit investments are valued monthly and recorded on a one-month lag. For alternative investment values reported on a lag, current market information is reviewed for any material changes in values at the reporting date. Historically, redemption requests have been considered quarterly, subject to notice of 90 days, although the advisor is currently only requiring notice of 65 days.

*Real Estate*

The real estate portfolio for the pension plans is an alternative investment primarily comprised of two funds with strategic categories of real estate investments. All real estate holdings are appraised externally at least annually, and appraisals are conducted by reputable, independent appraisal firms that are members of the Appraisal Institute. All external appraisals are performed in accordance with the Uniform Standards of Professional Appraisal Practices. The property valuations and assumptions about each property are reviewed quarterly by the investment advisor and values are adjusted if there has been a significant change in circumstances relating to the property since the last external appraisal. The fair value of one of the funds is updated monthly, and there is no lag in reported value.

The real estate fund of funds investment for the Empire-Tilden, Hibbing and United Taconite VEBA plans invests in pooled investment vehicles that in turn invest in commercial real estate properties. Valuations are performed quarterly and financial statements are prepared on a semi-annual basis, with annual audited statements. Asset values for this fund are reported with a one-quarter lag, and current market information is reviewed for any material changes in values at the reporting date. Withdrawals are permitted on the last business day of each quarter subject to a 65-day prior written notice.

110

*Pension*

The fair value of our pension plan assets by asset category is as follows:

| | (In Millions) | | | |
|---|---|---|---|---|
| | **December 31, 2018** | | | |
| Asset Category | **Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1)** | **Significant Other Observable Inputs (Level 2)** | **Significant Unobservable Inputs (Level 3)** | **Total** |
| Equity securities: | | | | |
| U.S. large-cap | $ 112.6 | $ — | $ — | $ 112.6 |
| U.S. small/mid-cap | 22.5 | — | — | 22.5 |
| International | 132.0 | — | — | 132.0 |
| Fixed income | 151.1 | 27.4 | — | 178.5 |
| Hedge funds | — | — | 37.2 | 37.2 |
| Private equity | — | — | 42.6 | 42.6 |
| Structured credit | — | — | 78.8 | 78.8 |
| Real estate | — | — | 70.5 | 70.5 |
| Cash | 12.5 | — | — | 12.5 |
| Total | $ 430.7 | $ 27.4 | $ 229.1 | $ 687.2 |

| | (In Millions) | | | |
|---|---|---|---|---|
| | December 31, 2017 | | | |
| Asset Category | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| Equity securities: | | | | |
| U.S. large-cap | $ 130.1 | $ — | $ — | $ 130.1 |
| U.S. small/mid-cap | 35.5 | — | — | 35.5 |
| International | 160.9 | — | — | 160.9 |
| Fixed income | 173.6 | 28.8 | — | 202.4 |
| Hedge funds | — | — | 37.4 | 37.4 |
| Private equity | — | — | 39.8 | 39.8 |
| Structured credit | — | — | 72.9 | 72.9 |
| Real estate | — | — | 65.5 | 65.5 |
| Cash | 5.3 | — | — | 5.3 |
| Total | $ 505.4 | $ 28.8 | $ 215.6 | $ 749.8 |

111

A005600

Table of Contents

The following represents the effect of fair value measurements using significant unobservable inputs (Level 3) on changes in plan assets:

| | (In Millions) | | | | |
|---|---|---|---|---|---|
| | Year Ended December 31, 2018 | | | | |
| | Hedge Funds | Private Equity Funds | Structured Credit Fund | Real Estate | Total |
| Beginning balance — January 1, 2018 | $ 37.4 | $ 39.8 | $ 72.9 | $ 65.5 | $ 215.6 |
| Actual return on plan assets: | | | | | |
| Relating to assets still held at the reporting date | (0.2) | 1.4 | 5.9 | 5.4 | 12.5 |
| Relating to assets sold during the period | — | 4.0 | — | — | 4.0 |
| Purchases | — | 5.2 | — | — | 5.2 |
| Sales | — | (7.8) | — | (0.4) | (8.2) |
| Ending balance — December 31, 2018 | $ 37.2 | $ 42.6 | $ 78.8 | $ 70.5 | $ 229.1 |

| | (In Millions) | | | | |
|---|---|---|---|---|---|
| | Year Ended December 31, 2017 | | | | |
| | Hedge Funds | Private Equity Funds | Structured Credit Fund | Real Estate | Total |
| Beginning balance — January 1, 2017 | $ 40.6 | $ 36.1 | $ 63.8 | $ 61.9 | $ 202.4 |
| Actual return on plan assets: | | | | | |
| Relating to assets still held at the reporting date | 2.5 | 0.3 | 9.1 | 4.2 | 16.1 |
| Relating to assets sold during the period | 0.4 | 4.5 | — | (0.1) | 4.8 |
| Purchases | 39.0 | 4.5 | — | 14.4 | 57.9 |
| Sales | (45.1) | (5.6) | — | (14.9) | (65.6) |
| Ending balance — December 31, 2017 | $ 37.4 | $ 39.8 | $ 72.9 | $ 65.5 | $ 215.6 |

### VEBA

Assets for OPEB plans include VEBA trusts pursuant to bargaining agreements that are available to fund retired employees' life insurance obligations and medical benefits. The fair value of our other benefit plan assets by asset category is as follows:

| | (In Millions) | | | |
|---|---|---|---|---|
| | December 31, 2018 | | | |
| Asset Category | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| Equity securities: | | | | |
| U.S. large-cap | $ 9.7 | $ — | $ — | $ 9.7 |
| U.S. small/mid-cap | 2.4 | — | — | 2.4 |
| International | 7.3 | — | — | 7.3 |
| Fixed income | 146.8 | 37.8 | — | 184.6 |
| Hedge funds | — | — | 11.4 | 11.4 |
| Private equity | — | — | 3.0 | 3.0 |
| Structured credit | — | — | 8.5 | 8.5 |
| Real estate | — | — | 13.1 | 13.1 |
| Cash | 0.2 | — | — | 0.2 |
| Total | $ 166.4 | $ 37.8 | $ 36.0 | $ 240.2 |

(In Millions)

| Asset Category | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
|---|---|---|---|---|
| | December 31, 2017 | | | |
| Equity securities: | | | | |
| U.S. large-cap | $ 11.4 | $ — | $ — | $ 11.4 |
| U.S. small/mid-cap | 2.8 | — | — | 2.8 |
| International | 8.8 | — | — | 8.8 |
| Fixed income | 164.1 | 40.0 | — | 204.1 |
| Hedge funds | — | — | 11.4 | 11.4 |
| Private equity | — | — | 3.9 | 3.9 |
| Structured credit | — | — | 7.9 | 7.9 |
| Real estate | — | — | 12.0 | 12.0 |
| Cash | 0.2 | — | — | 0.2 |
| Total | $ 187.3 | $ 40.0 | $ 35.2 | $ 262.5 |

The following represents the effect of fair value measurements using significant unobservable inputs (Level 3) on changes in plan assets:

(In Millions)

| | Hedge Funds | Private Equity Funds | Structured Credit Fund | Real Estate | Total |
|---|---|---|---|---|---|
| | Year Ended December 31, 2018 | | | | |
| Beginning balance — January 1, 2018 | $ 11.4 | $ 3.9 | $ 7.9 | $ 12.0 | $ 35.2 |
| Actual return on plan assets: | | | | | |
| Relating to assets still held at the reporting date | — | (0.1) | 0.6 | 1.1 | 1.6 |
| Relating to assets sold during the period | — | 0.3 | — | — | 0.3 |
| Purchases | — | — | — | — | — |
| Sales | — | (1.1) | — | — | (1.1) |
| Ending balance — December 31, 2018 | $ 11.4 | $ 3.0 | $ 8.5 | $ 13.1 | $ 36.0 |

(In Millions)

| | Hedge Funds | Private Equity Funds | Structured Credit Fund | Real Estate | Total |
|---|---|---|---|---|---|
| | Year Ended December 31, 2017 | | | | |
| Beginning balance — January 1, 2017 | $ 11.2 | $ 4.3 | $ 6.9 | $ 11.1 | $ 33.5 |
| Actual return on plan assets: | | | | | |
| Relating to assets still held at the reporting date | 0.8 | 0.9 | 2.0 | 3.4 | 7.1 |
| Relating to assets sold during the period | — | (0.4) | (1.0) | (2.5) | (3.9) |
| Purchases | 17.1 | 1.8 | 2.1 | 3.0 | 24.0 |
| Sales | (17.7) | (2.7) | (2.1) | (3.0) | (25.5) |
| Ending balance — December 31, 2017 | $ 11.4 | $ 3.9 | $ 7.9 | $ 12.0 | $ 35.2 |

113

Table of Contents

**Contributions**

Annual contributions to the pension plans are made within income tax deductibility restrictions in accordance with statutory regulations. In the event of plan termination, the plan sponsors could be required to fund additional shut down and early retirement obligations that are not included in the pension obligations. Costs for early termination for pensions and other benefits are estimated to be $22.1 million and $3.4 million, respectively. The Company currently has no intention to shut down, terminate or withdraw from any of its employee benefit plans.

| | | | (In Millions) | | |
|---|---|---|---|---|---|
| | | | Other Benefits | | |
| Company Contributions | Pension Benefits | VEBA | Direct Payments | Total | |
| 2017 | $ 24.4 | $ — | $ 2.1 | $ 2.1 | |
| 2018 | 27.6 | — | 3.8 | 3.8 | |
| 2019 (Expected)[1] | 15.9 | — | 3.5 | 3.5 | |

[1] Pursuant to the bargaining agreement, benefits can be paid from VEBA trusts that are at least 70% funded (all VEBA trusts are over 70% funded at December 31, 2018). Funding obligations have been suspended as UTAC's, Tilden's and Empire's share of the value of their respective trust assets have reached 90% of their obligation.

VEBA plans are not subject to minimum regulatory funding requirements. Amounts contributed are pursuant to bargaining agreements.

Contributions by participants to the OPEB plans were $5.6 million for the year ended December 31, 2018 and $4.6 million for the year ended December 31, 2017.

**Estimated Cost for 2019**

For 2019, we estimate net periodic benefit cost as follows:

| | (In Millions) |
|---|---|
| Defined benefit pension plans | $ 21.5 |
| Other postretirement benefits | (2.8) |
| Total | $ 18.7 |

**Estimated Future Benefit Payments**

| | | (In Millions) | | |
|---|---|---|---|---|
| | | Other Benefits | | |
| | Pension Benefits | Gross Company Benefits | Less Medicare Subsidy | Net Benefit Payments |
| 2019 | $ 70.4 | $ 18.0 | $ (0.8) | $ 17.2 |
| 2020 | 67.9 | 17.7 | (0.8) | 16.9 |
| 2021 | 67.5 | 17.2 | (0.9) | 16.3 |
| 2022 | 67.0 | 17.0 | (0.9) | 16.1 |
| 2023 | 67.9 | 16.9 | (1.0) | 15.9 |
| 2024-2028 | 309.7 | 82.2 | (5.4) | 76.8 |

A005603

Table of Contents

## NOTE 9 - STOCK COMPENSATION PLANS

At December 31, 2018, we have outstanding awards under various share-based compensation plans, which are described below. The compensation cost charged against income from continuing operations for those plans was $15.1 million, $18.2 million and $13.6 million in 2018, 2017 and 2016, respectively, which primarily was recorded in *Selling, general and administrative expenses* in the Statements of Consolidated Operations. There was no income tax benefit recognized for the years ended December 31, 2018, 2017 and 2016, due to the full valuation allowance.

**Employees' Plans**

The A&R 2015 Equity Plan was approved by our Board of Directors on February 21, 2017 and by our shareholders on April 25, 2017. The A&R 2015 Equity Plan increased the maximum number of shares that may be issued by 15.0 million common shares. The 2015 Equity Plan was approved by our Board of Directors on March 26, 2015 and by our shareholders on May 19, 2015. The 2015 Equity Plan replaced the 2012 Equity Plan, and allowed for a maximum of 12.9 million common shares to be issued. No additional grants were issued from the 2012 Equity Plan after the date of approval of the 2015 Equity Plan; however, all awards previously granted under the 2012 Amended Equity Plan will continue in full force and effect in accordance with the terms of outstanding awards.

Following is a summary of approved grants by the Compensation Committee :

| Grant Year | Vesting Date | Plan Issued Under | Restricted Stock Units Granted | Performance Shares Granted |
|---|---|---|---|---|
| 2018 | 12/31/2020 | A&R 2015 Equity Plan | 685,599 | 675,599 |
| 2017 | 12/31/2019 | A&R 2015 Equity Plan | 532,358 | 249,106 |
| 2017 | 12/31/2019 | Amended 2015 Equity Plan | 553,725 | 553,725 |
| 2016 | 12/31/2018 | 2015 Equity Plan | 3,406,716 | — |

*Performance Shares*

The outstanding performance shares vest over a period of three years and are intended to be paid out in common shares. Performance is measured on the basis of relative TSR for the period and measured against the constituents of the S&P Metals and Mining ETF Index at the beginning of the relevant performance period. The final payout for the outstanding performance period grants will vary from 0% to 200% of the original grant depending on whether and to what extent the Company achieves certain objectives and performance goals as established by the Compensation Committee.

Following is a summary of our performance share award agreements currently outstanding :

| Performance Share Plan Year | Performance Shares Granted | Forfeitures to Date | Expected to Vest | Grant Date | Grant Date Fair Value | Performance Period |
|---|---|---|---|---|---|---|
| 2018 | 675,599 | 2,236 | 673,363 | 2/21/2018 | $ 11.93 | 1/1/2018 - 12/31/2020 |
| 2017 | 249,106 | — | 249,106 | 6/26/2017 | $ 10.74 | 5/31/2017 - 12/31/2019 |
| 2017 | 553,725 | 51,471 | 502,254 | 2/21/2017 | $ 19.69 | 1/1/2017 - 12/31/2019 |

*Restricted Stock Units*

All of the outstanding restricted stock units are subject to continued employment, are retention based, and are payable in common shares or cash in certain circumstances at a time determined by the Compensation Committee at its discretion. The outstanding restricted stock units that were granted in 2018, 2017, and 2016 cliff vest in three years on December 31, 2020, 2019 and 2018, respectively.

*Stock Options*

The 412,710 stock options that were granted during the first quarter of 2015 vested on December 31, 2017, are exercisable at a strike price of $7.70 and expire on January 12, 2025. The 250,000 stock options that were granted in the fourth quarter of 2014 vested in equal thirds on each of December 31, 2015, 2016 and 2017 and are exercisable at a strike price of $13.83 and expire on November 17, 2021. As of December 31, 2018, 563,230 stock options remain outstanding and are exercisable with a weighted average price of $10.42.

*Employee Stock Purchase Plan*

On March 26, 2015, upon recommendation by the Compensation Committee, our Board of Directors approved and adopted, subject to the approval of Cliffs' shareholders at the 2015 Annual Meeting, the Cliffs Natural Resources Inc. 2015 Employee Stock Purchase Plan. This plan was approved by our shareholders at the 2015 Annual Meeting held May 19, 2015. Ten million common shares have been reserved for issuance under this plan; however, as of December 31, 2018, this program has not been made active and no common shares have been purchased. We sought shareholder approval of this plan for the purpose of qualifying the reserved common shares for special tax treatment under Section 423 of the IRC of 1986, as amended.

**Nonemployee Directors**

Our nonemployee directors are entitled to receive restricted share awards under the Directors' Plan. For 2018, 2017 and 2016, nonemployee directors were granted a specified number of restricted shares, with a value equal to $100,000, $100,000, and $85,000, respectively. The number of shares is based on the closing price of our common shares on the date of the Annual Meeting. The awards are subject to any deferral election and pursuant to the terms of the Directors' Plan and an award agreement.

On April 23, 2018, our Governance and Nominating Committee of the Board of Directors approved the acceleration of vesting of the restricted share awards granted to the nonemployee directors prior to April 2018, which were generally subject to three-year vesting. Effective April 30, 2018 and under the terms of the Directors' Plan, the vesting of these outstanding awards was accelerated. The Governance and Nominating Committee also approved a change to the vesting period for all future awards under the Directors' Plan. The nonemployee director restricted awards granted on April 25, 2018 and all future awards are subject to one-year vesting.

For the last three years, grants of restricted and/or deferred shares have been awarded to elected or re-elected nonemployee directors as follows:

| Year of Grant | Restricted Shares | Deferred Shares |
|---|---|---|
| 2018 | 92,718 | 17,170 |
| 2017 | 93,359 | 17,289 |
| 2016 | 135,038 | 29,583 |

**Other Information**

The following table summarizes the share-based compensation expense that we recorded in continuing operations:

| | (In Millions, except per share amounts) | | | | | |
|---|---|---|---|---|---|---|
| | **2018** | | 2017 | | 2016 | |
| Cost of goods sold and operating expenses | $ | 1.7 | $ | 1.9 | $ | 1.8 |
| Selling, general and administrative expenses | | 13.4 | | 16.3 | | 11.8 |
| Reduction of operating income from continuing operations before income taxes | | 15.1 | | 18.2 | | 13.6 |
| Income tax benefit[1] | | — | | — | | — |
| Reduction of net income from continuing operations attributable to Cliffs shareholders | $ | 15.1 | $ | 18.2 | $ | 13.6 |
| Reduction of continuing operations earnings per common share attributable to Cliffs shareholders: | | | | | | |
| Basic | $ | 0.05 | $ | 0.06 | $ | 0.07 |
| Diluted | $ | 0.05 | $ | 0.06 | $ | 0.07 |

[1] No income tax benefit due to the full valuation allowance.

116

Table of Contents

Stock option, restricted stock awards and performance share activity under our long-term equity plans and Directors' Plans are as follows:

| | **2018** | 2017 | 2016 |
|---|---|---|---|
| | **Shares** | Shares | Shares |
| Stock options: | | | |
| Outstanding at beginning of year | **599,870** | 599,870 | 607,489 |
| Exercised | **(36,640)** | — | — |
| Forfeited/canceled | **—** | — | (7,619) |
| Outstanding at end of year | **563,230** | 599,870 | 599,870 |
| Restricted awards: | | | |
| Outstanding and restricted at beginning of year | **4,776,483** | 5,461,783 | 2,338,070 |
| Granted during the year | **795,487** | 1,196,731 | 3,571,337 |
| Vested and issued | **(627,567)** | (1,813,315) | (271,988) |
| Forfeited/canceled | **(140,155)** | (68,716) | (175,636) |
| Outstanding and restricted at end of year | **4,804,248** | 4,776,483 | 5,461,783 |
| Performance shares: | | | |
| Outstanding at beginning of year | **1,848,312** | 1,368,469 | 1,496,489 |
| Granted during the year | **675,599** | 802,831 | |
| Vested and issued | **(489,953)** | — | (59,260) |
| Forfeited/canceled | **(609,235)** | (322,988) | (68,760) |
| Outstanding at end of year | **1,424,723** | 1,848,312 | 1,368,469 |
| Vested or expected to vest as of December 31, 2018 [1] | **6,792,201** | | |
| Directors' retainer and voluntary shares: | | | |
| Outstanding at beginning of year | **—** | — | — |
| Granted during the year | **27,300** | 25,476 | — |
| Vested and issued | **(27,300)** | (25,476) | — |
| Outstanding at end of year | **—** | — | — |
| Reserved for future grants or awards at end of year: | | | |
| Employee plans | **12,949,420** | | |
| Directors' plans | **502,378** | | |
| Total | **13,451,798** | | |

[1] With the adoption of ASU 2016-09, we assume all shares will vest until the date of vesting or forfeiture.

A summary of our outstanding share-based awards as of  December 31, 2018 is shown below:

| | Shares | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Outstanding, beginning of year | 7,224,665 | $ | 6.79 |
| Granted | 1,498,386 | $ | 9.51 |
| Vested and issued | (1,181,460) | $ | 7.38 |
| Forfeited/canceled | (749,390) | $ | 10.22 |
| Outstanding, end of year | 6,792,201 | $ | 6.90 |

The total compensation cost related to outstanding awards not yet recognized is  $17.1 million at December 31, 2018. The weighted average remaining period for the awards outstanding at December 31, 2018 is approximately 1.0 year.

117

Table of Contents

**NOTE 10 - INCOME TAXES**

*Income from continuing operations before income taxes* includes the following components:

| | (In Millions) | | |
|---|---|---|---|
| | **2018** | 2017 | 2016 |
| United States | $ **565.0** | $ 90.7 | $ 124.9 |
| Foreign | **(0.3)** | 17.5 | (14.5) |
| | $ **564.7** | $ 108.2 | $ 110.4 |

The components of the income tax benefit on continuing operations consist of the following:

| | (In Millions) | | |
|---|---|---|---|
| | **2018** | 2017 | 2016 |
| Current provision (benefit): | | | |
| United States federal | $ **(0.5)** | $ (252.6) | $ (11.1) |
| United States state & local | **—** | (0.1) | (0.5) |
| Foreign | **0.7** | 0.3 | (0.1) |
| | **0.2** | (252.4) | (11.7) |
| Deferred benefit: | | | |
| United States federal | **(475.4)** | — | (0.5) |
| Total income tax benefit from continuing operations | $ **(475.2)** | $ (252.4) | $ (12.2) |

118

Reconciliation of our income tax attributable to continuing operations computed at the U.S. federal statutory rate is as follows:

| | | (In Millions) | | | | | |
|---|---|---|---|---|---|---|---|
| | **2018** | | 2017 | | 2016 | |
| Tax at U.S. statutory rate | $ **118.6** | **21.0 %** | $ 37.9 | 35.0 % | $ 38.6 | 35.0 % |
| Increase (decrease) due to: | | | | | | |
| Percentage depletion in excess of cost depletion | **(54.6)** | **(9.7)** | (61.6) | (56.9) | (36.1) | (32.7) |
| Impact of tax law change - remeasurement of deferred taxes | **—** | **—** | 407.5 | 376.6 | 149.1 | 135.1 |
| Dissolution of Luxembourg entities | **161.7** | **28.6** | — | — | — | — |
| Prior year adjustments in current year | **(1.0)** | **(0.2)** | (1.1) | (1.0) | (11.8) | (10.7) |
| Valuation allowance build (reversal): | | | | | | |
| Tax law change - remeasurement of deferred taxes | **—** | **—** | (407.5) | (376.6) | (149.1) | (135.1) |
| Current year activity | **(80.6)** | **(14.3)** | (466.3) | (431.0) | 122.9 | 111.3 |
| Release of U.S. valuation allowance | **(460.5)** | **(81.5)** | — | — | — | — |
| Repeal of AMT | **—** | **—** | (235.3) | (217.5) | — | — |
| Dissolution of Luxembourg entities | **(161.7)** | **(28.6)** | — | — | — | — |
| Prior year adjustments in current year | **1.0** | **0.2** | (3.5) | (3.2) | 9.3 | 8.4 |
| Tax uncertainties | **(1.3)** | **(0.2)** | (1.4) | (1.3) | (11.3) | (10.2) |
| Worthless stock deduction | **—** | **—** | — | — | (73.4) | (66.5) |
| Impact of foreign operations | **0.1** | **—** | 477.9 | 441.7 | (40.6) | (36.8) |
| Other items, net | **3.1** | **0.6** | 1.0 | 0.9 | (9.8) | (8.9) |
| Provision for income tax benefit and effective income tax rate including discrete items | $ **(475.2)** | **(84.1)%** | $ (252.4) | (233.3)% | $ (12.2) | (11.1)% |

Our tax provision for the year ended December 31, 2018 was a benefit of $475.2 million and an effective tax rate of negative 84.1% compared with a benefit of $252.4 million and an effective tax rate of negative 233.3% for the prior year. The increase in income tax benefit from the prior year is primarily due to release of the valuation allowance in the U.S. of $460.5 million in the fourth quarter of 2018. Additionally, during 2018, a legal entity reduction initiative was completed resulting in the dissolution of two Luxembourg entities, both of which held net operating loss deferred tax assets. This asset reduction resulted in an expense of $161.7 million which was fully offset by a decrease in valuation allowance. In December 2017, a benefit of $235.3 million was recorded as a result of the repeal of AMT in the 2017 U.S. income tax reform legislation. Additionally, the impact of tax law change - remeasurement of deferred taxes for the year ended December 31, 2017 primarily relates to the statutory rate reduction in the U.S. that decreased the deferred tax assets by $334.1 million, which was fully offset by a decrease in the valuation allowance. Also on December 31, 2017 and 2016, there was a Luxembourg rate reduction that decreased the deferred tax assets by $73.4 million and $149.1 million, respectively. Both of these asset reductions were fully offset by a decrease in valuation allowance. The impact of foreign operations relates to income and losses in foreign jurisdictions where the statutory rates, ranging from 0% to 29.22%, differ from the U.S. statutory rate of 21% for the year ended December 31, 2018 and 35% for the years ended December 31, 2017 and 2016.

119

A005608

The components of income taxes for other than continuing operations consisted of the following:

| | | (In Millions) | | | | |
|---|---|---|---|---|---|---|
| | | **2018** | | 2017 | | 2016 |
| Other comprehensive (income) loss: | | | | | | |
| Postretirement benefit liability | $ | 3.6 | $ | — | $ | — |
| Unrealized net loss on derivative financial instruments | | 0.7 | | — | | — |
| Other | | — | | — | | 0.5 |
| Total | $ | 4.3 | $ | — | $ | 0.5 |

Significant components of our deferred tax assets and liabilities are as follows:

| | | (In Millions) | | |
|---|---|---|---|---|
| | | **2018** | | 2017 |
| Deferred tax assets: | | | | |
| Operating loss carryforwards | $ | 2,118.8 | $ | 2,362.4 |
| Pensions | | 77.5 | | 76.3 |
| OPEB | | 25.3 | | 25.6 |
| Deferred income | | 23.3 | | 24.2 |
| Intangible assets | | 11.6 | | 13.0 |
| Property, plant and equipment and mineral rights | | 13.3 | | — |
| State and local | | 68.2 | | 74.2 |
| Other liabilities | | 36.8 | | 30.4 |
| Total deferred tax assets before valuation allowance | | 2,374.8 | | 2,606.1 |
| Deferred tax asset valuation allowance | | (1,287.3) | | (1,983.1) |
| Net deferred tax assets | | 1,087.5 | | 623.0 |
| Deferred tax liabilities: | | | | |
| Property, plant and equipment and mineral rights | | — | | (1.5) |
| Investment in ventures | | (141.2) | | (137.5) |
| Intercompany notes | | (465.7) | | (465.7) |
| Other assets | | (15.8) | | (18.3) |
| Total deferred tax liabilities | | (622.7) | | (623.0) |
| Net deferred tax assets | $ | 464.8 | $ | — |

We had gross domestic (including states) and foreign net operating loss carryforwards of $3.6 billion and $6.6 billion, respectively, at December 31, 2018. We had gross domestic and foreign net operating loss carryforwards at December 31, 2017 of $4.2 billion and $7.2 billion, respectively. The U.S. Federal net operating losses will begin to expire in 2034 and state net operating losses will begin to expire in 2019. The foreign net operating losses can be carried forward indefinitely. We had foreign tax credit carryforwards of $5.8 million at December 31, 2018 and 2017. The foreign tax credit carryforwards will begin to expire in 2020.

We recorded a $695.8 million net decrease in the valuation allowance of certain deferred tax assets in the year ended December 31, 2018. As of December 31, 2018, our U.S. operations emerged from a three-year cumulative loss position. As the significant negative evidence of cumulative losses has been eliminated, we undertook an evaluation of the continuing need for a valuation allowance on the U.S. deferred tax assets, the majority of which relate to the U.S. tax net operating losses.

In completing our evaluation of whether a valuation allowance was still needed, we considered all available positive and negative evidence. Positive evidence considered included the emergence from the three-year cumulative loss position, our long-term customer contracts with minimum tonnage requirements, the global scarcity of iron ore pellets, near term forecasts of strong profitability and the recently revised IRC Section 163(j) interest deduction limitation.

120

A005609

Table of Contents

Negative evidence included the overall size of the deferred tax asset with limited carryforward and no carryback opportunity, the finite nature of the iron ore resources we mine, the uncertainty of steel tariffs that positively impacted our revenue rates in 2018 and the various market signs that the U.S. economy may be nearing the end of the current expansion.

We also considered that future realization of the deferred tax assets depends on the existence of sufficient taxable income of the appropriate character during the carryforward period. In considering sources of taxable income, we identified that a portion of the deferred tax assets would be utilized by existing taxable temporary differences reversing in the same periods as existing deductible temporary differences. In addition, we determined that carryback opportunities and tax planning strategies do not exist as potential sources of future taxable income. Lastly, forecasting future taxable income was considered, but is challenging in a cyclical industry such as ours as it relies heavily on the accuracy of key assumptions, particularly about key pricing benchmarks.

Because historical information is verifiable and more objective than forecast information and due to the cyclicality of the industry, we developed an estimate of future income based on our historical earnings through the most recent industry cycle. We adjusted historical earnings for certain non-recurring items as well as to reflect the current corporate structure by eliminating the impact of discontinued operations and extinguished debt ("core earnings"). Additionally, we adjusted core earnings to reflect the impact of the recently revised IRC Section 163(j) interest expense deduction limitation as well as permanent tax adjustments. The IRC Section 163(j) limitation will limit our interest expense deduction, particularly in down years in the industry cycle, resulting in higher taxable income.

Based on the core earnings analysis, the Company's average annual book taxable income through the business cycle is in excess of the estimated $109.0 million taxable income that would be required annually to fully utilize the deferred tax assets within the 19 year carryforward period. We ascribed significant weight in our assessment to the core earnings analysis and the resulting projection of taxable income through the industry cycle. Based on the weight of this positive evidence, and after considering the other available positive and negative evidence, we determined that it was appropriate to release all of the valuation allowance related to U.S. federal deferred tax assets at December 31, 2018 as it is more likely than not that the entire amount of the U.S. deferred tax asset will be realized before the end of the carryforward period. The income tax benefit recorded for the reversal of the valuation allowance against the U.S. deferred tax assets is $460.5 million.

During 2018, a legal entity reduction initiative was completed resulting in the dissolution of two Luxembourg entities, both of which held net operating loss deferred tax assets. This asset reduction resulted in an expense of $161.7 million which was fully offset by a decrease in valuation allowance. The remainder of the decrease relates to current year activity.

We continue to maintain a full valuation allowance against the remaining Luxembourg subsidiaries net deferred tax assets of approximately $1.2 billion. Our losses in Luxembourg in recent periods represent sufficient negative evidence to require a full valuation allowance against the deferred tax assets in that jurisdiction. We intend to maintain a valuation allowance against the deferred tax assets related to these operating losses, until sufficient positive evidence exists to support the realization of such assets.

We also have a valuation allowance recorded against certain state net operating losses and foreign tax credits, which are expected to expire before utilization of approximately $38.3 million and $5.8 million at December 31, 2018 and 2017, respectively.

At December 31, 2018 and 2017, we had no cumulative undistributed earnings of foreign subsidiaries included in consolidated retained earnings. Accordingly, no provision has been made for U.S. deferred taxes related to future repatriation of earnings.

<div align="center">121</div>

Table of Contents

A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows:

| | | (In Millions) | | |
|---|---|---|---|---|
| | **2018** | 2017 | 2016 | |
| Unrecognized tax benefits balance as of January 1 | $ **33.5** | $ 30.7 | $ 156.2 | |
| Increase (decrease) for tax positions in prior years | **0.1** | (2.8) | (61.0) | |
| Increase for tax positions in current year | **3.6** | 4.5 | 0.2 | |
| Settlements | **—** | 1.0 | (64.7) | |
| Lapses in statutes of limitations | **(8.2)** | — | — | |
| Other | **—** | 0.1 | — | |
| Unrecognized tax benefits balance as of December 31 | $ **29.0** | $ 33.5 | $ 30.7 | |

At December 31, 2018 and 2017, we had $29.0 million and $33.5 million, respectively, of unrecognized tax benefits recorded. Of this amount, $4.2 million and $6.1 million, respectively, were recorded in *Other liabilities* and $24.8 million and $27.4 million, respectively, were recorded as *Other non-current assets* in the Statements of Consolidated Financial Position for both years. If the $29.0 million were recognized, only $4.2 million would impact the effective tax rate. We do not expect that the amount of unrecognized benefits will change significantly within the next 12 months. At December 31, 2018 and 2017, we had $2.7 million and $2.1 million, respectively, of accrued interest and penalties related to the unrecognized tax benefits recorded in *Other liabilities* in the Statements of Consolidated Financial Position.

Tax years 2015 and forward remain subject to examination for the U.S. and tax years 2008 and forward remain subject to examination for Canada.

## NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS

The following is a summary of our environmental and mine closure obligations:

| | | (In Millions) | |
|---|---|---|---|
| | | December 31, | |
| | **2018** | 2017 | |
| Environmental | $ **2.5** | $ 2.9 | |
| Mine closure[1] | **172.4** | 168.4 | |
| Total environmental and mine closure obligations | **174.9** | 171.3 | |
| Less current portion | **2.9** | 3.6 | |
| Long-term environmental and mine closure obligations | $ **172.0** | $ 167.7 | |

[1] Includes our active operating mines, our indefinitely idled Empire mine and a closed mine formerly operating as LTVSMC.

### Environmental

Our mining and exploration activities are subject to various laws and regulations governing the protection of the environment. We conduct our operations to protect the public health and environment and believe our operations are in compliance with applicable laws and regulations in all material respects. Our environmental liabilities include obligations for known environmental remediation exposures at various active and closed mining operations and other sites, and have been recognized based on the estimated cost of investigation and remediation at each site. If the cost can only be estimated as a range of possible amounts with no specific amount being more likely, the minimum of the range is accrued. Future expenditures are not discounted unless the amount and timing of the cash disbursements are readily known. Potential insurance recoveries have not been reflected. Additional environmental obligations could be incurred, the extent of which cannot be assessed.

### Mine Closure

The accrued closure obligation for our mining operations provides for contractual and legal obligations associated

122

Table of Contents

with the eventual closure of the mining operations. We performed a detailed assessment of our asset retirement obligations related to our active mining locations in accordance with our accounting policy, under which we perform an in-depth evaluation of the liability every three years in addition to routine annual assessments. In 2017, we employed a third-party specialist to assist in the triennial in-depth evaluation.

For the assessments performed, we determined the obligations based on detailed estimates adjusted for factors that a market participant would consider (e.g., inflation, overhead and profit) and then discounted the obligation using the current credit-adjusted risk-free interest rate based on the corresponding life of mine. The estimate also incorporates incremental increases in the closure cost estimates and changes in estimates of mine lives. The closure date for each of our active operating mine sites was determined based on the exhaustion date of the remaining iron ore reserves. The closure date and expected timing of the capital requirements to meet our obligations for our indefinitely idled or closed mines, is determined based on the unique circumstances of each property. For indefinitely idled or closed mines, the accretion of the liability is recognized over the anticipated timing of remediation. The amortization of the related asset and accretion of the liability is recognized over the estimated mine lives for our active operations.

The following represents a roll forward of our asset retirement obligation liability for the years ended:

| | (In Millions) | |
| | December 31, | |
| | 2018 | 2017 |
|---|---|---|
| Asset retirement obligation at beginning of year | $ 168.4 | $ 187.8 |
| Accretion expense | 9.5 | 13.9 |
| Remediation payments | (1.0) | (5.6) |
| Revision in estimated cash flows | (4.5) | (27.7) |
| Asset retirement obligation at end of year | $ 172.4 | $ 168.4 |

For the year ended December 31, 2017, the revision of estimated cash flows relates primarily to updates to our estimates resulting from our three-year in-depth review of our closure obligations for each of our U.S. mines. The primary driver of the decrease in estimated cash flows was the Empire mine, as the mine closure obligation was reduced $26.2 million as a result of the refinement of the cash flows required for reclamation, remediation and structural removal. Prior estimates were based on RS Means (a common costing methodology used in the construction and demolition industry) average costing data while the current estimate was compiled using a more detailed cost build-up approach.

123

Table of Contents

**NOTE 12 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES**

The following table presents the fair value of our derivative instruments and the classification of each in the  Statements of Consolidated Financial Position:

| | | (In Millions) | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Derivative Assets** | | | | **Derivative Liabilities** | | | |
| | **December 31, 2018** | | December 31, 2017 | | **December 31, 2018** | | December 31, 2017 | |
| Derivative Instrument | **Balance Sheet Location** | **Fair Value** | Balance Sheet Location | Fair Value | **Balance Sheet Location** | **Fair Value** | Balance Sheet Location | Fair Value |
| Derivatives designated as hedging instruments under ASC 815: | | | | | | | | |
| Commodity contracts | *Derivative assets* | $    0.1 | | $    — | *Other current liabilities* | $    3.7 | *Other current liabilities* | $    0.3 |
| Derivatives not designated as hedging instruments under ASC 815: | | | | | | | | |
| Customer supply agreement | *Derivative assets* | 89.3 | *Derivative assets* | 37.9 | | — | | — |
| Provisional pricing arrangements | *Derivative assets* | 2.1 | | — | | — | *Other current liabilities* | 1.7 |
| Total derivatives not designated as hedging instruments under ASC 815: | | $    91.4 | | $    37.9 | | $    — | | $    1.7 |
| Total derivatives | | $    91.5 | | $    37.9 | | $    3.7 | | $    2.0 |

**Derivatives Designated as Hedging Instruments - Cash Flow Hedges**

*Commodity Contracts*

The following table presents our outstanding hedge contracts:

| | (Quantities in Millions) | | | | | |
|---|---|---|---|---|---|---|
| | **December 31, 2018** | | | December 31, 2017 | | |
| | **Notional Amount** | **Unit of Measure** | **Varying Maturity Dates** | Notional Amount | Unit of Measure | Varying Maturity Dates |
| Natural gas | 1.8 | MMBtu | January 2019 - August 2019 | 3.5 | MMBtu | January 2018 - November 2018 |
| Diesel | 11.0 | Gallons | January 2019 - December 2019 | — | | |

**Derivatives Not Designated as Hedging Instruments**

*Customer Supply Agreement*

A supply agreement with one customer provides for supplemental revenue or refunds to the customer based on the average annual daily steel market price for hot-rolled coil steel at the time the iron ore product is consumed in the customer's blast furnace. Historically, prior to the contract that commenced in 2017, this supplemental revenue and refund data source was the customer's average annual realized steel price. The supplemental pricing is characterized as a freestanding derivative and is required to be accounted for separately once control transfers to the customer. The derivative instrument, which is finalized based on a future price, is adjusted to fair value through *Product revenues* each reporting period based upon current market data and forward-looking estimates provided by management until the pellets are consumed and the amounts are settled.

*Provisional Pricing Arrangements*

Certain of our supply agreements specify provisional price calculations, where the pricing mechanisms generally are based on market pricing, with the final revenue rate based on certain market inputs at a specified period in time in

124

the future, per the terms of the supply agreements. Market inputs are tied to indexed price adjustment factors that are integral to the iron ore supply contracts and vary based on the agreement. The pricing mechanisms typically include adjustments based upon changes in the Platts 62% Price, along with Atlantic Basin pellet premiums, published Platts international indexed freight rates and changes in specified Producer Price Indices, including those for industrial commodities, fuel and steel. The pricing adjustments generally operate in the same manner, with each factor typically comprising a portion of the price adjustment, although the weighting of each factor varies based upon the specific terms of each agreement. The price adjustment factors have been evaluated to determine if they qualify as embedded derivatives. The price adjustment factors share the same economic characteristics and risks as the host contract and are integral to the host contract as inflation adjustments; accordingly, they have not been separately valued as derivative instruments.

Revenue is recognized generally upon delivery to our customers. Revenue is measured at the point that control transfers and represents the amount of consideration we expect to receive in exchange for transferring goods. Changes in the expected revenue rate from the date that control transfers through final settlement of contract terms is recorded in accordance with Topic 815 and is characterized as a derivative and accounted for separately. Subsequently, the derivative instruments are adjusted to fair value through *Product revenues* each reporting period based upon current market data and forward-looking estimates provided by management until the final revenue rate is determined.

The 2018 amounts represent the difference between the amount we expected to receive when revenue was initially measured at the point control transfers and our subsequent estimate of the final revenue rate based on the price calculation established in the supply agreements. The 2017 and 2016 amounts represent the difference between the provisional price agreed upon with our customers based on the supply agreement terms and our estimate of the final revenue rate based on the price calculations established in the supply agreements.

The following summarizes the effect of our derivatives that are not designated as hedging instruments in the Statements of Consolidated Operations :

| | | (In Millions) | | | | |
|---|---|---|---|---|---|---|
| Derivatives Not Designated as Hedging Instruments | Location of Gain (Loss) Recognized in Income on Derivative | Year Ended December 31, | | | | |
| | | 2018 | | 2017 | | 2016 |
| Customer supply agreements | *Product revenues* | $ | 425.8 | $ 163.3 | $ | 41.7 |
| Provisional pricing arrangements | *Product revenues* | | (3.2) | (42.7) | | 14.2 |
| Commodity contracts | *Cost of goods sold and operating expenses* | | — | (1.3) | | 1.9 |
| Total | | $ | 422.6 | $ 119.3 | $ | 57.8 |

Refer to NOTE 7 - FAIR VALUE OF FINANCIAL INSTRUMENTS for additional information.

## NOTE 13 - DISCONTINUED OPERATIONS

The information below sets forth selected financial information related to operating results of our businesses classified as discontinued operations, which include our former Asia Pacific Iron Ore, North American Coal and Canadian operations. While the reclassification of revenues and expenses related to discontinued operations from prior periods has no impact upon previously reported net income, the Statements of Consolidated Operations present the revenues and expenses that were reclassified from the specified line items to discontinued operations and the Statements of Consolidated Financial Position present the assets and liabilities that were reclassified from the specified line items to assets and liabilities of discontinued operations. The charts below provide an asset group breakout for each financial statement line impacted by discontinued operations.

A005614

|  | (In Millions) | | | | |
|---|---|---|---|---|---|
|  | Year Ended December 31, | | | | |
|  | **2018** | | 2017 | | 2016 |
| Income (loss) from discontinued operations, net of tax | | | | | |
| Asia Pacific Iron Ore | $ | **118.3** | $ | 21.2 | $ | 96.6 |
| North American Coal | | **(3.6)** | | 2.6 | | (2.4) |
| Canadian Operations | | **(26.5)** | | (21.3) | | (17.5) |
| | $ | **88.2** | $ | 2.5 | $ | 76.7 |

|  | (In Millions) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | December 31, 2018 | | | | December 31, 2017 | | | |
|  | **Asia Pacific Iron Ore** | **North American Coal** | **Total** | | Asia Pacific Iron Ore | North American Coal | | Total |
| Current assets of discontinued operations | $ **12.4** | $ **—** | $ **12.4** | $ 118.5 | $ — | | $ 118.5 |
| Non-current assets of discontinued operations | $ **—** | $ **—** | $ **—** | $ 20.3 | $ — | | $ 20.3 |
| Current liabilities of discontinued operations | $ **3.8** | $ **2.9** | $ **6.7** | $ 71.8 | $ 3.2 | | $ 75.0 |
| Non-current liabilities of discontinued operations | $ **8.3** | $ **—** | $ **8.3** | $ 52.2 | $ — | | $ 52.2 |

|  | (In Millions) | | | | |
|---|---|---|---|---|---|
|  | Year Ended December 31, | | | | |
|  | **2018** | | 2017 | | 2016 |
| Net cash provided (used) by operating activities | | | | | |
| Asia Pacific Iron Ore | $ | **(81.3)** | $ | 79.6 | $ | 99.8 |
| Canadian Operations | | **(14.6)** | | — | | — |
| | $ | **(95.9)** | $ | 79.6 | $ | 99.8 |
| | | | | | | |
| Net cash provided (used) by investing activities | | | | | |
| Asia Pacific Iron Ore | $ | **19.8** | $ | (2.8) | $ | (0.4) |
| Canadian Operations | | **—** | | (7.7) | | 6.8 |
| North American Coal | | **—** | | 2.1 | | 3.6 |
| | $ | **19.8** | $ | (8.4) | $ | 10.0 |

### *Asia Pacific Iron Ore Operations*

*Background*

In January 2018, we announced that we would accelerate the time frame for the planned closure of our Asia Pacific Iron Ore mining operations in Australia. In April 2018, we committed to a course of action leading to the permanent closure of our Asia Pacific Iron Ore mining operations and, as planned, completed our final shipment in June 2018. Factors considered in this decision included increasingly discounted prices for lower-iron-content ore and the quality of the remaining iron ore reserves.

During 2018, we sold all of the assets of our Asia Pacific Iron Ore business through a series of sales to third parties. As a result of our planned exit, management determined that our Asia Pacific Iron Ore operating segment met the criteria to be classified as held for sale and a discontinued operation under *ASC Topic 205, Presentation of Financial Statements* . As such, all current and historical Asia Pacific Iron Ore operating segment results are classified within discontinued operations.

126

*Income from Discontinued Operations*

For the reasons discussed above, our previously reported Asia Pacific Iron Ore operating segment results for all periods presented, as well as exit costs, are classified as discontinued operations.

|  | (In Millions) | | |
| --- | --- | --- | --- |
|  | Year Ended December 31, | | |
| ***Income from Discontinued Operations*** | **2018** | 2017 | 2016 |
| Revenues from product sales and services | **$ 129.1** | $ 464.2 | $ 554.5 |
| Cost of goods sold and operating expenses | **(230.7)** | (427.9) | (440.9) |
| Sales margin | **(101.6)** | 36.3 | 113.6 |
| Other operating expense | **(3.3)** | (9.9) | (10.4) |
| Other expense | **(2.3)** | (5.2) | (6.6) |
| Gain on foreign currency translation | **228.1** | — | — |
| Impairment of long-lived assets | **(2.6)** | — | — |
| Income from discontinued operations, net of tax | **$ 118.3** | $ 21.2 | $ 96.6 |

*Recorded Assets and Liabilities*

|  | (In Millions) | |
| --- | --- | --- |
| ***Assets and Liabilities of Discontinued Operations*** | **December 31, 2018** | December 31, 2017 |
| Cash and cash equivalents | **$ 12.4** | $ 29.4 |
| Accounts receivable, net | **—** | 33.9 |
| Inventories | **—** | 45.0 |
| Supplies and other inventories | **—** | 5.1 |
| Other current assets | **—** | 5.1 |
| Total current assets of discontinued operations | **12.4** | 118.5 |
| Property, plant and equipment, net | **—** | 17.2 |
| Other non-current assets | **—** | 3.1 |
| Total assets of discontinued operations | **$ 12.4** | $ 138.8 |
|  |  |  |
| Accounts payable | **$ 3.4** | $ 28.2 |
| Accrued liabilities | **0.4** | 28.0 |
| Other current liabilities | **—** | 15.6 |
| Total current liabilities of discontinued operations | **3.8** | 71.8 |
| Environmental and mine closure obligations | **—** | 28.8 |
| Other liabilities | **8.3** | 23.4 |
| Total liabilities of discontinued operations | **$ 12.1** | $ 124.0 |

*Foreign Currency*

Historically, the functional currency of our Australian subsidiaries was the Australian dollar.  The financial statements of our Australian subsidiaries were previously translated into U.S. dollars using the exchange rate at each balance sheet date for assets and liabilities and a weighted average exchange rate for each period for revenues, expenses, gains and losses. Translation adjustments were recorded as *Accumulated other comprehensive loss*. Income taxes were not provided for foreign currency translation adjustments. Concurrent with the sale of assets to Mineral Resources Limited in 2018, management determined that there had been significant changes in economic factors related to our Australian subsidiaries. The change in economic factors is a result of the sale and conveyance of substantially all assets and liabilities of our Australian subsidiaries to third parties, representing a significant change in operations. As such, the functional currency for the Australian subsidiaries was changed from the Australian dollar to the U.S. dollar and all

127

A005616

Table of Contents

remaining Australian denominated monetary balances will be remeasured prospectively through the Statements of Consolidated Operations.

In addition, as a result of the liquidation of substantially all of the Australian subsidiaries' net assets, the historical changes in foreign currency translation recorded in *Accumulated other comprehensive loss* in the Statements of Consolidated Financial Position totaling $228.1 million was reclassified and recognized as a gain in *Income from discontinued operations, net of tax* in the Statements of Consolidated Operations.

### North American Coal Operations

As of March 31, 2015, management determined that our North American Coal operating segment met the criteria to be classified as held for sale under *ASC Topic 205, Presentation of Financial Statements.* The North American Coal segment continued to meet the criteria throughout 2015 until we sold our North American Coal operations during the fourth quarter of 2015. As such, all current and historical North American Coal operating segment results are classified as discontinued operations in our financial statements. Historical results also include our CLCC assets, which were sold during the fourth quarter of 2014.

We have recognized a tax benefit of $1.0 million for the year ended December 31, 2018 included in *Income from discontinued operations, net of tax* in the Statements of Consolidated Operations related to a loss on our North American Coal investments. There was no tax expense or benefit recognized for the years ended December 31, 2017 and 2016.

### Canadian Operations

#### CCAA Proceedings

On January 27, 2015, we announced that the Bloom Lake Group commenced restructuring proceedings in Montreal, Quebec under the CCAA to address the Bloom Lake Group's immediate liquidity issues and to preserve and protect its assets for the benefit of all stakeholders while restructuring and/or sale options were explored. Additionally, on May 20, 2015, the Wabush Group commenced restructuring proceedings in Montreal, Quebec under the CCAA.

During March 2018, we entered into a restructuring term sheet that documented the proposed agreed to terms of a plan of compromise or arrangement with the Bloom Lake Group, the Wabush Group and the Monitor in the CCAA proceedings. By order of the Québec Superior Court of Justice (Commercial Division) (the "Court") dated April 20, 2018, the Bloom Lake Group and the Wabush Group were authorized to file a joint plan of compromise and arrangement dated April 16, 2018 (the "Original Plan"). Following discussions with various stakeholder groups, the Bloom Lake Group and the Wabush Group were authorized by the Court to amend the Original Plan and to file the amended and restated joint plan of compromise and arrangement dated May 16, 2018 (the "Amended Plan"). The Amended Plan was approved by the required majorities of each unsecured creditor class and was sanctioned by the Court by order dated June 29, 2018. In addition, the Bloom Lake Group and the Wabush Group brought a motion before the Court on July 30, 2018 seeking to make further amendments to the Amended Plan to address the manner in which certain distributions under the Amended Plan would be effected. On July 31, 2018, the conditions precedent to the implementation of the Amended Plan were satisfied and the Amended Plan was implemented.

Under the terms of the Amended Plan, we and certain of our wholly-owned subsidiaries made a C$19.0 million cash contribution to the Wabush Group pension plans and agreed to contribute into the CCAA estate any remaining distributions or payments we may be entitled to receive as creditors of the Bloom Lake Group and the Wabush Group for distribution to other creditors. The Original Plan did not resolve certain employee claims asserted against us and certain of our affiliates outside of the CCAA proceedings. The Amended Plan resolved those employee claims, all claims by the Bloom Lake Group, the Wabush Group and their respective creditors against us as well as all of our claims against the Bloom Lake Group and the Wabush Group.

#### Loss on Discontinued Operations

Our Canadian exit represented a strategic shift in our business. For this reason, our previously reported Eastern Canadian Iron Ore and Ferroalloys operating segment results for all periods prior to the respective deconsolidations, as well as costs to exit, are classified as discontinued operations.

128

The chart below provides a breakout of loss from deconsolidation:

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| | **Year Ended December 31,** | | | | | |
| | **2018** | | 2017 | | 2016 | |
| Investment impairment on deconsolidation[1] | $ | **(67.5)** | $ | 3.0 | $ | (17.5) |
| Guarantees and contingent liabilities | | **41.0** | | (24.3) | | — |
| Total loss from deconsolidation | $ | **(26.5)** | $ | (21.3) | $ | (17.5) |

[1] Includes the adjustments to fair value of our remaining interest in the Canadian Entities for the years ended December 31, 2018, 2017 and 2016, and a tax expense resulting from the implementation of the Amended Plan for the year ended December 31, 2018.

### Investments in the Canadian Entities

From the date of deconsolidation until the Amended Plan was approved by the required majorities of each unsecured creditor class and was sanctioned by the Court by order dated June 29, 2018 (the "Sanction Order"), we adjusted our investment in the Canadian Entities to zero with a corresponding charge to *Income from discontinued operations, net of tax* .

### Amounts Receivable from the Canadian Entities

Prior to the deconsolidations, certain of our wholly-owned subsidiaries made loans to the Canadian Entities for the purpose of funding their operations and had accounts receivable generated in the ordinary course of business. The loans, corresponding interest and the accounts receivable were considered intercompany transactions and eliminated in our consolidated financial statements. Since the deconsolidations, the loans, associated interest and accounts receivable are considered related party transactions and have been recognized in our consolidated financial statements at their estimated fair value. As of December 31, 2017 we had $51.6 million classified as *Loans to and accounts receivables from the Canadian Entities* in the Statements of Consolidated Financial Position. Following the approval of the Amended Plan, we reversed our outstanding $51.6 million classified within *Loans to and accounts receivables from the Canadian Entities* with a corresponding charge to *Income from discontinued operations, net of tax* in the Statements of Consolidated Financial Position for the year ended December 31, 2018.

### Income Tax Expense

We have recognized tax expense of $15.9 million for the year ended December 31, 2018, included in *Income from discontinued operations, net of tax* related to a gain on our Canadian investments. This expense is primarily the result of the current year receipt of CCAA estate distributions which were immediately contributed back into the CCAA estate as required by the Amended Plan. There was no tax expense or benefit recognized for the years ended December 31, 2017 and 2016.

### Guarantees and Contingent Liabilities

Under the terms of the approved Amended Plan in 2018, we and certain of our wholly-owned subsidiaries made a C$19.0 million cash contribution included in *Income from discontinued operations, net of tax* to the Wabush Group pension plans.

During 2017, we became aware that it was probable the Monitor would assert a preference claim against the Company and/or certain of its affiliates. We estimated a liability of $55.6 million, which included the value of our related-party claims against the Bloom Lake Group and the Wabush Group, classified as *Contingent claims* in the Statements of Consolidated Financial Position as of December 31, 2017. Following the approval of the Amended Plan, we reversed our outstanding liability of $55.6 million with a corresponding credit to *Income from discontinued operations, net of tax* in the Statements of Consolidated Operations for the year ended December 31, 2018.

During 2017, the Wabush Scully Mine was sold as part of the ongoing CCAA proceedings for the Wabush Group. We previously recorded liabilities of $37.2 million related to guarantees for certain environmental obligations of the Canadian Entities, classified as *Other liabilities* in the Statements of Consolidated Financial Position as of December 31, 2016. As part of this transaction, we were required to fund the buyer's financial assurance shortfall of $7.7 million in order to complete the conveyance of the environmental remediation obligations to the buyer, which released us from our guarantees and resulted in a net gain of $31.4 million included in *Income from discontinued operations, net of tax* in the Statements of Consolidated Operations for the year ended December 31, 2017.

129

Table of Contents

**NOTE 14 - CAPITAL STOCK**

**Share Repurchase Program**

On November 26, 2018, we announced that our Board of Directors authorized a program to repurchase outstanding common shares in the open market or in privately negotiated transactions, up to a maximum of $200 million. We are not obligated to make any purchase and the program may be suspended or discontinued at any time. During 2018, we repurchased 5.4 million common shares at a cost of approximately $47.5 million in aggregate, including commissions and fees, or an average price of approximately $8.78 per share. As of December 31, 2018, there was approximately $152.7 million remaining under the authorization. The share repurchase program is active until December 31, 2019.

**Dividends**

On October 18, 2018, the Board of Directors declared a quarterly cash dividend on our common shares of $0.05 per share. As a result, we have recorded $15.0 million in *Other current liabilities* in the Statements of Consolidated Financial Position for the year ended December 31, 2018. Subsequent to year end on January 15, 2019, the cash dividend was paid to shareholders of record as of the close of business on January 4, 2019.

**Common Share Public Offering**

On February 9, 2017, we issued 63.25 million common shares in an underwritten public offering at a public offering price of $10.75 per common share. We received net proceeds of $661.3 million. The net proceeds from the issuance of our common shares and our issuance of $500 million aggregate principal amount of 2025 Senior Notes were used to redeem in full all of our outstanding 8.00% 2020 1.5 Lien Notes and 7.75% 2020 Second Lien Notes. The aggregate principal amount outstanding of debt redeemed was $648.6 million. Additionally, through tender offers, we purchased $422.2 million in aggregate principal amount of debt, excluding unamortized discounts and deferred charges, of our 5.90% 2020 Senior Notes, our 4.80% 2020 Senior Notes and our 4.875% 2021 Senior Notes. In addition, we redeemed $35.6 million aggregate principal amount of the 8.25% 2020 First Lien Notes with the remaining net proceeds from our common share offering.

On August 10, 2016, we issued 44.4 million common shares in an underwritten public offering at a public offering price of $6.75 per common share. We received net proceeds of $287.4 million. The net proceeds from the issuance of our common shares were used to fully redeem our 3.95% 2018 Senior Notes.

**Preferred Shares Conversion to Common Shares**

On January 4, 2016, we announced that our Board of Directors determined the final quarterly dividend of our Preferred Shares would not be paid in cash, but instead, pursuant to the terms of the Preferred Shares, the conversion rate was increased such that holders of the Preferred Shares received additional common shares in lieu of the accrued dividend at the time of the mandatory conversion on February 1, 2016. The number of common shares issued on conversion was determined based on the average VWAP per share of our common shares during the 20 trading day period beginning on, and including, the 23rd scheduled trading day prior to February 1, 2016, subject to customary anti-dilution adjustments. Upon conversion on February 1, 2016, an aggregate of 26.5 million common shares were issued, representing 25.2 million common shares issuable upon conversion and 1.3 million that were issued in lieu of a final cash dividend.

**Debt-for-Equity Exchanges**

During the year ended December 31, 2016, we entered into a series of privately negotiated exchange agreements whereby we issued an aggregate of 8.2 million common shares in exchange for $10.0 million aggregate principal amount of our 3.95% 2018 Senior Notes, $20.1 million aggregate principal amount of our 4.80% 2020 Senior Notes and $26.8 million aggregate principal amount of our 4.875% 2021 Senior Notes. There were no exchanges that represented more than 1% of our outstanding common shares during any quarter. Accordingly, we recognized a gain of $11.3 million in *Gain (loss) on extinguishment/restructuring of debt* in the Statements of Consolidated Operations for the year ended December 31, 2016. The issuances of the common shares in exchange for our senior notes due 2018, 2020 and 2021 were made in reliance on the exemption from registration provided in Section 3(a)(9) of the Securities Act.

130

Table of Contents

**NOTE 15 - ACCUMULATED OTHER COMPREHENSIVE LOSS**

The components of *Accumulated other comprehensive loss* within Cliffs shareholders' equity (deficit) and related tax effects allocated to each are shown below:

| | (In Millions) | | |
|---|---|---|---|
| | Pre-tax Amount | Tax Benefit | After-tax Amount |
| **As of December 31, 2018:** | | | |
| **Postretirement benefit liability** | $ **(408.1)** | $ **127.0** | $ **(281.1)** |
| **Unrealized net loss on derivative financial instruments** | **(3.5)** | **0.7** | **(2.8)** |
| | $ **(411.6)** | $ **127.7** | $ **(283.9)** |
| As of December 31, 2017: | | | |
| Postretirement benefit liability | $ (387.3) | $ 123.4 | $ (263.9) |
| Foreign currency translation adjustments | 225.4 | — | 225.4 |
| Unrealized net loss on derivative financial instruments | (0.5) | — | (0.5) |
| | $ (162.4) | $ 123.4 | $ (39.0) |
| As of December 31, 2016: | | | |
| Postretirement benefit liability | $ (384.0) | $ 123.4 | $ (260.6) |
| Foreign currency translation adjustments | 239.3 | — | 239.3 |
| | $ (144.7) | $ 123.4 | $ (21.3) |

131

The following tables reflect the changes in *Accumulated other comprehensive loss* related to Cliffs shareholders' equity (deficit) for  December 31, 2018, 2017 and 2016:

| | Postretirement Benefit Liability, net of tax | Unrealized Net Gain (Loss) on Foreign Currency Translation | Net Unrealized Loss on Derivative Financial Instruments, net of tax | Accumulated Other Comprehensive Loss |
|---|---|---|---|---|
| | (In Millions) | | | |
| Balance December 31, 2017 | $ (263.9) | $ 225.4 | $ (0.5) | $ (39.0) |
| Other comprehensive income (loss) before reclassifications | (42.9) | 2.7 | (0.6) | (40.8) |
| Net loss (gain) reclassified from accumulated other comprehensive loss | 25.7 | (228.1) | (1.7) | (204.1) |
| Balance December 31, 2018 | $ (281.1) | $ — | $ (2.8) | $ (283.9) |

| | Postretirement Benefit Liability, net of tax | Unrealized Net Gain (Loss) on Foreign Currency Translation | Net Unrealized Loss on Derivative Financial Instruments, net of tax | Accumulated Other Comprehensive Loss |
|---|---|---|---|---|
| | (In Millions) | | | |
| Balance December 31, 2016 | $ (260.6) | $ 239.3 | $ — | $ (21.3) |
| Other comprehensive loss before reclassifications | (29.8) | (13.9) | (0.5) | (44.2) |
| Net loss reclassified from accumulated other comprehensive loss | 26.5 | — | — | 26.5 |
| Balance December 31, 2017 | $ (263.9) | $ 225.4 | $ (0.5) | $ (39.0) |

| | Postretirement Benefit Liability, net of tax | Unrealized Net Gain (Loss) on Securities, net of tax | Unrealized Net Gain on Foreign Currency Translation | Net Unrealized Gain (Loss) on Derivative Financial Instruments, net of tax | Accumulated Other Comprehensive Loss |
|---|---|---|---|---|---|
| | (In Millions) | | | | |
| Balance December 31, 2015 | $ (241.4) | $ 0.1 | $ 220.7 | $ 2.6 | $ (18.0) |
| Other comprehensive income (loss) before reclassifications | (44.8) | (0.1) | 18.4 | (3.3) | (29.8) |
| Net loss reclassified from accumulated other comprehensive loss | 25.6 | — | 0.2 | 0.7 | 26.5 |
| Balance December 31, 2016 | $ (260.6) | $ — | $ 239.3 | $ — | $ (21.3) |

132

A005621

The following table reflects the details about *Accumulated other comprehensive loss* components related to Cliffs shareholders' equity:

**(In Millions)**

| Details about Accumulated Other Comprehensive Loss Components | Amount of (Gain)/Loss Reclassified into Income | | | Affected Line Item in the Statement of Consolidated Operations |
|---|---|---|---|---|
| | Year Ended December 31, 2018 | Year Ended December 31, 2017 | Year Ended December 31, 2016 | |
| Amortization of pension and postretirement benefit liability: | | | | |
| Prior service costs[1] | $ (0.8) | $ (0.4) | $ (1.5) | *Other non-operating income* |
| Net actuarial loss[1] | 26.2 | 26.9 | 27.1 | *Other non-operating income* |
| Curtailments[1] | 0.3 | — | — | *Other non-operating income* |
| | $ 25.7 | $ 26.5 | $ 25.6 | Net of taxes |
| | | | | |
| Changes in foreign currency translation: | | | | |
| Unrealized gain on dissolution of entity | $ — | $ — | $ 0.2 | *Other non-operating income* |
| Gain on foreign currency translation[2] | (228.1) | — | — | *Income from discontinued operations, net of tax* |
| | $ (228.1) | $ — | $ 0.2 | Net of taxes |
| | | | | |
| Unrealized gain (loss) on derivative financial instruments: | | | | |
| Treasury lock | $ — | $ — | $ 1.2 | *Gain (loss) on extinguishment/restructuring of debt* |
| Commodity contracts | (1.7) | — | — | *Cost of goods sold and operating expenses* |
| | (1.7) | — | 1.2 | Total before taxes |
| Income tax expense | — | — | (0.5) | *Income tax benefit* |
| | $ (1.7) | $ — | $ 0.7 | Net of taxes |
| | | | | |
| Total reclassifications for the period | $ (204.1) | $ 26.5 | $ 26.5 | |

[1] These accumulated other comprehensive loss components are included in the computation of net periodic benefit cost. See NOTE 8 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS for further information.

[2] Represents Australian accumulated currency translation adjustments due to the liquidation of substantially all of our Australian subsidiaries' net assets. See NOTE 13 - DISCONTINUED OPERATIONS for further information.

133

A005622

Table of Contents

**NOTE 16 - CASH FLOW INFORMATION**

A reconciliation of capital additions to cash paid for capital expenditures is as follows:

| | (In Millions) | | |
|---|---|---|---|
| | Year Ended December 31, | | |
| | **2018** | 2017 | 2016 |
| Capital additions[1] | $ **394.8** | $ 156.0 | $ 68.5 |
| Less: | | | |
| Non-cash accruals | **93.6** | (2.2) | (0.6) |
| Capital leases | **7.6** | 6.5 | — |
| Grants | **(2.5)** | — | — |
| Cash paid for capital expenditures including deposits | $ **296.1** | $ 151.7 | $ 69.1 |

[1] Includes capital additions related to discontinued operations of $0.1 million, $2.8 million and $0.2 million for the years ended December 31, 2018, 2017 and 2016, respectively.

Cash payments for interest and income taxes are as follows:

| | (In Millions) | | |
|---|---|---|---|
| | **2018** | 2017 | 2016 |
| Taxes paid on income | $ **2.9** | $ 1.7 | $ 5.9 |
| Income tax refunds | $ **(11.3)** | $ (7.8) | $ (5.3) |
| Interest paid on debt obligations net of capitalized interest [1] | $ **105.7** | $ 139.0 | $ 184.0 |

[1] Capitalized interest was $6.5 million for the year ended December 31, 2018.

*Non-Cash Financing Activities - Declared Dividends*

On October 18, 2018, the Board of Directors declared a quarterly cash dividend on our common shares of $0.05 per share. The cash dividend of $15.0 million was paid on January 15, 2019 to shareholders of record as of the close of business on January 4, 2019.

**NOTE 17 - RELATED PARTIES**

One of our four operating mines, Hibbing, is a co-owned joint venture with companies that are integrated steel producers or their subsidiaries. We are the manager of Hibbing and rely on our joint venture partners to make their required capital contributions and to pay for their share of the iron ore pellets that we produce. The following is a summary of the mine ownership of the co-owned iron ore mine at December 31, 2018:

| Mine | Cleveland-Cliffs Inc. | ArcelorMittal | U.S. Steel |
|---|---|---|---|
| Hibbing | 23.0% | 62.3% | 14.7% |

*Product revenues* from related parties were as follows:

| | (In Millions) | | |
|---|---|---|---|
| | Year Ended December 31, | | |
| | **2018** | 2017 | 2016 |
| Product revenues from related parties | $ **1,234.5** | $ 806.7 | $ 830.1 |
| Total product revenues | $ **2,172.3** | $ 1,644.6 | $ 1,379.7 |
| Related party product revenue as a percent of total product revenue | **56.8%** | 49.1% | 60.2% |

A005623

Table of Contents

The following table presents the classification of related party assets and liabilities in the Statements of Consolidated Financial Position:

| Balance Sheet Location | (In Millions) | | | |
| --- | --- | --- | --- | --- |
| | December 31, 2018 | | December 31, 2017 | |
| Accounts receivable, net | $ | 176.0 | $ | 68.1 |
| Derivative assets | | 89.3 | | 37.9 |
| Partnership distribution payable | | (43.5) | | (44.2) |
| Other current liabilities | | (1.8) | | (12.3) |
| Other liabilities | | — | | (41.4) |
| | $ | 220.0 | $ | 8.1 |

During 2017, our ownership interest in Empire increased to 100% when we reached an agreement to distribute the noncontrolling interest net assets of $132.7 million to ArcelorMittal, in exchange for its interest in Empire. The net assets were agreed to be distributed in three installments of $44.2 million each, the first of which was paid upon the execution of the agreement, the second of which was paid in August 2018, and the final of which is due in August 2019. The remaining installment is reflected in *Partnership distribution payable* in the Statements of Consolidated Financial Position as of December 31, 2018.

A supply agreement with one customer provides for supplemental revenue or refunds to the customer based on the average annual daily market price for hot-rolled coil steel at the time the product is consumed in the customer's blast furnace. The supplemental pricing is characterized as a freestanding derivative. Refer to NOTE 12 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES for further information.

135

Table of Contents

**NOTE 18 - EARNINGS PER SHARE**

The following table summarizes the computation of basic and diluted earnings per share:

| | (In Millions, Except Per Share Amounts) | | | | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | | | |
| | **2018** | | 2017 | | 2016 | |
| Income from continuing operations | $ | **1,039.9** | $ | 360.6 | $ | 122.6 |
| Loss (income) from continuing operations attributable to noncontrolling interest | | **—** | | 3.9 | | (25.2) |
| Net income from continuing operations attributable to Cliffs shareholders | $ | **1,039.9** | $ | 364.5 | $ | 97.4 |
| Income from discontinued operations, net of tax | | **88.2** | | 2.5 | | 76.7 |
| Net income attributable to Cliffs shareholders | $ | **1,128.1** | $ | 367.0 | $ | 174.1 |
| Weighted average number of shares: | | | | | | |
| Basic | | **297.2** | | 288.4 | | 197.7 |
| $316.25 million 1.50% 2025 Convertible Senior Notes | | **3.4** | | — | | — |
| Employee stock plans | | **3.5** | | 4.6 | | 2.4 |
| Diluted | | **304.1** | | 293.0 | | 200.1 |
| Earnings per common share attributable to Cliffs common shareholders - basic: | | | | | | |
| Continuing operations | $ | **3.50** | $ | 1.27 | $ | 0.49 |
| Discontinued operations | | **0.30** | | 0.01 | | 0.39 |
| | $ | **3.80** | $ | 1.28 | $ | 0.88 |
| Earnings per common share attributable to Cliffs common shareholders - diluted: | | | | | | |
| Continuing operations | $ | **3.42** | $ | 1.25 | $ | 0.49 |
| Discontinued operations | | **0.29** | | 0.01 | | 0.38 |
| | $ | **3.71** | $ | 1.26 | $ | 0.87 |

The dilutive impact of 2025 Convertible Notes that were issued in December 2017 is calculated based on the treasury-stock method with the number of dilutive shares being calculated based on the difference in the average share price and the conversion price. There was no dilution during 2017 related to the common share equivalents for the 2025 Convertible Notes as our common shares average price did not rise in value above the conversion price.

Table of Contents

**NOTE 19 - COMMITMENTS AND CONTINGENCIES**

**Purchase Commitments**

In 2017, we began to incur capital commitments related to the construction of our HBI production plant in Toledo, Ohio. We expect to spend approximately $830 million on the HBI production plant, exclusive of construction-related contingencies and capitalized interest through 2020. Through December 31, 2018, we have entered into contracts and purchase orders for approximately $580 million of the total capital investment for the HBI production plant, of which a total of approximately $180 million has been expended project-to-date, including deposits. Of the remaining committed capital, expenditures of approximately $425 million and $225 million are expected to be made during 2019 and 2020, respectively.

**Contingencies**

We are currently the subject of, or party to, various claims and legal proceedings incidental to our operations. If management believes that a loss arising from these matters is probable and can reasonably be estimated, we record the amount of the loss or the minimum estimated liability when the loss is estimated using a range, and no point within the range is more probable than another. As additional information becomes available, any potential liability related to these matters is assessed and the estimates are revised, if necessary. These claims and legal proceedings are subject to inherent uncertainties and unfavorable rulings could occur. An unfavorable ruling could include monetary damages, additional funding requirements or an injunction. If an unfavorable ruling were to occur, there exists the possibility of a material impact on the financial position and results of operations for the period in which the ruling occurs or future periods. However, we do not believe that any pending claims or legal proceedings will have a material effect on our financial position, results of operations or cash flows.

We previously recorded a liability in the Statements of Consolidated Financial Position related to the CCAA proceedings, in which a settlement was reached during the period ended June 30, 2018. Refer to NOTE 13 - DISCONTINUED OPERATIONS for information on the CCAA proceedings.

*Environmental Matters*

We had environmental liabilities of $2.5 million and $2.9 million at December 31, 2018 and 2017, respectively, including obligations for known environmental remediation exposures at active and closed mining operations and other sites. These amounts have been recognized based on the estimated cost of investigation and remediation at each site, and include site studies, design and implementation of remediation plans, legal and consulting fees, and post-remediation monitoring and related activities. Future expenditures are not discounted unless the amount and timing of the cash disbursements are readily known. Potential insurance recoveries have not been reflected. Additional environmental obligations could be incurred, the extent of which cannot be assessed. The amount of our ultimate liability with respect to these matters may be affected by several uncertainties, primarily the ultimate cost of required remediation and the extent to which other responsible parties contribute. Refer to NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS for further information.

*Tax Matters*

The calculation of our tax liabilities involves dealing with uncertainties in the application of complex tax regulations. We recognize liabilities for anticipated tax audit issues based on our estimate of whether, and the extent to which, additional taxes will be due. If we ultimately determine that payment of these amounts is unnecessary, we reverse the liability and recognize a tax benefit during the period in which we determine that the liability is no longer necessary. We also recognize tax benefits to the extent that it is more likely than not that our positions will be sustained when challenged by the taxing authorities. To the extent we prevail in matters for which liabilities have been established, or are required to pay amounts in excess of our liabilities, our effective tax rate in a given period could be materially affected. An unfavorable tax settlement would require use of our cash and result in an increase in our effective tax rate in the year of resolution. A favorable tax settlement would be recognized as a reduction in our effective tax rate in the year of resolution. Refer to NOTE 10 - INCOME TAXES for further information.

**NOTE 20 - SUBSEQUENT EVENTS**

We have evaluated subsequent events through the date of financial statement issuance.

Table of Contents

**NOTE 21 - QUARTERLY RESULTS OF OPERATIONS (UNAUDITED)**

The sum of quarterly EPS may not equal EPS for the year due to discrete quarterly calculations.

| | First | Second | Third | Fourth | Year |
|---|---|---|---|---|---|
| | (In Millions, Except Per Share Amounts) [1] | | | | |
| | 2018 | | | | |
| | Quarters | | | | |
| Revenues from product sales and services | $   180.0 | $   714.3 | $   741.8 | $   696.3 | $   2,332.4 |
| Sales margin | 61.5 | 284.5 | 261.6 | 202.0 | 809.6 |
| Net income (loss) from continuing operations attributable to Cliffs shareholders | (13.4) | 229.4 | 199.8 | 624.1 | 1,039.9 |
| Income (loss) from discontinued operations, net of tax | (70.9) | (64.3) | 238.0 | (14.6) | 88.2 |
| Net income (loss) attributable to Cliffs common shareholders | $   (84.3) | $   165.1 | $   437.8 | $   609.5 | $   1,128.1 |
| Earnings (loss) per common share attributable to Cliffs common shareholders - basic: | | | | | |
| Continuing operations | $   (0.05) | $   0.77 | $   0.67 | $   2.11 | $   3.50 |
| Discontinued operations | (0.24) | (0.22) | 0.80 | (0.05) | 0.30 |
| | $   (0.29) | $   0.55 | $   1.47 | $   2.06 | $   3.80 |
| Earnings (loss) per common share attributable to Cliffs common shareholders - diluted: | | | | | |
| Continuing operations | $   (0.05) | $   0.76 | $   0.64 | $   2.03 | $   3.42 |
| Discontinued operations | (0.24) | (0.21) | 0.77 | (0.05) | 0.29 |
| | $   (0.29) | $   0.55 | $   1.41 | $   1.98 | $   3.71 |

[1] On January 1, 2018, we adopted Topic 606 and applied it to all contracts that were not completed using the modified retrospective method. The comparative period information has not been retrospectively revised and continues to be reported under the accounting standards in effect for those periods. Refer to NOTE 2 – NEW ACCOUNTING STANDARDS for information regarding the adoption of Topic 606.

The diluted earnings per share calculation for the first quarter of 2018 excludes equity plan awards of   3.8 million that were anti-dilutive.

138

| | (In Millions, Except Per Share Amounts) | | | | |
|---|---|---|---|---|---|
| | 2017 | | | | |
| | Quarters | | | | |
| | First | Second | Third | Fourth | Year |
| Revenues from product sales and services | $ 286.2 | $ 471.3 | $ 596.7 | $ 511.8 | $ 1,866.0 |
| Sales margin | 49.0 | 144.7 | 157.8 | 116.1 | 467.6 |
| Income (loss) from continuing operations | $ (78.5) | $ 83.8 | $ 22.3 | $ 333.0 | $ 360.6 |
| Loss (income) from continuing operations attributable to noncontrolling interest | 1.7 | 1.7 | 0.5 | — | 3.9 |
| Net income (loss) from continuing operations attributable to Cliffs shareholders | $ (76.8) | $ 85.5 | $ 22.8 | $ 333.0 | $ 364.5 |
| Income (loss) from discontinued operations, net of tax | 48.7 | (53.7) | 30.6 | (23.1) | 2.5 |
| Net income (loss) attributable to Cliffs common shareholders | $ (28.1) | $ 31.8 | $ 53.4 | $ 309.9 | $ 367.0 |
| Earnings (loss) per common share attributable to Cliffs common shareholders - basic: | | | | | |
| Continuing operations | $ (0.29) | $ 0.28 | $ 0.08 | $ 1.12 | $ 1.27 |
| Discontinued operations | 0.18 | (0.18) | 0.10 | (0.08) | 0.01 |
| | $ (0.11) | $ 0.10 | $ 0.18 | $ 1.04 | $ 1.28 |
| Earnings (loss) per common share attributable to Cliffs common shareholders - diluted: | | | | | |
| Continuing operations | $ (0.29) | $ 0.28 | $ 0.08 | $ 1.11 | $ 1.25 |
| Discontinued operations | 0.18 | (0.18) | 0.10 | (0.08) | 0.01 |
| | $ (0.11) | $ 0.10 | $ 0.18 | $ 1.03 | $ 1.26 |

The diluted earnings per share calculation for the first quarter of 2017 excludes equity plan awards of 4.6 million that were anti-dilutive.

139

A005628

Table of Contents

**NOTE 22 - SUPPLEMENTARY GUARANTOR INFORMATION**

The accompanying condensed consolidating financial information has been prepared and presented pursuant to SEC Regulation S-X, Rule 3-10, "Financial Statements of Guarantors and Issuers of Guaranteed Securities Registered or Being Registered." Certain of our subsidiaries have guaranteed the obligations under the $1.075 billion 5.75% 2025 Senior Notes issued by Cleveland-Cliffs Inc. See NOTE 6 - DEBT AND CREDIT FACILITIES for further information.

The following presents the condensed consolidating financial information for: (i) the Parent Company and the Issuer of the guaranteed obligations (Cleveland-Cliffs Inc.); (ii) the Guarantor subsidiaries, on a combined basis; (iii) the non-guarantor subsidiaries, on a combined basis; (iv) consolidating eliminations; and (v) Cleveland-Cliffs Inc. and Subsidiaries on a consolidated basis. Each Guarantor subsidiary is 100% owned by the Parent Company as of December 31, 2018. The condensed consolidating financial information is presented as if the Guarantor structure at December 31, 2018 existed for all years presented. As a result, the Guarantor subsidiaries within the condensed consolidating financial information as of December 31, 2018 and 2017 and for the years ended December 31, 2018, 2017 and 2016 include results of subsidiaries that were previously less than wholly-owned and were historically non-guarantors until 100% ownership was obtained.

Each of the Guarantor subsidiaries fully and unconditionally guarantee, on a joint and several basis, the obligations of Cleveland-Cliffs Inc. under the $1.075 billion 5.75% 2025 Senior Notes. The guarantee of a Guarantor subsidiary will be automatically and unconditionally released and discharged, and such Guarantor subsidiary's obligations under the guarantee and the related indenture governing the $1.075 billion 5.75% 2025 Senior Notes (the "Indenture") will be automatically and unconditionally released and discharged, upon:

(a) any sale, exchange, transfer or disposition of such Guarantor subsidiary (by merger, consolidation, or the sale of) or the capital stock of such Guarantor subsidiary after which the applicable Guarantor subsidiary is no longer a subsidiary of the Company or the sale of all or substantially all of such Guarantor subsidiary's assets (other than by lease);

(b) upon designation of any Guarantor subsidiary as an "excluded subsidiary" (as defined in the Indenture); and

(c) upon defeasance or satisfaction and discharge of the Indenture.

Each entity in the consolidating financial information follows the same accounting policies as described in the consolidated financial statements. The accompanying condensed consolidating financial information has been presented on the equity method of accounting for all periods presented. Under this method, investments in subsidiaries are recorded at cost and adjusted for the subsidiaries' cumulative results of operations, capital contributions and distributions, and other changes in equity. Elimination entries include consolidating and eliminating entries for investments in subsidiaries, and intra-entity activity and balances.

140

Condensed Consolidating Statement of Financial Position
As of December 31, 2018
(In Millions)

| | Cleveland-Cliffs Inc. | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **CURRENT ASSETS** | | | | | |
| Cash and cash equivalents | $ 819.8 | $ 0.7 | $ 2.7 | $ — | $ 823.2 |
| Accounts receivable, net | 9.2 | 221.3 | 0.3 | (4.1) | 226.7 |
| Inventories | — | 87.9 | — | — | 87.9 |
| Supplies and other inventories | — | 93.2 | — | — | 93.2 |
| Derivative assets | 0.1 | 91.4 | — | — | 91.5 |
| Income tax receivable, current | 117.3 | — | — | — | 117.3 |
| Current assets of discontinued operations | — | — | 12.4 | — | 12.4 |
| Other current assets | 10.0 | 16.9 | 0.5 | — | 27.4 |
| TOTAL CURRENT ASSETS | 956.4 | 511.4 | 15.9 | (4.1) | 1,479.6 |
| PROPERTY, PLANT AND EQUIPMENT, NET | 13.3 | 1,221.9 | 50.8 | — | 1,286.0 |
| **OTHER ASSETS** | | | | | |
| Deposits for property, plant and equipment | — | 68.4 | 14.6 | — | 83.0 |
| Income tax receivable, non-current | 117.2 | 4.1 | — | — | 121.3 |
| Deferred income taxes | 463.6 | — | 1.2 | — | 464.8 |
| Investment in subsidiaries | 1,262.3 | 50.8 | — | (1,313.1) | — |
| Long-term intercompany notes | — | — | 121.3 | (121.3) | — |
| Other non-current assets | 8.0 | 85.4 | 1.5 | — | 94.9 |
| TOTAL OTHER ASSETS | 1,851.1 | 208.7 | 138.6 | (1,434.4) | 764.0 |
| TOTAL ASSETS | $ 2,820.8 | $ 1,942.0 | $ 205.3 | $ (1,438.5) | $ 3,529.6 |
| **LIABILITIES** | | | | | |
| **CURRENT LIABILITIES** | | | | | |
| Accounts payable | $ 5.3 | $ 181.4 | $ 4.2 | $ (4.1) | $ 186.8 |
| Accrued employment costs | 28.5 | 45.4 | 0.1 | — | 74.0 |
| State and local taxes payable | — | 35.4 | 0.1 | — | 35.5 |
| Accrued interest | 38.4 | — | — | — | 38.4 |
| Partnership distribution payable | — | 43.5 | — | — | 43.5 |
| Current liabilities of discontinued operations | — | — | 6.7 | — | 6.7 |
| Other current liabilities | 30.6 | 51.3 | 1.4 | — | 83.3 |
| TOTAL CURRENT LIABILITIES | 102.8 | 357.0 | 12.5 | (4.1) | 468.2 |
| **POSTEMPLOYMENT BENEFIT LIABILITIES** | | | | | |
| Pensions | 58.3 | 390.5 | (230.4) | — | 218.4 |
| Other postretirement benefits | 6.0 | 23.9 | 0.4 | — | 30.3 |
| TOTAL POSTEMPLOYMENT BENEFIT LIABILITIES | 64.3 | 414.4 | (230.0) | — | 248.7 |
| ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS | — | 152.1 | 19.9 | — | 172.0 |
| LONG-TERM DEBT | 2,092.9 | — | — | — | 2,092.9 |
| LONG-TERM INTERCOMPANY NOTES | 121.3 | — | — | (121.3) | — |
| NON-CURRENT LIABILITIES OF DISCONTINUED OPERATIONS | — | — | 8.3 | — | 8.3 |
| OTHER LIABILITIES | 15.3 | 99.5 | 0.5 | — | 115.3 |
| TOTAL LIABILITIES | 2,396.6 | 1,023.0 | (188.8) | (125.4) | 3,105.4 |
| COMMITMENTS AND CONTINGENCIES | | | | | |
| **EQUITY** | | | | | |
| TOTAL EQUITY | 424.2 | 919.0 | 394.1 | (1,313.1) | 424.2 |
| TOTAL LIABILITIES AND EQUITY | $ 2,820.8 | $ 1,942.0 | $ 205.3 | $ (1,438.5) | $ 3,529.6 |

A005630

**Condensed Consolidating Statement of Financial Position**

**As of December 31, 2017**

**(In Millions)**

| | Cleveland-Cliffs Inc. | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **CURRENT ASSETS** | | | | | |
| Cash and cash equivalents | $ 948.9 | $ 2.1 | $ 27.3 | $ — | $ 978.3 |
| Accounts receivable, net | 4.5 | 102.9 | — | (0.7) | 106.7 |
| Inventories | — | 138.4 | — | — | 138.4 |
| Supplies and other inventories | — | 88.8 | — | — | 88.8 |
| Derivative assets | — | 37.9 | — | — | 37.9 |
| Income tax receivable, current | 11.4 | 1.9 | — | — | 13.3 |
| Loans to and accounts receivables from the Canadian Entities | 44.7 | 6.9 | — | — | 51.6 |
| Current assets of discontinued operations | — | — | 118.5 | — | 118.5 |
| Other current assets | 5.0 | 5.6 | 0.5 | — | 11.1 |
| TOTAL CURRENT ASSETS | 1,014.5 | 384.5 | 146.3 | (0.7) | 1,544.6 |
| PROPERTY, PLANT AND EQUIPMENT, NET | 17.5 | 965.5 | 50.8 | — | 1,033.8 |
| **OTHER ASSETS** | | | | | |
| Deposits for property, plant and equipment | — | 8.2 | 9.6 | — | 17.8 |
| Income tax receivable, non-current | 235.3 | — | — | — | 235.3 |
| Investment in subsidiaries | 1,024.3 | 29.9 | — | (1,054.2) | — |
| Long-term intercompany notes | — | — | 242.0 | (242.0) | — |
| Non-current assets of discontinued operations | — | — | 20.3 | — | 20.3 |
| Other non-current assets | 7.8 | 91.8 | 2.0 | — | 101.6 |
| TOTAL OTHER ASSETS | 1,267.4 | 129.9 | 273.9 | (1,296.2) | 375.0 |
| TOTAL ASSETS | $ 2,299.4 | $ 1,479.9 | $ 471.0 | $ (1,296.9) | $ 2,953.4 |
| **LIABILITIES** | | | | | |
| **CURRENT LIABILITIES** | | | | | |
| Accounts payable | $ 7.1 | $ 92.3 | $ 0.8 | $ (0.7) | $ 99.5 |
| Accrued employment costs | 13.7 | 38.9 | 0.1 | — | 52.7 |
| State and local taxes payable | — | 30.0 | 0.2 | — | 30.2 |
| Accrued interest | 31.4 | — | — | — | 31.4 |
| Contingent claims | 55.6 | — | — | — | 55.6 |
| Partnership distribution payable | — | 44.2 | — | — | 44.2 |
| Current liabilities of discontinued operations | — | — | 75.0 | — | 75.0 |
| Other current liabilities | 7.4 | 54.5 | 1.7 | — | 63.6 |
| TOTAL CURRENT LIABILITIES | 115.2 | 259.9 | 77.8 | (0.7) | 452.2 |
| POSTEMPLOYMENT BENEFIT LIABILITIES | | | | | |
| Pensions | 59.2 | 403.6 | (240.0) | — | 222.8 |
| Other postretirement benefits | 7.2 | 27.0 | 0.7 | — | 34.9 |
| TOTAL POSTEMPLOYMENT BENEFIT LIABILITIES | 66.4 | 430.6 | (239.3) | — | 257.7 |
| ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS | — | 140.6 | 27.1 | — | 167.7 |
| LONG-TERM DEBT | 2,304.2 | — | — | — | 2,304.2 |
| LONG-TERM INTERCOMPANY NOTES | 242.0 | — | — | (242.0) | — |
| NON-CURRENT LIABILITIES OF DISCONTINUED OPERATIONS | — | — | 52.2 | — | 52.2 |
| OTHER LIABILITIES | 15.7 | 147.2 | 0.6 | — | 163.5 |
| TOTAL LIABILITIES | 2,743.5 | 978.3 | (81.6) | (242.7) | 3,397.5 |
| **COMMITMENTS AND CONTINGENCIES** | | | | | |
| **EQUITY** | | | | | |
| TOTAL CLIFFS SHAREHOLDERS' EQUITY (DEFICIT) | (444.1) | 501.6 | 552.4 | (1,054.2) | (444.3) |
| NONCONTROLLING INTEREST | — | — | 0.2 | — | 0.2 |
| TOTAL DEFICIT | (444.1) | 501.6 | 552.6 | (1,054.2) | (444.1) |
| TOTAL LIABILITIES AND DEFICIT | $ 2,299.4 | $ 1,479.9 | $ 471.0 | $ (1,296.9) | $ 2,953.4 |

142

Condensed Consolidating Statement of Operations and Comprehensive Income

For the Year Ended December 31, 2018

(In Millions)

| | Cleveland-Cliffs Inc. | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **REVENUES FROM PRODUCT SALES AND SERVICES** | | | | | |
| Product | $ — | $ 2,172.3 | $ — | $ — | $ 2,172.3 |
| Freight and venture partners' cost reimbursements | — | 160.1 | — | — | 160.1 |
| | — | 2,332.4 | — | — | 2,332.4 |
| **COST OF GOODS SOLD AND OPERATING EXPENSES** | — | (1,522.8) | — | — | (1,522.8) |
| SALES MARGIN | — | 809.6 | — | — | 809.6 |
| **OTHER OPERATING INCOME (EXPENSE)** | | | | | |
| Selling, general and administrative expenses | (86.1) | (30.4) | (0.3) | — | (116.8) |
| Miscellaneous - net | (0.3) | (23.6) | 4.3 | — | (19.6) |
| | (86.4) | (54.0) | 4.0 | — | (136.4) |
| OPERATING INCOME (LOSS) | (86.4) | 755.6 | 4.0 | — | 673.2 |
| **OTHER INCOME (EXPENSE)** | | | | | |
| Interest expense, net | (117.6) | (2.1) | 0.8 | — | (118.9) |
| Loss on extinguishment of debt | (6.8) | — | — | — | (6.8) |
| Other non-operating income (loss) | (3.5) | 0.9 | 19.8 | — | 17.2 |
| | (127.9) | (1.2) | 20.6 | — | (108.5) |
| **INCOME (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES** | (214.3) | 754.4 | 24.6 | — | 564.7 |
| **INCOME TAX BENEFIT** | 474.7 | — | 0.5 | | 475.2 |
| **EQUITY IN INCOME OF SUBSIDIARIES** | 858.2 | 25.5 | — | (883.7) | — |
| **INCOME FROM CONTINUING OPERATIONS** | 1,118.6 | 779.9 | 25.1 | (883.7) | 1,039.9 |
| **INCOME FROM DISCONTINUED OPERATIONS, net of tax** | 9.5 | 12.3 | 66.4 | — | 88.2 |
| **NET INCOME ATTRIBUTABLE TO CLIFFS SHAREHOLDERS** | $ 1,128.1 | $ 792.2 | $ 91.5 | $ (883.7) | $ 1,128.1 |
| **OTHER COMPREHENSIVE LOSS** | (244.9) | (24.1) | (256.7) | 280.8 | (244.9) |
| **TOTAL COMPREHENSIVE INCOME (LOSS) ATTRIBUTABLE TO CLIFFS SHAREHOLDERS** | $ 883.2 | $ 768.1 | $ (165.2) | $ (602.9) | $ 883.2 |

143

**Condensed Consolidating Statement of Operations and Comprehensive Income**

**For the Year Ended December 31, 2017**

(In Millions)

| | Cleveland-Cliffs Inc. | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUES FROM PRODUCT SALES AND SERVICES | | | | | |
| Product | $ — | $ 1,644.6 | $ — | $ — | $ 1,644.6 |
| Freight and venture partners' cost reimbursements | — | 221.4 | — | — | 221.4 |
| | — | 1,866.0 | — | — | 1,866.0 |
| COST OF GOODS SOLD AND OPERATING EXPENSES | — | (1,398.4) | — | — | (1,398.4) |
| SALES MARGIN | — | 467.6 | — | — | 467.6 |
| OTHER OPERATING INCOME (EXPENSE) | | | | | |
| Selling, general and administrative expenses | (77.2) | (19.9) | (5.8) | — | (102.9) |
| Miscellaneous - net | (2.3) | 11.0 | 16.8 | — | 25.5 |
| | (79.5) | (8.9) | 11.0 | — | (77.4) |
| OPERATING INCOME (LOSS) | (79.5) | 458.7 | 11.0 | — | 390.2 |
| OTHER INCOME (EXPENSE) | | | | | |
| Interest expense, net | (126.8) | (1.0) | 1.0 | — | (126.8) |
| Loss on extinguishment of debt | (165.4) | — | — | — | (165.4) |
| Other non-operating income (expense) | (4.0) | (3.0) | 17.2 | — | 10.2 |
| | (296.2) | (4.0) | 18.2 | — | (282.0) |
| INCOME (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES | (375.7) | 454.7 | 29.2 | — | 108.2 |
| INCOME TAX BENEFIT (EXPENSE) | 251.4 | 1.3 | (0.3) | — | 252.4 |
| EQUITY IN INCOME OF SUBSIDIARIES | 512.6 | 11.8 | — | (524.4) | — |
| INCOME FROM CONTINUING OPERATIONS | 388.3 | 467.8 | 28.9 | (524.4) | 360.6 |
| INCOME (LOSS) FROM DISCONTINUED OPERATIONS, net of tax | (21.3) | 1.7 | 22.1 | — | 2.5 |
| NET INCOME | 367.0 | 469.5 | 51.0 | (524.4) | 363.1 |
| INCOME ATTRIBUTABLE TO NONCONTROLLING INTEREST | — | 3.9 | — | — | 3.9 |
| NET INCOME ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | $ 367.0 | $ 473.4 | $ 51.0 | $ (524.4) | $ 367.0 |
| OTHER COMPREHENSIVE INCOME (LOSS) | (4.0) | 12.9 | (4.8) | (8.1) | (4.0) |
| TOTAL COMPREHENSIVE INCOME ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | $ 363.0 | $ 486.3 | $ 46.2 | $ (532.5) | $ 363.0 |

144

A005633

**Condensed Consolidating Statement of Operations and Comprehensive Income**
**For the Year Ended December 31, 2016**
**(In Millions)**

| | Cleveland-Cliffs Inc. | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUES FROM PRODUCT SALES AND SERVICES | | | | | |
| Product | $ — | $ 1,379.7 | $ — | $ — | $ 1,379.7 |
| Freight and venture partners' cost reimbursements | — | 174.8 | — | — | 174.8 |
| | — | 1,554.5 | — | — | 1,554.5 |
| COST OF GOODS SOLD AND OPERATING EXPENSES | — | (1,274.4) | — | — | (1,274.4) |
| SALES MARGIN | — | 280.1 | — | — | 280.1 |
| OTHER OPERATING INCOME (EXPENSE) | | | | | |
| Selling, general and administrative expenses | (94.3) | (18.0) | (3.5) | — | (115.8) |
| Miscellaneous - net | (5.6) | (12.4) | (15.6) | — | (33.6) |
| | (99.9) | (30.4) | (19.1) | — | (149.4) |
| OPERATING INCOME (LOSS) | (99.9) | 249.7 | (19.1) | — | 130.7 |
| OTHER INCOME (EXPENSE) | | | | | |
| Interest expense, net | (194.5) | 0.1 | 0.5 | — | (193.9) |
| Gain on extinguishment/restructuring of debt | 166.3 | — | — | — | 166.3 |
| Other non-operating income (expense) | (4.1) | (5.0) | 16.4 | — | 7.3 |
| | (32.3) | (4.9) | 16.9 | — | (20.3) |
| INCOME (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES | (132.2) | 244.8 | (2.2) | — | 110.4 |
| INCOME TAX BENEFIT | 4.3 | 3.0 | 4.9 | | 12.2 |
| EQUITY IN INCOME OF SUBSIDIARIES | 319.1 | 13.7 | — | (332.8) | — |
| INCOME FROM CONTINUING OPERATIONS | 191.2 | 261.5 | 2.7 | (332.8) | 122.6 |
| INCOME (LOSS) FROM DISCONTINUED OPERATIONS, net of tax | (17.1) | 2.6 | 91.2 | — | 76.7 |
| NET INCOME (LOSS) | 174.1 | 264.1 | 93.9 | (332.8) | 199.3 |
| INCOME ATTRIBUTABLE TO NONCONTROLLING INTEREST | — | (25.2) | — | — | (25.2) |
| NET INCOME ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | $ 174.1 | $ 238.9 | $ 93.9 | $ (332.8) | $ 174.1 |
| OTHER COMPREHENSIVE INCOME (LOSS) | (3.3) | (20.7) | 15.4 | 5.3 | (3.3) |
| TOTAL COMPREHENSIVE INCOME ATTRIBUTABLE TO CLIFFS SHAREHOLDERS | $ 170.8 | $ 218.2 | $ 109.3 | $ (327.5) | $ 170.8 |

145

Condensed Consolidating Statement of Cash Flows
For the Year Ended December 31, 2018
(In Millions)

| | Cleveland-Cliffs Inc. | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net cash provided (used) by operating activities | $ (120.7) | $ 741.0 | $ (141.8) | $ — | $ 478.5 |
| INVESTING ACTIVITIES | | | | | |
| Purchase of property, plant and equipment | (1.2) | (207.3) | (0.1) | — | (208.6) |
| Deposits for property, plant and equipment | — | (82.3) | (5.2) | | (87.5) |
| Intercompany investing | 399.1 | (7.1) | 120.7 | (512.7) | — |
| Other investing activities | — | 3.1 | 19.9 | — | 23.0 |
| Net cash provided (used) in investing activities | 397.9 | (293.6) | 135.3 | (512.7) | (273.1) |
| FINANCING ACTIVITIES | | | | | |
| Repurchase of common shares | (47.5) | — | — | — | (47.5) |
| Debt issuance costs | (1.5) | — | — | — | (1.5) |
| Repurchase of debt | (234.5) | — | — | — | (234.5) |
| Distributions of partnership equity | — | (44.2) | — | — | (44.2) |
| Intercompany financing | (120.7) | (402.4) | 10.4 | 512.7 | — |
| Other financing activities | (2.1) | (2.2) | (43.2) | — | (47.5) |
| Net cash used by financing activities | (406.3) | (448.8) | (32.8) | 512.7 | (375.2) |
| EFFECT OF EXCHANGE RATE CHANGES ON CASH | — | — | (2.3) | — | (2.3) |
| DECREASE IN CASH AND CASH EQUIVALENTS, INCLUDING CASH CLASSIFIED WITHIN CURRENT ASSETS OF DISCONTINUED OPERATIONS | (129.1) | (1.4) | (41.6) | — | (172.1) |
| LESS: DECREASE IN CASH AND CASH EQUIVALENTS CLASSIFIED WITHIN CURRENT ASSETS OF DISCONTINUED OPERATIONS | — | — | (17.0) | — | (17.0) |
| NET DECREASE IN CASH AND CASH EQUIVALENTS | (129.1) | (1.4) | (24.6) | — | (155.1) |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF YEAR | 948.9 | 2.1 | 27.3 | — | 978.3 |
| CASH AND CASH EQUIVALENTS AT END OF YEAR | $ 819.8 | $ 0.7 | $ 2.7 | $ — | $ 823.2 |

146

A005635

**Condensed Consolidating Statement of Cash Flows**
**For the Year Ended December 31, 2017**
**(In Millions)**

| | Cleveland-Cliffs Inc. | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net cash provided (used) by operating activities | $ (166.8) | $ 430.0 | $ 74.9 | $ — | $ 338.1 |
| INVESTING ACTIVITIES | | | | | |
| Purchase of property, plant and equipment | (3.4) | (79.8) | (51.7) | — | (134.9) |
| Deposits for property, plant and equipment | — | (11.7) | (5.1) | | (16.8) |
| Intercompany investing | 225.7 | (7.3) | (45.1) | (173.3) | — |
| Other investing activities | (7.7) | 3.4 | — | — | (4.3) |
| Net cash provided (used) by investing activities | 214.6 | (95.4) | (101.9) | (173.3) | (156.0) |
| FINANCING ACTIVITIES | | | | | |
| Net proceeds from issuance of common shares | 661.3 | — | — | — | 661.3 |
| Proceeds from issuance of debt | 1,771.5 | — | — | — | 1,771.5 |
| Debt issuance costs | (28.6) | — | — | — | (28.6) |
| Repurchase of debt | (1,720.7) | — | — | — | (1,720.7) |
| Acquisition of noncontrolling interest | (105.0) | — | — | — | (105.0) |
| Distributions of partnership equity | — | (52.9) | — | — | (52.9) |
| Intercompany financing | 45.0 | (277.6) | 59.3 | 173.3 | — |
| Other financing activities | (5.8) | (4.5) | (16.4) | — | (26.7) |
| Net cash provided (used) by financing activities | 617.7 | (335.0) | 42.9 | 173.3 | 498.9 |
| EFFECT OF EXCHANGE RATE CHANGES ON CASH | — | — | 3.3 | — | 3.3 |
| INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS, INCLUDING CASH CLASSIFIED WITHIN CURRENT ASSETS OF DISCONTINUED OPERATIONS | 665.5 | (0.4) | 19.2 | — | 684.3 |
| LESS: INCREASE IN CASH AND CASH EQUIVALENTS CLASSIFIED WITHIN CURRENT ASSETS OF DISCONTINUED OPERATIONS | — | — | 18.8 | — | 18.8 |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | 665.5 | (0.4) | 0.4 | — | 665.5 |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF YEAR | 283.4 | 2.5 | 26.9 | — | 312.8 |
| CASH AND CASH EQUIVALENTS AT END OF YEAR | $ 948.9 | $ 2.1 | $ 27.3 | $ — | $ 978.3 |

147

**Condensed Consolidating Statement of Cash Flows**
**For the Year Ended December 31, 2016**
**(In Millions)**

| | Cleveland-Cliffs Inc. | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net cash provided (used) by operating activities | $ (275.7) | $ 462.9 | $ 115.8 | $ — | $ 303.0 |
| INVESTING ACTIVITIES | | | | | |
| Purchase of property, plant and equipment | (6.2) | (55.1) | (0.4) | — | (61.7) |
| Deposits for property, plant and equipment | — | (4.9) | (2.5) | — | (7.4) |
| Intercompany investments | 356.6 | (3.3) | (117.0) | (236.3) | — |
| Other investing activities | 0.4 | 10.8 | — | — | 11.2 |
| Net cash provided (used) by investing activities | 350.8 | (52.5) | (119.9) | (236.3) | (57.9) |
| FINANCING ACTIVITIES | | | | | |
| Net proceeds from issuance of common shares | 287.4 | — | — | — | 287.4 |
| Debt issuance costs | (5.2) | — | — | — | (5.2) |
| Borrowings under credit facilities | 105.0 | — | — | — | 105.0 |
| Repayments on credit facilities | (105.0) | — | — | — | (105.0) |
| Repayments on equipment loans | (95.6) | — | — | — | (95.6) |
| Repurchase of debt | (305.4) | — | — | — | (305.4) |
| Distributions of partnership equity | — | (59.9) | — | — | (59.9) |
| Intercompany financing | 117.0 | (339.9) | (13.4) | 236.3 | — |
| Other financing activities | (0.6) | (9.9) | (17.2) | — | (27.7) |
| Net cash used by financing activities | (2.4) | (409.7) | (30.6) | 236.3 | (206.4) |
| EFFECT OF EXCHANGE RATE CHANGES ON CASH | — | — | (0.5) | — | (0.5) |
| INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS, INCLUDING CASH CLASSIFIED WITHIN CURRENT ASSETS OF DISCONTINUED OPERATIONS | 72.7 | 0.7 | (35.2) | — | 38.2 |
| LESS: DECREASE IN CASH AND CASH EQUIVALENTS CLASSIFIED WITHIN CURRENT ASSETS OF DISCONTINUED OPERATIONS | — | — | (35.3) | — | (35.3) |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | 72.7 | 0.7 | 0.1 | — | 73.5 |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF YEAR | 210.7 | 1.8 | 26.8 | — | 239.3 |
| CASH AND CASH EQUIVALENTS AT END OF YEAR | $ 283.4 | $ 2.5 | $ 26.9 | $ — | $ 312.8 |

148

A005637

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the shareholders and the Board of Directors of
Cleveland-Cliffs Inc.

**Opinion on the Financial Statements**

We have audited the accompanying statements of consolidated financial position of Cleveland-Cliffs Inc. and subsidiaries (the "Company") as of December 31, 2018 and 2017, the related statements of consolidated operations, comprehensive income, cash flows, and changes in equity, for each of the three years in the period ended December 31, 2018, and the related notes and the financial schedule listed in the Index at Item 15 (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2018 and 2017, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2018, in conformity with accounting principles generally accepted in the United States of America.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 8, 2019, expressed an unqualified opinion on the Company's internal control over financial reporting.

**Change in Accounting Principle**

As discussed in Note 2 to the consolidated financial statements, effective January 1, 2018, the Company changed its method of accounting for revenue by adopting FASB ASC 606, *Revenue from Contracts with Customers* , on a modified retrospective basis.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

*/s/ DELOITTE & TOUCHE LLP*

Cleveland, Ohio
February 8, 2019

We have served as the Company's auditor since 2004.

149

A005638

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the shareholders and the Board of Directors of
Cleveland-Cliffs Inc.

**Opinion on Internal Control over Financial Reporting**

We have audited the internal control over financial reporting of Cleveland-Cliffs Inc. and subsidiaries (the "Company") as of December 31, 2018, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by COSO.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated financial statements and financial statement schedule as of and for the year ended December 31, 2018, of the Company and our report dated February 8, 2019, expressed an unqualified opinion on those financial statements and financial statement schedule and included an explanatory paragraph regarding the Company's change to its method of accounting for revenue by adopting FASB ASC 606, *Revenue from Contracts with Customers* .

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying *Management's Report on Internal Control Over Financial Reporting* . Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

*/s/ DELOITTE & TOUCHE LLP*

Cleveland, Ohio
February 8, 2019

Table of Contents

**Item 9.**    *Changes in and Disagreements With Accountants on Accounting and Financial Disclosure*

    *None.*

**Item 9A.**    *Controls and Procedures*

    We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our President and Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure based solely on the definition of "disclosure controls and procedures" in Rule 13a-15(e) promulgated under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

    As of the end of the period covered by this report, we carried out an evaluation under the supervision and with the participation of our management, including our President and Chief Executive Officer and our Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures. Based on the foregoing, our President and Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective.

Table of Contents

**Management's Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as such term is defined under Rule 13a-15(f) promulgated under the Exchange Act.

Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Company's consolidated financial statements for external purposes in accordance with generally accepted accounting principles.

Internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit the preparation of the consolidated financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with appropriate authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the consolidated financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management conducted an assessment of the Company's internal control over financial reporting as of  December 31, 2018 using the framework specified in *Internal Control - Integrated Framework* (2013), published by the Committee of Sponsoring Organizations of the Treadway Commission. Based on such assessment, management has concluded that the Company's internal control over financial reporting was effective as of December 31, 2018.

The effectiveness of the Company's internal control over financial reporting as of  December 31, 2018 has been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report that appears herein.

February 8, 2019

**Changes in Internal Control Over Financial Reporting**

There have been no changes in our internal control over financial reporting or in other factors that occurred during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B.**      *Other Information*

*None.*

152

Table of Contents

**PART III**

**Item 10.**    ***Directors, Executive Officers and Corporate Governance***

The information required to be furnished by this Item will be set forth in our definitive proxy statement for the 2019 Annual Meeting of Shareholders (the "Proxy Statement") under the headings "Board Meetings and Committees - Audit Committee", "Code of Business Conduct and Ethics", "Independence and Related Party Transactions", "Information Concerning Director Nominees" and "Section 16(a) Beneficial Ownership Reporting Compliance", and is incorporated herein by reference and made a part hereof from the Proxy Statement. The information regarding executive officers required by this Item is set forth in *Part I - Item 1. Business* hereof under the heading "Executive Officers of the Registrant", which information is incorporated herein by reference and made a part hereof.

**Item 11.**    ***Executive Compensation***

The information required to be furnished by this Item will be set forth in our Proxy Statement under the headings "Director Compensation", "Compensation Committee Report", "Compensation Committee Interlocks and Insider Participation" and "Executive Compensation" and is incorporated herein by reference and made a part hereof from the Proxy Statement.

**Item 12.**    ***Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters***

The information required to be furnished by this Item regarding "Securities Authorized for Issuance Under Equity Compensation Plans", "Related Stockholder Matters" and "Security Ownership" will be set forth in the Proxy Statement under the headings "Independence and Related Party Transactions", "Ownership of Equity Securities of the Company" and "Equity Compensation Plan Information", respectively, and is incorporated herein by reference and made part hereof from the Proxy Statement.

**Item 13.**    ***Certain Relationships and Related Transactions, and Director Independence***

The information required to be furnished by this Item will be set forth in the Proxy Statement under the heading "Independence and Related Party Transactions" and is incorporated herein by reference and made a part hereof from the Proxy Statement.

**Item 14.**    ***Principal Accountant Fees and Services***

The information required to be furnished by this Item will be set forth in the Proxy Statement under the heading "Ratification of Independent Registered Public Accounting Firm" and is incorporated herein by reference and made a part hereof from the Proxy Statement.

Table of Contents

**PART IV**

**Item 15.**     ***Exhibits and Financial Statement Schedules***

(a)(1) and (2) - List of Financial Statements and Financial Statement Schedules.

The following consolidated financial statements of Cleveland-Cliffs Inc. are included at  *Item 8. Financial Statements and Supplementary Data*  above:

•    Statements of Consolidated Financial Position - December 31, 2018 and 2017

•    Statements of Consolidated Operations  - Years ended December 31, 2018, 2017 and 2016

•    Statements of Consolidated Comprehensive Income (Loss)  - Years ended December 31, 2018, 2017 and 2016

•    Statements of Consolidated Cash Flows  - Years ended December 31, 2018, 2017 and 2016

•    Statements of Consolidated Changes in Equity  - Years ended December 31, 2018, 2017 and 2016

•    Notes to Consolidated Financial Statements

The following consolidated financial statement schedule of Cleveland-Cliffs Inc. is included herein in Item 15(d) and attached as   Exhibit 99(a):

Schedule II - Valuation and Qualifying Accounts

All other schedules for which provision is made in the applicable accounting regulation of the SEC are not required under the related instructions or are inapplicable, and therefore have been omitted.

(3) List of Exhibits

All documents referenced below have been filed pursuant to the Securities Exchange Act of 1934 by Cleveland-Cliffs Inc., file number 1-09844, unless otherwise indicated.

| Exhibit Number | Exhibit |
|---|---|
| | **Plan of purchase, sale, reorganization, arrangement, liquidation or succession** |
| 2.1 | ***Unit Purchase Agreement, dated as of December 22, 2015, by and among Cliffs Natural Resources Inc., CLF PinnOak LLC and Seneca Coal Resources, LLC (filed as Exhibit 2.3 to Cliffs' Form 10-K for the period ended December 31, 2015 and incorporated herein by reference) |
| | **Articles of Incorporation and By-Laws of Cleveland-Cliffs Inc.** |
| 3.1 | Third Amended Articles of Incorporation of Cliffs, as filed with the Secretary of State of the State of Ohio on May 13, 2013 (filed as Exhibit 3.1 to Cliffs' Form 8-K on May 13, 2013 and incorporated herein by reference) |
| 3.2 | Certificate of Amendment to Third Amended Articles of Incorporation of Cliffs, as filed with the Secretary of State of the State of Ohio on April 26, 2017 (filed as Exhibit 3.1 to Cliffs' Form 8-K on April 27, 2017 and incorporated herein by reference) |
| 3.3 | Certificate of Amendment to Third Amended Articles of Incorporation of Cliffs, as amended, as filed with the Secretary of State of the State of Ohio on August 15, 2017 (filed as Exhibit 3.1 to Cliffs' Form 8-K on August 17, 2017 and incorporated herein by reference) |
| 3.4 | Regulations of Cliffs (filed as Exhibit 3.2 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| | **Instruments defining rights of security holders, including indentures** |
| 4.1 | Indenture between Cliffs Natural Resources Inc. and U.S. Bank National Association, as trustee, dated March 17, 2010 (filed as Exhibit 4.3 to Cliffs' Registration Statement on Form S-3 No. 333-186617 on February 12, 2013 and incorporated herein by reference) |
| 4.2 | Form of 6.25% Notes due 2040 Third Supplemental Indenture between Cliffs Natural Resources Inc. and U.S. Bank National Association, as trustee, dated September 20, 2010, including Form of 6.25% Notes due 2040 (filed as Exhibit 4.4 to Cliffs' Form 8-K on September 17, 2010 and incorporated herein by reference) |

[Table of Contents](#)

| 4.3 | Form of 4.875% Notes due 2021 Fourth Supplemental Indenture between Cliffs Natural Resources Inc. and U.S. Bank National Association, as trustee, dated March 23, 2011, including Form of 4.875% Notes due 2021 (filed as Exhibit 4.1 to Cliffs' Form 8-K on March 23, 2011 and incorporated herein by reference) |
| --- | --- |
| 4.4 | Fifth Supplemental Indenture between Cliffs Natural Resources Inc. and U.S. Bank National Association, as trustee, dated March 31, 2011 (filed as Exhibit 4(b) to Cliffs' Form 10-Q for the period ended June 30, 2011 and incorporated herein by reference) |
| 4.5 | Seventh Supplemental Indenture between Cliffs Natural Resources Inc. and U.S. Bank National Association, as trustee, dated May 7, 2013 (as filed as Exhibit 4.1 to Cliffs' Form 10-Q for the period ended June 30, 2013 and incorporated herein by reference) |
| 4.6 | Eighth Supplemental Indenture, dated as of December 19, 2017, by and between Cleveland-Cliffs Inc. and U.S. Bank National Association, as trustee, including Form of 1.50% Convertible Senior Notes due 2025 (filed as Exhibit 4.2 to Cliffs' Form 8-K on December 19, 2017 and incorporated herein by reference) |
| 4.7 | Indenture, dated as of February 27, 2017, among Cliffs Natural Resources Inc. (n/k/a Cleveland-Cliffs Inc.), the Guarantors party thereto and U.S. Bank National Association, as trustee, including Form of 5.75% Senior Notes due 2025 (filed as Exhibit 4.1 to Cliffs' Form 8-K on August 7, 2017 and incorporated herein by reference) |
| 4.8 | First Supplemental Indenture, dated as of August 7, 2017, among Cliffs Natural Resources Inc. (n/k/a Cleveland-Cliffs Inc.), the Guarantors party thereto and U.S. Bank National Association, as trustee, including Form of 5.75% Senior Notes due 2025 (filed as Exhibit 4.2 to Cliffs' Form 8-K filed on August 7, 2017 and incorporated herein by reference) |
| 4.9 | Second Supplemental Indenture, dated as of September 29, 2017, among Cliffs Empire II Inc. and Empire Iron Mining Partnership, as additional guarantors, Cleveland-Cliffs Inc., the Guarantors party thereto and U.S. Bank National Association, as trustee (filed as Exhibit 4.11 to Cliffs' Form 10-K for period ended December 31, 2017 and incorporated herein by reference) |
| 4.10 | Third Supplemental Indenture, dated as of October 27, 2017, among Cliffs TIOP II, LLC, Marquette Range Coal Service Company and Tilden Mining Company L.C., as additional guarantors thereto, Cleveland-Cliffs Inc., the Guarantors party thereto and U.S. Bank National Association, as trustee (filed as Exhibit 4.12 to Cliffs' Form 10-K for period ended December 31, 2017 and incorporated herein by reference) |
| 4.11 | Indenture, dated as of December 19, 2017, by and among Cleveland-Cliffs Inc., the guarantors party thereto and U.S. Bank National Association, as trustee and first lien notes collateral agent, including Form of 4.875% Senior Secured Notes due 2024 (filed as Exhibit 4.1 to Cliffs' Form 8-K filed on December 19, 2017 and incorporated herein by reference) |
| 4.12 | Registration Rights Agreement, dated as of February 27, 2017, by and among Cliffs Natural Resources Inc. (n/k/a Cleveland-Cliffs Inc.), the Guarantors party thereto and Merrill Lynch, Pierce, Fenner & Smith Incorporated, as representative of the several initial purchasers (filed as Exhibit 4.2 to Cliffs' Form 10-Q for the period ended March 31, 2017 and incorporated herein by reference) |
| 4.13 | Joinder to Registration Rights Agreement, dated as of August 7, 2017, by and among Cliffs Natural Resources Inc. (n/k/a Cleveland-Cliffs Inc.), the Guarantors party thereto and Credit Suisse Securities (USA) LLC, as representative of the several initial purchasers (filed as Exhibit 4.3 to Cliffs' Form 8-K on August 7, 2017 and incorporated herein by reference) |
| 4.14 | Form of Common Share Certificate (filed as Exhibit 4.4 to Cliffs' Form 10-Q for the period ended September 30, 2017 and incorporated herein by reference) |
| | **Material contracts** |
| 10.1 | Amended and Restated Syndicated Facility Agreement, by and among Bank of America, N.A., as Administrative Agent and Australian Security Trustee, the Lenders that are Parties hereto, as the Lenders, Cleveland-Cliffs Inc., as Parent and a Borrower, and the Subsidiaries of Parent Party hereto, as Borrowers, dated as of February 28, 2018 (filed as Exhibit 10.1 to Cliffs' Form 10-Q for the period ended March 31, 2018 and incorporated herein by reference) |
| 10.2 | * Form of Change in Control Severance Agreement (covering newly hired officers) (filed as Exhibit 10.4 to Cliffs' Form 8-K/A on September 16, 2014 and incorporated herein by reference) |
| 10.3 | * Form of 2016 Change in Control Severance Agreement (filed as Exhibit 10.1 to Cliffs' 10-Q for the period ended September 30, 2016 and incorporated herein by reference) |
| 10.4 | * Cleveland-Cliffs Inc. 2012 Non-Qualified Deferred Compensation Plan (effective January 1, 2012) dated November 8, 2011 (filed as Exhibit 10.1 to Cliffs' Form 8-K on November 8, 2011 and incorporated herein by reference) |
| 10.5 | * Form of Indemnification Agreement between Cleveland-Cliffs Inc. and Directors (filed as Exhibit 10.5 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.6 | * Cliffs Natural Resources Inc. Amended and Restated 2014 Nonemployee Directors' Compensation Plan (filed as Exhibit 10.1 to Cliffs' Form 8-K on May 2, 2016 and incorporated herein by reference) |

155

| 10.7 | *Form of Restricted Shares Agreement for Nonemployee Directors (filed as Exhibit 10.1 to Cliffs' Form 10-Q for the period ended June 30, 2018 and incorporated herein by reference) |
|---|---|
| 10.8 | *Form of Deferred Shares Agreement for Nonemployee Directors (filed Exhibit 10.2 to Cliffs' Form 10-Q for the period ended June 30, 2018 and incorporated herein by reference) |
| 10.9 | * Trust Agreement No. 1 (Amended and Restated effective June 1, 1997), dated June 12, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to the Cleveland-Cliffs Inc Supplemental Retirement Benefit Plan, Severance Pay Plan for Key Employees and certain executive agreements (filed as Exhibit 10.10 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.10 | * Trust Agreement No. 1 Amendments to Exhibits, effective as of January 1, 2000, by and between Cleveland-Cliffs Inc and KeyBank National Association, as Trustee (filed as Exhibit 10.11 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.11 | * First Amendment to Trust Agreement No. 1, effective September 10, 2002, by and between Cleveland-Cliffs Inc and KeyBank National Association, as Trustee (filed as Exhibit 10.12 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.12 | * Second Amendment to Trust Agreement No. 1 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(y) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.13 | * Third Amendment to Trust Agreement No. 1 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.15 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.14 | * Amended and Restated Trust Agreement No. 2, effective as of October 15, 2002, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to Executive Agreements and Indemnification Agreements with the Company's Directors and certain Officers, the Company's Severance Pay Plan for Key Employees, and the Retention Plan for Salaried Employees (filed as Exhibit 10.14 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.15 | * Second Amendment to Amended and Restated Trust Agreement No. 2 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(aa) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.16 | * Third Amendment to Amended and Restated Trust Agreement No. 2 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.18 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.17 | * Trust Agreement No. 7, dated as of April 9, 1991, by and between Cliffs Natural Resources Inc and KeyBank National Association, Trustee, with respect to the Cleveland-Cliffs Inc Supplemental Retirement Benefit Plan (filed as Exhibit 10.23 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.18 | * First Amendment to Trust Agreement No. 7, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, dated as of March 9, 1992 (filed as Exhibit 10.24 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.19 | * Second Amendment to Trust Agreement No. 7, dated November 18, 1994, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.25 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.20 | * Third Amendment to Trust Agreement No. 7, dated May 23, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.26 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.21 | * Fourth Amendment to Trust Agreement No. 7, dated July 15, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.27 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.22 | * Amendment to Exhibits to Trust Agreement No. 7, effective as of January 1, 2000, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.28 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.23 | * Sixth Amendment to Trust Agreement No. 7 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(oo) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |

| 10.24 | * Seventh Amendment to Trust Agreement No. 7 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.34 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.25 | * Trust Agreement No. 10, dated as of November 20, 1996, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to the Cleveland-Cliffs Inc Nonemployee Directors' Compensation Plan (filed as Exhibit 10.36 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.26 | *First Amendment to Trust Agreement No. 10 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(ww) to Cliffs' Form 10-K for the period ended February 26, 2009 and incorporated herein by reference) |
| 10.27 | * Second Amendment to Trust Agreement No. 10 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.45 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.28 | *Severance Agreement and Release, by and between P. Kelly Tompkins and Cleveland-Cliffs Inc., effective December 31, 2017 (filed as Exhibit 10.36 to Cliffs' Form 10-K for period ended December 31, 2017 and incorporated herein by reference) |
| 10.29 | * Letter Agreement, by and between Lourenco Goncalves and Cliffs Natural Resources Inc., signed as of September 11, 2014 (filed as Exhibit 10.1 to Cliffs' Form 8-K/A on September 16, 2014 and incorporated herein by reference) |
| 10.30 | * Cleveland-Cliffs Inc and Subsidiaries Management Performance Incentive Plan Summary, effective January 1, 2004 (filed as Exhibit 10.47 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.31 | * Cliffs Natural Resources Inc. 2017 Executive Management Performance Incentive Plan effective January 1, 2017 (filed as Exhibit 10.2 to Cliffs' Form 8-K on April 27, 2017 and incorporated herein by reference) |
| 10.32 | * Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan (filed as Exhibit 10.1 to Cliffs' Form 8-K on August 4, 2014 and incorporated herein by reference) |
| 10.33 | * Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Performance Unit Award Memorandum (2014 Grant) and Performance Unit Award Agreement (filed as Exhibit 10.3 to Cliffs' Form 8-K/A on September 16, 2014 and incorporated herein by reference) |
| 10.34 | * Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Non-Qualified Stock Option Award Memorandum (3-Year Vesting – January 2015 Grant) and Stock Option Award Agreement (filed as Exhibit 10.69 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.35 | * Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan (filed as Exhibit 10.1 to Cliffs' Form 8-K on May 21, 2015 and incorporated herein by reference) |
| 10.36 | * Form of Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan Restricted Stock Unit Award Memorandum (Vesting December 31, 2018) and Restricted Stock Unit Award Agreement (filed as Exhibit 10.1 to Cliffs' Form 10-Q for the period ended March 31, 2016 and incorporated herein by reference) |
| 10.37 | * Form of Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan Cash Incentive Award Memorandum (TSR) (Vesting December 31, 2018) and Cash Incentive Award Agreement (TSR) (filed as Exhibit 10.2 to Cliffs' Form 10-Q for the period ended March 31, 2016 and incorporated herein by reference) |
| 10.38 | * Form of Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan Cash Incentive Award Memorandum (EBITDA) (January 1, 20XX - December 31, 20XX) and Cash Incentive Award Agreement (EBITDA) (filed as Exhibit 10.3 to Cliffs' Form 10-Q for the period ended March 31, 2016 and incorporated herein by reference) |
| 10.39 | * Form of Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan, as Amended, Performance Share Award Memorandum and Performance Share Award Agreement (filed as Exhibit 10.3 to Cliffs' Form 10-Q for the period ended June 30, 2017 and incorporated herein by reference) |
| 10.40 | * Cliffs Natural Resources Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan (filed as Exhibit 10.1 to Cliffs' Form 8-K on April 27, 2017 and incorporated herein by reference) |
| 10.41 | * Form of Cliffs Natural Resources Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan Performance Share Award Memorandum and Performance Share Award Agreement (filed as Exhibit 10.4 to Cliffs' Form 10-Q for the period ended June 30, 2017 and incorporated herein by reference) |
| 10.42 | * Form of Cliffs Natural Resources Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan Restricted Stock Unit Award Memorandum and Restricted Stock Unit Award Agreement (filed as Exhibit 10.5 to Cliffs' Form 10-Q for the period ended June 30, 2017 and incorporated herein by reference) |

A005646

| 10.43 | * Form of Cleveland-Cliffs Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan Restricted Stock Unit Award Memorandum (Vesting December 31, 2020) and Restricted Stock Unit Award Agreement (filed as Exhibit 10.2 to Cliffs' Form 10-Q for the period ended March 31, 2018 and incorporated herein by reference) |
| 10.44 | * Form of Cleveland-Cliffs Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan Performance Share Award Memorandum and Performance Share Award Agreement (filed as Exhibit 10.3 to Cliffs' Form 10-Q for the period ended March 31, 2018 and incorporated herein by reference) |
| 10.45 | * Form of Cleveland-Cliffs Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan Cash Incentive Award Memorandum (TSR) (Vesting December 31, 2020) and Cash Incentive Award Agreement (TSR) (filed as Exhibit 10.4 to Cliffs' Form 10-Q for the period ended March 31, 2018 and incorporated herein by reference) |
| 10.46 | * Cliffs Natural Resources Inc. Supplemental Retirement Benefit Plan (as Amended and Restated effective December 1, 2006) dated December 31, 2008 (filed as Exhibit 10(mmm) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.47 | * Cliffs Natural Resources Inc. 2015 Employee Stock Purchase Plan (filed as Exhibit 4.4 to Cliffs' Registration Statement on Form S-8 on August 20, 2015 and incorporated herein by reference) |
| 10.48 | ** Pellet Sale and Purchase Agreement, effective as of October 31, 2016, by and among Cliffs Natural Resources Inc., The Cleveland-Cliffs Iron Company and Cliffs Mining Company and ArcelorMittal USA LLC (filed as Exhibit 10.72 to Cliffs' Registration Statement on Form S-1/A No. 333-212054 on August 4, 2016 and incorporated herein by reference) |
| 10.49 | ** Amended and Restated Pellet Sale and Purchase Agreement, effective as of December 31, 2015, by and among The Cleveland-Cliffs Iron Company, Cliffs Mining Company and AK Steel Corporation (filed as Exhibit 10.59 to Cliffs' Form 10-K/A for the period ended December 31, 2017 and incorporated herein by reference) |
| 10.50 | ** Pellet Sale and Purchase Agreement, effective as of January 1, 2014, by and among Cliffs Mining Company (f/k/a Cliffs Sales Company) and AK Steel Corporation (filed herewith) |
| 21 | Subsidiaries of the Registrant (filed herewith) |
| 23 | Consent of Independent Registered Public Accounting Firm (filed herewith) |
| 24 | Power of Attorney (filed herewith) |
| 31.1 | Certification Pursuant to 15 U.S.C. Section 7241, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, signed and dated by Lourenco Goncalves as of February 8, 2019 (filed herewith) |
| 31.2 | Certification Pursuant to 15 U.S.C. Section 7241, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, signed and dated by Timothy K. Flanagan as of February 8, 2019 (filed herewith) |
| 32.1 | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed and dated by Lourenco Goncalves, Chairman, President and Chief Executive Officer of Cleveland-Cliffs Inc., as of February 8, 2019 (filed herewith) |
| 32.2 | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed and dated by Timothy K. Flanagan, Executive Vice President, Chief Financial Officer of Cleveland-Cliffs Inc., as of February 8, 2019 (filed herewith) |
| 95 | Mine Safety Disclosures (filed herewith) |
| 99(a) | Schedule II – Valuation and Qualifying Accounts (filed herewith) |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

―――――――――

| * | Indicates management contract or other compensatory arrangement. |
| ** | Confidential treatment requested and/or approved as to certain portions, which portions have been omitted and filed separately with the Securities and Exchange Commission. |
| *** | Certain immaterial schedules and exhibits to this exhibit have been omitted pursuant to the provisions of Regulation S-K, Item 601(b)(2). A copy of any of the omitted schedules and exhibits will be furnished to the Securities and Exchange Commission upon request. |

158

Table of Contents

(c) Exhibits listed in Item 15(a)(3) above are incorporated herein by reference.

(d) The schedule listed above in Item 15(a)(1) and (2) is attached as  Exhibit 99(a) and incorporated herein by reference.

159

Table of Contents

**Item 16.**      ***Form 10-K Summary***

*None.*

160

A005649

Table of Contents

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

CLEVELAND-CLIFFS INC.

By:   /s/ R. C. Cebula
      _____
      Name:    R. Christopher Cebula
      Title:   Vice President, Corporate Controller &
               Chief Accounting Officer

Date:   February 8, 2019

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signatures | Title | Date |
|---|---|---|
| /s/ C. L. Goncalves<br>C. L. Goncalves | Chairman, President and<br>Chief Executive Officer<br>(Principal Executive Officer) | February 8, 2019 |
| /s/ T. K. Flanagan<br>T. K. Flanagan | Executive Vice President,<br>Chief Financial Officer<br>(Principal Financial Officer) | February 8, 2019 |
| /s/ R. C. Cebula<br>R. C. Cebula | Vice President, Corporate Controller &<br>Chief Accounting Officer<br>(Principal Accounting Officer) | February 8, 2019 |
| *<br>J. T. Baldwin | Director | February 8, 2019 |
| *<br>R. P. Fisher, Jr. | Director | February 8, 2019 |
| *<br>S. M. Green | Director | February 8, 2019 |
| M. A. Harlan | Director | N/A |
| J. L. Miller | Director | N/A |
| *<br>J. A. Rutkowski, Jr. | Director | February 8, 2019 |
| *<br>E. M. Rychel | Director | February 8, 2019 |
| *<br>M. D. Siegal | Director | February 8, 2019 |
| *<br>G. Stoliar | Director | February 8, 2019 |
| *<br>D. C. Taylor | Director | February 8, 2019 |

* The undersigned, by signing his name hereto, does sign and execute this Annual Report on Form 10-K pursuant to a Power of Attorney executed on behalf of the above-indicated officers and directors of the registrant and filed herewith as Exhibit 24 on behalf of the registrant.

By:   /s/ T. K. Flanagan
      _____
      (T. K. Flanagan, as Attorney-in-Fact)

161

A005650

CONFIDENTIAL MATERIAL HAS BEEN OMITTED AND FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION. ASTERISKS DENOTE SUCH OMISSIONS.

**CONFIDENTIAL**

**EXHIBIT 10.50**

### PELLET SALE AND PURCHASE AGREEMENT

**THIS AGREEMENT,** entered into, dated February 19, 2014 and effective as of January 1, 2014 ("Agreement"), by and among **CLIFFS SALES COMPANY**, an Ohio corporation ("Cliffs") and **AK STEEL CORPORATION,** a Delaware corporation ("AK Steel").

### RECITALS

**WHEREAS,** Cliffs desires to sell to AK Steel and AK Steel desires to purchase from Cliffs certain quantities of grades of iron ore pellets such grades of iron ore pellets, all upon the terms and subject to the conditions contained herein.

**NOW, THEREFORE,** in consideration of the mutual covenants hereinafter set forth, Cliffs and AK Steel agree as follows:

**Section 1 - Definitions**.

The terms quoted in the above parentheses of the first introductory paragraph of this Agreement and the WHEREAS clause, other terms quoted throughout this Agreement, and the terms defined below in this Section 1 shall have the meanings assigned to them for purposes of this Agreement.

(a)    "AK Steel Facilities" AK Steel's facilities in Middletown, OH or Ashland, KY.

(b)    "Cliffs Pellets" shall mean Tilden Pellets and, beginning in 2015 Contract year, United Pellets, or at any time during the term of this Agreement, any other mutually agreeable pellets produced at a mine affiliated with Cliffs.

(c)    "Contract Year" shall be a calendar year commencing on January 1 and ending December 31 during the Term of this Agreement.

(d)    "Lower Lakes Docks" shall mean the Torco Dock located near Toledo, Ohio and the Kinder Morgan Dock located near Ashtabula, Ohio or other mutually agreeable dock(s).

(e)    The word "pellets", as used herein, shall mean iron-bearing products obtained by the pelletizing of iron ore or iron ore concentrates, suitable for making iron in blast furnaces.

(f)    "Shipping Season" shall mean generally March 25 through January 15 of the following year, but may be adjusted by the Army Corps of Engineers.

(g)    "Term" shall mean January 1, 2014 through and including December 31, 2023.

(h)    "Tilden Pellets" shall mean Tilden hematite flux pellets from the Tilden mine in Ishpeming, Michigan.

(i)    The word "ton", as used herein, shall mean a gross ton of 2,240 pounds avoirdupois natural weight.

(j)    "United Pellets" shall mean United Taconite partial flux pellets from the United Taconite mine in Eveleth, Minnesota.

**Section 2. - Sale and Purchase/Tonnage**.

During each of the Contract Years 2014 through 2023, and each Contract Year thereafter as long as this Agreement remains in effect, Cliffs shall sell and deliver to AK Steel and AK Steel shall purchase and receive from Cliffs and pay for a tonnage of pellets ("AK Steel's Annual Pellet Tonnage") which tonnage shall be equal to:

1

CONFIDENTIAL MATERIAL HAS BEEN OMITTED AND FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION. ASTERISKS DENOTE SUCH OMISSIONS.

**CONFIDENTIAL**

(a)    For the Contract Year 2014, Cliffs shall sell and deliver to AK Steel, and AK Steel shall purchase and receive from Cliffs, and pay Cliffs for, a tonnage of Cliffs Pellets for use at AK Steel's Facilities that is \*\*\* tons of Cliffs Pellets, as defined below.

(b)    For the Contract Year 2015, Cliffs shall sell and deliver to AK Steel, and AK Steel shall purchase and receive from Cliffs, and pay Cliffs for, a tonnage of Cliffs Pellets for use at AK Steel's Facilities that is \*\*\* tons.

(c)    For each of the eight (8) Contract Years 2016 through and including 2023, Cliffs shall sell and deliver to AK Steel, and AK Steel shall purchase and receive from Cliffs, and pay Cliffs for, a tonnage of Cliffs Pellets for use at AK Steel's Facilities that is \*\*\* tons.

**Section 3. - Pellet Grades and Specifications**

(a)    Both AK Steel and Cliffs recognize the preference is for the supply of Tilden Pellets. Cliff may begin supplying AK Steel with United Pellets, or other mutually agreeable pellets, in the 2015 Contract Year. The United Pellets, or other mutually agreeable pellets, shall be limited to \*\*\* of the Annual Nomination for such Contract Year and for the Contract Years thereafter for the remainder of the Term of the Agreement. The parties shall mutually use commercially reasonable efforts to ensure that at any given time the United Pellets do not to exceed approximately \*\*\* of the total stockpiles of Cliffs Pellets located at the Lower Lakes Docks. The pellet typical analysis for Tilden Pellets is attached hereto as Exhibit A. The pellet typical analysis for United Pellets is attached hereto as Exhibit B.

(b)    The Parties agree to develop mutually agreeable key quality performance metrics for the supply of Cliffs Pellets through the term of this Agreement. The Parties will meet quarterly to discuss the key quality performance metrics as provided for in Exhibit A and Exhibit B, or other mutually agreeable pellets, as of the date entered into this Agreement and the progress with regard to the continuous improvement goals.

**Section 4. - Notification and Nomination.**

(a)    For each of the ten (10) Contract Years 2014 through and including 2023, AK Steel shall notify Cliffs in writing of AK Steel's preliminary nomination on or before November 15 of the preceding year ("Preliminary Nomination"), which Preliminary Nomination shall be consistent with Sections 2(a), (b) and (c) above.

(b)    As part of each Contract Years' Preliminary Nomination, AK Steel shall provide to Cliffs the percentage of the annual tonnage to be delivered to each of the Lower Lakes Docks ("Preliminary Annual Dock Schedule"). On or before August 1 of the then current Contract Year, AK Steel may, by written notification to Cliffs, adjust its Preliminary Annual Dock Schedule for the then current Contract Year by not more than \*\*\* up or down. After August 1 of a Contract Year AK Steel's Preliminary Annual Dock Schedule, including any adjustments, shall be final ("Final Annual Dock Schedule").

(c)    AK Steel may revise its Preliminary Nomination on or before the dates below, by the amounts set forth below, so long as the revised nominations are not less than the minimum tonnage and or greater than the maximum tonnage set forth in Sections 2(a), (b) and (c) above for each Contract Year.

(d)    For each of the Contract Years 2014 through and including 2016, AK Steel shall have an option to nominate up to \*\*\* tons ("Optional Tonnage") more than the maximum tonnage set forth in Sections 2(a), (b) and (c) above for such Contract Year which shall be included with its Preliminary Nomination on or before November 15 of the preceding year. If AK Steel elects to take a portion of or all of the Optional Tonnage greater than the maximum tonnage

2

CONFIDENTIAL MATERIAL HAS BEEN OMITTED AND FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION. ASTERISKS DENOTE SUCH OMISSIONS.

**CONFIDENTIAL**

set forth above, then the maximum tonnage plus the Optional Tonnage shall be fixed and final for such Contract Year and the adjustment dates set forth below shall not be applicable.

(e)    With respect to each Preliminary Nomination for each Contract Year beginning with 2014, on or before *** of the then current Contract Year of the purchase and sale, AK Steel may, by written notification to Cliffs, adjust its Preliminary Nomination for the then current Contract Year by not more than *** up or down.

(i)    For example, for the 2014 Contract Year, on ***, 2014 AK Steel may adjust its Preliminary Nomination up or down by not more than ***.  AK Steel may then again adjust its Preliminary Nomination up or down by not more than *** on or before ***, 2014. AK Steel may make a final adjustment to its Preliminary Nomination up or down by not more than *** on or before ***, 2014.

(f)    AK Steel shall be limited to *** adjustments to its Preliminary Nomination during a Contract Year.  AK Steel may not make any adjustments to its Preliminary Nomination after *** of any Contract Year, regardless of whether it has made one, two, three or no adjustments by ***.  After *** of a Contract Year AK Steel's Preliminary Nomination, including any adjustments, shall be final ("Final Nomination"), and AK Steel shall be obligated to purchase and Cliffs shall be obligated to sell such tonnage of Cliffs Pellets in accordance with such Final Nomination.

(g)    Beginning *** Contract year, as part of its Preliminary Nomination, AK Steel may nominate additional tonnage beyond the maximum tonnage set forth in Section 2(c) ("Excess Tonnage"). In addition to the Preliminary Nomination for the maximum tonnage for such Contract Year, AK Steel shall provide to Cliffs in writing its Excess Tonnage requirements on or before *** and Cliffs shall have thirty (30) days from the date of the request to determine whether Cliffs shall supply none, some or all of the requested Excess Tonnage.

(h)    In order to provide Cliffs with the necessary information to plan shipments of Cliffs Pellets, on *** of the then current Contract Year, AK Steel shall provide Cliffs with a monthly shipping schedule for the current year's shipping season (the "Shipping Schedule"). Thereafter, AK Steel shall provide an updated Shipping Schedule on the fifteenth day of each month through *** of the Contract Year.

(i).    Notwithstanding the foregoing, nothing contained in this Section 4 shall permit AK Steel to adjust its Preliminary Nomination in any manner which would result in a Final Nomination that is beyond the *** maximum or minimum of AK Steel's Annual Pellet Tonnage set forth in Section 2 of this Agreement.

**Section 5. - Price and Adjustments**.

(a). Cliffs Pellets delivered to Toledo, Ohio shall have a 2014 base price of $*** per ton iron unit ("Toledo Base Price"). Cliffs Pellets delivered to Ashtabula, Ohio shall have a 2014 base price of $*** per ton iron unit ("Ashtabula Base Price" and together with Toledo Base Price, "Base Prices").

(b).    Beginning in 2014, the Base Prices shall be adjusted, up or down, each year for the Contract Year in determination as follows:

i.        *** Change in PPI - *** as published by the U. S Bureau of Labor Statistics (*** i.e. for the Contract Year 2014, the adjustment will be based on the ***);

ii.        *** Change in PPI - *** as published by the U. S Bureau of Labor Statistics (*** i.e. for the Contract Year 2014, the adjustment will be based on the ***);

iii.        *** Change in PPI - *** as published by the U. S Bureau of Labor Statistics (*** i.e. for the Contract Year 2014, the adjustment will be based on the ***);

3

CONFIDENTIAL MATERIAL HAS BEEN OMITTED AND FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION. ASTERISKS DENOTE SUCH OMISSIONS.

**CONFIDENTIAL**

iv.      *** Change in the annual daily average *** (*** i.e. for the Contract Year 2014, the adjustment will be based on the ***);

v.      Sum the results obtained in (i) through (iv);

vi.      Multiply the results determined in (v) above by the preceding Contract Year's then adjusted prices per iron unit;

vii.      Add the results determined in (vi) above to the preceding Contract Year's then adjusted prices per iron unit to determine the current Contract Year's then adjusted prices per iron unit.

a.      On or before *** of the current Contract Year a provisional calculation to determine preliminary estimated adjusted prices will be made by Cliffs in a manner consistent with Section 5(b) based upon (i) the most recently published preliminary PPI data, or if not available using a commercially reasonable estimate, and (ii) the year-to-date annual daily average *** of the current Contract Year ("*** Adjustment"). The *** Adjustment will be used for calculating provisional prices (the "*** Provisional Pricing") for shipments of Cliffs Pellets from *** of the current Contract Year through *** of the Current Contract Year, however, the final index numbers will ultimately be used, when available to determine final adjusted prices. On or before *** of the current Contract Year a provisional calculation to determine estimated adjusted prices will be made by Cliffs in a manner consistent with Section 5(b) based upon (i) the finalized PPI data, if published, or if not available using a commercially reasonable estimate, and (ii) the year-to-date annual daily average *** as of *** of the current Contract Year ("*** Adjustment"). The *** Adjustment will be used for calculating provisional pricing will be made by Cliffs (the "*** Provisional Pricing") for shipments of Cliffs Pellets from *** of the current Contract Year through *** of the Current Contract Year, however, the final index numbers will ultimately be used, when available to determine adjusted prices. The *** Adjustment may result in an invoice ("*** Adjustment Invoice") based upon the difference between the *** Provisional Pricing and the *** Provisional Pricing for shipments of Cliffs Pellets from *** of the current Contract Year through *** of the Current Contract Year. The *** Price Adjustment Invoice may result in amounts due to or from AK Steel, as the case may be. Payment of the *** Price Adjustment Invoice shall be received by AK Steel or Cliffs, as the case may be, on or before *** of the current Contract Year. On or before *** of the year following the Contract Year a final calculation consistent with Section 5(b) and (c) utilizing all finalized data for the Contract Year in determination shall be generated by Cliffs and provided to AK Steel ("Final Price Adjustment Invoice"). The Final Price Adjustment Invoice may result in amounts due to or from AK Steel, as the case may be based upon the difference between the *** Provisional Pricing and the *** Provisional Pricing for shipments of Cliffs Pellets from *** of the current Contract Year through *** of the Current Contract Year. Payment of the Final Price Adjustment Invoice shall be received by AK Steel or Cliffs, as the case may be, on or before *** of the year following the Contract Year in determination. Additionally, the final calculation consistent with Section 5(b) used to prepare the Final Price Adjustment Invoice shall be used for shipments of Cliffs Pellets from ***.

(c)      An example of how to calculate a Contract Year's adjusted price per iron unit is attached hereto as Exhibit C.

(d)      In the event any of the above adjustment indices or the *** cease to be published and are no longer publicly available, then the parties agree that they shall negotiate a commercially reasonable substitute or new adjustment methodology that is representative of the intent of the parties in the above calculation. Such discussions shall proceed upon receipt of written notice by one party to the other party. Should the parties fail to reach a mutually

4

CONFIDENTIAL MATERIAL HAS BEEN OMITTED AND FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION. ASTERISKS DENOTE SUCH OMISSIONS.

CONFIDENTIAL

agreeable resolution within sixty (60) days of the date of receipt of the written notice, then the remaining indices and/or *** shall be increased on a prorata basis in place of the missing adjustment factor(s).

## Section 6. - Payments.

(a)    Cliffs shall invoice AK Steel for *** of Cliffs Pellets *** Cliffs Pellet shipments. If the payment date is a holiday then it shall be paid upon the following business day. Title and risk of loss shall transfer to AK Steel immediately upon receipt of payment by Cliffs. So long ***.

(b)    The Cliffs Pellets are sold to AK Steel with the understanding of the parties that the Cliffs Pellets are for consumption purposes only.  AK Steel may, at its expense, transfer and consume Cliffs Pellets at and among any of the AK Steel Facilities.  AK Steel may not transfer, sell, trade or otherwise dispose of the Cliffs Pellets to a third party without the prior written consent of Cliffs regardless of whether title has passed to AK Steel.

(c).    In the event AK Steel shall fail to make payment when due of any or all amounts, Cliffs, in addition to all other remedies available to Cliffs in law or in equity, shall have the right, but not the obligation, to withhold further performance by Cliffs under this Agreement until all claims Cliffs may have against AK Steel under this Agreement are fully satisfied.

(d).    All payments shall be made in U.S. dollars.

## Section 7. - Sampling and Analyses.

All pellet sampling procedures and analytical tests conducted on Cliffs Pellets sold to AK Steel to demonstrate compliance with typical specifications and analysis limits shall be performed on each pellet vessel shipment and shall be provided to AK Steel within seven (7) days of vessel loading. Sample and test methods shall be in accordance with Cliffs' existing practice and based on the appropriate ASTM or ISO standard methods published at the time of testing or the customary procedures and practices, or any other procedures and practices that may be mutually agreed to by Cliffs and AK Steel. AK Steel may, at any time and from time to time through one or more authorized representatives, and with prior notice to Cliffs, be present during production, loading, or to observe sampling and analysis of pellets being processed for shipment to AK Steel.

## Section 8. - Delivery and Transfer of Ownership.

(a)    Cliffs shall deliver to AK Steel the annual tonnage of Cliffs Pellets for AK Steel to the Lower Lakes Docks. Cliffs assumes the obligation for arranging and providing appropriate vessels for the transportation of the Cliffs Pellets delivered by Cliffs to the Lower Lakes Docks. Such delivery shall be in approximately equal amounts over the nine-month vessel Shipping Season. AK Steel will instruct the Lower Lakes Docks to segregate the Tilden Pellets from the United Pellets, which AK Steel shall notify Cliffs of such instructions.

(b)    Title, and all risk of loss, damage or destruction of Cliffs Pellets shall transfer to AK Steel upon receipt of payment as provided for in Section 6(a).

## Section 9. - Shipments.

Cliffs shall be responsible for delivering Cliffs Pellets to the Lower Lakes Docks in approximately equal amounts over the nine-month period of March 25 through January 15 ("Vessel Season"). During the term of this Agreement the parties will ensure that the Cliffs Pellets will be delivered by Cliffs on a prorata basis over the Vessel Season and taken by AK Steel on a prorata basis over ***. Each Vessel Season is determined by the U.S. Army Corps of Engineers and other uncontrollable factors, such as weather, and is subject to change.

5

A005655

CONFIDENTIAL MATERIAL HAS BEEN OMITTED AND FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION. ASTERISKS DENOTE SUCH OMISSIONS.

CONFIDENTIAL

**Section 10. - Weights**.

The weight determined by certified railroad scale weights, certified belt scale weights, or certified bin scale weights in accordance with the procedures in effect from time to time at each of the loading ports ***.

**Section 11. - Audit Rights**.

Cliffs shall have the right but not the obligation to audit AK Steel's consumption of pellets on a quarterly basis to determine and verify the accuracy of AK Steel's Annual Pellet Tonnage requirements.

**Section 12. - Freeze Protection**.

AK Steel shall have the right, but not the obligation, to apply at its cost freeze conditioning agents and/or tarping to Cliffs Pellets during periods of cold weather. In the event Cliffs sells to third parties pellets to which AK Steel has applied freeze protection and/or tarping, then Cliffs shall reimburse AK Steel for the cost of applying freeze conditioning agents and/or tarping to such pellets.

**Section 13. - Warranties**.

**THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, WHICH EXTEND BEYOND THE PROVISIONS OF THIS AGREEMENT, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR INTENDED PURPOSE**. All notices for substantial variance in specifications of the Cliffs Pellets from the specifications and analysis limits described in Exhibit A and B shall be given in writing delivered to Cliffs within Thirty (30) calendar days after completion of discharge of the Cliffs Pellets at the Lower Lakes Docks, or any claim arising from any substantial variance shall be deemed waived by AK Steel. Each party shall afford the other party prompt and reasonable opportunity to inspect the Cliffs Pellets as to which any notice is given as above stated. No claim will be entertained after the Cliffs Pellets have been consumed. The Cliffs Pellets shall not be returned to Cliffs without prior written consent of Cliffs. In no event shall either party be liable for the other's cost of processing, lost profits, injury to good will or any other special or consequential damages.

**Section 14. - Force Majeure**.

(a).    Force Majeure shall be defined as any unforeseeable event that delays or prevents a Party from performing, in whole or in part, any of its obligations under this Agreement due to any cause beyond the reasonable control of and not due to the fault or negligence of the declaring Party, including but not limited to acts of God, war, riots, civil insurrection, acts of the public enemy, terrorism, strikes, lockouts, natural disasters, breakdown of or damage to necessary facilities or equipment, transportation delays, orders or acts of civil or military authorities, legislation, regulation or administrative orders, or any limitation or prohibition on, or inability to obtain governmental permits or approvals required by law and necessary to, the mining, transporting, storing, or handling of iron ore, or other unforeseeable causes that are beyond the reasonable control and without the fault or negligence of the Party affected thereby. Notwithstanding the foregoing, Force Majeure, for purposes of this Agreement, shall not include (i) the ability of Cliffs to sell Cliffs Pellets to a third party at a price greater than the applicable price as set forth in Section 5 hereof; (ii) loss of AK Steel's markets; (iii) AK Steel's ability to purchase Cliffs Pellets from a third party at a price lower than the applicable price as set forth in Section 5 hereof; or (iv) financial difficulties of any kind.

6

CONFIDENTIAL

(b).    If because of Force Majeure either Cliffs or AK Steel is rendered wholly or partially unable to carry out its respective obligations under this Agreement, and if such Party promptly gives the other Party written notice of such Force Majeure in accordance with Paragraph 13(d) below, the obligations and liabilities of the Party giving such notice and the corresponding obligation of the other Party shall be excused to the extent made necessary by and during the continuance of such Force Majeure; provided, however, that the Party claiming Force Majeure shall use its best efforts to eliminate the cause or effect of the Force Majeure as soon as and to the extent possible except that labor disputes or strikes shall be settled at the sole discretion of the Party affected. To the extent possible, Cliffs and AK Steel shall utilize good faith efforts to minimize the adverse effects of a Force Majeure. AK Steel shall have the option to require Cliffs to make up any deliveries excused by reason of a Force Majeure (at the price existing as of the date of the occurrence of the Force Majeure) prior to the termination of this Agreement. Cliffs shall have the option to require AK Steel to make up any purchases excused by reason of Force Majeure (at the price existing as of the date of the occurrence of the Force Majeure) prior to the termination of this Agreement.

(c).    If Cliffs claims Force Majeure and is unable to meet all of its delivery obligations hereunder, or if AK Steel claims Force Majeure and is unable to meet all of its purchase obligations hereunder, then any reductions in Cliffs' deliveries or AK Steel's purchases (as applicable) shall be allocated on a pro rata basis with all other iron ore supply or purchase agreements involving iron ore of the same type and quality as the Cliffs Pellets. Upon a written request by the Party not claiming Force Majeure, the declaring Party shall provide reasonable written documentation to establish that its deliveries or purchases (as applicable) have been allocated on such a pro rata basis.

(d).    Should either Party experience an event of Force Majeure impacting its ability to perform its obligations under this Agreement, said Party shall provide written notice within ten (10) business days to the Party not claiming Force Majeure setting forth the date(s) on which the Force Majeure occurred, a brief description of the event of Force Majeure, and the estimated duration of the impact of the Force Majeure at that time.

(e).    If a Party declares a complete or partial Force Majeure based on damage to and/or unexpected conditions with respect to any real and/or personal property within its custody or control, then the Party not claiming Force Majeure and/or its appointed designee shall have the right to inspect (upon a written request) the property affected by the Force Majeure. The non-declaring Party shall choose the date and time of the inspection, however, such date and time must be consented to by the declaring Party, which consent shall not be unreasonably withheld. The declaring Party shall make such property available for inspection within twenty (20) Business Days after the Party not claiming Force Majeure requests the inspection. A Party is entitled to one such inspection per declared Force Majeure, but upon the written consent of the declaring Party, additional inspections may be permitted. Such consent shall not be unreasonably withheld.

<u>Section 15. - Notices</u>.

All notices, consents, reports and other documents authorized and required to be given pursuant to this Agreement shall be given in writing and either personally served on an officer of the parties hereto to whom it is given or mailed, postage prepaid, or sent by e-mail addressed as follows:

A005657

CONFIDENTIAL

If to Cliffs:

    200 Public Square - 32nd Floor
    Cleveland, Ohio 44114
    Attention: Senior Vice President Global Iron Ore Metallic Sales
    cc: Group Counsel - Commercial
    E-mail: Terrence.mee@cliffsnr.com
        Susanne.dickerson@cliffsnr.com

If to AK Steel:

    9227 Centre Pointe Drive
    West Chester, OH 45069
    Attn: Vice President - Engineering, Raw Materials & Energy
    E-mail: mo.reed@aksteel.com
    cc: Manager Raw Materials Purchasing
    E-mail: alexander.vincze@akstell.com

provided, however, that any party may change the address to which notices or other communications to it shall be sent by giving to the other party written notice of such change, in which case notices and other communications to the party giving the notice of the change of address shall not be deemed to have been sufficiently given or delivered unless addressed to it at the new address as stated in said notice.

**Section 16. - Term**.

    (a)   The Term of this Agreement shall commence as of January 1, 2014 and continue through December 31, 2023.

    (b)   This Agreement shall remain valid and fully enforceable for the fulfillment of obligations incurred prior to termination.

**Section 17. - Amendment**.

This Agreement may not be modified or amended except by an instrument in writing signed by the parties hereto.

**Section 18. - Merger, Transfer and Assignment**.

    (a)   AK Steel shall not merge, consolidate or reorganize with any person, partnership, corporation or other entity unless the surviving or resulting person, partnership, corporation or other entity assumes in writing all of AK Steel's obligations under this Agreement. Any obligations required to be assumed by a surviving or resulting person, partnership, corporation or entity in accordance with this Section 17(a) shall be limited to the AK Steel obligations under this Agreement, and this Section 17(a) is not intended (i) to impose and shall not be deemed to impose upon any such surviving or resulting person, partnership, corporation or entity, including AK Steel, any obligation with respect to any pellet requirements it may have for any facility or facilities it owns or operates other than AK Steel, nor (ii) to allow the surviving or resulting person, partnership, corporation or other entity to substitute any other pellet tonnage available from any other pellet purchase or pellet equity commitment of such surviving or resulting person, partnership, corporation or other entity in order to satisfy the assumed obligations under this Agreement for AK Steel .

    (b)   AK Steel shall not sell or transfer all or any of the blast furnace operations at AK Steel to any other person, partnership, corporation, joint venture or other entity ("Transferee") unless the Transferee assumes in writing all of AK Steel's obligations under this Agreement, as such obligations relate to AK Steel being sold or transferred. Any obligations required to be assumed by a Transferee in accordance with this Section 17(b) shall be limited to the

A005658

CONFIDENTIAL

AK Steel obligations under this Agreement relating to the particular facility or facilities sold or transferred. This Section 17(b) is not intended (i) to impose and shall not be deemed to impose upon any such Transferee any obligation with respect to any pellet requirements such Transferee may have for any facility or facilities such Transferee owns or operates other than AK Steel , nor (ii) to allow such Transferee to substitute any other pellet tonnage available from any other pellet purchase or pellet equity commitment of such Transferee in order to satisfy the assumed obligations under this Agreement.

(c)    AK Steel shall not assign its rights or delegate its obligations under this Agreement except as provided in Section 17(a) or 17(b).

(d)    Cliffs shall not merge, consolidate or reorganize with any person, partnership, corporation or other entity unless the surviving or resulting person, partnership, corporation or other entity assumes in writing all of Cliffs' obligations under this Agreement. Cliffs shall not sell or transfer all or substantially all of its iron ore business to any other person, partnership, corporation, joint venture or other entity ("Cliffs Transferee") unless the Cliffs Transferee assumes in writing all of Cliffs' obligations under this Agreement.

(e)    Cliffs shall not assign its rights or delegate its obligations under this Agreement except as provided in Section 17(d).

(f)    All the covenants, stipulations and agreements herein contained shall inure to the benefit of and bind the parties hereto and their respective successors, transferees and permitted assigns, and any of the latter's subsequent successors, transferees and permitted assigns.

**Section 19. - Waiver**.

No waiver of any of the terms of this Agreement shall be valid unless in writing. No waiver or any breach of any provision hereof or default under any provisions hereof shall be deemed a waiver of any subsequent breach or default of any kind whatsoever.

**Section 20. - Confidentiality**.

(a)    Cliffs and AK Steel acknowledge that this Agreement contains certain pricing, adjustment and term provisions which are confidential, proprietary or of a sensitive commercial nature and which would put Cliffs or AK Steel at a competitive disadvantage if disclosed to the public, including without limitation, Section 2, Section 3, Section 4, Section 5, Section 6 and all of the Schedules, Appendices and Exhibits hereto ("Confidential Information"). Cliffs and AK Steel agree that all provisions of this Agreement shall be kept confidential and, without the prior written consent of the other party, shall not be disclosed to any party not a party to this Agreement except as required by law or governmental or judicial order and except that disclosure of the existence of this Agreement shall not be precluded by this Section 19.

(b)    If either party is required by law or governmental or judicial order or receives legal process or court or agency directive requesting or requiring disclosure of any of the Confidential Information contained in this Agreement, such party will promptly notify the other party prior to disclosure to permit such party to seek a protective order or take other appropriate action to preserve the confidentiality of such Confidential Information. If either party determines to file this Agreement with the Securities and Exchange Commission ("Commission") or any other federal, state or local governmental or regulatory authority, or with any stock exchange or similar body, such determining party will use its best efforts to obtain confidential treatment of such Confidential Information pursuant to any applicable rule, regulation or procedure of the Commission and any applicable rule, regulation or procedure relating to confidential filings made

9

CONFIDENTIAL

with any such other authority or exchange. If the Commission (or any such other authority or exchange) denies such party's request for confidential treatment of such Confidential Information, such party will use its best efforts to obtain confidential treatment of the portions thereof that the other party designates. Each party will allow the other party to participate in seeking to obtain such confidential treatment for Confidential Information.

**Section 21. - Governing Law and Arbitration**.

(a)    This Agreement shall in all respects, including matters of construction, validity and performance, be governed by and be construed in accordance with the laws of the State of Ohio, excluding its choice of law principles.

(b)    Upon notice by either party to the other, all disputes, claims, questions or disagreements arising out of or relating to this Agreement, breach, termination, enforcement, interpretation or validity of this Agreement, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration administered by the American Arbitration Association in accordance with the provisions of its Commercial Arbitration Rules, modified as follows:

(i).    The place of arbitration shall be Cleveland, Ohio;

(ii).    Unless the parties consent in writing to a lesser number, the arbitration proceedings shall be conducted before a panel of three neutral arbitrators, one to be appointed by Cliffs, one to be appointed by AK Steel, and the third to be selected by the two arbitrators.  None of the arbitrators shall be an employee, officer, director or consultant of, or of a direct competitor of, AK Steel or Cliffs;

(iii).    Either party may apply to the arbitrators seeking injunctive relief until the arbitration award is rendered or the controversy is otherwise resolved. Either party also may, without waiving any remedy under this Agreement, seek from any court having jurisdiction any interim or provisional relief that is necessary to protect the rights or property of that party, pending the establishment of the arbitral tribunal (or pending the arbitral tribunal's determination of the merits of the controversy);

(iv).    Consistent with the expedited nature of arbitration, each party will, upon the written request of the other party, promptly provide the other with copies of documents on which the producing party may rely or otherwise which may be relevant in support of or in opposition to any claim or defense; any dispute regarding discovery, or the relevance or scope thereof, shall be determined by the arbitrators, which determination shall be conclusive; and all discovery shall be completed within forty-five (45) days following the appointment of the arbitrators;

(v).    In connection with any arbitration arising out of this Agreement, the arbitrators shall have no authority to alter, amend, or modify any of the terms and conditions of this Agreement, and further, the arbitrators may not enter any award that alters, amends or modifies terms or conditions of this Agreement in any form or manner;

(vi).    The arbitration shall be "Baseball Style" wherein each party shall submit to the arbitrators and exchange with each other in advance of the hearing their last, best offers. The arbitrators shall be limited to awarding only one or the other of the two figures submitted;

(vii).    The award or decision shall be made within nine (9) months of the filing of the notice of intention to arbitrate, and the arbitrators shall agree to comply with this schedule before accepting appointment; *provided, however*, that this time limit may be extended by written agreement signed by both parties or by the arbitrators, if necessary; and

(viii).    In connection with any arbitration related to this Agreement, each party shall be responsible for its own costs and expenses, and the parties will equally split the cost of conducting the arbitration itself.

10

CONFIDENTIAL

(c)    The judgment of the arbitrators shall be final and binding on the parties, and judgment upon the award rendered by the arbitrators may be entered and enforced by any court of the United States or any state thereof. The arbitrators shall render their final decision within nine (9) months of the filing of the arbitration demand.

### Section 22. - Representations and Warranties.

(a)    AK Steel represents and warrants to Cliffs that (i) the execution and delivery of this Agreement by AK Steel and the performance of its obligations hereunder have been duly authorized by all requisite corporate action, (ii) neither the execution and delivery of this Agreement, nor the performance of its obligations hereunder by AK Steel shall, or after the lapse of time or giving of notice shall, conflict with, violate or result in a breach of, or constitute a default under any certificate of incorporation or bylaws of AK Steel or any law, statute, rule or regulation applicable to it, or conflict with, violate or result in a breach of or constitute a default under the material agreement to which it is a party or by which it or any of its properties is bound, or any judgment, order, award or decree to which AK Steel is a party or by which it is bound, or require any approval, consent, authorization or other action by any court, governmental authority or regulatory body or any creditor of AK Steel or any other person or entity, and (iii) this Agreement constitutes a valid and binding obligation of AK Steel and is enforceable against AK Steel in accordance with its terms.

(b)    Cliffs represents and warrants to AK Steel that: (i) the execution and delivery of this Agreement by Cliffs and the performance of its obligations hereunder have been duly authorized by all requisite corporate actions, (ii) neither the execution and delivery of this Agreement nor the performance of its obligations hereunder by Cliffs shall, or after the lapse of time or giving of notice shall, conflict with, violate or result in a breach of, or constitute a default under any articles of incorporation or regulations of Cliffs or any law, statute, rule or regulation applicable to it, or conflict with, violate or result in the breach of or constitute a default under any material agreement to which it is a party or by which it or any of its properties is bound, or any judgment, order, award or decree to which Cliffs is a party or by which it is bound, or require any approval, consent, authorization or other action by any court, governmental authority or regulatory body or any creditor of Cliffs or any other person or entity, and (iii) this Agreement constitutes a valid and binding obligation of Cliffs and is enforceable against Cliffs in accordance with its terms.

### Section 23. - Counterparts.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and may be delivered by electronic transmission.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

11

CONFIDENTIAL

**Section 23. - Severability**.

In the event any of the provision, or portions thereof, in this Agreement are held to be unenforceable or invalid by any court of competent or arbitration panel, the validity and enforceability of the remaining provisions, or portions thereof, shall not be affected thereby.

**IN WITNESS WHEREOF,** the parties have executed this Agreement effective as of the date first written above.

**CLIFFS SALES COMPANY**                         **AK STEEL CORPORATION**

By:    /s/ P. Kelly Tompkins                 By:    /s/ Mo Reed

Name:  P. Kelly Tompkins                       Name:  Mo Reed

Title:                                             Title:  VP Engineering, Raw Materials & Energy

Date:  2/27/2014                              Date:  2/20/2014

A005662

CONFIDENTIAL MATERIAL HAS BEEN OMITTED AND FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION. ASTERISKS DENOTE SUCH OMISSIONS.

**CONFIDENTIAL**

EXHIBIT A

CLIFFS SALES COMPANY

AK STEEL CORPORATION

PELLET TYPICAL ANALYSIS AS LOADED TO VESSEL FOR SHIPMENT

| | Report Frequency | TILDEN HEMATITE | | |
|---|---|---|---|---|
| | | Typical | Minimum | Maximum |
| **Moisture** | V | *** | | *** |
| **A. DRY CHEMICAL ANALYSIS** | | | | |
| Fe | V | 61.0 | | |
| SiO2 | V | *** | *** | *** |
| Al2O3 | V | *** | *** | *** |
| CaO | V | *** | *** | *** |
| MgO | V | *** | *** | *** |
| Mn | V | *** | | |
| Phos | V | *** | | *** |
| CaO / SiO2 | V | *** | *** | *** |
| | | | | |
| **B. SIZING, Wt. %** | | | | |
| % + 1/2" | V | *** | | *** |
| % - 1/2" x + 3/8" | V | *** | *** | |
| % - 1/4" | V | *** | *** | |
| | | | | |
| **C. TUMBLE TEST** | | | | |
| % + 1/4" before tumble | V | *** | *** | |
| % + 1/4" after tumble | V | *** | *** | |
| | | | | |
| **D. COMPRESSION TEST** | | | | |
| Minus 1/2" by plus 3/8" | V | *** | *** | |
| % - 300 lbs | V | *** | | *** |
| | | | | |
| **D. METALLURGICAL TESTS** | | | | |
| LTB | V | *** | *** | |
| Reducibility R40 | V | *** | *** | |

**LETTER "V" DENOTES THAT ANALYSIS TO BE PROVIDED ON EACH VESSEL SHIPMENT OF PELLETS**

13

CONFIDENTIAL MATERIAL HAS BEEN OMITTED AND
FILED SEPARATELY WITH THE SECURITIES AND
EXCHANGE COMMISSION. ASTERISKS DENOTE SUCH
OMISSIONS.

**CONFIDENTIAL**

EXHIBIT B

CLIFFS SALES COMPANY

AK STEEL CORPORATION

PELLET TYPICAL ANALYSIS AS LOADED TO VESSEL FOR SHIPMENT

| | Report Frequency | UNITED TACONITE PARTIAL FLUX | | |
| --- | --- | --- | --- | --- |
| | | Typical | Minimum | Maximum |
| **Moisture** | V | *** | | |
| **A. DRY CHEMICAL ANALYSIS** | V | | | |
| Fe | V | 65.2 | *** | |
| SiO2 | V | *** | *** | *** |
| Al2O3 | V | *** | | |
| CaO | V | *** | | |
| MgO | V | *** | | |
| Mn | V | *** | | |
| Phos | V | *** | | *** |
| **B. SIZING, Wt. %** | | | | |
| % + 1/2" | V | *** | | |
| % - 1/2" x + 3/8" | V | *** | *** | |
| **C. TUMBLE TEST** | | | | |
| % + 1/4" before tumble | V | *** | *** | |
| % + 1/4" after tumble | V | *** | *** | |
| **D. COMPRESSION TEST** | | | | |
| Minus 1/2" by plus 3/8" | V | *** | *** | |
| % - 300 lbs | V | *** | | |
| **D. METALLURGICAL TESTS** | | | | |
| LTB | V | *** | *** | |
| Reducibility R40 | V | *** | *** | |

**LETTER "V" DENOTES THAT ANALYSIS TO BE PROVIDED ON EACH VESSEL SHIPMENT OF PELLETS**

14

CONFIDENTIAL MATERIAL HAS BEEN OMITTED AND FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION. ASTERISKS DENOTE SUCH OMISSIONS.

**CONFIDENTIAL**

EXHIBIT C

CLIFFS SALES COMPANY

AK STEEL CORPORATION

EXAMPLE OF 2014 - 2023 ANNUAL PELLET PRICE CALCULATION

| | |
|---|---|
| **2014 Pellet Price Calculation** | |
| (All dollar values and index percent changes are estimated for illustrative purposes only.) | |
| | |
| Percent Change in PPI - *** (***) [1] | *** |
| **Percent Change in PPI - *** ** | *** |
| | |
| Percent Change in PPI - *** (***) [1] | *** |
| **Percent Change in PPI - *** ** | *** |
| | |
| Percent Change in PPI - *** (***) [1] | *** |
| **Percent Change in PPI *** ** | *** |
| | |
| *** arithmetic average of each *** [2] | *** |
| *** arithmetic average of each *** price [2] | *** |
| Percent Change in *** (***) | *** |
| **Percent Change in *** ** | *** |
| | |
| **Total Adjustment Factors Percent Change** | *** |
| | |
| | |
| 2014 Base Price Per Iron Unit Delivered to Toledo, OH | *** |
| Per Iron Unit Price Change | *** |
| **Final 2014 Price Per Iron Unit Delivered to Toledo, OH** | *** |
| | |
| 2014 Base Price Per Iron Unit Delivered to Ashtabula, OH | *** |
| Per Iron Unit Price Change | *** |
| **Final 2014 Price Per Iron Unit Delivered to Ashtabula, OH** | *** |

[1] As published by the Bureau of Labor Statistics, based on a ***

[2] ***

15

**Exhibit 21**

**SIGNIFICANT SUBSIDIARIES**
**CLEVELAND-CLIFFS INC. AS OF DECEMBER 31, 2018**

| Name | Cliffs' Effective Ownership | Place of Incorporation |
|------|------|------|
| Cliffs Mining Company | 100% | Delaware, USA |
| Cliffs Minnesota Mining Company | 100% | Delaware, USA |
| Cliffs TIOP Holding, LLC | 100% | Delaware, USA |
| Cliffs TIOP, Inc. | 100% | Michigan, USA |
| Cliffs UTAC Holding LLC | 100% | Delaware, USA |
| The Cleveland-Cliffs Iron Company | 100% | Ohio, USA |
| Northshore Mining Company | 100% | Michigan, USA |

**Exhibit 23**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in:

Registration Statement No. 333-215980 on Form S-3 pertaining to the registration of an indeterminate number of common shares, preferred stock, depositary shares, warrants and subscription rights as well as an indeterminate amount of debt securities that may from time to time be issued at indeterminate prices;

Registration Statement No. 333-56661 on Form S-8 (as amended by Post-Effective Amendment No.1) pertaining to the Northshore Mining Company and Silver Bay Power Company Retirement Savings Plan and the related prospectus;

Registration Statement No. 333-184620 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2012 Incentive Equity Plan;

Registration Statement No. 333-197687 on Form S-8 pertaining to the Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan;

Registration Statement No. 333-197688 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2014 Nonemployee Directors' Compensation Plan;

Registration Statement No. 333-204369 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan;

Registration Statement No. 333-206487 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2015 Employee Stock Purchase Plan;

Registration Statement No. 333-210954 on Form S-8 pertaining to the Cliffs Natural Resources Inc. Amended and Restated 2014 Nonemployee Directors' Compensation Plan; and

Registration Statement No. 333-217506 on Form S-8 pertaining to the Cliffs Natural Resources Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan.

of our reports dated February 8, 2019, relating to the consolidated financial statements and financial statement schedule of Cleveland-Cliffs Inc. (which report expresses an unqualified opinion and includes an explanatory paragraph relating to the Company's change to its method of accounting for revenue by adopting FASB ASC 606, *Revenue from Contracts with Customers* ), and the effectiveness of Cleveland-Cliffs Inc.'s internal control over financial reporting, appearing in this Annual Report on Form 10-K of Cleveland-Cliffs Inc. for the year ended December 31, 2018.

*/s/ DELOITTE & TOUCHE LLP*

Cleveland, Ohio
February 8, 2019

Exhibit 24

**POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS, that the undersigned Directors and officers of Cleveland-Cliffs Inc., an Ohio corporation ("Company"), hereby constitute and appoint C. Lourenco Goncalves, Timothy K. Flanagan, James D. Graham and R. Christopher Cebula, and each of them, their true and lawful attorney or attorneys-in-fact, with full power of substitution and revocation, for them and in their name, place and stead, to sign on their behalf as a Director or officer of the Company, or both, as the case may be, an Annual Report on Form 10-K pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2018, and to sign any and all amendments to such Annual Report, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorney or attorneys-in-fact, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as they might or could do in person, hereby ratifying and confirming all that said attorney or attorneys-in-fact or any of them or their substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Executed as of the 7th day of February, 2019.

| | |
|---|---|
| /s/ C. L. Goncalves | /s/ T. K. Flanagan |
| C. L. Goncalves,<br>Chairman, President and Chief Executive Officer | T. K. Flanagan,<br>Executive Vice President, Chief Financial Officer |
| /s/ R. C. Cebula | /s/ J. T. Baldwin |
| R. C. Cebula,<br>Vice President, Corporate Controller & Chief Accounting Officer | J. T. Baldwin, Director |
| /s/ R. P. Fisher, Jr. | /s/ S. M. Green |
| R. P. Fisher, Jr., Director | S. M. Green, Director |
| /s/ J. A. Rutkowski, Jr. | /s/ E. M. Rychel |
| J. A. Rutkowski, Jr., Director | E. M. Rychel, Director |
| /s/ M. D. Siegal | /s/ G. Stoliar |
| M. D. Siegal, Director | G. Stoliar, Director |
| /s/ D. C. Taylor | |
| D. C. Taylor, Director | |

Exhibit 31.1

**CERTIFICATION**

I, Lourenco Goncalves, certify that:

1.    I have reviewed this annual report on Form 10-K of Cleveland-Cliffs Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)), for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected or is reasonably likely to materially affect the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    February 8, 2019            By:    /s/ Lourenco Goncalves
                                            Lourenco Goncalves
                                            Chairman, President and Chief Executive Officer

Exhibit 31.2

**CERTIFICATION**

I, Timothy K. Flanagan, certify that:

1.    I have reviewed this annual report on Form 10-K of Cleveland-Cliffs Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)), for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected or is reasonably likely to materially affect the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    February 8, 2019         By:    /s/ Timothy K. Flanagan
_____
                                          Timothy K. Flanagan
                                          Executive Vice President, Chief Financial Officer

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Cleveland-Cliffs Inc. (the "Company") on Form 10-K for the period ended   December 31, 2018, as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), I, Lourenco Goncalves, Chairman, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1)     The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)     The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date:     February 8, 2019

By:   /s/ Lourenco Goncalves
Lourenco Goncalves
Chairman, President and Chief Executive Officer

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Cleveland-Cliffs Inc. (the "Company") on Form 10-K for the period ended   December 31, 2018, as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), I, Timothy K. Flanagan, Executive Vice President, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1)     The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)     The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date:     February 8, 2019

By:  /s/ Timothy K. Flanagan
Timothy K. Flanagan
Executive Vice President, Chief Financial Officer

**Exhibit 95**

**Mine Safety Disclosures**

The operation of our mines located in the United States is subject to regulation by MSHA under the FMSH Act. MSHA inspects these mines on a regular basis and issues various citations and orders when it believes a violation has occurred under the FMSH Act. We present information below regarding certain mining safety and health citations that MSHA has issued with respect to our mining operations. In evaluating this information, consideration should be given to factors such as: (i) the number of citations and orders will vary depending on the size of the mine; (ii) the number of citations issued will vary from inspector to inspector and mine to mine, and (iii) citations and orders can be contested and appealed and, in that process, are often reduced in severity and amount, and are sometimes dismissed.

Under the Dodd-Frank Act, each operator of a coal or other mine is required to include certain mine safety results within its periodic reports filed with the SEC. As required by the reporting requirements included in §1503(a) of the Dodd-Frank Act, we present the following items regarding certain mining safety and health matters, for the period presented, for each of our mine locations that are covered under the scope of the Dodd-Frank Act:

(A)   The total number of violations of mandatory health or safety standards that could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard under section 104 of the FMSH Act (30 U.S.C. 814) for which the operator received a citation from MSHA;

(B)   The total number of orders issued under section 104(b) of the FMSH Act (30 U.S.C. 814(b));

(C)   The total number of citations and orders for unwarrantable failure of the mine operator to comply with mandatory health or safety standards under section 104(d) of the FMSH Act (30 U.S.C. 814(d));

(D)   The total number of imminent danger orders issued under section 107(a) of the FMSH Act (30 U.S.C. 817(a));

(E)   The total dollar value of proposed assessments from MSHA under the FMSH Act (30 U.S.C. 801 et seq.);

(F)   Legal actions pending before the Federal Mine Safety and Health Review Commission involving such coal or other mine as of the last day of the period;

(G)   Legal actions initiated before the Federal Mine Safety and Health Review Commission involving such coal or other mine during the period; and

(H)   Legal actions resolved before the Federal Mine Safety and Health Review Commission involving such coal or other mine during the period.

During the year ended December 31, 2018, our U.S. mine locations did not receive any flagrant violations under Section 110(b)(2) of the FMSH Act, no orders issued under Section 104(b) of the FMSH Act, and no written notices of a pattern of violations, or the potential to have a pattern of such violations, under section 104(e) of the FMSH Act. In addition, there were no mining-related fatalities at any of our U.S. mine locations during this same period.

Following is a summary of the information listed above for the year ended December 31, 2018:

| Mine Name/ MSHA ID No. | Operation | (A) Section 104 S&S Citations | (B) Section 104(b) Orders | (C) Section 104(d) Orders | (D) Section 107(a) Citations & Orders | (E) Total Dollar Value of MSHA Proposed Assessments (1) | (F) Legal Actions Pending as of Last Day of Period | | (G) Legal Actions Initiated During Period | (H) Legal Actions Resolved During Period |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Year Ended December 31, 2018 | | | | |
| Tilden / 2000422 | Iron Ore | 39 | — | — | — | $ 870,361 | 13 | (2) | 7 | 10 |
| Empire / 2001012 | Iron Ore | — | — | — | — | $ — | — | | — | — |
| Northshore Plant / 2100831 | Iron Ore | 48 | — | — | — | $ 303,879 | 11 | (3) | 9 | 3 |
| Northshore Mine / 2100209 | Iron Ore | 6 | — | — | — | $ 818 | — | | — | — |
| Hibbing / 2101600 | Iron Ore | 19 | — | 3 | — | $ 198,213 | 9 | (4) | 9 | 4 |
| United Taconite Plant / 2103404 | Iron Ore | 5 | — | — | — | $ 44,013 | — | | — | — |
| United Taconite Mine / 2103403 | Iron Ore | 3 | — | — | — | $ 1,844 | — | | — | — |

(1)    Amounts included under the heading "Total Dollar Value of MSHA Proposed Assessments" are the total dollar amounts for proposed assessments received from MSHA on or before December 31, 2018.

(2)    This number consists of 12 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules and 1 pending legal action related to complaints of discharge, discrimination, or interference referenced in Subpart E of FMSH Act's procedural rules.

(3)    This number consists of 11 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules.

(4)    This number consists of 8 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules and 1 pending legal action related to complaints of discharge, discrimination, or interference referenced in Subpart E of FMSH Act's procedural rules.

**Exhibit 99(a)**

**Cleveland-Cliffs Inc. and Subsidiaries**
**Schedule II – Valuation and Qualifying Accounts**
**(In Millions)**

| Classification | Balance at Beginning of Year | Additions — Charged to Cost and Expenses | Additions — Charged to Other Accounts | Acquisition | Deductions | Balance at End of Year |
|---|---|---|---|---|---|---|
| Year Ended December 31, 2018: | | | | | | |
| Deferred Tax Valuation Allowance | $ 1,983.1 | $ (691.3) | $ (4.5) | $ — | $ — | $ 1,287.3 |
| Year Ended December 31, 2017: | | | | | | |
| Deferred Tax Valuation Allowance | $ 3,095.1 | $ (1,120.0) | $ (9.8) | $ 17.8 | $ — | $ 1,983.1 |
| Year Ended December 31, 2016: | | | | | | |
| Deferred Tax Valuation Allowance | $ 3,099.8 | $ (7.6) | $ 5.1 | $ — | $ 2.2 | $ 3,095.1 |
| Accounts Receivable Allowance | $ 7.1 | $ — | $ (7.1) | $ — | $ — | $ — |

# EXHIBIT 95

A005676

<div align="center">

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

# FORM 10-K

</div>

☒    Annual Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2019

<div align="center">OR</div>

☐    Transition Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the transition period from    to

<div align="center">

Commission File No. 1-13696

# AK STEEL HOLDING CORPORATION

(Exact name of registrant as specified in its charter)

</div>

| | |
|---|---|
| **Delaware** | **31-1401455** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

<div align="center">

**9227 Centre Pointe Drive, West Chester, Ohio 45069**

(Address of principal executive offices, including zip code)

Registrant's telephone number, including area code: **(513) 425-5000**

Securities registered pursuant to Section 12(b) of the Act:

</div>

| Title of Each Class | Trading Symbol | Name of Each Exchange on Which Registered |
|---|---|---|
| **Common Stock $0.01 Par Value** | **AKS** | **The New York Stock Exchange** |

<div align="center">Securities registered pursuant to Section 12(g) of the Act: None</div>

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act.  Yes ☐ No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months. Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer ☐ | Non-accelerated filer ☐ |
| Smaller reporting company ☐ | | Emerging growth company ☐ | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company as defined in Rule 12b-2 of the Securities Exchange Act of 1934.  Yes ☐ No ☒

Aggregate market value of the registrant's voting stock held by non-affiliates at June 30, 2019: $743,645,887
There were 316,909,268 shares of common stock outstanding as of February 18, 2020.

<div align="center">

**DOCUMENTS INCORPORATED BY REFERENCE**

</div>

The information required to be furnished pursuant to Part III of this Form 10-K will be set forth in, and incorporated by reference

from, the registrant's definitive proxy statement for the annual meeting of stockholders (the "2020 Proxy Statement"), which will be filed with the Securities and Exchange Commission not later than 120 days after the end of the fiscal year ended December 31, 2019.

**AK Steel Holding Corporation**
**Table of Contents**

| | | Page |
|---|---|---|
| ***PART I*** | | |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 10 |
| Item 1B. | Unresolved Staff Comments | 18 |
| Item 2. | Properties | 18 |
| Item 3. | Legal Proceedings | 19 |
| Item 4. | Mine Safety Disclosures | 19 |
| ***PART II*** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 19 |
| Item 6. | Selected Financial Data | 22 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 22 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 38 |
| Item 8. | Financial Statements and Supplementary Data | 39 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 90 |
| Item 9A. | Controls and Procedures | 90 |
| Item 9B. | Other Information | 93 |
| ***PART III*** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 93 |
| Item 11. | Executive Compensation | 93 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 93 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 93 |
| Item 14. | Principal Accounting Fees and Services | 93 |
| ***PART IV*** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 94 |
| Item 16. | Form 10-K Summary | 98 |
| | Signatures | 99 |

-i-

*Table of Contents*

(Dollars in millions, except per share and per ton amounts or as otherwise specifically noted)

## PART I

**Item 1.**            **Business.**

### Overview

AK Steel Holding Corporation ("AK Holding") was formed under the laws of Delaware in 1993. Through its wholly owned subsidiary, AK Steel Corporation ("AK Steel"), it is a leading producer of flat-rolled carbon, stainless and electrical steel products, primarily for the automotive, infrastructure and manufacturing, and distributors and converters markets. Other subsidiaries also provide customer solutions with carbon and stainless steel tubing products, advanced-engineered solutions, tool design and build, hot- and cold-stamped steel components, and complex assemblies. AK Steel is the successor to Armco Inc. and has built upon Armco's rich history of creating leading-edge steel innovations since its formation in 1899. Unless the context indicates otherwise, references to "we," "us" and "our" refer to AK Holding and its subsidiaries.

Our mission is to create innovative, high-quality steel solutions for our customers and our key values of safety, quality, productivity and innovation, along with environmental responsibility and sustainability, are its foundation. We have approximately 9,300 employees in North America and Europe, as well as manufacturing operations across seven states in the eastern U.S., Canada and Mexico.

Our corporate strategy is comprised of three pillars:
- commercializing our innovative new products and services;
- transforming our operations to significantly improve our competitive position; and
- driving future growth into new markets and downstream businesses.

On December 2, 2019, we entered into an Agreement of Plan of Merger (as it may be amended from time to time, the "Merger Agreement") among us, Cleveland-Cliffs Inc. ("Cliffs") and Pepper Merger Sub Inc., a direct, wholly owned subsidiary of Cliffs ("Merger Sub"), pursuant to which, subject to the satisfaction or (to the extent permissible) waiver of the conditions set forth therein, Cliffs will acquire AK Holding by way of the merger of Merger Sub with and into AK Holding (the "Merger"), with AK Holding surviving such Merger as a wholly owned subsidiary of Cliffs. Under the terms of the Merger Agreement, at the effective time of the Merger, AK Holding stockholders will be entitled to receive 0.40 Cliffs common shares for each outstanding share of AK Holding common stock they own at the effective time. Upon completion of the proposed Merger, it is expected that AK Holding stockholders will own approximately 32% and Cliffs shareholders will own approximately 68% of the combined company on a fully diluted basis. We expect to complete the Merger in the first quarter of 2020, subject to the receipt of customary regulatory and stockholder approvals and the satisfaction or (to the extent permissible) waiver of the other closing conditions under the Merger Agreement. See the discussion under *Cleveland-Cliffs Acquisition* in Item 7 for additional information.

### Customers and Markets

We target customers who require comprehensive steel solutions that involve the most technically demanding, highest-quality steel products, "just-in-time" delivery, technical support and product development leadership. Our research and engineering expertise, robust product quality and delivery capabilities, as well as our emphasis on collaborative customer technical support and product planning, are critical factors in our ability to serve our customer markets. Our strategy is to focus on markets for our steel solutions that deliver higher margins, where possible, and reduce amounts sold into the typically lower-margin commodity spot markets, which have experienced substantial volatility in pricing over the past several years primarily as a result of shifting international trade environments and related effects on the domestic markets we serve.

We sell our products to customers in three broad market categories: (i) automotive; (ii) infrastructure and manufacturing, which includes electrical power; and (iii) distributors and converters. The following table presents the percentage of our net sales to each of these markets:

| Market | 2019 | 2018 | 2017 |
|---|---|---|---|
| Automotive | 66% | 63% | 65% |
| Infrastructure and Manufacturing | 16% | 15% | 16% |
| Distributors and Converters | 18% | 22% | 19% |

We sold approximately 70% of our flat-rolled steel shipments in 2019 under fixed base price contracts. These contracts are typically one year in duration and expire at various times throughout the year. Some of these contracts have a surcharge mechanism that passes

- 1-

*Table of Contents*

through certain changes in input costs. We sold the remainder of our flat-rolled steel shipments in 2019 into the spot market at prevailing market prices or under contracts that involve variable pricing that is tied to an independently published steel index.

*Automotive Market*

The automotive industry is our core market, and we aim to address the principal needs of major automotive manufacturers and their suppliers. We specialize in manufacturing difficult-to-produce, high-quality steel products, combined with demanding delivery performance, customer technical support and collaborative relationships, to develop breakthrough steel solutions that help our customers meet their product requirements. In addition, many of our competitors do not have the capability to supply the full portfolio of products that we make for our automotive customers, such as steel for exposed automotive applications, the most sophisticated grades of advanced high-strength steels ("AHSS") and value-added stainless steel products. The exacting requirements for servicing the automotive market generally enable us to justify higher selling prices for products sold to that market than for the commodity types of carbon and stainless steels sold to other markets.

In light of the automotive market's importance to us, North American light vehicle production has a significant impact on our total sales and shipments. North American light vehicle production for 2019 declined 4% to approximately 16.3 million units from the prior year, due in part to a strike at General Motors ("GM") that halted its vehicle production for over one month. We currently expect a slight increase in North American light vehicle production in 2020. Furthermore, consumer demand for SUVs, trucks, crossovers and larger vehicles continued to increase while demand for smaller sedans and compact cars declined. We benefit from intentionally targeting larger vehicle platforms to take advantage of consumer preferences, and we have focused on and have been successful in getting sourced on numerous SUV, truck, crossover and larger vehicle platforms. As a result, more than three-quarters of the carbon automotive steel that we sell is used to produce these popular larger vehicles. In addition to benefiting from our exposure to consumers' strong demand for larger vehicles, these vehicles also typically contain a higher volume of steel than smaller sedans and compact cars, providing us the opportunity to sell a greater proportion of our steel products to our automotive customers. Ford Motor Company ("Ford") accounted for 11% of our net sales in both 2019 and 2018, and FCA (an affiliate of Fiat Chrysler Automobiles N.V.) accounted for 11% and 10% of our net sales in 2019 and 2018. No other customer represented more than 10% of our net sales in either year.

Automotive manufacturers are under pressure to achieve heightened federally mandated fuel economy standards through 2025 (the Corporate Average Fuel Economy, or "CAFE," standards). The CAFE standards generally require automobile manufacturers to meet an average fuel economy goal, which is approximately 50 miles per gallon across the fleet of vehicles they produce by the year 2025, with certain milestones to be met in interim periods. The United States Environmental Protection Agency ("EPA") and the National Highway Traffic Safety Administration have proposed rolling back the fuel economy goal under the CAFE standards to average fuel economy requirements that would be closer to 37 miles per gallon across the fleet of vehicles they produce by the year 2025. However, California and other states continue to maintain the more stringent emissions standards, and the EPA's Science Advisory Board and certain auto makers have expressed differing preferences for approaches to regulation aimed at improving fuel efficiencies. As a result, our automotive customers continue to explore various avenues for achieving the standards, including lightweighting components and developing more fuel-efficient engines. Lightweighting efforts include the use of alternatives to traditional carbon steels, such as AHSS and other materials. While this could reduce the aggregate volume of steel consumed by the automotive industry, we expect that demand will increase for current and next-generation AHSS and that our AHSS and other innovative steels will command higher margins. We are collaborating with our automotive customers and their suppliers to develop innovative solutions using our developments in lightweighting, efficiency, and material strength and formability across our extensive product portfolio, in combination with our automotive stamping and tube-making capabilities. We are also working with our customers to develop steels with greater heat resistance for exhaust systems that support new, fuel-efficient engines that run at higher temperatures.

Among our innovative solutions for automotive customers are our press-hardenable steel ("PHS") products for hot-stamping applications. Our ULTRALUME® PHS is an aluminized Type 1 heat-treatable boron steel. Our customers depend on ULTRALUME PHS when they require high-strength parts with complex geometries. These steels enable automotive manufacturers to reduce vehicle weight while continuing to keep pace with critical safety requirements. In October 2019, we entered a licensing agreement with ArcelorMittal that provides us, as the sole North American licensee, the right to have ULTRALUME PHS hot-stamped parts manufactured by both us and our customers in the U.S., Canada and Mexico. This licensing agreement resolves a long-standing dispute regarding alleged patent infringement, and we believe that it will result in expanded adoption of this product going forward and growth in our sales over the next several years.

Automotive manufacturers have also been increasing their development of hybrid/electric vehicles ("H/EVs") in order to meet the CAFE standards and growing customer adoption of H/EVs. Many motors used in H/EVs being sold in the U.S. today are imported from foreign suppliers, but more local sourcing and manufacturing of motors is expected to occur in the future. As the only North

American producer of high-efficiency non-oriented electrical steel ("NOES"), which is a critical component of H/EV motors, we are positioned to potentially benefit from the growth of H/EVs going forward. We believe our strong foundation in electrical steels and long-standing relationships with automotive manufacturers and their suppliers will provide us with an advantage in this market as it

- 2-

A005683

*Table of Contents*

continues to grow and mature. Likewise, the growing customer adoption of H/EVs may also increase demand for improvements in the electric grid to support higher demand for more extensive battery charging, which our grain-oriented electrical steels ("GOES") could support.

*Infrastructure and Manufacturing Market*

The infrastructure and manufacturing market primarily represents sales to manufacturers of heating, ventilation and air conditioning equipment, appliances, and power transmission and distribution transformers, who produce equipment for the electrical grid. Domestic construction activity and the replacement of aging infrastructure directly affects sales of our carbon, stainless and electrical steel products, particularly for GOES. In 2019, housing starts in the U.S. increased slightly from the prior year, and our domestic GOES customers continue to experience steady demand consistent with the construction and electrical transformer replacement markets. We also believe that the market growth of H/EVs may require upgrades to the U.S. electrical grid infrastructure to support increased demand for electricity, and thus increased demand for our GOES products in the coming years.

Over the past couple of years, electrical steel pricing declined substantially in many international markets, which contributed to GOES imports into the U.S. doubling in the first quarter of 2019 from 2017 before declining since that point. We believe that foreign competitors are continuing to circumvent existing trade laws, primarily by increasing imports of downstream electrical products not currently covered by the Section 232 steel tariff, which include electrical transformer cores and core assemblies, electrical transformers, and even laminations, which are simply cut pieces of electrical steel. To avoid the Section 232 steel tariff, producers have either increased their imports of foreign-made downstream electrical goods or moved some of their domestic production outside the United States, which adversely affects our electrical steel business. These actions have suppressed domestic electrical steel pricing through 2018 and 2019. In the absence of a remedy against these actions to circumvent the Section 232 steel tariff on electrical steel, these actions are likely to continue and increase over time, significantly pressuring our electrical steel business. We continue to work proactively to mitigate or eliminate this potential avenue for avoiding and circumventing the steel tariff, including by communicating our concerns to the U.S. government and requesting appropriate action to address this issue.

*Distributors and Converters Market*

Steel distributors and converters typically source from the commodity carbon, stainless and electrical spot markets. Demand and pricing can be highly dependent on a variety of factors outside our control, including global and domestic commodity steel production capacity, the relative health of countries' economies and whether they are consuming or exporting excess steel capacity, the provisions of international trade agreements and fluctuations in international currencies and, therefore, are subject to a high degree of volatility. Because of this volatility and our strategy to focus on value-added products, we have taken deliberate actions to reduce our exposure to these commodity markets.

*Geographic Presence*

We sell all our carbon steel products principally to customers in North America, and we sell our electrical and stainless steel products primarily in North America and Europe. Our customer base is geographically diverse and there is no single country outside the U.S. where our sales are material compared to our total net sales. For the vast majority of international sales, we are not the importer of record and do not bear the responsibility for paying any applicable tariffs.

**Research, Innovation and Operations**

Rapidly evolving and highly competitive markets require our customers to seek new, comprehensive steel solutions, and we believe we are well positioned to deliver the most robust solutions through our broad portfolio of offerings. In addition to our flat-rolled steels, this includes carbon and stainless tubular products, sophisticated tool and die designs, and lightweight, complex, hard-to-manufacture components and assemblies for the automotive market. Collaboration across our steel, tube-making, stamping and materials research groups generates innovative and comprehensive solutions for our customers, which we believe enhances our competitive advantage.

Creating innovative products and breakthrough solutions is a strategic priority, as we believe differentiation through producing higher value steels to meet challenging requirements enables us to maintain and enhance our margins. We conduct a broad range of research and development activities aimed at improving existing products and processes and developing new ones. Our tradition of steel innovation has produced a highly diversified flat-rolled steel product portfolio. As part of our underlying strategy to focus on higher-value materials and minimize exposure to commodity products, we have invested in research and innovation totaling $30.7, $29.4 and $28.1 in 2019, 2018 and 2017. Our on-going efforts at our state-of-the-art Research and Innovation Center in Middletown, Ohio, to enhance technical collaboration have increased the introduction of new steel solutions to the marketplace.

*Table of Contents*

*Research and Innovation Awards*

The Office of Energy Efficiency and Renewable Energy under the U.S. Department of Energy ("DOE") continues to grant AK Steel awards for innovative steel research. In March 2019, we received an award to leverage high performance computing from the Lawrence Livermore National Laboratory to conduct hot rolling research. Researchers from AK Steel are working in collaboration with scientists from the Computational Engineering Division to build a "Fast Acting Reduced Ordered Model" to predict the properties of a finished steel coil after hot rolling in order to improve product consistency, provide immediate feedback on product quality, and to save time, money and energy by reducing the need for expensive industrial trials. This research also will complement current artificial intelligence models used in the manufacture of AK Steel's portfolio of innovative steel products.

We are currently in the second year of a three-year project that was announced in October 2018, when the DOE selected us to receive an award of up to $1.2 under the Office of Energy Efficiency and Renewable Energy's Advanced Manufacturing Office program to investigate novel low-density steels. The project is being conducted in collaboration with the DOE, Oak Ridge National Laboratory Materials Science and Technology Division, and the Advanced Steel Processing and Products Research Center at the Colorado School of Mines. The objective of the project is to conduct alloy design, laboratory validation, and testing of low-density steels that are alternatives to currently available advanced high strength steels and other lightweight metals. These low-density steels are expected to generate energy savings by bringing efficiencies in manufacturing and lifetime savings in automotive structural applications. We have begun mathematical modeling and laboratory scale investigations for the program.

We are also in the third year of a project that the DOE awarded to us in May 2017 to develop the next generation of advanced NOES for motors used in a wide variety of industrial and automotive applications. Laboratory proof of concept for this project has been successfully completed and industrial scale trials have been conducted.

These three awards underscore our track record of innovation and our commitment to being a leader in next generation steel product and process development.

In November 2019, the Auto/Steel Partnership recognized members of AK Steel's Advanced Engineering team as part of the partnership's 2019 Excellence Awards. The partnership is an automotive material consortium comprised of North American automotive original equipment manufacturing ("OEM") companies and steel producers from the American Iron and Steel Institute's Automotive Applications Council who leverage shared research in a pre-competitive environment. Project teams within the partnership conduct studies in vehicle design applications using steel. Along with other award recipients, we were recognized for collaboration and technical expertise in finding solutions to industry problems. This included the use of new stamping technologies to facilitate potential applications of Next-Generation AHSS in future automotive body structures. AK Steel received an award in the Individual Category for providing exceptional leadership to the partnership. In addition, AK Steel's Advanced Engineering group and other members of the partnership Stamping Team were recognized for excellence in the Project Team category.

*Carbon Steel*

We direct most of our research and innovation efforts on carbon steel towards applications for automotive manufacturers and their suppliers. We are particularly focused on AHSS for the automotive market, and we produce virtually every AHSS grade currently used by our customers. Our AHSS grades, such as Dual Phase 590, 780 and 980, have been adopted by our customers for both stamped and roll-formed parts, and our NEXMET® 1000 and 1200 products have demonstrated enhanced strength, formability and opportunities for automotive lightweighting in cold-stamped applications. We are also pursuing application of NEXMET 440EX and NEXMET 490EX in surface-critical, exposed auto body panels as an alternative to aluminum.

Third-Generation Advanced High-Strength Steel

Our third generation NEXMET 1000 and NEXMET 1200 AHSS products enable our customers to achieve significant lightweighting in the unexposed structural components of their vehicles. NEXMET 1200, for example, offers superior formability similar to conventional Dual Phase 600 steel, but at twice the strength level. We have expanded the application of the NEXMET technology to our tubular products from AK Tube LLC ("AK Tube") and stamped components from PPHC Holdings, LLC ("Precision Partners"). These AHSS products allow automotive engineers to design lightweight parts that meet rigorous service and safety requirements. The NEXMET family of steels helps our customers achieve vehicle weight savings for ambitious fuel efficiency standards while avoiding significant capital costs required to re-design production facilities to use alternative materials.

Both galvanized and cold-rolled NEXMET 1000 and NEXMET 1200 AHSS are progressing through product qualification with several OEM customers, and the first automotive production parts manufactured from NEXMET material will appear on a new vehicle platform that is planned to launch in late 2020. A number of stamping and component assembly trials have been completed

successfully, with more planned and underway. Because the timing of automotive design and production cycles spans several years, widespread automotive customer adoption of revolutionary new material such as NEXMET AHSS may also extend over several years.

- 4-

*Table of Contents*

We expect that other automotive vehicle platforms will incorporate NEXMET AHSS in their designs and that NEXMET AHSS will become a strong differentiator for AK Steel going forward.

### Specialty Stainless and Electrical Steel

We continue to develop new and improved specialty stainless and electrical steels for a variety of applications in the automotive, infrastructure and manufacturing, and other markets. For example, we are working with our automotive customers and their exhaust system suppliers to develop new stainless steels for exhaust systems that can withstand higher exhaust gas temperatures associated with future engine designs to achieve increased fuel economy. These steels exhibit improved resistance to thermal fatigue and corrosion over currently available materials. We are also developing stainless steels with unique cosmetic appearances (specialized finishes and colors) for use in architectural and appliance applications.

We are a global leader in producing the highest-quality electrical steel products, which are iron-silicon alloys with unique magnetic properties, and our electrical steels are among the most energy efficient in the world. We sell GOES primarily to manufacturers of power transmission and distribution transformers and NOES to manufacturers of electric motors and generators in both the infrastructure and manufacturing and automotive market. Our GOES customers require high-quality steels with low core losses and high magnetic permeability for the production of efficient electrical transformers, which help to lower costs of electricity generation, transmission and distribution. Although we produce both GOES and NOES products, our primary focus remains on the higher-efficiency GOES products, as these are more challenging to produce and typically command higher selling prices and margins than NOES products.

### Downstream Steel Applications

Our portfolio of steel solutions includes the operations of Precision Partners, which provides advanced-engineered solutions, tool design and build, hot- and cold-stamped components and complex assemblies for the automotive market. In addition to Precision Partners, our downstream operations include AK Tube, which manufactures advanced tubular products for automotive and other applications using carbon and stainless steels, and Combined Metals of Chicago, LLC, a premier processor and distributor of flat-rolled stainless steel products. We believe that collaboration among our steelmaking operations and our downstream businesses can accelerate the adoption of our innovative steel products by automotive manufacturers and their Tier 1 suppliers.

Our research and technical experts, along with engineers from Precision Partners and AK Tube, have undertaken numerous collaborative projects that are generating robust solutions for our customers. Precision Partners' expertise in tool design and stamping capabilities has allowed us to create prototype components using AK Steel's innovative new materials and present customers with new potential steel solutions. This approach has and will continue to demonstrate to customers that they can significantly lightweight automotive parts on an accelerated timeline and in a cost-effective manner by using our highly formable grades of AHSS in place of traditional material types.

In addition, our collaborative projects are enhancing our collective knowledge and experience in the stamping of new, advanced grades of steel, advanced-engineered solutions, and tool design and build. For example, Precision Partners specializes in hot-stamping PHS for automotive applications. AK Steel's experience as a leader in PHS and Precision Partners' expertise in hot-stamping has enabled these teams to have greater insight into these high-growth areas and has accelerated product development and customer adoption of these automotive lightweighting solutions. Likewise, collaboration with AK Tube strategically advances our mission to innovate in AHSS for the automotive industry, as AK Tube has been at the forefront of producing tubular products from third-generation AHSS. We believe the combination of Precision Partners' stamping and advanced die-making capabilities, AK Tube's leading tubemaking capabilities and AK Steel's breakthrough material introductions will enhance our ability to deliver innovative, steel solutions to our customers.

Precision Partners has recently been awarded contracts from two major automotive manufacturers to supply single-piece hot-stamped door rings and complex assemblies. Taken together, the awards are expected to represent approximately $50.0 of projected annual stamping and assembly revenue beginning in late 2020 or early 2021, in addition to revenue from a large, one-time tooling award. In winning these contracts, Precision Partners has been able to leverage its hot-stamping tooling leadership, in addition to its innovative hot-stamping process, to capture new strategic opportunities and demonstrate that it is one of the few companies in North America that has the technical capabilities to produce a major complex assembly and stamping work of this nature.

## Sustainability

We are committed to operating in a sustainable manner. Beyond ensuring that we are acting responsibly to serve our communities

and the environment, sustainably operating our company also opens opportunities to grow our business, increase customer collaboration and loyalty, differentiate us from our competition, and attract, retain and motivate employees. Steel is the most recycled material on

- 5-

*Table of Contents*

the planet—more than aluminum, plastic, paper and glass combined each year—which establishes a strong foundation for ou sustainability initiatives.

In December 2019, AK Steel was named to *Newsweek's* "America's Most Responsible Companies 2020" list. *Newsweek* published its first ranking of 300 companies from more than 2,000 of the largest U.S. public companies by revenue to determine "which firms were tops when it comes to doing good." This list focused on performance in the environmental, social and corporate governance areas. AK Steel was the only integrated steel mill included in the *Newsweek* 2020 list.

In April 2019, we issued our Sustainability Report for 2018 that highlights our corporate-wide sustainability efforts and our efforts to support our employees, encourage diversity and inclusion, contribute to our communities, and demonstrate our commitment to the environment, among other initiatives. We also disclose our steelmaking operations' energy and water usage, air emissions, waste generation and targets for reducing our environmental footprint. In addition, our Sustainability Report includes our scope 1 greenhouse gas emissions, which are generally direct emissions from owned or controlled sources, and reduction targets for those emissions. Our Sustainability Report (which is not incorporated into this Annual Report) can be found in the "Corporate Citizenship" section of our website at www.aksteel.com.

*Employee Safety*

Our employees and their safety are of paramount importance to us. Our occupational health and safety policies and programs are the cornerstone of our operating philosophy and are integrated into all of our daily operations and activities. We rigorously manage, control and focus on eliminating or minimizing potential exposure to the hazards associated with making and working around steel. Our low recordable injury rate, based on U.S. Occupational Safety and Health Administration ("OSHA") criteria, reflects our effectiveness in protecting our employees. In 2019, one of our facilities operated with zero OSHA DART (days away, restricted, or job transfer) injuries for the entire year. During the fourth quarter of 2019, three of our facilities operated with zero OSHA recordable injuries, while six facilities operated with zero OSHA DART injuries. Our full-year 2019 performance at our steelmaking facilities, measured as the number of OSHA recordable injuries per 200,000 labor hours, was 0.46, which was nearly three times better than the industry average (year-to-date through the third quarter, which is the latest industry information currently available).

We consistently lead the U.S. steel industry in safety, outperforming the steel industry average injury frequencies for each of the last ten years, and we have received numerous awards recognizing our safety performance. In May 2019, AK Steel's Middletown Works received the Max Eward Safety Award for 2018 from the American Coke and Coal Chemicals Institute ("ACCCI"), a leading industry trade organization. The award recognizes Middletown Works for operating one of the safest cokemaking facilities in America and operating all of 2018 without a single OSHA recordable injury. This ACCCI recognition marks the 18th time in the last 22 years that one or more AK Steel coke plants have received the Max Eward Safety Award. In May 2019, our Coshocton Works and Zanesville Works were recognized for outstanding safety performance by the Ohio Bureau of Workers' Compensation, Division of Safety and Hygiene. We continue to focus on safety in all we do, driving safety results that lead our industry.

*Environmental Responsibility*

We maintain an unwavering commitment to responsible environmental performance throughout our operations. In 2019, we experienced another year of outstanding overall environmental performance. In addition, to emphasize and reinforce the importance of sustainability and environmental responsibility at the company and to continue to drive improved performance in these areas, since January 2018 our Board of Directors has incorporated an environmental performance component into our annual management incentive plan. After assessing a variety of potential performance categories to incorporate, including an evaluation of areas most ripe for improvement, the Board chose to include air permit deviation events as a category for measuring performance under our annual management incentive plan for 2018 and again in 2019. An air permit deviation event occurs when an event at our steelmaking operations results in noncompliance under the Title V air permits that govern those facilities. In 2019, we had our best performance in the past six years in terms of air permit deviation events, recording our lowest annual total during that period.

We believe that our strong environmental performance is a direct result of the proactive approach we take to environmental management and the close collaborative efforts that we employ across the company. We target sustainable performance in all aspects of our operations, including continuous improvement in operations that include air, water and waste management. Our comprehensive environmental policy provides that we will:

- commit the necessary resources to comply with all applicable environmental laws, regulations, permits and agreements applicable to us;
- reduce environmental risks through operating practices and emergency preparedness programs;

- encourage recycling, recovery and reuse of residual materials, as well as the reduction and prevention of emissions and releases when feasible;
- participate in efforts to develop and implement environmental laws and regulations;

- 6-

*Table of Contents*

- continually evaluate compliance with applicable environmental laws and regulations; and
- strive to continually improve the effectiveness of our environmental management efforts.

Certain production units in our operations are inherently water-intensive. However, we continuously seek opportunities to reduce water usage and increase water reuse at our steelmaking plants. In addition, our steelmaking facilities are located near abundant sources of water and we do not believe that any of those operations are located in regions that experience high water stress.

The International Organization for Standardization ("ISO") has certified all of our steelmaking plants with ISO 14001 environmental management certification, and our environmental affairs professionals oversee environmental compliance throughout our organization. We also invest heavily in equipment to help meet our environmental objectives. For example, in 2019, we spent $141.3 to operate and maintain our environmental controls and invested $23.0 in environmental projects. During 2019, we completed a $6.0 project at our Rockport Works to install a more modern, environmentally friendly and lower-cost pickling process.

*Strategic Opportunities Related to Climate Change*

Our strategy of creating new innovative steel solutions and improving existing products enables us to contribute to carbon reduction efforts and the achievement of sustainability goals throughout the product supply chain. Innovative products in each of the carbon, stainless, electrical, tubular, and stamped steel component families further the sustainability goals of many of our customers. For example, in the automotive market our customers are benefiting from our carbon lightweighting solutions to meet their heightened fuel economy targets under the CAFE standards. We are also providing customers with stainless steel and tubular solutions that allow for greater heat resistance in vehicle exhaust systems, enabling exhaust systems to handle the higher engine exhaust temperatures needed for increased fuel economy. In addition, we continue to develop higher-efficiency NOES products for use in future H/EVs and GOES products for their required infrastructure, a market that we anticipate will grow over time. Our steels also contribute to sustainability goals beyond the automotive market. For instance, our GOES products are among the highest-efficiency electrical steels in the world. These GOES products provide low core loss and high magnetic permeability to transmit electricity across electrical grids in the U.S. and around the world more efficiently through better-performing electrical transformers.

While greenhouse gas emissions are a natural byproduct of steel manufacturing today, we continue to take steps to increase energy efficiency while remaining competitive in the global steel marketplace. For example, through the American Iron and Steel Institute ("AISI"), we participate in the DOE's Climate VISION agreement. This program assists domestic steelmakers in their continued efforts to lead the global steel sector in voluntary emissions reductions. We are also a member of the federal ENERGY STAR program, which identifies and promotes energy-efficient products to help reduce greenhouse gas emissions. ENERGY STAR is a joint program of the EPA and the DOE, helping businesses and consumers save money and protect the environment through energy-efficient products and practices. As with other companies engaged in the production of steel, certain aspects of our production process are carbon-intensive and current technology does not currently afford us the ability to dramatically lower our direct greenhouse gas emissions without significantly reducing the scope of our operations. However, we and other steel producers in the United States are actively participating in research and development to develop technology, processes and approaches to reduce emissions during the steelmaking processes, but these developments are likely to occur over the longer term.

In addition, the production phase of steelmaking is less carbon-intensive than the processes for producing certain other competing materials, such as aluminum. Thus, while the CAFE standards have motivated the use of alternative materials in some vehicles to help achieve lightweighting goals, we intend to continue to educate governments, the automotive industry and other key stakeholders that steel is the most sustainable metal to reduce greenhouse gas emissions across the entire life cycle of a vehicle. These benefits are made even greater when utilizing our advanced steel products for vehicle lightweighting.

Our Sustainability Report issued in April 2019 includes targeted emissions reductions and an inventory of our scope 1 greenhouse gas emissions at our steelmaking plants, along with time-bound, quantitative targets for reducing scope 1 greenhouse gas emissions at those plants. Over time, we also plan to expand our efforts to scope 2 greenhouse gas emissions, which generally are indirect emissions from purchased energy sources, as we develop our internal systems for tracking and targeting scope 1 greenhouse gas reductions.

**Production Resources**

*Employees*

Approximately 5,600 of our 9,300 employees are represented by labor unions. The labor contracts covering these represented

employees expire between 2020 and 2023. See the discussion under *Labor Agreements* in Item 7 for additional information on these agreements.

- 7-

*Table of Contents*

*Raw Materials and Other Inputs*

Our steel manufacturing operations require carbon and stainless steel scrap, coal, coke, chrome, iron ore, nickel and zinc as primary raw materials. We also consume natural gas, electricity, graphite electrodes and industrial gases. We make most of our purchases of iron ore, coke, industrial gases and a portion of our electricity at negotiated prices under annual or multi-year agreements with periodic price adjustments. We purchase substantially all of our iron ore from Cliffs under multi-year contracts. We typically purchase most of our metallurgical coal under annual fixed-price agreements, but we also obtain approximately 15% of our metallurgical coal needs from our own mine at AK Coal Resources, Inc. ("AK Coal"). We typically purchase carbon and stainless steel scrap, natural gas, a substantial portion of our electricity and most other raw materials at prevailing market prices, which may fluctuate with market supply and demand. Additionally, we may hedge portions of our energy and raw materials purchases to reduce volatility and risk, which is discussed in more detail in *Quantitative and Qualitative Disclosures about Market Risk* in Item 7A.

We also attempt to reduce the risk of future supply shortages and price volatility in other ways. If multi-year contracts are available in the marketplace, we may use these contracts to secure sufficient supply to satisfy our key raw material needs. When multi-year contracts are not available, or are not available on acceptable terms, we purchase the remainder of our raw materials needs under annual contracts or conduct spot purchases. We also regularly evaluate alternative sources and substitute materials. We believe that we have secured, or will be able to secure, adequate supply sources for our raw materials and energy requirements for 2020.

## Competition

We principally compete with domestic and foreign producers of flat-rolled carbon, stainless and electrical steel, carbon and stainless tubular products, aluminum, carbon fiber, concrete and other materials that may be used as a substitute for flat-rolled steels in manufactured products. Precision Partners and AK Tube both compete against other niche companies in highly fragmented markets.

Price, quality, on-time delivery, customer service and product innovation are the primary competitive factors in the steel industry and vary in importance according to the product category and customer requirements. Steel producers that sell to the automotive market face competition from aluminum manufacturers (and, to a lesser extent, other materials) as automotive manufacturers attempt to develop vehicles that will enable them to satisfy more stringent, government-imposed fuel efficiency standards. To address automotive manufacturers' lightweighting needs that the aluminum industry is targeting, we and others in the steel industry are developing AHSS grades that we believe provide weight savings similar to aluminum, while being stronger, less costly, more sustainable, easier to repair and more environmentally friendly. Aluminum penetration has been primarily limited to specific automotive applications, such as outer panels and closures, rather than entire body designs. In addition, our automotive customers who continue to use steel, as opposed to aluminum and other alternative materials, are able to avoid the significant capital expenditures required to re-tool their manufacturing processes to accommodate the use of non-steel materials.

Mini-mills (producers using electric arc furnaces) typically have competitive cost advantages as a result of their different production processes and lower labor costs associated with what are often non-union workforces. Their primary raw materials are scrap metal and increasingly pig iron, which blast furnaces produce. Mini-mills generally offer a narrower range of products than integrated steel mills, but the increasing use of pig iron, direct reduced iron and compacted hot briquetted iron have enabled them to expand their product capabilities in recent years. However, mini-mills do not have the equipment capabilities to produce the product range that we offer, nor do they possess our depth of customer service, technical support and research and innovation. Recent new or restarted steelmaking capacity in mini-mills has been primarily intended to service markets other than automotive, thus capping negative impacts to our revenues.

Domestic steel producers, including us, face significant competition from foreign producers. For many reasons, these foreign producers often are able to sell products in the U.S. at prices substantially lower than domestic producers. Depending on the country of origin, these reasons may include government subsidies; lower labor, raw material, energy and regulatory costs; less stringent environmental regulations; less stringent safety requirements; the maintenance of artificially low exchange rates against the U.S. dollar; and preferential trade practices in their home countries. Since late 2017, import levels of carbon and stainless flat-rolled products into the United States have shown a gradual and steady decline and have recently been more reflective of historical levels before the unprecedented surges that began in 2014. However, import levels for GOES products are much higher than their historical levels. These may not be in the form of master coils or slit coils, but rather in the form of cut laminations or assembled transformer cores—which are imported under different tariff codes not subject to the current Section 232 tariffs. Import levels are affected to varying degrees by the relative level of steel production in China and other countries, the strength of demand for steel outside the U.S. and the relative strength or weakness of the U.S. dollar against various foreign currencies. Imports of finished steel into the United States accounted for approximately 19%, 23% and 27% of domestic steel market consumption in

2019, 2018 and 2017.

We continue to provide pension and healthcare benefits to a great number of our retirees, resulting in a competitive disadvantage compared to certain other domestic and foreign steel producers that do not provide such benefits to any or most of their retirees. However, we have taken a number of actions to reduce pension and healthcare benefits costs, including negotiating

- 8-

*Table of Contents*

progressive labor agreements that have significantly reduced total employment costs at all of our union-represented facilities, transferring all responsibility for healthcare benefits for various groups of retirees to Voluntary Employee Benefits Association trusts, offering voluntary lump-sum settlements to pension plan participants, lowering retiree benefit costs for salaried employees, and transferring pension obligations to highly rated insurance companies. These actions have not only reduced some of the risks associated with our pension fund obligations, but more importantly have reduced our risk exposure to performance of the financial markets, which are a principal driver of pension funding requirements. We continue to actively seek opportunities to reduce pension and healthcare benefits costs.

**Information about our Executive Officers**

The following table provides the name, age and principal position of each of our executive officers as of February 18, 2020:

| Name | Age | Position |
|------|-----|----------|
| Roger K. Newport | 55 | Chief Executive Officer |
| Kirk W. Reich | 51 | President and Chief Operating Officer |
| Joseph C. Alter | 42 | Vice President, General Counsel and Corporate Secretary |
| Brian K. Bishop | 48 | Vice President, Carbon Steel Operations |
| Stephanie S. Bisselberg | 49 | Vice President, Human Resources |
| Renee S. Filiatraut | 56 | Vice President, Litigation, Labor and External Affairs |
| Gregory A. Hoffbauer | 53 | Vice President, Controller and Chief Accounting Officer |
| Michael A. Kercsmar | 48 | Vice President, Specialty Steel Operations |
| Scott M. Lauschke | 50 | Vice President, Sales and Customer Service |
| Maurice A. Reed | 57 | Vice President, Strategic Planning and Business Development |
| Christopher J. Ross | 52 | Vice President, Treasurer and Interim Chief Financial Officer |

*Roger K. Newport* has served as Chief Executive Officer since January 2016. Prior to that, Mr. Newport served as Executive Vice President, Finance and Chief Financial Officer since May 2015. Prior to that, Mr. Newport served as Senior Vice President, Finance and Chief Financial Officer since May 2014, and as Vice President, Finance and Chief Financial Officer since May 2012. Prior to that, Mr. Newport served in a variety of other capacities since joining us in 1985, including Vice President—Business Planning and Development, Controller and Chief Accounting Officer, Assistant Treasurer, Investor Relations, Manager—Financial Planning and Analysis, Product Manager, Senior Product Specialist and Senior Auditor.

*Kirk W. Reich* has served as President and Chief Operating Officer since January 2016. Prior to that, Mr. Reich served as Executive Vice President, Manufacturing since May 2015. Before assuming that role, Mr. Reich served as Senior Vice President, Manufacturing since May 2014, and as Vice President, Procurement and Supply Chain Management since May 2012. Prior to that, Mr. Reich served in a variety of other capacities since joining us in 1989, including Vice President—Specialty Steel Operations, General Manager—Middletown Works, Manager—Mobile Maintenance/Maintenance Technology, General Manager—Mansfield Works, Manager—Processing and Shipping, Technical Manager, Process Manager and Civil Engineer.

*Joseph C. Alter* has served as Vice President, General Counsel and Corporate Secretary since May 2015. Prior to that, Mr. Alter served as Vice President, General Counsel and Chief Compliance Officer since May 2014 and Assistant General Counsel, Corporate and Chief Compliance Officer since December 2012. Since joining us in 2009, Mr. Alter served as Corporate Counsel and Chief Compliance Officer and as Corporate Counsel. Prior to joining us, Mr. Alter was Corporate Counsel at Convergys Corporation and an attorney with the law firm of Keating Muething & Klekamp PLL.

*Brian K. Bishop* has served as Vice President, Carbon Steel Operations since March 2016. Prior to that, Mr. Bishop served as Director, Carbon Steel Operations since July 2015 and General Manager, Dearborn Works since September 2014. Prior to that, Mr. Bishop was General Manager—Maintenance, Repair and Operations Purchasing since May 2013. Since joining us in 1995, Mr. Bishop progressed through a number of positions, including General Manager—Middletown Works, General Manager—Mansfield Works, Manager—Occupational Safety and Health and Shift Manager at Middletown Works.

*Stephanie S. Bisselberg* has served as Vice President, Human Resources since April 2013. She also served as Assistant General Counsel—Labor, Labor Counsel and Assistant Labor Counsel since joining us in 2004. Prior to joining us, Ms. Bisselberg was an attorney with the law firm of Taft, Stettinius and Hollister LLP.

A005697

*Table of Contents*

*Renee S. Filiatraut* has served as Vice President, Litigation, Labor and External Affairs since May 2014. Prior to that, Ms. Filiatraut served as Assistant General Counsel, Litigation since December 2012. Before joining us as Litigation Counsel in 2011, Ms. Filiatraut was a Partner with Thompson Hine LLP.

*Gregory A. Hoffbauer* has served as Vice President, Controller and Chief Accounting Officer since January 2016. Prior to that, Mr. Hoffbauer served as Controller and Chief Accounting Officer since February 2013. Before joining us as Assistant Controller in 2011, Mr. Hoffbauer was Director of Accounting with NewPage Corporation. Mr. Hoffbauer also was Controller for Day International, Inc. and served in a number of increasingly responsible accounting and auditing positions for Deloitte & Touche LLP, including Audit Senior Manager.

*Michael A. Kercsmar* has served as Vice President, Specialty Steel Operations since March 2016. Prior to that, Mr. Kercsmar served as Director, Specialty Steel Operations since July 2015 and General Manager, Coshocton Works and Zanesville Works since June 2013. Mr. Kercsmar served in a number of roles since joining us in 1997, including General Manager—Mansfield Works, Manager—Occupational Safety and Health at Middletown Works, Department Manager—South Coating, and Shift Manager in the cold strip mill at Middletown Works.

*Scott M. Lauschke* has served as Vice President, Sales and Customer Service since joining us in February 2015. Before joining us, Mr. Lauschke was Vice President and General Manager of AFGlobal Corporation from July 2013 through November 2014. Before that, Mr. Lauschke served in various roles of increasing responsibility at The Timken Company, including General Sales Manager.

*Maurice A. Reed* has served as Vice President, Strategic Planning and Business Development since August 2018. Prior to that, he served as Vice President, Engineering, Raw Materials and Energy since May 2012. Prior to that, Mr. Reed served in a variety of other capacities since joining us in 1996, including Director—Engineering and Raw Materials, Director—Engineering and Energy General Manager—Engineering, Operations Support and Primary Process Research and General Manager—Engineering. Before joining us, Mr. Reed held a number of increasingly responsible engineering technology positions for National Steel Corporation.

*Christopher J. Ross* has served as Vice President, Treasurer and Interim Chief Financial Officer since November 2019. Prior to that, Mr. Ross was Vice President and Treasurer since January 2018, Treasurer since February 2016 and General Manager, Cash Management and Finance since August 2012. Mr. Ross served in a number of roles since joining us in 1997, including General Manager—Strategic Planning and Financial Analysis, General Manager—Investor Relations and Diversified Business Group Assistant Treasurer, Manager—Investor Relations, Product Manager—Hot Dip Galvanized and Electrogalvanized, Senior Accountant—Financial Planning and Analysis and Cost Accountant at Middletown Works.

## Available Information

We maintain a website at www.aksteel.com. Information about us is available on the website free of charge, including our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934. Such information is posted to the website as soon as reasonably practicable after submission to the Securities and Exchange Commission. Information on our website is not incorporated by reference into this report.

## Item 1A.        Risk Factors.

We caution readers that our business activities involve risks and uncertainties that could cause actual results to differ materially from those we currently expect. While the items listed below represent the most significant risks to us, we regularly monitor and report risks to the Board of Directors through a formal Total Enterprise Risk Management program.

**Risk of reduced selling prices, shipments and profits associated with a highly competitive and cyclical industry**. The competitive landscape in the steel industry reflects shifting domestic and international political priorities, an uncertain global trade landscape, and intense competition from domestic and foreign competitors producing steel and substitute products. These conditions directly impact our pricing. It is impossible to predict whether the domestic and/or global economies or industry sectors of those economies that are key to our sales will continue to improve and generate enough demand to absorb some of the existing excess capacity in the steel industry, as well as new or expanded capacity. Also, we cannot know how customers or competitors will react to these and other factors and how their actions could affect market dynamics and sales of, and prices for, our products. Market price and demand for steel are very hard to predict and decreases in either or both could adversely impact our sales, financial results and cash flows. In addition, our direct sales to the automotive industry generate approximately 66% of our revenue and we make additional sales to distributors and converters whom, we believe, ultimately resell some of that volume to the automotive market. If automotive demand should decline substantially or we lose market share to competitors, our sales, financial

results and cash flows could be severely impacted.

- 10-

Table of Contents

**Risk of domestic and global steel overcapacity**.  Significant global steel capacity and new or expanded production capacity in North America in recent years has caused and continues to cause capacity to exceed demand globally, as well as in our primary markets in North America. In fact, significant increases in new production capacity and a restart of previously idled capacity in the U.S. by our competitors has occurred in recent periods, as new carbon and stainless steelmaking and finishing facilities have begun or may soon begin production. In addition, foreign competitors have substantially increased their production capacity in the last few years and, in some instances appear to have targeted the U.S. market for imports. Also, some foreign economies, such as China, have slowed relative to recent historical norms, resulting in an increased volume of steel products that cannot be consumed by industries in those foreign steel producers' own countries. Although import levels of carbon and stainless flat-rolled products into the United States have shown a gradual and steady decline over the past two years, imports of other steel products remain at historic highs and the risk remains of even greater levels of imports, depending upon foreign market and economic conditions, changes in trade agreements and treaties, laws, regulations or government policies affecting trade, the value of the U.S. dollar relative to other currencies, and other variables beyond our control. A significant further increase in domestic capacity or foreign imports could adversely affect our sales, financial results and cash flows.

**Risks related to U.S. government actions on trade agreements and treaties, laws, regulations or policies affecting trade.**
 Under the Trump Administration, the U.S. government has altered its approach to international trade policy, both generally and with respect to the matters directly and indirectly affecting the steel industry. In recent years, the U.S. government undertook certain unilateral actions affecting trade and also renegotiated existing bilateral or multi-lateral trade agreements or entered into new agreements or treaties with foreign countries. For example, in March 2018, President Trump signed a proclamation pursuant to Section 232 imposing a 25 percent tariff on imported steel. In retaliation against the Section 232 tariffs, the European Union subsequently imposed its own tariffs against certain steel products and other goods imported from the U.S. If the Section 232 tariffs are removed or substantially lessened, whether through legal challenge, legislation or otherwise, imports of foreign steel would likely increase and steel prices in the U.S. would likely fall, which would materially adversely affect our sales, financial results and cash flows. In addition, on December 10, 2019, representatives of the U.S., Mexico and Canada signed a revision to the United States-Mexico-Canada Trade Agreement ("USMCA"), which was proposed to replace the existing North American Free Trade Agreement ("NAFTA") among those countries. On January 29, 2020, President Trump signed the USMCA Implementation Act on behalf of the U.S. Because all of our manufacturing facilities are located in North America and our principal market is automotive manufacturing in North America, we believe that the USMCA has the potential to positively impact our business by incentivizing automakers and other manufacturers to increase manufacturing production in North America and to use North American steel. However, it is difficult to predict the short- and long-term implications of changes in trade policy and, therefore, whether USMCA or other new or renegotiated trade agreements, treaties, laws, regulations or policies will have a beneficial or detrimental impact on our business and our customers' and suppliers' business. Adverse effects could occur directly from a disruption to trade and commercial transactions and/or indirectly by adversely affecting the U.S. economy or certain sectors thereof, thereby impacting demand for our customers' products, and in turn negatively affecting demand for our products. Key links of the supply chain for some of our key customers, including automotive manufacturers, could be negatively impacted by USMCA or other new or renegotiated trade agreements, treaties, laws, regulations of policies. Any of these actions and their direct and indirect impacts could materially adversely affect our sales, financial results and cash flows.

**Risk of changes in the cost of raw materials, supplies and energy**.  The price that we pay for energy, key supplies and raw materials, such as electricity, natural gas, industrial gases, graphite electrodes, iron ore, chrome, zinc and coal, can fluctuate significantly based on market factors. In some cases, the prices at which we sell steel will not change in tandem with changes in our raw materials, supplies and energy costs. Global demand and supply, particularly Chinese demand and supply, for certain raw materials can have a significant influence on our costs for those raw materials, especially iron ore and coal, as well as supplies for production whose prices are impacted by raw material prices, such as graphite electrodes and refractory materials. However, our sales prices are generally driven by North American demand, which can result in a compression in our margins in cases where raw material costs increase and our sales prices do not move enough to cover those increases. The majority of our shipments are sold under contracts that do not allow us to pass through all increases in raw materials, supplies and energy costs. Some of our shipments to contract customers include variable-pricing mechanisms allowing us to adjust the total sales price based upon changes in specified raw materials, supplies and energy costs. Those adjustments, however, rarely reflect all of our underlying raw materials, supplies and energy cost changes. The scope of the adjustment may also be limited by the terms of the negotiated language, including limitations on when the adjustment occurs. For shipments we make to the spot market, market conditions or timing of sales may not allow us to recover the full amount of an increase in raw material, supplies or energy costs. In such circumstances, a significant increase in raw material, supplies or energy costs likely would adversely impact our financial results and cash flows. Conversely, in certain circumstances, we may not realize all of the benefits when the price for certain raw materials, supplies or energy declines. For example, this can occur when we lock in the price of a raw material over a set period and the spot market price for the material declines during that period. Our need to consume existing inventories may also delay the impact of a change in prices of raw materials or supplies. New inventory may not be purchased until some portion of the existing inventory is consumed. The impact of this risk is particularly significant for iron ore and coke because of the volumes held in

inventory. We manage our exposure to the risk of iron ore price increases by hedging a portion of our annual iron ore supply and by maintaining supply agreements where the IODEX, the global iron ore price index, is only one factor affecting our price of iron ore pellets. Significant changes in raw material costs may also

- 11-

*Table of Contents*

increase the potential for inventory value write-downs in the event of a reduction in selling prices and our inability to realize the cost of the inventory.

**Risk from our significant amount of debt and other obligations.** On December 31, 2019, we had $1,997.3 of indebtedness outstanding. We also had pension and other postretirement benefit obligations totaling $758.8. We anticipate making approximately $45.0 of required annual pension contributions in 2020. Based on current funding projections, we expect to make contributions to the master pension trust of approximately $45.0 for 2021 and $35.0 for 2022, though funding projections for 2021 and beyond could be materially affected by differences between expected and actual returns on plan assets, actuarial data and assumptions relating to plan participants, the discount rate used to measure the pension obligations and changes to regulatory funding requirements. Furthermore, actions to reduce our pension obligations, such as transferring retiree obligations to insurance companies through purchased annuity contracts could accelerate the timing or increase the amount of contributions that we are required to make to the master pension trust. We also have the ability to borrow additional amounts under our $1,500.0 revolving credit facility (the "Credit Facility"). At December 31, 2019, we had $450.0 of outstanding borrowings under the Credit Facility with outstanding letters of credit of $72.5, resulting in maximum remaining availability of $977.5 under the Credit Facility, subject to customary borrowing conditions, including a borrowing base, which is determined by the value of eligible collateral less outstanding borrowings and letters of credit. At December 31, 2019, borrowing availability under the Credit Facility was $804.6 based on eligible collateral at that time. Our debt and pension obligations, along with other financial obligations, could have important consequences. For example, they could increase our vulnerability to general adverse economic and industry conditions; require a substantial portion of our cash flows to be dedicated to interest payments and debt service, reducing the amount of cash flows available for other purposes, such as working capital, capital expenditures, acquisitions, joint ventures ("JVs") or general corporate purposes; limit our ability to obtain future additional financing; reduce our planning flexibility for, or ability to react to, changes in our business and the industry; and place us at a competitive disadvantage with competitors who may have less indebtedness and other obligations or greater access to financing.

**Risk of severe financial hardship or bankruptcy of one or more of our major customers or key suppliers or JVs.** Sales and operations of a majority of our customers are sensitive to general economic conditions, especially as they affect the North American automotive and housing industries. If there is a significant weakening of current economic conditions, whether because of secular or cyclical issues, it could lead to financial difficulties or even bankruptcy filings by our customers. The concentration of customers in a specific industry, such as the automotive industry, may increase our risk because of the likelihood that circumstances may affect multiple customers at the same time. The nature of that impact would likely include lost sales or losses associated with the potential inability to collect all outstanding accounts receivable. Such an event could also negatively impact our financial results and cash flows. In addition, some of our key suppliers, particularly those who supply us with critical raw materials for the steelmaking process, have recently faced severe financial challenges or bankruptcy and other suppliers or JVs may face such circumstances in the future. Also, we purchase all of our iron ore from Cliffs under two multi-year contracts. This reliance on a single supplier for a primary raw material may increase our risk of increased costs from substitute suppliers or supply chain disruptions. Key suppliers facing financial hardship or operating in bankruptcy could experience operational disruption or even face liquidation, which could result in our inability to secure replacement raw materials on a timely basis, or at all, or cause us to incur increased costs to do so. Such events could adversely impact our operations, financial results and cash flows.

**Risk related to our significant proportion of sales to the automotive market.** In 2019, approximately 66% of our sales were to the automotive market. In addition to the size of our exposure to the automotive industry, we face risks related to our relative concentration of sales to certain specific automotive manufacturers. In 2019, two customers each accounted for 11% of our net sales. Automotive production and sales are cyclical and sensitive to general economic conditions and other factors, including interest rates, consumer credit, and consumer spending and preferences. If automotive production and sales decline, our sales and shipments to the automotive market are likely to decline in a corresponding manner. Adverse impacts that we may sustain as a result include, without limitation, lower margins because of the need to sell our steel to less profitable customers and markets, higher fixed costs from lower steel production if we are unable to sell the same amount of steel to other customers and markets, and/or lower sales, shipments and margins generally as our competitors face similar challenges and compete vigorously in other markets. These adverse impacts would negatively affect our sales, financial results and cash flows. Additionally, the trend toward lightweighting in the automotive industry, which requires lighter gauges of steel at higher strengths, could result in a lower volume of steel required by that industry over time. Moreover, competition for automotive business has intensified in recent years, as steel producers and companies producing alternative materials have focused their efforts on capturing and/or expanding their market share of automotive business because of less favorable conditions in other markets for steel and other metals, including commodity products and steel for use in the oil and gas markets. As a result, the potential exists that we may lose market share to existing or new entrants or that automotive manufacturers will take advantage of the intense competition among potential suppliers to pressure our pricing and margins in order to maintain or expand our market share with them, which could negatively affect our sales, financial results and cash flows.

**Risk of reduced demand in key product markets due to competition from aluminum and other alternatives to steel**.  The automotive market is important to our business, both in terms of volume and margins. Automotive manufacturers are under pressure to meet the government-mandated CAFE standards, which require increasing fuel economy for automobiles in the future. Automotive manufacturers have begun to incorporate aluminum and other alternative materials into their vehicles and continue to investigate the

- 12-

*Table of Contents*

potential risks and benefits of expanding the use of non-steel materials. For example, one major automotive company has begun substituting aluminum for carbon steel in the body of some of its vehicles. Although automotive manufacturers have incorporated aluminum and other competing materials at a much slower rate than some experts previously expected, if demand for steel from one or more of our major automotive customers was to significantly decline because of increased use of aluminum or other competing materials in substitution for steel, it likely would negatively affect our sales, financial results and cash flows.

**Risks of excess inventory of raw materials.**  We have certain raw material supply contracts that include minimum annual purchases, subject to exceptions for *force majeure* and other circumstances. If our need for a particular raw material is reduced for an extended period significantly below what we projected at the contract's inception, or what we projected at the time an annual nomination was made under certain contracts, we could be required to purchase quantities of raw materials that exceed our anticipated annual needs. If our existing supply contracts require us to purchase raw materials in quantities beyond our needs, and if we do not succeed in reaching an agreement with a particular raw material supplier to reduce the quantity of raw materials we purchase from that supplier, then we would likely be required to purchase more of a particular raw material in a given year than we need, negatively affecting our financial results, liquidity and cash flows.

**Risk of supply chain disruptions or poor quality of raw materials or supplies.** Our sales, financial results and cash flows could be adversely affected by transportation, raw material, energy or other key supply disruptions, or poor quality of raw materials, particularly scrap, coal, coke, iron ore and alloys. In addition, we may experience supply chain disruptions or increased costs from transportation-related challenges due to new or enhanced regulation, changes to providers' operations, labor shortages or other factors. Disruptions or quality issues, whether the result of severe financial hardships or bankruptcies of suppliers, natural or man-made disasters, other adverse weather events, or other unforeseen events, could reduce production or increase costs at one or more of our plants and potentially adversely affect customers or markets to which we sell our products. Any significant disruption or quality issue in any of the areas addressed above would adversely affect our sales, financial results and cash flows.

**Risk of production disruption or reduced production levels**.  When business conditions permit, we attempt to operate our facilities at production levels that are at or near capacity. High production levels are important to our financial results because they enable us to spread fixed costs over a greater number of production tons. We have implemented a strategy to target markets for our products that deliver higher margins, where possible, and reduce amounts sold into the typically lower-margin spot markets. This ongoing strategy relies on our ability to sell higher-margin products that overcome the effects of lower production volumes on our fixed costs. If we are unable to sustain this strategy successfully, it would adversely affect our sales, financial results and cash flows. Production disruptions at facilities we own or at our joint ventures could be caused by unanticipated plant outages or equipment failures, a lack of redundancy for key production assets, or lack of adequate raw materials, energy or other supplies, particularly under circumstances where we lack adequate redundant facilities. Production disruptions could result in significant costs and potential liability to us, as well as negative publicity and damage to our reputation with current or potential customers. In addition, the occurrence of natural or man-made disasters, adverse weather conditions or similar events could significantly disrupt our operations, negatively impact the operations of other companies or contractors we depend upon, or adversely affect customers or markets who buy our products. Any significant disruption or reduced level of production would adversely affect our sales, financial results and cash flows.

**Risks associated with our healthcare obligations**.  We provide healthcare coverage to our active employees and to a significant portion of our retirees, as well as certain members of their families. We are self-insured for substantially all of our healthcare coverage. While we have reduced our exposure to rising healthcare costs to a significant degree through cost sharing, cost caps and VEBA trusts, the cost of providing such healthcare coverage may be greater on a relative basis for us than for our competitors because they either provide a lower level of benefits, require that their participants pay more for their benefits, or do not provide coverage to as broad a group of participants (e.g., they do not provide retiree healthcare benefits). In addition, our costs for retiree healthcare obligations could be affected by fluctuations in interest rates or by federal healthcare legislation.

**Risks associated with our pension obligations**.  We have a substantial pension obligation that, along with the related pension expense (income) and funding requirements, is directly affected by various changes in assumptions, including the selection of appropriate mortality assumptions and discount rates. These items also are affected by the rate and timing of employee retirements, actual experience compared to actuarial projections and asset returns in the securities markets. Such changes could increase our cost for those obligations, which could have a material adverse effect on our results and ability to meet those obligations. In addition, changes in the laws governing pensions could also materially adversely affect our costs and ability to meet our pension obligations. Also, under the method of accounting we use for pension obligation reporting, we recognize into our results of operations, as a "corridor" adjustment, any unrecognized actuarial net gains or losses that exceed 10% of the larger of projected benefit obligations or plan assets. These corridor adjustments are driven mainly by changes in assumptions and by events and circumstances beyond our control, primarily changes in interest rates, performance of the financial markets, and mortality and retirement projections. A corridor adjustment, if required after a re-measurement of our pension obligations, historically has been

recorded in the fourth quarter of the year, though one may be recorded at any time if an interim remeasurement occurs. A corridor adjustment can have a significant impact on our financial statements when it occurs, although its immediate recognition reduces the impact of unrealized gains or losses on future periods. A corridor charge does not have any immediate impact on our cash flows. We also contribute to multiemployer pension

- 13-

*Table of Contents*

plans according to collective bargaining agreements that cover certain union-represented employees. Participating in these multiemployer plans exposes us to potential liabilities if the multiemployer plan is unable to pay its underfunded obligations or we choose to stop participating in the plan. For example, in 2019 the trustees for the IAM National Pension Fund (the "Fund") voluntarily elected to place the Fund in the Red Zone for 2019 and implement a rehabilitation plan, which requires both an increase in employer contributions and reduction of certain employee pension benefits. Depending on negotiations with one of our affected unions, our contributions to the Fund could increase approximately $2.0 in 2020, with gradually increasing requirements through 2031.

**Risk of not reaching new labor agreements on a timely basis**.  Most of our hourly employees are represented by various labor unions and are covered by collective bargaining agreements with expiration dates between March 2020 and July 2023. One of those contracts is scheduled to expire in 2020. The labor contract with the International Association of Machinists and Aerospace Workers, Local 1943, which governs approximately 1,750 production employees at Middletown Works, expires on March 15, 2020. We intend to negotiate with the union to reach a new, competitive labor agreement in advance of the current expiration date. We cannot predict, however, when a new, competitive labor agreement with the union will be reached or what the impact of such agreement will be on our operating costs, operating income and cash flows. There is the potential of a work stoppage at this location in 2020 and beyond if we cannot reach timely agreement in contract negotiations before the contract expiration. If a work stoppage occurs, it could have a material impact on our operations, financial results and cash flows. For labor contracts at other locations that expire after 2020, a similar risk applies.

**Risks associated with major litigation, arbitrations, environmental issues and other contingencies**.  We have described several significant legal and environmental proceedings in Note 11 to the consolidated financial statements in Item 8. For environmental issues, changes in application or scope of laws or regulations applicable to us, or negative outcomes in pending or future litigation, could have significant adverse impacts, including requiring capital expenditures to ensure compliance with the laws, regulations, or court decisions, increased difficulty in obtaining future permits or meeting future permit requirements, incurring costs for emission allowances, restriction of production, and higher prices for certain raw materials. One or more of these adverse developments could negatively impact our operations, financial results and cash flows. For litigation, arbitrations and other legal proceedings, it is not possible to predict with certainty the outcome of such matters and we could incur future judgments, fines or penalties or enter into settlements of lawsuits, arbitrations and claims that could have an adverse effect on our business, results of operations and financial condition. In addition, while we maintain insurance coverage for certain claims, we may not be able to obtain insurance on acceptable terms in the future and, if we obtain such insurance, it may not provide adequate coverage against all claims. We establish reserves based on our assessment of contingencies, including contingencies for claims asserted against us in connection with litigation, arbitrations and environmental issues. Adverse developments in litigation, arbitrations, environmental issues or other legal proceedings may affect our assessment and estimates of the loss contingency recorded as a reserve and require us to make payments in excess of our reserves, which could negatively affect our operations, financial results and cash flows.

**Risk associated with regulatory compliance and changes.** Our business and the businesses of our customers and suppliers are subject to a wide variety of government regulations, including those relating to environmental permitting requirements. The regulations promulgated or adopted by various government agencies, and the interpretations and application of such regulations, are dynamic and constantly evolving. If new regulations arise, the application of existing regulations expands, or the interpretation of applicable regulations changes, we may incur additional costs for compliance, including capital expenditures. For example, the EPA is required to routinely reassess the National Ambient Air Quality Standards ("NAAQS") for criteria pollutants like nitrogen dioxide, sulfur dioxide, lead, ozone and particulate matter. These standards are frequently subject to litigation and revision. Revisions to the NAAQS could require us to make significant capital expenditures to ensure compliance and could make it more difficult for us to obtain required permits in the future. These risks are higher for our facilities that are located in non-attainment areas. Complex foreign and U.S. laws and regulations apply to our domestic and international operations, including but not limited to the Foreign Corrupt Practices Act and other anti-bribery laws, regulations related to import/export controls, the Office of Foreign Assets Control sanctions program, anti-boycott provisions, the European Union's General Data Protection Regulation ("GDPR") and other U.S. and foreign privacy regulations, and transportation and logistics regulations. These laws and regulations and changes in these laws and regulations may increase our cost of doing business in international jurisdictions and expose our operations and our employees to elevated risk. We have implemented policies and processes designed to comply with these laws and regulations, but failure by our employees, contractors or agents to comply with these laws and regulations could result in possible administrative, civil or criminal liability and reputational harm to us and our employees. We may also be indirectly affected through regulatory changes that impact our customers or suppliers. Regulatory changes that impact our customers could reduce the quantity of our products they demand or the price of our products that they are willing to pay. Regulatory changes that impact our suppliers could decrease the supply of products or availability of services they sell to us or could increase the price they demand for products or services they sell to us.

**Risks associated with climate change and greenhouse gas emissions**. Our business and operations, as well as the business and

operations of our key suppliers and customers, may become subject to legislation or regulation intended to limit climate change or greenhouse gas emissions. It is possible that limitations on, or taxes or other assessments related to, greenhouse gas emissions may be imposed in the United States through legislation or regulation. For example, the EPA has issued and/or proposed regulations addressing greenhouse gas emissions, including regulations that will require large sources and suppliers in the United States to report

- 14-

Table of Contents

greenhouse gas emissions. In addition, the U.S. Congress has introduced from time to time legislation aimed at limiting carbon emissions from carbon-intensive business operations. The CAFE standards and other existing and future climate change-related legislation and regulation could also affect our customers, and in particular our automotive customers, as they may elect to use lower volumes of steel to achieve mandates related to emissions. Similarly, our suppliers may incur cost increases in order to comply with climate control legislation and regulation, which they could in turn attempt to pass through to us in the form of higher prices for critical goods and services. It is impossible to forecast the terms of the final regulations and legislation, if any, and the resulting effects on us. Depending upon the terms of any such legislation or regulation, we could suffer negative financial impacts because of increased energy, operational, environmental and other costs to comply with the limitations that would be imposed on greenhouse gas emissions. In addition, depending upon whether similar limitations are imposed globally, the regulations and/or legislation could negatively impact our ability to compete with foreign steel companies situated in areas not subject to such limitations. Until all of the terms of such regulation and legislation are known, we cannot reasonably or reliably estimate their impact on our financial condition, operating performance or ability to compete.

**Risks associated with financial, credit, capital and banking markets**.  In the ordinary course of business, we seek to access financial, credit, capital and banking markets at competitive rates. Currently, we believe we have adequate access to these markets to meet our reasonably anticipated business needs. We provide and receive normal trade financing to our customers and from our suppliers. If access to competitive financial, credit, capital and banking markets by us, or our customers or suppliers, is impaired, our operations, financial results and cash flows could be adversely impacted.

**Risk associated with derivative contracts to hedge commodity pricing volatility**. We use cash-settled commodity price swaps and options to reduce pricing volatility for a portion of our raw material, energy and other commodity purchases. We employ a systematic approach in order to mitigate the risk of potential volatile price movements of certain commodities. This approach is intended to protect us against a sharp rise in the price of commodities. However, engaging in the use of swaps, options and similar agreements for hedging entails a variety of risks. For example, if the price of an underlying commodity falls below the price at which we hedged the commodity, we will benefit from the lower market price for the commodity purchased, but may not realize the full benefit of the lower commodity price because of the hedged transaction. In certain circumstances we also could be required to provide collateral for a potential derivative liability or close our hedging transaction for the commodity. Additionally, there may be a timing lag (particularly for iron ore) between a decline in the price of a commodity underlying a derivative contract, which could require us to make payments in the short-term to provide collateral or settle the relevant hedging transaction, and the period when we experience the benefits of the lower cost input through physical purchases of the commodity the hedge covers. Further, for derivatives designated as cash flow hedges, we initially record the effective gains and losses in accumulated other comprehensive income (loss) and reclassify them to earnings in the same period we recognize the effect of the associated hedged transaction. We record all derivative gains or losses for which hedge accounting treatment has not been elected to earnings in the period the gain or loss occurs. Changes in the fair value of derivatives for which hedge accounting treatment has not been elected may result in increased volatility in our reported earnings. For example, we immediately recognize changes in the fair value of our iron ore derivative contracts in earnings when the fair value changes, instead of when we recognize the underlying cost of iron ore, thus potentially increasing the volatility of our results of operations. Each of these risks related to our hedging transactions could adversely affect our financial results and cash flows.

**Risks related to the potential permanent idling of facilities.** We perform strategic reviews of our business on an ongoing basis, which includes evaluating each of our plants and operating units to assess their strategic benefits, competitiveness and viability. As part of these reviews, we may idle—whether temporarily or permanently—certain of our existing facilities in order to reduce o eliminate participation in markets where we determine that our returns are not acceptable. For example, in 2019 we permanently closed our Ashland Works plant. Our closure of Ashland Works resulted in the incurrence and acceleration of cash expenses, including those relating to labor benefit obligations, a multiemployer plan withdrawal liability, take-or-pay supply agreements and accelerated environmental remediation costs, as well as charges for impairment of those assets and the effects on pension and OPEB liabilities. Other risks associated with the closure of Ashland Works include, without limitation, our failure to achieve the projected savings and higher than expected closure costs. For operations other than Ashland Works, we could incur similar types of cash and non-cash costs if we elect to temporarily or permanently idle any of our other currently operating assets or facilities as part of our ongoing strategic reviews. We will generally endeavor to transition products produced at an affected operation to our other facilities, including joint ventures. Customers could respond negatively to this requested transition and take current or future business from us. Alternatively, we could fail to meet customer specifications at the facilities to which these products will be transitioned, resulting in customer dissatisfaction or claims, or face other unanticipated operational issues. If we elect to permanently idle other material facilities or assets, it could adversely affect our operations, financial results and cash flows.

**Risk of inability to fully realize benefits of margin enhancement initiatives.** In recent years we have undertaken several significant projects in an effort to lower costs and enhance margins. These projects and initiatives include efforts to focus production and sales on higher margin products, increase our operating rates and lower our costs. We identified a number of areas

for enhancing profitability, including increasing our percentage of contract sales, producing and selling a greater value-added mix of products and developing new products that can command higher prices from customers. For example, we expect Precision Partners to continue to grow as it expands its operations and capabilities with revenues that can realize higher margins than our average business. Goodwill is a significant part

- 15-

*Table of Contents*

of Precision Partners' assets and our inability to realize the benefits of the growth in its business model could result in an impairment of goodwill. As another example, we have recently undertaken several significant information technology ("IT") projects, including new and upgraded enterprise systems that affect key areas of our business and operations. Although we anticipate that these IT projects will increase our efficiency, should these projects face unexpected challenges, whether during implementation, adoption or other stages, it could have adverse impacts on our business or operations. Generally, if one or more of these key cost-savings or margin enhancement projects are unsuccessful, are significantly less effective in achieving the level and timing of combined cost savings or margin enhancement than we anticipated, or do not achieve results as quickly as anticipated, our financial results and cash flows could be adversely impacted.

**Risk of IT security threats, cybercrime and exposure of private information.** We rely on IT systems and networks in almost every aspect of our business activities. In addition, we and certain of our third-party data processing providers collect and store sensitive data, and our vendors or suppliers may collect and store sensitive data about us in their information system environments. We have taken, and intend to continue to take, what we believe are appropriate and reasonable steps to prevent security breaches in our systems and networks. In recent years, however, both the number and sophistication of IT security threats and cybercrimes have increased. Additionally, regulatory pressure has increased for companies to prevent security breaches and notify stakeholders if data is exposed. These IT security threats and increasingly sophisticated cybercrimes pose a risk to system security and the confidentiality, availability and integrity of our data. A breach in security could expose us to risks of production downtimes and operations disruptions, misuse of information or systems, or the compromise of confidential information, which in turn could adversely affect our reputation, competitive position, business and financial results.

**Risks associated with changes in tax laws and regulations.** We are a large corporation with operations in the U.S. and other jurisdictions. As such, we are subject to tax laws and regulations of the U.S. federal, state and local governments, as well as various foreign jurisdictions. We compute our income tax provision based on enacted tax rates in the jurisdictions in which we operate. Significant judgment is required in determining our tax provision for income taxes. Changes in tax laws or regulations may be enacted that could adversely affect our overall tax assets and liabilities. Any changes in enacted tax laws, rules or regulatory or judicial interpretations, any adverse outcome in connection with tax audits in any jurisdiction, or any change in the pronouncements relating to accounting for income taxes could materially and adversely impact our financial condition and results of operations.

**Risks related to the uncertain consideration our stockholders will receive in the Merger because the market price of Cliffs common shares will fluctuate.** Subject to the terms and conditions set forth in the Merger Agreement, upon consummation of the Merger, each share of our common stock issued and outstanding immediately prior to the effective time of the Merger (other than restricted shares and shares of our common stock owned by us, Cliffs or Merger Sub) will be converted into the right to receive 0.40 Cliffs common shares (as well as cash in lieu of any fractional Cliffs common shares and any dividends or distributions on the Cliffs common shares with a record date at or after the effective time of the Merger). The exchange ratio in the Merger is fixed, and there will be no adjustment to the consideration to be received by our stockholders in the Merger for changes in the market price of Cliffs common shares or our common stock prior to the completion of the Merger. The market value of Cliffs common shares may fluctuate prior to the closing of the transaction as a result of a variety of factors, including general market and economic conditions, changes in Cliffs' business, operations and prospects and regulatory considerations. Such factors are difficult to predict and in many cases may be beyond our control or Cliffs' control. The actual value of the consideration to be received by our stockholders at the completion of the Merger will depend on the market value of the Cliffs common shares at that time. This market value may differ, possibly materially, from the market value of Cliffs common shares at the time the Merger Agreement was entered into or at any other time.

**Risk that the Merger Agreement may be terminated in accordance with its terms and the Merger may not be completed.** The Merger Agreement contains a number of conditions that must be satisfied or waived in order to complete the Merger. Those conditions include, among others:

- the adoption of the Merger Agreement by our stockholders;
- the approval by Cliffs shareholders of the Merger Agreement and the transactions contemplated by the Merger Agreement, including the issuance of Cliffs common shares in connection with the Merger;
- the approval to list the Cliffs common shares issuable in connection with the Merger on the NYSE;
- the expiration or termination of the antitrust waiting period applicable to the Merger and receipt of required regulatory approvals in Mexico;
- the absence of any governmental order or law prohibiting the consummation of the Merger;
- the accuracy of Cliffs' and our respective representations and warranties under the Merger Agreement (subject to the materiality standards set forth in the Merger Agreement);
- Cliffs' and our performance of their respective obligations under the Merger Agreement in all material respects;
- the absence of a material adverse effect on Cliffs (as described in the Merger Agreement); and

- our receipt of a written opinion of our tax counsel (or, if our tax counsel is unwilling or unable to deliver such tax opinion, Cliffs' tax counsel, or, if Cliffs' tax counsel does not deliver such an opinion, subject to our using reasonable best efforts to

- 16-

*Table of Contents*

obtain the tax opinion from another nationally recognized tax counsel reasonably acceptable to us) regarding the U.S. federal income tax treatment of the transaction.

These conditions to the closing of the Merger may not be fulfilled in a timely manner or at all, and, accordingly, the Merger may be delayed or may not be completed. In addition, if the Merger is not completed by June 30, 2020 (subject to our and Cliffs' ability to extend the date to September 30, 2020 and then December 31, 2020 if required antitrust approvals have not yet been obtained or there is an impediment under any antitrust law), either Cliffs or we may choose not to proceed with the Merger. The parties can mutually decide to terminate the Merger Agreement at any time, before or after the receipt of our stockholder approval or Cliffs shareholder approval.

**Risk that an adverse ruling in one or more lawsuits filed against AK Steel, its directors, Cliffs, its directors and Merger Sub in connection with the Merger may delay the completion of the Merger or prevent the Merger from being completed.** Six actions, including one putative class action lawsuit, have been filed in federal court in Delaware, Michigan and New York by purported stockholders of ours in connection with the Merger: the Stein Action, Spuhler Action, Franchi Action, Raul Action, Ruiz Action and Rubin Action (collectively, the "AK Steel Stockholder Federal Actions", each as defined and described in Note 11 to the consolidated financial statements in Item 8). A seventh action, the Pate Action (as defined and described in Note 11 to the consolidated financial statements), has been filed by a purported AK Steel stockholder as a putative class action in state court in Ohio (the Pate Action and the AK Steel Stockholder Federal Actions are collectively referred to as the "AK Steel Stockholder Actions."). Each of the AK Steel Stockholder Actions names AK Steel and its directors as defendants, and the Franchi Action and Pate Action each name Cliffs and Merger Sub as additional defendants. An eighth action, the Nessim Action (as defined and described in Note 11 to the consolidated financial statements), has been filed in federal court in New York against Cliffs and its directors by a purported shareholder of Cliffs (the Nessim Action and the AK Steel Stockholder Federal Actions are collectively referred to as the "Federal Stockholder Actions," and all eight actions are collectively referred to as the "Stockholder Actions."). Each of the Federal Stockholder Actions alleges, among other things, that the registration statement on Form S-4 filed by Cliffs in connection with the Merger is false and misleading and/or omits material information concerning the transactions contemplated by the Merger Agreement in violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Rule 14a-9 promulgated under the Exchange Act. The Pate Action alleges breach of fiduciary duty claims against the AK Steel directors and aiding and abetting claims against AK Steel, Cliffs and Merger Sub in connection with the transactions contemplated by the Merger Agreement, including that the registration statement on Form S-4 filed by Cliffs in connection with the Merger is false and misleading and/or omits material information concerning the transactions contemplated by the Merger Agreement. The plaintiffs in the Stockholder Actions, among other things, seek to enjoin the transactions contemplated by the Merger Agreement and an award of attorneys' fees and expenses.

Additional lawsuits related to the transactions contemplated by the Merger Agreement may be filed in the future. Even if the lawsuits are without merit, these claims can result in substantial costs and divert management time and resources. There can be no assurance that any of the defendants will be successful in defending the pending or any potential future lawsuits. A preliminary injunction could delay or jeopardize the completion of the Merger, and an adverse judgment granting permanent injunctive relief could indefinitely enjoin the completion of the Merger. An adverse judgment in any Stockholder Action could result in monetary damages, which could have a negative impact on Cliffs' and AK Steel's respective liquidity and financial condition.

**Risk of negative impacts on the price of shares of our common stock and our debt securities, our future business and financial results as a result of failing to complete the Merger.** If the Merger is not completed for any reason, including the failure of either company's stockholders to approve the requisite transactions, our business and financial results may be adversely affected, including as follows:

• we may experience negative reactions from the financial markets, including negative impacts on the market price of our common stock and debt securities;
• the manner in which customers, vendors, business partners and other third parties perceive us may be negatively impacted, which in turn could affect our ability to compete for new business or obtain renewals in the marketplace more broadly;
• we may experience negative reactions from employees, which may adversely affect, among other things, productivity, employee turnover and occupational safety; and
• we have and will continue to expend significant time and resources that could otherwise have been spent on our existing businesses and the pursuit of other opportunities that could have been beneficial to us, and our ongoing business and financial results may be adversely affected.

In addition to the above risks, if the Merger Agreement is terminated and our board seeks an alternative transaction, our stockholders cannot be certain that we will be able to find a party willing to engage in a transaction on more attractive terms than the Merger. If the Merger Agreement is terminated under specified circumstances, we also may be required to pay Cliffs a

termination fee.

**Risks associated with the Merger Agreement limiting our ability to pursue alternatives to the Merger.** The Merger Agreement contains provisions that may discourage a third party from submitting an acquisition proposal to us that might result in greater value to

- 17-

*Table of Contents*

our stockholders than the Merger, or may result in a potential competing acquirer proposing to pay a lower per share price to acquire us than it might otherwise have proposed to pay. These provisions include a general prohibition on our soliciting or, subject to certain exceptions relating to the exercise of fiduciary duties by our board, entering into discussions with any third party regarding any acquisition proposal or offer for a competing transaction, and a termination fee that is payable to Cliffs if we terminate the Merger Agreement to accept a superior acquisition proposal.

**Risk of business uncertainties while the Merger is pending and related adverse effects on our business.** Uncertainty about the effect of the Merger on employees, suppliers and customers may have an adverse effect on us. These uncertainties may impair our ability to attract, retain and motivate key personnel until the Merger is completed, and could cause suppliers, customers and others that deal with us to seek to change our existing business relationships. In addition, the Merger Agreement restricts us from entering into certain corporate transactions and taking other specified actions without the consent of Cliffs, and generally requires us to continue our operations in the ordinary course, until completion of the Merger. These restrictions may prevent us from pursuing attractive business opportunities that may arise prior to the completion of the Merger.

**Risk of the significant transaction and Merger-related costs exceeding our expectations.** We have incurred and will incur substantial expenses in connection with the negotiation and completion of the transactions contemplated by the Merger Agreement, including, among others, fees paid to financial, legal and accounting advisors, employee retention costs, severance and benefit costs and filing fees. Many of these costs will be borne by us even if the Merger is not completed and could have an adverse effect on our financial condition and operating results.

**Risk that uncertainties associated with the Merger cause a loss of management personnel and other employees, which could adversely affect our future business and operations.** We are dependent on the experience and industry knowledge of our officers and other employees to execute our business plans. Our success depends in part upon our ability to retain management personnel and other employees. Our current and prospective employees may experience uncertainty about their roles within the combined company following the Merger, which may have an adverse effect on our ability to attract or retain management and other personnel while the transaction is pending.

**Item 1B.        Unresolved Staff Comments.**

None.

**Item 2.        Properties.**

We lease our corporate headquarters in West Chester, Ohio, through 2029, with two five-year options to extend the lease. We own our Research and Innovation Center located in Middletown, Ohio.

Our operations consist primarily of seven steelmaking and finishing plants in the United States. We own all of our steelmaking and finishing facilities. In addition, we operate two coke plants, a metallurgical coal production facility, three tube manufacturing plants and ten tooling and stamping operations in the United States, Canada and Mexico.

Butler Works is located in Butler, Pennsylvania, and produces stainless, electrical and carbon steel. Melting takes place in an electric arc furnace that feeds an argon-oxygen decarburization unit for the specialty steels. A ladle metallurgy furnace feeds two double-strand continuous casters. Butler Works also includes a hot rolling mill, annealing and pickling units and two tandem cold rolling mills. It also has various intermediate and finishing operations for both stainless and electrical steels.

Coshocton Works is located in Coshocton, Ohio, and consists of a stainless steel finishing plant containing two Sendzimer mills and two Z-high mills for cold reduction, four annealing and pickling lines, nine bell annealing furnaces, four hydrogen annealing furnaces, two bright annealing lines and other processing equipment, including temper rolling, slitting and packaging facilities.

Dearborn Works is located in Dearborn, Michigan, and its operations include carbon steel melting, casting, hot and cold rolling and finishing operations for carbon steel. It consists of a blast furnace, basic oxygen furnaces, two ladle metallurgy furnaces, a vacuum degasser and two slab casters. Dearborn Works also has a hot rolling mill, a pickle line/tandem cold mill, batch anneal shops, a temper mill and a hot-dip galvanizing line for finishing products.

Mansfield Works is located in Mansfield, Ohio, and produces stainless steel. Operations include a melt shop with two electric arc furnaces, an argon-oxygen decarburization unit, a ladle metallurgy furnace, a thin-slab continuous caster and a hot rolling mill.

Middletown Works is located in Middletown, Ohio, and melts carbon steel and processes carbon and stainless steel. It consists of a

coke facility, a blast furnace, basic oxygen furnaces, a CAS-OB, a vacuum degasser and a continuous caster for the production of

- 18-

*Table of Contents*

carbon steel. Middletown Works also has a hot rolling mill, cold rolling mill, two pickling lines, four annealing facilities, two temper mills and three coating lines for finishing products.

Rockport Works is located near Rockport, Indiana, and consists of a carbon and stainless steel finishing plant containing a continuous cold rolling mill, a continuous hot-dip galvanizing and galvannealing line, a continuous carbon and stainless steel pickling line, a continuous stainless steel annealing and pickling line, hydrogen annealing facilities and a temper mill.

Zanesville Works is located in Zanesville, Ohio, and consists of a finishing plant for some of the stainless and electrical steel produced at Butler Works and Mansfield Works and has a Sendzimer cold rolling mill, annealing and pickling lines, high-temperature box anneal and other decarburization and coating units.

AK Tube, a subsidiary, owns a plant in Walbridge, Ohio, which operates six electric resistance welded tube mills. It also has a plant on leased land in Columbus, Indiana, which operates seven electric resistance welded tube mills, three high-speed cold saws. AK Tube's leased plant in Queretaro, Mexico, operates one electric resistance welded tube mill and one high-speed cold saw.

AK Coal, a subsidiary, produces metallurgical coal from reserves in Somerset County, Pennsylvania.

Mountain State Carbon, LLC, a subsidiary, produces furnace and foundry coke from its cokemaking facility in Follansbee, West Virginia, which consists of four batteries.

Precision Partners, a subsidiary, provides advanced-engineered solutions, tool design and build, hot- and cold-stamped steel components and complex assemblies for the automotive market across ten plants in Ontario, Alabama and Kentucky. Its facilities feature seven large-bed, hot-stamping presses providing thirteen lines of production; 81 cold-stamping presses ranging from 200 tons to 3,000 tons of pressing capacity; 17 large-bed, high-tonnage tryout presses with prove-out capabilities for new tool builds; and 144 multi-axis welding assembly cells. Precision Partners owns one facility in Ontario and the remainder are leased.

**Item 3.**        **Legal Proceedings.**

Information for this item may be found in Note 11 to the consolidated financial statements in Item 8, which is incorporated herein by reference.

**Item 4.**        **Mine Safety Disclosures.**

The operations of AK Coal's North Fork mine and coal wash plant (collectively, the "AK Coal Operations") are subject to regulation by the Mine Safety and Health Administration ("MSHA") under the Federal Mine Safety and Health Act of 1977, as amended ("Mine Act"). MSHA inspects mining and processing operations, such as the AK Coal Operations, on a regular basis and issues various citations and orders when it believes a violation has occurred under the Mine Act. Exhibit 95.1 to this Annual Report presents citations and orders from MSHA and other regulatory matters required to be disclosed by Section 1503(a) of the Dodd-Frank Wall Street Reform and Consumer Protection Act or otherwise under this Item 4.

<center>PART II</center>

**Item 5.**        **Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.**

AK Holding's common stock is listed on the New York Stock Exchange (symbol: AKS). As of February 18, 2020, there were 316,909,268 shares of common stock outstanding and held of record by 3,470 stockholders. Because depositories, brokers and other nominees hold many of these shares, the number of record holders is not representative of the number of beneficial holders. There were no unregistered sales of equity securities in the year ended December 31, 2019.

<center>- 19-</center>

*Table of Contents*

## ISSUER PURCHASES OF EQUITY SECURITIES

| Period | Total Number of Shares Purchased (a) | Average Price Paid Per Share (a) | Total Number of Shares (or Units) Purchased as Part of Publicly Announced Plans or Programs (b) | Approximate Dollar Value of Shares that May Yet be Purchased Under the Plans or Programs (b) |
|---|---|---|---|---|
| October 2019 | 414 | $ 2.43 | — | |
| November 2019 | — | — | — | |
| December 2019 | — | — | — | |
| Total | 414 | 2.43 | — | $ 125.6 |

    (a)  Employees may have us withhold shares to pay federal, state and local taxes due upon the vesting of restricted stock or performance shares under the terms of the AK Steel Holding Corporation 2019 Omnibus Supplemental Incentive Plan. In this event, the withheld shares have a fair market value equal to the minimum statutory withholding rate that tax authorities could impose on the transaction. We repurchase the withheld shares at the quoted closing price on the day we withhold the shares.

    (b)  On October 21, 2008, the Board of Directors authorized us to repurchase, from time to time, up to $150.0 of our outstanding equity securities. The Board of Directors' authorization specified no expiration date. We did not repurchase any of our equity securities under this authorization in 2019.

- 20-

*Table of Contents*

The following graph compares cumulative total stockholder return on AK Holding's common stock for the five-year period from January 1, 2015 through December 31, 2019, with the cumulative total return for the same period of (i) the Standard & Poor's Small Cap 600 Stock Index, and (ii) the New York Stock Exchange Arca Steel Index. These comparisons assume an investment of $100 at the beginning of the period and reinvestment of dividends.



| | January 1, | December 31, | | | | |
|---|---|---|---|---|---|---|
| | 2015 | 2015 | 2016 | 2017 | 2018 | 2019 |
| AK Holding | $ 100 | $ 38 | $ 172 | $ 95 | $ 38 | $ 55 |
| NYSE Arca Steel | 100 | 56 | 107 | 130 | 102 | 111 |
| S&P 600 Small Cap | 100 | 97 | 121 | 135 | 122 | 147 |

- 21-

A005718

*Table of Contents*

**Item 6.**     **Selected Financial Data.**

The following selected historical consolidated financial data should be read along with the consolidated financial statements presented in Item 8 and *Management's Discussion and Analysis of Financial Condition and Results of Operations* presented in Item 7.

| | 2019 | 2018 | 2017 | 2016 | 2015 |
|---|---|---|---|---|---|
| | *(dollars in millions, except per share and per ton data)* | | | | |
| **Statement of Operations Data:** | | | | | |
| Net sales | $ 6,359.4 | $ 6,818.2 | $ 6,080.5 | $ 5,882.5 | $ 6,692.9 |
| Operating profit (loss) | 209.3 | 364.4 | 260.2 | 217.6 | (67.4) |
| Net income (loss) attributable to AK Steel Holding Corporation (a) | 11.2 | 186.0 | 103.5 | (16.8) | (652.3) |
| Basic earnings (loss) per share | 0.04 | 0.59 | 0.33 | (0.07) | (3.67) |
| Diluted earnings (loss) per share (a) | 0.04 | 0.59 | 0.32 | (0.07) | (3.67) |
| **Other Data:** | | | | | |
| Total flat-rolled shipments (in thousands of tons) | 5,342.2 | 5,683.4 | 5,596.2 | 5,936.4 | 6,974.0 |
| Selling price per flat-rolled ton | $ 1,078 | $ 1,091 | $ 1,022 | $ 955 | $ 929 |
| **Balance Sheet Data:** | | | | | |
| Cash and cash equivalents | $ 31.0 | $ 48.6 | $ 38.0 | $ 173.2 | $ 56.6 |
| Working capital | 959.8 | 1,072.7 | 1,070.1 | 1,077.1 | 899.5 |
| Total assets (b) | 4,590.6 | 4,515.7 | 4,474.8 | 4,101.7 | 4,157.8 |
| Long-term debt | 1,968.8 | 1,993.7 | 2,110.1 | 1,816.6 | 2,354.1 |
| Current portion of pension and other postretirement benefit obligations | 41.0 | 38.7 | 40.1 | 41.3 | 77.7 |
| Pension and other postretirement benefit obligations (excluding current portion) | 717.8 | 829.9 | 894.2 | 1,093.7 | 1,146.9 |
| Total equity (deficit) | 477.3 | 429.5 | 300.6 | 149.8 | (528.4) |

(a)  In 2019, we recorded a charge of $69.3 ($0.22 per diluted share) to permanently close Ashland Works. In 2019, 2018 and 2016, we recorded pension settlement charges of $26.9 ($0.08 per diluted share), $14.5 ($0.05 per diluted share) and $25.0 ($0.11 per diluted share). In 2017, we recorded an asset impairment charge of $75.6 ($0.24 per diluted share) related to the Ashland Works blast furnace and steelmaking operations ("Ashland Works Hot End") and a credit of $19.3 ($0.06 per diluted share) for the reversal of a liability for transportation costs. In 2016, we also recorded costs of $69.5 ($0.30 per diluted share) to terminate a pellet offtake agreement and for related transportation costs. Under our method of accounting for pensions and other postretirement benefits, we recorded pension corridor charges of $78.4 ($0.34 per diluted share) and $144.3 ($0.81 per diluted share) in 2016 and 2015, and OPEB corridor credits of $35.3 ($0.15 per diluted share) and $13.1 ($0.07 per diluted share) in 2016 and 2015. In 2015, we also recorded a charge for a temporary facility idling of $28.1 ($0.16 per diluted share) for the Ashland Works Hot End and impairments of our investments in our former Magnetation LLC joint venture of $256.3 ($1.44 per diluted share) and AFSG Holdings, Inc. of $41.6 ($0.23 per diluted share).

(b)  We adopted Accounting Standards Update No. 2016-02, *Leases (Topic 842)*, as of January 1, 2019 through the modified retrospective method and recorded additional lease assets and liabilities of $291.1 as of January 1, 2019. Prior period amounts have not been adjusted and continue to be reported in accordance with our historical accounting treatment.

**Item 7.**     **Management's Discussion and Analysis of Financial Condition and Results of Operations.**

**Executive Overview**

We are a leading producer of flat-rolled carbon, stainless and electrical steel products, primarily for the automotive, infrastructure and manufacturing, and distributors and converters markets. Our downstream businesses also provide customer solutions with carbon and stainless steel tubing products, high-end stainless steel finishing, advanced-engineered solutions, tool design and build, hot- and cold-stamped steel components and complex assemblies.

Our mission is to create innovative, high-quality steel solutions for our customers and our key values of safety, quality, productivity

and innovation, along with environmental responsibility and sustainability, are its foundation. We target customers who require the most technically demanding, highest-quality steel products, "just-in-time" delivery, technical support and product development assistance. Our robust product quality and delivery capabilities, as well as our emphasis on collaborative customer technical support and product planning, are critical factors in our ability to serve our customer markets. We focus on value-added steel solutions rather than sales into commodity steel markets.

- 22-

*Table of Contents*

**2019 Financial Overview**

In 2019, we made significant capital investments to strengthen the company for the long-run, including a major planned outage that will lower our steelmaking costs at Dearborn Works and the construction of a new Precision Partners facility to grow our market position and capabilities in automotive stamping and complex assembly. While those investments will benefit the company in future years, we faced market headwinds in 2019 that impacted our financial results. Those headwinds included lower shipments resulting from challenging steel market conditions with softening spot market steel prices and a slight decline in automotive demand, including reduced shipments to General Motors as a result of the 40-day strike that halted its vehicle production. Our 2019 net income was $11.2, or $0.04 per diluted share of common stock, which reflected a charge for the Ashland Works closure of $69.3 (or $0.22 per diluted share), compared to 2018 net income of $186.0, or $0.59 per diluted share. Our 2019 results also reflected a pension settlement charge of $26.9, or $0.08 per diluted share, from a pension annuity transaction that we entered into in the fourth quarter of 2019 as part of our efforts to de-risk our balance sheet. Our 2018 results reflected a pension settlement charge of $14.5, or $0.05 per diluted share, for a separate pension annuity transaction that we entered into in 2018. Excluding the Ashland closure and pension settlement charges, 2019 adjusted net income was $107.4, or $0.34 per diluted share, compared to 2018 adjusted net income of $200.5, or $0.64 per diluted share. Our adjusted EBITDA (as defined in *Non-GAAP Financial Measures*) was $446.5, or 7.0% of net sales, for 2019, compared to adjusted EBITDA of $563.4, or 8.3% of net sales, for 2018.

Our 2019 results reflected lower shipments of flat-rolled steel from a year ago, primarily due to a softening of sales to the distributors and converters market and reduced shipments to the automotive market. The average selling price per flat-rolled steel ton decreased by 1% in 2019 from 2018, primarily due to lower selling prices for carbon spot market sales. These impacts were partially offset by higher selling prices to the automotive market and lower costs for scrap, alloys and energy. Maintenance outage costs in 2019 were $81.0, compared to $91.1 in 2018. We recorded mark-to-market unrealized gains on iron ore derivatives of $49.6 in 2019, as compared to unrealized gains of $0.2 in 2018.

In January 2019, we announced our intent to close Ashland Works, including the previously idled blast furnace and steelmaking operations ("Ashland Works Hot End"), and the hot dip galvanizing coating line that had remained operational. During 2019, we transitioned products to our other, lower cost U.S. coating lines and in November 2019 ceased operations at the Ashland Works coating line. We recorded a charge of $69.3, or $0.22 per diluted share, during 2019 for termination of certain take-or-pay agreements, supplemental unemployment and other employee benefit costs, estimated multiemployer plan withdrawal liability, and other costs. See discussion below and in Note 3 to the consolidated financial statements.

During 2019, we transferred $615.6 of pension obligations to a highly-rated insurance company for approximately 4,250 retirees or their beneficiaries. Since mid-2016, we have transferred a total of $1.1 billion in pension trust assets to purchase four non-participating annuity contracts that require highly-rated insurance companies to pay the transferred pension obligations to approximately 20,000 pension participants. The settlement charges related to these transactions represent the recognition of unrealized actuarial losses that were being recognized over the future estimated remaining lives of the affected pension participants.

**2019 Compared to 2018**

*Steel Shipments*

Flat-rolled steel shipments in 2019 were 5,342,200 tons, a 6% decrease compared to 2018 shipments of 5,683,400 tons. The decrease was a result of lower shipments to the distributors and converters market and a 6% decline in shipments to the automotive market, due in part to the 40-day strike at General Motors. Shipments of flat-rolled steel by product category for 2019 and 2018, as a percent of total flat-rolled steel shipments, were as follows:

- 23-

*Table of Contents*

## Flat-Rolled Steel Shipments by Product Category

### 2019



chart-2601d370323755ce89f.jpg

*Net Sales*

The following table presents information on net sales:

|  | 2019 | 2018 | Increase (Decrease) |
|---|---|---|---|
| Net sales | $ 6,359.4 | $ 6,818.2 | (7)% |
| Average net selling price per ton | 1,078 | 1,091 | (1)% |
| Net sales outside the United States | 569.4 | 634.8 |  |
| Net sales outside the United States as a percent of net sales | 9% | 9% |  |

The decrease in net sales was driven primarily by lower shipments and lower spot market steel pricing, which includes the effect of surcharges, partly offset by higher selling prices for automotive shipments. The decrease in average net selling price per ton was primarily driven by reduced selling prices in the carbon spot market.

The following table presents the percentage of net sales to each of our markets:

| Market | 2019 | 2018 |
|---|---|---|
| Automotive | 66% | 63% |

| | | |
|---|---|---|
| Infrastructure and Manufacturing | 16% | 15% |
| Distributors and Converters | 18% | 22% |

*Cost of Products Sold*

Cost of products sold in 2019 of $5,606.3, or 88.2% of net sales, decreased from 2018 cost of products sold of $5,911.0, or 86.7% of net sales. The decrease was largely due to a lower volume of shipments and lower costs for scrap, alloys and energy, which were partially offset by higher costs for iron ore, coal and coke. Cost of products sold in 2019 included total outage costs of $81.0, compared to total outage costs in 2018 of $91.1, which included unplanned outage costs at our Middletown Works totaling $50.9. We had $18.9 of insurance recoveries in 2019, compared to insurance recoveries totaling $15.1 in 2018. We recorded mark-to-market gains of $49.6 and $0.2 for 2019 and 2018 from iron ore derivatives that do not qualify as cash flow hedges for accounting purposes.

*Selling and Administrative Expense*

Selling and administrative expense decreased to $295.2 in 2019 from $322.6 in 2018. The decrease was primarily a result of lower variable compensation expense compared to the prior year.

- 24-

*Table of Contents*

*Depreciation Expense*

Depreciation expense decreased to $192.6 in 2019 from $220.2 in 2018. The decline was primarily a result of a significant amount of fixed assets related to the initial construction of our Rockport Works facility becoming fully depreciated as of December 31, 2018, partly offset by higher depreciation at SunCoke Middletown.

*Ashland Works Closure*

As a result of the decision to permanently close Ashland Works discussed in Note 3 to the consolidated financial statements, we recorded a charge in 2019 of $69.3, which included $18.5 for termination of certain take-or-pay supply agreements, $20.1 for supplemental unemployment and other employee benefit costs, pension and other postretirement employee benefit ("OPEB") termination benefits of $13.3 (recorded in pension and OPEB (income) expense), an estimated multiemployer plan withdrawal liability of $10.0, and $7.4 for other costs.

*Operating Profit*

Operating profit for 2019 of $209.3 was lower than 2018 operating profit of $364.4. Included in operating profit was SunCoke Middletown's operating profit of $52.2 and $58.4 for 2019 and 2018.

*Interest Expense*

Interest expense for 2019 decreased to $146.6 from $151.6 in 2018, primarily as a result of lower average borrowings under the Credit Facility in 2019.

*Pension and OPEB (Income) Expense*

Pension and OPEB expense was $12.0 in 2019, compared to income of $19.2 in 2018. The change from income to expense in 2019 was primarily due to pension and OPEB termination benefits of $13.3 recognized in 2019 associated with the Ashland Works closure and a lower expected return on plan assets, partially offset by a greater amount of amortization of unrealized gains. We also recorded settlement losses of $26.9 and $14.5 in 2019 and 2018 as a result of purchases of non-participating annuity contracts for certain retirees and lump sum payouts to new retirees.

*Other (Income) Expense*

Other (income) expense was income of $18.5 in 2019 and income of $5.9 in 2018. Included in 2019 was a gain of $11.6 related to the sale of electrical transmission assets at our Dearborn Works.

*Income Tax Expense (Benefit)*

We recorded income tax expense of $6.2 in 2019, compared to an income tax benefit of $6.2 in 2018. Included in 2018 is an income tax benefit of $5.3 as a result of a reduction in our valuation allowance caused by changes to the tax net operating loss carryover rules included in the Tax Cuts and Jobs Act of 2017 that allow us to use certain indefinite-lived deferred tax liabilities as a source of future income to realize deferred tax assets.

*Net Income and Adjusted Net Income Attributable to AK Steel Holding Corporation*

Net income attributable to AK Holding in 2019 was $11.2, or $0.04 per diluted share. Net income in 2019 included a charge for the Ashland Works closure of $69.3, or $0.22 per diluted share, and a pension settlement loss of $26.9, or $0.08 per diluted share. Excluding these items, we reported adjusted net income attributable to AK Holding of $107.4, or $0.34 per diluted share, for 2019.

Net income attributable to AK Holding in 2018 was $186.0, or $0.59 per diluted share. Net income in 2018 reflected a pension settlement charge of $14.5, or $0.05 per diluted share. Excluding this item, we reported adjusted net income attributable to AK Holding of $200.5, or $0.64 per diluted share, for 2018.

*Adjusted EBITDA*

Adjusted EBITDA was $446.5, or 7.0% of net sales, for 2019, as compared to $563.4, or 8.3% of net sales, for 2018.

*Table of Contents*

For a comparison of the year ended December 31, 2018 to the year ended December 31, 2017, refer to *2018 Compared to 2017*, which is incorporated herein by reference, of *Management's Discussion and Analysis of Financial Condition and Results of Operations* in Item 7 of our Annual Report on Form 10-K for the year ended December 31, 2018.

**Non-GAAP Financial Measures**

In certain of our disclosures, we have reported adjusted EBITDA, adjusted EBITDA margin and adjusted net income attributable to AK Holding that exclude the effects of noncontrolling interests, costs associated with the closure of Ashland Works, pension settlement charges and a credit for adjustment to a liability for transportation costs. We believe that reporting adjusted net income attributable to AK Holding (as a total and on a per share basis) with these items excluded more clearly reflects our current operating results and provides investors with a better understanding of our overall financial performance. Adjustments to net income attributable to AK Holding do not result in an income tax effect as any gross income tax effects are offset by a corresponding change in the deferred income tax valuation allowance.

EBITDA is an acronym for earnings before interest, taxes, depreciation and amortization. It is a metric that is sometimes used to compare the results of different companies by removing the effects of different factors that might otherwise make comparisons inaccurate or inappropriate. For purposes of this report, we have made the adjustments to EBITDA noted in the preceding paragraph. The adjusted results, although not financial measures under generally accepted accounting principles in the United States ("GAAP") and not identically applied by other companies, facilitate the ability to analyze our financial results in relation to those of our competitors and to our prior financial performance by excluding items that otherwise would distort the comparison. Adjusted EBITDA, adjusted EBITDA margin and adjusted net income are not, however, intended as alternative measures of operating results or cash flow from operations as determined in accordance with GAAP and are not necessarily comparable to similarly titled measures used by other companies.

Neither current stockholders nor potential investors in our securities should rely on adjusted EBITDA, adjusted EBITDA margin or adjusted net income as a substitute for any GAAP financial measure and we encourage investors and potential investors to review the following reconciliations of adjusted EBITDA and adjusted net income.

**Reconciliation of Adjusted EBITDA**

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Net income attributable to AK Holding | $ 11.2 | $ 186.0 | $ 103.5 |
| Net income attributable to noncontrolling interests | 51.8 | 58.1 | 61.4 |
| Income tax expense (benefit) | 6.2 | (6.2) | (2.2) |
| Interest expense, net | 145.7 | 150.7 | 150.9 |
| Depreciation and amortization | 209.8 | 237.0 | 236.3 |
| EBITDA | 424.7 | 625.6 | 549.9 |
| Less: EBITDA of noncontrolling interests (a) | 74.4 | 76.7 | 77.7 |
| Ashland Works closure | 69.3 | — | — |
| Pension settlement charges | 26.9 | 14.5 | — |
| Credit for adjustment of liability for transportation costs | — | — | (19.3) |
| Asset impairment charge | — | — | 75.6 |
| Adjusted EBITDA | $ 446.5 | $ 563.4 | $ 528.5 |
| Adjusted EBITDA margin | 7.0% | 8.3% | 8.7% |

    (a)   The reconciliation of net income attributable to noncontrolling interests to EBITDA of noncontrolling interests is as follows:

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Net income attributable to noncontrolling interests | $ 51.8 | $ 58.1 | $ 61.4 |
| Depreciation | 22.6 | 18.6 | 16.3 |
| EBITDA of noncontrolling interests | $ 74.4 | $ 76.7 | $ 77.7 |

*Table of Contents*

**Reconciliation of Adjusted Net Income**

| | 2019 | 2018 | 2017 |
|---|---|---|---|
| **Reconciliation to Net Income Attributable to AK Holding** | | | |
| Net income attributable to AK Holding, as reported | $ 11.2 | $ 186.0 | $ 103.5 |
| Ashland Works closure | 69.3 | — | — |
| Pension settlement charges | 26.9 | 14.5 | — |
| Credit for adjustment of liability for transportation costs | — | — | (19.3) |
| Asset impairment charge | — | — | 75.6 |
| Adjusted net income attributable to AK Holding | $ 107.4 | $ 200.5 | $ 159.8 |
| | | | |
| **Reconciliation to Diluted Earnings per Share** | | | |
| Diluted earnings per share, as reported | $ 0.04 | $ 0.59 | $ 0.32 |
| Ashland Works closure | 0.22 | — | — |
| Pension settlement charges | 0.08 | 0.05 | — |
| Credit for adjustment of liability for transportation costs | — | — | (0.06) |
| Asset impairment charge | — | — | 0.24 |
| Adjusted diluted earnings per share | $ 0.34 | $ 0.64 | $ 0.50 |

## Liquidity and Capital Resources

We have a revolving credit facility (the "Credit Facility") that expires in September 2022 with a $1,500.0 commitment. At December 31, 2019, we had total liquidity of $835.4, consisting of $30.8 of cash and cash equivalents and $804.6 of availability under the Credit Facility. Our obligations under the Credit Facility are secured by inventory and accounts receivable. Availability under the Credit Facility fluctuates monthly based on our varying levels of eligible collateral. Our eligible collateral was $1,327.1 at December 31, 2019, after application of applicable advance rates. At December 31, 2019, we had $450.0 of outstanding borrowings under the Credit Facility, and $72.5 of outstanding letters of credit that further reduced availability. During the year ended December 31, 2019, our borrowings from the Credit Facility ranged from $285.0 to $475.0, with outstanding borrowings averaging $356.0 per day.

We believe that our current sources of liquidity will be adequate to meet our obligations for the foreseeable future. We expect to fund future liquidity requirements for items such as capital investments, employee and retiree benefit obligations, scheduled debt maturities and debt redemptions with internally generated cash and other financing sources. As part of our efforts to improve our capital structure, we regularly evaluate accessing the capital markets as a source of liquidity if we view conditions as favorable. We may use the Credit Facility as necessary to fund requirements for working capital, capital investments and other general corporate purposes. We are focused on reducing debt through free cash flow generation. Our Credit Facility is scheduled to expire in September 2022 and any amounts outstanding under it at the time of expiration would need to be repaid or refinanced.

From time to time, we may repurchase, as we have done previously, outstanding notes in the open market on an unsolicited basis, by tender offer, through privately negotiated transactions or otherwise. Our forward-looking statements on liquidity are based on currently available information and expectations and, if the information or expectations are inaccurate or conditions deteriorate, there could be a material adverse effect on our liquidity.

We have significant debt maturities and other obligations that will be due in future periods, including possible required cash contributions to our qualified pension plan. For further information, see the *Contractual Obligations* section.

Cash from operating activities totaled $265.9 for 2019, which includes $68.6 that was generated by and can only be used by SunCoke Middletown for its operations or for distribution to its equity owners. Cash generated from a $60.2 decrease in accounts receivable, a $73.7 decrease in inventory and a $75.0 decrease in other assets was partially offset by cash used for a $172.8 decrease in accounts payable and other current liabilities. During the year, we made required annual pension contributions of $43.5 and payments for other pension and OPEB benefits of $27.7. The remaining cash from operations was generated from normal business activities for the year.

*Investing and Financing Activities*

During 2019, net cash used for investing activities totaled $188.2, primarily for capital investments, including $14.0 of capital investments made by SunCoke Middletown. Cash used for capital investments, excluding SunCoke Middletown, totaled $180.8 in 2019. Our increase in 2019 from 2018 was primarily due to significant capital investments to strengthen the company for the long-run,

- 27-

*Table of Contents*

including a major planned outage that will lower our steelmaking costs at Dearborn Works and the construction of a new Precision Partners facility to grow our market position and capabilities in automotive stamping and complex assembly.

Net cash used for financing activities in 2019 was $95.3, primarily for payments to retire the aggregate principal amount of $148.5 of our Exchangeable Notes, partly offset by from borrowings on the Credit Facility. The total cash used for financing activities also includes $55.6 of payments from SunCoke Middletown to SunCoke.

### Restrictions Under Debt Agreements

The indentures governing our senior indebtedness and tax-exempt fixed-rate industrial revenue bonds ("IRBs") (collectively, the "Notes") and Credit Facility contain restrictions and covenants that may limit our operating flexibility. The Credit Facility contains customary restrictions, including limitations on, among other things, distributions and dividends, acquisitions and investments, dispositions, indebtedness, liens and affiliate transactions. Availability is calculated as the lesser of the total commitments under the Credit Facility or eligible collateral after advance rates, less outstanding revolver borrowings and letters of credit. The Credit Facility requires us to maintain a minimum fixed charge coverage ratio of one to one if availability under the Credit Facility is less than $150.0. We are in compliance with restrictions and covenants under our Credit Facility and Notes and, in the absence of any significant and sustained material adverse events, expect that we will remain in compliance for the foreseeable future.

The indentures governing the Notes include customary restrictions on (a) the incurrence of additional debt by certain of our subsidiaries, (b) the incurrence of certain liens, (c) the amount of sale/leaseback transactions, and (d) our ability to merge or consolidate with other entities or to sell, lease or transfer all or substantially all of our assets to another entity. The Notes also contain customary events of default. In addition, the indenture governing the 7.50% Senior Secured Notes due July 2023 includes covenants with customary restrictions on the use of proceeds from the sale of collateral.

We do not expect any of these restrictions to affect or limit our ability to conduct our business in the ordinary course. During 2019, we were in compliance with all the terms and conditions of our debt agreements.

### Employee Benefit Obligations

In recent years, we have taken multiple steps in reducing and de-risking our pension obligations, including freezing all benefits under our major pension plan, closing our pension plans to new participants, and providing lump sum distributions to eligible participants. During 2019, we transferred $615.6 of pension obligations to an insurance company for approximately 4,250 retirees or their beneficiaries. Since mid-2016, we have transferred a total of $1.1 billion in pension trust assets to purchase four non-participating annuity contracts that require highly-rated insurance companies to pay the transferred pension obligations to approximately 20,000 pension participants. These actions greatly reduce our exposure to financial market volatility and the risk of significant increases in future required pension contributions as a result of this volatility. We intend to actively seek options to further de-risk our pension and OPEB obligations.

Our pension and OPEB obligations recorded on our consolidated balance sheets declined by $109.8 in 2019, primarily due to contributing $43.5 to the pension trust and achieving favorable investment returns from pension plan assets. We will be required to make contributions to our plan's pension trust of varying amounts until it is fully funded, and some of these contributions could be substantial. We are required to make approximately $45.0 of pension contributions in 2020. Based on current actuarial assumptions, we expect to make required annual pension contributions of approximately $45.0 for 2021 and $35.0 for 2022. The amount and timing of future required contributions to the pension trust depend on assumptions about future events. The most significant of these assumptions are the future investment performance of the pension funds, actuarial data about plan participants and the interest rate we use to discount benefits to their present value. In addition, the amount and timing of future contributions may be affected by future activities we may take to reduce and de-risk our pension obligations. Because of the variability of factors underlying these assumptions, including the possibility of future pension legislation or increased pension insurance premiums, the reliability of estimated future pension contributions decreases as the length of time until we must make the contribution increases. Effective January 1, 2020, we changed our assumption for future expected returns on plan assets to 7.50% from 6.75% in response to a change in asset allocation.

We provide healthcare benefits to a significant portion of our employees and retirees. OPEB benefits have been either eliminated for new employees or are subject to caps on the share of benefits we pay. Based on the assumptions used to value other postretirement benefits, primarily retiree healthcare and life insurance benefits, annual cash payments for these benefits are expected to be in a range that trends down from $35.6 in 2020 to $7.6 over the next 30 years.

*Table of Contents*

*Ashland Works Closure*

In January 2019, our Board of Directors approved and we announced the planned closure of our Ashland Works, including the previously idled Ashland Works Hot End and the hot dip galvanizing coating line that continued to operate. Factors that influenced our decision to close Ashland Works included an uncertain global trade landscape influenced by shifting domestic and international political priorities, Ashland Works' high cost of production, and continued intense competition from domestic and foreign steel competitors. These conditions directly impacted our pricing, which in turn directly impacted our assessment of the demand forecasts for the markets we serve. Despite several favorable trade actions, carbon steel imports remained at a high level, driven by global overcapacity, particularly in China. We expected global overcapacity to be exacerbated by several domestic steel companies that had restarted or planned new capacity additions in the United States. In addition, we concluded that we had sufficient coating capacity to meet our customers' needs without using our coating operations at Ashland Works. We have transitioned products to our other, lower cost U.S. coating lines and closed the Ashland Works coating line in November 2019.

By transitioning production to our other, lower cost operations in the United States that have available capacity, we have increased those operations' utilization rates. Once fully implemented, these actions are projected to result in annual savings of over $40.0, primarily from switching production to lower-cost operations, reducing the costs for ongoing maintenance, utilities and supplier obligations at Ashland Works, and lowering transportation costs by being able to process steel closer to the end customer and eliminate additional product movement between our facilities. These savings, which began in 2019, and the positive impact of the Administration's policies to address unfair trade practices will help facilitate our longer-term growth plans by helping us maintain and enhance our more cost-effective steelmaking facilities and further driving growth and innovation.

For the year ended December 31, 2019, we have recorded a charge of $69.3, which included $18.5 for termination of take-or-pay supply agreements, $20.1 for supplemental unemployment and other employee benefit costs, pension and OPEB termination benefits of $13.3 (recorded in pension and OPEB (income) expense), an estimated multiemployer plan withdrawal liability of $10.0 (after a fourth quarter 2019 credit of $8.0 to adjust the estimate), and $7.4 for other costs. We made cash payments of $8.8 in 2019 related to the 2019 charge and expect to make cash payments of approximately $25.0 in 2020 and the remaining amount over several years thereafter. The supplemental unemployment and other employee benefit costs are expected to be paid primarily in 2020 and 2021. The actual multiemployer plan withdrawal liability will not be known until a future date and is expected to be paid over a number of years. Ongoing costs to maintain the equipment and utilities and meet supplier obligations related to the idled Ashland Works Hot End were $12.6, $20.0 and $21.2 for the years ended December 31, 2019, 2018 and 2017. These cash costs related to closing the facility will decline in future years. We recorded $4.0 of accelerated depreciation related to the coating line fixed assets for the year ended December 31, 2019 to fully depreciate them.

*Off-Balance Sheet Arrangements*

There were no material off-balance sheet arrangements as of December 31, 2019.

**Selected Factors that Affect Our Operating Results**

*Automotive Market*

We sell a significant portion of our carbon and stainless steel flat-rolled and tubular products directly to automotive manufacturers and their Tier 1 suppliers, as well as to distributors, service centers and converters who in some cases resell the products to the automotive industry. Because the automotive market is an important element of our business and growth strategy, North American light vehicle production has a significant impact on our total sales and shipments. In 2019, North American light vehicle production declined to approximately 16.3 million units from the prior year, due in part to the 40-day strike at GM that halted its vehicle production. As a result of these factors, flat-rolled steel shipments to the automotive industry declined 6%. Substantially all of Precision Partners' revenue is from the automotive market and new vehicle platforms in its hot-stamping and cold-stamping business drove a higher level of revenue in 2019 than in 2018.

In May 2019, GM and Ford each presented us with prestigious supplier awards. At the GM 27th Annual Supplier of the Year Awards, GM recognized its best suppliers that have consistently exceeded GM's expectations, created outstanding value or introduced innovations to GM. AK Steel was awarded as a Supplier of the Year for Non-Fabricated Steel, the second consecutive year that we received the award. In addition, at Ford's 21st Annual Ford World Excellence Awards, Ford recognized AK Steel as a top-performing global supplier and presented us with its Smart Brand Pillar award in recognition of demonstrated leadership in Ford's primary brand pillars. Further, AK Tube was one of just three suppliers to receive a Supplier of the Year award from Kirchhoff Automotive in 2019.

*Table of Contents*

*Carbon Steel Spot Market*

Since 2016, we have intentionally and substantially reduced our sales and shipments to the commodity carbon steel spot market and implemented a strategy to focus our product mix on value-added steel products. Generally, sales into the carbon steel spot market are at prevailing market prices, which are highly volatile, and are subject to intense competition from both low-cost domestic producers and cheap, unfairly traded foreign imports. Fluctuations in spot market prices have a direct effect on our results and are driven by factors mostly outside our control. In addition, the spot market price fluctuations do not always directly correlate with our raw material and energy costs and, consequently, we have limited ability to pass through increases in costs to customers absent increases in the market price. We reduced shipments of our commodity carbon steels in 2019 compared to 2018, primarily due to declining carbon spot market prices.

*Specialty Stainless and Electrical Steel Markets*

We are a leading manufacturer of value-added stainless steel, primarily for the automotive market. Stainless steel is typically priced with a fixed base price and surcharges to reflect changes in the cost of certain raw materials. Thus, while we expect changes in revenues will generally offset changes in costs, there may be a timing lag from the change in costs in one period to the change in revenue in a different period.

We are also a leading manufacturer of GOES and other electrical steels, which we sell to customers primarily in North America and Europe. We have experienced a notable decline in shipments to international markets due to global overcapacity and both direct and indirect effects of European and Chinese trade actions. Our domestic electrical steel sales have also declined due to increased imports of laminations (cut sheets of steel) and transformer cores (which includes both stacked and wound laminations).

*Trade Matters*

Section 232 Investigation of Imported Foreign Steel

On April 19, 2017, the Commerce Department initiated an investigation pursuant to Section 232 of the Trade Expansion Act, as amended by the Trade Act of 1974 ("Section 232"), into whether imports of foreign steel into the U.S. posed a threat to U.S. national security. On March 8, 2018, President Trump signed a proclamation pursuant to Section 232 imposing a 25 percent tariff on imported steel. Following the proclamation, the U.S. government announced various agreements for exemptions from the Section 232 steel tariff for certain countries, including Argentina, Australia, Brazil and South Korea. Some of these countries, such as South Korea and Brazil, have agreed to a quota system that limits their annual imports of steel into the U.S. In addition, although steel products from the European Union, Canada and Mexico were initially exempted from the tariff, on June 1, 2018, those exemptions expired and the Section 232 tariff was applied to steel imports from these countries as well.

In retaliation against the Section 232 tariffs, the European Union, Mexico and Canada subsequently imposed their own tariffs against certain steel products and other goods imported from the U.S. The Mexican retaliatory tariffs went into effect on June 5, 2018, the European Union's tariffs began to apply on June 22, 2018, and Canadian tariffs became effective on July 1, 2018. We ship steel products into Canada, Mexico and the European Union and have been required to pay tariffs on certain of our shipments. On May 17, 2019, the United States announced an agreement with Canada and Mexico to remove the Section 232 tariffs for steel and aluminum imports from those countries and for the removal of all retaliatory tariffs imposed on American goods by those countries. The agreement provides for aggressive monitoring and a mechanism to prevent surges in imports of steel and aluminum. If surges in imports of specific steel products occur, the United States may re-impose Section 232 tariffs on those products. Any retaliation by Canada and Mexico, however, would then be limited to steel products. The Section 232 steel and related retaliatory tariffs still remain in place with the European Union, and negotiations between the U.S. and European Union are ongoing. In addition to the ongoing country-by-country negotiations in which the U.S. government is engaged, the Commerce Department has also implemented a system for petitioning the U.S. government to exempt specific products (for instance, a certain grade of steel) from the tariff and a process for challenging these exemption requests. The possibility exists that, despite our objections, the Commerce Department may grant exemption requests for imported steel products that would have a significant adverse impact on our business.

The Section 232 steel tariffs originally only applied to certain steel products, including flat-rolled carbon, stainless and electrical steel products, but not to certain downstream goods that may contain these steels. On January 24, 2020, President Trump signed a proclamation expanding the scope of the duties to a limited number of steel and aluminum derivative products including nails, staples, electrical wires and body stampings for motor vehicles and tractors. Those countries that are currently exempt or subject to a quota are excluded from this action. Downstream electrical steel products were not included. As a result, some third parties or customers may attempt to substitute purchases of our flat-rolled steel with imports of downstream goods containing foreign steel

product inputs that are not subject to the tariff or trade cases. These actions would circumvent the purpose and intent of the Section 232 steel tariffs. The effects of the limited scope of the steel tariff are particularly salient to our electrical steel business. Imports of downstream electrical goods not currently covered by the tariff include electrical transformer cores and core assemblies, electrical transformers, and even

- 30-

*Table of Contents*

laminations, which are simply cut pieces of electrical steel. To avoid the Section 232 steel tariff, producers have continued to increase their imports of foreign-made downstream electrical goods or moved some of their domestic production outside the United States, which adversely affects our electrical steel business. In the absence of a remedy against these actions to circumvent the Section 232 steel tariff on electrical steel, these actions are likely to increase over time, pressuring our electrical steel business. We continue to proactively work to mitigate or eliminate this potential avenue for avoiding and circumventing the steel tariff, including by communicating our concerns to the U.S. government and requesting appropriate action to address this issue. In the absence of decisive action by the U.S. government or a meaningful change in business or market conditions, we expect our electrical steel business to continue to face material downward pressure. We believe the United States' electrical infrastructure is critical to national security and that additional actions are necessary and should be undertaken by the U.S. government to preserve its short- and long-term integrity.

Members of the U.S. Congress have introduced legislation to restrict the President's power to implement tariffs on national security grounds. Some of the proposed legislation has included provisions that would require Congressional approval of the current Section 232 proclamations or they would terminate. If such legislation is passed by both the House of Representatives and Senate, President Trump would have the ability to veto it, which would then require a two-thirds majority vote in each of the branches of Congress to override the presidential veto. In addition, there are pending challenges to the President's authority and actions under Section 232 in the U.S. court system and before international bodies.

<u>United States-Mexico-Canada Trade Agreement ("USMCA")</u>

On December 10, 2019, representatives of the U.S., Mexico and Canada signed a revision to the USMCA, which was proposed to replace the existing North American Free Trade Agreement ("NAFTA") among those countries. Among other requirements, the USMCA, as proposed, includes revised "rules of origin" that encourage automobiles and other products manufactured in North America to contain higher levels of North American-made content and that require an increased percentage of work on North American-made automobiles be performed by workers earning at least $16 per hour in order to be exempt from tariffs. The proposed terms of the USMCA also include provisions that incentivize the use of North American steel. Because all of our manufacturing facilities are located in North America and our principal market is automotive, we believe that the USMCA has the potential to positively impact our business by incentivizing automakers and other manufacturers to increase manufacturing production in North America and to use North American steel. For the proposed USMCA to take effect, legislative bodies for all the countries must approve and ratify the agreement. The U.S. and Mexico have ratified the revised agreement. Canada still has to ratify it and that is expected to occur in 2020. At this time, the USMCA does not alter or affect the terms of Section 232 tariffs on imported steel or related retaliatory tariffs, which continue to remain in effect.

*Raw Materials*

Iron ore is one of the principal raw materials required for our steel manufacturing operations. We purchased approximately 5.8 million tons of iron ore pellets in 2019 and expect to purchase approximately 6.5 million tons in 2020. We make most of our purchases of iron ore at negotiated prices under multi-year agreements. For 2020, we expect to purchase all of our iron ore from Cliffs. The price we pay for iron ore is affected by a variety of factors under the terms of our contracts, including measures of general industrial inflation and steel prices and a variable-price mechanism that adjusts the annual average price we pay for iron ore based on reference to an iron ore index referred to as the IODEX. A change in one of more of the factors upon which our iron ore price is determined (whether that may be the IODEX, inflation, steel prices or other indices) typically affects to varying degrees the price we pay for iron ore. Accordingly, the actual impact on us from a change in these factors will vary depending on the percentage of the total iron ore we purchase and how much each factor is weighted for pricing under related contracts. In addition, the total net cost we pay for iron ore is affected by our hedging activities, which are described below. Thus, for example, although a significant event could directly or indirectly result in an increase in the IODEX, a material impact on our iron ore costs would be tempered because (i) the IODEX is only one component of our price for iron ore, (ii) our iron ore contracts contain a fixed pellet premium, and (iii) we hedge a substantial portion of our 2020 IODEX exposure.

In addition to integrated risk strategies, we employ derivative financial instruments to manage iron ore price risk that we cannot mitigate through our customer contracts. Although we use derivative instruments to reduce our exposure if iron ore costs increase, these instruments may also reduce potential benefits should iron ore costs decline. We employ a systematic approach in our hedging strategy to mitigate iron ore exposure. We hedge a higher proportion of our near-term iron ore exposure and a lower proportion for our longer-term exposure through a combination of swaps and options. As of December 31, 2019, we have hedged the IODEX component for a portion of our iron ore purchases for 2020 and 2021 through the use of iron ore derivatives with notional amounts of 1,215,000 tons and 280,000 tons, which represents a substantial portion of our 2020 IODEX exposure. Our hedging activities further reduce our exposure to changes in the IODEX on the total cost we pay for iron ore. Our iron ore derivatives do not meet the accounting criteria for hedge accounting treatment. As a result, the changes in fair value for those

derivatives are immediately recognized in earnings, instead of when we recognize the underlying cost of iron ore, thus potentially increasing the volatility of our results of operations. This volatility does not affect the ultimate gains or losses on the derivative contracts we will recognize in the financial statements, but only the timing of recognition.

- 31-

*Table of Contents*

*Precision Partners*

On August 4, 2017, we acquired 100% of the equity of Precision Partners, which provides advanced-engineered solutions, tool design and build, hot- and cold-stamped steel components and complex assemblies for the automotive market. Founded in 1955, Precision Partners is headquartered in Ontario, Canada, and has more than 1,000 employees, including approximately 300 engineers and skilled tool makers, across ten plants in Ontario, Alabama and Kentucky. Precision Partners specializes in manufacturing lightweight, complex components and assemblies, and it offers a broad portfolio of highly-engineered solutions. Among other benefits, we believe Precision Partners:

- complements our core focus on product innovation, accelerating the development and introduction of existing and new AHSS and PHS to the high-growth automotive lightweighting space;
- provides a fully integrated downstream platform that further strengthens our close collaboration with our automotive customers and their Tier 1 suppliers; and
- leverages our expertise in metals forming with Precision Partners' expertise in tool design and advanced product design-engineering capabilities in hot and cold stamping.

Precision Partners complements our reputation as a well-respected supplier to our core automotive portfolio. Importantly, we believe that Precision Partners has accelerated our efforts to drive adoption of our innovative steel products by automotive manufacturers and their Tier 1 suppliers. Our steelmaking experts and Precision Partners' engineers have undertaken numerous collaboration projects aimed at achieving this goal. Precision Partners' expertise in tool design and stamping capabilities has allowed us to deliver to customers fully formed prototypes of automotive components utilizing our innovative steel products. As such, we are now able to provide solutions through prototype automotive components. This approach has and will continue to demonstrate to customers that they can significantly lightweight automotive parts on an accelerated timeline by using our high-strength, highly formable grades of steel in place of traditional lower-strength grades or alternative materials. In addition, these collaborative projects are enhancing Precision Partners' knowledge and experience in tool design and build, and stamping of new, advanced grades of steel, enabling it to provide expert solutions to automotive customers now and in the future.

*Labor Agreements*

At December 31, 2019, we employed approximately 9,300 people, of which approximately 5,600 are represented by labor unions under various contracts that expire between 2020 and 2023.

In April 2019, we and the United Steelworkers, Local 1865, which represents production employees at Ashland Works, reached an agreement to revise and extend the collective bargaining agreement. The new agreement includes terms governing the permanent closure of the facility, including benefits to employees who are terminated or transition to other AK Steel plants.

In May 2019, members of the United Steelworkers, Local 1190, ratified a three-year labor agreement covering approximately 220 production employees at Mountain State Carbon, LLC. The new agreement will be in effect through April 30, 2022.

In May 2019, members of the United Auto Workers, Local 4104, which governs approximately 100 production employees at Zanesville Works, ratified a new three-year labor agreement. The new agreement will be in effect through May 31, 2022.

In July 2019, members of the United Auto Workers, Local 3303, which governs approximately 1,100 production and maintenance employees at Butler Works, ratified a new three-year agreement. The new agreement will be in effect through June 15, 2022.

In September 2019, members of the United Auto Workers, Local 3462, which governs approximately 310 production employees at Coshocton Works, ratified a new agreement. The new agreement will be in effect through July 31, 2023.

Agreements that expire within the next twelve months include an agreement with the International Association of Machinists and Aerospace Workers, Local 1943, which governs approximately 1,750 production employees at Middletown Works, scheduled to expire March 15, 2020, and an agreement with United Steelworkers, Local 1915, which governs approximately 100 production employees at AK Tube's Walbridge plant, scheduled to expire January 22, 2021.

*Potential Impact of Climate Change Legislation*

On an ongoing basis we assess the potential impacts and implications of climate change and associated legislation and regulation on our business, operations, customers, suppliers, markets and other relevant areas. In 2010, the EPA issued a final "tailoring rule"

providing new regulations governing major stationary sources of greenhouse gas emissions under the Clean Air Act. Generally, the tailoring rule requires that new or modified sources of high volumes of greenhouse gases must follow heightened permit standards and

- 32-

*Table of Contents*

lower emissions thresholds. The EPA continues to work on further greenhouse gas emissions rules that would apply more broadly and to lower levels of emission sources. In 2014, the U.S. Supreme Court partially upheld and partially invalidated the tailoring rule. The decision's impact will often require us to conduct a best available control technology analysis for greenhouse gases for new major projects. The tailoring rule will not materially adversely affect us in the near term and we cannot reliably estimate the regulation's long-term impact. However, there are a number of factors that may affect us, including the EPA's tailoring rule and other similar regulations, such as the EPA's Clean Power Plant Rule established on August 3, 2015, implications from the Paris Climate Agreement arising from the 2015 United Nations Climate Change Conference or similar accords relating to climate change. These and other factors could cause us to suffer negative financial impacts over time from increased energy, environmental and other costs needed to comply with the limitations that our suppliers would impose on us directly or indirectly.

In 2017, the EPA announced its intention to repeal the Clean Power Plant Rule and the U.S. State Department gave formal notice of its intent to withdraw from the Paris Climate Agreement. The earliest date for the United States to completely withdraw from the Paris Agreement is November 4, 2020. Given these recent developments, we expect the near-term negative impacts to our business directly arising from climate change legislation to be low. However, we do not expect the potential challenges to our business arising from climate change to decline in the long term, and we do not expect our key customers in our principal markets to substantially reduce their focus on climate change-related issues. This is particularly true for our automotive manufacturer customers, who remain subject to CAFE standards and other regulations aimed at reducing vehicle emissions, as well as potential changes in global consumer demands for vehicles with lower impacts on the environment. In addition, automotive manufacturers typically design light vehicle platforms for multiple international markets, so other countries' climate change legislation and regulations that govern the automotive manufacturers likely will continue to affect their approach for the U.S. market.

In addition, the possibility exists that some form of federally-enacted legislation or additional regulations in the U.S. may further impose limitations on greenhouse gas emissions. In the past, bills have been introduced in the United States Congress that aim to limit carbon emissions over long periods from facilities that emit significant amounts of greenhouse gases. Such bills, if enacted, would apply to the steel industry, in general, and to us, in particular, because producing steel from elemental iron creates carbon dioxide, one of the targeted greenhouse gases. Although we and other steel producers in the United States are actively participating in research and development to develop technology, processes and approaches for reducing greenhouse gas emissions, these developments will take time and it is impossible to predict when or to what degree these efforts will be successful. To address this need for developing new technologies, approaches and processes, not just in the steel industry but elsewhere, proposed legislation has been introduced in the past that included a system of carbon emission credits. Such credits would be available to certain companies for a period, similar to the European Union's existing "cap and trade" system. However, it is virtually impossible to forecast the provisions of any such final legislation and its effects on us.

If regulation or legislation to address climate change or regulate carbon emissions is enacted, it is reasonable to assume that the net financial impact on us will be negative, despite some potential benefits discussed below. On balance, such regulation or legislation likely would cause us to incur increased energy, environmental and other costs to comply with the limitations that would be imposed on greenhouse gas emissions. For example, additional costs could take the form of new or retrofitted equipment or the development of new technologies (e.g., sequestration) to try to control or reduce greenhouse gas emissions.

The future enactment of climate control or greenhouse gas emissions legislation or regulation could produce benefits for us that would offset somewhat the adverse effects noted above. For example, if climate control legislation or regulation continues to drive automotive manufacturers to meet higher fuel efficiency targets, we could benefit from increased sales of our broad portfolio of products: NOES for H/EV motors, GOES for upgrading electrical grid infrastructure required to support more H/EVs, stainless steels needed for exhaust systems and other components for more efficient engines, and AHSS products to lightweight automobiles. Moreover, if climate change legislation provides further incentives for energy efficiency, up to certain levels, we could benefit from increased sales of our GOES products, which are already among the most energy-efficient electrical steels in the world. We sell our electrical steels primarily to manufacturers of power transmission and distribution transformers and electrical motors and generators, the demand for which could grow if energy efficiency standards increase. In addition, climate control legislation may enhance sales of our products in different ways. For instance, if the legislation promotes the use of renewable energy technology, such as wind or solar technology, it could increase demand for our high-efficiency electrical steel products used in power transformers, which are needed to connect these new sources to the electricity grid.

The ultimate impacts on us from any additional climate change or emissions reduction legislation or regulation would depend on the final terms of any such legislation or regulation. Presently, we are unable to predict with any reasonable degree of accuracy when or even if climate control legislation or regulation will be enacted, or if it is, what its terms and applicability to us will be. As a result, we currently have no reasonable basis to reliably predict or estimate the specific effects any eventually enacted laws may have on us or how we may be able to reduce any negative impacts on our business and operations. In the meantime, the items described above provide some indication of the potential mixed impact on us from climate control legislation or regulation

generally.

*Table of Contents*

*Cleveland-Cliffs Acquisition*

On December 2, 2019, we entered the Merger Agreement pursuant to which, subject to the satisfaction or (to the extent permissible) waiver of the conditions set forth therein, Cliffs will acquire AK Holding by way of the Merger. Under the terms of the Merger Agreement, at the effective time of the Merger, AK Holding stockholders will become entitled to receive 0.40 Cliffs common shares for each outstanding share of AK Holding common stock they own at the effective time. Upon completion of the proposed Merger, AK Holding stockholders are expected to own approximately 32% and Cliffs shareholders to own approximately 68% of the combined company on a fully diluted basis.

The completion of the Merger is subject to the receipt of antitrust clearance in the United States. Under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended ("HSR Act"), and the rules promulgated thereunder, the Merger may not be completed until we and Cliffs have each filed notification and report forms with the United States Federal Trade Commission ("FTC"), and the Antitrust Division of the United States Department of Justice ("DOJ"), and the applicable waiting period (or any extension thereof) has expired or been terminated. On January 22, 2020, we and Cliffs each received notification from the FTC of the early termination of the waiting period applicable to the Merger under the HSR Act. Each of our and Cliffs' obligation to effect the Merger is also subject to obtaining regulatory approval from the antitrust authorities in Canada and Mexico. On February 12, 2020, we and Cliffs each received a "no-action" letter from the Canadian Competition Bureau, clearing the Merger under Canadian competition law. On January 6, 2020, we and Cliffs each submitted notifications and an application for Mexican Competition Commission (Comisión Federal de Competencia Económica) clearance of the Merger and that process is ongoing.

On February 4, 2020, the SEC declared effective the registration statement on Form S-4 that Cliffs had filed with the SEC in connection with the Merger and Cliffs filed a final prospectus with respect to the Cliffs common shares that will be issued to our stockholders in the Merger. We also filed our definitive joint proxy statement with the SEC on February 4, 2020, and we and Cliffs each commenced mailing the definitive joint proxy statement to our respective stockholders on February 5, 2020. The definitive joint proxy statement contains information relating to the Merger and also announced that each company will hold a special meeting of its respective stockholders on March 10, 2020, where the stockholders of each company will be asked to vote on matters related to the transaction, including for our stockholders to approve the adoption of the Merger Agreement and Cliffs shareholders to approve the Merger Agreement and related transactions, including the issuance of the Cliffs common shares to our stockholders in the Merger.

We expect to complete the Merger in the first quarter of 2020, subject to the receipt of customary regulatory and stockholder approvals and the satisfaction or (to the extent permissible) waiver of the other closing conditions under the Merger Agreement.

*Critical Accounting Estimates*

We prepare our financial statements in conformity with accounting principles generally accepted in the United States of America. These principles permit choices among alternatives and require numerous estimates of financial matters. Accounting estimates are based on historical experience and information that is available to us about current events and actions we may take in the future. We believe the accounting principles chosen are appropriate under the circumstances, and that the estimates, judgments and assumptions involved in financial reporting are reasonable. There can be no assurance that actual results will not differ from these estimates. We believe the accounting estimates discussed below represent those accounting estimates requiring the exercise of judgment where a different set of judgments could result in the greatest changes to reported results.

<u>Asset Impairment</u>

We have various assets that are subject to impairment testing, including property, plant and equipment, goodwill and equity method investments. If circumstances indicate that an asset has lost value below its carrying amount, we review the asset for impairment. We evaluate the effect of changes in operations and estimate future cash flows to measure fair value. We use assumptions, such as revenue growth rates, terminal growth rates, EBITDA margins and cost of capital, as part of these analyses and our selections of the assumptions to use can result in different conclusions. We believe the data and assumptions used are appropriate in the circumstances and consistent with internal projections. The most recent annual goodwill impairment tests indicated that the fair values of the relevant reporting units were in excess of their carrying value. However, while an improvement from the prior year, the estimated fair value of the Precision Partners reporting unit was still relatively close to its carrying amount. We believe that this result is reasonable as this reporting unit was acquired in August 2017. Changes in certain assumptions in the impairment tests could have resulted in various scenarios, including an increase in fair value or a decrease in fair value below the carrying amount of Precision Partners. We believe certain key assumptions, such as cost of capital and terminal growth rates, used in our assessment have an appropriate degree of conservatism. For the tubular reporting unit, AK Tube's estimated fair value was substantially higher than its carrying amount. Our businesses operate in highly cyclical industries and the valuation of these

businesses can fluctuate, which may lead to impairment charges in future periods. Fair value is determined using quoted market prices, estimates based on prices of similar assets, or anticipated cash flows discounted at a rate commensurate with risk.

- 34-

*Table of Contents*

We consider the need to evaluate long-lived assets for indicators of impairment at least quarterly to determine if events or changes in circumstances indicate the carrying amount of such assets may not be recoverable. We evaluate long-lived assets associated with our steelmaking operations for impairment based on a collective asset grouping that includes the operations of all facilities. We manage these operations as part of an "integrated process" that allows us to route production to various facilities so that we can maximize financial results and cash flows. If the carrying value of a long-lived asset group exceeds its fair value, we determine that an impairment has occurred and we recognize a loss based on the amount that the carrying value exceeds the fair value, less cost to dispose, for assets we plan to sell or abandon.

### Income Taxes

We recognize deferred tax assets and liabilities based on the estimated future tax effects of differences between the financial statement and tax bases of assets and liabilities given the enacted tax laws. We regularly evaluate the need for a valuation allowance against our deferred tax assets by assessing whether it is more likely than not that we will realize the deferred tax assets in the future. We assess the need for a valuation allowance each reporting period, with any additions or adjustments reflected in earnings in the period of assessment. We have maintained a full valuation allowance against our net U.S. deferred tax assets since 2012, with appropriate consideration for the future reversal of our taxable temporary differences. At December 31, 2019, our deferred tax asset valuation allowance was $659.4.

In assessing the need for a valuation allowance, we have considered both positive and negative evidence related to the likelihood of realization of the deferred tax assets for each jurisdiction. At December 31, 2019, we considered the existence of recent cumulative income from U.S. operations as a source of positive evidence. We generated losses from U.S. operations for several periods through 2016 and in 2019 and accordingly generated significant cumulative losses in those periods, which is a significant source of objective negative evidence. Despite income reported in 2017 and 2018 from U.S. operations, the following forms of negative evidence concerning our ability to realize our domestic deferred tax assets were considered:

- we have historical evidence that the steel industry we operate within has business cycles of longer than a few years and therefore attribute significant weight to our cumulative losses over longer business cycles in evaluating our ability to generate future taxable income;
- the global steel industry has been experiencing global overcapacity and periods of increased foreign steel imports into the U.S., which has created volatile economic conditions and uncertainty relative to predictions of future taxable income;
- while we have changed our business model to de-emphasize sales of commodity business and believe that this model will generate improved financial results throughout an industry cycle, we have not experienced all parts of the cycle and therefore we do not know what results our business model will produce in those circumstances;
- our U.S. operations have generated losses in 2019 and cumulatively significant losses in prior years and the competitive landscape in the steel industry reflects shifting domestic and international political priorities, an uncertain global trade landscape, and continued intense competition from domestic and foreign steel competitors, all of which present significant uncertainty regarding our ability to routinely generate U.S. income in the near term;
- significant volatility in spot market selling prices for carbon steel; and
- a substantial portion of our U.S. deferred tax assets are tax carryforwards with expiration dates that may prevent us from using them prior to expiration.

At December 31, 2019, we concluded that objective and subjective negative evidence outweighed positive evidence, and therefore it was not more likely than not that we would be able to realize our net deferred tax assets. As a result of the cyclical nature of our industry and to the extent that the improvement in our financial results is sustainable, there is the potential for different weighting of positive and negative factors in the future as facts and circumstances change. Accordingly, material changes in the valuation allowance may be recognized in future periods.

We evaluate uncertainty in our tax positions and only recognize benefits when the tax position is believed to be more likely than not to be sustained upon audit. We have tax filing requirements in many states and are subject to audit in these states, as well as at the federal level. Tax audits by their nature are often complex and can require several years to resolve. In the preparation of the consolidated financial statements, we exercise judgment in estimating the potential exposure of unresolved tax matters. While actual results could vary, we believe that we have adequately accrued the ultimate outcome of these unresolved tax matters.

### Pension and OPEB Plans

Accounting for retiree pension and healthcare benefits requires the use of actuarial methods and assumptions, including assumptions about current employees' future retirement dates, anticipated mortality rates, the benchmark interest rate used to discount benefits to their present value, anticipated future increases in healthcare costs and our obligations under collective

bargaining agreements with respect to pension and healthcare benefits for retirees. Changing any of these assumptions could have a material effect on the calculation of our total obligation for future pension and healthcare benefits.

- 35-

*Table of Contents*

Actuarial net gains and losses occur when actual experience differs from any of the many assumptions used to value the benefit plans or when the assumptions change, as they may each year when a valuation or remeasurement is performed. The major factors contributing to our actuarial gains and losses are changes in the discount rate used to value plan liabilities as of the measurement date and changes in the expected lives of plan participants. We believe the mortality assumptions selected for determining the expected lives of plan participants are most closely associated with the expected lives of our plan participants. However, selecting other available assumptions would likely increase the plan obligations. In addition, a major factor contributing to actuarial gains and losses for our pension plan is the difference between expected and actual returns on plan assets. For OPEB plans, differences in estimated versus actual healthcare costs and changes in assumed healthcare cost trend rates are additional factors generally contributing to actuarial gains and losses. However, we do not expect changes in these OPEB assumptions to have a material effect on us since most of our plans have caps on the share of benefits we pay. In addition to their effect on the funded status of the plans and their potential for corridor adjustments, these factors affect future net periodic benefit expenses. Changes in key assumptions can have a material effect on the amount of benefit obligation and annual expense we record. For example, a 25 basis point decrease in the discount rate would decrease the interest cost component of pension income in 2020 by $3.0. A 25 basis point decrease in the discount rate would have increased the pension obligation at December 31, 2019, by approximately $36.0 and the OPEB obligation by approximately $10.0. A 25 basis point decrease in the expected rate of return on pension plan assets would decrease the projected 2020 pension income by approximately $3.0.

Under our method of accounting for pension and OPEB plans, we recognize into income any unrecognized actuarial net gains or losses that exceed 10% of the larger of projected benefit obligations or plan assets as of the measurement date, defined as the corridor. Amounts inside the corridor are amortized over the plan participants' life expectancy. Our method results in faster recognition of actuarial net gains and losses than the minimum amortization method permitted by prevailing accounting standards and used by the vast majority of companies in the United States. Faster recognition under this method also results in the potential for highly volatile and difficult to forecast corridor adjustments.

### Environmental and Legal Contingencies

We are involved in a number of environmental and other legal proceedings. We record a liability when we determine that litigation has commenced or a claim or assessment has been asserted and, based on available information, it is probable that the outcome of the litigation, claim or assessment, whether by decision or settlement, will be unfavorable and the amount of the liability is reasonably estimable. We measure the liability using available information, including the extent of damage, similar historical situations, our allocable share of the liability and, in the case of environmental liabilities, the need to provide site investigation, remediation and future monitoring and maintenance. We record accruals for probable costs based on a combination of litigation and settlement strategies on a case-by-case basis and, where appropriate, supplement those with incurred-but-not-reported development reserves. However, amounts we record in the financial statements in accordance with accounting principles generally accepted in the United States exclude costs that are not probable or that may not be currently estimable. The ultimate costs of these environmental and legal proceedings may, therefore, be higher than those we have recorded on our financial statements. In addition, changes in assumptions or the effectiveness of our strategies can materially affect results of operations in future periods.

## Contractual Obligations

In the ordinary course of business, we enter into agreements that obligate us to make legally enforceable future payments. These agreements include those for borrowing money, leasing equipment and purchasing goods and services. The following table summarizes by category expected future cash outflows associated with contractual obligations we have as of December 31, 2019**.**

| Contractual Obligations | Less than 1 year | 1-3 years | 3-5 years | More than 5 years | Total |
|---|---|---|---|---|---|
| Long-term debt | $ 7.3 | $ 856.2 | $ 442.0 | $ 691.8 | $ 1,997.3 |
| Interest on debt (a) | 124.2 | 205.6 | 113.0 | 81.4 | 524.2 |
| Operating lease obligations | 67.8 | 97.9 | 67.0 | 144.5 | 377.2 |
| Purchase obligations and commitments | 2,006.2 | 2,334.7 | 1,070.6 | 1,512.7 | 6,924.2 |
| Pension and OPEB obligations (b) | 41.0 | 78.2 | 74.2 | 565.4 | 758.8 |
| Other non-current liabilities (c) | — | 51.8 | 23.5 | 78.8 | 154.1 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Total | $ | 2,246.5 | $ | 3,624.4 | $ | 1,790.3 | $ | 3,074.6 | $ 10,735.8 |

(a)  Amounts include contractual interest payments using the interest rates as of December 31, 2019 applicable to our variable-rate debt and stated fixed interest rates for fixed-rate debt.

A005747

*Table of Contents*

    (b)   Future cash contributions to our qualified pension trust are not included in the table above. We have approximately $45.0 of required contributions for 2020. Based on current actuarial assumptions, the estimates for our contributions are approximately $45.0 for 2021 and $35.0 for 2022. Estimates of cash contributions to the pension trust to be made after 2020 are uncertain since several variable factors impact defined benefit pension plan contributions and required contributions are significantly affected by asset returns. Because we expect the pension trust to make pension benefit payments beyond the next five years, the net pension liability is included in the More than 5 years column. We estimate other postretirement benefit payments, after receipt of Medicare subsidy reimbursements, will be $35.6 for 2020 and we expect them to trend down to $7.6 over the next 30 years. For a more detailed description of these obligations, see Note 8 to the consolidated financial statements.

    (c)   Excludes the long-term portion of operating lease obligations.

In calculating the amounts for purchase obligations, we identified contracts where we have a legally enforceable obligation to purchase products or services from the vendor or make payments to the vendor for an identifiable period. For each identified contract, we determined our best estimate of payments to be made under the contract assuming (1) the continued operation of existing production facilities, (2) normal business levels, (3) both parties would adhere to the contract in good faith throughout its term, and (4) prices in the contract. Because of changes in the markets we serve, changes in business decisions regarding production levels or unforeseen events, the actual amounts paid under these contracts could differ significantly from the amounts presented above. For example, circumstances could arise which create exceptions to minimum purchase obligations in the contracts. We calculated the purchase obligations in the table above without considering such exceptions.

A number of our purchase contracts specify a minimum volume or price for the products or services covered by the contract. If we were to purchase only the minimums specified, the payments in the table would be reduced. Under "requirements contracts" the quantities of goods or services we are required to purchase may vary depending on our needs, which are dependent on production levels and market conditions at the time. If our business deteriorates or increases, the amount we are required to purchase under such a contract would likely change. Many of our agreements for the purchase of goods and services allow us to terminate the contract without penalty if we give 30 to 90 days' notice. Any such termination could reduce the projected payments.

Our consolidated balance sheets contain liabilities for pension and OPEB and other long-term obligations. We calculate the benefit plan liabilities using actuarial assumptions that we believe are reasonable under the circumstances. However, because changes in circumstances can have a significant effect on the liabilities and expenses associated with these plans including, in the case of pensions, pending or future legislation, we cannot reasonably and accurately project payments into the future. While we do include information about these plans in the above table, we also discuss these benefits elsewhere in this *Management's Discussion and Analysis of Financial Condition and Results of Operations* and in the notes to the consolidated financial statements.

The other long-term liabilities on our consolidated balance sheets include accruals for environmental and legal issues, employment-related benefits and insurance, liabilities established for uncertain tax positions, and other obligations. These amounts generally do not arise from contractual negotiations with the parties receiving payment in exchange for goods and services. The ultimate amount and timing of payments are uncertain and, in many cases, depend on future events occurring, such as the filing of a claim or completion of due diligence investigations, settlement negotiations, audit and examinations by taxing authorities, documentation or legal proceedings.

## New Accounting Pronouncements

The information called for by this section is incorporated herein by reference to the *Adoption of New Accounting Principles* section of Note 1 of the consolidated financial statements.

## Forward-Looking Statements

Certain statements we make or incorporate by reference in this Form 10-K, or make in other documents we furnish to or file with the Securities Exchange Commission, as well as in press releases or in presentations made by our employees, reflect our estimates and beliefs and are intended to be, and are hereby identified as "forward-looking statements" for purposes of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Words such as "expects," "anticipates," "believes," "intends," "plans," "estimates" and other similar references to future periods typically identify such forward-looking statements. We caution readers that forward-looking statements reflect our current beliefs and judgments, but are not guarantees of future performance or outcomes. They are based on a number of assumptions and estimates that are inherently subject to economic, competitive, regulatory, and operational risks, uncertainties and contingencies that are beyond our control, and upon assumptions about future business decisions and conditions that may change. In particular, these include, but are not limited to, statements in the *Liquidity and Capital Resources* section and Item 7A, *Quantitative and Qualitative Disclosures about Market Risk.*

We caution readers that such forward-looking statements involve risks and uncertainties that could cause actual results to differ materially from those currently expected. See Item 1A, *Risk Factors* for more information on certain of these risks and uncertainties.

- 37-

*Table of Contents*

Any forward-looking statement made in this document speaks only as of the date on which it is made. We undertake no obligation to publicly update any forward-looking statement, whether as a result of new information, future developments or otherwise, except as may be required by law.

**Item 7A.        Quantitative and Qualitative Disclosures about Market Risk.**

Our primary areas of market risk include changes in (a) interest rates, (b) commodity prices and (c) foreign currency exchange rates.

**Interest Rate Risk**

We manage interest rate risk in our capital structure by issuing variable- and fixed-rate debt. Our outstanding long-term indebtedness (excluding unamortized debt discount and issuance costs) was $1,997.3 and $2,035.4 at December 31, 2019 and 2018. The amount outstanding at December 31, 2019, consisted of $1,521.3 of fixed-rate debt, $26.0 of variable-rate IRBs and $450.0 of variable-rate borrowings from our Credit Facility. An increase in prevailing interest rates would increase interest expense and interest paid for the variable-rate debt, including any outstanding borrowings from the Credit Facility. For example, a 100 basis point increase in interest rates would increase annual interest expense by approximately $4.8 on our outstanding debt at December 31, 2019.

**Commodity Price Risk**

Commodity prices for certain carbon, stainless and electrical steels and raw material and energy inputs represent a source of market risk. Prices for certain raw materials and energy have been volatile over the last several years, with chrome, iron ore, natural gas, zinc, and scrap being especially volatile. We attempt to mitigate commodity price risk by aligning fixed and variable components in the following commitments:

- customer pricing contracts;
- supplier purchasing agreements; and
- derivative financial instruments.

Some customer contracts have fixed-pricing terms, which increase our exposure to fluctuations in raw material and energy costs. To reduce our exposure, we enter annual, fixed-price agreements for certain raw materials. Some of our existing multi-year raw material supply agreements have required minimum purchase quantities. Under adverse economic conditions, those minimums may exceed our needs. Absent exceptions for *force majeure* and other circumstances affecting the legal enforceability of the agreements, these minimum purchase requirements may compel us to purchase quantities of raw materials that could significantly exceed our anticipated needs or pay damages to the supplier for shortfalls. In these circumstances, we would attempt to negotiate agreements for new purchase quantities. There is a risk, however, that we would not be successful in reducing purchase quantities, either through negotiation or litigation. If that occurred, we would likely be required to purchase more of a particular raw material in a particular year than we need, negatively affecting our results of operations and cash flows.

In many cases, our customer contracts do not include variable-pricing mechanisms that adjust selling prices in response to changes in the costs of certain raw materials and energy, though some of our customer contracts include such mechanisms. We may enter multi-year purchase agreements for certain raw materials with similar variable-price mechanisms, allowing us to achieve natural hedges between the customer pricing contracts and supplier purchasing agreements. Therefore, in some cases price fluctuations for energy (particularly natural gas and electricity), raw materials (such as scrap, chrome, zinc and nickel) or other commodities may be, in part, passed on to customers rather than absorbed solely by us. There is a risk, however, that the variable-price mechanisms in the sales contracts may not necessarily change in tandem with the variable-price mechanisms in our purchase agreements, negatively affecting our results of operations and cash flows.

If we are unable to align fixed and variable components between customer pricing contracts and supplier purchasing agreements, we use cash-settled commodity price swaps and options to hedge the market risk associated with the purchase of certain of our raw materials and energy requirements. We routinely use these derivative instruments to hedge a portion of our natural gas, iron ore, zinc and electricity requirements. Our hedging strategy is designed to protect us from excessive pricing volatility. However, since we do not typically hedge 100% of our exposure, abnormal price increases in any of these commodity markets might still negatively affect operating costs.

For derivatives designated in cash flow hedging relationships, we record the gains and losses from the use of these instruments in accumulated other comprehensive income (loss) on the consolidated balance sheets and subsequently recognize the accumulated

gains and losses into cost of goods sold in the same period when the associated underlying transactions occur. At December 31, 2019, accumulated other comprehensive income (loss) included $25.0 in unrealized pre-tax losses for these derivative instruments. All other commodity price swaps and options are marked-to-market and recognized into cost of products sold with the offset recognized as an asset or accrued liability. See Note 18 of the consolidated financial statements for further information on our outstanding derivatives.

- 38-

*Table of Contents*

The following table presents the negative effect on pre-tax income of a hypothetical change in the fair value of derivative instruments outstanding at December 31, 2019, due to an assumed 10% and 25% decrease in the market price of each of the indicated commodities:

| Commodity Derivative | Negative Effect on Pre-tax Income | |
| --- | --- | --- |
| | 10% Decrease | 25% Decrease |
| Natural gas | $ 8.7 | $ 21.8 |
| Nickel | (0.1) | (0.2) |
| Zinc | 2.7 | 6.6 |
| Electricity | 4.5 | 11.2 |
| Iron ore | 12.5 | 20.7 |

Because we structure and use these instruments as hedges, the benefit of lower prices paid for the physical commodity used in the normal production cycle or higher prices received on the sale of product would offset these hypothetical losses. We do not enter into derivative contracts for trading purposes.

**Foreign Currency Exchange Rate Risk**

Exchange rate fluctuations affect our accounts receivable that are denominated in euros and our operating costs that are denominated in Canadian dollars, and we use forward currency contracts to reduce our exposure to certain of these currency price fluctuations. At December 31, 2019 and 2018, we had outstanding forward currency contracts with a total contract value of $1.7 and $4.6 for the sale of euros. Based on the contracts outstanding at December 31, 2019, a 10% change in the dollar-to-euro exchange rate would result in a pre-tax impact of $0.2 on the fair value of these contracts, which would offset the effect of a change in the exchange rate on the underlying receivable. At December 31, 2019 and 2018, we had outstanding forward currency contracts with a total contract value of $55.9 and $86.9 for the purchase of Canadian dollars. Based on the contracts outstanding at December 31, 2019, a 10% change in the U.S. dollar-to-Canadian dollar exchange rate would result in a pre-tax impact of $5.6 on the fair value of these contracts, which would offset the effect of a change in the exchange rate on the underlying operating costs. See Note 18 of the consolidated financial statements for further information on our outstanding forward contracts.

**Item 8.**        **Financial Statements and Supplementary Data.**

**AK Steel Holding Corporation and Subsidiaries**
**Index to Consolidated Financial Statements**

| | Page |
| --- | --- |
| Management's Responsibility for Consolidated Financial Statements | 40 |
| Report of Independent Registered Public Accounting Firm | 41 |
| Consolidated Statements of Operations for the Years Ended December 31, 2019, 2018 and 2017 | 43 |
| Consolidated Statements of Comprehensive Income for the Years Ended December 31, 2019, 2018 and 2017 | 44 |
| Consolidated Balance Sheets as of December 31, 2019 and 2018 | 45 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2019, 2018 and 2017 | 47 |
| Consolidated Statements of Stockholders' Equity for the Years Ended December 31, 2019, 2018 and 2017 | 48 |
| Notes to Consolidated Financial Statements | 49 |

- 39-

*Table of Contents*

## MANAGEMENT'S RESPONSIBILITY FOR CONSOLIDATED FINANCIAL STATEMENTS

We prepare our consolidated financial statements in conformity with accounting principles generally accepted in the United States of America. These principles permit choices among alternatives and require numerous estimates of financial matters. We believe the accounting principles chosen are appropriate under the circumstances, and that the estimates, judgments and assumptions involved in our financial reporting are reasonable.

We are responsible for the integrity and objectivity of the financial information presented in our consolidated financial statements. We maintain a system of internal accounting controls designed to provide reasonable assurance that employees comply with stated policies and procedures, that assets are safeguarded and that financial reports are fairly presented. On a regular basis, financial management discusses internal accounting controls and financial reporting matters with our independent registered public accounting firm and our Audit Committee, composed solely of independent outside directors. The independent registered public accounting firm and the Audit Committee also meet privately to discuss and assess our accounting controls and financial reporting.

Dated:  February 20, 2020                          /s/ Roger K. Newport

                                                   Roger K. Newport

                                                   Chief Executive Officer and Director

Dated:  February 20, 2020                          /s/ Christopher J. Ross

                                                   Christopher J. Ross

                                                   Vice President, Treasurer and Interim Chief Financial Officer

- 40-

*Table of Contents*

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Stockholders and Board of Directors of AK Steel Holding Corporation

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of AK Steel Holding Corporation (the Company) as of December 31, 2019 and 2018, the related consolidated statements of operations, comprehensive income, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2019, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2019 and 2018, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2019, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2019, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 Framework) and our report dated February 20, 2020 expressed an unqualified opinion thereon.

**Adoption of ASU No. 2016-02**

As discussed in the paragraph under the caption "Adoption of New Accounting Principles" described in Note 1 to the consolidated financial statements, effective January 1, 2019, the Company changed its method of accounting for leases due to the adoption of Accounting Standards Update No. 2016-02, *Leases (Topic 842)*.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matters**

The critical audit matters communicated below are matters arising from the current period audit of the financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

- 41-

*Table of Contents*

**Realizability of Deferred Tax Assets**

*Description of the Matter*

As more fully described in Note 6, at December 31, 2019, the Company had gross deferred tax assets on deductible temporary differences and carryforwards of $833.9 million reduced by a valuation allowance of $659.4 million, both primarily related to the U.S. Deferred tax assets must be reduced by a valuation allowance if, based upon the weight of all available evidence, it is more likely than not that some portion, or all, of the deferred tax assets will not be realized.

Auditing management's analysis of the realizability of its U.S. deferred tax assets was complex and highly judgmental due to the weighting of positive and negative evidence with respect to future reversals of taxable U.S. temporary differences and future U.S. taxable income exclusive of reversing temporary differences and carryforwards.

*How We Addressed the Matter in Our Audit*

We obtained an understanding, evaluated the design and tested the operating effectiveness of controls relating to the realizability of deferred tax assets. Our audit procedures included testing controls over management's projections of future reversals of existing taxable temporary differences and future taxable income (exclusive of reversing temporary differences and carryforwards) and testing the completeness and accuracy of the underlying data used by the Company.

To test the realizability of the Company's deferred tax assets, we performed audit procedures which included, among others, assessing the positive and negative evidence related to the likelihood of realization of the U.S. deferred tax assets. We tested the Company's scheduling of the reversal of existing temporary taxable differences used as a source of taxable income were of the appropriate character to realize existing deferred tax assets. We assessed the historical accuracy of management's forecasted U.S. taxable income, exclusive of reversing temporary differences and carryforwards, and compared the forecasts to current industry and economic trends. We involved tax professionals to evaluate the application of jurisdictional tax laws and regulations used in the Company's assumptions and calculations.

**Precision Partners' Reporting Unit Goodwill**

*Description of the Matter*

At December 31, 2019, goodwill was $255.5 million, and included $222.7 million related to the Precision Partners' reporting unit. As discussed in Note 1 to the consolidated financial statements, goodwill is reviewed for potential impairment at the reporting unit level at least annually on October 1 and whenever events or circumstances make it more likely than not that impairment may have occurred.

Auditing management's annual goodwill impairment assessment for the Precision Partners' reporting unit was complex due to the significant estimation required to determine the fair value of the reporting unit. In particular, the fair value estimate was sensitive to significant assumptions, such as revenue growth rates, the terminal growth rate, EBITDA margin, and the weighted average cost of capital, which are affected by expectations about future market or economic conditions.

*How We Addressed the Matter in Our Audit*

We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over the Company's goodwill impairment review process. For example, we tested controls over management's review of the significant judgmental assumptions, including revenue growth rates, the terminal growth rate, EBITDA margin, and the weighted average cost of capital.

To test the Company's annual goodwill impairment assessment for the Precision Partners' reporting unit, we performed audit procedures that included, among others, evaluating the estimated fair value of the Precision Partners' reporting unit, including evaluating methodologies used. We involved our specialists in the evaluation of the significant assumptions described above and testing the underlying data used by the Company in its analysis for completeness and accuracy. We compared the significant assumptions used by management to current industry and economic trends, recent historical performance and other factors. We assessed the historical accuracy of management's estimates and performed sensitivity analyses of significant assumptions to evaluate the changes in the fair value of the reporting unit that would result from changes in the assumptions.

/s/ ERNST & YOUNG LLP

We have served as the Company's auditor since 2013.

Cincinnati, Ohio

February 20, 2020

- 42-

*Table of Contents*

**AK STEEL HOLDING CORPORATION**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

**Years Ended December 31, 2019, 2018 and 2017**

**(dollars in millions, except per share data)**

| | 2019 | 2018 | 2017 |
|---|---|---|---|
| Net sales | $ 6,359.4 | $ 6,818.2 | $ 6,080.5 |
| | | | |
| Cost of products sold (exclusive of items shown separately below) | 5,606.3 | 5,911.0 | 5,253.1 |
| Selling and administrative expenses | 295.2 | 322.6 | 284.9 |
| Depreciation | 192.6 | 220.2 | 226.0 |
| Ashland Works closure | 56.0 | — | — |
| Credit for adjustment of liability for transportation costs | — | — | (19.3) |
| Asset impairment charge | — | — | 75.6 |
| Total operating costs | 6,150.1 | 6,453.8 | 5,820.3 |
| **Operating profit** | 209.3 | 364.4 | 260.2 |
| Interest expense | 146.6 | 151.6 | 152.3 |
| Pension and OPEB (income) expense | 12.0 | (19.2) | (71.9) |
| Other (income) expense | (18.5) | (5.9) | 17.1 |
| **Income before income taxes** | 69.2 | 237.9 | 162.7 |
| Income tax expense (benefit) | 6.2 | (6.2) | (2.2) |
| **Net income** | 63.0 | 244.1 | 164.9 |
| Less: Net income attributable to noncontrolling interests | 51.8 | 58.1 | 61.4 |
| **Net income attributable to AK Steel Holding Corporation** | $ 11.2 | $ 186.0 | $ 103.5 |
| **Net income per share attributable to AK Steel Holding Corporation common stockholders:** | | | |
| Basic | $ 0.04 | $ 0.59 | $ 0.33 |
| Diluted | $ 0.04 | $ 0.59 | $ 0.32 |

See notes to consolidated financial statements.

- 43-

*Table of Contents*

**AK STEEL HOLDING CORPORATION**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**

**Years Ended December 31, 2019, 2018 and 2017**

**(dollars in millions)**

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Net income | $ 63.0 | $ 244.1 | $ 164.9 |
| Other comprehensive income, before tax: | | | |
| Foreign currency translation gain (loss) | (0.6) | (1.7) | 4.7 |
| Cash flow hedges: | | | |
| Gains (losses) arising in period | (31.5) | (5.6) | (11.5) |
| Reclassification of losses (gains) to net income | 8.9 | (10.3) | (6.1) |
| Pension and OPEB plans: | | | |
| Prior service credit (cost) arising in period | — | 11.1 | 4.7 |
| Gains (losses) arising in period | 50.5 | (63.6) | 94.2 |
| Reclassification of prior service cost (credits) included in net income | (9.6) | (9.8) | (53.8) |
| Reclassification of losses (gains) included in net income | 15.7 | 29.3 | 6.3 |
| **Other comprehensive income (loss), before tax** | 33.4 | (50.6) | 38.5 |
| Income tax expense in other comprehensive income | 1.4 | — | — |
| **Other comprehensive income (loss)** | 32.0 | (50.6) | 38.5 |
| **Comprehensive income** | 95.0 | 193.5 | 203.4 |
| Less: Comprehensive income attributable to noncontrolling interests | 51.8 | 58.1 | 61.4 |
| **Comprehensive income attributable to AK Steel Holding Corporation** | $ 43.2 | $ 135.4 | $ 142.0 |

See notes to consolidated financial statements.

- 44-

*Table of Contents*

## AK STEEL HOLDING CORPORATION
## CONSOLIDATED BALANCE SHEETS
### December 31, 2019 and 2018
### (dollars in millions, except per share data)

| | 2019 | 2018 |
|---|---|---|
| **ASSETS** | | |
| **Current assets:** | | |
| Cash and cash equivalents | $ 31.0 | $ 48.6 |
| Accounts receivable, net | 577.9 | 635.8 |
| Inventory | 1,346.2 | 1,419.9 |
| Other current assets | 65.2 | 97.0 |
| Total current assets | 2,020.3 | 2,201.3 |
| **Property, plant and equipment** | 7,168.9 | 6,969.2 |
| Accumulated depreciation | (5,237.0) | (5,057.6) |
| Property, plant and equipment, net | 1,931.9 | 1,911.6 |
| **Other non-current assets:** | | |
| Goodwill and intangible assets | 293.4 | 298.9 |
| Other non-current assets | 345.0 | 103.9 |
| **TOTAL ASSETS** | $ 4,590.6 | $ 4,515.7 |
| **LIABILITIES AND EQUITY** | | |
| **Current liabilities:** | | |
| Accounts payable | $ 705.1 | $ 801.0 |
| Accrued liabilities | 314.4 | 288.9 |
| Current portion of pension and other postretirement benefit obligations | 41.0 | 38.7 |
| Total current liabilities | 1,060.5 | 1,128.6 |
| **Non-current liabilities:** | | |
| Long-term debt | 1,968.8 | 1,993.7 |
| Pension and other postretirement benefit obligations | 717.8 | 829.9 |
| Other non-current liabilities | 366.2 | 134.0 |
| **TOTAL LIABILITIES** | 4,113.3 | 4,086.2 |
| **Equity:** | | |
| Common stock, authorized 450,000,000 shares of $.01 par value each; issued 317,768,621 and 316,595,613 shares in 2019 and 2018; outstanding 316,401,478 and 315,535,765 shares in 2019 and 2018 | 3.2 | 3.2 |
| Additional paid-in capital | 2,904.2 | 2,894.9 |
| Treasury stock, common shares at cost, 1,367,143 and 1,059,848 shares in 2019 and 2018 | (7.3) | (6.4) |
| Accumulated deficit | (2,680.6) | (2,691.8) |
| Accumulated other comprehensive loss | (68.0) | (100.0) |
| Total stockholders' equity | 151.5 | 99.9 |
| Noncontrolling interests | 325.8 | 329.6 |
| **TOTAL EQUITY** | 477.3 | 429.5 |

A005759

| TOTAL LIABILITIES AND EQUITY | $ | 4,590.6 | $ | 4,515.7 |
|---|---|---|---|---|

*Table of Contents*

The consolidated balance sheets as of December 31, 2019 and 2018, include the following amounts for consolidated variable interest entities, before intercompany eliminations. See Note 16 for more information concerning variable interest entities.

| | 2019 | 2018 |
|---|---|---|
| **Middletown Coke Company, LLC ("SunCoke Middletown")** | | |
| Cash and cash equivalents | $ 0.1 | $ 1.1 |
| Inventory | 24.1 | 21.1 |
| Property, plant and equipment | 446.1 | 427.8 |
| Accumulated depreciation | (127.7) | (106.9) |
| Accounts payable | 19.2 | 13.7 |
| Other assets (liabilities), net | 1.5 | (1.2) |
| Noncontrolling interests | 324.9 | 328.2 |
| | | |
| **Other variable interest entities** | | |
| Cash and cash equivalents | $ 0.1 | $ 0.5 |
| Property, plant and equipment | 11.7 | 11.7 |
| Accumulated depreciation | (10.0) | (9.8) |
| Other assets (liabilities), net | 0.1 | 0.5 |
| Noncontrolling interests | 0.9 | 1.4 |

See notes to consolidated financial statements.

- 46-

*Table of Contents*

**AK STEEL HOLDING CORPORATION**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**Years Ended December 31, 2019, 2018 and 2017**
**(dollars in millions)**

| | 2019 | 2018 | 2017 |
|---|---|---|---|
| **Cash flows from operating activities:** | | | |
| Net income | $ 63.0 | $ 244.1 | $ 164.9 |
| Adjustments to reconcile net income to cash flows from operating activities: | | | |
| Depreciation | 169.9 | 201.6 | 209.8 |
| Depreciation—SunCoke Middletown | 22.7 | 18.6 | 16.2 |
| Amortization | 32.7 | 32.0 | 24.1 |
| Ashland Works closure | 56.0 | — | — |
| Asset impairment charge—Ashland Works Hot End | — | — | 75.6 |
| Credit for adjustment of liability for transportation costs | — | — | (19.3) |
| Deferred income taxes | (1.0) | (8.0) | (9.0) |
| Contributions to pension trust | (43.5) | (49.9) | (44.1) |
| Pension and OPEB (income) expense | 17.8 | (11.6) | (64.4) |
| (Gains) losses on retirement of debt | (0.8) | (2.0) | 21.3 |
| Mark-to-market (gains) losses on derivative contracts | (44.0) | (8.9) | (45.7) |
| Other operating items, net | (7.6) | 2.4 | 20.1 |
| Changes in assets and liabilities, net of effect of acquired business: | | | |
| Accounts receivable | 60.2 | (125.0) | (34.4) |
| Inventory | 73.7 | (34.8) | (116.7) |
| Accounts payable and other current liabilities | (172.8) | 119.6 | 46.2 |
| Other assets | 75.0 | 52.9 | (6.5) |
| Other pension payments | (0.9) | (1.0) | (1.1) |
| OPEB payments | (26.8) | (35.6) | (39.6) |
| Other liabilities | (7.7) | (29.7) | 1.4 |
| Net cash flows from operating activities | 265.9 | 364.7 | 198.8 |
| **Cash flows from investing activities** | | | |
| Capital investments | (180.8) | (150.1) | (149.6) |
| Capital investments—SunCoke Middletown | (14.0) | (1.9) | (2.9) |
| Investment in acquired business, net of cash acquired | — | — | (360.4) |
| Other investing items, net | 6.6 | 0.1 | 4.2 |
| Net cash flows from investing activities | (188.2) | (151.9) | (508.7) |
| **Cash flows from financing activities:** | | | |
| Net borrowings (repayments) under credit facility | 115.0 | (115.0) | 450.0 |
| Proceeds from issuance of long-term debt | — | — | 680.0 |
| Redemption of long-term debt | (152.3) | (12.6) | (848.4) |
| Debt issuance costs | — | — | (25.3) |
| SunCoke Middletown distributions to noncontrolling interest owners | (55.6) | (73.7) | (79.1) |

| | | | |
|---|---:|---:|---:|
| Other financing items, net | (2.4) | (0.9) | (2.5) |
| Net cash flows from financing activities | (95.3) | (202.2) | 174.7 |
| Net increase (decrease) in cash and cash equivalents | (17.6) | 10.6 | (135.2) |
| Cash and cash equivalents, beginning of year | 48.6 | 38.0 | 173.2 |
| Cash and cash equivalents, end of year | $ 31.0 | $ 48.6 | $ 38.0 |

See notes to consolidated financial statements.

- 47-

A005763

*Table of Contents*

**AK STEEL HOLDING CORPORATION**

**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**

**Years Ended December 31, 2019, 2018 and 2017**

**(dollars in millions)**

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| **Common stock** | | | |
| Balance at beginning of period | $ 3.2 | $ 3.2 | $ 3.1 |
| Share-based compensation | — | — | 0.1 |
| Balance at end of period | 3.2 | 3.2 | 3.2 |
| **Additional paid-in capital** | | | |
| Balance at beginning of period | 2,894.9 | 2,884.8 | 2,855.4 |
| Share-based compensation | 9.2 | 9.2 | 7.6 |
| Stock options exercised | 0.1 | 0.9 | 0.5 |
| Exchangeable notes exchange feature | — | — | 21.3 |
| Balance at end of period | 2,904.2 | 2,894.9 | 2,884.8 |
| **Treasury stock** | | | |
| Balance at beginning of period | (6.4) | (5.4) | (2.4) |
| Purchase of treasury stock | (0.9) | (1.0) | (3.0) |
| Balance at end of period | (7.3) | (6.4) | (5.4) |
| **Accumulated deficit** | | | |
| Balance at beginning of period | (2,691.8) | (2,877.0) | (2,980.5) |
| Cumulative effect of adopting new hedging standard | — | (0.8) | — |
| Net income attributable to AK Steel Holding Corporation | 11.2 | 186.0 | 103.5 |
| Balance at end of period | (2,680.6) | (2,691.8) | (2,877.0) |
| **Accumulated other comprehensive loss** | | | |
| Balance at beginning of period | (100.0) | (50.2) | (88.7) |
| Cumulative effect of adopting new hedging standard | — | 0.8 | — |
| Change in accumulated other comprehensive loss | 32.0 | (50.6) | 38.5 |
| Balance at end of period | (68.0) | (100.0) | (50.2) |
| **Noncontrolling interests** | | | |
| Balance at beginning of period | 329.6 | 345.2 | 362.9 |
| Net income attributable to noncontrolling interests | 51.8 | 58.1 | 61.4 |
| Net distributions to noncontrolling interests | (55.6) | (73.7) | (79.1) |
| Balance at end of period | 325.8 | 329.6 | 345.2 |
| **Total equity** | $ 477.3 | $ 429.5 | $ 300.6 |

See notes to consolidated financial statements.

- 48-

*Table of Contents*

**AK STEEL HOLDING CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(dollars in millions, except per share amounts or as otherwise specifically noted)**

**NOTE 1 - Summary of Significant Accounting Policies**

*Basis of Presentation*—These financial statements consolidate the operations and accounts of AK Steel Holding Corporation ("AK Holding"), its wholly owned subsidiary AK Steel Corporation ("AK Steel"), all subsidiaries in which AK Holding has a controlling interest, and two variable interest entities for which AK Steel is the primary beneficiary. Unless the context indicates otherwise, references to "we," "us" and "our" refer to AK Holding and its subsidiaries. We also operate Mexican and European trading companies that buy and sell steel and steel products and other materials. We manage operations on a consolidated, integrated basis so that we can use the most appropriate equipment and facilities for the production of a product, regardless of product line. Therefore, we conclude that we operate in a single business segment. All intercompany transactions and balances have been eliminated.

*Use of Estimates*—The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires the use of estimates and assumptions that affect the amounts reported. We base these estimates on historical experience and information available to us about current events and actions we may take in the future. Estimates and assumptions affect significant items that include the carrying value of long-lived assets, including investments and goodwill; valuation allowances for receivables, inventories and deferred income tax assets; legal and environmental liabilities; workers compensation and asbestos liabilities; share-based compensation; and assets and obligations of employee benefit plans. There can be no assurance that actual results will not differ from these estimates.

*Revenue Recognition*—We generate our revenue through product sales, and shipping terms generally indicate when we have fulfilled our performance obligations and passed control of products to our customer. Our revenue transactions consist of a single performance obligation to transfer promised goods. We have contracts with a substantial portion of our customers. These contracts usually define the mechanism for determining the sales price, but the contracts do not impose a specific quantity on either party. Quantities to be delivered to the customer are determined at a point near the date of delivery through purchase orders or other written instructions we receive from the customer. Spot market sales are made through purchase orders or other written instructions. We recognize revenue when we have fulfilled a performance obligation, which is typically when we have shipped products at the customer's instructions. For sales with shipping terms that transfer title and control at the destination point, we recognize revenue when the customer receives the goods and our performance obligation is complete. For sales with shipping terms that transfer title and control at the shipping point with us bearing responsibility for freight costs to the destination, we determine that we have fulfilled a single performance obligation and recognize revenue when we ship the goods. For our tooling solutions, we record progress payments that we receive from a customer as accrued liabilities until we recognize the revenue when the customer provides written acceptance that our performance obligation has been fulfilled.

Revenue is measured as the amount of consideration we expect to receive in exchange for transferring product. We reduce the amount of revenue recognized for estimated returns and other customer credits, such as discounts and volume rebates, based on the expected value to be realized. Payment terms are consistent with terms standard to the markets we serve. Sales taxes collected from customers are excluded from revenues.

We recognize an allowance for credit loss at the time a receivable is recorded based on our estimate of expected credit losses and adjust this estimate over the life of the receivable as needed. We evaluate the aggregation and risk characteristics of receivable pools and develop loss rates that reflect historical collections, current forecasts of future economic conditions over the time horizon we are exposed to credit risk, and payment terms or conditions that may materially affect future forecasts. We expect credit losses associated with major auto companies to be lower than other customer pools.

*Cost of Products Sold*—Cost of products sold consists primarily of raw materials, energy costs, supplies consumed in the manufacturing process, manufacturing labor, contract labor and direct overhead expense necessary to manufacture the finished steel product, as well as distribution and warehousing costs. Our share of the income (loss) of investments in associated companies accounted for under the equity method is included in costs of products sold since these operations are integrated with our overall steelmaking operations.

*Share-Based Compensation*—Compensation costs for stock awards are recognized over their vesting period using the straight-line method. We estimate stock award forfeitures expected to occur to determine the compensation cost we recognize each period.

*Legal Fees*—Legal fees associated with litigation and similar proceedings that are not expected to provide a benefit in future periods are expensed as incurred. Legal fees associated with activities that are expected to provide a benefit in future periods, such as costs associated with the issuance of debt, are capitalized as incurred.

- 49-

*Table of Contents*

*Income Taxes*—Interest and penalties from uncertain tax positions are included in income tax expense.

*Cash Equivalents*—Cash equivalents include short-term, highly liquid investments that are readily convertible to known amounts of cash and have an original maturity of three months or less.

*Inventory*—Inventories are valued at the lower of cost or net realizable value. We measure the cost of inventories using the average cost method.

*Property, Plant and Equipment*—Plant and equipment are depreciated under the straight-line method over their estimated lives. Estimated lives are as follows: land improvements over 20 years, leaseholds over the life of the related operating lease term, buildings over 40 years and machinery and equipment over two to 20 years. The estimated weighted-average life of our machinery and equipment is 13 years at the end of 2019. Amortization expense for assets recorded under finance leases is included in depreciation expense. Costs incurred to develop coal mines are capitalized when incurred. We use the units-of-production method utilizing only proven and probable reserves in the depletion base to compute the depletion of coal reserves and mine development costs. We expense costs for major maintenance activities at our operating facilities when the activities occur.

We review the carrying value of long-lived assets to be held and used and long-lived assets to be disposed of when events and circumstances warrant such a review. If the carrying value of a long-lived asset exceeds its fair value, an impairment has occurred and a loss is recognized based on the amount by which the carrying value exceeds the fair value, less cost to dispose, for assets to be sold or abandoned. We determine fair value by using quoted market prices, estimates based on prices of similar assets or anticipated cash flows discounted at a rate commensurate with risk.

*Goodwill and Intangible Assets*—Goodwill relates to our AK Tube LLC ("AK Tube") and PPHC Holdings, LLC ("Precision Partners") businesses. Intangible assets are recorded at cost, and those with finite lives are amortized over their estimated useful lives. We review goodwill for potential impairment at least annually on October 1 each year and whenever events or circumstances make it more likely than not that impairment may have occurred. Considering operating results and the estimated fair value of the businesses, the most recent annual goodwill impairment tests indicated that the fair value of each of our business reporting units was in excess of its carrying value. No goodwill impairment was recorded as a result of the annual impairment tests in the past three years.

*Leases*—We determine if an arrangement contains a lease at inception. We recognize right-of-use assets and liabilities associated with leases based on the present value of the future minimum lease payments over the lease term at the later of the commencement date of the lease or January 1, 2019 (the implementation date of Accounting Standards Update No. 2016-02, *Leases (Topic 842)*). We use our incremental borrowing rate at the recognition date in determining the present value of future payments for leases that do not have a readily determinable implicit rate. Lease terms reflect options to extend or terminate the lease when it is reasonably certain that the option will be exercised. For leases that include residual value guarantees or payments for terminating the lease, we include these costs in the lease liability when it is probable that we will incur them. Right-of-use assets and obligations for short-term leases (leases with an initial term of 12 months or less) are not recognized in the consolidated balance sheet. Lease expense for short-term leases is recognized on a straight-line basis over the lease term. We have agreements that contain lease and non-lease components. In assessing whether an agreement includes a lease component, we consider the nature of the assets included under the agreement and our right to direct their use. We allocate the costs of the agreement to the separate components based on the relative standalone prices of the components. Where observable standalone prices are not readily available, we estimate the standalone price based on the most observable information available. For leases of real estate and certain light equipment, such as vehicles and mobile equipment, and for certain contracts that contain assets, such as production support, natural gas, electricity and industrial gas agreements, we account for the lease and non-lease components in the contracts as a single lease component.

*Investments*—Investments in associated companies are accounted for under the equity method. We review an investment for impairment when circumstances indicate that a loss in value below its carrying amount is other than temporary.

*Debt Issuance Costs*—Debt issuance costs for the revolving credit facility are included in other non-current assets and all other debt issuance costs reduce the carrying amount of long-term debt.

*Pension and Other Postretirement Benefits*—We recognize into income, as of a measurement date, any unrecognized actuarial net gains or losses that exceed 10% of the larger of the projected benefit obligations or the plan assets, defined as the "corridor." Amounts inside the corridor are amortized over the plan participants' life expectancy. We determine the expected return on assets using the fair value of plan assets.

- 50-

*Table of Contents*

*Concentrations of Credit Risk*—We are primarily a producer of carbon, stainless and electrical steels and steel products, which are sold to a number of markets, including automotive, infrastructure and manufacturing, and distributors and converters. We had two customers that accounted for 11% and 11% of net sales in 2019, two customers that accounted for 11% and 10% of net sales in 2018, and one customer that accounted for 12% of net sales in 2017. Approximately 62% and 52% of accounts receivable outstanding at December 31, 2019 and 2018, are due from businesses associated with the U.S. automotive industry, including 15% of receivables due from one automotive customer as of December 31, 2019, and 13% due from one automotive customer as of December 31, 2018.

*Labor Agreements*—At December 31, 2019, we employed approximately 9,300 people, of which approximately 5,600 are represented by labor unions under various agreements that expire between 2020 and 2023. In April 2019, we and the United Steelworkers, Local 1865, which represents production employees at Ashland Works, reached an agreement to revise and extend the collective bargaining agreement. The new agreement includes terms governing the permanent closure of the facility, including benefits to employees who are terminated or transition to other AK Steel plants. In May 2019, members of the United Steelworkers, Local 1190, ratified a three-year labor agreement covering approximately 220 production employees at Mountain State Carbon, LLC. The new agreement will be in effect through April 30, 2022. In May 2019, members of the United Auto Workers, Local 4104, which governs approximately 100 production employees at Zanesville Works, ratified a new three-year labor agreement. The new agreement will be in effect through May 31, 2022. In July 2019, members of the United Auto Workers, Local 3303, which governs approximately 1,100 production and maintenance employees at Butler Works, ratified a new three-year agreement. The new agreement will be in effect through June 15, 2022. In September 2019, members of the United Auto Workers, Local 3462, which governs approximately 310 production employees at Coshocton Works, ratified a new agreement. The new agreement will be in effect through July 31, 2023. Other agreements that expire within the next twelve months include an agreement with the International Association of Machinists and Aerospace Workers, Local 1943, which governs approximately 1,750 production employees at Middletown Works, scheduled to expire March 15, 2020, and an agreement with United Steelworkers, Local 1915, which governs approximately 100 production employees at AK Tube's Walbridge plant, scheduled to expire January 22, 2021.

*Financial Instruments*—We are a party to derivative instruments that are designated and qualify as hedges for accounting purposes. We may also use derivative instruments to which we do not apply hedge accounting treatment. Our objective in using these instruments is to limit operating cash flow exposure to fluctuations in the fair value of selected commodities and currencies.

Fluctuations in the price of certain commodities we use in production processes may affect our income and cash flows. We have implemented raw material and energy surcharges for some contract customers. For certain commodities where such exposure exists, we may use cash-settled commodity price swaps, collars and purchase options, with a duration of up to two years, to hedge the price of a portion of our natural gas, iron ore, electricity, zinc and nickel requirements. We may designate some of these instruments as cash flow hedges and changes in their fair value and settlements are recorded in accumulated other comprehensive income. We subsequently reclassify gains and losses from accumulated other comprehensive income to cost of products sold in the same period we recognize the earnings associated with the underlying transaction. The change in fair value for other instruments is immediately recorded in cost of products sold with the offset recorded as assets or liabilities.

Exchange rate fluctuations affect a portion of revenues and operating costs that are denominated in foreign currencies, and we use currency forwards and options to reduce our exposure to these currency price fluctuations. These derivative contracts have durations up to three years. Contracts that sell euros have not been designated as hedges for accounting purposes and gains or losses are reported in earnings immediately in other income (expense). Contracts that purchase Canadian dollars are designated as hedges for accounting purposes, which requires us to record the gains and losses for the derivatives in accumulated other comprehensive income and reclassify them into cost of products sold in the same period we recognize costs for the associated underlying operations.

We formally document all relationships between hedging instruments and hedged items, as well as risk management objectives and strategies for undertaking various hedge transactions. In this documentation, we specifically identify the asset, liability, firm commitment or forecasted transaction that has been designated as a hedged item, and state how the hedging instrument is expected to hedge the risks from that item. We formally measure effectiveness of hedging relationships both at the hedge inception and on an ongoing basis. We discontinue hedge accounting prospectively when we determine that the derivative is no longer effective in offsetting changes in the fair value or cash flows of a hedged item; when the derivative expires or is sold, terminated or exercised; when it is probable that the forecasted transaction will not occur; when a hedged firm commitment no longer meets the definition of a firm commitment; or when we determine that designation of the derivative as a hedge instrument is no longer appropriate. Our derivative contracts may contain collateral funding requirements. We have master netting arrangements with counterparties, giving us the right to offset amounts owed under the derivative instruments and the collateral. We do not offset derivative assets and

liabilities or collateral on our consolidated balance sheets. Cash flows associated with purchasing and settling derivative contracts are classified as operating cash flows.

*Asbestos and Environmental Accruals*—For a number of years, we have been remediating sites where hazardous materials may have been released, including sites no longer owned by us. In addition, a number of lawsuits alleging asbestos exposure have been filed and

- 51-

*Table of Contents*

continue to be filed against us. We have established accruals for estimated probable costs from asbestos claim settlements and environmental investigation, monitoring and remediation. If the accruals are not adequate to meet future claims, operating results and cash flows may be negatively affected. Our accruals do not consider the potential for insurance recoveries. We have partial insurance coverage for some future asbestos claims. In addition, some existing insurance policies covering asbestos and environmental contingencies may serve to partially reduce future covered expenditures.

*Adoption of New Accounting Principles—*We adopted Accounting Standards Update No. 2016-02, *Leases (Topic 842)*, as subsequently amended, as of January 1, 2019 through the modified retrospective method applied to those contracts that were not completed as of January 1, 2019. Topic 842 requires entities to recognize lease assets and lease liabilities and disclose key information about leasing arrangements for certain leases. Results for reporting periods beginning after January 1, 2019 are presented under Topic 842, while prior period amounts have not been adjusted and continue to be reported in accordance with our historical accounting treatment. We elected the package of practical expedients permitted under the transition guidance within the new standard, which among other things, allowed us to carry forward the historical lease classification. We also elected the practical expedient related to land easements, allowing us to carry forward our accounting treatment for land easements on existing agreements. Adoption of the new standard resulted in recording additional lease assets and liabilities of $291.1 as of January 1, 2019. The adoption of the standard did not materially impact our consolidated net earnings or cash flows.

We adopted Accounting Standards Update No. 2016-13, *Financial Instruments—Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments*, as subsequently amended, as of December 31, 2019. The standard requires entities to recognize credit losses at the time financial assets, including receivables, are recorded by estimating lifetime expected credit losses. The effect of adoption of the new guidance was not material to our consolidated financial statements.

## NOTE 2 - Proposed Cleveland-Cliffs Acquisition

On December 2, 2019, we entered into an Agreement of Plan of Merger (as it may be amended from time to time, the "Merger Agreement") among us, Cleveland-Cliffs Inc. ("Cliffs") and Pepper Merger Sub Inc., a direct, wholly owned subsidiary of Cliffs ("Merger Sub") pursuant to which, subject to the satisfaction or (to the extent permissible) waiver of the conditions set forth therein, Cliffs will acquire AK Holding by way of the merger of Merger Sub with and into AK Holding (the "Merger"), with AK Holding surviving such Merger as a wholly owned subsidiary of Cliffs. Under the terms of the Merger Agreement, at the effective time of the Merger, AK Holding stockholders will become entitled to receive 0.40 Cliffs common shares for each outstanding share of AK Holding common stock they own at the effective time. Upon completion of the proposed Merger, it is expected that, AK Holding stockholders will own approximately 32% of the combined company and Cliffs shareholders will own approximately 68% of the combined company on a fully diluted basis. We expect to complete the Merger in the first quarter of 2020, subject to the receipt of customary regulatory and stockholder approvals and the satisfaction or (to the extent permissible) waiver of the other closing conditions under the Merger Agreement.

On January 14, 2020, Cliffs commenced consent solicitations and offers to exchange any and all outstanding 6.375% Senior Notes due 2025 ("2025 Notes") and 7.00% Senior Notes due 2027 ("2027 Notes") issued by AK Steel for the same aggregate principal amount of new notes to be issued by Cliffs, subject to completion of the Merger and the satisfaction of certain other conditions. On January 28, 2020, we received the requisite consents to adopt the proposed amendments to amend the respective indentures governing the 2025 Notes ("2025 Notes Indenture") and the 2027 Notes ("2027 Notes Indenture"). Those amendments deleted certain covenants from the indentures, as set forth in a Form 8-K that we filed with the SEC on January 29, 2020. On January 29, 2020, we and U.S. Bank National Association, as trustee (the "Trustee") entered into the Ninth Supplemental Indenture with respect to the 2027 Notes Indenture (the "Ninth Supplemental Indenture") and the Tenth Supplemental Indenture with respect to the 2025 Notes Indenture (the "Tenth Supplemental Indenture" and, together with the Ninth Supplemental Indenture, the "Supplemental Indentures") giving effect to the proposed amendments. The Supplemental Indentures will become operative as to the 2025 Notes and 2027 Notes only upon completion of the Merger and the satisfaction of certain other conditions.

*Table of Contents*

**NOTE 3 - Supplementary Financial Statement Information**

*Revenue*

Net sales by market are presented below:

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Automotive | $ 4,172.2 | $ 4,284.7 | $ 3,951.5 |
| Infrastructure and Manufacturing | 1,006.0 | 1,049.1 | 948.0 |
| Distributors and Converters | 1,181.2 | 1,484.4 | 1,181.0 |
| Total | $ 6,359.4 | $ 6,818.2 | $ 6,080.5 |

Net sales by product line are presented below:

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Carbon steel | $ 4,143.6 | $ 4,409.1 | $ 4,034.5 |
| Stainless and electrical steel | 1,617.5 | 1,793.8 | 1,687.6 |
| Tubular products, components and other | 598.3 | 615.3 | 358.4 |
| Total | $ 6,359.4 | $ 6,818.2 | $ 6,080.5 |

We sell domestically to customers located primarily in the Midwestern and Eastern United States and to foreign customers located primarily in Canada, Mexico and Western Europe. Net sales to customers located outside the United States totaled $569.4, $634.8 and $627.1 for 2019, 2018 and 2017.

*Research and Development Costs*

We conduct a broad range of research and development activities aimed at improving existing products and manufacturing processes and developing new products and processes. Research and development costs, which are recorded as selling and administrative expenses when incurred, totaled $30.7, $29.4 and $28.1 in 2019, 2018 and 2017.

*Allowance for Credit Losses*

Changes in the allowance for credit losses for the years ended December 31, 2019, 2018 and 2017, are presented below:

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Balance at beginning of year | $ 6.6 | $ 6.8 | $ 7.8 |
| Increase (decrease) in allowance | (1.6) | 0.3 | (1.0) |
| Receivables written off | (0.7) | (0.5) | — |
| Balance at end of year | $ 4.3 | $ 6.6 | $ 6.8 |

*Inventory*

Inventories as of December 31, 2019 and 2018, consist of:

|  | 2019 | 2018 |
|---|---|---|
| Finished and semi-finished | $ 971.4 | $ 1,054.4 |
| Raw materials | 374.8 | 365.5 |
| Inventory | $ 1,346.2 | $ 1,419.9 |

- 53-

*Table of Contents*

*Property, Plant and Equipment*

Property, plant and equipment as of December 31, 2019 and 2018, consist of:

|  | 2019 | 2018 |
|---|---|---|
| Land, land improvements and leaseholds | $ 271.2 | $ 272.1 |
| Buildings | 514.8 | 509.7 |
| Machinery and equipment | 6,213.6 | 6,061.6 |
| Construction in progress | 169.3 | 125.8 |
| Total | 7,168.9 | 6,969.2 |
| Less accumulated depreciation | (5,237.0) | (5,057.6) |
| Property, plant and equipment, net | $ 1,931.9 | $ 1,911.6 |

Interest on capital projects capitalized in 2019, 2018 and 2017 was $3.1, $1.6 and $1.9. Asset retirement obligations were $10.6 and $8.5 at December 31, 2019 and 2018.

*Goodwill and Intangible Assets*

Changes in goodwill for the years ended December 31, 2019, 2018 and 2017 are presented below:

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Balance at beginning of year | $ 255.0 | $ 253.8 | $ 32.8 |
| Acquisition | 0.5 | 1.2 | 221.0 |
| Balance at end of year | $ 255.5 | $ 255.0 | $ 253.8 |

At December 31, 2019, goodwill consisted of $222.7 related to our Precision Partners business and $32.8 related to our AK Tube business.

Intangible assets at December 31, 2019 and 2018, consist of:

|  | Gross Amount | Accumulated Amortization | Net Amount |
|---|---|---|---|
| **As of December 31, 2019** | | | |
| Customer relationships | $ 36.6 | $ (12.5) | $ 24.1 |
| Technology | 23.0 | (9.2) | 13.8 |
| Intangible assets | $ 59.6 | $ (21.7) | $ 37.9 |
| | | | |
| **As of December 31, 2018** | | | |
| Customer relationships | $ 36.6 | $ (7.4) | $ 29.2 |
| Technology | 19.3 | (4.6) | 14.7 |
| Intangible assets | $ 55.9 | $ (12.0) | $ 43.9 |

Amortization expense related to intangible assets was $9.7, $9.0 and $4.0 in 2019, 2018 and 2017. Amortization expense is included in costs of products sold. The remaining average life of our intangible assets is 4.6 years for customer relationships and 3.6 years for technology. Estimated annual amortization expense for intangible assets over the next five years is $10.6 for 2020, $8.4 for 2021, $8.4 for 2022, $7.1 for 2023 and $3.4 in 2024.

*Table of Contents*

*Other Non-current Assets*

Other non-current assets as of December 31, 2019 and 2018, consist of:

|  | 2019 | 2018 |
|---|---|---|
| Operating lease assets | $ 244.5 | $ — |
| Investments in affiliates | 79.5 | 80.5 |
| Other | 21.0 | 23.4 |
| Other non-current assets | $ 345.0 | $ 103.9 |

*Accrued Liabilities*

Accrued liabilities as of December 31, 2019 and 2018, consist of:

|  | 2019 | 2018 |
|---|---|---|
| Salaries, wages and benefits | $ 83.0 | $ 127.8 |
| Current portion of operating lease liabilities | 49.6 | — |
| Interest | 33.8 | 34.8 |
| Other | 148.0 | 126.3 |
| Accrued liabilities | $ 314.4 | $ 288.9 |

*Ashland Works Closure*

In January 2019, our Board of Directors approved and we announced the planned closure of our Ashland Works, including the previously idled blast furnace and steelmaking operations ("Ashland Works Hot End") and the hot dip galvanizing coating line that had continued to operate. Factors that influenced our decision to close Ashland Works included an uncertain global trade landscape influenced by shifting domestic and international political priorities, Ashland Works' high cost of production, and continued intense competition from domestic and foreign steel competitors. These conditions directly impacted our pricing, which in turn directly impacted our assessment of the demand forecasts for the markets we serve. Despite several favorable trade actions, carbon steel imports remained at a high level, driven by global overcapacity, particularly in China. We expected global overcapacity to be exacerbated by several domestic steel companies that had restarted or planned new capacity additions in the United States. In addition, we concluded that we had sufficient coating capacity to meet our customers' needs without using our coating operations at Ashland Works. We transitioned products to our other, lower cost coating lines in the U.S. and closed the Ashland Works coating line in November 2019.

For the year ended December 31, 2019, we recorded a charge of $69.3, which included $18.5 for termination of take-or-pay supply agreements, $20.1 for supplemental unemployment and other employee benefit costs, pension and other postretirement benefit ("OPEB") termination benefits of $13.3 (recorded in pension and OPEB (income) expense), an estimated multiemployer plan withdrawal liability of $10.0, and $7.4 for other costs. The supplemental unemployment and other employee benefit costs are expected to be paid primarily in 2020 and 2021. The actual multiemployer plan withdrawal liability will not be known until a future date and is expected to be paid over a number of years. Ongoing costs to maintain the equipment and utilities and meet supplier obligations related to the idled Ashland Works Hot End were $12.6, $20.0 and $21.2 for the years ended December 31, 2019, 2018 and 2017. These cash costs related to closing the facility will decline in future years. We recorded $4.0 of accelerated depreciation related to the coating line fixed assets for the year ended December 31, 2019 to fully depreciate them.

The supplemental unemployment and other employee benefit costs were recorded as accrued and other non-current liabilities, and the activity for the year ended December 31, 2019, was as follows:

|  | 2019 |
|---|---|
| Charge for supplemental unemployment and other employee benefit costs | $ 20.1 |

| | | |
|---|---|---|
| Payments | | (1.0) |
| Balance at end of year | $ | 19.1 |

*Table of Contents*

In the fourth quarter of 2015, we temporarily idled the Ashland Works Hot End. We incurred charges in the fourth quarter of 2015 for supplemental unemployment and other employee benefit costs that were recorded as accrued liabilities, and the activity for the years ended December 31, 2018, and 2017 was as follows:

|  | 2018 | 2017 |
|---|---|---|
| Balance at beginning of year | $ 1.5 | $ 6.2 |
| Payments | (1.5) | (5.3) |
| Additions to the reserve | — | 0.6 |
| Balance at end of year | $ — | $ 1.5 |

During 2017, we recognized a non-cash asset impairment charge of $75.6, primarily related to the long-lived assets associated with the Ashland Works Hot End.

**NOTE 4 - Acquisition of Precision Partners**

In August 2017, we acquired Precision Partners, which provides advanced-engineered solutions, tool design and build, hot- and cold-stamped steel components and complex assemblies for the automotive market. Precision Partners is headquartered in Ontario, Canada, and operates ten plants in Ontario, Alabama and Kentucky. We acquired Precision Partners to advance our core focus on the high-growth automotive lightweighting market and our prominent position in advanced high strength steels, further strengthen our close collaboration with automotive market customers, and leverage both companies' research and innovation in metals forming. The consolidated financial statements reflect the effects of the acquisition and Precision Partner's financial results subsequent to the acquisition. For the year ended December 31, 2017, we incurred acquisition costs of $6.2, primarily for transaction fees and direct costs, including legal, finance, consulting and other professional fees. These costs are included in selling and administrative expenses in the consolidated statements of operations.

**NOTE 5 - Investments in Affiliates**

We have investments in several businesses accounted for using the equity method of accounting. Investees and equity ownership percentages are presented below:

|  | Equity Ownership % |
|---|---|
| Combined Metals of Chicago, LLC | 40.0% |
| Delaco Processing, LLC | 49.0% |
| Rockport Roll Shop LLC | 50.0% |
| Spartan Steel Coating, LLC | 48.0% |

Cost of products sold includes $5.1, $6.6 and $7.0 in 2019, 2018 and 2017 for our share of income of equity investees. As of December 31, 2019, our carrying cost of our investment in Spartan Steel exceeded our share of the underlying equity in net assets by $7.7. This difference is being amortized and the amortization expense is included in cost of products sold.

Summarized financial statement data for all investees is presented below:

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Revenue | $ 330.2 | $ 329.8 | $ 292.7 |
| Gross profit | 94.6 | 91.0 | 88.9 |
| Net income (loss) | 15.5 | 19.4 | 20.7 |

|  | 2019 | 2018 |
|---|---|---|

| | | | |
|---|---|---|---|
| Current assets | $ | 114.2 | $ 123.6 |
| Noncurrent assets | | 80.3 | 74.4 |
| Current liabilities | | 18.8 | 16.9 |
| Noncurrent liabilities | | 96.1 | 54.2 |

- 56-

*Table of Contents*

We regularly transact business with these equity investees. Transactions with all equity investees for the years indicated are presented below:

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Sales to equity investees | $ 67.6 | $ 104.4 | $ 80.6 |
| Purchases from equity investees | 42.3 | 31.2 | 33.0 |

Outstanding receivables and payables with all equity investees as of the end of the year indicated are presented below:

|  | 2019 | 2018 |
|---|---|---|
| Accounts receivable from equity investees | $ 1.5 | $ 1.9 |
| Accounts payable to equity investees | 3.9 | 6.4 |

In 2016, we terminated our iron ore pellet offtake agreement with Magnetation LLC, ceased purchasing iron ore pellets from them, and recorded a liability for obligations under contracts with other third parties to transport pellets to our facilities. In 2017, we recorded a credit of $19.3 to reduce the liability when we reached an agreement for transportation services to begin using rail cars that we idled after the termination of the pellet supply agreement.

**NOTE 6 - Income Taxes**

---

We and our subsidiaries file a consolidated federal income tax return that includes all domestic companies owned 80% or more by us and the proportionate share of our interest in equity method investments. State tax returns are filed on a consolidated, combined or separate basis depending on the applicable laws relating to us and our domestic subsidiaries.

Components of income (loss) before income taxes for the years ended December 31, 2019, 2018 and 2017, are presented below:

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| United States | $ (9.3) | $ 168.3 | $ 91.6 |
| Foreign | 26.7 | 11.5 | 9.7 |
| Noncontrolling interests | 51.8 | 58.1 | 61.4 |
| Income before income taxes | $ 69.2 | $ 237.9 | $ 162.7 |

Significant components of deferred tax assets and liabilities at December 31, 2019 and 2018 are presented below:

|  | 2019 | 2018 |
|---|---|---|
| Deferred tax assets: |  |  |
| Net operating and capital loss and tax credit carryforwards | $ 496.2 | $ 516.7 |
| Postretirement benefits | 87.9 | 81.8 |
| Pension benefits | 84.2 | 114.1 |
| Leases | 63.3 | — |
| Inventories | 23.4 | 38.5 |
| Other assets | 78.9 | 65.1 |
| Valuation allowance | (659.4) | (693.5) |
| Total deferred tax assets | 174.5 | 122.7 |
| Deferred tax liabilities: |  |  |
| Depreciable assets | (106.3) | (108.3) |

| | | |
|---|---|---|
| Leases | (60.0) | — |
| Other liabilities | (27.9) | (33.4) |
| Total deferred tax liabilities | (194.2) | (141.7) |
| Net deferred tax liabilities | $ (19.7) | $ (19.0) |

We regularly evaluate the need for a valuation allowance for deferred tax assets by assessing whether it is more likely than not that we will realize future deferred tax assets. We assess the valuation allowance each reporting period and reflect any additions or adjustments in earnings in the same period. At December 31, 2019, we considered the existence of recent cumulative income from U.S. operations as a source of positive evidence. We have generated losses from U.S. operations for several of our recent periods through 2016 and for

- 57-

*Table of Contents*

2019 and accordingly have generated significant cumulative losses in those periods, which is a significant source of objective negative evidence. Despite the recent income reported in 2017 and 2018 from U.S. operations, the following forms of negative evidence concerning our ability to realize our domestic deferred tax assets were considered:

- we have historical evidence that the steel industry we operate within has business cycles of longer than a few years and therefore attribute significant weight to our cumulative losses over longer business cycles in evaluating our ability to generate future taxable income;
- the global steel industry has been experiencing global overcapacity and periods of increased foreign steel imports into the U.S., which have created volatile economic conditions and uncertainty relative to predictions of future income;
- while we have changed our business model to de-emphasize sales of commodity products and believe that this model will generate improved financial results throughout an industry cycle, we have not experienced all parts of the cycle since we made these changes and therefore we do not know what results our business model will produce in all circumstances;
- our U.S. operations have generated significant losses in prior years and the competitive landscape in the steel industry reflects shifting domestic and international political priorities, an uncertain global trade landscape, and continued intense competition from domestic and foreign steel competitors, all of which present significant uncertainty regarding our ability to routinely generate U.S. income in the near term;
- there has been significant recent volatility in spot market selling prices for carbon and stainless steel; and
- a substantial portion of our U.S. deferred tax assets consists of tax carryforwards with expiration dates that may prevent us from using them prior to expiration.

As of December 31, 2019 and 2018, we concluded that the negative evidence outweighed the positive evidence and we maintained a valuation allowance for our net deferred tax assets in the U.S. To determine the appropriate valuation allowance, we considered the timing of future reversal of our taxable temporary differences that supports realizing a portion of our federal and state deferred tax assets. This accounting treatment has no effect on our ability to use the loss carryforwards and tax credits to reduce future cash tax payments.

Changes in the valuation allowance for the years ended December 31, 2019, 2018 and 2017, are presented below:

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Balance at beginning of year | $ 693.5 | $ 735.7 | $ 1,189.7 |
| Change in valuation allowance: |  |  |  |
| Included in income tax expense (benefit) | (26.2) | (52.8) | (62.3) |
| Change in deferred assets in other comprehensive income | (7.9) | 10.6 | 8.5 |
| Effect of tax rate changes | — | — | (400.2) |
| Balance at end of year | $ 659.4 | $ 693.5 | $ 735.7 |

At December 31, 2019, we had $2,081.6 in federal regular net operating loss carryforwards, which will expire between 2030 and 2037. Our net operating loss carryovers were generated in years prior to 2018, retain the original 20-year carryover periods, and can be used to offset future taxable income without limitation. At December 31, 2019, we had research and development ("R&D") credit carryforwards of $1.2 that we may use to offset future income tax liabilities. The R&D credits expire between 2027 and 2028. At December 31, 2019, we had $76.3 in deferred tax assets for state net operating loss carryforwards and tax credit carryforwards, before considering valuation allowances, which will expire between 2020 and 2039.

Significant components of income tax expense (benefit) are presented below:

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Current: |  |  |  |
| Federal | $ 0.2 | $ (0.5) | $ (4.5) |
| State | (0.1) | (0.3) | 0.3 |
| Foreign | 5.1 | 2.1 | 2.4 |
| Deferred: |  |  |  |
| Federal | (0.1) | (5.3) | 0.7 |

| | | | | | | |
|---|---|---|---|---|---|---|
| State | | — | | — | | 0.1 |
| Foreign | | 2.5 | | (2.2) | | (0.4) |
| Amount allocated to other comprehensive income | | (1.4) | | — | | — |
| Change in valuation allowance on beginning-of-the-year deferred tax assets | | — | | — | | (0.8) |
| Income tax expense (benefit) | $ | 6.2 | $ | (6.2) | $ | (2.2) |

- 58-

*Table of Contents*

The Tax Cuts and Jobs Act of 2017 (the "Tax Act"), signed into law on December 22, 2017, reduced the corporate income tax rate to 21% beginning in 2018, among other provisions. We recognized the effects of changes in tax rates and laws on deferred tax balances in 2017, the period in which the legislation was enacted. At December 31, 2017, we remeasured our deferred tax assets and liabilities based on the rate at which they are expected to reverse in the future, which is generally 21% at the U.S. federal level. As a result, our income tax expense for the fourth quarter of 2017 included a non-cash credit of $4.3 for the decrease in the value of our net deferred tax liabilities.

The Tax Act also introduced a one-time transition tax on the cumulative undistributed earnings of our foreign subsidiaries as of December 31, 2017. As a result, our taxable income for 2017 included $24.3 as our gross transition tax obligation. We did not incur a cash tax liability for the transition tax due to the availability of existing net operating loss carryforwards. At December 31, 2019 we had $11.4 of accumulated undistributed earnings of our foreign subsidiaries that has not been subject to U.S. income tax as they are considered indefinitely reinvested. Substantially all of the earnings as of December 31, 2017 were subject to U.S. taxation as a result of the transition tax inclusion provided for by the Tax Act. The Tax Act also establishes a broad exemption from U.S. taxation for dividends paid from our foreign affiliates after 2017. Consequently, there will generally be no incremental U.S. taxable income generated if we repatriate these foreign earnings in the future. However, foreign withholding taxes on dividend distributions could apply, unless they are eliminated by a treaty between the United States and the country where our foreign affiliate is located. Since we consider these earnings to be permanently invested in our foreign subsidiaries, we did not record any withholding taxes that would be assessed if the earnings were repatriated by payment of a dividend. If we repatriated the earnings, we estimate that the withholding tax liability would not be material at December 31, 2019.

Staff Accounting Bulletin No. 118 established a one-year period from the date of enactment in which to account for the impact of the Tax Act. During 2018, we reduced our valuation allowance and recorded an income tax benefit of $5.3 as a result of changes to the tax net operating carryover rules included in the Tax Act that allow us to use certain indefinite-lived deferred tax liabilities as a source of future income to realize deferred tax assets. As of December 31, 2018, we had accounted for the material aspects of the Tax Act.

The reconciliation of income tax on income before income taxes computed at the U.S. federal statutory tax rates to actual income tax expense is presented below:

| | 2019 | 2018 | 2017 |
|---|---|---|---|
| Income tax expense at U.S. federal statutory rate | $    14.5 | $    50.0 | $    57.2 |
| Income tax expense calculated on noncontrolling interests | (10.9) | (12.2) | (21.5) |
| State and foreign tax expense, net of federal tax | 12.9 | (2.3) | 6.3 |
| Increase (decrease) in deferred tax asset valuation allowance | (26.2) | (52.8) | (51.8) |
| Amount allocated to other comprehensive income | (1.4) | — | — |
| Remeasurement of deferred taxes for U.S. tax legislation | — | — | (4.3) |
| Transition tax on foreign earnings | — | — | 7.9 |
| Non-deductible compensation | 4.7 | 8.1 | — |
| Other permanent differences | 7.3 | 2.3 | 2.4 |
| Other differences | 5.3 | 0.7 | 1.6 |
| Income tax expense (benefit) | $    6.2 | $    (6.2) | $    (2.2) |

Our federal, state and local tax returns are subject to examination by various taxing authorities. Federal returns and most state returns for periods beginning in 2016 are open for examination, while certain state and local returns are open for examination for periods beginning in 2015. However, taxing authorities have the ability to adjust net operating loss carryforwards generated in years before these periods. We have not recognized certain tax benefits because of the uncertainty of realizing the entire value of the tax position taken on income tax returns until taxing authorities review them. We have established appropriate income tax accruals, and believe that the outcomes of future federal examinations, as well as ongoing and future state and local examinations, will not have a material adverse impact on our financial position, results of operations or cash flows. When statutes of limitations expire or taxing authorities resolve uncertain tax positions, we will adjust income tax expense for the unrecognized tax benefits. We have no tax positions for which it is reasonably possible that the total amounts of unrecognized tax benefits will significantly change within twelve months of December 31, 2019.

A005785

*Table of Contents*

A reconciliation of the change in unrecognized tax benefits for 2019, 2018 and 2017 is presented below:

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Balance at beginning of year | $ 87.2 | $ 89.4 | $ 124.2 |
| Decreases for prior year tax positions | (12.2) | (2.2) | (0.5) |
| Increases (decreases) for current year tax positions | 0.3 | — | 0.3 |
| Increases (decreases) related to tax rate changes (a) | — | — | (34.6) |
| Balance at end of year | $ 75.3 | $ 87.2 | $ 89.4 |

    (a)  As a result of the Tax Act, the value of unrecognized tax benefits associated with net operating loss carryforwards and other temporary differences was reduced to reflect the lower tax rates that will apply if the uncertainties related to these deferred tax assets materialize in the future.

Included in the balance of unrecognized tax benefits at December 31, 2019 and 2018, are $72.3 and $72.8 of tax benefits that, if recognized, would affect the effective tax rate. Also included in the balance of unrecognized tax benefits at December 31, 2019 and 2018, are $3.0 and $14.5 of tax benefits that, if recognized, would result in adjustments to other tax accounts, primarily deferred taxes.

## NOTE 7 - Long-term Debt and Other Financing

Debt balances at December 31, 2019 and 2018, are presented below:

|  | 2019 | 2018 |
|---|---|---|
| Credit Facility | $ 450.0 | $ 335.0 |
| 7.50% Senior Secured Notes due July 2023 (effective rate of 8.3%) | 380.0 | 380.0 |
| 7.625% Senior Notes due October 2021 | 406.2 | 406.2 |
| 6.375% Senior Notes due October 2025 (effective rate of 7.1%) | 270.2 | 274.8 |
| 7.00% Senior Notes due March 2027 | 391.6 | 391.6 |
| Industrial Revenue Bonds due 2020 through 2028 | 99.3 | 99.3 |
| 5.00% Exchangeable Senior Notes due November 2019 (effective rate of 10.8%) | — | 148.5 |
| Unamortized debt discount and issuance costs | (28.5) | (41.7) |
| Total long-term debt | $ 1,968.8 | $ 1,993.7 |

During 2019, we were in compliance with all the terms and conditions of our debt agreements.

Maturities of long-term debt for the next five years, at December 31, 2019, are presented below:

| Year | Debt Maturities |
|---|---|
| 2020  (a) | $ 7.3 |
| 2021 | 406.2 |
| 2022 | 450.0 |
| 2023 | 380.0 |
| 2024 | 62.0 |

    (a)  Amounts maturing in 2020 are classified as long-term based on our ability and intent to refinance on a long-term basis.

*Credit Facility*

We have a $1,500.0 revolving credit facility (the "Credit Facility") that expires in September 2022 and is guaranteed by AK Steel's parent company, AK Holding, and by AK Tube, AK Steel Properties, Inc. and Mountain State Carbon LLC, three 100%-owned subsidiaries of AK Steel (referred to together as the "Subsidiary Guarantors"). The Credit Facility contains customary restrictions, including limitations on, among other things, distributions and dividends, acquisitions and investments, dispositions, indebtedness, liens and affiliate transactions. The Credit Facility requires that we maintain a minimum fixed charge coverage ratio of one to one if availability under the Credit Facility is less than $150.0. The Credit Facility's current availability significantly exceeds $150.0. Availability is calculated as the lesser of the Credit Facility commitments or eligible collateral after advance rates, less outstanding revolver borrowings and letters of credit. We secure our Credit Facility obligations with our inventory and accounts receivable, and the Credit Facility's availability fluctuates monthly based on the varying levels of eligible collateral. We do not expect any of these

- 60-

*Table of Contents*

restrictions to affect or limit our ability to conduct business in the ordinary course. The Credit Facility includes a "first-in, last-out" or "FILO" tranche, which allows us to use a portion of our eligible collateral at higher advance rates.

At December 31, 2019, our aggregate borrowing base, after application of applicable advance rates, was $1,327.1. As of December 31, 2019, we had $450.0 in outstanding borrowings. Availability as of December 31, 2019 was further reduced by $72.5 for outstanding letters of credit, resulting in remaining availability of $804.6. The weighted-average interest rate on the outstanding borrowings at December 31, 2019 was 3.32%.

### Senior Secured Notes

AK Steel has outstanding 7.50% Senior Secured Notes due July 2023 (the "Secured Notes"). The Secured Notes are fully and unconditionally guaranteed by AK Holding and the Subsidiary Guarantors. The Secured Notes are secured by first priority liens on the plant, property and equipment (other than certain excluded property, and subject to permitted liens) of AK Steel and the Subsidiary Guarantors and any proceeds from them. The book value of the collateral as of December 31, 2019 was approximately $1.4 billion. The indenture governing the Secured Notes includes covenants with customary restrictions on (a) the incurrence of additional debt by certain subsidiaries, (b) the incurrence of certain liens, (c) the incurrence of sale/leaseback transactions, (d) the use of proceeds from the sale of collateral, and (e) our ability to merge or consolidate with other entities or to sell, lease or transfer all or substantially all of our assets to another entity. The Secured Notes also contain customary events of default. We may redeem the Secured Notes at 103.750% until July 15, 2020, 101.875% until July 15, 2021, and 100.000% thereafter, together with all accrued and unpaid interest to the date of redemption.

### Senior Unsecured Notes

AK Steel has outstanding 7.625% Senior Notes due October 2021 (the "2021 Notes"). We may redeem the 2021 Notes at 100.0%, together with all accrued and unpaid interest to the date of redemption.

AK Steel has outstanding 6.375% Senior Unsecured Notes due October 2025 (the "2025 Notes"). Before October 15, 2020, we may redeem the 2025 Notes at a price equal to par plus a make-whole premium and all accrued and unpaid interest to the date of redemption. After that date, we may redeem them at 103.188% until October 15, 2021, 101.594% thereafter until October 15, 2022, and 100.000% thereafter, together with all accrued and unpaid interest to the date of redemption. In 2017, we recognized other expense of $8.4 related to the issuance of the 2025 Notes. During 2019 and 2018, we repurchased an aggregate principal amount of $4.6 and $5.2 of the 2025 Notes in private, open market transactions. We recognized a net gain on the repurchases totaling $0.6 and $0.7 for the years ended December 31, 2019 and 2018, which is included in other (income) expense.

AK Steel has outstanding 7.00% Senior Unsecured Notes due March 2027 (the "2027 Notes"). Before March 15, 2022, we may redeem the 2027 Notes at a price equal to par plus a make-whole premium and all accrued and unpaid interest to the date of redemption. After that date, we may redeem them at 103.500% until March 15, 2023, 102.333% thereafter until March 15, 2024, 101.167% thereafter until March 15, 2025, and 100.000% thereafter, together with all accrued and unpaid interest to the date of redemption. In 2017, we recognized other expense of $13.1 related to the issuance of the 2027 Notes. During 2018, we repurchased an aggregate principal amount of $8.4 of the 2027 Notes in private, open market transactions. We recognized a net gain on the repurchases totaling $1.3 for the year ended December 31, 2018, which is included in other (income) expense.

The 2021 Notes, the 2025 Notes, the 2027 Notes and the unsecured industrial revenue bonds ("IRBs") discussed below (collectively, the "Senior Unsecured Notes") are equal in right of payment. AK Holding and the Subsidiary Guarantors each, fully and unconditionally, jointly and severally, guarantees the payment of interest, principal and premium, if any, on the Senior Unsecured Notes. The indentures governing the 2021 Notes, the 2025 Notes, the 2027 Notes and the unsecured IRBs include covenants with customary restrictions on (a) the incurrence of additional debt by certain subsidiaries, (b) the incurrence of certain liens, (c) the amount of sale/leaseback transactions, and (d) our ability to merge or consolidate with other entities or to sell, lease or transfer all or substantially all of our assets to another entity. The indentures governing the Senior Unsecured Notes also contain customary events of default. The Senior Unsecured Notes rank junior in priority to the Secured Notes to the extent of the value of the assets securing the Secured Notes.

### Industrial Revenue Bonds

AK Steel has outstanding $73.3 aggregate principal amount of fixed-rate, tax-exempt IRBs (the "unsecured IRBs") at December 31, 2019. The weighted-average fixed interest rate of the unsecured IRBs is 6.8%. The unsecured IRBs are unsecured senior debt obligations of AK Steel that are equal in ranking with the other Senior Unsecured Notes. In addition, AK Steel has outstanding $26.0 aggregate principal amount of variable-rate taxable IRBs at December 31, 2019, that are backed by letters of credit.

*Table of Contents*

*Exchangeable Notes*

AK Steel's  5.0% Exchangeable Senior Notes due November 2019 (the "Exchangeable Notes") were redeemed at their maturity date. Although the Exchangeable Notes were issued at par, for accounting purposes the proceeds received from the issuance of the notes were allocated between debt and equity to reflect the fair value of the exchange option embedded in the notes and the fair value of similar debt without the exchange option. Therefore, we recorded $38.7 of the gross proceeds of the Exchangeable Notes as an increase in additional paid-in capital with the offsetting amount recorded as a debt discount. We amortized the debt discount and issuance costs over the term of the Exchangeable Notes using the effective interest method. As of December 31, 2018, the net carrying amount of the Exchangeable Notes was $141.4.

**NOTE 8 - Pension and Other Postretirement Benefits**

*Summary*

We provide noncontributory pension and various healthcare and life insurance benefits to a significant portion of our employees and retirees. Benefits are provided through defined benefit and defined contribution plans that we sponsor, as well as multiemployer plans for certain union members. Our defined benefit pension plans are not fully funded. We will be required to make pension contributions of approximately $45.0 for 2020. Based on current actuarial assumptions, we expect to make required pension contributions of approximately $45.0 for 2021 and $35.0 for 2022. Factors that affect future funding projections include differences between expected and actual returns on plan assets, actuarial data and assumptions relating to plan participants, the discount rate used to measure the pension obligations and changes to regulatory funding requirements. We expect to make OPEB payments, after receipt of Medicare subsidy reimbursements, of approximately $35.6 in 2020.

- 62-

Table of Contents

*Defined Benefit Plans*

Plan Obligations

Amounts presented below are calculated based on benefit obligation and asset valuation measurement dates of December 31, 2019 and 2018:

| | Pension Benefits | | Other Benefits | |
| --- | --- | --- | --- | --- |
| | 2019 | 2018 | 2019 | 2018 |
| Change in benefit obligations: | | | | |
| Benefit obligations at beginning of year | $ 2,210.0 | $ 2,808.0 | $ 398.2 | $ 448.5 |
| Service cost | 2.5 | 3.2 | 3.5 | 4.5 |
| Interest cost | 85.9 | 94.5 | 16.4 | 15.6 |
| Plan participants' contributions | — | — | 24.3 | 24.7 |
| Actuarial loss (gain) | 206.5 | (148.8) | 16.2 | (23.7) |
| Amendments | — | — | — | (11.1) |
| Benefits paid | (211.3) | (268.1) | (53.2) | (62.6) |
| Annuity settlement | (615.6) | (278.8) | — | — |
| Termination benefits—Ashland Works | 9.7 | — | 3.6 | — |
| Medicare subsidy reimbursement received | — | — | 2.1 | 2.3 |
| Benefit obligations at end of year | $ 1,687.7 | $ 2,210.0 | $ 411.1 | $ 398.2 |
| | | | | |
| Change in plan assets: | | | | |
| Fair value of plan assets at beginning of year | $ 1,739.6 | $ 2,322.2 | $ — | $ — |
| Actual gain (loss) on plan assets | 382.5 | (87.0) | — | — |
| Employer contributions | 44.8 | 51.3 | 26.8 | 35.6 |
| Plan participants' contributions | — | — | 24.3 | 24.7 |
| Benefits paid | (211.3) | (268.1) | (53.2) | (62.6) |
| Annuity settlement | (615.6) | (278.8) | — | — |
| Medicare subsidy reimbursement received | — | — | 2.1 | 2.3 |
| Fair value of plan assets at end of year | $ 1,340.0 | $ 1,739.6 | $ — | $ — |
| Funded status | $ (347.7) | $ (470.4) | $ (411.1) | $ (398.2) |
| | | | | |
| Amounts recognized in the consolidated balance sheets: | | | | |
| Current liabilities | $ (5.4) | $ (1.2) | $ (35.6) | $ (37.5) |
| Noncurrent liabilities | (342.3) | (469.2) | (375.5) | (360.7) |
| Total | $ (347.7) | $ (470.4) | $ (411.1) | $ (398.2) |
| | | | | |
| Amounts recognized in accumulated other comprehensive loss, before taxes: | | | | |
| Actuarial loss (gain) | $ 48.5 | $ 134.1 | $ (15.5) | $ (35.4) |
| Prior service cost (credit) | 15.9 | 19.4 | (69.2) | (82.4) |
| Total | $ 64.4 | $ 153.5 | $ (84.7) | $ (117.8) |

The accumulated benefit obligation for all defined benefit pension plans was $1,675.8 and $2,188.6 at December 31, 2019 and 2018. All our defined benefit pension plans have an accumulated benefit obligation in excess of plan assets. The amounts included in current liabilities represent only the amounts of our unfunded pension and OPEB benefit plans that we expect to pay in the next year.

During the fourth quarter of 2019, we transferred to a highly rated insurance company $615.6 of pension obligations for approximately 4,250 retirees or their beneficiaries. As part of this transaction, we transferred a similar amount of pension trust assets to purchase a non-participating annuity contract that requires the insurance company to pay the transferred pension obligations to the

- 63-

*Table of Contents*

pension participants. As a result of the transfer of pension assets in November 2019, we recorded a settlement loss of $26.9 in the fourth quarter of 2019 to recognize the portion of the unrealized actuarial loss associated with the transferred obligations.

During the fourth quarter of 2018, we transferred to a highly rated insurance company $278.8 of pension obligations for approximately 5,400 retirees or their beneficiaries. As part of this transaction, we transferred a similar amount of pension trust assets to purchase a non-participating annuity contract. As a result of the transfer of pension assets in October 2018, we recorded a settlement loss of $14.5 in the fourth quarter of 2018.

During 2019, we recognized pension and OPEB termination benefits of $13.3 related to the Ashland Works closure.

The 2019 change in the actuarial loss (gain) for the pension plans in the table above primarily consisted of gains of $272.8 for actual pension asset return greater than expected and changes in demographic assumptions, partially offset by a loss of $182.4 for the decrease in discount rate used to value the benefit obligations and a loss of $31.0 for changes in mortality tables. The 2019 change in the actuarial loss (gain) for the OPEB plan in the table above primarily consisted of a loss of $33.7 for the decrease in discount rate used to value the benefit obligations, partly offset by gains related to changes in demographic assumptions and lower than expected benefit payments.

Assumptions used to value benefit obligations and determine pension and OPEB (income) expense are presented below:

| | Pension Benefits | | | Other Benefits | | |
|---|---|---|---|---|---|---|
| | **2019** | **2018** | **2017** | **2019** | **2018** | **2017** |
| Assumptions used to determine benefit obligations at December 31: | | | | | | |
| Discount rate | 3.29% | 4.22% | 3.54% | 3.33% | 4.27% | 3.59% |
| Rate of compensation increase | 4.00% | 4.00% | 4.00% | | | |
| Interest crediting rate | 3.80% | 3.80% | 3.80% | | | |
| Subsequent year healthcare cost trend rate | | | | 6.17% | 6.50% | 6.65% |
| Ultimate healthcare cost trend rate | | | | 4.50% | 4.50% | 4.50% |
| Year ultimate healthcare cost trend rate begins | | | | 2025 | 2025 | 2025 |
| Assumptions used to determine pension and OPEB (income) expense for the year ended December 31: | | | | | | |
| Discount rate | 4.14% | 3.69% | 3.93% | 4.27% | 3.59% | 4.04% |
| Expected return on plan assets | 6.75% | 7.00% | 7.25% | | | |
| Rate of compensation increase | 4.00% | 4.00% | 4.00% | | | |
| Interest crediting rate | 3.80% | 3.80% | 3.80% | | | |

We determine the discount rate at each remeasurement by finding a hypothetical portfolio of individual high-quality corporate bonds available at the measurement date with coupon and principal payments that could satisfy the plans' expected future benefit payments that we use to calculate the projected benefit obligation. The discount rate is the single rate that is equivalent to the average yield on that hypothetical portfolio of bonds. We changed our assumption for future expected returns on pension plan assets to 7.50% from 6.75%, effective January 1, 2020 in response to a change in asset allocation.

Estimated future benefit payments to beneficiaries are presented below:

| | Pension Plans | Other Benefits |
|---|---|---|
| 2020 | $ 142.6 | $ 35.6 |

| | | |
|---|---|---|
| 2021 | 134.7 | 34.7 |
| 2022 | 137.2 | 34.0 |
| 2023 | 125.4 | 32.1 |
| 2024 | 130.7 | 30.4 |
| 2025 through 2029 | 592.7 | 129.4 |

- 64-

*Table of Contents*

Plan Assets

Our investments in the master pension trust primarily include indexed and actively-managed funds. A fiduciary committee sets the target asset mix and monitors asset performance. We determine the master pension trust's projected long-term rate of return based on the asset allocation, the trust's investment policy statement and our long-term capital market return assumptions for the master trust.

We have developed an investment policy that considers liquidity requirements, expected investment return, funded status and expected asset risk, as well as standard industry practices. The investment policy also dictates a target allocation based primarily on the funded status of the plan. The target asset allocation for the master pension trust at December 31, 2019 was 60% equity and 40% fixed income. Equity investments consist of individual securities, equity mutual funds and common/collective trusts with equity investment strategies, which are diversified across multiple industry sectors, company market capitalizations and geographical investment strategies. The equity mutual funds and common/collective trusts have no unfunded commitments or significant redemption restrictions. Fixed-income investments consist of individual securities and common/collective trusts, which invest primarily in investment-grade and high-yield corporate bonds and U.S. Treasury securities. The fixed-income investments are diversified by ratings, maturities, industries and other factors. Plan assets contain no significant concentrations of risk from individual securities or industry sectors. The master pension trust has no direct investments in our common stock or fixed-income securities.

Master pension trust investments measured at fair value on a recurring basis at December 31, 2019 and 2018 are presented below, with certain assets presented by level within the fair value hierarchy. As a practical expedient, we estimate the value of common/collective trusts and equity mutual funds by using the net asset value ("NAV") per share multiplied by the number of shares of the trust investment held as of the measurement date. If we have the ability to redeem our investment in the respective alternative investment at the NAV with no significant restrictions on the redemption at the consolidated balance sheet date, excluding equity mutual funds, we categorized the alternative investment as a reconciliation of pension investments reported in the fair value hierarchy to the master pension trust's balance. See Note 17 for more information on the determination of fair value.

| | Quoted Prices in Active Markets for Identical Assets (Level 1) | | Significant Other Observable Inputs (Level 2) | | Total | |
|---|---|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 | 2019 | 2018 |
| **Investments in fair value hierarchy** | | | | | | |
| Equity investments: | | | | | | |
| U.S. securities | $ 39.1 | $ 35.4 | $ — | $ — | $ 39.1 | $ 35.4 |
| Global securities | — | — | 140.2 | 131.4 | 140.2 | 131.4 |
| Fixed-income investments: | | | | | | |
| High-yield U.S. securities | — | — | 87.2 | 84.5 | 87.2 | 84.5 |
| Other U.S. securities | — | — | 318.2 | 700.8 | 318.2 | 700.8 |
| Global securities | — | — | 66.1 | 82.8 | 66.1 | 82.8 |
| Other investments | — | — | 79.1 | 78.0 | 79.1 | 78.0 |
| Total pension investments in fair value hierarchy | $ 39.1 | $ 35.4 | $ 690.8 | $ 1,077.5 | $ 729.9 | $ 1,112.9 |
| **Investments with fair values measured at net asset value** | | | | | | |
| Common/collective trusts: | | | | | | |
| U.S. equity securities (a) | | | | | 367.2 | 355.8 |
| Global equity securities (a) | | | | | 196.9 | 178.2 |
| Global fixed-income securities (b) | | | | | 46.0 | 92.7 |
| Total pension assets at fair value | | | | | $ 1,340.0 | $ 1,739.6 |

(a)   Investments may include common stocks, options and futures.
(b)   Investments may include investment-grade and high-yield corporate bonds, interest rate swaps, options and futures.

- 65-

*Table of Contents*

Periodic Benefit Costs

Components of pension and OPEB (income) expense for the years 2019, 2018 and 2017 are presented below:

| | Pension Benefits | | | Other Benefits | | |
|---|---|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2019 | 2018 | 2017 |
| Components of pension and OPEB (income) expense: | | | | | | |
| Service cost | $ 2.5 | $ 3.2 | $ 2.8 | $ 3.5 | $ 4.5 | $ 4.7 |
| Interest cost | 85.9 | 94.5 | 108.2 | 16.4 | 15.6 | 17.3 |
| Expected return on plan assets | (109.7) | (148.8) | (149.9) | — | — | — |
| Amortization of prior service cost (credit) | 3.6 | 3.8 | 4.7 | (13.2) | (13.6) | (58.5) |
| Recognized net actuarial loss (gain): | | | | | | |
| Annual amortization | (7.6) | 16.1 | 10.5 | (3.6) | (1.3) | (4.2) |
| Settlement loss | 26.9 | 14.5 | — | — | — | — |
| Termination benefits—Ashland Works | 9.7 | — | — | 3.6 | — | — |
| Pension and OPEB (income) expense | $ 11.3 | $ (16.7) | $ (23.7) | $ 6.7 | $ 5.2 | $ (40.7) |

*Defined Contribution Plans*

All employees are eligible to participate in various defined contribution plans. Certain of these plans have features with matching contributions or other company contributions based on our financial results. Total expense from these plans was $29.0, $31.1 and $24.9 in 2019, 2018 and 2017.

*Multiemployer Pension Plans*

We contribute to multiemployer pension plans according to collective bargaining agreements that cover certain union-represented employees. The following risks of participating in these multiemployer plans differ from single employer pension plan risks:
- Employer contributions to a multiemployer plan may be used to provide benefits to employees of other participating employers.
- If a participating employer stops contributing to a multiemployer plan, the remaining participating employers may need to assume the unfunded obligations of the plan.
- If the multiemployer plan becomes significantly underfunded or is unable to pay its benefits, we may be required to contribute additional amounts in excess of the rate required by the collective bargaining agreements.
- If we choose to stop participating in a multiemployer plan, we may be required to pay that plan an amount based on the underfunded status of the plan, referred to as a withdrawal liability.

We are a party to a collective bargaining agreement at Ashland Works that requires contributions to the Steelworkers Pension Trust multiemployer pension plan. We recorded an estimated withdrawal liability of $10.0 in 2019 as a result of the closure of that facility. The actual withdrawal liability will not be known until a future year and is expected to be paid over a number of years. See Note 3 for further information.

In April 2019, the trustees for the IAM National Pension Fund (the "Fund") voluntarily elected to place the Fund in the Red Zone for 2019 and implement a rehabilitation plan. The rehabilitation plan provides two options for a new schedule to be adopted by employers and their covered bargaining employees to both increase employer contributions and reduce certain employee pension benefits. Depending on the schedule selected, our contributions to the Fund could increase approximately $2.0 in 2020, with gradually increasing requirements through 2031.

A005797

*Table of Contents*

Our participation in these multiemployer plans for the years ended December 31, 2019, 2018 and 2017, is presented below. We do not provide more than five percent of the total contributions to any multiemployer plan. Forms 5500 are not yet available for plan years ending in 2019.

| Pension Fund | EIN/Pension Plan Number | Pension Protection Act Zone Status (a) | | FIP/RP Status Pending/Implemented (b) | Contributions | | | Surcharge Imposed (c) | Expiration Date of Collective Bargaining Agreement |
|---|---|---|---|---|---|---|---|---|---|
| | | 2019 | 2018 | | 2019 | 2018 | 2017 | | |
| Steelworkers Pension Trust | 23-6648508/499 | Green | Green | No | $ 3.9 | $ 4.2 | $ 6.3 | No | 1/22/2021 to 5/14/2021 (d) |
| IAM National Pension Fund's National Pension Plan | 51-6031295/002 | Red | Green | Yes | 18.9 | 17.7 | 18.4 | Yes | 3/15/2020 to 6/15/2022 (e) |
| | | | | | $ 22.8 | $ 21.9 | $ 24.7 | | |

(a)  The most recent Pension Protection Act zone status available in 2019 and 2018 is for each plan's year-end at December 31, 2018 and 2017, except that the IAM National Pension Fund's National Pension Plan reflects the election by the Fund to place the Fund in Red Zone in April 2019. The plan's actuary certifies the zone status. Generally, plans in the red zone are less than 65% funded, plans in the yellow zone are between 65% and 80% funded, and plans in the green zone are at least 80% funded. The Steelworkers Pension Trust and IAM National Pension Fund's National Pension Plan elected funding relief under section 431(b)(8) of the Internal Revenue Code and section 304(b)(8) of the Employment Retirement Income Security Act of 1974 (ERISA). This election allows those plans' investment losses for the plan year ended December 31, 2008, to be amortized over 29 years for funding purposes.

(b)  The "FIP/RP Status Pending/Implemented" column indicates plans for which a financial improvement plan (FIP) or a rehabilitation plan (RP) is either pending or has been implemented, as defined by ERISA.

(c)  The surcharge represents an additional required contribution due as a result of the critical funding status of the plan.

(d)  We are a party to three collective bargaining agreements at our Ashland Works, Mansfield Works and at the AK Tube Walbridge plant that require contributions to the Steelworkers Pension Trust. The labor contract for approximately 100 hourly employees at the AK Tube Walbridge plant expires January 22, 2021. The labor contract for approximately 300 hourly employees at Mansfield Works expires on March 31, 2021. The labor contract for approximately 10 active hourly employees at the Ashland Works currently expires May 14, 2021.

(e)  We are a party to three collective bargaining agreements at our Butler Works, Middletown Works and Zanesville Works that require contributions to the IAM National Pension Fund's National Pension Plan. The labor contract for approximately 1,750 hourly employees at Middletown Works expires on March 15, 2020. The labor contract for approximately 100 hourly employees at Zanesville Works expires on May 31, 2022. The labor contract for approximately 1,100 hourly employees at Butler Works expires on June 15, 2022.

## NOTE 9 - Leases

We have leases primarily for offices, production buildings and equipment. Our leases have remaining contractual lease terms of up to 20 years. Certain leases include options to extend the lease terms, and those extensions are for periods from 1 to 32 years depending on the particular lease. Some leases may also include options to terminate the leases. Certain leases include variable lease payments based on production, usage or independent factors such as changes in published producer price indices.

- 67-

*Table of Contents*

Lease costs are presented below:

|  | 2019 |
|---|---|
| Operating leases | $ 67.7 |
| Short-term leases | 45.7 |
| Variable lease costs | 73.0 |
| Total | $ 186.4 |

Rental expense was $48.1 and $43.1 for 2018 and 2017.

Other information related to leases was as follows:

|  | 2019 |
|---|---|
| Cash paid for operating leases within cash flows from operating activities | $ 74.4 |
| Right-of-use assets obtained in exchange for operating lease liabilities | 28.9 |
| Weighted-average remaining lease term of operating leases (in years) | 8.2 |
| Weighted-average discount rate for operating leases | 8.5% |

Future minimum lease payments under noncancelable operating leases as of December 31, 2019, were as follows:

| Year ending December 31: | |
|---|---|
| 2020 | $ 67.8 |
| 2021 | 54.1 |
| 2022 | 43.8 |
| 2023 | 37.2 |
| 2024 | 29.8 |
| Thereafter | 144.5 |
| Total future minimum operating lease payments | 377.2 |
| Less imputed interest | 115.5 |
| Total operating lease liabilities | 261.7 |
| Less current portion of operating lease liabilities (included in Accrued liabilities) | 49.6 |
| Long-term operating lease liabilities (included in Other non-current liabilities) | $ 212.1 |

## NOTE 10 - Commitments

We purchase substantial portions of the principal raw materials required for our steel manufacturing operations under annual and multi-year agreements, some of which have minimum quantity requirements. We also use large volumes of natural gas, electricity and industrial gases in our steel manufacturing operations. We negotiate most of our purchases of chrome, coke, industrial gases, iron ore and a portion of our electricity under multi-year agreements. The iron ore agreements typically have a variable-price mechanism that adjusts the price of iron ore periodically, based on reference to an iron ore index and other market-based factors. We typically purchase coal under annual fixed-price agreements. We also purchase certain transportation services under multi-year contracts with minimum quantity requirements.

Commitments for future capital investments at December 31, 2019, totaled approximately $65.2, all of which we expect to incur in 2020.

**NOTE 11 - Environmental and Legal Contingencies**

*Environmental Contingencies*

Domestic steel producers, including us, must follow stringent federal, state and local laws and regulations designed to protect human health and the environment. We have spent the following amounts over the past three years for environmental-related capital investments and environmental compliance:

- 68-

*Table of Contents*

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Environmental-related capital investments | $    23.0 | $    7.1 | $    6.8 |
| Environmental compliance costs | 141.3 | 126.3 | 129.5 |

We and our predecessors have been involved in steel manufacturing and related operations since 1900. Although we believe our operating practices have been consistent with prevailing industry standards, hazardous materials may have been released at operating sites or third-party sites in the past, including operating sites that we no longer own. If we reasonably can, we have estimated potential remediation expenditures for those sites where future remediation efforts are probable based on identified conditions, regulatory requirements or contractual obligations arising from the sale of a business or facility. For sites involving government-required investigations, we typically make an estimate of potential remediation expenditures only after the investigation is complete and when we better understand the nature and scope of the remediation. In general, the material factors in these estimates include the costs associated with investigations, delineations, risk assessments, remedial work, governmental response and oversight, site monitoring, and preparation of reports to the appropriate environmental agencies. We have recorded the following liabilities for environmental matters on our consolidated balance sheets:

|  | 2019 | 2018 |
|---|---|---|
| Accrued liabilities | $    6.1 | $    8.0 |
| Other non-current liabilities | 32.6 | 31.2 |

We cannot predict the ultimate costs for each site with certainty because of the evolving nature of the investigation and remediation process. Rather, to estimate the probable costs, we must make certain assumptions. The most significant of these assumptions is for the nature and scope of the work that will be necessary to investigate and remediate a particular site and the cost of that work. Other significant assumptions include the cleanup technology that will be used, whether and to what extent any other parties will participate in paying the investigation and remediation costs, reimbursement of past response and future oversight costs by governmental agencies, and the reaction of the governing environmental agencies to the proposed work plans. Costs for future investigation and remediation are not discounted to their present value. To the extent that we have been able to reasonably estimate future liabilities, we do not believe that there is a reasonable possibility that we will incur a loss or losses that exceed the amounts we accrued for the environmental matters discussed below that would, either individually or in the aggregate, have a material adverse effect on our consolidated financial condition, results of operations or cash flows. However, since we recognize amounts in the consolidated financial statements in accordance with accounting principles generally accepted in the United States that exclude potential losses that are not probable or that may not be currently estimable, the ultimate costs of these environmental proceedings may be higher than the liabilities we currently have recorded in our consolidated financial statements.

Except as we expressly note below, we do not currently anticipate any material effect on our consolidated financial position, results of operations or cash flows as a result of compliance with current environmental regulations. Moreover, because all domestic steel producers operate under the same federal environmental regulations, we do not believe that we are more disadvantaged than our domestic competitors by our need to comply with these regulations. Some foreign competitors may benefit from less stringent environmental requirements in the countries where they produce, resulting in lower compliance costs for them and providing those foreign competitors with a cost advantage on their products.

According to the Resource Conservation and Recovery Act ("RCRA"), which governs the treatment, handling and disposal of hazardous waste, the EPA and authorized state environmental agencies may conduct inspections of RCRA-regulated facilities to identify areas where there have been releases of hazardous waste or hazardous constituents into the environment and may order the facilities to take corrective action to remediate such releases. Environmental regulators may inspect our major steelmaking facilities. While we cannot predict the future actions of these regulators, it is possible that they may identify conditions in future inspections of these facilities which they believe require corrective action.

Under authority from the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), the EPA and state environmental authorities have conducted site investigations at certain of our facilities and other third-party facilities, portions of which previously may have been used for disposal of materials that are currently regulated. The results of these investigations are still pending, and we could be directed to spend funds for remedial activities at the former disposal areas. Because of the uncertain status of these investigations, however, we cannot reliably predict whether or when such spending might be required or its magnitude.

As previously noted, on April 29, 2002, we entered a mutually agreed-upon administrative order on consent with the EPA pursuant to Section 122 of CERCLA to perform a Remedial Investigation/Feasibility Study ("RI/FS") of the former Hamilton Plant site located in New Miami, Ohio. The plant ceased operations in 1990 and all of its former structures have been demolished. We submitted the investigation portion of the RI/FS and completed supplemental studies. We currently have accrued $0.7 for the remaining cost of the RI/FS. Until the RI/FS is complete, we cannot reliably estimate the additional costs, if any, we may incur for potentially required remediation of the site or when we may incur them.

- 69-

Table of Contents

As previously reported, on September 30, 1998, our predecessor, Armco Inc., received an order from the EPA under Section 3013 of RCRA requiring it to develop a plan for investigation of eight areas of our Mansfield Works that allegedly could be sources of contamination. A site investigation began in November 2000 and is continuing. We cannot reliably estimate how long it will take to complete this site investigation. We currently have accrued $0.5 for the projected cost of the remaining investigation and corrective measures study. Until the site investigation and study are complete, we cannot reliably estimate the additional costs, if any, we may incur for potentially required remediation of the site or when we may incur them.

As previously noted, on September 26, 2012, the EPA issued an order under Section 3013 of RCRA requiring us to develop a plan for investigation of four areas at our former Ashland Works coke plant. The Ashland Works coke plant ceased operations in 2011 and all of its former structures have been demolished and removed. In 1981, we acquired the plant from Honeywell International Corporation (as successor to Allied Corporation), who had managed the coking operations there for approximately 60 years. In connection with the sale of the coke plant, Honeywell agreed to indemnify us from certain claims and obligations that could arise from the investigation and we intend to pursue such indemnification from Honeywell, if necessary. We cannot reliably estimate how long it will take to complete the site investigation. On March 10, 2016, the EPA invited us to participate in settlement discussions regarding an enforcement action. Settlement discussions between the parties are ongoing, though whether the parties will reach agreement and any such agreement's terms are uncertain. We currently have accrued $1.4 for the projected cost of the investigation and known remediation. Until the site investigation is complete, we cannot reliably estimate the costs, if any, we may incur for potential additional required remediation of the site or when we may incur them.

As previously reported, on July 15, 2009, we and the Pennsylvania Department of Environmental Protection ("PADEP") entered a Consent Order and Agreement (the "Consent Order") to resolve an alleged unpermitted discharge of wastewater from the closed Hillside Landfill at our former Ambridge Works. Under the terms of the Consent Order, we paid a penalty and also agreed to implement various corrective actions, including an investigation of the area where landfill activities occurred, submission of a plan to collect and treat surface waters and seep discharges, and upon approval from PADEP, implementation of that plan. We have accrued $4.8 for the remedial work required under the approved plan and Consent Order. A National Pollution Discharge Elimination System ("NPDES") permit was issued in 2019 that includes a compliance schedule. We currently estimate that the remaining work will be completed in accordance with the schedule in 2022.

As previously reported, on June 29, 2000, the United States filed a complaint on behalf of the EPA against us in the U.S. District Court for the Southern District of Ohio, Case No. C-1-00530, alleging violations of the Clean Air Act, the Clean Water Act and RCRA at our Middletown Works. Subsequently, the State of Ohio, the Sierra Club and the National Resources Defense Council intervened. On May 15, 2006, the court entered a Consent Decree in Partial Resolution of Pending Claims (the "Consent Decree"). Under the Consent Decree, we agreed to undertake a comprehensive RCRA facility investigation at Middletown Works and, as appropriate, complete a corrective measures study. The Consent Decree also required us to implement certain RCRA corrective action interim measures. We have completed the remedial activity at Dicks Creek, but continue to work on the RCRA facility investigation and certain interim measures. We have accrued $13.1 for the cost of known remediation and other work required under the Consent Decree.

As previously reported, on May 12, 2014, the Michigan Department of Environment, Great Lakes, and Energy ("EGLE") (previously the Michigan Department of Environmental Quality) issued to our Dearborn Works an Air Permit to Install No. 182-05C (the "PTI") to increase the emission limits for the blast furnace and other emission sources. The PTI was issued as a correction to a prior permit to install that did not include certain information during the prior permitting process. On July 10, 2014, the South Dearborn Environmental Improvement Association ("SDEIA"), Detroiters Working for Environmental Justice, Original United Citizens of Southwest Detroit and the Sierra Club filed a Claim of Appeal of the PTI in the State of Michigan, Wayne County Circuit, Case No. 14-008887-AA. The appellants and EGLE required the intervention of Severstal Dearborn, LLC ("Dearborn") (now owned by us) in this action as an additional appellee. The appellants allege multiple deficiencies with the PTI and the permitting process. On July 2, 2019, the Circuit Court dismissed the PTI appeal and ruled that EGLE appropriately issued the permit modification. The appellants have appealed that decision. Until the appeal is resolved, we cannot determine what the ultimate permit limits will be. Until the permit limits are determined and final, we cannot reliably estimate the costs we may incur, if any, or when we may incur them.

As previously reported, on August 21, 2014, the SDEIA filed a Complaint under the Michigan Environmental Protection Act in the State of Michigan, Wayne County Circuit Case No. 14-010875-CE. The plaintiffs allege that the air emissions from our Dearborn Works are impacting the air, water and other natural resources, as well as the public trust in such resources. The plaintiffs are requesting, among other requested relief, that the court assess and determine the sufficiency of the PTI's limitations. On October 15, 2014, the court ordered a stay of the proceedings until a final order is issued in Wayne County Circuit Court Case No. 14-008887-AA (discussed above). When the proceedings resume, we will vigorously contest these claims. Until the claims in this

Complaint are resolved, we cannot reliably estimate the costs we may incur, if any, or when we may incur them.

As previously reported, on April 27, 2000, EGLE issued RCRA Corrective Action Order No. 111-04-00-07E to Rouge Steel Company and Ford Motor Company for the property that includes our Dearborn Works. The Corrective Action Order has been amended five

- 70-

*Table of Contents*

times. We are a party to the Corrective Action Order as the successor-in-interest to Dearborn, which was the successor-in-interest to Rouge Steel Company. The Corrective Action Order requires the site-wide investigation, and where appropriate, remediation of the facility. The site investigation and remediation are ongoing. We cannot reliably estimate how long it will take to complete this site investigation and remediation. To date, Ford Motor Company has incurred most of the costs of the investigation and remediation due to its prior ownership of the steelmaking operations at Dearborn Works. Until the site investigation is complete, we cannot reliably estimate the additional costs we may incur, if any, for any potentially required remediation of the site or when we may incur them.

As previously reported, we received an order in October 2002 from the EPA under Section 3013 of RCRA requiring us to investigate several areas of Zanesville Works that allegedly could be sources of contamination. A site investigation began in 2003 and was approved by EPA in November 2012. On October 28, 2016, the EPA requested that we conduct a corrective measures study and implement these measures as necessary. We subsequently agreed to proceed with a voluntary corrective measures study and have accrued $0.8 for the study. Until the study is complete, we cannot reliably estimate the costs, if any, we may incur for potential required remediation of the site or when we may incur them.

On November 18, 2019 and November 26, 2019, EGLE issued Notices of Violations ("NOVs") with respect to the basic oxygen furnace at Dearborn Works alleging violations of manganese and lead limits. We are investigating these claims and will work with EGLE to attempt to resolve them. We will vigorously contest any claims that cannot be resolved through a settlement. Until a settlement is reached with EGLE or the claims of the NOVs are otherwise resolved, we cannot reliably estimate the costs, if any, associated with any potentially required work.

In addition to the foregoing matters, we are or may be involved in proceedings with various regulatory authorities that may require us to pay fines, comply with more rigorous standards or other requirements or incur capital and operating expenses for environmental compliance. We believe that the ultimate disposition of the proceedings will not have, individually or in the aggregate, a material adverse effect on our consolidated financial condition, results of operations or cash flows.

*Legal Contingencies*

As previously reported, since 1990 we have been named as a defendant in numerous lawsuits alleging personal injury as a result of exposure to asbestos. The great majority of these lawsuits have been filed on behalf of people who claim to have been exposed to asbestos while visiting the premises of one of our current or former facilities. The majority of asbestos cases pending in which we are a defendant do not include a specific dollar claim for damages. In the cases that do include specific dollar claims for damages, the complaint typically includes a monetary claim for compensatory damages and a separate monetary claim in an equal amount for punitive damages, but does not attempt to allocate the total monetary claim among the various defendants.

The number of asbestos cases pending at December 31, 2019, is presented below:

|  | Asbestos Cases Pending at December 31, 2019 |
| --- | --- |
| Cases with specific dollar claims for damages: |  |
| Claims up to $0.2 | 183 |
| Claims above $0.2 to $5.0 | 4 |
| Claims above $5.0 to $20.0 | 3 |
| Total claims with specific dollar claims for damages (a) | 190 |
| Cases without a specific dollar claim for damages | 177 |
| Total asbestos cases pending | 367 |

    (a)   Involve a total of 2,265 plaintiffs and 21,406 defendants

In each case, the amount described is per plaintiff against all of the defendants, collectively. Thus, it usually is not possible at the outset of a case to determine the specific dollar amount of a claim against us. In fact, it usually is not even possible at the outset to determine which of the plaintiffs actually will pursue a claim against us. Typically, that can only be determined through written interrogatories or other discovery after a case has been filed. Therefore, in a case involving multiple plaintiffs and multiple defendants, we initially only account for the lawsuit as one claim. After we have determined through discovery whether a particular plaintiff will pursue a claim, we make an appropriate adjustment to statistically account for that specific claim. It has been our

experience that only a small percentage of asbestos plaintiffs ultimately identify us as a target defendant from whom they actually seek damages and most of these claims ultimately are either dismissed or settled for a small fraction of the damages initially claimed. We maintain appropriate reserves within a range of possible outcomes for asbestos claims. Asbestos-related claims information in 2019, 2018 and 2017, is presented below:

- 71-

*Table of Contents*

| | 2019 | 2018 | 2017 |
|---|---|---|---|
| New Claims Filed | 64 | 68 | 58 |
| Pending Claims Disposed Of | 40 | 61 | 61 |
| Total Amount Paid in Settlements | $ 3.5 | $ 1.4 | $ 1.2 |

Since the onset of asbestos claims against us in 1990, six asbestos claims against us proceeded to trial in five separate cases. Five out of six claims concluded with a verdict in our favor. On June 14, 2019, judgment was entered on a jury verdict in an asbestos case in state court in Oklahoma against a party that was indemnified by us and another unrelated defendant. The judgment amount was $8.1 against both defendants jointly and severally. We are appealing that judgment and intend to contest the matter vigorously, which may include asserting contribution claims against the other defendant. We continue to vigorously defend all asbestos claims. Based upon present knowledge, and the factors above, we believe it is unlikely that the resolution in the aggregate of the asbestos claims against us will have a materially adverse effect on our consolidated results of operations, cash flows or financial condition. However, predictions about the outcome of pending litigation, particularly claims alleging asbestos exposure, are subject to substantial uncertainties. These uncertainties include (1) the significantly variable rate at which new claims may be filed, (2) the effect of bankruptcies of other companies currently or historically defending asbestos claims, (3) the litigation process from jurisdiction to jurisdiction and from case to case, (4) the type and severity of the disease each claimant is alleged to suffer, and (5) the potential for enactment of legislation affecting asbestos litigation.

Six actions, including one putative class action lawsuit, have been filed in federal court in Delaware, Michigan and New York by purported AK Steel stockholders in connection with the Merger: Stein v. AK Steel Holding Corp., et al., Case No. 1:20-cv-00054 (D. Del., filed January 14, 2020) (the "Stein Action"); Spuhler v. AK Steel Holding Corp., et al., Case No. 1:20-cv-00444 (S.D.N.Y., filed January 16, 2020) (the "Spuhler Action"); Franchi v. AK Steel Holding Corp., et al., Case No. 1:20-cv-00078 (D. Del., filed January 17, 2020) (the "Franchi Action"); Raul v. AK Steel Holding Corp., et al., No. 1:20-cv-00611 (S.D.N.Y., filed January 23, 2020) (the "Raul Action"); Ruiz v. AK Steel Holding Corp., et al., No. 1:20-cv-00620 (E.D.N.Y., filed February 4, 2020) (the "Ruiz Action"); and Rubin v. AK Steel Holding Corp., et al., No. 2:20-cv-10379-BAF-DRG (E.D. Mich., filed February 12, 2020) (the "Rubin Action"). The Stein Action, Spuhler Action, Franchi Action, Raul Action, Ruiz Action and Rubin Action are collectively referred to as the "AK Steel Stockholder Federal Actions." A seventh action, Pate v. AK Steel Holding Corp., et al., Case No. CV 2020 01 0196 (Ohio Common Pleas, Butler County, filed January 28, 2020) (the "Pate Action"), has been filed by a purported AK Steel stockholder as a putative class action in state court in Ohio. The Pate Action and the AK Steel Stockholder Federal Actions are collectively referred to as the "AK Steel Stockholder Actions." Each of the AK Steel Stockholder Actions names AK Steel and its directors as defendants, and the Franchi Action and Pate Action name Cliffs and Merger Sub as additional defendants. An eighth action, Nessim v. Cleveland-Cliffs Inc., et al., Case No. 1:20-cv-00850 (S.D.N.Y., filed January 31, 2020) (the "Nessim Action"), has been filed in federal court in New York against Cliffs and its directors by a purported shareholder of Cliffs. The Nessim Action and the AK Steel Stockholder Federal Actions are collectively referred to as the "Federal Stockholder Actions," and all eight actions are collectively referred to as the "Stockholder Actions." Each of the Federal Stockholder Actions alleges, among other things, that the registration statement on Form S-4 filed by Cliffs in connection with the Merger is false and misleading and/or omits material information concerning the transactions contemplated by the Merger Agreement in violation of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated under the Exchange Act. The Pate Action alleges breach of fiduciary duty claims against the AK Steel directors and aiding and abetting claims against AK Steel, Cliffs and Merger Sub in connection with the transactions contemplated by the Merger Agreement, including that the registration statement on Form S-4 filed by Cliffs in connection with the Merger is false and misleading and/or omits material information concerning the transactions contemplated by the Merger Agreement. The plaintiffs in the Stockholder Actions, among other things, seek to enjoin the transactions contemplated by the Merger Agreement and an award of attorneys' fees and expenses. We believe that the allegations in each of these complaints lack merit and plan to contest the matters vigorously.

*Other Contingencies*

In addition to the matters discussed above, there are various pending and potential claims against us and our subsidiaries involving product liability, commercial, employee benefits and other matters arising in the ordinary course of business. Because of the considerable uncertainties which exist for any claim, it is difficult to reliably or accurately estimate what the amount of a loss would be if a claimant prevails. If material assumptions or factual understandings we rely on to evaluate exposure for these contingencies prove to be inaccurate or otherwise change, we may be required to record a liability for an adverse outcome. If, however, we have reasonably evaluated potential future liabilities for all of these contingencies, including those described more specifically above, it is our opinion, unless we otherwise noted, that the ultimate liability from these contingencies, individually and in the aggregate, should not have a material effect on our consolidated financial position, results of operations or cash flows.

A005808

*Table of Contents*

**NOTE 12 - Stockholders' Equity**

*Common Stock*

Our common stockholders may receive dividends when and as declared by the Board of Directors out of funds legally available for distribution. The holders have one vote per share in respect of all matters and are not entitled to preemptive rights.

*Preferred Stock*

There are 25,000,000 shares of preferred stock authorized; no shares are issued or outstanding.

*Dividends*

The instruments governing our outstanding senior debt allow dividend payments. However, our Credit Facility restricts dividend payments under certain conditions. Dividends are permitted if no default or event of default exists under the terms of the Credit Facility and (i) availability under the Credit Facility exceeds 20% of the lesser of the Credit Facility commitment or eligible collateral after advance rates or (ii) availability exceeds 15% of the lesser of the Credit Facility commitment or eligible collateral after advance rates and we meet a fixed charge coverage ratio of one to one as of the most recently ended fiscal quarter. At December 31, 2019, availability under the Credit Facility significantly exceeds these amounts. If we cannot meet either of these thresholds, annual dividends would be limited to the greater of $18.0 or 0.5% of consolidated total assets, with additional dividends permitted equal to the greater of $25.0 or 0.7% of consolidated total assets in aggregate over the life of the Credit Facility.

*Share Repurchase Program*

In October 2008, the Board of Directors authorized us to repurchase, from time to time, up to $150.0 of our outstanding common stock. We have not made any common stock repurchases under this program in the last three years. As of December 31, 2019, we had remaining $125.6 for repurchase under the Board of Directors' authorization.

**NOTE 13 - Share-based Compensation**

In May 2019, our stockholders approved the 2019 Omnibus Supplemental Incentive Plan ("OSIP"), which authorizes granting an aggregate maximum of 14.4 million shares under the OSIP through May 31, 2029. The OSIP permits and the prior Stock Incentive Plan permitted the granting of nonqualified stock option, restricted stock, performance shares and restricted stock unit awards to our directors, officers and other employees. Under the OSIP, any dividends on unvested awards are subject to the same restrictions as the underlying award. Approximately 14 million shares were available for future grant as of December 31, 2019.

Share-based compensation expense for the years ended December 31, 2019, 2018 and 2017, is presented below:

| **Share-based Compensation Expense** | | **2019** | | **2018** | | **2017** |
|---|---|---|---|---|---|---|
| Stock options | $ | 2.5 | $ | 2.5 | $ | 2.1 |
| Restricted stock | | 2.3 | | 3.1 | | 2.9 |
| Restricted stock units issued to Directors | | 1.1 | | 1.2 | | 1.2 |
| Performance shares | | 2.3 | | 2.0 | | 1.5 |
| Equity-based long-term performance plan | | 1.0 | | 0.4 | | — |
| Share-based compensation expense | $ | 9.2 | $ | 9.2 | $ | 7.7 |

*Stock Options*

Stock options have a maximum term of ten years and holders may not exercise them earlier than six months after the grant date or another term the award agreement may specify. Stock options granted to officers and other employees vest and become exercisable in three equal installments on the first, second and third anniversaries of the grant date. The exercise price of each option must equal or exceed the market price of our common stock on the grant date. We have not and, pursuant to the terms of our plans may

not, reprice stock options to lower the exercise price.

We use the Black-Scholes option valuation model to value the nonqualified stock options. We use historical data of stock option exercise behaviors to estimate the expected life that granted options will be outstanding. The risk-free interest rate is based on the

- 73-

*Table of Contents*

Daily Treasury Yield Curve published by the U.S. Treasury on the grant date. The expected volatility is determined by using a blend of historical and implied volatility. We do not expect to pay dividends over the term of the options based on our current dividend policy. We also estimate that option holders will forfeit 5% of the options.

The following weighted-average assumptions are used in the Black-Scholes option pricing model to estimate the fair value of granted options as of the grant date:

| | **2019** | **2018** | **2017** |
|---|---|---|---|
| Expected volatility | 63.6% – 65.3% | 58.8% – 61.6% | 61.5% – 64.0% |
| Weighted-average volatility | 64.5% | 59.5% | 62.5% |
| Expected term (in years) | 3.5 – 6.6 | 3.4 – 6.6 | 3.3 – 6.5 |
| Risk-free interest rate | 2.6% – 2.7% | 2.3% – 2.6% | 1.6% – 2.2% |
| Weighted-average grant-date fair value per share of granted options | $1.52 | $3.51 | $5.33 |

Option activity for the year ended December 31, 2019, is presented below:

| **Stock Options** | **Shares** | **Weighted-Average Exercise Price** | **Weighted-Average Remaining Contractual Life (in years)** | **Aggregate Intrinsic Value** |
|---|---|---|---|---|
| Outstanding at December 31, 2018 | 3,403,862 | $  6.90 | | |
| Granted | 1,199,415 | 2.66 | | |
| Exercised | (43,167) | 1.74 | | |
| Forfeited and expired | (428,701) | 11.38 | | |
| Outstanding at December 31, 2019 | 4,131,409 | 5.26 | 6.9 | $  1.6 |
| Exercisable at December 31, 2019 | 2,215,816 | 6.01 | 5.3 | 0.8 |
| Unvested at December 31, 2019 | 1,915,593 | 4.39 | 8.4 | 0.7 |
| Unvested at December 31, 2019 expected to vest | 1,819,813 | 4.39 | 8.4 | 0.7 |

The total intrinsic value of stock option awards that holders exercised during the years ended December 31, 2019, 2018, and 2017 was $0.1, $0.3 and $0.2. Each exercised option's intrinsic value is the quoted average of the reported high and low sales price on the exercise date. As of December 31, 2019, total unrecognized compensation costs for non-vested stock options were $0.8, which we expect to recognize over a weighted-average period of 1.6 years.

*Restricted Stock*

Restricted stock awards granted to officers and other employees ordinarily vest ratably on the first, second and third anniversaries of the grant. Non-vested restricted stock awards activity for the year ended December 31, 2019, is presented below:

| **Restricted Stock Awards** | **Restricted Shares** | **Weighted-Average Grant Date Fair Value** |
|---|---|---|
| Outstanding at December 31, 2018 | 506,703 | $  6.45 |
| Granted | 772,054 | 2.65 |

| | | |
|---|---|---|
| Vested/restrictions lapsed | (745,001) | 3.98 |
| Canceled | (93,651) | 4.32 |
| Outstanding at December 31, 2019 | 440,105 | 4.42 |

The weighted-average grant date fair value of restricted stock awards granted during the years ended December 31, 2019, 2018 and 2017, was $2.65, $6.56 and $9.78 per share. The total intrinsic value of restricted stock awards that vested (i.e., restrictions lapsed) during the years ended December 31, 2019, 2018 and 2017, was $2.0, $3.2 and $4.1. As of December 31, 2019, total unrecognized

*Table of Contents*

compensation costs for non-vested restricted stock awards were $0.9, which we expect to recognize over a weighted-average period of 1.6 years.

*Restricted Stock Units*

Restricted stock units ("RSUs") represent equity-based compensation granted to Directors. RSU grants vest immediately, but we do not settle them (i.e., issue the underlying shares of stock) until one year after the grant date, unless a Director elects to defer the settlement to six months after his or her Board service is terminated. They may elect to take settlement in a single distribution or in annual installments up to fifteen years.

*Performance Shares*

Performance shares are granted to executive officers and other employees. They earn the awards by meeting performance measures over a three-year period. Though a target number of performance shares are awarded on the grant date, for 2019 and 2018 grants the total number of performance shares that will actually be issued to the participant, if any, at the expiration of the performance period will be based on our total share return compared to the VanEck Vectors Steel ETF. For 2017, the total number of performance shares that will be issued to the participant, if any, at the expiration of the performance period for those grants will be based on two equally-rated metrics: (i) our share performance compared to a prescribed compounded annual growth rate and (ii) our total share return compared to the VanEck Vectors Steel ETF.

The following weighted-average assumptions are used in a Monte Carlo simulation model to estimate the fair value of performance shares granted:

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Company expected volatility | 62.3% | 67.3% | 68.0% |
| VanEck Vectors Steel ETF expected volatility | 45.3% | 52.2% | 48.9% |
| Risk-free interest rate | 2.6% | 2.2% | 1.5% |
| Weighted-average grant-date fair value per performance share granted | $ 3.09 | $ 8.05 | $ 10.78 |

Non-vested performance share awards activity for the year ended December 31, 2019, is presented below:

| Performance Share Awards | Performance Shares | Weighted-Average Grant Date Fair Value |
|---|---|---|
| Outstanding at December 31, 2018 | 614,800 | $ 9.19 |
| Granted | 595,733 | 3.09 |
| Earned | — | — |
| Expired or forfeited | (338,058) | 9.38 |
| Outstanding at December 31, 2019 | 872,475 | 4.95 |

As of December 31, 2019, total unrecognized compensation costs for non-vested performance share awards were $2.1, which we expect to recognize over a weighted-average period of 1.6 years.

*Equity-based Long-term Performance Plan*

During 2018, in order to further align our management and stockholder interests, the Board of Directors changed the structure of long-term incentive compensation for executive officers. For performance periods beginning in 2019, 50% of the long-term incentive plan compensation earned by executive officers will now be denominated in stock instead of the 30% denominated in stock for the performance period that began in 2018. In addition, beginning in 2019, 30% of the compensation earned by other non-executive officer participants under the long-term incentive plan will now be paid in stock. The remaining portion of the long-term incentive plan for all participants will be settled in cash. As a result, the equity-based portion of the long-term incentive

plan is treated as share-based compensation with a performance condition.

- 75-

*Table of Contents*

Non-vested long-term performance plan share awards activity for the year ended December 31, 2019, is presented below:

| **Long-Term Performance Plan Share Awards** | **Long-Term Performance Plan Shares** | | **Weighted-Average Grant Date Fair Value** |
|---|---:|---|---:|
| Outstanding at December 31, 2018 | 250,400 | $ | 5.04 |
| Granted | 678,714 | | 2.66 |
| Expired or forfeited | (70,900) | | 3.39 |
| Outstanding at December 31, 2019 | 858,214 | | 3.24 |

As of December 31, 2019, total unrecognized compensation costs for non-vested long-term performance share awards were $1.6, which we expect to recognize over a weighted-average period of 1.8 years.

- 76-

*Table of Contents*

**NOTE 14 - Comprehensive Income (Loss)**

Other comprehensive income (loss), net of tax, information is presented below:

| | 2019 | 2018 | 2017 |
|---|---|---|---|
| **Foreign currency translation** | | | |
| Balance at beginning of period | $ (0.6) | $ 1.1 | $ (3.6) |
| Other comprehensive income (loss)—foreign currency translation gain (loss) | (0.6) | (1.7) | 4.7 |
| Balance at end of period | $ (1.2) | $ (0.6) | $ 1.1 |
| **Cash flow hedges** | | | |
| Balance at beginning of period | $ 7.2 | $ 22.3 | $ 39.9 |
| Cumulative effect of adopting new hedging standard | — | 0.8 | — |
| Other comprehensive income (loss): | | | |
| Gains (losses) arising in period | (31.5) | (5.6) | (11.5) |
| Income tax expense (benefit) | (1.1) | — | — |
| Gains (losses) arising in period, net of tax | (30.4) | (5.6) | (11.5) |
| Reclassification of losses (gains) to net income (loss): | | | |
| Recorded in cost of products sold | 8.9 | (10.3) | (6.1) |
| Income tax (expense) benefit (b) | 0.3 | — | — |
| Net amount of reclassification of losses (gains) to net income (loss), net of tax | 8.6 | (10.3) | (6.1) |
| Total other comprehensive income (loss), net of tax | (21.8) | (15.9) | (17.6) |
| Balance at end of period | $ (14.6) | $ 7.2 | $ 22.3 |
| **Pension and OPEB plans** | | | |
| Balance at beginning of period | $ (106.6) | $ (73.6) | $ (125.0) |
| Other comprehensive income (loss): | | | |
| Prior service credit (cost) arising in period | — | 11.1 | 4.7 |
| Gains (losses) arising in period | 50.5 | (63.6) | 94.2 |
| Subtotal | 50.5 | (52.5) | 98.9 |
| Income tax expense (benefit) | 2.0 | — | — |
| Gains (losses) arising in period, net of tax | 48.5 | (52.5) | 98.9 |
| Reclassification to net income (loss): | | | |
| Prior service costs (credits) (a) | (9.6) | (9.8) | (53.8) |
| Actuarial (gains) losses (a) | 15.7 | 29.3 | 6.3 |
| Subtotal | 6.1 | 19.5 | (47.5) |
| Income tax (expense) benefit (b) | 0.2 | — | — |
| Amount of reclassification to net income (loss), net of tax | 5.9 | 19.5 | (47.5) |
| Total other comprehensive income (loss), net of tax | 54.4 | (33.0) | 51.4 |
| Balance at end of period | $ (52.2) | $ (106.6) | $ (73.6) |

(a)  Included in pension and OPEB (income) expense
(b)  Included in income tax expense (benefit)

A005816

*Table of Contents*

**NOTE 15 - Earnings per Share**

Reconciliation of the numerators and denominators for basic and diluted EPS computations is presented below:

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Net income attributable to AK Steel Holding Corporation | $ 11.2 | $ 186.0 | $ 103.5 |
| | | | |
| Common shares outstanding (weighted-average shares in millions): | | | |
| Common shares outstanding for basic earnings per share | 315.8 | 314.8 | 314.3 |
| Effect of exchangeable debt | — | — | 4.5 |
| Effect of dilutive stock-based compensation | 0.8 | 0.8 | 0.9 |
| Common shares outstanding for diluted earnings per share | 316.6 | 315.6 | 319.7 |
| | | | |
| Basic earnings per share | $ 0.04 | $ 0.59 | $ 0.33 |
| Diluted earnings per share | $ 0.04 | $ 0.59 | $ 0.32 |
| | | | |
| Potentially issuable common shares (in millions) excluded from earnings per share calculation due to anti-dilutive effect | 3.6 | 2.4 | 1.4 |

**NOTE 16 - Variable Interest Entities**

*SunCoke Middletown*

We purchase all the coke and electrical power generated from SunCoke Middletown's plant under long-term supply agreements. SunCoke Middletown is a variable interest entity because we have committed to purchase all the expected production from the facility through at least 2031 and we are the primary beneficiary. Therefore, we consolidate SunCoke Middletown's financial results with our financial results, even though we have no ownership interest in SunCoke Middletown. SunCoke Middletown had income before income taxes of $52.2, $58.4 and $61.7 for the years ended December 31, 2019, 2018 and 2017 that was included in our consolidated income before income taxes.

*Vicksmetal/Armco Associates*

We own a 50% interest in Vicksmetal/Armco Associates ("VAA"), a joint venture with Vicksmetal Company. VAA slits electrical steel primarily for AK Steel, though also for third parties. VAA is a variable interest entity and we are the primary beneficiary. Therefore, we consolidate VAA's financial results with our financial results.

**NOTE 17 - Fair Value Measurements**

We measure certain assets and liabilities at fair value. Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability (i.e., the "exit price") in an orderly transaction between market participants at the measurement date. In determining fair value, we use various valuation approaches. The hierarchy of those valuation approaches is in three levels based on the reliability of inputs. Assets and liabilities are classified in their entirety based on the lowest level of input that is significant to the fair value measurement. Below is a summary of the hierarchy levels:

- Level 1 inputs are quoted prices in active markets for identical assets or liabilities that we have the ability to access at the measurement date.

- Level 2 inputs are inputs, other than quoted prices, that are directly or indirectly observable for the asset or liability. Level 2 inputs include model-generated values that rely on inputs either directly observed or readily derived from available market data sources, such as Bloomberg or other news and data vendors. They include quoted prices for similar assets or liabilities in active markets, inputs other than quoted prices that are observable for the asset or liability (e.g., interest rates and yield curves observable at commonly quoted intervals or current market) and contractual prices for the underlying financial instrument, as well as other relevant economic factors. As a practical expedient, we estimate the value of money market mutual funds by using a $1.00 per share multiplied by the number of shares in the fund as of the measurement date. We generate fair values for our commodity derivative contracts and foreign currency forward contracts from observable futures prices for the

- 78-

*Table of Contents*

respective commodity or currency, from sources such as the New York Mercantile Exchange (NYMEX) or the London Metal Exchange (LME). In cases where the derivative is an option contract (including caps, floors and collars), we adjust our valuations to reflect the counterparty's valuation assumptions. After validating that the counterparty's assumptions for implied volatilities reflect independent source's assumptions, we discount these model-generated future values with discount factors that reflect the counterparty's credit quality. We apply different discount rates to different contracts since the maturities and counterparties differ. As of December 31, 2019, a spread over benchmark rates of less than 1.4% was used for derivatives valued as assets and less than 4.0% for derivatives valued as liabilities. We have estimated the fair value of long-term debt based upon quoted market prices for the same or similar issues or on the current interest rates available to us for debt on similar terms and with similar maturities.

- Level 3 inputs are unobservable inputs for the asset or liability. Unobservable inputs are used to measure fair value to the extent that observable inputs are not available, thereby allowing for situations in which there is little, if any, market activity for the asset or liability at the measurement date. This level of categorization is not applicable to our valuations on a normal recurring basis.

Assets and liabilities measured at fair value on a recurring basis are presented below:

|  | 2019 | | | 2018 | | |
|---|---|---|---|---|---|---|
|  | Level 1 | Level 2 | Total | Level 1 | Level 2 | Total |
| **Assets measured at fair value** | | | | | | |
| Cash and cash equivalents | $ 31.0 | $ — | $ 31.0 | $ 48.6 | $ — | $ 48.6 |
| Other current assets: | | | | | | |
| Foreign exchange contracts | — | — | — | — | 0.1 | 0.1 |
| Commodity hedge contracts | — | 12.9 | 12.9 | — | 13.0 | 13.0 |
| Other non-current assets: | | | | | | |
| Foreign exchange contracts | — | 0.1 | 0.1 | — | 0.4 | 0.4 |
| Commodity hedge contracts | — | 2.7 | 2.7 | — | 2.9 | 2.9 |
| Assets measured at fair value | $ 31.0 | $ 15.7 | $ 46.7 | $ 48.6 | $ 16.4 | $ 65.0 |
| | | | | | | |
| **Liabilities measured at fair value** | | | | | | |
| Accrued liabilities: | | | | | | |
| Foreign exchange contracts | $ — | $ (0.5) | $ (0.5) | $ — | $ (1.2) | $ (1.2) |
| Commodity hedge contracts | — | (16.5) | (16.5) | — | (5.9) | (5.9) |
| Other non-current liabilities: | | | | | | |
| Foreign exchange contracts | — | (0.2) | (0.2) | — | (1.5) | (1.5) |
| Commodity hedge contracts | — | (1.9) | (1.9) | — | (1.6) | (1.6) |
| Liabilities measured at fair value | $ — | $ (19.1) | $ (19.1) | $ — | $ (10.2) | $ (10.2) |
| | | | | | | |
| **Liabilities measured at other than fair value** | | | | | | |
| Long-term debt, including current portions: | | | | | | |
| Fair value | $ — | $(2,023.5) | $(2,023.5) | $ — | $(1,852.4) | $(1,852.4) |
| Carrying amount | — | (1,968.8) | (1,968.8) | — | (1,993.7) | (1,993.7) |

See Note 8 for information on the fair value of pension plan assets. The carrying amounts of our other financial instruments do not differ materially from their estimated fair values at December 31, 2019 and 2018.

**NOTE 18 - Derivative Instruments and Hedging Activities**

Exchange rate fluctuations affect a portion of revenues and operating costs that are denominated in foreign currencies, and we use forward currency and currency option contracts to reduce our exposure to certain of these currency price fluctuations. Contracts to sell euros have not been designated as cash flow hedges for accounting purposes, and gains or losses are reported in earnings immediately in other (income) expense. Contracts to purchase Canadian dollars are designated as cash flow hedges for accounting purposes, and we record the gains and losses for the derivatives and premiums paid for option contracts in accumulated other comprehensive income (loss) until we reclassify them into cost of products sold when we recognize the associated underlying operating costs.

- 79-

*Table of Contents*

We are exposed to fluctuations in market prices of raw materials and energy sources. We may use cash-settled commodity price swaps and options to hedge the market risk associated with the purchase of certain of our raw materials and energy requirements. For input commodities, these derivatives are typically used for a portion of our electricity, iron ore, natural gas, nickel and zinc requirements. Our hedging strategy is to reduce the effect on earnings from the price volatility of these various commodity exposures, including timing differences between when we incur raw material commodity costs and when we receive sales surcharges from our customers based on those raw materials. Independent of any hedging activities, price changes in any of these commodity markets could negatively affect operating costs.

All commodity derivatives are recognized as an asset or liability at fair value. We record the gains and losses and premiums paid for option contracts for commodity derivatives designated as cash flow hedges of forecasted purchases of raw materials and energy sources in accumulated other comprehensive income (loss) and reclassify them into cost of products sold when we recognize earnings for the associated underlying transaction. We record all gains or losses from commodity derivatives for which hedge accounting treatment has not been elected to earnings immediately in cost of products sold. We routinely use iron ore derivatives to reduce the volatility of the cost of our iron ore purchases. These derivatives do not qualify for hedge accounting treatment. We have no collateral deposited with counterparties under collateral funding arrangements as of December 31, 2019.

Outstanding derivative contracts and the period over which we are hedging our exposure to the volatility in future cash flows are presented below:

| **Hedge Contracts** | **Settlement Dates** | **2019** | | **2018** | |
|---|---|---|---|---|---|
| Commodity contracts: | | | | | |
| Nickel (in lbs) | January 2020 to June 2020 | | 150,000 | | — |
| Natural gas (in MMBTUs) | January 2020 to December 2021 | | 37,708,000 | | 39,868,000 |
| Zinc (in lbs) | January 2020 to December 2021 | | 35,550,000 | | 52,150,000 |
| Iron ore (in metric tons) | January 2020 to June 2021 | | 1,495,000 | | 2,125,000 |
| Electricity (in MWHs) | January 2020 to August 2021 | | 1,683,000 | | 1,461,000 |
| Foreign exchange contracts: | | | | | |
| Euros (in millions) | January 2020 to January 2020 | € | 1.5 | € | 4.0 |
| Canadian dollars (in millions) | January 2020 to December 2021 | C$ | 72.6 | C$ | 118.6 |

The fair value of derivative instruments as of December 31, 2019 and 2018, is presented below:

| **Asset (liability)** | **2019** | | **2018** | |
|---|---|---|---|---|
| Derivatives designated as hedging instruments: | | | | |
| Other current assets—commodity contracts | $ | 0.1 | $ | 3.4 |
| Other non-current assets: | | | | |
| Commodity contracts | | — | | 1.0 |
| Foreign exchange contracts | | 0.1 | | 0.4 |
| Accrued liabilities: | | | | |
| Commodity contracts | | (16.5) | | (4.7) |
| Foreign exchange contracts | | (0.5) | | (1.2) |
| Other non-current liabilities: | | | | |
| Commodity contracts | | (1.9) | | (1.2) |
| Foreign exchange contracts | | (0.2) | | (1.5) |
| Derivatives not designated as hedging instruments: | | | | |
| Other current assets: | | | | |
| Commodity contracts | | 12.8 | | 9.6 |

| | | |
|---|---|---|
| Foreign exchange contracts | — | 0.1 |
| Other non-current assets—commodity contracts | 2.7 | 1.9 |
| Accrued liabilities—commodity contracts | — | (1.2) |
| Other non-current liabilities—commodity contracts | — | (0.4) |

A005822

*Table of Contents*

Gains (losses) on derivative instruments for the years ended December 31, 2019, 2018 and 2017, are presented below:

| Gain (loss) | 2019 | 2018 | 2017 |
|---|---|---|---|
| Derivatives designated as cash flow hedges: | | | |
| Commodity contracts: | | | |
| Recognized in accumulated other comprehensive income that were included in the assessment of effectiveness | $ (32.3) | $ (0.2) | $ (11.5) |
| Reclassified from accumulated other comprehensive income into cost of products sold | (7.2) | 11.2 | 6.1 |
| Foreign exchange contract: | | | |
| Recognized in accumulated other comprehensive income that were included in the assessment of effectiveness | 0.8 | (5.4) | — |
| Reclassified from accumulated other comprehensive income into cost of products sold | (1.7) | (0.9) | — |
| Derivatives not designated as hedging instruments: | | | |
| Commodity contracts—recognized in cost of products sold | 52.2 | (2.4) | 31.6 |
| Foreign exchange contracts—recognized in other (income) expense | — | 0.1 | (1.6) |

Gains (losses) before tax expected to be reclassified into cost of products sold within the next twelve months for our existing commodity contracts that qualify for hedge accounting are presented below:

| Hedge | Gains (losses) |
|---|---|
| Natural gas | $ (10.5) |
| Electricity | (5.8) |
| Zinc | (3.1) |
| Canadian dollars | (1.3) |

**NOTE 19 - Supplementary Cash Flow Information**

Net cash paid (received) during the period for interest, net of capitalized interest, and income taxes are presented below:

| | 2019 | 2018 | 2017 |
|---|---|---|---|
| Net cash paid (received) during the period for: | | | |
| Interest, net of capitalized interest | $ 137.5 | $ 136.3 | $ 130.5 |
| Income taxes | (9.5) | (5.5) | 0.1 |

Included in net cash flows from operations was cash provided by SunCoke Middletown of $68.6, $76.6 and $77.1 for the years ended December 31, 2019, 2018 and 2017. Consolidated cash and cash equivalents at December 31, 2019, and 2018, include SunCoke Middletown's cash and cash equivalents of $0.1 and $1.1. SunCoke Middletown's cash and cash equivalents have no compensating balance arrangements or legal restrictions, but are not available for our use.

We had capital investments during the years ended December 31, 2019, 2018 and 2017, that had not been paid as of the end of the respective period. These amounts are included in accounts payable and accrued liabilities and have been excluded from the consolidated statements of cash flows until paid. We also granted restricted stock to certain employees and restricted stock units to directors under the OSIP and prior Stock Incentive Plan. Non-cash investing and financing activities for the years ended December 31, 2019, 2018 and 2017, are presented below:

| | 2019 | 2018 | 2017 |
|---|---|---|---|
| Capital investments | $ 50.9 | $ 33.4 | $ 37.3 |
| Issuance of restricted stock and restricted stock units | 2.8 | 4.5 | 4.6 |

A005824

*Table of Contents*

**NOTE 20 - Quarterly Information (Unaudited)**

| | 2019 | | | | |
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | Year |
|---|---|---|---|---|---|
| Net sales | $ 1,697.7 | $ 1,680.5 | $ 1,535.5 | $ 1,445.7 | $ 6,359.4 |
| Operating profit | 41.2 | 106.6 | 51.1 | 10.4 | 209.3 |
| Net income (loss) attributable to AK Holding | (4.5) | 66.8 | 2.8 | (53.9) | 11.2 |
| Basic and diluted earnings (loss) per share | $ (0.01) | $ 0.21 | $ 0.01 | $ (0.17) | $ 0.04 |

| | 2018 | | | | |
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | Year |
|---|---|---|---|---|---|
| Net sales | $ 1,658.9 | $ 1,746.6 | $ 1,735.6 | $ 1,677.1 | $ 6,818.2 |
| Operating profit | 63.6 | 99.5 | 114.8 | 86.5 | 364.4 |
| Net income (loss) attributable to AK Holding | 28.7 | 56.6 | 67.2 | 33.5 | 186.0 |
| Basic and diluted earnings (loss) per share | $ 0.09 | $ 0.18 | $ 0.21 | $ 0.11 | $ 0.59 |

Included in net income (loss) attributable to AK Holding in the first quarter, fourth quarter and full year of 2019 was a charge of $77.4, a credit of $8.1 and a charge of $69.3, respectively, for the Ashland Works closure. Also included in net income (loss) attributable to AK Holding in the fourth quarter and full year of 2019 was a pension settlement charge of $26.9. Included in net income (loss) attributable to AK Holding in the fourth quarter and full year of 2018 was a pension settlement charge of $14.5.

**NOTE 21 - Supplementary Guarantor Information**

AK Steel's Secured Notes, 2021 Notes, 2025 Notes and 2027 Notes (collectively, the "Senior Notes") are governed by indentures entered into by AK Holding and its 100%-owned subsidiary, AK Steel. Under the terms of the indentures, AK Holding and the Subsidiary Guarantors each fully and unconditionally, jointly and severally, guarantee the payment of interest, principal and premium, if any, on each of the notes included in the Senior Notes.

We present all investments in subsidiaries in the supplementary guarantor information using the equity method of accounting. Therefore, the net income (loss) of the subsidiaries accounted for using the equity method is in their parents' investment accounts. The principal elimination entries eliminate investments in subsidiaries and inter-company balances and transactions. The following supplementary condensed consolidating financial statements present information about AK Holding, AK Steel, the Subsidiary Guarantors and the other non-guarantor subsidiaries.

- 82-

*Table of Contents*

**Condensed Statements of Comprehensive Income (Loss)**
**Year Ended December 31, 2019**

| | AK Holding | AK Steel | Guarantor Subsidiaries | Other Non-Guarantor Subsidiaries | Eliminations | Consolidated Company |
|---|---|---|---|---|---|---|
| Net sales | $ — | $ 5,784.3 | $ 304.1 | $ 751.5 | $ (480.5) | $ 6,359.4 |
| Cost of products sold (exclusive of items shown separately below) | — | 5,228.5 | 212.9 | 598.5 | (433.6) | 5,606.3 |
| Selling and administrative expenses | 4.3 | 283.0 | 13.8 | 40.0 | (45.9) | 295.2 |
| Depreciation | — | 142.1 | 8.5 | 42.0 | — | 192.6 |
| Ashland Works closure | — | 56.0 | — | — | — | 56.0 |
| Total operating costs | 4.3 | 5,709.6 | 235.2 | 680.5 | (479.5) | 6,150.1 |
| Operating profit (loss) | (4.3) | 74.7 | 68.9 | 71.0 | (1.0) | 209.3 |
| Interest expense | — | 139.3 | — | 7.3 | — | 146.6 |
| Pension and OPEB (income) expense | — | 12.0 | — | — | — | 12.0 |
| Other (income) expense | — | 2.6 | (23.2) | (4.1) | 6.2 | (18.5) |
| Income (loss) before income taxes | (4.3) | (79.2) | 92.1 | 67.8 | (7.2) | 69.2 |
| Income tax expense (benefit) | — | (25.4) | 23.0 | 10.5 | (1.9) | 6.2 |
| Equity in net income (loss) of subsidiaries | 15.5 | 69.3 | — | 1.9 | (86.7) | — |
| Net income (loss) | 11.2 | 15.5 | 69.1 | 59.2 | (92.0) | 63.0 |
| Less: Net income attributable to noncontrolling interests | — | — | — | 51.8 | — | 51.8 |
| Net income (loss) attributable to AK Steel Holding Corporation | 11.2 | 15.5 | 69.1 | 7.4 | (92.0) | 11.2 |
| Other comprehensive income (loss) | 32.0 | 32.0 | — | (0.6) | (31.4) | 32.0 |
| Comprehensive income (loss) attributable to AK Steel Holding Corporation | $ 43.2 | $ 47.5 | $ 69.1 | $ 6.8 | $ (123.4) | $ 43.2 |

- 83-

*Table of Contents*

**Condensed Statements of Comprehensive Income (Loss)**
**Year Ended December 31, 2018**

| | AK Holding | AK Steel | Guarantor Subsidiaries | Other Non-Guarantor Subsidiaries | Eliminations | Consolidated Company |
|---|---|---|---|---|---|---|
| Net sales | $ — | $ 6,244.7 | $ 320.8 | $ 752.8 | $ (500.1) | $ 6,818.2 |
| Cost of products sold (exclusive of items shown separately below) | — | 5,519.8 | 221.4 | 620.9 | (451.1) | 5,911.0 |
| Selling and administrative expenses | 3.5 | 320.0 | 14.5 | 34.2 | (49.6) | 322.6 |
| Depreciation | — | 171.5 | 8.0 | 40.7 | | 220.2 |
| Total operating costs | 3.5 | 6,011.3 | 243.9 | 695.8 | (500.7) | 6,453.8 |
| Operating profit (loss) | (3.5) | 233.4 | 76.9 | 57.0 | 0.6 | 364.4 |
| Interest expense | — | 145.9 | — | 5.7 | — | 151.6 |
| Pension and OPEB (income) expense | — | (19.2) | — | — | — | (19.2) |
| Other (income) expense | — | 8.7 | (16.4) | (2.9) | 4.7 | (5.9) |
| Income (loss) before income taxes | (3.5) | 98.0 | 93.3 | 54.2 | (4.1) | 237.9 |
| Income tax expense (benefit) | — | (26.5) | 23.3 | (2.0) | (1.0) | (6.2) |
| Equity in net income (loss) of subsidiaries | 189.5 | 65.0 | — | 0.7 | (255.2) | — |
| Net income (loss) | 186.0 | 189.5 | 70.0 | 56.9 | (258.3) | 244.1 |
| Less: Net income attributable to noncontrolling interests | — | — | — | 58.1 | — | 58.1 |
| Net income (loss) attributable to AK Steel Holding Corporation | 186.0 | 189.5 | 70.0 | (1.2) | (258.3) | 186.0 |
| Other comprehensive income (loss) | (50.6) | (50.6) | — | (1.7) | 52.3 | (50.6) |
| Comprehensive income (loss) attributable to AK Steel Holding Corporation | $ 135.4 | $ 138.9 | $ 70.0 | $ (2.9) | $ (206.0) | $ 135.4 |

- 84-

*Table of Contents*

**Condensed Statements of Comprehensive Income (Loss)**
**Year Ended December 31, 2017**

| | AK Holding | AK Steel | Guarantor Subsidiaries | Other Non-Guarantor Subsidiaries | Eliminations | Consolidated Company |
|---|---|---|---|---|---|---|
| Net sales | $ — | $ 5,755.1 | $ 285.9 | $ 496.3 | $ (456.8) | $ 6,080.5 |
| Cost of products sold (exclusive of items shown separately below) | — | 5,082.0 | 197.7 | 387.2 | (413.8) | 5,253.1 |
| Selling and administrative expenses | 3.7 | 285.5 | 13.5 | 26.9 | (44.7) | 284.9 |
| Depreciation | — | 189.3 | 7.5 | 29.2 | — | 226.0 |
| Asset impairment charge | — | 75.6 | — | — | — | 75.6 |
| Credit for adjustment of liability for transportation costs | — | (19.3) | — | — | — | (19.3) |
| Total operating costs | 3.7 | 5,613.1 | 218.7 | 443.3 | (458.5) | 5,820.3 |
| Operating profit (loss) | (3.7) | 142.0 | 67.2 | 53.0 | 1.7 | 260.2 |
| Interest expense | — | 150.3 | — | 2.0 | — | 152.3 |
| Pension and OPEB (income) expense | — | (71.9) | — | — | — | (71.9) |
| Other (income) expense | — | 30.1 | (11.4) | (5.4) | 3.8 | 17.1 |
| Income (loss) before income taxes | (3.7) | 33.5 | 78.6 | 56.4 | (2.1) | 162.7 |
| Income tax expense (benefit) | — | (29.4) | 29.9 | (1.8) | (0.9) | (2.2) |
| Equity in net income (loss) of subsidiaries | 107.2 | 44.3 | — | — | (151.5) | — |
| Net income (loss) | 103.5 | 107.2 | 48.7 | 58.2 | (152.7) | 164.9 |
| Less: Net income attributable to noncontrolling interests | — | — | — | 61.4 | — | 61.4 |
| Net income (loss) attributable to AK Steel Holding Corporation | 103.5 | 107.2 | 48.7 | (3.2) | (152.7) | 103.5 |
| Other comprehensive income (loss) | 38.5 | 38.5 | — | 4.7 | (43.2) | 38.5 |
| Comprehensive income (loss) attributable to AK Steel Holding Corporation | $ 142.0 | $ 145.7 | $ 48.7 | $ 1.5 | $ (195.9) | $ 142.0 |

- 85-

*Table of Contents*

**Condensed Balance Sheets**
**December 31, 2019**

| | AK Holding | AK Steel | Guarantor Subsidiaries | Other Non-Guarantor Subsidiaries | Eliminations | Consolidated Company |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Current assets: | | | | | | |
| Cash and cash equivalents | $ — | $ 11.8 | $ 0.1 | $ 19.1 | $ — | $ 31.0 |
| Accounts receivable, net | — | 437.4 | 25.7 | 124.1 | (9.3) | 577.9 |
| Inventory | — | 1,214.9 | 56.0 | 85.5 | (10.2) | 1,346.2 |
| Other current assets | — | 59.1 | 0.2 | 5.9 | — | 65.2 |
| Total current assets | — | 1,723.2 | 82.0 | 234.6 | (19.5) | 2,020.3 |
| Property, plant and equipment | — | 6,234.4 | 199.5 | 735.0 | — | 7,168.9 |
| Accumulated depreciation | — | (4,917.2) | (111.3) | (208.5) | — | (5,237.0) |
| Property, plant and equipment, net | — | 1,317.2 | 88.2 | 526.5 | — | 1,931.9 |
| Other non-current assets: | | | | | | |
| Investment in subsidiaries | (3,108.8) | 2,023.7 | — | 72.0 | 1,013.1 | — |
| Inter-company accounts | 3,260.3 | — | 1,734.6 | — | (4,994.9) | — |
| Goodwill and intangible assets | — | — | 32.8 | 260.6 | — | 293.4 |
| Other non-current assets | — | 248.6 | 2.8 | 93.6 | — | 345.0 |
| TOTAL ASSETS | $ 151.5 | $ 5,312.7 | $ 1,940.4 | $ 1,187.3 | $ (4,001.3) | $ 4,590.6 |
| **LIABILITIES AND EQUITY (DEFICIT)** | | | | | | |
| Current liabilities: | | | | | | |
| Accounts payable | $ — | $ 614.2 | $ 25.4 | $ 70.1 | $ (4.6) | $ 705.1 |
| Accrued liabilities | — | 276.0 | 8.8 | 29.6 | — | 314.4 |
| Current portion of pension and other postretirement benefit obligations | — | 40.7 | — | 0.3 | — | 41.0 |
| Total current liabilities | — | 930.9 | 34.2 | 100.0 | (4.6) | 1,060.5 |
| Non-current liabilities: | | | | | | |
| Long-term debt | — | 1,968.8 | — | — | — | 1,968.8 |
| Pension and other postretirement benefit obligations | — | 714.8 | — | 3.0 | — | 717.8 |
| Inter-company accounts | — | 4,513.6 | — | 558.6 | (5,072.2) | — |
| Other non-current liabilities | — | 293.4 | 2.1 | 70.7 | — | 366.2 |
| TOTAL LIABILITIES | — | 8,421.5 | 36.3 | 732.3 | (5,076.8) | 4,113.3 |
| Equity (deficit): | | | | | | |
| Total stockholders' equity (deficit) | 151.5 | (3,108.8) | 1,904.1 | 129.2 | 1,075.5 | 151.5 |
| Noncontrolling interests | — | — | — | 325.8 | — | 325.8 |
| TOTAL EQUITY (DEFICIT) | 151.5 | (3,108.8) | 1,904.1 | 455.0 | 1,075.5 | 477.3 |
| TOTAL LIABILITIES AND EQUITY (DEFICIT) | $ 151.5 | $ 5,312.7 | $ 1,940.4 | $ 1,187.3 | $ (4,001.3) | $ 4,590.6 |

*Table of Contents*

**Condensed Balance Sheets**
**December 31, 2018**

| | AK Holding | AK Steel | Guarantor Subsidiaries | Other Non-Guarantor Subsidiaries | Eliminations | Consolidated Company |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Current assets: | | | | | | |
| Cash and cash equivalents | $ — | $ 22.1 | $ 8.2 | $ 18.3 | $ — | $ 48.6 |
| Accounts receivable, net | — | 515.4 | 34.0 | 95.3 | (8.9) | 635.8 |
| Inventory | — | 1,299.6 | 53.9 | 75.6 | (9.2) | 1,419.9 |
| Other current assets | — | 85.5 | 0.1 | 11.4 | — | 97.0 |
| Total current assets | — | 1,922.6 | 96.2 | 200.6 | (18.1) | 2,201.3 |
| Property, plant and equipment | — | 6,111.1 | 189.7 | 668.4 | — | 6,969.2 |
| Accumulated depreciation | — | (4,785.5) | (102.8) | (169.3) | — | (5,057.6) |
| Property, plant and equipment, net | — | 1,325.6 | 86.9 | 499.1 | — | 1,911.6 |
| Other non-current assets: | | | | | | |
| Investment in subsidiaries | (3,017.4) | 1,931.1 | — | 68.2 | 1,018.1 | — |
| Inter-company accounts | 3,117.3 | — | 1,630.7 | — | (4,748.0) | — |
| Goodwill and intangible assets | — | — | 32.9 | 266.0 | — | 298.9 |
| Other non-current assets | — | 54.3 | — | 49.6 | — | 103.9 |
| **TOTAL ASSETS** | $ 99.9 | $ 5,233.6 | $ 1,846.7 | $ 1,083.5 | $ (3,748.0) | $ 4,515.7 |
| **LIABILITIES AND EQUITY (DEFICIT)** | | | | | | |
| Current liabilities: | | | | | | |
| Accounts payable | $ — | $ 722.5 | $ 26.2 | $ 55.5 | $ (3.2) | $ 801.0 |
| Accrued liabilities | — | 251.5 | 8.7 | 28.7 | — | 288.9 |
| Current portion of pension and other postretirement benefit obligations | — | 38.4 | — | 0.3 | — | 38.7 |
| Total current liabilities | — | 1,012.4 | 34.9 | 84.5 | (3.2) | 1,128.6 |
| Non-current liabilities: | | | | | | |
| Long-term debt | — | 1,993.7 | — | — | — | 1,993.7 |
| Pension and other postretirement benefit obligations | — | 827.0 | — | 2.9 | — | 829.9 |
| Inter-company accounts | — | 4,312.3 | — | 511.2 | (4,823.5) | — |
| Other non-current liabilities | — | 105.6 | 0.2 | 28.2 | — | 134.0 |
| **TOTAL LIABILITIES** | — | 8,251.0 | 35.1 | 626.8 | (4,826.7) | 4,086.2 |
| Equity (deficit): | | | | | | |
| Total stockholders' equity (deficit) | 99.9 | (3,017.4) | 1,811.6 | 127.1 | 1,078.7 | 99.9 |
| Noncontrolling interests | — | — | — | 329.6 | — | 329.6 |
| TOTAL EQUITY (DEFICIT) | 99.9 | (3,017.4) | 1,811.6 | 456.7 | 1,078.7 | 429.5 |
| **TOTAL LIABILITIES AND EQUITY (DEFICIT)** | $ 99.9 | $ 5,233.6 | $ 1,846.7 | $ 1,083.5 | $ (3,748.0) | $ 4,515.7 |

*Table of Contents*

**Condensed Statements of Cash Flows**
**Year Ended December 31, 2019**

| | AK Holding | AK Steel | Guarantor Subsidiaries | Other Non-Guarantor Subsidiaries | Eliminations | Consolidated Company |
|---|---|---|---|---|---|---|
| Net cash flows from operating activities | $ (3.2) | $ 114.6 | $ 76.2 | $ 83.6 | $ (5.3) | $ 265.9 |
| Cash flows from investing activities: | | | | | | |
| Capital investments | — | (133.5) | (3.8) | (57.5) | — | (194.8) |
| Other investing items, net | — | 6.6 | — | — | — | 6.6 |
| Net cash flows from investing activities | — | (126.9) | (3.8) | (57.5) | — | (188.2) |
| Cash flows from financing activities: | | | | | | |
| Net borrowings (repayments) under credit facility | — | 115.0 | — | — | — | 115.0 |
| Redemption of long-term debt | — | (152.3) | — | — | — | (152.3) |
| Inter-company activity | 3.9 | 41.0 | (80.5) | 30.3 | 5.3 | — |
| SunCoke Middletown distributions to noncontrolling interest owners | — | — | — | (55.6) | — | (55.6) |
| Other financing items, net | (0.7) | (1.7) | — | — | — | (2.4) |
| Net cash flows from financing activities | 3.2 | 2.0 | (80.5) | (25.3) | 5.3 | (95.3) |
| Net increase (decrease) in cash and cash equivalents | — | (10.3) | (8.1) | 0.8 | — | (17.6) |
| Cash and equivalents, beginning of year | — | 22.1 | 8.2 | 18.3 | — | 48.6 |
| Cash and equivalents, end of year | $ — | $ 11.8 | $ 0.1 | $ 19.1 | $ — | $ 31.0 |

**Condensed Statements of Cash Flows**
**Year Ended December 31, 2018**

| | AK Holding | AK Steel | Guarantor Subsidiaries | Other Non-Guarantor Subsidiaries | Eliminations | Consolidated Company |
|---|---|---|---|---|---|---|
| Net cash flows from operating activities | $ (2.3) | $ 209.7 | $ 83.1 | $ 83.8 | $ (9.6) | $ 364.7 |
| Cash flows from investing activities: | | | | | | |
| Capital investments | — | (122.9) | (8.1) | (21.0) | — | (152.0) |
| Other investing items, net | — | 0.8 | — | (0.7) | — | 0.1 |
| Net cash flows from investing activities | — | (122.1) | (8.1) | (21.7) | — | (151.9) |
| Cash flows from financing activities: | | | | | | |
| Net borrowings (repayments) under credit facility | — | (115.0) | — | — | — | (115.0) |
| Redemption of long-term debt | — | (12.6) | — | — | — | (12.6) |
| Inter-company activity | 2.5 | 48.3 | (74.0) | 13.6 | 9.6 | — |
| SunCoke Middletown distributions to noncontrolling interest owners | — | — | — | (73.7) | — | (73.7) |
| Other financing items, net | (0.2) | (0.7) | — | — | — | (0.9) |
| Net cash flows from financing activities | 2.3 | (80.0) | (74.0) | (60.1) | 9.6 | (202.2) |
| Net increase (decrease) in cash and cash equivalents | — | 7.6 | 1.0 | 2.0 | — | 10.6 |
| Cash and equivalents, beginning of year | — | 14.5 | 7.2 | 16.3 | — | 38.0 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Cash and equivalents, end of year | $ | — | $ | 22.1 | $ | 8.2 | $ | 18.3 | $ | — | $ | 48.6 |

- 88-

*Table of Contents*

**Condensed Statements of Cash Flows**
**Year Ended December 31, 2017**

| | AK Holding | AK Steel | Guarantor Subsidiaries | Other Non-Guarantor Subsidiaries | Eliminations | Consolidated Company |
|---|---|---|---|---|---|---|
| Net cash flows from operating activities | $ (2.5) | $ 67.3 | $ 73.3 | $ 61.7 | $ (1.0) | $ 198.8 |
| Cash flows from investing activities: | | | | | | |
| Capital investments | — | (131.8) | (5.6) | (15.1) | — | (152.5) |
| Investment in acquired business, net of cash acquired | — | (360.4) | — | — | — | (360.4) |
| Other investing items, net | — | 4.0 | — | 0.2 | — | 4.2 |
| Net cash flows from investing activities | — | (488.2) | (5.6) | (14.9) | — | (508.7) |
| Cash flows from financing activities: | | | | | | |
| Net borrowings (repayments) under credit facility | — | 450.0 | — | — | — | 450.0 |
| Proceeds from issuance of long-term debt | — | 680.0 | — | — | — | 680.0 |
| Redemption of long-term debt | — | (848.4) | — | — | — | (848.4) |
| Debt issuance costs | — | (25.3) | — | — | — | (25.3) |
| Inter-company activity | 5.0 | 31.2 | (64.9) | 27.7 | 1.0 | — |
| SunCoke Middletown distributions to noncontrolling interest owners | — | — | — | (79.1) | — | (79.1) |
| Other financing items, net | (2.5) | — | — | — | — | (2.5) |
| Net cash flows from financing activities | 2.5 | 287.5 | (64.9) | (51.4) | 1.0 | 174.7 |
| Net increase (decrease) in cash and cash equivalents | — | (133.4) | 2.8 | (4.6) | — | (135.2) |
| Cash and equivalents, beginning of year | — | 147.9 | 4.4 | 20.9 | — | 173.2 |
| Cash and equivalents, end of year | $ — | $ 14.5 | $ 7.2 | $ 16.3 | $ — | $ 38.0 |

- 89-

*Table of Contents*

**Item 9.          Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.**

None.

**Item 9A.          Controls and Procedures.**

We maintain a system of disclosure controls and procedures that is designed to provide reasonable assurance that information is disclosed and accumulated and communicated to management in a timely fashion. An evaluation of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) was performed as of the end of the period covered by this report. This evaluation was performed under the supervision and with the participation of management, including the Chief Executive Officer and Chief Financial Officer. Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective to provide reasonable assurance that information we are required to disclose in the reports that we file or submit under the Exchange Act is accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure and are effective to provide reasonable assurance that such information is recorded, processed, summarized and reported within the time periods specified by the Securities and Exchange Commission's rules and forms.

There has been no change in our internal control over financial reporting during the fourth quarter ended December 31, 2019, that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

Management's Report on Internal Control over Financial Reporting and the Report of Independent Registered Public Accounting Firm are presented on the following pages.

- 90-

*Table of Contents*

**MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING**

Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) or 15d-15(f) promulgated under the Securities Exchange Act of 1934. Those rules define internal control over financial reporting as a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and include those policies and procedures that:

   a)   pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of assets;

   b)   provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures are being made only in accordance with authorizations of management and directors; and

   c)   provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

We assessed the effectiveness of our internal control over financial reporting as of December 31, 2019. In making this assessment, we used the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 Framework).

Based on our assessment and those criteria, we have determined that, as of December 31, 2019, our internal control over financial reporting was effective.

Our independent registered public accounting firm has issued an attestation report on the effectiveness of our internal control over financial reporting, which appears on the following page.

Dated:   February 20, 2020                              /s/ Roger K. Newport

                                                        Roger K. Newport

                                                        Chief Executive Officer and Director

Dated:   February 20, 2020                              /s/ Christopher J. Ross

                                                        Christopher J. Ross

                                                        Vice President, Treasurer and Interim Chief Financial Officer

- 91-

*Table of Contents*

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Stockholders and Board of Directors of AK Steel Holding Corporation

**Opinion on Internal Control over Financial Reporting**

We have audited AK Steel Holding Corporation's internal control over financial reporting as of December 31, 2019, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, AK Steel Holding Corporation (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2019, based on the COSO criteria.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of December 31, 2019 and 2018, the related consolidated statements of operations, comprehensive income, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2019, and the related notes and our report dated February 20, 2020 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying *Management's Report on Internal Control Over Financial Reporting*. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ ERNST & YOUNG LLP
Cincinnati, Ohio
February 20, 2020

- 92-

A005838

*Table of Contents*

**Item 9B.**        **Other Information.**

None.

## PART III

**Item 10.**        **Directors, Executive Officers and Corporate Governance.**

Information with respect to our Executive Officers is set forth in Part I of this Annual Report pursuant to General Instruction G of Form 10-K. The information required to be furnished pursuant to this item with respect to our Directors will be set forth under the caption "Election of Directors" in our proxy statement (the "2020 Proxy Statement") to be furnished to stockholders in connection with the solicitation of proxies by our Board of Directors for use at the 2020 Annual Meeting of Stockholders, and such information under that caption is incorporated herein by reference.

The information required to be furnished pursuant to this item with respect to compliance with Section 16(a) of the Exchange Act, if any, will be set forth under the caption "Delinquent Section 16(a) Reports" in the 2020 Proxy Statement and is incorporated herein by reference.

The information required to be furnished pursuant to this item with respect to the Audit Committee and the Audit Committee financial expert will be set forth under the caption "Committees of the Board of Directors" in the 2020 Proxy Statement and is incorporated herein by reference.

Information required to be furnished pursuant to this item with respect to any material changes to the process by which security holders may recommend nominees to the Board of Directors will be set forth under the caption "Stockholder Proposals for the 2021 Annual Meeting and Nominations of Directors" in the 2020 Proxy Statement and is incorporated herein by reference.

We have adopted a Code of Ethics for Principal Officers covering our Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer and other persons performing a similar function; a Code of Conduct for Directors, Officers and employees; and Corporate Governance Guidelines. These documents, along with charters of our Audit, Corporate Sustainability, Finance, Management Development and Compensation, and Nominating and Governance Committees, are posted on our website at www.aksteel.com. Any required disclosure of amendments to or waivers of the provisions of the Code of Ethics for Principal Officers or Code of Conduct also will be posted on our website.

**Item 11.**        **Executive Compensation.**

The information required to be furnished pursuant to this item will be set forth under the caption "Executive Compensation" and in the Director Compensation Table and its accompanying narrative in the 2020 Proxy Statement and is incorporated herein by reference.

**Item 12.**        **Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.**

The information required to be furnished pursuant to this item with respect to compensation plans under which our equity securities are authorized for issuance will be set forth under the caption "Equity Compensation Plan Information" in the 2020 Proxy Statement and is incorporated herein by reference.

Other information required to be furnished pursuant to this item will be set forth under the caption "Stock Ownership" in the 2020 Proxy Statement and is incorporated herein by reference.

**Item 13.**        **Certain Relationships and Related Transactions, and Director Independence.**

The information required to be furnished pursuant to this item will be set forth under the captions "Related Person Transactions" and "Board Independence" in the 2020 Proxy Statement and is incorporated herein by reference.

**Item 14.**        **Principal Accounting Fees and Services.**

The information required to be furnished pursuant to this item will be set forth under the caption "Principal Accounting Firm Fees" in the 2020 Proxy Statement and is incorporated herein by reference.

*Table of Contents*

## PART IV

**Item 15.    Exhibits, Financial Statement Schedules.**

*(a)(1) Financial Statements*

The consolidated financial statements of AK Steel Holding Corporation filed as part of this Annual Report are included in Item 8.

*(a)(2) Financial Statement Schedules*

All financial statement schedules are omitted because they are not applicable or the required information is contained in the applicable financial statements or notes thereto.

*(a)(3) Exhibits*

| Exhibit Number | Description |
|---|---|
| 2.1 | Agreement and Plan of Merger, dated as of December 2, 2019, by and among AK Steel Holding Corporation, Cleveland-Cliffs Inc. and Pepper Merger Sub Inc. (incorporated herein by reference to Exhibit 2.1 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on December 4, 2019). |
| 3.1 | Restated Certificate of Incorporation of AK Steel Holding Corporation (incorporated herein by reference to Exhibit 3.1 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2016, as filed with the Commission on October 25, 2016). |
| *3.2 | By-laws of AK Steel Holding Corporation, as amended and restated as of December 2, 2019. |
| 4.1 | Indenture, dated as of May 11, 2010, among AK Steel Corporation, as issuer, AK Steel Holding Corporation, as guarantor, and U.S. Bank National Association, as trustee (incorporated herein by reference to Exhibit 4.1 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on May 11, 2010). |
| 4.1(a) | Fifth Supplemental Indenture, dated as of September 16, 2014, among AK Steel Corporation, as issuer, AK Steel Holding Corporation, as parent guarantor, AK Steel Properties, Inc. and AK Tube LLC, as subsidiary guarantors, and U.S. Bank National Association, as trustee (incorporated herein by reference to Exhibit 4.1 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on September 16, 2014). |
| 4.1(b) | Sixth Supplemental Indenture, dated as of July 27, 2016, among AK Steel Corporation, as issuer, AK Steel Holding Corporation, as parent guarantor, Mountain State Carbon, LLC, as subsidiary guarantor, and U.S. Bank National Association, as trustee (incorporated herein by reference to Exhibit 4.3 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2016, as filed with the Commission on July 29, 2016). |
| 4.1(c) | Seventh Supplemental Indenture, dated as of March 23, 2017, among AK Steel Corporation, as issuer, the guarantors named therein and U.S. Bank National Association, as trustee (incorporated herein by reference to Exhibit 4.1 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on March 23, 2017). |
| 4.1(d) | Eighth Supplemental Indenture, dated as of August 9, 2017, among AK Steel Corporation, as issuer, the guarantors named therein and U.S. Bank National Association, as trustee (incorporated herein by reference to Exhibit 4.1 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on August 9, 2017). |

4.1(e)      Ninth Supplemental Indenture, dated January 29, 2020, between AK Steel Corporation and U.S. Bank National Association, as trustee (incorporated herein by reference to Exhibit 4.1 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on January 29, 2020).

4.1(f)      Tenth Supplemental Indenture, dated January 29, 2020, between AK Steel Corporation and U.S. Bank National Association, as trustee (incorporated herein by reference to Exhibit 4.2 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on January 29, 2020).

*Table of Contents*

| Exhibit Number | Description |
|---|---|
| 4.2 | Indenture, dated as of June 20, 2016, among AK Steel Corporation, as issuer, the guarantors named therein and U.S. Bank National Association, as trustee and collateral agent (incorporated herein by reference to Exhibit 4.1 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on June 20, 2016). |
| 4.2(a) | First Supplemental Indenture dated as of July 27, 2016, among AK Steel Corporation, as issuer, Mountain State Carbon, LLC, as subsidiary guarantor and U.S. Bank National Association, as trustee and collateral agent (incorporated herein by reference to Exhibit 4.2 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2016, as filed with the Commission on July 29, 2016). |
| *4.3 | Description of Securities. |
| 10.1+ | Executive Deferred Compensation Plan, as amended and restated as of October 18, 2007 (incorporated herein by reference to Exhibit 10.2 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2007, as filed with the Commission on November 6, 2007). |
| 10.2+ | Directors' Deferred Compensation Plan, as amended and restated as of October 18, 2007 (incorporated herein by reference to Exhibit 10.3 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2007, as filed with the Commission on November 6, 2007). |
| 10.3 | Policy Concerning Severance Agreements with Senior Executives (incorporated herein by reference to Exhibit 99.3 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2003, as filed with the Commission on November 14, 2003). |
| 10.4+ | Omnibus Management Incentive Plan, as of May 25, 2017 (incorporated herein by reference to Exhibit 10.1 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on May 26, 2017). |
| 10.5+ | Supplemental Thrift Plan, as amended and restated as of January 1, 2018 (incorporated by reference to Exhibit 10.5 to AK Steel Holding Corporation's Annual Report on Form 10-K for the year ended December 31, 2017, as filed with the Commission on February 15, 2018). |
| 10.6+ | Executive Minimum and Supplemental Retirement Plan, as amended and restated as of October 18, 2007 (incorporated herein by reference to Exhibit 10.1 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2007, as filed with the Commission on November 6, 2007). |
| 10.6(a)+ | First Amendment to the Executive Minimum and Supplemental Retirement Plan, as amended and restated as of October 18, 2007 (incorporated herein by reference to Exhibit 10.1 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2008, as filed with the Commission on November 4, 2008). |
| 10.6(b)+ | Second Amendment to the Executive Minimum and Supplemental Retirement Plan, as amended and restated as of October 18, 2007 (incorporated herein by reference to Exhibit 10.4 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2009, as filed with the Commission on November 3, 2009). |

10.7+    Executive Retirement Income Plan adopted March 20, 2014 (incorporated by reference to Exhibit 10.10 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2014, as filed with the Commission on May 2, 2014).

10.8+    Form of Executive Officer Severance Agreement (incorporated by reference to Exhibit 10.8 to AK Steel Holding Corporation's Annual Report on Form 10-K for the year ended December 31, 2016, as filed with the Commission on February 17, 2017).

10.9+    Form of Executive Officer Change of Control Agreement (incorporated by reference to Exhibit 10.9 to AK Steel Holding Corporation's Annual Report on Form 10-K for the year ended December 31, 2016, as filed with the Commission on February 17, 2017).

- 95-

*Table of Contents*

| Exhibit Number | Description |
|---|---|
| 10.10+ | AK Steel Holding Corporation Stock Incentive Plan, as amended and restated as of May 26, 2016 (incorporated herein by reference to Exhibit 10.1 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on May 27, 2016). |
| 10.11 | Second Amended and Restated Loan and Security Agreement, dated as of September 13, 2017, among AK Steel Corporation, as Borrower, the guarantors named therein, certain financial institutions, as Lenders, and Bank of America, N.A., as agent for the Lenders (incorporated by reference to Exhibit 10.1 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2017, as filed with the Commission on November 3, 2017). |
| 10.11(a) | First Amendment to Second Amended and Restated Loan and Security Agreement, dated as of September 13, 2017, among AK Steel Corporation, as Borrower, the guarantors named therein, certain financial institutions, as Lenders, and Bank of America, N.A., as agent for the Lenders (incorporated by reference to Exhibit 10.1 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2019, as filed with the Commission on April 29, 2019). |
| 10.12 | Air Quality Facilities Loan Agreement dated as of February 1, 2012 between AK Steel Corporation and the Ohio Air Quality Development Authority – $36,000,000 Revenue Refunding Bonds, Series 2012-A (incorporated herein by reference to Exhibit 10.1 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on February 7, 2012). |
| 10.12(a) | Guaranty Agreement dated as of April 29, 2014, by AK Tube LLC and AK Steel Properties, Inc. to Wells Fargo Bank, National Association, as trustee, pertaining to the Ohio Air Quality Development Authority – $36,000,000 Revenue Refunding Bonds, Series 2012-A (incorporated by reference to Exhibit 10.7 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2014, as filed with the Commission on May 2, 2014). |
| 10.12(b) | Guaranty Agreement, dated as of July 27, 2016, by Mountain State Carbon, LLC to Wells Fargo Bank, National Association, as trustee, pertaining to the Ohio Air Quality Development Authority – $36,000,000 Revenue Refunding Bonds, Series 2012-A (incorporated herein by reference to Exhibit 10.8 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2016, as filed with the Commission on July 29, 2016). |
| 10.13 | Loan Agreement dated as of February 1, 2012 between AK Steel Corporation and the City of Rockport, Indiana – $30,000,000 Revenue Refunding Bonds, Series 2012-A (incorporated herein by reference to Exhibit 10.2 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on February 7, 2012). |
| 10.13(a) | Guaranty Agreement dated as of April 29, 2014, by AK Tube LLC and AK Steel Properties, Inc. to Wells Fargo Bank, National Association, as trustee, pertaining to City of Rockport, Indiana – $30,000,000 Revenue Refunding Bonds, Series 2012-A (incorporated by reference to Exhibit 10.8 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2014, as filed with the Commission on May 2, 2014). |
| 10.13(b) | Guaranty Agreement, dated as of July 27, 2016, by Mountain State Carbon, LLC to Wells Fargo Bank, National Association, as trustee, pertaining to City of Rockport, Indiana – $30,000,000 Revenue Refunding Bonds, Series 2012-A (incorporated herein by reference to Exhibit 10.9 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2016, as filed with the Commission on July 29, 2016). |

10.14       Loan Agreement dated as of February 1, 2012 between AK Steel Corporation and the Butler County Industrial Development Authority – $7,300,000 Revenue Refunding Bonds, Series 2012-A (incorporated herein by reference to Exhibit 10.3 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on February 7, 2012).

10.14(a)    Guaranty Agreement dated as of April 29, 2014, by AK Tube LLC and AK Steel Properties, Inc. to Wells Fargo Bank, National Association, as trustee, pertaining to Butler County Industrial Development Authority – $7,300,000 Revenue Refunding Bonds, Series 2012-A (incorporated by reference to Exhibit 10.9 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2014, as filed with the Commission on May 2, 2014).

- 96-

*Table of Contents*

| Exhibit Number | Description |
|---|---|
| 10.14(b) | Guaranty Agreement, dated as of July 27, 2016, by Mountain State Carbon, LLC to Wells Fargo Bank, National Association, as trustee, pertaining to Butler County Industrial Development Authority – $7,300,000 Revenue Refunding Bonds, Series 2012-A (incorporated herein by reference to Exhibit 10.10 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2016, as filed with the Commission on July 29, 2016). |
| 10.15 | Security Agreement, dated as of June 20, 2016, among the AK Steel Corporation and U.S. Bank National Association, as trustee and collateral agent (incorporated herein by reference to Exhibit 10.1 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on June 20, 2016). |
| 10.15(a) | Security Agreement Supplement, dated as of July 27, 2016, between Mountain State Carbon, LLC and U.S. Bank National Association, as collateral agent (incorporated herein by reference to Exhibit 10.6 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2016, as filed with the Commission on July 29, 2016). |
| 10.16 | Collateral Trust Agreement dated as of November 20, 2012, among AK Steel and U.S. Bank National Association, as trustee and collateral agent (incorporated by reference to Exhibit 10.4 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on November 20, 2012). |
| 10.16(a) | Supplement to Collateral Trust Agreement dated as of April 29, 2014, among AK Steel Corporation, AK Tube LLC, AK Steel Properties, Inc. and U.S. Bank National Association, as trustee and collateral agent (incorporated by reference to Exhibit 10.6 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2014, as filed with the Commission on May 2, 2014). |
| 10.16(b) | Collateral Trust Agreement Joinder, dated as of June 20, 2016, among AK Steel Corporation and U.S. Bank National Association, as trustee and collateral agent (incorporated herein by reference to Exhibit 10.2 to AK Steel Holding Corporation's Current Report on Form 8-K, as filed with the Commission on June 20, 2016). |
| 10.16(c) | Supplement to Collateral Trust Agreement, dated as of July 27, 2016, among AK Steel Corporation, Mountain State Carbon, LLC and U.S. Bank National Association, as collateral agent (incorporated herein by reference to Exhibit 10.7 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2016, as filed with the Commission on July 29, 2016). |
| 10.17+ | Form of Director and Officer Indemnification Agreement (incorporated by reference to Exhibit 10.1 to AK Steel Holding Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2013, as filed with the Commission on November 1, 2013). |
| 10.18+ | AK Steel Holding Corporation 2019 Omnibus Supplemental Incentive Plan (incorporated by reference to Exhibit 10.1 to AK Steel Holding Corporation's Current Report on Form 8-K/A, as filed with the Commission on May 29, 2019). |
| 21.1 | Subsidiaries of AK Steel Holding Corporation (incorporated by reference to Exhibit 21.1 to AK Steel Holding Corporation's Annual Report on Form 10-K for the year ended December 31, 2017, as filed with the Commission on February 15, 2018). |

*23.1            Consent of Ernst & Young LLP.

*31.1            Section 302 Certification of Chief Executive Officer.

*31.2            Section 302 Certification of Chief Financial Officer.

*32.1            Section 906 Certification of Chief Executive Officer.

*32.2            Section 906 Certification of Chief Financial Officer.

A005848

*Table of Contents*

| Exhibit Number | Description |
|---|---|
| *95.1 | Mine Safety Disclosure. |
| 101.Ins | XBRL Instance Document – the XBRL Instance Document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document |
| *101.Sch | XBRL Taxonomy Extension Schema Document |
| *101.Cal | XBRL Taxonomy Extension Calculation Linkbase Document |
| *101.Def | XBRL Taxonomy Extension Definition Linkbase Document |
| *101.Lab | XBRL Taxonomy Extension Label Linkbase Document |
| *101.Pre | XBRL Taxonomy Extension Presentation Linkbase Document |
| 104 | Cover Page Interactive Data File (formatted as inline XBRL and contained in Exhibit 101) |

\* Filed or furnished herewith, as applicable

\+ Management contract or compensatory plan or arrangement

**Item 16.        Form 10-K Summary.**

None.

- 98-

A005849

*Table of Contents*

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized in West Chester, Ohio, on February 20, 2020.

AK Steel Holding Corporation

(Registrant)

/s/ Christopher J. Ross

Christopher J. Ross

Vice President, Treasurer and Interim Chief Financial Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below as of February 20, 2020 by the following persons on behalf of the registrant and in the capacities indicated.

| Signature & Title | Signature & Title |
|---|---|
| /s/ Ralph S. Michael, III | /s/ Mark G. Essig |
| Ralph S. Michael, III | Mark G. Essig |
| Chairman of the Board | Director |
| /s/ Roger K. Newport | /s/ William K. Gerber |
| Roger K. Newport | William K. Gerber |
| Chief Executive Officer and Director | Director |
| /s/ Christopher J. Ross | /s/ Gregory B. Kenny |
| Christopher J. Ross | Gregory B. Kenny |
| Vice President, Treasurer and Interim Chief Financial Officer | Director |
| /s/ Gregory A. Hoffbauer | /s/ Dwayne A. Wilson |
| Gregory A. Hoffbauer | Dwayne A. Wilson |
| Vice President, Controller and Chief Accounting Officer | Director |
| /s/ Dennis C. Cuneo | /s/ Vicente Wright |
| Dennis C. Cuneo | Vicente Wright |
| Director | Director |
| /s/ Sheri H. Edison | /s/ Arlene M. Yocum |
| Sheri H. Edison | Arlene M. Yocum |
| Director | Director |

- 99-

A005850

EXHIBIT 3.2

**BY-LAWS**
**OF**
**AK STEEL HOLDING CORPORATION**
(a Delaware corporation)

ARTICLE I

Stockholders

SECTION 1. <u>Annual Meetings</u>. The annual meeting of stockholders for the election of directors and for the transaction of other business as may properly come before the meeting shall be held each year at the date and time, within or without the State of Delaware, as the Board of Directors shall determine. No matter (including the nomination of a person for election as a director) may be presented for stockholder action at an annual meeting of stockholders unless such matter is: (a) specified in the notice of the meeting (or any supplement to the notice) given by or at the direction of the Board of Directors; (b) otherwise presented at the meeting by or at the direction of the Board of Directors, (c) properly presented for action at the meeting by a stockholder in accordance with the notice provisions set forth in Sections 9 or 10 of this Article I and any other applicable requirements, or (d) a procedural matter presented, or accepted for presentation, by the Chairman in his or her sole discretion.

SECTION 2. <u>Special Meetings</u>. Special meetings of stockholders for the transaction of business as may properly come before the meeting may be called by order of the Board of Directors or the Chief Executive Officer or upon the written request delivered to the Chief Executive Officer by stockholders holding together at least a majority of all the shares of the Corporation entitled to vote at the meeting, and shall be held on the date and at the time, within or without the State of Delaware, as may be specified by the order or, in the case of a stockholder request, on a date and time determined by the Secretary. When-ever the directors or the Chief Executive Officer or the Secretary shall fail to fix the place, the meeting shall be held at the principal executive office of the Corporation. Any stockholder request submitted shall meet the requirements of Section 10 of this Article I. No matter may be presented for stockholder action at a special meeting of stockholders unless such matter is: (a) specified in the notice of the meeting (or any supplement to the notice) given by or at the direction of the Board of Directors; (b) otherwise presented at the meeting by or at the direction of the Board of Directors, (c) properly presented for action at the meeting by a stockholder in accordance with the notice provisions set forth in Section 10 of this Article I and any other applicable requirements, or (d) a procedural matter presented, or accepted for presentation, by the Chairman in his or her sole discretion. No special meeting of stockholders shall be called for the purpose of removing or electing a director or directors or amending the Bylaws of the Corporation, such matters to be considered only at the annual meeting of stockholders; provided, however, that a special meeting may be called for the purpose of removing a director for cause, as such term is defined under Delaware law, and, provided further that the cause alleged must be set forth in the request for the meeting. Business transacted at any special meeting requested by stockholders shall be limited to the purpose or purposes stated in the request for the meeting; provided, however, that nothing herein shall prohibit the Board of Directors from submitting matters to the stockholders at any special meeting requested by stockholders.

SECTION 3. <u>Notice of Meetings</u>. Written notice of all meetings of the stockholders, stating the place, date and hour of the meeting and the place within the city or other municipality or community at which the list of stock-holders may be examined, shall be mailed or delivered to each stockholder not less than 10 nor more than 60 days prior to the meeting unless the lapse of the

prescribed period of time shall have been waived. Notice of any special meeting shall state in general terms the purpose or purposes for which the meeting is to be held. Notice by mail shall be deemed to be given when deposited, with postage thereon

1

prepaid, in the United States mail. If a meeting is adjourned to another time, not more than 30 days hence, and/or to another place, and if an announcement of the adjourned time and/or place is made at the meeting, it shall not be necessary to give notice of the adjourned meeting unless the directors, after adjournment, fix a new record date for the adjourned meeting. Notice need not be given to any stockholder who submits a written waiver of notice before or after the time stated therein. Attendance of a person at a meeting of stockholders shall constitute a waiver of notice of such meeting, except when the stockholder attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders need be specified in any written waiver of notice.

SECTION 4. Stockholder Lists. The officer who has charge of the stock ledger of the Corporation shall prepare, at least 10 days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. The list shall be open to the examination of any stockholder, during the 10 day period, at the stockholder's expense, for any purpose germane to the meeting, either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or, if not so specified, at the place where the meeting is to be held. The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.

The stock ledger shall be the only evidence as to the identities of the stockholders entitled to examine the stock ledger, the list required by this section or the books of the Corporation, or to vote in person or by proxy at any meeting of stockholders.

SECTION 5. Quorum. Except as otherwise provided by law or the Corporation's Certificate of Incorporation, a quorum for the transaction of business at any meeting of stockholders shall consist of the holders of record of a majority of the issued and outstanding shares of the capital stock of the Corporation entitled to vote at the meeting, present in person or by proxy. If there be no quorum, the holders of a majority of the shares so present or represented may adjourn the meeting from time to time, without further notice, until a quorum shall have been obtained. When a quorum is once present it is not broken by the subsequent withdrawal of any stockholder.

SECTION 6. Organization. Meetings of stockholders shall be presided over by the Chairman, if any, or if none or in the Chairman's absence, the Vice-Chairman, if any, or if none or in the Vice-Chairman's absence, the Chief Executive Officer, if any, or if none or in the Chief Executive Officer's absence, the President, if any, or if none or in the President's absence, a Vice-President, or, if none of the foregoing is present, by a chairman to be chosen by the stockholders entitled to vote who are present in person or by proxy at the meeting. The Secretary of the Corporation, or in the Secretary's absence an Assistant Secretary, shall act as secretary of every meeting, but if neither the Secretary nor an Assistant Secretary is present, the presiding officer of the meeting shall appoint any person present to act as secretary of the meeting.

SECTION 7. Voting; Proxies; Required Vote.

(a) At each meeting of stockholders, every stockholder shall be entitled to vote in person or by proxy appointed by instrument in writing, subscribed by the stockholder or by the stockholder's duly authorized attorney-in-fact (but no proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period), and, unless the Certificate of Incorporation provides otherwise, shall have one vote for each share of stock entitled to vote registered in the name of the stockholder on the books of the Corporation on the applicable record date fixed pursuant to these By-laws. At all elections of directors the voting may but need not be by ballot. Except as provided in Section 11 of Article II (relating to vacancies), each

director shall be elected by the vote of the majority of votes cast with respect to that director's election at any meeting for the election of directors at which a quorum is present; provided, however, that if as of a date that is 14 calendar days in advance of

2

the date that the Corporation files its definitive proxy statement (regardless of whether or not thereafter revised or supplemented) with the Securities and Exchange Commission, the number of nominees exceeds the number of directors to be elected, the directors shall be elected by the vote of a plurality of the shares present in person or represented by proxy at any such meeting and entitled to vote on the election of directors. In the event that the election is to be determined by a plurality of the votes cast, stockholders shall be permitted only to vote "for" a nominee or to "withhold" their vote with respect to such nominee. In the event that the election is to be determined by a majority of the votes cast, stockholders shall be permitted to vote "for" or "against" a nominee and, for purposes of the election of a director, a majority of the votes cast means that the number of shares voted "for" a director must exceed the number of votes cast "against" that director. If, at a meeting for the election of directors at which directors will be elected by a majority of the votes cast, an incumbent director fails to be elected, any such director shall tender his or her resignation to the Board within 30 days from the date of the certification of the election results. The Nominating & Governance Committee of the Board will consider what it deems to be the relevant facts and circumstances and make a recommendation to the Board on whether to accept or reject the resignation, or whether other action should be taken. The Board will act on the tendered resignation, taking into account the Nominating & Governance Committee's recommendation and any other facts or circumstances it deems to be relevant, and publicly disclose its decision and the rationale underlying it within 90 days from the date of the certification of the election results. A tender of resignation pursuant to this section shall be delivered to the Board, and the resignation shall be effective when accepted by the Board, notwithstanding anything in Section 10 of Article II to the contrary. In the event that the Board acts to accept a tendered resignation, the Board may act to fill the vacancy created by the resignation in accordance with Section 11 of Article II, or the Board may act to reduce the size of the Board in accordance with Section 2(A) of Article II. Except as otherwise required by law or the Certificate of Incorporation, any other action shall be authorized by a majority of the votes of the shares present in person or represented by proxy at the meeting and entitled to vote on the subject matter.

(b) Any action required or permitted to be taken at any meeting of stockholders may, except as otherwise required by law or the Certificate of Incorporation, be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of record of the issued and outstanding capital stock of the Corporation that would be necessary to authorize or take that action at a meeting at which all shares entitled to vote thereon were present and voted, and the writing or writings are filed with the permanent records of the Corporation. Prompt notice of the taking of corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.

(c) Where a separate vote by a class or classes is required, a majority of the outstanding shares of such class or classes, present in person or represented by proxy, shall constitute a quorum entitled to take action with respect to the vote on that matter, and the affirmative vote of the majority of shares of that class or classes present in person or represented by proxy at the meeting shall be the act of that class or classes, unless otherwise provided in the Corporation's Certificate of Incorporation.

SECTION 8. Inspectors. The Board of Directors, in advance of any meeting, shall appoint one or more inspectors of election to act at the meeting or any adjournment thereof. If an inspector or inspectors are not so appointed or any per-son who may be appointed as an inspector fails to appear or act, the person presiding at the meeting shall appoint one or more inspectors. Each inspector before entering upon the discharge of his or her duties, shall take and sign an oath faithfully to execute the duties of inspector at the meeting with strict impartiality and according to the best of his or her ability. The inspectors shall determine the number of shares of stock outstanding and the voting power of each, the shares of stock represented at the meeting, the existence of a quorum, and the validity and effect of proxies, and shall receive votes, ballots or consents, hear and determine all challenges and

questions arising in connection with the right to vote, count and tabulate all votes, ballots or consents, determine the result,

3

and do all acts as are proper to conduct the election or vote with fairness to all stockholders. On request of the person presiding at the meeting, the inspector or inspectors shall make a report in writing of any challenge, question or matter determined by the inspector or inspectors and execute a certificate of any fact found by the inspector or inspectors.

SECTION 9. Notice of Stockholder Nominee.

(a) Only persons who are nominated in accordance with the procedures set forth in this paragraph shall be eligible for election as directors of the Corporation. Nominations of persons for election to the Board of Directors of the Corporation may be made at an annual meeting of stockholders (i) by or at the direction of the Board of Directors or (ii) by any stock-holder of the Corporation entitled to vote for the election of directors at such meeting who complies with the procedures set forth in this section. All nominations by stockholders shall be made pursuant to timely notice in proper written form to the Secretary of the Corporation. To be timely, a stockholder's notice shall be delivered to or mailed and received at the principal executive offices of the Corporation (A) in the case of an annual meeting that is called for a date that is within 30 days before or after the anniversary date of the immediately preceding annual meeting of stockholders, by close of business on a date that is not less than 60 days nor more than 90 days prior to such anniversary date, and (B) in the case of an annual meeting that is called for a date that is not within 30 days before or after the anniversary date of the immediately preceding annual meeting or where no annual meeting has been held within the past year, not later than the close of business on the tenth day following the day on which notice of the date of the meeting was mailed or public disclosure of the date of the meeting was made, whichever occurs first. In no event shall the public disclosure of an adjournment or postponement of an annual meeting commence a new time period (or extend the time period) for the giving of a stockholder's notice under this section. For purposes of these Bylaws, "public disclosure" shall mean disclosure in a press release reported by the Dow Jones News Service, Associated Press or other comparable national financial news service or in a document publicly filed by the Corporation with the Securities and Exchange Commission pursuant to Sections 13, 14, or 15 of the Securities Exchange Act of 1934, as amended.

(b) To be in proper written form, a stockholder's notice delivered to the Secretary pursuant to this section shall set forth in writing (i) as to each person whom such stockholder proposes to nominate for election or re-election as a director, all information relating to such person that is required to be disclosed in solicitations of proxies for election of directors pursuant to Regulation 14A under the Securities Exchange Act of 1934, as amended, and shall specifically include such person's written consent to being named in the proxy statement as a nominee and to serving as a director if elected and the number of shares of capital stock of the Corporation owned of record and beneficially by such person; and (ii) as to such stockholder:

(A) a representation that such stockholder is a holder of record or beneficial owner of stock of the Corporation entitled to vote at the meeting and the name and address, as they appear on the Corporation's books, of such stockholder and any stockholder of record of the stockholder's shares,

(B) the class and number of shares of the Corporation that are owned of record and beneficially by such stockholder and owned by any stockholder of record of such stockholder's shares, as of the date of the stockholder's notice, and a representation that such stockholder shall notify the Corporation in writing of the number of such shares owned of record and beneficially as of the record date for the meeting promptly following the record date;

(C) a description of any agreement, arrangement or understanding with respect to the nomination between or among such stockholder and any of its affiliates or associates, and any other person or persons (including their names), and a representation that the stockholder shall notify the Corporation in writing of any such agreement, arrangement or understanding in effect as of the record date for the meeting promptly following the record date;

(D) a description of any agreement, arrangement or understanding (including any derivative or short positions, profit interests, options, hedging transactions, and borrowed or loaned shares) that has been entered into as of the date of the

4

notice by, or on behalf of, such shareholder, the effect or intent of which is to mitigate loss to, manage risk or benefit of share price changes for, or increase or decrease the voting power of such shareholder with respect to shares of stock of the Corporation, and a representation that such shareholder shall notify the Corporation in writing of any such agreement, arrangement or understanding in effect as of the record date for the meeting promptly following the record date;

(E) a representation that such shareholder intends to appear in person or by proxy at the meeting to propose the nomination; and

(F) a representation whether such shareholder intends or is part of a group that intends to deliver a proxy statement and/or form of proxy to holders of at least the percentage of the Corporation's outstanding capital stock required to elect the proposed nominee, and/or otherwise to solicit proxies from stockholders in support of the nomination.

(c) At the request of the Board of Directors, any person nominated by the Board of Directors for election as a director shall furnish to the Secretary of the Corporation that information required to be set forth in a stockholder's notice of nomination which pertains to the nominee. No person shall be eligible for election as a director unless nominated in accordance with the procedures set forth in the By-laws of the Corporation. Notwithstanding anything in the Bylaws to the contrary, if a stockholder intending to make a nomination pursuant to this Section 9 does not provide the information and make the representations required under clauses (ii)(A) through (E) of subsection (b) of this section promptly following the record date, or such stockholder (or a duly authorized proxy of such stockholder) does not appear at the meeting to present the nominations, such nomination shall be disregarded, notwithstanding that proxies in respect of such nomination may have been received by the Corporation. The chairman of the meeting shall, if the facts warrant, determine and declare to the meeting that a nomination was not made in accordance with the procedures prescribed by the By-laws of the Corporation, and if he or she shall so determine, the chairman shall so declare to the meeting and the defective nomination shall be disregarded.

SECTION 9A.    <u>Proxy Access</u>

(a) Whenever the Board of Directors solicits proxies with respect to the election of directors at an annual meeting of stockholders, subject to the provisions of this Section 9A, the Corporation shall include in its proxy statement for such annual meeting, in addition to any persons nominated for election by the Board of Directors or any committee thereof, the name, together with the Required Information (defined below), of any person nominated for election (the "Stockholder Nominee") to the Board of Directors by a stockholder or group of no more than 20 stockholders (counting as one stockholder, for this purpose, any Qualifying Fund (defined below)) that satisfies the requirements of this Section 9A (such stockholder or stockholder group, including each member thereof to the extent the context requires, the "Eligible Stockholder"), and who expressly elects at the time of providing the notice required by this Section 9A (the "Notice of Proxy Access Nomination") to have its nominee included in the Corporation's proxy materials pursuant to this Section 9A. In the event that the Eligible Stockholder consists of a group of stockholders, any and all requirements and obligations for an individual Eligible Stockholder that are set forth in these Bylaws, including the Minimum Holding Period (as defined below), shall apply to each member of such group; provided, however, that the Required Ownership Percentage shall apply to the ownership of the group in the aggregate. For purposes of this Section 9A, "Qualifying Fund" shall mean any two or more funds that are (1) under common management and investment control, (2) part of the same family of funds or sponsored by the same employer or (3) a "group of investment companies" as such term is defined in Section 12(d)(1)(G)(ii) of the Investment Company Act of 1940. Also for purposes of this Section 9A, the "Required Information" that the Corporation will include in its proxy statement is (1) the information provided to the Secretary of the Corporation concerning the Stockholder Nominee and the Eligible Stockholder that is required to be disclosed in the Corporation's proxy statement by the regulations promulgated under the Exchange Act, and (2) if the Eligible Stockholder so elects, at the time of submitting the Notice of Proxy Access Nomination, a written statement, not to exceed 500 words, in support of the Stockholder

Nominee(s)' candidacy (the

5

"Statement"). To be timely, the Required Information must be delivered and received by the Secretary of the Corporation within the time period specified in Section 9A(b) below. Notwithstanding anything to the contrary contained in this Section 9A, the Corporation may omit from its proxy materials any information or Statement (or portion thereof) that it, in good faith, believes is untrue in any material respect (or omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading) or would violate any applicable law or regulation, and the Corporation may solicit against, and include in the proxy statement its own statement relating to, any Eligible Stockholder or Stockholder Nominee.

(b) To be timely, the Notice of Proxy Access Nomination must be addressed to the Secretary of the Company and delivered to, or mailed to and received by, the Secretary of the Company no earlier than one hundred fifty (150) days and no later than one hundred twenty (120) days before the anniversary of the date that the Company issued its proxy statement for the previous year's annual meeting of stockholders. In no event shall the public disclosure of an adjournment or postponement of an annual meeting commence a new time period (or extend the time period) for the giving of a Notice of Proxy Access Nomination under this section.

(c) The maximum number of Stockholder Nominees nominated by all Eligible Stockholders that will be included in the Corporation's proxy materials with respect to an annual meeting of stockholders shall not exceed the greater of (x) two (2) and (y) 25% of the total number of directors in office (rounded down to the nearest whole number) as of the last day on which a Notice of Proxy Access Nomination may be delivered pursuant to and in accordance with this Section 9A (the "Final Proxy Access Nomination Date"). In the event that one or more vacancies for any reason occurs after the Final Proxy Access Nomination Date but before the date of the annual meeting and the Board of Directors resolves to reduce the size of the Board of Directors in connection therewith, the maximum number of Stockholder Nominees included in the Corporation's proxy materials shall be calculated based on the number of directors in office as so reduced. Any individual (1) nominated by an Eligible Stockholder for inclusion in the Corporation's proxy materials pursuant to this Section 9A whom the Board of Directors decides to nominate as a nominee of the Board of Directors, (2) who is a director in office who had been nominated pursuant to this Section 9A or Section 9 with respect to either of the two (2) preceding annual meetings, and (3) any individual nominated by an Eligible Stockholder for inclusion in the Corporation's proxy materials pursuant to this Section 9A but whose nomination is subsequently withdrawn or who is deemed to be ineligible pursuant to the terms of this Section 9A by the Board of Directors, shall be counted as one of the Stockholder Nominees for purposes of determining when the maximum number of Stockholder Nominees provided for in this Section 9A has been reached. Any Eligible Stockholder submitting more than one Stockholder Nominee for inclusion in the Corporation's proxy materials pursuant to this Section 9A shall rank such Stockholder Nominees based on the order that the Eligible Stockholder desires such Stockholder Nominees to be selected for inclusion in the Corporation's proxy statement in the event that the total number of Stockholder Nominees submitted by Eligible Stockholders pursuant to this Section 9A exceeds the maximum number of nominees provided for in this Section 9A. In the event that the number of Stockholder Nominees submitted by Eligible Stockholders pursuant to this Section 9A exceeds the maximum number of nominees provided for in this Section 9A, the highest ranking Stockholder Nominee who meets the requirements of this Section 9A from each Eligible Stockholder will be selected for inclusion in the Corporation's proxy materials until the maximum number is reached, going in order of the amount (largest to smallest) of shares of the Corporation's outstanding common stock each Eligible Stockholder disclosed as owned in its respective Notice of Proxy Access Nomination submitted to the Corporation. If the maximum number is not reached after the highest ranking Stockholder Nominee who meets the requirements of this Section 9A from each Eligible Stockholder has been selected, this process will continue as many times as necessary, following the same order each time, until the maximum number is reached. Notwithstanding anything to the contrary contained in this Section 9A, if the Corporation receives notice pursuant to

Section 9 of these Bylaws that a stockholder intends to nominate for election at such meeting a number of nominees greater than or equal to 50% of the total number of directors to be elected at such meeting, no Stockholder Nominees will be included in the

6

Corporation's proxy materials with respect to such meeting pursuant to this Section 9A unless the Board determines otherwise in their reasonable discretion.

(d) For purposes of this Section 9A, an Eligible Stockholder shall be deemed to "own" only those outstanding shares of common stock of the Corporation as to which the stockholder possesses both:

(i)    the full voting and investment rights pertaining to the shares; and

(ii)    the full economic interest in (including the opportunity for profit from and risk of loss on) such shares; provided that the number of shares calculated in accordance with clauses (i) and (ii) shall not include any shares:

(x)    sold by such stockholder or any of its affiliates in any transaction that has not been settled or closed, including any short sale;

(y)    borrowed by such stockholder or any of its affiliates for any purposes or purchased by such stockholder or any of its affiliates pursuant to an agreement to resell; or

(z)    subject to any option, warrant, forward contract, swap, contract of sale, other derivative or similar agreement entered into by such stockholder or any of its affiliates, whether any such instrument or agreement is to be settled with shares or with cash based on the notional amount or value of shares of outstanding common stock of the Corporation, in any such case which instrument or agreement has, or is intended to have, or if exercised by either party would have, the purpose or effect of:

(1) reducing in any manner, to any extent or at any time in the future, such stockholder's or its affiliates' full right to vote or direct the voting of any such shares; and/or

(2) hedging, offsetting or altering to any degree any gain or loss realized or realizable from maintaining the full economic ownership of such shares by such stockholder or its affiliates.

A stockholder shall "own" shares held in the name of a nominee or other intermediary so long as the stockholder retains the right to instruct how the shares are voted with respect to the election of directors and possesses the full economic interest in the shares. A stockholder's ownership of shares shall be deemed to continue during any period in which the stockholder has delegated any voting power by means of a proxy, power of attorney or other instrument or arrangement which is revocable at any time by the stockholder. An Eligible Stockholder's ownership of shares shall be deemed to continue during any period in which the Eligible Stockholder has loaned such shares provided that the Eligible Stockholder has the power to recall such loaned shares on 5 business days' notice, has recalled such loaned shares as of the date of the Notice of Proxy Access Nomination, continues to hold such shares through the date of the annual meeting and will vote such shares at the annual meeting. The terms "owned," "owning" and other variations of the word "own" shall have correlative meanings. Whether outstanding shares of the common stock of the Corporation are "owned" for these purposes shall be determined by the Board of Directors or any committee thereof, in each case, in its sole discretion, which determination shall be conclusive and binding on the Corporation and its stockholders. For purposes of this Section 9A, the term "affiliate" or "affiliates" shall have the meaning ascribed thereto under the General Rules and Regulations under the Exchange Act. An Eligible Stockholder shall include in its Notice of Proxy Access Nomination the number of shares it is deemed to own for the purposes of this Section 9A.

(e) In order to make a nomination pursuant to this Section 9A, an Eligible Stockholder must have owned (as defined above) the Required Ownership Percentage (as defined below) of the Corporation's outstanding common stock (the "Required Shares") continuously for the Minimum Holding Period (as defined below) as of both the date that is within 7 days prior to the date that the Notice of Proxy Access Nomination is delivered to, or mailed to and received by, the Secretary of the Corporation in accordance with this Section 9A and the record date for determining the stockholders entitled to vote at the annual meeting and must continue to own the Required Shares through the meeting date. For purposes of this Section 9A, the "Required Ownership Percentage" is 3% or more of the Corporation's outstanding common stock, and the "Minimum Holding Period" is 3 years.

7

(f) Within the time period specified in this Section 9A for delivering the Notice of Proxy Access Nomination, an Eligible Stockholder must provide the following information in writing to the Secretary of the Corporation:

(i) one or more written statements from the record holder of the shares (and from each intermediary through which the shares are or have been held during the Minimum Holding Period) verifying that, as of a date within seven calendar days prior to the date the Notice of Proxy Access Nomination is delivered to, or mailed to and received by, the Secretary of the Corporation, the Eligible Stockholder owns, and has owned continuously for the Minimum Holding Period, the Required Shares, and the Eligible Stockholder's agreement to provide, within 5 business days after the record date for the annual meeting, written statements from the record holder and intermediaries verifying the Eligible Stockholder's continuous ownership of the Required Shares through the record date;

(ii) a copy of the Schedule 14N that has been filed with the SEC as required by Rule 14a-18 under the Exchange Act;

(iii) the information, representations and agreements that are the same as those that would be required to be set forth in a stockholder's notice of nomination pursuant to Section 9 of these Bylaws;

(iv) the consent of each Stockholder Nominee to being named in the proxy statement as a nominee and to serving as a director if elected;

(v) a representation that the Eligible Stockholder:

(A) acquired the Required Shares in the ordinary course of business and not with the intent to change or influence control at the Corporation, and does not presently have such intent,

(B) has not nominated and will not nominate for election any individual as a director at the annual meeting, other than its Stockholder Nominee(s),

(C) has not engaged and will not engage in, and has not and will not be a "participant" in another person's, "solicitation" within the meaning of Rule 14a-1(l) under the Exchange Act in support of the election of any individual as a director at the annual meeting, other than its Stockholder Nominee(s) or a nominee of the Board of Directors,

(D) agrees to comply with all applicable laws and regulations with respect to any solicitation in connection with the meeting or applicable to the filing and use, if any, of soliciting material,

(E) will provide facts, statements and other information in all communications with the Corporation and its stockholders that are or will be true and correct in all material respects and do not and will not omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and

(F) will not distribute to any stockholder any form of proxy for the annual meeting other than the form distributed by the Corporation;

(vi) an undertaking that the Eligible Stockholder agrees to:

(A) maintain the Required Ownership Percentage of the Required Shares through the date of the annual meeting;

(B) assume all liability stemming from any legal or regulatory violation arising out of the Eligible Stockholder's communications with the stockholders of the Corporation or out of the information that the Eligible Stockholder provided to the Corporation;

(C) indemnify and hold harmless the Corporation and each of its directors, officers and employees individually against any liability, loss or damages in connection with any threatened or pending action, suit or proceeding, whether legal, administrative or investigative, against the Corporation or any of its directors, officers or employees arising out of any nomination, solicitation or other activity by the Eligible Stockholder in connection with its efforts to elect the Stockholder Nominee

pursuant to this Section 9A;

8

(D) file with the SEC any solicitation or other communication with the Corporation's stockholders relating to the meeting at which the Stockholder Nominee will be nominated, regardless of whether any such filing is required under Regulation 14A of the Exchange Act or whether any exemption from filing is available thereunder; and

(E) if it is a Qualifying Fund whose stock ownership is counted for purposes of qualifying as an Eligible Stockholder, provide to the Secretary of the Corporation documentation reasonably satisfactory to the Board of Directors that demonstrates that the funds included within the Qualifying Fund satisfy the definition thereof.

(vii) in the case of a nomination by a group of stockholders that together is an Eligible Stockholder, the designation in a signed writing by all group members of one group member that is authorized to act on behalf of all such members with respect to the nomination and matters related thereto, including withdrawal of the nomination.

Further, within 10 days after the record date for the annual meeting, each Eligible Stockholder must provide written statements from the record holder and intermediaries verifying such person's continuous ownership of their shares through the record date, together with any additional information reasonably requested to verify such person's ownership.

(g) Within the time period specified in this Section 9A for delivering the Notice of Proxy Access Nomination, a Stockholder Nominee must deliver to the Secretary of the Corporation:

(i) the information required with respect to persons whom a stockholder proposes to nominate for election or reelection as a director by Section 9(b) of these Bylaws;

(ii) a written representation and agreement that such person:

(A) will act as a representative of all of the stockholders of the Corporation while serving as a director;

(B) is not and will not become a party to (1) any agreement, arrangement or understanding with, and has not given any commitment or assurance to, any person or entity as to how such Stockholder Nominee, if elected as a director of the Corporation, will act or vote on any issue or question that has not been disclosed to the Corporation (a "Voting Commitment") or (2) any Voting Commitment that could limit or interfere with such Stockholder Nominee's ability to comply, if elected as a director of the Corporation, with such Stockholder Nominee's fiduciary duties under applicable law;

(C) is not or will not become a party to any agreement, arrangement or understanding with any person or entity other than the Corporation with respect to direct or indirect compensation, reimbursement or indemnification in connection with service or action as a director that has not been disclosed to the Corporation;

(D) will comply with the Corporation's applicable codes of conduct, corporate governance policies, and other policies and procedures, including corporate governance, conflict of interest, confidentiality and stock ownership and trading policies and guidelines, and any other policies and guidelines applicable to directors, as well as the applicable provisions of these Bylaws; and

(E) will provide facts, statements and other information in all communications with the Corporation and its stockholders that are or will be true and correct in all material respects (and shall not omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

At the request of the Corporation, the Stockholder Nominee(s) must submit all completed and signed questionnaires required of directors and officers of the Corporation including, but not limited to, the questionnaire described in Section 9 of these Bylaws. The Corporation may request such additional information as necessary to permit the Board of Directors to determine if each Stockholder Nominee is independent under the listing standards of the principal U.S. exchange upon which the common stock of the Corporation is listed, any applicable rules of the SEC and any publicly disclosed standards used by the Board of Directors in determining and disclosing the independence of the Corporation's directors.

(h) In the event that any information or communications provided by the Eligible Stockholder or the Stockholder Nominee to the Corporation or its stockholders ceases to be true and correct in all material respects or omits a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, each Eligible Stockholder or Stockholder Nominee, as the case may be, shall promptly notify the Secretary of the Corporation of any defect in such previously provided information and of the information that is required to correct any such defect; it being understood, for the avoidance of doubt, that providing any such notification will not be deemed to cure any such defect or limit the remedies available to the Corporation relating to any such defect.

(i) The Corporation shall not be required to include, pursuant to this Section 9A, a Stockholder Nominee in its proxy materials for any meeting of stockholders, or, if the proxy statement already has been filed, to allow the nomination of the Stockholder Nominee, notwithstanding that proxies in respect of such vote may have been received by the Corporation:

(i) for which the Secretary of the Corporation receives a notice that a stockholder has nominated such Stockholder Nominee for election to the Board of Directors pursuant to the advance notice requirements for stockholder nominees for director set forth in Section 9 of these Bylaws;

(ii) if the Eligible Stockholder who has nominated such Stockholder Nominee has engaged in or is currently engaged in, or has been or is a "participant" in another person's, "solicitation" within the meaning of Rule 14a-1(l) under the Exchange Act in support of the election of any individual as a director at the annual meeting other than its Stockholder Nominee(s) or a nominee of the Board of Directors;

(iii) if the Stockholder Nominee (A) is not independent under the listing standards of each principal U.S. exchange upon which the common stock of the Corporation is listed, any applicable rules of the SEC and any publicly disclosed standards used by the Board of Directors in determining and disclosing independence of the Corporation's directors, in each case as determined by the Board of Directors in its sole discretion, or (B) does not qualify as independent under the audit committee independence requirements set forth in the rules of the principal U.S. exchange on which shares of the Corporation are listed, as a "non-employee director" under Exchange Act Rule 16b-3, or as an "outside director" for the purposes of Section 162(m) of the Internal Revenue Code (or any successor provision);

(iv) if the Stockholder Nominee's election as a member of the Board of Directors would cause the Corporation to be in violation of these Bylaws, the Certificate of Incorporation, the rules and listing standards of the principal U.S. exchanges upon which the common stock of the Corporation is traded, or any applicable state or federal law, rule or regulation;

(v) if the Stockholder Nominee is or has been, within the past 3 years, an officer or director of a competitor, as defined in Section 8 of the Clayton Antitrust Act of 1914 or as determined by the Board of Directors in its sole discretion;

(vi) if the Stockholder Nominee is a named subject of a pending criminal proceeding (excluding traffic violations and other minor misdemeanors) or has been convicted in such a criminal proceeding within the past 10 years;

(vii) if the Stockholder Nominee is subject to any order of the type specified in Rule 506(d) of Regulation D promulgated under the Securities Act of 1933, as amended;

(viii) if such Stockholder Nominee or the applicable Eligible Stockholder shall have provided information to the Corporation in respect to such nomination that was untrue in any material respect or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading, as determined by the Board of Directors or any committee thereof, in each case, in its sole discretion; or

(ix) the Eligible Stockholder or applicable Stockholder Nominee fails to comply with its obligations pursuant to these Bylaws, including, but not limited to, this Section 9A or otherwise ceases to be an Eligible Stockholder.

(j) Notwithstanding anything to the contrary set forth herein, the Board of Directors or the chairperson of the meeting of stockholders shall declare a nomination by an Eligible Stockholder to be invalid, and such nomination shall be disregarded notwithstanding that proxies in respect of such vote may have been received by the Corporation, if:

(i) the Stockholder Nominee(s) and/or the applicable Eligible Stockholder shall have breached or failed to comply with its or their representations or obligations under these Bylaws, including, without limitation, this Section 9A for the current year, or with respect to the prior year's annual meeting; or

(ii) the Eligible Stockholder (or a qualified representative thereof) does not appear at the meeting of stockholders to present any nomination pursuant to this Section 9A.

(k) Any Stockholder Nominee who is included in the Corporation's proxy materials for a particular annual meeting of stockholders but either:

(i) withdraws from or becomes ineligible or unavailable for election at the annual meeting; or

(ii) does not receive at least 25% of the votes cast in favor of such Stockholder Nominee's election will be ineligible to be a Stockholder Nominee pursuant to this Section 9A for the next two annual meetings.

For the avoidance of doubt, this Section 9A(k) shall not prevent any stockholder from nominating any person to the Board of Directors pursuant to and in accordance with Section 9 of these Bylaws.

(l) The Board of Directors shall have the exclusive power and authority to interpret the provisions of these Bylaws and make all determinations deemed necessary or advisable in connection therewith. All such actions, interpretations and determinations that are done or made by the Board of Directors shall be final, conclusive and binding on the Corporation, the stockholders and all other parties.

(m) No stockholder shall be permitted to join more than one group of stockholders to become an Eligible Stockholder for purposes of nominations pursuant to this Section 9A per each annual meeting of stockholders. In the event that any Eligible Stockholder, either individually or part of a group, nominates a Stockholder Nominee that is elected to the Board of Directors, then such Eligible Stockholder shall not be permitted to utilize the provisions set forth in this Section 9A in connection with the following two annual meetings after such Stockholder Nominee is elected to the Board of Directors (other than with respect to the nomination of such previously elected Stockholder Nominee).

(n) This Section 9A shall be the exclusive method for stockholders to include nominees for director in the Corporation's proxy materials.

SECTION 10. Stockholder Proposals.

(a) For business (other than the nomination of a person for election as a director, which is governed by Section 9 of this Article I) properly to be brought by a stockholder before a meeting of stockholders, the stockholder must have given timely notice thereof in proper written form to the Secretary of the Corporation. To be timely a stockholder's notice must be delivered to or mailed and received at the principal executive offices of the Corporation (i) in the case of an annual meeting that is called for a date that is within 30 days before or after the anniversary date of the immediately preceding annual meeting of stockholders, by close of business on a date that is not less than 60 days nor more than 90 days prior to such anniversary date, and (ii) in the case of an annual meeting that is called for a date that is not within 30 days before or after the anniversary date of the immediately preceding annual meeting or where no annual meeting has been held within the past year, or in the case of a special meeting, not later than the close of business on the tenth day following the day on which notice of the date of the meeting was mailed or public disclosure (as defined in Section 9 of this Article I) of the date of the meeting was made, whichever occurs first. In no event shall

the public disclosure of an adjournment or postponement of an annual or special meeting commence a new time period (or extend the time period) for the giving of a stockholder's notice under this section.

(b) To be in proper written form, such stockholder's notice to the Secretary shall set forth in writing (i) as to each matter the stockholder proposes to bring before the meeting, a brief description of:

(A)    the business desired to be brought before the meeting;

(B)    the reasons for conducting such business at the meeting;

(C)    any material interest in such business of the stockholder and the beneficial owner, if any, on whose behalf the proposal is made; and

(D)    all agreements, arrangements and understandings between or among the stockholder and beneficial owner, if any, and its or their affiliates or associates, and any other person or persons (including their names) in connection with the proposal of such business, and a representation that the stockholder shall notify the Corporation in writing of any such agreement, arrangement or understanding in effect as of the record date for the meeting promptly following the record date; and

(ii) as to the stockholder giving the notice and the beneficial owner, if any, on whose behalf the proposal is made:

(A)    a representation that such stockholder is a holder of record or beneficial owner of stock of the Corporation entitled to vote at the meeting and the name and address of such stockholder, and of such beneficial owner or stockholder of record of the shares owned by such stockholder, if any, as they appear on the Corporation's books;

(B)    the class and number of shares of stock which are, directly or indirectly, owned beneficially and of record by such stockholder and such beneficial owner or stockholder of record of the shares owned by such stockholder, if any, as of the date of the stockholder's notice, and a representation that the stockholder shall notify the Corporation in writing of the number of such shares owned of record and beneficially as of the record date for the meeting promptly following the record date;

(C)    any agreement, arrangement or understanding (including any derivative or short positions, profit interests, options, hedging transactions, and borrowed or loaned shares) that has been entered into as of the date the notice by, or on behalf of, such shareholder, the effect or intent of which is to mitigate loss to, manage risk or benefit of share price changes for, or increase or decrease the voting power of such shareholder with respect to shares of stock of the Corporation, and a representation that such shareholder shall notify the Corporation in writing of any such agreement, arrangement or understanding in effect as of the record date for the meeting promptly following the record date;

(D)    a representation that the stockholder giving the notice intends to appear in person or by proxy at the meeting to propose the matter; and

(E)    a representation as to whether the stockholder giving the notice intends or is part of a group that intends to deliver a proxy statement and/or form of proxy to holders of at least the percentage of the Corporation's outstanding capital stock required to approve or adopt the matter, and/or otherwise to solicit proxies from stockholders in support of such stockholder's proposal or position.

(c) Notwithstanding anything in the By-laws to the contrary, (i) no business shall be conducted at an annual or special meeting of the stockholders except in accordance with the procedures set forth in the Bylaws of the Corporation, and (ii) if a stockholder does not provide the information and make the representations required under clauses (i)(D) and (ii)(A) through (D) of subsection (b) of this section promptly following the record date, or such stockholder (or a duly authorized proxy of such stockholder) does not appear at the meeting to present the proposed business, such business shall not be transacted, notwithstanding that proxies in respect of such business may have been received by the Corporation. The chairman of an annual or special meeting

shall, if the facts warrant, determine and declare to the meeting that business was not properly brought before the meeting in

12

accordance with the provisions of the Bylaws of the Corporation, and, if he or she should so determine, the chairman shall so declare to the meeting and any such business not properly brought before the meeting shall not be transacted. Nothing in these Bylaws shall be deemed to affect any right of stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Securities Exchange Act of 1934, as amended.

<div align="center">ARTICLE II</div>

<div align="center">Board of Directors</div>

SECTION 1. <u>General Powers</u>. The business, property and affairs of the Corporation shall be managed by, or under the direction of, the Board of Directors.

SECTION 2. <u>Qualification; Number; Term; Remuneration</u>.

(a)   Each director shall be at least 18 years of age. A director need not be a stockholder, a citizen of the United States, or a resident of the State of Delaware. The number of directors constituting the entire Board shall be seven, or a larger number as may be fixed from time to time by action of the stockholders or Board of Directors, one of whom may be selected by the Board of Directors to be its Chairman. The use of the phrase "entire Board" herein refers to the total number of directors that the Corporation would have if there were no vacancies.

(a)   Directors who are elected at an annual meeting of stockholders, and directors who are elected in the interim to fill vacancies and newly created director-ships, shall hold office until the next annual meeting of stockholders and until their successors are elected and qualified or until their earlier resignation or removal.

(b)   Directors may be paid their expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a fixed sum for attendance at each meeting of the Board of Directors or a stated salary as director. No payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for attending committee meetings.

SECTION 3. <u>Quorum and Manner of Voting</u>. Except as otherwise provided by law, a majority of the entire Board shall constitute a quorum. A majority of the directors present, whether or not a quorum is present, may adjourn a meeting from time to time to another time and place without notice. The vote of the majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors.

SECTION 4. <u>Places of Meetings</u>. Meetings of the Board of Directors may be held at any place within or without the State of Delaware, as may from time to time be fixed by resolution of the Board of Directors, or as may be specified in the notice of meeting.

SECTION 5. <u>Annual Meeting</u>. Following the annual meeting of stockholders, the newly elected Board of Directors shall meet for the purpose of the election of officers and the transaction of other business as may properly come before the meeting. The meeting may be held without notice immediately after the annual meeting of stockholders at the same place at which the stockholders' meeting is held.

SECTION 6. <u>Regular Meetings</u>. Regular meetings of the Board of Directors shall be held at the times and places as the Board of Directors shall from time to time by resolution determine. Notice need not be given of regular meetings of the Board of Directors held at times and places fixed by resolution of the Board of Directors.

SECTION 7. <u>Special Meetings</u>. Special meetings of the Board of Directors shall be held whenever called by the Chairman of the Board, the Chief Executive Officer or by a majority of the directors then in office.

SECTION 8. <u>Notice of Special Meetings</u>. A notice of the place, date and time and the purpose or purposes of each special

13

meeting of the Board of Directors shall be sent to each director at least five calendar days before the special meeting, if sent via United States mail or overnight delivery, or at least one day before the special meeting, if sent via electronic mail, in-person delivery, or provided orally via telephone.

SECTION 9. Organization. At all meetings of the Board of Directors, the Chairman, if any, or if none or in the Chairman's absence or inability to act, the Chief Executive Officer, if any, or if none or in the Chief Executive Officer's absence or inability to act, the President, or in the President's absence or inability to act, any Vice-President who is a member of the Board of Directors, or in the Vice-President's absence or inability to act, a chairman chosen by the directors, shall preside. The Secretary of the Corporation shall act as secretary at all meetings of the Board of Directors when present, and, in the Secretary's absence, the presiding officer may appoint any person to act as secretary.

SECTION 10. Resignation and Removal. Any director may resign at any time upon written notice to the Corporation and the resignation shall take effect upon receipt thereof by the Chief Executive Officer or Secretary unless otherwise specified in the resignation. Any or all of the directors may be removed, with or without cause, by the holders of a majority of the shares of stock outstanding and entitled to vote for the election of directors.

SECTION 11. Vacancies. Unless otherwise provided in these By-laws, vacancies on the Board of Directors, whether caused by resignation, death, disqualification, removal, an increase in the authorized number of directors or otherwise, may be filled by the affirmative vote of a majority of the remaining directors, although less than a quorum, or by a sole remaining director, or at a special meeting of the stockholders, by the holders of shares entitled to vote for the election of directors.

SECTION 12. Action by Written Consent. Any action required or permitted to be taken at any meeting of the Board of Directors may be taken without a meeting if all the directors consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board of Directors.

SECTION 13. Electronic Communication. Any one or more members of the Board of Directors or any committee thereof may participate in a meeting of the Board of Directors or any committee by means of a conference telephone, audio-visual communications or similar communications equipment allowing all persons participating in the meeting to hear each other at the same time. Participation by this means shall constitute presence in person at a meeting.

<div align="center">

ARTICLE III

Committees

</div>

SECTION 1. Appointment. From time to time the Board of Directors by a resolution adopted by a majority of the entire Board may appoint any committee or committees for any purpose or purposes, to the extent lawful, which shall have powers as shall be determined and specified by the Board of Directors in the resolution of appointment.

SECTION 2. Procedures, Quorum and Manner of Acting. Each committee shall fix its own rules of procedure, and shall meet where and as provided by the rules or by resolution of the Board of Directors. Except as otherwise provided by law, the presence of a majority of the then appointed members of a committee shall constitute a quorum for the transaction of business by that committee, and in every case where a quorum is present the affirmative vote of a majority of the members of the committee present shall be the act of the committee. Each committee shall keep minutes of its proceedings, and actions taken by a committee shall be reported to the Board of Directors.

SECTION 3. Action by Written Consent. Any action required or permitted to be taken at any meeting of any committee of

the Board of Directors may be taken without a meeting if all the members of the committee consent thereto in writing, and the

14

writing or writings are filed with the minutes of proceedings of the committee.

SECTION 4. <u>Term; Termination</u>. In the event any person shall cease to be a director of the Corporation, that person shall simultaneously therewith cease to be a member of any committee appointed by the Board of Directors.

<div align="center">ARTICLE IV</div>

<div align="center"><u>Officers</u></div>

SECTION 1. <u>Election and Qualifications</u>. The Officers of the Corporation shall include a President, one or more Vice-Presidents (any one or more of whom may be given an additional designation of rank or function), a Treasurer and a Secretary, all of whom shall be elected by the Board of Directors. In addition, the Officers of the Corporation may include an assistant secretary, assistant treasurer and other officers, each of whom may be elected by the Board of Directors or appointed by the President. Each officer shall have the powers and duties as may be prescribed by these By-laws and as may be assigned by the Board of Directors or the President.

SECTION 2. <u>Term of Office and Remuneration</u>. The term of office of all officers shall be one year and until their respective successors have been elected and qualified. Any vacancy in any office arising from any cause may be filled for the unexpired portion of the term by the Board of Directors. The remuneration of all officers of the Corporation may be fixed by the Board of Directors or in the manner as the Board of Directors shall provide.

SECTION 3. <u>Resignation; Removal</u>. Any officer may resign at any time upon written notice to the Corporation and the resignation shall take effect upon receipt thereof by the President or Secretary, unless otherwise specified in the resignation. Any officer shall be subject to removal, with or without cause, at any time by vote of a majority of the entire Board.

SECTION 4. <u>Chairman of the Board</u>. The Chairman of the Board of Directors, if there be one, shall preside at all meetings of the Board of Directors and shall have other powers and duties as may from time to time be assigned by the Board of Directors.

SECTION 5. <u>Chief Executive Officer</u>. The Chief Executive Officer of the Corporation shall have duties as customarily pertain to that office. The Chief Executive Officer shall have general management and supervision of the property, business and affairs of the Corporation and over its other officers; may appoint and remove assistant officers and other agents and employees, other than officers referred to in Section 1 of this Article IV; and may execute and deliver in the name of the Corporation powers of attorney, contracts, bonds and other obligations and instruments.

SECTION 6. <u>President</u>. The President shall have duties as customarily pertain to that office. The President may execute and deliver in the name of the Corporation con-tracts, bonds and other obligations and instruments pertaining to such activities, and shall have other authority as from time to time may be assigned by the Board of Directors or the Chief Executive Officer.

SECTION 7. <u>Vice-President</u>. A Vice-President may execute and deliver in the name of the Corporation contracts and other obligations and instruments pertaining to the regular course of the duties of said office, and shall have other authority as from time to time may be assigned by the Board of Directors or the Chief Executive Officer.

SECTION 8. <u>Treasurer</u>. The Treasurer shall in general have all duties incident to the position of Treasurer and other duties as may be assigned by the Board of Directors or the Chief Executive Officer.

SECTION 9. <u>Secretary</u>. The Secretary shall in general have all the duties incident to the office of Secretary and other duties as may be assigned by the Board of Directors or the Chief Executive Officer.

SECTION 10. <u>Assistant Officers</u>. Any assistant officer shall have powers and duties of the officer the assistant officer

assists as that officer or the Board of Directors or the Chief Executive Officer shall from time to time prescribe.

15

ARTICLE V

Books and Records

SECTION 1. Location. The books and records of the Corporation may be kept at the place or places within or outside the State of Delaware as the Board of Directors or the respective officers in charge thereof may from time to time determine. The record books containing the names and addresses of all stockholders, the number and class of shares of stock held by each and the dates when they respectively became the owners of record thereof shall be kept as prescribed in the By-laws by the Secretary or by another officer or agent as shall be designated by the Board of Directors.

SECTION 2. Addresses of Stockholders. Notices of meetings and all other corporate notices may be delivered personally or mailed to each stockholder at the stockholder's address as it appears on the records of the Corporation.

SECTION 3. Fixing Date for Determination of Stockholders of Record.

(a)     In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date that shall not be more than 60 nor less than 10 days before the date of the meeting. If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

(a)     In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date that shall not precede the date the resolution fixing the record date is adopted by the Board of Directors, and which date shall not be more than ten days after the date upon which the resolution fixing the record date is adopted by the Board. If no record date has been fixed by the Board of Directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is required, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in this State, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested. If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by this chapter, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board of Directors adopts the resolution taking the prior action.

(b)     In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date that shall not precede the date the resolution fixing the record date is adopted. If no record date is fixed, the record date for determining stockholders for any purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

ARTICLE VI

Certificates Representing Stock

16

SECTION 1. <u>Certificates; Signatures</u>. The shares of the Corporation shall be represented by certificates, provided that the Board of Directors of the Corporation may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be uncertificated shares. The resolution shall not apply to shares represented by a certificate until the certificate is surrendered to the Corporation. Notwithstanding the adoption of a resolution by the Board of Directors, every holder of stock represented by certificates and upon request every holder of uncertificated shares shall be entitled to have a certificate, signed by or in the name of the Corporation by the Chairman or Vice-Chairman of the Board of Directors, or the President or Vice-President, and by the Treasurer or an Assistant Treasurer, or the Secretary or an Assistant Secretary of the Corporation, representing the number of shares registered in certificate form. Any and all signatures on any certificate may be facsimiles. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be an officer, transfer agent or registrar before the certificate is issued, it may be issued by the Corporation with the same effect as if he or she were an officer, transfer agent or registrar at the date of issue. The name of the holder of record of the shares represented thereby, with the number of the shares and the date of issue, shall be entered on the books of the Corporation.

SECTION 2. <u>Transfers of Stock</u>. Upon compliance with provisions restricting the transfer or registration of transfer of shares of stock, if any, shares of capital stock shall be transferable on the books of the Corporation only by the holder of record thereof in person, or by duly authorized attorney, upon surrender and cancellation of certificates for a like number of shares, properly endorsed, and the payment of all taxes due thereon.

SECTION 3. <u>Fractional Shares</u>. The Corporation may, but shall not be required to, issue certificates for fractions of a share where necessary to effect authorized transactions, or the Corporation may pay in cash the fair value of fractions of a share as of the time when those entitled to receive the fractions are determined, or it may issue scrip in registered or bearer form over the manual or facsimile signature of an officer of the Corporation or of its agent, exchangeable as therein provided for full shares, but the scrip shall not entitle the holder to any rights of a stockholder except as therein provided.

The Board of Directors shall have power and authority to make all rules and regulations as it may deem expedient concerning the issue, transfer and registration of certificates representing shares of the Corporation.

SECTION 4. <u>Lost, Stolen or Destroyed Certificates</u>. The Corporation may issue a new certificate of stock in place of any certificate, theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Board of Directors may require the owner of any lost, stolen or destroyed certificate, or his legal representative, to give the Corporation a bond sufficient to indemnify the Corporation against any claim that may be made against it on account of the alleged loss, theft or destruction of any certificate or the issuance of any new certificate.

<div align="center">ARTICLE VII</div>

<div align="center"><u>Dividends</u></div>

Subject always to the provisions of law and the Certificate of Incorporation, the Board of Directors shall have full power to determine whether any, and, if any, what part of any, funds legally available for the payment of dividends shall be declared as dividends and paid to stockholders; the division of the whole or any part of the funds of the Corporation shall rest wholly within the lawful discretion of the Board of Directors, and it shall not be required at any time, against that discretion, to divide or pay any part of those funds among or to the stockholders as dividends or otherwise; and before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends any sum or sums as the Board of Directors from time to time, in its absolute discretion, thinks proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the Corporation, or for any other purpose as the Board of Directors shall think conducive to the interest of the Corporation, and the Board of Directors may modify or abolish any reserve in the manner in that it was created.

17

ARTICLE VIII

Ratification

Any transaction, questioned in any law suit on the ground of lack of authority, defective or irregular execution, adverse interest of director, officer or stockholder, non-disclosure, miscomputation, or the application of improper principles or practices of accounting, may be ratified before or after judgment, by the Board of Directors or by the stockholders, and if so ratified shall have the same force and effect as if the questioned transaction had been originally duly authorized. The ratification shall be binding upon the Corporation and its stockholders and shall constitute a bar to any claim or execution of any judgment in respect of the questioned transaction.

ARTICLE IX

Corporate Seal

The corporate seal shall have inscribed thereon the name of the Corporation and the year of its incorporation, and shall be in the form and contain other words and/or figures as the Board of Directors shall determine. The corporate seal may be used by printing, engraving, lithographing, stamping or otherwise making, placing or affixing, or causing to be printed, engraved, lithographed, stamped or otherwise made, placed or affixed, upon any paper or document, by any process whatsoever, an impression, facsimile or other reproduction of said corporate seal.

ARTICLE X

Fiscal Year

The fiscal year of the Corporation shall be fixed, and shall be subject to change, by the Board of Directors. Unless otherwise fixed by the Board of Directors, the fiscal year of the Corporation shall be the calendar year.

ARTICLE XI

Waiver of Notice

Whenever notice is required to be given by these By-laws or by the Certificate of Incorporation or by law, a written waiver thereof, signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice.

ARTICLE XII

Bank Accounts, Drafts, Contracts, Etc.

SECTION 1. Bank Accounts and Drafts. In addition to any bank accounts as may be authorized by the Board of Directors, the primary financial officer or any person designated by said primary financial officer, whether or not an employee of the Corporation, may authorize bank accounts to be opened or maintained in the name and on behalf of the Corporation as he or she may deem necessary or appropriate, and payments from those bank accounts to be made upon and according to the check of the Corporation in accordance with the written instructions of said primary financial officer, or other person so designated by the Treasurer.

SECTION 2. Contracts. The Board of Directors may authorize any person or persons, in the name and on behalf of the Corporation, to enter into or execute and deliver any and all deeds, bonds, mortgages, contracts and other obligations or instruments, and this authority may be general or confined to specific instances.

SECTION 3. Proxies; Powers of Attorney; Other Instruments. The Chairman, the President or any other person designated

by either of them shall have the power and authority to execute and deliver proxies, powers of attorney and other instruments on

18

behalf of the Corporation in connection with the rights and powers incident to the ownership of stock by the Corporation. The Chairman, the President or any other person authorized by proxy or power of attorney executed and delivered by either of them on behalf of the Corporation may attend and vote at any meeting of stock-holders of any company in which the Corporation may hold stock, and may exercise on behalf of the Corporation any and all of the rights and powers incident to the ownership of that stock at any meeting, or otherwise as specified in the proxy or power of attorney so authorizing that person. The Board of Directors, from time to time, may confer like powers upon any other person.

SECTION 4. <u>Financial Reports</u>. The Board of Directors may appoint the primary financial officer or other fiscal officer or any other officer to cause to be prepared and furnished to stockholders entitled thereto any special financial notice and/or financial statement, as the case may be, which may be required by any provision of law.

<div align="center">

ARTICLE XIII

<u>Amendments</u>

</div>

Subject to the provisions of the Certificate of Incorporation and the provisions of the General Corporation Law of the State of Delaware, the power to amend, alter or repeal these By-laws and to adopt new By-laws may be exercised by the Board of Directors or by the stockholders.

<div align="center">

ARTICLE XIV

<u>Exclusive Forum</u>

</div>

Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware shall, to the fullest extent permitted by applicable law, be the sole and exclusive forum for (a) any derivative action or proceeding brought on behalf of the Corporation, (b) any action asserting a claim of breach of a fiduciary duty owed by any current or former director, officer, employee or stockholder of the Corporation to the Corporation or the Corporation's stockholders, (c) any action asserting a claim arising pursuant to any provision of the General Corporation Law of the State of Delaware, the Corporation's Certificate of Incorporation or these By-laws (as each may be amended and in effect from time to time) or as to which the General Corporation Law of the State of Delaware confers jurisdiction on the Court of Chancery of the State of Delaware, or (4) any action asserting a claim governed by the internal affairs doctrine. Any person or entity purchasing or otherwise acquiring or holding any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Article XIV. Failure to enforce the foregoing provisions would cause the Corporation irreparable harm and the Corporation shall be entitled to equitable relief, including injunction and specific performance, to enforce the foregoing provisions.

<u>*As Amended and Restated as of December 2, 2019.*</u>

<div align="center">

19

</div>

<div align="right">**EXHIBIT 4.3**</div>

## DESCRIPTION OF THE REGISTRANT'S SECURITIES REGISTERED PURSUANT TO SECTION 12 OF THE SECURITIES EXCHANGE ACT OF 1934

### DESCRIPTION OF CAPITAL STOCK

AK Holding's authorized capital stock consists of 450,000,000 shares of common stock, par value $.01 per share and 25,000,000 shares of preferred stock, par value $1.00 per share. The following is a summary of all the material provisions of the common stock and the preferred stock, which we refer to as our common stock and preferred stock, respectively. This summary is subject to, and qualified in its entirety by, the provisions of our Certificate of Incorporation and our Bylaws and by applicable law. Our Certificate of Incorporation and our Bylaws have been incorporated by reference as exhibits to the Annual Report on Form 10-K, and we refer to them as our Certificate of Incorporation and Bylaws, respectively. The summaries of these documents are qualified in their entirety by reference to the full text of the documents. AK Holding is a Delaware corporation and is subject to the Delaware General Corporation Law (the "DGCL").

**Common Stock**

The holders of our common stock are entitled to one vote for each share on all matters voted on by the stockholders. The holders of our common stock do not have any conversion, redemption or preemptive rights. The holders of our common stock are entitled to dividends as declared by our Board of Directors. On liquidation, holders are entitled to receive, on a pro rata basis, all of our assets available for distribution to the holders of common stock. The rights and dividends upon liquidation may be junior to the rights of holders of any preferred stock.

**Preferred Stock**

As of the date hereof, there are no shares of our preferred stock outstanding. Our Board of Directors is authorized to provide for the issuance of an aggregate of 25,000,000 shares of preferred stock, in one or more series, and to fix for each series:

- the designation and number of shares;
- the dividend rights;
- the dividend rate;
- the voting rights;
- the rights and terms of redemption (including sinking fund provisions);
- the redemption price;
- the liquidation preferences of any wholly unissued series of shares of preferred stock, or any or all of them;
- whether the shares will be made convertible into, or exchangeable for, shares of any other class or classes or of any other series of the same class of our stock, and if made so, on what terms;
- whether the issue of any additional shares of this series or any future series or any other class of stock will have any restrictions and, if so, the nature of these restrictions;
- any other designations, powers, preferences, rights, qualifications, limitations and restrictions as are permitted by the DGCL;
- the rights and terms of redemption (including sinking fund provisions); and
- the redemption price.

**Dividend Rights**

Under Delaware law, a corporation may pay dividends out of surplus or, if no surplus exists, out of net profits for the fiscal year in which the dividends are declared and/or its preceding fiscal year. However, dividends may not be paid out of these net profits if the capital of the corporation is less than the aggregate amount of capital represented by the outstanding stock of all classes having a preference upon the distribution of assets. Dividends may be paid in cash, property or in shares of capital stock. Before declaring dividends, our Board of Directors can set aside funds for a reserve to meet contingencies,

1

subject to the rights of preferred stockholders, if any. The holders of our common stock are entitled to dividends as declared by our Board of Directors.

## Cumulative Voting and Other Rights

Cumulative voting permits a stockholder to cast as many votes in the election of directors for each share of stock held by him as there are directors to be elected and each stockholder may cast all his votes for a single candidate or distribute his votes among two or more candidates, as he chooses. Under Delaware law, cumulative voting is not permitted unless provided for by a specific provision in the certificate of incorporation. Our Certificate of Incorporation does not provide for cumulative voting.

Delaware law requires voting by separate classes only with respect to amendments to the certificate of incorporation that adversely affect the holders of those classes or that increase or decrease the aggregate number of authorized shares or the par value of the shares of any of those classes.

## Repurchase of Stock

Under Delaware law, a corporation may repurchase or redeem its own stock only out of surplus and only if the capital of the corporation is not impaired or when such redemption would not impair capital. However, a corporation may redeem preferred stock out of capital if those shares will be retired upon redemption and the stated capital of the corporation is reduced pursuant to a resolution of its board of directors by the amount of capital represented by those shares.

## Anti-takeover Effects of Provisions of our Certificate of Incorporation and Bylaws

We are a Delaware corporation, and the anti-takeover provisions of Delaware law impose various impediments to the ability of a third party to acquire control of us, even if a change in control would be beneficial to our existing stockholders. In addition, our Board of Directors, or a committee thereof, has the power, without stockholder approval, to designate the terms of one or more series of preferred stock and issue shares of preferred stock. The ability of our Board of Directors, or a committee thereof, to create and issue a new series of preferred stock and certain provisions of Delaware law and our Certificate of Incorporation and Bylaws could impede a merger, takeover or other business combination involving us or discourage a potential acquirer from making a tender offer for our common stock, which, under certain circumstances, could reduce the market price of our common stock.

## Charter Amendments

Delaware law provides that the certificate of incorporation of a corporation may be amended upon adoption by the board of directors of a resolution setting forth the proposed amendment and declaring its advisability, followed by the favorable vote of the holders of a majority of the outstanding stock entitled to vote on the amendment. It also provides that a certificate of incorporation may require a greater vote for amendment than would otherwise be required under Delaware law. Subject to the requirements of Delaware law, the provisions of our Certificate of Incorporation may be amended by the affirmative vote of the holders of a majority of our outstanding common stock.

## Bylaws and Regulations

Under Delaware law, the power to adopt, amend or repeal the bylaws is vested in the stockholders unless the certificate of incorporation vests this power in the directors. Vesting this power in the directors does not divest the stockholders of the power to adopt, alter or repeal the bylaws. Our Certificate of Incorporation expressly authorizes the adoption, amendment or repeal of our Bylaws by the affirmative vote of a majority of the whole Board of Directors at any regular or special meeting of our Board of Directors, or by unanimous written consent of the directors, or by the affirmative vote of the holders of record of a majority of the issued and outstanding shares of stock of the Corporation entitled to vote in respect thereof, given at an annual meeting or at any special meeting.

## Board of Directors

Under our Bylaws, any director may resign at any time upon written notice and any or all of the directors may be removed with or without cause, by the holders of a majority of the shares of stock outstanding and entitled to vote for the election of directors. Board vacancies, whether caused by resignation, death, disqualification, removal, an increase in the authorized number of directors or otherwise, may be filled by the affirmative vote of a majority of the remaining directors or at a special meeting of the stockholders by the holders of shares entitled to vote for the election of directors.

**Action without a Meeting; Right to Call Special Meeting of Stockholders**

Delaware law provides that any action that may be taken at a meeting of stockholders may be taken without a meeting, without prior notice and without a vote, if the holders of stock having not less than the minimum number of votes otherwise required to approve the action consent in writing, unless otherwise provided in the certificate of incorporation. Our Bylaws do not alter the vote required.

Under Delaware law, special meetings of the stockholders may be called by a corporation's board of directors or by those persons who are authorized by the corporation's certificate of incorporation or bylaws. Our Bylaws provide that special meetings may be called by our Board of Directors or the Chief Executive Officer or upon the written request delivered to the Chief Executive Officer by stockholders holding together at least a majority of all of our shares entitled to vote at the meeting. No business other than that stated in the notice will be transacted at any special meeting; provided, however, that matters given by or at the direction of the Board of Directors or otherwise presented at the meeting by or at the direction of the Board of Directors may be presented. In addition, our Chairman, in his or her sole discretion, may present, or accept for presentation, procedural matters.

These provisions may have the effect of delaying consideration of a stockholder proposal until the next annual meeting unless a special meeting is called by our board or our stockholders as described above.

**Advance Notice Requirements for Nominations**

Our Bylaws contain advance notice procedures with regard to stockholder proposals related to the nomination of candidates for election as directors. These procedures provide that notice of stockholder proposals related to stockholder nominations for the election of directors must be received by our corporate secretary, in the case of an annual meeting, by close of business on a date that is not less than 60 days nor more than 90 days prior to the first anniversary of the preceding year's annual meeting of stockholders. However, if the annual meeting is called for a date that is more than 30 days before or after that anniversary date, or where no annual meeting has been held within the past year, notice by the stockholder in order to be timely must be received not later than the close of business on the tenth day following the day on which notice of the date of the meeting was mailed or public disclosure of the date of the meeting was made, whichever occurs first.

No special meeting of stockholders shall be called for the purpose of removing or electing a director or directors or amending our Bylaws; provided, however, that a special meeting may be called for the purpose of removing a director for cause, as such term is defined under Delaware law, and, provided further that the cause alleged must be set forth in the request for the meeting A stockholder's notice to our corporate secretary must be in proper written form and must set forth information related to the stockholder giving the notice and the beneficial owner (if any) on whose behalf the nomination is made, including:

- a representation that such stockholder is a holder of record or beneficial owner of our stock entitled to vote at the meeting and the name and address, as they appear on our books, of such stockholder and any stockholder of record of the stockholder's shares;

- the class and number of shares of our stock that are owned of record and beneficially by such stockholder and owned by any stockholder of record of such stockholder's shares, as of the date of the stockholder's notice, and a representation that such stockholder shall notify us in writing of the number of such shares owned of record and beneficially as of the record date for the meeting promptly following the record date;

- a description of any agreement, arrangement or understanding with respect to the nomination between or among such stockholder and any of its affiliates or associates, and any other person or persons (including their names), and a representation that the stockholder shall notify us in writing of any such agreement, arrangement or understanding in effect as of the record date for the meeting promptly following the record date;

- a description of any agreement, arrangement or understanding (including any derivative or short positions, profit interests, options, hedging transactions, and borrowed or loaned shares) that has been entered into as of the date of the notice by, or on behalf of, such shareholder, the effect or intent of which is to mitigate loss to, manage risk or benefit of share price changes for, or increase or decrease the voting power of such shareholder with respect to shares of our stock, and a representation that such shareholder shall notify us in writing of any such agreement, arrangement or understanding in effect as of the record date for the meeting promptly following the record date;

- a representation that such shareholder intends to appear in person or by proxy at the meeting to propose the nomination; and

3

- a representation whether such shareholder intends or is part of a group that intends to deliver a proxy statement and/or form of proxy to holders of at least the percentage of our outstanding capital stock required to elect the proposed nominee, and/or otherwise to solicit proxies from stockholders in support of the nomination.

As to each person whom the stockholder proposes to nominate for election as a director:

- all information relating to the person that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors pursuant to the Securities Exchange Act of 1934, as amended (the "Exchange Act); and

- the nominee's written consent to being named in the proxy statement as a nominee and to serving as a director if elected.

**Advance Notice Requirements for Stockholder Proposals and Proxy Access**

Our Bylaws contain advance notice procedures with regard to stockholder proposals not related to director nominations. These notice procedures, in the case of an annual meeting of stockholders, are the same as the notice requirements for stockholder proposals related to director nominations discussed above insofar as they relate to the timing of receipt of notice by our corporate secretary.

A stockholder's notice to our corporate secretary must be in proper written form and must set forth, as to each matter the stockholder and the beneficial owner (if any) proposes to bring before the meeting:

- the business desired to be brought before the meeting;

- the reasons for conducting such business at the meeting;

- any material interest in such business of the stockholder and the beneficial owner, if any, on whose behalf the proposal is made; and

- all agreements, arrangements and understandings between or among the stockholder and beneficial owner, if any, and its or their affiliates or associates, and any other person or persons (including their names) in connection with the proposal of such business, and a representation that the stockholder shall notify us in writing of any such agreement, arrangement or understanding in effect as of the record date for the meeting promptly following the record date.

As to the stockholder giving the notice and the beneficial owner, if any, on whose behalf the proposal is made:

- a representation that such stockholder is a holder of record or beneficial owner of our stock entitled to vote at the meeting and the name and address of such stockholder, and of such beneficial owner or stockholder of record of the shares owned by such stockholder, if any, as they appear on the Corporation's books;

- the class and number of shares of stock which are, directly or indirectly, owned beneficially and of record by such stockholder and such beneficial owner or stockholder of record of the shares owned by such stockholder, if any, as of the date of the stockholder's notice, and a representation that the stockholder shall notify us in writing of the number of such shares owned of record and beneficially as of the record date for the meeting promptly following the record date;

- any agreement, arrangement or understanding (including any derivative or short positions, profit interests, options, hedging transactions, and borrowed or loaned shares) that has been entered into as of the date the notice by, or on behalf of, such shareholder, the effect or intent of which is to mitigate loss, manage risk or benefit of share price changes for, or increase or decrease the voting power of such shareholder with respect to shares of our stock, and a representation that such shareholder shall notify us in writing of any such agreement, arrangement or understanding in effect as of the record date for the meeting promptly following the record date;

- a representation that the stockholder giving the notice intends to appear in person or by proxy at the meeting to propose the matter; and

- a representation as to whether the stockholder giving the notice intends or is part of a group that intends to deliver a proxy statement and/or form of proxy to holders of at least the percentage of our outstanding capital stock required to approve or adopt the matter, and/or otherwise to solicit proxies from stockholders in support of such stockholder's proposal or position.

4

Our by-laws contain a "proxy access" provision. This provision allows eligible stockholders to have their director nominees, together with an optional statement of support from the nominating stockholder, included in our proxy statement whenever the board solicits proxies with respect to the election of directors at an annual meeting of stockholders.

An eligible stockholder is any single stockholder (or group of up to 20 stockholders) holding at least 3% of the outstanding shares of our common stock continuously for at least three years, both as of the date 7 days prior to the notice delivered to the Secretary and the date of the meeting.

To be timely, a notice of the nomination and other required information must be delivered to our Secretary no earlier than 150 days and no later than 120 days before the anniversary of the date that we issued our proxy statement for the previous year's annual meeting of stockholders.

We are not required to include in our proxy statement more than the greater of (1) two nominees and (2) 25% of the total number of directors in office (rounded down), subject to adjustment in the event of a decrease in the size of the board prior to the meeting.

### Mergers and Consolidations

Under Delaware law, mergers or consolidations, other than so-called parent-subsidiary mergers, must be approved by the directors of each constituent corporation and adopted by the affirmative vote of the holders of a majority of the outstanding shares entitled to vote on the agreement, or by a greater vote if provided in the certificate of incorporation. Our Certificate of Incorporation does not alter the vote required. Under Delaware law, the separate vote of any class of shares is not required. Additionally, Delaware law provides that, unless its certificate of incorporation provides otherwise, no vote of the stockholders of the surviving corporation is required to approve the merger if:

- the agreement of merger does not amend in any respect the corporation's certificate of incorporation;

- each share outstanding immediately prior to the effective date is to be an identical outstanding or treasury share of the surviving corporation after the effective date; and

- the number of shares of the surviving corporation's common stock to be issued in the merger plus the number of shares of common stock into which any other securities to be issued in the merger are initially convertible does not exceed 20% of its common stock outstanding immediately prior to the effective date of the merger.

### Other Corporate Transactions

Delaware law requires a majority vote on disposition of all or substantially all of a corporation's assets and on dissolutions, unless a greater vote is provided for in the certificate of incorporation. Our Certificate of Incorporation does not alter the vote required.

### Loans to Officers and Directors

Delaware law permits a corporation to lend money to, or to guarantee an obligation of, an officer or other employee of the corporation or any subsidiary of the corporation, including an officer or employee who is also a director of the corporation or of its subsidiaries, whenever that loan or guarantee may, in the judgment of the directors, reasonably be expected to benefit the corporation. Delaware law generally does not impose liability on the directors who vote for or assent to the making of a loan to an officer, director, or stockholder.

### Fiduciary Duties of Directors

Under Delaware law, the business and affairs of a corporation are managed by or under the direction of its boards of directors. In exercising their powers, directors are charged with the fiduciary duties of loyalty and care. A party challenging the decision of a board of directors generally bears the burden of rebutting the applicability of the so-called "business judgment rule," a presumption that, in making a business decision, directors acted on an informed basis, in good faith and in the honest belief that the action was taken in the best interests of the corporation, by demonstrating that, in reaching their decision, the directors breached one or more of their fiduciary duties. Unless this presumption is rebutted, the business judgment exercised by directors in making their decisions is not subject to judicial review. Where, however, the presumption is rebutted, and in some other circumstances, the directors bear the burden of demonstrating the entire fairness of the relevant transaction. In spite of the business judgment rule, Delaware courts may subject directors' conduct to enhanced scrutiny in taking defensive actions in response to a threat to corporate control or approving a transaction resulting in a sale of control.

5

**Liability of Directors**

Subsection (b)(7) of Section 102 of the DGCL enables a corporation in its original certificate of incorporation or an amendment thereto to eliminate or limit the personal liability of a director to the corporation or its stockholders for monetary damages for violations of the director's fiduciary duty, except (i) for any breach of the director's duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) pursuant to Section 174 of the DGCL (providing for liability of directors for unlawful payment of dividends or unlawful stock purchases or redemptions) or (iv) for any transaction from which a director derived an improper personal benefit. Our Certificate of Incorporation has eliminated the personal liability of our directors to the fullest extent permitted by law.

**Indemnification of Directors and Officers**

Subsection (a) of Section 145 of the DGCL ("Section 145") empowers a corporation to indemnify any current or former director, officer, employee or agent of the corporation who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the corporation) by reason of the fact that such person is or was a director or officer of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred in connection with such action, suit or proceeding provided that such director or officer acted in good faith in a manner reasonably believed to be in, or not opposed to, the best interests of the corporation, and, with respect to any criminal action or proceeding, provided further that such director or officer had no reasonable cause to believe his conduct was unlawful Subsection (b) of Section 145 empowers a corporation to indemnify any director or officer, or former director or officer, who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the corporation to procure a judgment in its favor by reason of the fact that such person acted in any of the capacities set forth above, against expenses (including attorneys' fees) actually and reasonably incurred in connection with the defense or settlement of such action or suit provided that such director or officer acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interests of the corporation, except that no indemnification may be made in respect of any claim, issue or matter as to which such director or officer shall have been adjudged to be liable to the corporation unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all of the circumstances of the case, such director or officer is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

Section 145 further provides that to the extent a director or officer of a corporation has been successful in the defense of any action, suit or proceeding referred to in subsections (a) or (b) or in the defense of any claim, issue or matter therein, he or she shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith; that indemnification and advancement of expenses provided by, or granted pursuant to, Section 145 shall not be deemed exclusive of any other rights to which the indemnified party may be entitled; and empowers the corporation to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against him or incurred by him in any such capacity, or arising out of his status as such, whether or not the corporation would have the power to indemnify him against such liabilities under Section 145.

Article Seven of our Certificate of Incorporation states that we shall indemnify any person who was or is a party or is threatened to be made a party to, or testifies in, any threatened, pending, or completed action, suit or proceeding, whether civil, criminal, administrative or investigative in nature, by reason of the fact that such person is or was our director, officer or employee, or is or was serving at our request as a director, officer or employee of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines, penalties amounts paid in settlement and other liabilities actually and reasonably incurred by such person in connection with such action, suit or proceeding to the fullest extent permitted by law, and we may adopt by-laws or enter into agreements with any such person for the purpose of providing such indemnification. We also enter into Indemnification Agreements with each Director, a form of which is incorporated by reference to our Annual Report on Form 10-K for the year ended December 31, 2015.

6

**Delaware Business Combination Statute**

Under Section 203 of the DGCL ("Section 203"), a corporation is prohibited from engaging in any business combination with a person who, together with his affiliates or associates, owns, or within a three-year period did own, 15% or more of the corporation's voting stock, an interested stockholder, unless:

- prior to the date on which the person became an interested stockholder, the board of directors approved either the business combination or the transaction which resulted in the stockholder becoming an interested stockholder;

- the interested stockholder acquired 85% of the voting stock of the corporation, excluding specified shares, upon consummation of the transaction; or

- on or after the date on which the person became an interested stockholder, the business combination is approved by the board of directors of the corporation and the affirmative vote, at an annual or special meeting and not by written consent, of at least two-thirds of the outstanding voting stock of the corporation, excluding shares held by the interested stockholder.

A business combination includes:

- mergers, consolidations and sales or other dispositions of 10% or more of the assets of a corporation to or with an interested stockholder;

- particular transactions resulting in the issuance or transfer to an interested stockholder of any stock of the corporation or its subsidiaries; and

- other transactions resulting in a disproportionate financial benefit to an interested stockholder.

Except as otherwise set forth in Section 203, an interested stockholder is defined to include:

- any person that is the owner of 15% or more of the outstanding voting stock of the corporation; and

- any person that is an affiliate or associate of the corporation and was the owner of 15% or more of the outstanding voting stock of the corporation at any time within three years immediately prior to the date of determination, or the affiliates and associates of any such person.

Our Certificate of Incorporation does not contain a provision by which we expressly elect not to be governed by Section 203. Our election to be subject to Section 203 may have positive or negative consequences, depending on the circumstances. Being subject to Section 203 may make it more difficult for a person who would be an interested stockholder to effect various business combinations with us for a three-year period. Section 203 also may have the effect of preventing changes in our management. Section 203 also could make it more difficult to accomplish transactions which our stockholders may otherwise deem to be in their best interests. The provisions of Section 203 may cause persons interested in acquiring us to negotiate in advance with our Board of Directors.

**Venue**

Our by-laws provide that, unless we consent in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of AK Steel, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee to AK Steel or its stockholders, (iii) any action asserting a claim arising pursuant to any provision of the DGCL or our governing documents, or (iv) any action asserting a claim governed by the internal affairs doctrine.

Our by-laws also provide that AK Steel is entitled to equitable relief, including injunction and specific performance, to enforce such provisions regarding forum.

**Listing**

Our common stock is listed for trading on the New York Stock Exchange under the symbol "AKS."

**Transfer Agent and Registrar**

The transfer agent and registrar for our common stock is Computershare Investor Services, LLC.

7

A005897

EXHIBIT 23.1

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in the following Registration Statements:

    (1)  Registration Statement (Form S-8 No. 333-124296) pertaining to the AK Steel Holding Corporation Stock Incentive Plan (as amended and restated as of January 16, 2003),

    (2)  Registration Statement (Form S-8 No. 333-168541) pertaining to the AK Steel Holding Corporation Stock Incentive Plan (as amended and restated as of March 18, 2010),

    (3)  Registration Statement (Form S-8 No. 333-199853) pertaining to the AK Steel Holding Corporation Stock Incentive Plan (as amended and restated as of March 20, 2014),

    (4)  Registration Statement (Form S-3 No. 333-194078) of AK Steel Holding Corporation and AK Steel Corporation (as amended as of September 8, 2014),

    (5)  Registration Statement (Form S-3 No. 333-210785) of AK Steel Holding Corporation and AK Steel Corporation (as amended as of March 16, 2017),

    (6)  Registration Statement (Form S-8 No. 333-212777) pertaining to the AK Steel Holding Corporation Stock Incentive Plan (as amended and restated as of May 26, 2016),

    (7)  Registration Statement (Form S-3 No. 333-229723) of AK Steel Holding Corporation and AK Steel Corporation (as amended as of February 15, 2019),

    (8)  Registration Statement (Form S-8 No. 333-232433) pertaining to the AK Steel Holding Corporation 2019 Omnibus Supplemental Incentive Plan (as of June 28, 2019), and

    (9)  Registration Statement (Form S-4 No. 333-235855) of Cleveland-Cliffs Inc. (as amended as of February 4, 2020);

of our reports dated February 20, 2020, with respect to the consolidated financial statements of AK Steel Holding Corporation and the effectiveness of internal control over financial reporting of AK Steel Holding Corporation included in this Annual Report (Form 10-K) of AK Steel Holding Corporation for the year ended December 31, 2019.

/s/ ERNST & YOUNG LLP
Cincinnati, Ohio
February 20, 2020

EXHIBIT 31.1

### SECTION 302 CERTIFICATION OF CHIEF EXECUTIVE OFFICER

I, Roger K. Newport, certify that:

1. I have reviewed this annual report on Form 10-K of AK Steel Holding Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: February 20, 2020                                    /s/ Roger K. Newport
                                                           Roger K. Newport
                                                           Chief Executive Officer

**EXHIBIT 31.2**

### SECTION 302 CERTIFICATION OF CHIEF FINANCIAL OFFICER

I, Christopher J. Ross, certify that:

1. I have reviewed this annual report on Form 10-K of AK Steel Holding Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):
   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated:  February 20, 2020                          /s/ Christopher J. Ross

                                                   Christopher J. Ross

                                                   Vice President, Treasurer and Interim Chief Financial Officer

**EXHIBIT 32.1**

**SECTION 906 CERTIFICATION OF CHIEF EXECUTIVE OFFICER**

I, Roger K. Newport, Chief Executive Officer of AK Steel Holding Corporation (the "Company"), do hereby certify in accordance with 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1) This Annual Report on Form 10-K for the period ending December 31, 2019 fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a) or 78o(d)), and,

(2) The information contained in this Annual Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: February 20, 2020                                   /s/ Roger K. Newport

                                                           Roger K. Newport

                                                           Chief Executive Officer

**EXHIBIT 32.2**

### SECTION 906 CERTIFICATION OF CHIEF FINANCIAL OFFICER

I, Christopher J. Ross, Vice President, Finance and Chief Financial Officer of AK Steel Holding Corporation (the "Company"), do hereby certify in accordance with 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

    (1)  This Annual Report on Form 10-K for the period ending December 31, 2019 fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a) or 78o(d)), and,

    (2)  The information contained in this Annual Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated:   February 20, 2020                     /s/ Christopher J. Ross

                                                  Christopher J. Ross

                                                  Vice President, Treasurer and Interim Chief Financial Officer

EXHIBIT 95.1

**MINE SAFETY DISCLOSURE EXHIBIT**

The operation of AK Coal Resources, Inc.'s North Fork mine and coal wash plant (collectively, the "AK Coal Operations") are subject to regulation by the Mine Safety and Health Administration ("MSHA") under the Federal Mine Safety and Health Act of 1977, as amended ("Mine Act"). MSHA inspects mining and processing operations, such as the AK Coal Operations, on a regular basis and issues various citations and orders when it believes a violation has occurred under the Mine Act. We present information below regarding certain mining safety and health citations that MSHA has issued with respect to the AK Coal Operations. In evaluating this information with respect to the AK Coal Operations, consideration should be given to the following factors, among others: (i) the number of citations and orders will vary depending on the size of the mine or plant; (ii) the number of citations issued will vary from inspector to inspector and location to location; and (iii) citations and orders can be contested and appealed and, in that process, are often reduced in severity and amount, and are sometimes dismissed.

Under the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), each operator of a coal or other mine or plant is required to include certain mine safety results within its periodic reports filed with the Securities and Exchange Commission. As required by the reporting requirements included in Section 1503(a) of the Dodd-Frank Act, we provide the following items regarding certain mining safety and health matters, for the period presented, for each of our locations that are covered under the scope of the Dodd-Frank Act:

(A)    The total number of violations of mandatory health or safety standards that could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard under section 104 of the Mine Act (30 U.S.C. 814) for which the operator received a citation from MSHA;

(B)    The total number of orders issued under section 104(b) of the Mine Act (30 U.S.C. 814(b));

(C)    The total number of citations and orders for unwarrantable failure of the mine operator to comply with mandatory health or safety standards under section 104(d) of the Mine Act (30 U.S.C. 814(d));

(D)    The total number of imminent danger orders issued under section 107(a) of the Mine Act (30 U.S.C. 817(a));

(E)    The total dollar value of proposed assessments from MSHA under the Mine Act (30 U.S.C. 801 et seq.);

(F)    Legal actions pending before Federal Mine Safety and Health Review Commission ("FMSHRC") involving such coal or other mine or plant as of the last day of the period;

(G)    Legal actions initiated before the FMSHRC involving such coal or other mine or plant during the period; and

(H)    Legal actions resolved before the FMSHRC involving such coal or other mine or plant during the period.

During the year ended December 31, 2019, the AK Coal Operations did not receive any flagrant violations under Section 110(b)(2) of the Mine Act. In addition, it did not receive any written notices of a pattern of violations, or the potential to have a pattern of such violations, under section 104(e) of the Mine Act. In addition, there were no mining-related fatalities at the AK Coal Operations during this same period.

For purposes of reporting regulatory matters under Section 1503(a) of the Dodd-Frank Act, we are providing the following table that sets forth the total number of specific citations and orders, the total dollar value of the proposed civil penalty assessments that were issued by MSHA, and a list of legal actions pending before the FMSHRC, including the Administrative Law Judges thereof, pursuant to the Mine Act, during the year ended December 31, 2019 for each of our subsidiaries that is a coal mine or plant operator, by individual location.

-1-

| MSHA | Mine Name | Significant and Substantial Citations Issued (Section 104 of the Mine Act) *Excludes 104(d) citations/ orders | Failure to Abate Orders (Section 104(b) of the Mine Act) | Unwarrantable Failure Citations/Orders Issued (Section 104(d) of the Mine Act) | Imminent Danger Orders Issued (Section 107(a) of the Mine Act) | Dollar Value of Proposed Civil Penalty Assessments (in Thousands) | Legal Actions Pending as of Last Day of Period | Legal Actions Initiated During Period | Legal Actions Resolved |
|---|---|---|---|---|---|---|---|---|---|
| 3609406 | Coal Innovations #1 | — | — | — | — | $ — | — | — | 1 |
| 3610041 | North Fork | 39 | — | 4 | — | $ 54 (a) | 3 (b) | 7 | 4 |

(a)  Notification has not yet been provided regarding the monetary amount of any proposed penalties with respect to some of the disclosed citations. The recipient is challenging several of the citations.

(b)  These pending legal actions all relate to contests of citations and orders referenced in Subpart B of the Mine Act's procedural rules.

-2-

# EXHIBIT 96

A005905

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

☒   ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2019

OR

☐   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission File Number: 1-8944

**CLIFFS**

## CLEVELAND-CLIFFS INC.
*(Exact name of registrant as specified in its charter)*

| Ohio | 34-1464672 |
|---|---|
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(I.R.S. Employer Identification No.)* |
| 200 Public Square,  Cleveland,  Ohio | 44114-2315 |
| *(Address of Principal Executive Offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code: (216) 694-5700**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Shares, par value $0.125 per share | CLF | New York Stock Exchange |

**Securities registered pursuant to section 12(g) of the Act: NONE**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.     Yes ☒    NO ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.     Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.     Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).     Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company.  See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☒ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).     Yes ☐    No ☒

As of June 28, 2019, the aggregate market value of the voting and non-voting common shares held by non-affiliates of the registrant, based on the closing price of $10.67 per share as reported on the New York Stock Exchange — Composite Index, was $2,839,987,963 (excluded from this figure are the voting shares beneficially owned by the registrant's officers and directors).

The number of shares outstanding of the registrant's common shares, par value $0.125 per share, was 271,441,006 as of February 18, 2020.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's proxy statement for its 2020 annual meeting of shareholders are incorporated by reference into Part III.

**TABLE OF CONTENTS**

|  |  | <u>Page Number</u> |
|---|---|---|
| **DEFINITIONS** |  | <u>1</u> |
| **PART I** |  |  |
| Item 1. | Business | <u>3</u> |
|  | Information About Our Executive Officers | <u>16</u> |
| Item 1A. | Risk Factors | <u>17</u> |
| Item 1B. | Unresolved Staff Comments | <u>32</u> |
| Item 2. | Properties | <u>33</u> |
| Item 3. | Legal Proceedings | <u>37</u> |
| Item 4. | Mine Safety Disclosures | <u>38</u> |
| **PART II** |  |  |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | <u>40</u> |
| Item 6. | Selected Financial Data | <u>42</u> |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | <u>43</u> |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | <u>63</u> |
| Item 8. | Financial Statements and Supplementary Data | <u>64</u> |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | <u>139</u> |
| Item 9A. | Controls and Procedures | <u>139</u> |
| Item 9B. | Other Information | <u>142</u> |
| **PART III** |  |  |
| Item 10. | Directors, Executive Officers and Corporate Governance | <u>143</u> |
| Item 11. | Executive Compensation | <u>143</u> |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | <u>143</u> |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | <u>143</u> |
| Item 14. | Principal Accountant Fees and Services | <u>143</u> |
| **PART IV** |  |  |
| Item 15. | Exhibits and Financial Statement Schedules | <u>144</u> |
| Item 16. | Form 10-K Summary | <u>148</u> |
| **SIGNATURES** |  | <u>149</u> |

## DEFINITIONS

The following abbreviations or acronyms are used in the text. References in this report to the "Company," "we," "us," "our" and "Cliffs" are to Cleveland-Cliffs Inc. and subsidiaries, collectively. References to "C$" refers to Canadian currency and "$" to United States currency.

| Abbreviation or acronym | Term |
| --- | --- |
| A&R 2015 Equity Plan | Cliffs Natural Resources Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan |
| ABL Facility | Amended and Restated Syndicated Facility Agreement by among Bank of America, N.A., as Administrative Agent and Australian Security Trustee, the Lenders that are parties hereto, as the Lenders, Cleveland-Cliffs Inc., as Parent and a Borrower, and the Subsidiaries of Parent party hereto, as Borrowers dated as of March 30, 2015, and Amended and Restated as of February 28, 2018 |
| Adjusted EBITDA | EBITDA excluding certain items such as extinguishment of debt, impacts of discontinued operations, foreign currency exchange remeasurement, severance, impairment of other long-lived assets, acquisition costs and intersegment corporate allocations of selling, general and administrative costs |
| AK Steel | AK Steel Holding Corporation and its consolidated subsidiaries (including AK Steel Corporation and its facilities in Ashland, Kentucky, Middletown, Ohio, and Dearborn, Michigan) |
| AK Steel 7.50% 2023 Notes | AK Steel Corporation's existing 7.50% secured notes due 2023 |
| AK Steel 7.625% 2021 Notes | AK Steel Corporation's existing 7.625% unsecured notes due 2021 |
| Algoma | Algoma Steel Inc. (previously, Essar Steel Algoma Inc.) |
| Amended 2015 Equity Plan | Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan, as amended |
| APBO | Accumulated Postretirement Benefit Obligation |
| ArcelorMittal | ArcelorMittal (as the parent company of ArcelorMittal Mines Canada, ArcelorMittal USA and ArcelorMittal Dofasco GP, as well as, many other subsidiaries) |
| ArcelorMittal USA | ArcelorMittal USA LLC (including many of its United States affiliates, subsidiaries and representatives. References to ArcelorMittal USA comprise all such relationships unless a specific ArcelorMittal USA entity is referenced) |
| AMT | Alternative Minimum Tax |
| ASC | Accounting Standards Codification |
| ASU | Accounting Standards Update |
| Atlantic Basin pellet premium | Platts Atlantic Basin Blast Furnace 65% Fe pellet premium |
| Bloom Lake Group | Bloom Lake General Partner Limited and certain of its affiliates, including Cliffs Quebec Iron Mining ULC |
| BNSF | Burlington Northern Santa Fe, LLC |
| Canadian Entities | Bloom Lake Group, Wabush Group and certain other wholly-owned subsidiaries |
| CCAA | Companies' Creditors Arrangement Act (Canada) |
| CERCLA | Comprehensive Environmental Response, Compensation and Liability Act of 1980 |
| Clean Water Act | Federal Water Pollution Control Act |
| CN | Canadian National Railway Company |
| Compensation Committee | Compensation and Organization Committee of the Board of Directors |
| Directors' Plan | Cliffs Natural Resources Inc. Amended and Restated 2014 Nonemployee Directors' Compensation Plan |
| Dodd-Frank Act | Dodd-Frank Wall Street Reform and Consumer Protection Act |
| DR-grade | Direct Reduction-grade |
| DRI | Direct Reduced Iron |
| EAF | Electric Arc Furnace |
| EBITDA | Earnings before interest, taxes, depreciation and amortization |
| Empire | Empire Iron Mining Partnership |
| EPA | U.S. Environmental Protection Agency |
| EPS | Earnings per share |
| ERM | Enterprise Risk Management |
| Exchange Act | Securities Exchange Act of 1934, as amended |
| FASB | Financial Accounting Standards Board |
| Fe | Iron |
| FeT | Total Iron |
| FIP | Federal Implementation Plan |
| FMSH Act | U.S. Federal Mine Safety and Health Act 1977, as amended |
| GAAP | Accounting principles generally accepted in the United States |
| GHG | Greenhouse gas |
| HBI | Hot Briquetted Iron |
| Hibbing | Hibbing Taconite Company, an unincorporated joint venture |

1

A005908

| Abbreviation or acronym | Term |
|---|---|
| Hot-rolled coil steel price | Average annual daily market price for hot-rolled coil steel |
| IRC | Internal Revenue Code |
| LIBOR | London Interbank Offered Rate |
| LIFO | Last-in, first-out |
| Long ton | 2,240 pounds |
| LS&I | Lake Superior & Ishpeming Railroad Company |
| Merger | The merger of Merger Sub with and into AK Steel, with AK Steel surviving the merger as a wholly owned subsidiary of Cliffs, subject to the conditions set forth in the Merger Agreement |
| Merger Agreement | Agreement and Plan of Merger, dated as of December 2, 2019, among Cliffs, AK Steel and Merger Sub |
| Merger Sub | Pepper Merger Sub Inc., a direct, wholly owned subsidiary of Cliffs |
| Metric ton | 2,205 pounds |
| MMBtu | Million British Thermal Units |
| MPCA | Minnesota Pollution Control Agency |
| MSHA | U.S. Mine Safety and Health Administration |
| Monitor | FTI Consulting Canada Inc. |
| NAAQS | National Ambient Air Quality Standards |
| Net ton | 2,000 pounds |
| New ABL Facility | New asset-based revolving credit facility expected to be entered into in connection with the Merger to replace the ABL Facility |
| New Cliffs Secured/Unsecured Notes | New series of secured notes and a new series of unsecured notes expected to be entered into in connection with the Merger to repurchase or redeem the AK Steel 7.50% 2023 Notes and, depending on market and other conditions, the AK Steel 7.625% 2021 Notes |
| $NO_2$ | Nitrogen dioxide |
| $NO_x$ | Nitrogen oxide |
| Northshore | Northshore Mining Company |
| NYSE | New York Stock Exchange |
| OPEB | Other postretirement benefits |
| OPEB cap | Medical premium maximums |
| OSHA | Occupational Safety and Health Administration |
| PBO | Projected benefit obligation |
| Platts 62% price | Platts IODEX 62% Fe Fines cost and freight North China |
| PPI | Producer Price Indices |
| S&P | Standard & Poor's Rating Services, a division of Standard & Poor's Financial Services LLC, a subsidiary of The McGraw-Hill Companies, Inc., and its successors |
| SEC | U.S. Securities and Exchange Commission |
| Securities Act | Securities Act of 1933, as amended |
| Silver Bay Power | Silver Bay Power Company |
| SIP | State Implementation Plan |
| $SO_2$ | Sulfur dioxide |
| STRIPS | Separate Trading of Registered Interest and Principal of Securities |
| Tilden | Tilden Mining Company L.C. |
| TMDL | Total Maximum Daily Load |
| Topic 606 | ASC Topic 606, Revenue from Contracts with Customers |
| Topic 815 | ASC Topic 815, Derivatives and Hedging |
| TRIR | Total Recordable Incident Rate |
| TSR | Total Shareholder Return |
| United Taconite | United Taconite LLC |
| U.S. | United States of America |
| U.S. Steel | U.S. Steel Corporation and all subsidiaries |
| USW | United Steelworkers |
| VEBA | Voluntary Employee Benefit Association trusts |
| Wabush Group | Wabush Iron Co. Limited and Wabush Resources Inc., and certain of their affiliates, including Wabush Mines (an unincorporated joint venture of Wabush Iron Co. Limited and Wabush Resources Inc.), Arnaud Railway Company and Wabush Lake Railway Company |
| WEPC | Wisconsin Electric Power Company |

A005909

Table of Contents

PART I

**Item 1.** *Business*

**Introduction**

Founded in 1847, Cleveland-Cliffs Inc. is the largest and oldest independent iron ore mining company in the United States. We are a major supplier of iron ore pellets to the North American steel industry from our mines and pellet plants located in Michigan and Minnesota. In 2020, we expect to be the sole producer of HBI in the Great Lakes region with the startup of our first production plant in Toledo, Ohio. Driven by the core values of safety, social, environmental and capital stewardship, our employees endeavor to provide all stakeholders with operating and financial transparency.

We are organized according to our differentiated products and have two reportable segments – the Mining and Pelletizing segment and the Metallics segment.

In our Mining and Pelletizing segment, we currently own or co-own four operational iron ore mines plus one indefinitely idled mine. We are currently operating one iron ore mine in Michigan and two iron ore mines in Minnesota. Additionally, we have a 23% ownership stake in a third iron ore mine in Minnesota. All four mines are currently operating at or near their respective current annual capacity. In our Metallics segment, we expect to complete construction of our HBI production plant in Toledo, Ohio and begin operations during the first half of 2020.

On December 2, 2019, we entered into the Merger Agreement, pursuant to which we have agreed to acquire AK Steel, a leading North American producer of flat-rolled carbon, stainless and electrical steel products, primarily for the automotive, infrastructure and manufacturing markets. We expect to complete the Merger in the first quarter of 2020. We believe the transaction will transform us into a best-in-class iron ore and steel producer with industry leading margins and a self-sufficiency in iron ore, along with the synergy value created from the combination of two public companies. Unless otherwise noted, discussion of our business and results of operations in this Annual Report on Form 10-K refers to our continuing operations on a stand-alone basis without giving effect to the Merger.

*Protecting our Mining and Pelletizing Business*

We are the market-leading iron ore producer in the U.S., supplying differentiated iron ore pellets under long-term contracts to major North American blast furnace steel producers. We have the unique advantage of being a low-cost, high-quality, iron ore pellet producer with significant transportation and logistics advantages to serve the Great Lakes steel market. The pricing structure and long-term nature of our existing contracts, along with our low-cost operating profile, position our Mining and Pelletizing segment as a strong cash flow generator in most commodity pricing environments. Since instituting our strategy in 2014 of focusing on this business, we have achieved significant accomplishments, including maximizing commercial leverage in pricing and securing sales volume certainty with steelmakers throughout the Great Lakes region, improving operating reliability by making operational improvements, realizing more predictability in cash flows, developing new demand avenues in the metallics industry, embracing the global push toward environmental stewardship and developing new pellet products to meet ever-evolving market demands.

We recognize the importance of our current strong position in the North American blast furnace steel industry, and one of our top priorities is to protect and enhance the market position of our Mining and Pelletizing business. This involves continuing to deliver high-quality, custom-made pellets that allow our customers to remain competitive in the quality, production efficiency, and environmental friendliness of their steel products. Protecting this business also involves continually evaluating opportunities to preserve our customer base, expand our production capacity and increase ore reserve life. In 2017, we achieved key accomplishments toward these goals by acquiring the remaining minority stake in our Tilden and Empire mines as well as additional real estate interests in Minnesota. In 2018, we began supplying pellets under two new customer supply agreements in the Great Lakes region. In addition, we executed the efficient exit of our Asia Pacific Iron Ore business, officially completing the divestiture of the Company's non-core iron ore assets. In 2019, we completed the upgrades at our Northshore mine to begin commercially producing DR-grade pellets.

The acquisition of AK Steel, when complete, is expected to ensure pellet volume commitments for approximately 6 million long tons of pellets, to complement our existing long-term minimum volume pellet offtake agreements with other key integrated steel producers and pellets to be consumed at our Toledo HBI production plant.

3

*Expanding our Customer Base and Product Offering*

The acquisition of AK Steel, when complete, is expected to allow us to benefit from a larger and more diverse base of customers, with less overall emphasis on commodity-linked contracts. The expansion of our customer base into the automotive industry, as well as other steel consuming manufacturers, through the acquisition of AK Steel is expected to generate more predictable earnings and cash flows due to the focus on value-added and non-commoditized products, and less exposure to volatile commodity indices. AK Steel is one of the few steel producers capable of producing the carbon and stainless steel grades critical to automotive lightweighting trends. AK Steel generally supplies more advanced steel products than EAF steelmakers, who have gained market share from other blast furnaces on less advanced commodity-grade steels. As currently configured, EAFs are largely unable to supply the highly-specified products that AK Steel primarily sells.

Although AK Steel has a different customer base compared to other blast furnace steelmakers, we cannot ignore the ongoing shift of steelmaking share in the U.S. away from our other blast furnace customers to the EAF steelmakers. Over the past 25 years, the market share of EAFs has nearly doubled. However, as EAFs have moved to higher-value steel products, they require more high-quality iron ore-based metallics instead of lower-grade scrap as raw material feedstock. As a result of this trend, one of our top strategic priorities will be to become a critical supplier of the EAF market by providing these specialized metallics.

In June 2017, we announced the planned construction of an HBI production plant in Toledo, Ohio. Over the past 32 months, we have made significant progress on the construction of this plant. During 2018, we increased the expected productive capacity of the Toledo HBI production plant from 1.6 million to 1.9 million metric tons per year based on market analysis, greater-than-expected customer demand and expansion opportunities identified during the construction process. We estimate the construction cost to be approximately $830 million plus a contingency of up to 20%, excluding capitalized interest, of which approximately $700 million was paid as of December 31, 2019. We expect that the HBI production plant, once operational, will consume approximately 2.8 million long tons of our DR-grade pellets per year. During 2019, we announced that we expect to reach commercial production ahead of schedule, in the first half of 2020.

We expect our HBI partially to replace the over 3 million metric tons of ore-based metallics that are imported into the Great Lakes region every year from Russia, Ukraine, Brazil and Venezuela, as well as the nearly 20 million metric tons of scrap used in the Great Lakes area every year. The Toledo site is in close proximity to over 20 EAFs, giving us a natural competitive freight advantage over import competitors. Not only does this production plant create another outlet for our high-margin pellets, but it also presents an attractive economic opportunity for us. As the only producer of DR-grade pellets in the Great Lakes region and with access to abundant, low-cost natural gas, we will be in a unique position to serve clients in the area and grow our customer base.

The acquisition of AK Steel, when complete, provides another potential outlet for HBI as it can also be used in integrated steel operations to increase productivity and reduce carbon footprint, allowing for more environmentally friendly steelmaking. AK Steel has used imported HBI in the past for these purposes.

## Segments

Operating segments are defined as components of an enterprise for which separate financial information is available that is evaluated regularly by the chief operating decision maker, or decision-making group, to decide how to allocate resources and to assess performance. Our Company's continuing operations are organized and managed in two business units according to our differentiated products: Mining and Pelletizing and Metallics. Until operational, expenses incurred in the Metallics segment will be recorded to *Miscellaneous - net*. Each of our business units qualifies as an operating segment with its results regularly reviewed by our chief operating decision maker. Our chief operating decision maker is our Chief Executive Officer. As of December 31, 2019, the Mining and Pelletizing segment and the Metallics segment are both reportable segments in accordance with *ASC Topic 280, Segment Reporting*.

4

**Mining and Pelletizing Segment**

We are a major producer of iron ore pellets, primarily selling production from our Mining and Pelletizing segment to integrated steel companies in the U.S. and Canada. We operate three iron ore mines: the Tilden mine in Michigan and the Northshore and United Taconite mines in Minnesota. Additionally, we have a 23% ownership stake in the Hibbing mine in Minnesota. These mines currently have an annual rated capacity of 27.4 million long tons of iron ore pellet production, representing 55% of total U.S. pellet production capacity. Based on our equity ownership in these mines, our share of the annual rated production capacity is currently 21.2 million long tons, representing 42% of total U.S. annual pellet capacity. The Empire mine located in Michigan, which historically had annual rated capacity of 5.5 million long tons, was indefinitely idled beginning in August 2016. During 2017, we acquired the remaining noncontrolling interest of the Empire and Tilden mines from ArcelorMittal USA and U.S. Steel, respectively. On August 12, 2019, our subsidiary, Cliffs Mining Company, ceased performing manager duties for the Hibbing mine and transitioned those duties to ArcelorMittal USA. Prior to this transition, we managed the Hibbing mine and our joint venture partners made required capital contributions and paid for their share of the iron ore pellets that we produced.

The following chart summarizes the estimated annual pellet production capacity and percentage of total U.S. pellet production capacity for each of the respective iron ore producers as of December 31, 2019:

**U.S. Pellet**

| | Annual Rated Capacity Tonnage | |
|---|---|---|
| | Current Estimated Capacity (Long Tons in Millions)[1] | Percent of Total U.S. Capacity |
| All Cliffs' owned and co-owned mines | 27.4 | 54.8 % |
| Other U.S. mines | | |
| U.S. Steel's Minnesota ore operations | | |
| Minnesota Taconite | 14.3 | 28.6 |
| Keewatin Taconite | 5.4 | 10.8 |
| Total U.S. Steel | 19.7 | 39.4 |
| ArcelorMittal USA Minorca mine | 2.9 | 5.8 |
| Total other U.S. mines | 22.6 | 45.2 |
| Total U.S. mines | 50.0 | 100.0 % |

[1] Empire mine was excluded from the estimated capacity calculation as it is indefinitely idled.

Our Mining and Pelletizing segment production generally is sold pursuant to long-term supply agreements. For the year ended December 31, 2019, our owned and co-owned mines produced a total of 25.7 million long tons of iron ore pellets. The 2019 production included 19.9 million long tons for our account and 5.8 million long tons on behalf of our steel company partners associated with the Hibbing mine. During 2018 and 2017, our owned and co-owned mines produced a total of 26.3 million and 25.5 million long tons, respectively.

We produce various grades of iron ore pellets, including standard, fluxed and DR-grade,  generally for use in our customers' operations as part of the steelmaking process. The variation in grade of iron ore pellets results from the specific chemical and metallurgical properties of the ores at each mine, the requirements of end users' steelmaking processes and whether or not fluxstone is added in the process. Although the grade or grades of pellets currently delivered to each customer are based on that customer's preferences, which depend in part on the characteristics of the customer's steelmaking operation, in certain cases our iron ore pellets can be used interchangeably. Standard pellets require less processing, are generally the least costly pellets to produce and are called "standard" because no ground fluxstone, such as limestone or dolomite, is added to the iron ore concentrate before turning the concentrate into pellets. In the case of fluxed pellets, fluxstone is added to the concentrate, which produces pellets that can perform at higher productivity levels in the customer's specific blast furnace and will minimize the amount of fluxstone the customer may be required to add to the blast furnace. DR-grade pellets require additional processing to make a pellet that contains higher iron and lower silica content than a standard pellet. Unlike standard or fluxed pellets, DR-grade pellets are produced to be fed into a DRI facility, which then are converted into DRI or HBI.

Additionally, as the EAF steel market continues to grow in the U.S., there is an opportunity for our iron ore to serve this market by providing pellets to the alternative metallics market to produce DRI, HBI and/or pig iron. During 2019, we began commercially producing and selling DR-grade pellets to our Metallics business unit and third parties.

5

Each of our Mining and Pelletizing segment mines is located near the Great Lakes. The majority of our iron ore pellets are transported via railroads to loading ports for shipment via vessel to blast furnace steelmakers in North America.

Our sales are influenced by seasonal factors in the first quarter of the year as shipments and sales are restricted due to closure of the Soo Locks at Sault Ste. Marie and the Welland Canal on the Great Lakes because of winter weather. During the first quarter, we continue to produce our products, but we cannot ship most of those products via lake vessel until the conditions on the Great Lakes are navigable, which causes our first and second quarter inventory levels to rise. Our limited practice of shipping product to ports on the lower Great Lakes or to customers' facilities prior to the transfer of control has somewhat mitigated the seasonal effect on first and second quarter inventories, as shipment from this point to the customers' operations is not limited by weather-related shipping constraints. As of December 31, 2019 and December 31, 2018, under Topic 606, we had finished goods of  1.0 million long tons and  0.8 million long tons, respectively, in transit or stored at ports and customer facilities on the lower Great Lakes to service customers, for which revenue had yet to be recognized. As of December 31, 2017, under the previous accounting standard, we had finished goods of 1.5 million long tons stored at ports and customer facilities on the lower Great Lakes to service customers for which revenue had yet to be recognized. Refer to NOTE 1 - BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES for further discussion on revenue recognition.

*Mining and Pelletizing Customers*

Our Mining and Pelletizing segment revenues primarily are derived from sales of iron ore pellets to the North American integrated steel industry, consisting primarily of three major customers. Generally, we have multi-year supply agreements with our customers. Sales volume under these agreements largely is dependent on customer requirements, and in certain cases, we are the sole supplier of iron ore to the customer. Most agreements contain a base price that is adjusted annually using one or more adjustment factors. Factors that could result in price adjustments under our contracts include changes in the Platts 62% price, hot-rolled coil steel price, the Atlantic Basin pellet premium, published Platts international indexed freight rates and changes in specified PPI, including those for industrial commodities, fuel and steel.

During 2019, 2018 and 2017, we sold 18.6 million, 20.6 million and 18.7 million long tons of iron ore product, respectively, to third parties from our share of production from our Mining and Pelletizing segment mines. Additionally, during 2019, we had intersegment sales of 0.8 million long tons of iron ore product. Refer to *Concentration of Customers* below for additional information regarding our major customers.

**Metallics Segment**

In June 2017, we announced the construction of an HBI production plant in Toledo, Ohio and in April 2018, we celebrated the ground breaking for the start of construction. Over the past 32 months, we have made significant progress on the construction of this plant. HBI is a specialized high-quality iron alternative to scrap that, when used as a feedstock, allows an EAF to produce more valuable grades of steel. We expect our HBI partially to replace the over 3 million metric tons of ore-based metallics that are imported into the Great Lakes region every year from Russia, Ukraine, Brazil and Venezuela, as well as approximately 20 million metric tons of scrap used in the Great Lakes area every year.

During 2018, we increased the expected productive capacity of the Toledo HBI production plant from 1.6 million to 1.9 million metric tons per year based on market analysis, greater-than-expected customer demand and expansion opportunities identified during the construction process. We expect that the HBI production plant, once operational, will consume approximately 2.8 million long tons of DR-grade pellets per year from our Mining and Pelletizing segment. We expect to reach commercial production in the first half of 2020.

**Discontinued Operations**

Unless otherwise noted, discussion of our business and results of operations in this Annual Report on Form 10-K refers to our continuing operations.

*Asia Pacific Iron Ore Operations*

During 2018, we committed to a course of action leading to the permanent closure of the Asia Pacific Iron Ore mining operations and sold all of the assets of our Asia Pacific Iron Ore business through a series of sales to third parties. As a result of our exit, management determined that our Asia Pacific Iron Ore operating segment met the criteria to be classified as held for sale and a discontinued operation under *ASC Topic 205, Presentation of Financial Statements*.

Table of Contents

As such, all current and historical Asia Pacific Iron Ore operating segment results are classified within discontinued operations.

Historically, the Asia Pacific Iron Ore operations served the Asian iron ore markets with direct-shipped fines and lump ore. During 2018 and 2017, we produced 2.7 million and 10.1 million metric tons, respectively, from our Asia Pacific Iron Ore operation. During 2018 and 2017, we sold 3.9 million and 9.8 million metric tons of iron ore, respectively, from our Asia Pacific Iron Ore operation.

Refer to NOTE 13 - DISCONTINUED OPERATIONS for further discussion of the Asia Pacific Iron Ore segment.

*Canadian Operations*

During 2015, we announced that the Bloom Lake Group and the Wabush Group commenced restructuring proceedings in Montreal, Quebec under the CCAA to address the immediate liquidity issues and to preserve and protect their assets for the benefit of all stakeholders while restructuring and/or sale options were explored.

The Bloom Lake Group and the Wabush Group filed a joint plan of compromise and arrangement that was approved by the required majorities of each unsecured creditor class and was sanctioned by the Court in June 2018. During July 2018, amendments were made to the plan to address the manner in which certain distributions under the plan would be effected and the plan was implemented. Under the terms of the amended plan, all employee claims, all claims by the Bloom Lake Group, the Wabush Group and their respective creditors against us as well as all of our claims against the Bloom Lake Group and the Wabush Group were resolved.

Expenses directly associated with the Canadian Entities are classified within discontinued operations. Refer to NOTE 13 - DISCONTINUED OPERATIONS for further discussion of the Canadian operations.

**Applied Technology, Research and Development**

We have been a leader in iron ore mining and processing technology since inception and have been in operation for over 170 years. We operated some of the first mines on Michigan's Marquette Iron Range and pioneered early open-pit and underground mining methods. From the first application of electrical power in Michigan's underground mines to the use of today's sophisticated computers and global positioning satellite systems, we have been a leader in the application of new technology to the centuries-old business of mineral extraction.

We are also a pioneer in iron ore pelletizing with over 60 years of experience. We are able to produce customized, environmentally friendly pellets to meet each customer's blast furnace specifications and produce both standard and fluxed pellets. Today, our engineering and technical staffs are engaged in full-time technical support of our operations, improvement of existing products and development of new products. Using our technical expertise and strong market position in the U.S. to increase our product offering, we have started producing DR-grade pellets. In recent years, we shipped DR-grade pellets, which were successfully processed in multiple DRI reactors to produce a high-quality DRI product.

With our experienced technical professionals and unsurpassed reputation for our pelletizing technology, we continue to deliver a world-class quality product to our customers. We are a pioneer in the development of emerging reduction technologies, a leader in the extraction of value from challenging resources and a front-runner in the implementation of safe and sustainable technology. Our technical experts are dedicated to excellence and deliver superior technical solutions tailored to our customer base. We are also devoted to promoting environmental sustainability in our industry, primarily evidenced with the development of our HBI facility in Toledo, Ohio. Similar to the market shift to pellets over 60 years ago, we recognize the need to serve the growing EAF market. We expect our introduction of HBI to the Great Lakes EAF market will be notable in the evolution of the steel industry.

Table of Contents

**Concentration of Customers**

In 2019, 2018 and 2017, three customers individually accounted for more than 10% of our consolidated product revenue. Product revenue from those customers totaled $1.8 billion, $2.1 billion and $1.5 billion of our total consolidated product revenue in 2019, 2018 and 2017, respectively. The following represents sales revenue attributable to each of these customers as a percentage of total product sales for those years:

| Customer[1] | Percentage Product Revenue | | |
| --- | --- | --- | --- |
| | **2019** | 2018 | 2017 |
| ArcelorMittal | **50%** | 57% | 48% |
| AK Steel | **29%** | 25% | 29% |
| Algoma | **18%** | 13% | 11% |

[1] Includes subsidiaries.

*ArcelorMittal*

Our pellet supply agreements with ArcelorMittal USA are based on customer requirements, except for the Indiana Harbor East facility, which is based on customer contract obligations. Currently, the parties participate in a long-term agreement, which became effective October 31, 2016, for the sale and delivery of ArcelorMittal USA's annual tonnage requirements that fall within a specific range of volume. This agreement expires at the end of December 2026. Additionally, in 2018 we entered into a multi-year agreement with ArcelorMittal Dofasco to sell and deliver a portion of its annual pellet consumption requirements.

ArcelorMittal USA is a 62.3% equity participant in Hibbing. During 2017, we acquired the 21% ownership interest of ArcelorMittal USA in Empire as part of an agreement to distribute the noncontrolling interest net assets of the mine.

In 2019, 2018 and 2017, our Mining and Pelletizing segment pellet sales to ArcelorMittal were 8.8 million, 10.1 million and 8.4 million long tons, respectively.

*AK Steel*

In August 2013, we entered into an agreement with AK Steel to provide iron ore pellets for use in its Middletown, Ohio and Ashland, Kentucky blast furnace facilities, the latter of which is currently idled. This contract includes minimum and maximum tonnage requirements for each year between 2014 and 2023. In 2019 and 2018, through contract amendments, we added tonnage with AK Steel above the maximum tonnage requirements specific to each contract year.

In 2015, we entered into an amended and restated agreement with AK Steel after it acquired Severstal Dearborn, LLC, under which we supply all of the Dearborn, Michigan facility's blast furnace pellet requirements through 2022, subject to specified minimum and maximum requirements in certain years.

On December 2, 2019, we entered into the Merger Agreement with AK Steel pursuant to which we will acquire all of the issued and outstanding shares of AK Steel common stock pursuant to the Merger. We expect to complete the Merger in the first quarter of 2020. Completion of the Merger is subject to various conditions, such as satisfaction or waiver of certain specified closing conditions, and it is possible that factors outside of our control could result in the Merger being completed at a later time or not at all. The Merger Agreement also contains certain termination rights that may be exercised by either us or AK Steel. We plan to complete the Merger as soon as reasonably practicable following the satisfaction of all applicable conditions.

In 2019, 2018 and 2017, our Mining and Pelletizing segment pellet sales to AK Steel were 5.5 million, 5.8 million and 5.6 million long tons, respectively.

*Algoma*

We have a long-term supply agreement under which we have agreed to provide a portion of the Canadian steelmaker's pellet needs through 2024. Additionally, Algoma entered into agreements with us wherein we sell additional incremental tonnage that equates to Algoma's annual iron ore pellet consumption. These agreements began in 2016 and run through December 2020.

In 2019, 2018 and 2017, our Mining and Pelletizing segment pellet sales to Algoma were 3.4 million, 3.5 million and 2.5 million long tons, respectively.

**Competition**

In our Mining and Pelletizing business segment, we primarily sell our product to steel producers with operations in North America. We compete directly with steel companies that own interests in iron ore mines in the United States and/or Canada, including U.S. Steel, and with major iron ore pellet exporters from Eastern Canada and Brazil.

A number of factors beyond our control affect the markets in which we sell our iron ore. Continued demand for our iron ore and the prices obtained by us primarily depend on the consumption patterns of the steel industry in the U.S., China and elsewhere around the world, as well as the availability, location, cost of transportation and competing prices.

**Environment**

Our mining activities are subject to various laws and regulations governing the protection of the environment. We conduct our operations in a manner that is protective of public health and the environment and believe our operations are in compliance with applicable laws and regulations in all material respects.

Environmental issues and their management continued to be an important focus at each of our operations throughout 2019. In the construction and operation of our facilities, substantial costs have been and will continue to be incurred to comply with regulatory requirements and avoid undue effect on the environment. In 2019, 2018 and 2017, our capital expenditures relating to environmental matters totaled approximately $9 million, $10 million and $21 million, respectively. It is estimated that capital expenditures for environmental improvements will total approximately $26 million in 2020 for various water treatment, air quality, dust control, tailings management, selenium management and other miscellaneous environmental projects.

*Regulatory Developments*

Various governmental bodies continually promulgate new or amended laws and regulations that affect us, our customers and our suppliers in many areas, including waste discharge and disposal, the classification of materials and products, air and water discharges and other environmental, health and safety matters. Although we believe that our environmental policies and practices are sound and do not expect that the application of any current laws, regulations or permits reasonably would be expected to result in a material adverse effect on our business or financial condition, we cannot predict the collective potential adverse impact of the expanding body of laws and regulations.

Specifically, there are several notable proposed or potential rulemakings or activities that could have a material adverse impact on our facilities in the future depending on their ultimate outcome: Minnesota's potential revisions to the sulfate wild rice water quality standard; evolving water quality standards for selenium and conductivity; scope of the Clean Water Act and the definition of "Waters of the United States"; Minnesota's Mercury TMDL and associated rules governing mercury air emission reductions; Climate Change and GHG Regulation; Regional Haze FIP Rule; legacy property, $NO_2$ and $SO_2$ NAAQS; and increased administrative and legislative initiatives related to financial assurance obligations for CERCLA, mining and reclamation obligations.

*Minnesota's Sulfate Wild Rice Water Quality Standard*

The Minnesota Governor established a Wild Rice Task Force by Executive Order in May 2018 that provided recommendations to the Governor's Office on wild rice restoration and regulation. The existing water quality standard for wild rice has not been applied to any of our discharge permits or enforced in decades, and it may be unenforceable because of legislation and because the water bodies to which the existing standard applies have never been identified specifically in rule, nor are there criteria for identifying them. MPCA is complying with the legislation that prohibits enforcement of the water quality standard until the obsolete standard is updated based on modern science. For these reasons, the impact of the proposed wild rice water quality standard to us is not estimable at this time, but it could have an adverse material impact if we are required to significantly reduce sulfate in our discharges.

*Selenium Discharge Regulation*

In Michigan, Empire and Tilden have implemented compliance plans to manage selenium according to the permit conditions. Empire and Tilden submitted the first permit-required Selenium Storm Water Management Plan to the Michigan Department of Environmental, Great Lakes, and Energy ("EGLE") in December 2011 and have updated it annually as required. The Selenium Storm Water Management Plans have outlined the activities that have been

9

Table of Contents

undertaken to address selenium in storm water discharges from our Michigan operations including an assessment of potential impacts to surface and ground water. The remaining infrastructure needed for implementation of the storm water collection and conveyance system will likely be completed in 2020. A storm water treatment system for both facilities is anticipated sometime before 2028. As of December 31, 2019, included within our Empire asset retirement obligation is a discounted liability of approximately $88 million, which includes the estimated costs associated with the construction of Empire's portion of the required infrastructure and expected future operating costs of the treatment facilities. Additionally, included within our Tilden future capital plan is approximately $25 million for the construction of Tilden's portion of the required infrastructure. We are continuing to assess and develop cost effective and sustainable treatment technologies.

In July 2016, the EPA published new selenium fish tissue limits and lower lentic and lotic water column concentration criteria, which may someday increase the cost for treatment should EGLE adopt these new standards in lieu of the existing limits required by the Great Lakes Water Quality Initiative. Accordingly, we cannot reasonably estimate the timing or long-term impact of the water quality criteria to our business.

*Mercury TMDL and Minnesota Taconite Mercury Reduction Strategy*

Since the 1990's the taconite industry has voluntarily reduced and removed mercury products and supported development of mercury emission reduction technology. While TMDL regulations are contained in the Clean Water Act, Minnesota developed in 2007 a Statewide Mercury TMDL that set an objective for 93% mercury air emission reductions from 1990 levels for sources within Minnesota. The State of Minnesota has acknowledged that approximately 90% of the mercury entering the state's airshed is from other national and international sources.

In September 2014, Minnesota promulgated the Mercury Air Emissions Reporting and Reduction Rules mandating mercury air emissions reporting and reductions from certain sources, including taconite facilities. The rule is applicable to all of our Minnesota operations and required submittal of a Mercury Reduction Plan to the MPCA by the end of 2018 with plan implementation requirements becoming effective on January 1, 2025. In the Mercury Reduction Plan, facilities must evaluate if available control technologies can technically achieve a 72% mercury reduction rate. If available control technologies cannot technically achieve a 72% mercury reduction rate, the facilities must propose alternative mercury reduction measures. One of the main tenets agreed upon for evaluating potential mercury reduction technologies during TMDL implementation and 2014 rule development proceedings was that the selected technology must meet the following "Adaptive Management Criteria": the technology must be technically feasible; must be economically feasible; must not impact pellet quality; and must not cause excessive corrosion in the indurating furnaces or air pollution control equipment.

The Mercury Reduction Plans for our Minnesota facilities were submitted to the MPCA in December 2018 and are currently being reviewed by the MPCA. There is currently no proven technology to cost effectively reduce mercury emissions from taconite furnaces to the target level of 72% while satisfying all four Adaptive Management Criteria. The Mercury Reduction Plans that were submitted to MPCA include documentation that describes the results of detailed engineering analysis and research testing on potential technologies to support this determination. The results of this analysis will guide further dialogue with the MPCA. Potential impacts to us are not estimable at this time because the submitted Mercury Reduction Plans are currently being reviewed by MPCA.

*Climate Change and GHG Regulation*

With the complexities and uncertainties associated with the U.S. and global navigation of the climate change issue as a whole, one of our potentially significant risks for the future is mandatory carbon pricing obligations. Policymakers are in the design process of carbon regulation at the state, regional, national and international levels. The current regulatory patchwork of carbon compliance schemes presents a challenge for multi-facility entities to identify their near-term risks. Amplifying the uncertainty, the dynamic forward outlook for carbon pricing obligations presents a challenge to large industrial companies to assess the long-term net impacts of carbon compliance costs on their operations. Our exposure on this issue includes both the direct and indirect financial risks associated with the regulation of GHG emissions, as well as potential physical risks associated with climate change adaptation. We are continuing to review the physical risks related to climate change. As an energy-intensive business, our GHG emissions inventory includes a broad range of emissions sources, such as iron ore furnaces and kilns, boilers, and diesel mining equipment, among others. As such, our most significant regulatory risks are: (1) the costs associated with on-site emissions levels (direct impacts), and (2) indirect costs passed through to us from electrical and fuel suppliers (indirect impacts).

Internationally, mechanisms to reduce emissions are being implemented in various countries, with differing designs and stringency, according to resources, economic structure and politics. The Paris Agreement to reduce global GHG emissions and limit global temperature increases to 2 degrees Celsius became effective in November 2016 with

10

Table of Contents

196 signatory countries. During the Obama Administration, the U.S. became a signatory to the Paris Agreement with a pledge to reduce its GHG emissions by 26-28% from 2005 levels by 2025. In June 2017, President Trump announced that the U.S. would cease all participation in the Paris Agreement and initiate formal withdrawal proceedings which are expected to be finalized in November 2020. Continued political attention to issues concerning climate change, the role of human activity in it and potential mitigation through regulation may have a material impact on our customer base, operations and financial results in the future.

In the U.S., future federal and/or state carbon regulation potentially presents a significantly greater impact to our operations. To date, the U.S. Congress has not legislated carbon constraints. In the absence of comprehensive federal carbon legislation, numerous state, regional, and federal regulatory initiatives are under development or are becoming effective, thereby creating a disjointed approach to GHG control and potential carbon pricing impacts.

Due to the potential patchwork of federal, state or regional carbon restriction schemes, our business and customer base could suffer negative financial impacts over time as a result of increased energy, environmental and other costs to comply with the limitations that would be imposed on GHG emissions. We believe our exposure can be reduced substantially by numerous factors, including currently contemplated regulatory flexibility mechanisms, such as allowance allocations, fixed process emissions exemptions, offsets and international provisions; emissions reduction opportunities, including energy efficiency, biofuels and fuel flexibility; and business opportunities associated with pursuing combined heat and power partnerships and new products, including DR-grade pellets, HBI, fluxed pellets and other efficiency-improving technologies.

We have worked proactively to develop a comprehensive, enterprise-wide GHG management strategy aimed at considering all significant aspects associated with GHG initiatives to plan effectively for and manage climate change issues, including risks and opportunities as they relate to the environment; stakeholders, including shareholders and the public; legislative and regulatory developments; operations; products and markets. Our direct Scope 1 and indirect Scope 2 GHG emissions, on a GHG-intensity basis for the Mining and Pelletizing segment, have been reduced by 16% compared to 2005 emissions with an objective to reduce the GHG intensity by 36% by the end of 2020 compared to 2005 emissions. By 2020 we expect to meet the U.S. 2015 Paris Agreement pledge of 26 to 28% GHG emissions reduction from 2005 baseline levels five years ahead of the 2025 target for both Scope 1 and Scope 2 emissions.  On a mass basis, we have reduced our Scope 1 and Scope 2 GHG mass emissions at our Mining and Pelletizing segment from 2005 levels by 30% through 2018 and expect to reduce these emissions from the 2005 levels by 46% through 2020.

*Regional Haze FIP Rule*

In June 2005, the EPA finalized amendments to its regional haze rules. The rules require states to establish goals and emission reduction strategies for improving visibility in all Class I national parks and wilderness areas to natural background levels by 2064. Among the states with Class I areas are Michigan and Minnesota, in which we currently own mining operations. The first phase of the regional haze rule required analysis and installation of Best Available Retrofit Technology ("BART") on eligible emission sources and incorporation of BART and associated emission limits into SIPs.

EPA disapproved Minnesota's and Michigan's BART SIP for taconite furnaces and instead promulgated a Taconite Regional Haze FIP in February 2013. We petitioned the Eighth Circuit Court of Appeals for a review of the FIP, and filed a joint motion for stay of the 2013 FIP, which was granted in June 2013. We reached a settlement agreement with EPA, which was subsequently published in the Federal Register to implement components of the settlement agreement in April 2016, with an effective date of May 12, 2016. We believe the 2016 Regional Haze FIP reflects progress toward a more technically and economically feasible regional haze implementation plan. In November 2016, the Eighth Circuit Court of Appeals terminated the June 2013 stay and extended the deadlines in the original 2013 FIP. Cost estimates associated with implementation of the 2013 and 2016 FIPs are reflected in our five-year capital plan.

Due to inconsistencies in language describing the procedures for calculating $NO_x$ emission limits between the settlement agreement and the 2016 FIP final rule, we jointly filed a Petition for Reconsideration and Petition for Judicial Review in June 2016. We have been working toward a settlement agreement with EPA to resolve the outstanding issue with the emission limit calculation method and anticipate resolution of the issue in 2020.  The outcome of this proceeding is not expected to have a material adverse impact to the business.

The states have begun to evaluate remaining visibility impacts to Class I air sheds and progress against the Uniform Rate of Progress glide path, which culminates in achieving natural visibility conditions in 2064, as part of the second Regional Haze decadal review period (2018-2028). The second decadal review will examine if additional

11

Table of Contents

technological controls are warranted for certain sources. The states are required to submit their updated Regional Haze SIPs by July 2021. At this time, we cannot reasonably estimate the likelihood or extent of any additional emission control requirements that may arise from Minnesota or Michigan's forthcoming 2021 SIP submittal to EPA, but we will continue to monitor developments in the interim.

### Former Cliffs-Dow Plant Site

We previously had a minority ownership interest in Cliffs-Dow Chemical, a joint venture that owned a charcoal production and wood chemical refining facility until the joint venture shares were sold in 1968 to a third party. The subject property was closed in 1969, and subsequent ownership passed through several parties from 1969 through 1997. Previous owners dismantled and removed most of the structures for scrap metal and the site remained idle until The Dow Chemical Company and subsidiaries of The Cleveland-Cliffs Iron Company and Georgia-Pacific Corporation reacquired the property and performed environmental mitigation on a portion of the subject property prior to selling the majority of the site to the city of Marquette, Michigan in 1997, which included property deed restrictions and environmental liability indemnification of the selling parties. We have been advised that there may be additional contamination located beyond the property boundaries of the portion sold to Marquette, Michigan that may have originated from historical operations of the wood chemical refining facility. It is reasonably likely that we and other potentially responsible parties could be requested or required to further investigate and potentially to remediate if warranted. We do not yet possess sufficient information to reasonably determine if, or the extent to which, remediation may be required or to reasonably estimate any potential cost to us.

### $NO_2$ and $SO_2$ NAAQS

During the first half of 2010, EPA promulgated rules that required each state to use a combination of air quality monitoring and computer modeling to determine each state's attainment classification status against new one-hour $NO_2$ and $SO_2$ NAAQS. During the third quarter of 2011, the EPA issued guidance to the regulated community on conducting refined air quality dispersion modeling and implementing the new $NO_2$ and $SO_2$ standards. In 2012, Minnesota issued Administrative Orders ("AOs") requiring taconite facilities to conduct modeling to demonstrate compliance with the $NO_2$ and $SO_2$ NAAQS pursuant to the Taconite Regional Haze SIP Long Term Strategy ("LTS"). Compliance with the LTS modeling demonstrations was originally set for June 2017, but Minnesota has not advanced work on its 2012 AOs and is expected to remove NAAQS modeling obligations under the LTS in light of reduction in haze emissions associated with implementation of the taconite Regional Haze FIP regulations.

All of our operations in Minnesota and Michigan are expected to be in attainment for $NO_2$ and $SO_2$ NAAQS without incurring additional capital investment. While we will continue to monitor these developments and assess potential impacts, we do not anticipate further capital investments will be necessary to address $NO_2$ and $SO_2$ NAAQS requirements at this time.

### Conductivity

Conductivity, the measurement of water's ability to conduct electricity, is a surrogate parameter that generally increases as the amount of dissolved minerals in water increases. In December 2016, EPA issued a notice soliciting public comments on its draft guidance, *Field-Based Methods for Developing Aquatic Life Criteria for Specific Conductivity*. In April 2017, comments were submitted by our trade associations providing objective evidence indicating the draft methodology was scientifically flawed and unfit for promulgation. EPA confirmed in October 2019 that the 2016 draft guidance was rescinded in accordance with an August 2019 EPA memorandum regarding draft guidance documents and further expressed that EPA must update the science and subject future recommended methods or criteria for conductivity to peer-review and public comment. Adoption of the previously proposed methodology is now unlikely.

### Definition of "Waters of the United States" Under the Clean Water Act

EPA and Army Corps of Engineers published a final rule in October 2019 repealing the 2015 rule that was to become effective on December 23, 2019. The next step will be for the agencies to publish a final rule that will revise the definition of "waters of the United States" which is anticipated to occur in 2020. This final rule, if similar to what was proposed in the December 2018 *Revised Definition of "Waters of the United States"* proposed rule, is not expected to have a material negative impact to our business. We are actively participating in the rulemaking and will continue assessing the potential impacts to our operations.

12

*CERCLA 108(b)*

In December 2016, EPA published a proposed amendment to CERCLA section 108(b) which is focused on developing financial assurance for managing hazardous substances in the hardrock mining industry. EPA had a court-mandated deadline for publication of the final rule by December 1, 2017. The proposed rule would have required hardrock mining facilities to calculate their level of financial responsibility based on a formula included in the rule, secure an instrument or otherwise self-insure for the calculated amount, demonstrate EPA the proof of the security, and maintain the security until EPA releases facilities from the CERCLA 108(b) regulations. The iron mining industry notified EPA of several errors in the assumptions upon which EPA drafted the rule, including a mistaken reliance on reporting data from a wholly different industry sector. We also participated in developing industry specific and national trade association comments and advocating directly with EPA and the White House Office of Management & Budget to address this and other errors with goals of exempting iron ore mining from CERCLA 108(b) applicability and correcting other deficiencies with the proposed rule. On December 1, 2017 EPA signed a federal register notice of EPA's decision not to issue final regulations for financial responsibility requirements for the hardrock mining industry under section 108(b) of CERCLA because EPA determined that the risks associated with these facilities' operations are addressed by existing federal and state programs and regulations and modern industry practices. In 2018, several environmental groups filed a challenge to EPA's decision to not issue a final rule. This challenge was rejected in a July 2019 decision by the U.S. Court of Appeals for the District of Columbia upholding EPA's determination to not issue CERCLA financial responsibility regulations for the hardrock mining industry.

## Energy

### *Electricity*

UMERC ("Upper Michigan Energy Resources Corporation"), a subsidiary of WEPC, is the sole supplier of electric power to our Tilden mine. UMERC provides 170 megawatts of electricity to Tilden at special rates that are regulated by the Michigan Public Service Commission. During August 2016, Tilden executed a new 20-year special contract with WEPC that was subsequently assigned to UMERC. Tilden commenced receiving power under the terms of this special contract on April 1, 2019.

Minnesota Power supplies electric power to the United Taconite mine. The United Taconite mine executed a new ten-year agreement with Minnesota Power that also included Northshore's Babbitt Mine. This agreement was finalized in May 2016 and was approved by the Minnesota Public Utilities Commission in November 2016.

Silver Bay Power, a wholly-owned subsidiary with a 115 megawatt power plant that is currently economically idled, historically provided the majority of Northshore's electrical energy requirements. In May 2016, Silver Bay Power entered into an agreement with Minnesota Power to purchase roughly half of Northshore's electricity needs from Minnesota Power through 2019. Beginning September 15, 2019, Silver Bay Power began to purchase 100% of the electricity requirements of Northshore from Minnesota Power; however, under certain circumstances the parties agreed to an interconnection agreement for Silver Bay Power to provide backup power when excess generation is necessary.

### *Process and Diesel Fuel*

We have a long-term contract providing for the transport of natural gas on the Northern Natural Gas Pipeline for our Mining and Pelletizing segment operations. Tilden has the capability of burning natural gas, coal or, to a lesser extent, oil. Northshore has the capability to burn natural gas and oil. United Taconite has the capability to burn coal, natural gas and petroleum coke. Consistent with 2019, we expect that during 2020 our Mining and Pelletizing segment operations will utilize both natural gas and coal to heat furnaces.

In our Metallics segment, we have a long-term contract providing for the transport of natural gas on the intrastate Generation Pipeline to our HBI production plant in Toledo, Ohio. The Toledo site also has access to multiple interstate pipelines, the use of which are managed through a long-term natural gas supply agreement. The HBI production plant will utilize natural gas for its process to transform DR-grade pellets into HBI.

All of our mines utilize diesel fuel mainly for our mobile fleet. Thompson Gas supplies diesel fuel to our Northshore and United Taconite mines. Our contract with Thompson Gas expired at the end of 2019, and the parties are negotiating an extension on this supply agreement. U.S. Oil, a division of U.S. Venture Inc., supplies diesel fuel to our Tilden mine under a current long-term supply agreement for Tilden's diesel fuel needs.

13

Table of Contents

**Employees**

Below is a summary of our employees:

| | December 31, | | |
|---|---|---|---|
| | **2019** | 2018 | 2017 |
| Mining and Pelletizing segment - Salaried [1] | **397** | 514 | 503 |
| Mining and Pelletizing segment - Hourly [1,2] | **1,712** | 2,208 | 2,182 |
| Metallics segment - Salaried | **40** | 26 | 6 |
| Metallics segment - Hourly | **48** | — | — |
| Discontinued Operations - Salaried | **—** | 2 | 79 |
| Corporate & Support Services - Salaried | **175** | 176 | 168 |
| Total | **2,372** | 2,926 | 2,938 |

[1] The December 31, 2018 and 2017 data includes the employees of the Hibbing mine that we managed prior to transitioning those duties to ArcelorMittal USA in August 2019.

[2] Excludes employees considered on lay-off status as a result of an indefinite or temporary idle.

Hourly employees at our Michigan and Minnesota iron ore mining operations, excluding Northshore, are represented by the USW and are covered by labor agreements between the USW and our various operating entities. These labor agreements cover approximately 1,200 active USW-represented employees at our Empire and Tilden mines in Michigan, and our United Taconite mine in Minnesota and are valid through September 30, 2022. Employees at our Northshore operations are not represented by a union and are not, therefore, covered by a collective bargaining agreement.

During August 2019, our subsidiary, Cliffs Mining Company, ceased performing manager duties for the Hibbing mine and transitioned those duties to ArcelorMittal USA. In connection with the transfer of manager duties for the Hibbing mine, Hibbing employees previously employed by Cliffs Mining Company are now employed by an ArcelorMittal USA controlled group entity.

Hourly employees at our LS&I railroads in Michigan are represented by seven unions covering approximately 100 employees. These labor agreements are covered by the Railway Labor Act and are subject to reopening for bargaining in 2020.

Salaried employees at our Mining and Pelletizing segment, Metallics segment, Corporate and Support Services are not represented by a union and are not, therefore, covered by collective bargaining agreements.

***Safety***

Safe production is our primary core value as we continue toward achieving a zero injury culture at our facilities. We constantly monitor our safety performance and make continuous improvements to affect change. Best practices and incident learnings are shared globally to ensure each facility can administer the most effective policies and procedures for enhanced workplace safety. Progress toward achieving our objectives is accomplished through a focus on proactive sustainability initiatives, and results are measured against established industry and company benchmarks, including our company-wide Total Reportable Incident Rate ("TRIR"). During 2019, our TRIR (including contractors) was 1.11 per 200,000 man-hours worked.

Refer to *Exhibit 95 Mine Safety Disclosures (filed herewith)* for mine safety information required in accordance with Section 1503(a) of the Dodd-Frank Act.

14

**Available Information**

Our headquarters are located at 200 Public Square, Suite 3300, Cleveland, Ohio 44114-2315, and our telephone number is (216) 694-5700. We are subject to the reporting requirements of the Exchange Act and its rules and regulations. The Exchange Act requires us to file reports, proxy statements and other information with the SEC.

The SEC maintains a website that contains reports, proxy statements and other information regarding issuers that file electronically with the SEC. These materials may be obtained electronically by accessing the SEC's home page at www.sec.gov.

We use our website, www.clevelandcliffs.com, as a channel for routine distribution of important information, including news releases, investor presentations and financial information. We also make available, free of charge on our website, our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to these reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act, as soon as reasonably practicable after we electronically file these documents with, or furnish them to, the SEC. In addition, our website allows investors and other interested persons to sign up to receive automatic email alerts when we post news releases and financial information on our website.

We also make available, free of charge, the charters of the Audit Committee, Governance and Nominating Committee and Compensation and Organization Committee as well as the Corporate Governance Guidelines and the Code of Business Conduct and Ethics adopted by our Board of Directors. These documents are available through our investor relations page on our website at *www.clevelandcliffs.com*. The SEC filings are available by selecting "Financial Information" and then "SEC Filings," and corporate governance materials are available by selecting "Corporate Governance" for the Board Committee Charters, operational governance guidelines and the Code of Business Conduct and Ethics.

References to our website or the SEC's website do not constitute incorporation by reference of the information contained on such websites, and such information is not part of this Annual Report on Form 10-K.

Copies of the above-referenced information are also available, free of charge, by calling (216) 694-5700 or upon written request to:

Cleveland-Cliffs Inc.
Investor Relations
200 Public Square, Suite 3300
Cleveland, OH 44114-2315

15

## INFORMATION ABOUT OUR EXECUTIVE OFFICERS

Following are the names, ages and positions of the executive officers of the Company as of   February 20, 2020. Unless otherwise noted, all positions indicated are or were held with Cleveland-Cliffs Inc.

| Name | Age | Position(s) Held |
|------|-----|------------------|
| Lourenco Goncalves | 62 | Chairman, President and Chief Executive Officer (August 2014 – present); and Chairman, President and Chief Executive Officer of Metals USA Holdings Corp., an American manufacturer and processor of steel and other metals (May 2006 – April 2013). |
| Clifford T. Smith | 60 | Executive Vice President, Chief Operating Officer (January 2019 – present); Executive Vice President, Business Development (April 2015 – December 2018); and Executive Vice President, Seaborne Iron Ore (January 2014 – April 2015). |
| Keith A. Koci | 55 | Executive Vice President, Chief Financial Officer (February 2019 – present); and Senior Vice President and Chief Financial Officer, Metals USA Holdings Corp. (2013 – February 2019). |
| Terry G. Fedor | 55 | Executive Vice President, Operations (February 2019 – present); Executive Vice President, U.S. Iron Ore (January 2014 – January 2019); and Vice President, Operations (February 2011 – January 2014). |
| Traci L. Forrester | 48 | Executive Vice President, Business Development (May 2019 – present); Vice President (January 2018 – May 2019); Deputy General Counsel & Assistant Secretary (January 2017 – May 2019); and Assistant General Counsel (August 2013 – January 2017). |
| James D. Graham | 54 | Executive Vice President (November 2014 – present); Chief Legal Officer (March 2013 – present); Secretary (March 2014 – present); and Vice President (January 2011 – October 2014). |
| Maurice D. Harapiak | 58 | Executive Vice President, Human Resources (March 2014 – present); Chief Administration Officer (January 2018 – present); and Regional Director, Human Resources - Barrick Gold of North America, a gold mining company (November 2011 – March 2014). |
| R. Christopher Cebula | 49 | Vice President, Corporate Controller & Chief Accounting Officer (February 2017 – present); and Senior Director, Corporate Financial Planning & Analysis (April 2013 – February 2017). |

All executive officers serve at the pleasure of the Board. There are no arrangements or understandings between any executive officer and any other person pursuant to which an executive officer was selected to be an officer of the Company. There is no family relationship between any of our executive officers, or between any of our executive officers and any of our directors.

A005923

**Item 1A.**        *Risk Factors*

An investment in our common shares or other securities is subject to risks inherent to our business and our industry. Described below are certain risks and uncertainties, the occurrences of which could have a material adverse effect on us. Before making an investment decision, you should consider carefully all of the risks described below together with the other information included in this report. The risks and uncertainties described below include known material risks that we face currently. Although we have extensive risk management policies, practices and procedures aimed to mitigate these risks, uncertainties may nevertheless impair our business operation. This report is qualified in its entirety by these factors.

Our ERM function provides a framework for management's consideration of risks when making strategic, financial, operational and/or project decisions. The framework is based on ISO 31000, an internationally recognized risk management standard. Management uses a consistent methodology to identify and assess risks, determine and implement risk mitigation actions, and monitor and communicate information about the Company's most significant risks. Through these processes, we have identified seven categories of risk that we are subject to: (I) economic and market, (II) regulatory, (III) financial, (IV) operational, (V) development and sustainability, (VI) human capital and (VII) risks related to the proposed Merger. The following risk factors are presented according to these key risk categories.

I.    ECONOMIC    AND    MARKET
      RISKS

***Uncertainty or weaknesses in global economic conditions, reduced economic growth in China and oversupply of iron ore and excess steel or imported products could affect adversely our business.***

The world price of iron ore is influenced strongly by global economic conditions, including international demand for and supply of iron ore products. In particular, the current level of international demand for raw materials used in steel production is driven largely by industrial growth in China. Uncertainty or weakness in global economic conditions, including the slowing economic growth rate in China, has resulted, and could in the future result, in decreased demand for our products and, together with oversupply of imported products, has and may continue to lead to decreased prices, resulting in lower revenue levels and decreasing margins, which have in the past and may in the future affect adversely our business and negatively impact our financial results. We are not able to predict whether the global economic conditions will improve or worsen and the impact it may have on our operations and the industry in general going forward.

***The volatility of commodity prices, namely iron ore and steel, affects our ability to generate revenue, maintain stable cash flow and fund our operations, including growth and expansion projects.***

Our profitability is dependent upon the price of the product that we sell to our customers and the price of the products our customers sell, namely iron ore and steel prices. The prices of iron ore and steel have fluctuated significantly in the past and are affected by factors beyond our control, including: steel inventories; changes in the productive capacity of U.S. domestic steel producers; international demand for raw materials used in steel production; rates of global economic growth, especially construction and infrastructure activity that requires significant amounts of steel; changes in the levels of economic activity in the U.S., China, India, Europe and other industrialized or developing countries; changes in China's emissions policies and environmental compliance enforcement practices; changes in production capacity of other iron ore suppliers, especially as additional supply comes online or where there is a significant increase in imports of steel into the U.S. or Europe; changes in trade laws; imposition or termination of duties, tariffs, import and export controls and other trade barriers impacting the iron ore markets; weather-related disruptions or natural disasters that may impact the global supply of iron ore; and the proximity, capacity and cost of infrastructure and transportation.

Our earnings, therefore, may fluctuate with the prices of the product we sell and of the products our customers sell. To the extent that the prices of iron ore and steel, including the Platts 62% price, hot-rolled coil steel price, Atlantic Basin pellet premium, Platts international indexed freight rates and changes in specified PPI, including those for industrial commodities, fuel and steel, significantly decline for an extended period of time, we may have to revise our operating plans, including curtailing production, reducing operating costs and capital expenditures, and discontinuing certain exploration and development programs. We also may have to take impairments on our long-lived assets and/or inventory. Sustained lower prices also could cause us to further reduce existing mineral reserves if certain reserves no longer can be economically mined or processed at prevailing prices. We may be unable to decrease our costs in an amount sufficient to offset reductions in revenues and may incur losses. These events could have a material adverse effect on us.

17

Table of Contents

***If steelmakers use methods other than blast furnace production to produce steel or use other inputs, or if their blast furnaces shut down or otherwise reduce production, the demand for our current iron ore products may decrease.***

Demand for our iron ore products in North America is largely determined by the operating rates for the blast furnaces of steel companies. However, not all finished steel is produced by blast furnaces; finished steel also may be produced by other methods that use scrap steel, pig iron, HBI and DRI. North American producers also can produce steel using imported iron ore products, which may reduce or eliminate the need for domestic iron ore. Future environmental restrictions on the use of blast furnaces in North America also may reduce our customers' use of their blast furnaces. Maintenance of blast furnaces may require substantial capital expenditures and may cause prolonged outages, which may reduce demand for our pellets. Our customers may choose not to maintain, or may not have the resources necessary to maintain, their blast furnaces. If our customers use methods to produce steel that do not use domestic iron ore pellets or if environmental or maintenance issues occur, demand for our current iron ore products may decrease, which could affect adversely our sales, margins, profitability and cash flows.

***Due to economic conditions and volatility in commodity prices, or otherwise, our customers could approach us about modifying their supply agreements or fail to perform under such agreements, which could impact adversely our sales, margins, profitability and cash flows.***

Although we have long-term contractual commitments for a majority of our iron ore pellet sales, uncertainty in global economic conditions may impact adversely the ability of our customers to meet their obligations to us. As a result of such market volatility, our customers could approach us about modifying their supply agreements or fail to perform under such agreements. Considering our limited base of current and potential blast furnace customers, any modifications to our sales agreements or customers' failures to perform under such agreements could impact adversely our sales, margins, profitability and cash flows. For example, certain customers in the North American integrated steel industry have experienced financial difficulties from time-to-time, including going through reorganization proceedings. A loss of sales to our existing customers could have a substantial negative impact on our sales, margins, profitability and cash flows. Other potential actions by our customers could result in additional contractual disputes and could ultimately require arbitration or litigation, either of which could be time consuming and costly. Any such disputes and/or inability to renew existing contracts on favorable terms could impact adversely our sales, margins, profitability and cash flows.

***Capacity expansions and limited rationalization of supply capacity within the mining industry could lead to lower or more volatile global iron ore prices, impacting our profitability.***

Global growth of iron ore demand, particularly from China, and higher iron ore prices resulted in iron ore miners expanding their production capacity in recent years to increase iron ore supply. In the past, however, moderation in demand following increases in production capacity has resulted in excess supply of iron ore, causing downward pressure on prices. A return to supply capacity expansions could lead to pricing pressure which can have an adverse impact on our sales, margins, profitability and cash flows. We do not have control over corporate strategies implemented by other iron ore producers that may result in volatility of global iron ore prices.

## II.  REGULATORY RISKS

***We are subject to extensive governmental regulation, which imposes, and will continue to impose, potential significant costs and liabilities on us. Future laws and regulations or the manner in which they are interpreted and enforced could increase these costs and liabilities or limit our ability to produce iron ore products.***

New laws or regulations, or changes in existing laws or regulations, or the manner of their interpretation or enforcement, could increase our cost of doing business and restrict our ability to operate our business or execute our strategies. This includes, among other things, changes in the interpretation of MSHA regulations, such as workplace exam rules or safety around mobile equipment, changes in the interpretation of OSHA regulations, such as standards for occupational exposure to noise and certain chemicals, the possible taxation under U.S. law of certain income from discontinued foreign operations, compliance costs and enforcement under the Dodd-Frank Act, and costs associated with the Healthcare and Education Reconciliation Act of 2010 and the regulations promulgated under these Acts and any replacements or amendments thereof. In addition, our operations are subject to various federal, state and local laws and regulations for human health and safety, air quality, water pollution, plant, wetlands, natural resources and wildlife protection, reclamation and restoration of mining properties, the discharge of materials into the environment, the effects that mining has on groundwater quality, conductivity and availability, and other related matters. Compliance with numerous governmental permits and approvals is required for our operations.

We cannot be certain that we have been or will be at all times in complete compliance with such laws, regulations, permits and approvals. If we violate or fail to comply with these laws, regulations, permits or approvals, we could be

18

fined or otherwise sanctioned by regulators. Compliance with the complex and extensive laws and regulations to which we are subject imposes substantial costs on us, which could increase over time because of heightened regulatory oversight, adoption of more stringent environmental standards, and greater demand for remediation services leading to shortages of equipment, supplies and labor, as well as other factors.

Specifically, there are several notable proposed or recently enacted rulemakings or activities to which we would be subject or that would further regulate and/or tax our North American integrated steel producer customers, which may also require us or our customers to reduce or otherwise change operations significantly or incur significant additional costs, depending on their ultimate outcome. These emerging or recently enacted rules, regulations and policy guidance include, but are not limited to: trade regulations, such as the United States-Mexico-Canada Agreement and/or other trade agreements, treaties or policies; Minnesota's potential revisions to the sulfate wild rice water quality standard; evolving water quality standards for selenium and conductivity; scope of the Clean Water Act and the definition of "Waters of the United States"; Minnesota's Mercury TMDL and associated rules governing mercury air emission reductions; Climate Change and GHG Regulation; Regional Haze FIP Rule; $NO_2$ and $SO_2$ NAAQS; and increased administrative and legislative initiatives related to financial assurance obligations for CERCLA, mining and reclamation obligations. Such new or more stringent legislation, regulations, interpretations or orders, when enacted and enforced, could have a material adverse effect on our business, results of operations, financial condition or profitability.

***Although the numerous regulations, operating permits and our management systems mitigate potential impacts to the environment, our operations inadvertently may impact the environment or cause exposure to hazardous substances, which could result in material liabilities to us.***

Our operations currently use, and have used in the past, hazardous materials, and, from time to time, we have generated solid and hazardous waste. We have been, and may in the future be, subject to claims under federal, state and local laws and regulations for toxic torts, natural resource damages and other damages as well as for the investigation and clean-up of soil, surface water, sediments, groundwater and other natural resources and reclamation of properties. Such claims for damages and reclamation may arise out of current or former conditions at sites that we own, lease or operate currently, as well as sites that we or our acquired companies have owned, leased or operated, and at contaminated sites that have been owned, leased or operated by our joint venture partners. Our liability for these claims may be strict, and/or joint and several, such that we may be held responsible for more than our share of the contamination or other damages, or even for entire claims regardless of fault. We are currently subject to potential liabilities relating to investigation and remediation activities at certain sites. In addition to sites currently owned, leased or operated, these include sites where we formerly conducted raw material processing or other operations, inactive sites that we currently own, predecessor sites, acquired sites, leased land sites and third-party waste disposal sites. We may be named as a potentially responsible party at other sites in the future and we cannot be certain that the costs associated with these additional sites will not be material.

We also could be subject to litigation for alleged bodily injuries arising from claimed exposure to hazardous substances allegedly used, released, or disposed of by us. In particular, we and certain of our subsidiaries were involved in various claims relating to the exposure of asbestos and silica to seamen who sailed until the mid-1980s on the Great Lakes vessels formerly owned and operated by certain of our subsidiaries. While several hundred of these claims against us had been combined in a multidistrict litigation docket and have since been dismissed and/or settled for non-material amounts, there remains a possibility that similar types of claims could be filed in the future.

Environmental impacts as a result of our operations, including exposures to hazardous substances or wastes associated with our operations, could result in costs and liabilities that could materially and adversely affect our margins, cash flow or profitability.

***We may be unable to obtain and/or renew permits necessary for our operations or be required to provide additional financial assurance, which could reduce our production, cash flows, profitability and available liquidity. We also could face significant permit and approval requirements that could delay our commencement or continuation of new or existing production operations which, in turn, could affect materially our profitability and available liquidity.***

Prior to commencement of mining and periodically after production begins, we must submit to and obtain approval from the appropriate regulatory authority of plans showing where and how mining and reclamation operations are to occur. These plans must include information such as the location of mining areas, stockpiles, surface waters, haul roads, tailings basins and drainage from mining operations. Any requirements imposed by any such authority may be costly and time-consuming and may delay commencement or continuation of exploration or production operations.

19

A005926

Mining and manufacturing companies must obtain numerous permits that impose strict conditions on various environmental and safety matters in connection with iron ore mining and production. These include permits issued by various federal, state and local agencies and regulatory bodies. The permitting rules are complex and may change over time, making our ability to comply with the applicable requirements more difficult or impractical and costly, possibly precluding the continuance of ongoing operations or the development of future operations. Interpretations of rules may also change over time and may lead to requirements, such as additional financial assurance, making it costlier to comply. The public, including special interest groups and individuals, have certain rights under various statutes to comment upon, submit objections to, and otherwise engage in the permitting process, including bringing citizens' lawsuits to challenge such permits or activities. Accordingly, required permits may not be issued or renewed in a timely fashion (or at all), or permits issued or renewed may be conditioned in a manner that may restrict our ability to conduct our mining and production activities efficiently, including the requirement for additional financial assurances that we may not be able to provide on commercially reasonable terms (or at all) and which would further limit our borrowing base under our ABL Facility. Such inefficiencies could reduce our production, cash flows, profitability or available liquidity.

III.   **FINANCIAL RISKS**

***A substantial majority of our sales are made under supply agreements with specified duration to a low number of customers that contain price-adjustment clauses that could adversely affect our profitability.***

A majority of our Mining and Pelletizing sales are made under supply agreements with specified durations to a limited number of customers. For the year ended December 31, 2019, approximately 99% of our revenues from product sales and services was derived from the North American integrated steel industry, and three customers together accounted for 97% of our Mining and Pelletizing product sales revenues. Our average remaining duration of our Mining and Pelletizing contracts as of December 31, 2019 is approximately five years. Pricing under our customer contracts is adjusted by certain factors, including Platts 62% price, hot-rolled coil steel price, Atlantic Basin pellet premium, Platts international indexed freight rates and changes in specified PPI, including those for industrial commodities, fuel and steel. As a result of these and other pricing constructs contained in our customer contracts, our financial results are sensitive to changes in iron ore and steel prices.

***Our existing and future indebtedness may limit cash flow available to invest in the ongoing needs of our business, which could prevent us from fulfilling our obligations under our senior notes and ABL Facility.***

As of December 31, 2019, we had $2,238.0 million aggregate principal amount of long-term debt outstanding, $400.0 million of which was secured (excluding $37.9 million of outstanding letters of credit and $38.2 million of finance leases), and $352.6 million of cash on our balance sheet. As of December 31, 2019, no loans were drawn under the ABL Facility and we had total availability of $395.7 million as a result of borrowing base limitations. As of December 31, 2019, the principal amount of letters of credit obligations and other commitments totaled $37.9 million, thereby further reducing available borrowing capacity on our ABL Facility to $357.8 million.

Our existing level of indebtedness requires us to dedicate a portion of our cash flow from operations to the payment of debt service, reducing the availability of our cash flow to fund capital expenditures, acquisitions or strategic development initiatives, and other general corporate purposes. Moreover, our level of indebtedness could have further consequences, including increasing our vulnerability to adverse economic or industry conditions, limiting our ability to obtain additional financing in the future to enable us to react to changes in our business, or placing us at a competitive disadvantage compared to businesses in our industry that have less indebtedness.

Although we were successful in financing our HBI project, our indebtedness could limit our ability to obtain additional financing on acceptable terms or at all for working capital, capital expenditures, acquisitions or strategic development initiatives, and general corporate purposes. Our liquidity needs could vary significantly and may be affected by general economic conditions, industry trends and many other factors not within our control. If we are unable to generate sufficient cash flow from operations in the future to service our debt, we may be required to refinance all or a portion of our existing debt. In addition, in connection with the consummation of the Merger, we expect to incur additional debt to, among other things, retire certain of AK Steel's existing debt and enter into the New ABL Facility. See *"—VII. Risks Related to the Proposed Merger—Following completion of the proposed Merger, our debt may limit our financial flexibility."*

Any failure to comply with covenants in the instruments governing our debt could result in an event of default which, if not cured or waived, would have a material adverse effect on us.

20

***We may not be able to generate sufficient cash to service all of our debt, and may be forced to take other actions to satisfy our obligations under our debt, which may not be successful.***

Our ability to make scheduled payments on or to refinance our debt obligations depends on our ability to generate cash in the future and our financial condition and operating performance, which are subject to prevailing economic and competitive conditions and to certain financial, business and other factors beyond our control. We cannot assure you that we will maintain a level of cash flows from operating activities sufficient to permit us to pay the principal, premium, if any, and interest on our debt.

We also have significant capital requirements, including interest payments to service our debt. If we incur significant losses in future periods, we may be unable to continue as a going concern. If we are unable to continue as a going concern, we may consider, among other options, restructuring our debt; however, there can be no assurance that these options will be undertaken and, if so undertaken, whether these efforts would succeed.

If our cash flows and capital resources are insufficient to fund our debt service obligations, we could face substantial liquidity problems and we may be forced to reduce or delay investments and capital expenditures, or to sell assets, seek additional capital, including additional secured or unsecured debt, or restructure or refinance our debt. We may be unable to consummate any proposed asset sales or recover the carrying value of these assets, and any proceeds may not be adequate to meet any debt service obligations then due. Any refinancing of our debt could be at higher interest rates and may require us to comply with more onerous covenants, making it more difficult to obtain surety bonds, letters of credit or other financing, particularly during periods in which credit markets are weak. Further, we may need to refinance all or a portion of our debt on or before maturity, and we may not be able to refinance any of our debt on commercially reasonable terms or at all, causing a change in our credit ratings; limiting our ability to compete with companies that are not as leveraged and that may be better positioned to withstand economic downturns; and limiting our flexibility in planning for, or reacting to, and increasing our vulnerability to, changes in our business, the industry in which we compete and general economic and market conditions. In addition, new or increased financial assurances may be demanded by our vendors or regulatory agencies that we may not be able to provide on commercially reasonable terms or at all.

Any of these examples potentially could have a material adverse impact on our results of operations, profitability, shareholders' equity and capital structure.

***A court or regulatory body could find that we are responsible, in whole or in part, for liabilities we transferred to third party purchasers.***

As part of our strategy to protect our core business, we have sold or otherwise disposed of several non-core assets, such as our North American Coal and Australian assets. Some of the transactions under which we sold or otherwise disposed of our non-core assets included provisions transferring certain liabilities to the purchasers or acquirers of those non-core assets. While we believe that all such transfers were completed properly and are legally binding, if the purchaser fails to fulfill its obligations, we may be at risk that some court or regulatory body could disagree and determine that we remain responsible for liabilities we intended to and did transfer.

***Our ability to collect payments from our customers depends on their creditworthiness.***

Our ability to receive payment for products sold and delivered to our customers depends on the creditworthiness of our customers. Generally, we deliver our products to our customers' facilities in advance of payment for those products. Under this practice for most of our customers, title and risk of loss do not pass to the customer until we receive payment; however, there is typically a period of time in which our products, for which we have reserved title, are within our customers' control. Where we have identified credit risk with certain customers, we have put in place alternate payment terms from time to time.

Customers outside of the U.S. may be subject to pressures and uncertainties that may affect their ability to pay, including trade barriers, exchange controls, and local economic and political conditions. Downturns in the economy and disruptions in the global financial markets have affected the creditworthiness of our customers from time to time. Some of our customers are highly leveraged. If economic conditions worsen or prolonged global, national or regional economic recession conditions return, it is likely to impact significantly the creditworthiness of our customers and could, in turn, increase the risk we bear on payment default for the credit we provide to our customers and could limit our ability to collect receivables. Failure to receive payment from our customers for products that we have delivered could affect adversely our results of operations, financial condition and liquidity.

21

***Our operating expenses could increase significantly if the price of electrical power, fuel or other energy sources increases.***

Our operations require significant use of energy. Energy expenses, which are approximately 15% to 25% of our total production costs, are sensitive to changes in electricity prices and fuel prices, including diesel fuel and natural gas prices. Prices for electricity, natural gas and fuel oils can fluctuate widely with availability and demand levels from other users. During periods of peak usage, supplies of energy may be curtailed and we may not be able to purchase them at historical rates. A disruption in the transmission of energy, inadequate energy transmission infrastructure, or the termination of any of our energy supply contracts could interrupt our energy supply and affect adversely our operations. While we have some long-term contracts with electrical suppliers, we are exposed to fluctuations in energy costs that can affect our production costs. As an example, our United Taconite mine is subject to changes in Minnesota Power's rates, such as periodic rate changes that are reviewed and approved by the state public utilities commission in response to an application filed by Minnesota Power. We also enter into market-based pricing supply contracts for electricity, natural gas and diesel fuel for use in our operations. Those contracts expose us to price increases in energy costs, which could cause our profitability to decrease significantly. In addition, U.S. public utilities may pass through additional capital and operating cost increases to their customers related to new or pending U.S. environmental regulations that may require significant capital investment and use of cleaner fuels in the future.

***Changes in credit ratings issued by nationally recognized statistical rating organizations could adversely affect our cost of financing and the market price of our securities.***

Credit rating agencies could downgrade our ratings due to various developments, including the Merger, factors specific to our business, a prolonged cyclical downturn in the mining or steel industry, or macroeconomic trends (such as global or regional recessions) and trends in credit and capital markets more generally. Any decline in our credit ratings may result in an increase to our cost of future financing and/or limit our access to the capital markets, which could harm our financial condition and results of operations, hinder our ability to refinance existing indebtedness on acceptable terms, have an adverse effect on the market price of our securities and may affect adversely the terms under which we purchase goods and services.

***Our actual operating results may differ significantly from our guidance.***

From time to time, we release guidance, including that set forth under "Management's Discussion and Analysis of Financial Condition and Results of Operations—Outlook" in our Annual Reports on Form 10-K and our Quarterly Reports on Form 10-Q, regarding our future performance. This guidance, which consists of forward-looking statements, is prepared by our management and is qualified by, and subject to, the assumptions and the other information included in our Annual Reports on Form 10-K and our Quarterly Reports on Form 10-Q. Our guidance is not prepared with a view toward compliance with published guidelines of the American Institute of Certified Public Accountants, and neither our independent registered public accounting firm nor any other independent or outside party compiles or examines the guidance and, accordingly, no such person expresses any opinion or any other form of assurance with respect thereto.

Guidance is based upon a number of assumptions and estimates that, while presented with numerical specificity, are inherently subject to business, economic and competitive uncertainties and contingencies, many of which are beyond our control and are based upon specific assumptions with respect to future business decisions, some of which will change. The principal reason that we release such data is to provide a basis for our management to discuss our business outlook with analysts and investors. We do not accept any responsibility for any projections or reports published by any such third parties.

Guidance is necessarily speculative in nature, and it can be expected that some or all of the assumptions of the guidance furnished by us will not materialize or will vary significantly from actual results. Accordingly, our guidance is only an estimate of what management believes is realizable as of the date of release. Actual results will vary from the guidance. Investors should also recognize that the reliability of any forecasted financial data diminishes the further in the future that the data are forecast. In light of the foregoing, investors are urged to put the guidance in context and not to place undue reliance on it.

Any failure to successfully implement our operating strategy or the occurrence of any of the risks described in our Annual Reports on Form 10-K or our Quarterly Reports on Form 10-Q could result in actual operating results being different than the guidance, and such differences may be adverse and material.

***Our assets as of December 31, 2019 include a deferred tax asset, the full value of which we may not be able to realize.***

22

We recognize deferred tax assets and liabilities based on differences between the financial statement carrying amounts and the tax basis of assets and liabilities. At December 31, 2019, the net deferred tax asset was $459.5 million, primarily related to U.S. net operating loss carryforwards. We regularly review our deferred tax assets for recoverability based on our history of earnings, expectations for future earnings and expected timing of reversals of temporary differences. Realization of deferred tax assets ultimately depends on the existence of sufficient taxable income. We believe the recorded net deferred tax asset at December 31, 2019 is fully realizable based on our expected future earnings.  However, our assumptions and estimates are inherently subject to business, economic and competitive uncertainties and contingencies, many of which are beyond our control and some of which may change. As a result, we could ultimately lose a portion of our deferred tax asset related to net operating loss carryforwards due to expiration, which could have a material adverse effect on our results of operations and cash flows.

***Holders of our common shares may not receive dividends on their common shares.***

Holders of our common shares are entitled to receive only such dividends as our Board of Directors may from time to time declare out of funds legally available for such payments. We are incorporated in Ohio and governed by the Ohio General Corporation Law, which allows a corporation to pay dividends, in general, in an amount that cannot exceed its surplus, as determined under Ohio law. Our ability to pay dividends will be subject to our future earnings, capital requirements and financial condition, as well as our compliance with covenants and financial ratios related to existing or future indebtedness, business prospects and other factors that our Board of Directors may deem relevant. Additionally, our ABL Facility contains, and agreements governing any of our future debt (including the New ABL Facility) may contain, covenants and other restrictions that, in certain circumstances, could limit the level of dividends that we are able to pay on our common shares. Although we recently have declared cash dividends on our common shares, we are not required to declare cash dividends on our common shares and our Board of Directors may reduce, defer or eliminate our common share dividend in the future.

***We rely on our joint venture partners to meet their payment obligations and we are subject to risks involving the acts or omissions of our joint venture partners.***

We co-own one of our four operating Mining and Pelletizing mines with ArcelorMittal USA and U.S. Steel. One of our joint venture partners is also our customer. We cannot control the actions of our joint venture partners, and we have limited ability to control the joint venture because we hold a minority interest and no longer manage the joint venture. Accordingly, we rely on our joint venture partners to make their required capital contributions and to pay for their share of the iron ore produced. If one or both of our joint venture partners fail to perform their obligations, the remaining joint venture partners, including ourselves, may be required to assume additional material obligations, including significant capital contributions, costs of environmental remediation, and pension and OPEB obligations.

IV.    **OPERATIONAL RISKS**

***Mine closures entail substantial costs. If we prematurely close one or more of our mines, our results of operations and financial condition would likely be affected adversely.***

If we prematurely close any of our mines, our production and revenues would be reduced unless we were able to increase production at our other mines in an offsetting amount, which may not be possible. The closure of a mining operation involves significant fixed closure costs, including accelerated employment legacy costs, severance-related obligations, reclamation and other environmental costs, and the costs of terminating long-term obligations, including customer, energy and transportation contracts and equipment leases. We base our assumptions regarding the life of our mines on detailed studies we perform from time to time, but those studies and assumptions are subject to uncertainties and estimates that may not be accurate. We recognize the costs of reclaiming open pits, stockpiles, tailings ponds, roads and other mining support areas based on the estimated mining life of our property. If we were to significantly reduce the estimated life of any of our mines, the mine-closure costs would be applied to a shorter period of production, which would increase costs per ton produced and could significantly and adversely affect our results of operations and financial condition.

A permanent mine closure could accelerate and significantly increase employment legacy costs, including our expense and funding costs for pension and OPEB obligations. A number of employees would be eligible for immediate retirement under special eligibility rules that apply upon a mine closure. All employees eligible for immediate retirement under the pension plans at the time of the permanent mine closure also could be eligible for OPEB, thereby accelerating our obligation to provide these benefits. Certain mine closures would precipitate a pension closure liability significantly greater than an ongoing operation liability and may trigger certain severance liability obligations.

***Our sales and competitive position depend on the ability to transport our products to our customers at competitive rates and in a timely manner.***

Disruption of the lake, rail and trucking transportation services because of weather-related problems, including ice and winter weather conditions on the Great Lakes or St. Lawrence Seaway, climate change, strikes, lock-outs, or other events and lack of alternative transportation options, could impair our ability to supply iron ore products to our customers at competitive rates or in a timely manner and, thus, could adversely affect our sales, margins and profitability. Further, reduced dredging and environmental changes, particularly at Great Lakes ports, could impact negatively our ability to move our iron ore products because lower water levels restrict the tonnage that vessels can haul, resulting in higher freight rates.

***Natural disasters, weather conditions, disruption of energy, unanticipated geological conditions, equipment failures, and other unexpected events may lead our customers, our suppliers or our facilities to curtail production or shut down operations.***

Operating levels within our industry are subject to unexpected conditions and events that are beyond the industry's control. Those events could cause industry members or their suppliers to curtail production or shut down a portion or all of their operations, which could reduce the demand for our iron ore products and affect adversely our sales, margins and profitability.

Interruptions in production capabilities inevitably will increase our production costs and reduce our profitability. For example, we do not have meaningful excess capacity for current production needs, and we are not able to quickly increase production or restart production at one mine to offset an interruption in production at another mine. Additionally, restart production costs can be even higher if required to be taken during extremely cold weather conditions.

A portion of our production costs are fixed regardless of current operating levels. As noted, our operating levels are subject to conditions beyond our control that can delay deliveries or increase the cost of production for varying lengths of time. These include weather conditions (for example, extreme winter weather, tornadoes, floods, and the lack of availability of process water due to drought) and natural and man-made disasters, tailings dam failures, pit wall failures, unanticipated geological conditions, including variations in the amount of rock and soil overlying the deposits of iron ore, variations in rock and other natural materials, and variations in geologic conditions and ore processing changes.

Our mining operations, ore processing facilities and logistics operations depend on critical pieces of equipment. This equipment may, on occasion, be out of service because of unanticipated failures. In addition, all of our mines and most of our processing facilities have been in operation for several decades, and the equipment is aged. In the future, we may experience additional lengthy shutdowns or periods of reduced production because of equipment failures. Further, remediation of any interruption in production capability may require us to make large capital expenditures that could have a negative effect on our profitability and cash flows. Our business interruption insurance would not cover all of the lost revenues associated with equipment failures. Longer-term business interruptions could result in a loss of customers, which could adversely affect our future sales levels and profitability.

Many of our mines and facilities are dependent on one source for electric power and for natural gas. A significant interruption in service from our energy suppliers due to terrorism or sabotage, weather conditions, natural disasters, or any other cause could result in substantial losses that may not be fully recoverable, either from our business interruption insurance or responsible third parties.

***We incur certain costs when production capacity is idled, including increased costs to resume production at idled facilities and costs to idle facilities.***

Our decisions concerning which facilities to operate and at what capacity levels are made based upon our customers' orders for products, as well as the quality, performance capabilities and production cost of our operations. During depressed market conditions, we may concentrate production at certain facilities and not operate others in response to customer demand, and as a result we may incur idle facility costs. In 2016, for example, two of our Minnesota mines were temporarily idled for a portion of the year, and we indefinitely idled the Empire mine in Michigan in August 2016.

24

When we restart idled facilities, we incur certain costs to replenish inventories, prepare the previously idled facilities for operation, perform the required mine stripping, repair and maintenance activities, and prepare employees to return to work safely and to resume production responsibilities. The amount of any such costs can be material, depending on a variety of factors, such as the period of idle time, necessary repairs and available employees, and is difficult to project.

If faced with overcapacity in the iron ore market, we may seek to rationalize assets through asset sales, temporary shutdowns, indefinite idles or facility closures.

**We may not have adequate insurance coverage for some business risks.**

As noted above, our operations are generally subject to a number of hazards and risks, which could result in damage to, or destruction of, equipment, properties or facilities. The insurance that we maintain to address risks that are typical in our business may not provide adequate coverage. Insurance against some risks, such as liabilities for environmental pollution, tailings basin breaches, or certain hazards or interruption of certain business activities, may not be available at an economically reasonable cost, or at all. Even if available, we may self-insure where we determine it is most cost-effective to do so. As a result, accidents or other negative developments involving our mining, production or transportation activities could have a material adverse effect on our operations.

**A disruption in, or failure of our information technology systems, including those related to cybersecurity, could adversely affect our business operations and financial performance.**

We rely on the accuracy, capacity and security of our information technology ("IT") systems for the operations of many of our business processes and to comply with regulatory, legal and tax requirements. While we maintain some of our critical information technology systems, we are also dependent on third parties to provide important IT services relating to, among other things, operational technology at our facilities, human resources, electronic communications and certain finance functions. Despite the security measures that we have implemented, including those related to cybersecurity, our systems could be breached or damaged by computer viruses, natural or man-made incidents or disasters, or unauthorized physical or electronic access. Though we have controls in place, we cannot provide assurance that a cyber-attack will not occur. Furthermore, we may have little or no oversight with respect to security measures employed by third-party service providers, which may ultimately prove to be ineffective at countering threats. Failures of our IT systems, whether caused maliciously or inadvertently, may result in the disruption of our business processes, or in the unauthorized release of sensitive, confidential or otherwise protected information, or result in the corruption of data, which could adversely affect our business operations and financial performance. In addition, we may be required to incur significant costs to protect against and, if required, remediate the damage caused by such disruptions or system failures in the future.

**Our profitability could be affected adversely by the failure of outside contractors and/or suppliers to perform.**

We rely on outside companies to provide key services, including the design and construction of our HBI production plant in Toledo, Ohio. Additionally, we use contractors to help complete certain capital projects, such as upgrades to our existing Mining and Pelletizing facilities. A contractor's or supplier's failure to perform could affect adversely our production, sales, and our ability to fulfill customer requirements. Such failure to perform in a significant way would result in additional costs for us, which also could affect adversely our production rates, sales, results of operations and profitability.

V.     DEVELOPMENT     AND     SUSTAINABILITY RISKS

**The cost and time to implement a strategic capital project may prove to be greater than originally anticipated.**

We undertake strategic capital projects, such as the HBI project, in order to enhance, expand or upgrade our mining and production capabilities or diversify our customer base. Our ability to achieve the anticipated production volumes, revenues or otherwise realize acceptable returns on strategic capital projects that we may undertake is subject to a number of risks, many of which are beyond our control, including a variety of market (such as a volatile pricing environment for iron ore products), operational, permitting and labor-related factors. Further, the cost to implement any given strategic capital project ultimately may prove to be greater and may take more time than originally anticipated. Inability to achieve the anticipated results from the implementation of our strategic capital projects, incurring unanticipated implementation costs or penalties, or the inability to meet contractual obligations could affect adversely our results of operations and future earnings and cash flow generation.

**We continually must replace ore reserves depleted by production. Exploration activities may not result in additional discoveries.**

Our ability to replenish our ore reserves is important to our long-term viability. Depleted ore reserves must be

25

replaced by further delineation of existing ore bodies or by locating new deposits in order to maintain production levels over the long term. For example, in 2017 we made investments in our Tilden and Empire mines and in land in Minnesota to provide future potential ore reserves. Based on the economic reserve analyses performed during 2019 and 2018, we revised the mine plans for Tilden and Northshore, respectively, to add ore reserves and extend mine life. Resource exploration and development are highly speculative in nature. Exploration projects involve many risks, require substantial expenditures and may not result in the discovery of sufficient additional mineral deposits that can be mined profitably. Once a site with mineralization is discovered, it may take several years from the initial phases of drilling until production is possible, during which time the economic feasibility of production may change. Substantial expenditures are required to establish recoverable proven and probable reserves and to construct mining and processing facilities. As a result, there is no assurance that current or future exploration programs will be successful, and there is a risk that depletion of reserves will not be offset by discoveries or acquisitions.

***We rely on estimates of our recoverable reserves, which is complex due to geological characteristics of the properties and the number of assumptions made.***

We regularly evaluate our iron ore reserves based on revenues and costs and update them as required in accordance with SEC Industry Guide 7. We anticipate further updating our mining properties disclosure in accordance with the SEC's Final Rule 13-10570, Modernization of Property Disclosures for Mining Registrants, which became effective February 25, 2019, and which rescinds Industry Guide 7 following a two-year transition period, which means that we will be required to comply with the new rule no later than our fiscal year beginning January 1, 2021. Estimates of reserves and future net cash flows necessarily depend upon a number of variable factors and assumptions, some of which are beyond our control, such as production capacity, effects of regulations by governmental agencies, future prices for iron ore, future industry conditions and operating costs, severance and excise taxes, development costs and costs of extraction and reclamation, all of which may vary considerably from actual results. Estimating the quantity and grade of reserves requires us to determine the size, shape and depth of our mineral bodies by analyzing geological data, such as samplings of drill holes. In addition to the geology assumptions regarding our mines, assumptions are also required to determine the economic feasibility of mining these reserves, including estimates of future commodity prices and demand, the mining methods we use, and the related costs incurred to develop and mine our reserves. For these reasons, estimates of the economically recoverable quantities of mineralized deposits attributable to any particular group of properties, classifications of such reserves based on risk of recovery and estimates of future net cash flows prepared by different engineers or by the same engineers at different times may vary substantially as the criteria change. Estimated ore reserves could be affected by future industry conditions, future changes in the SEC's mining property disclosure requirements, geological conditions and ongoing mine planning. Actual volume and grade of reserves recovered, production rates, revenues and expenditures with respect to our reserves will likely vary from estimates, and if such variances are material, our sales and profitability could be affected adversely.

***Defects in title or loss of any leasehold interests in our mining properties could limit our ability to mine these properties or result in significant unanticipated costs.***

A portion of our mining operations are conducted on properties we lease, license or as to which we have easements or other possessory interests, which we refer to as "leased properties." Consistent with industry practice, title to most of these leased properties and mineral rights are not usually verified until we make a commitment to develop a property, which may not occur until after we have obtained necessary permits and completed exploration of the leased property. In some cases, title with respect to leased properties is not verified at all because we instead rely on title information or representations and warranties provided by lessors or grantors. We do not maintain title insurance on our owned or leased properties. A title defect or the loss of any lease, license or easement for any leased mining property could affect adversely our ability to mine any associated reserves. In addition, from time to time the rights of third parties for competing uses of adjacent, overlying, or underlying lands such as for roads, easements and public facilities may affect our ability to operate as planned if our title is not superior or arrangements cannot be negotiated.

Any challenge to our title could delay the exploration and development of some reserves, deposits or surface rights, cause us to incur unanticipated costs and could ultimately result in the loss of some or all of our interest in those reserves or surface rights. In the event we lose reserves, deposits or surface rights, we may have to shut down or significantly alter the sequence of our mining operations, which may affect adversely our future production, revenues and cash flows. Additionally, if we lose any leasehold interests relating to any of our pellet plants or loadout facilities, we may need to find an alternative location to process our iron ore and load it for delivery to customers, which could result in significant unanticipated costs. Finally, we could incur significant liability if we inadvertently mine on property we do not own or lease.

26

***In order to continue to foster growth in our business and maintain stability of our earnings, we must maintain our social license to operate with our stakeholders.***

Maintaining a strong reputation and consistent operational and safety track record is vital in order to continue to foster growth and maintain stability in our earnings. As sustainability expectations increase and regulatory requirements continue to evolve, maintaining our social license to operate becomes increasingly important. We incorporate social license expectations in our ERM program. Our ability to maintain our reputation and strong operating track record could be threatened, including by circumstances outside of our control, such as disasters caused or suffered by other companies in our industry. If we are not able to respond effectively to these and other challenges to our social license to operate, our reputation could be damaged significantly. Damage to our reputation could affect adversely our operations and ability to foster growth projects.

***Estimates and timelines relating to new development projects are uncertain and we may incur higher costs and lower economic returns than estimated.***

Mining industry development projects typically require a number of years and significant expenditures before production is possible. Such projects could experience unexpected problems and delays during development, construction and/or start-up.

Our decision to develop a project typically is based on the results of feasibility studies, which estimate the anticipated economic returns of a project. The actual project profitability or economic feasibility may differ from such estimates as a result of any of the following factors, among others: changes in tonnage, grades and metallurgical characteristics of ore or other raw materials to be mined and processed; estimated future prices of the relevant product; changes in customer demand; higher construction and infrastructure costs; the quality of the data on which engineering assumptions were made; higher production costs; adverse geotechnical conditions; availability of adequate labor force; availability and cost of water and energy; availability and cost of transportation; fluctuations in inflation and currency exchange rates; availability and terms of financing; delays in obtaining environmental or other government permits or changes in laws and regulations including environmental laws and regulations; weather or severe climate impacts; and potential delays relating to social and community issues.

***Our HBI project will require the commitment of substantial resources. Any unanticipated costs or delays associated with our HBI project could have a material adverse effect on our financial condition or results of operations.***

Our ongoing efforts with respect to our HBI project require the commitment of substantial capital expenditures. We currently expect to incur capital expenditures through 2020 of approximately $830 million plus a contingency of up to 20%, excluding capitalized interest, on the development of the HBI production plant in Toledo, Ohio, of which approximately $700 million was paid as of December 31, 2019. Our estimated expenses may increase as personnel and equipment associated with advancing development and commercial production are added. The timely completion and successful commercial startup of the HBI project will depend in part on the following:

- maintaining required federal, state and local permits;

- completing construction work, commissioning and integration of all of the systems comprising our HBI production plant;

- negotiating sales contracts for our planned production; and

- other factors, many of which are beyond our control.

Any unanticipated costs or delays associated with our HBI project could have a material adverse effect on our financial condition or results of operations and could require us to seek additional capital, which may not be available on commercially acceptable terms or at all.

**VI.    HUMAN CAPITAL RISKS**

***Our profitability could be affected adversely if we fail to maintain satisfactory labor relations.***

Production in our mines and processing facilities is dependent upon the efforts of our employees. We are party to labor agreements with various labor unions that represent employees at some of our operations. Such labor agreements are negotiated periodically, and, therefore, we are subject to the risk that these agreements may not be able to be renewed on reasonably satisfactory terms. It is difficult to predict what issues may arise as part of the collective bargaining process, and whether negotiations concerning these issues will be successful. Due to union activities or other employee actions,

27

[Table of Contents](#)

we could experience labor disputes, work stoppages or other disruptions in our production of iron ore that could affect us adversely. The USW represents all hourly employees at United Taconite and Tilden mines. Our labor agreements with the USW were ratified in October 2018 and extended for a four-year term, effective as of October 1, 2018.

If we enter into a new labor agreement with any union that significantly increases our labor costs relative to our competitors or fail to come to an agreement upon expiry, our ability to compete may be materially and adversely affected.

***We may encounter labor shortages for critical operational positions, which could affect adversely our ability to produce our products.***

We are predicting a long-term shortage of skilled workers for the mining and metals processing industries, and competition for the available workers limits our ability to attract and retain employees as well as engage third-party contractors. As our experienced employees retire, we may have difficulty replacing them at competitive wages.

***Our expenditures for pension and OPEB obligations could be materially higher than we have predicted if our underlying assumptions differ from actual outcomes, there are mine closures, or our joint venture partners fail to perform their obligations that relate to employee pension plans.***

We provide defined benefit pension plans and OPEB to certain eligible union and non-union employees, including our share of expense and funding obligations with respect to our unconsolidated joint venture. Our pension and OPEB expenses and our required contributions to our pension and OPEB plans are affected directly by the value of plan assets, the projected and actual rate of return on plan assets, and the actuarial assumptions we use to measure our defined benefit pension plan obligations, including the rate at which future obligations are discounted.

We cannot predict whether changing market or economic conditions, regulatory changes or other factors will increase our pension and OPEB expenses or our funding obligations, diverting funds we would otherwise apply to other uses.

We have calculated our unfunded pension and OPEB obligations based on a number of assumptions. If our assumptions do not materialize as expected, cash expenditures and costs that we incur could be materially higher. Moreover, we cannot be certain that regulatory changes will not increase our obligations to provide these or additional benefits. These obligations also may increase substantially in the event of adverse medical cost trends or unexpected rates of early retirement, particularly for bargaining unit retirees.

***We depend on our senior management team and other key employees, and the loss of these employees could adversely affect our business.***

Our success depends in part on our ability to attract and motivate our senior management and key employees. Achieving this objective may be difficult due to a variety of factors, including fluctuations in the global economic and industry conditions, competitors' hiring practices, cost reduction activities, and the effectiveness of our compensation programs. Competition for qualified personnel can be intense. We must continue to recruit, retain, and motivate our senior management and key personnel in order to maintain our business and support our projects. A loss of senior management and key personnel could prevent us from capitalizing on business opportunities, and our operating results could be adversely affected.

## VII.    RISKS RELATED TO THE PROPOSED MERGER

***The Merger Agreement may be terminated in accordance with its terms and the Merger may not be completed.***

The Merger Agreement contains a number of conditions that must be satisfied or waived in order to complete the Merger. Those conditions include, among others:

- the adoption of the Merger Agreement by AK Steel stockholders;

- the approval by our shareholders of the Merger Agreement and the transactions contemplated by the Merger Agreement, including the issuance of our common shares in connection with the Merger;

- the receipt of required regulatory approval in Mexico;

- the absence of any governmental order or law prohibiting the consummation of the Merger;

- the accuracy of our and AK Steel's respective representations and warranties under the Merger Agreement (subject to the materiality standards set forth in the Merger Agreement);

Table of Contents

- the performance by us and AK Steel of our respective obligations under the Merger Agreement in all material respects; and

- the absence of a material adverse effect (as described in the Merger Agreement) on us or AK Steel.

These conditions to the closing of the Merger may not be fulfilled in a timely manner or at all, and, accordingly, the Merger may be delayed or may not be completed.

In addition, if the Merger is not completed by June 30, 2020 (subject to the parties each being entitled to extend the date to September 30, 2020 and then December 31, 2020 if required antitrust approvals have not yet been obtained or there is an impediment under any antitrust law), either party may choose not to proceed with the Merger. The parties can mutually decide to terminate the Merger Agreement at any time, before or after the receipt of AK Steel stockholder approval or our shareholder approval.

***Failure to complete the Merger could negatively impact the price of our common shares as well as our future business and financial results.***

If the Merger is not completed for any reason, including the failure of our shareholders to approve the Merger Agreement and the transactions contemplated by the Merger Agreement, including the issuance of our common shares in connection with the Merger, or the failure of AK Steel stockholders to adopt the Merger Agreement, our business and financial results may be adversely affected, including as follows:

- we may experience negative reactions from the financial markets, including negative impacts on the market price of our common shares;

- the manner in which customers, vendors, business partners and other third parties perceive us may be negatively impacted, which in turn could affect our ability to compete for new business or obtain renewals in the marketplace more broadly;

- we may experience negative reactions from employees, which may adversely affect, among other things, productivity and occupational safety; and

- we will have expended significant time and resources that could otherwise have been spent on our existing businesses and the pursuit of other opportunities that could have been beneficial to us, and our ongoing business and financial results may be adversely affected.

If the Merger Agreement is terminated under specified circumstances, we may be required to pay AK Steel a termination fee.

***We are subject to business uncertainties while the Merger is pending, which could adversely affect our business.***

Uncertainty about the effect of the Merger on employees, suppliers and customers may have an adverse effect on us. These uncertainties may impair our ability to attract, retain and motivate key personnel until the Merger is completed and for a period of time thereafter, and could cause our suppliers, customers and others that deal with us to seek to change their existing business relationships with us. For example, our steelmaking customers may not want to purchase their iron ore from a company that is also a competitor.

***The Merger may be less accretive than expected, or may be dilutive, to our earnings per share, which may negatively affect the market price of our common shares.***

The Merger may be less accretive than expected, or may be dilutive, to our earnings per share. Estimates of our earnings per share in the future are based on preliminary estimates that may materially change. In addition, future events and conditions could decrease or delay any accretion, result in dilution or cause greater dilution than is currently expected, including:

- adverse changes in market conditions;

- commodity prices for iron ore and steel;

- production levels;

- operating results;

- competitive conditions;

29

- laws and regulations affecting the iron ore and steel businesses;

- capital expenditure obligations;

- higher than expected integration costs;

- lower than expected synergies; and

- general economic conditions.

Any dilution of, or decrease or delay of any accretion to, our earnings per share could cause the price of our common shares to decline.

***We will incur significant transaction and Merger-related costs in connection with the Merger, which may be in excess of those anticipated by us.***

We expect to continue to incur a number of non-recurring costs associated with completing the Merger, combining the operations of the two companies and achieving anticipated synergies. These fees and costs have been, and will continue to be, substantial. The substantial majority of non-recurring expenses will consist of transaction costs related to the Merger and include, among others, fees paid to financial, legal and accounting advisors, employee retention costs, severance, change of control and benefit costs, and filing fees.

We will also incur transaction fees and costs related to formulating and implementing integration plans, including facilities and systems consolidation costs and employment-related costs. We will continue to assess the magnitude of these costs, and additional unanticipated costs may be incurred in the Merger and the integration of the two companies' businesses. Although we expect that the elimination of duplicative costs, as well as the realization of other efficiencies related to the integration of the businesses, should allow us to offset integration-related costs over time, this net benefit may not be achieved in the near term or at all.

The costs described above, as well as other unanticipated costs and expenses, could have a material adverse effect on our financial condition and operating results following the completion of the Merger.

Many of these costs will be borne by us even if the Merger is not completed.

***Following completion of the proposed Merger, our debt may limit our financial flexibility.***

As of December 31, 2019, we had approximately $2.1 billion of outstanding indebtedness. We expect to incur and/or assume approximately $2.2 billion of debt to complete the acquisition of AK Steel. If we seek to refinance our and/or AK Steel's existing indebtedness, there can be no guarantee that we would be able to execute the refinancing on favorable terms or at all. In addition, in connection with entering into the Merger Agreement, we obtained commitments to provide debt financing in an amount sufficient to repay AK Steel's outstanding indebtedness under its revolving credit facility as well as AK Steel's outstanding senior secured notes. Although the receipt of such financing is not a condition to the closing of the Merger, the unavailability of such financing could adversely impact the financial condition and liquidity of the combined company.

Assuming we do not repay, repurchase, redeem, exchange or otherwise terminate any of our or AK Steel's existing indebtedness, immediately following the completion of the Merger, we expect to have approximately $4.3 billion of outstanding indebtedness.

Any increase in our indebtedness could have adverse effects on our financial condition and results of operations, including:

- increasing our vulnerability to changing economic, regulatory and industry conditions;

- limiting our ability to compete and our flexibility in planning for, or reacting to, changes in our business and industry;

- limiting our ability to pay dividends to our shareholders;

- limiting our ability to borrow additional funds; and

- requiring us to dedicate a substantial portion of our cash flow from operations to payments on our debt, thereby reducing funds available for working capital, capital expenditures, acquisitions, share repurchases, dividends and other purposes.

30

In addition, in connection with executing our business strategies following the Merger, we expect to continue to evaluate the possibility of acquiring additional assets and making further strategic investments, and we may elect to finance these endeavors by incurring additional indebtedness.

Our ability to arrange any additional financing for the purposes described above or otherwise will depend on, among other factors, our financial position and performance, as well as prevailing market conditions and other factors beyond our control. We cannot assure you that we will be able to obtain such financing on acceptable terms or at all.

***We or AK Steel are the target of securities class action and derivative lawsuits that could result in substantial costs and may delay or prevent the Merger from being completed.***

Securities class action lawsuits and derivative lawsuits are often brought against public companies when companies enter into agreements for transactions similar to those contemplated by the Merger Agreement, and such lawsuits have been brought against us or AK Steel in connection with the Merger Agreement. For example, several such lawsuits have been filed against AK Steel and its directors and are currently pending. Two such lawsuits have also named us as a defendant, and another lawsuit has been filed against us and our directors (refer to *Part I - Item 3. Legal Proceedings* for additional information on these lawsuits). Even if the lawsuits are without merit, these claims can result in substantial costs and divert management time and resources. An adverse judgment could result in monetary damages, which could have a negative impact on our liquidity and financial condition. Additionally, if a plaintiff is successful in obtaining an injunction prohibiting completion of the Merger, then that injunction may delay or prevent the Merger from being completed, which may adversely affect our business, financial position and results of operations.

***Even if we complete the Merger, we may fail to realize all of the anticipated benefits of the proposed Merger, and our integration with AK Steel may not be as successful as anticipated.***

The success of the proposed Merger will depend, in part, on our ability to realize the anticipated benefits and cost savings from combining our businesses with AK Steel's businesses. The anticipated benefits and cost savings of the proposed Merger may not be realized fully or at all, may take longer to realize than expected, may require more non-recurring costs and expenditures to realize than expected or could have other adverse effects that we do not currently foresee. Some of the assumptions that we have made, such as with respect to anticipated operating synergies or the costs associated with realizing such synergies; significant long-term cash flow generation; and the benefits of being a vertically integrated value-added iron ore and steel producing enterprise, may not be realized. In addition, there could be potential unknown liabilities and unforeseen expenses associated with the Merger and/or AK Steel's businesses that were not discovered in the course of performing due diligence.

The Merger involves numerous operational, strategic, financial, accounting, legal, tax and other functions, systems and management controls that must be integrated. Difficulties in integrating the two companies may result in the combined company performing differently than expected, in operational challenges or in the failure to realize anticipated expense-related efficiencies. Following completion of the Merger, we may also experience challenges associated with managing the larger, more complex, integrated businesses. The integration process may result in the loss of key employees, the disruption of ongoing businesses, or inconsistencies in standards, controls, procedures and policies.

***Following completion of the proposed Merger, the market price of our common shares may decline in the future as a result of the sale of our common shares held by former AK Steel stockholders or our current shareholders.***

We expect to issue approximately 133 million of our common shares to AK Steel stockholders in the Merger (including shares underlying AK Steel equity awards expected to be outstanding at the effective time of the Merger, which will be converted into awards with respect to our common shares). Following their receipt of our common shares as merger consideration, former AK Steel stockholders may seek to sell our common shares delivered to them. Other shareholders may also seek to sell our common shares held by them following, or in anticipation of, completion of the Merger. These sales (or the perception that these sales may occur), coupled with the increase in the outstanding number of our common shares, may affect the market for, and the market price of, our common shares in an adverse manner.

***Following completion of the proposed Merger, we may record tangible and intangible assets, including goodwill, that could become impaired and result in material non-cash charges to our results of operations in the future.***

The Merger will be accounted for as an acquisition by us in accordance with GAAP. Under the acquisition method of accounting, the assets and liabilities of AK Steel and its subsidiaries will be recorded, as of completion of the Merger, at their respective fair values and added to our assets and liabilities. Our reported financial condition and results of operations for periods after completion of the Merger will reflect AK Steel balances and results after completion of the

31

Table of Contents

Merger but will not be restated retroactively to reflect the historical financial position or results of operations of AK Steel and its subsidiaries for periods prior to the Merger.

Under the acquisition method of accounting, the total purchase price will be allocated to AK Steel's tangible assets and liabilities and identifiable intangible assets based on their fair values as of the date of completion of the Merger. The excess, if any, of the purchase price over those fair values will be recorded as goodwill. To the extent the value of tangible or intangible assets, including goodwill, becomes impaired, we may be required to incur material non-cash charges relating to such impairment. Our operating results may be significantly impacted from both the impairment and the underlying trends in the business that triggered the impairment.

***The ability to use AK Steel's and our respective pre-Merger net operating loss carryforwards and certain other tax attributes to offset future taxable income may be subject to certain limitations.***

If a corporation undergoes an "ownership change" within the meaning of Section 382 of the IRC, the corporation's net operating loss carryforwards and certain other tax attributes arising before the "ownership change" are subject to limitations after the "ownership change." An "ownership change" under Section 382 of the IRC generally occurs if one or more shareholders or groups of shareholders who own at least 5% of the corporation's equity increase their ownership in the aggregate by more than 50 percentage points over their lowest ownership percentage within a rolling period that begins on the later of three years prior to the testing date and the date of the last "ownership change." If an "ownership change" were to occur, Section 382 of the IRC would impose an annual limit on the amount of pre-ownership change net operating loss carryforwards and other tax attributes the corporation could use to reduce its taxable income, potentially increasing and accelerating the corporation's liability for income taxes, and also potentially causing tax attributes to expire unused. The amount of the annual limitation is determined based on a corporation's value immediately prior to the ownership change.

As of December 31, 2018, AK Steel had U.S. federal net operating loss carryforwards of approximately $2.2 billion and approximately $89.2 million in deferred tax assets for state net operating loss carryforwards and tax credit carryforwards. The Merger likely will result in an "ownership change" with respect to AK Steel. Accordingly, all or a portion of AK Steel's U.S. federal net operating loss carryforwards and certain other tax attributes likely would be subject to limitations (or disallowance) on their use after the Merger. Similar rules with respect to the state net operating loss carryforwards may apply under state tax laws.

As of December 31, 2018, we had U.S. federal net operating loss carryforwards of approximately $2.1 billion and state net operating loss carryforwards of approximately $1.5 billion. Our ability to utilize the $2.1 billion U.S. federal net operating loss carryforwards may be limited if we experience an "ownership change" under Section 382 of the IRC. Similar rules with respect to the $1.5 billion state net operating loss carryforwards may apply under state tax laws. The issuance of our common shares to AK Steel stockholders in the Merger or in connection with other issuances or sales of our common shares (including certain transactions involving our common shares that are outside of our control) could cause an "ownership change".

Subsequent "ownership changes" may further affect the limitation in future years, and similar rules may also apply under state and foreign tax laws. Consequently, even if we achieve profitability following the Merger, we may not be able to utilize a material portion of AK Steel's or our net operating loss carryforwards and other tax attributes, which, in addition to increasing our U.S. federal income tax liability, could adversely affect our share price, financial condition, results of operations and cash flows.

***Completion of the Merger may trigger change in control or other provisions in certain agreements to which AK Steel is a party.***

The completion of the Merger may trigger change in control or other provisions in certain agreements to which AK Steel is a party and to which the combined company will be subject following the Merger. If we are unable to obtain consents to the Merger from the counterparties or negotiate waivers of those provisions, the counterparties may exercise their rights and remedies under the agreements, which may include terminating the agreements or seeking monetary damages. Even if we are able to obtain consents or negotiate waivers, the counterparties may require consideration for granting such consents or waivers or seek to renegotiate the agreements on terms less favorable to us.

**Item 1B.**       ***Unresolved Staff Comments***

We have no unresolved comments from the SEC.

**Item 2.**        ***Properties***

The following map shows the locations of our operations and offices as of  December 31, 2019:



**Mining and Pelletizing**

All of our iron ore mining operations are open-pit mines. Additional pit development is underway as required by long-range mine plans. Drilling programs are conducted periodically to collect modeling data and for refining ongoing operations.

Geologic models are developed for all mines to define the major ore and waste rock types. Computerized block models for iron ore are constructed that include all relevant geologic and metallurgical data. These are used to generate grade and tonnage estimates, followed by detailed mine design and life of mine operating schedules.

We currently own or co-own four operating iron ore mines in Michigan and Minnesota, as well as one indefinitely idled mine in Michigan. We produced 19.9 million, 20.3 million and 18.8 million long tons of iron ore pellets in 2019, 2018 and 2017, respectively, at those mines for our account. During 2019, 2018 and 2017 our owned and co-owned mines produced 5.8 million, 6.0 million and 6.7 million long tons, respectively, on behalf of current and previous steel company partners of the mines.

Our Mining and Pelletizing segment mines produce from deposits located within the Biwabik and Negaunee Iron Formation, which are classified as Lake Superior type iron formations that formed under similar sedimentary conditions in shallow marine basins approximately two billion years ago. Magnetite and hematite are the predominant iron oxide ore minerals present, with lesser amounts of goethite and limonite. Quartz is the predominant waste mineral present, with lesser amounts of other chiefly iron bearing silicate and carbonate minerals. The ore minerals liberate from the waste minerals upon fine grinding.

A005940

| Mine | Cliffs Ownership | Infrastructure | Mineralization | Operating Since | Current Annual Capacity[1,2] | 2019 Production[1,2] | Mineral Owned | Rights Leased |
|---|---|---|---|---|---|---|---|---|
| Tilden | 100% | Mine, Concentrator, Pelletizer, Railroad | Hematite & Magnetite | 1974 | 8.0 | 7.7 | 100% | —% |
| Northshore | 100% | Mine, Concentrator, Pelletizer, Railroad | Magnetite | 1990 | 6.0 | 5.2 | —% | 100% |
| United Taconite | 100% | Mine, Concentrator, Pelletizer | Magnetite | 1965 | 5.4 | 5.3 | —% | 100% |
| Hibbing | 23% | Mine, Concentrator, Pelletizer | Magnetite | 1976 | 8.0 | 7.5 | 3% | 97% |
| Empire[3] | 100% | Mine, Concentrator, Pelletizer | Magnetite | 1963 | * | — | 53% | 47% |

[1] Reported on a wet basis in millions of long tons, equivalent to 2,240 pounds.

[2] Figures reported on 100% basis.

[3] Empire was indefinitely idled beginning August 2016.

* Historically, Empire had an annual capacity of 5.5 million long tons; currently indefinitely idled.

### Tilden Mine

The Tilden mine is located on the Marquette Iron Range in Michigan's Upper Peninsula approximately five miles south of Ishpeming, Michigan. Over the past five years, the Tilden mine has produced between 7.6 million and 7.7 million long tons of iron ore pellets annually. During 2017, we acquired the remaining 15% equity interest in Tilden owned by U.S. Steel, bringing our ownership to 100% of the mine. We own all of the ore reserves at the Tilden mine. Operations consist of an open pit truck and shovel mine, a concentrator that utilizes single stage crushing, AG mills, magnetite separation and floatation to produce hematite and magnetite concentrates that are then supplied to the on-site pellet plant. From the site, pellets are transported by our LS&I rail to a ship loading port at Marquette, Michigan, operated by LS&I.

### Northshore Mine

The Northshore mine is located in northeastern Minnesota, approximately two miles south of Babbitt, Minnesota, on the northeastern end of the Mesabi Iron Range. Northshore's processing facilities are located in Silver Bay, Minnesota, near Lake Superior. Over the past five years, the Northshore mine has produced between 3.2 million and 5.6 million long tons of iron ore pellets annually. The Northshore mine was idled from January through May 2016. The temporary idle was a result of historic levels of steel imports into the U.S. and reduced demand from our steel-producing customers. In 2019 we completed our low silica capital upgrade to produce DR-grade pellets on a commercial scale while maintaining overall production capacity of the Northshore processing facility. We are able to produce 3.5 million long tons of DR-grade pellets annually.

We own 100% of the Northshore mine. Mining is conducted on multiple mineral leases having varying expiration dates. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates. We are currently engaged in arbitration proceedings with Mesabi Trust relating to a royalty agreement under which Northshore extracts iron ore from Mesabi Trust lands in return for paying royalties to Mesabi Trust. For further information, refer to *Item 3. Legal Proceedings* of this Annual Report on Form 10-K.

Northshore operations consist of an open pit truck and shovel mine where two stages of crushing occur before the ore is transported along a wholly owned 47-mile rail line to the plant site in Silver Bay. At the plant site, two additional stages of crushing occur before the ore is sent to the concentrator. The concentrator utilizes rod mills and magnetic separation to produce a magnetite concentrate, which is delivered to the pellet plant located on-site. The plant site has its own ship loading port located on Lake Superior.

34

A005941

*United Taconite Mine*

The United Taconite mine is located on Minnesota's Mesabi Iron Range in and around the city of Eveleth, Minnesota. The United Taconite concentrator and pelletizing facilities are located ten miles south of the mine, near the town of Forbes, Minnesota. Over the past five years, the United Taconite mine has produced between 1.5 million and 5.3 million long tons of iron ore pellets annually. The United Taconite mine was temporarily idled from January through August 2016. The temporary idle was a result of historic levels of steel imports into the U.S. and reduced demand from our steel-producing customers. Throughout 2019 and 2018 the United Taconite mine was substantially at full production levels.

We own 100% of the United Taconite mine. Mining is conducted on multiple mineral leases having varying expiration dates. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates. United Taconite operations consist of an open pit truck and shovel mine where two stages of crushing occur before the ore is transported by rail, operated by CN, to the plant site. At the plant site an additional stage of crushing occurs before the ore is sent to the concentrator. The concentrator utilizes rod mills and magnetic separation to produce a magnetite concentrate, which is delivered to the pellet plant. From the plant site, pellets are transported by CN rail to a ship loading port at Duluth, Minnesota, operated by CN.

*Hibbing Mine*

The Hibbing mine is located in the center of Minnesota's Mesabi Iron Range and is approximately ten miles north of Hibbing, Minnesota, and five miles west of Chisholm, Minnesota. On August 12, 2019, our subsidiary, Cliffs Mining Company, ceased performing manager duties for the Hibbing mine and transitioned those duties to ArcelorMittal USA. Prior to this transition, we managed the Hibbing mine and our joint venture partners made required capital contributions and paid for their share of the iron ore pellets that we produced. Over the past five years, the Hibbing mine has produced between 7.5 million and 8.2 million long tons of iron ore pellets annually. We own 23% of Hibbing, a subsidiary of ArcelorMittal USA has a 62.3% interest and a subsidiary of U.S. Steel has a 14.7% interest. Each partner takes its share of production pro rata; however, provisions in the joint venture agreement allow additional or reduced production to be delivered under certain circumstances. Mining is conducted on multiple mineral leases having varying expiration dates. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates. Hibbing operations consist of an open pit truck and shovel mine, a concentrator that utilizes single stage crushing, AG mills and magnetic separation to produce a magnetite concentrate, which is then delivered to an on-site pellet plant. From the site, pellets are transported by BNSF rail to a ship loading port at Superior, Wisconsin, operated by BNSF.

*Empire Mine*

The Empire mine is located on the Marquette Iron Range in Michigan's Upper Peninsula approximately 15 miles southwest of Marquette, Michigan. The Empire mine has had no production since the indefinite idle began in August 2016, compared to historically having an annual capacity of 5.5 million long tons of iron ore pellets.

During 2017, our ownership interest in Empire increased to 100% as we reached an agreement to distribute the noncontrolling interest net assets to ArcelorMittal USA, in exchange for its interest in Empire. Prior to the indefinite idle, operations consisted of an open pit truck and shovel mine, a concentrator that utilizes single stage crushing, AG mills, magnetic separation and floatation to produce a magnetite concentrate that was then supplied to the on-site pellet plant. From the site, pellets were transported by CN rail to a ship loading port at Escanaba, Michigan, operated by CN.

**Metallics Segment**

Our HBI production plant is the first venture of our Metallics segment. It is the first facility of its kind in the Great Lakes region and is located near the Port of Toledo, in northwestern Ohio, in close proximity to future EAF customers. In addition, the Toledo site is near an existing dock, has rail access and heavy haul roads for construction and operation logistics. We are leasing the property on which the plant is being constructed. Our Toledo plant is expected to produce HBI, a specialized high quality iron alternative to scrap and pig iron, at a rate of 1.9 million metric tons per year when brought to production and is expected to begin commercial production in the first half of 2020.

Refer to NOTE 18 - COMMITMENTS AND CONTINGENCIES for further discussion of capital commitments related to our HBI production plant.

35

**Mineral Policy**

We have a corporate policy prescribing internal controls and procedures with respect to auditing and estimating of minerals. The procedures contained in the policy include the calculation of mineral estimates at each property by our engineers, geologists and accountants, as well as third-party consultants. Management compiles and reviews the calculations, and once finalized, such information is used to prepare the disclosures for our annual and quarterly reports. The disclosures are reviewed and approved by management, including our chief executive officer and chief financial officer. Additionally, the long-range mine planning and mineral estimates are reviewed annually by our Audit Committee. Furthermore, all changes to mineral estimates, other than those due to production, are adequately documented and submitted to senior operations officers for review and approval. Finally, periodic reviews of long-range mine plans and mineral reserve estimates are conducted at mine staff meetings, senior management meetings and by independent experts.

Reserves are defined by SEC Industry Standard Guide 7 as that part of a mineral deposit that could be economically and legally extracted and produced at the time of the reserve determination. All reserves are classified as proven or probable and are supported by life-of-mine plans.

Reserve estimates are based on pricing that does not exceed the three-year trailing average index price of iron adjusted to our realized price. We evaluate and analyze mineral reserve estimates in accordance with our mineral policy and SEC requirements. The table below identifies the year in which the latest reserve estimate was completed.

**Mining and Pelletizing**

| Property | Date of Latest Economic Reserve Analysis |
|---|---|
| Tilden | 2019 |
| Northshore | 2018 |
| United Taconite | 2019 |
| Hibbing | 2015 |

Ore reserve estimates for our iron ore mines as of December 31, 2019 were estimated from fully designed open pits developed using three-dimensional modeling techniques. These fully designed pits incorporate design slopes, practical mining shapes and access ramps to assure the accuracy of our reserve estimates. All operations' reserves have been adjusted net of production through 2019.

36

Table of Contents

All tonnages reported for our Mining and Pelletizing operating segment are in long tons of 2,240 pounds and are reported on a 100% basis.

**Mining and Pelletizing Mineral Reserves**
**as of December 31, 2019**
**(In Millions of Long Tons)**

| Property | Cliffs Share | Proven | | Probable | | Proven & Probable | | Saleable Product[2,3] | | Previous Year | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Tonnage | % Grade | Tonnage | % Grade | Tonnage | % Grade[5] | Process Recovery[4] | Tonnage | Proven & Probable Crude Ore | Saleable Product |
| Tilden[1] | 100% | 185.3 | 35.2 | 418.1 | 34.6 | 603.4 | 34.8 | 34% | 206.4 | 324.4 | 122.1 |
| Northshore | 100% | 275.1 | 25.3 | 540.9 | 23.8 | 816.0 | 24.3 | 33% | 265.3 | 835.1 | 270.2 |
| United Taconite | 100% | 173.5 | 23.1 | 631.5 | 22.1 | 805.0 | 22.3 | 31% | 253.3 | 814.4 | 259.5 |
| Hibbing | 23% | 97.2 | 19.7 | 24.7 | 19.6 | 121.9 | 19.7 | 27% | 32.4 | 149.8 | 39.7 |
| **Totals** | | **731.1** | | **1,615.2** | | **2,346.3** | | | **757.4** | **2,123.7** | **691.5** |

[1] Tilden hematite reported grade is percent FeT; all other properties are percent magnetic iron.

[2] Saleable product is a standard pellet containing 65 to 66% Fe calculated from both proven and probable mineral reserves.

[3] Saleable product is reported on a dry basis. Shipped products typically contain 1 to 4% moisture.

[4] Process recovery includes all factors for converting crude ore tonnage to a saleable product.

[5] Cutoff grades are 15% magnetic iron for Hibbing, 17% for United Taconite, 19% for Northshore and 20% for Tilden. Cutoff for Tilden hematite is 25% FeT.


Item 3.      *Legal Proceedings*

**Legal Proceedings Relating to our Business**

*Mesabi Metallics Adversary Proceeding.* On September 7, 2017, Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) ("Mesabi Metallics") filed a complaint against Cleveland-Cliffs Inc. in the *Essar Steel Minnesota LLC and ESML Holdings Inc.* bankruptcy proceeding that is pending in the United States Bankruptcy Court, District of Delaware. Mesabi Metallics alleges tortious interference with its contractual rights and business relations involving certain vendors, suppliers and contractors, violations of federal and Minnesota antitrust laws through monopolization, attempted monopolization and restraint of trade, violation of the automatic stay, and civil conspiracy with unnamed Doe defendants. Mesabi Metallics amended its complaint to add additional defendants, including, among others, our subsidiary, Cleveland-Cliffs Minnesota Land Development Company LLC ("Cliffs Minnesota Land"), and to add additional claims, including avoidance and recovery of unauthorized post-petition transfers of real estate interests, claims disallowance, civil contempt and declaratory relief. Mesabi Metallics seeks, among other things, unspecified damages and injunctive relief. Cliffs and Cliffs Minnesota Land filed counterclaims against Mesabi Metallics, Chippewa Capital Partners ("Chippewa"), and Thomas M. Clarke ("Clarke") for tortious interference and civil conspiracy, as well as additional claims against Chippewa and Clarke for aiding and abetting tortious interference, for which we seek, among other things, damages and injunctive relief. Our counterclaim against Clarke for libel was dismissed on jurisdictional grounds. The parties filed various dispositive motions on certain of the claims, including a motion for partial summary judgment to settle a dispute over real estate transactions between Cliffs Minnesota Land and Glacier Park Iron Ore Properties LLC ("GPIOP"). A ruling in favor of Cliffs, Cliffs Minnesota Land and GPIOP was issued on July 23, 2018, finding that Mesabi Metallics' leases had terminated and upholding Cliffs' and Cliffs Minnesota Land's purchase and lease of the contested real estate interests. Mesabi Metallics filed a Motion for Leave to File an Interlocutory Appeal, which was denied on September 10, 2019. Discovery is ongoing. We believe the claims asserted against us are without merit, and we intend to continue to vigorously defend against any remaining claims in the lawsuit.

*Mesabi Trust Arbitration .* On December 9, 2019, Mesabi Trust filed a demand for arbitration with the American Arbitration Association against Northshore and Cleveland-Cliffs Inc. alleging various breaches of a royalty agreement under which Northshore extracts iron ore from Mesabi Trust lands in return for paying royalties to Mesabi Trust. In its demand, Mesabi Trust asserts that we improperly based royalty payments for intercompany sales of DR-grade pellets on artificially low pricing of DR-grade pellet sales to one of our arms' length third-party customers. Mesabi Trust further

37

Table of Contents

asserts that we paid royalties too soon on DR-grade pellets stockpiled at Northshore and destined for shipment to our HBI production plant. The allegations also include failure to provide access to information and individuals necessary to determine compliance with the royalty agreement. In addition to seeking damages and costs, Mesabi Trust seeks declarations as to the methodology and timing for calculating royalties on our intercompany DR-grade pellet sales, and that Mesabi Trust should have full and unfettered access to all of our information and employees. We filed our answering statement to Mesabi Trust's demand for arbitration on January 15, 2020. The two arbitrators appointed by the parties are required to appoint a third arbitrator on or before March 6, 2020. We believe the claims asserted against us are without merit, and we intend to vigorously defend against them.

*Taconite MACT Compliance Review.* EPA Region 5 issued Notices of Violation during the first quarter of 2014 to Empire, Tilden and United Taconite related to alleged historical violations of the Taconite MACT rule and certain elements of their respective state-issued Title V operating permits dating back to 2010. Final settlement for alleged exceedances was resolved for United Taconite by consent decree with a civil penalty paid of $0.1 million and a supplemental environmental project. The allegations for Tilden and Empire were resolved by consent decree with civil penalties paid of no more than $0.2 million and $0.1 million, respectively.

*CCAA Proceedings.* Refer to NOTE 13 - DISCONTINUED OPERATIONS for a description of the CCAA proceedings with respect to the Bloom Lake Group and the Wabush Group. Such description is incorporated by reference into this Item 3.

**Legal Proceedings Relating to the Merger**

*Franchi, et al. v. AK Steel Holding Corp., et al.*, Case No. 1:20-cv-00078 (D. Del.) (the "Franchi Action"). On January 17, 2020, a purported stockholder of AK Steel filed this putative class action lawsuit in federal court in Delaware against AK Steel, the directors of AK Steel, Cleveland-Cliffs Inc. and Merger Sub. The complaint alleges that the Form S-4 Registration Statement filed in connection with the proposed Merger is false and misleading and/or omits material information concerning the transactions contemplated by the Merger Agreement in violation of the federal securities laws.

*Nessim, et al. v. Cleveland-Cliffs Inc., et al.*, Case No. 1:20-cv-00850 (S.D.N.Y.) (the "Nessim Action"). On January 31, 2020, a purported shareholder of Cleveland-Cliffs Inc. filed this putative class action lawsuit in federal court in New York against us and each of our directors. The complaint, like the complaint in the Franchi Action, alleges that the Form S-4 Registration Statement filed in connection with the proposed Merger is false and misleading and/or omits material information concerning the transactions contemplated by the Merger Agreement in violation of the federal securities laws.

*Pate, et al. v. AK Steel Holding Corp., et al.*, Case No. CV 2020 01 0196 (Ohio Common Pleas, Butler County) (the "Pate Action"). On January 28, 2020, a purported stockholder of AK Steel filed this putative class action lawsuit in state court in Ohio against AK Steel, the directors of AK Steel, Cleveland-Cliffs Inc. and Merger Sub. Among other things, the complaint alleges breaches of fiduciary duty claims against the AK Steel directors and aiding and abetting claims against AK Steel, us and Merger Sub in connection with the transactions contemplated by the Merger Agreement, including that the registration statement on Form S-4 filed in connection with the proposed Merger is false and misleading and/or omits material information concerning the transactions contemplated by the Merger Agreement.

The lawsuits relating to the Merger, among other requested relief, seek to enjoin the transactions contemplated by the Merger Agreement and an award of attorneys' fees and expenses. We believe the Franchi, Nessim and Pate Actions are without merit, and we intend to vigorously defend against them.

**Item 4.**        *Mine Safety Disclosures*

We are committed to protecting the occupational health and well-being of each of our employees. Safety is one of our core values, and we strive to ensure that safe production is the first priority for all employees. Our internal objective is to achieve zero injuries and incidents across the Company by focusing on proactively identifying needed prevention activities, establishing standards and evaluating performance to mitigate any potential loss to people, equipment, production and the environment. We have implemented intensive employee training that is geared toward maintaining a high level of awareness and knowledge of safety and health issues in the work environment through the development and coordination of requisite information, skills and attitudes. We believe that through these policies, we have developed an effective safety management system.

Under the Dodd-Frank Act, each operator of a coal or other mine is required to include certain mine safety results within its periodic reports filed with the SEC. As required by the reporting requirements included in §1503(a) of the Dodd-Frank Act and Item 104 of Regulation S-K, the required mine safety results regarding certain mining safety and health

38

matters for each of our mine locations that are covered under the scope of the Dodd-Frank Act are included in Exhibit 95 of   *Item 15. Exhibits and Financial Statement Schedules* of this Annual Report on Form 10-K.

A005946

Table of Contents

PART II

**Item 5.**     *Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities*

**Stock Exchange Information**

Our common shares (ticker symbol CLF) are listed on the NYSE.

**Holders**

At February 18, 2020, we had 1,095 shareholders of record.

**Shareholder Return Performance**

The following graph shows changes over the past five-year period in the value of $100 invested in: (1) Cliffs' common shares; (2) S&P 500 Index; (3) S&P Small Cap 600 Index; (4) S&P Metals and Mining Select Industry Index; and (5) S&P Total Market Index. The values of each investment are based on price change plus reinvestment of all dividends reported to shareholders, based on monthly granularity.



40

A005947

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|
| **Cleveland-Cliffs Inc.** | Return % | — | (77.87) | 432.28 | (14.27) | 6.66 | **12.60** |
| | Cum $ | 100.00 | 22.13 | 117.79 | 100.98 | 107.71 | **121.28** |
| **S&P 500 Index** | Return % | — | 1.38 | 11.93 | 21.80 | (4.39) | **31.48** |
| | Cum $ | 100.00 | 101.38 | 113.47 | 138.21 | 132.14 | **173.74** |
| **S&P Small Cap 600 Index** [1] | Return % | — | (2.01) | 26.46 | 13.15 | (8.52) | **22.74** |
| | Cum $ | 100.00 | 97.99 | 123.92 | 140.21 | 128.27 | **157.44** |
| **S&P Metals and Mining Select Industry Index** | Return % | — | (50.76) | 105.09 | 20.61 | (26.76) | **14.70** |
| | Cum $ | 100.00 | 49.24 | 100.99 | 121.80 | 89.21 | **102.32** |
| **S&P Total Market Index** [1] | Return % | — | 0.46 | 12.62 | 21.13 | (5.30) | **30.89** |
| | Cum $ | 100.00 | 100.46 | 113.14 | 137.04 | 129.78 | **169.87** |

[1] During the year ended December 31, 2019, we were added to the S&P Small Cap 600 Index. As a result, we are replacing the S&P Total Market Index with the S&P Small Cap 600 Index. The data for the S&P Total Market Index is reflected for comparative purposes.

**Issuer Purchases of Equity Securities**

The following table presents information with respect to repurchases by us of our common shares during the periods indicated:

### ISSUER PURCHASES OF EQUITY SECURITIES

| Period | Total Number of Shares (or Units) Purchased[1] | Average Price Paid per Share (or Unit) | | Total Number of Shares (or Units) Purchased as Part of Publicly Announced Plans or Programs | Maximum Number (or Approximate Dollar Value) of Shares (or Units) that May Yet be Purchased Under the Plans or Programs[2] | |
|---|---|---|---|---|---|---|
| October 1 - 31, 2019 | 1,375 | $ | 7.19 | — | $ | 229,356 |
| November 1 - 30, 2019 | 709 | $ | 6.96 | — | $ | 229,356 |
| December 1 - 31, 2019 | — | $ | — | — | $ | 229,356 |
| **Total** | **2,084** | **$** | **7.11** | **—** | | **—** |

[1] All shares were delivered to us to satisfy tax withholding obligations due upon the vesting or payment of stock awards.

[2] On November 26, 2018, we announced a new share repurchase program which was authorized by our Board of Directors, pursuant to which we could buy back our outstanding common shares in the open market or in privately negotiated transactions up to a maximum of $200 million, excluding commissions and fees. On April 25, 2019, we announced that our Board of Directors increased the common share repurchase authorization by an additional $100 million, excluding commissions and fees. The program could be executed through open-market purchases, including through Rule 10b5-1 agreements, or privately negotiated transactions. The authorization was effective until December 31, 2019.

A005948

**Item 6.**     *Selected Financial Data*

**Summary of Financial and Other Statistical Data - Cleveland-Cliffs Inc. and Subsidiaries**

| Financial data (in millions, except per share amounts) | 2019 | | 2018 (a) | | 2017 (b) | | 2016 (c) | | 2015 (d) |
|---|---|---|---|---|---|---|---|---|---|
| Revenue from product sales and services | $ | 1,989.9 | $ | 2,332.4 | $ | 1,866.0 | $ | 1,554.5 | $ | 1,525.4 |
| Income from continuing operations | $ | 294.5 | $ | 1,039.9 | $ | 360.6 | $ | 122.6 | $ | 134.3 |
| Income (loss) from discontinued operations, net of tax * | $ | (1.7) | $ | 88.2 | $ | 2.5 | $ | 76.7 | $ | (882.7) |
| Earnings (loss) per common share attributable to Cliffs common shareholders - basic | | | | | | | | | | |
|   Continuing operations | $ | 1.07 | $ | 3.50 | $ | 1.27 | $ | 0.49 | $ | 0.57 |
|   Discontinued operations * | | (0.01) | | 0.30 | | 0.01 | | 0.39 | | (5.71) |
| Earnings (loss) per common share attributable to Cliffs common shareholders - basic | $ | 1.06 | $ | 3.80 | $ | 1.28 | $ | 0.88 | $ | (5.14) |
| Earnings (loss) per common share attributable to Cliffs common shareholders - diluted | | | | | | | | | | |
|   Continuing operations | $ | 1.04 | $ | 3.42 | $ | 1.25 | $ | 0.49 | $ | 0.57 |
|   Discontinued operations * | | (0.01) | | 0.29 | | 0.01 | | 0.38 | | (5.70) |
| Earnings (loss) per common share attributable to Cliffs common shareholders - diluted | $ | 1.03 | $ | 3.71 | $ | 1.26 | $ | 0.87 | $ | (5.13) |
| | | | | | | | | | | |
| Total assets | $ | 3,503.8 | $ | 3,529.6 | $ | 2,953.4 | $ | 1,923.9 | $ | 2,135.5 |
| Long-term debt obligations (including finance leases) | $ | 2,144.6 | $ | 2,104.5 | $ | 2,311.8 | $ | 2,178.6 | $ | 2,704.1 |
| | | | | | | | | | | |
| Cash dividends declared to preferred shareholders | | | | | | | | | | |
|  - Per depositary share | $ | — | $ | — | $ | — | $ | — | $ | 1.32 |
|  - Total | $ | — | $ | — | $ | — | $ | — | $ | 38.4 |
| Cash dividends declared to common shareholders | | | | | | | | | | |
|  - Per share | $ | 0.27 | $ | 0.05 | $ | — | $ | — | $ | — |
|  - Total | $ | 75.0 | $ | 15.0 | $ | — | $ | — | $ | — |

Note: This information should be read in conjunction with Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations and Item 8. Financial Statements and Supplementary Data.

(*) Refer to NOTE 13 - DISCONTINUED OPERATIONS, for information regarding discontinued operations.

(a) During 2018, we recorded an income tax benefit of $475.2 million, primarily related to the release of the valuation allowance in the U.S. Refer to NOTE 10 - INCOME TAXES for further information. Additionally, on January 1, 2018, we adopted Topic 606 and applied it to all contracts that were not completed using the modified retrospective method. We recognized the cumulative effect of initially applying Topic 606 as an adjustment of $34.0 million to the opening balance of *Retained deficit*. The comparative period information has not been retrospectively revised and continues to be reported under the accounting standards in effect for those periods.

(b) Refer to NOTE 6 - DEBT AND CREDIT FACILITIES for information regarding debt issuances and extinguishments, NOTE 14 - SHAREHOLDERS' EQUITY for information regarding a common share issuance and NOTE 10 - INCOME TAXES for information regarding the financial impact of Public Law 115–97, commonly known as the "Tax Cuts and Jobs Act".

(c) During 2016, we recorded a net gain of $166.3 million related to debt restructuring activities that occurred throughout the year, including the issuance of $218.5 million aggregate principal of 8.00% 2020 1.5 Lien Notes in exchange for $512.2 million aggregate principal amount of our existing senior notes, the issuance of an aggregate of 8.2 million common shares in exchange for $56.9 million aggregate principal amount of our existing senior notes and a loss on the redemption of the full $283.6 million outstanding of our 3.95% 2018 Senior Notes at a total redemption price of $301.0 million. We also issued 44.4 million common shares in an underwritten public offering. We received net proceeds of $287.6 million at a public offering price of $6.75 per common share.

(d) During 2015, our Eastern Canada Iron Ore segment commenced restructuring proceedings in Montreal, Quebec under the CCAA. As a result of these proceedings, the Canadian entities were deconsolidated and all financial results were classified within discontinued operations. During 2015, our North American Coal operating segment met the criteria to be classified as held for sale under *ASC Topic 205, Presentation of Financial Statements*, until the operations were sold during the fourth quarter, and as a result, all financial results were classified within discontinued operations. Refer to NOTE 13 - DISCONTINUED OPERATIONS, for information regarding discontinued operations.

A005949

**Item 7.**        *Management's Discussion and Analysis of Financial Condition and Results of Operations*

Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") is designed to provide a reader of our financial statements with a narrative from the perspective of management on our financial condition, results of operations, liquidity and other factors that may affect our future results. The following discussion should be read in conjunction with the consolidated financial statements and related notes that appear elsewhere in this document.

## Industry Overview

The key driver of our business is demand for steelmaking raw materials from U.S. steelmakers. During 2019, the U.S. produced approximately 88 million metric tons of crude steel, which is 1% higher compared to 2018, representing about 5% of total global crude steel production. U.S. total steel capacity utilization was approximately 80% during 2019, which is an approximate 3% increase from 2018. Throughout 2019, global crude steel production increased about 2% compared to 2018, driven by an approximate 7% increase in Chinese crude steel production.

For the year ended December 31, 2019, conditions in the global iron ore market were at their most favorable levels since 2014. In January 2019, a tailings dam operated by Vale S.A., the largest iron ore miner in the world, suffered a catastrophic failure resulting in hundreds of fatalities in Brumadinho, Brazil. The fallout of this disaster led to multiple disruptions in iron ore supply. Due in large part to these disruptions and China's healthy steel production levels, the Platts 62% price, a key component in our supply contracts, averaged $93 per metric ton in 2019, a 35% increase from the $69 per metric ton average in 2018.

The Atlantic Basin pellet premium, another important pricing factor in our contracts, averaged $57 per metric ton for the year ended  December 31, 2019, a 3% decrease compared to 2018. However, the market for pellets deteriorated rapidly during the second half of 2019, ending at a price of $38 per metric ton. Given both the weak steel market conditions in Europe and declining demand for high-quality iron ore products in China, pellet suppliers have lowered premiums dramatically. This drove the Atlantic Basin pellet premium to a three-year low, representing a substantial deterioration from the multi-year highs seen earlier in the year.

The hot-rolled coil steel price, which is an important attribute in the calculation of supplemental revenue in a customer's supply agreement, averaged $601 per net ton for the year ended December 31, 2019, 27% lower than last year. While purchasers scrambled to place steel orders in the wake of the Section 232 tariffs implemented last year, the U.S. market has since cooled and prices have moved substantially lower due to weak global supply-demand conditions, inventory destocking, increased local supply and lower demand for sheet products. In addition, scrap steel prices fell to three-year lows due to lack of export demand, putting additional pressure on pricing in the steel supply chain.

Our consolidated revenues were $2.0 billion and $2.3 billion for the years ended December 31, 2019 and 2018, respectively, with net income from continuing operations of $1.04  and $3.42 per diluted share, respectively. Net income from continuing operations for 2019, when compared to 2018, was negatively impacted by an income tax benefit of $475.2 million in 2018, primarily due to the release of the valuation allowance in the U.S., which was not repeated in 2019. Sales margin decreased by $233.9 million during 2019 when compared to 2018, primarily driven by the decrease in revenue from lower overall average realized product revenue rates and lower sales volumes.

## Strategy

### *Protecting our Mining and Pelletizing Segment Business*

We are the market-leading iron ore producer in the U.S., supplying differentiated iron ore pellets under long-term contracts to major North American blast furnace steel producers. We have the unique advantage of being a low-cost, high-quality, iron ore pellet producer with significant transportation and logistics advantages to serve the Great Lakes steel market. The pricing structure and long-term nature of our existing contracts, along with our low-cost operating profile, position our Mining and Pelletizing segment as a strong cash flow generator in most commodity pricing environments. Since instituting our strategy in 2014 of focusing on this business, we have achieved significant accomplishments, including maximizing commercial leverage in pricing and securing sales volume certainty with steelmakers throughout the Great Lakes region, improving operating reliability by making operational improvements, realizing more predictability in cash flows, developing new demand avenues in the metallics industry, embracing the global push toward environmental stewardship and developing new pellet products to meet ever-evolving market demands.

We recognize the importance of our current strong position in the North American blast furnace steel industry, and one of our top priorities is to protect and enhance the market position of our Mining and Pelletizing business. This

43

Table of Contents

involves continuing to deliver high-quality, custom-made pellets that allow our customers to remain competitive in the quality, production efficiency, and environmental friendliness of their steel products. Protecting this business also involves continually evaluating opportunities to preserve our customer base, expand our production capacity and increase ore reserve life. In 2017, we achieved key accomplishments toward these goals by acquiring the remaining minority stake in our Tilden and Empire mines as well as additional real estate interests in Minnesota. In 2018, we began supplying pellets under two new customer supply agreements in the Great Lakes region. In addition, we executed the efficient exit of our Asia Pacific Iron Ore business, officially completing the divestiture of the Company's non-core iron ore assets. In 2019, we completed the upgrades at our Northshore mine to begin commercially producing DR-grade pellets.

The acquisition of AK Steel, when complete, is expected to ensure pellet volume commitments for approximately 6 million long tons of pellets, to complement our existing long-term minimum volume pellet offtake agreements with other key integrated steel producers and pellets to be consumed at our Toledo HBI production plant.

### Expanding our Customer Base and Product Offering

The acquisition of AK Steel, when complete, is expected to allow us to benefit from a larger and more diverse base of customers, with less overall emphasis on commodity-linked contracts. The expansion of our customer base into the automotive industry, as well as other steel consuming manufacturers, through the acquisition of AK Steel is expected to generate more predictable earnings and cash flows due to the focus on value-added and non-commoditized products, and less exposure to volatile commodity indices. AK Steel is one of the few steel producers capable of producing the carbon and stainless steel grades critical to automotive lightweighting trends. AK Steel generally supplies more advanced steel products than EAF steelmakers, who have gained market share from other blast furnaces on less advanced commodity-grade steels. As currently configured, EAFs are largely unable to supply the highly-specified products that AK Steel primarily sells.

Although AK Steel has a different customer base compared to other blast furnace steelmakers, we cannot ignore the ongoing shift of steelmaking share in the U.S. away from our other blast furnace customers to the EAF steelmakers. Over the past 25 years, the market share of EAFs has nearly doubled. However, as EAFs have moved to higher-value steel products, they require more high-quality iron ore-based metallics instead of lower-grade scrap as raw material feedstock. As a result of this trend, one of our top strategic priorities will be to become a critical supplier of the EAF market by providing these specialized metallics.

In June 2017, we announced the planned construction of an HBI production plant in Toledo, Ohio. Over the past 32 months, we have made significant progress on the construction of this plant. During 2018, we increased the expected productive capacity of the Toledo HBI production plant from 1.6 million to 1.9 million metric tons per year based on market analysis, greater-than-expected customer demand and expansion opportunities identified during the construction process. We estimate the construction cost to be approximately $830 million plus a contingency of up to 20%, excluding capitalized interest, of which approximately $700 million was paid as of December 31, 2019. We expect that the HBI production plant, once operational, will consume approximately 2.8 million long tons of our DR-grade pellets per year. During 2019, we announced that we expect to reach commercial production ahead of schedule, in the first half of 2020.

We expect our HBI partially to replace the over 3 million metric tons of ore-based metallics that are imported into the Great Lakes region every year from Russia, Ukraine, Brazil and Venezuela, as well as the nearly 20 million metric tons of scrap used in the Great Lakes area every year. The Toledo site is in close proximity to over 20 EAFs, giving us a natural competitive freight advantage over import competitors. Not only does this production plant create another outlet for our high-margin pellets, but it also presents an attractive economic opportunity for us. As the only producer of DR-grade pellets in the Great Lakes region and with access to abundant, low-cost natural gas, we will be in a unique position to serve clients in the area and grow our customer base.

The acquisition of AK Steel, when complete, provides another potential outlet for HBI as it can also be used in integrated steel operations to increase productivity and reduce carbon footprint, allowing for more environmentally friendly steelmaking. AK Steel has used imported HBI in the past for these purposes.

### Maintaining Discipline on Costs and Capital Allocation

We believe our ability to execute our strategy is dependent on maintaining our financial position, balance sheet strength and financial flexibility, which will enable us to manage through the inherent cyclical demand for our products and volatility in commodity prices. Our streamlined organization and support functions are well-aligned with our strategic direction. Our capital allocation plan is focused on expanding our customer base through the acquisition of AK Steel and the Metallics segment, strengthening and protecting our Mining and Pelletizing segment operations, maintaining balance sheet flexibility and returning excess capital to shareholders.

44

As the implementation of our strategy has strengthened the business, we have put additional emphasis on returning excess capital to shareholders and the continued improvement of our balance sheet via continued reduction of long-term debt and extension of long-term debt maturities. Since 2018, when we announced a share repurchase program, we have repurchased 29.8 million common shares for $299.8 million in the aggregate under the $300 million share repurchase program. In 2019, we began paying a quarterly cash dividend of $0.05 per common share, which increased 20% to $0.06 per common share in the third quarter of 2019. In the fourth quarter 2019, we also paid a special cash dividend of $0.04 per common share. Since 2015, we have reduced our annual interest expense by 54%, or approximately $120 million, by using various liability management strategies consistent with our capital allocation priorities and our stated objective of improving the strength of our balance sheet and simplifying the capital structure. Given the cyclical nature of our business, we will continue to be opportunistic in managing our balance sheet and capital structure, which should put us in an optimal position to manage through any commodity environment, and we continue to seek the best opportunities to accomplish this.

**Recent Developments**

On December 2, 2019, we entered into the Merger Agreement with AK Steel and Merger Sub, pursuant to which, upon the terms and subject to the conditions set forth therein, Merger Sub will merge with and into AK Steel, with AK Steel surviving the Merger as a wholly owned subsidiary of Cliffs.

Pursuant to the Merger Agreement, at the effective time of the Merger, each share of AK Steel common stock issued and outstanding prior to the effective time of the Merger will be converted into, and become exchangeable for, 0.400 of a share of our common stock, par value $0.125 per share.

We expect to complete the Merger in the first quarter of 2020. Completion of the Merger is subject to various conditions, such as satisfaction or waiver of certain specified closing conditions, and it is possible that factors outside of our control could result in the Merger being completed at a later time or not at all. The Merger Agreement also contains certain termination rights that may be exercised by either us or AK Steel. We plan to complete the Merger as soon as reasonably practicable following the satisfaction of all applicable conditions.

In connection with the consummation of the Merger, we expect to: (i) use the net proceeds from the issuance of the New Cliffs Secured/Unsecured Notes, as well as cash on hand, to repurchase, redeem or otherwise retire the AK Steel 7.50% 2023 Notes and the AK Steel 7.625% 2021 Notes; and (ii) enter into the New ABL Facility to replace our existing ABL Facility and AK Steel's existing revolving credit facility, refinance in full all amounts outstanding under AK Steel's existing revolving credit facility, provide funds to pay any cash that is required to be paid pursuant to the terms of the Merger Agreement in lieu of the issuance of any fractional Cliffs common shares in the Merger and pay certain Merger-related expenses. In connection with entering into the Merger Agreement, we entered into a commitment letter with certain lenders with respect to our entry into the New ABL Facility and pursuant to which, on the terms and subject to the conditions in such commitment letter, such lenders have agreed to provide us with an aggregate principal amount of $1,500.0 million. We intend to seek additional commitments of $500.0 million during the primary "retail" syndication of the New ABL Facility.

On February 18, 2020, our Board of Directors declared a quarterly cash dividend on our common shares of $0.06 per share. The cash dividend will be payable on April 15, 2020, to shareholders of record as of the close of business on April 3, 2020.

**Business Segments**

Our Company's continuing operations are organized and managed in two business units according to our differentiated products: Mining and Pelletizing and Metallics. Our Mining and Pelletizing segment is a major supplier of iron ore pellets to the North American steel industry from our mines and pellet plants located in Michigan and Minnesota. In our Metallics segment, we expect to complete construction of our HBI production plant in Toledo, Ohio and begin operations during the first half of 2020.

45

*2019 Compared to 2018*

### Consolidated Results of Operations

The following table presents a reconciliation of our gross *Revenues from product sales and services* and *Sales margin* by reportable segment to consolidated *Revenues from product sales and services* and *Sales margin* by reportable segment:

| | (In Millions) | | |
| --- | --- | --- | --- |
| | Year Ended December 31, 2019 | | |
| | Mining and Pelletizing | Metallics | Total |
| Operating segment revenues from product sales and services | $ 2,069.2 | $ — | $ 2,069.2 |
| Elimination of intersegment revenues | (79.3) | — | (79.3) |
| Total revenues from product sales and services | $ 1,989.9 | $ — | $ 1,989.9 |
| | | | |
| Operating segment sales margin | $ 600.0 | $ — | $ 600.0 |
| Elimination of intersegment sales margin | (24.3) | — | (24.3) |
| Total sales margin | $ 575.7 | $ — | $ 575.7 |

*Revenues from product sales and services* of $2,332.4 million and *Sales margin* of $809.6 million related to our Mining and Pelletizing segment accounted for all of our consolidated revenues and sales margin for the year ended December 31, 2018.

Refer to *Mining and Pelletizing Segment Results* for further discussion of our segment operating results.

### Other Operating Income (Expense)

The following is a summary of *Other operating income (expense)*:

| | (In Millions) | | |
| --- | --- | --- | --- |
| | 2019 | 2018 | Variance Favorable/ (Unfavorable) |
| Selling, general and administrative expenses | $ (119.4) | $ (113.5) | $ (5.9) |
| Miscellaneous - net: | | | |
| Empire idle costs | (17.9) | (24.1) | 6.2 |
| Metallics startup costs | (8.1) | (3.3) | (4.8) |
| Other | (1.0) | 4.5 | (5.5) |
| Total Miscellaneous - net | (27.0) | (22.9) | (4.1) |
| | $ (146.4) | $ (136.4) | $ (10.0) |

*Selling, general and administrative expenses* for the year ended December 31, 2019 was $5.9 million higher than 2018, primarily due to diligence and other acquisition costs associated with the Merger.

46

A005953

Table of Contents

***Other Expense***

The following is a summary of *Other expense*:

| | (In Millions) | | |
|---|---|---|---|
| | **2019** | 2018 | Variance Favorable/ (Unfavorable) |
| Interest expense, net | $ **(101.2)** | $ (118.9) | $ 17.7 |
| Loss on extinguishment of debt | **(18.2)** | (6.8) | (11.4) |
| Other non-operating income (expense): | | | |
| Net periodic benefit costs other than service cost component | **(0.6)** | 14.0 | (14.6) |
| Other | **2.8** | 3.2 | (0.4) |
| | $ **(117.2)** | $ (108.5) | $ (8.7) |

*Interest expense, net* for the year ended December 31, 2019 was $17.7 million lower than 2018, primarily due to an increase in capitalized interest related to the construction of the HBI production plant and upgrades at the Northshore plant. Additionally, debt restructuring activities during 2018 reduced 2019 interest expense.

*Loss on extinguishment of debt* for the year ended December 31, 2019 of $18.2 million was related to the redemption of all of our then-outstanding 4.875% Senior Notes due 2021 and the repurchase of $600 million aggregate principal amount of our 5.75% Senior Notes due 2025 completed during the second quarter of 2019. This compares to a loss of $6.8 million for the year ended December 31, 2018, primarily related to the redemption in full of our outstanding 4.80% 2020 Senior Notes and 5.90% 2020 Senior Notes and the repurchase of certain of our other senior notes. Refer to NOTE 6 - DEBT AND CREDIT FACILITIES for further discussion.

*Net periodic benefit costs other than service cost component* for the year ended December 31, 2019 was $14.6 million higher than 2018, primarily due to lower expected returns on assets and higher interest costs. Refer to NOTE 8 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS for further detail on the components of net periodic benefit costs other than service cost component.

***Income Taxes***

Our tax rate is affected by permanent items, such as depletion. It also is affected by discrete items that may occur in any given period, but are not consistent from period to period. The following represents a summary of our tax provision and corresponding effective rates:

| | (In Millions) | |
|---|---|---|
| | **2019** | 2018 |
| Income tax benefit (expense) | $ **(17.6)** | $ 475.2 |
| Effective tax rate | **5.7%** | (84.1)% |

A005954

Table of Contents

A reconciliation of our income tax attributable to continuing operations compared to the U.S. federal statutory rate is as follows:

| | (In Millions) | | | |
| --- | --- | --- | --- | --- |
| | **2019** | | 2018 | |
| Tax at U.S. statutory rate | $ **65.5** | **21.0 %** | $ 118.6 | 21.0 % |
| Increase (decrease) due to: | | | | |
| Percentage depletion in excess of cost depletion | **(49.3)** | **(15.8)** | (54.6) | (9.7) |
| Luxembourg legal entity reduction | **846.0** | **271.1** | 161.7 | 28.6 |
| Valuation allowance release: | | | | |
| Current year activity | **—** | **—** | (79.6) | (14.1) |
| Release of U.S. valuation allowance | **—** | **—** | (460.5) | (81.5) |
| Luxembourg legal entity reduction | **(846.0)** | **(271.1)** | (161.7) | (28.6) |
| Other items, net | **1.4** | **0.5** | 0.9 | 0.2 |
| Provision for income tax expense (benefit) and effective income tax rate including discrete items | $ **17.6** | **5.7 %** | $ (475.2) | (84.1)% |

Our tax provision for the year ended December 31, 2019 was an expense of $17.6 million and an effective tax rate of 5.7% compared with a benefit of $475.2 million and an effective tax rate of negative 84.1% for the prior year. The increase in income tax expense from the prior year is primarily due to release of the valuation allowance in the U.S. of $460.5 million in 2018. The Luxembourg legal entity reduction relates to initiatives resulting in the dissolution of entities and settlement of related financial instruments in the years ended December 31, 2019 and 2018. These 2019 and 2018 net operating loss deferred tax asset reductions resulted in tax expense of $846.0 million and $161.7 million, respectively, which were fully offset by decreases in the valuation allowance.

See NOTE 10 - INCOME TAXES for further information.

***Income (loss) from discontinued operations, net of tax***

During the year ended December 31, 2019, we recorded a loss of $1.7 million within *Income (loss) from discontinued operations, net of tax* . During the year ended December 31, 2018, we recorded income of $88.2 million, primarily due to the exit from our Asia Pacific Iron Ore operations. As a result of the liquidation of the Australian subsidiaries' net assets, the historical changes in foreign currency translation recorded in *Accumulated other comprehensive loss* in the Statements of Consolidated Financial Position totaling $228.1 million was reclassified and recognized as a gain in *Income (loss) from discontinued operations, net of tax,* which was partially offset by operating losses and exit costs at Asia Pacific Iron Ore and the settlement of the CCAA proceedings. Refer to NOTE 13 - DISCONTINUED OPERATIONS for further information.

**Mining and Pelletizing Segment Results**

The following is a summary of the Mining and Pelletizing segment results:

| | (In Millions) | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Changes due to: | | | | | | |
| | Year Ended December 31, | | | | Revenue and cost rate | | Sales volume | | Freight | | Total change |
| | **2019** | | 2018 | | | | | | | | |
| Revenues from product sales and services | $ **2,069.2** | $ | 2,332.4 | $ | (127.3) | $ | (117.7) | $ | (18.2) | $ | (263.2) |
| Cost of goods sold | **(1,469.2)** | | (1,522.8) | | (39.8) | | 75.2 | | 18.2 | | 53.6 |
| Sales margin | $ **600.0** | $ | 809.6 | $ | (167.1) | $ | (42.5) | $ | — | $ | (209.6) |

48

| Per Long Sales Ton Information | Year Ended December 31, | | Difference | Percent change |
|---|---|---|---|---|
| | 2019 | 2018 | | |
| Realized product revenue rate[1] | $ 99.50 | $ 105.64 | $ (6.14) | (5.8)% |
| Cash cost of goods sold rate[1,2] | 64.45 | 62.95 | 1.50 | 2.4 % |
| Depreciation, depletion & amortization | 4.08 | 3.32 | 0.76 | 22.9 % |
| Total cost of goods sold rate | 68.53 | 66.27 | 2.26 | 3.4 % |
| Sales margin | $ 30.97 | $ 39.37 | $ (8.40) | (21.3)% |
| | | | | |
| Sales tons[3] (In thousands) | 19,371 | 20,563 | | |
| Production tons[3] (In thousands) | 19,915 | 20,329 | | |

[1] Excludes revenues and expenses related to freight, which are offsetting and have no impact on sales margin.

[2] Cash cost of goods sold rate is a non-GAAP financial measure. Refer to "Non-GAAP Reconciliation" for reconciliation in dollars back to our consolidated financial statements.

[3] Tons are long tons. Includes Cliffs' 23% share of the Hibbing mine production. Includes intercompany sales to our Metallics segment of 788 thousand long tons for the year ended December 31, 2019.

Sales margin was $600.0 million for the year ended December 31, 2019, compared with $809.6 million for the year ended December 31, 2018. Sales margin per long ton decreased 21.3% to $30.97 per long ton during the year ended December 31, 2019 compared to 2018.

Revenue decreased by $245.0 million during the year ended December 31, 2019, compared to 2018, excluding the freight decrease of $18.2 million, driven by:

- A decrease in the average year-to-date realized product revenue rate of $6.14 per long ton, or 5.8%, during the year ended December 31, 2019, compared to 2018, which resulted in a decrease of $127.3 million, predominantly due to:

  ◦ A decrease in the hot-rolled coil steel price, which negatively affected the realized revenue rate by $16 per long ton or $311 million; and

  ◦ Lower pellet premiums which negatively affected the realized revenue rate by $2 per long ton or $40 million.

  ◦ These decreases were offset partially by higher full-year Platts 62% price, which positively affected the realized revenue rate by $13 per long ton, or $260 million.

- Lower third-party sales volume of 2.0 million long tons, due to decreased customer demand, which was offset partially by increased intercompany demand of 0.8 million long tons, for a net decrease of 1.2 million long tons or decreased revenues of $117.7 million.

Cost of goods sold decreased $35.4 million during the year ended December 31, 2019, compared to 2018, excluding the domestic freight decrease of $18.2 million, driven by:

- A decrease in sales volume of 1.2 million long tons, which resulted in decreased costs of $75 million period-over-period.

- This decrease was offset partially by an unfavorable change in the full-year cost predominantly due to:

  ◦ Increased stripping and lower ore recovery, which together increased costs by $35 million, or $2 per long ton, increased depreciation of $15 million, or $1 per long ton, increased commodity supply usage of $12 million, or $1 per long ton, and increased maintenance of $9 million, or $1 per long ton.

  ◦ This unfavorable change was offset partially by decreased royalties of $14 million, or $1 per long ton, lower energy rates resulting in lower costs of $12 million, or $1 per long ton, and decreased labor costs of $11 million, or $1 per long ton.

A005956

Table of Contents

*EBITDA and Adjusted EBITDA*

We evaluate performance based on EBITDA and Adjusted EBITDA, which are non-GAAP measures. These measures are used by management, investors, lenders and other external users of our financial statements to assess our operating performance and to compare operating performance to other companies in the iron ore industry. In addition, management believes EBITDA and Adjusted EBITDA are useful measures to assess the earnings power of the business without the impact of capital structure and can be used to assess our ability to service debt and fund future capital expenditures in the business.

| | (In Millions) | |
|---|---|---|
| | **2019** | 2018 |
| Net income | $ **292.8** | $ 1,128.1 |
| Less: | | |
| Interest expense, net | **(101.6)** | (121.3) |
| Income tax benefit (expense) | **(17.6)** | 460.3 |
| Depreciation, depletion and amortization | **(85.1)** | (89.0) |
| Total EBITDA | $ **497.1** | $ 878.1 |
| Less: | | |
| Impact of discontinued operations | $ **(1.3)** | $ 120.6 |
| Loss on extinguishment of debt | **(18.2)** | (6.8) |
| Severance costs | **(1.7)** | — |
| Acquisition costs | **(6.5)** | — |
| Foreign exchange remeasurement | — | (0.9) |
| Impairment of other long-lived assets | — | (1.1) |
| Total Adjusted EBITDA | $ **524.8** | $ 766.3 |
| | | |
| EBITDA: | | |
| Mining and Pelletizing | $ **648.1** | $ 852.9 |
| Metallics | **(8.1)** | (3.3) |
| Corporate and Other (including discontinued operations) | **(142.9)** | 28.5 |
| Total EBITDA | $ **497.1** | $ 878.1 |
| | | |
| Adjusted EBITDA: | | |
| Mining and Pelletizing | $ **668.3** | $ 875.3 |
| Metallics | **(8.1)** | (3.3) |
| Corporate | **(135.4)** | (105.7) |
| Total Adjusted EBITDA | $ **524.8** | $ 766.3 |

EBITDA for the year ended December 31, 2019 decreased by  $381.0 million on a consolidated basis from 2018. The unfavorable variance in EBITDA for the year ended December 31, 2019 was primarily due to a decrease in sales margin of $233.9 million and an unfavorable impact from discontinued operations of $121.9 million compared to the prior-year period. The unfavorable impact from discontinued operations is primarily due to the historical changes in foreign currency translation that were previously recorded in *Accumulated other comprehensive loss* totaling $228.1 million, which were reclassified and recognized as a gain in *Income (loss) from discontinued operations, net of tax* during 2018. The favorable impact from reclassification of historical foreign currency translation changes was partially offset by operating losses and exit costs at Asia Pacific Iron Ore and the settlement of the CCAA proceedings. Refer to NOTE 13 - DISCONTINUED OPERATIONS for further information.

Adjusted EBITDA decreased by $241.5 million for the year ended December 31, 2019 from the comparable period in 2018. The decrease was primarily due to lower consolidated sales margin of $233.9 million for the year ended December 31, 2019, compared to the prior year.

A005957

The discussion of our *Consolidated Results of Operations* for 2018 compared to 2017 can be found in Part II, Item 7., "Management's Discussion and Analysis of Financial Condition and Results of Operations", of our Form 10-K for the period ended December 31, 2018, filed with the SEC on February 8, 2019.

**Liquidity, Cash Flows and Capital Resources**

Our primary sources of liquidity are *Cash and cash equivalents* and cash generated from our operating and financing activities. Our capital allocation decision-making process is focused on returning capital to shareholders while maintaining the strength of our balance sheet and creating financial flexibility to make strategic investments and manage through the inherent cyclical demand for our products and volatility in commodity prices. We are focused on maximizing the cash generation of our operations, reducing operating costs, and aligning capital investments with our strategic priorities and the requirements of our business plan, including regulatory and permission-to-operate related projects.

During 2019, we took action in alignment with our capital allocation priorities. First, we repurchased 24.4 million common shares for $252.9 million in the aggregate under the $300 million share repurchase program and increased our quarterly cash dividend by 20%, along with declaring a special cash dividend. Second, we focused on protecting our business by allocating capital to both sustaining our existing operations and our two major expansion capital projects: the HBI production plant in Toledo, Ohio and the completion of the upgrade to the Northshore plant to replace up to 3.5 million long tons of blast furnace pellet production with DR-grade pellet production. Finally, using the net proceeds from the issuance of our 5.875% 2027 Senior Notes, along with cash generated by operations, we redeemed in full all of our outstanding 4.875% 2021 Senior Notes and repurchased $600 million aggregate principal amount of our outstanding 5.75% 2025 Senior Notes pursuant to a tender offer. Accordingly, we have no debt maturing until 2024.

Based on our outlook for the next 12 months, which is subject to continued changing demand from steelmakers that utilize our products and volatility in iron ore and domestic steel prices, we expect to generate cash from operations sufficient to meet the needs of our existing operations, service our debt obligations and fund our dividends.

In connection with the consummation of the Merger, we expect to use the net proceeds from the issuance of the New Cliffs Secured/Unsecured Notes, as well as cash on hand, to repurchase, redeem or otherwise retire the AK Steel 7.50% 2023 Notes and the AK Steel 7.625% 2021 Notes.

Refer to "Outlook" for additional guidance regarding expected future results, including projections on pricing, sales volume and production.

The following discussion summarizes the significant items impacting our cash flows during 2019 and comparative years as well as expected impacts to our future cash flows over the next 12 months. Refer to the Statements of Consolidated Cash Flows for additional information.

*Operating Activities*

Net cash provided by operating activities was $562.5 million and $478.5 million for the years ended December 31, 2019 and 2018, respectively. The incremental increase in cash provided by operating activities during 2019 compared to 2018 primarily was due to the collection of the $117.3 million income tax receivable in the current year and prior-year uses of cash by our discontinued operations, which were not recurring in the current year. These were offset partially by lower cash generated from our operations.

Our U.S. cash and cash equivalents balance at December 31, 2019 was $351.0 million, or 99.5% of our consolidated total cash and cash equivalents balance of $352.6 million. Additionally, we had a cash balance at December 31, 2019 of $7.0 million classified as part of *Other current assets* in the Statements of Consolidated Financial Position, which will be utilized to support our exit from Australia.

*Investing Activities*

Net cash used by investing activities was $644.4 million for the year ended December 31, 2019, compared to $273.1 million for the year ended December 31, 2018. We had capital expenditures including capitalized interest of approximately $656 million and $296 million for the years ended December 31, 2019 and 2018, respectively. The 2019 capital expenditures include the continued development of our HBI project, the upgrades at Northshore and sustaining capital spend.

51

Table of Contents

During the year ended December 31, 2019, we had cash outflows, including deposits, of approximately $520 million on the development of the HBI production plant and approximately $40 million on the upgrades at Northshore, excluding amounts attributable to capitalized interest. This compares to cash outflows, including deposits, during the year ended December 31, 2018, of approximately $180 million on the development of the HBI production plant and approximately $50 million on the upgrades at Northshore. Additionally, we spent approximately $69 million globally on expenditures related to sustaining capital during 2019 and 2018. Sustaining capital spend includes infrastructure, mobile equipment, environmental, safety and health, fixed equipment and product quality.

We anticipate total cash used for capital expenditures during the next 12 months to be approximately $360 million, excluding amounts attributable to capitalized interest. Included within this estimate is approximately $70 million for sustaining capital and $290 million related to development of the HBI production plant.

### Financing Activities

Net cash used by financing activities was $394.1 million for the year ended December 31, 2019, compared to $375.2 million for the year ended December 31, 2018. Net cash used by financing activities during the 2019 primarily related to the repurchase of 24.4 million common shares for $252.9 million in the aggregate under the $300 million share repurchase program, which was active until December 31, 2019. Additionally, we issued $750 million aggregate principal amount of 5.875% 2027 Senior Notes, which provided net proceeds of approximately $714 million. The net proceeds from the notes offering, along with cash on hand, were used to redeem in full all of our then-outstanding 4.875% 2021 Senior Notes and to purchase $600 million aggregate principal amount of our outstanding 5.75% 2025 Senior Notes pursuant to a tender offer. In total, during 2019, we purchased $724.0 million aggregate principal amount of senior notes for $729.3 million in cash.

Additional uses of cash from financing activities during 2019 included payments of regular quarterly cash dividends and a special cash dividend on our common shares of $72.1 million and a cash payment of $44.2 million related to the third and final annual installment of the distribution of Empire partnership equity.

Uses of cash from financing activities during 2018 primarily related to the redemption of various tranches of unsecured debt. We redeemed in full all of our then-outstanding $400 million 5.90% 2020 Senior Notes and $500 million 4.80% 2020 Senior Notes and purchased certain other outstanding senior notes. In total, during 2018 we purchased $227.4 million aggregate principal amount of senior notes for $234.5 million. Additionally, we repurchased 5.4 million common shares for $47.5 million in the aggregate under the share repurchase program.

Other uses of cash for financing activities during 2018 included cash payments of $44.2 million for the second annual installment of the distribution of the Empire partnership equity and $41.4 million for repayments of lease liabilities related to the discontinuation of our Asia Pacific Iron Ore operations.

We anticipate future uses of cash for financing activities during the next 12 months to include regular quarterly cash dividend payments of approximately $0.06 per common share outstanding. On February 18, 2020, our Board of Directors declared a quarterly cash dividend on our common shares of $0.06 per share. The cash dividend will be payable on April 15, 2020, to shareholders of record as of the close of business on April 3, 2020.

The discussion of our *Liquidity, Cash Flows and Capital Resources* results for 2018 compared to 2017 can be found in Part II, Item 7., "Management's Discussion and Analysis of Financial Condition and Results of Operations", in our Form 10-K for the period ended December 31, 2018, filed with the SEC on February 8, 2019.

The following represents our future cash commitments and contractual obligations as of  December 31, 2019:

| | Total | Less than 1 Year | 1 - 3 Years | 3 - 5 Years | More than 5 Years |
|---|---|---|---|---|---|
| | | | Payments Due by Period (In Millions) | | |
| Long-term debt | $ 2,238.0 | $ — | $ — | $ 400.0 | $ 1,838.0 |
| Interest on debt[1] | 988.9 | 117.4 | 228.4 | 218.6 | 424.5 |
| Operating lease obligations | 15.7 | 3.3 | 4.4 | 3.9 | 4.1 |
| Finance lease obligations | 43.1 | 8.9 | 15.8 | 11.5 | 6.9 |
| Purchase obligations: | | | | | |
|   Open purchase orders | 68.4 | 68.3 | 0.1 | — | — |
|   HBI production plant[2] | 290.0 | 290.0 | — | — | — |
|   Minimum "take or pay" purchase commitments [3] | 986.9 | 149.1 | 243.7 | 166.7 | 427.4 |
|   Total purchase obligations | 1,345.3 | 507.4 | 243.8 | 166.7 | 427.4 |
| Other long-term liabilities: | | | | | |
|   Pension funding minimums | 373.6 | 20.2 | 84.3 | 112.8 | 156.3 |
|   OPEB claim payments | 89.2 | 3.5 | 6.8 | 6.6 | 72.3 |
|   Environmental and mine closure obligations | 167.3 | 2.4 | 44.5 | 1.9 | 118.5 |
|   Other | 17.1 | 8.5 | 4.0 | 2.8 | 1.8 |
|   Total other long-term liabilities | 647.2 | 34.6 | 139.6 | 124.1 | 348.9 |
|   Total | $ 5,278.2 | $ 671.6 | $ 632.0 | $ 924.8 | $ 3,049.8 |

[1] Refer to NOTE 6 - DEBT AND CREDIT FACILITIES for additional information regarding our debt and related interest rates.

[2] Includes purchase obligations and contracted amounts of approximately $260 million.

[3] Includes minimum railroad transportation obligations, minimum electric power demand charges, minimum diesel and natural gas obligations and minimum port facility obligations.

The above table does not reflect $4.4 million of unrecognized tax benefits, which we have recorded for uncertain tax positions, as we are unable to determine a reasonable and reliable estimate of the timing of future payments.

Refer to NOTE 18 - COMMITMENTS AND CONTINGENCIES for additional information regarding our future commitments and obligations.

53

**Capital Resources**

We expect to fund our business obligations from available cash, current and future operations and existing and future borrowing arrangements. We also may pursue other funding strategies in the capital markets to strengthen our liquidity, extend debt maturities and/or fund strategic initiatives. The following represents a summary of key liquidity measures:

| | (In Millions) | |
| --- | --- | --- |
| | December 31, 2019 | December 31, 2018 |
| Cash and cash equivalents | $ 352.6 | $ 823.2 |
| | | |
| Available borrowing base on ABL Facility [1] | $ 395.7 | $ 323.7 |
| ABL Facility loans drawn | — | — |
| Letter of credit obligations and other commitments | (37.9) | (55.0) |
| Borrowing capacity available | $ 357.8 | $ 268.7 |

[1] The ABL Facility has a maximum borrowing base of $450 million, determined by applying customary advance rates to eligible accounts receivable, inventory and certain mobile equipment.

Our primary sources of funding are cash and cash equivalents, which totaled $352.6 million as of December 31, 2019, cash generated by our business, availability under the ABL Facility and other financing activities. Cash and cash equivalents include cash on hand and on deposit as well as all short-term securities held for the primary purpose of general liquidity. The combination of cash and availability under the ABL Facility gives us $710.4 million in liquidity entering the first quarter of 2020, which is expected to be adequate to fund operations, letter of credit obligations, sustaining and expansion capital expenditures and other cash commitments for at least the next 12 months.

As of December 31, 2019, we were in compliance with the ABL Facility liquidity requirements and, therefore, the springing financial covenant requiring a minimum Fixed Charge Coverage Ratio of 1.0 to 1.0 was not applicable. We believe that the cash on hand and the ABL Facility provide us sufficient liquidity to support our operating, investing and financing activities. We have the capability to issue additional unsecured notes and, subject to the limitations set forth in our existing debt indentures, additional secured indebtedness, if we elect to access the debt capital markets. However, available capacity of these notes could be limited by market conditions.

In connection with the consummation of the Merger, we expect to enter into the New ABL Facility to replace our existing ABL Facility and AK Steel's existing revolving credit facility, refinance in full all amounts outstanding under AK Steel's existing revolving credit facility, provide funds to pay any cash that is required to be paid pursuant to the terms of the Merger Agreement in lieu of the issuance of any fractional Cliffs common shares in the Merger and pay certain Merger-related expenses. We expect that the New ABL Facility's covenants, events of default and representations and warranties will be substantially similar to the existing ABL Facility and will have substantially similar collateral and guarantee requirements. In connection with entering into the Merger Agreement, we entered into a commitment letter with certain lenders with respect to our entry into the New ABL Facility and pursuant to which, on the terms and subject to the conditions in such commitment letter, such lenders have agreed to provide us with an aggregate principal amount of $1,500.0 million. We intend to seek additional commitments of $500.0 million during the primary "retail" syndication of the New ABL Facility.

We intend from time to time to seek to retire or purchase our outstanding senior notes with cash on hand, borrowings from existing credit sources or new debt financings and/or exchanges for debt or equity securities, in open market purchases, privately negotiated transactions or otherwise. Such repurchases, if any, will depend on prevailing market conditions, our liquidity requirements, contractual restrictions and other factors, and the amounts involved may be material.

**Off-Balance Sheet Arrangements**

In the normal course of business, we are a party to certain arrangements that are not reflected on our Statements of Consolidated Financial Position. These arrangements include minimum "take or pay" purchase commitments, such as minimum electric power demand charges, minimum coal, diesel and natural gas purchase commitments, minimum railroad transportation commitments and minimum port facility usage commitments; and financial instruments with off-balance sheet risk, such as bank letters of credit and bank guarantees.

54

**Market Risks**

We are subject to a variety of risks, including those caused by changes in commodity prices and interest rates. We have established policies and procedures to manage such risks; however, certain risks are beyond our control.

***Pricing Risks***

*Commodity Price Risk*

Our consolidated revenues include the sale of a single product, iron ore pellets, in the North American market. Our financial results can vary significantly as a result of fluctuations in the market prices of iron ore, hot-rolled coil steel and iron ore pellet premiums. World market prices for these commodities have fluctuated historically and are affected by numerous factors beyond our control. The world market price that is most commonly utilized in our iron ore sales contracts is the Platts 62% price, which can fluctuate widely due to numerous factors, such as global economic growth or contraction, change in demand for steel or changes in availability of supply.

*Customer Supply Agreement*

A supply agreement with one customer provides for supplemental revenue or refunds based on the hot-rolled coil steel price at the time the iron ore product is consumed in the customer's blast furnaces. At December 31, 2019, we had derivative assets of $44.5 million, representing the fair value of the pricing factors, based upon the amount of unconsumed long tons and an estimated hot-rolled coil steel price for the period in which the iron ore is expected to be consumed in the customer's blast furnaces, subject to final pricing at a future date. We estimate that a $75 positive or negative change in the hot-rolled coil steel price realized from the December 31, 2019 estimated price recorded would cause the fair value of the derivative instrument to increase or decrease by approximately $22 million, respectively, thereby impacting our consolidated revenues by the same amount. We have not entered into any hedging programs to mitigate the risk of adverse price fluctuations.

***Volatile Energy and Fuel Costs***

The volatile cost of energy is an important factor affecting the production costs at our iron ore operations. Our consolidated Mining and Pelletizing segment operations consumed 15 million MMBtu of natural gas at an average delivered price of $3.31 per MMBtu during 2019. Additionally, our consolidated Mining and Pelletizing segment operations consumed 18 million gallons of diesel fuel at an average delivered price of $2.16 per gallon during 2019.

Our strategy to address volatile natural gas and diesel rates includes improving efficiency in energy usage, identifying alternative providers and utilizing the lowest cost alternative fuels. We utilize a hedging program to manage the price risk of natural gas and diesel at our operations. We will continue to monitor relevant energy markets for risk mitigation opportunities and may make additional forward purchases or employ other hedging instruments in the future as warranted and deemed appropriate by management. We estimate that, a 10% change from our 2019 average natural gas and diesel fuel prices would result in a change of approximately $9 million in our annual fuel and energy cost based on expected consumption for 2020.

In the ordinary course of business, there may also be increases and decreases in prices relative to electricity costs at our mine sites. Specifically, certain contracts are exposed to market pricing or subject to a power supply cost recovery mechanism that is based on variations in the utility's actual fuel and purchase power expenses. Two of our operating mine site's contracts are market based, while one of our operating mine sites has a regulated power contract that has limited exposure to market volatility. We estimate a 10% change from our 2019 average electricity prices for our market based electricity contracts would result in a change of approximately $11 million in our annual electricity cost based on expected consumption for 2020. We will continue to monitor relevant energy markets for risk mitigation opportunities; however, we are currently not engaged in a hedge program for electricity costs.

***Valuation of Other Long-Lived Assets***

Long-lived assets are reviewed for impairment upon the occurrence of events or changes in circumstances that would indicate that the carrying value of the assets may not be recoverable. Such indicators may include: a significant decline in expected future cash flows; a sustained, significant decline in market pricing; a significant adverse change in legal or environmental factors or in the business climate; changes in estimates of our recoverable reserves; and unanticipated competition. Any adverse change in these factors could have a significant impact on the recoverability of our long-lived assets and could have a material impact on our consolidated statements of operations and statement of financial position.

55

A005962

Table of Contents

A comparison of each asset group's carrying value to the estimated undiscounted net future cash flows expected to result from the use of the assets, including cost of disposition, is used to determine if an asset is recoverable. Projected future cash flows reflect management's best estimates of economic and market conditions over the projected period, including growth rates in revenues and costs, estimates of future expected changes in operating margins and capital expenditures. If the carrying value of the asset group is higher than its undiscounted net future cash flows, the asset group is measured at fair value and the difference is recorded as a reduction to the long-lived assets. We estimate fair value using a market approach, an income approach or a cost approach. As of December 31, 2019, no impairment factors were present that would indicate that the carrying value of our asset groups may not be recoverable; as a result, no impairment assessment was required.

### Interest Rate Risk

Interest payable on our senior notes is at fixed rates. Interest payable under our ABL Facility is at a variable rate based upon the base rate plus the base rate margin depending on the excess availability. As of December 31, 2019, we had no amounts drawn on the ABL Facility.

### Supply Concentration Risks

Many of our facilities are dependent on one source each of electric power and natural gas. A significant interruption or change in service or rates from our energy suppliers could impact materially our production costs, margins and profitability.

## Outlook

All outlook projections only refer to Cliffs on a standalone basis, and do not contemplate the pending acquisition of AK Steel.

Based on the full-year average pricing assumptions including iron ore prices of $90 per metric ton, steel prices of $650 per short ton, and pellet premiums of $50 per metric ton, we would expect to generate approximately $300 million to $325 million of net income and $550 million to $575 million of Adjusted EBITDA for the full-year 2020. Refer to the table below for a reconciliation of EBITDA and Adjusted EBITDA to net income.

In 2020, we also expect $125 million in interest expense, $25 million in non-cash tax expense and $100 million in depreciation, depletion, and amortization.

Additionally, we expect to receive approximately $60 million in cash tax refunds during the third quarter of 2020.

Our 2020 capital spending expectation is $350 million to $400 million, including the remaining spend to complete the Toledo HBI production plant, carryover from 2019, sustaining capital, and capitalized interest.

## Non-GAAP Reconciliation - EBITDA and Adjusted EBITDA Outlook

| | (In Millions) | |
| --- | --- | --- |
| | **Year Ending December 31,** | |
| | **2020** | |
| Net income | $ | 300 - 325 |
| Less: | | |
| Interest expense, net | | (125 ) |
| Income tax expense | | (25 ) |
| Depreciation, depletion and amortization | | (100 ) |
| EBITDA | $ | 550 - 575 |
| | | |
| Less: | | |
| Adjustments[1] | $ | — |
| Adjusted EBITDA | $ | 550 - 575 |

[1] Adjustments to EBITDA are unpredictable by nature and thus cannot be forecasted.

56

A005963

**Recently Issued Accounting Pronouncements**

Refer to NOTE 1 - BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES of the consolidated financial statements for a description of recent accounting pronouncements, including the respective dates of adoption and effects on results of operations and financial condition.

**Critical Accounting Estimates**

Management's discussion and analysis of financial condition and results of operations is based on our consolidated financial statements, which have been prepared in accordance with GAAP. Preparation of financial statements requires management to make assumptions, estimates and judgments that affect the reported amounts of assets, liabilities, revenues, costs and expenses, and the related disclosures of contingencies. Management bases its estimates on various assumptions and historical experience, which are believed to be reasonable; however, due to the inherent nature of estimates, actual results may differ significantly due to changed conditions or assumptions. On a regular basis, management reviews the accounting policies, assumptions, estimates and judgments to ensure that our financial statements are fairly presented in accordance with GAAP. However, because future events and their effects cannot be determined with certainty, actual results could differ from our assumptions and estimates, and such differences could be material. Management believes that the following critical accounting estimates and judgments have a significant impact on our financial statements.

*Revenue Recognition*

*Customer Supply Agreement*

A supply agreement with one customer provides for supplemental revenue or refunds to the customer based on the hot-rolled coil steel price in the year the iron ore product is consumed in the customer's blast furnace. The supplemental pricing is characterized as a freestanding derivative and is required to be accounted for separately once control transfers to the customer. The derivative instrument, which is finalized based on a future price, is adjusted to fair value as a revenue adjustment each reporting period until the pellets are consumed and the amounts are settled.

The fair value of the instrument is determined using a market approach based on an estimate of the hot-rolled coil steel price, and takes into consideration current market conditions and nonperformance risk. At December 31, 2019, we had a derivative asset of $44.5 million, representing the fair value of the pricing factors, based upon the amount of unconsumed long tons and the estimated hot-rolled coil steel price related to the period in which the iron ore is expected to be consumed in the customer's blast furnace at each respective steelmaking facility, subject to final pricing at a future date. We recognized net derivative revenue of $78.1 million in *Product revenues* in the Statements of Consolidated Operations for the year ended December 31, 2019.

The accuracy of our estimates typically increases as the year progresses based on additional information in the market becoming available. Our estimates for supplemental revenue adjustments have been materially correct related to the Mining and Pelletizing segment's product revenues for the year ended December 31, 2019, 2018 and 2017.

*Mineral Reserves*

We regularly evaluate our mineral reserves and update them as required in accordance with SEC Industry Guide 7. We perform an in-depth evaluation of our mineral reserve estimates by iron ore mine on a periodic basis, in addition to routine annual assessments. The determination of mineral reserves requires us, with the support of our third-party experts, to make significant estimates and assumptions related to key inputs including (1) the determination of the size and scope of the iron ore body through technical modeling, (2) the estimates of future iron ore prices, production costs and capital expenditures, and (3) management's mine plan for the proven and probable mineral reserves. The significant estimates and assumptions could be affected by future industry conditions, geological conditions and ongoing mine planning. Additional capital and development expenditures may be required to maintain effective production capacity. Generally, as mining operations progress, haul distances increase. Alternatively, changes in economic conditions or the expected quality of mineral reserves could decrease capacity of mineral reserves. Technological progress could alleviate such factors or increase capacity of mineral reserves.

We use our mineral reserve estimates, combined with our estimated annual production levels, to determine the mine closure dates utilized in recording the fair value liability for asset retirement obligations for our active operating mines. Refer to NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS, for further information. Since the liability represents the present value of the expected future obligation, a significant change in mineral reserves or

57

mine lives could have a substantial effect on the recorded obligation. We also utilize mineral reserves for evaluating potential impairments of mine asset groups as they are indicative of future cash flows and in determining maximum useful lives utilized to calculate depreciation, depletion and amortization of long-lived mine assets. Increases or decreases in mineral reserves or mine lives could significantly affect these items.

**Valuation of Long-Lived Assets**

In assessing the recoverability of our long-lived asset groups, significant assumptions regarding the estimated future cash flows and other factors to determine the fair value of the respective assets must be made, as well as the related estimated useful lives. If these estimates or their related assumptions change in the future as a result of changes in strategy or market conditions, we may be required to record impairment charges for these assets in the period such determination was made.

We monitor conditions that indicate that the carrying value of an asset or asset group may be impaired. In order to determine if assets have been impaired, assets are grouped and tested at the lowest level for which identifiable, independent cash flows are available. An impairment loss exists when projected undiscounted net cash flows are less than the carrying value of the asset group. The measurement of the impairment loss to be recognized is based on the difference between the fair value and the carrying value of the asset group. Fair value can be determined using a market approach, income approach or cost approach. The impairment analysis and fair value determination can result in substantially different outcomes based on changes in critical assumptions and estimates, including the quantity and quality of remaining mineral reserves, future iron ore prices and production costs. The long-lived assets of the Mining and Pelletizing segment and Metallics segment were $1,156.0 million and $810.4 million, respectively, as of December 31, 2019 and $1,110.9 million and $200.5 million, respectively, as of December 31, 2018.

During 2019, 2018 and 2017 there were no impairment indicators present at our continuing operations; as a result, no impairment assessments were required.

Refer to NOTE 1 - BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES  for further information regarding our policy on asset impairment.

**Asset Retirement Obligations and Environmental Remediation Costs**

The accrued mine closure obligations for our active mining operations provide for contractual and legal obligations associated with the eventual closure of the mining operations. We perform an in-depth evaluation of the liability every three years in addition to our routine annual assessments. In 2017, we employed a third-party specialist to assist in the evaluation. Our obligations are determined based on detailed estimates adjusted for factors that a market participant would consider (e.g., inflation, overhead and profit), which are escalated at an assumed rate of inflation to the estimated closure dates, and then discounted using the current credit-adjusted risk-free interest rate. The estimate also incorporates incremental increases in the closure cost estimates and changes in estimates of mine lives. The closure date for each location is determined based on the exhaustion date of the remaining iron ore reserves, which is dependent on our estimate of mineral reserves. The estimated obligations are particularly sensitive to the impact of changes in mine lives given the difference between the inflation and discount rates. Changes in the base estimates of legal and contractual closure costs due to changes in legal or contractual requirements, available technology, inflation, overhead or profit rates also could have a significant impact on the recorded obligations.

We have a formal policy for environmental protection and remediation. Our obligations for known environmental matters at active and closed mining operations and other sites have been recognized based on estimates of the cost of investigation and remediation at each site. If the obligation can only be estimated as a range of possible amounts, with no specific amount being more likely, the minimum of the range is accrued. Management reviews its environmental remediation sites quarterly to determine if additional cost adjustments or disclosures are required. The characteristics of environmental remediation obligations, where information concerning the nature and extent of clean-up activities is not immediately available and which are subject to changes in regulatory requirements, result in a significant risk of increase to the obligations as they mature. Expected future expenditures are not discounted to present value unless the amount and timing of the cash disbursements can be reasonably estimated. Potential insurance recoveries are not recognized until realized. Refer to NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS, for further information.

58

**Income Taxes**

Our income tax expense, deferred tax assets and liabilities and reserves for unrecognized tax benefits reflect management's best assessment of estimated future taxes to be paid. We are subject to income taxes in the U.S. and various foreign jurisdictions. Significant judgments and estimates are required in determining the consolidated income tax expense.

Deferred income taxes arise from temporary differences between tax and financial statement recognition of revenue and expense. In evaluating our ability to recover our deferred tax assets, we consider all available positive and negative evidence, including scheduled reversals of deferred tax liabilities, projected future taxable income, tax planning strategies and recent financial operations. In projecting future taxable income, we begin with historical results adjusted for the results of discontinued operations and changes in accounting policies and incorporate assumptions including the amount of future state, federal and foreign pretax operating income, the reversal of temporary differences, and the implementation of feasible and prudent tax planning strategies. These assumptions require significant judgment about the forecasts of future taxable income and are consistent with the plans and estimates we are using to manage the underlying businesses.

At December 31, 2019 and 2018, we had a valuation allowance of $441.3 million and $1,287.3 million, respectively, against our deferred tax assets. Of this amount, $44.2 million and $44.1 million relate to the U.S. deferred tax assets at December 31, 2019 and 2018, respectively and $397.1 million and $1,243.2 million relate to foreign deferred tax assets, respectively.

At December 31, 2018, we determined that it was appropriate to release all of the valuation allowance related to U.S. federal deferred tax assets as it is more likely than not that the entire deferred tax asset will be realized before the end of the carryforward period. See NOTE 10 - INCOME TAXES for further information and considerations related to the release.

Our losses in Luxembourg in recent periods represent sufficient negative evidence to require a full valuation allowance against the deferred tax assets in that jurisdiction. We intend to maintain a valuation allowance against the deferred tax assets related to these operating losses, until sufficient positive evidence exists to support the realization of such assets.

Changes in tax laws and rates also could affect recorded deferred tax assets and liabilities in the future. The calculation of our tax liabilities involves dealing with uncertainties in the application of complex tax laws and regulations in various jurisdictions across our global operations. The ultimate impact of the U.S. income tax reform legislation may differ from our current estimates due to changes in the interpretations and assumptions made as well as additional regulatory guidance that may be issued.

Accounting for uncertainty in income taxes recognized in the financial statements requires that a tax benefit from an uncertain tax position be recognized when it is more likely than not that the position will be sustained upon examination, including resolutions of any related appeals or litigation processes, based on technical merits.

We recognize tax liabilities in accordance with *ASC 740, Income Taxes*, and we adjust these liabilities when our judgment changes because of evaluation of new information not previously available. Due to the complexity of some of these uncertainties, the ultimate resolution may result in payment that is materially different from our current estimate of the tax liabilities. These differences will be reflected as increases or decreases to income tax expense in the period in which they are determined. Refer to NOTE 10 - INCOME TAXES, for further information.

**Employee Retirement Benefit Obligations**

We offer defined benefit pension plans, defined contribution pension plans and OPEB plans, primarily consisting of retiree healthcare benefits, to most employees in North America as part of a total compensation and benefits program. The defined benefit pension plans largely are noncontributory and benefits generally are based on employees' years of service and average earnings for a defined period prior to retirement, or a minimum formula.

Following is a summary of our U.S. defined benefit pension and OPEB funding and expense:

| | Pension | | OPEB | |
| | Funding | Expense (Benefit) | Funding | Expense (Benefit) |
|---|---|---|---|---|
| 2017 | $ 24.4 | $ 18.0 | $ 2.1 | $ (6.1) |
| 2018 | 27.6 | 12.7 | 3.8 | (5.9) |
| 2019 | 16.4 | 22.4 | 3.7 | (2.5) |
| 2020 (Estimated) | 20.2 | 16.7 | 3.5 | (8.7) |

Assumptions used in determining the benefit obligations and the value of plan assets for defined benefit pension plans and OPEB plans, primarily consisting of retiree healthcare benefits, that we offer are evaluated periodically by management. Critical assumptions, such as the discount rate used to measure the benefit obligations, the expected long-term rate of return on plan assets, the medical care cost trend, and the rate of compensation increase are reviewed annually.

As of December 31, 2019 and 2018, we used the following assumptions:

| | Pension and Other Benefits | |
| | 2019 | 2018 |
|---|---|---|
| Plan discount rates: | | |
| Iron Hourly Pension Plan | 3.34 % | 4.31 % |
| Salaried Pension Plan | 3.18 | 4.21 |
| Ore Mining Pension Plan | N/A | 4.33 |
| SERP | 3.05 | 4.22 |
| Hourly OPEB Plan | 3.28 | 4.29 |
| Salaried OPEB Plan | 3.29 | 4.27 |
| Rate of compensation increase - Salaried | 3.00 | 3.00 |
| Rate of compensation increase - Hourly | 2.00 | 2.00 |
| Pension plan expected return on plan assets | 8.25 | 8.25 |
| OPEB plan expected return on plan assets | 7.00 | 7.00 |
| Health care cost trend rate assumed for next year | 6.50 | 6.75 |
| Ultimate health care cost trend rate | 5.00 | 5.00 |
| Year that the ultimate rate is reached | 2026 | 2026 |

The decrease in the discount rates in 2019 was driven by the change in corporate bond yields, which were down approximately 110 basis points compared to the prior year.

Additionally, on December 31, 2019, the assumed mortality improvement projection was changed from generational scale MP-2018 to generational scale MP-2019. The healthy mortality assumption was updated to the Pri-2012 mortality tables with blue collar and white collar adjustments made for certain hourly and salaried groups to determine the expected life of our plan participants.

60

Following are sensitivities of potential further changes in these key assumptions on the estimated 2020 pension and OPEB expense and the pension and OPEB obligations as of December 31, 2019:

| | (In Millions) | | | |
| --- | --- | --- | --- | --- |
| | Increase in Expense | | Increase in Benefit Obligation | |
| | Pension | OPEB | Pension | OPEB |
| Decrease discount rate 0.25% | $ 3.3 | $ 0.2 | $ 29.7 | $ 7.0 |
| Decrease return on assets 1.00% | 7.2 | 2.6 | N/A | N/A |

Changes in actuarial assumptions, including discount rates, employee retirement rates, mortality, compensation levels, plan asset investment performance and healthcare costs, are determined based on analyses of actual and expected factors. Changes in actuarial assumptions and/or investment performance of plan assets may have a significant impact on our financial condition due to the magnitude of our retirement obligations. Refer to NOTE 8 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS for further information.

**Forward-Looking Statements**

This report contains statements that constitute "forward-looking statements" within the meaning of the federal securities laws. As a general matter, forward-looking statements relate to anticipated trends and expectations rather than historical matters. Forward-looking statements are subject to uncertainties and factors relating to Cliffs' operations and business environment that are difficult to predict and may be beyond our control. Such uncertainties and factors may cause actual results to differ materially from those expressed or implied by the forward-looking statements. These statements speak only as of the date of this report, and we undertake no ongoing obligation, other than that imposed by law, to update these statements. Uncertainties and risk factors that could affect Cliffs' future performance and cause results to differ from the forward-looking statements in this report include, but are not limited to:

- uncertainty and weaknesses in global economic conditions, including downward pressure on prices caused by oversupply of imported products, reduced market demand and risks related to U.S. government actions with respect to Section 232 of the Trade Expansion Act (as amended by the Trade Act of 1974), the United States-Mexico-Canada Agreement and/or other trade agreements, treaties or policies;

- continued volatility of iron ore and steel prices and other trends, which may impact the price-adjustment calculations under our sales contracts;

- our ability to successfully diversify our product mix and add new customers beyond our traditional blast furnace clientele;

- our ability to cost-effectively achieve planned production rates or levels, including at our HBI plant;

- our ability to successfully identify and consummate any strategic investments or development projects, including our HBI plant;

- the impact of our blast furnace customers reducing their steel production due to increased market share of steel produced using other methods or lighter-weight steel alternatives;

- our actual economic iron ore reserves or reductions in current mineral estimates, including whether any mineralized material qualifies as a reserve;

- the outcome of any contractual disputes with our customers, joint venture partners or significant energy, material or service providers or any other litigation or arbitration;

- problems or uncertainties with sales volume or mix, productivity, tons mined, transportation, mine-closure obligations, environmental liabilities, employee-benefit costs and other risks of the mining industry;

- impacts of existing and increasing governmental regulation and related costs and liabilities, including failure to receive or maintain required operating and environmental permits, approvals, modifications or other authorization of, or from, any governmental or regulatory entity and costs related to implementing improvements to ensure compliance with regulatory changes;

61

A005968

- our ability to maintain adequate liquidity, our level of indebtedness and the availability of capital could limit cash flow available to fund working capital, planned capital expenditures, acquisitions and other general corporate purposes or ongoing needs of our business;

- our ability to continue to pay cash dividends, and the amount and timing of any cash dividends;

- our ability to maintain appropriate relations with unions and employees;

- the ability of our customers, joint venture partners and third party service providers to meet their obligations to us on a timely basis or at all;

- events or circumstances that could impair or adversely impact the viability of a mine or production plant and the carrying value of associated assets, as well as any resulting impairment charges;

- uncertainties associated with natural disasters, weather conditions, unanticipated geological conditions, supply or price of energy, equipment failures and other unexpected events;

- adverse changes in interest rates and tax laws;

- the potential existence of significant deficiencies or material weakness in our internal control over financial reporting ;

- the possibility that the Merger Agreement may be terminated and the proposed Merger may not be completed, whether due to the inability to obtain regulatory approvals, as a result of litigation instituted against AK Steel and/or us, the inability to obtain shareholder approval, or the inability to satisfy any other condition to the completion of the Merger;

- our ability to realize the anticipated benefits of the proposed Merger and to successfully integrate the businesses of AK Steel into our existing businesses, including uncertainties associated with maintaining relationships with customers, vendors and employees, as well as realizing the estimated future synergies;

- the possibility that the Merger may be less accretive than expected, and may be dilutive, to our earnings per share, whether as a result of adverse changes in market conditions, volatility in the commodity prices for iron ore and/or steel, adverse regulatory developments or otherwise; and

- additional debt we assume, or other proposed financing transactions we may enter into, in connection with the proposed Merger may negatively impact our credit profile and limit our financial flexibility.

For additional factors affecting the business of Cliffs, refer to *Part I – Item 1A. Risk Factors.* You are urged to carefully consider these risk factors.

**Non-GAAP Reconciliation**

We present cash cost of goods sold rate per long ton, which is a non-GAAP financial measure that management uses in evaluating operating performance. We believe our presentation of non-GAAP cash cost of goods sold is useful to investors because it excludes depreciation, depletion and amortization, which are non-cash, and freight, which has no impact on sales margin, thus providing a more accurate view of the cash outflows related to the sale of iron ore. The presentation of this measure is not intended to be considered in isolation from, as a substitute for, or as superior to, the financial information prepared and presented in accordance with GAAP. The presentation of this measure may be different from non-GAAP financial measures used by other companies. Below is a reconciliation in dollars of this non-GAAP financial measure to our Mining and Pelletizing segment cost of goods sold.

| | (In Millions) | |
| --- | --- | --- |
| | Year Ended December 31, | |
| | **2019** | 2018 |
| Cost of goods sold | $ (1,469.2) | $ (1,522.8) |
| Less: | | |
| Freight | (141.8) | (160.1) |
| Depreciation, depletion & amortization | (79.0) | (68.2) |
| Cash cost of goods sold | $ (1,248.4) | $ (1,294.5) |

A005969

**Item 7A.**         ***Quantitative and Qualitative Disclosures About Market Risk***

Information regarding our Market Risk is presented under the caption *Market Risks*, which is included in *Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations* and is incorporated by reference and made a part hereof.

A005970

Item 8.    *Financial Statements and Supplementary Data*

**Statements of Consolidated Financial Position**

Cleveland-Cliffs Inc. and Subsidiaries

| | | (In Millions) | |
|---|---|---|---|
| | | December 31, | |
| | | **2019** | 2018 |
| **ASSETS** | | | |
| **Current Assets:** | | | |
| Cash and cash equivalents | $ | **352.6** | $ 823.2 |
| Accounts receivable, net | | **94.0** | 226.7 |
| Inventories | | **317.4** | 181.1 |
| Derivative assets | | **45.8** | 91.5 |
| Income tax receivable, current | | **58.6** | 117.3 |
| Other current assets | | **29.5** | 39.8 |
| Total current assets | | **897.9** | 1,479.6 |
| **Non-current assets:** | | | |
| Property, plant and equipment, net | | **1,929.0** | 1,286.0 |
| Income tax receivable, non-current | | **62.7** | 121.3 |
| Deferred income taxes | | **459.5** | 464.8 |
| Other non-current assets | | **154.7** | 177.9 |
| TOTAL ASSETS | $ | **3,503.8** | $ 3,529.6 |
| **LIABILITIES AND EQUITY** | | | |
| **Current liabilities:** | | | |
| Accounts payable | $ | **193.2** | $ 186.8 |
| Accrued liabilities | | **126.3** | 158.9 |
| State and local taxes payable | | **37.9** | 35.5 |
| Other current liabilities | | **52.0** | 87.0 |
| Total current liabilities | | **409.4** | 468.2 |
| **Non-current liabilities:** | | | |
| Long-term debt | | **2,113.8** | 2,092.9 |
| Pension and OPEB liabilities | | **311.5** | 248.7 |
| Environmental and mine closure obligations | | **164.9** | 172.0 |
| Other non-current liabilities | | **146.3** | 123.6 |
| TOTAL LIABILITIES | | **3,145.9** | 3,105.4 |
| Commitments and contingencies (See Note 18) | | | |
| **Equity:** | | | |
| Common Shares - par value $0.125 per share | | | |
| Authorized - 600,000,000 shares (2018 - 600,000,000 shares); | | | |
| Issued - 301,886,794 shares (2018 - 301,886,794 shares); | | | |
| Outstanding - 270,084,005 shares (2018 - 292,611,569 shares) | | **37.7** | 37.7 |
| Capital in excess of par value of shares | | **3,872.1** | 3,916.7 |
| Retained deficit | | **(2,842.4)** | (3,060.2) |
| Cost of 31,802,789 common shares in treasury (2018 - 9,275,225 shares) | | **(390.7)** | (186.1) |
| Accumulated other comprehensive loss | | **(318.8)** | (283.9) |
| TOTAL EQUITY | | **357.9** | 424.2 |
| TOTAL LIABILITIES AND EQUITY | $ | **3,503.8** | $ 3,529.6 |

*The accompanying notes are an integral part of these  consolidated financial statements.*

64

A005971

**Statements of Consolidated Operations**

Cleveland-Cliffs Inc. and Subsidiaries

| | | (In Millions, Except Per Share Amounts) | | |
|---|---|---|---|---|
| | | Year Ended December 31, | | |
| | | 2019 | 2018 | 2017 |
| Revenues from product sales and services | $ | **1,989.9** | $ 2,332.4 | $ 1,866.0 |
| Cost of goods sold and operating expenses | | **(1,414.2)** | (1,522.8) | (1,398.4) |
| **Sales margin** | | **575.7** | 809.6 | 467.6 |
| Other operating income (expense): | | | | |
| Selling, general and administrative expenses | | **(119.4)** | (113.5) | (102.9) |
| Miscellaneous - net | | **(27.0)** | (22.9) | 25.5 |
| Total other operating expense | | **(146.4)** | (136.4) | (77.4) |
| **Operating income** | | **429.3** | 673.2 | 390.2 |
| Other income (expense): | | | | |
| Interest expense, net | | **(101.2)** | (118.9) | (126.8) |
| Loss on extinguishment of debt | | **(18.2)** | (6.8) | (165.4) |
| Other non-operating income | | **2.2** | 17.2 | 10.2 |
| Total other expense | | **(117.2)** | (108.5) | (282.0) |
| **Income from continuing operations before income taxes** | | **312.1** | 564.7 | 108.2 |
| Income tax benefit (expense) | | **(17.6)** | 475.2 | 252.4 |
| **Income from continuing operations** | | **294.5** | 1,039.9 | 360.6 |
| Income (loss) from discontinued operations, net of tax | | **(1.7)** | 88.2 | 2.5 |
| **Net income** | | **292.8** | 1,128.1 | 363.1 |
| Loss attributable to noncontrolling interest | | **—** | — | 3.9 |
| **Net income attributable to Cliffs shareholders** | $ | **292.8** | $ 1,128.1 | $ 367.0 |
| | | | | |
| **Earnings (loss) per common share attributable to Cliffs shareholders - basic** | | | | |
| Continuing operations | $ | **1.07** | $ 3.50 | $ 1.27 |
| Discontinued operations | | **(0.01)** | 0.30 | 0.01 |
| | $ | **1.06** | $ 3.80 | $ 1.28 |
| **Earnings (loss) per common share attributable to Cliffs shareholders - diluted** | | | | |
| Continuing operations | $ | **1.04** | $ 3.42 | $ 1.25 |
| Discontinued operations | | **(0.01)** | 0.29 | 0.01 |
| | $ | **1.03** | $ 3.71 | $ 1.26 |
| **Average number of shares (in thousands)** | | | | |
| Basic | | **276,761** | 297,176 | 288,435 |
| Diluted | | **284,480** | 304,141 | 292,961 |

*The accompanying notes are an integral part of these consolidated financial statements.*

65

A005972

Table of Contents

**Statements of Consolidated Comprehensive Income**

Cleveland-Cliffs Inc. and Subsidiaries

| | (In Millions) | | |
|---|---|---|---|
| | Year Ended December 31, | | |
| | **2019** | 2018 | 2017 |
| **Net income attributable to Cliffs shareholders** | $ **292.8** | $ 1,128.1 | $ 367.0 |
| Other comprehensive income (loss): | | | |
| Changes in pension and OPEB, net of tax | **(34.6)** | (17.2) | 11.5 |
| Changes in foreign currency translation | **—** | (225.4) | (13.9) |
| Changes in derivative financial instruments, net of tax | **(0.3)** | (2.3) | (0.5) |
| **Other comprehensive loss** | **(34.9)** | (244.9) | (2.9) |
| Other comprehensive loss attributable to the noncontrolling interest | **—** | — | (1.1) |
| **Total comprehensive income attributable to Cliffs shareholders** | $ **257.9** | $ 883.2 | $ 363.0 |

*The accompanying notes are an integral part of these  consolidated financial statements.*

66

A005973

Table of Contents

**Statements of Consolidated Cash Flows**

Cleveland-Cliffs Inc. and Subsidiaries

| | | (In Millions) | |
|---|---|---|---|
| | | Year Ended December 31, | |
| | **2019** | 2018 | 2017 |
| **OPERATING ACTIVITIES** | | | |
| Net income | $ **292.8** | $ 1,128.1 | $ 363.1 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation, depletion and amortization | **85.1** | 89.0 | 87.7 |
| Deferred income taxes | **16.8** | (460.5) | — |
| Loss on extinguishment of debt | **18.2** | 6.8 | 165.4 |
| Loss (gain) on derivatives | **46.8** | (110.2) | (4.1) |
| Gain on foreign currency translation | **—** | (228.1) | — |
| Other | **65.4** | 20.7 | 45.5 |
| Changes in operating assets and liabilities: | | | |
| Receivables and other assets | **254.5** | 51.7 | (246.3) |
| Inventories | **(136.3)** | 43.5 | (4.2) |
| Payables, accrued expenses and other liabilities | **(80.8)** | (62.5) | (69.0) |
| Net cash provided by operating activities | **562.5** | 478.5 | 338.1 |
| **INVESTING ACTIVITIES** | | | |
| Purchase of property, plant and equipment | **(639.0)** | (208.6) | (134.9) |
| Deposits for property, plant and equipment | **(17.0)** | (87.5) | (16.8) |
| Other investing activities | **11.6** | 23.0 | (4.3) |
| Net cash used by investing activities | **(644.4)** | (273.1) | (156.0) |
| **FINANCING ACTIVITIES** | | | |
| Repurchase of common shares | **(252.9)** | (47.5) | — |
| Dividends paid | **(72.1)** | — | — |
| Net proceeds from issuance of common shares | **—** | — | 661.3 |
| Proceeds from issuance of debt | **720.9** | — | 1,771.5 |
| Debt issuance costs | **(6.8)** | (1.5) | (28.6) |
| Repurchase of debt | **(729.3)** | (234.5) | (1,720.7) |
| Acquisition of noncontrolling interest | **—** | — | (105.0) |
| Distributions of partnership equity | **(44.2)** | (44.2) | (52.9) |
| Other financing activities | **(9.7)** | (47.5) | (26.7) |
| Net cash provided (used) by financing activities | **(394.1)** | (375.2) | 498.9 |
| Effect of exchange rate changes on cash | **—** | (2.3) | 3.3 |
| Increase (decrease) in cash and cash equivalents, including cash classified within other current assets related to discontinued operations | **(476.0)** | (172.1) | 684.3 |
| Less: increase (decrease) in cash and cash equivalents from discontinued operations, classified within other current assets | **(5.4)** | (17.0) | 18.8 |
| Net increase (decrease) in cash and cash equivalents | **(470.6)** | (155.1) | 665.5 |
| Cash and cash equivalents at beginning of year | **823.2** | 978.3 | 312.8 |
| Cash and cash equivalents at end of year | $ **352.6** | $ 823.2 | $ 978.3 |

*The accompanying notes are an integral part of these  consolidated financial statements.*

67

**Statements of Consolidated Changes in Equity**

Cleveland-Cliffs Inc. and Subsidiaries

|  | Number of Common Shares Outstanding | Par Value of Common Shares Issued | Capital in Excess of Par Value of Shares | Retained Deficit | Common Shares in Treasury | Accumulated Other Comprehensive Loss | Non-Controlling Interest | Total |
|---|---|---|---|---|---|---|---|---|
|  | (In Millions) | | | | | | | |
|  | Cliffs Shareholders | | | | | | | |
| January 1, 2017 | 233.1 | $ 29.8 | $ 3,347.0 | $ (4,574.3) | $ (245.5) | $ (21.3) | $ 133.8 | $ (1,330.5) |
| Comprehensive income (loss) | — | — | — | 367.0 | — | (4.0) | (2.8) | 360.2 |
| Issuance of convertible debt | — | — | 83.4 | — | — | — | — | 83.4 |
| Equity offering | 63.3 | 7.9 | 653.4 | — | — | — | — | 661.3 |
| Acquisition of noncontrolling interest | — | — | (70.2) | — | — | (18.9) | (15.9) | (105.0) |
| Distributions of partnership equity | — | — | (17.3) | — | — | 5.2 | (116.7) | (128.8) |
| Capital contributions by noncontrolling interest to subsidiary | — | — | — | — | — | — | 1.8 | 1.8 |
| Stock and other incentive plans | 1.0 | — | (62.4) | — | 75.9 | — | — | 13.5 |
| December 31, 2017 | 297.4 | $ 37.7 | $ 3,933.9 | $ (4,207.3) | $ (169.6) | $ (39.0) | $ 0.2 | $ (444.1) |
| Adoption of accounting standard | — | — | — | 34.0 | — | — | — | 34.0 |
| Comprehensive income (loss) | — | — | — | 1,128.1 | — | (244.9) | — | 883.2 |
| Distributions to noncontrolling interest | — | — | — | — | — | — | (0.2) | (0.2) |
| Stock and other incentive plans | 0.6 | — | (17.2) | — | 31.0 | — | — | 13.8 |
| Common stock repurchases | (5.4) | — | — | — | (47.5) | — | — | (47.5) |
| Common stock dividends ($0.05 per share) | — | — | — | (15.0) | — | — | — | (15.0) |
| December 31, 2018 | 292.6 | $ 37.7 | $ 3,916.7 | $ (3,060.2) | $ (186.1) | $ (283.9) | $ — | $ 424.2 |
| Comprehensive income (loss) | — | — | — | 292.8 | — | (34.9) | — | 257.9 |
| Stock and other incentive plans | 1.9 | — | (44.6) | — | 48.3 | — | — | 3.7 |
| Common stock repurchases | (24.4) | — | — | — | (252.9) | — | — | (252.9) |
| Common stock dividends ($0.27 per share) | — | — | — | (75.0) | — | — | — | (75.0) |
| December 31, 2019 | 270.1 | $ 37.7 | $ 3,872.1 | $ (2,842.4) | $ (390.7) | $ (318.8) | $ — | $ 357.9 |

*The accompanying notes are an integral part of these consolidated financial statements.*

A005975

**Cleveland-Cliffs Inc. and Subsidiaries**

Notes to Consolidated Financial Statements

**NOTE 1 - BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES**

**Nature of Existing Business**

Founded in 1847, Cleveland-Cliffs Inc. is the largest and oldest independent iron ore mining company in the United States. We are a major supplier of iron ore pellets to the North American steel industry from our mines and pellet plants located in Michigan and Minnesota. In 2020, we expect to be the sole producer of HBI in the Great Lakes region with the startup of our first production plant in Toledo, Ohio.

Our Company's continuing operations are organized and managed in  two operating segments according to our differentiated products. Our Mining and Pelletizing segment is a major supplier of iron ore pellets to the North American steel industry from our mines and pellet plants located in Michigan and Minnesota. Our Metallics segment includes our HBI production plant in Toledo, Ohio, which is currently under construction and expected to be completed during the first half of 2020. During the second quarter of 2019, Northshore mine began supplying DR-grade pellets to our Metallics segment, which will be used as feedstock for the HBI production plant when we begin production in 2020.

Unless otherwise noted, discussion of our business and results of operations in this Annual Report on Form 10-K refers to our continuing operations on a stand-alone basis without giving effect to the Merger.

**Proposed Merger with AK Steel**

On December 2, 2019, we entered into the Merger Agreement with AK Steel and Merger Sub, pursuant to which, upon the terms and subject to the conditions set forth therein, Merger Sub will merge with and into AK Steel, with AK Steel surviving the Merger as a wholly owned subsidiary of Cliffs.

Pursuant to the Merger Agreement, at the effective time of the Merger, each share of AK Steel common stock issued and outstanding prior to the effective time of the Merger will be converted into, and become exchangeable for, 0.400 of a share of our common stock, par value $0.125 per share.

We expect to complete the Merger in the first quarter of 2020. Completion of the Merger is subject to various conditions, such as satisfaction or waiver of certain specified closing conditions, and it is possible that factors outside of our control could result in the Merger being completed at a later time or not at all. The Merger Agreement also contains certain termination rights that may be exercised by either us or AK Steel. We plan to complete the Merger as soon as reasonably practicable following the satisfaction of all applicable conditions.

**Significant Accounting Policies**

We consider the following policies to be beneficial in understanding the judgments involved in the preparation of our consolidated financial statements and the uncertainties that could impact our financial condition, results of operations and cash flows. Certain prior period amounts have been reclassified to conform with the current year presentation.

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The more significant areas requiring the use of management estimates and assumptions relate to mineral reserves; future realizable cash flow; environmental, reclamation and closure obligations; valuation of long-lived assets, inventory, tax assets and post-employment, post-retirement and other employee benefit liabilities; reserves for contingencies and litigation; and the fair value of derivative instruments. Actual results could differ from estimates. Management reviews its estimates on an ongoing basis. Changes in facts and circumstances may alter such estimates and affect the results of operations and financial position in future periods.

69

A005976

*Basis of Consolidation*

The consolidated financial statements include our accounts and the accounts of our wholly owned subsidiaries, including the following iron ore operations at December 31, 2019:

| Name | Location | Business Segment | Status of Operations |
|------|----------|------------------|----------------------|
| Northshore | Minnesota | Mining and Pelletizing | Active |
| United Taconite | Minnesota | Mining and Pelletizing | Active |
| Tilden | Michigan | Mining and Pelletizing | Active |
| Empire | Michigan | Mining and Pelletizing | Indefinitely Idled |
| Toledo HBI | Ohio | Metallics | Construction Stage |

Intercompany transactions and balances are eliminated upon consolidation.

*Equity Method Investment*

We have an investment in an unconsolidated joint venture that we have the ability to exercise significant influence over, but not control, and is accounted for under the equity method.

Our 23% ownership interest in Hibbing is recorded as an equity method investment. As of December 31, 2019 and 2018, our investment in Hibbing was $18.0 million and $15.4 million, respectively, classified in *Other non-current liabilities* in the Statements of Consolidated Financial Position.

Our share of equity income is eliminated against consolidated product inventory upon production, and against *Cost of goods sold and operating expenses* when sold. This effectively reduces the cost of our share of the mining venture's production, reflecting the cost-based nature of our participation in the unconsolidated joint venture.

*Noncontrolling Interests*

During 2017, our ownership interest in Empire increased to 100% as we reached an agreement to distribute the noncontrolling interest net assets of $132.7 million to ArcelorMittal USA, in exchange for its interest in Empire. The parties agreed that the net assets were to be distributed in three installments of $44.2 million each, the balance of which was recorded in *Other current liabilities* in the Statements of Consolidated Financial Position. The final installment was paid in August 2019. Upon payment of the first installment, we assumed ArcelorMittal USA's 21% interest and reflected the ownership percentage change in our consolidated financial statements. During the year ended December 31, 2017, we accounted for the increase in ownership as an equity transaction, which resulted in a net $12.1 million decrease in equity attributable to Cliffs' shareholders and a $116.7 million decrease in *Noncontrolling interest*. The net loss attributable to the noncontrolling interest of the Empire mining venture was $3.9 million for the year ended December 31, 2017.

During 2017, we also acquired the remaining 15% equity interest in Tilden owned by U.S. Steel for $105.0 million. With the closing of this transaction, we have 100% ownership of the mine. During the year ended December 31, 2017, we accounted for the increase in ownership as an equity transaction, which resulted in an $89.1 million decrease in equity attributable to Cliffs' shareholders and a $15.9 million decrease in *Noncontrolling interest*.

*Cash and Cash Equivalents*

Cash and cash equivalents include cash on hand and on deposit as well as all short-term securities held for the primary purpose of general liquidity. We consider investments in highly liquid debt instruments with an original maturity of three months or less from the date of acquisition and longer maturities when funds can be withdrawn in three months or less without a significant penalty to be cash equivalents. We routinely monitor and evaluate counterparty credit risk related to the financial institutions in which our short-term investment securities are held.

*Trade Accounts Receivable and Allowance for Doubtful Accounts*

Trade accounts receivable are recorded at the point control transfers and represents the amount of consideration we expect to receive in exchange for transferred goods and do not bear interest. The allowance for doubtful accounts is our best estimate of the expected credit losses over the life of our existing accounts receivable. We establish provisions for expected lifetime losses on accounts receivable at the time a receivable is recorded based on historical experience, customer credit quality and forecasted economic conditions. We regularly review our accounts receivable balances and establish or adjust the allowance as necessary using the specific identification method.

*Inventories*

*Product Inventories*

The Mining and Pelletizing segment cost of product inventories is determined using the LIFO method and is stated at the lower of cost or market. The Metallics segment cost of product inventories is determined using the weighted-average method and is stated at the lower of cost or net realizable value.

*Supplies and Other Inventories*

Supply inventories include replacement parts, fuel, chemicals and other general supplies, which are expected to be used or consumed in normal operations. Supply inventories also include critical spares. Critical spares are replacement parts for equipment that is critical for the continued operation of the mine or processing facilities.

Supply inventories are stated at the lower of cost or net realizable value using average cost, less an allowance for obsolete and surplus items.

Refer to NOTE 4 - INVENTORIES for further information.

**Derivative Financial Instruments and Hedging Activities**

We are exposed to certain risks related to the ongoing operations of our business, including those caused by changes in commodity prices and energy rates. We have established policies and procedures, including the use of certain derivative instruments, to manage such risks, if deemed necessary.

Derivative financial instruments are recognized as either assets or liabilities in the  Statements of Consolidated Financial Position  and measured at fair value. On the date a qualifying hedging instrument is executed, we designate the hedging instrument as a hedge of the variability of cash flows to be received or paid related to a forecasted transaction (cash flow hedge). We formally document all relationships between hedging instruments and hedged items, as well as our risk-management objective and strategy for undertaking various hedge transactions. This process includes linking all derivatives that are designated as cash flow hedges to specific firm commitments or forecasted transactions. We also formally assess, both at the hedge's inception and on an ongoing basis, whether the derivatives that are used in hedging transactions are highly effective in offsetting changes in cash flows of the related hedged items. When it is determined that a derivative is not highly effective as a hedge or that it has ceased to be a highly effective hedge, we discontinue hedge accounting prospectively and record all future changes in fair value in the period of the instrument's earnings or losses.

For derivative instruments that have been designated as cash flow hedges, the changes in fair value are recorded in  *Accumulated other comprehensive loss*. Amounts recorded in *Accumulated other comprehensive loss* are reclassified to earnings or losses in the period the underlying hedged transaction affects earnings or when the underlying hedged transaction is no longer reasonably possible of occurring.

For derivative instruments that have not been designated as cash flow hedges, such as provisional pricing arrangements and supplemental revenue or refunds contained within a customer supply agreement, changes in fair value are recorded in the period of the instrument's earnings or losses.

Refer to *Revenue Recognition* below for discussion of derivatives recorded as a result of pricing terms in our sales contracts. Additionally, refer to NOTE 12 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES  for further information.

71

### Property, Plant and Equipment

Our properties are stated at the lower of cost less accumulated depreciation or fair value. Depreciation of plant and equipment is computed principally by the straight-line method based on estimated useful lives, not to exceed the mine lives. Depreciation continues to be recognized when operations are idled temporarily. Depreciation and depletion is recorded over the following estimated useful lives:

| Asset Class | Basis | Life |
|---|---|---|
| Land rights and mineral rights | Units of production | Life of mine |
| Office and information technology | Straight line | 3 to 15 years |
| Buildings | Straight line | 45 years |
| Mining equipment | Straight line/Double declining balance | 3 to 20 years |
| Processing equipment | Straight line | 10 to 45 years |
| Electric power facilities | Straight line | 10 to 45 years |
| Land improvements | Straight line | 20 to 45 years |
| Asset retirement obligation | Straight line | Life of mine |

Refer to NOTE 5 - PROPERTY, PLANT AND EQUIPMENT for further information.

### Other Intangible Assets

Our mine permits are subject to periodic amortization on a straight line basis over their estimated useful life, which corresponds with the life of mine.

### Asset Impairment

We monitor conditions that may affect the carrying value of our long-lived tangible and intangible assets when events and circumstances indicate that the carrying value of the asset groups may not be recoverable. In order to determine if assets have been impaired, assets are grouped and tested at the lowest level for which identifiable, independent cash flows are available ("asset group"). An impairment loss exists when projected net undiscounted cash flows are less than the carrying value of the asset group. The measurement of the impairment loss to be recognized is based on the difference between the fair value and the carrying value of the asset group. Fair value can be determined using a market approach, income approach or cost approach.

For the years ended December 31, 2019, 2018 and 2017, no impairment factors were present that would indicate the carrying value of any of our asset groups may not be recoverable; as a result, no impairment assessments were required.

### Fair Value Measurements

ASC Topic 820, Fair Value Measurements and Disclosures , establishes a three-level valuation hierarchy for classification of fair value measurements. The valuation hierarchy is based upon the transparency of inputs to the valuation of an asset or liability as of the measurement date. Inputs refer broadly to the assumptions that market participants would use in pricing an asset or liability. Inputs may be observable or unobservable. Observable inputs are inputs that reflect the assumptions market participants would use in pricing the asset or liability developed based on market data obtained from independent sources. Unobservable inputs are inputs that reflect our own views about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances. The three-tier hierarchy of inputs is summarized below:

• Level 1 — Valuation is based upon quoted prices (unadjusted) for identical assets or liabilities in active markets.

• Level 2 — Valuation is based upon quoted prices for similar assets and liabilities in active markets, or other inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

• Level 3 — Valuation is based upon other unobservable inputs that are significant to the fair value measurement.

A005979

The classification of assets and liabilities within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement in its entirety.

Refer to NOTE 7 - FAIR VALUE OF FINANCIAL INSTRUMENTS  and NOTE 8 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS for further information.

### Pensions and Other Postretirement Benefits

We offer defined benefit pension plans, defined contribution pension plans and OPEB plans, primarily consisting of retiree healthcare benefits, to most employees as part of a total compensation and benefits program.

We recognize the funded or unfunded status of our pension and OPEB obligations on our  December 31, 2019 and 2018 Statements of Consolidated Financial Position based on the difference between the market value of plan assets and the actuarial present value of our retirement obligations on that date, on a plan-by-plan basis. If the plan assets exceed the pension and OPEB obligations, the amount of the surplus is recorded as an asset; if the pension and OPEB obligations exceed the plan assets, the amount of the underfunded obligations is recorded as a liability. Year-end balance sheet adjustments to pension and OPEB assets and obligations are recorded as *Accumulated other comprehensive loss* in the Statements of Consolidated Financial Position .

The actuarial estimates of the PBO and APBO incorporate various assumptions including the discount rates, the rates of increases in compensation, healthcare cost trend rates, mortality, retirement timing and employee turnover. The discount rate is determined based on the prevailing year-end rates for high-grade corporate bonds with a duration matching the expected cash flow timing of the benefit payments from the various plans. The remaining assumptions are based on our estimates of future events by incorporating historical trends and future expectations. The amount of net periodic cost that is recorded in the Statements of Consolidated Operations  consists of several components including service cost, interest cost, expected return on plan assets, and amortization of previously unrecognized amounts. Service cost represents the value of the benefits earned in the current year by the participants. Interest cost represents the cost associated with the passage of time. Certain items, such as plan amendments, gains and/or losses resulting from differences between actual and assumed results for demographic and economic factors affecting the obligations and assets of the plans, and changes in other assumptions are subject to deferred recognition for income and expense purposes. The expected return on plan assets is determined utilizing the weighted average of expected returns for plan asset investments in various asset categories based on historical performance, adjusted for current trends. Service costs are classified within *Cost of goods sold and operating expenses , Selling, general and administrative expenses*  and *Miscellaneous - net* while the interest cost, expected return on assets, amortization of prior service costs/credits, net actuarial gain/loss, and other costs are classified within *Other non-operating income*.

Refer to NOTE 8 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS for further information.

### Asset Retirement Obligations

Asset retirement obligations are recognized when incurred and recorded as liabilities at fair value. The fair value of the liability is determined as the discounted value of the expected future cash flows. The asset retirement obligation is accreted over time through periodic charges to earnings. In addition, the asset retirement cost is capitalized and amortized over the life of the related asset. Reclamation costs are adjusted periodically to reflect changes in the estimated present value resulting from the passage of time and revisions to the estimates of either the timing or amount of the reclamation costs. We review, on an annual basis, unless otherwise deemed necessary, the asset retirement obligation at each mine site in accordance with the provisions of *ASC Topic 410, Asset Retirement and Environmental Obligations*. We perform an in-depth evaluation of the liability every three years in addition to our routine annual assessments.

Future reclamation costs for inactive mines are accrued based on management's best estimate at the end of each period of the costs expected to be incurred at a site. Such cost estimates include, where applicable, ongoing maintenance and monitoring costs. Changes in estimates at inactive mines are reflected in earnings in the period an estimate is revised.

Refer to NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS  for further information.

73

Table of Contents

*Environmental Remediation Costs*

We have a formal policy for environmental protection and restoration. Our mining and exploration activities are subject to various laws and regulations governing protection of the environment. We conduct our operations to protect the public health and environment and believe our operations are in compliance with applicable laws and regulations in all material respects. Our environmental liabilities, including obligations for known environmental remediation exposures at active and closed mining operations and other sites, have been recognized based on the estimated cost of investigation and remediation at each site. If the cost can only be estimated as a range of possible amounts with no point in the range being more likely, the minimum of the range is accrued. Future expenditures are not discounted unless the amount and timing of the cash disbursements reasonably can be estimated. It is possible that additional environmental obligations could be incurred, the extent of which cannot be assessed. Potential insurance recoveries have not been reflected in the determination of the liabilities.

Refer to NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS for further information.

*Revenue Recognition - Pre-Adoption of Topic 606 (2017)*

Prior to the adoption of Topic 606, revenue was recognized from a sale when persuasive evidence of an arrangement existed, the price was fixed or determinable, the product was delivered in accordance with shipping terms, title and risk of loss were transferred to the customer in accordance with the specified provisions of each supply agreement and collection of the sales price reasonably was assured. Our supply agreements provide that title and risk of loss transfer to the customer either upon loading of the vessel, shipment or when payment is received. Under certain supply agreements, we ship the product to ports on the lower Great Lakes or to the customers' facilities prior to the transfer of title. Our rationale for shipping iron ore products to certain customers and retaining title until payment is received for these products is to minimize credit risk exposure.

Sales were recorded at a sales price specified in the relevant supply agreements resulting in revenue and a receivable at the time of sale. The majority of our contracts have pricing mechanisms that require price estimation at the time of delivery with price finalization at a future period. Upon revenue recognition for provisionally priced sales, a derivative was created for the difference between the sales price used and expected future settlement price. The derivative was adjusted to fair value through *Revenues from product sales and services* as a revenue adjustment each reporting period based upon current market data and forward-looking estimates determined by management until the final sales price was determined. The principal risks associated with recognition of sales on a provisional basis include Platts 62% price, Atlantic Basin pellet premium and index freight fluctuations between the date initially recorded and the date of final settlement. For revenue recognition, we estimated the future settlement rate; however, if significant changes in inputs occurred between the provisional pricing date and the final settlement date, we were required to either return a portion of the sales proceeds received or bill for the additional sales proceeds due based on the provisional sales price.

*Revenue Recognition - Post-Adoption of Topic 606 (2018 and 2019)*

We sell a single product, iron ore pellets, in the North American market. With the adoption of Topic 606 as of January 1, 2018, revenue is recognized generally when iron ore is delivered to our customers. Revenue is measured at the point that control transfers and represents the amount of consideration we expect to receive in exchange for transferring goods. We offer standard payment terms to our customers, generally requiring settlement within 30 days.

We enter into supply contracts of varying lengths to provide customers iron ore pellets to use in their blast furnaces. Blast furnaces run continuously with a constant feed of iron ore and once shut down, cannot easily be restarted. As a result, we ship iron ore in large quantities for storage and use by customers at a later date. Customers do not simultaneously receive and consume the benefits of the iron ore. Based on our assessment of the factors that indicate the pattern of satisfaction, we transfer control of the iron ore at a point in time upon shipment or delivery of the product. The customer is able to direct the use of, and obtain substantially all of the benefits from, the product at the time the product is delivered.

74

Most of our customer supply agreements specify a provisional price, which is used for initial billing and cash collection. Revenue recorded in accordance with Topic 606 is calculated using the expected revenue rate at the point when control transfers. The final settlement includes market inputs for a specified period of time, which may vary by customer, but typically include one or more of the following: Platts 62% price, Atlantic Basin pellet premium, Platts international indexed freight rates and changes in specified PPI, including industrial commodities, energy and steel. Changes in the expected revenue rate from the date control transfers through final settlement of contract terms is recorded in accordance with Topic 815. Refer to NOTE 12 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES for further information on how our estimated and final revenue rates are determined.

A supply agreement with a customer provides for supplemental revenue or refunds based on the hot-rolled coil steel price in the year the iron ore is consumed in the customer's blast furnaces. As control transfers prior to consumption, the supplemental revenue is recorded in accordance with Topic 815. Refer to NOTE 12 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES for further information on supplemental revenue or refunds.

Included within *Revenues from product sales and services* is derivative revenue related to Topic 815 of  $7.5 million, $422.6 million and $120.6 million for the years ended December 31, 2019, 2018 and 2017, respectively.

As of December 31, 2019 and 2018, under Topic 606, we had finished goods of  1.0 million long tons and  0.8 million long tons, respectively, in transit or stored at ports and customer facilities on the lower Great Lakes to service customers, for which revenue had yet to be recognized. Under the previous accounting standard, we did not recognize revenue and related cost of goods sold until title transferred to the customer, usually when payment was received. As of December 31, 2017, under the previous accounting standard, we had finished goods of 1.5 million long tons stored at ports and customer facilities on the lower Great Lakes to service customers, for which revenue had yet to be recognized.

*Practical expedients and exemptions*

We have elected to treat all shipping and handling costs as fulfillment costs because a significant portion of these costs are incurred prior to control transfer.

We have various long-term sales contracts with minimum purchase and supply requirement provisions that extend beyond the current reporting period. The portion of our transaction price for these contracts that is allocated entirely to wholly unsatisfied performance obligations is based on market prices that have not yet been determined and therefore is variable in nature. As such, we have not disclosed the value of unsatisfied performance obligations pursuant to the practical expedient.

**Cost of Goods Sold**

*Cost of goods sold and operating expenses*  represents all direct and indirect costs and expenses applicable to the sales from our mining operations.

In some circumstances, as requested by the customer, we will coordinate and ship our product via vessel directly to the port nearest to the customer's blast furnace. In this type of contract, the customer will pay one amount inclusive of both product and freight. We recognize revenue for both product revenue and the  amount reimbursed for the  vessel freight to the final port. We separate these revenue types in NOTE 2 - SUPPLEMENTARY FINANCIAL STATEMENT INFORMATION . Accordingly, the revenue we record for freight is offset by an equal amount included in *Cost of goods sold and operating expenses* for costs we incur for that freight, resulting in no impact on sales margin.

Operating expenses represented the portion of the Tilden mining venture costs prior to our  100% ownership; that is, the costs attributable to the share of the mine's production owned by the other joint venture partner in the Tilden mine until we acquired the remaining 15% noncontrolling interest during 2017. The mining venture functioned as a captive cost company, supplying product only to its owners effectively for the cost of production. Accordingly, the noncontrolling interests' revenue amounts were stated at cost of production and were offset by an equal amount included in *Cost of goods sold and operating expenses* resulting in no sales margin reflected for the noncontrolling partner participant. As we were responsible for product fulfillment under the venture, we acted as a principal in the transaction and, accordingly, recorded revenue under these arrangements on a gross basis.

We received management fees or royalties, which were earned as pellets were produced for our joint ownership mines, until we ceased our mine manager duties at Hibbing and until we purchased the remaining interest in Tilden.

75

*Repairs and Maintenance*

Repairs, maintenance and replacement of components are expensed as incurred. The cost of major equipment overhauls is capitalized and depreciated over the estimated useful life, which is the period until the next scheduled overhaul, generally five years. All other planned and unplanned repairs and maintenance costs are expensed when incurred.

*Share-Based Compensation*

The fair value of each performance share grant is estimated on the date of grant using a Monte Carlo simulation to forecast relative TSR performance. A correlation matrix of historic and projected stock prices was developed for both the Company and its predetermined peer group of mining and metals companies. The fair value assumes that objective will be achieved. The expected term of the grant represents the time from the grant date to the end of the service period. We estimate the volatility of our common shares and that of the peer group of mining and metals companies using daily price intervals for all companies. The risk-free interest rate is the rate at the grant date on zero-coupon government bonds, with a term commensurate with the remaining performance period.

The fair value of the restricted stock units is determined based on the closing price of our common shares on the grant date.

Upon vesting of share-based compensation awards, we issue shares from treasury shares before issuing new shares. Forfeitures are recognized when they occur.

The fair value of stock options is estimated on the date of grant using a Black-Scholes model using the grant date price of our common shares and option exercise price, and assumptions regarding the option's expected term, the volatility of our common shares, the risk-free interest rate, and the dividend yield over the option's expected term.

Refer to NOTE 9 - STOCK COMPENSATION PLANS for additional information.

*Income Taxes*

Income taxes are based on income for financial reporting purposes, calculated using tax rates by jurisdiction, and reflect a current tax liability or asset for the estimated taxes payable or recoverable on the current year tax return and expected annual changes in deferred taxes. Any interest or penalties on income tax are recognized as a component of *Income tax benefit (expense)*.

We account for income taxes under the asset and liability method, which requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the financial statements. Under this method, deferred tax assets and liabilities are determined based on the differences between the financial statement and tax basis of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. The effect of a change in tax rates on deferred tax assets and liabilities is recognized within *Net income* in the period that includes the enactment date.

We record net deferred tax assets to the extent we believe these assets will more likely than not be realized. In making such determination, we consider all available positive and negative evidence, including scheduled reversals of deferred tax liabilities, projected future taxable income, tax planning strategies and recent financial results of operations.

Accounting for uncertainty in income taxes recognized in the financial statements requires that a tax benefit from an uncertain tax position be recognized when it is more likely than not that the position will be sustained upon examination, including resolutions of any related appeals or litigation processes, based on technical merits.

See NOTE 10 - INCOME TAXES for further information.

76

***Discontinued Operations***

*Asia Pacific Iron Ore Operations*

During 2018, we committed to a course of action leading to the permanent closure of the Asia Pacific Iron Ore mining operations and sold all of the assets of our Asia Pacific Iron Ore business through a series of sales to third parties. As a result of our exit, management determined that our Asia Pacific Iron Ore operating segment met the criteria to be classified as held for sale and a discontinued operation under *ASC Topic 205, Presentation of Financial Statements*. As such, all current and historical Asia Pacific Iron Ore operating segment results are classified within discontinued operations.

*Canadian Operations*

During 2015, we announced that the Bloom Lake Group and the Wabush Group commenced restructuring proceedings in Montreal, Quebec under the CCAA to address the immediate liquidity issues and to preserve and protect their assets for the benefit of all stakeholders while restructuring and/or sale options were explored. Our Canadian exit represented a strategic shift in our business. For this reason, all Eastern Canadian Iron Ore costs to exit are classified as discontinued operations.

Refer to NOTE 13 - DISCONTINUED OPERATIONS for further discussion of the Asia Pacific Iron Ore segment and Eastern Canadian Iron Ore discontinued operations.

***Foreign Currency***

Our financial statements are prepared with the U.S. dollar as the reporting currency and the functional currency of all subsidiaries is the U.S. dollar. In August 2018, management determined that there were significant changes in economic factors related to our Australian subsidiaries. The change in economic factors was a result of the sale and conveyance of substantially all assets and liabilities of our Australian subsidiaries to third parties, representing a significant change in operations. As such, the functional currency for the Australian subsidiaries changed from the Australian dollar to the U.S. dollar and all remaining Australian denominated monetary balances will be remeasured prospectively through the Statements of Consolidated Operations.

As a result of the liquidation of the Australian subsidiaries' assets, the historical impact of foreign currency translation recorded in *Accumulated other comprehensive loss* in the Statements of Consolidated Financial Position of $228.1 million was reclassified and recognized as a gain in *Income (loss) from discontinued operations, net of tax* in the Statements of Consolidated Operations for the year ended December 31, 2018.

Refer to NOTE 13 - DISCONTINUED OPERATIONS for further information regarding our Australian subsidiaries.

***Earnings Per Share***

We present both basic and diluted earnings per share amounts for continuing operations and discontinued operations. Total basic earnings per share amounts are calculated by dividing *Net income attributable to Cliffs shareholders* by the weighted average number of common shares outstanding during the period presented. Total diluted earnings per share amounts are calculated by dividing *Net income attributable to Cliffs shareholders* by the weighted average number of common shares, common share equivalents under stock plans using the treasury-stock method and the calculated common share equivalents in excess of the conversion rate related to our 2025 Convertible Senior Notes using the treasury-stock method. Common share equivalents are excluded from EPS computations in the periods in which they have an anti-dilutive effect.

See NOTE 6 - DEBT AND CREDIT FACILITIES and NOTE 17 - EARNINGS PER SHARE for further information.

**Recent Accounting Pronouncements**

*Issued and Adopted*

In February 2016, the FASB issued *ASU No. 2016-02, Leases (Topic 842)* . The new standard requires lessees to recognize a right-of-use asset and a lease liability on the balance sheet for all leases except for short-term leases. For lessees, leases are classified as either operating or finance leases. We adopted this standard on its effective date of January 1, 2019 using the optional alternative approach, which requires application of the new guidance at the beginning of the standard's effective date. Adoption of the updated standard did not have a material effect on our consolidated financial statements.

In June 2016, the FASB issued *ASU No. 2016-13, Financial Instruments-Credit Losses (Topic 326)* , which introduces a new accounting model, Current Expected Credit Losses ("CECL"). CECL requires earlier recognition of credit losses, while also providing additional transparency about credit risk. CECL utilizes a lifetime expected credit loss measurement objective for the recognition of credit losses at the time the financial asset is originated or acquired. The expected credit losses are adjusted each period for changes in expected lifetime credit losses. We elected to early adopt this standard on December 31, 2019. Adoption of the updated standard did not have a material effect on our consolidated financial statements.

On January 1, 2018, we adopted Topic 606 and applied it to all contracts that were not completed using the modified retrospective method. We recognized the cumulative effect of initially applying Topic 606 as an adjustment of $34.0 million to the opening balance of *Retained deficit*. The comparative period information for the year ended December 31, 2017, has not been retrospectively revised and continues to be reported under the accounting standards in effect for that period. The adoption of Topic 606 increased 2018 *Revenues from product sales and services* and *Net income* by $68.1 million and $46.2 million, respectively.

Under Topic 606, revenue is generally recognized upon delivery to our customers, which is earlier than under the previous guidance. As an example, for certain iron ore shipments where revenue was previously recognized upon title transfer when payment was received, we now recognize revenue when control transfers, which is generally upon delivery. While we continue to retain title until we receive payment in many cases, we determined upon review of our customer contracts that the preponderance of control indicators pass to our customers' favor when we deliver our products; thus, we generally concluded that control transfers at that point. As a result of the adoption of Topic 606 and vessel deliveries not occurring during the winter months because of the closure of the Soo Locks at Sault Ste. Marie and the Welland Canal, our revenues and net income will be relatively lower than historical levels during the first quarter of each year and relatively higher than historical levels during the remaining three quarters of each year. However, the total amount of revenue recognized during the year should remain substantially the same as under previous accounting standards, assuming revenue rates and volumes are consistent between years. The adoption of Topic 606 did not have an impact on net cash flows in our Statements of Consolidated Cash Flows.

## NOTE 2 - SUPPLEMENTARY FINANCIAL STATEMENT INFORMATION

*Revenues from Product Sales and Services*

The following table represents our *Revenues from product sales and services* contributed by each category of products and services:

| | (In Millions) | | |
|---|---|---|---|
| | Year Ended December 31, | | |
| | **2019** | 2018 | 2017 |
| Revenue category: | | | |
| Product | $ **1,848.1** | $ 2,172.3 | $ 1,644.6 |
| Freight | **141.8** | 160.1 | 166.7 |
| Venture partner's cost reimbursements | **—** | — | 54.7 |
| Total revenues from product sales and services | $ **1,989.9** | $ 2,332.4 | $ 1,866.0 |

Freight and venture partner's cost reimbursements are included in both *Revenues from product sales and services* and *Cost of goods sold and operating expenses* and are offset within *Sales margin*.

There was no allowance for doubtful accounts at December 31, 2019 and 2018 and no bad debt expense for the years ended December 31, 2018 and 2017.

78

Table of Contents

*Deferred Revenue*

The table below summarizes our deferred revenue balances:

| | (In Millions) | | | | | | |
|---|---|---|---|---|---|---|---|
| | Deferred Revenue (Current) | | | | Deferred Revenue (Long-Term) | | |
| | Year Ended December 31, | | | | Year Ended December 31, | | |
| | **2019** | | 2018 | | **2019** | | 2018 |
| Opening balance as of January 1 | $ | **21.0** | $ | 23.8 | $ | **38.5** | $ | 51.4 |
| Closing balance as of December 31 | | 22.1 | | 21.0 | | 25.7 | | 38.5 |
| Increase (Decrease) | $ | **1.1** | $ | (2.8) | $ | **(12.8)** | $ | (12.9) |

The terms of one of our pellet supply agreements required supplemental payments to be paid by the customer during the period 2009 through 2012. Installment amounts received under this arrangement in excess of sales were classified as *Other current liabilities* and *Other non-current liabilities* in the Statements of Consolidated Financial Position upon receipt of payment. Revenue is recognized over the life of the supply agreement, which extends until 2022, in equal annual installments. As of December 31, 2019 and December 31, 2018, installment amounts received in excess of sales totaled $38.5 million and $51.3 million, respectively, related to this agreement. As of December 31, 2019, and December 31, 2018, deferred revenue of $12.8 million was recorded in *Other current liabilities* and $25.7 million and $38.5 million, respectively, was recorded as long-term in *Other non-current liabilities* in the Statements of Consolidated Financial Position, related to this agreement.

Due to the payment terms and the timing of cash receipts near a period end, cash receipts can exceed deliveries for certain customers. Revenue associated with these transactions totaling $9.3 million and $8.2 million was deferred and included in *Other current liabilities* in the Statements of Consolidated Financial Position as of December 31, 2019 and December 31, 2018, respectively.

*Accrued Liabilities*

The following table presents the detail of our *Accrued liabilities* in the Statements of Consolidated Financial Position :

| | (In Millions) | | | |
|---|---|---|---|---|
| | December 31, | | | |
| | **2019** | | 2018 | |
| Accrued employment costs | $ | **61.7** | $ | 74.0 |
| Accrued interest | | 29.0 | | 38.4 |
| Accrued dividends | | 17.8 | | 15.0 |
| Accrued royalties | | 8.4 | | 17.3 |
| Other | | 9.4 | | 14.2 |
| Accrued liabilities | $ | **126.3** | $ | 158.9 |

79

Table of Contents

*Cash Flow Information*

A reconciliation of capital additions to cash paid for capital expenditures is as follows:

| | (In Millions) | | |
| --- | --- | --- | --- |
| | Year Ended December 31, | | |
| | **2019** | 2018 | 2017 |
| Capital additions[1] | $ **689.8** | $ 394.8 | $ 156.0 |
| Less: | | | |
| Non-cash accruals | **15.3** | 93.6 | (2.2) |
| Right-of-use assets - finance leases | **29.3** | 7.6 | 6.5 |
| Grants | **(10.8)** | (2.5) | — |
| Cash paid for capital expenditures including deposits | $ **656.0** | $ 296.1 | $ 151.7 |

[1] Includes capital additions related to discontinued operations of $0.1 million and $2.8 million for the years ended December 31, 2018 and 2017, respectively.

Cash payments (receipts) for interest and income taxes are as follows:

| | (In Millions) | | |
| --- | --- | --- | --- |
| | **2019** | 2018 | 2017 |
| Taxes paid on income | $ **0.2** | $ 2.9 | $ 1.7 |
| Income tax refunds | **(117.9)** | (11.3) | (7.8) |
| Interest paid on debt obligations net of capitalized interest [1] | **97.6** | 105.7 | 139.0 |

[1] Capitalized interest was $24.8 million and $6.5 million for the years ended December 31, 2019 and 2018, respectively.

*Non-Cash Financing Activities - Declared Dividends*

On December 2, 2019, the Board of Directors declared a quarterly cash dividend on our common shares of $0.06 per share. The cash dividend of $16.2 million was paid on January 15, 2020 to shareholders of record as of the close of business on January 3, 2020.

**NOTE 3 - SEGMENT REPORTING**

Our Company's continuing operations are organized and managed in two operating segments according to our differentiated products. Our Mining and Pelletizing segment is a major supplier of iron ore pellets to the North American steel industry from our mines and pellet plants located in Michigan and Minnesota. Our Metallics segment includes our HBI production plant in Toledo, Ohio, which is currently under construction and expected to be completed during the first half of 2020. During the second quarter of 2019, Northshore mine began supplying DR-grade pellets to our Metallics segment, which will be used as feedstock for the HBI production plant. All intersegment sales were eliminated in consolidation.

We evaluate performance based on sales margin, defined as revenues less cost of goods sold identifiable to each segment. Additionally, we evaluate performance on a segment basis, as well as a consolidated basis, based on EBITDA and Adjusted EBITDA. These measures are used by management, investors, lenders and other external users of our financial statements to assess our operating performance and to compare operating performance to other companies in the iron ore industry. In addition, management believes EBITDA and Adjusted EBITDA are useful measures to assess the earnings power of the business without the impact of capital structure and can be used to assess our ability to service debt and fund future capital expenditures in the business.

Table of Contents

The following tables present a summary of our reportable segments including a reconciliation of segment revenues to total *Revenues from product sales and services*, segment sales margin to total *Sales margin* and a reconciliation of *Net income* to EBITDA and Adjusted EBITDA:

| | (In Millions) | | |
| --- | --- | --- | --- |
| | Year Ended December 31, 2019 | | |
| | Mining and Pelletizing | Metallics | Total |
| Operating segment revenues from product sales and services | $ 2,069.2 | $ — | $ 2,069.2 |
| Elimination of intersegment revenues | (79.3) | — | (79.3) |
| Total revenues from product sales and services | $ 1,989.9 | $ — | $ 1,989.9 |
| | | | |
| Operating segment sales margin | $ 600.0 | $ — | $ 600.0 |
| Elimination of intersegment sales margin | (24.3) | — | (24.3) |
| Total sales margin | $ 575.7 | $ — | $ 575.7 |

Revenues from product sales and services of $2,332.4 million and $1,866.0 million, respectively, and sales margin of $809.6 million and $467.6 million, respectively, related to our Mining and Pelletizing segment accounted for all of our consolidated revenues and sales margin for years ended December 31, 2018 and December 31, 2017.

|  | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
|  | **2019** | | 2018 | | 2017 | |
| Net income | $ | **292.8** | $ | 1,128.1 | $ | 363.1 |
| Less: | | | | | | |
| Interest expense, net | | **(101.6)** | | (121.3) | | (132.0) |
| Income tax benefit (expense) | | **(17.6)** | | 460.3 | | 252.4 |
| Depreciation, depletion and amortization | | **(85.1)** | | (89.0) | | (87.7) |
| Total EBITDA | $ | **497.1** | $ | 878.1 | $ | 330.4 |
| Less: | | | | | | |
| Impact of discontinued operations | $ | **(1.3)** | $ | 120.6 | $ | 22.0 |
| Loss on extinguishment of debt | | **(18.2)** | | (6.8) | | (165.4) |
| Severance costs | | **(1.7)** | | — | | — |
| Acquisition costs | | **(6.5)** | | — | | — |
| Foreign exchange remeasurement | | **—** | | (0.9) | | 13.9 |
| Impairment of other long-lived assets | | **—** | | (1.1) | | — |
| Total Adjusted EBITDA | $ | **524.8** | $ | 766.3 | $ | 459.9 |
|  | | | | | | |
| EBITDA: | | | | | | |
| Mining and Pelletizing | $ | **648.1** | $ | 852.9 | $ | 534.9 |
| Metallics | | **(8.1)** | | (3.3) | | (0.4) |
| Corporate and Other (including discontinued operations) | | **(142.9)** | | 28.5 | | (204.1) |
| Total EBITDA | $ | **497.1** | $ | 878.1 | $ | 330.4 |
|  | | | | | | |
| Adjusted EBITDA: | | | | | | |
| Mining and Pelletizing | $ | **668.3** | $ | 875.3 | $ | 559.4 |
| Metallics | | **(8.1)** | | (3.3) | | (0.4) |
| Corporate | | **(135.4)** | | (105.7) | | (99.1) |
| Total Adjusted EBITDA | $ | **524.8** | $ | 766.3 | $ | 459.9 |

82

The following table summarizes our depreciation, depletion and amortization and capital additions:

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| | 2019 | | 2018 | | 2017 | |
| Depreciation, depletion and amortization: | | | | | | |
| Mining and Pelletizing | $ | 79.0 | $ | 68.2 | $ | 66.6 |
| Metallics | | 0.6 | | — | | — |
| Corporate | | 5.5 | | 5.6 | | 6.8 |
| Total depreciation, depletion and amortization | $ | 85.1 | $ | 73.8 | $ | 73.4 |
| | | | | | | |
| Capital additions[1]: | | | | | | |
| Mining and Pelletizing | $ | 128.1 | $ | 145.0 | | 136.8 |
| Metallics | | 558.4 | | 248.1 | | 13.7 |
| Corporate and Other | | 3.3 | | 1.6 | | 2.7 |
| Total capital additions | $ | 689.8 | $ | 394.7 | $ | 153.2 |

[1] Refer to NOTE 2 - SUPPLEMENTARY FINANCIAL STATEMENT INFORMATION for additional information.

A summary of assets by segment is as follows:

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| | December 31, | | | | | |
| | 2019 | | 2018 | | 2017 | |
| Assets: | | | | | | |
| Mining and Pelletizing | $ | 1,643.1 | $ | 1,694.1 | $ | 1,500.6 |
| Metallics | | 913.6 | | 265.9 | | 13.4 |
| Total reportable segment assets | | 2,556.7 | | 1,960.0 | | 1,514.0 |
| Corporate and Other | | 940.1 | | 1,557.2 | | 1,300.6 |
| Assets of discontinued operations | | 7.0 | | 12.4 | | 138.8 |
| Total assets | $ | 3,503.8 | $ | 3,529.6 | $ | 2,953.4 |

Included in the consolidated financial statements are the following amounts relating to geographic location:

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| | 2019 | | 2018 | | 2017 | |
| Revenues from product sales and services: | | | | | | |
| United States | $ | 1,505.2 | $ | 1,847.3 | $ | 1,504.5 |
| Canada | | 448.1 | | 395.1 | | 206.2 |
| Other countries | | 36.6 | | 90.0 | | 155.3 |
| Total revenues from product sales and services | $ | 1,989.9 | $ | 2,332.4 | $ | 1,866.0 |
| | | | | | | |
| Property, plant and equipment, net: | | | | | | |
| United States | $ | 1,929.0 | $ | 1,286.0 | $ | 1,033.8 |

### Concentrations in Revenue

In 2019, 2018 and 2017, three customers individually accounted for more than 10% of our consolidated product revenue. Total product revenue from those customers represents $1.8 billion, $2.1 billion and $1.5 billion of our total consolidated product revenue in 2019, 2018 and 2017, respectively.

Table of Contents

**NOTE 4 - INVENTORIES**

The following table presents the detail of our *Inventories* in the Statements of Consolidated Financial Position :

| | (In Millions) | |
| --- | --- | --- |
| | December 31, | |
| | **2019** | 2018 |
| Product inventories | | |
| Finished goods | $ **114.1** | $ 77.8 |
| Work-in-process | **68.7** | 10.1 |
| Total product inventories | **182.8** | 87.9 |
| Supplies and other inventories | **134.6** | 93.2 |
| Inventories | $ **317.4** | $ 181.1 |

The excess of current cost over LIFO cost of iron ore inventories was  $101.3 million and $95.6 million at December 31, 2019 and 2018, respectively. As of December 31, 2019, the product inventory balance for the Mining and Pelletizing segment increased, resulting in a LIFO increment in 2019. The effect of the inventory build was an increase in *Inventories* of $34.2 million in the Statements of Consolidated Financial Position for the year ended December 31, 2019. As of December 31, 2018, the product inventory balance for the Mining and Pelletizing segment declined, resulting in the liquidation of a LIFO layer in 2018. The effect of the inventory reduction was a decrease in *Cost of goods sold and operating expenses*  of $0.2 million in the Statements of Consolidated Operations for the year ended December 31, 2018.

The allowance for obsolete and surplus items in supplies and other inventories was  $12.7 million and $12.6 million at December 31, 2019 and 2018, respectively.

**NOTE 5 - PROPERTY, PLANT AND EQUIPMENT**

The following table indicates the carrying value of each of the major classes of our consolidated property, plant and equipment:

| | (In Millions) | |
| --- | --- | --- |
| | December 31, | |
| | **2019** | 2018 |
| Land rights and mineral rights | $ **549.7** | $ 549.6 |
| Office and information technology | **71.9** | 70.0 |
| Buildings | **157.8** | 87.2 |
| Mining equipment | **581.9** | 548.5 |
| Processing equipment | **791.8** | 645.8 |
| Electric power facilities | **81.9** | 58.7 |
| Land improvements | **32.5** | 23.8 |
| Asset retirement obligation | **1.7** | 14.8 |
| Other | **27.9** | 25.2 |
| Construction-in-progress | **730.3** | 284.8 |
| | **3,027.4** | 2,308.4 |
| Allowance for depreciation and depletion | **(1,098.4)** | (1,022.4) |
| | $ **1,929.0** | $ 1,286.0 |

At December 31, 2019 and 2018, we had deposits for property, plant and equipment of  $34.0 million and $83.0 million, respectively, included in *Other non-current assets*.

We recorded depreciation expense of $76.6 million, $65.6 million and $65.8 million in the Statements of Consolidated Operations  for the years ended December 31, 2019, 2018 and 2017, respectively.

We recorded capitalized interest into property, plant and equipment of $24.8 million and $6.5 million during the years ended December 31, 2019 and 2018, respectively.

The net book value of the land rights and mineral rights is as follows :

| | (In Millions) | |
| --- | --- | --- |
| | December 31, | |
| | 2019 | 2018 |
| Land rights | $ 12.4 | $ 12.4 |
| Mineral rights: | | |
| Cost | $ 537.3 | $ 537.2 |
| Depletion | (134.1) | (126.5) |
| Net mineral rights | $ 403.2 | $ 410.7 |

We recorded depletion expense of $7.5 million, $7.4 million and $6.8 million in the Statements of Consolidated Operations for the years ended December 31, 2019, 2018 and 2017, respectively.

## NOTE 6 - DEBT AND CREDIT FACILITIES

The following represents a summary of our long-term debt:

| | (In Millions) | | | | |
| --- | --- | --- | --- | --- | --- |
| | December 31, 2019 | | | | |
| Debt Instrument | Annual Effective Interest Rate | Total Principal Amount | Debt Issuance Costs | Unamortized Discounts | Total Debt |
| Senior Secured Notes: | | | | | |
| $400 Million 4.875% 2024 Senior Notes | 5.00% | $ 400.0 | $ (4.6) | $ (1.8) | $ 393.6 |
| Senior Unsecured Notes: | | | | | |
| $316.25 Million 1.50% 2025 Convertible Senior Notes | 6.26% | 316.3 | (4.6) | (65.0) | 246.7 |
| $1.075 Billion 5.75% 2025 Senior Notes | 6.01% | 473.3 | (3.6) | (5.5) | 464.2 |
| $750 Million 5.875% 2027 Senior Notes | 6.49% | 750.0 | (6.3) | (27.3) | 716.4 |
| $800 Million 6.25% 2040 Senior Notes | 6.34% | 298.4 | (2.2) | (3.3) | 292.9 |
| ABL Facility | N/A | 450.0 | N/A | N/A | — |
| Long-term debt | | | | | $ 2,113.8 |

85

Table of Contents

(In Millions)

| Debt Instrument | Annual Effective Interest Rate | Total Principal Amount | Debt Issuance Costs | Unamortized Discounts | Total Debt |
|---|---|---|---|---|---|
| | | December 31, 2018 | | | |
| Senior Secured Notes: | | | | | |
| $400 Million 4.875% 2024 Senior Notes | 5.00% | $ 400.0 | $ (5.7) | $ (2.2) | $ 392.1 |
| Unsecured Senior Notes: | | | | | |
| $700 Million 4.875% 2021 Senior Notes | 4.89% | 124.0 | (0.2) | — | 123.8 |
| $316.25 Million 1.50% 2025 Convertible Senior Notes | 6.26% | 316.3 | (5.5) | (75.6) | 235.2 |
| $1.075 Billion 5.75% 2025 Senior Notes | 6.01% | 1,073.3 | (9.9) | (14.6) | 1,048.8 |
| $800 Million 6.25% 2040 Senior Notes | 6.34% | 298.4 | (2.3) | (3.3) | 292.8 |
| ABL Facility | N/A | 450.0 | N/A | N/A | — |
| Fair Value Adjustment to Interest Rate Hedge | | | | | 0.2 |
| Long-term debt | | | | | $ 2,092.9 |

**Outstanding Senior Secured Notes**

Our Senior Secured Notes bear interest at a rate of 4.875% per annum, which is payable semi-annually in arrears on January 15 and July 15 of each year. The Senior Secured Notes mature on January 15, 2024 and are secured senior obligations of the Company.

Our Senior Secured Notes are jointly and severally and fully and unconditionally guaranteed on a senior secured basis by substantially all of our material domestic subsidiaries and are secured (subject in each case to certain exceptions and permitted liens) by (i) a first-priority lien on substantially all of our assets and the assets of the guarantors, and (ii) a second-priority lien on the ABL Collateral (as defined below), which is junior to a first-priority lien for the benefit of the lenders under our ABL Facility.

The terms of the Senior Secured Notes contain certain covenants; however, there are no financial covenants. Upon the occurrence of a change of control triggering event, as defined in the indenture, we will be required to offer to purchase the notes of the applicable series at a purchase price equal to 101% of the principal amount, plus accrued and unpaid interest, if any, to, but not including, the date of purchase.

The following is a summary of redemption prices for our Senior Secured Notes:

| Redemption Period | Redemption Price[1] | Restricted Amount |
|---|---|---|
| Prior to January 15, 2021 - using proceeds of equity issuance [2] | 104.875 % | Up to 35% of original aggregate principal |
| Prior to January 15, 2021 [2] | 100.000 | |
| Prior to January 15, 2021 | 103.000 | Up to 10% of original aggregate principal |
| Beginning on January 15, 2021 | 102.438 | |
| Beginning on January 15, 2022 | 101.219 | |
| Beginning on January 15, 2023 | 100.000 | |

[1] Plus accrued and unpaid interest, if any, up to but excluding the redemption date.

[2] Plus a "make-whole" premium.

**Outstanding Senior Unsecured Notes**

***$750 Million 5.875% 2027 Senior Notes - 2019 Offering***

On May 13, 2019, we entered into an indenture among the Company, the guarantors party thereto and U.S. Bank National Association, as trustee, relating to the issuance of $750 million aggregate principal amount of 5.875%

86

A005993

2027 Senior Notes. The 5.875% 2027 Senior Notes were issued at 96.125% of face value. The 5.875% 2027 Senior Notes were issued in a private transaction exempt from the registration requirements of the Securities Act of 1933. Pursuant to the registration rights agreement executed as part of the offering, we agreed to file a registration statement with the SEC with respect to a registered offer to exchange the 5.875% 2027 Senior Notes for publicly registered notes within 365 days of the closing date, with all significant terms and conditions remaining the same.

The 5.875% 2027 Senior Notes bear interest at a rate of 5.875% per annum, payable semi-annually in arrears on June 1 and December 1 of each year, commencing on December 1, 2019. The 5.875% 2027 Senior Notes mature on June 1, 2027.

The 5.875% 2027 Senior Notes are unsecured obligations and rank equally in right of payment with all of our existing and future unsecured and unsubordinated indebtedness. The 5.875% 2027 Senior Notes are guaranteed on a senior unsecured basis by our material direct and indirect wholly-owned domestic subsidiaries and, therefore, are structurally senior to any of our existing and future indebtedness that is not guaranteed by such guarantors and are structurally subordinated to all existing and future indebtedness and other liabilities of our subsidiaries that do not guarantee the 5.875% 2027 Senior Notes.

The 5.875% 2027 Senior Notes may be redeemed, in whole or in part, at any time at our option not less than 30 days nor more than 60 days after prior notice is sent to the holders of the 5.875% 2027 Senior Notes. The following is a summary of redemption prices for our 5.875% 2027 Senior Notes:

| Redemption Period | Redemption Price[1] | Restricted Amount |
|---|---|---|
| Prior to June 1, 2022 - using proceeds of equity issuance | 105.875 % | Up to 35% of original aggregate principal |
| Prior to June 1, 2022[2] | 100.000 | |
| Beginning on June 1, 2022 | 102.938 | |
| Beginning on June 1, 2023 | 101.958 | |
| Beginning on June 1, 2024 | 100.979 | |
| Beginning on June 1, 2025 and thereafter | 100.000 | |

[1] Plus accrued and unpaid interest, if any, up to but excluding the redemption date.

[2] Plus a "make-whole" premium.

In addition, if a change of control triggering event, as defined in the indenture, occurs with respect to the 5.875% 2027 Senior Notes, we will be required to offer to purchase the notes at a purchase price equal to 101% of the aggregate principal amount, plus accrued and unpaid interest, if any, to, but not including, the date of purchase.

The terms of the 5.875% 2027 Senior Notes contain certain customary covenants; however, there are no financial covenants.

Debt issuance costs of $6.8 million were incurred related to the offering of the 5.875% 2027 Senior Notes and are included in *Long-term debt* in the Statements of Consolidated Financial Position .

### *$316.25 Million 1.50% 2025 Convertible Senior Notes*

The 2025 Convertible Notes bear interest at a rate of 1.50% per year, payable semiannually in arrears on January 15 and July 15 of each year. The 2025 Convertible Notes mature on January 15, 2025. The 2025 Convertible Notes are senior unsecured obligations and rank senior in right of payment to any of our indebtedness that is expressly subordinated in right of payment to the 2025 Convertible Notes; equal in right of payment to any of our unsecured indebtedness that is not so subordinated; effectively junior in right of payment to any of our secured indebtedness to the extent of the value of the assets securing such indebtedness; and structurally junior to all indebtedness and other liabilities (including trade payables) of our subsidiaries. The terms of the 2025 Convertible Notes contain certain customary covenants; however, there are no financial covenants.

Holders may convert their 2025 Convertible Notes at their option at any time prior to the close of business on the business day immediately preceding July 15, 2024, only under the following circumstances: (1) during any calendar quarter commencing after the calendar quarter ending on March 31, 2018, if the last reported sale price of our common shares, par value $0.125 per share, for at least 20 trading days (whether or not consecutive) during a period of 30 consecutive trading days ending on the last trading day of the immediately preceding calendar quarter is greater than

87

or equal to 130% of the conversion price on each applicable trading day; (2) during the five-business day period after any five-consecutive trading day period (the "measurement period") in which the trading price per $1,000 principal amount of 2025 Convertible Notes for each trading day of the measurement period was less than 98% of the product of the last reported sale price of our common shares and the conversion rate on each such trading day; (3) if we call the notes for redemption, at any time prior to the close of business on the scheduled trading day immediately preceding the redemption date; or (4) upon the occurrence of specified corporate events. On or after July 15, 2024 until the close of business on the second scheduled trading day immediately preceding the maturity date, holders may convert their 2025 Convertible Notes at any time, regardless of the foregoing circumstances. Upon conversion, we will pay or deliver, as the case may be, cash, common shares or a combination of cash and common shares, at our election.

Upon the issuance of the 2025 Convertible Notes the initial conversion rate was 122.4365 common shares per $1,000 principal, with a conversion price of $8.17 per common share. The conversion rate is subject to adjustment in some circumstances, including the payment of dividends on common shares, but will not be adjusted for any accrued and unpaid interest. In addition, following certain corporate events that occur prior to the maturity date, or if we deliver a notice of redemption, we will, in certain circumstances, increase the conversion rate for a holder who elects to convert its 2025 Convertible Notes in connection with such a corporate event or notice of redemption, as the case may be. As of December 31, 2019, the conversion rate was 126.3479 common shares per $1,000 principal amount of 2025 Convertible Notes.

We may not redeem the 2025 Convertible Notes prior to January 15, 2022. We may redeem all or any portion of the 2025 Convertible Notes, for cash at our option on or after January 15, 2022 if the last reported sale price of our common shares has been at least 130% of the conversion price then in effect for at least 20 trading days (whether or not consecutive) during any 30-consecutive trading day period (including the last trading day of such period) ending on, and including, the trading day immediately preceding the date on which we provide notice of redemption at a redemption price equal to 100% of the principal amount of the 2025 Convertible Notes to be redeemed, plus accrued and unpaid interest to, but excluding, the redemption date.

It is our current intent to settle conversions through combination settlement. Our ability to settle conversions through combination settlement and cash settlement will be subject to restrictions in the agreement governing our ABL Facility and may be subject to restrictions in agreements governing our future debt.

If we undergo a fundamental change as defined in the indenture, holders may require us to repurchase for cash all or any portion of their 2025 Convertible Notes at a fundamental change repurchase price equal to 100% of the principal amount of the 2025 Convertible Notes to be repurchased, plus accrued and unpaid interest to, but excluding, the fundamental change repurchase date.

In accounting for the issuance of the notes, we separated the 2025 Convertible Notes into liability and equity components. The carrying amount of the liability component was calculated by measuring the fair value of similar liabilities that did not have associated convertible features. The carrying amount of the equity component of $85.9 million representing the conversion option was determined by deducting the fair value of the liability component from the par value of the notes. The difference represents the debt discount that is amortized to interest expense over the term of the notes. The equity component is not remeasured as long as it continues to qualify for equity classification.

### Other Outstanding Unsecured Senior Notes

The following represents a summary of our other unsecured senior notes' maturity and interest payable due dates:

| Debt Instrument | Maturity | Interest Payable (until maturity) |
|---|---|---|
| $1.075 Billion 5.75% 2025 Senior Notes | March 1, 2025 | March 1 and September 1 |
| $800 Million 6.25% 2040 Senior Notes | October 1, 2040 | April 1 and October 1 |

The senior notes are unsecured obligations and rank equally in right of payment with all our other existing and future unsecured and unsubordinated indebtedness. There are no subsidiary guarantees of the interest and principal amounts for the 2040 Senior Notes. The 2025 Senior Notes are guaranteed on a senior unsecured basis by our material direct and indirect wholly-owned domestic subsidiaries and, therefore, are structurally senior to any of our existing and future indebtedness that is not guaranteed by such guarantors and are structurally subordinated to all existing and future indebtedness and other liabilities of our subsidiaries that do not guarantee the 2025 Senior Notes.

The 2040 Senior Notes may be redeemed any time at our option not less than 30 days nor more than 60 days after prior notice is sent to the holders. The 2040 Senior Notes are redeemable at a redemption price equal to the greater of (1) 100% of the principal amount of the notes to be redeemed or (2) the sum of the present values of the remaining scheduled payments of principal and interest on the notes to be redeemed, discounted to the redemption date on a semi-annual basis at the treasury rate plus 40 basis points, plus accrued and unpaid interest, if any, to, but not including, the date of redemption.

We may redeem the 2025 Senior Notes, in whole or in part, on or after March 1, 2020, at the redemption prices set forth in the indenture, plus accrued and unpaid interest, if any, to, but not including, the date of redemption, and prior to March 1, 2020, at a redemption price equal to 100% of the principal amount thereof plus a "make-whole" premium set forth in the indenture, plus accrued and unpaid interest, if any, to, but not including, the date of redemption. We may also redeem up to 35% of the aggregate principal amount of the 2025 Senior Notes on or prior to March 1, 2020 at a redemption price equal to 105.75% of the principal amount thereof, plus accrued and unpaid interest, if any, to, but not including, the date of redemption with the net cash proceeds of one or more equity offerings.

In addition, if a change of control triggering event, as defined in the applicable indenture, occurs with respect to the unsecured notes, we will be required to offer to purchase the notes of the applicable series at a purchase price equal to 101% of the principal amount, plus accrued and unpaid interest, if any, to, but not including, the date of purchase.

The terms of the unsecured notes contain certain customary covenants; however, there are no financial covenants.

**Debt Extinguishment - 2019**

During the year ended December 31, 2019, we used the net proceeds from the issuance of $750 million aggregate principal amount of 5.875% 2027 Senior Notes, along with cash on hand, to redeem in full all of our outstanding 4.875% 2021 Senior Notes and to fund the repurchase of $600 million aggregate principal amount of our outstanding 5.75% 2025 Senior Notes in a tender offer.

The following is a summary of the debt extinguished and the respective loss on extinguishment:

| | (In Millions) | | | |
|---|---|---|---|---|
| | Year Ended December 31, 2019 | | | |
| | Debt Extinguished | | (Loss) on Extinguishment[1] | |
| Unsecured Notes: | | | | |
| $700 Million 4.875% 2021 Senior Notes | $ | 124.0 | $ | (5.3) |
| $1.075 Billion 5.75% 2025 Senior Notes | | 600.0 | | (12.9) |
| | $ | 724.0 | $ | (18.2) |

[1] This includes premiums paid related to the redemption of our notes of $5.3 million.

**Debt Extinguishment - 2018**

During the year ended December 31, 2018, we redeemed in full all of our outstanding 5.90% 2020 Senior Notes and 4.80% 2020 Senior Notes with cash on hand. Additionally, we purchased certain of our 4.875% 2021 Senior Notes and 5.75% 2025 Senior Notes.

89

Table of Contents

The following is a summary of the debt extinguished and the respective gain (loss) on extinguishment:

| | (In Millions) | | | |
| | Year Ended December 31, 2018 | | | |
| | Debt Extinguished | | Gain (Loss) on Extinguishment[1] | |
| Unsecured Notes: | | | | |
| $400 Million 5.90% 2020 Senior Notes | $ | 88.9 | $ | (3.3) |
| $500 Million 4.80% 2020 Senior Notes | | 122.4 | | (3.7) |
| $700 Million 4.875% 2021 Senior Notes | | 14.4 | | 0.1 |
| $1.075 Billion 5.75% 2025 Senior Notes | | 1.7 | | 0.1 |
| | $ | 227.4 | $ | (6.8) |

[1] This includes premiums paid related to the redemption of our notes of $7.1 million.

## Debt Extinguishment - 2017

During the year ended December 31, 2017, we issued 63.3 million common shares in an underwritten public offering. We received net proceeds of $661.3 million at a public offering price of $10.75 per common share. The net proceeds from the issuance of our common shares and the net proceeds from the issuance of $1.075 Billion 5.75% 2025 Senior Notes were used to redeem in full all of our outstanding 8.25% 2020 First Lien Notes, 8.00% 2020 1.5 Lien Notes and 7.75% 2020 Second Lien Notes. Additionally, through tender offers, we purchased certain of our 5.90% 2020 Senior Notes, our 4.80% 2020 Senior Notes and our 4.875% 2021 Senior Notes.

The following is a summary of the debt extinguished and the respective gain (loss) on extinguishment:

| | (In Millions) | | | |
| | Year Ended December 31, 2017 | | | |
| | Debt Extinguished | | Gain (Loss) on Extinguishment[1] | |
| Secured Notes: | | | | |
| $540 Million 8.25% 2020 First Lien Notes | $ | 540.0 | $ | (93.5) |
| $218.5 Million 8.00% 2020 1.5 Lien Notes | | 218.5 | | 45.1 |
| $544.2 Million 7.75% 2020 Second Lien Notes | | 430.1 | | (104.5) |
| Unsecured Notes: | | | | |
| $400 Million 5.90% 2020 Senior Notes | | 136.7 | | (7.8) |
| $500 Million 4.80% 2020 Senior Notes | | 114.4 | | (1.9) |
| $700 Million 4.875% 2021 Senior Notes | | 171.0 | | (2.8) |
| | $ | 1,610.7 | $ | (165.4) |

[1] This includes premiums paid related to the redemption of our notes of $110.0 million.

90

**Debt Maturities**

The following represents a summary of our debt instrument maturities based on the principal amounts outstanding at December 31, 2019:

| | (In Millions) |
|---|---:|
| | **Maturities of Debt** |
| 2020 | $ — |
| 2021 | — |
| 2022 | — |
| 2023 | — |
| 2024 | 400.0 |
| 2025 and thereafter | 1,838.0 |
| Total maturities of debt | $ 2,238.0 |

**ABL Facility**

On February 28, 2018, we amended and restated our senior secured asset-based revolving credit facility with various financial institutions. The ABL Facility will mature upon the earlier of February 28, 2023 or 60 days prior to the maturity of certain other material debt and provides for up to $450.0 million in borrowings, including a $248.8 million sublimit for the issuance of letters of credit and a $100.0 million sublimit for swingline loans. Availability under the ABL Facility is limited to an eligible borrowing base, as applicable, determined by applying customary advance rates to eligible accounts receivable, inventory and certain mobile equipment.

The ABL Facility and certain bank products and hedge obligations are guaranteed by us and certain of our existing wholly-owned U.S. subsidiaries and are required to be guaranteed by certain of our future U.S. subsidiaries. Amounts outstanding under the ABL Facility are secured by (i) a first-priority security interest in the accounts receivable and other rights to payment, inventory, as-extracted collateral, certain investment property, deposit accounts, securities accounts, certain general intangibles and commercial tort claims, certain mobile equipment, commodities accounts and other related assets of ours, the other borrowers and the guarantors, and proceeds and products of each of the foregoing (collectively, the "ABL Collateral") and (ii) a second-priority security interest in substantially all of our assets and the assets of the other borrowers and the guarantors other than the ABL Collateral.

Borrowings under the ABL Facility bear interest, at our option, at a base rate or, if certain conditions are met, a LIBOR rate, in each case plus an applicable margin. The base rate is equal to the greater of the federal funds rate plus 0.5%, the LIBOR rate based on a one-month interest period plus 1% and the floating rate announced by Bank of America Merrill Lynch as its "prime rate" and 1%. The LIBOR rate is a per annum fixed rate equal to LIBOR with respect to the applicable interest period and amount of LIBOR rate loan requested.

The ABL Facility contains customary representations and warranties and affirmative and negative covenants including, among others, covenants regarding the maintenance of certain financial ratios if certain conditions are triggered, covenants relating to financial reporting, covenants relating to the payment of dividends on, or purchase or redemption of, our capital stock, covenants relating to the incurrence or prepayment of certain debt, covenants relating to the incurrence of liens or encumbrances, covenants relating to compliance with laws, covenants relating to transactions with affiliates, covenants relating to mergers and sales of all or substantially all of our assets and limitations on changes in the nature of our business.

The ABL Facility provides for customary events of default, including, among other things, the event of nonpayment of principal, interest, fees, or other amounts, a representation or warranty proving to have been materially incorrect when made, failure to perform or observe certain covenants within a specified period of time, a cross-default to certain material indebtedness, the bankruptcy or insolvency of the Company and certain of its subsidiaries, monetary judgment defaults of a specified amount, invalidity of any loan documentation, a change of control of the Company, and ERISA defaults resulting in liability of a specified amount. If an event of default exists (beyond any applicable grace or cure period, if any), the administrative agent may and, at the direction of the requisite number of lenders, shall declare all amounts owing under the ABL Facility immediately due and payable, terminate such lenders' commitments to make loans under the ABL Facility and/or exercise any and all remedies and other rights under the ABL Facility. For certain events of default related to insolvency and receivership, the commitments of the lenders will be automatically terminated and all outstanding loans and other amounts will become immediately due and payable.

91

A005998

As of December 31, 2019 and 2018, we were in compliance with the ABL Facility liquidity requirements and, therefore, the springing financial covenant requiring a minimum fixed charge coverage ratio of 1.0 to 1.0 was not applicable.

The following represents a summary of our borrowing capacity under the ABL Facility:

| | (In Millions) | |
| --- | --- | --- |
| | December 31, 2019 | December 31, 2018 |
| Available borrowing base on ABL Facility [1] | $ 395.7 | $ 323.7 |
| Letter of credit obligations and other commitments [2] | (37.9 ) | (55.0 ) |
| Borrowing capacity available [3] | $ 357.8 | $ 268.7 |

[1] The ABL Facility has a maximum borrowing base of $450 million, determined by applying customary advance rates to eligible accounts receivable, inventory and certain mobile equipment.

[2] We issued standby letters of credit with certain financial institutions in order to support business obligations including, but not limited to, workers compensation and environmental obligations.

[3] As of December 31, 2019 and 2018 we had no loans drawn under the ABL Facility.

## NOTE 7 - FAIR VALUE OF FINANCIAL INSTRUMENTS

The following represents the assets and liabilities measured at fair value:

| | (In Millions) | | | |
| --- | --- | --- | --- | --- |
| | December 31, 2019 | | | |
| | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| Assets: | | | | |
| Cash equivalents | $ — | $ 187.6 | $ — | $ 187.6 |
| Derivative assets | — | — | 45.8 | 45.8 |
| Total | $ — | $ 187.6 | $ 45.8 | $ 233.4 |
| Liabilities: | | | | |
| Derivative liabilities | $ — | $ 3.2 | $ 1.1 | $ 4.3 |
| Total | $ — | $ 3.2 | $ 1.1 | $ 4.3 |

| | (In Millions) | | | |
| --- | --- | --- | --- | --- |
| | December 31, 2018 | | | |
| | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| Assets: | | | | |
| Cash equivalents | $ 0.8 | $ 542.6 | $ — | $ 543.4 |
| Derivative assets | — | 0.1 | 91.4 | 91.5 |
| Total | $ 0.8 | $ 542.7 | $ 91.4 | $ 634.9 |
| Liabilities: | | | | |
| Derivative liabilities | $ — | $ 3.7 | $ — | $ 3.7 |
| Total | $ — | $ 3.7 | $ — | $ 3.7 |

A005999

Financial assets classified in Level 1 included money market funds. The valuation of these instruments is based upon unadjusted quoted prices for identical assets in active markets.

The valuation of financial assets and liabilities classified in Level 2 is determined using a market approach based upon quoted prices for similar assets and liabilities in active markets, or other inputs that are observable. Level 2 assets included commercial paper at December 31, 2019 and commercial paper, certificates of deposit and commodity hedge contracts at December 31, 2018. Level 2 liabilities included commodity hedge contracts at December 31, 2019 and 2018.

The Level 3 assets and liabilities consist of a freestanding derivative instrument related to a certain supply agreement and derivative assets and liabilities related to certain provisional pricing arrangements with our customers.

The supply agreement included in our Level 3 assets contains provisions for supplemental revenue or refunds based on the hot-rolled coil steel price in the year the iron ore product is consumed in the customer's blast furnaces. We account for these provisions as derivative instruments at the time of sale and adjust the derivative instruments to fair value through *Revenues from product sales and services* each reporting period until the product is consumed and the amounts are settled. We had assets of $44.5 million and $89.3 million at December 31, 2019 and 2018, respectively, related to this supply agreement.

The provisional pricing arrangements included in our Level 3 assets/liabilities specify provisional price calculations, where the pricing mechanisms generally are based on market pricing, with the final revenue rate to be based on market inputs at a specified point in time in the future, per the terms of the supply agreements. The difference between the estimated final revenue rate at the date of sale and the estimated final revenue rate at the measurement date is characterized as a derivative and is required to be accounted for separately once the revenue has been recognized. The derivative instruments are adjusted to fair value through *Revenues from product sales and services* each reporting period based upon current market data and forward-looking estimates provided by management until the final revenue rates are determined. At December 31, 2019, we had assets of $1.3 million and liabilities of $1.1 million related to provisional pricing arrangements. At December 31, 2018, we had assets of $2.1 million related to provisional pricing arrangements.

The following table illustrates information about quantitative inputs and assumptions for the derivative assets and derivative liabilities categorized in Level 3 of the fair value hierarchy:

**Qualitative/Quantitative Information About Level 3 Fair Value Measurements**

| | Fair Value at December 31, 2019 (In Millions) | Balance Sheet Location | Valuation Technique | Unobservable Input | Point Estimate |
|---|---|---|---|---|---|
| Customer supply agreement | $44.5 | *Derivative assets* | Market Approach | Management's estimate of hot-rolled coil steel price per net ton | $650 |
| Provisional pricing arrangements | $1.3 | *Derivative assets* | Market Approach | Management's estimate of Platts 62% price per dry metric ton | $76 |
| Provisional pricing arrangements | $1.1 | *Other current liabilities* | Market Approach | PPI estimates | 197 |

The significant unobservable input used in the fair value measurement of our customer supply agreement is a forward-looking estimate of the hot-rolled coil steel price determined by management.

A t December 31, 2019, the significant unobservable inputs used in the fair value measurement of our provisional pricing arrangements were management's estimate of Platts 62% price based upon current market data and index pricing and estimates for PPI data, including those for industrial commodities, fuel and steel. During the year, significant unobservable inputs used in the fair value measurement of our provisional pricing arrangements also included the Atlantic Basin pellet premium based upon current market data and index pricing, of which includes forward-looking estimates determined by management. Refer to NOTE 12 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES for further information.

93

The following tables represent a reconciliation of the changes in fair value of financial instruments measured at fair value on a recurring basis using significant unobservable inputs (Level 3):

| | Derivative Assets (Level 3) | | Derivative Liabilities (Level 3) | |
| | Year Ended December 31, | | Year Ended December 31, | |
| (In Millions) | 2019 | 2018 | 2019 | 2018 |
|---|---|---|---|---|
| Beginning balance - January 1 | $ 91.4 | $ 49.5 | $ — | $ (1.7) |
| Total gains (losses) included in earnings | 78.6 | 428.7 | (71.1) | (6.1) |
| Settlements | (124.2) | (386.8) | 70.0 | 7.8 |
| Ending balance - December 31 | $ 45.8 | $ 91.4 | $ (1.1) | $ — |
| Total gains (losses) for the period included in earnings attributable to the change in unrealized gains (losses) on assets still held at the reporting date | $ 45.8 | $ 91.4 | $ (1.1) | $ — |

The carrying values of certain financial instruments (e.g. *Accounts receivable, net*, *Accounts payable* and *Other current liabilities*) approximate fair value and, therefore, have been excluded from the table below. A summary of the carrying value and fair value of other financial instruments were as follows:

| | | December 31, 2019 | | December 31, 2018 | |
| | | (In Millions) | | | |
| | Classification | Carrying Value | Fair Value | Carrying Value | Fair Value |
|---|---|---|---|---|---|
| Long-term debt: | | | | | |
| Secured Notes: | | | | | |
| $400 Million 4.875% 2024 Senior Notes | Level 1 | $ 393.6 | $ 410.0 | $ 392.1 | $ 370.2 |
| Unsecured Notes: | | | | | |
| $700 Million 4.875% 2021 Senior Notes | Level 1 | — | — | 123.8 | 122.3 |
| $316.25 Million 1.50% 2025 Convertible Senior Notes | Level 1 | 246.7 | 385.0 | 235.2 | 352.4 |
| $1.075 Billion 5.75% 2025 Senior Notes | Level 1 | 464.2 | 473.3 | 1,048.8 | 962.0 |
| $750 Million 5.875% 2027 Senior Notes | Level 1 | 716.4 | 718.5 | — | — |
| $800 Million 6.25% 2040 Senior Notes | Level 1 | 292.9 | 250.2 | 292.8 | 232.8 |
| ABL Facility | Level 2 | — | — | — | — |
| Fair Value Adjustment to Interest Rate Hedge | Level 2 | — | — | 0.2 | 0.2 |
| Total long-term debt | | $ 2,113.8 | $ 2,237.0 | $ 2,092.9 | $ 2,039.9 |

The fair value of long-term debt was determined using quoted market prices.

### NOTE 8 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS

We offer defined benefit pension plans, defined contribution pension plans and OPEB plans, primarily consisting of retiree healthcare benefits, to most employees as part of a total compensation and benefits program. The defined benefit pension plans are noncontributory and benefits generally are based on a minimum formula or employees' years of service and average earnings for a defined period prior to retirement.

We offer retiree medical coverage to hourly retirees of our USW-represented mines. Currently, we have a four-year agreement with the USW which began October 1, 2018 and is effective through September 30, 2022. The 2018 USW agreement established the set fixed monthly medical premiums for participants who retired prior to January 1, 2015. These fixed premiums will expire on December 31, 2020 and revert to increasing premiums based on a cost-sharing formula thereafter. The agreement also provides for an OPEB cap that limits the amount of our contributions toward retiree medical insurance coverage per calendar year for each retiree and spouse of a retiree who retired on or

94

after January 1, 2015. The amount of the annual OPEB cap is based upon the gross plan costs we incurred in 2014. The OPEB cap does not apply to surviving spouses. In lieu of retiree medical coverage, USW-represented employees hired after September 1, 2016 receive a 401(k) contribution of $0.60 per hour worked to a restricted Retiree Health Care Account.

In addition, we currently provide various levels of OPEB to some full-time employees who meet certain length of service and age requirements (a portion of which is pursuant to collective bargaining agreements). Most plans require retiree contributions and have deductibles, co-pay requirements and benefit limits. Most bargaining unit plans require retiree contributions and co-pays for medical and prescription drug coverage. There is a cap on our cost for medical coverage under the salaried plans. The annual limit applies to each covered participant and equals $7,000 for coverage prior to age 65, with the retiree's participation adjusted based on the age at which the retiree's benefits commence. We do not provide OPEB for most salaried employees hired after January 1, 1993. Retiree healthcare coverage is provided through programs administered by insurance companies whose charges are based on benefits paid.

On August 12, 2019, Cliffs Mining Company, our subsidiary, ceased performing manager duties for the Hibbing mine and transitioned those duties to ArcelorMittal USA. In connection with this transition, Cliffs Mining Company and ArcelorMittal USA entered into a transition agreement, pursuant to which the Ore Mining Companies Pension Plan previously sponsored by Cliffs Mining Company is now sponsored by ArcelorMittal Hibbing Management LLC. In connection with the transfer of manager duties for the Hibbing mine, Hibbing employees previously employed by Cliffs Mining Company became employed by an ArcelorMittal USA controlled group entity. All non-Hibbing active and retired participants were transferred to our Salaried Pension Plan. This transition did not have a material impact on our consolidated financial statements in the year ended December 31, 2019.

The following table summarizes the annual expense (income) recognized related to the retirement plans:

| | | (In Millions) | | | | |
|---|---|---|---|---|---|---|
| | | **2019** | | 2018 | | 2017 |
| Defined benefit pension plans | $ | **22.4** | $ | 12.7 | $ | 18.0 |
| Defined contribution pension plans | | **3.4** | | 3.1 | | 2.9 |
| OPEB plans | | **(2.5)** | | (5.9) | | (6.1) |
| Total | $ | **23.3** | $ | 9.9 | $ | 14.8 |

95

**Obligations and Funded Status**

The following tables and information provide additional disclosures:

| | Pension Benefits | | Other Benefits | |
|---|---|---|---|---|
| | **2019** | 2018 | **2019** | 2018 |
| **Change in benefit obligations:** | | | | |
| Benefit obligations — beginning of year | $ **905.7** | $ 973.1 | $ **241.9** | $ 265.9 |
| Service cost (excluding expenses) | **17.3** | 18.7 | **1.7** | 2.2 |
| Interest cost | **34.9** | 30.3 | **9.5** | 8.3 |
| Plan amendments | **—** | 2.2 | **—** | 12.8 |
| Actuarial (gain) loss | **111.8** | (57.0) | **18.9** | (29.4) |
| Benefits paid | **(62.2)** | (60.7) | **(25.6)** | (24.4) |
| Participant contributions | **—** | — | **5.8** | 5.6 |
| Other | **13.6** | (0.9) | **2.3** | 0.9 |
| Benefit obligations — end of year | $ **1,021.1** | $ 905.7 | $ **254.5** | $ 241.9 |
| | | | | |
| **Change in plan assets:** | | | | |
| Fair value of plan assets — beginning of year | $ **687.2** | $ 749.8 | $ **240.2** | $ 262.5 |
| Actual return on plan assets | **98.1** | (29.6) | **35.1** | (8.2) |
| Participant contributions | **—** | — | **0.5** | 0.5 |
| Employer contributions | **16.4** | 27.6 | **2.5** | 3.0 |
| Benefits paid | **(62.2)** | (60.7) | **(18.6)** | (17.6) |
| Other | **9.4** | 0.1 | **—** | — |
| Fair value of plan assets — end of year | $ **748.9** | $ 687.2 | $ **259.7** | $ 240.2 |
| Funded status | $ **(272.2)** | $ (218.5) | $ **5.2** | $ (1.7) |
| | | | | |
| **Amounts recognized in Statements of Financial Position:** | | | | |
| Non-current assets | $ **—** | $ — | $ **48.5** | $ 32.1 |
| Current liabilities | **(0.5)** | (0.1) | **(3.5)** | (3.5) |
| Non-current liabilities | **(271.7)** | (218.4) | **(39.8)** | (30.3) |
| Total amount recognized | $ **(272.2)** | $ (218.5) | $ **5.2** | $ (1.7) |
| | | | | |
| **Amounts recognized in accumulated other comprehensive loss:** | | | | |
| Net actuarial loss | $ **382.1** | $ 330.1 | $ **72.6** | $ 82.1 |
| Prior service cost (credit) | **7.3** | 8.5 | **(7.9)** | (9.9) |
| Net amount recognized | $ **389.4** | $ 338.6 | $ **64.7** | $ 72.2 |

(In Millions)

96

A006003

| (In Millions) | | | | | | | |
|---|---|---|---|---|---|---|---|
| **2019** | | | | | | | |
| | **Pension Plans** | | | | **Other Benefits** | | |
| | **Salaried** | **Hourly** | **SERP** | **Total** | **Salaried** | **Hourly** | **Total** |
| Fair value of plan assets | $ 293.7 | $ 455.2 | $ — | $ 748.9 | $ — | $ 259.7 | $ 259.7 |
| Benefit obligation | (407.2) | (607.3) | (6.6) | (1,021.1) | (37.7) | (216.8) | (254.5) |
| Funded status | $ (113.5) | $ (152.1) | $ (6.6) | $ (272.2) | $ (37.7) | $ 42.9 | $ 5.2 |

| (In Millions) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2018 | | | | | | | | |
| | Pension Plans | | | | | Other Benefits | | |
| | Salaried | Hourly | Mining | SERP | Total | Salaried | Hourly | Total |
| Fair value of plan assets | $ 249.8 | $ 429.4 | $ 8.0 | $ — | $ 687.2 | $ — | $ 240.2 | $ 240.2 |
| Benefit obligation | (340.8) | (548.9) | (10.7) | (5.3) | (905.7) | (32.9) | (209.0) | (241.9) |
| Funded status | $ (91.0) | $ (119.5) | $ (2.7) | $ (5.3) | $ (218.5) | $ (32.9) | $ 31.2 | $ (1.7) |

The accumulated benefit obligation for all defined benefit pension plans was $1,010.0 million and $896.8 million at December 31, 2019 and 2018, respectively.

**Components of Net Periodic Benefit Cost**

| (In Millions) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Pension Benefits** | | | **Other Benefits** | | | |
| | **2019** | 2018 | 2017 | **2019** | 2018 | 2017 | |
| Service cost | $ 17.3 | $ 18.7 | $ 17.1 | $ 1.7 | $ 2.2 | $ 1.8 | |
| Interest cost | 34.9 | 30.3 | 30.5 | 9.5 | 8.3 | 8.3 | |
| Expected return on plan assets | (54.6) | (60.0) | (54.5) | (16.8) | (18.4) | (17.7) | |
| Amortization: | | | | | | | |
|    Prior service costs (credits) | 1.2 | 2.2 | 2.6 | (2.0) | (3.0) | (3.0) | |
|    Net actuarial loss | 23.5 | 21.2 | 22.3 | 5.1 | 5.0 | 4.5 | |
| Curtailments | 0.1 | 0.3 | — | — | — | — | |
| Net periodic benefit cost (credit) | $ 22.4 | $ 12.7 | $ 18.0 | $ (2.5) | $ (5.9) | $ (6.1) | |

97

**Components of Accumulated Other Comprehensive Loss (Income)**

The following includes details on the significant actuarial losses (gains) impacting the benefit obligation:

| | (In Millions) | | | |
|---|---|---|---|---|
| | **Pension Benefits** | | **Other Benefits** | |
| | **2019** | 2018 | **2019** | 2018 |
| Discount rates | $ **105.8** | $ (75.7) | $ **25.5** | $ (19.0) |
| Demographic losses | **12.3** | 21.7 | **3.6** | 2.3 |
| Mortality | **(6.3)** | (3.0) | **(3.9)** | (0.8) |
| Per capita claims | **—** | — | **(9.4)** | (11.9) |
| Other | **—** | — | **3.1** | — |
| Actuarial (gain) loss on benefit obligation | **111.8** | (57.0) | **18.9** | (29.4) |
| Actual returns on assets (over) under estimate | **(43.5)** | 89.6 | **(18.3)** | 26.6 |
| Amortization of net actuarial loss | **(23.5)** | (21.2) | **(5.1)** | (5.0) |
| Amortization of prior service credits (costs) | **(1.2)** | (2.2) | **2.0** | 3.0 |
| Current year prior service costs | **—** | 2.2 | **—** | 12.8 |
| Other | **7.2** | (0.3) | **(5.0)** | 1.5 |
| Total recognized in accumulated other comprehensive loss (income) | $ **50.8** | $ 11.1 | $ **(7.5)** | $ 9.5 |

**Assumptions**

The discount rate for determining PBO is determined individually for each plan as noted in the assumption chart below. The discount rates are determined by matching the projected cash flows used to determine the PBO and APBO to a projected yield curve of 936 Aa graded bonds in the 40th to 90th percentiles. These bonds are either noncallable or callable with make-whole provisions.

On December 31, 2019, the assumed mortality improvement projection was changed from generational scale MP-2018 to generational scale MP-2019. The healthy mortality assumption was updated to the Pri-2012 mortality tables with blue collar adjustments for the Iron Hourly Pension and Hourly OPEB plans, with white collar adjustments for the Salaried OPEB Plan, and without adjustments for the Salaried Pension Plan.

On December 31, 2018, the assumed mortality improvement projection was changed from generational scale MP-2017 to generational scale MP-2018. The healthy mortality assumption was the RP-2014 mortality tables with blue collar adjustments for the Iron Hourly Pension and Hourly OPEB plans, with white collar adjustments for the Salaried OPEB Plan, and without adjustments for the Salaried Pension Plan.

The following represents weighted-average assumptions used to determine benefit obligations:

| | Pension Benefits | | | Other Benefits | | |
|---|---|---|---|---|---|---|
| | December 31, | | | December 31, | | |
| | **2019** | | 2018 | **2019** | | 2018 |
| Discount rate: | | | | | | |
| Iron Hourly Pension Plan | **3.34** % | | 4.31 % | **N/A** % | | N/A % |
| Salaried Pension Plan | **3.18** | | 4.21 | **N/A** | | N/A |
| Ore Mining Pension Plan | **N/A** | | 4.33 | **N/A** | | N/A |
| Supplemental Executive Retirement Plan | **3.05** | | 4.22 | **N/A** | | N/A |
| Hourly OPEB Plan | **N/A** | | N/A | **3.28** | | 4.29 |
| Salaried OPEB Plan | **N/A** | | N/A | **3.29** | | 4.27 |
| Interest crediting rate | **6.00** | | 6.00 | **N/A** | | N/A |
| Salaried rate of compensation increase | **3.00** | | 3.00 | **3.00** | | 3.00 |
| Hourly rate of compensation increase | **2.00** | | 2.00 | **N/A** | | N/A |

98

The following represents weighted-average assumptions used to determine net benefit cost:

| | Pension Benefits | | | Other Benefits | | |
| | December 31, | | | December 31, | | |
| | **2019** | 2018 | 2017 | **2019** | 2018 | 2017 |
|---|---|---|---|---|---|---|
| Obligation Discount Rate: | | | | | | |
| Iron Hourly Pension Plan | **4.31 %** | 3.61 % | 4.02 % | **N/A %** | N/A % | N/A % |
| Salaried Pension Plan | **4.22** | 3.52 | 3.91 | **N/A** | N/A | N/A |
| Ore Mining Pension Plan | **N/A** | 3.61 | 4.04 | **N/A** | N/A | N/A |
| Supplemental Executive Retirement Plan | **4.21** | 3.54 | 3.90 | **N/A** | N/A | N/A |
| Hourly OPEB Plan | **N/A** | N/A | N/A | **4.29** | 3.60 | 4.03 |
| Salaried OPEB Plan | **N/A** | N/A | N/A | **4.28** | 3.57 | 3.98 |
| Service Cost Discount Rate: | | | | | | |
| Iron Hourly Pension Plan | **4.49** | 3.76 | 4.30 | **N/A** | N/A | N/A |
| Salaried Pension Plan | **4.23** | 3.53 | 3.93 | **N/A** | N/A | N/A |
| Ore Mining Pension Plan | **N/A** | 3.75 | 4.27 | **N/A** | N/A | N/A |
| Supplemental Executive Retirement Plan | **4.11** | 3.43 | 3.69 | **N/A** | N/A | N/A |
| Hourly OPEB Plan | **N/A** | N/A | N/A | **4.48** | 3.73 | 4.23 |
| Salaried OPEB Plan | **N/A** | N/A | N/A | **4.54** | 3.76 | 4.30 |
| Interest Cost Discount Rate: | | | | | | |
| Iron Hourly Pension Plan | **3.96** | 3.21 | 3.38 | **N/A** | N/A | N/A |
| Salaried Pension Plan | **3.85** | 3.08 | 3.21 | **N/A** | N/A | N/A |
| Ore Mining Pension Plan | **N/A** | 3.22 | 3.41 | **N/A** | N/A | N/A |
| Supplemental Executive Retirement Plan | **3.89** | 3.16 | 3.36 | **N/A** | N/A | N/A |
| Hourly OPEB Plan | **N/A** | N/A | N/A | **3.95** | 3.10 | 3.24 |
| Salaried OPEB Plan | **N/A** | N/A | N/A | **3.91** | 3.15 | 3.28 |
| | | | | | | |
| Interest crediting rate | **6.00** | 6.00 | 6.00 | **N/A** | N/A | N/A |
| Expected return on plan assets | **8.25** | 8.25 | 8.25 | **7.00** | 7.00 | 7.00 |
| Salaried rate of compensation increase | **3.00** | 3.00 | 3.00 | **3.00** | 3.00 | 3.00 |
| Hourly rate of compensation increase | **2.00** | 2.00 | 2.00 | **N/A** | N/A | N/A |

The following represents assumed health care cost trend rates:

| | December 31, | |
| | **2019** | 2018 |
|---|---|---|
| Health care cost trend rate assumed for next year | **6.50 %** | 6.75 % |
| Ultimate health care cost trend rate | **5.00** | 5.00 |
| Year that the ultimate rate is reached | **2026** | 2026 |

**Plan Assets**

Our financial objectives with respect to our pension and VEBA plan assets are to fully fund the actuarial accrued liability for each of the plans, to maximize investment returns within reasonable and prudent levels of risk, and to maintain sufficient liquidity to meet benefit obligations on a timely basis.

Our investment objective is to outperform the expected return on assets assumption used in the plans' actuarial reports over the life of the plans. The expected return on assets takes into account historical returns and estimated future long-term returns based on capital market assumptions applied to the asset allocation strategy. The expected return is net of investment expenses paid by the plans. In addition, investment performance is monitored on a quarterly basis by benchmarking to various indices and metrics for the one-, three- and five-year periods.

99

Table of Contents

The asset allocation strategy is determined through a detailed analysis of assets and liabilities by plan, which defines the overall risk that is acceptable with regard to the expected level and variability of portfolio returns, surplus (assets compared to liabilities), contributions and pension expense.

The asset allocation review process involves simulating capital market behaviors including global asset class performance, inflation and interest rates in order to evaluate various asset allocation scenarios and determine the asset mix with the highest likelihood of meeting financial objectives. The process includes factoring in the current funded status and likely future funded status levels of the plans by taking into account expected growth or decline in the contributions over time.

The asset allocation strategy varies by plan. The following table reflects the actual asset allocations for pension and VEBA plan assets as of December 31, 2019 and 2018, as well as the 2020 weighted average target asset allocations. Equity investments include securities in large-cap, mid-cap and small-cap companies located in the U.S. and worldwide. Fixed income investments primarily include corporate bonds and government debt securities.

| | Pension Assets | | | VEBA Assets | | |
|---|---|---|---|---|---|---|
| | 2020 Target Allocation | Percentage of Plan Assets at December 31, | | 2020 Target Allocation | Percentage of Plan Assets at December 31, | |
| Asset Category | | 2019 | 2018 | | 2019 | 2018 |
| Equity securities | 45.0% | **44.0%** | 38.9% | 8.0% | **7.2%** | 8.1% |
| Fixed income | 28.0% | **26.1%** | 26.0% | 80.0% | **79.8%** | 77.0% |
| Hedge funds | 5.0% | **5.4%** | 5.4% | 4.0% | **4.8%** | 4.7% |
| Private equity | 7.0% | **6.6%** | 6.2% | 3.0% | **0.7%** | 1.2% |
| Structured credit | 7.5% | **7.0%** | 11.4% | 2.0% | **2.1%** | 3.5% |
| Real estate | 7.5% | **9.4%** | 10.3% | 3.0% | **5.4%** | 5.4% |
| Cash | —% | **1.5%** | 1.8% | —% | **—%** | 0.1% |
| Total | 100.0% | **100.0%** | 100.0% | 100.0% | **100.0%** | 100.0% |

Following is a description of the inputs and valuation methodologies used to measure the fair value of our plan assets.

*Equity Securities*

Equity securities classified as Level 1 investments include U.S. large-, small- and mid-cap investments and international equities. These investments are comprised of securities listed on an exchange, market or automated quotation system for which quotations are readily available. The valuation of these securities is determined using a market approach and is based upon unadjusted quoted prices for identical assets in active markets.

*Fixed Income*

Fixed income securities classified as Level 1 investments include bonds and government debt securities. These investments are comprised of securities listed on an exchange, market or automated quotation system for which quotations are readily available. The valuation of these securities is determined using a market approach and is based upon unadjusted quoted prices for identical assets in active markets. Also included in fixed income is a portfolio of U.S. Treasury STRIPS, which are zero-coupon bearing fixed income securities backed by the full faith and credit of the U.S. government. The securities sell at a discount to par because there are no incremental coupon payments. STRIPS are not issued directly by the Treasury but rather are created by a financial institution, government securities broker or government securities dealer. Liquidity on the issue varies depending on various market conditions; however, in general the STRIPS market is slightly less liquid than that of the U.S. Treasury Bond market. The STRIPS are priced daily through a bond pricing vendor and are classified as Level 2.

*Hedge Funds*

Hedge funds are alternative investments comprised of direct or indirect investment in offshore hedge funds with an investment objective to achieve equity-like returns with one half the volatility of equities and moderate correlation. The valuation techniques used to measure fair value attempt to maximize the use of observable inputs and minimize the use of unobservable inputs. Considerable judgment is required to interpret the factors used to develop estimates of fair value. Valuations of the underlying investment funds are obtained and reviewed. The securities that are valued by the funds are interests in the investment funds and not the underlying holdings of such investment funds. Thus, the inputs

100

used to value the investments in each of the underlying funds may differ from the inputs used to value the underlying holdings of such funds. Hedge funds are valued monthly and recorded on a one-month lag.

*Private Equity Funds*

Private equity funds are alternative investments that represent direct or indirect investments in partnerships, venture funds or a diversified pool of private investment vehicles (fund of funds).

Investment commitments are made in private equity funds based on an asset allocation strategy, and capital calls are made over the life of the funds to fund the commitments. As of December 31, 2019, remaining commitments total $37.1 million for our pension and OPEB plans. Committed amounts are funded from plan assets when capital calls are made. Investment commitments are not pre-funded in reserve accounts.

Private equity investments are valued quarterly and recorded on a one-quarter lag. For alternative investment values reported on a lag, current market information is reviewed for any material changes in values at the reporting date. Capital distributions for the funds do not occur on a regular frequency. Liquidation of these investments would require sale of the partnership interest.

*Structured Credit*

Structured credit investments are alternative investments comprised of collateralized debt obligations and other structured credit investments that are priced based on valuations provided by independent, third-party pricing agents, if available. Such values generally reflect the last reported sales price if the security is actively traded. The third-party pricing agents may also value structured credit investments at an evaluated bid price by employing methodologies that utilize actual market transactions, broker-supplied valuations or other methodologies designed to identify the market value of such securities.

Structured credit investments are valued monthly and recorded on a one-month lag. For alternative investment values reported on a lag, current market information is reviewed for any material changes in values at the reporting date. Historically, redemption requests have been considered quarterly, subject to notice of 90 days, although the advisor is currently only requiring notice of 65 days.

*Real Estate*

The real estate portfolio for the pension plans is an alternative investment comprised of one fund with strategic categories of real estate investments. All real estate holdings are appraised externally at least annually, and appraisals are conducted by reputable, independent appraisal firms that are members of the Appraisal Institute. All external appraisals are performed in accordance with the Uniform Standards of Professional Appraisal Practices. The property valuations and assumptions about each property are reviewed quarterly by the investment advisor and values are adjusted if there has been a significant change in circumstances relating to the property since the last external appraisal. The fair value of the fund is updated monthly so there is no lag in reported value. Redemption requests are considered on a quarterly basis, subject to notice of 45 days.

The real estate fund of funds investment for the Empire-Tilden, Hibbing and United Taconite VEBA plans invests in pooled investment vehicles that in turn invest in commercial real estate properties. Valuations are performed quarterly and financial statements are prepared on a semi-annual basis, with annual audited statements. Asset values for this fund are reported with a one-quarter lag, and current market information is reviewed for any material changes in values at the reporting date. Withdrawals are permitted on the last business day of each quarter subject to a 95-day prior written notice.

101

Table of Contents

*Pension*

The fair value of our pension plan assets by asset category is as follows:

| | (In Millions) | | | |
| --- | --- | --- | --- | --- |
| | December 31, 2019 | | | |
| Asset Category | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| Equity securities: | | | | |
| U.S. large-cap | $ 139.1 | $ — | $ — | $ 139.1 |
| U.S. small/mid-cap | 29.3 | — | — | 29.3 |
| International | 161.4 | — | — | 161.4 |
| Fixed income | 173.0 | 22.3 | — | 195.3 |
| Hedge funds | — | — | 40.2 | 40.2 |
| Private equity | — | — | 49.5 | 49.5 |
| Structured credit | — | — | 52.3 | 52.3 |
| Real estate | — | — | 70.4 | 70.4 |
| Cash | 11.4 | — | — | 11.4 |
| Total | $ 514.2 | $ 22.3 | $ 212.4 | $ 748.9 |

| | (In Millions) | | | |
| --- | --- | --- | --- | --- |
| | December 31, 2018 | | | |
| Asset Category | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| Equity securities: | | | | |
| U.S. large-cap | $ 112.6 | $ — | $ — | $ 112.6 |
| U.S. small/mid-cap | 22.5 | — | — | 22.5 |
| International | 132.0 | — | — | 132.0 |
| Fixed income | 151.1 | 27.4 | — | 178.5 |
| Hedge funds | — | — | 37.2 | 37.2 |
| Private equity | — | — | 42.6 | 42.6 |
| Structured credit | — | — | 78.8 | 78.8 |
| Real estate | — | — | 70.5 | 70.5 |
| Cash | 12.5 | — | — | 12.5 |
| Total | $ 430.7 | $ 27.4 | $ 229.1 | $ 687.2 |

102

The following represents the fair value measurements of changes in plan assets using significant unobservable inputs (Level 3):

| | (In Millions) | | | | |
|---|---|---|---|---|---|
| | Year Ended December 31, 2019 | | | | |
| | Hedge Funds | Private Equity Funds | Structured Credit Fund | Real Estate | Total |
| Beginning balance — January 1, 2019 | $ 37.2 | $ 42.6 | $ 78.8 | $ 70.5 | $ 229.1 |
| Actual return on plan assets: | | | | | |
| Relating to assets still held at the reporting date | 3.4 | (1.0) | 0.5 | (4.2) | (1.3) |
| Relating to assets sold during the period | — | 1.2 | 0.8 | 28.6 | 30.6 |
| Purchases | — | 16.5 | — | — | 16.5 |
| Sales | — | (9.3) | (26.8) | (23.8) | (59.9) |
| Other | (0.4) | (0.5) | (1.0) | (0.7) | (2.6) |
| Ending balance — December 31, 2019 | $ 40.2 | $ 49.5 | $ 52.3 | $ 70.4 | $ 212.4 |

| | (In Millions) | | | | |
|---|---|---|---|---|---|
| | Year Ended December 31, 2018 | | | | |
| | Hedge Funds | Private Equity Funds | Structured Credit Fund | Real Estate | Total |
| Beginning balance — January 1, 2018 | $ 37.4 | $ 39.8 | $ 72.9 | $ 65.5 | $ 215.6 |
| Actual return on plan assets: | | | | | |
| Relating to assets still held at the reporting date | (0.2) | 1.4 | 5.9 | 5.4 | 12.5 |
| Relating to assets sold during the period | — | 4.0 | — | — | 4.0 |
| Purchases | — | 5.2 | — | — | 5.2 |
| Sales | — | (7.8) | — | (0.4) | (8.2) |
| Ending balance — December 31, 2018 | $ 37.2 | $ 42.6 | $ 78.8 | $ 70.5 | $ 229.1 |

*VEBA*

Assets for OPEB plans include VEBA trusts pursuant to bargaining agreements that are available to fund retired employees' life insurance obligations and medical benefits. The fair value of our other benefit plan assets by asset category is as follows:

| | (In Millions) | | | |
| | December 31, 2019 | | | |
| Asset Category | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
|---|---|---|---|---|
| Equity securities: | | | | |
| U.S. large-cap | $ 9.3 | $ — | $ — | $ 9.3 |
| U.S. small/mid-cap | 2.3 | — | — | 2.3 |
| International | 7.0 | — | — | 7.0 |
| Fixed income | 166.4 | 40.9 | — | 207.3 |
| Hedge funds | — | — | 12.4 | 12.4 |
| Private equity | — | — | 1.7 | 1.7 |
| Structured credit | — | — | 5.5 | 5.5 |
| Real estate | — | — | 14.0 | 14.0 |
| Cash | 0.2 | — | — | 0.2 |
| Total | $ 185.2 | $ 40.9 | $ 33.6 | $ 259.7 |

| | (In Millions) | | | |
| | December 31, 2018 | | | |
| Asset Category | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
|---|---|---|---|---|
| Equity securities: | | | | |
| U.S. large-cap | $ 9.7 | $ — | $ — | $ 9.7 |
| U.S. small/mid-cap | 2.4 | — | — | 2.4 |
| International | 7.3 | — | — | 7.3 |
| Fixed income | 146.8 | 37.8 | — | 184.6 |
| Hedge funds | — | — | 11.4 | 11.4 |
| Private equity | — | — | 3.0 | 3.0 |
| Structured credit | — | — | 8.5 | 8.5 |
| Real estate | — | — | 13.1 | 13.1 |
| Cash | 0.2 | — | — | 0.2 |
| Total | $ 166.4 | $ 37.8 | $ 36.0 | $ 240.2 |

104

Table of Contents

The following represents the effect of fair value measurements using significant unobservable inputs (Level 3) on changes in plan assets:

| | (In Millions) | | | | |
|---|---|---|---|---|---|
| | Year Ended December 31, 2019 | | | | |
| | Hedge Funds | Private Equity Funds | Structured Credit Fund | Real Estate | Total |
| Beginning balance — January 1, 2019 | $ 11.4 | $ 3.0 | $ 8.5 | $ 13.1 | $ 36.0 |
| Actual return on plan assets: | | | | | |
| Relating to assets still held at the reporting date | 1.0 | (0.6) | 0.1 | 0.9 | 1.4 |
| Relating to assets sold during the period | — | — | 0.1 | — | 0.1 |
| Purchases | — | — | — | — | — |
| Sales | — | (0.7) | (3.2) | — | (3.9) |
| Ending balance — December 31, 2019 | $ 12.4 | $ 1.7 | $ 5.5 | $ 14.0 | $ 33.6 |

| | (In Millions) | | | | |
|---|---|---|---|---|---|
| | Year Ended December 31, 2018 | | | | |
| | Hedge Funds | Private Equity Funds | Structured Credit Fund | Real Estate | Total |
| Beginning balance — January 1, 2018 | $ 11.4 | $ 3.9 | $ 7.9 | $ 12.0 | $ 35.2 |
| Actual return on plan assets: | | | | | |
| Relating to assets still held at the reporting date | — | (0.1) | 0.6 | 1.1 | 1.6 |
| Relating to assets sold during the period | — | 0.3 | — | — | 0.3 |
| Purchases | — | — | — | — | — |
| Sales | — | (1.1) | — | — | (1.1) |
| Ending balance — December 31, 2018 | $ 11.4 | $ 3.0 | $ 8.5 | $ 13.1 | $ 36.0 |

**Contributions**

Annual contributions to the pension plans are made within income tax deductibility restrictions in accordance with statutory regulations. In the event of plan termination, the plan sponsors could be required to fund additional shut down and early retirement obligations that are not included in the pension obligations. Costs for early termination for pensions and OPEB are estimated to be $14.9 million and $3.0 million, respectively. We currently have no intention to shut down, terminate or withdraw from any of our employee benefit plans.

| | (In Millions) | | | |
|---|---|---|---|---|
| | | Other Benefits | | |
| Company Contributions | Pension Benefits | VEBA | Direct Payments | Total |
| 2018 | $ 27.6 | $ — | $ 3.8 | $ 3.8 |
| 2019 | 16.4 | — | 3.7 | 3.7 |
| 2020 (Expected)[1] | 20.2 | — | 3.5 | 3.5 |

[1] Pursuant to the bargaining agreement, benefits can be paid from VEBA trusts that are at least 70% funded (all VEBA trusts are over 70% funded at December 31, 2019). Funding obligations have been suspended as UTAC's, Tilden's and Empire's share of the value of their respective trust assets have reached 90% of their obligation.

VEBA plans are not subject to minimum regulatory funding requirements. Amounts contributed are pursuant to bargaining agreements.

105

Contributions by participants to the OPEB plans were $5.8 million for the year ended December 31, 2019 and $5.6 million for the year ended December 31, 2018.

**Estimated Cost for 2020**

For 2020, we estimate net periodic benefit cost (credit) as follows:

| | (In Millions) |
|---|---|
| Defined benefit pension plans | $ 16.7 |
| OPEB plans | (8.7) |
| Total | $ 8.0 |

**Estimated Future Benefit Payments**

| | | (In Millions) | | |
|---|---|---|---|---|
| | | Other Benefits | | |
| | Pension Benefits | Gross Company Benefits | Less Medicare Subsidy | Net Benefit Payments |
| 2020 | $ 73.6 | $ 17.2 | $ (0.7) | $ 16.5 |
| 2021 | 71.1 | 16.6 | (0.8) | 15.8 |
| 2022 | 70.4 | 16.3 | (0.8) | 15.5 |
| 2023 | 71.2 | 16.3 | (0.8) | 15.5 |
| 2024 | 66.9 | 16.1 | (0.9) | 15.2 |
| 2025-2029 | 318.2 | 77.3 | (4.6) | 72.7 |

**NOTE 9 - STOCK COMPENSATION PLANS**

At December 31, 2019, we had outstanding awards under various share-based compensation plans, which are described below. The following table summarizes the share-based compensation expense that we recorded in continuing operations:

| | (In Millions, except per share amounts) | | |
|---|---|---|---|
| | 2019 | 2018 | 2017 |
| Cost of goods sold and operating expenses | $ 2.0 | $ 1.7 | $ 1.9 |
| Selling, general and administrative expenses | 15.6 | 13.4 | 16.3 |
| Reduction of operating income from continuing operations before income taxes | 17.6 | 15.1 | 18.2 |
| Income tax benefit[1] | (3.7) | — | — |
| Reduction of net income from continuing operations attributable to Cliffs shareholders | $ 13.9 | $ 15.1 | $ 18.2 |
| Reduction of continuing operations earnings per common share attributable to Cliffs shareholders: | | | |
| Basic | $ 0.05 | $ 0.05 | $ 0.06 |
| Diluted | $ 0.05 | $ 0.05 | $ 0.06 |

[1] No income tax benefit in 2018 and 2017 due to the full valuation allowance.

**Employees' Plans**

The A&R 2015 Equity Plan was approved by our Board of Directors on February 21, 2017 and by our shareholders on April 25, 2017. The A&R 2015 Equity Plan increased the maximum number of shares that may be issued by 15.0 million common shares.

106

A006013

Table of Contents

Following is a summary of approved grants by the Compensation Committee :

| Grant Year | Vesting Date | Plan Issued Under | Restricted Stock Units Granted | Performance Shares Granted |
|---|---|---|---|---|
| 2019 | 12/31/2021 | A&R 2015 Equity Plan | 572,104 | 572,104 |
| 2018 | 12/31/2020 | A&R 2015 Equity Plan | 685,599 | 675,599 |
| 2017 | 12/31/2019 | A&R 2015 Equity Plan | 532,358 | 249,106 |
| 2017 | 12/31/2019 | Amended 2015 Equity Plan | 553,725 | 553,725 |

*Performance Shares*

The outstanding performance shares vest over a period of three years and are intended to be paid out in common shares. Performance is measured on the basis of relative TSR for the period and measured against the constituents of the S&P Metals and Mining ETF Index at the beginning of the relevant performance period. The final payout for the outstanding performance period grants will vary from 0% to 200% of the original grant depending on whether and to what extent the Company achieves certain objectives and performance goals as established by the Compensation Committee.

Following is a summary of our performance share award agreements outstanding as of December 31, 2019 :

| Performance Share Plan Year | Performance Shares Granted | Forfeitures to Date | Expected to Vest | Grant Date | Grant Date Fair Value | Performance Period |
|---|---|---|---|---|---|---|
| 2019 | 572,104 | 15,879 | 556,225 | 2/19/2019 | $ 18.31 | 1/1/2019 - 12/31/2021 |
| 2018 | 675,599 | 35,320 | 640,279 | 2/21/2018 | $ 11.93 | 1/1/2018 - 12/31/2020 |
| 2017 | 249,106 | — | 249,106 | 6/26/2017 | $ 10.74 | 5/31/2017 - 12/31/2019 |
| 2017 | 553,725 | 63,457 | 490,268 | 2/21/2017 | $ 19.69 | 1/1/2017 - 12/31/2019 |

The performance shares granted on February 21, 2017 were paid at 161.2% of the original grant based on the final performance evaluation versus the performance goals that were established in the grants. The performance shares granted on June 26, 2017 were paid at 200.0%.

*Restricted Stock Units*

All of the outstanding restricted stock units are subject to continued employment, are retention based, and are payable in common shares or cash in certain circumstances at a time determined by the Compensation Committee at its discretion. The restricted stock units that were granted in 2017 vested on December 31, 2019. The restricted stock units that were granted in 2019 and 2018 cliff vest in three years on December 31, 2021 and December 31, 2020, respectively.

*Stock Options*

The 412,710 stock options that were granted during the first quarter of 2015 vested on December 31, 2017, are exercisable at a strike price of $7.70 and expire on January 12, 2025. The 250,000 stock options that were granted in the fourth quarter of 2014 vested in equal thirds on each of December 31, 2015, 2016 and 2017 and are exercisable at a strike price of $13.83 and expire on November 17, 2021. As of December 31, 2019, 563,230 stock options remain outstanding and are exercisable with a weighted average price of $10.42.

*Employee Stock Purchase Plan*

On March 26, 2015, upon recommendation by the Compensation Committee, our Board of Directors approved and adopted, subject to the approval of Cliffs' shareholders at the 2015 Annual Meeting, the Cliffs Natural Resources Inc. 2015 Employee Stock Purchase Plan. This plan was approved by our shareholders at the 2015 Annual Meeting held May 19, 2015. Ten million common shares have been reserved for issuance under this plan; however, as of December 31, 2019, this program has not been made active and no common shares have been purchased. We sought shareholder approval of this plan for the purpose of qualifying the reserved common shares for special tax treatment under Section 423 of the IRC of 1986, as amended.

[Table of Contents]

**Nonemployee Directors**

Our nonemployee directors are entitled to receive restricted share awards under the Directors' Plan. For 2019, 2018 and 2017, nonemployee directors were granted a specified number of restricted shares, with a value equal to $100,000. The number of shares is based on the closing price of our common shares on the date of the Annual Meeting. The awards are subject to any deferral election and pursuant to the terms of the Directors' Plan and an award agreement.

On April 23, 2018, our Governance and Nominating Committee of the Board of Directors approved the acceleration of vesting of the restricted share awards granted to the nonemployee directors prior to April 2018, which were generally subject to a vesting period of three years. Effective April 30, 2018 and under the terms of the Directors' Plan, the vesting of these outstanding awards was accelerated. The Governance and Nominating Committee also approved a change to the vesting period for all future awards under the Directors' Plan. The nonemployee director restricted share awards granted on April 25, 2018 and all future awards are subject to a vesting period of one year.

For the last three years, grants of restricted and/or deferred shares have been awarded to elected or re-elected nonemployee directors as follows:

| Year of Grant | Restricted Shares | Deferred Shares |
|---|---|---|
| 2019 | 86,477 | 23,659 |
| 2018 | 92,718 | 17,170 |
| 2017 | 93,359 | 17,289 |

**Other Information**

Stock option, restricted awards and performance share activity under our long-term equity plans and Directors' Plans are as follows:

| | 2019 | 2018 | 2017 |
|---|---|---|---|
| | Shares | Shares | Shares |
| Stock options: | | | |
| Outstanding at beginning of year | 563,230 | 599,870 | 599,870 |
| Exercised | — | (36,640) | — |
| Forfeited/canceled | — | — | — |
| Outstanding at end of year | 563,230 | 563,230 | 599,870 |
| Restricted awards: | | | |
| Outstanding and restricted at beginning of year | 4,804,248 | 4,776,483 | 5,461,783 |
| Granted during the year | 682,240 | 795,487 | 1,196,731 |
| Vested and issued | (3,168,195) | (627,567) | (1,813,315) |
| Forfeited/canceled | (60,974) | (140,155) | (68,716) |
| Outstanding and restricted at end of year | 2,257,319 | 4,804,248 | 4,776,483 |
| Performance shares: | | | |
| Outstanding at beginning of year | 1,424,723 | 1,848,312 | 1,368,469 |
| Granted during the year | 572,104 | 675,599 | 802,831 |
| Vested and issued | — | (489,953) | — |
| Forfeited/canceled | (60,949) | (609,235) | (322,988) |
| Outstanding at end of year | 1,935,878 | 1,424,723 | 1,848,312 |
| Vested or expected to vest as of December 31, 2019 [1] | 4,756,427 | | |
| Directors' retainer and voluntary shares: | | | |
| Outstanding at beginning of year | — | — | — |
| Granted during the year | 31,075 | 27,300 | 25,476 |
| Vested and issued | (31,075) | (27,300) | (25,476) |
| Outstanding at end of year | — | — | — |
| Reserved for future grants or awards at end of year: | | | |
| Employee plans | 9,931,740 | | |
| Directors' plans | 389,692 | | |
| Total | 10,321,432 | | |

[1] We assume all shares will vest until the date of vesting or forfeiture.

A summary of our outstanding share-based award activity for the year ended December 31, 2019 is as follows:

| | Shares | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Outstanding, beginning of year | 6,792,201 | $ | 6.90 |
| Granted | 1,285,419 | $ | 14.18 |
| Vested and issued | (3,199,270) | $ | 2.20 |
| Forfeited/canceled | (121,923) | $ | 12.21 |
| Outstanding, end of year | 4,756,427 | $ | 11.90 |

The total compensation cost related to outstanding awards not yet recognized is $16.0 million at December 31, 2019. The weighted average remaining period for the awards outstanding at December 31, 2019 is approximately 1.2 years.

109

A006016

## NOTE 10 - INCOME TAXES

*Income from continuing operations before income taxes* includes the following components:

| | | (In Millions) | | | | |
|---|---|---|---|---|---|---|
| | | **2019** | | 2018 | | 2017 |
| United States | $ | **311.9** | $ | 565.0 | $ | 90.7 |
| Foreign | | **0.2** | | (0.3) | | 17.5 |
| | $ | **312.1** | $ | 564.7 | $ | 108.2 |

The components of the income tax provision (benefit) on continuing operations consist of the following:

| | | (In Millions) | | | | |
|---|---|---|---|---|---|---|
| | | **2019** | | 2018 | | 2017 |
| Current provision (benefit): | | | | | | |
| United States federal | $ | **(0.7)** | $ | (0.5) | $ | (252.6) |
| United States state & local | | **0.1** | | — | | (0.1) |
| Foreign | | **0.2** | | 0.7 | | 0.3 |
| | | **(0.4)** | | 0.2 | | (252.4) |
| Deferred provision (benefit): | | | | | | |
| United States federal | | **18.0** | | (475.4) | | — |
| Total income tax provision (benefit) from continuing operations | $ | **17.6** | $ | (475.2) | $ | (252.4) |

Reconciliation of our income tax attributable to continuing operations computed at the U.S. federal statutory rate is as follows:

| | | (In Millions) | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | **2019** | | | 2018 | | | 2017 |
| Tax at U.S. statutory rate | $ | **65.5** | **21.0 %** | $ | 118.6 | 21.0 % | $ | 37.9 | 35.0 % |
| Increase (decrease) due to: | | | | | | | | |
| Percentage depletion in excess of cost depletion | | **(49.3)** | **(15.8)** | | (54.6) | (9.7) | | (61.6) | (56.9) |
| Impact of tax law change - remeasurement of deferred taxes | | **—** | **—** | | — | — | | 407.5 | 376.6 |
| Luxembourg legal entity reduction | | **846.0** | **271.1** | | 161.7 | 28.6 | | — | — |
| Valuation allowance release: | | | | | | | | |
| Tax law change - remeasurement of deferred taxes | | **—** | **—** | | — | — | | (407.5) | (376.6) |
| Current year activity | | **—** | **—** | | (79.6) | (14.1) | | (469.8) | (434.2) |
| Release of U.S. valuation allowance | | **—** | **—** | | (460.5) | (81.5) | | — | — |
| Repeal of AMT | | **—** | **—** | | — | — | | (235.3) | (217.5) |
| Luxembourg legal entity reduction | | **(846.0)** | **(271.1)** | | (161.7) | (28.6) | | — | — |
| Impact of foreign operations | | **0.2** | **0.1** | | 0.1 | — | | 477.9 | 441.7 |
| Other items, net | | **1.2** | **0.4** | | 0.8 | 0.2 | | (1.5) | (1.4) |
| Provision for income tax expense (benefit) and effective income tax rate including discrete items | $ | **17.6** | **5.7 %** | $ | (475.2) | (84.1)% | $ | (252.4) | (233.3)% |

The increase in income tax expense from 2018 to 2019 is primarily due to release of the valuation allowance in the U.S. of $460.5 million in 2018. The Luxembourg legal entity reduction relates to initiatives resulting in the dissolution of certain entities and settlement of related financial instruments in the years ended December 31, 2019 and 2018.

110

These 2019 and 2018 net operating loss deferred tax asset reductions resulted in tax expense of $846.0 million and $161.7 million, respectively, which were fully offset by decreases in the respective valuation allowance.

In December 2017, a benefit of $235.3 million was recorded as a result of the repeal of AMT in the 2017 U.S. Tax Cuts and Jobs Act. Additionally, the impact of tax law change - remeasurement of deferred taxes for the year ended December 31, 2017 primarily relates to the statutory rate reduction in the U.S. that decreased the deferred tax assets by $334.1 million, which was fully offset by a decrease in the valuation allowance. Also on December 31, 2017, there was a Luxembourg rate reduction that decreased the deferred tax assets by $73.4 million, which was fully offset by a decrease in valuation allowance. The impact of foreign operations relates to income and losses in foreign jurisdictions where the statutory rates, ranging from 0% to 24.94%, differ from the U.S. statutory rate of 21% for the years ended December 31, 2019 and 2018 and 35.0% for the year ended December 31, 2017.

The components of income taxes for other than continuing operations consisted of the following:

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| | **2019** | | 2018 | | 2017 | |
| Other comprehensive income: | | | | | | |
| Postretirement benefit liability | $ | **11.4** | $ | 3.6 | $ | — |
| Unrealized net loss on derivative financial instruments | | **0.1** | | 0.7 | | — |
| Total | $ | **11.5** | $ | 4.3 | $ | — |

Significant components of our deferred tax assets and liabilities are as follows:

| | (In Millions) | | | |
|---|---|---|---|---|
| | **2019** | | 2018 | |
| Deferred tax assets: | | | | |
| Operating loss & other carryforwards | $ | **794.9** | $ | 2,118.8 |
| Pension and OPEB liabilities | | **113.7** | | 102.8 |
| Deferred income | | **25.2** | | 23.3 |
| Property, plant and equipment and mineral rights | | **1.4** | | 13.3 |
| State and local | | **71.0** | | 68.2 |
| Other liabilities | | **45.1** | | 48.4 |
| Total deferred tax assets before valuation allowance | | **1,051.3** | | 2,374.8 |
| Deferred tax asset valuation allowance | | **(441.3)** | | (1,287.3) |
| Net deferred tax assets | | **610.0** | | 1,087.5 |
| Deferred tax liabilities: | | | | |
| Investment in partnerships | | **(136.8)** | | (141.2) |
| Intercompany notes | | **—** | | (465.7) |
| Other assets | | **(13.7)** | | (15.8) |
| Total deferred tax liabilities | | **(150.5)** | | (622.7) |
| Net deferred tax assets | $ | **459.5** | $ | 464.8 |

We had gross domestic (including states) and foreign net operating loss carryforwards of $3.5 billion and $1.6 billion, respectively, at December 31, 2019. We had gross domestic and foreign net operating loss carryforwards of $3.6 billion and $6.6 billion, respectively, at December 31, 2018. The U.S. federal net operating losses will begin to expire in 2034 and state net operating losses will begin to expire in 2020. The foreign net operating losses can be carried forward indefinitely. We had foreign tax credit carryforwards of $5.8 million at December 31, 2019 and 2018. The foreign tax credit carryforwards will begin to expire in 2020. We had gross interest expense limitation carryforwards of $55.3 million for the year ended December 31, 2019. This interest expense can be carried forward indefinitely.

111

Table of Contents

The changes in the valuation allowance are presented below:

| | (In Millions) | | |
|---|---|---|---|
| | **2019** | 2018 | 2017 |
| Balance at beginning of year | $ 1,287.3 | $ 1,983.1 | $ 3,095.1 |
| Change in valuation allowance: | | | |
| Included in income tax expense (benefit) | (846.0) | (691.3) | (1,120.0) |
| Change in deferred assets in other comprehensive income | — | (4.5) | (9.8) |
| Acquisition of noncontrolling interest | — | — | 17.8 |
| Balance at end of year | $ 441.3 | $ 1,287.3 | $ 1,983.1 |

During 2019, a legal entity reduction initiative was completed in Luxembourg resulting in the dissolution of certain entities and settlement of related financial instruments, triggering the utilization of $1.3 billion of net operating loss deferred tax asset and reversal of the intercompany notes deferred tax liability of $446.5 million.  In addition, prior year adjustments in Luxembourg and a statutory rate reduction from  26.01% to 24.94% resulted in a net increase to the operating loss carryforward deferred tax asset of $46.2 million. The total net deferred tax reduction resulted in an expense of $846.0 million which was fully offset by a decrease in the valuation allowance. During 2018, a similar legal entity reduction initiative was completed resulting in the dissolution of certain Luxembourg entities which resulted in a decrease in the net operating loss deferred tax asset of $161.7 million which was fully offset by a decrease in valuation allowance. We continue to maintain a full valuation allowance against the remaining Luxembourg net deferred tax assets of $397.1 million at December 31, 2019. Our losses in Luxembourg in recent periods represent sufficient negative evidence to require a full valuation allowance against the deferred tax assets in that jurisdiction. We intend to maintain a valuation allowance against the deferred tax assets related to these operating losses, until sufficient positive evidence exists to support the realization of such assets.

We recorded a $695.8 million net decrease in the valuation allowance in the year ended December 31, 2018. As of December 31, 2018, our U.S. operations emerged from a three-year cumulative loss position. As the significant negative evidence of cumulative losses has been eliminated, we undertook an evaluation of the continuing need for a valuation allowance on the U.S. deferred tax assets, the majority of which relate to the U.S. tax net operating losses.

In completing our evaluation of whether a valuation allowance was still needed, we considered all available positive and negative evidence. Positive evidence considered included the emergence from the three-year cumulative loss position, our long-term customer contracts with minimum tonnage requirements, the global scarcity of iron ore pellets, near term forecasts of strong profitability and the recently revised IRC Section 163(j) interest deduction limitation. Negative evidence included the overall size of the deferred tax asset with limited carryforward and no carryback opportunity, the finite nature of the iron ore resources we mine, the uncertainty of steel tariffs that positively impacted our revenue rates in 2018 and the various market signs that the U.S. economy may be nearing the end of the current expansion.

We also considered that future realization of the deferred tax assets depends on the existence of sufficient taxable income of the appropriate character during the carryforward period. In considering sources of taxable income, we identified that a portion of the deferred tax assets would be utilized by existing taxable temporary differences reversing in the same periods as existing deductible temporary differences. In addition, we determined that carryback opportunities and tax planning strategies do not exist as potential sources of future taxable income. Lastly, forecasting future taxable income was considered, but is challenging in a cyclical industry such as ours as it relies heavily on the accuracy of key assumptions, particularly about key pricing benchmarks.

Because historical information is verifiable and more objective than forecast information and due to the cyclicality of the industry, we developed an estimate of future income based on our historical earnings through the most recent industry cycle. We adjusted historical earnings for certain non-recurring items as well as to reflect the current corporate structure by eliminating the impact of discontinued operations and extinguished debt ("core earnings"). Additionally, we adjusted core earnings to reflect the impact of the recently revised IRC Section 163(j) interest expense deduction limitation as well as permanent tax adjustments. The IRC Section 163(j) limitation will limit our interest expense deduction, particularly in down years in the industry cycle, resulting in higher taxable income.

Based on the core earnings analysis, the Company's average annual book taxable income through the business cycle is in excess of the estimated $109.0 million taxable income that would be required annually to fully utilize the

112

A006019

Table of Contents

deferred tax assets within the 19 year carryforward period. We ascribed significant weight in our assessment to the core earnings analysis and the resulting projection of taxable income through the industry cycle. Based on the weight of this positive evidence, and after considering the other available positive and negative evidence, we determined that it was appropriate to release all of the valuation allowance related to U.S. federal deferred tax assets at December 31, 2018 as it is more likely than not that the entire amount of the U.S. deferred tax asset will be realized before the end of the carryforward period. The income tax benefit recorded for the reversal of the valuation allowance against the U.S. deferred tax assets was $460.5 million.

We also have a valuation allowance recorded against certain state net operating losses and foreign tax credits, which are expected to expire before utilization. At December 31, 2019 and 2018, we had a valuation allowance recorded against certain state net operating losses of  $38.4 million  and $38.3 million, respectively. At December 31, 2019 and 2018, we had a valuation allowance recorded against certain foreign tax credits of approximately  $5.8 million.

At December 31, 2019 and 2018, we had no cumulative undistributed earnings of foreign subsidiaries included in consolidated retained earnings. Accordingly, no provision has been made for U.S. deferred taxes related to future repatriation of earnings.

A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows:

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| | **2019** | | 2018 | | 2017 | |
| Unrecognized tax benefits balance as of January 1 | $ | **29.0** | $ | 33.5 | $ | 30.7 |
| Increase (decrease) for tax positions in prior years | | **0.2** | | 0.1 | | (2.8 ) |
| Increase for tax positions in current year | | — | | 3.6 | | 4.5 |
| Settlements | | — | | — | | 1.0 |
| Lapses in statutes of limitations | | — | | (8.2 ) | | — |
| Other | | — | | — | | 0.1 |
| Unrecognized tax benefits balance as of December 31 | $ | **29.2** | $ | 29.0 | $ | 33.5 |

At December 31, 2019 and 2018, we had $29.2 million and $29.0 million, respectively, of unrecognized tax benefits recorded. Of this amount, $4.4 million and $4.2 million, were recorded in *Other non-current liabilities* for the years ended December 31, 2019 and 2018, respectively, and $24.8 million was recorded in *Other non-current assets* for both years in the Statements of Consolidated Financial Position . If the unrecognized tax benefits were recognized, the entire $29.2 million would impact the effective tax rate. We do not expect that the amount of unrecognized benefits will change significantly within the next 12 months. At December 31, 2019 and 2018, we had  $3.7 million and $2.7 million, respectively, of accrued interest and penalties related to the unrecognized tax benefits recorded in *Other non-current liabilities* in the Statements of Consolidated Financial Position .

Tax years 2016 and forward remain subject to examination for the U.S. and tax years 2008 and forward remain subject to examination for Canada.

Table of Contents

**NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS**

The following is a summary of our environmental and mine closure obligations:

|  | (In Millions) | |
|---|---|---|
|  | December 31, | |
|  | **2019** | 2018 |
| Environmental | $ **2.0** | $ 2.5 |
| Mine closure[1] | **165.3** | 172.4 |
| Total environmental and mine closure obligations | **167.3** | 174.9 |
| Less current portion | **2.4** | 2.9 |
| Long-term environmental and mine closure obligations | $ **164.9** | $ 172.0 |

[1] Includes $22.0 million and $35.0 million related to our active operations as of December 31, 2019 and 2018, respectively, with the remaining balance attributable to inactive operations, including our indefinitely idled Empire mine and a closed mine formerly operating as LTV Steel Mining Company.

**Environmental**

Our mining and exploration activities are subject to various laws and regulations governing the protection of the environment. We conduct our operations to protect the public health and environment and believe our operations are in compliance with applicable laws and regulations in all material respects. Our environmental liabilities include obligations for known environmental remediation exposures at various active and closed mining operations and other sites, and have been recognized based on the estimated cost of investigation and remediation at each site. If the cost can only be estimated as a range of possible amounts with no specific amount being more likely, the minimum of the range is accrued. Future expenditures are not discounted unless the amount and timing of the cash disbursements are readily known. Potential insurance recoveries have not been reflected. Additional environmental obligations could be incurred, the extent of which cannot be assessed.

**Mine Closure**

The accrued closure obligation for our mining operations provides for contractual and legal obligations associated with the eventual closure of the mining operations. We performed a detailed assessment of our asset retirement obligations related to our active mining locations in accordance with our accounting policy, under which we perform an in-depth evaluation of the liability every three years in addition to routine annual assessments. In 2017, we employed a third-party specialist to assist in the triennial in-depth evaluation.

For the assessments performed, we determined the obligations based on detailed estimates adjusted for factors that a market participant would consider (e.g., inflation, overhead and profit) and then discounted the obligation using the current credit-adjusted risk-free interest rate based on the corresponding life of mine. The estimate also incorporates incremental increases in the closure cost estimates and changes in estimates of mine lives. The closure date for each of our active operating mine sites was determined based on the exhaustion date of the remaining iron ore reserves. The closure date and expected timing of the capital requirements to meet our obligations for our indefinitely idled or closed mines, is determined based on the unique circumstances of each property. For indefinitely idled or closed mines, the accretion of the liability is recognized over the anticipated timing of remediation. The amortization of the related asset and accretion of the liability is recognized over the estimated mine lives for our active operations.

The following represents a roll forward of our asset retirement obligation liability:

|  | (In Millions) | |
|---|---|---|
|  | December 31, | |
|  | **2019** | 2018 |
| Asset retirement obligation at beginning of year | $ **172.4** | $ 168.4 |
| Accretion expense | **10.1** | 9.5 |
| Remediation payments | **(0.8)** | (1.0) |
| Revision in estimated cash flows | **(16.4)** | (4.5) |
| Asset retirement obligation at end of year | $ **165.3** | $ 172.4 |

114

Table of Contents

The revision in estimated cash flows during the year ended December 31, 2019 for $16.4 million primarily relates to an extension of the life-of-mine plan for Tilden mine based on the economic reserve analysis performed during 2019.

**NOTE 12 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES**

The following table presents the fair value of our derivative instruments and the classification of each in the Statements of Consolidated Financial Position:

| | (In Millions) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Derivative Assets | | | | Derivative Liabilities | | | |
| | December 31, 2019 | | December 31, 2018 | | December 31, 2019 | | December 31, 2018 | |
| Derivative Instrument | Balance Sheet Location | Fair Value | Balance Sheet Location | Fair Value | Balance Sheet Location | Fair Value | Balance Sheet Location | Fair Value |
| Derivatives designated as hedging instruments under ASC 815: | | | | | | | | |
| Commodity contracts | | $ — | *Derivative assets* | $ 0.1 | *Other current liabilities* | $ 3.2 | *Other current liabilities* | $ 3.7 |
| Derivatives not designated as hedging instruments under ASC 815: | | | | | | | | |
| Customer supply agreement | *Derivative assets* | 44.5 | *Derivative assets* | 89.3 | | — | | — |
| Provisional pricing arrangements | *Derivative assets* | 1.3 | *Derivative assets* | 2.1 | *Other current liabilities* | 1.1 | | — |
| Total derivatives not designated as hedging instruments under ASC 815: | | $ 45.8 | | $ 91.4 | | $ 1.1 | | $ — |
| Total derivatives | | $ 45.8 | | $ 91.5 | | $ 4.3 | | $ 3.7 |

**Derivatives Designated as Hedging Instruments - Cash Flow Hedges**

*Commodity Contracts*

The following table presents our outstanding hedge contracts:

| | (Quantities in Millions) | | | | | |
|---|---|---|---|---|---|---|
| | December 31, 2019 | | | December 31, 2018 | | |
| | Notional Amount | Unit of Measure | Varying Maturity Dates | Notional Amount | Unit of Measure | Varying Maturity Dates |
| Natural gas | 20.1 | MMBtu | January 2020 - December 2021 | 1.8 | MMBtu | January 2019 - August 2019 |
| Diesel | 0.8 | Gallons | January 2020 | 11.0 | Gallons | January 2019 - December 2019 |

**Derivatives Not Designated as Hedging Instruments**

***Customer Supply Agreement***

A supply agreement with one customer provides for supplemental revenue or refunds to the customer based on the hot-rolled coil steel price at the time the iron ore product is consumed in the customer's blast furnace. The supplemental pricing is characterized as a freestanding derivative and is required to be accounted for separately once control transfers to the customer. The derivative instrument, which is finalized based on a future price, is adjusted to fair value through *Revenues from product sales and services* each reporting period based upon current market data and forward-looking estimates provided by management until the pellets are consumed and the amounts are settled.

115

Table of Contents

*Provisional Pricing Arrangements*

Certain of our supply agreements specify provisional price calculations, where the pricing mechanisms generally are based on market pricing, with the final revenue rate based on certain market inputs at a specified period in time in the future, per the terms of the supply agreements. Market inputs are tied to indexed price adjustment factors that are integral to the iron ore supply contracts and vary based on the agreement. The pricing mechanisms typically include adjustments based upon changes in the Platts 62% price, Atlantic Basin pellet premium, Platts international indexed freight rates and changes in specified PPI, including those for industrial commodities, fuel and steel. The pricing adjustments generally operate in the same manner, with each factor typically comprising a portion of the price adjustment, although the weighting of each factor varies based upon the specific terms of each agreement. The price adjustment factors have been evaluated to determine if they qualify as embedded derivatives. The price adjustment factors share the same economic characteristics and risks as the host sales contract and are integral to the host sales contract as inflation adjustments; accordingly, they have not been separately valued as derivative instruments.

Revenue is recognized generally upon delivery to our customers. Revenue is measured at the point that control transfers and represents the amount of consideration we expect to receive in exchange for transferring goods. Changes in the expected revenue rate from the date that control transfers through final settlement of contract terms is recorded in accordance with Topic 815 and is characterized as a derivative instrument and accounted for separately. Subsequently, the derivative instruments are adjusted to fair value through *Revenues from product sales and services* each reporting period based upon current market data and forward-looking estimates provided by management until the final revenue rate is determined.

The 2019 and 2018 amounts represent the difference between the amount we expected to receive when revenue was initially measured at the point control transfers and our subsequent estimate of the final revenue rate based on the price calculation established in the supply agreements. The 2017 amounts represent the difference between the provisional price agreed upon with our customers based on the supply agreement terms and our estimate of the final revenue rate based on the price calculations established in the supply agreements.

The following summarizes the effect of our derivatives that are not designated as hedging instruments in the Statements of Consolidated Operations :

| | | (In Millions) | | |
|---|---|---|---|---|
| **Derivatives Not Designated as Hedging Instruments** | **Location of Gain (Loss) Recognized in Income on Derivative** | Year Ended December 31, | | |
| | | **2019** | 2018 | 2017 |
| Customer supply agreements | *Revenues from product sales and services* | $    78.1 | $    425.8 | $    163.3 |
| Provisional pricing arrangements | *Revenues from product sales and services* | (70.6) | (3.2) | (42.7) |
| Commodity contracts | *Cost of goods sold and operating expenses* | — | — | (1.3) |
| Total | | $    7.5 | $    422.6 | $    119.3 |

Refer to NOTE 7 - FAIR VALUE OF FINANCIAL INSTRUMENTS  for additional information.

**NOTE 13 - DISCONTINUED OPERATIONS**

The information below sets forth selected financial information related to operating results of our businesses classified as discontinued operations, which include our former Asia Pacific Iron Ore, North American Coal and Canadian operations. While the reclassification of revenues and expenses related to discontinued operations from prior periods have no impact upon previously reported *Net income,* the Statements of Consolidated Operations  present the revenues and expenses that were reclassified from the specified line items to *Income (loss) from discontinued operations, net of tax* . The charts below provide an asset group breakout for each financial statement line impacted by discontinued operations.

116

| | (In Millions) | | |
|---|---|---|---|
| | **Year Ended December 31,** | | |
| | **2019** | 2018 | 2017 |
| Income (loss) from discontinued operations, net of tax | | | |
| Asia Pacific Iron Ore | $ **(1.5)** | 118.3 | 21.2 |
| Canadian Operations | **0.3** | (26.5) | (21.3) |
| Other | **(0.5)** | (3.6) | 2.6 |
| | $ **(1.7)** | $ 88.2 | $ 2.5 |

| | (In Millions) | | |
|---|---|---|---|
| | **Year Ended December 31,** | | |
| | **2019** | 2018 | 2017 |
| Net cash provided (used) by operating activities | | | |
| Asia Pacific Iron Ore | $ **(2.1)** | $ (81.3) | $ 79.6 |
| Canadian Operations | **—** | (14.6) | — |
| | $ **(2.1)** | $ (95.9) | $ 79.6 |
| | | | |
| Net cash provided (used) by investing activities | | | |
| Asia Pacific Iron Ore | $ **0.1** | $ 19.8 | $ (2.8) |
| Canadian Operations | **0.3** | — | (7.7) |
| Other | **—** | — | 2.1 |
| | $ **0.4** | $ 19.8 | $ (8.4) |

*Asia Pacific Iron Ore Operations*

*Background*

During 2018, we committed to a course of action leading to the permanent closure of the Asia Pacific Iron Ore mining operations and sold all of the assets of our Asia Pacific Iron Ore business through a series of sales to third parties. As a result of our exit, management determined that our Asia Pacific Iron Ore operating segment met the criteria to be classified as held for sale and a discontinued operation under *ASC Topic 205, Presentation of Financial Statements*. As such, all current and historical Asia Pacific Iron Ore operating segment results are classified within discontinued operations.

*Income (Loss) from Discontinued Operations*

For the reasons described above, our previously related Asia Pacific Iron Ore operating segment results for all periods presented, as well as exit costs, are classified as discontinued operations.

| | (In Millions) | | |
|---|---|---|---|
| | **Year Ended December 31,** | | |
| *Income (Loss) from Discontinued Operations* | **2019** | 2018 | 2017 |
| Revenues from product sales and services | $ **—** | $ 129.1 | $ 464.2 |
| Cost of goods sold and operating expenses | **—** | (230.7) | (427.9) |
| Sales margin | **—** | (101.6) | 36.3 |
| Other operating expense | **(1.1)** | (3.3) | (9.9) |
| Other expense | **(0.4)** | (2.3) | (5.2) |
| Gain on foreign currency translation | **—** | 228.1 | — |
| Impairment of long-lived assets | **—** | (2.6) | — |
| Income (loss) from discontinued operations, net of tax | $ **(1.5)** | $ 118.3 | $ 21.2 |

117

A006024

*Gain on Foreign Currency Translation*

As a result of the liquidation of the Australian subsidiaries' net assets, the historical changes in foreign currency translation recorded in *Accumulated other comprehensive loss* in the Statements of Consolidated Financial Position totaling $228.1 million was reclassified and recognized as a gain in *Income (loss) from discontinued operations, net of tax* in the Statements of Consolidated Operations for the year ended December 31, 2018.

## Canadian Operations

### Background

During 2015, we announced that the Bloom Lake Group and the Wabush Group commenced restructuring proceedings in Montreal, Quebec under the CCAA to address the immediate liquidity issues and to preserve and protect their assets for the benefit of all stakeholders while restructuring and/or sale options were explored.

The Bloom Lake Group and the Wabush Group filed a joint plan of compromise and arrangement that was approved by the required majorities of each unsecured creditor class and was sanctioned by the Court in June 2018. During July 2018, amendments were made to the plan to address the manner in which certain distributions under the plan would be effected and the plan was implemented. Under the terms of the amended plan, all employee claims, all claims by the Bloom Lake Group, the Wabush Group and their respective creditors against us as well as all of our claims against the Bloom Lake Group and the Wabush Group were resolved.

### Income (Loss) on Discontinued Operations

Our Canadian exit represented a strategic shift in our business. For this reason, all current and historical Eastern Canadian Iron Ore and Ferroalloys operating segment results are classified as discontinued operations.

#### Amounts Receivable from the Canadian Entities

Prior to the deconsolidations, certain of our wholly-owned subsidiaries made loans to the Canadian Entities for the purpose of funding their operations and had accounts receivable generated in the ordinary course of business. The loans, corresponding interest and the accounts receivable were considered intercompany transactions and eliminated in our consolidated financial statements. Since the deconsolidations, the loans, associated interest and accounts receivable are considered related party transactions and have been recognized in our consolidated financial statements at their estimated fair value. Following the approval of the amended plan, we reversed our outstanding asset of $51.6 million, with a corresponding charge to *Income (loss) from discontinued operations, net of tax* in the Statements of Consolidated Operations for the year ended December 31, 2018.

#### Income Tax Expense

We have recognized tax expense of $15.9 million for the year ended December 31, 2018, included in *Income (loss) from discontinued operations, net of tax* related to a gain on our Canadian investments. This expense is primarily the result of the receipt during 2018 of CCAA estate distributions which were immediately contributed back into the CCAA estate as required by the amended plan. There was no tax expense or benefit recognized for the years ended December 31, 2019 and 2017.

#### Guarantees and Contingent Liabilities

During 2018, under the terms of the amended plan, we and certain of our wholly-owned subsidiaries made a cash contribution of C$19.0 million to the Wabush Group pension plans and agreed to contribute into the CCAA estate any remaining distributions or payments we may be entitled to receive as creditors of the Bloom Lake Group and the Wabush Group for distribution to other creditors. The C$19.0 million cash contribution was included in *Income (loss) from discontinued operations, net of tax* in the Statements of Consolidated Operations for the year ended December 31, 2018.

During 2017, we became aware that it was probable the Monitor would assert a preference claim against the Company and/or certain of its affiliates and we estimated a liability, which included the value of our related-party claims against the Bloom Lake Group and the Wabush Group. Following the approval of the amended plan, we reversed our outstanding liability of $55.6 million, with a corresponding credit to *Income (loss) from discontinued operations, net of tax* in the Statements of Consolidated Operations for the year ended December 31, 2018.

During 2017, the Wabush Scully Mine was sold as part of the ongoing CCAA proceedings for the Wabush Group. As part of this transaction, the environmental remediation obligations were transferred to the buyer and we were released

118

from certain guarantees which resulted in a net gain of $31.4 million included in *Income (loss) from discontinued operations, net of tax* in the Statements of Consolidated Operations for the year ended December 31, 2017.

**NOTE 14 - SHAREHOLDERS' EQUITY**

**Share Repurchase Program**

In November 2018, we announced that our Board of Directors authorized a program to repurchase outstanding common shares in the open market or in privately negotiated transactions, up to a maximum of $200 million, excluding commissions and fees. In April 2019, we announced that our Board of Directors increased the common share repurchase authorization by an additional $100 million, excluding commissions and fees. During 2019, we repurchased 24.4 million common shares at a cost of $252.9 million in the aggregate, including commissions and fees. During 2018, we repurchased 5.4 million common shares at a cost of approximately $47.5 million in aggregate, including commissions and fees. The share repurchase program was active until December 31, 2019.

**Dividends**

The below table summarizes our recent dividend activity:

| Declaration Date | Record Date | Payment Date | Dividend Declared per Common Share[1] |
|---|---|---|---|
| 12/2/2019 | 1/3/2020 | 1/15/2020 | $ 0.06 |
| 9/3/2019 | 10/4/2019 | 10/15/2019 | $ 0.10 |
| 5/31/2019 | 7/5/2019 | 7/15/2019 | $ 0.06 |
| 2/19/2019 | 4/5/2019 | 4/15/2019 | $ 0.05 |
| 10/18/2018 | 1/4/2019 | 1/15/2019 | $ 0.05 |

[1] The dividend declared on September 3, 2019 included a special cash dividend of $0.04 per common share.

**Common Share Public Offering**

On February 9, 2017, we issued 63.3 million common shares in an underwritten public offering at a public offering price of $10.75 per common share. We received net proceeds of $661.3 million. The net proceeds from the issuance of our common shares were used to redeem various tranches of our outstanding long-term debt. Refer to NOTE 6 - DEBT AND CREDIT FACILITIES for further information.

**Preferred Stock**

We have 3,000,000 Class A preferred shares authorized and 4,000,000 Class B preferred shares authorized; no preferred shares are issued or outstanding.

119

Table of Contents

**NOTE 15 - ACCUMULATED OTHER COMPREHENSIVE LOSS**

The components of *Accumulated other comprehensive loss* within Cliffs shareholders' equity and related tax effects allocated to each are shown below:

| | (In Millions) | | |
|---|---|---|---|
| | Pre-tax Amount | Tax Benefit | After-tax Amount |
| **As of December 31, 2019:** | | | |
| Postretirement benefit liability | $ (454.1) | $ 138.4 | $ (315.7) |
| Unrealized net loss on derivative financial instruments | (3.9) | 0.8 | (3.1) |
| | $ (458.0) | $ 139.2 | $ (318.8) |
| As of December 31, 2018: | | | |
| Postretirement benefit liability | $ (408.1) | $ 127.0 | $ (281.1) |
| Unrealized net loss on derivative financial instruments | (3.5) | 0.7 | (2.8) |
| | $ (411.6) | $ 127.7 | $ (283.9) |
| As of December 31, 2017: | | | |
| Postretirement benefit liability | $ (387.3) | $ 123.4 | $ (263.9) |
| Foreign currency translation adjustments | 225.4 | — | 225.4 |
| Unrealized net loss on derivative financial instruments | (0.5) | | (0.5) |
| | $ (162.4) | $ 123.4 | $ (39.0) |

The following table reflects the changes in *Accumulated other comprehensive loss* related to Cliffs shareholders' equity:

| | (In Millions) | | | |
|---|---|---|---|---|
| | Postretirement Benefit Liability, net of tax | Foreign Currency Translation | Derivative Financial Instruments, net of tax | Accumulated Other Comprehensive Loss |
| January 1, 2017 | $ (260.6) | $ 239.3 | $ — | $ (21.3) |
| Other comprehensive loss before reclassifications | (29.8) | (13.9) | (0.5) | (44.2) |
| Net loss reclassified from accumulated other comprehensive loss | 26.5 | — | — | 26.5 |
| December 31, 2017 | (263.9) | 225.4 | (0.5) | (39.0) |
| Other comprehensive income (loss) before reclassifications | (42.9) | 2.7 | (0.6) | (40.8) |
| Net loss (gain) reclassified from accumulated other comprehensive loss | 25.7 | (228.1) | (1.7) | (204.1) |
| December 31, 2018 | (281.1) | — | (2.8) | (283.9) |
| Other comprehensive loss before reclassifications | (56.7) | — | (2.3) | (59.0) |
| Net loss reclassified from accumulated other comprehensive loss | 22.1 | — | 2.0 | 24.1 |
| December 31, 2019 | $ (315.7) | $ — | $ (3.1) | $ (318.8) |

120

A006027

Table of Contents

The following table reflects the details about *Accumulated other comprehensive loss* components reclassified from Cliffs shareholders' equity:

| Details about Accumulated Other Comprehensive Loss Components | Amount of (Gain)/Loss Reclassified into Income, Net of Tax (In Millions) | | | Affected Line Item in the Statement of Consolidated Operations |
|---|---|---|---|---|
| | Year Ended December 31, 2019 | Year Ended December 31, 2018 | Year Ended December 31, 2017 | |
| Amortization of pension and OPEB liability: | | | | |
| Prior service costs[1] | $ (0.7) | $ (0.8) | $ (0.4) | *Other non-operating income* |
| Net actuarial loss[1] | 28.6 | 26.2 | 26.9 | *Other non-operating income* |
| Curtailments[1] | 0.1 | 0.3 | — | *Other non-operating income* |
| | 28.0 | 25.7 | 26.5 | Total before taxes |
| Income tax expense | (5.9) | — | — | *Income tax benefit (expense)* |
| | $ 22.1 | $ 25.7 | $ 26.5 | Net of taxes |
| | | | | |
| Changes in foreign currency translation: | | | | |
| Gain on foreign currency translation[2] | $ — | $ (228.1) | $ — | *Income (loss) from discontinued operations, net of tax* |
| | $ — | $ (228.1) | $ — | |
| | | | | |
| Changes in derivative financial instruments: | | | | |
| Commodity contracts | $ 2.5 | $ (1.7) | $ — | *Cost of goods sold and operating expenses* |
| Income tax expense | (0.5) | — | — | *Income tax benefit (expense)* |
| | $ 2.0 | $ (1.7) | $ — | Net of taxes |
| | | | | |
| Total reclassifications for the period | $ 24.1 | $ (204.1) | $ 26.5 | |

[1] These accumulated other comprehensive loss components are included in the computation of net periodic benefit cost. See NOTE 8 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS for further information.

[2] Represents Australian accumulated currency translation adjustments due to the liquidation of our Australian subsidiaries' net assets. See NOTE 13 - DISCONTINUED OPERATIONS for further information.

## NOTE 16 - RELATED PARTIES

Hibbing is a co-owned joint venture with companies that are integrated steel producers or their subsidiaries. In 2018, we tendered our resignation as the mine manager of the Hibbing mine and we transitioned this role to the majority owner in August 2019. The following is a summary of the mine ownership of the co-owned iron ore mine at December 31, 2019:

| Mine | Cleveland-Cliffs Inc. | ArcelorMittal USA | U.S. Steel |
|---|---|---|---|
| Hibbing | 23.0% | 62.3% | 14.7% |

121

A006028

Table of Contents

*Product revenues* from related parties were as follows:

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| | **Year Ended December 31,** | | | | | |
| | | **2019** | | 2018 | | 2017 |
| Product revenues from related parties | $ | **915.3** | $ | 1,234.5 | $ | 806.7 |
| Total product revenues | | **1,848.1** | | 2,172.3 | | 1,644.6 |
| Related party product revenue as a percent of total product revenue | | **49.5%** | | 56.8% | | 49.1% |

The following table presents the classification of related party assets and liabilities in the  Statements of Consolidated Financial Position :

| | (In Millions) | | | |
|---|---|---|---|---|
| | **December 31,** | | | |
| **Balance Sheet Location of Assets (Liabilities)** | | **2019** | | 2018 |
| *Accounts receivable, net* | $ | **31.1** | $ | 176.0 |
| *Derivative assets* | | **44.5** | | 89.3 |
| *Other current liabilities* | | **(2.0 )** | | (45.3) |
| | $ | **73.6** | $ | 220.0 |

*Derivative assets*

A supply agreement with one customer provides for supplemental revenue or refunds to the customer based on the hot-rolled coil steel price at the time the product is consumed in the customer's blast furnace. The supplemental pricing is characterized as a freestanding derivative. Refer to NOTE 12 - DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES for further information.

*Other current liabilities*

During 2017, our ownership interest in Empire increased to  100% as we reached an agreement to distribute the noncontrolling interest net assets of $132.7 million to ArcelorMittal USA, in exchange for its interest in Empire. The net assets were agreed to be distributed in three installments of $44.2 million each, the balance of which was recorded in *Other current liabilities* in the Statements of Consolidated Financial Position . The final installment was paid in August 2019.

122

A006029

Table of Contents

## NOTE 17 - EARNINGS PER SHARE

The following table summarizes the computation of basic and diluted earnings per share:

| | (In Millions, Except Per Share Amounts) | | |
| --- | --- | --- | --- |
| | Year Ended December 31, | | |
| | **2019** | 2018 | 2017 |
| Income from continuing operations | $ **294.5** | $ 1,039.9 | $ 360.6 |
| Loss from continuing operations attributable to noncontrolling interest | **—** | — | 3.9 |
| Net income from continuing operations attributable to Cliffs shareholders | **294.5** | 1,039.9 | 364.5 |
| Income (loss) from discontinued operations, net of tax | **(1.7)** | 88.2 | 2.5 |
| Net income attributable to Cliffs shareholders | $ **292.8** | $ 1,128.1 | $ 367.0 |
| | | | |
| Weighted average number of shares: | | | |
| Basic | **276.8** | 297.2 | 288.4 |
| Convertible senior notes | **4.4** | 3.4 | — |
| Employee stock plans | **3.3** | 3.5 | 4.6 |
| Diluted | **284.5** | 304.1 | 293.0 |
| | | | |
| Earnings (loss) per common share attributable to Cliffs common shareholders - basic: | | | |
| Continuing operations | $ **1.07** | $ 3.50 | $ 1.27 |
| Discontinued operations | **(0.01)** | 0.30 | 0.01 |
| | $ **1.06** | $ 3.80 | $ 1.28 |
| Earnings (loss) per common share attributable to Cliffs common shareholders - diluted: | | | |
| Continuing operations | $ **1.04** | $ 3.42 | $ 1.25 |
| Discontinued operations | **(0.01)** | 0.29 | 0.01 |
| | $ **1.03** | $ 3.71 | $ 1.26 |

There was no dilution during 2017 related to the common share equivalents for the convertible senior notes as our common shares average price did not rise in value above the conversion price.

## NOTE 18 - COMMITMENTS AND CONTINGENCIES

### Purchase Commitments

In 2017, we began to incur capital commitments related to the construction of our HBI production plant in Toledo, Ohio. We now expect to reach commercial production ahead of schedule, in the first half of 2020. In total, we expect to spend approximately $830 million plus a contingency of up to 20% on the HBI production plant, excluding capitalized interest, through 2020, of which approximately $700 million was paid as of December 31, 2019. As of December 31, 2019, we have contracts and purchase orders in place for approximately $260 million for the HBI production plant. We expect cash capital expenditures for the HBI production plant of approximately $290 million during 2020.

### Contingencies

We are currently the subject of, or party to, various claims and legal proceedings incidental to our current and historical operations. These claims and legal proceedings are subject to inherent uncertainties and unfavorable rulings could occur. An unfavorable ruling could include monetary damages, additional funding requirements or an injunction. If an unfavorable ruling were to occur, there exists the possibility of a material adverse effect on the financial position and results of operations for the period in which the ruling occurs or future periods. However, based on currently available information we do not believe that any pending claims or legal proceedings will result in a material adverse effect in relation to our consolidated financial statements.

123

Table of Contents

*Environmental Matters*

We had environmental liabilities of $2.0 million and $2.5 million at December 31, 2019 and 2018, respectively, including obligations for known environmental remediation exposures at active and closed mining operations and other sites. These amounts have been recognized based on the estimated cost of investigation and remediation at each site, and include site studies, design and implementation of remediation plans, legal and consulting fees, and post-remediation monitoring and related activities. Future expenditures are not discounted unless the amount and timing of the cash disbursements are readily known. Potential insurance recoveries have not been reflected. Additional environmental obligations could be incurred, the extent of which cannot be assessed. The amount of our ultimate liability with respect to these matters may be affected by several uncertainties, primarily the ultimate cost of required remediation and the extent to which other responsible parties contribute. Refer to NOTE 11 - ENVIRONMENTAL AND MINE CLOSURE OBLIGATIONS for further information.

*Tax Matters*

The calculation of our tax liabilities involves dealing with uncertainties in the application of complex tax regulations. We recognize liabilities for anticipated tax audit issues based on our estimate of whether, and the extent to which, additional taxes will be due. If we ultimately determine that payment of these amounts is unnecessary, we reverse the liability and recognize a tax benefit during the period in which we determine that the liability is no longer necessary. We also recognize tax benefits to the extent that it is more likely than not that our positions will be sustained when challenged by the taxing authorities. To the extent we prevail in matters for which liabilities have been established, or are required to pay amounts in excess of our liabilities, our effective tax rate in a given period could be materially affected. An unfavorable tax settlement would require use of our cash and result in an increase in our effective tax rate in the year of resolution. A favorable tax settlement would be recognized as a reduction in our effective tax rate in the year of resolution. Refer to NOTE 10 - INCOME TAXES for further information.

## NOTE 19 - SUBSEQUENT EVENTS

On February 18, 2020, our Board of Directors declared a quarterly cash dividend on our common shares of $0.06 per share. The cash dividend will be payable on April 15, 2020, to shareholders of record as of the close of business on April 3, 2020.

124

**NOTE 20 - QUARTERLY RESULTS OF OPERATIONS (UNAUDITED)**

The sum of quarterly EPS may not equal EPS for the year due to discrete quarterly calculations.

|  | (In Millions, Except Per Share Amounts) | | | | |
|---|---|---|---|---|---|
|  | 2019 | | | | |
|  | Quarters | | | | |
|  | First | Second | Third | Fourth | Year |
| Revenues from product sales and services | $ 157.0 | $ 743.2 | $ 555.6 | $ 534.1 | $ 1,989.9 |
| Sales margin | 30.9 | 263.0 | 154.9 | 126.9 | 575.7 |
| Net income (loss) from continuing operations attributable to Cliffs shareholders | $ (22.1) | $ 161.4 | $ 91.8 | $ 63.4 | $ 294.5 |
| Loss from discontinued operations, net of tax | — | (0.6) | (0.9) | (0.2) | (1.7) |
| Net income (loss) attributable to Cliffs common shareholders | $ (22.1) | $ 160.8 | $ 90.9 | $ 63.2 | $ 292.8 |
| Earnings (loss) per common share attributable to Cliffs common shareholders - basic: |  |  |  |  |  |
| Continuing operations | $ (0.08) | $ 0.59 | $ 0.34 | $ 0.23 | $ 1.07 |
| Discontinued operations | — | — | — | — | (0.01) |
|  | $ (0.08) | $ 0.59 | $ 0.34 | $ 0.23 | $ 1.06 |
| Earnings (loss) per common share attributable to Cliffs common shareholders - diluted: |  |  |  |  |  |
| Continuing operations | $ (0.08) | $ 0.57 | $ 0.33 | $ 0.23 | $ 1.04 |
| Discontinued operations | — | — | — | — | (0.01) |
|  | $ (0.08) | $ 0.57 | $ 0.33 | $ 0.23 | $ 1.03 |

The diluted earnings per share calculation for the first quarter of 2019 excludes equity plan awards of 4.2 million and convertible senior notes awards of 7.3 million that were anti-dilutive.

125

Table of Contents

| | | (In Millions, Except Per Share Amounts) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2018 | | | | | | | |
| | | | Quarters | | | | | | | |
| | First | | Second | | Third | | Fourth | | Year | |
| Revenues from product sales and services | $ | 180.0 | $ | 714.3 | $ | 741.8 | $ | 696.3 | $ | 2,332.4 |
| Sales margin | | 61.5 | | 284.5 | | 261.6 | | 202.0 | | 809.6 |
| Net income (loss) from continuing operations attributable to Cliffs shareholders | $ | (13.4) | $ | 229.4 | $ | 199.8 | $ | 624.1 | $ | 1,039.9 |
| Income (loss) from discontinued operations, net of tax | | (70.9) | | (64.3) | | 238.0 | | (14.6) | | 88.2 |
| Net income (loss) attributable to Cliffs common shareholders | $ | (84.3) | $ | 165.1 | $ | 437.8 | $ | 609.5 | $ | 1,128.1 |
| Earnings (loss) per common share attributable to Cliffs common shareholders - basic: | | | | | | | | | | |
| Continuing operations | $ | (0.05) | $ | 0.77 | $ | 0.67 | $ | 2.11 | $ | 3.50 |
| Discontinued operations | | (0.24) | | (0.22) | | 0.80 | | (0.05) | | 0.30 |
| | $ | (0.29) | $ | 0.55 | $ | 1.47 | $ | 2.06 | $ | 3.80 |
| Earnings (loss) per common share attributable to Cliffs common shareholders - diluted: | | | | | | | | | | |
| Continuing operations | $ | (0.05) | $ | 0.76 | $ | 0.64 | $ | 2.03 | $ | 3.42 |
| Discontinued operations | | (0.24) | | (0.21) | | 0.77 | | (0.05) | | 0.29 |
| | $ | (0.29) | $ | 0.55 | $ | 1.41 | $ | 1.98 | $ | 3.71 |

     *Net income (loss) from continuing operations attributable to Cliffs shareholders* increased during the three months ended December 31, 2018, relative to the preceding three quarters, due primarily to the release of the deferred tax valuation allowance in the U.S. of $460.5 million.

     The diluted earnings per share calculation for the first quarter of 2018 excludes equity plan awards of 3.8 million that were anti-dilutive.

A006033

**NOTE 21 - SUPPLEMENTARY GUARANTOR INFORMATION**

The accompanying condensed consolidating financial information has been prepared and presented pursuant to SEC Regulation S-X, Rule 3-10, "Financial Statements of Guarantors and Issuers of Guaranteed Securities Registered or Being Registered." Certain of our subsidiaries (the "Guarantors") have guaranteed the obligations under the 5.75% 2025 Senior Notes and the 5.875% 2027 Senior Notes issued by Cleveland-Cliffs Inc. See NOTE 6 - DEBT AND CREDIT FACILITIES for further information.

The following presents the condensed consolidating financial information for: (i) the Parent Company and the Issuer of the guaranteed obligations (Cleveland-Cliffs Inc.); (ii) the Guarantor subsidiaries, on a combined basis; (iii) the non-guarantor subsidiaries, on a combined basis; (iv) consolidating eliminations; and (v) Cleveland-Cliffs Inc. and subsidiaries on a consolidated basis. Each Guarantor subsidiary is 100% owned by the Parent Company as of December 31, 2019. The condensed consolidating financial information is presented as if the Guarantor structure at December 31, 2019 existed for all years presented. As a result, the Guarantor subsidiaries within the condensed consolidating financial information as of December 31, 2019 and 2018 and for the years ended December 31, 2019, 2018 and 2017 include results of subsidiaries that were previously less than wholly-owned and were historically non-guarantors until 100% ownership was obtained.

Each of the Guarantor subsidiaries fully and unconditionally guarantees, on a joint and several basis, the obligations of Cleveland-Cliffs Inc. under the 5.75% 2025 Senior Notes and the 5.875% 2027 Senior Notes. The guarantee of a Guarantor subsidiary will be automatically and unconditionally released and discharged, and such Guarantor subsidiary's obligations under the guarantee and the related indenture governing the 5.75% 2025 Senior Notes and the 5.875% 2027 Senior Notes (the "Indentures") will be automatically and unconditionally released and discharged, upon:

(a) any sale, exchange, transfer or disposition of such Guarantor subsidiary (by merger, consolidation, or the sale of) or the capital stock of such Guarantor subsidiary after which the applicable Guarantor subsidiary is no longer a subsidiary of the Company or the sale of all or substantially all of such Guarantor subsidiary's assets (other than by lease);

(b) designation of any Guarantor subsidiary as an "excluded subsidiary" (as defined in the Indenture); and

(c) defeasance or satisfaction and discharge of the Indenture.

Each entity in the consolidating financial information follows the same accounting policies as described in the consolidated financial statements. The accompanying condensed consolidating financial information has been presented on the equity method of accounting for all periods presented. Under this method, investments in subsidiaries are recorded at cost and adjusted for the subsidiaries' cumulative results of operations, capital contributions and distributions, and other changes in equity. Elimination entries include consolidating and eliminating entries for investments in subsidiaries, and intra-entity activity and balances.

127

Condensed Consolidating Statement of Financial Position
As of December 31, 2019
(In Millions)

| | Cleveland-Cliffs Inc. | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **Current Assets:** | | | | | |
| Cash and cash equivalents | $ 349.7 | $ 0.1 | $ 2.8 | $ — | $ 352.6 |
| Accounts receivable, net | 4.9 | 93.0 | 0.3 | (4.2) | 94.0 |
| Inventories | — | 317.4 | — | — | 317.4 |
| Derivative assets | — | 45.8 | — | — | 45.8 |
| Income tax receivable, current | 58.6 | — | — | — | 58.6 |
| Other current assets | 9.1 | 13.0 | 7.4 | — | 29.5 |
| Total current assets | 422.3 | 469.3 | 10.5 | (4.2) | 897.9 |
| **Non-current assets:** | | | | | |
| Property, plant and equipment, net | 11.2 | 1,867.1 | 50.7 | — | 1,929.0 |
| Income tax receivable, non-current | 58.6 | 4.1 | — | — | 62.7 |
| Deferred income taxes | 458.3 | — | 1.2 | — | 459.5 |
| Investment in subsidiaries | 1,821.1 | 47.2 | — | (1,868.3) | — |
| Long-term intercompany notes | — | — | 121.3 | (121.3) | — |
| Other non-current assets | 15.1 | 121.4 | 18.2 | — | 154.7 |
| TOTAL ASSETS | $ 2,786.6 | $ 2,509.1 | $ 201.9 | $ (1,993.8) | $ 3,503.8 |
| **LIABILITIES AND EQUITY** | | | | | |
| **Current liabilities:** | | | | | |
| Accounts payable | $ 5.7 | $ 187.5 | $ 4.2 | $ (4.2) | $ 193.2 |
| Accrued liabilities | 80.7 | 45.5 | 0.1 | — | 126.3 |
| State and local taxes payable | — | 37.9 | — | — | 37.9 |
| Other current liabilities | 6.0 | 38.6 | 7.4 | — | 52.0 |
| Total current liabilities | 92.4 | 309.5 | 11.7 | (4.2) | 409.4 |
| **Non-current liabilities:** | | | | | |
| Long-term debt | 2,113.8 | — | — | — | 2,113.8 |
| Pension and OPEB liabilities | 80.5 | 496.9 | (265.9) | — | 311.5 |
| Environmental and mine closure obligations | — | 145.6 | 19.3 | — | 164.9 |
| Long-term intercompany notes | 121.3 | — | — | (121.3) | — |
| Other non-current liabilities | 20.7 | 120.3 | 5.3 | — | 146.3 |
| TOTAL LIABILITIES | 2,428.7 | 1,072.3 | (229.6) | (125.5) | 3,145.9 |
| Commitments and contingencies | | | | | |
| TOTAL EQUITY | 357.9 | 1,436.8 | 431.5 | (1,868.3) | 357.9 |
| TOTAL LIABILITIES AND EQUITY | $ 2,786.6 | $ 2,509.1 | $ 201.9 | $ (1,993.8) | $ 3,503.8 |

128

Condensed Consolidating Statement of Financial Position
As of December 31, 2018
(In Millions)

| | Cleveland-Cliffs Inc. | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **Current Assets:** | | | | | |
| Cash and cash equivalents | $ 819.8 | $ 0.7 | $ 2.7 | $ — | $ 823.2 |
| Accounts receivable, net | 9.2 | 221.3 | 0.3 | (4.1) | 226.7 |
| Inventories | — | 181.1 | — | — | 181.1 |
| Derivative assets | 0.1 | 91.4 | — | — | 91.5 |
| Income tax receivable, current | 117.3 | — | — | — | 117.3 |
| Other current assets | 10.0 | 16.9 | 12.9 | — | 39.8 |
| Total current assets | 956.4 | 511.4 | 15.9 | (4.1) | 1,479.6 |
| **Non-current assets:** | | | | | |
| Property, plant and equipment, net | 13.3 | 1,221.9 | 50.8 | — | 1,286.0 |
| Income tax receivable, non-current | 117.2 | 4.1 | — | — | 121.3 |
| Deferred income taxes | 463.6 | — | 1.2 | — | 464.8 |
| Investment in subsidiaries | 1,262.3 | 50.8 | — | (1,313.1) | — |
| Long-term intercompany notes | — | — | 121.3 | (121.3) | — |
| Other non-current assets | 8.0 | 153.8 | 16.1 | — | 177.9 |
| **TOTAL ASSETS** | $ 2,820.8 | $ 1,942.0 | $ 205.3 | $ (1,438.5) | $ 3,529.6 |
| **LIABILITIES AND EQUITY** | | | | | |
| **Current liabilities:** | | | | | |
| Accounts payable | $ 5.3 | $ 181.4 | $ 4.2 | $ (4.1) | $ 186.8 |
| Accrued liabilities | 92.7 | 66.1 | 0.1 | — | 158.9 |
| State and local taxes payable | — | 35.4 | 0.1 | — | 35.5 |
| Other current liabilities | 4.8 | 74.1 | 8.1 | — | 87.0 |
| Total current liabilities | 102.8 | 357.0 | 12.5 | (4.1) | 468.2 |
| **Non-current liabilities:** | | | | | |
| Long-term debt | 2,092.9 | — | — | — | 2,092.9 |
| Pension and OPEB liabilities | 64.3 | 414.4 | (230.0) | — | 248.7 |
| Environmental and mine closure obligations | — | 152.1 | 19.9 | — | 172.0 |
| Long-term intercompany notes | 121.3 | — | — | (121.3) | — |
| Other non-current liabilities | 15.3 | 99.5 | 8.8 | — | 123.6 |
| **TOTAL LIABILITIES** | 2,396.6 | 1,023.0 | (188.8) | (125.4) | 3,105.4 |
| Commitments and contingencies | | | | | |
| **TOTAL EQUITY** | 424.2 | 919.0 | 394.1 | (1,313.1) | 424.2 |
| **TOTAL LIABILITIES AND EQUITY** | $ 2,820.8 | $ 1,942.0 | $ 205.3 | $ (1,438.5) | $ 3,529.6 |

129

**Condensed Consolidating Statement of Operations and Comprehensive Income**
**For the Year Ended December 31, 2019**
**(In Millions)**

| | Cleveland-Cliffs Inc. | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Revenues from product sales and services | $ — | $ 1,989.9 | $ — | $ — | $ 1,989.9 |
| Cost of goods sold and operating expenses | — | (1,414.2) | — | — | (1,414.2) |
| **Sales margin** | — | 575.7 | — | — | 575.7 |
| Other operating income (expense): | | | | | |
| Selling, general and administrative expenses | (100.7) | (18.3) | (0.4) | — | (119.4) |
| Miscellaneous - net | 0.1 | (26.0) | (1.1) | — | (27.0) |
| Total other operating expense | (100.6) | (44.3) | (1.5) | — | (146.4) |
| **Operating income (loss)** | (100.6) | 531.4 | (1.5) | — | 429.3 |
| Other income (expense): | | | | | |
| Interest income (expense), net | (99.4) | (2.3) | 0.5 | — | (101.2) |
| Loss on extinguishment of debt | (18.2) | — | — | — | (18.2) |
| Other non-operating income (expense) | (4.0) | (12.9) | 19.1 | — | 2.2 |
| Total other income (expense) | (121.6) | (15.2) | 19.6 | — | (117.2) |
| **Income (loss) from continuing operations before income taxes** | (222.2) | 516.2 | 18.1 | — | 312.1 |
| Income tax expense | (17.0) | (0.4) | (0.2) | — | (17.6) |
| Equity in income of subsidiaries | 531.6 | 18.3 | — | (549.9) | |
| **Income from continuing operations** | 292.4 | 534.1 | 17.9 | (549.9) | 294.5 |
| Income (loss) from discontinued operations, net of tax | 0.4 | (0.3) | (1.8) | — | (1.7) |
| **Net income attributable to Cliffs shareholders** | $ 292.8 | $ 533.8 | $ 16.1 | $ (549.9) | $ 292.8 |
| Other comprehensive income (loss) | (34.9) | (35.8) | 16.9 | 18.9 | (34.9) |
| **Total comprehensive income attributable to Cliffs shareholders** | $ 257.9 | $ 498.0 | $ 33.0 | $ (531.0) | $ 257.9 |

130

Condensed Consolidating Statement of Operations and Comprehensive Income (Loss)
For the Year Ended December 31, 2018
(In Millions)

| | Cleveland-Cliffs Inc. | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Revenues from product sales and services | $ — | $ 2,332.4 | $ — | $ — | $ 2,332.4 |
| Cost of goods sold and operating expenses | — | (1,522.8) | — | — | (1,522.8) |
| **Sales margin** | — | 809.6 | — | — | 809.6 |
| Other operating income (expense): | | | | | |
| Selling, general and administrative expenses | (86.1) | (27.1) | (0.3) | — | (113.5) |
| Miscellaneous - net | (0.3) | (26.9) | 4.3 | — | (22.9) |
| Total other operating income (expense) | (86.4) | (54.0) | 4.0 | — | (136.4) |
| **Operating income (loss)** | (86.4) | 755.6 | 4.0 | — | 673.2 |
| Other income (expense): | | | | | |
| Interest income (expense), net | (117.6) | (2.1) | 0.8 | — | (118.9) |
| Loss on extinguishment of debt | (6.8) | — | — | — | (6.8) |
| Other non-operating income (expense) | (3.5) | 0.9 | 19.8 | — | 17.2 |
| Total other income (expense) | (127.9) | (1.2) | 20.6 | — | (108.5) |
| **Income (loss) from continuing operations before income taxes** | (214.3) | 754.4 | 24.6 | — | 564.7 |
| Income tax benefit | 474.7 | — | 0.5 | — | 475.2 |
| Equity in income of subsidiaries | 858.2 | 25.5 | — | (883.7) | — |
| **Income from continuing operations** | 1,118.6 | 779.9 | 25.1 | (883.7) | 1,039.9 |
| Income from discontinued operations, net of tax | 9.5 | 12.3 | 66.4 | — | 88.2 |
| **Net income attributable to Cliffs shareholders** | $ 1,128.1 | $ 792.2 | $ 91.5 | $ (883.7) | $ 1,128.1 |
| Other comprehensive loss | (244.9) | (24.1) | (256.7) | 280.8 | (244.9) |
| **Total comprehensive income (loss) attributable to Cliffs shareholders** | $ 883.2 | $ 768.1 | $ (165.2) | $ (602.9) | $ 883.2 |

131

Table of Contents

Condensed Consolidating Statement of Operations and Comprehensive Income

For the Year Ended December 31, 2017

(In Millions)

| | Cleveland-Cliffs Inc. | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Revenues from product sales and services | $ — | $ 1,866.0 | $ — | $ — | $ 1,866.0 |
| Cost of goods sold and operating expenses | — | (1,398.4) | — | — | (1,398.4) |
| **Sales margin** | — | 467.6 | — | — | 467.6 |
| Other operating income (expense): | | | | | |
| Selling, general and administrative expenses | (77.2) | (19.9) | (5.8) | — | (102.9) |
| Miscellaneous - net | (2.3) | 11.0 | 16.8 | — | 25.5 |
| Total other operating income (expense) | (79.5) | (8.9) | 11.0 | — | (77.4) |
| **Operating income (loss)** | (79.5) | 458.7 | 11.0 | — | 390.2 |
| Other income (expense): | | | | | |
| Interest income (expense), net | (126.8) | (1.0) | 1.0 | — | (126.8) |
| Loss on extinguishment of debt | (165.4) | — | — | — | (165.4) |
| Other non-operating income (expense) | (4.0) | (3.0) | 17.2 | — | 10.2 |
| Total other income (expense) | (296.2) | (4.0) | 18.2 | — | (282.0) |
| **Income (loss) from continuing operations before income taxes** | (375.7) | 454.7 | 29.2 | — | 108.2 |
| Income tax benefit (expense) | 251.4 | 1.3 | (0.3) | — | 252.4 |
| Equity in income of subsidiaries | 512.6 | 11.8 | — | (524.4) | — |
| **Income from continuing operations** | 388.3 | 467.8 | 28.9 | (524.4) | 360.6 |
| Income (loss) from discontinued operations, net of tax | (21.3) | 1.7 | 22.1 | — | 2.5 |
| **Net income** | 367.0 | 469.5 | 51.0 | (524.4) | 363.1 |
| Loss attributable to noncontrolling interest | — | 3.9 | — | — | 3.9 |
| **Net income attributable to Cliffs shareholders** | $ 367.0 | $ 473.4 | $ 51.0 | $ (524.4) | $ 367.0 |
| Other comprehensive income (loss) | (4.0) | 12.9 | (4.8) | (8.1) | (4.0) |
| **Total comprehensive income attributable to Cliffs shareholders** | $ 363.0 | $ 486.3 | $ 46.2 | $ (532.5) | $ 363.0 |

132

**Condensed Consolidating Statement of Cash Flows**
**For the Year Ended December 31, 2019**
**(In Millions)**

| | Cleveland-Cliffs Inc. | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net cash provided (used) by operating activities | $ (50.0) | $ 616.3 | $ (3.8) | $ — | $ 562.5 |
| **INVESTING ACTIVITIES** | | | | | |
| Purchase of property, plant and equipment | (1.2) | (637.8) | — | — | (639.0) |
| Deposits for property, plant and equipment | — | (14.0) | (3.0) | — | (17.0) |
| Intercompany investing | (63.9) | (3.7) | (0.1) | 67.7 | — |
| Other investing activities | — | 10.8 | 0.8 | — | 11.6 |
| Net cash used by investing activities | (65.1) | (644.7) | (2.3) | 67.7 | (644.4) |
| **FINANCING ACTIVITIES** | | | | | |
| Repurchase of common shares | (252.9) | — | — | — | (252.9) |
| Dividends paid | (72.1) | — | — | — | (72.1) |
| Proceeds from issuance of debt | 720.9 | — | — | — | 720.9 |
| Debt issuance costs | (6.8) | — | — | — | (6.8) |
| Repurchase of debt | (729.3) | — | — | — | (729.3) |
| Distributions of partnership equity | — | (44.2) | — | — | (44.2) |
| Intercompany financing | 0.1 | 63.4 | 4.2 | (67.7) | — |
| Other financing activities | (14.9) | 8.6 | (3.4) | — | (9.7) |
| Net cash provided (used) by financing activities | (355.0) | 27.8 | 0.8 | (67.7) | (394.1) |
| Effect of exchange rate changes on cash | — | — | — | — | — |
| Decrease in cash and cash equivalents, including cash classified within other current assets related to discontinued operations | (470.1) | (0.6) | (5.3) | — | (476.0) |
| Less: decrease in cash and cash equivalents from discontinued operations, classified within other current assets | — | — | (5.4) | — | (5.4) |
| Net increase (decrease) in cash and cash equivalents | (470.1) | (0.6) | 0.1 | — | (470.6) |
| Cash and cash equivalents at beginning of year | 819.8 | 0.7 | 2.7 | — | 823.2 |
| Cash and cash equivalents at end of year | $ 349.7 | $ 0.1 | $ 2.8 | $ — | $ 352.6 |

133

Condensed Consolidating Statement of Cash Flows
For the Year Ended December 31, 2018
(In Millions)

| | Cleveland-Cliffs Inc. | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net cash provided (used) by operating activities | $ (120.7) | $ 741.0 | $ (141.8) | $ — | $ 478.5 |
| **INVESTING ACTIVITIES** | | | | | |
| Purchase of property, plant and equipment | (1.2) | (207.3) | (0.1) | — | (208.6) |
| Deposits for property, plant and equipment | — | (82.3) | (5.2) | — | (87.5) |
| Intercompany investing | 399.1 | (7.1) | 120.7 | (512.7) | |
| Other investing activities | — | 3.1 | 19.9 | — | 23.0 |
| Net cash provided (used) by investing activities | 397.9 | (293.6) | 135.3 | (512.7) | (273.1) |
| **FINANCING ACTIVITIES** | | | | | |
| Repurchase of common shares | (47.5) | — | — | — | (47.5) |
| Debt issuance costs | (1.5) | — | — | — | (1.5) |
| Repurchase of debt | (234.5) | — | — | — | (234.5) |
| Distributions of partnership equity | — | (44.2) | — | — | (44.2) |
| Intercompany financing | (120.7) | (402.4) | 10.4 | 512.7 | |
| Other financing activities | (2.1) | (2.2) | (43.2) | — | (47.5) |
| Net cash used by financing activities | (406.3) | (448.8) | (32.8) | 512.7 | (375.2) |
| Effect of exchange rate changes on cash | — | — | (2.3) | — | (2.3) |
| Decrease in cash and cash equivalents, including cash classified within other current assets related to discontinued operations | (129.1) | (1.4) | (41.6) | — | (172.1) |
| Less: decrease in cash and cash equivalents from discontinued operations, classified within other current assets | — | — | (17.0) | — | (17.0) |
| Net decrease in cash and cash equivalents | (129.1) | (1.4) | (24.6) | — | (155.1) |
| Cash and cash equivalents at beginning of year | 948.9 | 2.1 | 27.3 | — | 978.3 |
| Cash and cash equivalents at end of year | $ 819.8 | $ 0.7 | $ 2.7 | $ — | $ 823.2 |

A006041

Table of Contents

Condensed Consolidating Statement of Cash Flows
For the Year Ended December 31, 2017
(In Millions)

| | Cleveland-Cliffs Inc. | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net cash provided (used) by operating activities | $ (166.8) | $ 430.0 | $ 74.9 | $ — | $ 338.1 |
| **INVESTING ACTIVITIES** | | | | | |
| Purchase of property, plant and equipment | (3.4) | (79.8) | (51.7) | — | (134.9) |
| Deposits for property, plant and equipment | — | (11.7) | (5.1) | — | (16.8) |
| Intercompany investments | 225.7 | (7.3) | (45.1) | (173.3) | — |
| Other investing activities | (7.7) | 3.4 | — | — | (4.3) |
| Net cash provided (used) by investing activities | 214.6 | (95.4) | (101.9) | (173.3) | (156.0) |
| **FINANCING ACTIVITIES** | | | | | |
| Net proceeds from issuance of common shares | 661.3 | — | — | — | 661.3 |
| Proceeds from issuance of debt | 1,771.5 | — | — | — | 1,771.5 |
| Debt issuance costs | (28.6) | — | — | — | (28.6) |
| Repurchase of debt | (1,720.7) | — | — | — | (1,720.7) |
| Acquisition of noncontrolling interest | (105.0) | — | — | — | (105.0) |
| Distributions of partnership equity | — | (52.9) | — | — | (52.9) |
| Intercompany financing | 45.0 | (277.6) | 59.3 | 173.3 | — |
| Other financing activities | (5.8) | (4.5) | (16.4) | — | (26.7) |
| Net cash provided (used) by financing activities | 617.7 | (335.0) | 42.9 | 173.3 | 498.9 |
| Effect of exchange rate on cash | — | — | 3.3 | — | 3.3 |
| Increase (decrease) in cash and cash equivalents, including cash classified within other current assets related to discontinued operations | 665.5 | (0.4) | 19.2 | — | 684.3 |
| Less: increase in cash and cash equivalents from discontinued operations, classified within other current assets | — | — | 18.8 | — | 18.8 |
| Net increase (decrease) in cash and cash equivalents | 665.5 | (0.4) | 0.4 | — | 665.5 |
| Cash and cash equivalents at beginning of year | 283.4 | 2.5 | 26.9 | — | 312.8 |
| Cash and cash equivalents at end of year | $ 948.9 | $ 2.1 | $ 27.3 | $ — | $ 978.3 |

135

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the shareholders and the Board of Directors of
Cleveland-Cliffs Inc.

**Opinion on the Financial Statements**

We have audited the accompanying statements of consolidated financial position of Cleveland-Cliffs Inc. and subsidiaries (the "Company") as of December 31, 2019 and 2018, the related statements of consolidated operations, comprehensive income, cash flows, and changes in equity, for each of the three years in the period ended December 31, 2019, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2019 and 2018, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2019, in conformity with accounting principles generally accepted in the United States of America.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2019, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 20, 2020, expressed an unqualified opinion on the Company's internal control over financial reporting.

**Change in Accounting Principle**

As discussed in Note 1 to the consolidated financial statements, effective January 1, 2018, the Company changed its method of accounting for revenue by adopting FASB ASC 606, *Revenue from Contracts with Customers*, on a modified retrospective basis.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current-period audit of the financial statements that was communicated or required to be communicated to the audit committee and that (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

***Mineral Reserves - Asset Retirement Obligations, Valuation of Long-Lived Assets and Depreciation, Depletion and Amortization of Property, Plant and Equipment -Refer to Notes 3, 5 and 11 to the financial statements***

*Critical Audit Matter Description*

Mineral reserve estimates, combined with estimated annual production levels, are used to determine the mine closure dates utilized in recording the fair value liability for asset retirement obligations for active operating mines. Since the liability represents the present value of the expected future obligation, a significant change in mineral reserves or mine lives could have a substantial effect on the recorded obligation. Mineral reserve estimates are also used in evaluating potential impairments of mine asset groups as they are indicative of future cash flows and in determining maximum useful lives utilized to calculate depreciation, depletion and amortization of long-lived mine assets. The Company performs an

136

in-depth evaluation of its mineral reserve estimates by iron ore mine on a periodic basis, in addition to routine annual assessments. The determination of mineral reserves requires management, with the support of management's experts, to make significant estimates and assumptions related to key inputs including (1) the determination of the size and scope of the iron ore body through technical modeling, (2) the estimates of future iron ore prices, production costs and capital expenditures, and (3) management's mine plan for the proven and probable mineral reserves (collectively "the mineral reserve inputs"). Changes in any of the judgments or assumptions related to the mineral reserve inputs can have a significant impact with respect to the accrual for asset retirement obligations, the impairment of long-lived asset groups and the amount of depreciation, depletion and amortization expense. The consolidated accrued mine closure obligation balance was $165.3 million as of December 31, 2019, of which $22.0 million related to active operations. The total asset balance associated with the Company's continuing operations for its Mining & Pelletizing reportable segment was $1,643.1 million as of December 31, 2019, of which $1,156.0 million related to long-lived assets. Depreciation, depletion and amortization expense for the Company's Mining & Pelletizing reportable segment was $79.0 million for the year ended December 31, 2019.

Given the significant judgments and assumptions made by management to estimate mineral reserves and the sensitivity of changes to mineral reserve estimates on the Company's recorded asset retirement obligations, long-lived asset impairment considerations, and calculated depreciation, depletion and amortization expense, performing audit procedures to evaluate the reasonableness of management's judgments and estimates related to the mineral reserve inputs required a high degree of auditor judgment and an increased extent of effort.

*How the Critical Audit Matter Was Addressed in the Audit*

Our audit procedures related to management's significant judgments and assumptions related to mineral reserve quantities and the related mine closure dates included the following, among others:

- We tested the operating effectiveness of internal controls related to the Company's estimation of mineral reserve quantities and the related mine closure dates.

- We evaluated the experience, qualifications and objectivity of management's experts, including in-house mine engineers.

- For an iron ore mine subject to the Company's routine annual assessment we evaluated management's assessment by:

  ◦ Understanding the process used by management to survey and analyze the geological and operational status of current year mine production.

  ◦ Evaluating the historical accuracy of management's technical model as compared to actual mine production results.

  ◦ Comparing the mine plan, updated for current year depletion, to

    ▪ Presentations to the Audit Committee.

    ▪ Information by asset group, asset retirement obligation valuation models, and depreciation, depletion and amortization expense calculations.

- For an iron ore mine subject to the Company's periodic in-depth evaluation of its mineral reserve estimate:

  ◦ We evaluated management's determination of the size and scope of the iron ore body, by:

    ▪ Understanding the process used by management to complete research and exploration activities including mineralized resource drill samples.

    ▪ Understanding the methodology utilized by management to apply the research and exploration data to the development of a technical model of the iron ore body.

    ▪ Evaluating the historical accuracy of management's technical model as compared to actual mine production results.

  ◦ We evaluated management's estimates of future iron ore prices, production costs and capital expenditures (the "financial assumptions"), by:

    ▪ Understanding and testing the methodology utilized by management for development of the

137

future iron ore prices recognizing that the price shall not exceed the three-year trailing average index price of iron ore adjusted to the Company's realized price.

- Evaluated management's ability to accurately forecast future iron ore prices, production costs and capital expenditures by comparing actual results to management's historical forecasts.

- Evaluated the reasonableness of management's estimates of future iron ore prices to forecasted information included in analyst reports.

- Evaluated the reasonableness of management's forecast for production costs and capital expenditures by comparing the forecasts to: (1) historical results and (2) internal communications to management and the Board of Directors.

◦ We evaluated management's mine plan for the proven and probable mineral reserves, by:

- Understanding the process used by management to develop the mine plan for proven and probable mineral reserves applying key inputs such as the technical model of the iron ore body and the financial assumptions.

- Comparing the mine plan to

- Presentations to the Audit Committee.

- Historical mine plan(s).

- Information by asset group, asset retirement obligation valuation models, and depreciation, depletion and amortization expense calculations.

*/s/ DELOITTE & TOUCHE LLP*

Cleveland, Ohio

February 20, 2020

We have served as the Company's auditor since 2004.

138

Table of Contents

**Item 9.**        *Changes in and Disagreements With Accountants on Accounting and Financial Disclosure*

*None.*

**Item 9A.**        *Controls and Procedures*

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our President and Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure based solely on the definition of "disclosure controls and procedures" in Rule 13a-15(e) promulgated under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

As of the end of the period covered by this report, we carried out an evaluation under the supervision and with the participation of our management, including our President and Chief Executive Officer and our Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures. Based on the foregoing, our President and Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective.

139

**Management's Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as such term is defined under Rule 13a-15(f) promulgated under the Exchange Act.

Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Company's consolidated financial statements for external purposes in accordance with generally accepted accounting principles.

Internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit the preparation of the consolidated financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with appropriate authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the consolidated financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management conducted an assessment of the Company's internal control over financial reporting as of  December 31, 2019 using the framework specified in *Internal Control - Integrated Framework* (2013), published by the Committee of Sponsoring Organizations of the Treadway Commission. Based on such assessment, management has concluded that the Company's internal control over financial reporting was effective as of December 31, 2019.

The effectiveness of the Company's internal control over financial reporting as of  December 31, 2019 has been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report that appears herein.

February 20, 2020

**Changes in Internal Control Over Financial Reporting**

There have been no changes in our internal control over financial reporting or in other factors that occurred during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

140

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the shareholders and the Board of Directors of
Cleveland-Cliffs Inc.

**Opinion on Internal Control over Financial Reporting**

We have audited the internal control over financial reporting of Cleveland-Cliffs Inc. and subsidiaries (the "Company") as of December 31, 2019, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2019, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by COSO.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated financial statements as of and for the year ended December 31, 2019, of the Company and our report dated February 20, 2020, expressed an unqualified opinion on those financial statements and included an explanatory paragraph regarding the Company's change to its method of accounting for revenue by adopting FASB ASC 606, *Revenue from Contracts with Customers* .

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying *Management's Report on Internal Control Over Financial Reporting* . Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

*/s/ DELOITTE & TOUCHE LLP*

Cleveland, Ohio
February 20, 2020

**Item 9B.**     *Other Information*

None.

---

142

A006049

**PART III**

**Item 10.**      ***Directors, Executive Officers and Corporate Governance***

The information required to be furnished by this Item will be set forth in our definitive proxy statement for the 2020 Annual Meeting of Shareholders (the "Proxy Statement") under the headings "Board Meetings and Committees - Audit Committee", "Code of Business Conduct and Ethics", "Independence and Related Party Transactions", and "Information Concerning Director Nominees", and is incorporated herein by reference and made a part hereof from the Proxy Statement. The information regarding executive officers required by this Item is set forth in *Part I - Item 1. Business* hereof under the heading "Information About Our Executive Officers", which information is incorporated herein by reference and made a part hereof.

**Item 11.**      ***Executive Compensation***

The information required to be furnished by this Item will be set forth in the Proxy Statement under the headings "Director Compensation", "Compensation Discussion and Analysis", "Compensation Committee Report", "Compensation Committee Interlocks and Insider Participation", "Compensation-Related Risk Assessment" and "Executive Compensation" and is incorporated herein by reference and made a part hereof from the Proxy Statement.

**Item 12.**      ***Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters***

The information required to be furnished by this Item will be set forth in the Proxy Statement under the headings "Ownership of Equity Securities of the Company" and "Equity Compensation Plan Information" and is incorporated herein by reference and made a part hereof from the Proxy Statement.

**Item 13.**      ***Certain Relationships and Related Transactions, and Director Independence***

The information required to be furnished by this Item will be set forth in the Proxy Statement under the heading "Independence and Related Party Transactions" and is incorporated herein by reference and made a part hereof from the Proxy Statement.

**Item 14.**      ***Principal Accountant Fees and Services***

The information required to be furnished by this Item will be set forth in the Proxy Statement under the heading "Ratification of Independent Registered Public Accounting Firm" and is incorporated herein by reference and made a part hereof from the Proxy Statement.

Table of Contents

**PART IV**

**Item 15.**      ***Exhibits and Financial Statement Schedules***

(a)(1) - List of Financial Statements

The following consolidated financial statements of Cleveland-Cliffs Inc. are included at *Item 8. Financial Statements and Supplementary Data* above:

•      Statements of Consolidated Financial Position - December 31, 2019 and 2018

•      Statements of Consolidated Operations - Years ended December 31, 2019, 2018 and 2017

•      Statements of Consolidated Comprehensive Income - Years ended December 31, 2019, 2018 and 2017

•      Statements of Consolidated Cash Flows - Years ended December 31, 2019, 2018 and 2017

•      Statements of Consolidated Changes in Equity - Years ended December 31, 2019, 2018 and 2017

•      Notes to Consolidated Financial Statements

(a)(2) - Financial Statement Schedules

All schedules for which provision is made in the applicable accounting regulation of the SEC are not required under the related instructions or are inapplicable, and therefore have been omitted or are contained in the applicable financial statements or the notes thereto.

(3) List of Exhibits

All documents referenced below have been filed pursuant to the Securities Exchange Act of 1934 by Cleveland-Cliffs Inc., file number 1-09844, unless otherwise indicated.

| Exhibit Number | Exhibit |
|---|---|
| | **Plan of purchase, sale, reorganization, arrangement, liquidation or succession** |
| 2.1 | \*\*\*Agreement and Plan of Merger, dated as of December 2, 2019, by and among Cleveland-Cliffs Inc., AK Steel Holding Corporation, and Pepper Merger Sub Inc. (filed as Exhibit 2.1 to Cliffs' Form 8-K filed on December 4, 2019 and incorporated herein by reference) |
| | **Articles of Incorporation and By-Laws of Cleveland-Cliffs Inc.** |
| 3.1 | Third Amended Articles of Incorporation of Cliffs, as filed with the Secretary of State of the State of Ohio on May 13, 2013 (filed as Exhibit 3.1 to Cliffs' Form 8-K on May 13, 2013 and incorporated herein by reference) |
| 3.2 | Certificate of Amendment to Third Amended Articles of Incorporation of Cliffs, as filed with the Secretary of State of the State of Ohio on April 26, 2017 (filed as Exhibit 3.1 to Cliffs' Form 8-K on April 27, 2017 and incorporated herein by reference) |
| 3.3 | Certificate of Amendment to Third Amended Articles of Incorporation of Cliffs, as amended, as filed with the Secretary of State of the State of Ohio on August 15, 2017 (filed as Exhibit 3.1 to Cliffs' Form 8-K on August 17, 2017 and incorporated herein by reference) |
| 3.4 | Regulations of Cliffs (filed as Exhibit 3.2 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| | **Instruments defining rights of security holders, including indentures** |
| 4.1 | Indenture between Cliffs Natural Resources Inc. and U.S. Bank National Association, as trustee, dated March 17, 2010 (filed as Exhibit 4.3 to Cliffs' Registration Statement on Form S-3 No. 333-186617 on February 12, 2013 and incorporated herein by reference) |
| 4.2 | Form of 6.25% Notes due 2040 Third Supplemental Indenture between Cliffs Natural Resources Inc. and U.S. Bank National Association, as trustee, dated September 20, 2010, including Form of 6.25% Notes due 2040 (filed as Exhibit 4.4 to Cliffs' Form 8-K on September 17, 2010 and incorporated herein by reference) |
| 4.3 | Fifth Supplemental Indenture between Cliffs Natural Resources Inc. and U.S. Bank National Association, as trustee, dated March 31, 2011 (filed as Exhibit 4(b) to Cliffs' Form 10-Q for the period ended June 30, 2011 and incorporated herein by reference) |

A006051

| 4.4 | Seventh Supplemental Indenture between Cliffs Natural Resources Inc. and U.S. Bank National Association, as trustee, dated May 7, 2013 (as filed as Exhibit 4.1 to Cliffs' Form 10-Q for the period ended June 30, 2013 and incorporated herein by reference) |
| 4.5 | Eighth Supplemental Indenture, dated as of December 19, 2017, by and between Cleveland-Cliffs Inc. and U.S. Bank National Association, as trustee, including Form of 1.50% Convertible Senior Notes due 2025 (filed as Exhibit 4.2 to Cliffs' Form 8-K on December 19, 2017 and incorporated herein by reference) |
| 4.6 | Indenture, dated as of February 27, 2017, among Cliffs Natural Resources Inc. (n/k/a Cleveland-Cliffs Inc.), the Guarantors party thereto and U.S. Bank National Association, as trustee, including Form of 5.75% Senior Notes due 2025 (filed as Exhibit 4.1 to Cliffs' Form 8-K on August 7, 2017 and incorporated herein by reference) |
| 4.7 | First Supplemental Indenture, dated as of August 7, 2017, among Cliffs Natural Resources Inc. (n/k/a Cleveland-Cliffs Inc.), the Guarantors party thereto and U.S. Bank National Association, as trustee, including Form of 5.75% Senior Notes due 2025 (filed as Exhibit 4.2 to Cliffs' Form 8-K filed on August 7, 2017 and incorporated herein by reference) |
| 4.8 | Second Supplemental Indenture, dated as of September 29, 2017, among Cliffs Empire II Inc. and Empire Iron Mining Partnership, as additional guarantors, Cleveland-Cliffs Inc. and U.S. Bank National Association, as trustee (filed as Exhibit 4.11 to Cliffs' Form 10-K for period ended December 31, 2017 and incorporated herein by reference) |
| 4.9 | Third Supplemental Indenture, dated as of October 27, 2017, among Cliffs TIOP II, LLC, Marquette Range Coal Service Company and Tilden Mining Company L.C., as additional guarantors, Cleveland-Cliffs Inc. and U.S. Bank National Association, as trustee (filed as Exhibit 4.12 to Cliffs' Form 10-K for period ended December 31, 2017 and incorporated herein by reference) |
| 4.10 | Fourth Supplemental Indenture, dated as of August 27, 2018, among IronUnits LLC, as additional guarantor, Cleveland-Cliffs Inc. and U.S. Bank National Association, as trustee (filed herewith) |
| 4.11 | Indenture, dated as of December 19, 2017, by and among Cleveland-Cliffs Inc., the guarantors party thereto and U.S. Bank National Association, as trustee and first lien notes collateral agent, including Form of 4.875% Senior Secured Notes due 2024 (filed as Exhibit 4.1 to Cliffs' Form 8-K filed on December 19, 2017 and incorporated herein by reference) |
| 4.12 | First Supplemental Indenture, dated as of August 27, 2018, among IronUnits LLC, as additional guarantor, Cleveland-Cliffs Inc. and U.S. Bank National Association, as trustee (filed herewith) |
| 4.13 | Indenture, dated as of May 13, 2019, among Cleveland-Cliffs Inc., the guarantors party thereto and U.S. Bank National Association, as trustee, including Form of 5.875% Senior Note due 2027 (filed as Exhibit 4.1 to Cliffs' Form 8-K filed on May 14, 2019 and incorporated herein by reference) |
| 4.14 | Registration Rights Agreement, dated as of May 13, 2019, among Cleveland-Cliffs Inc., the guarantors party thereto and Goldman Sachs & Co. LLC, as the initial purchaser (filed as Exhibit 10.1 to Cliffs' Form 8-K filed on May 14, 2019 and incorporated herein by reference) |
| 4.15 | Form of Common Share Certificate (filed as Exhibit 4.1 to Cliffs' Form 10-Q for the period ended September 30, 2019 and incorporated herein by reference) |
| 4.16 | Description of Securities Registered under Section 12 of the Securities Exchange Act of 1934 (filed herewith) |
| | **Material contracts** |
| 10.1 | Amended and Restated Syndicated Facility Agreement, by and among Bank of America, N.A., as Administrative Agent and Australian Security Trustee, the Lenders that are Parties hereto, as the Lenders, Cleveland-Cliffs Inc., as Parent and a Borrower, and the Subsidiaries of Parent Party hereto, as Borrowers, dated as of February 28, 2018 (filed as Exhibit 10.1 to Cliffs' Form 10-Q for the period ended March 31, 2018 and incorporated herein by reference) |
| 10.2 | * Form of Change in Control Severance Agreement (covering newly hired officers) (filed as Exhibit 10.4 to Cliffs' Form 8-K/A on September 16, 2014 and incorporated herein by reference) |
| 10.3 | * Form of 2016 Change in Control Severance Agreement (filed as Exhibit 10.1 to Cliffs' 10-Q for the period ended September 30, 2016 and incorporated herein by reference) |
| 10.4 | * Cleveland-Cliffs Inc. 2012 Non-Qualified Deferred Compensation Plan (effective January 1, 2012) dated November 8, 2011 (filed as Exhibit 10.1 to Cliffs' Form 8-K on November 8, 2011 and incorporated herein by reference) |
| 10.5 | * Form of Director and Officer Indemnification Agreement between Cleveland-Cliffs Inc. and Directors and Officers (filed as Exhibit 10.2 to Cliffs' Form 10-Q for the period ended March 31, 2019 and incorporated herein by reference) |
| 10.6 | * Cliffs Natural Resources Inc. Amended and Restated 2014 Nonemployee Directors' Compensation Plan (filed as Exhibit 10.1 to Cliffs' Form 8-K on May 2, 2016 and incorporated herein by reference) |
| 10.7 | *Form of Restricted Shares Agreement for Nonemployee Directors (filed as Exhibit 10.1 to Cliffs' Form 10-Q for the period ended June 30, 2018 and incorporated herein by reference) |

145

A006052

Table of Contents

| | |
|---|---|
| 10.8 | *Form of Deferred Shares Agreement for Nonemployee Directors (filed Exhibit 10.2 to Cliffs' Form 10-Q for the period ended June 30, 2018 and incorporated herein by reference) |
| 10.9 | * Trust Agreement No. 1 (Amended and Restated effective June 1, 1997), dated June 12, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to the Cleveland-Cliffs Inc Supplemental Retirement Benefit Plan, Severance Pay Plan for Key Employees and certain executive agreements (filed as Exhibit 10.10 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.10 | * Trust Agreement No. 1 Amendments to Exhibits, effective as of January 1, 2000, by and between Cleveland-Cliffs Inc and KeyBank National Association, as Trustee (filed as Exhibit 10.11 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.11 | * First Amendment to Trust Agreement No. 1, effective September 10, 2002, by and between Cleveland-Cliffs Inc and KeyBank National Association, as Trustee (filed as Exhibit 10.12 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.12 | * Second Amendment to Trust Agreement No. 1 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10.y) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.13 | * Third Amendment to Trust Agreement No. 1 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.15 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.14 | * Amended and Restated Trust Agreement No. 2, effective as of October 15, 2002, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to Executive Agreements and Indemnification Agreements with the Company's Directors and certain Officers, the Company's Severance Pay Plan for Key Employees, and the Retention Plan for Salaried Employees (filed as Exhibit 10.14 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.15 | * Second Amendment to Amended and Restated Trust Agreement No. 2 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(aa) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.16 | * Third Amendment to Amended and Restated Trust Agreement No. 2 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.18 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.17 | * Trust Agreement No. 7, dated as of April 9, 1991, by and between Cliffs Natural Resources Inc and KeyBank National Association, Trustee, with respect to the Cleveland-Cliffs Inc Supplemental Retirement Benefit Plan (filed as Exhibit 10.23 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.18 | * First Amendment to Trust Agreement No. 7, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, dated as of March 9, 1992 (filed as Exhibit 10.24 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.19 | * Second Amendment to Trust Agreement No. 7, dated November 18, 1994, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.25 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.20 | * Third Amendment to Trust Agreement No. 7, dated May 23, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.26 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.21 | * Fourth Amendment to Trust Agreement No. 7, dated July 15, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.27 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.22 | * Amendment to Exhibits to Trust Agreement No. 7, effective as of January 1, 2000, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.28 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.23 | * Sixth Amendment to Trust Agreement No. 7 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(oo) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.24 | * Seventh Amendment to Trust Agreement No. 7 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.34 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |

A006053

Table of Contents

| 10.25 | * Trust Agreement No. 10, dated as of November 20, 1996, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to the Cleveland-Cliffs Inc Nonemployee Directors' Compensation Plan (filed as Exhibit 10.36 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| --- | --- |
| 10.26 | *First Amendment to Trust Agreement No. 10 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(ww) to Cliffs' Form 10-K for the period ended February 26, 2009 and incorporated herein by reference) |
| 10.27 | * Second Amendment to Trust Agreement No. 10 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.45 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.28 | *Severance Agreement and Release, by and between Timothy K. Flanagan and Cleveland-Cliffs Inc., effective February 12, 2019  (filed as Exhibit 10.1 to Cliffs' Form 10-Q for period ended March 31, 2019 and incorporated herein by reference) |
| 10.29 | * Letter Agreement, by and between Lourenco Goncalves and Cliffs Natural Resources Inc., signed as of September 11, 2014 (filed as Exhibit 10.1 to Cliffs' Form 8-K/A on September 16, 2014 and incorporated herein by reference) |
| 10.30 | * Cleveland-Cliffs Inc and Subsidiaries Management Performance Incentive Plan Summary, effective January 1, 2004 (filed as Exhibit 10.47 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.31 | * Cliffs Natural Resources Inc. 2017 Executive Management Performance Incentive Plan effective January 1, 2017 (filed as Exhibit 10.2 to Cliffs' Form 8-K on April 27, 2017 and incorporated herein by reference) |
| 10.32 | * Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan (filed as Exhibit 10.1 to Cliffs' Form 8-K on August 4, 2014 and incorporated herein by reference) |
| 10.33 | * Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Non-Qualified Stock Option Award Memorandum (3-Year Vesting – January 2015 Grant) and Stock Option Award Agreement (filed as Exhibit 10.69 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.34 | * Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan (filed as Exhibit 10.1 to Cliffs' Form 8-K on May 21, 2015 and incorporated herein by reference) |
| 10.35 | * Cliffs Natural Resources Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan (filed as Exhibit 10.1 to Cliffs' Form 8-K on April 27, 2017 and incorporated herein by reference) |
| 10.36 | * Form of Cleveland-Cliffs Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan Restricted Stock Unit Award Memorandum (Vesting December 31, 2020) and Restricted Stock Unit Award Agreement (filed as Exhibit 10.2 to Cliffs' Form 10-Q for the period ended March 31, 2018 and incorporated herein by reference) |
| 10.37 | * Form of Cleveland-Cliffs Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan Performance Share Award Memorandum and Performance Share Award Agreement (filed as Exhibit 10.3 to Cliffs' Form 10-Q for the period ended March 31, 2018 and incorporated herein by reference) |
| 10.38 | * Form of Cleveland-Cliffs Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan Cash Incentive Award Memorandum (TSR) (Vesting December 31, 2020) and Cash Incentive Award Agreement (TSR) (filed as Exhibit 10.4 to Cliffs' Form 10-Q for the period ended March 31, 2018 and incorporated herein by reference) |
| 10.39 | * Cliffs Natural Resources Inc. Supplemental Retirement Benefit Plan (as Amended and Restated effective December 1, 2006) dated December 31, 2008 (filed as Exhibit 10(mmm) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.40 | * Cliffs Natural Resources Inc. 2015 Employee Stock Purchase Plan (filed as Exhibit 4.4 to Cliffs' Registration Statement on Form S-8 on August 20, 2015 and incorporated herein by reference) |
| 10.41 | ** Pellet Sale and Purchase Agreement, effective as of October 31, 2016, by and among Cliffs Natural Resources Inc., The Cleveland-Cliffs Iron Company and Cliffs Mining Company and ArcelorMittal USA LLC (filed as Exhibit 10.72 to Cliffs' Registration Statement on Form S-1/A No. 333-212054 on August 4, 2016 and incorporated herein by reference) |
| 10.42 | ** Amended and Restated Pellet Sale and Purchase Agreement, effective as of December 31, 2015, by and among The Cleveland-Cliffs Iron Company, Cliffs Mining Company and AK Steel Corporation (filed as Exhibit 10.59 to Cliffs' Form 10-K/A for the period ended December 31, 2017 and incorporated herein by reference) |
| 10.43 | ** Pellet Sale and Purchase Agreement, effective as of January 1, 2014, by and among Cliffs Mining Company (f/k/a Cliffs Sales Company) and AK Steel Corporation (filed as Exhibit 10.50 to Cliffs' Form 10-K for the period ended December 31, 2018 and incorporated herein by reference) |
| 21 | Subsidiaries of the Registrant (filed herewith) |
| 23 | Consent of Independent Registered Public Accounting Firm (filed herewith) |

A006054

| 24 | Power of Attorney (filed herewith) |
| 31.1 | Certification Pursuant to 15 U.S.C. Section 7241, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, signed and dated by Lourenco Goncalves as of February 20, 2020 (filed herewith) |
| 31.2 | Certification Pursuant to 15 U.S.C. Section 7241, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, signed and dated by Keith A. Koci as of February 20, 2020 (filed herewith) |
| 32.1 | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed and dated by Lourenco Goncalves, Chairman, President and Chief Executive Officer of Cleveland-Cliffs Inc., as of February 20, 2020 (filed herewith) |
| 32.2 | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed and dated by Keith A. Koci, Executive Vice President, Chief Financial Officer of Cleveland-Cliffs Inc., as of February 20, 2020 (filed herewith) |
| 95 | Mine Safety Disclosures (filed herewith) |
| 101 | The following financial information from Cleveland-Cliffs Inc.'s Annual Report on Form 10-K for the year ended December 31, 2019 formatted in Inline XBRL (Extensible Business Reporting Language) includes: (i) the Statements of Consolidated Financial Position, (ii) the Statements of Consolidated Operations, (iii) the Statements of Consolidated Comprehensive Income, (iv) the Statements of Consolidated Cash Flows, (v) the Statements of Consolidated Changes in Equity, and (vi) Notes to the Consolidated Financial Statements. |
| 104 | The cover page from this Annual Report on Form 10-K, formatted in Inline XBRL. |

_____

| * | Indicates management contract or other compensatory arrangement. |
| ** | Confidential treatment requested and/or approved as to certain portions, which portions have been omitted and filed separately with the Securities and Exchange Commission. |
| *** | Certain immaterial schedules and exhibits to this exhibit have been omitted pursuant to the provisions of Regulation S-K, Item 601(a)(5). A copy of any of the omitted schedules and exhibits will be furnished to the Securities and Exchange Commission upon request. |

**Item 16.**    *Form 10-K Summary*

*None.*

148

A006055

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

CLEVELAND-CLIFFS INC.

By:    /s/ R. C. Cebula
_____
Name:    R. Christopher Cebula
Title:    Vice President, Corporate Controller &
Chief Accounting Officer

Date:        February 20, 2020

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signatures | Title | Date |
|---|---|---|
| /s/ C. L. Goncalves | Chairman, President and | February 20, 2020 |
| C. L. Goncalves | Chief Executive Officer | |
| | (Principal Executive Officer) | |
| /s/ K. A. Koci | Executive Vice President, | February 20, 2020 |
| K. A. Koci | Chief Financial Officer | |
| | (Principal Financial Officer) | |
| /s/ R. C. Cebula | Vice President, Corporate Controller & | February 20, 2020 |
| R. C. Cebula | Chief Accounting Officer | |
| | (Principal Accounting Officer) | |
| * | Director | February 20, 2020 |
| J. T. Baldwin | | |
| * | Director | February 20, 2020 |
| R. P. Fisher, Jr. | | |
| * | Director | February 20, 2020 |
| S. M. Green | | |
| * | Director | February 20, 2020 |
| M. A. Harlan | | |
| * | Director | February 20, 2020 |
| J. L. Miller | | |
| * | Director | February 20, 2020 |
| J. A. Rutkowski, Jr. | | |
| * | Director | February 20, 2020 |
| E. M. Rychel | | |
| * | Director | February 20, 2020 |
| M. D. Siegal | | |
| * | Director | February 20, 2020 |
| G. Stoliar | | |
| * | Director | February 20, 2020 |
| D. C. Taylor | | |

* The undersigned, by signing his name hereto, does sign and execute this Annual Report on Form 10-K pursuant to a Power of Attorney executed on behalf of the above-indicated directors of the registrant and filed herewith as Exhibit 24 on behalf of the registrant.

By:    /s/ K. A. Koci
_____
(K. A. Koci, as Attorney-in-Fact)

149

A006056

EXHIBIT 4.10

**FOURTH SUPPLEMENTAL INDENTURE**

**5.75% SENIOR NOTES DUE 2025**

This Supplemental Indenture, dated as of August 27, 2018 (this "**Supplemental Indenture**" or "**Guarantee**"), among IronUnits LLC (the "**Additional Guarantor**"), Cleveland-Cliffs Inc. (f/k/a Cliffs Natural Resources Inc.) (together with its successors and assigns, the "**Company**"), and U.S. Bank National Association, as Trustee (the "**Trustee**") under the Indenture referred to below.

WITNESSETH:

WHEREAS, the Company, the Guarantors party thereto and the Trustee have heretofore executed and delivered an Indenture, dated as of February 27, 2017, as supplemented by that certain First Supplemental Indenture, dated as of August 7, 2017, among the Company, the Guarantors party thereto, and the Trustee, that certain Second Supplemental Indenture, dated as of September 29, 2017, among the Company, the Guarantors party thereto, and the Trustee, and that certain Third Supplemental Indenture, dated as of October 27, 2017, among the Company, the Guarantors party thereto, and the Trustee (as so supplemented, the "**Indenture**"), providing for the issuance of an aggregate principal amount of $1,075,000,000 of 5.75% Senior Notes due 2025 of the Company (the "**Notes**");

WHEREAS, Section 3.08 of the Indenture provides that, after the Issue Date, the Company is required to cause certain direct or indirect Subsidiaries of the Company to execute and deliver to the Trustee a supplemental indenture pursuant to which such Subsidiary will unconditionally guarantee, on a joint and several basis with the other Guarantors, the full and prompt payment of the principal of, premium, if any, and interest on the Notes on an unsecured basis; and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee and the Company are authorized to execute and deliver this Supplemental Indenture to amend or supplement the Indenture, without the consent of any Holder;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Additional Guarantor, the Company and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

ARTICLE 1
Definitions

Section 1.01 *Defined Terms*.

As used in this Supplemental Indenture, terms defined in the Indenture or in the preamble or recital hereto are used herein as therein defined. The words "herein," "hereof" and "hereby" and other words of similar import used in this Supplemental Indenture refer to this Supplemental Indenture as a whole and not to any particular section hereof.

ARTICLE 2
Agreement to be Bound; Guarantee

Section 2.01 *Agreement to be Bound*. The Additional Guarantor hereby becomes party to the Indenture as a Guarantor and as such will have all of the rights and be subject to all of the obligations and agreements of a Guarantor under the Indenture. The Additional Guarantor agrees to be bound by all of the provisions of the Indenture applicable to an Additional Guarantor and to perform all of the obligations and agreements of a Guarantor under the Indenture.

Section 2.02 *Guarantee*. The Additional Guarantor agrees, on a joint and several basis with all the existing Guarantors, to fully, unconditionally and irrevocably Guarantee to each Holder of the Notes and the Trustee the Obligations pursuant to Article 10 of the Indenture on an unsecured basis.

Fourth Supplemental Indenture - 5.75% Senior Notes due 2025

ARTICLE 3
Miscellaneous

Section 3.01        *Notices.* All notices and other communications to the Additional Guarantor shall be given as provided in the Indenture to the Additional Guarantor, at its address set forth below, with a copy to the Company as provided in the Indenture for notices to the Company.

IronUnits LLC
c/o   Cleveland-Cliffs Inc.
      200 Public Square, Suite 3300
      Cleveland, Ohio 44114
      Attention:   James Graham, Executive Vice President,
            Chief Legal Officer & Secretary

Section 3.02   *Parties.* Nothing expressed or mentioned herein is intended or shall be construed to give any Person, firm or corporation, other than the Holders and the Trustee, any legal or equitable right, remedy or claim under or in respect of this Supplemental Indenture or the Indenture or any provision herein or therein contained.

Section 3.03   *Governing Law*. This Supplemental Indenture shall be governed by, and construed in accordance with, the laws of the State of New York.

Section 3.04   *Severability Clause.* In case any provision in this Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

Section 3.05   *Ratification of Indenture; Supplemental Indenture Part of Indenture*. Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby. The Trustee shall not be responsible for and makes no representation or warranty as to the validity, execution, or sufficiency of this Supplemental Indenture or with respect to the recitals contained herein, all of which recitals are made solely by the other parties hereto.

Section 3.06   *Counterparts.* The parties hereto may sign one or more copies of this Supplemental Indenture in counterparts, all of which together shall constitute one and the same agreement.

Section 3.07   *Headings.* The headings of the Articles and the sections in this Guarantee are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof.

Section 3.08   *Execution, Delivery and Validity*. The Company and Additional Guarantor each represent and warrant to the Trustee that this Supplemental Indenture has been duly and validly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, receivership, administration, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

IRONUNITS LLC, as a Guarantor


By:      /s/ James D. Graham
Name:    James D. Graham
Title:   Secretary


CLEVELAND-CLIFFS INC.


By:      /s/ Timothy K. Flanagan
Name:    Timothy K. Flanagan
Title:   Executive Vice President & Chief Financial Officer


U.S. BANK NATIONAL ASSOCIATION, as Trustee


By:      /s/ Elizabeth Thuning
Name:    Elizabeth Thuning
Title:   Vice President


Fourth Supplemental Indenture - 5.75% Senior Notes due 2025

EXHIBIT 4.12

## FIRST SUPPLEMENTAL INDENTURE

This Supplemental Indenture, dated as of August 27, 2018 (this " **Supplemental Indenture**" or "**Guarantee**"), among IronUnits LLC (the "**Additional Guarantor**"), Cleveland-Cliffs Inc., (together with its successors and assigns, the " **Company**"), and U.S. Bank National Association, as Trustee under the Indenture referred to below.

WITNESSETH:

WHEREAS, the Company, the Guarantors, the First Lien Notes Collateral Agent and the Trustee have heretofore executed and delivered an Indenture, dated as of December 19, 2017 (as amended, supplemented, waived or otherwise modified, the "**Indenture**"), providing for the issuance of an aggregate principal amount of $400,000,000 of 4.875% Senior Secured Notes due 2024 of the Company (the "**Notes**");

WHEREAS, Section 3.08 of the Indenture provides that, after the Issue Date, the Company is required to cause certain direct or indirect Subsidiaries of the Company to execute and deliver to the Trustee a supplemental indenture pursuant to which such Subsidiary will unconditionally guarantee, on a joint and several basis with the other Guarantors, the full and prompt payment of the principal of, premium, if any, and interest on the Notes on a secured basis; and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee and the Company are authorized to execute and deliver this Supplemental Indenture to amend or supplement the Indenture, without the consent of any Holder;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Additional Guarantor, the Company and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

ARTICLE 1
Definitions

Section 1.01                *Defined Terms*.

As used in this Supplemental Indenture, terms defined in the Indenture or in the preamble or recital hereto are used herein as therein defined. The words "herein," "hereof" and "hereby" and other words of similar import used in this Supplemental Indenture refer to this Supplemental Indenture as a whole and not to any particular section hereof.

ARTICLE 2
Agreement to be Bound; Guarantee

*Section 2.01    Agreement to be Bound* . The Additional Guarantor hereby becomes a party to the Indenture as a Guarantor and as such will have all of the rights and be subject to all of the obligations and agreements of a Guarantor under the Indenture. The Additional Guarantor hereby becomes a party to the Security Agreement, pursuant to the terms of such agreement, as a Grantor thereunder with the same force and effect as if originally named therein as a Grantor and as such hereby assumes all obligations and liabilities of a Grantor thereunder. The Additional Guarantor agrees to be bound by all of the provisions of the Indenture and the Collateral Documents applicable to an Additional Guarantor and to perform all of the obligations and agreements of a Guarantor under the Indenture and the Collateral Documents.

*Section 2.02    Guarantee*. The Additional Guarantor agrees, on a joint and several basis with all the existing Guarantors, to fully, unconditionally and irrevocably Guarantee to each Holder of the Notes and the Trustee the Obligations pursuant to Article 10 of the Indenture on a secured basis.

First Supplemental Indenture - 4.875% Senior Secured Notes due 2024

ARTICLE 3
Miscellaneous

Section 1.01          *Notices.* All notices and other communications to the Additional Guarantor shall be given as provided in the Indenture to the Additional Guarantor, at its address set forth below, with a copy to the Company as provided in the Indenture for notices to the Company.

IronUnits LLC
c/o   Cleveland-Cliffs Inc.
      200 Public Square, Suite 3300
      Cleveland, Ohio 44114
      Attention:   James Graham, Executive Vice President,
                   Chief Legal Officer & Secretary

Section 3.02    *Parties.* Nothing expressed or mentioned herein is intended or shall be construed to give any Person, firm or corporation, other than the Holders and the Trustee, any legal or equitable right, remedy or claim under or in respect of this Supplemental Indenture or the Indenture or any provision herein or therein contained.

Section 3.03    *Governing Law.* This Supplemental Indenture shall be governed by, and construed in accordance with, the laws of the State of New York.

Section 3.04    *Severability Clause.* In case any provision in this Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

Section 3.05    *Ratification of Indenture; Supplemental Indenture Part of Indenture.* Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby. The Trustee shall not be responsible for and makes no representation or warranty as to the validity, execution, or sufficiency of this Supplemental Indenture or with respect to the recitals contained herein, all of which recitals are made solely by the other parties hereto.

Section 3.06    *Counterparts.* The parties hereto may sign one or more copies of this Supplemental Indenture in counterparts, all of which together shall constitute one and the same agreement.

Section 3.07    *Headings.* The headings of the Articles and the sections in this Guarantee are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof.

Section 3.08    *Execution, Delivery and Validity.* The Company and Additional Guarantor each represent and warrant to the Trustee that this Supplemental Indenture has been duly and validly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, receivership, administration, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

First Supplemental Indenture - 4.875% Senior Secured Notes due 2024

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

IRONUNITS LLC, as a Guarantor

By:      /s/ James D. Graham
Name:    James D. Graham
Title:   Secretary

CLEVELAND-CLIFFS INC.

By:      /s/ Timothy K. Flanagan
Name:    Timothy K. Flanagan
Title:   Executive Vice President & Chief Financial Officer

U.S. BANK NATIONAL ASSOCIATION, as Trustee

By:      /s/ Elizabeth Thuning
Name:    Elizabeth Thuning
Title:   Vice President

First Supplemental Indenture - 4.875% Senior Secured Notes due 2024

**EXHIBIT 4.16**

**DESCRIPTION OF SECURITIES**
**REGISTERED UNDER SECTION 12 OF THE SECURITIES EXCHANGE ACT OF 1934**

The following is a summary of the terms and provisions of the common shares, par value $0.125 per share ("Common Shares"), of Cleveland-Cliffs Inc., an Ohio corporation (the "Company"), and is qualified by reference to the Company's articles of incorporation and regulations, which are incorporated by reference herein and attached as exhibits to the Company's most recent Annual Report on Form 10-K filed with the Securities and Exchange Commission, and to applicable provisions of Ohio law.

**Common Shares**

The Company has authorized 600,000,000 Common Shares. The holders of Common Shares are entitled to one vote for each share on all matters upon which shareholders have the right to vote and, upon proper notice, are entitled to cumulative voting rights in the election of directors. The Common Shares do not have any preemptive rights, are not subject to redemption and do not have the benefit of any sinking fund. Holders of Common Shares are entitled to receive such dividends as the Company's directors from time to time may declare out of funds legally available therefor. Entitlement to dividends is subject to the preferences granted to other classes of securities the Company has or may have outstanding in the future. In the event of the Company's liquidation, holders of Common Shares are entitled to share in any of the Company's assets remaining after satisfaction in full of its liabilities and satisfaction of such dividend and liquidation preferences as may be possessed by the holders of other classes of securities the Company has or may have outstanding in the future.

**Preferred Stock**

The Company has authorized 3,000,000 shares of serial preferred stock, Class A, without par value ("Class A Preferred Stock"), and 4,000,000 shares of serial preferred stock, Class B, without par value ("Class B Preferred Stock" and, collectively with the Class A Preferred Stock, "Preferred Stock"). Under the Company's articles of incorporation, the Company's board of directors can issue, without further shareholder action, up to 3,000,000 shares of Class A Preferred Stock and up to 4,000,000 shares of Class B Preferred Stock, in each case, with such rights and restrictions as the Company's board of directors may determine.

In some cases, the issuance of Preferred Stock could delay, defer or prevent a change in control and make it harder to remove present management, without further action by the Company's shareholders. Under some circumstances, Preferred Stock could also decrease the amount of earnings and assets available for distribution to holders of Common Shares if the Company liquidates or dissolves and could also restrict or limit dividend payments to holders of Common Shares.

**Ohio Control Share Acquisition Statute**

The Ohio Control Share Acquisition Statute requires the prior authorization of the shareholders of certain corporations in order for any person to acquire, either directly or indirectly, shares of that corporation that would entitle the acquiring person to exercise or direct the exercise of 20% or more of the voting power of that corporation in the election of directors or to exceed specified other percentages of voting power. In the event an acquiring person proposes to make such an acquisition, the person is required to deliver to the corporation a statement disclosing, among other things, the number of shares owned, directly or indirectly, by the person, the range of voting power that may result from the proposed acquisition and the identity of the acquiring person. Within 10 days after receipt of this statement, the corporation must call a special meeting of shareholders to vote on the proposed acquisition. The acquiring person may complete the proposed acquisition only if the acquisition is approved by the affirmative vote of the holders of at least a majority of the voting power of all shares entitled to vote in the election of directors represented at the meeting excluding the voting power of all "interested shares." Interested shares include any shares held by the acquiring person and those held by officers and directors who are employees of the corporation as well as by certain others, including many holders commonly characterized as arbitrageurs. The Ohio Control Share Acquisition Statute does not apply to a corporation if its articles of incorporation or code of regulations state that the statute does not apply to a corporation. Neither the Company's articles of incorporation nor its regulations contain a provision opting out of this statute.

**Ohio Interested Shareholder Statute**

Chapter 1704 of the Ohio Revised Code prohibits certain corporations from engaging in a "chapter 1704 transaction" with an "interested shareholder" for a period of three years after the date of the transaction in which the person became an interested shareholder, unless, among other things:

- the articles of incorporation expressly provide that the corporation is not subject to the statute (the Company has not made this election); or

- the board of directors of the corporation approves the chapter 1704 transaction or the acquisition of the shares before the date the shares were acquired.

After the three-year moratorium period, the corporation may not consummate a chapter 1704 transaction unless, among other things, it is approved by the affirmative vote of the holders of at least two-thirds of the voting power in the election of directors and the holders of a majority of the voting shares, excluding all shares beneficially owned by an interested shareholder or an affiliate or associate of an interested shareholder, or the shareholders receive certain minimum consideration for their shares. A chapter 1704 transaction includes certain mergers, sales of assets, consolidations, combinations and majority share acquisitions involving an interested shareholder. An interested shareholder is defined to include, with limited exceptions, any person who, together with affiliates and associates, is the beneficial owner of a sufficient number of shares of the corporation to entitle the person, directly or indirectly, alone or with others, to exercise or direct the exercise of 10% or more of the voting power in the election of directors after taking into account all of the person's beneficially owned shares that are not then outstanding.

**Exhibit 21**

**SIGNIFICANT SUBSIDIARIES**
**CLEVELAND-CLIFFS INC. AS OF DECEMBER 31, 2019**

| Name | Cliffs' Effective Ownership | Place of Incorporation |
|---|---|---|
| Cliffs Mining Company | 100% | Delaware, USA |
| Cliffs Minnesota Mining Company | 100% | Delaware, USA |
| Cliffs TIOP Holding, LLC | 100% | Delaware, USA |
| Cliffs TIOP, Inc. | 100% | Michigan, USA |
| Cliffs TIOP II, LLC | 100% | Delaware, USA |
| Cliffs UTAC Holding LLC | 100% | Delaware, USA |
| IronUnits LLC | 100% | Delaware, USA |
| Northshore Mining Company | 100% | Delaware, USA |
| The Cleveland-Cliffs Iron Company | 100% | Ohio, USA |

**Exhibit 23**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in:

Registration Statement No. 333-235855 on Form S-4 (as amended by Amendment No. 1) pertaining to the joint proxy statement/prospectus filed by AK Steel Holding Corporation and Cleveland-Cliffs Inc.;

Registration Statement No. 033-56661 on Form S-8 (as amended by Post-Effective Amendment No.1) pertaining to the Northshore Mining Company and Silver Bay Power Company Retirement Savings Plan and the related prospectus;

Registration Statement No. 333-184620 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2012 Incentive Equity Plan;

Registration Statement No. 333-197687 on Form S-8 pertaining to the Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan;

Registration Statement No. 333-197688 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2014 Nonemployee Directors' Compensation Plan;

Registration Statement No. 333-204369 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan;

Registration Statement No. 333-206487 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2015 Employee Stock Purchase Plan;

Registration Statement No. 333-210954 on Form S-8 pertaining to the Cliffs Natural Resources Inc. Amended and Restated 2014 Nonemployee Directors' Compensation Plan; and

Registration Statement No. 333-217506 on Form S-8 pertaining to the Cliffs Natural Resources Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan.

of our reports dated February 20, 2020, relating to the financial statements of Cleveland-Cliffs Inc. and the effectiveness of Cleveland-Cliffs Inc.'s internal control over financial reporting, appearing in this Annual Report on Form 10-K for the year ended December 31, 2019.

*/s/ DELOITTE & TOUCHE LLP*

Cleveland, Ohio
February 20, 2020

Exhibit 24

### POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that the undersigned Directors and officers of Cleveland-Cliffs Inc., an Ohio corporation ("Company"), hereby constitute and appoint C. Lourenco Goncalves, Keith A. Koci, James D. Graham and R. Christopher Cebula, and each of them, their true and lawful attorney or attorneys-in-fact, with full power of substitution and revocation, for them and in their name, place and stead, to sign on their behalf as a Director or officer of the Company, or both, as the case may be, an Annual Report on Form 10-K pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2019, and to sign any and all amendments to such Annual Report, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorney or attorneys-in-fact, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as they might or could do in person, hereby ratifying and confirming all that said attorney or attorneys-in-fact or any of them or their substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Executed as of the 18th day of February, 2020.

| | |
|---|---|
| /s/ C. L. Goncalves | /s/ Keith A. Koci |
| C. L. Goncalves, Chairman, President and Chief Executive Officer | K. A. Koci, Executive Vice President, Chief Financial Officer |
| /s/ R. C. Cebula | /s/ J. T. Baldwin |
| R. C. Cebula, Vice President, Corporate Controller & Chief Accounting Officer | J. T. Baldwin, Director |
| /s/ R. P. Fisher, Jr. | /s/ S. M. Green |
| R. P. Fisher, Jr., Director | S. M. Green, Director |
| /s/ M. A. Harlan | /s/ J. L. Miller |
| M. A. Harlan, Director | J. L. Miller, Director |
| /s/ J. A. Rutkowski, Jr. | /s/ E. M. Rychel |
| J. A. Rutkowski, Jr., Director | E. M. Rychel, Director |
| /s/ M. D. Siegal | /s/ G. Stoliar |
| M. D. Siegal, Director | G. Stoliar, Director |
| /s/ D. C. Taylor | |
| D. C. Taylor, Director | |

Exhibit 31.1

**CERTIFICATION**

I, Lourenco Goncalves, certify that:

1.     I have reviewed this annual report on Form 10-K of Cleveland-Cliffs Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)), for the registrant and have:

   (a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected or is reasonably likely to materially affect the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:   February 20, 2020          By:     /s/ Lourenco Goncalves

Lourenco Goncalves
Chairman, President and Chief Executive Officer

Exhibit 31.2

**CERTIFICATION**

I, Keith A. Koci, certify that:

1. I have reviewed this annual report on Form 10-K of Cleveland-Cliffs Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)), for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected or is reasonably likely to materially affect the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:   February 20, 2020          By:    /s/ Keith A. Koci

                                          Keith A. Koci
                                          Executive Vice President, Chief Financial Officer

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Cleveland-Cliffs Inc. (the "Company") on Form 10-K for the period ended  December 31, 2019, as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), I, Lourenco Goncalves, Chairman, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1)     The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)     The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date:     February 20, 2020

By:  /s/ Lourenco Goncalves

Lourenco Goncalves
Chairman, President and Chief Executive Officer

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Cleveland-Cliffs Inc. (the "Company") on Form 10-K for the period ended  December 31, 2019, as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), I, Keith A. Koci, Executive Vice President, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1)     The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)     The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date:                          February 20, 2020

By:  /s/ Keith A. Koci
_____
Keith A. Koci
Executive Vice President, Chief Financial Officer

**Exhibit 95**

**Mine Safety Disclosures**

The operation of our mines located in the United States is subject to regulation by MSHA under the FMSH Act. MSHA inspects these mines on a regular basis and issues various citations and orders when it believes a violation has occurred under the FMSH Act. We present information below regarding certain mining safety and health citations that MSHA has issued with respect to our mining operations. In evaluating this information, consideration should be given to factors such as: (i) the number of citations and orders will vary depending on the size of the mine; (ii) the number of citations issued will vary from inspector to inspector and mine to mine, and (iii) citations and orders can be contested and appealed and, in that process, are often reduced in severity and amount, and are sometimes dismissed.

Under the Dodd-Frank Act, each operator of a coal or other mine is required to include certain mine safety results within its periodic reports filed with the SEC. As required by the reporting requirements included in §1503(a) of the Dodd-Frank Act, we present the following items regarding certain mining safety and health matters, for the period presented, for each of our mine locations that are covered under the scope of the Dodd-Frank Act:

(A)   The total number of violations of mandatory health or safety standards that could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard under section 104 of the FMSH Act (30 U.S.C. 814) for which the operator received a citation from MSHA;

(B)   The total number of orders issued under section 104(b) of the FMSH Act (30 U.S.C. 814(b));

(C)   The total number of citations and orders for unwarrantable failure of the mine operator to comply with mandatory health or safety standards under section 104(d) of the FMSH Act (30 U.S.C. 814(d));

(D)   The total number of imminent danger orders issued under section 107(a) of the FMSH Act (30 U.S.C. 817(a));

(E)   The total dollar value of proposed assessments from MSHA under the FMSH Act (30 U.S.C. 801 et seq.);

(F)   Legal actions pending before the Federal Mine Safety and Health Review Commission involving such coal or other mine as of the last day of the period;

(G)   Legal actions instituted before the Federal Mine Safety and Health Review Commission involving such coal or other mine during the period; and

(H)   Legal actions resolved before the Federal Mine Safety and Health Review Commission involving such coal or other mine during the period.

During the year ended December 31, 2019, our mine locations did not receive any flagrant violations under Section 110(b)(2) of the FMSH Act (30 U.S.C. 820(b)(2)) and did not receive any written notices of a pattern of violations, or the potential to have a pattern of such violations, under section 104(e) of the FMSH Act (30 U.S.C. 814(e)). In addition, there were no mining-related fatalities at any of our mine locations during this same period.

Following is a summary of the information described above for the year ended December 31, 2019:

| Mine Name/ MSHA ID No. | Operation | (A) Section 104 S&S Citations | (B) Section 104(b) Orders | (C) Section 104(d) Orders | (D) Section 107(a) Citations & Orders | (E) Total Dollar Value of MSHA Proposed Assessments (1) | (F) Legal Actions Pending as of Last Day of Period | (G) Legal Actions Instituted During Period | (H) Legal Actions Resolved During Period |
|---|---|---|---|---|---|---|---|---|---|
| Tilden / 2000422 | Iron Ore | 36 | — | — | — | $ 726,148 | 8 (2) | 7 | 10 |
| Empire / 2001012 | Iron Ore | — | — | — | — | $ — | — | — | — |
| Northshore Plant / 2100831 | Iron Ore | 9 | — | — | — | $ 122,498 | 13 (3) | 8 | 10 |
| Northshore Mine / 2100209 | Iron Ore | 4 | — | — | 1 | $ 29,976 | 5 (4) | 5 | 5 |
| Hibbing / 2101600 (7) | Iron Ore | 9 | — | — | — | $ 49,276 | 7 (5) | 5 | 6 |
| United Taconite Plant / 2103404 | Iron Ore | 22 | — | — | — | $ 240,848 | 3 (6) | 3 | 2 |
| United Taconite Mine / 2103403 | Iron Ore | 4 | — | — | — | $ 5,111 | — | — | — |

(1)  Amounts included under the heading "Total Dollar Value of MSHA Proposed Assessments" are the total dollar amounts for proposed assessments received from MSHA on or before December 31, 2019.

(2)  This number consists of 8 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules.

(3)  This number consists of 13 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules.

(4)  This number consists of 3 pending legal actions related to contests of citations and orders referenced in Subpart B of FMSH Act's procedural rules and 2 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules.

(5)  This number consists of 7 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules.

(6)  This number consists of 3 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules.

(7)  On August 12, 2019, Cliffs Mining Company, our subsidiary, ceased performing manager duties at Hibbing (including operating the mine) and transitioned those duties to ArcelorMittal USA. As a result, data for Hibbing / 2101600 is for the period January 1, 2019 through August 11, 2019.

# EXHIBIT 97

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

☒    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934

For the fiscal year ended  December 31, 2020

OR

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission File Number: 1-8944

**CLIFFS**

## CLEVELAND-CLIFFS INC.
*(Exact name of registrant as specified in its charter)*

| Ohio | 34-1464672 |
|---|---|
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(I.R.S. Employer Identification No.)* |
| 200 Public Square,  Cleveland,  Ohio | 44114-2315 |
| *(Address of Principal Executive Offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code: (216) 694-5700**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Shares, par value $0.125 per share | CLF | New York Stock Exchange |

**Securities registered pursuant to section 12(g) of the Act: NONE**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☒    NO ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).    Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).    Yes ☐    No ☒

As of June 30, 2020, the aggregate market value of the voting and non-voting common shares held by non-affiliates of the registrant, based on the closing price of $5.52 per share as reported on the New York Stock Exchange — Composite Index, was $2,171,029,299 (excluded from this figure are the voting shares beneficially owned by the registrant's officers and directors).

The number of shares outstanding of the registrant's common shares, par value $0.125 per share, was498,885,558 as of February 24, 2021.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's proxy statement for its 2021 annual meeting of shareholders are incorporated by reference into Part III.

**TABLE OF CONTENTS**

|  |  | **Page Number** |
|---|---|---|
| **DEFINITIONS** |  | 1 |
| **PART I** |  |  |
| Item 1. | Business | 4 |
|  | Information About Our Executive Officers | 19 |
| Item 1A. | Risk Factors | 20 |
| Item 1B. | Unresolved Staff Comments | 34 |
| Item 2. | Properties | 35 |
| Item 3. | Legal Proceedings | 42 |
| Item 4. | Mine Safety Disclosures | 43 |
| **PART II** |  |  |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 44 |
| Item 6. | Selected Financial Data | 45 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 45 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 68 |
| Item 8. | Financial Statements and Supplementary Data | 69 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 142 |
| Item 9A. | Controls and Procedures | 142 |
| Item 9B. | Other Information | 145 |
| **PART III** |  |  |
| Item 10. | Directors, Executive Officers and Corporate Governance | 146 |
| Item 11. | Executive Compensation | 146 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 146 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 146 |
| Item 14. | Principal Accountant Fees and Services | 146 |
| **PART IV** |  |  |
| Item 15. | Exhibits and Financial Statement Schedules | 147 |
| Item 16. | Form 10-K Summary | 153 |
| **SIGNATURES** |  | 154 |

## DEFINITIONS

The following abbreviations or acronyms are used in the text. References in this report to the "Company," "we," "us," "our" and "Cliffs" are to Cleveland-Cliffs Inc. and subsidiaries, collectively. References to "$" is to United States currency.

| Abbreviation or acronym | Term |
|---|---|
| 2012 Amended Equity Plan | Cliffs Natural Resources Inc. 2012 Incentive Equity Plan, as amended or amended and restated from time to time |
| A&R 2015 Equity Plan | Cliffs Natural Resources Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan |
| ABL Amendment | Second Amendment to Asset-Based Revolving Credit Agreement, dated as of December 9, 2020, among Cleveland-Cliffs Inc., the lenders party thereto from time to time and Bank of America, N.A., as administrative agent |
| ABL Facility | Asset-Based Revolving Credit Agreement, dated as of March 13, 2020, among Cleveland-Cliffs Inc., the lenders party thereto from time to time and Bank of America, N.A., as administrative agent, as amended as of March 27, 2020, and December 9, 2020, and as may be further amended from time to time |
| Acquisitions | The AK Steel Merger and AM USA Transaction, together |
| Adjusted EBITDA | EBITDA, excluding certain items such as EBITDA of noncontrolling interests, extinguishment of debt, severance, acquisition-related costs, amortization of inventory step-up, impacts of discontinued operations and intersegment corporate allocations of selling, general and administrative costs |
| AG | Autogenous grinding |
| AHSS | Advanced high-strength steel |
| AK Coal | AK Coal Resources, Inc., an indirect, wholly owned subsidiary of AK Steel, and related coal mining assets |
| AK Steel | AK Steel Holding Corporation (n/k/a Cleveland-Cliffs Steel Holding Corporation) and its consolidated subsidiaries, including AK Steel Corporation (n/k/a Cleveland-Cliffs Steel Corporation), its direct, wholly owned subsidiary, collectively, unless stated otherwise or the context indicates otherwise |
| AK Steel Merger | The merger of Merger Sub with and into AK Steel, with AK Steel surviving the merger as a wholly owned subsidiary of Cleveland-Cliffs Inc., subject to the terms and conditions set forth in the Merger Agreement, consummated on March 13, 2020 |
| AK Steel Merger Agreement | Agreement and Plan of Merger, dated as of December 2, 2019, among Cleveland-Cliffs Inc., AK Steel and Merger Sub |
| AM USA Transaction | The acquisition of ArcelorMittal USA, consummated on December 9, 2020, and the entry into the ABL Amendment, together |
| AM USA Transaction Agreement | Transaction Agreement, dated as of September 28, 2020, by and between Cleveland-Cliffs Inc. and ArcelorMittal S.A. |
| AMT | Alternative minimum tax |
| AOCI | Accumulated other comprehensive income (loss) |
| APBO | Accumulated postretirement benefit obligation |
| ArcelorMittal | ArcelorMittal S.A., a company organized under the laws of Luxembourg and the former ultimate parent company of ArcelorMittal USA |
| ArcelorMittal USA | Substantially all of the operations of the former ArcelorMittal USA LLC, its subsidiaries and certain affiliates, and Kote and Tek, collectively |
| ASC | Accounting Standards Codification |
| ASTM | American Society for Testing and Materials |
| ASU | Accounting Standards Update |
| BART | Best available retrofit technology |
| BNSF | Burlington Northern Santa Fe, LLC |
| Board | The Board of Directors of Cleveland-Cliffs Inc. |
| CARES Act | Coronavirus Aid, Relief, and Economic Security Act |
| CECL | Current expected credit losses |
| CERCLA | Comprehensive Environmental Response, Compensation and Liability Act of 1980 |
| CFR | Cost and freight |
| Clean Water Act | Federal Water Pollution Control Act |
| CN | Canadian National Railway Company |
| Compensation Committee | Compensation and Organization Committee of the Board |
| COVID-19 | A novel strain of coronavirus that the World Health Organization declared a global pandemic in March 2020 |
| Directors' Plan | Cliffs Natural Resources Inc. Amended and Restated 2014 Nonemployee Directors' Compensation Plan |
| Dodd-Frank Act | Dodd-Frank Wall Street Reform and Consumer Protection Act |
| DOE | U.S. Department of Energy |
| DR-grade | Direct reduction-grade |
| EAF | Electric arc furnace |
| EBITDA | Earnings before interest, taxes, depreciation and amortization |
| EDC Revolving Facility | Credit Facility Agreement, dated November 9, 2020, among Export Development Canada and Cleveland-Cliffs Inc.'s indirect, wholly owned subsidiaries, Fleetwood Metal Industries Inc. and The Electromac Group Inc. |
| EGLE | Michigan Department of Environment, Great Lakes and Energy |

1

A006077

| Abbreviation or acronym | Term |
|---|---|
| Empire | Iron ore mining property owned by Empire Iron Mining Partnership, an indirect, wholly owned subsidiary of Cliffs |
| EPA | U.S. Environmental Protection Agency |
| EPS | Earnings per share |
| ERISA | Employee Retirement Income Security Act of 1974, as amended |
| Exchange Act | Securities Exchange Act of 1934, as amended |
| FASB | Financial Accounting Standards Board |
| Fe | Iron |
| FeT | Total iron |
| FILO | First-in, last-out |
| FIP | Federal implementation plan |
| FMSH Act | Federal Mine Safety and Health Act of 1977, as amended |
| Former ABL Facility | Amended and Restated Syndicated Facility Agreement, dated as of March 30, 2015, among Cleveland-Cliffs Inc., the subsidiary borrowers party thereto, the lenders party thereto and Bank of America, N.A., as administrative agent, as amended and restated as of February 28, 2018, and as further amended, which was terminated on March 13, 2020 in connection with entering into the ABL Facility |
| GAAP | Accounting principles generally accepted in the United States |
| GHG | Greenhouse gas |
| GOES | Grain oriented electrical steel |
| H/EV | Hybrid/electric vehicle |
| HBI | Hot briquetted iron |
| Hibbing | Iron ore mining property owned by Hibbing Taconite Company, an unincorporated joint venture between subsidiaries of Cliffs and U.S. Steel |
| HRC | Hot-rolled coil steel |
| IRB | Industrial Revenue Bond |
| IRC | U.S. Internal Revenue Code of 1986, as amended |
| IT | Information technology |
| Kote and Tek | I/N Kote L.P. (n/k/a Cleveland-Cliffs Kote L.P.) and I/N Tek L.P. (n/k/a Cleveland-Cliffs Tek L.P.), former joint ventures between subsidiaries of the former ArcelorMittal USA LLC and Nippon Steel Corporation |
| LIBOR | London Interbank Offered Rate |
| LIFO | Last-in, first-out |
| Long ton | 2,240 pounds |
| LS&I | Lake Superior & Ishpeming Railroad Company |
| Merger Sub | Pepper Merger Sub Inc., a direct, wholly owned subsidiary of Cliffs prior to the AK Steel Merger |
| Metric ton | 2,205 pounds |
| Minorca | Iron ore mining property owned by Cleveland-Cliffs Minorca Mine Inc. (f/k/a ArcelorMittal Minorca Mine Inc.), an indirect, wholly owned subsidiary of Cliffs acquired in connection with the AM USA Transaction |
| MMBtu | Million British Thermal Units |
| MPCA | Minnesota Pollution Control Agency |
| MSHA | U.S. Mine Safety and Health Administration |
| Net ton | 2,000 pounds |
| NOL | Net operating loss |
| NOVs | Notices of violations |
| NO$_x$ | Nitrogen oxide |
| NOES | Non-oriented electrical steel |
| Northshore | Iron ore mining property owned by Northshore Mining Company, a direct, wholly owned subsidiary of Cliffs |
| NPDES | National Pollutant Discharge Elimination System, authorized by the Clean Water Act |
| NYSE | New York Stock Exchange |
| OPEB | Other postretirement benefits |
| OSHA | Occupational Safety and Health Administration |
| PBO | Projected benefit obligation |
| PHS | Press-hardened steel |
| Platts 62% price | Platts IODEX 62% Fe Fines CFR North China |
| PPI | Producer Price Indices |
| Precision Partners | PPHC Holdings, LLC, an indirect, wholly owned subsidiary of AK Steel, and its subsidiaries, collectively, unless stated otherwise or the context indicates otherwise |
| RCRA | Resource Conservation and Recovery Act |
| RI/FS | Remedial Investigation/Feasibility Study |

2

| Abbreviation or acronym | Term |
|---|---|
| ROM | Run-of-mine coal |
| S&P | Standard & Poor's |
| SEC | U.S. Securities and Exchange Commission |
| Section 232 | Section 232 of the Trade Expansion Act of 1962 |
| Securities Act | Securities Act of 1933, as amended |
| SIP | State Implementation Plan |
| STRIPS | Separate Trading of Registered Interest and Principal of Securities |
| SunCoke Middletown | Middletown Coke Company, LLC, a subsidiary of SunCoke Energy, Inc. |
| Tilden | Iron ore mining property owned by Tilden Mining Company L.C., an indirect, wholly owned subsidiary of Cliffs |
| TMDL | Total maximum daily load |
| Topic 805 | ASC Topic 805, Business Combinations |
| Topic 815 | ASC Topic 815, Derivatives and Hedging |
| TSR | Total shareholder return |
| Tubular Components | Cleveland-Cliffs Tubular Components LLC (f/k/a AK Tube LLC), an indirect, wholly owned subsidiary of AK Steel |
| United Taconite | Iron ore mining property owned by United Taconite LLC, an indirect, wholly owned subsidiary of Cliffs |
| U.S. | United States of America |
| U.S. Steel | U.S. Steel Corporation and its subsidiaries, collectively, unless stated otherwise or the context indicates otherwise |
| USMCA | United States-Mexico-Canada Agreement |
| USW | United Steelworkers |
| VEBA | Voluntary employee benefit association trusts |
| VIE | Variable interest entity |

3

PART I

Item 1.          *Business*

**Introduction**

Cliffs is the largest flat-rolled steel producer in North America. Founded in 1847 as a mine operator, we are also the largest supplier of iron ore pellets in North America. In 2020, we acquired two major steelmakers, AK Steel and ArcelorMittal USA, vertically integrating our legacy iron ore business with quality-focused steel production and emphasis on the automotive end market. Our fully integrated portfolio includes custom-made pellets and HBI; flat-rolled carbon steel, stainless, electrical, plate, tinplate and long steel products; as well as carbon and stainless steel tubing, hot and cold stamping and tooling. Headquartered in Cleveland, Ohio, we employ approximately 25,000 people across our mining, steel and downstream manufacturing operations in the United States and Canada.

On March 13, 2020, we completed the acquisition of AK Steel, a leading producer of flat-rolled carbon, stainless and electrical steel products. These operations consist primarily of seven steelmaking and finishing plants, two cokemaking operations, three tube manufacturing plants and ten tooling and stamping operations. The Tubular Components and Precision Partners businesses provide customer solutions with carbon and stainless steel tubing products, die design and tooling, and hot- and cold-stamped components.

On December 9, 2020, we completed the acquisition of ArcelorMittal USA. These operations include six steelmaking facilities, eight finishing facilities, two iron ore mining and pelletizing operations, one coal mining complex and three cokemaking operations. These assets build upon our existing high-end steelmaking and raw material capabilities, and also open up new markets to us. The combination provides us additional scale and technical capabilities necessary in a competitive and increasingly quality-focused marketplace.

**Competitive Strengths**

As the largest flat-rolled steel producer in North America, we benefit from having the size and scale necessary in a competitive, capital intensive business. Our sizeable operating footprint provides us with the operational leverage, flexibility and cost performance to achieve competitive margins throughout the business cycle. We also have a unique vertically integrated profile, which begins at the mining stage and goes all the way through the manufacturing of steel products, including stamping, tooling and tubing. This positioning gives us both lower and more predictable costs throughout the supply chain and more control over both our manufacturing inputs and our end product destination.

Our legacy business of producing iron ore pellets, our primary steelmaking raw material input, is another competitive advantage. Mini-mills (producers using EAFs) comprise about 70% of steel production in the U.S. Their primary iron input is scrap metal, which has unpredictable and often volatile pricing. By controlling our iron ore pellet supply, our primary steelmaking raw material feedstock can be secured at a stable and predictable cost, and not subject to factors outside of our control.

We are also the largest supplier of automotive-grade steel in the U.S. Compared to other steel end markets, automotive steel is generally higher quality and more operationally and technologically intensive to produce. As such, it often generates higher through-the-cycle margins, making it a desirable end market for the steel industry. With our continued technological innovation, as well as leading delivery performance, we expect to remain the leader in supplying this industry.

We offer the most comprehensive flat-rolled steel product selection in the industry, along with several complementary products and services. A sampling of this offering includes AHSS, hot-dipped galvanized, aluminized, galvalume, electrogalvanized, galvanneal, HRC, cold-rolled coil, plate, tinplate, GOES, NOES, stainless steels, tool & die, stamped components, rail and slabs. Across the quality spectrum and the supply chain, our customers can frequently find the solutions they need from our product selection.

We are the first and the only supplier of HBI in the Great Lakes region. Construction of our Toledo, Ohio, direct reduction plant was completed in the fourth quarter of 2020. From this modern plant, we offer a high-quality scrap and pig iron alternative to the several EAFs in the region. Previously, ore-based metallics that compete with our HBI had to be imported from locations like Russia, Ukraine and Brazil. With growing EAF capacity in the U.S. and

4

increasing tightness in the scrap market, we expect our Toledo direct reduction plant to generate healthy margins for us going forward.

**Strategy**

### *Optimizing Our Fully-Integrated Steelmaking Footprint*

We have transformed into a fully-integrated steel enterprise with the size and scale to achieve improved through-the-cycle margins and are the largest flat-rolled steel producer in North America.

Now that the AM USA Transaction is completed, our focus is on the integration of these facilities within our footprint. These assets build upon our existing high-end steelmaking and raw material capabilities, and also open up new markets to us. The combination provides us the additional scale and technical capabilities necessary in a competitive and increasingly quality-focused marketplace. We have ample opportunities to implement improvements in logistics, procurement, utilization and quality.

We expect the AM USA Transaction to improve our production capabilities, flexibility, and cost performance. We have identified approximately $150 million of potential cost synergies through asset optimization, economies of scale, and duplicative overhead savings. The AM USA Transaction also enhances optionality for future production of merchant pig iron to complement our HBI offering in the metallics space.

### *Maximizing Our Commercial Strengths*

With the Acquisitions completed, we now have enhanced our offering to a full suite of flat steel products encompassing all steps of the steel manufacturing process. We have increased our industry-leading market share in the automotive sector, where our portfolio of high-end products will deliver a broad range of differentiated solutions for this highly sought after customer base.

We believe we have the broadest flat steel product offering in North America, and can meet customer needs from a variety of end markets and quality specifications. We have several finishing and downstream facilities with advanced technological capabilities. We also pride ourselves on our excellent delivery performance, which provides us opportunities to augment our relationships with current customers given our reputation as a reliable supplier.

We are also proponents of the "value over volume" approach in terms of steel supply. We take our leadership role in the industry very seriously and intend to manage our steel output in a responsible manner.

### *Expanding to New Markets*

Our Toledo direct reduction plant allows us to offer another unique, high-quality product to discerning raw material buyers. EAF steelmakers primarily use scrap for their iron feedstock, and our HBI offers a sophisticated alternative with less impurities, allowing other steelmakers to increase the quality of their respective end-steel products and reduce reliance on imported metallics.

The completed Acquisitions provide other potential outlets for HBI, as it can also be used in our integrated steel operations to increase productivity and help to reduce carbon footprint, allowing for more cost efficient and environmentally friendly steelmaking.

We are also seeking to expand our customer base with the rapidly growing and desirable electric vehicle market. At this time, we believe the North American automotive industry is approaching a monumental inflection point, with the adoption of electrical motors in passenger vehicles. As this market grows, it will require more advanced steel applications to meet the needs of electric vehicle producers and consumers. With our unique technical capabilities, we believe we are positioned better than any other North American steelmaker to supply the steel and parts necessary to fill these needs.

### *Improving Financial Flexibility*

Given the cyclicality of our business, it is important to us to be in the financial position to easily withstand any negative demand or pricing pressure we may encounter. As such, our top priority for the allocation of our free cash flow is to improve our balance sheet via the reduction of long-term debt. During the COVID-19 pandemic, we were able to issue secured debt to provide insurance capital through the uncertain industry conditions that the pandemic caused. Now that business conditions have improved and we expect to generate healthy free cash flow during 2021, we have the ability to lower our long-term debt balance.

5

Table of Contents

Our stated initial target will be to reduce total debt to less than three times our annual Adjusted EBITDA. We will continue to review the composition of our debt, as we are interested in both extending our maturity profile and increasing our ratio of unsecured debt to secured debt, which we demonstrated by executing a series of favorable debt and equity capital markets transactions during February 2021, as described under *Part II – Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.* These actions will better prepare us to navigate more easily through potentially volatile industry conditions in the future.

### *Enhance our Environmental Sustainability*

As the Company transforms, our commitment to operating our business in a more environmentally responsible manner remains constant. One of the most important issues impacting our industry, our stakeholders and our planet is climate change. As a result, we are continuing Cliffs' proactive approach by announcing our plan to reduce GHG emissions 25% from 2017 levels by 2030. This goal represents combined Scope 1 (direct) and Scope 2 (indirect) GHG emission reductions across all of our operations.

Prior to setting this goal with our newly acquired steel assets, we exceeded our previous 26% GHG reduction target at our legacy facilities six years ahead of our 2025 goal. In 2019, we reduced our combined Scope 1 and Scope 2 GHG emissions by 42% on a mass basis from 2005 baseline levels. Our goal is to further reduce those emissions in coming years.

Additionally, many of our steel assets have improved plant and energy efficiency through participation in programs like the U.S. Department of Energy's Better Plants program and the EPA's Energy Star program. With our longstanding focus on plant and energy efficiency, we aim to build on our previous successes across our newly integrated enterprise.

Our GHG reduction commitment is based on executing the following five strategic priorities:

- Developing domestically sourced, high quality iron ore feedstock and utilizing natural gas in the production of HBI;

- Implementing energy efficiency and clean energy projects;

- Investing in the development of carbon capture technology;

- Enhancing our GHG emissions transparency and sustainability focus; and

- Supporting public policies that facilitate GHG reduction in the domestic steel industry.

## Business Operations

We are vertically integrated from the mining of iron ore and coal; to production of metallics and coke; through iron making, steelmaking, rolling and finishing; and to downstream tubular components, stamping and tooling. We have the unique advantage as a steel producer of being fully or partially self-sufficient with our production of raw materials for steel manufacturing, which includes iron ore pellets, HBI and coking coal. As we expand our presence, we believe such vertical integration represents a sustainable business model that is in the best interest of all stakeholders and the surest way to secure a long-term competitive advantage.

We strive to operate responsibly and produce more environmentally friendly iron ore pellets that enable production of clean steel, which is also the most recycled material on the planet. Additionally, our investment in the direct reduction plant in Toledo, Ohio, also helps to support environmental stewardship, as the production of HBI is more environmentally friendly than its substitute, foreign pig iron. From a focus on key environmental processes, such as steel recycling and water reuse, to corporate and social responsibility, sustainability is central to our values and operations.

We have updated our segment structure to coincide with our new business model and are organized into four operating segments based on differentiated products, Steelmaking, Tubular, Tooling and Stamping, and European Operations. Through the third quarter ended September 30, 2020, we had operated through two reportable segments – the Steel and Manufacturing segment and the Mining and Pelletizing segment. However, given the recent transformation of the business, beginning with our financial statements as of and for the year ended December 31, 2020, we primarily operate through one reportable segment – the Steelmaking segment.

Table of Contents

The following table lists our main properties, their location and their products and services:

| Property | Segment | State/ Province | Products and Services |
|---|---|---|---|
| Hibbing (85.3% ownership) | Steelmaking | Minnesota | Iron ore pellets |
| Minorca | Steelmaking | Minnesota | Iron ore pellets |
| Northshore | Steelmaking | Minnesota | Iron ore pellets |
| Tilden | Steelmaking | Michigan | Iron ore pellets |
| United Taconite | Steelmaking | Minnesota | Iron ore pellets |
| Empire (indefinitely idled) | Steelmaking | Michigan | Iron ore pellets |
| Toledo | Steelmaking | Ohio | HBI |
| Princeton | Steelmaking | West Virginia | Coal |
| Mountain State Carbon | Steelmaking | West Virginia | Coke |
| Monessen | Steelmaking | Pennsylvania | Coke |
| Warren | Steelmaking | Ohio | Coke |
| Ashland Works (idled) | Steelmaking | Kentucky | Potential pig iron plant |
| Burns Harbor | Steelmaking | Indiana | Hot-rolled, cold-rolled, and hot-dipped galvanized sheet and coke |
| Burns Harbor Plate and Gary Plate | Steelmaking | Indiana | Carbon steel plate, high-strength low alloy steel plate, ASTM grades steel plate |
| Butler Works | Steelmaking | Pennsylvania | Flat-rolled electrical and stainless steel, stainless and carbon semi-finished slabs |
| Cleveland | Steelmaking | Ohio | Hot-rolled and hot-dipped galvanized sheet |
| Coatesville | Steelmaking | Pennsylvania | Steel plate - carbon, high-strength low-alloy, commercial allow, military alloy, flame-cut |
| Columbus | Steelmaking | Ohio | Hot-dipped galvanized steel |
| Conshohocken | Steelmaking | Pennsylvania | Coiled and discrete plate, military alloy, commercial alloy, heat-treated carbon |
| Coshocton Works | Steelmaking | Ohio | Flat-rolled stainless steel |
| Dearborn Works | Steelmaking | Michigan | Carbon semi-finished slabs, hot-dipped galvanized, AHSS |
| Indiana Harbor | Steelmaking | Indiana | Hot-rolled, cold-rolled and hot-dipped galvanized sheet |
| Kote and Tek | Steelmaking | Indiana | Cold-rolled, hot-dipped galvanized and galvannealed, electrogalvanized coil |
| Mansfield Works | Steelmaking | Ohio | Semi-finished hot bands, high chrome ferritic and martensitic stainless steels |
| Middletown Works | Steelmaking | Ohio | Hot-rolled, cold-rolled, hot-dipped galvanized, aluminized sheet and coke |
| Piedmont | Steelmaking | North Carolina | Plasma-cuts plate steel products into blanks |
| Riverdale | Steelmaking | Illinois | Hot-rolled sheet |
| Rockport Works | Steelmaking | Indiana | Cold-rolled carbon, coated and stainless steels |
| Steelton | Steelmaking | Pennsylvania | Railroad rails, specialty blooms, flat bars |
| Weirton | Steelmaking | West Virginia | Tinplate, cold-rolled sheet |
| Zanesville Works | Steelmaking | Ohio | Electrical steels |
| Tubular Components | Other Businesses | Indiana and Ohio | AHSS tube, electric resistant welded tubing |
| Precision Partners | Other Businesses | Ontario, Alabama and Kentucky | Cold and hot stamp assembly solutions |

7

Table of Contents

**Customers and Markets**

We primarily sell our products to customers in four broad market categories: automotive; infrastructure and manufacturing, which includes electrical power; distributors and converters; and steel producers, which consume iron ore and metallics. The following table presents the percentage of our net sales to each of these markets during the year:

| Market | 2020 |
|---|---|
| Automotive | 45 % |
| Infrastructure and manufacturing | 15 % |
| Distributors and converters | 13 % |
| Steel producers | 27 % |

Certain of our flat-rolled steel shipments are sold under fixed base price contracts. These contracts are typically one year in duration and expire at various times throughout the year. Some of these contracts have a surcharge mechanism that passes through certain changes in input costs. A certain portion of our flat-rolled steel shipments are sold based on the spot market at prevailing market prices or under contracts that involve variable pricing that is tied to an independently published steel index.

We sell our steel products principally to customers in North America. For the vast majority of international sales, we are not the importer of record and do not bear the responsibility for paying any applicable tariffs.

*Automotive Market*

The automotive industry is our largest market, and we aim to address the principal needs of major automotive manufacturers and their suppliers. We specialize in manufacturing difficult-to-produce, high-quality steel products, combined with demanding delivery performance, customer technical support and collaborative relationships, to develop breakthrough steel solutions that help our customers meet their product requirements. In addition, many of our competitors do not have the capability to supply the full portfolio of products that we make for our automotive customers, such as steel for exposed automotive applications, the most sophisticated grades of AHSS and value-added stainless steel products. The exacting requirements for servicing the automotive market generally allows for higher selling prices for products sold to that market than for the commodity types of carbon and stainless steels sold to other markets.

In light of the automotive market's importance to us, North American light vehicle production has a significant impact on our total sales and shipments. North American light vehicle production for 2020 declined 20% to approximately 13 million units from the prior year due to impacts of the COVID-19 pandemic, which forced businesses to begin to shut down at the end of March 2020 until they slowly re-started near the end of the second quarter. During the third quarter of 2020, auto makers saw the pent-up demand bring sales back to more normal levels as buyers and dealers adapted to new procedures and virtual shopping. Fourth quarter 2020 sales were more in line with expected sales for the time of year, but did not quite return to pre-COVID-19 levels. Currently, we are expecting North American light vehicle production in 2021 to significantly increase and return to near 2019 levels, which to an extent depends on continued demand, the level of fiscal stimulus provided under the new Biden Administration, timing of COVID-19 vaccination distribution and how quickly the economy recovers.

Furthermore, during 2020, consumer demand for sport utility vehicles, trucks, crossovers and larger vehicles continued to increase while demand for smaller sedans and compact cars declined. We benefit from intentionally targeting larger vehicle platforms to take advantage of consumer preferences, and we have focused on and have been successful in getting sourced on numerous sport utility vehicles, truck, crossover and larger vehicle platforms. As a result, a significant portion of the carbon automotive steel that we sell is used to produce these popular larger vehicles. In addition to benefiting from our exposure to consumers' strong demand for larger vehicles, these vehicles also typically contain a higher volume of steel than smaller sedans and compact cars, providing us the opportunity to sell a greater proportion of our steel products to our automotive customers.

Automotive manufacturers are under pressure to achieve heightened federally mandated fuel economy standards (the Corporate Average Fuel Economy, or "CAFE," standards). The CAFE standards generally require automobile manufacturers to meet an average fuel economy goal across the fleet of vehicles they produce with certain milestone dates. As a result, our automotive customers continue to explore various avenues for achieving the standards, including light weighting components and developing more fuel-efficient engines. Light weighting efforts include the use of alternatives to traditional carbon steels, such as AHSS and other materials. While this could reduce the aggregate volume of steel consumed by the automotive industry, we expect that demand will increase for current

8

and next-generation AHSS and that our AHSS and other innovative steels will command higher margins. We are collaborating with our automotive customers and their suppliers to develop innovative solutions using our developments in light weighting, efficiency, and material strength and formability across our extensive product portfolio, in combination with our automotive stamping and tube-making capabilities. We are also working with our customers to develop steels with greater heat resistance for exhaust systems that support new, fuel-efficient engines that run at higher temperatures.

Automotive manufacturers have also been increasing their development of H/EVs and battery electric vehicles in order to meet the CAFE standards and growing customer adoption of H/EVs. Many motors used in H/EVs being sold in the U.S. today are imported from foreign suppliers, but more local sourcing and manufacturing of motors is expected to occur in the future. As the only North American producer of high-efficiency NOES, which is a critical component of H/EV motors, we are positioned to potentially benefit from the growth of H/EVs going forward. We believe our strong foundation in electrical steels and long-standing relationships with automotive manufacturers and their suppliers will provide us with an advantage in this market as it continues to grow and mature. Likewise, the growing customer adoption of H/EVs may also increase demand for improvements in the electric grid to support higher demand for more extensive battery charging, which our GOES could support.

*Infrastructure and Manufacturing Market*

We sell a variety of our steel products, including plate, carbon, stainless, electrical, tinplate and rail, to the infrastructure and manufacturing market. This market includes sales to manufacturers of heating, ventilation and air conditioning equipment, appliances, power transmission and distribution transformers, storage tanks, ships and railcars, wind towers, machinery parts, heavy equipment, military armor, food preservation, and railway lines. Domestic construction activity and the replacement of aging infrastructure directly affects sales of steel to this market. During 2020, there were nearly 1.4 million new housing starts in the U.S., an increase of approximately 6% from 2019, and home sales reached nearly 6 million, the highest annual mark since 2006, with the supply of existing homes having reached all-time lows. The recent strength in home sales has been due to lower mortgage rates and remote work flexibility and is expected to continue through 2021.

*Distributors and Converters Market*

Virtually all of the grades of steel we produce are sold to the steel distributors and converters market. This market generally represents downstream steel service centers, who source various types of steel from us and fabricate it according to their customers' needs. Our steel is typically sold to this market on a spot basis or under short-term contracts linked to steel pricing indices. Demand and pricing for this market can be highly dependent on a variety of factors outside our control, including global and domestic commodity steel production capacity, the relative health of countries' economies and whether they are consuming or exporting excess steel capacity, the provisions of international trade agreements and fluctuations in international currencies and, therefore, are subject to market changes in steel prices.

The price for domestic HRC, which is an important attribute in the profitability of this end market, averaged $588 per net ton for the year ended December 31, 2020, 2% lower than the prior year. The price of HRC was negatively impacted by lower demand related to the COVID-19 pandemic, and hit a low point of $438 per net ton on April 30, 2020. However, as the industry recovered and supply-demand dynamics improved, the price rebounded dramatically, rising to a peak of $1,030 per net ton by December 31, 2020 and reaching all time-highs early in 2021. The improved pricing environment should bolster profitability for this end market during 2021.

*Steel Producers Market*

The steel producers market represents third-party sales to other steel producers, including those who operate blast furnaces and EAFs. It includes sales of raw materials and semi-finished and finished goods, including iron ore pellets, coal, coke, HBI and steel products.

The merchant portion of our iron ore pellet production is sold pursuant to long-term supply agreements and through spot contracts. Certain of our supply agreements contain a base price that is adjusted periodically as specified by the contracts, using one or more adjustment factors. Factors that could result in price adjustments under our contracts include changes in the Platts 62% price, published Platts international indexed freight rates and changes in specified PPI, including those for industrial commodities, fuel and steel.

As a result of the Acquisitions, production from our iron ore mines is now predominantly consumed by our newly acquired steelmaking operations. On a full-year basis, we would expect between 22 million and 24 million long tons of our iron ore pellets to be consumed by our steelmaking operations. During 2020, 2019 and 2018, we sold 12

9

million, 19 million and 21 million long tons of iron ore product, respectively, to third parties from our share of production from our iron ore mines.

We produce various grades of iron ore pellets, including standard, fluxed and DR-grade, for use as part of the steelmaking process. The variation in grade of iron ore pellets results from the specific chemical and metallurgical properties of the ores at each mine, the requirements of end users' steelmaking processes and whether or not fluxstone is added in the process. Although the grade or grades of pellets currently delivered to each customer are based on that customer's preferences, which depend in part on the characteristics of the customer's steelmaking operation, in certain cases our iron ore pellets can be used interchangeably. Standard pellets require less processing, are generally the least costly pellets to produce and are called "standard" because no ground fluxstone, such as limestone or dolomite, is added to the iron ore concentrate before turning the concentrate into pellets. In the case of fluxed pellets, fluxstone is added to the concentrate, which produces pellets that can perform at higher productivity levels in the customer's specific blast furnace and will minimize the amount of fluxstone the customer may be required to add to the blast furnace. DR-grade pellets require additional processing to make a pellet that contains higher iron and lower silica content than a standard pellet. Unlike standard or fluxed pellets, DR-grade pellets are produced to be fed into a direct reduction facility.

Beginning in 2021, we expect to also sell HBI to third-party customers, primarily EAFs with operations in the Great Lakes region. We expect our Toledo direct reduction plant to begin shipping saleable product to third-party customers during the first quarter of 2021. The Toledo direct reduction plant has a nameplate production capacity of 1.9 million metric tons, and we expect to reach its productive capacity by the second quarter of 2021.

## Applied Technology, Research and Development

We have an extensive history of being an innovator dating back more than a century. From upstream research and development, to downstream applications, we have dedicated technical and engineering resources that begin with improving customers' production and manufacturing performance to applications for their end product use.

We have been a leader in iron ore mining and processing technology through the application of new technology to the centuries-old business of mineral extraction. We have also been a pioneer in iron ore pelletizing with over 60 years of experience. We are able to produce customized, environmentally friendly pellets to meet blast furnace specifications and produce standard, fluxed and DR-grade pellets.

We now have a world-class research and development team expanding our capabilities to bring new steel products to the marketplace. Rapidly evolving and highly competitive markets for our steel products require our customers to seek new, comprehensive steel solutions, and we believe we are well positioned to deliver the most robust solutions through our broad portfolio of offerings. Collaboration across our research groups and operations generates innovative and comprehensive solutions for our customers, which we believe enhances our competitive advantage.

Creating innovative products and breakthrough solutions is a strategic priority, as we believe differentiation through producing higher value steels to meet challenging requirements enables us to maintain and enhance our margins. We conduct a broad range of research and development activities aimed at improving existing products and processes and developing new ones. Our innovation of steel has produced a highly diversified steel product portfolio. As part of our underlying strategy to focus on higher-value materials and minimize exposure to commodity products, we have invested in research and innovation totaling $15 million in 2020. Our ongoing efforts at our state-of-the-art Research and Innovation Center in Middletown, Ohio, to enhance technical collaboration have increased the introduction of new steel solutions to the marketplace.

### HBI

We are a pioneer in the development of emerging reduction technologies, a leader in the extraction of value from challenging resources and a front-runner in the implementation of safe and sustainable technology. We are also devoted to promoting environmental sustainability, evidenced with the development of our direct reduction plant in Toledo, Ohio. We expect our introduction of HBI to the Great Lakes EAF market will be notable in the evolution of the steel industry.

We completed construction of our Toledo direct reduction plant and began production in the fourth quarter of 2020. Our Toledo direct reduction plant is expected to produce 1.9 million metric tons of HBI per year, replacing a portion of the over 3 million metric tons of ore-based metallics that are imported into the Great Lakes region every year from Russia, Ukraine, Brazil and Venezuela, as well as approximately 20 million metric tons of scrap used in the Great Lakes area every year.

A006086

[Table of Contents]

### Carbon Steel

We focus much of our research and innovation efforts on carbon steel applications for automotive manufacturers and their suppliers. We are particularly focused on AHSS for the automotive market, and we produce virtually every AHSS grade currently used by our customers. Our AHSS grades, such as Dual Phase 590, 780, 980 and 1180, have been adopted by our customers for both stamped and roll-formed parts, and our NEXMET® 1000 and 1200 products have demonstrated enhanced strength, formability and opportunities for automotive light weighting in cold-stamped applications. We are also pursuing application of NEXMET 440EX and NEXMET 490EX in surface-critical, exposed auto body panels as an alternative to aluminum.

### Third Generation Advanced High-Strength Steel

Our third generation NEXMET 1000 and NEXMET 1200 AHSS products enable our customers to achieve significant light weighting in the unexposed structural components of their vehicles. NEXMET 1200, for example, offers superior formability similar to conventional Dual Phase 600 steel, but at twice the strength level. We have expanded the application of the NEXMET technology to our tubular products and stamped components businesses. These AHSS products allow automotive engineers to design lightweight parts that meet rigorous service and safety requirements. The NEXMET family of steels helps our customers achieve vehicle weight savings for ambitious fuel efficiency standards while avoiding significant capital costs required to re-design production facilities to use alternative materials.

Both galvanized and cold-rolled NEXMET 1000 and NEXMET 1200 AHSS are progressing through product qualification with several original equipment manufacturer customers. A number of stamping and component assembly trials have been completed successfully, with more planned and underway. Because the timing of automotive design and production cycles spans several years, widespread automotive customer adoption of revolutionary new material such as NEXMET AHSS may also extend over several years. We expect that other automotive vehicle platforms will incorporate NEXMET AHSS in their designs and that NEXMET AHSS will become a strong differentiator for us going forward.

### Downstream Steel Applications

Our portfolio of steel solutions includes the operations of Precision Partners, which provides advanced-engineered solutions, tool design and build, hot and cold-stamped components and complex assemblies for the automotive market. In addition to Precision Partners, our downstream operations include Tubular Components, which manufactures advanced tubular products for automotive and other applications using carbon and stainless steels. We believe that collaboration among our steelmaking operations and our downstream businesses can accelerate the adoption of our innovative steel products by automotive manufacturers and their Tier 1 suppliers.

Our research and technical experts have undertaken numerous collaborative projects that are generating robust solutions for our customers. Precision Partners' expertise in tool design and stamping capabilities has allowed us to create prototype components using AK Steel's innovative new materials and present customers with new potential steel solutions. This approach has and, we expect, will continue to demonstrate to customers that they can significantly lightweight automotive parts on an accelerated timeline and in a cost-effective manner by using our highly formable grades of AHSS in place of traditional material types.

In addition, our collaborative projects are enhancing our collective knowledge and experience in the stamping of new, advanced grades of steel, advanced engineered solutions, and tool design and build. For example, Precision Partners specializes in hot-stamping PHS for automotive applications. AK Steel's experience as a leader in PHS and Precision Partners' expertise in hot-stamping has enabled these teams to have greater insight into these high-growth areas and has accelerated product development and customer adoption of these automotive light weighting solutions. Likewise, collaboration with Tubular Components strategically advances our mission to innovate in AHSS for the automotive industry, as Tubular Components has been at the forefront of producing tubular products from third-generation AHSS. We believe the combination of Precision Partners' stamping and advanced die-making capabilities, Tubular Component's leading tube making capabilities and our breakthrough material introductions will enhance our ability to deliver innovative, steel solutions to our customers.

Precision Partners has recently been awarded contracts with several customers to supply complex assemblies and stamped automotive parts. In winning these contracts, Precision Partners has been able to leverage our hot-stamping tooling leadership, in addition to our innovative hot-stamping process, to capture new strategic opportunities and demonstrate that Precision Partners is one of the few businesses in North America that has the technical capabilities to produce a major complex assembly and stamping work of this nature.

**Competition**

We principally compete with domestic and foreign producers of flat-rolled carbon, plate, stainless, rail and electrical steel, carbon and stainless tubular products, aluminum, carbon fiber, concrete and other materials that may be used as a substitute for flat-rolled steels in manufactured products. Precision Partners and Tubular Components both compete against other niche companies in highly fragmented markets.

Price, quality, on-time delivery, customer service and product innovation are the primary competitive factors in the steel industry and vary in importance according to the product category and customer requirements. Steel producers that sell to the automotive market face competition from aluminum manufacturers (and, to a lesser extent, other materials) as automotive manufacturers attempt to develop vehicles that will enable them to satisfy more stringent, government-imposed fuel efficiency standards. To address automotive manufacturers' light weighting needs that the aluminum industry is targeting, we and others in the steel industry are developing AHSS grades that we believe provide weight savings similar to aluminum, while being stronger, less costly, more sustainable, easier to repair and more environmentally friendly. Aluminum penetration has been primarily limited to specific automotive applications, such as outer panels and closures, rather than entire body designs. In addition, our automotive customers who continue to use steel, as opposed to aluminum and other alternative materials, are able to avoid the significant capital expenditures required to re-tool their manufacturing processes to accommodate the use of non-steel materials.

Mini-mills (producers using EAFs) comprise about 70% of steel production in the U.S. Their primary raw material is scrap metal, which has unpredictable and often volatile pricing. Due to the announced mini-mill capacity additions in the U.S. and increasing demand for scrap from China, we expect the price of scrap to remain elevated over historical averages, providing our integrated footprint a competitive advantage. Mini-mills also generally offer a narrower range of products than integrated steel mills, but the increasing use of pig iron and direct reduced iron have enabled them to modestly expand their product capabilities in recent years. However, we believe mini-mills often do not have the equipment capabilities to produce the product range that integrated facilities offer, nor do we believe they possess our depth of customer service, technical support, and research and innovation.

Domestic steel producers, including us, face significant competition from foreign producers. For many reasons, these foreign producers often are able to sell products in the U.S. at prices substantially lower than domestic producers. Depending on the country of origin, these reasons may include government subsidies; lower labor, raw material, energy and regulatory costs; less stringent environmental regulations; less stringent safety requirements; the maintenance of artificially low exchange rates against the U.S. dollar; and preferential trade practices in their home countries. Since late 2017, import levels of flat-rolled products into the United States have shown a gradual and steady decline and have recently been more reflective of historical levels before the unprecedented surge that began in 2014. We believe the decline is at least partially attributable to the implementation of certain trade restrictions on imported steel over the past five years, including both targeted trade cases and the more broad Section 232 tariffs. Modifications to these trade restrictions by government officials could directly or indirectly impact import levels in the future. Import levels are also affected to varying degrees by the relative level of steel production in China and other countries, the strength of demand for steel outside the U.S. and the relative strength or weakness of the U.S. dollar against various foreign currencies. Imports of finished steel into the U.S. accounted for approximately 18% of domestic steel market consumption in 2020.

We continue to provide significant pension and healthcare benefits to a great number of our retirees compared to certain other domestic and foreign steel producers that do not provide such benefits to any or most of their retirees, which increases our overall cost of production relative to certain other steelmakers. However, we have taken a number of actions to reduce pension and healthcare benefits costs, including negotiating progressive labor agreements that have significantly reduced total employment costs at all of our union-represented facilities, transferring all responsibility for healthcare benefits for various groups of retirees to VEBAs, offering voluntary lump-sum settlements to pension plan participants, lowering retiree benefit costs for salaried employees, and transferring pension obligations to highly rated insurance companies. These actions have not only reduced some of the risks associated with our pension fund obligations, but more importantly have reduced our risk exposure to performance of the financial markets, which are a principal driver of pension funding requirements. We continue to actively seek opportunities to reduce pension and healthcare benefits costs.

A006088

**Environment**

Our mining, steel and downstream manufacturing operations are subject to various laws and regulations governing the protection of the environment. We monitor these laws and regulations, which change over time, to assess whether the changes affect our operations. We conduct our operations in a manner that is protective of public health and the environment.

Environmental matters and their management continued to be an important focus at each of our operations throughout 2020, including operations at AK Steel (acquired in March 2020) and ArcelorMittal USA (acquired in December 2020). In the construction and operation of our facilities, substantial costs have been and will continue to be incurred to comply with regulatory requirements and avoid undue effect on the environment. In 2020, 2019, and 2018, our capital expenditures relating to environmental matters totaled approximately $34 million, $9 million, and $10 million, respectively. Our current estimate for capital expenditures for environmental improvements in 2021 is approximately $51 million for various water treatment, air quality, dust control, tailings management and other miscellaneous environmental projects. Additionally, we expect capital expenditures for environmental improvements for each of 2022 and 2023 to be generally in line with 2021's estimated spending.

*Regulatory Developments*

Various governmental bodies continually promulgate new or amended laws and regulations that affect us, our customers, and our suppliers in many areas, including waste discharge and disposal, the classification of materials and products, air and water discharges and other environmental, health, and safety matters. Although we believe that our environmental policies and practices are sound and do not expect that the application of any current laws, regulations or permits would reasonably be expected to result in a material adverse effect on our business or financial condition, we cannot predict the collective potential adverse impact of the expanding body of laws and regulations. Moreover, because all domestic steel and mining producers operate under the same federal environmental regulations, we do not believe that we are more disadvantaged than our domestic competitors by our need to comply with these regulations. Some foreign competitors may benefit from less stringent environmental requirements in the countries where they produce, resulting in lower compliance costs for them and providing those foreign competitors with a cost advantage on their products.

Specifically, there are several notable proposed or potential rulemakings or activities that could have a material adverse impact on our facilities in the future depending on their ultimate outcome: Minnesota's potential revisions to the sulfate wild rice water quality standard; evolving water quality standards for selenium and conductivity; scope of the Clean Water Act and the definition of "Waters of the United States"; Minnesota's Mercury TMDL and associated rules governing mercury air emission reductions; Climate Change and GHG Regulation; the Regional Haze FIP Rule; and the regulation of discharges to groundwater.

*Minnesota's Sulfate Wild Rice Water Quality Standard*

The Minnesota Governor established a Wild Rice Task Force by Executive Order in May 2018 that provided recommendations to the Governor's Office on wild rice restoration and regulation. The existing water quality standard for wild rice has not been applied to any of our discharge permits or enforced in decades, and it may be unenforceable because of legislation and because the water bodies to which the existing standard applies have never been identified specifically in rule, nor are there criteria for identifying them. The MPCA is complying with the legislation that prohibits enforcement of the water quality standard until the obsolete standard is updated based on modern science. For these reasons, the impact of the proposed wild rice water quality standard to our Minnesota iron ore mining and pelletizing operations is not estimable at this time, but it could have an adverse material impact if we are required to significantly reduce sulfate in our discharges.

*Selenium Discharge Regulation*

In Michigan, the Empire and Tilden mines have implemented compliance plans to manage selenium according to the permit conditions. The remaining infrastructure needed for management of selenium in stormwater will likely be completed in 2021. A water treatment system for both facilities is anticipated sometime before 2028. As of December 31, 2020, included within our Empire asset retirement obligation is a discounted liability of approximately $100 million, which includes the estimated costs associated with the construction of Empire's portion of the required infrastructure and expected future operating costs of the treatment facilities. Additionally, included within our Tilden future capital plan is approximately $20 million for the construction of Tilden's portion of the required infrastructure. We are continuing to assess and develop cost effective and sustainable treatment technologies.

13

Table of Contents

In July 2016, the EPA published new selenium fish tissue limits and lower lentic and lotic water column concentration criteria, which may someday increase the cost for treatment should EGLE adopt these new standards in lieu of the existing limits required by the Great Lakes Water Quality Initiative. Accordingly, we cannot reasonably estimate the timing or long-term impact of the water quality criteria to our business.

*Mercury TMDL and Minnesota Taconite Mercury Reduction Strategy*

In September 2014, Minnesota promulgated the Mercury Air Emissions Reporting and Reduction Rules mandating mercury air emissions reporting and reductions from certain sources, including taconite facilities. The rule is applicable to all of our Minnesota iron mining and pelletizing operations and required submittal of a Mercury Reduction Plan to the MPCA by the end of 2018 with plan implementation requirements becoming effective on January 1, 2025. In the Mercury Reduction Plan, facilities evaluated if available control technologies can technically achieve a 72% mercury reduction rate. If available control technologies cannot technically achieve a 72% mercury reduction rate, the facilities must propose alternative mercury reduction measures. One of the main tenets agreed upon for evaluating potential mercury reduction technologies during TMDL implementation and 2014 rule development proceedings was that the selected technology must meet the following "Adaptive Management Criteria": the technology must be technically feasible; must be economically feasible; must not impact pellet quality; and must not cause excessive corrosion in the indurating furnaces or air pollution control equipment.

The Mercury Reduction Plans for our Minnesota facilities were submitted to the MPCA in December 2018.  In 2020, the MPCA provided comments on the plans and we responded in a timely manner. There is currently no proven technology to cost effectively reduce mercury emissions from taconite furnaces to achieve the targeted 72% reduction rate, while satisfying all four Adaptive Management Criteria. The Mercury Reduction Plans that were submitted to the MPCA include documentation that describes the results of detailed engineering analysis and research testing on potential technologies to support this determination. The results of this analysis will continue to guide dialogue with the MPCA. Potential impacts to us are not estimable at this time because the revised Mercury Reduction Plans and additional technical information are currently being reviewed by the MPCA.

*Climate Change and GHG Regulation*

With the complexities and uncertainties associated with the U.S. and global navigation of the climate change issue as a whole, one of our potentially significant risks for the future is mandatory carbon pricing obligations. Policymakers are in the design process of carbon regulation at the state, regional, national and international levels. The current regulatory patchwork of carbon compliance schemes presents a challenge for multi-facility entities to identify their near-term risks. Amplifying the uncertainty, the dynamic forward outlook for carbon pricing obligations presents a challenge to large industrial companies to assess the long-term net impacts of carbon compliance costs on their operations. Our exposure on this issue includes both the direct and indirect financial risks associated with the regulation of GHG emissions, as well as potential physical risks associated with climate change adaptation. We are continuing to review the physical risks related to climate change. As an energy-intensive business, our GHG emissions inventory includes a broad range of emissions sources, such as iron ore furnaces and kilns, diesel mining equipment, and integrated steelmaking facilities, among others. As such, our most significant regulatory risks are: (1) the costs associated with on-site emissions levels (direct impacts), and (2) indirect costs passed through to us from electrical and fuel suppliers (indirect impacts).

Internationally, mechanisms to reduce emissions are being implemented in various countries, with differing designs and stringency, according to resources, economic structure and politics. The Paris Agreement to reduce global GHG emissions and limit global temperature increases to 2 degrees Celsius became effective in November 2016 with 196 signatory countries. On January 20, 2021, President Biden signed an executive order triggering the 30-day process of rejoining the Paris Agreement, beginning the process of a pledge to reduce U.S. GHG emissions. During the Obama Administration, the U.S. became a signatory to the Paris Agreement with a pledge to reduce its GHG emissions by 26-28% from 2005 levels by 2025. Continued attention to issues concerning climate change, the role of human activity in it and potential mitigation through regulation may have a material impact on our customer base, operations and financial results in the future.

In the U.S., future federal and/or state carbon regulation potentially presents a significantly greater impact to our operations. To date, the U.S. Congress has not legislated carbon constraints. In the absence of comprehensive federal carbon legislation, numerous state, regional and federal regulatory initiatives are under development or are becoming effective, thereby creating a disjointed approach to GHG control and potential carbon pricing impacts. We intend to remain active in the discussions related to legislative and regulatory changes at the federal and state levels.

14

Table of Contents

Due to the potential patchwork of federal, state or regional carbon restriction schemes, our business and customer base could suffer negative financial impacts over time as a result of increased energy, environmental and other costs to comply with the limitations that would be imposed on GHG emissions. We believe our exposure can be reduced substantially by numerous factors, including currently contemplated regulatory flexibility mechanisms, such as allowance allocations, fixed process emissions exemptions, offsets and international provisions; emissions reduction opportunities, including energy efficiency, biofuels and fuel flexibility; and business opportunities associated with pursuing combined heat and power partnerships and new products, including DR-grade pellets, HBI, fluxed pellets and other efficiency-improving technologies.

*Regional Haze FIP Rule*

In June 2005, the EPA finalized amendments to its regional haze rules that require states to establish goals and emission reduction strategies for improving visibility in all Class I national parks and wilderness areas to natural background levels by 2064. Among the states with Class I areas are Michigan and Minnesota, in which we currently own mining operations, and Indiana, in which we own steelmaking operations. The first phase of the regional haze rule required analysis and installation of BART on eligible emission sources and incorporation of BART and associated emission limits into SIPs.

EPA disapproved Minnesota's and Michigan's BART SIPs for taconite furnaces and instead promulgated a Taconite Regional Haze FIP in February 2013. We petitioned the Eighth Circuit Court of Appeals for a review of the FIP and filed a joint motion for stay of the 2013 FIP, which was granted in June 2013. We reached a settlement agreement with EPA, which was subsequently published in the Federal Register to implement components of the settlement agreement in April 2016, with an effective date of May 12, 2016. We believe the 2016 Regional Haze FIP reflects progress toward a more technically and economically feasible regional haze implementation plan. In November 2016, the Eighth Circuit Court of Appeals terminated the June 2013 stay and extended the deadlines in the original 2013 FIP. Cost estimates associated with implementation of the 2013 and 2016 FIPs are reflected in our five-year capital plan.

Due to inconsistencies in language describing the procedures for calculating NOx emission limits between the settlement agreement and the 2016 FIP final rule, we jointly filed a Petition for Reconsideration and Petition for Judicial Review in June 2016. We have been working toward a settlement agreement with EPA to resolve the outstanding issue with the emission limit calculation method and anticipate resolution of the issue in 2021. The outcome of this proceeding is not expected to have a material adverse impact on us.

In 2020, the states began a second decadal review, which examined if additional technological controls are warranted for certain sources. The states are required to submit their updated Regional Haze SIPs by July 2021. At this time, we do not expect any state will require additional emission control requirements on our operations. We will review and comment on SIPs as necessary in the states in which we operate.

*Conductivity*

Conductivity, the measurement of water's ability to conduct electricity, is a surrogate parameter that generally increases as the amount of dissolved minerals in water increases. In December 2016, EPA issued a notice soliciting public comments on its draft guidance, *Field-Based Methods for Developing Aquatic Life Criteria for Specific Conductivity*. In April 2017, comments were submitted by our trade associations providing objective evidence indicating the draft methodology was scientifically flawed and unfit for promulgation. EPA confirmed in October 2019 that the 2016 draft guidance was rescinded in accordance with an August 2019 EPA memorandum regarding draft guidance documents and further expressed that EPA must update the science and subject future recommended methods or criteria for conductivity to peer review and public comment. Although the adoption of the previously proposed methodology is unlikely in the states, the Fond du Lac Band in Minnesota adopted certain conductivity criteria in 2020. We are assessing the impact of those criteria on our Minnesota iron ore mining and pelletizing operations and evaluating methods to challenge the criteria as a whole or on a site-by-site basis.

*Definition of "Waters of the United States" Under the Clean Water Act*

The EPA and Army Corps of Engineers published a final rule in October 2019 repealing the 2015 rule that was to become effective on December 23, 2019. On April 21, 2020, the EPA and the Department of the Army published the Navigable Waters Protection Rule in the Federal Register to finalize a revised definition of "waters of the United States" under the Clean Water Act. For the first time, the agencies have streamlined the definition so that it includes four simple categories of jurisdictional waters, provides clear exclusions for many water features that traditionally have not been regulated, and defines terms in the regulatory text that have never been defined before. The rule is on

15

appeal in various jurisdictions. The rule is not expected to have a material adverse effect on us, but we will continue to assess the potential impacts to our operations.

*Regulation of Discharges to Groundwater*

In general, states traditionally have regulated discharges of pollutants to groundwater through various programs such as wellhead protection programs and regulations related to remediation. In April 2020, the United States Supreme Court held in *County of Maui v. Hawai'i Wildlife Fund* that EPA (and delegated states) have jurisdiction under the NPDES program if the discharge to groundwater is the "functional equivalent" of a discharge to waters of the United States. Until now, the NPDES program has only regulated direct discharges to waters of the United States from point sources. EPA subsequently issued a guidance document on what the term "functional equivalent" means. Although we do not anticipate that broadening EPA jurisdiction over groundwater discharges will materially adversely affect our operations, the impact to our operations is not reasonably estimable at this time.

## Raw Materials and Energy

Our steelmaking operations require iron ore, coke, coal, ferrous and carbon and stainless scrap, chrome, nickel and zinc as primary raw materials. We also consume natural gas, electricity, industrial gases and diesel fuel at our steelmaking and mining operations. As a vertically integrated steel company, we are able to internally supply a majority of our raw materials needed for our steelmaking operations. We also attempt to reduce the risk of future supply shortages and price volatility in other ways. If multi-year contracts are available in the marketplace for those raw materials that we cannot supply internally, we may use these contracts to secure sufficient supply to satisfy our key raw material needs. When multi-year contracts are not available, or are not available on acceptable terms, we purchase the remainder of our raw materials needs under annual contracts or conduct spot purchases. We also regularly evaluate alternative sources and substitute materials. Additionally, we may hedge portions of our energy and raw materials purchases to reduce volatility and risk. We believe that we have secured, or will be able to secure, adequate supply to fulfill our raw materials and energy requirements for 2021.

The raw materials needed to produce a ton of steel will fluctuate based upon the specifications of the final steel products, the quality of raw materials and, to a lesser extent, differences among steel production equipment. For example, generally, in our integrated steelmaking facilities, we consume approximately 1.4 net tons of coal to produce one net ton of coke. The process to produce one ton of raw steel generally requires approximately 1.4 net tons of iron ore pellets, 0.4 net tons of coke and 0.3 net tons of steel scrap. At normal operating levels, we also consume approximately 6 MMBtu's of natural gas per net ton produced. Additionally, on average, our EAF's require 1.1 net tons of ferrous or stainless scrap to produce one net ton of high quality steel. We consume approximately 420 kilowatt-hours of electricity per net ton of steel produced. While these estimated consumption amounts are presented to give a general sense of raw material and energy consumption used in our steel production, substantial variations may occur.

Our investment into HBI production provides us access, when needed, to clean iron units in order to make advanced steel and stainless products. This access to our own production provides us flexibility and allows us to avoid the risks and carbon footprints of imported iron substitutes. Iron substitutes imported into the U.S. are traditionally sourced from regions of the world that have historically experienced greater political turmoil and have lower pollution standards than the U.S. Our investment demonstrates our raw material and company strategy in responsibly managing the risks of pricing, availability and overall carbon footprint of our critical inputs.

We typically purchase ferrous and stainless steel scrap, natural gas, a substantial portion of our electricity and most other raw materials at prevailing market prices, which may fluctuate with market supply and demand.

*Iron Ore*

We own or co-own five active iron ore mines in Minnesota and Michigan. Based on our ownership in these mines, our share of annual rated iron ore production capacity is approximately 28.0 million long tons, which supplies all of the iron ore needed for our steelmaking operations. Refer to *Part I - Item 2. Properties* for additional information.

*Coke and Coal*

We own five cokemaking facilities, including two coke batteries located within our steelmaking facilities. These facilities currently provide over half of the coke requirements for our steelmaking operations and have an annual rated capacity of approximately 3.9 million tons. Additionally, we have coke supply agreements with suppliers that provide our remaining requirements. Our purchases of coke are made under annual or multi-year agreements

16

with periodic price adjustments. We typically purchase most of our metallurgical coal under annual fixed-price agreements. We have annual rated metallurgical coal production capacity of 2.3 million net tons from our Princeton mine, which supplies a portion of our metallurgical coal needs. We believe there are adequate external supplies of coke and coal available at competitive market prices to meet our needs. Refer to *Part I - Item 2. Properties* for additional information.

*Steel Scrap and Other Materials*

Generally, approximately 43% of our steel scrap requirements are generated internally through normal operations. We believe that supplies of steel scrap, chrome, nickel and zinc adequate to meet the needs of our steelmaking operations are readily available from outside sources at competitive market prices.

*Energy*

We consume a large amount of natural gas, electricity, industrial gases and diesel fuel, which are significant costs to our operations. The majority of our energy requirements are purchased from outside sources. Access to long-term, low cost sources of energy in various forms is critically important to our operations.

Natural gas is procured for our operations utilizing a combination of long-term, annual, quarterly, monthly and spot contracts from various suppliers at market-based pricing. We believe access to low-cost and reliable sources of natural gas is available to meet our operations' requirements.

We purchase electricity for all of our operations in either regulated or deregulated markets. Due to the distinct nature of these markets, we procure electricity through either long-term or annual contracts. Some operations also use self-generated coke oven gas and/or blast furnace gas to produce electricity, which reduces our need to purchase electricity from external sources. We also closely monitor developments at the state and federal levels that could impact electricity availability or cost and incorporate such changes into our electricity supply strategy in order to maintain reliable, low-cost supply. We believe there is an adequate supply of competitively priced electricity to fulfill our requirements.

We purchase industrial gases under long-term contracts with various suppliers. We believe we have access to adequate supplies of industrial gases to meet our needs.

We predominantly purchase diesel fuel for our mining operations under long-term contracts with various suppliers. We believe we have access to adequate supplies of diesel fuel to meet our needs.

**Human Capital**

As of December 31, 2020, we employed approximately 25,000 people. Approximately 24,000 were employed in the U.S., with the remainder employed in Ontario, Canada. Approximately 24,000 employees were employed at production facilities, with the balance employed in corporate support roles. The vast majority of our approximately 20,000 hourly employees were subject to collective bargaining agreements (approximately 18,500) with various labor unions. Overall, we have good relations with our workforce and the labor unions that represent our hourly employees.

We believe that our future success largely depends upon our continued ability to attract and retain a highly skilled workforce. We provide our employees with competitive salaries, incentive-based bonus programs that provide above-market compensation opportunities when the Company performs well, development programs that enable continued learning and growth, and a robust benefit package that promotes well-being across all aspects of their lives, including health care, retirement planning and paid time off. In addition to these programs, we have used targeted, equity-based grants with vesting conditions to facilitate retention of key personnel. These tools have enabled us to increase the retention of key personnel, including our corporate and site leadership teams and critical technical talent.

The success of our business is fundamentally connected to the well-being of our people. Accordingly, we are committed to the health, safety and wellness of our employees. We provide our employees and their families with access to a variety of innovative, flexible and convenient health and wellness programs, including benefits that provide protection and security so they can have peace of mind concerning events that may require time away from work or that impact their financial well-being; that support their physical and mental health by providing tools and resources to help them improve or maintain their health and encourage engagement in healthy behaviors; and that offer choice where possible so they can customize their benefits to meet their needs and the needs of their families. In response to the COVID-19 pandemic, we implemented significant changes that we determined were in the best interest of our employees, as well as the communities in which we operate, and which comply with government regulations. This includes having all employees who could perform their work remotely work from home, while implementing numerous safety measures for employees continuing critical on-site work at our operations.

17

*Safety*

Safe production is our primary core value as we continue toward achieving a zero injury culture at our facilities. We constantly monitor our safety performance and make continuous improvements to affect change. Best practices and incident learnings are shared globally to ensure each facility can administer the most effective policies and procedures for enhanced workplace safety. Progress toward achieving our objectives is accomplished through a focus on proactive sustainability initiatives, and results are measured against established industry and company benchmarks, including our company-wide Total Reportable Incident Rate. During 2020, our Total Reportable Incident Rate (including contractors) was 0.92 per 200,000 hours worked.

Refer to *Exhibit 95 Mine Safety Disclosures (filed herewith)* for mine safety information required in accordance with Section 1503(a) of the Dodd-Frank Act.

**Available Information**

Our headquarters are located at 200 Public Square, Suite 3300, Cleveland, Ohio 44114-2315, and our telephone number is (216) 694-5700. We are subject to the reporting requirements of the Exchange Act and its rules and regulations. The Exchange Act requires us to file reports, proxy statements and other information with the SEC.

The SEC maintains a website that contains reports, proxy statements and other information regarding issuers that file electronically with the SEC. These materials may be obtained electronically by accessing the SEC's home page at www.sec.gov.

We use our website, www.clevelandcliffs.com, as a channel for routine distribution of important information, including news releases, investor presentations and financial information. We also make available, free of charge on our website, our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to these reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act, as soon as reasonably practicable after we electronically file these documents with, or furnish them to, the SEC. In addition, our website allows investors and other interested persons to sign up to receive automatic email alerts when we post news releases and financial information on our website.

We also make available, free of charge, the charters of the Audit Committee, Strategy and Sustainability Committee, Governance and Nominating Committee and Compensation and Organization Committee as well as the Corporate Governance Guidelines and the Code of Business Conduct and Ethics adopted by our Board of Directors. These documents are available through our investor relations page on our website at *www.clevelandcliffs.com*. The SEC filings are available by selecting "Financial Information" and then "SEC Filings," and corporate governance materials are available by selecting "Corporate Governance" for the Board Committee Charters, operational governance guidelines and the Code of Business Conduct and Ethics.

References to our website or the SEC's website do not constitute incorporation by reference of the information contained on such websites, and such information is not part of this Annual Report on Form 10-K.

Copies of the above-referenced information are also available, free of charge, by calling (216) 694-5700 or upon written request to:

Cleveland-Cliffs Inc.

Investor Relations

200 Public Square, Suite 3300

Cleveland, OH 44114-2315

18

## INFORMATION ABOUT OUR EXECUTIVE OFFICERS

Following are the names, ages and positions of the executive officers of the Company as of February 26, 2021. Unless otherwise noted, all positions indicated are or were held with Cleveland-Cliffs Inc.

| Name | Age | Position(s) Held |
|---|---|---|
| Lourenco Goncalves | 63 | Chairman, President and Chief Executive Officer (August 2014 – present); and Chairman, President and Chief Executive Officer of Metals USA Holdings Corp., an American manufacturer and processor of steel and other metals (May 2006 – April 2013). |
| Clifford T. Smith | 61 | Executive Vice President, Chief Operating Officer (January 2019 – present); Executive Vice President, Business Development (April 2015 – January 2019). |
| Keith A. Koci | 56 | Executive Vice President, Chief Financial Officer (February 2019 – present); and Senior Vice President and Chief Financial Officer, Metals USA Holdings Corp. (2013 – February 2019). |
| Terry G. Fedor | 56 | Executive Vice President, Chief Operating Officer, Steel Mills (March 2020 – present); Executive Vice President, Operations (February 2019 – March 2020); and Executive Vice President, U.S. Iron Ore (January 2014 – January 2019). |
| Traci L. Forrester | 49 | Executive Vice President, Business Development (May 2019 – present); Vice President (January 2018 – May 2019); Deputy General Counsel & Assistant Secretary (January 2017 – May 2019); and Assistant General Counsel (August 2013 – January 2017). |
| James D. Graham | 55 | Executive Vice President (November 2014 – present); Chief Legal Officer (March 2013 – present); and Secretary (March 2014 – present). |
| Maurice D. Harapiak | 59 | Executive Vice President, Human Resources (March 2014 – present); and Chief Administration Officer (January 2018 – present). |
| Kimberly A. Floriani | 38 | Vice President, Corporate Controller & Chief Accounting Officer (April 2020 – present); Director, Accounting & Reporting (August 2015 – April 2020); Manager, Financial Reporting (January 2012 – August 2015). |

All executive officers serve at the pleasure of the Board. There are no arrangements or understandings between any executive officer and any other person pursuant to which an executive officer was selected to be an officer of the Company. There is no family relationship between any of our executive officers, or between any of our executive officers and any of our directors.

**Item 1A.**        *Risk Factors*

An investment in our common shares or other securities is subject to risks inherent in our businesses and the industries in which we operate. Described below are certain risks and uncertainties, the occurrences of which could have a material adverse effect on us. The risks and uncertainties described below include known material risks that we face currently, but our material risks are constantly evolving and the below descriptions may not include future risks that are not presently known, that are not currently believed to be material or that are common to all businesses. Although we have extensive risk management policies, practices and procedures in place that are aimed to mitigate these risks, the occurrence of these uncertainties may nevertheless impair our business operations and adversely affect the actual outcome of matters as to which forward-looking statements are made. This report is qualified in its entirety by these risk factors. Before making an investment decision, investors should consider carefully all of the risks described below together with the other information included in this report and the other reports we file with the SEC.

Management has identified several categories of material risk that we are subject to, including: (I) economic and market, (II) regulatory, (III) financial, (IV) operational, (V) development and sustainability and (VI) human capital. Although the risks are organized by these headings, and each risk is discussed separately, many are interrelated.

## I. ECONOMIC AND MARKET RISKS

***The ongoing COVID-19 pandemic has had, and is expected to continue to have, an adverse impact on our businesses.***

The ongoing COVID-19 pandemic is continuing to impact countries, communities, supply chains and markets. Responses by individuals, governments and businesses to the COVID-19 pandemic and efforts to reduce its spread, including quarantines, travel restrictions, business closures, and mandatory stay-at-home or work-from-home orders, have led to significant disruptions to overall business and economic activity. While vaccines are now being manufactured and distributed, it is currently unknown when or whether the economy will return to pre-pandemic levels of consumer and business activity.

During 2020, the COVID-19 pandemic adversely affected our businesses by temporarily curtailing certain of our end markets. In particular, the automotive industry, which we rely on directly and indirectly for a significant amount of our sales, was severely disrupted during the first half of 2020. The slowdown in the automotive industry led, in turn, to disruptions to our operations. For example, although our steel and mining operations are considered "essential" by the states in which we operate, certain of our mining and production facilities were idled for various periods during 2020 in response to the decrease in customer demand. While we were able to resume operations at many of these facilities later in 2020, we cannot predict whether any other production facilities or mines will experience disruptions in the future as a result of adverse impacts of the COVID-19 pandemic.

In addition, the COVID-19 pandemic has heightened the risk that a significant portion of our workforce and on-site contractors will suffer illness or otherwise be unable to perform their ordinary work functions. While we instituted remote work policies where practical across our footprint, the safe and responsible operation of our production facilities often requires that workers be on-site. Accordingly, during 2020, we experienced direct and indirect workforce impacts from COVID-19 at many of our operations. We also may need to reduce our workforce as a result of declines in our business caused by the COVID-19 pandemic, and there can be no assurance that we will be able to rehire our workforce once our business has recovered. We may also experience supply chain disruptions or operational issues with our vendors, as our suppliers and contractors face similar challenges related to the COVID-19 pandemic.

Because the impact of the COVID-19 pandemic continues to evolve, we cannot predict the full extent to which our businesses, results of operations, financial condition or liquidity will ultimately be impacted. To the extent the COVID-19 pandemic adversely affects our businesses, it may also have the effect of exacerbating many of the other risks described in this "Risk Factors" section, any of which could have a material adverse effect on us.

***The volatility of commodity prices, including steel and iron ore, affects our ability to generate revenue, maintain stable cash flows and fund our operations, including growth and expansion projects.***

Our profitability is dependent upon the prices of the steel and iron ore products that we sell to our customers and the prices of the products our customers sell. As an integrated producer of steel and iron ore, we experience direct impacts of steel price fluctuations through customer sales, as well as direct and indirect impacts of iron ore price fluctuations through third-party sales and the impacts that fluctuations in iron ore prices have on steel prices. The prices of steel and iron ore have fluctuated significantly in the past and are affected by factors beyond our control, including: international demand for raw materials used in steel production; rates of global economic growth, especially

20

construction and infrastructure activity that requires significant amounts of steel; changes in the levels of economic activity in the U.S., China, India, Europe and other industrialized or developing economies; changes in China's emissions policies and environmental compliance enforcement practices; changes in the production capacity, production rate and inventory levels of other steel producers and iron ore suppliers; changes in trade laws; volumes of unfairly traded imports; imposition or termination of duties, tariffs, import and export controls and other trade barriers impacting the steel and iron ore markets; weather-related disruptions, infectious disease outbreaks, such as the COVID-19 pandemic, or natural disasters that may impact the global supply of steel or iron ore; and the proximity, capacity and cost of infrastructure and transportation.

Our earnings, therefore, may fluctuate with the prices of the products we sell and of the products our customers sell. To the extent that the prices of steel and iron ore, including the hot-rolled coil steel price, coated and other specialty steel prices, the Platts 62% Price, pellet premiums and Platts international indexed freight rates, significantly decline for an extended period of time, whether due to the COVID-19 pandemic or otherwise, we may have to further revise our operating plans, including curtailing production, reducing operating costs and capital expenditures, and discontinuing certain exploration and development programs. We also may have to take impairments on our goodwill, intangible assets, long-lived assets and/or inventory. Sustained lower prices also could cause us to further reduce existing mineral reserves if certain reserves no longer can be economically mined or processed at prevailing prices. We may be unable to decrease our costs in an amount sufficient to offset reductions in revenues and may incur losses. These events could have a material adverse effect on us.

***We sell a significant portion of our steel products to the automotive market and fluctuations or changes in the automotive market could adversely affect our business operations and financial performance.***

For the full-year 2020, approximately 40% of AK Steel's and ArcelorMittal USA's combined sales were to the automotive market. Beyond these direct sales to the automotive industry, we make additional sales to distributors and converters, which may ultimately resell some of that volume to the automotive market. In addition to the size of our exposure to the automotive industry, we face risks arising from our relative concentration of sales to certain specific automotive manufacturers, including several significant customers that idled certain automotive production facilities in 2020 in response to the COVID-19 pandemic. In addition, automotive production and sales are cyclical and sensitive to general economic conditions and other factors, including interest rates, consumer credit, and consumer spending and preferences, as well as the current COVID-19 pandemic. If automotive production and sales decline, our sales and shipments to the automotive market are likely to decline in a corresponding manner. Adverse impacts that we may sustain as a result include, without limitation, lower margins because of the need to sell our steel to less profitable customers and markets, higher fixed costs from lower steel production if we are unable to sell the same amount of steel to other customers and markets, and lower sales, shipments, pricing and margins generally as our competitors face similar challenges and compete vigorously in other markets that we serve. These adverse impacts would negatively affect our sales, financial results and cash flows. Additionally, the trend toward light weighting in the automotive industry, which requires lighter gauges of steel at higher strengths, could result in lower steel volumes required by that industry over time.

Moreover, despite our newly acquired position as the largest flat-rolled steel producer in North America, competition for automotive business has intensified in recent years, as steel producers and companies producing alternative materials have focused their efforts on capturing and/or expanding their market share of automotive business because of less favorable conditions in other markets for steel and other metals, including commodity products and steel for use in the oil and gas markets. As a result, the potential exists that we may lose market share to existing or new entrants or that automotive manufacturers will take advantage of the intense competition among potential suppliers during annual contract renewal negotiations to pressure our pricing and margins in order to maintain or expand our market share with them, which could negatively affect our sales, financial results and cash flows.

***Global steelmaking overcapacity, steel imports and oversupply of iron ore could lead to lower or more volatile global steel and iron ore prices, impacting our profitability.***

Significant global steel capacity and new or expanded production capacity in North America in recent years has caused and continues to cause capacity to exceed demand globally, as well as in our primary markets in North America. Although certain of our U.S. competitors temporarily shut down production capacity during the COVID-19 pandemic, a restart of previously idled capacity and the development of new capacity by our U.S. competitors has occurred in recent months and may occur in the future in connection with any economic recovery following the COVID-19 pandemic. In addition, foreign competitors have substantially increased their steel production capacity in the last few years and in some instances appear to have targeted the U.S. market for imports. Also, some foreign economies, such as China, have slowed relative to recent historical norms, resulting in an increased volume of steel

21

Table of Contents

products that cannot be consumed by industries in those foreign steel producers' own countries. The risk of even greater levels of imports may continue, depending upon foreign market and economic conditions, changes in trade agreements and treaties, laws, regulations or government policies affecting trade, the value of the U.S. dollar relative to other currencies and other variables beyond our control. A significant further increase in domestic steel capacity or foreign imports could adversely affect our sales, financial results and cash flows. In addition, recent increases in the market prices of iron ore products could cause new producers to enter the market or existing producers to expand productive capacity. Excess iron ore supply combined with reduced global steel demand, including in China, could lead to lower iron ore prices, which would typically contribute to lower steel prices, as iron ore is a principal steelmaking raw material. Downward pressure on iron ore and/or steel prices could have an adverse effect on our results of operations, financial condition and profitability.

***Severe financial hardship or bankruptcy of one or more of our major customers or key suppliers could adversely affect our business operations and financial performance.***

Sales and operations of a majority of our customers are sensitive to general economic conditions, especially, with respect to our steel customers, as they affect the North American automotive, housing, construction, appliance, energy and other industries. Some of our customers are highly leveraged. If there is a significant weakening of current economic conditions, whether because of operational, cyclical or other issues, including the COVID-19 pandemic, it could impact significantly the creditworthiness of our customers and lead to other financial difficulties or even bankruptcy filings by our customers. Failure to receive payment from our customers for products that we have delivered could adversely affect our results of operations, financial condition and liquidity. The concentration of customers in a specific industry, such as the automotive industry, may increase our risk because of the likelihood that circumstances may affect multiple customers at the same time. For example, during the first half of 2020, the automotive industry was significantly disrupted by the COVID-19 pandemic, which concurrently adversely impacted multiple customers. Such events could cause us to experience lost sales or losses associated with the potential inability to collect all outstanding accounts receivable and reduced liquidity. Similarly, if our key suppliers face financial hardship or need to operate in bankruptcy, such suppliers could experience operational disruption or even face liquidation, which could result in our inability to secure replacement raw materials on a timely basis, or at all, or cause us to incur increased costs to do so. Such events could adversely impact our operations, financial results and cash flows.

## II. REGULATORY RISKS

***U.S. government actions on trade agreements and treaties, laws, regulations or policies affecting trade could lead to lower or more volatile global steel or iron ore prices, impacting our profitability.***

In recent years, the U.S. government has altered its approach to international trade policy, both generally and with respect to matters directly and indirectly affecting the steel industry, including by undertaking certain unilateral actions affecting trade, renegotiating existing bilateral or multilateral trade agreements, and entering into new agreements or treaties with foreign countries. For example, in March 2018, the U.S. government issued a proclamation pursuant to Section 232 imposing a 25% tariff on imported steel that was being unfairly traded by certain foreign competitors at artificially low prices. In retaliation against the Section 232 tariffs, the European Union subsequently imposed its own tariffs against certain steel products and other goods imported from the U.S. Moreover, in light of the U.S. government leadership changes resulting from the November 2020 federal congressional and presidential elections, it is currently uncertain what changes, if any, the U.S. government may make to its recent tariff and trade policies and priorities. If, for example, the Section 232 tariffs are removed or substantially lessened, whether through legal challenge, legislation, executive action or otherwise, imports of foreign steel would likely increase and steel prices in the U.S. would likely fall, which could materially adversely affect our sales, financial results and cash flows.

In addition, during 2020, the USMCA was implemented among the U.S., Mexico and Canada in place of the North American Free Trade Agreement. Because all of our steel manufacturing facilities are located in North America and one of our principal markets is automotive manufacturing in North America, we believe that the USMCA has the potential to positively impact our business by incentivizing automakers and other manufacturers to increase manufacturing production in North America and to use North American steel. However, it is difficult to predict the short- and long-term implications of changes in trade policy and, therefore, whether the USMCA or other new or renegotiated trade agreements, treaties, laws, regulations or policies that may be implemented in connection with the recent U.S. government leadership changes, or otherwise, will have a beneficial or detrimental impact on our business and our customers' and suppliers' businesses. Adverse effects could occur directly from a disruption to trade and commercial transactions and/or indirectly by adversely affecting the U.S. economy or certain sectors of the economy, impacting demand for our customers' products and, in turn, negatively affecting demand for our products. Important

22

links of the supply chain for some of our key customers, including automotive manufacturers, could be negatively impacted by the USMCA or other new or renegotiated trade agreements, treaties, laws, regulations or policies. Any of these actions and their direct and indirect impacts could materially adversely affect our sales, financial results and cash flows.

Although we may currently benefit from certain antidumping and countervailing duty orders, any such relief is subject to periodic reviews and challenges, which can result in revocation of the orders or reduction of the duties. In addition, previously granted and future petitions for trade relief may not be successful or fully effective at preventing harm. Even if received, it is uncertain if any relief will be continued in the future or will be adequate to counteract completely the harmful effects of unfairly traded imports.

***We are subject to extensive governmental regulation, which imposes, and will continue to impose, potential significant costs and liabilities on us. Future laws and regulations or the manner in which they are interpreted and enforced could increase these costs and liabilities or limit our ability to produce our raw materials and products.***

New laws or regulations, or changes in existing laws or regulations, including the response of federal, state, local and foreign governments to the COVID-19 pandemic or arising out of the changes in U.S. government leadership resulting from the November 2020 elections, or the manner of their interpretation or enforcement, could increase our cost of doing business and restrict our ability to operate our businesses or execute our strategies. This includes, among other things, changes in the interpretation of MSHA regulations, such as workplace exam rules or safety around mobile equipment, reevaluation of the National Ambient Air Quality Standards, such as revised nitrogen dioxide, sulfur dioxide, lead, ozone and particulate matter criteria, changes in the interpretation of OSHA regulations, such as standards for occupational exposure to noise, certain chemicals or hazardous substances and infectious diseases, and the possible taxation under U.S. law of certain income from foreign operations.

In addition, we and our operations are subject to various international, foreign, federal, state, provincial and local laws and regulations relating to protection of the environment and human health and safety, including those relating to air quality, water pollution, plant, wetlands, natural resources and wildlife protection (including endangered or threatened species), reclamation, remediation and restoration of properties and related surety bonds or other financial assurances, land use, the discharge of materials into the environment, the effects that industrial operations and mining have on groundwater quality, conductivity and availability, the management of electrical equipment containing polychlorinated biphenyls, and other related matters. Compliance with numerous governmental permits and approvals is required for our operations. We cannot be certain that we have been or will be at all times in complete compliance with such laws, regulations, permits and approvals. If we violate or fail to comply with these laws, regulations, permits or approvals, we could be fined, required to cease operations, subject to criminal or civil liability, or otherwise sanctioned by regulators. In particular, federal or state regulatory agencies have the authority, under certain circumstances following significant health and safety incidents, such as fatalities, to order a facility to be temporarily or permanently closed. Compliance with the complex and extensive laws and regulations to which we are subject imposes substantial costs on us, which could increase over time because of heightened regulatory oversight, adoption of more stringent environmental, health and safety standards and greater demand for remediation services leading to shortages of equipment, supplies and labor, as well as other factors.

Specifically, there are several notable proposed or recently enacted rulemakings or activities to which we would be subject or that would further regulate and/or tax us and our customers, which may also require us or our customers to reduce or otherwise change operations significantly or incur significant additional costs, depending on their ultimate outcome. These emerging or recently enacted rules, regulations and policy guidance include, but are not limited to: governmental regulations imposed in response to the COVID-19 pandemic; trade regulations, such as the USMCA and/or other trade agreements, treaties or policies; tariffs, such as the 25% tariff on imported steel imposed under Section 232; Minnesota's potential revisions to the sulfate wild rice water quality standard; evolving water quality standards for selenium and conductivity; scope of the Clean Water Act and the definition of "Waters of the United States"; Minnesota's Mercury TMDL and associated rules governing mercury air emission reductions; Climate Change and GHG Regulation; the Regional Haze FIP Rule; and the regulation of discharges to water. In addition, the Biden Administration has indicated via executive orders and in campaign statements that it will propose more stringent environmental regulation, in particular related to climate change. Any new or more stringent legislation, regulations, rules, interpretations or orders, when enacted and enforced, could have a material adverse effect on our business, results of operations, financial condition or profitability.

Our operations may be impacted by the recent enactment, and ongoing consideration, of significant federal and state laws and regulations relating to certain mine-related issues, such as the stability of tailings basins, mine drainage and fill activities, reclamation and safety in underground mines. With respect to underground mines, for

Table of Contents

example, these laws and regulations include requirements for constructing and maintaining caches for the storage of additional self-contained self-rescuers throughout underground mines; installing rescue chambers in underground mines; continuous tracking of and communication with personnel in the mines; installing cable lifelines from the mine portal to all sections of the mine to assist in emergency escape; submission and approval of emergency response plans; and additional safety training. Additionally, there are requirements for the prompt reporting of accidents and increased fines and penalties for violations of these and existing regulations. These laws and regulations may cause us to incur substantial additional costs.

Additionally, our operations are subject to the risks of doing business abroad and we must comply with complex foreign and U.S. laws and regulations, which may include, but are not limited to, the Foreign Corrupt Practices Act and other anti-bribery laws, regulations related to import/export and trade controls, the European Union's General Data Protection Regulation and other U.S. and foreign privacy regulations, and transportation and logistics regulations. These laws and regulations may increase our costs of doing business in international jurisdictions and expose our operations and our employees to elevated risk. We require our employees, contractors and agents to comply with these and all other applicable laws and regulations, but failure to do so could result in possible administrative, civil or criminal liability and reputational harm to us and our employees. We may also be indirectly affected through regulatory changes that impact our customers, which in turn could reduce the quantity of our products they demand or the prices for our products they are willing to pay. Regulatory changes that impact our suppliers could decrease the supply of products or availability of services they sell to us or could increase the price they demand for products or services they sell to us.

***Our operations inadvertently may impact the environment or cause exposure to hazardous substances, which could result in material liabilities to us.***

Our operations currently use, and have in the past used, hazardous materials, and, from time to time, we have generated solid and hazardous waste. We have been, and may in the future be, subject to claims under international, foreign, federal, state, provincial and local laws and regulations for toxic torts, natural resource damages and other damages as well as for the investigation and clean-up of soil, surface water, sediments, groundwater and other natural resources and reclamation of properties. Such claims for damages and reclamation may arise out of current or former conditions at sites that we or our acquired companies currently own, lease or operate, as well as sites that we or our acquired companies formerly owned, leased or operated, and at contaminated sites that are or have been owned, leased or operated by our joint venture partners. We may also have liability for contamination at third-party sites where we have sent hazardous wastes. Our liability for these claims may be strict and/or joint and several, such that we may be held responsible for more than our share of the contamination or other damages, or even for entire claims regardless of fault. We are currently subject to potential liabilities relating to investigation and remediation activities at certain sites. In addition to sites currently owned, leased or operated, these include sites where we formerly conducted raw material processing or other operations, inactive sites that we currently own, formerly owned predecessor sites, acquired sites, leased land sites and third-party waste disposal sites. We may be named as a potentially responsible party at other sites in the future and we cannot be certain that the costs associated with these additional sites will not exceed any reserves we have established or otherwise be material.

We also are subject to claims asserting bodily injuries arising from alleged exposure to hazardous substances. For example, certain of our subsidiaries have been named in lawsuits claiming exposure to asbestos, many of which have been dismissed and/or settled for non-material amounts. It is likely that similar types of claims will continue to be filed in the future.

***We may be unable to obtain, maintain, renew or comply with permits necessary for our operations or be required to provide additional financial assurances, which could reduce our production, cash flows, profitability and available liquidity.***

We must obtain, maintain and comply with numerous permits that require approval of operational plans and impose strict conditions on various environmental, health and safety matters in connection with our steel production and processing and mining and other operations. These include permits issued by various federal, state, provincial, foreign and local agencies and regulatory bodies. The permitting rules are complex and may change over time, making our ability to comply with the applicable requirements more difficult or impractical and costly, possibly precluding the continuance of ongoing operations or the development of future operations. Interpretations of rules may also change over time and may lead to requirements, such as additional financial assurance, making it costlier to comply. For example, heightened levels of regulatory oversight with respect to our coal operations acquired as part of the AM USA Transaction could impact, delay or disrupt our ability to obtain new or renewed permits or modifications to existing permits.

24

In addition, the public, including special interest groups and individuals, have certain rights under various statutes to comment upon, submit objections to, and otherwise engage in the permitting process, including bringing citizens' lawsuits to challenge such permits or activities. Accordingly, required permits may not be issued or renewed in a timely fashion (or at all), or permits issued or renewed may include conditions that we cannot meet or otherwise be conditioned in ways that may restrict our ability to conduct our production and mining activities efficiently or include requirements for additional financial assurances that we may not be able to provide on commercially reasonable terms (or at all), which could reduce available borrowing capacity under our ABL Facility. Such conditions, restrictions or requirements could reduce our production, cash flows, profitability or liquidity.

## III. FINANCIAL RISKS

***Our existing and future indebtedness may limit cash flow available to invest in the ongoing needs of our businesses, which could prevent us from fulfilling our obligations under our senior notes, ABL Facility and other debt, and we may be forced to take other actions to satisfy our obligations under our debt, which may not be successful.***

As of December 31, 2020, we had $5,595 million aggregate principal amount of long-term debt outstanding, $2,195 million of which was secured (excluding $247 million of outstanding letters of credit and $335 million of finance leases), and $112 million of cash on our balance sheet. On December 9, 2020, in connection with the consummation of the AM USA Transaction, we amended our ABL Facility to, among other things, increase the tranche A revolver commitments available under the ABL Facility by an additional $1,500 million. After giving effect to this amendment, the aggregate principal amount of tranche A revolver commitments under our ABL Facility is $3,350 million, and the aggregate principal amount of tranche B revolver commitments under our ABL Facility remains at $150 million. As of December 31, 2020, $1,510 million was outstanding under our ABL Facility, and the principal amount of letters of credit obligations and other commitments totaled $247 million. As of December 31, 2020, the available borrowing capacity on our ABL Facility was $1,743 million.

We dedicate a portion of our cash flow from operations to the payment of debt service, reducing the availability of our cash flow to fund capital expenditures, acquisitions or strategic development initiatives, and other general corporate purposes. Our ability to make scheduled payments on or to refinance our debt obligations depends on our ability to generate cash in the future and our financial condition and operating performance, which are subject to prevailing economic and competitive conditions and to certain financial, business and other factors beyond our control, including the impact of the COVID-19 pandemic. There can be no assurance that we will maintain a level of cash flows from operating activities sufficient to permit us to pay the principal, premium, if any, and interest on our debt. In addition, any failure to comply with covenants in the instruments governing our debt could result in an event of default that, if not cured or waived, would have a material adverse effect on us.

Our level of indebtedness could have further consequences, including, but not limited to, increasing our vulnerability to adverse economic or industry conditions, placing us at a competitive disadvantage compared to other businesses in the industries in which we operate that are not as leveraged and that may be better positioned to withstand economic downturns, limiting our flexibility to plan for, or react to, changes in our businesses and the industries in which we operate, and requiring us to refinance all or a portion of our existing debt. We may not be able to refinance on commercially reasonable terms or at all, and any refinancing of our debt could be at higher interest rates and may require us to comply with more onerous covenants, making it more difficult to obtain surety bonds, letters of credit or other financial assurances that may be demanded by our vendors or regulatory agencies, particularly during periods in which credit markets are weak.

A portion of our borrowing capacity and outstanding indebtedness bears interest at a variable rate based on LIBOR. There is considerable uncertainty regarding the publication of LIBOR beyond 2021. The uncertainty regarding the future of LIBOR, as well as the transition from LIBOR to another benchmark rate or rates, could have adverse impacts on our outstanding debt that currently uses LIBOR as a benchmark rate and, in turn, could adversely affect our financial condition and results of operations.

If we are unable to service our debt obligations, we could face substantial liquidity problems and we may be forced to reduce or delay investments and capital expenditures, or to sell assets, seek additional capital, including additional secured or unsecured debt, or restructure or refinance our debt, and we may be unable to continue as a going concern. We may be unable to consummate any proposed asset sales or recover the carrying value of these assets, and any proceeds may not be adequate to meet any debt service obligations then due. Any of these examples potentially could have a material adverse impact on our results of operations, profitability, shareholders' equity and capital structure.

25

***Changes in credit ratings issued by nationally recognized statistical rating organizations could adversely affect our cost of financing and the market price of our securities.***

Credit rating agencies could downgrade our ratings due to various developments, including matters arising out of the AK Steel Merger or the AM USA Transaction, incurring additional indebtedness and other factors specific to our businesses, a prolonged cyclical downturn in the steel and mining industries, whether due to the COVID-19 pandemic or otherwise, or macroeconomic trends (such as global or regional recessions), and trends in credit and capital markets more generally. Any decline in our credit ratings may result in an increase to our cost of future financing or limit our access to the capital markets, which could harm our financial condition, hinder our ability to refinance existing indebtedness on acceptable terms, or have an adverse effect on the market price of our securities and the terms under which we purchase goods and services.

***Our actual operating results may differ significantly from our guidance.***

From time to time, we release guidance, including that set forth under "Management's Discussion and Analysis of Financial Condition and Results of Operations–Outlook" in our Annual Reports on Form 10-K and our Quarterly Reports on Form 10-Q, regarding our future performance. This guidance, which consists of forward-looking statements, is prepared by our management and is qualified by, and subject to, the assumptions and the other information included in our Annual Reports on Form 10-K and our Quarterly Reports on Form 10-Q. Our guidance is not prepared with a view toward compliance with published guidelines of the American Institute of Certified Public Accountants, and neither our independent registered public accounting firm nor any other independent or outside party compiles or examines the guidance and, accordingly, no such person expresses any opinion or any other form of assurance with respect thereto.

Guidance is based upon a number of assumptions and estimates that, while presented with numerical specificity, are inherently subject to business, economic and competitive uncertainties and contingencies, many of which are beyond our control and are based upon specific assumptions with respect to future business decisions, some of which will change. The principal reason that we release such data is to provide a basis for our management to discuss our business outlook with analysts and investors. We do not accept any responsibility for any projections or reports published by any such third parties.

Guidance is necessarily speculative in nature, and it can be expected that some or all of the assumptions of the guidance furnished by us will not materialize or will vary significantly from actual results. Accordingly, our guidance is only an estimate of what management believes is realizable as of the date of release. Actual results will vary from the guidance. Investors should also recognize that the reliability of any forecasted financial data diminishes the further in the future that the data are forecast. In light of the foregoing, investors are urged to put the guidance in context and not to place undue reliance on it.

Any failure to successfully implement our operating strategy or the occurrence of any of the risks described in our Annual Reports on Form 10-K or our Quarterly Reports on Form 10-Q could result in actual operating results being different than the guidance, and such differences may be adverse and material.

***Our assets as of December 31, 2020 include a deferred tax asset, the full value of which we may not be able to realize.***

We recognize deferred tax assets and liabilities based on differences between the financial statement carrying amounts and the tax basis of assets and liabilities. At December 31, 2020, the net deferred tax asset was $492 million, primarily related to U.S. NOLs. We regularly review our deferred tax assets for recoverability based on our history of earnings, expectations for future earnings and expected timing of reversals of temporary differences. Realization of deferred tax assets ultimately depends on the existence of sufficient taxable income. We believe the recorded net deferred tax asset at December 31, 2020, is fully realizable based on our expected future earnings. However, our assumptions and estimates are inherently subject to business, economic and competitive uncertainties and contingencies, many of which are beyond our control and some of which may change. As a result, we could ultimately lose a portion of our deferred tax asset related to NOLs due to expiration, which could have a material adverse effect on our results of operations and cash flows.

***The ability to use our NOLs and certain other tax attributes to offset future taxable income may be subject to certain limitations.***

If a corporation undergoes an "ownership change" within the meaning of Section 382 of the IRC, the corporation's NOLs and certain other tax attributes arising before the "ownership change" are subject to limitations after the "ownership change." An "ownership change" under Section 382 of the IRC generally occurs if one or more

shareholders or groups of shareholders who own at least 5% of the corporation's equity increase their ownership in the aggregate by more than 50 percentage points over their lowest ownership percentage within a rolling period that begins on the later of three years prior to the testing date and the date of the last "ownership change." If an "ownership change" were to occur, Section 382 of the IRC would impose an annual limit on the amount of pre-ownership change NOLs and other tax attributes the corporation could use to reduce its taxable income, potentially increasing and accelerating the corporation's liability for income taxes, and also potentially causing tax attributes to expire unused. The amount of the annual limitation is determined based on a corporation's value immediately prior to the ownership change.

As of December 31, 2020, after taking into account limitations (or disallowance) on use, we had $2,510 million and $1,009 million of available U.S. federal and state NOLs, respectively, including amounts acquired in the AK Steel Merger. The use of our common shares in the Acquisitions in conjunction with subsequent issuances or sales of our shares (including transactions that are outside of our control) could cause us to experience an "ownership change." If we experience an "ownership change" under Section 382 of the IRC, further limitations (or disallowances) may apply and similar rules may also apply under state and foreign laws. Consequently, we may not be able to utilize a material portion of our NOLs and other tax attributes, which, in addition to increasing our U.S. federal and state income tax liability, could adversely affect our share price, financial condition, results of operations and cash flows.

***Holders of our common shares may not receive dividends on their common shares.***

We are not required to declare cash dividends on our common shares and, in April 2020, we announced the suspension of future dividends. Holders of our common shares are entitled to receive only such dividends as our Board may from time to time declare out of funds legally available for such payments. We are incorporated in Ohio and governed by the Ohio General Corporation Law, which allows a corporation to pay dividends, in general, in an amount that cannot exceed its surplus, as determined under Ohio law. Our ability to pay dividends will be subject to our future earnings, capital requirements and financial condition, as well as our compliance with covenants and financial ratios related to existing or future indebtedness, business prospects and other factors that our Board may deem relevant. Additionally, our ABL Facility contains, and agreements governing any of our future debt may contain, covenants and other restrictions that, in certain circumstances, could limit the level of dividends that we are able to pay on our common shares.

## IV. OPERATIONAL RISKS

***We face significant risks relating to our recent acquisitions of the AK Steel and ArcelorMittal USA businesses.***

During 2020, we completed both the AK Steel Merger and the AM USA Transaction. These recent transformative acquisitions involve a number of significant risks and uncertainties that may adversely affect us, including the following:

- inability to realize anticipated synergies or other expected benefits or cost savings;

- additional debt incurred or assumed in connection with the acquisitions could limit our financial flexibility, including our ability to acquire additional assets and make further strategic investments in the future;

- diversion of financial resources to the new operations or acquired businesses;

- assumption of substantial additional environmental exposures, commitments, contingencies and remediation and reclamation projects;

- liabilities for acquired pension and OPEB obligations, which could require us to make significant cash expenditures and funding contributions in excess of current estimates and contribution rates;

- impairment of recorded tangible and intangible asset values, including goodwill, could result in material non-cash charges to our results of operations in the future;

- failure to successfully integrate acquired systems, business processes, policies and procedures;

- exposure to unknown liabilities and unforeseen costs that were not discovered during due diligence;

- loss of human capital resources and support services historically provided by ArcelorMittal and potential failure of ArcelorMittal or its affiliates to perform under various contracts entered into in connection with the AM USA Transaction, including the intellectual property license agreement, slab supply agreement and

27

transition services agreement, which could adversely impact our integration of the ArcelorMittal USA operations;

- potential loss of key employees, suppliers or customers; and

- other challenges associated with managing the larger, more complex and integrated combined businesses.

If one or more of these risks and uncertainties were to materialize, we could experience reduced sales, higher costs, lower profitability and other adverse impacts to our operations and businesses.

In addition, in connection with the closing of the AM USA Transaction, we issued approximately 78 million of our common shares to an indirect, wholly owned subsidiary of ArcelorMittal, equating to approximately 16% of our then-outstanding common shares. On February 11, 2021, in connection with our sale of 20 million of our common shares in an underwritten public offering, such subsidiary of ArcelorMittal, as a selling shareholder in the offering, sold 40 million of our common shares. We believe such subsidiary of ArcelorMittal continues to hold approximately 38 million of our common shares, equating to approximately 8% of our outstanding common shares following completion of such offering. Although ArcelorMittal and its affiliates are subject to certain restrictions and requirements under an Investor Rights Agreement with respect to its and its affiliates' ownership and voting of our common shares, at such a level of beneficial ownership, ArcelorMittal and its affiliates may be able to exert influence over us and actions requiring the approval of our common shareholders. Under the Investor Rights Agreement, ArcelorMittal and its affiliates are permitted to transfer all of our common shares held by them, subject to certain restrictions on transfers to persons whose beneficial ownership of our common shares following any such transfer would exceed 5% or 10% of our then-outstanding common shares. Sales of our shares by ArcelorMittal and its affiliates or other shareholders, coupled with the increase in the outstanding number of our common shares, may affect the market for, and the market price of, our common shares in an adverse manner.

We also issued 583,273 shares of Series B Preferred Stock to an indirect, wholly owned subsidiary of ArcelorMittal in connection with the closing of the AM USA Transaction. Pursuant to the terms of the Series B Preferred Stock, from and after the 24-month anniversary of the issue date of the Series B Preferred Stock (the "24-Month Anniversary"), each holder of a share of Series B Preferred Stock is entitled to receive cash dividends (the "Additional Dividends") that will accrue and compound at a significant rate. Although the Series B Preferred Stock is redeemable at our option 180 days after the issue date, the agreements governing our debt may restrict us from paying the redemption price at any given time. If we are unable to redeem the Series B Preferred Stock prior to the 24-Month Anniversary and we become obligated to pay the Additional Dividends, we may be required to divert financial resources from our operations or borrow additional debt in order to satisfy such obligations, which could have a material adverse effect on our business, financial condition and results of operations.

***We have limited ability to control our joint venture operations, rely on our joint venture partners to meet their payment obligations, and are subject to risks involving the acts or omissions of our joint venture partners.***

As part of the AM USA Transaction, we acquired ArcelorMittal USA's interest in Hibbing and again became the manager of Hibbing, which we co-own with U.S. Steel. In our steel business, we are party to various joint venture arrangements primarily related to downstream steel processing operations. Due to shared ownership, we have limited ability to control our joint venture operations, and we cannot control the actions of our joint venture partners. Accordingly, we rely on our joint venture partners to make their required capital contributions and to pay for their share of joint venture obligations. If our joint venture partners experience financial hardship or fail to perform their obligations, we may be required to assume additional material obligations to minimize operational disruption or as part of a liquidation, including significant capital contributions, costs of environmental remediation, and pension and OPEB obligations.

***Our operating expenses could increase significantly if the price of raw materials, electrical power, fuel or other energy sources increases.***

Our operations require significant use of energy and raw materials. Energy expenses are sensitive to changes in electricity, energy transportation and fuel prices, including diesel fuel and natural gas. Although we are self-sufficient in iron ore, other raw materials or production inputs where we are wholly or partially dependent on third-party suppliers include industrial gases, graphite electrodes, scrap, chrome, zinc, coke and coal. Prices for electricity, natural gas, fuel oils and raw materials can fluctuate widely with availability and demand levels from other users, including fluctuations caused by the impact of the COVID-19 pandemic. During periods of peak usage, although some operations have contractual arrangements in place whereby they receive certain offsetting payments in exchange for electricity load reduction, supplies of energy and raw materials in general may be curtailed and we may not be able to purchase them at historical rates. A disruption in the transmission of energy, inadequate energy transmission

infrastructure, or the termination of any of our energy supply contracts could interrupt our energy supply and adversely affect our operations. While we have some long-term contracts with electrical, natural gas and raw material suppliers, we are exposed to fluctuations in energy, natural gas and raw material costs that can affect our production costs. As an example, our Toledo direct reduction plant is subject to changes in the market price of natural gas, which is a key input in the direct reduction of iron ore pellets to produce HBI. We enter into many market-based pricing supply contracts for electricity, natural gas and diesel fuel for use in our operations. Those contracts expose us to price increases in energy costs, which could cause our profitability to decrease significantly. In addition, U.S. public utilities may impose rate increases and pass through additional capital and operating cost increases to their customers related to new or pending U.S. environmental regulations or other charges that may require significant capital investment and use of cleaner fuels in the future. In particular, the recent decision of the U.S. Court of Appeals for the District of Columbia vacating and remanding the Affordable Clean Energy Rule, as well as recent executive orders from President Biden regarding the environment and climate change, indicate that new or revised regulations under the Biden Administration could result in rate increases from U.S. utilities.

The majority of our steel shipments are sold under contracts that do not allow us to pass through all increases in raw materials, supplies and energy costs. Some of our steel shipments to contract customers include variable-pricing mechanisms allowing us to adjust the total sales price based on changes in specified raw materials, supplies and energy costs. Those adjustments, however, rarely reflect all of our underlying raw materials, supplies and energy cost changes. The scope of the adjustment may also be limited by the terms of the negotiated language, including limitations on when the adjustment occurs. Our need to consume existing inventories may also delay the impact of a change in prices of raw materials or supplies. Significant changes in raw material costs may also increase the potential for inventory value write-downs in the event of a reduction in selling prices and our inability to realize the cost of the inventory.

***Steelmaking facility or mine closures entail substantial costs. If our assumptions underlying our accruals for closure costs prove to be inaccurate or we prematurely close one or more of our facilities or mines, our results of operations and financial condition would likely be adversely affected.***

If faced with overcapacity in the market or other adverse conditions, including as a result of the COVID-19 pandemic, we may seek to rationalize assets through asset sales, temporary shutdowns, indefinite idles or facility closures. If we indefinitely idle or permanently close any of our facilities or mines, our production and revenues would be reduced unless we were able to increase production at our other facilities or mines in an offsetting amount, which may not be possible, and could result in customers responding negatively by taking current or future business away from us if we seek to transition production to a different facility. Alternatively, we could fail to meet customer specifications at the facilities to which products are transitioned, resulting in customer dissatisfaction or claims.

The closure of a steelmaking facility or mining operation involves significant closure costs, including reclamation and other environmental costs, the costs of terminating long-term obligations, including customer, energy and transportation contracts and equipment leases, and certain accounting charges, including asset impairment and accelerated depreciation. In addition, a permanent steelmaking facility or mine closure could accelerate and significantly increase employment legacy costs, including our expense and funding costs for pension and OPEB obligations and multiemployer pension withdrawal liabilities. A number of employees would be eligible for immediate retirement under special eligibility rules that apply upon a steelmaking facility or mine closure. All employees eligible for immediate retirement under the pension plans at the time of the permanent closure also could be eligible for OPEB, thereby accelerating our obligation to provide these benefits. Certain closures would precipitate a pension closure liability significantly greater than an ongoing operation liability and may trigger certain severance liability obligations.

We base our assumptions regarding the life of our mines on detailed studies we perform from time to time, but those studies and assumptions are subject to uncertainties and estimates that may not be accurate. We recognize the costs of reclaiming open pits, stockpiles, tailings ponds, roads and other mining support areas based on the estimated mining life of our property. If our assumptions underlying our accruals for closure costs, including reclamation and other environmental costs, prove to be inaccurate or insufficient, or our liability in any particular year is greater than currently anticipated, our results of operations and financial condition could be adversely affected. In addition, if we were to significantly reduce the estimated life of any of our mines, the mine closure costs would be applied to a shorter period of production, which would increase costs per ton produced and could adversely affect our results of operations and financial condition.

29

*Our sales and competitive position depend on the ability to transport our products to our customers at competitive rates and in a timely manner.*

Disruption of the lake, rail and/or trucking transportation services because of weather-related problems, including ice and winter weather conditions on the Great Lakes or St. Lawrence Seaway, climate change, strikes, lock-outs, driver shortages and other disruptions in the trucking industry, rail network constraints, global or domestic pandemics or epidemics (such as the COVID-19 pandemic) or other infectious disease outbreaks, in each case causing a business disruption, or other events and lack of alternative transportation options could impair our ability to move products internally among our facilities and to supply products to our customers at competitive rates or in a timely manner and, thus, could adversely affect our sales, margins and profitability. Further, dredging issues and environmental changes, particularly at Great Lakes ports, could impact adversely our ability to move certain of our products or result in higher freight rates. Similarly, we depend on third-party transportation services for delivery of raw materials to us, and failures or delays in delivery would have an adverse effect on our ability to maintain steady-state production operations to meet customer obligations.

*Natural or human-caused disasters, weather conditions, disruption of energy, unanticipated geological conditions, equipment failures, infectious disease outbreaks, and other unexpected events may lead our customers, our suppliers or our facilities to curtail production or shut down operations.*

Operating levels within our industry and the industries of our customers and suppliers are subject to unexpected conditions and events that are beyond the industries' control. Those events, including the occurrence of an infectious disease or illness, such as the COVID-19 pandemic, could cause industry members or their suppliers to curtail production or shut down a portion or all of their operations, which could reduce the demand for our products and adversely affect our sales, margins and profitability. For example, the temporary production shutdowns in the automotive industry during 2020 as a result of the COVID-19 pandemic and associated reduction in demand for our products led to our decision to temporarily idle certain steelmaking facilities and iron ore mines.

Our operating levels are subject to conditions beyond our control that can delay deliveries or increase the cost of production for varying lengths of time. Factors that could cause production disruptions could include adverse weather conditions (for example, extreme winter weather, tornadoes, floods, and the lack of availability of process water due to drought) and natural and man-made disasters, lack of adequate raw materials, energy or other supplies, and infectious disease outbreaks, such as the COVID-19 pandemic. In addition, factors that could adversely impact production and operations at our mining operations include tailings dam failures, pit wall failures, unanticipated geological conditions, including variations in the amount of rock and soil overlying deposits of iron ore and coal, variations in rock and other natural materials, and variations in geologic conditions and processing changes.

Our mining operations, processing facilities, steelmaking and logistics operations depend on critical pieces of equipment. This equipment may, on occasion, be out of service because of unanticipated failures or unplanned outages. In addition, most of our mines and production and processing facilities have been in operation for several decades, and the equipment is aged. In the future, we may experience additional lengthy shutdowns or periods of reduced production because of equipment failures. Further, remediation of any interruption in production capability may require us to make large capital expenditures that could have a negative impact on our profitability and cash flows. Our business interruption insurance would not cover all of the lost revenues associated with equipment failures. Longer-term business disruptions could result in a loss of customers, which could adversely affect our future sales levels and revenues.

Many of our production facilities and mines are dependent on one source for electric power, natural gas, industrial gases and/or certain other raw materials or supplies. A significant interruption in service from our suppliers due to the COVID-19 pandemic, terrorism or sabotage, weather conditions, natural disasters, equipment failure or any other cause could result in substantial losses that may not be fully recoverable, either from our business interruption insurance or responsible third parties.

*We incur certain costs when production capacity is idled, as well as increased costs to resume production at previously idled facilities.*

Our decisions concerning which facilities to operate and at what production levels are made based in part upon our customers' orders for products, as well as the quality, performance capabilities and cost of our operations. During depressed market conditions, we may concentrate production at certain facilities and not operate others in response to customer demand, and as a result we may incur idle costs that could offset our anticipated savings from not operating the idled facility. For example, due to reduced demand as a result of the COVID-19 pandemic, certain of our steelmaking facilities and iron ore mines were temporarily idled during portions of 2020 and we continued to incur

certain fixed costs at those facilities. We cannot predict whether our operations will experience additional disruptions in the future.

When we restart idled facilities, we incur certain costs to replenish inventories, prepare the previously idled facilities for operation, perform the required repair and maintenance activities, and prepare employees to return to work safely and resume production responsibilities. The amount of any such costs can be material, depending on a variety of factors, such as the period of idle time, necessary repairs and available employees, and is difficult to project.

***We may not have adequate insurance coverage for some business risks.***

Our operations are generally subject to a number of hazards and risks, which could result in personal injury or damage to, or destruction of, equipment, properties or facilities. The insurance that we maintain to address risks that are typical in our businesses may not provide adequate coverage. Insurance against some risks, such as liabilities for environmental pollution, tailings basin breaches, or certain hazards or interruption of certain business activities, may not be available at an economically reasonable cost, or at all. Even if available, we may self-insure where we determine it is most cost effective to do so. As a result, despite the insurance coverage that we carry, accidents or other negative developments involving our production, mining, processing or transportation activities causing losses in excess of policy limits, or losses arising from events not covered under insurance policies, could have a material adverse effect on our financial condition and cash flows.

***A disruption in or failure of our IT systems, including those related to cybersecurity, could adversely affect our business operations and financial performance.***

We rely on the accuracy, capacity, integrity and security of our IT systems for the operation of many of our business processes and to comply with regulatory, legal and tax requirements. While we maintain some of our critical IT systems, we are also dependent on third parties to provide important IT services relating to, among other things, operational process technology at our facilities, human resources, electronic communications and certain finance functions. Further, in connection with the Acquisitions, we inherited certain legacy hardware and software IT systems that can be supported only by a very limited number of specialists in the market, and our increased reliance on these legacy IT systems may increase the risk of IT system disruption or failure, which could adversely affect our operations.

Despite the security measures that we have implemented, including those related to cybersecurity, our IT systems could be breached or damaged by computer viruses, natural or man-made incidents or disasters, or unauthorized physical or electronic access or intrusions. Though we have controls in place, we cannot provide assurance that a cyberattack will not occur. Furthermore, we may have little or no oversight with respect to security measures employed by third-party service providers, which may ultimately prove to be ineffective at countering threats. We may also experience increased risk of IT system failures or cyberattacks as many of our employees continue to work from home as part of our response to the COVID-19 pandemic. In addition, we may experience increased risk of IT system failures or cyberattacks as transitional activities relating to the Acquisitions are in progress, since these activities expose each company to the other's security vulnerabilities, and because the Acquisitions may attract the attention of potential cyber criminals.

Failures of our IT systems, whether caused maliciously or inadvertently, may result in the disruption of our business processes, or in the unauthorized release of sensitive, confidential, personally identifiable or otherwise protected information, or result in the corruption of data, each of which could adversely affect our businesses. For example, cybersecurity vulnerabilities could result in an interruption of the functionality of our automated manufacturing operating systems, which, if compromised, could cease, threaten, delay or slow down our ability to produce or process steel or any of our other products for the duration of such interruption, which could result in reputational harm and may adversely affect our results of operations, financial condition and cash flows. In addition, any compromise of the security of our IT systems could result in a loss of confidence in our security measures and subject us to litigation, regulatory investigations and negative publicity that could adversely affect our reputation and financial condition. Our customers, suppliers and vendors may also access or store certain of our sensitive information on their IT systems, which, if breached, attacked or accessed by unauthorized persons, could likewise expose our sensitive information and adversely impact our businesses. Furthermore, as cybersecurity threats continue to evolve and become more sophisticated, we may be required to incur significant costs and invest additional resources to protect against and, if required, remediate the damage caused by such disruptions or system failures in the future.

31

Table of Contents

## V. DEVELOPMENT AND SUSTAINABILITY RISKS

***The cost and time to implement a strategic capital project may prove to be greater than originally anticipated.***

From time to time, we undertake strategic capital projects, such as our recently-completed Toledo direct reduction plant, in order to enhance, expand or upgrade our production and mining capabilities or diversify our customer base. Our ability to achieve the anticipated production volumes, revenues or otherwise realize acceptable returns on strategic capital projects that we may undertake is subject to a number of risks, many of which are beyond our control, including a variety of market (such as a volatile pricing environment for our products), operational, permitting and labor-related factors. Further, the cost to implement any given strategic capital project ultimately may prove to be greater and may take more time than originally anticipated. Inability to achieve the anticipated results from the implementation of our strategic capital projects, incurring unanticipated implementation costs or penalties, or the inability to meet contractual obligations could adversely affect our results of operations and future earnings and cash flow generation.

***We must continually replace reserves depleted by production. Exploration activities may not result in additional discoveries.***

Our ability to replenish mineral reserves is important to our long-term viability. Depleted reserves must be replaced by further delineation of existing mineral bodies or by locating new deposits in order to maintain production levels over the long term. Decisions to defer mine development activities may adversely impact our ability to substantially increase future mineral production. Resource exploration and development are highly speculative in nature. Exploration projects involve many risks, require substantial expenditures and may not result in the discovery of sufficient additional mineral deposits that can be mined economically. Once a mineral body is discovered, it may take several years from the initial phases of drilling until production is possible, during which time the economic feasibility of production may change. Substantial expenditures are required to establish recoverable proven and probable reserves and to construct mining and processing facilities. As a result, there is no assurance that current or future exploration programs will be successful, and there is a risk that depletion of reserves will not be offset by discoveries or acquisitions.

***We rely on estimates of our recoverable reserves, which is complex due to geological characteristics of the properties and the number of assumptions made.***

We regularly evaluate our iron ore and coal reserves based on revenues and costs and update them as required in accordance with SEC regulations. We anticipate further updating our mining properties disclosure in accordance with the SEC's Final Rule 13-10570, Modernization of Property Disclosures for Mining Registrants, which became effective February 25, 2019, and which rescinds SEC Industry Guide 7 following a two-year transition period, which means that we will be required to comply with the new rule no later than our fiscal year beginning January 1, 2021.

Estimates of reserves and future net cash flows necessarily depend upon a number of variable factors and assumptions, some of which are beyond our control, such as production capacity, effects of regulations by governmental agencies, future prices for iron ore and coal, future industry conditions and operating costs, severance and excise taxes, development costs, and costs of extraction and reclamation. Estimating the quantity and grade of reserves requires us to determine the size, shape and depth of our mineral bodies by analyzing geological data, such as samplings of drill holes. Estimated reserves could be affected by future industry conditions, future changes in the SEC's mining property disclosure requirements, geological conditions and ongoing mine planning. Actual volume and grade of reserves recovered, production rates, revenues and expenditures with respect to our reserves will likely vary from estimates, and if such variances are material, our sales and profitability could be adversely affected.

***Defects in title or loss of any leasehold interests in our mining properties could limit our ability to mine these properties or result in significant unanticipated costs.***

Many of our operations are conducted on properties we lease, license or as to which we have easements or other possessory interests. We generally do not maintain title insurance on our properties. A title defect or the loss of any lease, license, easement or other possessory interest for any mining property could adversely affect our ability to mine any associated reserves. In addition, from time to time the rights of third parties for competing uses of adjacent, overlying or underlying lands, such as for roads, easements, public facilities or other mining activities, may affect our ability to operate as planned if our title is not superior or mutually acceptable arrangements cannot be negotiated. Any challenge to our title could delay the exploration and development of some reserves, deposits or surface rights, cause us to incur unanticipated costs, and could ultimately result in the loss of some or all of our interest in those properties.

32

In the event we lose reserves, deposits or surface rights, we may be required to shut down or significantly alter impacted mining operations, thereby affecting future production, revenues and cash flows.

***In order to continue to foster growth in our businesses and maintain stability of our earnings, we must maintain our social license to operate with our stakeholders.***

Maintaining a strong reputation and consistent operational, environmental and safety track record is vital in order to continue to foster growth and maintain stability in our earnings. As stakeholders' sustainability expectations increase and regulatory requirements continue to evolve, maintaining our social license to operate becomes increasingly important. Our ability to maintain our reputation and strong operating track record could be threatened, including by challenges relating to the integration of the AK Steel and ArcelorMittal USA businesses or by circumstances outside of our control, such as disasters caused or suffered by other companies in the steel and mining industries. If we are not able to respond effectively to these and other challenges to our social license to operate, our reputation could be damaged significantly. Damage to our reputation could adversely affect our operations and ability to foster growth projects.

## VI. HUMAN CAPITAL RISKS

***Our profitability could be adversely affected if we fail to maintain satisfactory labor relations.***

Our production is dependent upon the efforts of our employees. We are party to labor agreements with various labor unions that represent employees at the majority of our operations. Such labor agreements are negotiated periodically, and, therefore, we are subject to the risk that these agreements may not be able to be renewed on reasonably satisfactory terms. It is difficult to predict what issues may arise as part of the collective bargaining process, and whether negotiations concerning these issues will be successful. Due to union activities or other employee actions, we could experience labor disputes, work stoppages or other disruptions in our production that could affect us adversely. We have labor agreements that will expire at five locations in 2021 and sixteen locations in 2022. If we enter into a new labor agreement with any union that significantly increases our labor costs relative to our competitors or fail to come to an agreement upon expiry, our ability to compete or continuity of production may be materially and adversely affected.

***We may encounter labor shortages for critical operational positions, which could adversely affect our ability to produce our products.***

We are predicting a long-term shortage of skilled workers in heavy industry and in certain highly specialized IT roles, and competition for the available workers limits our ability to attract and retain employees as well as engage third-party contractors. As our experienced employees retire, we may have difficulty replacing them at competitive wages. In addition, the ongoing COVID-19 pandemic has resulted and may continue to result in increased government restrictions and regulation, including quarantines of our personnel and potential inability to access facilities, which has adversely affected and could continue to adversely affect our operations.

***Our expenditures for pension and OPEB obligations could be materially higher than we have predicted if our underlying assumptions differ from actual outcomes, there are regulatory changes or our joint venture partners fail to perform their obligations that relate to employee pension plans.***

We provide defined benefit pension plans and OPEB to certain eligible union and non-union employees, including our share of expense and funding obligations with respect to our unconsolidated joint ventures. Our pension and OPEB expenses and our required contributions to our pension and OPEB plans are affected directly by the value of plan assets, the projected and actual rate of return on plan assets, and the actuarial assumptions we use to measure our defined benefit pension plan obligations, including the rate at which future obligations are discounted. We cannot predict whether changing market or economic conditions, regulatory changes or other factors will increase our pension and OPEB expenses or our funding obligations, diverting funds we would otherwise apply to other uses.

We have calculated our unfunded pension and OPEB obligations based on a number of assumptions. If our assumptions do not materialize as expected, cash expenditures and costs that we incur could be materially higher. Moreover, we cannot be certain that regulatory changes will not increase our obligations to provide these or additional benefits. These obligations also may increase substantially in the event of adverse medical cost trends or unexpected rates of early retirement, particularly for bargaining unit retirees. In addition, changes in the laws governing pensions could also materially adversely affect our costs and ability to meet our pension obligations.

We also contribute to certain multiemployer pension plans, including the Steelworkers' Pension Trust, for which we are one of the largest contributing employers. If other contributors were to default on their obligations to contribute to any such plans, we could become liable for additional unfunded contributions to the plans.

In addition, some of the transactions in which we previously sold or otherwise disposed of our non-core assets included provisions transferring certain pension and other liabilities to the purchasers or acquirers of those assets. While we believe that all such transfers were completed properly and are legally binding, if the purchaser fails to fulfill its obligations, we may be at risk that a court, arbitrator or regulatory body could disagree and determine that we remain responsible for pension and other liabilities that we intended to and did transfer.

***We depend on our senior management team and other key employees, and the loss of these employees could adversely affect our businesses.***

Our success depends in part on our ability to attract, retain, develop and motivate our senior management and key employees. Achieving this objective may be difficult due to a variety of factors, including fluctuations in the global economic and industry conditions, competitors' hiring practices, cost reduction activities, and the effectiveness of our compensation programs. Competition for qualified personnel can be intense. We must continue to recruit, retain, develop and motivate our senior management and key personnel in order to maintain our business and support our projects. A loss of senior management and key personnel could prevent us from capitalizing on business opportunities, and our operating results could be adversely affected. We are also subject to the risk that the COVID-19 pandemic may impact the health or effectiveness of members of our senior management team or other key employees.

**Item 1B.**      ***Unresolved Staff Comments***

We have no unresolved comments from the SEC.

34

**Item 2.**        *Properties*

The following map shows the locations of our operations and offices as of December 31, 2020:



## CLIFFS
### Company Offices and Operations

● **Corporate Offices**
1. Cleveland-Cliffs Headquarters
2. Regional Office – West Chester
3. Regional Office – Chicago
4. Regional Office – Richfield
5. Research & Innovation Center

○ **Steelmaking**
6. Northshore Mine
7. Tilden Mine
8. United Taconite Mine
9. Minorca Mine
10. Hibbing Taconite Mine
11. Empire Mine (indefinitely idled)
12. Princeton Mine
13. Warren
14. Mountain State Carbon
15. Monessen Coke
16. Indiana Harbor
17. Burns Harbor
18. Cleveland
19. Middletown Works
20. Dearborn Works
21. Butler Works
22. Mansfield Works
23. Ashland Works (idled)

25. Coatesville
26. Steelton
27. Riverdale
28. Zanesville Works
29. Rockport Works
30. Coshocton Works
31. Burns Harbor Plate
32. Columbus
33. Conshohocken
34. Tek and Kote
35. Piedmont
36. Weirton

◉ **Tooling and Stamping**
37. Precision Partners – Windsor and Ontario
38. Precision Partners – Sylacauga
39. Precision Partners – Bowling Green

○ **Tubular**
40. Tubular Components – Walbridge
41. Tubular Components – Columbus

**European Operations** *(not shown)*

35

**Corporate Offices**

We lease our corporate headquarters in Cleveland, Ohio. We also have leased office space in West Chester, Ohio and Chicago, Illinois. We own our office space located in Richfield, Ohio, and our Research and Innovation Center located in Middletown, Ohio.

**Steelmaking**

*Steelmaking and Finishing Facilities*

Below is a listing and description of our principal steelmaking and finishing facilities:

Burns Harbor is a fully integrated steelmaking facility located on Lake Michigan in Northwest Indiana, 50 miles southeast of Chicago. The location allows for prime shipping access to the Port of Indiana, as well as excellent highway and railroad transport. Burns Harbor's major production facilities include coke plant operations, iron producing, steel producing, hot rolling and finishing and plate rolling and heat treating. The plant operates two blast furnaces and is capable of producing hot-rolled sheet, cold-rolled sheet and hot dip galvanized sheet. Burns Harbor is capable of producing nearly 5 million net tons of raw steel annually. Burns Harbor serves key markets including the automotive, appliance, construction, converters, distribution and pipe and tube markets.

Burns Harbor Plate and Gary Plate are located in Burns Harbor and Gary, Indiana, respectively, and are heat treating and finishing operations producing carbon steel plate, high-strength low alloy steel plate and ASTM grades steel plate. These operations serve the construction, distribution, energy, heavy equipment, infrastructure, military, pipe and tube, rail car and shipbuilding markets.

Butler Works is located in Butler, Pennsylvania, and produces stainless, electrical and carbon steel. Melting takes place in an EAF that feeds an argon-oxygen decarburization unit for the specialty steels. A ladle metallurgy furnace feeds two double-strand continuous casters, which are capable of producing 1 million net tons of raw steel annually. Butler Works also includes a hot rolling mill, annealing and pickling units and two tandem cold rolling mills. It also has various intermediate and finishing operations for both stainless and electrical steels. Butler Works primarily serves the power and distribution transformers and stainless and carbon converters markets.

The Cleveland facility is an integrated steelmaking facility strategically located on the Cuyahoga River in Cleveland, Ohio, with access to the Port of Cleveland and Great Lakes shipping, as well as excellent highway and railroad transport. The Cleveland facility is supplied with coke from our cokemaking operations in Warren, Ohio. Cleveland's major production facilities include two blast furnaces, two steel producing facilities, an 84-inch hot strip mill, a pickling line, a five-stand tandem mill, and a hot dip coating line. The plant's two blast furnaces feed the two steelmaking facilities, which are capable of producing more than 3 million net tons of raw steel annually. Products made at this location are hot-rolled, cold-rolled and hot-dipped galvanized sheet and semi-finished slabs. The Cleveland facility serves the automotive, construction, converters and distribution markets.

The Kote and Tek operations are located in New Carlisle, Indiana, and receive substantially all of their feedstock from Indiana Harbor via daily unit trains. Cleveland-Cliffs Tek is a continuous cold-rolling plant that is capable of producing 1.7 million net tons of sheet steel annually through a continuous descale cold mill and 1.0 million net tons of sheet steel annually through a continuous annealing processing line. Cleveland-Cliffs Kote has separate lines producing 0.5 million net tons of hot-dip galvanized and galvannealed and 0.5 million net tons of electrogalvanized sheet annually. The principal customers of Kote and Tek are in the automotive and appliance markets.

Coatesville is a steel plate production facility located in Coatesville, Pennsylvania, about 40 miles west of Philadelphia, Pennsylvania, and has access to highways and railroads. The facility produces steel from scrap in an EAF and is capable of producing approximately 0.8 million net tons of raw steel annually. The facility also operates ingot teeming facilities, a slab caster, two plate mills, heat-treating facilities, quench and temper and flame-cut shape facilities. The Coatesville facility refines more than 450 different steel chemistries and, together with the Conshohocken facility, produces some of the widest, thickest and heaviest steel plates in the industry. Steel plate products made at this location include carbon, high-strength low-alloy, commercial alloy, military alloy and flame-cut steel. Coatesville serves the aircraft and aerospace, construction, distribution, energy, heavy equipment, military, mold and tool and shipbuilding markets.

Our Columbus operations include a hot-dip galvanizing facility in Columbus, Ohio, and a processing facility in nearby Obetz, Ohio. These operations are temporarily idled due to the COVID-19 pandemic. These central Ohio locations are able to utilize highway and rail transport shipping access. Two zinc pots enable the transition between

36

A006112

coatings to be accomplished in a timely manner while allowing for longer exposed runs. The plant produces hot-dip galvanized sheet using cold-rolled coils supplied by other Cliffs facilities and is capable of coating 450,000 net tons annually. The Columbus operations serve the automotive and distribution markets.

Conshohocken is a plate finishing facility located on the Schuylkill River adjacent to Philadelphia, Pennsylvania. The area is surrounded by highway and railroad systems that provide shipping access. Coatesville supplies steel plate to the Conshohocken plant, which operates heat treat, finishing and inspection facilities for steel plate finishing. The Conshohocken plant has a steckel mill that is currently idled, which is capable of producing coil and discrete plates. Conshohocken plate products are used in construction and military applications.

Coshocton Works is located in Coshocton, Ohio, and consists of a stainless steel finishing plant containing two Sendzimer mills and two Z-high mills for cold reduction, four annealing and pickling lines, bell annealing furnaces, two bright annealing lines, two temper mills, and other processing equipment, including temper rolling, slitting and a packaging line. Coshocton Works produces various flat-rolled stainless steel products including austenitic (chrome nickel) stainless steel grades, martensitic (chrome) stainless steel grades and ferritic (chrome) stainless steel grades, serving the automotive, appliance, distribution and medical markets among others.

Dearborn Works is located in Dearborn, Michigan, with carbon steel melting, casting, cold rolling and finishing operations for carbon steel. The major production facilities include a blast furnace, basic oxygen furnaces, two ladle metallurgy furnaces, a vacuum degasser, two slab casters, a pickling line tandem cold mill and a hot-dipped galvanizing line. Dearborn Works is capable of producing between 2 and 3 million net tons of raw steel annually. Products made at this location include carbon slabs, hot dip galvanized ZINCGRIP®, hot dip galvannealed ZINCGRIP GA steel and AHSS. Dearborn Works serves the automotive, heating, ventilation and air conditioning, converters and distribution markets. During 2020, the Dearborn Works hot strip mill, anneal and temper operations were permanently idled as part of our cost reduction efforts.

Indiana Harbor is one of the largest integrated steelmaking facilities in North America and is located in East Chicago, Indiana, just 20 miles southeast of Chicago, Illinois. The major production facilities include three blast furnaces, two of which are currently operating, a recycle plant, four basic oxygen furnaces, ladle metallurgy facilities and vacuum degassing, four continuous casting machines, a slab dimensioning facility, an 80-inch hot strip mill, a pickling line, a five-stand tandem mill, batch and continuous annealing, a temper mill and two hot-dip galvanizing lines. Indiana Harbor currently operates two blast furnaces capable of producing 5.5 million net tons of raw steel annually and has a diverse facility capable of making a full range of flat products, including AHSS, American Petroleum Institute pipe skelp, motor-laminations, automotive exposed and martinsitic grades. Indiana Harbor is a leader in North American development of new automotive products, and is a primary supplier of coils to Kote and Tek. Indiana Harbor serves the automotive, appliance, contractor applications, distribution, strip converters and tubular markets.

Mansfield Works is located in Mansfield, Ohio, and produces high chrome ferritics and martensitic stainless steels and semi-finished hot bands. The major production facilities include a melt shop with two EAFs, an argon oxygen decarburization unit, a ladle metallurgy facility, a thin slab continuous caster, a walking beam slab furnace and a hot rolling mill. The thin slab caster uses an advanced technology production system to meet customer specifications. Mansfield Works is capable of producing approximately 0.6 million net tons of raw steel annually. Mansfield Works serves the automotive and appliance for stainless products markets.

Middletown Works is an integrated steel operation with carbon steel melting, casting, hot and cold rolling, and finishing operations located in Middletown, Ohio. The major production facilities include a coke facility, a blast furnace, basic oxygen furnaces, a Composition Adjustment by Sealed argon bubbling – Oxygen Blowing (CAS-OB), a vacuum degasser and a continuous caster for the production of carbon steel, which is capable of producing nearly 3 million net tons of raw steel annually. Middletown Works also has a hot strip mill, pickling lines, a five-stand cold mill, an electrogalvanizing line, a hot dip carbon and stainless aluminizing line, a hot dip galvanizing line, box annealing furnaces, temper mills and an open coil annealing facility for finishing products. Products made at this location include hot-rolled and cold-rolled carbon steels, enameling steels, electrogalvanized ZINCGRIP ELECTRASMOOTH® steels, hot dip galvanized ZINCGRIP products and aluminized carbon and stainless steels. Middletown Works serves the automotive, appliance, heating, ventilation and air conditioning, culvert and distribution markets.

Piedmont is a finishing facility located in Newton, North Carolina, 50 miles northwest of Charlotte. The facility specializes in plasma cutting plate steel products into blanks for machinery and automotive manufacturers and primarily serves the truck axle blank business. Additionally, it provides services such as part leveling and just-in-time deliveries.

37

A006113

Table of Contents

Riverdale is a compact strip mill that produces hot-rolled sheet located in Illinois, 14 miles west of our Indiana Harbor facility. The location allows for close shipping access to Lake Michigan, and is surrounded by highway and railroad systems. The Riverdale facility operates two basic oxygen furnaces, a ladle metallurgy facility, continuous thin slab caster, tunnel furnace and hot strip mill, which are capable of producing approximately 1 million net tons of thin-slab casting and rolling annually. The light gauge capabilities and tight gauge tolerances are desired characteristics for line pipe and structural and mechanical tubing producers. Principal products made at this plant include hot-rolled black bands in a full range of grades, including high carbon and alloy. The Riverdale facility primarily serves cold-rolled strip producers who supply the automotive, saw blade and strapping markets.

Rockport Works is located on the Ohio River in southwest Indiana near Rockport, Indiana. Rockport Works consists of a carbon and stainless steel finishing plant containing a continuous cold rolling mill, a continuous hot-dip galvanizing and galvannealing line, a continuous carbon and stainless steel pickling line, a continuous stainless steel annealing and pickling line, hydrogen annealing facilities and a temper mill. Utilizing innovative manufacturing technologies, the plant incorporates automated guidance vehicles and automated cranes to move the steel through the various finishing operations. Steels from Rockport Works include a full range of cold-rolled carbon, coated and stainless steels in either the annealed and pickled or temper rolled surface condition. Product offerings include a wide variety of AHSS. The Rockport Works hot dip galvanizing and galvannealing line incorporates revolutionary proprietary technologies, including induction transition heating, which provides rapid, accurate annealing temperature control. In addition, the Rockport Works line produces 80-inch sheet steel. Rockport Works serves the automotive, appliance, heating, ventilation and air conditioning and distribution for carbon and stainless markets.

Steelton is one of only three rail producers in North and South America and is located in Steelton, Pennsylvania, about 100 miles west of Philadelphia, Pennsylvania. Steelton consists of a 150 net ton direct current EAF with ladle refining and vacuum degassing, a three-strand continuous jumbo bloom caster and an ingot teeming facility. Steelton has an annual steelmaking capacity of 1 million net tons. Steelton produces railroad rails, specialty blooms and flat bars for use in railroad and forging markets.

Our Weirton facility is a tinplate facility located on the northern panhandle of West Virginia along the Ohio River in the city of Weirton, West Virginia. The location provides shipping access along the Ohio River, as well as highway and railroad shipping. Products made at this location include cold-rolled and tinplate products serving the distribution and packaging markets.

Zanesville Works is located on the Muskingum River in Zanesville, Ohio. The finishing facility's products include regular GOES and cold-rolled NOES. These specialty flat-rolled steels enable customers to create a variety of products, including generators, transformers and a host of other electrical devices. The primary markets Zanesville Works serves are the power and distribution transformers markets.

In the aggregate, we have annual production capacity of approximately 23 million net tons of raw steel. Due to the timing of the Acquisitions and the idling of facilities in response to impacts of the COVID-19 pandemic, our steelmaking facilities produced a total of 4 million net tons of raw steel during the year ended December 31, 2020.

*Direct Reduction Plant, Iron Ore Mines and Pellet Plants*

Our direct reduction plant is located in Toledo, Ohio, and is near an existing dock, has rail access and heavy haul roads for operation logistics. We are leasing the property on which the plant is located. Our Toledo direct reduction plant, which began production in the fourth quarter of 2020, produces a specialized high quality iron alternative to scrap and pig iron. The Toledo direct reduction plant has annual capacity of 1.9 million metric tons of HBI per year, and we expect to reach full production rate by the second quarter of 2021.

All of our iron ore mining operations are open-pit mines. Additional pit development is underway as required by long-range mine plans. Drilling programs are conducted periodically to collect modeling data and for refining ongoing operations.

Geologic models are developed for all mines to define the major ore and waste rock types. Computerized block models for iron ore are constructed that include all relevant geologic and metallurgical data. These are used to generate grade and tonnage estimates, followed by detailed mine design and life of mine operating schedules.

We currently own or co-own five operating iron ore mines in Michigan and Minnesota, as well as one indefinitely idled mine in Michigan. Following the AM USA Transaction, we now have an aggregate annual production capacity of approximately 28 million long tons of iron ore pellets, including our 85.3% share of the Hibbing mine production. Historically, our share of production capacity was approximately 21 million long tons of iron ore pellets

38

Table of Contents

annually. We produced 17 million, 20 million and 20 million long tons of iron ore pellets in 2020, 2019 and 2018, respectively.

Our iron ore mines produce from deposits located within the Biwabik and Negaunee Iron Formation, which are classified as Lake Superior type iron formations that formed under similar sedimentary conditions in shallow marine basins approximately two billion years ago. Magnetite and hematite are the predominant iron oxide ore minerals present, with lesser amounts of goethite and limonite. Quartz is the predominant waste mineral present, with lesser amounts of other chiefly iron bearing silicate and carbonate minerals. The ore minerals liberate from the waste minerals upon fine grinding.

The Hibbing mine is located in the center of Minnesota's Mesabi Iron Range and is approximately ten miles north of Hibbing, Minnesota, and five miles west of Chisholm, Minnesota. We own an 85.3% interest in the Hibbing mine, which has been operating since 1976. A subsidiary of U.S. Steel owns the remaining 14.7% of the Hibbing mine. Prior to the AM USA Transaction, we owned 23% of Hibbing, ArcelorMittal USA had a 62.3% interest and U.S. Steel had a 14.7% interest. On December 9, 2020, as a result of the AM USA Transaction, we acquired an additional 62.3% ownership stake in the Hibbing mine and became the majority owner and mine manager. Each partner takes its share of production pro rata; however, provisions in the joint venture agreement allow additional or reduced production to be delivered under certain circumstances. In 2020, the Hibbing mine produced 5.5 million long tons of iron ore pellets, of which 1.6 million long tons were for our account. Hibbing owns 3% of the ore reserves and leases 97% via multiple mineral leases having varying expiration dates. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates. Hibbing operations consist of an open pit truck and shovel mine, a concentrator that utilizes single stage crushing, AG mills and magnetic separation to produce a magnetite concentrate, which is then delivered to an on-site pellet plant. From the site, pellets are transported by BNSF rail to a ship loading port at Superior, Wisconsin, operated by BNSF.

The Minorca mine is located in the center of Minnesota's Mesabi Iron Range near Virginia, Minnesota. In 2020, the mine produced 2.8 million long tons of iron ore pellets, of which approximately 0.2 million long tons were produced during the period subsequent to the AM USA Transaction. We own 100% of the Minorca mine, which has been operating since 1977, and lease 100% of the mineral rights. Mining is conducted on multiple mineral leases having varying expiration dates. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates. This operation includes a concentrating and pelletizing facility, along with two open pit iron ore mines located approximately seven miles from the processing facilities. The processing operations consist of a crushing facility, a three-line concentration facility and a single-line straight grate pelletizing plant. Pellets are transported by CN rail to ports on Lake Superior and shipped to Indiana Harbor located in East Chicago, Indiana.

The Northshore mine is located in northeastern Minnesota, approximately two miles south of Babbitt, Minnesota, on the northeastern end of the Mesabi Iron Range. Northshore's processing facilities are located in Silver Bay, Minnesota, near Lake Superior. In 2020, the Northshore mine produced 3.8 million long tons of iron ore pellets, including both standard and DR-grade pellets. We own 100% of the Northshore mine, which has been operating since 1990, and lease 100% of the mineral rights. Mining is conducted on multiple mineral leases having varying expiration dates. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates. Operations consist of an open pit truck and shovel mine where two stages of crushing occur before the ore is transported along a wholly owned 47-mile rail line to the plant site in Silver Bay. At the plant site, two additional stages of crushing occur before the ore is sent to the concentrator. The concentrator utilizes rod mills and magnetic separation to produce a magnetite concentrate, which is delivered to the pellet plant located on-site. The plant site has its own ship loading port located on Lake Superior.

The Tilden mine is located on the Marquette Iron Range in Michigan's Upper Peninsula approximately five miles south of Ishpeming, Michigan. In 2020, the Tilden mine produced 6.3 million long tons of iron ore pellets. We own 100% of the Tilden mine, which has been operating since 1974. We own 91% and lease the remaining 9% of the ore reserves. Operations consist of an open pit truck and shovel mine, a concentrator that utilizes single stage crushing, AG mills, magnetite separation and floatation to produce hematite and magnetite concentrates that are then supplied to the on-site pellet plant. From the site, pellets are transported by our LS&I rail to a ship loading port at Marquette, Michigan, operated by LS&I.

The United Taconite mine is located on Minnesota's Mesabi Iron Range in and around the city of Eveleth, Minnesota. The United Taconite concentrator and pelletizing facilities are located ten miles south of the mine, near the town of Forbes, Minnesota. In 2020, the United Taconite mine produced 5.2 million long tons of iron ore pellets. We own 100% of the United Taconite mine, which has been operating since 1965, and lease 100% of the mineral rights. Mining is conducted on multiple mineral leases having varying expiration dates. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates. United Taconite operations consist of

39

an open pit truck and shovel mine where two stages of crushing occur before the ore is transported by rail, operated by CN, to the plant site. At the plant site an additional stage of crushing occurs before the ore is sent to the concentrator. The concentrator utilizes rod mills and magnetic separation to produce a magnetite concentrate, which is delivered to the on-site pellet plant. From the plant site, pellets are transported by CN rail to a ship loading port at Duluth, Minnesota, operated by CN.

The Empire mine was indefinitely idled in 2016 and had an annual iron ore pellet production capability of 6 million long tons. We own 47% of the ore reserves and lease the remaining 53%.

*Coal Mining and Cokemaking*

Princeton is a coal mining complex located in West Virginia that specializes in surface and underground mining of metallurgical coal to produce coke and pulverized coal injection coal. We have annual rated metallurgical coal production capacity of 2.3 million net tons from our Princeton mine. In 2020, the mine produced approximately 1.6 million net tons of coal, of which approximately 0.1 million net tons were produced during the period subsequent to the AM USA Transaction. We own 100% of the Princeton mine, which has been operating since 1995. We own 52% of the coal reserves and lease 48% via multiple mineral leases having varying expiration dates. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates. Princeton's operations consist of two open-pit surface mines, two underground mines, a preparation plant and two rail loadouts.

In 2020, our cokemaking facilities produced between 2.0 million and 2.5 million net tons of coke, of which approximately 0.6 million net tons were produced during the period subsequent to the respective date of acquisition for each facility. Mountain State Carbon produces furnace coke and related by-products from its plant in Follansbee, West Virginia, which consists of four batteries. Monessen produces furnace coke and related by-products in Monessen, Pennsylvania, and is temporarily idled due to the COVID-19 pandemic. Warren produces furnace coke and related by-products from its plant in Warren, Ohio, and supplies the Cleveland facility. We also operate cokemaking facilities located within Burns Harbor and Middletown Works.

**Other Businesses**

Our Tubular operating segment consists of our subsidiary Tubular Components, which has plants in Walbridge, Ohio; Columbus, Indiana; and Queretaro, Mexico. The Walbridge plant operates six electric resistance welded tube mills. The Columbus plant also operates six electric resistance welded tube mills and four high-speed cold saws on leased property. The plant in Queretaro, Mexico is currently in the process of being shut down and has ceased tube production. The Queretaro plant is located on leased land in a leased building, under a lease that expires in April 2021. The high-speed cold saw that was operating at the Queretaro plant has already been relocated to the Columbus plant and the tube mill will be returned to the U.S. and replace an existing, older tube mill currently in operation.

Our Tooling and Stamping operating segment consists of our subsidiary Precision Partners, which provides advanced-engineered solutions, tool design and build, hot- and cold-stamped steel components and complex assemblies for the automotive market across ten plants, of which certain of these are under long-term lease agreements, in Ontario, Alabama and Kentucky. Its facilities feature seven large-bed, hot-stamping presses, providing 13 lines of production; 81 cold-stamping presses ranging from 150 net tons to 3,000 net tons of pressing capacity; 17 large-bed, high-tonnage tryout presses with prove-out capabilities for new tool builds; and 144 multi-axis welding assembly cells. We are also in the process of constructing a new Precision Partners facility in Tennessee. We expect to complete construction and begin production of prototype components in the third quarter of 2021, and expect to reach commercial production in the first quarter of 2022.

**Mineral Policy**

We have a corporate policy prescribing internal controls and procedures with respect to auditing and estimating of minerals. The procedures contained in the policy include the calculation of mineral estimates at each property by our engineers, geologists and accountants, as well as third-party consultants. Management compiles and reviews the calculations, and once finalized, such information is used to prepare the disclosures for our annual and quarterly reports. The disclosures are reviewed and approved by management, including our chief executive officer and chief financial officer. Additionally, the long-range mine planning and mineral estimates are reviewed annually by our Audit Committee. Furthermore, all changes to mineral estimates, other than those due to production, are adequately documented and submitted to senior operations officers for review and approval. Finally, periodic reviews of long-range mine plans and mineral reserve estimates are conducted at mine staff meetings, senior management meetings and by independent experts.

40

Reserves are defined by SEC Industry Standard Guide 7 as that part of a mineral deposit that could be economically and legally extracted and produced at the time of the reserve determination. All reserves are classified as proven or probable and are supported by life-of-mine plans.

Reserve estimates are based on pricing that does not exceed the three-year trailing average index price of iron ore and coal adjusted to realized price. We evaluate and analyze mineral reserve estimates in accordance with our mineral policy and SEC requirements. The table below identifies the year in which the latest reserve estimate was completed.

| Property | Date of Latest Economic Reserve Analysis |
|---|---|
| **Iron ore mines:** | |
| Hibbing | 2015 |
| Minorca | 2019 |
| Northshore | 2020 |
| Tilden | 2019 |
| United Taconite | 2019 |
| **Coal mines:** | |
| Princeton | 2019 |

Ore reserve estimates for our iron ore mines were estimated from fully designed open pits developed using three-dimensional modeling techniques. These fully designed pits incorporate design slopes, practical mining shapes and access ramps to assure the accuracy of our reserve estimates. All operations' reserves have been adjusted net of production through 2020.

The following represents iron ore mineral reserves:

**Iron Ore Mineral Reserves
as of December 31, 2020
(In Millions of Long Tons)**

| Property | Proven | | Probable | | Proven & Probable | | Process Recovery[4] |
|---|---|---|---|---|---|---|---|
| | Tonnage | % Grade | Tonnage | % Grade | Tonnage | % Grade[3] | |
| Hibbing[1] | 76 | 19.7 | 25 | 19.6 | 101 | 19.7 | 27% |
| Minorca | 113 | 23.6 | 7 | 25.3 | 120 | 23.7 | 31% |
| Northshore | 318 | 25.3 | 519 | 24.1 | 837 | 24.6 | 29% |
| Tilden[2] | 168 | 35.2 | 418 | 34.8 | 586 | 34.8 | 34% |
| United Taconite | 158 | 23.1 | 631 | 22.1 | 789 | 22.3 | 31% |
| **Total** | **833** | | **1,600** | | **2,433** | | |

[1] The Hibbing mine is reported on a 100% basis, of which, our ownership is 85.3%.
[2] Tilden hematite reported grade is percent FeT; all other properties are percent magnetic iron.
[3] Cutoff for Tilden hematite is 25% FeT. Cutoff grades for magnetic ore are 20% for Tilden, 19% for Northshore, 16% for Minorca, 17% for United Taconite and 15% for Hibbing.
[4] Process recovery includes all factors for converting crude ore tonnage, shown above, to a dry saleable product.

The following represents recoverable coal reserves:

**Recoverable Coal Reserves
as of December 31, 2020
(In Millions of Net Tons)**

| Property | Proven | | Probable | | Proven & Probable | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | ROM | Wet Recovery | ROM | Wet Recovery | ROM | Wet Recovery | Ash % | Sulfur % | Volatile % |
| Princeton Coal | 69.5 | 44.7 | 26.5 | 11.0 | 96.0 | 55.7 | 5% | 0.7% | 18% |

41

**Item 3.**        *Legal Proceedings*

**Legal Proceedings Relating to our Business**

*Mesabi Metallics Adversary Proceeding.* On September 7, 2017, Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) ("Mesabi Metallics") filed a complaint against Cleveland-Cliffs Inc. in the *Essar Steel Minnesota LLC and ESML Holdings Inc.* bankruptcy proceeding that is pending in the United States Bankruptcy Court, District of Delaware. Mesabi Metallics alleges tortious interference with its contractual rights and business relations involving certain vendors, suppliers and contractors, violations of federal and Minnesota antitrust laws through monopolization, attempted monopolization and restraint of trade, violation of the automatic stay, and civil conspiracy with unnamed Doe defendants. Mesabi Metallics amended its complaint to add additional defendants, including, among others, our subsidiary, Cleveland-Cliffs Minnesota Land Development Company LLC ("Cliffs Minnesota Land"), and to add additional claims, including avoidance and recovery of unauthorized post-petition transfers of real estate interests, claims disallowance, civil contempt and declaratory relief. Mesabi Metallics seeks, among other things, unspecified damages and injunctive relief. Cliffs and Cliffs Minnesota Land filed counterclaims against Mesabi Metallics, Chippewa Capital Partners ("Chippewa"), and Thomas M. Clarke ("Clarke") for tortious interference and civil conspiracy, as well as additional claims against Chippewa and Clarke for aiding and abetting tortious interference, for which we seek, among other things, damages and injunctive relief. Our counterclaim against Clarke for libel was dismissed on jurisdictional grounds. The parties filed various dispositive motions on certain of the claims, including a motion for partial summary judgment to settle a dispute over real estate transactions between Cliffs Minnesota Land and Glacier Park Iron Ore Properties LLC ("GPIOP"). A ruling in favor of Cliffs, Cliffs Minnesota Land and GPIOP was issued on July 23, 2018, finding that Mesabi Metallics' leases had terminated and upholding Cliffs' and Cliffs Minnesota Land's purchase and lease of the contested real estate interests. Mesabi Metallics filed a Motion for Leave to File an Interlocutory Appeal, which was denied on September 10, 2019. Discovery is ongoing. We believe the claims asserted against us are without merit, and we intend to continue to vigorously defend against any remaining claims in the lawsuit.

*Mesabi Trust Arbitration*. On December 9, 2019, Mesabi Trust filed a demand for arbitration with the American Arbitration Association against Northshore and Cleveland-Cliffs Inc. alleging various breaches of a royalty agreement under which Northshore extracts iron ore from Mesabi Trust lands in return for paying royalties to Mesabi Trust. In its demand, Mesabi Trust asserts that we improperly based royalty payments for intercompany sales of DR-grade pellets on artificially low pricing of DR-grade pellet sales to one of our arms' length third-party customers. Mesabi Trust further asserts that we paid royalties too soon on DR-grade pellets stockpiled at Northshore and destined for shipment to our Toledo direct reduction plant. The allegations also include failure to provide access to information and individuals necessary to determine compliance with the royalty agreement. In addition to seeking damages and costs, Mesabi Trust seeks declarations as to the methodology and timing for calculating royalties on our intercompany DR-grade pellet sales, and that Mesabi Trust should have full and unfettered access to all of our information and employees. During 2020, the parties appointed a three-member arbitration panel and engaged in discovery. The arbitration hearing is scheduled for May 2021. We believe the claims asserted against us are without merit, and we intend to vigorously defend against them.

*Certain Legacy Legal Proceedings Relating to our Steel Operations* . Certain of our acquired subsidiaries have been named as defendants, among many other named defendants, in numerous lawsuits filed since 1990 claiming injury allegedly resulting from exposure to asbestos. Similar lawsuits seeking monetary relief continue to be filed in various jurisdictions in the U.S., which cases are vigorously defended. Although predictions about the outcome of pending litigation is subject to uncertainties, based upon present knowledge, we believe it is unlikely that the resolution in the aggregate of these claims will have a materially adverse effect on our consolidated results of operations, cash flows or financial condition.

**Legal Proceedings Relating to Environmental Matters**

SEC regulations require us to disclose certain information about administrative or judicial proceedings involving the environment and to which a governmental authority is a party if we reasonably believe that such proceedings may result in monetary sanctions above a stated threshold. Pursuant to SEC regulations, we use a threshold of $1 million for purposes of determining whether disclosure of any such proceedings is required. We believe that this threshold is reasonably designed to result in disclosure of any such proceedings that are material to our business or financial condition. Applying this threshold, we are disclosing the following environmental proceedings for the period covered by this report:

*Dearborn Works Air NOVs.* On November 18, 2019, November 26, 2019, and March 16, 2020, EGLE issued NOVs with respect to the basic oxygen furnace electrostatic precipitator at Dearborn Works alleging violations of manganese, lead and opacity limits. We are investigating these claims and will work with EGLE to attempt to resolve

42

A006118

Table of Contents

them. We intend to vigorously contest any claims that cannot be resolved through a settlement. Until a settlement is reached with EGLE or the claims of the NOVs are otherwise resolved, we cannot reasonably estimate the costs, if any, associated with any potentially required work.

Additional information for this item relating to certain other environmental proceedings may be found under the headings *EPA Administrative Order In Re: Ashland Coke* and *Burns Harbor Water Issues* in NOTE 21 - COMMITMENTS AND CONTINGENCIES to the consolidated financial statements in *Part II – Item 8. Financial Statements and Supplementary Data*, which information is incorporated herein by reference.

**Item 4.**        ***Mine Safety Disclosures***

We are committed to protecting the occupational health and well-being of each of our employees. Safety is one of our core values, and we strive to ensure that safe production is the first priority for all employees. Our internal objective is to achieve zero injuries and incidents across the Company by focusing on proactively identifying needed prevention activities, establishing standards and evaluating performance to mitigate any potential loss to people, equipment, production and the environment. We have implemented intensive employee training that is geared toward maintaining a high level of awareness and knowledge of safety and health issues in the work environment through the development and coordination of requisite information, skills and attitudes. We believe that through these policies, we have developed an effective safety management system.

Under the Dodd-Frank Act, each operator of a coal or other mine is required to include certain mine safety results within its periodic reports filed with the SEC. As required by the reporting requirements included in §1503(a) of the Dodd-Frank Act and Item 104 of Regulation S-K, the required mine safety results regarding certain mining safety and health matters for each of our mine locations that are covered under the scope of the Dodd-Frank Act are included in Exhibit 95 of *Part IV – Item 15. Exhibits and Financial Statement Schedules* of this Annual Report on Form 10-K.

43

Table of Contents

## PART II

**Item 5.**    ***Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities***

### Stock Exchange Information

Our common shares (ticker symbol CLF) are listed on the NYSE.

### Holders

At February 24, 2021, we had 2,586 shareholders of record.

### Shareholder Return Performance

The following graph shows changes over the past five-year period in the value of $100 invested in: (1) Cliffs' common shares; (2) S&P 500 Index; (3) S&P Small Cap 600 Index; and (4) S&P Metals and Mining Select Industry Index. The values of each investment are based on price change plus reinvestment of all dividends reported to shareholders, based on monthly granularity.



|  |  | 2015 | 2016 | 2017 | 2018 | 2019 | **2020** |
|---|---|---|---|---|---|---|---|
| **Cleveland-Cliffs Inc.** | Return % | — | 432.28 | (14.27) | 6.66 | 12.60 | **77.46** |
|  | Cum $ | 100.00 | 532.28 | 456.32 | 486.71 | 548.04 | **972.55** |
| **S&P 500 Index** | Return % | — | 11.93 | 21.80 | (4.39) | 31.48 | **18.39** |
|  | Cum $ | 100.00 | 111.93 | 136.33 | 130.35 | 171.38 | **202.90** |
| **S&P Small Cap 600 Index** | Return % | — | 26.46 | 13.15 | (8.52) | 22.74 | **11.24** |
|  | Cum $ | 100.00 | 126.46 | 143.09 | 130.90 | 160.66 | **178.72** |
| **S&P Metals and Mining Select Industry Index** | Return % | — | 105.09 | 20.61 | (26.76) | 14.70 | **15.97** |
|  | Cum $ | 100.00 | 205.09 | 247.36 | 181.17 | 207.80 | **240.98** |

44

**Issuer Purchases of Equity Securities**

The following table presents information with respect to repurchases by the Company of our common shares during the periods indicated:

### ISSUER PURCHASES OF EQUITY SECURITIES

| Period | Total Number of Shares (or Units) Purchased[1] | | Average Price Paid per Share (or Unit) | Total Number of Shares (or Units) Purchased as Part of Publicly Announced Plans or Programs | Maximum Number (or Approximate Dollar Value) of Shares (or Units) that May Yet be Purchased Under the Plans or Programs | |
|---|---|---|---|---|---|---|
| October 1 - 31, 2020 | 2,293 | $ | 6.69 | — | $ | — |
| November 1 - 30, 2020 | 3,594 | | 7.23 | — | | — |
| December 1 - 31, 2020 | 262 | | 12.88 | — | | — |
| **Total** | **6,149** | **$** | **7.27** | **—** | **$** | **—** |

[1] All shares were delivered to us to satisfy tax withholding obligations due upon the vesting or payment of stock awards.

**Item 6.**    *Selected Financial Data*

   [Reserved]

**Item 7.**    *Management's Discussion and Analysis of Financial Condition and Results of Operations*

   Management's Discussion and Analysis of Financial Condition and Results of Operations is designed to provide a reader of our financial statements with a narrative from the perspective of management on our financial condition, results of operations, liquidity and other factors that may affect our future results. The following discussion should be read in conjunction with the consolidated financial statements and related notes that appear in *Part II – Item 8. Financial Statements and Supplementary Data* of this Annual Report on Form 10-K.

**Overview**

   The year 2020 represented a transformative period in our Company's 173-year history. During the year, we completed the vertical integration of our legacy iron ore pellet business with the acquisitions of steelmakers AK Steel and ArcelorMittal USA, becoming the largest flat-rolled steel producer in North America. Our new unique, vertically integrated business model provides a competitive advantage over other steelmakers that procure a larger proportion of their steelmaking raw materials from external sources, and allows us to control our production from upstream mining to downstream stamping and tubing.

   We believe the Acquisitions give us a leading position in the highly desirable automotive end market, where we supply best-in-class volumes, quality and delivery performance, and give us the most comprehensive flat steel product offering in the industry. Due to the much larger operational footprint we now have, we anticipate synergies of approximately $310 million from asset optimization, economies of scale and streamlining overhead, over half of which have already been set in motion.

   We are now focused on maximizing the value of the iron ore pellets we produce from our legacy and recently acquired mines in Michigan and Minnesota. A majority of the pellets we produce is dedicated to internal consumption, and we do not rely on external sources of pellets. As such, our new Steelmaking segment captures effectively all of the production activity in the steelmaking process, which begins at our mines.

   In 2020, we also completed construction of and began production at our state-of-the-art direct reduction plant in Toledo, Ohio. This facility produces high-quality HBI, and is the first of its kind in the Great Lakes region. Our HBI provides a high-quality and environmentally friendly alternative to the scrap and imported pig iron that our potential customers currently utilize. We expect to begin selling this product to third parties during the first quarter of 2021 and reach nameplate capacity at our direct reduction plant during the second quarter of 2021.

   Along with these notable accomplishments, we have been able to successfully navigate through the COVID-19 pandemic while preserving the health and safety of both our workforce and our Company for the long term. The COVID-19 pandemic caused its fair share of challenges, as disruptions in demand led to lower sales output and necessitated the unplanned idling of certain production facilities. These production outages, along with the lower

demand and lower prices that came as a result of the pandemic, generated weaker results during the year than what we would normally expect.

As the demand environment began to recover, our results in the second half of the year improved dramatically and operations at temporarily idled facilities resumed. Now, with steel prices and scrap prices in the U.S. recently reaching all-time highs, we believe our decisive actions and accomplishments during 2020 will allow us to deliver strong financial results and free cash flow in 2021. We also believe our new vertically integrated business model is well-equipped to navigate and succeed through future pricing or demand volatility that is common in our industry.

Despite the ongoing pandemic, we also continued our best practices from both a safety and environmental standpoint. During 2020, our safety TRIR (including contractors) was 0.92 per 200,000 hours worked. On environmental matters, we recently made a commitment to reduce GHG emissions 25% by 2030 from 2017 levels, a higher reduction target than our competitors and a demonstration of the newfound leadership role we plan to take in the domestic steel industry.

## Recent Developments

### Acquisition of ArcelorMittal USA

On December 9, 2020, pursuant to the terms of the AM USA Transaction Agreement, we purchased ArcelorMittal USA from ArcelorMittal. In connection with the closing of the AM USA Transaction, as contemplated by the terms of the AM USA Transaction Agreement, ArcelorMittal's former joint venture partner in Kote and Tek exercised its put right pursuant to the terms of the Kote and Tek joint venture agreements. As a result, we purchased all of such joint venture partner's interests in Kote and Tek. Following the closing of the AM USA Transaction, we own 100% of the interests in Kote and Tek.

The assets of ArcelorMittal USA acquired by us at the closing of the AM USA Transaction include six steelmaking facilities, eight finishing facilities, three cokemaking operations, two iron ore mining and pelletizing operations and one coal mining complex. Refer to NOTE 3 - ACQUISITIONS for additional information.

### Financing Transactions

On December 9, 2020, we entered into the ABL Amendment. The ABL Amendment modified the ABL Facility to, among other things, increase the amount of tranche A revolver commitments available thereunder by an additional $1.5 billion and increase certain dollar baskets related to certain negative covenants that apply to the ABL Facility. After giving effect to the ABL Amendment, the aggregate principal amount of tranche A revolver commitments under the ABL Facility is $3.35 billion and the aggregate principal amount of tranche B revolver commitments under the ABL Facility remains at $150 million.

On February 11, 2021, we sold 20 million of our common shares, and the indirect, wholly owned subsidiary of ArcelorMittal to which approximately 78 million common shares were issued as part of the consideration paid by us in connection with the closing of the AM USA Transaction sold 40 million common shares, in each case at a price per share to the underwriter of $16.12, in an underwritten public offering. We also granted the underwriter an option to purchase up to an additional 9 million common shares from us at a price per share to the underwriter of $16.12. The underwriter has until March 10, 2021 to exercise such option, which it may do in full, in part or not at all. We did not receive any proceeds from the sale of the common shares by the selling shareholder in the offering. We intend to use the net proceeds to us from the offering, plus cash on hand, to redeem up to approximately $334 million aggregate principal amount of our outstanding 9.875% 2025 Senior Secured Notes. We intend to use any remaining net proceeds to us following such redemption to reduce borrowings under our ABL Facility.

On February 17, 2021, we issued $500 million aggregate principal amount of 4.625% 2029 Senior Notes and $500 million aggregate principal amount of 4.875% 2031 Senior Notes in an offering that was exempt from the registration requirements of the Securities Act. We intend to use the net proceeds from the notes offering to redeem all of the outstanding 4.875% 2024 Senior Secured Notes and 6.375% 2025 Senior Notes issued by Cleveland-Cliffs Inc. and all of the outstanding 7.625% 2021 AK Senior Notes, 7.50% 2023 AK Senior Notes and 6.375% 2025 AK Senior Notes issued by AK Steel Corporation (n/k/a Cleveland-Cliffs Steel Corporation), and pay fees and expenses in connection with such redemptions, and reduce borrowings under our ABL Facility.

### Company Structure

We have updated our segment structure to coincide with our new business model and are organized into four operating segments based on differentiated products, Steelmaking, Tubular, Tooling and Stamping, and European Operations. Our previous Mining and Pelletizing segment is included within Steelmaking as iron ore pellets are a

A006122

primary raw material for our steel products. We have one reportable segment - Steelmaking. Our other operating segments are classified as our Other Businesses.

**COVID-19**

In December 2019, COVID-19 surfaced in Wuhan, China, and then spread to other countries, including the United States. In March 2020, the World Health Organization characterized COVID-19 as a pandemic. Efforts to contain the spread of COVID-19 intensified throughout 2020, and many countries, including the United States, took steps to restrict travel, temporarily close businesses and issue quarantine orders. It remains unclear how long and to what degree of severity the economic impact of the COVID-19 pandemic will be felt.

On March 27, 2020, the CARES Act was signed into law.  The CARES Act, among other things, includes provisions relating to refundable payroll tax credits, deferment of employer-side social security payments, NOL carryback periods, AMT credit refunds, modifications to the net interest deduction limitations and technical corrections to tax depreciation methods for qualified improvement property.  During 2020, the CARES Act provided liquidity relief by enabling us to accelerate the receipt of $60 million of AMT credit refunds in July 2020, defer pension contributions until January 2021, and defer employer social security payments until 2021 and 2022.

We continue to utilize stringent social distancing procedures in our operating facilities, including checking employees' temperatures and symptoms before entering the workplace each day and deep cleaning our operational facilities. Although we continue to utilize these measures, the outbreak of COVID-19 has heightened the risk that a significant portion of our workforce will suffer illness or otherwise be unable to perform their ordinary work functions.

Although steel and iron ore production are considered "essential" by the states in which we operate, certain of our facilities and construction activities were temporarily idled during the second quarter of 2020 due primarily to temporarily reduced product demand. Most of these temporarily idled facilities were restarted during the second quarter of 2020, and the remaining operations were restarted during the third quarter of 2020. Our Columbus and Monessen facilities acquired through the AM USA Transaction are temporarily idled due to the COVID-19 pandemic.

We cannot predict whether our operations will experience additional disruptions in the future. We may also continue to experience supply chain disruptions or operational issues with our vendors, as our suppliers and contractors face similar challenges related to the COVID-19 pandemic. Because the impact of the COVID-19 pandemic continues to evolve, we cannot currently predict the extent to which our business, results of operations, financial condition or liquidity will ultimately be impacted.

To mitigate the impact of the COVID-19 pandemic, we took a number of steps throughout 2020 to solidify our liquidity position, including issuing $520 million aggregate principal amount of secured debt, adding a $150 million FILO tranche to our ABL Facility, idling several facilities both temporarily and permanently, temporarily deferring our Chief Executive Officer's compensation by 40%, temporarily deferring salaries by up to 20%, temporarily deferring other salaried employee benefits, and temporarily suspending capital expenditures. Lastly, our Board suspended future dividends, which was a typical cash obligation of approximately $100 million on an annualized basis.

47

**Results of Operations**

*Overview*

For the year ended December 31, 2020, we had a *Net loss* of $81 million. For the years ended December 31, 2019 and 2018, we had *Net income* of $293 million and $1,128 million, respectively. Our total revenues, diluted EPS and Adjusted EBITDA were as follows:



See "— Results of Operations — Adjusted EBITDA" below for a reconciliation of our *Net Income (loss)* to Adjusted EBITDA.

*Revenues*



Revenues from iron products made up 100% of our revenues by product line for the year ended December 31, 2019.

48

A006124

During the year ended December 31, 2020, our consolidated *Revenues* were approximately $5.4 billion, an increase of approximately $3.4 billion, or 169%, compared to 2019. The increase was due to the addition of $4.0 billion in revenues as a result of the Acquisitions, partially offset by a decrease in revenue from iron products of $655 million resulting from lower sales volumes of 6.9 million long tons compared to 2019. The lower sales volumes of iron products in 2020, as compared to 2019, were partially due to the diversion of pellets for internal consumption following the Acquisitions. Overall, we experienced lower customer demand during 2020 as a result of the reduced manufacturing activity caused by the COVID-19 pandemic.

***Revenues by Market***

The following table represents our consolidated *Revenues* and percentage of revenues to each of the markets we supply:

|  | (In Millions) | | | |
|  | Year Ended December 31, | | | |
|  | 2020 | | 2019 | |
|  | Revenue | % | Revenue | % |
|---|---|---|---|---|
| Automotive | $ 2,391 | 45 % | $ — | — % |
| Infrastructure and Manufacturing | 818 | 15 % | — | — % |
| Distributors and Converters | 722 | 13 % | — | — % |
| Steel producers [1] | 1,423 | 27 % | 1,990 | 100 % |
| Total revenues | $ 5,354 | | $ 1,990 | |

[1] Includes *Realization of deferred revenue* of $35 million for the year ended December 31, 2020.

*Automotive Market*

North American light vehicle production for 2020 declined 20% to approximately 13 million units from the prior year due to the impacts of the COVID-19 pandemic, which forced automotive businesses to shut down from the end of the first quarter of 2020 until near the end of the second quarter of 2020. During the third quarter of 2020, auto makers saw pent-up demand bring sales back to more normal levels as buyers and dealers adapted to new procedures and virtual shopping. Fourth quarter 2020 sales for the automotive industry were more in line with expected sales for the time of year, returning to near pre-COVID-19 levels.

*Infrastructure and Manufacturing*

Domestic construction activity and the replacement of aging infrastructure directly affects sales of our carbon, stainless and electrical steel products, particularly for GOES. Additionally, during 2020, there were nearly 1.4 million new housing starts in the U.S., an increase of approximately 6% from 2019, and home sales reached nearly 6 million, the highest annual mark since 2006, despite the supply of existing homes reaching all-time lows. This provides a positive indication that domestic GOES customers could continue to experience steady demand consistent with the construction and electrical transformer replacement markets.

*Distributors and Converters*

Steel distributors and converters typically source from the commodity carbon, stainless and electrical spot markets. The price for domestic HRC, which is an important attribute in the profitability of this end market, averaged $588 per net ton for the year ended December 31, 2020. The price of HRC was negatively impacted by lower demand related to the COVID-19 pandemic, and hit a low point of $438 per net ton on April 30, 2020. However, after the industry recovered and supply-demand dynamics improved, the price rebounded dramatically, improving to a peak of $1,030 per net ton by December 31, 2020.

*Steel Producers Market*

The steel producers market represents third-party sales to other steel producers, including those who operate blast furnaces and EAFs. It includes sales of raw materials and semi-finished and finished goods, including iron ore pellets, coal, coke, HBI and steel products. Iron ore product revenues declined during 2020, as compared to 2019, partially as a result of the Acquisitions as our iron ore pellet production was consumed internally and the respective intercompany revenue was eliminated in consolidation. Additionally, we experienced lower customer demand during 2020 as a result of the reduced manufacturing activity caused by the impacts of the COVID-19 pandemic.

Table of Contents

### *Operating Costs*

#### *Cost of goods sold*

*Cost of goods sold* increased by $3,688 million for the year ended December 31, 2020, as compared to the prior year, primarily due to the addition of 4 million net tons of steel shipments resulting from the Acquisitions, partially offset by lower sales volumes of iron products. During 2020, *Cost of goods sold* was unfavorably impacted by temporary idle-related costs of approximately $225 million, resulting from the impacts of the COVID-19 pandemic.

#### *Selling, general and administrative expenses*

As a result of the Acquisitions, our *Selling, general and administrative expenses* increased by $131 million during the year ended December 31, 2020, as compared to 2019.

#### *Acquisition-related costs*

The *Acquisition-related costs* of $90 million for the year ended December 31, 2020, include severance of $38 million and other various third-party expenses related to the Acquisitions of $52 million. Refer to NOTE 3 - ACQUISITIONS for further information on the Acquisitions.

#### *Miscellaneous – net*

*Miscellaneous – net* increased by $33 million for the year ended December 31, 2020, as compared to the prior year, which was primarily due to an increase in expenses incurred at our Toledo direct reduction plant, primarily related to the hiring and training of employees leading up to the start of production.

### *Other Income (Expense)*

#### *Interest expense, net*

*Interest expense, net* increased by $137 million for the year ended December 31, 2020, as compared to the prior year, primarily due to the incremental debt that we incurred in connection with the AK Steel Merger. The increase was offset partially by an increase in capitalized interest, primarily related to the construction of the Toledo direct reduction plant.

#### *Gain (loss) on extinguishment of debt*

The *Gain (loss) on extinguishment of debt* of $130 million for the year ended December 31, 2020 primarily relates to the repurchase of $748 million aggregate principal amount of our outstanding senior notes of various series using the net proceeds from the issuance of an additional $555 million aggregate principal amount of our 9.875% 2025 Senior Secured Notes on April 24, 2020 and other sources of cash. This compares to a loss on extinguishment of debt of $18 million for the year ended December 31, 2019, primarily related to the redemption of all of our then-outstanding 4.875% 2021 Senior Notes and the repurchase of $600 million aggregate principal amount of our 5.75% 2025 Senior Notes. Refer to NOTE 8 - DEBT AND CREDIT FACILITIES for further details.

#### *Other non-operating income*

The increase of $54 million in *Other non-operating income* primarily relates to an increase in net periodic benefit credits other than service cost component predominantly due to the expected return on assets resulting from the Acquisitions and increased asset values for the plans held in 2019. Refer to NOTE 10 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS for further details.

### *Income Taxes*

Our effective tax rate is affected by permanent items, primarily depletion. It also is affected by discrete items that may occur in any given period, but are not consistent from period to period. The following represents a summary of our tax provision and corresponding effective rates:

| | (In Millions) | | | |
|---|---|---|---|---|
| | **Year Ended December 31,** | | | |
| | **2020** | | 2019 | |
| Income tax benefit (expense) | $ | **111** | $ | (18) |
| Effective tax rate | | **57 %** | | 6 % |

50

Table of Contents

A reconciliation of our income tax attributable to continuing operations compared to the U.S. federal statutory rate is as follows:

| | (In Millions) | | | |
|---|---|---|---|---|
| | Year Ended December 31, | | | |
| | 2020 | | 2019 | |
| Tax at U.S. statutory rate | $ (41) | 21 % | $ 66 | 21 % |
| Increase (decrease) due to: | | | | |
| Percentage depletion in excess of cost depletion | (42) | 22 | (49) | (16) |
| Non-taxable income related to noncontrolling interests | (9) | 4 | — | — |
| Luxembourg legal entity reduction | — | — | 846 | 271 |
| Valuation allowance release: | | | | |
| Luxembourg legal entity reduction | — | — | (846) | (271) |
| State taxes, net | (11) | 6 | — | — |
| Other items, net | (8) | 4 | 1 | 1 |
| Provision for income tax expense (benefit) and effective income tax rate including discrete items | $ (111) | 57 % | $ 18 | 6 % |

The increase in income tax benefit in 2020, as compared to the prior year, is directly related to the increase in the pre-tax book loss year-over-year. The Luxembourg legal entity reduction relates to initiatives resulting in the dissolution of entities and settlement of related financial instruments in the year ended December 31, 2019. The 2019 NOL deferred tax asset reduction resulted in tax expense of $846 million, which was fully offset by a decrease in the valuation allowance.

See NOTE 12 - INCOME TAXES for further information.

### Adjusted EBITDA

We evaluate performance based on Adjusted EBITDA, which is a non-GAAP measure. This measure is used by management, investors, lenders and other external users of our financial statements to assess our operating performance and to compare operating performance to other companies in the steel industry, although it is not necessarily comparable to similarly titled measures used by other companies. In addition, management believes Adjusted EBITDA is a useful measure to assess the earnings power of the business without the impact of capital structure and can be used to assess our ability to service debt and fund future capital expenditures in the business.

51

The following table provides a reconciliation of our *Net income (loss)* to Adjusted EBITDA:

| | (In Millions) | |
|---|---|---|
| | **Year Ended December 31,** | |
| | **2020** | 2019 |
| Net income (loss) | $ **(81)** | $ 293 |
| Less: | | |
| Interest expense, net | **(238)** | (101) |
| Income tax benefit (expense) | **111** | (18) |
| Depreciation, depletion and amortization | **(308)** | (85) |
| Total EBITDA | $ **354** | $ 497 |
| Less: | | |
| EBITDA from noncontrolling interests [1] | $ **56** | $ — |
| Gain (loss) on extinguishment of debt | **130** | (18) |
| Severance costs | **(38)** | (2) |
| Acquisition-related costs excluding severance costs | **(52)** | (7) |
| Amortization of inventory step-up | **(96)** | — |
| Impact of discontinued operations | **1** | (1) |
| Total Adjusted EBITDA | $ **353** | $ 525 |

[1] EBITDA of noncontrolling interests includes $41 million for income and $15 million for depreciation, depletion and amortization for the year ended December 31, 2020.

The following table provides a summary of our Adjusted EBITDA by segment:

| | (In Millions) | |
|---|---|---|
| | **Year Ended December 31,** | |
| | **2020** | 2019 |
| Adjusted EBITDA: | | |
| Steelmaking | $ **433** | $ 636 |
| Other Businesses | **47** | — |
| Corporate and eliminations | **(127)** | (111) |
| Total Adjusted EBITDA | $ **353** | $ 525 |

The year ended December 31, 2020 results were unfavorably impacted by decreased customer demand resulting from the impacts of the COVID-19 pandemic. As a result of the COVID-19 pandemic, we incurred temporary idle-related costs resulting from production curtailments, excluding idle depreciation, depletion and amortization expense, of approximately $214 million during 2020.

Adjusted EBITDA from Corporate and eliminations primarily relates to *Selling, general and administrative expenses* at our Corporate headquarters.

The discussion of our Consolidated Results of Operations for 2019 compared to 2018 can be found in   Part II, Item 7., "Management's Discussion and Analysis of Financial Condition and Results of Operations," of our Annual Report on Form 10-K for the year ended December 31, 2019, filed with the SEC on February 20, 2020.

### Steelmaking

The following is a summary of our Steelmaking segment results included in our consolidated financial statements for the years ended December 31, 2020 and 2019. These results include the AK Steel operations subsequent to March 13, 2020, the ArcelorMittal USA operations subsequent to December 9, 2020, and our results from operations previously reported as part of our Mining and Pelletizing segment.

52

A006128

Table of Contents

The following is a summary of the Steelmaking segment operating results:

| | Year Ended December 31, | |
|---|---|---|
| | **2020** | 2019 |
| **Operating Results - In Millions** | | |
| Revenues[1] | $ 4,965 | $ 1,990 |
| Cost of goods sold | $ (4,749) | $ (1,414) |
| **Selling Price - Per Ton** | | |
| Average net selling price per net ton of steel products | $ 947 | N/A |
| Average net selling price per long ton of iron products | $ 114 | $ 107 |

[1] Includes *Realization of deferred revenue* of $35 million for the year ended December 31, 2020.

The following table represents our segment *Revenues* by product line:

| | (Dollars In Millions, Sales Volumes In Thousands) | | | |
|---|---|---|---|---|
| | Year Ended December 31, | | | |
| | **2020** | | 2019 | |
| | **Revenue** | **Volume[1]** | Revenue | Volume[1] |
| Hot-rolled steel | $ 386 | 633 | $ — | — |
| Cold-rolled steel | 490 | 682 | — | — |
| Coated steel | 1,747 | 1,911 | — | — |
| Stainless and electrical steel | 868 | 416 | — | — |
| Other steel products | 92 | 141 | — | — |
| Iron products[2] | 1,335 | 11,707 | 1,990 | 18,583 |
| Other | 47 | N/A | — | — |
| **Total** | $ 4,965 | | $ 1,990 | |

[1] Carbon steel products, stainless and electrical steel and plate steel volumes are stated in net tons. Iron product volumes are stated in long tons.

[2] Includes *Realization of deferred revenue* of $35 million for the year ended December 31, 2020.

*Operating Results*

Despite the downward pressures on markets as a result of the COVID-19 pandemic during 2020, the operating results during the second half of the year showed significant signs of improvement heading into 2021, as we have seen pricing for HRC continue to rise and sales volumes begin to return to normal. Steelmaking revenues increased by $2,975 million compared to 2019, due to the addition of sales following the Acquisitions. This increase was partially offset by a decrease in revenue from iron products of $655 million resulting from lower sales volumes of 7 million long tons compared to 2019, partially due to the diversion of pellets for internal consumption following the Acquisitions, as well as lower overall demand from customers as a result of the impacts of the COVID-19 pandemic.

Cost of goods sold increased $3,335 million during 2020, compared to 2019, predominantly due to additional sales resulting from the Acquisitions; however, this increase was also unfavorably impacted by idle-related costs of approximately $225 million, driven by the temporary idling of facilities in response to lower customer demand due to the COVID-19 pandemic.

As a result, Adjusted EBITDA was $433 million for the year ended December 31, 2020, compared to $636 million for the prior year. Refer to "— Results of Operations" above for additional information.

Table of Contents

*Production*

During 2020, we produced 4 million net tons of raw steel, 17 million long tons of iron ore pellets and 1 million net tons of coke. During 2020, certain of our operations were temporarily idled in response to the COVID-19 pandemic, with most restarting and resuming production in the second quarter of 2020 and the remainder in the third quarter of 2020. Dearborn Works' hot strip mill, anneal and temper operations and AK Coal remain permanently idled as part of the permanent cost reduction efforts. Our Columbus and Monessen facilities acquired through the AM USA Transaction are temporarily idled due to impacts of the COVID-19 pandemic. During 2019, we produced 20 million long tons of iron ore pellets.

**Liquidity, Cash Flows and Capital Resources**

Our primary sources of liquidity are *Cash and cash equivalents* and cash generated from our operations, availability under the ABL Facility and other financing activities. Our capital allocation decision-making process is focused on preserving healthy liquidity levels, while maintaining the strength of our balance sheet and creating financial flexibility to manage through the inherent cyclical demand for our products and volatility in commodity prices. We are focused on maximizing the cash generation of our operations, reducing debt, and aligning capital investments with our strategic priorities and the requirements of our business plan, including regulatory and permission-to-operate related projects.

Since the onset of the COVID-19 pandemic in the U.S., our primary focus has been on maintaining adequate levels of liquidity to manage through a potentially prolonged economic downturn. In alignment with this, we made several operational adjustments, including facility closures, idles and extended maintenance outages. Along with the cost savings achieved through these operational adjustments, during 2020, we reduced planned capital expenditures for the year, reduced overhead costs and suspended our quarterly dividend payment. Additionally, on April 17, 2020 and April 24, 2020, we issued $400 million aggregate principal amount and an additional $555 million aggregate principal amount, respectively, of 9.875% 2025 Senior Secured Notes to further bolster our liquidity position and pay-down existing debt. We also issued an additional $120 million aggregate principal amount of 6.75% 2026 Senior Secured Notes on June 19, 2020, the net proceeds of which we used to finance construction of our Toledo direct reduction plant. Prior to such use, the net proceeds were used to temporarily reduce the outstanding borrowings under our ABL Facility. We believe these measures have helped us to maintain healthy liquidity levels during the COVID-19 pandemic.

Now that business conditions have improved and we expect to generate healthy free cash flow during 2021, we believe we have the ability to lower our long-term debt balance. Our stated initial target will be to reduce total debt to less than three times our annual Adjusted EBITDA. We also look at the composition of our debt, as well, as we are interested in both extending our maturity profile and increasing our ratio of unsecured debt to secured debt. These actions will better prepare us to navigate more easily through potentially volatile industry conditions in the future. In furtherance of these goals, we consummated certain financing transactions in February 2021.

On February 11, 2021, we sold 20 million common shares and the indirect, wholly owned subsidiary of ArcelorMittal to which approximately 78 million common shares were issued as part of the consideration paid by us in connection with the closing of the AM USA Transaction sold 40 million common shares, in each case at a price per share to the underwriter of $16.12, in an underwritten public offering. We also granted the underwriter an option to purchase up to an additional 9 million common shares from us at a price per share to the underwriter of $16.12. The underwriter has until March 10, 2021 to exercise such option, which it may do in full, in part or not at all. We did not receive any proceeds from the sale of the common shares by the selling shareholder in the offering. We intend to use the net proceeds to us from the offering, plus cash on hand, to redeem up to approximately $334 million aggregate principal amount of our outstanding 9.875% 2025 Senior Secured Notes. We intend to use any remaining net proceeds to us following such redemption to reduce borrowings under our ABL Facility.

On February 17, 2021, we issued $500 million aggregate principal amount of 4.625% 2029 Senior Notes and $500 million aggregate principal amount of 4.875% 2031 Senior Notes in an offering that was exempt from the registration requirements of the Securities Act. We intend to use the net proceeds from the notes offering to redeem all of the outstanding 4.875% 2024 Senior Secured Notes and 6.375% 2025 Senior Notes issued by Cleveland-Cliffs Inc. and all of the outstanding 7.625% 2021 AK Senior Notes, 7.50% 2023 AK Senior Notes and 6.375% 2025 AK Senior Notes issued by AK Steel Corporation (n/k/a Cleveland-Cliffs Steel Corporation), and pay fees and expenses in connection with such redemptions, and reduce borrowings under our ABL Facility.

In connection with the underwritten public offering, we provided notice to redeem $322.4 million aggregate principal amount of our 9.875% 2025 Senior Secured Notes on March 11, 2021. In connection with the notes offering, we provided notice to redeem all of the outstanding 4.875% 2024 Senior Secured Notes, 6.375% 2025 Senior Notes,

Table of Contents

7.625% 2021 AK Senior Notes, 7.50% 2023 AK Senior Notes and 6.375% 2025 AK Senior Notes on March 12, 2021. Refer to NOTE 22 – SUBSEQUENT EVENTS for more information regarding February 2021 financing transactions.

The application of the net proceeds to us from the February 2021 financing transactions will shift our debt horizon, by providing a four-year window in which none of our long-term notes are due, clearing the way for us to fully focus on operational integration.

Based on our outlook for the next 12 months, which is subject to continued changing demand from customers and volatility in domestic steel prices, we expect to have ample liquidity through cash generated from operations and availability under our ABL Facility sufficient to meet the needs of our operations and service our debt obligations.

The following discussion summarizes the significant items impacting our cash flows during 2020 and comparative years as well as expected impacts to our future cash flows over the next 12 months. Refer to the Statements of Consolidated Cash Flows for additional information.

### Operating Activities

Net cash used by operating activities was $261 million for the year ended December 31, 2020, compared to net cash provided by operating activities of $563 million for the year ended December 31, 2019. The change in cash used by operating activities during 2020, compared to cash provided by operating activities in 2019, was due primarily to the slowing economy in connection with the COVID-19 pandemic, resulting in reduced customer demand and the need to temporarily idle many of our operations, which had an adverse effect on our operating results. Our working capital was negatively impacted as a result of ArcelorMittal USA's accounts receivable factoring arrangement that was in place prior to the AM USA Transaction. This negatively impacted working capital by $315 million for the year ended December 31, 2020 and is expected to impact the first quarter of 2021 by approximately $260 million.

Our U.S. *Cash and cash equivalents* balance at December 31, 2020 was $90 million, or 84% of our consolidated *Cash and cash equivalents* balance, excluding cash related to our consolidated VIE of $5 million. Additionally, we had a cash balance at December 31, 2020 of $4 million classified as part of *Other current assets* in the Statements of Consolidated Financial Position related to our discontinued operations.

### Investing Activities

Net cash used by investing activities was $2,042 million and $644 million for the years ended December 31, 2020 and 2019, respectively. During the year ended December 31, 2020, we had net cash outflows of $658 million related to the AM USA Transaction, net of cash acquired. Additionally, during the year ended December 31, 2020, we had net cash outflows of $869 million related to the AK Steel Merger, net of cash acquired, which included $590 million used to repay the former AK Steel Corporation revolving credit facility and $324 million used to purchase outstanding 7.50% 2023 AK Senior Notes. Refer to NOTE 3 - ACQUISITIONS for additional details on the Acquisitions.

Additionally, we had capital expenditures, including capitalized interest, of $525 million and $656 million for the years ended December 31, 2020 and 2019, respectively. We had cash outflows, including deposits and capitalized interest, for the development of the Toledo direct reduction plant of $348 million and $544 million for the years ended December 31, 2020 and 2019, respectively. During the year ended December 31, 2019, we also had cash outflows, including deposits and capitalized interest, of $43 million on the upgrades at Northshore. Additionally, we spent $177 million and $69 million on sustaining capital expenditures during 2020 and 2019, respectively. Sustaining capital expenditures include capital expenditures related to infrastructure, mobile equipment, fixed equipment, product quality, environment, health and safety.

During 2020, in response to the COVID-19 pandemic, we temporarily limited our cash used for capital expenditures to critical sustaining capital, but have now resumed growth capital spending. During the fourth quarter of 2020, we completed construction of our Toledo direct reduction plant. We anticipate total cash used for capital expenditures during the next 12 months to be between $600 million and $650 million.

### Financing Activities

Net cash provided by financing activities was $2,059 million for the year ended December 31, 2020, compared to net cash used by financing activities of $394 million for the year ended December 31, 2019. Cash provided by financing activities for the year ended December 31, 2020 primarily related to the issuances in separate offerings consummated on March 13, 2020 and June 19, 2020 of $845 million combined aggregate principal amount of 6.75% 2026 Senior Secured Notes, the issuances in separate offerings consummated on April 17, 2020 and April 24, 2020 of $955 million combined aggregate principal amount of 9.875% 2025 Senior Secured Notes and borrowings

55

of $2,060 million under the ABL Facility. The net proceeds from the initial issuance of $725 million aggregate principal amount of the 6.75% 2026 Senior Secured Notes on March 13, 2020, along with cash on hand, were used to purchase $373 million aggregate principal amount of 7.625% 2021 AK Senior Notes and $367 million aggregate principal amount of 7.50% 2023 AK Senior Notes, in each case issued by AK Steel Corporation (n/k/a Cleveland-Cliffs Steel Corporation), that we accepted for purchase pursuant to our tender offers for any and all such notes then-outstanding in connection with the AK Steel Merger and to pay for the $44 million of debt issuance costs in the first quarter of 2020. The net proceeds from the additional issuance of $555 million aggregate principal amount of the 9.875% 2025 Senior Secured Notes on April 24, 2020 were used to repurchase $736 million aggregate principal amount of our outstanding senior notes of various series in private exchanges exempt from the registration requirements of the Securities Act. The net proceeds from the additional issuance of $120 million aggregate principal amount of 6.75% 2026 Senior Secured Notes on June 19, 2020 were used to finance construction of our Toledo direct reduction plant. Prior to such use, the net proceeds were used to temporarily reduce the outstanding borrowings under our ABL Facility. Additionally, during the year ended December 31, 2020, we repaid $550 million under the ABL Facility.

Net cash used by financing activities during 2019 primarily related to the repurchase of 24 million common shares for $253 million in the aggregate under the $300 million share repurchase program, which was active until December 31, 2019. Additionally, we issued $750 million aggregate principal amount of 5.875% 2027 Senior Notes, which provided net proceeds of approximately $714 million. The net proceeds from the notes offering, along with cash on hand, were used to redeem in full all of our then-outstanding 4.875% 2021 Senior Notes and to purchase $600 million aggregate principal amount of our outstanding 5.75% 2025 Senior Notes pursuant to a tender offer. In total, during 2019, we purchased $724 million aggregate principal amount of senior notes for $729 million in cash.

Additional uses of cash from financing activities during 2019 included payments of regular quarterly cash dividends and a special cash dividend on our common shares of $72 million and a cash payment of $44 million to the third and final annual installment of the distribution of Empire partnership equity.

We have temporarily suspended future dividend distributions as a result of impacts of the COVID-19 pandemic in order to preserve cash during this time of economic uncertainty. We anticipate future uses of cash and cash provided by financing activities during the next 12 months to include opportunistic debt transactions as part of our liability management strategy, similar to the transactions that occurred during 2020 and February 2021, in addition to providing supplemental financing to meet cash requirements for business improvement opportunities.

The discussion of our *Liquidity, Cash Flows and Capital Resources* results for 2019 compared to 2018 can be found in Part II, Item 7., "Management's Discussion and Analysis of Financial Condition and Results of Operations", in our Annual Report on Form 10-K for the year ended December 31, 2019, filed with the SEC on February 20, 2020.

The following represents our future cash commitments and contractual obligations as of December 31, 2020:

| | | Payments Due by Period (In Millions) | | | |
|---|---|---|---|---|---|
| | Total | Less than 1 Year | 1 - 3 Years | 3 - 5 Years | More than 5 Years |
| Long-term debt[1] | $ 5,595 | $ 34 | $ 13 | $ 2,197 | $ 3,351 |
| Interest on debt[1] | 1,772 | 303 | 601 | 507 | 361 |
| Operating lease obligations | 363 | 70 | 99 | 72 | 122 |
| Finance lease obligations | 394 | 100 | 173 | 45 | 76 |
| Purchase obligations: | | | | | |
| Open purchase orders | 347 | 342 | 5 | — | — |
| Minimum "take or pay" purchase commitments [2] | 8,853 | 2,865 | 2,708 | 1,607 | 1,673 |
| Total purchase obligations | 9,200 | 3,207 | 2,713 | 1,607 | 1,673 |
| Other long-term liabilities: | | | | | |
| Pension funding minimums | 887 | 202 | 178 | 238 | 269 |
| OPEB claim payments | 1,777 | 144 | 280 | 269 | 1,084 |
| Environmental and asset retirement obligations | 589 | 27 | 51 | 42 | 469 |
| Other | 272 | 71 | 99 | 31 | 71 |
| Total other long-term liabilities | 3,525 | 444 | 608 | 580 | 1,893 |
| Total | $ 20,849 | $ 4,158 | $ 4,207 | $ 5,008 | $ 7,476 |

[1] Refer to NOTE 8 - DEBT AND CREDIT FACILITIES for additional information regarding our debt and related interest rates.
[2] Includes minimum railroad and vessel transportation obligations, minimum electric power demand charges, minimum diesel and natural gas obligations and minimum port facility obligations. Additionally, includes our coke purchase commitments related to our coke supply agreement with SunCoke Middletown.

Refer to NOTE 21 - COMMITMENTS AND CONTINGENCIES for additional information regarding our future commitments and obligations.

57

A006133

*Capital Resources*

We expect to fund our business obligations from available cash, current and future operations and existing and future borrowing arrangements. We also may pursue other funding strategies in the capital markets to strengthen our liquidity, extend debt maturities and/or fund strategic initiatives. The following represents a summary of key liquidity measures:

| | (In Millions) |
| --- | --- |
| | December 31, 2020 |
| *Cash and cash equivalents* | $ 112 |
| Cash and cash equivalents from discontinued operations, included within *Other current assets* | 4 |
| Less: Cash and cash equivalents from VIE's | (5) |
| Total cash and cash equivalents | $ 111 |
| | |
| Available borrowing base on ABL Facility [1] | $ 3,500 |
| Borrowings | (1,510) |
| Letter of credit obligations | (247) |
| Borrowing capacity available | $ 1,743 |

[1] As of December 31, 2020, the ABL Facility had a maximum borrowing base of $3.5 billion, determined by applying customary advance rates to eligible accounts receivable, inventory and certain mobile equipment.

Our primary sources of funding are cash and cash equivalents, which totaled $111 million as of December 31, 2020, cash generated by our business, availability under the ABL Facility and other financing activities. Cash and cash equivalents include cash on hand and on deposit. The combination of cash and availability under the ABL Facility gives us $1.9 billion in liquidity entering the first quarter of 2021, which is expected to be adequate to fund operations, letter of credit obligations, sustaining and expansion capital expenditures and other cash commitments for at least the next 12 months.

As of February 24, 2021, we had total liquidity of approximately $2.6 billion, consisting of approximately $200 million in cash and approximately $2.4 billion of availability under its ABL credit facility, of which approximately $850 million is expected to be used to redeem the senior notes for which notice of redemption was provided in connection with the offerings consummated in February 2021.

As of December 31, 2020, we were in compliance with the ABL Facility liquidity requirements and, therefore, the springing financial covenant requiring a minimum Fixed Charge Coverage Ratio of 1.0 to 1.0 was not applicable. We believe that the cash on hand and the ABL Facility provide us sufficient liquidity to support our operating, investing and financing activities. We have the capability to issue additional unsecured notes and, subject to the limitations set forth in our existing senior notes indentures, additional secured debt, if we elect to access the debt capital markets. However, our ability to issue additional notes could be limited by market conditions.

We intend from time to time to seek to retire or purchase our outstanding senior notes with cash on hand, borrowings from existing credit sources or new debt financings and/or exchanges for debt or equity securities, in open market purchases, privately negotiated transactions or otherwise. Such repurchases, if any, will depend on prevailing market conditions, our liquidity requirements, contractual restrictions and other factors, and the amounts involved may be material.

*Off-Balance Sheet Arrangements*

In the normal course of business, we are a party to certain arrangements that are not reflected on our Statements of Consolidated Financial Position. These arrangements include minimum "take or pay" purchase commitments, such as minimum electric power demand charges, minimum coal, diesel and natural gas purchase commitments, minimum railroad transportation commitments and minimum port facility usage commitments; and financial instruments with off-balance sheet risk, such as bank letters of credit and bank guarantees.

## Information about our Guarantors and the Issuer of our Guaranteed Securities

The accompanying summarized financial information has been prepared and presented pursuant to SEC Regulation S-X, Rule 3-10, "Financial Statements of Guarantors and Issuers of Guaranteed Securities Registered or

Being Registered," and Rule 13-01 "Financial Disclosures about Guarantors and Issuers of Guaranteed Securities and Affiliates Whose Securities Collateralized a Registrant's Securities." Certain of our subsidiaries (the "Guarantor subsidiaries") have fully and unconditionally, and jointly and severally, guaranteed the obligations under (a) the 5.75% 2025 Senior Notes, the 6.375% 2025 Senior Notes, the 5.875% 2027 Senior Notes and the 7.00% 2027 Senior Notes issued by Cleveland-Cliffs Inc. on a senior unsecured basis and (b) the 4.875% 2024 Senior Secured Notes, the 6.75% 2026 Senior Secured Notes and the 9.875% 2025 Senior Secured Notes on a senior secured basis. See NOTE 7 - DEBT AND CREDIT FACILITIES for further information.

The following presents the summarized financial information on a combined basis for Cleveland-Cliffs Inc. (parent company and issuer of the guaranteed obligations) and the Guarantor subsidiaries, collectively referred to as the obligated group. Transactions between the obligated group have been eliminated. Information for the non-Guarantor subsidiaries was excluded from the combined summarized financial information of the obligated group.

Each Guarantor subsidiary is consolidated by Cleveland-Cliffs Inc. as of December 31, 2020. Refer to Exhibit 22.1, incorporated herein by reference, for the detailed list of entities included within the obligated group as of December 31, 2020 and December 31, 2019.

The guarantee of a Guarantor subsidiary with respect to Cliffs' 5.75% 2025 Senior Notes, 6.375% 2025 Senior Notes, 5.875% 2027 Senior Notes, 7.00% 2027 Senior Notes, 4.875% 2024 Senior Secured Notes, 6.75% 2026 Senior Secured Notes and 9.875% 2025 Senior Secured Notes will be automatically and unconditionally released and discharged, and such Guarantor subsidiary's obligations under the guarantee and the related indentures (the "Indentures") will be automatically and unconditionally released and discharged, upon the occurrence of any of the following, along with the delivery to the trustee of an officer's certificate and an opinion of counsel, each stating that all conditions precedent provided for in the applicable Indenture relating to the release and discharge of such Guarantor subsidiary's guarantee have been complied with:

(a) any sale, exchange, transfer or disposition of such Guarantor subsidiary (by merger, consolidation, or the sale of) or the capital stock of such Guarantor subsidiary after which the applicable Guarantor subsidiary is no longer a subsidiary of the Company or the sale of all or substantially all of such Guarantor subsidiary's assets (other than by lease), whether or not such Guarantor subsidiary is the surviving entity in such transaction, to a person which is not the Company or a subsidiary of the Company as of December 31, 2020; provided that (i) such sale, exchange, transfer or disposition is made in compliance with the applicable Indenture, including the covenants regarding consolidation, merger and sale of assets and, as applicable, dispositions of assets that constitute notes collateral, and (ii) all the obligations of such Guarantor subsidiary under all debt of the Company or its subsidiaries terminate upon consummation of such transaction;

(b) designation of any Guarantor subsidiary as an "excluded subsidiary" (as defined in the Indentures); or

(c) defeasance or satisfaction and discharge of the Indentures.

Each entity in the summarized combined financial information follows the same accounting policies as described in the consolidated financial statements. The accompanying summarized combined financial information does not reflect investments of the obligated group in non-Guarantor subsidiaries. The financial information of the obligated group is presented on a combined basis; intercompany balances and transactions within the obligated group have been eliminated. The obligated group's amounts due from, amounts due to, and transactions with, non-Guarantor subsidiaries and related parties have been presented in separate line items.

**Summarized Combined Financial Information of the Issuer and Guarantor Subsidiaries:**

The following table is summarized combined financial information from the Statements of Condensed Consolidated Financial Position of the obligated group:

| | (In Millions) | |
| --- | --- | --- |
| | December 31, 2020 | December 31, 2019 |
| Current assets | $ 4,903 | $ 891 |
| Non-current assets | 10,535 | 2,382 |
| Current liabilities | (2,767) | (393) |
| Non-current liabilities | (10,563) | (2,792) |

59

The following table is summarized combined financial information from the Statements of Condensed Consolidated Operations of the obligated group:

| | (In Millions) |
| --- | --- |
| | Year Ended |
| | December 31, 2020 |
| Revenues[1] | $ 5,170 |
| Cost of goods sold | (5,008) |
| Loss from continuing operations | (120) |
| Net loss | (118) |
| Net loss attributable to Cliffs shareholders | (118) |

[1] Includes *Realization of deferred revenue* of $35 million for the year ended December 31, 2020.

As of December 31, 2020 and 2019, the obligated group had the following balances with non-Guarantor subsidiaries and other related parties:

| | (In Millions) | |
| --- | --- | --- |
| | December 31, 2020 | December 31, 2019 |
| **Balances with non-Guarantor subsidiaries:** | | |
| Accounts receivable, net | $ 69 | $ — |
| Accounts payable | (17) | — |
| | | |
| **Balances with other related parties:** | | |
| Accounts receivable, net | $ 2 | $ 31 |
| Other current assets | — | 45 |
| Accounts payable | (6) | — |
| Other current liabilities | — | (2) |

Additionally, for the year ended December 31, 2020, the obligated group had *Revenues* of $893 million and *Cost of goods sold* of $602 million, in each case with other related parties.

**Market Risks**

We are subject to a variety of risks, including those caused by changes in commodity prices and interest rates. We have established policies and procedures to manage such risks; however, certain risks are beyond our control.

*Pricing Risks*

In the ordinary course of business, we are exposed to market risk and price fluctuations related to the sale of our products, which are impacted primarily by market prices for HRC, and the purchase of energy and raw materials used in our operations, which are impacted by market prices for electricity, natural gas, ferrous and stainless steel scrap, chrome, coal, coke, nickel and zinc. Our strategy to address market risk has generally been to obtain competitive prices for our products and services and allow operating results to reflect market price movements dictated by supply and demand; however, we make forward physical purchases and enter into hedge contracts to manage exposure to price risk related to the purchases of certain raw materials and energy used in the production process.

Our financial results can vary for our operations as a result of fluctuations in market prices. We attempt to mitigate these risks by aligning fixed and variable components in our customer pricing contracts, supplier purchasing agreements and derivative financial instruments.

Some customer contracts have fixed-pricing terms, which increase our exposure to fluctuations in raw material and energy costs. To reduce our exposure, we enter into annual, fixed-price agreements for certain raw materials. Some of our existing multi-year raw material supply agreements have required minimum purchase quantities. Under adverse economic conditions, those minimums may exceed our needs. Absent exceptions for force

A006136

Table of Contents

majeure and other circumstances affecting the legal enforceability of the agreements, these minimum purchase requirements may compel us to purchase quantities of raw materials that could significantly exceed our anticipated needs or pay damages to the supplier for shortfalls. In these circumstances, we would attempt to negotiate agreements for new purchase quantities. There is a risk, however, that we would not be successful in reducing purchase quantities, either through negotiation or litigation. If that occurred, we would likely be required to purchase more of a particular raw material in a particular year than we need, negatively affecting our results of operations and cash flows.

Certain of our customer contracts include variable-pricing mechanisms that adjust selling prices in response to changes in the costs of certain raw materials and energy, while other of our customer contracts exclude such mechanisms. We may enter multi-year purchase agreements for certain raw materials with similar variable-price mechanisms, allowing us to achieve natural hedges between the customer contracts and supplier purchase agreements. Therefore, in some cases, price fluctuations for raw materials (particularly natural gas and electricity), raw materials (such as scrap, chrome, zinc and nickel) or other commodities may be, in part, passed on to customers rather than absorbed solely by us. There is a risk, however, that the variable-price mechanisms in the sales contracts may not necessarily change in tandem with the variable-price mechanisms in our purchase agreements, negatively affecting our results of operations and cash flows.

Our strategy to address volatile natural gas rates and electricity rates includes improving efficiency in energy usage, identifying alternative providers and utilizing the lowest cost alternative fuels. If we are unable to align fixed and variable components between customer contracts and supplier purchase agreements, we use cash-settled commodity price swaps and options to hedge the market risk associated with the purchase of certain of our raw materials and energy requirements. Additionally, we routinely use these derivative instruments to hedge a portion of our natural gas, electricity and zinc requirements. Our hedging strategy is designed to protect us from excessive pricing volatility. However, since we do not typically hedge 100% of our exposure, abnormal price increases in any of these commodity markets might still negatively affect operating costs. The following table summarizes the impact of a 10% and 25% change in market price from the December 31, 2020 estimated price on our derivative instruments, thereby impacting our pre-tax income by the same amount.

| | (In Millions) | |
| | Positive or Negative Effect on Pre-tax Income | |
| Commodity Derivative | 10% Increase or Decrease | 25% Increase or Decrease |
|---|---|---|
| Natural gas | $ 28 | $ 69 |
| Electricity | 2 | 4 |
| Zinc | 1 | 2 |

### *Valuation of Goodwill and Other Long-Lived Assets*

We assign goodwill arising from acquired companies to the reporting units that are expected to benefit from the synergies of the acquisition. Goodwill is tested on a qualitative basis for impairment at the reporting unit level on an annual basis (October 1) and between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value. These events or circumstances could include a significant change in the business climate, legal factors, operating performance indicators, competition or sale or disposition of a significant portion of a reporting unit. As necessary, should our qualitative test indicate that it is more likely than not that the fair value of a reporting unit is less than its carry amount, we perform a quantitative test to determine the amount of impairment, if any, to the carrying value of the reporting unit and its associated goodwill.

Application of the goodwill impairment test requires judgment, including the identification of reporting units, assignment of assets and liabilities to reporting units, assignment of goodwill to reporting units and if a quantitative assessment is deemed necessary in determination of the fair value of each reporting unit. The fair value of each reporting unit is estimated using a discounted cash flow methodology, which considers forecasted cash flows discounted at an estimated weighted average cost of capital. Assessing the recoverability of our goodwill requires significant assumptions regarding the estimated future cash flows and other factors to determine the fair value of a reporting unit, including, among other things, estimates related to forecasts of future revenues, expected Adjusted EBITDA, expected capital expenditures and working capital requirements, which are based upon our long-range plan estimates. The assumptions used to calculate the fair value of a reporting unit may change from year to year based on operating results, market conditions and other factors. Changes in these assumptions could materially affect the determination of fair value for each reporting unit.

61

Long-lived assets are reviewed for impairment upon the occurrence of events or changes in circumstances that would indicate that the carrying value of the assets may not be recoverable. Such indicators may include: a significant decline in expected future cash flows; a sustained, significant decline in market pricing; a significant adverse change in legal or environmental factors or in the business climate; changes in estimates of our recoverable reserves; and unanticipated competition. Any adverse change in these factors could have a significant impact on the recoverability of our long-lived assets and could have a material impact on our consolidated statements of operations and statement of financial position.

A comparison of each asset group's carrying value to the estimated undiscounted net future cash flows expected to result from the use of the assets, including cost of disposition, is used to determine if an asset is recoverable. Projected future cash flows reflect management's best estimate of economic and market conditions over the projected period, including growth rates in revenues and costs, and estimates of future expected changes in operating margins and capital expenditures. If the carrying value of the asset group is higher than its undiscounted net future cash flows, the asset group is measured at fair value and the difference is recorded as a reduction to the long-lived assets. We estimate fair value using a market approach, an income approach or a cost approach. While we concluded that an event triggering the need for an impairment assessment did not occur during the year ended December 31, 2020, a prolonged COVID-19 pandemic could impact the results of operations due to changes to assumptions that would indicate that the carrying value of our asset groups may not be recoverable.

### Interest Rate Risk

Interest payable on our senior notes is at fixed rates. Interest payable under our ABL Facility is at a variable rate based upon the applicable base rate plus the applicable base rate margin depending on the excess availability. As of December 31, 2020, we had $1,510 million outstanding under the ABL Facility. An increase in prevailing interest rates would increase interest expense and interest paid for any outstanding borrowings under the ABL Facility. For example, a 100 basis point change to interest rates under the ABL Facility at the December 31, 2020 borrowing level would result in a change of $15 million to interest expense on an annual basis.

### Supply Concentration Risks

Many of our operations and mines rely on one source for each of electric power and natural gas. A significant interruption or change in service or rates from our energy suppliers could materially impact our production costs, margins and profitability.

## Recently Issued Accounting Pronouncements

Refer to NOTE 1 - BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES of the consolidated financial statements for a description of recent accounting pronouncements, including the respective dates of adoption and effects on results of operations and financial condition.

## Critical Accounting Estimates

Management's discussion and analysis of financial condition and results of operations is based on our consolidated financial statements, which have been prepared in accordance with GAAP. Preparation of financial statements requires management to make assumptions, estimates and judgments that affect the reported amounts of assets, liabilities, revenues, costs and expenses, and the related disclosures of contingencies. Management bases its estimates on various assumptions and historical experience, which are believed to be reasonable; however, due to the inherent nature of estimates, actual results may differ significantly due to changed conditions or assumptions. On a regular basis, management reviews the accounting policies, assumptions, estimates and judgments to ensure that our financial statements are fairly presented in accordance with GAAP. However, because future events and their effects cannot be determined with certainty, actual results could differ from our assumptions and estimates, and such differences could be material. Management believes that the following critical accounting estimates and judgments have a significant impact on our financial statements.

### Business Combinations

Assets acquired and liabilities assumed in a business combination are recognized and measured based on their estimated fair values at the acquisition date, while the acquisition-related costs are expensed as incurred. Any excess of the purchase consideration when compared to the fair value of the net tangible and intangible assets acquired, if any, is recorded as goodwill. We engaged independent valuation specialists to assist with the determination of the fair value of assets acquired, liabilities assumed, noncontrolling interest, and goodwill, for the Acquisitions. If the initial accounting for the business combination is incomplete by the end of the reporting period in which the acquisition occurs, an estimate will be recorded. Subsequent to the acquisition date, and not later than one

62

Table of Contents

year from the acquisition date, we will record any material adjustments to the initial estimate based on new information obtained that would have existed as of the date of the acquisition. Any adjustment that arises from information obtained that did not exist as of the date of the acquisition will be recorded in the period the adjustment arises.

### Valuation of Goodwill and Other Long-Lived Assets

The valuation of goodwill and other long-lived assets includes various assumptions and are considered critical accounting estimates. Refer to "–Market Risks" above for additional information.

### Mineral Reserves

We regularly evaluate our mineral reserves and update them as required in accordance with SEC Industry Guide 7. We perform an in-depth evaluation of our mineral reserve estimates by mine on a periodic basis, in addition to routine annual assessments. The determination of mineral reserves requires us, with the support of our third-party experts, to make significant estimates and assumptions related to key inputs including (1) the determination of the size and scope of the iron ore body through technical modeling, (2) the estimates of future iron ore prices, production costs and capital expenditures, and (3) management's mine plan for the proven and probable mineral reserves. The significant estimates and assumptions could be affected by future industry conditions, geological conditions and ongoing mine planning. Additional capital and development expenditures may be required to maintain effective production capacity. Generally, as mining operations progress, haul distances increase. Alternatively, changes in economic conditions or the expected quality of mineral reserves could decrease capacity of mineral reserves. Technological progress could alleviate such factors or increase capacity of mineral reserves.

We use our mineral reserve estimates, combined with our estimated annual production levels, to determine the mine closure dates utilized in recording the fair value liability for asset retirement obligations for our active operating mines. Refer to NOTE 14 - ASSET RETIREMENT OBLIGATIONS, for further information. Since the liability represents the present value of the expected future obligation, a significant change in mineral reserves or mine lives could have a substantial effect on the recorded obligation. We also utilize mineral reserves for evaluating potential impairments of mine asset groups as they are indicative of future cash flows and in determining maximum useful lives utilized to calculate depreciation, depletion and amortization of long-lived mine assets and in determining the estimated fair value of mineral reserves established through the purchase price allocation in a business combination. The consolidated asset retirement obligation balance was $342 million as of December 31, 2020, of which $83 million related to active iron ore mine operations. The total asset balance associated with our Steelmaking reportable segment was $15,849 million as of December 31, 2020, of which $1,661 million related to long-lived assets associated with our combined iron ore mine asset groups, and is inclusive of $235 million related to iron ore mineral reserves acquired through the AM USA Transaction. Depreciation, depletion and amortization expense for the our combined iron ore mine asset groups was $78 million for the year ended December 31, 2020. Increases or decreases in mineral reserves or mine lives could significantly affect these items.

### Asset Retirement Obligations

The accrued closure obligation is predominantly related to our indefinitely idled and closed iron ore mining operations and provides for contractual and legal obligations associated with the eventual closure of those operations. We perform an in-depth evaluation of the liability every three years in addition to our routine annual assessments. In 2020, we employed third-party specialists to assist in the evaluation. Our obligations are determined based on detailed estimates adjusted for factors that a market participant would consider (e.g., inflation, overhead and profit), which are escalated at an assumed rate of inflation to the estimated closure dates, and then discounted using the current credit-adjusted risk-free interest rate. The estimate also incorporates incremental increases in the closure cost estimates and changes in estimates of mine lives for our active mine sites. The closure date for each of our active mine sites is determined based on the exhaustion date of the remaining iron ore reserves, which is dependent on our estimate of mineral reserves. The estimated obligations for our active mine sites are particularly sensitive to the impact of changes in mine lives given the difference between the inflation and discount rates. The closure dates for a majority of our steelmaking facilities are indefinite, and as such, the asset retirement obligations are recorded at present values using estimated ranges of the economic lives of the underlying assets. Changes in the base estimates of legal and contractual closure costs due to changes in legal or contractual requirements, available technology, inflation, overhead or profit rates also could have a significant impact on the recorded obligations. Refer to NOTE 14 - ASSET RETIREMENT OBLIGATIONS, for further information.

Table of Contents

*Environmental Remediation Costs*

We have a formal policy for environmental protection and remediation. Our obligations for known environmental matters at active and closed operations have been recognized based on estimates of the cost of investigation and remediation at each facility. If the obligation can only be estimated as a range of possible amounts, with no specific amount being more likely, the minimum of the range is accrued. Management reviews its environmental remediation sites quarterly to determine if additional cost adjustments or disclosures are required. The characteristics of environmental remediation obligations, where information concerning the nature and extent of clean-up activities is not immediately available and which are subject to changes in regulatory requirements, result in a significant risk of increase to the obligations as they mature. Expected future expenditures are not discounted to present value unless the amount and timing of the cash disbursements can be reasonably estimated.

*Income Taxes*

Our income tax expense, deferred tax assets and liabilities and reserves for unrecognized tax benefits reflect management's best assessment of estimated future taxes to be paid. We are subject to income taxes in the U.S. and various foreign jurisdictions. Significant judgments and estimates are required in determining the consolidated income tax expense.

Deferred income taxes arise from temporary differences between tax and financial statement recognition of revenue and expense. In evaluating our ability to recover our deferred tax assets, we consider all available positive and negative evidence, including scheduled reversals of deferred tax liabilities, projected future taxable income, tax planning strategies and recent financial operations. In projecting future taxable income, we begin with historical results adjusted for the results of discontinued operations and changes in accounting policies and incorporate assumptions including the amount of future state, federal and foreign pretax operating income, the reversal of temporary differences, and the implementation of feasible and prudent tax planning strategies. These assumptions require significant judgment about the forecasts of future taxable income and are consistent with the plans and estimates we are using to manage the underlying businesses.

At December 31, 2020 and 2019, we had a valuation allowance of $836 million and $441 million, respectively, against our deferred tax assets. Of these amounts, $439 million and $44 million relate to the U.S. deferred tax assets at December 31, 2020 and 2019, respectively, and $397 million and $397 million relate to foreign deferred tax assets, respectively.

At December 31, 2018, we determined that it was appropriate to release all of the valuation allowance related to U.S. federal deferred tax assets as it is more likely than not that the entire deferred tax asset will be realized before the end of the carryforward period. See NOTE 12 - INCOME TAXES for further information and considerations related to the release.

Our losses in Luxembourg in recent periods represent sufficient negative evidence to require a full valuation allowance against the deferred tax assets in that jurisdiction. We intend to maintain a valuation allowance against the deferred tax assets related to these operating losses, unless and until sufficient positive evidence exists to support the realization of such assets.

Changes in tax laws and rates also could affect recorded deferred tax assets and liabilities in the future. The calculation of our tax liabilities involves dealing with uncertainties in the application of complex tax laws and regulations in various jurisdictions across our global operations. The ultimate impact of the U.S. income tax reform legislation may differ from our current estimates due to changes in the interpretations and assumptions made as well as additional regulatory guidance that may be issued.

Accounting for uncertainty in income taxes recognized in the financial statements requires that a tax benefit from an uncertain tax position be recognized when it is more likely than not that the position will be sustained upon examination, including resolutions of any related appeals or litigation processes, based on technical merits.

We recognize tax liabilities in accordance with *ASC 740, Income Taxes*, and we adjust these liabilities when our judgment changes because of evaluation of new information not previously available. Due to the complexity of some of these uncertainties, the ultimate resolution may result in payment that is materially different from our current estimate of the tax liabilities. These differences will be reflected as increases or decreases to income tax expense in the period in which they are determined. Refer to NOTE 12 - INCOME TAXES, for further information.

64

*Employee Retirement Benefit Obligations*

We offer defined benefit pension plans, defined contribution pension plans and OPEB plans, primarily consisting of retiree healthcare benefits, to most employees in North America as part of a total compensation and benefits program.

The following is a summary of our U.S. defined benefit pension and OPEB funding and expense:

| | Pension | | OPEB | |
| --- | --- | --- | --- | --- |
| | **Funding** | **Expense (Benefit)** | **Funding** | **Expense (Benefit)** |
| 2018 | $ 28 | $ 13 | $ 4 | $ (6) |
| 2019 | 16 | 22 | 4 | (2) |
| **2020** | **50** | **(31)** | **25** | **8** |
| 2021 (Estimated)[1] | 202 | (168) | 144 | 86 |

[1] The estimated 2021 pension funding includes $118 million, which was deferred as a result of the CARES Act.

Assumptions used in determining the benefit obligations and the value of plan assets for defined benefit pension plans and OPEB plans, primarily consisting of retiree healthcare benefits, that we offer are evaluated periodically by management. Critical assumptions, such as the discount rate used to measure the benefit obligations, the expected long-term rate of return on plan assets, the medical care cost trend, and the rate of compensation increase are reviewed annually.

The following represents weighted-average assumptions used to determine benefit obligations and net benefit costs:

| | Pension | | Other Benefits | |
| --- | --- | --- | --- | --- |
| | December 31, | | December 31, | |
| | **2020** | 2019 | **2020** | 2019 |
| Discount rate | **2.34 %** | 3.27 % | **2.71 %** | 2.71 % |
| Compensation rate increase | **2.56** | 2.53 | **3.00** | 3.00 |
| Expected return on plan assets | **7.69** | 8.25 | **6.82** | 7.00 |

The following represents assumed weighted-average health care cost trend rates:

| | December 31, | |
| --- | --- | --- |
| | **2020** | 2019 |
| Health care cost trend rate assumed for next year | **6.05 %** | 6.50 % |
| Ultimate health care cost trend rate | **4.59** | 5.00 |
| Year that the ultimate rate is reached | **2031** | 2026 |

The discount rates used to measure plan liabilities as of the December 31 measurement date are determined individually for each plan. The discount rates are determined by matching the projected cash flows used to determine the plan liabilities to a projected yield curve of high-quality corporate bonds available at the measurement date. Discount rates for expense are calculated using the granular approach for each plan.

Depending on the plan, we use either company-specific base mortality tables or tables issued by the Society of Actuaries. We adopted the Pri-2012 mortality tables from the Society of Actuaries in 2019. On December 31, 2020, the assumed mortality improvement projection was updated from generational scale MP-2019 to generational scale MP-2020 for the Pri-2012 mortality tables.

Following are sensitivities of potential further changes in these key assumptions on the estimated 2021 pension and OPEB expense and the pension and OPEB obligations as of December 31, 2020:

| | | (In Millions) | | | |
|---|---|---|---|---|---|
| | Increase (Decrease) in Expense | | | Increase in Benefit Obligation | |
| | Pension | OPEB | | Pension | OPEB |
| Decrease discount rate 0.25% | $ (4) | $ (2) | $ | 164 | $ 131 |
| Decrease return on assets 1.00% | 53 | 8 | | N/A | N/A |

Changes in actuarial assumptions, including discount rates, employee retirement rates, mortality, compensation levels, plan asset investment performance and healthcare costs, are determined based on analyses of actual and expected factors. Changes in actuarial assumptions and/or investment performance of plan assets may have a significant impact on our financial condition due to the magnitude of our retirement obligations.

Refer to NOTE 10 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS for further information.

**Forward-Looking Statements**

This report contains statements that constitute "forward-looking statements" within the meaning of the federal securities laws. As a general matter, forward-looking statements relate to anticipated trends and expectations rather than historical matters. Forward-looking statements are subject to uncertainties and factors relating to our operations and business environment that are difficult to predict and may be beyond our control. Such uncertainties and factors may cause actual results to differ materially from those expressed or implied by the forward-looking statements. These statements speak only as of the date of this report, and we undertake no ongoing obligation, other than that imposed by law, to update these statements. Uncertainties and risk factors that could affect our future performance and cause results to differ from the forward-looking statements in this report include, but are not limited to:

• disruptions to our operations relating to the COVID-19 pandemic, including the heightened risk that a significant portion of our workforce or on-site contractors may suffer illness or otherwise be unable to perform their ordinary work functions;

• continued volatility of steel and iron ore market prices, which directly and indirectly impact the prices of the products that we sell to our customers;

• uncertainties associated with the highly competitive and cyclical steel industry and our reliance on the demand for steel from the automotive industry, which has been experiencing a trend toward light weighting that could result in lower steel volumes being consumed;

• potential weaknesses and uncertainties in global economic conditions, excess global steelmaking capacity, oversupply of iron ore, prevalence of steel imports and reduced market demand, including as a result of the COVID-19 pandemic;

• severe financial hardship, bankruptcy, temporary or permanent shutdowns or operational challenges, due to the COVID-19 pandemic or otherwise, of one or more of our major customers, including customers in the automotive market, key suppliers or contractors, which, among other adverse effects, could lead to reduced demand for our products, increased difficulty collecting receivables, and customers and/or suppliers asserting force majeure or other reasons for not performing their contractual obligations to us;

• risks related to U.S. government actions with respect to Section 232, the USMCA and/or other trade agreements, tariffs, treaties or policies, as well as the uncertainty of obtaining and maintaining effective antidumping and countervailing duty orders to counteract the harmful effects of unfairly traded imports;

• impacts of existing and increasing governmental regulation, including climate change and other environmental regulation that may be proposed under the Biden Administration, and related costs and liabilities, including failure to receive or maintain required operating and environmental permits, approvals, modifications or other authorizations of, or from, any governmental or regulatory authority and costs related to implementing improvements to ensure compliance with regulatory changes, including potential financial assurance requirements;

• potential impacts to the environment or exposure to hazardous substances resulting from our operations;

- our ability to maintain adequate liquidity, our level of indebtedness and the availability of capital could limit cash flow necessary to fund working capital, planned capital expenditures, acquisitions, and other general corporate purposes or ongoing needs of our business;

- adverse changes in credit ratings, interest rates, foreign currency rates and tax laws;

- limitations on our ability to realize some or all of our deferred tax assets, including our NOLs;

- our ability to realize the anticipated synergies and benefits of the Acquisitions and to successfully integrate the businesses of AK Steel and ArcelorMittal USA into our existing businesses, including uncertainties associated with maintaining relationships with customers, vendors and employees;

- additional debt we assumed, incurred or issued in connection with the Acquisitions, as well as additional debt we incurred in connection with enhancing our liquidity during the COVID-19 pandemic, may negatively impact our credit profile and limit our financial flexibility;

- known and unknown liabilities we assumed in connection with the Acquisitions, including significant environmental, pension and OPEB obligations;

- the ability of our customers, joint venture partners and third-party service providers to meet their obligations to us on a timely basis or at all;

- supply chain disruptions or changes in the cost or quality of energy sources or critical raw materials and supplies, including iron ore, industrial gases, graphite electrodes, scrap, chrome, zinc, coke and coal;

- liabilities and costs arising in connection with any business decisions to temporarily idle or permanently close a mine or production facility, which could adversely impact the carrying value of associated assets and give rise to impairment charges or closure and reclamation obligations, as well as uncertainties associated with restarting any previously idled mine or production facility;

- problems or disruptions associated with transporting products to our customers, moving products internally among our facilities or suppliers transporting raw materials to us;

- uncertainties associated with natural or human-caused disasters, adverse weather conditions, unanticipated geological conditions, critical equipment failures, infectious disease outbreaks, tailings dam failures and other unexpected events;

- our level of self-insurance and our ability to obtain sufficient third-party insurance to adequately cover potential adverse events and business risks;

- disruptions in, or failures of, our information technology systems, including those related to cybersecurity;

- our ability to successfully identify and consummate any strategic investments or development projects, cost-effectively achieve planned production rates or levels, and diversify our product mix and add new customers;

- our actual economic iron ore and coal reserves or reductions in current mineral estimates, including whether we are able to replace depleted reserves with additional mineral bodies to support the long-term viability of our operations;

- the outcome of any contractual disputes with our customers, joint venture partners, lessors, or significant energy, raw material or service providers, or any other litigation or arbitration;

- our ability to maintain our social license to operate with our stakeholders, including by fostering a strong reputation and consistent operational and safety track record;

- our ability to maintain satisfactory labor relations with unions and employees;

- availability of workers to fill critical operational positions and potential labor shortages caused by the COVID-19 pandemic, as well as our ability to attract, hire, develop and retain key personnel, including within the acquired AK Steel and ArcelorMittal USA businesses;

- unanticipated or higher costs associated with pension and OPEB obligations resulting from changes in the value of plan assets or contribution increases required for unfunded obligations; and

Table of Contents

- potential significant deficiencies or material weaknesses in our internal control over financial reporting.

For additional factors affecting our businesses, refer to *Part I – Item 1A. Risk Factors.* You are urged to carefully consider these risk factors.

**Item 7A.**        ***Quantitative and Qualitative Disclosures About Market Risk***

Information regarding our Market Risk is presented under the caption *Market Risks*, which is included in *Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations* and is incorporated by reference and made a part hereof.

68

**Item 8.**   *Financial Statements and Supplementary Data*

**Statements of Consolidated Financial Position**

Cleveland-Cliffs Inc. and Subsidiaries

|  | (In Millions) | |
|---|---|---|
|  | December 31, | |
|  | **2020** | 2019 |
| **ASSETS** | | |
| **Current assets:** | | |
| Cash and cash equivalents | $        **112** | $        353 |
| Accounts receivable, net | **1,169** | 94 |
| Inventories | **3,828** | 317 |
| Income tax receivable, current | **24** | 59 |
| Other current assets | **165** | 75 |
| Total current assets | **5,298** | 898 |
| **Non-current assets:** | | |
| Property, plant and equipment, net | **8,743** | 1,929 |
| Goodwill | **1,406** | 2 |
| Deferred income taxes | **537** | 460 |
| Other non-current assets | **787** | 215 |
| **TOTAL ASSETS** | $        **16,771** | $        3,504 |
| **LIABILITIES AND EQUITY** | | |
| **Current liabilities:** | | |
| Accounts payable | $        **1,575** | $        193 |
| Accrued employment costs | **460** | 67 |
| State and local taxes | **147** | 38 |
| Pension and OPEB liabilities, current | **151** | 4 |
| Other current liabilities | **596** | 107 |
| Total current liabilities | **2,929** | 409 |
| **Non-current liabilities:** | | |
| Long-term debt | **5,390** | 2,114 |
| Pension and OPEB liabilities, non-current | **4,113** | 312 |
| Other non-current liabilities | **1,260** | 311 |
| **TOTAL LIABILITIES** | **13,692** | 3,146 |
| Commitments and contingencies (See Note 21) | | |
| Series B Participating Redeemable Preferred Stock - no par value | | |
| Authorized, Issued and Outstanding - 583,273 shares | **738** | — |
| **Equity:** | | |
| Common Shares - par value $0.125 per share | | |
| Authorized - 600,000,000 shares (2019 - 600,000,000 shares); | | |
| Issued - 506,832,537 shares (2019 - 301,886,794 shares); | | |
| Outstanding - 477,517,372 shares (2019 - 270,084,005 shares) | **63** | 37 |
| Capital in excess of par value of shares | **5,431** | 3,873 |
| Retained deficit | **(2,989)** | (2,842) |
| Cost of 29,315,165 common shares in treasury (2019 - 31,802,789 shares) | **(354)** | (391) |
| Accumulated other comprehensive loss | **(133)** | (319) |
| Total Cliffs shareholders' equity | **2,018** | 358 |
| Noncontrolling interest | **323** | — |
| **TOTAL EQUITY** | **2,341** | 358 |
| **TOTAL LIABILITIES, REDEEMABLE PREFERRED STOCK AND EQUITY** | $        **16,771** | $        3,504 |

*The accompanying notes are an integral part of these consolidated financial statements.*

**Statements of Consolidated Operations**

Cleveland-Cliffs Inc. and Subsidiaries

| | | | (In Millions, Except Per Share Amounts) | | | | |
|---|---|---|---|---|---|---|---|
| | | | Year Ended December 31, | | | | |
| | | **2020** | | 2019 | | 2018 | |
| Revenues | $ | **5,319** | $ | 1,990 | $ | 2,332 | |
| Realization of deferred revenue | | **35** | | — | | — | |
| Operating costs: | | | | | | | |
| Cost of goods sold | | **(5,102)** | | (1,414) | | (1,523) | |
| Selling, general and administrative expenses | | **(244)** | | (113) | | (113) | |
| Acquisition-related costs | | **(90)** | | (7) | | — | |
| Miscellaneous – net | | **(60)** | | (27) | | (23) | |
| Total operating costs | | **(5,496)** | | (1,561) | | (1,659) | |
| **Operating income (loss)** | | **(142)** | | 429 | | 673 | |
| Other income (expense): | | | | | | | |
| Interest expense, net | | **(238)** | | (101) | | (119) | |
| Gain (loss) on extinguishment of debt | | **130** | | (18) | | (7) | |
| Other non-operating income | | **57** | | 3 | | 18 | |
| Total other expense | | **(51)** | | (116) | | (108) | |
| **Income (loss) from continuing operations before income taxes** | | **(193)** | | 313 | | 565 | |
| Income tax benefit (expense) | | **111** | | (18) | | 475 | |
| **Income (loss) from continuing operations** | | **(82)** | | 295 | | 1,040 | |
| Income (loss) from discontinued operations, net of tax | | **1** | | (2) | | 88 | |
| **Net income (loss)** | | **(81)** | | 293 | | 1,128 | |
| Income attributable to noncontrolling interest | | **(41)** | | — | | — | |
| **Net income (loss) attributable to Cliffs shareholders** | $ | **(122)** | $ | 293 | $ | 1,128 | |
| | | | | | | | |
| **Earnings (loss) per common share attributable to Cliffs shareholders - basic** | | | | | | | |
| Continuing operations | $ | **(0.32)** | $ | 1.07 | $ | 3.50 | |
| Discontinued operations | | **—** | | (0.01) | | 0.30 | |
| | $ | **(0.32)** | $ | 1.06 | $ | 3.80 | |
| **Earnings (loss) per common share attributable to Cliffs shareholders - diluted** | | | | | | | |
| Continuing operations | $ | **(0.32)** | $ | 1.04 | $ | 3.42 | |
| Discontinued operations | | **—** | | (0.01) | | 0.29 | |
| | $ | **(0.32)** | $ | 1.03 | $ | 3.71 | |

*The accompanying notes are an integral part of these consolidated financial statements.*

70

A006146

Table of Contents

**Statements of Consolidated Comprehensive Income**

Cleveland-Cliffs Inc. and Subsidiaries

| | (In Millions) | | |
| --- | --- | --- | --- |
| | Year Ended December 31, | | |
| | **2020** | 2019 | 2018 |
| Net income (loss) | $ **(81)** | $ 293 | $ 1,128 |
| Other comprehensive income (loss): | | | |
| Changes in pension and OPEB, net of tax | **181** | (35) | (17) |
| Changes in foreign currency translation | **3** | — | (225) |
| Changes in derivative financial instruments, net of tax | **2** | — | (3) |
| Total other comprehensive income (loss) | **186** | (35) | (245) |
| **Comprehensive income** | **105** | 258 | 883 |
| Comprehensive income attributable to noncontrolling interests | **(41)** | — | — |
| **Comprehensive income attributable to Cliffs shareholders** | $ **64** | $ 258 | $ 883 |

*The accompanying notes are an integral part of these consolidated financial statements.*

71

A006147

[Table of Contents]

**Statements of Consolidated Cash Flows**

Cleveland-Cliffs Inc. and Subsidiaries

| | (In Millions) | | |
|---|---|---|---|
| | Year Ended December 31, | | |
| | **2020** | 2019 | 2018 |
| **OPERATING ACTIVITIES** | | | |
| Net income (loss) | $ **(81)** | $ 293 | $ 1,128 |
| Adjustments to reconcile net income (loss) to net cash provided (used) by operating activities: | | | |
| Depreciation, depletion and amortization | **308** | 85 | 89 |
| Amortization of inventory step-up | **96** | — | — |
| Deferred income taxes | **(101)** | 17 | (461) |
| Loss (gain) on extinguishment of debt | **(130)** | 18 | 7 |
| Loss (gain) on derivatives | **(104)** | 47 | (110) |
| Gain on foreign currency translation | **—** | — | (228) |
| Other | **11** | 66 | 21 |
| Changes in operating assets and liabilities, net of business combination: | | | |
| Receivables and other assets | **(42)** | 255 | 52 |
| Inventories | **(146)** | (136) | 44 |
| Pension and OPEB payments and contributions | **(75)** | (20) | (32) |
| Payables, accrued expenses and other liabilities | **3** | (62) | (31) |
| Net cash provided (used) by operating activities | **(261)** | 563 | 479 |
| **INVESTING ACTIVITIES** | | | |
| Purchase of property, plant and equipment | **(525)** | (656) | (296) |
| Acquisition of ArcelorMittal USA, net of cash acquired | **(658)** | — | — |
| Acquisition of AK Steel, net of cash acquired | **(869)** | — | — |
| Other investing activities | **10** | 12 | 23 |
| Net cash used by investing activities | **(2,042)** | (644) | (273) |
| **FINANCING ACTIVITIES** | | | |
| Repurchase of common shares | **—** | (253) | (48) |
| Dividends paid | **(41)** | (72) | — |
| Proceeds from issuance of debt | **1,763** | 721 | — |
| Debt issuance costs | **(76)** | (7) | (2) |
| Repurchase of debt | **(1,023)** | (729) | (235) |
| Borrowings under credit facilities | **2,060** | — | — |
| Repayments under credit facilities | **(550)** | — | — |
| SunCoke Middletown distributions to noncontrolling interest owners | **(61)** | — | — |
| Other financing activities | **(13)** | (54) | (91) |
| Net cash provided (used) by financing activities | **2,059** | (394) | (376) |
| Effect of exchange rate changes on cash | **—** | — | (2) |
| Decrease in cash and cash equivalents, including cash classified within other current assets related to discontinued operations | **(244)** | (475) | (172) |
| Less: decrease in cash and cash equivalents from discontinued operations, classified within other current assets | **(3)** | (5) | (17) |
| Net decrease in cash and cash equivalents | **(241)** | (470) | (155) |
| Cash and cash equivalents at beginning of year | **353** | 823 | 978 |
| Cash and cash equivalents at end of year | $ **112** | $ 353 | $ 823 |

*The accompanying notes are an integral part of these consolidated financial statements.*

72

**Statements of Consolidated Changes in Equity**

Cleveland-Cliffs Inc. and Subsidiaries

| | | | | | | | | (In Millions) |
|---|---|---|---|---|---|---|---|---|
| | Cliffs Shareholders | | | | | | | |
| | Number of Common Shares Outstanding | Par Value of Common Shares Issued | Capital in Excess of Par Value of Shares | Retained Deficit | Common Shares in Treasury | AOCI (Loss) | Non-controlling Interest | Total |
| December 31, 2017 | 297 | $ 37 | $ 3,934 | $ (4,207) | $ (170) | $ (39) | $ — | $ (445) |
| Adoption of accounting standard | — | — | — | 34 | — | — | — | 34 |
| Comprehensive income (loss) | — | — | — | 1,128 | — | (245) | — | 883 |
| Stock and other incentive plans | 1 | — | (17) | — | 31 | — | — | 14 |
| Common stock repurchases | (5) | — | — | — | (47) | — | — | (47) |
| Common stock dividends ($0.05 per share) | — | — | — | (15) | — | — | — | (15) |
| December 31, 2018 | 293 | $ 37 | $ 3,917 | $ (3,060) | $ (186) | $ (284) | $ — | $ 424 |
| Comprehensive income (loss) | — | — | — | 293 | — | (35) | — | 258 |
| Stock and other incentive plans | 2 | — | (44) | — | 48 | — | — | 4 |
| Common stock repurchases | (24) | — | — | — | (253) | — | — | (253) |
| Common stock dividends ($0.27 per share) | — | — | — | (75) | — | — | — | (75) |
| December 31, 2019 | 271 | $ 37 | $ 3,873 | $ (2,842) | $ (391) | $ (319) | $ — | $ 358 |
| Comprehensive income (loss) | — | — | — | (122) | — | 186 | 41 | 105 |
| Stock and other incentive plans | 2 | — | (24) | — | 37 | — | — | 13 |
| Acquisition of AK Steel | 127 | 16 | 602 | — | — | — | 330 | 948 |
| Acquisition of ArcelorMittal USA | 78 | 10 | 980 | — | — | — | 13 | 1,003 |
| Common stock dividends ($0.06 per share) | — | — | — | (25) | — | — | — | (25) |
| Net distributions to noncontrolling interests | — | — | — | — | — | — | (61) | (61) |
| December 31, 2020 | 478 | $ 63 | $ 5,431 | $ (2,989) | $ (354) | $ (133) | $ 323 | $ 2,341 |

*The accompanying notes are an integral part of these consolidated financial statements.*

73

A006149

Notes to Consolidated Financial Statements

Cleveland-Cliffs Inc. and Subsidiaries

**NOTE 1 - BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES**

**Business, Consolidation and Presentation**

*Nature of Business*

Cliffs is the largest flat-rolled steel producer in North America. Founded in 1847 as a mine operator, we are also the largest producer of iron ore pellets in North America. In 2020, we acquired two major steelmakers, AK Steel and ArcelorMittal USA, vertically integrating our legacy iron ore business. Our fully-integrated portfolio includes custom-made pellets and HBI; flat-rolled carbon steel, stainless, electrical, plate, tinplate and long steel products; as well as carbon and stainless steel tubing, hot and cold stamping and tooling. Headquartered in Cleveland, Ohio, we employ approximately 25,000 people across our mining, steel and downstream manufacturing operations in the United States and Canada.

Unless otherwise noted, discussion of our business and results of operations in this Annual Report on Form 10-K refers to our continuing operations.

*Acquisition of AK Steel*

On March 13, 2020, we consummated the AK Steel Merger, pursuant to which, upon the terms and subject to the conditions set forth in the AK Steel Merger Agreement, Merger Sub was merged with and into AK Steel, with AK Steel surviving the AK Steel Merger as a wholly owned subsidiary of Cleveland-Cliffs Inc. Refer to NOTE 3 - ACQUISITIONS for further information.

AK Steel is a North American producer of flat-rolled carbon, stainless and electrical steel products, primarily for the automotive, infrastructure and manufacturing markets. These operations consist primarily of seven steelmaking and finishing plants, two cokemaking operations, three tube manufacturing plants and ten tooling and stamping operations. The acquisition of AK Steel transformed us into a vertically integrated producer of value-added iron ore and steel products.

*Acquisition of ArcelorMittal USA*

On December 9, 2020, pursuant to the terms of the AM USA Transaction Agreement, we purchased ArcelorMittal USA from ArcelorMittal. In connection with the closing of the AM USA Transaction, as contemplated by the terms of the AM USA Transaction Agreement, ArcelorMittal's former joint venture partner in Kote and Tek exercised its put right pursuant to the terms of the Kote and Tek joint venture agreements. As a result, we purchased all of such joint venture partner's interests in Kote and Tek. Following the closing of the AM USA Transaction, we own 100% of the interests in Kote and Tek.

The assets of ArcelorMittal USA we acquired at the closing of the AM USA Transaction include six steelmaking facilities, eight finishing facilities, three cokemaking operations, two iron ore mining and pelletizing operations and one coal mining complex.

Refer to NOTE 3 - ACQUISITIONS for further information.

*Business Operations*

We are vertically integrated from the mining of iron ore and coal; to production of metallics and coke; through iron making, steelmaking, rolling and finishing; and to downstream tubular components, stamping and tooling. We have the unique advantage as a steel producer of being fully or partially self-sufficient with our production of raw materials for steel manufacturing, which includes iron ore pellets, HBI and coking coal.

We have updated our segment structure to coincide with our new business model and are organized into four operating segments based on differentiated products, Steelmaking, Tubular, Tooling and Stamping, and European Operations. Through the third quarter ended September 30, 2020, we had operated through two reportable segments – the Steel and Manufacturing segment and the Mining and Pelletizing segment. However, given the recent

74

transformation of the business, beginning with our financial statements as of and for the year ended December 31, 2020, we primarily operate through one reportable segment – the Steelmaking segment.

### COVID-19

In response to the COVID-19 pandemic, we made various operational changes to adjust to the demand for our products. Although steel and iron ore production have been considered "essential" by the states in which we operate, certain of our facilities and construction activities were temporarily idled during the second quarter of 2020. Most of these temporarily idled facilities were restarted during the second quarter, and the remaining operations were restarted during the third quarter. Dearborn Works' hot strip mill, anneal and temper operations and AK Coal remain permanently idled as part of the permanent cost reduction efforts. Our Columbus and Monessen facilities acquired through the AM USA Transaction are temporarily idled due to the COVID-19 pandemic.

### Basis of Consolidation

The condensed consolidated financial statements consolidate our accounts and the accounts of our wholly owned subsidiaries, all subsidiaries in which we have a controlling interest and VIEs for which we are the primary beneficiary. All intercompany transactions and balances are eliminated upon consolidation.

### Investments in Affiliates

We have investments in several businesses accounted for using the equity method of accounting. These investments are included within our Steelmaking segment. We review an investment for impairment when circumstances indicate that a loss in value below its carrying amount is other than temporary. Investees and equity ownership percentages are presented below:

| Investee | Equity Ownership Percentage |
|---|---|
| Combined Metals of Chicago, LLC | 40.0% |
| Spartan Steel Coating, LLC | 48.0% |

As of December 31, 2019, our 23% ownership in Hibbing was recorded as an equity method investment. As a result of the acquisition of ArcelorMittal USA, we acquired an additional 62.3% ownership interest in Hibbing. As of December 31, 2020, our ownership in the Hibbing joint venture was 85.3% and was fully consolidated within our operating results with a noncontrolling interest.

We recorded a basis difference for Spartan Steel of $33 million as part of the AK Steel Merger. The basis difference relates to the excess of the fair value over the investee's carrying amount of property, plant and equipment and will be amortized over the remaining useful lives of the underlying assets.

As of December 31, 2020, our investment in affiliates of $105 million was classified in *Other non-current assets*. As of December 31, 2019, our investment in affiliates of $18 million was classified in *Other non-current liabilities*.

## Significant Accounting Policies

We consider the following policies to be beneficial in understanding the judgments involved in the preparation of our consolidated financial statements and the uncertainties that could impact our financial condition, results of operations and cash flows. Certain prior period amounts have been reclassified to conform with the current year presentation.

### Use of Estimates

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Our mineral reserves; future realizable cash flow; environmental, reclamation and closure obligations; valuation of business combinations, long-lived assets, inventory, tax assets and post-employment, post-retirement and other employee benefit liabilities; reserves for contingencies and litigation require the use of various management estimates and assumptions. Actual results could differ from estimates. Management reviews its estimates on an ongoing basis. Changes in facts and circumstances may alter such estimates and affect the results of operations and financial position in future periods.

A006151

### Business Combinations

Assets acquired and liabilities assumed in a business combination are recognized and measured based on their estimated fair values at the acquisition date, while the acquisition-related costs are expensed as incurred. Any excess of the purchase consideration when compared to the fair value of the net tangible and intangible assets acquired, if any, is recorded as goodwill. We engaged independent valuation specialists to assist with the determination of the fair value of assets acquired, liabilities assumed, noncontrolling interest, and goodwill, for the Acquisitions. If the initial accounting for the business combination is incomplete by the end of the reporting period in which the acquisition occurs, an estimate will be recorded. Subsequent to the acquisition date, and not later than one year from the acquisition date, we will record any material adjustments to the initial estimate based on new information obtained that would have existed as of the date of the acquisition. Any adjustment that arises from information obtained that did not exist as of the date of the acquisition will be recorded in the period the adjustment arises.

### Cash and Cash Equivalents

Cash and cash equivalents include cash on hand and on deposit as well as all short-term securities held for the primary purpose of general liquidity. We consider investments in highly liquid debt instruments with an original maturity of three months or less from the date of acquisition and longer maturities when funds can be withdrawn in three months or less without a significant penalty to be cash equivalents. We routinely monitor and evaluate counterparty credit risk related to the financial institutions in which our short-term investment securities are held.

### Trade Accounts Receivable and Allowance for Credit Loss

Trade accounts receivable are recorded at the point control transfers and represent the amount of consideration we expect to receive in exchange for transferred goods and do not bear interest. We establish provisions for expected lifetime losses on accounts receivable at the time a receivable is recorded based on historical experience, customer credit quality and forecasted economic conditions. We regularly review our accounts receivable balances and the allowance for credit loss and establish or adjust the allowance as necessary using the specific identification method in accordance with CECL. We evaluate the aggregation and risk characteristics of receivable pools and develop loss rates that reflect historical collections, current forecasts of future economic conditions over the time horizon we are exposed to credit risk, and payment terms or conditions that may materially affect future forecasts.

### Inventories

Inventories are generally stated at the lower of cost or net realizable value using average cost, excluding depreciation and amortization. Certain iron ore inventories are stated at the lower of cost or market using the LIFO method.

Refer to NOTE 2 - SUPPLEMENTARY FINANCIAL STATEMENT INFORMATION for further information.

### Derivative Financial Instruments and Hedging Activities

We are exposed to certain risks related to the ongoing operations of our business, including those caused by changes in commodity prices and energy rates. We have established policies and procedures, including the use of certain derivative instruments, to manage such risks, if deemed necessary.

Derivative financial instruments are recognized as either assets or liabilities in the Statements of Consolidated Financial Position and measured at fair value. On the date a qualifying hedging instrument is executed, we designate the hedging instrument as a hedge of the variability of cash flows to be received or paid related to a forecasted transaction (cash flow hedge). We formally document all relationships between hedging instruments and hedged items, as well as our risk-management objective and strategy for undertaking various hedge transactions. This process includes linking all derivatives that are designated as cash flow hedges to specific firm commitments or forecasted transactions. We also formally assess, both at the hedge's inception and on an ongoing basis, whether the derivatives that are used in hedging transactions are highly effective in offsetting changes in cash flows of the related hedged items. When it is determined that a derivative is not highly effective as a hedge, we discontinue hedge accounting prospectively and record all future changes in fair value in the period of the instrument's earnings or losses.

For derivative instruments that have been designated as cash flow hedges, the changes in fair value are recorded in *Accumulated other comprehensive loss*. Amounts recorded in *Accumulated other comprehensive loss* are

76

reclassified to earnings or losses in the period the underlying hedged transaction affects earnings or when the underlying hedged transaction is no longer reasonably possible of occurring.

For derivative instruments that have not been designated as cash flow hedges, such as provisional pricing arrangements, changes in fair value are recorded in the period of the instrument's earnings or losses.

Refer to *Revenue Recognition* below for discussion of derivatives recorded as a result of pricing terms in our sales contracts. Additionally, refer to NOTE 15 - DERIVATIVE INSTRUMENTS for further information.

### Property, Plant and Equipment

Our properties are stated at the lower of cost less accumulated depreciation. Depreciation of plant and equipment is computed principally by the straight-line method based on estimated useful lives. Depreciation continues to be recognized when operations are idled temporarily. Depreciation and depletion are recorded over the following estimated useful lives:

| Asset Class | Basis | Life |
|---|---|---|
| Land, land improvements and mineral rights | | |
| Land and mineral rights | Units of production | Life of mine |
| Land improvements | Straight line | 20 to 45 years |
| Buildings | Straight line | 20 to 45 years |
| Equipment | Straight line/Double declining balance | 3 to 20 years |

Refer to NOTE 6 - PROPERTY, PLANT AND EQUIPMENT for further information.

### Goodwill

Goodwill represents the excess purchase price paid over the fair value of the net assets during an acquisition. Goodwill is not amortized, but is assessed for impairment on an annual basis on October 1 (or more frequently if necessary).

### Other Intangible Assets and Liabilities

Intangible assets and liabilities are subject to periodic amortization on a straight-line basis over their estimated useful lives as follows:

| Type | Basis | Useful Life |
|---|---|---|
| Intangible assets: | | |
| Customer relationships | Straight line | 18 years |
| Developed technology | Straight line | 17 years |
| Trade names and trademarks | Straight line | 10 years |
| Mining permits | Straight line | Life of mine |
| Intangible liabilities: | | |
| Above-market supply contracts | Straight line | Contract term |

Refer to NOTE 7 - GOODWILL AND INTANGIBLE ASSETS AND LIABILITIES for further information.

### Leases

We determine if an arrangement contains a lease at inception. We recognize right-of-use assets and lease liabilities associated with leases based on the present value of the future minimum lease payments over the lease term at the commencement date. Lease terms reflect options to extend or terminate the lease when it is reasonably certain that the option will be exercised. For short-term leases (leases with an initial lease term of 12 months or less), right-of-use assets and lease liabilities are not recognized in the consolidated balance sheet, and lease expense is recognized on a straight-line basis over the lease term.

Refer to NOTE 13 - LEASE OBLIGATIONS for further information.

*Asset Impairment*

We monitor conditions that may affect the carrying value of our long-lived tangible and intangible assets when events and circumstances indicate that the carrying value of the asset groups may not be recoverable. In order to determine if assets have been impaired, assets are grouped and tested at the lowest level for which identifiable, independent cash flows are available ("asset group"). The measurement of the impairment loss to be recognized is based on the difference between the fair value and the carrying value of the asset group. Fair value can be determined using a market approach, income approach or cost approach.

For the years ended December 31, 2020, 2019 and 2018, no impairment indicators were present that would indicate the carrying value of any of our asset groups may not be recoverable; as a result, no impairment assessments were required.

*Fair Value Measurements*

*ASC Topic 820, Fair Value Measurements and Disclosures* , establishes a three-level valuation hierarchy for classification of fair value measurements. The valuation hierarchy is based upon the transparency of inputs to the valuation of an asset or liability as of the measurement date. Inputs refer broadly to the assumptions that market participants would use in pricing an asset or liability. Inputs may be observable or unobservable. Observable inputs are inputs that reflect the assumptions market participants would use in pricing the asset or liability developed based on market data obtained from independent sources. Unobservable inputs are inputs that reflect our own views about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances. The three-tier hierarchy of inputs is summarized below:

- Level 1 — Valuation is based upon quoted prices (unadjusted) for identical assets or liabilities in active markets.

- Level 2 — Valuation is based upon quoted prices for similar assets and liabilities in active markets, or other inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

- Level 3 — Valuation is based upon other unobservable inputs that are significant to the fair value measurement.

The classification of assets and liabilities within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement in its entirety.

Refer to NOTE 9 - FAIR VALUE OF FINANCIAL INSTRUMENTS and NOTE 10 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS for further information.

*Pensions and Other Postretirement Benefits*

We offer defined benefit pension plans, defined contribution pension plans and OPEB plans, primarily consisting of retiree healthcare benefits as part of our total compensation and benefits programs.

We recognize the funded or unfunded status of our pension and OPEB obligations on our December 31, 2020 and 2019 Statements of Consolidated Financial Position based on the difference between the market value of plan assets and the actuarial present value of our retirement obligations on that date, on a plan-by-plan basis. If the plan assets exceed the pension and OPEB obligations, the amount of the surplus is recorded as an asset; if the pension and OPEB obligations exceed the plan assets, the amount of the underfunded obligations is recorded as a liability. Year-end balance sheet adjustments to pension and OPEB assets and obligations are recorded as *Accumulated other comprehensive loss* in the Statements of Consolidated Financial Position.

The actuarial estimates of the PBO and APBO incorporate various assumptions including the discount rates, the rates of increases in compensation, healthcare cost trend rates, mortality, retirement timing and employee turnover.  The discount rate is determined based on the prevailing year-end rates for high-grade corporate bonds with a duration matching the expected cash flow timing of the benefit payments from the various plans. The remaining assumptions are based on our estimates of future events by incorporating historical trends and future expectations. The amount of net periodic cost that is recorded in the Statements of Consolidated Operations consists of several components including service cost, interest cost, expected return on plan assets, and amortization of previously unrecognized amounts. Service cost represents the value of the benefits earned in the current year by the participants. Interest cost represents the cost associated with the passage of time. Certain items, such as plan amendments, gains and/or losses resulting from differences between actual and assumed results for demographic

78

and economic factors affecting the obligations and assets of the plans, and changes in other assumptions are subject to deferred recognition for income and expense purposes. The expected return on plan assets is determined utilizing the weighted average of expected returns for plan asset investments in various asset categories based on historical performance, adjusted for current trends. Service costs are classified within *Cost of goods sold, Selling, general and administrative expenses* and *Miscellaneous – net* while the interest cost, expected return on assets, amortization of prior service costs/credits, net actuarial gain/loss, and other costs are classified within *Other non-operating income.*

Refer to NOTE 10 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS for further information.

### Labor Agreements

At December 31, 2020, we employed approximately 25,000 people, of which approximately 18,500 were represented by labor unions under various agreements. We have agreements that will expire at five locations in 2021 and sixteen locations in 2022. Workers at some of our North American facilities are covered by agreements with the USW or other unions that have various expiration dates.

### Asset Retirement Obligations

Asset retirement obligations are recognized when incurred and recorded as liabilities at fair value. The fair value of the liability is determined as the discounted value of the expected future cash flows. The asset retirement obligation is accreted over time through periodic charges to earnings. In addition, the asset retirement cost is capitalized and amortized over the life of the related asset. Reclamation costs are adjusted periodically to reflect changes in the estimated present value resulting from the passage of time and revisions to the estimates of either the timing or amount of the reclamation costs. We review, on an annual basis, unless otherwise deemed necessary, the asset retirement obligation for each applicable operation in accordance with the provisions of *ASC Topic 410, Asset Retirement and Environmental Obligations.* We perform an in-depth evaluation of the liability every three years in addition to our routine annual assessments.

Future reclamation costs for inactive operations are accrued based on management's best estimate at the end of each period of the costs expected to be incurred at a site. Such cost estimates include, where applicable, ongoing maintenance and monitoring costs. Changes in estimates at inactive operations are reflected in earnings in the period an estimate is revised.

Refer to NOTE 14 - ASSET RETIREMENT OBLIGATIONS for further information.

### Environmental Remediation Costs

We have a formal policy for environmental protection and restoration. Certain of our operating activities are subject to various laws and regulations governing protection of the environment. We conduct our operations to protect the public health and environment and believe our operations are in compliance with applicable laws and regulations in all material respects. Our environmental liabilities, including obligations for known environmental remediation exposures, have been recognized based on the estimated cost of investigation and remediation at each site. If the cost can only be estimated as a range of possible amounts with no point in the range being more likely, the minimum of the range is accrued. Future expenditures are discounted unless the amount and timing of the cash disbursements cannot be reasonably estimated. It is possible that additional environmental obligations could be incurred, the extent of which cannot be assessed. Potential insurance recoveries have not been reflected in the determination of the liabilities.

Refer to NOTE 21 - COMMITMENTS AND CONTINGENCIES for further information.

### Revenue Recognition

Sales are recognized when our performance obligations are satisfied. Generally, our performance obligations are satisfied, control of our products is transferred and revenue is recognized at a single point in time, when title transfers to our customer for product shipped according to shipping terms. Shipping and other transportation costs charged to customers are treated as fulfillment activities and are recorded in both revenue and cost of sales at the time control is transferred to the customer. Refer to NOTE 4 - REVENUES for further information.

### Repairs and Maintenance

Repairs, maintenance and replacement of components are expensed as incurred. The cost of major equipment overhauls is capitalized and depreciated over the estimated useful life, which is the period until the next scheduled overhauls. All other planned and unplanned repairs and maintenance costs are expensed when incurred.

*Share-Based Compensation*

The fair value of each performance share grant is estimated on the date of grant using a Monte Carlo simulation to forecast relative TSR performance. A correlation matrix of historical and projected stock prices was developed for both the Company and its predetermined peer group of mining and metals companies. The fair value assumes that the performance objective will be achieved. The expected term of the grant represents the time from the grant date to the end of the service period. We estimate the volatility of our common shares and that of the peer group of mining and metals companies using daily price intervals for all companies. The risk-free interest rate is the rate at the grant date on zero-coupon government bonds, with a term commensurate with the remaining performance period.

The fair value of the restricted stock units is determined based on the closing price of our common shares on the grant date.

Upon vesting of share-based compensation awards, we issue shares from treasury shares before issuing new shares. Forfeitures are recognized when they occur.

The fair value of stock options is estimated on the date of grant using a Black-Scholes model using the grant date price of our common shares and option exercise price, and assumptions regarding the option's expected term, the volatility of our common shares, the risk-free interest rate, and the dividend yield over the option's expected term.

Refer to NOTE 11 - STOCK COMPENSATION PLANS for additional information.

*Income Taxes*

Income taxes are based on income for financial reporting purposes, calculated using tax rates by jurisdiction, and reflect a current tax liability or asset for the estimated taxes payable or recoverable on the current year tax return and expected annual changes in deferred taxes. Any interest or penalties on income tax are recognized as a component of *Income tax benefit (expense)*.

We account for income taxes under the asset and liability method, which requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the financial statements. Under this method, deferred tax assets and liabilities are determined based on the differences between the financial statement and tax basis of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. The effect of a change in tax rates on deferred tax assets and liabilities is recognized within *Net income (loss)* in the period that includes the enactment date.

We record net deferred tax assets to the extent we believe these assets will more likely than not be realized. In making such determination, we consider all available positive and negative evidence, including scheduled reversals of deferred tax liabilities, projected future taxable income, tax planning strategies and recent financial results of operations.

Accounting for uncertainty in income taxes recognized in the financial statements requires that a tax benefit from an uncertain tax position be recognized when it is more likely than not that the position will be sustained upon examination, including resolutions of any related appeals or litigation processes, based on technical merits.

See NOTE 12 - INCOME TAXES for further information.

*Discontinued Operations*

During 2018, we committed to a course of action leading to the permanent closure of the Asia Pacific Iron Ore mining operations and sold all of the assets of our Asia Pacific Iron Ore business through a series of sales to third parties. As a result of our exit, management determined that our Asia Pacific Iron Ore mining operations met the criteria to be classified as held for sale and a discontinued operation under *ASC Topic 205, Presentation of Financial*

80

A006156

*Statements*. As such, all current and historical Asia Pacific Iron Ore operating results are classified within discontinued operations.

### Foreign Currency

Our financial statements are prepared with the U.S. dollar as the reporting currency and the functional currency of all subsidiaries is the U.S. dollar, except for our European Operations for which the functional currency is the Euro. In August 2018, management determined that there were significant changes in economic factors related to our Australian subsidiaries. The change in economic factors was a result of the sale and conveyance of substantially all assets and liabilities of our Australian subsidiaries to third parties, representing a significant change in operations. As such, the functional currency for the Australian subsidiaries changed from the Australian dollar to the U.S. dollar and all remaining Australian denominated monetary balances will be remeasured prospectively through the Statements of Consolidated Operations.

As a result of the liquidation of the Australian subsidiaries' assets, the historical impact of foreign currency translation recorded in *Accumulated other comprehensive loss* in the Statements of Consolidated Financial Position of $ 228 million was reclassified and recognized as a gain in *Income (loss) from discontinued operations, net of tax* in the Statements of Consolidated Operations for the year ended December 31, 2018.

### Earnings Per Share

We present both basic and diluted EPS amounts for continuing operations and discontinued operations. Total basic EPS amounts are calculated by dividing *Net income (loss) attributable to Cliffs shareholders* , less the earnings allocated to our Series B Participating Redeemable Preferred Stock, by the weighted average number of common shares outstanding during the period presented.

Total diluted EPS amounts are calculated by dividing *Net income (loss) attributable to Cliffs shareholders* by the weighted average number of common shares, common share equivalents under stock plans using the treasury-stock method, common share equivalents of the *Series B Participating Redeemable Preferred Stock* using the if-converted method and the calculated common share equivalents in excess of the conversion rate related to our 1.50% 2025 Convertible Senior Notes using the treasury-stock method. Common share equivalents are excluded from EPS computations in the periods in which they have an anti-dilutive effect.

See NOTE 8 - DEBT AND CREDIT FACILITIES and NOTE 20 - EARNINGS PER SHARE for further information.

### Variable Interest Entities

We assess whether we have a variable interest in legal entities in which we have a financial relationship and, if so, whether or not those entities are VIEs. A VIE is an entity with insufficient equity at risk for the entity to finance its activities without additional subordinated financial support or in which equity investors lack the characteristics of a controlling financial interest. If an entity is determined to be a VIE, we evaluate whether we are the primary beneficiary. The primary beneficiary analysis is a qualitative analysis based on power and economics. We conclude that we are the primary beneficiary and consolidate the VIE if we have both (i) the power to direct the activities of the VIE that most significantly influence the VIE's economic performance and (ii) the obligation to absorb losses of, or the right to receive benefits from, the VIE that could potentially be significant to the VIE. Refer to NOTE 19 - VARIABLE INTEREST ENTITIES for additional information.

## Recent Accounting Pronouncements

### Issued and Adopted

On March 2, 2020, the SEC issued a final rule that amended the disclosure requirements related to certain registered securities under SEC Regulation S-X, Rule 3-10, which required separate financial statements for subsidiary issuers and guarantors of registered debt securities unless certain exceptions are met. The final rule replaces the previous requirement under Rule 3-10 to provide condensed consolidating financial information in the registrant's financial statements with a requirement to provide alternative financial disclosures (which include summarized financial information of the parent and any issuers and guarantors, as well as other qualitative disclosures) in either the registrant's *Management's Discussion and Analysis of Financial Condition and Results of Operations* or its financial statements, in addition to other simplifications. The final rule is effective for filings on or after January 4, 2021, and early adoption is permitted. We elected to early adopt this disclosure update for the period ended March 31, 2020. As a result, we have excluded the footnote disclosures required under the previous Rule 3-10, and applied the final rule by including the summarized financial information and qualitative disclosures in *Part II -*

*Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations*  of this Annual Report on Form 10-K and Exhibit 22, filed herewith.

In February 2016, the FASB issued  *ASU No. 2016-02, Leases (Topic 842)* . The new standard requires lessees to recognize a right-of-use asset and a lease liability on the balance sheet for all leases except for short-term leases. For lessees, leases are classified as either operating or finance leases. We adopted this standard on its effective date of January 1, 2019 using the optional alternative approach, which requires application of the new guidance at the beginning of the standard's effective date. Adoption of the updated standard did not have a material effect on our consolidated financial statements.

In June 2016, the FASB issued  *ASU No. 2016-13, Financial Instruments-Credit Losses (Topic 326)* , which introduces a new accounting model, CECL. CECL requires earlier recognition of credit losses, while also providing additional transparency about credit risk. CECL utilizes a lifetime expected credit loss measurement objective for the recognition of credit losses at the time the financial asset is originated or acquired. The expected credit losses are adjusted each period for changes in expected lifetime credit losses. We elected to early adopt this standard on December 31, 2019. Upon adoption, the updated standard did not have a material effect on our consolidated financial statements.

### Issued and Not Effective

In August 2020, the FASB issued  *ASU 2020-06, Debt—Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging— Contracts in Entity's Own Equity (Subtopic 815-40)* . This update requires certain convertible instruments to be accounted for as a single liability measured at its amortized cost. Additionally, the update requires the use of the "if-converted" method, removing the treasury stock method, when calculating diluted shares. The two methods of adoption are the full and modified retrospective approaches. We expect to utilize the modified retrospective approach. Using this approach, the guidance shall be applied to transactions outstanding as of the beginning of the fiscal year in which the amendment is adopted. The final rule is effective for fiscal years beginning after December 15, 2021. Early adoption is permitted for fiscal years beginning after December 15, 2020, including interim periods within those fiscal years. We are continuing to evaluate the impact of this update to our consolidated financial statements and would expect to adopt at the required adoption date of January 1, 2022.

## NOTE 2 - SUPPLEMENTARY FINANCIAL STATEMENT INFORMATION

### Allowance for Credit Losses

The following is a roll-forward of our allowance for credit losses associated with  *Accounts receivable, net*:

| | (In Millions) | |
| --- | --- | --- |
| | **2020** | 2019 |
| Allowance for credit losses as of January 1 | $        — | $        — |
| Increase in allowance | **(5)** | — |
| Allowance for credit losses as of December 31 | $      **(5)** | $        — |

### Inventories

The following table presents the detail of our  *Inventories* in the Statements of Consolidated Financial Position:

| | (In Millions) | |
| --- | --- | --- |
| | **Year Ended December 31,** | |
| | **2020** | 2019 |
| Product inventories | | |
| Finished and semi-finished goods | $     **2,125** | $        114 |
| Work-in-process | **—** | 69 |
| Raw materials | **1,431** | 9 |
| Total product inventories | **3,556** | 192 |
| Manufacturing supplies and critical spares | **272** | 125 |
| Inventories | $    **3,828** | $        317 |

A006158

[Table of Contents]

The excess of current cost over LIFO cost of iron ore inventories was $ 104 million and $101 million at December 31, 2020 and 2019, respectively. As of December 31, 2020, the product inventory balance for iron ore inventories decreased, resulting in the liquidation of a LIFO layer. The effect of the inventory reduction was an increase in *Cost of goods sold* of $30 million in the Statements of Consolidated Operations for the year ended December 31, 2020. As of December 31, 2019, the product inventory balance for iron ore inventories increased, resulting in a LIFO increment in 2019. The effect of the inventory build was an increase in *Inventories* of $34 million in the Statements of Consolidated Financial Position for the year ended December 31, 2019.

The allowance for obsolete and surplus items in supplies and other inventories was $ 13 million at both December 31, 2020 and 2019.

**Cash Flow Information**

A reconciliation of capital additions to cash paid for capital expenditures is as follows:

| | (In Millions) | | |
| --- | --- | --- | --- |
| | Year Ended December 31, | | |
| | **2020** | 2019 | 2018 |
| Capital additions | $ **483** | $ 690 | $ 395 |
| Less: | | | |
| Non-cash accruals | **(86)** | 15 | 94 |
| Right-of-use assets - finance leases | **44** | 29 | 8 |
| Grants | **—** | (10) | (3) |
| Cash paid for capital expenditures including deposits | $ **525** | $ 656 | $ 296 |

Cash payments (receipts) for interest and income taxes are as follows:

| | (In Millions) | | |
| --- | --- | --- | --- |
| | **2020** | 2019 | 2018 |
| Taxes paid on income | $ **5** | $ — | $ 3 |
| Income tax refunds | **(120)** | (118) | (11) |
| Interest paid on debt obligations net of capitalized interest [1] | **170** | 98 | 106 |

[1] Capitalized interest was $53 million, $25 million and $7 million for the years ended December 31, 2020, 2019 and 2018, respectively.

*Non-Cash Investing and Financing Activities*

| | (In Millions) | | |
| --- | --- | --- | --- |
| | **2020** | 2019 | 2018 |
| Fair value of common shares issued as part of consideration in connection with AM USA Transaction | $ **990** | $ — | $ — |
| Fair value of Series B Participating Redeemable Preferred Stock issued as part of consideration in connection with AM USA Transaction | **738** | — | — |
| Fair value of settlement of a pre-existing relationship as part of consideration in connection with AM USA Transaction | **237** | — | — |
| Fair value of common shares issued as consideration in connection with AK Steel Merger | **618** | — | — |
| Fair value of equity awards assumed in connection with AK Steel Merger | **4** | — | — |

**Discontinued Operations**

We had income from discontinued operations, net of tax of $ 88 million for the year ended December 31, 2018. During 2018, we sold all of the assets of our Asia Pacific Iron Ore mining operations, which had operating losses of $105 million for the year ended December 31, 2018. Additionally, as a result of the liquidation of the net assets of our Australian subsidiaries, the historical changes in foreign currency translation recorded in *Accumulated other comprehensive loss* totaling $228 million was reclassified and recognized as a gain in *Income (loss) from discontinued operations, net of tax.*

83

**NOTE 3 - ACQUISITIONS**

In 2020, we acquired two major steelmakers, AK Steel and ArcelorMittal USA, vertically integrating our legacy iron ore business with steel production. Our fully-integrated portfolio includes custom-made pellets and HBI; flat-rolled carbon steel, stainless, electrical, plate, tinplate and long steel products; as well as carbon and stainless steel tubing, hot and cold stamping and tooling. The AK Steel Merger combined Cliffs, a producer of iron ore pellets, with AK Steel, a producer of flat-rolled carbon, stainless and electrical steel products, to create a vertically integrated producer of value-added iron ore and steel products. The AM USA Transaction transformed us into a fully-integrated steel enterprise with the size and scale to achieve improved through-the-cycle margins.

We now have a presence across the entire steel manufacturing process, from mining to pelletizing to the development and production of finished high value steel products. The combination is expected to create significant opportunities to generate additional value from market trends across the entire steel value chain and enable more consistent, predictable performance through normal market cycles.

**Acquisition of ArcelorMittal USA**

*Overview*

On December 9, 2020, pursuant to the terms of the AM USA Transaction Agreement, we purchased ArcelorMittal USA from ArcelorMittal.  In connection with the closing of the AM USA Transaction, as contemplated by the terms of the AM USA Transaction Agreement, ArcelorMittal's former joint venture partner in Kote and Tek exercised its put right pursuant to the terms of the Kote and Tek joint venture agreements.  As a result, we purchased all of such joint venture partner's interests in Kote and Tek. Following the closing of the AM USA Transaction, we own 100% of the interests in Kote and Tek.

Following the acquisition, the operating results of ArcelorMittal USA are included in our  consolidated financial statements. For the period subsequent to the acquisition (December 9, 2020 through December 31, 2020), ArcelorMittal USA generated *Revenues* of $446 million and a loss of $ 40 million included within *Net income (loss) attributable to Cliffs shareholders* , which included $21 million related to amortization of the fair value inventory step-up.

Additionally, we incurred acquisition-related costs excluding severance costs of $ 26 million for the year ended  December 31, 2020, which were recorded in *Acquisition-related costs* on the Statements of Consolidated Operations .

The AM USA Transaction was accounted for under the acquisition method of accounting for business combinations.

The fair value of the total purchase consideration was determined as follows:

|  |  | (In Millions) |
| --- | --- | --- |
| Fair value of Cliffs common shares issued | $ | 990 |
| Fair value of Series B Participating Redeemable Preferred Stock issued |  | 738 |
| Fair value of settlement of a pre-existing relationship |  | 237 |
| Cash consideration (subject to customary working capital adjustments) |  | 631 |
| Total purchase consideration | $ | 2,596 |

84

The fair value of Cliffs common shares issued is calculated as follows:

| | | |
|---|---|---|
| Number of Cliffs common shares issued | | 78,186,671 |
| Closing price of Cliffs common share as of December 9, 2020 | $ | 12.66 |
| Fair value of Cliffs common shares issued (in millions) | $ | 990 |

The fair value of Cliffs Series B Participating Redeemable Preferred Stock issued is calculated as follows:

| | | |
|---|---|---|
| Number of Cliffs Series B Participating Redeemable Preferred Stock issued | | 583,273 |
| Redemption price as of December 9, 2020 | $ | 1,266 |
| Fair value of Cliffs Series B Participating Redeemable Preferred Stock issued (in millions) | $ | 738 |

The fair value of the estimated cash consideration is comprised of the following:

| | | (In Millions) |
|---|---|---|
| Cash consideration pursuant to the AM USA Transaction Agreement | $ | 505 |
| Cash consideration for purchase of the remaining JV partners' interest of Kote and Tek | | 182 |
| Estimated total cash consideration receivable | | (56) |
| Total estimated cash consideration | $ | 631 |

The cash portion of the purchase price is subject to customary working capital adjustments.

The fair value of the settlement of a pre-existing relationship is comprised of the following:

| | | (In Millions) |
|---|---|---|
| Accounts receivable | $ | 97 |
| Freestanding derivative asset from customer supply agreement | | 140 |
| Total fair value of settlement of a pre-existing relationship | $ | 237 |

### Valuation Assumption and Preliminary Purchase Price Allocation

We estimated fair values at December 9, 2020 for the preliminary allocation of consideration to the net tangible and intangible assets acquired and liabilities assumed in connection with the AM USA Transaction. During the measurement period, we will continue to obtain information to assist in finalizing the fair value of assets acquired and liabilities assumed, which may differ materially from these preliminary estimates. If we determine any measurement period adjustments are material, we will apply those adjustments, including any related impacts to net income, in the reporting period in which the adjustments are determined. We are in the process of conducting a valuation of the assets acquired and liabilities assumed related to the AM USA Transaction, most notably, inventories, personal and real property, mineral reserves, leases, investments, deferred taxes, asset retirement obligations, pension and OPEB liabilities, and the final allocation will be made when completed, including the result of any identified goodwill. Accordingly, the provisional measurements noted below are preliminary and subject to modification in the future.

Table of Contents

The preliminary purchase price allocation to assets acquired and liabilities assumed in the AM USA Transaction was:

|  | (In Millions) |
|---|---|
| Cash and cash equivalents | $ 35 |
| Accounts receivable, net | 349 |
| Inventories | 2,115 |
| Income tax receivable, current | 12 |
| Other current assets | 22 |
| Property, plant and equipment | 4,017 |
| Other non-current assets | 158 |
| Accounts payable | (758) |
| Accrued employment costs | (271) |
| State and local taxes | (76) |
| Pension and OPEB liabilities, current | (109) |
| Other current liabilities | (322) |
| Pension and OPEB liabilities, non-current | (3,195) |
| Other non-current liabilities | (598) |
| Noncontrolling interest | (13) |
| Net identifiable assets acquired | 1,366 |
| Goodwill | 1,230 |
| Total net assets acquired | $ 2,596 |

The goodwill resulting from the acquisition of ArcelorMittal USA primarily represents the growth opportunities in the automotive, construction, appliances, infrastructure and machinery and equipment markets, as well as any synergistic benefits to be realized from the AM USA Transaction and was assigned to our flat steel operations within our Steelmaking segment. Goodwill is expected to be deductible for U.S. federal income tax purposes.

**Acquisition of AK Steel**

*Overview*

On March 13, 2020, pursuant to the AK Steel Merger Agreement, we completed the acquisition of AK Steel, in which we were the acquirer. As a result of the AK Steel Merger, each share of AK Steel common stock issued and outstanding immediately prior to the effective time of the AK Steel Merger (other than excluded shares) was converted into the right to receive 0.400 Cliffs common shares and, if applicable, cash in lieu of any fractional Cliffs common shares.

Following the acquisition, the operating results of AK Steel are included in our consolidated financial statements. For the period subsequent to the acquisition (March 13, 2020 through December 31, 2020), AK Steel generated Revenues of $3,573 million and a loss of $302 million included within Net income (loss) attributable to Cliffs shareholders, which included $74 million and $35 million related to amortization of the fair value inventory step-up and severance costs, respectively.

Additionally, we incurred acquisition-related costs excluding severance costs of $26 million for the year ended December 31, 2020, which were recorded in *Acquisition-related costs* on the Statements of Consolidated Operations .

Refer to NOTE 8 - DEBT AND CREDIT FACILITIES for information regarding debt transactions executed in connection with the AK Steel Merger.

The AK Steel Merger was accounted for under the acquisition method of accounting for business combinations. The acquisition date fair value of the consideration transferred totaled $1,535 million. The following tables summarize the consideration paid for AK Steel and the estimated fair values of the assets acquired and liabilities assumed at the acquisition date.

The fair value of the total purchase consideration was determined as follows:

| | (In Millions) |
|---|---|
| Fair value of AK Steel debt | $ 914 |
| Fair value of Cliffs common shares issued for AK Steel outstanding common stock | 618 |
| Other | 3 |
| Total purchase consideration | $ 1,535 |

The fair value of Cliffs common shares issued for outstanding shares of AK Steel common stock and with respect to Cliffs common shares underlying converted AK Steel equity awards that vested upon completion of the AK Steel Merger is calculated as follows:

| | (In Millions, Except Per Share Amounts) |
|---|---|
| Number of shares of AK Steel common stock issued and outstanding | 317 |
| Exchange ratio | 0.400 |
| Shares of Cliffs common shares issued to AK Steel stockholders | 127 |
| Price per share of Cliffs common shares | $ 4.87 |
| Fair value of Cliffs common shares issued for outstanding AK Steel common stock | $ 618 |

The fair value of AK Steel's debt included in the consideration is calculated as follows:

| | (In Millions) |
|---|---|
| Credit Facility | $ 590 |
| 7.50% Senior Secured Notes due July 2023 | 324 |
| Fair value of debt included in consideration | $ 914 |

**Valuation Assumption and Preliminary Purchase Price Allocation**

We estimated fair values at March 13, 2020 for the preliminary allocation of consideration to the net tangible and intangible assets acquired and liabilities assumed in connection with the AK Steel Merger. During the measurement period, we will continue to obtain information to assist in finalizing the fair value of assets acquired and liabilities assumed, which may differ materially from these preliminary estimates. If we determine any measurement period adjustments are material, we will apply those adjustments, including any related impacts to net income, in the reporting period in which the adjustments are determined. We are in the process of conducting a valuation of the assets acquired and liabilities assumed related to the AK Steel Merger, most notably, personal and real property, leases, deferred taxes, asset retirement obligations and intangible assets and liabilities, and the final allocation will be made when completed, including the result of any identified goodwill. Accordingly, the provisional measurements noted below are preliminary and subject to modification in the future.

87

Table of Contents

The preliminary purchase price allocation to assets acquired and liabilities assumed in the AK Steel Merger was:

| | Initial Allocation of Consideration | Measurement Period Adjustments | Updated Allocation |
|---|---|---|---|
| | (In Millions) | | |
| Cash and cash equivalents | $ 38 | $ 1 | $ 39 |
| Accounts receivable, net | 666 | (2) | 664 |
| Inventories | 1,563 | (243) | 1,320 |
| Income tax receivable, current | 3 | — | 3 |
| Other current assets | 65 | (16) | 49 |
| Property, plant and equipment | 2,184 | 128 | 2,312 |
| Deferred income taxes | — | 30 | 30 |
| Other non-current assets | 475 | (3) | 472 |
| Accounts payable | (636) | (8) | (644) |
| Accrued employment costs | (94) | 1 | (93) |
| State and local taxes | (35) | 4 | (31) |
| Pension and OPEB liabilities, current | (75) | (3) | (78) |
| Other current liabilities | (201) | 5 | (196) |
| Long-term debt | (1,179) | — | (1,179) |
| Pension and OPEB liabilities, non-current | (873) | 2 | (871) |
| Other non-current liabilities | (507) | 72 | (435) |
| Noncontrolling interest | — | (1) | (1) |
| Net identifiable assets acquired | 1,394 | (33) | 1,361 |
| Goodwill | 141 | 33 | 174 |
| Total net assets acquired | $ 1,535 | $ — | $ 1,535 |

During the period subsequent to the AK Steel Merger, we made certain measurement period adjustments to the acquired assets and liabilities assumed due to clarification of information utilized to determine fair value during the measurement period. The *Inventories* measurement period adjustments of $243 million resulted in a favorable impact of $8 million to *Cost of goods sold* for the year ended December 31, 2020.

The goodwill resulting from the acquisition of AK Steel was assigned to our downstream Tubular and Tooling and Stamping operating segments. Goodwill is calculated as the excess of the purchase price over the net identifiable assets recognized and primarily represents the growth opportunities in light weighting solutions to automotive customers, as well as any synergistic benefits to be realized. Goodwill from the AK Steel Merger is not expected be deductible for income tax purposes.

The preliminary purchase price allocated to identifiable intangible assets and liabilities acquired was:

| | (In Millions) | Weighted Average Life (In Years) |
|---|---|---|
| Intangible assets: | | |
| Customer relationships | $ 77 | 18 |
| Developed technology | 60 | 17 |
| Trade names and trademarks | 11 | 10 |
| Total identifiable intangible assets | $ 148 | 17 |
| Intangible liabilities: | | |
| Above-market supply contracts | $ (71) | 12 |

The above-market supply contracts relate to the long-term coke and energy supply agreements with SunCoke Energy, which includes SunCoke Middletown, a consolidated VIE. Refer to NOTE 19 - VARIABLE INTEREST ENTITIES for further information.

88

Table of Contents

*Pro Forma Results*

The following table provides unaudited pro forma financial information, prepared in accordance with Topic 805, for the years ended December 31, 2020 and 2019, as if ArcelorMittal USA and AK Steel had been acquired as of January 1, 2019:

|  | (In Millions) | |
|---|---|---|
|  | Year Ended December 31, | |
|  | **2020** | 2019 |
| Revenues | $ **12,837** | $ 17,163 |
| Net income (loss) attributable to Cliffs shareholders | **(520)** | (11) |

The unaudited pro forma financial information has been calculated after applying our accounting policies and adjusting the historical results with pro forma adjustments, net of tax, that assume the Acquisitions occurred on January 1, 2019. Significant pro forma adjustments include the following:

1.  The elimination of intercompany revenues between Cliffs and ArcelorMittal USA and AK Steel of $ 844 million and $1,499 million for the years ended December 31, 2020 and 2019, respectively.

2.  The 2020 pro forma net loss was adjusted to exclude $ 96 million of non-recurring inventory acquisition accounting adjustments incurred during the year ended December 31, 2020. The 2019 pro forma net loss was adjusted to include $362 million of non-recurring inventory acquisition accounting adjustments for the year ended December 31, 2019.

3.  The elimination of non-recurring transaction costs incurred by Cliffs, AK Steel and ArcelorMittal USA in connection with the Acquisitions were $ 93 million for the year ended December 31, 2020. The 2019 pro forma net loss was adjusted to include $93 million of non-recurring transaction cost adjustments for the year ended December 31, 2019.

4.  The 2020 pro forma net loss was adjusted to exclude restructuring costs of $ 1,820 million of non-recurring costs incurred by ArcelorMittal USA prior to the AM USA Transaction.

5.  The 2020 and 2019 pro forma net losses were adjusted to exclude $ 140 million and $129 million for the years ended December 31, 2020 and 2019, respectively, for the impact of reversal of the fees charged for management, financial and legal services under the Industrial Franchise Agreement with the former parent.

6.  Total other pro forma adjustments included reduced expenses of $ 32 million for the year ended December 31, 2020, primarily due to decreased depreciation expense and pension and OPEB expense, offset partially by increased interest and amortization expense.

7.  Total other pro forma adjustments included an expense of $ 76 million for the year ended December 31, 2019, primarily due to increased interest, amortization and pension and OPEB expense, offset partially by decreased depreciation expense.

8.  The income tax impact of pro forma transaction adjustments that affect *Net income (loss) attributable to Cliffs shareholders* at a statutory rate of 24.3% resulted in an increased benefit to *Income tax benefit (expense)* of $170 million and $117 million for the years ended December 31, 2020 and 2019, respectively.

The unaudited pro forma financial information does not reflect the potential realization of synergies or cost savings, nor does it reflect other costs relating to the integration of the acquired companies. This unaudited pro forma financial information should not be considered indicative of the results that would have actually occurred if the Acquisitions had been consummated on January 1, 2019, nor are they indicative of future results.

**NOTE 4 - REVENUES**

We generate our revenue through product sales, in which shipping terms generally indicate when we have fulfilled our performance obligations and transferred control of products to our customer. Our revenue transactions consist of a single performance obligation to transfer promised goods. Our contracts with customers usually define the mechanism for determining the sales price, which is generally fixed upon transfer of control, but the contracts generally do not impose a specific quantity on either party. Quantities to be delivered to the customer are generally determined at a point near the date of delivery through purchase orders or other written instructions we receive from the customer. Spot market sales are made through purchase orders or other written instructions. We consider our performance obligation to be complete and recognize revenue when control transfers in accordance with shipping terms.

Revenue is measured as the amount of consideration we expect to receive in exchange for transferring product. We reduce the amount of revenue recognized for estimated returns and other customer credits, such as discounts and volume rebates, based on the expected value to be realized. Payment terms are consistent with terms standard to the markets we serve. Sales taxes collected from customers are excluded from revenues.

Prior to the AM USA Transaction, we had a supply agreement with ArcelorMittal USA, which included supplemental revenue or refunds based on the HRC price in the year the iron ore was consumed in ArcelorMittal USA's blast furnaces. As control transferred prior to consumption, the supplemental revenue was recorded in accordance with Topic 815. All sales occurring subsequent to the AM USA Transaction are intercompany and eliminated in consolidation. Included within *Revenues* related to Topic 815 for the supplemental revenue portion of the supply agreement is derivative revenue of $ 122 million, $78 million and $426 million for the years ended December 31, 2020, 2019 and 2018, respectively.

The following table represents our *Revenues* by market:

|  | (In Millions) | | |
|---|---|---|---|
|  | Year Ended December 31, | | |
|  | **2020** | 2019 | 2018 |
| **Steelmaking:** | | | |
| Automotive | $ **2,062** | $ — | $ — |
| Infrastructure and manufacturing | **784** | — | — |
| Distributors and converters | **696** | — | — |
| Steel producers [1] | **1,423** | 1,990 | 2,332 |
| **Total steelmaking** | **4,965** | 1,990 | 2,332 |
| **Other Businesses:** | | | |
| Automotive | **329** | — | — |
| Infrastructure and manufacturing | **34** | — | — |
| Distributors and converters | **26** | — | — |
| **Total Other Businesses** | **389** | — | — |
| **Total revenues** | $ **5,354** | $ 1,990 | $ 2,332 |

[1] Includes *Realization of deferred revenue* of $35 million for the year ended December 31, 2020.

90

Table of Contents

The following table represents our consolidated *Revenues* by product line:

| | **(Dollars In Millions, Sales Volumes in Thousands)** | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **Year Ended December 31,** | | | | | |
| | **2020** | | 2019 | | 2018 | |
| | **Revenue** | **Volume[1]** | Revenue | Volume[1] | Revenue | Volume[1] |
| **Steelmaking:** | | | | | | |
| Hot-rolled steel | $ 386 | 633 | $ — | — | $ — | — |
| Cold-rolled steel | 490 | 682 | — | — | — | — |
| Coated steel | 1,747 | 1,911 | — | — | — | — |
| Stainless and electrical steel | 868 | 416 | — | — | — | — |
| Other steel products | 92 | 141 | — | — | — | — |
| Iron products[2] | 1,335 | 11,707 | 1,990 | 18,583 | 2,332 | 20,563 |
| Other | 47 | N/A | — | | — | |
| **Total steelmaking** | **4,965** | | 1,990 | | 2,332 | |
| **Other Businesses:** | | | | | | |
| Other | 389 | N/A | — | N/A | — | N/A |
| **Total revenues** | $ 5,354 | | $ 1,990 | | $ 2,332 | |

[1] Carbon steel products, stainless and electrical steel and plate steel volumes are stated in net tons. Iron product volumes are stated in long tons.

[2] Includes *Realization of deferred revenue* of $35 million for the year ended December 31, 2020.

**Deferred Revenue**

The table below summarizes our deferred revenue balances:

| | **(In Millions)** | | | |
| --- | --- | --- | --- | --- |
| | **Deferred Revenue (Current)** | | **Deferred Revenue (Long-Term)** | |
| | **2020** | 2019 | **2020** | 2019 |
| Opening balance as of January 1 | $ 22 | $ 21 | $ 26 | $ 39 |
| Net increase (decrease) | (15) | 1 | (26) | (13) |
| Closing balance as of December 31 | $ 7 | $ 22 | $ — | $ 26 |

Prior to the AK Steel Merger, our iron ore pellet sales agreement with Severstal Dearborn, LLC, subsequently assumed by AK Steel, required supplemental payments to be paid by the customer during the period from 2009 through 2013. Installment amounts received under this arrangement in excess of sales were classified as deferred revenue in the Statements of Consolidated Financial Position upon receipt of payment and the revenue was recognized over the term of the supply agreement, which had extended until 2022, in equal annual installments. As a result of the termination of that iron ore pellet sales agreement, we realized $35 million of deferred revenue, which was recognized within *Realization of deferred revenue* in the Statements of Consolidated Operations during the year ended December 31, 2020.

We have certain other sales agreements that require customers to pay in advance. Payments received pursuant to these agreements prior to revenue being recognized are recorded as deferred revenue in *Other current liabilities.*

**NOTE 5 - SEGMENT REPORTING**

We are vertically integrated from the mining of iron ore and coal; to production of metallics and coke; through iron making, steelmaking, rolling, finishing; and to downstream tubing, stamping and tooling. We are organized into four operating segments based on our differentiated products - Steelmaking, Tubular, Tooling and Stamping, and European Operations. Our previous Mining and Pelletizing segment is included within the Steelmaking operating segment as iron ore pellets are a primary raw material for our steel products. We have one reportable segment - Steelmaking. The operating segment results of our Tubular, Tooling and Stamping, and European Operations that do not constitute reportable segments are combined and disclosed in the Other Businesses category. Our Steelmaking

segment is the largest flat-rolled steel producer supported by being the largest iron ore pellet producer in North America, primarily serving the automotive, infrastructure and manufacturing, and distributors and converters markets. Our Other Businesses primarily include the operating segments that provide customer solutions with carbon and stainless steel tubing products, advanced-engineered solutions, tool design and build, hot- and cold-stamped steel components, and complex assemblies. All intersegment transactions were eliminated in consolidation.

We evaluate performance on an operating segment basis, as well as a consolidated basis, based on Adjusted EBITDA, which is a non-GAAP measure. This measure is used by management, investors, lenders and other external users of our financial statements to assess our operating performance and to compare operating performance to other companies in the steel industry. In addition, management believes Adjusted EBITDA is a useful measure to assess the earnings power of the business without the impact of capital structure and can be used to assess our ability to service debt and fund future capital expenditures in the business.

Our results by segment are as follows:

| | (In Millions) | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Year Ended December 31, | | | | | |
| | **2020** | | 2019 | | 2018 | |
| Revenues: | | | | | | |
| Steelmaking[1] | $ | **4,965** | $ | 1,990 | $ | 2,332 |
| Other Businesses | | **389** | | — | | — |
| Total revenues | $ | **5,354** | $ | 1,990 | $ | 2,332 |
| | | | | | | |
| Adjusted EBITDA: | | | | | | |
| Steelmaking | $ | **433** | $ | 636 | $ | 872 |
| Other Businesses | | **47** | | — | | — |
| Corporate and eliminations | | **(127)** | | (111) | | (106) |
| Total Adjusted EBITDA | $ | **353** | $ | 525 | $ | 766 |

[1] Includes *Realization of deferred revenue* of $35 million for the year ended December 31, 2020.

92

The following table provides a reconciliation of our consolidated *Net income (loss)* to total Adjusted EBITDA:

| | (In Millions) | | |
| --- | --- | --- | --- |
| | Year Ended December 31, | | |
| | **2020** | 2019 | 2018 |
| Net income (loss) | $ **(81)** | $ 293 | $ 1,128 |
| Less: | | | |
| Interest expense, net | **(238)** | (101) | (121) |
| Income tax benefit (expense) | **111** | (18) | 460 |
| Depreciation, depletion and amortization | **(308)** | (85) | (89) |
| | **354** | 497 | 878 |
| Less: | | | |
| EBITDA from noncontrolling interests [1] | **56** | — | — |
| Gain (loss) on extinguishment of debt | **130** | (18) | (7) |
| Severance costs | **(38)** | (2) | — |
| Acquisition-related costs excluding severance costs | **(52)** | (7) | — |
| Amortization of inventory step-up | **(96)** | — | — |
| Impact of discontinued operations | **1** | (1) | 121 |
| Foreign exchange remeasurement | **—** | — | (1) |
| Impairment of other long-lived assets | **—** | — | (1) |
| Total Adjusted EBITDA | $ **353** | $ 525 | $ 766 |

[1] EBITDA of noncontrolling interests includes $41 million for income and $15 million for depreciation, depletion and amortization for the year ended December 31, 2020.

The following table summarizes our depreciation, depletion and amortization and capital additions by segment:

| | (In Millions) | | |
| --- | --- | --- | --- |
| | Year Ended December 31, | | |
| | **2020** | 2019 | 2018 |
| Depreciation, depletion and amortization: | | | |
| Steelmaking | $ **276** | $ 80 | $ 68 |
| Other Businesses | **27** | — | — |
| Corporate | **5** | 5 | 6 |
| Total depreciation, depletion and amortization | $ **308** | $ 85 | $ 74 |
| | | | |
| Capital additions [1] | | | |
| Steelmaking | $ **436** | $ 687 | $ 393 |
| Other Businesses | **45** | — | — |
| Corporate | **2** | 3 | 2 |
| Total capital additions | $ **483** | $ 690 | $ 395 |

[1] Refer to NOTE 2 - SUPPLEMENTARY FINANCIAL STATEMENT INFORMATION for additional information.

93

The following summarizes our assets by segment:

| | (In Millions) | |
| --- | --- | --- |
| | December 31, | |
| | **2020** | 2019 |
| Assets: | | |
| Steelmaking | $ **15,849** | $ 2,557 |
| Other Businesses | **239** | — |
| Total segment assets | **16,088** | 2,557 |
| Corporate | **683** | 947 |
| Total assets | $ **16,771** | $ 3,504 |

Included in the consolidated financial statements are the following amounts relating to geographic location based on product destination:

| | (In Millions) | | |
| --- | --- | --- | --- |
| | **2020** | 2019 | 2018 |
| Revenues: | | | |
| United States | $ **4,580** | $ 1,505 | $ 1,847 |
| Canada | **602** | 448 | 395 |
| Other countries | **172** | 37 | 90 |
| Total revenues | $ **5,354** | $ 1,990 | $ 2,332 |
| Property, plant and equipment, net: | | | |
| United States | $ **8,647** | $ 1,929 | $ 1,286 |
| Canada | **91** | — | — |
| Other countries | **5** | — | — |
| Total property, plant and equipment, net | $ **8,743** | $ 1,929 | $ 1,286 |

## NOTE 6 - PROPERTY, PLANT AND EQUIPMENT

The following table indicates the carrying value of each of the major classes of our depreciable assets:

| | (In Millions) | |
| --- | --- | --- |
| | December 31, | |
| | **2020** | 2019 |
| Land, land improvements, and mineral rights | $ **1,213** | $ 582 |
| Buildings | **703** | 158 |
| Equipment | **6,786** | 1,456 |
| Other | **151** | 101 |
| Construction in progress | **1,364** | 730 |
| Total property, plant and equipment [1] | **10,217** | 3,027 |
| Allowance for depreciation and depletion | **(1,474)** | (1,098) |
| Property, plant, and equipment, net | $ **8,743** | $ 1,929 |

[1] Includes right-of-use assets related to finance leases of $361 million and $49 million as of December 31, 2020 and 2019, respectively.

We recorded depreciation expense of $298 million, $77 million and $66 million for the years ended December 31, 2020, 2019 and 2018, respectively.

We recorded capitalized interest into property, plant and equipment of $ 53 million, $25 million and $7 million during the years ended December 31, 2020, 2019 and 2018, respectively.

94

Table of Contents

The net book value of the mineral and land rights are as follows:

| | | (In Millions) | | |
| --- | --- | --- | --- | --- |
| | | December 31, | | |
| | | **2020** | | 2019 |
| Mineral rights: | | | | |
| Cost | $ | **773** | $ | 537 |
| Depletion | | **(142)** | | (134) |
| Net mineral rights | $ | **631** | $ | 403 |
| | | | | |
| Land rights | $ | **361** | $ | 12 |

We recorded depletion expense of $8 million, $8 million and $7 million for the years ended December 31, 2020, 2019, and 2018, respectively.

**NOTE 7 - GOODWILL AND INTANGIBLE ASSETS AND LIABILITIES**

**Goodwill**

The following is a summary of goodwill by segment:

| | | (In Millions) | | |
| --- | --- | --- | --- | --- |
| | | December 31, | | |
| | | **2020** | | 2019 |
| Steelmaking | $ | **1,232** | $ | 2 |
| Other Businesses | | **174** | | — |
| Total goodwill | $ | **1,406** | $ | 2 |

The increase in the balance of goodwill in our Steelmaking segment as of December 31, 2020, compared to December 31, 2019, is due to the preliminary assignment of $1,230 million to *Goodwill* in 2020 based on the preliminary purchase price allocation for the acquisition of ArcelorMittal USA. The increase in the balance of goodwill for our Other Businesses as of December 31, 2020, compared to December 31, 2019, is due to the preliminary assignment of $174 million to *Goodwill* in 2020 based on the preliminary purchase price allocation for the acquisition of AK Steel, which was attributable to our Tubular and Tooling and Stamping operating segments.

95

**Intangible Assets and Liabilities**

The following is a summary of our intangible assets and liabilities:

| | | (In Millions) | | |
| --- | --- | --- | --- | --- |
| | Classification[1] | Gross Amount | Accumulated Amortization | Net Amount |
| **As of December 31, 2020** | | | | |
| Intangible assets: | | | | |
| Customer relationships | *Other non-current assets* | $ 77 | $ (3) | $ 74 |
| Technology | *Other non-current assets* | 60 | (3) | 57 |
| Trade names and trademarks | *Other non-current assets* | 11 | (1) | 10 |
| Mining permits | *Other non-current assets* | 72 | (25) | 47 |
| Total intangible assets | | $ 220 | $ (32) | $ 188 |
| Intangible liabilities: | | | | |
| Above-market supply contracts | *Other non-current liabilities* | $ (71) | $ 7 | $ (64) |
| **As of December 31, 2019** | | | | |
| Intangible assets: | | | | |
| Mining permits | *Other non-current assets* | $ 72 | $ (24) | $ 48 |

[1] Amortization of intangible liabilities related to above-market supply contracts and intangible assets related to mining permits is recognized in *Cost of goods sold.* Amortization of all other intangible assets is recognized in *Selling, general and administrative expenses.*

Amortization expense related to intangible assets was $ 8 million and $1 million for the years ended December 31, 2020 and 2019, respectively. Estimated future amortization expense related to intangible assets is $10 million annually for the years 2021 through 2025.

Income from amortization related to the intangible liabilities was $ 7 million for the year ended December 31, 2020. Estimated future amortization income related to the intangible liabilities is $8 million annually for the years 2021 through 2025.

96

**NOTE 8 - DEBT AND CREDIT FACILITIES**

The following represents a summary of our long-term debt:

**(In Millions)**

**December 31, 2020**

| Debt Instrument | Issuer[1] | Annual Effective Interest Rate | Total Principal Amount | Unamortized Debt Issuance Costs | Unamortized Premiums (Discounts) | Total Debt |
|---|---|---|---|---|---|---|
| Senior Secured Notes: | | | | | | |
| 4.875% 2024 Senior Secured Notes | Cliffs | 5.00% | $    395 | $         (3) | $         (1) | $    391 |
| 9.875% 2025 Senior Secured Notes | Cliffs | 10.57% | 955 | (8) | (25) | 922 |
| 6.75% 2026 Senior Secured Notes | Cliffs | 6.99% | 845 | (20) | (9) | 816 |
| Senior Unsecured Notes: | | | | | | |
| 7.625% 2021 AK Senior Notes | AK Steel | 7.33% | 34 | — | — | 34 |
| 7.50% 2023 AK Senior Notes | AK Steel | 6.17% | 13 | — | — | 13 |
| 6.375% 2025 Senior Notes | Cliffs | 8.11% | 64 | — | (4) | 60 |
| 6.375% 2025 AK Senior Notes | AK Steel | 8.11% | 29 | — | (2) | 27 |
| 1.50% 2025 Convertible Senior Notes | Cliffs | 6.26% | 296 | (4) | (49) | 243 |
| 5.75% 2025 Senior Notes | Cliffs | 6.01% | 396 | (3) | (4) | 389 |
| 7.00% 2027 Senior Notes | Cliffs | 9.24% | 73 | — | (8) | 65 |
| 7.00% 2027 AK Senior Notes | AK Steel | 9.24% | 56 | — | (6) | 50 |
| 5.875% 2027 Senior Notes | Cliffs | 6.49% | 556 | (4) | (18) | 534 |
| 6.25% 2040 Senior Notes | Cliffs | 6.34% | 263 | (2) | (3) | 258 |
| IRBs due 2024 to 2028 | AK Steel | Various | 92 | — | 2 | 94 |
| EDC Revolving Facility[3] | * | 3.25% | 40 | — | — | 18 |
| ABL Facility[3] | Cliffs[2] | 2.15% | 3,500 | — | — | 1,510 |
| Total debt | | | | | | 5,424 |
| Less: current debt | | | | | | 34 |
| Total long-term debt | | | | | | $    5,390 |

* Our subsidiaries, Fleetwood Metal Industries Inc. and The Electromac Group Inc., are the borrowers under the EDC Revolving Facility.

[1] Unless otherwise noted, references in this column and throughout this Note 8 - DEBT AND CREDIT FACILITIES to "Cliffs" are to Cleveland-Cliffs Inc., and references to "AK Steel" are to AK Steel Corporation (n/k/a Cleveland-Cliffs Steel Corporation).

[2] Refers to Cleveland-Cliffs Inc. as borrower under our ABL Facility.

[3] The total principal amounts for the indicated credit facilities are stated at their respective maximum borrowing capacities.

97

A006173

Table of Contents

(In Millions)

| Debt Instrument | Issuer[1] | Annual Effective Interest Rate | Total Principal Amount | Debt Issuance Costs | Unamortized Discounts | Total Debt |
|---|---|---|---|---|---|---|
| **December 31, 2019** | | | | | | |
| Senior Secured Notes: | | | | | | |
| 4.875% 2024 Senior Notes | Cliffs | 5.00% | $ 400 | $ (5) | $ (2) | $ 393 |
| Senior Unsecured Notes: | | | | | | |
| 1.50% 2025 Convertible Senior Notes | Cliffs | 6.26% | 316 | (4) | (65) | 247 |
| 5.75% 2025 Senior Notes | Cliffs | 6.01% | 473 | (3) | (6) | 464 |
| 5.875% 2027 Senior Notes | Cliffs | 6.49% | 750 | (6) | (27) | 717 |
| 6.25% 2040 Senior Notes | Cliffs | 6.34% | 298 | (2) | (3) | 293 |
| Former ABL Facility | Cliffs[2] | N/A | 450 | N/A | N/A | — |
| Total long-term debt | | | | | | $ 2,114 |

[1] Unless otherwise noted, references in this column to "Cliffs" are to Cleveland-Cliffs Inc.

[2] Refers to Cleveland-Cliffs Inc. and certain of its subsidiaries as borrowers under our Former ABL Facility.

**Outstanding Senior Secured Notes**

***9.875% 2025 Senior Secured Notes***

On April 17, 2020, we entered into an indenture among Cliffs, the guarantors party thereto and U.S. Bank National Association, as trustee and notes collateral agent, relating to the issuance by Cliffs of $400 million aggregate principal amount of 9.875% 2025 Senior Secured Notes issued at 94.5% of face value.

On April 24, 2020, we issued an additional $ 555 million aggregate principal amount of 9.875% 2025 Senior Secured Notes issued at 99.0% of face value. These additional notes are of the same class and series as, and otherwise identical to, the 9.875% 2025 Senior Secured Notes issued on April 17, 2020, other than with respect to the date of issuance and issue price.

The 9.875% 2025 Senior Secured Notes were issued in private placement transactions exempt from the registration requirements of the Securities Act. The 9.875% 2025 Senior Secured Notes bear interest at a rate of 9.875% per annum, payable semi-annually in arrears on April 17 and October 17 of each year, commencing on October 17, 2020. The 9.875% 2025 Senior Secured Notes will mature on October 17, 2025 and are secured senior obligations of Cliffs.

The 9.875% 2025 Senior Secured Notes are jointly and severally and fully and unconditionally guaranteed on a senior secured basis by substantially all of our material domestic subsidiaries and are secured (subject in each case to certain exceptions and permitted liens) by (i) a first-priority lien, on a pari passu basis with the 6.75% 2026 Senior Secured Notes and 4.875% 2024 Senior Secured Notes, on substantially all of our assets and the assets of the guarantors, other than the ABL Collateral (as defined below), and (ii) a second-priority lien on the ABL Collateral, which is junior to a first-priority lien for the benefit of the lenders under our ABL Facility.

98

Table of Contents

The 9.875% 2025 Senior Secured Notes may be redeemed, in whole or in part, at any time at our option upon not less than 30, and not more than 60, days' prior notice sent to the holders of the 9.875% 2025 Senior Secured Notes. The following is a summary of redemption prices for our 9.875% 2025 Senior Secured Notes:

| Redemption Period | Redemption Price[1] | Restricted Amount |
|---|---|---|
| Prior to October 17, 2022 - using proceeds of equity issuance | 109.875 % | Up to 35% of original aggregate principal |
| Prior to October 17, 2022[2] | 100.000 | |
| Beginning on October 17, 2022 | 107.406 | |
| Beginning on April 17, 2023 | 104.938 | |
| Beginning on April 17, 2024 | 102.469 | |
| Beginning on April 17, 2025 and thereafter | 100.000 | |

[1] Plus accrued and unpaid interest, if any, up to, but excluding, the redemption date.
[2] Plus a "make-whole" premium.

In addition, if a change in control triggering event, as defined in the indenture, occurs with respect to the 9.875% 2025 Senior Secured Notes, we will be required to offer to purchase the notes at a purchase price equal to 101% of their principal amount, plus accrued and unpaid interest, if any, to, but not including, the date of purchase.

The terms of the 9.875% 2025 Senior Secured Notes contain certain customary covenants; however, there are no financial covenants.

***6.75% 2026 Senior Secured Notes***

On March 13, 2020, we entered into an indenture among Cliffs, the guarantors party thereto and U.S. Bank National Association, as trustee and notes collateral agent, relating to the issuance of $725 million aggregate principal amount of 6.75% 2026 Senior Secured Notes issued at 98.783% of face value.

On June 19, 2020, we issued an additional $ 120 million aggregate principal amount of 6.75% 2026 Senior Secured Notes issued at 99.25% of face value. These additional notes are of the same class and series as, and otherwise identical to, the 6.75% 2026 Senior Secured Notes issued on March 13, 2020, other than with respect to the date of issuance and issue price.

The 6.75% 2026 Senior Secured Notes were issued in private placement transactions exempt from the registration requirements of the Securities Act. The 6.75% 2026 Senior Secured Notes bear interest at a rate of 6.75% per annum, payable semi-annually in arrears on March 15 and September 15 of each year, commencing on September 15, 2020. The 6.75% 2026 Senior Secured Notes mature on March 15, 2026 and are secured senior obligations of Cliffs.

The 6.75% 2026 Senior Secured Notes are jointly and severally and fully and unconditionally guaranteed on a senior secured basis by substantially all of our material domestic subsidiaries and are secured (subject in each case to certain exceptions and permitted liens) by (i) a first-priority lien, on a pari passu basis with the 4.875% 2024 Senior Secured Notes and 9.875% 2025 Senior Secured Notes, on substantially all of our assets and the assets of the guarantors, other than the ABL Collateral, and (ii) a second-priority lien on the ABL Collateral, which is junior to a first-priority lien for the benefit of the lenders under our ABL Facility.

99

The 6.75% 2026 Senior Secured Notes may be redeemed, in whole or in part, at any time at our option upon not less than 30, and not more than 60, days' prior notice sent to the holders of the 6.75% 2026 Senior Secured Notes. The following is a summary of redemption prices (expressed as a percentage of the principal amount to be redeemed) for our 6.75% 2026 Senior Secured Notes:

| Redemption Period | Redemption Price[1] | Restricted Amount |
|---|---|---|
| Prior to March 15, 2022 - using proceeds of equity issuance | 106.750 % | Up to 35% of original aggregate principal |
| Prior to March 15, 2022[2] | 100.000 | |
| Beginning on March 15, 2022 | 105.063 | |
| Beginning on March 15, 2023 | 103.375 | |
| Beginning on March 15, 2024 | 101.688 | |
| Beginning on March 15, 2025 and thereafter | 100.000 | |

[1] Plus accrued and unpaid interest, if any, up to, but excluding, the redemption date.
[2] Plus a "make-whole" premium.

In addition, if a change in control triggering event, as defined in the indenture, occurs with respect to the 6.75% 2026 Senior Secured Notes, we will be required to offer to purchase the notes at a purchase price equal to 101% of their principal amount, plus accrued and unpaid interest, if any, to, but not including, the date of purchase.

The terms of the 6.75% 2026 Senior Secured Notes contain certain customary covenants; however, there are no financial covenants.

***4.875% 2024 Senior Secured Notes***

Our 4.875% 2024 Senior Secured Notes bear interest at a rate of 4.875% per annum, which is payable semi-annually in arrears on January 15 and July 15 of each year. The 4.875% 2024 Senior Secured Notes mature on January 15, 2024 and are secured senior obligations of Cliffs.

Our 4.875% 2024 Senior Secured Notes are jointly and severally and fully and unconditionally guaranteed on a senior secured basis by substantially all of our material domestic subsidiaries and are secured (subject in each case to certain exceptions and permitted liens) by (i) a first-priority lien, on a pari passu basis with the 9.875% 2025 Senior Secured Notes and 6.75% 2026 Senior Secured Notes, on substantially all of our assets and the assets of the guarantors, other than the ABL Collateral, and (ii) a second-priority lien on the ABL Collateral, which is junior to a first-priority lien for the benefit of the lenders under our ABL Facility.

The 4.875% 2024 Senior Secured Notes may be redeemed, in whole or in part, at any time at our option upon not less than 30, and not more than 60, days' prior notice sent to the holders of the 4.875% 2024 Senior Secured Notes. The following is a summary of redemption prices (expressed as a percentage of the principal amount to be redeemed) for our 4.875% 2024 Senior Secured Notes:

| Redemption Period | Redemption Price[1] |
|---|---|
| Beginning on January 15, 2021 | 102.438 % |
| Beginning on January 15, 2022 | 101.219 |
| Beginning on January 15, 2023 and thereafter | 100.000 |

[1] Plus accrued and unpaid interest, if any, up to but excluding the redemption date.

In addition, if a change in control triggering event, as defined in the indenture, occurs with respect to the 4.875% 2024 Senior Secured Notes, we will be required to offer to purchase the notes at a purchase price equal to 101% of their principal amount, plus accrued and unpaid interest, if any, to, but not including, the date of purchase.

The terms of the 4.875% 2024 Senior Secured Notes contain certain covenants; however, there are no financial covenants.

**Outstanding Senior Unsecured Notes**

*Cliffs Senior Notes exchanged for AK Steel Corporation Senior Notes*

On March 16, 2020, we entered into indentures, in each case among Cliffs, the guarantors party thereto and U.S. Bank National Association, as trustee, relating to the issuance by Cliffs of $232 million aggregate principal amount of 6.375% 2025 Senior Notes and $ 335 million aggregate principal amount of 7.00% 2027 Senior Notes. The new notes were issued in exchange for equal aggregate principal amounts of 6.375% 2025 AK Senior Notes and 7.00% 2027 AK Senior Notes, respectively, issued by AK Steel Corporation. The 6.375% 2025 Senior Notes and 7.00% 2027 Senior Notes were issued in connection with the AK Steel Merger pursuant to private exchange offers exempt from the registration requirements of the Securities Act made by Cliffs. Pursuant to the registration rights agreements executed in connection with the issuance of the new notes, we agreed to file registration statements with the SEC with respect to registered offers to exchange the 6.375% 2025 Senior Notes and 7.00% 2027 Senior Notes for publicly registered notes within 365 days of the closing date, with all significant terms and conditions remaining the same.

The 6.375% 2025 Senior Notes and 7.00% 2027 Senior Notes are unsecured obligations and rank equally in right of payment with all of our existing and future unsecured and unsubordinated indebtedness. The notes are guaranteed on a senior unsecured basis by our material direct and indirect wholly owned domestic subsidiaries and, therefore, are structurally senior to any of our existing and future indebtedness that is not guaranteed by such guarantors and are structurally subordinated to all existing and future indebtedness and other liabilities of our subsidiaries that do not guarantee the notes.

In addition, if a change in control triggering event, as defined in the indentures, occurs with respect to the 6.375% 2025 Senior Notes or 7.00% 2027 Senior Notes, we will be required to offer to purchase the notes at a purchase price equal to 101% of their principal amount, plus accrued and unpaid interest, if any, to, but not including, the date of purchase.

The terms of the 6.375% 2025 Senior Notes and 7.00% 2027 Senior Notes contain certain customary covenants; however, there are no financial covenants.

*6.375% 2025 Senior Notes*

The 6.375% 2025 Senior Notes bear interest at a rate of 6.375% per annum, payable semi-annually in arrears on April 15 and October 15 of each year, commencing on April 15, 2020. The 6.375% 2025 Senior Notes mature on October 15, 2025.

The 6.375% 2025 Senior Notes may be redeemed, in whole or in part, at any time at our option upon not less than 30, and not more than 60, days' prior notice sent to the holders of the 6.375% 2025 Senior Notes. The following is a summary of redemption prices (expressed as a percentage of the principal amount to be redeemed) for our 6.375% 2025 Senior Notes:

| Redemption Period | Redemption Price[1] |
|---|---|
| Beginning on October 15, 2020 | 103.188 % |
| Beginning on October 15, 2021 | 101.594 |
| Beginning on October 15, 2022 and thereafter | 100.000 |

[1] Plus accrued and unpaid interest, if any, up to but excluding the redemption date.

*7.00% 2027 Senior Notes*

The 7.00% 2027 Senior Notes bear interest at a rate of 7.00% per annum, payable semi-annually in arrears on March 15 and September 15 of each year, commencing on September 15, 2020. The 7.00% 2027 Senior Notes mature on March 15, 2027.

The 7.00% 2027 Senior Notes may be redeemed, in whole or in part, at any time at our option upon not less than 30, and not more than 60, days' prior notice sent to the holders of the 7.00% 2027 Senior Notes. The following is a summary of redemption prices (expressed as a percentage of the principal amount to be redeemed) for our 7.00% 2027 Senior Notes:

| Redemption Period | Redemption Price[1] |
|---|---|
| Prior to March 15, 2022[2] | 100.000 % |
| Beginning on March 15, 2022 | 103.500 |
| Beginning on March 15, 2023 | 102.333 |
| Beginning on March 15, 2024 | 101.167 |
| Beginning on March 15, 2025 and thereafter | 100.000 |

[1] Plus accrued and unpaid interest, if any, up to but excluding the redemption date.
[2] Plus a "make-whole" premium.

### AK Steel Corporation Unsecured Senior Notes

As of December 31, 2020, AK Steel Corporation had outstanding a total of $ 132 million aggregate principal amount of 7.625% 2021 AK Senior Notes, 7.50% 2023 AK Senior Notes, 6.375% 2025 AK Senior Notes and 7.00% 2027 AK Senior Notes. These senior notes are unsecured obligations and rank equally in right of payment with AK Steel Corporation's guarantees of Cliffs' unsecured and unsubordinated indebtedness. These notes contain no financial covenants.

The 7.625% 2021 AK Senior Notes, 7.50% 2023 AK Senior Notes, 6.375% 2025 AK Senior Notes and 7.00% 2027 AK Senior Notes may be redeemed, in whole or in part, at any time at our option upon not less than 30, and not more than 60, days' prior notice sent to the respective holders of such notes.

We may redeem the 7.625% 2021 AK Senior Notes at 100.000% of their principal amount, together with all accrued and unpaid interest to the date of redemption.

The following is a summary of redemption prices (expressed as a percentage of the principal amount to be redeemed) for the 7.50% 2023 AK Senior Notes:

| Redemption Period | Redemption Price[1] |
|---|---|
| Beginning on July 15, 2020 | 101.875 % |
| Beginning on July 15, 2021 and thereafter | 100.000 |

[1] Plus accrued and unpaid interest, if any, up to but excluding the redemption date.

The following is a summary of redemption prices (expressed as a percentage of the principal amount to be redeemed) for the 6.375% 2025 AK Senior Notes:

| Redemption Period | Redemption Price[1] |
|---|---|
| Beginning on October 15, 2020 | 103.188 % |
| Beginning on October 15, 2021 | 101.594 |
| Beginning on October 15, 2022 and thereafter | 100.000 |

[1] Plus accrued and unpaid interest, if any, up to but excluding the redemption date.

The following is a summary of redemption prices (expressed as a percentage of the principal amount to be redeemed) for the 7.00% 2027 AK Senior Notes:

| Redemption Period | Redemption Price[1] |
|---|---|
| Prior to March 15, 2022[2] | 100.000 % |
| Beginning on March 15, 2022 | 103.500 |
| Beginning on March 15, 2023 | 102.333 |
| Beginning on March 15, 2024 | 101.167 |
| Beginning on March 15, 2025 and thereafter | 100.000 |

[1] Plus accrued and unpaid interest, if any, up to but excluding the redemption date.
[2] Plus a "make-whole" premium.

### 1.50% 2025 Convertible Senior Notes

The 1.50% 2025 Convertible Senior Notes bear interest at a rate of 1.50% per year, payable semiannually in arrears on January 15 and July 15 of each year. The 1.50% 2025 Convertible Senior Notes mature on January 15, 2025. The 1.50% 2025 Convertible Senior Notes are senior unsecured obligations and rank senior in right of payment to any of our indebtedness that is expressly subordinated in right of payment to the 1.50% 2025 Convertible Senior Notes; equal in right of payment to any of our unsecured indebtedness that is not so subordinated; effectively junior in right of payment to any of our secured indebtedness to the extent of the value of the assets securing such indebtedness; and structurally junior to all indebtedness and other liabilities (including trade payables) of our subsidiaries. The terms of the 1.50% 2025 Convertible Senior Notes contain certain customary covenants; however, there are no financial covenants.

Holders may convert their 1.50% 2025 Convertible Senior Notes at their option at any time prior to the close of business on the business day immediately preceding July 15, 2024, only under the following circumstances: (1) during any calendar quarter commencing after the calendar quarter ending on March 31, 2018, if the last reported sale price of our common shares, par value $0.125 per share, for at least 20 trading days (whether or not consecutive) during a period of 30 consecutive trading days ending on the last trading day of the immediately preceding calendar quarter is greater than or equal to 130% of the conversion price on each applicable trading day; (2) during the five-business day period after any five-consecutive trading day period (the "measurement period") in which the trading price per $1,000 principal amount of 1.50% 2025 Convertible Senior Notes for each trading day of the measurement period was less than 98% of the product of the last reported sale price of our common shares and the conversion rate on each such trading day; (3) if we call the notes for redemption, at any time prior to the close of business on the scheduled trading day immediately preceding the redemption date; or (4) upon the occurrence of specified corporate events. On or after July 15, 2024 until the close of business on the second scheduled trading day immediately preceding the maturity date, holders may convert their 1.50% 2025 Convertible Senior Notes at any time, regardless of the foregoing circumstances. Upon conversion, we will pay or deliver, as the case may be, cash, common shares or a combination of cash and common shares, at our election.

Upon the issuance of the 1.50% 2025 Convertible Senior Notes the initial conversion rate was  122.4365 common shares per $1,000 principal, with a conversion price of $8.17 per common share. The conversion rate is subject to adjustment in some circumstances, including the payment of dividends on common shares, but will not be adjusted for any accrued and unpaid interest. In addition, following certain corporate events that occur prior to the maturity date, or if we deliver a notice of redemption, we will, in certain circumstances, increase the conversion rate for a holder who elects to convert its 1.50% 2025 Convertible Senior Notes in connection with such a corporate event or notice of redemption, as the case may be. As of December 31, 2020, the conversion rate was 129.2985 common shares per $1,000 principal amount of 1.50% 2025 Convertible Senior Notes.

We may not redeem the 1.50% 2025 Convertible Senior Notes prior to January 15, 2022. We may redeem all or any portion of the 1.50% 2025 Convertible Senior Notes, for cash at our option on or after January 15, 2022 if the last reported sale price of our common shares has been at least 130% of the conversion price then in effect for at least 20 trading days (whether or not consecutive) during any 30-consecutive trading day period (including the last trading day of such period) ending on, and including, the trading day immediately preceding the date on which we provide notice of redemption at a redemption price equal to 100% of the principal amount of the 1.50% 2025 Convertible Senior Notes to be redeemed, plus accrued and unpaid interest to, but excluding, the redemption date.

A006179

Table of Contents

It is our current intent to settle conversions through combination settlement or fully in cash. Our ability to settle conversions through combination settlement and cash settlement will be subject to restrictions in the agreement governing our ABL Facility and may be subject to restrictions in agreements governing our future debt.

If we undergo a fundamental change as defined in the indenture, holders may require us to repurchase for cash all or any portion of their 1.50% 2025 Convertible Senior Notes at a fundamental change repurchase price equal to 100% of the principal amount of the 1.50% 2025 Convertible Senior Notes to be repurchased, plus accrued and unpaid interest to, but excluding, the fundamental change repurchase date.

In accounting for the issuance of the notes, we separated the 1.50% 2025 Convertible Senior Notes into liability and equity components. The carrying amount of the liability component was calculated by measuring the fair value of similar liabilities that did not have associated convertible features. The carrying amount of the equity component of $86 million representing the conversion option was determined by deducting the fair value of the liability component from the par value of the notes. The difference represents the debt discount that is amortized to interest expense over the term of the notes. The equity component is not remeasured as long as it continues to qualify for equity classification.

### Other Outstanding Unsecured Senior Notes

The following represents a summary of our other unsecured senior notes' maturity and interest payable due dates:

| Debt Instrument | Maturity | Interest Payable (until maturity) |
|---|---|---|
| 5.75% 2025 Senior Notes | March 1, 2025 | March 1 and September 1 |
| 5.875% 2027 Senior Notes | June 1, 2027 | June 1 and December 1 |
| 6.25% 2040 Senior Notes | October 1, 2040 | April 1 and October 1 |

The senior notes are unsecured obligations and rank equally in right of payment with all our other existing and future unsecured and unsubordinated indebtedness. There are no subsidiary guarantees of the interest and principal amounts for the 6.25% 2040 Senior Notes. The 5.75% 2025 Senior Notes and 5.875% 2027 Senior Notes are guaranteed on a senior unsecured basis by our material direct and indirect wholly owned domestic subsidiaries and, therefore, are structurally senior to any of our existing and future indebtedness that is not guaranteed by such guarantors and are structurally subordinated to all existing and future indebtedness and other liabilities of our subsidiaries that do not guarantee the 5.75% 2025 Senior Notes and 5.875% 2027 Senior Notes.

We may redeem the 5.75% 2025 Senior Notes, in whole or in part, on or after March 1, 2020, at the redemption prices set forth in the indenture, plus accrued and unpaid interest, if any, to, but not including, the date of redemption.

We may redeem the 5.875% 2027 Senior Notes, in whole or in part, on or after June 1, 2022, at the redemption prices set forth in the indenture, plus accrued and unpaid interest, if any, to, but not including, the date of redemption, and prior to June 1, 2022, at a redemption price equal to 100% of the principal amount thereof plus a "make-whole" premium set forth in the indenture, plus accrued and unpaid interest, if any, to, but not including, the date of redemption. We may also redeem up to 35% of the aggregate principal amount of the 5.875% 2027 Senior Notes on or prior to June 1, 2022 at a redemption price equal to 105.875% of the principal amount thereof, plus accrued and unpaid interest, if any, to, but not including, the date of redemption with the net cash proceeds of one or more equity offerings.

The 6.25% 2040 Senior Notes may be redeemed any time at our option upon not less than 30, nor more than 60, days' prior notice is sent to the holders. The 6.25% 2040 Senior Notes are redeemable at a redemption price equal to the greater of (1) 100% of the principal amount of the notes to be redeemed or (2) the sum of the present values of the remaining scheduled payments of principal and interest on the notes to be redeemed, discounted to the redemption date on a semi-annual basis at the treasury rate plus 40 basis points, plus accrued and unpaid interest, if any, to, but not including, the date of redemption.

In addition, if a change of control triggering event, as defined in the applicable indenture, occurs with respect to the unsecured notes, we will be required to offer to purchase the notes of the applicable series at a purchase price equal to 101% of the principal amount, plus accrued and unpaid interest, if any, to, but not including, the date of purchase.

The terms of the unsecured notes contain certain customary covenants; however, there are no financial covenants.

**ABL Facility**

On March 13, 2020, in connection with the AK Steel Merger, we entered into a new ABL Facility with various financial institutions to replace and refinance Cliffs' Former ABL Facility and AK Steel Corporation's former revolving credit facility. The ABL Facility will mature upon the earlier of March 13, 2025 or 91 days prior to the maturity of certain other material debt and provided for up to $2 billion in borrowings, including a $555 million sublimit for the issuance of letters of credit and a $125 million sublimit for swingline loans. Availability under the ABL Facility is limited to an eligible borrowing base, as applicable, determined by applying customary advance rates to eligible accounts receivable, inventory and certain mobile equipment.

On March 27, 2020, the ABL Facility was amended, by and among Cliffs, the lenders and the administrative agent. The amendment modified the ABL Facility to, among other things, provide for a new FILO tranche B of commitments in the aggregate amount of $150 million by exchanging existing commitments under the ABL Facility. The total commitments under the ABL Facility after giving effect to the amendment remained at $2 billion. The terms and conditions (other than the pricing) that apply to the FILO tranche are substantially the same as the terms and conditions that apply to the tranche A facility of the ABL Facility immediately prior to the amendment.

On December 9, 2020, we entered into the ABL Amendment with various financial institutions. The ABL Amendment modified the ABL Facility to, among other things, increase the amount of tranche A revolver commitments available thereunder by an additional $1.5 billion and increase certain dollar baskets related to certain negative covenants that apply to the ABL Facility. After giving effect to the ABL Amendment, the aggregate principal amount of tranche A revolver commitments under the ABL Facility is $3.35 billion and the aggregate principal amount of FILO tranche B revolver commitments under the ABL Facility remains at $150 million.

The ABL Facility and certain bank products and hedge obligations are guaranteed by certain of our existing wholly owned U.S. subsidiaries and are required to be guaranteed by certain of our future U.S. subsidiaries. Amounts outstanding under the ABL Facility are secured by (i) a first-priority security interest in the accounts receivable and other rights to payment, inventory, as-extracted collateral, certain investment property, deposit accounts, securities accounts, certain general intangibles and commercial tort claims, certain mobile equipment, commodities accounts and other related assets of ours, the other borrowers and the guarantors, and proceeds and products of each of the foregoing (collectively, the "ABL Collateral") and (ii) a second-priority security interest in substantially all of our assets and the assets of the other borrowers and the guarantors other than the ABL Collateral.

Borrowings under the ABL Facility bear interest, at our option, at a base rate or, if certain conditions are met, a LIBOR rate, in each case plus an applicable margin. We may amend our ABL Facility to replace the LIBOR rate with one or more secured overnight financing based rates or an alternative benchmark rate, giving consideration to any evolving or then-existing convention for similar dollar denominated syndicated credit facilities for such alternative benchmarks.

The ABL Facility contains customary representations and warranties and affirmative and negative covenants including, among others, covenants regarding the maintenance of certain financial ratios if certain conditions are triggered, covenants relating to financial reporting, covenants relating to the payment of dividends on, or purchase or redemption of, our capital stock, covenants relating to the incurrence or prepayment of certain debt, covenants relating to the incurrence of liens or encumbrances, covenants relating to compliance with laws, covenants relating to transactions with affiliates, covenants relating to mergers and sales of all or substantially all of our assets and limitations on changes in the nature of our business.

The ABL Facility provides for customary events of default, including, among other things, the event of nonpayment of principal, interest, fees or other amounts, a representation or warranty proving to have been materially incorrect when made, failure to perform or observe certain covenants within a specified period of time, a cross-default to certain material indebtedness, the bankruptcy or insolvency of the Company and certain of its subsidiaries, monetary judgment defaults of a specified amount, invalidity of any loan documentation, a change of control of the Company, and ERISA defaults resulting in liability of a specified amount. If an event of default exists (beyond any applicable grace or cure period), the administrative agent may, and at the direction of the requisite number of lenders shall, declare all amounts owing under the ABL Facility immediately due and payable, terminate such lenders' commitments to make loans under the ABL Facility and/or exercise any and all remedies and other rights under the ABL Facility. For certain events of default related to insolvency and receivership, the commitments of the lenders will be automatically terminated and all outstanding loans and other amounts will become immediately due and payable.

105

A006181

As of December 31, 2020 and 2019, we were in compliance with the ABL Facility liquidity requirements and, therefore, the springing financial covenant requiring a minimum fixed charge coverage ratio of 1.0 to 1.0 was not applicable.

The following represents a summary of our borrowing capacity under the ABL Facility:

| | (In Millions) |
|---|---|
| | December 31, 2020 |
| Available borrowing base on ABL Facility [1] | $ 3,500 |
| Borrowings | (1,510) |
| Letter of credit obligations [2] | (247) |
| Borrowing capacity available | $ 1,743 |

[1] As of December 31, 2020, the ABL Facility has a maximum borrowing base of $3.5 billion. The available borrowing base is determined by applying customary advance rates to eligible accounts receivable, inventory and certain mobile equipment.

[2] We issued standby letters of credit with certain financial institutions in order to support business obligations including, but not limited to, workers' compensation, employee severance, insurance, operating agreements, IRBs and environmental obligations.

## Other Financing Arrangements

### Industrial Revenue Bonds

AK Steel Corporation had outstanding $66 million aggregate principal amount of fixed-rate, tax-exempt IRBs as of December 31, 2020. The weighted-average fixed rate of these IRBs is 6.86%. These IRBs are unsecured senior debt obligations that are equal in ranking with AK Steel Corporation's senior notes and AK Steel Corporation's guarantees of Cliffs' unsubordinated indebtedness. These IRBs are effectively subordinated to AK Steel Corporation's guarantees of Cliffs' secured indebtedness to the extent of the value of AK Steel Corporation's assets securing such guarantees. In addition, AK Steel Corporation had outstanding $26 million aggregate principal amount of variable-rate IRBs as of December 31, 2020 that are backed by a letter of credit. These IRBs contain certain customary covenants; however, there are no financial covenants.

### EDC Revolving Facility

On November 9, 2020, our Canadian subsidiaries Fleetwood Metal Industries Inc. and The Electromac Group Inc. entered into a new revolving facility with Export Development Canada. The EDC Revolving Facility enables our Tooling and Stamping business to finance the purchase of tooling and related equipment to manufacture and process long lead-time parts for our automotive customers. The EDC Revolving Facility provides for up to $40 million in borrowings and expires in November 2022. Borrowings under the EDC Revolving Facility bear interest at a LIBOR rate plus a base rate. The EDC Revolving Facility is secured by the assets of Fleetwood Metal Industries Inc. and The Electromac Group Inc. and fully guaranteed by Cliffs. As of December 31, 2020, we had outstanding borrowings on the EDC Revolving Facility of $18 million.

## Debt Extinguishment - 2020

During the year ended December 31, 2020, we used the net proceeds from the offering of the additional 9.875% 2025 Senior Secured Notes to repurchase $736 million aggregate principal amount of our outstanding senior notes of various series, which resulted in a net debt reduction of $181 million. We also repurchased an additional $35 million aggregate principal amount of our outstanding senior notes of various series and we redeemed $7 million aggregate principal amount of our outstanding 2020 IRBs, with cash on hand.

Additionally, in connection with the AK Steel Merger, we purchased $364 million aggregate principal amount of 7.625% 2021 AK Senior Notes and $311 million aggregate principal amount of 7.50% 2023 AK Senior Notes upon early settlement of tender offers made by Cliffs. The net proceeds from the offering of 6.75% 2026 Senior Secured Notes, along with a portion of the ABL Facility borrowings, were used to fund such purchases. As the 7.625% 2021 AK Senior Notes and 7.50% 2023 AK Senior Notes were recorded at fair value just prior to being purchased, there was no gain or loss on extinguishment. Additionally, in connection with the final settlement of the tender offers, we purchased $9 million aggregate principal amount of the 7.625% 2021 AK Senior Notes and $56 million aggregate principal amount of the 7.50% 2023 AK Senior Notes with cash on hand.

106

The following is a summary of the debt extinguished and the respective impact on extinguishment:

| | (In Millions) | |
| | Year Ended December 31, 2020 | |
| | Debt Extinguished | Gain (Loss) on Extinguishment |
|---|---|---|
| 7.625% 2021 AK Senior Notes | $ 373 | $ — |
| 7.50% 2023 AK Senior Notes | 367 | 3 |
| 4.875% 2024 Senior Secured Notes | 6 | 1 |
| 6.375% 2025 Senior Notes | 168 | 21 |
| 1.50% 2025 Convertible Senior Notes | 20 | 1 |
| 5.75% 2025 Senior Notes | 77 | 16 |
| 7.00% 2027 Senior Notes | 262 | 27 |
| 5.875% 2027 Senior Notes | 195 | 49 |
| 6.25% 2040 Senior Notes | 36 | 13 |
| 6.375% 2025 AK Senior Notes | 9 | (1) |
| Total | $ 1,513 | $ 130 |

Subsequent to the year ended December 31, 2020, we consummated an underwritten public offering of our common shares and a private offering of new senior unsecured notes. We intend to use the net proceeds to us from the underwritten public offering of our common shares, plus cash on hand, to redeem up to approximately $334 million aggregate principal amount of our outstanding 9.875% 2025 Senior Secured Notes. We intend to use any remaining net proceeds from the underwritten public offering of our common shares following such redemption to reduce borrowings under our ABL Facility. We intend to use the net proceeds from the private notes offering to redeem all of our outstanding 4.875% 2024 Senior Secured Notes, 7.625% 2021 AK Senior Notes, 7.50% 2023 AK Senior Notes, 6.375% 2025 Senior Notes and 6.375% 2025 AK Senior Notes, and pay fees and expenses in connection with such redemptions, and reduce borrowings under our ABL Facility. Refer to NOTE 22 - SUBSEQUENT EVENTS for further information regarding the offerings consummated subsequent to the year ended December 31, 2020.

**Debt Extinguishment - 2019**

During the year ended December 31, 2019, we used the net proceeds from the issuance of $ 750 million aggregate principal amount of 5.875% 2027 Senior Notes, along with cash on hand, to redeem in full all of our outstanding 4.875% 2021 Senior Notes and to fund the repurchase of $600 million aggregate principal amount of our outstanding 5.75% 2025 Senior Notes in a tender offer.

The following is a summary of the debt extinguished and the respective impact on extinguishment:

| | (In Millions) | |
| | Year Ended December 31, 2019 | |
| | Debt Extinguished | (Loss) on Extinguishment |
|---|---|---|
| 4.875% 2021 Senior Notes | $ 124 | $ (5) |
| 5.75% 2025 Senior Notes | 600 | (13) |
| Total | $ 724 | $ (18) |

107

**Debt Extinguishment - 2018**

During the year ended December 31, 2018, we redeemed in full all of our outstanding 5.90% 2020 Senior Notes and 4.80% 2020 Senior Notes with cash on hand. Additionally, we purchased certain of our 4.875% 2021 Senior Notes and 5.75% 2025 Senior Notes.

The following is a summary of the debt extinguished and the respective impact on extinguishment:

| | (In Millions) | |
| --- | --- | --- |
| | Year Ended December 31, 2018 | |
| | Debt Extinguished | (Loss) on Extinguishment |
| 5.90% 2020 Senior Notes | $ 89 | $ (3) |
| 4.80% 2020 Senior Notes | 122 | (4) |
| 4.875% 2021 Senior Notes | 14 | — |
| 5.75% 2025 Senior Notes | 2 | — |
| Total | $ 227 | $ (7) |

**Debt Maturities**

The following represents a summary of our debt instrument maturities based on the principal amounts outstanding at December 31, 2020:

| | (In Millions) |
| --- | --- |
| | Maturities of Debt |
| 2021 | $ 34 |
| 2022 | — |
| 2023 | 13 |
| 2024 | 457 |
| 2025 | 1,740 |
| Thereafter | 3,351 |
| Total maturities of debt | $ 5,595 |

**NOTE 9 - FAIR VALUE OF FINANCIAL INSTRUMENTS**

There were no significant assets or liabilities measured at fair value as of December 31, 2020.  The following represents the assets and liabilities measured at fair value as of December 31, 2019:

| | (In Millions) | | | |
| --- | --- | --- | --- | --- |
| | December 31, 2019 | | | |
| | Quoted Prices in Active Markets for Identical Assets/Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| Assets: | | | | |
| Cash equivalents - Commercial paper | $ — | $ 188 | $ — | $ 188 |
| Other current assets: | | | | |
| Customer supply agreement | — | — | 45 | 45 |
| Total | $ — | $ 188 | $ 45 | $ 233 |

108

Table of Contents

The valuation of financial assets classified in Level 2 was determined using a market approach based upon quoted prices for similar assets in active markets, or other inputs that were observable.

Our supply agreement with ArcelorMittal USA contained provisions for supplemental revenue or refunds based on the HRC price in the year the iron ore product was consumed in ArcelorMittal USA's blast furnaces. We accounted for these provisions as derivative instruments at the time of sale and adjusted the derivative instruments to fair value through *Revenues* each reporting period until the product was consumed and the amounts were settled. These instruments were classified as Level 3 assets. Upon the completion of the AM USA Transaction, the outstanding derivatives were settled as part of acquisition accounting.

The following tables represent a reconciliation of the changes in fair value of financial instruments measured at fair value on a recurring basis using significant unobservable inputs (Level 3):

| | (In Millions) | |
|---|---|---|
| | Level 3 Assets | |
| | **2020** | 2019 |
| Beginning balance - January 1 | $        45 | $        89 |
| Total gains included in earnings | 122 | 79 |
| Settlements | (27) | (123) |
| Settlement of pre-existing relationship | (140) | — |
| Ending balance - December 31 | $        — | $        45 |
| Total gains for the period included in earnings attributable to the change in unrealized gains on assets still held at the reporting date | $        — | $        45 |

The carrying values of certain financial instruments (e.g. *Accounts receivable, net*, *Accounts payable* and *Other current liabilities*) approximate fair value and, therefore, have been excluded from the table below. A summary of the carrying value and fair value of other financial instruments were as follows:

| | | (In Millions) | | | |
|---|---|---|---|---|---|
| | | **December 31, 2020** | | December 31, 2019 | |
| | Classification | **Carrying Value** | **Fair Value** | Carrying Value | Fair Value |
| Senior notes | Level 1 | $        3,802 | $        4,446 | $        2,114 | $        2,237 |
| IRBs due 2024 to 2028 | Level 1 | 94 | 91 | — | — |
| EDC Revolving Facility - outstanding balance | Level 2 | 18 | 18 | — | — |
| ABL Facility - outstanding balance | Level 2 | 1,510 | 1,510 | — | — |
| Total | | $        5,424 | $        6,065 | $        2,114 | $        2,237 |

The fair value of both current and long-term debt was determined using quoted market prices.

## NOTE 10 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS

We offer defined benefit pension plans, defined contribution pension plans and OPEB plans to a significant portion of our employees and retirees. Benefits are also provided through multiemployer plans for certain union members.

As a result of the acquisitions of AK Steel and ArcelorMittal USA, we assumed the obligations under their defined benefit pension plans, OPEB plans, defined contribution plans and commitments to multiemployer pension plans according to collective bargaining agreements that cover certain union-represented employees. The AK Steel defined benefit pension plans and OPEB plans acquired amounted to a benefit obligation, net of assets of $949 million based on a March 13, 2020 measurement. The ArcelorMittal USA defined benefit pension plans and OPEB plans acquired amounted to a benefit obligation, net of assets of $3,294 million based on a December 9, 2020 measurement.

### Defined Benefit Pension Plans

The defined benefit pension plans are largely noncontributory and limited in participation. Most plans are closed to new participants with only the legacy iron ore hourly and salaried plans still open. The pension benefit

Table of Contents

calculations vary by plan, but are generally based on employee's years of service and compensation or a fixed rate and years of service. Certain salaried plans calculate benefits using a cash balance formula, which earns interest credits and allocations based on a percent of pay.

**OPEB Plans**

We offer postretirement health care and life insurance benefits to retirees through various plans. The vast majority of our plans are closed to new participants. In lieu of retiree medical coverage, many union-represented employees receive a 401(k) contribution per hour worked to a restricted Retiree Health Care Account. Cost sharing features between the employer and retiree vary by plan and several plans include employer caps. Retiree healthcare coverage is provided through programs administered by insurance companies whose charges are based on benefits paid. Certain labor agreements require the funding of VEBAs, which, depending on funding levels, may be used to reimburse the employer for paid benefits.

A006186

**Obligations and Funded Status**

The following tables and information provide additional disclosures:

| | | Pension Benefits | | OPEB | |
|---|---|---|---|---|---|
| **Change in benefit obligations:** | | 2020 | 2019 | 2020 | 2019 |
| Benefit obligations — beginning of year | $ | **1,021** | $ 906 | $ **255** | $ 242 |
| Service cost | | **23** | 17 | **8** | 2 |
| Interest cost | | **64** | 35 | **19** | 10 |
| Actuarial loss | | **162** | 112 | **14** | 19 |
| Benefits paid | | **(146)** | (62) | **(89)** | (26) |
| Participant contributions | | **—** | — | **22** | 6 |
| Acquired through business combinations | | **5,535** | — | **3,528** | — |
| Effect of settlement | | **(94)** | — | **—** | — |
| Other | | **—** | 13 | **—** | 2 |
| Benefit obligations — end of year | $ | **6,565** | $ 1,021 | $ **3,757** | $ 255 |
| | | | | | |
| **Change in plan assets:** | | | | | |
| Fair value of plan assets — beginning of year | $ | **749** | $ 687 | $ **260** | $ 240 |
| Actual return on plan assets | | **472** | 98 | **45** | 35 |
| Participant contributions | | **—** | — | **17** | 1 |
| Employer contributions | | **50** | 16 | **30** | 3 |
| Benefits paid | | **(146)** | (62) | **(88)** | (19) |
| Acquired through business combinations | | **4,301** | — | **519** | — |
| Effect of settlement | | **(94)** | — | **—** | — |
| Other | | **—** | 10 | **—** | — |
| Fair value of plan assets — end of year | $ | **5,332** | $ 749 | $ **783** | $ 260 |
| Funded status | $ | **(1,233)** | $ (272) | $ **(2,974)** | $ 5 |
| | | | | | |
| **Amounts recognized in Statements of Financial Position:** | | | | | |
| Non-current assets | $ | **3** | $ — | $ **54** | $ 49 |
| Current liabilities | | **(12)** | — | **(139)** | (4) |
| Non-current liabilities | | **(1,224)** | (272) | **(2,889)** | (40) |
| Total amount recognized | $ | **(1,233)** | $ (272) | $ **(2,974)** | $ 5 |
| | | | | | |
| **Amounts recognized in accumulated other comprehensive loss:** | | | | | |
| Net actuarial loss | $ | **164** | $ 382 | $ **56** | $ 73 |
| Prior service cost (credit) | | **6** | 7 | **(6)** | (8) |
| Net amount recognized | $ | **170** | $ 389 | $ **50** | $ 65 |

The accumulated benefit obligation for all defined benefit pension plans was $ 6,537 million and $ 1,010 million at December 31, 2020 and 2019, respectively.

111

**Components of Net Periodic Benefit Cost (Credit)**

| | | | | | | | | | (In Millions) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Pension Benefits | | | | | | | OPEB | | | |
| | | **2020** | | 2019 | | 2018 | | **2020** | | 2019 | | 2018 |
| Service cost | $ | **23** | $ | 17 | $ | 19 | $ | **8** | $ | 2 | $ | 2 |
| Interest cost | | **64** | | 35 | | 30 | | **19** | | 10 | | 8 |
| Expected return on plan assets | | **(140)** | | (55) | | (60) | | **(20)** | | (17) | | (18) |
| Amortization: | | | | | | | | | | | | |
|    Net actuarial loss | | **27** | | 24 | | 21 | | **3** | | 5 | | 5 |
|    Prior service costs (credits) | | **1** | | 1 | | 2 | | **(2)** | | (2) | | (3) |
| Settlements | | **(6)** | | — | | 1 | | **—** | | — | | — |
| Net periodic benefit cost (credit) | $ | **(31)** | $ | 22 | $ | 13 | $ | **8** | $ | (2) | $ | (6) |

For 2021, we estimate net periodic benefit cost (credit) as follows:

| | | (In Millions) |
|---|---|---|
| Defined benefit pension plans | $ | (168) |
| OPEB plans | | 86 |
| Total | $ | (82) |

**Components of Accumulated Other Comprehensive Loss (Income)**

The following includes details on the significant actuarial losses (gains) impacting the benefit obligation:

| | | | | | | (In Millions) | | |
|---|---|---|---|---|---|---|---|---|
| | | Pension Benefits | | | | OPEB | | |
| | | **2020** | | 2019 | | **2020** | | 2019 |
| Discount rates | $ | **181** | $ | 106 | $ | **44** | $ | 26 |
| Demographic (gains) losses | | **(3)** | | 12 | | **(11)** | | 4 |
| Mortality | | **(16)** | | (6) | | **(4)** | | (4) |
| Per capita claims | | **—** | | — | | **(10)** | | (9) |
| Other | | **—** | | — | | **(5)** | | 3 |
| Actuarial loss on benefit obligation | | **162** | | 112 | | **14** | | 20 |
| Actual returns on assets over expected | | **(332)** | | (44) | | **(26)** | | (18) |
| Amortization of net actuarial loss | | **(27)** | | (24) | | **(3)** | | (5) |
| Amortization of prior service credits (costs) | | **(1)** | | (1) | | **2** | | 2 |
| Settlements | | **6** | | — | | **—** | | — |
| Other | | **(27)** | | 7 | | **(2)** | | (5) |
| Total recognized in accumulated other comprehensive loss (income) | $ | **(219)** | $ | 50 | $ | **(15)** | $ | (6) |

112

**Contributions**

Annual contributions to the pension plans are made within income tax deductibility restrictions in accordance with statutory regulations. OPEB plans are not subject to minimum regulatory funding requirements, but rather amounts are contributed pursuant to bargaining agreements.

| | | | (In Millions) | | |
| | | | Other Benefits | | |
| Company Contributions (Reimbursements) | Pension Benefits | VEBA | Direct Payments | Total | |
|---|---|---|---|---|---|
| 2019 | $ 16 | $ — | $ 4 | $ 4 | |
| 2020 | 50 | — | 25 | 25 | |
| 2021 (Expected)[1] | 202 | (16) | 144 | 128 | |

[1] Pursuant to the applicable bargaining agreements, benefits can be paid from certain VEBAs that are at least 70% funded (all VEBAs are over 70% funded at December 31, 2020). Certain agreements with plans holding VEBA assets have capped healthcare costs. For the ArcelorMittal USA VEBA, depending on funding levels and/or Company profits, we may withdraw money from the VEBA plans to the extent funds are available for costs in excess of the cap. The 2021 expected pension contributions include $118 million in deferred 2020 pension contributions in connection with the CARES Act that were paid on January 4, 2021.

**Estimated Future Benefit Payments**

| | (In Millions) | |
| | Pension Benefits | OPEB |
|---|---|---|
| 2021 | $ 486 | $ 191 |
| 2022 | 462 | 185 |
| 2023 | 480 | 180 |
| 2024 | 455 | 178 |
| 2025 | 433 | 176 |
| 2026-2030 | 1,983 | 884 |

**Assumptions**

The discount rates used to measure plan liabilities as of the December 31 measurement date are determined individually for each plan. The discount rates are determined by matching the projected cash flows used to determine the plan liabilities to a projected yield curve of high-quality corporate bonds available at the measurement date. Discount rates for expense are calculated using the granular approach for each plan.

Depending on the plan, we use either company-specific base mortality tables or tables issued by the Society of Actuaries. We adopted the Pri-2012 mortality tables from the Society of Actuaries in 2019. On December 31, 2020, the assumed mortality improvement projection was updated from generational scale MP-2019 to generational scale MP-2020 for the Pri-2012 mortality tables.

The following represents weighted-average assumptions used to determine benefit obligations:

| | Pension Benefits | | | | OPEB | | | |
| | December 31, | | | | December 31, | | | |
| | 2020 | | 2019 | | 2020 | | 2019 | |
|---|---|---|---|---|---|---|---|---|
| Discount rate | 2.34 | % | 3.27 | % | 2.71 | % | 3.28 | % |
| Interest crediting rate | 5.25 | | 6.00 | | N/A | | N/A | |
| Compensation rate increase | 2.56 | | 2.53 | | 3.00 | | 3.00 | |

113

A006189

The following represents weighted-average assumptions used to determine net benefit cost:

| | Pension Benefits | | | OPEB | | |
|---|---|---|---|---|---|---|
| | December 31, | | | December 31, | | |
| | **2020** | 2019 | 2018 | **2020** | 2019 | 2018 |
| Obligation discount rate | **3.02 %** | 4.27 % | 3.58 % | **3.28 %** | 4.29 % | 3.60 % |
| Service cost discount rate | **3.34** | 4.35 | 3.64 | **3.35** | 4.49 | 3.73 |
| Interest cost discount rate | **2.53** | 3.92 | 3.16 | **2.51** | 3.94 | 3.11 |
| | | | | | | |
| Interest crediting rate | **5.50** | 6.00 | 6.00 | **N/A** | N/A | N/A |
| Expected return on plan assets | **7.69** | 8.25 | 8.25 | 6.82 | 7.00 | 7.00 |
| Compensation rate increase | **2.56** | 2.53 | 2.49 | 3.00 | 3.00 | 3.00 |

The following represents assumed weighted-average health care cost trend rates:

| | December 31, | |
|---|---|---|
| | **2020** | 2019 |
| Health care cost trend rate assumed for next year | **6.05 %** | 6.50 % |
| Ultimate health care cost trend rate | **4.59** | 5.00 |
| Year that the ultimate rate is reached | **2031** | 2026 |

**Plan Assets**

Our financial objectives with respect to our pension and VEBA assets are to fully fund the actuarial accrued liability for each of the plans, to maximize investment returns within reasonable and prudent levels of risk, and to maintain sufficient liquidity to meet benefit obligations on a timely basis.

Our investment objective is to outperform the expected return on assets assumption used in the plans' actuarial reports over the life of the plans. The expected return on assets takes into account historical returns and estimated future long-term returns based on capital market assumptions applied to the asset allocation strategy. The expected return is net of investment expenses paid by the plans. In addition, investment performance is monitored on a quarterly basis by benchmarking to various indices and metrics for the one-, three- and five-year periods.

The asset allocation strategy is determined through a detailed analysis of assets and liabilities by plan, which defines the overall risk that is acceptable with regard to the expected level and variability of portfolio returns, surplus (assets compared to liabilities), contributions and pension expense.

The asset allocation review process involves simulating capital market behaviors including global asset class performance, inflation and interest rates in order to evaluate various asset allocation scenarios and determine the asset mix with the highest likelihood of meeting financial objectives. The process includes factoring in the current funded status and likely future funded status levels of the plans by taking into account expected growth or decline in the contributions over time.

The asset allocation strategy varies by plan. The following table reflects the actual asset allocations for pension and VEBA assets as of December 31, 2020 and 2019, as well as the 2021 weighted average target asset allocations. Equity investments include securities in large-cap, mid-cap and small-cap companies located in the U.S. and worldwide. Fixed income investments primarily include corporate bonds and government debt securities.

114

| Asset Category | Pension Assets | | | VEBA Assets | | |
|---|---|---|---|---|---|---|
| | 2021 Target Allocation | Percentage of Plan Assets at December 31, | | 2021 Target Allocation | Percentage of Plan Assets at December 31, | |
| | | 2020 | 2019 | | 2020 | 2019 |
| Equity securities | 41.3 % | 51.8 % | 44.0 % | 20.3 % | 22.2 % | 7.2 % |
| Fixed income | 39.7 | 33.8 | 27.6 | 69.6 | 66.4 | 79.8 |
| Hedge funds | 5.0 | 2.2 | 5.4 | 1.1 | 1.8 | 4.8 |
| Private equity | 2.2 | 2.1 | 6.6 | 1.4 | 0.4 | 0.7 |
| Structured credit | 5.2 | 5.0 | 7.0 | 1.0 | 0.9 | 2.1 |
| Real estate | 5.2 | 3.3 | 9.4 | 1.1 | 1.8 | 5.4 |
| Absolute return fixed income | 1.4 | 1.8 | — | 5.5 | 6.5 | — |
| Total | 100.0 % | 100.0 % | 100.0 % | 100.0 % | 100.0 % | 100.0 % |

As a practical expedient, in accordance with ASC 820-10, certain investments that are measured at fair value using the NAV per share have not been classified in the fair value hierarchy below. NAV is based on the value of the underlying assets owned by the fund, minus its liabilities, and then divided by its number of shares outstanding.

The fair value of our pension assets by asset category is as follows:

| | (In Millions) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Asset Category | Quoted Prices in Active Markets for Identical Assets (Level 1) | | Significant Other Observable Inputs (Level 2) | | Significant Unobservable Inputs (Level 3) | | Investments Measured at Net Asset Value | | Total | |
| | 2020 | 2019 | 2020 | 2019 | 2020 | 2019 | 2020 | 2019 | 2020 | 2019 |
| Equity securities: | | | | | | | | | | |
| U.S. equities | $ 1,163 | $ 169 | $ — | $ — | $ — | $ — | $ 787 | $ — | $ 1,950 | $ 169 |
| Global equities | 615 | 161 | — | — | — | — | 195 | — | 810 | 161 |
| Fixed income: | | | | | | | | | | |
| U.S. government securities [1] | 141 | 11 | 295 | 22 | — | — | 40 | — | 476 | 33 |
| U.S. corporate bonds | 512 | 174 | 466 | — | — | — | 303 | — | 1,281 | 174 |
| Non U.S. and other bonds | — | — | 46 | — | — | — | — | — | 46 | — |
| Hedge funds | — | — | — | — | 118 | 40 | — | — | 118 | 40 |
| Private equity | — | — | — | — | 114 | 50 | — | — | 114 | 50 |
| Structured credit | — | — | — | — | 264 | 52 | — | — | 264 | 52 |
| Real estate | — | — | — | — | 174 | 70 | — | — | 174 | 70 |
| Absolute return fixed income | — | — | — | — | — | — | 99 | — | 99 | — |
| Total | $ 2,431 | $ 515 | $ 807 | $ 22 | $ 670 | $ 212 | $ 1,424 | $ — | $ 5,332 | $ 749 |

[1] Includes cash equivalents.

Table of Contents

Assets for OPEB plans include VEBA trusts pursuant to bargaining agreements that are available to fund retired employees' life insurance obligations and medical benefits. The fair value of our other benefit plan assets by asset category is as follows:

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | \multicolumn{12}{c}{(In Millions)} |
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | | Significant Other Observable Inputs (Level 2) | | Significant Unobservable Inputs (Level 3) | | Investments Measured at Net Asset Value | | Total | |
| Asset Category | 2020 | 2019 | 2020 | 2019 | 2020 | 2019 | 2020 | 2019 | 2020 | 2019 |
| Equity securities: | | | | | | | | | | |
| U.S. equities | $ 26 | $ 12 | $ — | $ — | $ — | $ — | $ 93 | $ — | $ 119 | $ 12 |
| Global equities | 6 | 7 | — | — | — | — | 49 | — | 55 | 7 |
| Fixed income: | | | | | | | | | | |
| U.S. government securities[1] | 62 | — | 94 | — | — | — | — | — | 156 | — |
| U.S. corporate bonds | 237 | 166 | 127 | 41 | — | — | — | — | 364 | 207 |
| Hedge funds | — | — | — | — | 14 | 12 | — | — | 14 | 12 |
| Private equity | — | — | — | — | 3 | 2 | — | — | 3 | 2 |
| Structured credit | — | — | — | — | 7 | 6 | — | — | 7 | 6 |
| Real estate | — | — | — | — | 14 | 14 | — | — | 14 | 14 |
| Absolute return fixed income | — | — | — | — | — | — | 51 | — | 51 | — |
| Total | $ 331 | $ 185 | $ 221 | $ 41 | $ 38 | $ 34 | $ 193 | $ — | $ 783 | $ 260 |

[1] Includes cash equivalents.

The following represents the fair value measurements of changes in plan assets using significant unobservable inputs (Level 3):

| | | | | |
|---|---|---|---|---|
| | \multicolumn{4}{c}{(In Millions)} |
| | Pension Assets | | VEBA Assets | |
| | 2020 | 2019 | 2020 | 2019 |
| Beginning balance — January 1 | $ 212 | $ 229 | $ 34 | $ 36 |
| Actual return on plan assets: | | | | |
| Relating to assets still held at the reporting date | 8 | (1) | 2 | 1 |
| Relating to assets sold during the period | 6 | 30 | 1 | — |
| Purchases | 195 | 17 | — | — |
| Sales | (13) | (60) | (1) | (3) |
| Acquired through business combinations | 262 | — | 2 | — |
| Other | — | (3) | — | — |
| Ending balance — December 31 | $ 670 | $ 212 | $ 38 | $ 34 |

Following is a description of the inputs and valuation methodologies used to measure the fair value of our plan assets.

*Equity Securities*

Equity securities classified as Level 1 investments include U.S. large-, small- and mid-cap investments and international equities. These investments are comprised of securities listed on an exchange, market or automated quotation system for which quotations are readily available. The valuation of these securities is determined using a market approach and is based upon unadjusted quoted prices for identical assets in active markets.

*Fixed Income*

Fixed income securities classified as Level 1 investments include bonds, government debt securities and cash equivalents. These investments are comprised of securities listed on an exchange, market or automated

A006192

quotation system for which quotations are readily available. The valuation of these securities is determined using a market approach and is based upon unadjusted quoted prices for identical assets in active markets. Also included in fixed income is a portfolio of U.S. Treasury STRIPS, which are zero-coupon bearing fixed income securities backed by the full faith and credit of the U.S. government. The securities sell at a discount to par because there are no incremental coupon payments. STRIPS are not issued directly by the Treasury, but rather are created by a financial institution, government securities broker or government securities dealer. Liquidity on the issue varies depending on various market conditions; however, in general, the STRIPS market is slightly less liquid than that of the U.S. Treasury Bond market. The STRIPS are priced daily through a bond pricing vendor and are classified as Level 2.

### Hedge Funds

Hedge funds are alternative investments comprised of direct or indirect investment in offshore hedge funds with an investment objective to achieve equity-like returns with one half the volatility of equities and moderate correlation. The valuation techniques used to measure fair value attempt to maximize the use of observable inputs and minimize the use of unobservable inputs. Considerable judgment is required to interpret the factors used to develop estimates of fair value. Valuations of the underlying investment funds are obtained and reviewed. The securities that are valued by the funds are interests in the investment funds and not the underlying holdings of such investment funds. Thus, the inputs used to value the investments in each of the underlying funds may differ from the inputs used to value the underlying holdings of such funds. Hedge funds are valued monthly and recorded on a one-month lag.

### Private Equity Funds

Private equity funds are alternative investments that represent direct or indirect investments in partnerships, venture funds or a diversified pool of private investment vehicles (fund of funds).

Investment commitments are made in private equity funds based on an asset allocation strategy, and capital calls are made over the life of the funds to fund the commitments. As of December 31, 2020, remaining commitments total $86 million for our pension and OPEB plans. Committed amounts are funded from plan assets when capital calls are made. Investment commitments are not pre-funded in reserve accounts.

Private equity investments are valued quarterly and recorded on a one-quarter lag. For private equity investment values reported on a lag, current market information is reviewed for any material changes in values at the reporting date. Capital distributions for the funds do not occur on a regular frequency. Liquidation of these investments would require sale of the partnership interest.

### Structured Credit

Structured credit funds provide flexibility and access to both complex and illiquid premiums by investing across global, public and private residential, commercial, corporate and specialty credit markets that are priced based on valuations provided by independent, third-party pricing agents, if available. Such values generally reflect the last reported sales price if the security is actively traded. The third-party pricing agents may also value structured credit investments at an evaluated bid price by employing methodologies that utilize actual market transactions, broker-supplied valuations or other methodologies designed to identify the market value of such securities.

Structured credit investments are valued monthly and certain funds have an initial lock-up period and withdrawal restrictions on a semi-annual and quarterly basis. For structured credit investment values reported on a lag, current market information is reviewed for any material changes in values at the reporting date.

### Real Estate

The real estate portfolio for the pension plans is an alternative investment comprised of funds with strategic categories of real estate investments. All real estate holdings are appraised externally at least annually, and appraisals are conducted by reputable, independent appraisal firms that are members of the Appraisal Institute. All external appraisals are performed in accordance with the Uniform Standards of Professional Appraisal Practices. The property valuations and assumptions about each property are reviewed quarterly by the investment manager and values are adjusted if there has been a significant change in circumstances relating to the property since the last external appraisal. The fair values of the funds are updated on either a monthly or quarterly basis. Redemption requests are considered on a quarterly basis, subject to notice requirements.

The real estate fund of funds investment for the Empire-Tilden, Hibbing and United Taconite VEBA plans invests in pooled investment vehicles that, in turn, invest in commercial real estate properties. Valuations are performed quarterly and financial statements are prepared on a semi-annual basis, with annual audited statements.

117

Table of Contents

Asset values for this fund are reported with a one-quarter lag, and current market information is reviewed for any material changes in values at the reporting date. Withdrawals are permitted on the last business day of each quarter subject to a 95-day prior written notice.

*Absolute Return Fixed Income*

Absolute return fixed income investments consist of a global fixed income fund with the investment objective of generating positive absolute returns over a full market cycle. The fund's investments in securities, forward exchange contracts and futures contracts are reported at fair value on a recurring monthly basis. The fund's trustee values securities based upon independent pricing sources and futures contracts are valued at closing settled prices. Redemptions of the fund at NAV are permitted monthly under most circumstances.

**Defined Contribution Plans**

Most employees are eligible to participate in various defined contribution plans. Certain of these plans have features with matching contributions or other Company contributions based on our financial results. Company contributions to these plans are expensed as incurred. Total expense from these plans was $22 million, $3 million and $3 million in 2020, 2019 and 2018, respectively.

**Multiemployer Plans**

We contribute to multiemployer pension plans according to collective bargaining agreements that cover certain union-represented employees. The following risks of participating in these multiemployer plans differ from single employer pension plans:

- Employer contributions to a multiemployer plan may be used to provide benefits to employees of other participating employers.

- If a participating employer stops contributing to a multiemployer plan, the remaining participating employers may need to assume the unfunded obligations of the plan.

- If the multiemployer plan becomes significantly underfunded or is unable to pay its benefits, we may be required to contribute additional amounts in excess of the rate required by the collective bargaining agreements.

- If we choose to stop participating in a multiemployer plan, we may be required to pay that plan an amount based on the underfunded status of the plan, referred to as a withdrawal liability.

We are a party to five collective bargaining agreements at our Ashland Works, Mansfield Works, United Taconite, Tubular Components and the majority of our ArcelorMittal USA locations that require contributions to the Steelworkers Pension Trust.

We are a party to three collective bargaining agreements at Butler Works, Middletown Works and Zanesville Works that require contributions to the International Association of Machinists and Aerospace Workers ("IAM") National Pension Fund's National Pension Plan. The plan voluntarily elected to place itself in the "Red Zone" in April 2019 and has implemented a rehabilitation plan. Additional contributions will be required as part of the rehabilitation plan until the plan exits the critical status.

118

Information with respect to multiemployer plans in which we participate follows:

| Pension Fund | EIN/Pension Plan Number | Pension Protection Act Zone Status (a) | | FIP/RP Status Pending/Implemented (b) | Contributions | | | Surcharge Imposed (c) | Expiration Date of Collective Bargaining Agreement |
|---|---|---|---|---|---|---|---|---|---|
| | | **2020** | 2019 | | **2020** | 2019 | 2018 | | |
| Steelworkers Pension Trust | 23-6648508/499 | Green | Green | No | $ 14 | $ 4 | $ 4 | No | 1/22/2021 to 10/1/2022 |
| IAM National Pension Fund's National Pension Plan | 51-6031295/002 | Red | Green | Yes | 16 | — | — | Yes | 5/31/2022 to 5/15/2023 |
| American Maritime Officers Plan | 13-1936709/001 | Green | Green | No | — | — | — | No | 7/31/2021 |
| Total | | | | | $ 30 | $ 4 | $ 4 | | |

(a) The most recent Pension Protection Act zone status available in 2020 and 2019 is for each plan's year-end at December 31, 2019 and 2018. The plan's actuary certifies the zone status. Generally, plans in the red zone are less than 65% funded, plans in the yellow zone are between 65% and 80% funded, and plans in the green zone are at least 80% funded.

(b) The "FIP/RP Status Pending/Implemented" column indicates plans for which a financial improvement plan or a rehabilitation plan is either pending or has been implemented, as defined by ERISA.

(c) The surcharge represents an additional required contribution due as a result of the critical funding status of the plan.

Prior to the Acquisitions, AK Steel and ArcelorMittal USA made up over 30% of the contributions to the Steelworkers Pension Trust in the last three years. Only two other employers contributed more than 5% during this period. As of December 31, 2019 (the last date for which we have information), the Steelworkers Pension Trust had a total actuarial liability of $5,748 million and assets with a market value of $ 5,372 million, for a funded ratio of about 93%.

**NOTE 11 - STOCK COMPENSATION PLANS**

At December 31, 2020, we had outstanding awards under two share-based compensation plans: the A&R 2015 Equity Plan and the 2012 Amended Equity Plan. On March 13, 2020, the maximum number of shares that may be issued under the A&R 2015 Equity Plan increased by 5.7 million common shares in relation to the outstanding AK Steel stock-based incentive awards that we converted at a 0.400 rate of exchange. The converted stock-based incentive awards include 2.0 million stock options, 1.0 million long-term performance plan awards, 0.5 million performance shares, 0.2 million restricted stock awards and 0.3 million restricted stock units. As of December 31, 2020, there were 4.9 million remaining shares available for grant under the A&R 2015 Equity Plan. No additional grants were issued from the 2012 Amended Equity Plan after the date of approval of the A&R 2015 Equity Plan; however, all awards previously granted under the 2012 Amended Equity Plan will continue in accordance with the terms of the outstanding awards.

**Stock-Based Compensation Expense**

The following table summarizes the total compensation expense recognized for stock-based compensation awards:

| | (In Millions, except per share amounts) | | | | | |
|---|---|---|---|---|---|---|
| | **Year Ended December 31,** | | | | | |
| | **2020** | | 2019 | | 2018 | |
| Cost of goods sold | $ | **(2)** | $ | (2) | $ | (2) |
| Selling, general and administrative expenses | | **(13)** | | (16) | | (13) |
| Acquisition-related costs | | **(2)** | | — | | — |
| Stock based compensation expense | | **(17)** | | (18) | | (15) |
| Income tax benefit[1] | | **4** | | 4 | | — |
| Stock based compensation expense, net of tax | $ | **(13)** | $ | (14) | $ | (15) |
| | | | | | | |
| Decrease in basic earnings per common share | $ | **(0.03)** | $ | (0.05) | $ | (0.05) |
| Decrease in diluted earnings per common share | $ | **(0.03)** | $ | (0.05) | $ | (0.05) |

[1] No income tax benefit in 2018 due to the full valuation allowance.

The total compensation cost related to outstanding awards not yet recognized is $ 14 million at December 31, 2020. This expense is expected to be recognized over the remaining weighted-average period of approximately 1.7 years.

*Performance Shares*

The following table summarizes the performance award activity:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2020** | | 2019 | | 2018 | |
| | **Number of Shares** | **Weighted Average Grant Date Fair Value** | Number of Shares | Weighted Average Grant Date Fair Value | Number of Shares | Weighted Average Grant Date Fair Value |
| Outstanding at beginning of year | **1,935,878** | **$ 15.58** | 1,424,723 | $ 14.46 | 1,848,312 | $ 13.42 |
| Granted | **2,510,853** | **5.49** | 572,104 | 18.31 | 675,599 | 11.93 |
| Distributed | **(1,938,786)** | **12.23** | — | — | (489,953) | 10.89 |
| Performance adjustment | **549,154** | **15.63** | — | — | (560,720) | 10.69 |
| Forfeited/canceled | **(604,873)** | **5.70** | (60,949) | 15.12 | (48,515) | 19.33 |
| Outstanding at end of year | **2,452,226** | **$ 10.34** | 1,935,878 | $ 15.58 | 1,424,723 | $ 14.46 |

The 2.5 million awards granted in 2020 include 1.0 million long-term performance plan awards and 0.5 million performance shares relating to the AK Steel replacement awards. As of December 31, 2020, 0.3 million long-term performance plan awards and 0.1 million performance shares were outstanding as a result of qualifying termination events that triggered accelerated performance share payouts and prorated long-term performance plan awards payouts at target. The long-term performance plan awards are based on a three-year Adjusted EBITDA metric. The weighted average grant date fair value for the converted performance awards was $4.59 per share.

The outstanding performance shares vest over a period of three years and are intended to be paid out in common shares. Performance is measured on the basis of relative TSR for the period and measured against the constituents of the S&P Metals and Mining ETF Index. The number of shares actually earned at the end of the three-year period will vary, based on performance, from 0% to 200% of the number of performance shares granted.

120

Table of Contents

***Restricted Stock Units***

The following table summarizes the restricted stock units activity:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2020** | | 2019 | | 2018 | |
| | **Number of Shares** | **Weighted Average Grant Date Fair Value** | Number of Shares | Weighted Average Grant Date Fair Value | Number of Shares | Weighted Average Grant Date Fair Value |
| Outstanding at beginning of year | **2,147,183** | **$ 9.10** | 4,694,360 | $ 4.18 | 4,403,112 | $ 3.64 |
| Granted | **1,160,928** | **4.87** | 572,104 | 11.24 | 685,599 | 7.53 |
| Distributed | **(1,101,115)** | **8.58** | (3,058,307) | 1.95 | (254,196) | 3.30 |
| Forfeited/canceled | **(63,413)** | **7.31** | (60,974) | 9.31 | (140,155) | 5.17 |
| Outstanding at end of year | **2,143,583** | **$ 7.12** | 2,147,183 | $ 9.10 | 4,694,360 | $ 4.18 |

The 1.2 million restricted stock units granted in 2020 include 0.2 million restricted stock awards relating to AK Steel replacement awards. The restricted stock awards relating to AK Steel vest ratably on the first, second and third anniversaries of the grant. We valued the restricted stock awards and restricted stock units at $4.87 per share using the closing price of our common shares on March 13, 2020, the grant date.

All of the outstanding restricted stock units are subject to continued employment, are retention based, and are payable in common shares or cash in certain circumstances at a time determined by the Compensation Committee at its discretion. The restricted stock units that were granted in 2020, 2019 and 2018 cliff vest over three years on December 31, 2022, December 31, 2021 and December 31, 2020, respectively.

***Stock Options***

The following table summarizes the stock option activity:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2020** | | 2019 | | 2018 | |
| | **Number of Shares** | **Weighted Average Exercise Price** | Number of Shares | Weighted Average Exercise Price | Number of Shares | Weighted Average Exercise Price |
| Outstanding at beginning of year | **563,230** | **$ 10.42** | 563,230 | $ 10.42 | 599,870 | $ 10.25 |
| Granted | **2,010,277** | **11.86** | — | — | — | — |
| Exercised | **(79,973)** | **7.01** | — | — | (36,640) | 7.70 |
| Forfeited/canceled | **(7,726)** | **41.04** | — | — | — | — |
| Outstanding at end of year | **2,485,808** | **$ 11.60** | 563,230 | $ 10.42 | 563,230 | $ 10.42 |
| | | | | | | |
| Exercisable at end of year | **2,172,052** | **$ 11.86** | 563,230 | $ 10.42 | 563,230 | $ 10.42 |

Stock options granted to date generally vest over a period from one to three years with an expiration date at ten years from the date of grant. On March 13, 2020, we granted 2.0 million options as AK Steel replacement awards. The weighted average fair value of the converted options was $0.51 per share and was calculated using the Black-Scholes option-pricing model. Qualifying termination events resulted in vest date accelerations and reductions to the option expiration date from ten years to three years.

The total intrinsic value of options exercised in 2020 and 2018 were immaterial. For options outstanding at December 31, 2020, the weighted-average remaining contractual life was 3.2 years and the aggregate intrinsic value was $ 11 million. For options exercisable at December 31, 2020, the weighted-average remaining contractual life was 2.5 years and the aggregate intrinsic value was $ 9 million.

121

**Nonemployee Directors**

Our nonemployee directors are entitled to receive restricted share awards under the Directors' Plan. For 2020, 2019 and 2018, nonemployee directors were granted a specified number of restricted shares, with a value equal to $100,000. The number of shares is based on the closing price of our common shares on the date of the Annual Meeting. The restricted share awards issued under the Directors' Plan generally vest 12 months from the grant date. The awards are subject to any deferral election and the terms of the Directors' Plan and an award agreement.

On March 13, 2020, 0.3 million restricted stock units previously awarded to the members of the AK Steel board of directors were distributed per the terms of the AK Steel Merger Agreement.

For the last three years, grants of restricted and/or deferred shares have been awarded to elected or re-elected nonemployee directors as follows:

| Year of Grant | Restricted Shares | Deferred Shares |
|---|---|---|
| 2020 | 253,809 | 54,794 |
| 2019 | 86,477 | 23,659 |
| 2018 | 92,718 | 17,170 |

## NOTE 12 - INCOME TAXES

*Income (loss) from continuing operations before income taxes* includes the following components:

| | (In Millions) | | |
|---|---|---|---|
| | **2020** | 2019 | 2018 |
| United States | $ (201) | $ 313 | $ 565 |
| Foreign | 8 | — | — |
| | $ (193) | $ 313 | $ 565 |

The components of the income tax provision (benefit) on continuing operations consist of the following:

| | (In Millions) | | |
|---|---|---|---|
| | **2020** | 2019 | 2018 |
| Current provision (benefit): | | | |
| United States federal | $ (2) | $ (1) | $ (1) |
| United States state & local | — | — | — |
| Foreign | (1) | — | 1 |
| | (3) | (1) | — |
| Deferred provision (benefit): | | | |
| United States federal | (95) | 19 | (475) |
| United States state & local | (11) | — | — |
| Foreign | (2) | — | — |
| Total income tax provision (benefit) from continuing operations | $ (111) | $ 18 | $ (475) |

122

A006198

Table of Contents

Reconciliation of our income tax attributable to continuing operations computed at the U.S. federal statutory rate is as follows:

| | 2020 | | 2019 | | 2018 | |
|---|---|---|---|---|---|---|
| Tax at U.S. statutory rate | $ (41) | 21 % | $ 66 | 21 % | $ 119 | 21 % |
| Increase (decrease) due to: | | | | | | |
|   Percentage depletion in excess of cost depletion | (42) | 22 | (49) | (16) | (55) | (10) |
|   Non-taxable income related to noncontrolling interests | (9) | 4 | — | — | — | — |
|   Luxembourg legal entity reduction | — | — | 846 | 271 | 162 | 29 |
| Valuation allowance release: | | | | | | |
|   Current year activity | — | — | — | — | (80) | (14) |
|   Release of U.S. valuation allowance | — | — | — | — | (461) | (81) |
|   Luxembourg legal entity reduction | — | — | (846) | (271) | (162) | (29) |
| State taxes, net | (11) | 6 | — | — | — | — |
| Other items, net | (8) | 4 | 1 | 1 | 2 | — |
| Provision for income tax expense (benefit) and effective income tax rate including discrete items | $ (111) | 57 % | $ 18 | 6 % | $ (475) | (84)% |

The increase in income tax benefit from 2019 to 2020 is directly correlated to the increase in pre-tax book loss from the prior period for both federal and state income tax purposes. The other primary driver of the increase in income tax benefit is related to income of noncontrolling interests for which no tax is recognized.

The increase in income tax expense from 2018 to 2019 is primarily due to release of the valuation allowance in the U.S. of $ 461 million in 2018, which did not recur in 2019. The Luxembourg legal entity reduction relates to initiatives resulting in the dissolution of certain entities and settlement of related financial instruments in the years ended December 31, 2019 and 2018. These 2019 and 2018 NOL deferred tax asset reductions resulted in tax expense of $846 million and $162 million, respectively, which were fully offset by decreases in the respective valuation allowance.

The components of income taxes for other than continuing operations consisted of the following:

| | 2020 | 2019 | 2018 |
|---|---|---|---|
| Other comprehensive income: | | | |
|   Postretirement benefit liability | $ (52) | $ 11 | $ 4 |
|   Unrealized net loss on derivative financial instruments | (1) | — | 1 |
| Total | $ (53) | $ 11 | $ 5 |

123

Significant components of our deferred tax assets and liabilities are as follows:

| | (In Millions) | |
| --- | --- | --- |
| | **2020** | 2019 |
| Deferred tax assets: | | |
| Operating loss and other carryforwards | $ **1,236** | $ 795 |
| Pension and OPEB liabilities | **228** | 114 |
| Property, plant and equipment and mineral rights | **—** | 1 |
| State and local | **132** | 71 |
| Other liabilities | **190** | 70 |
| Total deferred tax assets before valuation allowance | **1,786** | 1,051 |
| Deferred tax asset valuation allowance | **(836)** | (441) |
| Net deferred tax assets | **950** | 610 |
| Deferred tax liabilities: | | |
| Investment in partnerships | **(144)** | (137) |
| Property, plant and equipment and mineral rights | **(246)** | — |
| Other assets | **(68)** | (14) |
| Total deferred tax liabilities | **(458)** | (151) |
| Net deferred tax assets | $ **492** | $ 459 |

We had gross domestic (including states) and foreign NOLs of $ 7,444 million and $1,592 million, respectively, at December 31, 2020. We had gross domestic and foreign NOLs of $3,459 million and $1,592 million, respectively, at December 31, 2019. The U.S. federal NOLs will begin to expire in 2034 and state NOLs will begin to expire in 2021. The foreign NOLs can be carried forward indefinitely. We had foreign tax credit carryforwards of $6 million at December 31, 2019, which expired in 2020. We had gross interest expense limitation carryforwards of $80 million and $55 million for the years ended December 31, 2020 and 2019, respectively. This interest expense can be carried forward indefinitely.

The changes in the valuation allowance are presented below:

| | (In Millions) | | |
| --- | --- | --- | --- |
| | **2020** | 2019 | 2018 |
| Balance at beginning of year | $ **441** | $ 1,287 | $ 1,983 |
| Change in valuation allowance: | | | |
| Included in income tax expense (benefit) | **(3)** | (846) | (691) |
| Change in deferred assets in other comprehensive income | **—** | — | (5) |
| Increase from acquisitions | **398** | — | — |
| Balance at end of year | $ **836** | $ 441 | $ 1,287 |

During 2020, we recorded a $398 million valuation allowance through opening balance sheet adjustments to reflect the portion of federal and state NOLs that are limited under Section 382 of the IRC acquired through the AK Steel Merger.

During 2019, a legal entity reduction initiative was completed in Luxembourg resulting in the dissolution of certain entities and settlement of related financial instruments, triggering the utilization of $1.3 billion of NOL deferred tax asset and reversal of the intercompany notes deferred tax liability of $ 447 million. In addition, prior year adjustments in Luxembourg and a statutory rate reduction from 26.01% to 24.94% resulted in a net increase to the operating loss carryforward deferred tax asset of $46 million. The total net deferred tax reduction resulted in an expense of $846 million which was fully offset by a decrease in the valuation allowance. During 2018, a similar legal entity reduction initiative was completed resulting in the dissolution of certain Luxembourg entities which resulted in a decrease in the NOL deferred tax asset of $162 million which was fully offset by a decrease in valuation allowance. We continue to maintain a full valuation allowance against the remaining Luxembourg net deferred tax assets of $397 million at December 31, 2020 and 2019. Our losses in Luxembourg in recent periods represent sufficient negative evidence to require a full valuation allowance against the deferred tax assets in that jurisdiction. We intend

124

to maintain a valuation allowance against the deferred tax assets related to these operating losses, until sufficient positive evidence exists to support the realization of such assets.

We recorded a $696 million net decrease in the valuation allowance in the year ended December 31, 2018. As of December 31, 2018, our U.S. operations emerged from a three-year cumulative loss position. As the significant negative evidence of cumulative losses had been eliminated, we undertook an evaluation of the continuing need for a valuation allowance on the U.S. deferred tax assets, the majority of which related to the U.S. tax NOLs.

In completing our evaluation of whether a valuation allowance was still needed, we considered all available positive and negative evidence. Positive evidence considered included the emergence from the three-year cumulative loss position, our long-term customer contracts with minimum tonnage requirements, the global scarcity of iron ore pellets, near term forecasts of strong profitability and the recently revised IRC Section 163(j) interest deduction limitation. Negative evidence included the overall size of the deferred tax asset with limited carryforward and no carryback opportunity, the finite nature of the iron ore resources we mine, the uncertainty of steel tariffs that positively impacted our revenue rates in 2018 and the various market signs that the U.S. economy may be nearing the end of the current expansion.

We also considered that future realization of the deferred tax assets depends on the existence of sufficient taxable income of the appropriate character during the carryforward period. In considering sources of taxable income, we identified that a portion of the deferred tax assets would be utilized by existing taxable temporary differences reversing in the same periods as existing deductible temporary differences. In addition, we determined that carryback opportunities and tax planning strategies do not exist as potential sources of future taxable income. Lastly, forecasting future taxable income was considered, but was challenging in a cyclical industry such as ours as it relies heavily on the accuracy of key assumptions, particularly about key pricing benchmarks.

Because historical information is verifiable and more objective than forecast information and due to the cyclicality of the industry, we developed an estimate of future income based on our historical earnings through the most recent industry cycle. We adjusted historical earnings for certain non-recurring items as well as to reflect the current corporate structure by eliminating the impact of discontinued operations and extinguished debt ("core earnings"). Additionally, we adjusted core earnings to reflect the impact of the recently revised IRC Section 163(j) interest expense deduction limitation as well as permanent tax adjustments. The IRC Section 163(j) limitation would limit our interest expense deduction, particularly in down years in the industry cycle, resulting in higher taxable income.

Based on the core earnings analysis, our average annual book taxable income through the business cycle was in excess of the estimated $ 10 million taxable income that would be required annually to fully utilize the deferred tax assets within the 19-year carryforward period. We ascribed significant weight in our assessment to the core earnings analysis and the resulting projection of taxable income through the industry cycle. Based on the weight of this positive evidence, and after considering the other available positive and negative evidence, we determined that it was appropriate to release all of the valuation allowance related to U.S. federal deferred tax assets at December 31, 2018 as it was more likely than not that the entire amount of the U.S. deferred tax asset would be realized before the end of the carryforward period. The income tax benefit recorded for the reversal of the valuation allowance against the U.S. deferred tax assets was $461 million for the year ended December 31, 2018.

We also have a valuation allowance recorded against certain state NOLs and foreign tax credits, which are expected to expire before utilization. At December 31, 2020 and 2019, we had a valuation allowance recorded against certain state NOLs of $98 million and $38 million, respectively. At December 31, 2019, we had a valuation allowance recorded against certain foreign tax credits of $6 million, which expired in 2020.

At December 31, 2020 and 2019, we had no cumulative undistributed earnings of foreign subsidiaries included in retained earnings. Accordingly, no provision has been made for U.S. deferred taxes related to future repatriation of earnings.

125

Table of Contents

A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows:

| | (In Millions) | | |
|---|---|---|---|
| | **2020** | 2019 | 2018 |
| Unrecognized tax benefits balance as of January 1 | $ **29** | $ 29 | $ 33 |
| Increase for tax positions in current year | **7** | — | 4 |
| Decrease for tax positions of prior year | **(4)** | — | — |
| Lapses in statutes of limitations | **—** | — | (8) |
| Increases from acquisitions | **75** | — | — |
| Unrecognized tax benefits balance as of December 31 | $ **107** | $ 29 | $ 29 |

At December 31, 2020 and 2019, we had $ 107 million and $29 million, respectively, of unrecognized tax benefits recorded. Of this amount, $9 million was recorded in *Other current liabilities* for the year ended December 31, 2020. Additionally, $ 2 million and $4 million, were recorded in *Other non-current liabilities* for the years ended December 31, 2020 and 2019, respectively, and $ 96 million was recorded in *Other non-current assets* for both years in the Statements of Consolidated Financial Position. If the unrecognized tax benefits were recognized, the entire $11 million would impact the effective tax rate. We do not expect that the amount of unrecognized benefits will change significantly within the next 12 months. At December 31, 2020 and 2019, we had $1 million and $4 million, respectively, of accrued interest and penalties related to the unrecognized tax benefits recorded in *Other non-current liabilities* in the Statements of Consolidated Financial Position.

Tax years 2016 and forward remain subject to examination for the U.S., and tax years 2008 and forward remain subject to examination for Canada.

## NOTE 13 - LEASE OBLIGATIONS

Our operating leases consist primarily of leases for office space, iron ore vessels, rail cars, processing equipment and mining equipment. Our finance leases consist primarily of processing equipment and mining equipment. We use our incremental borrowing rate as the discount rate to determine the present value of the lease payments, as our leases do not have readily determinable implicit discount rates. Our incremental borrowing rate is the rate of interest that we would have to borrow on a collateralized basis over a similar term and amount in a similar economic environment to pay our lease obligations. We determine the incremental borrowing rates for our leases by adjusting the local risk-free interest rate with a credit risk premium corresponding to our credit rating. From time to time, we may enter into arrangements for the construction or purchase of an asset and then enter into a financing arrangement to lease the asset. We recognize leased assets and liabilities under these arrangements when we obtain control of the asset.

Lease costs are presented below:

| | (In Millions) | |
|---|---|---|
| | Year Ended December 31, | |
| | **2020** | 2019 |
| Operating leases | $ **43** | $ 4 |
| Finance leases: | | |
| Amortization of lease cost | **15** | 6 |
| Interest on lease liabilities | **4** | 2 |
| Short-term leases | **13** | 6 |
| Total | $ **75** | $ 18 |

126

A006202

Table of Contents

Other information related to leases was as follows:

| | (In Millions) | | | |
|---|---|---|---|---|
| | Year Ended December 31, | | | |
| | **2020** | | 2019 | |
| Cash paid for amounts included in measurement of lease liabilities: | | | | |
| Operating leases within cash flows from operating activities | $ | **43** | $ | 4 |
| Finance leases within cash flows from operating activities | $ | **4** | $ | 2 |
| Finance leases within cash flows from financing activities | $ | **15** | $ | 6 |
| Right-of-use assets obtained in exchange for new finance lease liabilities [1] | $ | **44** | $ | 29 |
| Weighted-average remaining lease term - operating leases (in years) | | **8** | | 10 |
| Weighted-average remaining lease term - finance leases (in years) | | **5** | | 6 |
| Weighted-average discount rate - operating leases | | **8 %** | | 8 % |
| Weighted-average discount rate - finance leases | | **4 %** | | 5 % |

[1] Right-of-use assets obtained in the Acquisitions are not included in this figure.

Future minimum lease payments under noncancellable finance and operating leases as of December 31, 2020 were as follows:

| | (In Millions) | | | |
|---|---|---|---|---|
| | Finance Leases | | Operating Leases | |
| 2021 | $ | **100** | $ | **70** |
| 2022 | | **95** | | **53** |
| 2023 | | **78** | | **46** |
| 2024 | | **23** | | **38** |
| 2025 | | **22** | | **34** |
| Thereafter | | **76** | | **122** |
| Total future minimum lease payments | | **394** | | **363** |
| Less: imputed interest | | **59** | | **99** |
| Total lease payments | | **335** | | **264** |
| Less: current portion of lease liabilities | | **91** | | **53** |
| Long-term lease liabilities | $ | **244** | $ | **211** |

The current and long-term portions of our finance lease liabilities are included in *Other current liabilities* and *Other non-current liabilities*, respectively. The current and long-term portions of our operating lease liabilities are included in *Other current liabilities* and *Other non-current liabilities*, respectively.

## NOTE 14 - ASSET RETIREMENT OBLIGATIONS

The following is a summary of our asset retirement obligations:

| | (In Millions) | | | |
|---|---|---|---|---|
| | December 31, | | | |
| | **2020** | | 2019 | |
| Asset retirement obligations[1] | $ | **342** | $ | 165 |
| Less: current portion | | **7** | | 2 |
| Long-term asset retirement obligations | $ | **335** | $ | 163 |

[1] Includes $190 million and $22 million related to our active operations as of December 31, 2020 and 2019, respectively.

The accrued closure obligation provides for contractual and legal obligations related to our indefinitely idled and closed operations and for the eventual closure of our active operations. We performed a detailed assessment of our asset retirement obligations related to our active operations most recently in 2020 in accordance with our

127

accounting policy, which requires us to perform an in-depth evaluation of the liability every three years in addition to routine annual assessments. In 2020, we employed third-party specialists to assist in the evaluation.

Additionally, we have included in our asset retirement obligation $ 172 million for our integrated steel facilities and other operations acquired in the Acquisitions. The closure date for each of our active mine sites was determined based on the exhaustion date of the remaining mineral reserves and the amortization of the related asset and accretion of the liability is recognized over the estimated mine lives. The closure date and expected timing of the capital requirements to meet our obligations for our indefinitely idled or closed mines is determined based on the unique circumstances of each property. For indefinitely idled or closed mines, the accretion of the liability is recognized over the anticipated timing of remediation. As the majority of our asset retirement obligations at our steelmaking operations have indeterminate settlement dates, asset retirement obligations have been recorded at present values using estimated ranges of the economic lives of the underlying assets.

The following is a roll-forward of our asset retirement obligation liability:

| | (In Millions) | | | |
|---|---|---|---|---|
| | | **2020** | | 2019 |
| Asset retirement obligation as of January 1 | $ | **165** | $ | 172 |
| Increase from acquisitions | | **172** | | — |
| Accretion expense | | **14** | | 10 |
| Remediation payments | | **(9)** | | (1) |
| Revision in estimated cash flows | | **—** | | (16) |
| Asset retirement obligation as of December 31 | $ | **342** | $ | 165 |

The revision in estimated cash flows during the year ended December 31, 2019 for $ 16 million primarily relates to an extension of the life-of-mine plan for Tilden mine based on the economic reserve analysis performed during 2019.

**NOTE 15 - DERIVATIVE INSTRUMENTS**

**Derivatives Not Designated as Hedging Instruments**

*Customer Supply Agreement*

A supply agreement with ArcelorMittal USA provided us supplemental revenue or provided refunds to ArcelorMittal USA based on the HRC price at the time the iron ore product was consumed in its blast furnaces. The supplemental pricing is characterized as a freestanding derivative instrument and is required to be accounted for separately once control transfers to the customer. The derivative instrument, which is finalized based on a future price, is adjusted to fair value through *Revenues* each reporting period based upon current market data and forward-looking estimates provided by management until the pellets are consumed and the amounts are settled. Upon the completion of the AM USA Transaction, the outstanding derivatives were settled as part of acquisition accounting. Included within *Revenues* related to Topic 815 for the supplemental revenue portion of the supply agreement is derivative revenue of $ 122 million, $78 million and $426 million for the years ended December 31, 2020, 2019 and 2018, respectively.

Refer to NOTE 9 - FAIR VALUE OF FINANCIAL INSTRUMENTS for additional information.

**NOTE 16 - CAPITAL STOCK**

**Acquisition of AK Steel**

As more fully described in NOTE 3 - ACQUISITIONS, we acquired AK Steel on March 13, 2020. At the effective time of the AK Steel Merger, each share of AK Steel common stock issued and outstanding prior to the effective time of the AK Steel Merger was converted into, and became exchangeable for, 0.400 Cliffs common shares, par value $ 0.125 per share. We issued a total of 127 million Cliffs common shares in connection with the AK Steel Merger at a fair value of $618 million. Following the closing of the AK Steel Merger, AK Steel's common stock was de-listed from the NYSE.

128

**Acquisition of ArcelorMittal USA**

As more fully described in NOTE 3 - ACQUISITIONS, we acquired ArcelorMittal USA on December 9, 2020. Pursuant to the terms of the AM USA Transaction Agreement, we issued 78,186,671 common shares and 583,273 shares of a new series of our Serial Preferred Stock, Class B, without par value, designated as the "Series B Participating Redeemable Preferred Stock," in each case to an indirect, wholly owned subsidiary of ArcelorMittal as part of the consideration paid by us in connection with the closing of the AM USA Transaction. Refer to *Preferred Stock* below for further information.

**Preferred Stock**

We have 3,000,000 shares of Serial Preferred Stock, Class A, without par value and  4,000,000 shares of Serial Preferred Stock, Class B, without par value, authorized; no Class A preferred shares are issued or outstanding. Pursuant to the terms of the AM USA Transaction Agreement, we issued  583,273 shares of a new series of our Serial Preferred Stock, Class B, without par value, designated Series B Participating Redeemable Preferred Stock, without par value, to an indirect, wholly owned subsidiary of ArcelorMittal on December 9, 2020.

*Series B Participating Redeemable Preferred Stock Terms*

The Series B Participating Redeemable Preferred Stock is classified for accounting purposes as temporary equity as a result of a change in control provision that could, under remote circumstances, require us to redeem the preferred stock for cash.

The Series B Participating Redeemable Preferred Stock ranks senior to our common shares with respect to dividend rights and rights on the distribution of assets upon any voluntary or involuntary liquidation, dissolution or winding up of the affairs of, and certain bankruptcy events involving, Cliffs. Each share of Series B Participating Redeemable Preferred Stock entitles its holder to receive a multiple, initially equal to 100 (subject to certain anti-dilution adjustments, the "Applicable Multiple"), of the aggregate amount per share of all dividends declared on the common shares. In addition, from and after the 24-month anniversary of the issue date of the Series B Participating Redeemable Preferred Stock (the "24-Month Anniversary"), each holder of a share of Series B Participating Redeemable Preferred Stock is entitled to receive cash dividends (the "Additional Dividends") accruing and compounding on a daily basis at the initial rate of 10% per annum on the sum of (i) the Applicable Multiple then in effect times the volume-weighted average price of the common shares for the 20 consecutive trading days ending on the trading day immediately preceding the 24-Month Anniversary and (ii) the amount of accumulated and unpaid dividends on the Series B Participating Redeemable Preferred Stock to, but not including, the 24-Month Anniversary, if any, which rate will increase by 2% per annum at the end of each six-month period following the 24-Month Anniversary. Additional Dividends will be payable, when, as and if declared by the Board, in quarterly installments.

The Series B Participating Redeemable Preferred Stock is redeemable, in whole or in part, at our option at any time and from time to time on and after the date that is 180 days after the issue date at a redemption price per share equal to the Applicable Multiple then in effect times the volume-weighted average price of the common shares for the 20 consecutive trading days ending on the trading day immediately preceding the date fixed for redemption, plus accumulated and unpaid dividends to, but not including, the redemption date.

In the event of a change of control of Cliffs, the Series B Participating Redeemable Preferred Stock will be subject to mandatory redemption at a redemption price per share equal to the Applicable Multiple then in effect times the volume-weighted average price of the common shares for the 20 consecutive trading days ending on the trading day immediately preceding the closing date of the transaction constituting such change of control.

In addition, pursuant to the terms of the Series B Participating Redeemable Preferred Stock, we are restricted from effecting any merger or consolidation with or into another entity unless the Series B Participating Redeemable Preferred Stock remains outstanding following the merger or consolidation, is exchanged for new preferred stock with substantially identical terms or is to be redeemed in connection with the closing of such merger or consolidation.

In addition to the foregoing, the Series B Participating Redeemable Preferred Stock is subject to the express terms of the Serial Preferred Stock, Class B, without par value, as set forth in Cleveland-Cliffs Inc.'s Fourth Amended Articles of Incorporation, as amended, except that holders of Series B Participating Redeemable Preferred Stock, in their capacity as such, do not have the right to vote with the other series of Serial Preferred Stock, Class B, without par value, then outstanding, if any, voting separately as a class, for the election of additional directors of Cleveland-Cliffs Inc. upon certain defaults by the Company in the payment of dividends, as provided in Cleveland-Cliffs Inc.'s Fourth Amended Articles of Incorporation, as amended.

Table of Contents

**Dividends**

The below table summarizes our recent dividend activity:

| Declaration Date | Record Date | Payment Date | Dividend Declared per Common Share[1] |
|---|---|---|---|
| 2/18/2020 | 4/3/2020 | 4/15/2020 | $ 0.06 |
| 12/2/2019 | 1/3/2020 | 1/15/2020 | 0.06 |
| 9/3/2019 | 10/4/2019 | 10/15/2019 | 0.10 |
| 5/31/2019 | 7/5/2019 | 7/15/2019 | 0.06 |
| 2/19/2019 | 4/5/2019 | 4/15/2019 | 0.05 |
| 10/18/2018 | 1/4/2019 | 1/15/2019 | 0.05 |

[1] The dividend declared on September 3, 2019 included a special cash dividend of $0.04 per common share.

Subsequent to the dividend paid on April 15, 2020, our Board temporarily suspended future dividends as a result of the COVID-19 pandemic in order to preserve cash during this time of economic uncertainty.

**Share Repurchase Program**

In November 2018, we announced that our Board of Directors authorized a program to repurchase outstanding common shares in the open market or in privately negotiated transactions, up to a maximum of $200 million, excluding commissions and fees. In April 2019, we announced that our Board of Directors increased the common share repurchase authorization by an additional $100 million, excluding commissions and fees. During 2019, we repurchased 24 million common shares at a cost of $253 million in the aggregate, including commissions and fees. The share repurchase program was effective until December 31, 2019.

**NOTE 17 - ACCUMULATED OTHER COMPREHENSIVE LOSS**

The components of *Accumulated other comprehensive loss* within Cliffs shareholders' equity and related tax effects allocated to each are shown below:

| | Pre-tax Amount | Tax Benefit | After-tax Amount |
|---|---|---|---|
| | (In Millions) | | |
| **As of December 31, 2020:** | | | |
| **Postretirement benefit liability** | $ (221) | $ 86 | $ (135) |
| **Foreign currency translation adjustments** | 3 | — | 3 |
| **Unrealized net loss on derivative financial instruments** | (1) | — | (1) |
| | $ (219) | $ 86 | $ (133) |
| As of December 31, 2019: | | | |
| Postretirement benefit liability | $ (454) | $ 138 | $ (316) |
| Unrealized net loss on derivative financial instruments | (4) | 1 | (3) |
| | $ (458) | $ 139 | $ (319) |
| As of December 31, 2018: | | | |
| Postretirement benefit liability | $ (408) | $ 127 | $ (281) |
| Unrealized net loss on derivative financial instruments | (4) | 1 | (3) |
| | $ (412) | $ 128 | $ (284) |

130

Table of Contents

The following table reflects the changes in *Accumulated other comprehensive loss* related to Cliffs shareholders' equity:

| | Postretirement Benefit Liability, net of tax | Foreign Currency Translation | Derivative Financial Instruments, net of tax | Accumulated Other Comprehensive Loss |
|---|---|---|---|---|
| | (In Millions) | | | |
| December 31, 2017 | $ (264) | $ 225 | $ — | $ (39) |
| Other comprehensive income (loss) before reclassifications | (43) | 3 | (1) | (41) |
| Net loss (gain) reclassified from accumulated other comprehensive loss | 26 | (228) | (2) | (204) |
| December 31, 2018 | (281) | — | (3) | (284) |
| Other comprehensive loss before reclassifications | (57) | — | (2) | (59) |
| Net loss reclassified from accumulated other comprehensive loss | 22 | — | 2 | 24 |
| December 31, 2019 | (316) | — | (3) | (319) |
| Other comprehensive income (loss) before reclassifications | 163 | 3 | (6) | 160 |
| Net loss reclassified from accumulated other comprehensive loss | 18 | — | 8 | 26 |
| December 31, 2020 | $ (135) | $ 3 | $ (1) | $ (133) |

The following table reflects the details about *Accumulated other comprehensive loss* components reclassified from Cliffs shareholders' equity:

| Details about Accumulated Other Comprehensive Loss Components | Amount of (Gain)/Loss Reclassified into Income, Net of Tax | | | Affected Line Item in the Statement of Consolidated Operations |
|---|---|---|---|---|
| | (In Millions) | | | |
| | Year Ended December 31, | | | |
| | **2020** | 2019 | 2018 | |
| Amortization of pension and OPEB liability: | | | | |
| Prior service costs[1] | $ (1) | $ (1) | $ (1) | *Other non-operating income* |
| Net actuarial loss[1] | 30 | 29 | 27 | *Other non-operating income* |
| Settlements[1] | (6) | — | — | *Other non-operating income* |
| | 23 | 28 | 26 | *Total before taxes* |
| Income tax expense | (5) | (6) | — | *Income tax benefit (expense)* |
| | $ 18 | $ 22 | $ 26 | *Net of taxes* |
| Changes in foreign currency translation: | | | | |
| Gain on foreign currency translation[2] | $ — | $ — | $ (228) | *Income (loss) from discontinued operations, net of tax* |
| Changes in derivative financial instruments: | | | | |
| Commodity contracts | $ 10 | $ 3 | $ (2) | *Cost of goods sold* |
| Income tax expense | (2) | (1) | — | *Income tax benefit (expense)* |
| | $ 8 | $ 2 | $ (2) | *Net of taxes* |
| Total reclassifications for the period, net of tax | $ 26 | $ 24 | $ (204) | |

[1] These accumulated other comprehensive loss components are included in the computation of net periodic benefit cost. See NOTE 10 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS for further information.

[2] Represents Australian accumulated currency translation adjustments due to the liquidation of our Australian subsidiaries' net assets.

131

Table of Contents

**NOTE 18 - RELATED PARTIES**

We have certain co-owned joint ventures with companies from the steel and mining industries, including integrated steel companies, their subsidiaries and other downstream users of steel and iron ore products.

Hibbing is a co-owned joint venture with U.S. Steel, in which, as of December 31, 2020, we own 85.3% and U.S. Steel owns 14.7%. As a result of the AM USA Transaction, we acquired an additional 62.3% ownership stake in the Hibbing mine and became the majority owner and mine manager. Prior to the AM USA Transaction, ArcelorMittal was a related party due to its ownership interest in Hibbing. As such, certain long-term contracts with ArcelorMittal resulted in *Revenues* from related parties, and are included within the below.

*Revenues* from related parties were as follows:

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | | | |
| | **2020** | | 2019 | | 2018 | |
| Revenue from related parties | $ | **893** | $ | 1,015 | $ | 1,344 |
| Revenues[1] | $ | **5,354** | $ | 1,990 | $ | 2,332 |
| Related party revenues as a percent of Revenues [1] | | **16.7 %** | | 51.0 % | | 57.6 % |
| Purchases from related parties | $ | **16** | $ | — | $ | — |

[1] Includes *Realization of deferred revenue* of $35 million for the year ended December 31, 2020.

The following table presents the classification of related party assets and liabilities in the Statements of Consolidated Financial Position:

| | (In Millions) | | | |
|---|---|---|---|---|
| | December 31, | | | |
| **Balance Sheet Location of Assets (Liabilities)** | **2020** | | 2019 | |
| *Accounts receivable, net* | $ | **2** | $ | 31 |
| *Other current assets* | | **—** | | 45 |
| *Accounts payable* | | **(6)** | | — |
| *Other current liabilities* | | **—** | | (2) |

*Other current assets*

Our supply agreement with ArcelorMittal USA contained provisions that provided us supplemental revenue or provided refunds to ArcelorMittal USA based on the HRC price at the time the iron ore product was consumed in its blast furnaces. The supplemental pricing was categorized as a freestanding derivative. Upon the completion of the AM USA Transaction, the outstanding derivative was settled as part of acquisition accounting.

**NOTE 19 - VARIABLE INTEREST ENTITIES**

***SunCoke Middletown***

We purchase all the coke and electrical power generated from SunCoke Middletown's plant under long-term supply agreements and have committed to purchase all the expected production from the facility through 2032. We consolidate SunCoke Middletown as a VIE because we are the primary beneficiary despite having no ownership interest in SunCoke Middletown. SunCoke Middletown had income before income taxes of $41 million for the year ended December 31, 2020, which was included in our consolidated income before income taxes.

132

The assets of the consolidated VIE can only be used to settle the obligations of the consolidated VIE and not obligations of the Company. The creditors of SunCoke Middletown do not have recourse to the assets or general credit of the Company to satisfy liabilities of the VIE. The consolidated balance sheet as of December 31, 2020 includes the following amounts for SunCoke Middletown:

| | (In Millions) |
| --- | --- |
| | December 31, 2020 |
| Cash and cash equivalents | $ 5 |
| Inventories | 21 |
| Property, plant and equipment, net | 308 |
| Accounts payable | (15) |
| Other assets (liabilities), net | (10) |
| Noncontrolling interest | (309) |

## NOTE 20 - EARNINGS PER SHARE

The following table summarizes the computation of basic and diluted EPS:

| | (In Millions, Except Per Share Amounts) | | |
| --- | --- | --- | --- |
| | Year Ended December 31, | | |
| | 2020 | 2019 | 2018 |
| Income (loss) from continuing operations | $ (82) | $ 295 | $ 1,040 |
| Income from continuing operations attributable to noncontrolling interest | (41) | — | — |
| Net income (loss) from continuing operations attributable to Cliffs shareholders | (123) | 295 | 1,040 |
| Income (loss) from discontinued operations, net of tax | 1 | (2) | 88 |
| Net income (loss) attributable to Cliffs shareholders | $ (122) | $ 293 | $ 1,128 |
| | | | |
| Weighted average number of shares: | | | |
| Basic | 379 | 277 | 297 |
| Convertible senior notes | — | 4 | 3 |
| Employee stock plans | — | 3 | 4 |
| Diluted | 379 | 284 | 304 |
| | | | |
| Earnings (loss) per common share attributable to Cliffs common shareholders - basic: | | | |
| Continuing operations | $ (0.32) | $ 1.07 | $ 3.50 |
| Discontinued operations | — | (0.01) | 0.30 |
| | $ (0.32) | $ 1.06 | $ 3.80 |
| Earnings (loss) per common share attributable to Cliffs common shareholders - diluted: | | | |
| Continuing operations | $ (0.32) | $ 1.04 | $ 3.42 |
| Discontinued operations | — | (0.01) | 0.29 |
| | $ (0.32) | $ 1.03 | $ 3.71 |

133

Table of Contents

The following table summarizes the shares that have been excluded from the diluted earnings per share calculation for the year ended December 31, 2020, as they were anti-dilutive:

| | (In Millions) |
| --- | --- |
| | 2020 |
| Redeemable preferred shares | 4 |
| Convertible senior notes | 2 |
| Shares related to employee stock plans | 1 |

## NOTE 21 - COMMITMENTS AND CONTINGENCIES

### Purchase Commitments

We purchase portions of the principal raw materials required for our steel manufacturing operations under annual and multi-year agreements, some of which have minimum quantity requirements. We also use large volumes of natural gas, electricity and industrial gases in our steel manufacturing operations. We negotiate most of our purchases of chrome, industrial gases and a portion of our electricity under multi-year agreements. Our purchases of coke are made under annual or multi-year agreements with periodic price adjustments. We typically purchase coal under annual fixed-price agreements. We also purchase certain transportation services under multi-year contracts with minimum quantity requirements.

### Contingencies

We are currently the subject of, or party to, various claims and legal proceedings incidental to our current and historical operations. These claims and legal proceedings are subject to inherent uncertainties and unfavorable rulings could occur. An unfavorable ruling could include monetary damages, additional funding requirements or an injunction. If an unfavorable ruling were to occur, there exists the possibility of a material adverse effect on the financial position and results of operations for the period in which the ruling occurs or future periods. However, based on currently available information we do not believe that any pending claims or legal proceedings will result in a material adverse effect in relation to our consolidated financial statements.

*Environmental Contingencies*

Although we believe our operating practices have been consistent with prevailing industry standards, hazardous materials may have been released at operating sites or third-party sites in the past, including operating sites that we no longer own. If we reasonably can, we estimate potential remediation expenditures for those sites where future remediation efforts are probable based on identified conditions, regulatory requirements, or contractual obligations arising from the sale of a business or facility. For sites involving government required investigations, we typically make an estimate of potential remediation expenditures only after the investigation is complete and when we better understand the nature and scope of the remediation. In general, the material factors in these estimates include the costs associated with investigations, delineations, risk assessments, remedial work, governmental response and oversight, site monitoring, and preparation of reports to the appropriate environmental agencies.

The following is a summary of our environmental obligations:

| | (In Millions) | | | |
| --- | --- | --- | --- | --- |
| | December 31, 2020 | | December 31, 2019 | |
| Environmental obligations | $ | 135 | $ | 2 |
| Less current portion | | 18 | | — |
| Long-term environmental obligations | $ | 117 | $ | 2 |

We cannot predict the ultimate costs for each site with certainty because of the evolving nature of the investigation and remediation process. Rather, to estimate the probable costs, we must make certain assumptions. The most significant of these assumptions is for the nature and scope of the work that will be necessary to investigate and remediate a particular site and the cost of that work. Other significant assumptions include the cleanup technology that will be used, whether and to what extent any other parties will participate in paying the investigation and remediation costs, reimbursement of past response costs and future oversight costs by governmental agencies, and the reaction of the governing environmental agencies to the proposed work plans. Costs for future investigation

134

Table of Contents

and remediation are not discounted to their present value, unless the amount and timing of the cash disbursements are readily known. To the extent that we have been able to reasonably estimate future liabilities, we do not believe that there is a reasonable possibility that we will incur a loss or losses that exceed the amounts we accrued for the environmental matters discussed below that would, either individually or in the aggregate, have a material adverse effect on our consolidated financial condition, results of operations or cash flows. However, since we recognize amounts in the consolidated financial statements in accordance with GAAP that exclude potential losses that are not probable or that may not be currently estimable, the ultimate costs of these environmental matters may be higher than the liabilities we currently have recorded in our consolidated financial statements.

Pursuant to RCRA, which governs the treatment, handling and disposal of hazardous waste, the EPA and authorized state environmental agencies may conduct inspections of RCRA-regulated facilities to identify areas where there have been releases of hazardous waste or hazardous constituents into the environment and may order the facilities to take corrective action to remediate such releases. Likewise, the EPA or the states may require closure or post-closure care of residual, industrial and hazardous waste management units, including, but not limited to, landfills and deep injection wells. Environmental regulators have the authority to inspect all of our facilities. While we cannot predict the future actions of these regulators, it is possible that they may identify conditions in future inspections of these facilities that they believe require corrective action.

Pursuant to CERCLA, the EPA and state environmental authorities have conducted site investigations at some of our facilities and other third-party facilities, portions of which previously may have been used for disposal of materials that are currently regulated. The results of these investigations are still pending, and we could be directed to spend funds for remedial activities at the former disposal areas. Because of the uncertain status of these investigations, however, we cannot reasonably predict whether or when such spending might be required or its magnitude.

On April 29, 2002, AK Steel entered a mutually agreed-upon administrative order with the consent of the EPA pursuant to Section 122 of CERCLA to perform a RI/FS of the Hamilton plant site located in New Miami, Ohio. The plant ceased operations in 1990 and all of its former structures have been demolished. AK Steel submitted the investigation portion of the RI/FS and completed supplemental studies. Until the RI/FS is complete, we cannot reasonably estimate the additional costs, if any, we may incur for potentially required remediation of the site or when we may incur them.

*EPA Administrative Order In Re: Ashland Coke*

On September 26, 2012, the EPA issued an order under Section 3013 of RCRA requiring a plan to be developed for investigation of four areas at the Ashland Works coke plant. The Ashland Works coke plant ceased operations in 2011 and all of its former structures have been demolished and removed. In 1981, AK Steel acquired the plant from Honeywell International Corporation (as successor to Allied Corporation), who had managed the coking operations there for approximately 60 years. In connection with the sale of the coke plant, Honeywell agreed to indemnify AK Steel against certain claims and obligations that could arise from the investigation, and we intend to pursue such indemnification from Honeywell, if necessary. We cannot reasonably estimate how long it will take to complete the site investigation. On March 10, 2016, the EPA invited AK Steel to participate in settlement discussions regarding an enforcement action. Settlement discussions between the parties are ongoing, though whether the parties will reach agreement and any such agreement's terms are uncertain. Until the site investigation is complete, we cannot reasonably estimate the costs, if any, we may incur for potential additional required remediation of the site or when we may incur them.

*Burns Harbor Water Issues*

In August 2019, ArcelorMittal Burns Harbor LLC (n/k/a Cleveland-Cliffs Burns Harbor LLC) suffered a loss of the blast furnace cooling water recycle system, which led to the discharge of cyanide and ammonia in excess of the Burns Harbor plant's NPDES permit limits. Since that time, the facility has taken numerous steps to prevent recurrence and maintain compliance with its NPDES permit. Since the August 2019 event, we have been engaged in settlement discussions with the U.S. Department of Justice, the EPA and the State of Indiana to resolve any alleged violations of environmental laws or regulations. Also, ArcelorMittal Burns Harbor LLC was served with a subpoena on December 5, 2019, from the United States District Court for the Northern District of Indiana relating to the August 2019 event and has responded to the subpoena requests. In addition, the plaintiffs in *Environmental Law & Policy Center et al. v. ArcelorMittal Burns Harbor LLC et al. (U.S. District Court, N.D. Indiana Case No. 19-cv-473)*, which was filed on December 20, 2019, have alleged violations resulting from the August 2019 event and other Clean Water Act claims. Although we cannot accurately estimate the amount of civil penalty, the cost of any injunctive relief requirements, or the costs to resolve third-party claims, including potential natural resource damages claims, they are likely to exceed the reporting threshold in total.

135

In addition to the foregoing matters, we are or may be involved in proceedings with various regulatory authorities that may require us to pay fines, comply with more rigorous standards or other requirements or incur capital and operating expenses for environmental compliance. We believe that the ultimate disposition of any such proceedings will not have, individually or in the aggregate, a material adverse effect on our consolidated financial condition, results of operations or cash flows.

*Tax Matters*

The calculation of our tax liabilities involves dealing with uncertainties in the application of complex tax regulations. We recognize liabilities for anticipated tax audit issues based on our estimate of whether, and the extent to which, additional taxes will be due. If we ultimately determine that payment of these amounts is unnecessary, we reverse the liability and recognize a tax benefit during the period in which we determine that the liability is no longer necessary. We also recognize tax benefits to the extent that it is more likely than not that our positions will be sustained when challenged by the taxing authorities. To the extent we prevail in matters for which liabilities have been established, or are required to pay amounts in excess of our liabilities, our effective tax rate in a given period could be materially affected. An unfavorable tax settlement would require use of our cash and result in an increase in our effective tax rate in the year of resolution. A favorable tax settlement would be recognized as a reduction in our effective tax rate in the year of resolution. Refer to NOTE 12 - INCOME TAXES for further information.

*Other Contingencies*

In addition to the matters discussed above, there are various pending and potential claims against us and our subsidiaries involving product liability, commercial, employee benefits and other matters arising in the ordinary course of business. Because of the considerable uncertainties that exist for any claim, it is difficult to reliably or accurately estimate what the amount of a loss would be if a claimant prevails. If material assumptions or factual understandings we rely on to evaluate exposure for these contingencies prove to be inaccurate or otherwise change, we may be required to record a liability for an adverse outcome. If, however, we have reasonably evaluated potential future liabilities for all of these contingencies, including those described more specifically above, it is our opinion, unless we otherwise noted, that the ultimate liability from these contingencies, individually or in the aggregate, should not have a material adverse effect on our consolidated financial position, results of operations or cash flows.

**NOTE 22 - SUBSEQUENT EVENTS**

On February 11, 2021, we sold  20 million common shares, and the indirect, wholly owned subsidiary of ArcelorMittal to which approximately  78 million common shares were issued as part of the consideration paid by us in connection with the closing of the AM USA Transaction sold 40 million common shares, in each case at a price per share to the underwriter of $16.12, in an underwritten public offering. We also granted the underwriter an option to purchase up to an additional 9 million common shares from us at a price per share to the underwriter of $ 16.12. The underwriter has until March 10, 2021 to exercise such option, which it may do in full, in part or not at all. We did not receive any proceeds from the sale of the common shares by the selling shareholder in the offering. We intend to use the net proceeds to us from the offering, plus cash on hand, to redeem up to approximately $334 million aggregate principal amount of our outstanding 9.875% 2025 Senior Secured Notes. We intend to use any remaining net proceeds to us following such redemption to reduce borrowings under our ABL Facility.

On February 9, 2021, following pricing of the underwritten public offering, we issued a conditional notice of partial redemption to holders of the 9.875% 2025 Senior Secured Notes to redeem $322 million aggregate principal amount of the outstanding 9.875% 2025 Senior Secured Notes on March 11, 2021, at a redemption price equal to 109.875% of the principal amount to be redeemed, plus accrued and unpaid interest, if any, to, but excluding, the redemption date. The conditional notice of partial redemption was subject to the condition precedent that we close the underwritten public offering of our common shares. As a result, following the closing of the underwritten public offering, the conditional notice of partial redemption became irrevocable.

On February 17, 2021, we issued $500 million aggregate principal amount of 4.625% 2029 Senior Notes and $ 500 million aggregate principal amount of 4.875% 2031 Senior Notes in an offering that was exempt from the registration requirements of the Securities Act. We intend to use the net proceeds from the notes offering to redeem all of the outstanding 4.875% 2024 Senior Secured Notes and 6.375% 2025 Senior Notes issued by Cleveland-Cliffs Inc. and all of the outstanding 7.625% 2021 AK Senior Notes, 7.50% 2023 AK Senior Notes and 6.375% 2025 AK Senior Notes issued by AK Steel Corporation (n/k/a Cleveland-Cliffs Steel Corporation), and pay fees and expenses in connection with such redemptions, and reduce borrowings under our ABL Facility.

On February 10, 2021, following pricing of the notes offering, we issued notices of redemption to the holders of the 4.875% 2024 Senior Secured Notes, 6.375% 2025 Senior Notes, 7.625% 2021 AK Senior Notes, 7.50% 2023

AK Senior Notes and 6.375% 2025 AK Senior Notes to redeem all of such notes outstanding on March 12, 2021, at the redemption prices listed below, plus accrued and unpaid interest, if any, to, but excluding, the redemption date. The notices of redemption with respect to the 4.875% 2024 Senior Secured Notes and the 6.375% 2025 Senior Notes were subject to the condition precedent that we close the notes offering. As a result, following the closing of the notes offering, the notices of redemption with respect to the 4.875% 2024 Senior Secured Notes and the 6.375% 2025 Senior Notes became irrevocable. The notices of redemption with respect to the 7.625% 2021 AK Senior Notes, 7.50% 2023 AK Senior Notes and 6.375% 2025 AK Senior Notes were not subject to any conditions and were irrevocable when issued.

| Debt Instrument | Redemption Price[1] |
| --- | --- |
| 4.875% 2024 Senior Secured Notes | 102.438 % |
| 6.375% 2025 Senior Notes | 103.188 |
| 7.625% 2021 AK Senior Notes | 100.000 |
| 7.50% 2023 AK Senior Notes | 101.875 |
| 6.375% 2025 AK Senior Notes | 103.188 |

[1] Plus accrued and unpaid interest, if any, up to but excluding the redemption date.

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the shareholders and the Board of Directors of
Cleveland-Cliffs Inc.

## Opinion on the Financial Statements

We have audited the accompanying statements of consolidated financial position of Cleveland-Cliffs Inc. and subsidiaries (the "Company") as of December 31, 2020 and 2019, the related statements of consolidated operations, comprehensive income, cash flows, and changes in equity, for each of the three years in the period ended December 31, 2020, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2020 and 2019, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2020, in conformity with accounting principles generally accepted in the United States of America.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2020, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 26, 2021, expressed an unqualified opinion on the Company's internal control over financial reporting.

## Basis for Opinion

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

## Critical Audit Matters

The critical audit matters communicated below are matters arising from the current-period audit of the financial statements that were communicated or required to be communicated to the audit committee and that (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing a separate opinion on the critical audit matters or on the accounts or disclosures to which they relate.

***Mineral Reserves — Asset Retirement Obligations, Valuation of Long-Lived Assets, Depreciation, Depletion and Amortization of Property, Plant and Equipment and Valuation in Acquisition Accounting —Refer to Notes 3, 5, 6 and 14 to the financial statements***

*Critical Audit Matter Description*

Iron ore mineral reserve estimates, combined with estimated annual production levels, are used to determine the iron ore mine closure dates utilized in recording the fair value liability for asset retirement obligations for active operating iron ore mines. Since the liability represents the present value of the expected future obligation, a significant change in iron ore mineral reserves or iron ore mine lives could have a substantial effect on the recorded obligation. Iron ore mineral reserve estimates are also used in evaluating potential impairments of iron ore mine asset groups as they are indicative of future cash flows and in determining maximum useful lives utilized to calculate depreciation, depletion and amortization of long-lived iron ore mine assets. Further, iron ore mineral reserve estimates are used in estimating the fair value of mineral reserves established through the purchase price allocation in a business combination. The Company performs an in-depth evaluation of its iron ore mineral reserve estimates by iron ore mine on a periodic basis, in addition to routine annual assessments. The determination of iron ore mineral reserves requires management, with the support of management's experts, to make significant estimates and assumptions related to

138

key inputs including (1) the determination of the size and scope of the iron ore body through technical modeling, (2) the estimates of future iron ore prices recognizing that the price shall not exceed the three-year trailing average index price of iron ore adjusted to the Company's realized price, production costs and capital expenditures, and (3) management's mine plan for the proven and probable iron ore mineral reserves (collectively "the iron ore mineral reserve inputs"). Changes in any of the judgments or assumptions related to the iron ore mineral reserve inputs can have a significant impact with respect to the accrual for asset retirement obligations, the impairment of long-lived asset groups, the amount of depreciation, depletion and amortization expense and the estimated fair value of mineral reserves established through the purchase price allocation in a business combination. The consolidated asset retirement obligation balance was $342 million as of December 31, 2020, of which $83 million related to active iron ore mine operations. The total asset balance associated with the Company's Steelmaking reportable segment was $15,849 million as of December 31, 2020, of which $1,661 million related to long-lived assets associated with the Company's combined iron ore mine asset groups, and is inclusive of $235 million related to iron ore mineral reserves acquired through the AM USA Transaction. Depreciation, depletion and amortization expense for the Company's combined iron ore mine asset groups was $78 million for the year ended December 31, 2020.

Given the significant judgments and assumptions made by management to estimate iron ore mineral reserves and the sensitivity of changes to iron ore mineral reserve estimates on the Company's recorded asset retirement obligations, long-lived asset impairment considerations, calculated depreciation, depletion and amortization expense and estimated fair value of mineral reserves established through the purchase price allocation of a business combination, performing audit procedures to evaluate the reasonableness of management's judgments and estimates related to the iron ore mineral reserve inputs required a high degree of auditor judgment and an increased extent of effort.

*How the Critical Audit Matter Was Addressed in the Audit*

Our audit procedures related to management's significant judgments and assumptions related to iron ore mineral reserve quantities and the related iron ore mine closure dates included the following, among others:

- We tested the operating effectiveness of internal controls related to the Company's estimation of iron ore mineral reserve quantities and the related iron ore mine closure dates.

- We evaluated the experience, qualifications and objectivity of management's experts, including in-house iron ore mine engineers.

- For an iron ore mine subject to the Company's routine annual assessment we evaluated management's assessment by:

  ◦ Understanding the process used by management to survey and analyze the geological and operational status of current year iron ore mine production.

  ◦ Evaluating the historical accuracy of management's technical model as compared to actual iron ore mine production results.

  ◦ Comparing the iron ore mine plan, updated for current year depletion, to

    ▪ Presentations to the Audit Committee.

    ▪ Information by asset group, asset retirement obligation valuation models, depreciation, depletion and amortization expense calculations and mineral reserve purchase price allocation valuation models.

- For an iron ore mine subject to the Company's periodic in-depth evaluation of its iron ore mineral reserve estimate:

  ◦ We evaluated management's determination of the size and scope of the iron ore body, by:

    ▪ Understanding the process used by management to complete research and exploration activities including mineralized resource drill samples.

    ▪ Understanding the methodology utilized by management to apply the research and exploration data to the development of a technical model of the iron ore body.

    ▪ Evaluating the historical accuracy of management's technical model as compared to actual iron ore mine production results.

139

◦ We evaluated management's estimates of future iron ore prices, production costs and capital expenditures (the "financial assumptions"), by:

   ▪ Understanding and testing the methodology utilized by management for development of the future iron ore prices recognizing that the price shall not exceed the three-year trailing average index price of iron ore adjusted to the Company's realized price.

   ▪ Evaluated management's ability to accurately forecast future iron ore prices, production costs and capital expenditures by comparing actual results to management's historical forecasts.

   ▪ Evaluated the reasonableness of management's estimates of future iron ore prices to forecasted information included in analyst reports.

   ▪ Evaluated the reasonableness of management's forecast for production costs and capital expenditures by comparing the forecasts to: (1) historical results and (2) internal communications to management and the Board of Directors.

◦ We evaluated management's iron ore mine plan for the proven and probable mineral reserves, by:

   ▪ Understanding the process used by management to develop the iron ore mine plan for proven and probable iron ore mineral reserves applying key inputs such as the technical model of the iron ore body and the financial assumptions.

   ▪ Comparing the iron ore mine plan to

      • Presentations to the Audit Committee.

      • Historical iron ore mine plan(s).

      • Information by asset group, asset retirement obligation valuation models, depreciation, depletion and amortization expense calculations, and mineral reserve purchase price allocation valuation models.

***Acquisitions — AK Steel —Refer to Note 3 to the financial statements***

*Critical Audit Matter Description*

The Company completed the acquisition of AK Steel Holding Corporation for approximately $1.5 billion on March 13, 2020. The Company accounted for the acquisition under the acquisition method of accounting for business combinations. Accordingly, the purchase price was initially allocated to three operations of the AK Steel business including Steelmaking, Tooling and Stamping and Tubular using a discounted cash flow model (the "Operations Allocation"). Following the Operations Allocation, the purchase price was then allocated to the assets acquired and liabilities assumed comprising the three operations of the AK Steel business based on their respective fair values, including $174 million goodwill balance assigned to the Tooling and Stamping and Tubular operations. The Operations Allocation required management to make significant estimates and assumptions related to forecasts of future revenues and earnings before interest, taxes, depreciation, and amortization (EBITDA) and discount rates.

Given the Operations Allocation requires management to make significant estimates and assumptions related to the forecasts of future revenues and EBITDA (the "Forecasts"), as well as the selection of the discount rates, and considering to the sensitivity of the allocated goodwill balance to changes in projected future cash flows at the Steelmaking, Tooling and Stamping, and Tubular operations, performing audit procedures to evaluate the reasonableness of the Forecasts and selected discount rates required a high degree of auditor judgment and an increased extent of effort, including the need to involve our fair value specialists.

*How the Critical Audit Matter Was Addressed in the Audit*

Our audit procedures related to the Forecasts and the selection of the discount rates included the following, among others:

   • We tested the operating effectiveness of internal controls over management's purchase price allocation, such as controls related to management's Forecasts and the selection of the discount rates.

140

- We evaluated the reasonableness of management's Forecasts by comparing the Forecasts to (1) historical results, (2) internal communications to management and the Board of Directors, and (3) forecasted information included in industry reports and other economic indicators.

- With the assistance of our fair value specialists, we evaluated the reasonableness of the discount rates by:

  ◦ Testing the source information underlying the determination of the discount rates and testing the mathematical accuracy of the calculation.

  ◦ Developing a range of independent estimates and comparing those to the discount rates selected by management.

- We evaluated whether management's Forecasts were consistent with evidence obtained in other areas of the audit.

*/s/ DELOITTE & TOUCHE LLP*

Cleveland, Ohio

February 26, 2021

We have served as the Company's auditor since 2004.

141

Table of Contents

**Item 9.**      *Changes in and Disagreements With Accountants on Accounting and Financial Disclosure*

     *None.*

**Item 9A.**      *Controls and Procedures*

     We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our President and Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure based solely on the definition of "disclosure controls and procedures" in Rule 13a-15(e) promulgated under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

     As of the end of the period covered by this report, we carried out an evaluation under the supervision and with the participation of our management, including our President and Chief Executive Officer and our Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures. Based on the foregoing, our President and Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective.

## Management's Report on Internal Control Over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as such term is defined under Rule 13a-15(f) promulgated under the Exchange Act.

Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Company's consolidated financial statements for external purposes in accordance with generally accepted accounting principles.

Internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit the preparation of the consolidated financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with appropriate authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the consolidated financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management conducted an assessment of the Company's internal control over financial reporting as of December 31, 2020 using the framework specified in *Internal Control - Integrated Framework* (2013), published by the Committee of Sponsoring Organizations of the Treadway Commission. We have excluded from our assessment the internal control over financial reporting at AK Steel, which was acquired on March 13, 2020, and whose assets as of December 31, 2020 constituted 32% of the Company's consolidated total assets as of December 31, 2020, and whose revenues for the period from March 13, 2020 through December 31, 2020, inclusive, constituted 67% of the Company's consolidated revenues for the year ended December 31, 2020. Management also excluded from our assessment the internal control over financial reporting at ArcelorMittal USA, which was acquired on December 9, 2020, and whose assets as of December 31, 2020 constituted 49% of the Company's consolidated total assets as of December 31, 2020, and whose revenues for the period from December 9, 2020 through December 31, 2020, inclusive, constituted 8% of the Company's consolidated revenues for the year ended December 31, 2020.

Based on such assessment, management has concluded that the Company's internal control over financial reporting was effective as of December 31, 2020.

The effectiveness of the Company's internal control over financial reporting as of December 31, 2020 has been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report that appears herein.

February 26, 2021

## Changes in Internal Control Over Financial Reporting

There have been no changes in our internal control over financial reporting or in other factors that occurred during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the shareholders and the Board of Directors of
Cleveland-Cliffs Inc.

**Opinion on Internal Control over Financial Reporting**

We have audited the internal control over financial reporting of Cleveland-Cliffs Inc. and subsidiaries (the "Company") as of December 31, 2020, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2020, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by COSO.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated financial statements as of and for the year ended December 31, 2020, of the Company and our report dated February 26, 2021, expressed an unqualified opinion on those financial statements.

As described in *Management's Report on Internal Control Over Financial Reporting*, management excluded from its assessment the internal control over financial reporting at AK Steel, which was acquired on March 13, 2020, and whose assets as of December 31, 2020 constituted 32% of the Company's consolidated total assets as of December 31, 2020, and whose revenues for the period from March 13, 2020 through December 31, 2020, inclusive, constituted 67% of the Company's consolidated revenues for the year ended December 31, 2020. Management also excluded from its assessment the internal control over financial reporting at ArcelorMittal USA, which was acquired on December 9, 2020, and whose assets as of December 31, 2020 constituted 49% of the Company's consolidated total assets as of December 31, 2020, and whose revenues for the period from December 9, 2020 through December 31, 2020, inclusive, constituted 8% of the Company's consolidated revenues for the year ended December 31, 2020. Accordingly, our audit did not include the internal control over financial reporting at either AK Steel or ArcelorMittal USA.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying *Management's Report on Internal Control Over Financial Reporting*. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

*/s/ DELOITTE & TOUCHE LLP*
Cleveland, Ohio
February 26, 2021

144

**Item 9B.**        *Other Information*

*None.*

A006221

**PART III**

**Item 10.**    *Directors, Executive Officers and Corporate Governance*

The information required to be furnished by this Item will be set forth in our definitive proxy statement for the 2021 Annual Meeting of Shareholders (the "Proxy Statement") under the headings "Board Meetings and Committees — Audit Committee", "Code of Business Conduct and Ethics", "Independence and Related Party Transactions", and "Information Concerning Director Nominees", and is incorporated herein by reference and made a part hereof from the Proxy Statement. The information regarding executive officers required by this Item is set forth in *Part I - Item 1. Business* hereof under the heading "Information About Our Executive Officers", which information is incorporated herein by reference and made a part hereof.

**Item 11.**    *Executive Compensation*

The information required to be furnished by this Item will be set forth in the Proxy Statement under the headings "Director Compensation", "Compensation Discussion and Analysis", "Compensation Committee Report", "Compensation Committee Interlocks and Insider Participation", "Compensation-Related Risk Assessment" and "Executive Compensation" and is incorporated herein by reference and made a part hereof from the Proxy Statement.

**Item 12.**    *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters*

The information required to be furnished by this Item will be set forth in the Proxy Statement under the headings "Ownership of Equity Securities of the Company" and "Equity Compensation Plan Information" and is incorporated herein by reference and made a part hereof from the Proxy Statement.

**Item 13.**    *Certain Relationships and Related Transactions, and Director Independence*

The information required to be furnished by this Item will be set forth in the Proxy Statement under the heading "Independence and Related Party Transactions" and is incorporated herein by reference and made a part hereof from the Proxy Statement.

**Item 14.**    *Principal Accountant Fees and Services*

The information required to be furnished by this Item will be set forth in the Proxy Statement under the heading "Ratification of Independent Registered Public Accounting Firm" and is incorporated herein by reference and made a part hereof from the Proxy Statement.

146

PART IV

**Item 15.**         *Exhibits and Financial Statement Schedules*

(a)(1) - List of Financial Statements

The following consolidated financial statements of Cleveland-Cliffs Inc. are included at  *Item 8. Financial Statements and Supplementary Data*  above:

- Statements of Consolidated Financial Position - December 31, 2020 and 2019

- Statements of Consolidated Operations - Years ended December 31, 2020, 2019 and 2018

- Statements of Consolidated Comprehensive Income - Years ended December 31, 2020, 2019 and 2018

- Statements of Consolidated Cash Flows - Years ended December 31, 2020, 2019 and 2018

- Statements of Consolidated Changes in Equity - Years ended December 31, 2020, 2019 and 2018

- Notes to Consolidated Financial Statements

(a)(2) - Financial Statement Schedules

All schedules for which provision is made in the applicable accounting regulation of the SEC are not required under the related instructions or are inapplicable, and therefore have been omitted or are contained in the applicable financial statements or the notes thereto.

(a)(3) List of Exhibits

All documents referenced below have been filed pursuant to the Securities Exchange Act of 1934 by Cleveland-Cliffs Inc., file number 1-09844, unless otherwise indicated.

| Exhibit Number | Exhibit |
| --- | --- |
| | **Plan of purchase, sale, reorganization, arrangement, liquidation or succession** |
| 2.1 | **Agreement and Plan of Merger, dated as of December 2, 2019, by and among Cleveland-Cliffs Inc., AK Steel Holding Corporation and Pepper Merger Sub Inc. (filed as Exhibit 2.1 to Cliffs' Form 8-K on December 4, 2019 and incorporated herein by reference) |
| 2.2 | **Transaction Agreement, dated as of September 28, 2020, by and between Cleveland-Cliffs Inc. and ArcelorMittal S.A. (filed as Exhibit 2.1 to Cliffs' Form 10-Q for the period ended September 30, 2020 and incorporated herein by reference) |
| | **Articles of Incorporation and Regulations of Cleveland-Cliffs Inc.** |
| 3.1 | Fourth Amended Articles of Incorporation of Cliffs, as filed with the Secretary of State of the State of Ohio on September 25, 2020 (filed as Exhibit 3.2 to Cliffs' Form 8-K on September 28, 2020 and incorporated herein by reference) |
| 3.2 | Certificate of Amendment to Fourth Amended Articles of Incorporation of Cliffs, as filed with the Secretary of State of Ohio on December 7, 2020 (filed as Exhibit 3.1 to Cliffs Form 8-K on December 9, 2020 and incorporated herein by reference) |
| 3.3 | Regulations of Cliffs (filed as Exhibit 3.2 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| | **Instruments defining rights of security holders, including indentures** |
| 4.1 | Indenture, dated as of March 17, 2010, between Cliffs Natural Resources Inc. (n/k/a Cleveland-Cliffs Inc.) and U.S. Bank National Association, as trustee (filed as Exhibit 4.3 to Cliffs' Registration Statement on Form S-3 (Registration No. 333-186617) on February 12, 2013 and incorporated herein by reference) |
| 4.2 | Third Supplemental Indenture, dated as of September 20, 2010, between Cliffs Natural Resources Inc. (n/k/a Cleveland-Cliffs Inc.) and U.S. Bank National Association, as trustee, including Form of 6.25% Notes due 2040 (filed as Exhibit 4.4 to Cliffs' Form 8-K on September 17, 2010 and incorporated herein by reference) |
| 4.3 | Fifth Supplemental Indenture, dated as of March 31, 2011, between Cliffs Natural Resources Inc. (n/k/a Cleveland-Cliffs Inc.) and U.S. Bank National Association, as trustee (filed as Exhibit 4(b) to Cliffs' Form 10-Q for the period ended June 30, 2011 and incorporated herein by reference) |

147

| 4.4 | Seventh Supplemental Indenture, dated as of May 7, 2013, between Cliffs Natural Resources Inc. (n/k/a Cleveland-Cliffs Inc.) and U.S. Bank National Association, as trustee (filed as Exhibit 4.1 to Cliffs' Form 10-Q for the period ended June 30, 2013 and incorporated herein by reference) |
| 4.5 | Eighth Supplemental Indenture, dated as of December 19, 2017, by and between Cleveland-Cliffs Inc. and U.S. Bank National Association, as trustee, including Form of 1.50% Convertible Senior Notes due 2025 (filed as Exhibit 4.2 to Cliffs' Form 8-K on December 19, 2017 and incorporated herein by reference) |
| 4.6 | Indenture, dated as of February 27, 2017, among Cliffs Natural Resources Inc. (n/k/a Cleveland-Cliffs Inc.), the Guarantors party thereto and U.S. Bank National Association, as trustee, including Form of 5.75% Senior Notes due 2025 (filed as Exhibit 4.1 to Cliffs' Form 8-K on August 7, 2017 and incorporated herein by reference) |
| 4.7 | First Supplemental Indenture, dated as of August 7, 2017, among Cliffs Natural Resources Inc. (n/k/a Cleveland-Cliffs Inc.), the Guarantors party thereto and U.S. Bank National Association, as trustee, including Form of 5.75% Senior Notes due 2025 (filed as Exhibit 4.2 to Cliffs' Form 8-K on August 7, 2017 and incorporated herein by reference) |
| 4.8 | Second Supplemental Indenture, dated as of September 29, 2017, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee (filed as Exhibit 4.11 to Cliffs' Form 10-K for the period ended December 31, 2017 and incorporated herein by reference) |
| 4.9 | Third Supplemental Indenture, dated as of October 27, 2017, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee (filed as Exhibit 4.12 to Cliffs' Form 10-K for the period ended December 31, 2017 and incorporated herein by reference) |
| 4.10 | Fourth Supplemental Indenture, dated as of August 27, 2018, among Cleveland-Cliffs Inc., the Additional Guarantor party thereto and U.S. Bank National Association, as trustee (filed as Exhibit 4.10 to Cliffs' Form 10-K for the period ended December 31, 2019 and incorporated herein by reference) |
| 4.11 | Fifth Supplemental Indenture, dated as of March 13, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee (filed as Exhibit 4.2 to Cliffs' Form 10-Q for the period ended March 31, 2020 and incorporated herein by reference) |
| 4.12 | Sixth Supplemental Indenture, dated as of May 22, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee (filed as Exhibit 4.4 to Cliffs' Form 10-Q for the period ended June 30, 2020 and incorporated herein by reference) |
| 4.13 | Seventh Supplemental Indenture, dated as of December 9, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee (filed herewith) |
| 4.14 | Eighth Supplemental Indenture, dated as of December 18, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee (filed herewith) |
| 4.15 | Indenture, dated as of December 19, 2017, by and among Cleveland-Cliffs Inc., the Guarantors party thereto and U.S. Bank National Association, as trustee and first lien notes collateral agent, including Form of 4.875% Senior Secured Notes due 2024 (filed as Exhibit 4.1 to Cliffs' Form 8-K on December 19, 2017 and incorporated herein by reference) |
| 4.16 | First Supplemental Indenture, dated as of August 27, 2018, among Cleveland-Cliffs Inc., the Additional Guarantor party thereto and U.S. Bank National Association, as trustee (filed as Exhibit 4.12 to Cliffs' Form 10-K for the period ended December 31, 2019 and incorporated herein by reference) |
| 4.17 | Second Supplemental Indenture, dated as of March 13, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee and first lien notes collateral agent (filed as Exhibit 4.3 to Cliffs' Form 10-Q for the period ended March 31, 2020 and incorporated herein by reference) |
| 4.18 | Third Supplemental Indenture, dated as of May 22, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee and first lien notes collateral agent (filed as Exhibit 4.5 to Cliffs' Form 10-Q for the period ended June 30, 2020 and incorporated herein by reference) |
| 4.19 | Fourth Supplemental Indenture, dated as of December 9, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee and first lien notes collateral agent (filed herewith) |
| 4.20 | Fifth Supplemental Indenture, dated as of December 18, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee and first lien notes collateral agent (filed herewith) |
| 4.21 | Indenture, dated as of May 13, 2019, among Cleveland-Cliffs Inc., the Guarantors party thereto and U.S. Bank National Association, as trustee, including Form of 5.875% Senior Notes due 2027 (filed as Exhibit 4.1 to Cliffs' Form 8-K on May 14, 2019 and incorporated herein by reference) |
| 4.22 | First Supplemental Indenture, dated as of March 13, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee (filed as Exhibit 4.4 to Cliffs' Form 10-Q for the period ended March 31, 2020 and incorporated herein by reference) |

148

A006224

| 4.23 | Second Supplemental Indenture, dated as of May 22, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee (filed as Exhibit 4.6 to Cliffs' Form 10-Q for the period ended June 30, 2020 and incorporated herein by reference) |
| 4.24 | Third Supplemental Indenture, dated as of December 9, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee (filed herewith) |
| 4.25 | Fourth Supplemental Indenture, dated as of December 18, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee (filed herewith) |
| 4.26 | Indenture, dated as of March 13, 2020, among Cleveland-Cliffs Inc., the Guarantors party thereto and U.S. Bank National Association, as trustee and first lien notes collateral agent, including Form of 6.75% Senior Secured Notes due 2026 (filed as Exhibit 4.1 to Cliffs' Form 10-Q for the period ended March 31, 2020 and incorporated herein by reference) |
| 4.27 | First Supplemental Indenture, dated as of May 22, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee and first lien notes collateral agent (filed as Exhibit 4.9 to Cliffs' Form 10-Q for the period ended June 30, 2020 and incorporated herein by reference) |
| 4.28 | Second Supplemental Indenture, dated as of June 19, 2020, among Cleveland-Cliffs Inc., the Guarantors party thereto and U.S. Bank National Association, as trustee and first lien notes collateral agent, including Form of 6.75% Senior Secured Notes due 2026 (filed as Exhibit 4.10 to Cliffs' Form 10-Q for the period ended June 30, 2020 and incorporated herein by reference) |
| 4.29 | Third Supplemental Indenture, dated as of December 9, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee and first lien notes collateral agent (filed herewith) |
| 4.30 | Fourth Supplemental Indenture, dated as of December 18, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee and first lien notes collateral agent (filed herewith) |
| 4.31 | Indenture, dated as of March 16, 2020, by and among Cleveland-Cliffs Inc., the Guarantors party thereto and U.S. Bank National Association, as trustee, including Form of 6.375% Senior Notes due 2025 (filed as Exhibit 4.5 to Cliffs' Form 10-Q for the period ended March 31, 2020 and incorporated herein by reference) |
| 4.32 | First Supplemental Indenture, dated as of May 22, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee (filed as Exhibit 4.8 to Cliffs' Form 10-Q for the period ended June 30, 2020 and incorporated herein by reference) |
| 4.33 | Second Supplemental Indenture, dated as of December 9, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee (filed herewith) |
| 4.34 | Third Supplemental Indenture, dated as of December 18, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee (filed herewith) |
| 4.35 | Registration Rights Agreement, dated March 16, 2020, among Cleveland-Cliffs Inc., the Guarantors party thereto and Credit Suisse Securities (USA) LLC, as dealer manager, with respect to Cleveland-Cliffs Inc.'s 6.375% Senior Notes due 2025 (filed as Exhibit 4.6 to Cliffs' Form 10-Q for the period ended March 31, 2020 and incorporated herein by reference) |
| 4.36 | Indenture, dated as of March 16, 2020, among Cleveland-Cliffs Inc., the Guarantors party thereto and U.S. Bank National Association, as trustee, including Form of 7.00% Senior Notes due 2027 (filed as Exhibit 4.7 to Cliffs' Form 10-Q for the period ended March 31, 2020 and incorporated herein by reference) |
| 4.37 | First Supplemental Indenture, dated as of May 22, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee (filed as Exhibit 4.7 to Cliffs' Form 10-Q for the period ended June 30, 2020 and incorporated herein by reference) |
| 4.38 | Second Supplemental Indenture, dated as of December 9, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee (filed herewith) |
| 4.39 | Third Supplemental Indenture, dated as of December 18, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee (filed herewith) |
| 4.40 | Registration Rights Agreement, dated March 16, 2020, among Cleveland-Cliffs Inc., as issuer, the Guarantors party thereto and Credit Suisse Securities (USA) LLC, as dealer manager, with respect to Cleveland-Cliffs Inc.'s 7.00% Senior Notes due 2027 (filed as Exhibit 4.8 to Cliffs' Form 10-Q for the period ended March 31, 2020 and incorporated herein by reference) |
| 4.41 | Indenture, dated as of April 17, 2020, among Cleveland-Cliffs Inc., the Guarantors party thereto and U.S. Bank National Association, as trustee and first lien notes collateral agent, including Form of 9.875% Senior Secured Notes due 2025 (filed as Exhibit 4.1 to Cliffs' Form 10-Q for the period ended June 30, 2020 and incorporated herein by reference) |

149

Table of Contents

| 4.42 | First Supplemental Indenture, dated as of April 24, 2020, among Cleveland-Cliffs Inc., the Guarantors party thereto and U.S. Bank National Association, as trustee and first lien notes collateral agent, including Form of 9.875% Senior Secured Notes due 2025 (filed as Exhibit 4.2 to Cliffs' Form 10-Q for the period ended June 30, 2020 and incorporated herein by reference) |
| 4.43 | Second Supplemental Indenture, dated as of May 22, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee and first lien notes collateral agent (filed as Exhibit 4.3 to Cliffs' Form 10-Q for the period ended June 30, 2020 and incorporated herein by reference) |
| 4.44 | Third Supplemental Indenture, dated as of December 9, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee and first lien notes collateral agent (filed herewith) |
| 4.45 | Fourth Supplemental Indenture, dated as of December 18, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee and first lien notes collateral agent (filed herewith) |
| 4.46 | Form of Common Share Certificate (filed as Exhibit 4.1 to Cliffs' Form 10-Q for the period ended September 30, 2019 and incorporated herein by reference) |
| 4.47 | Form of Series B Participating Redeemable Preferred Stock Certificate (included in Exhibit 3.2) |
| 4.48 | Description of Securities Registered under Section 12 of the Securities Exchange Act of 1934 (filed herewith) |
| | **Material contracts** |
| 10.1 | * Form of Change in Control Severance Agreement (covering newly hired officers) (filed as Exhibit 10.4 to Cliffs' Form 8-K/A on September 16, 2014 and incorporated herein by reference) |
| 10.2 | * Form of 2016 Change in Control Severance Agreement (filed as Exhibit 10.1 to Cliffs' 10-Q for the period ended September 30, 2016 and incorporated herein by reference) |
| 10.3 | * Cleveland-Cliffs Inc. 2012 Non-Qualified Deferred Compensation Plan (effective January 1, 2012) dated November 8, 2011 (filed as Exhibit 10.1 to Cliffs' Form 8-K on November 8, 2011 and incorporated herein by reference) |
| 10.4 | * Form of Director and Officer Indemnification Agreement between Cleveland-Cliffs Inc. and Directors and Officers (filed as Exhibit 10.2 to Cliffs' Form 10-Q for the period ended March 31, 2019 and incorporated herein by reference) |
| 10.5 | * Cliffs Natural Resources Inc. Amended and Restated 2014 Nonemployee Directors' Compensation Plan (filed as Exhibit 10.1 to Cliffs' Form 8-K on May 2, 2016 and incorporated herein by reference) |
| 10.6 | *Form of Restricted Shares Agreement for Nonemployee Directors (filed as Exhibit 10.1 to Cliffs' Form 10-Q for the period ended June 30, 2018 and incorporated herein by reference) |
| 10.7 | *Form of Deferred Shares Agreement for Nonemployee Directors (filed as Exhibit 10.2 to Cliffs' Form 10-Q for the period ended June 30, 2018 and incorporated herein by reference) |
| 10.8 | * Trust Agreement No. 1 (Amended and Restated effective June 1, 1997), dated June 12, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to the Cleveland-Cliffs Inc Supplemental Retirement Benefit Plan, Severance Pay Plan for Key Employees and certain executive agreements (filed as Exhibit 10.10 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.9 | * Trust Agreement No. 1 Amendments to Exhibits, effective as of January 1, 2000, by and between Cleveland-Cliffs Inc and KeyBank National Association, as Trustee (filed as Exhibit 10.11 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.10 | * First Amendment to Trust Agreement No. 1, effective September 10, 2002, by and between Cleveland-Cliffs Inc and KeyBank National Association, as Trustee (filed as Exhibit 10.12 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.11 | * Second Amendment to Trust Agreement No. 1 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(y) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.12 | * Third Amendment to Trust Agreement No. 1 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.15 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.13 | * Amended and Restated Trust Agreement No. 2, effective as of October 15, 2002, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to Executive Agreements and Indemnification Agreements with the Company's Directors and certain Officers, the Company's Severance Pay Plan for Key Employees, and the Retention Plan for Salaried Employees (filed as Exhibit 10.14 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |

| 10.14 | * Second Amendment to Amended and Restated Trust Agreement No. 2 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(aa) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
|---|---|
| 10.15 | * Third Amendment to Amended and Restated Trust Agreement No. 2 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.18 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.16 | * Trust Agreement No. 4 dated April 9, 2014 between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to the Cleveland-Cliffs Inc Supplemental Retirement Benefit Plan (filed as Exhibit 10.23 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.17 | * First Amendment to Trust Agreement No. 7, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, dated as of March 9, 1992 (filed as Exhibit 10.24 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.20 | * Second Amendment to Trust Agreement No. 7, dated November 18, 1994, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.25 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.21 | * Third Amendment to Trust Agreement No. 7, dated May 23, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.26 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.22 | * Fourth Amendment to Trust Agreement No. 7, dated July 15, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.27 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.23 | * Amendment to Exhibits to Trust Agreement No. 7, effective as of January 1, 2000, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.28 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.24 | * Sixth Amendment to Trust Agreement No. 7 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(oo) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.25 | * Seventh Amendment to Trust Agreement No. 7 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.34 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.26 | * Trust Agreement No. 10, dated as of November 20, 1996, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to the Cleveland-Cliffs Inc Nonemployee Directors' Compensation Plan (filed as Exhibit 10.36 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.27 | *First Amendment to Trust Agreement No. 10 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(ww) to Cliffs' Form 10-K for the period ended February 26, 2009 and incorporated herein by reference) |
| 10.28 | * Second Amendment to Trust Agreement No. 10 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.45 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |
| 10.29 | * Letter Agreement, by and between Lourenco Goncalves and Cliffs Natural Resources Inc., signed as of September 11, 2014 (filed as Exhibit 10.1 to Cliffs' Form 8-K/A on September 16, 2014 and incorporated herein by reference) |
| 10.30 | * Cleveland-Cliffs Inc and Subsidiaries Management Performance Incentive Plan Summary, effective January 1, 2004 (filed as Exhibit 10.47 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference) |
| 10.31 | * Cliffs Natural Resources Inc. 2017 Executive Management Performance Incentive Plan effective January 1, 2017 (filed as Exhibit 10.2 to Cliffs' Form 8-K on April 27, 2017 and incorporated herein by reference) |
| 10.32 | * Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan (filed as Exhibit 10.1 to Cliffs' Form 8-K on August 4, 2014 and incorporated herein by reference) |
| 10.33 | * Form of Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan Non-Qualified Stock Option Award Memorandum (3-Year Vesting – January 2015 Grant) and Stock Option Award Agreement (filed as Exhibit 10.69 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference) |

151

A006227

Table of Contents

| 10.34 | * Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan (filed as Exhibit 10.1 to Cliffs' Form 8-K on May 21, 2015 and incorporated herein by reference) |
|---|---|
| 10.35 | * Cliffs Natural Resources Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan (filed as Exhibit 10.1 to Cliffs' Form 8-K on April 27, 2017 and incorporated herein by reference) |
| 10.36 | * Form of Cleveland-Cliffs Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan Restricted Stock Unit Award Memorandum and Restricted Stock Unit Award Agreement (filed as Exhibit 10.2 to Cliffs' Form 10-Q for the period ended March 31, 2018 and incorporated herein by reference) |
| 10.37 | * Form of Cleveland-Cliffs Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan Performance Share Award Memorandum and Performance Share Award Agreement (filed as Exhibit 10.3 to Cliffs' Form 10-Q for the period ended March 31, 2018 and incorporated herein by reference) |
| 10.38 | * Form of Cleveland-Cliffs Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan Cash Incentive Award Memorandum (TSR) and Cash Incentive Award Agreement (TSR) (filed as Exhibit 10.4 to Cliffs' Form 10-Q for the period ended March 31, 2018 and incorporated herein by reference) |
| 10.39 | * Cliffs Natural Resources Inc. Supplemental Retirement Benefit Plan (as Amended and Restated effective December 1, 2006) dated December 31, 2008 (filed as Exhibit 10(mmm) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference) |
| 10.40 | Asset-Based Revolving Credit Agreement, dated as of March 13, 2020, among Cleveland-Cliffs Inc., the lenders party thereto from time to time and Bank of America, N.A., as administrative agent (filed as Exhibit 10.1 to Cliffs' Form 10-Q for the period ended March 31, 2020 and incorporated herein by reference) |
| 10.41 | First Amendment to Asset-Based Revolving Credit Agreement, dated as of March 27, 2020, among Cleveland-Cliffs Inc., the lenders party thereto from time to time and Bank of America, N.A., as administrative agent (filed as Exhibit 10.2 to Cliffs' Form 10-Q for the period ended March 31, 2020 and incorporated herein by reference) |
| 10.42 | Second Amendment to Asset-Based Revolving Credit Agreement, dated as of December 9, 2020, among Cleveland-Cliffs Inc., the lenders party thereto from time to time and Bank of America, N.A., as administrative agent (filed herewith) |
| 10.43 | Investor Rights Agreement, dated as of December 9, 2020, by and between Cleveland-Cliffs Inc. and ArcelorMittal S.A. (filed as Exhibit 10.1 to Cliffs' Form 8-K on December 9, 2020 and incorporated herein by reference) |
| 21 | Subsidiaries of the Registrant (filed herewith) |
| 22 | Schedule of the obligated group, including the parent and issuer and the subsidiary guarantors that have guaranteed the obligations under the 4.875% 2024 Senior Secured Notes, the 5.75% 2025 Senior Notes, the 6.375% 2025 Senior Notes, the 6.75% 2026 Senior Notes, the 5.875% 2027 Senior Notes, the 7.00% 2027 Senior Notes and the 9.875% 2025 Senior Secured Notes issued by Cleveland-Cliffs Inc. (filed herewith) |
| 23 | Consent of Independent Registered Public Accounting Firm (filed herewith) |
| 24 | Power of Attorney (filed herewith) |
| 31.1 | Certification Pursuant to 15 U.S.C. Section 7241, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, signed and dated by Lourenco Goncalves as of February 26, 2021 (filed herewith) |
| 31.2 | Certification Pursuant to 15 U.S.C. Section 7241, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, signed and dated by Keith A. Koci as of February 26, 2021 (filed herewith) |
| 32.1 | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed and dated by Lourenco Goncalves, Chairman, President and Chief Executive Officer of Cleveland-Cliffs Inc., as of February 26, 2021 (filed herewith) |
| 32.2 | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed and dated by Keith A. Koci, Executive Vice President, Chief Financial Officer of Cleveland-Cliffs Inc., as of February 26, 2021 (filed herewith) |
| 95 | Mine Safety Disclosures (filed herewith) |
| 101 | The following financial information from Cleveland-Cliffs Inc.'s Annual Report on Form 10-K for the year ended December 31, 2020 formatted in Inline XBRL (Extensible Business Reporting Language) includes: (i) the Statements of Consolidated Financial Position, (ii) the Statements of Consolidated Operations, (iii) the Statements of Consolidated Comprehensive Income, (iv) the Statements of Consolidated Cash Flows, (v) the Statements of Consolidated Changes in Equity, and (vi) Notes to the Consolidated Financial Statements. |
| 104 | The cover page from this Annual Report on Form 10-K, formatted in Inline XBRL. |

_____

\*      Indicates management contract or other compensatory arrangement.

\*\*    Certain immaterial schedules and exhibits to this exhibit have been omitted pursuant to the provisions of Regulation S-K, Item 601(a)(5). A copy of any of the omitted schedules and exhibits will be furnished to the Securities and Exchange Commission upon request.

**Item 16.**          ***Form 10-K Summary***

None.

153

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

CLEVELAND-CLIFFS INC.

By:  /s/ Kimberly A. Floriani
_____
Name:    Kimberly A. Floriani
Title:     Vice President, Corporate Controller &
Date:   February 26, 2021                      Chief Accounting Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signatures | Title | Date |
|---|---|---|
| /s/ C. L. Goncalves<br>C. L. Goncalves | Chairman, President and<br>Chief Executive Officer<br>(Principal Executive Officer) | February 26, 2021 |
| /s/ K. A. Koci<br>K. A. Koci | Executive Vice President,<br>Chief Financial Officer<br>(Principal Financial Officer) | February 26, 2021 |
| /s/ K. A. Floriani<br>K. A. Floriani | Vice President, Corporate Controller<br>& Chief Accounting Officer<br>(Principal Accounting Officer) | February 26, 2021 |
| *<br>J. T. Baldwin | Director | February 26, 2021 |
| *<br>R. P. Fisher, Jr. | Director | February 26, 2021 |
| *<br>W. K. Gerber | Director | February 26, 2021 |
| *<br>S. M. Green | Director | February 26, 2021 |
| *<br>M. A. Harlan | Director | February 26, 2021 |
| *<br>R. S. Michael, III | Director | February 26, 2021 |
| *<br>J. L. Miller | Director | February 26, 2021 |
| *<br>E. M. Rychel | Director | February 26, 2021 |
| *<br>G. Stoliar | Director | February 26, 2021 |
| *<br>D. C. Taylor | Director | February 26, 2021 |
| *<br>A. M. Yocum | Director | February 26, 2021 |

* The undersigned, by signing his name hereto, does sign and execute this Annual Report on Form 10-K pursuant to a Power of Attorney executed on behalf of the above-indicated directors of the registrant and filed herewith as Exhibit 24 on behalf of the registrant.

By:   /s/ K. A. Koci
_____
(K. A. Koci, as Attorney-in-Fact)

154

A006230

**EXHIBIT 4.13**

SEVENTH SUPPLEMENTAL INDENTURE
5.75% SENIOR NOTES DUE 2025

This Supplemental Indenture, dated as of December 9, 2020 (this " **Supplemental Indenture**" or "**Guarantee**"), among Cleveland-Cliffs Steel Holdings Inc., ArcelorMittal Burns Harbor LLC, ArcelorMittal Cleveland LLC, ArcelorMittal Cleveland Works Railway Inc., ArcelorMittal Columbus LLC, ArcelorMittal Kote Inc., ArcelorMittal Minorca Mine Inc., ArcelosrMittal Monessen LLC, ArcelorMittal Plate LLC, ArcelorMittal Riverdale LLC, ArcelorMittal South Chicago & Indiana Harbor Railway Inc., ArcelorMittal Steelton LLC, ArcelorMittal Tek Inc., ArcelorMittal USA LLC, ArcelorMittal Weirton LLC, Mid-Vol Coal Sales, Inc., Mittal Steel USA — Railways Inc. (the "**Additional Guarantors**"), Cleveland-Cliffs Inc. (f/k/a Cliffs Natural Resources Inc.) (together with its successors and assigns, the "**Company**") and U.S. Bank National Association, as Trustee (the " **Trustee**") under the Indenture referred to below.

WITNESSETH:

WHEREAS, the Company, the Guarantors party thereto and the Trustee have heretofore executed and delivered an Indenture, dated as of February 27, 2017, as supplemented by that certain First Supplemental Indenture, dated as of August 7, 2017, among the Company, the Guarantors party thereto, and the Trustee, that certain Second Supplemental Indenture, dated as of September 29, 2017, among the Company, the Guarantors party thereto, and the Trustee, that certain Third Supplemental Indenture, dated as of October 27, 2017, among the Company, the Guarantors party thereto, and the Trustee, that certain Fourth Supplemental Indenture, dated as of August 27, 2018, among the Company, the Guarantor party thereto, and the Trustee, that certain Fifth Supplemental Indenture, dated as of March 13, 2020, among the Company, the Guarantors party thereto, and the Trustee, and that certain Sixth Supplemental Indenture, dated as of May 22, 2020, among the Company, the Guarantors party thereto, and the Trustee (as so supplemented, the "**Indenture**"), providing for the issuance of an aggregate principal amount of $1,075,000,000 of 5.75% Senior Notes due 2025 of the Company (the "**Notes**");

WHEREAS, Section 3.08 of the Indenture provides that, after the Issue Date, the Company is required to cause certain direct or indirect Subsidiaries of the Company to execute and deliver to the Trustee a supplemental indenture pursuant to which such Subsidiary will unconditionally guarantee, on a joint and several basis with the other Guarantors, the full and prompt payment of the principal of, premium, if any, and interest on the Notes on an unsecured basis; and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee and the Company are authorized to execute and deliver this Supplemental Indenture to amend or supplement the Indenture, without the consent of any Holder;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Additional Guarantors, the Company and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

ARTICLE 1
Definitions

Section 1.01 Defined Terms.

As used in this Supplemental Indenture, terms defined in the Indenture or in the preamble or recital hereto are used herein as therein defined. The words "herein," "hereof" and "hereby" and other words of similar import used in this Supplemental Indenture refer to this Supplemental Indenture as a whole and not to any particular section hereof.

ARTICLE 2
Agreement to be Bound; Guarantee

Section 2.01 *Agreement to be Bound.* The Additional Guarantors hereby become parties to the Indenture as Guarantors and as such will have all of the rights and be subject to all of the obligations and agreements of a Guarantor under the Indenture. The Additional Guarantors agree to be bound by all of the provisions of the Indenture applicable to an Additional Guarantor and to perform all of the obligations and agreements of a Guarantor under the Indenture.

Section 2.01 *Guarantee.* The Additional Guarantors agree, on a joint and several basis with all the existing Guarantors, to fully, unconditionally and irrevocably Guarantee to each Holder of the Notes and the Trustee the Obligations pursuant to Article 10 of the Indenture on an unsecured basis.

ARTICLE 3
Miscellaneous

Section 3.01 *Notices.* All notices and other communications to the Additional Guarantors shall be given as provided in the Indenture to the Additional Guarantors, at their respective addresses set forth below, with a copy to the Company as provided in the Indenture for notices to the Company.

Cleveland-Cliffs Steel Holdings Inc.
c/o Cleveland-Cliffs Inc.
    200 Public Square, Suite 3300
    Cleveland, Ohio 44114
    Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal Burns Harbor LLC
c/o Cleveland-Cliffs Inc.
    200 Public Square, Suite 3300
    Cleveland, Ohio 44114
    Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal Cleveland LLC
c/o Cleveland-Cliffs Inc.
    200 Public Square, Suite 3300
    Cleveland, Ohio 44114
    Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal Cleveland Works Railway Inc.
c/o Cleveland-Cliffs Inc.
    200 Public Square, Suite 3300
    Cleveland, Ohio 44114
    Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal Columbus LLC
c/o Cleveland-Cliffs Inc.
    200 Public Square, Suite 3300
    Cleveland, Ohio 44114
    Attention: James Graham, Executive Vice President,
        Chief Legal Officer & Secretary

ArcelorMittal Kote Inc.
c/o Cleveland-Cliffs Inc.
    200 Public Square, Suite 3300
    Cleveland, Ohio 44114
    Attention:James Graham, Executive Vice President,
        Chief Legal Officer & Secretary

ArcelorMittal Minorca Mine Inc.
c/o Cleveland-Cliffs Inc.
    200 Public Square, Suite 3300
    Cleveland, Ohio 44114
    Attention: James Graham, Executive Vice President,
        Chief Legal Officer & Secretary

ArcelorMittal Monessen LLC
c/o Cleveland-Cliffs Inc.
    200 Public Square, Suite 3300
    Cleveland, Ohio 44114
    Attention: James Graham, Executive Vice President,
        Chief Legal Officer & Secretary

ArcelorMittal Plate LLC
c/o Cleveland-Cliffs Inc.
    200 Public Square, Suite 3300
    Cleveland, Ohio 44114
    Attention: James Graham, Executive Vice President,
        Chief Legal Officer & Secretary

ArcelorMittal Riverdale LLC
c/o Cleveland-Cliffs Inc.
    200 Public Square, Suite 3300
    Cleveland, Ohio 44114
    Attention: James Graham, Executive Vice President,
        Chief Legal Officer & Secretary

ArcelorMittal South Chicago & Indiana Harbor Railway Inc.
c/o Cleveland-Cliffs Inc.
    200 Public Square, Suite 3300
    Cleveland, Ohio 44114
    Attention: James Graham, Executive Vice President,
        Chief Legal Officer & Secretary

ArcelorMittal Steelton LLC
c/o Cleveland-Cliffs Inc.
    200 Public Square, Suite 3300
    Cleveland, Ohio 44114

Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal Tek Inc.
c/o Cleveland-Cliffs Inc.
    200 Public Square, Suite 3300
    Cleveland, Ohio 44114
    Attention: James Graham, Executive Vice President,
        Chief Legal Officer & Secretary

ArcelorMittal USA LLC
c/o Cleveland-Cliffs Inc.
    200 Public Square, Suite 3300
    Cleveland, Ohio 44114
    Attention: James Graham, Executive Vice President,
        Chief Legal Officer & Secretary

ArcelorMittal Weirton LLC
c/o Cleveland-Cliffs Inc.
    200 Public Square, Suite 3300
    Cleveland, Ohio 44114
    Attention: James Graham, Executive Vice President,
        Chief Legal Officer & Secretary

Mid-Vol Coal Sales, Inc.
c/o    Cleveland-Cliffs Inc.
    200 Public Square, Suite 3300
    Cleveland, Ohio 44114
    Attention: James Graham, Executive Vice President,
        Chief Legal Officer & Secretary

Mittal Steel USA — Railways Inc.
c/o Cleveland-Cliffs Inc.
    200 Public Square, Suite 3300
    Cleveland, Ohio 44114
    Attention: James Graham, Executive Vice President,
        Chief Legal Officer & Secretary

Section 3.02 *Parties.* Nothing expressed or mentioned herein is intended or shall be construed to give any Person, firm or corporation, other than the Holders and the Trustee, any legal or equitable right, remedy or claim under or in respect of this Supplemental Indenture or the Indenture or any provision herein or therein contained.

Section 3.03 *Governing Law.* This Supplemental Indenture shall be governed by, and construed in accordance with, the laws of the State of New York.

Section 3.04 *Severability Clause.* In case any provision in this Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

Section 3.05 *Ratification of Indenture; Supplemental Indenture Part of Indenture.* Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and

provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby. The Trustee shall not be responsible for and makes no representation or warranty as to the validity, execution, or sufficiency of this Supplemental Indenture or with respect to the recitals contained herein, all of which recitals are made solely by the other parties hereto.

Section 3.06 *Counterparts*. The parties hereto may sign one or more copies of this Supplemental Indenture in counterparts, all of which together shall constitute one and the same agreement.

Section 3.07 *Headings*. The headings of the Articles and the sections in this Guarantee are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof.

Section 3.08 *Execution, Delivery and Validity*. The Company and the Additional Guarantors each represent and warrant to the Trustee that this Supplemental Indenture has been duly and validly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, receivership, administration, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

CLEVELAND-CLIFFS STEEL HOLDINGS INC., as a Guarantor

By:    /s/ James D. Graham
     Name: James D. Graham
     Title: Secretary

ARCELORMITTAL BURNS HARBOR LLC, as a Guarantor

By:    /s/ James D. Graham
     Name: James D. Graham
     Title: General Counsel & Secretary

ARCELORMITTAL CLEVELAND LLC, as a Guarantor

By:    /s/ James D. Graham
     Name: James D. Graham
     Title: General Counsel & Secretary

ARCELORMITTAL CLEVELAND WORKS RAILWAY INC., as a Guarantor

By:    /s/ James D. Graham
     Name: James D. Graham
     Title: General Counsel & Secretary

ARCELORMITTAL COLUMBUS LLC, as a Guarantor

By:    /s/ James D. Graham
     Name: James D. Graham
     Title: General Counsel & Secretary

Seventh Supplemental Indenture – 5.75% Senior Notes due 2025

ARCELORMITTAL KOTE INC., as a Guarantor

By:  /s/ James D. Graham
_____
    Name: James D. Graham
    Title: General Counsel & Secretary

ARCELORMITTAL MINORCA MINE INC., as a Guarantor

By:  /s/ James D. Graham
_____
    Name: James D. Graham
    Title: General Counsel & Secretary

ARCELORMITTAL MONESSEN LLC, as a Guarantor

By:  /s/ James D. Graham
_____
    Name: James D. Graham
    Title: General Counsel & Secretary

ARCELORMITTAL PLATE LLC, as a Guarantor

By:  /s/ James D. Graham
_____
    Name: James D. Graham
    Title: General Counsel & Secretary

ARCELORMITTAL RIVERDALE LLC, as a Guarantor

By:  /s/ James D. Graham
_____
    Name: James D. Graham
    Title: General Counsel & Secretary

ARCELORMITTAL SOUTH CHICAGO & INDIANA HARBOR
RAILWAY INC., as a Guarantor

By:  /s/ James D. Graham
_____
    Name: James D. Graham
    Title: General Counsel & Secretary

Seventh Supplemental Indenture – 5.75% Senior Notes due 2025

ARCELORMITTAL STEELTON LLC, as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: General Counsel & Secretary


ARCELORMITTAL TEK INC., as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: General Counsel & Secretary


ARCELORMITTAL USA LLC, as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: Executive Vice President, Chief Legal Officer & Secretary


ARCELORMITTAL WEIRTON LLC, as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: General Counsel & Secretary


MID-VOL COAL SALES, INC., as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: General Counsel & Secretary


MITTAL STEEL USA — RAILWAYS INC., as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: General Counsel & Secretary


Seventh Supplemental Indenture – 5.75% Senior Notes due 2025

CLEVELAND-CLIFFS INC.

By:    /s/ Keith A. Koci
      Name: Keith A. Koci
      Title: Executive Vice President, Chief Financial Officer

U.S. BANK NATIONAL ASSOCIATION, as Trustee

By:    /s/ Elizabeth A. Thuning
      Name: Elizabeth A. Thuning
      Title: Vice President

Seventh Supplemental Indenture – 5.75% Senior Notes due 2025

**EXHIBIT 4.14**

**EIGHTH SUPPLEMENTAL INDENTURE**
**5.75% SENIOR NOTES DUE 2025**

This Supplemental Indenture, dated as of December 18, 2020 (this " **Supplemental Indenture**" or " **Guarantee**"), among I/N Tek L.P., I/N Kote L.P., Tek Kote Acquisition Corporation (the "**Additional Guarantors**"), Cleveland-Cliffs Inc. (f/k/a Cliffs Natural Resources Inc.) (together with its successors and assigns, the "**Company**") and U.S. Bank National Association, as Trustee (the " **Trustee**") under the Indenture referred to below.

WITNESSETH:

WHEREAS, the Company, the Guarantors party thereto and the Trustee have heretofore executed and delivered an Indenture, dated as of February 27, 2017, as supplemented by that certain First Supplemental Indenture, dated as of August 7, 2017, among the Company, the Guarantors party thereto, and the Trustee, that certain Second Supplemental Indenture, dated as of September 29, 2017, among the Company, the Guarantors party thereto, and the Trustee, that certain Third Supplemental Indenture, dated as of October 27, 2017, among the Company, the Guarantors party thereto, and the Trustee, that certain Fourth Supplemental Indenture, dated as of August 27, 2018, among the Company, the Guarantor party thereto, and the Trustee, that certain Fifth Supplemental Indenture, dated as of March 13, 2020, among the Company, the Guarantors party thereto, and the Trustee, that certain Sixth Supplemental Indenture, dated as of May 22, 2020, among the Company, the Guarantors party thereto, and the Trustee, and that certain Seventh Supplemental Indenture, dated as of December 9, 2020, among the Company, the Guarantors party thereto, and the Trustee (as so supplemented, the "**Indenture**"), providing for the issuance of an aggregate principal amount of $1,075,000,000 of 5.75% Senior Notes due 2025 of the Company (the "**Notes**");

WHEREAS, Section 3.08 of the Indenture provides that, after the Issue Date, the Company is required to cause certain direct or indirect Subsidiaries of the Company to execute and deliver to the Trustee a supplemental indenture pursuant to which such Subsidiary will unconditionally guarantee, on a joint and several basis with the other Guarantors, the full and prompt payment of the principal of, premium, if any, and interest on the Notes on an unsecured basis; and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee and the Company are authorized to execute and deliver this Supplemental Indenture to amend or supplement the Indenture, without the consent of any Holder;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Additional Guarantors, the Company and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

ARTICLE 1
Definitions

Section 1.01 Defined Terms.

As used in this Supplemental Indenture, terms defined in the Indenture or in the preamble or recital hereto are used herein as therein defined. The words "herein," "hereof" and "hereby" and other words of similar import used in this Supplemental Indenture refer to this Supplemental Indenture as a whole and not to any particular section hereof.

ARTICLE 2

Agreement to be Bound; Guarantee

Section 2.01 *Agreement to be Bound*. The Additional Guarantors hereby become parties to the Indenture as Guarantors and as such will have all of the rights and be subject to all of the obligations and agreements of a Guarantor under the Indenture. The Additional Guarantors agree to be bound by all of the provisions of the Indenture applicable to an Additional Guarantor and to perform all of the obligations and agreements of a Guarantor under the Indenture.

Section 2.02 *Guarantee*. The Additional Guarantors agree, on a joint and several basis with all the existing Guarantors, to fully, unconditionally and irrevocably Guarantee to each Holder of the Notes and the Trustee the Obligations pursuant to Article 10 of the Indenture on an unsecured basis.

ARTICLE 3
Miscellaneous

Section 3.01 *Notices*. All notices and other communications to the Additional Guarantors shall be given as provided in the Indenture to the Additional Guarantors, at their respective addresses set forth below, with a copy to the Company as provided in the Indenture for notices to the Company.

I/N Tek L.P.
c/o Cleveland-Cliffs Inc.
  200 Public Square, Suite 3300
  Cleveland, Ohio 44114
  Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

I/N Kote L.P.
c/o Cleveland-Cliffs Inc.
  200 Public Square, Suite 3300
  Cleveland, Ohio 44114
  Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

Tek Kote Acquisition Corporation
c/o Cleveland-Cliffs Inc.
  200 Public Square, Suite 3300
  Cleveland, Ohio 44114
  Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

Section 3.02 *Parties*. Nothing expressed or mentioned herein is intended or shall be construed to give any Person, firm or corporation, other than the Holders and the Trustee, any legal or equitable right, remedy or claim under or in respect of this Supplemental Indenture or the Indenture or any provision herein or therein contained.

Section 3.03 *Governing Law*. This Supplemental Indenture shall be governed by, and construed in accordance with, the laws of the State of New York.

Section 3.04 *Severability Clause*. In case any provision in this Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

Section 3.05 *Ratification of Indenture; Supplemental Indenture Part of Indenture*. Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby. The Trustee shall not be responsible for and makes no representation or warranty as to the validity, execution, or sufficiency of this Supplemental Indenture or with respect to the recitals contained herein, all of which recitals are made solely by the other parties hereto.

Section 3.06 *Counterparts*. The parties hereto may sign one or more copies of this Supplemental Indenture in counterparts, all of which together shall constitute one and the same agreement.

Section 3.07 *Headings*. The headings of the Articles and the sections in this Guarantee are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof.

Section 3.08 *Execution, Delivery and Validity*. The Company and the Additional Guarantors each represent and warrant to the Trustee that this Supplemental Indenture has been duly and validly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, receivership, administration, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

I/N TEK L.P., as a Guarantor

By:    /s/ James D. Graham
     Name: James D. Graham
     Title: General Counsel & Secretary

I/N KOTE L.P., as a Guarantor

By:    /s/ James D. Graham
     Name: James D. Graham
     Title: General Counsel & Secretary

TEK KOTE ACQUISITION CORPORATION, as a Guarantor

By:    /s/ James D. Graham
     Name: James D. Graham
     Title: General Counsel & Secretary

CLEVELAND-CLIFFS INC.

By:    /s/ Keith A. Koci
     Name: Keith A. Koci
     Title: Executive Vice President, Chief Financial Officer

U.S. BANK NATIONAL ASSOCIATION, as Trustee

By:    /s/ Elizabeth A. Thuning
     Name: Elizabeth A. Thuning
     Title: Vice President

Eighth Supplemental Indenture – 5.75% Senior Notes due 2025

**EXHIBIT 4.19**

### FOURTH SUPPLEMENTAL INDENTURE

This Supplemental Indenture, dated as of December 9, 2020 (this " **Supplemental Indenture**" or "**Guarantee**"), among Cleveland-Cliffs Steel Holdings Inc., ArcelorMittal Burns Harbor LLC, ArcelorMittal Cleveland LLC, ArcelorMittal Cleveland Works Railway Inc., ArcelorMittal Columbus LLC, ArcelorMittal Kote Inc., ArcelorMittal Minorca Mine Inc., ArcelorMittal Monessen LLC, ArcelorMittal Plate LLC, ArcelorMittal Riverdale LLC, ArcelorMittal South Chicago & Indiana Harbor Railway Inc., ArcelorMittal Steelton LLC, ArcelorMittal Tek Inc., ArcelorMittal USA LLC, ArcelorMittal Weirton LLC, Mid-Vol Coal Sales, Inc., Mittal Steel USA — Railways Inc. (the "**Additional Guarantors**"), Cleveland-Cliffs Inc. (together with its successors and assigns, the " **Company**") and U.S. Bank National Association, as Trustee and First Lien Notes Collateral Agent under the Indenture referred to below.

WITNESSETH:

WHEREAS, the Company, the Guarantors, the First Lien Notes Collateral Agent and the Trustee have heretofore executed and delivered an Indenture, dated as of December 19, 2017 (as amended, supplemented, waived or otherwise modified, the "**Indenture**"), providing for the issuance of an aggregate principal amount of $400,000,000 of 4.875% Senior Secured Notes due 2024 of the Company (the "**Notes**");

WHEREAS, Section 3.08 of the Indenture provides that, after the Issue Date, the Company is required to cause certain direct or indirect Subsidiaries of the Company to execute and deliver to the Trustee a supplemental indenture pursuant to which such Subsidiary will unconditionally guarantee, on a joint and several basis with the other Guarantors, the full and prompt payment of the principal of, premium, if any, and interest on the Notes on a secured basis; and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee and the Company are authorized to execute and deliver this Supplemental Indenture to amend or supplement the Indenture, without the consent of any Holder;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Additional Guarantors, the Company and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

ARTICLE 1
Definitions

Section 1.01 *Defined Terms.*

As used in this Supplemental Indenture, terms defined in the Indenture or in the preamble or recital hereto are used herein as therein defined. The words "herein," "hereof" and "hereby" and other words of similar import used in this Supplemental Indenture refer to this Supplemental Indenture as a whole and not to any particular section hereof.

ARTICLE 2
Agreement to be Bound; Guarantee

Second 2.01 *Agreement to be Bound*. The Additional Guarantors hereby become parties to the Indenture as Guarantors and as such will have all of the rights and be subject to all of the obligations and agreements of a Guarantor under the Indenture. The Additional Guarantors hereby become parties to the Security Agreement, pursuant to the terms of such agreement, as Grantors thereunder with the same force and effect as if originally named therein as Grantors and as such hereby assume all obligations and

liabilities of a Grantor thereunder. The Additional Guarantors agree to be bound by all of the provisions of the Indenture and the Collateral Documents applicable to an Additional Guarantor and to perform all of the obligations and agreements of a Guarantor under the Indenture and the Collateral Documents.

Section 2.02 *Guarantee*. The Additional Guarantors agree, on a joint and several basis with all the existing Guarantors, to fully, unconditionally and irrevocably Guarantee to each Holder of the Notes and the Trustee the Obligations pursuant to Article 10 of the Indenture on a secured basis.

ARTICLE 3
Miscellaneous

Section 3.01 *Notices*. All notices and other communications to the Additional Guarantors shall be given as provided in the Indenture to the Additional Guarantors, at their respective addresses set forth below, with a copy to the Company as provided in the Indenture for notices to the Company.

Cleveland-Cliffs Steel Holdings Inc.
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
Chief Legal Officer & Secretary

ArcelorMittal Burns Harbor LLC
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
Chief Legal Officer & Secretary

ArcelorMittal Cleveland LLC
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
Chief Legal Officer & Secretary

ArcelorMittal Cleveland Works Railway Inc.
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
Chief Legal Officer & Secretary

ArcelorMittal Columbus LLC
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
Chief Legal Officer & Secretary

A006245

ArcelorMittal Kote Inc.
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal Minorca Mine Inc.
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal Monessen LLC
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal Plate LLC
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal Riverdale LLC
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal South Chicago & Indiana Harbor Railway Inc.
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal Steelton LLC
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

- 3 -

ArcelorMittal Tek Inc.
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
 Chief Legal Officer & Secretary

ArcelorMittal USA LLC
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
 Chief Legal Officer & Secretary

ArcelorMittal Weirton LLC
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
 Chief Legal Officer & Secretary

Mid-Vol Coal Sales, Inc.
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
 Chief Legal Officer & Secretary

Mittal Steel USA — Railways Inc.
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
 Chief Legal Officer & Secretary

Section 3.02 *Parties.* Nothing expressed or mentioned herein is intended or shall be construed to give any Person, firm or corporation, other than the Holders and the Trustee, any legal or equitable right, remedy or claim under or in respect of this Supplemental Indenture or the Indenture or any provision herein or therein contained.

Section 3.03 *Governing Law.* This Supplemental Indenture shall be governed by, and construed in accordance with, the laws of the State of New York.

Section 3.04 *Severability Clause.* In case any provision in this Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

Section 3.05 *Ratification of Indenture; Supplemental Indentures Part of Indenture*. Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be

- 4 -

bound hereby. The Trustee shall not be responsible for and makes no representation or warranty as to the validity, execution, or sufficiency of this Supplemental Indenture or with respect to the recitals contained herein, all of which recitals are made solely by the other parties hereto.

Section 3.06 *Counterparts.* The parties hereto may sign one or more copies of this Supplemental Indenture in counterparts, all of which together shall constitute one and the same agreement.

Section 3.07 *Headings.* The headings of the Articles and the sections in this Guarantee are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof.

Section 3.08 *Execution, Delivery and Validity* . The Company and the Additional Guarantors each represent and warrant to the Trustee that this Supplemental Indenture has been duly and validly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, receivership, administration, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

- 5 -

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

CLEVELAND-CLIFFS STEEL HOLDINGS INC., as a Guarantor

By:　　　　　/s/ James D. Graham
_____
　　　Name: James D. Graham
　　　Title: Secretary

ARCELORMITTAL BURNS HARBOR LLC, as a Guarantor

By:　　　　　/s/ James D. Graham
_____
　　　Name: James D. Graham
　　　Title: General Counsel & Secretary

ARCELORMITTAL CLEVELAND LLC, as a Guarantor

By:　　　　　/s/ James D. Graham
_____
　　　Name: James D. Graham
　　　Title: General Counsel & Secretary

ARCELORMITTAL CLEVELAND WORKS RAILWAY INC., as a Guarantor

By:　　　　　/s/ James D. Graham
_____
　　　Name: James D. Graham
　　　Title: General Counsel & Secretary

Fourth Supplemental Indenture – 4.875% Senior Secured Notes due 2024

ARCELORMITTAL COLUMBUS LLC., as a Guarantor

By: _____/s/ James D. Graham_____
    Name: James D. Graham
    Title: General Counsel & Secretary

ARCELORMITTAL KOTE INC., as a Guarantor

By: _____/s/ James D. Graham_____
    Name: James D. Graham
    Title: General Counsel & Secretary

ARCELORMITTAL MINORCA MINE INC., as a Guarantor

By: _____/s/ James D. Graham_____
    Name: James D. Graham
    Title: General Counsel & Secretary

ARCELORMITTAL MONESSEN LLC., as a Guarantor

By: _____/s/ James D. Graham_____
    Name: James D. Graham
    Title: General Counsel & Secretary

ARCELORMITTAL PLATE LLC., as a Guarantor

By: _____/s/ James D. Graham_____
    Name: James D. Graham
    Title: General Counsel & Secretary

ARCELORMITTAL RIVERDALE LLC, as a Guarantor

By: _____/s/ James D. Graham_____
    Name: James D. Graham
    Title: General Counsel & Secretary

Fourth Supplemental Indenture – 4.875% Senior Secured Notes due 2024

ARCELORMITTAL SOUTH CHICAGO & INDIANA HARBOR RAILWAY INC, as a Guarantor

By: _____/s/ James D. Graham_____
    Name: James D. Graham
    Title: General Counsel & Secretary

ARCELORMITTAL STEELTON LLC, as a Guarantor

By: _____/s/ James D. Graham_____
    Name: James D. Graham
    Title: General Counsel & Secretary


ARCELORMITTAL TEK INC, as a Guarantor

By: _____/s/ James D. Graham_____
    Name: James D. Graham
    Title: General Counsel & Secretary

ARCELORMITTAL USA LLC, as a Guarantor

By: _____/s/ James D. Graham_____
    Name: James D. Graham
    Title: Executive Vice President, Chief Legal Officer & Secretary


ARCELORMITTAL WEIRTON LLC, as a Guarantor

By: _____/s/ James D. Graham_____
    Name: James D. Graham
    Title: General Counsel & Secretary


MID-VOL COAL SALES, INC., as a Guarantor

By: _____/s/ James D. Graham_____
    Name: James D. Graham
    Title: Secretary


Fourth Supplemental Indenture – 4.875% Senior Secured Notes due 2024

MITTAL STEEL USA —— RAILWAYS INC., as a Guarantor

By: _____ /s/ James D. Graham _____
      Name: James D. Graham
      Title: General Counsel & Secretary

CLEVELAND-CLIFFS INC.

By: _____ /s/ Keith A. Koci _____
      Name: Keith A. Koci
      Title: Executive Vice President, Chief Financial Officer

U.S. BANK NATIONAL ASSOCIATION,
as Trustee and First Lien Notes Collateral Agent

By: _____ /s/ Elizabeth A. Thuning _____
      Name: Elizabeth A. Thuning
      Title: Vice President

    Fourth Supplemental Indenture – 4.875% Senior Secured Notes due 2024

EXHIBIT 4.20

**FIFTH SUPPLEMENTAL INDENTURE**

This Supplemental Indenture, dated as of December 18, 2020 (this " **Supplemental Indenture**" or "**Guarantee**"), among I/N Tek L.P., I/N Kote L.P., Tek Kote Acquisition Corporation (the "**Additional Guarantors**"), Cleveland-Cliffs Inc. (together with its successors and assigns, the " **Company**") and U.S. Bank National Association, as Trustee and First Lien Notes Collateral Agent under the Indenture referred to below.

WITNESSETH:

WHEREAS, the Company, the Guarantors, the First Lien Notes Collateral Agent and the Trustee have heretofore executed and delivered an Indenture, dated as of December 19, 2017 (as amended, supplemented, waived or otherwise modified, the "**Indenture**"), providing for the issuance of an aggregate principal amount of $400,000,000 of 4.875% Senior Secured Notes due 2024 of the Company (the "**Notes**");

WHEREAS, Section 3.08 of the Indenture provides that, after the Issue Date, the Company is required to cause certain direct or indirect Subsidiaries of the Company to execute and deliver to the Trustee a supplemental indenture pursuant to which such Subsidiary will unconditionally guarantee, on a joint and several basis with the other Guarantors, the full and prompt payment of the principal of, premium, if any, and interest on the Notes on a secured basis; and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee and the Company are authorized to execute and deliver this Supplemental Indenture to amend or supplement the Indenture, without the consent of any Holder;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Additional Guarantors, the Company and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

ARTICLE 1
Definitions

Section 1.01 *Defined Terms*.

As used in this Supplemental Indenture, terms defined in the Indenture or in the preamble or recital hereto are used herein as therein defined. The words "herein," "hereof" and "hereby" and other words of similar import used in this Supplemental Indenture refer to this Supplemental Indenture as a whole and not to any particular section hereof.

ARTICLE 2
Agreement to be Bound; Guarantee

Section 2.01 *Agreement to be Bound*. The Additional Guarantors hereby become parties to the Indenture as Guarantors and as such will have all of the rights and be subject to all of the obligations and agreements of a Guarantor under the Indenture. The Additional Guarantors hereby become parties to the Security Agreement, pursuant to the terms of such agreement, as Grantors thereunder with the same force and effect as if originally named therein as Grantors and as such hereby assume all obligations and liabilities of a Grantor thereunder. The Additional Guarantors agree to be bound by all of the provisions of the Indenture and the Collateral Documents applicable to an Additional Guarantor and to perform all of the obligations and agreements of a Guarantor under the Indenture and the Collateral Documents.

Section 2.02 *Guarantee.* The Additional Guarantors agree, on a joint and several basis with all the existing Guarantors, to fully, unconditionally and irrevocably Guarantee to each Holder of the Notes and the Trustee the Obligations pursuant to Article 10 of the Indenture on a secured basis.

ARTICLE 3
Miscellaneous

Section 3.01 *Notices.* All notices and other communications to the Additional Guarantors shall be given as provided in the Indenture to the Additional Guarantors, at their respective addresses set forth below, with a copy to the Company as provided in the Indenture for notices to the Company.

> I/N Tek L.P.
> c/o Cleveland-Cliffs Inc.
> 200 Public Square, Suite 3300
> Cleveland, Ohio 44114
> Attention: James Graham, Executive Vice President,
>   Chief Legal Officer & Secretary

> I/N Kote L.P.
> c/o Cleveland-Cliffs Inc.
> 200 Public Square, Suite 3300
> Cleveland, Ohio 44114
> Attention: James Graham, Executive Vice President,
>   Chief Legal Officer & Secretary

> Tek Kote Acquisition Corporation
> c/o Cleveland-Cliffs Inc.
> 200 Public Square, Suite 3300
> Cleveland, Ohio 44114
> Attention: James Graham, Executive Vice President,
> Chief Legal Officer & Secretary

Section 3.02 *Parties.* Nothing expressed or mentioned herein is intended or shall be construed to give any Person, firm or corporation, other than the Holders and the Trustee, any legal or equitable right, remedy or claim under or in respect of this Supplemental Indenture or the Indenture or any provision herein or therein contained.

Section 3.03 *Governing Law.* This Supplemental Indenture shall be governed by, and construed in accordance with, the laws of the State of New York.

Section 3.04 *Severability Clause.* In case any provision in this Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

Section 3.05 *Ratification of Indenture; Supplemental Indentures Part of Indenture*. Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby. The Trustee shall not be responsible for and makes no representation or warranty as to the validity, execution, or sufficiency of this Supplemental Indenture or with respect to the recitals contained herein, all of which recitals are made solely by the other parties hereto.

- 2 -

Section 3.06 *Counterparts*. The parties hereto may sign one or more copies of this Supplemental Indenture in counterparts, all of which together shall constitute one and the same agreement.

Section 3.07 *Headings*. The headings of the Articles and the sections in this Guarantee are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof.

Section 3.08 *Execution, Delivery and Validity*. The Company and the Additional Guarantors each represent and warrant to the Trustee that this Supplemental Indenture has been duly and validly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, receivership, administration, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

- 3 -

A006255

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

I/N TEK L.P., as a Guarantor

By:    /s/ James D. Graham
       Name: James D. Graham
       Title: General Counsel & Secretary

I/N KOTE L.P., as a Guarantor

By:    /s/ James D. Graham
       Name: James D. Graham
       Title: General Counsel & Secretary

TEK KOTE ACQUISITION CORPORATION, as a Guarantor

By:    /s/ James D. Graham
       Name: James D. Graham
       Title: General Counsel & Secretary

CLEVELAND-CLIFFS INC.

By:    /s/ Keith A. Koci
       Name: Keith A. Koci
       Title: Executive Vice President, Chief Financial Officer

U.S. BANK NATIONAL ASSOCIATION,
as Trustee and First Lien Notes Collateral Agent

By:    /s/ Elizabeth A. Thuning
       Name: Elizabeth A. Thuning
       Title: Vice President

Fifth Supplemental Indenture – 4.875% Senior Secured Notes due 2024

EXHIBIT 4.24

**THIRD SUPPLEMENTAL INDENTURE**
**5.875% SENIOR GUARANTEED NOTES DUE 2027**

This Supplemental Indenture, dated as of December 9, 2020 (this " **Supplemental Indenture**" or "**Guarantee**"), among Cleveland-Cliffs Steel Holdings Inc., ArcelorMittal Burns Harbor LLC, ArcelorMittal Cleveland LLC, ArcelorMittal Cleveland Works Railway Inc., ArcelorMittal Columbus LLC, ArcelorMittal Kote Inc., ArcelorMittal Minorca Mine Inc., ArcelorMittal Monessen LLC, ArcelorMittal Plate LLC, ArcelorMittal Riverdale LLC, ArcelorMittal South Chicago & Indiana Harbor Railway Inc., ArcelorMittal Steelton LLC, ArcelorMittal Tek Inc., ArcelorMittal USA LLC, ArcelorMittal Weirton LLC, Mid-Vol Coal Sales, Inc., Mittal Steel USA — Railways Inc. (the "**Additional Guarantors**"), Cleveland-Cliffs Inc. (together with its successors and assigns, the " **Company**") and U.S. Bank National Association, as Trustee (the "**Trustee**") under the Indenture referred to below.

WITNESSETH:

WHEREAS, the Company, the Guarantors party thereto and the Trustee have heretofore executed and delivered an Indenture, dated as of May 13, 2019 (as amended, supplemented, waived or otherwise modified, the "**Indenture**"), providing for the issuance of an aggregate principal amount of $750,000,000 of 5.875% Senior Guaranteed Notes due 2027 of the Company (the "**Notes**");

WHEREAS, Section 3.08 of the Indenture provides that, after the Issue Date, the Company is required to cause certain direct or indirect Subsidiaries of the Company to execute and deliver to the Trustee a supplemental indenture pursuant to which such Subsidiary will unconditionally guarantee, on a joint and several basis with the other Guarantors, the full and prompt payment of the principal of, premium, if any, and interest on the Notes on an unsecured basis; and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee and the Company are authorized to execute and deliver this Supplemental Indenture to amend or supplement the Indenture, without the consent of any Holder;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Additional Guarantors, the Company and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

ARTICLE 1
Definitions

Section 1.01 Defined Terms.

As used in this Supplemental Indenture, terms defined in the Indenture or in the preamble or recital hereto are used herein as therein defined. The words "herein," "hereof" and "hereby" and other words of similar import used in this Supplemental Indenture refer to this Supplemental Indenture as a whole and not to any particular section hereof.

ARTICLE 2
Agreement to be Bound; Guarantee

Section 2.01 *Agreement to be Bound*. The Additional Guarantors hereby become parties to the Indenture as Guarantors and as such will have all of the rights and be subject to all of the obligations and agreements of a Guarantor under the Indenture. The Additional Guarantors agree to be bound by all of

the provisions of the Indenture applicable to an Additional Guarantor and to perform all of the obligations and agreements of a Guarantor under the Indenture.

Section 2.02 *Guarantee.* The Additional Guarantors agree, on a joint and several basis with all the existing Guarantors, to fully, unconditionally and irrevocably Guarantee to each Holder of the Notes and the Trustee the Obligations pursuant to Article 10 of the Indenture on an unsecured basis.

ARTICLE 3
Miscellaneous

Section 3.01 *Notices.* All notices and other communications to the Additional Guarantors shall be given as provided in the Indenture to the Additional Guarantors, at their respective addresses set forth below, with a copy to the Company as provided in the Indenture for notices to the Company.

Cleveland-Cliffs Steel Holdings Inc.
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Burns Harbor LLC
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Cleveland LLC
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Cleveland Works Railway Inc.
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Columbus LLC
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Kote Inc.
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,

Chief Legal Officer & Secretary

ArcelorMittal Minorca Mine Inc.
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Monessen LLC
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Plate LLC
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Riverdale LLC
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal South Chicago & Indiana Harbor Railway Inc.
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Steelton LLC
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Tek Inc.
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal USA LLC
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Weirton LLC
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

Mid-Vol Coal Sales, Inc.
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

Mittal Steel USA — Railways Inc.
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

Section 3.02 *Parties.* Nothing expressed or mentioned herein is intended or shall be construed to give any Person, firm or corporation, other than the Holders and the Trustee, any legal or equitable right, remedy or claim under or in respect of this Supplemental Indenture or the Indenture or any provision herein or therein contained.

Section 3.03 *Governing Law.* This Supplemental Indenture shall be governed by, and construed in accordance with, the laws of the State of New York.

Section 3.04 *Severability Clause.* In case any provision in this Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

Section 3.05 *Ratification of Indenture; Supplemental Indenture Part of Indenture.* Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby. The Trustee shall not be responsible for and makes no representation or warranty as to the validity, execution, or sufficiency of this Supplemental Indenture or with respect to the recitals contained herein, all of which recitals are made solely by the other parties hereto.

Section 3.06 *Counterparts*. The parties hereto may sign one or more copies of this Supplemental Indenture in counterparts, all of which together shall constitute one and the same agreement.

Section 3.07 *Headings*. The headings of the Articles and the sections in this Guarantee are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof.

Section 3.08 *Execution, Delivery and Validity*. The Company and the Additional Guarantors each represent and warrant to the Trustee that this Supplemental Indenture has been duly and validly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, receivership, administration, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

CLEVELAND-CLIFFS STEEL HOLDINGS INC., as a Guarantor

By:  /s/ James D. Graham
Name: James D. Graham
Title: Secretary

ARCELORMITTAL BURNS HARBOR LLC, as a Guarantor

By:  /s/ James D. Graham
Name: James D. Graham
Title: General Counsel & Secretary

ARCELORMITTAL CLEVELAND LLC, as a Guarantor

By:  /s/ James D. Graham
Name: James D. Graham
Title: General Counsel & Secretary

ARCELORMITTAL CLEVELAND WORKS RAILWAY INC., as a Guarantor

By:  /s/ James D. Graham
Name: James D. Graham
Title: General Counsel & Secretary

ARCELORMITTAL COLUMBUS LLC., as a Guarantor

By:  /s/ James D. Graham
Name: James D. Graham
Title: General Counsel & Secretary

ARCELORMITTAL KOTE INC., as a Guarantor

By:  /s/ James D. Graham
Name: James D. Graham
Title: General Counsel & Secretary

Third Supplemental Indenture – 5.875% Senior Guaranteed Notes due 2027

A006262

ARCELORMITTAL MINORCA MINE INC., as a Guarantor

By:      /s/ James D. Graham
         Name: James D. Graham
         Title: General Counsel & Secretary


ARCELORMITTAL MONESSEN LLC., as a Guarantor

By:      /s/ James D. Graham
         Name: James D. Graham
         Title: General Counsel & Secretary


ARCELORMITTAL PLATE LLC., as a Guarantor

By:      /s/ James D. Graham
         Name: James D. Graham
         Title: General Counsel & Secretary


ARCELORMITTAL RIVERDALE LLC, as a Guarantor

By:      /s/ James D. Graham
         Name: James D. Graham
         Title: General Counsel & Secretary


ARCELORMITTAL SOUTH CHICAGO & INDIANA HARBOR
RAILWAY INC, as a Guarantor

By:      /s/ James D. Graham
         Name: James D. Graham
         Title: General Counsel & Secretary


ARCELORMITTAL STEELTON LLC, as a Guarantor

By:      /s/ James D. Graham
         Name: James D. Graham
         Title: General Counsel & Secretary


Third Supplemental Indenture – 5.875% Senior Guaranteed Notes due 2027

ARCELORMITTAL TEK INC, as a Guarantor

By:     /s/ James D. Graham
        Name: James D. Graham
        Title: General Counsel & Secretary

ARCELORMITTAL USA LLC, as a Guarantor

By:     /s/ James D. Graham
        Name: James D. Graham
        Title: Executive Vice President, Chief Legal Officer & Secretary

ARCELORMITTAL WEIRTON LLC, as a Guarantor

By:     /s/ James D. Graham
        Name: James D. Graham
        Title: General Counsel & Secretary

MID-VOL COAL SALES, INC., as a Guarantor

By:     /s/ James D. Graham
        Name: James D. Graham
        Title: Secretary

MITTAL STEEL USA —– RAILWAYS INC., as a Guarantor

By:     /s/ James D. Graham
        Name: James D. Graham
        Title: General Counsel & Secretary

CLEVELAND-CLIFFS INC.

By:     /s/ Keith A. Koci
        Name: Keith A. Koci
        Title: Executive Vice President, Chief Financial Officer

Third Supplemental Indenture – 5.875% Senior Guaranteed Notes due 2027

U.S. BANK NATIONAL ASSOCIATION, as Trustee

By:    /s/ Elizabeth A. Thuning
       Name: Elizabeth A. Thuning
       Title: Vice President

Third Supplemental Indenture – 5.875% Senior Guaranteed Notes due 2027

**EXHIBIT 4.25**

**FOURTH SUPPLEMENTAL INDENTURE**
**5.875% SENIOR GUARANTEED NOTES DUE 2027**

This Supplemental Indenture, dated as of December 18, 2020 (this " **Supplemental Indenture**" or "**Guarantee**"), among I/N Tek L.P., I/N Kote L.P., Tek Kote Acquisition Corporation (the "**Additional Guarantors**"), Cleveland-Cliffs Inc. (together with its successors and assigns, the " **Company**") and U.S. Bank National Association, as Trustee (the "**Trustee**") under the Indenture referred to below.

WITNESSETH:

WHEREAS, the Company, the Guarantors party thereto and the Trustee have heretofore executed and delivered an Indenture, dated as of May 13, 2019 (as amended, supplemented, waived or otherwise modified, the "**Indenture**"), providing for the issuance of an aggregate principal amount of $750,000,000 of 5.875% Senior Guaranteed Notes due 2027 of the Company (the "**Notes**");

WHEREAS, Section 3.08 of the Indenture provides that, after the Issue Date, the Company is required to cause certain direct or indirect Subsidiaries of the Company to execute and deliver to the Trustee a supplemental indenture pursuant to which such Subsidiary will unconditionally guarantee, on a joint and several basis with the other Guarantors, the full and prompt payment of the principal of, premium, if any, and interest on the Notes on an unsecured basis; and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee and the Company are authorized to execute and deliver this Supplemental Indenture to amend or supplement the Indenture, without the consent of any Holder;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Additional Guarantors, the Company and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

ARTICLE 1
Definitions

Section 1.01 Defined Terms.

As used in this Supplemental Indenture, terms defined in the Indenture or in the preamble or recital hereto are used herein as therein defined. The words "herein," "hereof" and "hereby" and other words of similar import used in this Supplemental Indenture refer to this Supplemental Indenture as a whole and not to any particular section hereof.

ARTICLE 2
Agreement to be Bound; Guarantee

Section 2.01 *Agreement to be Bound*. The Additional Guarantors hereby become parties to the Indenture as Guarantors and as such will have all of the rights and be subject to all of the obligations and agreements of a Guarantor under the Indenture. The Additional Guarantors agree to be bound by all of the provisions of the Indenture applicable to an Additional Guarantor and to perform all of the obligations and agreements of a Guarantor under the Indenture.

Section 2.02 *Guarantee*. The Additional Guarantors agree, on a joint and several basis with all the existing Guarantors, to fully, unconditionally and irrevocably Guarantee to each Holder of the Notes and the Trustee the Obligations pursuant to Article 10 of the Indenture on an unsecured basis.

ARTICLE 3

Miscellaneous

Section 3.01 *Notices.* All notices and other communications to the Additional Guarantors shall be given as provided in the Indenture to the Additional Guarantors, at their respective addresses set forth below, with a copy to the Company as provided in the Indenture for notices to the Company.

I/N Tek L.P.
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
   Chief Legal Officer & Secretary

I/N Kote L.P.
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
   Chief Legal Officer & Secretary

Tek Kote Acquisition Corporation
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
Chief Legal Officer & Secretary

Section 3.02 *Parties.* Nothing expressed or mentioned herein is intended or shall be construed to give any Person, firm or corporation, other than the Holders and the Trustee, any legal or equitable right, remedy or claim under or in respect of this Supplemental Indenture or the Indenture or any provision herein or therein contained.

Section 3.03 *Governing Law.* This Supplemental Indenture shall be governed by, and construed in accordance with, the laws of the State of New York.

Section 3.04 *Severability Clause.* In case any provision in this Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

Section 3.05 *Ratification of Indenture; Supplemental Indenture Part of Indenture.* Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby. The Trustee shall not be responsible for and makes no representation or warranty as to the validity, execution, or sufficiency of this Supplemental Indenture or with respect to the recitals contained herein, all of which recitals are made solely by the other parties hereto.

Section 3.06 *Counterparts*. The parties hereto may sign one or more copies of this Supplemental Indenture in counterparts, all of which together shall constitute one and the same agreement.

Section 3.07 *Headings*. The headings of the Articles and the sections in this Guarantee are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof.

Section 3.08 *Execution, Delivery and Validity*. The Company and the Additional Guarantors each represent and warrant to the Trustee that this Supplemental Indenture has been duly and validly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, receivership, administration, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

I/N TEK L.P., as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: General Counsel & Secretary

I/N KOTE L.P., as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: General Counsel & Secretary

TEK KOTE ACQUISITION CORPORATION, as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: General Counsel & Secretary

CLEVELAND-CLIFFS INC.

By:    /s/ Keith A. Koci
      Name: Keith A. Koci
      Title: Executive Vice President, Chief Financial Officer

U.S. BANK NATIONAL ASSOCIATION, as Trustee

By:    /s/ Elizabeth A. Thuning
      Name: Elizabeth A. Thuning
      Title: Vice President

Fourth Supplemental Indenture – 5.875% Senior Guaranteed Notes due 2027

EXHIBIT 4.29

**THIRD SUPPLEMENTAL INDENTURE**
**6.75% SENIOR SECURED NOTES DUE 2026**

This Supplemental Indenture, dated as of December 9, 2020 (this " **Supplemental Indenture**" or "**Guarantee**"), among Cleveland-Cliffs Steel Holdings Inc., ArcelorMittal Burns Harbor LLC, ArcelorMittal Cleveland LLC, ArcelorMittal Cleveland Works Railway Inc., ArcelorMittal Columbus LLC, ArcelorMittal Kote Inc., ArcelorMittal Minorca Mine Inc., ArcelorMittal Monessen LLC, ArcelorMittal Plate LLC, ArcelorMittal Riverdale LLC, ArcelorMittal South Chicago & Indiana Harbor Railway Inc., ArcelorMittal Steelton LLC, ArcelorMittal Tek Inc., ArcelorMittal USA LLC, ArcelorMittal Weirton LLC, Mid-Vol Coal Sales, Inc., Mittal Steel USA — Railways Inc. (the "**Additional Guarantors**"), Cleveland-Cliffs Inc. (together with its successors and assigns, the " **Company**") and U.S. Bank National Association, as Trustee and First Lien Notes Collateral Agent under the Indenture referred to below.

WITNESSETH:

WHEREAS, the Company, the Guarantors, the First Lien Notes Collateral Agent and the Trustee have heretofore executed and delivered an Indenture, dated as of March 13, 2020 (as amended, supplemented, waived or otherwise modified, the "**Indenture**"), providing for the issuance of an aggregate principal amount of $845,000,000 of 6.75% Senior Secured Notes due 2026 of the Company (the "**Notes**");

WHEREAS, Section 3.08 of the Indenture provides that, after the Issue Date, the Company is required to cause certain direct or indirect Subsidiaries of the Company to execute and deliver to the Trustee a supplemental indenture pursuant to which such Subsidiary will unconditionally guarantee, on a joint and several basis with the other Guarantors, the full and prompt payment of the principal of, premium, if any, and interest on the Notes on a secured basis; and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee and the Company are authorized to execute and deliver this Supplemental Indenture to amend or supplement the Indenture, without the consent of any Holder;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Additional Guarantors, the Company and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

ARTICLE 1
Definitions

Section 1.01 *Defined Terms*.

As used in this Supplemental Indenture, terms defined in the Indenture or in the preamble or recital hereto are used herein as therein defined. The words "herein," "hereof" and "hereby" and other words of similar import used in this Supplemental Indenture refer to this Supplemental Indenture as a whole and not to any particular section hereof.

ARTICLE 2
Agreement to be Bound; Guarantee

Section 2.01 *Agreement to be Bound*. The Additional Guarantors hereby become parties to the Indenture as Guarantors and as such will have all of the rights and be subject to all of the obligations and agreements of a Guarantor under the Indenture. The Additional Guarantors hereby become parties to the

Security Agreement, pursuant to the terms of such agreement, as Grantors thereunder with the same force and effect as if originally named therein as Grantors and as such hereby assume all obligations and liabilities of a Grantor thereunder. The Additional Guarantors agree to be bound by all of the provisions of the Indenture and the Collateral Documents applicable to an Additional Guarantor and to perform all of the obligations and agreements of a Guarantor under the Indenture and the Collateral Documents.

Section 2.02 *Guarantee*. The Additional Guarantors agree, on a joint and several basis with all the existing Guarantors, to fully, unconditionally and irrevocably Guarantee to each Holder of the Notes and the Trustee the Obligations pursuant to Article 10 of the Indenture on a secured basis.

<div align="center">

ARTICLE 3

Miscellaneous

</div>

Section 3.01 *Notices*. All notices and other communications to the Additional Guarantors shall be given as provided in the Indenture to the Additional Guarantors, at their respective addresses set forth below, with a copy to the Company as provided in the Indenture for notices to the Company.

Cleveland-Cliffs Steel Holdings Inc.
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Burns Harbor LLC
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Cleveland LLC
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Cleveland Works Railway Inc.
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Columbus LLC
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Kote Inc.
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Minorca Mine Inc.
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Monessen LLC
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Plate LLC
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Riverdale LLC
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal South Chicago & Indiana Harbor Railway Inc.
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Steelton LLC
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Tek Inc.
 c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
 Chief Legal Officer & Secretary

ArcelorMittal USA LLC
 c/o   Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
 Chief Legal Officer & Secretary

ArcelorMittal Weirton LLC
 c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
 Chief Legal Officer & Secretary

Mid-Vol Coal Sales, Inc.
 c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
 Chief Legal Officer & Secretary

Mittal Steel USA — Railways Inc.
 c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
 Chief Legal Officer & Secretary

Section 3.02 *Parties.* Nothing expressed or mentioned herein is intended or shall be construed to give any Person, firm or corporation, other than the Holders and the Trustee, any legal or equitable right, remedy or claim under or in respect of this Supplemental Indenture or the Indenture or any provision herein or therein contained.

Section 3.03 *Governing Law.* This Supplemental Indenture shall be governed by, and construed in accordance with, the laws of the State of New York.

Section 3.04 *Severability Clause.* In case any provision in this Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

Section 3.05 *Ratification of Indenture; Supplemental Indentures Part of Indenture.* Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall

form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby. The Trustee shall not be responsible for and makes no representation or warranty as to the validity, execution, or sufficiency of this Supplemental Indenture or with respect to the recitals contained herein, all of which recitals are made solely by the other parties hereto.

Section 3.06 *Counterparts*. The parties hereto may sign one or more copies of this Supplemental Indenture in counterparts, all of which together shall constitute one and the same agreement.

Section 3.07 *Headings*. The headings of the Articles and the sections in this Guarantee are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof.

Section 3.08 *Execution, Delivery and Validity*. The Company and Additional Guarantors each represent and warrant to the Trustee that this Supplemental Indenture has been duly and validly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, receivership, administration, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

CLEVELAND-CLIFFS STEEL HOLDINGS INC., as a Guarantor

By:    /s/ James D. Graham
       Name: James D. Graham
       Title: Secretary

ARCELORMITTAL BURNS HARBOR LLC, as a Guarantor

By:    /s/ James D. Graham
       Name: James D. Graham
       Title: General Counsel & Secretary

ARCELORMITTAL CLEVELAND LLC, as a Guarantor

By:    /s/ James D. Graham
       Name: James D. Graham
       Title: General Counsel & Secretary

ARCELORMITTAL CLEVELAND WORKS RAILWAY INC., as a Guarantor

By:    /s/ James D. Graham
       Name: James D. Graham
       Title: General Counsel & Secretary

ARCELORMITTAL COLUMBUS LLC., as a Guarantor

By:    /s/ James D. Graham
       Name: James D. Graham
       Title: General Counsel & Secretary

ARCELORMITTAL KOTE INC., as a Guarantor

By:    /s/ James D. Graham
       Name: James D. Graham
       Title: General Counsel & Secretary

Third Supplemental Indenture – 6.75% Senior Secured Notes due 2026

ARCELORMITTAL MINORCA MINE INC., as a Guarantor

By:    /s/ James D. Graham
       Name: James D. Graham
       Title: General Counsel & Secretary


ARCELORMITTAL MONESSEN LLC., as a Guarantor

By:    /s/ James D. Graham
       Name: James D. Graham
       Title: General Counsel & Secretary


ARCELORMITTAL PLATE LLC., as a Guarantor

By:    /s/ James D. Graham
       Name: James D. Graham
       Title: General Counsel & Secretary

ARCELORMITTAL RIVERDALE LLC, as a Guarantor

By:    /s/ James D. Graham
       Name: James D. Graham
       Title: General Counsel & Secretary


ARCELORMITTAL SOUTH CHICAGO & INDIANA HARBOR
RAILWAY INC, as a Guarantor

By:    /s/ James D. Graham
       Name: James D. Graham
       Title: General Counsel & Secretary


ARCELORMITTAL STEELTON LLC, as a Guarantor

By:    /s/ James D. Graham
       Name: James D. Graham
       Title: General Counsel & Secretary


Third Supplemental Indenture – 6.75% Senior Secured Notes due 2026

ARCELORMITTAL TEK INC, as a Guarantor

By:     /s/ James D. Graham
        Name: James D. Graham
        Title: General Counsel & Secretary

ARCELORMITTAL USA LLC, as a Guarantor

By:     /s/ James D. Graham
        Name: James D. Graham
        Title: Executive Vice President, Chief Legal Officer & Secretary

ARCELORMITTAL WEIRTON LLC, as a Guarantor

By:     /s/ James D. Graham
        Name: James D. Graham
        Title: General Counsel & Secretary

MID-VOL COAL SALES, INC., as a Guarantor

By:     /s/ James D. Graham
        Name: James D. Graham
        Title: Secretary

MITTAL STEEL USA -–– RAILWAYS INC., as a Guarantor

By:     /s/ James D. Graham
        Name: James D. Graham
        Title: General Counsel & Secretary

CLEVELAND-CLIFFS INC.

By:     /s/ Keith A. Koci
        Name: Keith A. Koci
        Title: Executive Vice President, Chief Financial Officer

Third Supplemental Indenture – 6.75% Senior Secured Notes due 2026

U.S. BANK NATIONAL ASSOCIATION,
as Trustee and First Lien Notes Collateral Agent

By:    /s/ Elizabeth A. Thuning
       Name: Elizabeth A. Thuning
       Title: Vice President

Third Supplemental Indenture – 6.75% Senior Secured Notes due 2026

EXHIBIT 4.30

**FOURTH SUPPLEMENTAL INDENTURE**
**6.75% SENIOR SECURED NOTES DUE 2026**

This Supplemental Indenture, dated as of December 18, 2020 (this " **Supplemental Indenture**" or "**Guarantee**"), among I/N Tek L.P., I/N Kote L.P., Tek Kote Acquisition Corporation (the "**Additional Guarantors**"), Cleveland-Cliffs Inc. (together with its successors and assigns, the " **Company**") and U.S. Bank National Association, as Trustee and First Lien Notes Collateral Agent under the Indenture referred to below.

WITNESSETH:

WHEREAS, the Company, the Guarantors, the First Lien Notes Collateral Agent and the Trustee have heretofore executed and delivered an Indenture, dated as of March 13, 2020 (as amended, supplemented, waived or otherwise modified, the "**Indenture**"), providing for the issuance of an aggregate principal amount of $845,000,000 of 6.75% Senior Secured Notes due 2026 of the Company (the "**Notes**");

WHEREAS, Section 3.08 of the Indenture provides that, after the Issue Date, the Company is required to cause certain direct or indirect Subsidiaries of the Company to execute and deliver to the Trustee a supplemental indenture pursuant to which such Subsidiary will unconditionally guarantee, on a joint and several basis with the other Guarantors, the full and prompt payment of the principal of, premium, if any, and interest on the Notes on a secured basis; and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee and the Company are authorized to execute and deliver this Supplemental Indenture to amend or supplement the Indenture, without the consent of any Holder;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Additional Guarantors, the Company and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

ARTICLE 1
Definitions

Section 1.01 *Defined Terms*.

As used in this Supplemental Indenture, terms defined in the Indenture or in the preamble or recital hereto are used herein as therein defined. The words "herein," "hereof" and "hereby" and other words of similar import used in this Supplemental Indenture refer to this Supplemental Indenture as a whole and not to any particular section hereof.

ARTICLE 2
Agreement to be Bound; Guarantee

Section 2.01 *Agreement to be Bound*. The Additional Guarantors hereby become parties to the Indenture as Guarantors and as such will have all of the rights and be subject to all of the obligations and agreements of a Guarantor under the Indenture. The Additional Guarantors hereby become parties to the Security Agreement, pursuant to the terms of such agreement, as Grantors thereunder with the same force and effect as if originally named therein as Grantors and as such hereby assume all obligations and liabilities of a Grantor thereunder. The Additional Guarantors agree to be bound by all of the provisions of

the Indenture and the Collateral Documents applicable to an Additional Guarantor and to perform all of the obligations and agreements of a Guarantor under the Indenture and the Collateral Documents.

Section 2.02 *Guarantee.* The Additional Guarantors agree, on a joint and several basis with all the existing Guarantors, to fully, unconditionally and irrevocably Guarantee to each Holder of the Notes and the Trustee the Obligations pursuant to Article 10 of the Indenture on a secured basis.

ARTICLE 3
Miscellaneous

Section 3.01 *Notices.* All notices and other communications to the Additional Guarantors shall be given as provided in the Indenture to the Additional Guarantors, at their respective addresses set forth below, with a copy to the Company as provided in the Indenture for notices to the Company.

I/N Tek L.P.
 c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
 Chief Legal Officer & Secretary

I/N Kote L.P.
 c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
 Chief Legal Officer & Secretary

Tek Kote Acquisition Corporation
 c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
Chief Legal Officer & Secretary

Section 3.02 *Parties.* Nothing expressed or mentioned herein is intended or shall be construed to give any Person, firm or corporation, other than the Holders and the Trustee, any legal or equitable right, remedy or claim under or in respect of this Supplemental Indenture or the Indenture or any provision herein or therein contained.

Section 3.03 *Governing Law.* This Supplemental Indenture shall be governed by, and construed in accordance with, the laws of the State of New York.

Section 3.04 *Severability Clause.* In case any provision in this Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

Section 3.05 *Ratification of Indenture; Supplemental Indentures Part of Indenture.* Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby. The Trustee shall not be responsible for and makes no representation or warranty as to the validity, execution, or sufficiency of this Supplemental Indenture or

with respect to the recitals contained herein, all of which recitals are made solely by the other parties hereto.

Section 3.06 *Counterparts*. The parties hereto may sign one or more copies of this Supplemental Indenture in counterparts, all of which together shall constitute one and the same agreement.

Section 3.07 *Headings*. The headings of the Articles and the sections in this Guarantee are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof.

Section 3.08 *Execution, Delivery and Validity*. The Company and Additional Guarantors each represent and warrant to the Trustee that this Supplemental Indenture has been duly and validly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, receivership, administration, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

I/N TEK L.P., as a Guarantor

By: _____/s/ James D. Graham_____
    Name: James D. Graham
    Title: General Counsel & Secretary

I/N KOTE L.P., as a Guarantor

By: _____/s/ James D. Graham_____
    Name: James D. Graham
    Title: General Counsel & Secretary

TEK KOTE ACQUISITION CORPORATION, as a Guarantor

By: _____/s/ James D. Graham_____
    Name: James D. Graham
    Title: General Counsel & Secretary

CLEVELAND-CLIFFS INC.

By: _____/s/ Keith A. Koci_____
    Name: Keith A. Koci
    Title: Executive Vice President, Chief Financial Officer

U.S. BANK NATIONAL ASSOCIATION,
as Trustee and First Lien Notes Collateral Agent

By: _____/s/ Elizabeth A. Thuning_____
    Name: Elizabeth A. Thuning
    Title: Vice President

Fourth Supplemental Indenture – 6.75% Senior Secured Notes due 2026

EXHIBIT 4.33

**SECOND SUPPLEMENTAL INDENTURE**
**6.375% SENIOR GUARANTEED NOTES DUE 2025**

This Supplemental Indenture, dated as of December 9, 2020 (this " **Supplemental Indenture**" or "**Guarantee**"), among Cleveland-Cliffs Steel Holdings Inc., ArcelorMittal Burns Harbor LLC, ArcelorMittal Cleveland LLC, ArcelorMittal Cleveland Works Railway Inc., ArcelorMittal Columbus LLC, ArcelorMittal Kote Inc., ArcelorMittal Minorca Mine Inc., ArcelorMittal Monessen LLC, ArcelorMittal Plate LLC, ArcelorMittal Riverdale LLC, ArcelorMittal South Chicago & Indiana Harbor Railway Inc., ArcelorMittal Steelton LLC, ArcelorMittal Tek Inc., ArcelorMittal USA LLC, ArcelorMittal Weirton LLC, Mid-Vol Coal Sales, Inc., Mittal Steel USA — Railways Inc. (the "**Additional Guarantors**"), Cleveland-Cliffs Inc. (together with its successors and assigns, the " **Company**") and U.S. Bank National Association, as Trustee under the Indenture referred to below.

WITNESSETH:

WHEREAS, the Company, the Guarantors and the Trustee have heretofore executed and delivered an Indenture, dated as of March 16, 2020 (as amended, supplemented, waived or otherwise modified, the "**Indenture**"), providing for the issuance of an aggregate principal amount of $231,824,000 of 6.375% Senior Guaranteed Notes due 2025 of the Company (the "**Notes**");

WHEREAS, Section 3.08 of the Indenture provides that, after the Issue Date, the Company is required to cause certain direct or indirect Subsidiaries of the Company to execute and deliver to the Trustee a supplemental indenture pursuant to which such Subsidiary will unconditionally guarantee, on a joint and several basis with the other Guarantors, the full and prompt payment of the principal of, premium, if any, and interest on the Notes on an unsecured basis; and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee and the Company are authorized to execute and deliver this Supplemental Indenture to amend or supplement the Indenture, without the consent of any Holder;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Additional Guarantors, the Company and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

ARTICLE 1
Definitions

Section 1.01 Defined Terms.

As used in this Supplemental Indenture, terms defined in the Indenture or in the preamble or recital hereto are used herein as therein defined. The words "herein," "hereof" and "hereby" and other words of similar import used in this Supplemental Indenture refer to this Supplemental Indenture as a whole and not to any particular section hereof.

ARTICLE 2
Agreement to be Bound; Guarantee

Section 2.01 *Agreement to be Bound*. The Additional Guarantors hereby become parties to the Indenture as Guarantors and as such will have all of the rights and be subject to all of the obligations and agreements of a Guarantor under the Indenture. The Additional Guarantors agree to be bound by all of

the provisions of the Indenture applicable to an Additional Guarantor and to perform all of the obligations and agreements of a Guarantor under the Indenture.

Section 2.02 *Guarantee.* The Additional Guarantors agree, on a joint and several basis with all the existing Guarantors, to fully, unconditionally and irrevocably Guarantee to each Holder of the Notes and the Trustee the Obligations pursuant to Article 10 of the Indenture on an unsecured basis.

ARTICLE 3
Miscellaneous

Section 3.01 *Notices.* All notices and other communications to the Additional Guarantors shall be given as provided in the Indenture to the Additional Guarantors, at their respective addresses set forth below, with a copy to the Company as provided in the Indenture for notices to the Company.

Cleveland-Cliffs Steel Holdings Inc.
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
Chief Legal Officer & Secretary

ArcelorMittal Burns Harbor LLC
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
Chief Legal Officer & Secretary

ArcelorMittal Cleveland LLC
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
Chief Legal Officer & Secretary

ArcelorMittal Cleveland Works Railway Inc.
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
Chief Legal Officer & Secretary

ArcelorMittal Columbus LLC
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
Chief Legal Officer & Secretary

ArcelorMittal Kote Inc.
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114

Attention: James Graham, Executive Vice President,
   Chief Legal Officer & Secretary

ArcelorMittal Minorca Mine Inc.
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
   Chief Legal Officer & Secretary

ArcelorMittal Monessen LLC
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
   Chief Legal Officer & Secretary

ArcelorMittal Plate LLC
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
   Chief Legal Officer & Secretary

ArcelorMittal Riverdale LLC
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
   Chief Legal Officer & Secretary

ArcelorMittal South Chicago & Indiana Harbor Railway Inc.
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
   Chief Legal Officer & Secretary

ArcelorMittal Steelton LLC
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
   Chief Legal Officer & Secretary

ArcelorMittal Tek Inc.
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
   Chief Legal Officer & Secretary

ArcelorMittal USA LLC
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Weirton LLC
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

Mid-Vol Coal Sales, Inc.
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

Mittal Steel USA — Railways Inc.
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

Section 3.02 *Parties.* Nothing expressed or mentioned herein is intended or shall be construed to give any Person, firm or corporation, other than the Holders and the Trustee, any legal or equitable right, remedy or claim under or in respect of this Supplemental Indenture or the Indenture or any provision herein or therein contained.

Section 3.03 *Governing Law*. This Supplemental Indenture shall be governed by, and construed in accordance with, the laws of the State of New York.

Section 3.04 *Severability Clause*. In case any provision in this Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

Section 3.05 *Ratification of Indenture; Supplemental Indentures Part of Indenture* .
Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby. The Trustee shall not be responsible for and makes no representation or warranty as to the validity, execution, or sufficiency of this Supplemental Indenture or with respect to the recitals contained herein, all of which recitals are made solely by the other parties hereto.

Section 3.06 *Counterparts*. The parties hereto may sign one or more copies of this Supplemental Indenture in counterparts, all of which together shall constitute one and the same agreement.

Section 3.07 *Headings*. The headings of the Articles and the sections in this Guarantee are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof.

Section 3.08 *Execution, Delivery and Validity*. The Company and Additional Guarantors each represent and warrant to the Trustee that this Supplemental Indenture has been duly and validly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, receivership, administration, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

CLEVELAND-CLIFFS STEEL HOLDINGS INC., as a Guarantor

By:    /s/ James D. Graham
         Name: James D. Graham
         Title: Secretary

ARCELORMITTAL BURNS HARBOR LLC, as a Guarantor

By:    /s/ James D. Graham
         Name: James D. Graham
         Title: General Counsel & Secretary

ARCELORMITTAL CLEVELAND LLC, as a Guarantor

By:    /s/ James D. Graham
         Name: James D. Graham
         Title: General Counsel & Secretary

ARCELORMITTAL CLEVELAND WORKS RAILWAY INC., as a Guarantor

By:    /s/ James D. Graham
         Name: James D. Graham
         Title: General Counsel & Secretary

ARCELORMITTAL COLUMBUS LLC., as a Guarantor

By:    /s/ James D. Graham
         Name: James D. Graham
         Title: General Counsel & Secretary

ARCELORMITTAL KOTE INC., as a Guarantor

By:    /s/ James D. Graham
         Name: James D. Graham
         Title: General Counsel & Secretary

Second Supplemental Indenture – 6.375% Senior Guaranteed Notes due 2025

ARCELORMITTAL MINORCA MINE INC., as a Guarantor

By:    /s/ James D. Graham
       Name: James D. Graham
       Title: General Counsel & Secretary

ARCELORMITTAL MONESSEN LLC., as a Guarantor

By:    /s/ James D. Graham
       Name: James D. Graham
       Title: General Counsel & Secretary

ARCELORMITTAL PLATE LLC., as a Guarantor

By:    /s/ James D. Graham
       Name: James D. Graham
       Title: General Counsel & Secretary

ARCELORMITTAL RIVERDALE LLC, as a Guarantor

By:    /s/ James D. Graham
       Name: James D. Graham
       Title: General Counsel & Secretary

ARCELORMITTAL SOUTH CHICAGO & INDIANA HARBOR
RAILWAY INC, as a Guarantor

By:    /s/ James D. Graham
       Name: James D. Graham
       Title: General Counsel & Secretary

ARCELORMITTAL STEELTON LLC, as a Guarantor

By:    /s/ James D. Graham
       Name: James D. Graham
       Title: General Counsel & Secretary

Second Supplemental Indenture – 6.375% Senior Guaranteed Notes due 2025

ARCELORMITTAL TEK INC, as a Guarantor

By:    /s/ James D. Graham
       Name: James D. Graham
       Title: General Counsel & Secretary

ARCELORMITTAL USA LLC, as a Guarantor

By:    /s/ James D. Graham
       Name: James D. Graham
       Title: Executive Vice President, Chief Legal Officer & Secretary

ARCELORMITTAL WEIRTON LLC, as a Guarantor

By:    /s/ James D. Graham
       Name: James D. Graham
       Title: General Counsel & Secretary

MID-VOL COAL SALES, INC., as a Guarantor

By:    /s/ James D. Graham
       Name: James D. Graham
       Title: Secretary

MITTAL STEEL USA ---- RAILWAYS INC., as a Guarantor

By:    /s/ James D. Graham
       Name: James D. Graham
       Title: General Counsel & Secretary

CLEVELAND-CLIFFS INC.

By:    /s/ Keith A. Koci
       Name: Keith A. Koci
       Title: Executive Vice President, Chief Financial Officer

Second Supplemental Indenture – 6.375% Senior Guaranteed Notes due 2025

U.S. BANK NATIONAL ASSOCIATION, as Trustee

By:    /s/ Elizabeth A. Thuning
      Name: Elizabeth A. Thuning
      Title: Vice President

Second Supplemental Indenture – 6.375% Senior Guaranteed Notes due 2025

**EXHIBIT 4.34**

**THIRD SUPPLEMENTAL INDENTURE**
**6.375% SENIOR GUARANTEED NOTES DUE 2025**

This Supplemental Indenture, dated as of December 18, 2020 (this " **Supplemental Indenture**" or "**Guarantee**"), among I/N Tek L.P., I/N Kote L.P., Tek Kote Acquisition Corporation (the "**Additional Guarantors**"), Cleveland-Cliffs Inc. (together with its successors and assigns, the " **Company**") and U.S. Bank National Association, as Trustee under the Indenture referred to below.

WITNESSETH:

WHEREAS, the Company, the Guarantors and the Trustee have heretofore executed and delivered an Indenture, dated as of March 16, 2020 (as amended, supplemented, waived or otherwise modified, the "**Indenture**"), providing for the issuance of an aggregate principal amount of $231,824,000 of 6.375% Senior Guaranteed Notes due 2025 of the Company (the "**Notes**");

WHEREAS, Section 3.08 of the Indenture provides that, after the Issue Date, the Company is required to cause certain direct or indirect Subsidiaries of the Company to execute and deliver to the Trustee a supplemental indenture pursuant to which such Subsidiary will unconditionally guarantee, on a joint and several basis with the other Guarantors, the full and prompt payment of the principal of, premium, if any, and interest on the Notes on an unsecured basis; and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee and the Company are authorized to execute and deliver this Supplemental Indenture to amend or supplement the Indenture, without the consent of any Holder;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Additional Guarantors, the Company and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

ARTICLE 1
Definitions

Section 1.01 Defined Terms.

As used in this Supplemental Indenture, terms defined in the Indenture or in the preamble or recital hereto are used herein as therein defined. The words "herein," "hereof" and "hereby" and other words of similar import used in this Supplemental Indenture refer to this Supplemental Indenture as a whole and not to any particular section hereof.

ARTICLE 2
Agreement to be Bound; Guarantee

Section 2.01 *Agreement to be Bound*. The Additional Guarantors hereby become parties to the Indenture as Guarantors and as such will have all of the rights and be subject to all of the obligations and agreements of a Guarantor under the Indenture. The Additional Guarantors agree to be bound by all of the provisions of the Indenture applicable to an Additional Guarantor and to perform all of the obligations and agreements of a Guarantor under the Indenture.

Section 2.02 *Guarantee.* The Additional Guarantors agree, on a joint and several basis with all the existing Guarantors, to fully, unconditionally and irrevocably Guarantee to each Holder of the Notes and the Trustee the Obligations pursuant to Article 10 of the Indenture on an unsecured basis.

ARTICLE 3
Miscellaneous

Section 3.01 *Notices.* All notices and other communications to the Additional Guarantors shall be given as provided in the Indenture to the Additional Guarantors, at their respective addresses set forth below, with a copy to the Company as provided in the Indenture for notices to the Company.

I/N Tek L.P.
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

I/N Kote L.P.
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

Tek Kote Acquisition Corporation
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

Section 3.02 *Parties.* Nothing expressed or mentioned herein is intended or shall be construed to give any Person, firm or corporation, other than the Holders and the Trustee, any legal or equitable right, remedy or claim under or in respect of this Supplemental Indenture or the Indenture or any provision herein or therein contained.

Section 3.03 *Governing Law*. This Supplemental Indenture shall be governed by, and construed in accordance with, the laws of the State of New York.

Section 3.04 *Severability Clause*. In case any provision in this Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

Section 3.05 *Ratification of Indenture; Supplemental Indentures Part of Indenture* .
Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby. The Trustee shall not be responsible for and makes no representation or warranty as to the validity, execution, or sufficiency of this Supplemental Indenture or with respect to the recitals contained herein, all of which recitals are made solely by the other parties hereto.

Section 3.06 *Counterparts*. The parties hereto may sign one or more copies of this Supplemental Indenture in counterparts, all of which together shall constitute one and the same agreement.

Section 3.07 *Headings*. The headings of the Articles and the sections in this Guarantee are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof.

Section 3.08 *Execution, Delivery and Validity*. The Company and Additional Guarantors each represent and warrant to the Trustee that this Supplemental Indenture has been duly and validly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, receivership, administration, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

I/N TEK L.P., as a Guarantor

By:    /s/ James D. Graham
     Name: James D. Graham
     Title: General Counsel & Secretary

I/N KOTE L.P., as a Guarantor

By:    /s/ James D. Graham
     Name: James D. Graham
     Title: General Counsel & Secretary

TEK KOTE ACQUISITION CORPORATION, as a Guarantor

By:    /s/ James D. Graham
     Name: James D. Graham
     Title: General Counsel & Secretary

CLEVELAND-CLIFFS INC.

By:    /s/ Keith A. Koci
     Name: Keith A. Koci
     Title: Executive Vice President, Chief Financial Officer

U.S. BANK NATIONAL ASSOCIATION, as Trustee

By:    /s/ Elizabeth A. Thuning
     Name: Elizabeth A. Thuning
     Title: Vice President

Third Supplemental Indenture – 6.375% Senior Guaranteed Notes due 2025

A006295

EXHIBIT 4.38

**SECOND SUPPLEMENTAL INDENTURE**
**7.00% SENIOR GUARANTEED NOTES DUE 2027**

This Supplemental Indenture, dated as of December 9, 2020 (this " **Supplemental Indenture**" or "**Guarantee**"), among Cleveland-Cliffs Steel Holdings Inc., ArcelorMittal Burns Harbor LLC, ArcelorMittal Cleveland LLC, ArcelorMittal Cleveland Works Railway Inc., ArcelorMittal Columbus LLC, ArcelorMittal Kote Inc., ArcelorMittal Minorca Mine Inc., ArcelorMittal Monessen LLC, ArcelorMittal Plate LLC, ArcelorMittal Riverdale LLC, ArcelorMittal South Chicago & Indiana Harbor Railway Inc., ArcelorMittal Steelton LLC, ArcelorMittal Tek Inc., ArcelorMittal USA LLC, ArcelorMittal Weirton LLC, Mid-Vol Coal Sales, Inc., Mittal Steel USA — Railways Inc. (the "**Additional Guarantors**"), Cleveland-Cliffs Inc. (together with its successors and assigns, the " **Company**") and U.S. Bank National Association, as Trustee under the Indenture referred to below.

WITNESSETH:

WHEREAS, the Company, the Guarantors and the Trustee have heretofore executed and delivered an Indenture, dated as of March 16, 2020 (as amended, supplemented, waived or otherwise modified, the "**Indenture**"), providing for the issuance of an aggregate principal amount of $335,376,000 of 7.00% Senior Guaranteed Notes due 2027 of the Company (the "**Notes**");

WHEREAS, Section 3.08 of the Indenture provides that, after the Issue Date, the Company is required to cause certain direct or indirect Subsidiaries of the Company to execute and deliver to the Trustee a supplemental indenture pursuant to which such Subsidiary will unconditionally guarantee, on a joint and several basis with the other Guarantors, the full and prompt payment of the principal of, premium, if any, and interest on the Notes on an unsecured basis; and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee and the Company are authorized to execute and deliver this Supplemental Indenture to amend or supplement the Indenture, without the consent of any Holder;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Additional Guarantors, the Company and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

ARTICLE 1
Definitions

Section 1.01 Defined Terms.

As used in this Supplemental Indenture, terms defined in the Indenture or in the preamble or recital hereto are used herein as therein defined. The words "herein**,**" "hereof" and "hereby" and other words of similar import used in this Supplemental Indenture refer to this Supplemental Indenture as a whole and not to any particular section hereof.

ARTICLE 2
Agreement to be Bound; Guarantee

Section 2.01 *Agreement to be Bound*. The Additional Guarantors hereby become parties to the Indenture as Guarantors and as such will have all of the rights and be subject to all of the obligations and agreements of a Guarantor under the Indenture. The Additional Guarantors agree to be bound by all

of the provisions of the Indenture applicable to an Additional Guarantor and to perform all of the obligations and agreements of a Guarantor under the Indenture.

Section 2.02 *Guarantee.* The Additional Guarantors agree, on a joint and several basis with all the existing Guarantors, to fully, unconditionally and irrevocably Guarantee to each Holder of the Notes and the Trustee the Obligations pursuant to Article 10 of the Indenture on an unsecured basis.

ARTICLE 3
Miscellaneous

Section 3.01 *Notices.* All notices and other communications to the Additional Guarantors shall be given as provided in the Indenture to the Additional Guarantors, at their respective addresses set forth below, with a copy to the Company as provided in the Indenture for notices to the Company.

Cleveland-Cliffs Steel Holdings Inc.
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Burns Harbor LLC
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Cleveland LLC
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Cleveland Works Railway Inc.
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Columbus LLC
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Kote Inc.
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114

Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal Minorca Mine Inc.
    c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal Monessen LLC
    c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal Plate LLC
    c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal Riverdale LLC
    c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal South Chicago & Indiana Harbor Railway Inc.
    c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal Steelton LLC
    c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal Tek Inc.
    c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal USA LLC
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Weirton LLC
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

Mid-Vol Coal Sales, Inc.
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

Mittal Steel USA — Railways Inc.
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

Section 3.02 *Parties.* Nothing expressed or mentioned herein is intended or shall be construed to give any Person, firm or corporation, other than the Holders and the Trustee, any legal or equitable right, remedy or claim under or in respect of this Supplemental Indenture or the Indenture or any provision herein or therein contained.

Section 3.03 *Governing Law*. This Supplemental Indenture shall be governed by, and construed in accordance with, the laws of the State of New York.

Section 3.04 *Severability Clause.* In case any provision in this Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

Section 3.05 *Ratification of Indenture; Supplemental Indentures Part of Indenture* . Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby. The Trustee shall not be responsible for and makes no representation or warranty as to the validity, execution, or sufficiency of this Supplemental Indenture or with respect to the recitals contained herein, all of which recitals are made solely by the other parties hereto.

Section 3.06 *Counterparts*. The parties hereto may sign one or more copies of this Supplemental Indenture in counterparts, all of which together shall constitute one and the same agreement.

Section 3.07 *Headings*. The headings of the Articles and the sections in this Guarantee are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof.

Section 3.08 *Execution, Delivery and Validity*. The Company and Additional Guarantors each represent and warrant to the Trustee that this Supplemental Indenture has been duly and validly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, receivership, administration, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

CLEVELAND-CLIFFS STEEL HOLDINGS INC., as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: Secretary

ARCELORMITTAL BURNS HARBOR LLC, as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: General Counsel & Secretary

ARCELORMITTAL CLEVELAND LLC, as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: General Counsel & Secretary

ARCELORMITTAL CLEVELAND WORKS RAILWAY INC., as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: General Counsel & Secretary

ARCELORMITTAL COLUMBUS LLC., as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: General Counsel & Secretary

ARCELORMITTAL KOTE INC., as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: General Counsel & Secretary

Second Supplemental Indenture – 7.00% Senior Guaranteed Notes due 2027

ARCELORMITTAL MINORCA MINE INC., as a Guarantor

By:  /s/ James D. Graham
_____
Name: James D. Graham
Title: General Counsel & Secretary

ARCELORMITTAL MONESSEN LLC., as a Guarantor

By:  /s/ James D. Graham
_____
Name: James D. Graham
Title: General Counsel & Secretary

ARCELORMITTAL PLATE LLC., as a Guarantor

By:  /s/ James D. Graham
_____
Name: James D. Graham
Title: General Counsel & Secretary

ARCELORMITTAL RIVERDALE LLC, as a Guarantor

By:  /s/ James D. Graham
_____
Name: James D. Graham
Title: General Counsel & Secretary

ARCELORMITTAL SOUTH CHICAGO & INDIANA HARBOR
RAILWAY INC, as a Guarantor

By:  /s/ James D. Graham
_____
Name: James D. Graham
Title: General Counsel & Secretary

ARCELORMITTAL STEELTON LLC, as a Guarantor

By:  /s/ James D. Graham
_____
Name: James D. Graham
Title: General Counsel & Secretary

Second Supplemental Indenture – 7.00% Senior Guaranteed Notes due 2027

ARCELORMITTAL TEK INC, as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: General Counsel & Secretary

ARCELORMITTAL USA LLC, as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: Executive Vice President, Chief Legal Officer & Secretary

ARCELORMITTAL WEIRTON LLC, as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: General Counsel & Secretary

MID-VOL COAL SALES, INC., as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: Secretary

MITTAL STEEL USA -— RAILWAYS INC., as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: General Counsel & Secretary

CLEVELAND-CLIFFS INC.

By:    /s/ Keith A. Koci
      Name: Keith A. Koci
      Title: Executive Vice President, Chief Financial Officer

Second Supplemental Indenture – 7.00% Senior Guaranteed Notes due 2027

U.S. BANK NATIONAL ASSOCIATION, as Trustee

By:      /s/ Elizabeth A. Thuning
         Name: Elizabeth A. Thuning
         Title: Vice President

Second Supplemental Indenture – 7.00% Senior Guaranteed Notes due 2027

EXHIBIT 4.39

**THIRD SUPPLEMENTAL INDENTURE**
**7.00% SENIOR GUARANTEED NOTES DUE 2027**

This Supplemental Indenture, dated as of December 18, 2020 (this " **Supplemental Indenture**" or "**Guarantee**"), among I/N Tek L.P., I/N Kote L.P., Tek Kote Acquisition Corporation (the "**Additional Guarantors**"), Cleveland-Cliffs Inc. (together with its successors and assigns, the " **Company**") and U.S. Bank National Association, as Trustee under the Indenture referred to below.

WITNESSETH:

WHEREAS, the Company, the Guarantors and the Trustee have heretofore executed and delivered an Indenture, dated as of March 16, 2020 (as amended, supplemented, waived or otherwise modified, the "**Indenture**"), providing for the issuance of an aggregate principal amount of $335,376,000 of 7.00% Senior Guaranteed Notes due 2027 of the Company (the "**Notes**");

WHEREAS, Section 3.08 of the Indenture provides that, after the Issue Date, the Company is required to cause certain direct or indirect Subsidiaries of the Company to execute and deliver to the Trustee a supplemental indenture pursuant to which such Subsidiary will unconditionally guarantee, on a joint and several basis with the other Guarantors, the full and prompt payment of the principal of, premium, if any, and interest on the Notes on an unsecured basis; and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee and the Company are authorized to execute and deliver this Supplemental Indenture to amend or supplement the Indenture, without the consent of any Holder;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Additional Guarantors, the Company and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

ARTICLE 1
Definitions

Section 1.01 Defined Terms.

As used in this Supplemental Indenture, terms defined in the Indenture or in the preamble or recital hereto are used herein as therein defined. The words "herein**,**" "hereof" and "hereby" and other words of similar import used in this Supplemental Indenture refer to this Supplemental Indenture as a whole and not to any particular section hereof.

ARTICLE 2
Agreement to be Bound; Guarantee

Section 2.01 *Agreement to be Bound*. The Additional Guarantors hereby become parties to the Indenture as Guarantors and as such will have all of the rights and be subject to all of the obligations and agreements of a Guarantor under the Indenture. The Additional Guarantors agree to be bound by all of the provisions of the Indenture applicable to an Additional Guarantor and to perform all of the obligations and agreements of a Guarantor under the Indenture.

Section 2.02 *Guarantee.* The Additional Guarantors agree, on a joint and several basis with all the existing Guarantors, to fully, unconditionally and irrevocably Guarantee to each Holder of the Notes and the Trustee the Obligations pursuant to Article 10 of the Indenture on an unsecured basis.

ARTICLE 3
Miscellaneous

Section 3.01 *Notices.* All notices and other communications to the Additional Guarantors shall be given as provided in the Indenture to the Additional Guarantors, at their respective addresses set forth below, with a copy to the Company as provided in the Indenture for notices to the Company.

I/N Tek L.P.
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

I/N Kote L.P.
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

Tek Kote Acquisition Corporation
  c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
Chief Legal Officer & Secretary

Section 3.02 *Parties.* Nothing expressed or mentioned herein is intended or shall be construed to give any Person, firm or corporation, other than the Holders and the Trustee, any legal or equitable right, remedy or claim under or in respect of this Supplemental Indenture or the Indenture or any provision herein or therein contained.

Section 3.03 *Governing Law.* This Supplemental Indenture shall be governed by, and construed in accordance with, the laws of the State of New York.

Section 3.04 *Severability Clause.* In case any provision in this Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

Section 3.05 *Ratification of Indenture; Supplemental Indentures Part of Indenture .*
Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby. The Trustee shall not be responsible for and makes no representation or warranty as to the validity, execution, or sufficiency of this Supplemental Indenture or with respect to the recitals contained herein, all of which recitals are made solely by the other parties hereto.

Section 3.06 *Counterparts.* The parties hereto may sign one or more copies of this Supplemental Indenture in counterparts, all of which together shall constitute one and the same agreement.

Section 3.07 *Headings.* The headings of the Articles and the sections in this Guarantee are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof.

Section 3.08 *Execution, Delivery and Validity*. The Company and Additional Guarantors each represent and warrant to the Trustee that this Supplemental Indenture has been duly and validly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, receivership, administration, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

I/N TEK L.P., as a Guarantor

By:      /s/ James D. Graham
     Name: James D. Graham
     Title: General Counsel & Secretary

I/N KOTE L.P., as a Guarantor

By:      /s/ James D. Graham
     Name: James D. Graham
     Title: General Counsel & Secretary

TEK KOTE ACQUISITION CORPORATION, as a Guarantor

By:      /s/ James D. Graham
     Name: James D. Graham
     Title: General Counsel & Secretary

CLEVELAND-CLIFFS INC.

By:      /s/ Keith A. Koci
     Name: Keith A. Koci
     Title: Executive Vice President, Chief Financial Officer

U.S. BANK NATIONAL ASSOCIATION, as Trustee

By:      /s/ Elizabeth A. Thuning
     Name: Elizabeth A. Thuning
     Title: Vice President

Third Supplemental Indenture – 7.00% Senior Guaranteed Notes due 2027

**EXHIBIT 4.44**

**THIRD SUPPLEMENTAL INDENTURE**
**9.875% SENIOR SECURED NOTES DUE 2025**

This Supplemental Indenture, dated as of December 9, 2020 (this " **Supplemental Indenture**" or "**Guarantee**"), among Cleveland-Cliffs Steel Holdings Inc., ArcelorMittal Burns Harbor LLC, ArcelorMittal Cleveland LLC, ArcelorMittal Cleveland Works Railway Inc., ArcelorMittal Columbus LLC, ArcelorMittal Kote Inc., ArcelorMittal Minorca Mine Inc., ArcelorMittal Monessen LLC, ArcelorMittal Plate LLC, ArcelorMittal Riverdale LLC, ArcelorMittal South Chicago & Indiana Harbor Railway Inc., ArcelorMittal Steelton LLC, ArcelorMittal Tek Inc., ArcelorMittal USA LLC, ArcelorMittal Weirton LLC, Mid-Vol Coal Sales, Inc., Mittal Steel USA — Railways Inc. (the "**Additional Guarantors**"), Cleveland-Cliffs Inc. (together with its successors and assigns, the " **Company**") and U.S. Bank National Association, as Trustee and First Lien Notes Collateral Agent under the Indenture referred to below.

WITNESSETH:

WHEREAS, the Company, the Guarantors, the First Lien Notes Collateral Agent and the Trustee have heretofore executed and delivered an Indenture, dated as of April 17, 2020, as supplemented by that certain First Supplemental Indenture, dated as of April 24, 2020, among the Company, the Guarantors party thereto, the Trustee and the First Lien Notes Collateral Agent, and that certain Second Supplemental Indenture, dated as of May 22, 2020, among the Company, the Guarantors party thereto, the Trustee and the First Lien Notes Collateral Agent (as so supplemented and as otherwise amended, supplemented, waived or otherwise modified, the "**Indenture**"), providing for the issuance of an aggregate principal amount of $955,159,000 of 9.875% Senior Secured Notes due 2025 of the Company (the "**Notes**");

WHEREAS, Section 3.08 of the Indenture provides that, after the Issue Date, the Company is required to cause certain direct or indirect Subsidiaries of the Company to execute and deliver to the Trustee a supplemental indenture pursuant to which such Subsidiary will unconditionally guarantee, on a joint and several basis with the other Guarantors, the full and prompt payment of the principal of, premium, if any, and interest on the Notes on a secured basis; and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee and the Company are authorized to execute and deliver this Supplemental Indenture to amend or supplement the Indenture, without the consent of any Holder;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Additional Guarantors, the Company and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

ARTICLE 1
Definitions

Section 1.01 *Defined Terms*.

As used in this Supplemental Indenture, terms defined in the Indenture or in the preamble or recital hereto are used herein as therein defined. The words "herein," "hereof" and "hereby" and other words of similar import used in this Supplemental Indenture refer to this Supplemental Indenture as a whole and not to any particular section hereof.

ARTICLE 2
Agreement to be Bound; Guarantee

Section 2.01 *Agreement to be Bound*. The Additional Guarantors hereby become parties to the Indenture as Guarantors and as such will have all of the rights and be subject to all of the obligations and agreements of a Guarantor under the Indenture. The Additional Guarantors hereby become parties to the Security Agreement, pursuant to the terms of such agreement, as Grantors thereunder with the same force and effect as if originally named therein as Grantors and as such hereby assume all obligations and liabilities of a Grantor thereunder. The Additional Guarantors agree to be bound by all of the provisions of the Indenture and the Collateral Documents applicable to an Additional Guarantor and to perform all of the obligations and agreements of a Guarantor under the Indenture and the Collateral Documents.

Section 2.02 *Guarantee*. The Additional Guarantors agree, on a joint and several basis with all the existing Guarantors, to fully, unconditionally and irrevocably Guarantee to each Holder of the Notes and the Trustee the Obligations pursuant to Article 10 of the Indenture on a secured basis.

ARTICLE 3
Miscellaneous

Section 3.01 *Notices.* All notices and other communications to the Additional Guarantors shall be given as provided in the Indenture to the Additional Guarantors, at their respective addresses set forth below, with a copy to the Company as provided in the Indenture for notices to the Company.

Cleveland-Cliffs Steel Holdings Inc.
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Burns Harbor LLC
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Cleveland LLC
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Cleveland Works Railway Inc.
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
  Chief Legal Officer & Secretary

ArcelorMittal Columbus LLC
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal Kote Inc.
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal Minorca Mine Inc.
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal Monessen LLC
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal Plate LLC
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal Riverdale LLC
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal South Chicago & Indiana Harbor Railway Inc.
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal Steelton LLC
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal Tek Inc.
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal USA LLC
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

ArcelorMittal Weirton LLC
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

Mid-Vol Coal Sales, Inc.
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

Mittal Steel USA — Railways Inc.
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

Section 3.02 *Parties.* Nothing expressed or mentioned herein is intended or shall be construed to give any Person, firm or corporation, other than the Holders and the Trustee, any legal or equitable right, remedy or claim under or in respect of this Supplemental Indenture or the Indenture or any provision herein or therein contained.

Section 3.03 *Governing Law.* This Supplemental Indenture shall be governed by, and construed in accordance with, the laws of the State of New York.

Section 3.04 *Severability Clause.* In case any provision in this Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

Section 3.05 *Ratification of Indenture; Supplemental Indentures Part of Indenture*. Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby. The Trustee shall not be responsible for and makes no representation or warranty as to the validity, execution, or sufficiency of this Supplemental Indenture or with respect to the recitals contained herein, all of which recitals are made solely by the other parties hereto.

Section 3.06 *Counterparts.* The parties hereto may sign one or more copies of this Supplemental Indenture in counterparts, all of which together shall constitute one and the same agreement.

Section 3.07 *Headings.* The headings of the Articles and the sections in this Guarantee are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof.

Section 3.08 *Execution, Delivery and Validity*. The Company and Additional Guarantors each represent and warrant to the Trustee that this Supplemental Indenture has been duly and validly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, receivership, administration, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

CLEVELAND-CLIFFS STEEL HOLDINGS INC., as a Guarantor

By:     /s/ James D. Graham
        Name: James D. Graham
        Title: Secretary

ARCELORMITTAL BURNS HARBOR LLC, as a Guarantor

By:     /s/ James D. Graham
        Name: James D. Graham
        Title: General Counsel & Secretary

ARCELORMITTAL CLEVELAND LLC, as a Guarantor

By:     /s/ James D. Graham
        Name: James D. Graham
        Title: General Counsel & Secretary

ARCELORMITTAL CLEVELAND WORKS RAILWAY INC., as a Guarantor

By:     /s/ James D. Graham
        Name: James D. Graham
        Title: General Counsel & Secretary

ARCELORMITTAL COLUMBUS LLC., as a Guarantor

By:     /s/ James D. Graham
        Name: James D. Graham
        Title: General Counsel & Secretary

ARCELORMITTAL KOTE INC., as a Guarantor

By:     /s/ James D. Graham
        Name: James D. Graham
        Title: General Counsel & Secretary

Third Supplemental Indenture – 9.875% Senior Secured Notes due 2025

ARCELORMITTAL MINORCA MINE INC., as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: General Counsel & Secretary

ARCELORMITTAL MONESSEN LLC., as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: General Counsel & Secretary

ARCELORMITTAL PLATE LLC., as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: General Counsel & Secretary

ARCELORMITTAL RIVERDALE LLC, as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: General Counsel & Secretary

ARCELORMITTAL SOUTH CHICAGO & INDIANA HARBOR
RAILWAY INC, as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: General Counsel & Secretary

ARCELORMITTAL STEELTON LLC, as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: General Counsel & Secretary

Third Supplemental Indenture – 9.875% Senior Secured Notes due 2025

ARCELORMITTAL TEK INC, as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: General Counsel & Secretary

ARCELORMITTAL USA LLC, as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: Executive Vice President, Chief Legal Officer & Secretary

ARCELORMITTAL WEIRTON LLC, as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: General Counsel & Secretary

MID-VOL COAL SALES, INC., as a Guarantor

By:    /s/ James D. Graham
      Name: James D. Graham
      Title: Secretary

CLEVELAND-CLIFFS INC.

By:    /s/ Keith A. Koci
      Name: Keith A. Koci
      Title: Executive Vice President, Chief Financial Officer

Third Supplemental Indenture – 9.875% Senior Secured Notes due 2025

U.S. BANK NATIONAL ASSOCIATION,
as Trustee and First Lien Notes Collateral Agent

By:     /s/ Elizabeth A. Thuning
        Name: Elizabeth A. Thuning
        Title: Vice President

Third Supplemental Indenture – 9.875% Senior Secured Notes due 2025

**EXHIBIT 4.45**

**FOURTH SUPPLEMENTAL INDENTURE**
**9.875% SENIOR SECURED NOTES DUE 2025**

This Supplemental Indenture, dated as of December 18, 2020 (this "**Supplemental Indenture**" or "**Guarantee**"), among I/N Tek L.P., I/N Kote L.P., Tek Kote Acquisition Corporation (the "**Additional Guarantors**"), Cleveland-Cliffs Inc. (together with its successors and assigns, the "**Company**") and U.S. Bank National Association, as Trustee and First Lien Notes Collateral Agent under the Indenture referred to below.

WITNESSETH:

WHEREAS, the Company, the Guarantors, the First Lien Notes Collateral Agent and the Trustee have heretofore executed and delivered an Indenture, dated as of April 17, 2020, as supplemented by that certain First Supplemental Indenture, dated as of April 24, 2020, among the Company, the Guarantors party thereto, the Trustee and the First Lien Notes Collateral Agent, that certain Second Supplemental Indenture, dated as of May 22, 2020, among the Company, the Guarantors party thereto, the Trustee and the First Lien Notes Collateral Agent, and that certain Third Supplemental Indenture, dated as of December 9, 2020, among the Company, the Guarantors party thereto, the Trustee and the First Lien Notes Collateral Agent (as so supplemented and as otherwise amended, supplemented, waived or otherwise modified, the "**Indenture**"), providing for the issuance of an aggregate principal amount of $955,159,000 of 9.875% Senior Secured Notes due 2025 of the Company (the "**Notes**");

WHEREAS, Section 3.08 of the Indenture provides that, after the Issue Date, the Company is required to cause certain direct or indirect Subsidiaries of the Company to execute and deliver to the Trustee a supplemental indenture pursuant to which such Subsidiary will unconditionally guarantee, on a joint and several basis with the other Guarantors, the full and prompt payment of the principal of, premium, if any, and interest on the Notes on a secured basis; and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee and the Company are authorized to execute and deliver this Supplemental Indenture to amend or supplement the Indenture, without the consent of any Holder;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Additional Guarantors, the Company and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

ARTICLE 1
Definitions

Section 1.01 *Defined Terms*.

As used in this Supplemental Indenture, terms defined in the Indenture or in the preamble or recital hereto are used herein as therein defined. The words "herein," "hereof" and "hereby" and other words of similar import used in this Supplemental Indenture refer to this Supplemental Indenture as a whole and not to any particular section hereof.

ARTICLE 2
Agreement to be Bound; Guarantee

Section 2.01 *Agreement to be Bound*. The Additional Guarantors hereby become parties to the Indenture as Guarantors and as such will have all of the rights and be subject to all of the obligations

and agreements of a Guarantor under the Indenture. The Additional Guarantors hereby become parties to the Security Agreement, pursuant to the terms of such agreement, as Grantors thereunder with the same force and effect as if originally named therein as Grantors and as such hereby assume all obligations and liabilities of a Grantor thereunder. The Additional Guarantors agree to be bound by all of the provisions of the Indenture and the Collateral Documents applicable to an Additional Guarantor and to perform all of the obligations and agreements of a Guarantor under the Indenture and the Collateral Documents.

Section 2.02 *Guarantee.* The Additional Guarantors agree, on a joint and several basis with all the existing Guarantors, to fully, unconditionally and irrevocably Guarantee to each Holder of the Notes and the Trustee the Obligations pursuant to Article 10 of the Indenture on a secured basis.

ARTICLE 3
Miscellaneous

Section 3.01 *Notices.* All notices and other communications to the Additional Guarantors shall be given as provided in the Indenture to the Additional Guarantors, at their respective addresses set forth below, with a copy to the Company as provided in the Indenture for notices to the Company.

I/N Tek L.P.

c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

I/N Kote L.P.
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
    Chief Legal Officer & Secretary

Tek Kote Acquisition Corporation
c/o Cleveland-Cliffs Inc.
200 Public Square, Suite 3300
Cleveland, Ohio 44114
Attention: James Graham, Executive Vice President,
Chief Legal Officer & Secretary

Section 3.02 *Parties.* Nothing expressed or mentioned herein is intended or shall be construed to give any Person, firm or corporation, other than the Holders and the Trustee, any legal or equitable right, remedy or claim under or in respect of this Supplemental Indenture or the Indenture or any provision herein or therein contained.

Section 3.03 *Governing Law.* This Supplemental Indenture shall be governed by, and construed in accordance with, the laws of the State of New York.

Section 3.04 *Severability Clause.* In case any provision in this Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall

not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

Section 3.05 *Ratification of Indenture; Supplemental Indentures Part of Indenture*. Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby. The Trustee shall not be responsible for and makes no representation or warranty as to the validity, execution, or sufficiency of this Supplemental Indenture or with respect to the recitals contained herein, all of which recitals are made solely by the other parties hereto.

Section 3.06 *Counterparts*. The parties hereto may sign one or more copies of this Supplemental Indenture in counterparts, all of which together shall constitute one and the same agreement.

Section 3.07 *Headings*. The headings of the Articles and the sections in this Guarantee are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof.

Section 3.08 *Execution, Delivery and Validity*. The Company and Additional Guarantors each represent and warrant to the Trustee that this Supplemental Indenture has been duly and validly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, receivership, administration, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

I/N TEK L.P., as a Guarantor

By:      /s/ James D. Graham
     Name: James D. Graham
     Title: General Counsel & Secretary

I/N KOTE L.P., as a Guarantor

By:      /s/ James D. Graham
     Name: James D. Graham
     Title: General Counsel & Secretary

TEK KOTE ACQUISITION CORPORATION, as a Guarantor

By:      /s/ James D. Graham
     Name: James D. Graham
     Title: General Counsel & Secretary

CLEVELAND-CLIFFS INC.

By:      /s/ Keith A. Koci
     Name: Keith A. Koci
     Title: Executive Vice President, Chief Financial Officer

U.S. BANK NATIONAL ASSOCIATION,
as Trustee and First Lien Notes Collateral Agent

By:      /s/ Elizabeth A. Thuning
     Name: Elizabeth A. Thuning
     Title: Vice President

Fourth Supplemental Indenture – 9.875% Senior Secured Notes due 2025

**EXHIBIT 4.48**

**DESCRIPTION OF SECURITIES REGISTERED UNDER
SECTION 12 OF THE SECURITIES EXCHANGE ACT OF 1934**

The following is a summary of the terms and provisions of the common shares, par value $0.125 per share ("Common Shares"), of Cleveland-Cliffs Inc., an Ohio corporation (the "Company"), and is qualified by reference to the Company's articles of incorporation and regulations, which are incorporated by reference herein and attached as exhibits to the Company's most recent Annual Report on Form 10-K filed with the Securities and Exchange Commission, and to applicable provisions of Ohio law.

**Common Shares**

The Company has authorized 600,000,000 Common Shares. The holders of Common Shares are entitled to one vote for each share on all matters upon which shareholders have the right to vote and, upon proper notice, are entitled to cumulative voting rights in the election of directors. The Common Shares do not have any preemptive rights, are not subject to redemption and do not have the benefit of any sinking fund. Holders of Common Shares are entitled to receive such dividends as the Company's directors from time to time may declare out of funds legally available therefor. Entitlement to dividends is subject to the preferences granted to other classes of securities the Company has or may have outstanding in the future. In the event of the Company's liquidation, holders of Common Shares are entitled to share in any of the Company's assets remaining after satisfaction in full of its liabilities and satisfaction of such dividend and liquidation preferences as may be possessed by the holders of other classes of securities the Company has or may have outstanding in the future.

**Preferred Stock**

The Company has authorized 3,000,000 shares of serial preferred stock, Class A, without par value ("Class A Preferred Stock"), and 4,000,000 shares of serial preferred stock, Class B, without par value ("Class B Preferred Stock" and, collectively with the Class A Preferred Stock, "Preferred Stock"), of which 583,273 shares have been designated as the "Series B Participating Redeemable Preferred Stock." Under the Company's articles of incorporation, the Company's board of directors can issue, without further shareholder action, up to 3,000,000 shares of Class A Preferred Stock and up to 4,000,000 shares of Class B Preferred Stock, in each case, with such rights and restrictions as the Company's board of directors may determine, subject to any shares of Preferred Stock of the applicable class then outstanding.

In some cases, the issuance of Preferred Stock could delay, defer or prevent a change in control and make it harder to remove present management, without further action by the Company's shareholders. Under some circumstances, Preferred Stock could also decrease the amount of earnings and assets available for distribution to holders of Common Shares if the Company liquidates or dissolves and could also restrict or limit dividend payments to holders of Common Shares.

*Series B Participating Redeemable Preferred Stock*

The Series B Participating Redeemable Preferred Stock ranks senior to the Common Shares with respect to dividend rights and rights on the distribution of assets upon any voluntary or involuntary liquidation, dissolution or winding up of the affairs of, and certain bankruptcy events involving, the Company. Each share of Series B Participating Redeemable Preferred Stock entitles its holder to receive a multiple, initially equal to 100 (subject to certain anti-dilution adjustments, the "Applicable Multiple"), of the aggregate amount per share of all dividends declared on the Common Shares. In addition, from and after the 24-month anniversary of the issue date of the Series B Participating Redeemable Preferred Stock (the "24-Month Anniversary"), each holder of a share of Series B Participating Redeemable

Preferred Stock is entitled to receive cash dividends (the "Additional Dividends") accruing and compounding on a daily basis at the initial rate of 10% per annum on the sum of (i) the Applicable Multiple then in effect times the volume-weighted average price of the Common Shares for the 20 consecutive trading days ending on the trading day immediately preceding the 24-Month Anniversary and (ii) the amount of accumulated and unpaid dividends on the Series B Participating Redeemable Preferred Stock to, but not including, the 24-Month Anniversary, if any, which rate will increase by 2% per annum at the end of each six-month period following the 24-Month Anniversary. Additional Dividends will be payable, when, as and if declared by the Company's board of directors, in quarterly installments.

The Series B Participating Redeemable Preferred Stock is redeemable, in whole or in part, at the Company's option at any time and from time to time on and after the date that is 180 days after the issue date at a redemption price per share equal to the Applicable Multiple then in effect times the volume-weighted average price of the Common Shares for the 20 consecutive trading days ending on the trading day immediately preceding the date fixed for redemption, plus accumulated and unpaid dividends to, but not including, the redemption date.

In the event of a change of control of the Company, the Series B Participating Redeemable Preferred Stock will be subject to mandatory redemption at a redemption price per share equal to the Applicable Multiple then in effect times the volume-weighted average price of the Common Shares for the 20 consecutive trading days ending on the trading day immediately preceding the closing date of the transaction constituting such change of control.

In addition, pursuant to the terms of the Series B Participating Redeemable Preferred Stock, the Company is restricted from effecting any merger or consolidation with or into another entity unless the Series B Participating Redeemable Preferred Stock remains outstanding following the merger or consolidation, is exchanged for new preferred stock with substantially identical terms or is to be redeemed in connection with the closing of such merger or consolidation.

In addition to the foregoing, the Series B Participating Redeemable Preferred Stock is subject to the express terms of the Class B Preferred Stock as set forth in the Company's articles of incorporation, except that holders of Series B Participating Redeemable Preferred Stock, in their capacity as such, do not have the right to vote with the other series of Class B Preferred Stock then outstanding, if any, voting separately as a class, for the election of additional directors of the Company upon certain defaults by the Company in the payment of dividends, as provided in the Company's articles of incorporation.

**Ohio Control Share Acquisition Statute**

The Ohio Control Share Acquisition Statute requires the prior authorization of the shareholders of certain corporations in order for any person to acquire, either directly or indirectly, shares of that corporation that would entitle the acquiring person to exercise or direct the exercise of 20% or more of the voting power of that corporation in the election of directors or to exceed specified other percentages of voting power. In the event an acquiring person proposes to make such an acquisition, the person is required to deliver to the corporation a statement disclosing, among other things, the number of shares owned, directly or indirectly, by the person, the range of voting power that may result from the proposed acquisition and the identity of the acquiring person. Within 10 days after receipt of this statement, the corporation must call a special meeting of shareholders to vote on the proposed acquisition. The acquiring person may complete the proposed acquisition only if the acquisition is approved by the affirmative vote of the holders of at least a majority of the voting power of all shares entitled to vote in the election of directors represented at the meeting excluding the voting power of all "interested shares." Interested shares include any shares held by the acquiring person and those held by officers and directors who are employees of the corporation as well as by certain others, including many holders commonly characterized as arbitrageurs. The Ohio Control Share Acquisition Statute does not apply to a corporation if its articles of incorporation or code of regulations state that the statute does not apply to a

corporation. Neither the Company's articles of incorporation nor its regulations contain a provision opting out of this statute.

**Ohio Interested Shareholder Statute**

Chapter 1704 of the Ohio Revised Code prohibits certain corporations from engaging in a "chapter 1704 transaction" with an "interested shareholder" for a period of three years after the date of the transaction in which the person became an interested shareholder, unless, among other things:

- the articles of incorporation expressly provide that the corporation is not subject to the statute (the Company has not made this election); or

- the board of directors of the corporation approves the chapter 1704 transaction or the acquisition of the shares before the date the shares were acquired.

After the three-year moratorium period, the corporation may not consummate a chapter 1704 transaction unless, among other things, it is approved by the affirmative vote of the holders of at least two-thirds of the voting power in the election of directors and the holders of a majority of the voting shares, excluding all shares beneficially owned by an interested shareholder or an affiliate or associate of an interested shareholder, or the shareholders receive certain minimum consideration for their shares. A chapter 1704 transaction includes certain mergers, sales of assets, consolidations, combinations and majority share acquisitions involving an interested shareholder. An interested shareholder is defined to include, with limited exceptions, any person who, together with affiliates and associates, is the beneficial owner of a sufficient number of shares of the corporation to entitle the person, directly or indirectly, alone or with others, to exercise or direct the exercise of 10% or more of the voting power in the election of directors after taking into account all of the person's beneficially owned shares that are not then outstanding.

**EXHIBIT 10.42**

**EXECUTION VERSION**

### SECOND AMENDMENT TO ASSET-BASED REVOLVING CREDIT AGREEMENT

SECOND AMENDMENT TO ASSET-BASED REVOLVING CREDIT AGREEMENT, dated as of December 9, 2020 (this "Amendment"), by and among CLEVELAND-CLIFFS INC., an Ohio corporation, as Parent and a Borrower ("Parent"), the lenders party hereto and Bank of America, N.A., as administrative agent (in such capacity, "Agent") for the Lenders (as defined below).

W I T N E S S E T H:

WHEREAS, Parent, the other borrowers party thereto from time to time, each lender from time to time party hereto (the "Lenders") and Agent have entered into an Asset-Based Revolving Credit Agreement, dated as of March 13, 2020, as amended by the First Amendment to Asset-Based Revolving Credit Agreement, dated as of March 27, 2020 (the "Existing Credit Agreement" and, as amended by this Amendment, the "Amended Credit Agreement") (capitalized terms not otherwise defined in this Amendment have the same meanings assigned thereto in the Existing Credit Agreement);

WHEREAS, pursuant to the Transaction Agreement, dated as of September 28, 2020, between Parent and ArcelorMittal S.A., an entity formed under the laws of Luxembourg (the "Seller") (together with all schedules, exhibits and annexes thereto, the "Acquisition Agreement"), Parent will, among other things, directly or indirectly, acquire (the "Acquisition") 100% of the equity interests of ArcelorMittal USA LLC (" AM USA" and together with its subsidiaries and affiliates, the "Target");

WHEREAS, in connection with the Acquisition and pursuant to Section 2.16(a) of the Existing Credit Agreement, Parent notified the Agent of its desire to obtain an Upsize Incremental Commitment in respect of the Tranche A Revolver Commitments in an aggregate principal amount of $1,500,000,000 (the "2020 Incremental ABL Commitments" and such incremental facility, the "Incremental ABL Facility");

WHEREAS, the Persons holding the 2020 Incremental ABL Commitments are severally willing to make the 2020 Incremental ABL Loans (" 2020 Incremental ABL Lenders") on the Effective Date (as defined below) in an aggregate amount equal to their respective 2020 Incremental ABL Commitment, subject to the terms and conditions set forth in this Amendment. The amount of the 2020 Incremental ABL Commitments of each 2020 Incremental ABL Lender is set forth opposite such 2020 Incremental ABL Lender's name in Exhibit C hereto under the caption "2020 Incremental ABL Commitment."

WHEREAS, pursuant to Section 14.1(a) of the Existing Credit Agreement, Parent has requested that Agent and the Lenders amend certain provisions of the Existing Credit Agreement;

WHEREAS, BofA Securities, Inc., Goldman Sachs Bank USA, Credit Suisse Loan Funding LLC, JPMorgan Chase Bank, N.A., Wells Fargo Bank, National Association, Deutsche Bank Securities Inc., PNC Capital Markets LLC, Citibank N.A., Barclays Bank PLC, Citizens Capital Markets, Inc., Fifth Third Bank, National Association and BMO Harris Bank, N.A., are acting as joint lead arrangers and joint book runners for this Amendment and the 2020 Incremental ABL Commitments (the "2020 Joint Lead Arrangers");

WHEREAS The Huntington National Bank, Regions Bank, MUFG Union Bank, N.A. and Truist Bank are acting as Co-Documentation Agents for this Amendment;

WHEREAS, the Lenders party hereto each consent to each of the amendments set forth in Section 2 hereof.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of all of which is hereby acknowledged, Parent, the undersigned Lenders constituting all of the Lenders under the Existing Credit Agreement, all of the 2020 Incremental

ABL Lenders and Agent are entering into this Amendment in order to amend the Existing Credit Agreement as set forth herein, in each case, subject to the terms and conditions set forth herein.

SECTION 1.    <u>Incremental ABL Facility</u>.

(a)    On the Effective Date, subject to the terms and conditions set forth herein, each 2020 Incremental ABL Lender agrees that it shall be a "Tranche A Revolving Lender" with a "Tranche A Revolver Commitment" under the Amended Credit Agreement in an aggregate principal amount equal to its 2020 Incremental ABL Commitments plus its initial Tranche A Revolver Commitment with such 2020 Incremental ABL Commitments (i) having the same terms and conditions as the initial Tranche A Revolver Commitments and constituting the same Class of Revolver Commitments as the initial Tranche A Revolver Commitments for all purposes under the Amended Credit Agreement and (ii) constituting a commitment to make additional Tranche A Revolving Loans on the same terms as the initial 2020 Tranche A Revolver Commitments under the Amended Credit Agreement.  In connection with the foregoing, all references in the Amended Credit Agreement and the other Loan Documents to a "Tranche A Revolver Commitment" or "Revolver Commitment", or similar terms shall, from and after the date hereof, be deemed to include the 2020 Incremental ABL Commitments and all references in the Amended Credit Agreement and the other Loan Documents to a "Tranche A Revolving Lender" or a "Revolving Lender", or similar terms shall from and after the date hereof, be deemed to include the 2020 Incremental ABL Lenders.

(b)    On the Effective Date, after giving effect to this Amendment, the aggregate principal amount of the Tranche A Revolver Commitments shall be $3,350,000,000 and the aggregate principal amount of the Tranche B Revolver Commitments shall be $150,000,000.

(c)    As of the Effective Date, each Lender (including the 2020 Incremental ABL Lenders) agrees that such Lender's Tranche A Revolving Loans and Letter of Credit and Swing Loan reimbursement obligations outstanding shall be adjusted consistent with Section 2.16(b) of the Amended Credit Agreement to give effect to the 2020 Incremental ABL Commitments.

SECTION 2.    <u>Amendments to Credit Agreement and Guaranty and Security Agreement</u> .

(a)    Effective on and as of the Effective Date, each of the Lenders party hereto, Parent and Agent agrees that the Existing Credit Agreement shall be amended to delete the stricken text (indicated textually in the same manner as the following example: <span style="color:red">stricken text</span>) and to add the double-underlined text (indicated textually in the same manner as the following example: <u>double-underlined text</u>) as set forth in the pages of the Credit Agreement attached as <u>Exhibit A</u> hereto.

(b)    Effective on and as of the Effective Date, Schedule C-1 of the Existing Credit Agreement is deleted in its entirety and replaced with Schedule C-1 attached as <u>Exhibit C</u> hereto.

(c)    Effective on and as of the Effective Date, Schedule E-1 of the Existing Credit Agreement is deleted in its entirety and replaced with Schedule E-1 attached as <u>Exhibit D</u> hereto.

(d)    Effective on and as of the Effective Date, Schedule E-2 of the Existing Credit Agreement is deleted in its entirety and replaced with Schedule E-2 attached as <u>Exhibit E</u> hereto.

(e)    Effective on and as of the Effective Date, Schedule E-3 of the Existing Credit Agreement is deleted in its entirety and replaced with Schedule E-3 attached as <u>Exhibit F</u> hereto.

(f)    Effective on and as of the Effective Date, Schedule P-4 of the Existing Credit Agreement is deleted in its entirety and replaced with Schedule P-4 attached as <u>Exhibit G</u> hereto.

(g)     Each Lender party hereto and Agent hereby acknowledge and agree that this Amendment shall constitute an Incremental Amendment pursuant to Section 2.16(d) of the Existing Credit Agreement.

(h)     Effective on and as of the Effective Date, each of the Lenders party hereto, Parent and Agent agrees that the definition of "Excluded Accounts" in the Guaranty and Security Agreement shall be amended and restated as follows:

"Excluded Accounts" means (a) any pension, payroll, trust, tax withholding or margin account funded in the ordinary course of business or required by applicable law, (b) any Deposit Accounts, Securities Accounts or other accounts having a total collected balance that does not, at any time exceed (i) $1,000,000 individually or (ii) $2,500,000 in the aggregate for all Grantors and all such accounts or (c) any disbursement account holding cash or Cash Equivalents used for the purposes permitted by clause (z) of the definition of "Permitted Liens" in the Credit Agreement.

SECTION 3.    Conditions of Effectiveness of the Amendment. The effectiveness of this Amendment and the Incremental ABL Facility is subject to satisfaction (or waiver) of the following conditions (the date of satisfaction (or waiver) of such conditions being the "Effective Date"):

(a)     Agent shall have received an executed counterpart (which may include a facsimile or other electronic transmission) of this Amendment from (i) Parent and (ii) each of the Tranche A Revolving Lenders, the Tranche B Revolving Lenders, the 2020 Incremental ABL Lenders and the Issuing Banks;

(b)     the Acquisition shall be consummated prior to or substantially contemporaneously with the effectiveness of this Amendment in all material respects in accordance with the Acquisition Agreement (in each case without any waiver, amendment, modification or supplement thereof by Parent or any of its affiliates or any consent or election thereunder by Parent or any of its affiliates (any one of the foregoing, a "Modification") that, in any such case, is material and adverse to BofA Securities, Inc. or Goldman Sachs Bank USA (in either case, in their capacities as joint lead arrangers) without the prior written consent of BofA Securities, Inc. and Goldman Sachs Bank USA (not to be unreasonably withheld, conditioned or delayed));

(c)     the 2020 Joint Lead Arrangers shall have received (i) either (x) copies of Parent's Governing Documents, as amended, modified, or supplemented and in effect on the Effective Date, which Governing Documents shall be (1) certified by an officer, director, manager, or equivalent person of Parent and (2) with respect to Governing Documents that are charter documents, certified as of a recent date by an appropriate governmental official or (y) a certificate from the Secretary or other officer of Parent which shall certify that the Governing Documents of Parent, together with all amendments thereto, delivered on the Closing Date have not been amended, repealed, modified or restated (except as attached thereto) since the date reflected thereon and each Governing Document is in full force and effect and (ii) a certificate from the Secretary or other officer of Parent (x) attesting to the resolutions of Parent's board of directors authorizing the execution, delivery, and performance of this Amendment and any related Loan Documents to which it is a party, (y) authorizing specific officers of Parent to execute this Amendment and any related Loan Documents to which it is a party, and (z) attesting to the incumbency and signatures of such specific officers of Parent;

(d)     Agent shall have received a certificate of status with respect to Parent (where applicable, or such other customary functionally equivalent certificates, to the extent available in the applicable jurisdiction), such certificate to be issued by the appropriate officer of the jurisdiction of organization of Parent, which certificate shall indicate that Parent is in good standing in such jurisdiction;

(e)     Agent shall have received a solvency certificate from the chief financial officer (or other comparable financial officer) of Parent in a form substantially consistent with the solvency certificate delivered on the Closing Date;

(f)      subject to the last two sentences of Section 5.12 of the Amended Credit Agreement, Liens on the Collateral of ArcelorMittal USA LLC and each of its Domestic Wholly-Owned Subsidiaries (other than any Excluded Subsidiary) (the "2020 Target Loan Parties") shall have been granted to the Agent and the Agent shall have received (x) evidence that appropriate Uniform Commercial Code financing statements and as-extracted collateral filings have been (or, on the Effective Date, will be) duly filed in such office or offices as may be necessary or, in the opinion of Agent, desirable to perfect the Agent's Liens in the Collateral of the 2020 Target Loan Parties, (y) certificates, notes or other instruments (if any) representing the Collateral of the 2020 Target Loan Parties required to be delivered pursuant to the Guaranty and Security Agreement and the Intercreditor Agreement, together with stock powers, note powers or other instruments of transfer (if any) with respect thereto endorsed in blank and (z) all other executed documents and instruments required by the Loan Documents to grant and perfect the Agent's Liens in the Collateral by the 2020 Target Loan Parties and, if applicable, be in proper form for filing; notwithstanding anything to the contrary herein, to the extent any Collateral of the 2020 Target Loan Parties (other than Collateral that may be perfected by the (x) filing of a UCC financing statement with the Secretary of State where the applicable debtor is located or (y) delivery of the stock certificate and stock power of AM USA) that cannot be delivered or a security interest therein cannot be created or perfected on the Effective Date after Parent's use of commercially reasonable efforts to do so, then the creation and/or perfection of the security interest in such Collateral shall not constitute a condition precedent hereunder but, instead, may be accomplished at any time prior to (i) with respect to the delivery of the stock certificates and stock powers of the Target (other than AM USA and any Excluded Equity), the date that is 30 days after the Effective Date (with extensions available in the applicable Agent's reasonable discretion), (ii) with respect to any as-extracted collateral UCC filings, the date that is 180 days after the Effective Date (with extensions available in the Agent's reasonable discretion), (iii) with respect to Blocked Account Control Agreements between AcerlorMittal USA LLC, the Agent and JPMorgan Chase Bank N.A. (the "Depositary") in respect of Account No. 927641589 maintained at the Depositary, the date that is 240 days after the Effective Date (with extensions available in the applicable Agent's reasonable discretion), (iv) with respect to the Blocked Account Control Agreement between AcerlorMittal USA LLC, the Agent and JPMorgan Chase Bank N.A. (the "Depositary") in respect of Accounts No. 730130788 and No. 826202538 maintained at the Depositary, the date that is 10 Business Days after the Effective Date (with extensions available in the applicable Agent's reasonable discretion), (v) with respect to any other Collateral, the date that is 90 days after the Effective Date (with extensions available in the applicable Agent's reasonable discretion) or (vi) with respect to any other Fixed Asset Priority Collateral, such dates as set forth in the Senior Secured Notes Documents;

(g)      Agent shall have received each of the following documents, in form and substance reasonably satisfactory to Agent, duly executed and delivered, and each such document shall be in full force and effect:

1.  a joinder to the Guaranty and Security Agreement executed by the 2020 Target Loan Parties;

2.  a Copyright Security Agreement, Patent Security Agreement and Trademark Security Agreement, as applicable, in each case, executed by the applicable 2020 Target Loan Parties; and

3.  an Acknowledgement to the Intercreditor Agreement executed by the 2020 Target Loan Parties;

(h)      each of the 2020 Incremental ABL Lenders shall have received, at least three Business Days prior to the Effective Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act, that such 2020 Incremental ABL Lender has requested at least 10 Business Days prior to the Effective Date, including, if Parent qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification in relation to Parent;

(i)        the 2020 Joint Lead Arrangers shall have received (a) unaudited consolidated balance sheets and related statements of income, comprehensive income and cash flows of Parent and its consolidated subsidiaries for each fiscal quarter (other than any fourth fiscal quarter) ended after December 31, 2019 and at least 45 days prior to the Effective Date (and the 2020 Joint Lead Arrangers hereby acknowledge receipt of such unaudited financial statements as of and for the fiscal quarters ended March 31, 2020, June 30, 2020 and September 30, 2020) and (b) the unaudited combined and consolidated financial statements of ArcelorMittal USA LLC for the fiscal quarter ending September 30, 2020 (and the 2020 Joint Lead Arrangers hereby acknowledge receipt of such unaudited financial statements);

(j)        no Default or Event of Default exists or would result immediately after giving effect to the transactions contemplated hereby;

(k)        the representations and warranties of the Loan Parties set forth in Section 4 of this Amendment are true and correct;

(l)        Agent shall have received a certificate signed by a Responsible Officer of Parent certifying as to the matters set forth in paragraphs (b), (j) and (k) of this Section 3;

(m)        Agent shall have received from each of Jones Day and Frost Brown Todd LLC, an opinion addressed to Agent and each of the Lenders party hereto and dated the Effective Date in form and substance reasonably satisfactory to Agent;

(n)        Agent shall have received the Reaffirmation Agreement attached as  Exhibit B hereto executed by each Loan Party (other than Parent); an

(o)        (i) Agent shall have received all fees and expenses required to be paid by Parent pursuant to the Amended and Restated Commitment Letter, dated as of October 12, 2020, between Agent, BofA Securities, Inc., Goldman Sachs Bank USA and Parent, the Fee Letter and the Engagement Letter, dated as of November 11, 2020, between Parent and BofA Securities, Inc. and (ii) Agent shall have received all other fees and expenses required to be paid by the Loan Parties pursuant to the Credit Agreement for which invoices have been presented at least three Business Days prior to the Effective Date or such later date to which Parent may agree (including the reasonable fees and expenses of legal counsel that are payable under the Credit Agreement), in each case on or before the Effective Date.

SECTION 4.        Representations and Warranties. To induce the other parties hereto to enter into this Amendment, each Loan Party represents and warrants to each of the Lenders party hereto and Agent that, as of the Effective Date:

(a)        this Amendment has been duly authorized, executed and delivered by each Loan Party and constitutes, and the Amended Credit Agreement constitutes, a legal, valid and binding obligation, enforceable against each Loan Party, in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, receivership, administration, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally; and

(b)        the representations and warranties of each Loan Party set forth in  Article 4 of the Amended Credit Agreement and the other Loan Documents are true and correct in all material respects (unless such representation and warranty is qualified by "materiality" or "Material Adverse Effect" or other similar qualification, in which case such representation and warranty shall be true and correct in all respects) on and as of the Effective Date (both immediately before and immediately after giving effect to this Amendment), except to the extent that such representations and warranties specifically refer to an earlier date or specified period, in which case they shall be true and correct in all material respects (unless such representation and warranty is qualified by "materiality" or "Material Adverse Effect" or other similar qualification, in which case such representation and warranty shall be true and correct in all respects) as of such earlier date or for such specified period.

SECTION 5.    <u>Reference to and Effect on the Existing Credit Agreement and the other Loan Documents</u> .

(a)    On and after the Effective Date, each reference in the Existing Credit Agreement to "this Agreement," "hereunder," "hereof" or words of like import referring to the Credit Agreement shall mean and be a reference to the Amended Credit Agreement.

(b)    The Amended Credit Agreement and each of the other Loan Documents are and shall continue to be in full force and effect and are hereby in all respects ratified and confirmed.

(c)    The execution, delivery and effectiveness of this Amendment shall not, except as expressly provided herein, operate as a waiver of any right, power or remedy of any Lender or Agent under any of the Loan Documents, nor constitute a waiver of any provision of any of the Loan Documents. Nothing herein contained shall be construed as a substitution or novation of the Obligations outstanding under the Existing Credit Agreement or the Loan Documents, which shall remain in full force and effect, except as modified hereby. On and after the Effective Date, this Amendment shall for all purposes constitute a Loan Document.

(d)    The parties hereto acknowledge and agree that the amendment of the Credit Agreement pursuant to this Amendment and all other Loan Documents amended and/or executed and delivered in connection herewith shall not constitute a novation of the Credit Agreement and the other Loan Documents as in effect prior to the Effective Date.

SECTION 6.    <u>Execution in Counterparts</u>. This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Delivery by facsimile or electronic transmission of an executed counterpart of a signature page to this Amendment shall be effective as delivery of an original executed counterpart of this Amendment.

SECTION 7.    <u>Governing Law</u>. This Amendment shall be governed by, and construed in accordance with, the laws of the State of New York.

SECTION 8.    <u>Headings</u>. Section headings herein are included for convenience of reference only and shall not affect the interpretation of this Amendment.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**PARENT**

CLEVELAND-CLIFFS INC.

By:    /s/ James D. Graham
Name: James D. Graham
Title: Executive Vice President, Chief Legal Officer & Secretary

[Signature Page to Second Amendment]

BANK OF AMERICA, N.A., as Agent, a 2020 Incremental ABL Lender, a Tranche A Revolving Lender, a Tranche B Revolving Lender and an Issuing Bank

By:   /s/ Thomas H. Herron
    Name:   Thomas H. Herron
    Title:   Senior Vice President

[Signature Page to Second Amendment]

Wells Fargo Bank, National Association, as a 2020 Incremental ABL Lender

By:    /s/ Andrew Dilley
   Name:    Andrew Dilley
   Title:    Authorized Signatory

Wells Fargo Bank, National Association, as a Tranche A Revolving Lender

By:    /s/ Andrew Dilley
   Name:    Andrew Dilley
   Title:    Authorized Signatory

Wells Fargo Bank, National Association, as a Tranche B Revolving Lender

By:    /s/ Andrew Dilley
   Name:    Andrew Dilley
   Title:    Authorized Signatory

Wells Fargo Bank, National Association, as an Issuing Bank

By:    /s/ Andrew Dilley
   Name:    Andrew Dilley
   Title:    Authorized Signatory

[Signature Page to Second Amendment]

JPMORGAN CHASE BANK, N.A., as a 2020 Incremental ABL Lender

By:   /s/ Eric B. Bergeson
   Name:   Eric B. Bergeson
   Title:    Authorized Officer

JPMORGAN CHASE BANK, N.A., as a Tranche A Revolving Lender

By:   /s/ Eric B. Bergeson
   Name:   Eric B. Bergeson
   Title:    Authorized Officer

JPMORGAN CHASE BANK, N.A., as a Tranche B Revolving Lender

By:   /s/ Eric B. Bergeson
   Name:   Eric B. Bergeson
   Title:    Authorized Officer

JPMORGAN CHASE BANK, N.A., as an Issuing Bank

By:   /s/ Eric B. Bergeson
   Name:   Eric B. Bergeson
   Title:    Authorized Officer

[Signature Page to Second Amendment]

FIFTH THIRD BANK, NATIONAL ASSOCIATION, as a 2020 Incremental ABL Lender

By:   /s/ Paul Vitti
   Name:   Paul Vitti
   Title:   Managing Director

FIFTH THIRD BANK, NATIONAL ASSOCIATION, as a Tranche A Revolving Lender

By:   /s/ Paul Vitti
   Name:   Paul Vitti
   Title:   Managing Director

FIFTH THIRD BANK, NATIONAL ASSOCIATION, as a Tranche B Revolving Lender

By:   /s/ Paul Vitti
   Name:   Paul Vitti
   Title:   Managing Director

FIFTH THIRD BANK, NATIONAL ASSOCIATION, as an Issuing Bank

By:   /s/ Paul Vitti
   Name:   Paul Vitti
   Title:   Managing Director

[Signature Page to Second Amendment]

PNC BANK, NATIONAL ASSOCIATION, as a 2020 Incremental ABL Lender

By:   /s/ Robert T. Brown
  Name:   Robert T. Brown
  Title:   Vice President


PNC BANK, NATIONAL ASSOCIATION, as a Tranche A Revolving Lender

By:   /s/ Robert T. Brown
  Name:   Robert T. Brown
  Title:   Vice President


PNC BANK, NATIONAL ASSOCIATION, as a Tranche B Revolving Lender

By:   /s/ Robert T. Brown
  Name:   Robert T. Brown
  Title:   Vice President


PNC BANK, NATIONAL ASSOCIATION, as an Issuing Bank

By:   /s/ Robert T. Brown
  Name:   Robert T. Brown
  Title:   Vice President


[Signature Page to Second Amendment]

BMO HARRIS BANK N.A., as a 2020 Incremental ABL Lender

By:   /s/ Ran Li
   Name:   Ran Li
   Title:   Authorized Signatory

BMO HARRIS BANK N.A., as a Tranche A Revolving Lender

By:   /s/ Ran Li
   Name:   Ran Li
   Title:   Authorized Signatory

BMO HARRIS BANK N.A., as a Tranche B Revolving Lender

By:   /s/ Ran Li
   Name:   Ran Li
   Title:   Authorized Signatory

[Signature Page to Second Amendment]

GOLDMAN SACHS BANK USA, as a 2020 Incremental ABL Lender

By:   /s/ Jacob Elder
    Name:   Jacob Elder
    Title:    Authorized Signatory

GOLDMAN SACHS BANK USA, as a Tranche A Revolving Lender

By:   /s/ Jacob Elder
    Name:   Jacob Elder
    Title:    Authorized Signatory

GOLDMAN SACHS BANK USA, as a Tranche B Revolving Lender

By:   /s/ Jacob Elder
    Name:   Jacob Elder
    Title:    Authorized Signatory

GOLDMAN SACHS BANK USA, as an Issuing Bank

By:   /s/ Jacob Elder
    Name:   Jacob Elder
    Title:    Authorized Signatory

[Signature Page to Second Amendment]

BARCLAYS BANK PLC, as a 2020 Incremental ABL Lender

By:    /s/ Craig Malloy
    Name:    Craig Malloy
    Title:    Director

BARCLAYS BANK PLC, as a Tranche A Revolving Lender

By:    /s/ Craig Malloy
    Name:    Craig Malloy
    Title:    Director

BARCLAYS BANK PLC, as a Tranche B Revolving Lender

By:    /s/ Craig Malloy
    Name:    Craig Malloy
    Title:    Director

BARCLAYS BANK PLC, as an Issuing Bank

By:    /s/ Craig Malloy
    Name:    Craig Malloy
    Title:    Director

[Signature Page to Second Amendment]

CITIBANK N.A., as a 2020 Incremental ABL Lender

By:    /s/ Brendan Mackay
   Name:    Brendan Mackay
   Title:    Vice President & Director

CITIBANK N.A., as a Tranche A Revolving Lender

By:    /s/ Brendan Mackay
   Name:    Brendan Mackay
   Title:    Vice President & Director

CITIBANK N.A., as a Tranche B Revolving Lender

By:    /s/ Brendan Mackay
   Name:    Brendan Mackay
   Title:    Vice President & Director

CITIBANK N.A., as an Issuing Bank

By:    /s/ Brendan Mackay
   Name:    Brendan Mackay
   Title:    Vice President & Director

[Signature Page to Second Amendment]

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as a 2020 Incremental ABL Lender

By:   /s/ Doreen Barr
   Name:   Doreen Barr
   Title:    Authorized Signatory

By:   /s/ Komal Shah
   Name:   Komal Shah
   Title:    Authorized Signatory


CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as a Tranche A Revolving Lender

By:   /s/ Doreen Barr
   Name:   Doreen Barr
   Title:    Authorized Signatory

By:   /s/ Komal Shah
   Name:   Komal Shah
   Title:    Authorized Signatory


CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as a Tranche B Revolving Lender

By:   /s/ Doreen Barr
   Name:   Doreen Barr
   Title:    Authorized Signatory

By:   /s/ Komal Shah
   Name:   Komal Shah
   Title:    Authorized Signatory


CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as an Issuing Bank

By:   /s/ Doreen Barr
   Name:   Doreen Barr
   Title:    Authorized Signatory

By:   /s/ Komal Shah
   Name:   Komal Shah
   Title:    Authorized Signatory


[Signature Page to Second Amendment]

DUETSCHE BANK AG NEW YORK BRANCH, as a 2020 Incremental ABL Lender

By:   /s/ Philip Tancorra
   Name:   Philip Tancorra
   Title:    Vice President

By:   /s/ Michael Strobel
   Name:   Michael Strobel
   Title:    Vice President

DUETSCHE BANK AG NEW YORK BRANCH, as a Tranche A Revolving Lender

By:   /s/ Philip Tancorra
   Name:   Philip Tancorra
   Title:    Vice President

By:   /s/ Michael Strobel
   Name:   Michael Strobel
   Title:    Vice President

DUETSCHE BANK AG NEW YORK BRANCH, as a Tranche B Revolving Lender

By:   /s/ Philip Tancorra
   Name:   Philip Tancorra
   Title:    Vice President

By:   /s/ Michael Strobel
   Name:   Michael Strobel
   Title:    Vice President

DUETSCHE BANK AG NEW YORK BRANCH, as an Issuing Bank

By:   /s/ Philip Tancorra
   Name:   Philip Tancorra
   Title:    Vice President

By:   /s/ Michael Strobel
   Name:   Michael Strobel
   Title:    Vice President

[Signature Page to Second Amendment]

Citizens Bank, N.A., as a 2020 Incremental ABL Lender

By:    /s/ Debra L. McAllonis
    Name:    Debra L. McAllonis
    Title:    Senior Vice President

Citizens Bank, N.A., as a Tranche A Revolving Lender

By:    /s/ Debra L. McAllonis
    Name:    Debra L. McAllonis
    Title:    Senior Vice President

Citizens Bank, N.A., as an Issuing Bank

By:    /s/ Debra L. McAllonis
    Name:    Debra L. McAllonis
    Title:    Senior Vice President

[Signature Page to Second Amendment]

THE HUNTINGTON NATIONAL BANK, as a 2020 Incremental ABL Lender

By:   /s/ Paul Weybrecht
   Name:   Paul Weybrecht
   Title:   Senior Vice President

THE HUNTINGTON NATIONAL BANK, as a Tranche A Revolving Lender

By:   /s/ Paul Weybrecht
   Name:   Paul Weybrecht
   Title:   Senior Vice President

THE HUNTINGTON NATIONAL BANK, as a Tranche B Revolving Lender

By:   /s/ Paul Weybrecht
   Name:   Paul Weybrecht
   Title:   Senior Vice President

THE HUNTINGTON NATIONAL BANK, as an Issuing Bank

By:   /s/ Paul Weybrecht
   Name:   Paul Weybrecht
   Title:   Senior Vice President

[Signature Page to Second Amendment]

REGIONS BANK, as a 2020 Incremental ABL Lender

By:   /s/ Stephen J. McGreevy
   Name:    Stephen J. McGreevy
   Title:    Managing Director

REGIONS BANK, as a Tranche A Revolving Lender

By:   /s/ Stephen J. McGreevy
   Name:    Stephen J. McGreevy
   Title:    Managing Director

REGIONS BANK, as a Tranche B Revolving Lender

By:   /s/ Stephen J. McGreevy
   Name:    Stephen J. McGreevy
   Title:    Managing Director

REGIONS BANK, as an Issuing Bank

By:   /s/ Stephen J. McGreevy
   Name:    Stephen J. McGreevy
   Title:    Managing Director

[Signature Page to Second Amendment]

MUFG Union Bank, N.A. as a 2020 Incremental ABL Lender

By:    /s/ Thomas Kainamura
   Name:    Thomas Kainamura
   Title:    Director

[Signature Page to Second Amendment]

TRUIST BANK, as a 2020 Incremental ABL Lender

By:   /s/ Stephen D. Metts
  Name:   Stephen D. Metts
  Title:   Director

TRUIST BANK, as a Tranche A Revolving Lender

By:   /s/ Stephen D. Metts
  Name:   Stephen D. Metts
  Title:   Director

TRUIST BANK, as a Tranche B Revolving Lender

By:   /s/ Stephen D. Metts
  Name:   Stephen D. Metts
  Title:   Director

[Signature Page to Second Amendment]

Siemens Financial Services, Inc., as a 2020 Incremental ABL Lender

By:    /s/ Mark Schafer
   Name:    Mark Schafer
   Title:

By:    /s/ Rich Holston
   Name:    Rich Holston
   Title:    VP

Siemens Financial Services, Inc., as a Tranche A Revolving Lender

By:    /s/ Mark Schafer
   Name:    Mark Schafer
   Title:

By:    /s/ Rich Holston
   Name:    Rich Holston
   Title:    VP

[Signature Page to Second Amendment]

U.S. BANK NATIONAL ASSOCIATION, as a Tranche A Revolving Lender

By:   /s/ Matthew Kasper
   Name:   Matthew Kasper
   Title:   Senior Vice President

[Signature Page to Second Amendment]

ROYAL BANK OF CANADA, as a 2020 Incremental ABL Lender

By:    /s/ Alexandre Camerlain
    Name:    Alexandre Camerlain
    Title:    Authorized Signatory

ROYAL BANK OF CANADA, as a Tranche A Revolving Lender

By:    /s/ Alexandre Camerlain
    Name:    Alexandre Camerlain
    Title:    Authorized Signatory

[Signature Page to Second Amendment]

CIT Bank, N.A., as a Tranche A Revolving Lender

By:   /s/ Robert L. Klein
   Name:   Robert L. Klein
   Title:   Director

[Signature Page to Second Amendment]

ING Capital LLC, as a Tranche A Revolving Lender

By:   /s/ Michael Chen
  Name:   Michael Chen
  Title:   Director

By:   /s/ Jeff Chu
  Name:   Jeff Chu
  Title:   Director

[Signature Page to Second Amendment]

**Exhibit A**

***EXECUTION VERSION***

**ASSET-BASED REVOLVING CREDIT AGREEMENT**

by and among

**BANK OF AMERICA, N.A.,**

**as Agent,**

**THE LENDERS THAT ARE PARTIES HERETO,**

**as the Lenders, and**

**CLEVELAND-CLIFFS INC.,**

**as Parent and a Borrower**

---

**BOFA SECURITIES, INC.,**
**CREDIT SUISSE LOAN FUNDING LLC,**
**JPMORGAN CHASE BANK, N.A.,**
**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
**DEUTSCHE BANK SECURITIES INC.,**
**GOLDMAN SACHS BANK USA,**
**PNC CAPITAL MARKETS LLC,**
**CITIGROUP GLOBAL MARKETS INC.,**
**BARCLAYS BANK PLC,**
**CITIZENS CAPITAL MARKETS, INC.,**
**REGIONS CAPITAL MARKETS,**
**THE HUNTINGTON NATIONAL BANK,**

and

**FIFTH THIRD BANK, NATIONAL ASSOCIATION,**
as Joint Lead Arrangers and Joint Book Runners

**Dated as of March 13, 2020**

(as amended by First Amendment to Asset-Based Revolving Credit Agreement, dated March 27, 2020 , as further amended by Second Amendment to Asset-Based Revolving Credit Agreement, dated December 9, 2020)

---

TABLE OF CONTENTS

|   |   |   | Page |
|---|---|---|---|
| 1 | DEFINITIONS AND CONSTRUCTION | | 1 |
|   | 1.1 | Definitions | 1 |
|   | 1.2 | Accounting Terms | 1 |
|   | 1.3 | Limited Condition Transaction | 2 |
|   | 1.4 | Construction | 2 |
|   | 1.5 | Time References | 3 |
|   | 1.6 | Schedules and Exhibits | 3 |
|   | 1.7 | Dollar Equivalent | 4 |
|   | 1.8 | LIBOR Rate | 4 |
|   | 1.9 | Pro Forma Effect of AMUSA Acquisition. | 4 |
| 2 | REVOLVING LOANS AND TERMS OF PAYMENT | | 4 |
|   | 2.1 | Revolving Loans | 4 |
|   | 2.2 | Additional Borrowers | 5 |
|   | 2.3 | Borrowing Procedures and Settlements | 6 |
|   | 2.4 | Payments; Reductions of Commitments; Prepayments | 13 |
|   | 2.5 | Promise to Pay; Promissory Notes | 17 |
|   | 2.6 | Interest Rates and Letter of Credit Fee: Rates, Payments, and Calculations | 18 |
|   | 2.7 | Crediting Payments | 19 |
|   | 2.8 | Designated Accounts | 19 |
|   | 2.9 | Maintenance of Loan Account; Statements of Obligations | 20 |
|   | 2.10 | Fees | 20 |
|   | 2.11 | Letters of Credit | 20 |
|   | 2.12 | [Reserved] | 27 |
|   | 2.13 | LIBOR Option | 27 |
|   | 2.14 | Capital Requirements | 31 |
|   | 2.15 | Joint and Several Liability | 32 |
|   | 2.16 | Incremental Borrowings | 34 |
|   | 2.17 | Tranche B Exchange Offer | 37 |
|   | 2.18 | Tranche A Exchange Offer | 38 |
| 3 | CONDITIONS; TERM OF AGREEMENT | | 39 |
|   | 3.1 | Conditions Precedent to the Closing Date | 39 |
|   | 3.2 | [Reserved] | 39 |
|   | 3.3 | Conditions Precedent to all Extensions of Credit | 39 |
|   | 3.4 | Maturity | 40 |
|   | 3.5 | Effect of Maturity | 40 |
|   | 3.6 | Early Termination by Borrowers | 40 |
|   | 3.7 | Conditions Subsequent | 40 |
| 4 | REPRESENTATIONS AND WARRANTIES | | 40 |
|   | 4.1 | Due Organization and Qualification; Subsidiaries | 41 |
|   | 4.2 | Due Authorization; No Conflict | 41 |

i

| | | Page |
|---|---|---|
| 4.3 | Governmental Consents | 41 |
| 4.4 | Binding Obligations; Perfected Liens | 42 |
| 4.5 | Title to Assets; No Encumbrances | 42 |
| 4.6 | Litigation | 42 |
| 4.7 | Compliance with Laws | 42 |
| 4.8 | Financial Statements; No Material Adverse Effect | 42 |
| 4.9 | Solvency | 42 |
| 4.10 | Employee Benefits | 43 |
| 4.11 | Environmental Condition | 43 |
| 4.12 | Complete Disclosure | 44 |
| 4.13 | Sanctions, PATRIOT Act, and FCPA | 44 |
| 4.14 | [Reserved.] | 44 |
| 4.15 | Payment of Taxes | 44 |
| 4.16 | Margin Stock | 44 |
| 4.17 | Governmental Regulation | 45 |
| 4.18 | OFAC | 45 |
| 4.19 | Employee and Labor Matters | 45 |
| 4.20 | [Reserved.] | 45 |
| 4.21 | [Reserved.] | 45 |
| 4.22 | Eligible Accounts | 45 |
| 4.23 | Eligible Inventory and Eligible Equipment | 45 |
| 4.24 | Material Contracts | 46 |
| 4.25 | Inventory and Equipment Records | 46 |
| 4.26 | EEA Financial Institutions | 46 |
| 5 | AFFIRMATIVE COVENANTS | 46 |
| 5.1 | Financial Statements, Reports, Certificates | 46 |
| 5.2 | Reporting | 46 |
| 5.3 | Existence | 46 |
| 5.4 | Maintenance of Properties | 46 |
| 5.5 | Taxes | 47 |
| 5.6 | Insurance | 47 |
| 5.7 | Inspection | 47 |
| 5.8 | Compliance with Laws | 48 |
| 5.9 | Environmental | 48 |
| 5.10 | [Reserved. | 48 |
| 5.11 | Formation of Subsidiaries | 48 |
| 5.12 | Further Assurances | 49 |
| 5.13 | Lender Meetings | 49 |
| 5.14 | [Reserved] AMUSA Accounts | 49 |
| 5.15 | Compliance with ERISA and the IRC | 50 |

|  |  |  | Page |
|---|---|---|---|
|  | 5.16 | Cash Management | 50 |
| 6 | NEGATIVE COVENANTS | | 51 |
|  | 6.1 | Indebtedness | 51 |
|  | 6.2 | Liens | 51 |
|  | 6.3 | Restrictions on Fundamental Changes | 51 |
|  | 6.4 | Disposal of Assets | 51 |
|  | 6.5 | Nature of Business | 51 |
|  | 6.6 | Prepayments and Amendments | 52 |
|  | 6.7 | Restricted Payments | 53 |
|  | 6.8 | Accounting Methods | 53 |
|  | 6.9 | Investments | 54 |
|  | 6.10 | Transactions with Affiliates | 54 |
|  | 6.11 | Use of Proceeds | 54 |
| 7 | FINANCIAL COVENANT | | 55 |
| 8 | EVENTS OF DEFAULT | | 55 |
|  | 8.1 | Payments | 55 |
|  | 8.2 | Covenants | 55 |
|  | 8.3 | Judgments | 55 |
|  | 8.4 | Voluntary Bankruptcy, etc | 56 |
|  | 8.5 | Involuntary Bankruptcy, etc | 56 |
|  | 8.6 | Default Under Other Agreements | 56 |
|  | 8.7 | Representations, etc | 56 |
|  | 8.8 | Security Documents | 56 |
|  | 8.9 | Loan Documents | 56 |
|  | 8.10 | Change in Control | 56 |
|  | 8.11 | ERISA and Pension Events | 56 |
| 9 | RIGHTS AND REMEDIES | | 57 |
|  | 9.1 | Rights and Remedies | 57 |
|  | 9.2 | Remedies Cumulative | 57 |
| 10 | WAIVERS; INDEMNIFICATION | | 58 |
|  | 10.1 | Demand; Protest; etc | 58 |
|  | 10.2 | The Lender Group's Liability for Collateral | 58 |
|  | 10.3 | Indemnification | 58 |
| 11 | NOTICES | | 59 |
| 12 | CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER; JUDICIAL REFERENCE PROVISION | | 60 |
| 13 | ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS | | 61 |
|  | 13.1 | Assignments and Participations | 61 |
|  | 13.2 | Successors | 65 |
| 14 | AMENDMENTS; WAIVERS | | 65 |

A006357

| | | | Page |
|---|---|---|---|
| | 14.1 | Amendments and Waivers | 65 |
| | 14.2 | Replacement of Certain Lenders | 67 |
| | 14.3 | No Waivers; Cumulative Remedies | 67 |
| 15 | | AGENT | 68 |
| | 15.1 | Appointment, Authority and Duties of Agent | 68 |
| | 15.2 | Liability of Agent | 69 |
| | 15.3 | Reliance by Agent | 69 |
| | 15.4 | Notice of Default or Event of Default | 69 |
| | 15.5 | Due Diligence and Non-Reliance | 69 |
| | 15.6 | Indemnification | 70 |
| | 15.7 | Individual Capacities | 70 |
| | 15.8 | Successor Agent | 70 |
| | 15.9 | Agreements Regarding Collateral and Borrower Materials | 71 |
| | 15.10 | Ratable Sharing | 71 |
| | 15.11 | Remittance of Payments and Collections | 72 |
| | 15.12 | Titles | 72 |
| | 15.13 | Bank of Product Providers | 72 |
| | 15.14 | No Third Party Beneficiaries | 72 |
| 16 | | [Reserved] | 73 |
| 17 | | WITHHOLDING TAXES | 73 |
| | 17.1 | Payments | 73 |
| | 17.2 | Exemptions | 73 |
| | 17.3 | Reductions | 75 |
| | 17.4 | Refunds | 75 |
| 18 | | GENERAL PROVISIONS | 76 |
| | 18.1 | Effectiveness | 76 |
| | 18.2 | Section Headings | 76 |
| | 18.3 | Interpretation | 76 |
| | 18.4 | Severability of Provisions | 76 |
| | 18.5 | Bank Product Providers | 76 |
| | 18.6 | Debtor-Creditor Relationship | 77 |
| | 18.7 | Counterparts; Electronic Execution | 78 |
| | 18.8 | Revival and Reinstatement of Obligations; Certain Waivers | 78 |
| | 18.9 | Confidentiality | 78 |
| | 18.10 | Survival | 80 |
| | 18.11 | Patriot Act | 80 |
| | 18.12 | Integration | 80 |
| | 18.13 | Parent as Agent for Borrowers | 80 |
| | 18.14 | Judgment Currency | 81 |
| | 18.15 | Acknowledgement and Consent to Bail-In of Affected Financial Institutions | 81 |

iv

TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| 18.16 | Certain ERISA Matters | 83 |
| 18.17 | Acknowledgement Regarding Any Supported QFCs | 84 |
| 18.18 | Application of Sanctions Provisions to the Loan Parties | 85 |
| 19 | INTERCREDITOR AGREEMENT | 85 |

v

**EXHIBITS AND SCHEDULES**

Exhibit A-1       Form of Assignment and Acceptance
Exhibit B-1       Form of Borrowing Base Certificate
Exhibit B-2       Form of Bank Product Provider Agreement
Exhibit C-1       Form of Compliance Certificate
Exhibit D-1       Form of Solvency Certificate
Exhibit L-1       Form of LIBOR Notice


Schedule 1.1       Definitions
Schedule A-1       [Reserved]
Schedule C-1       Revolver Commitments
Schedule E-1       Existing Hedge Obligations
Schedule E-2       Existing Letters of Credit
Schedule E-3       Excluded Subsidiary Indebtedness
Schedule I-1       Immaterial Subsidiaries
Schedule J-1       Joint Ventures
Schedule P-1       Permitted Investments
Schedule P-2       Permitted Liens
Schedule P-3       [Reserved]
Schedule P-4       Permitted Indebtedness
Schedule 3.1       Conditions Precedent to Closing Date
Schedule 3.7       Conditions Subsequent
Schedule 4.1(b)       Capitalization of Borrowers
Schedule 4.1(c)       Capitalization of Borrowers' Subsidiaries
Schedule 4.1(d)       Subscriptions, Options, Warrants, Calls
Schedule 4.6       Litigation
Schedule 4.11       Environmental Conditions
Schedule 5.1       Financial Statements, Reports, Certificates
Schedule 5.2       Collateral Reporting
Schedule 5.16       Deposit Accounts

**ASSET-BASED REVOLVING CREDIT AGREEMENT**

**THIS ASSET-BASED REVOLVING CREDIT AGREEMENT** , is dated as of March 13, 2020, by and among the lenders identified on the signature pages hereof (each of such lenders, together with its successors and permitted assigns, is referred to hereinafter as a "Lender", as that term is hereinafter further defined), **BANK OF AMERICA, N.A.**, as administrative agent for each member of the Lender Group and the Bank Product Providers (in such capacity, together with its successors and assigns in such capacity, "Agent"), and **CLEVELAND-CLIFFS INC.**, an Ohio corporation ("Parent").

The parties agree as follows:

**1.     DEFINITIONS AND CONSTRUCTION.**

1.1     Definitions. Capitalized terms used in this Agreement shall have the meanings specified therefor on Schedule 1.1.

1.2     Accounting Terms. All accounting terms not specifically defined herein shall be construed in accordance with GAAP; provided, that if Parent notifies Agent that Borrowers request an amendment to any provision hereof to eliminate the effect of any Accounting Change occurring after the Closing Date or in the application thereof on the operation of such provision (or if Agent notifies Borrowers that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such Accounting Change or in the application thereof, then Agent and Borrowers agree that they will negotiate in good faith amendments to the provisions of this Agreement that are directly affected by such Accounting Change with the intent of having the respective positions of the Lenders and Borrowers after such Accounting Change conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon and agreed to by the Required Lenders, the provisions in this Agreement shall be calculated as if no such Accounting Change had occurred; provided further that the parties hereto agree that the adoption of ASC 606 by the Borrowers and their Subsidiaries prior to the date hereof shall not constitute an Accounting Change. When used herein, the term "financial statements" shall include the notes and schedules thereto. Whenever the term "Parent" is used in respect of a financial covenant or a related definition, it shall be understood to mean Parent and its Subsidiaries on a consolidated basis, unless the context clearly requires otherwise. For purposes of calculating the Tranche A Borrowing Base, the Tranche B Borrowing Base and the Aggregate Borrowing Base, such calculation of Inventory shall be on a "first-in, first-out" basis. Notwithstanding anything to the contrary contained herein, (a) all financial statements delivered hereunder shall be prepared, and all financial covenants contained herein shall be calculated, without giving effect to any election under the Statement of Financial Accounting Standards No. 159 (or any similar accounting principle) permitting a Person to value its financial liabilities or Indebtedness at the fair value thereof, (b) the term "unqualified opinion" as used herein to refer to opinions or reports provided by accountants shall mean an opinion or report that does not include any explanation, supplemental comment, or other comment concerning the ability of the applicable Person to continue as a going concern or concerning the scope of the audit (other than a "going concern" or like qualification or exception resulting solely from (i) maturity of any Indebtedness (including the Revolver Commitments) occurring within one (1) year from the time such opinion is delivered, and/or (ii) the projected or potential breach of any of the financial covenants set forth in this Agreement or any agreement governing any Indebtedness during the one-year period following the date such opinion is delivered), and (c) notwithstanding the foregoing or anything else to the contrary in this Agreement, all leases of the Borrowers and their respective Subsidiaries that were treated as "operating leases" prior to the adoption of ASC 842 shall continue to be accounted for as such for all purposes under the Loan Documents. For purposes of determining satisfaction of the Payment Conditions set forth in this Agreement or the financial covenant set forth in Section 7 of this Agreement, such determination shall be calculated on a pro forma basis (including pro forma adjustments arising out of events which are directly attributable to any Permitted Acquisition, Permitted Disposition or Permitted Investment that are factually supportable, and are expected to have a continuing impact, in each case determined on a basis

consistent with Article 11 of Regulation S-X promulgated under the Securities Act and as interpreted by the staff of the SEC or in such other manner acceptable to Agent).

1.3    Limited Condition Transaction. Notwithstanding anything to the contrary herein, for purposes of determining compliance with any test or covenant contained in this Agreement with respect to any period during which any Limited Condition Transaction is consummated, the Fixed Charge Coverage Ratio shall be calculated with respect to such period and such Limited Condition Transaction on a pro forma basis; provided that, for purposes of determining the permissibility of any Limited Condition Transaction under this Agreement, at the option of Parent (Parent's election to exercise such option in connection with any Limited Condition Transaction, an "LCA Election") the date of determination for calculation of any such ratios shall be deemed to be the date the definitive agreements for such Limited Condition Transaction are entered into (the "LCA Test Date") and if, after giving pro forma effect to the Limited Condition Transaction and all related transactions (including incurrences or prepayments of Indebtedness and Liens, dispositions and Restricted Payments) to be entered into in connection therewith as if they had occurred at the beginning of the most recent date of determination ending prior to the LCA Test Date, Parent could have entered into such Limited Condition Transaction on the relevant LCA Test Date in compliance with such ratio, such ratio shall be deemed to have been complied with. For the avoidance of doubt, if the Parent has made an LCA Election and any of the ratios for which compliance was determined or tested as of the LCA Test Date is not met as a result of fluctuations in any such ratio, including due to fluctuations in EBITDA of the Parent and its Subsidiaries, at or prior to the consummation of the relevant Limited Condition Transaction, such ratio will be deemed to have been met notwithstanding such fluctuations solely for purposes of determining whether the relevant Limited Condition Transaction is permitted to be consummated. If the Parent has made an LCA Election for any Limited Condition Transaction, then in connection with any subsequent calculation of any ratio availability with respect to any other transaction (including any incurrence or prepayment of Indebtedness or Liens, dispositions or Restricted Payments) on or following the relevant LCA Test Date and prior to the earlier of the date on which such Limited Condition Transaction is consummated, such Limited Condition Transaction is terminated or expires without consummation of such Limited Condition Transaction, any such ratio shall be calculated on a pro forma basis assuming such Limited Condition Transaction and other transactions in connection therewith have been consummated. For determining permissibility of a Limited Condition Transaction, for purposes of determining compliance with any provision of this Agreement which requires that no Default or Event of Default, as applicable, has occurred, is continuing or would result from the consummation of such Limited Condition Transaction, as applicable, such condition shall, at the option of the Parent, be deemed satisfied, so long as no Default or Event of Default, as applicable, exists on the date the definitive agreements for such Limited Condition Transaction are entered into and no Event of Default under Section 8.1, 8.4 or 8.5 exists on the date of consummation of the Limited Condition Transaction or would result therefrom. For the avoidance of doubt, if the Parent has exercised its option under this Section 1.3, and any Default or Event of Default occurs following the date the definitive agreements for the applicable Limited Condition Transaction were entered into and prior to the consummation of such Limited Condition Transaction, any such Default or Event of Default (other than an Event of Default under Section 8.1, 8.4 or 8.5) shall be deemed to not have occurred or be continuing for purposes of determining whether such Limited Condition Transaction is permitted hereunder.

1.4    Construction.

(a)    Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be. Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified. Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document

2

shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties. Any reference herein to any Person shall be construed to include such Person's successors and assigns. Any requirement of a writing contained herein or in any other Loan Document shall be satisfied by the transmission of a Record.

(b)    Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean (i) the payment or repayment in full in immediately available funds of (A) the principal amount of, and interest accrued and unpaid with respect to, all outstanding Loans, together with the payment of any premium applicable to the repayment of the Loans, (B) all Lender Group Expenses that have accrued and are unpaid for which an invoice has been provided to Parent, and (C) all fees or charges that have accrued hereunder or under any other Loan Document (including the Letter of Credit Fees and the Unused Line Fee) and are unpaid, (ii) in the case of contingent reimbursement obligations with respect to Letters of Credit, providing Letter of Credit Collateralization, (iii) in the case of obligations with respect to Bank Products (other than Hedge Obligations), providing Bank Product Collateralization, (iv) the receipt by Agent of cash collateral in order to secure any other contingent Obligations for which a claim or demand for payment has been made on or prior to such time or in respect of matters or circumstances known to Agent or a Lender at such time that are reasonably expected to result in any loss, cost, damage, or expense (including attorneys' fees and legal expenses), such cash collateral to be in such amount as Agent reasonably determines is appropriate to secure such contingent Obligations, (v) the payment or repayment in full in immediately available funds of all other outstanding Obligations (including the payment of any termination amount then applicable (or which would or could become applicable as a result of the repayment of the other Obligations) under Hedge Agreements provided by Hedge Providers) other than (A) unasserted contingent indemnification Obligations, (B) any Bank Product Obligations (other than Hedge Obligations) that, at such time, are allowed by the applicable Bank Product Provider to remain outstanding without being required to be repaid or cash collateralized, and (C) any Hedge Obligations that, at such time, are allowed by the applicable Hedge Provider to remain outstanding without being required to be repaid, and (vi) the termination of all of the Revolver Commitments of the Lenders.

(c)    Any reference herein or in any other Loan Document to any law, statute, rule or regulation shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such law.

(d)    Any reference herein to a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company or a limited partnership , or an allocation of assets to a series of a limited liability company or a limited partnership (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale or transfer, or similar term, as applicable, to, of or with a separate Person. Any division of a limited liability company or a limited partnership shall constitute a separate Person hereunder (and each division of any limited liability company or any limited partnership that is a Subsidiary, Joint Venture or any other like term shall also constitute such a Person or entity).

1.5    Time References. Unless the context of this Agreement or any other Loan Document clearly requires otherwise, all references to time of day refer to Chicago time. For purposes of the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to and including"; provided that, with respect to a computation of fees or interest payable to Agent or any Lender, such period shall include the first day, but not the last day so long as payment thereof is received prior to the time specified in Section 2.6 hereof, but in any event shall consist of at least one (1) full day.

3

1.6    Schedules and Exhibits. All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

1.7    Dollar Equivalent.

(a)    Agent shall determine the Dollar Equivalent of any Letter of Credit not denominated in Dollars (i) on the date of issuance thereof and the date of any amendment thereto that increases the face amount thereof, in each case using the Spot Rate for the Agreed Currency other than Dollars in relation to Dollars in effect on the date immediately prior to the applicable issuance or amendment date, and (ii) at such other times as may be determined by either Agent or an Issuing Bank in its Permitted Discretion, in each case using the Spot Rate for the Agreed Currency other than Dollars in relation to Dollars in effect on the date of determination. Each amount determined pursuant to this Section 1.7(a) shall be the Dollar Equivalent of the applicable Letter of Credit until the next calculation thereof pursuant to the preceding sentences of this Section 1.7(a), absent manifest error. Upon the request of the Borrowers, Agent shall notify Borrowers and the Lenders of each calculation of the Dollar Equivalent of each Letter of Credit denominated in an Agreed Currency other than Dollars.

(b)    Wherever in this Agreement in connection with any Letter of Credit, an amount, such as a required minimum, sublimit, maximum, or multiple amount, is expressed in Dollars, but such Letter of Credit is denominated in an Agreed Currency other than Dollars, such amount shall be the Agreed Currency Equivalent of such Dollar amount (rounded to the nearest unit of such Agreed Currency that is equivalent to one (1) Dollar, with 0.5 of a unit being rounded upward).

(c)    Principal, interest, reimbursement obligations, cash collateral for reimbursement obligations, fees, and all other amounts payable to Agent or Lenders under this Agreement and the other Loan Documents shall be payable (except as otherwise specifically provided herein) in Dollars.

(d)    If at any time following one or more fluctuations in the exchange rate of any Agreed Currency other than Dollars against the Dollar, all or any part of the Obligations exceeds more than 102% of any other limit set forth herein for such Obligations, the Borrowers of such Obligations shall within one (1) Business Day of written notice of same from Agent immediately make the necessary payments or repayments to reduce such Obligations, or Cash Collateralize such Obligations, to an amount necessary to eliminate such excess over 100% of such limit.

1.8    LIBOR Rate. Agent does not warrant, nor accept responsibility, nor shall Agent have any liability with respect to the administration, submission, or any other matter related to the rates in the definition of LIBOR Rate or with respect to any comparable or successor rate thereto (including as may be provided pursuant to Section 2.13(d)(iv)).

1.9    Pro Forma Effect of AMUSA Acquisition. Notwithstanding anything contained herein, for purposes of calculating EBITDA and Fixed Charges Coverage Ratio, the EBITDA and all of the components of Fixed Charge Coverage Ratio of the AMUSA Target Loan Parties and their Subsidiaries shall be deemed to be zero ($0) for any period ending prior to the Second Amendment Effective Date.

## 2.    REVOLVING LOANS AND TERMS OF PAYMENT.

2.1    Revolving Loans

(a)    Subject to the terms and conditions of this Agreement, and during the term of this Agreement, each Tranche A Revolving Lender agrees (severally, not jointly or jointly and severally) to make revolving loans ("Tranche A Revolving Loans ") in Dollars to the Borrowers in a principal amount not to exceed *the lesser of*:

(i)    such Lender's Tranche A Revolver Commitment at such time, or

4

(ii)    such Lender's Pro Rata Share of an amount equal to (x) the Tranche A Line Cap at such time *less* (y) the sum of (A) the Letter of Credit Usage at such time, (B) the principal amount of Swing Loans outstanding at such time and (C) the principal amount of Tranche A Revolving Loans outstanding at such time; provided that, if any Tranche B Facility exists at such time, no Tranche A Revolving Loans may be made to any Borrower unless the amount of outstanding Tranche B Revolving Loans is equal to the Tranche B Line Cap;

(b)    Subject to the terms and conditions of this Agreement, from the First Amendment Effective Date and until the earlier of one Business Day prior to the Maturity Date and the termination of the Tranche B Revolver Commitment of such Lender, each Tranche B Revolving Lender agrees (severally, not jointly or jointly and severally) to make Tranche B Revolving Loans in Dollars to the Borrowers in a principal amount not to exceed such Lender's Tranche B Revolver Commitment at such time; provided that after giving effect to such transaction, the aggregate amount of the Tranche B Revolving Loans then outstanding would not exceed the Tranche B Line Cap.

Anything to the contrary in clauses (a) and (b) of this Section 2.1(a) notwithstanding, Agent shall have the right (but not the obligation), in the exercise of its Permitted Discretion, to establish and increase or decrease Receivable Reserves, Inventory/Equipment Reserves, Bank Product Reserves, Pari Secured Hedge Reserves, Dilution Reserves and other Reserves against the Tranche A Borrowing Base or the Tranche A Line Cap, including based on review of the Borrowers' employment and labor contracts; provided that no reserve shall be established, increased or decreased except upon not less than three (3) Business Days' prior written notice from the Agent to the Parent, during which period employees, agents or other representatives of the Agent shall use commercially reasonable efforts to be available during regular business hours to discuss any such proposed establishment or modification of such reserve with the Parent and, without limiting the right of the Agent to establish or modify reserves in its Permitted Discretion, the Parent may take such action as may be required so that the circumstances, conditions, events or contingencies that are the basis for such reserve or modification thereof no longer exist, in a manner and to the extent reasonably satisfactory to the Agent in its Permitted Discretion; provided that no such prior written notice shall be required for any modifications to any reserves (x) during any Cash Dominion Trigger Period, during a Financial Covenant Period, during any period of weekly collateral reporting as provided in Section 5.2, or after the occurrence and during the continuance of any Event of Default or (y) resulting by virtue of mathematical calculations of the amount of the reserves in accordance with the methodology of calculation previously utilized. The amount of any Receivable Reserve, Inventory/Equipment Reserve, Bank Product Reserve, Pari Secured Hedge Reserves or other Reserve established by Agent shall have a reasonable relationship to the event, condition, other circumstance, or fact that is the basis for such reserve as determined by Agent in its Permitted Discretion and shall not be duplicative of any other reserve established and currently maintained. Upon establishment or increase in reserves, Agent agrees to make itself available to discuss the reserve or increase, and Borrowers may take such action as may be required so that the event, condition, circumstance, or fact that is the basis for such reserve or increase no longer exists, in a manner and to the extent reasonably satisfactory to Agent in the exercise of its Permitted Discretion. In no event shall such notice and opportunity limit the right of Agent to establish or change such Receivable Reserve, Inventory/Equipment Reserve, Bank Product Reserve, Pari Secured Hedge Reserves or other Reserves, unless Agent shall have determined, in its Permitted Discretion, that the event, condition, other circumstance, or fact that was the basis for such Receivable Reserve, Inventory/Equipment Reserve, Bank Product Reserve, Pari Secured Hedge Reserves or other Reserves or such change no longer exists or has otherwise been adequately addressed by Borrowers.

(c)    The outstanding principal amount of the Revolving Loans, together with interest accrued and unpaid thereon, shall constitute Obligations and shall be due and payable on the Maturity Date or, if earlier, on the date on which they are declared due and payable pursuant to the terms of this Agreement.

(d)    Amounts borrowed pursuant to this Section 2.1 may be repaid and, subject to the terms and conditions of this Agreement, reborrowed at any time during the term of this Agreement.

5

2.2    Additional Borrowers.

(a)    The Parent may from time to time designate one or more wholly-owned Subsidiaries of Parent organized in the United States as an Additional Borrower by delivering to the Agent:

(i)    all documentation and other customary information required by regulatory authorities under applicable " *know your customer*" and anti-money laundering rules and regulations, including, without limitation, the Patriot Act, that the Agent or any Lender has reasonably requested, including, if such Subsidiary qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification in relation to such Subsidiary, without any written objection submitted by any Lender or the Agent within five (5) Business Days of its receipt of such documentation and other information;

(ii)    solely to the extent such Subsidiary is not already a Loan Party, (A) all documents, joinders, supplements, updated schedules, instruments, certificates and agreements and all other actions and information, then required by or in respect of such Subsidiary by Section 5.11 or by the Guaranty and Security Agreement (without giving effect to any grace periods for delivery of such items, the updating of such information or the taking of such actions), (B) a customary opinion of counsel of such Subsidiary and (C) a customary secretary's certificate attaching such documents as were delivered by the existing Borrowers on the Closing Date;

(iii)    promissory notes in respect of such Subsidiary in its capacity as Additional Borrower in favor of any Lender requesting such promissory notes, in form and substance consistent with the notes (if any) provided by the existing Borrowers as of the Closing Date; and

(iv)    a joinder agreement in form and substance reasonably satisfactory to the Agent whereby such Subsidiary becomes party hereto as a Borrower.

(b)    The designation of any wholly-owned Subsidiary of Parent organized in the United States as an Additional Borrower shall only be effective two (2) Business Days following the delivery of the documents set forth in, and satisfaction of the requirements of, Section 2.2(a).

2.3    Borrowing Procedures and Settlements.

( a )    **Procedure for Borrowings**. Each Borrowing shall be made by a written request by an Authorized Person delivered to Agent and received by Agent no later than (i) 12:00 noon on the Business Day that is the requested Funding Date in the case of a request for a Swing Loan or a Revolving Loan that is a Base Rate Loan and (ii) 12:00 noon on the Business Day that is three (3) Business Days (or solely with respect to a Borrowing on the Closing Date, one (1) Business Day) prior to the requested Funding Date in the case of a Revolving Loan that is a LIBOR Rate Loan, in each case, specifying (A) the amount of such Borrowing, (B) the requested Funding Date (which shall be a Business Day), (C) whether such Borrowing is to be a Borrowing of Base Rate Loans or a Borrowing of LIBOR Rate Loans, (D) in the case of a Borrowing of LIBOR Rate Loans, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period" and (E) whether the Borrowing is of Tranche A Revolving Loans or Tranche B Revolving Loans; provided that if any Tranche B Facility exists at such time, such Borrowing shall be Tranche A Revolving Loans unless the outstanding principal amount of Tranche B Revolving Loans is less than the Tranche B Line Cap, in which case up to an amount equal to the Tranche B Line Cap minus the outstanding principal amount of Tranche B Revolving Loans of such Revolving Loans shall be Tranche B Revolving Loans, and the remaining amount of such Revolving Loans shall be Tranche A Revolving Loans; provided that Agent may, in its sole discretion, elect to accept as timely requests that are received later than the times specified above on the applicable Business Day. In lieu of delivering the above-described written request, any Authorized Person may give Agent electronic notice of such request by the required time. In such circumstances, Borrowers agree that any such electronic notice will be confirmed in writing within 24

6

hours of the giving of such electronic notice, but the failure to provide such written confirmation shall not affect the validity of the request.

(b)    [**Reserved**].

( c )    **Making of Swing Loans**. Subject to the terms and conditions of this Agreement, so long as either (i) the aggregate amount of Swing Loans made since the last Settlement Date, *minus* all payments or other amounts applied to Swing Loans since the last Settlement Date,  *plus* the amount of the requested Swing Loan does not exceed $125,000,000, or (ii) the Swing Lender, in its sole discretion, agrees to make a Swing Loan notwithstanding the foregoing limitation, the Swing Lender shall make a Revolving Loan (any such Revolving Loan made by the Swing Lender pursuant to this Section 2.3(c) being referred to as a "Swing Loan" and all such Revolving Loans being referred to as " Swing Loans") in Dollars available to the Borrowers on the Funding Date applicable thereto by transferring immediately available funds in the amount of such requested Borrowing to the Designated Account. Each Swing Loan shall be deemed to be a Revolving Loan hereunder and shall be subject to all the terms and conditions (including Section 3) applicable to other Revolving Loans, except that all payments (including interest) on any Swing Loan shall be payable to the Swing Lender solely for its own account. Subject to the provisions of Section 2.3(f)(iii), the Swing Lender shall not make and shall not be obligated to make any Swing Loan if the Swing Lender has actual knowledge that (A) one or more of the applicable conditions precedent set forth in Section 3 will not be satisfied on the requested Funding Date for the applicable Borrowing, or (B) the requested Borrowing would exceed the Excess Availability on such Funding Date. The Swing Lender shall not otherwise be required to determine whether the applicable conditions precedent set forth in Section 3 have been satisfied on the Funding Date applicable thereto prior to making any Swing Loan. The Swing Loans shall be secured by Liens granted under the Loan Documents, constitute Revolving Loans and Obligations, and bear interest at the rate applicable from time to time to Revolving Loans that are Base Rate Loans.

(d)    [**Reserved**].

(e)    **Making of Revolving Loans.**

(i)    In the event that a Swing Lender refuses to or is not obligated to make a Swing Loan, then after receipt of a request for a Borrowing pursuant to Section 2.3(a), Agent shall notify the Lenders by telecopy, telephone, email, or other electronic form of transmission, of the requested Borrowing; such notification to be sent on the Business Day that is one (1) Business Day prior to the requested Funding Date (or, in the case of a request for a Loan delivered on the requested Funding Date, no later than 1:00 p.m. on the requested Funding Date). If Agent has notified the Lenders of a requested Borrowing on the Business Day that is one (1) Business Day prior to the Funding Date (or, in the case of a request for a Loan delivered on the requested Funding Date), then each Lender shall make the amount of such Lender's Pro Rata Share of the requested Borrowing available to Agent in immediately available funds, to the Agent's Account, not later than 3:00 p.m., in the case of any Loan requested to be funded on the Funding Date, or 10:00 a.m., in the case of any other request, in each case, on the Business Day that is the requested Funding Date. After Agent's receipt of the proceeds of such Revolving Loans from the Lenders, Agent shall make the proceeds thereof available to applicable Borrowers on the applicable Funding Date by transferring immediately available funds equal to such proceeds received by Agent to the Designated Account; provided, that, subject to the provisions of Sections 2.3(f)(iii) and 2.3(f)(iv), no Lender shall have an obligation to make any Revolving Loan, if (1) one or more of the applicable conditions precedent set forth in     Section 3.3 are not satisfied on the requested Funding Date for the applicable Borrowing unless such condition has been waived, or (2) the requested Borrowing would exceed the Excess Availability on such Funding Date.

(ii)    Unless Agent receives notice from a Lender prior to 9:30 a.m. on the Business Day that is the requested Funding Date relative to a requested Borrowing as to which Agent has notified the Lenders of a requested Borrowing that such Lender will not make available as and when required hereunder to Agent for the account of the applicable Borrowers the amount of that Lender's Pro Rata Share of the Borrowing, Agent may assume that each Lender has made or will make such amount

7

available to Agent in immediately available funds on the Funding Date and Agent may (but shall not be so required), in reliance upon such assumption, make available to the applicable Borrowers a corresponding amount. If, on the requested Funding Date, any Lender shall not have remitted the full amount that it is required to make available to Agent in immediately available funds and if Agent has made available to the applicable Borrowers such amount on the requested Funding Date, then such Lender shall make the amount of such Lender's Pro Rata Share of the requested Borrowing available to Agent in immediately available funds, to the Agent's Account, no later than 10:00 a.m. on the Business Day that is the first Business Day after the requested Funding Date (in which case, the interest accrued on such Lender's portion of such Borrowing for the Funding Date shall be for Agent's separate account). If any Lender shall not remit the full amount that it is required to make available to Agent in immediately available funds as and when required hereby and if Agent has made available to Borrowers such amount, then that Lender shall be obligated to immediately remit such amount to Agent, together with interest at the Defaulting Lender Rate for each day until the date on which such amount is so remitted. A notice submitted by Agent to any Lender with respect to amounts owing under this Section 2.3(e)(ii) shall be conclusive, absent manifest error. If the amount that a Lender is required to remit is made available to Agent, then such payment to Agent shall constitute such Lender's Revolving Loan for all purposes of this Agreement. If such amount is not made available to Agent on the Business Day following the Funding Date, Agent will notify Borrowers of such failure to fund and, within one (1) Business Day after receipt of such notice, the Borrowers shall pay such amount to Agent for Agent's account, together with interest thereon for each day elapsed since the date of such Borrowing, at a rate per annum equal to the interest rate applicable at the time to the Revolving Loans composing such Borrowing.

(f)    **Protective Advances and Optional Overadvances.**

(i)    Any contrary provision of this Agreement or any other Loan Document notwithstanding, but subject to Section 2.3(f)(iv), at any time after the occurrence and during the continuance of a Default or an Event of Default, or that any of the other applicable conditions precedent set forth in Section 3.3 are not satisfied, Agent hereby is authorized by the Borrowers and the Lenders, from time to time, in Agent's Permitted Discretion, to make Tranche A Revolving Loans that are Base Rate Loans to, or for the benefit of, the Borrowers, on behalf of the Revolving Lenders, that Agent, in its Permitted Discretion, deems necessary or desirable (1) to preserve or protect the Collateral, or any portion thereof, or (2) to enhance the collectability or likelihood of repayment of the Obligations, so long as such Tranche A Revolving Loans do not cause Revolver Usage to exceed the Maximum Revolver Amount (the Revolving Loans described in this Section 2.3(f)(i) shall be referred to as "Protective Advances"). The Revolving Lenders shall participate on a pro rata basis in the Protective Advances outstanding from time to time. Required Lenders may at any time revoke Agent's authority to make further Protective Advances by written notice to Agent. Agent shall use reasonable efforts to notify Parent of the existence of any Protective Advance on or about the date when made (it being understood that the failure to provide such notification to Parent shall have no effect on such Protective Advance).

(ii)    Any contrary provision of this Agreement or any other Loan Document notwithstanding, but subject to Section 2.3(f)(iv), if there is an Overadvance at any time, the excess amount shall be payable by the Borrowers within one (1) Business Day after receipt of demand from Agent, but all such Revolving Loans shall nevertheless constitute Obligations of the Borrowers secured by the applicable Collateral of the Loan Parties and entitled to all benefits of the Loan Documents. Agent may require the Revolving Lenders to honor requests for Overadvance Loans and to forbear from requiring the Borrowers to cure an Overadvance, (a) when no other Event of Default is known to the Agent, as long as (i) the Overadvance does not continue for more than 30 consecutive days (and no Overadvance may exist for at least five (5) consecutive days thereafter before further Overadvance Loans are required), and (ii) the Overadvance is not known by Agent to exceed 5.0% of the Maximum Revolver Amount and (b) regardless of whether an Event of Default exists, if Agent discovers an Overadvance not previously known by it to exist, as long as from the date of such discovery the Overadvance is not increased and does not continue for more than 30 consecutive days. In no event shall Overadvance Loans be required that would cause (x) Revolver Usage (including for this purpose, the aggregate principal amount of Overadvance Loans) to exceed the aggregate Revolver Commitments or (y) any Revolving Lenders' Pro Rata Share of Revolver Usage (including, for this purpose, the aggregate

8

principal amount of Overadvance Loans) to exceed its Revolver Commitment. Any funding of an Overadvance Loan or sufferance of an Overadvance shall not constitute a waiver by Agent or Lenders of the Event of Default caused thereby. Agent shall use reasonable efforts to notify Parent of the existence of any Overadvance on or about the date when made (it being understood that the failure to provide such notification to Parent shall have no effect on such Overadvance).

        (iii)    Each Protective Advance and each Overadvance (each, an "Extraordinary Advance") shall be deemed to be a Revolving Loan hereunder, except that no Extraordinary Advance shall be eligible to be a LIBOR Rate Loan and, prior to Settlement therefor, all payments on the Extraordinary Advances shall be payable to Agent solely for its own account. The Extraordinary Advances shall be repayable within one (1) Business Day of demand thereof, secured by the Liens granted under the Loan Documents, constitute Obligations hereunder, and bear interest at the rate applicable from time to time to Revolving Loans that are Base Rate Loans.

        (iv)    Notwithstanding anything contained in this Agreement or any other Loan Document to the contrary, no Extraordinary Advance may be made by Agent if such Extraordinary Advance would cause the aggregate principal amount of Extraordinary Advances outstanding to exceed an amount equal to 10% of the Maximum Revolver Amount.

        (v)    The provisions of this Section 2.3(f) are for the exclusive benefit of Agent, Swing Lender, and the Lenders and are not intended to benefit Borrowers (or any other Loan Party) in any way.

    (g)    **Settlement.**

        (i)    Obligations. It is agreed that each Revolving Lender's funded portion of the Revolving Loans is intended by the Revolving Lenders to equal, at all times, such Lender's Pro Rata Share of the outstanding Revolving Loans. Such agreement notwithstanding, the Agent, the Swing Lender, and the other Revolving Lenders agree (which agreement shall not be for the benefit of Borrowers) that in order to facilitate the administration of this Agreement and the other Loan Documents, Settlement among the Revolving Lenders as to the Revolving Loans, the Swing Loans, and the Extraordinary Advances shall take place on a periodic basis in accordance with the following provisions:

           (A)    Agent shall request settlement ("Settlement") with the Revolving Lenders on a weekly basis, or on a more frequent basis if so determined by Agent in its sole discretion (1) on behalf of the Swing Lender, with respect to the outstanding Swing Loans; provided that if any Tranche B Facility exists at such time, Swing Loans shall be settled as Tranche A Revolving Loans unless the outstanding principal amount of Tranche B Revolving Loans is less than the Tranche B Line Cap, in which case up to an amount equal to the Tranche B Line Cap minus the outstanding principal amount of Tranche B Revolving Loans of such Revolving Loans shall be settled as Tranche B Revolving Loans, and the remaining amount of such Revolving Loans shall be settled as Tranche A Revolving Loans, (2) for itself, with respect to the outstanding Extraordinary Advances, and (3) with respect to the Borrowers' or any of their Subsidiaries' payments or other amounts received, as to each by notifying the Revolving Lenders by telecopy, telephone, email or other electronic form of transmission, of such requested Settlement, no later than 2:00 p.m. on the Business Day immediately prior to the date of such requested Settlement (the date of such requested Settlement being the "Settlement Date"). Such notice of a Settlement Date shall include a summary statement of the amount of outstanding Revolving Loans, Swing Loans, and Extraordinary Advances for the period since the prior Settlement Date. Subject to the terms and conditions contained herein (including Section 2.3(i)): (y) if the amount of the Revolving Loans (including Swing Loans, and Extraordinary Advances) made by a Revolving Lender that is not a Defaulting Lender exceeds such Revolving Lender's Pro Rata Share of the Revolving Loans (including Swing Loans, and Extraordinary Advances) as of a Settlement Date, then Agent shall, by no later than 12:00 p.m. on the Settlement Date, transfer in immediately available funds to a Deposit Account of such Revolving Lender (as such Revolving Lender may designate), an amount such that each such Revolving Lender shall, upon receipt of such amount, have as of the Settlement Date, its Pro Rata Share of the Revolving Loans (including Swing Loans, and Extraordinary Advances), and (z) if the amount of the

9

Revolving Loans (including Swing Loans, and Extraordinary Advances) made by a Revolving Lender is less than such Lender's Pro Rata Share of the Revolving Loans (including Swing Loans, and Extraordinary Advances) as of a Settlement Date, such Revolving Lender shall no later than 12:00 p.m. on the Settlement Date transfer in immediately available funds to Agent's Account, an amount such that each such Revolving Lender shall, upon transfer of such amount, have as of the Settlement Date, its Pro Rata Share of the Revolving Loans (including Swing Loans and Extraordinary Advances). Such amounts made available to Agent under clause (z) of the immediately preceding sentence shall be applied against the amounts of the Swing Loans or Extraordinary Advances and, together with the portion of such Swing Loans or Extraordinary Advances representing the Swing Lender's Pro Rata Share thereof, shall constitute Revolving Loans of such Lenders. If any such amount is not made available to Agent by any Revolving Lender on the Settlement Date applicable thereto to the extent required by the terms hereof, Agent shall be entitled to recover for its account such amount on demand from such Revolving Lender together with interest thereon at the Defaulting Lender Rate.

(B)    In determining whether a Revolving Lender's balance of the Revolving Loans, Swing Loans, and Extraordinary Advances is less than, equal to, or greater than such Revolving Lender's Pro Rata Share of the Revolving Loans, Swing Loans, and Extraordinary Advances as of a Settlement Date, Agent shall, as part of the relevant Settlement, apply to such balance the portion of payments actually received in good funds by Agent with respect to principal, interest, fees payable by the Borrowers and allocable to the Revolving Lenders hereunder, and proceeds of Collateral securing the Obligations.

(C)    Between Settlement Dates, Agent, to the extent Extraordinary Advances or Swing Loans are outstanding, may pay over to Agent or the Swing Lender, as applicable, any payments or other amounts received by Agent, that in accordance with the terms of this Agreement would be applied to the reduction of the Revolving Loans, for application to the Extraordinary Advances or Swing Loans. Between Settlement Dates, Agent, to the extent no Extraordinary Advances or Swing Loans are outstanding, may pay over to the Swing Lender any payments or other amounts received by Agent, that in accordance with the terms of this Agreement would be applied to the reduction of the Revolving Loans, for application to the Swing Lender's Pro Rata Share of the Revolving Loans. If, as of any Settlement Date, payments or other amounts of Parent and its Subsidiaries received since the then immediately preceding Settlement Date have been applied to the Swing Lender's Pro Rata Share of the Revolving Loans other than to Swing Loans, as provided for in the previous sentence, the Swing Lender shall pay to Agent for the accounts of the Revolving Lenders, and Agent shall pay to the Revolving Lenders (other than a Defaulting Lender if Agent has implemented the provisions of Section 2.3(i)), to be applied to the outstanding Revolving Loans of such Revolving Lenders, an amount such that each such Revolving Lender shall, upon receipt of such amount, have, as of such Settlement Date, its Pro Rata Share of the Revolving Loans. During the period between Settlement Dates, the Swing Lender with respect to Swing Loans, Agent with respect to Extraordinary Advances, and each Revolving Lender with respect to the Revolving Loans other than Swing Loans and Extraordinary Advances, shall be entitled to interest at the applicable rate or rates payable under this Agreement on the daily amount of funds deployed by the Swing Lender, Agent, or the Revolving Lenders, as applicable.

(ii)    Anything in this Section 2.3(g) to the contrary notwithstanding, in the event that a Lender is a Defaulting Lender, Agent shall be entitled to refrain from remitting settlement amounts to the Defaulting Lender and, instead, shall be entitled to elect to implement the provisions set forth in Section 2.3(i).

(h)    **Notation.** Agent, as a non-fiduciary agent for Borrowers, shall maintain a register (consistent with the Register required pursuant to Section 13.1(h)) showing the principal amount of the Revolving Loans owing to each Lender, including the Swing Loans owing to the Swing Lender, and Extraordinary Advances owing to Agent, and the interests therein of each Lender, from time to time and such register shall, absent manifest error, conclusively be presumed to be correct and accurate.

(i)    **Defaulting Lenders.**

10

(i)    <u>Generally</u>. Notwithstanding the provisions of <u>Section 2.4(b)(iv)</u>, Agent shall not be obligated to transfer to a Defaulting Lender any payments made by Borrowers (or any of them) to Agent for the Defaulting Lender's benefit or any proceeds of Collateral that would otherwise be remitted hereunder to the Defaulting Lender, and, in the absence of such transfer to the Defaulting Lender, Agent shall transfer any such payments (A) first, to the Swing Lender to the extent of any Swing Loans that were made by the Swing Lender and that were required to be, but were not, paid by the Defaulting Lender; <u>provided</u> that if any Tranche B Facility exists at such time, Swing Loans shall be treated as Tranche A Revolving Loans unless the outstanding principal amount of Tranche B Revolving Loans is less than the Tranche B Line Cap, in which case up to an amount equal to the Tranche B Line Cap minus the outstanding principal amount of Tranche B Revolving Loans of such Revolving Loans shall be treated as Tranche B Revolving Loans, and the remaining amount of such Revolving Loans shall be treated as Tranche A Revolving Loans, (B) second, to Issuing Banks, to the extent of the portion of a Letter of Credit Disbursement that was required to be, but was not, paid by the Defaulting Lender, (C) third, to each Non-Defaulting Lender ratably in accordance with their Revolver Commitments (but, in each case, only to the extent that such Defaulting Lender's portion of a Revolving Loan (or other funding obligation) was funded by such other Non-Defaulting Lender), (D) to a suspense account maintained by Agent, the proceeds of which shall be retained by Agent and may be made available to be re-advanced to or for the benefit of the Borrowers (upon the request of Borrowers and subject to the conditions set forth in <u>Section 3.3</u>) as if such Defaulting Lender had made its portion of Revolving Loans (or other funding obligations) hereunder, and (E) from and after the date on which all other Obligations have been paid in full, to such Defaulting Lender in accordance with tier (M) of <u>Section 2.4(b)(iv)</u>. Subject to the foregoing, Agent may hold and, in its discretion, re-lend to the Borrowers for the account of such Defaulting Lender the amount of all such payments received and retained by Agent for the account of such Defaulting Lender. Solely for the purposes of voting or consenting to matters with respect to the Loan Documents (including the calculation of Pro Rata Share in connection therewith) and for the purpose of calculating the fee payable under <u>Section 2.10(b)</u>, such Defaulting Lender shall be deemed not to be a "<u>Lender</u>" and such Lender's Revolver Commitments shall be deemed to be zero; <u>provided</u>, that the foregoing shall not apply to any of the matters governed by <u>Section 14.1(a)(i)</u> through <u>(iv)</u> and <u>(xii)</u>. The provisions of this <u>Section 2.3(i)</u> shall remain effective with respect to such Defaulting Lender until the earlier of (y) the date on which all of the Non-Defaulting Lenders, Agent, Issuing Banks, and Borrowers shall have waived, in writing, the application of this <u>Section 2.3(i)</u> to such Defaulting Lender, or (z) the date on which such Defaulting Lender makes payment of all amounts that it was obligated to fund hereunder, pays to Agent all amounts owing by Defaulting Lender in respect of the amounts that it was obligated to fund hereunder, and, if requested by Agent, provides adequate assurance of its ability to perform its future obligations hereunder (on which earlier date, so long as no Event of Default has occurred and is continuing, any remaining cash collateral held by Agent pursuant to <u>Section 2.3(i)(ii)</u> shall be released to the Borrowers). The operation of this <u>Section 2.3(i)</u> shall not be construed to increase or otherwise affect the Revolver Commitment of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by any Borrower of its duties and obligations hereunder to Agent, Issuing Banks, or to the Lenders other than such Defaulting Lender. Any failure by a Defaulting Lender to fund amounts that it was obligated to fund hereunder shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle Borrowers, at their option, upon written notice to Agent, to arrange for a substitute Lender to assume the Revolver Commitment of such Defaulting Lender, such substitute Lender to be reasonably acceptable to Agent. In connection with the arrangement of such a substitute Lender, the Defaulting Lender shall have no right to refuse to be replaced hereunder, and agrees to execute and deliver a completed form of Assignment and Acceptance in favor of the substitute Lender (and agrees that it shall be deemed to have executed and delivered such document if it fails to do so) subject only to being paid its share of the outstanding Obligations (other than Bank Product Obligations, but including (1) all interest, fees, and other amounts that may be due and payable in respect thereof, and (2) an assumption of its Pro Rata Share of its participation in the applicable Letters of Credit); <u>provided</u>, that, subject to <u>Section 18.15</u>, any such assumption of the Revolver Commitment of such Defaulting Lender shall not be deemed to constitute a waiver of any of the Lender Group's or Borrowers' rights or remedies against any such Defaulting Lender arising out of or in relation to such failure to fund. In the event of a direct conflict between the priority provisions of this <u>Section 2.3(i)</u> and any other provision contained in this Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together

11

and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.3(i) shall control and govern.

(ii)    Revolving Lenders as Defaulting Lenders. If any Swing Loan or Letter of Credit is outstanding at the time that a Revolving Lender becomes a Defaulting Lender then:

(A)    such Defaulting Lender's Swing Loan Exposure and Letter of Credit Exposure shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Pro Rata Shares but only to the extent (x) the sum of all Non-Defaulting Lenders' Revolving Loan Exposures *plus* such Defaulting Lender's Swing Loan Exposure and Letter of Credit Exposure does not exceed the total of all Non-Defaulting Lenders' Revolver Commitments, (y) no Non-Defaulting Lender's Pro Rata Share of Revolver Usage exceeds its Revolver Commitment; provided that no Tranche A Revolving Lender shall be required to fund or participate in Tranche A Revolving Loans in excess of its Tranche A Revolver Commitment and no Tranche B Revolving Lender shall be required to fund or participate in Tranche B Revolving Loans in excess of its Tranche B Revolver Commitment and (z) the conditions set forth in Section 3.3 are satisfied at such time;

(B)    if the reallocation described in clause (A) above cannot, or can only partially, be effected, the Borrowers shall within one (1) Business Day following notice by the Agent (x) first, prepay such Defaulting Lender's Swing Loan Exposure (after giving effect to any partial reallocation pursuant to clause (A) above) and (y) second, cash collateralize such Defaulting Lender's Letter of Credit Exposure (after giving effect to any partial reallocation pursuant to clause (A) above), pursuant to a cash collateral agreement to be entered into in form and substance reasonably satisfactory to the Agent, for so long as such Letter of Credit Exposure is outstanding; provided, that the Borrowers shall not be obligated to cash collateralize any Defaulting Lender's Letter of Credit Exposure if such Defaulting Lender is also an Issuing Bank;

(C)    if the Borrowers cash collateralize any portion of such Defaulting Lender's Letter of Credit Exposure pursuant to this Section 2.3(i)(ii), the Borrowers shall not be required to pay any Letter of Credit Fees to Agent for the account of such Defaulting Lender pursuant to    Section 2.6(b) with respect to such cash collateralized portion of such Defaulting Lender's Letter of Credit Exposure during the period such Letter of Credit Exposure is cash collateralized;

(D)    to the extent the Letter of Credit Exposure of the Non-Defaulting Lenders is reallocated pursuant to this    Section 2.3(i)(ii), then the Letter of Credit Fees payable to the Non-Defaulting Lenders pursuant to Section 2.6(b) shall be adjusted in accordance with such Non-Defaulting Lenders' Letter of Credit Exposure;

(E)    to the extent any Defaulting Lender's Letter of Credit Exposure is neither cash collateralized nor reallocated pursuant to this Section 2.3(i)(ii), then, without prejudice to any rights or remedies of any Issuing Bank or any Revolving Lender hereunder, all Letter of Credit Fees that would have otherwise been payable to such Defaulting Lender under Section 2.6(b) with respect to such portion of such Letter of Credit Exposure shall instead be payable to the applicable Issuing Bank until such portion of such Defaulting Lender's Letter of Credit Exposure is cash collateralized or reallocated;

(F)    so long as any Revolving Lender is a Defaulting Lender, the Swing Lender shall not be required to make any Swing Loan and no Issuing Bank shall be required to issue, amend, or increase any Letter of Credit, in each case, to the extent (x) the Defaulting Lender's Pro Rata Share of such Swing Loans or Letter of Credit cannot be reallocated pursuant to this Section 2.3(i)(ii) or (y) the Swing Lender or Issuing Banks, as applicable, have not otherwise entered into arrangements reasonably satisfactory to the Swing Lender or Issuing Banks, as applicable, and the Borrowers to eliminate the Swing Lender's or Issuing Banks' risk with respect to the Defaulting Lender's participation in Swing Loans or Letters of Credit; and

12

(G)    Agent may release any cash collateral provided by the Borrowers pursuant to this  Section 2.3(i)(ii) to any Issuing Bank and such Issuing Bank may apply any such cash collateral to the payment of such Defaulting Lender's Pro Rata Share of any Letter of Credit Disbursement that is not reimbursed by the Borrowers pursuant to Section 2.11(d).

(iii)    [Reserved].

( j )    **Independent Obligations.** All Revolving Loans (other than Swing Loans and Extraordinary Advances) shall be made by the Lenders contemporaneously and in accordance with their Pro Rata Shares. The obligations of the Lenders under this Agreement to make Loans and to fund participations in Letters of Credit, Swing Loans and Extraordinary Advances are several (and not joint and several). It is understood that (i) no Lender shall be responsible for any failure by any other Lender to perform its obligation to make any Revolving Loan (or other extension of credit) hereunder, nor shall any Revolver Commitment of any Lender be increased or decreased as a result of any failure by any other Lender to perform its obligations hereunder, and (ii) no failure by any Lender to perform its obligations hereunder shall excuse any other Lender from its obligations hereunder.

2.4    Payments; Reductions of Commitments; Prepayments.

(a)    **Payments by Borrowers.**

(i)    Except as otherwise expressly provided herein, all payments by the Borrowers (or any of them) shall be made to the Agent's Account designated for the currency of the applicable payment and shall be made in immediately available funds, no later than 1:30 p.m. on the date specified herein. Any payment received by Agent later than 1:30 p.m. shall be deemed to have been received (unless Agent, in its sole discretion, elects to credit it on the date received) on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(ii)    Unless Agent receives notice from the Borrowers (or any of them) prior to the date on which any payment is due to the Lenders (or any of them) that such Borrowers will not make such payment in full as and when required, Agent may assume that such Borrowers have made (or will make) such payment in full to Agent on such date in immediately available funds and Agent may (but shall not be so required), in reliance upon such assumption, distribute to each Lender on such due date an amount equal to the amount then due such Lender. If and to the extent Borrowers (or any of them) do not make such payment in full to Agent on the date when due, each Lender severally shall repay to Agent on demand such amount distributed to such Lender, together with interest thereon at the Defaulting Lender Rate for each day from the date such amount is distributed to such Lender until the date repaid.

(b)    **Apportionment and Application.**

(i)    So long as no Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders, all principal and interest payments received by Agent shall be apportioned ratably among the Lenders (according to the unpaid principal balance of the portion of the Obligations to which such payments relate held by each Lender) and all payments of fees and expenses received by Agent (other than fees or expenses that are for Agent's separate account or for the separate account of Issuing Banks) shall be apportioned ratably among the Lenders having a Pro Rata Share of the type of Revolver Commitment or portion of the Obligation to which a particular fee or expense relates.

(ii)    Subject to Section 2.4(b)(vii) and Section 2.4(d), all payments to be made hereunder by the Borrowers shall be remitted to Agent and all such payments, and all proceeds of Collateral securing the Obligations received by Agent, shall be applied, so long as no Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders, subject to the Intercreditor Agreement, to reduce the balance of the Revolving Loans

13

outstanding and, thereafter, to the Borrowers (to be wired to the Designated Account) or such other Person entitled thereto under applicable law.

(iii)    [Reserved].

(iv)    At any time that an Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders, subject to the Intercreditor Agreement, all payments remitted to Agent by the Borrowers and all proceeds of Collateral securing the Obligations received by Agent shall be applied as follows:

(A)    _first_, to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to Agent under the Loan Documents in respect of the Obligations, until paid in full,

(B)    _second_, to pay any fees then due to Agent under the Loan Documents in respect of the Obligations until paid in full,

(C)    _third_, ratably to pay interest due in respect of all Protective Advances until paid in full,

(D)    _fourth_, ratably to pay the principal of all Protective Advances until paid in full,

(E)    _fifth_, ratably to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to any of the Revolving Lenders or Issuing Banks under the Loan Documents, until paid in full,

(F)    _sixth_, ratably to pay any fees then due to any of the Revolving Lenders or Issuing Banks under the Loan Documents until paid in full,

(G)    _seventh_, ratably to pay interest accrued in respect of the Swing Loans until paid in full,

(H)    _eighth_, ratably to pay the principal of all Swing Loans until paid in full,

(I)    _ninth_, to Agent, to be held by Agent, for the benefit of the Issuing Banks (and for the ratable benefit of each of the Revolving Lenders that have an obligation to pay to Agent, for the account of the Issuing Banks, a share of each Letter of Credit Disbursement in connection with each Letter of Credit), as cash collateral in an amount up to the sum of 103% of the Letter of Credit Usage (to the extent permitted by applicable law, such cash collateral shall be applied to the reimbursement of any Letter of Credit Disbursement as and when such disbursement occurs and, if a Letter of Credit expires undrawn, the cash collateral held by Agent in respect of such Letter of Credit shall, to the extent permitted by applicable law, be reapplied pursuant to this _Section 2.4(b)(iv)_, beginning with tier (A) hereof),

(J)    _tenth_, ratably to pay interest accrued in respect of the Tranche A Revolving Loans under the Tranche A Facility (other than U.S. Protective Advances) until paid in full,

(K)    _eleventh_,

i.    ratably to pay the principal of all Tranche A Revolving Loans under the Tranche A Facility until paid in full, and

ii.    ratably up to the amount of the most recently established Pari Secured Hedge Reserves (after taking into account any amounts previously paid pursuant to this

14

clause ii during the continuation of the applicable Application Event), to a. the Hedge Providers with Pari Secured Hedge Obligations based upon amounts then certified by the applicable Hedge Provider to Agent (in form and substance satisfactory to Agent and in accordance with <u>Section 18.5</u>) to be due and payable to such Hedge Providers on account of Pari Secured Hedge Obligations, and b. with any balance to be paid to Agent, to be held by Agent, for the ratable benefit of the applicable Hedge Providers, as cash collateral (which cash collateral may be released by Agent to the applicable Hedge Provider and applied by such Hedge Provider to the payment or reimbursement of any amounts due and payable with respect to Pari Secured Hedge Obligations owed to the applicable Hedge Provider as and when such amounts first become due and payable and, if and at such time as all such Pari Secured Hedge Obligations are paid or otherwise satisfied in full, the cash collateral held by Agent in respect of such Pari Secured Hedge Obligations shall be reapplied pursuant to this <u>Section 2.4(b)(iv)</u>, beginning with tier (A) hereof),

      (L)   <u>twelfth</u>, ratably to pay interest accrued in respect of the Tranche B Revolving Loans under the Tranche B Facility until paid in full,

      (M)   <u>thirteenth,</u> ratably to pay the principal of all Tranche B Revolving Loans under the Tranche B Facility until paid in full, and

      (N)   <u>fourteenth</u>, to pay any other Obligations other than Obligations owed to Defaulting Lenders (including being paid, ratably to the Bank Product Providers on account of all amounts then due and payable in respect of Bank Product Obligations (other than Pari Secured Hedge Obligations) based upon amounts then certified by the applicable Bank Product Providers to Agent (in form and substance reasonably satisfactory to Agent and in accordance with <u>Section 18.5</u>), with any balance to be paid to Agent, to be held by Agent, for the ratable benefit of the Bank Product Providers, as cash collateral (which cash collateral may be released by Agent to the applicable Bank Product Provider and applied by such Bank Product Provider to the payment or reimbursement of any amounts due and payable with respect to Bank Product Obligations owed to the applicable Bank Product Provider as and when such amounts first become due and payable and, if and at such time as all such Bank Product Obligations are paid or otherwise satisfied in full, the cash collateral held by Agent in respect of such Bank Product Obligations shall be reapplied pursuant to this <u>Section 2.4(b)(iv)</u>, beginning with tier (A) hereof),

      (O)   <u>fifteenth</u>, ratably to pay any Obligations owed to Defaulting Lenders; and

      (P)   <u>sixteenth</u>, to the Borrowers (to be wired to the Designated Account) or such other Person entitled thereto under applicable law.

      Notwithstanding anything to the contrary herein, the parties hereto agree that the unpaid principal of the Pari Secured Hedging Obligations (i.e., the termination payments that are due and payable thereunder after taking into account the effect of any legally enforceable netting arrangements (the "<u>Net Termination Payments</u>")) shall be paid, ratably with the unpaid principal of Revolving Loans, pursuant to <u>clause (K)</u> above; <u>provided</u> that if on the date of any application of cash or proceeds in accordance with this <u>Section 2.4(b)(iv)</u>, the aggregate Net Termination Payments due and payable with respect to such Pari Secured Hedge Obligations exceeds an amount equal to (x) $25,000,000, <u>minus</u> (y) the aggregate amount of Pari Secured Hedge Obligations previously paid pursuant to this <u>Section 2.4(b)(iv)</u> ((x) minus (y), the "<u>Available Hedge Amount</u>" at such date); then: (1) the Obligations payable pursuant to <u>clause (K)(ii)</u> shall be the Net Termination Payments due and payable with respect to Pari Secured Hedge Obligations in an aggregate amount equal to the Available Hedge Amount at such date (which Available Hedge Amount shall represent and be comprised of a ratable portion (the "<u>Permitted Ratable Portion</u>") of the Net Termination Payments due and payable with respect to each Pari Secured Hedge Obligation), and (2) the portion of the termination payments due and payable (or that would be due and payable assuming a termination on such date of determination) with respect to each Pari Secured Hedge Obligation that is in excess of the Permitted Ratable Portion referred to in clause (1) (and is therefore not paid ratably with the unpaid principal of Revolving Loans pursuant to <u>clause (K)</u>) shall, for all purposes of this <u>Section 2.4(b)(iv)</u>, be treated as and deemed to be Obligations of

15

a Bank Product Provider payable under <u>clause (L)</u> above, and shall be paid, ratably with the all other Obligations, pursuant to <u>clause (L)</u> above.

(v) [Reserved].

(vi) Agent promptly shall distribute to each Lender, pursuant to the applicable wire instructions received from each Lender in writing, such funds as it may be entitled to receive, subject to a Settlement delay as provided in <u>Section 2.3(g)</u>.

(vii) In each instance, so long as no Application Event has occurred and is continuing, <u>Section 2.4(b)(iv)</u> shall not apply to any payment made by the Borrowers (or any of them) to Agent and specified by such Borrowers to be for the payment of specific Obligations then due and payable (or prepayable) under any provision of this Agreement or any other Loan Document.

(viii) For purposes of <u>Section 2.4(b)(iv)</u>, "paid in full" of a type of Obligation means payment in cash or immediately available funds of all amounts owing on account of such type of Obligation, including interest accrued after the commencement of any Insolvency Proceeding, default interest, interest on interest, and expense reimbursements, irrespective of whether any of the foregoing would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding.

(ix) In the event of a direct conflict between the priority provisions of this <u>Section 2.4</u> and any other provision contained in this Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, if the conflict relates to the provisions of <u>Section 2.3(i)</u> and this <u>Section 2.4</u>, then the provisions of <u>Section 2.3(i)</u> shall control and govern, and if otherwise, then the terms and provisions of this <u>Section 2.4</u> shall control and govern.

( c ) **Reduction of Commitments.** The Revolver Commitments shall terminate on the Maturity Date. Borrowers may reduce the Revolver Commitments of either Class, without premium or penalty, to an amount not less than the sum of (A) the Revolver Usage of such Class as of such date, plus (B) the principal amount of all Revolving Loans of such Class not yet made as to which a request has been given by Borrowers under <u>Section 2.3(a)</u>, plus (C) the amount of all Letters of Credit of such Class not yet issued as to which a request has been given by Borrowers pursuant to <u>Section 2.11(a)</u>. Each such reduction shall be in an amount which is not less than $5,000,000 (unless the Revolver Commitments are being reduced to zero and the amount of the Revolver Commitments in effect immediately prior to such reduction are less than $5,000,000), shall be made by providing not less than five (5) Business Days prior written notice to Agent or such shorter period as the Agent may agree in its reasonable discretion, and shall be irrevocable; <u>provided</u> that such notice of termination may state that such notice is conditioned upon the effectiveness of other credit facilities or the closing of one or more securities offerings or other transactions, in which case such notice may be revoked by Borrowers (by notice to Agent from Parent on or prior to the specified effective date) if such condition is not satisfied. Once reduced, the Revolver Commitments may not be increased. Each such reduction of the Revolver Commitments shall reduce the Revolver Commitments of each Revolving Lender proportionately in accordance with its ratable share thereof.

(d) **Optional Prepayments.** The Borrowers may prepay the principal of any Revolving Loan at any time in whole or in part, without premium or penalty (<u>provided</u> that no Tranche B Revolving Loan may be prepaid unless, prior to or simultaneously with such prepayment, all outstanding Tranche A Revolving Loans are repaid in full) upon not less than (x) three (3) Business Days prior written notice to Agent, in the case of LIBOR Rate Revolving Loan and (y) same day written notice to Agent, in the case of Base Rate Revolving Loans (each such notice to be irrevocable), <u>provided</u> that such notice may state that such notice is conditioned upon the effectiveness of other credit facilities or the closing of one or more securities offerings or other transactions, in which case such notice may be revoked by the Borrowers (by notice to Agent from Parent on or prior to the specified effective date) if such condition is

not satisfied; provided, further that no such notice shall be required during a Cash Dominion Trigger Period.

(e)  **Mandatory Prepayments.**

(i)  If, at any time and subject to Section 1.7(d), the Tranche A Revolver Usage on such date exceeds (A) the Tranche A Borrowing Base reflected in the Borrowing Base Certificate most recently delivered by Borrowers (and, in the case of the Tranche A Borrowing Base reflected in the Borrowing Base Certificate delivered on the Closing Date, subject to the last paragraph of the definition of "Tranche A Borrowing Base") to Agent, *less* the aggregate amount of reserves, if any, established by Agent under Section 2.1(a) after the date of such Borrowing Base Certificate or (B) the Maximum Revolver Amount, then the Borrowers shall, within one (1) Business Day, prepay the Obligations in accordance with Section 2.4(f) in an aggregate amount equal to the amount of such excess.

(ii)  At any time during a Cash Dominion Trigger Period, the Agent shall have the right, subject to Section 2.4(b)(iv), to distribute and apply on a daily basis all amounts held in the Dominion Account to prepay the Obligations in accordance with Section 2.4(f).

(iii)  If, at any time and subject to Section 1.7(d), the Tranche B Revolving Loan Exposure on such date exceeds the Tranche B Line Cap then in effect, such excess shall (A) to the extent that the conditions to a Tranche A Revolving Loan in the amount of such excess under Section 3.3 are satisfied at such time, be deemed drawn under the Tranche A Facility pursuant to the Line Cap then in effect and (B) to the extent that the conditions to a Tranche A Revolving Loan in the amount of such excess under Section 3.3 are not satisfied at such time, give rise to a Reserve against the Tranche A Line Cap then in effect in an amount equal to such excess, and if the result causes the Tranche A Revolving Usage to exceed the Tranche A Line Cap then in effect the Borrowers shall immediately after demand, apply an amount equal to such excess to prepay the Loans and any interest accrued thereon, first, repay or prepay Swing Loans, second, repay or prepay Tranche A Revolving Borrowings, third, replace or Cash Collateralize outstanding Letters of Credit in an amount sufficient to eliminate such excess, and fourth, repay or prepay Tranche B Revolving Borrowings.

(g)  **Application of Payments.** Each prepayment pursuant to Section 2.4(e)(i), Section 2.4(e)(i) and Section 2.4(e)(iii) shall, (A) so long as no Application Event shall have occurred and be continuing, be applied, first, to the outstanding principal amount of the Tranche A Revolving Loans until paid in full, second, to cash collateralize the Letters of Credit in an amount equal to the sum of (x) 103% of the Letter of Credit Usage that is denominated in Dollars, and (y) 103% of the Letter of Credit Usage that is denominated in an Agreed Currency other than Dollars and third, to the outstanding Tranche B Revolving Loans, and (B) if an Application Event shall have occurred and be continuing, be applied in the manner set forth in Section 2.4(b)(iv).

(g)  **Generally.** Any mandatory prepayments required under Section 2.4(d) shall not result in a permanent reduction of the Revolver Commitments. All prepayments made pursuant to Section 2.4(d) or Section 2.4(d) shall be accompanied by accrued and unpaid interest on the amount so prepaid.

2.5  Promise to Pay; Promissory Notes.

(a)  The Borrowers agree to pay the Lender Group Expenses of Agent, the Issuing Banks, and the Revolving Lenders on the earlier of (1) the first day of the month following the date on which the applicable Lender Group Expenses were first incurred and invoiced or (2) the date on which demand therefor is made by Agent (it being acknowledged and agreed that any charging of such costs, expenses or Lender Group Expenses to the applicable Loan Account pursuant to the provisions of Section 2.6(d) shall be deemed to constitute a demand for payment thereof for the purposes of this subclause (ii)). The Borrowers promise to pay all of the Obligations (including principal, interest, premiums, if any, fees, costs,

(b)    [Reserved].

(c)    Any Lender may request that any portion of its Revolver Commitments or the Revolving Loans made by it be evidenced by one or more promissory notes. In such event, the Borrowers shall execute and deliver to such Lender or its registered assigns the requested promissory notes payable to such Lender in a form furnished by Agent and reasonably satisfactory to such Borrowers. Thereafter, the portion of the Revolver Commitments and Revolving Loans evidenced by such promissory notes and interest thereon shall at all times be represented by one or more promissory notes in such form payable to the payee named therein or its registered assigns.

2.6    Interest Rates and Letter of Credit Fee: Rates, Payments, and Calculations.

(a)    **Interest Rates.** Except as provided in Section 2.6(c), all Obligations (except for undrawn Letters of Credit) that have been charged to the applicable Loan Account pursuant to the terms hereof shall bear interest as follows:

(i)    if the relevant Obligation is a Revolving Loan that is a LIBOR Rate Loan, at a per annum rate equal to the LIBOR Rate plus the Applicable Margin, and

(ii)    if the relevant Obligation is a Revolving Loan that is a Base Rate Loan, at a per annum rate equal to the Base Rate plus the Applicable Margin.

(b)    **Letter of Credit Fees.** The Borrowers shall pay Agent (for the ratable benefit of the Revolving Lenders), a Letter of Credit fee (the "Letter of Credit Fee") (which fee shall be in addition to the fronting fees and commissions, other fees, charges and expenses set forth in    Section 2.11(l)) that shall accrue at a per annum rate equal to the Tranche A LIBOR Rate Margin times the undrawn amount of all outstanding Letters of Credit.

(c)    **Default Rate.** Upon the occurrence and during the continuation of an Event of Default,

(i)    the overdue Obligations shall bear interest at a per annum rate equal to two (2) percentage points above the per annum rate otherwise applicable hereunder, and

(ii)    the overdue Letter of Credit Fees shall be increased to two (2) percentage points above the per annum rate otherwise applicable hereunder.

Interest at the above referenced rate (the "Default Rate") shall be payable upon demand.

(d)    **Payment.**

(i)    Except to the extent provided to the contrary in    Section 2.4(g), Section 2.10, Section 2.11(l), and Section 2.13(a), (A) all interest, all Letter of Credit Fees, all Unused Line Fees and all other fees payable hereunder or under any of the other Loan Documents shall be due and payable, in arrears, on the first day of each quarter and on the Maturity Date, (B) [reserved], and (C) all costs and expenses payable hereunder or under any of the other Loan Documents, and all Lender Group Expenses shall be due and payable on the earlier of (x) the first day of the month following the date on which the applicable costs, expenses, or Lender Group Expenses were first incurred and invoiced, or (y) the date on which demand therefor is made by Agent (it being acknowledged and agreed that any charging of such costs, expenses or Lender Group Expenses to the applicable Loan Account pursuant to the provisions of the following clause (ii) shall be deemed to constitute a demand for payment thereof for the purposes of this subclause (y)).

(ii)    The Borrowers hereby authorize Agent, from time to time during any Cash Dominion Trigger Period, with prior notice to the Borrowers that the Agent is exercising its rights

18

under this Section 2.6(d)(ii) (provided that after delivery of such notice, no additional notice shall be required during such Cash Dominion Trigger Period), to charge to the Loan Account (A) on the first day of each quarter, all interest accrued during the prior quarter on the Revolving Loans hereunder, (B) on the first day of each quarter, all Letter of Credit Fees accrued or chargeable hereunder during the prior quarter, (C) as and when due and payable, all fees and costs provided for in Section 2.10(a) or (c), (D) on the first day of each quarter, the Unused Line Fee accrued during the prior quarter pursuant to Section 2.10(b), (E) as and when due and payable, all other fees payable hereunder or under any of the other Loan Documents, (F) as and when due and payable, the fronting fees and all commissions, other fees, charges and expenses provided for in Section 2.11(l), (G) as and when due and payable, all other Lender Group Expenses of Agent, the Issuing Banks, and the Revolving Lenders, and (H) as and when due and payable all other payment obligations payable under any Loan Document or any Bank Product Agreement (including any amounts due and payable to the Bank Product Providers in respect of Bank Products). All amounts (including interest, fees, costs, expenses, Lender Group Expenses, or other amounts payable hereunder or under any other Loan Document or under any Bank Product Agreement) charged to the Loan Account shall thereupon constitute Revolving Loans hereunder, shall constitute Obligations hereunder, and shall initially accrue interest at the rate then applicable to Revolving Loans that are Base Rate Loans (unless and until converted into LIBOR Rate Loans in accordance with the terms of this Agreement).

(e)  **Computation.** All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 360-day year or, in the case of Base Rate Loans (or any fees or expenses based on the Base Rate), on the basis of a 365-day year or 366-day year, as applicable, in each case, for the actual number of days elapsed in the period during which the interest or fees accrue. In the event the Base Rate is changed from time to time hereafter, the rates of interest hereunder based upon the Base Rate automatically and immediately shall be increased or decreased by an amount equal to such change in the Base Rate.

(f)  **Intent to Limit Charges to Maximum Lawful Rate.**  In no event shall the interest rate or rates payable under this Agreement, *plus* any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. Borrowers and the Lender Group, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; provided, that, anything contained herein to the contrary notwithstanding, if such rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, ipso facto, as of the date of this Agreement, the Borrowers are and shall be liable only for the payment of such maximum amount as is allowed by law, and payment received from any Borrowers in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

2.7  Crediting Payments. The receipt of any payment item by Agent shall not be required to be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds made to the Agent's Account or unless and until such payment item is honored when presented for payment. Should any payment item not be honored when presented for payment, then Borrowers shall be deemed not to have made such payment and interest shall be calculated accordingly. Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Agent only if it is received into the Agent's Account on a Business Day on or before 1:30 p.m. If any payment item is received into the Agent's Account on a non-Business Day or after 1:30 p.m. on a Business Day (unless Agent, in its sole discretion, elects to credit it on the date received), it shall be deemed to have been received by Agent as of the opening of business on the immediately following Business Day.

2.8  Designated Accounts. Agent is authorized to make the Revolving Loans, and Issuing Bank is authorized to issue the Letters of Credit, under this Agreement based upon electronic or other instructions received from anyone purporting to be an Authorized Person or, without instructions, if pursuant to Section 2.6(d)(ii). The Borrowers agree to establish and maintain the Designated Account with the Designated Account Bank for the purpose of receiving the proceeds of the Revolving Loans

19

A006379

requested by the Borrowers and made by Agent or the Revolving Lenders hereunder. Unless otherwise agreed by Agent and the Borrowers, any Revolving Loan or Swing Loan requested by the Borrowers and made by Agent or the Revolving Lenders hereunder shall be made to the Designated Account.

2.9    Maintenance of Loan Account; Statements of Obligations. Agent shall maintain an account on its books in the name of the Borrowers (the "Loan Account") on which the Borrowers will be charged with all Revolving Loans (including Extraordinary Advances and Swing Loans) made by Agent, the Swing Lender, or the Revolving Lenders to the Borrowers or for the Borrowers' account, the Letters of Credit issued or arranged by any Issuing Bank for the Borrowers' account, and with all other payment Obligations hereunder or under the other Loan Documents, including, accrued interest, fees and expenses, and Lender Group Expenses. In accordance with Section 2.7, the Loan Account will be credited with all payments received by Agent from the Borrowers or for the Borrowers' account. Agent shall make available to the Borrowers monthly statements regarding the Loan Account, including the principal amount of the Revolving Loans, interest accrued hereunder, fees accrued or charged hereunder or under the other Loan Documents, and a summary itemization of all charges and expenses constituting Lender Group Expenses accrued hereunder or under the other Loan Documents, and each such statement, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between the Borrowers and the Lender Group unless, within 30 days after Agent first makes such a statement available to the Borrowers, the Borrowers shall deliver to Agent written objection thereto describing the error or errors contained in such statement.

2.10    Fees

(a)    **Agent Fees.** The Borrowers shall pay to Agent, for the account of Agent, the "ABL Agency Fee" set forth in Section 1 of the Fee Letter, which ABL Agency Fee shall be earned, due and payable to Agent quarterly in advance commencing on the Closing Date and on the first calendar day of the month after each quarter thereafter for so long as this Agreement is in effect.

(b)    **Unused Line Fees.** The Borrowers shall pay to Agent, for the ratable account of the Revolving Lenders, an unused line fee (the " Unused Line Fee") in an amount equal to the Applicable Unused Line Fee Percentage per annum times the result of (i) the aggregate amount of the Revolver Commitments, less (ii) the average amount of the Revolver Usage during the immediately preceding quarter (or portion thereof), which Unused Line Fee shall be due and payable, in arrears, on the first day of each quarter from and after the Closing Date up to the first day of the quarter prior to the date on which the Obligations are paid in full and on the date on which the Obligations are paid in full.

(c)    **Field Examination and Other Fees.** The Borrowers shall pay to Agent, Agent's then standard field examination, appraisal, and valuation fees and charges (including charges of its internal examination and appraisal groups), as and when incurred or chargeable, the fees or charges paid or incurred by Agent (including allocated costs of employees of Agent) to perform field examinations of Parent or its Subsidiaries, to establish electronic collateral reporting systems, to appraise the Collateral, or any portion thereof, or to assess Parent's or its Subsidiaries' business valuation; provided, that so long as no Event of Default and no Field Examination/Appraisal Triggering Event shall have occurred and be continuing, the Borrowers shall not be obligated to reimburse Agent for more than one (1) field examination, one (1) appraisal of the Collateral consisting of inventory, one (1) appraisal of the Collateral consisting of equipment, and one (1) business valuation during any calendar year; provided, further that (i) if a Field Examination/Appraisal Triggering Event occurs in any calendar year, the limits in the immediately preceding proviso shall each be increased to two (2) and (ii) during the existence and continuance of an Event of Default, the limits in the immediately preceding proviso shall each be increased to four (4).

2.11    Letters of Credit.

(a)    Subject to the terms and conditions of this Agreement, upon the request of the Borrowers made in accordance herewith, during the period from the Closing Date until the Letter of Credit Expiration Date, each Issuing Bank agrees to issue a requested Letter of Credit for the account of the

20

Borrowers (which issuance, subject to Section 2.11(h), may be for an Account Party), it being agreed that each Issuing Bank shall only be required to issue standby Letters of Credit unless it otherwise agrees (in its sole discretion). By submitting a request to an Issuing Bank for the issuance of a Letter of Credit, the Borrowers shall be deemed to have requested that such Issuing Bank issue the requested Letter of Credit. Each request for the issuance of a Letter of Credit, or the amendment, renewal, or extension of any outstanding Letter of Credit, shall be irrevocable and shall be made in writing by an Authorized Person and delivered to the applicable Issuing Bank via telefacsimile or other electronic method of transmission reasonably acceptable to such Issuing Bank and at least three (3) Business Days (or such shorter period as agreed by the applicable Issuing Bank) in advance of the requested date of issuance, amendment, renewal, or extension. Each such request shall be in form and substance reasonably satisfactory to such Issuing Bank and (i) shall specify (A) the amount and applicable Agreed Currency of such Letter of Credit, (B) the date of issuance, amendment, renewal, or extension of such Letter of Credit, (C) the proposed expiration date of such Letter of Credit, (D) the name and address of the beneficiary of the Letter of Credit, and (E) such other information (including, the conditions to drawing, and, in the case of an amendment, renewal, or extension, identification of the Letter of Credit to be so amended, renewed, or extended) as shall be reasonably necessary to prepare, amend, renew, or extend such Letter of Credit, and (ii) shall be accompanied by such Issuer Documents as Agent or such Issuing Bank may reasonably request or require, to the extent that such requests or requirements are consistent with the Issuer Documents that such Issuing Bank generally requests for Letters of Credit in similar circumstances. The applicable Issuing Bank's records of the content of any such request will be conclusive, absent manifest error. Unless otherwise specified, all references herein to the amount of a Letter of Credit at any time shall be deemed to mean the maximum face amount of such Letter of Credit after giving effect to all increases thereof contemplated by such Letter of Credit related thereto, whether or not such maximum face amount is in effect at such time.

(b)    No Issuing Bank shall issue a Letter of Credit if any of the following would result after giving effect to the requested issuance:

(i)    the Letter of Credit Usage would exceed the Letter of Credit Sublimit, or the aggregate undrawn amount of all outstanding Letters of Credit issued by such Issuing Bank would exceed the Letter of Credit Sublimit with respect to such Issuing Bank,

(ii)    the Letter of Credit Usage would exceed the Maximum Revolver Amount less the sum of the outstanding principal amount of Revolving Loans (including Swing Loans) at such time,

(iii)    the Letter of Credit Usage would exceed the Tranche A Borrowing Base at such time less the sum of the outstanding principal amount of Tranche A Revolving Loans (including Swing Loans) at such time, or

(iv)    the expiration date of such requested Letter of Credit would occur after the earlier to occur of the date that is 12 months after the date of issuance of such Letter of Credit and the Letter of Credit Expiration Date, unless such Issuing Bank and the Agent have approved such expiration date (it being understood that the obligation of Revolving Lenders to fund participations in Letters of Credit shall expire immediately following the Maturity Date (for this purpose, pursuant to clause (a) of the definition thereof)).

In addition, no Issuing Bank shall issue or be obligated to issue any Letter of Credit if it has actual knowledge that one or more of the applicable conditions precedent set forth in Section 3 is not satisfied on the requested Funding Date. On the Maturity Date, the Borrowers shall provide Letter of Credit Collateralization to Agent (or make other arrangements acceptable to the applicable Issuing Bank) to be held as security for Borrowers' reimbursement obligations in respect of drawings that may subsequently occur under issued and outstanding Letters of Credit.

(c)    In the event there is a Defaulting Lender as of the date of any request for the issuance of a Letter of Credit, no Issuing Bank shall be required to issue or arrange for such Letter of

21

Credit to the extent (i) the Defaulting Lender's Letter of Credit Exposure with respect to such Letter of Credit may not be reallocated pursuant to Section 2.3(i)(ii), or (ii) such Issuing Bank has not otherwise entered into arrangements reasonably satisfactory to it and the Borrowers to eliminate such Issuing Bank's risk with respect to the participation in such Letter of Credit of the Defaulting Lender, which arrangements may include the Borrowers cash collateralizing such Defaulting Lender's Letter of Credit Exposure in accordance with Section 2.3(i)(ii). Additionally, no Issuing Bank shall have any obligation to issue a Letter of Credit if (A) any order, judgment, or decree of any Governmental Authority or arbitrator shall, by its terms, purport to enjoin or restrain such Issuing Bank from issuing such Letter of Credit, or any law applicable to such Issuing Bank or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such Issuing Bank shall prohibit or request that such Issuing Bank refrain from the issuance of letters of credit generally or such Letter of Credit in particular, (B) the issuance of such Letter of Credit would violate one or more policies of such Issuing Bank applicable to letters of credit generally, or (C) if amounts demanded to be paid under any Letter of Credit will or may not be in an Agreed Currency.

(d)    Any Issuing Bank (other than Bank of America or any of its Affiliates) shall notify Agent in writing no later than the Business Day immediately following the Business Day on which such Issuing Bank receives a request for issuance of any Letter of Credit. The applicable Issuing Bank will not issue any requested Letter of Credit if it receives written notice from the Agent (with a copy to Parent) that the proposed Letter of Credit would cause an Overadvance to occur. Each Letter of Credit shall be in form and substance reasonably acceptable to the applicable Issuing Bank, including the requirement that the amounts payable thereunder must be payable in an Agreed Currency. If an Issuing Bank makes a payment under a Letter of Credit, the Borrowers shall pay to Agent an amount equal to the applicable Letter of Credit Disbursement in the same currency as such Letter of Credit (i) within one (1) Business Day after such Letter of Credit Disbursement in the case of Letters of Credit denominated in Dollars and (ii) within two (2) Business Days after such Letter of Credit Disbursement in the case of Letters of Credit denominated in an Agreed Currency other than Dollars is made and, in the absence of such payment, the amount of such Letter of Credit Disbursement (or, in the case of a Letter of Credit Disbursement in an Agreed Currency other than Dollars, the Agreed Currency Equivalent of such Letter of Credit Disbursement) immediately and automatically shall be deemed to be a Revolving Loan hereunder (notwithstanding any failure to satisfy any condition precedent set forth in Section 3) and, initially, shall bear interest at the rate then applicable to Revolving Loans that are Base Rate Loans. If a Letter of Credit Disbursement is deemed to be a Revolving Loan hereunder, the Borrowers' obligation to pay the amount of such Letter of Credit Disbursement to the applicable Issuing Bank shall be automatically converted into an obligation to pay the resulting Revolving Loan. Promptly following receipt by Agent of any payment from the Borrowers pursuant to this paragraph, Agent shall distribute such payment to the applicable Issuing Bank or, to the extent that Revolving Lenders have made payments pursuant to Section 2.11(e) to reimburse the applicable Issuing Bank, then to such Revolving Lenders and such Issuing Bank as their interests may appear.

(e)    Promptly following receipt of a notice of a Letter of Credit Disbursement pursuant to Section 2.11(d), each Revolving Lender agrees to fund its Pro Rata Share of any Revolving Loan deemed made pursuant to Section 2.11(d) on the same terms and conditions as if the Borrowers had requested the amount thereof as a Revolving Loan and Agent shall promptly pay to the applicable Issuing Bank the amounts so received by it from the Revolving Lenders; provided that in the case of Letters of Credit denominated in an Agreed Currency other than Dollars, each Revolving Lender shall fund in Dollars its Pro Rata Share of the amount equal to the Agreed Currency Equivalent of such Letter of Credit Disbursement amount. By the issuance of a Letter of Credit (or an amendment, renewal, or extension of a Letter of Credit) and without any further action on the part of any Issuing Bank or the Revolving Lenders, the applicable Issuing Bank shall be deemed to have granted to each Revolving Lender, and each Revolving Lender shall be deemed to have purchased, a participation in each Letter of Credit issued by such Issuing Bank, in an amount equal to its Pro Rata Share of such Letter of Credit, and each such Revolving Lender agrees to pay to Agent, for the account of such Issuing Bank, such Revolving Lender's Pro Rata Share of any Letter of Credit Disbursement made by such Issuing Bank under the applicable Letter of Credit. In consideration of and in furtherance of the foregoing, each Revolving Lender hereby absolutely and unconditionally agrees to pay to Agent, for the account of the applicable Issuing Bank,

such Revolving Lender's Pro Rata Share of each Letter of Credit Disbursement made by such Issuing Bank and not reimbursed by the Borrowers on the date due as provided in Section 2.11(d), or of any reimbursement payment that is required to be refunded (or that Agent or the applicable Issuing Bank elects, based upon the advice of counsel, to refund) to the Borrowers for any reason. Each Revolving Lender acknowledges and agrees that its obligation to deliver to Agent, for the account of the applicable Issuing Bank, an amount equal to its respective Pro Rata Share of each Letter of Credit Disbursement pursuant to this Section 2.11(e) shall be absolute and unconditional and such remittance shall be made notwithstanding the occurrence or continuation of an Event of Default or Default or the failure to satisfy any condition set forth in Section 3.

(f)     Each Borrower agrees to indemnify, defend and hold harmless each member of the Lender Group (including each Issuing Bank and its branches, Affiliates, and correspondents) and each such Person's respective directors, officers, employees, attorneys and agents (each, including each Issuing Bank, a "Letter of Credit Related Person") (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable fees and disbursements of one counsel in each relevant jurisdiction (and, solely in the case of an actual or perceived conflict of interest, one additional counsel to each group of affected persons similarly situated) and all other reasonable and documented costs and out-of-pocket expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), which may be incurred by or awarded against any Letter of Credit Related Person (other than any Taxes that are governed by Section 17, or Excluded Taxes) (the "Letter of Credit Indemnified Costs"), and which arise out of or in connection with, or as a result of this Agreement, any Letter of Credit, any Issuer Document, or any Drawing Document referred to in or related to any Letter of Credit, or any action or proceeding arising out of any of the foregoing (whether administrative, judicial or in connection with arbitration); in each case, including that resulting from the Letter of Credit Related Person's own negligence (other than resulting from such Person's bad faith or willful misconduct or constituting gross negligence); provided, however, that such indemnity shall not be available to any Letter of Credit Related Person claiming indemnification to the extent that such Letter of Credit Indemnified Costs may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the bad faith, gross negligence or willful misconduct of the Letter of Credit Related Person claiming indemnity. This indemnification provision shall survive termination of this Agreement and all Letters of Credit.

(g)     The liability of each Issuing Bank (or any other Letter of Credit Related Person) under, in connection with or arising out of any Letter of Credit (or pre-advice), regardless of the form or legal grounds of the action or proceeding, shall be limited to direct damages suffered by the Borrowers that result from such Issuing Bank's bad faith, gross negligence or willful misconduct in (i) honoring a presentation under a Letter of Credit that on its face does not at least substantially comply with the terms and conditions of such Letter of Credit, (ii) failing to honor a presentation under a Letter of Credit that strictly complies with the terms and conditions of such Letter of Credit or (iii) retaining Drawing Documents presented under a Letter of Credit. Each Issuing Bank shall be deemed to have acted with due diligence and reasonable care if such Issuing Bank's conduct is in accordance with Standard Letter of Credit Practice or in accordance with this Agreement. The Borrowers' aggregate remedies against each Issuing Bank and any Letter of Credit Related Person for wrongfully honoring a presentation under any Letter of Credit or wrongfully retaining honored Drawing Documents shall in no event exceed the aggregate amount paid by the Borrowers to the applicable Issuing Bank in respect of the honored presentation in connection with such Letter of Credit under Section 2.11(d), plus interest at the rate then applicable to Base Rate Loans hereunder.

(h)     The Borrowers are responsible for the final text of the Letter of Credit as issued by any   Issuing Bank, irrespective of any assistance such Issuing Bank may provide such as drafting or recommending text or by such Issuing Bank's use or refusal to use text submitted by the Borrowers. Prior to the issuance of a Letter of Credit, the Borrowers understand that the final form of any Letter of Credit may be subject to such revisions and changes as are deemed necessary or appropriate by the applicable Issuing Bank, and the Borrowers hereby consent to such revisions and change so long as they are (1) not materially different from the application executed in connection therewith and (2) are in accordance with

23

international standard banking practice. The Borrowers are solely responsible for the suitability of the Letter of Credit for the Borrowers' purposes. If the Borrowers request any Issuing Bank to issue a Letter of Credit for an affiliated or unaffiliated third party (an "Account Party"), (i) such Account Party shall have no rights against such Issuing Bank; (ii) the Borrowers shall be responsible for the application and obligations under this Agreement; and (iii) communications (including notices) related to the respective Letter of Credit shall be among such Issuing Bank and the Borrowers. The Borrowers will examine the copy of the Letter of Credit and any other document sent by each Issuing Bank in connection therewith and shall promptly notify such Issuing Bank (not later than three (3) Business Days following the Borrowers' receipt of documents from such Issuing Bank) of any non-compliance with the Borrowers' instructions and of any discrepancy in any document under any presentment or other irregularity. The Borrowers understand and agree that no Issuing Bank is required to extend the expiration date of any Letter of Credit for any reason. With respect to any Letter of Credit containing an "automatic amendment" to extend the expiration date of such Letter of Credit for additional consecutive periods of 12 months (but in no event shall the expiration date extend beyond the Letter of Credit Expiration Date unless such Issuing Bank and the Agent have approved such expiration date (it being understood that the obligation of Revolving Lenders to fund participations in Letters of Credit shall expire immediately following the Maturity Date (for this purpose, pursuant to clause (a) of the definition thereof)), any Issuing Bank, in its sole and absolute discretion, may give notice of nonrenewal of such Letter of Credit and, if the Borrowers do not at any time want such Letter of Credit to be renewed, the Borrowers will so notify Agent and the applicable Issuing Bank at least 30 calendar days (or such later date as agreed to by the applicable Issuing Bank) before such Issuing Bank is required to notify the beneficiary of such Letter of Credit or any advising bank of such nonrenewal pursuant to the terms of such Letter of Credit.

( i )    The Borrowers' reimbursement and payment obligations under this Section are absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever, provided, however, that subject to Section 2.11(g) above, the foregoing shall not release any Issuing Bank from such liability to the Borrowers as may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction against such Issuing Bank following reimbursement or payment of the obligations and liabilities, including reimbursement and other payment obligations, of the Borrowers to such Issuing Bank arising under, or in connection with, this Section 2.11 or any Letter of Credit.

(j)    Without limiting any other provision of this Agreement, each Issuing Bank and each other Letter of Credit Related Person (if applicable) shall not be responsible to the Borrowers for, and no Issuing Bank's rights and remedies against the Borrowers and the obligation of the Borrowers to reimburse each Issuing Bank for each drawing under each Letter of Credit shall be impaired by:

(i)    honor of a presentation under any Letter of Credit that on its face substantially complies with the terms and conditions of such Letter of Credit, even if the Letter of Credit requires strict compliance by the beneficiary;

(ii)    honor of a presentation of any Drawing Document that appears on its face to have been signed, presented or issued (A) by any purported successor or transferee of any beneficiary or other Person required to sign, present or issue such Drawing Document or (B) under a new name of the beneficiary;

(iii)    acceptance as a draft of any written or electronic demand or request for payment under a Letter of Credit, even if non-negotiable or not in the form of a draft or notwithstanding any requirement that such draft, demand or request bear any or adequate reference to a Letter of Credit;

(iv)    the identity or authority of any presenter or signer of any Drawing Document or the form, accuracy, genuineness or legal effect of any Drawing Document (other than the applicable Issuing Bank's determination that such Drawing Document appears on its face substantially to comply with the terms and conditions of a Letter of Credit);

(v)    acting upon any instruction or request relative to a Letter of Credit or requested a Letter of Credit that an Issuing Bank in good faith believes to have been given by a Person authorized to give such instruction or request;

(vi)    any errors, omissions, interruptions or delays in transmission or delivery of any message, advice or document (regardless of how sent or transmitted) or for errors in interpretation of technical terms or in translation or any delay in giving or failing to give notice to the Borrowers;

(vii)    any acts, omissions or fraud by, or the insolvency of, any beneficiary, any nominated person or entity or any other Person or any breach of contract between any beneficiary and any Borrower or any of the parties to the underlying transaction to which the Letter of Credit relates;

(viii)    assertion or waiver of any provision of the ISP or UCP that primarily benefits an issuer of a Letter of Credit, including any requirement that any Drawing Document be presented to it at a particular hour or place;

(ix)    payment to any presenting bank (designated or permitted by the terms of the applicable Letter of Credit) claiming that it rightfully honored or is entitled to reimbursement or indemnity under Standard Letter of Credit Practice applicable to it;

(x)    acting or failing to act as required or permitted under Standard Letter of Credit Practice applicable to where Issuing Bank has issued, confirmed, advised or negotiated such Letter of Credit, as the case may be;

(xi)    honor of a presentation after the expiration date of any Letter of Credit notwithstanding that a presentation was made prior to such expiration date and dishonored by the applicable Issuing Bank if subsequently Issuing Bank or any court or other finder of fact determines such presentation should have been honored;

(xii)    dishonor of any presentation that does not strictly comply or that is fraudulent, forged or otherwise not entitled to honor; or

(xiii)    honor of a presentation that is subsequently determined by the applicable Issuing Bank to have been made in violation of international, federal, state or local restrictions on the transaction of business with certain prohibited Persons.

(k)    [Reserved.]

(l)    The Borrowers shall pay immediately upon demand to Agent for the account of the applicable Issuing Bank as non-refundable fees, commissions, and charges (it being acknowledged and agreed that any charging of such fees, commissions, and charges to the Loan Account pursuant to the provisions of Section 2.6(d)(ii) shall be deemed to constitute a demand for payment thereof for the purposes of this  Section 2.11(l)): (1) a fronting fee which shall be imposed by the applicable Issuing Bank upon the issuance of each Letter of Credit of 0.125% per annum of the face amount thereof, which fee shall be payable quarterly in arrears, on the first day of each quarter, and on maturity, *plus* (2) any and all other customary commissions, fees and charges then in effect imposed by, and any and all reasonable and documented out-of-pocket expenses incurred by, the applicable Issuing Bank, or by any adviser, confirming institution or entity or other nominated person, relating to Letters of Credit, at the time of issuance of any Letter of Credit and upon the occurrence of any other activity with respect to any Letter of Credit (including, transfers, assignments of proceeds, amendments, drawings, extensions or cancellations) which charges shall be paid as and when incurred.

(m)    If by reason of (x) any Change in Law, or (y) compliance by any Issuing Bank or any other member of the Lender Group with any direction, request, or requirement (irrespective of whether having the force of law) of any Governmental Authority or monetary authority including, Regulation D of the Board of Governors as from time to time in effect (and any successor thereto):

25

(i)    any reserve, deposit, or similar requirement is or shall be imposed or modified in respect of any Letter of Credit issued or caused to be issued hereunder or hereby, or

(ii)    there shall be imposed on any Issuing Bank or any other member of the Lender Group any other condition regarding any Letter of Credit, or

(iii)    there shall be imposed on any member of the Lender Group or Agent any Taxes (other than (A) Indemnified Taxes and (B) Excluded Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto,

and the result of the foregoing is to increase, directly or indirectly, the cost to any Issuing Bank or any other member of the Lender Group of issuing, making, participating in, or maintaining any Letter of Credit or to reduce the amount receivable in respect thereof, then, and in any such case, Agent may, at any time within 180 days after the additional cost is incurred or the amount received is reduced, notify the Borrowers, and the Borrowers shall pay within 30 days after demand therefor, such amounts as Agent may specify to be necessary to compensate the applicable Issuing Bank or any other member of the Lender Group for such additional cost or reduced receipt, together with interest on such amount from the date of such demand until payment in full thereof at the rate then applicable to Base Rate Loans hereunder; provided, that (a) the Borrowers shall not be required to provide any compensation pursuant to this Section 2.11(m) for any such amounts incurred more than 180 days prior to the date on which the demand for payment of such amounts is first made to the Borrowers, and (b) if an event or circumstance giving rise to such amounts is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof. The determination by Agent of any amount due pursuant to this Section 2.11(m), as set forth in a certificate setting forth the calculation thereof in reasonable detail, shall, in the absence of manifest or demonstrable error, be final and conclusive and binding on all of the parties hereto.

(n)    Unless otherwise expressly agreed by the applicable Issuing Bank and the Borrowers when a Letter of Credit is issued, (i) the rules of the ISP and the UCP shall apply to each standby Letter of Credit, and (ii) the rules of the UCP shall apply to each commercial Letter of Credit.

(o)    In the event of a direct conflict between the provisions of this Section 2.11 and any provision contained in any Issuer Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.11 shall control and govern.

(p)    The provisions of this Section 2.11 shall survive the termination of this Agreement and the repayment in full of the Obligations with respect to any Letters of Credit that remain outstanding thereafter.

(q)    Notwithstanding anything to the contrary contained herein, any Issuing Bank may, upon thirty (30) days' notice to the Borrowers and the Lenders, resign as an Issuing Bank; provided that on or prior to the expiration of such 30-day period with respect to such resignation, the relevant Issuing Bank shall have identified a successor Issuing Bank reasonably acceptable to the Borrowers willing to accept its appointment as successor Issuing Bank. In the event of any such resignation of an Issuing Bank, the Borrowers shall be entitled to appoint from among the Lenders willing to accept such appointment a successor Issuing Bank hereunder; provided that no failure by the Borrowers to appoint any such successor shall affect the resignation of the relevant Issuing Bank, as the case may be, except as expressly provided above. If an Issuing Bank resigns as an Issuing Bank, it shall retain all the rights and obligations of an Issuing Bank hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as an Issuing Bank and all obligations with respect thereto.

26

( r )    Each Existing Letter of Credit shall be assumed by the Borrowers and deemed a Letter of Credit issued hereunder for account of the Borrowers for all purposes under this Agreement without need for any further action by the Borrowers or any other Person, and shall be subject to and governed by the terms and conditions of this Agreement. On the Second Amendment Effective Date, each Existing Letter of Credit, to the extent outstanding, shall automatically and without further action by the parties thereto be deemed converted to Letters of Credit issued pursuant to this Section 2.11 for the account of the Borrowers and subject to the provisions hereof.

2.12    [Reserved].

2.13    LIBOR Option.

(a)    **Interest and Interest Payment Dates.**  In lieu of having interest charged at the rate based upon the Base Rate, the Borrowers shall have the option, subject to Section 2.13(b) below (the "LIBOR Option") to have interest on all or a portion of the Revolving Loans be charged (whether at the time when made (unless otherwise provided herein), upon conversion from a Base Rate Loan to a LIBOR Rate Loan, or upon continuation of a LIBOR Rate Loan as a LIBOR Rate Loan) at a rate of interest based upon the LIBOR Rate. Interest on LIBOR Rate Loans shall be payable on the earliest of (i) the last day of the Interest Period applicable thereto; provided, that, subject to the following clauses (ii) and (iii), in the case of any Interest Period greater than three (3) months in duration, interest shall be payable at three (3) month intervals after the commencement of the applicable Interest Period and on the last day of such Interest Period), (ii) the date on which all or any portion of the Obligations are accelerated pursuant to the terms hereof, or (iii) the date on which this Agreement is terminated pursuant to the terms hereof. On the last day of each applicable Interest Period, unless Borrowers have properly exercised the LIBOR Option with respect thereto, the interest rate applicable to such LIBOR Rate Loan automatically shall convert to the rate of interest then applicable to Base Rate Loans of the same type hereunder. At any time that an Event of Default has occurred and is continuing, at the written election of the Required Lenders, no Borrower shall have the option to request that any Revolving Loans bear interest at a rate based upon the LIBOR Rate.

(b)    **LIBOR Election.**

(i)    Borrowers may, at any time and from time to time, so long as no Event of Default has occurred and is continuing, and the Required Lenders have not elected pursuant to Section 2.13(a) to prohibit LIBOR Rate Loans, elect to exercise the LIBOR Option by notifying Agent prior to 11:00 a.m. at least three (3) Business Days prior to the commencement of the proposed Interest Period (the "LIBOR Deadline"). Notice of Borrowers' election of the LIBOR Option for a permitted portion of the Revolving Loans and an Interest Period pursuant to this Section shall be made by delivery to Agent of a LIBOR Notice received by Agent before the LIBOR Deadline, or by electronic notice received by Agent before the LIBOR Deadline (to be confirmed by delivery to Agent of a LIBOR Notice received by Agent prior to 5:00 p.m. on the same day). Promptly upon its receipt of each such LIBOR Notice, Agent shall provide a copy thereof to each of the affected Lenders. Each LIBOR Notice shall be irrevocable and binding on the Borrowers.

(ii)    In connection with each LIBOR Rate Loan, each Borrower of such Revolving Loan shall indemnify, defend, and hold Agent and the Lenders harmless against any actual loss, cost, or expense incurred by Agent or any Lender as a result of (A) the payment of any principal of any applicable LIBOR Rate Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (B) the conversion of any LIBOR Rate Loan other than on the last day of the Interest Period applicable thereto, or (C) the failure to borrow, convert, continue or prepay any LIBOR Rate Loan on a date that is not the last day of the Interest Period or the date otherwise specified in any LIBOR Notice delivered pursuant hereto (such losses, costs, or expenses, "Funding Losses"). A certificate of Agent or a Lender delivered to the Borrowers setting forth in reasonable detail any amount or amounts that Agent or such Lender is entitled to receive pursuant to this Section 2.13 shall be conclusive absent manifest error. The Borrowers shall pay such amount to Agent or the Lender, as applicable, within 30 days of the date of their receipt of such certificate. If a payment of any LIBOR Rate

27

Loan on a day other than the last day of the applicable Interest Period would result in a Funding Loss, Agent may, in its sole discretion at the request of the Borrowers, hold the amount of such payment as cash collateral in support of the Obligations until the last day of such Interest Period and apply such amounts to the payment of the applicable LIBOR Rate Loan on such last day, it being agreed that Agent has no obligation to so defer the application of payments to any LIBOR Rate Loan and that, in the event that Agent does not defer such application, the Borrowers shall be obligated to pay any resulting Funding Losses.

(iii)    Unless Agent, in its sole discretion, agrees otherwise, Borrowers shall have not more than ten (10) LIBOR Rate Loans in effect at any given time. Borrowers may only exercise the LIBOR Option for proposed LIBOR Rate Loans of at least $1,000,000 (and integral multiples of $500,000 in excess thereof).

(c)    **Conversion.** The Borrowers may convert LIBOR Rate Loans to Base Rate Loans at any time; provided, that in the event that LIBOR Rate Loans are converted or prepaid on any date that is not the last day of the Interest Period applicable thereto, including as a result of any prepayment through the required application by Agent of any payments or proceeds of Collateral in accordance with Section 2.4(b) or for any other reason, including early termination of the term of this Agreement or acceleration of all or any portion of the Obligations pursuant to the terms hereof, each Borrower of such Revolving Loans shall indemnify, defend, and hold Agent and the Lenders and their Participants harmless against any and all Funding Losses in accordance with Section 2.13(b)(ii).

(d)    **Special Provisions Applicable to LIBOR Rate.**

(i)    The LIBOR Rate may be adjusted by Agent with respect to any Lender on a prospective basis to take into account any additional or increased costs to such Lender of maintaining or obtaining any eurodollar deposits or increased costs, in each case, due to changes in applicable law occurring subsequent to the commencement of the then applicable Interest Period, including any Changes in Law (including any Changes in Laws relating to Taxes, other than Indemnified Taxes, which shall be governed by Section 17, and Excluded Taxes) and changes in the reserve requirements imposed by the Board of Governors, which additional or increased costs would increase the cost of funding or maintaining loans bearing interest at the LIBOR Rate. In any such event, the affected Lender shall give Borrowers and Agent notice of such a determination and adjustment and Agent promptly shall transmit the notice to each other Lender and, upon its receipt of the notice from the affected Lender, Borrowers may, by notice to such affected Lender (A) require such Lender to furnish to Borrowers a statement setting forth in reasonable detail the basis for adjusting such LIBOR Rate and the method for determining the amount of such adjustment, or (B) repay the LIBOR Rate Loans of such Lender with respect to which such adjustment is made (together with any amounts due under Section 2.13(b)(ii)).

(ii)    If any Lender determines that any applicable law has made it unlawful for any Lender to make, maintain or fund LIBOR Rate Loans, or to determine or charge interest rates based upon the LIBOR Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the applicable interbank market, then, on notice thereof by such Lender to Parent through Agent, any obligation of such Lender to make or continue LIBOR Rate Loans or to convert Base Rate Loans to LIBOR Rate Loans, shall be suspended until such Lender notifies Agent and Parent that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Borrowers shall, upon demand from such Lender (with a copy to Agent), prepay or convert all such LIBOR Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such LIBOR Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such LIBOR Rate Loans. Upon any such prepayment or conversion, each Borrower shall also pay accrued interest on the amount of Loans so prepaid or converted.

(iii)    If the Required Lenders determine that for any reason in connection with any request for a LIBOR Rate Loan or a conversion to or continuation thereof that (a) deposits are not

being offered to banks in the applicable offshore interbank market for the applicable amount and Interest Period of such LIBOR Rate Loan, (b) adequate and reasonable means do not exist for determining the LIBOR Rate for any requested Interest Period with respect to a proposed LIBOR Rate Loan, or (c) the LIBOR Rate for any requested Interest Period with respect to a proposed LIBOR Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such LIBOR Rate Loan, Agent will promptly so notify Parent and each Lender. Thereafter, the obligation of the Lenders to make or maintain LIBOR Rate Loans shall be suspended until Agent (upon the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, Parent (on behalf of the Borrowers) may revoke any pending request for a Borrowing of, conversion to or continuation of LIBOR Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

(iv)    Notwithstanding anything to the contrary in this Agreement or any other Loan Documents, if Agent determines (which determination shall be conclusive absent manifest error), or Parent or the Required Lenders notify Agent (with, in the case of the Required Lenders, a copy to Parent) that Parent or the Required Lenders (as applicable) have determined, that:

(A)    adequate and reasonable means do not exist for ascertaining the LIBOR Rate for any ~~requested~~ Interest Period hereunder or any other tenors of the LIBOR Rate, including, without limitation, because the LIBOR Screen Rate is not available or published on a current basis and such circumstances are unlikely to be temporary; or

(B)    the administrator of the LIBOR Screen Rate or a Governmental Authority having jurisdiction over Agent or such administrator has made a public statement identifying a specific date after which the LIBOR Rate or the LIBOR Screen Rate shall no longer be made available, or used for determining the interest rate of loans, provided that, at the time of such statement, there is no successor administrator that is satisfactory to the Agent, that will continue to provide the LIBOR Rate after such specific date (such specific date, the "Scheduled Unavailability Date"), ~~or~~

(C)    the administrator of the LIBOR Screen Rate or a Governmental Authority having jurisdiction over such administrator has made a public statement announcing that all Interest Periods and other tenors of the LIBOR Rate are no longer representative,

(D)    ~~(C)~~ syndicated loans currently being executed, or that include language similar to that contained in this Section, are being executed or amended (as applicable) to incorporate or adopt a new benchmark interest rate to replace the LIBOR Rate,

then, in the case of clauses (A) through (C) above, on a date and time determined by Agent (any such date, "LIBOR Replacement Date"), which date shall be at the end of an Interest Period or on the relevant interest payment date, as applicable, for interest calculated and shall occur reasonably promptly upon the occurrence of any of the events or circumstances under clauses (A), (B) or (C) above and, solely with respect to clause (B) above, no later than the Scheduled Unavailability Date, the LIBOR Rate will be replaced hereunder and under the other Loan Documents with, subject to the proviso below, the first available alternative set forth in the order below for any payment period for interest calculated that can be determined by Agent, in each case, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document ("LIBOR Successor Rate"; and any such rate before giving effect to the Related Adjustment, "Pre-Adjustment Successor Rate"):

(x) Term SOFR plus the Related Adjustment; and

(y) SOFR plus the Related Adjustment;

and in the case of clause (D) above, Agent and Borrower may amend this Agreement solely for the purpose of replacing the LIBOR Rate under this Agreement and the other Loan Documents in accordance with the definition of "LIBOR Successor Rate" and such amendment will become effective at 5:00 p.m. on the fifth Business Day after Agent shall have notified Lenders and Borrower of the occurrence of the

29

circumstances described in clause (D) above unless, prior to such time, Required Lenders have delivered to Agent written notice that such Required Lenders object to the implementation of a LIBOR Successor Rate pursuant to such clause; provided, that if Agent determines that Term SOFR has become available, is administratively feasible for Agent and would have been identified as the Pre-Adjustment Successor Rate in accordance with the foregoing if it had been so available at the time that the LIBOR Successor Rate then in effect was so identified, and notifies Borrower and Lenders of such availability, then from and after the beginning of the Interest Period, relevant interest payment date or payment period for interest calculated, in each case, commencing no less than 30 days after the date of such notice, the Pre-Adjustment Successor Rate shall be Term SOFR and the LIBOR Successor Rate shall be Term SOFR plus the relevant Related Adjustment.

Agent will promptly (in one or more notices) notify Borrower and Lenders of (x) any occurrence of any of the events, periods or circumstances under clauses (A) through (D) above, (y) a LIBOR Replacement Date, and (z) the LIBOR Successor Rate. Any LIBOR Successor Rate shall be applied in a manner consistent with market practice; provided, that to the extent such market practice is not administratively feasible for Agent, such LIBOR Successor Rate shall be applied in a manner as otherwise reasonably determined by Agent. Notwithstanding anything else herein, if at any time any LIBOR Successor Rate as so determined would otherwise be less than 0.25%, the LIBOR Successor Rate will be deemed to be 0.25% for the purposes of this Agreement and the other Loan Documents.

In connection with the implementation of a LIBOR Successor Rate, Agent will have the right to make LIBOR Successor Rate Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such LIBOR Successor Rate Conforming Changes will become effective without any further action or consent of any other party to this Agreement; provided, that with respect to any such amendment effected, Agent shall post each such amendment implementing such LIBOR Successor Rate Conforming Changes to Borrower and Lenders reasonably promptly after such amendment becomes effective.

If events or circumstances of the type described in clauses (A) through (C) above have occurred with respect to the LIBOR Successor Rate then in effect, then the successor rate thereto shall be determined in accordance with the definition of "LIBOR Successor Rate."

~~then, reasonably promptly after~~ Notwithstanding anything to the contrary herein, (a) after any such determination by Agent or receipt by Agent of any such notice described under Section 2.13(d)(IV)(A) through (C), as applicable, ~~Agent and Parent may amend this Agreement to replace the LIBOR Rate with (x) one or more SOFR Based Rates or (y) an~~ if Agent determines that none of the LIBOR Successor Rates is available on or prior to the LIBOR Replacement Date, (ii) if the events or circumstances described in Section 2.13(d)(IV)(D) have occurred but none of the LIBOR Successor Rates is available, or (iii) if the events or circumstances of the type described in Section 2.13(d)(IV)(A) through (C) have occurred with respect to the LIBOR Successor Rate then in effect and Agent determines that none of the LIBOR Successor Rates is available, then in each case, Agent and Borrower may amend this Agreement solely for the purpose of replacing LIBOR or any then current LIBOR Successor Rate in accordance with this Section at the end of any Interest Period, relevant interest payment date or payment period for interest calculated, as applicable, with another alternate benchmark rate~~,~~ giving due consideration to any evolving or then existing convention for similar ~~Dollar~~U.S. dollar denominated syndicated credit facilities for such alternative benchmarks and, in each case, including any Related Adjustments and any other mathematical or other adjustments to such benchmark giving due consideration to any evolving or then existing convention for similar ~~Dollar~~U.S. dollar denominated syndicated credit facilities for such benchmarks, which adjustment or method for calculating such adjustment shall be published on an information service as selected by ~~the~~ Agent from time to time in its reasonable discretion and may be periodically updated ~~(the "Adjustment," and~~. For the avoidance of doubt, any such proposed rate, ~~a "~~ and adjustments shall constitute a LIBOR Successor Rate~~") and any. Any~~ such amendment shall become effective at 5:00 p.m. ~~(New York time)~~ on the fifth Business Day after Agent shall have posted such proposed amendment to ~~all~~Lenders and ~~Parent~~Borrower unless, prior to such time, ~~Lenders comprising the~~ Required Lenders have delivered to Agent written notice that such Required Lenders ~~(A) in the case of an amendment to replace the LIBOR Rate with a rate described in clause (x), object to the Adjustment;~~

30

or (B) in the case of an amendment to replace the LIBOR Rate with a rate described in clause (y),   object to such amendment ; provided that  for the avoidance of doubt, in the case of clause (A), the Required Lenders shall not be entitled to object to any SOFR-Based Rate contained in any such amendment. Such   LIBOR Successor Rate shall be applied in a manner consistent with market practice; provided that to the extent such market practice is not administratively feasible for the Agent, such LIBOR Successor Rate shall be applied in a manner as otherwise reasonably determined by   the Agent .

If, at the end of any Interest Period, relevant interest payment date or payment period for interest calculated,   no LIBOR Successor Rate has been determined in accordance with Section 2.13(d)(IV) and the circumstances under  clause 2.13(d)(IV)(A) or (C) above exist or the Scheduled Unavailability Date has occurred (as applicable), Agent will promptly so notify ParentBorrower  and each LenderLenders . Thereafter, (xa) the obligation of the Lenders to make or maintain LIBOR Rate Loans shall be suspended (to the extent of the affected LIBOR  Rate Loans or , Interest Periods ), interest payment dates or payment periods),  and (yb) the LIBOR Rate component shall no longer be utilized in determining  the Base Rate, until the LIBOR Successor Rate has been determined in accordance with Section 2.13(d)(IV). Upon receipt of such notice, any Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of LIBOR Rate Loans (to the extent of the affected  LIBOR Rate Loans or, Interest Periods, interest payment dates or payment periods ) or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans (subject to the foregoing clause (yb) of this paragraph) in the amount specified therein).
Notwithstanding anything else herein, any definition of LIBOR Successor Rate shall provide that in no event shall such LIBOR Successor Rate be less than zero for purposes of this Agreement.

In connection with the implementation of a LIBOR Successor Rate,  the Agent will have the right to make LIBOR Successor Rate Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such LIBOR Successor Rate Conforming Changes will become effective without any further action or consent of any other party to this Agreement.

(e)  **No Requirement of Matched Funding.** Anything to the contrary contained herein notwithstanding, neither Agent, nor any Lender, nor any of their Participants, is required actually to acquire eurodollar deposits to fund or otherwise match fund any Obligation as to which interest accrues at the LIBOR Rate.

2.14   Capital Requirements.

(a)   If, after the date hereof, any Issuing Bank or any Lender determines that (1) any Change in Law regarding capital or reserve requirements for banks or bank holding companies, or (2) compliance by such Issuing Bank or such Lender, or their respective parent bank holding companies, with any guideline, request or directive of any Governmental Authority regarding capital adequacy or liquidity requirements (whether or not having the force of law), has the effect of reducing the return on such Issuing Bank's, such Lender's, or such holding companies' capital as a consequence of such Issuing Bank's or such Lender's commitments hereunder to a level below that which such Issuing Bank, such Lender, or such holding companies could have achieved but for such Change in Law or compliance (taking into consideration such Issuing Bank's, such Lender's, or such holding companies' then existing policies with respect to capital adequacy or liquidity requirements and assuming the full utilization of such entity's capital) by any amount deemed by such Issuing Bank or such Lender to be material, then such Issuing Bank or such Lender may notify Borrowers and Agent thereof. Following receipt of such notice, the Borrowers agree to pay such Issuing Bank or such Lender on demand the amount of such reduction or return of capital as and when such reduction is determined, payable within 30 days after presentation to such Issuing Bank or such Lender of a statement in the amount and setting forth in reasonable detail such Issuing Bank's or such Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error). In determining such amount, such Issuing Bank or such Lender may use any reasonable averaging and attribution methods. Failure or delay on the part of such Issuing Bank or any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Issuing Bank's or such

31

Lender's right to demand such compensation; provided that no Borrower shall be required to compensate an Issuing Bank or a Lender pursuant to this Section for any reductions in return incurred more than 180 days prior to the date that such Issuing Bank or such Lender notifies Borrowers of such Change in Law giving rise to such reductions and of such Lender's intention to claim compensation therefor; provided further that if such claim arises by reason of the Change in Law that is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(b)    If Issuing Bank or any Lender requests additional or increased costs referred to in Section 2.11(m), or Section 2.13(d)(i) or amounts under Section 2.14(a) or sends a notice under Section 2.13(d)(ii) relative to changed circumstances (such Issuing Bank or Lender, an " Affected Lender"), then such Affected Lender shall use reasonable efforts to promptly designate a different one of its lending offices or to assign its rights and obligations hereunder to another of its offices or branches, if (i) in the reasonable judgment of such Affected Lender, such designation or assignment would eliminate or reduce amounts payable pursuant to Section 2.11(m), Section 2.13(d)(i) or Section 2.14(a), as applicable, or would eliminate the illegality or impracticality of funding or maintaining LIBOR Rate Loans and (ii) in the reasonable judgment of such Affected Lender, such designation or assignment would not subject it to any material unreimbursed cost or expense and would not otherwise be materially disadvantageous to it. Borrowers agree to pay all reasonable out-of-pocket costs and expenses incurred by such Affected Lender in connection with any such designation or assignment. If, after such reasonable efforts, such Affected Lender does not so designate a different one of its lending offices or assign its rights to another of its offices or branches so as to eliminate Borrowers' obligation to pay any future amounts to such Affected Lender pursuant to Section 2.11(m), Section 2.13(d)(i) or Section 2.14(a), as applicable, or to enable the Borrowers to obtain LIBOR Rate Loans, then Borrowers (without prejudice to any amounts then due to such Affected Lender under Section 2.11(m), Section 2.13(d)(i) or Section 2.14(a), as applicable) may, unless prior to the effective date of any such assignment the Affected Lender withdraws its request for such additional amounts under Section 2.11(m), Section 2.13(d)(i) or Section 2.14(a), as applicable, or indicates that it is no longer unlawful or impractical to fund or maintain LIBOR Rate Loans, may designate a different Issuing Bank or substitute a Lender, in each case, reasonably acceptable to Agent to purchase the Obligations owed to such Affected Lender and such Affected Lender's commitments hereunder (a "Replacement Lender"), and if such Replacement Lender agrees to such purchase, such Affected Lender shall assign to the Replacement Lender its Obligations and commitments, and upon such purchase by the Replacement Lender, which such Replacement Lender shall be deemed to be "Issuing Bank" or a "Lender" (as the case may be) for purposes of this Agreement and such Affected Lender shall cease to be "Issuing Bank" or a "Lender" (as the case may be) for purposes of this Agreement.

(c)    Notwithstanding anything herein to the contrary, the protection of Sections 2.11(m), 2.13(d), and 2.14 shall be available to each Issuing Bank and each Lender (as applicable) regardless of any possible contention of the invalidity or inapplicability of the law, rule, regulation, judicial ruling, judgment, guideline, treaty or other change or condition which shall have occurred or been imposed, so long as it shall be customary for issuing banks or lenders affected thereby to comply therewith. Notwithstanding any other provision herein, neither any Issuing Bank nor any Lender shall demand compensation pursuant to this Section 2.14 if it shall not at the time be the general policy or practice of such Issuing Bank or such Lender (as the case may be) to demand such compensation in similar circumstances under comparable provisions of other credit agreements, if any.

2.15    Joint and Several Liability.

(a)    Each Borrower is accepting joint and several liability for the Obligations hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Lender Group under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and, with respect to Letters of Credit, their Subsidiaries, and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations.

(b)    Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers,

A006392

with respect to the payment and performance of all of the Obligations (including any Obligations arising under this  Section 2.15), it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them.

(c)    If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Obligation until such time as all of the Obligations are paid in full.

(d)    The Obligations of each Borrower under the provisions of this Section 2.15 constitute the absolute and unconditional, full recourse Obligations of each Borrower enforceable against each Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of the provisions of this Agreement (other than this Section 2.15(d)) or any other circumstances whatsoever.

(e)    Except as otherwise expressly provided in this Agreement, each Borrower hereby waives notice of acceptance of its joint and several liability with respect to the other Borrowers, notice of any Revolving Loans or Letters of Credit issued under or pursuant to this Agreement, notice of the occurrence of any Default, Event of Default, or of any demand for any payment under this Agreement, notice of any action at any time taken or omitted by Agent or Lenders under or in respect of any of the Obligations, any requirement of diligence or to mitigate damages and, generally, to the extent permitted by applicable law, all demands, notices and other formalities of every kind in connection with this Agreement (except as otherwise provided in this Agreement). Each Borrower hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by Agent or Lenders at any time or times in respect of any default by any Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by Agent or Lenders in respect of any of the Obligations, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of the Obligations or the addition, substitution or release, in whole or in part, of any Borrower. Without limiting the generality of the foregoing, each Borrower assents to any other action or delay in acting or failure to act on the part of any Agent or Lender with respect to the failure by any Borrower to comply with any of its respective Obligations, including, without limitation, any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this Section 2.15 afford grounds for terminating, discharging or relieving any Borrower, in whole or in part, from any of its Obligations under this Section 2.15, it being the intention of each Borrower that, so long as any of the Obligations hereunder remain unsatisfied, the Obligations of each Borrower under this Section 2.15 shall not be discharged except by performance and then only to the extent of such performance. The Obligations of each Borrower under this Section 2.15 shall not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any other Borrower or any Agent or Lender.

(f)    Each Borrower represents and warrants to Agent and Lenders that such Borrower is currently informed of the financial condition of Borrowers and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations. Each Borrower further represents and warrants to Agent and Lenders that such Borrower has read and understands the terms and conditions of the Loan Documents. Each Borrower hereby covenants that such Borrower will continue to keep informed of the Borrowers' financial condition and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Obligations.

(g)    The provisions of this Section 2.15 are made for the benefit of Agent, each member of the Lender Group, each Bank Product Provider, and their respective successors and assigns, and may be enforced by it or them from time to time against any or all Borrowers (to the extent provided in this Section 2.15) as often as occasion therefor may arise and without requirement on the part of Agent, any member of the Lender Group, any Bank Product Provider, or any of their successors or assigns first

33

to marshal any of its or their claims or to exercise any of its or their rights against any Borrower or to exhaust any remedies available to it or them against any Borrower or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy. The provisions of this Section 2.15 shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied. If at any time, any payment, or any part thereof, made in respect of any of the Obligations, is rescinded or must otherwise be restored or returned by Agent or any Lender upon the insolvency, bankruptcy or reorganization of any Borrower, or otherwise, the provisions of this Section will forthwith be reinstated in effect, as though such payment had not been made.

(h)    Each Borrower hereby agrees that it will not enforce any of its rights of contribution or subrogation against any other Borrower with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to Agent or Lenders with respect to any of the Obligations or any collateral security therefor until such time as all of the Obligations have been paid in full in cash. Any claim which any Borrower may have against any other Borrower with respect to any payments to any Agent or any member of the Lender Group hereunder or under any of the Bank Product Agreements are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to any Borrower, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be paid in full in cash before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Borrower therefor.

(i)    Each Borrower hereby agrees that after the occurrence and during the continuance of any Event of Default, upon notice from the Agent, such Borrower will not demand, sue for or otherwise attempt to collect any indebtedness of any other Borrower owing to such Borrower until the Obligations shall have been paid in full in cash. If, notwithstanding the foregoing sentence, such Borrower shall collect, enforce or receive any amounts in respect of such indebtedness, such amounts shall be collected, enforced and received by such Borrower as trustee for Agent, and such Borrower shall deliver any such amounts to Agent for application to the Obligations in accordance with Section 2.4(b).

2.16    Incremental Borrowings.

(a)    Increases of the Revolver Commitments. The Borrowers may at any time or from time to time after the Closing Date, by notice from the Parent to the Agent (whereupon the Agent shall promptly deliver a copy to each of the Lenders), request one or more incremental Tranche A Revolver Commitments (each an "Upsize Incremental Commitment" and all of them, collectively, the "Upsize Incremental Commitments" and any such loans thereunder, the "Upsize Incremental Loans"). Each tranche of Upsize Incremental Commitments shall be in an aggregate principal amount that is not less than $10,000,000; provided that such amount may be less than $10,000,000 if such amount represents all remaining availability under the limit set forth in the next sentence. Any such increase in Tranche A Revolver Commitments may increase the Letter of Credit Sublimit subject to the consent of the Agent and the applicable Issuing Bank; provided that any such increase in the Letter of Credit Sublimit shall be provided by an Issuing Bank reasonably acceptable to the Agent and the Parent and no Issuing Bank at the time shall have any obligation to provide such increase. Notwithstanding anything to the contrary herein, the aggregate principal amount of the Upsize Incremental Commitments shall not exceed $400,000,000500,000,000 after the Second Amendment Effective Date less the aggregate principal amount of all Foreign Subsidiary Incremental Commitments which have been provided pursuant to Section 2.16(c). The Upsize Incremental Loans (i) shall rank pari passu in right of payment and of security with the Loans and (ii) shall be implemented by way of increase of the Tranche A Revolver Commitments and, except as to arrangement, underwriting or similar fees, shall be on terms identical to the existing Tranche A Revolver Commitments, including the Applicable Margin and any other pricing matter related to the Tranche A Revolver Commitments; provided that the OID or up-front fees (if any) applicable to any Upsize Incremental Loans will be determined by the Borrowers and the Lenders and/or Additional Lenders providing such Upsize Incremental Commitments and Upsize Incremental Loans. As a condition precedent to such an increase, (i) no Default or Event of Default shall exist on the date of the

effectiveness of any Incremental Amendment (or would exist after giving effect thereto), (ii) the representations and warranties contained in the Loan Documents shall be accurate in all material respects before and after the effectiveness of any Incremental Amendment referred to below; <u>provided</u> that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; <u>provided</u>, <u>further</u>, that, any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates, (iii) all fees and expenses owing in respect of any such Incremental Amendment to the Agent and the Lenders and/or Additional Lenders providing the Upsize Incremental Commitments thereunder shall have been paid and (iv) the Borrowers shall have delivered all customary agreements, certificates, opinions and other customary documents reasonably requested by the Agent. No Lender shall have any obligation, express or implied, to offer to provide any Upsize Incremental Commitments.

(b)    <u>Adjustment of Tranche A Revolving Loans for Increases of the Tranche A Revolver Commitment</u>. Each Tranche A Revolving Lender that is acquiring an Upsize Incremental Commitment on the effective date of any Incremental Amendment shall (i) make a Tranche A Revolving Loan, the proceeds of which will be used to prepay the Tranche A Revolving Loans of the other Tranche A Revolving Lenders immediately prior to such effective date and (ii) automatically and without further act be deemed to have assumed a portion of the other Tranche A Revolving Lenders' participations hereunder in outstanding Letters of Credit and Swing Loan reimbursement obligations, so that, after giving effect thereto, the Tranche A Revolving Loans and Letter of Credit and Swing Loan reimbursement obligations outstanding are held by the Tranche A Revolving Lenders pro rata based on their Tranche A Revolver Commitments after giving effect to such Incremental Amendment. If there is a new borrowing of Tranche A Revolving Loans on the effective date of any Upsize Incremental Amendment, the Tranche A Revolving Lenders after giving effect to such Incremental Amendment shall make such Tranche A Revolving Loans in accordance with <u>Section 2.1</u>.

(c)    <u>Foreign Subsidiary Incremental Facilities</u>. The Borrowers may at any time or from time to time after the Closing Date, by notice from the Parent to the Agent (whereupon the Agent shall promptly deliver a copy to each of the Lenders), request one or more additional asset-based revolving loan facilities be established hereunder (each a "<u>Foreign Subsidiary Incremental Facility</u>", the commitments of the lenders thereunder, the " <u>Foreign Subsidiary Incremental Commitment</u>" any such loans thereunder, the "<u>Foreign Subsidiary Incremental Loans</u>") and/or that any then-existing Foreign Subsidiary Incremental Commitments be increased, in each case, denominated in Dollars or another currency agreed to by the Agent and the Foreign Subsidiary Lenders providing such Foreign Subsidiary Incremental Facility and in a minimum amount of $25,000,000, or in increments of $10,000,000 in excess thereof; <u>provided</u> that, in each case, (i) the aggregate principal amount of Foreign Subsidiary Incremental Commitments established pursuant to this clause (c) shall not exceed $100,000,000 less, to the extent in excess of $~~300,000,000~~400,000,000, the aggregate principal amount of Upsize Incremental Commitments made pursuant to <u>Section 2.16(a)</u> greater than $~~300,000,000~~400,000,000; (ii) the borrowers of such Foreign Subsidiary Incremental Facilities (the " <u>Foreign Subsidiary Borrowers</u>") shall be wholly-owned Subsidiaries of Parent that are organized under the laws of Canada, England & Wales, the Netherlands, Germany or such other jurisdiction as agreed to by the Agent and the Lenders providing such Foreign Subsidiary Incremental Loans (or, in each case, any state, province or territory thereof, as applicable) (provided that for the avoidance of doubt, such Foreign Subsidiary Borrower shall not be required to become a Guarantor with respect to any Loan); (iii) the borrowing base established for any such Foreign Subsidiary Incremental Facility (including the definitions and components thereof) will be reasonably acceptable to the Agent; (iv) the Agent and Foreign Subsidiary Lenders providing such Foreign Subsidiary Incremental Facility will have received on or prior to the effectiveness of such Foreign Subsidiary Incremental Facility customary field examinations and appraisals, in form and substance reasonably satisfactory to the Agent and such Foreign Subsidiary Lenders, of the Foreign Subsidiary Borrowers' assets that will be included in the borrowing base for such Foreign Subsidiary Incremental Facility; (v) the advance rates with respect to the collateral of the Foreign Subsidiary Borrowers (the "<u>Foreign Subsidiary Collateral</u>") under any such Foreign Subsidiary Incremental Facility shall be no higher than the advance rates applicable to the Tranche A Revolving Loans; (vi) the Foreign Subsidiary Lenders that provide such Foreign Subsidiary Incremental Facility shall benefit from a first-priority perfected

35

security interest in the Foreign Subsidiary Collateral for such Foreign Subsidiary Incremental Facility pursuant to documentation reasonably satisfactory to the Agent; it being agreed that no Lender (other than a Foreign Subsidiary Lender in its capacity as such) will benefit from any security interest in the Foreign Subsidiary Collateral; (vii) any such Foreign Subsidiary Incremental Facility (x) may benefit from a guaranty from the Borrowers and the Guarantors which guaranty may be secured by the Collateral on a junior basis to the Liens securing the Obligations of the Lender Group (other than any Foreign Subsidiary Lender) or (y) to the extent requested by the Borrowers or the Agent, such Foreign Subsidiary Incremental Facility may benefit from a guaranty from the Borrower and the Guarantors which guaranty may be secured by the Collateral on a *pari passu* basis with the Liens securing the Obligations of the Lender Group and, in the event such Foreign Subsidiary Incremental Facility is secured on a *pari passu* basis with the Liens securing the Obligations of the Lender Group, (A) each Lender (including each Foreign Subsidiary Lender) shall enter into a customary loss sharing agreement in form and substance reasonably acceptable to the Agent and the Supermajority Lenders or (B) the post-enforcement "waterfall" under Section 2.4(b)(iv) shall be amended such that the proceeds of the Collateral of the Loan Parties organized in the United States (or any state or territory thereof) are applied to the Foreign Subsidiary Borrower's Obligations only after the other Obligations have been paid in full; (viii) the maturity date of any such Foreign Subsidiary Incremental Facility will be after the Maturity Date; (ix) each Foreign Subsidiary Borrower shall have appointed a process agent that is a Person incorporated or organized under the laws of the United States of America, any state thereof or in the District of Columbia; (x) no Default or Event of Default shall have occurred and be continuing or shall occur as a result of such establishment or increase in Foreign Subsidiary Incremental Facilities, as applicable; (xi) the representations and warranties contained in the Loan Documents shall be accurate in all material respects (or in all respects with respect to any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language) before and after such establishment or increase in Foreign Subsidiary Incremental Facilities, as applicable; (xii) prior to the date of such establishment or increase, each Lender shall have received written notice from Agent of the aggregate principal amount of such requested Foreign Subsidiary Incremental Facility or increase thereto, as applicable; (xiii) notwithstanding anything to the contrary in this Agreement or any of the other Loan Documents, (a) the Obligations of the Foreign Subsidiary Borrowers under this Agreement or any of the other Loan Documents shall be separate and distinct from the Obligations of any Loan Party organized in the United States including, without limitation, the Parent, and shall be expressly limited to the Obligations of each applicable Foreign Subsidiary Borrower, (b) the liability of any Foreign Subsidiary Borrower for the payment and performance of its covenants, representations and warranties or obligations (payment or otherwise) set forth in this Agreement and the other Loan Documents shall be several from but not joint with the Obligations of the Parent and any other Loan Party organized in the United States, and (c) the Foreign Subsidiary Collateral, or any other credit support provided by the Foreign Subsidiary Borrowers, shall not secure or be applied in satisfaction, by way of payment, prepayment, or otherwise, of all or any portion of the Obligations of the Parent and any other Loan Party organized in the United States; and (xiv) the Borrowers shall, and shall cause their applicable Subsidiaries (including any applicable Foreign Subsidiary Borrowers) to, execute and deliver such documents, opinions, certificates, instruments or information (including any "know your customer" information and any Beneficial Ownership Regulation information reasonably requested by the Agent or any Lender (through the Agent)) and take such other actions as may be reasonably requested by Agent in connection with such establishment or increase, as applicable. Any request under this Section 2.16(c) shall be submitted by the Borrowers to Agent (and Agent shall forward copies to the Lenders), specify the proposed effective date and the amount of each such requested Foreign Subsidiary Incremental Facility or increase thereto, as applicable, and be accompanied by an officer's certificate of the Borrowers stating that (x) no Default or Event of Default exists or will occur as a result of such establishment or increase(s), as applicable and (y) the representations and warranties contained in the Loan Documents are accurate in all material respects (or in all respects with respect to any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language) before and after the such establishment or increase(s), as applicable. The Borrowers may also specify any fees offered to those Lenders and/or Additional Lenders (the "Foreign Subsidiary Lenders") that agree to provide such Foreign Subsidiary Incremental Facilities or increases thereto, as applicable, which fees may be variable based upon the amount by which any such Foreign Subsidiary Lender is willing to increase the principal amount of its Foreign Subsidiary Incremental Commitments and/or provide a new Foreign Subsidiary Incremental Facility, as applicable. No Lender shall have any obligation, express or implied, to offer to provide any

36

Foreign Subsidiary Incremental Facility or to increase its existing Foreign Subsidiary Incremental Commitments.

( d )    Incremental Amendments . Each notice from the Parent pursuant to Section 2.16(a) or (c) shall set forth the requested amount and proposed terms of the relevant Incremental Commitments and Incremental Loans. Incremental Commitments and Incremental Loans may be made by any existing Lender (it being understood that no existing Lender will have an obligation to make a portion of any Incremental Commitment or Incremental Loan) or by any Additional Lender that is an Eligible Transferee reasonably acceptable to the Agent and, in the case of any Upsize Incremental Commitments, each Issuing Bank (each such consent not to be unreasonably withheld, delayed or conditioned). Incremental Commitments shall become effective under this Agreement pursuant to an amendment (an "Incremental Amendment") to this Agreement and, as appropriate, the other Loan Documents, executed by the Borrowers, each Lender agreeing to provide such Incremental Commitment, if any, each Additional Lender, if any, the Agent and, if applicable, the Issuing Bank. The Incremental Amendment may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Agent and the Parent, to effect the provisions of this Section 2.16. The effectiveness of (and, in the case of any Incremental Amendment for an Incremental Loan, the Borrowing under) any Incremental Amendment shall be subject to the satisfaction on the date thereof of each of the conditions set forth in Section 3.3. The Borrowers shall use the proceeds of the Incremental Loans for any purpose not prohibited by this Agreement.

This Section 2.16 shall supersede any provisions in Section 14.1 to the contrary.

2.17    Tranche B Exchange Offer.

(a)    Notwithstanding anything to the contrary in this Agreement, subject to the terms of this Section 2.17, the Borrowers may at any time and from time to time (but no more than twice during the term of this Agreement) when no Default or Event of Default then exists or would result immediately after giving effect thereto request that Revolver Commitments, together with any related outstandings, be converted into a Tranche B Facility in an aggregate amount to be agreed between the Borrowers and the Agent not to exceed $150,000,000225,000,000 during the term of this Agreement (a " Tranche B Exchange"). In order to establish any Tranche B Facility, the Borrowers shall provide a notice to the Agent (who shall provide a copy of such notice to each of the Lenders) (a "Tranche B Exchange Offer") setting forth the proposed terms of the Tranche B Revolver Commitments to be established, which shall (x) be identical as offered to each Lender (including as to fees payable, if any) and (y) be on the terms set forth herein relating to the Tranche B Facility and such other terms as may be agreed by Agent and the Borrowers.

(b)    The Borrowers shall provide the Tranche B Exchange Offer at least ten (10) Business Days prior to the date on which Lenders are requested to respond, and shall agree to such procedures, if any, as may be established by, or acceptable to, the Agent, in each case acting reasonably to accomplish the purposes of this Section 2.17. No Lender shall have any obligation to agree to participate in any Tranche B Exchange Offer. Any Lender wishing to participate in the Tranche B Exchange Offer shall notify the Agent on or prior to the date specified in such Tranche B Exchange Offer of the amount of its existing Tranche A Revolver Commitments which it requests be converted into Tranche B Revolver Commitments. Any Lender that does not respond to the Tranche B Exchange Offer on or prior to the date specified therein shall be deemed to have rejected such Tranche B Exchange Offer. In the event that the aggregate principal amount of existing Tranche A Revolver Commitments of Lenders accepting such Tranche B Exchange Offer exceeds the amount of Tranche B Revolver Commitments requested, existing Tranche A Revolver Commitments shall be converted to Tranche B Revolver Commitments on a pro rata basis based on the aggregate principal amount of Tranche A Revolving Loans included in each such Tranche B Exchange Offer.

(c)    Tranche B Revolver Commitments shall be established pursuant to an amendment to this Agreement among the Borrowers, Agent and each Tranche B Revolving Lender

37

providing Tranche B Revolver Commitments thereunder which shall be consistent with the provisions set forth in  Section 2.17(a) above (but which shall not require the consent of any other Lender). Such amendment shall include such changes as the Agent and the Borrowers shall deem necessary or desirable to clarify the administration of the Tranche B Facility and the Tranche B Borrowing Base hereunder in a manner consistent with this Agreement, including to amend the definition of Line Cap herein to include the aggregate amount of the Tranche A Borrowing Base and the Tranche B Borrowing Base, to amend the definition of Excess Availability herein to include the Tranche B Borrowing Base in the calculation of Excess Availability, to calculate an aggregate Borrowing Base where appropriate and any related changes. The Agent shall promptly notify each Lender as to the effectiveness of such amendment. Upon the effectiveness of such amendment, the establishment of any Tranche B Revolver Commitments shall result in a permanent Dollar-for-Dollar decrease in the Tranche A Revolver Commitments. If amounts are outstanding under the Tranche A Facility at the time of establishment of a Tranche B Facility, such amounts up to the Tranche B Line Cap shall be deemed outstanding under the newly-established Tranche B Facility, and only the excess over the applicable Tranche B Line Cap shall be deemed thereafter outstanding under the Tranche A Facility. The Lenders under the Tranche A Facility and Tranche B Facility will be required to make such payments and reallocations to one another as the Agent shall see fit in order to effect this reallocation, as a condition to the effectiveness of any amendment instituting a Tranche B Facility.

(d)    With respect to any Tranche B Exchange consummated by the Borrowers pursuant to this  Section 2.17, such exchange shall not constitute voluntary or mandatory payments or prepayments for purposes of this Agreement or an incremental borrowing. The Agent and the Lenders hereby consent to each such exchange and the other transactions contemplated by this Section 2.17 and hereby waive the requirements of any provision of this Agreement or any other Loan Document that may otherwise prohibit any transaction contemplated by this Section 2.17; provided that such consent shall not be deemed to be an acceptance of the Tranche B Exchange Offer. Notwithstanding anything to the contrary in this Agreement, no Tranche B Exchange shall be consummated if a Default or Event of Default exists or would result immediately after giving effect thereto.

This Section 2.17 shall supersede any provisions in  Section 14.1 (other than clauses (a)(xi) and (c) thereof) to the contrary.

2.18    Tranche A Exchange Offer.

(a)    Notwithstanding anything to the contrary in this Agreement, subject to the terms of this  Section 2.18, the Borrowers may at any time and from time to time (but no more than twice during the term of this Agreement) when no Default or Event of Default then exists request or would result immediately after giving effect thereto that up to the full amount of the Tranche B Revolver Commitments, together with any related outstandings, be converted into Tranche A Revolver Commitments (a "Tranche A Exchange"); provided that after giving effect to any such Tranche A Exchange, the aggregate amount of the Tranche A Revolver Usage then outstanding would not exceed the Tranche A Line Cap. In order to effect the Tranche A Exchange, the Borrowers shall provide a notice to the Agent (who shall provide a copy of such notice to each of the Lenders) (a "Tranche A Exchange Offer ").

(b)    The Borrowers shall provide the Tranche A Exchange Offer at least ten (10) Business Days prior to the date on which Lenders are requested to respond, and shall agree to such procedures, if any, as may be established by, or acceptable to, the Agent, in each case acting reasonably to accomplish the purposes of this Section 2.18. No Lender shall have any obligation to agree to participate in any Tranche A Exchange Offer. Any Lender wishing to participate in the Tranche A Exchange Offer shall notify the Agent on or prior to the date specified in such Tranche A Exchange Offer of the amount of its existing Tranche B Revolver Commitments which it requests be converted into Tranche A Revolver Commitments. Any Lender that does not respond to the Tranche A Exchange Offer on or prior to the date specified therein shall be deemed to have rejected such Tranche A Exchange Offer. In the event that the aggregate principal amount of existing Tranche B Revolver Commitments of Lenders accepting such Tranche A Exchange Offer exceeds the amount of Tranche A Revolver Commitments requested, existing Tranche B Revolver Commitments shall be converted to Tranche A Revolver

38

Commitments on a pro rata basis based on the aggregate principal amount of Tranche B Revolving Loans included in each such Tranche A Exchange Offer.

(c)    Any such Tranche A Exchange shall be established pursuant to an amendment to this Agreement among the Borrowers, Agent and each Tranche B Revolving Lender participating in the Tranche A Exchange which shall be consistent with the provisions set forth in Section 2.18(a) above (but which shall not require the consent of any other Lender). Such amendment shall include such changes as the Agent and the Borrowers shall deem necessary or desirable to clarify the administration of the Tranche A Facility or the Tranche B Facility and the Tranche A Borrowing Base or the Tranche B Borrowing Base hereunder in a manner consistent with this Agreement. The Agent shall promptly notify each Lender as to the effectiveness of such amendment. Upon the effectiveness of such amendment, the Tranche A Exchange shall result in a permanent Dollar-for-Dollar decrease in the Tranche B Revolver Commitments. If amounts are outstanding under the Tranche B Facility at the time of the Tranche A Exchange, such amounts up to the applicable Tranche A Line Cap shall be deemed outstanding under the Tranche A Facility. The Lenders under the Tranche A Facility and Tranche B Facility will be required to make such payments and reallocations to one another as the Agent shall see fit in order to effect this reallocation, as a condition to the effectiveness of any amendment instituting the Tranche A Exchange.

(d)    With respect to any Tranche A Exchange consummated by the Borrowers pursuant to this Section 2.18, such exchange shall not constitute voluntary or mandatory payments or prepayments or an incremental borrowing for purposes of this Agreement. The Agent and the Lenders hereby consent to each such exchange and the other transactions contemplated by this Section 2.18 and hereby waive the requirements of any provision of this Agreement or any other Loan Document that may otherwise prohibit any transaction contemplated by this Section 2.18; provided that such consent shall not be deemed to be an acceptance of the Tranche A Exchange Offer. Notwithstanding anything to the contrary in this Agreement, no Tranche A Exchange shall be consummated if a Default or Event of Default exists or would result after giving effect thereto.

This Section 2.18 shall supersede any provisions in Section 14.1 (other than clauses (a)(xi) and (c) thereof) to the contrary.

## 3.    CONDITIONS; TERM OF AGREEMENT.

3.1    Conditions Precedent to the Closing Date. The effectiveness of this Agreement and the obligation of each Lender to make the initial extensions of credit on the Closing Date as provided for under this Agreement is subject to the fulfillment, to the satisfaction (or waiver) of Agent and each Lender, of each of the conditions precedent set forth on Schedule 3.1 (the delivery of a Lender's signature page to this Agreement being conclusively deemed to be its satisfaction or waiver of the conditions precedent).

3.2    [Reserved].

3.3    Conditions Precedent to all Extensions of Credit. The obligation of the Lender Group (or any member thereof) to make any Revolving Loans hereunder (or to extend any other credit hereunder) at any time after the Closing Date shall be subject to the following conditions precedent:

(a)    the representations and warranties of Parent and its Subsidiaries contained in this Agreement or in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date);

(b)    no Default or Event of Default shall have occurred and be continuing on the date of such extension of credit, nor shall immediately result from the making thereof;

(c)    after giving effect to any extension of credit, (i) in the case of Tranche A Revolving Loans, the Tranche A Revolver Usage shall not exceed the Tranche A Line Cap and (ii) in the case of Tranche B Revolving Loans, the Tranche B Revolver Usage shall not exceed the Tranche B Line Cap; and

(d)    such extension of credit shall not conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any Material Indebtedness and the Borrower shall be deemed to represent and warrant that such extension of credit is permitted under all Material Indebtedness.

Each request for an extension of credit submitted by a Borrower shall be deemed to be a representation and warranty that the conditions specified in this Section 3.3 have been satisfied on and as of the date of the applicable credit extension.

3.4    Maturity. This Agreement shall continue in full force and effect for a term ending on the Maturity Date.

3.5    Effect of Maturity.

(a)    On the Maturity Date, all commitments of the Lender Group to provide additional credit hereunder shall automatically be terminated and all of the Obligations immediately shall become due and payable without notice or demand and the Borrowers shall be required to repay all of the Obligations in full.

(b)    No termination of the obligations of any member of the Lender Group (other than payment in full of the Obligations and termination of the Revolver Commitments) shall relieve or discharge any Loan Party of its duties, obligations, or covenants hereunder or under any other Loan Document. Except as otherwise set forth herein or in the other Loan Documents, Agent's Liens in the Collateral securing the Obligations shall continue to secure the Obligations and shall remain in effect until all Obligations have been paid in full and the Revolver Commitments have been terminated, at which time Agent will, at Borrowers' sole expense, execute and deliver any termination statements, lien releases, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are reasonably necessary to release, as of record, Agent's or such Lender's, as applicable, Liens in the Collateral securing the Obligations.

3.6    Early Termination by Borrowers. Borrowers have the option, at any time upon five (5) Business Days prior written notice to Agent, to terminate this Agreement and terminate the Revolver Commitments hereunder by repaying to Agent all of the Obligations in full. The foregoing notwithstanding, (a) Borrowers may rescind termination notices relative to proposed payments in full of the Obligations with the proceeds of third party Indebtedness or other transactions if the closing for such issuance or incurrence or other transaction does not happen on or before the date of the proposed termination (in which case, a new notice shall be required to be sent in connection with any subsequent termination), and (b) Borrowers may extend the date of termination at any time with the consent of Agent (which consent shall not be unreasonably withheld or delayed).

3.7    Conditions Subsequent. The obligation of the Lender Group (or any member thereof) to continue to make Revolving Loans (or otherwise extend credit hereunder) is subject to the fulfillment, on or before the date applicable thereto (unless such date is extended, in writing (including via electronic transmission), by Agent, which Agent may do without obtaining the consent of the other members of the Lender Group), of the conditions subsequent set forth on Schedule 3.7 (the failure by Borrowers to so perform or cause to be performed such conditions subsequent as and when required by the terms thereof, shall constitute an Event of Default).

**4.    REPRESENTATIONS AND WARRANTIES.**

40

4.1    Due Organization and Qualification; Subsidiaries.

(a)    Each Loan Party (i) is duly organized or incorporated and existing and in good standing (where applicable) under the laws of the jurisdiction of its organization or incorporation, (ii) is qualified to do business in any state where the failure to be so qualified would reasonably be expected to result in a Material Adverse Effect, and (iii) has all requisite corporate or other organizational power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby.

(b)    Set forth on Schedule 4.1(b) is a complete and accurate description, as of the Closing Date, of the authorized Equity Interests of each Borrower (other than Parent), by class, and, as of the Closing Date, a description of the number of shares of each such class that is issued and outstanding. No Borrower (other than Parent) is subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its Equity Interests or any security convertible into or exchangeable for any of its Equity Interests.

(c)    Set forth on Schedule 4.1(c), is, as of the Closing Date, a complete and accurate list of the Loan Parties' direct and indirect Subsidiaries, showing: (i) in the case of direct subsidiaries, the number of shares of each class of common and preferred Equity Interests authorized for each of such Subsidiaries, and (ii) the percentage of the outstanding shares of each such class owned directly or indirectly by Parent. All of the outstanding Equity Interests of each such Subsidiary has been validly issued and is fully paid and non-assessable (to the extent such concept is applicable).

(d)    Except as set forth on Schedule 4.1(d), there are no subscriptions, options, warrants, or calls relating to any shares of any Subsidiaries' Equity Interests, including any right of conversion or exchange under any outstanding security or other instrument.

4.2    Due Authorization; No Conflict.

(a)    As to each Loan Party, the execution, delivery, and performance by such Loan Party of the Loan Documents to which it is a party have been duly authorized by all necessary corporate or organizational action on the part of such Loan Party.

(b)    As to each Loan Party, the execution, delivery, and performance by such Loan Party of the Loan Documents to which it is a party do not and will not (i) violate any material provision of federal, state, or local law or regulation applicable to any Loan Party or its Subsidiaries, the Governing Documents of any Loan Party or its Subsidiaries, or any order, judgment, or decree of any court or other Governmental Authority binding on any Loan Party or its Subsidiaries, (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any Material Contract of any Loan Party or its Subsidiaries where any such conflict, breach or default would individually or in the aggregate reasonably be expected to have a Material Adverse Effect, (iii) result in or require the creation or imposition of any Lien of any nature whatsoever upon any assets of any Loan Party, other than Permitted Liens, or (iv) require any approval of any holder of Equity Interests of a Loan Party or any approval or consent of any Person under any Material Contract of any Loan Party, other than (x) consents or approvals that have been obtained and that are still in force and effect or (y) except, in the case of a Material Contract, for consents or approvals, the failure to obtain would not individually or in the aggregate reasonably be expected to cause a Material Adverse Effect.

4.3    Governmental Consents. The execution, delivery, and performance by each Loan Party of the Loan Documents to which such Loan Party is a party and the consummation of the transactions contemplated by the Loan Documents do not and will not require any registration with, consent, or approval of, or notice to, or other action with or by, any Governmental Authority, except for (i) registrations, consents, approvals, notices, or other actions that have been obtained and that are still in force and

41

effect, and (ii) filings and recordings with respect to the Collateral to be made, or otherwise delivered to Agent for filing or recordation.

4.4    Binding Obligations; Perfected Liens.

(a)    Each Loan Document has been duly executed and delivered by each Loan Party that is a party thereto and is the legally valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, receivership, administration, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

(b)    Subject to Section 3.7, Section 5.11, Section 5.12 and Section 5.16, Agent's Liens in the Collateral (other than, for the avoidance of doubt, Excluded Property) are validly created and perfected, upon the filing of financing statements, the filing of as-extracted filings, the recordation of the intellectual property security agreements and the execution of Control Agreements, in each case, in the appropriate filing offices, and, in the case of ABL Priority Collateral, first priority Liens, subject only to Permitted Liens.

4.5    Title to Assets; No Encumbrances. Each of the Loan Parties and its Subsidiaries has (a) good, sufficient and legal title to (in the case of fee interests in Real Property), (b) valid leasehold interests in (in the case of leasehold interests in real or personal property), and (c) good and marketable title to (in the case of all other personal property), all of their respective assets that are material or necessary for the conduct of their business, taken as a whole, and reflected in their most recent financial statements delivered pursuant to Section 5.1, in each case except for assets disposed of since the date of such financial statements to the extent permitted hereunder. All of such assets are free and clear of Liens except for Permitted Liens.

4.6    Litigation. Except as set forth on Schedule 4.6, there are no actions, suits, or proceedings pending or, to the knowledge of any Borrower, threatened in writing against a Loan Party or any of its Subsidiaries that either individually or in the aggregate would reasonably be expected to result in a Material Adverse Effect. Since the Closing Date, there has been no change in the status of the actions, suits or proceedings set forth on Schedule 4.6 that, either individually or in the aggregate, has resulted in, or would reasonably be expected to materially increase the likelihood of, a Material Adverse Effect.

4.7    Compliance with Laws. No Loan Party nor any of its Subsidiaries (a) is in violation of any applicable laws, rules, regulations, executive orders, or codes (including Environmental Laws) that, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect, or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any Governmental Authority, that, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect.

4.8    Financial Statements; No Material Adverse Effect. The audited financial statements relating to the Parent and its Subsidiaries as of December 31, 2016, December 31 2017, December 31, 2018 and December 31, 2019 that have been delivered by the Parent to Agent have been prepared in all material respects in accordance with GAAP and present fairly in all material respects, the Parent's and its Subsidiaries' consolidated financial condition as of the date thereof and results of operations for the period then ended. Since December 31, 2019, no event, circumstance, or change has occurred that has or would reasonably be expected to result in a Material Adverse Effect with respect to the Loan Parties and their Subsidiaries.

4.9    Solvency.

(a)    Each Borrower, individually, is Solvent and the Parent and its Subsidiaries, taken as a whole, are Solvent.

(b)    No transfer of property is being made by any Loan Party and no obligation is being incurred by any Loan Party in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of such Loan Party.

4.10    Employee Benefits.

(a)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect: (i) each Loan Party, each of its Subsidiaries and each of their ERISA Affiliates has complied with ERISA, the IRC and all applicable laws regarding each Employee Benefit Plan; (ii) each Employee Benefit Plan is, and has been, maintained in substantial compliance with ERISA, the IRC, all applicable laws and the terms of each such Employee Benefit Plan; (iii) no liability to the PBGC (other than for the payment of current premiums which are not past due) by any Loan Party or its Subsidiaries or the ERISA Affiliates has been incurred or is reasonably expected by any Loan Party or its Subsidiaries or the ERISA Affiliates to be incurred with respect to any Pension Plan; (iv) no Notification Event exists or has occurred in the past six (6) years; and (v) there exists no Unfunded Pension Liability with respect to any Pension Plans.

(b)    With respect to any scheme or arrangement mandated by a government other than the United States and with respect to each employee benefit plan maintained or contributed to by any Loan Party that is not subject to United States laws (such schemes, arrangements and employee benefit plans, collectively, "Foreign Plans"), none of the following events or conditions exists and is continuing that, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect: (i) non-compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders, (ii) failure to be maintained, where required, in good standing with applicable regulatory authorities, (iii) non-compliance with any obligation of any Loan Party or its Subsidiaries in connection with the termination or partial termination of, or withdrawal from, any such Foreign Plan, (iv) any Lien on the property of any Loan Party or its Subsidiaries in favor of a Governmental Authority as a result of any action or inaction regarding such a Foreign Plan, (v) for each such Foreign Plan which is a funded or insured plan, failure to be funded or insured on an ongoing basis to the extent required by applicable non-U.S. law (using actuarial methods and assumptions which are consistent with the valuations last filed with the applicable Governmental Authorities) or (vi) any pending or threatened disputes that, to the knowledge of the Loan Party or any of its Subsidiaries, would reasonably be expected to result in liability to any Loan Party or any Subsidiaries.

(c)    Each Borrower represents and warrants as of the Closing Date that such Borrower is not and will not be using Plan Assets of one or more Plans in connection with the Loans, the Letters of Credit or the Revolver Commitments.

4.11    Environmental Condition. Except as set forth on Schedule 4.11 or for any matters that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect, (a) to each Borrower's knowledge, no Loan Party's nor any of its Subsidiaries' properties or assets has ever been used by a Loan Party, its Subsidiaries, or by previous owners or operators in the disposal of, or to produce, store, handle, treat, release, or transport, any Hazardous Materials, where such disposal, production, storage, handling, treatment, release or transport was in violation of any applicable Environmental Law, (b) to each Borrower's knowledge, no Loan Party's nor any of its Subsidiaries' properties or assets have ever been listed on the National Priorities List, CERCLIS or any similar state or local list of Hazardous Materials disposal sites pursuant to any Environmental Law, and (c) no Loan Party nor any of its Subsidiaries nor any of their respective facilities or operations is subject to any Environmental Liability or to any outstanding written order, consent decree, negotiated agreements or settlement agreement with any Person relating to any violation of Environmental Law or Environmental Liability.

43

4.12    Complete Disclosure. All factual information taken as a whole (other than forward-looking information and projections and information of a general economic nature and general information about Borrowers' industry) furnished by or on behalf of a Loan Party or its Subsidiaries in writing to Agent or any Lender (including all information contained in the Schedules hereto or in the other Loan Documents) for purposes of or in connection with this Agreement or the other Loan Documents, and all other such factual information taken as a whole (other than forward-looking information and projections and information of a general economic nature and general information about Borrowers' industry) hereafter furnished by or on behalf of a Loan Party or its Subsidiaries in writing to Agent or any Lender will be, true and accurate, in all material respects, on the date as of which such information is dated or certified and not incomplete by omitting to state any material fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided. The Projections delivered to Agent on December 3, 2019 represent, and as of the date on which any other Projections are delivered to Agent, such additional Projections, were prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable by the Parent at the time made and at the time so furnished (it being understood that such Projections are subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties and their Subsidiaries, and no assurances can be given that such Projections will be realized, and although reflecting Borrowers' good faith estimate, projections or forecasts based on methods and assumptions which Borrowers believed to be reasonable at the time such Projections were prepared, are not to be viewed as facts, and that actual results during the period or periods covered by the Projections may differ materially from projected or estimated results).

4.13    Sanctions, PATRIOT Act, and FCPA. To the extent applicable, each Loan Party and each Subsidiary of a Loan Party is in compliance, in all material respects, with the (a) Trading with the Enemy Act, as amended, the International Emergency Economic Powers Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, (b) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT Act of 2001) (the " Patriot Act "), and (c) anti-corruption laws applicable to such Loan Party or such Subsidiary, including the United States Foreign Corrupt Practices Act of 1977, as amended ("FCPA").

4.14    [Reserved.]

4.15    Payment of Taxes. Except as otherwise permitted under Section 5.5, all Tax returns and reports of each Loan Party and its Subsidiaries required to be filed by any of them have been timely filed, and all Taxes due and payable and all assessments, fees and other governmental charges upon a Loan Party and its Subsidiaries and upon their respective assets, income, businesses and franchises that are due and payable have been paid when due and payable, except, in each case, (x) to the extent such Taxes or assessments are being contested by such Loan Party or such Subsidiary diligently, in good faith, and by appropriate proceedings, and provided adequate provisions in accordance with GAAP has been made therefor, or (y) where the failure to file or pay would not reasonably be expected to have a Material Adverse Effect. As of the Closing Date, no Loan Party knows of any proposed tax assessment against a Loan Party or any of its Subsidiaries, except for any tax assessment that would not reasonably be expected to have a Material Adverse Effect.

4.16    Margin Stock. No Loan Party or any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock. No part of the proceeds of the loans made to Borrowers will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors.

44

4.17    Governmental Regulation. No Loan Party or any of its Subsidiaries is subject to regulation under the Federal Power Act or the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable. No Loan Party or any of its Subsidiaries is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

4.18    OFAC. No Loan Party or any of its Subsidiaries is in violation in any material respect of any of the country or list based economic and trade sanctions administered and enforced by OFAC or any other Sanctions. No Loan Party nor any of its Subsidiaries, nor to the knowledge of any Loan Party, any director, officer, employee, agent, or affiliate of any Loan Party or their Subsidiaries, (a) is, or is owned or controlled by Persons that are, Sanctioned Persons or Sanctioned Entities, (b) has its assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities.

4.19    Employee and Labor Matters. There is (a) no unfair labor practice complaint pending or, to the knowledge of any Loan Party or Subsidiary, threatened against any Loan Party or its Subsidiaries before any Governmental Authority and no grievance or arbitration proceeding pending or threatened against any Loan Party or any of its Subsidiaries which arises out of or under any collective bargaining agreement, (b) no strike, labor dispute, slowdown, stoppage or similar action or grievance pending or threatened in writing against any Loan Party or its Subsidiaries or (c) to the knowledge of any Loan Party or its Subsidiaries, no union representation question existing with respect to the employees of any Loan Party or its Subsidiaries and no union organizing activity taking place with respect to any of the employees of Parent or its Subsidiaries, in each case in clause (a) through (c) above, which would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. None of any Loan Party or its Subsidiaries has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act or similar state law, which remains unpaid or unsatisfied and which would reasonably be expected to have a Material Adverse Effect. The hours worked and payments made to employees of any Loan Party and its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable legal requirements, except to the extent such violations would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. All material payments due from any Loan Party or its Subsidiaries on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of Parent, except where the failure to do so would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

4.20    [Reserved.]

4.21    [Reserved.]

4.22    Eligible Accounts. As to each Account that is identified by Borrowers as an Eligible Account in the most recent Borrowing Base Certificate submitted to Agent, such Account is not excluded as ineligible by virtue of one or more of the excluding criteria (other than any Agent-discretionary criteria) set forth in the definition of Eligible Accounts.

4.23    Eligible Inventory and Eligible Equipment. As to each item of Inventory that is identified by Borrowers as Eligible Inventory in the most recent Borrowing Base Certificate submitted to Agent and as to each item of Equipment that is identified by Borrowers as Eligible Equipment in the most recent Borrowing Base Certificate submitted to Agent, such Inventory or Equipment (as the case may be) is not excluded as ineligible by virtue of one or more of the excluding criteria (other than any Agent-discretionary criteria) set forth in the definition of Eligible Inventory or Eligible Equipment (as the case may be).

45

4.24    Material Contracts. Except for matters which, either individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, each Material Contract (other than those that have expired at the end of their normal terms) (a) is in full force and effect and is binding upon and enforceable against the applicable Loan Party or its Subsidiary and, to each Borrower's knowledge, each other Person that is a party thereto in accordance with its terms, and (b) is not in default due to the action or inaction of the applicable Loan Party or its Subsidiary.

4.25    Inventory and Equipment Records. Each Loan Party keeps correct and accurate records itemizing and describing the type, quality and quantity of its Inventory and Equipment and the book value thereof, in each case, consistent with past practice, except with respect to Inventory, which shall be determined on a "first-in, first-out" basis.

4.26    EEA Financial Institutions. No Loan Party is an EEA Financial Institution.

## 5.    AFFIRMATIVE COVENANTS.

Each Borrower covenants and agrees that, until termination of all of the Revolver Commitments and payment in full of the Obligations:

5.1    Financial Statements, Reports, Certificates. Borrowers (i) will deliver to Agent (with copies to any Lender, if so requested by such Lender) each of the financial statements, reports, and other items set forth on Schedule 5.1 no later than the times specified therein, (ii) [reserved], (iii) agree to maintain a system of accounting that enables Borrowers to produce financial statements in accordance with GAAP in all material respects, and (iv) agree that they will, and will cause each other Loan Party to, (A) keep a reporting system that shows all additions, sales, claims, returns, and allowances with respect to their and their Subsidiaries' sales, and (B) maintain their billing systems and practices substantially as in effect as of the Closing Date and shall only make material modifications thereto with notice to, and with the consent of, Agent. The requirements of this Section 5.1 may be satisfied by notice to the Agent that such documents required to be delivered pursuant to this Section 5.1 (to the extent included on Form 10-K or Form 10-Q) have been filed with the SEC.

5.2    Reporting. Borrowers (a) will deliver to Agent (with copies to any Lender, if so requested by such Lender) each of the reports set forth on Schedule 5.2 at the times specified therein (including weekly reporting of the Borrowing Base during an Increased Borrowing Base Reporting Period, as more fully set forth in Schedule 5.2), and (b) agree to use commercially reasonable efforts in cooperation with Agent to facilitate and implement a system of electronic collateral reporting in order to provide electronic reporting of each of the items set forth on Schedule 5.2. All calculations of Availability in any Borrowing Base Certificate shall be made by the Parent and certified by a financial officer of the Parent; provided that the Agent may from time to time review and adjust any such calculation in consultation with the Parent to the extent the calculation is not made in accordance with this Agreement or does not accurately reflect the Reserves.

5.3    Existence. Except as otherwise permitted under Section 6.3 or Section 6.4, each Borrower will, and will cause each of its Subsidiaries to, at all times preserve and keep in full force and effect such Person's (a) valid existence and good standing (where applicable) in its jurisdiction of organization or incorporation except with respect to any Subsidiary that is not a Loan Party, as would not reasonably be expected to result in a Material Adverse Effect and, (b) except as would not reasonably be expected to result in a Material Adverse Effect, good standing (where applicable) with respect to all other jurisdictions in which it is qualified to do business and any rights, franchises, permits, licenses, accreditations, authorizations, or other approvals material to their businesses.

5.4    Maintenance of Properties. Except as otherwise permitted under Section 6.3 or Section 6.4 or the shutdown, winding down, idling, placing on care and maintenance or other similar transaction related to a mine, plant or facility, the Loan Parties and their Subsidiaries, taken as a whole,

will maintain and preserve its assets that are necessary and material for its business, taken as a whole, in good working order and condition, ordinary wear, tear, casualty, and condemnation and Permitted Dispositions excepted.

5.5    Taxes. Each Loan Party will, and will cause each of its Subsidiaries to, pay in full before delinquency or before the expiration of any extension period all material governmental assessments and Taxes imposed, levied, or assessed against it, or any of its assets or in respect of any of its income, businesses, or franchises, except (i) to the extent that the validity of such governmental assessment or Tax is the subject of a Permitted Protest or (ii) to the extent such failure to pay would not reasonably be expected to result in a Material Adverse Effect.

5.6    Insurance. Each Loan Party will, and will cause each of its Subsidiaries to, at Loan Parties' expense, (a) maintain insurance respecting each Loan Party and its Subsidiaries' assets wherever located, covering liabilities, losses or damages as are customarily insured against by other Persons engaged in same or similar businesses and similarly situated and located. All such policies of insurance shall be with financially sound and reputable insurance companies and in such amounts as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located. All property insurance policies covering the Collateral are subject to the Intercreditor Agreement, to be made payable to Agent for the benefit of Agent and the Lenders, as their interests may appear, in case of loss, pursuant to a standard loss payable endorsement with a standard noncontributory "lender" or "secured party" clause and are to contain such other provisions as Agent may reasonably require to fully protect the Lenders' interest in the Collateral and to any payments to be made under such policies. All certificates of property and general liability insurance are to be delivered to Agent, with the loss payable (but only in respect of Collateral) or additional insured, as applicable, endorsements (it being understood that Agent shall not be named an additional insured with respect to liability insurance) in favor of Agent and shall provide for not less than 30 days (ten (10) days in the case of non-payment) prior written notice to Agent of the exercise of any right of cancellation or such other terms reasonably acceptable to the Agent in its Permitted Discretion. If any Loan Party or its Subsidiaries fails to maintain such insurance, Agent may arrange for such insurance, but at Loan Parties' expense and without any responsibility on Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. Upon the occurrence and during the continuance of an Event of Default, subject to the Intercreditor Agreement, Agent shall have the right to elect to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

5.7    Inspection.

(a)    Each Loan Party will, and will cause each of its Subsidiaries to, permit Agent, any Lender, and each of their respective duly authorized representatives or agents to visit any of its properties and inspect any of its assets or books and records, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with its Responsible Officers, at such reasonable times and intervals as Agent or any Lender, as applicable, may designate and, so long as no Event of Default has occurred and is continuing, with reasonable prior notice to Borrowers and during regular business hours, provided that the Loan Parties shall only be obligated to reimburse Agent for one (1) inspection and visit in any fiscal year so long as no Event of Default has occurred and is continuing.

(b)    Each Loan Party will, and will cause each of its Subsidiaries to, permit Agent and each of its duly authorized representatives or agents to conduct field examinations, appraisals and valuations, with expenses for such field examinations, appraisals and valuations being subject to Section 2.10(c), at such reasonable times and intervals as Agent may designate in its Permitted Discretion and, so long as no Event of Default has occurred and is continuing, with reasonable prior notice to Borrowers and during regular business hours. So long as no Event of Default has occurred and

47

is continuing, Agent agrees to provide Borrowers with a copy of the report for any inventory or equipment appraisal upon request by Borrowers so long as (i) such report exists, (ii) the third person employed by Agent to perform such valuation consents to such disclosure, and (iii) Borrowers execute and deliver to Agent a non-reliance letter reasonably satisfactory to Agent.

5.8    Compliance with Laws. Each Borrower will, and will cause each of its Subsidiaries to, (a) comply with the requirements of all applicable laws, rules, regulations (including OFAC and anti-corruption laws applicable to such Borrower or such Subsidiary, including FCPA), and orders of any Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect and (b) maintain in effect and enforce policies and procedures designed, in each case, in their reasonable business judgment, to ensure compliance by each Borrower and its Subsidiaries and their respective directors, officers, employees and agents with OFAC, FCPA, other applicable anti-corruption laws, other applicable anti-money laundering laws and other laws applicable to Sanctioned Persons.

5.9    Environmental. Except as would not reasonably be expected to result in a Material Adverse Effect, each Borrower will, and will cause each of its Subsidiaries to:

(a)    comply with Environmental Laws; and

(b)    take any Remedial Action required to abate any release of which any Borrower has knowledge of a Hazardous Material in violation of any Environmental Law from or onto property owned or operated by any Borrower or its Subsidiaries or resulting from the business of any Borrower or any of its Subsidiaries, to the extent required by applicable Environmental Law.

5.10    [Reserved.]

5.11    Formation of Subsidiaries. Each Borrower will, at the time that any Loan Party forms any direct or indirect Subsidiary (other than any such Subsidiary that is an Excluded Subsidiary) or acquires any direct or indirect Subsidiary after the Closing Date (other than any such Subsidiary that is an Excluded Subsidiary), within 30 days of such formation or acquisition (or such later date as permitted by Agent in its sole discretion) (a) cause such new Subsidiary to provide to Agent a joinder to the Guaranty and Security Agreement, together with such other security agreements and any applicable Additional Documents (as defined below), as well as appropriate financing statements, all in form and substance reasonably satisfactory to Agent (including being sufficient to grant Agent a Lien (subject to Permitted Liens) in and to the assets of such newly formed or acquired Subsidiary (excluding any Excluded Property), in each case consistent with the Loan Documents executed on the Closing Date), (b) provide, or cause the applicable Loan Party to provide, to Agent a pledge agreement (or an addendum to the Guaranty and Security Agreement) and appropriate certificates and powers or financing statements, pledging all of the direct or beneficial ownership interest in such new Subsidiary to the extent not constituting Excluded Property in form and substance reasonably satisfactory to Agent, provided, that, for the avoidance of doubt, not more than 65% of the total outstanding voting Equity Interest of any first tier Subsidiary of a Loan Party that is a CFC or a FSHCO (but none of the Equity Interest of any Subsidiary of such CFC or FSHCO) shall be required to be pledged, (c) if such new Subsidiary is to be a Borrower, cause such new Subsidiary to provide the documentation set forth in Section 2.2(a), and (d) if requested by the Agent, provide to Agent all other documentation, including one or more opinions of counsel reasonably satisfactory to Agent, which, in its Permitted Discretion, is appropriate with respect to the execution and delivery of the applicable documentation referred to above. Any document, agreement, or instrument executed or issued pursuant to this Section 5.11 shall constitute a Loan Document. Notwithstanding the foregoing, Section 5.12 below or anything contained herein or in any other Loan Document to the contrary, it is understood and agreed that to the extent that the Fixed Asset Priority Collateral Agent is satisfied with or agrees to any deliveries in respect of any asset or property (other than ABL Priority Collateral), Agent shall be deemed to be satisfied with such deliveries to the extent substantially the same as those delivered to the Fixed Asset Priority Collateral Agent and the Loan Parties

48

shall not be required to deliver any Additional Documents with respect thereto. So long as the Intercreditor Agreement is in effect, a Loan Party may satisfy its obligations hereunder and under the other Loan Documents to deliver Collateral that constitutes Fixed Asset Priority Collateral to Agent by delivering such Collateral that constitutes Fixed Asset Priority Collateral to the Fixed Asset Priority Collateral Agent or its agent, designee or bailee.

5.12    Further Assurances. Each Borrower will, and will cause each of the other Loan Parties to, at any time upon the reasonable request of Agent, subject to the terms of the Intercreditor Agreement and Section 5.11 and Section 18, execute or deliver to Agent any and all financing statements, security agreements, as-extracted collateral filings, pledges, assignments, opinions of counsel and all other documents (the "Additional Documents") that Agent may reasonably request in form and substance reasonably satisfactory to Agent, to create, perfect, and continue to perfect Agent's Liens in all Collateral of each Loan Party (whether now owned or hereafter arising or acquired, tangible or intangible in each case, to the extent not constituting Excluded Property) to the extent not constituting Excluded Property. Each of the parties hereto hereby agree that that the Collateral shall not include any real property or interest therein (other than as-extracted collateral interests) and to the extent any Liens, mortgages or other filings have been made with respect thereto, each Lender hereby authorizes the Agent to take such actions and make such filings as necessary or advisable to release or terminate any such Lien, mortgage or other filing (it being understood that all as-extracted collateral filings will remain in place). Other than as contemplated by Section 2.16(c), no action in any non-U.S. jurisdiction shall be required in order to create or perfect any security interest in favor of the Agent.

5.13    Lender Meetings. Parent will, within 90 days after the close of each fiscal year of Parent, at the request of Agent or of the Required Lenders and upon reasonable prior notice, hold a meeting (at a mutually agreeable location and time or, at the option of Agent, by conference call) with all Lenders who choose to attend such meeting at which meeting shall be reviewed the financial results of the previous fiscal year and the financial condition of Parent and its Subsidiaries and the Projections presented for the current fiscal year of Parent.

5.14    [Reserved]AMUSA Accounts.

(a)    The Loan Parties shall transfer on each Business Day all funds that pertain to Accounts included in the Borrowing Base that are held in any Collection Accounts (as defined in the Transition Agreement) to a Blocked Account.

(b)    Until the earlier of (x) the date that each Collection Account constitutes a Blocked Account, (y) termination of the Transition Agreement and (z) the entering into an intercreditor agreement among Ester Finance Technologies, the Agent and certain of the Borrowers in form reasonably satisfactory to the Agent (any such date, the "Transition Agreement End Date"), the Borrowers shall deliver to the Agent a weekly report of the (i) the identity of the Receivables (as defined in the Transition Agreement) to which all prior collections under the Transition Agreement relate, including, without limitation, whether such Receivables are Sold Receivables or Unsold Receivables (each as defined in the Transition Agreement) and (ii) the outstanding amount of Sold Receivables.

(c)    The Borrowers shall provide the Agent with prompt notice of (i) any Servicing Termination Event (as defined in the Transition Agreement), (ii) the Borrowers knowledge of the exercise by the Purchaser of its rights under any Existing Collection Account Agreement, and (iii) the occurrence of the Cliffs USA Release Date or the Cliffs Ontario Release Date (each as defined in the Transition Agreement).

(d)    If any Borrower has knowledge of the exercise by the Purchaser of its rights under any Existing Collection Account Agreement, it shall (i) designate, in accordance with the Transition Agreement, a Blocked Account into which any funds held in any Collection Accounts that pertain to Accounts included in the Borrowing Base will be transferred and provide notice to the Agent of the occurrence of such designation and (ii) require that the Purchaser (as defined in the Transition

49

Agreement) transfer proceeds related to Unsold Receivables into a Blocked Account as frequently as reasonably practical.

(e)    The Borrowers shall use commercially efforts to, on or prior to January 31, 2021 (with extensions available in the Agent's reasonable discretion), (i) terminate the Existing Collection Transition Agreement (as defined in the Transition Agreement) in respect of Account No. 927641589 and (ii) release any restrictions in respect of such Account that would prevent the Agent from obtaining a Control Agreement.

(f)    Upon the request of the Agent, the Borrower shall use commercially reasonable efforts to enter into an intercreditor agreement among Ester Finance Technologies, the Agent and certain of the Borrowers in form reasonably satisfactory to the Agent.

5.15    Compliance with ERISA and the IRC. Each Borrower will, and will cause each of its Subsidiaries to, comply with the provisions of ERISA and the IRC applicable to employee benefit plans as defined in Section 3(3) of ERISA and the laws applicable to any Foreign Plan, except to the extent any failure to comply, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

5.16    Cash Management.

(a)    Accounts.

( i )    Schedule 5.16 sets forth all Deposit Accounts and securities accounts, including all lockbox accounts and Dominion Accounts maintained by the Loan Parties, as of the Closing Date.

(ii)    Within 90 days after the Closing Date or after the acquisition or establishment of a lockbox, Deposit Account or securities account (or, in each case, such longer period as the Agent may agree in its sole discretion), each Loan Party shall take all actions necessary to obtain a Control Agreement from each applicable lockbox servicer or depository bank over each Deposit Account and securities account set forth on Schedule 5.16 (other than Excluded Accounts), establishing Agent's control (within the meaning of the Code) and Lien in each such Deposit Account and securities account, which may only be exercised by Agent during any Cash Dominion Trigger Period, requiring immediate deposit of all remittances received in the lockbox, Deposit Account or and securities account to a Dominion Account designated by Agent, and waiving offset rights of such servicer or bank, except for customary administrative charges; provided that if such Control Agreements with respect to all such Deposit Accounts and securities account maintained as of the Closing Date that are not obtained within 90 days after the Closing Date (or such longer period that the Agent may agree in its sole discretion), each Loan Party shall immediately transfer all funds in such Deposit Accounts and securities account to a Blocked Account subject to a Control Agreement. Each Loan Party shall be the sole account holder of each Deposit Account and securities account and shall not allow any other Person (other than the Agent and the applicable depositary bank) to have control over any such Deposit Account and securities account (other than Excluded Accounts) or any deposits therein. Each Loan Party shall promptly notify the Agent of any opening or closing of a Deposit Account or securities account (other than an Excluded Account) and, subject to compliance with this clause (ii), shall not open any Deposit Account, lockbox or securities account (other than an Excluded Account) unless such Deposit Account, lockbox or securities account is a Blocked Account.

(iii)    If a Blocked Account is not maintained with Bank of America, Agent may, during any Cash Dominion Trigger Period, require immediate and daily transfer of all funds in such account to a Blocked Account maintained with Bank of America or to a Dominion Account.

(b)    [Reserved].

(c)    Proceeds of Collateral. Within 90 days after the Closing Date (or such longer period as the Agent may agree in its sole discretion), each Loan Party shall request in writing and otherwise take all necessary steps to ensure that all payments on Accounts or otherwise relating to ABL Priority Collateral are made directly to a Blocked Account (or a lockbox relating to a Blocked Account). If any Loan Party receives cash or payment items with respect to any ABL Priority Collateral, it shall hold same in trust for Agent and promptly (not later than three (3) Business Days thereafter) deposit same into a Blocked Account.

6    **NEGATIVE COVENANTS.**

Each Borrower covenants and agrees that, until termination of all of the Revolver Commitments and payment in full of the Obligations:

6.1    Indebtedness. Each Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness, except for Permitted Indebtedness.

6.2    Liens. Each Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume, or suffer to exist, directly or indirectly, any Lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens.

6.3    Restrictions on Fundamental Changes. Each Borrower will not, and will not permit any of its Subsidiaries to,

(a)    other than in order to consummate a Permitted Acquisition, Permitted Investment or Permitted Disposition, enter into any merger, consolidation, or amalgamation, except for (i) any merger, consolidation or amalgamation between Loan Parties, provided, that (x) if such transaction involves a Borrower, a Borrower must be the surviving entity of any such transaction; provided that if a U.S. Borrower shall merge, consolidate or amalgamate with a Foreign Subsidiary Borrower, such U.S. Borrower shall be the surviving Borrower, (y) Parent must be the surviving entity of any such transaction to which it is a party and (z) in the case of any transaction involving a Loan Party, a Loan Party must be the surviving entity of such transaction, (ii) any merger, consolidation or amalgamation among a Loan Party and a Subsidiary that is not a Loan Party so long a Loan Party is the surviving entity of any such transaction or such surviving Subsidiary becomes a Loan Party concurrently with such merger, consolidation or amalgamation, and (iii) any merger, consolidation or amalgamation among Subsidiaries (that are not a Loan Party) of any Borrower; or

(b)    liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution), except for (i) the liquidation, winding up or dissolution of any Subsidiary (other than a Loan Party) so long as such dissolution, winding up or liquidation, as applicable, would not reasonably be expected to have a Material Adverse Effect or (ii) the liquidation or dissolution of a Loan Party (other than Parent) so long as all of the assets (including any interest in any Equity Interests) of such liquidating or dissolving Loan Party are transferred to a Loan Party that is not liquidating or dissolving.

6.4    Disposal of Assets. Other than Permitted Dispositions, each Borrower will not, and will not permit any of its Subsidiaries to, convey, sell, lease, license, assign, transfer, or otherwise dispose of any of its or their assets.

6.5    Nature of Business. Each Borrower will not, and will not permit any of its Subsidiaries to change in any material respect the general nature of their business, taken as a whole, from the general nature of the business as of the Closing Date; provided, that the foregoing shall not prevent any Borrower and its Subsidiaries from (i) engaging in any business that is reasonably related, complementary or ancillary thereto or (ii) disposing of any business pursuant to a Permitted Disposition.

6.6.    Prepayments and Amendments. Each Borrower will not, and will not permit any of its Subsidiaries to:

(a)    except in connection with the Transactions or any Refinancing Indebtedness permitted by  Section 6.1,

(i)    optionally prepay, redeem, defease, purchase, or otherwise acquire any Indebtedness of any Borrower or its Subsidiaries consisting of Indebtedness permitted under clauses (f), (p), (q), (t), (u), (v), (z) or (aa) of the definition of Permitted Indebtedness, or any other Indebtedness with an outstanding amount greater than $25,000,000 that is secured by Liens on the Collateral that rank junior to the Liens on the Collateral securing the Obligations, in all such cases, prior to the maturity date applicable to such Indebtedness, except (A) any prepayment, redemption, defeasance, purchase or other acquisition with Qualified Equity Interests so long as at the time of such prepayment, redemption, defeasance, purchase or other acquisition no Default or Event of Default has occurred and is continuing or would result therefrom, (B) any prepayment, redemption, defeasance, purchase or other acquisition with the net cash proceeds of an issuance of Qualified Equity Interests within 60 days of such issuance (or such later date as agreed to by the Agent in its sole discretion)) so long as (1) at the time of such prepayment, redemption, defeasance, purchase or other acquisition no Default or Event of Default has occurred and is continuing or would result therefrom and (2) the net cash proceeds of such issuance of Qualified Equity Interests are maintained in a segregated Deposit Account subject to the "control" of the Agent until the earlier of (a) application toward such prepayment, redemption, defeasance, purchase or other acquisition and (b) the date that is 60 days after such issuance, (C) any prepayment, redemption, defeasance, purchase or other acquisition so long as, at the time of such prepayment, redemption, defeasance, purchase or other acquisition, no Default or Event of Default has occurred and is continuing or would result therefrom and either (1) the Payment Conditions are satisfied at such time or (2) for each of the 30 consecutive days immediately preceding such prepayment, redemption, defeasance, purchase or other acquisition, and both before and after giving effect to such prepayment, redemption, defeasance, purchase or other acquisition, (x) no Loans are outstanding and (y) Liquidity is at least $500,000,000; provided, further that the foregoing conditions under this clause (C) shall not be required to be satisfied with respect to prepayments, redemptions, defeasances, purchases or other acquisitions of any such Indebtedness in an aggregate principal amount (for all such prepayments, redemptions, defeasances, purchases or other acquisitions) of up to the greater of (x) $~~100,000,000~~200,000,000 and (y) 1.5% of Consolidated Net Tangible Assets, measured as of the last day of the fiscal quarter ending prior to the date of such prepayment for which financial statements have been delivered to the Agent, during the term of this Agreement and (D) any prepayment, redemption, defeasance, purchase or other acquisition of the Convertible Notes with Qualified Equity Interests; provided that this Section 6.6(a)(i) shall not apply to any prepayment, redemption, defeasance, purchase, or other acquisition of the Convertible Notes to the extent such event or condition occurs as a result of (x) the satisfaction of a conversion contingency pursuant to the Convertible Notes (as in effect on the date hereof) or the exercise by a holder of the Convertible Notes of a conversion right resulting from the satisfaction of a conversion contingency pursuant to the Convertible Notes (as in effect on the date hereof) (it being understood that any such prepayment, redemption, defeasance, purchase, or other acquisition of the Convertible Notes made in cash in reliance on this clause (x) shall be subject to satisfaction of the Payment Conditions at the time thereof, other than prepayments, redemptions, defeasances, purchases or other acquisitions (i) of less than $~~30,000,000~~60,000,000 in the aggregate during the term of this Agreement, or (ii) paid in lieu of fractional shares)) or (y) a required repurchase under the Convertible Notes; provided further that nothing in this  Section 6.6 shall prohibit the payment of Indebtedness permitted under this Agreement at the time of the final maturity of the obligations under such Indebtedness, or

(ii)    make any payment on account of Indebtedness that has been contractually subordinated in right of payment to the Obligations if such payment is not permitted at such time under the subordination terms and conditions, or

(b)    except in connection with the Transactions or any Refinancing Indebtedness permitted by  Section 6.1, directly or indirectly, amend, modify, or change any of the terms or provisions of:

52

(i)    any agreement, instrument, document, indenture, or other writing evidencing or concerning Permitted Indebtedness permitted under clauses (f), (p), (q), (t), (u), (v), (z) or (aa) of the definition of Permitted Indebtedness (A) if such Indebtedness could not have been incurred (including as Refinancing Indebtedness) on such terms (without limiting <u>clause (ii)</u> below) or (B) if such amendment, modification or change could reasonably be expected to affect the interests of the Lenders adversely in any material respect, or

(ii)    the Governing Documents of any Loan Party or any of its Subsidiaries, the Existing Senior Notes, the Convertible Notes or the Senior Secured Notes, in each case if the effect thereof, either individually or in the aggregate, would reasonably be expected to be materially adverse to the interests of the Lenders.

6.7    Restricted Payments. Each Borrower will not, and will not permit any of its Subsidiaries to make any Restricted Payment; provided, that, so long as it is permitted by law and the Governing Documents of such Borrower or its Subsidiaries,

(a)    the Borrowers and their respective Subsidiaries may make Restricted Payments to purchase, redeem or otherwise acquire or retire  <u>any Equity Interests</u> pursuant to a management or employee benefit plan in an aggregate amount not to exceed the greater of (x) $  ~~50,000,000~~100,000,000 and (y) 0.75% of Consolidated Net Tangible Assets, measured as of the last day of the fiscal quarter ending prior to the date of such Restricted Payment for which financial statements have been delivered to the Agent, per fiscal year,

(b)    Parent and each Subsidiary may declare and make dividend payments or other distributions payable solely in Equity Interests (other than Disqualified Equity Interests),

(c)    (i) any Borrower may make Restricted Payments to another Borrower, (ii) any Subsidiary that is not a Borrower may make Restricted Payments to any Borrower or any Guarantor, (iii) any Subsidiary that is not a Loan Party may make Restricted Payments to any other Subsidiary and (iv) any Borrower (other than Parent) or any Subsidiary may make any Restricted Payments to its parent entity (or, if such Subsidiary is a non-wholly owned Subsidiary, to its parent entities on a pro rata basis based on its parents' relative ownership interests),

(d)    [Reserved],

(e)    in addition to the foregoing, Parent may make any other Restricted Payments so long as (i) the Payment Conditions are satisfied at the time declared and (ii) until such time as such Restricted Payment is made, a Reserve has been established by Agent in an amount equal to the Restricted Payment so declared; <u>provided</u>, that, so long as no Default or Event of Default has occurred and is continuing or would result therefrom, the foregoing conditions shall not be required to be satisfied with respect to Restricted Payments in an aggregate principal amount of up to the greater of (x) $~~50,000,000~~100,000,000 and (y) 0.75% of Consolidated Net Tangible Assets, measured as of the last day of the fiscal quarter ending prior to the date of such prepayment for which financial statements have been delivered to the Agent, during any fiscal year, and

(f)    Parent may make Restricted Payments of the type described in clauses (b) and (c) of the definition thereof so long as (i) no Default or Event of Default has occurred and is continuing or would result therefrom and (ii) for each of the 30 consecutive days immediately preceding such Restricted Payment, and both before and after giving effect to such Restricted Payment, (A) no Loans are outstanding, and (B) Liquidity is not less than $500,000,000.

6.8    Accounting Methods. Each Borrower will not, and will not permit any of its Subsidiaries to modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP or, except to the extent that such modification or change would impact the calculation of the Fixed Charge Coverage Ratio or the Borrowing Base (or any component definition of any of the foregoing), such modification or change of its method of accounting is permitted by GAAP, or in the case

53

of any Subsidiary or any Borrower (other than Parent), in order to conform the fiscal year of such Subsidiary or Borrower to the fiscal year of the Parent (or other than changes to conform to the accounting methodology used by the Parent on the Closing Date)).

6.9    Investments. Each Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly, make or acquire any Investment except for Permitted Investments.

6.10    Transactions with Affiliates. Each Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction with any Affiliate of any Borrower or any of its Subsidiaries except for:

(a)    transactions or a series of related transactions between such Borrower or its Subsidiaries, on the one hand, and any Affiliate of such Borrower or its Subsidiaries, on the other hand, so long as such transactions (i) are no less favorable, taken as a whole, to such Borrower or its Subsidiaries, as applicable, than would be obtained in an arm's-length transaction with a non-Affiliate or (ii) have been approved by a majority of the disinterested members of the Parent's board of directors,

(b)    so long as it has been approved by such Borrower's or its applicable Subsidiary's board of directors (or comparable governing body) in accordance with applicable law, any indemnity provided for the benefit of directors (or comparable managers) of such Borrower or its applicable Subsidiary,

(c)    the payment of reasonable compensation, severance, or employee benefit arrangements to employees, officers, and outside directors of such Borrower and its Subsidiaries in the ordinary course of business,

(d)    transactions permitted by Section 6.1, Section 6.3, Section 6.7 or Section 6.9,

(e)    the Joint Venture Agreements and any transactions contemplated therein,

(f)    transactions or a series of related transactions among the Parent or any of its wholly-owned Subsidiaries on the one hand and the Parent or any of its wholly-owned Subsidiaries on the other hand, so long as such transactions or series of related transactions (w) involve aggregate payments or consideration of less than $25,000,000 for such transaction or series of related transactions, (x) are among Loan Parties, (y) are among non-Loan Party Subsidiaries or (z) are, when taken as a whole, no less favorable to the Loan Parties than could be obtained on an arms-length terms with a non-Affiliate, and

(g)    to the extent the Payment Conditions are satisfied at the time of, and after giving pro forma effect to, such transactions, otherwise on terms determined in the reasonable business judgment of Parent.

6.11    Use of Proceeds.

(a)    Each Borrower will not, and will not permit any of its Subsidiaries to, use the proceeds of any loan made hereunder for any purpose other than working capital, general corporate purposes including, without limitation, the repayment of indebtedness, Capital Expenditures, Restricted Payments and Permitted Investments, in each case, to the extent not prohibited by the terms hereof; provided that, on the Closing Date, the amount of Revolving Loans incurred shall not exceed $800,000,000 and the proceeds thereof shall be used to (i) pay the fees, costs, and expenses incurred in connection with this Agreement and the other Loan Documents and (ii) consummate the Closing Date Refinancing; provided, further, that no part of the proceeds of the loans made to Borrowers will be used to purchase or carry any such Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors.

54

(b)    No part of the proceeds of the Loans made or Letters of Credit issued hereunder will be used by any Loan Party or any of their Affiliates, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the FCPA, Anti-Money Laundering Laws or any other applicable anti-corruption laws.

(c)    No proceeds of any Loan made or Letters of Credit issued hereunder will be used, directly or indirectly, by any Loan Party or Subsidiary thereof to fund any operations in or with, finance any investments or activities in or with, or make any payments to, a Sanctioned Person or a Sanctioned Entity or otherwise result in a violation of any Sanctions.

## 7    FINANCIAL COVENANT.

Each Borrower covenants and agrees that, until termination of all of the Revolver Commitments and payment in full of the Obligations, commencing on the date on which a Financial Covenant Period begins and measured as of the end of the fiscal quarter immediately preceding the date on which a Financial Covenant Period first begins and as of each fiscal quarter end thereafter during such Financial Covenant Period, the Parent and its Subsidiaries on a consolidated basis will have a Fixed Charge Coverage Ratio, measured on a quarter-end basis, of at least 1.00:1.00 for the 12-month period ending as of the end of each fiscal quarter.

## 8    EVENTS OF DEFAULT.

Any one or more of the following events shall constitute an event of default (each, an " Event of Default") under this Agreement:

8.1    Payments. If Borrowers (or any of them) fail to pay when due and payable, or when declared due and payable, (a) all or any portion of the Obligations consisting of interest, fees, or charges due the Lender Group, reimbursement of Lender Group Expenses, or other amounts (other than any portion thereof constituting principal) constituting Obligations (including any portion thereof that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), and such failure continues for a period of five (5) Business Days, (b) all or any portion of the principal of the Loans, or (c) any amount payable to any Issuing Bank in reimbursement of any drawing under a Letter of Credit;

8.2    Covenants. If any Loan Party or any of its Subsidiaries:

(a)    fails to perform or observe any covenant or other agreement contained in any of (i)  Sections 3.7, 5.1, 5.2, 5.3 (solely if any Borrower is not validly existing or in good standing (to the extent such concept is applicable) in its jurisdiction of organization or incorporation), Section 5.6, Section 5.7(a), Section 5.11, Section 5.12, Section 5.13, Section 5.14 or Section 5.16 of this Agreement, (ii) Section 6 of this Agreement or (iii) Section 7 of this Agreement or (iv) Section 3(f) of the Second Amendment;

(b)    fails to perform or observe any covenant or other agreement contained in this Agreement, or in any of the other Loan Documents, in each case, other than any such covenant or agreement that is the subject of another provision of this Section 8 (in which event such other provision of this  Section 8 shall govern), and such failure continues for a period of 30 days after the earlier of (i) the date on which such failure shall first become known to any Responsible Officer of any Borrower or (ii) the date on which written notice thereof is given to Borrowers by Agent;

8.3    Judgments. If one or more judgments, orders, or awards for the payment of money involving an aggregate amount of $150,000,000 or more (except to the extent covered by insurance pursuant to which the insurer has not denied coverage) is entered or filed against a Loan Party or any of

55

its Subsidiaries, or with respect to any of their respective assets, and either i) there is a period of 60 consecutive days at any time after the entry of any such judgment, order, or award during which (1) the same is not discharged, satisfied, vacated, or bonded pending appeal, or (2) a stay of enforcement thereof is not in effect, or ii) enforcement proceedings are commenced upon such judgment, order, or award;

8.4    Voluntary Bankruptcy, etc. If an Insolvency Proceeding is commenced by a Loan Party or any of its Significant Subsidiaries;

8.5    Involuntary Bankruptcy, etc. If an Insolvency Proceeding is commenced against a Loan Party or any of its Significant Subsidiaries and any of the following events occur: (a) such Loan Party or such Significant Subsidiary consents to the institution of such Insolvency Proceeding against it, (b) the petition commencing the Insolvency Proceeding is not timely controverted, (c) the petition commencing the Insolvency Proceeding is not dismissed within 60 calendar days of the date of the filing thereof, (d) an interim trustee is appointed to take possession of all or any substantial portion of the properties or assets of, or to operate all or any substantial portion of the business of, such Loan Party or its Significant Subsidiary, or (e) an order for relief shall have been issued or entered therein;

8.6    Default Under Other Agreements. If there is a default in one or more agreements to which a Loan Party or any of its Subsidiaries is a party with one or more third Persons relative to a Loan Party's or any of its Subsidiaries' Indebtedness (other than any letter of credit fully secured by cash or Cash Equivalents) involving an aggregate amount of $150,000,000 or more, and such default (a) occurs at the final maturity of the obligations thereunder, or (b) results in a right by such third Person, irrespective of whether exercised, to accelerate the maturity of such Loan Party's or its Subsidiary's obligations thereunder;

8.7    Representations, etc. If any warranty, representation, certificate, statement, or Record made herein or in any other Loan Document or delivered in writing to Agent or any Lender in connection with this Agreement or any other Loan Document proves to be untrue in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date of issuance or making or deemed making thereof;

8.8    Security Documents. If the Guaranty and Security Agreement, or any other Loan Document that purports to create a Lien or guaranty of Obligations, shall, for any reason, fail or cease to create a valid and perfected Lien or guaranty (as applicable) on a material portion of the Collateral or guarantees (as applicable) covered thereby (or a Loan Party shall so assert), except for a failure or cessation (a) pursuant to the terms hereof or thereof or (b) as the result of an action or failure to act on the part of Agent;

8.9    Loan Documents. The validity or enforceability of any Loan Document shall at any time for any reason (other than solely as the result of an action or failure to act on the part of Agent) be declared to be null and void, or a proceeding shall be commenced by a Loan Party or its Subsidiaries, or by any Governmental Authority having jurisdiction over a Loan Party, seeking to establish the invalidity or unenforceability thereof, or a Loan Party shall deny that such Loan Party has any liability or obligation purported to be created under any Loan Document;

8.10    Change in Control. A Change in Control shall occur, whether directly or indirectly; or

8.11    ERISA and Pension Events. The occurrence of any of the following events: (a) any Loan Party or any of its Subsidiaries or the ERISA Affiliates fails to make full payment within 30 days when due of all amounts which any Loan Party or any of its Subsidiaries or the ERISA Affiliates is required to pay as contributions, installments, or otherwise to or with respect to a Pension Plan or Multiemployer Plan, and such failure, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect, (b) an accumulated funding deficiency or funding shortfall occurs or exists, whether or not waived, with respect to any Pension Plan, that, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect, (c) a Notification Event, which, individually or in the aggregate, would

reasonably be expected to result in a Material Adverse Effect, (d) any Loan Party or any of its Subsidiaries or their ERISA Affiliates completely or partially withdraws from one or more Multiemployer Plans and (i) incurs Withdrawal Liability, (ii) requires payment in any one (1) calendar year, or (iii) fails to make any Withdrawal Liability payment when due, which in each case of (i), (ii) and (iii), individually or in the aggregate would reasonably be expected to result in a Material Adverse Effect, or (e) the existence of any facts or circumstances with respect to the Employee Benefit Plans in the aggregate that results in or is likely to result in a Material Adverse Effect.

9.    **RIGHTS AND REMEDIES.**

    9.1    Rights and Remedies. Upon the occurrence and during the continuation of an Event of Default, Agent may, and, at the instruction of the Required Lenders, shall (in each case under clauses (a) or (b) by written notice to Borrowers), in addition to any other rights or remedies provided for hereunder or under any other Loan Document or by applicable law, do any one or more of the following:

        (a)    (i) declare the principal of, and any and all accrued and unpaid interest and fees in respect of, the Loans and all other Obligations (other than the Bank Product Obligations), whether evidenced by this Agreement or by any of the other Loan Documents to be immediately due and payable, whereupon the same shall become and be immediately due and payable and the Borrowers shall be obligated to repay all of such Obligations in full, without presentment, demand, protest, or further notice or other requirements of any kind, all of which are hereby expressly waived by each Borrower, and (ii) direct Borrowers to provide (and Borrowers agree that upon receipt of such notice Borrowers will provide) Letter of Credit Collateralization to Agent to be held as security for Borrowers' reimbursement obligations for drawings that may subsequently occur under issued and outstanding Letters of Credit;

        (b)    declare the Revolver Commitments terminated, whereupon the Revolver Commitments shall immediately be terminated together with (i) any obligation of any Revolving Lender to make Revolving Loans, (ii) the obligation of the Swing Lender to make Swing Loans, and (iii) the obligation of any Issuing Bank to issue Letters of Credit; and

        (c)    exercise all other rights and remedies available to Agent or the Lenders under the Loan Documents, under applicable law, or in equity.

    The foregoing to the contrary notwithstanding, upon the occurrence of any Event of Default described in   Section 8.4 or Section 8.5, in addition to the remedies set forth above, without any notice to Borrowers or any other Person or any act by the Lender Group, the Revolver Commitments shall automatically terminate and the Obligations (other than the Bank Product Obligations), inclusive of the principal of, and any and all accrued and unpaid interest and fees in respect of, the Loans and all other Obligations (other than the Bank Product Obligations), whether evidenced by this Agreement or by any of the other Loan Documents, shall automatically become and be immediately due and payable and the Borrowers shall be obligated to repay all of such Obligations in full (including the Borrowers being obligated to provide (and the Borrowers agree that they will provide) (1) Letter of Credit Collateralization to Agent to be held as security for Borrowers' reimbursement obligations in respect of drawings that may subsequently occur under issued and outstanding Letters of Credit and (2) Bank Product Collateralization to be held as security for Borrowers' or their Subsidiaries' obligations in respect of outstanding Bank Products), without presentment, demand, protest, or notice or other requirements of any kind, all of which are expressly waived by each Borrower.

    9.2    Remedies Cumulative. The rights and remedies of the Lender Group under this Agreement, the other Loan Documents, and all other agreements shall be cumulative. The Lender Group shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity. No exercise by the Lender Group of one right or remedy shall be deemed an election, and no waiver by the Lender Group of any Event of Default shall be deemed a continuing waiver. No delay by the Lender Group shall constitute a waiver, election, or acquiescence by it.

57

10  **WAIVERS; INDEMNIFICATION.**

10.1    Demand; Protest; etc. Each Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by the Lender Group on which any Borrower may in any way be liable.

10.2    The Lender Group's Liability for Collateral. Each Borrower hereby agrees that: (a) so long as Agent complies with its obligations, if any, under the Code, the Lender Group shall not in any way or manner be liable or responsible for: (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person, and (b) all risk of loss, damage, or destruction of the Collateral shall be borne by Borrowers.

10.3    Indemnification. Subject to Section 2.15, each Borrower shall pay, indemnify, defend, and hold the Agent-Related Persons and the Lender-Related Persons (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable and documented fees and disbursements of counsel (limited to one primary counsel and one local counsel in each relevant jurisdiction for all Indemnified Persons, taken as a whole, and, solely in the case of an actual or perceived conflict of interest, one additional counsel to each group of Indemnified Persons similarly situated) and one environmental consultant and all other reasonable and documented out-of-pocket costs and expenses incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (a) in connection with or as a result of or related to the execution and delivery (provided that Borrowers shall not be liable for costs and expenses (including attorneys' fees) of any Lender (other than Bank of America) incurred in advising, structuring, drafting, reviewing, administering or syndicating the Loan Documents), enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of Parent's and its Subsidiaries' compliance with the terms of the Loan Documents (provided, that the indemnification in this clause (a) shall not extend to (i) disputes solely between or among the Lenders that do not involve any acts or omissions of any Loan Party, or (ii) disputes solely between or among the Lenders and their respective Affiliates that do not involve any acts or omissions of any Loan Party; it being understood and agreed that the indemnification in this clause (a) shall extend to Agent (but not the Lenders) relative to disputes between or among Agent on the one hand, and one or more Lenders, or one or more of their Affiliates, on the other hand, (b) with respect to any actual or prospective investigation, litigation, or proceeding related to this Agreement, any other Loan Document, the making of any Loans or issuance of any Letters of Credit hereunder, or the use of the proceeds of the Loans or the Letters of Credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto, and (c) in connection with or arising out of any presence or release of Hazardous Materials giving rise to liability or for which any Lender is required to incur costs at, on, under, to or from the business or any assets or properties currently or formerly owned, leased or operated by any Loan Party or any of its Subsidiaries or any Environmental Liabilities related in any way to the Loan Parties or any of their Subsidiaries or the business or any such assets or properties of any Borrower or any of its Subsidiaries (each and all of the foregoing, the "Indemnified Liabilities"). The foregoing to the contrary notwithstanding, no Borrower shall have any obligation to any Indemnified Person under this Section 10.3 with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the bad faith, gross negligence or willful misconduct by such Indemnified Person or its officers, directors, employees, attorneys, or agents. This provision shall survive the termination of this Agreement and the repayment in full of the Obligations. If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which Borrowers were required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by Borrowers with

58

respect thereto. This Section 10.3 shall not apply to (x) any Taxes or any costs attributable to Taxes that are governed by Section 17, or (y) any Excluded Taxes or any costs attributable to Excluded Taxes. WITHOUT LIMITATION, THE FOREGOING INDEMNITY SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION (OTHER THAN A GROSSLY NEGLIGENT ACT OR OMISSION OR TO THE EXTENT CONSTITUTING BAD FAITH OR WILLFUL MISCONDUCT) OF SUCH INDEMNIFIED PERSON OR OF ANY OTHER PERSON.

11.   **NOTICES**.

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement or any other Loan Document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, or electronic mail (at such email addresses as a party may designate in accordance herewith). In the case of notices or demands to any Borrower or Agent, as the case may be, they shall be sent to the respective address set forth below:

If to any Borrower:   c/o **CLEVELAND-CLIFFS INC.**
200 Public Square #3300
Cleveland, Ohio 44114
Attn: James Graham
Email: james.graham@clevelandcliffs.com

With a copy to:

Cleveland-Cliffs Inc.
200 Public Square #3300
Cleveland, Ohio 44114
Attn: Keith Koci
Email: Keith.Koci@clevelandcliffs.com

If to Agent:   **BANK OF AMERICA, N.A.**
~~135 S. LaSalle St., Suite 925~~
110 N. Wacker Drive
IL4-110-08-03
Chicago, IL ~~6060~~60606
Attn: Thomas Herron
Tel No.: 312-992-6107
Email: thomas.h.herron@bofa.com

If to Issuing Bank:   To Agent

If to any Lender:   At such address as such Lender may designate in writing to the Agent from time to time or via the Platform

Any party hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party. Each notice shall be effective only (a) if given by email transmission, when transmitted to the applicable email address, if confirmation of receipt is received; (b) if given by mail, three (3) Business Days after deposit in the mail, with first-class postage pre-paid, addressed to the applicable address; or (c) if given by personal delivery, when duly delivered to the notice address with receipt acknowledged. Any written communication that is not sent in conformity with the foregoing provisions shall nevertheless be effective on the date actually received by the noticed party. Any notice received by Parent shall be deemed received by all Borrowers. Electronic

communications (including e-mail, messaging and websites) may be used only in a manner reasonably acceptable to Agent and, unless otherwise agreed by Agent, only for routine communications, such as delivery of administrative matters and distribution of Loan Documents. Agent makes no assurance as to the privacy or security of electronic communications. Voice mail shall not be effective notices under the Loan Documents.

12.  **CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER; JUDICIAL REFERENCE PROVISION.**

(a)    THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO, AND ANY CLAIMS, CONTROVERSIES OR DISPUTES ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

(b)    THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK, STATE OF NEW YORK; <u>PROVIDED</u>, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE AGENT ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND.  EACH BORROWER AND EACH MEMBER OF THE LENDER GROUP WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS <u>SECTION 12(b)</u>.

(c)    TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH BORROWER AND EACH MEMBER OF THE LENDER GROUP HEREBY WAIVE THEIR RESPECTIVE RIGHTS, IF ANY, TO A JURY TRIAL OF ANY CLAIM, CONTROVERSY, DISPUTE OR CAUSE OF ACTION DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS (EACH A "<u>CLAIM</u>"). EACH BORROWER AND EACH MEMBER OF THE LENDER GROUP REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.   IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(d)    EACH BORROWER HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK AND THE STATE OF NEW YORK, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENTS, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL

JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT AGENT MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(e)    NO CLAIM MAY BE MADE BY ANY PARTY HERETO AGAINST ANY LOAN PARTY, THE AGENT, THE SWING LENDER, ANY OTHER LENDER, ISSUING BANK, OR ANY AFFILIATE, DIRECTOR, OFFICER, EMPLOYEE, COUNSEL, REPRESENTATIVE, AGENT, OR ATTORNEY-IN-FACT OF ANY OF THEM FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES OR LOSSES IN RESPECT OF ANY CLAIM FOR BREACH OF CONTRACT OR ANY OTHER THEORY OF LIABILITY ARISING OUT OF OR RELATED TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR ANY ACT, OMISSION, OR EVENT OCCURRING IN CONNECTION THEREWITH, AND EACH PARTY HEREBY WAIVES, RELEASES, AND AGREES NOT TO SUE UPON ANY CLAIM FOR SUCH DAMAGES, WHETHER OR NOT ACCRUED AND WHETHER OR NOT KNOWN OR SUSPECTED TO EXIST IN ITS FAVOR; PROVIDED THAT NOTHING HEREIN SHALL LIMIT THE BORROWERS' OBLIGATIONS TO INDEMNIFY THE AGENT-RELATED PERSONS AND THE LENDER-RELATED PERSONS AS REQUIRED UNDER, AND SUBJECT TO, <u>SECTION</u> 10.3.

13.    **ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS.**

13.1    Assignments and Participations.

(a)    (i) Subject to the conditions set forth in clause (a)(ii) below, any Lender may assign and delegate all or any portion of its rights and duties under the Loan Documents (including the Obligations owed to it and its Revolver Commitments) to one or more assignees so long as such prospective assignee is an Eligible Transferee (each, an "<u>Assignee</u>"), with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(A)    Borrowers; <u>provided</u>, that no consent of Borrowers shall be required (1) if an Event of Default has occurred and is continuing, or (2) in connection with an assignment to a Person that is a Lender or an Affiliate (other than natural persons) of a Lender; <u>provided</u> <u>further</u>, that Borrowers shall be deemed to have consented to a proposed assignment unless they object thereto by written notice to Agent within five (5) Business Days after having received notice thereof; and

(B)    Agent and each Issuing Bank; <u>provided</u>, that no consent of Agent or any Issuing Bank shall be required in connection with an assignment to a Person that is a Lender or an Affiliate (other than natural persons) of a Lender.

(ii)    Assignments shall be subject to the following additional conditions:

(A)    [Reserved,]

(B)    no assignment may be made, (i) to a Competitor, or (ii) to a natural person,

(C)    no assignment may be made to a Loan Party or an Affiliate of a Loan Party,

61

(D)    the amount of the Revolver Commitments and the other rights and obligations of the assigning Lender hereunder and under the other Loan Documents subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to Agent) shall be in a minimum amount (unless waived by Agent) of $5,000,000 (except such minimum amount shall not apply to (1) an assignment or delegation by any Lender to any other Lender, an Affiliate of any Lender, or a Related Fund of such Lender or (2) a group of new Lenders, each of which is an Affiliate of each other or a Related Fund of such new Lender to the extent that the aggregate amount to be assigned to all such new Lenders is at least $5,000,000) or (3) in the case of an assignment of the entire remaining amount of the assigning Lender's Revolver Commitment and/or Obligations at the time owing to it),

(E)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement,

(F)    the parties to each assignment shall execute and deliver to Agent an Assignment and Acceptance;  provided, that Borrowers and Agent may continue to deal solely and directly with the assigning Lender in connection with the interest so assigned to an Assignee until written notice of such assignment, together with payment instructions, addresses, and related information with respect to the Assignee, have been given to Borrowers and Agent by such Lender and the Assignee,

(G)    unless waived by Agent, the assigning Lender or Assignee has paid to Agent, for Agent's separate account, a processing fee in the amount of $3,500, and

(H)    the assignee, if it is not a Lender, shall deliver to Agent an administrative questionnaire in a form approved by Agent (the "Administrative Questionnaire").

(b)    From and after the date that Agent receives the executed Assignment and Acceptance, records it in the Register, and if applicable, receives payment of the required processing fee, (i) the Assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, subject to Agent's recording of the Assignment and Acceptance in the Register as required by Section 13.1(h), shall be a "Lender" and shall have the rights and obligations of a Lender under the Loan Documents, and (ii) the assigning Lender shall, to the extent that rights and obligations hereunder and under the other Loan Documents have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (except with respect to Section 10.3) and be released from any future obligations under this Agreement (and in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement and the other Loan Documents, such Lender shall cease to be a party hereto and thereto); provided, that nothing contained herein shall release any assigning Lender from obligations that survive the termination of this Agreement, including such assigning Lender's obligations under Section 15 and Section 18.9(a).

(c)    By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the Assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (i) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document furnished pursuant hereto, (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Borrower or the performance or observance by any Borrower of any of its obligations under this Agreement or any other Loan Document furnished pursuant hereto, (iii) such Assignee confirms that it has received a copy of this Agreement, together with such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance, (iv) such Assignee will, independently and without reliance upon Agent, such assigning Lender or any other Lender, and based

62

on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement, (v) such Assignee appoints and authorizes Agent to take such actions and to exercise such powers under this Agreement and the other Loan Documents as are delegated to Agent, by the terms hereof and thereof, together with such powers as are reasonably incidental thereto, and (vi) such Assignee agrees that it will perform all of the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)    Immediately upon Agent's receipt of the required processing fee, if applicable, and delivery of notice to the assigning Lender pursuant to <u>Section 13.1(b)</u>, this Agreement shall be deemed to be amended to the extent, but only to the extent, necessary to reflect the addition of the Assignee and the resulting adjustment of the Revolver Commitments arising therefrom. The Revolver Commitment allocated to each Assignee shall reduce such Revolver Commitments of the assigning Lender pro tanto.

(e)    Any Lender may at any time sell to one or more commercial banks, financial institutions, or other Persons that is an Eligible Transferee and is not a Competitor (a "<u>Participant</u>") participating interests in all or any portion of its Obligations, its Revolver Commitment, and the other rights and interests of that Lender (the "<u>Originating Lender</u>") hereunder and under the other Loan Documents; <u>provided</u>, that (i) the Originating Lender shall remain a " <u>Lender</u>" for all purposes of this Agreement and the other Loan Documents and the Participant receiving the participating interest in the Obligations, the Revolver Commitments, and the other rights and interests of the Originating Lender hereunder shall not constitute a "<u>Lender</u>" hereunder or under the other Loan Documents and the Originating Lender's obligations under this Agreement shall remain unchanged, (ii) the Originating Lender shall remain solely responsible for the performance of such obligations, (iii) Borrowers, Agent, and the Lenders shall continue to deal solely and directly with the Originating Lender in connection with the Originating Lender's rights and obligations under this Agreement and the other Loan Documents (it being understood that the documentation required under <u>Section 17.2</u> shall be delivered to the participating Lender), (iv) no Lender shall transfer or grant any participating interest under which the Participant has the right to approve any amendment to, or any consent or waiver with respect to, this Agreement or any other Loan Document, except to the extent such amendment to, or consent or waiver with respect to this Agreement or of any other Loan Document would (A) extend the final maturity date of the Obligations hereunder in which such Participant is participating, (B) reduce the interest rate applicable to the Obligations hereunder in which such Participant is participating (excluding the imposition of the Default Rate), (C) release all or substantially all of the Collateral or guaranties (except to the extent expressly provided herein or in any of the Loan Documents) supporting the Obligations hereunder in which such Participant is participating, (D) postpone the payment of, or reduce the amount of, the interest or fees payable to such Participant through such Lender (other than a waiver of default interest), or (E) decreases the amount or postpones the due dates of scheduled principal repayments or prepayments payable to such Participant through such Lender, (v) no participation shall be sold to a natural person, (vi) no participation shall be sold to a Loan Party or an Affiliate of a Loan Party, and (vii) all amounts payable by Borrowers hereunder shall be determined as if such Lender had not sold such participation. The rights of any Participant only shall be derivative through the Originating Lender with whom such Participant participates and no Participant shall have any rights under this Agreement or the other Loan Documents or any direct rights as to the other Lenders, Agent, Borrowers, the Collateral, or otherwise in respect of the Obligations. Notwithstanding the preceding sentence, the Borrower agrees that each Participant shall be entitled to the benefits of <u>Section 17</u> (Withholding Taxes) (subject to the requirements and limitations therein, including the requirements under <u>Section 17.2</u> (Forms and Exemptions) (it being understood that the documentation required under   <u>Section 17.2</u> shall be delivered to the Lender granting the participation only) and <u>Section 2.14</u>, in each case to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (a) of this <u>Section 13.1</u>; <u>provided</u> that such Participant (A) agrees to be subject to the provisions of <u>Sections 14.2</u> (Replacement of Certain Lenders) as if it were an assignee under paragraph (a) of this <u>Section 13.1</u>; and (B) shall not be entitled to receive any greater payment under   <u>Section 17</u> (Withholding Taxes) or <u>Section 2.14</u>, with respect to any participation, than its Originating Lender would have been entitled to receive, except to the extent such entitlement to receive a

63

greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. No Participant shall have the right to participate directly in the making of decisions by the Lenders among themselves.

(f)     In connection with any such assignment or participation or proposed assignment or participation or any grant of a security interest in, or pledge of, its rights under and interest in this Agreement, a Lender may, subject to the provisions of <u>Section 18.9</u>, disclose all documents and information which it now or hereafter may have relating to any Borrower and its Subsidiaries and their respective businesses.

(g)     Any other provision in this Agreement notwithstanding, any Lender may at any time create a security interest in, or pledge, all or any portion of its rights under and interest in this Agreement in favor of any Federal Reserve Bank in accordance with Regulation A of the Federal Reserve Bank or U.S. Treasury Regulation 31 CFR §203.24 or any other central bank, and such Federal Reserve Bank or such central bank, as applicable, may enforce such pledge or security interest in any manner permitted under applicable law.

(h)     Agent (as a non-fiduciary agent on behalf of Borrowers) shall maintain, or cause to be maintained, a register (the "<u>Register</u>") on which it enters the name and address of each Lender as the registered owner of the Loans (and the principal amount thereof and stated interest thereon) held by such Lender (each, a "<u>Registered Loan</u>"). A Registered Loan (and the registered note, if any, evidencing the same) may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register (and each registered note shall expressly so provide) and any assignment or sale of all or part of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by registration of such assignment or sale on the Register, together with the surrender of the registered note, if any, evidencing the same duly endorsed by (or accompanied by a written instrument of assignment or sale duly executed by) the holder of such registered note, whereupon, at the request of the designated assignee(s) or transferee(s), one or more new registered notes in the same aggregate principal amount shall be issued to the designated assignee(s) or transferee(s). Prior to the registration of assignment or sale of any Registered Loan (and the registered note, if any evidencing the same), Borrowers, the Agent and the Lenders shall treat the Person in whose name such Registered Loan (and the registered note, if any, evidencing the same) is registered as the owner thereof for the purpose of receiving all payments thereon and for all other purposes, notwithstanding notice to the contrary.

(i)     In the event that a Lender sells participations in the Registered Loan, such Lender, as a non-fiduciary agent on behalf of Borrowers, shall maintain (or cause to be maintained) a register on which it enters the name and address of all participants thereof and stated interest thereon held by it (and the principal amount (and stated interest thereon) of the portion of such Registered Loans that is subject to such participations) (the "<u>Participant Register</u>"); <u>provided</u> that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or participations in Letters of Credit and Swing Loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan or participation in a Letter of Credit or Swing Loan is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. A Registered Loan (and the registered note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall expressly so provide). Any participation of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register. The conclusiveness of the Participant Register shall be subject to the qualification "absent manifest error".

(j)     Agent shall make a copy of the Register (and each Lender shall make a copy of its Participant Register to the extent it has one) available for review by Borrowers from time to time as Borrowers may reasonably request.

64

13.2    Successors. This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that no Borrower may assign this Agreement or any other Loan Document or any rights or duties hereunder or thereunder without the Lenders' prior written consent and any prohibited assignment shall be absolutely void ab initio. No consent to assignment by the Lenders shall release any Borrower from its Obligations. A Lender may assign this Agreement and the other Loan Documents and its rights and duties hereunder and thereunder pursuant to Section 13.1 and, except as expressly required pursuant to Section 13.1, no consent or approval by any Borrower is required in connection with any such assignment.

## 14.    AMENDMENTS; WAIVERS.

14.1    Amendments and Waivers.

(a)    No amendment, waiver or other modification of any provision of this Agreement or any other Loan Document (other than Bank Product Agreements or the Fee Letter), and no consent with respect to any departure by any Borrower therefrom, shall be effective unless the same shall be in writing and signed by the Required Lenders (or by Agent at the written request of the Required Lenders) and the Loan Parties that are party thereto and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given; provided that no such waiver, amendment, or consent shall, unless in writing and signed by all of the Lenders directly affected thereby and all of the Loan Parties that are party thereto, do any of the following:

(i)    increase the amount of or extend the expiration date of any Revolver Commitment of any Lender or amend, modify, or eliminate the last sentence of Section 2.4(c),

(ii)    postpone or delay any date fixed by this Agreement or any other Loan Document for any payment of principal, interest, fees, or other amounts due hereunder or under any other Loan Document,

(iii)    reduce the principal of, or the rate of interest on, any loan or other extension of credit hereunder, or reduce any fees or other amounts payable hereunder or under any other Loan Document (except in connection with the waiver of applicability of Section 2.6(c) (which waiver shall be effective with the written consent of the Required Lenders)),

(iv)    amend, modify, or eliminate this Section or any provision of this Agreement providing for consent or other action by all Lenders,

(v)    amend, modify, or eliminate Section 3.1 or 3.3,

(vi)    amend, modify, or eliminate Section 15.9 or 15.10,

(vii)    other than as permitted by Section 15.9, release Agent's Lien in and to all or substantially all of the Collateral,

(viii)    amend, modify, or eliminate the definitions of "Required Lenders", "Supermajority Lenders" or "Pro Rata Share", or amend or modify the percentage set forth in any other provision of any Loan Document (including this Section 14.1) specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder,

(ix)    contractually subordinate any of Agent's Liens on the ABL Priority Collateral,

65

(x)    other than in connection with a merger, liquidation, dissolution or sale of such Person expressly permitted by the terms hereof or the other Loan Documents, or if such Person constitutes an Excluded Subsidiary, release any Borrower or any Guarantor from any obligation for the payment of money or consent to the assignment or transfer by any Borrower or any Guarantor of any of its rights or duties under this Agreement or the other Loan Documents if such release would release all or substantially all of the guarantees provided thereunder,

(xi)    amend, modify, or eliminate any of the provisions of  Section 2.4(b)(i), (ii) or (iv) or Section 2.4(d) or (f), or

(xii)    amend, modify, or eliminate any of the provisions of  Section 13.1 (1) with respect to assignments to, or participations with, Persons who are Loan Parties or their Affiliates or (2) in a manner which further restricts assignments by Lenders thereunder.

(b)    No amendment, waiver, modification, or consent shall amend, modify, waive, or eliminate,

(i)    the definition of, or any of the terms or provisions of, the Fee Letter, without the written consent of Agent and Borrowers (and shall not require the written consent of any of the Lenders),

(ii)    any provision of Section 15 pertaining to Agent, or any other rights or duties of Agent under this Agreement or the other Loan Documents, without the written consent of Agent, Borrowers, and the Required Lenders;

(c)    No amendment, waiver, modification, elimination, or consent shall amend, modify, or eliminate (i) the definition of Borrowing Base, Tranche A Borrowing Base or Tranche B Borrowing Base (or any of the defined terms including the definitions of Eligible Accounts, Eligible Inventory, Eligible Investment Grade Accounts and Eligible Equipment) that are used in any such definition) to the extent that any such change results in more credit being made available to the Borrowers based upon any Borrowing Base, but not otherwise, the last paragraph of Section 2.1(a), (ii) the definition of ~~Maximum Revolver Amount, (iii) the definition of~~ "ABL Priority Collateral" contained in the Intercreditor Agreement, (iii) Section 4.01 of the Intercreditor Agreement or ( ~~v~~iv) the Tranche B Line Cap in a manner that would increase clause (a) thereof above $~~150,000,000~~225,000,000, in each case, without the written consent of Agent, Borrowers, and the Supermajority Lenders;

(d)    [Reserved];

(e)    No amendment, waiver, modification, elimination, or consent shall amend, modify, or waive any provision of this Agreement or the other Loan Documents pertaining to any Issuing Bank, or any other rights or duties of any Issuing Bank under this Agreement or the other Loan Documents, without the written consent of such Issuing Bank, Agent, Borrowers, and the Required Lenders;

(f)    No amendment, waiver, modification, elimination, or consent shall amend, modify, or waive any provision of this Agreement or the other Loan Documents pertaining to the Swing Lender, or any other rights or duties of the Swing Lender under this Agreement or the other Loan Documents, without the written consent of such Swing Lender, Agent, Borrowers, and the Required Lenders; and

(g)    Anything in  this Section 14.1 to  the  contrary  notwithstanding, (i)  any  amendment,  modification,  elimination,  waiver,  consent, termination, or release of, or with respect to, any provision of this Agreement or any other Loan Document that relates only to the relationship of the Lender Group among themselves, and that does not affect the rights or obligations of any Borrower, shall not require

66

consent by or the agreement of any Loan Party, (ii) any amendment, waiver, modification, elimination, or consent of or with respect to any provision of this Agreement or any other Loan Document may be entered into without the consent of, or over the objection of, any Defaulting Lender other than any of the matters governed by Section 14.1(a)(i) through (iv) that affect such Lender and (iii) Agent and Parent shall be permitted to amend any provision of this Agreement or any other Loan Document (and such amendment shall become effective without any further action or consent of any other party to any Loan Document) if Agent and Parent shall have jointly identified an obvious error or any error or omission of a technical or immaterial nature in any such provision.

(h)    Notwithstanding the foregoing, the Agent and the Borrowers may enter into an Incremental Amendment in accordance with Section 2.16, and the Agent and the Borrowers may enter into an amendment pursuant to Section 2.13(d), Section 2.17 and Section 2.18, and, in any case, such document shall be effective to amend the terms of this Agreement and the other applicable Loan Documents, in each case without any further action or consent of any other party to any Loan Documents except as otherwise required by such Section.

14.2    Replacement of Certain Lenders

(a)    If (i) any action to be taken by the Lender Group or Agent hereunder requires the consent, authorization, or agreement of all Lenders or all Lenders affected thereby and if such action has received the consent, authorization, or agreement of the Required Lenders but not of all Lenders or all Lenders affected thereby, or (ii) any Lender makes a claim for compensation under Section 17, then Borrowers, at their sole cost and expense (including any assignment fees), upon at least five (5) Business Days prior irrevocable notice, may permanently replace any Lender that failed to give its consent, authorization, or agreement (a "Non-Consenting Lender") or any Lender that made a claim for compensation (a " Tax Lender") with one or more Replacement Lenders, and the Non-Consenting Lender or Tax Lender, as applicable, shall have no right to refuse to be replaced hereunder.  Such notice to replace the Non-Consenting Lender or Tax Lender, as applicable, shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given.

(b)    Prior to the effective date of such replacement, the Non-Consenting Lender or Tax Lender, as applicable, and each Replacement Lender shall execute and deliver an Assignment and Acceptance, subject only to the Non-Consenting Lender or Tax Lender, as applicable, being repaid in full its share of the outstanding Obligations (without any premium or penalty of any kind whatsoever, but including (i) all interest, fees and other amounts that may be due in payable in respect thereof, and (ii) an assumption of its Pro Rata Share of participations in the Letters of Credit). If the Non-Consenting Lender or Tax Lender, as applicable, shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, Agent may, but shall not be required to, execute and deliver such Assignment and Acceptance in the name or and on behalf of the Non-Consenting Lender or Tax Lender, as applicable, and irrespective of whether Agent executes and delivers such Assignment and Acceptance, the Non-Consenting Lender or Tax Lender, as applicable, shall be deemed to have executed and delivered such Assignment and Acceptance. The replacement of any Non-Consenting Lender or Tax Lender, as applicable, shall be made in accordance with the terms of Section 13.1. Until such time as one or more Replacement Lenders shall have acquired all of the Obligations, the Revolver Commitments, and the other rights and obligations of the Non-Consenting Lender or Tax Lender, as applicable, hereunder and under the other Loan Documents, the Non-Consenting Lender or Tax Lender, as applicable, shall remain obligated to make the Non-Consenting Lender's or Tax Lender's, as applicable, Pro Rata Share of Revolving Loans and to purchase a participation in each Letter of Credit, in an amount equal to its Pro Rata Share of participations in such Letters of Credit.

14.3    No Waivers; Cumulative Remedies. No failure by Agent or any Lender to exercise any right, remedy, or option under this Agreement or any other Loan Document, or delay by Agent or any Lender in exercising the same, will operate as a waiver thereof. No waiver by Agent or any Lender will be

67

effective unless it is in writing, and then only to the extent specifically stated.  No waiver by Agent or any Lender on any occasion shall affect or diminish Agent's and each Lender's rights thereafter to require strict performance by Parent and Borrowers of any provision of this Agreement. Agent's and each Lender's rights under this Agreement and the other Loan Documents will be cumulative and not exclusive of any other right or remedy that Agent or any Lender may have.

15.    **AGENT.**

15.1    Appointment, Authority and Duties of Agent.

(a)    <u>Appointment and Authority</u>. Each Lender appoints and designates Bank of America as Agent under all Loan Documents. Agent may, and each Lender authorizes Agent to, enter into all Loan Documents to which Agent is intended to be a party and accept the Guaranty and Security Agreement. Any action taken by Agent in accordance with the provisions of the Loan Documents, and the exercise by Agent of any rights or remedies set forth therein, together with all other powers reasonably incidental thereto, shall be authorized by and binding upon all Lenders (an Bank Product Providers). Without limiting the generality of the foregoing, Agent shall have the sole and exclusive authority to (a) act as the disbursing and collecting agent for Lenders with respect to all payments and collections arising in connection with the Loan Documents; (b) execute and deliver as Agent each Loan Document, including any intercreditor or subordination agreement, and accept delivery of each Loan Document; (c) act as collateral agent for the Lenders for purposes of perfecting and administering Liens under the Loan Documents, and for all other purposes stated therein; (d) manage, supervise or otherwise deal with Collateral; and (e) take any Enforcement Action or otherwise exercise any rights or remedies with respect to any Collateral or under any Loan Documents, applicable law or otherwise. Agent alone shall be authorized to determine eligibility and applicable advance rates under the Borrowing Base, whether to impose or release any reserve, or whether any conditions to funding or issuance of a Letter of Credit have been satisfied, which determinations and judgments, if exercised in good faith, shall exonerate Agent from liability to any Lender, Bank Product Provider or other Person for any error in judgment.

(b)    **Duties**. The title of "Agent" is used solely as a matter of market custom and the duties of Agent are administrative in nature only.  The Agent shall not have any duties except those expressly set forth in the Loan Documents, and in no event does Agent have any agency, fiduciary or implied duty to or relationship with any Lender, Bank Product Provider or other Person by reason of any Loan Document or related transaction. The conferral upon Agent of any right shall not imply a duty to exercise such right, unless instructed to do so by Lenders in accordance with this Agreement.

(c)    **Agent Professionals**. The Agent may perform its duties through agents and employees. The Agent may consult with and employ Agent Professionals, and shall be entitled to act upon, and shall be fully protected in any action taken in good faith reliance upon, any advice given by an Agent Professional. The Agent shall not be responsible for the negligence or misconduct of any agents, employees or Agent Professionals selected by it with reasonable care.

(d)    **Instructions of Required Lenders**. The rights and remedies conferred upon Agent under the Loan Documents may be exercised without the necessity of joining any other party, unless required by applicable law. In determining compliance with a condition for any action hereunder, including satisfaction of any condition in <u>Section 3</u>, Agent may presume that the condition is satisfactory to a Lender and Bank Product Provider unless Agent has received written notice to the contrary from such Lender or Bank Product Provider before Agent takes the action. Agent may request instructions from Required Lenders or other Lenders or Bank Product Providers with respect to any act (including the failure to act) in connection with any Loan Documents or Collateral, and may seek assurances to its reasonable satisfaction from Lenders or Bank Product Providers of their indemnification obligations against Applicable Claims that could be incurred by Agent. Agent may refrain from any act until it has received such instructions or assurances, and shall not incur liability to any Person by reason of so

68

refraining. Instructions of Required Lenders shall be binding upon all Lenders (and Bank Product Providers), and no Lender (or Bank Product Provider) shall have any right of action whatsoever against Agent as a result of Agent acting or refraining from acting pursuant to instructions of Required Lenders. Notwithstanding the foregoing, instructions by and consent of specific parties shall be required to the extent provided in Section 14.1. In no event shall Agent be required to take any action that it determines in its discretion is contrary to applicable law or any Loan Documents or could subject any Agent-Related Person to liability.

15.2    Liability of Agent. The Agent shall not be liable to any Lender or Bank Product Provider for any action taken or omitted to be taken under the Loan Documents, except for losses directly and solely caused by its bad faith, gross negligence or willful misconduct. The Agent shall not assume any responsibility for any failure or delay in performance or any breach by any Loan Party, Lender or Bank Product Provider of any obligations under the Loan Documents. The Agent shall not make any express or implied representation, warranty or guarantee to Lenders or Bank Product Providers with respect to any Obligations, Collateral, Liens, Loan Documents or Loan Party. No Agent-Related Person shall be responsible to Lender (and Bank Product Providers) for any recitals, statements, information, representations or warranties contained in any Loan Documents or Borrower Materials; the execution, validity, genuineness, effectiveness or enforceability of any Loan Documents; the genuineness, enforceability, collectability, value, sufficiency, location or existence of any Collateral, or the validity, extent, perfection or priority of any Lien therein; the validity, enforceability or collectability of any Obligations; or the assets, liabilities, financial condition, results of operations, business, creditworthiness or legal status of any Loan Party or Account Debtor. No Agent-Related Person shall have any obligation to any Lender or Bank Product Provider to ascertain or inquire into the existence of any Default or Event of Default, the observance by any Loan Party of any terms of the Loan Documents, or the satisfaction of any conditions precedent contained in any Loan Documents.

15.3    Reliance by Agent. The Agent shall be entitled to rely, and shall be fully protected in relying, upon any certification, notice or other communication (including those by telephone, telex, telegram, telecopy or e-mail) believed by it to be genuine and correct and to have been signed, sent or made by the proper Person. The Agent shall have a reasonable and practicable amount of time to act upon any instruction, notice or other communication under any Loan Document, and shall not be liable for any delay in acting.

15.4    Notice of Default or Event of Default. Agent shall not be deemed to have knowledge of any Default or Event of Default, or of any failure to satisfy any conditions in Section 3, unless it has received written notice from a Borrower or Required Lenders specifying the occurrence and nature thereof. If any Lender acquires knowledge of a Default, Event of Default or failure of such conditions, it shall promptly notify Agent and the other Lenders thereof in writing. Each Lender (and Bank Product Provider) agrees that, except as otherwise provided in any Loan Documents or with the written consent of Agent and Required Lenders, it will not take any Enforcement Action, accelerate Obligations (other than Bank Product Obligations) or assert any rights relating to any Collateral.

15.5    Due Diligence and Non-Reliance. Each Lender acknowledges and agrees that it has, independently and without reliance upon Agent or any other Lenders, and based upon such documents, information and analyses as it has deemed appropriate, made its own credit analysis of each Loan Party and its own decision to enter into this Agreement and to fund Loans and participate in Letters of Credit hereunder. Each Lender (and Bank Product Provider) has made such inquiries as it feels necessary concerning the Loan Documents, Collateral and Loan Parties. Each Lender (and Bank Product Provider) acknowledges and agrees that the other Lenders (and Bank Product Providers) have made no representations or warranties concerning any Loan Party, any Collateral or the legality, validity, sufficiency or enforceability of any Loan Documents or Obligations. Each Lender (and Bank Product Provider) will, independently and without reliance upon any other Lender (or Bank Product Provider), and based upon such financial statements, documents and information as it deems appropriate at the time, continue to

69

make and rely upon its own credit decisions in making Loans and participating in Letters of Credit, and in taking or refraining from any action under any Loan Documents. Except for notices, reports and other information expressly requested by a Lender, Agent shall have no duty or responsibility to provide any Lender (or Bank Product Provider) with any notices, reports or certificates furnished to Agent by any Loan Party or any credit or other information concerning the affairs, financial condition, business or properties of any Loan Party (or any of its Affiliates) which may come into possession of any Agent-Related Person.

15.6    Indemnification. EACH LENDER (AND BANK PRODUCT PROVIDER) SEVERALLY SHALL INDEMNIFY AND HOLD HARMLESS AGENT-RELATED PERSONS AND ISSUING BANK INDEMNITEES, TO THE EXTENT NOT REIMBURSED BY LOAN PARTIES (AND WITHOUT LIMITING THEIR OBLIGATION TO DO SO), ON A PRO RATA BASIS, AGAINST ALL APPLICABLE CLAIMS THAT MAY BE INCURRED BY OR ASSERTED AGAINST ANY SUCH INDEMNIFIED PERSON, PROVIDED THAT ANY APPLICABLE CLAIM AGAINST AN AGENT-RELATED PERSON RELATES TO OR ARISES FROM ITS ACTING AS OR FOR AGENT (IN THE CAPACITY OF AGENT); PROVIDED THAT NO LENDER SHALL BE REQUIRED TO INDEMNIFY ANY AGENT-RELATED PERSON OR ISSUING BANK INDEMNITEE FOR APPLICABLE CLAIMS THAT A COURT OF COMPETENT JURISDICTION HAS FINALLY DETERMINED TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH AGENT-RELATED PERSON OR ISSUING BANK INDEMNITEE. In Agent's discretion, it may reserve for any Applicable Claims made against an Agent-Related Person or Issuing Bank Indemnitee, and may satisfy any judgment, order or settlement relating thereto, from proceeds of Collateral prior to making any distribution of Collateral proceeds to Lenders (and Bank Product Providers). If Agent is sued by any receiver, trustee or other Person for any alleged preference or fraudulent transfer, then any monies paid by Agent in settlement or satisfaction of such proceeding, together with all interest, costs and expenses (including attorneys' fees) incurred in the defense of same, shall be promptly reimbursed to Agent by each Lender (and Bank Product Provider) to the extent of its Pro Rata Share.

15.7    Individual Capacities. As a Lender, Bank of America shall have the same rights and remedies under the Loan Documents as any other Lender, and the terms "Lenders", "Required Lenders", "Supermajority Lenders" or any similar term shall include Bank of America in its capacity as a Lender. Agent, Lenders and their Affiliates may accept deposits from, lend money to, provide Bank Products to, act as financial or other advisor to, and generally engage in any kind of business with, Loan Parties and their Affiliates, as if they were not Agent or Lenders hereunder, without any duty to account therefor to any Lender (or Bank Product Provider). In their individual capacities, Agent, Lenders and their Affiliates may receive information regarding Loan Parties, their Affiliates and their Account Debtors (including information subject to confidentiality obligations), and shall have no obligation to provide such information to any Lender (or Bank Product Provider).

15.8    Successor Agent.

(a)    Resignation; Successor Agent. Agent may resign at any time by giving at least 30 days written notice thereof to Lenders and Borrowers. Required Lenders may appoint a successor to replace the resigning Agent, which successor shall be (a) a Lender or an Affiliate of a Lender; or (b) a financial institution reasonably acceptable to Required Lenders and, in either case, provided no Event of Default exists, reasonably acceptable to Borrowers. If no successor agent is appointed prior to the effective date of Agent's resignation, then Agent may appoint a successor agent that is a financial institution acceptable to it (which shall be a Lender unless no Lender accepts the role) or in the absence of such appointment, Required Lenders shall on such date assume all rights and duties of Agent hereunder, provided that Agent shall consult with Parent prior to such appointment. Upon acceptance by any successor Agent of its appointment hereunder, such successor Agent shall thereupon succeed to and become vested with all the powers and duties of the retiring Agent without further act. On the effective date of its resignation, the retiring Agent shall be discharged from its duties and obligations hereunder in its capacity as Agent but shall continue to have all rights and protections under the Loan Documents with respect to actions taken or omitted to be taken by it while Agent, including the indemnification set forth in Sections 15.6 and 10.3, and all rights and protections under this Section 15. Any successor to Bank of

70

America by merger or acquisition of stock or this loan shall continue to be Agent hereunder without further act on the part of any Lender (or Bank Product Provider) or Loan Party.

(b)    Co-Collateral Agent. If appropriate under applicable law, Agent may appoint a Person to serve as a co-collateral agent or separate collateral agent under any Loan Document. Each right, remedy and protection intended to be available to Agent under the Loan Documents shall also be vested in such agent. Lenders (and Bank Product Providers) shall execute and deliver any instrument or agreement that Agent may request to effect such appointment. If any such agent shall die, dissolve, become incapable of acting, resign or be removed, then all the rights and remedies of the agent, to the extent permitted by applicable law, shall vest in and be exercised by Agent until appointment of a new agent.

15.9    Agreements Regarding Collateral and Borrower Materials.

(a)    Lien Releases; Care of Collateral. Lenders (and Bank Product Providers) authorize Agent to release any Lien with respect to any Collateral (a) upon payment in full of the Obligations (other than unasserted contingent obligations); (b) that is the subject of a disposition or Lien that Borrowers certify in writing is a Permitted Disposition or any other disposition permitted by the Loan Documents or a Permitted Lien entitled to priority over Agent's Liens (and Agent may rely conclusively on any such certificate without further inquiry); (c) that does not constitute a material part of the Collateral; (d) that is owned by a Loan Party if such Loan Party becomes an Excluded Subsidiary; (e) if required or permitted under the terms of any other Loan Documents, including any intercreditor agreement, or (f) subject to Section 14.1, with the consent of Required Lenders. Lenders (and Bank Product Providers) authorize Agent to subordinate its Liens to any Permitted Purchase Money Indebtedness or other Lien entitled to priority hereunder. The Agent shall not have any obligation to assure that any Collateral exists or is owned by a Loan Party, or is cared for, protected or insured, nor to assure that Agent's Liens have been properly created, perfected or enforced, or are entitled to any particular priority, nor to exercise any duty of care with respect to any Collateral.

(b)    Possession of Collateral. Agent, Lenders and Bank Product Providers appoint each Lender as agent (for the benefit of Lender (and Bank Product Providers)) for the purpose of perfecting Liens in any Collateral held or controlled by such Lender, to the extent such Liens are perfected by possession or control. If any Lender obtains possession or control of any Collateral, it shall notify Agent thereof and, promptly upon Agent's request, deliver such Collateral to Agent or otherwise deal with it in accordance with Agent's instructions.

(c)    Agent shall promptly provide to Lenders, when complete, any field examination, audit, appraisal report or valuation prepared for Agent with respect to any Loan Party or Collateral ("Report") and other Borrower Materials received pursuant to Schedule 5.1 or 5.2. Reports and other Borrower Materials may be made available to Lenders by providing access to them on the Platform, but Agent shall not be responsible for system failures or access issues that may occur from time to time. Each Lender agrees (a) that Reports are not intended to be comprehensive audits or examinations, and that Agent or any other Person performing an audit or examination will inspect only limited information and will rely significantly upon Borrowers' books, records and representations; (b) that Agent makes no representation or warranty as to the accuracy or completeness of any Borrower Materials and shall not be liable for any information contained in or omitted from any Borrower Materials, including any Report; and (c) to keep all Borrower Materials confidential in accordance with Section 18.9(a). Each Lender shall indemnify and hold harmless Agent and any other Person preparing a Report from any action such Lender may take as a result of or any conclusion it may draw from any Borrower Materials, as well as from any Applicable Claims arising as a direct or indirect result of Agent furnishing same to such Lender, via the Platform or otherwise.

15.10    Ratable Sharing.

71

(a)    If any Lender obtains any payment or reduction of any Obligation, whether through set-off or otherwise, in excess of its ratable share of such Obligation, such Lender shall forthwith purchase from Lenders (and Bank Product Providers) participations in the affected Obligation as are necessary to share the excess payment or reduction on a pro rata basis or in accordance with Section 2.4(b)(iv). If any of such payment or reduction is thereafter recovered from the purchasing Lender, the purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest. Notwithstanding the foregoing, if a Defaulting Lender obtains a payment or reduction of any Obligation, it shall immediately turn over the full amount thereof to Agent for application under Section 2.3(i) and it shall provide a written statement to Agent describing the Obligation affected by such payment or reduction. No Lender shall set off against an Agent Account without Agent's prior consent.

15.11    Remittance of Payments and Collections.

(a)    <u>Remittances Generally</u>. All payments by any Lender to Agent shall be made by the time and on the day set forth in this Agreement, in immediately available funds. If no time for payment is specified or if payment is due on demand by Agent and request for payment is made by Agent by 1:00 p.m. on a Business Day, payment shall be made by Lender not later than 3:00 p.m. on such day, and if request is made after 1:00 p.m., then payment shall be made by 11:00 a.m. on the next Business Day.  Payment by Agent to any Lender (or Bank Product Provider) shall be made by wire transfer, in the type of funds received by Agent. Any such payment shall be subject to Agent's right of offset for any amounts due from such payee under the Loan Documents.

(b)    <u>Failure to Pay</u>. If any Lender (or Bank Product Provider) fails to pay any amount when due by it to Agent pursuant to the terms hereof, such amount shall bear interest, from the due date until paid in full, at the greater of the Federal Funds Rate or the rate determined by Agent as customary for interbank compensation for two (2) Business Days and thereafter at the Default Rate for Base Rate Loans. In no event shall Borrowers be entitled to credit for any interest paid by a Lender (or Bank Product Provider) to Agent, nor shall a Defaulting Lender be entitled to interest on amounts held by Agent pursuant to Section 2.3(i).

(c)    <u>Recovery of Payments</u>. If Agent pays an amount to a Lender (or Bank Product Provider) in the expectation that a related payment will be received by Agent from a Loan Party and such related payment is not received, then Agent may recover such amount from the Lender (or Bank Product Provider). If Agent determines that an amount received by it must be returned or paid to a Loan Party or other Person pursuant to applicable law or otherwise, then Agent shall not be required to distribute such amount to any Lender (or Bank Product Provider). If any amounts received and applied by Agent to Obligations held by a Lender (or Bank Product Provider) are later required to be returned by Agent pursuant to applicable law, such Lender (or Bank Product Provider) shall pay to Agent, on demand, its share of the amounts required to be returned.

15.12    Titles. Each Lender, other than Bank of America, that is designated in connection with this credit facility as a "Joint Lead Arranger" or "Joint Bookrunner" of any kind shall have no right or duty under any Loan Documents other than those applicable to all Lenders, and shall in no event have any fiduciary duty to any Lender (or any Bank Product Provider).

15.13    Bank of Product Providers. Each Bank Product Provider, by delivery of a notice (including by way of delivery of a Bank Product Provider Agreement) to Agent of a Bank Product, agrees to be bound by the Loan Documents, including Section 2.4(b)(iv), Section 18.5, Section 18.9(c) and Section 15. Each Bank Product Provider shall indemnify and hold harmless Agent-Related Persons, to the extent not reimbursed by Loan Parties, against all Applicable Claims that may be incurred by or asserted against any Agent-Related Person in connection with such provider's Bank Product Obligations.

15.14    No Third Party Beneficiaries. This Section 15 is an agreement solely among Lender (and Bank Product Providers) and Agent, and shall survive payment in full of the Obligations. This Section 15

72

does not confer any rights or benefits upon Borrowers or any other Person. As between Borrowers and Agent, any action that Agent may take under any Loan Documents or with respect to any Obligations shall be conclusively presumed to have been authorized and directed by Lenders (and Bank Product Providers).

16.    **[RESERVED]**

17.    **WITHHOLDING TAXES.**

17.1    Payments. All payments made by any Loan Party hereunder or under any note or other Loan Document will be made without setoff, counterclaim, or other defense. In addition, all such payments will be made free and clear of, and without deduction or withholding for, any Taxes, except as required by applicable law. If any applicable law requires any deduction or withholding of an Indemnified Tax, then the applicable Loan Party agrees (subject to Section 2.15 of this Agreement) to pay the full amount of such Indemnified Taxes and such additional amounts as may be necessary so that every payment of all amounts due under this Agreement, any note, or Loan Document, including any amount paid pursuant to this Section 17.1 after withholding or deduction for or on account of any Indemnified Taxes, will not be less than the amount provided for herein. The applicable Loan Party will furnish to Agent as promptly as possible after the date the payment of any Indemnified Tax is due pursuant to applicable law, certified copies of Tax receipts evidencing such payment by the applicable Loan Party. The applicable Loan Party agrees to timely pay any present or future stamp, value added or documentary taxes or any other excise or property taxes, charges, or similar levies that arise from any payment made hereunder or from the execution, delivery, performance, recordation, or filing of, or otherwise with respect to this Agreement or any other Loan Document in accordance with applicable law, except any such taxes with respect to Agent, any Lender, Participant or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder imposed as a result of a present or former connection between such Agent, Lender, Participant or such other recipient and the jurisdiction imposing such tax that are taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 14.2).

17.2    Exemptions.

(a)    Any Lender or Participant that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under this Agreement or any other Loan Document shall deliver to Agent and Parent (or, in the case of a Participant, to the Lender granting the participation only), at the time or times prescribed by applicable law and at the time or times reasonably requested by Agent or Parent, such properly completed and executed documentation reasonably requested by Agent or Parent or prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender or Participant, if reasonably requested by Agent or Parent, shall deliver to Agent and Parent (or, in the case of a Participant, to the Lender granting the participation only) such other documentation prescribed by applicable law or reasonably requested by Agent or Parent as will enable Agent or Parent to determine whether or not such Lender or Participant is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 17.2(c) and paragraphs (a)(i) through (a)(iv) of this Section 17.2(a)) shall not be required if in the Lender's or the Participant's reasonable judgment such completion, execution or submission would subject such Lender or Participant to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender or Participant. Without limiting the generality of the foregoing:

(i)    if such Lender or Participant is entitled to claim an exemption from United States withholding Tax pursuant to the portfolio interest exception under Sections 881(c) or 871(h) of the IRC (the "Portfolio Interest Exemption"), (A) a statement of the Lender or Participant (a "Tax Status Certificate"), signed under penalty of perjury, in form and substance reasonably satisfactory to Agent and

Parent that it is not (1) a "bank" as described in Section 881(c)(3)(A) of the IRC, (2) a 10 percent (10.0%) shareholder of Parent (within the meaning of Section 881(c)(3)(B) of the IRC), or (3) a controlled foreign corporation related to Borrowers within the meaning of Section 881(c)(3)(C) of the IRC, and (B) a properly completed and executed IRS Form W-8BEN or W-8BEN-E, as applicable, or Form W-8IMY (with proper attachments);

(ii)    if such Lender or Participant is entitled to claim an exemption from, or a reduction of, withholding Tax under a United States tax treaty, a properly completed and executed copy of IRS Form W-8BEN or W-8BEN-E, as applicable;

(iii)    if such Lender or Participant is entitled to claim that interest paid under this Agreement is exempt from United States withholding Tax because it is effectively connected with a United States trade or business of such Lender, a properly completed and executed copy of IRS Form W-8ECI;

(iv)    if such Lender or Participant is entitled to claim that interest paid under this Agreement is exempt from United States withholding Tax because such Lender or Participant serves as an intermediary, a properly completed and executed copy of IRS Form W-8IMY (with proper attachments);

(v)    where such Lender or Participant is a partnership (for U.S. federal income tax purposes) or otherwise not a beneficial owner (e.g., where such Lender has sold a participation), IRS Form W-8IMY accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, or IRS Form W-9 (or, in each case, any successor thereto) and all required supporting documentation from each beneficial owner, as applicable (including, where one or more of the underlying beneficial owner(s) is claiming the benefits of the Portfolio Interest Exemption, a Tax Status Certificate of such beneficial owner(s) (provided that, if the Lender is a partnership and not a participating Lender, the Tax Status Certificate from the beneficial owner(s) may be provided by such Lender on behalf of the beneficial owner(s))); or

(vi)    a properly completed and executed copy of any other form or forms, including IRS Form W-9, as may be required under the IRC or other laws of the United States as a condition to exemption from, or reduction of, United States withholding or backup withholding Tax.

(b)    Any Lender or Participant that is not a United States person within the meaning of Section 7701(a)(3) of the IRC shall, to the extent it is legally entitled to do so, deliver to Agent and Parent (or, in the case of a Participant, to the Lender granting the participation only) (in such number of copies as shall be requested by the recipient) on or about the date on which such Lender or Participant becomes a Lender or Participant under this Agreement (and from time to time thereafter upon the reasonable request of Agent or Parent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit Agent or Parent to determine the withholding or deduction required to be made.

(c)    Each Lender or Participant shall provide new forms (or successor forms) upon the expiration or obsolescence of any previously delivered forms (or promptly notify Agent and Parent in writing that such Lender or Participant is not legally eligible to do so) and to notify promptly Agent and Parent (or, in the case of a Participant, the Lender granting the participation only) of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

(d)    If a payment made to a Lender or Participant under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender or Participant were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the IRC, as applicable), such Lender shall deliver to Parent and the Agent, or, in the case of

74

a Participant, to the Lender granting the participation, at the time or times prescribed by law and at such time or times reasonably requested by Parent or the Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the IRC) and such additional documentation reasonably requested by Parent or the Agent as may be necessary for Parent and the Agent to comply with their obligations under FATCA and to determine that such Lender or Participant has complied with its obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this Section 17.2(d), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

17.3    Reductions.

(a)    If a Lender or a Participant is subject to an applicable withholding Tax, Borrowers or Agent (or, in the case of a Participant, the Lender granting the participation) may withhold from any payment to such Lender or such Participant an amount equivalent to the applicable withholding Tax. If the forms or other documentation required by Section 17.2(a) or 17.2(c) are not delivered to Agent and Parent (or, in the case of a Participant, to the Lender granting the participation), then Agent or Borrowers (or, in the case of a Participant, to the Lender granting the participation) may withhold from any payment to such Lender or such Participant not providing such forms or other documentation an amount equivalent to the applicable withholding Tax.

(b)    Each Loan Party shall (subject to Section 2.15 of this Agreement) indemnify Lender or Agent, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 17) payable or paid by such Lender or Agent or required to be withheld or deducted from a payment due from or on account of any obligation of any Loan Party to such Lender or Agent and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the applicable Loan Party by such Lender (with a copy to Agent), or by the Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(c)    Each Lender shall severally indemnify Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 17) attributable to such Lender (but only to the extent that any Loan Party has not already indemnified Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 13.1(i) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by Agent shall be conclusive absent manifest error. Each Lender hereby authorizes Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by Agent to the Lender from any other source against any amount due to the Agent under this Section 17.3(c).

17.4    Refunds. If Agent or a Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes for which it has received additional amounts pursuant to this Section 17, so long as no Default or Event of Default has occurred and is continuing, it shall pay over such refund to the applicable Loan Party (but only to the extent of payments made, or additional amounts paid, by the applicable Loan Party under this Section 17 with respect to Taxes giving rise to such refund), net of all out-of-pocket expenses of Agent or such Lender and without interest (other than any interest paid by the applicable Governmental Authority with respect to such a refund); provided, that the applicable Loan Party, upon the request of Agent or such Lender, agrees to repay the

75

amount paid over to the applicable Loan Party (*plus* any penalties, interest or other charges imposed by the applicable Governmental Authority, other than such penalties, interest or other charges imposed as a result of the bad faith, willful misconduct or gross negligence of Agent hereunder) to Agent or such Lender in the event Agent or such Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this <u>Section 17.4</u>, in no event will the Agent or Lender be required to pay any amount to a Loan Party pursuant to this <u>Section 17.4</u> the payment of which would place Agent or Lender in a less favorable net after-Tax position than the Lender or Agent would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. Notwithstanding anything in this Agreement to the contrary, this <u>Section 17.4</u> shall not be construed to require Agent or any Lender to make available its Tax returns (or any other information which it deems confidential) to the applicable Loan Party or any other Person.

18.    **GENERAL PROVISIONS.**

18.1    Effectiveness. This Agreement shall be binding and deemed effective when executed by each Borrower, Agent and each Lender whose signature is provided for on the signature pages hereof.

18.2    Section Headings. Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

18.3    Interpretation. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against the Lender Group or any Borrower, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

18.4    Severability of Provisions. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

18.5    Bank Product Providers.

(a)    Each Bank Product Provider in its capacity as such shall be deemed a third party beneficiary hereof and of the provisions of the other Loan Documents for purposes of any reference in a Loan Document to the parties for whom Agent is acting. Agent hereby agrees to act as agent for such Bank Product Providers and, by virtue of entering into a Bank Product Agreement, the applicable Bank Product Provider shall be automatically deemed to have appointed Agent as its agent and to have accepted the benefits of the Loan Documents. It is understood and agreed that the rights and benefits of each Bank Product Provider under the Loan Documents consist exclusively of such Bank Product Provider's being a beneficiary of the Liens and security interests (and, if applicable, guarantees) granted to Agent and the right to share in payments and collections out of the Collateral as more fully set forth herein. In addition, each Bank Product Provider, by virtue of entering into a Bank Product Agreement, shall be automatically deemed to have agreed that Agent shall have the right, but shall have no obligation, to establish, maintain, relax, or release reserves in respect of the Bank Product Obligations and that if reserves are established there is no obligation on the part of Agent to determine or insure whether the amount of any such reserve is appropriate or not. In connection with any such distribution of payments or proceeds of Collateral, Agent shall be entitled to assume no amounts are due or owing to any Bank Product Provider unless such Bank Product Provider has provided a written certification (setting forth a reasonably detailed calculation) to Agent as to the amounts that are due and owing to it and such written certification is received by Agent a reasonable period of time prior to the making of such distribution. Agent shall have no obligation to calculate the amount due and payable with respect to any Bank Products, but may rely upon the written certification of the amount due and payable from the applicable

76

Bank Product Provider. In the absence of an updated certification, Agent shall be entitled to assume that the amount due and payable to the applicable Bank Product Provider is the amount last certified to Agent by such Bank Product Provider (including in any Bank Product Provider Agreement) as being due and payable (less any distributions made to such Bank Product Provider on account thereof). The Borrowers may obtain Bank Products from any Bank Product Provider, although Borrowers are not required to do so. Each Borrower acknowledges and agrees that no Bank Product Provider has committed to provide any Bank Products and that the providing of Bank Products by any Bank Product Provider is in the sole and absolute discretion of such Bank Product Provider. Notwithstanding anything to the contrary in this Agreement or any other Loan Document, no provider or holder of any Bank Product shall have any voting or approval rights hereunder (or be deemed a Lender) solely by virtue of its status as the provider or holder of such agreements or products or the Obligations owing thereunder, nor shall the consent of any such provider or holder be required (other than in their capacities as Lenders, to the extent applicable) for any matter hereunder or under any of the other Loan Documents, including as to any matter relating to the Collateral or the release of Collateral or Guarantors.

(b)    At any time prior to or within ten (10) days after the date of the provision of the applicable Bank Product to the Borrowers or their Subsidiaries, or in the case of a Bank Product in effect on the ~~Closing~~Second Amendment Effective  Date, at least ~~five~~two (~~5~~2) Business Days prior to the ~~Closing~~Second Amendment Effective  Date, if the applicable Borrower or Subsidiary and the applicable Bank Product Provider desire that the monetary obligations in respect of such Bank Product Agreement be treated as "Bank Product Obligations" or, in the case of transactions under a Hedge Agreement, "Pari Secured Hedge Obligations" hereunder with rights in respect of payment of proceeds of the Collateral in accordance with the waterfall provisions set forth in Section 2.4(b)(iv), the applicable Bank Product Provider shall provide to the Agent an executed Bank Product Provider Agreement (to be acknowledged by the Agent) that specifies, (i) with respect to each Bank Product Provider Agreement that is a Hedge Agreement, whether such Hedge Agreement is to be a "Pari Secured Hedge Agreement" and treated as *pari passu* in priority of payment with the principal outstanding of the Revolving Loans in accordance with clause (K) of the waterfall provisions set forth in Section 2.4(b)(iv), so long as such Hedge Agreement is with any counterparty that is a Hedge Provider at the time such Hedge Agreement is entered into and (ii) the maximum amount of such Bank Product Obligations to be secured by the Collateral as of the date of such Bank Product Provider Agreement (which maximum amount may be updated by further notice from the applicable Bank Product Provider to the Agent from time to time). If, in any Bank Product Provider Agreement, the applicable Hedge Provider shall fail to include that a Hedge Agreement shall constitute a Pari Secured Hedge Agreement, then such Hedge Agreement shall not constitute a Pari Secured Hedge Agreement and shall be afforded the priority of payment of proceeds of the Collateral under Section 2.4(b)(iv)(L) of the waterfall provisions. If, at any time, a Revolving Lender ceases to be a Revolving Lender under the Agreement, then, from and after the date on which it ceases to be a Revolving Lender thereunder, neither it nor any of its Affiliates shall constitute Bank Product Providers and the obligations with respect to Bank Product Agreements entered into with such former Revolving Lender or any of its Affiliates shall no longer constitute Bank Product Obligations and, if applicable, Pari Secured Hedge Obligations. If, at any time, the aggregate marked to market exposure of Pari Secured Hedge Obligations exceeds the Available Hedge Amount, then the portion of the marked to market exposure of each Pari Secured Hedge Obligation that is in excess of the Available Hedge Amount shall, for all purposes of  Section 2.4(b)(iv), be treated as and deemed to be Obligations of a Bank Product Provider payable under clause (L) of Section 2.4(b)(iv) and shall be paid in accordance with the last paragraph of  Section 2.4(b)(iv).

18.6    Debtor-Creditor Relationship. The relationship between the Lenders and Agent, on the one hand, and the Loan Parties, on the other hand, is solely that of creditor and debtor. No member of the Lender Group has (or shall be deemed to have) any fiduciary relationship or duty to any Loan Party arising out of or in connection with the Loan Documents or the transactions contemplated thereby, and there is no agency or joint venture relationship between the members of the Lender Group, on the one hand, and the Loan Parties, on the other hand, by virtue of any Loan Document or any transaction

77

contemplated therein. Each Lender and their affiliates may have economic interests that conflict with those of the Borrower.

18.7    Counterparts; Electronic Execution. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.  The foregoing shall apply to each other Loan Document mutatis mutandis.

18.8    Revival and Reinstatement of Obligations; Certain Waivers. If any member of the Lender Group or any Bank Product Provider repays, refunds, restores, or returns in whole or in part, any payment or property (including any proceeds of Collateral) previously paid or transferred to such member of the Lender Group or such Bank Product Provider in full or partial satisfaction of any Obligation or on account of any other obligation of any Loan Party under any Loan Document or any Bank Product Agreement, because the payment, transfer, or the incurrence of the obligation so satisfied is asserted or declared to be void, voidable, or otherwise recoverable under any applicable law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent transfers, preferences, or other voidable or recoverable obligations or transfers (each, a "Voidable Transfer"), or because such member of the Lender Group or Bank Product Provider elects to do so on the reasonable advice of its counsel in connection with a claim that the payment, transfer, or incurrence is or may be a Voidable Transfer, then, as to any such Voidable Transfer, or the amount thereof that such member of the Lender Group or Bank Product Provider elects to repay, restore, or return (including pursuant to a settlement of any claim in respect thereof), and as to all reasonable costs, expenses, and attorneys' fees of such member of the Lender Group or Bank Product Provider related thereto, (1) the liability of the Loan Parties with respect to the amount or property paid, refunded, restored, or returned will automatically and immediately be revived, reinstated, and restored and will exist and (2) Agent's Liens securing such liability shall be effective, revived, and remain in full force and effect, in each case, as fully as if such Voidable Transfer had never been made.  If, prior to any of the foregoing, (a) Agent's Liens shall have been released or terminated or (b) any provision of this Agreement shall have been terminated or cancelled, Agent's Liens, or such provision of this Agreement, shall be reinstated in full force and effect and such prior release, termination, cancellation or surrender shall not diminish, release, discharge, impair or otherwise affect the obligation of any Loan Party in respect of such liability or any Collateral securing such liability.

18.9    Confidentiality.

(a)    Agent and Lenders each individually (and not jointly or jointly and severally) agree that material, non-public information regarding Parent and its Subsidiaries, their operations, assets, and existing and contemplated business plans ("Confidential Information") shall be treated by Agent and the Lenders in a confidential manner, and shall not be disclosed by Agent and the Lenders to Persons who are not parties to this Agreement, except: (i) to attorneys for and other advisors, accountants, auditors, and consultants to any member of the Lender Group and, to employees, directors and officers of any member of the Lender Group (the Persons in this clause (i) and clause (ii) below, "Lender Group Representatives") on a "need to know" basis in connection with this Agreement and the transactions contemplated hereby and on a confidential basis, (ii) to Subsidiaries and Affiliates of any member of the Lender Group (including the Bank Product Providers) and any of their attorneys for and other advisors, accountants, auditors and consultants to any member of the Lender Group and to employees, directors and officers on a "need to know" basis in connection with this Agreement and the transactions contemplated hereby and on a confidential basis, provided that any such Person shall have agreed to receive such information hereunder subject to the terms of this  Section 18.9, (iii) as may be required by

78

regulatory authorities so long as such authorities are informed of the confidential nature of such information, (iv) as may be required by statute, decision, or judicial or administrative order, rule, or regulation; provided that (x) prior to any disclosure under this clause (iv), the disclosing party agrees to provide Borrowers with prior notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior notice to Borrowers pursuant to the terms of the applicable statute, decision, or judicial or administrative order, rule, or regulation and (y) any disclosure under this clause (iv) shall be limited to the portion of the Confidential Information as may be required by such statute, decision, or judicial or administrative order, rule, or regulation, (v) as may be agreed to in advance in writing by Borrowers, (vi) as requested or required by any Governmental Authority pursuant to any subpoena or other legal process, provided, that, (x) prior to any disclosure under this clause (vi) the disclosing party agrees to provide Borrowers with prior written notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior written notice to Borrowers pursuant to the terms of the subpoena or other legal process and (y) any disclosure under this clause (vi) shall be limited to the portion of the Confidential Information as may be required by such Governmental Authority pursuant to such subpoena or other legal process, (vii) as to any such information that is or becomes generally available to the public (other than as a result of prohibited disclosure by Agent or the Lenders or the Lender Group Representatives), (viii) in connection with any assignment, participation or pledge of any Lender's interest under this Agreement, provided that prior to receipt of Confidential Information any such assignee, participant, or pledgee shall have agreed in writing to receive such Confidential Information either subject to the terms of this Section 18.9 or pursuant to confidentiality requirements substantially similar to those contained in this Section 18.9 (and such Person may disclose such Confidential Information to Persons employed or engaged by them as described in clause (i) above), (ix) in connection with any litigation or other adversary proceeding involving parties hereto which such litigation or adversary proceeding involves claims related to the rights or duties of such parties under this Agreement or the other Loan Documents; provided, that, prior to any disclosure to any Person (other than any Loan Party, Agent, any Lender, any of their respective Affiliates, or their respective counsel) under this clause (x) with respect to litigation involving any Person (other than any Borrower, Agent, any Lender, any of their respective Affiliates, or their respective counsel), the disclosing party agrees to provide Borrowers with prior written notice thereof, and (x) in connection with, and to the extent reasonably necessary for, the exercise of any secured creditor remedy under this Agreement or under any other Loan Document. In addition, the Agent and the Lenders may disclose the existence of this Agreement and publicly available information about this Agreement to (i) any actual or prospective direct or indirect counterparty (or its advisors) to any swap or derivative transaction relating to the Borrowers or (ii) market data collectors, similar service providers to the lending industry, and service providers to the Agent and the Lenders in connection with the administration and management of this Agreement.

(b)    Anything in this Agreement to the contrary notwithstanding, Agent may disclose customary information concerning the terms and conditions of this Agreement and the other Loan Documents to loan syndication and pricing reporting services or in its marketing or promotional materials, with such information to consist of deal terms and other information customarily found in such publications or marketing or promotional materials and may otherwise use the name, logos, and other insignia of any Borrower or the other Loan Parties and the Revolver Commitments provided hereunder in any "tombstone" or other advertisements, on its website or in other marketing materials of the Agent.

(c)    The Loan Parties hereby acknowledge that Agent or its Affiliates may make available to the Lenders materials or information provided by or on behalf of Borrowers hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks, SyndTrak or another similar electronic system (the "Platform") and certain of the Lenders may be " public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Loan Parties or their securities) (each, a "Public Lender"). The Loan Parties shall be deemed to have authorized Agent and its Affiliates and the Lenders to treat Borrower Materials marked "PUBLIC" or otherwise at any time filed with the SEC as not containing any material non-public information with respect to the Loan Parties or their securities for purposes of United States federal and state securities laws. All Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as

79

"Public Investor" (or another similar term). Agent and its Affiliates and the Lenders shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" or that are not at any time filed with the SEC as being suitable only for posting on a portion of the Platform not marked as "Public Investor" (or such other similar term).

18.10    Survival. All representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that Agent, Issuing Bank, or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of, or any accrued interest on, any Loan or any fee or any other amount payable under this Agreement is outstanding or unpaid or any Letter of Credit is outstanding and so long as the Revolver Commitments have not expired or been terminated.

18.11    Patriot Act. Each Lender that is subject to the requirements of the Patriot Act hereby notifies Borrowers that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies each Borrower, which information includes the name and address of each Borrower and other information that will allow such Lender to identify each Borrower in accordance with the Patriot Act. In addition, if Agent is required by law or regulation or internal policies to do so, it shall have the right to periodically conduct i) Patriot Act searches, OFAC/PEP searches, and customary individual background checks for the Loan Parties and ii) OFAC/PEP searches and customary individual background checks for the Loan Parties' senior management and key principals, and each Borrower agrees to cooperate in respect of the conduct of such searches and further agrees that the reasonable costs and charges for such searches shall constitute Lender Group Expenses hereunder and be for the account of Borrowers.

18.12    Integration. This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof. The foregoing to the contrary notwithstanding, all Bank Product Agreements, if any, are independent agreements governed by the written provisions of such Bank Product Agreements, which will remain in full force and effect, unaffected by any repayment, prepayments, acceleration, reduction, increase, or change in the terms of any credit extended hereunder, except as otherwise expressly provided in such Bank Product Agreement.

18.13    Parent as Agent for Borrowers. Each Borrower hereby irrevocably appoints Parent as the borrowing agent and attorney-in-fact for all Borrowers (the "Administrative Borrower") which appointment shall remain in full force and effect unless and until Agent shall have received prior written notice signed by each Borrower that such appointment has been revoked and that another Borrower has been appointed Administrative Borrower. Each Borrower hereby irrevocably appoints and authorizes the Administrative Borrower i) to provide Agent with all notices with respect to Revolving Loans and Letters of Credit obtained for the benefit of any Borrower and all other notices and instructions under this Agreement and the other Loan Documents (and any notice or instruction provided by Administrative Borrower shall be deemed to be given by Borrowers hereunder and shall bind each Borrower), ii) to receive notices and instructions from members of the Lender Group (and any notice or instruction provided by any member of the Lender Group to the Administrative Borrower in accordance with the terms hereof shall be deemed to have been given to each Borrower), iii) to take such action as the Administrative Borrower deems appropriate on its behalf to obtain Revolving Loans and Letters of Credit and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement and (d) execute and deliver any amendments, consents, waivers or other instruments related to this Agreement and the other Loan Documents on behalf of such Borrower and any such amendment, consent, waiver or other instrument shall be binding upon and enforceable against such other Borrower to the same extent as if

made directly by such Borrower (but Agent shall be entitled to require execution thereof by all Borrowers). It is understood that the handling of the Loan Account and Collateral in a combined fashion, as more fully set forth herein (and subject to the terms herein), is done solely as an accommodation to the Borrowers in order to utilize the collective borrowing powers of the Borrowers in the most efficient and economical manner and at their request, and that Lender Group shall not incur liability to any Borrower as a result hereof. Each Borrower expects to derive benefit, directly or indirectly, from the handling of the Loan Account and the Collateral in a combined fashion, as more fully set forth herein (and subject to the terms herein), since the successful operation of each Borrower is dependent on the continued successful performance of the integrated group. To induce the Lender Group to do so, and in consideration thereof, each Borrower hereby jointly and severally agrees to indemnify each member of the Lender Group and holds each member of the Lender Group harmless against any and all liability, expense, loss or claim of damage or injury, made against the Lender Group by any Borrower or by any third party whosoever, arising from or incurred by reason of (i) the handling of the Loan Account and Collateral securing the Obligations as herein provided, or (ii) the Lender Group's relying on any instructions of the Administrative Borrower, except that the Borrowers will have no liability to the relevant Agent-Related Person or Lender-Related Person under this Section 18.13 with respect to any liability that has been finally determined by a court of competent jurisdiction to have resulted solely from the bad faith, gross negligence or willful misconduct of such Agent-Related Person or Lender-Related Person, as the case may be.

18.14    Judgment Currency. If for the purpose of obtaining judgment in any court it is necessary to convert an amount due hereunder in the currency in which it is due (the "Original Currency") into another currency (the "Second Currency"), the rate of exchange applied shall be that at which, in accordance with normal banking procedures, the Agent could purchase in the New York foreign exchange market, the Original Currency with the Second Currency on the date two (2) Business Days preceding that on which judgment is given. Each Obligor agrees that its obligation in respect of any Original Currency due from it hereunder shall, notwithstanding any judgment or payment in such other currency, be discharged only to the extent that, on the Business Day following the date the Agent receives payment of any sum so adjudged to be due hereunder in the Second Currency, the Agent may, in accordance with normal banking procedures, purchase, in the New York foreign exchange market, the Original Currency with the amount of the Second Currency so paid; and if the amount of the Original Currency so purchased or could have been so purchased is less than the amount originally due in the Original Currency, each Obligor agrees as a separate obligation and notwithstanding any such payment or judgment to indemnify the Agent against such loss. The term "rate of exchange" in this Section 18.14 means the Spot Rate at which the Agent, in accordance with normal practices, is able on the relevant date to purchase the Original Currency with the Second Currency, and includes any premium and costs of exchange payable in connection with such purchase.

18.15    Acknowledgement and Consent to Bail-In of Affected Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an Affected Financial Institution; and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge

81

institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

As used herein, the following terms have the following meanings:

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, rule, regulation or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person subject to IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

A006442

"<u>Write-Down and Conversion Powers</u>" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

18.16    Certain ERISA Matters.

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Agent and not, for the avoidance of doubt, to or for the benefit of the Borrowers or any other Loan Party, that at least one of the following is and will be true:

(i)    such Lender is not using Plan Assets of one or more Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments or this Agreement,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement,

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Agent, in its sole discretion, and such Lender.

(b)    In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Agent and not, for the avoidance of doubt, to or for the benefit of the Borrowers or any other Loan Party, that the Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and

83

performance of the Loans, the Letters of Credit, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

(c)    For purposes of this Section 18.16, the following terms shall have the meanings assigned here:

(i)    "Commitments" means the Incremental Commitments and the Revolver Commitments.

(ii)    "PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

18.17    Acknowledgement Regarding Any Supported QFCs. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for any Hedge Agreement or any other agreement or instrument that is a QFC (such support, "QFC Credit Support", and each such QFC, a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)    In the event a Covered Entity that is party to a Supported QFC (each, a " Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)    As used in this Section 18.17, the following terms have the following meanings:

(i)    "BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

(ii)    "Covered Entity" means any of the following: (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

(iii)    "Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

84

(iv)    "QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

18.18    Application of Sanctions Provisions to the Loan Parties. Sections 4.7, 4.13, 4.18 and 5.8 shall only apply to any of the Loan Parties, any Subsidiary, any Affiliate or any broker or other agent of any Loan Party which is bound by any Anti-Boycott Regulations insofar as the giving of and compliance with such representations, warranties, covenants and undertakings do not and will not result in a violation of or conflict with, or liability under any Anti-Boycott Regulations.

19.    **INTERCREDITOR AGREEMENT**

The terms of this Agreement and the other Loan Documents (other than the Intercreditor Agreement), any Lien granted to the Agent pursuant to any Loan Document and the exercise of any right or remedy by the Agent hereunder are subject to the provisions of the Intercreditor Agreement.  In the event of any inconsistency between the provisions of this Agreement and the Loan Documents (other than the Intercreditor Agreement), on the one hand, and the Intercreditor Agreement, on the other hand, the provisions of the Intercreditor Agreement shall supersede the provisions of this Agreement and the Loan Documents (other than the Intercreditor Agreement). Without limiting the generality of the foregoing, and notwithstanding anything herein to the contrary, all rights and remedies of the Agent (and the Lender Group) shall be subject to the terms of the Intercreditor Agreement, and until the Discharge of Fixed Asset Obligations (as defined in the Intercreditor Agreement), (i) except for express requirements of this Agreement, no Loan Party shall be required hereunder or under any other Loan Document to take any action in respect of the Fixed Asset Priority Collateral that is inconsistent with such Loan Party's obligations under the Senior Secured Notes Documents except if otherwise provided in the Intercreditor Agreement and (ii) any obligation of any Loan Party hereunder or under any other Loan Document with respect to the delivery or control of any Fixed Asset Priority Collateral, the novation of any lien on any certificate of title, bill of lading or other document, the giving of any notice to any bailee or other Person, the provision of voting rights or the obtaining of any consent of any Person, in each case in respect of any Fixed Asset Priority Collateral shall be deemed to be satisfied if such Loan Party complies with the requirements of the similar provision of the applicable Senior Secured Notes Document.

[Signature pages to follow.]

85

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**BORROWER**

CLEVELAND-CLIFFS INC.

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

[*Signature Page to Asset-Based Revolving Credit Agreement*]

BANK OF AMERICA, N.A., as Agent and as a
Lender

By: _____

Name:
Title:

[*Signature Page to Asset-Based Revolving Credit Agreement* ]

[_____]
By:
    Name: _____
    Title:


*If second signature is needed:*




By:      _____
    Name:
    Title:


[*Signature Page to Asset-Based Revolving Credit Agreement* ]

SCHEDULE 1.1

As used in the Agreement, the following terms shall have the following definitions:

"2024 Senior Secured Notes" means those certain 4.875% Senior Secured Notes due 2024 issued by Parent on December 19, 2017 in the initial aggregate principal amount of $400,000,000.

"2024 Senior Secured Notes Indenture" means the Indenture, dated as of December 19, 2017 , governing the 2024 Senior Secured Notes, by and among Parent, as issuer, the guarantors from time to time party thereto, and U.S. Bank National Association, as trustee and first lien notes collateral agent.

"2025 Senior Secured Notes" means those certain 9.875% Senior Secured Notes due 2025 issued by Parent on April 17, 2020 in the initial aggregate principal amount of $400,000,000 and on April 24, 2020 in the additional aggregate principal amount of $555,159,000.

"2025 Senior Secured Notes Indenture" means the Indenture, dated as of April 17, 2020, governing the 2025 Senior Secured Notes, by and among Parent, as issuer, the guarantors from time to time party thereto, and U.S. Bank National Association, as trustee and first lien notes collateral agent.

"2026 Senior Secured Notes" means those certain 6.75% Senior Secured Notes due 2026, issued by Parent on the Closing Date in the initial aggregate principal amount of $725,000,000 and on June 19, 2020 in the additional aggregate principal amount of $120,000,000 .

"2026 Senior Secured Notes Indenture" means the Indenture dated as of March 13, 2020, governing the 2026 Senior Secured Notes, by and among Parent, as issuer, the guarantors from time to time party thereto, and U.S. Bank National Association, as trustee and first lien notes collateral agent.

"ABL Priority Collateral" has the meaning specified therefor in the Intercreditor Agreement.

"Account" means an account (as that term is defined in the Code).

"Account Debtor" means any Person who is obligated on an Account, chattel paper, or a general intangible.

"Account Party" has the meaning specified therefor in  Section 2.11(h) of this Agreement.

"Accounting Change" means any change in accounting principles required or permitted by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants (or successor thereto or any agency with similar functions).

"Acquired Indebtedness" means Indebtedness of a Person whose assets or Equity Interests are acquired by Parent or any of its Subsidiaries in a Permitted Acquisition; provided, that such Indebtedness (a) was in existence prior to the date of such Permitted Acquisition, (b) was not incurred in connection with, or in contemplation of, such Permitted Acquisition and (c) is not revolving Indebtedness of a Subsidiary that is not an Excluded Subsidiary.

"Acquisition" means (a) the purchase or other acquisition by a Person or its Subsidiaries of all or substantially all of the assets of (or any division or business line of) any other Person (other than a Subsidiary), or (b) the purchase or other acquisition (whether by means of a merger, consolidation, or otherwise) by a Person or its Subsidiaries of all or substantially all of the Equity Interests of any other Person (other than a Subsidiary).

1

"Additional Borrower" means any wholly-owned Subsidiary of Parent organized in the United States that becomes a Borrower after the Closing Date pursuant to Section 2.2.

"Additional Documents" has the meaning specified therefor in Section 5.12 of the Agreement.

"Additional Lender" means, at any time, any bank, other financial institution or institutional investor that, in any case, is not an existing Lender, that is an Eligible Transferee and that agrees to provide any portion of any Incremental Commitments in accordance with Section 2.16; provided that each Additional Lender shall be subject to the approval of the Agent and, in the case of an Upsize Incremental Commitment, each Issuing Bank (such approval not to be unreasonably withheld, delayed or conditioned), in each case to the extent any such consent would be required from the Agent and such Issuing Bank, as applicable, under Section 13.1 for an assignment of Revolver Commitments to such Additional Lender.

"Adjustment" has the meaning specified in Section 2.13(d)(iv) of this Agreement.

"Administrative Borrower" has the meaning specified therefor in Section 18.13 of the Agreement.

"Administrative Questionnaire" has the meaning specified therefor in Section 13.1(a)(ii)(H) of this Agreement.

"Affected Lender" has the meaning specified therefor in Section 2.14(b) of the Agreement.

"Affiliate" means, as applied to any Person, any other Person who controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" means the possession, directly or indirectly through one or more intermediaries, of the power to direct the management and policies of a Person, whether through the ownership of Equity Interests, by contract, or otherwise; provided, that, for purposes of the definition of Eligible Accounts and Section 6.10 of the Agreement: (a) any Person which owns directly or indirectly 10% or more of the Equity Interests having ordinary voting power for the election of directors or other members of the governing body of a Person or 10% or more of the partnership or other ownership interests of a Person (other than as a limited partner of such Person) shall be deemed an Affiliate of such Person, and (b) each partnership in which a Person is a general partner shall be deemed an Affiliate of such Person.

"Agent" has the meaning specified therefor in the preamble to the Agreement.

"Agent Professionals" attorneys, accountants, appraisers, auditors, business valuation experts, environmental engineers or consultants, turnaround consultants, and other professionals and experts retained by Agent.

"Agent-Related Persons" means Agent, together with its Affiliates, officers, directors, employees, attorneys, and agents.

"Agent's Account" means the Deposit Account of Agent that has been designated as such, in writing, by Agent to Borrowers and the Lenders.

"Agent's Liens" means the Liens granted by any Loan Party to Agent under the Loan Documents and securing the Obligations (or any portion thereof).

"Aggregate Borrowing Base" means on any date of determination, the sum of the Tranche A Borrowing Base, plus the Tranche B Borrowing Base.

2

"Agreed Currency" means (a) Dollars, (b) Canadian Dollars, (c) Pounds Sterling, (d) Euros, (e) Japanese Yen, (f) Swiss Francs and (g) any other currency approved in writing by the Agent and the applicable Issuing Bank that is freely traded and exchangeable into Dollars.

"Agreed Currency Equivalent" means, at any time, with respect to any amount denominated in an Agreed Currency other than Dollars, the equivalent amount thereof in the applicable Agreed Currency, as determined by Agent on the basis of the Spot Rate for the purchase of such Agreed Currency with Dollars.

"Agreement" means the Asset-Based Revolving Credit Agreement to which this Schedule 1.1 is attached, as may be amended, restated, supplemented or otherwise modified from time to time.

"AK IRBs" means those certain bonds issued pursuant to (i) the Trust Indenture, dated as of February 1, 2012, between the City of Rockport, Indiana and Wells Fargo Bank, National Association, as trustee, (ii) the Trust Indenture, dated as of February 1, 2012, between the Ohio Air Quality Development Authority and Wells Fargo Bank, National Association, as trustee, (iii) the Trust Indenture, dated as of February 1, 2012, between the Butler County Industrial Development Authority and Wells Fargo Bank, National Association, as trustee, and (iv) the Indenture of Trust by and between the Ohio Air Quality Development Authority and U.S. Bank National Association, as trustee, dated as of June 1, 2004, and any Refinancing Indebtedness with respect thereto.

"AK Steel Acquisition" means the direct or indirect acquisition by the Parent of 100% of the equity interests of the Target pursuant to the AK Steel Acquisition Agreement.

"AK Steel Acquisition Agreement" means the Agreement and Plan of Merger, dated as of December 2, 2019, among the Parent, Pepper Merger Sub Inc. and the Target, together with all schedules, exhibits and annexes thereto without giving effect to any amendment, waiver or supplement thereto that would cause clause (a) of Schedule 3.1 to fail to be satisfied.

"AK Steel Acquisition Agreement Representations" means the representations and warranties made by or on behalf of the Target in the AK Steel Acquisition Agreement as are material to the interests of the Lenders or the Joint Lead Arrangers (in their capacities as such), but only to the extent that Parent (or any of its Affiliates) has the right to terminate its obligations (or to refuse to consummate the AK Steel Acquisition) under the AK Steel Acquisition Agreement as a result of a breach of any of such representations and warranties.

"Alternative Borrowing Base Amount" means the amount equal to the aggregate of (x) the amount of (A) the "U.S. Borrowing Base" (as defined in the Existing Syndicated Facility Agreement) as set forth in the most recently delivered "Borrowing Base Certificate" delivered to Bank of America, N.A., as administrative agent, under and pursuant to the Existing Syndicated Facility Agreement, minus (B) the "Eligible Accounts" (as defined in the Existing Syndicated Facility Agreement) set forth in such Borrowing Base Certificate that are owed by an "Account Debtor" that is the Target or any of its Affiliates plus (y) the amount of (A) the "Tranche A Borrowing Base" (as defined in the Target ABL Credit Agreement) as set forth in the most recently delivered "Borrowing Base Certificate" delivered to Bank of America, N.A., as administrative agent, under and pursuant to the Target ABL Credit Agreement, minus (B) the "Eligible Accounts" (as defined in the Target ABL Credit Agreement) set forth in such Borrowing Base Certificate that are owed by an "Account Debtor" that is the Parent or any of its Affiliates.

"AM SA Receivables Facility" means the receivables facility of ArcelorMittal S.A. to which AMUSA was an originator under on and prior to the Second Amendment Effective Date.

"AMUSA" means ArcelorMittal USA LLC.

"AMUSA Acquisition" means the direct or indirect acquisition by Parent of 100% of the equity interests of AMUSA and certain of its subsidiaries pursuant to the AMUSA Acquisition Agreement.

"AMUSA Acquisition Agreement" means the Transaction Agreement, dated as of September 28, 2020, among Parent, AMUSA and ArcelorMittal S.A., an entity formed under the laws of Luxembourg.

"AMUSA Target Loan Parties" means AMUSA and each of its Domestic Wholly-Owned Subsidiaries (other than any Excluded Subsidiary).

"Anti-Boycott Regulations" means any anti-boycott laws or regulations applicable to a Loan Party or Subsidiary, including, without limitation, under section 7 of the German Foreign Trade Regulation (Außenwirtschaftsverordnung, "AWV") (in conjunction with sections 4, 19 paragraph 3 no. 1a) of the German Foreign Trade Act (Außenwirtschaftsgesetz) and section 81 paragraph 1 no. 1 AWV), any provision of Council Regulation (EC) 2271/96 and Commission Delegated Regulation (EC) No 2018/1100 and The Extraterritorial US Legislation (Sanctions against Cuba, Iran and Libya) (Protection of Trading Interests) Order 1996 of the United Kingdom (as amended, supplemented, varied or otherwise modified from time to time).

"APIO" means Cliffs Asia Pacific Iron Ore Pty Ltd ACN 001 892 995, a company incorporated under the laws of Australia.

"Applicable Claims" means all claims, liabilities, obligations, losses, damages, penalties, judgments, proceedings, interest, costs and expenses of any kind (including remedial response costs, reasonable and documented attorneys' fees and Lender Group Expenses) at any time (including after payment in full of the Obligations or replacement of Agent or any Lender) incurred by any Indemnified Person or asserted against any Indemnified Person by any Loan Party or other Person, in any way relating to (a) any Loans, Letters of Credit, Loan Documents, Borrower Materials, or the use thereof or transactions relating thereto, (b) any action taken or omitted in connection with any Loan Documents, (c) the existence or perfection of any Liens, or realization upon any Collateral, (d) exercise of any rights or remedies under any Loan Documents or applicable law, or (e) failure by any Loan Party to perform or observe any terms of any Loan Document, in each case including all costs and expenses relating to any investigation, litigation, arbitration or other proceeding (including an Insolvency Proceeding or appellate proceedings), whether or not the applicable Indemnified Person is a party thereto.

"Applicable Margin" means, as of any date of determination the applicable margin set forth in the following table that corresponds to the average daily Excess Availability for the most recently ended fiscal quarter; provided, that for the period from the ~~Closing~~Second Amendment Effective Date through the end of the first ~~two (2)~~ full fiscal ~~quarters~~quarter of the Borrowers ending after the ~~Closing~~Second Amendment Effective Date, the Applicable Margin shall be ~~no less than~~ the margin in the row styled "Level II":

4

| Level | Average Daily Aggregate Excess Availability | Applicable Margin Relative to Base Rate Tranche A Revolving Loans (the "Tranche A Base Rate Margin") | Applicable Margin Relative to LIBOR Rate Tranche A Revolving Loans (the "Tranche A LIBOR Rate Margin") | Applicable Margin Relative to Base Rate Tranche B Revolving Loans (the "Tranche B Base Rate Margin") | Applicable Margin Relative to LIBOR Rate Tranche B Revolving Loans (the "Tranche B LIBOR Rate Margin") |
|---|---|---|---|---|---|
| I | ≥ 66 2/3% of the Tranche A Line Cap | ~~0.25~~0.50% | ~~1.25~~1.50% | 2.00% | 3.00% |
| II | < 66 2/3% of Tranche A Line Cap | ~~0.50~~0.75% | ~~1.50~~1.75% | 2.25% | 3.25% |

From and after the first full fiscal quarter ending after the Second Amendment Effective Date, the Tranche A Base Rate Margins and the Tranche A LIBOR Rate Margins in the rows styled "Level I" and "Level II" shall be reduced by 0.25% if the Consolidated Total Leverage Ratio as set forth in the most recent Compliance Certificate received by the Agent pursuant to Section 5.1 does not exceed 4.00 to 1.00; provided that, such reduction shall cease to exist if the Consolidated Total Leverage Ratio as set forth in the most recent Compliance Certificate received by the Agent pursuant to Section 5.1 has increased to 4.00 to 1.00 or greater. Except as set forth in the foregoing proviso, the Applicable Margin shall be re-determined quarterly (i) on the first day of the month following the date of delivery to Agent of the certified calculation of Excess Availability pursuant to Section 5.1 of the Agreement and (ii) on the first Business Day immediately following the date a Compliance Certificate is received by the Agent pursuant to Section 5.1. In the event that the information contained in any Borrowing Base Certificate is shown to be inaccurate, and such inaccuracy, if corrected, would have led to the application of a higher Applicable Margin for any period (an "Applicable Period") than the Applicable Margin actually applied for such Applicable Period, then (i) Borrowers shall immediately deliver to Agent a correct Borrowing Base Certificate for such Applicable Period, (ii) the Applicable Margin shall be determined as if the correct Applicable Margin (as set forth in the table above) were applicable for such Applicable Period, and (iii) the Borrowers shall immediately deliver to Agent full payment in respect of the accrued additional interest as a result of such increased Applicable Margin for such Applicable Period, which payment shall be promptly applied by Agent to the affected Obligations. If (i) Borrowers fail to provide such certification when such certification is due, the Applicable Margin shall be set at the margin in the row styled "Level II" as of the first day of the month following the date on which the certification was required to be delivered until the date on which such certification is delivered (on which date (but not retroactively), without constituting a waiver of any Default or Event of Default occasioned by the failure to timely deliver such certification, the Applicable Margin shall be set at the margin based upon the calculations disclosed by such certification or (ii) Borrowers fail to deliver a Compliance Certificate when due, the Applicable Margin shall be set based solely on Average Daily Aggregate Excess Availability (for, the avoidance of doubt, without any reduction based upon a Consolidated Total Leverage Ratio) as of the first Business Day on which the Compliance Certificate was required to be delivered and was not delivered until the date on which a Compliance Certificate is delivered in accordance with Section 5.1.

"Applicable Unused Line Fee Percentage" means, as of any date of determination, the applicable percentage set forth in the following table that corresponds to the Average Revolver Usage of the Borrowers for the most recently completed quarter:

| Level | Average Tranche A Revolver Usage | Applicable Unused Line Fee Percentage |
|---|---|---|
| I | ≥ 50% of the Maximum Revolver Amount | 0.250% |
| II | < 50% of the Maximum Revolver Amount | 0.300% |

A006453

The Applicable Unused Line Fee Percentage with respect to the Tranche B Revolving Loans shall be set forth in the following table that corresponds to the Average Revolver Usage of the Borrowers for the most recently completed quarter:

| Level | Average Tranche B Revolver Usage | Applicable Unused Line Fee Percentage |
|-------|----------------------------------|---------------------------------------|
| I | ≥ 50% of the Maximum Revolver Amount | 0.250% |
| II | < 50% of the Maximum Revolver Amount | 0.300% |

The Applicable Unused Line Fee Percentage shall be re-determined on the first day of each quarter by Agent.

"Application Event" means the occurrence of (a) a failure by Borrowers (or any of them) to repay all of the Obligations in full on the Maturity Date, (b) an exercise by Agent or the Required Lenders of the remedies set forth in Section 9.1(a) or 9.1(b) or the automatic acceleration of the obligations as set forth in the last paragraph of Section 9.1 or (c) an Event of Default and the election by the Required Lenders to require that payments and proceeds of Collateral be applied pursuant to Section 2.4(b)(iv) of the Agreement.

"Approved Automotive Subsidiaries" means (x) any Mexican Subsidiary or Canadian Subsidiary of Ford Motor Company, General Motors Company, Toyota Motor Corporation or Fiat Chrysler Automobiles N.V., (y) any Mexican Subsidiary or Canadian Subsidiary of a Subsidiary of Honda Motor Co., Ltd. or Nissan Motor Co., Ltd. that is organized under the laws of the United States or any state of the United States or the District of Columbia and (z) any other Mexican Subsidiary or Canadian Subsidiary of an Account Debtor that is an automotive company, which Mexican Subsidiary or Canadian Subsidiary, in the case of this clause (z), shall be reasonably approved by the Agent in writing from time to time.

"Assignee" has the meaning specified therefor in Section 13.1(a) of the Agreement.

"Assignment and Acceptance" means an Assignment and Acceptance Agreement substantially in the form of Exhibit A-1 to the Agreement.

"Authorized Person" means any one of the individuals identified by written notice from Borrowers to Agent, as updated from time to time.

"Available Hedge Amount" has the meaning specified therefor in the last paragraph of Section 2.4(b)(iv) of the Agreement.

"Availability" means, as of any date of determination, the amount that the Borrowers are entitled to borrow as Revolving Loans under Section 2.1 of the Agreement (after giving effect to the then outstanding Revolver Usage); provided, that Availability on the Closing Date shall not exceed $800,000,000.

"Bank of America" means Bank of America, N.A., a national banking association.

"Bank Product" means any one or more of the following financial products or accommodations extended to a Borrower or its Subsidiaries by a Bank Product Provider: (a) credit cards (including commercial cards (including so-called "purchase cards", "procurement cards" or "p-cards")), (b) credit card processing services, (c) debit cards, (d) stored value cards, (e) Cash Management Services, (f) supply chain financing, or (g) transactions under Hedge Agreements.

6

"Bank Product Agreements" means those agreements entered into from time to time by a Borrower or its Subsidiaries with a Bank Product Provider in connection with the obtaining of any of the Bank Products.

"Bank Product Collateralization" means providing cash collateral (pursuant to documentation reasonably satisfactory to Agent) to be held by Agent for the benefit of the applicable Bank Product Providers (other than the Hedge Providers) in an amount reasonably determined by Agent in its Permitted Discretion or any other credit support acceptable by the Agent and the Bank Product Provider, in each case, as sufficient to satisfy the reasonably estimated credit exposure with respect to the then existing Bank Product Obligations owed to such Bank Product Providers (other than Hedge Obligations).

"Bank Product Obligations" means (a) all obligations, liabilities, reimbursement obligations, fees, or expenses owing by the Borrowers and their Subsidiaries to any Bank Product Provider pursuant to or evidenced by a Bank Product Agreement and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, (b) all Hedge Obligations (including Pari Secured Hedge Obligations), and (c) all amounts that Agent or any Revolving Lender is obligated to pay to a Bank Product Provider as a result of Agent or such Revolving Lender purchasing participations from, or executing guarantees or indemnities or reimbursement obligations to, a Bank Product Provider with respect to the Bank Products provided by such Bank Product Provider to the Borrowers or their Subsidiaries; provided that in order for any item described in clauses (a), (b), or (c) above, as applicable, to constitute "Bank Product Obligations", if the applicable Bank Product Provider is any Person other than Bank of America or its Affiliates or any Bank Product Provider holding Existing Hedge Obligations, then the applicable Bank Product must have ~~been provided on or after the Closing Date (or, if in existence prior to the Closing Date, five (5) days prior to the Closing Date)~~ <u>provided</u> and Agent shall have received a Bank Product Provider Agreement within ten (10) days (or such later date as Agent and Parent may agree) after the date of the provision of the applicable Bank Product to the Borrowers or their respective Subsidiaries <u>(or, if such Bank Product Obligations are in existence prior to the Second Amendment Effective Date, two (2) Business Days prior to the Second Amendment Effective Date)</u>; provided further that the Bank Product Obligations shall not include any Excluded Swap Obligations.

"Bank Product Provider" means any Revolving Lender or any of its Affiliates, including each of the foregoing in its capacity, if applicable, as a Hedge Provider; provided, that no such Person (other than Bank of America or its Affiliates) shall constitute a Bank Product Provider with respect to a Bank Product unless and until Agent receives a Bank Product Provider Agreement from such Person and with respect to the applicable Bank Product within ten (10) days (or such later date as Agent and Parent may agree) (or, if in existence prior to the ~~Closing~~<u>Second Amendment Effective</u> Date, ~~five~~<u>two</u> (~~5~~<u>2</u>) ~~days~~<u>Business Days</u> prior to the ~~Closing~~<u>Second Amendment Effective</u> Date) after the provision of such Bank Product to the Borrowers or their respective Subsidiaries; provided, further, that if, at any time, a Revolving Lender ceases to be a Lender under the Agreement, then, from and after the date on which it ceases to be a Lender thereunder, neither it nor any of its Affiliates shall constitute Bank Product Providers and the obligations with respect to Bank Products provided by such former Revolving Lender or any of its Affiliates shall no longer constitute Bank Product Obligations.

"Bank Product Provider Agreement" means an agreement in substantially the form attached hereto as  Exhibit B-2 to the Agreement or otherwise in form and substance reasonably satisfactory to Agent, duly executed by the applicable Bank Product Provider~~, the Parent,~~ and Agent.

"Bank Product Reserves" means, as of any date of determination, those reserves that Agent deems necessary or appropriate to establish (based upon the Bank Product Providers' determination of the liabilities and obligations of the Borrowers and their Subsidiaries in respect of Bank Product Obligations and certified to the Agent in accordance with Section 18.5) in respect of Bank Products then provided or outstanding (including, for the avoidance of doubt, any Pari Secured Hedge Reserves).

"Bankruptcy Code" means title 11 of the United States Code, as in effect from time to time.

"Base Rate" means the greatest of (a) the Federal Funds Rate *plus* ½%, (b) the LIBOR Rate (which rate shall be calculated based upon an Interest Period of one (1) month and shall be determined on a daily basis), *plus* ~~1.00~~1.25%, (c) the Prime Rate and (d) 1.00%. Any change in the Base Rate due to a change in the Prime Rate, the Federal Funds Rate or the LIBOR Rate, as the case may be, shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Rate or the LIBOR Rate, as the case may be; provided that, if the LIBOR Rate is no longer available as set forth in Section 2.13, then Base Rate shall be determined without giving effect to clause (b) of this definition.

"Base Rate Loan" means each portion of the Loans that bears interest at a rate determined by reference to the Base Rate.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation, which certification shall be substantially similar in substance to the form of Certification Regarding Beneficial Owners of Legal Entity Customers included as Appendix A to the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" 31 C.F.R. § 1010.230, as amended from time to time.

"Benefit Plan" means an employee benefit plan as defined in Section 3(3) of ERISA (other than a Pension Plan or Multiemployer Plan) to which any Loan Party incurs or otherwise has any obligation or liability, contingent or otherwise.

"Blocked Account" means a deposit account that is subject to a Control Agreement.

"Board of Directors" means, as to any Person, the board of directors (or comparable managers) of such Person, or any committee thereof duly authorized to act on behalf of the board of directors (or comparable managers).

"Board of Governors" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Borrowers" means Cleveland-Cliffs Inc., an Ohio corporation, and each Additional Borrower.

"Borrower Materials" has the meaning specified therefor in  Section 18.9(c) of the Agreement.

"Borrowing" means a borrowing consisting of Revolving Loans made on the same day by Lenders (or Agent on behalf thereof), or by a Swing Lender in the case of a Swing Loan, or by Agent in the case of an Extraordinary Advance.

"Borrowing Base" shall mean (a) with respect to the Tranche A Revolver Commitment, the Tranche A Borrowing Base and (b) with respect to any Tranche B Revolver Commitment, if any, the Tranche B Borrowing Base.

"Borrowing Base Certificate" means a certificate substantially in the form of  Exhibit B-1.

"Business Day" means any day except Saturday, Sunday, or other day on which banks are authorized or required to close in the states of California or New York, except that if a determination of a Business Day shall relate to a LIBOR Rate Loan, the term "Business Day" also shall exclude any day on which banks are closed for dealings in Dollar deposits in the London interbank market.

"Canadian Dollars" means the lawful currency of Canada as in effect from time to time.

8

"Canadian Subsidiary" means, with respect to any Person, a Subsidiary of such Person that is organized under the laws of Canada.

"Capital Expenditures" means, with respect to any Person for any period, the amount of all expenditures by such Person and its Subsidiaries during such period that are capital expenditures as determined in accordance with GAAP, unless such expenditures are financed with Indebtedness incurred after the Closing Date that are not Loans.

"Capitalized Lease Obligation" means that portion of the obligations under a Capital Lease that is required to be capitalized in accordance with GAAP.

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Cash Collateral Account" means a blocked, non-interest bearing deposit account at Bank of America or a financial institution selected by the Agent, in the name of the Parent and under the sole dominion and control of the Agent, and otherwise established in a manner reasonably satisfactory to the Agent.

"Cash Collateralize" means to pledge and deposit with or deliver to the Agent, for the benefit of the Agent, each applicable Issuing Bank, the Swing Lender or the Revolving Lenders, as collateral or other credit support for Letter of Credit Obligations, Obligations in respect of Swing Loans or obligations of Revolving Lenders to fund participations in respect of either thereof (as the context may require), (a) cash or deposit account balances or (b) if the Swing Lender or the applicable Issuing Bank benefiting from such collateral shall agree in its sole discretion, other credit support, in each case pursuant to documentation in form and substance satisfactory to the Swing Lender or the applicable Issuing Bank, as applicable. "Cash Collateral" shall have a meaning correlative to the foregoing and shall include the proceeds of such cash collateral and other credit support.

"Cash Dominion Trigger Event" means (a) the occurrence and continuance of any Specified Event of Default or (b) the failure of the Borrowers to maintain Excess Availability of at least the greater of (x) $~~100,000,000~~175,000,000 and (y) 10% of the Line Cap.

"Cash Dominion Release Event" means Excess Availability is at least the greater of (a) $~~100,000,000~~175,000,000 and (b) 10% of the Line Cap for thirty (30) consecutive days and no Specified Event of Default is outstanding during such thirty (30) consecutive day period.

"Cash Dominion Trigger Period" means the period commencing with a Cash Dominion Trigger Event and ending with a Cash Dominion Release Event.

"Cash Equivalents" means (a) Domestic Cash Equivalents, and (b) Foreign Cash Equivalents.

"Cash Management Services" means any cash management or related services including treasury, depository, return items, overdraft, controlled disbursement, merchant store value cards, e-payables services, electronic funds transfer, interstate depository network, automatic clearing house transfer (including the Automated Clearing House processing of electronic funds transfers through the direct Federal Reserve Fedline system) and other customary cash management arrangements.

"CFC" means a controlled foreign corporation (as that term is defined in the IRC).

"Change in Control" means that:

(a) any "person" or "group" (as those terms are used in Section 13(d)(3) of the Exchange Act, it being agreed that an employee of the Parent or any of its Subsidiaries for whom shares are held under

9

an employee stock ownership, employee retirement, employee savings or similar plan and whose shares are voted in accordance with the instructions of such employee shall not be a member of a "group" (as that term is used in Section 13(d)(3) of the Exchange Act) solely because such employee's shares are held by a trustee under said plan) becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of Equity Interests of Parent (or other securities convertible into such Equity Interests) representing 50% or more of the combined voting power of all Equity Interests of Parent entitled (without regard to the occurrence of any contingency) to vote for the election of members of the Board of Directors of Parent;

(b) except in connection with a transaction permitted by Section 6.3 or 6.4, Borrowers fail to own and control, directly or indirectly, 100% of the Equity Interests of each other Loan Party (or if such Subsidiary becomes a Loan Party after the Closing Date, the amount owned and controlled, directly or indirectly, as of the date such Subsidiary becomes a Loan Party);

(c) [reserved]; or

(d) the occurrence of any "Change in Control" (or any similar or like term) as defined in any Senior Secured Notes Indenture, the Convertible Notes Indenture, any Existing Senior Notes Indenture or any indenture, agreement, note or similar document governing or evidencing Indebtedness that is outstanding in an aggregate principal amount of $100,000,000 or more.

"Change in Law" means the occurrence after the date of the Agreement of: (a) the adoption or effectiveness of any law, rule, regulation, judicial ruling, judgment or treaty, (b) any change in any law, rule, regulation, judicial ruling, judgment or treaty or in the administration, interpretation, implementation or application by any Governmental Authority of any law, rule, regulation, guideline or treaty, or (c) the making or issuance by any Governmental Authority of any request, rule, guideline or directive, whether or not having the force of law; provided that notwithstanding anything in the Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities shall, in each case, be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"Claims" has the meaning assigned to such term in Section 12(c).

"Class" (a) when used with respect to Lenders, shall refer to whether such Lender has a Loan or Commitment with respect to the Tranche A Facility or the Tranche B Facility, (b) when used with respect to Commitments, refers to whether such Commitments are Tranche A Revolving Commitments or Tranche B Revolving Commitments and (c) when used with respect to Loans or a Borrowing, refers to whether such Loans, or the Loans comprising such Borrowing, are Loans under the Tranche A Facility or Tranche B Facility.

"Closing Date" means the date on which Agent sends Borrowers a written notice that each of the conditions precedent set forth on Schedule 3.1 either have been satisfied or have been waived, which date is March 13, 2020.

"Closing Date Refinancing" means the prepayment and redemption in full of all Indebtedness and other outstanding obligations and liabilities under the Existing Syndicated Facility Agreement, the Target ABL Credit Agreement and the Target Senior Secured Notes and the termination, release and discharge of all Liens and guarantees granted by the Loan Parties and their respective Subsidiaries (including the Target and its Subsidiaries) in connection therewith.

10

"Code" means the New York Uniform Commercial Code, as in effect from time to time;  provided, however, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, priority, or remedies with respect to Agent's Lien on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "Code" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority, or remedies.

"Collateral" means all assets and interests in assets and proceeds thereof now owned or hereafter acquired by any Loan Party in or upon which a Lien is granted by such Person in favor of Agent or the Lenders under any of the Loan Documents.

"Collateral Access Agreement" means a landlord waiver, bailee letter, carrier agreement or acknowledgement agreement of any lessor, warehouseman, processor, carrier, consignee, or other Person (including any Joint Venture) in possession of, having a Lien upon, or having rights or interests in any Loan Parties' books and records, Equipment, or Inventory, in each case, in form and substance reasonably satisfactory to Agent.

"Commencement Date" has the meaning assigned to such term on  Schedule 5.2.

"Commitment Letter" means that certain second amended and restated commitment letter, dated as of December 19, 2019, among the Joint Lead Arrangers and the Parent.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Competitor" means any Person which is a direct competitor of Borrowers or their Subsidiaries and is disclosed to the Agent in writing (which may be distributed by the Agent to the Lenders) prior to the Closing Date (as updated on or before the Second Amendment Effective Date)  and such Person's parent entities, affiliates and subsidiaries, in each case, that are readily identifiable as such by virtue of their names; provided, that in connection with any assignment or participation, the Assignee or Participant with respect to such proposed assignment or participation that is an investment bank, a commercial bank, a finance company, a fund, or other Person which merely has an economic interest in any such direct competitor, and is not itself such a direct competitor of Borrowers or their Subsidiaries, shall not be deemed to be a direct competitor for the purposes of this definition.

"Compliance Certificate" means a certificate substantially in the form of  Exhibit C-1  to the Agreement delivered by the chief financial officer or other senior financial officer of Parent to Agent.

"Confidential Information" has the meaning specified therefor in  Section 18.9(a) of the Agreement.

"Consolidated Net Tangible Assets " means the aggregate amount of assets (less applicable reserves and other properly deductible items) after deducting therefrom (a) all current liabilities (excluding any Indebtedness for money borrowed having a maturity of less than 12 months from the date of the most recent consolidated balance sheet of Parent but which by its terms is renewable or extendable beyond 12 months from such date at the option of Parent) and (b) all goodwill, trade names, patents, unamortized debt discount and expense and any other like intangibles, in each case as set forth on the most recent consolidated balance sheet of Parent and computed in accordance with GAAP.

"Consolidated Total Assets " means, as to any Person as of any date of determination, all amounts that would, in conformity with GAAP, be set forth opposite the caption "total assets" (or any like caption) on a consolidated balance sheet of such Person as of such date of determination.

"Consolidated Total Debt" means, at any date, the aggregate principal amount of all (i) Indebtedness for borrowed money of Parent and its Subsidiaries at such date (including unreimbursed

obligations in respect of letters of credit but excluding undrawn letters of credit) and (ii) Indebtedness in respect of Capital Leases and purchase money obligations, in each case, determined on a consolidated basis in accordance with GAAP.

"Consolidated Total Leverage Ratio" means, as at the last day of any fiscal period, the ratio of (a) Consolidated Total Debt on such day to (b) EBITDA for such period.

"Control Agreement" means, with respect to any applicable deposit or securities account established by a Loan Party, an agreement, in form and substance reasonably satisfactory to the Agent, establishing Control (as defined in the Uniform Commercial Code) of such an account by the Agent and whereby the Person maintaining such account agrees to comply only with the instructions originated by the Agent without the further consent of any Loan Party.

"Convertible Notes" means those certain 1.50% Convertible Senior Notes due 2025 issued by Parent on December 19, 2017 in the initial aggregate principal amount of $316,250,000 and any additional Permitted Indebtedness which is convertible at the option of the Parent, into Qualified Equity Interests of the Parent permitted hereunder.

"Convertible Notes Documents" means the Convertible Notes, the Convertible Notes Indenture, and all other agreements, documents and instruments entered into now or in the future in connection with the Convertible Notes or the Convertible Notes Indenture.

"Convertible Notes Indenture" means the Indenture dated as of March 17, 2010 (as amended, supplemented or otherwise modified from time to time), governing the Convertible Notes, by and between Parent, as issuer, and U.S. Bank National Association, as trustee.

"Copyright Security Agreement" has the meaning specified therefor in the Guaranty and Security Agreement.

"Default" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Defaulting Lender" means any Lender that (a) has failed to fund any amounts required to be funded by it under the Agreement within two (2) Business Days of the date that it is required to do so under the Agreement (including the failure to make available to Agent amounts required pursuant to a Settlement or to make a required payment in connection with a Letter of Credit Disbursement), (b) notified Borrowers, Agent, or any Lender in writing that it does not intend to comply with all or any portion of its funding obligations under the Agreement, (c) has made a public statement to the effect that it does not intend to comply with its funding obligations under the Agreement or under other agreements generally (as reasonably determined by Agent) under which it has committed to extend credit, (d) failed, within three (3) Business Days after written request by Agent, to confirm that it will comply with the terms of the Agreement relating to its obligations to fund any amounts required to be funded by it under the Agreement (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (d) upon receipt of such written confirmation by the Agent and the Borrower), (e) otherwise failed to pay over to Agent or any other Lender any other amount required to be paid by it under the Agreement within two (2) Business Days of the date that it is required to do so under the Agreement, or (f) (i) becomes or is insolvent or has a parent company that has become or is insolvent, (ii) becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, or custodian or appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or (iii) has, or has a direct or indirect parent company that has, become the subject of a Bail-In Action (as defined in Section 18.15); provided, however that a Lender shall not be a Defaulting

12

Lender solely by virtue of (i) a Governmental Authority's ownership of an equity interest in such Lender or parent company unless the ownership provides immunity for such Lender from jurisdiction of courts within the United States or from enforcement of judgments or writs of attachment on its assets, or permits such Lender or Governmental Authority to repudiate or otherwise to reject such Lender's agreements or (ii) such Lender becoming subject to an Undisclosed Administration; provided, further, that a Lender shall not be deemed to be a Defaulting Lender under clauses (a), (b) or (c) if it has notified Agent and Parent in writing that it will not make a funding because a condition to funding (specifically identified in the notice) is not or cannot be satisfied.

"Default Rate" has the meaning specified therefor in  Section 2.6(c) of the Agreement.

"Defaulting Lender Rate" means (a) for the first three (3) days from and after the date the relevant payment is due, the Base Rate, and (b) thereafter, (i) in the case of Tranche A Revolving Loans, the interest rate then applicable to Tranche A Revolving Loans that are Base Rate Loans (inclusive of the Tranche A Base Rate Margin applicable thereto) and (ii) in the case of Tranche B Revolving Loans, the interest rate then applicable to Tranche B Revolving Loans that are Base Rate Loans (inclusive of the Tranche B Base Rate Margin applicable thereto).

"Deposit Account" means any deposit account (as that term is defined in the Code).

"Designated Account" means the Deposit Account of Administrative Borrower designated as such, in writing, by Borrowers to Agent.

"Designated Account Bank" means a bank at which the Designated Account is located and that is located within the United States and has been designated as such, in writing, by Borrowers to Agent.

"Designated Non-Cash Consideration" means the fair market value of non-cash consideration received by any Loan Party in connection with a Permitted Disposition that is so designated as Designated Non-Cash Consideration pursuant to an officer's certificate delivered by Parent to Agent at least three (3) Business Days prior to the consummation of such Permitted Disposition (which certificate will set forth the basis for such valuation), less the amount of cash or Cash Equivalents, received in connection with a subsequent sale of or collection on such Designated Non-Cash Consideration.

"Designated Port" means each port, dock, marine terminal or similar location that is an Identified Location.

"Dilution Percent" means the percent, determined as of the end of the Loan Parties' most recent field examination, equal to (a) bad debt write-downs or write-offs, discounts, returns, promotions, credits, credit memos and other dilutive items with respect to active Accounts of the Loan Parties, divided by (b) active gross sales.

"Dilution Percentage" means at any time, one (1) percentage point (or fraction thereof) for each percentage point (or fraction thereof) by which the Dilution Percent for the Loan Parties exceeds five percent (5.0%).

"Dilution Reserve" means a reserve equal to the product of (x) the Dilution Percentage times (y) the value of all Eligible Accounts of the Loan Parties at such time.

"Disqualified Equity Interests" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all

13

other Obligations that are accrued and payable and the termination of the Revolver Commitments), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 181 days after the Maturity Date.

"Dollar Equivalent" means, at any time, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in any currency other than Dollars, the equivalent amount thereof in Dollars, as determined by Agent on the basis of the Spot Rate for the purchase of Dollars with such currency.

"Dollars" or "$" means United States dollars.

"Domestic Cash Equivalents" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one (1) year from the date of acquisition thereof, (b) marketable direct obligations issued or fully guaranteed by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within one (1) year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Rating Group ("S&P") or Moody's Investors Service, Inc. (" Moody's"), (c) commercial paper maturing no more than 270 days from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, (d) certificates of deposit, time deposits, overnight bank deposits or bankers' acceptances maturing within one (1) year from the date of acquisition thereof issued by any Lender or any other bank organized under the laws of the United States or any state thereof or the District of Columbia or any United States branch of a foreign bank having at the date of acquisition thereof combined capital and surplus of not less than $1,000,000,000, (e) Deposit Accounts maintained with (i) any bank that satisfies the criteria described in clause (d) above, or (ii) any other bank organized under the laws of the United States or any state thereof so long as the full amount maintained with any such other bank is insured by the Federal Deposit Insurance Corporation, (f) repurchase obligations of any commercial bank satisfying the requirements of clause (d) of this definition or recognized securities dealer having combined capital and su*rplus* of not less than $1,000,000,000, having a term of not more than seven (7) days, with respect to securities satisfying the criteria in clauses (a) or (d) above, (g) debt securities with maturities of six (6) months or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the criteria described in clause (d) above, (h) Investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (g) above and (i) Investments of the type described in the "Cash Investment Policy" of Parent, dated as of April 30, 2019, together with any modifications thereto reasonably acceptable to the Agent.

"Dominion Account" a collection account at Bank of America in the United States over which Agent has exclusive control.

"Drawing Document" means any Letter of Credit or other document presented for purposes of drawing under any Letter of Credit.

"EBITDA" means, subject to Section 1.9 hereof, with respect to any fiscal period:

(a) Parent's consolidated net earnings (or loss),

*minus*

(b) without duplication, the sum of the following amounts of Parent for such period to the extent included in determining consolidated net earnings (or loss) for such period:

14

(i) any extraordinary, unusual, or non-recurring gains,

(ii) interest income, and

(iii) exchange, translation or performance gains relating to any hedging transactions or foreign currency fluctuations,

*plus*

(c) without duplication, the sum of the following amounts of Parent for such period to the extent included in determining consolidated net earnings (or loss) for such period:

(i) any non-cash extraordinary, unusual, or non-recurring losses,

(ii) Interest Expense,

(iii) Tax expense based on income, profits or capital, including federal, foreign, state, franchise and similar Taxes (and for the avoidance of doubt, specifically excluding any sales Taxes or any other Taxes held in trust for a Governmental Authority),

(iv) depreciation and amortization for such period,

(v) (A) with respect to any Permitted Acquisition after the Closing Date, costs, fees, charges, or expenses consisting of out-of-pocket expenses owed by Parent or any of its Subsidiaries to any Person for services performed by such Person in connection with such Permitted Acquisition incurred within 180 days of the consummation of such Permitted Acquisition, up to an aggregate amount (for all such items in this clause (v)) for such Permitted Acquisition not to exceed the greater of (x) $~~5,000,000~~10,000,000 and (y) 5.00% of the Purchase Price of such Permitted Acquisition and (B) with respect to the Transactions, costs, fees, charges, or expenses consisting of expenses owed by Parent or any of its Subsidiaries to any Person in connection with or resulting from the Transactions or the transactions related thereto,

(vi) (A) purchase accounting adjustments, including, without limitation, a dollar for dollar adjustment for that portion of revenue that would have been recorded in the relevant period had the balance of deferred revenue (unearned income) recorded on the closing balance sheet and before application of purchase accounting not been adjusted downward to fair value to be recorded on the opening balance sheet in accordance with GAAP purchase accounting rules; and (B) non-cash adjustments in accordance with GAAP purchase accounting rules under Statement of Financial Accounting Standards No. 805, in the event that such an adjustment is required by Parent's independent auditors, in each case, as determined in accordance with GAAP,

(vii) costs and expenses incurred during such period in connection with the restructuring of APIO, in an aggregate amount for all such costs and expenses incurred during such period not to exceed $10,000,000 for such period,

(viii) non-cash compensation expense (including deferred non-cash compensation expense), or other non-cash expenses or charges, arising from the sale or issuance of Equity Interests, the granting of stock options, and the granting of stock appreciation rights and similar arrangements (including any repricing, amendment, modification, substitution, or change of any such Equity Interests, stock option, stock appreciation rights, or similar arrangements) *minus* the amount of any such expenses or charges when paid in cash to the extent not deducted in the computation of net earnings (or loss),

(ix) one-time non-cash restructuring charges,

15

(x) non-cash exchange, translation, or performance losses relating to any hedging transactions or foreign currency fluctuations,

(xi) non-cash losses on sales of fixed assets or write-downs of fixed or intangible assets (excluding ABL Priority Collateral),

(xii) any non-cash loss, charge or expense (but only to the extent not relating to the ABL Priority Collateral),

(xiii) financing fees, costs, accruals, payments and expenses (including rationalization, legal, Tax, structuring and other costs and expenses and non-operating or non-recurring professional fees, costs and expenses related thereto), related to, to the extent permitted under this Agreement, any Permitted Investments, Permitted Dispositions (other than in the ordinary course of business), issuances of Equity Interests and issuances, amendments, modifications, refinancings or repayments of Permitted Indebtedness (in each case, regardless of whether or not consummated), and

(xiv) any severance, relocation, consolidation, closing, integration, facilities opening, business optimization, transition or restructuring costs, charges or expenses (including any costs or expenses associated with any expatriate), any signing, retention or completion bonuses; provided that the amount of costs, charges or expenses added back in reliance on this clause (c)(xiv) in any period may not exceed, together with Expected Cost Savings added back in reliance on clause (d) in such period, an amount equal to 20% of EBITDA for such period (calculated before giving effect to such add-backs or adjustments pursuant to this clause (c)(xiv) and clause (d)),

*plus*

(d) the full pro forma "run rate" cost savings, operating expense reductions, operational improvements and synergies (collectively, "Expected Cost Savings") (net of actual amounts realized) that are reasonably identifiable and factually supportable (in the good faith determination of Parent, as certified by a Responsible Officer of Parent in the Compliance Certificate required by Section 5.1 to be delivered in connection with the financial statements for such period) related to the Transactions, any Permitted Investment, Permitted Disposition, operating improvement, restructuring, cost savings initiative and/or any similar initiative (any such Permitted Investment, Permitted Disposition, operating improvement, restructuring, cost savings initiative and/or similar initiative, a "Cost Saving Initiative") , in each case, prior to, on or after the Closing Date; provided, that with respect to Cost Saving Initiatives under this clause (d), (1) substantial steps toward the action necessary to realize any such cost savings, operating expense reduction, operating improvement and/or synergy added back in reliance on this clause (d) with respect to the Transactions, any Permitted Investment, Permitted Disposition, operating improvement, restructuring, cost savings initiative and/or any similar initiative are expected to be taken within 18 months following the date on which Parent determines to take such action and (2) the amount of such Expected Cost Savings added back in reliance on clause (d) in any period shall not exceed, together with costs, charges or expenses added back in reliance on clause (c)(xiv) in such period, an amount equal to 20.0% of EBITDA for such period (calculated before giving effect to such add-backs or adjustments pursuant to this clause (d) and clause (c)(xiv)),

in each case, determined on a consolidated basis in accordance with GAAP.

"Eligible Accounts" means those Accounts created by a Loan Party in the ordinary course of its business, that arise out of such Loan Party's sale of goods or rendition of services, that comply with each of the representations and warranties respecting Eligible Accounts made in the Loan Documents, and that are not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, that such criteria may be revised from time to time by Agent in Agent's Permitted Discretion (subject to two (2) days' written notice to the Parent) to address the results of any field examination performed by (or on behalf of) Agent from time to time after the Closing Date. In determining the amount to be included,

16

Eligible Accounts shall be calculated net of customer deposits, unapplied cash, Taxes, discounts, credits, allowances, and rebates. Eligible Accounts shall not include the following:

(a) Accounts that (i) the Account Debtor has failed to pay within 120 days of original invoice date or (ii) are more than 60 days past due,

(b) Accounts owed by an Account Debtor (or its Affiliates) where 50% or more of all Accounts owed by that Account Debtor (or its Affiliates) are deemed ineligible under clause (a) above,

(c) Accounts with respect to which the Account Debtor is an Affiliate of any Loan Party or an employee or agent of any Loan Party or any Affiliate of any Loan Party; provided that the foregoing shall not apply to Accounts owed by partners in Joint Ventures, Eligible Customers or their respective Affiliates that constitute Affiliates to the extent that such Accounts were generated on terms that are no less favorable, taken as a whole, to such Loan Party than would be obtained in an arm's-length transaction with a non-Affiliate,

(d) Accounts arising in a transaction wherein goods are placed on consignment or are sold pursuant to a guaranteed sale, a sale or return, a sale on approval, a bill and hold, or any other terms by reason of which the payment by the Account Debtor may be conditional,

(e) Accounts that are not payable in Dollars,

(f) Accounts with respect to which the Account Debtor either (i) does not maintain its chief executive office in the United States or Canada (or any state or territory thereof), (ii) is not organized under the laws of the United States or Canada (or any state or territory thereof), or (iii) is the government of any foreign country or sovereign state, or of any state, province, municipality, or other political subdivision thereof, or of any department, agency, public corporation, or other instrumentality thereof, unless, in each case, either (x) the Account is supported by an irrevocable letter of credit reasonably satisfactory to Agent in its Permitted Discretion (as to form, substance, and issuer or domestic confirming bank) that has been delivered to Agent and is directly drawable by Agent, or (y) the Account is covered by credit insurance in form, substance, and amount, and by an insurer, reasonably satisfactory to Agent in its Permitted Discretion; provided that (i) Accounts whereby Hyundai Motor Company or Posco, or one of their respective subsidiaries organized in South Korea, is the Account Debtor, (ii) up to $~~50,000,000~~**75,000,000** of Accounts with respect to which the Account Debtor either maintains its chief executive office in an Eligible Country (or any territory thereof) or is organized under the laws of an Eligible Country or any political subdivision thereof, (iii) up to $~~10,000,000~~**20,000,000** of Accounts whereby a Subsidiary of ThyssenKrupp AG organized in Brazil is the Account Debtor, (iv) up to $ ~~25,000,000~~**50,000,000** of Accounts whereby an Approved Automotive Subsidiary is the Account Debtor and (v) up to $~~25,000,000 of~~**50,000,000 of** Accounts of the Loan Parties taken as a whole, in each case, may be deemed to be Eligible Accounts if they do not satisfy this clause (f) so long as they satisfy the other eligibility criteria set forth in this definition,

(g) Accounts with respect to which the Account Debtor is either (i) the United States or any department, agency, or instrumentality of the United States (exclusive, however, of Accounts with respect to which Loan Parties have complied, to the reasonable satisfaction of Agent, with the Assignment of Claims Act, 31 U.S.C. §3727), or (ii) any state or municipality of the United States,

(h) Accounts with respect to which the Account Debtor is a creditor of a Loan Party, has or has asserted a right of recoupment or setoff, or has disputed its obligation to pay all or any portion of the Account, to the extent of such claim, right of recoupment or setoff, or dispute,

(i) Accounts with respect to an Account Debtor whose aggregate Accounts owing to the Loan Parties exceeds 25% of the aggregate Eligible Accounts (or such lower percentage as the Agent may establish for any such Account Debtor in its Permitted Discretion if the creditworthiness of such Account

Debtor deteriorates), but only to the extent of such excess; _provided_, that, in each case, the amount of Eligible Accounts that are excluded because they exceed the foregoing percentage shall be determined by Agent based on all of the otherwise Eligible Accounts prior to giving effect to any eliminations based upon the foregoing concentration limit,

(j) [reserved],

(k) Accounts with respect to which the Account Debtor is subject to an Insolvency Proceeding, is not, in the reasonable determination of Parent, Solvent, has gone out of business, or as to which any Loan Party has received notice of an imminent Insolvency Proceeding or a material impairment of the financial condition of such Account Debtor,

(l) Accounts, the collection of which, Agent, in its Permitted Discretion, believes to be doubtful, including by reason of the Account Debtor's financial condition,

(m) Accounts that are not subject to a valid and perfected first priority Agent's Lien, including accounts that arose from the sale of coal, iron ore or other as-extracted collateral (as defined in the Code) in the United States, if an as-extracted collateral filing in the applicable jurisdiction has not been filed for the benefit of the Agent with respect to the location of the mining operation and/or mineheads from which such coal, iron ore or other as-extracted collateral was extracted; _provided_ that, in the event that any as-extracted collateral filing is not made within 30 days after the date of acquisition of an interest in the applicable location or minehead, any such Account covered by such filing shall not constitute an Eligible Account until the day that is 91 days after such as-extracted collateral filing is made,

(n) Accounts with respect to which (i) the goods giving rise to such Account have not been shipped and billed to the Account Debtor, or (ii) the services giving rise to such Account have not been performed and billed to the Account Debtor; _provided_ that up to $50,000,000 of unbilled Accounts may be deemed to be Eligible Accounts if (x) any such Account has not been unbilled for more than 30 days, (y) the applicable goods have been shipped or the applicable services have been performed, as applicable, and (z) such Accounts satisfy the other eligibility criteria set forth in this definition,

(o) Accounts with respect to which the Account Debtor is a Sanctioned Person or Sanctioned Entity, or

(p) Accounts that represent the right to receive progress payments or other advance billings that are due prior to the completion of performance by the applicable Loan Party of the subject contract for goods or services, or

(q) Accounts owned by a target acquired in connection with a Permitted Acquisition or other Permitted Investment (other than the AMUSA Acquisition), until the completion of an appraisal and field examination with respect to such target, in each case, reasonably satisfactory to Agent (which appraisal and field examination may be conducted prior to the closing of such Permitted Acquisition); _provided_ that Accounts that otherwise satisfy the other eligibility criteria set forth in this definition in an amount not to exceed, together with Inventory constituting Eligible Inventory pursuant to the proviso to clause (l) of such definition, 15% of the Aggregate Borrowing Base (as reported in the most recent Borrowing Base Certificate delivered to the Agent in accordance herewith) then in effect shall constitute Eligible Accounts until the earlier of (x) receipt by the Agent of an appraisal and field examination of such target and its assets that is reasonably satisfactory to the Agent and (y) the 90th calendar day following the consummation of the relevant Permitted Acquisition or other Permitted Investment.

"Eligible Contract" means a contract among a Loan Party, as seller, and one or more Eligible Customers, as buyer, relating to the sale of pellets and related products, including metallics, in the United States (i) whereby the applicable Loan Party retains title to the applicable pellets and related products, including metallics, Inventory until payment is made by the Eligible Customer in respect of such pellets

18

and related products, including metallics, Inventory and (ii) that provides for minimum purchases annually or a requirements contract of a quality of pellets and related products, including metallics, that is customized to the requirements of such Eligible Customer.

"Eligible Contract Inventory Location" means a location within the United States owned, leased or operated by an Eligible Customer where pellets and related products, including metallics, of a Loan Party is held prior to the passage of title of such Inventory from such Loan Party to the Eligible Customer pursuant to an Eligible Contract.

"Eligible Country" means each of the United Kingdom, Germany, Italy, the Netherlands, Singapore, Switzerland, Austria, any other member state of the European Union prior to May 1, 2014 and any other country approved by the Required Lenders in their sole discretion; provided, however, that upon 15 days' notice to Parent, Agent may, at its sole discretion, remove as an Eligible Country any country that does not have foreign currency ratings of "A" or better by S&P and "A2" or better by Moody's.

"Eligible Customer" means ~~ArcelorMittal USA, ArcelorMittal Dofasco Inc.,~~ Algoma Steel Inc., and their respective Subsidiaries and any other Person (including successors-in-interest of the foregoing) approved by the Agent in its Permitted Discretion.

"Eligible Equipment" means Equipment of a Loan Party that is Mobile Equipment, that complies with each of the representations and warranties respecting Eligible Equipment made in the Loan Documents, and that is not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, that such criteria may be revised from time to time by Agent in Agent's Permitted Discretion and subject to two (2) days' written notice to the Parent to address the results of any field examination or appraisal performed by Agent from time to time after the Closing Date. An item of Equipment shall not be included in Eligible Equipment if:

(a) a Loan Party does not have good, valid, and marketable title thereto,

(b) a Loan Party does not have actual and exclusive possession thereof (either directly or through a bailee or agent of a Borrower),

(c) it is not located at one of the Identified Locations located in the continental United States (or in-transit from one such location in the continental United States to another such location in the continental United States),

(d) it is in-transit to or from a location of a Loan Party (other than with respect to Equipment of the Loan Parties in-transit from one of the Identified Location located in the continental United States to another Identified Location located in the continental United States),

(e) it is located on real property leased by a Loan Party from a third party or with a bailee, in a contract warehouse or at the location of a Joint Venture, customer or other third party, in each case, unless (A) it is subject to a Collateral Access Agreement executed by the lessor, bailee, warehouseman, Joint Venture, customer or other third party, as the case may be or (B) with respect to Equipment located on leased real property, with a bailee or in a contract warehouse, it is the subject of Landlord Reserves,

(f) it is not subject to a valid and perfected first priority Agent's Lien,

(g) it (i) is not in good repair and normal operating condition, ordinary wear and tear excepted, in accordance with its intended use in the business of the Loan Parties, (ii) is out for repair, (iii) does not meet in all material respects all standards imposed by any Governmental Authority having regulatory authority over such Equipment, (iv) is substantially worn, damaged, defective or obsolete, or (v) constitutes furnishings, real property or fixtures,

19

(h) it constitutes spare parts inventory or "<u>surplus</u>" equipment,

(i) it is "<u>subject to</u>" (within the meaning of Section 9-311 of the Code) any certificate of title or comparable statute, or

(j) it was acquired in connection with a Permitted Acquisition or other Permitted Investment, until the completion of an appraisal and field examination of such Inventory, in each case, reasonably satisfactory to Agent (which appraisal and field examination may be conducted prior to the closing of such Permitted Acquisition or other Permitted Investment).

"<u>Eligible Inventory</u>" means Inventory of a Loan Party that complies with each of the representations and warranties respecting Eligible Inventory made in the Loan Documents, and that is not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; <u>provided</u>, that such criteria may be revised from time to time by Agent in Agent's Permitted Discretion to address the results of any field examination or appraisal performed by Agent from time to time after the Closing Date. In determining the amount to be so included, Inventory shall be valued at the lower of cost or market on a monthly basis in connection with delivery of each monthly Borrowing Base Certificate and a basis consistent with Loan Parties' historical accounting practices. An item of Inventory shall not be included in Eligible Inventory if:

(a) a Loan Party does not have good, valid, and marketable title thereto,

(b) a Loan Party does not have ownership thereof,

(c) except with respect to up to $50,000,000 of Inventory owned by a Loan Party that is located in Canada, it is not located at an Identified Location located in the continental United States (or in-transit from one such location in the continental United States to another such location in the continental United States),

(d) [reserved],

(e) other than with regards to in-transit Inventory not deemed ineligible under clause (f) of this definition, it is located on real property leased by a Loan Party from a third party or with a bailee or in a contract warehouse or at the location of a Joint Venture, customer, processor or other third party, in each case, unless (i) either (A) it is subject to a Collateral Access Agreement executed by the lessor, bailee, warehouseman, Joint Venture, customer or other third party, as the case may be, (B) with respect to Inventory located on leased real property, with a bailee or in a contract warehouse, it is the subject of Landlord Reserves, or (C) it is located at an Eligible Contract Inventory Location, and (ii) other than with respect to Inventory at a location of a Joint Venture or customer or at an Eligible Contract Inventory Location or a Designated Port located in the United States, it is segregated or otherwise separately identifiable from goods of others, if any, on the premises,

(f) it is in-transit to a Designated Port on a carrier not owned by one of the Loan Parties unless Agent has received a Collateral Access Agreement with the applicable carrier with respect thereto; <u>provided</u> that, up to, when taken together with Inventory constituting Eligibility Inventory pursuant to the proviso in clause (g), $50,000,000 of such Inventory shall constitute Eligible Inventory so long as it satisfies the other eligibility criteria set forth in this definition, except that while any In-Transit Inventory Triggering Event has occurred and is continuing, the Agent may in its Permitted Discretion not include such Inventory as Eligible Inventory,

(g) it is the subject of a bill of lading or other document of title other than those delivered to Agent as to goods in-transit as set forth in clauses (c), (e) or (f) above; <u>provided</u> that, up to, when taken together with Inventory constituting Eligibility Inventory pursuant to the proviso in clause (f), $ ~~50,000,000~~100,000,000 of such Inventory shall constitute Eligible Inventory so long as it satisfies the

20

A006468

other eligibility criteria set forth in this definition, except that while any In-Transit Inventory Triggering Event has occurred and is continuing, the Agent may in its Permitted Discretion not include such Inventory as Eligible Inventory,

(h) it is not subject to a valid and perfected first priority Agent's Lien,

(i) it consists of goods returned or rejected by a Loan Party's customers,

(j) it consists of goods that are obsolete or slow moving, unmerchantable, restrictive or custom items, packaging, samples, manufacturing supplies, display items or bags, replacement parts and shipping materials, bill and hold goods, defective or damaged goods, "seconds", or Inventory acquired on consignment,

(k) it is subject to third party trademark, licensing or other proprietary rights, unless Agent is satisfied in its Permitted Discretion that such Inventory can be freely sold by Agent on and after the occurrence of an Event of a Default despite such third party rights,

(l) it was acquired in connection with a Permitted Acquisition or other Permitted Investment (other than the AMUSA Acquisition), until the completion of an appraisal and field examination of such Inventory, in each case, reasonably satisfactory to the Agent (which appraisal and field examination may be conducted prior to the closing of such Permitted Acquisition); provided that Inventory that otherwise satisfies the other eligibility criteria set forth in this definition in an amount not to exceed, together with Accounts constituting Eligible Accounts pursuant to the proviso to clause (q) of such definition, 15% of the Aggregate Borrowing Base (as reported in the most recent Borrowing Base Certificate delivered to the Agent in accordance herewith) then in effect shall constitute Eligible Inventory until the earlier of (x) receipt by the Agent of an appraisal and field examination of such Inventory that is reasonably satisfactory to the Agent and (y) the 90th calendar day following the consummation of the Permitted Acquisition or other Permitted Investment,

(m) it was acquired from a Sanctioned Person or Sanctioned Entity, or it does not meet all standards imposed by any Governmental Authority or constitutes Hazardous Materials,

(n) it constitutes work in process or raw material, other than (i) in the case of iron ore located in the United States, work in process that has been converted into concentrate, pellets or related products, including metallics, (ii) in the case of coal located in the United States, work in process and raw material and (iii) work in process and raw materials of the legacy business of the Target Loan Parties as consistent with the Alternative Borrowing Base, or

(o) to the extent mined by a Loan Party or was extracted from a location owned or leased by a Loan Party and, in either case, it constitutes coal, iron ore or other as-extracted collateral (as defined in the UCC) in the United States, unless an as-extracted collateral filing in the applicable jurisdiction has been filed for the benefit of the Agent with respect to the location of the mining operation and/or mineheads from which such coal, iron ore or other as-extracted collateral was extracted.

"Eligible Investment Grade Accounts" means, at any time, any Eligible Accounts in respect of which the Account Debtor has an Investment Grade Rating as of the date of delivery of the applicable Borrowing Base Certificate.

"Eligible Transferee" means (a) any Lender (other than a Defaulting Lender), any Affiliate of any Lender and any Related Fund of any Lender; (b) (i) a commercial bank organized under the laws of the United States or any state thereof, and having total assets in excess of $1,000,000,000; (ii) a savings and loan association or savings bank organized under the laws of the United States or any state thereof, and having total assets in excess of $1,000,000,000; (iii) a commercial bank organized under the laws of any other country or a political subdivision thereof; provided that (A) (x) such bank is acting through a branch

or agency located in the United States or (y) such bank is organized under the laws of a country that is a member of the Organization for Economic Cooperation and Development or a political subdivision of such country, and (B) such bank has total assets in excess of $1,000,000,000; (c) any other entity (other than a natural person, Loan Party or an Affiliate of a Loan Party) that is an "<u>accredited investor</u>" (as defined in Regulation D under the Securities Act) that extends credit or buys loans as one of its businesses including insurance companies, investment or mutual funds and lease financing companies, and having total assets in excess of $1,000,000,000; and (d) any other Person (other than a natural person, Loan Party or Affiliate of a Loan Party) approved by Agent, each Issuing Bank and, so long as no Event of Default is continuing, Parent.

"<u>Employee Benefit Plan</u>" means any Benefit Plan, Multiemployer Plan or Pension Plan.

"<u>Enforcement Action</u>" any action to enforce any Obligations (other than Bank Product Obligations) or Loan Documents or to exercise any rights or remedies relating to any Collateral (whether by judicial action, self-help, notification of Account Debtors, setoff or recoupment, credit bid, action in a Loan Party's Insolvency Proceeding or otherwise) while an Event of Default exists.

"<u>Environmental Action</u>" means any written complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter, or other written communication from any Governmental Authority, or any third party involving violations of Environmental Laws or releases of Hazardous Materials at, on, under, to or from (a) any assets, properties and adjoining properties, or businesses or adjoining businesses of any Borrower, any Subsidiary of any Borrower, or, to the extent potentially giving rise to liability to any Borrower or any of their respective Subsidiaries, any of their predecessors in interest, or (b) any facilities which received Hazardous Materials generated by any Borrower, any Subsidiary of any Borrower, or, to the extent potentially giving rise to liability to any Borrower or any of their respective Subsidiaries, any of their predecessors in interest.

"<u>Environmental Law</u>" means any applicable federal, state, provincial, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy, or rule of common law, in each case as amended, or any judicial or administrative order, consent decree or judgment, in each case, to the extent binding on any Borrower or its Subsidiaries, relating to protection of the environment, the generation, handling, storage, treatment, release or disposal of, or exposure to, hazardous or toxic materials, or the effect of the environment on human health, in each case as amended from time to time.

"<u>Environmental Liabilities</u>" means all liabilities, monetary obligations, losses, damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts, or consultants, and costs of investigation and feasibility studies), fines, penalties, sanctions, and interest incurred or arising under any Environmental Law or as a result of any claim or demand relating to any Environmental Law, Environmental Action or Remedial Action required by any Governmental Authority or any third party.

"<u>Equipment</u>" means equipment (as that term is defined in the Code).

"<u>Equity Interest</u>" means, with respect to a Person, all of the shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in such Person, whether voting or nonvoting, including capital stock (or other ownership or profit interests or units), preferred stock, or any other "<u>equity security</u>" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act), but excluding any debt securities convertible into, exchangeable for or referencing any of the foregoing, including without limitation the Convertible Notes (prior to any conversion thereof into Equity Interests).

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statutes, and all regulations and guidance promulgated thereunder. Any reference to a specific

22

section of ERISA shall be deemed to be a reference to such section of ERISA and any successor statutes, and all regulations and guidance promulgated thereunder.

"ERISA Affiliate" means (a) any Person subject to ERISA whose employees are treated as employed by the same employer as the employees of any Loan Party under IRC Section 414(b), (b) any trade or business subject to ERISA whose employees are treated as employed by the same employer as the employees of any Loan Party under IRC Section 414(c), (c) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any organization subject to ERISA that is a member of an affiliated service group of which any Loan Party is a member under IRC Section 414(m), or (d) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any Person subject to ERISA that is a party to an arrangement with any Loan Party and whose employees are aggregated with the employees of any Loan Party under IRC Section 414(o).

"Euro" means the single currency of the Participating Member States.

"Event of Default" has the meaning specified therefor in  Section 8 of the Agreement.

"Excess Availability" means, as of any date of determination, (i) the Line Cap,  *minus* (ii) the outstanding Revolver Usage.

"Exchange Act" means the Securities Exchange Act of 1934, as in effect from time to time.

"Excluded Accounts" has the meaning specified in the Guaranty and Security Agreement.

"Excluded Property" has the meaning specified therefor in the Guaranty and Security Agreement.

"Excluded Subsidiary" means (i) any direct or indirect Foreign Subsidiary of Parent, (ii) any non-Foreign Subsidiary if substantially all of its assets consist of the Voting Stock of one or more direct or indirect Foreign Subsidiaries of Parent, (iii) any non-Foreign Subsidiary of a Foreign Subsidiary, (iv) any Subsidiary that is an Immaterial Subsidiary, (v) any non-Wholly Owned Subsidiary, to the extent, and for so long as, a guarantee by such Subsidiary of the obligations of the Borrowers under the Loan Documents would be prohibited by the terms of any organizational document, joint venture agreement or shareholder's agreement applicable to such Subsidiary, provided that such prohibition existed on the Closing Date or, with respect to any Subsidiary formed or acquired after the Closing Date or which became a Permitted Joint Venture after the Closing Date (and, in the case of any Subsidiary acquired after the Closing Date, for so long as such prohibition was not incurred in contemplation of such acquisition), on the date such Subsidiary is so formed or acquired or became a Permitted Joint Venture, (vi) any parent entity of any non-Wholly Owned Subsidiary, to the extent, and for so long as, a guarantee by such Subsidiary, of the obligations of the Borrowers under the Loan Documents would be prohibited by the terms of any organizational document, joint venture agreement or shareholder's agreement applicable to the non-Wholly Owned Subsidiary to which such Subsidiary is a parent, provided that (A) such prohibition existed on the Closing Date or, with respect to any Subsidiary formed or acquired after the Closing Date (and, in the case of any Subsidiary acquired after the Closing Date, for so long as such prohibition was not incurred in contemplation of such acquisition), on the date such Subsidiary is so formed or acquired and (B) a direct or indirect parent company of such parent entity (1) shall be a Guarantor and (2) shall be a holding company not engaged in any business activities or having any assets or liabilities other than (x) its ownership and acquisition of the Equity Interest of the applicable joint venture (or any other entity holding an ownership interest in such joint venture), together with activities directly related thereto, (y) actions required by law to maintain its existence and (z) activities incidental to its maintenance and continuance and to the foregoing activities, (vii) Cleveland-Cliffs International Holding Company, so long as substantially all of its assets consist of equity interests in, or indebtedness of, one or more Foreign Subsidiaries, (viii) [reserved], and (ix) any Subsidiary of a Person described in the foregoing clauses (i), (ii), (iii), (iv), (v), (vi) or (vii), provided, in each case, that such Subsidiary has not guaranteed any Obligations of the Borrowers or guarantors under the Existing Senior Notes Documents.

"Excluded Swap Obligations" means with respect to any Loan Party, any Swap Obligation if, and to the extent that, all or a portion of the Guaranty Obligations of such Person of, or the grant by such Person of a security interest to secure, such Swap Obligation (or any Guaranty Obligation thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof). If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guaranty Obligation or security interest is or becomes illegal.

"Excluded Taxes" means with respect to Agent, any Lender, any Participant or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder, (i) any Tax imposed on (or measured by) the net income or net profits (however denominated) and franchise Taxes, in each case, (A) imposed as a result of such Agent, Lender, Participant or other recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision or taxing authority thereof) or (B) imposed as a result of a present or former connection between such Agent, Lender, Participant or other recipient and the jurisdiction or taxing authority imposing the Tax (other than any such connection arising solely from such Agent, Lender, Participant or other recipient having executed, delivered or performed its obligations or received payment under, or enforced its rights or remedies under this Agreement or any other Loan Document), (ii) any branch profits Taxes or backup withholding Taxes imposed by the United States or any similar Tax imposed by any other jurisdiction in which any Loan Party is located, (iii) Taxes resulting from a Lender's or a Participant's failure to comply with the requirements of Section 17.2 of this Agreement, (iv) any United States federal Taxes that would be imposed on amounts payable to a Lender pursuant to a law in effect at the time such Lender becomes a party to this Agreement (or designates a new lending office), except for (A) any amount that such Lender (or its assignor, if any) was previously entitled to receive pursuant to Section 17.1 of this Agreement, if any, with respect to such withholding Tax at the time such Lender became a party to this Agreement (or designated a new lending office), and (B) additional withholding Taxes that may be imposed after the time such Lender became a party to this Agreement (or designated a new lending office), as a result of a change in law, rule, regulation, order or other decision with respect to any of the foregoing by any Governmental Authority, and (v) any withholding Taxes imposed under FATCA.

"Existing Debt" means (a) the Existing Senior Notes, (b) the Senior Secured Notes, (c) the Convertible Notes, and (d) any other agreement, indenture or other instrument with respect to indebtedness for borrowed money (excluding capital leases) of the Loan Parties of more than $100,000,000.

"Existing Hedge Obligations" means the obligations or liabilities arising under, owing pursuant to, or existing in respect of the Hedge Agreements set forth on Schedule E-1, but only for so long as the counterpart constitutes a Hedge Provider hereunder.

"Existing Letters of Credit" means the letters of credit issued prior to the ~~Closing~~Second Amendment Effective Date pursuant to either the Existing Syndicated Facility Agreement or the Target ABL Credit Agreement and as set forth on Schedule E-2.

"Existing Senior Notes" means, collectively: (a) those certain 6.25% Senior Notes due 2040 issued by Parent on September 20, 2010 in the initial aggregate principal amount of $500,000,000 ~~and~~, (b) those certain 5.75% Senior Notes due 2025 issued by Parent on February 27, 2017 in the initial aggregate principal amount of $500,000,000 and on August 7, 2017 in the additional aggregate principal amount of $575,000,000 and (c) the Existing Target Senior Notes.

"Existing Senior Notes Documents" means the Existing Senior Notes, each Existing Senior Notes Indenture, and all other agreements, documents and instruments entered into now or in the future in connection with the Existing Senior Notes or any Existing Senior Notes Indenture.

24

"Existing Senior Notes Indenture" means any indenture governing any of the Existing Senior Notes.

"Existing Syndicated Facility Agreement" means that certain Amended and Restated Syndicated Facility Agreement, dated as of March 30, 2015 (as amended and restated as of February 28, 2018, and as further amended, supplemented or otherwise modified prior to the date hereof), among Parent, the other borrowers from time to time party thereto, the lenders party thereto and Bank of America, N.A., as administrative agent.

"Existing Target Senior Notes " means, collectively: (a) those certain 7.625% Senior Notes due 2021 issued by AK Steel Corporation on September 16, 2014 in the initial aggregate principal amount of $430,000,000; (b) those certain 6.375% Senior Notes due 2025 issued by AK Steel Corporation on August 9, 2017 in the initial aggregate principal amount of $280,000,000; and (c) those certain 7.00% Senior Notes due 2027 issued by AK Steel Corporation on March 23, 2017 in the initial aggregate principal amount of $400,000,000.

"Extraordinary Advances" has the meaning specified therefor in  Section 2.3(f)(iii) of the Agreement.

"FATCA" means Sections 1471 through 1474 of the IRC, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the IRC and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the IRC.

"FCPA" has the meaning assigned to such term in  Section 4.13.

"Fee Letter" means that certain ~~second amended and restated fee letter, dated as of December 19, 2019, between Parent and the Joint Lead Arrangers~~ Amended and Restated Fee Letter, dated as of October 12, 2020, among Agent, BofA Securities, Inc., Goldman Sachs Bank USA and Parent .

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal to, for each day during such period, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by Agent from three (3) Federal funds brokers of recognized standing selected by it.

"Field Examination/Appraisal Triggering Event" means any date on which Excess Availability is less than the greater of (a) 15% of the Line Cap, and (b) $~~125,000,000~~218,750,000.

"Financial Covenant Period" means a period which shall commence on any date of determination on which Excess Availability is less than the greater of (i) 10% of the Line Cap and (ii) $~~100,000,000~~175,000,000, and shall continue until Excess Availability is not less than the greater of (a) 10% of the Line Cap and (b) $~~100,000,000~~175,000,000 for a period of 60 consecutive days.

"First Amendment" means the First Amendment to this Agreement, dated as of the First Amendment Effective Date.

"First Amendment Effective Date" means March 27, 2020.

"Fixed Asset Priority Collateral" has the meaning specified therefor in the Intercreditor Agreement.

25

"Fixed Asset Priority Collateral Agent" has the meaning specified therefor in the Intercreditor Agreement.

"Fixed Charges" means, with respect to any fiscal period and with respect to Parent determined on a consolidated basis in accordance with GAAP but subject to Section 1.2, the sum, without duplication, of (a) Interest Expense accrued (other than (x) interest paid-in-kind, amortization of financing fees, and other non-cash Interest Expense and (y) make-whole payments, premiums or similar payments related to the prepayment or extinguishment of Indebtedness) during such period to the extent required to be paid in cash, (b) scheduled principal payments in respect of Funded Indebtedness that are required to be paid in cash during such period (excluding, for the avoidance of doubt, (w) any payments made with the proceeds of an equity issuance of Parent to the extent such proceeds are applied to any such principal payments in respect of Funded Indebtedness within one hundred eighty (180) days, (x) any mandatory or voluntary prepayments, (y) any payments made at the maturity of such Funded Indebtedness or (z) any payments made in connection with the Transactions or any Refinancing of such Funded Indebtedness), (c) all Restricted Payments paid in cash pursuant to Section 6.7(a) or (e) during such period and (d) all cash payments in connection with pensions or other post-retirement benefit obligations (only to the extent not otherwise deducted in the calculation of clause (a) of the definition of EBITDA as an expense on the Parent's income statement) in excess of $50,000,000.

"Fixed Charge Coverage Ratio" means, with respect to any fiscal period and with respect to Parent determined on a consolidated basis in accordance with GAAP subject to Section 1.9 hereof, the ratio of (a) (i) EBITDA for such period minus (ii) Capital Expenditures made (to the extent not already incurred in a prior period) or incurred during such period to the extent required to be paid in cash (except (x) any amounts related to capitalized interest with respect thereto, (y) any Capital Expenditures made or incurred after the Closing Date but on or prior to September 30, 2020 in an aggregate amount not to exceed $250,000,000 in connection with the Toledo, Ohio hot briquetted iron production plant or (z) those financed with Indebtedness (other than Revolving Loans) or proceeds of an equity issuance of Parent to the extent such proceeds are applied to finance such Capital Expenditures within one hundred eighty (180) days) minus (iii) federal, state and local income Taxes paid in cash during such period (net of federal, state and local Tax refunds received in cash during such period) (it being understood that the amount subtracted pursuant to this clause (iii) shall not be less than $0), to (b) Fixed Charges for such period. For purposes of calculating the items in clauses (a)(i), (a)(ii) and clause (b) above, such amounts for the fiscal quarter ending December 31, 2019 shall be $172,826,000, $80,584,000 and $253,901,000, respectively, for the fiscal quarter ending September 30, 2019 shall be $252,384,000, $75,037,000 and $104,688,000, respectively, and for the fiscal quarter ending June 30, 2019 shall be $417,220,000, $75,427,000 and $96,679,000, respectively, in each case, subject to adjustment on a pro forma basis for all transactions consummated after the date of this Agreement for which the Fixed Charge Coverage Ratio is tested on a pro forma basis and includes such period.

"Foreign Benefit Event" shall mean, with respect to any Foreign Plan, (a) the existence of unfunded liabilities in excess of the amount permitted under any applicable law, (b) the failure to make the required contributions or payments, under any applicable law, on or before the due date for such contributions or payments, (c) the receipt of a notice by a Governmental Authority relating to the intention to terminate any such Foreign Plan or to appoint a trustee or similar official to administer any such Foreign Plan, or alleging the insolvency of any such Foreign Plan, (d) the incurrence of any liability by any Loan Party or any Subsidiary under applicable law on account of the complete or partial termination of such Foreign Plan or the complete or partial withdrawal of any participating employer therein, or (e) the occurrence of any transaction that is prohibited under any applicable law and that could reasonably be expected to result in the incurrence of any liability by any Loan Party or any of its Subsidiaries, or the imposition on any Loan Party or any of its Subsidiaries of any fine, excise tax or penalty resulting from any noncompliance with any applicable law.

"Foreign Cash Equivalents" means (a) certificates of deposit, bankers' acceptances, or time deposits maturing within one (1) year from the date of acquisition thereof, in each case payable in an

Agreed Currency and issued by any bank organized under the laws of any Specified State and having at the date of acquisition thereof combined capital and surplus of not less than $1,000,000,000 (calculated at the then applicable Spot Rate), (b) Deposit Accounts maintained with any bank that satisfies the criteria described in clause (a) above, (c) Investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) and (b) above and (d) Investments of the type described in the "Cash Investment Policy" of Parent, dated as of April 30, 2019, together with any modifications thereto reasonably acceptable to the Agent.

"Foreign Plan" has the meaning specified in Section 4.10(b).

"Foreign Subsidiary" means any Subsidiary of Parent that was not formed under the laws of the United States or any state of the United States or the District of Columbia.

"Foreign Subsidiary Borrowers" has the meaning specified in Section 2.16(c).

"Foreign Subsidiary Collateral" has the meaning specified in Section 2.16(c).

"Foreign Subsidiary Incremental Commitment" has the meaning specified in Section 2.16(c).

"Foreign Subsidiary Incremental Facility" has the meaning specified in Section 2.16(c).

"Foreign Subsidiary Incremental Loans" has the meaning specified in Section 2.16(c).

"Foreign Subsidiary Lenders" has the meaning specified in Section 2.16(c).

"FSHCO" means a Subsidiary that is organized under the laws of the United States, any state thereof or the District of Columbia substantially all of the assets of which consist of Equity Interests of one or more CFCs or FSHCOs. For the avoidance of doubt, Cleveland-Cliffs International Holding Company shall be considered a FSHCO.

"Funded Indebtedness" means, as of any date of determination, all Indebtedness for borrowed money or letters of credit of Parent, determined on a consolidated basis in accordance with GAAP.

"Funding Date" means the date on which a Borrowing occurs.

"Funding Losses" has the meaning specified therefor in Section 2.13(b)(ii) of the Agreement.

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States, consistently applied.

"Governing Documents" means, with respect to any Person, the certificate or articles of incorporation, by-laws, articles of association, or other organizational documents of such Person.

"Governmental Authority" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, municipal or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantor" means (a) each Subsidiary of each Borrower as of the Closing Date (other than any Excluded Subsidiary), and (b) each other Person that becomes a guarantor after the Closing Date pursuant to Section 5.11 of the Agreement.

27

"<u>Guaranty and Security Agreement</u>" means the guaranty and security agreement, dated as of the Closing Date, executed and delivered by each of the Borrowers and each of the Guarantors to Agent.

"<u>Guaranty Obligations</u>" means as to any Person (without duplication) any obligation of such Person guaranteeing any Indebtedness ("primary Indebtedness") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent: (i) to purchase any such primary Indebtedness or any property constituting direct or indirect security therefor; (ii) to advance or supply funds for the purchase or payment of any such primary Indebtedness or to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary Indebtedness of the ability of the primary obligor to make payment of such primary Indebtedness; or (iv) otherwise to assure or hold harmless the owner of such primary Indebtedness against loss in respect thereof, provided, however, that the definition of Guaranty Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guaranty Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary Indebtedness in respect of which such Guaranty Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder).

"<u>Hazardous Materials</u>" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable Environmental Laws as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity", (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids or synthetic gas, (c) any explosives or any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

"<u>Hedge Agreement</u>" means a "<u>swap agreement</u>" as that term is defined in Section 101(53B)(A) of the Bankruptcy Code.

"<u>Hedge Obligations</u>" means any and all obligations or liabilities, whether absolute or contingent, due or to become due, now existing or hereafter arising, of the Borrowers and their Subsidiaries arising under, owing pursuant to, or existing in respect of Hedge Agreements entered into with one or more of the Hedge Providers, including without limitation, the Existing Hedge Obligations and the Pari Secured Hedge Obligations; <u>provided</u>, however, that the Hedge Obligations shall not include any Excluded Swap Obligations.

"<u>Hedge Provider</u>" means any Revolving Lender or any of its Affiliates; provided, that no such Person (other than Bank of America or its Affiliates) shall constitute a Hedge Provider unless and until Agent receives a Bank Product Provider Agreement from such Person and with respect to the applicable Hedge Agreement within ten (10) days (or such later date as the Agent shall agree) (or ~~five~~two (~~5~~2) Business Days prior to the ~~Closing~~<u>Second Amendment Effective</u> Date with respect to any Hedge Agreement existing on the ~~Closing~~<u>Second Amendment Effective</u> Date) after the execution and delivery of such Hedge Agreement with a Borrower or its Subsidiaries; provided further, that if, at any time, a Revolving Lender ceases to be a Revolving Lender under the Agreement, then, from and after the date on which it ceases to be a Revolving Lender thereunder, neither it nor any of its Affiliates shall constitute Hedge Providers and the obligations with respect to Hedge Agreements entered into with such former Revolving Lender or any of its Affiliates shall no longer constitute Hedge Obligations.

"<u>Hedge Reserves</u>" means, as of any date of determination, those reserves that Agent deems necessary or appropriate, in its Permitted Discretion and subject to the last paragraph of <u>Section 2.1(a)</u>, to establish and maintain with respect to the Hedge Obligations of the Borrowers or their Subsidiaries secured by the Collateral.

"Identified Locations" means the locations identified on the most recently delivered location report provided pursuant to clause (m) of  Schedule 5.2  of the Agreement or such other locations identified by the Borrowers to the Agent from time to time.

"Immaterial Subsidiary" means (a) the Persons identified on Schedule I-1 to this Agreement and (b) any other Subsidiary that, together with its Subsidiaries, does not have (i) Consolidated Total Assets in excess of 5.0% of the Consolidated Total Assets of Parent and its Subsidiaries on a consolidated basis as of the date of the most recent consolidated balance sheet of Parent or (ii) consolidated total revenues in excess 5.0% of the consolidated total revenues of Parent and its Subsidiaries on a consolidated basis for the most recently ended four (4) fiscal quarters for which internal financial statements of Parent are available immediately preceding such calculation date; provided that any such Subsidiary, when taken together with all other Immaterial Subsidiaries does not, in each case together with their respective Subsidiaries, have (i) Consolidated Total Assets with a value in excess of 10.0% of the Consolidated Total Assets of Parent and its Subsidiaries on a consolidated basis or (ii) consolidated total revenues in excess of 10.0% of the consolidated total revenues of Parent and its Subsidiaries on a consolidated basis. For the avoidance of doubt, no Borrower shall be an Immaterial Subsidiary.

"In-Transit Inventory Triggering Event" means any date on which Excess Availability is less than the greater of (a) 20% of the Line Cap, and (b) $~~300,000,000~~525,000,000.

"Increased Borrowing Base Reporting Period" has the meaning specified in  Schedule 5.2.

"Incremental Amendment" has the meaning specified in  Section 2.16(d).

"Incremental Commitment" means each Upsize Incremental Commitment and/or each Foreign Subsidiary Incremental Commitment, as the context requires.

"Incremental Loans" means the Upsize Incremental Loans and/or the Foreign Subsidiary Incremental Loans, as the context requires.

"Indebtedness" as to any Person means (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers' acceptances, or other financial products, (c) all obligations of such Person as a lessee under Capital Leases, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all obligations of such Person to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business), (f) all monetary obligations of such Person owing under Hedge Agreements (which amount shall be calculated based on the amount that would be payable by such Person if the Hedge Agreement were terminated on the date of determination), (g) any Disqualified Equity Interests of such Person, and (h) any obligation of such Person guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (g) above. For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness which is limited or is non-recourse to a Person or for which recourse is limited to an identified asset shall be valued at the lesser of (A) if applicable, the limited amount of such obligations, and (B) if applicable, the fair market value of such assets securing such obligation. For purposes of this definition, no obligation of AMUSA with respect to AM SA Receivables Facility shall constitute Indebtedness for purposes of this Agreement.

"Indemnified Liabilities" has the meaning specified therefor in  Section 10.3 of the Agreement.

"Indemnified Person" has the meaning specified therefor in Section 10.3 of the Agreement.

"Indemnified Taxes" means, any Taxes other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document.

"Insolvency Proceeding" means with respect to any Person, (a) any proceeding, corporate action, procedure or step commenced or taken by or against that Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief, or (b) the appointment of a custodian, trustee, receiver, interim receiver, national receiver, receiver-manager, monitor, liquidator, administrator, judicial manager, administrative receiver, supervisor, compulsory manager, Controller or similar custodian for that Person or for substantially all of its assets.

"Intercompany Subordination Agreement" means an intercompany subordination agreement, dated as of the Closing Date, executed and delivered by each of the other Loan Parties and Agent.

"Intercreditor Agreement" means that certain ABL Intercreditor Agreement, dated as of December 19, 2017, between Agent and U.S. Bank National Association, as collateral agent in respect of the Senior Secured Notes and acknowledged and agreed to by the Loan Parties.

"Interest Expense" means, for any period, the aggregate of the interest expense of Parent for such period, determined on a consolidated basis in accordance with GAAP.

"Interest Period" means, with respect to each LIBOR Rate Loan, a period commencing on the date of the making of such LIBOR Rate Loan (or the continuation of a LIBOR Rate Loan or the conversion of a Base Rate Loan to a LIBOR Rate Loan) and ending one week thereafter, 1, 2, 3, or 6 months thereafter or, if agreed to by all Lenders, such shorter or longer period; provided, that (a) interest shall accrue at the applicable rate based upon the LIBOR Rate from and including the first day of each Interest Period to, but excluding, the day on which any Interest Period expires, (b) any Interest Period that would end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (c) with respect to an Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period), the Interest Period shall end on the last Business Day of the calendar month that is 1, 2, 3, 6 or 12 months after the date on which the Interest Period began, as applicable, and (d) Borrowers may not elect an Interest Period which will end after the Maturity Date.

"Inventory" means inventory (as that term is defined in the Code).

"Inventory/Equipment Reserves" means, as of any date of determination, (a) Landlord Reserves for locations of any Loan Parties, and (b) those reserves that Agent deems necessary or appropriate, in its Permitted Discretion and subject to the last paragraph of Section 2.1(a), to establish and maintain (including reserves for slow moving Inventory and Inventory shrinkage) with respect to Eligible Inventory or Eligible Equipment of the Loan Parties or the Maximum Revolver Amount.

"Investment" means, with respect to any Person, any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances, capital contributions (excluding (a) commission, travel, and similar advances to directors, officers and employees of such Person made in the ordinary course of business, and (b) bona fide accounts receivable arising in the ordinary course of business), or acquisitions of Equity Interests, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person), and any other items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP. The amount of any Investment shall be the original cost of such Investment *plus* the cost of all additions thereto, without any

adjustment for increases or decreases in value, or write-ups, write-downs, or write-offs with respect to such Investment.

"Investment Grade Rating" means, with respect to any Person, such Person's senior unsecured long-term non-credit-enhanced indebtedness has a rating equal to or higher than Baa3 (or the equivalent) by Moody's or a rating equal to or higher than BBB- (or the equivalent) by S&P.

"IRC" means the Internal Revenue Code of 1986, as amended.

"ISDA Definitions" means the 2006 ISDA Definitions (or successor definitional booklet for interest rate derivatives) published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time.

"ISP" means, with respect to any Letter of Credit, the International Standby Practices 1998 (International Chamber of Commerce Publication No. 590) and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued.

"Issuer Document" means, with respect to any Letter of Credit, a letter of credit application, a letter of credit agreement, or any other document, agreement or instrument entered into (or to be entered into) by a Borrower in favor of Issuing Bank and relating to such Letter of Credit.

"Issuing Bank" means Bank of America (or any of its Affiliates), Credit Suisse AG, Cayman Islands Branch (or any of its Affiliates), JPMorgan Chase Bank, N.A., Wells Fargo Bank, National Association, Deutsche Bank AG New York Branch, Goldman Sachs Bank USA, PNC Bank, National Association, Citibank, N.A., Barclays Bank PLC, Citizens Bank, N.A., Regions Bank, The Huntington National Bank, Fifth Third Bank, National Association and each other Revolving Lender appointed by Parent and agreed by the Agent and such Revolving Lender, in their sole discretion, to become an Issuing Bank for the purpose of issuing Letters of Credit pursuant to Section 2.11 of the Agreement, and, in each case, their respective permitted successors and assigns. Each Issuing Bank shall be deemed to be a Lender and a Revolving Lender.

"Issuing Bank Indemnitees" means each Issuing Bank and its officers, directors, employees, Affiliates, agents and attorneys.

"Joint Book Runners" means BofA Securities, Inc., Credit Suisse Loan Funding LLC, JPMorgan Chase Bank, N.A., Wells Fargo Bank, National Association, Deutsche Bank Securities Inc., Goldman Sachs Bank USA, PNC Capital Markets LLC, Citigroup Global Markets Inc., Barclays Bank PLC, Citizens Capital Markets, Inc., Regions Capital Markets, The Huntington National Bank and Fifth Third Bank, National Association.

"Joint Lead Arrangers" means BofA Securities, Inc., Credit Suisse Loan Funding LLC, JPMorgan Chase Bank, N.A., Wells Fargo Bank, National Association, Deutsche Bank Securities Inc., Goldman Sachs Bank USA, PNC Capital Markets LLC, Citigroup Global Markets Inc., Barclays Bank PLC, Citizens Capital Markets, Inc., Regions Capital Markets, The Huntington National Bank and Fifth Third Bank, National Association.

"Joint Venture" means a corporation, partnership, limited liability company or other entity or organization that has voting Equity Interests directly or indirectly owned by Parent; provided, however, that none of the following shall be a Joint Venture hereunder: (i) any wholly-owned Subsidiary of Parent and (ii) any trade creditor or customer in which Parent or any of its Subsidiaries has made an Investment pursuant to clause (t) of the definition of Permitted Investments.

"Joint Venture Agreements" means, collectively any agreement which establishes a Joint Venture and any governing documents related thereto.

31

"Landlord Reserve" means, as to each location not owned by a Loan Party at which a Loan Party has Inventory of a type included in the Borrowing Base, Equipment of a type included in the Borrowing Base or books and records related to Accounts of a type included in the Borrowing Base or any such Inventory or Equipment located and as to which a Collateral Access Agreement has not been received by Agent, a reserve in an amount equal to the greater of (a) the number of months' rent for which the landlord, bailee or warehousemen will have, under applicable law, a Lien in the Inventory or Equipment of such Loan Party to secure the payment of rent or other amounts under the lease or other agreement relative to such location, or (b) with respect to a location where Inventory is located, six (6) months' rent and charges under the lease or other agreement relative to such location and with respect to a location where Equipment is located, 12 months' rent and charges under the lease or other agreement relative to such location.

"Lender" has the meaning set forth in the preamble to the Agreement, shall include each Tranche B Revolving Lender, Issuing Bank and the Swing Lender, and shall also include any other Person made a party to the Agreement pursuant to the provisions of Section 13.1 of the Agreement and " Lenders" means each of the Lenders or any one or more of them. For avoidance of doubt, each Additional Lender is a Lender to the extent any such Person has executed and delivered an Incremental Amendment and to the extent such Incremental Amendment shall have become effective in accordance with the terms hereof and thereof.

"Lender Group" means each of the Lenders (including each Tranche B Revolving Lender, Issuing Bank and the Swing Lender) and Agent, or any one or more of them.

"Lender Group Expenses" means all (a) reasonable and documented costs and out-of-pocket expenses (including insurance premiums), other than Excluded Taxes and Indemnified Taxes, required to be paid by any Borrower or its Subsidiaries under any of the Loan Documents that are paid, advanced, or incurred by Agent, (b) reasonable and documented out-of-pocket fees or charges paid or incurred by Agent in connection with the Lender Group's transactions with each Borrower and its Subsidiaries under any of the Loan Documents, including, photocopying, notarization, couriers and messengers, telecommunication, public record searches, filing fees, recording fees, publication, real estate surveys and environmental audits, (c) Agent's customary fees and charges imposed or incurred in connection with any background checks or OFAC/PEP searches related to any Borrower or its Subsidiaries, (d) Agent's customary fees and charges (as adjusted from time to time) with respect to the disbursement of funds (or the receipt of funds) to or for the account of any Borrower (whether by wire transfer or otherwise), together with any out-of-pocket costs and expenses incurred in connection therewith, (e) customary charges imposed or incurred by Agent resulting from the dishonor of checks payable by or to any Loan Party, (f) reasonable and documented out-of-pocket costs and expenses paid or incurred by Agent to correct any default or enforce any provision of the Loan Documents, or during the continuance of an Event of Default, in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (g) field examination, appraisal, and valuation fees and expenses of Agent related to any field examinations, appraisals, or valuation to the extent of the fees and charges (and up to the amount of any limitation) provided in Section 2.10 of the Agreement, (h) Agent's reasonable and documented costs and out-of-pocket expenses (including reasonable documented attorneys' fees and expenses) relative to third party claims or any other lawsuit or adverse proceeding paid or incurred, whether in enforcing or defending the Loan Documents or otherwise in connection with the transactions contemplated by the Loan Documents, Agent's Liens in and to the Collateral, or the Lender Group's relationship with any Borrower or any of its Subsidiaries, (i) Agent's reasonable and documented costs and out-of-pocket expenses (including reasonable and documented attorneys' fees and due diligence expenses) incurred in advising, structuring, drafting, reviewing, administering (including travel, meals, and lodging), syndicating (including reasonable and documented costs and out-of-pocket expenses relative to CUSIP, DXSyndicate™, SyndTrak or other communication costs incurred in connection with a syndication of the loan facilities), or amending, waiving, or modifying the Loan Documents, and (j) Agent's and each Lender's reasonable and documented costs and out-of-pocket expenses (including reasonable and

documented attorneys', accountants', consultants', and other advisors' fees and expenses) incurred in terminating, enforcing (including attorneys', accountants', consultants', and other advisors' fees and expenses incurred in connection with a "workout," a "restructuring," or an Insolvency Proceeding concerning any Borrower or any of its Subsidiaries or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether a lawsuit or other adverse proceeding is brought, or in taking any Enforcement Action or any Remedial Action with respect to the Collateral.

"Lender Group Representatives" has the meaning specified therefor in Section 18.9(a) of the Agreement.

"Lender-Related Person" means, with respect to any Lender, such Lender, together with such Lender's Affiliates, officers, directors, employees, attorneys, and agents.

"Letter of Credit" means a letter of credit (as that term is defined in the Code) issued by an Issuing Bank for the account of a Borrower pursuant to the Agreement, including, without limitation, the Existing Letters of Credit.

"Letter of Credit Collateralization" means either (a) providing cash collateral (pursuant to documentation reasonably satisfactory to Agent and the Issuing Bank, including provisions that specify that the Letter of Credit Fees and all commissions, fees, charges and expenses provided for in Section 2.11(l) of the Agreement (including any fronting fees) will continue to accrue while the Letters of Credit are outstanding) to be held by Agent for the benefit of the Revolving Lenders in an amount equal to the sum of (i) 103% of the then existing Letter of Credit Usage that is denominated in Dollars, and (ii) 103% of the then existing Letter of Credit Usage that is denominated in an Agreed Currency other than Dollars, (b) delivering to Agent documentation executed by all beneficiaries under the Letters of Credit, in form and substance reasonably satisfactory to Agent and Issuing Bank, terminating all of such beneficiaries' rights under the Letters of Credit, or (c) providing Agent with a standby letter of credit, in form and substance reasonably satisfactory to Agent, from a commercial bank acceptable to Agent (in its sole discretion) in an amount equal to the sum of (i) 103% of the then existing Letter of Credit Usage that is denominated in Dollars, and (ii) 103% of the then existing Letter of Credit Usage that is denominated in an Agreed Currency other than Dollars (it being understood that the Letter of Credit Fee and all fronting fees set forth in the Agreement will continue to accrue while the Letters of Credit are outstanding and that any such fees that accrue must be an amount that can be drawn under any such standby letter of credit).

"Letter of Credit Disbursement" means a payment made by any Issuing Bank pursuant to a Letter of Credit.

"Letter of Credit Expiration Date" shall mean the date which is five (5) Business Days prior to the Maturity Date (as determined pursuant to clause (a) of the definition thereof).

"Letter of Credit Exposure" means, as of any date of determination with respect to any Revolving Lender, such Revolving Lender's Pro Rata Share of the Letter of Credit Usage on such date.

"Letter of Credit Fee" has the meaning specified therefor in Section 2.6(b) of the Agreement.

"Letter of Credit Indemnified Costs" has the meaning specified therefor in Section 2.11(f) of the Agreement.

"Letter of Credit Related Person" has the meaning specified therefor in Section 2.11(f) of the Agreement.

"Letter of Credit Sublimit" means an amount equal to $555,000,000, which amount (i) shall be allocated in the following amounts: $170,000,000.00 to Bank of America (or any of its Affiliates),

33

$30,000,000.00 to Credit Suisse AG, Cayman Islands Branch (or any of its Affiliates), $45,000,000.00 to JPMorgan Chase Bank, N.A., $45,000,000.00 to Wells Fargo Bank, National Association, $30,000,000.00 to Deutsche Bank AG New York Branch, $30,000,000.00 to Goldman Sachs Bank USA, $55,000,000.00 to PNC Bank, National Association, $27,000,000.00 to Citibank, N.A., $21,000,000.00 to Barclays Bank PLC, $27,000,000.00 to Citizens Bank, N.A., $27,000,000.00 to Regions Bank, $21,000,000.00 to The Huntington National Bank and $27,000,000.00 to Fifth Third Bank, National Association and (ii) may be increased in connection with the incurrence of Incremental Commitments in accordance with Section 2.16(a) upon the agreement of (x) one or more existing Issuing Banks to increase their allocation of the Letter of Credit Sublimit or (y) one or more Additional Lenders appointed by Parent and agreed by the Agent and such Additional Lender, in their sole discretion, to become an Issuing Bank for the purpose of issuing Letters of Credit pursuant to Section 2.11 to provide such increase.

"Letter of Credit Usage" means, as of any date of determination, the aggregate undrawn amount of all outstanding Letters of Credit.

"LIBOR Deadline" has the meaning specified therefor in Section 2.13(b)(i) of the Agreement.

"LIBOR Notice" means a written notice substantially in the form of Exhibit L-1 to the Agreement.

"LIBOR Option" has the meaning specified therefor in Section 2.13(a) of the Agreement.

"LIBOR Rate" means the per annum rate of interest (rounded up, if necessary, to the nearest 1/100th of 1%) determined by Agent at or about 11:00 a.m. (London time) two (2) Business Days prior to an interest period, for a term equivalent to such period, equal to the London Interbank Offered Rate, or comparable or successor rate approved by Agent, as published on the applicable Reuters screen page (or other commercially available source designated by Agent from time to time); provided, that any such comparable or successor rate shall be applied by Agent, if administratively feasible, in a manner consistent with market practice (and, if any such rate is below zero, the LIBOR Rate shall be deemed to be zero); provided, further, that the LIBOR Rate shall in no event be less than 0.000.25% per annum.

"LIBOR Rate Loan" means each portion of a Loan that bears interest at a rate determined by reference to the LIBOR Rate.

"LIBOR Replacement Date" has the meaning specified in Section 2.13(d)(iv) of this Agreement.

"LIBOR Screen Rate" means the LIBOR Rate quote on the applicable screen page that Agent designates to determine the LIBOR Rate (or such other commercially available source providing such quotations as designated by Agent from time to time).

"LIBOR Successor Rate" has the meaning specified in Section 2.13(d)(iv) of this Agreement.

"LIBOR Successor Rate Conforming Changes" means, with respect to any proposed LIBOR Successor Rate, means any conforming changes to the definition of Base Rate, Interest Period, timing and frequency of determining rates and making payments of interest and other technical, administrative or operational matters (including, for the avoidance of doubt, the definition of Business Day, timing of borrowing requests or prepayment, conversion or continuation notices, and length of look-back periods) as may be appropriate, in the Agent's discretion of Agent, to reflect the adoption and implementation of such LIBOR Successor Rate and to permit the administration thereof by Agent in a manner substantially consistent with market practice (or, if Agent determines that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such LIBOR Successor Rate exists, in such other manner of administration as Agent determines is reasonably necessary in connection with the administration of this Agreement and any other Loan Document).

34

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory or other), security interest, or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever, including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"Limited Condition Transaction" means any Permitted Acquisition or other similar Investment that constitutes a Permitted Investment, in each case, whose consummation is not conditioned on the availability of, or on obtaining, third party financing.

"Line Cap" means, as of any date of determination, the lesser of (a) the Maximum Revolver Amount and (b) the Aggregate Borrowing Base as of such date.

"Liquidity" means, as of any date of determination, the sum of Excess Availability  *plus* Qualified Cash held in an account agreed between Parent and Agent (and any successor account agreed by Parent and Agent) as of such date of determination, which account is subject to a Cash Collateral Account letter agreement between Bank of America and the Loan Party which is the holder of such account *plus* unrestricted cash in a Blocked Account.

"Loan" means any Revolving Loan, Tranche A Revolving Loan, Tranche B Revolving Loan, Swing Loan, Incremental Loan or Extraordinary Advance made (or to be made) hereunder.

"Loan Account" has the meaning specified therefor in  Section 2.9 of the Agreement.

"Loan Documents" means the Agreement, the Control Agreements, the Copyright Security Agreement, any Borrowing Base Certificate, the Fee Letter, the Guaranty and Security Agreement, the Intercompany Subordination Agreement, the Intercreditor Agreement, any Issuer Documents, the Letters of Credit, the Patent Security Agreement, the Trademark Security Agreement, any Incremental Amendment, any note or notes executed by Borrowers in connection with the Agreement and payable to any member of the Lender Group, and any other instrument or agreement entered into, now or in the future, by any Borrower or any of its Subsidiaries and any member of the Lender Group in connection with the Agreement.

"Loan Party" means any Borrower or any Guarantor. "Loan Parties" means, collectively, the Borrowers and the Guarantors.

"Margin Stock" as defined in Regulation U of the Board of Governors as in effect from time to time.

"Material Adverse Effect" means (a) a material adverse effect in the business, operations, results of operations, assets, liabilities or financial condition of Borrowers and their Subsidiaries, taken as a whole, (b) a material impairment of Borrowers' and their Subsidiaries' ability, when taken as a whole, to perform their obligations under the Loan Documents to which they are parties or of the Lender Group's ability to enforce the Obligations or realize upon a material portion of the Collateral (other than as a result of as a result of an action taken or not taken that is solely in the control of Agent), or (c) a material impairment of the enforceability or priority of Agent's Liens with respect to all or a material portion of the Collateral.

"Material Contract" means, with respect to any Person, (a) any agreement, indenture or other instrument with respect to Existing Debt and (b) any contract or agreement, the loss of which would reasonably be expected to result in a Material Adverse Effect.

35

"Material Indebtedness" any agreement, indenture or other instrument with respect to Indebtedness for borrowed money of the Loan Parties of $150,000,000 or more.

"Maturity Date" means the earlier of (a) March 13, 2025 and (b) the date that is 91 days before the stated maturity date of any portion of the Existing Debt, if (in the case of this clause (b)) on such date the aggregate principal amount of all Existing Debt outstanding that would mature on or before such 91st day exceeds $100,000,000 (unless on and from such 91st day, and until such portion of the Existing Debt is either (i) less than $100,000,000 in the aggregate, or (ii) repaid, redeemed, defeased, extended or refinanced such that it matures 91 days after the Maturity Date set forth in clause (a), the Loan Parties have Qualified Cash in excess of such amount greater than $100,000,000 or have deposited such amount in excess of $100,000,000 with the trustee, agent or similar person with respect to such Existing Debt). References in the Agreement to "91 days after the Maturity Date" shall mean the Maturity Date as determined pursuant to clause (a) of this definition.

"Maximum Revolver Amount" means $~~2,000,000,000~~3,500,000,000, decreased by the amount of reductions in the Revolver Commitments made in accordance with Section 2.4(c) of the Agreement and as may be increased pursuant to  Section 2.16.

"Mexican Subsidiary" means, with respect to any Person, a Subsidiary of such Person that is organized under the laws of Mexico.

"Mobile Equipment" means any forklifts, trailers, graders, dump trucks, water trucks, grapple trucks, lift trucks, flatbed trucks, fuel trucks, other trucks, dozers, cranes, loaders, skid steers, excavators, back hoes, shovels, drill crawlers, other drills, scrappers, graders, gondolas, flat cars, ore cars, shuttle cars, jenny cars, conveyors, locomotives, miners, other rail cars, and any other vehicles, mobile equipment and other equipment similar to any of the foregoing.

"Moody's" has the meaning specified therefor in the definition of Domestic Cash Equivalents.

"Multiemployer Plan" means any multiemployer plan within the meaning of Section 3(37) or 4001(a)(3) of ERISA with respect to which any Loan Party or any of its Subsidiaries or their respective ERISA Affiliates has an obligation to contribute or has any liability, contingent or otherwise or could be assessed Withdrawal Liability assuming a complete or partial withdrawal from any such multiemployer plan.

"Net Book Value" means, (i) with respect to Equipment, the net book value under GAAP (but net of delivery charges, sales tax, federal excise tax and other costs incidental to the purchase thereof) as reported by Borrowers to Agent; provided that for purposes of the calculation of the Borrowing Base, the Net Book Value of the Equipment shall not include (a) the portion of the value of the Equipment equal to the profit earned by any Affiliate of Parent on the sale thereof to any Loan Party, or (b) write-ups or write-downs in value with respect to currency exchange rates, (ii) with respect to Accounts, the net book value under GAAP and (iii) with respect to Inventory, the net book value under GAAP as reported by Borrowers to Agent.

"Net Orderly Liquidation Value" means, with respect to Equipment or Inventory, the orderly liquidation value of such Equipment or Inventory determined for each category of such Equipment or Inventory (but net of all associated costs and expenses of such liquidation) as specified in the most recent appraisal received by Agent from an appraisal company reasonably acceptable to Agent in its Permitted Discretion. With respect to Eligible Equipment, the Net Orderly Liquidation Value shall be determined as of the date of each Borrowing Base Certificate giving effect to depreciation and assuming that since the last appraisal the ratio of Net Book Value to Net Orderly Liquidation Value has remained constant.

"Net Termination Payments" has the meaning specified therefor in  Section 2.4(b)(iv) of the Agreement.

36

"Non-Consenting Lender" has the meaning specified therefor in Section 14.2(a) of the Agreement.

"Non-Defaulting Lender" means each Lender other than a Defaulting Lender.

"Notification Event" means (a) the occurrence of a "reportable event" described in Section 4043 of ERISA for which the 30-day notice requirement has not been waived by applicable regulations issued by the PBGC with respect to a Pension Plan, (b) the withdrawal of any Loan Party or ERISA Affiliate from a Pension Plan during a plan year in which it was a "substantial employer" as defined in Section 4001(a)(2) of ERISA, (c) the termination of a Pension Plan, the filing of a notice of intent to terminate a Pension Plan or the treatment of a Pension Plan amendment as a termination, under Section 4041 of ERISA, if the plan assets are not sufficient to pay all plan liabilities, (d) the institution of proceedings to terminate, or the appointment of a trustee with respect to, any Pension Plan or Multiemployer Plan by the PBGC, (e) any other event or condition that would constitute grounds under Sections 4042(a)(1)-(3) of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan, (f) the imposition of a Lien pursuant to the IRC or ERISA in connection with any Employee Benefit Plan or the existence of any facts or circumstances that would reasonably be expected to result in the imposition of a Lien, (g) the partial or complete withdrawal of any Loan Party or ERISA Affiliate from a Multiemployer Plan or the receipt of notification that a partial or complete withdrawal has occurred, (h) the reorganization or insolvency of a Multiemployer Plan under ERISA, (i) the termination of a Multiemployer Plan under Section 4041A of ERISA or the institution by the PBGC of proceedings to terminate or to appoint a trustee to administer a Multiemployer Plan under ERISA including the filing of a notice of reorganization, insolvency or termination (or treatment of a plan amendment as termination) under Section 4041A of ERISA, (j) any Pension Plan being in "at risk status" within the meaning of IRC Section 430(i), (k) receipt of notification by any Loan Party or ERISA Affiliate that any Multiemployer Plan being in "endangered status" or "critical status" within the meaning of IRC Section 432(b) or the determination that any Multiemployer Plan is insolvent within the meaning of Title IV of ERISA, (l) with respect to any Pension Plan, any Loan Party or ERISA Affiliate incurring a substantial cessation of operations within the meaning of ERISA Section 4062(e), (m) the failure of any Pension Plan to meet the minimum funding standards within the meaning of the IRC or ERISA (including Section 412 or 430 of the IRC or Section 302 of ERISA), in each case, whether or not waived, (n) the filing of an application for a waiver of the minimum funding standards within the meaning of the IRC or ERISA (including Section 412 or 430 of the IRC or Section 302 of ERISA) with respect to any Pension Plan, or (o) any event that results in or would reasonably be expected to result in a liability by a Loan Party pursuant to the excise tax provisions of the IRC relating to Employee Benefit Plans.

"Obligations" means (a) all loans (including the Revolving Loans (inclusive of Extraordinary Advances and Swing Loans)), debts, principal, interest (including any interest that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), reimbursement or indemnification obligations with respect to Letters of Credit (irrespective of whether contingent), premiums, liabilities (including all amounts charged to the Loan Account pursuant to the Agreement), obligations (including indemnification obligations), fees, Lender Group Expenses (including any fees or expenses that accrue after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), guaranties, and all covenants and duties of any other kind and description owing by any Loan Party arising out of, under, pursuant to, in connection with, or evidenced by the Agreement or any of the other Loan Documents and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all other expenses or other amounts that the Loan Parties are required to pay or reimburse by the Loan Documents or by law or otherwise in connection with the Loan Documents, and (b) all Bank Product Obligations; provided, however, that the Obligations shall not include any Excluded Swap Obligations. Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents include the obligation to pay (i) the principal of the Revolving Loans, (ii) interest accrued on the Revolving Loans, (iii) the amount necessary to reimburse any Issuing Bank for amounts paid or payable pursuant to Letters of Credit, (iv)

Letter of Credit commissions, fees (including fronting fees) and charges, (v) Lender Group Expenses, (vi) fees payable under the Agreement or any of the other Loan Documents, and (vii) indemnities and other amounts payable by any Loan Party under any Loan Document. Any reference in the Agreement or in the Loan Documents to the Obligations shall include all or any portion thereof and any extensions, modifications, renewals, or alterations thereof, both prior and subsequent to any Insolvency Proceeding.

"OFAC" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"OID" means original issue discount.

"Originating Lender" has the meaning specified therefor in  Section 13.1(e) of the Agreement.

"Overadvance" means, as of any date of determination, that the Revolver Usage is greater than any of the limitations set forth in   Section 2.1(a) or Section 2.11, in each case subject to  Section 1.7(d).

"Overadvance Loan" shall mean a Revolving Loan that is a Base Rate Loan made when an Overadvance exists or is caused by the funding thereof.

"Parent" has the meaning specified therefor in the preamble to the Agreement.

"Pari Secured Hedge Agreement" means each Hedge Agreement designated by the applicable Hedge Provider as a "Pari Secured Hedge Agreement" in a Bank Product Provider Agreement delivered to the Agent pursuant to Section 18.5(b); provided that no such designation shall be permitted if after giving effect thereto (and to the applicable Pari Secured Hedge Reserves), Excess Availability would be less than $0.

"Pari Secured Hedge Obligations" means all Hedge Obligations in respect of Pari Secured Hedge Agreements; provided that in order for any such Hedge Obligations to constitute "Pari Secured Hedge Obligations", if the applicable Hedge Provider is any Person other than Bank of America or its Affiliates, then Agent shall have received a Bank Product Provider Agreement with respect to the applicable Hedge Agreement within, (x) with respect to any Existing Hedge Obligations, ten (10) days (or such later date as the Agent shall agree) (or ~~five~~two (~~5~~2) Business Days prior to the  ~~Closing~~Second Amendment Effective Date with respect to any Hedge Agreement existing on the ~~Closing~~Second Amendment Effective Date) of the ~~Closing~~Second Amendment Effective Date and (y) with respect to any Hedge Agreement entered into after the ~~Closing~~Second Amendment Effective Date, ten (10) days (or such later date as the Agent shall agree) after the date of the provision of the applicable Hedge Agreement to the Borrowers or their Subsidiaries.

"Pari Secured Hedge Reserves" means, as of any date of determination, those reserves that Agent deems necessary or appropriate to establish (based upon the Hedge Providers' determination of the liabilities and obligations of the Borrowers and their Subsidiaries in respect of Pari Secured Hedge Obligations and certified to the Agent in accordance with Section 18.5) in respect of Pari Secured Hedge Obligations then provided or outstanding.

"Participant" has the meaning specified therefor in  Section 13.1(e) of the Agreement.

"Participant Register" has the meaning set forth in  Section 13.1(i) of the Agreement.

"Participating Member State" means any member state of the European Union that adopts or has adopted the Euro as its lawful currency in accordance with legislation of the European Union relating to economic and monetary union.

"Patent Security Agreement" has the meaning specified therefor in the Guaranty and Security Agreement.

38

"Patriot Act" has the meaning specified therefor in Section 4.13 of the Agreement.

"Payment Conditions" means:

(a) with respect to any proposed transaction pursuant to clause (g) or clause (m) of the definition of Permitted Investments or clause (c) of the definition of Permitted Acquisitions, that (A) no Default or Event of Default has occurred and is continuing or would result therefrom and (B) (i) Borrowers' Excess Availability for each of the 30 consecutive days immediately preceding the date of such transaction, and both immediately before and immediately after giving effect to such transaction, is in excess of the greater of (I) $~~125,000,000~~218,750,000 and (II) 15% of the Line Cap or (ii) (1) Borrowers' Excess Availability for each of the 30 consecutive days immediately preceding the date of such transaction, and both immediately before and immediately after giving effect to such transaction, is in excess of the greater of (I) $~~100,000,000~~175,000,000 and (II) 10% of the Line Cap and (2) immediately after giving pro forma effect to such transaction, the Fixed Charge Coverage Ratio of Parent and its Subsidiaries is at least 1.00:1.00 as of the 12-month period ending as of the most recently ended fiscal quarter (calculated assuming that such transaction was consummated as of the end of such fiscal quarter); and

(b) with respect to any other proposed transaction, that (A) no Default or Event of Default has occurred and is continuing or would result therefrom and (B) (i) Borrowers' Excess Availability for each of the 30 consecutive days immediately preceding the date of such transaction, and both immediately before and immediately after giving effect to such transaction, is in excess of the greater of (I) $~~200,000,000~~350,000,000 and (II) 20% of the Line Cap or (ii) (1) Borrowers' Excess Availability for each of the 30 consecutive days immediately preceding the date of such transaction, and both immediately before and immediately after giving effect to such transaction, is in excess of the greater of (I) $~~125,000,000~~218,750,000 and (II) 15% of the Line Cap and (2) immediately after giving pro forma effect to such transaction, the Fixed Charge Coverage Ratio of Parent and its Subsidiaries is at least 1.00:1.00 as of the 12-month period ending as of the most recently ended fiscal quarter (calculated assuming that such transaction was consummated as of the end of such fiscal quarter).

"PBGC" means the Pension Benefit Guaranty Corporation or any successor agency.

"Pension Plan" means any employee benefit plan, other than a Multiemployer Plan, which is subject to the provisions of Title IV or Section 302 of ERISA or Sections 412 or 430 of the IRC sponsored, maintained, or contributed to by any Loan Party, Subsidiary or their respective ERISA Affiliates or to which any Loan Party, Subsidiary or their respective ERISA Affiliate has any liability, contingent or otherwise.

"Permitted Acquisition" means any Acquisition so long as:

(a) no Default or Event of Default shall have occurred and be continuing or would result from the consummation of the proposed Acquisition and the proposed Acquisition is consensual,

(b) for any Permitted Acquisition pursuant to which the aggregate purchase price is greater than $500,000,000, Borrowers have provided Agent with five (5) Business Days' (or such shorter period as Agent may agree) prior notice, and such information, including historical financial statements and projections, as Agent shall have reasonably requested (to the extent available),

(c) the Payment Conditions will be satisfied, and

(d) the subject assets or Equity Interests, as applicable, are being acquired directly by a Borrower or one of its Subsidiaries and, in connection therewith, the applicable Loan Party shall have complied with Section 5.11 or 5.12 of the Agreement, as applicable.

"Permitted Discretion" means a determination made in good faith based upon the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

A006487

"Permitted Dispositions" means:

(a) sales, abandonment, or other dispositions of any personal property or Real Property that, in the reasonable judgment of any Borrower or any of its Subsidiaries, has become obsolete, worn out or no longer used or useful or, except with respect to personal property included in the Borrowing Base, is surplus or has become uneconomic, in each case in the ordinary course of business and (ii) licenses, leases or subleases of Real Property or personal property in the ordinary course of business so long as such licenses, leases or subleases do not individually or in the aggregate interfere in any material respect with the ordinary conduct of the business of Borrowers and their Subsidiaries,

(b) sales of Inventory to buyers in the ordinary course of business,

(c) the use or transfer of money or Cash Equivalents in a manner that is not prohibited by the terms of the Agreement or the other Loan Documents,

(d) the licensing or sublicensing of patents, trademarks, copyrights, and other intellectual property rights in the ordinary course of business,

(e) the granting of Permitted Liens,

(f) the sale or discount, in each case without recourse, of accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof,

(g) any involuntary loss, damage or destruction of property,

(h) any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property,

(i) the licensing, leasing or subleasing of assets (other than Real Property) of any Borrower or its Subsidiaries in the ordinary course of business,

(j) the sale or issuance of Equity Interests (other than Disqualified Equity Interests) of Parent,

(k) the lapse or abandonment of registered patents, trademarks, copyrights and other intellectual property of any Borrower or any of its Subsidiaries to the extent that, in the reasonable judgment of such Borrower or Subsidiary, such intellectual property is not economically desirable in the conduct of its business,

(l) the making of Restricted Payments (in cash or stock) that are expressly permitted to be made pursuant to the Agreement,

(m) the making of Permitted Investments (in cash) or the consummation of a transaction permitted by Section 6.3,

(n) the sale, transfer, lease or other disposition of assets (i) from any Loan Party to another Loan Party, (ii) from any Subsidiary of any Borrower that is not a Loan Party to any Loan Party or any other Subsidiary of any Borrower, or (iii) from any Loan Party to a Subsidiary that is not a Loan Party, in the case of this clause (iii) only, in an aggregate amount not exceed the greater of (x) $~~50,000,000~~100,000,000 and (y) 0.75% of Consolidated Net Tangible Assets, measured as of the last day of the fiscal quarter ending prior to the date of such disposition for which financial statements have been delivered to the Agent, during any fiscal year,

40

(o) dispositions of assets acquired by Borrowers and the Subsidiaries pursuant to a Permitted Acquisition consummated within 12 months of the date of the proposed disposition so long as (i) the consideration received for the assets to be so disposed is at least equal to the fair market value of such assets and for at least 75% cash, (ii) the assets to be so disposed are not necessary or economically desirable in connection with the business of Borrowers and their Subsidiaries, (iii) the assets to be so disposed are readily identifiable as assets acquired pursuant to the subject Permitted Acquisition and (iv) if any such assets consist of ABL Priority Collateral that are of a type included in the Borrowing Base and have a fair market value in excess of $50,000,000100,000,000, the Parent shall have delivered an updated Borrowing Base Certificate reflecting the disposition of those assets,

(p) sales or dispositions of assets as disclosed to the Agent in writing (which may be distributed by the Agent to the Lenders) prior to the Closing Date, provided that if any such assets consist of ABL Priority Collateral that are of a type included in the Borrowing Base and have a fair market value in excess of $50,000,000100,000,000, the Parent shall have delivered an updated Borrowing Base Certificate reflecting the disposition of those assets,

(q) sales or dispositions of assets not otherwise permitted in clauses (a) through (p) above or clauses (r) through (v) below so long as (i) made at fair market value for at least 75% cash, (ii) if any such assets consist of ABL Priority Collateral that are of a type included in the Borrowing Base and have a fair market value in excess of $50,000,000100,000,000, the Parent shall have delivered an updated Borrowing Base Certificate reflecting the disposition of those assets and (iii) the aggregate fair market value of all assets disposed of during any fiscal year would not exceed the greater of (x) $100,000,000200,000,000 and (y) 1.50% of Consolidated Net Tangible Assets, measured as of the last day of the fiscal quarter ending prior to the date of such disposition for which financial statements have been delivered to the Agent,

(r) sales or dispositions of assets for fair market value and at least 75% cash so long as (i) the Payment Conditions are satisfied and (ii) if any such assets consist of ABL Priority Collateral that are of a type included in the Borrowing Base and have a fair market value in excess of $50,000,000, the Parent shall have delivered an updated Borrowing Base Certificate reflecting the disposition of those assets,

(s) [reserved]transactions contemplated by the AMUSA Acquisition Agreement and the Transaction Documents (as defined therein) ,

(t) the direct or indirect sale or other disposition of Collateral by a Loan Party in connection with any Permitted Joint Venture; provided that such Loan Party receives consideration at least equal to the fair market value of the Collateral subject to the sale or other disposition (and, in the case of ABL Priority Collateral, for 100% cash), and

(u) sales or dispositions of assets in an aggregate amount not to exceed $10,000,00020,000,000 in any fiscal year;

provided that for purposes of clauses (o), (q), (r) and (t) above the following shall be deemed cash with respect to the disposition of assets (other than ABL Priority Collateral) (A) the repayment or assumption by the transferee of Indebtedness secured by Liens with a priority to the Liens securing the Obligations (other than Indebtedness incurred in contemplation of such disposition), (B) the repayment or assumption by the transferee of liabilities (as shown on the Parent's most recent balance sheet or in the notes thereto), other than liabilities that are subordinated in right of payment to the Obligations, (C) any securities, notes or other obligations received by any Loan Party that are, within 180 days of the disposition of such assets, converted by such Loan Party into cash or Cash Equivalents and (D) any Designated Non-Cash Consideration received by such Loan Party in such disposition having an aggregate fair market value, taken together with all other Designated Non-Cash Consideration received pursuant to this proviso that has at that time not been converted into cash or Cash Equivalents not to

41

exceed the greater of (x) $ ~~150,000,000~~300,000,000 and (y) 2.25% of Consolidated Net Tangible Assets at the time of the receipt of such Designated Non-Cash Consideration (with the fair market value of each item of Designated Non-Cash Consideration being measured at the time received and without giving effect to subsequent changes in value).

"Permitted Indebtedness" means:

(a) Indebtedness evidenced by the Agreement or the other Loan Documents,

(b) Indebtedness set forth on Schedule P-4 to the Agreement and any Refinancing Indebtedness in respect of such Indebtedness,

( c ) Permitted Purchase Money Indebtedness in an aggregate amount outstanding at any time not to exceed the greater of (x) $ ~~825,000,000~~1,650,000,000 and (y) 12.50% of Consolidated Net Tangible Assets, measured as of the last day of the fiscal quarter ending prior to the date of such incurrence for which financial statements have been delivered to the Agent, and any Refinancing Indebtedness in respect of such Indebtedness,

(d) endorsement of instruments or other payment items for deposit,

(e) Indebtedness (i) incurred in the ordinary course of business in respect of surety and appeal bonds, performance bonds, bid bonds, appeal bonds, reclamation bonds, completion guarantee and similar obligations, or any similar financial assurance obligations under Environmental Laws or worker's compensation laws or with respect to self-insurance obligations and (ii) consisting of guarantees arising with respect to customary indemnification obligations to purchasers in connection with Permitted Dispositions,

(f) (i) Indebtedness of any Borrower that is incurred in connection with a Permitted Acquisition solely for the purpose of consummating such Permitted Acquisition so long as (A) no Event of Default has occurred and is continuing or would result therefrom, (B) such Indebtedness is not incurred for working capital purposes, (C) such Indebtedness does not mature prior to the date that is 181 days after the Maturity Date, (D) such Indebtedness does not amortize until 181 days after the Maturity Date, (E) such Indebtedness does not provide for the payment of interest thereon in cash or Cash Equivalents other than current market interest, as determined by the Parent in its reasonable business judgment, (F) if such Indebtedness is secured (1) the Liens securing such Indebtedness shall be *pari passu* with or junior to the Liens securing the Senior Secured Notes (or if the Senior Secured Notes are no longer outstanding at such time, such Liens would have been *pari passu* with or junior to the Liens securing the Senior Secured Notes had the Senior Secured Notes been outstanding), (2) any Liens on ABL Priority Collateral shall be junior to the Liens on the ABL Priority Collateral securing the Obligations, (3) the Liens securing such Indebtedness are subject to an intercreditor agreement in form and substance reasonably satisfactory to Agent (it being agreed the form and substance of the Intercreditor Agreement is acceptable) and (4) on a pro forma basis after giving effect to such Indebtedness, the Parent's "Consolidated Secured Leverage Ratio" (as defined in each Senior Secured Notes Indenture as of the date hereof) does not exceed 3.00:1.00 and (G) on a pro forma basis after giving effect to such Indebtedness, Parent is in compliance with the financial covenant set forth in Section 7 of this Agreement (regardless of whether a Financial Covenant Period is then in effect), and (ii) any Refinancing Indebtedness in respect of such Indebtedness,

(g) Acquired Indebtedness in an aggregate principal amount not to exceed the greater of (x) $ ~~250,000,000~~500,000,000, and (y) 3.75% of Consolidated Net Tangible Assets, measured as of the last day of the fiscal quarter ending prior to the date of such incurrence for which financial statements have been delivered to the Agent, outstanding at any one time and any Refinancing Indebtedness in respect thereof,

(h) Indebtedness (i) incurred in the ordinary course of business under performance, surety, statutory, or appeal bonds or guarantees, and completion guarantees (or obligations in respect of letters of credit related thereto in an amount not to exceed the greater of (x) $30,000,00060,000,000 and (y) 0.50% of Consolidated Net Tangible Assets, measured as of the last day of the fiscal quarter ending prior to the date of such incurrence for which financial statements have been delivered to the Agent, outstanding at any one time) and (ii) in respect of letters of credit which are backstopped or supported by a Letter of Credit issued hereunder,

(i) Indebtedness owed to any Person (or their financing affiliates) providing property, casualty, liability, or other insurance to any Borrower or any of its Subsidiaries, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the year in which such Indebtedness is incurred and such Indebtedness is outstanding only during such year or in connection with the financing of insurance premiums in the ordinary course of business,

(j) the incurrence by Parent or any of its Subsidiaries of Indebtedness under Hedge Agreements that are incurred for the bona fide purpose of hedging the interest rate, commodity, or foreign currency risks associated with Parent's and its Subsidiaries' operations and not for speculative purposes,

(k) Indebtedness incurred in the ordinary course of business in respect of credit cards, credit card processing services, debit cards, stored value cards, commercial cards (including so-called "purchase cards", "procurement cards" or "p-cards"), Cash Management Services, or other Bank Products,

(l) Guaranty Obligations in respect of Indebtedness otherwise permitted under this definition; provided that any guaranty by a Loan Party of Indebtedness of a Subsidiary that is not a Loan Party must be permitted by clause (q) of the definition of "Permitted Investment",

(m) contingent liabilities in respect of any indemnification obligation, adjustment of purchase price, non-compete, or similar obligation of any Loan Party or a Subsidiary incurred in connection with the consummation of one or more Permitted Acquisitions,

(n) Indebtedness composing Permitted Investments (other than clause (u)(i) of the definition thereof),

(o) Indebtedness incurred in respect of netting services, overdraft protection, and other like services, in each case, incurred in the ordinary course of business,

(p) Indebtedness of any Borrower or its Subsidiaries in respect of earn-outs owing to sellers of assets or Equity Interests to such Borrower or its Subsidiaries that is incurred in connection with the consummation of one or more Permitted Acquisitions and any Refinancing Indebtedness in respect of such Indebtedness,

(q) Indebtedness incurred in connection with any sale/leaseback transaction and any Refinancing Indebtedness in respect of such Indebtedness; provided, that such Indebtedness incurred from and after the Closing Date shall be in an aggregate principal amount not to exceed the greater of (x) $200,000,000400,000,000 and (y) 3.0% of Consolidated Net Tangible Assets, measured as of the last day of the fiscal quarter ending prior to the date of such incurrence for which financial statements have been delivered to the Agent, at any time outstanding,

(r) customer advances for prepayment of sales,

(s) accrual of interest, accretion or amortization of original issue discount, or the payment of interest in kind, in each case, on Indebtedness that otherwise constitutes Permitted Indebtedness,

43

(t) Indebtedness evidenced by the Existing Senior Notes in an aggregate principal amount not to exceed the aggregate principal amount thereof outstanding on the Closing Date, and any Refinancing Indebtedness in respect thereof,

(u) (i) Indebtedness evidenced by the 2024 Senior Secured Notes in an aggregate principal amount not to exceed $400,000,000 at any one time outstanding and any Refinancing Indebtedness in respect thereof, (ii) Indebtedness evidenced by the 2025 Senior Secured Notes in an aggregate principal amount not to exceed $955,159,000 at any one time outstanding and any Refinancing Indebtedness in respect thereof, (iii) Indebtedness incurred under the 2026 Senior Secured Notes, in an aggregate principal amount not to exceed $~~725,000,000~~845,000,000 at any one time outstanding and any Refinancing Indebtedness in respect thereof and (~~iii~~iv) Indebtedness in an aggregate principal amount not to exceed the greater of (x) an amount equal to (1) $1,250,000,000 *minus* (2) the principal amount of Indebtedness incurred pursuant to clause (u)(i) and (u)(ii) above and (y) an amount that, on a pro forma basis upon giving effect the incurrence thereof, would not cause Parent's "Consolidated Secured Leverage Ratio" (as defined in each Senior Secured Notes Indenture as of the date hereof) to exceed 3.00:1.00 (and any Refinancing Indebtedness in respect of any such Indebtedness), so long as, in the case of this clause (~~iii~~iv), (A) if such Indebtedness is secured by the Collateral, (x) the Liens securing such Indebtedness shall be *pari passu* with or junior to the Liens securing the Senior Secured Notes (or if the Senior Secured Notes are no longer outstanding at such time, such Liens would have been *pari passu* with or junior to the Liens securing the Senior Secured Notes had the Senior Secured Notes been outstanding), (y) any Liens on ABL Priority Collateral shall be junior to the Liens on the ABL Priority Collateral securing the Obligations and (z) the Liens securing such Indebtedness are subject to an intercreditor agreement in form and substance satisfactory to Agent (it being agreed the form and substance of the Intercreditor Agreement is acceptable), (B) such Indebtedness does not mature prior to the date that is 181 days after the Maturity Date, (C) such Indebtedness does not amortize until 181 days after the Maturity Date, and (D) after giving effect to the incurrence of any such Indebtedness after the Closing Date, Parent is in compliance with the financial covenant set forth in <u>Section 7</u> of this Agreement (regardless of whether a Financial Covenant Period is then in effect),

(v) any other unsecured Indebtedness incurred by any Borrower or any of its Subsidiaries so long as (i) no Default or Event of Default has occurred and is continuing or would result from the incurrence of such Indebtedness, (ii) such Indebtedness does not mature prior to the date that is 181 days after the Maturity Date, (iii) such Indebtedness does not amortize until 181 days after the Maturity Date and (iv) after giving effect to the incurrence of any such Indebtedness, Parent is in compliance with the financial covenant set forth in <u>Section 7</u> of this Agreement (regardless of whether a Financial Covenant Period is then in effect); <u>provided</u> that conditions (ii) and (iii) above shall not be required to be satisfied with respect to Indebtedness in an aggregate principal amount not to exceed $~~100,000,000~~200,000,000 during the term of the Agreement,

(w) (i) Indebtedness of Excluded Subsidiaries listed on <u>Schedule E-3</u> and any Refinancing Indebtedness in respect of such Indebtedness, and (ii) additional Indebtedness of Excluded Subsidiaries in an aggregate amount at any time outstanding not to exceed the greater of (x) $~~150,000,000~~300,000,000 and (y) 2.25% of Consolidated Net Tangible Assets, measured as of the last day of the fiscal quarter ending prior to the date of such incurrence for which financial statements have been delivered to the Agent,

(x) [Reserved],

(y) Permitted Intercompany Advances and Contributions,

(z) Indebtedness evidenced by the Convertible Notes in an aggregate principal amount at any time outstanding not to exceed $316,250,000 and any Refinancing Indebtedness in respect thereof,

(aa) the AK IRBs, and

44

(bb) other Indebtedness in an aggregate amount at any time outstanding not to exceed the greater of (A) $1,000,000,000 2,000,000,000 and (B) 15% of Consolidated Net Tangible Assets measured as of the last day of the fiscal quarter ending prior to the date of such incurrence for which financial statements have been delivered to the Agent, so long as in the case of this clause (bb), (i) such Indebtedness does not mature prior to the date that is 181 days after the Maturity Date, (ii) such Indebtedness does not amortize until 181 days after the Maturity Date and (iii) if such Indebtedness is secured, Liens securing such Indebtedness are permitted under clause (ff) of the definition of "Permitted Liens"; provided that conditions (i) and (ii) above shall not be required to be satisfied with respect to Indebtedness in an aggregate principal amount at any one time outstanding not to exceed $100,000,000 200,000,000.

"Permitted Intercompany Advances and Contributions" means loans, advances or capital contributions made by (a) a Loan Party to another Loan Party, (b) [reserved], (c) a Subsidiary of a Borrower that is not a Loan Party to another Subsidiary of a Borrower that is not a Loan Party, (d) a Subsidiary of a Borrower that is not a Loan Party to a Loan Party, so long as the parties thereto are party to the Intercompany Subordination Agreement, (e) a Loan Party to a Joint Venture existing on the Closing Date and set forth on Schedule J-1 so long as such loans, advances or capital contributions are required by and made in accordance with the Joint Venture Agreements as in effect on the Closing Date and set forth on Schedule J-1, and (f) a Loan Party to a Joint Venture or Subsidiary that is not a Loan Party in an aggregate amount for this clause (f), which shall not exceed, together with all Investments made pursuant to clause (q) of the definition of Permitted Investments, the greater of (x) $400,000,000 800,000,000 and (y) 6.0% of Consolidated Net Tangible Assets, measured as of the last day of the fiscal quarter ending prior to the date of such incurrence for which financial statements have been delivered to the Agent, at any time outstanding.

"Permitted Investments" means:

(a) Investments in cash and Cash Equivalents,

(b) Investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business,

(c) advances made in connection with purchases of goods or services in the ordinary course of business,

(d) Investments received in settlement of amounts due to any Loan Party or any of its Subsidiaries effected in the ordinary course of business or owing to any Loan Party or any of its Subsidiaries as a result of Insolvency Proceedings involving an account debtor or upon the foreclosure or enforcement of any Lien in favor of a Loan Party or its Subsidiaries,

(e) Investments owned by any Loan Party or any of its Subsidiaries on the Closing Date in their respective Subsidiaries and other Investments set forth on Schedule P-1 to the Agreement,

(f) guarantees and other contingent liabilities permitted under the definition of Permitted Indebtedness (other than clause (n) thereof),

(g) Permitted Intercompany Advances and Contributions,

(h) Equity Interests or other securities acquired in connection with the satisfaction or enforcement of Indebtedness or claims due or owing to a Loan Party or its Subsidiaries (in bankruptcy of customers or suppliers or otherwise outside the ordinary course of business) or as security for any such Indebtedness or claims,

45

(i) deposits of cash made in the ordinary course of business to secure performance of operating leases,

(j) loans and advances to employees, officers, and directors of a Borrower or any of its Subsidiaries for bona fide business purposes in the ordinary course of business,

(k) Permitted Acquisitions,

(l) acquisitions of property, plant and equipment to be used in the ordinary course of business,

(m) Investments so long as the Payment Conditions are satisfied at the time thereof,

(n) Investments resulting from entering into (i) Bank Product Agreements, or (ii) agreements relative to Indebtedness that is permitted under clause (j) of the definition of Permitted Indebtedness,

(o) equity Investments by any Loan Party in any Subsidiary of such Loan Party which is required by law to maintain a minimum net capital requirement or as may be otherwise required by applicable law,

(p) Investments held by a Person acquired in a Permitted Acquisition to the extent that such Investments were not made in contemplation of or in connection with such Permitted Acquisition and were in existence on the date of such Permitted Acquisition,

(q) so long as no Event of Default has occurred and is continuing or would result therefrom, any other Investments in an aggregate amount not to exceed the greater of (x) $~~200,000,000~~400,000,000 and (y) 3.0% of Consolidated Net Tangible Assets, measured as of the last day of the fiscal quarter ending prior to the date of such Investment for which financial statements have been delivered to the Agent, during the term of the Agreement,

(r) Hedge Obligations incurred in the ordinary course of business and not for speculative purposes,

(s) mergers, consolidations or amalgamations permitted by Section 6.3,

(t) Investments in securities of trade creditors or customers in the ordinary course of business that are received (i) in settlement of bona fide disputes or pursuant to any plan of reorganization or liquidation or similar arrangement upon the bankruptcy or insolvency of such trade creditors or customers or (ii) in the settlement of debts created in the ordinary course of business,

(u) Permitted Dispositions (other than in reliance on clause (m) thereof), and

(v) Investments in Joint Ventures existing as of the Closing Date and set forth on Schedule J-1 for the purpose of financing such entities' (i) operating expenses incurred in the ordinary course of business, (ii) reasonable Capital Expenditures and (iii) other reasonable obligations that are accounted for by the Parent and its Subsidiaries as increases in equity in such Joint Ventures.

"Permitted Joint Venture" means any Person at least 50% of the capital stock of which is owned by a Loan Party if (a) such Person is engaged in a business related to that of a Loan Party and (b) the Loan Party has the right to appoint at least half of the members of the Board of Directors (or equivalent governing body, including, without limitation, of the general partner of a limited partnership) of such Person.

"Permitted Liens" means

46

(a) Liens granted to, or for the benefit of, Agent to secure the Obligations or any portion thereof,

(b) Liens for unpaid Taxes, assessments, or other governmental charges or levies that either (i) are not yet delinquent by more than 30 days or which can thereafter be paid without penalties, or (ii) do not have priority over Agent's Liens with respect to the ABL Priority Collateral and the underlying Taxes, assessments, or charges or levies are the subject of Permitted Protests,

(c) judgment Liens arising solely as a result of the existence of judgments, orders, or awards that do not constitute an Event of Default under <u>Section 8.3</u> of the Agreement,

(d) Liens set forth on <u>Schedule P-2</u> to the Agreement, any continuation or extension thereof;  <u>provided</u>, that to qualify as a Permitted Lien, any such Lien described on <u>Schedule P-2</u> to the Agreement shall only secure the Indebtedness that it secures on the Closing Date, and any Refinancing Indebtedness in respect thereof,

(e) the interests of lessors under operating leases and non-exclusive licensors under license agreements,

(f) purchase money Liens or the interests of lessors under Capital Leases to the extent that such Liens or interests secure Permitted Purchase Money Indebtedness and so long as (i) in the case of Permitted Purchase Money Indebtedness described in clauses (a) and (b) of the definition thereof, (A) such Lien attaches only to the asset purchased or acquired and the proceeds thereof, and (B) such Lien only secures the Indebtedness that was incurred to acquire the asset purchased or acquired or any Refinancing Indebtedness in respect thereof, and (ii) in the case of Permitted Purchase Money Indebtedness described in clauses (a) through (c) of the definition thereof, such Lien does not attach to ABL Priority Collateral (other than with respect to Permitted Purchase Money Indebtedness (and Refinancing Indebtedness in respect thereof) in an aggregate principal amount not to exceed the greater of (x) $~~250,000,000~~500,000,000 and (y) 3.75% of Consolidated Net Tangible Assets, measured as of the last day of the fiscal quarter ending prior to the date of such incurrence for which financial statements have been delivered to the Agent, at any time outstanding secured by Mobile Equipment (and not any other ABL Priority Collateral) but only to the extent that Parent shall have delivered a notice to Agent clearly identifying the Mobile Equipment subject to such Lien prior to the granting of such Lien),

(g) Liens arising by operation of law in favor of warehousemen, landlords, carriers, vendors', mechanics, materialmen, laborers, suppliers and other like Liens, incurred in the ordinary course of business, and which Liens either (i) are for sums not yet delinquent by more than 30 days, or (ii) are the subject of Permitted Protests,

(h) Liens on amounts pledged or deposited to secure any Borrower's and its Subsidiaries obligations in connection with worker's compensation, other unemployment insurance and similar legislation,

(i) Liens on amounts deposited to secure any Borrower's and its Subsidiaries obligations in connection with the making or entering into of bids, tenders, or leases in the ordinary course of business and not in connection with the borrowing of money,

(j) Liens on amounts deposited to secure any Borrower's and its Subsidiaries reimbursement obligations with respect to surety or appeal bonds obtained in the ordinary course of business,

(k) with respect to any Real Property, easements, rights of way, zoning and similar restrictions, reservations (including severances, leases or reservations of oil, gas, coal, minerals or water rights), restrictions or encumbrances in respect of real property or title defects that were not incurred in

47

connection with indebtedness and do not in the aggregate materially impair their use in the operation of the business of the Parent and its Subsidiaries,

(l) non-exclusive licenses of patents, trademarks, copyrights, and other intellectual property rights in the ordinary course of business,

(m) Liens that are replacements of Permitted Liens to the extent that the original Indebtedness is the subject of permitted Refinancing Indebtedness and so long as the replacement Liens only encumber those assets that secured the original Indebtedness,

(n) rights of setoff, bankers' liens and other similar Liens upon deposits of funds in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such Deposit Accounts in the ordinary course of business,

(o) Liens granted in the ordinary course of business on the unearned portion of insurance premiums securing the financing of insurance premiums to the extent the financing is permitted under the definition of Permitted Indebtedness,

(p) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods,

(q) Liens solely on any cash earnest money deposits made by a Borrower or any of its Subsidiaries in connection with any letter of intent or purchase agreement with respect to a Permitted Acquisition,

(r) Liens assumed by any Borrower or its Subsidiaries in connection with a Permitted Acquisition that secure Acquired Indebtedness; provided that, to the extent any Liens incurred under this clause (r) secures Acquired Indebtedness of a Loan Party in an aggregate principal outstanding (for all such transactions) of greater than $~~50,000,000~~100,000,000 and such Liens secures ABL Priority Collateral, then such Liens shall, within 120 days after the date of assumption thereof, be subject to an intercreditor agreement in form and substance reasonably satisfactory to Agent (it being agreed the form and substance of the Intercreditor Agreement is acceptable) providing that such Liens on ABL Priority Collateral are junior to the Liens on the ABL Priority Collateral securing the Obligations,

(s) Liens on the Collateral securing any Indebtedness permitted to be incurred pursuant to clause (f) or (u) of the definition of "Permitted Indebtedness" and Refinancing Indebtedness in respect thereof, so long as such Liens are subject to the Intercreditor Agreement or such intercreditor agreement in form and substance reasonably satisfactory to the Agent (it being agreed that the form of the Intercreditor Agreement is satisfactory),

(t) Liens in the nature of royalties, dedications of reserves under supply agreements, mining leases or similar rights or interests granted, taken subject to or otherwise imposed on properties consistent with normal practices in the mining industry and any precautionary UCC financing statement filings in respect of leases or consignment arrangements (and not any Indebtedness) entered into in the ordinary course of business,

(u) leases or subleases of properties, in each case entered into in the ordinary course of business so long as such leases or subleases do not, individually or in the aggregate, (i) interfere in any material respect with the ordinary conduct of the business of Borrowers or their respective Subsidiaries or (ii) materially impair the use or the value of the property subject thereto,

(v) Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business in accordance with the past business practices of such Person, and any products or proceeds thereof to the extent covered by such Liens,

48

(w) the filing of UCC financing statements in connection with operating leases, consignment of goods or bailment agreements,

(x) Liens on assets of a Subsidiary that is not a Loan Party in favor of a Borrower or a Subsidiary of a Borrower,

(y) Liens created solely for the purpose of securing Indebtedness permitted by clause (q) of the definition of "Permitted Indebtedness"; provided that any such Liens attach only to the property being leased or acquired pursuant to such Indebtedness and do not encumber any other property (other than any products or proceeds thereof to the extent covered by such Liens),

(z) Liens on (i) letters of credit securing another standby letter of credit, and (ii) cash or Cash Equivalents securing (x) reimbursement or counterindemnity obligations with respect to any standby letter of credit, or (y) any Hedge Obligations of the Parent or any of its Subsidiaries, as to which the aggregate amount of the obligations secured thereby does not exceed the greater of (x) $50,000,000100,000,000 and (y) 0.75% of Consolidated Net Tangible Assets, measured as of the last day of the fiscal quarter ending prior to the date of such incurrence for which financial statements have been delivered to the Agent, at any time outstanding; provided that any such cash or Cash Equivalents shall be held in an Excluded Account not subject to the Agent's control (within the meaning of the Code),

(aa) Liens on the assets of Excluded Subsidiaries securing Indebtedness of Excluded Subsidiaries permitted under clause (w) of the definition of "Permitted Indebtedness",

(bb) Liens in the nature of royalties, dedications of reserves or similar rights or interests granted, taken subject to or otherwise imposed on properties consistent with normal practices in the mining industries and any precautionary UCC financing statement filings in respect of leases or consignment arrangements (and not any Indebtedness) entered into in the ordinary course of business,

(cc) [reserved],

(dd) Liens on assets or property not constituting Collateral in an amount not to exceed the greater of (x) $975,000,0001,950,000,000, and (y) 14.625% of Consolidated Net Tangible Assets, measured as of the last day of the fiscal quarter ending prior to the date of such incurrence for which financial statements have been delivered to the Agent,

(ee) other Liens as to which the aggregate amount of the obligations secured thereby does not exceed the greater of (x) $200,000,000400,000,000 and (y) 3.0% of Consolidated Net Tangible Assets, measured as of the last day of the fiscal quarter ending prior to the date of such incurrence for which financial statements have been delivered to the Agent, at any time outstanding; provided, however, that no more than $ 15,000,00030,000,000 of such Liens permitted under this clause (ee) shall be secured by the ABL Priority Collateral, and

(ff) Liens securing any Indebtedness permitted to be incurred pursuant to clause (bb) of the definition of "Permitted Indebtedness", so long as, if such Indebtedness is secured by the Collateral, (x) the Liens securing such Indebtedness shall be pari passu with or junior to the Liens securing the Senior Secured Notes (or if the Senior Secured Notes are no longer outstanding at such time, such Liens would have been pari passu with or junior to the Liens securing the Senior Secured Notes had the Senior Secured Notes been outstanding), (y) any Liens on ABL Priority Collateral shall be junior to the Liens on the ABL Priority Collateral securing the Obligations and (z) the Liens securing such Indebtedness are subject to the Intercreditor Agreement or such intercreditor agreement in form and substance reasonably satisfactory to the Agent (it being agreed that the form and substance of the Intercreditor Agreement is acceptable), and

(gg) any Liens on the assets of AMUSA in connection with the AM SA Receivables Facility.

49

"Permitted Protest" means the right of any Borrower or any of its Subsidiaries to protest any Lien (other than any Lien that secures the Obligations), Taxes (other than payroll Taxes or Taxes that are the subject of a United States federal Tax lien), or rental payment, provided that (a) a reserve with respect to such obligation is established on such Borrower's or its Subsidiaries' books and records in such amount as is required under GAAP, (b) any such protest is instituted by such Borrower or its Subsidiary, as applicable, in good faith, and (c) with respect to any Lien on ABL Priority Collateral, Agent is satisfied in its Permitted Discretion that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Agent's Liens on such ABL Priority Collateral.

"Permitted Purchase Money Indebtedness" means, as of any date of determination, (a) purchase money Indebtedness, including any such Indebtedness assumed in connection with a Permitted Acquisition, (b) Capitalized Lease Obligations, including any such obligations assumed in connection with a Permitted Acquisition, and (c) Indebtedness incurred to finance the acquisition, construction or improvement of any fixed or capital assets, including any indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on such assets before the acquisition thereof, and any Refinancing Indebtedness thereof, provided that, with respect to the Indebtedness described in clause (c) of this definition ("Project Indebtedness"), (w) such Project Indebtedness is incurred before or within 180 days after such acquisition or the completion of such construction or improvement, (x) such Project Indebtedness shall be secured only by the property acquired, constructed or improved in connection with the incurrence of such Project Indebtedness, (y) with respect to such Project Indebtedness assumed in connection with a Permitted Acquisition, the amount of such Project Indebtedness shall not exceed 100% of the total consideration paid in connection with such Permitted Acquisition and (z) with respect to Project Indebtedness incurred to finance the acquisition of any fixed or capital assets, such Project Indebtedness shall constitute not more than 100% of the aggregate consideration paid with respect to such fixed or capital assets.

"Permitted Ratable Portion" has the meaning specified in Section 2.4(b)(iv).

"Person" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"Plan" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" subject to Section 4975 of the Code or (c) any Person whose assets include Plan Assets of any such "employee benefit plan" or "plan".

"Plan Assets" means "plan assets" within the meaning of U.S. Department of Labor Regulation 29 C.F.R. Section 2510.3-101, as modified by Section 3(42) of ERISA.

"Platform" has the meaning specified therefor in Section 18.9(c) of the Agreement.

"Pounds Sterling" shall mean British Pounds Sterling or any successor currency in the United Kingdom.

"Pre-Adjustment Successor Rate" has the meaning specified in Section 2.13(d)(iv) of this Agreement.

"Prime Rate" the rate of interest announced by Bank of America from time to time as its prime rate. Such rate is set by Bank of America on the basis of various factors, including its costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some

50

loans, which may be priced at, above or below such rate. Any change in such rate publicly announced by Bank of America shall take effect at the opening of business on the day specified in the announcement.

"Pro Rata Share" means, as of any date of determination:

(a) with respect to a Lender's obligation to make all or a portion of the Revolving Loans, with respect to such Lender's right to receive payments of interest, fees, and principal with respect to the Revolving Loans, and with respect to all other computations and other matters related to the Revolver Commitments or the Revolving Loans, the percentage obtained by dividing (i) the Revolving Loan Exposure of such Lender by (ii) the aggregate Revolving Loan Exposure of all Lenders,

(b) with respect to a Lender's obligation to participate in the Letters of Credit, with respect to such Lender's obligation to reimburse any Issuing Bank, and with respect to such Lender's right to receive payments of Letter of Credit Fees, and with respect to all other computations and other matters related to the Letters of Credit, the percentage obtained by dividing (i) the Revolving Loan Exposure of such Lender by (ii) the aggregate Revolving Loan Exposure of all Lenders; provided, that if all of the Revolving Loans have been repaid in full and all Revolver Commitments have been terminated, but Letters of Credit remain outstanding, Pro Rata Share under this clause shall be determined as if the Revolver Commitments had not been terminated and based upon the Revolver Commitments as they existed immediately prior to their termination,

(c) [reserved],

(d) [reserved], and

(e) with respect to all other matters and for all other matters as to a particular Lender (including the indemnification obligations arising under Section 15.6 of the Agreement), the percentage obtained by dividing (i) the Revolving Loan Exposure of such Lender by (ii) the aggregate Revolving Loan Exposure of all Lenders, in any such case as the applicable percentage may be adjusted by assignments permitted pursuant to Section 13.1; provided, that if all of the Loans have been repaid in full, all Letters of Credit have been made the subject of Letter of Credit Collateralization, and all Revolver Commitments have been terminated, Pro Rata Share under this clause shall be determined as if the Revolving Loan Exposures had not been repaid, collateralized, or terminated and shall be based upon the Revolving Loan Exposures as they existed immediately prior to their repayment, collateralization, or termination.

"Projections" means Parent's forecasted (a) balance sheets, (b) profit and loss statements, and (c) cash flow statements, all prepared on a basis consistent with Parent's historical financial statements, together with appropriate supporting details and a statement of underlying assumptions.

"Protective Advances" has the meaning specified therefor in Section 2.3(f)(i) of the Agreement.

"Public Lender" has the meaning specified therefor in Section 18.9(c) of the Agreement.

"Purchase Price" means, with respect to any Acquisition, an amount equal to the aggregate consideration, whether cash, property or securities (including the fair market value of any Equity Interests of Parent issued in connection with such Acquisition), paid or delivered by a Borrower or one of its Subsidiaries in connection with such Acquisition (whether paid at the closing thereof or payable thereafter and whether fixed or contingent), but excluding therefrom (a) any cash of the seller and its Affiliates used to fund any portion of such consideration and (b) any cash or Cash Equivalents acquired in connection with such Acquisition.

"Qualified Cash" means, as of any date of determination, the amount of unrestricted cash and Cash Equivalents of the Loan Parties that is not identifiable proceeds of Collateral and that is held by Bank of America in the account referred to in the definition of Liquidity.

51

"<u>Qualified Equity Interest</u>" means and refers to any Equity Interests issued by Parent (and not by one or more of its Subsidiaries) that is not a Disqualified Equity Interest.

"<u>Real Property</u>" means, collectively, all right, title and interest in and to any and all the parcels of or interests in real property owned or leased by a person or as to which a person otherwise has a possessory interest (including by license or easement), together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures.

"<u>Receivable Reserves</u>" means, as of any date of determination, those reserves that Agent deems necessary or appropriate, in its Permitted Discretion and subject to the last paragraph of <u>Section 2.1(a)</u>, to establish and maintain (including reserves for rebates, discounts, warranty claims, ~~and~~ returns or, until the Transition Agreement End Date, Accounts that are subject to the Transition Agreement not to exceed the amount of proceeds of such Account in a Collection Account (as defined in the Transition Agreement)) with respect to the Eligible Accounts of the Loan Parties or the Maximum Revolver Amount.

"<u>Record</u>" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"<u>Refinancing Indebtedness</u>" means refinancings, renewals, or extensions of Indebtedness so long as:

(a) such refinancings, renewals, or extensions do not result in an increase in the principal amount of the Indebtedness so refinanced, renewed, or extended, other than by the amount of premiums paid thereon and the fees and expenses incurred in connection therewith and by the amount of unfunded commitments with respect thereto,

(b) such refinancings, renewals, or extensions do not result in a shortening of the average weighted maturity (measured as of the refinancing, renewal, or extension) of the Indebtedness so refinanced, renewed, or extended, nor are they on terms or conditions that, taken as a whole, (i) are more burdensome in any material respect to the Parent or any of its Subsidiaries than the Indebtedness being refinanced as determined by Parent in its reasonable business judgment or (ii) are or could be expected to be materially adverse to the interests of the Lenders; <u>provided</u> that the Existing Senior Notes may be refinanced on substantially the same terms as the terms of the Senior Secured Notes,

(c) if the Indebtedness that is refinanced, renewed, or extended was subordinated in right of payment to the Obligations, then the terms and conditions of the refinancing, renewal, or extension must include subordination terms and conditions that, when taken as a whole, as determined by Parent in its reasonable business judgment, are at least as favorable to the Lender Group as those that were applicable to the refinanced, renewed, or extended Indebtedness,

(d) the Indebtedness that is refinanced, renewed, or extended is not recourse to any Person that is liable on account of the Obligations other than those Persons which were obligated with respect to the Indebtedness that was refinanced, renewed, or extended; <u>provided</u> that the Existing Senior Notes may be refinanced on substantially the same terms as the terms of the Senior Secured Notes,

(e) [reserved], and

(f) if such Refinancing Indebtedness in respect of any Existing Senior Notes is secured, such Refinancing Indebtedness shall be secured on a junior priority basis with respect to the ABL Priority Collateral pursuant to an intercreditor agreement in form and substance reasonably acceptable to the Agent, it being agreed the form and substance of the Intercreditor Agreement is acceptable; <u>provided</u> that other than the Existing Senior Notes, no unsecured Indebtedness may be refinanced with secured Indebtedness.

52

"Register" has the meaning set forth in Section 13.1(h) of the Agreement.

"Registered Loan" has the meaning set forth in Section 13.1(h) of the Agreement.

"Related Adjustment" in determining any LIBOR Successor Rate, means the first relevant available alternative set forth in the order below that can be determined by Agent applicable to such LIBOR Successor Rate: (a) the spread adjustment, or method for calculating or determining such spread adjustment, that has been selected or recommended by the Relevant Governmental Body for the relevant Pre-Adjustment Successor Rate (taking into account the interest period, interest payment date or payment period for interest calculated and/or tenor thereto) and which adjustment or method (i) is published on an information service as selected by Agent from time to time in its reasonable discretion or (ii) solely with respect to Term SOFR, if not currently published, which was previously so recommended for Term SOFR and published on an information service acceptable to Agent; or (b) the spread adjustment that would apply (or has previously been applied) to the fallback rate for a derivative transaction referencing the ISDA Definitions (taking into account the interest period, interest payment date or payment period for interest calculated and/or tenor thereto).

"Related Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Relevant Governmental Body" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York for the purpose of recommending a benchmark rate to replace the LIBOR Rate in loan agreements similar to this Agreement.

"Remedial Action" means all actions required by Environmental Laws or a Governmental Authority taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) restore or reclaim natural resources or the environment, (d) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other similar response actions with respect to Hazardous Materials required by Environmental Laws or a Governmental Authority.

"Replacement Lender" has the meaning specified therefor in Section 2.14(b) of the Agreement.

"Report" has the meaning specified therefor in Section 15.9(c) of this Agreement.

"Required Lenders" means, at any time, Lenders having or holding more than 50% of the aggregate Revolving Loan Exposure of all Lenders; provided, that the Revolving Loan Exposure of any Defaulting Lender shall be disregarded in the determination of the Required Lenders.

"Reserves" means, as of any date of determination, those reserves without duplication to Receivable Reserves, Bank Product Reserves, Dilution Reserves, Inventory/Equipment Reserves and Hedge Reserves that Agent deems necessary or appropriate, in its Permitted Discretion and subject to the last paragraph of Section 2.1(a), to establish and maintain (including reserves with respect to (a) sums that any Borrower or its Subsidiaries are required to pay under any Section of the Agreement or any other Loan Document (such as Taxes, assessments, insurance premiums, or, in the case of leased assets, rents or other amounts payable under such leases) and has failed to pay, and (b) amounts owing by any Borrower or its Subsidiaries to any Person to the extent secured by a Lien on, or trust over, any of the ABL Priority Collateral (other than a Permitted Lien), which Lien or trust, in the Permitted Discretion of

53

Agent likely would have a priority superior to the Agent's Liens in and to such item of the ABL Priority Collateral) with respect to the Borrowing Base or the Maximum Revolver Amount.

"Responsible Officer" shall mean any of the President, Chairman, Chief Executive Officer, Chief Operating Officer, Vice Chairman, any Executive Vice President, Chief Financial Officer, General Counsel, Chief Legal Officer, Treasurer or Assistant Treasurer, of Parent.

"Restricted Payment" means to (a) declare or pay any dividend or make any other payment or distribution, directly or indirectly, on account of Equity Interests issued by any Borrower or any of its Subsidiaries or to the direct or indirect holders of Equity Interests issued by such Borrower or such Subsidiary in their capacity as such (other than dividends or distributions payable in Qualified Equity Interests issued by Parent), (b) purchase, redeem, make any sinking fund or similar payment, or otherwise acquire or retire for value (including in connection with any merger or consolidation involving any Borrower or any of its Subsidiaries) any Equity Interests issued by any Borrower or any of its Subsidiaries, and (c) make any payment to retire, or to obtain the surrender of, any outstanding warrants, options, or other rights to acquire Equity Interests of any Borrower or any of its Subsidiaries now or hereafter outstanding.

"Revolver Commitment" means the Tranche A Revolver Commitment and the Tranche B Revolver Commitment, if any.

"Revolver Usage" means, as of any date of determination, the sum of (a) the amount of outstanding Revolving Loans (inclusive of Swing Loans and Protective Advances), *plus* (b) the amount of the Letter of Credit Usage.

"Revolving Lender" means a Lender that has a Revolver Commitment or that has an outstanding Revolving Loan.

"Revolving Loan Exposure" means, with respect to any Revolving Lender, as of any date of determination (a) prior to the termination of the Revolver Commitments, the amount of such Lender's Revolver Commitments, and (b) after the termination of the Revolver Commitments, the aggregate outstanding principal amount of the Revolving Loans of such Lender.

"Revolving Loans" means the Tranche A Revolving Loans and the Tranche B Revolving Loans.

"Sanctioned Entity" means (a) a country or territory or a government of a country, (b) an agency of the government of a country or territory, (c) an organization directly or indirectly owned or controlled by a country or territory or its government, (d) a Person located, organized, or resident in or determined to be resident in a country or territory, in each case, that is subject to a country-based sanctions program administered and enforced by OFAC, Her Majesty's Treasury of the United Kingdom, the European Union, or the United Nations Security Council.

"Sanctioned Person" means at any time, any Person listed in the Sanctions-related list of designated Persons maintained by the OFAC, the U.S. Department of State, the United Nations Security Council, the European Union or any European Union State, or Her Majesty's Treasury of the United Kingdom, or any Person directly or indirectly owned 50% or more, by an such Persons.

"Sanctions" means individually and collectively, respectively, any and all economic sanctions, trade sanctions, financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes anti-terrorism laws and other sanctions laws, regulations or embargoes, including those imposed, administered or enforced from time to time by: (a) the United States of America, including those administered by OFAC, the U.S. Department of State or through any existing or future executive order, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d)

A006502

Her Majesty's Treasury of the United Kingdom, or (d) any other Governmental Authority with jurisdiction over any member of Lender Group or any Loan Party or any of their respective Subsidiaries or Affiliates.

"S&P" has the meaning specified therefor in the definition of Domestic Cash Equivalents.

"Scheduled Unavailability Date" has the meaning specified in Section 2.13(d)(iv) of this Agreement.

"SEC" means the United States Securities and Exchange Commission and any successor thereto.

"Second Amendment" means the Second Amendment to this Agreement, dated as of the Second Amendment Effective Date.

"Second Amendment Effective Date" means December 9, 2020.

"Securities Account" means a securities account (as that term is defined in the Code).

"Securities Act" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"Senior Secured Notes" means, collectively: (a) the 2024 Senior Secured Notes; ~~and~~ (b) the 2025 Senior Secured Notes; and (c ) the 2026 Senior Secured Notes, each as amended, supplemented or otherwise modified from time to time.

"Senior Secured Notes Documents" means the Senior Secured Notes, each Senior Secured Notes Indenture, and all other agreements, documents and instruments entered into now or in the future in connection with the Senior Secured Notes or any Senior Secured Notes Indenture.

"Senior Secured Notes Indenture" means each of: (a) the 2024 Senior Secured Notes Indenture; ~~and~~ (b) the 2025 Senior Secured Notes Indenture; and (c) the 2026 Senior Secured Notes Indenture , each as amended, supplemented or otherwise modified from time to time.

"Settlement" has the meaning specified therefor in Section 2.3(g)(i)(A) of the Agreement.

"Settlement Date" has the meaning specified therefor in Section 2.3(g)(i)(A) of the Agreement.

"Significant Subsidiary" means any Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02(w)(1) or (2) of Regulation S-X promulgated under the Securities Act, as such regulation is in effect on the Issue Date.

"SOFR" with respect to any ~~day~~Business Day means the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark (or a successor administrator) on the Federal Reserve Bank of New ~~York's~~York's website (or any successor source) at approximately 8:00 a.m. (New York City time) on the immediately succeeding Business Day and, in each case, that has been selected or recommended by the Relevant Governmental Body.

"SOFR-Based Rate" means SOFR or Term SOFR.

"Solvent" means, with respect to any Person as of any date of determination, that (a) at fair valuations, the sum of such Person's debts (including contingent liabilities) is less than all of such Person's assets, (b) such Person is not engaged or about to engage in a business or transaction for which the remaining assets of such Person are unreasonably small in relation to the business or

55

transaction or for which the property remaining with such Person is an unreasonably small capital, and (c) such Person has not incurred and does not intend to incur, or reasonably believe that it will incur, debts beyond its ability to pay such debts as they become due (whether at maturity or otherwise), and (d) such Person is "solvent" or not "insolvent", as applicable within the meaning given those terms and similar terms under applicable laws relating to fraudulent transfers and conveyances. For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"Specified Event of Default" shall mean any Event of Default arising under Section 8.1, 8.2 (relating to a failure to deliver a Borrowing Base Certificate when required (after the applicable grace period) or a failure to comply with Section 5.16 or Section 7), 8.4, 8.5, or 8.7 (relating to misrepresentations related to the Tranche A Borrowing Base, the Tranche B Borrowing Base or the Aggregate Borrowing Base).

"Specified Representations" means the representations and warranties made in respect of the Borrower and its direct and indirect Subsidiaries (including, for the avoidance of doubt, the Target and its direct and indirect Subsidiaries) in Sections 4.1(a), 4.2 (other than, solely in the case of the Target and its Subsidiaries, 4.2(b)(ii) and in the case of the Parent and its Subsidiaries (excluding the Target and its Subsidiaries) solely with respect to Material Contracts governing Indebtedness related to borrowed money), 4.4(a), 4.4(b) (limited to creation, validity and perfection except as provided in the last paragraph of Schedule 3.1), 4.9 (after giving effect to the Transactions on the Closing Date), 4.13(b) and, solely with respect to the use of proceeds of the extensions of credit on the Closing Date, 4.13(a) and (c).

"Specified State" means any one of (a) Canada, (b) The Netherlands, (c) Luxembourg and (d) the United States of America.

"Spot Rate" means the exchange rate, as determined by Agent, that is applicable to conversion of one currency into another currency, which is (a) the exchange rate reported by Bloomberg (or other commercially available source designated by Agent) as of the end of the preceding business day in the financial market for the first currency; or (b) if such report is unavailable for any reason, the spot rate for the purchase of the first currency with the second currency as in effect during the preceding business day in Agent's principal foreign exchange trading office for the first currency.

"Standard Letter of Credit Practice" means, for any Issuing Bank, any domestic or foreign law or letter of credit practices applicable in the city in which such Issuing Bank issued the applicable Letter of Credit or, for its branch or correspondent, such laws and practices applicable in the city in which it has advised, confirmed or negotiated such Letter of Credit, as the case may be, in each case, (a) which letter of credit practices are of banks that regularly issue letters of credit in the particular city, and (b) which laws or letter of credit practices are required or permitted under ISP or UCP, as chosen in the applicable Letter of Credit.

"Subsidiary" of a Person means a corporation, partnership, limited liability company, or other entity in which that Person directly or indirectly owns or controls the Equity Interests having ordinary voting power to elect a majority of the Board of Directors of such corporation, partnership, limited liability company, or other entity.

"Supermajority Lenders" means, at any time, Lenders having or holding collectively more than (x) 66 2/3% of the aggregate Tranche A Revolving Loan Exposure of all Lenders and (y) 66 2/3% of the aggregate Tranche B Revolving Loan Exposure of all Lenders; provided, that (a) the Revolving Loan Exposure of any Defaulting Lender shall be disregarded in the determination of the Supermajority Lenders, and (b) at any time there are two (2) or more Lenders with Revolving Loan Exposure of a given

56

Class, "Supermajority Lenders" must include at least two (2) Lenders in such Class (who are not Affiliates of one another).

"Swap Obligation" means, with respect to any Loan Party, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Swing Lender" means Bank of America or any other Revolving Lender that, at the request of Borrowers and with the consent of Agent agrees, in such Revolving Lender's sole discretion, to become the Swing Lender under Section 2.3(c) of the Agreement.

"Swing Loan" has the meaning specified therefor in Section2.3(c) of the Agreement.

"Swing Loan Exposure" means, as of any date of determination with respect to any Lender, such Lender's Pro Rata Share of the Swing Loans on such date.

"Target" means AK Steel Holding Corporation, a Delaware corporation.

"Target ABL Credit Agreement " that certain Second Amended and Restated Loan and Security Agreement, dated as of September 13, 2017, among the Target, as borrower, the borrowing base guarantors party thereto, the lenders from time to time party thereto and Bank of America, N.A., as agent.

"Target Loan Parties" means AK Steel Holding Corporation and each of its Domestic Wholly-Owned Subsidiaries (other than any Excluded Subsidiary).

"Target Senior Secured Notes " means those certain 7.50% Senior Secured Notes due 2023 issued by AK Steel Corporation on June 20, 2016 in the initial aggregate principal amount of $380,000,000 and the indenture governing such notes.

"Taxes" means any taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein, and all interest, penalties or similar liabilities with respect thereto.

"Tax Lender" has the meaning specified therefor in Section 14.2(a) of the Agreement.

"Term SOFR" means the forward-looking term rate for any period that is approximately (as determined by ~~the~~ Agent) as long as any of the ~~periods contemplated by~~Interest Period options set forth in the definition of ~~the term ""~~"Interest Period~~"~~" and that is based on SOFR and that has been selected or recommended by the Relevant Governmental Body, in each case as published on an information service as selected by ~~the~~ Agent from time to time in its reasonable discretion.

"Trademark Security Agreement" has the meaning specified therefor in the Guaranty and Security Agreement.

"Tranche A Base Rate Margin " has the meaning set forth in the definition of Applicable Margin.

"Tranche A Borrowing Base " means, as of any date of determination, the sum of:

(a) 85% of the amount of Eligible Accounts (other than Eligible Investment Grade Accounts) of the Loan Parties, *plus*

(b)    90% of Eligible Investment Grade Accounts of the Loan Parties~~;~~, *plus*

(c) *the lesser* of (i) the product of 80% multiplied by the value (calculated at the lower of cost or market on a basis consistent with Loan Parties' historical accounting practices) of Eligible Inventory of the Loan Parties at such time, and (ii) the product of 85% multiplied by the Net Orderly Liquidation Value of Eligible Inventory of the Loan Parties at such time, *plus*

(d) 65% of the Net Book Value of Accounts with respect to which the Account Debtor either maintains its chief executive office in the United States or is organized under the laws of the United States that are owned by the AMUSA Target Loan Parties, until the earlier of (x) 180 days calendar days (or such longer period agreed to by the Agent in its sole discretion) following the consummation of the AMUSA Acquisition and (y) completion of an appraisal and field examination with respect to such AMUSA Target Loan Party, in each case, reasonably satisfactory to Agent; plus

(e) 50% of the Net Book Value of Inventory owned by AMUSA Target Loan Parties, until the earlier of (x) 180 days calendar days (or such longer period agreed to by the Agent in its sole discretion) following the consummation of the AMUSA Acquisition and (y) completion of an appraisal and field examination with respect to such AMUSA Target Loan Party, in each case, reasonably satisfactory to Agent; plus

(df) *the lesser* of (i) 100% of the Net Book Value of Eligible Equipment of the Loan Parties at such time, and (ii) 85% multiplied by the Net Orderly Liquidation Value of Eligible Equipment of the Loan Parties at such time; provided that this clause (df) of the Tranche A Borrowing Base shall not account for more than 3010% of the availability created by the Tranche A Borrowing Base, *minus*

(g) the aggregate amount of reserves, if any, established by Agent under Section 2.1(a) of the Agreement.

"Tranche A Exchange" has the meaning specified therefor in Section 2.18 of the Agreement.

"Tranche A Exchange Offer" has the meaning specified therefor in Section 2.18 of the Agreement.

"Tranche A Facility" means the Tranche A Revolver Commitments of the Tranche A Revolving Lenders and the Loans and Letter of Credit Disbursements pursuant to those Commitments in accordance with the terms hereof.

"Tranche A LIBOR Rate Margin" has the meaning set forth in the definition of Applicable Margin.

"Tranche A Line Cap" means as of any date of determination, the lesser of (a) the Maximum Revolver Amount *minus* the Tranche B Revolver Commitment of all Lenders (if any) and (b) the Tranche A Borrowing Base as of such date.

"Tranche A Revolving Borrowing" means a Borrowing comprised of Tranche A Revolving Loans.

"Tranche A Revolver Commitment" means, with respect to each Tranche A Revolving Lender, its Tranche A Revolver Commitment, and, with respect to all Tranche A Revolving Lenders, their Tranche A Revolver Commitments, in each case as such Dollar amounts are set forth beside such Tranche A Revolving Lender's name under the applicable heading on Schedule C-1 to the Agreement or in the Assignment and Acceptance or Incremental Amendment pursuant to which such Tranche A Revolving Lender became a Tranche A Revolving Lender under the Agreement, as such amounts may be reduced or increased from time to time pursuant to a Tranche B Exchange Offer or an assignment made in accordance with the provisions of Section 13.1 of the Agreement.

"Tranche A Revolver Usage" means, as of any date of determination, the sum of (a) the amount of outstanding Tranche A Revolving Loans (inclusive of Swing Loans and Protective Advances), *plus* (b) the amount of the Letter of Credit Usage.

"Tranche A Revolving Lender" means a Lender that has a Tranche A Revolver Commitment or that has an outstanding a Tranche A Revolving Loan.

"Tranche A Revolving Loan Exposure " means, with respect to any Tranche A Revolving Lender, as of any date of determination (a) prior to the termination of the Tranche A Revolver Commitments, the amount of such Lender's Tranche A Revolving Lenders Commitments, and (b) after the termination of the Tranche A Revolver Commitments, the aggregate outstanding principal amount of the Tranche A Revolving Loans of such Lender.

"Tranche A Revolving Loans" has the meaning specified therefor in  Section 2.1(a) of the Agreement and includes any Letter of Credit Disbursement, as provided in Section 2.11(d) but shall not include Tranche B Revolving Loans.

"Tranche B Base Rate Margin " has the meaning set forth in the definition of Applicable Margin.

"Tranche B Borrowing" means a Borrowing comprised of Tranche B Revolving Loans under the Tranche B Facility.

"Tranche B Borrowing Base" means, as of any date of determination, the sum of:

(a) 5% of the amount of Eligible Accounts of the Loan Parties, *plus*

(b) 10% of the Net Orderly Liquidation Value of Eligible Inventory of the Loan Parties at such time, *minus*

(c) the aggregate amount of reserves, if any, established by Agent under Section 2.1(a) of the Agreement.

"Tranche B Exchange Offer " has the meaning specified therefor in  Section 2.17 of the Agreement.

"Tranche B Facility" means the Tranche B Revolver Commitments of the Tranche B Revolving Lenders and the Tranche B Revolving Loans pursuant to those Tranche B Revolver Commitments resulting from a Tranche B Exchange Offer, if any.

"Tranche B LIBOR Rate Margin " has the meaning set forth in the definition of Applicable Margin.

"Tranche B Line Cap " means as of any date of determination, an amount equal to the lesser of (a)  ~~$150,000,000~~the Tranche B Revolver Commitments  and (b) the Tranche B Borrowing Base.

"Tranche B Revolver Commitment" means, with respect to each Tranche B Revolving Lender, its commitment under the Tranche B Facility to make Tranche B Revolving Loans up to the Tranche B Line Cap, and, with respect to all Tranche B Revolving Lenders, their commitments under the Tranche B Facility to make Tranche B Revolving Loans up to the Tranche B Line Cap, in each case, in such Dollar Amounts as are set forth beside such Tranche B Revolving Lender's name under the applicable heading on Schedule C-1 to the Agreement or in the Assignment and Acceptance pursuant to which such Tranche B Revolving Lender became a Tranche B Revolving Lender under the Agreement, as such amounts may be reduced or increased from time to time pursuant to a Tranche A Exchange Offer or an assignment made in accordance with the provisions of Section 13.1 of the Agreement.

"Tranche B Revolving Lender" means any Lender hereunder that accepts a Tranche B Exchange Offer pursuant to  Section 2.17 hereof and has a resulting Tranche B Revolver Commitment under the Tranche B Facility.

59

"<u>Tranche B Revolving Loan Exposure</u>" means, with respect to any Tranche B Revolving Lender, as of any date of determination (a) prior to the termination of the Tranche B Revolver Commitments, the amount of such Lender's Tranche B Revolver Commitments, and (b) after the termination of the Tranche B Revolver Commitments, the aggregate outstanding principal amount of the Tranche B Revolving Loans of such Lender.

"<u>Tranche B Revolving Loans</u>" means advances made to or at the instructions of the Borrowers pursuant to  <u>Section 2.3</u> hereof under the Tranche B Facility.

"<u>Transactions</u>" means (a) the execution and delivery of the Agreement, (b) the occurrence of the Closing Date, (c) the consummation of the AK Steel Acquisition, (d) the Closing Date Refinancing and (e) the payment of fees, costs and expenses incurred in connection with the foregoing transactions.

"<u>Transition Agreement</u>" means the Release and Transition Agreement dated December 8, 2020 among AMUSA, ArcelorMittal Ontario G.P., Ester Finance Technologies and Arcelormittal Treasury.

"<u>UCP</u>" means, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits 2007 Revision, International Chamber of Commerce Publication No. 600 and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued.

"<u>Undisclosed Administration</u>" means, in relation to a Lender or its direct or indirect parent company that is a solvent person, the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian, or other similar official by a supervisory authority or regulator under or based on the law in the country where such Lender or such parent company is subject to home jurisdiction, if applicable law requires that such appointment not be disclosed.

"<u>Unfunded Pension Liability</u>" means, with respect to any Pension Plan at any time, the amount of any of its unfunded benefit liabilities as defined in Section 4001(a)(18) of ERISA.

"<u>United States</u>" and "<u>U.S.</u>" mean the United States of America.

"<u>Unused Line Fee</u>" has the meaning specified therefor in  <u>Section 2.10(b)</u> of the Agreement.

"<u>Upsize Incremental Commitment</u>" has the meaning specified in  <u>Section 2.16(a)</u>.

"<u>Upsize Incremental Loans</u>" has the meaning specified in  <u>Section 2.16(a)</u>.

"<u>Voidable Transfer</u>" has the meaning specified therefor in  <u>Section 18.8</u> of the Agreement.

"<u>Withdrawal Liability</u>" means liability with respect to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

**SCHEDULE 3.1**

The effectiveness of the Agreement and the obligation of each Lender to make its initial extension of credit provided for in the Agreement is subject to the fulfillment, to the reasonable satisfaction of each Lender (the delivery of a signature page to the Agreement by a Lender being conclusively deemed to be its satisfaction or waiver of the following), of each of the following conditions precedent:

(a)     The AK Steel Acquisition shall be consummated prior to or substantially contemporaneously with the initial Borrowing hereunder on the Closing Date in all material respects in accordance with the AK Steel Acquisition Agreement (in each case without any waiver, amendment, modification or supplement thereof by the Parent or any of its affiliates or any consent or election thereunder by the Parent or any of its affiliates (any one of the foregoing, a "Modification") that, in any such case, is material and adverse to the Lenders or the Joint Lead Arrangers (in either case, in their capacities as such) without the prior written consent of the Joint Lead Arrangers (not to be unreasonably withheld, conditioned or delayed) (it being understood and agreed that any Modification that results in a change to the definition of the term "Company Material Adverse Effect" or a change to, or waiver of, Section 5.1(f)(ii) of the AK Steel Acquisition Agreement (as in effect on December 2, 2019), in each case shall be deemed to be materially adverse to the Lenders and the Joint Lead Arrangers and any net increase in the aggregate amount of the cash consideration to be paid by the Parent in respect of the AK Steel Acquisition funded with the proceeds of any additional Indebtedness shall be deemed to be materially adverse to the Lenders and the Joint Lead Arrangers;

(b)     The AK Steel Acquisition Agreement Representations shall be true and correct in all material respects and the Specified Representations shall be true and correct in all material respects (or, in each case, in all respects, if separately qualified by materiality) as of the date hereof (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date);

(c)     Subject to Section 3.7 and the last paragraph of this Schedule 3.1, Liens on the Collateral shall have been granted to the Agent and the Agent shall have received (x) evidence that appropriate Uniform Commercial Code financing statements and as-extracted collateral filings have been (or, on the Closing Date, will be) duly filed in such office or offices as may be necessary or, in the opinion of Agent, desirable to perfect the Agent's Liens in and to the Collateral of the Loan Parties (including the Target Loan Parties), (y) certificates, notes or other instruments (if any) representing the Collateral required to be delivered pursuant to the Guaranty and Security Agreement and the Intercreditor Agreement, together with stock powers, note powers or other instruments of transfer (if any) with respect thereto endorsed in blank and (z) all other executed documents and instruments required by the Loan Documents to grant and perfect the Agent's Liens in the Collateral by the Loan Parties and, if applicable, be in proper form for filing;

(d)     Agent shall have received each of the following documents (including, if applicable, any restatements or reaffirmations thereof), in form and substance reasonably satisfactory to Agent, duly executed and delivered, and each such document shall be in full force and effect:

1.   this Agreement executed by each Borrower, Agent and each Lender;

2.   the Guaranty and Security Agreement executed by the Loan Parties (including the Target Loan Parties);

61

3. the Copyright Security Agreement, the Patent Security Agreement and the Trademark Security Agreement, in each case, executed by the applicable Loan Parties (including the Target Loan Parties);

4. the Intercompany Subordination Agreement executed by the Loan Parties (including the Target Loan Parties) and the Agent;

5. a supplement to the Intercreditor Agreement designating this Agreement as an "ABL Credit Agreement" for the purposes of the Intercreditor Agreement executed by the Agent and the Borrowers;

6. an Additional Fixed Asset Designation and an Additional Fixed Asset Joinder (each as defined in the Intercreditor Agreement) with respect to the 2026 Senior Secured Notes; and

7. an Acknowledgement to the Intercreditor Agreement executed by the Target Loan Parties;

(e)    Agent shall have received a certificate from the Secretary or a director of each Loan Party (including the Target Loan Parties) (i) attesting to the resolutions of such Loan Party's board of directors or equivalent governing body authorizing its execution, delivery, and performance of the Loan Documents to which it is a party, (ii) authorizing specific officers of such Loan Party to execute the Loan Documents to which it is a party, and (iii) attesting to the incumbency and signatures of such specific officers of such Loan Party;

(f)    Agent shall have received copies of each Loan Party's (including the Target Loan Parties') Governing Documents, as amended, modified, or supplemented and in effect on the Closing Date, which Governing Documents shall be (i) certified by an officer, director, manager, or equivalent person, of such Loan Party, and (ii) with respect to Governing Documents that are charter documents, certified as of a recent date by an appropriate governmental official;

(g)    Agent shall have received a certificate of status with respect to each Loan Party (including the Target Loan Parties) (where applicable, or such other customary functionally equivalent certificates, to the extent available in the applicable jurisdiction), such certificate to be issued by the appropriate officer of the jurisdiction of organization of such Loan Party, which certificate shall indicate that such Loan Party is in good standing in such jurisdiction;

(h)    Agent shall have received a certificate of insurance, together with the endorsements thereto, as are required by  Section 5.6 of the Agreement, the form and substance of which shall be reasonably satisfactory to Agent;

(i)    Agent shall have received from Jones Day, special New York, Delaware, Ohio, Michigan and Minnesota counsel to the Loan Parties, an opinion addressed to the Agent and each of the Lenders and dated the Closing Date in form and substance reasonably satisfactory to the Agent;

(j)    Agent shall have received a solvency certificate from the Chief Financial Officer (or other comparable financial officer) of the Parent substantially in the form of Exhibit D-1;

(k)    The Closing Date Refinancing shall have been consummated prior to, or shall be made or consummated substantially concurrently with, the initial Borrowings on the Closing Date and, after giving effect to the consummation of the Transactions, the Parent and its Subsidiaries (including, without limitation, the Target and its Subsidiaries) shall have no

62

outstanding Disqualified Equity Interests or material indebtedness for borrowed money other than (a) Revolver Usage, provided, that Revolver Usage shall not exceed $800,000,000 plus the amount of the Letter of Credit Usage under the Existing Letters of Credit, (b) the 2024 Senior Secured Notes and the 2026 Senior Secured Notes, (c) the Existing Senior Notes (to the extent any such Existing Senior Notes are not exchanged pursuant to any exchange offers or refinanced with Refinancing Indebtedness on or before the Closing Date), (d) the Convertible Notes, (e) intercompany debt and intercompany preferred equity in existence on the Closing Date, (g) ordinary course working capital facilities in existence on the Closing Date, (h) overdraft, letter of credit and other banking facilities of the Parent and its Subsidiaries existing on December 2, 2019 entered into in the ordinary course of business and (i) ordinary course hedging arrangements in existence on the Closing Date;

(l)    Agent (on behalf of the Lenders) shall have received (i)(x) audited consolidated balance sheets and related statements of income, comprehensive income, stockholder's equity and cash flows of each of the Parent and its consolidated Subsidiaries and the Target and its consolidated Subsidiaries for the fiscal years ended December 31, 2016, December 31, 2017 and December 31, 2018 and each subsequent fiscal year ended at least 60 days prior to the Closing Date and (y) unaudited consolidated balance sheets and related statements of income, comprehensive income and cash flows of each of the Parent and its consolidated Subsidiaries and the Target and its consolidated Subsidiaries for each fiscal quarter (other than any fourth fiscal quarter) ended after December 31, 2018 and at least 40 days prior to the Closing Date and (ii) a pro forma consolidated balance sheet and related pro forma consolidated statement of income of the Parent as of, and for the twelve-month period ending on, the last day of the most recently completed four-fiscal quarter period for which financial statements of the Parent pursuant to clause (x) above has been delivered, in each case prepared after giving effect to the Transactions as if the Transactions had occurred as of such date (in the case of such balance sheet) or at the beginning of such period (in the case of such income statement), without any requirement to reflect therein adjustments for purchase accounting;

(m)    Borrowers shall have paid (i) all Lender Group Expenses incurred in connection with the transactions evidenced by the Agreement and the other Loan Documents and (ii) all fees required to be paid on the Closing Date pursuant to the Commitment Letter and Fee Letter and out-of-pocket expenses required to be paid on the Closing Date pursuant to the Commitment Letter shall, in each case to the extent invoices have been presented at least three (3) Business Days prior to the Closing Date, upon the initial extensions of credit on the Closing Date, have been paid;

(n)    Agent shall have received an executed Borrowing Base Certificate, certifying as to the initial Borrowing Base or the Alternative Borrowing Base Amount (as applicable) on the Closing Date;

(o)    Agent shall have received a certificate dated as of the Closing Date and signed by a Responsible Officer of the Parent, to the effect set forth in clauses (a) and (b) of this Schedule 3.1;

(p)    [Reserved]; and

(q)    Agent (on behalf of the Lenders) shall have received, at least three (3) Business Days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the Patriot Act, that the Agent or any Lender has requested at least ten (10) Business Days prior to the Closing Date, including, if any Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification in relation to the Borrower.

Notwithstanding anything to the contrary herein, to the extent any Collateral (other than Collateral that may be perfected by (A) the filing of a UCC financing statement or (B) taking delivery and possession of stock (or other equity interest) certificates (other than any certificate issued by the Target) and related stock powers executed in blank with respect to the equity interests that constitute the Collateral (provided that certificates and stock powers in the possession of the collateral trustee in respect of the Senior Secured Notes shall be deemed delivered)) that cannot be delivered or a security interest therein cannot be created or perfected on the Closing Date after the Parent's use of commercially reasonable efforts to do so, then the creation and/or perfection of the security interest in such Collateral shall not constitute a condition precedent to the obligation of each Lender to make its initial extension of credit provided for in the Agreement on the Closing Date but, instead, may be accomplished at any time prior to the date that is 90 days after the Closing Date (with extensions available in the applicable Agent's reasonable discretion) or on any date set forth in Schedule 3.7.

64

SCHEDULE 3.7

[TO BE ATTACHED]

65

**SCHEDULE 5.1**

Deliver to Agent (with copies to any Lender, if so requested by such Lender) each of the financial statements, reports, or other items set forth below at the following times in a form reasonably satisfactory to Agent:

| | |
|---|---|
| within 45 days after the end of each of Parent's fiscal quarters, | (a)    an unaudited consolidated balance sheet, income statement, statement of cash flow, and statement of shareholder's equity covering Parent's and its Subsidiaries' operations during such period and compared to the prior period and plan, together with a corresponding discussion and analysis of results from management (or notice to the Administrative Agent that such discussion and analysis is in the Parent's Form 10-Q), and<br><br>(b)    a Compliance Certificate along with the underlying calculations, including the calculations to arrive at EBITDA , the Consolidated Total Leverage Ratio and Fixed Charge Coverage Ratio (whether or not required to be tested). |
| within 90 days after the end of each of Parent's fiscal years, | (c)    consolidated financial statements of Parent and its Subsidiaries for each such fiscal year, audited by independent certified public accountants of national standing or otherwise reasonably acceptable to Agent and accompanied by an unqualified opinion (as defined in Section 1.2 of the Agreement), of such accountants to the effect that such audited financial statements have been prepared in accordance with GAAP (such audited financial statements to include a balance sheet, income statement, statement of cash flow, and statement of shareholder's equity, and, if prepared, such accountants' final letter to management),<br><br>(d)    unaudited consolidating financial statements of Parent and the other Loan Parties for each such fiscal year, and<br><br>(e)    a Compliance Certificate along with the underlying calculations, including the calculations to arrive at EBITDA , the Consolidated Total Leverage Ratio and Fixed Charge Coverage Ratio (whether or not required to be tested). |
| within 60 days after the end of each of Parent's fiscal years, | (f)    copies of Parent's Projections, in a form reasonably satisfactory to Agent, in its Permitted Discretion, for the forthcoming three (3) years, year by year, and for the forthcoming fiscal year, fiscal quarter by fiscal quarter, certified by the chief financial officer or other senior financial officer of Parent as being prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable by Parent at the time made and at the time so furnished. |
| if and when filed by Parent, | (g)    Form 10-Q quarterly reports, Form 10-K annual reports, and Form 8-K current reports,<br><br>(h)    any other filings made by Parent with the SEC, and<br><br>(i)    any other information that is provided by Parent to its shareholders generally. |

66

| within five (5) Business Days after any Borrower has knowledge of any event or condition that constitutes a Default or an Event of Default, | (j) notice of such event or condition and a statement of the curative action that Borrowers propose to take with respect thereto. |
|---|---|
| within five (5) Business Days after any Borrower has knowledge thereof, | (k) notice of all actions, suits, or proceedings brought by or against any Borrower or any of its Restricted Subsidiaries before any Governmental Authority which would reasonably be expected to result in a Material Adverse Effect. |
| promptly and in any event within 30 days after the filing thereof with the United States Department of Labor or other Governmental Authority, | (l) copies of each Schedule SB (Actuarial Information) to the Annual Report (Form 5500 Series) including, to the extent required, the related financial and actuarial statements and opinions and other supporting statements, certifications, schedules and information with respect to each Pension Plan. |
| promptly upon the request of Agent, | (m) (i) written notice of the commencement of any Environmental Action or receipt of any written notice that an Environmental Action will be filed against a Borrower or its Subsidiaries, in each case, to the extent such Environmental Action would reasonably be expected to result in a Material Adverse Effect, and (ii) written notice of a violation, citation, or other administrative order from a Governmental Authority, to the extent such violation, citation, or other administrative order would reasonably be expected to result in a Material Adverse Effect.<br><br>(n) any other information reasonably requested relating to the financial condition of any Borrower or its Restricted Subsidiaries. |
| promptly after any Borrower has knowledge thereof, | (o) any loss of ABL Priority Collateral exceeding $50,000,000 covered by a Borrower's or a Borrower's Subsidiary's casualty or business interruption insurance; provided that during the continuance of an Event of Default or a Cash Dominion Trigger Period, the threshold included in this sentence shall be $25,000,000. |

For the avoidance of doubt, each document described above may be delivered electronically pursuant to the terms of  Section 5.1 or Section 11 of the Agreement.

67

**SCHEDULE 5.2**

Provide Agent (with copies to any Lender, if so requested by such Lender) with each of the documents set forth below at the following times in a form reasonably satisfactory to Agent:

| | |
|---|---|
| monthly, within 20 days after the end of each fiscal month during each of Parent's fiscal years, or during any Increased Borrowing Base Reporting Period (as defined below), weekly (no later than Wednesday of each week as of and for the immediately preceding week), | (a) an executed Borrowing Base Certificate,<br><br>(b) a detailed aging, by total, of Loan Parties' Accounts, together with a reconciliation and supporting documentation for any reconciling items noted,<br><br>(c) a monthly Account roll-forward, in a format reasonably acceptable to Agent in its Permitted Discretion, tied to the beginning and ending account receivable balances of Loan Parties' general ledger,<br><br>(d) notice of all material claims, offsets, or disputes asserted by Account Debtors with respect to Loan Parties' Accounts,<br><br>(e) Inventory system/perpetual reports specifying the cost and the wholesale market value and Net Orderly Liquidation Value of each Loan Party's Inventory, by category, with additional detail showing additions to and deletions therefrom,<br><br>(f) Equipment reports specifying the Net Book Value and Net Orderly Liquidation Value of each Loan Party's Mobile Equipment, with reasonable additional detail showing additions to and deletions therefrom,<br><br>(g) a detailed calculation of Inventory and Equipment categories that are not eligible for the Borrowing Base,<br><br>(h) a summary aging, by vendor, of Loan Parties and their Subsidiaries' accounts payable and any book overdraft and an aging, by vendor, of any held checks, and<br><br>(i) a detailed report regarding Loan Parties' and their Subsidiaries' cash and Cash Equivalents, including an indication of which amounts constitute Qualified Cash (items (a) – (i) are referred to as the "Borrowing Base Materials"). |
| promptly upon the request of Agent, | (j) other reasonably requested supporting documentation related to the Borrowing Base Materials. |
| monthly, within 30 days after the end of each fiscal month during each of Parent's fiscal years, | (k) a reconciliation of Accounts, trade accounts payable, Inventory and Mobile Equipment of Loan Parties' general ledger accounts to their monthly financial statements including any book reserves related to each category. |
| quarterly, within 45 days after the end of each fiscal quarter during each of Parent's fiscal years, | (l) a report regarding each Loan Party's and its Subsidiaries' accrued, but unpaid, ad valorem taxes.<br><br>(m) a report setting forth the current location of Loan Parties' Inventory and Mobile Equipment included in the most recent Borrowing Base Certificate. |
| promptly, upon the reasonable request by Agent (but no more frequently than semi-annually), | (n) copies of material purchase orders and invoices for Inventory and Equipment of any Loan Party or its Subsidiaries and/or corresponding shipping and delivery documents and credit memos, in each case, together with corresponding supporting documentation.<br><br>(o) such other reports as to the Collateral or the financial condition of any Loan Party and its Subsidiaries, as Agent may request in its Permitted Discretion, including intra-quarter updates as to the locations of Inventory and Mobile Equipment included in the most recent Borrowing Base Certificate. |

As used herein, "Increased Borrowing Base Reporting Period" means a period which shall commence on any date of determination (the "Commencement Date") on which Excess Availability is less than the greater of (a) 12.5% of the Line Cap, and (b) $ ~~100,000,000~~175,000,000, and shall continue until the last day of the first fiscal month ending after the Commencement Date when Excess Availability has been greater than or equal to (x) 12.5% of the Line Cap, and (y) $~~100,000,000~~175,000,000 for a period of 60 consecutive days.

For the avoidance of doubt, each document described above may be delivered electronically, to the extent such an electronic delivery system has been implemented, pursuant to the terms of Section 5.2 or Section 11 of the Agreement.

69

**Exhibit B**

<u>Reaffirmation</u>

Reference is made to the Second Amendment to Asset-Based Revolving Credit Agreement, dated as of December 9, 2020 (the " <u>Amendment</u>"), by and among CLEVELAND-CLIFFS INC., an Ohio corporation, as Parent and a Borrower ("<u>Parent</u>"), the lenders party hereto and Bank of America, N.A., as administrative agent (in such capacity, "<u>Agent</u>") for the Lenders. Capitalized terms not otherwise defined herein have the same meanings assigned thereto in the Amendment.

Each of the undersigned Loan Parties hereby acknowledges that it has read the Amendment and consents to its terms, and further hereby affirms, confirms, represents, warrants and agrees that (a) notwithstanding the effectiveness of the Amendment, the obligations of such Loan Party under each of the Loan Documents to which such Loan Party is a party shall not be impaired and each of the Loan Documents to which such Loan Party is a party is, and shall continue to be, in full force and effect and is hereby confirmed and ratified in all respects and (b) after giving effect to the Amendment, (i) the execution, delivery, performance or effectiveness of the Amendment shall not impair the validity, effectiveness or priority of the Liens granted pursuant to the Loan Documents and such Liens shall continue unimpaired with the same priority to secure repayment of all Obligations, whether heretofore or hereafter incurred, and (ii) the Guaranty and Security Agreement, as and to the extent provided in the Loan Documents, shall continue in full force and effect in respect of the Obligations under the Credit Agreement and the other Loan Documents.

[SIGNATURE PAGES FOLLOW]

**LOAN PARTIES**

Cliffs Mining Company
Northshore Mining Company
The Cleveland-Cliffs Iron Company
Metallics Sales Company


By: _____
Name:
Title:




Cliffs Minnesota Mining Company
Cliffs TIOP, Inc.
Lake Superior & Ishpeming Railroad Company
Silver Bay Power Company
United Taconite LLC
Cliffs UTAC Holding LLC
IronUnits LLC
SNA Carbon, LLC
AKS Investments, Inc.
AK Tube LLC
AK Steel Properties, Inc.
AH Management, Inc.
PPHC Holdings, LLC
Mountain State Carbon, LLC
Precision Partners Holding Company
Fleetwood Metal Industries, LLC
Cannon Automotive Solutions – Bowling Green, Inc.


By: _____
Name:
Title:




Cliffs TIOP II, LLC
Cliffs TIOP Holding, LLC
By: _____
Name:
Title:

A006519

Tilden Mining Company L.C.

By: _____
Name:
Title:


AK Steel Corporation
AK Steel Holding Corporation

By: _____
Name:
Title:


[Signature Page to Second Amendment Reaffirmation]

Exhibit C

**SCHEDULE C-1**

REVOLVER COMMITMENTS

**Tranche A Revolver Commitments**

| Lender | Existing Tranche A Commitment (USD) | 2020 Incremental ABL Commitment (USD) | Total Tranche A Commitment (USD) | Applicable Percentage |
|---|---|---|---|---|
| BOFA SECURITIES, INC. | $260,000,000.00 | $150,000,000.00 | $410,000,000.00 | 12.24% |
| WELLS FARGO BANK, NATIONAL ASSOCIATION | $165,000,000.00 | $125,000,000.00 | $290,000,000.000 | 8.66% |
| JPMORGAN CHASE BANK, N.A. | $165,000,000.00 | $75,000,000.00 | $240,000,000.00 | 7.16% |
| FIFTH THIRD BANK, NATIONAL ASSOCIATION | $93,500,000.00 | $150,000,000.00 | $243,500,000.00 | 7.27% |
| PNC BANK, NATIONAL ASSOCIATION | $120,500,000.00 | $120,000,000.00 | $240,500,000.00 | 7.18% |
| BMO HARRIS BANK N.A. | $53,500,000.00 | $140,000,000.00 | $193,500,000.00 | 5.78% |
| GOLDMAN SACHS BANK USA | $105,000,000.00 | $80,000,000.00 | $185,000,000.00 | 5.52% |
| BARCLAYS BANK PLC | $70,000,000.00 | $100,000,000.00 | $170,000,000.00 | 5.07% |
| CITIBANK, N.A. | $93,500,000.00 | $75,000,000.00 | $168,500,000.00 | 5.03% |
| CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH | $111,000,000.00 | $55,000,000.00 | $166,000,000.00 | 4.96% |
| DEUTSCHE BANK AG NEW YORK BRANCH | $111,000,000.00 | $55,000,000.00 | $166,000,000.00 | 4.96% |
| CITIZENS BANK, N.A. | $100,000,000.00 | $50,000,000.00 | $150,000,000.00 | 4.48% |
| THE HUNTINGTON NATIONAL BANK | $70,000,000.00 | $50,000,000.00 | $120,000,000.00 | 3.58% |
| REGIONS BANK | $85,000,000.00 | $25,000,000.00 | $110,000,000.00 | 3.28% |
| MUFG UNION BANK, N.A. | $- | $100,000,000.00 | $100,000,000.00 | 2.99% |
| TRUIST BANK | $39,500,000.00 | $57,500,000.00 | $97,000,000.00 | 2.90% |
| SIEMENS FINANCIAL SERVICES, INC. | $35,000,000.00 | $40,000,000.00 | $75,000,000.00 | 2.24% |
| U.S. BANK NATIONAL ASSOCIATION | $60,000,000.00 | $- | $60,000,000.00 | 1.79% |
| ROYAL BANK OF CANADA | $35,000,000.00 | $15,000,000.00 | $50,000,000.00 | 1.49% |
| NYCB SPECIALTY FINANCE COMPANY, LLC | $42,500,000.00 | $- | $42,500,000.00 | 1.27% |
| CIT BANK, N.A. | $- | $37,500,000.00 | $37,500,000.00 | 1.12% |
| ING CAPITAL LLC | $35,000,000.00 | $- | $35,000,000.00 | 1.04% |
| **Total** | **$1,850,000,000.00** | **$1,500,000,000.00** | **$3,350,000,000.00** | **100%** |

**Tranche B Revolver Commitments**

| Lender | Tranche B Commitment (USD) | Applicable Percentage |
|---|---|---|
| BOFA SECURITIES, INC. | $40,000,000.00 | 26.67% |
| WELLS FARGO BANK, NATIONAL ASSOCIATION | $10,000,000.00 | 6.67% |
| JPMORGAN CHASE BANK, N.A. | $10,000,000.00 | 6.67% |
| PNC BANK, NATIONAL ASSOCIATION | $9,500,000.00 | 6.33% |
| CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH | $9,000,000.00 | 6.00% |
| DEUTSCHE BANK AG NEW YORK BRANCH | $9,000,000.00 | 6.00% |
| GOLDMAN SACHS BANK USA | $15,000,000.00 | 10.00% |
| REGIONS BANK | $15,000,000.00 | 10.00% |
| FIFTH THIRD BANK, NATIONAL ASSOCIATION | $6,500,000.00 | 4.33% |
| CITIBANK, N.A. | $6,500,000.00 | 4.33% |
| BARCLAYS BANK PLC | $5,000,000.00 | 3.33% |
| THE HUNTINGTON NATIONAL BANK | $5,000,000.00 | 3.33% |
| BMO HARRIS BANK N.A. | $6,500,000.00 | 4.33% |
| TRUIST BANK | $3,000,000.00 | 2.00% |
| **Total** | **$150,000,000.00** | **100%** |

**Letter of Credit Sublimits**

| Lender | Letter of Credit Amount (USD) | Applicable Percentage |
|---|---|---|
| BOFA SECURITIES, INC. | $170,000,000.00 | 30.6306% |
| PNC BANK, NATIONAL ASSOCIATION | $55,000,000.00 | 9.9099% |
| WELLS FARGO BANK, NATIONAL ASSOCIATION | $45,000,000.00 | 8.1081% |
| JPMORGAN CHASE BANK, N.A. | $45,000,000.00 | 8.1081% |
| CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH | $30,000,000.00 | 5.4054% |
| DEUTSCHE BANK AG NEW YORK BRANCH | $30,000,000.00 | 5.4054% |
| GOLDMAN SACHS BANK USA | $30,000,000.00 | 5.4054% |
| REGIONS BANK | $27,000,000.00 | 4.8649% |
| FIFTH THIRD BANK, NATIONAL ASSOCIATION | $27,000,000.00 | 4.8649% |
| CITIBANK, N.A. | $27,000,000.00 | 4.8649% |
| CITIZENS BANK, N.A. | $27,000,000.00 | 4.8649% |
| BARCLAYS BANK PLC | $21,000,000.00 | 3.7838% |
| THE HUNTINGTON NATIONAL BANK | $21,000,000.00 | 3.7838% |
| **Total** | **$555,000,000.00** | **100%** |

**Exhibit D**

**SCHEDULE E-1**

EXISTING HEDGE OBLIGATIONS

None.

Exhibit E

**SCHEDULE E-2**

EXISTING LETTERS OF CREDIT

| Account Party | Issuing Bank | Expiry Date | Letter of Credit Amount | Beneficiary |
|---|---|---|---|---|
| United Taconite LLC | Bank of America, N.A. | 03/13/2020 | $21,222.26 | Minnesota Department of Natural Resources |
| Cleveland-Cliffs Iron Company as Managing Agent for Tilden Mining Co. | PNC Bank, National Association | 03/22/2020 | $10,000,000.00 | WEC Energy Group, Inc. |
| Cleveland-Cliffs Inc. | Bank of America, N.A. | 05/15/2020 | $6,326,260.00 | Ace American Insurance Company |
| Empire Iron Mining Partnership | Bank of America, N.A. | 06/30/2020 | $750,000.00 | Bureau of Workers Disability |
| Cleveland-Cliffs Iron Company | Bank of America, N.A. | 06/30/2020 | $400,000.00 | Department of Energy, Labor and Economic Growth |
| United Taconite LLC | Bank of America, N.A. | 08/21/2020 | $1,900,000.00 | Eveleth Fee Office Inc. |
| Northshore Mining Company | Bank of America, N.A. | 10/24/2020 | $4,000,000.00 | Minnesota Department of Natural Resources |
| Cleveland-Cliffs Inc. | Bank of America, N.A. | 10/24/2020 | $3,782,104.00 | National Union Fire Insurance Co. |
| Cleveland-Cliffs Inc. | Bank of America, N.A. | 11/5/2020 | $2,671,467.00 | Northern Natural Gas Company |
| Tilden Mining Company LC | Bank of America, N.A. | 11/9/2020 | $750,000.00 | Department of Licensing |
| Cleveland-Cliffs Inc. | Bank of America, N.A. | 11/18/2020 | $320,041.00 | Rockwood Casualty Insurance Co. |
| Cleveland-Cliffs Inc. | Bank of America, N.A. | 11/19/2020 | $3,967,129.00 | National Union Fire Insurance Co. |
| Northshore Mining Company | Bank of America, N.A. | 12/18/2020 | $3,051,091.00 | Minnesota Department of Natural Resources |
| AK Steel Corporation | Bank of America, N.A. | 06/23/2020 | $250,000.00 | The Travelers Indemnity Company |
| AK Steel Corporation | PNC Bank, National Association | 12/22/2020 | $1,811,888.00 | US EPA |
| AK Steel Corporation | PNC Bank, National Association | 05/26/2020 | $4,925,420.00 | Pennsylvania EPA |
| AK Steel Corporation | PNC Bank, National Association | 05/26/2020 | $5,379,000.00 | KY Workers Comp |

| AK Steel Corporation | PNC Bank, National Association | 09/07/2020 | $842,518.00 | PNC |
| AK Steel Corporation | PNC Bank, National Association | 05/27/2021 | $44,000.00 | Ohio EPA |
| AK Steel Corporation | Bank of America, N.A. | 08/31/2020 | $1,972,965.00 | Chief Remediation Division |
| AK Steel Corporation | PNC Bank, National Association | 04/01/2020 | $7,817,408.00 | Regional Administrator Region 5 US EPA |
| AK Steel Corporation | PNC Bank, National Association | 05/26/2020 | $846,683.00 | WV Workers Comp |
| AK Steel Corporation | PNC Bank, National Association | 05/26/2020 | $4,767,967.00 | Travelers Casualty & Surety |
| AK Steel Corporation | Bank of America, N.A. | 06/30/2020 | $2,000,000.00 | Department of Licensing |
| AK Steel Corporation | Bank of America, N.A. | 04/27/2020 | $3,578,016.00 | Pennsylvania EPA |
| AK Steel Corporation | Bank of America, N.A. | 05/10/2020 | $26,242,200.00 | US Bank National Association |
| AK Steel Corporation | Bank of America, N.A. | 08/18/2020 | $1,681,049.00 | Ohio EPA |
| AK Steel Corporation | Bank of America, N.A. | 04/30/2022 | $10,000.00 | Bank of America |
| AK Steel Corporation | Bank of America, N.A. | 04/14/2020 | $4,600,000.00 | Ohio Bureau of Workers Comp |
| AK Steel Corporation | PNC Bank, National Association | 05/27/2021 | $838,640.00 | Texas Natural Resources |
| AK Steel Corporation | PNC Bank, National Association | 05/27/2021 | $1,899,290.00 | Pennsylvania EPA |
| AK Steel Corporation | PNC Bank, National Association | 05/26/2020 | $417,000.00 | Employers Ins. Wausau |
| AK Steel Corporation | Bank of America, N.A. | 09/15/2020 | $475,000.00 | Zurich American Insurance Company |

| AK Steel Corporation | Bank of America, N.A. | 04/30/2022 | $10,000.00 | Bank of America |
|---|---|---|---|---|
| AK Steel Corporation | PNC Bank, National Association | 05/26/2020 | $2,000,000.00 | Self Insurance Division |
| AK Steel Corporation | PNC Bank, National Association | 05/26/2020 | $112,384.00 | WV Workers Comp |
| ArcelorMittal USA LLC | Citibank, N.A. | 12/31/2021 | $25,595,080.00 | NY State Dept. of Environmental Conservation |
| ArcelorMittal USA LLC | JPMorgan Chase Bank, N.A. | 2/14/2021 | $200,000.00 | Liberty Mutual Insurance Co. |
| ArcelorMittal USA LLC | JPMorgan Chase Bank, N.A. | 4/16/2021 | $1,750,000.00 | Zurich American Insurance Co. |

**Exhibit F**

<u>**SCHEDULE E-3**</u>

EXCLUDED SUBSIDIARY INDEBTEDNESS

- Indebtedness under the revolving credit facility established pursuant to the Credit Facility Agreement, dated as of November 9, 2020 (the " <u>EDC Facility Agreement</u>"), among Fleetwood Metal Industries Inc. and The Electromac Group Inc., as borrowers, Cleveland-Cliffs Inc., as the guarantor, and Export Development Canada, as lender, as amended from time to time, up to an aggregate principal amount of U.S.$40,000,000;

- Indebtedness under the multicurrency credit facilities established pursuant to the loan agreements between Electromac Group Inc., as borrower, and Flex-N-Gate, as lender, as amended from time to time, up to an aggregate principal amount of U.S.$40,000,000.

**Exhibit G**

### SCHEDULE P-4

PERMITTED INDEBTEDNESS

- Any Debt of PPHC Holdings, LLC and/or any of its Subsidiaries existing on the Closing Date and any refinancing indebtedness thereof in an aggregate outstanding principal amount not to exceed $75,000,000.00

- The Excluded Subsidiary Indebtedness set forth on Schedule E-3 hereto

- Guaranty Obligations of Cleveland-Cliffs Inc. under the Guarantee Agreement, dated as of December 9, 2020, in favor of Export Development Canada made pursuant to the EDC Facility Agreement

Exhibit 21

**SIGNIFICANT SUBSIDIARIES**
**CLEVELAND-CLIFFS INC. AS OF DECEMBER 31, 2020**

| Name | Cliffs' Effective Ownership | Place of Incorporation or Formation |
|---|---|---|
| Cleveland-Cliffs Burns Harbor LLC | 100% | Delaware, USA |
| Cleveland-Cliffs Steel Corporation | 100% | Delaware, USA |
| Cleveland-Cliffs Steel Holding Corporation | 100% | Delaware, USA |
| Cleveland-Cliffs Steel LLC | 100% | Delaware, USA |
| Cliffs Mining Company | 100% | Delaware, USA |
| Cliffs Minnesota Mining Company | 100% | Delaware, USA |
| Cliffs TIOP Holding, LLC | 100% | Delaware, USA |
| Cliffs TIOP, Inc. | 100% | Michigan, USA |
| Cliffs UTAC Holding LLC | 100% | Delaware, USA |
| IronUnits LLC | 100% | Delaware, USA |
| Northshore Mining Company | 100% | Delaware, USA |
| Cleveland-Cliffs Steel Holdings Inc. | 100% | Ohio, USA |
| The Cleveland-Cliffs Iron Company | 100% | Ohio, USA |

The following entities are included in the obligated group, as defined in the Annual Report on Form 10-K of Cleveland Cliffs Inc. to which this document is being filed as an exhibit, including Cleveland-Cliffs Inc., as the parent and issuer, and the subsidiary guarantors that have guaranteed the obligations under the 4.875% 2024 Senior Secured Notes, the 5.75% 2025 Senior Notes, the 6.375% 2025 Senior Notes, the 6.75% 2026 Senior Secured Notes, the 5.875% 2027 Senior Notes, the 7.00% 2027 Senior Notes and the 9.875% 2025 Senior Secured Notes issued by Cleveland- Cliffs Inc.

| Exact Name of Issuer or Guarantor Subsidiary (1) | Reported as Issuer or Guarantor Subsidiary | State of Incorporation or Organization | IRS Employer Identification Number |
|---|---|---|---|
| Cleveland-Cliffs Inc. | Issuer | Ohio | 34-1464672 |
| Cleveland-Cliffs Burns Harbor LLC f/k/a ArcelorMittal Burns Harbor LLC | (3) | Delaware | 20-0653414 |
| Cleveland-Cliffs Cleveland Works LLC f/k/a ArcelorMittal Cleveland Works LLC | (3) | Delaware | 04-3634649 |
| Cleveland-Cliffs Columbus LLC f/k/a ArcelorMittal Columbus LLC | (3) | Delaware | 01-0807137 |
| Cleveland-Cliffs Investments Inc. f/k/a AKS Investments, Inc. | (3) | Ohio | 31-1283531 |
| Cleveland-Cliffs Kote Inc. f/k/a ArcelorMittal Kote Inc. | (3) | Delaware | 36-3665216 |
| Cleveland-Cliffs Kote L.P. f/k/a I/N Kote L.P. | (3) | Delaware | 36-3665288 |
| Cleveland-Cliffs Minorca Mine Inc. f/k/a ArcelorMittal Minorca Mine Inc. | (3) | Delaware | 36-2814042 |
| Cleveland-Cliffs Monessen Coke LLC f/k/a ArcelorMittal Monessen LLC | (3) | Delaware | 25-1850170 |
| Cleveland-Cliffs Plate LLC f/k/a ArcelorMittal Plate LLC | (3) | Delaware | 20-0653500 |
| Cleveland-Cliffs Railways Inc. f/k/a Mittal Steel USA - Railways Inc. | (3) | Delaware | 56-2348283 |
| Cleveland-Cliffs Riverdale LLC f/k/a ArcelorMittal Riverdale LLC | (3) | Delaware | 74-3062732 |
| Cleveland-Cliffs South Chicago & Indiana Harbor Railway Inc. f/k/a ArcelorMittal South Chicago & Indiana Harbor Railway Inc. | (3) | Delaware | 04-3634638 |
| Cleveland-Cliffs Steel Corporation f/k/a AK Steel Corporation | (3) | Delaware | 31-1267098 |
| Cleveland-Cliffs Steel Holding Corporation f/k/a AK Steel Holding Corporation | (3) | Delaware | 31-1401455 |
| Cleveland-Cliffs Steel LLC f/k/a ArcelorMittal USA LLC | (3) | Delaware | 71-0871875 |
| Cleveland-Cliffs Steel Management Inc. f/k/a AH Management, Inc. | (3) | Delaware | 51-0390893 |
| Cleveland-Cliffs Steel Properties Inc. f/k/a AK Steel Properties, Inc. | (3) | Delaware | 51-0390894 |
| Cleveland-Cliffs Steelton LLC f/k/a ArcelorMittal Steelton LLC | (3) | Delaware | 20-0653772 |
| Cleveland-Cliffs Steelworks Railway Inc. f/k/a ArcelorMittal Cleveland Works Railway Inc. | (3) | Delaware | 04-3634622 |
| Cleveland-Cliffs Tek Inc. f/k/a ArcelorMittal Tek Inc. | (3) | Delaware | 36-3519946 |
| Cleveland-Cliffs Tek Kote Acquisition Corporation f/k/a Tek Kote Acquisition Corporation | (3) | Ohio | 85-4304182 |
| Cleveland-Cliffs Tek L.P. f/k/a I/N Tek L.P. | (3) | Delaware | 363525438 |
| Cleveland-Cliffs Tubular Components LLC f/k/a AK Tube LLC | (3) | Delaware | 31-1283531 |
| Cleveland-Cliffs Weirton LLC f/k/a ArcelorMittal Weirton LLC | (3) | Delaware | 56-2435202 |
| Cannon Automotive Solutions - Bowling Green, Inc. | (3) | Delaware | 26-0766559 |
| Cleveland-Cliffs Steel Holdings, Inc. | (3) | Ohio | 85-4084783 |
| Cliffs Mining Company | (2) | Delaware | 34-1120353 |
| Cliffs Minnesota Mining Company | (2) | Delaware | 42-1609117 |
| Cliffs TIOP Holding, LLC | (2) | Delaware | 47-2182060 |
| Cliffs TIOP, Inc. | (2) | Michigan | 34-1371049 |
| Cliffs TIOP II, LLC | (2) | Delaware | 61-1857848 |
| Cliffs UTAC Holding LLC | (2) | Delaware | 26-2895214 |
| Fleetwood Metal Industries, LLC | (3) | Delaware | 98-0508950 |
| IronUnits LLC | (2) | Delaware | 34-1920747 |
| Lake Superior & Ishpeming Railroad Company | (2) | Michigan | 38-6005761 |
| Metallics Sales Company | (3) | Delaware | 84-2076079 |
| Mid-Vol Coal Sales, Inc. | (3) | West Virginia | 55-0761501 |
| Mountain State Carbon, LLC | (3) | Delaware | 31-1267098 |
| Northshore Mining Company | (2) | Delaware | 84-1116857 |

| Exact Name of Issuer or Guarantor Subsidiary (1) | Reported as Issuer or Guarantor Subsidiary | State of Incorporation or Organization | IRS Employer Identification Number |
|---|---|---|---|
| Precision Partners Holding Company | (3) | Delaware | 22-3639336 |
| PPHC Holdings, LLC | (3) | Delaware | 31-1283531 |
| Silver Bay Power Company | (2) | Delaware | 84-1126359 |
| SNA Carbon, LLC | (3) | Delaware | 31-1267098 |
| The Cleveland-Cliffs Iron Company | (2) | Ohio | 34-0677332 |
| Tilden Mining Company L.C. | (2) | Michigan | 34-1804848 |
| United Taconite LLC | (2) | Delaware | 42-1609118 |

(1) The address and phone number of each issuer and guarantor subsidiary is c/o Cleveland-Cliffs Inc., 200 Public Square, Suite 3300, Cleveland, Ohio 44114, (216) 694-5700.

(2) The entity is included as a guarantor subsidiary as of December 31, 2020 and 2019.

(3) The entity is included as a guarantor subsidiary as of December 31, 2020.

**Exhibit 23**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in:

Registration Statement No. 333-237324 on Form S-3;

Registration Statement No. 333-184620 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2012 Incentive Equity Plan;

Registration Statement No. 333-197687 on Form S-8 pertaining to the Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan;

Registration Statement No. 333-197688 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2014 Nonemployee Directors' Compensation Plan;

Registration Statement No. 333-204369 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan;

Registration Statement No. 333-210954 on Form S-8 pertaining to the Cliffs Natural Resources Inc. Amended and Restated 2014 Nonemployee Directors' Compensation Plan;

Registration Statement No. 333-217506 on Form S-8 pertaining to the Cliffs Natural Resources Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan; and

Registration Statement No. 333-237144 on Form S-8 pertaining to the Cliffs Natural Resources Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan;

of our reports dated February 26, 2021, relating to the financial statements of Cleveland-Cliffs Inc. and the effectiveness of Cleveland-Cliffs Inc.'s internal control over financial reporting, appearing in this Annual Report on Form 10-K for the year ended December 31, 2020.

*/s/ DELOITTE & TOUCHE LLP*

Cleveland, Ohio

February 26, 2021

**Exhibit 24**

**POWER OF ATTORNEY**

    KNOW ALL MEN BY THESE PRESENTS, that the undersigned Directors and officers of Cleveland-Cliffs Inc., an Ohio corporation ("Company"), hereby constitute and appoint C. Lourenco Goncalves, Keith A. Koci, James D. Graham and Kimberly A. Floriani, and each of them, their true and lawful attorney or attorneys-in-fact, with full power of substitution and revocation, for them and in their name, place and stead, to sign on their behalf as a Director or officer of the Company, or both, as the case may be, an Annual Report on Form 10-K pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2020, and to sign any and all amendments to such Annual Report, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorney or attorneys-in-fact, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as they might or could do in person, hereby ratifying and confirming all that said attorney or attorneys-in-fact or any of them or their substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Executed as of the 24th day of February, 2021.

| | |
|---|---|
| /s/ C. L. Goncalves | /s/ Keith A. Koci |
| C. L. Goncalves, | K. A. Koci, |
| Chairman, President and Chief Executive Officer | Executive Vice President, Chief Financial Officer |
| /s/ K. A. Floriani | /s/ J. T. Baldwin |
| K. A. Floriani, | J. T. Baldwin, Director |
| Vice President, Corporate Controller & Chief Accounting Officer | |
| /s/ R. P. Fisher, Jr. | /s/ W. K. Gerber |
| R. P. Fisher, Jr., Director | W. K. Gerber, Director |
| /s/ S. M. Green | /s/ M. A. Harlan |
| S. M. Green, Director | M. A. Harlan, Director |
| /s/ R. S. Michael, III | /s/ J. L. Miller |
| R. S. Michael, III, Director | J. L. Miller, Director |
| /s/ E. M. Rychel | /s/ G. Stoliar |
| E. M. Rychel, Director | G. Stoliar, Director |
| /s/ D. C. Taylor | /s/ A. M. Yocum |
| D. C. Taylor, Director | A. M. Yocum, Director |

**Exhibit 31.1**

**CERTIFICATION**

I, Lourenco Goncalves, certify that:

1.  I have reviewed this annual report on Form 10-K of Cleveland-Cliffs Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)), for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected or is reasonably likely to materially affect the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    February 26, 2021

By:    /s/ Lourenco Goncalves
Lourenco Goncalves
Chairman, President and Chief Executive Officer

**Exhibit 31.2**

**CERTIFICATION**

I, Keith A. Koci, certify that:

1.  I have reviewed this annual report on Form 10-K of Cleveland-Cliffs Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)), for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected or is reasonably likely to materially affect the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    February 26, 2021        By:    /s/ Keith A. Koci

Keith A. Koci

Executive Vice President, Chief Financial Officer

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Cleveland-Cliffs Inc. (the "Company") on Form 10-K for the period ended December 31, 2020, as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), I, Lourenco Goncalves, Chairman, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1)     The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)     The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date:     February 26, 2021

By: /s/ Lourenco Goncalves
      Lourenco Goncalves
      Chairman, President and Chief Executive Officer

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Cleveland-Cliffs Inc. (the "Company") on Form 10-K for the period ended December 31, 2020, as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), I, Keith A. Koci, Executive Vice President, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1)     The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)     The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date:      February 26, 2021

By: /s/ Keith A. Koci
Keith A. Koci
Executive Vice President, Chief Financial Officer

**Exhibit 95**

**Mine Safety Disclosures**

The operation of our mines located in the United States is subject to regulation by MSHA under the FMSH Act. MSHA inspects these mines on a regular basis and issues various citations and orders when it believes a violation has occurred under the FMSH Act. We present information below regarding certain mining safety and health citations that MSHA has issued with respect to our mining operations. In evaluating this information, consideration should be given to factors such as: (i) the number of citations and orders will vary depending on the size of the mine; (ii) the number of citations issued will vary from inspector to inspector and mine to mine, and (iii) citations and orders can be contested and appealed and, in that process, are often reduced in severity and amount, and are sometimes dismissed.

Under the Dodd-Frank Act, each operator of a coal or other mine is required to include certain mine safety results within its periodic reports filed with the SEC. As required by the reporting requirements included in §1503(a) of the Dodd-Frank Act, we present the following items regarding certain mining safety and health matters, for the period presented, for each of our mine locations that are covered under the scope of the Dodd-Frank Act:

(A) The total number of violations of mandatory health or safety standards that could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard under section 104 of the FMSH Act (30 U.S.C. 814) for which the operator received a citation from MSHA;

(B) The total number of orders issued under section 104(b) of the FMSH Act (30 U.S.C. 814(b));

(C) The total number of citations and orders for unwarrantable failure of the mine operator to comply with mandatory health or safety standards under section 104(d) of the FMSH Act (30 U.S.C. 814(d));

(D) The total number of imminent danger orders issued under section 107(a) of the FMSH Act (30 U.S.C. 817(a));

(E) The total dollar value of proposed assessments from MSHA under the FMSH Act (30 U.S.C. 801 et seq.);

(F) Legal actions pending before the Federal Mine Safety and Health Review Commission involving such coal or other mine as of the last day of the period;

(G) Legal actions instituted before the Federal Mine Safety and Health Review Commission involving such coal or other mine during the period; and

(H) Legal actions resolved before the Federal Mine Safety and Health Review Commission involving such coal or other mine during the period.

During the year ended December 31, 2020, our mine locations did not receive any flagrant violations under Section 110(b)(2) of the FMSH Act (30 U.S.C. 820(b)(2)) and did not receive any written notices of a pattern of violations, or the potential to have a pattern of such violations, under section 104(e) of the FMSH Act (30 U.S.C. 814(e)). In addition, there were no mining-related fatalities at any of our mine locations during this same period.

Following is a summary of the information described above for the year ended December 31, 2020:

| Mine Name/ MSHA ID No. | Operation | (A) Section 104 S&S Citations | (B) Section 104(b) Orders | (C) Section 104(d) Orders | (D) Section 107(a) Citations & Orders | (E) Total Dollar Value of MSHA Proposed Assessments (1) | (F) Legal Actions Pending as of Last Day of Period | | (G) Legal Actions Instituted During Period | (H) Legal Actions Resolved During Period |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **Year Ended December 31, 2020** | | | | |
| Tilden / 2000422 | Iron Ore | 24 | — | — | — | $ 594,804 | — | | 5 | 6 |
| Empire / 2001012 | Iron Ore | — | — | — | — | $ — | — | | — | — |
| Northshore Plant / 2100831 | Iron Ore | 5 | — | — | — | $ 151,185 | 4 | (2) | 6 | 8 |
| Northshore Mine / 2100209 | Iron Ore | — | — | — | — | $ 2,125 | — | | 2 | 2 |
| United Taconite Plant / 2103404 | Iron Ore | 5 | — | — | — | $ 41,321 | 1 | (3) | 3 | 3 |
| United Taconite Mine / 2103403 | Iron Ore | — | — | — | — | $ 5,663 | — | | — | — |
| Hibbing / 2101600 (8) | Iron Ore | 4 | — | — | — | $ — | 3 | (4) | — | — |
| Minorca Mine / 2102449 (8) | Iron Ore | 2 | — | — | — | $ — | — | | — | 1 |
| AK Coal / North Fork / 3610041 | Coal | 3 | — | — | — | $ 5,443 | 2 | (5) | 2 | 2 |
| Virginia Point No. 1 Surface Mine / 4407172 (8) | Coal | — | — | — | — | $ — | — | | — | — |
| Low Gap Surface Mine / 4605741 (8) | Coal | — | — | — | — | $ — | — | | — | — |
| Eckman Surface Mine / 4608647 (8) | Coal | 1 | — | — | — | $ — | — | | — | — |
| Redhawk Surface Mine / 4609300 (8) | Coal | — | — | — | — | $ — | — | | — | — |
| Dry Branch Surface Mine / 4609395 (8) | Coal | — | — | — | — | $ — | — | | — | — |
| Dans Branch Surface Mine / 4609517 (8) | Coal | — | — | — | — | $ — | — | | — | — |
| Eckman Loadout / 4603341 (8) | Coal | — | — | — | — | $ — | — | | — | — |
| Roadfork Loadout / 4608278 (8) | Coal | — | — | — | — | $ — | — | | — | — |
| Eckman Plant / 4609357 (8) | Coal | — | — | — | — | $ — | 1 | (6) | — | — |
| Mine No. 35 / 4608131 (8) | Coal | — | — | — | — | $ — | — | | — | — |
| Mine No. 39 / 4609261 (8) | Coal | 6 | — | 1 | — | $ — | — | | — | — |
| Mine No. 43 / 4609496 (8) | Coal | 7 | — | — | — | $ — | 1 | (7) | — | — |

(1) Amounts included under the heading "Total Dollar Value of MSHA Proposed Assessments" are the total dollar amounts for proposed assessments received from MSHA on or before December 31, 2020.

(2) This number consists of 4 pending legal actions related to appeals of judges' decisions or orders to the Federal Mine Safety and Health Review Commission referenced in Subpart H of FMSH Act's procedural rules.

(3) This number consists of 1 pending legal action related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules.

(4) This number consists of 3 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules.

(5) This number consists of 2 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules.

(6) This number consists of 1 pending legal action related to complaints of discharge, discrimination, or interference referenced in Subpart E of FMSH Act's procedural rules.

(7) This number consists of 1 pending legal action related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules.

(8) On December 9, 2020, these locations were acquired by Cleveland-Cliffs Inc. The data herein represents the period of ownership from December 9, 2020 to December 31, 2020.

# EXHIBIT 98

A006540

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE
ACT OF 1934

For the fiscal year ended December 31, 2022

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT
OF 1934

For the transition period from _____ to _____

Commission File Number: 1-8944

**CLIFFS**

## CLEVELAND-CLIFFS INC.

*(Exact name of registrant as specified in its charter)*

| Ohio | 34-1464672 |
|---|---|
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(I.R.S. Employer Identification No.)* |
| 200 Public Square,  Cleveland,  Ohio | 44114-2315 |
| *(Address of Principal Executive Offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code: (216) 694-5700**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Shares, par value $0.125 per share | CLF | New York Stock Exchange |

Securities registered pursuant to section 12(g) of the Act: NONE

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.     Yes ☒     NO ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.     Yes ☐     No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.     Yes ☒     No ☐

Indicate by check mark whether the registrant has submitted electronically and attestation every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).     Yes ☒     No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).     Yes ☐     No ☒

As of June 30, 2022, the aggregate market value of the voting and non-voting common shares held by non-affiliates of the registrant, based on the closing price of $15.37 per share as reported on the New York Stock Exchange — Composite Index, was $7,844,058,129 (excluded from this figure are the voting shares beneficially owned by the registrant's officers and directors).

The number of shares outstanding of the registrant's common shares, par value $0.125 per share, was 514,787,304 as of February 13, 2023.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's proxy statement for its 2023 annual meeting of shareholders are incorporated by reference into Part III.

# TABLE OF CONTENTS

|  |  | **Page Number** |
|---|---|---|
| **DEFINITIONS** |  | 1 |
| **PART I** |  |  |
| ITEM 1. | BUSINESS | 4 |
|  | Information About Our Executive Officers | 16 |
| ITEM 1A. | RISK FACTORS | 17 |
| ITEM 1B. | UNRESOLVED STAFF COMMENTS | 28 |
| ITEM 2. | PROPERTIES | 29 |
| ITEM 3. | LEGAL PROCEEDINGS | 39 |
| ITEM 4. | MINE SAFETY DISCLOSURES | 40 |
| **PART II** |  |  |
| ITEM 5. | MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 41 |
| ITEM 6. | [Reserved] | 42 |
| ITEM 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 42 |
| ITEM 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 58 |
| ITEM 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 59 |
| ITEM 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 106 |
| ITEM 9A. | CONTROLS AND PROCEDURES | 106 |
| ITEM 9B. | OTHER INFORMATION | 108 |
| ITEM 9C. | DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS | 108 |
| **PART III** |  |  |
| ITEM 10. | DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE | 109 |
| ITEM 11. | EXECUTIVE COMPENSATION | 109 |
| ITEM 12. | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 109 |
| ITEM 13. | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE | 109 |
| ITEM 14. | PRINCIPAL ACCOUNTANT FEES AND SERVICES | 109 |
| **PART IV** |  |  |
| ITEM 15. | EXHIBITS AND FINANCIAL STATEMENT SCHEDULES | 110 |
| ITEM 16. | FORM 10-K SUMMARY | 115 |
| **SIGNATURES** |  | 116 |

## DEFINITIONS

The following abbreviations or acronyms are used in the text. References in this report to the "Company," "we," "us," "our," "Cleveland-Cliffs" and "Cliffs" are to Cleveland-Cliffs Inc. and subsidiaries, collectively. References to "$" is to United States currency.

| Abbreviation or acronym | Term |
|---|---|
| 4.625% 2029 Senior Notes | 4.625% Senior Guaranteed Notes due 2029 issued by Cleveland-Cliffs Inc. on February 17, 2021 in an aggregate principal amount of $500 million |
| 4.875% 2031 Senior Notes | 4.875% Senior Guaranteed Notes due 2031 issued by Cleveland-Cliffs Inc. on February 17, 2021 in an aggregate principal amount of $500 million |
| 2012 Amended Equity Plan | Cliffs Natural Resources Inc. 2012 Incentive Equity Plan, as amended or amended and restated from time to time |
| 2020 Acquisitions | The AK Steel Merger and AM USA Transaction, collectively |
| 2021 Equity Plan | Cleveland-Cliffs Inc. 2021 Equity and Incentive Compensation Plan |
| A&R 2015 Equity Plan | Cliffs Natural Resources Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan |
| ABL Facility | Asset-Based Revolving Credit Agreement, dated as of March 13, 2020, among Cleveland-Cliffs Inc., the lenders party thereto from time to time and Bank of America, N.A., as administrative agent, as amended as of March 27, 2020, December 9, 2020 and December 17, 2021, and as may be further amended from time to time |
| Adjusted EBITDA | EBITDA, excluding certain items such as EBITDA of noncontrolling interests, extinguishment of debt, acquisition-related expenses and adjustments, asset impairment and other, net |
| AG | Autogenous grinding |
| AHSS | Advanced high-strength steel |
| AK Steel | AK Steel Holding Corporation (n/k/a Cleveland-Cliffs Steel Holding Corporation) and its consolidated subsidiaries, including AK Steel Corporation (n/k/a Cleveland-Cliffs Steel Corporation), its direct, wholly owned subsidiary, collectively, unless stated otherwise or the context indicates otherwise |
| AK Steel Merger | The merger of Merger Sub with and into AK Steel, with AK Steel surviving the merger as a wholly owned subsidiary of Cleveland-Cliffs Inc., subject to the terms and conditions set forth in the Merger Agreement, consummated on March 13, 2020 |
| AM USA Transaction | The acquisition of ArcelorMittal USA, consummated on December 9, 2020 |
| AM USA Transaction Agreement | Transaction Agreement, dated as of September 28, 2020, by and between Cleveland-Cliffs Inc. and ArcelorMittal |
| AOCI | Accumulated other comprehensive income (loss) |
| ArcelorMittal | ArcelorMittal S.A., a company organized under the laws of Luxembourg and the former ultimate parent company of ArcelorMittal USA |
| ArcelorMittal USA | Substantially all of the operations of the former ArcelorMittal USA LLC, its subsidiaries and certain affiliates, and Kote and Tek, collectively |
| ASC | Accounting Standards Codification |
| ASU | Accounting Standards Update |
| Board | The Board of Directors of Cleveland-Cliffs Inc. |
| BOF | Basic oxygen furnace |
| CAFE | Corporate Average Fuel Economy |
| CARES Act | Coronavirus Aid, Relief, and Economic Security Act |
| CERCLA | Comprehensive Environmental Response, Compensation and Liability Act of 1980 |
| CHIPS Act | Creating Helpful Incentives to Produce Semiconductors and Science Act of 2022 |
| Clean Water Act | Federal Water Pollution Control Act |
| CN | Canadian National Railway Company |
| Compensation Committee | Compensation and Organization Committee of the Board |
| COVID-19 | A novel strain of coronavirus that the World Health Organization declared a global pandemic in March 2020 |
| Directors' Plan | Cleveland-Cliffs Inc. 2021 Nonemployee Directors' Compensation Plan |
| Dodd-Frank Act | Dodd-Frank Wall Street Reform and Consumer Protection Act |
| DOE | U.S. Department of Energy |
| DR-grade | Direct reduction-grade |
| EAF | Electric arc furnace |
| EBITDA | Earnings before interest, taxes, depreciation and amortization |
| EDC | Export Development Canada |
| Empire | Iron ore mining property owned by Empire Iron Mining Partnership, an indirect, wholly owned subsidiary of Cliffs |

A006544

| Abbreviation or acronym | Term |
| --- | --- |
| EPA | U.S. Environmental Protection Agency |
| EPS | Earnings per share |
| ERISA | Employee Retirement Income Security Act of 1974, as amended |
| EV | Electric vehicle |
| Exchange Act | Securities Exchange Act of 1934, as amended |
| FASB | Financial Accounting Standards Board |
| Fe | Iron |
| FeT | Total iron |
| FIP | Federal implementation plan |
| FPT | Ferrous Processing and Trading Company, including certain related entities |
| FPT Acquisition | The purchase of FPT, subject to the terms and conditions set forth in the FPT Acquisition Agreement |
| FPT Acquisition Agreement | Securities Purchase Agreement, dated as of October 8, 2021, by and between Cleveland-Cliffs Inc. and Anthony Soave Revocable Trust u/a/d January 14, 1987, as amended and restated |
| GAAP | Accounting principles generally accepted in the United States |
| GHG | Greenhouse gas |
| GOES | Grain oriented electrical steel |
| HAP | Hazardous air pollutant |
| HBI | Hot briquetted iron |
| Hibbing | Iron ore mining property owned by Hibbing Taconite Company, an unincorporated joint venture between subsidiaries of Cliffs and U.S. Steel |
| HRC | Hot-rolled coil steel |
| HVAC | Heating, ventilation and air conditioning equipment |
| IAM | International Association of Machinists and Aerospace Workers |
| Inflation Reduction Act | Inflation Reduction Act of 2022 |
| Infrastructure and Jobs Act | Infrastructure Investment and Jobs Act of 2021 |
| IRB | Industrial Revenue Bond |
| IRC | U.S. Internal Revenue Code of 1986, as amended |
| ISO | International Organization for Standardization |
| IT | Information technology |
| JSW Steel | JSW Steel (USA) Inc. and JSW Steel USA Ohio, Inc., collectively |
| Kote and Tek | Cleveland-Cliffs Kote L.P. and Cleveland-Cliffs Tek L.P., collectively |
| LIBOR | London Interbank Offered Rate |
| LIFO | Last-in, first-out |
| LoM | Life-of-mine |
| Long ton (lt) | 2,240 pounds |
| Merger Sub | Pepper Merger Sub Inc., a direct, wholly owned subsidiary of Cliffs prior to the AK Steel Merger |
| Metric ton (mt) | 2,205 pounds |
| Minorca | Iron ore mining property owned by Cleveland-Cliffs Minorca Mine Inc. (f/k/a ArcelorMittal Minorca Mine Inc.), an indirect, wholly owned subsidiary of Cliffs acquired in connection with the AM USA Transaction |
| MMBtu | Million British Thermal Units |
| MPCA | Minnesota Pollution Control Agency |
| MSHA | Mine Safety and Health Administration of the U.S. Department of Labor |
| NAV | Net asset value |
| Net ton (nt) | 2,000 pounds |
| NOL | Net operating loss |
| NOES | Non-oriented electrical steel |
| Northshore | Iron ore mining property owned by Northshore Mining Company, a direct, wholly owned subsidiary of Cliffs |
| NPDES | National Pollutant Discharge Elimination System, authorized by the Clean Water Act |
| OPEB | Other postretirement benefits |
| OSHA | Occupational Safety and Health Administration of the U.S. Department of Labor |

Table of Contents

| Abbreviation or acronym | Term |
|---|---|
| PHS | Press-hardened steel |
| Platts 62% price | Platts IODEX 62% Fe Fines CFR North China |
| QA/QC | Quality assurance/quality control |
| QP | Qualified person, within the meaning set forth in Item 1300 of Regulation S-K |
| RI/FS | Remedial Investigation/Feasibility Study |
| S&P | Standard & Poor's |
| SEC | U.S. Securities and Exchange Commission |
| Section 232 | Section 232 of the Trade Expansion Act of 1962 (as amended by the Trade Act of 1974) |
| Securities Act | Securities Act of 1933, as amended |
| SLR | SLR Consulting US LLC (f/k/a SLR International Corporation) |
| SOFR | Secured Overnight Financing Rate |
| STRIPS | Separate Trading of Registered Interest and Principal of Securities |
| SunCoke Middletown | Middletown Coke Company, LLC, a subsidiary of SunCoke Energy, Inc. |
| Tilden | Iron ore mining property owned by Tilden Mining Company L.C., an indirect, wholly owned subsidiary of Cliffs |
| TMDL | Total maximum daily load |
| Tooling and Stamping | Cleveland-Cliffs Tooling and Stamping Holdings LLC (f/k/a PPHC Holdings, LLC), an indirect, wholly owned subsidiary of Cliffs, together with its subsidiaries |
| Topic 805 | ASC Topic 805, Business Combinations |
| Topic 815 | ASC Topic 815, Derivatives and Hedging |
| TSR | Total shareholder return |
| Tubular Components | Cleveland-Cliffs Tubular Components LLC (f/k/a AK Tube LLC), an indirect, wholly owned subsidiary of Cliffs |
| U.S. | United States of America |
| U.S. Steel | United States Steel Corporation and its subsidiaries, collectively, unless stated otherwise or the context indicates otherwise |
| UAW | United Auto Workers |
| United Taconite | Iron ore mining property owned by United Taconite LLC, an indirect, wholly owned subsidiary of Cliffs |
| USMCA | United States-Mexico-Canada Agreement |
| USW | United Steelworkers |
| VEBA | Voluntary employee benefit association trusts |
| VIE | Variable interest entity |
| WLT | Wet long ton |

Table of Contents

## PART I

### ITEM 1. BUSINESS

#### INTRODUCTION

We are the largest flat-rolled steel producer in North America. Founded in 1847 as a mine operator, we are also the largest manufacturer of iron ore pellets in North America. We are vertically integrated from mined raw materials, direct reduced iron, and ferrous scrap to primary steelmaking and downstream finishing, stamping, tooling and tubing. We are the largest supplier of steel to the automotive industry in North America and serve a diverse range of other markets due to our comprehensive offering of flat-rolled steel products. Headquartered in Cleveland, Ohio, we employ approximately 27,000 people across our operations in the United States and Canada.

#### COMPETITIVE STRENGTHS

As the largest flat-rolled steel producer in North America, we benefit from having the size and scale necessary in a competitive, capital intensive business. Our sizeable operating footprint provides us with the operational leverage and flexibility to achieve competitive margins throughout the business cycle. We also have a unique vertically integrated profile from mined raw materials, direct reduced iron, and ferrous scrap to primary steelmaking and downstream finishing, stamping, tooling and tubing. This positioning gives more predictable costs throughout our supply chain and more control over both our manufacturing inputs and our end product destination.

Our primary competitive strength lies within our automotive steel business. We are the largest supplier of automotive-grade steel in the U.S. Compared to other steel end markets, automotive steel is generally higher quality, more operationally and technologically intensive to produce, and requires significantly more devotion to customer service than other steel end markets. This dedication to service and the infrastructure in place to meet our automotive customers' demanding needs took decades to develop and we believe is unmatched in our industry. We have continued to invest capital and resources to meet the requirements needed to serve the automotive industry and intend to maintain our position as the industry leader going forward.

Due to its demanding nature, the automotive steel business typically generates higher through-the-cycle margins, making it a desirable end market. Over the past two years, we have been able to increase the fixed prices for our automotive contracts significantly. Demand for our automotive-grade steel is expected to increase in the coming years as a result of pent-up automotive demand arising out of supply chain issues and the replacement of older vehicles.

Our integrated footprint provides us with a significant competitive advantage in supplying automotive and other highly demanding end markets as we are able to produce a wide range of high-quality products. Our integrated facilities utilize domestic internally sourced iron ore as the primary feedstock, which allows us to produce a higher quality product with low residual content. We also operate EAF facilities, which gives us insight into their limitations. Companies that are primarily EAF producers are limited in their product range as their equipment is designed to utilize scrap as the main feedstock, which often contains high residual or impure content, such as copper, limiting their ability to meet certain high grades of steel that demand virgin iron. We also believe companies that primarily operate EAFs do not possess our breadth and depth of customer service, technical support and research and development capabilities.

Since the acquisition of our steelmaking assets, we have dedicated significant resources to maintain and upgrade our facilities and equipment. The quality of our assets gives us a unique advantage in product offerings and operational efficiencies. In 2022, we brought our facilities and equipment up to the standard required to maintain and improve the quality and reliability of our supply to the automotive industry, as well as other end markets. The necessary resources that we have invested in our footprint are expected to keep our assets at an automotive-grade quality and reliability for years to come.

Our industry leading portfolio of fixed price contracts provides us a competitive advantage as the steel industry is often viewed as volatile and subject to the market price of steel. Our fixed price contracts allowed us to achieve a higher average selling price in 2022 compared to 2021 despite the price of domestic spot HRC falling approximately $562 per net ton during that time period. We also expect to benefit from improved fixed price contracts in 2023.

Our ability to source our primary feedstock domestically and internally is a competitive strength. This model reduces our exposure to volatile pricing and unreliable global sourcing. The ongoing conflict between Russia and Ukraine has displayed the importance of our U.S.-centric footprint, as our competitors who primarily operate EAF furnaces rely on imported pig iron to produce flat-rolled steel, the supply of which has been disrupted by that conflict. The best example is our legacy business of producing iron ore pellets, which is our primary steelmaking raw material input. By controlling our iron ore pellet supply, our primary steelmaking raw material feedstock can be secured at a stable and predictable cost and not be subject to as many factors outside of our control.

We believe we offer the most comprehensive flat-rolled steel product selection in the industry, along with several complementary products and services. A sampling of our offering includes advanced high-strength steel, hot-dipped galvanized, aluminized, galvalume, electrogalvanized, galvanneal, HRC, cold-rolled coil, plate, tinplate, GOES, NOES, stainless steel, tool and die, stamped components, rail, slab and cast ingot. Across the quality spectrum and the supply chain, our customers can frequently find the solutions they need from our product selection. Our broad range of product offerings also gives us a competitive advantage in commercial negotiations as our customers can source the majority, if not all, of their steel product needs from us.

We are currently the only producer of both electrical steels referred to as GOES and NOES in the U.S. The recently passed Infrastructure and Jobs Act in the U.S. provides funding to be used for the modernization of the electrical grid and the infrastructure needed to allow for increased EV adoption, both of which require electrical steels. As a result, with increased demand for both transformers and motors for EVs, we expect to benefit from this position in what is currently a rapidly growing market.

We are the first and the only producer of HBI in the Great Lakes region. Construction of our Toledo direct reduction plant was completed in the fourth quarter of 2020 and reached full run-rate nameplate annual capacity of 1.9 million metric tons during the middle of 2021. From this modern plant, we produce a high-quality, low-cost and low-carbon intensive HBI product that can be used in our blast furnaces as a productivity enhancer, or in our BOFs and EAFs as a premium scrap alternative. We use HBI to stretch out hot metal production, lowering carbon intensity and reliance on coke. As a result of our internal usage of HBI, coupled with our ongoing evaluation of coke use strategies, we idled our coke facility at Middletown Works during the third quarter of 2021 and permanently closed our Mountain State Carbon coke plant in the first quarter of 2022. With increasing tightness in the scrap and metallics markets combined with our own internal needs, we expect our Toledo direct reduction plant to support healthy margins for us going forward.

## STRATEGY

### MAXIMIZE OUR COMMERCIAL STRENGTHS

We offer a full suite of flat steel products encompassing all steps of the steel manufacturing process. We have an industry-leading market share in the automotive sector, where our portfolio of high-end products delivers a broad range of differentiated solutions for this highly sought after customer base.

As a result of our exposure to these high-end markets, we have the highest fixed price contractual volumes in our industry. Approximately 45% of our volumes are sold under these contracts. These contracts reduce volatility and allow for more predictable through-the-cycle margins. Our fixed contract values are expected to significantly improve in 2023 compared to 2022. In addition to our fixed price contracts, we anticipate having more volumes under index-linked contracts in 2023 and beyond, which should reduce our reliance on spot sales and allow us to improve our efficiency with increased volumes.

Our unique capabilities, driven by our portfolio of assets and technical expertise, give us an advantage in our flat-rolled product offering. We offer products that have superior formability, surface quality, strength and corrosion resistance for the automotive industry. We are also the only producer of GOES and NOES in the U.S. In addition, our state-of-the-art Research and Innovation Center in Middletown, Ohio gives us the ability to collaborate with our customers and create new products and develop new and efficient steel manufacturing processes. During 2022, we introduced our MOTOR-MAX™ product line of NOES for high frequency motors and generators. These unique product offerings and customer service capabilities enable us to remain the leading steel supplier to the automotive industry.

### TAKE ADVANTAGE OF OUR U.S.-CENTRIC, INTERNALLY SOURCED SUPPLY CHAIN

The conflict between Russia and Ukraine has reinforced the unique advantage of our vertically integrated business model. Two-thirds of U.S. imports of pig iron, a critical raw material for flat-rolled EAFs, has historically been sourced from Russia and Ukraine. This supply remains largely disrupted, driving volatility in input costs and reducing availability for our competitors' ferrous inputs. We, on the other hand, produce our pig iron and liquid steel entirely in the U.S., supported by internally sourced iron ore and HBI and supplemented with internally sourced scrap. In addition, our internally produced pig iron is more environmentally friendly than imported pig iron, which is often made from sintered iron ore fines and with higher coke rates, for example. While competitors are forced to scramble for materials, we are able to take advantage of our vertically integrated footprint.

We began construction of our HBI plant in 2017, in part because of the uncertainty of the industry sourcing metallics from Russia and Ukraine. Russia had previously invaded the Crimea peninsula in 2014, and we saw a need for more on-shore metallics capacity in the U.S. HBI, which is a lower-carbon alternative to imported pig iron, has now become a critical component of our decarbonization strategy.

### OPTIMIZE OUR FULLY-INTEGRATED STEELMAKING FOOTPRINT

We are a fully-integrated steel enterprise with the size and scale to achieve margins above industry averages for flat-rolled steel. Our focus remains on realizing our inherent cost advantage in flat-rolled steel while also lowering carbon emissions. The combination of our ferrous raw materials, including iron ore, scrap and HBI, allows us to do so relative to peers who must rely on more unpredictable and unreliable raw material sourcing strategies.

We have ample access to scrap along with internally sourced HBI. Our ability to optimize use of these raw materials in our blast furnaces and BOFs ultimately boosts liquid steel output, reduces coke needs and lowers carbon emissions from our operations. As a result of the successful operational improvements, we announced the indefinite idle of the Indiana Harbor #4 blast furnace in the first quarter of 2022. The indefinite idle reduced our operational blast furnaces from eight to seven.

We used 2022 as an opportunity to optimize our steelmaking footprint by dedicating significant resources to bring our facilities and equipment up to the standard required to maintain and improve our supply to the automotive industry. The necessary resources that we have invested in our footprint are expected to keep our assets at automotive-grade quality and reliability for years to come. With our facilities and equipment in the best shape since the acquisition of our steelmaking assets and no major investments expected until at least 2025, we are well positioned to benefit from operating efficiencies and improved capabilities in the coming years.

## ADVANCE OUR PARTICIPATION IN THE GREEN ECONOMY

We are seeking to expand our customer base with the rapidly growing and desirable EV market. At this time, we believe the North American automotive industry is approaching a structural inflection point, with the adoption of electrical motors in passenger vehicles. As this market grows, it will require more advanced steel applications to meet the needs of EV producers and consumers. These features include the strength and formability of our flat-rolled steel used for battery enclosures in EVs. With our unique technical capabilities and leadership in the automotive industry, we believe we are positioned better than any other North American steelmaker to supply the steel and parts necessary to fill these needs.

We also have the right products to meet the growing demand for renewable energy as well as for the modernization of the U.S. electrical grid. We offer plate products that can be used in windmills, which we estimate contain 130 tons of steel per megawatt of electricity. In addition, panels for solar power are heavy consumers of galvanized steel, where we are a leading producer. We estimate solar panels consume 40 tons of steel per megawatt of electricity.

We are currently the sole producer of electrical steel in the U.S., which can facilitate the modernization of the U.S. electrical grid. Along with charging networks, electrical steels are also needed in the motors of EVs.

## ENHANCE OUR ENVIRONMENTAL SUSTAINABILITY

Our commitment to operating our business in a more environmentally responsible manner remains constant. One of the most important issues impacting our industry, our stakeholders and our planet is climate change. In early 2021, we announced our commitment to reduce GHG emissions 25% from 2017 levels by 2030. This goal represents combined Scope 1 (direct emissions) and Scope 2 (indirect emissions from purchased electricity or other forms of energy) GHG emission reductions across all of our operations. On a per ton basis, we reduced our integrated Scope 1 and Scope 2 GHG intensity from 1.82 per metric ton of crude steel produced in 2020 to 1.67 in 2021.

We plan to achieve our GHG emissions reduction goal by focusing on actionable, commercially viable technologies and solutions while supporting research for breakthrough technologies for the primary iron and steel sector. In an effort to build on our GHG emissions reduction progress, we have continued our partnership with the DOE as part of the Better Climate Challenge initiative, which was established in December 2021. Throughout 2022, we further pursued opportunities such as carbon capture and the use of hydrogen within our facilities. Additionally, we have started forming partnerships to develop alternative energy sources - such as wind, solar and hydrogen - which will benefit our own environmental footprint while combating the global impacts of climate change.

Our future GHG emissions reductions are expected to be driven by the use of direct reduced iron in blast furnaces, the stretching of hot metal with additional scrap, driving more productivity out of fewer blast furnaces, implementing hydrogen use where possible, utilizing carbon capture, procuring more clean energy and operating with higher energy efficiency.

## IMPROVE OUR FINANCIAL FLEXIBILITY

Given the cyclicality of our business, it is important to us to be in the financial position to easily withstand economic cycles. In 2022, we demonstrated our ability to generate healthy free cash flow and use it to reduce substantial amounts of debt, return capital to shareholders through our share repurchase program and make investments to both improve and grow our business. We have also been able to take advantage of volatility in the debt markets to repurchase notes in the open market at a discount. Throughout 2022, we made open market repurchases of $351 million aggregate principal amount of assorted series of notes at an average price of 92% of par.

We expect to have ample opportunities to reduce our debt with our own free cash flow generation in the coming years. During 2022, we reduced outstanding debt by approximately $1.1 billion while returning $240 million in capital to shareholders via share repurchases.

## BUSINESS OPERATIONS

We have a vertically integrated portfolio, which begins at the mining stage and goes all the way through the manufacturing of steel products, including stamping, tooling and tubing. We have the unique advantage as a steel producer of being fully or partially self-sufficient with our production of raw materials for steel manufacturing, which includes iron ore pellets, HBI, scrap and coking coal. We are organized into four operating segments based on the differentiated products – Steelmaking, Tubular, Tooling and Stamping and European Operations. We primarily operate through one reportable segment – the Steelmaking segment.

Our primary steel producing and finishing facilities are located across Illinois, Indiana, Michigan, Ohio, Pennsylvania and West Virginia. We operate 7 blast furnaces and 5 EAFs with the configured capability of producing approximately 20 million tons of raw crude steel annually. Raw crude steel is generally cast into slabs and finished based on customer specifications. Finishing is completed on site at our integrated operations or at one of our standalone finishing facilities.

Ferrous raw materials for the production of steel are internally sourced from our iron ore mines in Michigan and Minnesota, our direct reduction plant in Ohio and our scrap facilities in Florida, Michigan, Ohio, Ontario and Tennessee. We also operate a coal mining complex in West Virginia and produce coke from our facilities in Ohio, Pennsylvania and Indiana.

Our Other Businesses primarily includes the Tubular Components and Tooling and Stamping operating segments that provide customer solutions with carbon and stainless steel tubing products, advanced-engineered solutions, tool design and build, hot- and cold-stamped steel components and complex assemblies.

Refer to *Part I - Item 2. Properties* for additional information.

## PRODUCTS AND MARKETS



| 2022 Product Mix (By Revenue) | Primary Products | | |
|---|---|---|---|
| | **HOT-ROLLED** | **STAINLESS AND ELECTRICAL** | **OTHER** |
| | **COLD-ROLLED** | ○ GOES | · Scrap |
| | **COATED** | ○ NOES | · Iron Ore |
| | · Aluminized | ○ Auto Chrome | · HBI |
| | · Electrogalvanized | **PLATE** | · Coal |
| | · Galvalume | | · Coke |
| | · Galvanneal | **SLAB AND OTHER STEEL PRODUCTS** | **NON-STEELMAKING** |
| | · Hot-dipped Galvanized | · Slab | · Stamped Components |
| | · Tinplate | · Rail | · Tool and Die |
| | | · Blooms | · Tubing |

2022 Product Mix pie chart labels: Other 10%, Non-steelmaking 3%, Hot-rolled 20%, Cold-rolled 14%, Coated 30%, Stainless/electrical 10%, Plate 7%, Slab and other steel products 6%

As a fully integrated steel enterprise, we have a comprehensive portfolio of steel solutions. We primarily sell our products to customers in four broad market categories. The following table presents the percentage of our revenues to each of these markets during the year:

| Market | Primary Products Sold to End Market | 2022 | 2021 |
|---|---|---|---|
| Direct automotive | Cold-rolled, galvanized, aluminized, NOES and stainless | **31 %** | 25 % |
| Infrastructure and manufacturing | Hot-rolled, cold-rolled, galvanized, plate, GOES, stainless, tinplate and rail | **26 %** | 27 % |
| Distributors and converters | All grades of steel | **28 %** | 38 % |
| Steel producers | Slab, scrap, iron ore, HBI, coal and coke | **15 %** | 10 % |

The change in percentages of revenues to each market in 2022, compared to 2021, was driven primarily by the increase in selling prices for our fixed price contracts to the direct automotive market, lower pricing on index linked sales, lower spot sales, and the inclusion of full-year results from the FPT Acquisition.

We sell our products principally to customers in North America. Approximately 45% of our flat-rolled steel shipments are sold under fixed base price contracts. These contracts are typically one year in duration and expire at various times throughout the year. Some of these contracts have a surcharge mechanism that passes through certain changes in input costs. A certain portion of our flat-rolled steel shipments are sold based on the spot market at prevailing market prices or under contracts that involve variable pricing that is tied to an independently published steel index.

### AUTOMOTIVE MARKET

We specialize in manufacturing difficult-to-produce and high-quality steel products with demanding delivery performance and first-class customer technical support. Through our collaborative relationships with automotive producers, we develop breakthrough steel solutions that help our customers meet their product requirements. The quality of our steel is appealing to end users because of its strength, surface quality, and formability. EAF producers' equipment is designed to utilize scrap as their main feedstock, which often contains high residual or impure content, limiting their product capabilities. The exacting requirements for servicing the automotive market generally allows for higher selling prices for products sold to that market than for the commodity types of steel sold to other markets.

The largest end user for our steel products is the automotive industry in North America, which makes light vehicle production a key driver of demand. During 2022, North American light vehicle production was 14.3 million units, up from 13.0 million units in both 2020 and 2021. While production improved from the prior year, it remained below the prior ten-year average of approximately 16.0 million units primarily due to the global semiconductor shortage, as well as other material shortages and supply chain disruptions. The long-term outlook for the automotive industry remains positive as pent-up demand remains strong, inventory levels are significantly below historical averages and the average age of vehicles on the road in the U.S. reached an all-time high during 2022.

Furthermore, during 2022, consumer demand for sport utility vehicles, trucks and crossovers continued to increase while demand for smaller sedans and compact cars declined. We benefit from intentionally targeting larger vehicle platforms to take advantage of consumer preferences, and we have focused on and have been successful in getting sourced on numerous large vehicle platforms. As a result, a significant portion of the automotive steel that we sell is used to produce these popular larger vehicles. In addition to benefiting from our exposure to consumers' strong demand for larger vehicles, these vehicles also typically contain a higher volume of steel than smaller sedans and compact cars, providing us the opportunity to sell a higher volume of our steel products.

Automotive manufacturers continue to explore opportunities to develop vehicles that are lighter in weight. We collaborate with our automotive customers and their suppliers to develop innovative solutions using our developments in light weighting, efficiency, and material strength and formability across our extensive product portfolio, in combination with our automotive stamping and tube-

Table of Contents

making capabilities. We are also working with our customers to develop steels with greater heat resistance for exhaust systems that support new, fuel-efficient engines that run at higher temperatures. We believe we offer steel products that are stronger, less expensive, have competitive weight savings, are easier to repair and are more environmentally friendly than alternative materials.

Automotive manufacturers have also been increasing their development of EVs in order to meet the growing customer adoption of EVs. Many motors used in EVs being sold in the U.S. today are imported from foreign suppliers, but more local sourcing and manufacturing of motors is expected to occur in the future. As the only North American producer of high-efficiency NOES, which is a critical component of EV motors, we are positioned to potentially benefit from the growth of EVs going forward. During 2022, we introduced our MOTOR-MAX™ product line of NOES for high frequency motors and generators. We believe our strong foundation in electrical steels and long-standing relationships with automotive manufacturers and their suppliers will provide us with an advantage in this market as it continues to grow and mature. Likewise, the growing customer adoption of EVs may also increase demand for improvements in the electric grid to support higher demand for more extensive battery charging, which our GOES could support.

The majority of our sales to the automotive market are under annual fixed price contracts. In 2023, our selling prices to this end market will be significantly higher than 2022 as a result of favorable contract renewals.

## INFRASTRUCTURE AND MANUFACTURING MARKET

We sell a variety of our steel products, including hot-rolled, cold-rolled, galvanized, plate, stainless, electrical, tinplate and rail, to the infrastructure and manufacturing market. This market includes sales to manufacturers of HVAC, appliances, power transmission and distribution transformers, storage tanks, ships and railcars, wind towers, machinery parts, heavy equipment, military armor, food preservation and railway lines. Domestic construction activity and the replacement of aging infrastructure directly affect sales of steel to this market. Nonresidential construction spending was strong in 2022 and will likely continue in 2023 supported by the Infrastructure and Jobs Act of 2021 and the CHIPS Act. The Infrastructure and Jobs Act of 2021 will likely increase demand for steel products related to renewable energy, as well as the modernization of the U.S. electrical grid. Our plate products can be used in windmills, which we estimate contain 130 metric tons of steel per megawatt of electrical generating capacity. Additionally, we estimate solar panels consume 40 metric tons of steel per megawatt of electrical generating capacity. We should also benefit from the Inflation Reduction Act, which provides a tax credit for consumers who buy new EVs, which should increase the demand for our electrical steel used in charging stations.

Sales to this end market are made under a combination of annual fixed price contracts and index-linked pricing arrangements. Our selling prices under our annual fixed price contracts will be significantly higher in 2023 compared to the prior year as a result of favorable renewals.

## DISTRIBUTORS AND CONVERTERS MARKET

Virtually all of the grades of steel we produce are sold to the steel distributors and converters market. This market generally represents downstream steel service centers, which source various types of steel from us and fabricate it according to their customers' needs. Our steel is typically sold to this market on a spot basis or under contracts linked to steel pricing indices. Demand and pricing for this market can be highly dependent on a variety of factors, including global and domestic commodity steel production capacity, demand for manufactured goods, the price of scrap, the relative health of the global economy, the import and export levels of other steel producing nations, the provisions of international trade agreements and fluctuations in international currencies.

The price for domestic HRC, the most significant index in driving the revenues and profitability of our Steelmaking segment, averaged $1,011 per net ton for 2022, compared to $1,573 per net ton in 2021. The main decline in pricing occurred in the second half of 2022 as service centers destocked inventory, interest rate hikes drove caution on new business and pricing for metallics declined.

## STEEL PRODUCERS MARKET

The steel producers market represents third-party sales to other steel producers, including those who operate blast furnaces and EAFs. It includes sales of raw materials and semi-finished and finished goods, including iron ore pellets, coal, coke, HBI, scrap, slab and other steel products.

The inclusion of full-year results for the FPT Acquisition in 2022 was the main driver in the year-over-year increase in revenues to the steel producers market. FPT is one of the largest processors of prime scrap in the country. Our expansion in scrap has continued to grow as we have leveraged our long-standing flat-rolled automotive and other customer relationships into recycling partnerships. Our steelmaking operations consume a large portion of the ferrous scrap processed by FPT. We also have third-party sales of ferrous and non-ferrous scrap.

Third-party slab sales are also a large component of sales to this market, which are primarily made under a long-term supply agreement that was initiated in connection with the closing of the AM USA Transaction.

Production from our iron ore mines is predominantly consumed by our steelmaking operations. During 2022 and 2021, we sold 3 million and 4 million long tons of iron ore products, respectively, to third parties from our share of production from our iron ore mines. The merchant portion of our iron ore pellet production is sold pursuant to long-term supply agreements and through spot contracts.

The price of busheling scrap, a necessary input for flat-rolled steel production in EAFs in the U.S., averaged $533 per long ton during 2022, an 11% decrease from the prior year, but remained well above the historical ten-year average of approximately $380 per long ton. We expect the price of busheling scrap to remain elevated above historical averages throughout 2023 due to the

[Table of Contents]

continued decline of prime scrap generation and the growth of EAF capacity in the U.S., along with a push for expanded scrap use globally.

## APPLIED TECHNOLOGY, RESEARCH AND DEVELOPMENT

The utilization of our research and development capabilities has allowed us to introduce new steel products to the marketplace. Our research and development activities provide us the ability to offer a broad range of steel products, improve existing products and processes and develop new ones. As part of our underlying strategy to maintain and improve our product, service and technical capabilities, research and innovation spend totaled $24 million and $17 million in 2022 and 2021, respectively.

As the largest supplier of steel to the automotive industry in North America, it is important that we maintain our world-class research and development team to expand our capabilities and bring new steel products to the marketplace. Our ongoing efforts begin at our state-of-the-art Research and Innovation Center in Middletown, Ohio, where we collaborate with our automotive customers and their suppliers to develop products that meet their needs. We have a customer technical support team that is dedicated to understanding customers' current and long-term requirements and translating them into product designs. The dedication and resources we allocate toward our research and development help us maintain our extensive product offering and provide our automotive customers with solutions to meet their steel needs. Our research and development capabilities will support us in efforts to remain the leading supplier to the automotive industry as automotive manufacturers continue to pursue EVs, lighter weight vehicles and other advancements in vehicle capabilities.

A prime example of our ability to help our customers through research and development can be seen in the support and products we offer as automotive manufacturers have started increasing their development of EVs to meet the growing consumer adoption of EVs. We are the only North American producer of high-efficiency NOES, which is a critical component of EV motors. During 2022, we introduced our MOTOR-MAX™ product line of NOES for high frequency motors and generators. We believe our strong foundation in electrical steels and long-standing relationships with automotive manufacturers and their suppliers will provide us with an advantage in this market as it continues to grow and mature.

## COMPETITION

Our Steelmaking segment primarily competes with domestic and foreign producers of flat-rolled carbon, plate, tinplate, stainless, rail and electrical steel, carbon and stainless tubular products, aluminum, carbon fiber, concrete and other materials that may be used as a substitute for flat-rolled steels in manufactured products. Our Tooling and Stamping and Tubular Components businesses both compete against other niche downstream business in highly fragmented markets.

The steel industry is often viewed as volatile and is subject to the market price of steel. Market pricing can be adversely impacted from foreign competition selling steel products into the U.S. at discounts and the oversupply of steel products within the domestic market from both domestic and foreign competition. To limit our exposure to volatility from market pricing, we have structured our business to have an industry leading portion of fixed price contracts. Our fixed price contracts provide us stability on a large portion of our business when market pricing is volatile.

Price, quality, on-time delivery, customer service, technical expertise and product innovation are the primary competitive factors in the steel industry and vary in importance according to the product category and customer requirements. Steel producers that sell to the automotive market are required to meet strict and high-quality product specifications that demand strong technical capabilities, investment in capital and other resources to manage inventory, customer service and research and development. As the largest supplier of steel to the automotive industry in North America, we continue to meet all the requirements needed to serve the automotive industry and maintain our position as the industry leader going forward. Significant capital investments in equipment, technology and other resources that would effectively replicate our processes, at a likely higher cost than ours, would be required for certain competitors to meet all the demands required of the automotive industry.

The steel industry has faced limited competition from aluminum manufacturers (and, to a lesser extent, other materials) as automotive manufacturers attempt to develop vehicles that are lighter in weight. To address automotive manufacturers' light weighting needs that the aluminum industry is targeting, we have developed AHSS grades that we believe provide weight savings similar to aluminum, while being stronger, less costly, easier to repair, more sustainable and more environmentally friendly. Aluminum penetration has been primarily limited to specific automotive applications, such as outer panels and closures, rather than entire body designs. In addition, our automotive customers who continue to use steel, as opposed to aluminum and other alternative materials, are able to avoid the significant capital expenditures required to re-tool their manufacturing processes to accommodate the use of non-steel materials. We do not expect the use of aluminum in vehicles to pose a significant threat as a replacement to steel.

EAFs comprise over 70% of steel production and more than 40% of flat-rolled steel production in the U.S. The primary raw materials used by EAFs include scrap metal and ore based metallics, which have unpredictable and often volatile pricing. Additionally, the availability of these materials can be unreliable as most competition relies on imported ore based metallics. Due to recently completed and further announced flat-rolled EAF capacity additions in the U.S. and increasing focus on industry decarbonization, we expect the price of scrap to remain elevated over historical averages, providing our integrated footprint a competitive cost advantage. Companies who primarily operate EAFs also generally offer a narrower range of products than integrated steel mills and are limited in their product quality as their equipment is designed to utilize scrap as the main feedstock, which often contains high residual content, such as copper, limiting their ability to meet certain high grades of steel that demand virgin iron feedstock. We also believe companies who primarily operate EAFs often do not have the equipment capabilities to produce the product range that integrated facilities offer, nor do we believe they possess our depth of customer service, technical support, and research and innovation. The additional capacity from domestic EAF competition could displace imports as the U.S.

is still the largest net importer of steel in the world, and domestically produced steel is generally more environmentally friendly than imported steel.

Domestic steel producers can face significant competition from foreign producers. In certain instances, these foreign producers are often able to sell products in the U.S. at prices substantially lower than domestic producers. Depending on the country of origin, these reasons may include government subsidies; lower labor, raw material, energy and regulatory costs; less stringent environmental regulations; less stringent safety requirements; the maintenance of artificially low exchange rates against the U.S. dollar; and preferential trade practices in their home countries. In 2022, finished steel imports increased 11% compared to the prior year as a result of less onerous trade restrictions for certain foreign competition and, at times, a disparity between domestic and foreign prices. Imports still remain below levels seen between 2013 and 2018, which we believe is at least partially attributable to the implementation of certain trade restrictions on imported steel, including both targeted trade cases and the more broad Section 232 tariffs. Further modifications to these trade restrictions by government authorities could directly or indirectly impact import levels in the future. Import levels are also affected to varying degrees by the relative level of steel production in China and other countries, the strength of demand for steel outside the U.S., and the relative strength or weakness of the U.S. dollar against various foreign currencies. Imports of finished steel into the U.S. accounted for 24% of domestic steel market consumption in 2022.

We continue to provide significant pension and healthcare benefits to a greater number of our retirees compared to certain other domestic and foreign steel producers that do not provide such benefits to any or most of their retirees, which impacts our overall cost of production relative to certain other steelmakers. However, we have taken a number of actions to reduce pension and healthcare benefits costs, including using our size and scale to proactively renegotiate lower healthcare premiums, negotiating progressive labor agreements, transferring responsibility for healthcare benefits for various groups of retirees to VEBAs, offering voluntary lump-sum settlements to pension plan participants and lowering retiree benefit costs for salaried employees. These actions have not only reduced some of the risks associated with our pension funding obligations, but more importantly have reduced our risk exposure to performance of the financial markets, which is a principal driver of pension funding requirements. We continue to actively seek opportunities to reduce pension and healthcare benefits costs.

## ENVIRONMENTAL MATTERS

Our operations are subject to various laws and regulations governing the protection of the environment. We monitor these laws and regulations, which change over time, to assess whether the changes affect our operations. We conduct our operations in a manner that is protective of public health and the environment.

Environmental matters and their management continue to be an important focus at each of our operations. From 2017 to 2021, we invested approximately $1 billion into our Toledo direct reduction plant, which provides a low carbon intensity raw material to our steelmaking operations. The HBI produced from the plant requires less energy to produce compared to traditional feedstock and can be used in blast furnaces to reduce emissions by improving energy efficiency and reducing the amount of coke required for steel production.

In the construction and operation of our facilities, substantial costs have been and will continue to be incurred to comply with regulatory requirements and avoid undue effect on the environment. In 2022, 2021 and 2020, our capital expenditures relating to environmental matters totaled $133 million, $62 million and $34 million, respectively. Our current estimate for capital expenditures for environmental improvements in 2023 is approximately $90 million for various water treatment, air quality, dust control, tailings management and other miscellaneous environmental projects. Additionally, we expect capital expenditures for environmental improvements for each of 2024 and 2025 to be generally in line with 2023's estimated spending.

## REGULATORY DEVELOPMENTS

Various governmental bodies continually promulgate new or amended laws and regulations that affect us, our customers and our suppliers in many areas, including air and water discharges, waste management and disposal, the classification of materials and products and other environmental, health and safety matters. Although we believe that our environmental policies and practices are sound and do not expect that the application of any current laws, regulations or permits would reasonably be expected to result in a material adverse effect on our business or financial condition, we cannot predict the collective potential adverse impact of the expanding body of laws and regulations. Moreover, because all domestic steel, scrap and mining producers operate under the same federal environmental regulations, we do not believe that we are more disadvantaged than our domestic competitors by our need to comply with these regulations. Some foreign competitors may benefit from less stringent environmental requirements in the countries where they produce, resulting in lower compliance costs for them and providing those foreign competitors with a cost advantage on their products.

Specifically, there are several notable proposed or potential rulemakings or activities that could have a material adverse impact on our facilities in the future depending on their ultimate outcome: climate change and GHG regulations; changes to the National Ambient Air Quality Standard for particulate matter; changes to ozone transport regulations; selenium discharge regulation; Minnesota's sulfate wild rice water quality standard; and Minnesota's mercury TMDL and mercury reduction rules.

### CLIMATE CHANGE AND GREENHOUSE GAS REGULATIONS

Continued attention to issues concerning climate change, the role of human activity in affecting climate change, and potential mitigation through regulation and legislation may have a material impact on our customers and suppliers, our operations and financial results in the future. Policymakers are evaluating or developing carbon regulation at the state, regional, national and international levels. Additionally, international treaties or agreements such as the Paris Agreement may influence legislative and regulatory decisions in the U.S. Potential climate-related regulations and legislation that could impact our business include

[Table of Contents]

reporting obligations, mandatory carbon reductions, carbon pricing mechanisms and trade policies, and climate-related procurement and product labeling requirements. The dynamic forward outlook for these potential regulations presents a challenge to large industrial companies to assess the long-term net impacts of carbon compliance costs on their operations. In the absence of comprehensive federal carbon legislation, numerous state, regional and federal regulatory initiatives are under development or are becoming effective, thereby creating a disjointed approach to GHG emissions control, potential carbon pricing and climate-related procurement activities. We intend to remain active in the discussions related to legislative and regulatory changes at the federal and state levels.

Our exposure on this issue includes both the direct and indirect financial risks associated with the regulation of GHG emissions, as well as potential physical risks associated with climate change adaptation. We are continuing to review the physical risks related to climate change. As an energy-intensive business, we have a broad range of GHG emissions sources, such as iron ore furnaces and kilns, mobile equipment, EAFs and integrated steelmaking facilities, among others. As such, among our most significant regulatory risks are: (1) the costs associated with on-site emissions levels (direct impacts) or the reduction thereof; and (2) indirect costs passed through to us from energy providers and other suppliers (indirect impacts).

Internationally, mechanisms to require or incentivize emissions reductions are being implemented in various countries, with differing designs and stringency, according to resources, economic structure and politics. However, some foreign competitors may benefit from less stringent climate-related requirements, providing those foreign competitors with a cost advantage on their products.

Due to the potential variety of federal, state or international carbon restriction schemes, our business and customer base could suffer negative financial impacts over time as a result of increased energy, environmental and other costs to comply with the limitations that could be imposed on GHG emissions. We believe our exposure can be reduced by numerous factors, including engaging with relevant stakeholders and policymakers on potential GHG regulation and legislation; emissions reduction opportunities, such as energy efficiency, industrial electrification, carbon capture, utilization and sequestration, renewable energy and fuel flexibility, such as hydrogen; and other efficiency-improving material inputs, products and technologies.

## CHANGES TO NATIONAL AMBIENT AIR QUALITY STANDARDS FOR PARTICULATE MATTER

On January 6, 2023, the EPA proposed changes to the National Ambient Air Quality Standards for particulate matter. The proposal seeks comment on lowering the primary annual fine particulate matter ($PM_{2.5}$) level from 12 micrograms per cubic meter (ug/m3) of air to $9 - 10$ ug/m3 while taking comment on alternative annual standard levels down to 8 ug/m3 and up to 11 ug/m3. The EPA is also proposing to retain current primary 24-hour $PM_{2.5}$ standard of 35 ug/m3 while soliciting comments on revising the level as low as 25 ug/m3. The lower the standard, the greater potential effect on our operations across the country. We are actively engaged with various experts and trade associations to provide legal and technical comments on the proposal. The rule is expected to be finalized in 2023, after which each state will have three years to submit a State Implementation Plan to the EPA detailing how it intends to address any nonattainment areas in the state. The potential changes to air pollution control equipment or operations needed at our plants to comply with a new particulate matter standard are not known at this time, and the potential cost is not estimable but could be material.

## CHANGES TO OZONE TRANSPORT REGULATIONS

In 2022, the EPA proposed to impose new standards for nitrogen oxide (an ozone precursor) on various industries (including the steel and iron ore sectors) that operate in specific states, including numerous states where we operate (Illinois, Indiana, Michigan, Minnesota, Ohio, Pennsylvania and West Virginia). While we participated in commenting on the proposed rule, pointing out its technical and legal flaws, a final rule is expected to be issued in the first six months of 2023 that could affect our facilities in the listed states. Since the technology originally proposed by the EPA is infeasible at our sites, any potential changes at our facilities that may be required to comply with the final rule are not known and not estimable at this time but could be material.

## SELENIUM DISCHARGE REGULATION

In Michigan, our Empire and Tilden mines have implemented compliance plans to manage selenium according to applicable permit conditions. A water treatment system for both facilities is anticipated sometime before 2028. As of December 31, 2022, included within our Empire asset retirement obligation is a discounted liability of approximately $110 million, which includes the estimated costs associated with the construction of Empire's portion of the required infrastructure and expected future operating costs of the treatment facilities. Additionally, included within our Tilden future capital plan is approximately $20 million for the construction of Tilden's portion of the required infrastructure. We are continuing to assess and develop potential cost effective and sustainable selenium treatment technologies.

In July 2016, the EPA published new selenium fish tissue limits and lower lentic and lotic water column concentration criteria, which may someday increase the cost for treatment should the Michigan Department of Environment, Great Lakes and Energy adopt these new standards in lieu of the existing limits required by the Great Lakes Water Quality Initiative. Accordingly, we cannot reasonably estimate the timing or long-term impact of these water quality criteria on our business.

## MINNESOTA'S SULFATE WILD RICE WATER QUALITY STANDARD

The Minnesota Governor established a Wild Rice Task Force by Executive Order in May 2018 that provided recommendations on wild rice restoration and regulation. The existing sulfate water quality standard for lakes and streams that contain wild rice has not been applied to any of our discharge permits or enforced historically by Minnesota. Further, the standard may be unenforceable because of legislation that prohibits the MPCA from enforcing it until the obsolete standard is updated based on modern science.

Minnesota submitted a list of impaired water revisions to the EPA in 2020. In 2021, the EPA disapproved of Minnesota's draft list and subsequently announced its proposed list of wild rice water bodies that were impaired due to sulfate under the Clean Water

Act's Section 303(d) process, which resulted in the addition of 32 waters in November 2021. At this time, it is unknown how the MPCA intends to implement requirements to address sulfate impaired waters.

For these reasons, the impact of potential obligations to address sulfate concentrations in certain water discharges from our Minnesota iron ore mining and pelletizing operations is not estimable at this time, but it could have a material adverse impact if we are required to significantly reduce sulfate in certain discharges.

### MINNESOTA'S MERCURY TMDL AND MERCURY REDUCTION RULES

In September 2014, Minnesota promulgated the Mercury Air Emissions Reporting and Reduction Rules, mandating mercury air emissions reporting and reductions from certain sources, including taconite facilities. The rules apply to all of our Minnesota iron ore mining and pelletizing operations and required submittal of a Mercury Reduction Plan to the MPCA in 2018 with plan implementation requirements becoming effective on January 1, 2025. In the Mercury Reduction Plan, facilities evaluated if available control technologies could technically achieve a 72% mercury reduction rate. If available control technologies could not technically achieve a 72% mercury reduction rate, the facilities must propose alternative mercury reduction measures. One of the main tenets agreed upon for evaluating potential mercury reduction technologies during TMDL implementation and 2014 rule development proceedings was that the selected technology must meet the following "Adaptive Management Criteria": the technology must be technically feasible; must be economically feasible; must not impact pellet quality; and must not cause excessive corrosion in the indurating furnaces or air pollution control equipment.

The Mercury Reduction Plans for our Minnesota facilities were submitted to the MPCA in December 2018. The plans determined that there are currently no proven technologies to cost effectively reduce mercury emissions from taconite furnaces to achieve the targeted 72% reduction rate, while satisfying all Adaptive Management Criteria. This determination was based on detailed engineering analysis and research testing. In January 2023, MPCA responded that certain technologies may be appropriate, and MPCA requested submission of revised Mercury Reduction Plans from the facilities. Potential impacts to us are not estimable at this time because the revised Mercury Reduction Plans remain under development.

### RISK AND TECHNOLOGY REVIEWS FOR TACONITE AND INTEGRATED IRON AND STEEL CATEGORIES

Under the Clean Air Act, within eight years after promulgating National Emissions Standards for Hazardous Air Pollutants in industry-specific categories, the EPA must review the standards to determine whether they continue to protect public health with an ample margin of safety and protect against adverse environment effects. In addition, the EPA is required to review and revise the standard every eight years to account for improvements in HAP control technology or methods.

The EPA has worked with the taconite and integrated iron and steel industries for years to collect data in order to recalculate the risk from HAP emissions from each category and to address whether new technologies existed in those sectors. In 2020, the EPA determined that the risk from the sources in both of those categories was acceptable and adopted new rules for both sectors in 2020. However, also in 2020, a court ruled that the EPA must address all HAPs in its National Emissions Standards for Hazardous Air Pollutants Risk and Technology Reviews. See Louisiana Environmental Action Network, et al. v. Environmental Protection Agency and Andrew Wheeler 955 F.3d 1088 (D.C. Cir. 2020). The EPA then reopened the rulemakings for numerous source categories, including taconite and integrated iron and steel, to confirm that all HAPs had been addressed in the updates to those rules.

In 2022, the EPA sent us information collection requests related to the emission of HAPs from taconite and integrated iron and steel sources, and we have fulfilled or are fulfilling those requests in the time prescribed by the EPA. The EPA is required by court order to issue a final rule by October 26, 2023 for the integrated iron and steel category and November 16, 2023 for the taconite category. Because the EPA has yet to propose revised rules, the impacts are not estimable at this time but could be material in future years.

## OTHER GOVERNMENT LAWS AND REGULATIONS

In addition to environmental laws and regulations, we are subject to various laws and regulations around the world. For example, changes in trade regulations, including tariffs or other import or export restrictions, could lead to lower or more volatile global steel prices, impacting our profitability. In addition, health and safety regulations, including OSHA and MSHA regulations, have necessitated, and may continue to necessitate, increased operating costs or capital investments to promote a safe working environment. We are also required to comply with complex foreign and U.S. laws and regulations, which may include the Foreign Corrupt Practices Act and other anti-bribery laws, the European Union's General Data Protection Regulation and other U.S. and foreign privacy regulations, and transportation and logistics regulations. The laws and regulations noted above, as well as other applicable laws and regulations, or the manner in which they are interpreted or enforced, may require us to make material investments in the form of additional processes, training and capital, among other things. For a discussion of the risks associated with certain applicable laws and regulations, see *Part I – Item 1A, Risk Factors.*

## RAW MATERIALS AND ENERGY

Our steelmaking operations require iron ore, HBI, coke, coal, ferrous and carbon and stainless scrap, chrome, nickel and zinc as primary raw materials. We also consume natural gas, electricity, industrial gases and diesel fuel at our operations. As a vertically integrated steel company, we are able to internally supply a majority of our ferrous raw materials needed for our steelmaking operations. We also attempt to reduce the risk of future supply shortages and price volatility in other ways. If multi-year contracts are available in the marketplace for those raw materials that we cannot supply internally, we may use these contracts to secure sufficient supply to satisfy our key raw material needs. When multi-year contracts are not available, or are not available on acceptable terms, we purchase the remainder of our raw material needs under annual contracts or conduct spot purchases. We

also regularly evaluate alternative sources and substitute materials. Additionally, we may hedge portions of our energy and raw materials purchases to reduce volatility and risk. We believe that we have secured, or will be able to secure, adequate supply to fulfill our raw materials and energy requirements for 2023.

The raw materials needed to produce a ton of steel will fluctuate based upon the specifications of the final steel products, the quality of raw materials and, to a lesser extent, differences among steel production equipment. For example, generally, in our integrated steelmaking facilities, we consume approximately 1.4 net tons of coal to produce one net ton of coke. The process to produce one ton of raw steel (generally defined as a carbon slab) requires approximately 1.4 net tons of iron ore pellets and/or HBI pellet equivalents, 0.3 to 0.4 net tons of coke and 0.3 net tons of steel scrap or scrap substitutes. At normal operating levels, we also consume approximately 5 to 6 MMBtu's of natural gas per net ton of raw steel produced, prior to rolling, finishing and further processing. Additionally, on average, our EAFs require 1.1 net tons of ferrous scrap, stainless scrap or scrap substitutes to produce one net ton of steel. While these estimated consumption amounts are presented to give a general sense of raw material and energy consumption used in our steel production, substantial variations may occur.

## IRON ORE

We own or co-own five active iron ore mines in Minnesota and Michigan. Based on our ownership in these mines, our share of annual rated iron ore production capacity is approximately 28 million long tons, which supplies all of the iron ore needed for our steelmaking operations. Refer to *Part I - Item 2. Properties* for additional information.

## HBI

Our investment into HBI production provides us access, when needed, to clean iron units in order to make advanced steel and stainless products. This access to our own production provides us flexibility and allows us to avoid the risks and carbon footprints of imported iron substitutes. Iron substitutes imported into the U.S. are traditionally sourced from regions of the world that have historically experienced greater political turmoil and have lower pollution standards than the U.S. Our investment demonstrates our raw material and company strategy in responsibly managing the risks of pricing, availability and overall carbon footprint of our critical inputs. We have an annual capacity of 1.9 million metric tons of HBI per year.

As a result of our internal usage of HBI, coupled with our ongoing evaluation of coke use strategies, we idled our coke facility at Middletown Works during the third quarter of 2021 and permanently closed our Mountain State Carbon coke plant in the first quarter of 2022.

## COKE AND COAL

We own three active cokemaking facilities, including one coke plant located within our Burns Harbor facility. These facilities currently provide approximately half of the coke requirements for our steelmaking operations and have an annual rated capacity of 2.6 million net tons. Additionally, we have coke supply agreements with suppliers that provide the remaining requirements. Our purchases of coke are made under annual or multi-year agreements with periodic price adjustments.

We have annual rated metallurgical coal production capacity of 2.3 million net tons from our Princeton mine, which supplies a portion of our metallurgical coal needs. We typically purchase most of our metallurgical coal under annual fixed-price agreements. We believe there are adequate external supplies of coke and coal available at competitive market prices to meet our needs. Refer to *Part I - Item 2. Properties* for additional information.

## STEEL SCRAP

We own the assets of FPT, which provide us sourcing and processing capabilities for both prime and obsolete scrap. This access is critical, because prime scrap demand is expected to grow as new flat-rolled EAF capacity is set to come online over the next five years. FPT includes 22 facilities that are primarily located in the Midwest near our steel facilities. Additionally, our access to scrap furthers our commitment to being an environmentally-friendly, low-carbon intensity steelmaker with a cleaner materials mix as we are able to better optimize productivity at our existing EAFs and BOFs.

The majority of our scrap requirements can be generated or processed from internal sources, including scrap generated at our steel production facilities. We believe that supplies of additional steel scrap to meet the needs of our steelmaking operations are readily available from outside sources at competitive market prices.

## OTHER MATERIALS

We believe that supplies of chrome, nickel and zinc adequate to meet the needs of our steelmaking operations are readily available from outside sources at competitive market prices.

## ENERGY

We consume a large amount of natural gas, electricity, industrial gases and diesel fuel, which are significant costs to our operations. The majority of our energy requirements are purchased from outside sources. Access to long-term, low-cost sources of energy in various forms is critically important to our operations.

Natural gas is procured for our operations utilizing a combination of long-term, annual, quarterly, monthly and spot contracts from various suppliers at market-based pricing. We believe access to low-cost and reliable sources of natural gas is available to meet our operations' requirements.

Table of Contents

We purchase electricity for all of our operations in either regulated or deregulated markets. Due to the distinct nature of these markets, we procure electricity through either long-term or annual contracts. Some of our operations also use self-generated coke oven gas and/or blast furnace gas to produce electricity, which is an environmentally-friendly practice that also reduces our need to purchase electricity from external sources. We also closely monitor developments at the state and federal levels that could impact electricity availability or cost and incorporate such changes into our electricity supply strategy in order to maintain reliable, low-cost supply. We are also currently contracting for the increased use of renewable energy to complement our existing supply, which will reduce our emissions profile. We believe there is an adequate supply of competitively priced electricity to fulfill our requirements.

We purchase industrial gases and diesel fuel under long-term contracts with various suppliers. We believe we have access to adequate supplies of industrial gases and diesel fuel to meet our needs.

## HUMAN CAPITAL

Cliffs has a long, proven history of attracting and retaining exceptional talent. We believe our employee-centric management philosophy is the key to our success. Even though many other employers are facing unprecedented labor shortages, we continued to grow during 2022.

As of December 31, 2022, we employed approximately 27,000 people, with approximately 26,000 employed in the U.S. Approximately 25,000 employees were employed at production locations, with the balance employed in corporate support roles. The vast majority of our approximately 21,000 hourly employees were subject to collective bargaining agreements (approximately 19,000) with various labor unions.

### LABOR RELATIONS

Our labor relations philosophy is a cornerstone of our talent strategy. At Cliffs, we know that maintaining strong, positive relationships with labor unions is key to our long-term growth. We recognize and respect the right of our employees to freely associate and collectively bargain, and we do not engage in harassment, intimidation or retaliation for their efforts to bargain collectively.

More than 90% of Cliffs' hourly workforce are represented by three prominent unions — USW, UAW and IAM. The hardworking men and women of Cliffs are the lifeblood of our Company. Our employees operate and maintain our facilities and are, ultimately, responsible for safely delivering a quality product internally and to our customers. Therefore, we engage with our unions as business partners, and together we have achieved a number of successes that benefit our business and our people alike.

**2022 HIGHLIGHTS**

- On October 12, 2022, a new 4-year labor agreement with the USW was ratified. The contract covers approximately 12,000 USW-represented employees at 13 operating locations, and is effective from September 1, 2022 through August 31, 2026.

- On September 30, 2022, a new 47-month labor agreement with the USW was ratified. The contract covers approximately 2,000 USW-represented employees at our legacy mining operations, and is effective from October 1, 2022 through August 31, 2026.

- Additionally, on June 24, 2022, a new 3-year labor agreement with the UAW was ratified. The contract covers approximately 1,100 UAW-represented employees at our Butler Works facility, and is effective June 15, 2022 through June 15, 2025.

We are proud to report we did not experience any strikes or lockouts last year. This positive partnership with our unions helps us remain competitive for talent and protects our customers and their supply chains from disruptions due to labor disagreements.

### TALENT RETENTION

We believe that our future success largely depends upon our continued ability to attract and retain a highly skilled workforce. We provide our employees with competitive salaries, incentive-based bonus programs that provide above-market compensation opportunities when our Company performs well, development programs that enable continued learning and growth, and a robust benefits package that promotes well-being across all aspects of their lives, including health care, retirement planning and paid time off. In addition to these programs, we have used targeted, equity-based grants with vesting conditions to facilitate retention of key personnel. These tools have enabled us to increase the retention of key personnel, including our corporate and site leadership teams and critical technical talent.

### ROBUST EMPLOYEE BENEFITS PROGRAMS

The success of our business is fundamentally connected to the well-being of our people. Accordingly, we are committed to the health, safety and wellness of our employees. We provide our employees and their families with access to a variety of innovative, flexible and convenient health and wellness programs, including benefits that provide protection and security so they can have peace of mind concerning events that may require time away from work or that impact their financial well-being; that support their physical and mental health by providing tools and resources to help them improve or maintain their health and encourage engagement in healthy behaviors; and that offer choice so they can customize their benefits to meet their needs and the needs of their families.

Table of Contents

## DIVERSITY, EQUITY AND INCLUSION

We continue to foster a culture of diversity, equity and inclusion at Cliffs. Through our OneCliffs Way of Doing Business (our Code of Business Conduct and Ethics), we outline our Core Values, which include Trust, Respect and Open Communication. To us, this means encouraging and accepting different views and supporting and advancing gender and racial diversity. Further, our OneCliffs Way of Doing Business provides that we will not make employment-related decisions nor will we discriminate based on race, color, religion, national origin, age, military or veteran status, disability, sex (including sexual orientation and gender identity), genetic information or any other characteristic protected by applicable law. We strive to make Cliffs a safe place to work for all. Harassment and/or intimidation are not tolerated anywhere in our Company, and we hope our people make a career at Cliffs doing meaningful and challenging work.

## SAFETY

Safe production is our primary core value as we continue to reinforce a zero injury culture at our facilities. We constantly monitor our safety performance and make continuous improvements to effect change. Best practices and incident learnings are shared throughout the Company to ensure each facility can administer the most effective policies and procedures for enhanced workplace safety. Progress toward achieving our objectives is accomplished through a focus on proactive sustainable safety initiatives, and results are measured against established industry and Company benchmarks, including our Company-wide Total Reportable Incident Rate. During 2022, our Total Reportable Incident Rate (including contractors) was 1.36 per 200,000 hours worked.

Refer to *Exhibit 95 Mine Safety Disclosures (filed herewith)* for mine safety information required in accordance with Section 1503(a) of the Dodd-Frank Act.

## AVAILABLE INFORMATION

Our headquarters are located at 200 Public Square, Suite 3300, Cleveland, Ohio 44114-2315, and our telephone number is (216) 694-5700. We are subject to the reporting requirements of the Exchange Act and its rules and regulations. The Exchange Act requires us to file reports, proxy statements and other information with the SEC.

The SEC maintains a website that contains reports, proxy statements and other information regarding issuers that file electronically with the SEC. These materials may be obtained electronically by accessing the SEC's home page at *www.sec.gov*.

We use our website, *www.clevelandcliffs.com*, as a channel for routine distribution of important information, including news releases, investor presentations and financial information. We also make available, free of charge on our website, our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to these reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act, as soon as reasonably practicable after we electronically file these documents with, or furnish them to, the SEC. In addition, our website allows investors and other interested persons to sign up to receive automatic email alerts when we post news releases and financial information on our website.

We also make available, free of charge, the charters of the Audit Committee, Strategy and Sustainability Committee, Governance and Nominating Committee, and Compensation and Organization Committee, as well as the Corporate Governance Guidelines, and the Code of Business Conduct and Ethics adopted by our Board of Directors. These documents are available through our investor relations page on our website at *www.clevelandcliffs.com*. The SEC filings are available by selecting "Investors" and then "SEC Filings," and corporate governance materials are available by selecting "Investors" and then "Governance" for the Board Committee Charters, the Corporate Governance Guidelines, and the Code of Business Conduct and Ethics.

References to our website or the SEC's website do not constitute incorporation by reference of the information contained on such websites, and such information is not part of this Annual Report on Form 10-K.

Copies of the above-referenced information are also available, free of charge, by calling (216) 694-5700 or upon written request to:

<div align="center">

Cleveland-Cliffs Inc.

Investor Relations

200 Public Square, Suite 3300

Cleveland, OH 44114-2315

</div>

## INFORMATION ABOUT OUR EXECUTIVE OFFICERS

Following are the names, ages and positions of the executive officers of the Company as of February 14, 2023. Unless otherwise noted, all positions indicated are or were held with Cleveland-Cliffs Inc.

| Name | Age | Position(s) Held |
| --- | --- | --- |
| Lourenco Goncalves | 64 | Chairman, President and Chief Executive Officer (August 2014 – present); and Chairman, President and Chief Executive Officer of Metals USA Holdings Corp., an American manufacturer and processor of steel and other metals (May 2006 – April 2013). |
| Clifford Smith | 63 | Executive Vice President & President, Cleveland-Cliffs Steel (September 2021 – present); Executive Vice President, Chief Operating Officer (January 2019 – September 2021); and Executive Vice President, Business Development (April 2015 – January 2019). |
| Keith Koci | 58 | Executive Vice President & President, Cleveland-Cliffs Services (September 2021 – present); Executive Vice President, Chief Financial Officer (February 2019 – September 2021); and Senior Vice President and Chief Financial Officer, Metals USA Holdings Corp. (2013 – February 2019). |
| Celso Goncalves | 34 | Executive Vice President, Chief Financial Officer (September 2021 – present); Senior Vice President, Finance & Treasurer (March 2020 – September 2021); Vice President, Treasurer (January 2018 – March 2020); and Assistant Treasurer (September 2016 – January 2018). |
| Terry Fedor | 58 | Executive Vice President, Operations (October 2022 – present); Executive Vice President, Operations, East (September 2021 – October 2022); Executive Vice President, Chief Operating Officer, Steel Mills (March 2020 – September 2021); Executive Vice President, Operations (February 2019 – March 2020); and Executive Vice President, U.S. Iron Ore (January 2014 – February 2019). |
| Traci Forrester | 51 | Executive Vice President, Environmental & Sustainability (May 2021 – present); Executive Vice President, Business Development (May 2019 – May 2021); Vice President, Deputy General Counsel & Assistant Secretary (January 2018 – May 2019); and Deputy General Counsel & Assistant Secretary (January 2017 – January 2018). |
| James Graham | 57 | Executive Vice President, Human Resources, Chief Legal and Administrative Officer & Secretary (April 2022 – present); and Executive Vice President, Chief Legal Officer & Secretary (November 2014 – April 2022). |
| Kimberly Floriani | 40 | Senior Vice President, Controller & Chief Accounting Officer (August 2021 – present); Vice President, Corporate Controller & Chief Accounting Officer (April 2020 – August 2021); and Director, Accounting & Reporting (August 2015 – April 2020). |

All executive officers serve at the pleasure of the Board. There are no arrangements or understandings between any executive officer and any other person pursuant to which an executive officer was selected to be an officer of the Company. Celso Goncalves, our Executive Vice President, Chief Financial Officer, is the son of Lourenco Goncalves, our Chairman, President and Chief Executive Officer. There is no other family relationship between any of our executive officers or between any of our executive officers and any of our directors.

## ITEM 1A. RISK FACTORS

An investment in our common shares or other securities is subject to risks inherent in our businesses and the industries in which we operate. Described below are certain risks and uncertainties, the occurrences of which could have a material adverse effect on us. The risks and uncertainties described below include known material risks that we face currently, but our material risks are constantly evolving and the below descriptions may not include future risks that are not presently known, that are not currently believed to be material or that are common to all businesses. Investors should not interpret the disclosure of any risk to imply that such risk has not already materialized. Although we have extensive risk management policies, practices and procedures in place that are aimed to mitigate these risks, the occurrence of these uncertainties may nevertheless impair our business operations and adversely affect the actual outcome of matters as to which forward-looking statements are made. This report is qualified in its entirety by these risk factors. Before making an investment decision, investors should consider carefully all of the risks described below together with the other information included in this report and the other reports we file with the SEC.

Management has identified several categories of material risks that we are subject to, including: (I) economic and market, (II) regulatory, (III) financial, (IV) operational, (V) sustainability and development and (VI) human capital. Although the risks are organized by these headings, and each risk is discussed separately, many are interrelated.

## I. ECONOMIC AND MARKET RISKS

### The volatility of commodity prices, including steel, iron ore and scrap metal, directly and indirectly affects our ability to generate revenue, maintain stable cash flows and fund our operations.

Our profitability is dependent upon the historically volatile market prices of steel, iron ore and scrap metal. We experience direct impacts of steel price fluctuations through customer sales, as well as direct and indirect impacts of iron ore and scrap metal price fluctuations through third-party sales and the impacts that fluctuations in iron ore and scrap metal prices have on steel prices. As described elsewhere in this report, the prices of steel, iron ore and scrap metal have fluctuated significantly in the recent past, which prices are unpredictable and affected by factors beyond our control, including: international demand for, and the impact of higher rates of inflation on, raw materials used in steel production; availability of scrap metal substitutes such as pig iron; commodity price speculation; rates of global economic growth, especially construction and infrastructure activity that requires significant amounts of steel; changes in the levels of economic activity in the U.S., China, India, Europe and other industrialized or developing economies, including as a result of the Russia-Ukraine conflict or otherwise; changes in China's emissions policies and environmental compliance enforcement practices; changes in the production capacity, production rate and inventory levels of other steel producers, iron ore suppliers and scrap metal processors and traders; changes in trade laws; volumes of unfairly traded imports; imposition or termination of duties, tariffs, import and export controls and other trade barriers impacting the steel and iron ore markets; climate change and other weather-related disruptions, infectious disease outbreaks, such as the COVID-19 pandemic, or natural disasters that may impact the global supply of steel, iron ore or scrap metal; and the proximity, capacity and cost of infrastructure and transportation.

Our revenues, therefore, fluctuate with the prices of the products we sell. Although we experienced generally higher average selling prices for our steel products during 2022 as compared to 2021 due to the impact of fixed price contracts and lagging price mechanisms, to the extent that commodity prices, including the HRC price, coated and other specialty steel prices, international steel prices and scrap metal prices, significantly decline for an extended period of time as they generally did during the second half of 2022, we may have to further revise our operating plans, including curtailing production, reducing operating costs and deferring capital expenditures. We also may have to record impairments on our goodwill, intangible assets, long-lived assets and/or inventory. Sustained lower prices also could cause us to further reduce existing mineral reserves if certain reserves no longer can be economically mined or processed at prevailing prices. Particularly during periods of increased inflation resulting in higher input costs as we experienced during 2022, we may be unable to decrease our costs in an amount sufficient to offset reductions in revenues and may incur losses. These events could have a material adverse effect on us.

### We sell a significant portion of our steel products to the automotive market, and fluctuations or changes in the automotive market could adversely affect our business operations and financial performance.

The largest end user for our steel products is the automotive industry in North America. Beyond these direct sales to the automotive industry, we make additional sales to distributors and converters, which may ultimately resell some of that volume to the automotive market. In addition to the magnitude of our exposure to the automotive industry, we face risks arising from our relative concentration of sales to certain specific automotive manufacturers, and our sales volumes and revenues may be adversely affected if we are unable to renew our fixed-price contracts with one or more significant automotive customers or if those customers choose to move certain portions of their parts business to alternate suppliers. Automotive production and sales are cyclical and sensitive to general economic conditions and other factors, including interest rates, consumer credit, spending and preferences, and supply chain disruptions, such as the current semiconductor shortage. If automotive production and sales decline, whether due to consumers facing reduced purchasing power caused by inflation, newly higher interest rates or otherwise, our sales and shipments to the automotive market are likely to decline in a corresponding manner. Adverse impacts that we may sustain as a result include, without limitation, lower margins because of the need to sell our steel to less profitable customers and markets, higher fixed costs from lower steel production if we are unable to sell the same amount of steel to other customers and markets, and lower sales, shipments, pricing and margins generally as our competitors face similar challenges and compete vigorously in other markets that we serve. These adverse impacts could negatively affect our sales, financial results and cash flows.

Moreover, despite our position as the largest flat-rolled steel producer in North America, competition for automotive business has intensified in recent years, as steel producers and companies producing alternative materials have focused their efforts on capturing and/or expanding their market share of automotive business because of less favorable conditions in other markets for steel and other metals, including commodity products. As a result, the potential exists that we may lose market share to existing or new entrants or that automotive manufacturers will take advantage of the intense competition among potential suppliers during periodic contract renewal negotiations to pressure our pricing and margins in order to maintain or expand our market share with them, which could negatively affect our sales, financial results and cash flows.

**Global steelmaking overcapacity, steel imports and oversupply of iron ore could lead to lower or more volatile global steel and iron ore prices, directly or indirectly impacting our profitability.**

Significant existing global steel capacity and new or expanded production capacity in recent years could potentially cause capacity to exceed demand globally. Although certain of our U.S. competitors temporarily shut down production capacity during the COVID-19 pandemic, much of the previously idled capacity has been restarted, and certain of our competitors have announced and are moving ahead with plans to develop new steelmaking capacity in the near term. In addition, certain foreign competitors, which may have cost advantages due to being owned, controlled or subsidized by foreign governments, have substantially increased their steel production capacity in the last few years and in some instances appear to have targeted the U.S. market for imports. The risk of even greater levels of imports may continue, depending upon foreign market and economic conditions, changes in trade agreements and treaties, laws, regulations or government policies affecting trade, the ability of foreign producers to circumvent U.S. trade sanctions and policy (including in the markets for tin mill products and electrical steels), the value of the U.S. dollar relative to other currencies and other variables beyond our control. In addition, higher sustained market prices of steel and iron ore products could cause new producers to enter the market or existing producers to further expand productive capacity, which could in turn lead to lower steel prices and increasing prices of steelmaking inputs, such as scrap metal. Excess steel and iron ore supply combined with reduced global steel demand, including in China due to new or continuing COVID-19 lockdowns or otherwise, and increased foreign imports could also lead to lower steel and iron ore prices. Downward pressure on steel and/or iron ore prices could have an adverse effect on our results of operations, financial condition and profitability.

**Severe financial hardship or bankruptcy of one or more of our major customers or key vendors could adversely affect our business operations and financial performance.**

Sales and operations of a majority of our customers are sensitive to general economic conditions in the North American automotive, housing, construction, appliance, energy, defense and other industries. Some of our customers are highly leveraged. If there is a significant weakening of current economic conditions, whether because of operational, cyclical, supply chain or other issues, including inflationary pressures, higher interest rates or currently unanticipated adverse developments arising out of the COVID-19 pandemic, it could cause customers to reduce, delay or cancel their orders with us, impact significantly the creditworthiness of our customers and lead to other financial difficulties or even bankruptcy filings by our customers. Failure to receive payment from our customers for products that we have delivered could adversely affect our results of operations, financial condition and liquidity. The concentration of customers in a specific industry, such as the automotive industry, may increase our risk because of the likelihood that circumstances may affect multiple customers at the same time. Such events could cause us to experience lost sales or losses associated with the potential inability to collect all outstanding accounts receivable and reduced liquidity. Similarly, if our key vendors face financial hardship or need to operate in bankruptcy, as we have been experiencing with one of our major steel mill slag services providers since 2022, such vendors could experience operational disruption or even face liquidation, which could result in such vendor defaulting on its obligations to us or in our inability to secure replacement materials or services on a timely basis, or at all, or cause us to incur increased costs to do so. Such events could adversely impact our continuity of operations, financial results and cash flows.

**The COVID-19 pandemic and the resulting economic volatility may continue to have an adverse impact on our businesses.**

The COVID-19 pandemic is continuing to impact countries, communities, supply chains and markets, though to a generally lesser extent than during 2020-2022. Responses by individuals, governments and businesses to ever-changing developments in the COVID-19 pandemic and efforts to reduce its spread, including quarantines, travel restrictions, business closures, and mandatory stay-at-home or work-from-home orders, while largely lifted during 2022, could be reinstituted in the event novel strains or new variants prove resistant to existing vaccines. We continue to be subject to risks arising out of the turbulence of the economic recovery associated with the COVID-19 pandemic, including inflationary pressures, which have generally increased the costs of our labor, raw materials, energy supplies and other production inputs, adversely impacting our results of operations and profitability. Despite our widespread vaccination efforts, we remain subject to the ongoing risk that a portion of our workforce or on-site contractors could suffer illness or otherwise be unable to perform their ordinary work functions due to adverse developments in the COVID-19 pandemic or other infectious disease outbreak. In addition, we have experienced, and may continue to experience, supply chain disruptions or operational issues with our vendors or logistics providers, as our suppliers and contractors face similar challenges related to the COVID-19 pandemic, including as a result of new or continued pandemic lockdowns in China. Because the prolonged COVID-19 pandemic and resulting economic volatility continues to evolve, we cannot predict the full extent to which our businesses, results of operations, financial condition or liquidity will ultimately be impacted. To the extent the COVID-19 pandemic adversely affects our businesses, it may also have the effect of exacerbating many of the other risks described in this "Risk Factors" section, any of which could have a material adverse effect on us.

Table of Contents

## II. REGULATORY RISKS

**U.S. government actions on trade agreements and treaties, laws, regulations or policies affecting trade could lead to lower or more volatile global steel prices, impacting our profitability.**

In recent years, the U.S. government has altered its approach to international trade policy, both generally and with respect to matters directly and indirectly affecting the steel industry, including by undertaking certain unilateral actions affecting trade, renegotiating existing bilateral or multilateral trade agreements, and entering into new agreements or treaties with foreign countries. For example, in March 2018, the U.S. government issued a proclamation pursuant to Section 232 imposing a 25% tariff on imported steel. These Section 232 tariffs were imposed on the basis of national security and addressed imported steel that was being unfairly traded by certain foreign competitors at artificially low prices. In retaliation against the Section 232 tariffs, the European Union subsequently imposed its own tariffs against certain steel products and other goods imported from the U.S. Following the U.S. government leadership changes resulting from the November 2020 presidential election, further changes in U.S. international trade policy have occurred and others may be forthcoming. For example, the U.S. government has agreed to modified tariff rate quota systems with each of the European Union, Japan and the United Kingdom that allow more imports from those trading partners to enter the U.S. market free of Section 232 tariffs. The U.S. government may also negotiate reductions or eliminations of Section 232 duties with other trading partners. If the Section 232 tariffs are further removed or substantially lessened, whether through legal challenge, legislation, executive action or otherwise, imports of foreign steel would likely increase and steel prices in the U.S. would likely fall, which could materially adversely affect our revenues, financial results and cash flows.

In addition, during 2020, the USMCA was implemented among the U.S., Mexico and Canada in place of the North American Free Trade Agreement. Because all of our steel manufacturing facilities are located in North America and one of our principal markets is automotive manufacturing in North America, we believe that the USMCA has the potential to positively impact our business by incentivizing automakers and other manufacturers to increase manufacturing production in North America and to use North American steel. However, it is difficult to predict the short- and long-term implications of changes in trade policy and, therefore, whether the USMCA or other new or renegotiated trade agreements, treaties, laws, regulations or policies that may be implemented by the U.S. government, or otherwise, will have a beneficial or detrimental impact on our business and our customers' and suppliers' businesses. Adverse effects could occur directly from a disruption to trade and commercial transactions and/or indirectly by adversely affecting the U.S. economy or certain sectors of the economy, impacting demand for our customers' products and, in turn, negatively affecting demand for our products. Important links of the supply chain for some of our key customers, including automotive manufacturers, could be negatively impacted by the USMCA or other new or renegotiated trade agreements, treaties, laws, regulations or policies.

While we may currently benefit from certain antidumping and countervailing duty orders, any such relief is subject to periodic reviews and challenges, which can result in revocation or modification of the orders or reduction of the duties. During 2022, the U.S. International Trade Commission reviewed and continued antidumping and countervailing duty orders covering imports from several major trading partners of some of our key products, including corrosion-resistant steel, cold-rolled steel, hot-rolled steel and cut-to-length plate. However, previously granted and currently pending petitions for trade relief, such as our recently filed trade cases seeking relief from unfairly traded tin mill products imports, may not be successful or fully effective at preventing harm from dumped and subsidized imports. Any of these actions and their direct and indirect impacts could materially adversely affect our revenues, financial results and cash flows.

**We are subject to extensive governmental regulation, which imposes potential significant costs and liabilities on us. Future laws and regulations or the manner in which they are interpreted and enforced could increase these costs and liabilities or limit our ability to produce our raw materials and products.**

New laws or regulations, or changes in existing laws or regulations, or the manner of their interpretation or enforcement, could increase our cost of doing business and restrict our ability to operate our businesses or execute our strategies. This includes, among other things: changes in MSHA regulations, such as respirable silica standards; reevaluation of the National Ambient Air Quality Standards, such as revised nitrogen dioxide, sulfur dioxide, lead, ozone and particulate matter criteria; changes in the interpretation of OSHA regulations, such as standards for occupational exposure to noise, certain chemicals or hazardous substances and infectious diseases; and changes in tax laws and regulations, including the possible taxation under U.S. or foreign country laws of certain income from worldwide operations, the U.S. 1% excise tax on certain corporate stock repurchases (which could increase our cost of future activity under our existing share repurchase program) and 15% corporate alternative minimum tax, both enacted as part of the Inflation Reduction Act and effective in 2023, and the 15% global minimum corporate tax under Pillar Two of the Organization for Economic Cooperation and Development's Global Anti-Base Erosion Rules, which has been adopted by the European Union requiring its Member States to implement national legislation applicable for fiscal years starting on or after December 31, 2023.

We and our operations are subject to various international, foreign, federal, state, provincial and local laws and regulations relating to protection of the environment and human health and safety, including those relating to air quality, water quality and conservation, plant, wetlands, natural resources and wildlife protection (including endangered or threatened species), reclamation, remediation and restoration of properties and related surety bonds or other financial assurances, land use, the discharge of materials into the environment, the effects that industrial operations and mining have on groundwater quality and availability, the management of electrical equipment containing polychlorinated biphenyls, and other related matters. Despite implementation of rigorous environmental protocols and management systems, we cannot be certain that we have been or will be at all times in complete compliance with all such laws and regulations. If we violate or fail to comply with these laws or regulations, we could be fined, required to cease operations, subject to criminal or civil liability, or otherwise sanctioned by regulators or barred from participating in

government contracts. In addition, federal or state regulatory agencies have the authority, under certain circumstances following significant health and safety incidents, such as fatalities, to order a mine or production facility to be temporarily or permanently closed. Compliance with the complex and extensive laws and regulations to which we are subject imposes substantial costs on us, which could increase over time because of heightened regulatory oversight, adoption of more stringent environmental, health and safety standards and greater demand for remediation services leading to shortages of equipment, supplies and labor, as well as other factors.

Specifically, there are several notable proposed or recently enacted rulemakings or activities to which we would be subject or that would further regulate and/or tax us and our customers, which may also require us or our customers to reduce or otherwise change operations significantly or incur significant additional costs, potentially limiting our ability to produce our raw materials and products, depending on their ultimate outcome. These emerging or recently enacted rules, regulations and policy guidance include, but are not limited to: trade regulations, such as the USMCA and/or other trade agreements, treaties or policies; changes in tariff policy, including with respect to the 25% tariff on certain imported steel imposed under Section 232; climate change mitigation strategies and GHG regulation; selenium discharge regulation; revisions to the sulfate wild rice water quality standard and its implementation; Minnesota's Mercury TMDL and associated federal rules governing mercury air emission reductions; the Regional Haze FIP Rule; ozone transport regulations; agency decisions related to environmental justice initiatives; revised National Ambient Air Quality Standards, particularly for ozone and particulate matter; and Superfund chemical and substance excise taxes under CERCLA, which were reinstated effective July 1, 2022 as part of the Infrastructure and Jobs Act. In addition, the Biden Administration has indicated via executive orders and in public statements that it will propose more stringent environmental regulation, in particular related to climate change. At the state level, agencies are adopting similar rules that may adversely impact us. Any new or more stringent legislation, regulations, rules, interpretations or orders, when enacted and enforced, including any related to required monitoring and reporting or reductions in, or taxes on, levels of carbon emissions, could have a material adverse effect on our business, results of operations, financial condition or profitability.

Our operations may be impacted by the recent enactment, and ongoing consideration, of significant federal and state laws and regulations relating to certain mine-related issues, such as the stability of tailings basins, mine drainage and fill activities, reclamation and safety in underground and surface mines. With respect to underground mines, for example, these laws and regulations include requirements for constructing and maintaining caches for the storage of additional self-contained self-rescuers throughout the mines; installing rescue chambers in the mines; continuous tracking of and communication with personnel in the mines; installing cable lifelines from the mine portal to all sections of the mine to assist in emergency escape; submission and approval of emergency response plans; and additional safety training. Additionally, there are requirements for the prompt reporting of accidents and increased fines and penalties for violations of these and existing regulations. These laws and regulations may cause us to incur substantial additional costs.

In addition, certain of our operations are subject to the risks of doing business abroad and we must comply with complex foreign and U.S. laws and regulations, which may include, but are not limited to, the Foreign Corrupt Practices Act and other anti-bribery laws, regulations related to import/export and trade controls, the European Union's General Data Protection Regulation and other U.S. and foreign privacy regulations, and transportation and logistics regulations. These laws and regulations may increase our costs of doing business in international jurisdictions and expose our operations and our employees to elevated risk. We require our employees, contractors and agents to comply with these and all other applicable laws and regulations, but failure to do so could result in possible administrative, civil or criminal liability and reputational harm to us and our employees.

As a supplier on federal, state and local public procurement projects, including projects that may arise out of proposed or recently enacted governmental legislation regarding infrastructure investments such as the Infrastructure Investment and Jobs Act of 2021, we may be subject to certain stringent procurement regulations that may present compliance challenges or may increase the costs of securing certain business. We may also be indirectly affected through regulatory changes that impact our customers, which in turn could reduce the quantity of our products they demand, adversely impact the terms upon which they purchase or the prices for our products they are willing to pay. Regulatory changes that impact our suppliers, such as any changes in labor or environmental standards in China, could decrease the availability of products or services they sell to us or could increase the price they demand for products or services they sell to us.

## Our operations use hazardous materials and inadvertently may impact the environment, which could result in material liabilities to us.

Our operations currently use, and have in the past used, hazardous materials and substances, and we have generated, and expect to continue to generate, solid and hazardous waste. We have been, and may in the future be, subject to claims under international, foreign, federal, state, provincial and local laws and regulations for toxic torts, natural resource damages and other damages as well as for the investigation and clean-up of soil, surface water, sediments, groundwater and other natural resources and reclamation of properties. Such claims for damages, as well as investigation, remediation and reclamation requirements, have arisen and may arise in the future out of current, future or former conditions at sites that we or our acquired companies own, lease or operate, as well as sites that we or our acquired companies formerly owned, leased or operated, and at contaminated sites that are or have been owned, leased or operated by our joint venture partners. We may also have liability for contamination at third-party sites where we have sent hazardous wastes. Our liability for these claims may be strict and/or joint and several, such that we may be held responsible for more than our share of the contamination or other damages, or even for entire claims regardless of fault. We may be named as a potentially responsible party at other third-party sites in the future, and we cannot be certain that the costs associated with these additional sites will not exceed any reserves we have established or otherwise be material.

Table of Contents

**We may be unable to obtain, maintain, renew or comply with permits and licenses necessary for our operations or be required to provide additional financial assurances, which could reduce our production, cash flows, profitability and available liquidity.**

We must obtain, maintain and comply with numerous permits and licenses that require approval of operational plans and impose strict conditions on various environmental, health and safety matters in connection with our steel production and processing and mining and other operations. These include permits and approvals issued by various federal, state, provincial, foreign and local agencies and regulatory bodies, with which we may not always be able to comply. The permitting rules are complex and may change over time, making our ability to comply with the applicable requirements more difficult or potentially impractical and costly, possibly precluding the continuance of ongoing operations or the development of future operations. Interpretations of rules may also change over time and may lead to requirements, such as additional financial assurances, making it costlier to comply. Moreover, despite our ongoing efforts to reduce our environmental footprint and improve the resiliency of our business model, heightened levels of regulatory oversight focused on addressing climate change and industrial activities that generate GHG emissions, such as our steelmaking, cokemaking and mining operations, could impact, delay or disrupt our ability to obtain new or renewed permits or modifications to existing permits.

In addition, the public, including special interest groups and individuals, have certain rights under various statutes and burgeoning environmental justice policies to comment upon, submit objections to, and otherwise engage in the permitting process, including bringing citizens' lawsuits to challenge such permits or activities. Accordingly, required permits may not be issued or renewed in a timely fashion or at all, or permits issued or renewed may include conditions that we cannot meet or otherwise be conditioned in ways that may restrict our ability to conduct our production, mining and processing activities efficiently or include requirements for additional financial assurances that we may not be able to provide on commercially reasonable terms or at all, which could reduce available borrowing capacity under our ABL Facility. Such conditions, restrictions or requirements could also reduce our production, cash flows or profitability.

## III. FINANCIAL RISKS

**Our existing and future indebtedness may limit cash flow available to invest in the ongoing needs of our businesses, which could prevent us from fulfilling our obligations under our senior notes, ABL Facility and other debt, and we may be forced to take other actions to satisfy our obligations under our debt, which may not be successful.**

As of December 31, 2022, we had $4,306 million aggregate principal amount of long-term debt outstanding, $829 million of which was secured (excluding $150 million of outstanding letters of credit and $215 million of finance leases), and $26 million of cash on our statement of consolidated financial position. As of December 31, 2022, $2,442 million aggregate principal amount of our senior notes was outstanding. The aggregate principal amount of revolver commitments under our ABL Facility is $4.5 billion. As of December 31, 2022, $1,864 million was outstanding under our ABL Facility, and the principal amount of letters of credit obligations and other commitments totaled $150 million. As of December 31, 2022, the available borrowing capacity on our ABL Facility was $2,486 million.

A portion of our cash flow from operations is used to service debt under our senior notes and ABL Facility, reducing the availability of cash to fund capital expenditures, acquisitions or strategic development initiatives, and other general corporate purposes. The amount of cash required to service debt under our senior notes has decreased year-over-year from $259 million in 2021 to $193 million in 2022 due to our continued repayment of long-term debt, which savings has been partially offset by the year-over-year increase in cash from $44 million in 2021 to $65 million in 2022 required to service loans under our ABL Facility because of higher interest rates under recent U.S. Federal Reserve monetary policy. Although it is uncertain whether the U.S. Federal Reserve will continue to raise interest rates during 2023 and beyond, unless we are able to further reduce the amount borrowed under our ABL Facility, higher rates would increase the amount of cash we would need to allocate to servicing the interest expense on our debt.

Our ability to make scheduled payments on the principal, premium, if any, and interest on our debt, or to refinance our debt obligations, depends on our ability to generate cash in the future and our financial condition and operating performance, which are subject to prevailing economic and competitive conditions and to certain financial, business and other factors beyond our control, as described elsewhere in this "Risk Factors" section. If we are unable to service our debt obligations, we could face substantial liquidity problems and we may be forced to reduce or delay investments and capital expenditures, or to sell assets, seek additional capital, including additional secured or unsecured debt, or restructure or refinance our debt, and we may be unable to continue as a going concern. We may be unable to consummate any proposed asset sales or recover the carrying value of these assets, and any proceeds may not be adequate to meet any debt service obligations then due. Any of these examples potentially could have a material adverse impact on our results of operations, profitability, shareholders' equity and capital structure. In addition, a failure to comply with any applicable covenants in the instruments governing our debt could result in an event of default that, if not cured or waived, would have a material adverse effect on us.

Our level of indebtedness could have further consequences, including, but not limited to, increasing our vulnerability to adverse economic or industry conditions, placing us at a competitive disadvantage compared to other businesses in the industries in which we operate that are not as leveraged and that may be better positioned to withstand economic downturns and recessionary environments, limiting our flexibility to plan for, or react to, changes in our businesses and the industries in which we operate, and requiring us to refinance all or a portion of our existing debt. We may not be able to refinance on commercially reasonable terms or at all, and any refinancing of our debt could be at higher interest rates and may require us to comply with more onerous covenants, making it more difficult to obtain surety bonds, letters of credit or other financial assurances that may be demanded by our vendors

or regulatory agencies, particularly during periods in which credit markets are weak. In addition, our cost of financing or refinancing, access to the capital markets, and the terms under which we purchase goods and services could be adversely affected if credit ratings agencies downgrade our ratings, whether due to factors specific to our business or debt profile, a prolonged cyclical downturn in the steel, scrap metal and mining industries or macroeconomic trends (such as global or regional recessions), increases in pension and OPEB obligations, recent adverse impacts of inflation and high interest rates, or trends in credit and capital markets more generally.

A portion of our borrowing capacity and outstanding indebtedness bears interest at a variable rate based on LIBOR. According to the FCA (Financial Conduct Authority: the authority that regulates LIBOR), the IBA (ICE Benchmark Administration Limited: the entity that calculates and publishes LIBOR) will permanently cease to publish each of the LIBOR settings by June 2023. It is unclear whether new methods of calculating LIBOR will be established such that it continues to exist after such end date, and there is considerable uncertainty regarding the publication or representativeness of LIBOR beyond such end date. The U.S. Federal Reserve, in conjunction with the Alternative Reference Rates Committee, is seeking to replace U.S. dollar LIBOR with a newly created index, SOFR. Our ABL Facility provides a mechanism to automatically transition to a SOFR-based benchmark when all U.S. dollar LIBOR settings are no longer provided or are no longer representative. In addition, our ABL Facility includes an option for us and the agent to jointly elect to transition early to a SOFR-based benchmark, or in certain circumstances, an alternative benchmark replacement. It is not possible to predict the effect of these changes, other reforms or the establishment of alternative reference rates. To the extent these interest rates increase, our interest expense will increase. If sources of capital for us are reduced, capital costs could increase materially. Restricted access to capital markets and/or increased borrowing costs could have an adverse effect on our results of operations, cash flows, financial condition and liquidity.

## Our actual operating results may differ significantly from our guidance.

From time to time, we release guidance, including that set forth under "Management's Discussion and Analysis of Financial Condition and Results of Operations–Outlook" in our Annual Reports on Form 10-K and our Quarterly Reports on Form 10-Q, regarding our future performance. This guidance, which consists of forward-looking statements, is prepared by our management and is qualified by, and subject to, the assumptions and the other information included in our Annual Reports on Form 10-K and our Quarterly Reports on Form 10-Q. Our guidance is not prepared with a view toward compliance with published guidelines of the American Institute of Certified Public Accountants, and neither our independent registered public accounting firm nor any other independent or outside party compiles or examines the guidance and, accordingly, no such person expresses any opinion or any other form of assurance with respect thereto.

Guidance is based upon a number of assumptions and estimates that, while presented with numerical specificity, are inherently subject to business, economic, regulatory and competitive uncertainties and contingencies, many of which are beyond our control and are based upon specific assumptions with respect to future business decisions, some of which will change. The principal reason that we release such data is to provide a basis for our management to discuss our business outlook with analysts and investors. We do not accept any responsibility for any projections or reports published by any such third parties.

Guidance is necessarily speculative in nature, and it can be expected that some or all of the assumptions of the guidance furnished by us will not materialize or will vary significantly from actual results. Accordingly, our guidance is only an estimate of what management believes is realizable as of the date of release. Actual results will vary from the guidance. Investors should also recognize that the reliability of any forecasted financial data diminishes the further in the future that the data are forecast. In light of the foregoing, investors are urged to put the guidance in context and not to place undue reliance on it. Any failure to successfully implement our operating strategy or the occurrence of any of the risks described in our Annual Reports on Form 10-K or our Quarterly Reports on Form 10-Q could cause actual operating results to differ from the guidance, and such differences may be adverse and material.

## We may be subject to various lawsuits, claims, arbitrations or governmental proceedings that could result in significant expenditures.

We are from time to time subject to various lawsuits, claims, arbitrations or governmental proceedings relating to commercial and business disputes, antitrust claims, environmental matters, government investigations, occupational or personal injury claims, property damage, labor and employment matters, or suits involving legacy operations and other matters. For example, certain of our subsidiaries have been named in lawsuits claiming exposure to asbestos, many of which have been dismissed and/or settled for non-material amounts. Nevertheless, it is likely that similar types of claims will continue to be filed in the future, and we could experience material adverse judgments or incur significant costs to defend such claims or any other existing and future lawsuits, claims, arbitrations or governmental proceedings. The insurance we maintain may not be adequate to protect us in the event of significant claims.

## IV. OPERATIONAL RISKS

## Our operating expenses could increase significantly if the prices of raw materials, electrical power, fuel or other energy sources increase.

Our operations require significant use of energy and raw materials. Although we are fully self-sufficient in iron ore and partially self-sufficient in coke, metallurgical coal and scrap metal, we are wholly or partially dependent on third-party suppliers for certain critical raw materials and production inputs, including industrial gases, graphite electrodes, chrome, zinc, coke, metallurgical coal and scrap metal. Prices for electricity, natural gas, diesel fuel, oils and raw materials can fluctuate widely with availability and demand levels from other users, including fluctuations caused by the impact of recent inflationary pressures, supply chain constraints, the

Russia-Ukraine conflict and the COVID-19 pandemic. For example, increased electricity demand to the grid in response to physical climate-related risks, adverse or extreme weather events and electrification of the economy could adversely impact energy prices. During periods of peak usage, although some operations have contractual arrangements in place whereby they receive certain offsetting payments in exchange for electricity load reduction, supplies of energy and raw materials in general may be curtailed and we may not be able to purchase them at historical rates. A disruption in the transmission of energy, inadequate energy transmission infrastructure, or the termination of any of our energy supply contracts could interrupt our energy supply and adversely affect our operations. While we have some long-term contracts with electrical, natural gas and raw material suppliers, we are exposed to fluctuations in energy, natural gas and raw material costs that can affect our production costs. We enter into many market-based pricing supply contracts for electricity, natural gas and diesel fuel for use in our operations. Those contracts expose us to price increases in energy costs, which could cause our profitability to decrease significantly. As an example, our Toledo direct reduction plant is subject to changes in the market price of natural gas, which is a key input in the direct reduction of iron ore pellets to produce HBI, and natural gas has been experiencing elevated market pricing since the second quarter of 2022. In addition, U.S. public utilities may impose rate increases and pass through additional capital and operating cost increases to their customers related to new or pending U.S. environmental regulations or other charges that may require significant capital investment and use of cleaner fuels in the future. In particular, the recent decision of the U.S. Court of Appeals for the District of Columbia vacating and remanding the Affordable Clean Energy Rule, as well as recent executive orders from President Biden regarding the environment and climate change, indicate that new or revised regulations under the Biden Administration could result in rate increases from U.S. public utilities. Although we regularly monitor and from time to time challenge rate cases initiated by these utilities or other sources seeking to increase the amounts that our facilities have to pay for electricity, natural gas or water, there is no assurance that our challenges will be successful in reducing or eliminating proposed rate increases.

The majority of our steel shipments are sold under contracts that do not allow us to pass through all increases in raw materials, supplies and energy costs. Some of our customer contracts include variable-pricing or surcharge mechanisms allowing us to adjust the total sales price based on changes in specified raw materials, supplies and energy costs. Those adjustments, however, rarely reflect all of our underlying raw materials, supplies and energy cost changes. The scope of the adjustment may also be limited by the terms of the negotiated language, including limitations on when and to what extent the adjustment occurs. Further, as a result of recent inflationary pressures, many of our vendors have been seeking substantial price increases in order to continue providing critical goods and services, and to the extent we are required to pay relatively more for our steelmaking inputs and are unable to recognize corresponding sales price increases, we would realize lower margins on sales of our products, negatively impacting our results of operations. Our need to consume existing inventories may also delay the impact of a change in prices of raw materials or supplies. Significant changes in raw material costs may also increase the potential for inventory value write-downs in the event of a reduction in selling prices and our inability to realize the cost of the inventory. As we source a portion of our critical supplies and raw materials from China, such as refractories, electrodes, chemicals and spare parts, existing tensions or further adverse geopolitical developments between the U.S. and China triggering or exacerbating sanctions or trading restrictions could lead to us experiencing disruptions, delays or higher costs in supplying our operations. In addition, even though we are partially self-sufficient in scrap metal, if the market price of scrap metal were to experience a sustained price increase, our cost to produce steel would be adversely affected due to the higher prices we would need to pay to acquire third-party scrap metal for consumption in our operations, which would adversely affect the margins we would realize on our fixed price contracts.

**Our sales and competitive position depend on transporting our products to customers at competitive rates and in a timely manner, and our ability to optimize our operational footprint depends on predictably and cost effectively moving products and raw materials internally among our facilities.**

Disruption of the rail, trucking, lake and other waterway transportation services because of weather-related problems, including ice and winter weather conditions on the Great Lakes or St. Lawrence Seaway, climate change, strikes, lock-outs, driver shortages and other disruptions in the trucking industry, train crew shortages or other rail network constraints, infectious disease outbreaks or other events and lack of alternative transportation options could impair our ability to move products internally among our facilities and to supply products to our customers at competitive rates or in a timely manner and, thus, could adversely affect our operations, revenues, margins and profitability. For example, if the vessel shipping season on the Great Lakes were to be interrupted or shortened as compared to historical levels, whether due to extended winter conditions, operational failure of critical shipping locks or otherwise, our ability to transport iron ore pellets to our steel mills could be adversely affected, resulting in potential operational disruptions and reduced production volumes. Further, dredging issues and environmental changes, particularly at Great Lakes ports or along navigable rivers, could impact adversely our ability to move certain of our products or result in higher freight rates. Similarly, we depend on third-party transportation services for delivery of raw materials and other production inputs to us, and failures or delays in delivery would have an adverse effect on our ability to maintain steady-state production and processing operations to meet customer obligations.

**The cost or time to implement a strategic or sustaining capital project may prove to be greater than originally anticipated.**

Most of our mines and production and processing facilities have been in operation for several decades, and the equipment is aged, requiring that we continually and successfully implement extensive and costly maintenance practices, programs and upgrades, which may take longer or be more costly than expected. From time to time, we undertake capital projects in order to enhance, expand, maintain or upgrade our production, mining and processing capabilities, such as the 2022 blast furnace reline project at our Cleveland Works, or to diversify our customer base, such as our Toledo direct reduction plant. Our ability to achieve the anticipated production volumes, revenues or otherwise realize acceptable returns on capital projects that we may undertake is subject to a number of risks, many of which are beyond our control, including a variety of market, operational, permitting and labor-

Table of Contents

related factors. Further, the cost to implement any given capital project may ultimately prove to be greater or may take more time than originally anticipated, including due to supply chain issues that may be experienced by our vendors, and the scope of a capital project may expand or otherwise be modified. Capital projects may also interrupt production capabilities, which could have an adverse effect on costs and profitability. Inability to achieve the expected results from the implementation of our capital projects, incurring unanticipated costs or delays, or the inability to meet contractual obligations could adversely affect our results of operations, future earnings and cash flow generation.

**Natural or human-caused disasters, weather conditions, disruption of energy, unanticipated geological conditions, equipment failures, infectious disease outbreaks, and other unexpected events may lead our customers, our suppliers or our facilities to curtail production or shut down operations.**

Operating levels within our industry and the industries of our customers and suppliers are subject to unexpected conditions and events that are beyond the industries' control. Those events, including the occurrence of an infectious disease, widespread illness or public health emergency, such as the COVID-19 pandemic, could cause industry members or their suppliers to curtail production or shut down a portion or all of their operations, which could reduce the demand for our products and adversely affect our revenues, margins and profitability. For example, the temporary production shutdowns in the automotive industry that occurred during 2020 as a result of the onset of the COVID-19 pandemic and associated reduction in demand for our products led to our decision to temporarily idle certain steelmaking facilities and iron ore mines.

Our operating levels are subject to conditions beyond our control that can delay deliveries or increase the cost of production for varying lengths of time. Factors that could cause production disruptions could include adverse weather conditions due to climate change or otherwise (such as severe winter weather, tornadoes, floods, temperature extremes and the lack of availability of process water due to drought) and natural and human-caused disasters, lack of adequate raw materials, energy or other supplies, and infectious disease outbreaks, such as the COVID-19 pandemic. Additional factors that could adversely impact production and operations at our mining facilities include tailings dam failures, pit wall failures, unanticipated geological conditions, including variations in the amount of rock and soil overlying deposits of iron ore and metallurgical coal, and processing changes.

Our mining operations, processing facilities, steelmaking and logistics operations depend on critical pieces of equipment. This equipment may, on occasion, be out of service because of unanticipated failures or unplanned outages. In the future, we may experience additional lengthy shutdowns or periods of reduced production because of equipment failures or unplanned maintenance activities. Further, remediation of any interruption in production capability may require us to make large capital expenditures that could have a negative impact on our profitability and cash flows. Our business interruption insurance may not be available to cover lost revenues associated with equipment failures or maintenance difficulties. Longer-term business disruptions could result in a loss of customers, which could adversely affect our future sales levels and revenues.

Many of our production facilities and mines are dependent on a single source for electric power, natural gas, water, industrial gases and/or certain other raw materials or supplies. A significant interruption in service from our suppliers due to production or transportation issues, workforce difficulties, terrorism or sabotage, weather conditions such as heat waves that may be attributable to climate change, natural disasters, equipment failure or any other cause could result in substantial losses that may not be fully recoverable, either from our business interruption insurance or responsible third parties.

**A disruption in or failure of our IT systems, including those related to cybersecurity, could adversely affect our business operations, reputation and financial performance.**

We rely on the accuracy, capacity, integrity and security of our IT systems for the operation of many of our business processes and to comply with regulatory, legal and tax requirements. While we maintain some of our critical IT systems, we are also dependent on third parties to provide important IT services relating to, among other things, off-site content hosting, operational process technology at our facilities, human resources, electronic communications and certain finance functions. Further, in connection with our recent acquisitions, we inherited certain legacy hardware and software IT systems that can be supported only by a very limited number of specialists in the market, and our increased reliance on these legacy IT systems may increase the risk of IT system disruption or failure, which could adversely affect our operations.

Despite the security measures that we have implemented, including those related to cybersecurity and data privacy, our IT systems could be breached or damaged by computer viruses, ransomware, natural or human-caused incidents or disasters, or unauthorized physical or electronic access or intrusions, any of which could result in the loss, theft or corruption of sensitive or essential business or personal information and the inability to access or control our IT systems or information. Given our status as a critical supplier of steel to U.S. business and defense interests and the U.S. government's broad support of Ukraine in defending against Russia's invasion, we may be the target of malicious cyber activities sponsored by the Russian or Chinese governments or other state actors like those described in recent threat advisories issued by the U.S. Cybersecurity & Infrastructure Security Agency. Though we have controls in place and regularly conduct employee training, we cannot provide assurance that a cyberattack will not occur or cause damage or business interruption. Furthermore, despite our efforts to audit certain critical vendors' information security controls, significant risk may remain with respect to security measures employed by third-party service providers, which may ultimately prove to be ineffective at countering threats.

Failures of our IT systems, whether caused maliciously or inadvertently, may result in the disruption of our business processes, or in the unauthorized release of sensitive, confidential, personally identifiable or otherwise protected information, or result in the corruption of data, each of which could adversely affect our businesses. For example, cybersecurity vulnerabilities could result in an interruption of the functionality of our automated manufacturing, operating, or health and safety systems, which, if compromised, could cease, threaten, delay or slow down our ability to produce or process steel or any of our other products for the duration of

Table of Contents

such interruption or lead to unanticipated health or safety incidents, which could result in reputational harm and may adversely affect our employees, results of operations, financial condition and cash flows. In addition, any compromise of the security of our IT systems could result in a loss of confidence in our security measures and subject us to litigation, regulatory investigations and negative publicity that could adversely affect our reputation and financial condition. Our customers, suppliers and vendors may also access or store certain of our sensitive information on their IT systems, which, if breached, attacked or accessed by unauthorized persons, could likewise expose our sensitive information and adversely impact our businesses. Furthermore, as cybersecurity threats continue to evolve and become more sophisticated, we may be required to incur significant costs and invest additional resources to protect against and, if required, remediate the damage caused by such disruptions or system failures in the future. The amount of insurance coverage we maintain and require our vendors to maintain may be inadequate to cover claims or liabilities resulting from cybersecurity attacks.

**The closure of an operating facility or mine entails substantial costs. If our assumptions underlying our accruals for closure costs prove to be inaccurate or we prematurely close one or more of our facilities or mines, our results of operations and financial condition would likely be adversely affected.**

If faced with overcapacity in the market, regulatory challenges or other adverse conditions, we may seek to rationalize manufacturing and production assets through sales, temporary shutdowns, indefinite idles or facility closures. If we indefinitely idle or permanently close any of our facilities or mines, our production and revenues would be reduced unless we were able to increase production at our other facilities or mines in an offsetting amount, which may not be possible, and could result in customers responding negatively by taking current or future business away from us if we seek to transition production to a different facility. Alternatively, we could fail to meet customer specifications at the facilities to which products are transitioned, resulting in customer dissatisfaction or claims. To the extent an idled or closed facility formerly supplied critical inputs to our upstream production facilities, such as our recently closed Mountain State Carbon cokemaking facility, we may need to secure alternate sources for such critical inputs, the cost and availability of which may be uncertain.

The closure of a steelmaking or other operating facility or mining operation involves significant closure costs, including reclamation and other environmental costs, the costs of terminating long-term obligations, including customer, energy and transportation contracts and equipment and real property leases, costs associated with the altered tax profile of an idled or closed facility, and certain accounting charges, including asset impairment and accelerated depreciation. In addition, a permanent facility or mine closure could accelerate and significantly increase employment legacy costs, including our expense and funding costs for pension and OPEB obligations and multiemployer pension withdrawal liabilities. For example, a number of employees would be eligible for immediate retirement under special eligibility rules that apply upon a steelmaking facility or mine closure. All employees eligible for immediate retirement under the pension plans at the time of the permanent closure also could be eligible for OPEB, thereby accelerating our obligation to provide these benefits. Certain closures would precipitate a pension closure liability significantly greater than an ongoing operation liability and may trigger certain severance liability obligations. In addition, we are party to several joint ventures relating to iron ore mining, downstream steel processing and scrap metal recycling, and if our joint venture partners experience financial hardships or fail to perform their obligations upon closure, we may be required to assume significant additional obligations on behalf of the joint venture, including costs of environmental remediation and pension and OPEB obligations.

We base our assumptions regarding the life of our mines on detailed studies we perform from time to time, but those studies and assumptions are subject to uncertainties and estimates that may not be accurate. We recognize the costs of reclaiming open pits, stockpiles, tailings ponds, roads and other mining support areas based on the estimated mining life of our properties. If our assumptions underlying our accruals for closure costs, including reclamation and other environmental costs, prove to be inaccurate or insufficient, or our liability in any particular year is greater than currently anticipated, our results of operations and financial condition could be adversely affected. In addition, if we were to significantly reduce the estimated life of any of our mines, the mine closure costs would be applied to a shorter period of production, which would increase costs per ton produced and could adversely affect our results of operations and financial condition.

**We incur certain costs when production capacity is idled, as well as increased costs to resume production at previously idled facilities.**

Our decisions concerning which facilities to operate and at what production levels are made based in part upon our customers' orders for products, as well as the quality, performance capabilities and cost of our operations. During depressed market conditions, we may concentrate production at certain facilities and not operate others in response to customer demand or other reasons, and as a result we may incur idle costs that could offset our anticipated savings from not operating the idled facility. For example, due to increased scrap usage and reduced demand for iron ore pellets in our steelmaking operations, our Northshore mining and pelletizing facility has been temporarily idled since mid-2022, and we have continued to incur certain fixed costs at that facility during the idle period. We cannot predict whether our operations will experience additional similar or dissimilar disruptions in the future. When we restart idled facilities, we incur certain costs to replenish inventories, prepare the previously idled facilities for operation, perform the required repair and maintenance activities, and prepare employees to return to work safely and resume production responsibilities. The amount of any such costs could be significant, depending on a variety of factors, such as the period of idle time, necessary repairs and available employees, and is difficult to project.

**We may not have adequate insurance coverage for some business risks.**

Our operations are generally subject to a number of hazards and risks that could result in personal injury or damage to, or destruction of, equipment, properties or facilities. Depending on the nature and extent of a loss, the insurance that we maintain to address risks that are typical in our businesses may not be adequate or available to fully protect or reimburse us, or our insurance

coverage may be limited, canceled or otherwise terminated. Insurance against some risks, such as liabilities for environmental pollution, tailings basin breaches, or certain hazards or interruption of certain business activities, may not be available at an economically reasonable cost, or at all. Even if available, we may self-insure or maintain high deductibles where we determine it is most cost effective to do so. As a result, despite the insurance coverage that we carry, accidents or other negative developments involving our production, mining, processing or transportation activities causing losses in excess of policy limits, or losses arising from events not covered under insurance policies or subject to substantial deductibles, could have a material adverse effect on our financial condition and cash flows. In addition, the potential increase in extreme weather events due to climate change or otherwise may adversely impact our access to cost effective insurance in the future. The risk of increased insurance costs may have greater impact where the adverse event results in us asserting an insurance claim, the cost of which our insurers may seek to recoup during a future insurance renewal through increased premiums or limitations on coverage.

## V. SUSTAINABILITY AND DEVELOPMENT RISKS

**As our customers, competitors and investors seek to reduce their carbon footprint, transition toward carbon neutrality and enhance the sustainability of their respective businesses, we face increased financial, regulatory, legal and reputational risks and potential loss of business opportunities because our operations utilize carbon-based energy sources and produce GHG emissions.**

As described in detail in *Part I - Item 1, Business - Environmental Matters - Regulatory Developments - Climate Change and GHG Regulations* above, because our operations use carbon-based energy and produce GHG emissions, we are subject to a number of risks relating to decarbonization initiatives being undertaken by regulators and other stakeholders as part of global efforts to address the potential impacts of climate change. For example, as part of climate change mitigation strategies, federal, state or local governmental authorities may introduce mandatory carbon pricing obligations, carbon emissions limitations, carbon taxes or carbon trading mechanisms, any of which could impose significant costs on our operations, including causing us to incur higher energy and supplier costs, invest in costly and potentially unproven emissions control or reduction technologies, and engage in more intensive environmental monitoring and reporting efforts. In addition, complying with current or future international treaties and federal, state or local laws or regulations concerning climate change and GHG emissions could negatively impact our ability, and that of our customers and suppliers, to compete with companies located in areas not subject to or not complying with such constraints. We may also face more limited access to, or increased costs of, capital to the extent financial institutions and investors increase expectations relating to lowering GHG emissions or reduce investments in carbon-intensive businesses or industries. Further, increased pressure from customers or other business partners seeking to reduce their indirect carbon footprints and achieve certain overall decarbonization targets, including by sourcing a larger percentage of steel products from recycled steel, could result in the potential loss of business opportunities if we are unable to meet their carbon, GHG emissions or sustainability expectations, or if we are perceived to have higher GHG intensity than our competition.

In addition, as part of our decarbonization strategy, we are investigating and from time to time may consider investments in or other relationships with various renewable and clean energy initiatives. For example, we have recently been engaging in various discussions with other companies, universities and national research laboratories with the goal of leveraging potential funding available under the DOE's Regional Clean Hydrogen Hubs Funding Opportunity Announcement to develop and implement clean hydrogen solutions for our industrial applications in place of carbon-based natural gas. We have also been engaging with renewable energy developers on clean energy projects, including the recently announced 200-megawatt Headwaters III Wind Farm being proposed for construction in Indiana. While we are pursuing these energy-related projects with the aim of contributing to a greener power grid and lowering our GHG emissions in alignment with our announced target of a 25% reduction from 2017 levels by 2030, there are no guarantees that sufficient funding or the necessary advanced technology will be available to complete any of these projects under currently anticipated timeframes or at all. In addition, we may not be successful in achieving our current or any future short, medium or long-term GHG emissions reduction goals, including any net-zero or near-zero goals, due to adverse changes in business conditions over time, unanticipated financial challenges, operational improvement efforts like carbon capture and sequestration projects at certain of our facilities that may not be as successful as originally forecasted, or regulatory developments arising after such goals were initially announced.

**In order to maintain consistent operational performance and foster growth in our businesses, we must maintain our social license to operate with our stakeholders.**

Maintaining a strong reputation and consistent operational, environmental and safety track records is vital in order to continue to foster business growth and maintain our permission to operate. As stakeholders' sustainability expectations increase and regulatory requirements continue to evolve, maintaining our social license to operate becomes increasingly important. Our ability to maintain our reputation and strong operating track record could be threatened, including by challenges relating to the integration of our recent acquisitions or by circumstances outside of our control, such as disasters caused or suffered by other companies in the steel and mining industries. Our social license to operate could also be adversely affected and claims have been and could continue to be made against us to the extent that environmental factors negatively impact local communities, such as air emissions, discharges to water, dust, odors, noise and other factors that are inherent in industrial activities like our steelmaking, cokemaking, scrap metal processing and mining operations, even if such activities are conducted in accordance with legal, regulatory and permit requirements. If we are not able to respond effectively to these and other challenges to our social license to operate, our reputation could be damaged significantly. Damage to our reputation or third-party claims initiated in response to our ongoing activities could adversely affect our continuity of operations, current and prospective business relationships, and ability to foster growth projects.

Table of Contents

**We rely on estimates of our recoverable mineral reserves, which is complex due to geological characteristics of the properties and the number of assumptions made.**

We regularly evaluate, and engage third-party QPs to review and validate, our mineral reserves based on revenues and costs and update them as required in accordance with SEC regulations. Estimates of mineral reserves and future net cash flows necessarily depend upon a number of variable factors and assumptions, some of which are beyond our control, such as production capacity, effects of governmental regulations, future prices for minerals we mine, future industry conditions and operating costs, severance and excise taxes, development costs, and costs of extraction and reclamation. Estimating the quantity and grade of mineral reserves requires us to determine the size, shape and depth of our mineralized bodies by analyzing geological data, such as samplings of drill holes, and a QP to review and validate our determinations. Estimated mineral reserves could be affected by future industry conditions, future changes in the SEC's mining property disclosure requirements, variation in geological conditions and ongoing mine planning. Actual volume and grade of reserves recovered, production rates, revenues on third-party sales and expenditures with respect to our reserves will likely vary from estimates, and if such variances are material, our sales and profitability could be adversely affected.

**Defects in title or loss of any access rights or leasehold interests in our mining properties could limit our ability to mine these properties or result in significant unanticipated costs.**

Many of our operations are conducted on properties we lease, license or as to which we have easements or other possessory interests. We generally do not maintain title insurance on our properties, and certain of our land access arrangements were negotiated many years ago and have not been updated. Any title defect, inability to negotiate future access rights required by our mine plans, or the loss of any lease, license, easement or other possessory interest for any mining property could adversely affect our ability to mine any associated reserves. In addition, from time to time the rights of third parties for competing uses of adjacent, overlying or underlying lands, such as for roads, easements, public facilities or other mining activities, may result in disputes and affect our ability to operate as planned if our title is not superior or mutually acceptable arrangements cannot be negotiated. Any challenge to or inability to establish our title or access could delay the exploration and development of some reserves, resources, deposits or surface rights, cause us to incur unanticipated costs, and could ultimately result in the loss of some or all of our interest in those properties. In the event we lose reserves, resources, deposits or surface rights, we may be required to shut down or significantly alter impacted mining operations, thereby affecting future production, internal supply patterns, revenues and cash flows.

## VI. HUMAN CAPITAL RISKS

**We depend on our senior management team and other key employees, and the loss of these employees could adversely affect our businesses.**

Our success depends in part on our ability to attract, retain, develop and motivate our senior management and key employees. Achieving this objective may be difficult due to a variety of factors, including fluctuations in the global economic and industry conditions, competitors' hiring practices, cost reduction activities, and the effectiveness of our compensation programs. Competition for qualified personnel can be intense. We must continue to recruit, retain, develop and motivate our senior management and key personnel in order to maintain our businesses and support our projects. A loss of senior management and key personnel could prevent us from capitalizing on business opportunities, and our operating results could be adversely affected.

**Our profitability could be adversely affected if we fail to maintain satisfactory labor relations.**

Our production is dependent upon the efforts of our employees. We are party to labor agreements with various labor unions that represent employees at the vast majority of our operations. Such labor agreements are negotiated periodically, and, therefore, we are subject to the risk that these agreements may not be able to be renewed on reasonably satisfactory terms. It is difficult to predict what issues may arise as part of the collective bargaining process, and whether negotiations concerning these issues will be successful. Due to union activities or other employee actions, we could experience labor disputes, work stoppages or other disruptions in our production that could affect us adversely. While we successfully negotiated all ten of our labor agreements that expired in 2022 covering over 15,000 represented employees, we have three labor agreements that will expire in 2023 and three labor agreements that will expire in 2024, and the outcomes of those labor negotiations are uncertain. If we enter into a new labor agreement with any union that significantly increases our labor costs relative to our competitors or fail to come to an agreement upon expiry, our ability to compete or continuity of production may be materially and adversely affected.

**Our expenditures for pension and OPEB obligations could be materially higher than we have predicted if our underlying assumptions differ from actual outcomes, there are regulatory changes or other multiemployer contributors fail to perform their obligations that relate to employee pension plans.**

We provide defined benefit pension plans, defined contribution and OPEB to certain eligible union and non-union employees. Our pension and OPEB expenses and our required contributions to our pension and OPEB plans are affected directly by the value of plan assets, the projected and actual rate of return on plan assets, and the actuarial assumptions we use to measure our defined benefit pension plan obligations, including the rate at which future obligations are discounted. We cannot predict whether changing market or economic conditions, regulatory changes or other factors will increase our pension and OPEB expenses or our funding obligations, diverting funds we would otherwise apply to other uses.

We have calculated our unfunded pension and OPEB obligations based on a number of assumptions. If our assumptions do not materialize as expected, cash expenditures and costs that we incur could be materially higher. Moreover, we cannot be certain that

regulatory changes will not increase our obligations to provide these or additional benefits. These obligations also may increase substantially in the event of adverse medical cost trends or unexpected rates of early retirement, particularly for bargaining unit retirees. In addition, changes in the laws governing pensions could also materially adversely affect our costs and ability to meet our pension obligations.

We also contribute to certain multiemployer pension plans, including the Steelworkers' Pension Trust, for which we are one of the largest contributing employers. If other contributors were to default on their obligations to contribute to any such plans, we could become liable for additional unfunded contributions to the plans.

In addition, some of the transactions in which we previously sold or otherwise disposed of our non-core assets included provisions transferring certain pension and other liabilities to the purchasers or acquirers of those assets. While we believe that all such transfers were completed properly and are legally binding, if the purchaser fails to fulfill its obligations, we may be at risk that a court, arbitrator or regulatory body could disagree and determine that we remain responsible for pension and other liabilities that we intended to and did transfer.

**We may encounter labor shortages for critical operational positions, which could adversely affect our ability to produce our products.**

We are predicting a long-term shortage of skilled workers in heavy industry, such as electricians, and in certain highly specialized IT roles, and competition for available workers limits our ability to attract and retain employees as well as engage third-party contractors. Due to the advanced age of much of our workforce, we may face potential labor shortages caused by senior employee attrition or otherwise, resulting in the loss of these experienced workers' specialized institutional knowledge of our legacy businesses and systems, and we may have difficulty replacing them at competitive wages or at all.

## ITEM 1B. UNRESOLVED STAFF COMMENTS

We have no unresolved comments from the SEC.

## ITEM 2. PROPERTIES

The following map shows the locations of our operations and corporate headquarters as of December 31, 2022:



★ Cleveland-Cliffs Headquarters

**Steelmaking**
1. Burns Harbor
2. Burns Harbor Plate & Gary Plate
3. Butler Works
4. Cleveland Works
5. Coatesville
6. Columbus, OH
7. Conshohocken
8. Coshocton Works
9. Dearborn Works
10. FPT – Florida Locations (2)
11. FPT – Michigan Locations (12)
12. FPT – Ohio Locations (5)
13. FPT – Tennessee Locations (2)
14. FPT – Ontario Location
15. Hibbing
16. Indiana Harbor
17. Mansfield Works
18. Middletown Works
19. Minorca
20. Monessen
21. Northshore
22. Piedmont
23. Princeton
24. Riverdale
25. Rockport Works
26. Steelton
27. Tek & Kote
28. Tilden
29. Toledo Direct Reduction Plant
30. United Taconite
31. Warren
32. Weirton
33. Zanesville Works

**Tooling & Stamping**
34. Bowling Green
35. Cleveland, TN
36. Sylacauga
37. Windsor & Ontario

**Tubular**
38. Columbus, IN
39. Walbridge

### CORPORATE OFFICES

We lease our corporate headquarters in Cleveland, Ohio. We also have leased office space in West Chester, Ohio; Chicago, Illinois; and Detroit, Michigan. We own office space located in Burns Harbor, Indiana and our Research and Innovation Center located in Middletown, Ohio.

### STEELMAKING

| Location | State | Raw Material | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| (Tons in millions) | | Iron Ore | Capacity (lt) | HBI | Capacity (mt) | Coke | Capacity (nt) | Coal | Capacity (nt) | Scrap | Capacity (mt) |
| Hibbing Taconite | MN | ● | 7.0 | | | | | | | | |
| Minorca | MN | ● | 3.0 | | | | | | | | |
| Northshore | MN | ● | 5.0 | | | | | | | | |
| Tilden | MI | ● | 7.0 | | | | | | | | |
| United Taconite | MN | ● | 6.0 | | | | | | | | |
| Toledo HBI | OH | | | ● | 1.9 | | | | | | |
| Burns Harbor (Coke) | IN | | | | | ● | 1.8 | | | | |
| Monessen | PA | | | | | ● | 0.3 | | | | |
| Warren | OH | | | | | ● | 0.5 | | | | |
| Princeton | WV | | | | | | | ● | 2.3 | | |
| FPT | Multiple | | | | | | | | | ● | N/A |

Table of Contents

| Location | | Raw Steel | | | Processing and Finishing | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| (Tons in millions) | State | BF-BOF | EAF | Configured Capacity (nt) | Hot-Rolled | Cold-Rolled | Coated | Stainless & Electrical | Plate | Slab & Other |
| Burns Harbor | IN | ● | | 5.0 | ● | ● | ● | | | ● |
| Burns Harbor Plate | IN | | | | | | | | ● | |
| Butler | PA | | ● | 0.4 | | | | ● | | |
| Cleveland Works | OH | ● | | 3.4 | ● | ● | ● | | | ● |
| Coatesville | PA | | ● | 0.2 | | | | | ● | ● |
| Columbus | OH | | | | | | ● | | | |
| Conshohocken | PA | | | | | | | | ● | |
| Coshocton | OH | | | | | | | ● | | |
| Dearborn Works | MI | ● | | 3.0 | | ● | ● | | | ● |
| Gary Plate | IN | | | | | | | | ● | |
| Indiana Harbor Works | IN | ● | | 4.0 | ● | ● | ● | | | ● |
| Mansfield Works | OH | | ● | 0.5 | | | | ● | | |
| Middletown Works | OH | ● | | 3.0 | ● | ● | ● | | | ● |
| Piedmont | NC | | | | | | | | ● | |
| Riverdale | IL | | | 0.7 | | | | | | |
| Rockport Works | IN | | | | | ● | ● | ● | | |
| Steelton | PA | | ● | 0.3 | | | | | | ● |
| Tek & Kote | IN | | | | ● | ● | | | | |
| Weirton | WV | | | | ● | ● | | | | |
| Zanesville | OH | | | | | | | ● | | |

## STEELMAKING AND FINISHING FACILITIES

Our primary steel producing and finishing facilities are located across Illinois, Indiana, Michigan, Ohio, Pennsylvania and West Virginia. We operate 7 blast furnaces and 5 EAFs on 9 properties. Finishing is completed on site at our integrated operations or at one of our 10 stand-alone processing and finishing facilities. In the aggregate, we have annual configured production capacity of approximately 20.5 million net tons of raw steel. During the years ended December 31, 2022 and 2021, our steelmaking facilities produced a total of 16.8 million and 18.3 million net tons of raw steel, respectively.

We indefinitely idled our Indiana Harbor #4 blast furnace in the second quarter of 2022, which had a production capacity of 2.1 million net tons of hot metal. The decision was based on the successful implementation of operational improvements, particularly the addition of significant amounts of HBI to the burden of our other blast furnaces and the maximization of scrap usage in BOFs.

We completed a reline of blast furnace #5 at Cleveland Works in the third quarter of 2022 along with other significant repairs and maintenance, such as work on the wastewater treatment plant and the onsite powerhouse. A reline is generally only performed once every 20 years.

## SCRAP PROCESSING FACILITIES

Our scrap business consists of our subsidiary FPT, which has 22 locations in Michigan, Ohio, Tennessee, Florida and Ontario. These facilities are primarily located in Michigan and Ohio, which are in close proximity to our scrap consuming steel facilities. During the year ended December 31, 2022, FPT processed approximately 3 million net tons of scrap metal, of which approximately 50% of total output was prime grade.

## DIRECT REDUCTION PLANT

Our direct reduction plant is located in Toledo, Ohio, is near an existing dock, and has rail access and heavy haul roads for operation logistics. We are leasing the property on which the plant is located. This plant produces a specialized high quality iron alternative to scrap and pig iron. It has annual capacity of 1.9 million metric tons of HBI per year. During the years ended December 31, 2022 and 2021, our direct reduction plant produced a total of 1.6 million and 1.4 million metric tons of HBI, respectively.

## IRON ORE MINES AND PELLET PLANTS

The following information concerning our mining properties has been prepared in accordance with the requirements of subpart 1300 of Regulation S-K, which first became applicable to us for the fiscal year ended December 31, 2021. These requirements differ significantly from the previously applicable disclosure requirements of SEC Industry Guide 7. Among other differences, subpart 1300 of Regulation S-K requires us to disclose our mineral resources, in addition to our mineral reserves, as of the end of our most recently completed fiscal year both in the aggregate and for each of our individually material mining properties.

As used in this Annual Report on Form 10-K, the terms "mineral resource," "measured mineral resource," "indicated mineral resource," "inferred mineral resource," "mineral reserve," "proven mineral reserve" and "probable mineral reserve" are defined and used in accordance with subpart 1300 of Regulation S-K. Under subpart 1300 of Regulation S-K, mineral resources may not be classified as "mineral reserves" unless the determination has been made by a QP that the mineral resources can be the basis of an

economically viable project. You are specifically cautioned not to assume that any part or all of the mineral deposits (including any mineral resources) in these categories will ever be converted into mineral reserves, as defined by the SEC.

You are cautioned that, except for that portion of mineral resources classified as mineral reserves, mineral resources do not have demonstrated economic value. Estimates of inferred mineral resources have too high of a degree of uncertainty as to their existence and may not be converted to a mineral reserve. Therefore, you are cautioned not to assume that all or any part of an inferred mineral resource exists, that it can be the basis of an economically viable project, or that it will ever be upgraded to a higher category. Likewise, you are cautioned not to assume that all or any part of measured or indicated mineral resources will ever be converted to mineral reserves.

See *Part I – Item 1A, Risk Factors – V. Sustainability and Development Risks - We rely on estimates of our recoverable mineral reserves, which is complex due to geological characteristics of the properties and the number of assumptions made.*

The information that follows relating to the Hibbing, Minorca, Northshore, Tilden and United Taconite iron ore mines is derived, for the most part, from, and in some instances is an extract from, the Technical Report Summaries relating to such properties prepared in compliance with Item 601(b)(96) and subpart 1300 of Regulation S-K. Portions of the following information are based on assumptions, qualifications and procedures that are not fully described herein. Reference should be made to the full text of the Technical Report Summaries, which are filed as Exhibits 96.1 through 96.5 to this Annual Report on Form 10-K and are incorporated by reference herein.

All of our iron ore mining operations are open-pit mines. Additional development is underway as required by long-range mine plans. Drilling programs are conducted periodically to collect geologic modeling data and for refining ongoing operations.

Geologic models are developed for all mines to define the major ore and waste rock types. Computerized block models for iron ore are constructed that include all relevant geologic and metallurgical data. These are used to generate grade and tonnage estimates, followed by detailed mine design and LoM operating schedules.

We currently own or co-own and operate five production-stage iron ore mines in Michigan and Minnesota, as well as one indefinitely idled mine in Michigan. Following the AM USA Transaction, we now have an aggregate annual production capacity of approximately 28 million long tons of iron ore pellets, including our 85.3% share of the Hibbing mine production. Our iron ore mines produce from deposits located within the Biwabik and Negaunee Iron Formation, which are classified as Lake Superior type iron formations that formed under similar sedimentary conditions in shallow marine basins approximately two billion years ago. Magnetite and hematite are the predominant iron oxide ore minerals present, with lesser amounts of goethite and limonite. Quartz is the predominant waste mineral present, with lesser amounts of other chiefly iron bearing silicate and carbonate minerals. The ore minerals liberate from the waste minerals upon fine grinding.

The following represents iron ore production for the last three fiscal years:

| Iron Ore Production | | | |
|---|---|---|---|
| (In millions of long tons) | **2022** | 2021 | 2020 |
| Hibbing[1] | **5** | 7 | |
| Minorca[1] | **3** | 3 | |
| Northshore[2] | **1** | 5 | |
| Tilden | **6** | 7 | |
| United Taconite | **5** | 5 | |
| **Total** | **20** | 27 | |

[1]Tonnage shown is reflective of ownership percentage during respective periods.

[2]In the second quarter of 2022, we temporarily idled our Northshore operations. It is anticipated that the Northshore mine will restart no earlier than the second quarter of 2023.

The following provides an overview of our iron ore properties:

All the infrastructure necessary to mine and process significant commercial quantities of iron ore is currently in place at all of our mine locations. Infrastructure items include high voltage electrical supplies, natural gas pipelines that connect to the North American distribution system, water sources, paved roads and highways, railroads for transporting crude ore and finished products, port facilities that connect to the Great Lakes, and accommodations for employees. Local and state infrastructure also includes hospitals, schools, airports, equipment suppliers, fuel suppliers, commercial laboratories and communication systems. Labor is readily available with major population centers within 25 miles of all of our properties.

All of our iron ore mining operations grant leases, licenses and easements for various purposes, including miscellaneous community land uses, utility infrastructure and other third-party uses, that encumber our properties but do not materially inhibit operations. Certain assets also serve as collateral securing obligations under our ABL Facility and our senior secured notes. We maintain the requisite state and federal permits and are in material compliance with all material permits.

## HIBBING

Hibbing (85.3% owned) is located immediately north of the city of Hibbing, Minnesota in the center of Minnesota's Mesabi Iron Range. The mining and processing operation is located between latitude 47°25'48" N and 47°31'48" N and longitude 93°04'54" W and 92°54'36" W.

Mining began in 1976 as a joint venture between Bethlehem Steel Corporation and Steel Company of Canada. Cliffs first became involved in the joint venture when it purchased Pickands Mather's 15% share in 1986. Prior to the AM USA Transaction, we owned 23% of Hibbing, ArcelorMittal USA had a 62.3% interest and U.S. Steel had a 14.7% interest. On December 9, 2020, as a result of the AM USA Transaction, we acquired an additional 62.3% ownership stake in the Hibbing mine and became the majority owner and mine manager.

Hibbing holds 30,670 acres of surface rights, of which 1,150 acres are associated with mineral leases. The majority of the mineral rights are leased. The property is comprised of 6,320 acres of mineral leases expiring between 2023 and 2056. Leases are maintained by making minimum prepaid royalty payments. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates.

The operation includes an open pit truck and shovel mine, a concentrator that utilizes single stage crushing, AG mills and magnetic separation to produce a magnetite concentrate, which is then delivered to an on-site pellet plant. From the site, pellets are transported by BNSF (Burlington Northern Santa Fe, LLC) rail to a ship loading port at Superior, Wisconsin, operated by BNSF.

The book value of Hibbing's long-lived assets was $151 million as of December 31, 2022.



Figure 3-2

Cleveland-Cliffs Inc.

**Hibbing Taconite Property**
Hibbing, Minnesota

**Property Tenure Map**

For more information, see Exhibit 96.1, the Technical Report Summary on the Hibbing Taconite Property, Minnesota, USA, prepared for the Company by the QP, SLR, with an effective date of December 31, 2021.

## MINORCA

Minorca (100% owned) is located in the center of Minnesota's Mesabi Iron Range. The Laurentian Pit is located near the City of Gilbert, Minnesota at latitude 47°30'0"N and longitude 92°26'30"W, East 1 Pit is located at latitude 47°31'30"N and longitude 92°23'30"W, and East 2 Pit is located just west of the City of Biwabik at latitude 47°32'0"N and longitude 92°22'30"W. The Minorca plant is located approximately seven miles to the northeast, near the town of Virginia, Minnesota at latitude 47°33'30"N and longitude 92°31.5'30"W.

Operations commenced in 1976 as an asset of Inland Steel Company. In 1998, Ispat International purchased Inland Steel and, in 2004, merged with LNM Holdings and International Steel Group to form Mittal Steel, which in 2007 merged with Arcelor to form ArcelorMittal. Minorca has been wholly owned by Cliffs since the 2020 AM USA Transaction.



Figure 3-2

Cleveland-Cliffs Inc.

**Minorca Property**
Virginia, Minnesota

**Property Tenure Map**

Minorca holds 13,690 acres of surface rights, of which 282 acres are associated with mineral leases. 100% of the mineral rights are leased. The property is comprised of 3,135 acres of mineral leases expiring between 2035 and 2056. Leases are maintained by making minimum prepaid royalty payments. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates.

The operation includes a concentrating and pelletizing facility, along with two open pit iron ore mines located approximately seven miles from the processing facilities. The processing operations consist of a crushing facility, a three-line concentration facility and a single-line straight grate pelletizing plant. Pellets are transported by CN rail to ports on Lake Superior.

The book value of Minorca's long-lived assets was $214 million as of December 31, 2022.

For more information, see Exhibit 96.2, Technical Report Summary on the Minorca Property, Minnesota, USA, prepared for the Company by the QP, SLR, with an effective date of December 31, 2021.

## NORTHSHORE

Northshore's (100% owned) mine is located on the northeastern edge of the Mesabi Iron Range in northeastern Minnesota, approximately four miles southeast of Babbitt, Minnesota at latitude 47°40'12.15"N and longitude 91°53'1.28"W. The processing facility is approximately 41 miles to the southeast and immediately adjacent to the city of Silver Bay in Lake County, Minnesota at latitude 47°17'38.95"N and longitude 91°15'23.38"W.

Operations commenced in 1952 as an asset of the Reserve Mining Company and continued production until 1986 when Reserve Mining declared bankruptcy. Cyprus Minerals Company purchased the facilities in 1989. Cyprus subsequently sold the facilities to Cliffs in 1994.



Northshore holds 28,041 acres of surface rights, of which 8,966 acres are associated with mineral leases. 100% of the mineral rights are leased. The property is comprised of 10,356 acres of mineral leases. Some leases do not expire until the mineral reserves are exhausted while others expire between 2034 and 2075. Leases are maintained by making minimum prepaid royalty payments. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates.

The operation includes an open pit truck and shovel mine where two stages of crushing occur before the ore is transported along a wholly owned 47-mile rail line to the plant site in Silver Bay. At the plant site, two additional stages of crushing occur before the ore is sent to the concentrator. The concentrator utilizes rod mills and magnetic separation to produce a magnetite concentrate, which is delivered to the pellet plant located on-site. The plant can produce both standard and DR-grade pellets. The plant site has its own ship loading port located on Lake Superior.

The book value of Northshore's long-lived assets was $243 million as of December 31, 2022.

For more information, see Exhibit 96.3, Technical Report Summary on the Northshore Property, Minnesota, USA, prepared for the Company by the QP, SLR, with an effective date of December 31, 2021.

## TILDEN

Tilden (100% owned) is located in Marquette County in Michigan's Upper Peninsula, on the Marquette Iron Range, approximately five miles south of the city of Ishpeming, Michigan at latitude 46° 29' N and longitude 87° 40' W.



The property commenced operations in 1974 under a partnership of Algoma Steel, Stelco, J&L Steel, Wheeling-Pittsburgh Steel, Sharon Steel, and The Cleveland-Cliffs Iron Company. The property has since been at least partially in the possession of a subsidiary of Cliffs. In 2001, Cliffs acquired Algoma Steel's 45% interest in Tilden. In 2017, Cliffs became the sole owner of Tilden.

Tilden holds 21,100 acres of surface rights and leases 2,470 acres of mineral rights expiring between 2061 and 2070. Leases are maintained by making minimum prepaid royalty payments. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates.

Operations include an open pit truck and shovel mine, a concentrator that utilizes single stage crushing, AG mills, and floatation to produce hematite concentrates that are then supplied to the on-site pellet plant. From the site, pellets are transported by our LS&I (Lake Superior & Ishpeming Railroad Company) rail to a ship loading port at Marquette, Michigan, operated by LS&I.

The book value of Tilden's long-lived assets was $233 million as of December 31, 2022.

For more information, see Exhibit 96.5, Technical Report Summary on the Tilden Property, Michigan, USA, prepared for the Company by the QP, SLR, with an effective date of December 31, 2021.

## UNITED TACONITE

United Taconite's (100% owned) mine and offices are located on Minnesota's Mesabi Iron Range just north of Eveleth, Minnesota at latitude 47°29'1.62" N, longitude 92°32'23.69" W. The processing facilities are located approximately eight miles to the southeast.



The property commenced operations as an asset of Eveleth Taconite Company in 1965 before it was purchased by United Taconite (70% Cliffs and 30% Laiwu Steel) in December 2003. The Property has been a wholly owned subsidiary of Cliffs since 2008.

United Taconite owns 14,199 acres of surface rights, of which 703 acres are associated with mineral leases. An additional 145 acres of surface rights are leased from the State of Minnesota. We lease 100% of the mineral rights comprising of 4,908 acres expiring between 2037 and 2066, with the exception of the State of Minnesota mineral lease, which expires in 2027. Leases are maintained by making minimum prepaid royalty payments. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates.

Operations include an open pit truck and shovel mine where two stages of crushing occur before the ore is transported by rail, operated by CN, to the plant site. At the plant site an additional stage of crushing occurs before the ore is sent to the concentrator. The concentrator utilizes rod mills and magnetic separation to produce a magnetite concentrate, which is delivered to the on-site pellet plant. From the plant site, pellets are transported by CN rail to a ship loading port at Duluth, MN, operated by CN.

The book value of United Taconite's long-lived assets was $568 million as of December 31, 2022.

For more information, see Exhibit 96.4, Technical Report Summary on the United Taconite Property, Minnesota, USA, prepared for the Company by the QP, SLR, with an effective date of December 31, 2021.

## MINERAL RESOURCES

Mineral resources are defined under Item 1300 of Regulation S-K as a concentration or occurrence of material of economic interest in or on the Earth's crust in such form, grade or quality, and quantity that there are reasonable prospects for economic extraction. A mineral resource is a reasonable estimate of mineralization, taking into account relevant factors such as cut-off grade, likely mining dimensions, location or continuity that, with the assumed justifiable technical and economic conditions, is likely to, in whole or part, become economically extractable.

A detailed breakdown of the mineral resources exclusive of mineral reserves is presented in the table below. Mineral resources were defined and constrained within open-pit shells, prepared by Cliffs, and based on a US$90.00/WLT pellet price, while meeting defined cut-off grade criteria and existing pellet specifications. All mineral resource estimates were reviewed and validated by the QP, SLR.

34 | **CLF** 2022 FORM 10-K

Table of Contents

The following represents iron ore mineral resources, exclusive of mineral reserves, as of December 31, 2022 and 2021:

**Iron Ore Mineral Resources**

| (In millions of long tons) | Measured Tonnage | Measured % Grade | Indicated Tonnage | Indicated % Grade | Measured + Indicated Tonnage | Measured + Indicated % Grade | Process Recovery | Inferred Tonnage | Inferred % Grade |
|---|---|---|---|---|---|---|---|---|---|
| Total Iron Ore | 1,351 | 22.5 | 1,483 | 23.6 | 2,834 | 23.1 | 31% | 420 | 32.4 |
| | | | | | | | | | |
| Michigan | — | — | 135 | 35.5 | 135 | 35.5 | 36% | 350 | 34.7 |
| Minnesota | 1,351 | 22.5 | 1,348 | 22.4 | 2,699 | 22.4 | 31% | 70 | 21.0 |
| | | | | | | | | | |
| Hibbing[1] | 8 | 19.2 | 1 | 18.7 | 9 | 19.2 | 25% | — | — |
| Minorca | 484 | 22.9 | 317 | 22.9 | 801 | 22.9 | 33% | 30 | 21.1 |
| Northshore | 767 | 22.1 | 391 | 22.4 | 1,158 | 22.2 | 26% | 14 | 19.8 |
| Tilden | — | — | 135 | 35.5 | 135 | 35.5 | 36% | 350 | 34.7 |
| United Taconite | 92 | 23.6 | 639 | 22.2 | 731 | 22.4 | 32% | 26 | 21.5 |

[1] Hibbing is reported at 85.3% based on our ownership level.

Reference point selected is the saleable tons based on the process recovery.

Process recovery may change based on the required saleable product mix and is reported as wet product percentage.

Mineral resources are estimated using the following cut-off grades: 25% FeT for Tilden hematite; 15% magnetic Fe for Northshore; 16% magnetic Fe for Minorca; 17% magnetic Fe for United Taconite; and 13% magnetic Fe for Hibbing.

Tonnage is reported in long tons equivalent to 2,240 pounds and has been rounded to the nearest 100,000.

Mineral resources are reported at a $90.00/lt wet standard pellet price freight-on-board (FOB) Lake Superior, which is based on the mine planning model's three-year trailing average of the realized product revenue rate.

We did not have any material changes to our mineral resources during 2022. The material assumptions and criteria used for the mineral resource estimates, including but not limited to leases, permits and geotechnical pit design, are covered in more detail in Sections 11 through 13 of the respective Technical Report Summaries filed as Exhibits 96.1 through 96.5 to this Annual Report on Form 10-K.

**MINERAL RESERVES**

Mineral reserves are defined under Item 1300 of Regulation S-K as an estimate of tonnage and grade or quality of indicated and measured mineral resources that, in the opinion of the QP, can be the basis of an economically viable project. More specifically, it is the economically mineable part of a measured or indicated mineral resource, which includes diluting materials and allowances for losses that may occur when the material is mined or extracted.

Proven mineral reserves are defined under Item 1300 of Regulation S-K as the economically mineable part of a measured mineral resource and can only result from conversion of a measured mineral resource. Probable mineral reserves are defined under Item 1300 of Regulation S-K as the economically mineable part of an indicated and, in some cases, a measured mineral resource. All mineral reserves are classified as proven or probable and are supported by LoM plans.

Mineral reserves are based on pricing that does not exceed the three-year trailing average index price of iron pellets adjusted to realized price. We evaluate and analyze, and engage QPs to review and verify, mineral reserves in accordance with our mineral policy and SEC requirements and then complete updated LoM plans. The table below identifies the year in which the latest updated LoM plan was completed.

Mineral reserves estimates for our iron mines are constrained by fully designed open pits developed using three-dimensional modeling techniques. These open pits incorporate design slopes, practical mining shapes and access ramps to assure the accuracy of our mineral reserve estimates. All operations' mineral reserves have been adjusted net of production through year-end 2022. All mineral reserves estimates as of December 31, 2021 were reviewed and validated by the QP, SLR.

35 | **CLF** 2022 FORM 10-K

The following represents iron ore mineral reserves as of December 31, 2022:

| | | Iron Ore Mineral Reserves as of December 31, 2022 | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Last LoM Plan | Proven | | Probable | | Proven & Probable | | Process |
| (In millions of long tons) | Reserve Analysis | Tonnage | % Grade | Tonnage | % Grade | Tonnage | % Grade | Recovery |
| Total Iron Ore | | 593 | 23.8 | 1,665 | 26.5 | 2,258 | 25.8 | 32% |
| | | | | | | | | |
| Michigan | | 4 | 35.3 | 500 | 34.7 | 504 | 34.7 | 37% |
| Minnesota | | 589 | 23.7 | 1,165 | 23.0 | 1,754 | 23.2 | 31% |
| | | | | | | | | |
| Hibbing[1] | 2021 | 67 | 18.7 | 8 | 18.7 | 75 | 18.7 | 26% |
| Minorca | 2021 | 95 | 23.7 | 7 | 25.1 | 102 | 23.8 | 34% |
| Northshore | 2020 | 299 | 25.3 | 519 | 24.1 | 818 | 24.6 | 29% |
| Tilden | 2021 | 4 | 35.3 | 500 | 34.7 | 504 | 34.7 | 37% |
| United Taconite | 2019 | 128 | 23.1 | 631 | 22.1 | 759 | 22.3 | 33% |

[1]Hibbing is reported at 85.3% based on our ownership level.

Reference point selected by the QP is the saleable tons based on the process recovery.

Process recovery may change based on the required saleable product mix and is reported as wet product percentage.

Mineral reserves are estimated using the following cut-off grades: 25% FeT for Tilden hematite; 19% magnetic Fe for Northshore; 16% magnetic Fe for Minorca; 17% magnetic Fe for United Taconite; and 13% magnetic Fe for Hibbing.

Tonnage is reported in long tons equivalent to 2,240 pounds and has been rounded to the nearest 100,000.

Mineral reserves are classified as probable if not scheduled within the first 20 years.

Mineral reserves are reported at a $90.00/lt wet standard pellet price freight-on-board (FOB) Lake Superior, which is based on the mine planning model's three-year trailing average of the realized product revenue rate.

The material assumptions and criteria used for the mineral reserves estimates, including but not limited to leases, permits and geotechnical pit design, are covered in more detail in Sections 11 through 13 of the respective Technical Report Summaries filed as Exhibits 96.1 through 96.5 to this Annual Report on Form 10-K.

A006579

For comparison purposes, the following represents iron ore mineral reserves as of December 31, 2021:

**Iron Ore Mineral Reserves**
**as of December 31, 2021**

| (In millions of long tons) | Proven | | Probable | | Proven & Probable | | Process |
|---|---|---|---|---|---|---|---|
| | Tonnage | % Grade | Tonnage | % Grade | Tonnage | % Grade | Recovery |
| Total Iron Ore | 638 | 23.6 | 1,682 | 26.6 | 2,320 | 25.8 | 33% |
| | | | | | | | |
| Michigan | 4 | 35.3 | 516 | 34.7 | 520 | 34.7 | 37% |
| Minnesota | 634 | 23.5 | 1,166 | 23.0 | 1,800 | 23.2 | 31% |
| | | | | | | | |
| Hibbing[1] | 85 | 18.7 | 8 | 18.7 | 93 | 18.7 | 25% |
| Minorca | 103 | 23.6 | 7 | 25.3 | 110 | 23.7 | 34% |
| Northshore | 303 | 25.3 | 519 | 24.1 | 822 | 24.6 | 29% |
| Tilden | 4 | 35.3 | 516 | 34.7 | 520 | 34.7 | 37% |
| United Taconite | 143 | 23.1 | 632 | 22.1 | 775 | 22.3 | 33% |

[1]Hibbing is reported at 85.3% based on our ownership level.

Reference point selected by the QP is the saleable tons based on the process recovery.

Process recovery may change based on the required saleable product mix and is reported as wet product percentage.

Mineral reserves are estimated using the following cut-off grades: 25% FeT for Tilden hematite; 19% magnetic Fe for Northshore; 16% magnetic Fe for Minorca; 17% magnetic Fe for United Taconite; and 15% magnetic Fe for Hibbing.

Tonnage is reported in long tons equivalent to 2,240 pounds and has been rounded to the nearest 100,000.

Mineral Reserves are classified as probable if not scheduled within the first 20 years.

Mineral Reserves are reported at a $90.00/lt wet standard pellet price freight-on-board (FOB) Lake Superior, which is based on the mine planning model's three-year trailing average of the realized product revenue rate.

Overall, mineral reserves estimates as of December 31, 2022, as compared to the prior-year period, decreased by 3%, which was driven by mining depletion.

**INTERNAL CONTROLS DISCLOSURE**

We demonstrated repeated attainment of annual production and quality targets for at least 40 years at each material iron ore mine operated by the Company. Internal controls the Company uses in its industry-standard approach to exploration and mineral resource and reserve estimation efforts are governed by its Mineral Reserve and Mineral Resource Estimation Policy and are detailed in Cliffs' minimum operating standards for Resource Estimation and Strategic Mine Planning. The controls include: confirmation of drill collar locations and drill hole traces, drill logging and sample collection and security, database verification and security, QA/QC programs, internal and third-party QP statistical analysis, third-party QP model validation, and reconciliation. Modeling and analysis of the Company's resources has been developed by Company personnel or third-party consultant SLR and reviewed by internal management and the external independent QP, SLR. Reserve estimations have been completed by Company personnel and reviewed by internal management and the QP, SLR.

Drill hole collar surveying methods have evolved with advancements in technology, moving from optical methods to global positioning system, which is currently in use. For the deposit type, all survey methods used for the collar locations are expected to provide adequate accuracy for the drill hole locations. Due to the relatively shallow depth and vertical nature of drill holes at Cliffs' Minnesota mining operations, downhole deviation surveys are typically not conducted. Drill holes pierce the generally shallow-dipping, tabular iron formation at near perpendicular angles. At the more geologically and structurally complex Tilden mine in Michigan, where drilling deeper than 500 feet is required, downhole surveys have moved from a clay-impression procedure to the gyroscopic method currently in use.

Drill core is transported directly from the drill rig to each site's core logging facility by either the drilling contractor or Cliffs' personnel. Temporary core storage is located at each site's secure logging facility. Depending on the mining operation, unused sample reserves, parts, concentrates and splits are securely stored in labeled boxes or barrels at a Cliffs laboratory facility or logging facility, or via a contracted external laboratory.

Cliffs' QA/QC programs are site-specific and range from in-development to well-developed, long standing protocols that involve formal procedures for the use of crude material standards developed from on-site material, as well as regularly inserted coarse and concentrate duplicate samples, control chart analysis and reporting. Cliffs typically uses internal and external labs for geometallurgical analyses that are accredited with ASQ/ANSI ISO-9001:2015 (American Society for Quality/American National Standards Institute) for their system of quality management. Quality sample results are monitored and enacted on where warranted. Also, Cliffs has implemented a drill campaign reporting practice to ensure results are documented, with defined and illustrated failure metrics, outcomes of investigations, comparisons with previous year's results and recommendations. The QP, SLR, reviewed Cliffs' QA/QC practices and provided recommendations for further work. Where QA/QC programs are still in

Table of Contents

development and prior to resource estimation, Cliffs conducted data verification studies utilizing a suite of blind crude ore standards and blind duplicates from historical sample reserves within the LoM plan. Where unaccredited labs provided data used in resource estimation, check lab studies were initiated to verify analytical results. Cliffs is currently working toward aligning QA/QC protocols at each mine to the Company's current best practice.

Cliffs maintains exploration drill hole data in an externally-managed, access-controlled acQuire database that is backed up online at regularly scheduled intervals to provide data redundancy and security. Certification of database integrity is accomplished by both visual and statistical inspections comparing geology, assay values and survey locations cross-referenced back to laboratory data and geologic logs. Any discrepancies identified are corrected by referring to hard-copy assay and core log information archived in Cliffs' Mine Engineering department file cabinets. Prior to modeling, a secondary validation check is completed using built-in data validation routines in the modeling software.

Cliffs performs routine drill hole database verification with every new drilling program and new block model build, including: check of unique drill hole identifications and collar coordinates; check of assay or lithology points extending past the specified maximum depth of drill hole; check of abnormal dips and azimuths of downhole drill hole surveys; check of negative, overlapping and missing intervals; and check of incorrect lithologic codes and assay values.

In 2020 and 2021, Cliffs' geologists completed data verification exercises within the LoM plan area for each mining operation. This was audited by the QP, SLR, to assess accuracy and completeness. Database values were checked against source documents including collar surveys, geologic logs and assay certificates. Data verification included collar coordinates, depth intervals of geologic units and assay samples, and results of geometallurgical analyses applied to mineral resource estimation and mine planning.

Cliffs' mineral resource estimates were validated by the QP, SLR, using standard industry techniques including statistical comparisons with composite samples and parallel nearest neighbor estimates, swath plots, as well as visual reviews in cross-section and plan. A visual review comparing blocks to drill holes for key economic variables, completed after the block modeling work, was performed to ensure general lithologic and analytical conformance. Cliffs' mining operations have demonstrated good agreement between planned and actual product produced over more than 40 years for each operation.

Cliffs classifies the mineral resources based primarily on drill hole spacing and influenced by geologic continuity, ranges of economic criteria and reconciliation. Some post-processing is undertaken to ensure spatial consistency and remove isolated and fringe blocks. The resource area for each operation is limited by a polygon and subsequent pit shell based on practical mining limits. To ensure that all mineral resource statements satisfy the "reasonable prospects for economic extraction" requirement, in the definition of the mineral resources under Item 1300 of Regulation S-K, factors significant to technical feasibility and potential economic viability are considered (e.g., ability to obtain permits and legal and land tenure considerations). Mineral resources are defined and constrained within optimized, open-pit shells, prepared by Cliffs and reviewed by the QP, SLR, and based on a US$90.00/WLT pellet value and target pellet iron content.

Grade and tonnage reconciliations are run on current production versus modeled production, which provides insight on the accuracy of the modeled assay data versus actual production for each mining operation.

For a discussion of comprehensive risk inherent in the estimation of mineral reserves, see *Part I - Item 1A, Risk Factors - V. Sustainability and Development Risks - We rely on estimates of our recoverable mineral reserves, which is complex due to the geological characteristics of the properties and the number of assumptions made.*

### COAL MINING AND COKEMAKING

Princeton is a coal mining complex located in West Virginia that specializes in surface and underground mining of metallurgical coal to produce coke and pulverized coal injection coal. We have annual rated metallurgical coal production capacity of 2.3 million net tons from our Princeton mine. In 2022, the mine produced 1.5 million net tons of coal. We own 100% of the Princeton mine, which has been operating since 1995. We own 60% of the mineral rights and lease 40% via multiple mineral leases having varying expiration dates. Mining leases routinely are renegotiated and renewed as they approach their respective expiration dates. Princeton's operations consist of three open-pit surface mines, two underground mines, a preparation plant and two rail loadouts.

Our Monessen and Warren facilities produce furnace coke and related by-products in Monessen, Pennsylvania and Warren, Ohio, respectively. We also operate a cokemaking facility located within Burns Harbor. These facilities have an aggregate annual rated capacity of 2.6 million net tons. In 2022, our cokemaking facilities produced 2.1 million net tons of coke.

As a result of our internal usage of HBI, coupled with our ongoing evaluation of coke use strategies, we idled our coke facility at Middletown Works during the third quarter of 2021 and permanently closed our Mountain State Carbon coke plant in the first quarter of 2022.

### OTHER BUSINESSES

Our Tubular operating segment consists of our subsidiary Tubular Components, which has plants in Walbridge, Ohio and Columbus, Indiana. The Walbridge plant operates six electric resistance welded tube mills on owned property. The Columbus plant operates five electric resistance welded tube mills and four high-speed cold saws on leased property.

Our Tooling and Stamping operating segment consists of our subsidiary Tooling and Stamping and its related companies, which provides advanced-engineered solutions, tool design and build, hot- and cold-stamped steel components and complex assemblies for the automotive market across ten plants, of which certain of these are under long-term lease agreements, in Ontario, Alabama, Kentucky and Tennessee. Its facilities feature eight large-bed, hot-stamping presses, providing 14 lines of production; 82 cold-

stamping presses ranging from 150 net tons to 3,000 net tons of pressing capacity; 18 large-bed, high-tonnage tryout presses with prove-out capabilities for new tool builds; and 151 multi-axis welding assembly cells. Our newly constructed facility in Tennessee began production in the third quarter of 2022.

Our European operating segment consists of trading companies that buy and sell steel, steel products and other materials.

## ITEM 3. LEGAL PROCEEDINGS

### LEGAL PROCEEDINGS RELATING TO OUR BUSINESS

*JSW Steel Litigation.* On June 8, 2021, JSW Steel filed a complaint against Cleveland-Cliffs Inc., AK Steel Holding Corporation (now known as Cleveland-Cliffs Steel Holding Corporation), Nucor Corporation and U.S. Steel in the United States District Court for the Southern District of Texas. JSW Steel alleges that the defendants engaged in a group boycott against JSW Steel in violation of federal and Texas antitrust laws by refusing to sell semi-finished steel slabs to JSW Steel, beginning in 2018 and continuing through the present; civil conspiracy among the defendants; and tortious interference with JSW Steel's contractual rights and business relations involving its vendors and customers. JSW Steel's allegations involve the tariffs and quotas imposed on steel imports by the U.S. government under Section 232 beginning in March 2018, which JSW Steel alleges raised the price of imported slabs, and statements made to the U.S. government related to exemption requests submitted by JSW Steel in 2018 and 2021. JSW Steel further claims that this alleged anticompetitive conduct negatively impacted JSW Steel's costs, production and revenues and prevented it from pursuing expansion plans at its Ohio and Texas facilities that would compete with the defendants. JSW Steel is seeking to hold the defendants jointly and severally liable for treble damages in an amount in excess of $500 million and other relief. On February 17, 2022, the district court granted the defendants' Motions to Dismiss in their entirety and dismissed all of JSW's claims with prejudice. On March 16, 2022, JSW filed a notice of appeal to the United States Court of Appeals for the Fifth Circuit, and oral arguments on the appeal were held on February 6, 2023. We continue to believe the claims asserted against us are without merit, and we are vigorously defending against them.

*Mesabi Metallics Adversary Proceeding.* On September 7, 2017, Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) ("Mesabi Metallics") filed a complaint against Cleveland-Cliffs Inc. in the *Essar Steel Minnesota LLC and ESML Holdings Inc.* bankruptcy proceeding that is pending in the United States Bankruptcy Court, District of Delaware. Mesabi Metallics alleges tortious interference with its contractual rights and business relations involving certain vendors, suppliers and contractors, violations of federal and Minnesota antitrust laws through monopolization, attempted monopolization and restraint of trade, violation of the automatic stay, and civil conspiracy with unnamed DOE defendants. Mesabi Metallics amended its complaint to add additional defendants, including, among others, our subsidiary, Cleveland-Cliffs Minnesota Land Development Company LLC ("Cliffs Minnesota Land"), and to add additional claims, including avoidance and recovery of unauthorized post-petition transfers of real estate interests, claims disallowance, civil contempt and declaratory relief. Mesabi Metallics seeks, among other things, unspecified damages and injunctive relief. Cliffs and Cliffs Minnesota Land filed counterclaims against Mesabi Metallics, Chippewa Capital Partners ("Chippewa"), and Thomas M. Clarke ("Clarke") for tortious interference and civil conspiracy, as well as additional claims against Chippewa and Clarke for aiding and abetting tortious interference, for which we seek, among other things, damages and injunctive relief. Our counterclaim against Clarke for libel was dismissed on jurisdictional grounds. The parties filed various dispositive motions on certain of the claims, including a motion for partial summary judgment to settle a dispute over real estate transactions between Cliffs Minnesota Land and Glacier Park Iron Ore Properties LLC ("GPIOP"). A ruling in favor of Cliffs, Cliffs Minnesota Land and GPIOP was issued on July 23, 2018, finding that Mesabi Metallics' leases had terminated and upholding Cliffs' and Cliffs Minnesota Land's purchase and lease of the contested real estate interests. Mesabi Metallics filed a Motion for Leave to File an Interlocutory Appeal, which was denied on September 10, 2019. Discovery is ongoing. We believe the claims asserted against us are without merit, and we intend to continue to vigorously defend against all remaining claims in the lawsuit.

*Certain Legacy Legal Proceedings Relating to our Steel Operations.* Certain of our acquired subsidiaries have been named as defendants, among many other named defendants, in numerous lawsuits filed since 1990 claiming injury allegedly resulting from exposure to asbestos. Similar lawsuits seeking monetary relief continue to be filed in various jurisdictions in the U.S., which cases are vigorously defended. Although predictions about the outcome of pending litigation is subject to uncertainties, based upon present knowledge, we believe it is unlikely that the resolution in the aggregate of these claims will have a material adverse effect on our consolidated results of operations, cash flows or financial condition.

### LEGAL PROCEEDINGS RELATING TO ENVIRONMENTAL MATTERS

SEC regulations require us to disclose certain information about administrative or judicial proceedings involving the environment and to which a governmental authority is a party if we reasonably believe that such proceedings may result in monetary sanctions above a stated threshold. Pursuant to SEC regulations, we use a threshold of $1 million for purposes of determining whether disclosure of any such proceedings is required. We believe that this threshold is reasonably designed to result in disclosure of any such proceedings that are material to our business or financial condition.

Information for this item relating to certain other environmental proceedings may be found under the heading *Burns Harbor Water Issues* in NOTE 20 - COMMITMENTS AND CONTINGENCIES to the consolidated financial statements in *Part II – Item 8. Financial Statements and Supplementary Data,* which information is incorporated herein by reference.

## ITEM 4. MINE SAFETY DISCLOSURES

We are committed to protecting the occupational health and well-being of each of our employees. Safety is one of our core values, and we strive to ensure that safe production is the first priority for all employees. Our internal objective is to achieve zero injuries and incidents across the Company by focusing on proactively identifying needed prevention activities, establishing standards and evaluating performance to mitigate any potential loss to people, equipment, production and the environment. We have implemented intensive employee training that is geared toward maintaining a high level of awareness and knowledge of safety and health issues in the work environment through the development and coordination of requisite information, skills and attitudes. We believe that through these policies, we have developed an effective safety management system.

Under the Dodd-Frank Act, each operator of a coal or other mine is required to include certain mine safety information within its periodic reports filed with the SEC. As required by the reporting requirements included in §1503(a) of the Dodd-Frank Act and Item 104 of Regulation S-K, the information concerning mine safety and health or other regulatory matters for each of our mine locations that are covered under the scope of the Dodd-Frank Act is included in Exhibit 95 of *Part IV – ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES* of this Annual Report on Form 10-K.

PART II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

### STOCK EXCHANGE INFORMATION

Our common shares (ticker symbol CLF) are listed on the NYSE (New York Stock Exchange).

### HOLDERS

At February 13, 2023, we had 2,528 shareholders of record.

### SHAREHOLDER RETURN PERFORMANCE

The following graph shows changes over the past five-year period in the value of $100 invested in: (1) Cliffs' common shares; (2) S&P 500 Index; (3) S&P Metals and Mining Select Industry Index; and (4) S&P MidCap 400 Index. The values of each investment are based on price change plus reinvestment of all dividends reported to shareholders, based on monthly granularity.



Comparison of 5 Year Cumulative Total Return
Assumes Initial Investment of $100
December 2022

|  |  | 2017 | 2018 | 2019 | 2020 | 2021 | **2022** |
|---|---|---|---|---|---|---|---|
| **Cleveland-Cliffs Inc.** | Return % | — | 6.66 | 12.60 | 77.46 | 49.52 | **(26.00)** |
|  | Cumulative $ | 100.00 | 106.66 | 120.09 | 213.12 | 318.65 | **235.81** |
| **S&P 500 Index** | Return % | — | (4.39) | 31.48 | 18.39 | 28.68 | **(18.13)** |
|  | Cumulative $ | 100.00 | 95.61 | 125.70 | 148.81 | 191.48 | **156.77** |
| **S&P Metals and Mining Select Industry Index** | Return % | — | (26.76) | 14.70 | 15.97 | 34.94 | **13.12** |
|  | Cumulative $ | 100.00 | 73.24 | 84.01 | 97.42 | 131.46 | **148.70** |
| **S&P MidCap 400 Index** | Return % | — | (11.10) | 26.17 | 13.65 | 24.73 | **(13.10)** |
|  | Cumulative $ | 100.00 | 88.90 | 112.17 | 127.48 | 159.01 | **138.18** |

## ISSUER PURCHASES OF EQUITY SECURITIES

The following table presents information with respect to repurchases by the Company of our common shares during the periods indicated:

| Period | Total Number of Shares (or Units) Purchased[1] | Average Price Paid per Share (or Unit) | Total Number of Shares (or Units) Purchased as Part of Publicly Announced Plans or Programs | Maximum Number (or Approximate Dollar Value) of Shares (or Units) that May Yet be Purchased Under the Plans or Programs[2] |
|---|---|---|---|---|
| October 1 - 31, 2022 | 894 | $    19.54 | — | $    790,302,500 |
| November 1 - 30, 2022 | 28,208 | 28.79 | — | 790,302,500 |
| December 1 - 31, 2022 | 2,000,054 | 15.06 | 2,000,000 | 760,216,700 |
| **Total** | **2,029,156** | **$    15.25** | **2,000,000** | |

[1] Includes 894 shares that were delivered to us in October 2022, 28,208 shares that were delivered to us in November 2022, and 54 shares that were delivered to us in December 2022 to satisfy tax withholding obligations due upon the vesting or payment of stock awards.

[2] On February 10, 2022, our Board of Directors authorized a program to repurchase our outstanding common shares in the open market or in privately negotiated transactions, which may include purchases pursuant to Rule 10b5-1 plans or accelerated share repurchases, up to a maximum of $1 billion. We are not obligated to make any purchases, and the program may be suspended or discontinued at any time. The share repurchase program does not have a specific expiration date.

## ITEM 6. [Reserved]

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

Management's Discussion and Analysis of Financial Condition and Results of Operations is designed to provide a reader of our financial statements with a narrative from the perspective of management on our financial condition, results of operations, liquidity and other factors that may affect our future results. The following discussion should be read in conjunction with the consolidated financial statements and related notes that appear in *Part II – Item 8. Financial Statements and Supplementary Data* of this Annual Report on Form 10-K.

Management's Discussion and Analysis of Financial Condition and Results of Operations included in this report discusses our financial condition and results of operations as of and for the years ended December 31, 2022 and 2021. A discussion related to our financial condition and results of operations for 2021 as compared to 2020 can be found in Part II, Item 7., "Management's Discussion and Analysis of Financial Condition and Results of Operations," of our Annual Report on Form 10-K for the year ended December 31, 2021, filed with the SEC on February 11, 2022.

### OVERVIEW

Throughout 2022, we continued to position the Company for long-term success as we generated record revenues, executed our commercial initiatives by improving our average selling prices, revamped our operational footprint, secured multi-year labor agreements with the majority of our USW employees, displayed the unique advantage of our U.S.-centric, internally sourced feedstock and continued to improve our balance sheet.

#### 2022 HIGHLIGHTS

- Record revenues of $23 billion
- Second-highest Adjusted EBITDA in company history (second only to 2021)
- Reduced net pension and OPEB liabilities by $2.1 billion
- Reduced outstanding debt by $1.1 billion, including $351 million of open market repurchases
- Increased year-over-year average steel selling price despite significantly lower commodity flat-rolled steel pricing
- Improved commercial contracts by generating substantial increases for our fixed price contracts
- Agreed to 4-year labor agreements with the USW covering 14,000 total employees
- Completed major maintenance cycle, including the reline of the Cleveland #5 blast furnace
- Benefited from vertically integrated footprint amidst raw material shortages related to the Russian invasion of Ukraine
- Returned $240 million in capital to shareholders through share repurchase program

Table of Contents

- Continued progress toward our goal of reducing GHG emissions
- Celebrated 175th anniversary as a company

We also continued our best practices from both a safety and environmental standpoint. During 2022, our safety TRIR (including contractors) was 1.36 per 200,000 hours worked. Throughout 2022, we made continued progress towards our goal of reducing GHG emissions with our optimal utilization of HBI and scrap throughout our facilities, as well as more efficient power generation through recycling of off-gases. We have also formed a partnership with the DOE as part of the Better Climate Challenge initiative, as we aim to build on our GHG emission reduction progress. We continue to pursue opportunities such as carbon capture and the use of hydrogen within our facilities. Additionally, we have started forming partnerships to develop renewable energy sources - such as wind, solar and hydrogen - which will benefit our own environmental footprint while combating the global impacts of climate change.

## FINANCIAL SUMMARY



See "— Non-GAAP Financial Measures" below for a reconciliation of our *Net income (loss)* to Adjusted EBITDA.

## ECONOMIC OVERVIEW

Steel market conditions in 2022 were notably volatile, driven by disruptions due to the conflict between Russia and Ukraine, continued supply chain issues, significantly higher energy prices and declines in demand as a result of recessionary fears. The price for domestic HRC, the most significant index impacting our revenues and profitability, averaged $1,011 per net ton for 2022, 36% lower than 2021, but well above the prior ten-year average of $712 per net ton. HRC prices receded below $700 per net ton in the fourth quarter of 2022, the lowest level since October 2020. The large decline in spot steel prices was driven by service center destocking, interest rate hikes driving caution on new business and declining metallics prices, which were driven by lower domestic steel production and excess raw material inventory. Continued automotive supply chain difficulties also limited the demand for steel from automotive manufacturers. Looking forward, we expect domestic steel demand to improve as imports have become less attractive, service centers restock inventory, automotive supply chain issues ease and incremental steel demand from the Infrastructure and Jobs Act is realized.

The recently passed CHIPS Act and Inflation Reduction Act should provide meaningful support for overall domestic steel demand in the coming years. Our extensive portfolio of products should result in increased steel demand from some of our end markets. The CHIPS Act promotes semiconductor manufacturing in the U.S., which should help support non-residential construction. Additionally, on-shoring manufacturing in the U.S. should reduce risk of supply chain issues in the future. The Inflation Reduction Act provides a tax credit for consumers who buy new EVs, which further incentivizes consumers to purchase vehicles in an environment where pent-up demand is still very strong from recent supply chain issues and low dealer inventory levels. In addition, the Inflation Reduction Act provides incentives for the use of domestic steel for investments in clean energy projects, including wind and solar projects, which consume a substantial amount of steel. Additional projects from the legislation could create incremental demand for our galvanized, GOES, NOES and other steel products. We expect to benefit from the spending related to the recently passed legislation in 2023 and beyond.

The largest market for our steel products is the automotive industry in North America, which makes light vehicle production a key driver of demand. During 2022, North American light vehicle production was approximately 14.3 million units, the highest annual production volume since 2019. While we have seen modest improvement, automotive production remains below historical levels and continues to be adversely affected by the global semiconductor shortage, as well as other material shortages and supply chain disruptions. This has caused several outages amongst light vehicle manufacturers. The long-term outlook for the automotive industry remains positive as pent-up demand is strong due to ongoing production and supply chain issues. Inventory levels have recently reached the highest level since April 2021, with 1.7 million units of gross stock at the end of 2022, but remain significantly below historical average inventory levels of 2.5 to 3.0 million units of gross stock. Additionally, the average age of cars on the road in the U.S. reached an all-time high during 2022, which should support demand as older vehicles need to be replaced. As the largest supplier of automotive-grade steel in the U.S., we expect to benefit from increased vehicle production in coming years.

The ongoing conflict between Russia and Ukraine has disrupted raw material sourcing for our EAF competitors and has further increased the volatility in their steelmaking input costs. Approximately two-thirds of all U.S. imported pig iron, an important feedstock for flat-rolled steel producing EAFs, has historically been sourced from Russia and Ukraine. Imported pig iron prices

averaged $687 per metric ton during 2022, which is significantly above the historical average of $440 per metric ton from September 2017 to December 2021. The recent decline from record levels in pricing is primarily due to lower domestic steel production and surplus raw material inventory as competitors purchased excess raw materials at the beginning of the conflict between Russia and Ukraine to ensure sufficient supply in a time of uncertainty. Higher than historical imported pig iron costs should continue to support a higher HRC price. Unlike other flat-rolled producers, we are not reliant on imported pig iron as we produce it in-house at our blast furnaces, using our own iron ore as the primary raw material.

The price for busheling scrap, a necessary input for flat-rolled steel production in EAFs in the U.S., averaged well above the historical ten-year average of $380 per long ton in 2022 and 2021. The busheling price averaged $533 per long ton in 2022 and $602 per long ton in 2021. Pricing fell to $350 per long ton during the fourth quarter of 2022, as domestic steel capacity utilization rates declined below 80% and competitors worked through excess raw material inventory. As prime scrap is a replacement to imported pig iron, we expect the busheling scrap price will continue to average at or above historical levels as the availability of imported pig iron from Russia and Ukraine remains disrupted. We expect the supply of busheling scrap to further tighten due to decreasing prime scrap generation from original equipment manufacturers and the growth of EAF capacity in the U.S., along with a push for expanded scrap use globally. As we are fully integrated and have primarily a blast furnace footprint, increased prices for busheling scrap in the U.S. bolster our competitive advantage, as we source the majority of our iron feedstock from our stable-cost mining and pelletizing operations in Minnesota and Michigan.

As for iron ore, the Platts 62% price averaged $120 per metric ton in 2022, which is 23% higher than the historical ten-year average. While higher iron ore prices play a role in increased steel prices, we also directly benefit from higher iron ore prices for the portion of iron ore pellets we sell to third parties.

The U.S. Federal Reserve has pushed interest rates to the highest level in 15 years in an attempt to slow demand and reduce inflation. Though we are a firm believer that the U.S. is the most resilient manufacturing economy in the world, rising interest rates could cause a significant economic downturn and impact various end markets that we serve and overall domestic steel demand. While we believe there is strong pent-up demand for light vehicles in the U.S., automotive sales could be negatively impacted due to higher interest rates. The non-residential construction market could also see delays in construction as increased rates drive caution on new business. If continued rising rates in the U.S. result in a recession, we believe that end-user demand for steel intensive products could be negatively impacted as a recession would likely result in higher unemployment, lower wages and less disposable income for consumers.

During 2022, we experienced higher costs than the prior year due to inflationary pressures on input and energy costs, as well as lower production volume and higher repair and maintenance spending. We expect to benefit from lower costs in 2023 and beyond as most inflationary items have started to ease, production volume improves, and repair and maintenance expenses normalize.

## STEELMAKING RESULTS
### COMPARISON OF 2022 TO 2021

The following is a summary of our Steelmaking segment results included in our consolidated financial statements for the years ended December 31, 2022 and 2021. The results for 2021 include the FPT operations subsequent to November 18, 2021 and full-year results for all other Steelmaking operations.

The following is a summary of the Steelmaking segment operating results:



| Total Revenue | Gross Margin | Adjusted EBITDA | Steel Shipments (nt) |
|---|---|---|---|
| $19,901 (2021) / $22,383 (2022) | $4,522 (2021) / $2,469 (2022) | $5,280 (2021) / $3,089 (2022) | 15,886 (2021) / 14,751 (2022) |
| STEEL PRODUCT REVENUE: $18,850 / $20,054 | GROSS MARGIN %: 23% / 11% | ADJUSTED EBITDA %: 27% / 14% | AVERAGE SELLING PRICE PER TON OF STEEL PRODUCTS: $1,187 / $1,360 |

## REVENUE

The following tables represent our steel shipments by product and total sales by market:

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2022 | | 2021 | | |
| (In thousands of net tons) | Volume | % | Volume | % | % Change |
| Steel shipments by product: | | | | | |
| Hot-rolled steel | 4,326 | 29 % | 4,886 | 31 % | (11) % |
| Cold-rolled steel | 2,286 | 16 % | 2,790 | 18 % | (18) % |
| Coated steel | 4,730 | 32 % | 5,056 | 32 % | (6) % |
| Stainless and electrical steel | 763 | 5 % | 674 | 4 % | 13 % |
| Plate | 880 | 6 % | 1,020 | 6 % | (14) % |
| Slab and other steel products | 1,766 | 12 % | 1,460 | 9 % | 21 % |
| Total steel shipments by product | 14,751 | | 15,886 | | (7) % |

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2022 | | 2021 | | |
| (In millions) | Revenue | % | Revenue | % | % Change |
| Steelmaking revenues by market: | | | | | |
| Direct automotive | $ 6,661 | 30 % | $ 4,726 | 24 % | 41 % |
| Infrastructure and manufacturing | 5,869 | 26 % | 5,380 | 27 % | 9 % |
| Distributors and converters | 6,388 | 29 % | 7,671 | 38 % | (17) % |
| Steel producers | 3,465 | 15 % | 2,124 | 11 % | 63 % |
| Total steelmaking revenues by market | $ 22,383 | | $ 19,901 | | 12 % |

*Revenues* increased by 12% during the year ended December 31, 2022, as compared to the prior-year, primarily due to:

- An increase in the direct automotive market of $1,935 million, or 41%, predominantly due to increases in selling prices as a result of favorable renewals of annual fixed price contracts.

- An increase in sales to the steel producers market of $1,341 million, or 63%, which was primarily driven by the inclusion of full-year results from the FPT Acquisition.

- These increases were partially offset by a decrease in the distributors and converters market of $1,283 million, or 17%, predominantly due to service center destocking, interest rate hikes driving caution on new business and pricing for metallics declining, which caused weaker demand from service centers for our steel products and large declines in spot steel pricing.

## GROSS MARGIN

Gross margin decreased by $2,053 million, or 45%, during the year ended December 31, 2022, as compared to the prior-year, primarily due to:

- Increased costs of production (approximately $3.6 billion impact) driven by higher raw materials and utility costs, including natural gas, coal, coke, alloys and scrap, coupled with increased investment in maintenance and labor costs; and

- A decrease in sales volumes (approximately $700 million impact) predominantly driven by lower shipments to the distributors and converters end market due to weaker demand.

- This was partially offset by an increase in selling prices (approximately $2.5 billion impact) driven by favorable renewals of annual sales contracts.

## ADJUSTED EBITDA

Adjusted EBITDA from our Steelmaking segment for the year ended December 31, 2022, decreased by $2,191 million, as compared to 2021, primarily due to the decreased gross margin from our operations. Additionally, our Steelmaking Adjusted EBITDA included $439 million and $392 million of *Selling, general and administrative expenses* for the years ended December 31, 2022 and 2021, respectively.

## CONSOLIDATED RESULTS
### COMPARISON OF 2022 TO 2021

### REVENUES & GROSS MARGIN

During the year ended December 31, 2022, our consolidated *Revenues* increased by $2,545 million, compared to 2021. The increase was primarily due to the increase in the average steel product selling price of $173 per net ton and the inclusion of full-year results from the FPT Acquisition, partially offset by the decrease of 1.1 million net tons of steel shipments from our Steelmaking segment.

During the year ended December 31, 2022, our consolidated gross margin decreased by $2,016 million, as compared to 2021. See "— Steelmaking Results" above for further detail on our operating results.

### SELLING, GENERAL AND ADMINISTRATIVE EXPENSES

*Selling, general and administrative expenses* increased by $43 million during the year ended December 31, 2022, as compared to 2021. The increase primarily relates to the inclusion of full-year results for the FPT Acquisition in 2022. Additionally, there were increases related to salaries and benefits and external service costs, partially offset by lower incentive compensation.

### MISCELLANEOUS – NET

*Miscellaneous – net* increased by $30 million for the year ended December 31, 2022, as compared to 2021. The increase in miscellaneous expense was primarily due to the $29 million asset impairment charge associated with the permanent closure of Mountain State Carbon and an increase in idle expenses. These increases were partially offset by the acquisition-related loss on equity method investment during 2021, which was not repeated in 2022.

### INTEREST EXPENSE, NET

*Interest expense, net* decreased by $61 million for the year ended December 31, 2022, as compared to the prior year. The decrease was primarily due to debt reduction activities during 2021 and 2022, which reduced interest expense on our senior notes. The decrease was partially offset by an increase in the ABL Facility interest expense primarily as a result of rising interest rates.

### LOSS ON EXTINGUISHMENT OF DEBT

The loss on extinguishment of debt of $75 million for the year ended December 31, 2022 primarily resulted from the redemption of all all $607 million aggregate principal amount of our outstanding 9.875% 2025 Senior Secured Notes in April 2022 and the redemption of all $294 million aggregate principal amount of our outstanding 1.500% 2025 Convertible Senior Notes in January 2022. The losses were partially offset by the net gain on extinguishment for the repurchase of $417 million aggregate principal amount of our outstanding IRBs and senior notes of various series.

The loss on extinguishment of debt of $88 million for the year ended December 31, 2021 primarily resulted from the redemption of $396 million aggregate principal amount of 5.750% 2025 Senior Notes, $395 million aggregate principal amount of 4.875% 2024 Senior Secured Notes and $347 million aggregate principal amount of 9.875% 2025 Senior Secured Notes.

Refer to NOTE 8 - DEBT AND CREDIT FACILITIES for further details.

### INCOME TAXES

Our effective tax rate is affected by permanent items, primarily depletion. It also is affected by discrete items that may occur in any given period but are not consistent from period to period. The following represents a summary of our tax provision and corresponding effective rates:

| (In millions) | Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2022** | | 2021 | |
| Income tax expense | **$** | **(423)** | $ | (773) |
| Effective tax rate | **23 %** | | 20 % | |

Table of Contents

A reconciliation of our income tax attributable to continuing operations compared to the U.S. federal statutory rate is as follows:

| (In millions) | Year Ended December 31, | | | |
| | 2022 | | 2021 | |
| --- | ---: | ---: | ---: | ---: |
| Tax at U.S. statutory rate | $ 377 | 21 % | $ 799 | 21 % |
| Increase (decrease) due to: | | | | |
| Percentage depletion in excess of cost depletion | (49) | (3) | (99) | (3) |
| State taxes, net | 71 | 4 | 86 | 2 |
| Federal & state provision to return | 27 | 1 | (2) | — |
| Other items, net | (3) | — | (11) | — |
| Provision for income tax expense and effective income tax rate including discrete items | $ 423 | 23 % | $ 773 | 20 % |

The decrease in income tax expense in 2022, as compared to the prior year, is directly related to the decrease in the pre-tax book income year-over-year.

See NOTE 11 - INCOME TAXES for further information.

## CASH FLOW, LIQUIDITY AND CAPITAL RESOURCES

### OVERVIEW

Our capital allocation decision-making process is focused on preserving healthy liquidity levels while maintaining the strength of our balance sheet and creating financial flexibility to manage through the cyclical demand for our products and volatility in commodity prices. We are focused on maximizing the cash generation of our operations, reducing debt, returning capital to shareholders and aligning capital investments with our strategic priorities and the requirements of our business plan, including regulatory and permission-to-operate related projects.

The following table provides a summary of our cash flows:

| (In millions) | Year Ended December 31, | |
| | 2022 | 2021 |
| --- | ---: | ---: |
| Cash flows provided by (used in): | | |
| Operating activities | $ 2,423 | $ 2,785 |
| Investing activities | (936) | (1,379) |
| Financing activities | (1,509) | (1,470) |
| Net decrease in cash and cash equivalents | $ (22) | $ (64) |
| | | |
| Free cash flow[1] | $ 1,480 | $ 2,080 |

[1] See "— Non-GAAP Financial Measures" for a reconciliation of our free cash flows.

The recent market environment has provided us opportunities to reduce our debt and return capital to shareholders with our own free cash flow generation. We also continue to look at the composition of our debt, as we are interested in both extending our average maturity length and increasing our ratio of unsecured debt to secured debt, which can be accomplished with cash provided by operating activities. During 2022, we took action in alignment with our capital allocation priorities, as follows:

- We redeemed all $294 million in aggregate principal amount outstanding of our 1.500% 2025 Convertible Senior Notes, $66 million aggregate principal amount outstanding of the IRBs and $607 million remaining aggregate principal amount outstanding of our 9.875% 2025 Senior Secured Notes; and

- We repurchased $351 million in aggregate principal amount of our outstanding senior notes of various series at an average price of 92% of par.

- Additionally, we returned capital to shareholders through our share repurchase program, repurchasing 12.5 million common shares at a cost of $240 million in the aggregate.

These actions give us additional financial flexibility and will better prepare us to navigate more easily through potentially volatile industry conditions in the future, while also prudently reducing our common share count.

## OPERATING ACTIVITIES

| (In millions) | 2022 | 2021 | Variance |
|---|---|---|---|
| Net income | $ 1,376 | $ 3,033 | $ (1,657) |
| Non-cash adjustments to net income | 1,218 | 1,949 | (731) |
| Income taxes | (22) | (136) | 114 |
| Pension and OPEB payments and contributions | (204) | (343) | 139 |
| Working capital (receivables, inventories, payables and other liabilities) | 55 | (1,718) | 1,773 |
| Net cash provided by operating activities | $ 2,423 | $ 2,785 | $ (362) |

The variance was driven by:

- A $1,657 million increase in net income after adjustments for non-cash items due to lower gross margins from lower steel sales volume and higher costs. See "—Steelmaking Results" above for further detail on our operating results.

- A $139 million decrease in payments and contributions relating to pension and OPEB plans resulting from improvements to our pension plans' funded status. The 2021 pension contributions also included $118 million in deferred 2020 pension contributions in connection with the CARES Act.

- A $1,773 million decrease in cash used for working capital primarily driven by lower increases in accounts receivable and inventories. In 2021, accounts receivable increased due to the unwind of the ArcelorMittal USA factoring agreement as well as rising revenue. Inventories also increased more in 2021 due to the global semiconductor shortage as well as higher raw material costs. During 2022, our inventory units declined but this was predominantly offset by higher costs.

## INVESTING ACTIVITIES

| (In millions) | 2022 | 2021 | Variance |
|---|---|---|---|
| Purchase of property, plant and equipment | $ (943) | $ (705) | $ (238) |
| Acquisitions, net of cash acquired | (31) | (707) | 676 |
| Other | 38 | 33 | 5 |
| Net cash used by investing activities | $ (936) | $ (1,379) | $ 443 |

The variance was driven by:

- A $238 million increase in cash used for capital expenditures primarily relating to sustaining capital expenditures, including the completion of a reline of blast furnace #5 at Cleveland Works during the third quarter of 2022. Sustaining capital spend includes infrastructure, mobile equipment, fixed equipment, product quality, environmental and health and safety.

- A $676 million decrease in cash used for acquisitions primarily relating to the FPT Acquisition made in 2021.

## FINANCING ACTIVITIES

| (In millions) | 2022 | 2021 | Variance |
|---|---|---|---|
| Series B Redeemable Preferred Stock redemption | $ — | $ (1,343) | $ 1,343 |
| Net repayments of debt | (1,358) | (372) | (986) |
| Net borrowings under credit facilities | 255 | 73 | 182 |
| Net issuance (repurchase) of common shares | (240) | 322 | (562) |
| Other | (166) | (150) | (16) |
| Net cash used by financing activities | $ (1,509) | $ (1,470) | $ (39) |

The variance was driven by:

- A $1,343 million decrease in cash used in 2022 resulting from the Series B Redeemable Preferred Stock redemption in 2021.

- A $804 million increase in cash used resulting from higher net repayments of debt in 2022, partially offset by increased borrowings on our ABL Facility, as compared to the prior-year.

- A $562 million increase in cash used to repurchase 12.5 million common shares in 2022, compared to 20.0 million common shares issued in 2021.

Table of Contents

## LIQUIDITY AND CAPITAL RESOURCES

Our primary sources of liquidity are *Cash and cash equivalents,* cash generated from our operations, availability under the ABL Facility and access to capital markets. We generally maintain minimal cash balances and utilize our access to our ABL Facility to cover fluctuations in our cash requirements. Cash and cash equivalents, which totaled $26 million as of December 31, 2022, include cash on hand and on deposit. The combination of cash and availability under our ABL Facility gives us $2.5 billion in liquidity as of December 31, 2022. We believe our liquidity and access to capital markets will be adequate to fund our cash requirements for the next 12 months and for the foreseeable future.

The ABL Facility, which matures in March 2025, has a maximum borrowing base of $4.5 billion, determined by applying customary advance rates to eligible accounts receivable, inventory and certain mobile equipment. The ABL Facility includes a $555 million sublimit for the issuance of letters of credit and a $200 million sublimit for swingline loans. As of December 31, 2022, outstanding letters of credit totaled $150 million, which reduced availability. We issue standby letters of credit with certain financial institutions in order to support business obligations, including, but not limited to, workers' compensation, employee severance, insurance, operating agreements and environmental obligations. The ABL Facility agreement contains various financial and other covenants. As of December 31, 2022, we were in compliance with all of our ABL Facility covenants.

We have the capability to issue additional unsecured notes and, subject to the limitations set forth in our existing senior notes indentures, additional secured debt, if we elect to access the debt capital markets. However, our ability to issue additional notes could be limited by market conditions. We intend from time to time to seek to redeem or repurchase our outstanding senior notes with cash on hand, borrowings from existing credit sources or new debt financings and/or exchanges for debt or equity securities, in open market purchases, privately negotiated transactions or otherwise. Such redemptions or repurchases, if any, will depend on prevailing market conditions, our liquidity requirements, contractual restrictions and other factors, and the amounts involved may be material.

Refer to NOTE 8 - DEBT AND CREDIT FACILITIES for more information on our ABL Facility and debt.

## MATERIAL CASH REQUIREMENTS

We have material cash requirements for known contractual obligations and commitments for the following:

### CAPITAL EXPENDITURES

We anticipate total cash used for capital expenditures during the next 12 months to be between $700 and $750 million, which primarily consists of sustaining capital spend. With our facilities and equipment in the best shape since the acquisition, we do not expect any major investments until at least 2025.

### PURCHASE OBLIGATIONS

In the normal course of business, we are a party to certain off-balance sheet arrangements that are not reflected on our Statements of Consolidated Financial Position. These arrangements include minimum "take or pay" purchase commitments, such as minimum electric power demand charges, minimum coal, diesel and natural gas purchase commitments, minimum railroad transportation commitments and minimum port facility usage commitments. Refer to NOTE 20 - COMMITMENTS AND CONTINGENCIES for further information.

### DEBT

We have principal long-term debt of $4,306 million with maturities starting in 2025. Refer to NOTE 8 - DEBT AND CREDIT FACILITIES for further information on our long-term debt and interest.

### LEASE OBLIGATIONS

We have future minimum lease payments under noncancellable finance and operating leases. As of December 31, 2022, the current and long-term liabilities for our lease obligations were $136 million and $317 million, respectively. Refer to NOTE 12 - LEASE OBLIGATIONS for further information.

### POST-RETIREMENT EMPLOYEE BENEFITS

We make both required and discretionary pension contributions. Required contributions are based on minimum funding requirements pursuant to ERISA regulations. We expect to make $32 million in contributions in 2023. Contributions in future years can significantly change and will depend on the actual returns on assets, discount rates, government regulations, changes to employee benefits through labor agreements and other demographic factors. The cash requirements for our OPEB plans consist of VEBA contributions and direct payments from corporate assets primarily for medical and drug costs. During 2022, we negotiated favorable Medicare Advantage Prescription Drug healthcare rates, which went into effect January 1, 2023. We also paused the contribution requirement to the Cleveland-Cliffs Steel LLC VEBA plan as part of the 2022 USW labor negotiations. The reduction in retiree healthcare rates and pause on the VEBA funding requirements is expected to reduce our use of cash from $198 million in 2022 to $73 million in 2023. Refer to NOTE 9 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS for further information.

### ENVIRONMENTAL AND ASSET RETIREMENT OBLIGATIONS

Refer to NOTE 20 - COMMITMENTS AND CONTINGENCIES and NOTE 13 - ASSET RETIREMENT OBLIGATIONS for further information on our environmental and asset retirement obligations.

**SHARE REPURCHASE PROGRAM**

On February 10, 2022, our Board of Directors authorized a program to repurchase outstanding common shares in the open market or in privately negotiated transactions, which may include purchases pursuant to Rule 10b5-1 plans or accelerated share repurchases, up to a maximum of $1 billion. As of December 31, 2022, there was $760 million remaining under the authorization. We are not obligated to make any purchases and the program may be suspended or discontinued at any time. The share repurchase program does not have a specific expiration date.

## NON-GAAP FINANCIAL MEASURES

### ADJUSTED EBITDA

We evaluate performance on an operating segment basis, as well as a consolidated basis, based on Adjusted EBITDA, which is a non-GAAP measure. This measure is used by management, investors, lenders and other external users of our financial statements to assess our operating performance and to compare operating performance to other companies in the steel industry. In addition, management believes Adjusted EBITDA is a useful measure to assess the earnings power of the business without the impact of capital structure and can be used to assess our ability to service debt and fund future capital expenditures in the business.

The following table provides a reconciliation of our *Net income (loss)* to Adjusted EBITDA:

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| (In millions) | | 2022 | | 2021 | | 2020 |
| Net income (loss) | $ | 1,376 | $ | 3,033 | $ | (81) |
| Less: | | | | | | |
| Interest expense, net | | (276) | | (337) | | (238) |
| Income tax benefit (expense) | | (423) | | (773) | | 111 |
| Depreciation, depletion and amortization | | (1,034) | | (897) | | (308) |
| Total EBITDA | $ | 3,109 | $ | 5,040 | $ | 354 |
| Less: | | | | | | |
| EBITDA from noncontrolling interests[1] | $ | 74 | $ | 75 | $ | 56 |
| Gain (loss) on extinguishment of debt | | (75) | | (88) | | 130 |
| Acquisition-related expenses and adjustments | | (1) | | (197) | | (148) |
| Asset impairment | | (29) | | — | | — |
| Other, net | | (29) | | (27) | | (37) |
| Total Adjusted EBITDA | $ | 3,169 | $ | 5,277 | $ | 353 |
| | | | | | | |
| [1] EBITDA of noncontrolling interests includes the following: | | | | | | |
| Net income attributable to noncontrolling interests | $ | 41 | $ | 45 | $ | 41 |
| Depreciation, depletion and amortization | | 33 | | 30 | | 15 |
| EBITDA of noncontrolling interests | $ | 74 | $ | 75 | $ | 56 |

The following table provides a summary of our Adjusted EBITDA by segment:

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| (In millions) | | 2022 | | 2021 |
| Adjusted EBITDA: | | | | |
| Steelmaking | $ | 3,089 | $ | 5,280 |
| Other Businesses | | 69 | | 9 |
| Corporate and eliminations | | 11 | | (12) |
| Total Adjusted EBITDA | $ | 3,169 | $ | 5,277 |

### FREE CASH FLOW

Free cash flow is a non-GAAP measure defined as operating cash flows less purchase of property, plant and equipment. Management believes it is an important measure to assess the cash generation available to service debt, strategic initiatives or other financing activities.

Table of Contents

The following table provides a reconciliation of our operating cash flows to free cash flows:

| (In millions) | Year Ended December 31, | |
|---|---|---|
| | **2022** | 2021 |
| Operating cash flows | $ **2,423** | $ 2,785 |
| Purchase of property, plant and equipment | **(943)** | (705) |
| Free cash flows | $ **1,480** | $ 2,080 |

## INFORMATION ABOUT OUR GUARANTORS AND THE ISSUER OF OUR GUARANTEED SECURITIES

The accompanying summarized financial information has been prepared and presented pursuant to SEC Regulation S-X, Rule 3-10, "Financial Statements of Guarantors and Issuers of Guaranteed Securities Registered or Being Registered," and Rule 13-01 "Financial Disclosures about Guarantors and Issuers of Guaranteed Securities and Affiliates Whose Securities Collateralized a Registrant's Securities." Certain of our subsidiaries (the "Guarantor subsidiaries") have fully and unconditionally, and jointly and severally, guaranteed the obligations under (a) the 5.875% 2027 Senior Notes, the 7.000% 2027 Senior Notes, the 4.625% 2029 Senior Notes and the 4.875% 2031 Senior Notes issued by Cleveland-Cliffs Inc. on a senior unsecured basis and (b) the 6.750% 2026 Senior Secured Notes on a senior secured basis. See NOTE 8 - DEBT AND CREDIT FACILITIES for further information.

The following presents the summarized financial information on a combined basis for Cleveland-Cliffs Inc. (parent company and issuer of the guaranteed obligations) and the Guarantor subsidiaries, collectively referred to as the obligated group. Transactions between the obligated group have been eliminated. Information for the non-Guarantor subsidiaries was excluded from the combined summarized financial information of the obligated group.

Each Guarantor subsidiary is consolidated by Cleveland-Cliffs Inc. as of December 31, 2022. Refer to Exhibit 22, incorporated herein by reference, for the detailed list of entities included within the obligated group as of December 31, 2022.

The guarantee of a Guarantor subsidiary with respect to Cliffs' 6.750% 2026 Senior Secured Notes, the 5.875% 2027 Senior Notes, the 7.000% 2027 Senior Notes, the 4.625% 2029 Senior Notes and the 4.875% 2031 Senior Notes will be automatically and unconditionally released and discharged, and such Guarantor subsidiary's obligations under the guarantee and the related indentures (the "Indentures") will be automatically and unconditionally released and discharged, upon the occurrence of any of the following, along with the delivery to the trustee of an officer's certificate and an opinion of counsel, each stating that all conditions precedent provided for in the applicable Indenture relating to the release and discharge of such Guarantor subsidiary's guarantee have been complied with:

(a) any sale, exchange, transfer or disposition of such Guarantor subsidiary (by merger, consolidation, or the sale of) or the capital stock of such Guarantor subsidiary after which the applicable Guarantor subsidiary is no longer a subsidiary of the Company or the sale of all or substantially all of such Guarantor subsidiary's assets (other than by lease), whether or not such Guarantor subsidiary is the surviving entity in such transaction, to a person which is not the Company or a subsidiary of the Company; provided that (i) such sale, exchange, transfer or disposition is made in compliance with the applicable Indenture, including the covenants regarding consolidation, merger and sale of assets and, as applicable, dispositions of assets that constitute notes collateral, and (ii) all the obligations of such Guarantor subsidiary under all debt of the Company or its subsidiaries terminate upon consummation of such transaction;

(b) designation of any Guarantor subsidiary as an "excluded subsidiary" (as defined in the Indentures); or

(c) defeasance or satisfaction and discharge of the Indentures.

Each entity in the summarized combined financial information follows the same accounting policies as described in the consolidated financial statements. The accompanying summarized combined financial information does not reflect investments of the obligated group in non-Guarantor subsidiaries. The financial information of the obligated group is presented on a combined basis; intercompany balances and transactions within the obligated group have been eliminated. The obligated group's amounts due from, amounts due to, and transactions with, non-Guarantor subsidiaries and related parties have been presented in separate line items.

### SUMMARIZED COMBINED FINANCIAL INFORMATION OF THE ISSUER AND GUARANTOR SUBSIDIARIES

The following table is summarized combined financial information from the Statements of Condensed Consolidated Financial Position of the obligated group:

| (In millions) | December 31, | |
|---|---|---|
| | **2022** | 2021 |
| Current assets | $ **7,063** | $ 6,539 |
| Non-current assets | **9,935** | 12,693 |
| Current liabilities | **(3,866)** | (3,222) |
| Non-current liabilities | **(6,630)** | (9,081) |

51 | **CLF** 2022 FORM 10-K

The following table is summarized combined financial information from the Statements of Condensed Consolidated Operations of the obligated group:

| (In millions) | Year Ended December 31, 2022 |
|---|---|
| Revenues | $ 21,376 |
| Cost of goods sold | (19,008) |
| Income from continuing operations | 1,107 |
| Net income | 1,109 |
| Net income attributable to Cliffs shareholders | 1,109 |

As of December 31, 2022 and 2021, the obligated group had the following balances with non-Guarantor subsidiaries and other related parties:

| (In millions) | December 31, | |
|---|---|---|
| | 2022 | 2021 |
| **Balances with non-Guarantor subsidiaries:** | | |
| Accounts receivable, net | $ 163 | $ 199 |
| Accounts payable | (527) | (186) |
| | | |
| **Balances with other related parties:** | | |
| Accounts receivable, net | $ 8 | $ 3 |
| Accounts payable | (13) | (7) |

Additionally, for the year ended December 31, 2022, the obligated group had *Revenues* of $133 million and *Cost of goods sold* of $103 million, in each case with other related parties.

## MARKET RISKS

We are subject to a variety of risks, including those caused by changes in commodity prices and interest rates. We have established policies and procedures to manage such risks; however, certain risks are beyond our control.

### PRICING RISKS

In the ordinary course of business, we are exposed to market risk and price fluctuations related to the sale of our products, which are impacted primarily by market prices for HRC, and the purchase of energy and raw materials used in our operations, which are impacted by market prices for electricity, natural gas, ferrous and stainless steel scrap, chrome, metallurgical coal, coke, nickel and zinc. Our strategy to address market risk has generally been to obtain competitive prices for our products and services and allow operating results to reflect market price movements dictated by supply and demand; however, we make forward physical purchases and enter into hedge contracts to manage exposure to price risk related to the purchases of certain raw materials and energy used in the production process.

Our financial results can vary for our operations as a result of fluctuations in market prices. We attempt to mitigate these risks by aligning fixed and variable components in our customer pricing contracts, supplier purchasing agreements and derivative financial instruments.

Some customer contracts have fixed-pricing terms, which increases our exposure to fluctuations in raw material and energy costs. To reduce our exposure, we enter into annual, fixed-price agreements for certain raw materials. Some of our existing multi-year raw material supply agreements have required minimum purchase quantities. Under adverse economic conditions, those minimums may exceed our needs. Absent exceptions for force majeure and other circumstances affecting the legal enforceability of the agreements, these minimum purchase requirements may compel us to purchase quantities of raw materials that could significantly exceed our anticipated needs or pay damages to the supplier for shortfalls. In these circumstances, we would attempt to negotiate agreements for new purchase quantities. There is a risk, however, that we would not be successful in reducing purchase quantities, either through negotiation or litigation. If that occurred, we would likely be required to purchase more of a particular raw material in a particular year than we need, negatively affecting our results of operations and cash flows.

Certain of our customer contracts include variable-pricing mechanisms that adjust selling prices in response to changes in the costs of certain raw materials and energy, while other of our customer contracts exclude such mechanisms. We may enter into multi-year purchase agreements for certain raw materials with similar variable-price mechanisms, allowing us to achieve natural hedges between the customer contracts and supplier purchase agreements. Therefore, in some cases, price fluctuations for energy (particularly natural gas and electricity), raw materials (such as scrap, chrome, zinc and nickel) or other commodities may be, in part, passed on to customers rather than absorbed solely by us. There is a risk, however, that the variable-price mechanisms in the sales contracts may not necessarily change in tandem with the variable-price mechanisms in our purchase agreements, negatively affecting our results of operations and cash flows.

Our strategy to address volatile natural gas rates and electricity rates includes improving efficiency in energy usage, identifying alternative providers and utilizing the lowest cost alternative fuels. If we are unable to align fixed and variable components between customer contracts and supplier purchase agreements, we use cash-settled commodity price swaps to hedge the market risk associated with the purchase of certain of our raw materials and energy requirements. Additionally, we routinely use these derivative instruments to hedge a portion of our natural gas and zinc requirements. During 2022, we initiated hedging programs for electricity and tin. Our hedging strategy is designed to protect us from excessive pricing volatility. However, since we do not typically hedge 100% of our exposure, abnormal price increases in any of these commodity markets might still negatively affect operating costs.

The following table summarizes the negative effect of a hypothetical change in the fair value of our derivative instruments outstanding as of December 31, 2022, due to a 10% and 25% change in the market price of each of the indicated commodities:

| | (In millions) | | | |
|---|---|---|---|---|
| Commodity Derivative | 10% Change | | 25% Change | |
| Natural gas | $ | 54 | $ | 136 |
| Electricity | | 3 | | 6 |
| Tin | | — | | 1 |

Any resulting changes in fair value would be recorded as adjustments to AOCI, net of income taxes, or recognized in net earnings, as appropriate. These hypothetical losses would be partially offset by the benefit of lower prices paid for the related commodities.

## VALUATION OF GOODWILL AND OTHER LONG-LIVED ASSETS

### GOODWILL

We assign goodwill arising from acquired companies to the reporting units that are expected to benefit from the synergies of the acquisition. Goodwill is tested on a qualitative or quantitative basis for impairment at the reporting unit level on an annual basis (October 1) and between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value. These events or circumstances could include a significant change in the business climate, legal factors, operating performance indicators, competition, or sale or disposition of a significant portion of a reporting unit. We have an unconditional option to bypass the qualitative test for any reporting unit in any period and proceed directly to performing the quantitative test. Should our qualitative test indicate that it is more likely than not that the fair value of a reporting unit is less than its carrying value, we perform a quantitative test to determine the amount of impairment, if any, to the carrying value of the reporting unit and its associated goodwill.

Application of the goodwill impairment test requires judgment, including the identification of reporting units, assignment of assets and liabilities to reporting units, assignment of goodwill to reporting units and if a quantitative assessment is deemed necessary in determination of the fair value of each reporting unit. The fair value of each reporting unit is estimated using the guideline public company method, the discounted cash flow methodology, or a combination of both, which considers forecasted cash flows discounted at an estimated weighted average cost of capital. Assessing the recoverability of our goodwill requires significant assumptions regarding the estimated future cash flows and other factors to determine the fair value of a reporting unit, including, among other things, estimates related to forecasts of future revenues, expected Adjusted EBITDA, expected capital expenditures and working capital requirements, which are based upon our long-range plan estimates. The assumptions used to calculate the fair value of a reporting unit may change from year to year based on operating results, market conditions and other factors. Changes in these assumptions could materially affect the determination of fair value for each reporting unit.

No impairment charges were identified in connection with our annual goodwill impairment test with respect to our identified reporting units. However, our Tooling and Stamping reporting unit fair value was not substantially in excess of its carrying values as of December 31, 2022. A slower than anticipated resolution of the supply chain issues related to the global semiconductor shortages that have hampered the automotive industry, higher than expected capital requirements, and/or an increase in the discount rate could result in future impairment indicators. We determined that our other identified reporting units were not at risk of failing the goodwill impairment test as of December 31, 2022.

### OTHER LONG-LIVED ASSETS

Long-lived assets are reviewed for impairment upon the occurrence of events or changes in circumstances that would indicate that the carrying value of the assets may not be recoverable. Such indicators may include: a significant decline in expected future cash flows; a sustained, significant decline in market pricing; a significant adverse change in legal or environmental factors or in the business climate; changes in estimates of our recoverable reserves; and unanticipated competition. Any adverse change in these factors could have a significant impact on the recoverability of our long-lived assets and could have a material impact on our consolidated statements of operations and statements of financial position.

A comparison of each asset group's carrying value to the estimated undiscounted net future cash flows expected to result from the use of the assets, including cost of disposition, is used to determine if an asset is recoverable. Projected future cash flows reflect management's best estimate of economic and market conditions over the projected period, including growth rates in revenues and costs, and estimates of future expected changes in operating margins and capital expenditures. If the carrying value of the asset group is higher than its undiscounted net future cash flows, the asset group is measured at fair value and the difference is recorded as a reduction to the long-lived assets. We estimate fair value using a market approach, an income approach or a cost approach. For the year ended December 31, 2022, we concluded that there were no additional triggering events resulting in the need for an

Table of Contents

impairment assessment except for the announcement of the permanent closure of Mountain State Carbon, which resulted in a $29 million asset impairment charge.

## INTEREST RATE RISK

Interest payable on our senior notes is at fixed rates. Interest payable under our ABL Facility is at a variable rate based upon the applicable base rate plus the applicable base rate margin depending on the excess availability. As of December 31, 2022, we had $1,864 million outstanding under our ABL Facility. An increase in prevailing interest rates would increase interest expense and interest paid for any outstanding borrowings under our ABL Facility. For example, a 100 basis point change to interest rates under our ABL Facility at the December 31, 2022 borrowing level would result in a change of $19 million to interest expense on an annual basis. For a discussion of the attendant risk, see *Part I - Item 1A, Risk Factors - III. Financial Risks - Our existing and future indebtedness may limit cash flow available to invest in the ongoing needs of our businesses, which could prevent us from fulfilling our obligations under our senior notes, ABL Facility and other debt, and we may be forced to take other actions to satisfy our obligations under our debt, which may not be successful.*

## SUPPLY CONCENTRATION RISKS

Many of our operations and mines rely on one source for each of electric power and natural gas. A significant interruption or change in service or rates from our energy suppliers could materially impact our production costs, margins and profitability.

## RECENTLY ISSUED ACCOUNTING PRONOUNCEMENTS

Refer to NOTE 1 - BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES of the consolidated financial statements for a description of recent accounting pronouncements, including the respective dates of adoption and effects on results of operations and financial condition.

## CRITICAL ACCOUNTING ESTIMATES

Management's discussion and analysis of financial condition and results of operations is based on our consolidated financial statements, which have been prepared in accordance with GAAP. Preparation of financial statements requires management to make assumptions, estimates and judgments that affect the reported amounts of assets, liabilities, revenues, costs and expenses, and the related disclosures of contingencies. Management bases its estimates on various assumptions and historical experience, which are believed to be reasonable; however, due to the inherent nature of estimates, actual results may differ significantly due to changed conditions or assumptions. On a regular basis, management reviews the accounting policies, assumptions, estimates and judgments to ensure that our financial statements are fairly presented in accordance with GAAP. However, because future events and their effects cannot be determined with certainty, actual results could differ from our assumptions and estimates, and such differences could be material. Management believes that the following critical accounting estimates and judgments have a significant impact on our financial statements.

## BUSINESS COMBINATIONS

Assets acquired and liabilities assumed in a business combination are recognized and measured based on their estimated fair values at the acquisition date, while the acquisition-related costs are expensed as incurred. Any excess of the purchase consideration when compared to the fair value of the net tangible and intangible assets acquired is recorded as goodwill. We engaged independent valuation specialists to assist with the determination of the fair value of assets acquired, liabilities assumed, noncontrolling interest, and goodwill, for the acquisitions. If the initial accounting for the business combination is incomplete by the end of the reporting period in which the acquisition occurs, an estimate will be recorded. Subsequent to the acquisition date, and not later than one year from the acquisition date, we will record any material adjustments to the initial estimate based on new information obtained that would have existed as of the date of the acquisition. Any adjustment that arises from information obtained that did not exist as of the date of the acquisition will be recorded in the period the adjustment arises.

## VALUATION OF GOODWILL AND OTHER LONG-LIVED ASSETS

The valuation of goodwill and other long-lived assets includes various assumptions and are considered critical accounting estimates. Refer to "–Market Risks" above for additional information.

## MINERAL RESERVES

We regularly evaluate, and engage QPs to review and validate, our mineral reserves and update them as required in accordance with Subpart 1300 of Regulation S-K. We perform an in-depth evaluation of our mineral reserve estimates by mine on a periodic basis, in addition to routine annual assessments. The determination of mineral reserves requires us and third-party QPs to make significant estimates and assumptions related to key inputs, including, but not limited to, (1) the determination of the size and scope of the iron ore body through technical modeling, (2) the estimates of future iron ore prices, production costs and capital expenditures, and (3) management's mine plan for the proven and probable mineral reserves. The significant estimates and assumptions could be affected by future industry conditions, geological conditions and ongoing mine planning. Additional capital and development expenditures may be required to maintain effective production capacity. Generally, as mining operations progress, haul distances increase. Alternatively, changes in economic conditions or the expected quality of mineral resources and reserves could decrease effective production capacity. Technological progress could alleviate such factors or increase capacity of mineral reserves.

Table of Contents

We use our mineral reserve estimates, combined with our estimated annual production levels, to determine the mine closure dates utilized in recording the fair value liability for asset retirement obligations for our active operating mines. Refer to NOTE 13 - ASSET RETIREMENT OBLIGATIONS, for further information. Since the liability represents the present value of the expected future obligation, a significant change in mineral reserves or mine lives could have a substantial effect on the recorded obligation. We also utilize mineral reserves for evaluating potential impairments of goodwill and mine asset groups as they are indicative of future cash flows and in determining maximum useful lives utilized to calculate depreciation, depletion and amortization of long-lived mine assets. The consolidated asset retirement obligation balance was $520 million as of December 31, 2022, of which $196 million related to active iron ore mine operations. The total goodwill balance associated with our Steelmaking reportable segment was $956 million as of December 31, 2022. The total asset balance associated with our Steelmaking reportable segment was $18,070 million as of December 31, 2022, of which $1,559 million related to long-lived assets associated with our combined iron ore mine asset groups. Depreciation, depletion and amortization expense for our combined iron ore mine asset groups was $161 million for the year ended December 31, 2022. Increases or decreases in mineral reserves or mine lives could significantly affect these items.

## ASSET RETIREMENT OBLIGATIONS

The accrued closure obligation is predominantly related to our indefinitely idled and closed iron ore mining operations and provides for contractual and legal obligations associated with the eventual closure of those operations. We perform an in-depth evaluation of the liability every three years in addition to our routine annual assessments. In 2020, we employed third-party specialists to assist in the evaluation. Our obligations are determined based on detailed estimates adjusted for factors that a market participant would consider (e.g., inflation, overhead and profit), which are escalated at an assumed rate of inflation to the estimated closure dates and then discounted using the current credit-adjusted risk-free interest rate. The estimate also incorporates incremental increases in the closure cost estimates and changes in estimates of mine lives for our active mine sites. The closure date for each of our active mine sites is determined based on the exhaustion date of the remaining mineral reserves, which is dependent on our estimate of mineral reserves. The estimated obligations for our active mine sites are particularly sensitive to the impact of changes in mine lives given the difference between the inflation and discount rates. The closure dates for a majority of our steelmaking facilities are indefinite, and as such, the asset retirement obligations are recorded at present values using estimated ranges of the economic lives of the underlying assets. Changes in the base estimates of legal and contractual closure costs due to changes in legal or contractual requirements, available technology, inflation, overhead or profit rates also could have a significant impact on the recorded obligations. Refer to NOTE 13 - ASSET RETIREMENT OBLIGATIONS, for further information.

## ENVIRONMENTAL REMEDIATION COSTS

We have a formal policy for environmental protection and remediation. Our obligations for known environmental matters at active and closed operations have been recognized based on estimates of the cost of investigation and remediation at each facility. If the obligation can only be estimated as a range of possible amounts, with no specific amount being more likely, the minimum of the range is accrued. Management reviews its environmental remediation sites quarterly to determine if additional cost adjustments or disclosures are required. The characteristics of environmental remediation obligations, where information concerning the nature and extent of clean-up activities is not immediately available and which are subject to changes in regulatory requirements, result in a significant risk of increase to the obligations as they mature. Expected future expenditures are discounted to present value unless the amount and timing of the cash disbursements cannot be reasonably estimated.

## INCOME TAXES

Our income tax expense, deferred tax assets and liabilities and reserves for unrecognized tax benefits reflect management's best assessment of estimated future taxes to be paid. We are subject to income taxes in the U.S. and various foreign jurisdictions. Significant judgments and estimates are required in determining the consolidated income tax expense.

Deferred income taxes arise from temporary differences between tax and financial statement recognition of revenue and expense. In evaluating our ability to recover our deferred tax assets, we consider all available positive and negative evidence, including scheduled reversals of deferred tax liabilities, projected future taxable income, tax planning strategies and recent financial operations. In projecting future taxable income, we begin with historical results adjusted for the results of discontinued operations and changes in accounting policies and incorporate assumptions including the amount of future state, federal and foreign pretax operating income, the reversal of temporary differences, and the implementation of feasible and prudent tax planning strategies. These assumptions require significant judgment about the forecasts of future taxable income and are consistent with the plans and estimates we are using to manage the underlying businesses.

At December 31, 2022 and 2021, we had a valuation allowance of $390 million and $409 million, respectively, against our deferred tax assets. At December 31, 2022 and 2021, our U.S. deferred tax assets were $48 million and $70 million, respectively, and our foreign deferred tax assets were $342 million and $339 million, respectively.

Our losses in Luxembourg in recent periods represent sufficient negative evidence to require a full valuation allowance against the deferred tax assets in that jurisdiction. We intend to maintain a valuation allowance against the deferred tax assets related to these operating losses, unless and until sufficient positive evidence exists to support the realization of such assets.

Changes in tax laws and rates also could affect recorded deferred tax assets and liabilities in the future. The calculation of our tax liabilities involves dealing with uncertainties in the application of complex tax laws and regulations in various jurisdictions across our global operations. The ultimate impact of U.S. income tax reform legislation may differ from our current estimates due to changes in the interpretations and assumptions made as well as additional regulatory guidance that may be issued.

[Table of Contents](#)

Accounting for uncertainty in income taxes recognized in the financial statements requires that a tax benefit from an uncertain tax position be recognized when it is more likely than not that the position will be sustained upon examination, including resolutions of any related appeals or litigation processes, based on technical merits.

We recognize tax liabilities in accordance with *ASC 740, Income Taxes,* and we adjust these liabilities when our judgment changes because of evaluation of new information not previously available. Due to the complexity of some of these uncertainties, the ultimate resolution may result in payment that is materially different from our current estimate of the tax liabilities. These differences will be reflected as increases or decreases to income tax expense in the period in which they are determined. Refer to NOTE 11 - INCOME TAXES, for further information.

## EMPLOYEE RETIREMENT BENEFIT OBLIGATIONS

We sponsor various defined benefit pension plans and OPEB plans for certain current employees and retirees. For accounting purposes, we use various actuarial assumptions and methodologies to measure the plan obligations, assets and related net periodic benefit expense at the end of each year. These assumptions include discount rates, expected return on plan assets, mortality rates, rates of compensation increase, healthcare trend rates and certain demographic assumptions. Assumptions and calculations are reviewed by management and reflect our best estimates and judgment. Future changes in assumptions or differences between actual and expected can significantly impact the future funded status of our plans as well as their related net periodic benefit expense.

We believe discount rates and expected return on assets are the most critical assumptions. The discount rates used to measure plan liabilities as of the December 31 measurement date are determined individually for each plan. The discount rates are determined by matching the projected cash flows used to determine the plan liabilities to a projected yield curve of high-quality corporate bonds available at the measurement date. Discount rates for expense are calculated using the granular approach for each plan.

The expected return on plan assets are calculated on a plan-by-plan basis and take into account each plan's strategic asset allocation. The calculation of rates by asset class are based primarily on our future expected returns and take into consideration the duration of the cash flows, active management and fees. The difference between our expected return on plan assets assumptions and the actual returns are recorded in AOCI and ultimately affects future earnings in subsequent years. Although our actual returns will likely differ from our estimate on any given year, the returns over the long term are expected to match our assumptions. In 2023, our weighted average expected return on assets for pension and OPEB plans will increase from 6.87% to 7.66% and from 4.86% to 5.87%, respectively. The increase is primarily related to a shift in investment strategy and asset mix for $2.9 billion of our pension and OPEB assets, to further align to the Company-wide investment strategy.

Cumulative actuarial gains and losses will be amortized to expense using the corridor method, where gains and losses are recognized if they exceed 10% of the greater of the fair value of plan assets or the plans' benefit obligations. The amortization period will vary by plan.

The following are sensitivities of potential further changes in these key assumptions on the estimated 2023 pension and OPEB expense and the pension and OPEB obligations as of December 31, 2022:

| (In millions) | Increase (Decrease) in Expense | | | Increase in Benefit Obligation | |
|---|---|---|---|---|---|
| | Pension | OPEB | | Pension | OPEB |
| Decrease discount rate 0.25% | $ (2) | $ | 2 | $ 92 | $ 28 |
| Decrease return on assets 1.00% | 41 | | 7 | N/A | N/A |

Refer to NOTE 9 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS for further information.

## FORWARD-LOOKING STATEMENTS

This report contains statements that constitute "forward-looking statements" within the meaning of the federal securities laws. As a general matter, forward-looking statements relate to anticipated trends and expectations rather than historical matters. Forward-looking statements are subject to uncertainties and factors relating to our operations and business environment that are difficult to predict and may be beyond our control. Such uncertainties and factors may cause actual results to differ materially from those expressed or implied by the forward-looking statements. These statements speak only as of the date of this report, and we undertake no ongoing obligation, other than that imposed by law, to update these statements. Investors are cautioned not to place undue reliance on forward-looking statements. Uncertainties and risk factors that could affect our future performance and cause results to differ from the forward-looking statements in this report include, but are not limited to:

- continued volatility of steel, iron ore and scrap metal market prices, which directly and indirectly impact the prices of the products that we sell to our customers;

- uncertainties associated with the highly competitive and cyclical steel industry and our reliance on the demand for steel from the automotive industry, which has been experiencing supply chain disruptions, such as the semiconductor shortage, and higher consumer interest rates, which could result in lower steel volumes being demanded;

- potential weaknesses and uncertainties in global economic conditions, excess global steelmaking capacity, oversupply of iron ore, prevalence of steel imports and reduced market demand, including as a result of inflationary pressures, the COVID-19 pandemic, conflicts or otherwise;

- severe financial hardship, bankruptcy, temporary or permanent shutdowns or operational challenges of one or more of our major customers, including customers in the automotive market, key suppliers or contractors, which, among other adverse effects, could disrupt our operations or lead to reduced demand for our products, increased difficulty collecting receivables, and customers and/or suppliers asserting force majeure or other reasons for not performing their contractual obligations to us;

- disruptions to our operations relating to an infectious disease outbreak or the COVID-19 pandemic, including workforce challenges and the risk that novel variants will prove resistant to existing vaccines or that new or continuing pandemic lockdowns in China will impact our ability to source certain critical supplies in a timely and predictable manner;

- risks related to U.S. government actions with respect to Section 232, the USMCA and/or other trade agreements, tariffs, treaties or policies, as well as the uncertainty of obtaining and maintaining effective antidumping and countervailing duty orders to counteract the harmful effects of unfairly traded imports;

- impacts of existing and increasing governmental regulation, including potential environmental regulations relating to climate change and carbon emissions, and related costs and liabilities, including failure to receive or maintain required operating and environmental permits, approvals, modifications or other authorizations of, or from, any governmental or regulatory authority and costs related to implementing improvements to ensure compliance with regulatory changes, including potential financial assurance requirements, and reclamation and remediation obligations;

- potential impacts to the environment or exposure to hazardous substances resulting from our operations;

- our ability to maintain adequate liquidity, our level of indebtedness and the availability of capital could limit our financial flexibility and cash flow necessary to fund working capital, planned capital expenditures, acquisitions, and other general corporate purposes or ongoing needs of our business;

- our ability to reduce our indebtedness or return capital to shareholders within the currently expected timeframes or at all;

- adverse changes in credit ratings, interest rates, foreign currency rates and tax laws, including adverse impacts as a result of the Inflation Reduction Act;

- the outcome of, and costs incurred in connection with, lawsuits, claims, arbitrations or governmental proceedings relating to commercial and business disputes, antitrust claims, environmental matters, government investigations, occupational or personal injury claims, property damage, labor and employment matters, or suits involving legacy operations and other matters;

- uncertain availability or cost, due to inflation or otherwise, of critical manufacturing equipment and spare parts;

- supply chain disruptions or changes in the cost, quality or availability of energy sources, including electricity, natural gas and diesel fuel, or critical raw materials and supplies, including iron ore, industrial gases, graphite electrodes, scrap metal, chrome, zinc, coke and metallurgical coal;

- problems or disruptions associated with transporting products to our customers, moving manufacturing inputs or products internally among our facilities, or suppliers transporting raw materials to us;

- the risk that the cost or time to implement a strategic or sustaining capital project may prove to be greater than originally anticipated;

- uncertainties associated with natural or human-caused disasters, adverse weather conditions, unanticipated geological conditions, critical equipment failures, infectious disease outbreaks, tailings dam failures and other unexpected events;

- cybersecurity incidents relating to, disruptions in, or failures of, information technology systems that are managed by us or third parties that host or have access to our data and systems, including the loss, theft or corruption of sensitive or essential business or personal information and the inability to access or control systems;

- liabilities and costs arising in connection with any business decisions to temporarily or indefinitely idle or permanently close an operating facility or mine, which could adversely impact the carrying value of associated assets and give rise to impairment charges or closure and reclamation obligations, as well as uncertainties associated with restarting any previously idled operating facility or mine;

- our level of self-insurance and our ability to obtain sufficient third-party insurance to adequately cover potential adverse events and business risks;

- uncertainties associated with our ability to meet customers' and suppliers' decarbonization goals and reduce our GHG emissions in alignment with our own announced targets;

- challenges to maintaining our social license to operate with our stakeholders, including the impacts of our operations on local communities, reputational impacts of operating in a carbon-intensive industry that produces GHG emissions, and our ability to foster a consistent operational and safety track record;

- our actual economic mineral reserves or reductions in current mineral reserve estimates, and any title defect or loss of any lease, license, easement or other possessory interest for any mining property;

- our ability to maintain satisfactory labor relations with unions and employees;

- unanticipated or higher costs associated with pension and OPEB obligations resulting from changes in the value of plan assets or contribution increases required for unfunded obligations;

- uncertain availability or cost of skilled workers to fill critical operational positions and potential labor shortages caused by experienced employee attrition or otherwise, as well as our ability to attract, hire, develop and retain key personnel;

- the amount and timing of any repurchases of our common shares; and

- potential significant deficiencies or material weaknesses in our internal control over financial reporting.

For additional factors affecting our businesses, refer to *Part I – ITEM 1A. RISK FACTORS.* You are urged to carefully consider these risk factors.

Forward-looking and other statements in this Annual Report on Form 10-K regarding our GHG reduction plans and goals are not an indication that these statements are necessarily material to investors or required to be disclosed in our filings with the SEC. In addition, historical, current and forward-looking GHG-related statements may be based on standards for measuring progress that are still developing, internal controls and processes that continue to evolve and assumptions that are subject to change in the future.

## ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Information regarding our market risk is presented under the caption "Market Risks," which is included in *ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS* and is incorporated by reference and made a part hereof.

58 | **CLF** 2022 FORM 10-K

Table of Contents

## ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

## STATEMENTS OF CONSOLIDATED FINANCIAL POSITION
### CLEVELAND-CLIFFS INC. AND SUBSIDIARIES

| | December 31, | |
|---|---|---|
| (In millions, except share information) | 2022 | 2021 |
| **ASSETS** | | |
| **Current assets:** | | |
| Cash and cash equivalents | $ 26 | $ 48 |
| Accounts receivable, net | 1,960 | 2,154 |
| Inventories | 5,130 | 5,188 |
| Other current assets | 306 | 263 |
| Total current assets | 7,422 | 7,653 |
| **Non-current assets:** | | |
| Property, plant and equipment, net | 9,070 | 9,186 |
| Goodwill | 1,130 | 1,116 |
| Pension and OPEB, asset | 356 | 223 |
| Other non-current assets | 777 | 797 |
| **TOTAL ASSETS** | $ 18,755 | $ 18,975 |
| **LIABILITIES AND EQUITY** | | |
| **Current liabilities:** | | |
| Accounts payable | $ 2,186 | $ 2,073 |
| Accrued employment costs | 429 | 585 |
| Other current liabilities | 934 | 903 |
| Total current liabilities | 3,549 | 3,561 |
| **Non-current liabilities:** | | |
| Long-term debt | 4,249 | 5,238 |
| Pension liability, non-current | 473 | 578 |
| OPEB liability, non-current | 585 | 2,383 |
| Deferred income taxes | 590 | 112 |
| Other non-current liabilities | 1,267 | 1,329 |
| **TOTAL LIABILITIES** | 10,713 | 13,201 |
| Commitments and contingencies (See Note 20) | | |
| **Equity:** | | |
| Common Shares - par value $0.125 per share | | |
| Authorized - 1,200,000,000 shares (2021 - 1,200,000,000 shares); | | |
| Issued - 531,051,530 shares (2021 - 506,832,537 shares); | | |
| Outstanding - 513,340,779 shares (2021 - 500,158,955 shares) | 66 | 63 |
| Capital in excess of par value of shares | 4,871 | 4,892 |
| Retained earnings (deficit) | 1,334 | (1) |
| Cost of 17,710,751 common shares in treasury (2021 -6,673,582 shares) | (310) | (82) |
| Accumulated other comprehensive income | 1,830 | 618 |
| Total Cliffs shareholders' equity | 7,791 | 5,490 |
| Noncontrolling interest | 251 | 284 |
| **TOTAL EQUITY** | 8,042 | 5,774 |
| **TOTAL LIABILITIES AND EQUITY** | $ 18,755 | $ 18,975 |

*The accompanying notes are an integral part of these consolidated financial statements.*

## STATEMENTS OF CONSOLIDATED OPERATIONS
### CLEVELAND-CLIFFS INC. AND SUBSIDIARIES

| (In millions, except per share amounts) | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2022 | | 2021 | | 2020 |
| Revenues | $ | 22,989 | $ | 20,444 | $ | 5,354 |
| Operating costs: | | | | | | |
| Cost of goods sold | | (20,471) | | (15,910) | | (5,102) |
| Selling, general and administrative expenses | | (465) | | (422) | | (244) |
| Acquisition-related costs | | (4) | | (20) | | (90) |
| Miscellaneous – net | | (110) | | (80) | | (60) |
| Total operating costs | | (21,050) | | (16,432) | | (5,496) |
| **Operating income (loss)** | | **1,939** | | 4,012 | | (142) |
| Other income (expense): | | | | | | |
| Interest expense, net | | (276) | | (337) | | (238) |
| Gain (loss) on extinguishment of debt | | (75) | | (88) | | 130 |
| Net periodic benefit credits other than service cost component | | 212 | | 210 | | 54 |
| Other non-operating income (loss) | | (4) | | 6 | | 3 |
| Total other expense | | (143) | | (209) | | (51) |
| **Income (loss) from continuing operations before income taxes** | | **1,796** | | 3,803 | | (193) |
| Income tax benefit (expense) | | (423) | | (773) | | 111 |
| **Income (loss) from continuing operations** | | **1,373** | | 3,030 | | (82) |
| Income from discontinued operations, net of tax | | 3 | | 3 | | 1 |
| **Net income (loss)** | | **1,376** | | 3,033 | | (81) |
| Income attributable to noncontrolling interest | | (41) | | (45) | | (41) |
| **Net income (loss) attributable to Cliffs shareholders** | $ | **1,335** | $ | 2,988 | $ | (122) |
| | | | | | | |
| **Earnings (loss) per common share attributable to Cliffs shareholders - basic** | | | | | | |
| Continuing operations | $ | 2.57 | $ | 5.62 | $ | (0.32) |
| Discontinued operations | | — | | 0.01 | | — |
| | $ | 2.57 | $ | 5.63 | $ | (0.32) |
| **Earnings (loss) per common share attributable to Cliffs shareholders - diluted** | | | | | | |
| Continuing operations | $ | 2.55 | $ | 5.35 | $ | (0.32) |
| Discontinued operations | | — | | 0.01 | | — |
| | $ | 2.55 | $ | 5.36 | $ | (0.32) |

*The accompanying notes are an integral part of these consolidated financial statements.*

## STATEMENTS OF CONSOLIDATED COMPREHENSIVE INCOME
### CLEVELAND-CLIFFS INC. AND SUBSIDIARIES

| (In millions) | | Year Ended December 31, | | |
| --- | --- | --- | --- | --- |
| | | **2022** | 2021 | 2020 |
| Net income (loss) | $ | **1,376** | $ 3,033 | (81) |
| Other comprehensive income (loss): | | | | |
| Changes in pension and OPEB, net of tax | | **1,298** | 684 | 181 |
| Changes in derivative financial instruments, net of tax | | **(84)** | 69 | 2 |
| Changes in foreign currency translation | | **(2)** | (2) | 3 |
| Total other comprehensive income | | **1,212** | 751 | 186 |
| **Comprehensive income** | | **2,588** | 3,784 | 105 |
| Comprehensive income attributable to noncontrolling interests | | **(41)** | (45) | (41) |
| **Comprehensive income attributable to Cliffs shareholders** | $ | **2,547** | $ 3,739 | $ 64 |

*The accompanying notes are an integral part of these consolidated financial statements.*

## STATEMENTS OF CONSOLIDATED CASH FLOWS
### CLEVELAND-CLIFFS INC. AND SUBSIDIARIES

| (In millions) | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| **OPERATING ACTIVITIES** | | | |
| Net income (loss) | $ 1,376 | $ 3,033 | $ (81) |
| Adjustments to reconcile net income (loss) to net cash provided (used) by operating activities: | | | |
| Depreciation, depletion and amortization | 1,034 | 897 | 308 |
| Amortization of inventory step-up | — | 161 | 96 |
| Deferred income taxes | 90 | 767 | (101) |
| Pension and OPEB credits | (132) | (103) | (23) |
| Loss (gain) on extinguishment of debt | 75 | 88 | (130) |
| Impairment of long-lived assets | 29 | 1 | — |
| Other | 122 | 138 | (70) |
| Changes in operating assets and liabilities, net of business combination: | | | |
| Receivables and other assets | 177 | (722) | (91) |
| Inventories | 64 | (1,370) | (146) |
| Income taxes | (22) | (136) | 50 |
| Pension and OPEB payments and contributions | (204) | (343) | (75) |
| Payables, accrued expenses and other liabilities | (186) | 374 | 5 |
| Net cash provided (used) by operating activities | 2,423 | 2,785 | (258) |
| **INVESTING ACTIVITIES** | | | |
| Purchase of property, plant and equipment | (943) | (705) | (525) |
| Acquisition of FPT, net of cash acquired | (31) | (761) | — |
| Acquisition of ArcelorMittal USA, net of cash acquired | — | 54 | (658) |
| Acquisition of AK Steel, net of cash acquired | — | — | (869) |
| Other investing activities | 38 | 33 | 10 |
| Net cash used by investing activities | (936) | (1,379) | (2,042) |
| **FINANCING ACTIVITIES** | | | |
| Series B Redeemable Preferred Stock redemption | — | (1,343) | — |
| Proceeds from issuance of common shares | — | 322 | — |
| Repurchase of common shares | (240) | — | — |
| Proceeds from issuance of debt | — | 1,000 | 1,763 |
| Debt issuance costs | — | (20) | (76) |
| Repayments of debt | (1,358) | (1,372) | (1,023) |
| Borrowings under credit facilities | 5,749 | 5,962 | 2,060 |
| Repayments under credit facilities | (5,494) | (5,889) | (550) |
| Other financing activities | (166) | (130) | (115) |
| Net cash provided (used) by financing activities | (1,509) | (1,470) | 2,059 |
| Net decrease in cash and cash equivalents | (22) | (64) | (241) |
| Cash and cash equivalents at beginning of year | 48 | 112 | 353 |
| Cash and cash equivalents at end of year | $ 26 | $ 48 | $ 112 |

*The accompanying notes are an integral part of these consolidated financial statements.*

## STATEMENTS OF CONSOLIDATED CHANGES IN EQUITY
### CLEVELAND-CLIFFS INC. AND SUBSIDIARIES

| | Cliffs Shareholders | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| (In millions) | Number of Common Shares Outstanding | Par Value of Common Shares Issued | Capital in Excess of Par Value of Shares | Retained Earnings (Deficit) | Common Shares in Treasury | AOCI (Loss) | Non-controlling Interest | Total |
| December 31, 2019 | 271 | $ 37 | $ 3,873 | $ (2,842) | $ (391) | $ (319) | $ — | $ 358 |
| Comprehensive income (loss) | — | — | — | (122) | — | 186 | 41 | 105 |
| Stock and other incentive plans | 2 | — | (24) | — | 37 | — | — | 13 |
| Acquisition of AK Steel | 127 | 16 | 602 | — | — | — | 330 | 948 |
| Acquisition of ArcelorMittal USA | 78 | 10 | 980 | — | — | — | 13 | 1,003 |
| Common share dividends ($0.06 per share) | — | — | — | (25) | — | — | — | (25) |
| Net distributions to noncontrolling interests | — | — | — | — | — | — | (61) | (61) |
| December 31, 2020 | 478 | $ 63 | $ 5,431 | $ (2,989) | $ (354) | $ (133) | $ 323 | $ 2,341 |
| Comprehensive income | — | — | — | 2,988 | — | 751 | 45 | 3,784 |
| Issuance of common shares | 20 | — | 78 | — | 244 | — | — | 322 |
| Stock and other incentive plans | 2 | — | (8) | — | 28 | — | — | 20 |
| Series B Redeemable Preferred Stock redemption | — | — | (604) | — | — | — | — | (604) |
| 1.500% 2025 Convertible Senior Notes redemption | — | — | (5) | — | — | — | — | (5) |
| Acquisition of ArcelorMittal USA - Measurement period adjustments | — | — | — | — | — | — | (22) | (22) |
| Net distributions to noncontrolling interests | — | — | — | — | — | — | (62) | (62) |
| December 31, 2021 | 500 | $ 63 | $ 4,892 | $ (1) | $ (82) | $ 618 | $ 284 | $ 5,774 |
| Comprehensive income | — | — | — | 1,335 | — | 1,212 | 41 | 2,588 |
| Stock and other incentive plans | 2 | — | 7 | — | 12 | — | — | 19 |
| 1.500% 2025 Convertible Senior Notes redemption | 24 | 3 | (28) | — | — | — | — | (25) |
| Common share repurchases | (13) | — | — | — | (240) | — | — | (240) |
| Net distributions to noncontrolling interests | — | — | — | — | — | — | (74) | (74) |
| December 31, 2022 | 513 | $ 66 | $ 4,871 | $ 1,334 | $ (310) | $ 1,830 | $ 251 | $ 8,042 |

*The accompanying notes are an integral part of these consolidated financial statements.*

A006606

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### CLEVELAND-CLIFFS INC. AND SUBSIDIARIES

## NOTE 1 - BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES

### BUSINESS, CONSOLIDATION AND PRESENTATION

#### NATURE OF BUSINESS

We are the largest flat-rolled steel producer in North America. Founded in 1847 as a mine operator, we are also the largest manufacturer of iron ore pellets in North America.  We are vertically integrated from mined raw materials, direct reduced iron and ferrous scrap to primary steelmaking and downstream finishing, stamping, tooling and tubing. We are the largest supplier of steel to the automotive industry in North America and serve a diverse range of markets due to our comprehensive offering of flat-rolled steel products. Headquartered in Cleveland, Ohio, we employ approximately 27,000 people across our operations in the United States and Canada, of which approximately 19,000 were represented by labor unions under various agreements. More than 90% of our hourly workforce is represented by three prominent unions - USW, UAW and IAM.

Unless otherwise noted, discussion of our business and results of operations in this Annual Report on Form 10-K refers to our continuing operations.

#### BUSINESS OPERATIONS

We are organized into four operating segments based on differentiated products, Steelmaking, Tubular, Tooling and Stamping, and European Operations. We primarily operate through one reportable segment – the Steelmaking segment.

#### BASIS OF CONSOLIDATION

The condensed consolidated financial statements consolidate our accounts and the accounts of our wholly owned subsidiaries, all subsidiaries in which we have a controlling interest and VIEs for which we are the primary beneficiary. All intercompany transactions and balances are eliminated upon consolidation.

#### INVESTMENTS IN AFFILIATES

We have investments in several businesses accounted for using the equity method of accounting. These investments are included within our Steelmaking segment. We review an investment for impairment when circumstances indicate that a loss in value below its carrying amount is other than temporary.

Our investment in affiliates of $133 million and $128 million as of December 31, 2022 and 2021, respectively, was classified in *Other non-current assets.*

### SIGNIFICANT ACCOUNTING POLICIES

We consider the following policies to be beneficial in understanding the judgments involved in the preparation of our consolidated financial statements and the uncertainties that could impact our financial condition, results of operations and cash flows. Certain prior period amounts have been reclassified to conform with the current year presentation.

#### USE OF ESTIMATES

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Our mineral reserves; future realizable cash flow; environmental, reclamation and closure obligations; valuation of business combinations, goodwill, long-lived assets, inventory, tax assets and post-employment, post-retirement and other employee benefit liabilities; reserves for contingencies and litigation require the use of various management estimates and assumptions. Actual results could differ from estimates. Management reviews its estimates on an ongoing basis. Changes in facts and circumstances may alter such estimates and affect the results of operations and financial position in future periods.

#### BUSINESS COMBINATIONS

Assets acquired and liabilities assumed in a business combination are recognized and measured based on their estimated fair values at the acquisition date, while the acquisition-related costs are expensed as incurred. Any excess of the purchase consideration when compared to the fair value of the net tangible and intangible assets acquired is recorded as goodwill. We engaged independent valuation specialists to assist with the determination of the fair value of assets acquired, liabilities assumed, noncontrolling interest, and goodwill, for the acquisitions. If the initial accounting for the business combination is incomplete by the end of the reporting period in which the acquisition occurs, an estimate will be recorded. Subsequent to the acquisition date, and not later than one year from the acquisition date, we will record any material adjustments to the initial estimate based on new information obtained that would have existed as of the date of the acquisition. Any adjustment that arises from information obtained that did not exist as of the date of the acquisition will be recorded in the period the adjustment arises.

#### CASH AND CASH EQUIVALENTS

Cash and cash equivalents include cash on hand and on deposit as well as all short-term securities held for the primary purpose of general liquidity. We routinely monitor and evaluate counterparty credit risk related to the financial institutions in which our short-term investment securities are held. Where right of offset exists, we report cash balances net.

Table of Contents

## TRADE ACCOUNTS RECEIVABLE AND ALLOWANCE FOR CREDIT LOSS

Trade accounts receivable are recorded at the point control transfers and represent the amount of consideration we expect to receive in exchange for transferred goods and do not bear interest. We establish provisions for expected lifetime losses on accounts receivable at the time a receivable is recorded based on historical experience, customer credit quality and forecasted economic conditions. We regularly review our accounts receivable balances and the allowance for credit loss and establish or adjust the allowance as necessary using the specific identification method. We evaluate the aggregation and risk characteristics of receivable pools and develop loss rates that reflect historical collections, current forecasts of future economic conditions over the time horizon we are exposed to credit risk, and payment terms or conditions that may materially affect future forecasts.

## INVENTORIES

Inventories are generally stated at the lower of cost or net realizable value using average cost, excluding depreciation and amortization. Certain iron ore inventories are stated at the lower of cost or market using the LIFO method.

## DERIVATIVE FINANCIAL INSTRUMENTS AND HEDGING ACTIVITIES

We are exposed to certain risks related to the ongoing operations of our business, including those caused by changes in commodity prices and energy rates. We have established policies and procedures, including the use of certain derivative instruments, to manage such risks.

Derivative financial instruments are recognized as either assets or liabilities on the Statements of Consolidated Financial Position and measured at fair value. On the date a qualifying hedging instrument is executed, we designate the hedging instrument as a hedge of the variability of cash flows to be received or paid related to a forecasted transaction (cash flow hedge). We formally document all relationships between hedging instruments and hedged items, as well as our risk-management objective and strategy for undertaking various hedge transactions. This process includes linking all derivatives that are designated as cash flow hedges to specific firm commitments or forecasted transactions. We also formally assess, both at the hedge's inception and on an ongoing basis, whether the derivatives that are used in hedging transactions are highly effective in offsetting changes in cash flows of the related hedged items. When it is determined that a derivative is not highly effective as a hedge, we discontinue hedge accounting prospectively and record all future changes in fair value in the period of the instrument's earnings or losses.

For derivative instruments that have been designated as cash flow hedges, the changes in fair value are recorded in *Accumulated other comprehensive income*. Amounts recorded in *Accumulated other comprehensive income* are reclassified to earnings or losses in the period the underlying hedged transaction affects earnings or when the underlying hedged transaction is no longer reasonably possible of occurring.

For derivative instruments that have not been designated as cash flow hedges, changes in fair value are recorded in the period of the instrument's earnings or losses.

## PROPERTY, PLANT AND EQUIPMENT

Our properties are stated at cost less accumulated depreciation. Depreciation of plant and equipment is computed principally by the straight-line method based on estimated useful lives. Depreciation continues to be recognized when operations are idled temporarily. Depreciation and depletion are recorded over the following estimated useful lives:

| Asset Class | Basis | Life |
|---|---|---|
| Land, land improvements and mineral rights | | |
| Land and mineral rights | Units of production | Life of mine |
| Land improvements | Straight line | 20 to 45 years |
| Buildings | Straight line | 20 to 45 years |
| Equipment | Straight line/Double declining balance | 3 to 45 years |

## GOODWILL

Goodwill represents the excess purchase price paid over the fair value of the net assets from an acquisition. Goodwill is not amortized for financial statement purposes, but it is assessed for impairment on an annual basis on October 1 (or more frequently if necessary).

## OTHER INTANGIBLE ASSETS AND LIABILITIES

Intangible assets and liabilities are subject to periodic amortization on a straight-line basis over their estimated useful lives.

## LEASES

We determine if an arrangement contains a lease at inception. We recognize right-of-use assets and lease liabilities associated with leases based on the present value of the future minimum lease payments over the lease term at the commencement date. Lease terms reflect options to extend or terminate the lease when it is reasonably certain that the option will be exercised. Short-term leases (leases with an initial lease term of 12 months or less), right-of-use assets and lease liabilities are not recognized on the Statements of Consolidated Financial Position. Operating lease expense is recognized on a straight-line basis over the lease term.

**ASSET IMPAIRMENT**

We monitor conditions that may affect the carrying value of our long-lived tangible and intangible assets when events and circumstances indicate that the carrying value of the asset groups may not be recoverable. In order to determine if assets have been impaired, assets are grouped and tested at the lowest level for which identifiable, independent cash flows are available ("asset group"). The measurement of the impairment loss to be recognized is based on the difference between the fair value and the carrying value of the asset group. Fair value can be determined using a market approach, income approach or cost approach.

During the year ended December 31, 2022, we concluded that there were no triggering events resulting in the need for an impairment assessment except for the announcement of the permanent closure of Mountain State Carbon, which resulted in a $29 million asset impairment charge during the year.

For the years ended December 31, 2021 and 2020, no impairment indicators were present that would indicate the carrying value of any of our asset groups may not be recoverable; as a result, no impairment assessments were required.

**FAIR VALUE MEASUREMENTS**

*ASC Topic 820, Fair Value Measurements and Disclosures*, establishes a three-level valuation hierarchy for classification of fair value measurements. The valuation hierarchy is based upon the transparency of inputs to the valuation of an asset or liability as of the measurement date. Inputs refer broadly to the assumptions that market participants would use in pricing an asset or liability. Inputs may be observable or unobservable. Observable inputs are inputs that reflect the assumptions market participants would use in pricing the asset or liability developed based on market data obtained from independent sources. Unobservable inputs are inputs that reflect our own views about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances. The three-tier hierarchy of inputs is summarized below:

- Level 1 — Valuation is based upon quoted prices (unadjusted) for identical assets or liabilities in active markets.
- Level 2 — Valuation is based upon quoted prices for similar assets and liabilities in active markets, or other inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.
- Level 3 — Valuation is based upon other unobservable inputs that are significant to the fair value measurement.

The classification of assets and liabilities within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement in its entirety.

**PENSION AND OTHER POSTRETIREMENT BENEFITS**

We offer defined benefit pension plans, defined contribution pension plans and OPEB plans, primarily consisting of retiree healthcare benefits as part of our total compensation and benefits programs.

We recognize the funded or unfunded status of our pension and OPEB obligations on the Statements of Consolidated Financial Position based on the difference between the market value of plan assets and the actuarial present value of our retirement obligations on that date, on a plan-by-plan basis. If the plan assets exceed the pension and OPEB obligations, the amount of the surplus is recorded as an asset; if the pension and OPEB obligations exceed the plan assets, the amount of the underfunded obligations is recorded as a liability. Year-end balance sheet adjustments to pension and OPEB assets and obligations are recorded as *Accumulated other comprehensive income* on the Statements of Consolidated Financial Position.

The actuarial estimates of the PBO (Projected benefit obligation) and APBO (Accumulated postretirement benefit obligation) incorporate various assumptions including the discount rates, the rates of increases in compensation, healthcare cost trend rates, mortality, retirement timing and employee turnover. The discount rate is determined based on the prevailing year-end rates for high-grade corporate bonds with a duration matching the expected cash flow timing of the benefit payments from the various plans. The remaining assumptions are based on our estimates of future events by incorporating historical trends and future expectations. The amount of net periodic cost that is recorded in the Statements of Consolidated Operations consists of several components including service cost, interest cost, expected return on plan assets, and amortization of previously unrecognized amounts. Service cost represents the value of the benefits earned in the current year by the participants. Interest cost represents the cost associated with the passage of time. Certain items, such as plan amendments, gains and/or losses resulting from differences between actual and assumed results for demographic and economic factors affecting the obligations and assets of the plans, and changes in other assumptions are subject to deferred recognition for income and expense purposes. The expected return on plan assets is calculated on a plan-by-plan basis using each plan's strategic asset allocation and our expected long-term capital market return assumptions. Service costs are classified within *Cost of goods sold, Selling, general and administrative expenses* and *Miscellaneous – net* while the interest cost, expected return on assets, amortization of prior service costs/credits, net actuarial gain/loss, and other costs are classified within *Net periodic benefit credits other than service cost component*.

Cumulative actuarial gains and losses will be amortized to expense using the corridor method, where gains and losses are recognized if they exceed 10% of the greater of the fair value of plan assets or the plans' benefit obligations. The amortization period will vary by plan.

## ASSET RETIREMENT OBLIGATIONS

An asset retirement obligation is recognized when incurred if a reasonable estimate of fair value can be made, and is initially measured at fair value. The fair value of the liability is determined as the discounted value of the expected future cash flows. The asset retirement obligation is accreted over time through periodic charges to earnings. In addition, the asset retirement cost is capitalized and amortized over the life of the related asset. Reclamation costs are adjusted periodically to reflect changes in the estimated present value resulting from the passage of time and revisions to the estimates of either the timing or amount of the reclamation costs. We review, on an annual basis, unless otherwise deemed necessary, the asset retirement obligation for each applicable operation in accordance with the provisions of *ASC Topic 410, Asset Retirement and Environmental Obligations*. We perform an in-depth evaluation of the liability every three years in addition to our routine annual assessments.

Future reclamation costs for inactive operations are accrued based on management's best estimate at the end of each period of the costs expected to be incurred at a site. Such cost estimates include, where applicable, ongoing maintenance and monitoring costs. Changes in estimates at inactive operations are reflected in earnings in the period an estimate is revised.

## ENVIRONMENTAL REMEDIATION COSTS

Our operating activities are subject to various laws and regulations governing protection of the environment. We conduct our operations to protect the public health and environment and believe our operations are in compliance with applicable laws and regulations in all material respects. Our environmental liabilities, including obligations for known environmental remediation exposures, have been recognized based on the estimated cost of investigation and remediation at each site. If the cost can only be estimated as a range of possible amounts with no point in the range being more likely, the minimum of the range is accrued. Future expenditures are discounted unless the amount and timing of the cash disbursements cannot be reasonably estimated. It is possible that additional environmental obligations could be incurred, the extent of which cannot be assessed. Potential insurance recoveries have not been reflected in the determination of the liabilities.

## REVENUE RECOGNITION

Sales are recognized when our performance obligations are satisfied. Generally, our performance obligations are satisfied, control of our products is transferred and revenue is recognized at a single point in time, when title transfers to our customer for product shipped according to shipping terms. Shipping and other transportation costs charged to customers are treated as fulfillment activities and are recorded in both revenue and cost of sales at the time control is transferred to the customer.

## REPAIRS AND MAINTENANCE

Repairs, maintenance and replacement of components are expensed as incurred. The cost of major equipment overhauls is capitalized and depreciated over the estimated useful life, which is the period until the next scheduled overhauls. All other planned and unplanned repairs and maintenance costs are expensed when incurred.

## SHARE-BASED COMPENSATION

The fair value of each performance share grant is estimated on the date of grant using a Monte Carlo simulation to forecast relative TSR performance. A correlation matrix of historical and projected stock prices was developed for both the Company and its predetermined peer group of metals and mining companies. The fair value assumes that the performance objective will be achieved. The expected term of the grant represents the time from the grant date to the end of the service period. We estimate the volatility of our common shares and that of the peer group of metals and mining companies using daily price intervals for all companies. The risk-free interest rate is the rate at the grant date on zero-coupon government bonds, with a term commensurate with the remaining performance period.

The fair value of the restricted stock units is determined based on the closing price of our common shares on the grant date.

Upon vesting of share-based compensation awards, we issue shares from treasury shares before issuing new shares. Forfeitures are recognized when they occur.

The fair value of stock options is estimated on the date of grant using a Black-Scholes model using the grant date price of our common shares, the option exercise price, the option's expected term, the volatility of our common shares, the risk-free interest rate and the dividend yield over the option's expected term.

## INCOME TAXES

Income taxes are based on income for financial reporting purposes, calculated using tax rates by jurisdiction, and reflect a current tax liability or asset for the estimated taxes payable or recoverable on the current year tax return and expected annual changes in deferred taxes. Any interest or penalties on income tax are recognized as a component of *Income tax benefit (expense)*.

We account for income taxes under the asset and liability method, which requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the financial statements. Under this method, deferred tax assets and liabilities are determined based on the differences between the financial statement and tax basis of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. The effect of a change in tax rates on deferred tax assets and liabilities is recognized within *Net income (loss)* in the period that includes the enactment date.

We record net deferred tax assets to the extent we believe these assets will more likely than not be realized. In making such determination, we consider all available positive and negative evidence, including scheduled reversals of deferred tax liabilities, projected future taxable income, tax planning strategies and recent financial results of operations.

Accounting for uncertainty in income taxes recognized in the financial statements requires that a tax benefit from an uncertain tax position be recognized when it is more likely than not that the position will be sustained upon examination, including resolutions of any related appeals or litigation processes, based on technical merits.

**FOREIGN CURRENCY**

Our financial statements are prepared with the U.S. dollar as the reporting currency, and the functional currency of all subsidiaries is the U.S. dollar, except for our European Operations for which the functional currency is the Euro.

**EARNINGS PER SHARE**

We present both basic and diluted EPS amounts for continuing operations and discontinued operations. Total basic EPS amounts are calculated by dividing *Net income (loss) attributable to Cliffs shareholders*, less the earnings allocated to any of our outstanding Series B Participating Redeemable Preferred Stock, by the weighted average number of common shares outstanding during the period presented.

Total diluted EPS amounts are calculated by dividing *Net income (loss) attributable to Cliffs shareholders* by the weighted average number of common shares, common share equivalents under stock plans using the treasury-stock method, common share equivalents of the Series B Participating Redeemable Preferred Stock using the if-converted method and the calculated common share equivalents in excess of the conversion rate related to our 1.500% 2025 Convertible Senior Notes using the treasury-stock method. Common share equivalents are excluded from EPS computations in the periods in which they have an anti-dilutive effect.

**VARIABLE INTEREST ENTITIES**

We assess whether we have a variable interest in legal entities in which we have a financial relationship and, if so, whether or not those entities are VIEs. A VIE is an entity with insufficient equity at risk for the entity to finance its activities without additional subordinated financial support or in which equity investors lack the characteristics of a controlling financial interest. If an entity is determined to be a VIE, we evaluate whether we are the primary beneficiary. The primary beneficiary analysis is a qualitative analysis based on power and economics. We conclude that we are the primary beneficiary and consolidate the VIE if we have both (i) the power to direct the activities of the VIE that most significantly influence the VIE's economic performance and (ii) the obligation to absorb losses of, or the right to receive benefits from, the VIE that could potentially be significant to the VIE.

## RECENT ACCOUNTING PRONOUNCEMENTS

**ISSUED AND ADOPTED**

In August 2020, the FASB issued *ASU 2020-06, Debt—Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging—Contracts in Entity's Own Equity (Subtopic 815-40).* This update requires certain convertible instruments to be accounted for as a single liability measured at its amortized cost. Additionally, the update requires the use of the "if-converted" method, removing the treasury stock method, when calculating diluted shares. We utilized the modified retrospective method of adoption; using this approach, the guidance was applied to transactions outstanding as of the beginning of the fiscal year in which the amendment was adopted. On January 18, 2022, we redeemed all of our outstanding 1.500% 2025 Convertible Senior Notes; therefore, there was a de minimis impact as a result of our adoption of this update.

**ISSUED AND NOT YET EFFECTIVE**

In September 2022, the FASB issued *ASU No. 2022-04, Liabilities - Supplier Finance Programs (Subtopic 405-50): Disclosure of Supplier Finance Program Obligations.* This guidance requires annual and interim disclosure of the key terms of outstanding supplier finance programs and a roll-forward of the related obligations. The new standard does not affect the recognition, measurement or financial statement presentation of the supplier finance program obligations. These amendments are effective for fiscal years beginning after December 15, 2022, except for the amendment on roll-forward information, which is effective for fiscal years beginning after December 15, 2023. Upon adoption, we may be required to include additional disclosures to the extent we have material supplier finance program obligations.

## NOTE 2 - SUPPLEMENTARY FINANCIAL STATEMENT INFORMATION

## ALLOWANCE FOR CREDIT LOSSES

The following is a roll-forward of our allowance for credit losses associated with *Accounts receivable, net*:

| (In millions) | 2022 | | 2021 | |
|---|---|---|---|---|
| Allowance for credit losses as of January 1 | $ | (4) | $ | (5) |
| Decrease in allowance | | — | | 1 |
| Allowance for credit losses as of December 31 | $ | (4) | $ | (4) |

## INVENTORIES

The following table presents the detail of our *Inventories* on the Statements of Consolidated Financial Position:

| | December 31, | |
|---|---|---|
| (In millions) | **2022** | 2021 |
| Product inventories | | |
|   Finished and semi-finished goods | $ **2,971** | $ 2,814 |
|   Raw materials | **1,794** | 2,070 |
|    Total product inventories | **4,765** | 4,884 |
| Manufacturing supplies and critical spares | **365** | 304 |
| Inventories | $ **5,130** | $ 5,188 |

The excess of current cost over LIFO cost of iron ore inventories was $69 million and $124 million at December 31, 2022 and 2021, respectively. As of December 31, 2022, the product inventory balance for iron ore inventories decreased, resulting in a liquidation of a LIFO layer in 2022. The effect of the inventory reduction was an increase in *Cost of goods sold* of $36 million in the Statements of Consolidated Operations for the year ended December 31, 2022. As of December 31, 2021, the product inventory balance for iron ore inventories increased, resulting in a LIFO increment in 2021. The effect of the inventory build was an increase in *Inventories* of $45 million on the Statements of Consolidated Financial Position for the year ended December 31, 2021.

## CASH FLOW INFORMATION

A reconciliation of capital additions to cash paid for capital expenditures is as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| (In millions) | **2022** | 2021 | 2020 |
| Capital additions | $ **1,033** | $ 857 | $ 483 |
| Less: | | | |
|   Non-cash accruals | **35** | 102 | (86) |
|   Right-of-use assets - finance leases | **55** | 50 | 44 |
| Cash paid for capital expenditures including deposits | $ **943** | $ 705 | $ 525 |

Additionally, included within *Other investing activities* on the Statements of Consolidated Cash Flows are grant reimbursements related to governmental funded capital projects. For the years ended December 31, 2022 and 2021, grant reimbursements were $27 million and $2 million, respectively.

Cash payments (receipts) for interest and income taxes are as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| (In millions) | **2022** | 2021 | 2020 |
| Taxes paid on income | $ **334** | $ 166 | $ 5 |
| Income tax refunds | **(3)** | (16) | (120) |
| Interest paid on debt obligations net of capitalized interest[1] | **249** | 299 | 170 |

[1] Capitalized interest was $9 million, $6 million and $53 million for the years ended December 31, 2022, 2021 and 2020, respectively.

Table of Contents

Other non-cash investing and financing activities are as follows:

| (In millions) | Year Ended December 31, | | |
|---|---|---|---|
| | **2022** | 2021 | 2020 |
| 1.500% 2025 Convertible Senior Notes redemption | $ 25 | $ — | $ — |
| Fair value of settlement of a pre-existing relationship as part of consideration in connection with FPT Acquisition | — | (20) | — |
| Fair value of common shares issued as part of consideration in connection with AM USA Transaction | — | — | 990 |
| Fair value of Series B Participating Redeemable Preferred Stock issued as part of consideration in connection with AM USA Transaction | — | — | 738 |
| Fair value of settlement of a pre-existing relationship as part of consideration in connection with AM USA Transaction | — | — | 237 |
| Fair value of common shares issued as consideration in connection with AK Steel Merger | — | — | 618 |
| Fair value of equity awards assumed in connection with AK Steel Merger | — | — | 4 |

## NOTE 3 - ACQUISITIONS

In 2020, we acquired two major steelmakers, AK Steel and ArcelorMittal USA, vertically integrating our legacy iron ore business with steel production. In 2021, we also entered into the scrap business with the FPT Acquisition. We are vertically integrated from mined raw materials, direct reduced iron and ferrous scrap to primary steelmaking and downstream finishing, stamping, tooling and tubing. We now have a presence across the entire steel manufacturing process, from mining to pelletizing to the development and production of finished high value steel products. The AK Steel Merger combined Cliffs, a historic producer of iron ore pellets, with AK Steel, a producer of flat-rolled carbon, stainless and electrical steel products, to create a vertically integrated producer of value-added iron ore and steel products. The AM USA Transaction transformed us into a fully-integrated steel enterprise with the size and scale to expand product offerings and improve through-the-cycle margins. The FPT Acquisition provides us a competitive advantage in sourcing prime scrap, a key raw material for our steelmaking facilities.

### FPT ACQUISITION

#### OVERVIEW

On November 18, 2021, pursuant to the FPT Acquisition Agreement, we completed the FPT Acquisition, in which we were the acquirer. Following the FPT Acquisition, the operating results of FPT are included in our consolidated financial statements. For the period subsequent to the FPT Acquisition (November 18, 2021 through December 31, 2021), FPT generated *Revenues* of $153 million and a loss of $18 million included within *Net income (loss) attributable to Cliffs shareholders,* which included $22 million related to amortization of the fair value inventory step-up.

The fair value of the total purchase consideration was determined as follows:

| (In millions) | |
|---|---|
| Cash consideration: | |
| Cash consideration pursuant to the FPT Acquisition Agreement | $ 778 |
| Cash consideration paid related to IRC Section 338(h)(10) | 23 |
| Total cash consideration | 801 |
| Fair value of settlement of a pre-existing relationship | (20) |
| Total purchase consideration | $ 781 |

We made certain elections under Section 338(h)(10) of the IRC with respect to entities acquired in connection with the FPT Acquisition that were finalized during the third quarter of 2022, which changed the final cash consideration.

Table of Contents

**VALUATION ASSUMPTION AND PURCHASE PRICE ALLOCATION**

The allocation of consideration to the net tangible and intangible assets acquired and liabilities assumed in connection with the FPT Acquisition was based on estimated fair values at November 18, 2021, and was finalized during the quarter ended December 31, 2022. The following is a summary of the purchase price allocation to assets acquired and liabilities assumed in the FPT Acquisition:

| (In millions) | Initial Allocation of Consideration | | Measurement Period Adjustments | | Final Allocation of Consideration as of December 31, 2022 | |
|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ | 9 | $ | — | $ | 9 |
| Accounts receivable, net | | 233 | | 2 | | 235 |
| Inventories | | 137 | | (2) | | 135 |
| Other current assets | | 4 | | (1) | | 3 |
| Property, plant and equipment | | 179 | | 12 | | 191 |
| Other non-current assets | | 74 | | (2) | | 72 |
| Accounts payable | | (122) | | — | | (122) |
| Accrued employment costs | | (8) | | — | | (8) |
| Other current liabilities | | (9) | | 3 | | (6) |
| Other non-current liabilities | | (21) | | — | | (21) |
| Net identifiable assets acquired | | 476 | | 12 | | 488 |
| Goodwill | | 279 | | 14 | | 293 |
| Total net assets acquired | $ | 755 | $ | 26 | $ | 781 |

The goodwill resulting from the FPT Acquisition primarily represents the incremental benefit of providing substantial access to prime scrap for our vertically integrated steelmaking business, as well as any synergistic benefits to be realized from the FPT Acquisition within our Steelmaking segment. We have $296 million in goodwill that is deductible for tax purposes from the FPT Acquisition.

The purchase price allocated to identifiable intangible assets acquired was:

| | (In millions) | | Weighted Average Life (In years) |
|---|---|---|---|
| Customer relationships | $ | 13 | 15 |
| Supplier relationships | | 29 | 18 |
| Trade names and trademarks | | 7 | 15 |
| Total identifiable intangible assets | $ | 49 | 17 |

Intangible assets are classified as *Other non-current assets* on the Statements of Consolidated Financial Position.

## ACQUISITION OF ARCELORMITTAL USA

### OVERVIEW

On December 9, 2020, pursuant to the terms of the AM USA Transaction Agreement, we purchased ArcelorMittal USA from ArcelorMittal.  In connection with the closing of the AM USA Transaction, as contemplated by the terms of the AM USA Transaction Agreement, ArcelorMittal's former joint venture partner in Kote and Tek exercised its put right pursuant to the terms of the Kote and Tek joint venture agreements. As a result, we purchased all of such joint venture partner's interests in Kote and Tek. Following the closing of the AM USA Transaction, we own 100% of the interests in Kote and Tek.

We incurred acquisition-related costs, excluding severance costs, of $3 million and $26 million for the years ended December 31, 2021 and 2020, respectively, in connection with the AM USA Transaction, which were recorded in *Acquisition-related costs* in the Statements of Consolidated Operations.

The fair value of the total purchase consideration was determined as follows:

| (In millions) | | |
|---|---|---|
| Fair value of Cliffs common shares issued | $ | 990 |
| Fair value of Cliffs Series B Participating Redeemable Preferred Stock issued | | 738 |
| Fair value of settlement of a pre-existing relationship | | 237 |
| Cash consideration | | 639 |
| Total purchase consideration | $ | 2,604 |

The fair value of Cliffs common shares issued was calculated as follows:

| | | |
|---|---|---|
| Number of Cliffs common shares issued | | 78,186,671 |
| Closing price of Cliffs common share as of December 9, 2020 | $ | 12.66 |
| Fair value of Cliffs common shares issued (in millions) | $ | 990 |

The fair value of Cliffs Series B Participating Redeemable Preferred Stock issued was calculated as follows:

| | | |
|---|---|---|
| Number of Cliffs Series B Participating Redeemable Preferred Stock issued | | 583,273 |
| Redemption price per share as of December 9, 2020 | $ | 1,266 |
| Fair value of Cliffs Series B Participating Redeemable Preferred Stock issued (in millions) | $ | 738 |

The fair value of the cash consideration was comprised of the following:

| (In millions) | | |
|---|---|---|
| Cash consideration pursuant to the AM USA Transaction Agreement | $ | 505 |
| Cash consideration for purchase of the remaining JV partner's interest of Kote and Tek | | 182 |
| Cash consideration pursuant to working capital adjustments | | (48) |
| Total cash consideration | $ | 639 |

The cash portion of the purchase price was subject to customary working capital adjustments, and the working capital adjustments were finalized during the second quarter of 2021. We made certain elections under Section 338(h)(10) of the IRC with respect to entities acquired in connection with the AM USA Transaction, which did not change the final cash consideration.

The fair value of the settlement of a pre-existing relationship was comprised of the following:

| (In millions) | | |
|---|---|---|
| Accounts receivable | $ | 97 |
| Freestanding derivative asset from customer supply agreement | | 140 |
| Total fair value of settlement of a pre-existing relationship | $ | 237 |

A006615

Table of Contents

**VALUATION ASSUMPTION AND PURCHASE PRICE ALLOCATION**

The allocation of consideration to the net tangible and intangible assets acquired and liabilities assumed in connection with the AM USA Transaction was based on estimated fair values at December 9, 2020, and was finalized during the quarter ended December 31, 2021. The following is a summary of the purchase price allocation to assets acquired and liabilities assumed in the AM USA Transaction:

| (In millions) | Initial Allocation of Consideration | Measurement Period Adjustments | Final Allocation Consideration as of December 31, 2021 |
|---|---|---|---|
| Cash and cash equivalents | $ 35 | $ — | $ 35 |
| Accounts receivable, net | 349 | (3) | 346 |
| Inventories | 2,115 | 14 | 2,129 |
| Other current assets | 34 | 2 | 36 |
| Property, plant and equipment | 4,017 | 387 | 4,404 |
| Deferred income taxes | — | 285 | 285 |
| Other non-current assets | 158 | 7 | 165 |
| Accounts payable | (736) | 8 | (728) |
| Accrued employment costs | (271) | 5 | (266) |
| State and local taxes | (76) | — | (76) |
| Other current liabilities | (453) | 23 | (430) |
| Pension liability, non-current | (730) | — | (730) |
| OPEB liability, non-current | (2,465) | — | (2,465) |
| Other non-current liabilities | (598) | (171) | (769) |
| Noncontrolling interest | (13) | 21 | 8 |
| Net identifiable assets acquired | 1,366 | 578 | 1,944 |
| Goodwill | 1,230 | (570) | 660 |
| Total net assets acquired | $ 2,596 | $ 8 | $ 2,604 |

During the period subsequent to the AM USA Transaction, we made certain measurement period adjustments to the acquired assets and liabilities assumed due to clarification of information utilized to determine fair value during the measurement period. The measurement period adjustments related to the revaluation of the Company's previously held equity method investment, which is now being consolidated post-acquisition, resulting in a loss of $31 million, within *Miscellaneous – net* for the year ended December 31, 2021.

The goodwill resulting from the acquisition of ArcelorMittal USA primarily represents the growth opportunities in the automotive, construction, appliances, infrastructure and machinery and equipment markets, as well as any synergistic benefits to be realized from the AM USA Transaction, and was assigned to our flat steel operations within our Steelmaking segment.

## ACQUISITION OF AK STEEL

### OVERVIEW

On March 13, 2020, pursuant to the AK Steel Merger Agreement (Agreement and Plan of Merger, dated as of December 2, 2019, among Cleveland-Cliffs Inc., AK Steel and Merger Sub), we completed the acquisition of AK Steel, in which we were the acquirer. As a result of the AK Steel Merger, each share of AK Steel common stock issued and outstanding immediately prior to the effective time of the AK Steel Merger (other than excluded shares) was converted into the right to receive 0.400 Cliffs common shares and, if applicable, cash in lieu of any fractional Cliffs common shares.

We incurred acquisition-related costs, excluding severance costs, of $1 million and $26 million for the years ended December 31, 2021 and 2020, respectively, in connection with the AK Steel Merger, which were recorded in *Acquisition-related costs* in the Statements of Consolidated Operations.

The fair value of the total purchase consideration was determined as follows:

| (In millions) | |
|---|---|
| Fair value of AK Steel debt | $ 914 |
| Fair value of Cliffs common shares issued for AK Steel outstanding common stock | 618 |
| Other | 3 |
| Total purchase consideration | $ 1,535 |

A006616

The fair value of Cliffs common shares issued for outstanding shares of AK Steel common stock and with respect to Cliffs common shares underlying converted AK Steel equity awards that vested upon completion of the AK Steel Merger was calculated as follows:

| (In millions, except per share amounts) | |
|---|---|
| Number of shares of AK Steel common stock issued and outstanding | 317 |
| Exchange ratio | 0.400 |
| Shares of Cliffs common shares issued to AK Steel stockholders | 127 |
| Price per share of Cliffs common shares | $ 4.87 |
| Fair value of Cliffs common shares issued for outstanding AK Steel common stock | $ 618 |

The fair value of AK Steel's debt included in the consideration was calculated as follows:

| (In millions) | |
|---|---|
| Credit Facility | $ 590 |
| 7.500% Senior Secured Notes due July 2023 | 324 |
| Fair value of debt included in consideration | $ 914 |

### VALUATION ASSUMPTION AND PURCHASE PRICE ALLOCATION

The allocation of consideration to the net tangible and intangible assets acquired and liabilities assumed in connection with the AK Steel Merger was based on estimated fair values at March 13, 2020, and was finalized during the quarter ended March 31, 2021. The following is a summary of the purchase price allocation to assets acquired and liabilities assumed in the AK Steel Merger:

| (In millions) | Initial Allocation of Consideration | Measurement Period Adjustments | Final Allocation of Consideration as of March 31, 2021 |
|---|---|---|---|
| Cash and cash equivalents | $ 38 | $ 1 | $ 39 |
| Accounts receivable, net | 666 | (2) | 664 |
| Inventories | 1,563 | (243) | 1,320 |
| Other current assets | 68 | (16) | 52 |
| Property, plant and equipment | 2,184 | 90 | 2,274 |
| Deferred income taxes | — | 69 | 69 |
| Other non-current assets | 475 | (4) | 471 |
| Accounts payable | (636) | (8) | (644) |
| Accrued employment costs | (94) | 1 | (93) |
| State and local taxes | (35) | 4 | (31) |
| Other current liabilities | (276) | 2 | (274) |
| Long-term debt | (1,179) | — | (1,179) |
| Pension liability, non-current | (473) | 10 | (463) |
| OPEB liability, non-current | (400) | (8) | (408) |
| Other non-current liabilities | (507) | 72 | (435) |
| Noncontrolling interest | — | (1) | (1) |
| Net identifiable assets acquired | 1,394 | (33) | 1,361 |
| Goodwill | 141 | 33 | 174 |
| Total net assets acquired | $ 1,535 | $ — | $ 1,535 |

During the period subsequent to the AK Steel Merger, we made certain measurement period adjustments to the acquired assets and liabilities assumed due to clarification of information utilized to determine fair value during the measurement period.

The goodwill resulting from the acquisition of AK Steel was assigned to our downstream Tubular and Tooling and Stamping operating segments. Goodwill is calculated as the excess of the purchase price over the net identifiable assets recognized and primarily represents the growth opportunities in light weighting solutions to automotive customers, as well as any synergistic benefits to be realized.

Table of Contents

The purchase price allocated to identifiable intangible assets and liabilities acquired was:

| | | (In millions) | Weighted Average Life (In Years) |
|---|---|---|---|
| **Intangible assets:** | | | |
| Customer relationships | $ | 77 | 18 |
| Developed technology | | 60 | 17 |
| Trade names and trademarks | | 11 | 10 |
| Total identifiable intangible assets | $ | 148 | 17 |
| **Intangible liabilities:** | | | |
| Above-market supply contracts | $ | (71) | 12 |

Intangible assets are classified as *Other non-current assets* on the Statements of Consolidated Financial Position. Intangible liabilities are classified as *Other non-current liabilities* on the Statements of Consolidated Financial Position.

The above-market supply contracts relate to the long-term coke and energy supply agreements with SunCoke Energy, which includes SunCoke Middletown, a consolidated VIE. Refer to NOTE 18 - VARIABLE INTEREST ENTITIES for further information.

## PRO FORMA RESULTS

### 2020 ACQUISITIONS

The following table provides unaudited pro forma financial information, prepared in accordance with Topic 805, as if ArcelorMittal USA and AK Steel had been acquired as of January 1, 2019:

| | | Year Ended December 31, 2020 |
|---|---|---|
| **(In millions)** | | |
| Revenues | $ | 12,837 |
| Net loss attributable to Cliffs shareholders | | (520) |

The unaudited pro forma financial information has been calculated after applying our accounting policies and adjusting the historical results with pro forma adjustments, net of tax, that assume the 2020 Acquisitions occurred on January 1, 2019. Significant pro forma adjustments include the following:

1. The elimination of intercompany revenues between Cliffs and ArcelorMittal USA and AK Steel of $44 million for the year ended December 31, 2020.

2. The 2020 pro forma net loss was adjusted to exclude $96 million of non-recurring inventory acquisition accounting adjustments incurred during the year ended December 31, 2020.

3. The elimination of non-recurring transaction costs incurred by Cliffs, AK Steel and ArcelorMittal USA in connection with the 2020 Acquisitions were $93 million for the year ended December 31, 2020.

4. The 2020 pro forma net loss was adjusted to exclude restructuring costs of $1,820 million of non-recurring costs incurred by ArcelorMittal USA prior to the AM USA Transaction.

5. The 2020 pro forma net loss was adjusted to exclude $140 million for the year ended December 31, 2020, for the impact of reversal of the fees charged for management, financial and legal services under the Industrial Franchise Agreement with the former parent.

6. Total other pro forma adjustments included reduced expenses of $32 million for the year ended December 31, 2020, primarily due to decreased depreciation expense and pension and OPEB expense, offset partially by increased interest and amortization expense.

7. The income tax impact of pro forma transaction adjustments that affect *Net income (loss) attributable to Cliffs shareholders* at a statutory rate of 24.3% resulted in an increased benefit to *Income tax benefit (expense)* of $170 million for the year ended December 31, 2020.

### FPT ACQUISITION

The following table provides unaudited pro forma financial information, prepared in accordance with Topic 805, as if FPT had been acquired as of January 1, 2020:

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| **(In millions)** | | 2021 | | 2020 |
| Revenues | $ | 21,701 | $ | 13,549 |
| Net income (loss) attributable to Cliffs shareholders | | 3,074 | | (526) |

The unaudited pro forma financial information has been calculated after applying our accounting policies and adjusting the historical results with pro forma adjustments, net of tax, that assume the FPT Acquisition occurred on January 1, 2020. There were no significant pro forma adjustments for the FPT Acquisition.

The unaudited pro forma financial information does not reflect the potential realization of synergies or cost savings, nor does it reflect other costs relating to the integration of the acquired companies. This unaudited pro forma financial information should not be considered indicative of the results that would have actually occurred if the 2020 Acquisitions had been consummated on January 1, 2019, or if the FPT Acquisition had been consummated on January 1, 2020, nor are they indicative of future results.

## NOTE 4 - REVENUES

We generate our revenue through product sales, in which shipping terms indicate when we have fulfilled our performance obligations and transferred control of products to our customer. Our revenue transactions consist of a single performance obligation to transfer promised goods. Our contracts with customers define the mechanism for determining the sales price, which is generally fixed upon transfer of control, but the contracts generally do not impose a specific quantity on either party. Quantities to be delivered to the customer are determined at a point near the date of delivery through purchase orders or other written instructions we receive from the customer. Spot market sales are made through purchase orders or other written instructions. We consider our performance obligation to be complete and recognize revenue when control transfers in accordance with shipping terms.

Revenue is measured as the amount of consideration we expect to receive in exchange for transferring product. We reduce the amount of revenue recognized for estimated returns and other customer credits, such as discounts and volume rebates, based on the expected value to be realized. Payment terms are consistent with terms standard to the markets we serve. Sales taxes collected from customers are excluded from revenues.

The following table represents our *Revenues* by market:

| (In millions) | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2022 | | 2021 | | 2020 |
| Steelmaking: | | | | | | |
| Direct automotive | $ | 6,661 | $ | 4,726 | $ | 2,062 |
| Infrastructure and manufacturing | | 5,869 | | 5,380 | | 784 |
| Distributors and converters | | 6,388 | | 7,671 | | 696 |
| Steel producers | | 3,465 | | 2,124 | | 1,423 |
| Total Steelmaking | | 22,383 | | 19,901 | | 4,965 |
| Other Businesses: | | | | | | |
| Direct automotive | | 478 | | 426 | | 329 |
| Infrastructure and manufacturing | | 52 | | 47 | | 34 |
| Distributors and converters | | 76 | | 70 | | 26 |
| Total Other Businesses | | 606 | | 543 | | 389 |
| Total revenues | $ | 22,989 | $ | 20,444 | $ | 5,354 |

The following table represents our *Revenues* by product line:

| (In millions) | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2022 | | 2021 | | 2020 |
| Steelmaking: | | | | | | |
| Hot-rolled steel | $ | 4,529 | $ | 5,615 | $ | 386 |
| Cold-rolled steel | | 3,193 | | 3,186 | | 490 |
| Coated steel | | 6,905 | | 5,864 | | 1,747 |
| Stainless and electrical steel | | 2,284 | | 1,622 | | 868 |
| Plate | | 1,651 | | 1,316 | | 46 |
| Slab and other steel products | | 1,492 | | 1,247 | | 46 |
| Other | | 2,329 | | 1,051 | | 1,382 |
| Total steelmaking | | 22,383 | | 19,901 | | 4,965 |
| Other Businesses: | | | | | | |
| Other | | 606 | | 543 | | 389 |
| Total revenues | $ | 22,989 | $ | 20,444 | $ | 5,354 |

## NOTE 5 - SEGMENT REPORTING

We are vertically integrated from mined raw materials and direct reduced iron and ferrous scrap to primary steelmaking and downstream finishing, stamping, tooling and tubing. We are organized into four operating segments based on our differentiated products - Steelmaking, Tubular, Tooling and Stamping, and European Operations. We have one reportable segment - Steelmaking. The operating segment results of our Tubular, Tooling and Stamping, and European Operations that do not constitute reportable segments are combined and disclosed in the Other Businesses category. Our Steelmaking segment operates as the largest flat-rolled steel producer supported by being the largest iron ore pellet producer as well as a leading prime scrap processor in North America, primarily serving the automotive, infrastructure and manufacturing, and distributors and converters markets. Our Other Businesses primarily include the operating segments that provide customer solutions with carbon and stainless steel tubing products, advanced-engineered solutions, tool design and build, hot- and cold-stamped steel components, and complex assemblies. All intersegment transactions were eliminated in consolidation.

We evaluate performance on an operating segment basis, as well as a consolidated basis, based on Adjusted EBITDA, which is a non-GAAP measure. This measure is used by management, investors, lenders and other external users of our financial statements to assess our operating performance and to compare operating performance to other companies in the steel industry. In addition, management believes Adjusted EBITDA is a useful measure to assess the earnings power of the business without the impact of capital structure and can be used to assess our ability to service debt and fund future capital expenditures in the business.

Our results by segment are as follows:

| (In millions) | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2022** | | 2021 | | 2020 | |
| Revenues: | | | | | | |
| Steelmaking | $ | **22,383** | $ | 19,901 | $ | 4,965 |
| Other Businesses | | **606** | | 543 | | 389 |
| Total revenues | $ | **22,989** | $ | 20,444 | $ | 5,354 |
| | | | | | | |
| Adjusted EBITDA: | | | | | | |
| Steelmaking | $ | **3,089** | $ | 5,280 | $ | 316 |
| Other Businesses | | **69** | | 9 | | 47 |
| Eliminations[1] | | **11** | | (12) | | (10) |
| Total Adjusted EBITDA | $ | **3,169** | $ | 5,277 | $ | 353 |

[1] In 2022, we began allocating Corporate *Selling, general and administrative expenses* to our operating segments. Prior periods have been adjusted to reflect this change. The Eliminations line now only includes sales between segments.

Table of Contents

The following table provides a reconciliation of our consolidated *Net income (loss)* to total Adjusted EBITDA:

| (In millions) | Year Ended December 31, | | |
| | 2022 | 2021 | 2020 |
|---|---|---|---|
| Net income (loss) | $ 1,376 | $ 3,033 | $ (81) |
| Less: | | | |
| Interest expense, net | (276) | (337) | (238) |
| Income tax benefit (expense) | (423) | (773) | 111 |
| Depreciation, depletion and amortization | (1,034) | (897) | (308) |
| | 3,109 | 5,040 | 354 |
| Less: | | | |
| EBITDA from noncontrolling interests[1] | 74 | 75 | 56 |
| Gain (loss) on extinguishment of debt | (75) | (88) | 130 |
| Acquisition-related expenses and adjustments | (1) | (197) | (148) |
| Asset impairment | (29) | — | — |
| Other, net | (29) | (27) | (37) |
| Total Adjusted EBITDA | $ 3,169 | $ 5,277 | $ 353 |
| | | | |
| [1] EBITDA of noncontrolling interests includes the following: | | | |
| Net income attributable to noncontrolling interests | $ 41 | $ 45 | $ 41 |
| Depreciation, depletion and amortization | 33 | 30 | 15 |
| EBITDA of noncontrolling interests | $ 74 | $ 75 | $ 56 |

The following table summarizes our depreciation, depletion and amortization and capital additions by segment:

| (In millions) | Year Ended December 31, | | |
| | 2022 | 2021 | 2020 |
|---|---|---|---|
| Depreciation, depletion and amortization: | | | |
| Steelmaking | $ (994) | $ (860) | $ (281) |
| Other Businesses | (40) | (37) | (27) |
| Total depreciation, depletion and amortization | $ (1,034) | $ (897) | $ (308) |
| | | | |
| Capital additions[1]: | | | |
| Steelmaking | $ 997 | $ 787 | $ 436 |
| Other Businesses | 30 | 52 | 45 |
| Corporate | 6 | 18 | 2 |
| Total capital additions | $ 1,033 | $ 857 | $ 483 |

[1] Refer to NOTE 2 - SUPPLEMENTARY FINANCIAL STATEMENT INFORMATION for additional information.

The following summarizes our assets by segment:

| (In millions) | December 31, | |
| | 2022 | 2021 |
|---|---|---|
| Assets: | | |
| Steelmaking | $ 18,070 | $ 18,326 |
| Other Businesses | 315 | 306 |
| Total segment assets | 18,385 | 18,632 |
| Corporate/Eliminations | 370 | 343 |
| Total assets | $ 18,755 | $ 18,975 |

Included in the consolidated financial statements are the following amounts relating to geographic location based on product destination:

| (In millions) | 2022 | 2021 | 2020 |
|---|---|---|---|
| Revenues: | | | |
| United States | $ 20,991 | $ 18,881 | $ 4,580 |
| Canada | 963 | 803 | 602 |
| Other countries | 1,035 | 760 | 172 |
| Total revenues | $ 22,989 | $ 20,444 | $ 5,354 |
| Property, plant and equipment, net: | | | |
| United States | $ 8,981 | $ 9,092 | $ 8,647 |
| Canada | 88 | 93 | 91 |
| Other countries | 1 | 1 | 5 |
| Total property, plant and equipment, net | $ 9,070 | $ 9,186 | $ 8,743 |

## NOTE 6 - PROPERTY, PLANT AND EQUIPMENT

The following table indicates the carrying value of each of the major classes of our depreciable assets:

| (In millions) | December 31, | |
|---|---|---|
| | 2022 | 2021 |
| Land, land improvements and mineral rights | $ 1,388 | $ 1,291 |
| Buildings | 921 | 889 |
| Equipment | 9,289 | 8,709 |
| Other | 238 | 229 |
| Construction in progress | 552 | 408 |
| Total property, plant and equipment[1] | 12,388 | 11,526 |
| Allowance for depreciation and depletion | (3,318) | (2,340) |
| Property, plant and equipment, net | $ 9,070 | $ 9,186 |

[1] Includes right-of-use assets related to finance leases of $408 million and $411 million as of December 31, 2022 and 2021, respectively.

We recorded depreciation expense of $988 million, $848 million and $298 million for the years ended December 31, 2022, 2021 and 2020, respectively. Depreciation expense for the year ended December 31, 2022 includes $23 million of accelerated depreciation related to the decision to indefinitely idle the coke facility at Middletown Works and $68 million of accelerated depreciation related to the indefinite idle of the Indiana Harbor #4 blast furnace.

During the year ended December 31, 2022, we announced the permanent closure of Mountain State Carbon, which resulted in a $9 million asset impairment charge.

The net book value of the mineral and land rights are as follows:

| (In millions) | December 31, | |
|---|---|---|
| | 2022 | 2021 |
| Mineral rights: | | |
| Cost | $ 780 | $ 780 |
| Depletion | (225) | (187) |
| Net mineral rights | $ 555 | $ 593 |
| | | |
| Land rights | $ 434 | $ 406 |

We recorded depletion expense of $38 million, $46 million and $8 million for the years ended December 31, 2022, 2021, and 2020, respectively.

## NOTE 7 - GOODWILL AND INTANGIBLE ASSETS AND LIABILITIES

**GOODWILL**

The following is a summary of *Goodwill* by segment:

| (In millions) | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Steelmaking | $ 956 | $ 942 |
| Other Businesses | 174 | 174 |
| Total goodwill | $ 1,130 | $ 1,116 |

The increase of $14 million in the balance of *Goodwill* in our Steelmaking segment as of December 31, 2022, compared to December 31, 2021, is due to the change in estimated identified goodwill as a result of measurement period adjustments to the purchase price allocation for the acquisition of FPT. Refer to NOTE 3 - ACQUISITIONS for further details.

**INTANGIBLE ASSETS AND LIABILITIES**

The following is a summary of our intangible assets and liabilities:

| (In millions) | December 31, 2022 | | | December 31, 2021 | | |
|---|---|---|---|---|---|---|
| | Gross Amount | Accumulated Amortization | Net Amount | Gross Amount | Accumulated Amortization | Net Amount |
| Intangible assets[1]: | | | | | | |
| Customer relationships | $ 90 | $ (13) | $ 77 | $ 95 | $ (8) | $ 87 |
| Developed technology | 60 | (10) | 50 | 60 | (6) | 54 |
| Trade names and trademarks | 18 | (4) | 14 | 18 | (2) | 16 |
| Mining permits | 72 | (27) | 45 | 72 | (26) | 46 |
| Supplier relationships | 29 | (1) | 28 | 18 | — | 18 |
| Total intangible assets | $ 269 | $ (55) | $ 214 | $ 263 | $ (42) | $ 221 |
| Intangible liabilities[2]: | | | | | | |
| Above-market supply contracts | $ (71) | $ 19 | $ (52) | $ (71) | $ 14 | $ (57) |

[1] Intangible assets are classified as *Other non-current assets*. Amortization related to mining permits is recognized in *Cost of goods sold*. Amortization of all other intangible assets is recognized in *Selling, general and administrative expenses*.

[2] Intangible liabilities are classified as *Other non-current liabilities*. Amortization of all intangible liabilities is recognized in *Cost of goods sold*.

Amortization expense related to intangible assets was $13 million and $10 million for the years ended December 31, 2022 and 2021, respectively. Estimated future amortization expense related to intangible assets is $13 million annually for the years 2023 through 2027.

Income from amortization related to intangible liabilities was $5 million and $7 million for the years ended December 31, 2022 and 2021, respectively. Estimated future amortization income related to the intangible liabilities is $5 million annually for the years 2023 through 2027.

## NOTE 8 - DEBT AND CREDIT FACILITIES

The following represents a summary of our long-term debt:

| | | | (In Millions) | |
|---|---|---|---|---|
| Debt Instrument | Issuer[1] | Annual Effective Interest Rate | December 31, 2022 | December 31, 2021 |
| **Senior Secured Notes:** | | | | |
| 9.875% 2025 Senior Secured Notes | Cliffs | 10.57% | $ — | $ 607 |
| 6.750% 2026 Senior Secured Notes | Cliffs | 6.99% | 829 | 845 |
| **Senior Unsecured Notes:** | | | | |
| 1.500% 2025 Convertible Senior Notes | Cliffs | 6.26% | — | 294 |
| 7.000% 2027 Senior Notes | Cliffs | 9.24% | 73 | 73 |
| 7.000% 2027 AK Senior Notes | AK Steel | 9.24% | 56 | 56 |
| 5.875% 2027 Senior Notes | Cliffs | 6.49% | 556 | 556 |
| 4.625% 2029 Senior Notes | Cliffs | 4.63% | 368 | 500 |
| 4.875% 2031 Senior Notes | Cliffs | 4.88% | 325 | 500 |
| 6.250% 2040 Senior Notes | Cliffs | 6.34% | 235 | 263 |
| IRBs | AK Steel | Various | — | 66 |
| ABL Facility[3] | Cliffs[2] | Variable[3] | 1,864 | 1,609 |
| Total debt | | | 4,306 | 5,369 |
| Unamortized discounts and issuance costs | | | (57) | (131) |
| Total long-term debt | | | $ 4,249 | $ 5,238 |

[1] Unless otherwise noted, references in this column and throughout this NOTE 8 - DEBT AND CREDIT FACILITIES to "Cliffs" are to Cleveland-Cliffs Inc., and references to "AK Steel" are to AK Steel Corporation (n/k/a Cleveland-Cliffs Steel Corporation).

[2] Refers to Cleveland-Cliffs Inc. as borrower under our ABL Facility.

[3] Our ABL Facility annual effective interest rate was 5.60% and 1.87%, respectively, as of December 31, 2022 and December 31, 2021.

### OUTSTANDING SENIOR SECURED NOTES

The 6.750% 2026 Senior Secured Notes bear interest at a rate of 6.750% per annum, payable semi-annually in arrears on March 15 and September 15 of each year. The 6.750% 2026 Senior Secured Notes will mature on March 15, 2026.

The 6.750% 2026 Senior Secured Notes are jointly and severally and fully and unconditionally guaranteed on a senior secured basis by substantially all of our material domestic subsidiaries and are secured (subject in each case to certain exceptions and permitted liens) by (i) a first-priority lien, on substantially all of our assets and the assets of the guarantors, other than the ABL Collateral (as defined below), and (ii) a second-priority lien on the ABL Collateral, which is junior to a first-priority lien for the benefit of the lenders under our ABL Facility.

We may redeem the 6.750% 2026 Senior Secured Notes in whole or in part, at any time at our option upon not less than 30, and not more than 60, days' prior notice sent to the holders of the 6.750% 2026 Senior Secured Notes. The 6.750% 2026 Senior Secured Notes became redeemable on March 15, 2022 at a redemption price equal to 105.063% of the principal amount thereof, and decrease to 103.375% on March 15, 2023, 101.688% on March 15, 2024 and are redeemable at par beginning on March 15, 2025. In each case, we pay the redemption premiums plus accrued and unpaid interest, if any, to, but not including, the date of redemption.

In addition, if a change in control triggering event, as defined in the indenture, occurs with respect to the 6.750% 2026 Senior Secured Notes, we will be required to offer to purchase the notes at a purchase price equal to 101% of their principal amount, plus accrued and unpaid interest, if any, to, but not including, the date of purchase.

The terms of the 6.750% 2026 Senior Secured Notes contain certain customary covenants; however, there are no financial covenants.

## OUTSTANDING SENIOR UNSECURED NOTES

### CLEVELAND-CLIFFS INC. UNSECURED SENIOR NOTES

The following represents a summary of our other unsecured senior notes' maturity and interest payable due dates:

| Debt Instrument | Maturity | Interest Payable (until maturity) |
| --- | --- | --- |
| 7.000% 2027 Senior Notes | March 15, 2027 | March 15 and September 15 |
| 5.875% 2027 Senior Notes | June 1, 2027 | June 1 and December 1 |
| 4.625% 2029 Senior Notes | March 1, 2029 | March 1 and September 1 |
| 4.875% 2031 Senior Notes | March 1, 2031 | March 1 and September 1 |
| 6.250% 2040 Senior Notes | October 1, 2040 | April 1 and October 1 |

The senior notes are unsecured obligations and rank equally in right of payment with all our other existing and future unsecured and unsubordinated indebtedness. The 7.000% 2027 Senior Notes, 5.875% 2027 Senior Notes, 4.625% 2029 Senior Notes and 4.875% 2031 Senior Notes are guaranteed on a senior unsecured basis by our material direct and indirect wholly owned domestic subsidiaries and, therefore, are structurally senior to any of our existing and future indebtedness that is not guaranteed by such guarantors and are structurally subordinated to all existing and future indebtedness and other liabilities of our subsidiaries that do not guarantee the notes. There are no subsidiary guarantees of the interest and principal amounts for the 6.250% 2040 Senior Notes.

The 7.000% 2027 Senior Notes may be redeemed, in whole or in part, at any time at our option upon not less than 30, and not more than 60 days' prior notice sent to the holders. The 7.000% 2027 Senior Notes became redeemable on March 15, 2022 at a redemption price equal to 103.500% of the principal amount thereof, and decrease to 102.333% on March 15, 2023, 101.167% on March 15, 2024 and are redeemable at par beginning on March 15, 2025. In each case, we pay the redemption premiums plus accrued and unpaid interest, if any, to, but not including, the date of redemption.

The 5.875% 2027 Senior Notes became redeemable on June 1, 2022 at a redemption price equal to 102.938% of the principal amount thereof, and decrease to 101.958% on June 1, 2023, 100.979% on June 1, 2024 and are redeemable at par beginning on June 1, 2025. In each case, we pay the redemption premiums plus accrued and unpaid interest, if any, to, but not including, the date of redemption.

The 4.625% 2029 Senior Notes may be redeemed, in whole or in part, on not less than 10, nor more than 60, days' prior notice sent to the holders of the notes. The 4.625% 2029 Senior Notes are redeemable prior to March 1, 2024, at a redemption price equal to 100% of the principal amount thereof plus a "make-whole" premium set forth in the indenture. We may also redeem up to 35% of the aggregate principal amount of the 4.625% 2029 Senior Notes prior to March 1, 2024 at a redemption price equal to 104.625% of the principal amount thereof with the net cash proceeds of one or more equity offerings. The 4.625% 2029 Senior Notes are redeemable beginning on March 1, 2024, at a redemption price equal to 102.313% of the principal amount thereof, decreasing to 101.156% on March 1, 2025 and are redeemable at par beginning on March 1, 2026. In each case, we pay the redemption and "make-whole" premiums plus accrued and unpaid interest, if any, to, but not including, the date of redemption.

The 4.875% 2031 Senior Notes may be redeemed, in whole or in part, on not less than 10, nor more than 60, days' prior notice sent to the holders of the notes. The 4.875% 2031 Senior Notes are redeemable prior to March 1, 2026, at a redemption price equal to 100% of the principal amount thereof plus a "make-whole" premium set forth in the indenture. We may also redeem up to 35% of the aggregate principal amount of the 4.875% 2031 Senior Notes prior to March 1, 2026 at a redemption price equal to 104.875% of the principal amount thereof with the net cash proceeds of one or more equity offerings. The 4.875% 2031 Senior Notes are redeemable beginning on March 1, 2026, at a redemption price equal to 102.438% of the principal amount thereof, decreasing to 101.625% on March 1, 2027, 100.813% on March 1, 2028 and are redeemable at par beginning on March 1, 2029. In each case, we pay the redemption and "make-whole" premiums plus accrued and unpaid interest, if any, to, but not including, the date of redemption.

The 6.250% 2040 Senior Notes may be redeemed any time at our option upon not less than 30, nor more than 60, days' prior notice is sent to the holders. The 6.250% 2040 Senior Notes are redeemable at a redemption price equal to the greater of (1) 100% of the principal amount of the notes to be redeemed or (2) the sum of the present values of the remaining scheduled payments of principal and interest on the notes to be redeemed, discounted to the redemption date on a semi-annual basis at the treasury rate plus 40 basis points, plus accrued and unpaid interest, if any, to, but not including, the date of redemption.

In addition, if a change of control triggering event, as defined in the applicable indenture, occurs with respect to the unsecured notes, we will be required to offer to purchase the notes of the applicable series at a purchase price equal to 101% of the principal amount, plus accrued and unpaid interest, if any, to, but not including, the date of purchase.

The terms of the unsecured notes contain certain customary covenants; however, there are no financial covenants.

### AK STEEL CORPORATION UNSECURED SENIOR NOTES

As of December 31, 2022, AK Steel had outstanding a total of $56 million aggregate principal amount of 7.000% 2027 AK Senior Notes. These senior notes are unsecured obligations and rank equally in right of payment with AK Steel's guarantees of Cliffs' unsecured and unsubordinated indebtedness. These notes contain no financial covenants.

The 7.000% 2027 AK Senior Notes may be redeemed, in whole or in part, at any time at our option upon not less than 30, and not more than 60, days' prior notice sent to the holders. The 7.000% 2027 AK Senior Notes became redeemable on March 15, 2022 at a redemption price equal to 103.500% of the principal amount thereof, and decrease to 102.333% on March 15, 2023, 101.167% on March 15, 2024 and are redeemable at par beginning on March 15, 2025. In each case, we pay the redemption premiums plus accrued and unpaid interest, if any, to, but not including, the date of redemption.

## ABL FACILITY

We have an ABL Facility which provides for up to $4.5 billion in borrowings, including a $555 million sublimit for the issuance of letters of credit and a $200 million sublimit for swingline loans. The ABL Facility will mature upon the earlier of March 13, 2025 or 91 days prior to the maturity of certain other material debt. Availability under the ABL Facility is limited to an eligible borrowing base, as applicable, determined by applying customary advance rates to eligible accounts receivable, inventory and certain mobile equipment.

The ABL Facility and certain bank products and hedge obligations are guaranteed by certain of our existing wholly owned U.S. subsidiaries and are required to be guaranteed by certain of our future U.S. subsidiaries. Amounts outstanding under the ABL Facility are secured by (i) a first-priority security interest in the accounts receivable and other rights to payment, inventory, as-extracted collateral, certain investment property, deposit accounts, securities accounts, certain general intangibles and commercial tort claims, certain mobile equipment, commodities accounts and other related assets of ours, the other borrowers and the guarantors, and proceeds and products of each of the foregoing (collectively, the "ABL Collateral") and (ii) a second-priority security interest in substantially all of our assets and the assets of the other borrowers and the guarantors other than the ABL Collateral.

Borrowings under the ABL Facility bear interest, at our option, at a base rate or, if certain conditions are met, a LIBOR rate, in each case, plus an applicable margin. We may amend our ABL Facility to replace the LIBOR rate with one or more secured overnight financing based rates or an alternative benchmark rate, giving consideration to any evolving or then-existing convention for similar dollar denominated syndicated credit facilities for such alternative benchmarks. If we do not amend or replace the ABL Facility, the ABL Facility provides a mechanism to automatically transition to a SOFR-based benchmark when all U.S. dollar LIBOR settings are no longer provided or are no longer representative.

The ABL Facility contains customary representations and warranties and affirmative and negative covenants including, among others, covenants regarding the maintenance of certain financial ratios if certain conditions are triggered, covenants relating to financial reporting, covenants relating to the payment of dividends on, or purchase or redemption of, our capital stock, covenants relating to the incurrence or prepayment of certain debt, covenants relating to the incurrence of liens or encumbrances, covenants relating to compliance with laws, covenants relating to transactions with affiliates, covenants relating to mergers and sales of all or substantially all of our assets and limitations on changes in the nature of our business. As of December 31, 2022 and 2021, we were in compliance with the ABL Facility liquidity requirements and, therefore, the springing financial covenant requiring a minimum fixed charge coverage ratio of 1.0 to 1.0 was not applicable.

The ABL Facility provides for customary events of default, including, among other things, the event of nonpayment of principal, interest, fees or other amounts, a representation or warranty proving to have been materially incorrect when made, failure to perform or observe certain covenants within a specified period of time, a cross-default to certain material indebtedness, the bankruptcy or insolvency of the Company and certain of its subsidiaries, monetary judgment defaults of a specified amount, invalidity of any loan documentation, a change of control of the Company, and ERISA defaults resulting in liability of a specified amount. If an event of default exists (beyond any applicable grace or cure period), the administrative agent may, and at the direction of the requisite number of lenders shall, declare all amounts owing under the ABL Facility immediately due and payable, terminate such lenders' commitments to make loans under the ABL Facility and/or exercise any and all remedies and other rights under the ABL Facility. For certain events of default related to insolvency and receivership, the commitments of the lenders will be automatically terminated and all outstanding loans and other amounts will become immediately due and payable.

The following represents a summary of our borrowing capacity under the ABL Facility:

| (In millions) | | December 31, 2022 |
|---|---|---|
| Available borrowing base on ABL Facility[1] | $ | 4,500 |
| Borrowings | | (1,864) |
| Letter of credit obligations[2] | | (150) |
| Borrowing capacity available | $ | 2,486 |

[1] As of December 31, 2022, the ABL Facility has a maximum available borrowing base of $4.5 billion. The borrowing base is determined by applying customary advance rates to eligible accounts receivable, inventory and certain mobile equipment.

[2] We issued standby letters of credit with certain financial institutions in order to support business obligations including, but not limited to, workers' compensation, employee severance, insurance, operating agreements and environmental obligations.

## DEBT EXTINGUISHMENTS - 2022

On January 18, 2022, we redeemed all of our outstanding 1.500% 2025 Convertible Senior Notes through a combination settlement, with the aggregate principal amount of $294 million paid in cash, and 24 million common shares, with a fair value of $499 million, delivered to noteholders in settlement of the premium due per the terms of the indenture, plus cash in respect of the accrued and unpaid interest on the 1.500% 2025 Convertible Senior Notes to, but not including, the redemption date per the terms of the indenture.

During the year ended December 31, 2022, we redeemed all $607 million remaining aggregate principal amount outstanding of our 9.875% 2025 Senior Secured Notes and all $66 million aggregate principal amount outstanding of the IRBs with available liquidity.

Additionally, during the year ended December 31, 2022, we repurchased $351 million in aggregate principal amount of our outstanding senior notes of various tranches with available liquidity at an average price of 92% of par.

The following is a summary of the debt extinguished and the respective impact on extinguishment:

| | Year Ended December 31, 2022 | |
|---|---|---|
| (In millions) | Debt Extinguished | Gain (Loss) on Extinguishment |
| 9.875% 2025 Senior Secured Notes | $ 607 | $ (85) |
| 6.750% 2026 Senior Secured Notes | 16 | (1) |
| 1.500% 2025 Convertible Senior Notes | 294 | (16) |
| 4.625% 2029 Senior Notes | 132 | 9 |
| 4.875% 2024 Senior Secured Notes | 175 | 13 |
| 6.250% 2040 Senior Notes | 28 | 3 |
| IRBs | 66 | 2 |
| Total | $ 1,318 | $ (75) |

## DEBT MATURITIES

The following represents a summary of our debt instrument maturities based on the principal amounts outstanding at December 31, 2022 (in millions):

| 2023 | 2024 | 2025 | 2026 | 2027 | Thereafter | Total |
|---|---|---|---|---|---|---|
| $ — | $ — | $ 1,864 | $ 829 | $ 685 | $ 928 | $ 4,306 |

## NOTE 9 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS

We offer defined benefit pension plans, defined contribution pension plans and OPEB plans to a significant portion of our employees and retirees. Benefits are also provided through multiemployer plans for certain union members.

### DEFINED BENEFIT PENSION PLANS

The defined benefit pension plans are largely noncontributory and limited in participation. Most plans are closed to new participants with only the legacy iron ore hourly and salaried plans still open. The pension benefit calculations vary by plan but are generally based on employees' years of service and compensation or a fixed rate and years of service. Certain salaried plans calculate benefits using a cash balance formula, which earns interest credits and allocations based on a percent of pay.

### OPEB PLANS

We offer postretirement health care and life insurance benefits to retirees through various funded and unfunded plans. The vast majority of our plans are closed to new participants. In lieu of retiree medical coverage, many union-represented employees receive a 401(k) contribution per hour worked to a restricted Retiree Health Care Account. Cost sharing features between the employer and retiree vary by plan and several plans include employer caps. Retiree healthcare coverage is provided through programs administered by insurance companies whose charges are based on benefits paid. Certain labor agreements require the funding of VEBAs, which, depending on funding levels, may be used to reimburse the employer for paid benefits.

### USW LABOR AGREEMENTS

On September 30, 2022, a new 47-month labor agreement with the USW was ratified. The contract became effective on October 1, 2022, and covers approximately 2,000 USW-represented employees at our United Taconite, Hibbing Taconite, Tilden and Empire mines. For the affected defined benefit pension plans, we agreed to increase the pre-2023 service multiplier to $115 and the service multiplier applicable to service beginning in 2023 to $126 for retirements after January 1, 2023. For the affected OPEB plans, we introduced a new Medicare Advantage plan to the Medicare-eligible retirees. Effective January 1, 2023, all Medicare-eligible retirees covered under this agreement will switch to this plan. The Medicare Advantage plan will offer similar benefits to the previous healthcare plan but will have significantly lower premiums due to increased government subsidies and our successful use of scale to negotiate better healthcare rates with our vendors.

On October 12, 2022, a new 4-year labor agreement with the USW, covering 12,000 USW-represented employees at 13 operating locations, was ratified. For the affected defined benefit pension plans, we agreed to increase the pre-2023 service multiplier to $115 and the service multiplier applicable to service beginning in 2023 to $126 for retirements after January 1, 2023. For the affected OPEB plans, we implemented a cap on healthcare costs for employees retiring after January 1, 2026. Separate from the labor agreements, we negotiated favorable Medicare Advantage Prescription Drug healthcare rates, which will go into effect January 1, 2023. Additionally, we paused the contribution requirement to the Cleveland-Cliffs Steel LLC VEBA based on earnings for the remainder of the labor agreement with the USW, which expires in September of 2026.

Additionally, we increased our contribution rate to the Steelworkers Pension Trust by $0.50 to $4.00 per eligible hour with both agreements. The increase was effective November 1, 2022.

These labor agreements triggered interim remeasurements on their ratification dates. All affected plans were remeasured again at December 31, 2022.

## OBLIGATIONS AND FUNDED STATUS

The following tables and information provide additional disclosures:

| (In millions) | Pension Benefits | | OPEB | |
|---|---|---|---|---|
| **Change in benefit obligations:** | **2022** | 2021 | **2022** | 2021 |
| Benefit obligations — beginning of year | $ **6,036** | $ 6,565 | $ **3,254** | $ 3,757 |
| Service cost | **45** | 56 | **35** | 51 |
| Interest cost | **144** | 103 | **72** | 74 |
| Plan amendments | **122** | — | **(163)** | 8 |
| Actuarial gain | **(1,236)** | (131) | **(1,781)** | (456) |
| Benefits paid | **(431)** | (456) | **(232)** | (227) |
| Participant contributions | **—** | — | **47** | 47 |
| Effect of settlement | **(34)** | (101) | **—** | — |
| Other | **—** | — | **1** | — |
| Benefit obligations — end of year | $ **4,646** | $ 6,036 | $ **1,233** | $ 3,254 |
| | | | | |
| **Change in plan assets:** | | | | |
| Fair value of plan assets — beginning of year | $ **5,606** | $ 5,332 | $ **812** | $ 783 |
| Actual return on plan assets | **(809)** | 668 | **(97)** | 29 |
| Participant contributions | **—** | — | **47** | 47 |
| Employer contributions | **6** | 163 | **198** | 180 |
| Benefits paid | **(431)** | (456) | **(232)** | (227) |
| Effect of settlement | **(34)** | (101) | **—** | — |
| Fair value of plan assets — end of year | $ **4,338** | $ 5,606 | $ **728** | $ 812 |
| Funded status | $ **(308)** | $ (430) | $ **(505)** | $ (2,442) |
| | | | | |
| **Amounts recognized in Statements of Financial Position:** | | | | |
| Non-current assets | $ **195** | $ 153 | $ **161** | $ 71 |
| Current liabilities | **(30)** | (5) | **(81)** | (130) |
| Non-current liabilities | **(473)** | (578) | **(585)** | (2,383) |
| Total amount recognized | $ **(308)** | $ (430) | $ **(505)** | $ (2,442) |
| | | | | |
| **Amounts recognized in accumulated other comprehensive loss (income):** | | | | |
| Net actuarial gain | $ **(361)** | $ (286) | $ **(1,996)** | $ (392) |
| Prior service cost (credit) | **121** | 5 | **(156)** | 4 |
| Net amount recognized | $ **(240)** | $ (281) | $ **(2,152)** | $ (388) |

The accumulated benefit obligation for all defined benefit pension plans was $4,628 million and $6,013 million at December 31, 2022 and 2021, respectively.

Table of Contents

## COMPONENTS OF NET PERIODIC BENEFIT COST (CREDIT)

| (In millions) | Pension Benefits | | | OPEB | | |
|---|---|---|---|---|---|---|
| | 2022 | 2021 | 2020 | 2022 | 2021 | 2020 |
| Service cost | $ 45 | $ 56 | $ 23 | $ 35 | $ 51 | $ 8 |
| Interest cost | 144 | 103 | 64 | 72 | 74 | 19 |
| Expected return on plan assets | (355) | (359) | (140) | (37) | (40) | (20) |
| Amortization: | | | | | | |
| Net actuarial loss (gain) | 13 | 32 | 27 | (43) | 3 | 3 |
| Prior service costs (credits) | 5 | 1 | 1 | (3) | (2) | (2) |
| Settlements | (8) | (22) | (6) | — | — | — |
| Net periodic benefit cost (credit) | $ (156) | $ (189) | $ (31) | $ 24 | $ 86 | $ 8 |

For 2023, we estimate net periodic benefit cost (credit) as follows:

| (In millions) | |
|---|---|
| Defined benefit pension plans | $ (29) |
| OPEB plans | (130) |
| Total | $ (159) |

## COMPONENTS OF OTHER COMPREHENSIVE LOSS (INCOME)

The following includes details on the significant actuarial losses (gains) impacting the benefit obligation and other components of other comprehensive loss (income):

| (In millions) | Pension Benefits | | OPEB | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| Discount rates | $ (1,143) | $ (224) | $ (441) | $ (117) |
| Demographic updates | (102) | 76 | (7) | 3 |
| Mortality | 17 | 19 | — | 13 |
| Per capita healthcare costs[1] | — | — | (1,328) | (350) |
| Other | (8) | (2) | (5) | (5) |
| Actuarial gain on benefit obligation | (1,236) | (131) | (1,781) | (456) |
| Actual returns on assets under (over) expected | 1,165 | (309) | 134 | 11 |
| Amortization of net actuarial gain (loss) | (13) | (32) | 43 | (3) |
| Amortization of prior service credits (costs) | (5) | (1) | 3 | 2 |
| Settlements | 8 | 22 | — | — |
| Plan amendments[2] | 122 | — | (163) | 8 |
| Total recognized in other comprehensive loss (income) | $ 41 | $ (451) | $ (1,764) | $ (438) |

[1] The gain in per capita healthcare costs in 2022 relating to our OPEB plans is primarily due to the negotiation of favorable Medicare Advantage Prescription Drug healthcare rates, which will go into effect January 1, 2023. Additionally, we expanded the Medicare Advantage program to retirees on some of our other plans which added additional savings. The negotiated rates extend through 2025.

[2] The plan amendment loss related to our pension plans is attributable to the increase to the pre-2023 service multiplier to $115 and the service multiplier applicable to service beginning in 2023 to $126 for retirements after January 1, 2023. The plan amendment gain related to our OPEB plans is attributable to the implementation of a cap on healthcare costs for employees retiring after January 1, 2026 on one of our Cleveland-Cliffs Steel LLC plans as well as the extension of the Medicare Advantage offering to plans that previously didn't have the program.

## CONTRIBUTIONS

We make both required and discretionary pension contributions. Required contributions are based on minimum funding requirements pursuant to ERISA regulations. Funded OPEB plans are not subject to minimum regulatory funding requirements, but rather amounts are contributed pursuant to bargaining agreements. Contributions toward unfunded OPEB plans are payments made directly from corporate assets. Company contributions and payments we expect to make in 2023, and made in 2022 and 2021 are as follows:

| (In millions) | Pension Benefits[1] | OPEB | | |
| | | VEBA[2] | Direct Payments | Total |
|---|---|---|---|---|
| 2021 | $ 163 | $ 67 | $ 113 | $ 180 |
| 2022 | 6 | 85 | 113 | 198 |
| 2023 (Expected) | 32 | — | 73 | 73 |

[1] The 2021 pension contributions include $118 million in deferred 2020 pension contributions in connection with the CARES Act that were paid on January 4, 2021.

[2] Pursuant to the applicable bargaining agreements, benefits can be paid from certain VEBAs that are at least 70% funded (all VEBAs were over 70% funded at December 31, 2022). Certain agreements with plans holding VEBA assets have capped healthcare costs. For the Cleveland-Cliffs Steel LLC VEBA, we are required to make contributions based on earnings, and we may withdraw money from the VEBA plan to the extent funds are available for costs in excess of the cap. VEBA withdrawals are represented net of direct payments. There will be no further contributions to the Cleveland-Cliffs Steel LLC VEBA based on earnings for the remainder of labor agreement with the USW which expires September of 2026.

## ESTIMATED FUTURE BENEFIT PAYMENTS

| (In millions) | Pension Benefits | OPEB[1] |
|---|---|---|
| 2023 | $ 502 | $ 115 |
| 2024 | 450 | 110 |
| 2025 | 428 | 103 |
| 2026 | 421 | 99 |
| 2027 | 410 | 96 |
| 2028-2032 | 1,826 | 451 |

[1] OPEB benefit payments are displayed net of participant contributions.

## ASSUMPTIONS

The discount rates used to measure plan liabilities as of the December 31 measurement date are determined individually for each plan. The discount rates are determined by matching the projected cash flows used to determine the plan liabilities to a projected yield curve of high-quality corporate bonds available at the measurement date. Discount rates for expense are calculated using the granular approach for each plan.

Depending on the plan, we use either company-specific base mortality tables or tables issued by the Society of Actuaries. For tables issued by the Society of Actuaries, we use Pri-2012 mortality tables with adjustments for blue collar, white collar or no collar depending on the plan. Mortality is projected for all plans using Scale MP-2021 with generational projection for both years.

The following represents weighted-average assumptions used to determine benefit obligations:

| | Pension Benefits | | OPEB | |
| | December 31, | | December 31, | |
| | 2022 | 2021 | 2022 | 2021 |
|---|---|---|---|---|
| Discount rate | 5.47 % | 2.75 % | 5.52 % | 3.01 % |
| Interest crediting rate | 5.39 | 5.35 | N/A | N/A |
| Compensation rate increase | 3.00 | 2.52 | 3.00 | 3.00 |

The following represents weighted-average assumptions used to determine net benefit cost:

| | Pension Benefits | | | OPEB | | |
|---|---|---|---|---|---|---|
| | December 31, | | | December 31, | | |
| | **2022** | 2021 | 2020 | **2022** | 2021 | 2020 |
| Obligation discount rate | **3.21 %** | 2.32 % | 3.02 % | **3.33 %** | 2.46 % | 3.28 % |
| Service cost discount rate | **3.49** | 2.78 | 3.34 | **3.91** | 3.28 | 3.35 |
| Interest cost discount rate | **2.75** | 1.64 | 2.53 | **3.01** | 2.04 | 2.51 |
| | | | | | | |
| Interest crediting rate | **5.39** | 5.35 | 5.50 | **N/A** | N/A | N/A |
| Expected return on plan assets | **6.87** | 6.84 | 7.69 | **4.86** | 5.20 | 6.82 |
| Compensation rate increase | **2.74** | 2.54 | 2.56 | **3.00** | 3.00 | 3.00 |

The following represents assumed weighted-average health care cost trend rates:

| | December 31, | |
|---|---|---|
| | **2022** | 2021 |
| Health care cost trend rate assumed for next year[1] | **5.44 %** | 2.36 % |
| Ultimate health care cost trend rate | **4.50 %** | 4.50 % |
| Year that the ultimate rate is reached | **2030** | 2031 |

[1] The health care trend rate for the next year is weighted for all of our OPEB plans and factors in our Medicare Advantage Prescription Drug pricing arrangements.

## PLAN ASSETS

Our investment objectives with respect to our pension and OPEB assets are to maximize investment returns within reasonable and prudent levels of risk and maintain sufficient liquidity to meet benefit obligations over the life of each plan. The asset allocations are tailored to each individual plan and are determined by analyzing each plan's duration of benefit obligations, funded status and risk profile. Our investment strategy utilizes a broad mix of equity, fixed income and alternative investments to generate returns and manage risk. Equity investments are diversified across large-cap, mid-cap and small-cap companies located in the U.S. and worldwide, with a bias towards U.S. companies. Fixed income investments primarily include corporate bonds and government debt securities, which are generally customized based on a plan's obligation duration. To enhance our diversification, we also invest in hedge funds, private equity, structured credit, real estate and absolute return fixed income.

We review investment performance, asset allocations and policy compliance on a quarterly basis. In the fourth quarter of 2022, we increased our fixed income allocation for one of our more mature pension plans, which totaled $1.2 billion on December 31, 2022. We also transitioned $2.9 billion of pension and OPEB assets to be managed by an external investment advisor in a delegated manner. Due to the timing of this transition, the 2023 target allocation will not match our actual December 31, 2022 asset mix, as the investment strategy will require us to start reallocating assets in the first quarter of 2023. The anticipated changes in our asset allocation will be reflected in our 2023 expected return on assets.

The expected return on plan assets are calculated on a plan-by-plan basis and take into account each plan's strategic asset allocation. The calculation of rates by asset class are based primarily on our future expected returns and take into consideration the duration of the cash flows, active management and fees.

Assets for OPEB plans include VEBA trusts pursuant to bargaining agreements that are available to fund retired employees' life insurance obligations and medical benefits. The following table reflects the actual asset allocations for pension and VEBA assets as of December 31, 2022 and 2021, as well as the 2023 weighted average target asset allocations:

| | Pension Assets | | | VEBA Assets | | |
| | 2023 Target Allocation | Actual Asset Allocation at December 31, | | 2023 Target Allocation | Actual Asset Allocation at December 31, | |
| Asset Category | | 2022 | 2021 | | 2022 | 2021 |
|---|---|---|---|---|---|---|
| Equity securities | 33.3 % | 36.1 % | 47.6 % | 21.9 % | 22.0 % | 22.5 % |
| Fixed income | 41.6 | 40.9 | 34.6 | 73.7 | 67.4 | 66.4 |
| Hedge funds | 9.2 | 2.7 | 2.2 | 2.2 | 1.9 | 1.8 |
| Private equity | 3.3 | 3.3 | 2.7 | — | — | — |
| Structured credit | 2.6 | 6.9 | 5.6 | 1.1 | 1.2 | 1.2 |
| Real estate | 10.0 | 8.2 | 5.6 | 1.1 | 1.7 | 2.1 |
| Absolute return fixed income | — | 1.9 | 1.7 | — | 5.8 | 6.0 |
| Total | 100.0 % | 100.0 % | 100.0 % | 100.0 % | 100.0 % | 100.0 % |

**FAIR VALUE MEASUREMENTS**

Investments classified as Level 1 primarily include equity investments and fixed income mutual funds that are based on observable quoted market prices on an active exchange. Fixed income investments classified as Level 2 include U.S. Treasury STRIPS which are priced daily through a bond pricing vendor as well as corporate bonds, mortgage-backed securities and non-US bonds which have valuations based on their bid-ask spreads or quoted prices of securities with similar characteristics.

Hedge funds, private equity, structured credit and real estate investments are classified as Level 3 due to the absence of quoted market prices and inherent lack of liquidity. These investments are generally valued at estimated fair value based on financial inputs from our investment advisors, investment managers or third party appraisers.

Investment commitments are made in private equity funds and capital calls are made over the life of the funds to fund the commitments. As of December 31, 2022, remaining commitments for our private equity investments total $117 million for our pension and OPEB plans. Committed amounts are funded from plan assets when capital calls are made.

As a practical expedient, in accordance with ASC 820-10, certain investments that are measured at fair value using the NAV per share have not been classified in the fair value hierarchy below. NAV is based on the value of the underlying assets owned by the fund, minus its liabilities, and then divided by its number of shares outstanding.

The fair value of our pension assets by asset category is as follows:

| (In millions) | Quoted Prices in Active Markets for Identical Assets (Level 1) | | Significant Other Observable Inputs (Level 2) | | Significant Unobservable Inputs (Level 3) | | Investments Measured at Net Asset Value | | Total | |
| Asset Category | 2022 | 2021 | 2022 | 2021 | 2022 | 2021 | 2022 | 2021 | 2022 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|
| Equity securities: | | | | | | | | | | |
| U.S. equities | $ 564 | $ 1,157 | $ — | $ — | $ — | $ — | $ 569 | 775 | $ 1,133 | $ 1,932 |
| Global equities | 328 | 617 | — | — | — | — | 106 | 117 | 434 | 734 |
| Fixed income: | | | | | | | | | | |
| U.S. government securities[1] | 87 | 140 | 380 | 310 | — | — | 63 | 50 | 530 | 500 |
| U.S. corporate bonds | 574 | 502 | 266 | 371 | — | — | 373 | 503 | 1,213 | 1,376 |
| Non U.S. and other bonds | — | — | 32 | 66 | — | — | — | — | 32 | 66 |
| Hedge funds | — | — | — | — | 115 | 125 | — | — | 115 | 125 |
| Private equity | — | — | — | — | 143 | 151 | — | — | 143 | 151 |
| Structured credit | — | — | — | — | 298 | 315 | — | — | 298 | 315 |
| Real estate | — | — | — | — | 356 | 313 | — | — | 356 | 313 |
| Absolute return fixed income | — | — | — | — | — | — | 84 | 94 | 84 | 94 |
| Total | $ 1,553 | $ 2,416 | $ 678 | $ 747 | $ 912 | $ 904 | $ 1,195 | 1,539 | $ 4,338 | $ 5,606 |

[1] Includes cash equivalents.

A006632

The fair value of our VEBA assets by asset category is as follows:

| (In millions) | Quoted Prices in Active Markets for Identical Assets (Level 1) | | Significant Other Observable Inputs (Level 2) | | Significant Unobservable Inputs (Level 3) | | Investments Measured at Net Asset Value | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Asset Category | 2022 | 2021 | 2022 | 2021 | 2022 | 2021 | 2022 | 2021 | 2022 | 2021 |
| Equity securities: | | | | | | | | | | |
| U.S. equities | $ 24 | $ 26 | $ — | $ — | $ — | $ — | $ 89 | $ 103 | $ 113 | $ 129 |
| Global equities | 5 | 6 | — | — | — | — | 42 | 48 | 47 | 54 |
| Fixed income: | | | | | | | | | | |
| U.S. government securities[1] | 149 | 111 | 79 | 80 | — | — | — | — | 228 | 191 |
| U.S. corporate bonds | 146 | 219 | 117 | 129 | — | — | — | — | 263 | 348 |
| Hedge funds | — | — | — | — | 14 | 15 | — | — | 14 | 15 |
| Private equity | — | — | — | — | — | — | — | — | — | — |
| Structured credit | — | — | — | — | 9 | 10 | — | — | 9 | 10 |
| Real estate | — | — | — | — | 12 | 17 | — | — | 12 | 17 |
| Absolute return fixed income | — | — | — | — | — | — | 42 | 48 | 42 | 48 |
| Total | $ 324 | $ 362 | $ 196 | $ 209 | $ 35 | $ 42 | $ 173 | $ 199 | $ 728 | $ 812 |

[1] Includes cash equivalents.

The following represents the fair value measurements of changes in plan assets using significant unobservable inputs (Level 3):

| (In millions) | Pension Assets | | VEBA Assets | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| Beginning balance — January 1 | $ 904 | $ 670 | $ 42 | $ 38 |
| Actual return on plan assets: | | | | |
| Relating to assets still held at the reporting date | (6) | 124 | 1 | 6 |
| Relating to assets sold during the period | 15 | 8 | 1 | — |
| Purchases | 28 | 142 | — | — |
| Sales | (29) | (40) | (9) | (2) |
| Acquired through business combinations | — | — | — | — |
| Ending balance — December 31 | $ 912 | $ 904 | $ 35 | $ 42 |

## DEFINED CONTRIBUTION PLANS

Most employees are eligible to participate in various defined contribution plans. Certain of these plans have features with matching contributions or other Company contributions based on our financial results. Company contributions to these plans are expensed as incurred. Total expense from these plans was $52 million, $55 million and $22 million in 2022, 2021 and 2020, respectively.

## MULTIEMPLOYER PLANS

We contribute to multiemployer pension plans according to collective bargaining agreements that cover certain union-represented employees. The risks of participating in these multiemployer plans are different from the risks of participating in single-employer pension plans in the following respects:

- Assets contributed to a multiemployer plan by one employer may be used to provide benefits to employees of other participating employers.

- If a participating employer stops contributing to a multiemployer plan, the unfunded obligations of the plan may be borne by the remaining participating employers.

- If the multiemployer plan becomes significantly underfunded or is unable to pay its benefits, we may be required to contribute additional amounts in excess of the rate required by the collective bargaining agreements.

- If we choose to stop participating in a multiemployer plan, we may be required to pay that plan an amount based on the underfunded status of the plan, referred to as a withdrawal liability.

Information with respect to multiemployer plans in which we participate follows:

| Pension Fund | EIN/Pension Plan Number | Pension Protection Act Zone Status[1] | | FIP/RP Status Pending/Implemented[2] | Contributions | | | Surcharge Imposed[3] | Expiration Date of Collective Bargaining Agreement[4] |
|---|---|---|---|---|---|---|---|---|---|
| | | **2022** | 2021 | | **2022** | 2021 | 2020 | | |
| Steelworkers Pension Trust | 23-6648508/499 | Green | Green | No | $ **93** | $ 88 | $ 14 | No | 4/1/2025 to 9/1/2026 |
| IAM National Pension Fund's National Pension Plan | 51-6031295/002 | Red | Red | Yes | **22** | 16 | 16 | Yes | 5/15/2023 to 6/15/2025 |
| Other Plans[5] | | | | | | | | | |
| Total | | | | | $ **115** | $ 104 | $ 30 | | |

[1] The most recent Pension Protection Act zone status available in 2022 and 2021 is for each plan's year-end at December 31, 2021 and 2020. The plan's actuary certifies the zone status. Generally, plans in the red zone are less than 65% funded, plans in the yellow zone are between 65% and 80% funded, and plans in the green zone are at least 80% funded. The IAM National Pension Fund's National Pension Plan voluntarily elected to place itself in the "Red Zone" in April 2019 and has implemented a rehabilitation plan to address its underfunded status. Additional contributions will be required as part of the rehabilitation plan until the plan exits the "Red Zone".

[2] The "FIP/RP Status Pending/Implemented" column indicates plans for which a financial improvement plan or a rehabilitation plan is either pending or has been implemented, as defined by ERISA.

[3] The surcharge represents an additional required contribution due as a result of the critical funding status of the plan.

[4] We are a party to six collective bargaining agreements that require contributions to the Steelworkers Pension Trust and three collective bargaining agreements that require contributions to the IAM National Pension Fund's National Pension Plan.

[5] Plans that are not individually significant to our Company are presented in aggregate.

With the ratification of our USW labor agreements in 2022, we increased our contribution rate to the Steelworkers Pension Trust by $3.50 to $4.00 per eligible hour. The increase was effective November 1, 2022.

We are one of the largest contributors to the Steelworkers Pension Trust. Our contributions exceeded 5% of total combined contributions in 2022 and 2021. As of January 1, 2022 (the last date for which we have information), the Steelworkers Pension Trust had a total actuarial liability of $6,170 million and assets with a market value of $6,871 million, for a funded ratio of about 111%.

## NOTE 10 - STOCK COMPENSATION PLANS

At December 31, 2022, we had outstanding awards under three share-based compensation plans: the 2021 Equity Plan, the A&R 2015 Equity Plan and the 2012 Amended Equity Plan. On April 28, 2021, our shareholders approved the 2021 Equity Plan, which succeeded the A&R 2015 Equity Plan and made available 26.0 million new common shares plus 2.5 million shares remaining available under the A&R 2015 Equity Plan. As of December 31, 2022, there were 25.0 million remaining shares available for grant under the 2021 Equity Plan. No additional grants were issued from the 2012 Amended Equity Plan or the A&R 2015 Equity Plan after the date of approval of the 2021 Equity Plan; however, all awards previously granted under the predecessor plans will continue in accordance with the terms of the outstanding awards.

Table of Contents

## STOCK-BASED COMPENSATION EXPENSE

The following table summarizes the total compensation expense recognized for stock-based compensation awards:

| (In millions, except per share amounts) | 2022 | 2021 | 2020 |
|---|---|---|---|
| Cost of goods sold | $ (5) | $ (2) | $ (2) |
| Selling, general and administrative expenses | (23) | (16) | (13) |
| Acquisition-related costs | — | — | (2) |
| Stock based compensation expense | (28) | (18) | (17) |
| Income tax benefit | 7 | 4 | 4 |
| Stock based compensation expense, net of tax | $ (21) | $ (14) | $ (13) |
| | | | |
| Decrease in basic earnings per common share | $ (0.04) | $ (0.03) | $ (0.03) |
| Decrease in diluted earnings per common share | $ (0.04) | $ (0.03) | $ (0.03) |

The total compensation cost related to outstanding awards not yet recognized is $40 million at December 31, 2022. This expense is expected to be recognized over the remaining weighted-average period of 1.8 years.

## PERFORMANCE SHARES

The following table summarizes the performance award activity:

| | 2022 | | 2021 | | 2020 | |
|---|---|---|---|---|---|---|
| (Shares in millions) | Number of Shares | Weighted Average Grant Date Fair Value | Number of Shares | Weighted Average Grant Date Fair Value | Number of Shares | Weighted Average Grant Date Fair Value |
| Outstanding at beginning of year | 2.4 | $ 14.04 | 2.5 | $ 10.34 | 1.9 | $ 15.58 |
| Granted | 1.0 | 28.46 | 0.7 | 25.12 | 1.0 | 6.93 |
| Granted - replacement awards | — | — | — | — | 1.6 | 4.59 |
| Distributed | (1.1) | 17.04 | (1.3) | 11.74 | (1.9) | 12.23 |
| Performance adjustment | 0.5 | 17.84 | 0.6 | 11.93 | 0.5 | 15.63 |
| Forfeited/canceled | (0.1) | 23.74 | (0.1) | 11.27 | (0.6) | 5.70 |
| Outstanding at end of year | 2.7 | $ 18.53 | 2.4 | $ 14.04 | 2.5 | $ 10.34 |

On March 13, 2020, we granted 1.0 million long-term performance plan awards and 0.5 million performance shares as AK Steel replacement awards. The long-term performance plan awards are based on a three-year Adjusted EBITDA metric.

We value our performance shares using a Monte Carlo simulation on the grant date. The outstanding performance shares vest over a period of three years and are intended to be paid out in common shares. Performance is measured on the basis of relative TSR for the period and measured against the constituents of the S&P Metals and Mining ETF Index. The number of shares actually earned at the end of the three-year period will vary, based on performance, from 0% to 200% of performance shares granted.

## RESTRICTED STOCK UNITS

The following table summarizes the restricted stock units activity:

| | 2022 | | 2021 | | 2020 | |
|---|---|---|---|---|---|---|
| (Shares in millions) | Number of Shares | Weighted Average Grant Date Fair Value | Number of Shares | Weighted Average Grant Date Fair Value | Number of Shares | Weighted Average Grant Date Fair Value |
| Outstanding at beginning of year | 2.1 | $ 10.31 | 2.1 | $ 7.12 | 2.1 | $ 9.10 |
| Granted | 1.0 | 19.41 | 0.7 | 17.45 | 1.0 | 4.87 |
| Granted - replacement awards | — | — | — | — | 0.2 | 4.87 |
| Distributed | (0.6) | 10.47 | (0.6) | 7.31 | (1.1) | 8.58 |
| Forfeited/canceled | (0.1) | 17.82 | (0.1) | 9.50 | (0.1) | 7.31 |
| Outstanding at end of year | 2.4 | $ 13.66 | 2.1 | $ 10.31 | 2.1 | $ 7.12 |

We value our restricted stock units using the closing price of our common shares on the grant date. All of the outstanding restricted stock units are subject to continued employment, are retention based, and are payable in common shares or cash in certain circumstances at a time determined by the Compensation Committee at its discretion. Most restricted stock units were granted under three-year cliff vesting terms.

## STOCK OPTIONS

The following table summarizes the stock option activity:

| | **2022** | | 2021 | | 2020 | |
|---|---|---|---|---|---|---|
| (Shares in millions) | **Number of Shares** | **Weighted Average Exercise Price** | Number of Shares | Weighted Average Exercise Price | Number of Shares | Weighted Average Exercise Price |
| Outstanding at beginning of year | **1.0** | **$ 12.75** | 2.5 | $ 11.60 | 0.6 | $ 10.42 |
| Granted - replacement awards | **—** | **—** | — | — | 2.0 | 11.86 |
| Exercised | **(0.3)** | **16.55** | (1.5) | 10.36 | (0.1) | 7.01 |
| Forfeited/canceled | **(0.1)** | **22.78** | — | 36.48 | — | 41.04 |
| Outstanding at end of year | **0.6** | **$ 10.39** | 1.0 | $ 12.75 | 2.5 | $ 11.60 |
| Exercisable at end of year | **0.6** | **$ 10.52** | 0.9 | $ 13.35 | 2.2 | $ 11.86 |

Stock options granted to date generally vest over a period from one to three years with an expiration date at ten years from the date of grant. On March 13, 2020, we granted 2.0 million options as AK Steel replacement awards. The weighted average fair value of the converted options was $0.51 per share and was calculated using the Black-Scholes option-pricing model.

The total intrinsic value of options exercised in 2022 was $3 million and the amount in 2021 was $13 million. For options outstanding at December 31, 2022, the weighted-average remaining contractual life was 2.6 years and the aggregate intrinsic value was $4 million. For options exercisable at December 31, 2022, the weighted-average remaining contractual life was 2.4 years and the aggregate intrinsic value was $4 million.

## NONEMPLOYEE DIRECTORS

Our nonemployee directors are entitled to receive restricted share awards under the Directors' Plan. For 2022, 2021 and 2020, nonemployee directors were granted a specified number of restricted shares, with a value equal to $140,000, $120,000 and $100,000, respectively. The number of shares is based on the closing price of our common shares on the date of the Annual Meeting. The restricted share awards issued under the Directors' Plan generally vest 12 months from the grant date. The awards are subject to any deferral election and the terms of the Directors' Plan and an award agreement.

## NOTE 11 - INCOME TAXES

*Income (loss) from continuing operations before income taxes* includes the following components:

| | Year Ended December 31, | | |
|---|---|---|---|
| (In millions) | **2022** | 2021 | 2020 |
| United States | **$ 1,803** | $ 3,827 | $ (201) |
| Foreign | **(7)** | (24) | 8 |
| Total | **$ 1,796** | $ 3,803 | $ (193) |

The components of the income tax provision (benefit) on continuing operations consist of the following:

| (In millions) | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Current provision (benefit): | | | |
| United States federal | $ 201 | $ 14 | $ (2) |
| United States state & local | 131 | 55 | — |
| Foreign | 1 | — | (1) |
| | 333 | 69 | (3) |
| Deferred provision (benefit): | | | |
| United States federal | 117 | 683 | (95) |
| United States state & local | (22) | 31 | (11) |
| Foreign | (5) | (10) | (2) |
| Total income tax provision (benefit) from continuing operations | $ 423 | $ 773 | $ (111) |

Reconciliation of our income tax attributable to continuing operations computed at the U.S. federal statutory rate is as follows:

| (In millions) | 2022 | | 2021 | | 2020 | |
|---|---|---|---|---|---|---|
| Tax at U.S. statutory rate | $ 377 | 21 % | $ 799 | 21 % | $ (41) | 21 % |
| Increase (decrease) due to: | | | | | | |
| Percentage depletion in excess of cost depletion | (49) | (3) | (99) | (3) | (42) | 22 |
| State taxes, net | 71 | 4 | 86 | 2 | (11) | 6 |
| Federal & state provision to return | 27 | 1 | (2) | — | — | — |
| Other items, net | (3) | — | (11) | — | (17) | 8 |
| Provision for income tax expense (benefit) and effective income tax rate including discrete items | $ 423 | 23 % | $ 773 | 20 % | $ (111) | 57 % |

The decrease in income tax expense in 2022, as compared to the prior year, is directly related to the decrease in the pre-tax book income year-over-year.

The increase in income tax expense in 2021 from income tax benefit in 2020 is directly correlated to the increase in pre-tax book income year-over-year.

The components of income taxes for other than continuing operations consisted of the following:

| (In millions) | 2022 | 2021 | 2020 |
|---|---|---|---|
| Other comprehensive income (loss): | | | |
| Pension and OPEB | $ (425) | $ (206) | $ (52) |
| Derivative financial instruments | 26 | (21) | (1) |
| Total | $ (399) | $ (227) | $ (53) |

Significant components of our deferred tax assets and liabilities are as follows:

| (In millions) | | 2022 | | 2021 |
|---|---|---|---|---|
| Deferred tax assets: | | | | |
| Operating loss and other carryforwards | $ | 389 | $ | 379 |
| Pension and OPEB liabilities | | 244 | | 584 |
| Environmental | | 96 | | 58 |
| Product inventories | | 54 | | 28 |
| State and local | | 14 | | 109 |
| Lease liabilities | | 62 | | 65 |
| Other liabilities | | 135 | | 136 |
| Total deferred tax assets before valuation allowance | | 994 | | 1,359 |
| Deferred tax asset valuation allowance | | (390) | | (409) |
| Net deferred tax assets | | 604 | | 950 |
| Deferred tax liabilities: | | | | |
| Investment in ventures | | (195) | | (191) |
| Lease assets | | (38) | | (93) |
| Property, plant and equipment and mineral rights | | (827) | | (641) |
| Other assets | | (122) | | (123) |
| Total deferred tax liabilities | | (1,182) | | (1,048) |
| Net deferred tax assets (liabilities) | $ | (578) | $ | (98) |

We had gross domestic (including states) and foreign NOLs of $2,278 million and $1,444 million, respectively, at December 31, 2022. We had gross domestic (including states) and foreign NOLs of $2,081 million and $1,407 million, respectively, at December 31, 2021. The U.S. federal NOLs will begin to expire in 2034 and state NOLs begin to expire in 2023. The foreign NOLs begin to expire in 2035. We had gross interest expense limitation carryforwards of $77 million and $18 million for the years ended December 31, 2022 and 2021, respectively. This interest expense can be carried forward indefinitely.

The changes in the valuation allowance are presented below:

| (In millions) | | 2022 | | 2021 | | 2020 |
|---|---|---|---|---|---|---|
| Balance at beginning of year | $ | 409 | $ | 836 | $ | 441 |
| Change in valuation allowance: | | | | | | |
| Included in income tax benefit | | (19) | | (82) | | (3) |
| Increase (decrease) from acquisitions | | — | | (345) | | 398 |
| Balance at end of year | $ | 390 | $ | 409 | $ | 836 |

At December 31, 2022 and 2021, we have a valuation allowance recorded of $42 million and $339 million, respectively, related to foreign deferred tax assets, and an additional $48 million and $70 million, respectively, against certain state NOLs, which are expected to expire before utilization.

During 2021, we recorded a decrease to the valuation allowance of $345 million related to the election filed with our 2020 federal tax return to waive the pre-acquisition NOLs that are limited under Section 382 of the IRC. An offsetting decrease was recorded in the NOL deferred tax asset in the same period. These amounts related to a portion of the $398 million valuation allowance recorded during 2020 through opening balance sheet adjustments to reflect the portion of federal and state NOLs that are limited under Section 382 of the IRC acquired through the AK Steel Merger.

At December 31, 2022 and 2021, we had no cumulative undistributed earnings of foreign subsidiaries included in retained earnings. Accordingly, no provision has been made for U.S. deferred taxes related to future repatriation of earnings.

A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows:

| (In millions) | | 2022 | | 2021 | | 2020 |
|---|---|---|---|---|---|---|
| Unrecognized tax benefits balance as of January 1 | $ | 35 | $ | 107 | $ | 29 |
| Increases for tax positions in current year | | 24 | | 4 | | 7 |
| Decrease due to tax positions in prior year | | (1) | | (66) | | (4) |
| Lapses in statutes of limitations | | — | | (10) | | — |
| Increases from acquisitions | | — | | — | | 75 |
| Unrecognized tax benefits balance as of December 31 | $ | 58 | $ | 35 | $ | 107 |

The following table presents the classification of unrecognized tax benefits on the Statements of Consolidated Financial Position:

| Balance Sheet Location (In millions) | December 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| Other current liabilities | — | $ 1 |
| Other non-current liabilities | 58 | 34 |

If the unrecognized tax benefits were recognized, the full $58 million would impact the effective tax rate. Interest and penalties related to unrecognized tax benefits are $3 million for the year ended December 31, 2022. We do not expect that the amount of unrecognized benefits will change significantly within the next 12 months.

Tax years 2016 and forward remain subject to examination for the U.S., and tax years 2018 and forward remain subject to examination for Canada.

## NOTE 12 - LEASE OBLIGATIONS

Our operating leases consist primarily of leases for land, office space, rail cars and storage tanks. Our finance leases consist primarily of mining equipment, an on-site coke battery and rail cars. We use our incremental borrowing rate as the discount rate to determine the present value of the lease payments, as our leases do not have readily determinable implicit discount rates. Our incremental borrowing rate is the rate of interest that we would have to borrow on a collateralized basis over a similar term and amount in a similar economic environment to pay our lease obligations. We determine the incremental borrowing rates for our leases by adjusting the local risk-free interest rate with a credit risk premium corresponding to our credit rating. From time to time, we may enter into arrangements for the construction or purchase of an asset and then enter into a financing arrangement to lease the asset. We recognize leased assets and liabilities under these arrangements when we obtain control of the asset.

Lease costs are presented below:

| (In millions) | Year Ended December 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| Operating leases | $ 64 | $ 70 |
| Finance leases: | | |
| Amortization of right-of-use assets | 103 | 94 |
| Interest on lease liabilities | 8 | 9 |
| Short-term leases | 160 | 66 |
| Total | $ 335 | $ 239 |

Other information related to leases was as follows:

| (In millions) | Year Ended December 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| Cash paid for amounts included in measurement of lease liabilities: | | |
| Operating leases within cash flows from operating activities | $ 62 | $ 70 |
| Finance leases within cash flows from operating activities | $ 8 | $ 9 |
| Finance leases within cash flows from financing activities | $ 96 | $ 94 |
| Right-of-use assets obtained in exchange for new finance lease liabilities[1] | $ 55 | $ 50 |
| Weighted-average remaining lease term - operating leases (in years) | 9 | 8 |
| Weighted-average remaining lease term - finance leases (in years) | 5 | 5 |
| Weighted-average discount rate - operating leases | 8 % | 7 % |
| Weighted-average discount rate - finance leases | 5 % | 4 % |

[1] Right-of-use assets obtained in acquisitions are not included in this figure.

Future minimum lease payments under noncancellable finance and operating leases as of December 31, 2022 were as follows:

| (In millions) | Finance Leases | | Operating Leases | |
|---|---|---|---|---|
| 2023 | $ | 101 | $ | 56 |
| 2024 | | 36 | | 48 |
| 2025 | | 32 | | 40 |
| 2026 | | 24 | | 35 |
| 2027 | | 13 | | 30 |
| Thereafter | | 63 | | 123 |
| Total future minimum lease payments | | 269 | | 332 |
| Less: imputed interest | | 54 | | 94 |
| Total lease payments | | 215 | | 238 |
| Less: current portion of lease liabilities | | 93 | | 43 |
| Long-term lease liabilities | $ | 122 | $ | 195 |

The current and long-term portions of our finance and operating lease liabilities are included in *Other current liabilities* and *Other non-current liabilities*, respectively.

## NOTE 13 - ASSET RETIREMENT OBLIGATIONS

The accrued closure obligation provides for contractual and legal obligations related to our indefinitely idled and closed operations and for the eventual closure of our active operations. The closure date for each of our active mine sites was determined based on the exhaustion date of the remaining mineral reserves, and the amortization of the related asset and accretion of the liability is recognized over the estimated mine lives. The closure date and expected timing of the capital requirements to meet our obligations for our indefinitely idled or closed mines is determined based on the unique circumstances of each property. For indefinitely idled or closed mines, the accretion of the liability is recognized over the anticipated timing of remediation. As the majority of our asset retirement obligations at our steelmaking operations have indeterminate settlement dates, asset retirement obligations have been recorded at present values using estimated ranges of the economic lives of the underlying assets.

We performed a detailed assessment of our asset retirement obligations related to our active operations most recently in 2020 in accordance with our accounting policy, which requires us to perform an in-depth evaluation of the liability every three years in addition to routine annual assessments. In 2020, we employed third-party specialists to assist in the evaluation.

The following is a summary of our asset retirement obligations:

| | December 31, | | | |
|---|---|---|---|---|
| (In millions) | **2022** | | 2021 | |
| Asset retirement obligations[1] | $ | **520** | $ | 449 |
| Less: current portion | | **21** | | 35 |
| Long-term asset retirement obligations | $ | **499** | $ | 414 |

[1] Includes $277 million and $293 million related to our active operations as of December 31, 2022 and 2021, respectively.

The following is a roll-forward of our asset retirement obligation liability:

| (In millions) | **2022** | | 2021 | |
|---|---|---|---|---|
| Asset retirement obligation as of January 1 | $ | **449** | $ | 342 |
| Increase from acquisitions | | **—** | | 116 |
| Reclassification from environmental obligations | | **63** | | — |
| Accretion expense | | **26** | | 18 |
| Remediation payments | | **(40)** | | (29) |
| Revision in estimated cash flows | | **22** | | 2 |
| Asset retirement obligation as of December 31 | $ | **520** | $ | 449 |

The increase from revision in estimated cash flows primarily relates to rising electricity costs associated with required water management systems related to closed coal mines in Pennsylvania.

## NOTE 14 - FAIR VALUE OF FINANCIAL INSTRUMENTS

The carrying values of certain financial instruments (e.g. *Accounts receivable, net*, *Accounts payable* and *Other current liabilities*) approximate fair value and, therefore, have been excluded from the table below. See NOTE 15 – DERIVATIVE INSTRUMENTS AND HEDGING for information on our derivative instruments, which are accounted for at fair value on a recurring basis.

A summary of the carrying value and fair value of other financial instruments were as follows:

| (In millions) | Classification | December 31, 2022 Carrying Value | December 31, 2022 Fair Value | December 31, 2021 Carrying Value | December 31, 2021 Fair Value |
|---|---|---|---|---|---|
| Senior notes | Level 1 | $ 2,385 | $ 2,311 | $ 3,561 | $ 3,911 |
| IRBs | Level 1 | — | — | 68 | 66 |
| ABL Facility - outstanding balance | Level 2 | 1,864 | 1,864 | 1,609 | 1,609 |
| Total | | $ 4,249 | $ 4,175 | $ 5,238 | $ 5,586 |

The valuation of financial assets classified in Level 2 was determined using a market approach based upon quoted prices for similar assets in active markets or other inputs that were observable.

## NOTE 15 - DERIVATIVE INSTRUMENTS AND HEDGING

We are exposed to fluctuations in market prices of raw materials and energy sources. We may use cash-settled commodity swaps to hedge the market risk associated with the purchase of certain of our raw materials and energy requirements. Our hedging strategy is to reduce the effect on earnings from the price volatility of these various commodity exposures, including timing differences between when we incur raw material commodity costs and when we receive sales surcharges from our customers based on those raw materials. Independent of any hedging activities, price changes in any of these commodity markets could negatively affect operating costs.

Our commodity contracts are designated as cash flow hedges for accounting purposes, and we record the gains and losses for the derivatives in *Accumulated other comprehensive income* until we reclassify them into *Cost of goods sold* when we recognize the associated underlying operating costs. Refer to NOTE 17 - ACCUMULATED OTHER COMPREHENSIVE INCOME (LOSS) for further information.

Our commodity contracts are classified as Level 2 as values were determined using a market approach based upon quoted prices for similar assets or other inputs that were observable.

The following table presents the notional amount of our outstanding hedge contracts:

| Commodity Contracts | Unit of Measure | Maturity Dates | Notional Amount December 31, 2022 | Notional Amount December 31, 2021 |
|---|---|---|---|---|
| Natural Gas | MMBtu | January 2023 - May 2025 | 127,790,000 | 92,591,000 |
| Zinc | Metric tons | Not Applicable | — | 16,092 |
| Electricity | Megawatt hours | January 2023 - December 2023 | 432,043 | — |
| Tin | Metric tons | January 2023 - December 2023 | 180 | — |

The following table presents the fair value of our cash flow hedges and the classification on the Statements of Consolidated Financial Position:

| Balance Sheet Location (In millions) | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Other current assets | $ 15 | $ 40 |
| Other non-current assets | 30 | — |
| Other current liabilities | (87) | (10) |
| Other non-current liabilities | (10) | (4) |

## NOTE 16 - CAPITAL STOCK

### SHARE REPURCHASE PROGRAM

On February 10, 2022, our Board of Directors authorized a program to repurchase outstanding common shares in the open market or in privately negotiated transactions, which may include purchases pursuant to Rule 10b5-1 plans or accelerated share repurchases, up to a maximum of $1 billion. We are not obligated to make any purchases and the program may be suspended or

discontinued at any time. The share repurchase program does not have a specific expiration date. For the year ended December 31, 2022, we repurchased 12.5 million common shares at a cost of $240 million in the aggregate.

## 1.500% 2025 CONVERTIBLE SENIOR NOTES REDEMPTION

On December 1, 2021, we issued a notice of redemption for all $294 million in aggregate principal amount outstanding of our 1.500% 2025 Convertible Senior Notes. Our 1.500% 2025 Convertible Senior Notes were redeemed on January 18, 2022, through a combination settlement, with the aggregate principal amount of $294 million paid in cash, and 24 million common shares, with a fair value of $499 million, delivered to noteholders in settlement of the premium due per the terms of the indenture, plus cash in respect of the accrued and unpaid interest on the 1.500% 2025 Convertible Senior Notes to, but not including, the redemption date per the terms of the indenture.

## UNDERWRITTEN PUBLIC OFFERING

On February 11, 2021, we sold 20 million of our common shares and 40 million common shares were sold by an affiliate of ArcelorMittal in an underwritten public offering. In each case, shares were sold at a price per share of $16.12. Prior to this sale, ArcelorMittal held approximately 78 million of our common shares, which were issued as a part of the consideration in connection with the AM USA Transaction. We did not receive any proceeds from the sale of the 40 million common shares sold on behalf of ArcelorMittal. We used the net proceeds from the offering, plus cash on hand, to redeem $322 million aggregate principal amount of our outstanding 9.875% 2025 Senior Secured Notes.

## SERIES B PARTICIPATING REDEEMABLE PREFERRED STOCK REDEMPTION

We had 583,273 shares of our Series B Participating Redeemable Preferred Stock issued and outstanding as of December 31, 2020. During the third quarter of 2021, we redeemed all 583,273 shares of our Series B Participating Redeemable Preferred Stock at a redemption price of $1.3 billion using borrowings under our ABL Facility.

## AMENDMENT TO ARTICLES OF INCORPORATION

On April 29, 2021, we filed a Certificate of Amendment to our Fourth Amended Articles of Incorporation, as amended, to increase the total number of authorized common shares from 600,000,000 to 1,200,000,000.

## PREFERRED STOCK

We have 3,000,000 shares of Serial Preferred Stock, Class A, without par value, authorized, of which none are issued or outstanding as of December 31, 2022. We also have 4,000,000 shares of Serial Preferred Stock, Class B, without par value, authorized, of which none are issued or outstanding as of December 31, 2022.

A006642

## NOTE 17 - ACCUMULATED OTHER COMPREHENSIVE INCOME (LOSS)

The components of *Accumulated other comprehensive income* within Cliffs shareholders' equity and related tax effects allocated to each are shown below:

| (In millions) | December 31, | | |
|---|---|---|---|
| | **2022** | 2021 | 2020 |
| **Foreign Currency Translation** | | | |
| Beginning balance | $ 1 | $ 3 | $ — |
| Other comprehensive income (loss) before reclassifications | (2) | (2) | 3 |
| Ending balance | $ (1) | $ 1 | $ 3 |
| | | | |
| **Derivative Instruments** | | | |
| Beginning balance | $ 68 | $ (1) | $ (3) |
| Other comprehensive income (loss) before reclassifications | 146 | 151 | (7) |
| Income tax | (33) | (34) | 1 |
| Other comprehensive income (loss) before reclassifications, net of tax | 113 | 117 | (6) |
| Losses (gains) reclassified from AOCI to net income[1] | (256) | (61) | 10 |
| Income tax expense (benefit)[2] | 59 | 13 | (2) |
| Net losses (gains) reclassified from AOCI to net income | (197) | (48) | 8 |
| Ending balance | $ (16) | $ 68 | $ (1) |
| | | | |
| **Pension and OPEB** | | | |
| Beginning balance | $ 549 | $ (135) | $ (316) |
| Other comprehensive income before reclassifications[4] | 1,759 | 878 | 210 |
| Income tax | (434) | (203) | (47) |
| Other comprehensive income before reclassifications, net of tax | 1,325 | 675 | 163 |
| Losses (gains) reclassified from AOCI to net income[3] | (36) | 12 | 23 |
| Income tax expense (benefit)[2] | 9 | (3) | (5) |
| Net losses (gains) reclassified from AOCI to net income | (27) | 9 | 18 |
| Ending balance | $ 1,847 | $ 549 | $ (135) |
| | | | |
| **Total AOCI Ending Balance** | $ 1,830 | $ 618 | $ (133) |

[1] Amounts recognized in *Cost of goods sold* in the Statements of Consolidated Operations.

[2] Amounts recognized in *Income tax benefit (expense)* in the Statements of Consolidated Operations.

[3] Amounts recognized in *Net periodic benefit credits other than service cost component* in the Statements of Consolidated Operations.

[4] Refer to NOTE 9 - PENSIONS AND OTHER POSTRETIREMENT BENEFITS for further information.

## NOTE 18 - VARIABLE INTEREST ENTITIES

### SUNCOKE MIDDLETOWN

We purchase all the coke and electrical power generated from SunCoke Middletown's plant under long-term supply agreements and have committed to purchase all the expected production from the facility through 2032. We consolidate SunCoke Middletown as a VIE because we are the primary beneficiary despite having no ownership interest in SunCoke Middletown. SunCoke Middletown had income before income taxes of $47 million and $52 million for the years ended December 31, 2022 and 2021, respectively, which was included in our consolidated *Income (loss) from continuing operations before income taxes.*

Table of Contents

The assets of the consolidated VIE can only be used to settle the obligations of the consolidated VIE and not obligations of the Company. The creditors of SunCoke Middletown do not have recourse to the assets or general credit of the Company to satisfy liabilities of the VIE. The Statements of Consolidated Financial Position includes the following amounts for SunCoke Middletown:

| | December 31, | |
| --- | --- | --- |
| (In millions) | 2022 | 2021 |
| Inventories | $ 28 | $ 20 |
| Property, plant and equipment, net | 288 | 300 |
| Accounts payable | (19) | (12) |
| Other assets (liabilities), net | (27) | (12) |
| Noncontrolling interests | (270) | (296) |

## NOTE 19 - EARNINGS PER SHARE

The following table summarizes the computation of basic and diluted EPS:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| (In millions, except per share amounts) | 2022 | 2021 | 2020 |
| Income (loss) from continuing operations | $ 1,373 | $ 3,030 | $ (82) |
| Income from continuing operations attributable to noncontrolling interest | (41) | (45) | (41) |
| Net income (loss) from continuing operations attributable to Cliffs shareholders | 1,332 | 2,985 | (123) |
| Income from discontinued operations, net of tax | 3 | 3 | 1 |
| Net income (loss) attributable to Cliffs shareholders | $ 1,335 | $ 2,988 | $ (122) |
| | | | |
| Weighted average number of shares: | | | |
| Basic | 519 | 498 | 379 |
| Redeemable preferred shares | — | 33 | — |
| Convertible senior notes[1] | 2 | 22 | — |
| Employee stock plans | 3 | 5 | — |
| Diluted | 524 | 558 | 379 |
| | | | |
| Earnings (loss) per common share attributable to Cliffs common shareholders - basic[2] | | | |
| Continuing operations | $ 2.57 | $ 5.62 | $ (0.32) |
| Discontinued operations | — | 0.01 | — |
| | $ 2.57 | $ 5.63 | $ (0.32) |
| Earnings (loss) per common share attributable to Cliffs common shareholders - diluted: | | | |
| Continuing operations | $ 2.55 | $ 5.35 | $ (0.32) |
| Discontinued operations | — | 0.01 | — |
| | $ 2.55 | $ 5.36 | $ (0.32) |

[1] On January 1, 2022, we adopted *ASU 2020-06, Debt - Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging - Contracts in Entity's Own Equity (Subtopic 815-40)*. We utilized the modified retrospective method of adoption; using this approach, the guidance was applied to transactions outstanding as of the beginning of the fiscal year.

[2] For the year ended December 31, 2021, basic earnings per share was calculated by dividing *Net income (loss) attributable to Cliffs shareholders*, less $187 million of earnings attributed to Series B Participating Redeemable Preferred Stock, by the weighted average number of basic common shares outstanding during the period presented.

## NOTE 20 - COMMITMENTS AND CONTINGENCIES

### PURCHASE COMMITMENTS

We purchase portions of the principal raw materials required for our steel manufacturing operations under annual and multi-year agreements, some of which have minimum quantity requirements. We also use large volumes of natural gas, electricity and industrial gases in our steel manufacturing operations. We negotiate most of our purchases of chrome, industrial gases and a portion of our electricity under multi-year agreements. Our purchases of coke are made under annual or multi-year agreements

with periodic price adjustments. We typically purchase coal under annual fixed-price agreements. We also purchase certain transportation services under multi-year contracts with minimum quantity requirements.

Unconditional purchase obligations, including take-or-pay agreements, are as follows (in millions):

| 2023 | 2024 | 2025 | 2026 | 2027 | Thereafter |
|------|------|------|------|------|------------|
| $ 2,503 | $ 1,072 | $ 766 | $ 225 | $ 117 | $ 785 |

## CONTINGENCIES

We are currently the subject of, or party to, various claims and legal proceedings incidental to our current and historical operations. These claims and legal proceedings are subject to inherent uncertainties and unfavorable rulings could occur. An unfavorable ruling could include monetary damages, additional funding requirements or an injunction. If an unfavorable ruling were to occur, there exists the possibility of a material adverse effect on our financial position and results of operations for the period in which the ruling occurs or future periods. However, based on currently available information we do not believe that any pending claims or legal proceedings will result in a material adverse effect in relation to our consolidated financial statements.

### ENVIRONMENTAL CONTINGENCIES

Although we believe our operating practices have been consistent with prevailing industry standards, hazardous materials may have been released at operating sites or third-party sites in the past, including operating sites that we no longer own. If we reasonably can, we estimate potential remediation expenditures for those sites where future remediation efforts are probable based on identified conditions, regulatory requirements, or contractual obligations arising from the sale of a business or facility. For sites involving government required investigations, we typically make an estimate of potential remediation expenditures only after the investigation is complete and when we better understand the nature and scope of the remediation. In general, the material factors in these estimates include the costs associated with investigations, delineations, risk assessments, remedial work, governmental response and oversight, site monitoring, and preparation of reports to the appropriate environmental agencies.

The following is a summary of our environmental obligations:

| (In millions) | December 31, | |
|---|---|---|
| | 2022 | 2021 |
| Environmental obligations | $ 141 | $ 207 |
| Less: current portion | 23 | 20 |
| Long-term environmental obligations | $ 118 | $ 187 |

The decrease in environmental obligations relates to a reclassification of $53 million from environmental to asset retirement obligations as of December 31, 2022.

We cannot predict the ultimate costs for each site with certainty because of the evolving nature of the investigation and remediation process. Rather, to estimate the probable costs, we must make certain assumptions. The most significant of these assumptions is for the nature and scope of the work that will be necessary to investigate and remediate a particular site and the cost of that work. Other significant assumptions include the cleanup technology that will be used, whether and to what extent any other parties will participate in paying the investigation and remediation costs, reimbursement of past response costs and future oversight costs by governmental agencies, and the reaction of the governing environmental agencies to the proposed work plans. Costs for future investigation and remediation are not discounted to their present values, unless the amount and timing of the cash disbursements are readily known. To the extent that we have been able to reasonably estimate future liabilities, we do not believe that there is a reasonable possibility that we will incur a loss or losses that exceed the amounts we accrued for the environmental matters discussed below that would, either individually or in the aggregate, have a material adverse effect on our consolidated financial condition, results of operations or cash flows. However, since we recognize amounts in the consolidated financial statements in accordance with GAAP that exclude potential losses that are not probable or that may not be currently estimable, the ultimate costs of these environmental matters may be higher than the liabilities we currently have recorded in our consolidated financial statements.

Pursuant to RCRA (Resource Conservation and Recovery Act), which governs the treatment, handling and disposal of hazardous waste, the EPA and authorized state environmental agencies may conduct inspections of RCRA-regulated facilities to identify areas where there have been releases of hazardous waste or hazardous constituents into the environment and may order the facilities to take corrective action to remediate such releases. Likewise, the EPA or the states may require closure or post-closure care of residual, industrial and hazardous waste management units. Environmental regulators have the authority to inspect all of our facilities. While we cannot predict the future actions of these regulators, it is possible that they may identify conditions in future inspections of these facilities that they believe require corrective action.

Pursuant to CERCLA, the EPA and state environmental authorities have conducted site investigations at some of our facilities and other third-party facilities, portions of which previously may have been used for disposal of materials that are currently regulated. The results of these investigations are still pending, and we could be directed to spend funds for remedial activities at the former disposal areas. Because of the uncertain status of these investigations, however, we cannot reasonably predict whether or when such spending might be required or its magnitude.

**BURNS HARBOR WATER ISSUES**

In August 2019, ArcelorMittal Burns Harbor LLC (n/k/a Cleveland-Cliffs Burns Harbor LLC) suffered a loss of the blast furnace cooling water recycle system, which led to the discharge of cyanide and ammonia in excess of the Burns Harbor plant's NPDES permit limits. Since that time, the facility has taken numerous steps to prevent recurrence and maintain compliance with its NPDES permit. We engaged in settlement discussions with the U.S. Department of Justice, the EPA and the State of Indiana to resolve any alleged violations of environmental laws or regulations arising out of the August 2019 event. Later stages of the settlement discussions included the Environmental Law and Policy Center (ELPC) and Hoosier Environmental Council (HEC), which had filed a lawsuit on December 20, 2019 in the U.S. District Court for the Northern District of Indiana alleging violations resulting from the August 2019 event and other Clean Water Act claims. On February 14, 2022, the United States and the State of Indiana filed a complaint and a proposed consent decree, and on April 21, 2022, the United States, with the consent of all of the parties, filed a motion seeking final approval of the consent decree from the court. The consent decree was approved by the court with an effective date of May 6, 2022. The consent decree requires specified enhancements to the mill's wastewater treatment systems and required us to pay a $3 million civil penalty, along with other terms and conditions. Other parties to the consent decree include the United States, the State of Indiana, ELPC and HEC. The ELPC/HEC civil litigation was dismissed with prejudice on May 12, 2022. In addition, ArcelorMittal Burns Harbor LLC was served with a subpoena on December 5, 2019, from the United States District Court for the Northern District of Indiana, relating to the August 2019 event and has responded to the subpoena requests, including follow-up requests. With the resolution of monetary sanctions and injunctive relief requirements under the consent decree, we do not believe that the costs to resolve any other third-party claims, including potential natural resource damages claims, that may arise out of the August 2019 event are likely to have, individually or in the aggregate, a material adverse effect on our consolidated financial condition, results of operations or cash flows.

In addition to the foregoing matters, we are or may be involved in proceedings with various regulatory authorities that may require us to pay fines, comply with more rigorous standards or other requirements or incur capital and operating expenses for environmental compliance. We believe that the ultimate disposition of any such proceedings will not have, individually or in the aggregate, a material adverse effect on our consolidated financial condition, results of operations or cash flows.

**TAX MATTERS**

The calculation of our tax liabilities involves dealing with uncertainties in the application of complex tax regulations. We recognize liabilities for anticipated tax audit issues based on our estimate of whether, and the extent to which, additional taxes will be due. If we ultimately determine that payment of these amounts is unnecessary, we reverse the liability and recognize a tax benefit during the period in which we determine that the liability is no longer necessary. We also recognize tax benefits to the extent that it is more likely than not that our positions will be sustained when challenged by the taxing authorities. To the extent we prevail in matters for which liabilities have been established, or are required to pay amounts in excess of our liabilities, our effective tax rate in a given period could be materially affected. An unfavorable tax settlement would require use of our cash and result in an increase in our effective tax rate in the year of resolution. A favorable tax settlement would be recognized as a reduction in our effective tax rate in the year of resolution. Refer to NOTE 11 - INCOME TAXES for further information.

**OTHER CONTINGENCIES**

In addition to the matters discussed above, there are various pending and potential claims against us and our subsidiaries involving product liability, personal injury, commercial, employee benefits and other matters arising in the ordinary course of business. Because of the considerable uncertainties that exist for any claim, it is difficult to reliably or accurately estimate what the amount of a loss would be if a claimant prevails. If material assumptions or factual understandings we rely on to evaluate exposure for these contingencies prove to be inaccurate or otherwise change, we may be required to record a liability for an adverse outcome. If, however, we have reasonably evaluated potential future liabilities for all of these contingencies, including those described more specifically above, it is our opinion, unless we otherwise noted, that the ultimate liability from these contingencies, individually or in the aggregate, should not have a material adverse effect on our consolidated financial position, results of operations or cash flows.

## NOTE 21 - SUBSEQUENT EVENTS

We have evaluated subsequent events through the date of financial statement issuance.

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the shareholders and the Board of Directors of

Cleveland-Cliffs Inc.

### OPINION ON THE FINANCIAL STATEMENTS

We have audited the accompanying statements of consolidated financial position of Cleveland-Cliffs Inc. and subsidiaries (the "Company") as of December 31, 2022 and 2021, the related statements of consolidated operations, comprehensive income, cash flows, and changes in equity, for each of the three years in the period ended December 31, 2022, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2022 and 2021, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2022, in conformity with accounting principles generally accepted in the United States of America.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2022, based on criteria established in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 14, 2023, expressed an unqualified opinion on the Company's internal control over financial reporting.

### BASIS FOR OPINION

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

### CRITICAL AUDIT MATTER

The critical audit matter communicated below is a matter arising from the current-period audit of the financial statements that was communicated or required to be communicated to the audit committee and that (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

**MINERAL RESERVES — ASSET RETIREMENT OBLIGATIONS, VALUATION OF GOODWILL AND LONG-LIVED ASSETS AND DEPRECIATION, DEPLETION AND AMORTIZATION OF PROPERTY, PLANT AND EQUIPMENT — REFER TO NOTES 5, 6, 7 AND 13 TO THE FINANCIAL STATEMENTS**

**Critical Audit Matter Description**

Iron ore mineral reserve estimates, combined with estimated annual production levels, are used to determine the iron ore mine closure dates utilized in recording the fair value liability for asset retirement obligations for active operating iron ore mines. Since the liability represents the present value of the expected future obligation, a significant change in iron ore mineral reserves or iron ore mine lives could have a substantial effect on the recorded obligation. Iron ore mineral reserve estimates are also used in evaluating potential impairments of goodwill and iron ore mine asset groups as they are indicative of future cash flows and in determining maximum useful lives utilized to calculate depreciation, depletion and amortization of long-lived iron ore mine assets.

The Company performs an in-depth evaluation of its iron ore mineral reserve estimates by iron ore mine on a periodic basis, in addition to routine annual assessments. The determination of iron ore mineral reserves requires management, with the support of management's experts, to make significant estimates and assumptions related to key inputs including (1) the determination of the size and scope of the iron ore body through technical modeling, (2) the estimates of future iron ore prices recognizing that the price shall not exceed the three-year trailing average index price of iron ore adjusted to the Company's realized price, production costs and capital expenditures, and (3) management's mine plan for the proven and probable iron ore mineral reserves (collectively "the iron ore mineral reserve inputs"). Changes in any of the judgments or assumptions related to the iron ore mineral reserve inputs can have a significant impact with respect to the accrual for asset retirement obligations, the impairment of goodwill and long-lived asset groups and the amount of depreciation, depletion and amortization expense. The consolidated asset retirement obligation balance was $520 million as of December 31, 2022, of which $196 million related to active iron ore mine operations. The total goodwill balance associated with the Company's Steelmaking reportable segment was $956 million as of December 31, 2022. The total asset balance associated with the Company's Steelmaking reportable segment was $18,070 million as of December 31, 2022, of which $1,559 million related to long-lived assets associated with the Company's combined iron ore mine asset groups.

Depreciation, depletion and amortization expense for the Company's combined iron ore mine asset groups was $161 million for the year ended December 31, 2022.

Given the significant judgments and assumptions made by management to estimate iron ore mineral reserves and the sensitivity of changes to iron ore mineral reserve estimates on the Company's recorded asset retirement obligations, goodwill and long-lived asset impairment considerations and calculated depreciation, depletion and amortization expense, performing audit procedures to evaluate the reasonableness of management's judgments and estimates related to the iron ore mineral reserve inputs required a high degree of auditor judgment and an increased extent of effort.

**How the Critical Audit Matter Was Addressed in the Audit**

Our audit procedures related to management's significant judgments and assumptions related to iron ore mineral reserve quantities and the related iron ore mine closure dates included the following, among others:

- We tested the operating effectiveness of internal controls related to the Company's estimation of iron ore mineral reserve quantities and the related iron ore mine closure dates.

- We evaluated the experience, qualifications and objectivity of management's experts, including in-house iron ore mine engineers and the third-party Qualified Person.

- For an iron ore mine subject to the Company's routine annual assessment we evaluated management's assessment by:

  ◦ Understanding the process used by management to survey and analyze the geological and operational status of current year iron ore mine production.

  ◦ Evaluating the historical accuracy of management's technical model as compared to actual iron ore mine production results.

  ◦ Comparing the iron ore mine plan per the most recent Technical Report Summary, updated for current year depletion, to:

    - Presentations to the Audit Committee.

    - Asset retirement obligation valuation models, goodwill impairment analysis, information provided by asset group and depreciation, depletion and amortization expense calculations.

*/s/ DELOITTE & TOUCHE LLP*

Cleveland, Ohio

February 14, 2023

We have served as the Company's auditor since 2004.

## ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

*None.*

## ITEM 9A. CONTROLS AND PROCEDURES

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our President and Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure based solely on the definition of "disclosure controls and procedures" in Rule 13a-15(e) promulgated under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

As of the end of the period covered by this report, we carried out an evaluation under the supervision and with the participation of our management, including our President and Chief Executive Officer and our Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures. Based on the foregoing, our President and Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective.

### MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as such term is defined under Rule 13a-15(f) promulgated under the Exchange Act.

Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Company's consolidated financial statements for external purposes in accordance with generally accepted accounting principles.

Internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit the preparation of the consolidated financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with appropriate authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the consolidated financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management conducted an assessment of the Company's internal control over financial reporting as of December 31, 2022 using the framework specified in *Internal Control - Integrated Framework* (2013), published by the Committee of Sponsoring Organizations of the Treadway Commission.

Based on such assessment, management has concluded that the Company's internal control over financial reporting was effective as of December 31, 2022.

The effectiveness of the Company's internal control over financial reporting as of December 31, 2022 has been audited by Deloitte & Touche LLP (PCAOB ID No. 34), an independent registered public accounting firm, as stated in their report that appears herein.

February 14, 2023

### CHANGES IN INTERNAL CONTROL OVER FINANCIAL REPORTING

There have been no changes in our internal control over financial reporting or in other factors that occurred during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the shareholders and the Board of Directors of

Cleveland-Cliffs Inc.

### OPINION ON INTERNAL CONTROL OVER FINANCIAL REPORTING

We have audited the internal control over financial reporting of Cleveland-Cliffs Inc. and subsidiaries (the "Company") as of December 31, 2022, based on criteria established in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2022, based on criteria established in Internal Control — Integrated Framework (2013) issued by COSO.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated financial statements as of and for the year ended December 31, 2022, of the Company and our report dated February 14, 2023, expressed an unqualified opinion on those financial statements.

### BASIS FOR OPINION

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

### DEFINITION AND LIMITATIONS OF INTERNAL CONTROL OVER FINANCIAL REPORTING

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

*/s/ DELOITTE & TOUCHE LLP*

Cleveland, Ohio

February 14, 2023

## ITEM 9B. OTHER INFORMATION

*None.*

## ITEM 9C. DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS

*Not applicable.*

**108** | **CLF** 2022 FORM 10-K

Table of Contents

## PART III

## ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

The information required to be furnished by this Item will be set forth in the definitive proxy statement for our 2023 Annual Meeting of Shareholders (the "Proxy Statement") under the headings "Board Meetings and Committees — Audit Committee", "Code of Business Conduct and Ethics", "Independence and Related Party Transactions", "Information Concerning Director Nominees" and "Delinquent Section 16(a) Reports" and is incorporated herein by reference and made a part hereof from the Proxy Statement. The information regarding executive officers required by this Item is set forth in *Part I - ITEM 1. Business* hereof under the heading "Information About Our Executive Officers", which information is incorporated herein by reference and made a part hereof.

## ITEM 11. EXECUTIVE COMPENSATION

The information required to be furnished by this Item will be set forth in the Proxy Statement under the headings "Director Compensation", "Compensation Discussion and Analysis", "Compensation Committee Report", "Compensation Committee Interlocks and Insider Participation", "Compensation-Related Risk Assessment" and "Executive Compensation" and is incorporated herein by reference and made a part hereof from the Proxy Statement.

## ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

The information required to be furnished by this Item will be set forth in the Proxy Statement under the headings "Ownership of Equity Securities of the Company" and "Equity Compensation Plan Information" and is incorporated herein by reference and made a part hereof from the Proxy Statement.

## ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

The information required to be furnished by this Item will be set forth in the Proxy Statement under the heading "Independence and Related Party Transactions" and is incorporated herein by reference and made a part hereof from the Proxy Statement.

## ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES

The information required to be furnished by this Item will be set forth in the Proxy Statement under the heading "Ratification of Independent Registered Public Accounting Firm" and is incorporated herein by reference and made a part hereof from the Proxy Statement.

**PART IV**

## ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

(a)(1) - List of Financial Statements

The following consolidated financial statements of Cleveland-Cliffs Inc. are included at *ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA* above:

- Statements of Consolidated Financial Position - December 31, 2022 and 2021
- Statements of Consolidated Operations - Years ended December 31, 2022, 2021 and 2020
- Statements of Consolidated Comprehensive Income - Years ended December 31, 2022, 2021 and 2020
- Statements of Consolidated Cash Flows - Years ended December 31, 2022, 2021 and 2020
- Statements of Consolidated Changes in Equity - Years ended December 31, 2022, 2021 and 2020
- Notes to Consolidated Financial Statements

(a)(2) - Financial Statement Schedules

All schedules for which provision is made in the applicable accounting regulation of the SEC are not required under the related instructions or are inapplicable, and therefore have been omitted or are contained in the applicable financial statements or the notes thereto.

(a)(3) List of Exhibits

All documents referenced below have been filed pursuant to the Securities Exchange Act of 1934 by Cleveland-Cliffs Inc., file number 1-09844, unless otherwise indicated.

**Exhibit Number Exhibit**

| | |
|---|---|
| | **Articles of Incorporation and Regulations of Cleveland-Cliffs Inc.** |
| 3.1 | Fourth Amended Articles of Incorporation of Cliffs, as filed with the Secretary of State of the State of Ohio on September 25, 2020 (filed as Exhibit 3.2 to Cliffs' Form 8-K on September 28, 2020 and incorporated herein by reference). |
| 3.2 | Certificate of Amendment to Fourth Amended Articles of Incorporation of Cliffs, as filed with the Secretary of State of the State of Ohio on December 7, 2020 (filed as Exhibit 3.1 to Cliffs' Form 8-K on December 9, 2020 and incorporated herein by reference). |
| 3.3 | Certificate of Amendment to Fourth Amended Articles of Incorporation of Cliffs, as amended, as filed with the Secretary of State of the State of Ohio on April 29, 2021 (filed as Exhibit 3.1 to Cliffs' Form 8-K on April 30, 2021 and incorporated herein by reference). |
| 3.4 | Regulations of Cliffs (filed as Exhibit 3.2 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference). |
| | **Instruments defining rights of security holders, including indentures** |
| 4.1 | Indenture, dated as of March 17, 2010, between Cliffs Natural Resources Inc. (n/k/a Cleveland-Cliffs Inc.) and U.S. Bank National Association, as trustee (filed as Exhibit 4.3 to Cliffs' Registration Statement on Form S-3 (Registration No. 333-186617) on February 12, 2013 and incorporated herein by reference). |
| 4.2 | Third Supplemental Indenture, dated as of September 20, 2010, between Cliffs Natural Resources Inc. (n/k/a Cleveland-Cliffs Inc.) and U.S. Bank National Association, as trustee, including Form of 6.25% Notes due 2040 (filed as Exhibit 4.4 to Cliffs' Form 8-K on September 17, 2010 and incorporated herein by reference). |
| 4.3 | Fifth Supplemental Indenture, dated as of March 31, 2011, between Cliffs Natural Resources Inc. (n/k/a Cleveland-Cliffs Inc.) and U.S. Bank National Association, as trustee (filed as Exhibit 4(b) to Cliffs' Form 10-Q for the period ended June 30, 2011 and incorporated herein by reference). |
| 4.4 | Seventh Supplemental Indenture, dated as of May 7, 2013, between Cliffs Natural Resources Inc. (n/k/a Cleveland-Cliffs Inc.) and U.S. Bank National Association, as trustee (filed as Exhibit 4.1 to Cliffs' Form 10-Q for the period ended June 30, 2013 and incorporated herein by reference). |
| 4.5 | Indenture, dated as of May 13, 2019, among Cleveland-Cliffs Inc., the Guarantors party thereto and U.S. Bank National Association, as trustee, including Form of 5.875% Senior Notes due 2027 (filed as Exhibit 4.1 to Cliffs' Form 8-K on May 14, 2019 and incorporated herein by reference). |
| 4.6 | First Supplemental Indenture, dated as of March 13, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee (filed as Exhibit 4.4 to Cliffs' Form 10-Q for the period ended March 31, 2020 and incorporated herein by reference). |

110

| Exhibit Number | Exhibit |
|---|---|
| 4.7 | Second Supplemental Indenture, dated as of May 22, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee (filed as Exhibit 4.6 to Cliffs' Form 10-Q for the period ended June 30, 2020 and incorporated herein by reference). |
| 4.8 | Third Supplemental Indenture, dated as of December 9, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee (filed as Exhibit 4.24 to Cliffs' Form 10-K for the period ended December 31, 2020 and incorporated herein by reference). |
| 4.9 | Fourth Supplemental Indenture, dated as of December 18, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee (filed as Exhibit 4.25 to Cliffs' Form 10-K for the period ended December 31, 2020 and incorporated herein by reference). |
| 4.10 | Fifth Supplemental Indenture, dated as of December 22, 2021, among Cleveland-Cliffs Inc., the Additional Guarantor party thereto and U.S. Bank National Association, as trustee (filed as Exhibit 4.11 to Cliffs' Form 10-K for the period ended December 31, 2021 and incorporated herein by reference). |
| 4.11 | Indenture, dated as of March 13, 2020, among Cleveland-Cliffs Inc., the Guarantors party thereto and U.S. Bank National Association, as trustee and first lien notes collateral agent, including Form of 6.75% Senior Secured Notes due 2026 (filed as Exhibit 4.1 to Cliffs' Form 10-Q for the period ended March 31, 2020 and incorporated herein by reference). |
| 4.12 | First Supplemental Indenture, dated as of May 22, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee and first lien notes collateral agent (filed as Exhibit 4.9 to Cliffs' Form 10-Q for the period ended June 30, 2020 and incorporated herein by reference). |
| 4.13 | Second Supplemental Indenture, dated as of June 19, 2020, among Cleveland-Cliffs Inc., the Guarantors party thereto and U.S. Bank National Association, as trustee and first lien notes collateral agent, including Form of 6.75% Senior Secured Notes due 2026 (filed as Exhibit 4.10 to Cliffs' Form 10-Q for the period ended June 30, 2020 and incorporated herein by reference). |
| 4.14 | Third Supplemental Indenture, dated as of December 9, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee and first lien notes collateral agent (filed as Exhibit 4.29 to Cliffs' Form 10-K for the period ended December 31, 2020 and incorporated herein by reference). |
| 4.15 | Fourth Supplemental Indenture, dated as of December 18, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee and first lien notes collateral agent (filed as Exhibit 4.30 to Cliffs' Form 10-K for the period ended December 31, 2020 and incorporated herein by reference). |
| 4.16 | Fifth Supplemental Indenture, dated as of December 22, 2021, among Cleveland-Cliffs Inc., the Additional Guarantor party thereto and U.S. Bank National Association, as trustee and first lien notes collateral agent (filed as Exhibit 4.17 to Cliffs' Form 10-K for the period ended December 31, 2021 and incorporated herein by reference). |
| 4.17 | Indenture, dated as of March 16, 2020, among Cleveland-Cliffs Inc., the Guarantors party thereto and U.S. Bank National Association, as trustee, including Form of 7.00% Senior Notes due 2027 (filed as Exhibit 4.7 to Cliffs' Form 10-Q for the period ended March 31, 2020 and incorporated herein by reference). |
| 4.18 | First Supplemental Indenture, dated as of May 22, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee (filed as Exhibit 4.7 to Cliffs' Form 10-Q for the period ended June 30, 2020 and incorporated herein by reference). |
| 4.19 | Second Supplemental Indenture, dated as of December 9, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee (filed as Exhibit 4.38 to Cliffs' Form 10-K for the period ended December 31, 2020 and incorporated herein by reference). |
| 4.20 | Third Supplemental Indenture, dated as of December 18, 2020, among Cleveland-Cliffs Inc., the Additional Guarantors party thereto and U.S. Bank National Association, as trustee (filed as Exhibit 4.39 to Cliffs' Form 10-K for the period ended December 31, 2020 and incorporated herein by reference). |
| 4.21 | Fourth Supplemental Indenture, dated as of December 22, 2021, among Cleveland-Cliffs Inc., the Additional Guarantor party thereto and U.S. Bank National Association, as trustee (filed as Exhibit 4.22 to Cliffs' Form 10-K for the period ended December 31, 2021 and incorporated herein by reference). |
| 4.22 | Indenture, dated as of February 17, 2021, among Cleveland-Cliffs Inc., the Guarantors party thereto and U.S. Bank National Association, as trustee, including Forms of 4.625% Senior Guaranteed Notes due 2029 and 4.875% Senior Guaranteed Notes due 2031 (filed as Exhibit 4.1 to Cliffs' Form 10-Q for the period ended March 31, 2021 and incorporated herein by reference). |
| 4.23 | First Supplemental Indenture, dated as of December 22, 2021, among Cleveland-Cliffs Inc., the Additional Guarantor party thereto and U.S. Bank National Association, as trustee (filed as Exhibit 4.30 to Cliffs' Form 10-K for the period ended December 31, 2021 and incorporated herein by reference). |
| 4.24 | Form of Common Share Certificate (filed as Exhibit 4.1 to Cliffs' Form 10-Q for the period ended September 30, 2019 and incorporated herein by reference). |
| 4.25 | Description of Securities Registered under Section 12 of the Securities Exchange Act of 1934 (filed herewith). |

A006654

Table of Contents

| Exhibit Number | Exhibit |
|---|---|
| | **Material contracts** |
| 10.1 | * Form of Change in Control Severance Agreement (covering newly hired officers) (filed as Exhibit 10.4 to Cliffs' Form 8-K/A on September 16, 2014 and incorporated herein by reference). |
| 10.2 | * Form of 2016 Change in Control Severance Agreement (filed as Exhibit 10.1 to Cliffs' 10-Q for the period ended September 30, 2016 and incorporated herein by reference). |
| 10.3 | * Cleveland-Cliffs Inc. 2012 Non-Qualified Deferred Compensation Plan (Amended and Restated effective October 26, 2021) (filed as Exhibit 10.3 to Cliffs' Form 10-K for the period ended December 31, 2021 and incorporated herein by reference). |
| 10.4 | * Form of Director and Officer Indemnification Agreement between Cleveland-Cliffs Inc. and Directors and Officers (filed as Exhibit 10.2 to Cliffs' Form 10-Q for the period ended March 31, 2019 and incorporated herein by reference). |
| 10.5 | * Cleveland-Cliffs Inc. 2021 Nonemployee Directors' Compensation Plan (filed as Exhibit 10.2 to Cliffs' Form 8-K on April 30, 2021 and incorporated herein by reference). |
| 10.6 | *Form of Restricted Shares Agreement for Nonemployee Directors (filed as Exhibit 10.3 to Cliffs' Form 10-Q for the period ended June 30, 2021 and incorporated herein by reference). |
| 10.7 | *Form of Deferred Shares Agreement for Nonemployee Directors (filed as Exhibit 10.4 to Cliffs' Form 10-Q for the period ended June 30, 2021 and incorporated herein by reference). |
| 10.8 | * Trust Agreement No. 1 (Amended and Restated effective June 1, 1997), dated June 12, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to the Cleveland-Cliffs Inc Supplemental Retirement Benefit Plan, Severance Pay Plan for Key Employees and certain executive agreements (filed as Exhibit 10.10 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference). |
| 10.9 | * Trust Agreement No. 1 Amendments to Exhibits, effective as of January 1, 2000, by and between Cleveland-Cliffs Inc and KeyBank National Association, as Trustee (filed as Exhibit 10.11 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference). |
| 10.10 | * First Amendment to Trust Agreement No. 1, effective September 10, 2002, by and between Cleveland-Cliffs Inc and KeyBank National Association, as Trustee (filed as Exhibit 10.12 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference). |
| 10.11 | * Second Amendment to Trust Agreement No. 1 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(y) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference). |
| 10.12 | * Third Amendment to Trust Agreement No. 1 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.15 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference). |
| 10.13 | * Amended and Restated Trust Agreement No. 2, effective as of October 15, 2002, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to Executive Agreements and Indemnification Agreements with the Company's Directors and certain Officers, the Company's Severance Pay Plan for Key Employees, and the Retention Plan for Salaried Employees (filed as Exhibit 10.14 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference). |
| 10.14 | * Second Amendment to Amended and Restated Trust Agreement No. 2 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(aa) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference). |
| 10.15 | * Third Amendment to Amended and Restated Trust Agreement No. 2 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.18 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference). |
| 10.16 | * Trust Agreement No. 7, dated as of April 9, 1991, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to the Cleveland-Cliffs Inc Supplemental Retirement Benefit Plan (filed as Exhibit 10.23 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference). |
| 10.17 | * First Amendment to Trust Agreement No. 7, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, dated as of March 9, 1992 (filed as Exhibit 10.24 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference). |
| 10.18 | * Second Amendment to Trust Agreement No. 7, dated November 18, 1994, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.25 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference). |
| 10.19 | * Third Amendment to Trust Agreement No. 7, dated May 23, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.26 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference). |

A006655

| Exhibit Number | Exhibit |
|---|---|
| 10.20 | * Fourth Amendment to Trust Agreement No. 7, dated July 15, 1997, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.27 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference). |
| 10.21 | * Amendment to Exhibits to Trust Agreement No. 7, effective as of January 1, 2000, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee (filed as Exhibit 10.28 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference). |
| 10.22 | * Sixth Amendment to Trust Agreement No. 7 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(oo) to Cliffs' Form 10-K for the period ended December 31, 2008 and incorporated herein by reference). |
| 10.23 | * Seventh Amendment to Trust Agreement No. 7 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.34 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference). |
| 10.24 | * Trust Agreement No. 10, dated as of November 20, 1996, by and between Cleveland-Cliffs Inc and KeyBank National Association, Trustee, with respect to the Cleveland-Cliffs Inc Nonemployee Directors' Compensation Plan (filed as Exhibit 10.36 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference). |
| 10.25 | *First Amendment to Trust Agreement No. 10 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of December 31, 2008 (filed as Exhibit 10(ww) to Cliffs' Form 10-K for the period ended February 26, 2009 and incorporated herein by reference). |
| 10.26 | * Second Amendment to Trust Agreement No. 10 between Cliffs Natural Resources Inc. (f/k/a Cleveland-Cliffs Inc) and KeyBank National Association, Trustee, entered into and effective as of July 28, 2014 (filed as Exhibit 10.45 to Cliffs' Form 10-K for the period ended December 31, 2014 and incorporated herein by reference). |
| 10.27 | * Separation and Release Agreement, by and between Maurice D. Harapiak and Cleveland-Cliffs Inc., effective April 22, 2022 (filed as Exhibit 10.1 to Cliffs' Form 10-Q for the period ended June 30, 2022 and incorporated herein by reference). |
| 10.28 | * Letter Agreement, by and between Lourenco Goncalves and Cliffs Natural Resources Inc., signed as of September 11, 2014 (filed as Exhibit 10.1 to Cliffs' Form 8-K/A on September 16, 2014 and incorporated herein by reference). |
| 10.29 | * Cleveland-Cliffs Inc and Subsidiaries Management Performance Incentive Plan Summary, effective January 1, 2004 (filed as Exhibit 10.47 to Cliffs' Form 10-K for the period ended December 31, 2011 and incorporated herein by reference). |
| 10.30 | * Cliffs Natural Resources Inc. 2017 Executive Management Performance Incentive Plan effective January 1, 2017 (filed as Exhibit 10.2 to Cliffs' Form 8-K on April 27, 2017 and incorporated herein by reference). |
| 10.31 | * Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan (filed as Exhibit 10.1 to Cliffs' Form 8-K on May 21, 2015 and incorporated herein by reference). |
| 10.32 | * Cliffs Natural Resources Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan (filed as Exhibit 10.1 to Cliffs' Form 8-K on April 27, 2017 and incorporated herein by reference). |
| 10.33 | * Form of Cleveland-Cliffs Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan Restricted Stock Unit Award Memorandum and Restricted Stock Unit Award Agreement (filed as Exhibit 10.2 to Cliffs' Form 10-Q for the period ended March 31, 2018 and incorporated herein by reference). |
| 10.34 | * Form of Cleveland-Cliffs Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan Performance Share Award Memorandum and Performance Share Award Agreement (filed as Exhibit 10.3 to Cliffs' Form 10-Q for the period ended March 31, 2018 and incorporated herein by reference). |
| 10.35 | * Form of Cleveland-Cliffs Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan Cash Incentive Award Memorandum (TSR) and Cash Incentive Award Agreement (TSR) (filed as Exhibit 10.4 to Cliffs' Form 10-Q for the period ended March 31, 2018 and incorporated herein by reference). |
| 10.36 | * Cleveland-Cliffs Inc. 2021 Equity and Incentive Compensation Plan (filed as Exhibit 10.1 to Cliffs' Form 8-K on April 30, 2021 and incorporated herein by reference). |
| 10.37 | * Form of Cleveland-Cliffs Inc. 2021 Equity and Incentive Compensation Plan Restricted Stock Unit Award Memorandum and Restricted Stock Unit Award Agreement (filed as Exhibit 10.1 to Cliffs' Form 10-Q for the period ended March 31, 2022 and incorporated herein by reference). |
| 10.38 | * Form of Cleveland-Cliffs Inc. 2021 Equity and Incentive Compensation Plan Performance Share Award Memorandum (TSR) and Performance Share Award Agreement (filed as Exhibit 10.2 to Cliffs' Form 10-Q for the period ended March 31, 2022 and incorporated herein by reference). |
| 10.39 | * Form of Cleveland-Cliffs Inc. 2021 Equity and Incentive Compensation Plan Cash Incentive Award Memorandum (TSR) and Cash Incentive Award Agreement (TSR) (filed as Exhibit 10.3 to Cliffs' Form 10-Q for the period ended March 31, 2022 and incorporated herein by reference). |

A006656

**Exhibit Number** **Exhibit**

| | |
|---|---|
| 10.40 | * Cleveland-Cliffs Inc. Supplemental Retirement Benefit Plan (as Amended and Restated effective October 26, 2021) (filed as Exhibit 10.40 to Cliffs' Form 10-K for the period ended December 31, 2021 and incorporated herein by reference). |
| 10.41 | Asset-Based Revolving Credit Agreement, dated as of March 13, 2020, among Cleveland-Cliffs Inc., the lenders party thereto from time to time and Bank of America, N.A., as administrative agent (filed as Exhibit 10.1 to Cliffs' Form 10-Q for the period ended March 31, 2020 and incorporated herein by reference). |
| 10.42 | First Amendment to Asset-Based Revolving Credit Agreement, dated as of March 27, 2020, among Cleveland-Cliffs Inc., the lenders party thereto from time to time and Bank of America, N.A., as administrative agent (filed as Exhibit 10.2 to Cliffs' Form 10-Q for the period ended March 31, 2020 and incorporated herein by reference). |
| 10.43 | Second Amendment to Asset-Based Revolving Credit Agreement, dated as of December 9, 2020, among Cleveland-Cliffs Inc., the lenders party thereto from time to time and Bank of America, N.A., as administrative agent (filed as Exhibit 10.42 to Cliffs' Form 10-K for the period ended December 31, 2020 and incorporated herein by reference). |
| 10.44 | Third Amendment to Asset-Based Revolving Credit Agreement, dated as of December 17, 2021, among Cleveland-Cliffs Inc., the lenders party thereto from time to time and Bank of America, N.A., as administrative agent (filed as Exhibit 10.1 to Cliffs' Form 8-K on December 23, 2021 and incorporated herein by reference). |
| 21 | Subsidiaries of the Registrant (filed herewith). |
| 22 | Schedule of the obligated group, including the parent and issuer and the subsidiary guarantors that have guaranteed the obligations under the 6.750% 2026 Senior Secured Notes, the 5.875% 2027 Senior Notes, the 7.000% 2027 Senior Notes, the 4.625% 2029 Senior Notes and the 4.875% 2031 Senior Notes issued by Cleveland-Cliffs Inc. (filed herewith). |
| 23.1 | Consent of Independent Registered Public Accounting Firm (filed herewith). |
| 23.2 | Consent of SLR Consulting US LLC (f/k/a SLR International Corporation) regarding Hibbing Taconite Property, Minnesota, USA (filed herewith). |
| 23.3 | Consent of SLR Consulting US LLC (f/k/a SLR International Corporation) regarding Minorca Property, Minnesota, USA (filed herewith). |
| 23.4 | Consent of SLR Consulting US LLC (f/k/a SLR International Corporation) regarding Northshore Property, Minnesota, USA (filed herewith). |
| 23.5 | Consent of SLR Consulting US LLC (f/k/a SLR International Corporation) regarding United Taconite Property, Minnesota, USA (filed herewith). |
| 23.6 | Consent of SLR Consulting US LLC (f/k/a SLR International Corporation) regarding Tilden Property, Michigan, USA (filed herewith). |
| 24 | Power of Attorney (filed herewith). |
| 31.1 | Certification Pursuant to 15 U.S.C. Section 7241, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, signed and dated by Lourenco Goncalves as of February 14, 2023 (filed herewith). |
| 31.2 | Certification Pursuant to 15 U.S.C. Section 7241, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, signed and dated by Celso L. Goncalves Jr. as of February 14, 2023 (filed herewith). |
| 32.1 | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed and dated by Lourenco Goncalves, Chairman, President and Chief Executive Officer of Cleveland-Cliffs Inc., as of February 14, 2023 (filed herewith). |
| 32.2 | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed and dated by Celso L. Goncalves Jr., Executive Vice President, Chief Financial Officer of Cleveland-Cliffs Inc., as of February 14, 2023 (filed herewith). |
| 95 | Mine Safety Disclosures (filed herewith). |
| 96.1 | Technical Report Summary on the Hibbing Taconite Property, Minnesota, USA, prepared for the Company by SLR International Corporation with an effective date of December 31, 2021 (filed as Exhibit 96.1 to Cliffs' Form 8-K on February 11, 2022 and incorporated herein by reference). |
| 96.2 | Technical Report Summary on the Minorca Property, Minnesota, USA, prepared for the Company by SLR International Corporation with an effective date of December 31, 2021 (filed as Exhibit 96.2 to Cliffs' Form 8-K on February 11, 2022 and incorporated herein by reference). |
| 96.3 | Technical Report Summary on the Northshore Property, Minnesota, USA, prepared for the Company by SLR International Corporation with an effective date of December 31, 2021 (filed as Exhibit 96.3 to Cliffs' Form 8-K on February 11, 2022 and incorporated herein by reference). |
| 96.4 | Technical Report Summary on the United Taconite Property, Minnesota, USA, prepared for the Company by SLR International Corporation with an effective date of December 31, 2021 (filed as Exhibit 96.4 to Cliffs' Form 8-K on February 11, 2022 and incorporated herein by reference). |

114

**Exhibit Number Exhibit**

| | |
|---|---|
| 96.5 | Technical Report Summary on the Tilden Property, Michigan, USA, prepared for the Company by SLR International Corporation with an effective date of December 31, 2021 (filed as Exhibit 96.5 to Cliffs' Form 10-K for the period ended December 31, 2021 and incorporated herein by reference). |
| 101 | The following financial information from Cleveland-Cliffs Inc.'s Annual Report on Form 10-K for the year ended December 31, 2022 formatted in Inline XBRL (Extensible Business Reporting Language) includes: (i) the Statements of Consolidated Financial Position, (ii) the Statements of Consolidated Operations, (iii) the Statements of Consolidated Comprehensive Income, (iv) the Statements of Consolidated Cash Flows, (v) the Statements of Consolidated Changes in Equity, and (vi) Notes to the Consolidated Financial Statements. |
| 104 | The cover page from this Annual Report on Form 10-K, formatted in Inline XBRL. |

———————

*Indicates management contract or other compensatory arrangement.

## ITEM 16. FORM 10-K SUMMARY

*None.*

115

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

CLEVELAND-CLIFFS INC.

By:  /s/ K. A. Floriani

Name:   Kimberly A. Floriani

Title:    Senior Vice President, Controller &
          Chief Accounting Officer

Date:    February 14, 2023

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signatures | Title | Date |
|---|---|---|
| /s/ C. L. Goncalves<br>C. L. Goncalves | Chairman, President and<br>Chief Executive Officer<br>(Principal Executive Officer) | February 14, 2023 |
| /s/ C. L. Goncalves Jr.<br>C. L. Goncalves Jr. | Executive Vice President,<br>Chief Financial Officer<br>(Principal Financial Officer) | February 14, 2023 |
| /s/ K. A. Floriani<br>K. A. Floriani | Senior Vice President, Controller<br>& Chief Accounting Officer<br>(Principal Accounting Officer) | February 14, 2023 |
| *<br>J. T. Baldwin | Director | February 14, 2023 |
| *<br>R. P. Fisher, Jr. | Director | February 14, 2023 |
| *<br>W. K. Gerber | Director | February 14, 2023 |
| *<br>S. M. Green | Director | February 14, 2023 |
| *<br>R. S. Michael, III | Director | February 14, 2023 |
| *<br>J. L. Miller | Director | February 14, 2023 |
| *<br>G. Stoliar | Director | February 14, 2023 |
| *<br>D. C. Taylor | Director | February 14, 2023 |
| *<br>A. M. Yocum | Director | February 14, 2023 |

* The undersigned, by signing his name hereto, does sign and execute this Annual Report on Form 10-K pursuant to a Power of Attorney executed on behalf of the above-indicated directors of the registrant and filed herewith as Exhibit 24 on behalf of the registrant.

By:   /s/ C. L. Goncalves Jr.

(C. L. Goncalves Jr., as Attorney-in-Fact)

116

A006659

**EXHIBIT 4.25**

### DESCRIPTION OF SECURITIES REGISTERED UNDER
### SECTION 12 OF THE SECURITIES EXCHANGE ACT OF 1934

The following is a summary of the terms and provisions of the common shares, par value $0.125 per share ("Common Shares"), of Cleveland-Cliffs Inc., an Ohio corporation (the "Company"), and is qualified by reference to the Company's articles of incorporation and regulations, which are incorporated by reference herein and attached as exhibits to the Company's most recent Annual Report on Form 10-K filed with the Securities and Exchange Commission, and to applicable provisions of Ohio law.

**Common Shares**

The Company has authorized 1,200,000,000 Common Shares. The holders of Common Shares are entitled to one vote for each share on all matters upon which shareholders have the right to vote and, upon proper notice, are entitled to cumulative voting rights in the election of directors. The Common Shares do not have any preemptive rights, are not subject to redemption and do not have the benefit of any sinking fund. Holders of Common Shares are entitled to receive such dividends as the Company's directors from time to time may declare out of funds legally available therefor. Entitlement to dividends is subject to the preferences granted to other classes of securities the Company has or may have outstanding in the future. In the event of the Company's liquidation, holders of Common Shares are entitled to share in any of the Company's assets remaining after satisfaction in full of its liabilities and satisfaction of such dividend and liquidation preferences as may be possessed by the holders of other classes of securities the Company has or may have outstanding in the future.

**Preferred Stock**

The Company has authorized 3,000,000 shares of serial preferred stock, Class A, without par value ("Class A Preferred Stock"), and 4,000,000 shares of serial preferred stock, Class B, without par value ("Class B Preferred Stock" and, collectively with the Class A Preferred Stock, "Preferred Stock"). Under the Company's articles of incorporation, the Company's board of directors can issue, without further shareholder action, up to 3,000,000 shares of Class A Preferred Stock and up to 4,000,000 shares of Class B Preferred Stock, in each case, with such rights and restrictions as the Company's board of directors may determine, subject to any shares of Preferred Stock of the applicable class then outstanding.

In some cases, the issuance of Preferred Stock could delay, defer or prevent a change in control and make it harder to remove present management, without further action by the Company's shareholders. Under some circumstances, Preferred Stock could also decrease the amount of earnings and assets available for distribution to holders of Common Shares if the Company liquidates or dissolves and could also restrict or limit dividend payments to holders of Common Shares.

**Ohio Control Share Acquisition Statute**

The Ohio Control Share Acquisition Statute requires the prior authorization of the shareholders of certain corporations in order for any person to acquire, either directly or indirectly, shares of that corporation that would entitle the acquiring person to exercise or direct the exercise of 20% or more of the voting power of that corporation in the election of directors or to exceed specified other percentages of voting power. In the event an acquiring person proposes to make such an acquisition, the person is required to deliver to the corporation a statement disclosing, among other things, the number of shares owned, directly or indirectly, by the person, the range of voting power that may result from the proposed acquisition and the identity of the acquiring person. Within 10 days after receipt of this statement, the corporation must call a special meeting of shareholders to vote on the proposed acquisition. The acquiring person may complete the proposed acquisition only if the acquisition is approved by the affirmative vote of the holders of at least a majority of the voting power of all shares entitled to vote in the election of directors represented at the meeting excluding the voting power of all "interested shares." Interested shares include any shares held by the acquiring person and those held by officers and directors who are employees of the corporation as well as by certain others, including many holders commonly characterized as arbitrageurs. The Ohio Control Share Acquisition Statute does not apply to a corporation if its articles of incorporation or code of regulations state that the statute does not apply to such corporation. Neither the Company's articles of incorporation nor its regulations contain a provision opting out of this statute.

**Ohio Interested Shareholder Statute**

Chapter 1704 of the Ohio Revised Code prohibits certain corporations from engaging in a "chapter 1704 transaction" with an "interested shareholder" for a period of three years after the date of the transaction in which the person became an interested shareholder, unless, among other things:

- the articles of incorporation expressly provide that the corporation is not subject to the statute (the Company has not made this election); or

- the board of directors of the corporation approves the chapter 1704 transaction or the acquisition of the shares before the date the shares were acquired.

After the three-year moratorium period, the corporation may not consummate a chapter 1704 transaction unless, among other things, it is approved by the affirmative vote of the holders of at least two-thirds of the voting power in the election of directors and the holders of a majority of the voting shares, excluding all shares beneficially owned by an interested shareholder or an affiliate or associate of an interested shareholder, or the shareholders receive certain minimum consideration for their shares. A chapter 1704 transaction includes certain mergers, sales of assets, consolidations, combinations and majority share acquisitions involving an interested shareholder. An interested shareholder is defined to include, with limited exceptions, any person who, together with affiliates and associates, is the beneficial owner of a sufficient number of shares of the corporation to entitle the person, directly or indirectly, alone or with others, to exercise or direct the exercise of 10% or more of the voting power in the election of directors after taking into account all of the person's beneficially owned shares that are not then outstanding.

EXHIBIT 21

**CLEVELAND-CLIFFS INC.**
**SUBSIDIARIES**
**AS OF DECEMBER 31, 2022**

| Name | Place of Incorporation or Organization |
| --- | --- |
| Cannon Automotive Solutions - Bowling Green, Inc. | Delaware |
| Cleveland-Cliffs Burns Harbor LLC | Delaware |
| Cleveland-Cliffs Cleveland Works LLC | Delaware |
| Cleveland-Cliffs Columbus LLC | Delaware |
| Cleveland-Cliffs FPT Services Company | Ohio |
| Cleveland-Cliffs Investments Inc. | Ohio |
| Cleveland-Cliffs Kote Inc. | Delaware |
| Cleveland-Cliffs Kote L.P. | Delaware |
| Cleveland-Cliffs Minorca Mine Inc. | Delaware |
| Cleveland-Cliffs Monessen Coke LLC | Delaware |
| Cleveland-Cliffs Plate LLC | Delaware |
| Cleveland-Cliffs Railways Inc. | Delaware |
| Cleveland-Cliffs Riverdale LLC | Delaware |
| Cleveland-Cliffs Services Holding Company | Ohio |
| Cleveland-Cliffs South Chicago & Indiana Harbor Railway Inc. | Delaware |
| Cleveland-Cliffs Steel Corporation | Delaware |
| Cleveland-Cliffs Steel Holding Corporation | Delaware |
| Cleveland-Cliffs Steel Holdings Inc. | Ohio |
| Cleveland-Cliffs Steel LLC | Delaware |
| Cleveland-Cliffs Steel Management Inc. | Delaware |
| Cleveland-Cliffs Steel Properties Inc. | Delaware |
| Cleveland-Cliffs Steelton LLC | Delaware |
| Cleveland-Cliffs Steelworks Railway Inc. | Delaware |
| Cleveland-Cliffs Tek Inc. | Delaware |
| Cleveland-Cliffs Tek Kote Acquisition Corporation | Ohio |
| Cleveland-Cliffs Tek L.P. | Delaware |
| Cleveland-Cliffs Tooling and Stamping Company | Delaware |
| Cleveland-Cliffs Tooling and Stamping Holdings LLC | Delaware |
| Cleveland-Cliffs Tubular Components LLC | Delaware |
| Cleveland-Cliffs Weirton LLC | Delaware |
| Cliffs Mining Company | Delaware |
| Cliffs Minnesota Mining Company | Delaware |
| Cliffs Steel Inc. | Ohio |
| Cliffs TIOP Holding, LLC | Delaware |
| Cliffs TIOP, Inc. | Michigan |
| Cliffs TIOP II, LLC | Delaware |
| Cliffs UTAC Holding LLC | Delaware |
| Ferrous Processing and Trading Company | Michigan |
| Fleetwood Metal Industries, LLC | Delaware |
| FPT Cleveland, LLC | Michigan |
| IronUnits LLC | Delaware |
| Lake Superior & Ishpeming Railroad Company | Michigan |

| Name | Place of Incorporation or Organization |
|---|:---:|
| Metallics Sales Company | Delaware |
| Mid-Vol Coal Sales, Inc. | West Virginia |
| Mountain State Carbon, LLC | Delaware |
| Northshore Mining Company | Delaware |
| Silver Bay Power Company | Delaware |
| SNA Carbon, LLC | Delaware |
| The Cleveland-Cliffs Iron Company | Ohio |
| Tilden Mining Company L.C. | Michigan |
| United Taconite LLC | Delaware |

EXHIBIT 22

The following entities are included in the obligated group as of December 31, 2022, as defined in the Annual Report on Form 10-K of Cleveland Cliffs Inc. to which this document is being filed as an exhibit, including Cleveland-Cliffs Inc., as the parent and issuer, and the subsidiary guarantors that have guaranteed the obligations under the 6.750% 2026 Senior Secured Notes, the 5.875% 2027 Senior Notes, the 7.000% 2027 Senior Notes, the 4.625% 2029 Senior Notes and the 4.875% 2031 Senior Notes issued by Cleveland-Cliffs Inc.

| Exact Name of Issuer or Guarantor Subsidiary (1) (2) | State of Incorporation or Organization | IRS Employer Identification Number |
|---|---|---|
| Cleveland-Cliffs Inc. | Ohio | 34-1464672 |
| Cannon Automotive Solutions - Bowling Green, Inc. | Delaware | 26-0766559 |
| Cleveland-Cliffs Burns Harbor LLC | Delaware | 20-0653414 |
| Cleveland-Cliffs Cleveland Works LLC | Delaware | 04-3634649 |
| Cleveland-Cliffs Columbus LLC | Delaware | 01-0807137 |
| Cleveland-Cliffs Investments Inc. | Ohio | 31-1283531 |
| Cleveland-Cliffs Kote Inc. | Delaware | 36-3665216 |
| Cleveland-Cliffs Kote L.P. | Delaware | 36-3665288 |
| Cleveland-Cliffs Minorca Mine Inc. | Delaware | 36-2814042 |
| Cleveland-Cliffs Monessen Coke LLC | Delaware | 25-1850170 |
| Cleveland-Cliffs Plate LLC | Delaware | 20-0653500 |
| Cleveland-Cliffs Railways Inc. | Delaware | 56-2348283 |
| Cleveland-Cliffs Riverdale LLC | Delaware | 74-3062732 |
| Cleveland-Cliffs South Chicago & Indiana Harbor Railway Inc. | Delaware | 04-3634638 |
| Cleveland-Cliffs Steel Corporation | Delaware | 31-1267098 |
| Cleveland-Cliffs Steel Holding Corporation | Delaware | 31-1401455 |
| Cleveland-Cliffs Steel Holdings Inc. | Ohio | 85-4084783 |
| Cleveland-Cliffs Steel LLC | Delaware | 71-0871875 |
| Cleveland-Cliffs Steel Management Inc. | Delaware | 51-0390893 |
| Cleveland-Cliffs Steel Properties Inc. | Delaware | 51-0390894 |
| Cleveland-Cliffs Steelton LLC | Delaware | 20-0653772 |
| Cleveland-Cliffs Steelworks Railway Inc. | Delaware | 04-3634622 |
| Cleveland-Cliffs Tek Inc. | Delaware | 36-3519946 |
| Cleveland-Cliffs Tek Kote Acquisition Corporation | Ohio | 85-4304182 |
| Cleveland-Cliffs Tek L.P. | Delaware | 363525438 |
| Cleveland-Cliffs Tooling and Stamping Company | Delaware | 22-3639336 |
| Cleveland-Cliffs Tooling and Stamping Holdings LLC | Delaware | 31-1283531 |
| Cleveland-Cliffs Tubular Components LLC | Delaware | 31-1283531 |
| Cleveland-Cliffs Weirton LLC | Delaware | 56-2435202 |
| Cliffs Mining Company | Delaware | 34-1120353 |
| Cliffs Minnesota Mining Company | Delaware | 42-1609117 |
| Cliffs Steel Inc. | Ohio | 87-3972693 |
| Cliffs TIOP Holding, LLC | Delaware | 47-2182060 |
| Cliffs TIOP, Inc. | Michigan | 34-1371049 |
| Cliffs TIOP II, LLC | Delaware | 61-1857848 |
| Cliffs UTAC Holding LLC | Delaware | 26-2895214 |
| Fleetwood Metal Industries, LLC | Delaware | 98-0508950 |
| IronUnits LLC | Delaware | 34-1920747 |
| Lake Superior & Ishpeming Railroad Company | Michigan | 38-6005761 |
| Metallics Sales Company | Delaware | 84-2076079 |
| Mid-Vol Coal Sales, Inc. | West Virginia | 55-0761501 |
| Mountain State Carbon, LLC | Delaware | 31-1267098 |
| Northshore Mining Company | Delaware | 84-1116857 |

**EXHIBIT 22**

| Exact Name of Issuer or Guarantor Subsidiary (1) (2) | State of Incorporation or Organization | IRS Employer Identification Number |
|---|---|---|
| Silver Bay Power Company | Delaware | 84-1126359 |
| SNA Carbon, LLC | Delaware | 31-1267098 |
| The Cleveland-Cliffs Iron Company | Ohio | 34-0677332 |
| Tilden Mining Company L.C. | Michigan | 34-1804848 |
| United Taconite LLC | Delaware | 42-1609118 |

(1) The address and phone number of each issuer and guarantor subsidiary is c/o Cleveland-Cliffs Inc., 200 Public Square, Suite 3300, Cleveland, Ohio 44114, (216) 694-5700.

(2) Cleveland-Cliffs Inc. is the issuer, all other entities listed are guarantor subsidiaries.

**EXHIBIT 23.1**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in:

Registration Statement No. 333-237324 on Form S-3;

Registration Statement No. 333-184620 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2012 Incentive Equity Plan;

Registration Statement No. 333-197687 on Form S-8 pertaining to the Cliffs Natural Resources Inc. Amended and Restated 2012 Incentive Equity Plan;

Registration Statement No. 333-197688 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2014 Nonemployee Directors' Compensation Plan;

Registration Statement No. 333-204369 on Form S-8 pertaining to the Cliffs Natural Resources Inc. 2015 Equity and Incentive Compensation Plan;

Registration Statement No. 333-210954 on Form S-8 pertaining to the Cliffs Natural Resources Inc. Amended and Restated 2014 Nonemployee Directors' Compensation Plan;

Registration Statement No. 333-217506 on Form S-8 pertaining to the Cliffs Natural Resources Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan;

Registration Statement No. 333-237144 on Form S-8 pertaining to the Cliffs Natural Resources Inc. Amended and Restated 2015 Equity and Incentive Compensation Plan;

Registration Statement No. 333-255571 on Form S-8 pertaining to the Cleveland-Cliffs Inc. 2021 Nonemployee Directors' Compensation Plan; and

Registration Statement No. 333-255572 on Form S-8 pertaining to the Cleveland-Cliffs Inc. 2021 Equity and Incentive Compensation Plan

of our reports dated February 14, 2023, relating to the financial statements of Cleveland-Cliffs Inc. and the effectiveness of Cleveland-Cliffs Inc.'s internal control over financial reporting, appearing in this Annual Report on Form 10-K for the year ended December 31, 2022.

*/s/ DELOITTE & TOUCHE LLP*

Cleveland, Ohio

February 14, 2023

EXHIBIT 23.2

**SLR Consulting US LLC**
**22118 20ᵗʰ Ave SE, Suite G202, Bothell, WA 98021 USA**



February 13, 2023

**CONSENT OF QUALIFIED PERSON**

**Re: Form 10-K of Cleveland-Cliffs Inc. (the "Company")**

SLR Consulting US LLC ("**SLR**"), in connection with the Company's Annual Report on Form 10-K for the year ended December 31, 2022 (the **Form 10-K**"), consents to:

- the incorporation by reference by the Company and use of the technical report titled "Technical Report Summary on the Hibbing Taconite Property, Minnesota, USA" (the "**Technical Report Summary**"), with an effective date of December 31, 2021 and dated February 7, 2022, that was prepared in accordance with Subpart 1300 of Regulation S-K promulgated by the U.S. Securities and Exchange Commission, as an exhibit to and referenced in the Form 10-K;

- the incorporation by reference of the Technical Report Summary into the Company's Registration Statement on Form S-3 (Registration No. 333-237324) and Registration Statements on Form S-8 (Registration Nos. 333-255571, 333-255572, 333-237144, 333-217506, 333-210954, 333-204369, 333-197687, 333-197688 and 333-184620) (collectively, the "**Registration Statements**");

- the use of and references to our name, including our status as an expert or "qualified person" (as defined in Subpart 1300 of Regulation S-K promulgated by the U.S. Securities and Exchange Commission), in connection with the Form 10-K, the Registration Statements and the Technical Report Summary; and

- any extracts from or a summary of the Technical Report Summary in the Form 10-K and incorporated by reference in the Registration Statements and the use of any information derived, summarized, quoted, or referenced from the Technical Report Summary, or portions thereof, that was prepared by us, that we supervised the preparation of, and/or that was reviewed and approved by us, that is included or incorporated by reference in the Form 10-K and the Registration Statements.

SLR is responsible for authoring, and this consent pertains to, the Technical Report Summary. SLR certifies that it has read the Form 10-K and that it fairly and accurately represents the information in the Technical Report Summary for which it is responsible.

**SLR Consulting US LLC (formerly SLR International Corporation)**
Per:

**(Signed)** *Richard J. Lambert*

Richard J. Lambert, P.E., P.Eng.
Global Technical Director
Technical Director, Mining Advisory US

global **environmental** and **advisory** solutions

**www.slrconsulting.com**

EXHIBIT 23.3



**SLR Consulting US LLC**
**22118 20ᵗʰ Ave SE, Suite G202, Bothell, WA 98021 USA**

February 13, 2023

**CONSENT OF QUALIFIED PERSON**

**Re: Form 10-K of Cleveland-Cliffs Inc. (the "Company")**

SLR Consulting US LLC ("**SLR**"), in connection with the Company's Annual Report on Form 10-K for the year ended December 31, 2022 (the **Form 10-K**"), consents to:

- the incorporation by reference by the Company and use of the technical report titled "Technical Report Summary on the Minorca Property, Minnesota, USA" (the "**Technical Report Summary**"), with an effective date of December 31, 2021 and dated February 7, 2022, that was prepared in accordance with Subpart 1300 of Regulation S-K promulgated by the U.S. Securities and Exchange Commission, as an exhibit to and referenced in the Form 10-K;

- the incorporation by reference of the Technical Report Summary into the Company's Registration Statement on Form S-3 (Registration No. 333-237324) and Registration Statements on Form S-8 (Registration Nos. 333-255571, 333-255572, 333-237144, 333-217506, 333-210954, 333-204369, 333-197687, 333-197688 and 333-184620) (collectively, the "**Registration Statements**");

- the use of and references to our name, including our status as an expert or "qualified person" (as defined in Subpart 1300 of Regulation S-K promulgated by the U.S. Securities and Exchange Commission), in connection with the Form 10-K, the Registration Statements and the Technical Report Summary; and

- any extracts from or a summary of the Technical Report Summary in the Form 10-K and incorporated by reference in the Registration Statements and the use of any information derived, summarized, quoted, or referenced from the Technical Report Summary, or portions thereof, that was prepared by us, that we supervised the preparation of, and/or that was reviewed and approved by us, that is included or incorporated by reference in the Form 10-K and the Registration Statements.

SLR is responsible for authoring, and this consent pertains to, the Technical Report Summary. SLR certifies that it has read the Form 10-K and that it fairly and accurately represents the information in the Technical Report Summary for which it is responsible.

**SLR Consulting US LLC (formerly SLR International Corporation)**
Per:

**(Signed) *Richard J. Lambert***

Richard J. Lambert, P.E., P.Eng.
Global Technical Director
Technical Director, Mining Advisory US

global **environmental** and **advisory** solutions

**www.slrconsulting.com**



EXHIBIT 23.4

**SLR Consulting US LLC**
**22118 20ᵗʰ Ave SE, Suite G202, Bothell, WA 98021 USA**

February 13, 2023

**CONSENT OF QUALIFIED PERSON**

**Re: Form 10-K of Cleveland-Cliffs Inc. (the "Company")**

SLR Consulting US LLC ("**SLR**"), in connection with the Company's Annual Report on Form 10-K for the year ended December 31, 2022 (the **Form 10-K**"), consents to:

- the incorporation by reference by the Company and use of the technical report titled "Technical Report Summary on the Northshore Property, Minnesota, USA" (the "**Technical Report Summary**"), with an effective date of December 31, 2021 and dated February 7, 2022, that was prepared in accordance with Subpart 1300 of Regulation S-K promulgated by the U.S. Securities and Exchange Commission, as an exhibit to and referenced in the Form 10-K;

- the incorporation by reference of the Technical Report Summary into the Company's Registration Statement on Form S-3 (Registration No. 333-237324) and Registration Statements on Form S-8 (Registration Nos. 333-255571, 333-255572, 333-237144, 333-217506, 333-210954, 333-204369, 333-197687, 333-197688 and 333-184620) (collectively, the "**Registration Statements**");

- the use of and references to our name, including our status as an expert or "qualified person" (as defined in Subpart 1300 of Regulation S-K promulgated by the U.S. Securities and Exchange Commission), in connection with the Form 10-K, the Registration Statements and the Technical Report Summary; and

- any extracts from or a summary of the Technical Report Summary in the Form 10-K and incorporated by reference in the Registration Statements and the use of any information derived, summarized, quoted, or referenced from the Technical Report Summary, or portions thereof, that was prepared by us, that we supervised the preparation of, and/or that was reviewed and approved by us, that is included or incorporated by reference in the Form 10-K and the Registration Statements.

SLR is responsible for authoring, and this consent pertains to, the Technical Report Summary. SLR certifies that it has read the Form 10-K and that it fairly and accurately represents the information in the Technical Report Summary for which it is responsible.

**SLR Consulting US LLC (formerly SLR International Corporation)**
Per:


**(Signed)** *Richard J. Lambert*

Richard J. Lambert, P.E., P.Eng.
Global Technical Director
Technical Director, Mining Advisory US

global **environmental** and **advisory** solutions

**www.slrconsulting.com**

EXHIBIT 23.5



**SLR Consulting US LLC**
**22118 20th Ave SE, Suite G202, Bothell, WA 98021 USA**

February 13, 2023

**CONSENT OF QUALIFIED PERSON**

**Re: Form 10-K of Cleveland-Cliffs Inc. (the "Company")**

SLR Consulting US LLC ("**SLR**"), in connection with the Company's Annual Report on Form 10-K for the year ended December 31, 2022 (the **Form 10-K**"), consents to:

- the incorporation by reference by the Company and use of the technical report titled "Technical Report Summary on the United Taconite Property, Minnesota, USA" (the "**Technical Report Summary**"), with an effective date of December 31, 2021 and dated February 7, 2022, that was prepared in accordance with Subpart 1300 of Regulation S-K promulgated by the U.S. Securities and Exchange Commission, as an exhibit to and referenced in the Form 10-K;

- the incorporation by reference of the Technical Report Summary into the Company's Registration Statement on Form S-3 (Registration No. 333-237324) and Registration Statements on Form S-8 (Registration Nos. 333-255571, 333-255572, 333-237144, 333-217506, 333-210954, 333-204369, 333-197687, 333-197688 and 333-184620) (collectively, the "**Registration Statements**");

- the use of and references to our name, including our status as an expert or "qualified person" (as defined in Subpart 1300 of Regulation S-K promulgated by the U.S. Securities and Exchange Commission), in connection with the Form 10-K, the Registration Statements and the Technical Report Summary; and

- any extracts from or a summary of the Technical Report Summary in the Form 10-K and incorporated by reference in the Registration Statements and the use of any information derived, summarized, quoted, or referenced from the Technical Report Summary, or portions thereof, that was prepared by us, that we supervised the preparation of, and/or that was reviewed and approved by us, that is included or incorporated by reference in the Form 10-K and the Registration Statements.

SLR is responsible for authoring, and this consent pertains to, the Technical Report Summary. SLR certifies that it has read the Form 10-K and that it fairly and accurately represents the information in the Technical Report Summary for which it is responsible.

**SLR Consulting US LLC (formerly SLR International Corporation)**
Per:

**(Signed)** *Richard J. Lambert*

Richard J. Lambert, P.E., P.Eng.
Global Technical Director
Technical Director, Mining Advisory US

global **environmental** and **advisory** solutions                    **www.slrconsulting.com**



EXHIBIT 23.6

**SLR Consulting US LLC**
**22118 20th Ave SE, Suite G202, Bothell, WA 98021 USA**

February 13, 2023

**CONSENT OF QUALIFIED PERSON**

**Re: Form 10-K of Cleveland-Cliffs Inc. (the "Company")**

SLR Consulting US LLC ("**SLR**"), in connection with the Company's Annual Report on Form 10-K for the year ended December 31, 2022 (the **Form 10-K**"), consents to:

- the incorporation by reference by the Company and use of the technical report titled "Technical Report Summary on the Tilden Property, Michigan, USA" (the "**Technical Report Summary**"), with an effective date of December 31, 2021 and dated February 7, 2022, that was prepared in accordance with Subpart 1300 of Regulation S-K promulgated by the U.S. Securities and Exchange Commission, as an exhibit to and referenced in the Form 10-K;

- the incorporation by reference of the Technical Report Summary into the Company's Registration Statement on Form S-3 (Registration No. 333-237324) and Registration Statements on Form S-8 (Registration Nos. 333-255571, 333-255572, 333-237144, 333-217506, 333-210954, 333-204369, 333-197687, 333-197688 and 333-184620) (collectively, the "**Registration Statements**");

- the use of and references to our name, including our status as an expert or "qualified person" (as defined in Subpart 1300 of Regulation S-K promulgated by the U.S. Securities and Exchange Commission), in connection with the Form 10-K, the Registration Statements and the Technical Report Summary; and

- any extracts from or a summary of the Technical Report Summary in the Form 10-K and incorporated by reference in the Registration Statements and the use of any information derived, summarized, quoted, or referenced from the Technical Report Summary, or portions thereof, that was prepared by us, that we supervised the preparation of, and/or that was reviewed and approved by us, that is included or incorporated by reference in the Form 10-K and the Registration Statements.

SLR is responsible for authoring, and this consent pertains to, the Technical Report Summary. SLR certifies that it has read the Form 10-K and that it fairly and accurately represents the information in the Technical Report Summary for which it is responsible.

**SLR Consulting US LLC (formerly SLR International Corporation)**
Per:

**(Signed)** *Richard J. Lambert*

Richard J. Lambert, P.E., P.Eng.
Global Technical Director
Technical Director, Mining Advisory US

global **environmental** and **advisory** solutions

**www.slrconsulting.com**

A006671

EXHIBIT 24

**POWER OF ATTORNEY**

KNOW ALL PEOPLE BY THESE PRESENTS, that the undersigned Directors and officers of Cleveland-Cliffs Inc., an Ohio corporation ("Company"), hereby constitute and appoint C. Lourenco Goncalves, Celso L. Goncalves Jr., James D. Graham and Kimberly A. Floriani, and each of them, their true and lawful attorney or attorneys-in-fact, with full power of substitution and revocation, for them and in their name, place and stead, to sign on their behalf as a Director or officer of the Company, or both, as the case may be, an Annual Report on Form 10-K pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2022, and to sign any and all amendments to such Annual Report, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorney or attorneys-in-fact, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as they might or could do in person, hereby ratifying and confirming all that said attorney or attorneys-in-fact or any of them or their substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Executed as of the 10th day of February, 2023.

| | |
|---|---|
| /s/ C. L. Goncalves | /s/ C. L. Goncalves Jr. |
| C. L. Goncalves, Chairman, President and Chief Executive Officer | C. L. Goncalves Jr., Executive Vice President, Chief Financial Officer |
| /s/ K. A. Floriani | /s/ J. T. Baldwin |
| K. A. Floriani, Senior Vice President, Controller & Chief Accounting Officer | J. T. Baldwin, Director |
| /s/ R. P. Fisher, Jr. | /s/ W. K. Gerber |
| R. P. Fisher, Jr., Director | W. K. Gerber, Director |
| /s/ S. M. Green | /s/ R. S. Michael, III |
| S. M. Green, Director | R. S. Michael, III, Director |
| /s/ J. L. Miller | /s/ G. Stoliar |
| J. L. Miller, Director | G. Stoliar, Director |
| /s/ D. C. Taylor | /s/ A. M. Yocum |
| D. C. Taylor, Director | A. M. Yocum, Director |

EXHIBIT 31.1

**CERTIFICATION**

I, Lourenco Goncalves, certify that:

1.    I have reviewed this annual report on Form 10-K of Cleveland-Cliffs Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)), for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected or is reasonably likely to materially affect the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

        Date:    February 14, 2023            By:    /s/ Lourenco Goncalves
                                                    Lourenco Goncalves
                                                    Chairman, President and Chief Executive Officer

**EXHIBIT 31.2**

**CERTIFICATION**

I, Celso L. Goncalves Jr., certify that:

1.  I have reviewed this annual report on Form 10-K of Cleveland-Cliffs Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)), for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected or is reasonably likely to materially affect the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    February 14, 2023              By:    /s/ Celso L. Goncalves Jr.

                                               Celso L. Goncalves Jr.

                                               Executive Vice President, Chief Financial Officer

**EXHIBIT 32.1**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Cleveland-Cliffs Inc. (the "Company") on Form 10-K for the period ended December 31, 2022, as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), I, Lourenco Goncalves, Chairman, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1)    The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)    The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date:        February 14, 2023

By: /s/ Lourenco Goncalves
Lourenco Goncalves

Chairman, President and Chief Executive Officer

**EXHIBIT 32.2**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Cleveland-Cliffs Inc. (the "Company") on Form 10-K for the period ended December 31, 2022, as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), I, Celso L. Goncalves Jr., Executive Vice President, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1)     The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)     The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date:     February 14, 2023

By: /s/ Celso L. Goncalves Jr.
Celso L. Goncalves Jr.
Executive Vice President, Chief Financial Officer

**EXHIBIT 95**

**MINE SAFETY DISCLOSURES**

The operation of our mines located in the United States is subject to regulation by MSHA under the FMSH Act. MSHA inspects these mines on a regular basis and issues various citations and orders when it believes a violation has occurred under the FMSH Act. We present information below regarding certain mining safety and health citations that MSHA has issued with respect to our mining operations. In evaluating this information, consideration should be given to factors such as: (i) the number of citations and orders will vary depending on the size of the mine; (ii) the number of citations issued will vary from inspector to inspector and mine to mine, and (iii) citations and orders can be contested and appealed and, in that process, are often reduced in severity and amount, and are sometimes dismissed.

Under the Dodd-Frank Act, each operator of a coal or other mine is required to include certain mine safety results within its periodic reports filed with the SEC. As required by the reporting requirements included in §1503(a) of the Dodd-Frank Act, we present the following items regarding certain mining safety and health matters, for the period presented, for each of our mine locations that are covered under the scope of the Dodd-Frank Act:

(A)   The total number of violations of mandatory health or safety standards that could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard under section 104 of the FMSH Act (30 U.S.C. 814) for which the operator received a citation from MSHA;

(B)   The total number of orders issued under section 104(b) of the FMSH Act (30 U.S.C. 814(b));

(C)   The total number of citations and orders for unwarrantable failure of the mine operator to comply with mandatory health or safety standards under section 104(d) of the FMSH Act (30 U.S.C. 814(d));

(D)   The total number of imminent danger orders issued under section 107(a) of the FMSH Act (30 U.S.C. 817(a));

(E)   The total dollar value of proposed assessments from MSHA under the FMSH Act (30 U.S.C. 801 et seq.);

(F)   Legal actions pending before the Federal Mine Safety and Health Review Commission involving such coal or other mine as of the last day of the period;

(G)   Legal actions instituted before the Federal Mine Safety and Health Review Commission involving such coal or other mine during the period; and

(H)   Legal actions resolved before the Federal Mine Safety and Health Review Commission involving such coal or other mine during the period.

During the year ended December 31, 2022, our mine locations did not receive any flagrant violations under section 110(b)(2) of the FMSH Act (30 U.S.C. 820(b)(2)) and did not receive any written notices of a pattern of violations, or the potential to have a pattern of such violations, under section 104(e) of the FMSH Act (30 U.S.C. 814(e)). In addition, there were no mining-related fatalities at any of our mine locations during this same period.

Following is a summary of the information described above for the year ended December 31, 2022:

| Mine Name/ MSHA ID No. | Operation | (A) Section 104 S&S Citations | (B) Section 104(b) Orders | (C) Section 104(d) Orders | (D) Section 107(a) Citations & Orders | (E) Total Dollar Value of MSHA Proposed Assessments (1) | (F) Legal Actions Pending as of Last Day of Period | | (G) Legal Actions Instituted During Period | (H) Legal Actions Resolved During Period |
|---|---|---|---|---|---|---|---|---|---|---|
| Tilden / 2000422 | Iron Ore | 34 | — | — | — | $ 430,256 | 2 | (2) | 3 | 2 |
| Empire / 2001012 | Iron Ore | — | — | — | — | $ — | — | | — | — |
| Northshore Plant / 2100831 | Iron Ore | 6 | — | — | — | $ 44,860 | — | | 5 | 10 |
| Northshore Mine / 2100209 | Iron Ore | — | — | — | — | $ 864 | — | | — | — |
| United Taconite Plant / 2103404 | Iron Ore | 30 | — | — | — | $ 159,698 | 4 | (3) | 7 | 6 |
| United Taconite Mine / 2103403 | Iron Ore | 3 | — | — | — | $ 1,324 | — | | — | 2 |
| Hibbing / 2101600 | Iron Ore | 5 | — | — | — | $ 32,330 | 1 | (4) | 5 | 5 |
| Minorca Mine / 2102449 | Iron Ore | 25 | 1 | — | — | $ 120,934 | — | | 1 | 2 |
| AK Coal / North Fork / 3610041 | Coal | — | — | — | — | $ — | — | | — | — |
| Coal Innovations #1 / 3609406 | Coal | — | — | — | — | $ — | — | | — | — |
| Virginia Point No. 1 Surface Mine / 4407172 | Coal | — | — | — | — | $ 1,528 | — | | — | — |
| Low Gap Surface Mine / 4605741 | Coal | 1 | — | — | — | $ 2,997 | — | | — | — |
| Eckman Surface Mine / 4608647 | Coal | — | — | — | — | $ 1,392 | — | | — | — |
| Redhawk Surface Mine / 4609300 | Coal | — | — | — | — | $ — | — | | — | — |
| Dry Branch Surface Mine / 4609395 | Coal | 2 | 1 | 2 | — | $ 40,563 | 2 | (5) | 2 | — |
| Dans Branch Surface Mine / 4609517 | Coal | — | — | — | — | $ — | — | | — | — |
| Eckman Loadout / 4603341 | Coal | — | — | — | — | $ — | — | | — | — |
| Roadfork Loadout / 4608278 | Coal | — | — | — | — | $ — | — | | — | — |
| Eckman Plant / 4609357 | Coal | 1 | — | — | — | $ 2,026 | — | | — | — |
| Mine No. 35 / 4608131 | Coal | — | — | — | — | $ — | — | | — | — |
| Mine No. 39 / 4609261 | Coal | 37 | — | — | — | $ 33,166 | 1 | (6) | 2 | 5 |
| Mine No. 43 / 4609496 | Coal | 28 | — | 1 | — | $ 70,099 | 2 | (7) | 4 | 4 |
| Mine No. 44 / 4609523 | Coal | 2 | — | — | — | $ 2,154 | — | | — | — |

(1)  Amounts included under the heading "Total Dollar Value of MSHA Proposed Assessments" are the total dollar amounts for proposed assessments received from MSHA on or before December 31, 2022.

(2)  This number consists of 2 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules.

(3)  This number consists of 4 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules.

(4)  This number consists of 1 pending legal action related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules.

(5)  This number consists of 2 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules.

(6)  This number consists of 1 pending legal action related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules.

(7)  This number consists of 2 pending legal actions related to contests of proposed penalties referenced in Subpart C of FMSH Act's procedural rules.