## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>ESSAR STEEL MINNESOTA LLC and ESML HOLDINGS INC.,<br><br>     Reorganized Debtors. | Chapter 11<br><br>Case No. 16-11626 (CTG)<br><br>(Jointly Administered) |
| MESABI METALLICS COMPANY LLC (F/K/A ESSAR STEEL MINNESOTA LLC),<br><br>    Plaintiff,<br><br>  v.<br><br>CLEVELAND-CLIFFS INC., *et al*.,<br><br>    Defendants. | Adv. Proc. No. 17-51210 (CTG) |
| CLEVELAND-CLIFFS INC., *et al*.,<br><br>    Counterclaim-Plaintiffs,<br><br>  v.<br><br>MESABI METALLICS COMPANY LLC,<br><br>    Counterclaim-Defendant. | |
| CLEVELAND-CLIFFS INC., *et al*.,<br><br>    Third-Party-Plaintiffs,<br><br>  v.<br><br>CHIPPEWA CAPITAL PARTNERS, LLC; and THOMAS M. CLARKE,<br><br>    Third-Party-Defendants.[1] | |

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO EXCLUDE THE EXPERT TESTIMONY OF ROGER N. EMMOTT

---

[1] Counterclaim-Plaintiffs Cleveland-Cliffs Inc. and Cleveland-Cliffs Minnesota Land Development LLC respectfully disagree that their claims against Chippewa Capital Partners, LLC and Thomas M. Clarke are third-party claims rather than counterclaims in this action.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 2

LEGAL STANDARD.......................................................................................... 3

ARGUMENT ..................................................................................................... 4

    I.     Emmott Lacks Expertise .................................................................. 4

    II.    Emmott Is Not A Reliable And Independent Expert ........................... 7

    III.   Emmott Has No Reliable Methodology.............................................. 9

    IV.   Emmott Fails To Consider Viable Alternative Theories .................... 11

    V.    Effect On Validity Of Particular Opinions ........................................ 13

        A.    The Viability Of Mesabi's Mine Plan ................................... 13

        B.    Cliffs' Acquisition Of Certain Property .................................. 15

        C.    Cliffs' Actions With Regard To Third Parties ......................... 18

        D.    Length Of Cliffs' Contracts.................................................... 20

        E.    Cause Of The Delays To Mesabi's Project ............................. 22

CONCLUSION.................................................................................................. 24

# TABLE OF AUTHORITIES

Page

CASES

Aloe Coal Co. v. Clark Equip. Co.,
816 F.2d 110 (3d Cir. 1987)..................................................................5

AstraZeneca LP v. Tap Pharm. Prod., Inc.,
444 F. Supp. 2d 278 (D. Del. 2006)......................................................16

AstraZeneca UK Ltd. v. Watson Lab'ys, Inc. (NV),
2012 WL 6043266 (D. Del. Nov. 14, 2012) ...........................................17

Balu v. Cincinnati Ins. Co.,
2021 WL 1427651 (E.D. Pa. Apr. 15, 2021) ...........................................5

CareDx, Inc. v. Natera, Inc.,
2021 WL 1840646 (D. Del. May 7, 2021)...............................................10

Daubert v. Merrell Dow Pharms., Inc.,
509 U.S. 579 (1993)........................................................................ passim

Gopalratnam v. Hewlett-Packard Co.,
877 F.3d 771 (7th Cir. 2017) ...............................................................12

Heller v. Shaw Indus., Inc.,
167 F.3d 146 (3d Cir. 1999)...................................................................4

Hines v. Consol. Rail Corp.,
926 F.2d 262 (3d Cir. 1991)..................................................................12

In re Nellson Nutraceutical, Inc.,
356 B.R. 364 (Bankr. D. Del. 2006) .......................................................4

In re Paoli R.R. Yard PCB Litig.,
35 F.3d 717 (3d Cir. 1994).............................................................4, 7, 9

In re Rosuvastatin Calcium Patent Litig.,
2009 WL 4800702 (D. Del. Dec. 11, 2009)............................................16

In re TMI Litig.,
  193 F.3d 613 (3d Cir. 1999), amended, 199 F.3d 158 (3d Cir. 2000) ................................9, 11

In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.,
  858 F.3d 787 (3d Cir. 2017)...........................................................................................4

Karlo v. Pittsburgh Glass Works, LLC,
  849 F.3d 61 (3d Cir. 2017)...........................................................................................9

Kumho Tire Co. v. Carmichael,
  526 U.S. 137 (1999)...................................................................................................3

Oddi v. Ford Motor Co.,
  234 F.3d 136 (3d Cir. 2000)..................................................................................13, 24

Orthoflex, Inc. v. ThermoTek, Inc.,
  986 F. Supp. 2d 776 (N.D. Tex. 2013) .................................................................8, 14

Oxford Gene Tech. Ltd. v. Mergen Ltd.,
  345 F. Supp. 2d 431 (D. Del. 2004).............................................................................17

Pineda v. Ford Motor Co.,
  520 F.3d 237 (3d Cir. 2008).....................................................................................9, 10

Schneider ex rel. Est. of Schneider v. Fried,
  320 F.3d 396 (3d Cir. 2003)........................................................................................7

Torain v. City of Philadelphia,
  2023 WL 174952 (E.D. Pa. Jan. 12, 2023) ..............................................................8

UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres,
  949 F.3d 825 (3d Cir. 2020)...........................................................................9, 11, 13, 24

United States v. Fleet Mgmt., Ltd.,
  332 F. App'x 753 (3d Cir. 2009) .............................................................................8, 12

United States v. Frazier,
  387 F.3d 1244 (11th Cir. 2004) ...............................................................................4

United States v. Williams,
  974 F.3d 320 (3d Cir. 2020).......................................................................................3

Waldorf v. Shuta,
  142 F.3d 601 (3d Cir. 1998)........................................................................................5

Wisconsin v. Indivior Inv.,
   2020 WL 6887885 (E.D. Pa. Nov. 24, 2020) ............................................................................8

ZF Meritor, LLC v. Eaton Corp.,
   696 F.3d 254 (3d Cir. 2012) .........................................................................................................3

**RULES**

Federal Rule of Evidence 702 ................................................................................... passim

**STATUTES**

Minnesota Statutes § 93.1925 ...........................................................................................17

## <u>INTRODUCTION</u>

Mesabi proffers Roger Emmott as a jack-of-all-trades, but he is an expert of none.  First, he lacks crucial qualifications to be able to evaluate the case and its background effectively.  While he has testified in a handful of commercial arbitrations (including one in which his opinion was excluded), he has never been qualified as an expert in any United States court, has no pertinent education, experience, or record publishing on these subjects, and candidly admits that his assignment here is fundamentally different than the "expert" work he has previously performed.  Second, his reports are nothing more than the rephrased opinions of Mesabi and their legal team.  He performed no analysis other than looking at a tiny fraction of the documents produced and reviewing about a quarter of the depositions taken in this matter.  He undertook no independent review of underlying data to evaluate key positions taken by Mesabi employees.  And he did not consider viable alternative causes for many of his opinions even though his testimony is that the impact of Cliffs' alleged conduct continues to this day.  Third, and most damningly, his analysis lacks any indica of reliable methodology.  Emmott admits that instead he merely drew an impression from the materials he reviewed.  This method, which he described as "triangulation," is not a basis for admissible expert testimony.

As a result of these three fundamental failures, Cliffs believes that Emmott's testimony should be excluded in whole.  In the alternative, Cliffs asks the Court to exclude the following specific opinions for the reasons stated:

- Emmott's opinion that "Mesabi's plan to develop the Project was well-conceived and highly viable," on account of his lack of qualification, his lack of independent review, and his lack of reliable methodology.  <u>See infra</u>, Section V.1.

- Emmott's opinion that "Cliffs' acquisition of [certain property] made no commercial sense except as a means to prevent Mesabi from beginning operations," on account of his lack of a reliable methodology, his impermissible testimony as to Cliffs' state of mind, and his failure to account for alternative causes.  <u>See infra</u>, Section V.2.

- Emmott's opinion that "Cliffs' refusal to allow third parties to work for Cliffs if they worked for the Mesabi Project was commercially unreasonable," on account of his lack of qualifications and lack of a reliable methodology. <u>See infra</u>, Section V.3.

- Emmott's opinion that "Cliffs' long-term, exclusive supply contracts are commercially unreasonable and contrary to the interests of buyers," on account of his lack of qualification and his lack of a reliable methodology. <u>See infra</u>, Section V.4.

- And, finally, Emmott's opinion that "the combined effect of Cliffs' actions … were [sic] a significant obstacle to Mesabi's ability to finance its project," on account of his failure to account for alternative causes and his failure to apply a reliable methodology. <u>See infra</u>, Section V.5.

Cliffs sets forth below the pertinent background of the case, the newly-enacted legal standard by which this Court is required to evaluate Emmott, and the reasons—both general and specific—that the Court ought to hold Emmott's opinions inadmissible and exclude his testimony from this case.

### <u>BACKGROUND</u>

This brief concerns the admissibility of the opinions offered by one of Plaintiff Mesabi Metallics Company LLC's ("<u>Mesabi</u>") experts, Roger Nigel Emmott ("<u>Emmott</u>"). Mesabi retained Emmott to provide testimony regarding, <u>inter alia</u>: "[t]he iron ore industry," "[t]he viability of Mesabi's plan to build an iron ore mine and pellet production facility near Nashwauk, Minnesota," "[t]he commercial reasonableness" of various of Defendants Cleveland-Cliffs Inc. and Cleveland-Cliffs Minnesota Land Development LLC's (collectively, "<u>Cliffs</u>") actions, and the effects of Cliffs' actions on Mesabi's ability to obtain financing for its project. Ex. 2, Expert Report of Roger N. Emmott at ¶ 6 ("Emmott Rep.").[2]

On the basis of his "experience and training," <u>id.</u> at ¶ 8, Emmott reached a number of sweeping conclusions regarding these topics, <u>id.</u> at ¶ 7.  He provided these opinions in a report dated April 28, 2023.  Emmott also wrote a reply report dated September 8, 2023, in which he said

---

[2] All exhibits are numbered according to the Declaration of Kristin S.M. Morrison in Support of this Motion.

that the "Cliffs Reports provide no reason for me to revise the opinions in my April Report."  Ex. 3, Reply Report of Roger N. Emmott at ¶ 2.  Emmott was then deposed on September 21, 2023. Ex. 1, Deposition of Roger N. Emmott 5:4 ("Emmott Dep.").

## **LEGAL STANDARD**

It is beyond dispute that judges have "a 'general "gatekeeping" obligation' with respect to all testimony based on specialized knowledge of some form." United States v. Williams, 974 F.3d 320, 358 (3d Cir. 2020) (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999)). Federal Rule of Evidence 702 also tasks judges with "ensur[ing] that such testimony is both reliable and relevant."  Id., see also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 594-95 (1993). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. Rule Evid. 702 (as amended and effective December 1, 2023).[3]  As the Third Circuit has "made clear, 'the reliability analysis [required by Daubert] applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion."  ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 291 (3d Cir. 2012)

---

[3] As the Court is no doubt aware, this revised version of Rule 702, which adds the proponent's burden as an explicit requirement in the text, came into effect on December 1, 2023.  In the words of the advisory committee notes, these amendments were enacted "to clarify and emphasize that the admissibility requirements set forth in the rule must be established to the court by a preponderance of the evidence," and that the burden to establish such admissibility lies with the proponent of the expert. Fed. R. Evid. 702 advisory committee's note.  The committee was concerned that "many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility.  These rulings are an incorrect application of Rules 702 and 104(a)."  Id.  This is not a change but rather a clarification to ensure the Rule was not misapplied, as many courts had done after Kumho Tire.  See Fed. R. Evid. 702 advisory committee's note.

(alterations in original) (quoting <u>Heller v. Shaw Indus., Inc.</u>, 167 F.3d 146, 155 (3d Cir. 1999)). Importantly, Mesabi, "as the proponent[] of the expert testimony, bear[s] the burden of demonstrating by a preponderance of the evidence that the testimony is admissible." <u>In re Nellson Nutraceutical, Inc.</u>, 356 B.R. 364, 372 (Bankr. D. Del. 2006).

In the words of the Supreme Court, "[e]xpert evidence can be both powerful and quite misleading." <u>Daubert</u>, 509 U.S. at 595 (internal quotation marks and citation omitted). As a result, "[t]he importance of <u>Daubert</u>'s gatekeeping requirement cannot be overstated." <u>United States v. Frazier</u>, 387 F.3d 1244, 1260 (11th Cir. 2004). "Both an expert's methodology and the application of that methodology must be reviewed for reliability." <u>In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.</u>, 858 F.3d 787, 792 (3d Cir. 2017). Finally, "<u>any</u> step that renders the analysis unreliable under the <u>Daubert factors renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.</u>" <u>In re Paoli R.R. Yard PCB Litig.</u>, 35 F.3d 717, 745 (3d Cir. 1994) (emphasis in original).

## **ARGUMENT**

Emmott cannot meet several of the Rule 702 requirements required to testify as an expert. First, he is not "qualified as an expert" in this sphere "by knowledge, skill, experience, training, or education." Fed. Rule Evid. 702. Second, his testimony does not "rest[] on a reliable foundation" and is merely a restatement of Mesabi's legal arguments. <u>Daubert</u>, 509 U.S. at 597. Finally, his testimony is not "the product of reliable principles and methods." Fed. Rule Evid. 702 (c).

## I.   **EMMOTT LACKS EXPERTISE**

With the possible exception of providing a general tutorial about how steel is made (Ex. 2, Emmott Rep. at § IV), Emmott is not qualified to speak as an expert in this case. Even before Rule 702's amendment, the Third Circuit has "not pursued a policy of qualifying any proffered witness

as an expert." <u>Waldorf v. Shuta</u>, 142 F.3d 601, 625 (3d Cir. 1998) (emphasis removed).  For example, in <u>Aloe Coal Co. v. Clark Equip. Co.</u>, the court disqualified a purported expert because he lacked relevant training and experience: "Drewnoski was not an engineer.  He had no experience in designing construction machinery.  He had no knowledge or experience in determining the cause of equipment fires.  He had no training as a mechanic.  He had never operated construction machinery ….  He was a salesman, who at times prepared damage estimates." 816 F.2d 110, 114 (3d Cir. 1987) (record citations omitted).  Likewise, in <u>Balu v. Cincinnati Ins. Co.</u>, a "senior claims adjuster and … Certified Roof Inspector" was disqualified from testifying about the cause of damage to the roof and interior of a pool room on the basis that he was not an engineer, and "expertise at identifying and estimating the cost to repair damage is not expertise at identifying the cause of the damage."  2021 WL 1427651, at *3 (E.D. Pa. Apr. 15, 2021).  Both <u>Aloe</u> and <u>Balu</u> stand for the proposition that experts testifying in specialized fields must have experience in that field: "An expert witness must have such skill, knowledge, or experience in the field as to make it appear that his opinion will probably aid the trier of fact in his search for the truth."  <u>Aloe</u>, 816 F.2d at 114.

Emmott is seeking to testify about decisions made in a specialized field of which he is not a member.  Though Emmott has a bachelor's degree in metallurgy, he took no classes in mine engineering as a part of that degree.  Ex. 1, Emmott Dep. 13:10-13.  He has never worked for an iron ore pellet company or an iron plant.  <u>Id.</u> at 41:8-10.  Instead, he seeks to testify as an expert on the basis that he has taken "several days" of mine planning training with a local organization, <u>id.</u> at 13:15-23, and that he worked on the finance side of a mining consulting operation, where he was a "director of investment and business planning," <u>id.</u> at 16:24-17:2.  On the basis of this experience, Emmott makes sweeping claims about the "historic[]" focus of the "iron ore industry

in the Great Lakes region," the viability of Mesabi's mine planning, the non-viability of Cliff's mining plans, and more.  Ex. 2, Emmott Rep. at ¶ 6.  Like the salesman in <u>Aloe</u>, this financer purports to possess expertise as to a matter that is, at most, adjacent to that which his education and experience would have exposed him.

Simply put, Emmott's qualifications are not sufficient to meet the requirements of Rule 702. In fact, Emmott admits that many of his opinions here are unlike any he has purported to offer before and involve situations without analogy in his experience.  He has never provided an expert opinion on the "reasons or motives behind a company's actions" "as a key part" of an expert opinion, Ex. 1, Emmott Dep. 35:18-22; he believes that "determin[ing] a company's intent with respect to future business plans" is "unique and unprecedented" and so has not done so in the past, <u>id.</u> at 90:1-11; he has never even been involved (as an expert or not) in a transaction involving "issues with land," <u>id.</u> at 110:2-8; he has never testified about protection of trade secrets, <u>id.</u> at 35:25-36:7; he has never worked in, been in operations in, or planned or engineered a pellet plant, <u>id.</u> at 123-24; and he has never before offered an opinion on the difficulty or ease of legal work, <u>id.</u> at 170:21-24.  Emmott admits that "this is the first time [he has] been involved in a purely U.S. matter," <u>id.</u> at 189:2-3, and at no point indicates that he has any experience with mines in the United States.[4]

Further, Emmott's opinion in an area that would be applicable here—the pricing of iron ore—was once rejected in a commercial arbitration because he "had not been an iron ore trader." Ex. 1, Emmott Dep. 32:17-33:4.  He has never testified as an expert in the United States in state or federal court, <u>id.</u> at 31:22-24, has never taught in a college or university setting, <u>id.</u> at 29:16-19, and has no peer reviewed or otherwise scholarly articles, <u>id.</u> at 29:19-23.  In fact, he has only

---

[4] Emmott's "Qualifications and Experience" section of his report states that he has "visited mines" in China, Ukraine, and Belgium and that he has done work relating to mines or potential mines in various African nations.  Ex. 2, Emmott Rep. at ¶ 16.

testified as an expert in any proceeding "five or six" times. Id. at 31:3-7. His "core skill," as he lists it on his LinkedIn page, is that he is an "expert witness." Id. at 41:14-16. His qualifications do not qualify him to exercise that "skill" in this case.

## II.  EMMOTT IS NOT A RELIABLE AND INDEPENDENT EXPERT

The Third Circuit has "explained that Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." Schneider ex rel. Est. of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003). As already discussed, Emmott is not qualified to opine in this case. In addition, his testimony is not reliable, that is, it is not "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" In re Paoli, 35 F.3d at 742 (quoting Daubert, 509 U.S. at 590). Here, the subjective belief on which Emmott's testimony rests is not even his own—rather, he is merely a mouthpiece for Mesabi's statements and arguments.

Consider Emmott's testimony as to his conclusions about the effect of the withdrawal of Mesabi's environmental legal counsel: when asked whether he "conduct[ed] any examination [him]self of the work of the two [environmental] law firms," Emmott admitted that he "made no independent evaluation" and that he "just relied on contemporaneous documents or people's statements." Ex. 1, Emmott Dep. 170:18-171:10.

Elsewhere, Emmott suggests that his opinion on the viability of Mesabi's mining plan is based entirely on the assumption that, as "the [NI 43-101] report was signed off by a qualified person and done to the standard," "it does meet the standard requirements." Id. at 60:5-11. More bluntly, Emmott agreed that "the only qualification for reliability [of such a report] is that a qualified person has put their name on the report."[5] Id. at 66:11-16. In other words—Emmott's

---

[5] This simplistic view of what makes an NI 43-101 report reliable is belied even by Emmott's own report. In assessing the commercial reasonableness of Cliffs' acquisition of the GPIOP properties, Emmott notes that NI 43-101 reports "must be written to a very rigorously specified standard." Ex. 2, Emmott Rep. at ¶ 111. Emmott cannot eat his cake

words—he did no "independent work" to evaluate the feasibility of Mesabi's mine plan.  Id. at 60:21-24.  In fact, his report bases his opinion that Mesabi's mine plan was feasible purely on the fact that, "[i]n 2012, Met-Chem Canada Inc. and Barr Engineering Co. completed a detailed evaluation report to NI 43-101 standards, validating and quantifying the project's mineral resources."  Ex. 2, Emmott Rep. at ¶ 92.  Emmott neither applies expertise to this issue nor has it to apply: instead, he merely states that someone else has done the work and that he takes them at their word.  This is not the mark of an admissible expert.

An expert may not simply put a veneer of expertise on the testimony of the party he or she represents.  As another court in this circuit has recognized, "Experts may not simply 'parrot' the ideas of other[s] … and should not 'become the mouthpiece of the witness on whose statements the expert purports to base his opinion.'"  Torain v. City of Philadelphia, 2023 WL 174952, at *5 (E.D. Pa. Jan. 12, 2023) (quoting Wisconsin v. Indivior Inv., 2020 WL 6887885, at *5 (E.D. Pa. Nov. 24, 2020)).  "Although in forming an independent opinion an expert can rely on information provided by a party's attorney, an expert cannot forgo his own independent analysis and rely exclusively on what an interested party tells him."  Orthoflex, Inc. v. ThermoTek, Inc., 986 F. Supp. 2d 776, 798–99 (N.D. Tex. 2013) (citations omitted).  Or, as the Third Circuit has held, "an expert's investigation requires inquiry and actual investigation, not a determination based solely on what the expert is told."  United States v. Fleet Mgmt., Ltd., 332 F. App'x 753, 756 (3d Cir. 2009).  Emmott fails to meet this bar throughout his report and associated testimony.

On these and other points, see infra, Section IV and V.1, Emmott admits that his opinions are not the result of independent analysis.  This alone should be sufficient to exclude his opinions.

---

and have it too—that is, he cannot both say that these reports are reliable so long as a reliable person writes them and also say that there are exacting standards according to which the reports are written.

## III. EMMOTT HAS NO RELIABLE METHODOLOGY

Most significantly, Emmott provides no reliable methodology on which his opinions rest. "Rule 702's reliability threshold requires expert testimony to be 'based on the methods and procedures of science, not on subjective belief and unsupported speculation.'" <u>UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres</u>, 949 F.3d 825, 833–34 (3d Cir. 2020) (quoting <u>Karlo v. Pittsburgh Glass Works, LLC</u>, 849 F.3d 61, 80-81 (3d Cir. 2017) (internal quotation marks omitted)).   The Third Circuit has established a set of factors by which trial courts are encouraged to evaluate the reliability of an expert's methodology.   Those factors include:

> "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put."

<u>Pineda v. Ford Motor Co.</u>, 520 F.3d 237, 247–48 (3d Cir. 2008) (citing <u>Paoli</u>, 35 F.3d at 742 n. 8). These factors, though not exhaustive, provide a starting point for a court's evaluation of a particular methodology.   Put in simpler terms, however, "the test is whether the particular opinion is based on valid reasoning and reliable methodology." <u>In re TMI Litig.</u>, 193 F.3d 613, 665 (3d Cir. 1999), <u>amended</u>, 199 F.3d 158 (3d Cir. 2000) (internal quotation marks omitted).

Emmott's "methodology" is not even properly described as a methodology.   Consider the following elements of his deposition testimony.   When asked if there was a "particular methodology or standard or practice that [he] followed to determine commercial reasonableness," Emmott replied that "each case is different" and that he has "learned to adapt to each case on its own merits."   Ex. 1, Emmott Dep. 35:6-10.   When pressed—"is there some methodology or is it simply the totality of the circumstances in that particular case?"—Emmott said that it was "the latter." <u>Id.</u> at 35:11-14.   More directly, Emmott agreed that the only "method" he employed was

"looking at the documents and the totality of the impression you get based on your … experience." Id. at 11:23-12:12.  When later asked in other words for a methodology consistent with that required by Rule 702, Emmott again declined to do so.  Emmott was asked: "What skill or what science do you apply to determine [Cliffs' intent] in acquiring the GPIOP mineral rights?"  Id. at 85:19-21.  He replied, in part, "Well, what skills or science?  I reviewed all associated documentation that appeared to be relevant.  And in my consulting work, we often use the word triangulation to come to an opinion about something."  Id. at 86:3-6.  Later in that same response he doubled and then tripled down on this characterization: "There were quite a lot of things that came together to allow[] me to make my conclusion.  You asked what skills and science I used, and I think it's a combination of my background.  But a lot of very, very, helpful documents and disclosure," id. at 87:8-13, and "everything triangulates to Cliffs was trying to block Mesabi," id. at 89:5-6.[6]

Whether or not there was a "standard methodology" that Emmott ought to have applied, the "triangulation" method Emmott used is not reliable by any metric.  "Triangulation" satisfies none of the Pineda factors—it does not consist of testable hypotheses, is not peer reviewed, is wildly prone to error, and so on.  Other courts have recognized this fact.  See CareDx, Inc. v. Natera, Inc., 2021 WL 1840646, at *3 (D. Del. May 7, 2021) (holding that, where "triangulation" was proposed as the methodology, the expert's "opinions are … inadmissible because they are not reliable.  They were not reached by application of a scientific method or procedure.").

Moreover, Emmott's "triangulation" method is nothing more than a subjective attempt to reach the "correct" conclusion.  He provides no studies to support his methods, admits that at least

_____

[6] Emmott's answer to this question, while non-responsive in large part, spills over onto multiple pages of transcript.  The entirety of the response, should the Court wish to review it without searching the transcript, is attached here as Appendix A.  A cursory review of the four-page answer shows that his opinion is just a regurgitation of Mesabi-friendly inferences from facts, and not expert analysis at all.

one of his conclusions is "somewhat subjective," Ex. 1, Emmott Dep. 131:24, and generally fails to point to objective measures by which his conclusions may be tested. As the Third Circuit has recognized, "it is impossible to test a hypothesis generated by a subjective methodology because the only person capable of testing or falsifying the hypothesis is the creator of the methodology." UGI Sunbury, 949 F.3d at 834 (quoting In re TMI Litig., 193 F.3d at 703 n.144). An "expert" whose entire process is simply to read documents and then pull an opinion out of the air has done nothing meriting the title.

## IV. EMMOTT FAILS TO CONSIDER VIABLE ALTERNATIVE THEORIES

Further evidence of Emmott's lack of a reliable methodology lies in his failure to consider alternatives to his conclusion that Cliffs was solely responsible for Mesabi's failures. Despite being aware of the litigation between Tom Clarke and Nubai in August of 2018, Emmott did not consider whether that litigation had anything to do with delays to the Mesabi project. Ex. 1, Emmott Dep. 152:14-153:11. He likewise did not consider whether Essar Global's reentry into the picture in 2018 affected the pace of the project. Id. at 154:10-155:2. Though he admitted that "the management team and track record of a company would be important" in evaluating the viability of a business plan, he merely "assume[d] that [Clarke] had a sufficiently good track record" and did not independently evaluate Clarke's track record. Id. at 159:9-161:24. Emmott also failed to consider the possibility that the State of Minnesota's attempt to debar Essar and Madhu Vuppuluri from doing business in the state may have had an impact on Mesabi's attempts to secure financing, despite admitting that such a proceeding "may have some effect" on investors' willingness to provide financing. Id. at 163:21-164:20. Emmott failed to consider any of these potential causes, and more, despite acknowledging that it "would … be important in reaching an opinion that Cliffs was the cause of the delay to look to see whether there were other issues that occurred apart from

Cliffs' conduct." Id. at 167:12-23.  As discussed infra, Section V, his lack of analysis of real-world facts undercuts any notion of reliability.

Courts have repeatedly held that expert testimony is not reliable—and is therefore inadmissible—where the expert has failed to consider viable alternative causes.  Consider Fleet Mgmt., where the Third Circuit held:

> [A]n expert's investigation requires inquiry and actual investigation, not a determination based solely on what the expert is told.  The District Court's criticism of Jones' failure to consider [alternative theories] was not a "quibble," as the government urges; it was an appropriate challenge to his failure to conduct his own investigation rather than rely on what others told him.
> …
> Simply stated, Jones's reasoning did not rule out other possible causes, or provide "an intelligible response as to why it was not the actual cause."  Hines v. Consol. Rail Corp., 926 F.2d 262, 270 n. 6 (3d Cir. 1991).  Instead, he accepted the cause that was consistent with … what the whistleblower … told him. … Therefore, he failed to follow the reliable methodology that he urges as the basis for the admissibility of his opinion, and his opinion could thus be excluded."

332 F. App'x at 755–56 (footnotes omitted, emphases added). [7]  Or consider Gopalratnam v. Hewlett-Packard Co., where it was held: "the actual explanation of [the event] is irrelevant to our Daubert analysis. What matters is that [the expert] failed to account for other possible explanations in arriving at his conclusion."  877 F.3d 771, 787 (7th Cir. 2017).  In excluding the expert's testimony, the Gopalratnam court relied on a Rule 702 advisory committee note for the proposition that "[w]hether the expert has adequately accounted for obvious alternative explanations" is relevant "in determining whether expert testimony is sufficiently reliable to be considered by the trier of fact."  Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

In short, Emmott's reliance on his ability to "triangulate" to an opinion on the viability of Mesabi's plans, the commercial unreasonableness of Cliffs' actions, and the cause for Mesabi's

---

[7] To the extent that Mesabi contends that this case is inapposite because it describes a requirement of a different methodology, Emmott has neither identified a reasonable methodology nor discussed why consideration of alternative causes is unnecessary under his purported methodology.

failure to secure financing is nothing more than Emmott working backwards from a conclusion. The hallmark of expertise is "rigor, not mere 'haphazard, intuitive inquiry.'" UGI Sunbury, 949 F.3d at 834 (quoting Oddi v. Ford Motor Co., 234 F.3d 136, 156 (3d Cir. 2000)). Emmott applied no reliable method in reaching his conclusions; his opinions should be excluded for that reason.

## V.  EFFECT ON VALIDITY OF PARTICULAR OPINIONS

As a result of these fundamental issues with Emmott's qualifications, objectivity, and methodology, Cliffs submits that the Court should exclude his report and testimony altogether.  To more fully illustrate how these issues affect Emmott's opinions, consider these issues as applied to Emmott's main opinions, as expressed in his "Executive Summary."  Ex. 2, Emmott Rep. at § II.[8]

### A.  The Viability of Mesabi's Mine Plan

Emmott opines that "Mesabi's plan to develop the Project was well-conceived and highly viable."  Id. at ¶¶ 7(a), 88-94.  Emmott lacks expertise to reach this conclusion.  He has never planned or engineered a mine, Ex. 1, Emmott Dep. 13:10-23, took no classes in mine engineering as a part of his formal education, id. at 13:10-13, and has never worked for an iron pellet company or an iron plant, id. at 41:8-10.  He freely admits that he is not qualified to prepare an NI 43-101 report[9] but contends that his lack of qualification poses no difficulty because he has often reviewed such a report.  Id. at 52:25-53:3.  To illustrate the significance of Emmott's lack of expertise, compare his experience with that of Richard Lambert, Cliffs' proffered expert on this topic.  Mr.

---

[8] If the Court is not inclined to grant this motion in full, Cliffs respectfully asks that the Court exclude testimony relating to some or all of these particular opinions for the reasons listed below each opinion.

[9] An NI 43-101 report is a standardized document for the Standards and Disclosure for Mineral Projects within Canada. While it can be used anywhere in the world, it is required for reporting mineral reserves and other factors for public companies in Canada.  See NI 43-101 Standards of Disclosure for Mineral Projects, Form 43-101F1 Technical Report and Related Consequential Amendments, available at https://mrmr.cim.org/media/1017/national-instrument-43-101.pdf (attached as Exhibit 4).  It is the form that Met-Chem, one of Mesabi's consultants, used in 2012 and 2020. See Ex. 1, Emmott Dep. 54:23-55:20.  Other jurisdictions have similar requirements, such as the SK-1300 mandated by the SEC in the United States.  As Mesabi is not a publicly listed company, no particular form is required, and the Met-Chem reports were neither required to be filed nor filed.

Lambert holds a bachelor's degree in mining engineering and has taught at the University of Toronto's Lassonde Institute of Mineral Engineering. Ex. 5, Expert Report of Richard J. Lambert at ¶ 6.  In a former role, nearly half of his company's work was in "preparing technical reports to NI 43-101 standards." Id. at ¶ 2.  He has worked directly on iron projects in the United States, including one elsewhere in the Mesabi Range. Id. at ¶ 5.  And he has "over 40 years of experience in mine management, mine engineering, mine operations and mine financial analyses." Id. at ¶ 4. Any one of these qualifications could be enough to demonstrate competency to testify under Rule 702; Emmott lacks all these and more.

Emmott purports to bolster statements in Mesabi's NI 43-101 report, but he did none of the work necessary to independently verify its contents. Ex. 1, Emmott Dep. 60:21-61:1.  He even admitted as much in his deposition.  When asked whether Mesabi's "mine plan, in your expertise, include[s] enough detail to show that the mine plan is feasible," Emmott replied: "I think that would require a thorough study of the other aspects of the report that back up these numbers." Id. at 60:5-9.  But Emmott did not review the underlying documentation on which the NI 43-101 report is based, only the reports themselves, as his list of reliance materials makes clear.  Ex. 2, Emmott Rep. at ¶ 3.  His testimony is clear that he did not evaluate whether the report complied with any standards beyond the simple requirement that a "qualified person" drafted the report.  Ex. 1, Emmott Dep. 64:22-65:4.  His report is clear that his conclusion that, as of June 2017, Mesabi could have had a mine and associated pellet plant up and running within two years is based on nothing more than repackaged reliance on the NI 43-101, Ex. 2, Emmott Rep. at ¶¶ 92-93—in other words, his testimony is based "exclusively on what an interested party [told] him." Orthoflex, 986 F. Supp. 2d at 798–99.  Any of these reasons is, independently, sufficient reason to find

Emmott's opinion as to the viability of Mesabi's mining plan inadmissible.  That they are all true is all the more reason to exclude his testimony.

### B.    Cliffs' Acquisition of Certain Property

Emmott's opinion that "Cliffs' acquisition of the GPIOP Property made no commercial sense except as a means to prevent Mesabi from beginning operations" is an impermissible attempt to discern a party's subjective state of mind.  Ex. 2, Emmott Rep. at ¶¶ 7(c), 95-152.  In deposition testimony, he doubled down:

> Q.  Okay.  Your report states in Paragraph 95: "Evidence suggests that Cliffs executed the GPIOP transaction to disrupt Mesabi's project."
> A.  Yes.
> Q.  Are you purporting to offer an expert opinion that Cliffs' purpose in the GPIOP transaction was only to disrupt Mesabi's project?
> A.  Yes, it does seem to be that way from a substantial amount of evidence, and some of which I cite here and some of which was, you know, in the very voluminous disclosure.

Ex. 1, Emmott Dep. 85:3-14.  This opinion should be excluded for several reasons.  First, Emmott used no reliable methodology to reach this conclusion.  Second, he seeks to opine, impermissibly, on Cliffs' mental state or intent in making the GPIOP purchase.  And third, he fails to consider obvious alternate theories as to why Cliffs might have consummated the transaction.

Emmott's lack of a reliable methodology has already been discussed at length, but it is worth noting that Emmott was explicit that he used "triangulation" to reach this opinion.  He was asked: "What skill or what science do you apply to determine that Cliffs' only purpose in acquiring the GPIOP mineral rights in December of '17 was to disrupt Mesabi's project?"  Id. at 85:19-25.  In response, he gave an answer that covers the better part of four pages of deposition transcript,[10] which begins: "Well, what skills or science?  I reviewed all associated documentation that appeared

---

[10] Full answer attached, App. A.

to be relevant.  And in my consulting work, we often used the word triangulation to come to an opinion about something."  Id. at 86:3-6.  As discussed supra, Section III, "triangulation" is not a reliable methodology.  This opinion should be excluded.

When asked to clarify, Emmott ultimately admitted that there is no methodology:

> Q.  So was there a particular methodology or is it just sort of able to see the constellation when all of the stars are lined up?
> MR. SUGGS: Objection to form.
> A.  I think I explained within my answer the type of methodology I used.  This is not something one does every day.  As I said in my report, the transaction is highly unusual.  So it's not like there is a standard methodology to understand how firms acquire parcels of land in the middle of other firms' mine plans.  It's not like there is a standard to do this.

Id. at 89:15-25.  Calling this scenario "unique and unprecedented," Emmott also admits that he has never offered an opinion concerning a company's future business plans:

> Q.  Have you ever tried to determine a company's intent with respect to future business plans by looking through e-mails, e-mails of competitors and other available statements?
> MR. SUGGS: Objection to form.
> A.  I believe aspects of my expert work have included such types of process, but they have usually been involved with, for example, matters of steel or iron ore pricing rather than determining the matters that we are discussing in this case.  This is, in my view, unique and unprecedented.

Id. at 90:1-11.

The reason that "determin[ing] a company's intent with respect to future business plans" is "unique and unprecedented," id. at 90:1-11, however, is not because these circumstances are somehow unprecedented but because the offering of such opinions by an expert is generally impermissible in the federal court system.  As has been noted in this district, "expert witnesses are not permitted to testify regarding intent, motive, or state or mind, or evidence by which such state of mind may be inferred."  AstraZeneca UK Ltd. v. Watson Lab'ys, Inc. (NV), 2012 WL 6043266, at *2 (D. Del. Nov. 14, 2012) (quoting In re Rosuvastatin Calcium Patent Litig., 2009 WL 4800702,

at *8 (D. Del. Dec. 11, 2009) (internal quotations omitted)); accord AstraZeneca LP v. Tap Pharm. Prod., Inc., 444 F. Supp. 2d 278, 293 (D. Del. 2006) (brackets in original) (quoting Oxford Gene Tech. Ltd. v. Mergen Ltd., 345 F. Supp. 2d 431, 443 (D. Del. 2004)) ("Expert witnesses are not 'permitted to testify ... regarding [the defendant's] intent, motive, or state of mind, or evidence by which such state of mind may be inferred.'"). Here, Emmott not only seeks to testify to Cliffs' intent or motive—he seeks to opine that a motive is Cliffs' only motive with regard to the transaction in question.

This opinion is further inadmissible for Emmott's failure to consider the factual backdrop of the case. Again, as the notes to Rule 702 suggest, "[w]hether the expert has adequately accounted for obvious alternative explanations" is relevant "in determining whether expert testimony is sufficiently reliable to be considered by the trier of fact." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. One such obvious alternative explanation is that Cliffs purchased the property because the State of Minnesota made clear that, should Cliffs ever want to be considered for state leases, it "would need to meet the requirements of Minnesota Statutes, section 93.1925, including securing ownership or leaseholds to ore adjacent to the state ore." Ex. 6, CLIFFS_000061383 (Letter to Cliffs from Minnesota Dept. of Natural Resources). Emmott does not cite this letter in his report, meaning he either did not review it or thought it irrelevant. Additionally, in deposition testimony, Emmott even acknowledged potential alternative explanations for Cliffs' purchase of the relevant properties. First, he admitted that, in contrast to "other deposits across the Mesabi Range," the property in question has characteristics "particularly required for DR [direct reduction pellet] production." Ex. 1, Emmott Dep. 90:22-91:6. Second, he admitted that the purchase "now seem[s] to make more [commercial] sense" in light of Cliffs' subsequent acquisition of the state leases. Id. at 92:19-93:13. Third, he admitted that Cliffs' CEO

had proposed an alternative reason for purchasing the property but that Cliffs' "normal modus operandi" indicated that the comment was irrelevant. Id. at 97:20-98:14.[11]

Despite knowing about these acknowledged alternative explanations for Cliffs' transaction, Emmott fails to adequately account—or, frankly, account at all—for their absence from his report, let alone explain why none of them motivated Cliffs. In his deposition, he even concedes that, with the award of the state leases combined with the GPIOP mineral rights, Cliffs' acquisition "now seem[s] to make more sense." Id. at 92:22-93:13. Emmott also ignores the reality that Cliffs' "normal modus operandi" is consistent with this long-term approach to property ownership: ██

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ Ex. 7, Deposition of Traci Forrester 130:3-11.

In sum, Emmott contends that Cliffs had no motivation in purchasing the GPIOP properties other than to frustrate Mesabi. Yet he applies no reliable methodology to reach this conclusion, impermissibly seeks to testify concerning Cliffs' motives or intent, and fails to account for obvious alternative explanations. This opinion should be excluded.

## C.  Cliffs' Actions with Regard to Third Parties

Emmott next opines that "Cliffs' refusal to allow third parties to work for Cliffs if they worked for the Mesabi Project was commercially unreasonable." Ex. 2, Emmott Rep. at ¶¶ 7(d), 153-167. He adds that this refusal would have caused "significant inefficiencies and add cost and delays" to Mesabi's project. Id. at ¶ 165. Emmott is not qualified to opine on the commercial

---

[11] As Emmott volunteered: "in regard to the GPIOP transaction, Mr. Goncalves at one point said we're always interested in buying iron ore, which is a fair comment." Ex. 1, Emmott Dep. 97:25-98:3.

reasonableness of Cliffs' actions and provides no reliable methodology on which his opinion is based.

First, Emmott is not qualified to testify on this issue. He has never run or worked at a pellet plant or mine. He is not an engineer and has no direct experience with the sort of trade secrets at issue in a case like this. He has never even provided expert testimony as to protection of trade secrets. Ex. 1, Emmott Dep. 35:25-36:5. As the basis of his qualification, he instead asserts that "I have very significant experience with my working at Hatch and Atkins of those subjects." Id. at 36:6-7. He later clarified, however, that this "very significant experience" consisted of "maybe two or three" instances "from a consulting perspective" where "extremely confidential commercial information" was at issue. Id. at 116:19-117:10. When pressed, he admitted that he had "not had quite similar experience" to the issues presented by the potential sharing of third-party vendors by Cliffs and Mesabi. Id. at 118:22-23. The situations he had encountered had involved "very strong confidentiality agreements and people working in different teams and having Chinese walls," but Emmott stated that he had never recalled being "in a situation … where [he] w[as] concerned that by actually working on [his] project, the workmen would gain the experience and knowledge that was at that time unique to your company and take it somewhere else." Id. at 117:12-118:4. In other words, Emmott has no experience with the factual scenario or type of trade secrets and protections involved here and thus is not equipped to opine as to what is commercially reasonable when attempting to protect such secrets.[12]

Second, as with all of his testimony, Emmott fails to provide any reliable methodology to support his opinion. Here in particular Emmott, when pressed as to whether there was "any other

---

[12] A Cliffs witness explained ███████████████████████████████████

██████████████████████████████████████████████ Ex. 8, Deposition of Terry G. Fedor, II 72:2, 75:9-10, 150:7.
Unsurprisingly, Emmott once again fails to reckon with this alternative explanation as to Cliffs' actions.

method" besides "looking at the documents and the totality of the impression you get based on your years of experience," responded that "I can't think of anything else." <u>Id.</u> at 12:5-12. He admitted that he had not done the "necessary" work "to understand exactly what was involved" as far as determining "how long a delay lasted as a result of a contractor leaving the project." <u>Id.</u> at 11:16-22. Instead, he offered as his opinion simply that "[t]here was a substantial delay." <u>Id.</u> at 11:12. Emmott admits that his "method," such as it was, was insufficiently rigorous to estimate how long any particular delay was as a result of Cliffs' conduct. He also failed to consider alternative accounts of what occurred. As an example, consider his testimony that he was unaware that Jamar—a contractor that Emmott opined was unreasonably barred, by Cliffs, from working with Mesabi—signed a ███████ construction contract with Mesabi in May of 2018. <u>Id.</u> at 147:6-11. When confronted with this fact, ████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████ <u>Id.</u> at 147:12-21. His "totality of the impression" methodology, by which he came to an opinion about the commercial reasonableness of Cliffs' actions, lacks the analytic structure that Rule 702 and <u>Daubert</u> require.

### D.   Length of Cliffs' Contracts

Emmott further offers an opinion that "Cliffs' long-term, exclusive supply contracts are commercially unreasonable and contrary to the interests of buyers." Ex. 2, Emmott Rep. at ¶¶ 7(e), 168-175. At his deposition, however, Emmott appeared to walk this opinion back, or at least modify it. He said: "it's not just the length of the contracts. It was the volumes as well, and with hindsight, I should probably have added that to my report." Ex. 1, Emmott Dep. 172:19-22. He modified this opinion because, "as I look back, it is clear that there are many contracts in the industry for ten years. I'm not trying to dispute that." <u>Id.</u> at 174:17-19. ████████████████████ ██████████████████████████████████████████████████████████████████

███████████████████████████████████████████. Ex. 9, Deposition of Madhu Vuppuluri 204:22-205:6 ("Vuppuluri Dep.").[13]

Emmott attempted to "amend" his opinion in two principal ways: first, "to include volume as well" as length, and second, to be dependent on the contract being "effectively forced upon a customer who has no other choice." Ex. 1, Emmott Dep. 174:24-175:10. Neither purported amendment holds water. To the extent that "volume" is the issue rather than merely length, Emmott has provided neither support nor methodology to explain what he means. His deposition testimony simply calls it "problematic" to have a long-term, high-volume contract because of its potential impact on competition.[14] Id. at 174:21, 173:4-9.

Beyond the bare fact of Emmott's contradictory and scattered approach to this opinion, Emmott lacks either qualifications or methodology to evaluate the length of such contracts. He has never testified as to the commercial reasonableness of contract lengths, id. at 33:9-12, and has not disclosed any past experience that would qualify him to evaluate the substantive reasonableness of contracts in this industry or in North America generally. And, again, when asked directly to identify a "particular methodology or standard or practice that [he] followed to determine commercial reasonableness," Emmott declined: "I think that each case is different. And I've learned to adapt to each case on its own merits." Id. at 35:6-10. When once more pressed to explain whether "there [is] some methodology" or whether he relied on "the totality of the circumstances in that particular case," Emmott said that it was "pretty much the latter." Id. at

---

[13] Mr. Vuppuluri's individual deposition is not among the selected depositions reviewed by Emmott in the course of preparing his report.

[14] Incidentally, and contrary to Emmott's understanding, Ex. 1, Emmott Dep. 173:10-14, ████████████████████████████. See, e.g., Ex. 9, Vuppuluri Dep. 204:22-24 ("████████████████████████████████████████████████████████████████████████████████████").

35:11-14.  According to his own testimony, Emmott's approach lacks methodology.  His opinions as to the reasonableness of Cliffs' contracts should therefore be excluded as unreliable.

### E.  Cause of the Delays to Mesabi's Project

Finally, Emmott concludes his executive summary with his opinion that "the combined effect of Cliffs' actions … were [sic] a significant obstacle to Mesabi's ability to finance its Project."  Ex. 2, Emmott Rep. at ¶¶ 7(f), 176-193.  He explains in his report: "In my opinion, many of Cliffs' actions would have had a major negative impact on how prospective equity investors and lenders viewed Mesabi's Project, including dramatically reducing the Project's value, substantially disrupting and delaying its development, and creating uncertainty about whether the Project can be completed and begin operations."  Id. at ¶ 177.  While this opinion comes nearest to falling within Emmott's area of purported expertise (although he has never before testified to a company's ability to get financing, Ex. 1, Emmott Dep. 36:8-11), his conclusion here depends entirely on the inadmissible opinions presented throughout the rest of his report.  To the extent that those are excluded, this opinion should be, too.

This opinion also fails on its own merits in that it fails altogether to consider alternative causes of Mesabi's failure.  Despite agreeing that his opinion is that, "[d]uring the entire period [of] 2014 through today, Cliffs' actions have continuously prevented or disrupted Mesabi from obtaining financing for its project," id. at 8:4-13, Emmott fails to account for actions that occurred between 2014 and the present day.  As has already been noted, Emmott fails to consider whether the litigation between two of the principals of the project contributed to the company's inability to secure financing.  Id. at 152:14-153:11.  This failure is particularly notable given that the litigation arose out of actions that allegedly were depriving "Chippewa and Mesabi … of funds that they desperately need in order to fund operations and continue immediate construction as required by the State of Minnesota."  Ex. 10, Decl. of Thomas M. Clarke in Support of Clarke's Mem. In Opp.

to Pl.'s Mot. for Temp. Restraining Order at ¶ 1, 6, 29, 30, <u>Nubai Glob. Inv. Ltd. v. Clarke</u>, No. 18-cv-02228 (D. Minn. Aug. 6, 2018), ECF 28.  Emmott also fails to consider whether the track record of the principals demonstrated independent potential for failure despite admitting that such considerations are important in evaluating a record.  Ex. 1, Emmott Dep. 159:9-161:24.  ████

████████████████████████████████████████████████████

████████████████████████████████.  *See* Ex. 11, MESABI00789548 at 1-2 (Minmetals Email Chain with Mesabi).  He fails to consider the possibility that the State of Minnesota's attempt to debar Essar and Madhu Vuppuluri from doing business in the state may have had an impact on Mesabi's attempts to secure financing, Ex. 1, Emmott Dep. 163:21-164:20—despite Mesabi's legal contention in another proceeding that "[t]he threat of debarment is affecting completion of the project. ... To raise sufficient capital ... new investors and lenders would need to enter into contractual agreements ... with Essar Global ... No third-party investor or lender will enter into such agreements with Essar Global ... while there is a threat of debarment." Ex. 12, Decl. of Sushil Baid in Opposition to Defendants' Motion to Dismiss at ¶ 7-8, <u>Essar Global Fund Ltd. v. Minn. Dept. of Nat. Res. et al.</u>, No. 62-cv-19-1122 (Minn. Dist. Ct. May 8, 2019).

Emmott also fails to account for several of Mesabi's own claimed causes for its delays. This include this Court's order in 2018 permitting GPIOP to transfer its leases to Cliffs: "The Bankruptcy Court's Order below struck a substantial blow to the nascent efforts of Mesabi ... to implement its confirmed plan of reorganization.  Absent an immediate appeal, Mesabi's prospects of carrying out its reorganization ... will be substantially impaired." Ex. 13, Appellant's Motion for Leave to File Interlocutory Appeal at ¶ 1, <u>In re: Essar Steel Minnesota LLC and ESML Holdings Inc.</u>, No. 17-512210-CTG (D. De. Aug. 28, 2018), ECF 111.  Likewise, Mesabi suggested in Minnesota state court that <u>Minnesota's</u> actions, not Cliffs', were responsible for

Mesabi's failure to secure financing: "The First and Second Conditions Precedents Notice and Notice of Termination create significant hurdles in obtaining funds from financiers, who will desire reassurance regarding the status of the Project. Therefore, it is essential that the Conditions … be withdrawn so that Mesabi can obtain the necessary funding for the Project." Ex. 14, Complaint at ¶ 81, <u>Mesabi Metallics Co., LLC. et al. v. Minn. Dept. of Nat. Res.</u>, No. 62-cv-21-3142 (Minn. Dist. Ct. May 28, 2021).

Emmott fails to consider any of these factors, and more, despite agreeing that such considerations "would … be important in reaching an opinion that Cliffs was the cause of the delay." Ex. 1, Emmott Dep. 167:12-23. His response to these failures is not to point to paragraphs in his report where he considered these or other alternative causes, because there are no such paragraphs. Instead, he asks the court to trust that he ruled out alternative causes on the basis that he "reviewed extensive documentation." <u>Id.</u> at 167:20-21. While reviewing extensive documentation is no doubt necessary in creating a coherent opinion, it is not sufficient to make a reliable methodology in itself. Over and over again, Emmott demonstrates that he lacks any sort of reliable methodology to reach his central conclusions. The Court should not permit him to opine in this case.

## CONCLUSION

When evaluating the reliability of an expert's report, "[c]ourts look for rigor, not mere 'haphazard, intuitive inquiry.'" <u>UGI Sunbury</u>, 949 F.3d at 834 (quoting <u>Oddi</u>, 234 F.3d at 156). Because Emmott is unqualified, because he is a mere mouthpiece for Mesabi's arguments, and because his conclusions are purely subjective and reached without a reliable methodology, his testimony fails to meet the standards set by Rule 702 and <u>Daubert</u>. The Court should exclude Emmott's testimony from the record.

Dated: December 8, 2023

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Michael S. Neiburg*
Michael S. Neiburg (No. 5275)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: mneiburg@ycst.com

-and-

JONES DAY
Robert S. Faxon (admitted pro hac vice)
Kristin S.M. Morrison (admitted pro hac vice)
Brian K. Grube (admitted pro hac vice)
Brett Bell (admitted pro hac vice)
Jones Day
North Point
901 Lakeside Avenue
Cleveland, OH 44114.1190
Telephone: +1.216.586.3939
Facsimile: +1.216.579.0212
E-mail: rfaxon@jonesday.com
kmorrison@jonesday.com
bkgrube@jonesday.com
bbell@jonesday.com

*Attorneys for Cleveland-Cliffs Inc. and
Cleveland-Cliffs Minnesota Land Development
LLC*