**WHITE & CASE**

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095
T +1 212 819 8200

whitecase.com

March 18, 2024

VIA ECF

Hon. J. Craig T. Goldblatt
U.S. Bankruptcy Court for the District of Delaware
824 North Market Street
3rd Floor, Courtroom #7
Wilmington, Delaware 19801

*Mesabi Metallics Company LLC v. Cleveland-Cliffs Inc. et.al.*, Adv. Proc. No. 17-51210

Dear Judge Goldblatt:

We write on behalf of Mesabi Metallics Company LLC ("Mesabi") regarding authorities raised by Cleveland-Cliffs, Inc. ("Cliffs") for the first time at oral argument on February 12, 2024 (the "February 12 Hearing"). Cliffs offered no explanation for its failure to raise the authorities in its briefing, and the Court would be justified in disregarding Cliffs' belated arguments. In any event, none of Cliffs' new arguments provides a basis to grant Cliffs' motion for summary judgment (D.I. 836).

### *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312 (2007)

Cliffs contended at oral argument that its acquisition of the GPIOP Property should be analyzed under *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312 (2007). Cliffs' counsel opined that "it was hard for me to even figure out exactly what Mesabi's theory with GPIOP is, but I think it is an overbuying claim."[1] Feb. 12 Hr'g Tr. 121:3-5. Cliffs then argued that overbuying claims "just do not work" under *Weyerhaeuser*. *Id.* at 121:17.

In *Weyerhaeuser*, the plaintiff (Ross-Simmons) and defendant (Weyerhaeuser) were rival sawmills that converted sawlogs into finished lumber. *Weyerhaeuser*, 549 U.S. at 315. Sawmills generally had three ways to acquire sawlogs, one of which was bidding for the logs on the open market. *Id*. As to the bidding process, the plaintiff claimed that Weyerhaeuser "bid[] up the price of sawlogs to a level that prevented [plaintiff] from being profitable." *Id*. The Court described the plaintiffs'

---

[1] A few seconds later, however, Cliffs' counsel stated, "I think the idea that Mesabi is trying to get at is this was some kind of merger." Feb. 12 Hr'g Tr. 121:18-22. Counsel then referred to "a section that Mesabi cites from Areeda, 1202(e)," which Cliffs described as "merger law." *Id.* But Mesabi did not cite that section of the Areeda treatise.

Hon. J. Craig T. Goldblatt

WHITE & CASE

theory as "predatory bidding," which "involves the exercise of market power on the buy side or input side of a market." *Id*. at 320. The predatory bidder attempts to use high input prices to force "competing buyers to exit the market for purchasing inputs," at which point the predatory bidder will use its buying power to lower input prices to the point that they "offset any [of its] losses suffered in bidding up input prices." *Id*. at 320-21.

After trial, a jury returned a verdict for Ross-Simmons, which the Ninth Circuit affirmed. The Supreme Court vacated that judgment. In so doing, the Court analogized the plaintiff's claim to predatory pricing, a topic the Court had addressed in *Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993). *Id*. at 321-22. The Court held that claims of predatory bidding should be analyzed using a variation of the test adopted in *Brooke Group* for evaluating predatory-pricing claims (*Brooke Group* requires a plaintiff asserting such a claim to show the defendant's prices were below its costs and the defendant had a "dangerous probability" of recouping its losses from the below-cost pricing). *Id*. at 318-19, 325-26. Because Ross-Simmons had admitted that it could not satisfy that test, its claim failed. *Id*. at 326.

Cliffs errs in at least three ways by relying on *Weyerhaeuser*. First, Cliffs once again compartmentalizes its exclusionary conduct in contravention of Supreme Court and Third Circuit precedent. *See* D.I. 894 at 33. As Mesabi explained in the second paragraph of its opposition brief, the record shows that Cliffs "developed a multi-pronged scheme to keep Mesabi from the market." *Id.* at 1. Cliffs' acquisition of the GPIOP Property was just one of several elements of that scheme, albeit a significant one that "delayed the Project and raised Mesabi's costs by well over $100 million." *Id.* at 2. By contrast, *Weyerhaeuser* did not involve a multi-part scheme.

Cliffs further errs by trying to squeeze this case into the *Weyerhaeuser* framework. As an initial matter, Cliffs incorrectly describes *Weyerhaeuser* as a case about a company buying inputs it "didn't really need . . . just to keep [a competitor] out." Feb. 12 Hr'g Tr. 121:6-7. As shown above, however, *Weyerhaeuser* involved a dominant buyer allegedly driving up the price of inputs through a bidding process, not acquiring sawlogs that it did not use. *Weyerhaeuser*, 549 U.S. at 315. Indeed, the defendant increased its production at all six of its mills every year from 1990 to 2000. *Id*.

Although the *Weyerhaeuser* Court explained in *dicta* that predatory bidding can be comparable to "predatory overbuying," such similarity depends on the "input purchaser's use of input *prices* . . . to exclude rival input purchasers." *Id.* at 322 n.3 (emphasis added). The Court explained, "In a predatory-overbuying scheme, the purchaser causes prices to rise by demanding more of the input." *Id.* The focus on price heavily influenced the Court's decision to restrict the scope of predatory claims, because the Court was reluctant to second-guess companies' pricing determinations. *Id.* at 325. The Third Circuit thus has observed that *Weyerhaeuser* is a case where "price itself functioned as the exclusionary tool." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 281 (3d Cir. 2012) (distinguishing *Weyerhaeuser* from allegations in *ZF Meritor* where other firms were "driven out not because they cannot compete on a price basis, but because they are never given an opportunity to compete"); *see also Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 32 (S.D.N.Y. 2016) (denying summary judgment for defendants because, unlike *Weyerhaeuser*, "where pricing operated as the lone exclusionary tool . . . the prices paid by [defendant] are not

2

**WHITE & CASE**

Hon. J. Craig T. Goldblatt

the clearly predominant method of exclusion. Rather, the length of the exclusive contracts and their staggered terms may also foreclose competition." (citing *ZF Meritor*, 696 F.3d at 276-77)).

Mesabi's claims do not fit the definition of predatory overbuying. Mesabi is not contending that Cliffs excluded Mesabi by bidding up the purchase price of iron ore through the GPIOP Transaction. Rather, Cliffs' acquisition made it extremely difficult (and in some cases impossible) for Mesabi to mine the iron ore at its Project site, impeding Mesabi's entry. *See, e.g.*, D.I. 894 at 21 (Goncalves stating Mesabi "cannot mine that site without a deal with Cleveland-Cliffs"). The GPIOP Transaction also upended Mesabi's efforts to obtain the financing needed to even build the Project. *Id.* at 30-31.

Another distinction: *Weyerhaeuser* is about the market power of purchasers, not sellers (monopsony power, not monopoly power). *Weyerhaeuser*, 549 U.S. at 315. The case was concerned only with the defendant's dominance of the upstream market for inputs (purchasing sawlogs), not the downstream market for finished products (selling lumber).[2] *See id.* at 321 (case does not "present a risk of significantly increased concentration in the market in which the monopsonist sells, *i.e.*, the market for finished lumber"). Mesabi's claims are based on Cliffs' efforts to exclude Mesabi from the downstream market for blast furnace pellets, thereby depriving iron ore customers of the benefits of competition.[3]

Finally, even viewing the GPIOP Transaction as an example of overbuying, Cliffs' *Weyerhaeuser* argument still fails. As the Areeda treatise explains, "*Weyerhaeuser* did not address the problem of longer-term supply contracts made with all or most available suppliers that might serve to foreclose rivals' access to supplies." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 768a1 (5th ed. 2022) ¶ 768a1 [hereinafter Antitrust Law]; *see also id.* at ¶ 768a4 ("*Except in the case of longer-term contracts*, *Weyerhaeuser* precludes such claims unless the *Brooke Group* requirements of below-cost pricing and recoupment are met.") (emphasis added). Cliffs' acquisition of the GPIOP Property is an extreme version of a long-term contract – foreclosing access for decades – and thus *Weyerhaeuser* does not apply.

**Antitrust Law ¶ 768a5**

Cliffs also argued for the first time at the February 12 Hearing that paragraph 768a5 of the Areeda treatise means that, to survive summary judgment, Mesabi must present evidence that Cliffs' purchase of the GPIOP Property was a "naked exclusion" where there is "a clear case of non-use" of the property. Feb. 12 Hr'g Tr. 116:7-9; *see also id.* 117:18-21. This newly cited authority, like *Weyerhaeuser*, also fails to justify summary judgment for Cliffs.

---

[2] The upstream and downstream markets may include different participants. A lumber company might compete with some companies to buy logs to supply its mills (*e.g.*, firms within cost-effective transportation range of the forest), but a larger group of companies to sell finished lumber produced at the mills (which might be profitably shipped farther).

[3] If the *Weyerhaeuser* test applied, there would be a dangerous probability that Cliffs would offset the costs of its purchase of the GPIOP Property due to its monopoly power in the downstream market.

WHITE & CASE

Hon. J. Craig T. Goldblatt

First, there is ample evidence that the GPIOP Transaction was a naked exclusion – Cliffs did not intend to use the GPIOP Property and in fact did not use it. *See, e.g.*, D.I. 894 at 20-23.

Second, although Cliffs claims that paragraph 768a5 requires Mesabi to show that "there is no other purpose" for Cliffs' purchase of the GPIOP Property, Feb. 12 Hr'g Tr. 116:7-9, that is not what the text says. Rather, paragraph 768a5 notes that the authors would "categorically condemn" only instances of vertical exclusion that are truly "naked." Antitrust Law ¶ 768a1. On the other hand, where there is a potential ancillary purpose or effect to the allegedly anticompetitive action, the tribunal should "look further." *Id.* Thus, Areeda does not suggest that Cliffs is immune from antitrust liability for the GPIOP Transaction, only that there may be situations where a similar acquisition does not violate the antitrust laws. For the many reasons explained in Mesabi's brief, however, this is not such a situation. D.I. 894 at 51-57, 63-70. Indeed, Areeda elsewhere explains why Cliffs' conduct is anticompetitive. *See, e.g.*, Antitrust Law ¶ 768a4 ("It would be exclusionary for a monopolist . . . to acquire supplies obviously in excess of its needs when such acquisitions deny appropriate access of the same supplies to rivals."); *id.* ¶ 768e1 ("While a practice that raises a rival's costs may not seem 'exclusionary,' in fact it is so. It forces reduced output on rivals, even though it may not drive them from the market altogether."); *id.* ¶ 768f ("A contract that increases the difficulty rivals face in either obtaining a supply or selling their output can be said to raise their costs. . . . When a practice raises a rival's costs without destroying the rival, one might wonder whether it constitutes 'monopolizing' conduct, but the answer is affirmative when we realize that the word 'monopoly' for purposes of §2 of the Sherman Act refers to a dominant firm, not exclusively to a firm that controls 100 percent of its market.").

Third, even applying Cliffs' flawed interpretation of the Areeda treatise, summary judgment would not be required because even respected treatises do not bind this Court. *See, e.g.*, *McClatchey v. AP*, No. 3:05-cv-145, 2007 U.S. Dist. LEXIS 41969, at *4 (W.D. Pa. June 8, 2007).

\*   \*   \*

In summary, neither of the authorities raised by Cliffs for the first time at oral argument supports granting Cliffs' summary judgment motion.

Sincerely,

**David H. Suggs**

cc:   Counsel of Record (via ECF)