# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ESSAR STEEL MINNESOTA LLC and ESML HOLDINGS INC.,<br><br>    Reorganized Debtors. | Chapter 11<br><br>Case No. 16-11626 (CTG)<br><br>Jointly Administered |
| MESABI METALLICS COMPANY LLC (f/k/a Essar Steel Minnesota, LLC),<br><br>    Plaintiff,<br><br>    v.<br><br>CLEVELAND-CLIFFS INC., *et al.*,<br><br>    Defendants. | Adv. Proc. No. 17-51210 (CTG)<br><br>**Related Docket Nos. 833, 835, 836, 870, 873, & 876**<br><br>**MEMORANDUM OPINION** |
| CLEVELAND-CLIFFS INC., *et al.*,<br><br>    Counterclaim-Plaintiffs,<br><br>    v.<br><br>MESABI METALLICS COMPANY LLC,<br><br>    Counterclaim-Defendant. | |
| CLEVELAND-CLIFFS INC., *et al.*,<br><br>    Third-Party-Plaintiffs,<br><br>    v.<br><br>CHIPPEWA CAPITAL PARTNERS, LLC,<br><br>    Third-Party-Defendant. | |

**TABLE OF CONTENTS**

Factual and Procedural Background ................................................................. 3

Jurisdiction ..................................................................................................... 13

Analysis ......................................................................................................... 18

I.     Each of the motions *in limine* will be denied .................................... 19

       A.    The motion to exclude Emmott's testimony will be denied ................. 23

       B.    The motion to exclude Zona's testimony will be denied as moot......... 24

       C.    The motion to exclude Davis' testimony will be denied as moot ......... 24

II.    Mesabi is entitled to partial summary judgment on its claim that Cliffs had monopoly power in the relevant market; Cliffs' summary judgment motion will be denied because there are genuine factual disputes on exclusionary conduct, antitrust injury, and damages ................................ 25

       A.    Mesabi is entitled to partial summary judgment on its claim that the relevant market, for antitrust purposes, is the market for blast furnace pellets in the Great Lakes region .................................... 26

            1.    Blast furnace pellets are the relevant product market.............. 28

            2.    The Great Lakes region is the relevant geographic market ...... 36

       B.    Mesabi is entitled to summary judgment on its claim that Cliffs possessed monopoly power in the relevant market..................... 43

       C.    Cliffs is not entitled to summary judgment on the claim that it did not engage in exclusionary conduct, cause antitrust injury, or cause damages to Mesabi ...................................................... 47

            1.    Cliffs has failed to establish that its conduct, viewed holistically, was not exclusionary ................................. 47

            2.    Cliffs has failed to show that its conduct did not cause antitrust injury .......................................................... 71

            3.    Cliffs has failed to show that Mesabi has not suffered damages as a result of the challenged conduct .......................... 77

III.    The motions for summary judgment on the state-law tort claims will
        be granted in part and denied in part ............................................................. 78

        A.    Cliffs is entitled to summary judgment on Mesabi's claim of
              tortious interference with contract, but only partial summary
              judgment on Mesabi's claim of tortious interference with
              business relationships ............................................................................. 79

              1.    The absence of evidence of an actual breach of contract is
                    fatal to Mesabi's claim of tortious interference with
                    contract ........................................................................................ 79

              2.    For essentially the same reasons that Mesabi's antitrust
                    claims survive summary judgment, so too do its claims
                    that Cliffs tortiously interfered with certain business
                    relationships ............................................................................... 83

        B.    Mesabi and Chippewa are entitled to summary judgment on
              Cliffs' counterclaims for tortious interference and aiding and
              abetting tortious interference with business relationships .................. 87

        C.    The Court grants both parties' motions for summary judgment on
              civil conspiracy because those claims fail as a matter of law .............. 94

Conclusion ..................................................................................................................... 95

Cleveland-Cliffs is a leading manufacturer of iron ore pellets, which are used in the production of steel.[1]  Essar Steel has sought, now for more than a decade, to build a facility in northern Minnesota that would permit it to compete with Cliffs in the mining and production of iron ore pellets.[2]  Unable to raise the funds necessary to complete construction, Essar Steel filed for bankruptcy in 2016 with the project incomplete.  Essar Steel confirmed its plan of reorganization in June 2017 and emerged from bankruptcy in December 2017, whereupon it became known as Mesabi.[3]  Its hope was that it would complete the project soon thereafter and enter the iron ore mining business.  To date, however, the facility remains incomplete.  In this lawsuit, which was filed in September 2017, Mesabi asserts that its inability to complete the project is a result of Cliffs' unlawful conduct.  It brings both antitrust and tort claims.  In response, Cliffs has counterclaimed, asserting tort claims against Mesabi.  Additionally, both sides assert conspiracy claims against one another.

The litigation has been active and contentious.  But it has now progressed as far as it can before this Court.  The principal claims are "non-core" matters, on which the parties are entitled to a trial by jury and an Article III adjudication.  The parties have made clear that they intend to exercise that right.[4]  The Court now has before

---

[1] Defendant Cleveland-Cliffs, Inc., along with is subsidiary, Cleveland-Cliffs Minnesota Land Development LLC, is referred to as either "Cleveland-Cliffs" or as "Cliffs."

[2] Debtors Essar Steel Minnesota LLC and ESML Holdings Inc. are referred to collectively as "Essar Steel."

[3] Plaintiff Mesabi Metallics Company LLC is referred to as "Mesabi."

[4] *See* D.I. 34 (Cliffs' answer to second amended complaint, including jury demand); May 12, 2021 Hr'g Tr. at 17 (counsel for Mesabi explaining that "Cliffs demanded a jury at the outset and we agreed to that … I believe both parties wanted there to be a jury trial, should neither

it three motions for summary judgment: cross motions for summary judgment on Mesabi's claims and a motion by Mesabi for summary judgment on Cliffs' counterclaims.  The Court also has before it three *in limine* motions filed by Cliffs that bear on the evidence that may properly be considered for summary judgment purposes.

For the reasons described below, the *in limine* motions will be denied (Part I). The summary judgment motions will be granted in part and denied in part. Specifically, the Court will grant Mesabi's motion for summary judgment on the definition of the relevant market and on the question of whether Cliffs had monopoly power (Parts II.A and II.B).  The Court will deny Cliff's motion for summary judgment on its contention that it did not exercise monopoly power, that Mesabi has suffered no antitrust injury, and that Mesabi suffered no damages (Part II.C).

With respect to the remaining claims, the Court will grant Cliffs' motion for summary judgment on the claim for tortious interference with contract but grant it only in part on the claim for tortious interference with business relationships (Part III.A).  The Court will grant Mesabi and Chippewa's motions for summary judgment on Cliffs' tortious interference claim (Part III.B).  And finally, both sides' motions for summary judgment on the claims for civil conspiracy will be granted (Part III.C).

This case must now move to the district court (upon a motion to withdraw the reference), where the genuinely disputed questions of material fact may be tried.

---

party prevail on its summary judgment motion or other dispositive motion prior to such a trial").

Appreciating, however, that the district judge charged with conducting that trial will not be steeped in the background of the parties' disputes, this Memorandum Opinion seeks, in addition to providing the Court's reasons for its disposition of the pending motions, to provide some of the context that may be useful to the district judge to whom this baton will be passed.

To that end, the Court will first set out (under "Factual and Procedural Background") a general overview of this case, describing, at a fairly high level of generality, the key disputes that have arisen and how they have been resolved. Part I of the analysis addresses the pending motions *in limine*. Part II addresses the parties' cross-motions for summary judgment on Mesabi's antitrust claims. And Part III addresses the cross-motions for summary judgment on the tort and conspiracy claims and counterclaims.

## Factual and Procedural Background

Essar Steel filed for bankruptcy in July 2016. As the first-day declaration explains, Essar Steel, which at the time of the bankruptcy filing was a subsidiary of Essar Global, was formed to develop and operate an iron ore pellet production facility in the western Mesabi range in northern Minnesota.[5] Despite having raised

---

[5] *See In re Essar Steel Minnesota LLC*, Bankr. D. Del. No. 16-11626 (the "Main Case."), D.I. 14 at 3. Essar Global Fund Limited is referred to as "Essar Global." The docket in the Main Case is cited as "Main Case D.I. __." The Court points to these materials solely for the purpose of providing context. The resolution of the summary judgment motions before the Court is based only on evidence in the summary judgment record.

That summary judgment record is included in appendices to nine different briefs – opening briefs, oppositions, and replies filed with respect to each of the three summary judgment motions (the cross-motions on Mesabi's claims and Mesabi's motion on Cliffs' counterclaims). It includes nearly 1,000 exhibits covering more than 41,000 pages and fills 66 separate volumes.

approximately $1 billion, the debtors entered bankruptcy without an operational facility, facing the risk of losing mineral leases, and needing to raise hundreds of millions of dollars in additional capital in order to complete the project.

The debtors confirmed a plan of reorganization in June 2017.[6] Under the plan, Chippewa would acquire Essar Steel and rename the reorganized debtors Mesabi.[7] The plan assigned the debtors' causes of action against Essar Global and its officers (whom the debtors had blamed for the failure to complete the project) to separate trusts established for the benefit of the debtors' secured and unsecured creditors, respectively.   The adversary proceeding brought against the company's former officers was filed in January 2017 and has since been resolved.[8]  In addition, it bears note that Essar Global, whose equity stake in Essar Steel was cancelled under the confirmed plan of reorganization, subsequently acquired Chippewa, and is therefore again the owner of Mesabi.[9]

---

Appendix A to this Memorandum Opinion contains (on its first page) a chart that identifies those nine appendices and labels them Appendix 1 – Appendix 9.   Appendix A to this Memorandum Opinion also contains a chart that sets forth, for each volume of each of those nine appendices, where each volume is filed on this Court's docket and the specific exhibits contained therein.   Specific documents in the summary judgment record are cited as "App. __, Ex. __."

[6] Main Case D.I. 1025.

[7] Chippewa Capital Partners is referred to as "Chippewa."

[8] *Nystrom v. Vuppuluri, et al.*, Bankr. D. Del. No. 17-50001.   Along the way, that adversary proceeding gave rise to several written opinions on motions to dismiss.  *See Nystrom v. Vuppuluri*, No. 17-50001-BLS, 2019 WL 2246712 (Bankr. D. Del. May 23, 2019); *Nystrom v. Vuppuluri*, No. 17-50001-BLS, 2021 WL 1812666 (Bankr. D. Del. May 5, 2021); *Nystrom v. Vuppuluri*, No. 17-50001, D.I. 234 (Bankr. D. Del. Sept. 27, 2021).

[9] *See* D.I. 956 § 4.1(j) (providing for cancellation of equity in Essar Steel).

The Essar Steel plan of reorganization provided that the reorganized debtors would maintain the estates' causes of action against Cliffs and other defendants, whose allegedly wrongful conduct was also claimed to be a cause of the debtors' failure to complete the project.  This adversary proceeding was filed in September 2017.[10]

The land that Essar Steel originally intended to mine as part of its project included land that it leased from an entity known as Glacier Park.[11]  During the bankruptcy case, Essar Steel sought to assume those leases.  Glacier Park objected to the motion to assume, contending that Essar Steel was unable to cure past defaults or provide adequate assurance of its future performance of its lease obligations, as § 365 of the Bankruptcy Code requires as a condition to assumption.  That dispute was ultimately settled, with the terms of the settlement providing that the leases would be assumed upon the plan becoming effective.  The agreement, however, set a deadline of October 31, 2017 for the plan to become effective.  The settlement agreement also obligated Mesabi to reach certain production thresholds.

Essar Steel was unable to consummate the transactions contemplated by the plan of reorganization by the October 31, 2017 deadline.  On December 9, 2017, Glacier Park executed new leases that conveyed the mineral rights to Cliffs.  The plan of reorganization ultimately became effective on December 22, 2017.[12]

---

[10] D.I. 1.

[11] Glacier Park Iron Ore Properties LLC is referred to as "Glacier Park."

[12] *Id.*; Main Case D.I. 1398.

The operative complaint in this lawsuit, the Second Amended Complaint, was filed in January 2018.[13]   It asserts 25 counts against Cliffs and Glacier Park.   In addition to the antitrust and tortious interference claims that are the subject of the pending motions, the complaint asserted a claim in which Mesabi contended that, notwithstanding the October 31, 2017 deadline and Glacier Park's subsequent agreement to lease that land to Cliffs, it had in fact assumed those leases when its plan became effective in December 2017.   The complaint also alleged that Glacier Park, by agreeing to lease that land to Cliffs, had violated the antitrust laws.   Glacier Park counterclaimed for breach of contract (alleging that Mesabi had not met the agreed production thresholds) and tortious interference.[14]   Cliffs also counterclaimed against Mesabi for tortious interference and civil conspiracy.[15]

In an opinion issued in June 2018, Judge Shannon (who was then presiding over this bankruptcy case) granted summary judgment in favor of Glacier Park and Cliffs on Mesabi's various counts that turned on the question whether Mesabi retained the right to assume the Glacier Park leases despite its failure to consummate its plan by the October 31, 2017 deadline.   As Judge Shannon explained it, the settlement "afforded material relief to both Mesabi and [Glacier Park].   For Mesabi, the Agreement provided certainty regarding the assumption of the Leases, assuming its Plan became effective.   For [Glacier Park], the Agreement provided a date by

---

[13] D.I. 18.

[14] D.I. 30.

[15] D.I. 34.

6

which it would either enjoy a contractual relationship with a lessee whose Plan has become effective, or it would have its property back in its possession to do with as it deemed prudent."[16] Judge Shannon concluded that Mesabi's failure to go effective on its plan by that deadline meant that the leases were rejected, and that Glacier Park was then free to lease those properties to Cliffs.[17]

Mesabi had also moved to dismiss Glacier Park's other claims. With respect to Glacier Park's counterclaims for tortious interference (in which Glacier Park argued that, by even suing Cliffs for leasing the Glacier Park land, Mesabi tortiously interfered with its agreement with Cliffs), the Court granted Mesabi's motion to dismiss. Because the lease between Glacier Park and Cliffs had not been breached, there was no claim for tortious interference with that contract. Alternatively, the Court found that Glacier Park's right to file suit against Mesabi was protected by the *Noer-Pennington* doctrine.[18] The Court denied, however, Mesabi's motion to dismiss Glacier Park's breach of contract claim alleging that Mesabi failed to meet the required production thresholds.[19]

---

[16] *Mesabi Metallics Company LLC v. Cleveland-Cliffs Inc., et al.,* 590 B.R. 109, 113 (Bankr. D. Del. 2018).

[17] *Id*. at 119-120. *See also* D.I. 104 (order granting partial summary judgment).

[18] *Mesabi Metallics Company LLC v. Cleveland Cliffs*, No. 17-51210, 2018 WL 6841348 (Bankr. D. Del. Dec. 12, 2018); D.I. 151.

[19] *Id.*

The Court granted partial summary judgment to Glacier Park on certain bankruptcy causes of action in March 2019.[20]  In January 2021, Mesabi and Glacier Park settled and dismissed their remaining claims and counterclaims.[21]

The case was transferred from Judge Shannon to the undersigned judge in May 2021.[22]  In May 2023, Cliffs announced that it had entered into an agreement with the state of Minnesota to acquire other leases that Mesabi viewed as critical to the completion of the project.  Mesabi filed a motion asking this Court to enter a preliminary injunction barring Cliffs from acquiring the state leases on the ground that Cliffs' actions were anticompetitive.[23]  The Court denied the motion.  The principal basis for the Court's ruling was evidence suggesting that even if Mesabi was correct and that Cliffs' conduct was anti-competitive (an issue the Court did not resolve), Minnesota's decision to award the leases to Cliffs stemmed at least in part from the state's frustration with Mesabi.  And because an injunction against Cliffs'

---

[20] D.I. 183.

[21] *See* D.I. 442, 450.  In addition to its counterclaim against Mesabi, Cliffs also asserted claims against Chippewa and Thomas Clark, who was the principal of Chippewa before it was acquired by Essar Global.  Cliffs' claim against Clark settled on the eve of the hearing on summary judgment.  *See* D.I. 1003, 1004.  Cliffs' claims against Chippewa remain pending and are addressed herein.  The Second Amended Complaint also asserts claims for violation of the automatic stay, to recover property under § 550 of the Bankruptcy Code, and to disallow claims under § 502(d) of the Bankruptcy Code.  Cliffs sought summary judgment on those claims.  D.I. 837 at 62-64.  Mesabi did not oppose that relief.  The Court will therefore enter summary judgment in favor of Cliffs on those claims.  Mesabi also asserts a separate claim for injunctive relief.  Because that is a remedy rather than a separate cause of action, the Court will grant summary judgment in favor of defendants on this claim, without prejudice to Mesabi's right to seek injunctive relief if it otherwise prevails on a claim for which such relief is appropriate.

[22] Main Case D.I. 1730; D.I. 502.

[23] D.I. 715.

8

acquiring the leases would bring no assurance that the state would award them to Mesabi (as opposed to some third party), the Court concluded that the risk that it might enter an injunction that would cause substantial economic harm to one party (Cliffs) without necessarily providing any benefit to another (Mesabi) counseled against the exercise of the Court's equitable authority.[24]

In July 2023, Mesabi moved the Court for an order seeking to unseal certain of the exhibits attached to its motion for a preliminary injunction. Those exhibits were documents it had obtained in discovery from Cliffs and had been marked as confidential under the terms of the protective order in place in this adversary proceeding, meaning that they could only be used for purposes of the litigation. As the protective order required, those documents had been filed under seal. But invoking the public's right of access to judicial records, Mesabi moved to have them unsealed, presumably so that it could use them for purposes unrelated to the litigation (such as to lobby the state of Minnesota).[25] The Court concluded that Third Circuit precedent required that it grant the motion.[26] Appreciating, however, the potential anomaly of permitting Mesabi to invoke the public right of access to circumvent the restrictions of the properly entered protective order, the Court stayed the order and certified a direct appeal to the Third Circuit under

---

[24] May 23, 2023 Hr'g Tr. at 179-188; D.I. 741.

[25] D.I. 774.

[26] *Mesabi Metallics Company v. Cleveland Cliffs, Inc.*, No. 17-51210, 2023 WL 6202448 (Bankr. D. Del. Sept. 22, 2023).

28 U.S.C. § 158(d)(2).[27]    The Third Circuit granted the direct appeal and has set argument for September 24, 2024.[28]

This Court heard argument on the parties' summary judgment motions on February 12, 2024 which continued onto March 25, 2024.  The Court also heard argument on the *in limine* motions on March 11, 2024.  The Court appreciates counsel's excellent advocacy and the parties' patience as it has sought to work through the complex issues presented by these motions.

For the sake of providing an overall roadmap of the course of the litigation and matters addressed in this Memorandum Opinion, the following charts are intended to summarize the status of the 25 claims set forth in Mesabi's Second Amended Complaint and the four counts contained in Cliffs' counterclaim.[29]

---

[27] *Id.*

[28] *See* D.I. 1067 (describing status of this appeal, as well as related dispute with which it has been consolidated).

[29] Glacier Park's counterclaims, all of which have been resolved, are omitted.

| MESABI'S SECOND AMENDED COMPLAINT – D.I. 38 | | | | |
|---|---|---|---|---|
| Count | Claim | Defendants | Disposition before this opinion | Disposition in this opinion |
| 1 | Tortious interference with contractual rights | Cliffs, Cliffs Minnesota | | Addressed in Part III.A.1 |
| 2 | Tortious interference with business relations or prospective economic advantage | Cliffs, Cliffs Minnesota | | Addressed in Part III.A.2 |
| 3 | Breach of contract – Glacier Park Settlement | Glacier Park | Summary judgment for defendants; D.I. 104 | |
| 4 | Breach of contract – mineral leases | Glacier Park | Summary judgment for defendants; D.I. 104 | |
| 5 | Breach of implied covenant of good faith and fair dealing – Glacier Park settlement | Glacier Park | Settled.  D.I. 442, 450 | |
| 6 | Breach of implied covenant of good faith and fair dealing – mineral leases | Glacier Park | Summary judgment for defendants; D.I. 104 | |
| 7 | Section 1 of Sherman Act, agreements in restraint of trade | Glacier Park | Settled.  D.I. 442, 450 | |
| | | Cliffs, Cliffs Minnesota | | Addressed in Part II |
| 8 | Section 2 of Sherman Act – monopolization | Cliffs, Cliffs Minnesota | | Addressed in Part II |
| 9 | Section 2 of Sherman Act – attempted monopolization | Cliffs, Cliffs Minnesota | | Addressed in Part II |
| 10 | Minn. Stat. § 325D.52 – monopolization | Cliffs, Cliffs Minnesota | | Addressed in Part II |
| 11 | Minn. Stat. § 325D.52 – attempted monopolization | Cliffs, Cliffs Minnesota | | Addressed in Part II |
| 12 | Automatic stay | Cliffs, Cliffs Minnesota | | Summary judgment granted for defendants, unopposed, p. 8, n.21 |

| Count | Claim | Defendants | Disposition before this opinion | Disposition in this opinion |
|---|---|---|---|---|
| 13 | Declaratory relief for violation of the automatic stay | Cliffs, Cliffs Minnesota | Summary judgment for defendants; D.I. 104 | |
| 14 | Civil contempt for violation of assumption order | Cliffs, Cliffs Minnesota, Glacier Park | Summary judgment for defendants; D.I. 104 | |
| 15 | Avoidance and recovery of fraudulent transfers | Glacier Park | Summary judgment for defendants; D.I. 183 | |
| 16 | Avoidance of unauthorized postpetition transfers | Cliffs, Cliffs Minnesota, Glacier Park | Summary judgment for defendants; D.I. 104 | |
| 17 | Recovery of avoided transfers | Cliffs, Cliffs Minnesota | | Summary judgment granted for defendants, unopposed, p. 8, n.21 |
| | | Glacier Park | Summary judgment for defendants; D.I. 183 | |
| 18 | Disallowance of claims under § 502(d) | | | Summary judgment granted for defendants, unopposed, p. 8, n.21 |
| 19 | Injunctive relief | Cliffs and Does 1-10 | | Summary judgment granted for defendants, unopposed, p. 8, n.21 |
| 20 | Injunction against Cliffs' acquisition of Glacier Park leases | Cliffs, Cliffs Minnesota, Glacier Park, Does 1-10 | Summary judgment for defendants; D.I. 104 | |
| 21 | Declaratory relief relating to Cliffs' acquisition of Glacier Park leases | Cliffs, Cliffs Minnesota, Glacier Park, Does 1-10 | Summary judgment for defendants; D.I. 104 | |
| 22 | Declaratory relief relating to assumption of Glacier Park leases | Cliffs, Cliffs Minnesota, Glacier Park, Does 1-10 | Summary judgment for defendants; D.I. 104 | |

| Count | Claim | Defendants | Disposition before this opinion | Disposition in this opinion |
|---|---|---|---|---|
| 23 | Declaratory relief relating to Glacier Park leases | Cliffs, Cliffs Minnesota, Glacier Park, Does 1-10 | Summary judgment for defendants; D.I. 104 | |
| 24 | Declaratory relief relating to Glacier Park leases | Cliffs, Cliffs Minnesota, Glacier Park, Does 1-10 | Summary judgment for defendants; D.I. 104 | |
| 25 | Civil Conspiracy | Cliffs, Cliffs Minnesota, Glacier Park, Does 1-10 | | |

| CLIFFS' COUNTERCLAIMS – D.I. 34 & 35 | | | | |
|---|---|---|---|---|
| Count | Claim | Defendants | Disposition before this opinion | Disposition in this opinion |
| 1 | Tortious interference with prospective business advantage as to Superior | Mesabi, Chippewa | | Part III.X |
| | | Clarke | Settled, D.I. 1003, 1004 | |
| 2 | Civil conspiracy | Mesabi, Chippewa | | Part III.X |
| | | Clarke | Settled, D.I. 1003, 1004 | |
| 3 | Aiding and abetting tortious interference with prospective business advantage | Clarke | Settled, D.I. 1003, 1004 | |
| | | Clarke | Settled, D.I. 1003, 1004 | |
| 4 | Libel | Clarke | Settled, D.I. 1003, 1004 | |

## Jurisdiction

The parties each assert that their respective claims and counterclaims are within the district court's jurisdiction provided in 28 U.S.C. § 1334.[30]  The Court agrees.  To be sure, the claims as between Mesabi and Cliffs, holding aside the few

---

[30] D.I. 18 ¶ 2; D.I. 34 Counterclaim ¶ 13.

bankruptcy claims that are being consensually dismissed (*see supra,* p. 8, n.21), do not "arise under" the Bankruptcy Code.  Nor are they the types of claims that could only arise in the bankruptcy context, so they fall outside the Court's "arising in" jurisdiction.  But their resolution does have a potential effect on the debtors' bankruptcy estate, and as such they fall within the Bankruptcy Code's "related to" jurisdiction.[31]

The source of subject-matter jurisdiction over Cliffs' claims against Chippewa is more complex.  Because Cliffs asserts that its claim is non-core, it is presumably contending that its claim falls within the related-to jurisdiction.[32]  To invoke that jurisdiction, however, the claim must have some effect on the bankruptcy estate, such as by giving rise to a right of indemnity.  The counterclaim does not expressly assert, however, that if Cliffs prevails on its claim, it would give rise to an indemnity claim by Chippewa against the estate.  And while Chippewa never argues that the case is

---

[31] *See Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir. 1984).  Because the complaint was filed before the plan became effective, the Court finds that the "conceivable effects" test is applicable.  But even if the claims were viewed as post-bankruptcy claims (because the complaint was filed after the plan was confirmed), there is a sufficient nexus between the claims and the confirmed plan of reorganization to satisfy the standard set forth in *In re Resorts Int'l, Inc.*, 372 F.3d 154, 165 (3d Cir. 2004).  To be sure, the claims that Mesabi previously asserted against Glacier Park related to the assumption of the Glacier Park leases arose under the Bankruptcy Code (and were therefore "core" matters).  But questions of jurisdiction and authority, like standing, must be viewed on a claim-by-claim basis.  *See Murthy v. Missouri*, 144 S. Ct. 1972, 1988 (2024) ("Our decisions make clear that standing is not dispensed in gross.  That is, plaintiffs must demonstrate standing for each claim that they press against each defendant, and for each form of relief that they seek.") (internal citations and quotations omitted).  As described above, the claims related to the assumption of the Glacier Park leases were all resolved in earlier stages of the litigation.

[32] D.I. 34 Counterclaims ¶ 13.  *See WRT Creditors Liquidation Trust v. C.I.B.C. Oppenheimer Corp.*, 75 F. Supp. 2d 596, 606 (S.D. Tex. 1999) ("Claims that 'arise under' the Bankruptcy Code or 'arise in' a bankruptcy case are 'core' matters; claims that 'relate to' a bankruptcy case, but do not arise in a bankruptcy case or under the Bankruptcy Code are 'non-core.'").

outside the scope of this Court's subject-matter jurisdiction, because of the Court's independent obligation to assure itself of the basis of its own jurisdiction, Chippewa's failure to raise the issue is not a sufficient basis to permit the Court to proceed.[33]  Nor is it sufficient that there is a logical relationship between the claims against Chippewa and those against Mesabi, because as Judge Shannon explained in *SemCrude*, the "supplemental jurisdiction" set out in 28 U.S.C. § 1367 does not apply when the principal basis of jurisdiction is § 1334.[34]

That said, because the allegations against Chippewa all arise out of its role as plan sponsor, the Court believes it appropriate to construe the counterclaims liberally to include such an implicit allegation of an indemnity claim.  That is sufficient to bring the claim within the "related to" jurisdiction and to permit the Court to proceed to consider the claim on the merits.

On the topic of jurisdiction, one additional point bears mention.  As described above, both parties agree that if the claims get past summary judgment, they seek to preserve their rights to a jury trial.  And even though Mesabi contended that the claims at issue are core and consented to the entry of judgment in the bankruptcy court, Cliffs has asserted throughout that the claims at issue are non-core, has not consented to the entry of judgment in the bankruptcy court, and has demanded a trial by jury.[35]

---

[33] *See Hartig Drug Company Inc. v. Senju Pharms. Co. Ltd.,* 836 F.3d 261, 267 (3d Cir. 2016) ("federal courts have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party").

[34] *In re Semcrude*, No. 08-11525, 2010 WL 5140487, at *18 (Bankr. D. Del. Dec. 13, 2010).

[35] D.I. 18 ¶¶ 1, 2; D.I. 34 at 1, 101.

Preserving the right to jury trial will require the parties to move the district court to withdraw the reference under 28 U.S.C. § 157(d).  The filing of such a motion after the bankruptcy court has conducted pre-trial proceedings is fully consistent with the longstanding practice in this jurisdiction in which, even in cases in which a party is entitled to a jury trial in the district court, the reference to the bankruptcy court is left in place until a case is "trial ready."[36]

That practice is eminently sensible in view of the fact that many such disputes are closely related to the underlying bankruptcy case with which bankruptcy judges are familiar; the practical fact that very few such cases actually proceed to trial, but instead are often resolved either by dispositive motion or through settlement; and the exceptionally heavy caseload borne by the district court in this district.

The practice does, however, give rise to one anomaly that warrants mention. It is settled law that the fact that a party is entitled to an Article III resolution of an action means only that "final judgment" must be entered by an Article III judge.  The bankruptcy court that is handling the case until it is "trial ready" will regularly decide motions that may dispose of particular claims against particular parties.  So long as the ruling is an interlocutory one and does not entail the entry of final judgment, there is no obstacle to the bankruptcy court resolving particular claims.[37]  Indeed, as

---

[36] *See, e.g., In re Big V Holding Corp.,* D. Del. No. 01-233, 2002 U.S. Dist. Lexis 12609 at *17-18 (D. Del. July 11, 2002) ("Withdrawal of the reference based on the ground that a party is entitled to a jury trial should be deferred until the case is 'trial ready.' It would be premature to withdraw the reference to the bankruptcy court based upon the unfixed proposition that a jury trial may occur in the future.") (internal citation omitted).

[37] *See generally In re Trinsum Group, Inc.*, 467 B.R. 734, 739-640 (Bankr. S.D.N.Y. 2012) (collecting authorities).

the discussion of the procedural history of this case (including Judge Shannon's resolution of the motions to dismiss and prior summary judgment motions), as well as this Court's consideration of the motions for partial summary judgment reveals, that is precisely what will have happened in this case before the district court withdraws the reference.

Moreover, the district court that ultimately withdraws the reference once a dispute is "trial ready" will rarely have occasion to revisit the bankruptcy court's prior rulings that may have disposed of claims or parties. While every trial judge retains the authority to reconsider prior interlocutory orders made in a case over which the judge is presiding, the principle of law-of-the-case generally counsels against such reconsideration.[38]  Rather, prior interlocutory rulings will merge into the district court's final judgment, which will then be reviewable as of right by the court of appeals.[39]

That practice does ensure that the bankruptcy court's rulings are ultimately reviewable by an Article III tribunal and therefore fully comports with the constitutional requirements.  It is somewhat different, however, from the conventional description of the bankruptcy courts as being subject to the close supervision and control of the district courts.  For example, the Supreme Court explained in *Wellness* that bankruptcy court judges "serve as judicial officers of the

---

[38] *See In re Broadstripe, LLC*, 435 B.R. 245, 255 (Bankr. D. Del. 2010).

[39] *See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 706 (3d Cir. 1996) ("Under the 'merger rule,' prior interlocutory orders merge with the final judgment in a case, and the interlocutory orders (to the extent that they affect the final judgment) may be reviewed on appeal from the final order.").

United States district court and collectively constitute a unit of the district court for that district.  Just as the ultimate decision whether to invoke a magistrate judge's assistance is made by the district court, bankruptcy courts hear matters solely on a district court's reference, which the district court may withdraw *sua sponte* or at the request of a party."[40]

When the case remains in bankruptcy court until it is "trial ready," however, the practical reality is that the bankruptcy court may issue interlocutory orders (such as on a partial motion to dismiss or partial motion for summary judgment) under which entire claims may be fully resolved, subject only to review by the court of appeals after the district court enters final judgment.  Again, this Court believes that the practice makes very good practical sense and is entirely consistent with the rights of the parties under Article III.  The partial disconnect, however, between this practical reality and the conventional description of the bankruptcy courts as a "unit of the district court" with every meaningful decision subject to the district court's review, is worth noting.

## Analysis

The cross-motions for summary judgment are brought under Civil Rule 56, as made applicable to this proceeding by Bankruptcy Rule 7056.  A party moving for summary judgment has the burden of showing "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[41]  A

---

[40] *Wellness Intern. Network, Ltd. v. Sharif*, 575 U.S. 665, 679 (2015) (internal quotations, brackets, and citations omitted).

[41] Fed. R. Civ. P. 56(a).

fact is "material" if it would affect the outcome of the suit,[42] and a dispute is "genuine" if a reasonable factfinder could, based on the evidence presented that would likely be admissible at trial, resolve the factual dispute in favor of the non-moving party.[43]  If, however, no reasonable jury could find for the non-moving party, then there is no "genuine issue for trial."[44]   On motions for summary judgment, all inferences, determinations about the weight to be afforded to particular evidence, and all judgments about credibility must be drawn in favor of the non-moving party.[45] Accordingly, because Parts II.A, II.B, and III.B address Mesabi's motion for summary judgment, in those portions of the opinion the Court draws all such inferences in Cliffs' favor.  Parts II.C and III.A address Cliffs' motion.  The Court accordingly draws such inferences in favor of Mesabi and Chippewa (as applicable) in those portions.  Part III.C addresses motions brought by both parties (on claims for civil conspiracy), so the Court draws inferences in favor of the non-moving party with respect to each motion.

## I.    Each of the motions *in limine* will be denied.

The summary judgment standard under Civil Rule 56(c)(2) permits a party to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."[46]   Accordingly, when a party relies on

---

[42] *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019).

[43] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[44] *First Nat'l Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289 (1968).

[45] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[46] Fed. R. Civ. P. 56(c)(2).

expert testimony to show the presence or absence of a genuine dispute of material fact (as Mesabi does) that party may be required to show that such expert testimony will be admissible under Federal Rule of Evidence 702.  And Cliffs has moved *in limine* to exclude the expert reports of three of Mesabi's witnesses, Graham Davis, Roger Emmott, and J. Douglas Zona.  In light of the procedural posture of this non-core matter, the parties agree that these motions are intended only to address the scope of the record this Court considers in connection with the summary judgment motions and is not intended to constrain the district court's exercise of its own judgment in ultimately deciding what testimony is properly admissible at trial. Accordingly, in addressing this motion, the Court is determining the admissibility of the expert opinions only to the extent the Court is otherwise relying on the expert's opinion (either directly, or indirectly, if the opinion forms the basis of another expert's opinion on which the Court relies) in this Memorandum Opinion.

Federal Rule of Evidence 702 provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)    the testimony is based on sufficient facts or data;

(c)    the testimony is the product of reliable principles and methods; and

(d)    the expert has reliably applied the principles and methods to the facts of the case.[47]

---

[47] Fed. R. Evid. 702.

As the Supreme Court explained in *Daubert*, Rule 702 requires (1) evidentiary reliability (*i.e.*, trustworthiness that the application of principles produce consistent results); and (2) evidence that will assist the factfinder in determining a fact in issue.[48]  Rule 702's admissibility standards for expert testimony are "not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes."[49]  Accordingly, Rule 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.  Pertinent evidence based on scientifically valid principles will satisfy those demands."[50]

A trial judge confronted with a motion to exclude expert testimony on *Daubert* grounds thus has three principal tasks: "(1) confirm the witness is a qualified expert; (2) check the proposed testimony is reliable and relates to matters requiring scientific, technical, or specialized knowledge; and (3) ensure the expert's testimony is sufficiently tied to the facts of the case, so that it fits the dispute and will assist the trier of fact."[51]

Importantly, however, in asking these questions, the role of the court is certainly not to determine whether the court believes that the expert's work is perfect

---

[48] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590-591 & n.9 (1993). ("In a case involving scientific evidence, *evidentiary reliability* will be based upon *scientific validity*.") (emphasis in original).

[49] *Id.* at 597.

[50] *Id.*

[51] *UGI Sunbury v. Permanent Easement for 1.757 Acres*, 949 F.3d 825, 832 (3d Cir. 2020) (internal quotation omitted).

and unimpeachable.  So long as the expert meets the "liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility."[52]

To oversimplify, Mesabi's expert case here proceeds as follows:  Emmott provides expertise relating to the mining of iron ore.  He opines that Mesabi's original plan for developing the facility was well conceived and achievable.  His factual description of the nature of the market for blast furnace pellets in the Great Lakes region, as well as his description of alternative products that are used in the manufacture of steel, form the basis of Zona's conclusions about the definition of the applicable market.  Zona is an economist.  His testimony forms the basis of Mesabi's argument that Cliffs had monopoly power in the relevant market.

Davis is Mesabi's expert on damages.  Davis relied on Emmott for his conclusions that the acts that Mesabi alleges were exclusionary would have interfered with one's ability to finance such a project and thus delayed its construction.  Davis then goes on to conclude, based on the assumption that Cliffs had engaged in exclusionary conduct, to calculate the damages that Mesabi would have suffered as a result of that conduct.  He concludes that this figure is approximately $1.9 billion.

Of the various challenges Cliffs makes to Mesabi's expert case, the one that gives the Court the greatest pause is the claim that Davis' damages calculation is not an appropriate "fit" with the evidence in the case.  For the reasons described below in Part II.C.3, however, the Court believes that this is a matter properly left to the

---

[52] *Kannankeril v. Terminix Intern., Inc.*, 128 F.3d 802, 809 (3d Cir. 1997).

district court. This Court need not quantify Mesabi's damages claim in order to resolve the pending motions for summary judgment. At this stage, all that Mesabi is required to do to satisfy the damages element of its antitrust claim is show the existence of sufficient evidence from which a reasonable factfinder can conclude that it has suffered *some* damages as a result of Cliffs' alleged anticompetitive conduct. As will be further described below, the Court is satisfied from the summary judgment record that Mesabi has met that burden. Accordingly, resolution of the pending motions does not require the Court to decide whether, under *Daubert*, Davis' damages figure may be presented to the jury.

### A. The motion to exclude Emmott's testimony will be denied.

Cliffs moves to exclude Emmott's testimony. As described above, Emmott's expertise in the iron ore mining business forms part of the basis for the opinions that Zona offers about market definition and for the conclusions Davis reaches with respect to damages. It certainly makes sense that in a case alleging anticompetitive conduct in the mining of blast furnace pellets, it would be helpful to the finder of fact to hear the testimony from a witness with expertise in the iron ore industry.

Emmott, who has 30 years of experience in the mining and metals industry, has relevant expertise.[53] And the opinions he provides (on which Zona and Davis rely) are matters within the scope of that expertise. As described above, in the context of the present motions, the Court need not adjudicate the admissibility of every opinion

---

[53] *See Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 327-328 (3d Cir. 2002) (explaining that "practical experience" can count as "specialized knowledge" and that a "proffered expert witness must possess skill or knowledge greater than the average layman") (internal citations, quotations, and ellipses omitted).

that Emmott offers. The Court is satisfied, however, that the opinions on which the Court is relying in connection with the disposition of this motion are sufficiently reliable that they would be admissible under Rule 702 and *Daubert*.

## B.    The motion to exclude Zona's testimony will be denied as moot.

Zona serves as Mesabi's economic expert. His reports set forth an array of opinions on various economic points. The only opinions Cliffs seek to exclude, however, are those that relate to "causation" and "effect." While the Court did rely on Zona's opinions with respect to the definition of the market and the question whether Cliffs had monopoly power, the Court has not, in this Memorandum Opinion, relied on the challenged opinions on "causation" or "effect." For that reason, the Court denies the *Daubert* motion, as it relates to those opinions, as moot.

## C.    The motion to exclude Davis' testimony will be denied as moot.

Davis is Mesabi's damages expert. He has built a model for calculating Mesabi's damages caused by Cliffs' alleged anticompetitive conduct. Cliffs' does not challenge his qualifications to testify as an expert or the basic analytic framework of his analysis (a discounted cash flow calculation, using the "real options" methodology, of the difference between the present value of Mesabi's project and the value it would have had "but for" Cliffs' allegedly anticompetitive conduct). Cliffs' central attack on Davis' testimony is that it does not "fit" the evidence in the case. Specifically, Cliffs' points out that there is substantial evidence of challenges and risks that Mesabi's project would have faced even in the absence of Cliffs' allegedly anticompetitive conduct. Because Davis' testimony does not take account of those risks and challenges, but instead proceeds on the assumption that without Cliff's allegedly

24

improper conduct the project would have faced smooth sailing, Cliffs argues that the testimony is not a proper "fit" for the facts of the case.[54]   In response, Mesabi acknowledges that certain of the assumptions that Davis made are disputed.   But it makes the fair point that the fact of such a dispute about an expert's assumptions does not by itself render an opinion inadmissible.   So long as the assumptions find some support in the evidence, a factual dispute about which set of assumptions are correct is typically left to the jury.[55]

In the end, this Court need not resolve that dispute.   As further described below, to overcome a motion for summary judgment with respect to the plaintiff's damages, a plaintiff need only point to evidence that would permit a reasonable factfinder to conclude that it suffered *some* damages on account of the defendant's conduct.   The summary judgment record contains sufficient evidence on this score without regard to Davis' testimony.   The Court therefore need not consider Davis' challenged testimony in order to resolve the present motions.   This motion *in limine* is therefore also denied as moot.

## II.   Mesabi is entitled to partial summary judgment on its claim that Cliffs had monopoly power in the relevant market; Cliffs' summary judgment motion will be denied because there are genuine factual disputes on exclusionary conduct, antitrust injury, and damages.

Mesabi asserts antitrust claims against Cliffs in counts 7-11.   Count 7 is brought under § 1 of the Sherman Act and alleges an agreement in restraint of trade. Counts 8 and 9 are brought under § 2 of the Sherman Act and allege monopolization

---

[54] *See In re TMI Litigation*, 193 F.3d 613, 670 (3d Cir. 1999).

[55] *See Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002).

and attempted monopolization, respectively. And counts 10 and 11 essentially mirror counts 8 and 9, though under Minnesota state law rather than under the Sherman Act.[56]

**A.   Mesabi is entitled to partial summary judgment on its claim that the relevant market, for antitrust purposes, is the market for blast furnace pellets in the Great Lakes region.**

The question whether Cliffs possesses monopoly power bears on all of the antitrust claims. The application to the claims of monopolization (and attempted monopolization) is the most direct. Monopolization under § 2 of the Sherman Act requires the plaintiff to show "(1) possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."[57] An attempt to monopolize under § 2 of the Sherman Act requires a showing "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."[58]

The question whether Cliffs has monopoly power is also relevant, however, to Mesabi's claim that Cliffs has formed a "combination in restraint of trade" under § 1

---

[56] *See Lorix v. Crompton Corp.,* 736 N.W.2d 619, 626 (Minn. 2007) (Minnesota's antitrust law is "generally interpreted consistently with federal antitrust law").

[57] *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 437 (3d Cir. 1997) (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 596 n. 19 (1985)). *See also Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,* 90 F.3d 737, 749 (3d Cir. 1996) (same); *Bonjorno v. Kaiser Aluminum & Chemical Corp.,* 752 F.2d 802, 808 (3d Cir. 1984) (same).

[58] *Philadelphia Taxi Ass'n, Inc. v. Uber Techs., Inc.,* 886 F.3d 332, 339 (3d Cir. 2018) (internal citations omitted).

of the Sherman Act.[59]  As the Supreme Court has explained, restraints imposed by agreements between competitors are typically unreasonable *per se*.[60]  Restraints that are not *per se* unreasonable, however, are judged under the "rule of reason," which "requires courts to conduct a fact-specific assessment of market power and market structure to assess the restraint' s actual effect on competition."[61]

Mesabi accordingly seeks partial summary judgment on the question whether Cliffs possesses monopoly power, relying primarily on Zona's expert report.  That analysis first requires an assessment of the relevant market.  To that end, Mesabi asserts that it is entitled to a determination that Cliffs has monopoly power with respect to the market for blast furnace pellets in the Great Lakes region.  Cliffs disputes each of these points, contending that the summary judgment record suggests that there are genuinely disputed factual questions on the issues of (a) the product market; (b) the geographic market; and (c) whether Cliffs has monopoly power, even if Mesabi is correct in its proposed definition of the market.  In its response, Cliffs does not rely on the testimony of its economic expert, Jonathan Orszag, whose report does not address these issues.  Instead, Cliffs relies exclusively (as it is certainly entitled to do) on the underlying factual record to suggest that there are genuinely disputed questions of fact that bear on these issues.

---

[59] 15 U.S.C. § 1.

[60] *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 723 (1988).

[61] *Ohio v. American Express*, 585 U.S. 529, 541 (2018) (internal quotation, citation, ellipses, and brackets omitted).

A relevant market for antitrust purposes is "the area of effective competition."[62] Relevant markets have two dimensions: product and geography.[63] Market definitions are generally questions of fact, and thus often present questions to be resolved by the jury.[64] To the extent the factual questions about market definition are not genuinely disputed, however, they may of course properly be resolved on summary judgment.[65]

### 1. Blast furnace pellets are the relevant product market.

In order to understand the relevant product market at hand, one must begin with an overview of what a blast furnace pellet is, and the role it plays in the manufacture of steel. Iron ore is a mineral substance that is an essential ingredient in the manufacture of steel.[66] Before iron ore can be converted into steel, it must be mined and processed into a form that can be used by steelmakers. The form of iron ore that is used to make steel varies, depending on factors such as the process used to produce the steel and the type and quality of the iron ore.[67] Generally, steel is produced in one of two ways, either through using a blast furnace or an electric arc furnace.[68]

---

[62] *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 327 (1961).

[63] *See Federal Trade Comm'n v. Hackensack Meridian Health, Inc.,* 30 F.4th 160, 166 (3d Cir. 2022).

[64] *See Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482 (1992) (market definition is a "factual inquiry"); *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 435 (3d Cir. 2016) ("scope of the market is a question of fact").

[65] Fed. R. Civ. P. 56(a).

[66] App. 1, Ex. 44 at A001769; App. 1, Ex. 9 (Emmott Rep.) ¶¶ 19-20 at A000468.

[67] App. 1, Ex. 9 (Emmott Rep.) ¶ 21 at A000468.

[68] *Id.* at ¶ 59 at A000484; App. 1, Ex. 59 at A002088.

A blast furnace is a smelting unit, in which iron ore feedstock is smelted into liquid iron. The liquid iron is then converted to steel in a separate basic oxygen furnace vessel.[69] An electric arc furnace, on the other hand, is a melting furnace in which an electric current produces an electric arc, which then melts the iron input. Oxygen is then injected to remove carbon and convert the iron input into liquid steel.[70] Blast pellets, which are small balls of very fine particles of iron ore combined with binding materials, are used in blast furnaces.[71] Either direct-reduced iron or hot-briquetted iron is used in an electric arc furnace.[72]

In defining the relevant product market, the Supreme Court has explained that that "the outer boundaries of a product market are determined by the reasonable interchangeability of use [by consumers] or the cross-elasticity of demand between the product itself and substitutes for it."[73] Reasonable "interchangeability implies that one product is roughly equivalent to another for the use to which it is put."[74] Factors to be considered include price, use, and qualities.[75] Moreover, the Supreme Court has recognized that submarkets may exist within a larger market.[76] There, "the boundaries of such a submarket may be determined by examining such practical

---

[69] App. 1, Ex. 9 (Emmott Rep.) ¶ 60 at A000484-A000485.

[70] *Id.* at ¶¶ 61, 69 at A000485, A000487.

[71] *Id.* at ¶ 23 at A000469.

[72] *Id.* at ¶¶ 61, 64 at A000485.

[73] *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

[74] *Allen–Myland, Inc. v. International Bus. Machines Corp.,* 33 F.3d 194, 206 (3d Cir. 1994) (internal quotations omitted).

[75] *Tunis Bros. Co. v. Ford Motor Co.,* 952 F.2d 715, 722 (3d Cir. 1991).

[76] *Brown Shoe Co.,* 370 U.S. at 325.

indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."[77]  Further, cross-elasticity of demand considers substitutability of products from the point of view of consumers.[78]  "Products in a relevant market [are] characterized by a cross-elasticity of demand, in other words, the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in that market."[79]

Courts have developed a test to define the relevant market which is known as the "hypothetical monopolist test."  Under that test, "if a hypothetical monopolist could impose a small but significant non-transitory increase in price ("SSNIP") in the proposed market, the market is properly defined."[80]  If consumers, however, would be able to "respond to a SSNIP by purchasing the product from outside the proposed market, thereby making the SSNIP unprofitable, the proposed market definition is too narrow."[81]  A typical SSNIP is five percent.[82]  The point is that if a hypothetical monopolist could sustain a five percent price increase for a given product or

---

[77] *Id.*

[78] *Queen City Pizza*, 124 F.3d at 438 n. 6.

[79] *Tunis Bros.,* 952 F.2d at 722.

[80] *Federal Trade Comm'n v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 338 (3d Cir. 2016) (discussed in context of the U.S. Merger Guidelines).  Despite the Court's general aversion to the use of unfamiliar acronyms (which the Court believes impair readability), the Court will acquiesce to the apparent convention in antitrust law and use the term "SSNIP."

[81] *Penn State Hersey*, 838 F.3d at 338.

[82] *Id.* at 338 n.1 (citing the 2010 Merger Guidelines).

geography, then there is not another product or geographical location that is a sufficiently close substitute for the product or location in question. In that case, the product or geography in which the hypothetical monopolist could impose a SSNIP is a properly defined market for antitrust purposes.

Mesabi's expert witness, Zona, applied the hypothetical monopolist test and determined that Cliffs could raise the price of blast furnace pellets by five percent without seeing customer substitution.[83] For that reason, he concludes, blast furnace pellets are the relevant product market for antitrust purposes. Zona concluded that, while the competitive price was not directly observed, Cliffs reported a cash cost of goods sold for pellets of about $60 per metric ton.[84] After adding transportation costs, Zona calculated that a SSNIP for Cliffs' blast furnace pellets would be approximately four dollars.[85] Zona concluded that consumers would not alter their behavior in response to that price increase.

In support of that conclusion, Zona explained (at times relying on Emmott, Mesabi's industry expert, and at other times relying on underlying record material) that none of the potential substitutes for blast furnace pellets is reasonably interchangeable. These potential substitutes include sinter, lump ore, direct-reduced iron and hot-briquetted iron. *First,* sinter is not reasonably interchangeable because it is not of comparable quality or cost to blast furnace pellets. Sinter is made from

---

[83] App. 1, Ex. 10 (Zona Rep). ¶¶ 51-56 at A000565-A000569.

[84] *Id.* at ¶ 27 at A000553-A000554.

[85] *Id.* at ¶ 34 at A000553-A000554.

sinter fines, which are too small to be directly fed into blast furnaces but too large to be formed into blast furnace pellets.[86]  Steelmakers in the region would need separate plants to process fines into sinter, which most steel mills in the Great Lakes region do not have.[87]  From 2015 to 2019, sinter made up only 6-7 percent of input to blast furnace steel mills in the Great Lakes region.[88]  Additionally, sinter contains a higher percentage of waste material and impurities (as compared to blast furnace pellets), which results in less efficient performance in blast furnaces and produces more pollution.[89]  For these reasons, nothing in the summary judgment record would support a conclusion that sinter is sufficiently interchangeable to call the product market definition into question.

*Second,* lump ore is not reasonably interchangeable with blast furnace pellets. While lump ore can be fed directly into blast furnaces, iron ore deposits in the region contain little lump ore.[90]  Due to its limited availability, steel producers in the Great Lakes region do not use lump ore in significant volumes.[91]  Steel mills also pay a premium for high-quality lump ore.[92]  The record thus makes plain that lump ore is

---

[86] App. 1, Ex. 9 (Emmott Rep.) ¶ 29 at A000470.

[87] App. 1, Ex. 9 (Emmott Rep.) ¶ 29 at A000470; App. 1, Ex. 56 at A002041; App. 1, Ex. 65 at A002442; App. 1, Ex. 10 (Zona Rep.) ¶ 34, tbl. 11 at A000556-A000557, A000616.

[88] App. 1, Ex. 10 (Zona Rep.) tbl. 11 at A000616.

[89] App. 1, Ex. 65 at A002441, A002445; App. 1, Ex. 1 (Finan Dep.) at A000044, pp. 171-172; *see also* App. 1, Ex. 32 at A001601; App. 1, Ex. 27 at A001534; App. 1, Ex. 2 (Tompkins Dep.) at A000094, p. 156; App. 1, Ex. 10 (Zona Rep.) ¶ 36 at A000558-A000559.

[90] App. 1, Ex. 9 (Emmott Rep.) ¶ 31 at A000472; App. 1, Ex 10 (Zona Rep.) ¶ 30(f) at A000797.

[91] App. 1, Ex. 1 (Finan Dep.) at A000015, pp. 53-54.

[92] App. 1, Ex. 13 (Lambert Rep.) ¶ 30(f) at A000797.

not reasonably interchangeable with blast furnace pellets because of its high costs and scarcity.

And *third*, neither direct-reduced iron nor hot-briquetted iron is reasonably interchangeable with blast furnace pellets because they are primarily used in the electric arc furnace steelmaking process.[93]  Blast furnaces and electric arc furnaces' inputs likely constitute separate submarkets within iron ore steel making.  The direct-reduced pellets that are necessary to generate direct-reduced iron or hot-briquetted iron require additional processing to make pellets that contain higher iron ore and lower silica content than the standard blast furnace pellet.  Unlike the standard blast furnace pellet, the direct-reduced-grade pellets must be converted to direct-reduced iron or hot-briquetted iron in order to make steel.  Blast furnace pellets, by contrast, are put directly into blast furnaces to create steel.  Direct-reduced iron or hot-briquetted iron are also more expensive than blast furnace pellets due to their higher iron ore content.[94]  The summary judgment record thus makes clear that neither direct-reduced iron nor hot-briquetted iron are reasonably interchangeable with blast furnace pellets.

Cliffs makes several arguments to challenge Mesabi's proposed market definition, but none creates a genuine dispute of material fact.  *First,* Cliffs' expert witness, Orszag, offered in his deposition some passing criticisms of Zona's

---

[93] App. 1, Ex. 12 (Orszag Rep.) ¶ 14 at A000684; App. 1, Ex. 11 (Persampieri Rep.) ¶ 8 at A000631-A000632.

[94] App. 1, Ex. 6 (Kozleuchar 30(b)(6) Dep.) at A00031, p. 66; App. 1, Ex. 12 (Orszag Rep.) ¶ 14 n. 37 at A000684.

application of the hypothetical monopolist test.[95]  Orszag did not, however, perform his own hypothetical monopolist test to respond to Zona's analysis of the relevant market or otherwise engage the matter in his own expert report.[96]  Orszag's elliptical criticisms are insufficient to create a genuine dispute of fact.

*Second,* Cliffs argues that the relevant product market should be expanded to include direct-reduced-grade pellets.  Direct-reduced-grade pellets are intermediate products used to make direct reduced iron.  As discussed above, however, direct-reduced-grade pellets are not reasonably interchangeable with blast furnace pellets.  They have higher iron ore content that requires additional processing in their production.  They must be converted into direct reduced iron before they can be used to make steel in electric arc furnaces.  Blast furnace pellets, on the other hand, are put directly into blast furnaces to create steel.  The features of direct-reduced-grade pellets illustrate their "peculiar characteristics and uses, [and] unique production facilities," as compared to blast furnace pellets.[97]

Further, the evidence in the summary judgment record makes clear that it would be uneconomic for customers to switch from blast furnace pellets to direct-reduced-grade pellets in response to a SSNIP.  In fact, during the relevant time frame, prices for direct-reduced-grade pellets exceeded prices for blast furnace pellets by

---

[95] App. 1, Ex. 8 (Orszag Dep.) at A000409, p. 32 (stating that Orszag was "agnostic on the relevant market," had "opinions about [Zona's] approach," but that his own focus was on a different issue – "analyzing direct effects in this case".).

[96] *See* App. 1, Ex. 8 (Orszag Dep.) at A000408; App. 1, Ex. 171 (Orszag Rep.) at A007516.

[97] *Brown Shoe Co.*, 370 U.S. at 325.

over four dollars.[98]  Cliffs offers no evidence in response.  Cliffs' argument that direct-reduced-grade pellets should be included as part of the relevant product market is thus unsuccessful.

*Third,* Cliffs argues that customers could switch from blast furnace pellets to those used in electric arc furnace steel production if a supplier increased prices above a competitive level.  The problem with that argument, however, is that for a customer with a blast furnace to switch to the materials used in electric arc furnaces, the customer would need to have or acquire an electric arc furnace.  And the summary judgment record shows that there were only three electric arc furnaces in the region during the relevant time frame, as compared to the 13 different blast furnaces in use at that time.  As a result, the summary judgment record does not contain evidence suggesting that it would be practical for a customer that otherwise used blast furnace pellets to switch to iron ore that required an electric arc furnace.[99]

*Fourth,* Cliffs argues that direct-reduced-grade pellets are reasonable substitutes for blast furnace pellets because steelmakers today are producing more steel with electric arc furnaces.  Here, the alleged anticompetitive conduct occurred from 2015 to 2019 and that is the relevant time frame for the purpose of defining the relevant market.  But as discussed above, in that time period steelmakers in the

---

[98] App. 1, Ex. 10 (Zona Rep.) fig. 2 at A000619.

[99] *Id.* at ¶ 51, fig. 1 at A000565-A000566; App. 1, Ex. 11 (Persampieri Rep.) ¶¶ 7-8 at A000631-A000632.

Great Lakes region were not using electric arc furnaces at volumes sufficient to make a SSNIP for blast furnace pellets unprofitable.[100]

And *fifth,* Cliffs contends that since Mesabi planned to produce both blast furnace pellets and direct-reduced-grade pellets, the two must be interchangeable. The interchangeability of products, however, is considered from the perspective of the consumer. That a supplier may produce two different products does not mean that consumers view them as ready substitutes for one another. This contention also fails to create a genuine dispute of fact.

### 2. The Great Lakes region is the relevant geographic market.

A relevant geographic market is "the area in which a potential buyer may rationally look for the goods or services he or she seeks."[101] The geographic market is not, however, "comprised of the region in which the seller attempts to sell its product."[102] Instead, the inquiry is "how far [consumers] are willing to travel *to avoid* paying the defendant's monopoly prices."[103] The scope of the relevant geographic market varies depending on the price, durability, and size of the product.[104] In addition, a geographic market is often a "function of cost of transportation."[105] In

---

[100] App. 1, Ex. 9 (Emmott Rep.) ¶¶ 62-63 at A000485; App. 1, Ex. 10 (Zona Rep.) ¶ 40, tbl. 14 at A000560-A000561, A000617.

[101] *Pennsylvania Dental Ass'n v. Med. Serv. Ass'n of Pa.,* 745 F.2d 248, 260 (3d Cir. 1984) (citing *Grinnell Corp.,* 384 U.S. at 575–576).

[102] *Tunis Bros.,* 952 F.2d at 726.

[103] Phillip E. Areeda and Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 550a2 (2024) (emphasis in original).

[104] *Id.*

[105] Herbert Hovenkamp*, Federal Antitrust Policy: The Law of Competition and Its Practice* 118 (6th ed. 2020).

other words, high transportation costs may narrow the scope of the relevant geographic market.[106] At bottom, the relevant geographic market is the area in which a defendant can increase its price without (1) "large numbers of its customers quickly turning to alternative supply sources outside the area," or (2) "producers outside the area quickly flooding the area with substitute products."[107]

As with the relevant product market, courts often employ the hypothetical monopolist test to determine the relevant geographic market. Zona conducted such a hypothetical monopolist test analysis and determined that the Great Lakes region is the relevant geographic market. Zona concluded that, because of the cost of transporting blast furnace pellets, Cliffs could implement a four-dollar price increase without being displaced by suppliers from outside of the region. Zona reached this conclusion by assessing how much it would cost outside suppliers to transport iron ore into the Great Lakes region. For example, the average cost of transporting blast furnace pellets *within* the Great Lakes region was $19.31 per ton.[108] By contrast, the average cost of shipping blast furnace pellets from Brazil to the Great Lakes region was $39.95 per ton, $20.64 more.[109] The cost of transporting blast furnace pellets to the Great Lakes region from eastern Canada was $41.85 per ton, $22.54 more than

---

[106] *See United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 358-359 (1963) ("The factor of inconvenience localizes banking competition as effectively as high transportation costs in other industries."); *Luria Bros. & Co. v. FTC,* 389 F.2d 847, 858-859 (3d Cir. 1968); *Heerwagen v. Clear Channel Commc'ns,* 435 F.3d 219, 228 (2d Cir. 2006).

[107] Hovenkamp, *supra* n.105, at 144.

[108] App. 1, Ex. 14 (Zona Reply Rep.) ¶ 67, tbl. 4 at A000910.

[109] *Id.*

within the Great Lakes region.[110]  In light of these very high transportation costs, the geographic market is appropriately limited to the Great Lakes region.

In response, Cliffs argues that certain customers of blast furnace pellets looked to suppliers outside of the Great Lakes region to source their pellets.  This argument, however, does not create a genuine dispute of material fact.  *First*, Cliffs points to the fact that ArcelorMittal USA, which is based in the Great Lakes Region, purchased some of its blast furnace pellets from ArcelorMittal Mining Canada, a corporate affiliate based in Canada.  Based on these purchases, Cliffs argues that the Great Lakes region is not the relevant geographic market.[111]  Cliffs also relies on comments from a representative of ArcelorMittal USA who "always said that it could supply its mills with iron ore form its own mining operation in Canada" to show that customers considered suppliers outside the Great Lakes region. [112]

Such purchases, however, do not bear on the definition of the relevant geographic market, because the applicable analysis excludes purchases from corporate affiliates.[113]  In other words, purchases from corporate affiliates within vertically integrated steel companies are irrelevant to an assessment of the applicable market.

---

[110] *Id.*

[111] These affiliates included AM Dofasco, ArcelorMittal Long Products Canada, and Cleveland Works. *See* App. 1, Ex. 5 (Zajac 30(b)(6) Dep.) at A000271-A000272, p. 33-39.  Mesabi argues that the evidence to which Cliffs points is hearsay that cannot be presented in a form that would be admissible in evidence.  *See* Fed. R. Civ. P. 56(c)(2).  Because the evidence, even if it were admissible, is insufficient as a matter of law (for the reasons described in the following paragraph), the Court need not address the issue.

[112] App. 1, Ex. 3 (Geissler 30(b)(6) Dep.) at A000148, p. 99.

[113] App. 1, Ex. 10 (Zona Rep.) ¶ 6(b), n.5 at A000545-A000546.

The 2010 and 2023 Merger Guidelines state that while captive supply sales within vertically integrated firms can be considered by courts, those sales need only be considered "to the extent that their inclusion accurately reflects their competitive significance."[114]  Otherwise put, if there is evidence to suggests that a vertically integrated company would respond to price increases by producing additional product so that it could supply buyers other than its own affiliate, then such purchases would bear on the definition of the relevant market.  In the absence of such evidence, however, sales between corporate affiliates are properly excluded.  Here, the record contains no evidence suggesting that ArcelorMittal Canada would respond to a price increase in the Great Lakes region by producing more blast furnace pellets in Canada to ship into the region.  Accordingly, its sales to its own affiliates should be excluded in considering the definition of the geographic market.

*Second*, Cliffs points to four customers that purchased blast furnace pellets from outside the Great Lakes region between 2015 and 2017 from sellers that were not corporate affiliates.  The evidence to which Zona pointed, however, suggests that these purchases – of only 0.02 to 0.04 million tons of iron ore aggregate per year – were sufficiently *de minimis* that they do not call into question the definition of the geographic market.[115]

---

[114] Merger Guidelines (2010), § 5.1, Merger Guidelines (2023) § 4.4.A.  Although the Merger Guidelines promulgated by the Department of Justice "are not binding on the courts, they are often used as persuasive authority."  *Penn State Hershey*, 838 F.3d at 338 n.2.

[115] App. 1, Ex. 10 (Zona Rep.) ¶ 54 at A000568.   Note that Zona's conclusions were for the years of 2017-2019 while Cliffs points to transactions occurring in 2015-2017.  Cliffs does not suggest, however, that the market changed materially from 2015-2017 to 2017-2019.  Cliffs also did not dispute the conclusion that 0.02 to 0.04 was *de minimis*, nor did Cliffs contend

In any event, purchases from outside the geographic region would only show that the geographic market was improperly defined if the prevailing prices in the market were competitive ones.  The point of the hypothetical monopolist test is that if a hypothetical monopolist can impose a SSNIP within a market, then the market is properly defined.  That does not mean that there is *no* price that might lead buyers to consider substitute products or those from other geographical regions.  Otherwise put, "a high cross-elasticity of demand may … be the product of monopoly power rather than a belief on the part of the consumers that the products are good substitutes for one another."[116]  There is always *some* price that may lead consumers to find a substitute from outside the market.  So unless there is reason to believe that the observed prices are competitive ones, the fact that there may be some purchases from outside the market does not necessarily mean that the market is improperly defined.

As Professors Areeda and Hovenkamp explain, "in a perfectly defined market, there is no substitution between those things that are inside the market and those that are outside."  In reality, however, they recognize that "the substitution is simply much less."[117]  By way of example, they explain that the conclusion that bicycles are in a different antitrust market from automobiles does not mean that *no one* would switch to a bicycle in response to an increase in the cost of automobiles.  In reality,

---

that 0.02 to 0.04 was inaccurate.  Cliffs accordingly has not pointed to evidence that gives rise to a genuine dispute of material fact.

[116] *Eastman Kodak Co.,* 63 F.3d at 105.

[117] Areeda and Hovenkamp, *supra* n. 103, ¶ 530a.

"relatively few would switch and … the price increase would have to be large."[118]  That is, in substance, what the summary judgment record shows here with respect to the geographic market.  It is true that there were some small number of customers who purchased from outside the Great Lakes region.  But on the record before the Court, that is insufficient to call into question the conclusion that the geographical market is properly defined.

Cliffs also argues that other customers "considered" sourcing their pellets from outside the Great Lakes region.[119]  That, however, is insufficient to create a genuine issue of fact with respect to the relevant market.  As discussed above, the mere existence of some *de minimis* volume of imports is an insufficient basis to conclude that the market is improperly defined.  It therefore follows *a fortiori* that consumers that considered purchasing from outside the market, but ultimately chose not to do so, is insufficient to show that the market is defined too narrowly.

Additionally, Cliffs contends that the geographic market is too narrow because Mesabi may export its pellets outside the Great Lake region.  The geographic market, however, is "not comprised of the region in which the seller attempts to sell its

---

[118] *Id.*

[119] App. 2, Ex. 34 (AMUSA Update Meeting with Corporate Strategy) at B0718 (slides stating that "IOC and AMMC options being considered for short or long term"); App. 2, Ex. 50 at B0968 (IOCC would be a potential supplier of pellets if U.S. Steel's current supplier went down); App. 2, Ex. 47 (AK Steel's 2017-2019 Iron Ore Supply) at B0958 (AK Steel listed potential bidders that included Cliffs, AMMC, IOCC, Vale, US Steel, and Tube City).

product, but, rather, is comprised of the area where customers would look to buy such a product."[120]

Cliffs also argues that the geographic market is too narrow because Cliffs' local prices depended on global indices. Cliffs contends that its supply contracts used pricing formulas that were tied to global or regional price indices.[121] Because Cliffs represents only a "sliver of global iron ore production," it argues that it could not possibly be a monopolist in the global iron ore industry.[122] The premise of Cliffs' argument is that because its pricing is based on global indices, the applicable market must be a global market. But Cliffs' *actual* pricing does not speak to the applicable test for determining the relevant market, which asks whether a *hypothetical* monopolist would have the ability to impose a SSNIP within a specified market. That test "starts by selecting a narrow candidate market" and does not expand beyond that market where the hypothetical monopolist could profitably implement a SSNIP.[123] As described above, the summary judgment record makes clear that this test is satisfied for the Great Lakes region. Accordingly, Cliffs' *actual* pricing methodology does not bear on the definition of the relevant geographic market.

Finally, Cliffs argues that Mesabi could not use Cliffs' own public statements and internal documents about the geographic market, some of which generally

---

[120] *United States Horticultural Supply v. Scotts Co.,* 367 F. App'x 305, 311 (3d Cir. 2010) (citing *Tunis Bros. Co.,* 952 F.2d at 726).

[121] App. 1, Ex. 5 (Zajac 30(b)(6) Dep.) at A000292, pp. 119–120.

[122] D.I. 890 at 1.

[123] *Hackensack Meridian Health,* 2021 WL 4145062, at *15) (citing *Penn State Hershey,* 838 F.3d at 338).

support Mesabi's contention about market definition, to demonstrate the applicable market for antitrust purposes. Mesabi contends that its economic analysis stands on its own and that Cliffs' statements merely reinforced the results of that analysis. Cliffs' statements need not be considered for this purpose. As described above, Mesabi has demonstrated based on its economic analysis that it is entitled to summary judgment on the question of the definition of the market without regard to Cliffs' statements. Cliffs' responses to Mesabi's analysis do not point to any record evidence that show that any material fact is genuinely disputed. The Court will, however, address the parties' arguments on whether or not to consider Cliffs' statements on summary judgment in Part II.C, in addressing the question whether Cliffs has exercised monopoly power.

### B.    Mesabi is entitled to summary judgment on its claim that Cliffs possessed monopoly power in the relevant market.

Monopoly power is generally defined as the ability to control prices and exclude competition in a given market.[124]  A plaintiff can establish monopoly power through either direct or indirect evidence.  Direct evidence includes a showing of supracompetitive prices and restricted output.[125]  On the other hand, monopoly power may be inferred from indirect evidence regarding the "structure and composition of the relevant market."[126]  To support a claim for monopoly power through indirect

---

[124] *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007).

[125] Direct evidence includes "an analysis of the defendant's costs, showing both that the defendant had an abnormally high price-cost margin and that the defendant restricted output." *Mylan Pharms.*, 838 F.3d at 434 (internal quotations and citations omitted).

[126] *Broadcom,* 501 F.3d at 307.

evidence, a plaintiff must show that (1) the defendants had a dominant share (market power) in the relevant market and (2) there were high barriers to entry into the market that protect the defendants' dominant position.[127]

Mesabi argues that indirect evidence shows that Cliffs enjoyed monopoly power in the relevant market. "Once the relevant . . . market is defined, evidence of [a] dominant market share within that market is a primary, but not [the] sole, determinant of monopoly power."[128]  A market share "significantly larger than 55%" is generally required to establish the defendant's monopoly power.[129]  Zona concluded that Cliffs' market share in non-captive supply blast furnace pellets ranged from 73-78 percent between 2015-2019.[130]  Cliffs does not dispute that analysis.

Mesabi also contends there were high barriers to entry to the blast furnace pellet market in the Great Lakes region.[131]  "Barriers to entry are factors, such as regulatory requirements, high capital costs, or technological obstacles, that prevent new competition from entering a market in response to a monopolist's supracompetitive prices."[132]  Professors Areeda and Hovenkamp suggest considering,

---

[127] *Mylan Pharms.,* 838 F.3d at 435.

[128] *Delaware Health Care Inc. v. MCD Holding Co.,* 957 F. Supp. 535, 541 (D. Del. 1997) (citing *Barr Labs., Inc. v. Abbott Labs.,* 978 F.2d 98, 112 (3d Cir. 1992)).

[129] *Mylan Pharms.,* 838 F.3d at 437 (citing *United States v. Dentsply Int'l, Inc.,* 399 F.3d 181, 187 (3d Cir. 2005)).  *Mylan* further explains that in "the absence of sufficient market share, we have, nonetheless, held that other factors may indicate the presence of monopoly power, including 'size and strength of competing firms, freedom of entry, pricing trends and practices in the industry, ability of consumers to substitute comparable goods, and consumer demand.'" *Id.* (citations omitted)).

[130] App. 1, Ex. 10 (Zona Rep.) ¶ 63, tbl. 3 at A000573, A000570.

[131] D.I. 838 at 27-28.

[132] *Broadcom,* 501 F.3d at 307 (internal citations omitted).

in determining whether a defendant has monopoly power, whether "entry [into the market by a new competitor] is likely to occur, to be effective in maintaining or restoring prices near the competitive level, and to do so in a timely fashion."[133]

Here, the cost and time associated with developing a new iron ore mine and pellet production operation in the Great Lakes region present high barriers to entry. Constructing and operating a mine would far exceed the two-year window described by the 1992 Mergers Guidelines. Indeed, the record evidence suggests that it would likely take up to ten years and more than $1 billion to do so.[134]

Cliffs made several arguments in response to Mesabi's indirect evidence, but none is sufficient to show the existence of a genuine dispute of material fact. *First*, Cliffs argues that a showing of market share alone is not enough to prove monopoly power.[135] While that is correct as far as it goes, Mesabi does not rely exclusively on Cliffs' market share. It also offered evidence of high barriers to entry that, when coupled with a predominant market share, support a claim of monopoly power.

*Second*, Cliffs also argues that it had a high market share due to historically geographic advantages over some of its competitors.[136] It contends that historical

---

[133] Areeda and Hovenkamp, supra n. 103, ¶ 422.

[134] App. 1, Ex. 10 (Zona Rep.) ¶¶ 71-72 at A000577-A000578; App. 1, Ex. 9 (Emmott Rep.) ¶¶ 39-42 at A000474-A000477; App. 1, Ex. 8 (Orszag Dep.) at A000410, p. 35 ("I think it's a fair proposition that there are significant capital expenditures that need to be made to … build a mine and … start production in … the [Great Lakes region]."). Note that the 2010 Guidelines have taken a less prescriptive view of the relevant time window. *See* 2010 Merger Guidelines ("the impact of entrants in the relevant market be rapid enough that customers are not significantly harmed by the merger"). Under either approach, however, the time and expense involved in developing an iron ore mine would constitute a substantial barrier to entry.

[135] D.I. 890 at 28.

[136] *Id.*; App. 1, Ex. 45 at A001837.

market shares are unreliable indicators of market power in markets with long-term contracts, such as the steel industry.  Cliffs cites no authority in support of that proposition.  And as a matter of ordinary logic, the fact that long-term contracts are customary in a particular market may well operate as a barrier to entry (making it more difficult for a new entrant to obtain a foothold).  In the absence of evidence of budding competition that appears likely to emerge over time (none of which Cliffs points to in the existing summary judgment record), there is no reason why long-term contracts would render a defendant's substantial market share an unreliable indicator of monopoly power.

*Finally*, Cliffs argues that Mesabi was incorrect to disregard sales to captive suppliers when assessing Cliffs' market share.[137]  To that end, the Merger Guidelines recommend that captive supply sales be considered by courts only "to the extent that their inclusion accurately reflects their competitive significance."[138]  As Professors Areeda and Hovenkamp explain, such captive supply sales are properly considered when there is reason to believe that the integrated firm would expand its production to supply others in competition with the defendant.[139]

Nothing in the record here suggests that the captive suppliers stood ready to compete with Cliffs for sales to consumers that were not their own affiliates.  To the contrary, Zona's analysis showed that the overall market shares of captive suppliers

---

[137] D.I. 891 at 91-92.

[138] Merger Guidelines (2010), § 5.1; Merger Guidelines (2023) § 4.4.A.

[139] Areeda and Hovenkamp, *supra* n. 103, ¶ 535.

in the Great Lakes region was less than 12 percent of the market and such sales to non-affiliated purchasers were *de minimis*.[140]  Cliffs points to no evidence to suggest that such captive suppliers had a material effect on competition in the applicable market.

It also bears note that Mesabi argues that direct evidence shows that Cliffs had monopoly power in the relevant market and was thus able to charge supracompetitive prices.   In view of the conclusion above, that Mesabi has demonstrated its entitlement to summary judgment based on the indirect evidence, the Court need not reach this issue.

> **C.    Cliffs is not entitled to summary judgment on the claim that it did not engage in exclusionary conduct, cause antitrust injury, or cause damages to Mesabi.**

Cliffs moves for summary judgment, contending that the record makes plain that (1) it did not engage in exclusionary conduct, (2) Mesabi has not suffered antitrust injury, and (3) Mesabi cannot demonstrate damages.  Because the record shows the existence of genuine issues of material fact as to each of these points, the Court denies the motion.

> **1.    Cliffs has failed to establish that its conduct, viewed holistically, was not exclusionary.**

Cliffs argues that Mesabi's antitrust claims under §§ 1 and 2 of the Sherman Act and the comparable Minnesota statute fail because Mesabi cannot prove the existence of anticompetitive agreements or exclusionary conduct.  The existence of

---

[140] App. 1, Ex. 10 (Zona Rep.) ¶ 68, tbl. 4 at A000575-A000576.

anticompetitive agreements or exclusionary conduct is an element of each of the antitrust claims at issue.  It bears on the second element under § 2 of the Sherman Act for monopolization.  There, the plaintiff must show "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."[141]  A demonstration of anticompetitive conduct is also what must be shown to establish the first element on an attempt to monopolize under § 2 of the Sherman Act.[142]  And finally, an anticompetitive agreement bears on the requirement for an agreement among competitors under § 1 of the Sherman Act.[143]

"Anticompetitive conduct may take a variety of forms, but it is generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits."[144]  Parts II.A and II.B of this Memorandum Opinion explain why the Court is granting partial summary judgment in Mesabi's favor on its claim that Cliffs had monopoly power.  But it has long been settled law that there is nothing at all wrong with *having* monopoly power.  Such power may be obtained through "superior skill, superior products [or] natural advantages."[145]  "The mere possession of monopoly power, and the concomitant charging of monopoly

---

[141] *Queen City Pizza,* 124 F.3d at 437 (citations omitted).

[142] *Lifewatch Servs. Inc. v. Highmark Inc.,* 902 F.3d 323, 331 (3d Cir. 2018).

[143] *Philadelphia Taxi,* 886 F.3d at 339 (internal citations omitted).

[144] *Broadcom*, 501 F.3d at 308 (citing *LePage's Inc. v. 3M*, 324 F.3d 141, 147 (3d Cir. 2003)).

[145] *United States v. United Shoe Machinery Corp.*, 110 F. Supp. 295, 342 (D. Mass. 1953).  *See also Grinnell*, 384 U.S. at 570-571 (monopoly power may be obtained "as a consequence of a superior product, business acumen, or historic accident").

prices, is not only not unlawful; it is an important element of the free-market system."[146] It "induces risk taking that produces innovation and economic growth."[147] Having such power "will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*."[148]

Broadly put, "conduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive."[149]   A practice that "deters potential rivals from entering the monopolist's market, or existing rivals from increasing their output in response to the monopolist's price increase," is an exclusionary one.[150]   By contrast, "conduct that merely harms competitors, however, while not harming the competitive process itself, is not anticompetitive."[151]   "It is axiomatic that the antitrust laws were passed for 'the protection of *competition,* not *competitors.*'"[152]   In considering the evidence, it is important to bear this last point in mind.   Federal antitrust law does not require business competitors to treat one another with kindness.   Case law recognizes that it is a rough and tumble world out there.   So long as the conduct in question does not impair competition, federal courts are not to impose liability on a defendant for engaging in sharp business practices or behaving like a bully.

---

[146] *Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).

[147] *Id.*

[148] *Id.* (emphasis in original).

[149] *Broadcom*, 501 F.3d at 308 (citing *Aspen Skiing*, 472 U.S. at 604–605).

[150] Hovenkamp, *supra* n. 105, at 351.

[151] *Broadcom*, 501 F.3d at 308 (citations omitted).

[152] *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 224 (1993).

Moreover, if the conduct in question is motivated by a legitimate business reason, rather than a desire to harm competition, then it does not violate the antitrust laws.[153] Cliffs is seeking summary judgment on this basis.

Mesabi's complaint alleges three categories of conduct by Cliffs that it contends are anticompetitive: (1) the ten-year pellet sale and purchase agreement that Cliffs entered into with ArcelorMittal in October 2016; (2) Cliffs' refusal to work with certain contractors if they continued to work with Mesabi; and (3) Cliffs' December 2017 land transaction with Glacier Park.

Cliffs moves for summary judgment on each separate agreement and action, asking the Court to consider each in isolation. That, however, is an improper standard for the Court to consider anticompetitive conduct. As the Supreme Court clarified in *Continental Ore Co. v. Union Carbide & Carbon Corp.*, courts must look to an alleged monopolist's conduct taken as a whole, rather than considering each aspect in isolation. There, the Court stated that "in a case like the one before us [alleging § 1 and § 2 violations], the duty of the jury was to look at the whole picture and not merely at the individual figures in it."[154]

Cliffs responds that the "holistic" analysis may not be used to circumvent the application of a particular test that would otherwise apply and not be satisfied. As Cliffs puts it, "five wrong claims do not make a right one."[155] That is true as far as it

---

[153] *Mylan Pharms.*, 838 F.3d at 438.

[154] *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (citations omitted). *See also Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, No. 22-2168, 2024 WL 3642432, at *12 (4th Cir. Aug. 5, 2024).

[155] D.I. 1069 at 2 (internal citations omitted).

goes.    A plaintiff's failure to satisfy an applicable legal standard cannot be circumvented by lumping it with a series of otherwise separate actions that also fail to meet the relevant standard in the hope that a jury might conclude that, viewed "holistically," the defendant's conduct was anticompetitive.    But that does not mean that where a plaintiff is challenging a *series* of actions as anticompetitive, a defendant is entitled to disaggregate its actions, insisting that each one be viewed separately, rather than *in its context*.    Where a defendant with monopoly power engages in a series of actions that stifle competition, it is no defense to an antitrust challenge to say that no *single* act, viewed in isolation, would not have had that effect.

In this case, some of the challenged conduct is subject to a particular test.    For example, in the context of exclusive contracts, courts have developed a test that asks whether the defendant's conduct operated to foreclose the plaintiff from access to the relevant market.[156]    Cliffs contends that the same test applies to its alleged interference with Mesabi's contractors.    Even accepting, for the purposes of this motion, that the test is applicable to that conduct, it would still be the case that one would ask the question whether the interference with contractors *viewed holistically* operated to foreclose competition in the relevant market.    A defendant may not divide-and-conquer by saying that no *single* act of interference with a contractor, in and of itself, could have operated to foreclose the plaintiff from accessing the relevant market.

---

[156] *See, e.g., Dentsply,* 399 F.3d at 191.

*Long-term contracts.* The first alleged anticompetitive agreement or exclusionary action was Cliffs' 2016 pellet sale and purchase agreement with ArcelorMittal's U.S.-based subsidiary, to which both parties refer as "AMUSA."[157] During the relevant time frame, AMUSA was one of the three largest purchasers of blast furnace pellets in the Great Lakes region.[158] AMUSA entered into a ten-year supply agreement contract with Mesabi in 2014, in which AMUSA was to purchase approximately 3.5 million dry metric tons of pellets from Mesabi, plus an additional 500,000 to 1 million tons of pellets.[159] This contract would supply some of the needs of only one of AMUSA's blast furnaces.[160] At that time, Cliffs was also supplying part of, but not all, the pellets for AMUSA at that same blast furnace.[161]

By May 2016, AMUSA terminated the contract due to Mesabi's failure to perform under the terms of the agreement.[162] After this termination, Cliffs signed a ten-year supply agreement with AMUSA.[163] Mesabi argues that it needed the AMUSA contract in order for its project to be viable. Mesabi further contends that Cliffs was aware of this when it entered into the ten-year agreement with AMUSA.[164]

---

[157] App. 5, Ex. 421 (ArcelorMittal Annual Report 2022) at B012307; App. 5, Ex. 414 (ArcelorMittal Annual Report 2015) at B010935; App. 5, Ex. 420 (ArcelorMittal Annual Report 2019) at B012159.

[158] App. 5, Ex. 44 (Zona Rep.) tbl. 4 at B002762.

[159] App. 5, Ex. 77 at B005053, B005059-B005060, B005067-B005068.

[160] *Id.*

[161] App. 5, Ex. 52 at B003331.

[162] App. 4, Ex. 84 at A002917.

[163] App. 4, Ex. 25 at A000274-A000304.

[164] App. 5, Ex. 125 at B005552; App. 5, Ex. 88 at B005274; App. 5, Ex. 57 at B003396; App. 5, Ex. 296 at B007205; App. 5, Ex. 26 (Goncalves Dep.) at B001564, p. 136.

Mesabi argues that the length of the contract, and its minimum purchase requirements, made the Cliffs-AMUSA agreement anticompetitive. According to Mesabi, the contract operated as a *de facto* exclusive agreement.

Before entering into the ten-year agreement, AMUSA and Cliffs had a two-year contract to supply blast furnace pellets until Mesabi completed its project.[165] When the parties were negotiating a new contract in 2016, AMUSA sought a short-term deal but Cliffs refused.[166] In addition to the duration of the contract, the 2016 agreement also contained a "take or pay" provision that required AMUSA "to purchase at least 7 million tons per year from Cliffs."[167] Mesabi argues that that requirement was substantially higher than any of the prior contracts between AMUSA and Cliffs.[168] The contract also provided Cliffs the right of first refusal to sell AMUSA blast furnace pellets in excess of 10 million gross tons.[169] Mesabi contends that these provisions operated to guarantee that no other supplier could sell to AMUSA besides Cliffs.

As noted above, one test that courts will employ to assess whether conduct is anticompetitive is whether the conduct operates substantially to foreclose a competitor from the market. There, "the test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the

---

[165] App. 5, Ex. 26 (Goncalves Dep.) at B001553, pp. 90-91.

[166] App. 5, Ex. 149 at B005862.

[167] App. 5, Ex. 26 (Goncalves Dep.) at B001571, pp. 163-164.

[168] App. 5, Ex. 145 at B005808; App. 5, Ex. 181 at B006083, B006088.

[169] App. 5, Ex. 26 (Goncalves Dep.) at B001594, p. 255.

market's ambit."[170]  In other words, "substantial foreclosure allows the dominant firm to prevent potential rivals from ever reaching 'the critical level necessary' to pose a real threat to the defendant's business."[171]  "It has been recognized, albeit in a somewhat different context, that even the foreclosure of 'one significant competitor' from the market may lead to higher prices and reduced output."[172]

The Third Circuit has held that "the primary antitrust concern with exclusive dealing arrangements is that they may be used by a monopolist to strengthen its position, which may ultimately harm competition."[173]  And while "long exclusive dealing contracts are not *per se* unlawful, '[t]he significance of any particular contract duration is a function of both the number of such contracts and market share covered by the exclusive-dealing contracts.'"[174]  Here, not only was Cliffs in such a long-term supply agreement with AMUSA, but it also was in similar long-term supply contracts with two other large blast furnace purchasers in the Great Lakes region.[175]  Cliffs was thus in contracts with the three largest customers in the region and those three contracts accounted for 80 percent of all non-captive blast furnace sales in the Great Lakes region from 2017 to 2019.[176]  Under these circumstances, whether the long-

---

[170] *Dentsply,* 399 F.3d at 191 (citing *LePage's*, 324 F.3d at 159-160).

[171] *ZF Meritor, LLC v. Eaton Corp.,* 696 F.3d 254, 286 (3d Cir. 2012).

[172] *LePage's,* 324 F.3d at 159 (quoting *Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 394 (7th Cir. 1984).

[173] *ZF Meritor,* 696 F.3d at 270.

[174] *Id.* at 287 (citing *Dentsply*, 399 F.3d at 191).

[175] App. 5, Ex. 26 (Goncalves Dep.) at B001538, p. 31 ("we had a long-term contract to supply, one, Arcelor – I'm talking size – one, ArcelorMittal; two, AK Steel; and, three, 308 Algoma").

[176] App. 5, Ex. 44 (Zona Rep.) tbl. 4 at B002762; *id.* tbl. 3 at B002757; App. 5, Ex. 185 at B006139-B006140; App. 5, Ex. 79 at B005150; App. 5, Ex. 143 at B005768-B005769; App. 5,

term contract so interfered with Mesabi's access to the market is a genuinely disputed question of material fact, which precludes the entry of summary judgment on the question whether Cliffs exercised monopoly power.

*Interference with contractors.*  The second complained of actions dealt with three separate contractors, each of which did business with both Cliffs and Mesabi. In each case, it is alleged that Cliffs threatened to terminate its relationship with the contractor unless the contractor stopped doing business with Mesabi.  These contractors were Jamar Company, Barr Engineering, and the Environmental Law Group.[177]  Contractors such as these are important to designing and constructing an iron ore mine and pellet production facility.[178]  Cliffs, of course, was a significant client for contractors in this region who worked on mining projects.  As such, the possibility that a contractor might lose Cliffs as a customer would certainly be cause for concern.[179]

Jamar is a specialty-services contractor.  It was performing the piping, insulation, and mechanical work for Mesabi's blast furnace pellet processing plant.[180] In 2016, Cliffs learned that Mesabi asked some of its contractors to sign a letter of

---

Ex. 278 at B007074-B007075; App. 5, Ex. 428 at B013135; App. 5, Ex. 62 at B003656-B003657.

[177] Jamar Company is referred to as "Jamar."  Barr Engineering is referred to as "Barr."

[178] App. 5, Ex. 43 (Emmott Rep.) ¶ 186 at B002706; App. 5, Ex. 47 (Lambert Rep.) ¶ 117 at B003063; App. 5, Ex. 205 at B006375; App. 5, Ex. 395 (Cliffs Annual Report 2017) at B009820.

[179] App. 5, Ex. 32 (Fedor Dep.) at B001899, pp. 147-148; App. 5, Ex. 232 at B006484; App. 5, Ex. 20 (Greenhouse 30(b)(6) Dep.) at B001283, pp. 42-43; App. 5, Ex. 21 (Hefner 30(b)(6) Dep.) at B001297, pp. 18-20.

[180] App. 5, Ex. 37 (Vuppuluri 30(b)(6) Dep.) at B002160, pp. 62-63.

support to the governor of Minnesota regarding Mesabi's project.[181]    Cliffs then contacted Jamar, with whom it had an existing relationship, stating that it would have ongoing opportunities for Jamar as long as Jamar did not support Mesabi.[182] Jamar abided by Cliffs' request and refused to work on Mesabi's project for the following year.[183]  But later, Cliffs found out that Jamar had signed a letter of support for Mesabi's restructuring efforts and plans.[184]  Cliffs allegedly sought to "shut down" all contractors that signed that letter by no longer soliciting bids for future work from them.[185]  Within a matter of months, Cliffs not only stopped soliciting new business from Jamar but also refused to let Jamar continue to work on its ongoing projects.[186] Once Jamar stopped supporting Mesabi, however, Cliffs restored the parties' business relationship.[187]

Barr is a consulting company that provides engineering and environmental consulting services.    Barr had been providing professional engineering and environmental services to Mesabi since the 1990s.[188]    In addition to several

---

[181] App. 5, Ex. 172 at B006001-B006002; App. 5, Ex. 167 at B005984.

[182] App. 5, Ex. 170 at B005995; App. 5, Ex. 178 at B006039; App. 5, Ex. 224 at B006463.

[183] App. 5, Ex. 224 at B006463.

[184] App. 5, Ex. 187 at B006170-B006173; App. 5, Ex. 186 at B006167-B006168.

[185] App. 5, Ex. 189 at B006177; App. 5, Ex. 199 at B006333.

[186] App. 5, Ex. 220 at B006432; App. 5, Ex. 222 at B006456.

[187] App. 5, Ex. 19 (Fellman 30(b)(6) Dep.) at B001230, pp. 107-108 (noting that Jamar received a call from Cliffs saying it had "made a mistake, had bad information [a]nd that the … ban was lifted"); App. 5, Ex. 231 at B006482 ("Based on recent development, the Jamar situation has changed.  Effective immediately, you are able to include them in the bidding process for upcoming requirements…").

[188] App. 5, Ex. 379 (Barr Website) at B009729; App. 5, Ex. 210 at B006403; App. 5, Ex. 235 at B006492; App. 5, Ex. 12 (Bigelow Dep.) at B000683, pp. 298-299.

engineering projects, Barr assisted Mesabi with environmental permit applications and compliance.[189]  Prior to August 2017, Barr had worked for both Mesabi and Cliffs for several years.[190]  And during that time, Barr used separate teams for Cliffs' and Mesabi's projects.[191]  Then, in May 2017, Cliffs instructed its employees to stop soliciting work from Barr due to Barr's continued support of Mesabi.[192]  The next month, Barr discovered that Cliffs had "officially black-listed" it based on its involvement in Mesabi's project.[193]  After learning that it might not be able to work for Cliffs because of its work with Mesabi, Barr contacted Cliffs to attempt to be reinstated. [194]  Work from Cliffs was important to Barr because Barr had "succeeded by building and sustaining a long-term relationships with clients such as Cliffs, with Cliffs bringing in approximately $4.5 - 6 million in revenue in 2017 and 2018 respectively."[195]  After Barr contacted Cliffs, Cliffs then explained that it would resume work with Barr if Barr completed the work currently under contract with

---

[189] App. 5, Ex 31 (Sutherland 30(b)(6) Dep.) at B001835-B001836, pp. 203-205; *id*. at B001844-B001845, pp. 240-241.

[190] App. 5, Ex. 76 at B005044; App. 5, Ex. 155 at B005889; App. 5, Ex. 37 (Vuppuluri 30(b)(6) Dep.) at B002152, p. 32; App. 5, Ex. 7 (Quist 30(b)(6) Dep.) at B000395, p. 31.

[191] App. 5, Ex. 9 (Ziemba 30(b)(6) Dep.) at B000454, p. 18; App. 5, Ex. 184 at B006132.

[192] App. 5, Ex. 217 at B006424.

[193] App. 5, Ex. 229 at B006478 ("We have information, that based on our decision to write a letter of intent for the [Project], it has some significant implications to our future work for Cliffs … But to cut to the chase. Cliffs purchasing department has been instructed to not issue Barr any new work orders. We will be trying to determine if this decision is reversible pending actions by us."); App. 5, Ex. 245 at B006573 ("I also talked with Jesse – he said that Barr is officially black-listed. … He said it is because of the [Mesabi] deal…").

[194] App. 5, Ex. 236 at B006498.

[195] App. 5, Ex. 53 at B003345; App. 5, Ex. 7 (Quist 30(b)(6) Dep.) at B000409, pp. 87-88.

Mesabi and did not proceed forward with any other assignments.[196]  In an August 2017 letter, Barr informed Mesabi of its decision to terminate their relationship.[197]

Barr recognized this decision could "have serious implications" for the viability of Mesabi's project, including Mesabi's ability to obtain financing.[198]  Indeed, drawing inferences in favor of the nonmoving party, the record would in fact support the conclusion that Barr played an important role in Mesabi's efforts to obtain financing, such as interacting with potential sources of capital in regard to their due diligence.[199]  The record would therefore permit the conclusion that Barr's resignation harmed Mesabi's efforts to obtain financing from potential sources of capital such as Bank of America and GSO.[200]  There is evidence suggesting that Mesabi also relied on the premise that Barr would be involved in the project in order to negotiate leases with the State of Minnesota.[201]  And the record would support a finding that Barr's departure played a role in Mesabi missing deadlines set in those negotiations, which delayed Mesabi's emergence from bankruptcy and further prejudiced its ability to secure funding.[202]

---

[196] App. 5, Ex. 9 (Ziemba 30(b)(6) Dep.) at B000457, p. 30.

[197] App. 5, Ex. 258 at B006645.

[198] App. 5, Ex. 54 at B003347.

[199] App. 5, Ex. 37 (Vuppuluri 30(b)(6) Dep.) at B002153, B002181, B002183-B002184, pp. 33, 145, 156-159; App. 5, Ex. 405 (Fennessey Decl.) ¶ 5 at B010889.

[200] App. 5, Ex. 37 (Vuppuluri 30(b)(6) Dep.) at B002181, p. 147; App. 5, Ex. 405 (Fennessey Decl.) ¶ 5 at B010889.

[201] App. 5, Ex. 221 at B006435-6438; App. 5, Ex. 12 (Bigelow Dep.) at B000686, B000688, pp. 311, 320.

[202] App. 5, Ex. 12 (Bigelow Dep.) at B000686, B000688-B000689, pp. 311, 320-321; *see also* App. 5, Ex. 16 (Clarke Dep.) at B000983-B000984, pp. 196-197; App. 5, Ex. 400 (Supplemental Order Implementing Settlement with State of Minnesota) at B010858-B010859; App. 5, Ex.

Beginning in 2010, Environmental Law Group was Mesabi's legal counsel, consulting Mesabi on numerous environmental law issues and assisting Mesabi with environmental permits.[203]  Environmental Law Group represented Cliffs at the same time.[204]  During that time frame, both parties waived any potential conflict relating to the dual representation.[205]  But in May 2017, Cliffs raised concerns with the firm about a conflict, which resulted in Environmental Law Group resigning from its representation of Mesabi effective June 1, 2017.[206]  A former Environmental Law Group lawyer, who was designated to testify as the firm's corporate representative, said that the decision to resign from representation of Mesabi was not in fact based on a conflict, but was instead due to Cliffs no longer being comfortable with the firm representing Mesabi.[207]  The Cliffs' employee, who raised the issue of a conflict, could not recall during his deposition the supposed conflict or any change that gave rise to such a conflict.[208]

*Glacier Park Leases.*  Finally, the third alleged anticompetitive agreement or exclusionary conduct was Cliffs' purchase of property rights from Glacier Park.  Prior to Cliffs acquiring these property rights, Mesabi held the mineral leases for the

---

401 (Second Supplemental Order Implementing Settlement with State of Minnesota) at B010861-B010864; App. 5, Ex. 362 (Amendment to Agreement with State of Minnesota) at B009169.

[203] App. 5, Ex. 37 (Vuppuluri 30(b)(6) Dep.) at B002156, p. 46.

[204] App. 5, Ex. 21 (Hefner 30(b)(6) Dep.) at B001296, p. 16

[205] App. 5, Ex. 215 at B006415.

[206] *Id.*; App. 5, Ex. 212 at B006408; App. 5, Ex. 214 at B006412-B006413.

[207] App. 5, Ex. 21 (Hefner 30(b)(6) Dep.) at B001309, pp. 65-66.

[208] App. 5, Ex. 11 (Cartella Dep.) at B000594, pp. 203-204.

Glacier Park property.[209]    The Glacier Park property consisted of large non-contiguous, asymmetric bundles of individual 40-acre land parcels known as "forties."[210]   Mesabi's project encompassed over 100 forties, with 30 forties making up the area where Mesabi holds permits to mine.[211]   Mesabi contends that the Glacier Park property sits in the center of those forties and thus Mesabi's project site.[212]   After Mesabi filed for bankruptcy, Chippewa, Glacier Park, and Mesabi entered into a settlement under which Mesabi would assume the Glacier Park mineral leases only if its plan of reorganization became effective on or before October 31, 2017.[213]   Mesabi argues that Chippewa was in active negotiations with Glacier Park when Cliffs acquired the property in November 2017.   Glacier Park and Chippewa began working on amending and restating the leases in October 2017 as well as discussing amending the October 31, 2017 deadline for the plan becoming effective that was set forth in the settlement agreement.[214]   Even when Mesabi's plan did not go effective by that deadline, Glacier Park and Chippewa continued to negotiate amendments to the

---

[209] App. 5, Ex. 305 at B007244.

[210] App. 5, Ex. 43 (Emmott Rep.) ¶¶ 96, 100 at B002682, B002683.

[211] Id. ¶ 97 at B002682.

[212] App. 5, Ex. 55 at B003352; App. 5, Ex. 43 (Emmott Rep.) ¶ 98 at B002682.

[213] App. 5, Ex. 262 at B006893; App. 5, Ex. 174 at B006012.

[214] App. 5, Ex. 277 at B007066-B007068; App. 5, Ex 279 at B007102-B007103.

settlement agreement.[215]  Chippewa contends that it believed it had an agreement in principle with Glacier Park as late as December 2017.[216]

Cliffs, however, ultimately stepped in to acquire the mineral rights, beginning negotiations and consummating a transaction in November 2017.[217]  Mesabi argues that the reason Cliffs acquired those parcels of land was to undermine the economic viability of its project.[218]  Mesabi contends that by acquiring the property, Cliffs reduced Mesabi's access to millions of tons of iron ore reverses, thereby diminishing the value of the project by 70 percent.[219]  This acquisition also made it inefficient for Mesabi to mine the portions of parcels that it still controlled because the property Cliffs acquired disrupted the mine plan's flow, which resulted in increased operating costs.[220]  In response to Cliffs' Glacier Park transaction, Mesabi had to create a new mine plan and engage a consultant to identify the remaining ore that was economically mineable, both of which were costly and time consuming.[221]  Moreover,

---

[215] App. 5, Ex. 292 at B007190-B007191.

[216] App. 5, Ex. 298 at B007216; App. 5, Ex. 404 (Oram Decl.) ¶ 12 at B010886; App. 5, Ex. 300 at B007225-B007226; App. 5, Ex. 405 (Fennessey Decl.) ¶ 10 at B010890; App. 5, Ex. 302 at B007233- B007234.

[217] App. 4, Ex. 27 at A000308.

[218] App. 5, Ex. 55 at B003352; App. 5, Ex. 43 (Emmott Rep.) ¶ 98 at B002682.

[219] App. 5, Ex. 42 (Davis Rep.) tbl. 4 at B002485; App. 5, Ex. 359 at B008763; App. 5, Ex. 37 (Vuppuluri 30(b)(6) Dep.) at B002149-B002150, B002166-B002166, pp. 20-24, 84-87.

[220] App. 5, Ex. 24 (Everett 30(b)(6) Dep.) at B001441, B001447, B001452, pp. 58-59, 81, 102-105.

[221] App. 5, Ex. 37 (Vuppuluri 30(b)(6) Dep.) at B002182, pp. 149-150; App. 5, Ex. 24 (Everett 30(b)(6) Dep.) at B001441, pp. 59-60; App. 5, Ex. 15 (Everett Dep.) at B000931, pp. 358-359.

Mesabi asserts that Cliffs' acquisition of the leases caused difficulties in Mesabi presenting itself as a viable entity to potential providers of capital.[222]

\* \* \*

Cliffs argues that its interference with contractors is irrelevant because, as long as Mesabi was able to find an alternative contractor (as it ultimately was), it was not "foreclosed from the market" within the meaning of the applicable caselaw.[223] The alleged antitrust violation, however, is not that Cliffs' conduct harmed competition for *contractors*. The question is whether the conduct harmed competition in the relevant market, which is the market for blast furnace iron ore pellets in the Great Lakes region. And to be sure, Mesabi will be required at trial to show a causal relationship between Cliffs' allegedly anticompetitive conduct and its failure to complete its project and bring a competing product to market. Cliffs will certainly be able to come forward with evidence that would support a conclusion that it did not. That is a matter to be decided at trial. For present purposes, the relevant point is that Mesabi's ability ultimately to hire an alternative contractor does not establish that it was not "foreclosed from the market" under applicable law.

Additionally, regardless of whether the applicable standard requires that the challenged conduct foreclosed Mesabi's access to the market, or (as for conduct for which no specific test is applicable) requires that the conduct in question had an

---

[222] App. 5, Ex. 37 (Vuppuluri 30(b)(6) Dep.) at B002166, pp. 84-87; App. 5, Ex. 34 (Fennessey 30(b)(6) Dep.) at B001988, pp. 97-98; App. 5, Ex. 43 (Emmott Rep.) ¶¶ 180-181 at B002704; App. 5, Ex. 42 (Davis Rep.) ¶ 55 at B002480-B002481.

[223] *See, e.g., Mylan Pharms.*, 838 F.3d at 438.

anticompetitive effect, the principle of *Continental* still applies.[224]  Accordingly, in applying the applicable legal standard to the conduct in question, one must view the challenged conduct holistically, rather than viewing any particular act as if it occurred in isolation.

Here, there is sufficient evidence that permits a reasonable juror to conclude that Cliffs' conduct was anticompetitive.  Acquiring key mining property and entering into a long-term exclusive supply agreement with one of the largest customers in the region, coupled with pressuring critical contractors working on Mesabi's project to terminate their relationships with Mesabi, could substantially foreclose Mesabi from the market and exclude competition.  Likewise, while Cliffs contends it did not acquire the Glacier Park leases in order to preclude competition from Mesabi, there is sufficient evidence in the summary judgment record to permit the conclusion that Cliffs did not acquire the leases to obtain access to iron ore, but instead to prevent Mesabi from completing its project.  For the purpose of this motion, it does not matter whether the applicable standard requires a determination that the defendant's conduct foreclosed the plaintiff from the relevant market or instead asks more generally whether the defendant's conduct had anti-competitive effects.  Either way, Mesabi has pointed to sufficient record evidence that would permit a reasonable factfinder to conclude that the standard has been satisfied.

---

[224] *Continental Ore Co.*, 370 U.S. at 699.

"Even if a company exerts monopoly power, it may defend its practices by establishing a business justification."[225]  Here, because there is sufficient evidence that permits a reasonable juror to conclude that Cliffs' conduct was anticompetitive, the burden shifts to Cliffs to show "nonpretextual procompetitive justifications for its conduct."[226]

Cliffs offers justifications for each of the three categories of alleged anticompetitive agreements or exclusionary conduct.  *First,* Cliffs claims that the legitimate business justification for its agreement with AMUSA was to stave off its own bankruptcy.[227]  In support of this contention, Cliffs relies only on comments from its CEO, Lourenco Goncalves, and the fact that its stock traded as low as $1.14 per share on January 12, 2016.[228]  As Mesabi pointed out, Cliffs cited no internal analysis supporting that contention.  And Goncalves (perhaps unsurprisingly) asserted at the time that the company did not face financial distress.[229]

Cliffs also argues that it competed with others to obtain AMUSA's contract and that AMUSA regarded the contractual price as "better than the market."[230]  Cliffs contends that AMUSA saw a ten-year contract as "the best economical contract at

---

[225] *Dentsply*, 399 F.3d at 196.

[226] *Mylan Pharms.,* 838 F.3d at 438 (internal citations and quotations omitted).

[227] App. 4, Ex. 4 (Goncalves Dep.) at A000043, A000044-A000045, pp. 33, 93-94.

[228] *See id.; see also* App. 4, Ex. 142 (Historical Data, Price History, Cleveland-Cliffs Inc., New York Stock Exchange: CLF, https://www.clevelandcliffs.com/investors/stock-info/historical-data (last accessed Nov. 10, 2023)) at A005185-A005190.

[229] App. 5, Ex. 26 (Goncalves Dep.) at B001553, pp. 93-94.

[230] App. 4, Ex. 18 (Geissler 30(b)(6) Dep.) at A000198-A000199, pp. 239-240.

that point in time."[231]  In response, Mesabi points to evidence showing not only that AMUSA wanted to purchase pellets from suppliers other than Cliffs but also that AMUSA requested a shorter term deal for the Cliffs' contract.[232]  In addition, Cliffs contends that a ten-year supply agreement was an industry standard.  Cliffs argues that long-term contracts provide security for the miners and consistency for the steelmakers.[233]  Further, Cliffs asserts that the industry norm was supported by the fact that Mesabi's agreement with AMUSA was also for a ten-year duration.  Mesabi, however, offers evidence of several blast furnace supply agreements within the Great Lakes region that were for shorter duration, such as one to three-year terms.[234]  Mesabi's contract with AMUSA was also for a much smaller volume of pellets and as such covered only a portion of AMUSA's overall demand.[235]  Moreover, Mesabi argues that Cliffs cannot take refuge in industry norms because "a monopolist is not free to take certain actions that a company in a competitive (or even oligopolistic) market may take."[236]  Overall, the evidence to which Mesabi points is sufficient to create a

---

[231] *Id.* at A000201, p. 258.

[232] App. 5, Ex. 97 at B005312; App. 5, Ex. 149 at B005862.

[233] App. 4, Ex. 7 (Zajac 30(b)(6) Dep.) at A000066-A000067, pp. 91-92.

[234] App. 5, Ex. 341 at B007629; App. 5, Ex. 146 at B005818; App. 5, Ex. 67 at B004006; App. 5, Ex. 68 at B004040; App. 5, Ex. 163 at B005962.

[235] App. 5, Ex. 185 at B006140 (Cliffs' contract with AMUSA was for 7 million gross tons of blast furnace pellets, right of first refusal for a total of 10 million gross tons); App. 5, Ex. 77 at B005059-B005060 (Mesabi's contract with AMUSA was for 3.5 million dry metric tons of pellets from Mesabi, plus an additional 500,000 to 1 million tons of pellets).

[236] *LePage's*, 324 F.3d at 151-152; *Ultronics, Inc. v. Cox Cable of San Diego, Inc.*, No. 88CV1718K, 1991 WL 1302931, at *6 (S.D. Cal. May 29, 1991) (rejecting justification that long-term contract was industry standard because testimony showed "defendants were seeking to 'push plaintiff out of the market,'" which was "alone sufficient to cast doubt" on purpose of defendants' contracts).

genuine dispute of fact as to whether Cliffs' justification for the AMUSA contract is pretextual.

*Second,* Cliffs claims that it had legitimate business justifications for its challenged actions regarding each of the three contractors.  Cliffs argues that its legitimate business justification for requesting that Jamar terminate its work with Mesabi was because Cliffs did not want Mesabi to benefit from working with a contractor that Cliffs had "invested significant time and money to develop sensitive, state-of-the-art projects."[237]  Cliffs contends that its legitimate business justification for asking Barr to terminate its work with Mesabi was the same as that with Jamar; Cliffs did not want Mesabi to gain any advantage from Barr due to Cliffs' investment in Barr.[238]  In relation to all three contractors, Cliffs contends that it did not want Mesabi to "free-ride on Cliffs' investment by securing that knowledge, directly or indirectly."[239]

Mesabi, however, presents evidence that Cliffs' reasons for influencing the contractors were not actually about confidentiality.  Rather, Mesabi argues that Cliffs' actions were intended to interfere with Mesabi's ability to compete.  As discussed earlier, Mesabi showed that Barr, for example, had mechanisms to guard against sharing any sensitive Cliffs' information.  Barr had separate teams working

---

[237] D.I. 837 at 34.

[238] *Id.*

[239] *Id.*

on Cliffs' and Mesabi's matters.    Moreover, it was common practice for Cliffs' contractors to sign non-disclosure agreements.

As for Environmental Law Group, Cliffs argues that its legitimate business justification for requesting that the firm terminate its work with Mesabi was an alleged conflict.    As discussed earlier, however, Mesabi points to the testimony of a former Environmental Law Group lawyer.    That lawyer explained that the firm's resignation from its representation of Mesabi was not in fact based on a conflict. Instead, the lawyer said that Cliffs had simply concluded that it was no longer comfortable with the firm representing Mesabi.[240]    The Cliffs' employee who raised the issue of a conflict could not recall during his deposition the nature of any formal legal conflict or identify any change that had given rise to such a conflict.[241]    The firm had represented both Cliffs and Mesabi for some time and both parties had waived any potential conflict relating to the dual representation.[242]    The Environmental Law Group also represented other entities in the mining industry concurrently with Cliffs, such as AMUSA.    Cliffs raised no conflict issues with that dual representation.[243]

At bottom, Mesabi argues that Cliffs' scheme to target service providers working for Mesabi denied Mesabi critical support for is project.    Mesabi cites several courts that have considered a defendant's refusal to work with contractors due to the

---

[240] App. 5, Ex. 21 (Hefner 30(b)(6) Dep.) at B001309, pp. 65-66.

[241] App. 5, Ex. 11 (Cartella Dep.) at B000594, pp. 203-204.

[242] App. 5, Ex. 21 (Hefner 30(b)(6) Dep.) at B001296, p. 16; App. 5, Ex. 215 at B006415-B006416.

[243] App. 5, Ex. 21 (Hefner 30(b)(6) Dep.) at B001297, B001298, pp. 17, 22.

contractors' relationship with a competitor to be anticompetitive conduct.[244]  Overall, Mesabi presents sufficient evidence that creates a genuine dispute of fact as to whether Cliffs' justifications for its challenged actions regarding the contractors was pretextual.

And *third,* Cliffs claims that the legitimate business justification for the Glacier Park transaction was its interest in acquiring that property so that it could avail itself of certain state mineral leases.  Cliffs argues that it had a long-standing interest in the availability and use of the Glacier Park property as a source of ore to support its production facility.[245]  Before Mesabi lost the agreement with Glacier Park, Cliffs approached the State of Minnesota about opportunities to obtain the state leases that were then held by Mesabi in the event that those leases were to become available.[246]  Cliffs contends that it took particular interest in the Glacier Park property when it learned that those state leases could become available to Cliffs so long as it owned or leased property with ore adjacent to the state ore, which was a condition that the Glacier Park property satisfied.[247]

In response, Mesabi argues that Cliffs had never studied the property in the form it was to be acquired – the non-contiguous parcels in the middle of Mesabi's mine site.  In other words, Mesabi contends that Cliffs never even considered whether

---

[244] *United States v. Microsoft Corp.,* 253 F.3d 34, 77-78 (D.C. Cir. 2001); *Lorain Journal Co. v. United States*, 342 U.S. 143, 148 (1951).

[245] App. 4, Ex. 6 (Johnson (30)(b)(6) Dep.) at A000060, p. 49; App. 4, Ex. 140 (Holihan Dec.) ¶ 28 at A005128; App. 4, Ex. 29 at A000322-A000327; App. 4, Ex. 36 at A000395-A000396.

[246] App. 4, Ex. 29 at A000322-A000327.

[247] *Id.*

the to-be-acquired Glacier Park property could be mined economically without the rights to the surrounding property, which Mesabi then owned.[248]  Mesabi also points to evidence that Cliffs rushed the Glacier Park transaction to the point of not receiving or reviewing reports and data about the property, including information about the total iron ore reserves available.[249]  Cliffs claims that the justification for the Glacier Park transaction was to set itself up to obtain the state leases.  But Cliffs could only get those leases if the state terminated Mesabi's ownership of them.[250]  Mesabi offers additional evidence that Cliffs analyzed how the Glacier Park transaction would impair or block Mesabi's ability to mine.[251]  The evidence Mesabi presents is sufficient to create a genuine dispute of fact as to whether Cliffs' justification for the Glacier Park transaction was pretextual.

In addition, Cliffs' own statements about its conduct may shed light on the veracity of its stated justifications.  For example, Cliffs concluded that if it could obtain a deal for the state mineral leases and a contract with AMUSA, Mesabi's "project [would] not [be] viable as a stand-alone."[252]  An internal slide presentation

---

[248] App. 5, Ex. 5 (Dunsmoor Dep.) at B000331, pp. 222-224; App. 5, Ex. 23 (Johnson 30(b)(6) Dep.) at B001387, p. 64; App. 5, Ex. 43 (Emmott Rep.) ¶ 106 at B002686.

[249] *Id.* ¶¶ 115–120 at B002688–B002689; App. 5, Ex. 309 at B007257; App. 5, Ex. 297 at B007211; App. 5, Ex. 290 at B007184.

[250] App. 5, Ex. 392 at B009809-B009810.

[251] App. 5, Ex. 350 at B008676.

[252] App. 5, Ex. 26 (Goncalves Dep.) at B001590, p. 240; App. 5, Ex. 125 at B005552 (Cartella wrote, "If Dayton cooperates and we get this deal – we will have the foothold we need and we can start firing grenades to sink them." Goncalves replied, "I agree, David. Thanks."); App. 5, Ex. 11 (Cartella Dep.) at B000563, p. 80 ("Q. You're talking about sinking [Mesabi], right? A. Yeah, to accomplish the goal of getting – acquiring our interest in the overall property."); App. 5, Ex. 125 at B005552 (Cartella wrote, "Add in a commercial deal with Mittal and it should be game over." Goncalves replied, "I agree, David. Thanks."); App. 5, Ex. 26 (Goncalves

suggested that a goal of Cliffs' was to "create concern about the viability of the project in the eyes of investors and customers" and "delay continuation of construction and commencement of operation."[253]  Once Cliffs obtained the list of contractors working with Mesabi, its employee stated that "here is the list . . . [p]rior to shutting them down can you look up each supplier so I can see where and how much business we do with each of them?  Once I'm ready I'll give you the go ahead to shut them down."[254] Here, shutting the contractors down meant that Cliffs would no longer solicit bids or work with them.

As for the Glacier Park transaction, Cliffs' CEO stated that "I own a patchwork of land inside [Mesabi's] network site. They cannot mine that site without a deal with Cleveland-Cliffs."[255]  Owning the Glacier Park property gave Cliffs "control of mine lands [and gave] Cliffs leverage and influence over the ability of their competitors to execute their plans" and permit Cliffs to "restrict[] existing competitors and potential new entrants."[256]  These statements certainly provide a basis from which a reasonable juror could conclude that Cliffs' stated bases for its actions were pretextual, and that

---

Dep.) at B001590, p. 240 ("And as soon as they tried to submit this to real investors, people would say, are you kidding me?" Q. "[Y]ou're saying real investors would look at the property split and not be willing to invest? A. They would not have enough ore, enough years of mining.").

[253] App. 5, Ex. 430 at B013150.

[254] App. 5, Ex. 189 at B006177.

[255] App. 5, Ex. 378 (Dec. 2, 2020 State of Minnesota Meeting of the Executive Council Transcript) at B009692.

[256] App. 5, Ex. 74 at B004490; App. 5, Ex. 114 at B005484.

its actual intent was to harm Mesabi's ability to compete.  Cliffs' motion for summary judgment on this basis must therefore be denied.

### 2. Cliffs has failed to show that its conduct did not cause antitrust injury.

A plaintiff in an antitrust case must establish that the challenged conduct caused a particular type of injury.  It is insufficient for a plaintiff to prove merely that its own economic condition would have been better in the absence of the defendant's anticompetitive conduct.[257]  Rather, the plaintiff must allege an injury that is of "the type the antitrust laws were intended to prevent" and that flows from the kind of conduct that makes the defendant's acts unlawful.[258]  This inquiry involves identifying the alleged anticompetitive conduct and determining whether that conduct injured consumers or competition in general.[259]  And as already discussed, courts must look at the conduct "as a whole rather than considering each aspect in isolation" to determine whether the conduct is anticompetitive.[260]  From there, the alleged injury must be "attributable to an anti-competitive aspect of the practice under scrutiny."[261]  As such, courts must "examine the causal connection between the

---

[257] *Philadelphia Taxi,* 886 F.3d at 343 (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477 (1977)).

[258] *Id.; Alberta Gas Chems. Ltd. v. E.I. du Pont de Nemours and Co.,* 826 F.2d 1235, 1240 (3d Cir. 1987) (explaining that to establish antitrust injury, "plaintiffs must prove more than harm causally linked to an illegal presence in the market").

[259] *See Philadelphia Taxi*, 886 F.3d at 344; *see also id.* at 339 ("[a]llegations of purportedly anticompetitive conduct are meritless if those acts would cause no deleterious effect on competition").

[260] *LePage's,* 324 F.3d at 162 (citing *Continental*, 370 U.S. at 699); *see also Philadelphia Taxi*, 886 F.3d at 339.

[261]*Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990); *West Penn Allegheny Health Sys. v. UPMC,* 627 F.3d 85, 101 (3d Cir. 2010).

purportedly unlawful conduct and the injury" claimed to the market and consumers.[262]

Here, there is sufficient evidence from which a reasonably jury could find that Mesabi suffered the type of injury that antitrust law is intended to prevent. Mesabi argues that it suffered an antitrust injury because Cliffs excluded Mesabi from the market. And by excluding Mesabi from the market, Cliffs deprived customers of the increased output and lower prices that Mesabi might have brought to the market.[263]

Cliffs argues that the three categories of its alleged anticompetitive agreements or exclusionary conduct did not cause Mesabi any antitrust injury. *First,* Cliffs argues that it did not cause Mesabi to suffer an antitrust injury due to its contract with AMUSA because Mesabi lost its contract with AMUSA after not being able to fulfill its obligations. Cliffs contends that even if it had not entered into the contract with AMUSA, Mesabi still would be in the same position today because Mesabi would have lost its AMUSA contract anyway.[264] Mesabi, however, argues that Cliffs' *de facto* exclusive agreement with AMUSA foreclosed a substantial share of the blast furnace pellet market that otherwise could have been available for rivals, including Mesabi. Mesabi points to evidence that AMUSA was one of the largest blast furnace pellets customers in the Great Lakes region and that Cliffs' contract with AMUSA amounted to approximately 40 percent of blast furnace pellet sales in the

---

[262] *Lifewatch Servs. Inc.*, 902 F.3d at 342 (quoting *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 265 (3d Cir. 1998)).

[263] D.I. 894 at 59.

[264] D.I. 837 at 39-41.

Great Lakes region from 2017 to 2019.[265]  Mesabi also sets forth evidence that Cliffs was the only supplier in the region that could have met all of AMUSA's blast furnace pellet demands.[266]  So, Mesabi argues, in the absence of Cliffs' contract with AMUSA, the terms of the contract with a different supplier would likely have been for a smaller portion of AMUSA's demand, giving Mesabi an opportunity to supply some of AMUSA's needs.  In addition, Mesabi presents evidence that having customer contracts was critical to obtaining financing.[267]  And Mesabi argues that by preventing Mesabi from signing with AMUSA, Cliffs ensured that investors and lenders were less likely to finance Mesabi's project.[268]

*Second,* Cliffs argues that its interactions with contractors did not cause Mesabi antitrust injury because it did not prevent or delay Mesabi's entry into the market.[269]  Cliffs contends that influencing Jamar's departure from working for Mesabi was not anticompetitive because Jamar eventually resumed working with Mesabi.[270]

Cliffs further contends that Barr's departure did not restrict Mesabi's access to engineering resources because Mesabi was also using another contractor, Kiewit,

---

[265] App. 5, Ex. 185 at B006139-B006140; App. 5, Ex. 44 (Zona Rep.) tbl. 4 at B002762.

[266] App. 5, Ex. 154 at B005887.

[267] App. 5, Ex. 26 (Goncalves Dep.) at B001539, p. 36.

[268] App. 5, Ex. 88 at B005274; App. 5, Ex. 57 at B003396; App. 5, Ex. 125 at B005552.

[269] D.I. 837 at 41-42.

[270] App. 4, Ex. 76 at A002629-A002672; App. 4, Ex. 52 at A000584; App. 4, Ex. 9 (Robb Bigelow Dep.) at A000090-A000091, pp. 426-427.

at the time.[271]  Cliffs argues that Mesabi promptly replaced Barr and thus did not suffer delay nor did Barr's departure cause Mesabi to fail to complete its project.  In response, Mesabi offers evidence that its timeline for emerging from bankruptcy and for starting and completing construction on its project was indeed delayed due to Barr's resignation.[272]  And as discussed above, there is certainly some evidence to support the claim that Barr's resignation harmed Mesabi's efforts to obtain financing from Bank of America and GSO because Barr interacted with potential bankers who were conducting due diligence.[273]  Similarly, there is evidence to suggest that Barr's departure played a role in causing Mesabi to miss deadlines set by the State of Minnesota.[274]  There is also evidence in the summary judgment record to suggest that missing those deadlines ultimately delayed Mesabi's emergence from bankruptcy and its ability to secure funding.[275]

Additionally, while Mesabi employed Kiewit in addition to Barr, Mesabi argues that no other contractor obtained the deep knowledge of Mesabi's project nor was more qualified for the project than Barr.[276]  Despite Kiewit's capabilities, Mesabi argues that Kiewit did not possess the same knowledge of Mesabi's project, of

---

[271] App. 4, Ex. 93 at A003072.

[272] App. 5, Ex. 37 (Vuppuluri 30(b)(6) Dep.) at B002152, pp. 31-32.

[273] Id. at B002181, p. 147; App. 5, Ex. 405 (Fennessey Decl.) ¶ 5 at B010889.

[274] App. 5, Ex. 221 at B006435-B006438; App. 5, Ex. 12 (Bigelow Dep.) at B000686, B000688, pp. 311, 320.

[275] Id.; App. 5, Ex. 16 (Clarke Dep.) at B000983-B000984, pp. 196-197.

[276] App. 5, Ex. 235 at B006492; App. 5, Ex. 12 (Bigelow Dep.) at B000686-B000687, B000690, pp. 312-313, 325; App. 5, Ex. 34 (Fennessey 30(b)(6) Dep.) at B002012, pp. 195-196; App. 5, Ex. 31 (Sutherland 30(b)(6) Dep.) at B001838, p. 216.

74

northern Minnesota's construction conditions, or of state and local regulations, all of which were necessary for the project.[277]  Not only did Kiewit have to start from scratch, but its cost estimate for its engineering services was more expensive than Barr's.[278]

Finally, Cliffs contends that the Environmental Law Group's departure presented no antitrust injury since Mesabi retained different environmental legal counsel within one week and Environmental Law Group allegedly finished its outstanding work for Mesabi before withdrawing.[279]  As with Barr, Cliffs argues that losing the firm did not negatively affect Mesabi because Mesabi quickly acquired new legal counsel.  Mesabi, however, contends that Environmental Law Group's seven years of institutional knowledge could not adequately be replaced.[280]

And *third,* Cliffs contends that it did not cause Mesabi to suffer an antitrust injury in relation to the Glacier Park transaction because Mesabi lost its contract with Glacier Park before Cliffs became involved with Glacier Park.[281]  Moreover, Cliffs argues that because Mesabi was able to develop a new mine plan for its project without the Glacier Park property, Cliffs' conduct was not anticompetitive.[282]

---

[277] D.I. 894 at 47.

[278] App. 5, Ex. 404 (Oram Decl.) ¶ 8 at B010885; App. 5, Ex. 285 at B007127, B007130, B007132, B007138; App. 5, Ex. 257 at B006643.

[279] App. 4, Ex. 120 at A004707.

[280] App. 5, Ex. 37 (Vuppuluri 30(b)(6) Dep.) at B002156-B002157, pp. 46, 50.

[281] D.I. 837 at 38-39.

[282] *Id.* at 37-39.

In response, Mesabi points to evidence showing that it suffered cost and delay in developing a new plan. As discussed earlier, Cliffs' acquisition reduced Mesabi's available iron ore reserves by 70 percent, which decreased the value of the project.[283] Mesabi needed to mine around Cliffs' newly acquired parcels, which resulted in inefficiencies that led to increased operating costs.[284] Developing a new plan not only took several years for Mesabi to complete but was also costly.[285] Mesabi contends that Cliffs' Glacier Park transaction also made it difficult for Mesabi to obtain financing.[286] And Mesabi further blames Cliffs' interference (including the AMUSA contract and the alleged meddling with contractors) for the fact that it failed to meet the deadline to emerge from bankruptcy and assume the Glacier Park leases.[287]

In essence, each of Cliffs' arguments centers on its contention that Mesabi's injuries might well have been caused by something other than Cliffs' conduct. And while a jury might ultimately reach that conclusion, Mesabi is correct in responding that to survive summary judgment it only needs to show a genuine dispute of fact about whether Cliffs' conduct was a material cause of Mesabi's injury. It need not

---

[283] App. 5, Ex. 42 (Davis Rep.) tbl. 4 at B002485; App. 5, Ex. 359 at B008763; App. 5, Ex. 37 (Vuppuluri 30(b)(6) Dep.) at B002149-B002150, B002166, pp. 20-24, 84-87.

[284] App. 5, Ex. 24 (Everett 30(b)(6) Dep.) at B001441, B001447, B001452, pp. 58-59, 81, 83-84, 102-105.

[285] *Id.* at B001441, pp. 59-60; App. 5, Ex. 15 (Everett Dep.) at B000931, pp. 358-359; App. 5, Ex. 37 (Vuppuluri 30(b)(6) Dep.) at B002182, pp. 149-150; App. 5, Ex. 321 at B007389; App. 5, Ex. 34 (Fennessey 30(b)(6) Dep.) at B001986, pp. 91-92.

[286] App. 5, Ex. 37 (Vuppuluri 30(b)(6) Dep.) at B002166, pp. 84-87; App. 5, Ex. 34 (Fennessey 30(b)(6) Dep.) at B001988, pp. 97-98; App. 5, Ex. 43 (Emmott Rep.) ¶¶ 180-181 at B002704; App. 5, Ex. 42 (Davis Rep.) ¶ 55 at B002480-B002481.

[287] D.I. 894 at 64.

prove that Cliffs' conduct was the sole cause.[288]    Viewing all of Cliffs' conduct collectively, Mesabi has pointed to sufficient evidence to permit a reasonable jury to conclude that Cliffs' conduct was a material cause of Mesabi's inability to enter the market and thus that Mesabi has suffered antitrust injury.    Cliffs' motion for summary judgment on this basis must therefore be denied.

### 3.    Cliffs has failed to show that Mesabi has not suffered damages as a result of the challenged conduct.

Once the plaintiff has proven the fact of an antitrust injury, it must then "make a showing regarding the amount of damages."[289] And to recover damages, the plaintiff must prove at least a "reasonable estimate" of the amount of the damages that is "not the product of speculation or guess work."[290]

Cliffs argues that even if Mesabi were able to prove both anticompetitive conduct and antitrust injury, it is still entitled to summary judgment because Mesabi cannot prove damages.    Cliffs contends that Mesabi's exclusive reliance on its expert, Davis, is not enough to establish damages.[291]

The Court does not find it necessary, however, to rely on Davis' conclusions in order to resolve this motion.    At the summary judgment stage, the plaintiff's burden to overcome summary judgment on damages is a light one.    A jury is ultimately

---

[288] *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.,* 395 U.S. 100, 114 n.9 (1969) ("plaintiff need not exhaust all possible alternative sources of injury" to prove injury); *American Bearing Co. v. Litton Indus., Inc.,* 729 F.2d 943, 952 (3d Cir. 1984).

[289] *Rossi v. Standard Roofing, Inc.,* 156 F.3d 452, 484 (3d Cir. 1998) (emphasis in original).

[290] *Id.* (quoting *In re Lower Lake Erie Iron Ore Antitrust Litig.,* 998 F.2d 1144, 1176 (3d Cir. 1993)).

[291] D.I. 837 at 46-49.

required to quantify damages with specificity, though caselaw makes clear that a "reasonable estimate" is sufficient so long as it is not "the product of speculation or guess work."[292]  At the summary judgment stage, a plaintiff need not demonstrate the specific amount of its damages, so long as it shows that a reasonable factfinder could conclude, from the evidence in the summary judgment record, that the plaintiff did in fact sustain an injury.[293]  Part II.C.2 of this Memorandum Opinion canvasses the evidence that would support a finding that Cliffs' alleged exclusionary actions caused Mesabi an antitrust injury.  That same body of evidence is more than sufficient to permit a conclusion that Mesabi sustained *some* damages.  To overcome Cliffs' motion for summary judgment on this point, that is all that is required.

## III.   The motions for summary judgment on the state-law tort claims will be granted in part and denied in part.

In addition to the antitrust claims, the parties have asserted three categories of state law claims against one another.  *First,* Mesabi asserts claims against Cliffs for tortious interference with contract and tortious interference with prospective business advantage.  *Second*, Cliffs asserts claims against Mesabi and Chippewa for tortious interference and the aiding and abetting thereof.  And *third*, both parties assert civil conspiracy claims against one another.  The parties defending against

---

[292] *In re Lower Lake Erie,* 998 F.2d at 1176.

[293] *See generally Jarvis v. A&M Records,* 827 F. Supp. 282, 296 (D. N.J. 1993) (denying summary judgment on ground that defendant had not established damages because, despite the court's rejection of the plaintiff's damages model, the damages still "do not amount to nothing.")

each of these claims have moved for summary judgment. Those motions will be granted in part and denied in part, as described below.

>    **A.    Cliffs is entitled to summary judgment on Mesabi's claim of tortious interference with contract, but only partial summary judgment on Mesabi's claim of tortious interference with business relationships.**

Mesabi asserts two claims for tortious interference against Cliffs in its complaint: tortious interference with contract and tortious interference with a prospective business relationship. The parties agree that these claims are governed by Minnesota law. Cliffs moves for summary judgment on these claims, arguing that Mesabi's claims fail for three reasons. *First*, Cliffs argues that it did not procure any actual breaches of contract, which is an element of the first claim. *Second*, Cliffs argues that Mesabi has no evidence to support the elements of a tortious interference with prospective business relationships claim. And *third*, Cliffs contends that under both claims, the actions that Mesabi says count as "interference" were lawful competition.

>    **1.    The absence of evidence of an actual breach of contract is fatal to Mesabi's claim of tortious interference with contract.**

As a leading treatise on tort law explains, the "law of interference with contract is … one part of a larger body of tort law aimed at protection of relationships, some economic and some personal."[294] When this tort first emerged, the cases "laid emphasis upon the existence of the contract, as something in the nature of a property

---

[294] W. Page Keeton, *Prosser and Keeton on Torts* § 129 (5th ed. 1984).

interest in the plaintiff."[295]  Thereafter, however, "the law has extended the principle to interference with advantageous economic relations even where they have not been cemented by contract."[296]

Minnesota law is in accord.  Under Minnesota law, to establish a claim of tortious interference with contract, the plaintiff must establish (1) the existence of a contract, (2) the defendant's knowledge of the contract, (3) that the defendant intentionally procured a breach of that contract, (4) that the defendant acted without justification, and (5) that the plaintiff suffered damages as a result of the breach.[297]

Consistent with the expansion of tort law to recognize the value of business relationships that are not memorialized in an enforceable contract, however, Minnesota law also recognizes a claim for interfering with a business relationship. To establish that claim, the plaintiff must show (1) the existence of a reasonable expectation of economic advantage, (2) the defendant's knowledge of the economic advantage, (3) that the defendant intentionally interfered with plaintiff's reasonable expectation of economic advantage, and the intentional interference is either independently tortious or in violation of a state or federal statute or regulation, (4) that in the absence of the wrongful act of the defendant, it is reasonably probable that

---

[295] *Id.*

[296] *Id.*

[297] *Furlev Sales & Assocs., Inc. v. N. Amer. Automotive Warehouse, Inc.,* 325 N.W.2d 20, 25 (Minn. 1982); *A & L Labs., Inc. v. Bou-Matic, LLC,* No. Civ. 02-4862, 2003 WL 21005305, at *3 (D. Minn. Apr. 25, 2003) (citing *Kallok v. Medtronic, Inc.,* 573 N.W.2d 356, 361 (Minn. 1998)).

plaintiff would have realized his economic advantage or benefit, and (5) that plaintiff sustained damages.[298]

The existence of a contract therefore does make a difference.  In the absence of a contract, the plaintiff must show (as part of the third element) not only that the defendant's action was intentional but *also* that the actions were "either independently tortious or in violation of a state or federal statute or regulation."  That showing of a separate wrong is not required where the plaintiff's relationship with which the defendant interfered had been memorialized in a contract.

Where there *is* a contract, however, the parties here apparently disagree on whether the defendant's conduct must cause the counterparty to breach the contract. As far as the record goes, while Mesabi points to contracts with which Cliffs allegedly interfered (including the Jamar, Barr, and Environmental Law Group contracts described above), there is no evidence suggesting that Cliffs induced a counterparty actually to breach a contract.  And the Minnesota Supreme Court, whose construction of Minnesota state law is of course definitive, has suggested that such a breach *is* required.  The third element of the claim, as that court has explained it, is that a "[defendant] intentionally procured a breach of contract."[299]  Some number of federal cases construing Minnesota law, however, have suggested otherwise, indicating that "an explicit breach of contract is not required" and that "any act injuring or destroying

---

[298] *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014).

[299] *See Furlev Sales*, 325 N.W.2d at 25.  *See also Hortonville Joint School Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 488 (1976) (federal courts are "bound to accept the interpretation of [state] law by the highest court of the State").

81

persons or property which … makes more difficult or prevents performance, or makes performance of a contract of less value to the promisee" will support a claim.[300]

Cliffs has the better of the argument on the construction of Minnesota law. The Minnesota Supreme Court has been clear that an element of the claim is that the defendant "procure a breach" of the contract.  None of the federal cases construing Minnesota law, on which Mesabi relies, adequately addresses those clear statements. To the extent Minnesota law recognizes a claim for actions that make the "performance of a contract of less value to the promisee," it does so under the tort of tortious interference with business relationships, which is the claim addressed below.[301]  The Court will accordingly grant Cliffs' motion for summary judgment on Mesabi's claim for tortious interference with contract.

---

[300] *Central Specialties, Inc. v. Large*, 18 F.4th 989, 998 (8th Cir. 2021) (internal quotations and citations omitted); *see also A&L Labs.*, 2003 WL 21005305, at *3; *N. PCS Servs., LLC v. Sprint Nextel Corp.*, No. 05-2744, 2007 WL 951546 (D. Minn. Mar. 27, 2007) (finding proof of actual breach is not necessary to establish a tortious interference claim); *U.S. Power, Inc. v. Siemens Power Transmission & Distrib., L.L.C.*, No. 02-525, 2006 WL 1876686, at *2 (D. Minn. July 5, 2006) ("actual breach of contract is not required for a tortious interference claim"); *Telluride Asset Mgmt. LLC,* No. 04-4862, 2005 WL 1719204, at *2 (D. Minn. July 11, 2005) ("an actual breach, however, is not required for a tortious interference claim to exist.").

[301] The Eighth Circuit decision in *Central Specialties*, for example, cited to the Minnesota Supreme Court's decision in *Royal Realty Co. v. Levin*, 69 N.W.2d 667, 671 (1955), for the proposition that a breach of contract was not required.  But that portion of *Royal Realty* was describing the tort of interference with business relationships, not tortious interference with contract).  *See Central Specialties*, 18 F.4th at 998.

In addition, a Minnesota federal district court construed the Minnesota Supreme Court's requirement that the defendant "procure" a breach of contract to include an *effort* by the defendant to induce a breach of contract, adopting a broad (if a bit archaic) construction of the word "procure" to mean not only "obtain" but also to "devise" or to "plot."  *See A&L Labs.,* 2003 WL 5105305, at *3.  Even that broader definition of "procure," however, would make no difference here, as Mesabi points to no evidence in the record of Cliffs seeking to induce a counterparty to breach a contract with Mesabi.

    **2.**    **For essentially the same reasons that Mesabi's antitrust claims survive summary judgment, so too do its claims that Cliffs tortiously interfered with certain business relationships.**

As described above, Minnesota law does recognize a claim for tortious interference with business relationships, which does not require the plaintiff to show an actual breach of contract.  Rather, to establish such a claim, a plaintiff must demonstrate (1) the existence of a reasonable expectation of economic advantage, (2) the defendant's knowledge of the economic advantage, (3) that the defendant intentionally interfered with plaintiff's reasonable expectation of economic advantage, and the intentional interference is either independently tortious or in violation of a state or federal statute or regulation, (4) that in the absence of the wrongful act of the defendant, it is reasonably probable that plaintiff would have realized his economic advantage or benefit, and (5) that plaintiff sustained damages.[302]

*Element 3 – intentional interference with economic advantage that is independently wrongful.*  As described above, Mesabi points to specific business relationships, such as those with the Environmental Law Group, Barr, Jamar, AMUSA, and Glacier Park, for which there is evidence that would permit a factfinder to conclude that Cliffs had interfered.  Because Cliffs did not induce a counterparty to breach its contract with Mesabi, that "interference" would not be tortious in the absence of a violation of some other statute.  But for the same reasons the Court

---

[302] *Gieseke*, 844 N.W.2d 210.

concluded that Mesabi's antitrust claims survive summary judgment, so do its claims for tortious interference with business relationships.

Cliffs also identifies several other entities as to which, it argues, the summary judgment record would not support a finding of tortious interference with a business relationship.[303] As to these entities, Mesabi's response to the tortious interference claims points to no evidence of such interference.[304] Cliffs is accordingly entitled to partial summary judgment on the claims that it tortiously interfered with Mesabi's business relationships with these entities.

*Element 5 – damages.* Cliffs also argues that Mesabi's tortious interference claim fails because Mesabi cannot show proof of damages from the loss of the business relationships. Under the fifth prong of the tortious interference claim, Mesabi "must establish wrongful, intentional conduct that affected specific relationships."[305] There, expectancy of future economic advantages through business relationships with unidentified third parties and the hope that past customers may choose to buy again

---

[303] The entities in question are the State of Minnesota; Superior Mineral Resources; Amptek Electric; A.W. Kuettel and Sons; Hammerlund Construction, Inc.; JK Mechanical Contractors, Inc.; Lakehead Constructors, Inc.; Midrex Technologies, Inc.; Northern Industrial Erectors, Inc.; North States Crane & Hoist; and Parsons Electric. It bears note that as to the State of Minnesota, while Mesabi's opposition to summary judgment [D.I. 894] makes no mention of it in the section of the brief responding to the contention that Cliffs is entitled to summary judgment on the claim of tortious interference, the statement of facts does mention Cliffs' dealings with the State of Minnesota (pp. 6, 22-23, 56). Even including those factual statements, however, the brief does not identify a material fact that would support a claim for tortious interference. Accordingly, the Court need not address Cliffs' arguments that its interactions with the State of Minnesota are protected by the *Noerr-Pennington* doctrine.

[304] D.I. 894 at 71-75.

[305] *R&A Small Engine, Inc. v. Midwest Stihl, Inc.,* No. 06-877, 2006 WL 3758292, at *4 (D. Minn. Dec. 20, 2006) (citation omitted).

is insufficient.[306]  General damages to the plaintiff's reputation as a business is also insufficient.[307]  And allegations of the "mere loss of unspecified business does not suffice to establish interference with business advantage."[308]

As with the antitrust claim discussed in Part II.C.3, for a plaintiff to survive summary judgment with respect to a claim as to which damages is an element, the summary judgment record only needs to be sufficient to permit a jury to find that the plaintiff suffered *some* damages.  So if the jury were otherwise to conclude, for example, that Cliffs tortiously interfered with one or more of the contractor relationships, it would follow as a matter of ordinary common sense that Mesabi would have had to incur *some* incremental cost to replace the lost contractor.  Because such an inference may be drawn from the evidence in the summary judgment record, Cliffs' motion for summary judgment on this point will be denied.  Once a showing of *some* injury is made, the precise quantification of damages is then left to the jury to decide.  Such precise quantification is not necessary to overcome summary judgment.

That said, it bears note that the evidence to which Mesabi points with respect to the damages it suffered as a result of the alleged tortious interference is quite general.  For example, Mesabi argues in opposition to Cliffs' motion that the tortious interference with certain relationships was "an integral part of its overall scheme to monopolize," and points to the Davis report as providing evidence of the damages.

---

[306] *Gieseke*, 844 N.W.2d at 221-222 (citations omitted).

[307] *Id.*

[308] *R&A Small Engine,* 2006 WL 3758292, at *4 (internal quotations and citations omitted).

The methodology used by Davis, however (even if the district court determines that the report is a sufficient "fit" for the evidence on the antitrust claim) does not purport to focus on the injury caused by the alleged tortious interference. Accordingly, while the record is sufficient to permit a conclusion that Mesabi suffered *some* damages as a result of the alleged tortious interference with business relationships, quantification of those damages will require more specific evidence of those damages.

*Lawful competition defense.* Cliffs' final argument on this claim is that none of the actions in question can amount to tortious interference with business relationships because they all protected under the doctrine of lawful competition. Under this doctrine, "a competitor who intentionally causes a third person not to enter into a prospective contractual relation with the defendant's competitor does not *tortiously* interfere (i) if the relation concerns a matter involved in the competition, (ii) the defendant 'does not employ wrongful means' or unlawfully restrain trade, and (iii) 'his purpose is at least in part to advance his interest in competing with the other.'"[309] That principle, however, cannot assist Cliffs on the claim for tortious interference with business relationships, since the third element of the claim in any event requires Mesabi to establish that Cliffs had otherwise engaged in wrongful conduct. Accordingly, the defense of lawful competition will necessarily be unavailable in any circumstance in which Mesabi is able to establish such a claim.

---

[309] *Eller v. Nat'l Football League Players Ass'n*, 731 F.3d 752, 759 (8th Cir. 2013) (emphasis in original) (citing *United Wild Rice,* 313 N.W.2d at 633).

\* \* \*

It may well turn out that this claim for tortious interference with business relationships is wholly academic. In view of the Court's entry of summary judgment on Mesabi's claim of tortious interference with contract, and that fact that prevailing on its antitrust claim is a necessary element of Mesabi's claim for tortious interference with business relationships, the tort claim may turn out to be a redundancy. If the antitrust claims fail at trial, so too must the tort claim. And if the antitrust claims succeed, the tort claim provides no liability for actions for which Cliffs would not already be liable on the antitrust claims. That said, while it may turn out to be of little or no practical consequence, for the reasons described above, the Court will deny Cliffs' motion for summary judgment on Mesabi's claim for tortious interference with business relationships with respect to those entities for which Mesabi has identified evidence of interference. The Court will grant the motion with respect to those entities with respect to which Mesabi has not identified such evidence.

### B.    Mesabi and Chippewa are entitled to summary judgment on Cliffs' counterclaims for tortious interference and aiding and abetting tortious interference with business relationships.

Cliffs asserts a counterclaim against Mesabi and Chippewa that, in some ways, mirrors the claim that Mesabi has brought against it. Mesabi argues that Cliffs tortiously interfered with its relationship with Glacier Park when Cliffs acquired the Glacier Park leases. In this count, Cliffs contends that Mesabi and Chippewa interfered with its relationship with Superior when Mesabi acquired the Superior leases.

87

The broader context for this dispute is also further described above as part of the case's procedural history. Before the bankruptcy filing, Mesabi (then known as Essar Steel Minnesota LLC) leased mineral rights from Glacier Park. Some of the rights leased from Glacier Park were on property in which Glacier Park held a 50 percent interest, the other 50 percent interest being held by another company, Superior.[310]  In addition to its lease with Glacier Park, Mesabi held a lease to Superior's interest in the mineral rights.[311]

During the bankruptcy case, Mesabi reached an agreement with both Glacier Park and Superior that would have entitled it to assume those leases had its plan of reorganization become effective by October 31, 2017.[312]  If not, the leases would be deemed rejected. When the deadline passed without the plan becoming effective, Cliffs acquired the Glacier Park leases. Mesabi responded to that action by, among other things, amending its complaint to accuse Glacier Park of violating the antitrust laws by leasing its land to Cliffs.

While Cliffs also expressed an interest in acquiring Superior's rights, Superior ultimately entered into an agreement with Mesabi under which Mesabi would obtain the Superior leases.[313]  Cliffs' counterclaim alleges that Mesabi and Chippewa tortiously interfered with its business relationships by blocking its efforts to acquire

---

[310] Superior Mineral Resources, LLC is referred to as "Superior." *See* App. 7, Ex. 1 (Dunsmoor Dep.) at A000044, p. 171.

[311] *Id.* at p. 172.

[312] App. 4, Ex. 46 at A000522.

[313] App. 7, Ex. 35 at A002127-A002130; App. 7, Ex. 39 at A002157; App. 7, Ex. 33 at A002119.

the Superior leases.  Specifically, Cliffs says that Mesabi threatened Superior with frivolous litigation in order to chill Superior's interest in negotiating with Cliffs.[314]

Mesabi contends that Cliffs' tortious interference claim fails for four reasons: (1) that Cliffs never had a reasonable expectation of entering into an agreement with Superior; (2) that Mesabi never threatened Superior with any litigation, let alone frivolous litigation, as it would have been required to do in order for its conduct to be tortious; (3) that at the time Mesabi amended its complaint to assert claims against Glacier Park, it had no knowledge of Cliffs' interest in the Superior leases; and (4) that the reason Superior declined Cliffs' offer in favor of Mesabi's was that Mesabi's offer was better.  The Court is persuaded that Mesabi is entitled to summary judgment based on its second argument.  Nothing in the record would permit a reasonable finder of fact to conclude that Mesabi threatened Superior with frivolous litigation.  The Court accordingly need not address the other arguments that Mesabi contends support the entry of summary judgment.

The elements of a claim for tortious interference with a business relationship are set forth in Part III.A.2 of this Memorandum Opinion.  A plaintiff is required to establish (1) the existence of a reasonable expectation of economic advantage, (2) the defendant's knowledge of the economic advantage, (3) that the defendant intentionally interfered with plaintiff's reasonable expectation of economic advantage, and the intentional interference is either independently tortious or in violation of a state or federal statute or regulation, (4) that in the absence of the

---

[314] D.I. 34.

wrongful act of the defendant, it is reasonably probable that plaintiff would have realized his economic advantage or benefit, and (5) that plaintiff sustained damages.[315]

Mesabi's second argument relates to the third element of the defense. Mesabi asserts that even if Cliffs had a reasonable expectation of reaching an agreement with Superior and even if Mesabi was aware of that expectation, no reasonable juror could find, based on the evidence in the summary judgment record, that any of Mesabi's actions interfered with Cliffs' expectation.[316] Cliffs contends that the evidence would support the conclusion that, between the fact that Mesabi brought suit against Glacier Park, and statements Mesabi allegedly made to Superior, Mesabi effectively threatened Superior with frivolous litigation in order to scare it away from engaging in negotiations with Cliffs.[317] The record evidence, however, would not support such a conclusion.

To be sure, to overcome summary judgment, Cliffs is not required to come forward with conclusive proof of a threat. Circumstantial evidence that would permit a reasonable jury to conclude that a threat was made would suffice to overcome summary judgment.[318] But even assuming that the record would support the

---

[315] *Gieseke*, 844 N.W.2d 210.

[316] App. 7, Ex. 4 (Snyder 30(b)(6) Dep.) at A000167, A000168, pp. 131, 135-136; App. 7, Ex. 36 at A002140; App. 7, Ex. 34 at A002122-A002124.

[317] App. 8, Ex. 1 (Dunsmoor Dep.) at B000009-B000011, pp. 174-176; App. 8, Ex. 38 at B000794; App. 8, Ex. 43 at B000828; App. 8, Ex. 47 at B000846.

[318] *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993).

contention that Mesabi threatened litigation, it does not support the contention that the threatened litigation was sufficiently frivolous to fall outside the protection of the *Noerr-Pennington* doctrine.

A very similar issue arose earlier in this litigation. Recall that when Glacier Park first agreed to lease its land to Cliffs, Mesabi responded by amending the complaint in this action to assert claims against Glacier Park. Glacier Park, in turn, counterclaimed against Mesabi, alleging that Mesabi's lawsuit tortiously interfered with its contractual arrangement with Cliffs. Judge Shannon granted summary judgment in favor of Glacier Park. He explained that the *Noerr-Pennington* doctrine, which was originally intended to shield activity protected by the First Amendment from giving rise to antitrust liability, "has been extended to protect a plaintiff from liability for tortious interference for filing a lawsuit."[319] And while the doctrine is subject to an exception for "sham litigation," he noted that the "sham exception is narrow, and the ... party attempting to invoke the exception bears a heavy burden of demonstrating that the [activities are] objectively meritless."[320] There, Judge Shannon found that Mesabi's claims against Glacier Park were not so objectively meritless that they fell within the sham litigation exception to the protections provided by the *Noerr-Pennington* doctrine.

The same is true here. In this circumstance, the implicit threat of litigation was the possibility that, even after the passage of the October 31, 2017 deadline for

---

[319] D.I. 148.

[320] *Id.* (internal quotation and citation omitted).

Mesabi's plan to go effective, Mesabi might take the position that it could nevertheless assume the Superior leases. Mesabi, of course, took that position as to Glacier Park and lost. Cliffs' argument is that Mesabi's threat that it would take the same position with respect to Superior may have caused Superior to shy away from negotiating with Cliffs.

Even if Mesabi made such a threat to Superior (and to be clear, Superior denies that it was threatened, and the evidence that such a threat was made is, at best, rather thin), the assertion of such a claim would not be so frivolous that it would fall within the sham litigation exception to *Noerr-Pennington*. It is true that when Mesabi advanced that argument against Glacier Park, Judge Shannon rejected it. But the fact that a party loses does not mean that its pursuit of the claim was a sham. Mesabi's position in the dispute with Glacier Park was that even though the leases had been rejected, they nevertheless retained the right later to assume them. As Judge Shannon described it:

> Mesabi's argument runs as follows: the Settlement Agreement gave Mesabi an absolute right to assume the Leases if its Plan became effective on or before October 31, 2017. That did not happen, so the Leases were rejected – *but not terminated* – on November 1, 2017, and [Glacier Park] never took any steps thereafter to terminate the Leases. Thus, when the Plan went effective on December 22, 2017, the Settlement Agreement provided that the rejected Leases were assumed and further provided that all pre-assumption defaults were waived. Mesabi reasons that missing the October 31 deadline was merely a waivable pre-assumption default.
>
> Separately, Mesabi contends that, even if the Court does not accept its construction of the Settlement Agreement, it should still prevail because the alternative would result in forfeiture of the Leases by the reorganized debtor, and forfeiture is strongly disfavored under governing Minnesota law. Finally, Mesabi places substantial weight on the fact that this Court's order approving the Settlement Agreement –

92

entered in August 2017 – stated that the Leases "are assumed as of the Effective Date of the Plan." It is Mesabi's position that this Order governs and provides that the Leases were assumed, irrespective of when the effective date happened, so long as the Plan ultimately became effective.[321]

Judge Shannon rejected this argument, concluding that the construction of the settlement agreement advanced by Cliffs and Glacier Park – that if the plan was not effective by the October 31, 2017 deadline, Glacier Park was free to lease the property to whomever it liked – was the better one. But that means that Mesabi lost, not that its position was so lacking in merit that even taking the position was no more than a sham. Accordingly, the Court concludes that even if Mesabi had threatened Superior that it would take the same position against it, such statements would be protected by the *Noerr-Pennington* doctrine and could not give rise to liability for tortious interference with business relationships.

Because that is a sufficient basis to deny Cliffs' motion for summary judgment, the Court need not address Mesabi's other arguments for summary judgment on Cliffs' counterclaim. In conclusion, Mesabi and Chippewa are entitled to summary judgment on Cliffs' tortious interreference claim. And because the underlying claim for tortious interference fails, Chippewa is entitled to summary judgment on Cliffs' claim that it aided and abetted such tortious interference.

---

[321] 590 B.R. at 114 (emphasis in original).

### C.  The Court grants both parties' motions for summary judgment on civil conspiracy because those claims fail as a matter of law.

Both parties brought civil conspiracy claims against each other.  A conspiracy claim requires a combination of two or more people to commit an unlawful act or a lawful act by unlawful means.[322]  Here, both claims fail as a matter of law because controlling case law holds that a corporate entity cannot conspire with itself.[323]  Cases applying Minnesota law have extended that principle to provide that a parent companies and its subsidiaries may not conspire with one another.[324]

Mesabi argues that Cliffs conspired with Cliffs Minnesota to interfere tortiously with Mesabi's contractual rights and business relationships and violate antitrust laws.  As addressed above, this claim fails as a matter of law because a parent corporation cannot conspire with its subsidiary.[325]

Cliffs argues that Mesabi conspired with Chippewa to interfere tortiously with Cliffs' attempt to purchase Superior's properties by using Mesabi's (allegedly threatened) Glacier Park lawsuit to coerce Superior into transacting with Mesabi over Cliffs.  As to Cliffs' conspiracy claim against Mesabi, it argues that Chippewa did not become the owner of Mesabi until after Mesabi emerged from bankruptcy on

---

[322] *See Nystrom & Assocs. v. Ellie Family Servs.,* No. 27-CV-22-10954, 2023 Minn. Dist. LEXIS 3353, at *10 (Minn. Dist. Ct. Jan. 27, 2023) (citing *Harding v. Ohio Cas. Ins. Co.,* 41 N.W.2d 818, 824 (Minn. 1950)).

[323] *See Copperweld v. Independence Tube Corp.,* 467 U.S. 752 (1984); *Howard v. Minn. Timberwolves Basketball Ltd. P'ship,* 636 N.W. 2d 551, 557 (Minn. Ct. App. 2001).

[324]  *See St. Jude Med., S.C., Inc. v. Biosense Webster, Inc.,* 994 F. Supp. 2d 1033, 1052 (D. Minn. 2014) (citing *Palm Beach Polo, Inc. v. Dickinson Fin. Corp.,* 221 F.3d 1343 (8th Cir. 2000)).  *See also Fogie v. Thorn Americas, Inc.*, 190 F.3d 889, 899 (8th Cir. 1999).

[325] *Id.*

December 22, 2017, meaning that Chippewa was not afforded the protection of a parent corporation for acts that took place before that date.[326]  That dispute, however, need not be resolved, as the conspiracy claim against Mesabi and Chippewa would fail in any event because the underlying tort claim also failed.  Because the Court is granting summary judgment to Mesabi and Chippewa on the claim that they tortiously interfered, they are similarly entitled to summary judgment on the claim that they conspired to engage in such tortious interference.  Accordingly, the Court will grant both parties' summary judgment motions on the conspiracy claims.

## Conclusion

For the foregoing reasons, the motions will be granted in part and denied in part.  The parties are directed to settle an appropriate order.

Dated: August 27, 2024

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE

---

[326] Main Case D.I. 990.

# APPENDIX A

| Appendix 1 | Mesabi's Appendix to its Summary Judgment Motion on Mesabi's Claims |
| Appendix 2 | Cliffs' Appendix to its Opposition to Mesabi's Summary Judgment on Mesabi's Claims |
| Appendix 3 | Mesabi's Appendix to its Reply in Support of Summary Judgment on Mesabi's Claims |
| Appendix 4 | Cliffs' Appendix to its Summary Judgment Motion on Mesabi's Claims |
| Appendix 5 | Mesabi's Appendix to its Opposition to Cliffs' Summary Judgment Motion on Mesabi's Claims |
| Appendix 6 | Cliffs' Appendix to its Reply in Support of Summary Judgment on Mesabi's Claims |
| Appendix 7 | Mesabi's Appendix to its Summary Judgment Motion on Cliffs' Counterclaims |
| Appendix 8 | Cliffs' Appendix to its Opposition to Mesabi's Summary Judgment Motion on Cliffs' Counterclaims |
| Appendix 9 | Mesabi's Appendix to its Reply in Support of Summary Judgment on Cliffs' Counterclaims |

| D.I. No. | Exhibit No. | Volume | Appendix Pages |
|---|---|---|---|
| **Mesabi's Appendix to its Summary Judgment Motion on Mesabi's Claims (Appendix 1)** | | | |
| 838-02 | 1-14 | Volume 1 | A000001-A000928 |
| 838-03 | 15-16 | Volume 2 | A000929 - A001187 |
| 838-04 | 17-19 | Volume 3 | A001188 - A001362 |
| 838-05 | 20-35 | Volume 4 | A001363 - A001625 |
| 838-06 | 36-46 | Volume 5 | A001626 - A001861 |
| 838-07 | 47-59 | Volume 6 | A001862 - A002091 |
| 838-08 | 60-61 | Volume 7 | A002092 - A002110 |
| 838-09 | 62 | Volume 8 | A002111 - A002390 |
| 841 | 63-68 | Volume 9 | A002391 - A003031 |
| 838-10 | 69-76 | Volume 10 | A003032 - A003672 |
| 838-11 | 77-87 | Volume 11 | A003673 - A004132 |
| 838-12 | 88 | Volume 12 | A004133 - A004164 |
| 838-13 | 89-99 | Volume 13 | A004165 - A006680 |
| **Cliffs' Appendix to its Opposition to Mesabi's Summary Judgment on Mesabi's Claims (Appendix 2)** | | | |
| 892 | 1-111 | Volume 1 | B0001-B5616 |
| **Mesabi's Appendix to its Reply in Support of its Summary Judgment Motion on Mesabi's Claims (Appendix 3)** | | | |
| 957 | 1-5 | Volume 1 | C000001 - C000025 |

2

| D.I. No. | Exhibit No. | Volume | Appendix Pages |
|---|---|---|---|
| Cliffs' Appendix to its Summary Judgment Motion on Mesabi's Claims (Appendix 4) | | | |
| 842 | 1-72 | Volume 1 | A000001 - A002398 |
| 843 | 73-96 | Volume 2 | A002399 - A004373 |
| 844 | 97-161 | Volume 3 | A004374 - A005782 |
| 845 | 162-184 | Volume 4 | A005783 - A009140 |
| Mesabi's Appendix to its Opposition to Cliffs' Summary Judgment Motion on Mesabi's Claims (Appendix 5) | | | |
| 896 | 1-41 | Volume 1 | B000001- B002447 |
| 897 | 42-43 | Volume 2 | B002448 - B002725 |
| 898 | 44-45 | Volume 3 | B002448 - B002725 |
| 899 | 46-51 | Volume 4 | B002930 - B003324 |
| 900 | 52-68 | Volume 5 | B003325 - B004069 |
| 901 | 69-72 | Volume 6 | B004070 - B004728 |
| 902 | | Volume 7 | B004729 - B004813 |
| 903 | 73 | Volume 8 | B004814 - B004902 |
| 904 | | Volume 9 | B004903 - B004980 |
| 905 | 74-97 | Volume 10 | B004981 - B005314 |
| 906 | 98-129 | Volume 11 | B005315 - B005566 |
| 907 | 130-153 | Volume 12 | B005567 - B005883 |
| 908 | 154-183 | Volume 13 | B005884 - B006129 |
| 909 | 184-209 | Volume 14 | B006130 - B006400 |
| 910 | 210-249 | Volume 15 | B006401 - B006615 |

| D.I. No. | Exhibit No. | Volume | Appendix Pages |
|---|---|---|---|
| 911 | 250-264 | Volume 16 | B006616 - B006920 |
| 912 | 265-291 | Volume 17 | B006921 - B007188 |
| 913 | 292-326 | Volume 18 | B007189 - B007418 |
| 914 | 327-343 | Volume 19 | B007419 - B007661 |
| 915 | 344-351 | Volume 20 | B007662 - B008679 |
| 916 | 352-359 | Volume 21 | B008680 - B009030 |
| 917 | 360-362 | Volume 22 | B009031 - B009175 |
| 918 | 363-377 | Volume 23 | B009176 - B009671 |
| 919 | 378-381 | Volume 24 | B009672 - B009745 |
| 920 | 382-390 | Volume 25 | B009746 - B009802 |
| 921 | 391-397 | Volume 26 | B009803 - B010348 |
| 922 | 398 | Volume 27 | B010349 - B010760 |
| 923 | 399-409 | Volume 28 | B010761 - B010913 |
| 924 | 410-413 | Volume 29 | B010914 - B010929 |
| 925 | 414-418 | Volume 30 | B010930 - B011787 |
| 926 | | Volume 31a | B011788 – B011809 |
| 927 | 419 | Volume 31b | B011810- B011865 |
| 928 | | Volume 32 | B011866- B011960 |
| 929 | 420 | Volume 33 | B011961 - B012303 |
| 930 | 421 | Volume 34 | B012304 - B012761 |
| 931 | 422-435 | Volume 35 | B012762 - B013194 |

4

| D.I. No. | Exhibit No. | Volume | Appendix Pages |
|---|---|---|---|
| | | | |
| **Cliffs' Appendix to its Reply in Support of its Summary Judgment Motion on Mesabi's Claims (Appendix 6)** | | | |
| 954 | 1-5 | Volume 1 | C001 - C119 |
| **Mesabi's Appendix to its Summary Judgment Motion on Cliffs' Counterclaims (Appendix 7)** | | | |
| 834-2 | 1-10 | Volume 1 | A000001 - A000737 |
| 834-3 | 11 | Volume 2 | A000738 - A001106 |
| 834-4 | 12-14 | Volume 3 | A001107 - A001735 |
| 834-5 | 15-31 | Volume 4 | A001736 - A002102 |
| 834-6 | 32-44 | Volume 5 | A002103 - A002287 |
| 834-7 | 45-46 | Volume 6 | A002288 - A002575 |
| 834-8 | 47-66 | Volume 7 | A002576 - A003146 |
| 834-9 | 67-74 | Volume 8 | A003147 - A005222 |
| **Cliffs' Appendix to its Opposition to Mesabi's Summary Judgment Motion on Cliffs' Counterclaims (Appendix 8)** | | | |
| 889 | 1-65 | Volume 1 | B000001 - B001205 |
| **Mesabi's Appendix to its Reply in Support of Its Summary Judgment Motion on Cliffs' Counterclaims (Appendix 9)** | | | |
| 955-1 | 1-6 | Volume 1 | C000001 - C000154 |