**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br>ESSAR STEEL MINNESOTA LLC and ESML HOLDINGS INC.,<br>Reorganized Debtors. | Chapter 11<br>Case No. 16-11626 (CTG)<br>(Jointly Administered) |
| MESABI METALLICS COMPANY LLC (F/K/A ESSAR STEEL MINNESOTA LLC),<br>Plaintiff,<br>v.<br>CLEVELAND-CLIFFS INC., et al.,<br>Defendants. | Adv. Proc. No. 17-51210 (CTG) |
| CLEVELAND-CLIFFS INC., et al.,<br>Counterclaim-Plaintiffs,<br>v.<br>MESABI METALLICS COMPANY LLC,<br>Counterclaim-Defendant. | |
| CLEVELAND-CLIFFS INC., et al.,<br>Third-Party-Plaintiffs,<br>v.<br>CHIPPEWA CAPITAL PARTNERS, LLC,<br>Third-Party-Defendant.[1] | |

**BRIEF OF DEFENDANTS CLEVELAND-CLIFFS INC. AND CLEVELAND-CLIFFS MINNESOTA LAND DEVELOPMENT LLC REGARDING UNSEALING UNDER SECTION 107**

[1] Counterclaim-Plaintiffs Cleveland-Cliffs Inc. and Cleveland-Cliffs Minnesota Land Development LLC respectfully disagree that their claims against Chippewa Capital Partners, LLC are third-party claims rather than counterclaims in this action.

# TABLE OF CONTENTS

**Page**

Table of Authorities .... ii

INTRODUCTION .... 1

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING .... 1

SUMMARY OF ARGUMENT .... 4

STATEMENT OF FACTS .... 4

ARGUMENT .... 6

I. SECTION 107(B) IS MET WHEN A PARTY DEMONSTRATES THAT DISCLOSURE WOULD RISK COMPETITIVE HARM .... 6

- A. The Section 107 Standard is Competitive Harm .... 6
- B. Meeting Section 107 is a Lower Bar Compared to the Common Law .... 8

II. CLIFFS CAN DEMONSTRATE THE RISK OF COMPETITIVE HARM AS TO THE INFORMATION AT ISSUE .... 10

- A. Mesabi Agreed Most of the Documents and All the Testimony Met a Higher Sealing Standard Than Section 107—And It Sought All for Competitive Reasons .... 11
- B. Disclosure of the Information Would Risk Competitive Injury .... 13

CONCLUSION .... 20

# TABLE OF AUTHORITIES

**Page**

CASES

In re Alterra Healthcare Corp.,
353 B.R. 66 (Bankr. D. Del. 2006) ....................8, 13, 16

In re Avandia Marketing, Sales Practices & Products Liability Litigation,
924 F.3d 662 (3d Cir. 2019).................... passim

In re Barney's, Inc.,
201 B.R. 703 (Bankr. S.D.N.Y. 1996)....................8, 13, 16

In re Cendant Corp.,
260 F.3d 183 (3d Cir. 2001)....................9

Mesabi Metallics Co. v. Cleveland-Cliffs, Inc. (In re ESML Holdings Inc),
135 F.4th 80 (3d Cir. 2025) .................... passim

In re Farmland Indus., Inc.,
290 B.R. 364 (Bankr. W.D. Mo. 2003)....................7, 15, 17, 19

In re FTX Trading,
2025 Bankr. LEXIS 1245 (Bankr. D. Del. May 21, 2025)....................8

In re Georgetown Steel Co., LLC,
306 B.R. 542 (Bankr. D.S.C. 2004)....................7

In re Gitto Glob. Corp.,
422 F.3d 1 (1st Cir. 2005)....................9, 10

In re Itel Corp.,
17 B.R. 942 (9th Cir. BAP 1982)....................7, 8

In re Northstar Energy, Inc.,
315 B.R. 425 (Bankr. E.D. Tex. 2004) ....................7

In re Nunn,
49 B.R. 963 (Bankr. E.D. Va. 1985)....................16

In re Orion Pictures Corp.,
21 F.3d 24 (2d Cir. 1994).................... passim

In re Roman Cath. Archbishopproducing ,
661 F.3d 417 (9th Cir. 2011) ....................................................................................10, 12

In re Transbrasil S.A. Linhas Aereas,
644 F. App'x 959 (11th Cir. 2016)....................................................................................9

Miller v. Indiana Hosp.,
16 F.3d 549 (3d Cir. 1994)...............................................................................................9

**STATUTES**

11 U.S.C. § 107............................................................................................................ passim

## INTRODUCTION

The parties now return to this Court on a question first presented in July 2023: whether certain documents filed under seal on the bankruptcy court's docket should remain under seal after one party's challenge to continued sealing. This Court recognized then that the Third Circuit had not yet provided the legal standard to apply to this question, and it permitted Cleveland-Cliffs Inc. ("Cliffs") to take a direct appeal to get the answer. See Adv. D.I. 811 at 3.[2] Pursuant to this Court's direction following Cliffs' successful appeal that established Section 107 of the Bankruptcy Code, and not the common law, governs the question, Cliffs now provides the Court with its argument and evidence to support "why that standard is met here." See Adv. D.I. 1097, 1101. Out of the 131 documents that Mesabi Metallics Company LLC ("Mesabi") asked this Court to unseal—including many containing Mesabi's information or information already publicly available—Cliffs asks to maintain under seal under the Section 107 standard the information in only seventeen documents and certain deposition testimony in the briefing. And of those, the parties previously agreed the testimony and thirteen of the documents met the higher common law sealing standard.

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

Cliffs understands the Court is familiar with the nature and stage of the broader proceeding. The District Court withdrew the reference for this case on February 14, 2025, and the case will proceed before that court for the remaining pretrial proceedings and trial.

The question now before this Court concerns the information in exhibits filed in connection with Mesabi Metallics Company LLC's ("Mesabi") preliminary injunction motion filed in May of 2023. The briefing referenced and attached almost 200 exhibits, and the parties each filed the briefing and most exhibits under seal and then in redacted form pursuant to the parties' Stipulation

[2] Unless otherwise noted, all references to "Adv. D.I." are to docket indicators in this action.

and Protective Order. The Court denied Mesabi's preliminary injunction motion, see Adv. D.I. 741, and some two months later, Mesabi asked the Court to unseal 131 of the filed exhibits and remove related redactions in the briefing, see Adv. D.I. 774. Mesabi's request included the majority of the briefing exhibits, many of which Mesabi had produced or that were already publicly available. But the request also included thirty-five documents that Cliffs had designated as protected under the Protective Order and asked to maintain under seal. See Adv. D.I. 811 at 7–8.

Cliffs objected to Mesabi's unsealing request on several grounds, among them that unsealing would cause competitive harm to Cliffs and that the information therefore ought remain sealed under the parties' Protective Order. Cliffs also opposed Mesabi's argument that the common law standard as outlined in In re Avandia Marketing, Sales Practices & Products Liability Litigation, 924 F.3d 662 (3d Cir. 2019), rather than the parties' Protective Order or 11 U.S.C. § 107, governs public access to papers on bankruptcy court dockets. See Adv. D.I. 811 at 8–9.

The Court held an initial hearing on Mesabi's unsealing request on August 7, 2023, and directed Cliffs to submit further materials to address which information would meet the common law standard as outlined in Avandia. See id. at 7–10; Adv. D.I. 783 (Aug. 7, 2023 Hr'g Tr. at 11–17). The parties met and conferred and reached agreement that, if the common law standard applied, thirteen of the documents should remain sealed, seven in full and six with redactions, and related references and certain deposition testimony should remain redacted in the briefing. See Adv. D.I. 797 at 9; Adv. D.I. 811 at 2, 10. The Court agreed that the parties' stipulated position made an evidentiary hearing based on the common law standard unnecessary, and it instead heard argument on August 28, 2023, regarding what legal standard should apply to this kind of unsealing request in bankruptcy courts. See Adv. D.I. 811 at 7–11. The Court ruled that the parties' Protective Order did not apply to the request and "§ 107 merely codifies the public right of access

to judicial records" as outlined in Avandia, and it granted Mesabi's motion to unseal the twenty-two remaining documents (i.e., the ones the parties had not agreed should remain sealed or redacted if the common law standard applied). Id. at 3, 28. The Court recognized that its ruling was subject to significant dispute and certified its order for "direct appeal to the Third Circuit." Id. at 3.[3]

The Third Circuit accepted the direct appeal and issued its opinion on April 16, 2025. The Third Circuit praised this Court's "astute[] recogni[tion]" that the precedent was unclear, clarified that "the sealing of documents in bankruptcy cases is governed not by the common law right of access, but by § 107 of the Bankruptcy Code," and vacated the Court's orders to the contrary. Mesabi Metallics Co. v. Cleveland-Cliffs, Inc. (In re ESML Holdings Inc), 135 F.4th 80, 88 (3d Cir. 2025) (hereinafter, "In re ESML"). The Third Circuit held that "§ 107 of the Bankruptcy Code … imposes a heavy, but distinct, burden for a party to keep docketed records from the public eye." Id. The ruling thus left it to this Court "in the first instance" to determine "[w]hether Cliffs has satisfied that burden," as "the Documents will remain sealed on the Bankruptcy Court's docket unless and until unsealed by the Bankruptcy Court." Id. at 91.

After the Third Circuit issued the mandate, on May 9, 2025, this Court notified the parties of its intent to "conduct an evidentiary hearing at which it will determine whether the records in question satisfy the standards set forth under Section 107 of the Bankruptcy Code." Adv. D.I. 1097 at 1. In accordance with the Court's subsequently-issued scheduling order (Adv. D.I. 1101), Cliffs files this brief in support of the continued sealing of material under Section 107.

---

[3] The Court later granted a motion to intervene from Greg Heyblom to request unsealing of the same documents on the same grounds, but it stayed this second order to permit that this ruling also be included in the direct appeal to the Third Circuit. See Adv. D.I. 1044 at 9; Adv. D.I. 1055. The Third Circuit accepted the direct appeal and consolidated the appeals for hearing and in its opinion. In re ESML, 135 F.4th at 90. As for Heyblom's intervention, the Third Circuit agreed with Cliffs that this Court had been without jurisdiction to consider Heyblom's motions, and therefore vacated the orders relating to Hebylom's motion to intervene and unseal. Id. at 97.

## SUMMARY OF ARGUMENT

1. This Court should keep the requested information sealed under Section 107(b) of the Bankruptcy Code as "confidential research, development or commercial information." 11 U.S.C. § 107(b)(1). Section 107 provides broader protection for information than the common law under Avandia, and "the bankruptcy court lacks discretion to decline to protect covered information." In re ESML, 135 F.4th at 96. The court must keep information under seal if the proponent shows an actual, objective, and substantial risk of competitive harm from disclosure; the proponent is not required to show a current, "clearly defined and serious injury." Id. at 97 (quoting Avandia, 924 F.3d at 672).

2. Each of the documents and testimony identified meets the Section 107 standard for sealing. Of the seventeen documents, thirteen contain information Mesabi already agreed meets the higher common law sealing standard. Mesabi also already agreed the identified deposition testimony contains information that meets the higher common law sealing standard. And as the Rasmussen Declaration shows, each document contains confidential commercial information and disclosure would run a substantial risk of competitive harm. The identified deposition testimony contains similar information as the documents.

## STATEMENT OF FACTS

A limited universe of seventeen documents and excerpted quotes from deposition testimony remains at issue from Mesabi's original request. Through stipulations reached prior to the Court's hearing on the legal question of whether the higher common law sealing standard applied in August 2023, the parties were able to narrow the documents at issue from 131 to thirty-five and to limit the portions of deposition testimony that should be redacted in the briefing. At that time, the parties agreed that, if the common law standard applied, the information in thirteen

documents and certain deposition testimony met the standard for protection and the documents should sealed in full or with redactions, with the related briefing references treated in the same manner.  See Decl. of Kristin Morrison ¶¶ 2–4 ("Morrison Declaration," attached as Exhibit C).

Under Section 107, Cliffs asks the Court to keep under seal information in seventeen documents—the thirteen the parties previously agreed met the common law standard for sealing, either in full or with redactions, and four additional for which it requests redactions that meet the Section 107 standard.  Cliffs also asks the Court to keep under seal the deposition testimony the parties previously agreed met the common law standard for sealing.  The seventeen documents are discussed in the Declaration of Scott Rasmussen in support of this brief, attached as Exhibit A ("Rasmussen Declaration"); a chart summarizing Cliffs' positions on these seventeen documents, plus the additional documents Mesabi originally asked to unseal, is attached as Exhibit B; and copies of the documents and a chart identifying the deposition testimony quotes are attached with the Morrison Declaration, Exhibit C, with the proposed redactions to the documents shown in yellow highlighting where appropriate.  For consistency, the seventeen documents are discussed using the exhibit numbers associated with the parties' briefing: Exhibits 22, 23, 25, 26, 35, 37, 38, 41, 42, 45, 49, and 54 to the Declaration of David H. Suggs in Support of Plaintiff's Motion for Preliminary Injunction [Adv. D.I. 716] (the "First Suggs Declaration"); Exhibit 31 to the Declaration of Kristin Morrison in Support of Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction [Adv. D.I. 726] (the "Morrison PI Declaration"); and Exhibits 62, 63, 64, and 70 to the Declaration of David H. Suggs in Further Support of Plaintiff's Motion for a Preliminary Injunction [Adv. D.I. 734] (the "Second Suggs Declaration").

## ARGUMENT

This Court should keep sealed under 11 U.S.C. § 107(b) the confidential commercial information in the seventeen documents identified in the Rasmussen Declaration and the deposition testimony identified in Exhibit 18 to the Morrison Declaration. Section 107 is more protective of judicial records than the common law. For sealing, this standard requires only that Cliffs show an "actual[,] objective" and "substantial risk that disclosure would detrimentally affect the producing party's competitive standing." In re ESML, 135 F.4th at 97. See Section I, infra. Cliffs meets that standard for the information in the seventeen documents and deposition testimony identified based on the evidence presented in the Rasmussen Declaration. See Section II, infra.[4]

### I. SECTION 107(B) IS MET WHEN A PARTY DEMONSTRATES THAT DISCLOSURE WOULD RISK COMPETITIVE HARM.

Section 107 of the Bankruptcy Code provides the standard for whether documents filed on the bankruptcy court's docket should remain under seal or be unsealed when continued sealing is challenged. Compared to the common law, § 107 presents a lower bar: the bankruptcy court must keep under seal records where there is a risk "disclosure would cause competitive injury." In re ESML, 135 F.4th at 97. Unlike the common law standard, this injury need not be current, clearly defined, or serious. Instead, any confidential commercial information must be protected. Id.

#### A. The Section 107 Standard is Competitive Harm.

By its express terms, § 107 protects parties from the disclosure of "confidential research, development, or commercial information." 11 U.S.C. § 107(b)(1). The Third Circuit confirmed that "confidential" modifies each of "research," "development," and "commercial information,"

---

[4] The parties previously reached agreement on the redactions to each party's briefs submitted for Mesabi's preliminary injunction motion for information that should be kept under seal under the higher common law standard. See Morrison Decl. ¶ 2–4. Cliffs' positions in this brief under the Section 107 standard do not impact those prior agreements. In the interests of efficiency, Cliffs proposes that the parties submit conforming, redacted public versions of the preliminary injunction briefs within two weeks of the Court's order based on Section 107.

and, by implication, that "the categories of information protected by § 107(b) entail that their disclosure would cause competitive injury." In re ESML, 135 F.4th at 96 n.8, 97.  There must be a "substantial risk that disclosure would detrimentally affect the producing party's competitive standing," and such risk "must be actual and objective."  Id. at 97.  But the Third Circuit did not precisely define the nature of the "competitive injury" that § 107 seeks to prevent.  Certainly, the Third Circuit noted that § 107 protects information for which disclosure would "'cause an unfair advantage to competitors.'"  Id. at 97 (quoting In re Orion Pictures Corp., 21 F.3d 24, 27 (2d Cir. 1994)).  The definitions of "competitive injury," "competitive standing," and "unfair advantage to competitors" are left to the case law and this Court.

The case law makes clear that a "competitive injury" is a low bar.  Disclosure of sensitive strategic, contractual, or financial information found in business discussions, analyses, reports, or the like, among other things, may all be sufficiently "commercial" and "confidential" that there is a substantial risk that disclosure would "cause 'an unfair advantage to competitors.'"  In re Orion Pictures, 21 F.3d at 27 (quoting In re Itel Corp., 17 B.R. 942, 944 (9th Cir. BAP 1982)).  Other courts interpreting Orion (and/or § 107 more broadly) have expanded on this point, protecting information about the following, for example: "short and long term marketing strategies," information regarding the "sale of certain assets and the retention of other assets," and other parts of the "operation of a business," In re Farmland Indus., Inc., 290 B.R. 364, 368 (Bankr. W.D. Mo. 2003); a list of a company's investors, In re Northstar Energy, Inc., 315 B.R. 425, 429–30 (Bankr. E.D. Tex. 2004); a list of key employees which included details about strategic plans regarding retention of those employees, In re Georgetown Steel Co., LLC, 306 B.R. 542, 547 (Bankr. D.S.C. 2004); and more.

This bankruptcy court has applied § 107 protections similarly. Judge Walrath previously noted that "confidential commercial 'information might include, without limitation, pricing formulae, short and long term marketing strategies and the terms of agreements with suppliers.'" In re Alterra Healthcare Corp., 353 B.R. 66, 76 (Bankr. D. Del. 2006) (quoting In re Barney's, Inc., 201 B.R. 703, 709 (Bankr. S.D.N.Y. 1996)). Chief Judge Owens applied the Third Circuit's recent decision in this case to mandate protection under § 107 for, among other things, "digital marketing strategies and pricing that could be used by competitors to undermine the Defendants in the marketplace and exclusivity provisions that could damage relationships with potential customers." In re FTX Trading, 2025 Bankr. LEXIS 1245, at *6-7 (Bankr. D. Del. May 21, 2025) (applying In re ESML, 135 F.4th at 96–97) (footnotes omitted).

In short, § 107 requires the Court to protect any confidential information which would give competitors "information as to the commercial operations" of the party seeking protection if they demonstrate that disclosure presents a substantial, objective risk that the competitor would use that information to cause competitive harm. In re Orion Pictures, 21 F.3d at 27 (quoting In re Itel Corp., 17 B.R. at 944).

**B. Meeting Section 107 is a Lower Bar Compared to the Common Law.**

The Third Circuit confirmed that "§ 107 diverges from the common law such that it displaces, rather than merely 'codifies,' that doctrine." In re ESML, 135 F.4th at 96. In particular, the Third Circuit identified "two major respects" in which § 107 displaces the common law standard. First, § 107 "permits sealing of 'a trade secret or confidential research, development, or commercial information'"—a "broader" category "than the information that could be protected under the common law doctrine." Id. (quoting 11 U.S.C. § 107(b)(1)). Second, § 107 divests the bankruptcy court of "discretion to decline to protect covered information." Id. If documents fall within the scope of § 107, the Court must protect them; unlike the common law, the court "lacks

discretion" to balance public and private interests because "with § 107, Congress has struck its own balance by which the courts must abide." Id.

The differences between the common law and § 107 are not merely academic: the Third Circuit reaffirmed that the requirements of § 107 are "not as onerous as the common law requirement[s]." Id. at 97. In particular, § 107 does not require that "disclosure 'will work a clearly defined and serious injury to the party seeking closure.'" Id. at 97 (quoting Miller v. Indiana Hosp., 16 F.3d 549, 551 (3d Cir. 1994)). Because it differs from the common law, § 107 does not include the requirement set forth in Avandia that a party must point to "current evidence to show how public dissemination of the pertinent materials now would cause the competitive harm." Avandia, 924 F.3d at 678 (quoting In re Cendant Corp., 260 F.3d 183, 196 (3d Cir. 2001)) (emphasis in original). The Third Circuit's clarification of the standard confirmed that the § 107(b) standard requires none of this: not a clearly defined injury, not a serious injury, not an injury based on current evidence, and not an injury based on the harm from disclosure now as opposed to some other time.

All § 107(b) requires is a showing that the information is "confidential research, development, or commercial information." 11 U.S.C. § 107(b)(1); see also In re Gitto Glob. Corp., 422 F.3d 1, 9 (1st Cir. 2005) (applying § 107(b)(2); "Once an interested party identifies material that is scandalous or defamatory, the court must protect the party."). Unlike the common law, therefore, there is no need for a showing of current harm; Congress instead found the disclosure of the confidential information harmful enough. See In re Transbrasil S.A. Linhas Aereas, 644 F. App'x 959, 962 (11th Cir. 2016) (citing In re Orion Pictures, 21 F.3d at 28) (emphasis in original) ("Section 107(b) … does not require the bankruptcy court to find a compelling interest or even

good cause. … Rather, upon determining that a movant has identified information that qualifies for protection under § 107(b), the bankruptcy court shall protect the information.").

The second difference between § 107 and the common law—the lack of discretion—also evinces Congress' intent to provide broad protection to parties in bankruptcy court. Unlike the two-step common law test,[5] § 107(b) requires only a one-step test: whether the information is "a trade secret or confidential research, development, or commercial information." In re ESML, 135 F.4th at 96 (quoting 11 U.S.C. § 107(b)(1)). Indeed, "the bankruptcy court lacks discretion to decline to protect covered information." Id. This lack of discretion further demonstrates how low the § 107 standard sets the bar: "The statute … 'eliminates the balancing of public and private interests required by the common law rule,' rendering 'the strength of the public's interest in a particular judicial record ... irrelevant.'" Id. (quoting In re Roman Cath. Archbishop, 661 F.3d 417, 430–31 (9th Cir. 2011). The Court need not—indeed, may not—"engage in a balancing of the equities, as required by the common law, but rather [must] determine whether the material at issue falls within … one of the § 107(b) categories." Gitto, 422 F.3d at 10. "Congress has struck its own balance by which the courts must abide." In re ESML, 135 F.4th at 96.

## II. CLIFFS CAN DEMONSTRATE THE RISK OF COMPETITIVE HARM AS TO THE INFORMATION AT ISSUE.

For each of the seventeen documents and the deposition testimony it seeks to maintain under seal, in whole or in part, Cliffs can demonstrate that the proposed protections cover "confidential commercial information" and there is a substantial risk disclosure "would cause competitive injury." In re ESML, 135 F.4th at 96, 97. For starters, Mesabi previously agreed that the information in the deposition testimony excerpts and thirteen of the seventeen documents met

[5] First, whether "the material is the kind of information that courts will protect," and second, whether disclosure will work a "current," "clearly defined and serious injury to the party seeking closure." See Avandia, 924 F.3d at 678.

the higher standard for sealing under the common law. Even beyond that fact, Mesabi itself sought this information to support its competitive position when negotiating adverse to Cliffs—it sought unsealing to use these documents and testimony in other litigation about mineral leases the State of Minnesota had awarded to Cliffs rather than to Mesabi.[6] And the supporting evidence discussed in the Rasmussen Declaration shows that disclosure of the confidential commercial information in these documents and testimony presents a substantial risk of competitive harm.

### A. Mesabi Agreed Most of the Documents and All the Testimony Met a Higher Sealing Standard Than Section 107—And It Sought All for Competitive Reasons.

The stipulated agreement the parties reached regarding sealing under the higher common law standard for most of the seventeen documents and all the deposition testimony excerpts during the original briefing and argument on this issue in 2023 should stand, meaning the lower bar for sealing under Section 107 is met for this information. The parties previously "reached a stipulation on those documents that should remain as confidential if the [common law] Avandia standard applied" because Mesabi "largely agreed with Cliffs' position regarding those documents that were sufficiently commercially sensitive to meet the Avandia standard." Adv. D.I. 811 at 10. That agreement included both sealing in full for seven documents[7] and redactions for six documents[8] and redactions for the deposition testimony excerpts in the briefing. See id.; Adv. D.I. 797 at 9; Ex. C ¶ 4. The additional four documents contain information that is just as commercially sensitive, as required to meet the Section 107 standard, explained below, although it may lack the current significance the higher common law standard requires. See In re ESML, 135 F.4th at 97.

---

[6] See Adv. D.I. 774 at 4 (discussing Mesabi's desired use of the materials outside this case).

[7] Exhibits 42, 45, and 54 to the First Suggs Declaration; Exhibit 31 to the Morrison Declaration; and Exhibits 62, 63, and 64 to the Second Suggs Declaration.

[8] Exhibits 22, 23, 35, 41, and 49 to the First Suggs Declaration; and Exhibit 70 to the Second Suggs Declaration.

Mesabi's stated purpose in seeking to have the information in all of these documents and testimony unsealed, as the Third Circuit acknowledged, was and is to use the information in seeking to recover certain state-owned mining leases in Minnesota which Mesabi lost through its own failures to launch. See In re ESML, 135 F.4th at 89.[9] In other words, Mesabi wants to use the information to cause competitive injury to Cliffs by seeking "to reverse Minnesota's award of the disputed mineral leases to Cliffs." Id. Mesabi itself demonstrates the need for protection here.

Additionally, most of the deposition testimony excerpts and many of the documents at issue were designated under the parties' Protective Order at the time of production during discovery not merely for protection from the public but also from the parties themselves, using the "Highly Confidential" or "Highly Confidential – Outside Attorneys' Eyes Only" designations. See Adv. D.I. 588 at 5–7, 8–12. The parties agreed to reserve these higher designations for information that the parties' employees (including in-house counsel) should not receive. Id. The "Outside Attorneys' Eyes Only" designation was further reserved for where "a Producing Party in good faith believes … that disclosing such information to anyone representing or working for the Receiving Party other than outside counsel could result in specific economic harm, compromise and/or jeopardize the Producing Party's competitive position, or provide competitive benefits to the Receiving Party." Id.

By seeking to unseal documents and testimony with these higher designations, Mesabi itself would get to see them for the first time. For Cliffs, with whom Mesabi seeks to compete, the idea of revealing strategies, pricing, and other confidential information directly to a would-be competitor has always been a non-starter. See, e.g., Adv. D.I. 847 at 34 (Cliffs' redacted brief in

[9] To the extent that Mesabi also stated that it intended to vindicate the public's interest in these documents, such intent is irrelevant. Under § 107, "the strength of the public's interest in a particular judicial record is irrelevant." In re Roman Cath. Archbishop, 661 F.3d at 430–31; see also In re ESML, 135 F.4th at 96 (same).

support of summary judgment) ("Cliffs legitimately did not want Mesabi … to free-ride on Cliffs' investment by securing [confidential] knowledge, directly or indirectly."). Disclosure of such information would certainly give Mesabi an "unfair advantage" in that it could use that information to undermine Cliffs' contracts with customers, vendors, and suppliers, among other things. See In re ESML, 135 F.4th at 97 (quoting In re Orion Pictures, 21 F.3d at 27).

**B. Disclosure of the Information Would Risk Competitive Injury.**

Cliffs requests to keep the information in only seventeen documents and limited deposition testimony excerpts under seal based on Section 107. For each, Cliffs provides the supporting information below to demonstrate an "actual[,]" "objective" and "substantial risk that disclosure would detrimentally affect the producing party's competitive standing." In re ESML, 135 F.4th at 97.

**#1: Exhibit 22** to the First Suggs Declaration. The document is a confidential presentation prepared for use in a meeting with some of Cliffs' key operational stakeholders. See Ex. A ¶ 7. Among other things, the presentation includes confidential analyses of Cliffs' iron ore prices, revenue and sales, strategic considerations regarding pricing targets, collective bargaining issues, and environmental issues, and pricing information as to rates with various vendors. See id. Any one of these issues, if disclosed, could wreak competitive harm: if competitors like Mesabi were to see Cliffs' pricing strategies, they could undercut Cliffs' prices; if pricing targets were revealed, customers and competitors could use those targets as leverage in discussions or may become upset at the price they received; if vendors were made aware of confidential pricing agreements between their competitors and Cliffs, they could very well seek to renegotiate their own contracts or use other vendors' price points as benchmarks for future negotiations. It is for these reasons that courts interpreting § 107 have included as protectable under § 107(b) "pricing formulae … and the terms of agreements with suppliers."' In re Alterra Healthcare, 353 B.R. at 76 (quoting In re Barney's,

201 B.R. at 709). Cliffs has proposed redactions to this document, and Mesabi previously agreed that the proposed redactions satisfied the higher common law standard for sealing. See Adv. D.I. 797 at 9; Adv. D.I. 811 at 10, 14; Ex. C ¶ 5.

**#2: Exhibit 23** to the First Suggs Declaration. The document is an analysis prepared for internal use by a Cliffs employee to evaluate the potential value of certain mineral producing properties in Minnesota. See Ex. A ¶ 8. This document includes strategic consideration relating to the past, present, and future value of certain land interest, as well as estimates of future revenue the land could provide to Cliffs and/or others. Were this information revealed, it would put Cliffs at a competitive disadvantage in negotiations with landowners in Minnesota (and elsewhere, for that matter) and [REDACTED]. See id. Cliffs has proposed certain redactions to this document that Mesabi had previously agreed satisfied the higher common law standard, along with one additional redaction for the second bullet on slide 9 based on the Section 107 standard. See Adv. D.I. 811 at 10, 14; Ex. C ¶ 6.

**#3 & #4: Exhibit 25 and Exhibit 26** to the First Suggs Declaration. The documents are internal email chains among Cliffs leadership regarding strategy considerations in negotiations and [REDACTED]. See Ex. A ¶¶ 9–10. Should these chains be disclosed, Cliffs could be placed at a competitive disadvantage relative to its competitors when dealing with [REDACTED], either because of the strategic considerations disclosure would reveal to [REDACTED] or because of the strategic considerations disclosure would reveal to competitors who would be engaging in the same sorts of [REDACTED] discussions. Cliffs has proposed redactions to these documents, as discussed in the Morrison Declaration. See Ex. C ¶¶ 7–8.

**#5: Exhibit 35** to the First Suggs Declaration. The document is a Cliffs internal presentation prepared in connection with a proposed transaction that was ultimately not consummated. See Ex. A ¶ 11. This presentation, which contains valuations of certain mineral rights in Minnesota and projections—through 2027—of the potential royalties and other values derivable from those properties, would risk competitive harm for many of the same reasons that the second document would: [redacted] See id. Cliffs has proposed certain redactions to this document which Mesabi had previously agreed satisfied the higher common law standard. See Adv. D.I. 811 at 10, 14; Ex. C ¶ 9.

**#6: Exhibit 37** to the First Suggs Declaration. The document is a confidential investor presentation which contains information about, among other things, Cliffs' strategies to lower costs, Cliffs' key assets and agreements, and Cliffs' decision-making process regarding selling and retaining certain assets. See Ex. A. ¶ 12. These issues are all highly sensitive and disclosure would create a risk of competitive harm for any number of obvious reasons. Disclosure of Cliffs' cost-mitigation strategies, for example, could be copied by competitors or leveraged by vendors to secure [redacted]. Disclosure of Cliffs' considerations as to the "sale of certain assets and the retention of other assets" is also precisely the kind of information other courts have protected under § 107. In re Farmland Indus., 290 B.R. at 368. Cliffs has proposed redactions to this document, as discussed in the Morrison Declaration. See Ex. C ¶ 10.

**#7: Exhibit 38** to the First Suggs Declaration. The document is an email from Cliffs CEO Lourenco Goncalves in which he discusses strategic considerations surrounding Cliffs' cost structure, pricing formulas, agreements with customers, and competitive advantages in the market. See Ex. A at ¶ 13. It should go without saying that disclosure of competitive advantages runs a

substantial risk of competitive harm—a competitor who seeks to gain an "unfair advantage" over Cliffs could hardly do better than to undermine what Cliffs itself sees as its competitive advantages. See In re ESML, 135 F.4th at 97 (quoting In re Orion Pictures, 21 F.3d at 27). Likewise, "pricing formulae … and the terms of agreements" are classic examples of confidential commercial information. In re Alterra Healthcare, 353 B.R. at 76 (quoting In re Barney's, 201 B.R. at 709). Cliffs has proposed redactions to this document, as discussed in the Morrison Declaration. See Ex. C ¶ 11.

**#8: Exhibit 41** to the First Suggs Declaration. The document is an email chain in which Cliffs leadership discusses strategic considerations regarding a potential sales relationship with a customer. See Ex. A at ¶ 14. As other courts have recognized, "[t]o allow a competitor access to [a] customer list would obviously have an adverse effect on [the party whose list it is]." In re Nunn, 49 B.R. 963, 965 (Bankr. E.D. Va. 1985). Even information as to one customer—particularly, as here, non-public information about considerations Cliffs had in contracting with that customer—could give competitors an unfair advantage in conversations with that customer or others. Cliffs has proposed certain redactions to this document which Mesabi had previously agreed satisfied the higher common law standard. See Adv. D.I. 811 at 10, 14; Ex. C ¶ 12.

**#9: Exhibit 42** to First Suggs Declaration. The document is an email and attachment discussing certain of Cliffs' strategic considerations surrounding Mesabi's project, with particular emphasis on Cliffs' strategic considerations with regard to a current Cliffs customer. See Ex. A ¶ 15. Disclosure of Cliffs' strategic considerations in evaluating potential competitors in the market and subsequent knock-on effects on a key customer would give Mesabi and other competitors an unfair advantage in discussions with that customer and others. See id. It is hard to imagine that evaluations of the pricing targets one entity believes a prospective competitor will need to hit in

order to compete viably would not be "confidential commercial information," the disclosure of which would provide an "unfair advantage" to the would-be competitor. See In re ESML, 135 F.4th at 97. Cliffs proposes sealing this document in full. Mesabi previously agreed that sealing in full satisfied the higher common law standard. See Adv. D.I. 797 at 9; Adv. D.I. 811 at 10, 14.

**#10: Exhibit 45** to the First Suggs Declaration. The document is an employee self-assessment which contains, among other things, strategic considerations relevant to Cliffs' ongoing determinations as to the lifetime and viability of various mining projects. See Ex. A ¶ 16. Were competitors to be made aware of these considerations, they could use that information to, among other things, apply leverage to Cliffs or Cliffs customers based on the dates and values therein referenced. See In re Farmland Indus., 290 B.R. at 369 ("disclosing to the public … the dates by which the Debtors' DIP Lenders are requiring that certain assets be marketed and sold … would be potentially detrimental to the ongoing operations of the Debtors, [and] would unfairly benefit the Debtors' competitors by providing them with critical, strategic marketing information"). The remaining information is the employees' internal thoughts on his performance, which separately would satisfy §107(b)(2) as protected personal information that need not be revealed. Cliffs proposes sealing this document in full. Mesabi previously agreed that sealing in full satisfied the higher common law standard. See Adv. D.I. 797 at 9; Adv. D.I. 811 at 10, 14.

**#11: Exhibit 49** to the First Suggs Declaration. The document is an email thread and attachment discussing elements of Cliffs' strategy for negotiations and [redacted] [redacted]. See Ex. A ¶ 17. [redacted] [redacted]. Public disclosure of Cliffs' strategies would put Cliffs at a competitive disadvantage in future negotiations—[redacted] [redacted]. See id. And as

Rasmussen declares, disclosure "would also give competitors insight into Cliffs' plans for use of the site, which could be used by competitors to supply customers that Cliffs might otherwise target." Id. Cliffs has proposed certain redactions to this document which Mesabi had previously agreed satisfied the higher common law standard. See Adv. D.I. 811 at 10, 14; Ex. C ¶ 15.

**#12: Exhibit 54** to the First Suggs Declaration. The document is an email chain in which Cliffs executives discussed valuations of and discussions concerning a potential acquisition of [redacted]. See Ex. A ¶ 18. It is nearly self-evident that disclosure of "non-public valuations" of a competitor's [redacted] would put Cliffs at a disadvantage not only relative to that competitor but also to others who may in the future seek to purchase those assets. Id. Cliffs proposes sealing this document in full. Mesabi previously agreed that sealing in full satisfied the higher common law standard. See Adv. D.I. 797 at 9; Adv. D.I. 811 at 10, 14.

**#13: Exhibit 31** to the Morrison PI Declaration. The document is an email chain among Cliffs leadership in which they discuss strategy considerations in advance of discussions with [redacted]. See Ex. A ¶ 19. As with other strategic discussions involving [redacted] [redacted], disclosure would grant competitors an unfair advantage insofar as it would reveal [redacted] strategies and discussions to competitors. Additionally, this document contains non-public information about Cliffs' possible strategies for the use of state property in Nashwauk, disclosure of which would give landowners, vendors, and competitors unfair leverage in discussions with Cliffs or potential customers. See id. Cliffs proposes sealing this document in full. Mesabi previously agreed that sealing in full satisfied the higher common law standard. See Adv. D.I. 797 at 9; Adv. D.I. 811 at 10, 14.

**#14 & #15: Exhibit 62 and Exhibit 63** to the Second Suggs Declaration. These documents are confidential presentations regarding Cliffs' options for [redacted]

[REDACTED]. See Ex. A ¶ 20–21. Disclosure of Cliffs' strategic plans would risk many different competitive harms, among them that disclosure of "logistical plans and project cost projections, would … put Cliffs at a disadvantage in negotiations with engineering, procurement, construction, and transportation suppliers, who could use Cliffs' internal assessment of the needs and costs for the project to [REDACTED]." Id. ¶ 20. Cliffs proposes sealing these documents in full. Mesabi previously agreed that sealing in full satisfied the higher common law standard. See Adv. D.I. 797 at 9; Adv. D.I. 811 at 10, 14.

**#16: Exhibit 64** to the Second Suggs Declaration. The document is a similar presentation to documents #14 and #15, which "contains non-public information concerning Cliffs' plans for use of [certain] property, including Cliffs' estimates of the cost and timelines for certain development tasks." Ex. A ¶ 22. As Cliffs has already noted, estimates of costs and timelines are precisely the sort of confidential information which competitors, vendors, and suppliers could use to gain a competitive advantage in negotiations with Cliffs, and should therefore be protected from disclosure. See In re Farmland Indus., 290 B.R. at 369. Cliffs proposes sealing this document in full. Mesabi previously agreed that sealing in full satisfied the higher common law standard. See Adv. D.I. 797 at 9; Adv. D.I. 811 at 10, 14.

**#17: Exhibit 70** to the Second Suggs Declaration. This document is a Pellet Sale and Purchase Agreement between Cliffs and ArcelorMittal USA. As stated in the Rasmussen Declaration, the exhibit "contains non-public and competitively sensitive information concerning Cliffs' iron ore pricing, pricing formulas, relevant indices, specifications, and other commercial terms on which Cliffs agreed to supply iron ore pellets to steelmakers" and is presented with the same redactions that were used for filing with the United States Securities & Exchange Commission. Ex. A ¶ 23. There can be little doubt that disclosure of confidential contract terms

would incur a substantial risk of an unfair advantage to competitors seeking to compete with Cliffs for the selling of iron ore pellets to. Indeed, In re Orion Pictures, on whose analysis the Third Circuit relied heavily, found that disclosure of "the overall structure, terms and conditions of [a licensing] Agreement, renders very likely a direct and adverse impairment to Orion's ability to negotiate favorable promotion agreements" with other entities. In re Orion Pictures, 21 F.3d at 28. So too with this contract. Cliffs has proposed certain redactions to this document which Mesabi had previously agreed satisfied the higher common law standard. See Adv. D.I. 811 at 10, 14; Ex. C ¶ 21.

**Deposition testimony** identified in Exhibit 18 to the Morrison Declaration. The deposition testimony excerpts discuss Cliffs' assessment and analysis of certain mineral rights in Minnesota, Cliffs' internal business plans for use of certain mineral rights, and the status of those plans. Disclosure of this information would risk competitive harm for many of the same reasons that the second and fifth documents containing similar information would: it would disadvantage Cliffs in future negotiations with landowners in Minnesota and with vendors and other parties with whom Cliffs needs to contract or reach agreement to implement these plans. Cliffs proposes to redact these deposition excerpts where used in Mesabi's Opening Brief, and Mesabi had previously agreed redacting this information satisfied the higher common law standard. See Adv. D.I. 811 at 10, 14; Ex. C ¶ 4.

## CONCLUSION

For these reasons, this Court should keep the information in the seventeen identified documents at issue sealed under Section 107 of the Bankruptcy Code.

Dated: May 30, 2025

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Michael S. Neiburg*

Michael S. Neiburg (No. 5275)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: 302.571.6600
Facsimile: 302.571.1253
Email: mneiburg@ycst.com

-and-

JONES DAY
Robert S. Faxon (admitted pro hac vice)
Kristin S.M. Morrison (admitted pro hac vice)
Brian K. Grube (admitted pro hac vice)
James R. Saywell (admitted pro hac vice)
North Point
901 Lakeside Avenue
Cleveland, OH 44114.1190
Telephone: 216.586.3939
Facsimile: 216.579.0212
E-mail: rfaxon@jonesday.com
kmorrison@jonesday.com
bkgrube@jonesday.com
jsaywell@jonesday.com

*Attorney for Cleveland-Cliffs Inc. and Cleveland-Cliffs Minnesota Land Development LLC*

# Exhibit A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br>ESSAR STEEL MINNESOTA LLC and ESML HOLDINGS INC.,<br>Reorganized Debtors. | Chapter 11<br>Case No. 16-11626 (CTG)<br>(Jointly Administered) |
| MESABI METALLICS COMPANY LLC (F/K/A ESSAR STEEL MINNESOTA LLC),<br>Plaintiff,<br>v.<br>CLEVELAND-CLIFFS INC., *et al.*,<br>Defendants. | Adv. Proc. No. 17-51210 (CTG) |
| CLEVELAND-CLIFFS INC., *et al.*,<br>Counterclaim-Plaintiffs,<br>v.<br>MESABI METALLICS COMPANY LLC,<br>Counterclaim-Defendant. | |
| CLEVELAND-CLIFFS INC., *et al.*,<br>Third-Party-Plaintiffs,<br>v.<br>CHIPPEWA CAPITAL PARTNERS, LLC,<br>Third-Party-Defendant.[1] | |

**DECLARATION OF SCOTT RASMUSSEN IN SUPPORT OF THE BRIEF OF DEFENDANTS CLEVELAND-CLIFFS INC. AND CLEVELAND-CLIFFS MINNESOTA LAND DEVELOPMENT LLC REGARDING UNSEALING UNDER SECTION 107**

[1] Counterclaim-Plaintiffs Cleveland-Cliffs Inc. and Cleveland-Cliffs Minnesota Land Development LLC respectfully disagree that their claims against Chippewa Capital Partners, LLC are third-party claims rather than counterclaims in this action.

I, Scott Rasmussen, do hereby declare:

1.      I am the Enterprise Director – Mining & Pelletizing for Cleveland-Cliffs Inc.

2.      I have worked for the company continuously since 1988.  I have been in my current role since November of 2022.

3.      My other roles with the company include: Senior Director – Cliffs Technology Group (2018–2022), Area Manager – Plant Operations (2015–2017), Area Manager – Metallurgical Processing (2009–2015), Area Manager – Pellet Plant Operations (2004–2009), Area Manager – Plant Operations (2002–2004), Area Manager – Concentrator Operations (2000–2002), Senior Section Manager – Concentrator Operations (1996–2000), Concentrator Plant Metallurgist (1988–1996), and Metallurgical Engineer (1981–1982).

4.      I have forty-one total years of experience in the mining and pelletizing business.

5.      My responsibilities require me to stay up to date on the company's strategic plan for its iron ore mining and pelletizing operations. I regularly review information concerning Cliffs' mining and pelletizing operations to facilitate operational decision-making and to assist production and forecasting. My roles include oversight of the company's land management department for mining operations and also efforts related to product development, process improvements, ore reserve optimization, cost reduction, risk management, pellet quality, safety and environmental compliance, for which I am familiar with the company's strategic plans, goals, opportunities, and competitive threats concerning the acquisition and development of ore producing properties. Since Cliffs became a vertically integrated steel company, my responsibilities have required me to understand the company's operations and strategic goals for the steel business as well. As such, I have personal knowledge of the facts set out below in this declaration or have obtained them from

a review of information provided to me by Cliffs' employees and professionals and Cliffs' business records.

6. I submit this declaration in support of the Brief of Defendants Cleveland-Cliffs Inc. and Cleveland-Cliffs Minnesota Land Development LLC Regarding Unsealing Under Section 107.

7. Exhibit 22 to the Declaration of David H. Suggs in Support of Plaintiff's Motion for Preliminary Injunction [Adv. D.I. 716] (hereafter referred to as the "First Suggs Declaration"), beginning at Bates number CLIFFS_000175413, is a presentation prepared in approximately February 2015 for use during a meeting of the company's L5 operational stakeholders. Slide 40 includes strategies that Cliffs could employ in future negotiations with labor unions; publication of slide 40 could put Cliffs at a disadvantage in ongoing or future negotiations with those labor unions. Slides 43 and 44 of Exhibit 22 contain non-public information concerning Cliffs' agreements with transportation suppliers, including the identity of such suppliers and the amounts that Cliffs paid for their respective services. Some of the vessel and rail rates on slides 43 and 44 are subject to contractual confidentiality provisions that prohibit public disclosure of the information shown on those slides. Public disclosure of the vessel and rail rates on Slides 43 and 44 and the related notes concerning Cliffs' contracts with its vessel and rail suppliers could put Cliffs at a competitive disadvantage in future negotiations with vessel and rail suppliers, who could use this non-public information regarding the rates of their competitors to [REDACTED] from Cliffs in future negotiations. Slide 65 of Exhibit 22 contains projections through 2023 concerning the amount of [REDACTED] that Cliffs may need to satisfy its environmental regulatory obligations. Disclosure of the information on Slide 65 could put Cliffs at a competitive disadvantage when negotiating with sellers of [REDACTED] [REDACTED], now or in the future. Although covered up by the graphic, slide 67 contains information which

can be copied from the PDF concerning Cliffs' negotiations with specific vendors to reduce costs. Slide 68 also identifies a specific discount rate that Cliffs receives from a particular vendor. Public disclosure of slides 67 and 68, which identify companies that Cliffs believes to be key suppliers, would put Cliffs at a competitive disadvantage when negotiating future contracts with those suppliers or potential competitors to those suppliers.

8. Exhibit 23 to the First Suggs Declaration, beginning at Bates number CLIFFS_000539963, is an internal document prepared by a Cliffs employee in approximately May 2013. Slides 4–12 include analysis of the potential value of certain mineral producing properties [REDACTED] to Cliffs, landowners, and other participants in the iron ore mining business [REDACTED]; analysis of lease agreement terms; and analysis of royalty projections for mineral producing properties owned or leased by Cliffs and its competitors, [REDACTED]. Public disclosure of the analysis and royalty calculations in Slides 4–12 of Exhibit 23 would put Cliffs at a competitive disadvantage in future negotiations with landowners or other counter-parties concerning the acquisition, lease, or use of the parcels described in the document, and specifically [REDACTED] described in Exhibit 23. The information contained in the first bullet point on Slide 9 of Exhibit 23 has been made public in this litigation and does not need to be redacted.

9. Exhibit 25 to the First Suggs Declaration, beginning at Bates number CLIFFS_000584190, is a July 2015 email chain among Cliffs executives that includes discussion and brainstorming ideas regarding negotiations with [REDACTED]. Disclosure of the non-public portions of Exhibit 25 that reveal Cliffs' internal business discussions around possible ways to approach the negotiations and

strategies the company might consider for potential communications and meetings with [redacted] [redacted] could put Cliffs at a competitive disadvantage when negotiating with [redacted] [redacted], now or in the future. The information not marked for redaction in Exhibit 25 either is not confidential or has been made public in this litigation and does not need to be redacted.

10. Exhibit 26 to the First Suggs Declaration, beginning at Bates number CLIFFS_000287255, is a December 2015 email chain among Cliffs executives that includes discussion and brainstorming ideas regarding Cliffs' potential public relations responses to a news article about [redacted] position on Mesabi's (then known as Essar Steel Minnesota) failure to pay contractors. Disclosure of the non-public portions of Exhibit 26 would put Cliffs at a competitive disadvantage by providing competitors with information about Cliffs' deliberative process for reaching decisions on public relations responses. The information not marked for redaction in Exhibit 26 either is not confidential or has been made public in this litigation and does not need to be redacted.

11. Exhibit 35 to the First Suggs Declaration, beginning at Bates number CLIFFS_000580724, is an internal presentation prepared in approximately June 2016 in connection with an unconsummated proposed transaction. Exhibit 35 contains Cliffs' valuation of certain properties and mineral rights in Minnesota, [redacted] [redacted]. Publicly disclosing the analysis, valuation, and royalty information in Exhibit 35, including the referenced portion of Exhibit 35 cited on pages 8 and 20 of Mesabi's Opening Brief [Adv. D.I. 715], would put Cliffs at a disadvantage in future negotiations with the landowners or other counter-parties concerning the acquisition, lease, or use of the properties discussed in Exhibit 35, and could specifically put Cliffs

[redacted] discussed in Exhibit 35. Disclosure of the analysis in Exhibit 35 could also put Cliffs at a disadvantage in the market by providing Cliffs' competitors with insight into Cliffs' strategy for its iron ore operations, which Cliffs' competitors could use to seek to acquire or drive up the cost of assets that Cliffs may otherwise be interested in acquiring. The information contained in the two bullet points on Slide 2 of Exhibit 35 not marked for redaction contains information about Mesabi (then known as Essar Steel Minnesota) that I am informed does not need to be redacted.

12. Exhibit 37 to the First Suggs Declaration, beginning at Bates number CLIFFS_000315934, is a January 2014 PowerPoint presentation that Cliffs prepared for use with investors. Slides 5–8, and 10–14 in Exhibit 37 include analysis that discusses Cliffs' strategies to lower costs, the impact of [redacted] on Cliffs' prices, a summary of key assets and initiatives, and Cliffs' offtake agreements and partnerships. Disclosure of the confidential commercial information in Exhibit 37 could put Cliffs at a competitive disadvantage by providing Cliffs' competitors insight into Cliffs' cost mitigation strategies and expenditure plans and the terms and information that Cliffs' investors consider for investment decisions regarding Cliffs' operations. The disclosure of the information in Slide 14 of Exhibit 37 also could put Cliffs at a disadvantage by providing competitors with information about Cliffs' internal decision-making process for selling or retaining certain assets, which competitors could use to their advantage in negotiations regarding asset divestitures or other business agreements, now or in the future.

13. Exhibit 38 to the First Suggs Declaration, beginning at Bates number CLIFFS_000629184, is a November 27, 2014 email from Cliffs' CEO Lourenco Goncalves to Credit Suisse and Jeffries employees attaching a draft of a December 2014 PowerPoint

presentation that Cliffs prepared for use with investors. The draft presentation contains information about Cliffs' cost structure, pricing, and advantages in maintaining contracts with iron ore customers. Disclosure of the information on Slides 16–23 of Exhibit 38 would put Cliffs at a competitive disadvantage by providing Cliffs' competitors insight into Cliffs' contract negotiation and cost-lowering strategies.

14. Exhibit 41 to the First Suggs Declaration, beginning at Bates number CLIFFS_000634212, is a March 2015 email chain . Pages 2 through 6 of the exhibit include a discussion between Cliffs and a customer of iron ore pellets regarding a potential sales relationship. Cliffs has sold iron ore to the customer identified in Exhibit 41 as recently as 2022 and could make additional sales to this customer in the future. Public disclosure of the portions of Exhibit 41 that reveal the discussion between Cliffs and the customer could therefore cause competitive harm to Cliffs by allowing competing iron ore suppliers to target the customer and attempt to win business away from Cliffs.

15. Exhibit 42 to the First Suggs Declaration, beginning at Bates number CLIFFS_000536945, is a January 27, 2015, email between Cliffs employees attaching an internal PowerPoint presentation. The presentation includes Cliffs' analysis of the strengths and weaknesses of the Mesabi project in Nashwauk and potential strategies for [REDACTED] , and it specifically includes discussion concerning [REDACTED], and Cliffs' assessment of [REDACTED]. Publicly disclosing the analysis and strategy discussed in Exhibit 42 would provide Mesabi a competitive advantage in future competition to supply pellets to iron ore customers, [REDACTED], in the event that Mesabi is able to commence production, including by giving Mesabi insight into Cliffs' understanding of the pricing that

Mesabi would be able to charge without incurring a loss. Disclosing Cliffs' analysis in Exhibit 42 of Mesabi's business and strategy for competing with Mesabi, [redacted] [redacted], would also put Cliffs at a competitive disadvantage in any future negotiations [redacted] [redacted].

16. Exhibit 45 to the First Suggs Declaration, beginning at Bates number CLIFFS_000690190, is an employee self-assessment prepared for Cliffs Human Resources department's talent management system by [redacted] as part of Cliffs' annual employee evaluation process and, as such, contains personal information specific to a former employee of the company. Disclosure of Cliffs' [redacted] [redacted], as well as the discussion of Cliffs' due diligence into and valuation of the Butler GPIOP lands in Itasca County and the impact that the acquisition would have on [redacted], would put Cliffs at a competitive disadvantage in any future negotiations involving the purchase or sale of mineral producing land that could support its operations at those mines, including by revealing the timelines when Cliffs may be most in need of additional ore resources and the dollar value that Cliffs places on those properties. Public disclosure of the best practices for mine planning would give competitors insight into Cliffs' processes and enable them to improve their own mine planning to better compete with Cliffs.

17. Exhibit 49 to the First Suggs Declaration, beginning at Bates number CLIFFS_000113105, is an April 2015 email thread between Cliffs executives, attaching a document outlining Cliffs' strategy for negotiations with [redacted] concerning mineral leases [redacted]. The attachment, which begins at page 3 of Exhibit 49, also

discusses potential uses for the mineral producing property owned by [REDACTED], including Cliffs' assessment of the strengths of the property, the steelmaking facilities that can be supplied from the site, and the types of products that could be produced from the ore body that is subject to the leases. Publicly disclosing the attachment included at pages 3-5 of Exhibit 49 would put Cliffs at a disadvantage in future negotiations with [REDACTED] concerning [REDACTED] [REDACTED], including both the property at issue ([REDACTED] [REDACTED]) and other [REDACTED] land. Disclosure of the attachment would also give competitors insight into Cliffs' plans for use of the site, which could be used by competitors to supply customers that Cliffs might otherwise target with products produced from [REDACTED].

18. Exhibit 54 to the First Suggs Declaration, beginning at Bates number CLIFFS_000309896, is a December 2015 email chain among Cliffs executives regarding Cliffs' discussion with [REDACTED] [REDACTED]. Exhibit 54 includes Cliffs' strategy for negotiating with [REDACTED] [REDACTED], including Cliffs' valuation of [REDACTED] [REDACTED]. Publicly disclosing Exhibit 54 would put Cliffs at a disadvantage in negotiating any future transaction with [REDACTED] [REDACTED] and other potential purchasers insight into Cliffs' non-public valuations of the underlying assets and negotiating strategies.

19. Exhibit 31 to the Declaration of Kristin Morrison in Support of Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction [Adv. D.I. 726], beginning at CLIFFS_000200851, is a March 2016 email among Cliffs executives regarding Cliffs' strategy for a meeting with [REDACTED]. The bullet points on page 2 of Exhibit 31

contain non-public information concerning Cliffs' [REDACTED] and Cliffs' potential uses for [REDACTED], including regarding the types of products Cliffs may produce with ore mined in Nashwauk and the customers Cliffs was considering supplying with such products. Publicly disclosing Exhibit 31 would put Cliffs at a disadvantage in future negotiation with landowners, [REDACTED], concerning transactions involving the property in Nashwauk, and would cause competitive harm to Cliffs by allowing competitors to pursue opportunities identified by Cliffs [REDACTED] in this strategy document.

20. Exhibit 62 to the Declaration of David H. Suggs in Further Support of Plaintiff's Motion for a Preliminary Injunction [Adv. D.I. 734] (the "Second Suggs Declaration"), beginning at Bates number CLIFFS_000732537, is a presentation prepared in approximately September 2015 discussing options for [REDACTED], including the possibility that Cliffs may [REDACTED], and Cliffs' plans for [REDACTED], including the logistical requirements and expected costs for the same. Although [REDACTED], Cliffs could pursue [REDACTED] as an additional or alternative option for [REDACTED]. Publicly disclosing Exhibit 62 would put Cliffs at a disadvantage in future negotiations with landowners [REDACTED] concerning land that Cliffs may [REDACTED]. Publicly disclosing Exhibit 63, including the logistical plans and project cost projections, would also put Cliffs at a disadvantage in negotiations

with engineering, procurement, construction, and transportation suppliers, who could use Cliffs' internal assessment of the needs and costs for the project to [redacted].

21. Exhibit 63 to the Second Suggs Declaration, beginning at Bates number CLIFFS_000732523, is a presentation prepared in October 2017 discussing options for [redacted], including the possibility that Cliffs may [redacted], and Cliffs' plans for [redacted], including the logistical requirements and expected costs for the same. Although [redacted], Cliffs could [redacted]. Publicly disclosing Exhibit 63 would put Cliffs at a disadvantage in future negotiations with landowners [redacted] concerning land that Cliffs may [redacted]. Publicly disclosing Exhibit 63, including the logistical plans and project cost projections, would also put Cliffs at a disadvantage in negotiations with engineering, procurement, construction, and transportation suppliers, who could use Cliffs' internal assessment of the needs and costs for the project to [redacted].

22. Exhibit 64 to the Second Suggs Declaration, beginning at Bates number CLIFFS_000102245, is a presentation prepared in approximately February 2018 regarding Cliffs' plans for property in Nashwauk acquired in Cliffs' transaction with Glacier Park Iron Ore Properties. The presentation contains non-public information concerning Cliffs' plans for use of the property, including Cliffs' estimates of the cost and timelines for certain development tasks. Publicly disclosing the cost and timeline information in Exhibit 64 (including the information recited on pages 16, 18, and 19 of Mesabi's Reply Brief [Adv. D.I. 733]) would put Cliffs at a

disadvantage when negotiating with suppliers that it may need to hire to assist in the development of Cliffs' Nashwauk project. Publicly disclosing the timelines included in Exhibit 64 (including the information recited on pages 16, 18, and 19 of The Second Suggs Declaration) would also put Cliffs at a disadvantage relative to competitors, who might seek to usurp opportunities [REDACTED] .

23. Exhibit 70 to the Second Suggs Declaration, beginning at Bates number CLIFFS_000017772, is a Pellet Sale and Purchase Agreement between Cliffs and ArcelorMittal USA, dated October 31, 2016 (the "Agreement"). Exhibit 70 contains non-public and competitively sensitive information concerning Cliffs' iron ore pricing, pricing formulas, relevant indices, specifications, and other commercial terms on which Cliffs agreed to supply iron ore pellets to steelmakers. Although Cliffs' now owns ArcelorMittal USA, Cliffs still sells iron ore pellets to external customers; publicly disclosing Exhibit 70 would put Cliffs at a disadvantage in negotiations with such customers, who could use the terms in Exhibit 70 in their negotiations against Cliffs. Publicly disclosing the pellet specifications for the ore that Cliffs uses in the former Arcelor blast furnaces that Cliffs has since acquired also could give Cliffs' competitors insight into Cliffs' processes and technical know-how and thus enable them to better compete with Cliffs by seeking to acquire ore and/or make steel that matches Cliffs' specifications. Therefore, Cliffs proposes redactions consistent with those in the public version of the Agreement filed with the Securities and Exchange Commission.

[*remainder of page intentionally blank*]

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: May 30, 2025

Scott Rasmussen

# Exhibit B

**Cliffs' Positions on Documents and Information that Mesabi Requested to Unseal in 2023 [See Adv. D.I. 774]**

| Exhibits Mesabi Sought to Unseal in 2023 | Unsealing Not Opposed [in 2023] | Unsealing Not Opposed [§ 107] | Document Description | Seal (in full or redacted) under § 107 |
|---|---|---|---|---|
| 22 – First Suggs Decl. (Mesabi Opening Br.) | | | Feb. 3, 2015, Cliffs PowerPoint Presentation titled "USIO L5 Meeting" (CLIFFS_000175413) | X[1] [Redacted] |
| 23 – First Suggs Decl. (Mesabi Opening Br.) | | | May 2013, PowerPoint Presentation titled "Glacier Park Company - May 2013 -Jesse Dunsmoor: Opportunity Scope" (CLIFFS_000539963) | X[2] [Redacted] |
| 25 – First Suggs Decl. (Mesabi Opening Br.) | | | Jul. 24, 2015, Email chain between Lourenco Goncalves and David Cartella re: Message from Unknown sender (916128056333), with attachment (CLIFFS_000584190) | X[3] [Redacted] |
| 26 – First Suggs Decl. (Mesabi Opening Br.) | | | Dec. 1, 2015, Email chain between, *inter alia*, Kelly Tompkins and David Cartella re: Dayton issues warning to Essar about paying companies working on Nashwauk site (CLIFFS_000287255) | X[4] [Redacted] |
| 35 – First Suggs Decl. (Mesabi Opening Br.) | | | June 2016, Cliffs PowerPoint Presentation titled "Project Viking Valuations" (CLIFFS_000580724) | X[5] [Redacted] |
| 37 – First Suggs Decl. (Mesabi Opening Br.) | | | Jan. 2014, Cliffs PowerPoint Presentation titled "Cliffs Natural Resources Inc." (CLIFFS_000315934) | X[6] [Redacted] |

[1] See Rasmussen Decl. ¶ 7. Mesabi previously agreed that the proposed redactions satisfied the higher common law standard for sealing. See Adv. D.I. 797 at 9; Adv. D.I. 811 at 10, 14. Proposed redactions shown highlighted on Morrison Decl. Ex. 5.

[2] See Rasmussen Decl. ¶ 8. Cliffs proposes redactions that Mesabi previously agreed satisfied the higher common law standard for sealing, see Adv. D.I. 811 at 10, 14, plus one additional redaction for the second bullet on Slide 9 based on the Section 107 standard. Proposed redactions shown highlighted on Morrison Decl. Ex. 6.

[3] See Rasmussen Decl. ¶ 9. Proposed redactions shown highlighted on Morrison Decl. Ex. 7.

[4] See Rasmussen Decl. ¶ 10. Proposed redactions shown highlighted on Morrison Decl. Ex. 8.

[5] See Rasmussen Decl. ¶ 11. Mesabi previously agreed that the proposed redactions satisfied the higher common law standard for sealing. See Adv. D.I. 811 at 10, 14. Proposed redactions shown highlighted on Morrison Decl. Ex. 9.

[6] See Rasmussen Decl. ¶ 12. Proposed redactions shown highlighted on Morrison Decl. Ex. 10.

**Cliffs' Positions on Documents and Information that Mesabi Requested to Unseal in 2023 [See Adv. D.I. 774]**

| Exhibits Mesabi Sought to Unseal in 2023 | Unsealing Not Opposed [in 2023] | Unsealing Not Opposed [§ 107] | Document Description | Seal (in full or redacted) under § 107 |
|---|---|---|---|---|
| 38 – First Suggs Decl. (Mesabi Opening Br.) | | | Nov. 27, 2014, Email from Lourenco Goncalves, *inter alia*, Peter Cohen and Peter Matt re: Roadshow Presentation needs improvement, with attachment (CLIFFS_000629184) | X[7] [Redacted] |
| 41 – First Suggs Decl. (Mesabi Opening Br.) | | | Mar. 28, 2015, Email chain between Lourenco Goncalves and Paul Finan re: [redacted] (CLIFFS_000634212) | X[8] [Redacted] |
| 42 – First Suggs Decl. (Mesabi Opening Br.) | | | Jan. 27, 2015, Email from Chris Schron to Kelly Tompkins re: Essar steel MN – potential CNR mitigating actions.pptx, with attachment (CLIFFS_000536945) | X[9] [Seal in full] |
| 45 – First Suggs Decl. (Mesabi Opening Br.) | | | Undated, Self Evaluation of [redacted] (CLIFFS_000690190) | X[10] [Seal in full] |
| 49 – First Suggs Decl. (Mesabi Opening Br.) | | | Apr. 3, 2015, Email from David Cartella to Kelly Tompkins re: Essar Negotiating Points and Considerations.docx, with attachments (CLIFFS_000113105) | X[11] [Redacted] |
| 54 – First Suggs Decl. (Mesabi Opening Br.) | | | Dec. 3, 2015, Email chain between Kelly Tompkins and Lourenco Goncalves re: [redacted] (CLIFFS_000309896) | X[12] [Seal in full] |

[7] See Rasmussen Decl. ¶ 13. Proposed redactions shown highlighted on Morrison Decl. Ex. 11.

[8] See Rasmussen Decl. ¶ 14. Mesabi previously agreed that the proposed redactions satisfied the higher common law standard for sealing. See Adv. D.I. 797 at 9; Adv. D.I. 811 at 10, 14. Proposed redactions shown highlighted on Morrison Decl. Ex. 12.

[9] See Rasmussen Decl. ¶ 15. Mesabi previously agreed that the sealing in full satisfied the higher common law standard for sealing. See Adv. D.I. 797 at 9; Adv. D.I. 811 at 10, 14.

[10] See Rasmussen Decl. ¶ 16. Mesabi previously agreed that the sealing in full satisfied the higher common law standard for sealing. See Adv. D.I. 797 at 9; Adv. D.I. 811 at 10, 14.

[11] See Rasmussen Decl. ¶ 17. Mesabi previously agreed that the proposed redactions satisfied the higher common law standard for sealing. See Adv. D.I. 797 at 9; Adv. D.I. 811 at 10, 14. Proposed redactions shown highlighted on Morrison Decl. Ex. 15.

[12] See Rasmussen Decl. ¶ 18. Mesabi previously agreed that the sealing in full satisfied the higher common law standard for sealing. See Adv. D.I. 797 at 9; Adv. D.I. 811 at 10, 14.

**Cliffs' Positions on Documents and Information that Mesabi Requested to Unseal in 2023 [See Adv. D.I. 774]**

| Exhibits Mesabi Sought to Unseal in 2023 | Unsealing Not Opposed [in 2023] | Unsealing Not Opposed [§ 107] | Document Description | Seal (in full or redacted) under § 107 |
|---|---|---|---|---|
| 31 – Morrison Decl. (Cliffs Opp'n Br.) | | | March 21, 2016, Email chain between, inter alia, K. Tompkins, P. Bloom re: [redacted] Meeting - Attendees and Draft Prep Notes (CLIFFS_000200851) | X[13] [Seal in full] |
| 62 – Second Suggs Decl. (Mesabi Reply Br.) | | | Sept. 2015, Cliffs PowerPoint presentation titled "[redacted], [redacted]" (CLIFFS_000732537) | X[14] [Seal in full] |
| 63 – Second Suggs Decl. (Mesabi Reply Br.) | | | Oct. 2017, Cliffs PowerPoint presentation titled "[redacted], [redacted]" (CLIFFS_000732523) | X[15] [Seal in full] |
| 64 – Second Suggs Decl. (Mesabi Reply Br.) | | | February 2018, Cliffs PowerPoint presentation titled "Butler Mine Project" (CLIFFS_000102245) | X[16] [Seal in full] |
| 70 – Second Suggs Decl. (Mesabi Reply Br.) | | | Oct. 31, 2016, Pellet Sale and Purchase Agreeement between Cliffs and ArcelorMittal USA (CLIFFS_000017772) | X[17] [Redacted] |
| 14 – Mesabi Opening Br. | X | | | |
| 16 – Mesabi Opening Br. | X | | | |
| 17 – Mesabi Opening Br. | X | | | |
| 18 – Mesabi Opening Br. | X | | | |
| 19 – Mesabi Opening Br. | X | | | |

[13] See Rasmussen Decl. ¶ 19. Mesabi previously agreed that the sealing in full satisfied the higher common law standard for sealing. See Adv. D.I. 797 at 9; Adv. D.I. 811 at 10, 14.

[14] See Rasmussen Decl. ¶ 20. Mesabi previously agreed that the sealing in full satisfied the higher common law standard for sealing. See Adv. D.I. 797 at 9; Adv. D.I. 811 at 10, 14.

[15] See Rasmussen Decl. ¶ 21. Mesabi previously agreed that the sealing in full satisfied the higher common law standard for sealing. See Adv. D.I. 797 at 9; Adv. D.I. 811 at 10, 14.

[16] See Rasmussen Decl. ¶ 22. Mesabi previously agreed that the sealing in full satisfied the higher common law standard for sealing. See Adv. D.I. 797 at 9; Adv. D.I. 811 at 10, 14.

[17] See Rasmussen Decl. ¶ 23. Mesabi previously agreed that the proposed redactions satisfied the higher common law standard for sealing. See Adv. D.I. 811 at 10, 14. Proposed redactions shown highlighted on Morrison Decl. Ex. 21.

**Cliffs' Positions on Documents and Information that Mesabi Requested to Unseal in 2023 [See Adv. D.I. 774]**

| Exhibits Mesabi Sought to Unseal in 2023 | Unsealing Not Opposed [in 2023] | Unsealing Not Opposed [§ 107] | Document Description | Seal (in full or redacted) under § 107 |
|---|---|---|---|---|
| 20 – Mesabi Opening Br. | X | | | |
| 21 – Mesabi Opening Br. | X | | | |
| 24 – Mesabi Opening Br. | | X | | |
| 27 – Mesabi Opening Br. | X | | | |
| 28 – Mesabi Opening Br. | | X | | |
| 29 – Mesabi Opening Br. | | X | | |
| 30 – Mesabi Opening Br. | | X | | |
| 31 – Mesabi Opening Br. | | X | | |
| 32 – Mesabi Opening Br. | | X | | |
| 33 – Mesabi Opening Br. | | X | | |
| 34 – Mesabi Opening Br. | | X | | |
| 36 – Mesabi Opening Br. | | X | | |
| 39 – Mesabi Opening Br. | | X | | |
| 40 – Mesabi Opening Br. | X | | | |

**Cliffs' Positions on Documents and Information
that Mesabi Requested to Unseal in 2023 [See Adv. D.I. 774]**

| Exhibits Mesabi Sought to Unseal in 2023 | Unsealing Not Opposed [in 2023] | Unsealing Not Opposed [§ 107] | Document Description | Seal (in full or redacted) under § 107 |
|---|---|---|---|---|
| 43 – Mesabi Opening Br. | | X | | |
| 44 – Mesabi Opening Br. | | X | | |
| 46 – Mesabi Opening Br. | | X | | |
| 47 – Mesabi Opening Br. | X | | | |
| 48 – Mesabi Opening Br. | X | | | |
| 50 – Mesabi Opening Br. | | X | | |
| 51 – Mesabi Opening Br. | | X | | |
| 52 – Mesabi Opening Br. | X | | | |
| 53 – Mesabi Opening Br. | | X | | |
| 55 – Mesabi Opening Br. | X | | | |
| 56 – Mesabi Opening Br. | X | | | |
| 57 – Mesabi Opening Br. | X | | | |
| 58 – Mesabi Opening Br. | X | | | |
| 59 – Mesabi Opening Br. | X | | | |
| 22 – Cliffs Opp'n Br. | X | | | |
| 23 – Cliffs Opp'n Br. | X | | | |
| 24 – Cliffs Opp'n Br. | X | | | |
| 25 – Cliffs Opp'n Br. | X | | | |
| 26 – Cliffs Opp'n Br. | X | | | |
| 27 – Cliffs Opp'n Br. | X | | | |

**Cliffs' Positions on Documents and Information
that Mesabi Requested to Unseal in 2023 [See Adv. D.I. 774]**

| Exhibits Mesabi Sought to Unseal in 2023 | Unsealing Not Opposed [in 2023] | Unsealing Not Opposed [§ 107] | Document Description | Seal (in full or redacted) under § 107 |
|---|---|---|---|---|
| 28 – Cliffs Opp'n Br. | X | | | |
| 29 – Cliffs Opp'n Br. | | X | | |
| 30 – Cliffs Opp'n Br. | X | | | |
| 32 – Cliffs Opp'n Br. | | X | | |
| 33 – Cliffs Opp'n Br. | X | | | |
| 34 – Cliffs Opp'n Br. | X | | | |
| 35 – Cliffs Opp'n Br. | X | | | |
| 36 – Cliffs Opp'n Br. | X | | | |
| 37 – Cliffs Opp'n Br. | X | | | |
| 38 – Cliffs Opp'n Br. | X | | | |
| 39 – Cliffs Opp'n Br. | X | | | |
| 40 – Cliffs Opp'n Br. | X | | | |
| 41 – Cliffs Opp'n Br. | X | | | |
| 42 – Cliffs Opp'n Br. | X | | | |
| 43 – Cliffs Opp'n Br. | X | | | |
| 44 – Cliffs Opp'n Br. | X | | | |
| 45 – Cliffs Opp'n Br. | X | | | |
| 46 – Cliffs Opp'n Br. | X | | | |
| 47 – Cliffs Opp'n Br. | X | | | |
| 48 – Cliffs Opp'n Br. | X | | | |
| 49 – Cliffs Opp'n Br. | X | | | |
| 50 – Cliffs Opp'n Br. | X | | | |

**Cliffs' Positions on Documents and Information
that Mesabi Requested to Unseal in 2023 [See Adv. D.I. 774]**

| Exhibits Mesabi Sought to Unseal in 2023 | Unsealing Not Opposed [in 2023] | Unsealing Not Opposed [§ 107] | Document Description | Seal (in full or redacted) under § 107 |
|---|---|---|---|---|
| 51 – Cliffs Opp'n Br. | X | | | |
| 52 – Cliffs Opp'n Br. | X | | | |
| 53 – Cliffs Opp'n Br. | X | | | |
| 54 – Cliffs Opp'n Br. | X | | | |
| 55 – Cliffs Opp'n Br. | X | | | |
| 56 – Cliffs Opp'n Br. | X | | | |
| 57 – Cliffs Opp'n Br. | X | | | |
| 58 – Cliffs Opp'n Br. | X | | | |
| 59 – Cliffs Opp'n Br. | X | | | |
| 60 – Cliffs Opp'n Br. | X | | | |
| 61 – Cliffs Opp'n Br. | X | | | |
| 62 – Cliffs Opp'n Br. | X | | | |
| 63 – Cliffs Opp'n Br. | X | | | |
| 64 – Cliffs Opp'n Br. | X | | | |
| 65 – Cliffs Opp'n Br. | X | | | |
| 66 – Cliffs Opp'n Br. | X | | | |
| 67 – Cliffs Opp'n Br. | X | | | |
| 68 – Cliffs Opp'n Br. | X | | | |
| 71 – Cliffs Opp'n Br. | X | | | |
| 72 – Cliffs Opp'n Br. | X | | | |
| 81 – Cliffs Opp'n Br. | X | | | |
| 82 – Cliffs Opp'n Br. | X | | | |

**Cliffs' Positions on Documents and Information
that Mesabi Requested to Unseal in 2023 [See Adv. D.I. 774]**

| Exhibits Mesabi Sought to Unseal in 2023 | Unsealing Not Opposed [in 2023] | Unsealing Not Opposed [§ 107] | Document Description | Seal (in full or redacted) under § 107 |
|---|---|---|---|---|
| 83 – Cliffs Opp'n Br. | X | | | |
| 84 – Cliffs Opp'n Br. | X | | | |
| 85 – Cliffs Opp'n Br. | X | | | |
| 86 – Cliffs Opp'n Br. | X | | | |
| 87 – Cliffs Opp'n Br. | X | | | |
| 88 – Cliffs Opp'n Br. | X | | | |
| 89 – Cliffs Opp'n Br. | X | | | |
| 90 – Cliffs Opp'n Br. | X | | | |
| 91 – Cliffs Opp'n Br. | X | | | |
| 92 – Cliffs Opp'n Br. | X | | | |
| 93 – Cliffs Opp'n Br. | X | | | |
| 95 – Cliffs Opp'n Br. | X | | | |
| 96 – Cliffs Opp'n Br. | X | | | |
| 97 – Cliffs Opp'n Br. | X | | | |
| 98 – Cliffs Opp'n Br. | X | | | |
| 102 – Cliffs Opp'n Br. | X | | | |
| 103 – Cliffs Opp'n Br. | X | | | |
| 105 – Cliffs Opp'n Br. | X | | | |
| 106 – Cliffs Opp'n Br. | X | | | |
| 107 – Cliffs Opp'n Br. | X | | | |
| 108 – Cliffs Opp'n Br. | X | | | |
| 109 – Cliffs Opp'n Br. | X | | | |

**Cliffs' Positions on Documents and Information
that Mesabi Requested to Unseal in 2023 [See Adv. D.I. 774]**

| Exhibits Mesabi Sought to Unseal in 2023 | Unsealing Not Opposed [in 2023] | Unsealing Not Opposed [§ 107] | Document Description | Seal (in full or redacted) under § 107 |
|---|---|---|---|---|
| 111 – Cliffs Opp'n Br. | X | | | |
| 112 – Cliffs Opp'n Br. | X | | | |
| 113 – Cliffs Opp'n Br. | X | | | |
| 114 – Cliffs Opp'n Br. | X | | | |
| 115 – Cliffs Opp'n Br. | X | | | |
| 116 – Cliffs Opp'n Br. | X | | | |
| 66 – Second Suggs Decl. (Reply Br.) | X | | | |
| 67 – Second Suggs Decl. (Reply Br.) | X | | | |
| 69 – Second Suggs Decl. (Reply Br.) | X | | | |

# Exhibit C

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br>ESSAR STEEL MINNESOTA LLC and ESML HOLDINGS INC.,<br>Reorganized Debtors. | Chapter 11<br>Case No. 16-11626 (CTG)<br>(Jointly Administered) |
| MESABI METALLICS COMPANY LLC (F/K/A ESSAR STEEL MINNESOTA LLC),<br>Plaintiff,<br>v.<br>CLEVELAND-CLIFFS INC., et al.,<br>Defendants. | Adv. Proc. No. 17-51210 (CTG) |
| CLEVELAND-CLIFFS INC., et al.,<br>Counterclaim-Plaintiffs,<br>v.<br>MESABI METALLICS COMPANY LLC,<br>Counterclaim-Defendant. | |
| CLEVELAND-CLIFFS INC., et al.,<br>Third-Party-Plaintiffs,<br>v.<br>CHIPPEWA CAPITAL PARTNERS, LLC,<br>Third-Party-Defendant.[1] | |

**DECLARATION OF KRISTIN S.M. MORRISON IN SUPPORT OF BRIEF OF DEFENDANTS CLEVELAND-CLIFFS INC. AND CLEVELAND-CLIFFS MINNESOTA LAND DEVELOPMENT LLC REGARDING UNSEALING UNDER SECTION 107**

[1] Counterclaim-Plaintiffs Cleveland-Cliffs Inc. and Cleveland-Cliffs Minnesota Land Development LLC respectfully disagree that their claims against Chippewa Capital Partners, LLC are third-party claims rather than counterclaims in this action.

I, Kristin S.M. Morrison, do hereby declare:

1.      Defendant Cleveland-Cliffs Inc. ("Cliffs") retained the law firm of Jones Day to represent it and its subsidiary, Defendant Cleveland-Cliffs Minnesota Land Development LLC, in connection with this dispute, which is an adversary proceeding filed in the chapter 11 proceedings of Essar Steel Minnesota LLC and ESML Holdings Inc., Case No. 16-11626.  I am a Partner with the law firm of Jones Day, and I have been admitted pro hac vice to practice before the United States Bankruptcy Court for the District of Delaware in this action.

2.      This declaration is submitted to provide the Court with copies of the seventeen documents and deposition testimony excerpts that include confidential commercial information that Cliffs seeks to keep under seal under 11 U.S.C. § 107.  As explained in the Brief Regarding Unsealing Under Section 107, and discussed in the subsequent paragraphs to this declaration, Cliffs requests that the information in seven documents be sealed in full, that the information in ten documents be redacted as marked on the copies of the documents attached to this declaration, and that the information quoted or referenced in the identified deposition testimony be redacted as marked on Exhibit 18 to this declaration, with conforming redactions for the information from these documents and testimony in the parties' briefing.  For consistency, the seventeen documents are discussed using the exhibit numbers from the parties' briefing as filed in 2023: Exhibits 22, 23, 25, 26, 35, 37, 38, 41, 42, 45, 49, and 54 to the Declaration of David H. Suggs in Support of Plaintiff's Motion for Preliminary Injunction [Adv. D.I. 716] (the "First Suggs Declaration"); Exhibit 31 to the Declaration of Kristin Morrison in Support of Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction [Adv. D.I. 726] (the "Morrison PI Declaration"); and Exhibits 62, 63, 64, and 70 to the Declaration of David H. Suggs in Further Support of Plaintiff's Motion for a Preliminary Injunction [Adv. D.I. 734] (the "Second Suggs Declaration").

3.      When addressing this issue in 2023, Cliffs and Plaintiff Mesabi Metallics Company LLC ("Mesabi") previously reached an agreement on the treatment of the information in thirteen of these documents if the common law standard for sealing applied, as outlined in the bullets below.

- The seven documents Cliffs requests to keep under seal under the Section 107 standard are the same seven documents that Mesabi had agreed could be sealed under the common law standard: Exhibits 42, 45, and 54 to the First Suggs Declaration; Exhibit 31 to the Morrison PI Declaration; and Exhibits 62, 63, and 64 to the Second Suggs Declaration.

- Five of the documents Cliffs requests to keep under seal as redacted under the Section 107 standard contain redactions for the same information that Mesabi had agreed could be sealed with redactions under the common law standard: Exhibits 22, 35, 41, and 49 to the First Suggs Declaration; and Exhibit 70 to the Second Suggs Declaration.

- One document that Cliffs requests to keep under seal as redacted under the Section 107 standard contain redactions for the same information that Mesabi had agreed could be sealed with redactions under the common law standard plus one additional redaction on slide 9: Exhibit 23 to the First Suggs Declaration.

- The four other documents that Cliffs requests to keep under seal as redacted under the Section 107 standard were not part of the parties' previous agreement: Exhibits 25, 26, 37, and 38 to the First Suggs Declaration.

4.      The parties also previously reached an agreement that the information in certain deposition testimony excerpts quoted or referenced in Mesabi's Opening Brief for a preliminary

injunction should be sealed under the common law standard.  Attached as Exhibit 18 to this declaration is a chart which identifies the content to be kept under seal as redacted consistent with that agreement.

5.      Attached as Exhibit 1 to this declaration is a true and correct copy of a document formerly filed as Exhibit 22 to the First Suggs Declaration.  Cliffs has proposed redactions to this document for the same information that Mesabi had agreed could be sealed with redactions under the common law standard.  The redactions are shown by yellow highlighting in the attached copy.

6.      Attached as Exhibit 2 to this declaration is a true and correct copy of a document formerly filed as Exhibit 23 to the First Suggs Declaration.  Cliffs has proposed redactions to this document for the same information that Mesabi had agreed could be sealed with redactions under the common law standard plus one additional redaction on slide 9.  The redactions are shown by yellow highlighting in the attached copy.

7.      Attached as Exhibit 3 to this declaration is a true and correct copy of a document formerly filed as Exhibit 25 to the First Suggs Declaration.  Cliffs has proposed redactions to this document.  The redactions are shown by yellow highlighting in the attached copy.

8.      Attached as Exhibit 4 to this declaration is a true and correct copy of a document formerly filed as Exhibit 26 to the First Suggs Declaration.  Cliffs has proposed redactions to this document.  The redactions are shown by yellow highlighting in the attached copy.

9.      Attached as Exhibit 5 to this declaration is a true and correct copy of a document formerly filed as Exhibit 35 to the First Suggs Declaration.  Cliffs has proposed redactions to this document for the same information that Mesabi had agreed could be sealed with redactions under the common law standard.  The redactions are shown by yellow highlighting in the attached copy.

10.     Attached as Exhibit 6 to this declaration is a true and correct copy of a document formerly filed as Exhibit 37 to the First Suggs Declaration.  Cliffs has proposed redactions to this document.  The redactions are shown by yellow highlighting in the attached copy.

11.     Attached as Exhibit 7 to this declaration is a true and correct copy of a document formerly filed as Exhibit 38 to the First Suggs Declaration.  Cliffs has proposed redactions to this document.  The redactions are shown by yellow highlighting in the attached copy.

12.     Attached as Exhibit 8 to this declaration is a true and correct copy of a document formerly filed as Exhibit 41 to the First Suggs Declaration.  Cliffs has proposed redactions to this document for the same information that Mesabi had agreed could be sealed with redactions under the common law standard.  The redactions are shown by yellow highlighting in the attached copy.

13.     Attached as Exhibit 9 to this declaration is a true and correct copy of a document formerly filed as Exhibit 42 to the First Suggs Declaration.  Cliffs has proposed sealing this document in full.  Mesabi previously agreed this document could be sealed under the common law standard.

14.     Attached as Exhibit 10 to this declaration is a true and correct copy of a document formerly filed as Exhibit 45 to the First Suggs Declaration.  Cliffs has proposed sealing this document in full.  Mesabi previously agreed this document could be sealed under the common law standard.

15.     Attached as Exhibit 11 to this declaration is a true and correct copy of a document formerly filed as Exhibit 49 to the First Suggs Declaration.  Cliffs has proposed redactions to this document for the same information that Mesabi had agreed could be sealed with redactions under the common law standard.  The redactions are shown by yellow highlighting in the attached copy.

16.     Attached as Exhibit 12 to this declaration is a true and correct copy of a document formerly filed as Exhibit 54 to the First Suggs Declaration.  Cliffs has proposed sealing this document in full.  Mesabi previously agreed this document could be sealed under the common law standard.

17.     Attached as Exhibit 13 to this declaration is a true and correct copy of a document formerly filed as Exhibit 31 to the Morrison PI Declaration.  Cliffs has proposed sealing this document in full.  Mesabi previously agreed this document could be sealed under the common law standard.

18.     Attached as Exhibit 14 to this declaration is a true and correct copy of a document formerly filed as Exhibit 62 to the Second Suggs Declaration.  Cliffs has proposed sealing this document in full.  Mesabi previously agreed this document could be sealed under the common law standard.

19.     Attached as Exhibit 15 to this declaration is a true and correct copy of a document formerly filed as Exhibit 63 to the Second Suggs Declaration.  Cliffs has proposed sealing this document in full.  Mesabi previously agreed this document could be sealed under the common law standard.

20.     Attached as Exhibit 16 to this declaration is a true and correct copy of a document formerly filed as Exhibit 64 to the Second Suggs Declaration.  Cliffs has proposed sealing this document in full.  Mesabi previously agreed this document could be sealed under the common law standard.

21.     Attached as Exhibit 17 to this declaration is a true and correct copy of a document formerly filed as Exhibit 70 to the Second Suggs Declaration.  Cliffs has proposed redactions to this document for the same information that Mesabi had agreed could be sealed with redactions

under the common law standard and that match the redactions applied when this document was filed with the United States Securities and Exchange Commission. The redactions are shown by yellow highlighting in the attached copy.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: May 30, 2025

*/s/ Kristin S.M. Morrison*

Kristin S.M. Morrison (admitted pro hac vice)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114.1190
Telephone: +1.216.586.7375
Facsimile: +1.216.579.0212
E-mail: kmorrison@jonesday.com

*Attorney for Cleveland-Cliffs Inc. and Cleveland-Cliffs Minnesota Land Development LLC*

# Exhibit 1

************************************

**THIS DOCUMENT WAS PROVIDED IN NATIVE FORMAT UPON REQUEST.**

************************************

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER CLIFFS_000175413



# USIO L5 Meeting

First Quarter
February 3, 2015

# AGENDA

1. **Safety Share and Context**

2. **USIO as the Core Business**
   - What does USIO as the Core Business Look Like?
   - Headwinds / Challenges Facing USIO
     - Market Conditions / Competition
     - Regulatory Costs
     - Productivity and Profitability
   - 2015 Game Plan

3. **USIO Sales / Shipping Update**

4. **2016 & Beyond Cost and Capital $55/ton**

5. **Q1 Site Updates**

6. **USIO Department Updates**

7. **Supply Chain $40M Initiative / New Org**

8. **Wrap-up / Takeaways**

# SAFETY SHARE – PRIMARY CRUSHER DOOR INCIDENT



## SAFETY SHARE – CRUSHER INCIDENT

- **On the 1-9-15 the 60" primary crusher had an ore chunk on the West side requiring the West pocket door to be opened to access the chunk with the hook on the overhead crane.**

- **The West pocket door could not open under its own power.**

- **The overhead crane was used to assist in opening the door by pulling near the lower drive chain.**

- **While pulling on the door it lifted off of the bottom track and pushed the inner handrail on the walkway toward the south.**

- **Two employees were standing on the walkway where the West pocket door was positioned. One person was remotely operating the crane and the other observing the door and a third employee was operating the door controls.**

- **When the door pushed the handrail to the south, the employee observing was caught between the two handrails. The employee operating the crane immediately lowered the door to allow the handrail to move enough to free the other employee.**

## SAFETY SHARE – CRUSHER INCIDENT



## SAFETY SHARE – WHAT ARE THE FACTS?

1. **The upper chain drive on the West pocket door was inoperable.**
2. **The rollers for the pocket doors had developed flat spots prior to the incident causing the doors to bind up while opening.**
3. **Three crusher employees were involved in opening the door.**
4. **The overhead crane was used to assist in opening the door at an angle and lifted the door off of the bottom track.**
5. **The crane operator and one employee were standing near the door on the walkway to observe for any binding while opening the door.**
6. **Dust and steam from the pocket and cold air created limited visibility for the crane operator making hand signals difficult to see.**

***This task has been performed before and the hazards associated were not properly identified. Why???***

## REFRESHER: WORK OF COMPLEXITY V

| Level 5 work is… | Level 5 work is not… |
|---|---|
| Organization shaping / Strategic | Task Based |
| Culturally sensitive | Role Based |
| Leverages positive environment and mitigates for negative environments | Short term |
| Forward thinking (+5 years) | Smaller Systems (Within mine site) |
| Upstanding significant risk | Informational |
| Major systems (Crossing Mine Sites) | Linear |



## USIO L5 GOAL / PURPOSE STATEMENT

USIO's organization, culture, and major systems are being refined to proactively mitigate, offset or leverage the impact of the environment on our productivity and profitability over time.

USIO AS THE CORE BUSINESS

## What does USIO as the Core Business look like?

- Bloom Lake idled. (Facing Sale, Permanent Closure or Bankruptcy)
- Logan County Coal Sold for $150 Million
- All other non-core assets are for sale
- USIO reorganized to include Supply Chain, Transportation, CTG and Capital Engineering Groups
- Eliminated 300 corporate personnel and overhead. More to follow.

HEADWINDS / CHALLENGES FACING USIO

## Lowest Global Iron Ore Prices in more than a decade due to increased global market supply

- For every $10/ton that Platts moves, it is equivalent to $3/ton to USIO; which means lower revenue and lower EBITDA
- Our largest fixed contracts with ArcelorMittal come due in 2016
- With projected lower Global pricing the Canadians begin to look into the US Market

## Great Lakes Market is a balanced 54 Million ton market

- Competition is coming in 2016 to compete for this market
  - Essar is constructing a 7 million ton mine with 2 billion tons of reserves to supply AM and themselves
  - IOC will need a place to put pellets if global pricing continues
  - USS is constructing Electric Arc Furnaces at Fairfield, Alabama which will potentially add 2 million excess tons
  - We have 2 million tons of excess currently and for the foreseeable future because we can’t export to Europe and Asia at these prices

## Environmental Compliance Costs

- Large Capital expenditures are necessary in 2015 ($29 million), 2016 ($93 million) and 2017 ($72 million) to comply with Selenium, NOX, SOX and Mercury.

2015 GAME PLAN FOR USIO

## So, what do we need to do?

- Make sure Essar is not completed (Lourenco and I are working on this)

- Continue to reduce corporate overhead

- USIO 2015 Business Plan drives $110 million dollars out of the business

- Drive cost and waste out of the system
  - Focus on better maintenance practices and standards
  - Remove variation from our operations
  - Energy is 1/3 of our costs

- Increase the productivity of our workforce to greater than 5 pellet tons/man hour
  - Reduced salary and hourly workforce through attrition and coming up with better work practices to absorb the attrition
  - Smart capex and flow sheet changes to reduce manpower and increase productivity

- Get to $59/ton Production Cash Costs and eventually to $55/ton; Most importantly get to $59/ton in 2015



# USIO Sales

## USIO SALES

### 2013, 2014, and 2015 Plan

| | Sales Tons (000s) | Revenues (millions) | Average Rate per Ton |
|---|---|---|---|
| 2013 | 21,300 | $2,668 | $113.07 |
| 2014 | 21,840 | $2,516 | $102.79 |
| 2015 Plan | 21,700 | $1,786 | $82.31 |

Platts IODEX 62% Fe
$ / DMT
140.00
120.00
100.00
80.00
60.00
40.00
20.00
0.00
Jan-14
Feb-14
Mar-14
Apr-14
May-14
Jun-14
Jul-14
Aug-14
Sep-14
Oct-14
Nov-14
Dec-14
Jan-15

CLIFFS

Platts IODEX 62% Fe
$ / DMT
200.00
180.00
160.00
140.00
120.00
100.00
80.00
60.00
40.00
20.00
0.00
Jun-08
Dec-08
Jun-09
Dec-09
Jun-10
Dec-10
Jun-11
Dec-11
Jun-12
Dec-12
Jun-13
Dec-13
Jun-14
Jan-15

CLIFFS

## EMPIRE SALES

### 2014 versus 2015 Plan

| | 2014 Sales Tons | 2015 Sales Tons | Difference |
|---|---|---|---|
| AM Indiana Harbor East (Standard) | 329 | - | (329) |
| AM Indiana Harbor East (Viceroy) | 1,641 | 2,125 | 484 |
| | | | |
| **Total** | **1,970** | **2,125** | **155** |



## TILDEN SALES

### 2014 versus 2015 Plan

| | 2014 Sales Tons | 2015 Sales Tons | Difference |
|---|---|---|---|
| AK Steel Ohio | 2,980 | 2,050 | (930) |
| AK Steel Michigan | 2,741 | 3,200 | 459 |
| Essar Algoma (Hem) | 1,029 | 1,930 | 901 |
| Essar Algoma (MF1) | 2,440 | 1,620 | (820) |
| AM Cleveland | 214 | - | (214) |
| AM Indiana Harbor West | 741 | - | (741) |
| | | | |
| **Total** | **10,145** | **8,800** | **(1,345)** |

## HIBBING SALES

### 2014 versus 2015 Plan

| | 2014 Sales Tons | 2015 Sales Tons | Difference |
|---|---|---|---|
| AM Burns Harbor | - | 250 | 250 |
| AM Dofasco | 234 | 1,250 | 1,016 |
| Baosteel | 107 | - | (107) |
| voestalpine | 398 | - | (398) |
| | | | |
| **Total** | **739** | **1,500** | **761** |



## NORTHSHORE SALES

### 2014 versus 2015 Plan

|  | 2014 Sales Tons | 2015 Sales Tons | Difference |
|---|---|---|---|
| AM Cleveland | 3,616 | 4,150 | 534 |
| AM Indiana Harbor West | 1,225 | 650 | (575) |
| Nippon Steel (Chips) | 80 | 75 | (5) |
| Concentrates | 19 | 30 | 11 |
|  |  |  |  |
| **Total** | **4,940** | **4,905** | **(35)** |



## UTAC SALES

### 2014 versus 2015 Plan

| | 2014 Sales Tons | 2015 Sales Tons | Difference |
|---|---|---|---|
| AHMSA | 719 | 620 | (99) |
| AK Steel Ohio | 34 | - | (34) |
| AM Cleveland | 18 | - | (18) |
| AM Indiana Harbor West | 2,196 | 3,675 | 1,479 |
| Nippon Steel (Chips) | 76 | 75 | (1) |
| US Steel | 1,000 | - | (1,000) |
| | | | |
| **Total** | **4,043** | **4,365** | **327** |

CLIFFS



Earnings Call

(We will now dial-in to the call)



# Consolidated
# 2015/Long Range Plan Presentation

**January 7, 2015**

# ASSUMPTIONS – PRICING







# ASSUMPTIONS – OTHERS











## RISKS, OPPORTUNITIES AND TOP-SIDE ADJUSTMENTS

- Incorporated more risk into the forecast than we have in the past for USIO and NAC.  That is, maintenance and capex reduced based on recent experience – if something breaks, it will likely be immediate downside to the forecast.
  - Potential upside:
    - APIO freight rates and premiums (approx. $20M)
    - AUD FX rate (assumed to be $0.85 – could be as low as $0.80)
  - CCAA scenario adjustments:
    - ECIO excluded from Consolidated Cliffs, beginning on 1/1/2015
    - Retained liabilities include equipment leases and hedging losses
    - Cash flow (DIP financing) – assumed to recover in December 2015 (e.g., exit CCAA)
  - Sale scenario adjustments:
    - Sale assumed to occur as of 12/31/14 and Cliffs gives buyer $200M in cash
- Top-side adjustments:
  - USIO – operating costs adjusted approximately $100M-$120M/year in 2016-2019
  - USIO – capex set at $100M/year in 2016-2019
  - USIO – Northshore royalty reduced to $3/T
  - NAC – capex set at $25M/year in 2018-2019
- Key USIO assumptions:
  - Labor contingency costs excluded and signing bonus reduced ($13M)
  - Essar MN does not come on-line on-time
  - Northshore back to 4 furnaces in 2017 to offset Empire closure
  - AM contract renewed at similar economics
  - No Empire extension

# CONSOLIDATED INCOME STATEMENT – ECIO CCAA SCENARIO

| Actual 2013 | | Q4 Forecast 2014 | Q4 Forecast 2015 | Q4 Forecast 2016 | Q4 Forecast 2017 | Q4 Forecast 2018 | Q4 Forecast 2019 |
|---|---|---|---|---|---|---|---|
| $ 5,691.4 | Total Revenue | $ 4,595.3 | $ 3,132.6 | $ 3,280.2 | $ 3,150.0 | $ 3,146.9 | $ 3,226.0 |
| (4,542.1) | Operating Costs | (4,115.0) | (2,778.3) | (2,839.8) | (2,756.4) | (2,710.4) | (2,754.5) |
| **1,149.3** | **Sales Margin** | **480.3** | **354.3** | **440.4** | **393.6** | **436.5** | **471.5** |
| (213.3) | Selling General & Administrative | (192.1) | (120.2) | (111.1) | (113.9) | (116.2) | (118.5) |
| (59.0) | Ferroalloys & Exploration | (8.7) | (3.8) | (0.5) | - | - | - |
| (18.3) | Severance & Other Restructuring Costs | (17.3) | - | - | - | - | - |
| 51.6 | Casualty Recoveries | 7.5 | - | - | - | - | - |
| (250.8) | Impairment Charge | (7,770.8) | - | - | - | - | - |
| 11.5 | Miscellaneous - Net | (679.2) | 11.6 | 11.6 | (34.1) | (28.4) | (22.8) |
| **671.1** | **Operating Profit** | **(8,180.3)** | **241.7** | **340.3** | **245.6** | **291.9** | **330.2** |
| (179.1) | Net Interest | (183.0) | (190.4) | (185.1) | (180.9) | (178.5) | (176.7) |
| (3.5) | Gain / (Loss) Derivative Instruments | 0.5 | - | - | - | - | - |
| 0.9 | Other Net | 10.5 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 |
| **489.4** | **Income Before Taxes and Non-Controlling Interest** | **(8,352.3)** | **51.7** | **155.6** | **65.2** | **113.8** | **153.8** |
| (55.1) | Income Tax (Expense) / Credit | 1,159.8 | (5.9) | (32.8) | (19.5) | (36.3) | (41.8) |
| **434.2** | **Income Before Non-Controlling Interest** | **(7,192.5)** | **45.8** | **122.8** | **45.7** | **77.5** | **112.0** |
| 51.7 | Non-Controlling Interest (net of tax) | 1,029.0 | (14.9) | (6.6) | 8.7 | 7.5 | 6.4 |
| (74.4) | Loss from Investments: Equity | (9.9) | (1.1) | (1.1) | (1.1) | (1.1) | (1.1) |
| **411.5** | **Income from Continuing Operations** | **(6,173.4)** | **29.8** | **115.1** | **53.3** | **83.9** | **117.3** |
| 2.0 | Gain from Discontinued Operations (net of tax) | 0.0 | - | - | - | - | - |
| **$ 413.5** | **Net Income Attributable to Cliffs Shareholders** | **$ (6,173.4)** | **$ 29.8** | **$ 115.1** | **$ 53.3** | **$ 83.9** | **$ 117.3** |
| (48.7) | Preferred Stock Dividends | (51.2) | (51.2) | - | - | - | - |
| **$ 364.8** | **Net Income Attributable To Common Shareholders** | **$ (6,224.6)** | **$ (21.4)** | **$ 115.1** | **$ 53.3** | **$ 83.9** | **$ 117.3** |
| 2.36 | Continuing Operations | (40.43) | (0.14) | 0.64 | 0.30 | 0.47 | 0.65 |
| 0.01 | Discontinued Operations | 0.00 | - | - | - | - | - |
| **$ 2.37** | **Earnings Per Share (diluted)** | **$ (40.43)** | **$ (0.14)** | **$ 0.64** | **$ 0.30** | **$ 0.47** | **$ 0.65** |
| **$ 1,261.7** | **Adjusted EBITDA *** | **$ 802.2** | **$ 441.2** | **$ 547.3** | **$ 430.2** | **$ 471.9** | **$ 505.6** |
| **5.5%** | **Adjusted EBITDA Margin %** | **17.5%** | **14.1%** | **16.7%** | **13.7%** | **15.0%** | **15.7%** |
| **174.3** | **Average Shares Outstanding (diluted)** | **154.0** | **154.2** | **179.7** | **179.9** | **180.2** | **180.2** |

*NOTE: Adjusted EBITDA excludes Impairments, Loss on sale of LCC, Wabush Sales Margin and related expenses, [redacted] and proxy dispute expenses*

# PRICE SENSITIVITIES – ECIO CCAA SCENARIO

## EBITDA

| ($ millions) | 2015 Min | 2015 Base | 2015 Max | 2016 Min | 2016 Base | 2016 Max | 2017 Min | 2017 Base | 2017 Max | 2018 Min | 2018 Base | 2018 Max | 2019 Min | 2019 Base | 2019 Max |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| USIO | $ 456 | $ 512 | $ 586 | $ 445 | $ 536 | $ 645 | $ 360 | $ 427 | $ 513 | $ 399 | $ 472 | $ 559 | $ 445 | $ 519 | $ 616 |
| ECIO | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| APIO | (75) | 16 | 141 | (80) | 57 | 217 | (98) | 5 | 136 | (110) | 13 | 155 | (109) | 16 | 180 |
| NAC | (30) | (12) | 17 | (47) | 7 | 64 | (24) | 55 | 111 | (32) | 47 | 102 | (49) | 28 | 79 |
| Corp & Other | (74) | (74) | (74) | (53) | (53) | (53) | (57) | (57) | (57) | (60) | (60) | (60) | (57) | (57) | (57) |
| **Total** | $ 278 | $ 441 | $ 670 | $ 265 | $ 547 | $ 873 | $ 181 | $ 430 | $ 703 | $ 198 | $ 472 | $ 756 | $ 230 | $ 506 | $ 818 |

| Pricing | 2015 Min | 2015 Base | 2015 Max | 2016 Min | 2016 Base | 2016 Max | 2017 Min | 2017 Base | 2017 Max | 2018 Min | 2018 Base | 2018 Max | 2019 Min | 2019 Base | 2019 Max |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Platts | $ 63 | $ 73 | $ 88 | $ 63 | $ 78 | $ 95 | $ 70 | $ 81 | $ 95 | $ 72 | $ 85 | $ 100 | $ 75 | $ 88 | $ 105 |
| BMA | $ 116 | $ 123 | $ 134 | $ 120 | $ 135 | $ 150 | $ 125 | $ 145 | $ 160 | $ 130 | $ 151 | $ 166 | $ 135 | $ 158 | $ 173 |

### Interest Coverage Ratio

### Secured Debt / EBITDA Ratio



# CONSOLIDATED CASH FLOW STATEMENT – ECIO CCAA SCENARIO

| Actual 2013 | | Q4 Forecast 2014 | Q4 Forecast 2015 | Q4 Forecast 2016 | Q4 Forecast 2017 | Q4 Forecast 2018 | Q4 Forecast 2019 |
|---|---|---|---|---|---|---|---|
| | **OPERATING:** | | | | | | |
| $ 361.8 | Net Income | $ (7,202.4) | $ 44.7 | $ 121.7 | $ 44.6 | $ 76.4 | $ 110.9 |
| 593.3 | Depreciation & Amortization | 498.2 | 199.1 | 206.7 | 184.2 | 179.6 | 175.0 |
| 74.4 | Equity Loss from Ventures | 9.9 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 |
| 116.4 | Change in Working Capital | 7,398.3 | 182.6 | (23.8) | (36.4) | (37.5) | 32.0 |
| **$ 1,145.9** | **Cash Provided (Used) From Operating Activities** | **$ 703.9** | **$ 427.5** | **$ 305.6** | **$ 193.5** | **$ 219.6** | **$ 332.1** |
| | **INVESTING:** | | | | | | |
| $ (861.6) | Capital Expenditures | $ (276.7) | $ (144.8) | $ (168.3) | $ (149.2) | $ (130.7) | $ (125.4) |
| 50.3 | Other Investing | (232.1) | 8.7 | 8.8 | - | - | - |
| **$ (811.3)** | **Cash Provided (Used) From Investing Activities** | **$ (508.8)** | **$ (136.1)** | **$ (159.6)** | **$ (149.2)** | **$ (130.7)** | **$ (125.4)** |
| | **FINANCING:** | | | | | | |
| 161.8 | Equipment Loan Facility | (20.9) | (21.8) | (22.7) | (23.6) | (24.6) | (24.6) |
| (325.0) | Revolver | (12.5) | 0.0 | 0.0 | (0.0) | 0.3 | (0.7) |
| (127.6) | Dividends | (143.2) | (143.7) | - | - | - | - |
| 23.3 | Minority Interest Investment | (11.4) | (44.9) | (42.1) | (75.3) | (0.0) | 0.0 |
| (51.8) | Lease Repayments & Other Financing | (78.9) | (43.3) | (32.2) | (29.9) | (25.4) | (14.7) |
| **$ (171.9)** | **Cash Provided (Used) From Financing Activities** | **$ (266.9)** | **$ (253.7)** | **$ (97.0)** | **$ (128.8)** | **$ (49.6)** | **$ (39.9)** |
| (22.4) | Effect of exchange rate changes on cash | 8.9 | 11.2 | (2.1) | (4.4) | 3.7 | 5.8 |
| 195.2 | Cash and Cash Equivalents (beginning) | 335.5 | 272.6 | 321.5 | 368.4 | 279.6 | 322.5 |
| 140.3 | Change in Cash and Cash Equivalents | (62.9) | 48.9 | 46.9 | (88.9) | 43.0 | 172.6 |
| **$ 335.5** | **Cash and Cash Equivalents (ending)** | **$ 272.6** | **$ 321.5** | **$ 368.4** | **$ 279.6** | **$ 322.5** | **$ 495.1** |
| **$ 156.7** | **Free Cash Flow** | **$ 284.0** | **$ 139.0** | **$ 137.3** | **$ 44.3** | **$ 88.9** | **$ 206.7** |
| **$ 3,043.5** | **Total Debt** | **$ 3,015.7** | **$ 2,994.0** | **$ 2,971.3** | **$ 2,947.7** | **$ 2,923.1** | **$ 2,897.5** |

*Free Cash Flow (FCF) = Cash Provided (Used) From Operating Activities – Capital Expenditures – Dividends*



# CONSOLIDATED BALANCE SHEET – ECIO CCAA SCENARIO

| Actual 2013 | | Q4 Forecast 2014 | Q4 Forecast 2015 | Q4 Forecast 2016 | Q4 Forecast 2017 | Q4 Forecast 2018 | Q4 Forecast 2019 |
|---|---|---|---|---|---|---|---|
| | **CURRENT ASSETS** | | | | | | |
| $ 335.5 | Cash & Equivalents | $ 272.6 | $ 321.5 | $ 368.4 | $ 279.6 | $ 322.5 | $ 495.1 |
| 269.5 | Accounts Receivable | 186.6 | 116.3 | 103.9 | 97.3 | 93.8 | 93.4 |
| 391.4 | Inventories | 369.9 | 358.4 | 409.3 | 381.2 | 348.4 | 227.0 |
| 563.9 | Other Current Assets | 445.1 | 449.9 | 438.0 | 434.4 | 446.0 | 447.1 |
| **1,560.3** | **Total Current Assets** | **1,274.3** | **1,246.1** | **1,319.7** | **1,192.5** | **1,210.8** | **1,262.7** |
| | **NON-CURRENT ASSETS** | | | | | | |
| 11,153.4 | Net Fixed Assets | 2,608.7 | 2,562.7 | 2,526.4 | 2,505.6 | 2,460.0 | 2,413.2 |
| 408.4 | Other Assets | 225.8 | 214.6 | 203.8 | 194.3 | 185.4 | 179.8 |
| **11,561.9** | **Total Non-Current Assets** | **2,834.5** | **2,777.3** | **2,730.2** | **2,699.8** | **2,645.4** | **2,593.0** |
| **$ 13,122.2** | **Total Assets** | **$ 4,108.8** | **$ 4,023.4** | **$ 4,049.9** | **$ 3,892.3** | **$ 3,856.2** | **$ 3,855.7** |
| | **CURRENT LIABILITIES** | | | | | | |
| 344.0 | Trade Payables | 257.9 | 247.9 | 263.5 | 246.8 | 243.1 | 241.0 |
| 392.6 | Accrued Expenses | 390.3 | 378.9 | 384.7 | 387.0 | 395.4 | 394.6 |
| 20.9 | Current Portion of Long-Term Debt | 21.8 | 22.7 | 23.6 | 24.6 | 25.6 | 25.6 |
| 328.1 | Other Current Liabilities | 145.0 | 327.2 | 264.9 | 236.6 | 211.8 | 206.4 |
| **1,085.7** | **Total Current Liabilities** | **815.0** | **976.7** | **936.7** | **894.9** | **875.9** | **867.5** |
| | **NON-CURRENT LIABILITIES** | | | | | | |
| 294.0 | Pension & OPEB | 220.8 | 222.5 | 245.5 | 256.8 | 238.4 | 215.8 |
| 309.7 | Environmental & Closure | 304.3 | 313.7 | 319.3 | 298.3 | 276.0 | 242.8 |
| 3,022.6 | Long-Term Debt | 2,994.0 | 2,971.3 | 2,947.7 | 2,923.1 | 2,897.5 | 2,871.9 |
| 1,525.8 | Other Liabilities | 281.4 | 221.9 | 183.4 | 153.6 | 126.8 | 102.1 |
| **5,152.2** | **Total Non-Current Liabilities** | **3,800.4** | **3,729.4** | **3,695.8** | **3,631.8** | **3,538.7** | **3,432.6** |
| **$ 6,237.9** | **Total Liabilities** | **$ 4,615.4** | **$ 4,706.1** | **$ 4,632.6** | **$ 4,526.7** | **$ 4,414.6** | **$ 4,300.1** |
| 814.9 | Noncontrolling Interest | (229.3) | (259.3) | (294.8) | (378.8) | (386.3) | (392.7) |
| 6,069.5 | Other Equity | (277.4) | (423.4) | (287.9) | (255.6) | (172.1) | (51.6) |
| **$ 6,884.3** | **Total Equity** | **$ (506.7)** | **$ (682.7)** | **$ (582.7)** | **$ (634.4)** | **$ (558.4)** | **$ (444.4)** |
| **$ 13,122.2** | **Total Liabilities and Equity** | **$ 4,108.8** | **$ 4,023.4** | **$ 4,049.9** | **$ 3,892.3** | **$ 3,856.2** | **$ 3,855.7** |
| | **Secured Debt / EBITDA Ratio** | **0.52** | **0.68** | **0.44** | **0.43** | **0.29** | **0.18** |
| | **Interest Coverage Ratio** | **4.02** | **2.47** | **3.11** | **2.54** | **2.81** | **3.02** |

# CONSOLIDATED CAPITAL EXPENDITURES

| Actuals 2013 | | Q4 Forecast 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|
| $ 47.8 | United States Iron Ore | $ 44.8 | $ 88.8 | $ 100.0 | $ 100.0 | $ 100.0 | $ 100.0 |
| 659.5 | Bloom Lake | 140.7 | - | - | - | - | - |
| 58.8 | Wabush | 42.1 | - | - | - | - | - |
| 64.1 | North American Coal | 28.5 | 36.6 | 29.9 | 37.5 | 24.7 | 25.2 |
| 25.3 | Asia Pacific Iron Ore | 16.6 | 12.8 | 23.5 | 8.6 | 3.8 | 0.2 |
| 1.0 | Ferroalloys | 0.1 | - | - | - | - | - |
| 0.5 | GOS/Global Other | - | - | - | - | - | - |
| **$ 857.0** | **Consolidated Global Operations** | **$ 272.8** | **$ 138.2** | **$ 153.4** | **$ 146.1** | **$ 128.5** | **$ 125.4** |
| 0.2 | Global Exploration Group | - | - | - | - | - | - |
| 4.5 | Corporate | 3.9 | 6.6 | 14.9 | 3.1 | 2.3 | - |
| **$ 861.6** | **Consolidated Capital Spend** | **$ 276.7** | **$ 144.8** | **$ 168.3** | **$ 149.2** | **$ 130.7** | **$ 125.4** |

| Actuals 2013 | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|
| $ 159.0 | Sustaining | $ 107.4 | $ 106.8 | $ 76.9 | $ 85.9 | $ 109.3 | $ 115.5 |
| 512.0 | Growth & Expansion | 35.3 | - | - | - | - | - |
| 153.0 | PTO | 119.4 | 34.1 | 91.5 | 63.3 | 21.4 | 9.8 |
| 37.6 | Productive | 14.6 | 4.0 | - | - | - | - |
| **$ 861.6** | **Consolidated Capital Spend** | **$ 276.7** | **$ 144.8** | **$ 168.3** | **$ 149.2** | **$ 130.7** | **$ 125.4** |



# USIO Financial Statements

# USIO – INCOME STATEMENT & SALES MARGIN

| Actual 2013 | | Forecast 2014 | 2015 Q1 | 2015 Q2 | 2015 Q3 | 2015 Q4 | Plan 2015 | 2016 Q1 | 2016 Q2 | 2016 Q3 | 2016 Q4 | LRP 2016 | LRP 2017 | LRP 2018 | LRP 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $ 2,667.9 | Total Revenue | $ 2,499.7 | $ 338.1 | $ 479.1 | $ 619.8 | $ 614.7 | $ 2,051.7 | $ 287.1 | $ 516.5 | $ 662.2 | $ 663.5 | $ 2,129.3 | $ 1,918.4 | $ 1,871.2 | $ 1,927.9 |
| (1,766.0) | Operating Costs | (1,797.1) | (253.6) | (382.6) | (499.7) | (496.8) | (1,632.7) | (223.3) | (405.9) | (542.8) | (523.0) | (1,695.1) | (1,536.5) | (1,452.6) | (1,464.6) |
| $ 901.9 | **Sales Margin** | $ 702.6 | $ 84.4 | $ 96.5 | $ 120.1 | $ 117.9 | $ 419.0 | $ 63.8 | $ 110.6 | $ 119.4 | $ 140.5 | $ 434.2 | $ 382.0 | $ 418.6 | $ 463.4 |
| (34.7) | Selling, General & Administrative | (20.1) | (4.7) | (4.1) | (5.0) | (4.6) | (18.4) | (4.2) | (4.3) | (3.7) | (3.6) | (15.9) | (10.4) | (9.6) | (13.7) |
| 12.0 | Total Royalties & Management Fee Revenue | 10.9 | 3.0 | 3.2 | 2.9 | 2.5 | 11.6 | 3.3 | 3.4 | 2.4 | 2.6 | 11.6 | 7.5 | 7.6 | 7.8 |
| 0.6 | Gain on Sale of Asset | (0.1) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| (2.3) | Miscellaneous - Net | 0.7 | 0.0 | (0.0) | (0.0) | 0.0 | (0.1) | 0.0 | (0.0) | (0.0) | 0.0 | (0.1) | (41.6) | (36.0) | (30.7) |
| $ 877.5 | **Operating Profit** | $ 694.0 | $ 82.8 | $ 95.6 | $ 117.9 | $ 115.8 | $ 412.1 | $ 62.9 | $ 109.6 | $ 118.0 | $ 139.5 | $ 429.9 | $ 337.5 | $ 380.6 | $ 426.8 |
| 2.3 | Net Interest | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.3) | (0.0) | 0.0 | (0.1) | (0.1) | (0.1) | 0.0 | 0.0 | 0.1 |
| 2.2 | Other - Net | 1.8 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| $ 882.0 | **Income Before Taxes and Minority Interest** | $ 695.7 | $ 82.7 | $ 95.5 | $ 117.9 | $ 115.7 | $ 411.8 | $ 62.9 | $ 109.6 | $ 117.9 | $ 139.5 | $ 429.8 | $ 337.5 | $ 380.6 | $ 427.0 |
| (1.6) | Income Tax Expense / (Credit) | 0.1 | (0.1) | (0.1) | (0.1) | (0.1) | (0.3) | (0.0) | (0.1) | (0.1) | (0.1) | (0.3) | (0.2) | (0.3) | (0.3) |
| 880.4 | **Income Before Minority Interest** | 695.8 | 82.6 | 95.5 | 117.8 | 115.7 | 411.5 | 62.8 | 109.5 | 117.8 | 139.4 | 429.5 | 337.2 | 380.3 | 426.6 |
| (20.7) | Noncontrolling Interest (net of tax) | (25.3) | (5.5) | (8.1) | (2.6) | 1.2 | (14.9) | (6.1) | (6.5) | 3.9 | 2.1 | (6.6) | 8.7 | 7.5 | 6.4 |
| $ 859.6 | **Net Income** | $ 670.4 | $ 77.2 | $ 87.4 | $ 115.2 | $ 116.9 | $ 396.6 | $ 56.8 | $ 103.0 | $ 121.7 | $ 141.4 | $ 422.9 | $ 346.0 | $ 387.9 | $ 433.1 |
| $ 1,000.0 | **EBITDA** | $ 803.4 | $ 106.3 | $ 119.3 | $ 83.1 | $ 142.9 | $ 511.5 | $ 88.7 | $ 135.9 | $ 26.3 | $ 167.1 | $ 536.0 | $ 426.9 | $ 471.6 | $ 519.2 |
| 41.5% | **EBITDA Margin %** | 35.9% | | | | | 27.9% | | | | | 29.0% | 25.6% | 28.5% | 30.5% |
| $ 1,030.1 | **Adj EBITDA** | $ 828.2 | $ 112.6 | $ 125.6 | $ 89.4 | $ 149.2 | $ 536.8 | $ 95.2 | $ 142.3 | $ 32.8 | $ 173.5 | $ 561.8 | $ 450.6 | $ 495.8 | $ 543.5 |
| | **Sales Margin - Per Ton** | | | | | | | | | | | | | | |
| $ 113.07 | Revenue | $ 102.68 | $ 93.33 | $ 84.40 | $ 82.13 | $ 82.30 | $ 84.39 | $ 86.06 | $ 86.82 | $ 84.02 | $ 85.01 | $ 85.27 | $ 82.20 | $ 84.52 | $ 87.19 |
| | **Cost of Goods Sold** | | | | | | | | | | | | | | |
| (64.65) | Cash Production Cost | (64.25) | (65.95) | (61.13) | (56.11) | (53.66) | (59.12) | (58.99) | (61.16) | (59.43) | (55.98) | (58.84) | (57.69) | (57.86) | (57.90) |
| 1.85 | Inventory Effects | 1.70 | 13.71 | 4.82 | (2.63) | (5.69) | 1.74 | 9.52 | 6.00 | (0.84) | (2.54) | 1.80 | 0.02 | 0.81 | 0.54 |
| (1.40) | Cost of Services | (1.20) | (1.90) | (1.38) | (1.09) | (1.02) | (1.26) | (2.35) | (1.46) | (1.18) | (1.10) | (1.38) | (1.38) | (1.48) | (1.49) |
| (0.89) | Period Costs | (1.72) | (5.96) | (3.26) | (0.55) | (0.11) | (1.87) | (3.79) | (3.84) | (1.23) | (0.23) | (1.90) | 0.07 | 0.08 | 0.08 |
| $ (65.08) | **Cash Cost of Goods Sold** | $ (65.46) | $ (60.11) | $ (60.95) | $ (60.39) | $ (60.48) | $ (60.51) | $ (55.61) | $ (60.47) | $ (62.68) | $ (59.86) | $ (60.32) | $ (58.98) | $ (58.46) | $ (58.77) |
| (5.65) | Depreciation, Depletion & Amortization | (4.94) | (7.24) | (4.62) | (3.76) | (4.07) | (4.58) | (8.78) | (5.06) | (3.87) | (4.12) | (4.90) | (4.41) | (4.65) | (4.73) |
| $ (70.72) | **Cost of Goods Sold** | $ (70.40) | $ (67.35) | $ (65.57) | $ (64.15) | $ (64.55) | $ (65.09) | $ (64.39) | $ (65.53) | $ (66.55) | $ (63.98) | $ (65.22) | $ (63.38) | $ (63.11) | $ (63.49) |
| $ 42.35 | **Sales Margin** | $ 32.28 | $ 25.98 | $ 18.83 | $ 17.98 | $ 17.75 | $ 19.31 | $ 21.67 | $ 21.29 | $ 17.48 | $ 21.03 | $ 20.06 | $ 18.82 | $ 21.41 | $ 23.70 |
| 20.3 | **Total Production Tons** | 22.4 | 5.3 | 5.4 | 5.7 | 5.5 | 21.9 | 5.5 | 5.4 | 4.9 | 5.7 | 21.6 | 19.2 | 19.2 | 19.3 |
| 21.3 | **Total Tons Sold** | 21.8 | 3.3 | 5.1 | 6.7 | 6.6 | 21.7 | 2.9 | 5.2 | 6.8 | 6.7 | 21.7 | 20.3 | 19.6 | 19.6 |



# USIO – CASH FLOW

| Actual 2013 | | Forecast 2014 | Q1 | Q2 | Q3 | Q4 | Plan 2015 | Q1 | Q2 | Q3 | Q4 | LRP 2016 | 2017 | LRP 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **OPERATING:** | | | | | | | | | | | | | | |
| $ 880.4 | Net Income | $ 695.8 | $ 82.6 | $ 95.5 | $ 117.8 | $ 115.7 | $ 411.5 | $ 62.8 | $ 109.5 | $ 117.8 | $ 139.4 | $ 429.5 | $ 337.2 | $ 380.3 | $ 426.6 |
| 109.8 | Depreciation & Amortization | 107.7 | 23.5 | 23.7 | 25.1 | 27.1 | 99.4 | 25.8 | 26.3 | 26.4 | 27.6 | 106.1 | 89.4 | 91.0 | 92.4 |
| (73.8) | Working Capital Changes and Other Adjustments | (124.2) | (118.5) | (5.7) | 18.2 | 85.5 | (20.4) | (138.3) | (35.9) | 89.7 | 79.6 | (4.8) | 7.6 | (59.4) | (75.3) |
| **$ 916.4** | **Net Cash Provided by Operating Activities** | **$ 679.3** | **$ (12.3)** | **$ 113.5** | **$ 161.1** | **$ 228.3** | **$ 490.5** | **$ (49.6)** | **$ 99.9** | **$ 234.0** | **$ 246.6** | **$ 530.8** | **$ 434.3** | **$ 411.9** | **$ 443.7** |
| | **INVESTING:** | | | | | | | | | | | | | | |
| (47.8) | Capital Expenditures | (44.8) | (14.6) | (28.3) | (33.8) | (12.1) | (88.8) | (14.9) | (35.1) | (31.3) | (18.8) | (100.0) | (100.0) | (100.0) | (100.0) |
| - | Other Investing | 9.5 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **$ (47.8)** | **Net Cash Used in Investing Activities** | **$ (35.3)** | **$ (14.6)** | **$ (28.3)** | **$ (33.8)** | **$ (12.1)** | **$ (88.8)** | **$ (14.9)** | **$ (35.1)** | **$ (31.3)** | **$ (18.8)** | **$ (100.0)** | **$ (100.0)** | **$ (100.0)** | **$ (100.0)** |
| **$ 868.6** | **Free Cash Flow** | **$ 643.9** | **$ (26.9)** | **$ 85.1** | **$ 127.3** | **$ 216.2** | **$ 401.8** | **$ (64.4)** | **$ 64.8** | **$ 202.7** | **$ 227.8** | **$ 430.8** | **$ 334.3** | **$ 311.9** | **$ 343.7** |

# USIO – BALANCE SHEET

| Actual 2013 | | Forecast 2014 | Q1 | Q2 | Q3 | Q4 | Plan 2015 | Q1 | Q2 | Q3 | Q4 | LRP 2016 | LRP 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **CURRENT ASSETS** | | | | | | | | | | | | | | |
| $ 11.0 | Cash & Equivalents | $ 107.4 | $ 77.5 | $ 146.3 | $ 261.1 | $ 462.2 | $ 462.2 | $ 382.9 | $ 437.4 | $ 631.5 | $ 849.6 | $ 849.6 | $ 1,107.3 | $ 1,417.8 | $ 1,760.1 |
| 68.6 | Receivables | 72.0 | 33.0 | 15.6 | 20.7 | 20.0 | 20.0 | 5.1 | 14.0 | 19.3 | 17.3 | 17.3 | 11.1 | 6.6 | 6.8 |
| 212.3 | Inventories | 253.7 | 414.1 | 442.8 | 360.6 | 267.0 | 267.0 | 444.2 | 480.2 | 352.9 | 269.8 | 269.8 | 220.1 | 219.6 | 221.9 |
| 57.7 | Derivatives | 71.8 | 47.2 | 44.5 | 60.2 | 71.7 | 71.7 | 48.2 | 44.9 | 59.4 | 74.3 | 74.3 | 74.6 | 75.4 | 73.6 |
| 1,522.6 | I/C Current Assets | 3,863.8 | 3,863.8 | 3,863.8 | 3,863.8 | 3,863.8 | 3,863.8 | 3,863.8 | 3,863.8 | 3,863.8 | 3,863.8 | 3,863.8 | 3,863.8 | 3,863.8 | 3,863.8 |
| 37.6 | Other Current Assets | 17.7 | 18.3 | 21.2 | 20.8 | 18.3 | 18.3 | 13.9 | 15.4 | 10.4 | 9.9 | 9.9 | 7.0 | 9.5 | 11.9 |
| **1,909.8** | **Total Current Assets** | **4,386.4** | **4,453.9** | **4,534.2** | **4,587.2** | **4,703.0** | **4,703.0** | **4,758.1** | **4,855.7** | **4,937.5** | **5,084.7** | **5,084.7** | **5,284.0** | **5,592.7** | **5,938.2** |
| | **NON CURRENT ASSETS** | | | | | | | | | | | | | | |
| 1,077.8 | Net Fixed Assets (includes mineral rights) | 996.4 | 988.1 | 993.4 | 1,002.7 | 988.4 | 988.4 | 978.1 | 987.6 | 993.1 | 984.9 | 984.9 | 998.2 | 1,009.8 | 1,020.1 |
| 950.9 | I/C Non Current Assets | 950.9 | 950.9 | 950.9 | 950.9 | 950.9 | 950.9 | 950.9 | 950.9 | 950.9 | 950.9 | 950.9 | 950.9 | 950.9 | 950.9 |
| 72.4 | Other Assets | 77.3 | 76.6 | 76.0 | 75.3 | 74.6 | 74.6 | 74.0 | 73.3 | 72.7 | 72.0 | 72.0 | 69.4 | 66.7 | 64.1 |
| **2,101.1** | **Total Non-Current Assets** | **2,024.5** | **2,015.6** | **2,020.2** | **2,028.9** | **2,013.9** | **2,013.9** | **2,002.9** | **2,011.7** | **2,016.6** | **2,007.8** | **2,007.8** | **2,018.4** | **2,027.4** | **2,035.0** |
| **$ 4,010.9** | **Total Assets** | **$ 6,410.9** | **$ 6,469.5** | **$ 6,554.5** | **$ 6,616.1** | **$ 6,716.9** | **$ 6,716.9** | **$ 6,761.0** | **$ 6,867.5** | **$ 6,954.1** | **$ 7,092.5** | **$ 7,092.5** | **$ 7,302.4** | **$ 7,620.1** | **$ 7,973.2** |
| | **CURRENT LIABILITIES** | | | | | | | | | | | | | | |
| 113.7 | Trade Payables | 118.5 | 104.0 | 109.9 | 108.8 | 108.2 | 108.2 | 104.1 | 114.0 | 109.1 | 120.6 | 120.6 | 95.5 | 93.1 | 93.9 |
| 75.7 | Accrued Expenses | 72.5 | 62.3 | 61.8 | 62.3 | 63.0 | 63.0 | 63.0 | 64.7 | 64.7 | 65.7 | 65.7 | 66.5 | 67.5 | 70.4 |
| - | Securitization of Receivables | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 1,295.8 | I/C Current Liabilities | 3,110.7 | 3,110.7 | 3,110.7 | 3,110.7 | 3,110.7 | 3,110.7 | 3,110.7 | 3,110.7 | 3,110.7 | 3,110.7 | 3,110.7 | 3,110.7 | 3,110.7 | 3,110.7 |
| 111.7 | Other Current Liabilities | 105.2 | 103.6 | 110.1 | 99.9 | 106.1 | 106.1 | 101.2 | 96.4 | 78.5 | 76.3 | 76.3 | 80.0 | 81.2 | 81.6 |
| **1,596.8** | **Total Current Liabilities** | **3,406.8** | **3,380.6** | **3,392.4** | **3,381.6** | **3,387.9** | **3,387.9** | **3,379.0** | **3,385.7** | **3,362.9** | **3,373.3** | **3,373.3** | **3,352.8** | **3,352.5** | **3,356.5** |
| | **NON-CURRENT LIABILITIES** | | | | | | | | | | | | | | |
| 121.5 | Pension & OPEB | 68.0 | 72.1 | 76.9 | 55.0 | 59.8 | 59.8 | 63.5 | 67.2 | 70.5 | 74.2 | 74.2 | 80.5 | 57.0 | 29.3 |
| 177.1 | Environmental & Closure | 162.8 | 163.9 | 165.0 | 166.1 | 167.2 | 167.2 | 168.5 | 169.7 | 170.8 | 169.8 | 169.8 | 146.1 | 121.5 | 86.0 |
| 156.6 | Other Liabilities | 125.4 | 124.9 | 112.4 | 99.9 | 87.5 | 87.5 | 87.2 | 82.6 | 77.9 | 73.3 | 73.3 | 59.1 | 44.9 | 30.6 |
| **455.2** | **Total Non-Current Liabilities** | **356.2** | **360.9** | **354.3** | **321.1** | **314.5** | **314.5** | **319.2** | **319.4** | **319.2** | **317.3** | **317.3** | **285.7** | **223.4** | **145.9** |
| **$ 2,052.0** | **Total Liabilities** | **$ 3,763.0** | **$ 3,741.5** | **$ 3,746.8** | **$ 3,702.7** | **$ 3,702.4** | **$ 3,702.4** | **$ 3,698.2** | **$ 3,705.1** | **$ 3,682.1** | **$ 3,690.6** | **$ 3,690.6** | **$ 3,638.5** | **$ 3,575.9** | **$ 3,502.4** |
| 221.1 | Non Controlling Interest | 227.1 | 230.0 | 222.3 | 212.9 | 197.1 | 197.1 | 188.7 | 185.2 | 173.1 | 161.6 | 161.6 | 77.6 | 70.1 | 63.6 |
| 1,737.8 | Other Equity | 2,420.8 | 2,498.0 | 2,585.3 | 2,700.5 | 2,817.4 | 2,817.4 | 2,874.1 | 2,977.2 | 3,098.8 | 3,240.3 | 3,240.3 | 3,586.2 | 3,974.1 | 4,407.2 |
| **$ 1,958.9** | **Total Equity** | **$ 2,647.9** | **$ 2,728.0** | **$ 2,807.7** | **$ 2,913.4** | **$ 3,014.5** | **$ 3,014.5** | **$ 3,062.8** | **$ 3,162.3** | **$ 3,271.9** | **$ 3,401.9** | **$ 3,401.9** | **$ 3,663.9** | **$ 4,044.2** | **$ 4,470.8** |
| **$ 4,010.9** | **Total Liabilities & Equity** | **$ 6,410.9** | **$ 6,469.5** | **$ 6,554.4** | **$ 6,616.1** | **$ 6,716.9** | **$ 6,716.9** | **$ 6,761.0** | **$ 6,867.4** | **$ 6,954.1** | **$ 7,092.5** | **$ 7,092.5** | **$ 7,302.4** | **$ 7,620.0** | **$ 7,973.2** |

# USIO – SITE SUBMITTED CASH PRODUCTION COST

**Production Tons (million tons)**

|  | 2013 | 2014 | | | 2015 | | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|
|  | 2013 Actual | Actual | 2014 Plan | Variance from Plan | Forecast | Variance from 2014 Actual | Forecast | Forecast | Forecast | Forecast |
| Empire | 3.0 | 4.3 | 3.8 | 0.4 | 4.0 | (0.2) | 3.6 | - | - | - |
| Hibbing | 7.7 | 7.7 | 7.8 | (0.1) | 7.8 | 0.1 | 8.0 | 7.8 | 7.8 | 7.8 |
| Northshore | 3.9 | 5.3 | 5.2 | 0.0 | 4.7 | (0.6) | 4.6 | 5.6 | 5.6 | 5.6 |
| Tilden | 7.5 | 7.6 | 7.8 | (0.2) | 7.7 | 0.1 | 7.7 | 7.6 | 7.6 | 7.7 |
| United | 5.2 | 4.9 | 5.4 | (0.4) | 5.1 | 0.2 | 5.2 | 5.4 | 5.4 | 5.4 |
| **Total Mine** | **27.2** | **29.7** | **30.0** | **(0.3)** | **29.3** | **(0.4)** | **29.2** | **26.4** | **26.4** | **26.5** |
| **Cliffs' Share** | **20.3** | **22.4** | **22.6** | **(0.1)** | **21.9** | **(0.5)** | **21.6** | **19.2** | **19.2** | **19.3** |

**Cash Production Cost Per Ton**

|  | 2013 | 2014 | | | 2015 | | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|
|  | 2013 Actual | Forecast | 2014 Plan | Variance from Plan | Forecast | Variance from 2014 Actual | Forecast | Forecast | Forecast | Forecast |
| Empire | $ 77.83 | $ 71.72 | $ 77.13 | $ (5.41) | $ 68.08 | $ (3.64) | $ 74.08 | $ - | $ - | $ - |
| Hibbing | 56.61 | 62.86 | 62.52 | 0.34 | 58.58 | (4.28) | 62.36 | 66.37 | 64.93 | 66.26 |
| Northshore | 73.17 | 65.14 | 66.80 | (1.66) | 61.31 | (3.83) | 64.74 | 59.22 | 60.01 | 60.82 |
| Tilden | 69.12 | 69.16 | 67.10 | 2.06 | 62.42 | (6.74) | 64.88 | 68.13 | 69.53 | 70.87 |
| United | 57.89 | 62.20 | 60.27 | 1.93 | 59.21 | (2.99) | 63.10 | 61.72 | 62.38 | 61.68 |
| **Total Mine** | **$ 64.98** | **$ 66.03** | **$ 65.92** | **$ 0.11** | **$ 61.44** | **$ (4.59)** | **$ 64.98** | **$ 64.41** | **$ 64.69** | **$ 65.53** |
| **Cliffs' Share** | **$ 64.65** | **$ 64.09** | **$ 64.03** | **$ 0.06** | **$ 59.38** | **$ (4.71)** | **$ 62.93** | **$ 61.59** | **$ 62.31** | **$ 62.82** |



# USIO – ADDITIONAL REDUCTIONS NEEDED

## Cash cost of Production Target:

| | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|
| Site Submitted Cost per ton | $ 62.93 | $ 61.59 | $ 62.31 | $ 62.82 |
| Target Cost per ton | $ 55.00 | $ 55.00 | $ 55.00 | $ 55.00 |
| Cost Change/(Savings) $ per ton | $ (7.93) | $ (6.59) | $ (7.31) | $ (7.82) |
| Reqd Change/(Savings) $ millions | $ (171.6) | $ (126.8) | $ (140.5) | $ (151.3) |

## Capital:

| | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|
| Empire | $ 16.6 | $ 19.5 | $ 7.5 | $ - |
| Tilden | 93.2 | 46.0 | 22.9 | 12.7 |
| Northshore | 39.0 | 33.9 | 13.2 | 24.8 |
| CTG | 0.2 | 0.2 | 0.1 | 0.2 |
| LS&I | 1.7 | 1.2 | 1.8 | 0.4 |
| Northern Conservation | 0.4 | 0.1 | 0.0 | 0.0 |
| United | 65.0 | 30.2 | 21.5 | 2.3 |
| **Total** | **$ 216.1** | **$ 131.1** | **$ 67.0** | **$ 40.3** |
| **Target** | **$ 100.0** | **$ 100.0** | **$ 100.0** | **$ 100.0** |
| **Reqd Savings** | **$ (116.1)** | **$ (31.1)** | **$ 33.0** | **$ 59.7** |

**2016 – 2019 Reductions need to be completed by end of April for Consolidation and Review**





# Q1 Site Updates

# SITE UPDATES

- **Quarter production projections**
- **Unbudgeted costs Q1**
- **Production forecast Q1**
- **Q2 outages – anything we foresee changing the plan?**

  - **CMO**
  - **Northshore**
  - **HibTac**
  - **UTAC**



# USIO Project Updates

USIO 2015 BARGAINING SUMMARY



SG&A UPDATE / BUSINESS IMPROVEMENT

## Corporate / USIO SG&A Update (K. Foran to update)

## Organization Structural Changes

- Supply Chain
- Business Improvement
- Site Changes

## ENERGY AGREEMENTS

1. **Agreement in principle between UPPCO and We energies**
   - Sale of Presque Isle Power Plant

2. **Agreement in principle between UPPCO and Cliffs**
   - Termination of SSR payment
   - Electric power supply agreement

3. **Agreement regarding settlement between We Energies, Cliffs, Governor Snyder, Attorney General Schuette, and the MPSC**
   - Agreement to not object to the merger of We Energies and Integrys

4. **Agreement in principle between Cliffs and Invenergy**
   - Construction of a cogeneration facility on Cliffs property

## VESSEL RATES (PER TON, INCL FUEL)

**CONFIDENTIAL**

| Pellets | 2014 Actual | 2015 Projected | Δ | Comments |
|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Stone** | | | | |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

CLIFFS



## RAIL RATES (FUEL SURCHARGES NOT INCLUDED) **CONFIDENTIAL**

| Pellets | RR | 2014 | 2015 | Δ | Comments |
|---|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Bentonite** | | | | | |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

[redacted]

[redacted]

CLIFFS



# USIO
## Health & Safety Update

## SAFETY PERFORMANCE USIO – YTD THROUGH 12.31.14

- *Contractor data included in and after 2012 statistics.*
- *2013 MSHA Industry Data used for TRIR Industry Averages.*
- *Most recent BLS data used for LTIR Industry Averages.*



## JANUARY FIELD ASSESSMENTS





## SAFETY PERFORMANCE USIO – YTD THROUGH 12.31.14

**Interviewed:**

**Employees – 390**

   **15% were supervisors and SM's**

**Contractors – 80**

**Observations:**

- **Crew (peer to peer) briefing and Take 5 – mostly individual (mental)**
- **All employees mentioned that they receive tools and resources when they ask for them.**
- **All employees and contractors stated they would stop a job or a co-worker if there was excessive or uncontrolled risk.**
- **Major controls used well - Hot work, lockout, fall protection, etc…**
- **Respiratory Protection – Beards are prevalent.  Task specific use understanding is a bit unclear for many employees interviewed.  May need future clarification/reinforcement.**

## OBSERVATIONS

- **Briefings/Tool Box talks/Pre-shift meetings – train the trainer approach/coaching may be needed for continuous improvement.**

- **Employee engagement in discussing "applied safety" controls and pinpointed behaviors could be enhanced.**

- **May need to clarify and encourage methods for employee concerns and feedback loop.  Variability in use of action cards/de-brief cards and understanding appears to vary among sections.**

- **Safety Interactions – understanding of requirements and methods to perform interactions varies greatly.**
  - Targeting of pinpointed behaviors could be enhanced.
  - All supervisors should perform the same minimum number of quality safety interactions

RECOMMENDATIONS

## Develop a detailed plan for each operation that defines accountability, frequency, and measurement methods for OPIP/MPIP scorecard elements.

- Scorecard elements need to be consistent with leadership modules/behavioral science
- No new initiatives are needed

Example: Each Section Manager performs a review and assessment of at least one tool box talk/pre-shift meeting/briefing performed by each direct report during the month.

- Each review includes feedback for improvement.
- Tactical "questioning" form of discussion and safety share to enhance employee engagement could be utilized.
- A criteria scoring sheet that defines success for briefing used by SM's to evaluate supervisors and provide specific feedback. Also used to track for OPIP.

Example: Perform assessment of first line supervisor safety interactions to include coaching and to provide feedback at a defined frequency.

- At least four first line supervisors would be assessed during the month by their section manager to determine effectiveness in
  - targeting defined at-risk practices (targeted actions)
  - providing feedback (positive and corrective) to work crew(s)
  - leading crews in "applied" Take 5 briefings
  - collecting safe vs. at-risk observations.

RECOMMENDATIONS

## Proposal

1. **Draft USIO plan and operation specific detailed plans with corporate H&S staff and AM's of safety to define each element of OPIP/MPIP scorecard**
   - Define criteria to measure success
   - Develop frequency of activities and accountabilities by level/role
   - Develop measurement methods such as assessment tool/checklists for section managers to assess supervisors briefs, de-briefs, SI's, etc…
2. **Review plans with each GM to obtain feedback**
3. **Review plans with site AM's**
4. **Communicate specific accountabilities to Supervisors and SM's**
5. **Assess for effectiveness quarterly**

# SAFETY

| Proactive Initiatives | 75 Pts. max | | Each site must be able to demonstrate compliance with the self scores entered below. |
|---|---|---|---|
| Safety Interactions | 5 pts. each | | A. The site defined number of integrated or focused safety interactions were performed during the month in each mine section<br>B. Safe vs. at-risk observations from safety interactions were tracked in the safety portal<br>C. At risk observation trends were addressed in supervisor safety meetings/briefings |
| Hazard Identification and Elimination | 5 pts. each | | A. Auditors, supervisors, hourly staff or combinations of the three, follow a locally defined process to ensure that potential citations are identified and tracked by mine section independent from a regulatory agency inspection.<br>B. There were no past due work orders or corrective actions from hazard ID and elimination during the month. |
| Incident Investigations | 5 pts. each | | A. Each incident investigation (for a reportable incident or near miss that could have been disabling) performed during the month identified the root cause and was entered in the safety portal..<br>B. Corrective actions from each incident investigation (described in A above) during the month addressed root causes and were entered in the safety portal. |
| Take 5 | 5 pts. | | The site executed a plan to improve the use and effectiveness of the Take 5 process as defined in the CNR Safety Leadership Modules during the month. |
| Supervisor Pre-shift/beginning of shift Safety Meetings | 10 pts. | | Each first and second level supervisor held a safety meeting/briefing at the beginning of each shift that addressed job planning and specific hazards to be controlled during the upcoming shift. Each meeting/briefing must include employee involvement. |
| After Action Reviews or Post Shift De-Briefings | 10 pts. | | Each first and second level supervisor performed daily After Action Reviews and/or Post Job/Shift Briefings during the month to provide feedback to their work crews on safe work performance. |
| Quality Assessments of safety briefings and AARs/De-briefs | 5 pts pre-shift<br>5 pts post shift | | Each Section Manager and Area Manager performed a review and assessment of at least one pre and/or post shift meeting/briefing for (site determined % which should include 100% of supervisors and section managers each quarter) direct reports during the month. Each direct report must receive feedback for improvement. |
| PPE and Tool use as observed | A. 5 pts.<br>B. 10 pts.<br>C. 15 pts. | | Points awarded when proper PPE and tools (site selects criteria such as respirators, hearing protectors, etc…) were observed being worn properly and used when needed in each mine sector. Site must demonstrate compliance.<br>A. 90% compliant<br>B. 95% compliant<br>C. 100% compliant |
| Other | 10 pts. | | Other initiative focused on improving first line supervisor effectiveness or to improve employee involvement during the month. |
| **Sustaining Safety Performance/Permission to Operate** | **50 Pts. max** | | **This section outlines status with Sustaining Safety Performance and Permission to Operate.** |
| Timely Completion of Corrective Actions (CA's) | 10 pts. | | All CA's for citations, incident investigations, audits, etc… were entered and tracked in the safety portal and there were no past due corrective actions during the month. |
| Site Incident Analysis | 10 pts. | | Safety data (WC, SI's, citations, other) was analyzed during the month to pinpoint root causes by section/department to be targeted for prevention with the site proactive initiatives section of this scorecard. |
| Assessments and Improvements | 10 pts. each | | A. An assessment was performed during the month to determine effectiveness of the site proactive initiatives and improvements were made during the month as a result of the assessment.<br>B. At least 10% of first line supervisors were assessed during the month to determine their effectiveness in targeting and preventing at-risk practices in their Safety Interactions /Observations including the ability to provide effective feedback. |
| Formalized Accountability | 5 pts. | | All area managers and/or direct reports to the site General Manager include this scorecard target in their goal plans and all first and second level supervisors include each site proactive initiative on this scorecard in their personal balanced scorecards or OPIP. |
| Contractor Performance Improvement | 5 pts. each | | A. Each contractor has the appropriate safety controls included in their work plan and contract<br>B. Each contractor on site has been audited/assessed for safe work practices and adherence to the safety elements of the contract<br>C. A Contractor Performance Improvement Plan (CPIP) to improve a Contractor's safety performance/compliance has been established. Site determines eligibility and CPIP criteria. |
| Inspection and Litigation Management | 10 pts. | | Each citation or NOV issued to the site during the month is documented and tracked in the safety portal to include position and defense information. |
| Other | 5 pts. | | Other activity to ensure safety performance, compliance, or PTO is sustained. |



# Cliffs Natural Resources Inc.

## Health & Safety

USIO
December 31st, 2014

# SAFETY PERFORMANCE UTAC – YTD THROUGH 12.31.14

- *Contractor data included in and after 2012 statistics.*
- *2013 MSHA Industry Data used for TRIR Industry Averages.*
- *Most recent BLS data used for LTIR Industry Averages.*



## SAFETY PERFORMANCE UTAC – YTD THROUGH 12.31.14





## SAFETY PERFORMANCE HIBTAC – YTD THROUGH 12.31.14

- *Contractor data included in and after 2012 statistics.*
- *2013 MSHA Industry Data used for TRIR Industry Averages.*
- *Most recent BLS data used for LTIR Industry Averages.*



# SAFETY PERFORMANCE HIBTAC – YTD THROUGH 12.31.14





## SAFETY PERFORMANCE CMO – YTD THROUGH 12.31.14

- *Contractor data included in and after 2012 statistics.*
- *2013 MSHA Industry Data used for TRIR Industry Averages.*
- *Most recent BLS data used for LTIR Industry Averages.*



## SAFETY PERFORMANCE CMO – YTD THROUGH 12.31.14





# SAFETY PERFORMANCE NSM – YTD THROUGH 12.31.14

- *Contractor data included in and after 2012 statistics.*
- *2013 MSHA Industry Data used for TRIR Industry Averages.*
- *Most recent BLS data used for LTIR Industry Averages.*



## SAFETY PERFORMANCE NSM – YTD THROUGH 12.31.14

## CAPITAL PROJECTS

- Michigan
  - T002 & Stormwater Selenium
  - Invenergy Co-Gen
- Northshore
  - DR-Grade Pellets
  - Gichigami
  - Basin Expansion
- United Taconite
  - Basin 3 Expansion Study
- Hibbing Taconite
  - Mine Resource & Reserve Study
  - Low NOx Burner Plant Trial
- USIO
  - Mercury Emissions
  - Silica Dust Control
  - Project Tracking/Forecasts/Budgets/RFA's



# PROCESS ENGINEERING – MAJOR ACTIVITIES

## CMO

- Tilden Flotation Evaluation – preparing for bench tests at CTC with FLSmidth
- Process support for Se removal / treatment projects
- Process support for clarifier replacement

## NSM

- Project Gichigami
- Grinding Study
- Process support for DR / low silica pellet project

## UTAC

- Vi - Fine crusher improvements / other process support
- Low NOx Burners

## Hibbing

- Low NOx Burners /Airflow Surveys

## All

- Ore Characterization / Mineralogy
- CEMS support
- Pellet Analysis – daily / cargo analysis, quarterly results, and contract requirements

## MINE ENGINEERING – GEOLOGY

Hibbing Taconite:
- 🟢 Long Range Mine Plan Evaluations: *current SR, & all permitted lands*
- 🟡 CIS Study for Expansion: *east side lands and strategic evaluation*

United Taconite
- 🟢 5 year mine plan
- 🟡 Ore performance evaluate: *evaluation of mine plan at mill performance cutoffs*

Northshore
- 🟡 Virginia Formation EAW
- 🟡 DRI ore characterization

Tilden
- 🟡 Long range mine plan update

Empire
- 🟢 Mine plans for evaluations

Royalty
- 🔴 United Royalty reduction
- 🟡 Hib-Tac lease extensions



# WETLAND IMPACT ESTIMATE







# USIO
# Supply Chain





* inserts / trough liner

# PRODUCTION COST INITIATIVES – PROCUREMENT 2015 PLAN

## Update / Action Plan

- Inventory Control
    - January Cost Avoidance $104k – Min/Max Adj. $40k; RO Adj $64k
    - Starting to track Suggested Inventory Control Reductions to site Approved
    - Working on developing new monthly inventory metrics to break down inventory into manageable tasks and categories
    - Engaging AddOns to develop a report for CWB process
        - 2014 USIO sites added $2.9M to inventory
        - 2014 USIO sites updated 1123 line items
- Energy
    - YTD Savings $5.8M – Diesel and Natural gas for Jan – April
    - Natural Gas market looks to be depressed over the next year will look to capitalize as the year progresses
    - Diesel market – will monitor current risk to market with potential strike 10% of US capacity may be effected
- Concerns – Staffing right now is going to be a hurdle
- Accountability Reviews
    - Initiated Bi-Weekly review with site Procurement Managers and Strategic Sourcing group to identify opportunities, develop strategy, and track execution
- Opportunities
    - Competitive pricing alternatives for Non-OE suppliers
    - Will develop strategy with Site maintenance groups to efficiently attack the groups and categories
    - Understand the entire vendor supply chain network to reduce overhead where applicable
    - Look for opportunities to consolidate our supplier and parts network to reduce costs and working capital where applicable

## Productivity and Profitability Over Time: $59/ton requirement

- Will the currently identified projects and saving initiatives get us to $59/ton?
- Is it sustainable? If not, what is the next body of work to make the savings sustainable?
- What are the cultural implications of the extreme actions that we will need to take in order to meet this commitment.
- Are all of our major systems (finance, procurement, project managements, mine planning, safety, and maintenance) functioning in a way that supports these efforts?

# APPENDIX

# REGULATORY / ENVIRONMENTAL

| What | How | Direct Impact | Indirect Impact | Update as of 2/3/15 |
|---|---|---|---|---|
| The Supreme Court placed the **Cross-State Air Pollution Rule** back into play | Market-based rule focuses on limiting NOx and SO2 emissions from power plants | Northshore's Silver Bay Power | Additional power costs down the road | |
| Minnesota **Mercury Reduction** and Reporting Rule | Establishes reduction targets for taconite sources by 2025 | No fully-developed indurating compatible technology can demonstrate achievement of this scale of reduction | Another long-term driver to the cost of power produced in MN | Developing project team and charter to study options; plan submittal to MPCA in 2018; compliance by 2025 |
| **Federal wetlands** policy/permitting required | 401 Certification issued prior to impacts of any wetlands | Adversarial groups are turning to the 401 program as a 'new avenue' to potentially delay projects | 1-2 year required to impact wetlands, Impacts must be in long range plans. | Recent (2015) wetland credits from Williams creek directed to Hib-Tac |
| **Minnesota wild rice/sulfate** standard | Recent attempt by the MPCA to apply the standard in a taconite permit (USS) | Flows from Tailing Basin or mine dewatering would be impacted if upstream of Wild Rice stand | Mitigation costs could be significant. | Continuing to monitor developments in regulatory settings |

CULTURE

## USIO's organization, culture, and major systems are being refined to proactively mitigate, offset or leverage the impact of the environment on our productivity and profitability.

- **Major cultural shift as the Line organization has embraced accountability for**
  1. Safety
  2. Environmental
  3. Business Improvement

The mine sites have become much more focused on improving these aspects of the business, where historically the culture was more focused on simply 'running' the business. There has been marked improvement in all three areas as a result.

- **However, most of the above cultural change has occurred in the management ranks S2-S4 – not yet rooted at S1 Supervisor/Crew level**
  - Check Six aimed at the S1 roles
  - How else can we drive a culture of accountability to the S1 Roles?

# Exhibit 2

************************************

**THIS DOCUMENT WAS PROVIDED IN NATIVE FORMAT UPON REQUEST.**

************************************

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER CLIFFS_000539963

Glacier Park Company – May 2013 – Jesse Dunsmoor

# OPPORTUNITY SCOPE

# GNIOP Assets

- GNIOP owns Lands related to the following active mining areas:
  - Lands owned account for about 30% of Minntac's productions
  - GNIOP lands account for about 70% of Essar Steel MN project
  - Lands controlled account for aboutt 25% of Hibtac lease lands and a significant portion of Keetac production
  - Lands owned account for a large portion of Magnetation / Mining Resources production

- Lands owned with significant resources:
  - Carmi Campbell
  - Buhl Kinney

# Glacier Park Company Ownership

- The GNIOP lands were originally controlled by Great Northern Railway which was forced to place the lands into a trust to comply with various laws limiting ownership of railroads and properties producing products shipped on the railroads
- The "reversioner" of the trust assets is Glacier Park Company
- Glacier Park Company is a wholly owned subsidiary of Conoco Phillips
- Conoco Phillips came to own Glacier Park Company after acquisition of Burlington Resources which was a division of Burlington Northern Santa Fe (BNSF) which came to own Glacier Park Company after acquisition of Great Northern Railway
- The acquisition of Burlington Resources was made based on land packages that included oil/gas reserves
- When the trust dissolves on April 6, 2015 control of the lands will revert back to Glacier Park Company wholly owned by Conoco Phillips

# Glacier Park Company Typical Lease Agreements



# Strategic Position of Interested Parties – [redacted]

- [redacted]
- [redacted]
- [redacted]
- [redacted]



# Strategic Position of Interested Parties – [redacted]

- [redacted]
- [redacted]
- [redacted]
- [redacted]



# Strategic Position of Interested Parties –



# Strategic Position of Interested Parties – Cliffs



# Strategic Position of Interested Parties – Cliffs cont.

- The major benefit to Cliffs would be the ability to terminate leases and limit the life of mine at other properties, limit development of new mines and limit expansion of existing mines which ensures that competitor production would not offset Cliffs pellets in the North American market



# Royalty and Life of Mine Caculations



# Royalty and Life of Mine Caculations



# Recommendation



# Exhibit 3

Message

**From:** Goncalves, Lourenco [/O=CCI/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=LOURENCO GONCALVESB95]
**Sent:** 7/24/2015 8:04:55 PM
**To:** Cartella, David T [/O=CCI/OU=Cleveland-Cliffs/cn=Locations/cn=Cleveland/cn=Accounts/cn=Standard Users/cn=DTCartella]
**CC:** Tompkins, Kelly [/O=CCI/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=PKTompkins]
**Subject:** Re: Message from Unknown sender (916128056333)
**Attachments:** image001.jpg

I agree, David. Thanks.

On Jul 24, 2015, at 4:03 PM, Cartella, David T <David.Cartella@CliffsNR.com> wrote:

All the more reason to be nice to Governor Dayton when you talk with him. If Dayton cooperates and we get this deal—we will have the foothold we need and we can start firing grenades to sink them.

3) Add in a commercial deal with Mittal and it should be game over.

<image001.jpg>

David T. Cartella
VP, Government, Environment, Energy and Public Affairs & Counsel
P 216.694.4380 M 216.212.7817
david.cartella@cliffsnr.com

CLIFFS NATURAL RESOURCES
200 Public Square, Suite 3300, Cleveland, OH 44114
P 216.694.5700 cliffsnaturalresources.com

**From:** Goncalves, Lourenco
**Sent:** Friday, July 24, 2015 3:37 PM
**To:** Cartella, David T
**Cc:** Tompkins, Kelly; Forrester, Traci L; Graham, James D
**Subject:** Re: Message from Unknown sender (916128056333)

On Jul 24, 2015, at 3:32 PM, Cartella, David T <David.Cartella@CliffsNR.com> wrote:



<image001.jpg>

David T. Cartella
VP, Government, Environment, Energy and Public Affairs & Counsel
P 216.694.4380 M 216.212.7817
david.cartella@cliffsnr.com

CLIFFS NATURAL RESOURCES
200 Public Square, Suite 3300, Cleveland, OH 44114
P 216.694.5700 cliffsnaturalresources.com

---

**From:** Bloom, Patrick M
**Sent:** Friday, July 24, 2015 3:03 PM
**To:** Cartella, David T
**Subject:** Fwd: Message from Unknown sender (916128056333)

Begin forwarded message:

> **From:** Cisco Unity Connection Messaging System <unityconnection@cle-cmunc1-32.cliffsnet.com>
> **Date:** July 24, 2015 at 2:46:27 PM EDT
> **To:** <pmbloom@cle-cmunc1-32.cliffsnet.com>
> **Subject: Message from Unknown sender (916128056333)**

<VoiceMessage.wav>

# Exhibit 4

**From:** Tompkins, Kelly
**Sent:** Tuesday, December 1, 2015 1:54 PM
**To:** Cartella, David T; Persico, Patricia M; Bloom, Patrick M
**Subject:** RE: Dayton issues warning to Essar about paying companies working on Nashwauk site

Kelly

***P. Kelly Tompkins***
**Executive Vice President & Chief Financial Officer**
**P 216.694.6529 M 216.577.8967 F 216.694.6509**
**kelly.tompkins@cliffsnr.com**

**Cliffs Natural Resources**
**200 Public Square, Suite 3300**
**Cleveland, Ohio 44114**

---

**From:** Cartella, David T
**Sent:** Tuesday, December 01, 2015 8:52 AM
**To:** Persico, Patricia M; Tompkins, Kelly; Bloom, Patrick M
**Subject:** RE: Dayton issues warning to Essar about paying companies working on Nashwauk site

Once Essar is dead, it will be our job to artfully reset the goals for the Government— We have to give Minnesota the belief they have another option in order for them to act—they need to be emboldened constantly. If they finally pull the plug, we can reset expectations. Until ESSAR is gone, it is "live to fight another day".

The real trick is to get Minnesota to trust us and not allow banks to assign their mineral to some other speculator. Once we control the minerals, we control the pace and type of development. Everything else falls into place.

CLIFFS

**David T. Cartella**
**VP, Government, Environment, Energy and Public Affairs & Counsel**
**P 216.694.4380 M 216.212.7817**
**david.cartella@cliffsnr.com**

**CLIFFS NATURAL RESOURCES**
**200 Public Square, Suite 3300, Cleveland, OH 44114**
**P 216.694.5700 cliffsnaturalresources.com**

---

**From:** Persico, Patricia M
**Sent:** Tuesday, December 01, 2015 8:27 AM
**To:** Tompkins, Kelly; Cartella, David T; Bloom, Patrick M
**Subject:** Fwd: Dayton issues warning to Essar about paying companies working on Nashwauk site

Kelly, Dave and Patrick,

Pat

**PATRICIA PERSICO**
Director, Global Communications
P 216.694.5316 M 216.650.0168
Patricia.persico@cliffsnr.com

**CLIFFS NATURAL RESOURCES INC.**
200 Public Square, Suite 3300
Cleveland, OH 44114-2315
P 216.694.5700 F 216.694.5385 cliffsnaturalresources.com

Begin forwarded message:

> **From:** "Karnowski, Sandra T" <Sandra.Karnowski@CliffsNR.com>
> **Date:** December 1, 2015 at 7:24:57 AM EST
> **To:** "Goncalves, Lourenco" <Lourenco.Goncalves@CliffsNR.com>, "Tompkins, Kelly" <Kelly.Tompkins@CliffsNR.com>, "Fedor, Terry G" <Terry.Fedor@CliffsNR.com>, "Cartella, David T" <David.Cartella@CliffsNR.com>, "Persico, Patricia M" <Patricia.Persico@CliffsNR.com>, "Bloom, Patrick M" <Patrick.Bloom@CliffsNR.com>, "Finan, Paul R" <Paul.Finan@CliffsNR.com>, "Ediger, Anna P" <Anna.Ediger@CliffsNR.com>
> **Subject: Dayton issues warning to Essar about paying companies working on Nashwauk site**
>
> Lourenco and Team,
>
> I've included below John Myers' Duluth News Tribune coverage of Governor Dayton's position on Essar's failure to pay contractors. You'll see Dayton has already pulled back a bit and offered Essar until Friday to pay up. He also added the statement, "We are all fed up with this. "I'd rather they sell it to someone who is going to operate it in a responsible way. I told them it is just totally unacceptable, just totally completely unacceptable."

Myers also stopped short of saying construction has been suspended on the Essar project, but did say work has slowed.

We'll continue to monitor the situation here in Minnesota.

Sandy

**Dayton issues warning to Essar about paying companies working on Nashwauk site**

Governor Mark Dayton on Monday pledged to play hardball with Essar Steel Minnesota, saying he'll call the state's $67 million loan to the company on Wednesday if Essar doesn't pay past due bills from local construction companies.

Essar essentially been in default on the state money since October because it failed to live up to an agreement to create jobs at an iron and steelmaking facility in Nashwauk by that date.

The company has moved ahead with work building a taconite plant at the Nashwauk site, but has shelved plans to make iron and steel at the site. That puts the company in violation of the 2007 agreement signed when the economic development money was awarded by the state. Essar for years has been dogged by allegations and legal action for not paying its bills in a timely fashion, something the governor has said is unacceptable in Minnesota.

In a statement released Monday, Dayton said he spoke by phone with Madhu Vuppuluri, president and CEO of Essar Steel Minnesota, on Nov. 25. Dayton said he informed Vuppuluri that if the company does not pay its Minnesota vendors by close of business on Wednesday, Dayton will "call the state's loan and demand its immediate repayment."

Later Monday, Dayton said he offered Essar a reprieve through Friday if Vuppuluri promised that payment would come by the end of the week, but said he had not yet received a commitment from the company.

Dayton went further and said that if the company pays vendors now but falls behind again, he will "call the state's loan and demand its immediate repayment."

"We are all fed up with this," Dayton said Monday night, referring to the nonpayment of vendors. "I'd rather they sell it to someone who is going to operate it in a responsible way. I told them it is just totally unacceptable, just totally completely unacceptable."

The harsh words came after what appeared to be a handshake deal between Vuppuluri and Dayton at a face-to-face meeting in Eveleth on Oct. 12. After that meeting, state officials said Essar had agreed to pay all contractors in full by the end of October and remain current after that.

"However, those assurances were not fulfilled," Dayton's office said in Monday's statement. "The governor reached across the table and had a warm handshake with Mr. Vuppuluri that all contractors would be paid," state Rep. Tom Anzelc, DFL-Balsam Township, said of the Oct. 12 meeting. "That accomplished nothing."

Anzelc said several contractors and vendors have not been paid for more than a month, some for as long as 180 days.

"Some have been paid in part. Some have been paid in full. But some haven't been paid at all. There doesn't seem to be any rhyme or reason involved with this company," Anzelc said.

Essar Steel Minnesota spokesman Mitch Brunfelt did not return requests to comment on the governor's threat Monday.

In addition, negotiations between the state and Essar on how quickly the state money will be repaid have failed to reach an agreement. The state was demanding at least $10 million up front and regular payments on the remaining balance once Essar began making taconite pellets. Essar has balked at those terms, state officials say.

"They just don't want to pay their bills," Anzelc said.

The $67 million from the state was awarded from the Minnesota Department of Employment and Economic Development, through Itasca County, to pay for roads and railroad track as well as gas, water, sewer and electrical lines to the sprawling plant site. The money was an incentive for Essar to go beyond processing taconite and add value and jobs by actually making iron and steel at the site.

While Dayton appears ready to get that money back, the effort may not be as easy as simply filing a lawsuit. Most of the state money was funneled through Itasca County, Nashwauk and the city's public utilities commission, and those entities would need to agree to pursue the case against Essar.

"We would instruct Itasca County to make a demand on Essar Global and Essar Minnesota, pursuant to the terms of the reimbursement agreement" from 2007, Madeline Koch, DEED spokeswoman, told the News Tribune.

In addition to the $67 million through DEED, the Iron Range Resources and Rehabilitation Board kicked in another $6 million loan for Essar. The IRRRB already has moved on several

occasions to delay repayment of that loan until Essar begins producing taconite and has income to pay it back. The IRRRB loan also is backed by a letter of credit from the parent company. But the state money has little collateral except for the utilities and other infrastructure already in place.

Essar's debt to the state and contractors aren't its only outstanding problems. In September, a federal judge entered a $32.9 million judgment against the firm after a jury agreed Essar violated a contract for natural gas to serve its Nashwauk taconite project. Essar is appealing that order.

Essar, which had stalled construction at the Nashwauk taconite facility for years, received $850 million in financing one year ago and began construction in earnest this year, although work has slowed at the site in recent weeks. The company has said it hopes to be making taconite there by late 2016. Critics have said that deadline can’t possibly be met.

Essar Steel Minnesota is a subsidiary of Mumbai, India-based Essar Global.

Sent from my mobile device

# Exhibit 5



# Project Viking Valuations

*June 2016*

BUSINESS CONFIDENTIAL

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000580724

# DEAL POINTS

- The Viking lands at Essar only make up 3% of the currently reported reserves.

- Essar lease term is until 2036 (20yr), unknown grounds for termination. Would also require the consent of the other 50% mineral owner, Superior Minerals

BUSINESS CONFIDENTIAL

CLIFFS

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER



BUSINESS CONFIDENTIAL

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER



BUSINESS CONFIDENTIAL

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

# Exhibit 6



# Cliffs Natural Resources Inc.

January 2014

Confidential

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

# FORWARD-LOOKING STATEMENTS

This presentation contains forward-looking statements within the meaning of the federal securities laws. Although the Company believes that its forward-looking statements are based on reasonable assumptions, such statements are subject to risks and uncertainties relating to Cliffs' operations and business environment that are difficult to predict and may be beyond Cliffs' control. Such uncertainties and factors may cause actual results to differ materially from those expressed or implied by forward-looking statements for a variety of reasons including without limitation: our ability to successfully replace our existing revolving credit facility with a new asset-based revolving credit facility; our ability to successfully execute an exit option for the Bloom Lake mine and any related cash outflows and associated liabilities of our Canadian operations; trends affecting our financial condition, results of operations or future prospects, particularly the continued volatility of iron ore and coal prices; our actual levels of capital spending; uncertainty or weaknesses in global economic conditions, including downward pressure on prices, reduced market demand and any slowing of the economic growth rate in China; availability of capital and our ability to maintain adequate liquidity and to successfully implement our financing plans; our ability to successfully identify and consummate any strategic investments and complete planned divestitures; our ability to cost-effectively achieve planned production rates or levels; changes in sales volume or mix; the outcome of any contractual disputes with our customers, joint venture partners or significant energy, material or service providers or any other litigation or arbitration; the impact of price-adjustment factors on our sales contracts; the ability of our customers and joint venture partners to meet their obligations to us on a timely basis or at all; our ability to reach agreement with our iron ore customers regarding any modifications to sales contract provisions or renewal or contracts; our actual economic iron ore and coal reserves or reductions in current mineral estimates, including whether any mineralized material qualifies as a reserve; the impact of our customers using other methods to produce steel or reducing their steel production; events or circumstances that could impair or adversely impact the viability of a mine and the carrying value of associated assets, as well as any resulting impairment charges; the results of prefeasibility and feasibility studies in relation to development projects; impacts of existing and increasing governmental laws and regulations and related costs and liabilities, including failure to receive or maintain required operating and environmental permits, approvals, modifications or other authorization of, or from, any governmental or regulatory entity and costs related to implementing improvements to ensure compliance with regulatory changes; uncertainties associated with natural disasters, weather conditions, unanticipated geological conditions, supply or price of energy, equipment failures and other unexpected events; adverse changes in currency values, currency exchange rates, interest rates and tax laws; our ability to maintain appropriate relations with unions and employees and enter into or renew collective bargaining agreements on satisfactory terms; risks related to international operations; the potential existence of significant deficiencies or material weakness in our internal control over financial reporting; problems or uncertainties with leasehold interests, productivity, tons mined, transportation, mine-closure obligations, environmental liabilities, employee-benefit costs and other risks of the mining industry; and other factors and risks that are set forth in the Company's offering circular related to this offering and the Company's most recently filed reports with the US Securities and Exchange Commission (the "SEC"). The information contained herein speaks as of the date of this presentation and may be superseded by subsequent events. Except as may be required by applicable securities laws, we do not undertake any obligation to revise or update any forward-looking statements contained in this presentation. Given these uncertainties, prospective investors are cautioned not to place undue reliance on such forward-looking statements.

This presentation contains non-GAAP measures. We have provided a reconciliation of such non-GAAP financial measures to the most directly comparable measures prepared in accordance with US GAAP in the appendix to this presentation.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

# CLIFFS IS A DIFFERENTIATED IRON ORE PRODUCER

CLIFFS

## 1 Highly-protected US market position

- US market geographically insular
- Long-term contracts and established relationships

## 2 "Tailor-made" products

- Customized to meet blast furnace specifications
- Results in strong level of co-dependency between Cliffs and the steel producers

## 3 Future profitability not tied to the seaborne market

- Performance tied to US steel production and contract terms
- Exiting Bloom Lake
- APIO and NAC will be optimized and sold when an acceptable price achieved
  - Sale of Logan County Coal is evidence of this strategy

Confidential

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER



# OUR FOCUS IS ON DIFFERENTIATED STEEL INPUTS

## PELLETS

*67% of LTM iron ore production*

- Captive, mill-specific products in the US

## LUMP ORE

*17% of LTM iron ore production*

- Commands price premium in Asia market

## FINES

*16% of LTM iron ore production*

- Spot-price based product driven by China demand

## METALLURGICAL COAL

Note: LTM 9/30/14 production figures exclude ECIO. Product mix assumes 100% of USIO production is pellets and APIO production is 52% lump ore and 48% fines.

Confidential

CLIFFS

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000315938

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000315939

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000315940



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

# CLIFFS IS WELL POSITIONED TO MAINTAIN ITS US MARKET LEADERSHIP

## 1 Cliffs will proactively protect its incumbent position

- Blast furnaces are run most efficiently with a consistent and reliable feed of raw materials
- Cliffs' customers value the quality and the consistency of the product Cliffs provides

## 2 Essar Steel Minnesota mine development is a manageable risk

- ESML must become a reliable supplier of Cliffs-quality pellets by 2017 to be a credible competitor
- Risk of cost overruns and potential for start-up delays exist

## 3 Cliffs is fully prepared to address ESML if it becomes a credible competitor

- Already in discussions regarding renewal of key contracts
- Have several options available to encourage renewal (including: Empire Mine extension, offer of uninterrupted supply, differentiated quality)

Confidential

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000315942

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000315943



Confidential

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000315945



13

Confidential

CLIFFS

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000315946

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000315947



CLIFFS

# Cliffs Natural Resources Inc.

January 2014

Confidential

*Highly Confidential*

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000315948

# Exhibit 7

Message

**From**: Lourenco Goncalves [lgoncalves1958@gmail.com]
**Sent**: 11/27/2014 3:55:23 PM
**To**: peter.cohen@credit-suisse.com; peter.matt@credit-suisse.com; douglas.pierson@credit-suisse.com; michael.speller@credit-suisse.com; 'Peter J. Scott' [pscott@jefferies.com]; klockhart@jefferies.com
**CC**: Goncalves, Lourenco [/O=CCI/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Lourenco Goncalvesb95]; Graham, James D [/O=CCI/OU=Cleveland-Cliffs/cn=Locations/cn=Cleveland/cn=Accounts/cn=Standard Users/cn=JDGraham]; Paradie, Terrance M [/O=CCI/OU=Cleveland-Cliffs/cn=Recipients/cn=TMParadie]; Petish, Dwayne M [/O=CCI/OU=Cleveland-Cliffs/cn=Recipients/cn=DMPetish]; Finan, Paul R [/O=CCI/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Prfinan]; Persico, Patricia M [/O=CCI/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=PMPersico]; mjsolecki@jonesday.com; jpdougherty@jonesday.com; Tompkins, Kelly [/O=CCI/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=PKTompkins]
**Subject**: Roadshow Presentation needs improvement
**Attachments**: Cliffs_Roadshow_11 26 2014_1930.pdf

---

**From:** Goncalves, Lourenco [mailto:Lourenco.Goncalves@CliffsNR.com]
**Sent:** Wednesday, November 26, 2014 8:11 PM
**To:** Lourenco Goncalves
**Subject:** Fwd: Cliffs Roadshow Presentation

Team,

If we don't properly educate the potential investors about how dominant Cliffs really is within the US market, these investors may not believe Cliffs is a differentiated iron ore company and a solid investment opportunity for them. The draft presentation attached is not addressing some points we must address with potential investors. Here is my proposal to fix all that:

1) Page 15 – Key Investment Highlights:

. USIO is our core business, which is highly stable and based in long term contracts

. Our existing long term contracts in the US generate revenues above current and forecast IODEX prices

. Our captive customers in the US are our own equity partners in our mines

. There is no US contract expiring until the end of 2016

. We don't anticipate any foreign or domestic competitor to become a threat to our business before we renew our long term contracts

. Our mine in Australia is cost competitive

. Resolution at Bloom Lake eliminates significant use of cash flow

. Sale of non-core assets to generate cash

. Highly disciplined corporate and capital expenditures under new management

2) Page 19 – Essar Minnesota is not a threat:

We should show very clearly that the contracts expiring in 2016 are both with ArcelorMittal, and that AM co-owns with us 62% of Tilden and 21% of Empire.

Essar was unable to build their Minnesota mine when iron prices where $150/ton or more. Now that prices are at $70/ton or less, if Essar resumes construction of their mine/pelletizing plant, they still need to finish construction, commission their plant, and produce pellets with consistent quality prior to the expiration of our 2016 contracts. Even if Essar does all that, they still have to displace Cliffs as a long term supplier of ArcelorMittal, a co-owner of our mines. Very high bar, I believe.

3) Page 21:

I suggest we change the colors used for the bars. Let's use red for the IODEX, light green for 2015E and darker green for 2016E.

4) Page 22:

I don't want to use the $65 figure, which is not comparable with the numbers used by the competition. We have already disclosed the breakdown including the $59 cash production cost, and even informed that this number will be $55 in 2015 and $50 in 2016. If we can't use the $59 for some reason, we would be better off not using this page.

5) Page 25:

Same logic as above. We can only demonstrate that we are competitive if we add the Capex needed to both Cliffs and to the Australian competitors. If we can't add the $1/ton Capex, we are better off not using this page.

6) Page 29:

The chart is not helping addressing the issue. I would try a better visualization of Capex and SG&A.

7) Page 33:

During Q3 results conference call, I gave two numbers as guidance: 2014 at $165 million, and 2015 at less than $150 million (and the latter was informed before we made the decision to shutdown Bloom Lake, which will help bring the number further down).

Please go ahead and turn the document one more time taking my comments into consideration, and include my Cliffs email address in the distribution list. Thanks.

Happy Thanksgiving.

Lourenco Goncalves

---

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER CLIFFS_000629186



CLIFFS

# Cliffs Natural Resources Inc.

## Senior Secured Notes Offering

December 2014

Confidential

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000629187

Legal to review

# FORWARD-LOOKING STATEMENTS

This presentation contains forward-looking statements within the meaning of the federal securities laws. Although the Company believes that its forward-looking statements are based on reasonable assumptions, such statements are subject to risks and uncertainties relating to Cliffs' operations and business environment that are difficult to predict and may be beyond Cliffs' control. Such uncertainties and factors may cause actual results to differ materially from those expressed or implied by forward-looking statements for a variety of reasons including without limitation: trends affecting our financial condition, results of operations or future prospects, particularly the continued volatility of iron ore and coal prices; our actual levels of capital spending; uncertainty or weaknesses in global economic conditions, including downward pressure on prices, reduced market demand , increases in supply and any slowing of the economic growth rate in China; our ability to successfully identify and consummate any strategic investments and complete planned divestitures; our ability to successfully integrate acquired companies into our operations and achieve post-acquisition synergies, including without limitation, Cliffs Quebec Iron Mining Limited (formerly Consolidated Thompson Iron Mining Limited); our ability to cost-effectively achieve planned production rates or levels; changes in sales volume or mix; the outcome of any contractual disputes with our customers, joint venture partners or significant energy, material or service providers or any other litigation or arbitration; the impact of price-adjustment factors on our sales contracts; the ability of our customers and joint venture partners to meet their obligations to us on a timely basis or at all; our ability to reach agreement with our iron ore customers regarding any modifications to sales contract provisions; our actual economic iron ore and coal reserves or reductions in current mineral estimates, including whether any mineralized material qualifies as a reserve; the impact of our customers using other methods to produce steel or reducing their steel production; events or circumstances that could impair or adversely impact the viability of a mine and the carrying value of associated assets, as well as any resulting impairment charges; the results of prefeasibility and feasibility studies in relation to development projects; impacts of existing and increasing governmental regulation and related costs and liabilities, including failure to receive or maintain required operating and environmental permits, approvals, modifications or other authorization of, or from, any governmental or regulatory entity and costs related to implementing improvements to ensure compliance with regulatory changes; uncertainties associated with natural disasters, weather conditions, unanticipated geological conditions, supply or price of energy, equipment failures and other unexpected events; adverse changes in currency values, currency exchange rates, interest rates and tax laws; availability of capital and our ability to maintain adequate liquidity and successfully implement our financing plans; our ability to maintain appropriate relations with unions and employees and enter into or renew collective bargaining agreements on satisfactory terms; risks related to international operations; the potential existence of significant deficiencies or material weakness in our internal control over financial reporting; problems or uncertainties with leasehold interests, productivity, tons mined, transportation, mine-closure obligations, environmental liabilities, employee-benefit costs and other risks of the mining industry; and other factors and risks that are set forth in the Company's most recently filed reports with the U.S. Securities and Exchange Commission (the "SEC"). The information contained herein speaks as of the date of this presentation and may be superseded by subsequent events. Except as may be required by applicable securities laws, we do not undertake any obligation to revise or update any forward-looking statements contained in this presentation.

Confidential

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

# AGENDA

**Management Participants**

Transaction Overview

Update On Our Business Strategy

Key Investment Highlights

Financial Overview

Appendix

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

## MANAGEMENT PARTICIPANTS

**Lourenco Goncalves**
Chairman, President, and CEO

**Terrance Paradie**
Executive Vice President, CFO & Treasurer

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

## AGENDA

Management Participants

**Transaction Overview**

Update on Our Business Strategy

Key Investment Highlights

Financial Overview

Appendix

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

## TRANSACTION OVERVIEW

- The contemplated financing and tender offer (the "Transaction") consists of the following:

  - New $1,100 million Senior Secured Notes

  - $600 million tender offer of the existing Senior Notes at a discount to par

  - $500 – 550 million ABL

- The financing proceeds will be used to refinance the Company's existing revolver, place additional cash on the balance sheet to supplement liquidity and fund the Company's cash tender for existing Senior Notes

- Key benefits from the proposed transaction include:

  - ✓ Enhances operational / financial flexibility by eliminating the financial maintenance covenants associated with the existing revolver

  - ✓ Preserves ample liquidity and extends the maturity of the revolving credit facility

  - ✓ Opportunistically delevers Cliffs' balance sheet via discount realized through a tender offer

- Pro forma for the Transaction, Cliffs will have net secured leverage of 0.9x and net total leverage of 3.0x based on LTM 9/30/14 EBITDA of $1,012 million



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000629192

# SOURCES & USES | PRO FORMA CAPITALIZATION

($ in millions)

| Sources | |
|---|---|
| ABL revolver ($500m – $550m) | – |
| Sr. Secured Notes due 2020 | $1,100 |
| **Total sources** | **$1,100** |

| Uses | |
|---|---|
| Cash to the balance sheet | $259 |
| Tender of $800m of Sr. Notes at discount[1] | 600 |
| Repayment of short-term borrowings | 213 |
| Fees and expenses | 28 |
| **Total uses** | **$1,100** |

- Pro forma total liquidity of $1,003 million
- ~$200 million discount captured with the tender offer

($ in millions)

| | As of 9/30/14 | Transaction Adjustments | Pro Forma 9/30/14 | Mult. Of EBITDA LTM 9/30/14 |
|---|---|---|---|---|
| Cash & equivalents | $244 | $259 | $503 | |
| New ABL facility ($500m – $550m) | – | – | – | |
| New Senior Secured Notes | – | 1,100 | 1,100 | |
| Equipment loans | 146 | – | 146 | |
| Capital leases | 186 | – | 186 | |
| Short-term borrowing arrangements | 213 | (213) | – | |
| Total secured debt | $546 | | $1,433 | 1.4x |
| **Net secured debt** | **302** | | **930** | **0.9x** |
| 5.200% Senior Notes due 01/2018 | 500 | (100) | 400 | |
| 5.900% Senior Notes due 03/2020 | 400 | (5) | 395 | |
| 4.800% Senior Notes due 10/2020 | 500 | (165) | 335 | |
| 4.875% Senior Notes due 04/2021 | 700 | (230) | 470 | |
| 6.250% Senior Notes due 10/2040 | 800 | (300) | 500 | |
| Total debt | $3,446 | | $3,533 | 3.5x |
| **Net debt** | **3,202** | | **3,030** | **3.0x** |
| Shareholders' equity (market value) | 1,252 | | 1,252 | |
| Noncontrolling interest | (208) | | (208) | |
| **Total market capitalization** | **$4,490** | | **$4,577** | |
| Adjusted EBITDA | | | | $1,012 |
| Adjusted EBITDA / PF Interest Exp.[2] | | | | 5.1x |

*[1] Assumes notes are tendered at an average price of $78.54.*

*[2] PF Interest expense of $197 million. Assumes [7.50]% rate on Senior Secured Notes.*

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

TBU

# SUMMARY TERMS FOR SENIOR SECURED NOTES

| | |
|---|---|
| Issuer | • Cliffs Natural Resources Inc. |
| Issue | • $1,100 million Senior Secured Notes |
| Ranking | • Senior Secured Notes |
| Maturity | • 5 years |
| Optional redemption | • Non-call 2 years<br>– Redeemable at par + 75% of the coupon in year 3 |
| Guarantors | • All wholly owned domestic subs |
| Collateral | • First-priority lien on:<br>– All material assets (including reserves, resources and real property) of wholly-owned domestic subsidiaries, excluding leaseholds<br>– Stock of all domestic subsidiaries, including holding companies which own stock of joint venture interests<br>– 2/3 of the shares of all first-tier foreign subsidiaries<br>• Second-priority lien on:<br>– A/R, inventory and mobile equipment of wholly-owned domestic subsidiaries |
| Covenants | • Generally consistent with existing notes indentures, but with certain limitations on incremental senior secured debt incurrence |
| Distribution | • 144a/Reg S, without registration rights |

Confidential

CLIFFS

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER



# SUMMARY CORPORATE GUARANTEE AND COLLATERAL STRUCTURE

Awaiting collateral package from Counsel
Cliffs Natural Resources Inc.
New Senior Secured Notes
U.S. Iron Ore
Asia Pacific Iron Ore
North American Coal
Eastern Canada Iron Ore
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]

Confidential

CLIFFS

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

# AGENDA

Management Participants

Transaction Overview

**Update on Our Business Strategy**

Key Investment Highlights

Financial Overview

Appendix

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

# THE NEW CLIFFS

1 Re-focus the Company on its core, highly profitable and resilient USIO business

- Optimize mine plans and cost structures
- Solidify contract positions on key customer contract renewals
- Pursue high-value growth opportunities, e.g. DRI

2 Review all other businesses for exit options / shutdown (ECIO) or divestiture (APIO and NAC)

- Currently pursuing exit options at Bloom Lake
- APIO and NAC will be sold if acceptable prices can be achieved
- If not sold, both APIO and NAC will be optimized from a cash flow standpoint

3 Optimize the capital structure to provide greater financial flexibility to execute our strategic plan

- Maintain ample liquidity – targeting ~$1 billion of availability through cash and a new ABL revolver
- Opportunistically delever the balance sheet and manage debt maturity profile through strategic tender processes

**New leadership installed to refocus the business on its core strengths and build stakeholder value**

Confidential

CLIFFS

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

# OUR FOCUS IS ON DIFFERENTIATED STEEL INPUTS

## PELLETS

*67% of LTM iron ore production*

- Captive, mill-specific products in the U.S.

## LUMP ORE

*17% of LTM iron ore production*

- Commands price premium in Asia market

## FINES

*16% of LTM iron ore production*

- Spot-price based product driven by China demand

## METALLURGICAL COAL

*Note: LTM production figures exclude Bloom Lake.*

Confidential

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER



# SUMMARY OF KEY INITIATIVES

| | Core strategic focus | Assets to be optimized or sold | | Shutdown |
|---|---|---|---|---|
| | USIO | APIO | NAC | Bloom Lake |
| Description | • Leading iron ore pellets producer and supplier in the U.S. domestic market<br>• Expected full-year 2014 sales volume of 22 Mt | • 52% lump iron ore with low silica and low moisture<br>• Expected full-year 2014 sales volume of 10-11 Mt | • High quality metallurgical coal operations with strong geographical market share<br>• Expected full-year 2014 sales volume of 7-8 Mt | • High quality ore with 66% iron content, low silica concentrate<br>• Expected full-year 2014 sales volume of 6-7 Mt |
| Q3 Adj. EBITDA | • $249 million | • $46 million | • $6 million | • ($33) million |
| Situation | • Focus ongoing business strategy around strengthening USIO's leading market position | • Considering asset divestiture | • Considering asset divestiture | • Pursuing exit strategy |
| Strategic Rationale | • Long mine life of ~31 years<br>• Largest U.S. pellet producer; rated capacity equal to 59% of total U.S. market | • Non-core geography<br>• Minimize seaborne iron ore commodity risk | • Non-core resource<br>• Eliminate the losses and capital expenditures | • Eliminate the losses and capital funding requirements |
| Key Objectives | • Enhance profitability and free cash flow generation capacity<br>• Renew maturing long-term contracts with similar terms that limit price volatility | • Must be fairly valued | • Must be fairly valued | • Execute exit option<br>• Up to $650-$700 shutdown costs<br>• Efforts to mitigate costs underway |
| Timing | • Ongoing | • Near term | • Near term | • Immediate |

Confidential

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

# AGENDA

Management Participants

Transaction Overview

Update on Our Business Strategy

**Key Investment Highlights**

Financial Overview

Appendix

Confidential

CLIFFS

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

## KEY INVESTMENT HIGHLIGHTS

1. Highly stable and resilient USIO is the core of our business
2. APIO is cost competitive and produces significant free cash flow
3. Resolution at Bloom Lake eliminates significant use of cash flow
4. Highly disciplined corporate and capital expenditure plan going forward
5. Best-in-class management team with long track record of success

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000629202



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000629203



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000629204



19
Confidential

CLIFFS

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000629205



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000629206



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000629207



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000629208



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000629209

 2

## APIO PRODUCES A PREMIUM PRODUCT VERSUS AUSTRALIAN MAJORS

**Substantially higher lump mix vs. competition results in pricing premium**

$16 / mt
Current lump premium[1]

Cliffs APIO
Fine 48%
Lump 52%

BHP Billiton
Lump 31%
Fine 69%

Rio Tinto
Lump 23%
Fine 77%

Fortescue
Fine 100%

[1]*Premium is relative to the 62% CFR China fines benchmark price.*

Confidential

CLIFFS

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

## ❷ APIO IS A COST-COMPETITIVE PRODUCER

$52
CASH COST PER TON OF LUMP / FINES
$22/ton
MINING
$30/ton
LOGISTICS / ADMIN

($ / long ton)
$122
$159
$108
$111
$96
$80
$69
$46
$66
$68
$64
$56
$53
$52
2010
2011
2012
2013
Q1A
Q2A
Q3A
2014
Cash cost
Average realized price

[1]Free cash flow = EBITDA – capex – corporate allocations.

Confidential

CLIFFS

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

# 2 APIO'S LOW COST STRUCTURE POSITIONS THE BUSINESS TO BE COMPETITIVE IN LOW PRICE ENVIRONMENTS

**$50 million capex / Life of Mine = $0.93 per ton[1]**

## Illustrative EBITDA and FCF sensitivity to market iron ore prices

($ in millions unless otherwise noted)

| IODEX price ($ / metric ton) | $70 | $80 | $90 |
|---|---|---|---|
| *Average realized price discount to IODEX[2]* | | *20%* | |
| Illustrative APIO realized price ($ / metric ton) | $56 | $64 | $72 |
| 2015E metric tons sold[2] (in millions) | | 11.0 | |
| **Illustrative APIO revenue** | **$616** | **$704** | **$792** |
| Total APIO cash cost ($48 / ton)[3] | | ($528) | |
| Illustrative APIO EBITDA | $88 | $176 | $264 |
| Illustrative maintenance capex ($0.93/t) | | ($10) | |
| Illustrative APIO FCF | $78 | $166 | $254 |

[1]Based on 64.5mt of reserves at 12/31/13 less 11mt produced in 2014 = 53.3mt; $50M/53.5mt = $0.93.
[2]Based on LTM as of 9/30/2014.
[3]Based on Q3 2014 guidance.

Confidential

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

To discuss disclosure on BL shutdown costs

# 3 RESOLUTION AT BLOOM LAKE STRENGTHENS CASH FLOW TO SUPPORT OUR CORE OPERATIONS

**Phase I is unsustainable**

**If a shutdown is pursued, costs will be spread over the next five years**

Illustrative EBITDA and FCF sensitivity to realized iron ore prices

| ($ in millions unless otherwise noted) | | | |
|---|---|---|---|
| **Illustrative BL revenue** | **Shut down of Bloom Lake will produce no revenue or EBITDA** | | |
| Total BL cash cost ($82 / metric ton)[1] | | | |
| Illustrative BL EBITDA | | | |
| BL assumed shutdown costs[2] | | ($200) | |
| Illustrative Phase I FCF[3] | ($401) | ($334) | ($268) |
| Illustrative net FCF savings | $201 | $134 | $68 |

[1]Cash cost of $81.71/ton based on Q3 2014 costs.
[2]$200 million shut down cost assumes $450 million of shutdown costs related to rail agreements spread evenly over 3 years. Remaining cost assume $250 million spread evenly over 5 years.
[3]Includes take-or-pay penalty costs, capex costs, and negative EBITDA generated from Bloom Lake Phase I operations (see appendix for reconciliation).

CLIFFS

Confidential

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

# CAPITAL EXPENDITURES WILL BE FOCUSED ON STRENGTHENING OUR CORE BUSINESS

## Capital allocation focused on improving performance of USIO

## Ongoing focus on free cash flow generation

($ in millions)
$1,128
24%
$862
65%
$300 1
$742
69%
$233
2012
2013
2014E
YTD Sep. 2013
YTD Sep. 2014
Capital Expenditures

[1]Capital expenditure estimate includes Bloom Lake.

Confidential

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER



4 HIGHLY DISCIPLINED CORPORATE-LEVEL EXPENDITURE PLAN GOING FORWARD

**"Right-size" the organization to better fit our new strategic direction**

**Streamline the businesses' support functions by eliminating duplication**

($ in millions)
$425
32%
$291
40%
$175[1]
$214
29%
$166
2012
2013
2014E
YTD Sep. 2013
YTD Sep. 2014
SG&A
Exploration

[1]Based on Q3 2014 guidance. Excludes special charges of $45 million.

29

Confidential

CLIFFS

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000629215



## 5 BEST-IN-CLASS MANAGEMENT WITH LONG TRACK RECORD OF SUCCESS

**Lourenco Goncalves**
*Chairman, President, CEO*
**30+ years of experience**

Cliffs Natural Resources
**Since August 2014**

Metals USA
**February 2003 – April 2013**

California Steel Industries
**March 1998 – February 2003**

**Terrance Paradie**
*Executive VP, CFO & Treasurer*
**22+ years of experience**

Cliffs Natural Resources
**Since October 2007**

KPMG
**September 1992 – October 2007**

**Terry Fedor**
*Executive VP, USIO*
**25+ years of experience**

Cliffs Natural Resources
**Since January 2011**

ArcelorMittal
**March 2005 – January 2011**

Confidential

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

# AGENDA

Management Participants

Transaction Overview

Update on Our Business Strategy

Key Investment Highlights

**Financial Overview**

Appendix

CLIFFS

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

# THESE TRANSACTIONS MAINTAIN STRONG LIQUIDITY AND ENHANCE FINANCIAL FLEXIBILITY

**New financing provides a covenant-free ABL and significant liquidity**

**Extends revolver maturity from 2017 to 2019**

Confidential

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000629218

# CLIFFS' BUSINESS WILL RETAIN A STRONG LIQUIDITY POSITION THROUGHOUT THE BL SHUTDOWN

| | | | |
|---|---|---|---|
| New ABL facility | $500 | | |
| Cash on balance sheet[1] | $503 | | |
| **Total liquidity** | **$1,003** | | |
| Cliffs FCF build-up[2] | | | |
| **IODEX price ($ / metric ton)** | **$70** | **$80** | **$90** |
| USIO FCF | $419 | $419 | $529 |
| APIO | $78 | $166 | $254 |
| NAC FCF[3] | ($17) | | |
| (Less) corporate overhead | ($175)[4] | | |
| (Less) interest expense | ($197) | | |
| **Illustrative Cliffs FCF** | **$85** | **$173** | **$371** |
| Bloom Lake assumed shutdown costs[5] | ($200) | | |
| **Illustrative Cliffs FCF incl. BL** | ($115) | ($27) | $171 |
| **Illustrative Cliffs pro forma liquidity** | **$888** | **$976** | **$1,174** |

[1]Pro forma for the proposed transaction.
[2]Assumes constant FCF from USIO and APIO over the projection period.
[3]Assumes $24 million EBITDA calculated based on annualized Q3 adj. EBITDA of $6 million and $41 million of capex calculated as Q3 2014 consolidated capex guidance of $275-$325 million less annualized YTD 2014 Bloom Lake capital additions of $150 million and multiplied by 28%, which represents NAC's contribution to YTD 2014 capital additions, excluding Bloom Lake.
[4]Based on Q3 2014 guidance.
[5]$200 million shut down cost assumes $450 million of shutdown costs related to rail agreements spread evenly over 3 years. Remaining cost assume $250 million spread evenly over 5 years.

Confidential

CLIFFS

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

# KEY INVESTMENT HIGHLIGHTS

1. Highly stable and resilient USIO is the core of our business
2. APIO is cost competitive and produces significant free cash flow
3. Resolution at Bloom Lake eliminates significant use of cash flow
4. Highly disciplined corporate and capital expenditure plan going forward
5. Best-in-class management team with long track record of success

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

# AGENDA

Management Participants

Transaction Overview

Update on Our Business Strategy

Key Investment Highlights

Financial Overview

**Appendix**

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000629221

# SUMMARY HISTORICAL CONSOLIDATED FINANCIAL PERFORMANCE

| ($ in millions) | Fiscal Year Ended December 31, | | | | LTM |
|---|---|---|---|---|---|
| | FY 2010 | FY 2011 | FY 2012 | FY 2013 | 9/30/2014 |
| **Production** | 35.0 | 39.9 | 42.1 | 40.4 | 40.3 |
| **Total Revenue** | $ 4,483.8 | $ 6,563.9 | $ 5,872.7 | $ 5,691.4 | $ 4,856.2 |
| *% Growth* | *104.1%* | *46.4%* | *(10.5%)* | *(3.1%)* | *(14.7%)* |
| Cost of Goods Sold | 3,024.2 | 3,952.6 | 4,708.7 | 4,540.2 | 4,279.0 |
| **Gross Profit** | $ 1,459.6 | $ 2,611.3 | $ 1,164.0 | $ 1,151.2 | $ 577.2 |
| *% Margin* | *32.6%* | *39.8%* | *19.8%* | *20.2%* | *11.9%* |
| **Adjusted EBITDA** | $ 1,774.4 | $ 3,069.5 | $ 1,675.2 | $ 1,474.6 | $ 1,012.4 |
| *% Margin* | *39.6%* | *46.8%* | *28.5%* | *25.9%* | *20.8%* |
| **Capex** | **$ 266.9** | **$ 880.7** | **$ 1,127.5** | **$ 861.6** | **$ 352.6** |
| *% of sales* | *6.0%* | *13.4%* | *19.2%* | *15.1%* | *7.3%* |

Confidential

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000629222

Company to provide historical EBITDA reconciliation by segment

# SUMMARY HISTORICAL FINANCIAL PERFORMANCE BY SEGMENT

| ($ in millions) | Fiscal Year Ended December 31, FY 2010 | FY 2011 | FY 2012 | FY 2013 | LTM 9/30/2014 |
|---|---|---|---|---|---|
| **U.S. Iron Ore** | **$ 2,443.7** | **$ 3,509.9** | **$ 2,723.3** | **$ 2,667.9** | **$ 2,417.0** |
| *% Growth* | *101.7%* | *43.6%* | *(22.4%)* | *(2.0%)* | |
| **Asia Pacific Iron Ore** | **1,123.9** | **1,363.5** | **1,259.3** | **1,224.3** | **1,024.4** |
| *% Growth* | *442.4%* | *21.3%* | *(7.6%)* | *(2.8%)* | |
| **Eastern Canada Iron Ore** | **477.7** | **1,178.1** | **1,008.9** | **978.7** | **715.6** |
| *% Growth* | *102.2%* | *146.6%* | *(14.4%)* | *(3.0%)* | |
| **North American Coal** | **438.2** | **512.1** | **881.1** | **821.9** | **699.2** |
| *% Growth* | *(19.2%)* | *16.9%* | *72.1%* | *(6.7%)* | |
| **Other** | **0.3** | **0.3** | **0.1** | **(1.4)** | **(1.4)** |
| **Total Revenue** | **$ 4,483.8** | **$ 6,563.9** | **$ 5,872.7** | **$ 5,691.4** | **$ 4,854.8** |
| *% Growth* | *104.1%* | *46.4%* | *(10.5%)* | *(3.1%)* | *(14.7%)* |
| **U.S. Iron Ore** | **$ 788.4** | **$ 1,679.3** | **$ 976.2** | **$ 901.9** | **$ 716.5** |
| *% Margin* | *32.3%* | *47.8%* | *35.8%* | *33.8%* | *29.6%* |
| **Asia Pacific Iron Ore** | **566.2** | **699.5** | **311.0** | **367.1** | **223.2** |
| *% Margin* | *50.4%* | *51.3%* | *24.7%* | *30.0%* | *21.8%* |
| **Eastern Canada Iron Ore** | **133.6** | **290.9** | **(121.4)** | **(103.3)** | **(216.0)** |
| *% Margin* | *28.0%* | *24.7%* | *(12.0%)* | *(10.6%)* | *(30.2%)* |
| **North American Coal** | **(28.6)** | **(58.4)** | **(1.8)** | **(14.5)** | **(146.5)** |
| *% Margin* | *(6.5%)* | *(11.4%)* | *(0.2%)* | *(1.8%)* | *(21.0%)* |
| **Gross Profit** | **$ 1,459.6** | **$ 2,611.3** | **$ 1,164.0** | **$ 1,151.2** | **$ 577.2** |
| *% Margin* | *32.6%* | *39.8%* | *19.8%* | *20.2%* | *11.9%* |
| **U.S. Iron Ore** | **$ 850.2** | **$ 1,765.6** | **$ 1,077.1** | **$ 1,022.4** | **$ 838.9** |
| *% Margin* | *34.8%* | *50.3%* | *39.6%* | *38.3%* | *34.7%* |
| **Asia Pacific Iron Ore** | **700.1** | **800.4** | **462.9** | **520.8** | **379.2** |
| *% Margin* | *62.3%* | *58.7%* | *36.8%* | *42.5%* | *37.0%* |
| **Eastern Canada Iron Ore** | **184.0** | **475.3** | **38.8** | **75.2** | **(44.5)** |
| *% Margin* | *38.5%* | *40.3%* | *3.8%* | *7.7%* | *(6.2%)* |
| **North American Coal** | **40.1** | **28.1** | **96.4** | **114.4** | **(25.0)** |
| *% Margin* | *9.2%* | *5.5%* | *10.9%* | *13.9%* | *(3.6%)* |
| **Adjusted EBITDA** | **$ 1,774.4** | **$ 3,069.5** | **$ 1,675.2** | **$ 1,732.7** | **$ 1,148.7** |
| *% Margin* | *39.6%* | *46.8%* | *28.5%* | *30.4%* | *23.7%* |

Confidential

CLIFFS

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

# BLOOM LAKE PHASE I OPERATIONS ILLUSTRATIVE FINANCIAL SUMMARY

## Illustrative EBITDA and FCF sensitivity to realized iron ore prices

($ in millions unless otherwise noted)

| IODEX price ($ / metric ton) | $70 | $80 | $90 |
|---|---|---|---|
| *Average realized price discount to IODEX[1]* | | *17%* | |
| Illustrative BL realized price ($ / metric ton) | $58 | $66 | $75 |
| LTM 9/30/14 metrics tons sold[1] (in millions) | | 8.0 | |
| **Illustrative BL revenue** | **$466** | **$533** | **$599** |
| Total BL cash cost ($82 / metric ton)[2] | | ($657) | |
| **Illustrative BL EBITDA** | **($191)** | **($124)** | **($58)** |
| Take-or-pay penalty costs | | ($60) | |
| BL capex[3] | | ($150) | |
| **Illustrative net FCF loss** | **($401)** | **($334)** | **($268)** |

Confidential

[1]*Based on LTM results as of 9/30/2014.*
[2]*Cash cost of $81.71/ton based on Q3 2014 costs.*
[3]*Capex of $150 million based on annualized YTD 9/30/2014 Bloom Lake capex.*

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

Company to provide Adjusted EBITDA reconciliation going back to 2009

## RECONCILIATION OF NON-GAAP MEASURES – EBITDA

| ($ in millions) | Year Ended December 31, 2012 | 2013 | LTM 9/30/2014 |
|---|---|---|---|
| **Net Income (loss)** | ($1,126.6) | $361.8 | ($6,957.6) |
| Interest Expense, Net | 195.6 | 179.1 | 179.5 |
| Income Tax | 255.9 | 55.1 | (1,026.2) |
| DD&A | 526.0 | 593.3 | 585.7 |
| **EBITDA** | **($149.1)** | **$1,189.3** | **($7,218.6)** |
| Impairment Charges | 1,415.3 | 250.8 | 8,023.9 |
| Wabush Backout | – | 73.2 | 196.6 |
| Foreign Exchange Remeasurement | – | (63.9) | (35.8) |
| Proxy & CIC costs | – | – | 26.2 |
| Litigation Judgement | – | 9.6 | – |
| Severance in SG&A | – | 15.6 | 20.1 |
| Other | (249.0) | – | – |
| **Adjusted EBITDA** | **$1,017.2** | **$1,474.6** | **$1,012.4** |

Confidential

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000629225

To be revised upon receipt of collateral package from counsel

# SUMMARY OF SENIOR SECURED NOTES COLLATERAL PACKAGE

**Collateral for Cliffs' new Senior Secured Bonds will be comprised of the following from the Company and each Guarantor:**

- A pledge of 100% of the stock of all material domestic wholly owned U.S. subsidiaries, subject to a limitation on debt secured by Principal Property or principal U.S. subsidiary interests and sale and leaseback obligations to 15% of CNTA, per existing Notes documents
- A pledge of the stock of foreign subsidiaries limited to 65% of voting equity interests and 100% on the non-voting interests due to tax considerations
- Second-priority lien on accounts receivable, inventory and unencumbered mobile equipment in the U.S. and Australia
- Equipment and other personal property that is able to be perfected with a Uniform Commercial Code ("UCC") filing
- Intellectual property recordings in the United States Patent and Trademark Office ("USPTO")
- Liens and control agreements over deposit accounts and securities accounts
- All or substantially all mortgages on owned and leased (subject to the obtainability of applicable consents) real property of meaningful size
- For Principal Property, limit amount such mortgage secures to 15% CNTA
- Mortgages on non-Principal Properties as available
- Leaseholds – if consent required, Company will use commercially reasonable efforts to obtain landlord consent to mortgage

**Guarantors include:** Northshore Mining Company, Cliffs Sales Company, Cliffs Minnesota Mining Company Cliffs North, American Coal LLC Silver Bay Power Company, Cliffs Empire Inc, Cliffs Tiop Inc, Cliffs Logan County Coal Inc, Cliffs West Virginia Coal Inc, United Taconite LLC, Pinnacle Mining Company LLC, Oak Grove Resources LLC, Toney's Fork Land LLC, Southern Eagle Land LLC, Cliffs Tiop Holding LLC, Cliffs Empire Holding LLC

Confidential

CLIFFS

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

# Exhibit 8

Message

**From**: Goncalves, Lourenco [/O=CCI/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=LOURENCO GONCALVESB95]
**Sent**: 3/28/2015 3:52:19 PM
**To**: Finan, Paul R [/O=CCI/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Prfinan]
**Subject**: Re: Meeting with Gov. Dayton

I agree. As demand improves, we are going to create a real shortage of pellets in the US.

On Mar 28, 2015, at 11:20 AM, Finan, Paul R <Paul.Finan@CliffsNR.com> wrote:

> That is what I presumed. Good to know, I wasn't sure if the Essar global parent would have to assume that debt.
>
> I know you don't like to use the word "leverage" in reference to upcoming negotiations, but the scales really tip in our favor if this plays out as we expect it to.
>
> Regards,
> Paul
>
> On Mar 28, 2015, at 11:13 AM, Goncalves, Lourenco <Lourenco.Goncalves@CliffsNR.com> wrote:
>
>> Essar MN goes bankrupt and the bondholders will own the assets.
>>
>> On Mar 28, 2015, at 11:05 AM, Finan, Paul R <Paul.Finan@CliffsNR.com> wrote:
>>
>>> Lourenco,
>>>
>>> Given the meeting results yesterday and this message from [REDACTED] things are certainly looking up!!
>>>
>>> I have been thinking about our conversation yesterday, and have been wondering - what happens to the Essar noteholders if things play out as we anticipate?
>>>
>>> Regards,
>>> Paul
>>>
>>> On Mar 28, 2015, at 10:25 AM, Goncalves, Lourenco <Lourenco.Goncalves@CliffsNR.com> wrote:
>>>
>>>> Paul, FYI.
>>>>
>>>> Begin forwarded message:
>>>>
>>>>> **From:** "Goncalves, Lourenco" <Lourenco.Goncalves@CliffsNR.com>
>>>>> **Date:** March 28, 2015 at 10:24:20 AM



HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER CLIFFS_000634213



HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000634214

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000634215

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000634216

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER CLIFFS_000634217

# Exhibit 9



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER CLIFFS_000536945

************************************

**THIS DOCUMENT WAS PROVIDED IN NATIVE FORMAT UPON REQUEST.**

************************************

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000536946







# Exhibit 10



HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER CLIFFS_000690190



HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER CLIFFS_000690191



HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER CLIFFS_000690192



HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER CLIFFS_000690193

# Exhibit 11

**From:** Cartella, David T
**Sent:** Friday, April 3, 2015 2:14 PM
**To:** Tompkins, Kelly
**Subject:** Fwd: Essar Negotiating Points and Considerations.docx
**Attachments:** Essar Negotiating Points and Considerations.PMB.docx; ATT00001.htm

Kelly FYI...regarding the general approach language Patrick added, I am not sure that is the case--could be more to the State's offer than just contingency (doubt it--but Patrick's language is limiting and LG may take issue with it). If I was going to characterize a general approach it would be to "do whatever is necessary (within reason) to hamstring ESSAR as much as possible and not let perfect be the enemy of good enough."

Sent from my iPhone

Begin forwarded message:

> **From:** "Bloom, Patrick M" <Patrick.Bloom@CliffsNR.com>
> **Date:** April 3, 2015 at 9:18:54 AM EDT
> **To:** "Tompkins, Kelly" <Kelly.Tompkins@CliffsNR.com>, "Fedor, Terry G" <Terry.Fedor@CliffsNR.com>, "Cartella, David T" <David.Cartella@CliffsNR.com>
> **Cc:** "Harapiak, Maurice D" <Maurice.Harapiak@CliffsNR.com>
> **Subject: RE: Essar Negotiating Points and Considerations.docx**
>
> All,
>
> I've attached a few minor additions to Dave's document, with edits reflected in track change format. My proposed additions are mostly clarifying points, but I did add a couple sentences at the top to spell out a general meeting approach. Please feel free to take or leave these edits.
>
> Thanks and have a nice weekend,
> Patrick
>
> ---
>
> **From:** Tompkins, Kelly
> **Sent:** Thursday, April 02, 2015 8:56 PM
> **To:** Fedor, Terry G; Cartella, David T
> **Cc:** Harapiak, Maurice D; Bloom, Patrick M
> **Subject:** RE: Essar Negotiating Points and Considerations.docx
>
> Guys, I will review tomorrow morning and send back some comments. I will probably go ahead at that point and also send to LG so he has a chance to noodle on it over the weekend. Thanks for pulling this draft together.
>
> ***P. Kelly Tompkins***
> **Executive Vice President & Chief Financial Officer**
> **P 216.694.6529 M 216.577.8967 F 216.694.6509**
> **kelly.tompkins@cliffsnr.com**
>
> **Cliffs Natural Resources**
> **200 Public Square, Suite 3300**

Cleveland, Ohio 44114

---

**From:** Fedor, Terry G
**Sent:** Thursday, April 02, 2015 8:38 PM
**To:** Cartella, David T
**Cc:** Tompkins, Kelly; Harapiak, Maurice D; Bloom, Patrick M
**Subject:** Re: Essar Negotiating Points and Considerations.docx

Dave,

This looks good. It looks like you captured all of the major points. I have nothing more to add.

Terry

Sent from my mobile device
Thanks Terry

On Apr 2, 2015, at 4:26 PM, Cartella, David T <David.Cartella@CliffsNR.com> wrote:

> Gents,
>
> Here is a first cut to stimulate some thought. Let me know your thoughts……..
> <Essar Negotiating Points and Considerations.docx>

**Negotiating Points and Considerations**

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER CLIFFS_000113107



HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000113108



HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER CLIFFS_000113109

# Exhibit 12



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER CLIFFS_000309896



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER CLIFFS_000309897



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER CLIFFS_000309898



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER CLIFFS_000309899

# EXHIBIT 13



HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER CLIFFS_000200851



HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER CLIFFS_000200852

# Exhibit 14



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732537



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732538



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732539



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732540



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732541



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732542



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER CLIFFS_000732543



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732544



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732545



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732546



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732547



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732549



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732550



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732551



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732552



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732553



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732554



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732555







































# Exhibit 15



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732523



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732524



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732525



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732526



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732527



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732528



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732529



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732530



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER                    CLIFFS_000732531



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732532



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732533



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732534



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER CLIFFS_000732535



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000732536



























# Exhibit 16



CLIFFS_000102245

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000102246

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000102247

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



CLIFFS_000102248

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000102249

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000102250

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000102251

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



CLIFFS_000102252

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000102253

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



CLIFFS_000102254

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



CLIFFS_000102255

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



CLIFFS_000102256

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



CLIFFS_000102257

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



CLIFFS_000102258

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000102259

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000102260

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



CLIFFS_000102261

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



CLIFFS_000102262

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000102263

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000102264

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



CLIFFS_000102265

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Exhibit 70

Confidential

# PELLET SALE AND PURCHASE AGREEMENT

**BY AND AMONG**

**CLIFFS NATURAL RESOURCES INC., CLIFFS MINING COMPANY,**

**THE CLEVELAND-CLIFFS IRON COMPANY**

**AND**

**ARCELORMITTAL USA LLC**

Dated as of October 31, 2016

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

# PELLET SALE AND PURCHASE AGREEMENT

This Pellet Sale and Purchase Agreement (the "Agreement") is entered into and effective as of October 31, 2016 by and among Cliffs Natural Resources Inc., The Cleveland-Cliffs Iron Company and Cliffs Mining Company (collectively, "Cliffs") and ArcelorMittal USA LLC ("AM").

## RECITALS

WHEREAS, AM desires to purchase from Cliffs, and Cliffs desires to sell to AM, Northshore, Hibbing, UTAC and Tilden Pellets for the Term of this Agreement, subject to the terms and conditions hereof.

NOW, THEREFORE, in consideration of the premises set forth above, their mutual covenants and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## 1. DEFINITIONS.

"AAA" has the meaning set forth in Section 20(b).

"Agreement" has the meaning set forth in the Preamble.

"AM" has the meaning set forth in the Preamble.

"Adjusted Annual Base Price" has the definition set forth in Section 4(b).

"Affiliate" means, with respect to any party, any Person who directly or indirectly controls, is controlled by or is under direct or indirect common control with, such party. A Person shall be deemed to "control" another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person through the ownership of voting securities, by contract or otherwise.

"AM Annual Requirements" means the collective total of the AM Cleveland Annual Tonnage Requirements, the AM Indiana Harbor West Annual Tonnage Requirements, and the AM Indiana Harbor East Annual Tonnage Requirements for a given Year.

"AM Cleveland" means AM's steel-making facility in Cleveland, Ohio.

"AM Cleveland Annual Tonnage Requirements" means for any Year the tonnage of Cliffs Pellets required for consumption on AM's C-5 and C-6 blast furnaces at AM Cleveland.

"AM Indiana Harbor East" means AM's steel-making facility in East Chicago, Indiana containing Blast Furnace IH-7.

"AM Indiana Harbor East Annual Tonnage Requirements" means for any Year the tonnage of Cliffs Pellets required for consumption on AM's IH-7 blast furnace at AM Indiana Harbor East, in excess of the pellets available for such blast furnace from AM's Minorca mine located near Virginia, Minnesota.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER CLIFFS_000017773

"AM Indiana Harbor West" shall mean AM's steel-making facility in East Chicago, Indiana containing Blast Furnaces IH-3 and IH-4.

"AM Indiana Harbor West Annual Tonnage Requirements" means for any Year the tonnage of Cliffs Pellets required for consumption on Blast Furnaces IH-3 and IH-4 at AM Indiana Harbor West.

"AMM" means the industry recognized periodical American Metal Markets.

"AMM Hot Band Price" shall have the meaning set forth in Section 5(a).

"Arbitral Panel" has the meaning set forth in Section 20(c).

"ASTM" means ASTM International. ASTM International is an international standards organization that develops and publishes voluntary consensus technical standards for a wide range of materials, products, systems and services.

"Bankruptcy Law" has the meaning set forth in Section 15(c)(iii).

"Certificate of Analysis" or "COA" means the document issued by a certified laboratory defining the vessel information, bill of lading date, product (or grade), customer, dock, product, cargo identification number, tonnage, destination, and certified chemical and physical assays performed in accordance with Section 8, for each cargo.

"Certified Laboratory" means a Cliffs internal laboratory operating in compliance with the requirements of ISO 9001 or external ISO 9001 or ISO 17025 certified external laboratory, designated by Cliffs and approved by AM.

"Cliffs" has the meaning set forth in the Preamble.

"Cliffs Pellets" means collectively, Hibbing Pellets, Northshore Pellets, Tilden Pellets and UTAC Pellets, and any other mutually agreeable iron ore bearing pellets produced at a facility owned, operated or managed by Cliffs that, in each case, are suitable for use in the blast furnaces in question and shall be consistent with the pellet specifications provided for in Exhibit C.

"Commission" has the meaning set forth in Section 19(c).

"Confidential Information" has the meaning set forth in Section 19(a).

"Controversy" has the meaning set forth in Section 20(b).

"Excess Annual Requirements Tonnage" shall have the meaning set forth in Section 2(c).

"Facility" means each of AM Indiana Harbor East, AM Indiana Harbor West and AM Cleveland.

"Force Majeure Event" has the meaning set forth in Section 13(a).

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

"Hibbing Pellets" means pellets produced at the Hibbing Taconite Company ("Hibbing"), located in Hibbing, Minnesota.

"ISO" means International Organization for Standardization. ISO is an international standard-setting body composed of representatives from various national standards organizations.

"Lot Composite Sample" means a gross, composite quantity of Cliffs Pellets obtained by combining subsamples from the same shipment that have been collected and prepared in accordance with applicable ASTM standards and guidelines and are representative of the quality of the entire shipment of Cliffs Pellets.

"Mustang Pellet" has the meaning set forth in Section 2(a)(iii).

"Net Ton" means 2,000 pounds avoirdupois at natural moisture.

"Northshore Pellets" means pellets produced at the Northshore Mining ("Northshore"), located in Silver Bay, Minnesota.

"pellets" mean iron ore in pellet form suitable for use in the blast furnaces.

"Permanent Shutdown" has the meaning set forth in Section 3(f).

"Person" means any individual, partnership, joint venture, firm, corporation, limited liability company, association, trust or any other legal entity.

"Platts" means seaborne traded iron ore fines information as published in the McGraw-Hill Companies Platts publication "Steel Markets Daily" or a successor publication.

"Platts Annual Price" has the meaning set forth in Section 4(b)(i).

"Preamble" means the all paragraphs in the Agreement that precede this Section 1.

"[REDACTED]" has the meaning set forth in Section 6(b).

"Shipment Week" has the meaning set forth in Section 6(a).

"[REDACTED]" has the meaning set forth in Section 5.

"Retained Sample" has the meaning set forth in Section 8(c)(ii).

"Revised Adjusted Annual Base Price" shall have the meaning set forth in Section 4(b).

"Term" has the meaning set forth in Section 15(a).

"[REDACTED]" has the meaning set forth in Section 5(a)

"Tilden Pellets" means pellets produced at the Tilden Mining Company LC ("Tilden"), located in Ishpeming, Michigan.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

"Ton," "Tonnage" or "Natural Gross Ton" means a gross ton of 2,240 pounds avoirdupois at natural moisture.

"Typical Specifications and Analysis Limits" means the average or "typical" value and, specification limits for chemical and physical assays for Cliffs Pellets to be delivered under this Agreement, as set forth on Exhibit C.

"UTAC Pellets" means pellets produced at the United Taconite LLC ("UTAC"), located in Eveleth, Minnesota, including the UTAC full flux "Mustang" pellet.

"Vessel Shipping Season" means generally March 25 of the current calendar year through January 15 of the following calendar year, but may be adjusted by the Army Corps of Engineers.

"Year" means a calendar year (starting and including January 1 and ending and including December 31).

Unless the context of this Agreement otherwise expressly requires: (i) references to the plural include the singular, and references to the singular include the plural, (ii) the terms "hereof," "herein," "hereunder," "hereto" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement and (iii) the terms "day" and "days" mean and refer to calendar day(s).

**2. SALE AND PURCHASE TONNAGE.**

(a) During the Years 2017 through 2026, Cliffs shall sell and deliver to AM and AM shall purchase, receive and pay for all of the following meeting the quality and other standards of the Agreement:

(i) Tonnage of Cliffs Pellets equal to the AM Cleveland Annual Tonnage Requirements;

(ii) Tonnage of Cliffs Pellets equal to the AM Indiana Harbor West Annual Tonnage Requirements; and

(iii) Tonnage of UTAC full flux pellets ("Mustang Pellets") equal to the AM Indiana Harbor East Annual Tonnage Requirements [redacted]. Both parties recognize at the time of execution UTAC has not produced Mustang Pellets. The parties agree to meet after [redacted] months of production to discuss and review the operational capability of UTAC to produce Mustang Pellets. [redacted]. The parties shall reduce any alteration to writing to be executed by both parties.

(a) For the Year 2017 only [redacted].

(iv) If AM's Minorca mine ceases to provide iron ore pellets then Cliffs and AM agree to meet and determine if there is a mutually agreeable solution for AM's tonnage needs and that takes into consideration Cliffs' need for timely notice to alter its mine plans. However, unless the parties mutually agree, Cliffs is not required to provide additional iron ore pellets in excess of the maximum as set forth in

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

Section 2(b).

(b) Notwithstanding the above, unless otherwise excused or permitted per the terms of this Agreement, AM must nominate and purchase an aggregate minimum of 7 million Tons annually (from any one or any combination of categories (i), (ii) and (iii) above), and Cliffs must deliver and sell Cliffs Pellets for the AM Annual Requirements up to an aggregate maximum of 10.0 million Tons annually. For the [redacted].

(c) After [redacted] of each contract Year, AM shall notify Cliffs of the maximum Tonnage of Cliffs Pellets that it can purchase and take delivery of from Cliffs in the following contract Year. Cliffs shall confirm within fifteen (15) days of such written notification from AM the maximum Tonnage of Cliffs Pellets that it can sell and deliver to AM. In no event shall this maximum Tonnage be less than the maximum Tonnage volumes in Section 2(b) above. If the Tonnage of Cliffs Pellets is less than AM Annual Requirements Tonnage, then AM is free to obtain a Tonnage of pellets from other sources equal to the difference between the maximum Cliffs Tonnage and the AM Annual Requirements Tonnage for the following contract Year. However, if Cliffs can supply all or a portion of AM Annual Requirements Tonnage in excess of the maximum Tonnage volumes in Section 2(b) above ("Excess Annual Requirements Tonnage"), then for any such Year the minimum in Section 2(b) above shall be adjusted upward in the same tonnage as the Excess Annual Requirements Tonnage (e.g. if the Excess Annual Requirements tonnage is 1 million tons then the minimum for such year shall increase to 8 million tons).

(d) The parties to this Agreement understand that it is a requirements contract. The Cliffs Pellets sold by Cliffs to AM pursuant to this Agreement are for consumption purposes only, and AM shall not sell or transfer the Cliffs Pellets to a third party. However, AM may transfer the Cliffs Pellets to another AM facility or affiliate following written notification to Cliffs.

**3. NOTIFICATION AND NOMINATION.**

(a) Beginning on [redacted], 2016 for the Year 2017, and on or by [redacted] of each following Year, ending on [redacted], 2025, AM shall notify Cliffs in writing of the preliminary estimated AM Cleveland Annual Tonnage Requirements, the preliminary estimated AM Indiana Harbor West Annual Tonnage Requirements and the preliminary estimated AM Indiana Harbor East Tonnage Requirements for the following Year. This notice shall include for each Facility:

(i) The expected starting Cliffs Pellets inventory as of [redacted] of such Year and the estimated ending Cliffs Pellets inventory as of [redacted] of such Year;

(ii) An individual Facility operating plan by month indicating the estimated pellet consumption from [redacted] to [redacted] of the Year in question; and

(iii) The Tonnage of Cliffs Pellets that AM estimates it will purchase during the Year.

(b) In respect of the AM Annual Requirements, AM shall inform Cliffs in writing before the [redacted] of [redacted]:

(i) The actual consumption of Cliffs Pellets at the designated blast furnaces at each Facility in the previous [REDACTED];

(ii) The planned [REDACTED] consumption of Cliffs Pellets for the remaining [REDACTED] in the [REDACTED] and the planned consumption for the first [REDACTED] of the following [REDACTED], in each case at the designated blast furnaces at each Facility; and

(iii) The actual starting Cliffs Pellets inventory as of [REDACTED] of such [REDACTED] and the estimated ending Cliffs Pellets inventory as of [REDACTED] of such [REDACTED].

(c) Cliffs shall have the right to determine the type of Cliffs Pellets that will be delivered to meet the AM Cleveland Annual Tonnage Requirements and the AM Indiana Harbor West Annual Tonnage Requirements and shall provide a written notification to AM on or before [REDACTED] setting forth such type of Cliffs Pellets to be provided in the following Year. Unless mutually agreed only Mustang Pellets shall be supplied to meet the AM Indiana Harbor East Annual Requirements. Cliffs recognizes that AM has a preferred type of pellets for both AM Cleveland and AM Indiana Harbor West and will take that into consideration when determining the Cliffs Pellets it will provide to those facilities. Specifically, Cliffs acknowledges that AM Cleveland prefers not to receive flux Pellets and that AM Indiana Harbor West prefers not to receive more than two Cliffs Pellet types, or more than 70% flux pellets.

(d) If [REDACTED] to Section 3(b) [REDACTED], so long as AM's Annual Requirements do not fall below the 7 million Ton minimum in Section 2(b) or modified minimum in Section 2(c) above. Further, [REDACTED] set forth in Section 2(a)(iii) above.

(e) If [REDACTED] nomination, AM will inform Cliffs pursuant to Section 3(b) above of the tonnage of Cliffs Pellets that AM shall purchase and Cliffs shall sell provided that if the remaining requirement increases by more than [REDACTED] Tons [REDACTED] from the previous [REDACTED] requirement or if the total [REDACTED] requirement increases above the original nomination in Section 3(a), then Cliffs shall inform AM in writing within fifteen (15) days of such notice of whether Cliffs' ability to supply all or any portion of the increased tonnage. In the event Cliffs cannot supply the increase, AM is free to obtain pellets from alternate sources, including by moving pellets (whether or not such pellets are Cliffs Pellets) between facilities (which may include, but will not be limited to, AM Cleveland, AM Indiana Harbor West and AM Indiana Harbor East). If the [REDACTED] nomination from AM exceeds the maximum annual nomination limit set forth in Section 2(c) above, then the same provisions in Section 2(c) shall apply.

(f) Blast Furnace Shutdowns.

(i) For purposes of this Section 3(f), "Permanent Shutdown" means a blast furnace will not operate to produce molten iron for a period of at least three (3) years.

(ii) In the event of a Permanent Shutdown of [REDACTED] at the [REDACTED] the AM minimum purchase obligation and the Cliffs maximum supply obligation set forth in Section 2(b) above shall both be [REDACTED]. However, Cliffs shall have the right to substitute an alternative flux pellet that has a [REDACTED], which may be delivered as an alternative pellet to another AM facility.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

(iii) In the event of a Permanent Shutdown of any blast furnace at or , the AM minimum purchase obligation and Cliffs maximum supply obligation set forth in Section 2(b) above shall each be tons for each furnace Permanently Shutdown. In the event of a Permanent Shutdown of all of the blast furnaces subject to this Agreement, then AM may transfer the Cliffs Pellets to another AM facility or affiliate following written notification to Cliffs.

(iv) The provisions of the Section 3(f) take effect twelve (12) months after AM gives written notice of any planned Permanent Shutdown of any blast furnace. In the event that AM elects within twelve (12) months of its initial notification not to shut down a blast furnace that was the subject of a notice of Permanent Shutdown or restarts production at any blast furnace within twelve (12) months of a Permanent Shutdown, the annual amounts of Tonnage shall revert to the minimum amounts that would have been effective absent such reduction. Where there was a notice of Permanent Shutdown and more than twelve (12) months have passed from the notice date, but the subject blast furnace was not actually shutdown, then the parties agree to meet and determine if there is a solution for AM's Tonnage needs that takes into consideration Cliffs' need for timely notice to alter its mine plans. If the parties agree to a solution, then the minimum amounts that were in effect before such reduction shall be reinstated.

**4. PRICE AND ADJUSTMENTS.**

(a) The base price for for each grade of Cliffs Pellet shall be:

| | Indiana Harbor $/gtu | Cleveland $/gtu | Pellet Fe Natural | Indiana Harbor $/WGT | Cleveland $/WGT |
|---|---|---|---|---|---|
| Hibbing Standard | $ | $ | 64.50 | $ | $ |
| Hibbing HC | $ | $ | 64.25 | $ | $ |
| Northshore Standard | $ | $ | 63.25 | $ | $ |
| Tilden Hematite Flux | $ | $ | 60.58 | $ | $ |
| United Standard | $ | $ | 63.67 | $ | $ |
| Mustang | $ | | | $ | |

All prices above are and associated with to the AM Facilities.

(b) In and subsequent Years, the base price per iron unit ($/gtu) shall be adjusted as follows (" "):

(i) (x) the , which is the amount by which the annual published the the



[redacted] ("[redacted]") [redacted] for the Year in determination [redacted] ([redacted] or [redacted]) [redacted] the [redacted] Year's [redacted]; [redacted] (y) the [redacted], which is the [redacted] Year's [redacted], and [redacted] the result obtained of (x) [redacted] (y) [redacted]; and

(ii) [redacted] the [redacted] determined in (i) above by the preceding Year's Adjusted Annual Base Prices, which will then yield the price adjustment per iron unit; and

(iii) [redacted] the [redacted] determined in (ii) above [redacted] preceding Year's Adjusted Base Prices, which [redacted] will then equal the current Year's Adjusted Base Prices.

Following the end of each the second and third calendar quarters during the then-current Year, Cliffs shall provide a revised estimated Adjusted Annual Base Prices for such Year based on the most recently published data ("Revised Adjusted Annual Base Prices"). The Revised Adjusted Annual Base Prices may result in amounts due to or from AM, as the case may be, based upon the difference between Cliffs' provisional calculation and the Revised Adjusted Annual Base Prices for the second calendar quarter and may result in amounts due to or from AM, as the case may be based upon the difference between the second calendar quarter Revised Adjusted Annual Base Prices and the third calendar quarter Revised Adjusted Annual Base Prices. Payment to or from AM shall be due ten (10) days following the receipt of the invoice or credit memo, as the case may be, from Cliffs.

(c) Those Adjusted Annual Base Prices per iron unit shall then become the then-current Year's estimated price for the Cliffs Pellets for the Year in determination.

(d) Cliffs shall verify the final Adjusted Annual Base Price of the prior Year's deliveries no later than February 15 following such Year. Any payment due from Cliffs to AM or AM to Cliffs shall be made by March 1.

(e) Sample calculations of the Adjusted Annual Base Price are set forth in Exhibit A, attached hereto and incorporated herein.

**5.** [redacted]

(a) In any Year in which the [redacted] provided for in Section 5(a)(i) and Section 5(a)(ii) below there shall be a [redacted] in Section 5(a)(i) and Section 5(a)(ii) below ("[redacted]").

(i) In 2017 the [redacted] shall be $[redacted] per Net Ton; in 2018 the [redacted] shall be $[redacted] per Net Ton; and in 2019 the [redacted] shall be $[redacted] per Net Ton.

(ii) Beginning in the year 2020, and in subsequent years, the prior year's [redacted] shall be adjusted by [redacted] (x) the [redacted] which is the amount by which the [redacted] (series [redacted]) published by the [redacted] for the year in determination changes (up or down) from

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

the immediately preceding year's [REDACTED] (series [REDACTED]) [REDACTED] (y) the [REDACTED] which is the immediately preceding year's [REDACTED] (series [REDACTED]) and then [REDACTED] the result obtained by (x) [REDACTED] (y) [REDACTED].

(b) If, in any of the first three (3) quarters of a Year, the [REDACTED] is [REDACTED] or [REDACTED] the [REDACTED] per Net Ton in either section 5(a)(i) or 5(a)(ii) above, a [REDACTED] shall be made by Cliffs, or AM, as the case may be, based upon the average [REDACTED] of the previous quarter.

(c) Within fifteen (15) days of the end of each quarter, AM shall notify Cliffs of the consumption of each Pellet type by the designated blast furnaces at each Facility in such quarter. Within fifteen (15) days of the end of each quarter, Cliffs shall notify AM of the actual [REDACTED]. Within thirty (30) days after the end of the quarter, payment shall be made by Cliffs to AM or AM to Cliffs, whichever the case may be.

(d) In the event that the [REDACTED] is [REDACTED] the [REDACTED] per Net Ton in either Section 5(a)(i) or Section 5(a)(ii) above, Cliffs shall pay to AM a sum equal to (with the various calculations being made in the order set forth below):

(i) The [REDACTED] the [REDACTED] and the [REDACTED] per Net Ton in either Section 5(a)(i) or Section 5(a)(ii) above, [REDACTED]

(ii) The actual Adjusted Base Prices per Ton price for the type(s) of Pellets consumed at the Facility, with the [REDACTED] of (i) and (ii) being [REDACTED]

(iii) The tonnage of each Pellet type consumed at the Facility, with the [REDACTED] of (ii) and (iii) being [REDACTED]. This final [REDACTED] will be the [REDACTED] by Cliffs to AM for the quarter.

(e) In the event that the [REDACTED] is above the [REDACTED] per Net Ton in either Section 5(a)(i) or Section 5(a)(ii) above, AM shall pay to Cliffs a sum equal to (with the various calculations being made in the order set forth below):

(i) The [REDACTED] the [REDACTED] and the [REDACTED] per Net Ton in either Section 5(a)(i) or Section 5(a)(ii) above, [REDACTED]

(ii) The actual Adjusted Base Prices per Ton price for the type(s) of Pellets consumed at the Facility, with the [REDACTED] of (i) and (ii) being [REDACTED]

(iii) The tonnage of each Pellet type consumed at the Facility, with the [REDACTED] of (ii) and (iii) [REDACTED]. This final [REDACTED] will be the [REDACTED] by AM to Cliffs for the quarter.

(f) No later than January 15 after the end of each Year AM shall provide the actual consumption of each Pellet type by the designated blast furnaces at each Facility in such Year. No later than January 31 after the end of each Year, Cliffs shall provide a final [REDACTED] calculation using the above formula with the actual [REDACTED] for such year. Any difference between this calculation and the sum of the three (3) quarterly payments shall be paid by the appropriate party by February 15th.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

(g) If [REDACTED] required to determine the [REDACTED] during any Year, or [REDACTED], then the parties shall negotiate in good faith [REDACTED] information. Should the parties fail to reach a mutually agreeable resolution within sixty (60) days of receipt of written notice by a Party requesting such negotiations, then the parties shall resolve the dispute according to Section 20. Sample calculations of the [REDACTED] are set forth in Exhibit B, attached hereto and incorporated herein.

6. **PAYMENT AND DELIVERY TERMS.**

(a) Following each calendar week Monday through Sunday ("Shipment Week"), Cliffs shall prepare an invoice based on the Adjusted Base Price per iron unit, the Certificate of Analysis for iron percentage and the bill of lading the quantity shipped during the Shipment Week to AM Cleveland, AM Indiana Harbor East and AM Indiana Harbor West. AM shall pay Cliffs all amounts due for the Cliffs Pellets by wire transfer of funds on the Wednesday of the 4th week following the Shipment Week.

(b) AM shall [REDACTED] to Cliffs [REDACTED] and [REDACTED] and [REDACTED] the Cliffs Pellets to the extent that AM [REDACTED] of any Cliffs Pellets [REDACTED] as required. The [REDACTED] to Cliffs [REDACTED] to a [REDACTED] of [REDACTED] and shall [REDACTED] upon the date of [REDACTED] from AM [REDACTED] for such [REDACTED]. Prior to such [REDACTED], Cliffs Pellets will at all times be [REDACTED] and [REDACTED] of [REDACTED] or [REDACTED] created by or through AM or any of its affiliates that is [REDACTED] to the [REDACTED] to Cliffs.

(c) Cliffs shall retain title to the cargoes of Cliffs Pellets delivered during the Shipment Week. Title, and all risk of loss, damage or destruction of the Cliffs Pellets shall transfer from Cliffs to AM following the receipt of payment from AM.

7. **QUALITY.**

(a) Cliffs Pellets, when loaded for shipment, shall conform to the designated grades and their respective specifications as defined in the Typical Specifications and Analysis Limits set forth in Exhibit C. Conformity shall be based on the Certificate of Analysis issued by Cliffs Certified Laboratory.

(i) The Typical Specifications and Analysis Limits set forth in Exhibit C for the Mustang Pellet are transitional. Both parties understand that the Mustang Pellet is a new product and are working together to determine the Typical Specifications and Analysis Limits that are commercially reasonable for Cliffs to produce and AM to consume. Cliffs shall complete its Mustang Pellet trial period not later [REDACTED], or such earlier dates that Cliffs provides to AM with [REDACTED] months' written notice. During such trial period the parties agree that Cliffs shall make commercially reasonable efforts to comply with the Typical Specifications and Analysis Limits in Exhibit C for the Mustang Pellet but shall not be subject to the price adjustment in Exhibit C. From [REDACTED] through [REDACTED], or such earlier dates that Cliffs provides to AM with [REDACTED] months' written notice, the parties shall work together to determine what adjustments are required to produce a Mustang Pellet that is commercially reasonable for each party. On or before [REDACTED], the parties shall reduce to writing and both sign an amendment to this Agreement setting forth the mutually agreed upon Typical Specifications and Analysis Limits for the Mustang Pellets. In the event that Cliffs is unable to produce a Mustang Pellet that meets the following requirements: below [REDACTED] (at the [REDACTED]

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER



) while being below by , AM's obligation to buy Mustang Pellets, and AM's obligation to purchase the AM Indiana Harbor East Annual Tonnage Requirements under this Agreement shall be deemed void and of no further effect, and, further, AM's Annual Requirements shall be reduced by Tons for the remainder of the Term, unless otherwise determined by AM in its sole discretion.

(b) Cargos containing Cliffs Pellets that do not conform to the specification limits defined in the Typical Specifications and Analysis Limits set forth in Exhibit C shall be subject to price adjustments as defined in Exhibit C.

(c) If the value for % +1/4" BT as recorded on a Certificate of Analysis is less than the lower specification limit defined in the Typical Specifications and Analysis Limits in Exhibit C, AM, at its option, may segregate and screen the Cliffs Pellets from that cargo and charge the costs back to Cliffs, however Cliffs shall have the right to inspect the cargo of Cliffs Pellets and sample and test the Cliffs Pellets prior to such screening.

(d) Based on the Certificate of Analysis issued by Cliffs Certified Laboratory, when the result for any quality variable defined in the Typical Specifications and Analysis Limits of Exhibit C does not conform to specification limits, Cliffs shall prepare a non-conformance report and indicate the corrective actions taken to return to conformance on subsequent cargos. The report shall include notifications and actions for all variables not conforming to specification limits.

**8. SAMPLING AND ANALYSES.**

(a) Pellet sampling procedures and analytical tests conducted on Cliffs Pellets sold to AM to demonstrate conformance with Typical Specifications and Analysis Limits shall be performed on each vessel shipment. Sampling and test methods shall be in accordance with the appropriate current ASTM or ISO guidelines or Cliffs customary procedures and practices, or any other procedures and practices that may be mutually agreed to by Cliffs and AM.

(b) AM may, at any time, through one or more authorized representatives, and with prior notice Cliffs, be present to observe production, loading, sampling, and/or analysis of Cliffs Pellets being processed for shipment to AM. Requests shall be submitted to and coordinated by Cliffs' Director – Global Corporate Quality.

(c) Cliffs or Cliffs' agent shall sample the Cliffs Pellets for each shipment. Sampling shall be performed at the loading port or, when it is not possible to take a representative sample at the loading port, prior to loading into rail cars at Cliffs operations. Sampling systems shall be designed in accordance with ASTM guidelines. Cliffs shall collect at least one (1) Lot Composite Sample and prepare two (2) sample splits of no less than thirty (30) pounds from each Lot Composite Sample. Sample splits shall be promptly distributed at Cliffs' expense as follows:

(i) One sample split from each Lot Composite Sample to the Certified Laboratory for analysis; and

(ii) One sample split from each Lot Composite Sample shall be retained by Cliffs for at least sixty (60) days following the vessel departure date ("Retained Sample").

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER CLIFFS_000017783

(d) AM may request additional splits from each Lot Composite Sample be taken and sent to a laboratory designated by AM. Cliffs shall provide identification information, including the type of Cliffs Pellet, date of sample, and vessel name for the requested sample. The costs associated with additional sample handling, preparation, and delivery to the designated laboratory shall be paid by AM. AM may change its designated laboratory upon advance written notice to Cliffs. AM's designated laboratory shall be certified to ISO 9001 or ISO 17025, and shall be capable of performing physical and chemical analyses on iron ore pellets and concentrates in accordance with applicable current ISO or ASTM guidelines.

(e) Physical and chemical analyses at the Certified Lab shall be performed in accordance with applicable current ISO or ASTM guidelines and, upon completion of the analysis, the Certificate of Analysis shall be immediately sent to AM or its designated Affiliate and to Cliffs.

(i) Cliffs shall make commercially reasonable efforts to deliver the COA from the Certified Lab to AM or the designated AM Affiliate within forty eight (48) hours after vessel departure. If the COA is not ready for distribution within forty-eight (48) hours, Cliffs will notify the designated AM contact listed in Section 8(e)(iii), prepare and distribute a preliminary COA including all results available, and issue a final certificate within seventy-two (72) hours of the vessel's departure.

(ii) If the results from Cliffs' Certified Laboratory and AM's designated laboratory are significantly different, AM should notify Cliffs and may request that the Retained Sample from the cargo in question be delivered to a third-party referee laboratory. The referee laboratory shall be registered to ISO-9001 or ISO 17025 and be capable of performing chemistry and physical testing on iron ore pellets and concentrates. The selection of a referee laboratory shall be mutually agreed upon by the parties. The results of the referee laboratory shall be conclusive for purposes of this Agreement.

(iii) Cliffs shall immediately notify all contacts listed below when, upon completion of a Certificate of Analysis, any test result does not conform to a specification limit defined in the Typical Specifications and Analysis Limits set forth in Exhibit C. Notifications shall be via email or telephone as indicated below. If Cliffs fails to promptly notify AM, reasonable costs, including demurrage charges or similar penalties, to the extent incurred as a result of Cliffs' failure or delay in delivering such notice, shall be paid by Cliffs. AM may change the designated notice recipients and Ore Sourcing Manager at any time upon written notice to Cliffs.

If destined for AM Indiana Harbor East:

(1) Joe Moore
Telephone: (219) 399-8650
Email: joseph.moore@arcelormittal.com

(2) Control Room, IH-7

Telephone: (219) 399-4507

If destined for AM Indiana Harbor West:

(1) Matt Collins
Telephone: (219) 399-4779

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

Email: matthew.collins@arcelormittal.com

If destined for AM Cleveland:

(1) Nick Pugliese
Telephone: (216) 429-7526
Email: nick.pugliese@arcelormittal.com

For all AM locations, notice must also be made to the following:

(1) Mickala Sherwood
Telephone: (219) 399-5842
Mickala.Sherwood@arcelormittal.com

(2) Email: AMUSAPurchasingContractAdministration@arcelormittal.com

**9. SHIPMENTS.** Shipments of Cliffs Pellets shall be in approximately equal amounts over the nine (9) month period of the Vessel Shipping Season each Year during the Term of this Agreement to ensure an adequate amount of inventory to allow a working pellet pile at AM's blast furnace ore docks.

**10. WEIGHTS.**

(a) Except as set forth in Section 10(b) below, vessel bill of lading weight shall be determined by railroad scale weights, belt scale weights, or bin scale weights calibrated and maintained in accordance with the manufacturers specification in effect from time to time at each of the loading ports, and shall be accepted by the parties as finally determining the amount (quantity) of Cliffs Pellets delivered to AM pursuant to this Agreement.

(b) In the event of a dispute, AM, at AM's expense, shall have the right to have a draft survey performed on vessels by an independent third party surveyor, mutually agreeable to both Cliffs and AM, to determine the weight of such shipment of Cliffs Pellets. If the vessel bill of lading weight is more than 3% higher or more than 3% lower than the draft survey weight, then the draft survey weight shall be the weight used in calculating the value of the cargo. In the event that the variance is greater than 3%, Cliffs and AM will investigate and remedy the cause of the variance.

**11. EMPLOYMENT OF VESSELS.** Cliffs assumes the obligation for arranging and providing appropriate vessel transportation of the Cliffs Pellets delivered by Cliffs to AM's blast furnace ore docks. Such delivery shall be in approximately equal amounts over the Vessel Shipping Season.

**12. WARRANTIES.** The Cliffs Pellets supplied by Cliffs pursuant to this Agreement will satisfy the quality and other specifications set forth in this Agreement and the Exhibits to this Agreement. THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, WHICH EXTEND BEYOND THE PROVISIONS OF THIS AGREEMENT, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR INTENDED PURPOSE. All claims for substantial variance in quality of the Cliffs Pellets, as described herein, shall be given in writing delivered to Cliffs within the thirty (30) calendar days after completion of discharge at port of discharge. No claim will be entertained after the Cliffs Pellets have been consumed. Each party shall afford the other party prompt and reasonable opportunity to inspect the Cliffs Pellets as to which any claim is made as above stated. The Cliffs Pellets shall not be returned without prior written consent of Cliffs. In no event shall Cliffs be liable for lost profits, injury to good will or any other special or consequential damages.

**13. FORCE MAJEURE.**

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

(a) No party hereto shall be liable for damages resulting from failure to produce, deliver or accept all or any of the Cliffs Pellets as described herein, if and to the extent that such production, delivery or acceptance would be contrary to or would constitute a violation of any regulation, order or requirement of a recognized governmental body or agency coming into effect after the date hereof, or if such failure is caused by acts of God, war, insurrections, interference by foreign powers, strikes, lockouts, labor disputes, fires, floods, embargoes, accidents, acts of terrorism, or uncontrollable delays at the mines or any Facility, on the railroads, docks or in transit, shortage of transportation facilities, disasters of navigation, or other causes, similar or dissimilar, that are not reasonably foreseeable and are beyond the reasonable control of the party charged with a failure to deliver or to accept the Cliffs Pellets (such occurrence, a "Force Majeure Event").

(b) The party declaring a Force Majeure Event shall provide written notice to the other party as soon as practicable of the occurrence or, as appropriate, notification by a third party of the anticipated imminent occurrence of a Force Majeure Event or notification by a governmental authority of an imminent change in law or regulation which would result in a Force Majeure Event, and the probable extent and duration of the Force Majeure Event. The party declaring the Force Majeure Event shall thereafter keep the other party regularly informed of all developments and of the status of its efforts to mitigate the impact of the Force Majeure Event.

(c) To the extent a Force Majeure Event is claimed hereunder by a party hereto, such Force Majeure Event shall relieve the other party from fulfilling its corresponding obligations hereunder to the party claiming such Force Majeure Event, but only for the period and to the extent of the claimed Force Majeure Event. The party that is subject to a Force Majeure Event shall use reasonable efforts to cure or remove the Force Majeure Event or overcome the effects of the Force Majeure Event as promptly as possible to resume performance of its obligations under this Agreement. The settlement of strikes, lockouts or other labor disputes or disturbances shall be entirely within the discretion of the party having the difficulty, and the foregoing requirement to use reasonable efforts to cure or mitigate the Force Majeure Event shall not require the settlement of such strikes, lockouts, labor disputes or disturbances.

(d) Upon cure of the Force Majeure Event, each party's obligations shall be renewed on a prorata basis for the period following such cure. For avoidance of doubt: The AM Annual Requirements, and Cliffs' corresponding delivery obligation, for the Year affected by the Force Majeure Event shall be reduced by the amount of Cliffs Pellets that the party affected by the Force Majeure Event could not deliver, or accept, as the case may be, during the Force Majeure Event. During the Force Majeure Event and upon cure of the Force Majeure Event, the party claiming a Force Majeure Event shall deliver to or take from the non-declaring party Cliffs Pellets, as may be available, on a prorata basis such that another supplier or customer does not receive disproportionate or inequitable treatment to the detriment of the non-declaring party.

(e) The non-claiming party may enter into reasonable alternative supply agreement or arrangements to mitigate the effects of the Force Majeure Event. In the event of a Force Majeure event lasting more than four (4) consecutive months, the parties shall meet and discuss options for how to proceed, which may include termination of the Agreement.

**14. NOTICES.**

(a) All notices and other communications authorized or required to be given hereunder shall be given in writing and shall be deemed to have been duly given (i) when delivered in person, (ii) one (1) business day after having been dispatched by a recognized overnight delivery service, (iii) five (5) business

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

days after having been mailed by registered or certified mail, return receipt requested, postage prepaid, or (iv) when dispatched by electronic mail (with confirmation of receipt), in each case addressed as follows:

If to any Cliffs Party:

Cliffs Natural Resources Inc.
200 Public Square – Suite 3300
Cleveland, Ohio 44114
Attention: Executive Vice President, Global Iron Ore
Electronic Mail: Terrence Mee.@cliffsnr.com

Further, a copy of required notices (excluding notices in the ordinary course of performance) to:

Cliffs Natural Resources Inc.
200 Public Square – Suite 3300
Cleveland, Ohio 44114
Attention: Chief Legal Officer
Electronic Mail: James.Graham@cliffsnr.com

If to AM:

ArcelorMittal USA LLC
3300 Dickey Road
East Chicago, IN 46312
Attention: Vice President of Procurement and Supply Chain
And a copy via email to: AMUSAPurchasing.ContractAdministration@arcelormittal.com

Further, a copy of required notices (excluding notices in the ordinary course of performance) to:

ArcelorMittal USA LLC
One South Dearborn, 19th Floor
Chicago, Illinois, 60603
Attention: General Counsel
And a copy via email to:
AMUSALawDepartment@arcelormittal.com

(b) Any party may change the contact information to which notices or other communications to it shall be sent by giving to the other parties written notice of such change in accordance with this Section 14.

**15. TERM; TERMINATION.**

(a) This Agreement shall commence as of October 31, 2016 and continue through December 31, 2026 (the "Term").

(b) This Agreement shall remain valid and fully enforceable for the fulfillment of obligations incurred prior to termination or expiration.

(c) This Agreement may be terminated at any time:

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

      (i) by either party, in the event of a material breach of the Agreement by the other party that is not cured pursuant to Section 25(a);

(ii) by either party in accordance with the provisions of Section 17 (a); or

(iii) (x) by AM, if any of the following shall occur with respect to any Cliffs entity that is a party to this Agreement (each Cliffs entity, a "subject party" with respect to terminations by AM) or (y) by Cliffs, if any of the following shall occur to AM (the "subject party" with respect terminations by Cliffs):

(1) pursuant to or within the meaning of the United States Bankruptcy Code or any other federal or state law relating to insolvency or relief of debtors (a "Bankruptcy Law"), a subject party shall: (i) commence a voluntary case or proceeding; (ii) consent to the entry of an order for relief against it in an involuntary case; (iii) be subject to an involuntary petition for entry of an order for relief in a bankruptcy case or insolvency proceeding, which involuntary petition is not dismissed within sixty (60) days; (iv) consent to the appointment of a trustee, receiver, assignee, liquidator, or similar official; (v) make an assignment for the benefit of its creditors; (vi) be unable to pay its debts as they become due; or (vii) be or become insolvent; or

(2) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (i) is for relief against a subject party in an involuntary case, (ii) appoints a trustee, receiver, assignee, liquidator or similar official for the subject party or substantially all of the subject party's properties, or (iii) orders the dissolution or liquidation of the subject party, and, in each case, the order or decree is not dismissed within sixty (60) days.

**16. AMENDMENT.** This Agreement may not be modified or amended except by an instrument in writing signed by the parties hereto. An email string shall not constitute an amendment. An electronic pdf or other electronically duplicated signature shall be acceptable.

**17. MERGER, TRANSFER AND ASSIGNMENT.**

(a) Neither this Agreement nor any of the rights or obligations hereunder may be assigned without the prior written consent of the other party, which consent shall not be unreasonably withheld (but, in determining whether to grant such consent, the transferee's creditworthiness and position as a competitor, as applicable, may be considered).

(b) All the covenants, stipulations and agreements herein contained shall inure to the benefit of and bind the parties hereto and their respective successors, transferees and permitted assigns, and any of the latter's subsequent successors, transferees and permitted assigns.

**18. WAIVER.** No waiver of any of the terms of this Agreement shall be valid unless in writing. No waiver or any breach of any provision hereof or default under any provisions hereof shall be deemed a waiver of any subsequent breach or default of any kind whatsoever.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

**19. CONFIDENTIALITY.**

(a) Cliffs and AM acknowledge that this Agreement contains certain requirements, specifications, pricing, adjustment and term provisions which are confidential, proprietary or of a sensitive commercial nature and which would put Cliffs or AM at a competitive disadvantage if disclosed to the public, including Section 4 and Section 5 and all of the Exhibits hereto ("Confidential Information"). Cliffs and AM agree that all provisions of this Agreement shall be kept confidential and, without the prior written consent of the other party, shall not be disclosed to any party that is not a party to this Agreement, or that is not the legal adviser to a party under this Agreement, except as required by law or governmental or judicial order and except that disclosure of the existence of this Agreement shall not be precluded by this Section 19.

(b) If either party or an Affiliate of any party is required by law or governmental or judicial order or receives legal process or court or agency directive requesting or requiring disclosure of any of the Confidential Information contained in this Agreement, such party will promptly notify the other party prior to disclosure to permit such party to seek a protective order or take other appropriate action to preserve the confidentiality of such Confidential Information.

(c) If either party or Affiliate of any party determines to file this Agreement with the Securities and Exchange Commission ("Commission") or any other federal, state or local governmental or regulatory authority, or with any stock exchange or similar body, such determining party will use its reasonable commercial efforts to obtain confidential treatment of such Confidential Information pursuant to any applicable rule, regulation or procedure of the Commission and any applicable rule, regulation or procedure relating to confidential filings made with any such other authority or exchange. If the Commission (or any such other authority or exchange) denies such party's request for confidential treatment of such Confidential Information, such party will use its reasonable commercial efforts to obtain confidential treatment of the portions thereof that the other party designates. Each party will allow the other party to participate in seeking to obtain such confidential treatment for Confidential Information. In the event that the Commission approves the treatment of portions of this Agreement as confidential, Cliffs and AM shall collaborate in creating the version of this Agreement to be filed with the Commission.

(d) None of the parties hereto or their respective Affiliates will issue any press release or otherwise disclose or make any public statement with respect to the transactions contemplated hereby without the prior consent of a duly authorized officer of the other parties, except to the extent that the disclosing party determines in good faith that it is so obligated by law, in which case such disclosing party shall give notice to the other parties in advance of such party's intent to make such disclosure, announcement or issue such press release, and the parties hereto or their Affiliates shall use reasonable efforts to cause a mutually agreeable release or disclosure or announcement to be issued. Notwithstanding the foregoing provisions of this Section 19(c), AM acknowledges that Cliffs will be entitled to include, in any publicly-released, forward looking sales projections, Cliffs' projections of sales to AM, and AM will be entitled to include, in any publicly released, forward looking purchase projections, AM's projections of volumes purchased from Cliffs, but only to the extent required by law or regulation.

**20. GOVERNING LAW; DISPUTE RESOLUTION.**

(a) This Agreement shall in all respects, including matters of construction, validity and performance, be governed by and be construed in accordance with the laws of the State of New York.

(b) If a dispute, claim, question or disagreement ("Controversy") arises from or relates to this Agreement or the breach thereof, and if the dispute cannot be settled through direct discussions, the parties

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

agree to endeavor first to settle the dispute by mediation administered by the American Arbitration Association under its Commercial Mediation Procedures before resorting to arbitration. The parties further agree that any unresolved Controversies arising under, out of, relating to, or in connection with this Agreement shall be settled by arbitration administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. Both parties are domestic US entities and the parties specifically agree that the International Centre for Dispute Resolution rules shall not apply.

(c) The arbitration will be administered by a panel of three independent and impartial arbitrators ("Arbitral Panel"). The party initiating the arbitration shall nominate one (1) arbitrator at the same time it files its request for arbitration, and the responding party shall nominate one (1) arbitrator at the time it files its answer to the request for arbitration. If a party does not timely name an arbitrator, then the AAA shall appoint that arbitrator. By thirty (30) days after the appointment of the two (2) arbitrators, the arbitrators shall have conferred and, if possible, have agreed upon a third arbitrator, who shall serve as the chairperson of the Arbitral Panel. In the event that the two (2) confirmed arbitrators have not agreed upon a chairperson of the Arbitral Panel, by the thirty (30) day time period or within such other longer time as the parties may agree, then the AAA shall appoint the chairperson pursuant to AAA Rule R-14, or such other applicable rule as shall be in place at that time. None of the arbitrators shall be an employee, officer, director or consultant of, or of a direct competitor of, AM or Cliffs.

(d) The site of the arbitration shall be New York, New York, and all testimonial hearings shall be heard in New York unless both parties agree otherwise.

(e) Either party may apply to the arbitrators seeking injunctive relief until the arbitration award is rendered or the controversy is otherwise resolved. Either party also may, without waiving any remedy under this Agreement, seek from any court having jurisdiction any interim or provisional relief that is necessary to protect the rights or property of that party, pending the establishment of a mediator, or the arbitral tribunal, as the case may be.

(f) Consistent with the expedited nature of arbitration, each party will, upon the written request of the other party, promptly provide the other with copies of documents on which the producing party may rely or otherwise which may be relevant in support of or in opposition to any claim or defense; any dispute regarding discovery, or the relevance or scope thereof, shall be determined by the arbitrators, which determination shall be conclusive; and all discovery shall be completed within 45 days following the appointment of the third arbitrator.

(g) The award or decision shall be made within nine (9) months of the filing of the notice of intention to arbitrate, and the arbitrators shall agree to comply with this schedule before accepting appointment; *provided, however*, that this time limit may be extended by written agreement signed by both parties or by the arbitrators, if necessary.

(h) The Arbitral Panel shall issue a reasoned award. The Arbitral Panel shall be without authority to issue any consequential, indirect, special or lost profit damages, except as provided in Section 25(c).

(i) The judgment of the arbitrators shall be final and binding on the parties, and judgment upon the award rendered by the arbitrators may be entered and enforced by any court of the United States or any state thereof.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

(j) The apportionment of final costs and fees, but not the attorney's fees of the parties, shall be determined by the Arbitral Panel as part of the final award and the consideration in fixing the costs and fees shall be in the discretion of the arbitrators consistent with the AAA Rules. Each party shall each bear its own attorney's fees incurred as a result of any Controversy, including those incurred in the prosecution or defense of the arbitration.

**21. AUDITS.** At their own expense, Cliffs and AM shall have the right to have any and all calculations relating to this Agreement made by the other party (including, but not limited to, the Adjusted Annual Base Price and [REDACTED]) verified by an independent third-party auditor. Cliffs and AM reserve the right to challenge any calculation made by the other party relating to this Agreement. In the event that any such calculation is challenged by either party, the parties agree to reasonably cooperate to resolve the disputed calculation.

**22. REPRESENTATIONS AND WARRANTIES.**

(a) AM represents and warrants to Cliffs that (i) the execution and delivery of this Agreement by AM and the performance of its obligations hereunder have been duly authorized by all requisite corporate action, (ii) neither the execution and delivery of this Agreement, nor the performance of its obligations hereunder by AM shall, or after the lapse of time or giving of notice shall, conflict with, violate or result in a breach of, or constitute a default under the charter documents of AM or any law, statute, rule or regulation applicable to it, or conflict with, violate or result in a breach of or constitute a default under any material agreement to which it is a party or by which it or any of its properties is bound, or any judgment, order, award or decree to which AM is a party or by which it is bound, or require any approval, consent, authorization or other action by any court, governmental authority or regulatory body or any creditor of AM or any other Person or entity, and (iii) this Agreement constitutes a valid and binding obligation of AM and is enforceable against AM in accordance with its terms.

(b) The Cliffs entities that are parties to this Agreement represent and warrant to AM that: (i) the execution and delivery of this Agreement by the Cliffs entities and the performance of their obligations hereunder have been duly authorized by all requisite corporate actions, (ii) neither the execution and delivery of this Agreement nor the performance of their obligations hereunder by the Cliffs entities shall, or after the lapse of time or giving of notice shall, conflict with, violate or result in a breach of, or constitute a default under the charter documents of the Cliffs entities or any law, statute, rule or regulation applicable to them, or conflict with, violate or result in the breach of or constitute a default under any material agreement to which any of them is a party or by which they or any of their properties is bound, or any judgment, order, award or decree to which any of the Cliffs entities is a party or by which it is bound, or require any approval, consent, authorization or other action by any court, governmental authority or regulatory body or any creditor of any Cliffs entity or any other Person or entity, and (iii) this Agreement constitutes a valid and binding obligation of the Cliffs entities that are parties to this Agreement and is enforceable against each Cliffs entity that is a party to this Agreement in accordance with its terms.

(c) Each of the parties to this Agreement represents and warrants that it is a producer, processor, commercial user or merchandiser of Cliffs Pellets, and it is entering into this Agreement for commercial purposes related to its business as such.

**23. COUNTERPARTS.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**24. COMPLIANCE WITH POLICIES.**

(a) Cliffs represents that it has read and understand AM's "Code of Business Conduct," which is currently accessible at http://www.arcelormittal.com/corp/corporate-responsibility/ethics-and-governance, and that it will make good faith efforts to comply with the Code of Business Conduct. Cliffs warrants and undertakes that it has not given, and will not give, any gift or commission or other material inducement, nor has agreed, and will not agree, to pay commission or other material inducement, to any AM employee, agent, servant or representative in connection with the making or performance of Agreement.

(b) Cliffs has read and understands AM's Anti-Corruption Guidelines currently accessible at http://www.arcelormittal.com/corp/corporate-responsibility/ethics-and-governance, and will make good faith efforts to comply with the Anti-Corruption Guidelines.

(c) Cliffs represents that it has read and understands AM's "Human Rights Policy," which is currently accessible at http://www.arcelormittal.com/corp/corporate-responsibility/ethics-and-governance, and will make good faith efforts to comply with the Human Rights Policy.

(d) AM represents that it has read and understands Cliffs' "Code of Business Conduct, Anti-Corruption Guidelines and Human Rights Policy" which is currently accessible at http://ir.cliffsnaturalresources.com/English/investors/corporate-governance/governance-highlights/default.aspx, and will make good faith efforts to comply with the Policy.

**25. RIGHTS AND REMEDIES; LIMITATIONS OF LIABILITY; NO LOST PROFITS OR CONSEQUENTIAL DAMAGES.**

(a) Except as explicitly provided to the contrary in this Agreement, the rights and remedies granted under this Agreement shall not be exclusive but shall be in addition to all other rights and remedies available at law or in equity in respect of the performance of this Agreement, including, but not limited to, claims for breach of contract; provided, however, that no party will have any right to offset or withhold performance under this Agreement due to any alleged or actual claims under any other agreement or matter. If a party has committed a material breach of one or more of its material obligations under this Agreement, such breaching party shall have the right to cure such material breach within thirty (30) days following the date of written notice of the material breach to such party by the non-breaching party, or if such material breach is not capable of cure within thirty (30) days, the breaching party shall have the right to commence efforts to cure within thirty (30) days and proceed diligently to cure the breach. In the absence of any such cure, the non-breaching party may exercise such rights and remedies, including specifically the right to terminate the Agreement as provided in Section 15(c) of this Agreement, as a result of such material breach.

(b) THE PARTIES AGREE THAT, EXCEPT AS OTHERWISE PROVIDED IN THIS SECTION 25, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR LOST PROFITS, INJURY TO GOOD WILL OR ANY OTHER INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES AS A RESULT OF A BREACH OF ANY PROVISION OF THIS AGREEMENT.

(c) In the case of any unexcused failure by a party to perform its obligations under this Agreement, the non-breaching party shall take commercially reasonable actions to mitigate its damages. All costs avoided by such actions and all net revenue generated by such actions shall reduce the damages chargeable to the breaching party for such nonperformance. The non-breaching party shall provide to the breaching party reasonable documentation to evidence that it took (or failed to take) such actions and to document the costs avoided and revenues generated by such actions.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

(d) Costs of cover incurred by the non-breaching party or the Affiliates of the non-breaching party shall be invoiced as reasonably incurred, and the breaching party shall pay the non-breaching party the amount of such invoice within fifteen (15) days after the date of the invoice. If the breaching party disputes any of the invoiced amounts, it shall provide written notice to the non-breaching party of its objection, but shall still pay the full amount of the invoice when due.

(e) Each of the Cliffs entities that is a party to this Agreement will be jointly and severally liable to AM for any breach of this Agreement by any Cliffs entity that is a party to this Agreement.

**26.** **Forward Contract**. The parties intend that this Agreement constitutes a "forward contract" and a "commodity forward agreement" within the meaning, respectively, of Section 101(25) and Section 101(53B)(A)(i)(VII) of the United States Bankruptcy Code.

**27.** **Mutual Drafting.** Each of AM and Cliffs acknowledge that this Agreement has been prepared jointly by the parties and shall not be construed against either party.

**28.** **Entire Agreement.** This Agreement and the Exhibits attached hereto represent the sole, complete and exclusive statement of agreement between the parties hereto, which supersedes all prior proposals, oral or written, and all other prior communications between the parties relating to the subject matter of this Agreement, and shall constitute one agreement for the purchase of Cliffs Pellets (notwithstanding that different types of Cliffs Pellets are being nominated for different facilities).

[*Remainder of Page Intentionally Left Blank*]

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed and delivered by their respective authorized officers as of the date first written above.

ARCELORMITTAL USA LLC

DocuSigned by: Eric Knorr
72434A66BFB840D...

Name: Eric C. Knorr
Title: Vice President, Procurement AMUSA

ARCELORMITTAL USA LLC

DocuSigned by: Neil Kohlberg
7C8F9E8D63F744E...

Name: Neil Kohlberg
Title: Vice President, Finance, Strategy and Procurement AMUSA

CLIFFS NATURAL RESOURCES INC.

DocuSigned by: Terrence P Mee
2BF02C1A88E740C...

Name: Terrence Mee
Title:

THE CLEVELAND-CLIFFS IRON COMPANY

DocuSigned by: Terrence P Mee
2BF02C1A88E740C...

Name: Terrence Mee
Title:

CLIFFS MINING COMPANY

DocuSigned by: Terrence P Mee
2BF02C1A88E740C...

Name: Terrence Mee
Title:

*[Signature Page to Pellet Sale and Purchase Agreement]*

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

DocuSign Envelope ID: EE544102-96A5-4CD7-8FCE-D7A5B3AB1C9E Case 17-51210-CTG Doc 1107 Filed 06/18/25 Page 367 of 408

## Exhibit A

EXHIBIT A
ILLUSTRATIVE ANNUAL BASE PRICE ADJUSTMENT - CLEVELAND & INDIANA HARBOR
AS DESCRIBED IN SECTION 4. PRICE AND ADJUSTMENTS

| | Hibbing Standard | | Hibbing HC | | NORTHSHORE | | TILDEN | | UNITED | | Mustang | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CLW | IH | CLW | IH | CLW | IH | CLW | IH | CLW | IH | CLW | IH |
| **(a) 2016 (previous) Year** | | | | | | | | | | | | |
| Price Per GTU | | | | | | | | | | | | |
| Iron Natural (Expected) | 64.50 | 64.50 | 64.25 | 64.25 | 63.25 | 63.25 | 60.58 | 60.58 | 63.67 | 63.67 | 59.18 | 59.18 |
| Price Per WGT | | | | | | | | | | | | |
| **(b) 2017 (and subsequent years) Adjustments** | | | | | | | | | | | | |
| (i) Previous Year Platts Annual Price (y) | | | | | | | | | | | | |
| Current Year | | | | | | | | | | | | |
| Year Over Year Change (x) | | | | | | | | | | | | |
| % Change Platts Annual Price | | | | | | | | | | | | |
| (ii) Iron Unit Adjustment ( x price per GTU) | | | | | | | | | | | | |
| (iii) Current Year's Adjusted Base Price Per GTU | | | | | | | | | | | | |
| Iron Natural (Expected) | 64.50 | 64.50 | 64.25 | 64.25 | 63.25 | 63.25 | 60.58 | 60.58 | 63.67 | 63.67 | 59.18 | 59.18 |
| Current Year's Adjusted Base Price Per WGT | | | | | | | | | | | | |

**Illustrative Data to Calculate Platts Annual Price**

Previous Year
Previous Year Average
Previous Year Average
Previous Year Platts Annual Price

Current Year
Current Year Average
Current Year Average
Current Year Platts Annual Price

24

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER CLIFFS_000017795

## Exhibit B

| | 5 Illustrative Calculation ( ) | Example 1 (2017) | Example 2 (2018) | Example 3 (2019) | Example 4 (2020) |
|---|---|---|---|---|---|
| (a)(i) | $/NT (defined for years 2017-2019, calculated years 2020-2026) | | | | |
| | Illustrative $/NT | | | | |
| (c)(i) | Difference between and $/NT | | | | |
| | (Y/N) | Yes | Yes | No | Yes |
| | Due (Cliffs/AM) | | | | |
| (c)(ii) | Illustrative Current Year $/Natural Gross Tons | | | | |
| | Northshore - Cleveland | $ 71.00 | $ 70.00 | $ 72.00 | $ 71.50 |
| | Mustang - Indiana Harbor | $ 74.00 | $ 73.00 | $ 75.00 | $ 74.50 |
| | United - Indiana Harbor | $ 71.00 | $ 70.00 | $ 72.00 | $ 71.50 |
| (c)(iii) | Illustrative Tonnage (Natural Gross Tons) | | | | |
| | Northshore - Cleveland | | | | |
| | Mustang - Indiana Harbor | | | | |
| | United - Indiana Harbor | | | | |
| | | | | | |
| | Illustrative Calculation (c)(i) (c)(ii) (c)(iii) | | | | |
| | Northshore - Cleveland | | | | |
| | Mustang - Indiana Harbor | | | | |
| | United - Indiana Harbor | | | | |
| | Total | | | | |
| | **Illustrative Price $/NT Calculation (applies to years 2020-2026)** | | | | |
| (a)(ii) | Previous Year (y) | | | | |
| | Current Year | | | | |
| | Year over Year Change (x) | | | | |
| | Adjustment Factor $/NT = | | | | |
| | Previous Year $/NT | | | | |
| | Adjustment Factor | | | | |
| | $/NT | | | | |
| | Illustrative Current Year $/NT | | | | |

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

# Exhibit C

## Typical Specifications and Analysis Limits and Penalties and Premiums

### Exhibit C.1 - Hibbing Taconite High Compression Pellet Quality Specifications

| Parameter | Units | Typical | Max | Min | Quality |
|---|---|---|---|---|---|
| | | | | | |
| Moisture | % | | | | |
| Fe | % | 65.90 | | | Price adjustment based on Fe tons supplied. |
| SiO2 | % | | | | |
| P | % | | | | |
| Mn | % | | | | |
| Alumina | % | | | | |
| CaO | % | | | | |
| MgO | % | | | | |
| C/S | | | | | |
| M/S | | | | | |
| Basicity | | | | | |
| Na2O + K2O | % | | | | |
| | | | | | |
| % 1/4" Before Tumble | % | | | | |
| % 1/4" After Tumble | % | | | | |
| "Q" Index | % | | | | |
| | | | | | |
| CCS | lb/pellet | | | | |
| -300 lb | % | | | | |
| plus 1/2" | % | | | | |
| +3/8" -1/2" | % | | | | |
| | | | | | |
| | | | | | |
| Metallurgical | | | | | |
| LTD | % | | | | |
| Swelling | % | | | | |
| R40 | %/min | | | | |
| Contraction | % | | | | |

**Notes:**

1. Analyses will be performed on a cargo basis unless specified (Q) for quarterly composite analysis.
2. Cliffs will make every effort to keep processes centered on typical values and conform to minimum and/or maximum specifications.
3. 
4. 

**Trace elements:**

Cliffs will provide assay values for trace elements based on a quarterly composite analysis. Trace elements included in the quarterly report are: Zn, Cu, Cd, V, Co, Pb, B, Ti, Cr, S, Ni.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

## Exhibit C.2 - Hibbing Taconite Standard Compression Pellet Quality Specifications

| Parameter | Units | Typical | Max | Min | Quality |
|---|---|---|---|---|---|
| | | | | | |
| Moisture | % | | | | |
| Fe | % | 66.05 | | | Price adjustment based on Fe tons supplied. |
| SiO2 | % | | | | |
| P | % | | | | |
| Mn | % | | | | |
| Alumina | % | | | | |
| CaO | % | | | | |
| MgO | % | | | | |
| C/S | | | | | |
| M/S | | | | | |
| Basicity | | | | | |
| Na2O + K2O | % | | | | |
| | | | | | |
| % 1/4" Before Tumble | % | | | | |
| % 1/4" After Tumble | % | | | | |
| "Q" Index | % | | | | |
| | | | | | |
| CCS | lb/pellet | | | | |
| -300 lb | % | | | | |
| plus 1/2" | % | | | | |
| +3/8" -1/2" | % | | | | |
| | | | | | |
| | | | | | |
| Metallurgical | | | | | |
| LTD | % | | | | |
| Swelling | % | | | | |
| R40 | %/min | | | | |
| Contraction | % | | | | |

**Notes:**

1. Analyses will be performed on a cargo basis unless specified (Q) for quarterly composite analysis.
2. Cliffs will make every effort to keep processes centered on typical values and conform to minimum and/or maximum specifications.
3. 
4. 
5. 

**Trace elements:**

Cliffs will provide assay values for trace elements based on a quarterly composite analysis. Trace elements included in the quarterly report are: Zn, Cu, Cd, V, Co, Pb, B, Ti, Cr, S, Ni.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

## Exhibit C.3 - United Taconite Standard Compression Pellet Quality Specifications

| Parameter | Units | Typical | Max | Min | Quality |
|---|---|---|---|---|---|
| | | | | | |
| Moisture | % | | | | |
| Fe | % | 65.30 | | | Price adjustment based on Fe tons supplied. |
| SiO2 | % | | | | |
| P | % | | | | |
| Mn | % | | | | |
| Alumina | % | | | | |
| CaO | % | | | | |
| MgO | % | | | | |
| C/S | | | | | |
| M/S | | | | | |
| Basicity | | | | | |
| Na2O + K2O | % | | | | |
| | | | | | |
| % 1/4" Before Tumble | % | | | | |
| % 1/4" After Tumble | % | | | | |
| "Q" Index | % | | | | |
| | | | | | |
| CCS | lb/pellet | | | | |
| -300 lb | % | | | | |
| plus 1/2" | % | | | | |
| +3/8" -1/2" | % | | | | |
| | | | | | |
| | | | | | |
| Metallurgical | | | | | |
| LTD | % | | | | |
| Swelling | % | | | | |
| R40 | %/min | | | | |
| Contraction | % | | | | |

**Notes:**

1. Analyses will be performed on a cargo basis unless specified (Q) for quarterly composite analysis.
2. Cliffs will make every effort to keep processes centered on typical values and conform to minimum and/or maximum specifications.
3. 
4. 

**Trace elements:**

Cliffs will provide assay values for trace elements based on a quarterly composite analysis. Trace elements included in the quarterly report are: Zn, Cu, Cd, V, Co, Pb, B, Ti, Cr, S, Ni.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

## Exhibit C.4 - Northshore Mining Standard Compression Pellet Quality Specifications

| Parameter | Units | Typical | Max | Min | Quality |
|---|---|---|---|---|---|
| | | | | | |
| Moisture | % | | | | |
| Fe | % | 65.14 | | | Price adjustment based on Fe tons supplied. |
| SiO2 | % | | | | |
| P | % | | | | |
| Mn | % | | | | |
| Alumina | % | | | | |
| CaO | % | | | | |
| MgO | % | | | | |
| C/S | | | | | |
| M/S | | | | | |
| Basicity | | | | | |
| Na2O + K2O | % | | | | |
| | | | | | |
| % 1/4" Before Tumble | % | | | | |
| % 1/4" After Tumble | % | | | | |
| "Q" Index | % | | | | |
| | | | | | |
| CCS | lb/pellet | | | | |
| -300 lb | % | | | | |
| plus 1/2" | % | | | | |
| +3/8" -1/2" | % | | | | |
| | | | | | |
| | | | | | |
| Metallurgical | | | | | |
| LTD | % | | | | |
| Swelling | % | | | | |
| R40 | %/min | | | | |
| Contraction | % | | | | |

**Notes:**

1. Analyses will be performed on a cargo basis unless specified (Q) for quarterly composite analysis.
2. Cliffs will make every effort to keep processes centered on typical values and conform to minimum and/or maximum specifications.
3. 
4. 
5. 

**Trace elements:**

Cliffs will provide assay values for trace elements based on a quarterly composite analysis. Trace elements included in the quarterly report are: Zn, Cu, Cd, V, Co, Pb, B, Ti, Cr, S, Ni.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

## Exhibit C.5 - Tilden Hemflux Pellet Quality Specifications

| Parameter | Units | Typical | Max | Min | Quality |
|---|---|---|---|---|---|
| | | | | | |
| Moisture | % | | | | |
| Fe | % | 61.40 | | 60.90 | Price adjustment based on Fe tons supplied. |
| SiO2 | % | | | | |
| P | % | | | | |
| Mn | % | | | | |
| Alumina | % | | | | |
| CaO | % | | | | |
| MgO | % | | | | |
| C/S | | | | | |
| M/S | | | | | |
| Basicity | | | | | |
| Na2O + K2O | % | | | | |
| | | | | | |
| % 1/4" Before Tumble | % | | | | |
| % 1/4" After Tumble | % | | | | |
| "Q" Index | % | | | | |
| | | | | | |
| CCS | lb/pellet | | | | (Note 5) |
| -300 lb | % | | | | (Note 5) |
| plus 1/2" | % | | | | |
| +3/8" -1/2" | % | | | | |
| | | | | | |
| | | | | | |
| Metallurgical | | | | | |
| LTD | % | | | | |
| Swelling | % | | | | |
| R40 | %/min | | | | |
| Contraction | % | | | | |

**Notes:**

1. Analyses will be performed on a cargo basis unless specified (Q) for quarterly composite analysis.
2. Cliffs will make every effort to keep processes centered on typical values and conform to minimum and/or maximum specifications.
3.
4.
5.

**Trace elements:**

Cliffs will provide assay values for trace elements based on a quarterly composite analysis. Trace elements included in the quarterly report are: Zn, Cu, Cd, V, Co, Pb, B, Ti, Cr, S, Ni.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

## Exhibit C.6 - United Taconite Mustang Pellet Quality Specifications

| Parameter | Units | Typical | Max | Min | Quality |
|---|---|---|---|---|---|
| | | | | | |
| Moisture | % | | | | |
| Fe | % | | | | Price adjustment based on Fe tons supplied. |
| SiO2 | % | | | | |
| P | % | | | | |
| Mn | % | | | | |
| Alumina | % | | | | |
| CaO | % | | | | |
| MgO | % | | | | |
| C/S | | | | | |
| M/S | | | | | |
| Basicity | | | | | |
| Na2O + K2O | % | | | | |
| | | | | | |
| % 1/4" Before Tumble | % | | | | |
| % 1/4" After Tumble | % | | | | |
| "Q" Index | % | | | | |
| | | | | | |
| CCS | lb/pellet | | | | |
| -300 lb | % | | | | |
| plus 1/2" | % | | | | |
| +3/8" -1/2" | % | | | | |
| | | | | | |
| | | | | | |
| Metallurgical | | | | | |
| LTD | % | | | | |
| Swelling | % | | | | |
| R40 | %/min | | | | |
| Contraction | % | | | | |

**Notes:**

1. Analyses will be performed on a cargo basis unless specified (Q) for quarterly composite analysis or (D) for daily production composite analysis.
2. Cliffs will make every effort to keep processes centered on typical values and conform to minimum and/or maximum specifications.
3. 
4. 

**Trace elements:**

Cliffs will provide assay values for trace elements based on a quarterly composite analysis. Trace elements included in the quarterly report are: Zn, Cu, Cd, V, Co, Pb, B, Ti, Cr, S, Ni.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

# Exhibit 17

DocuSign Envelope ID: EE544102-96A5-4CD7-8FCE-D7A5B3AB1C9E Case 17-51210-CTG Doc 1107 Filed 06/18/25 Page 376 of 408

**Confidential**

**PELLET SALE AND PURCHASE AGREEMENT**

**BY AND AMONG**

**CLIFFS NATURAL RESOURCES INC., CLIFFS MINING COMPANY,**

**THE CLEVELAND-CLIFFS IRON COMPANY**

**AND**

**ARCELORMITTAL USA LLC**

Dated as of October 31, 2016

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000017772

# PELLET SALE AND PURCHASE AGREEMENT

This Pellet Sale and Purchase Agreement (the "Agreement") is entered into and effective as of October 31, 2016 by and among Cliffs Natural Resources Inc., The Cleveland-Cliffs Iron Company and Cliffs Mining Company (collectively, "Cliffs") and ArcelorMittal USA LLC ("AM").

## RECITALS

WHEREAS, AM desires to purchase from Cliffs, and Cliffs desires to sell to AM, Northshore, Hibbing, UTAC and Tilden Pellets for the Term of this Agreement, subject to the terms and conditions hereof.

NOW, THEREFORE, in consideration of the premises set forth above, their mutual covenants and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## 1. DEFINITIONS.

"AAA" has the meaning set forth in Section 20(b).

"Agreement" has the meaning set forth in the Preamble.

"AM" has the meaning set forth in the Preamble.

"Adjusted Annual Base Price" has the definition set forth in Section 4(b).

"Affiliate" means, with respect to any party, any Person who directly or indirectly controls, is controlled by or is under direct or indirect common control with, such party. A Person shall be deemed to "control" another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person through the ownership of voting securities, by contract or otherwise.

"AM Annual Requirements" means the collective total of the AM Cleveland Annual Tonnage Requirements, the AM Indiana Harbor West Annual Tonnage Requirements, and the AM Indiana Harbor East Annual Tonnage Requirements for a given Year.

"AM Cleveland" means AM's steel-making facility in Cleveland, Ohio.

"AM Cleveland Annual Tonnage Requirements" means for any Year the tonnage of Cliffs Pellets required for consumption on AM's C-5 and C-6 blast furnaces at AM Cleveland.

"AM Indiana Harbor East" means AM's steel-making facility in East Chicago, Indiana containing Blast Furnace IH-7.

"AM Indiana Harbor East Annual Tonnage Requirements" means for any Year the tonnage of Cliffs Pellets required for consumption on AM's IH-7 blast furnace at AM Indiana Harbor East, in excess of the pellets available for such blast furnace from AM's Minorca mine located near Virginia, Minnesota.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

"AM Indiana Harbor West" shall mean AM's steel-making facility in East Chicago, Indiana containing Blast Furnaces IH-3 and IH-4.

"AM Indiana Harbor West Annual Tonnage Requirements" means for any Year the tonnage of Cliffs Pellets required for consumption on Blast Furnaces IH-3 and IH-4 at AM Indiana Harbor West.

"AMM" means the industry recognized periodical American Metal Markets.

"AMM Hot Band Price" shall have the meaning set forth in Section 5(a).

"Arbitral Panel" has the meaning set forth in Section 20(c).

"ASTM" means ASTM International. ASTM International is an international standards organization that develops and publishes voluntary consensus technical standards for a wide range of materials, products, systems and services.

"Bankruptcy Law" has the meaning set forth in Section 15(c)(iii).

"Certificate of Analysis" or "COA" means the document issued by a certified laboratory defining the vessel information, bill of lading date, product (or grade), customer, dock, product, cargo identification number, tonnage, destination, and certified chemical and physical assays performed in accordance with Section 8, for each cargo.

"Certified Laboratory" means a Cliffs internal laboratory operating in compliance with the requirements of ISO 9001 or external ISO 9001 or ISO 17025 certified external laboratory, designated by Cliffs and approved by AM.

"Cliffs" has the meaning set forth in the Preamble.

"Cliffs Pellets" means collectively, Hibbing Pellets, Northshore Pellets, Tilden Pellets and UTAC Pellets, and any other mutually agreeable iron ore bearing pellets produced at a facility owned, operated or managed by Cliffs that, in each case, are suitable for use in the blast furnaces in question and shall be consistent with the pellet specifications provided for in Exhibit C.

"Commission" has the meaning set forth in Section 19(c).

"Confidential Information" has the meaning set forth in Section 19(a).

"Controversy" has the meaning set forth in Section 20(b).

"Excess Annual Requirements Tonnage" shall have the meaning set forth in Section 2(c).

"Facility" means each of AM Indiana Harbor East, AM Indiana Harbor West and AM Cleveland.

"Force Majeure Event" has the meaning set forth in Section 13(a).

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

"Hibbing Pellets" means pellets produced at the Hibbing Taconite Company ("Hibbing"), located in Hibbing, Minnesota.

"ISO" means International Organization for Standardization. ISO is an international standard-setting body composed of representatives from various national standards organizations.

"Lot Composite Sample" means a gross, composite quantity of Cliffs Pellets obtained by combining subsamples from the same shipment that have been collected and prepared in accordance with applicable ASTM standards and guidelines and are representative of the quality of the entire shipment of Cliffs Pellets.

"Mustang Pellet" has the meaning set forth in Section 2(a)(iii).

"Net Ton" means 2,000 pounds avoirdupois at natural moisture.

"Northshore Pellets" means pellets produced at the Northshore Mining ("Northshore"), located in Silver Bay, Minnesota.

"pellets" mean iron ore in pellet form suitable for use in the blast furnaces.

"Permanent Shutdown" has the meaning set forth in Section 3(f).

"Person" means any individual, partnership, joint venture, firm, corporation, limited liability company, association, trust or any other legal entity.

"Platts" means seaborne traded iron ore fines information as published in the McGraw-Hill Companies Platts publication "Steel Markets Daily" or a successor publication.

"Platts Annual Price" has the meaning set forth in Section 4(b)(i).

"Preamble" means the all paragraphs in the Agreement that precede this Section 1.

"[REDACTED]" has the meaning set forth in Section 6(b).

"Shipment Week" has the meaning set forth in Section 6(a).

"[REDACTED]" has the meaning set forth in Section 5.

"Retained Sample" has the meaning set forth in Section 8(c)(ii).

"Revised Adjusted Annual Base Price" shall have the meaning set forth in Section 4(b).

"Term" has the meaning set forth in Section 15(a).

"[REDACTED]" has the meaning set forth in Section 5(a)

"Tilden Pellets" means pellets produced at the Tilden Mining Company LC ("Tilden"), located in Ishpeming, Michigan.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000017775

"Ton," "Tonnage" or "Natural Gross Ton" means a gross ton of 2,240 pounds avoirdupois at natural moisture.

"Typical Specifications and Analysis Limits" means the average or "typical" value and, specification limits for chemical and physical assays for Cliffs Pellets to be delivered under this Agreement, as set forth on Exhibit C.

"UTAC Pellets" means pellets produced at the United Taconite LLC ("UTAC"), located in Eveleth, Minnesota, including the UTAC full flux "Mustang" pellet.

"Vessel Shipping Season" means generally March 25 of the current calendar year through January 15 of the following calendar year, but may be adjusted by the Army Corps of Engineers.

"Year" means a calendar year (starting and including January 1 and ending and including December 31).

Unless the context of this Agreement otherwise expressly requires: (i) references to the plural include the singular, and references to the singular include the plural, (ii) the terms "hereof," "herein," "hereunder," "hereto" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement and (iii) the terms "day" and "days" mean and refer to calendar day(s).

**2. SALE AND PURCHASE TONNAGE.**

(a) During the Years 2017 through 2026, Cliffs shall sell and deliver to AM and AM shall purchase, receive and pay for all of the following meeting the quality and other standards of the Agreement:

(i) Tonnage of Cliffs Pellets equal to the AM Cleveland Annual Tonnage Requirements;

(ii) Tonnage of Cliffs Pellets equal to the AM Indiana Harbor West Annual Tonnage Requirements; and

(iii) Tonnage of UTAC full flux pellets ("Mustang Pellets") equal to the AM Indiana Harbor East Annual Tonnage Requirements [REDACTED] Both parties recognize at the time of execution UTAC has not produced Mustang Pellets. The parties agree to meet after [REDACTED] months of production to discuss and review the operational capability of UTAC to produce Mustang Pellets. [REDACTED]. The parties shall reduce any alteration to writing to be executed by both parties.

(a) For the Year 2017 only [REDACTED]

(iv) If AM's Minorca mine ceases to provide iron ore pellets then Cliffs and AM agree to meet and determine if there is a mutually agreeable solution for AM's tonnage needs and that takes into consideration Cliffs' need for timely notice to alter its mine plans. However, unless the parties mutually agree, Cliffs is not required to provide additional iron ore pellets in excess of the maximum as set forth in

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

Section 2(b).

(b) Notwithstanding the above, unless otherwise excused or permitted per the terms of this Agreement, AM must nominate and purchase an aggregate minimum of 7 million Tons annually (from any one or any combination of categories (i), (ii) and (iii) above), and Cliffs must deliver and sell Cliffs Pellets for the AM Annual Requirements up to an aggregate maximum of 10.0 million Tons annually. For the

(c) After of each contract Year, AM shall notify Cliffs of the maximum Tonnage of Cliffs Pellets that it can purchase and take delivery of from Cliffs in the following contract Year. Cliffs shall confirm within fifteen (15) days of such written notification from AM the maximum Tonnage of Cliffs Pellets that it can sell and deliver to AM. In no event shall this maximum Tonnage be less than the maximum Tonnage volumes in Section 2(b) above. If the Tonnage of Cliffs Pellets is less than AM Annual Requirements Tonnage, then AM is free to obtain a Tonnage of pellets from other sources equal to the difference between the maximum Cliffs Tonnage and the AM Annual Requirements Tonnage for the following contract Year. However, if Cliffs can supply all or a portion of AM Annual Requirements Tonnage in excess of the maximum Tonnage volumes in Section 2(b) above ("Excess Annual Requirements Tonnage"), then for any such Year the minimum in Section 2(b) above shall be adjusted upward in the same tonnage as the Excess Annual Requirements Tonnage (e.g. if the Excess Annual Requirements tonnage is 1 million tons then the minimum for such year shall increase to 8 million tons).

(d) The parties to this Agreement understand that it is a requirements contract. The Cliffs Pellets sold by Cliffs to AM pursuant to this Agreement are for consumption purposes only, and AM shall not sell or transfer the Cliffs Pellets to a third party. However, AM may transfer the Cliffs Pellets to another AM facility or affiliate following written notification to Cliffs.

**3. NOTIFICATION AND NOMINATION.**

(a) Beginning on , 2016 for the Year 2017, and on or by of each following Year, ending on , 2025, AM shall notify Cliffs in writing of the preliminary estimated AM Cleveland Annual Tonnage Requirements, the preliminary estimated AM Indiana Harbor West Annual Tonnage Requirements and the preliminary estimated AM Indiana Harbor East Tonnage Requirements for the following Year. This notice shall include for each Facility:

(i) The expected starting Cliffs Pellets inventory as of of such Year and the estimated ending Cliffs Pellets inventory as of of such Year;

(ii) An individual Facility operating plan by month indicating the estimated pellet consumption from to of the Year in question; and

(iii) The Tonnage of Cliffs Pellets that AM estimates it will purchase during the Year.

(b) In respect of the AM Annual Requirements, AM shall inform Cliffs in writing before the of .

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

        (i) The actual consumption of Cliffs Pellets at the designated blast furnaces at each Facility in the previous [REDACTED].

(ii) The planned [REDACTED] consumption of Cliffs Pellets for the remaining [REDACTED] in the [REDACTED] and the planned consumption for the first [REDACTED] of the following [REDACTED] in each case at the designated blast furnaces at each Facility, and

(iii) The actual starting Cliffs Pellets inventory as of [REDACTED] of such [REDACTED] and the estimated ending Cliffs Pellets inventory as of [REDACTED] of such [REDACTED].

(c) Cliffs shall have the right to determine the type of Cliffs Pellets that will be delivered to meet the AM Cleveland Annual Tonnage Requirements and the AM Indiana Harbor West Annual Tonnage Requirements and shall provide a written notification to AM on or before [REDACTED] setting forth such type of Cliffs Pellets to be provided in the following Year. Unless mutually agreed only Mustang Pellets shall be supplied to meet the AM Indiana Harbor East Annual Requirements. Cliffs recognizes that AM has a preferred type of pellets for both AM Cleveland and AM Indiana Harbor West and will take that into consideration when determining the Cliffs Pellets it will provide to those facilities. Specifically, Cliffs acknowledges that AM Cleveland prefers not to receive flux Pellets and that AM Indiana Harbor West prefers not to receive more than two Cliffs Pellet types, or more than 70% flux pellets.

(d) If [REDACTED] to Section 3(b) [REDACTED], so long as AM's Annual Requirements do not fall below the 7 million Ton minimum in Section 2(b) or modified minimum in Section 2(c) above. Further, [REDACTED] set forth in Section 2(a)(iii) above.

(e) If [REDACTED] nomination, AM will inform Cliffs pursuant to Section 3(b) above of the tonnage of Cliffs Pellets that AM shall purchase and Cliffs shall sell provided that if the remaining requirement increases by more than [REDACTED] Tons [REDACTED] from the previous [REDACTED] requirement or if the total [REDACTED] requirement increases above the original nomination in Section 3(a), then Cliffs shall inform AM in writing within fifteen (15) days of such notice of whether Cliffs' ability to supply all or any portion of the increased tonnage. In the event Cliffs cannot supply the increase, AM is free to obtain pellets from alternate sources, including by moving pellets (whether or not such pellets are Cliffs Pellets) between facilities (which may include, but will not be limited to, AM Cleveland, AM Indiana Harbor West and AM Indiana Harbor East). If the [REDACTED] nomination from AM exceeds the maximum annual nomination limit set forth in Section 2(c) above, then the same provisions in Section 2(c) shall apply.

(f) Blast Furnace Shutdowns.

(i) For purposes of this Section 3(f), "Permanent Shutdown" means a blast furnace will not operate to produce molten iron for a period of at least three (3) years.

(ii) In the event of a Permanent Shutdown of [REDACTED] at the [REDACTED] the AM minimum purchase obligation and the Cliffs maximum supply obligation set forth in Section 2(b) above shall both be [REDACTED]. However, Cliffs shall have the right to substitute an alternative flux pellet that has a [REDACTED], which may be delivered as an alternative pellet to another AM facility.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

    (iii) In the event of a Permanent Shutdown of any blast furnace at [REDACTED] or [REDACTED], the AM minimum purchase obligation and Cliffs maximum supply obligation set forth in Section 2(b) above shall each be [REDACTED] tons for each furnace Permanently Shutdown. In the event of a Permanent Shutdown of all of the blast furnaces subject to this Agreement, then AM may transfer the Cliffs Pellets to another AM facility or affiliate following written notification to Cliffs.

(iv) The provisions of the Section 3(f) take effect twelve (12) months after AM gives written notice of any planned Permanent Shutdown of any blast furnace. In the event that AM elects within twelve (12) months of its initial notification not to shut down a blast furnace that was the subject of a notice of Permanent Shutdown or restarts production at any blast furnace within twelve (12) months of a Permanent Shutdown, the annual amounts of Tonnage shall revert to the minimum amounts that would have been effective absent such reduction. Where there was a notice of Permanent Shutdown and more than twelve (12) months have passed from the notice date, but the subject blast furnace was not actually shutdown, then the parties agree to meet and determine if there is a solution for AM's Tonnage needs that takes into consideration Cliffs' need for timely notice to alter its mine plans. If the parties agree to a solution, then the minimum amounts that were in effect before such reduction shall be reinstated.

**4. PRICE AND ADJUSTMENTS.**

(a) The base price for [REDACTED] for each grade of Cliffs Pellet shall be:

| | Indiana Harbor $/gtu | Cleveland $/gtu | Pellet Fe Natural | Indiana Harbor $/WGT | Cleveland $/WGT |
|---|---|---|---|---|---|
| Hibbing Standard | $[REDACTED] | $[REDACTED] | 64.50 | $[REDACTED] | $[REDACTED] |
| Hibbing HC | $[REDACTED] | $[REDACTED] | 64.25 | $[REDACTED] | $[REDACTED] |
| Northshore Standard | $[REDACTED] | $[REDACTED] | 63.25 | $[REDACTED] | $[REDACTED] |
| Tilden Hematite Flux | $[REDACTED] | $[REDACTED] | 60.58 | $[REDACTED] | $[REDACTED] |
| United Standard | $[REDACTED] | $[REDACTED] | 63.67 | $[REDACTED] | $[REDACTED] |
| Mustang | $[REDACTED] | [REDACTED] | [REDACTED] | $[REDACTED] | [REDACTED] |

All prices above are [REDACTED] and [REDACTED] associated with [REDACTED] to the AM Facilities.

(b) In [REDACTED] and subsequent Years, the base price per iron unit ($/gtu) shall be adjusted as follows ("[REDACTED]"):

(i) [REDACTED] (x) the [REDACTED] which is the amount by which the annual published [REDACTED] the [REDACTED] [REDACTED] the [REDACTED]

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER



[redacted] ("[redacted]") [redacted] for the Year in determination [redacted] ([redacted] or [redacted]) [redacted] the [redacted] Year's [redacted]; [redacted] (y) the [redacted] which is the [redacted] Year's [redacted] and [redacted] the result obtained of (x) [redacted] (y) [redacted]; and

(ii) [redacted] the [redacted] determined in (i) above by the preceding Year's Adjusted Annual Base Prices, which will then yield the price adjustment per iron unit; and

(iii) [redacted] the [redacted] determined in (ii) above [redacted] preceding Year's Adjusted Base Prices, which [redacted] will then equal the current Year's Adjusted Base Prices.

Following the end of each the second and third calendar quarters during the then-current Year, Cliffs shall provide a revised estimated Adjusted Annual Base Prices for such Year based on the most recently published data ("Revised Adjusted Annual Base Prices"). The Revised Adjusted Annual Base Prices may result in amounts due to or from AM, as the case may be, based upon the difference between Cliffs' provisional calculation and the Revised Adjusted Annual Base Prices for the second calendar quarter and may result in amounts due to or from AM, as the case may be based upon the difference between the second calendar quarter Revised Adjusted Annual Base Prices and the third calendar quarter Revised Adjusted Annual Base Prices. Payment to or from AM shall be due ten (10) days following the receipt of the invoice or credit memo, as the case may be, from Cliffs.

(c) Those Adjusted Annual Base Prices per iron unit shall then become the then-current Year's estimated price for the Cliffs Pellets for the Year in determination.

(d) Cliffs shall verify the final Adjusted Annual Base Price of the prior Year's deliveries no later than February 15 following such Year. Any payment due from Cliffs to AM or AM to Cliffs shall be made by March 1.

(e) Sample calculations of the Adjusted Annual Base Price are set forth in Exhibit A, attached hereto and incorporated herein.

**5.** [redacted]

(a) In any Year in which the [redacted] provided for in Section 5(a)(i) and Section 5(a)(ii) below there shall be a [redacted] in Section 5(a)(i) and Section 5(a)(ii) below ("[redacted]").

(i) In 2017 the [redacted] shall be $[redacted] per Net Ton; in 2018 the [redacted] shall be $[redacted] per Net Ton; and in 2019 the [redacted] shall be $[redacted] per Net Ton.

(ii) Beginning in the year 2020, and in subsequent years, the prior year's [redacted] shall be adjusted by [redacted] (x) the [redacted] which is the amount by which the [redacted] (series [redacted]) published by the [redacted] for the year in determination changes (up or down) from

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

the immediately preceding year's [redacted] (series [redacted]) [redacted] (y) the [redacted] which is the immediately preceding year's [redacted] (series [redacted]) and then [redacted] the result obtained by (x) [redacted] (y) [redacted].

(b) If, in any of the first three (3) quarters of a Year, the [redacted] is [redacted] or [redacted] the [redacted] per Net Ton in either section 5(a)(i) or 5(a)(ii) above, a [redacted] shall be made by Cliffs, or AM, as the case may be, based upon the average [redacted] of the previous quarter.

(c) Within fifteen (15) days of the end of each quarter, AM shall notify Cliffs of the consumption of each Pellet type by the designated blast furnaces at each Facility in such quarter. Within fifteen (15) days of the end of each quarter, Cliffs shall notify AM of the actual [redacted] Within thirty (30) days after the end of the quarter, payment shall be made by Cliffs to AM or AM to Cliffs, whichever the case may be.

(d) In the event that the [redacted] is [redacted] the [redacted] per Net Ton in either Section 5(a)(i) or Section 5(a)(ii) above, Cliffs shall pay to AM a sum equal to (with the various calculations being made in the order set forth below):

(i) The [redacted] the [redacted] and the [redacted] per Net Ton in either Section 5(a)(i) or Section 5(a)(ii) above, [redacted]

(ii) The actual Adjusted Base Prices per Ton price for the type(s) of Pellets consumed at the Facility, with the [redacted] of (i) and (ii) being [redacted]

(iii) The tonnage of each Pellet type consumed at the Facility, with the [redacted] of (ii) and (iii) being [redacted]. This final [redacted] will be the [redacted] by Cliffs to AM for the quarter.

(e) In the event that the [redacted] is above the [redacted] per Net Ton in either Section 5(a)(i) or Section 5(a)(ii) above, AM shall pay to Cliffs a sum equal to (with the various calculations being made in the order set forth below):

(i) The [redacted] the [redacted] and the [redacted] per Net Ton in either Section 5(a)(i) or Section 5(a)(ii) above, [redacted]

(ii) The actual Adjusted Base Prices per Ton price for the type(s) of Pellets consumed at the Facility, with the [redacted] of (i) and (ii) being [redacted]

(iii) The tonnage of each Pellet type consumed at the Facility, with the [redacted] of (ii) and (iii) [redacted]. This final [redacted] will be the [redacted] by AM to Cliffs for the quarter.

(f) No later than January 15 after the end of each Year AM shall provide the actual consumption of each Pellet type by the designated blast furnaces at each Facility in such Year. No later than January 31 after the end of each Year, Cliffs shall provide a final [redacted] calculation using the above formula with the actual [redacted] for such year. Any difference between this calculation and the sum of the three (3) quarterly payments shall be paid by the appropriate party by February 15th.

(g) If [redacted] required to determine the [redacted] during any Year, or [redacted] then the parties shall negotiate in good faith [redacted] information. Should the parties fail to reach a mutually agreeable resolution within sixty (60) days of receipt of written notice by a Party requesting such negotiations, then the parties shall resolve the dispute according to Section 20. Sample calculations of the [redacted] are set forth in Exhibit B, attached hereto and incorporated herein.

6. **PAYMENT AND DELIVERY TERMS.**

(a) Following each calendar week Monday through Sunday ("Shipment Week"), Cliffs shall prepare an invoice based on the Adjusted Base Price per iron unit, the Certificate of Analysis for iron percentage and the bill of lading the quantity shipped during the Shipment Week to AM Cleveland, AM Indiana Harbor East and AM Indiana Harbor West. AM shall pay Cliffs all amounts due for the Cliffs Pellets by wire transfer of funds on the Wednesday of the 4th week following the Shipment Week.

(b) AM shall [redacted] to Cliffs [redacted] and [redacted] and [redacted] the Cliffs Pellets to the extent that AM [redacted] of any Cliffs Pellets [redacted] as required. The [redacted] to Cliffs [redacted] to a [redacted] of [redacted] and shall [redacted] upon the date of [redacted] from AM [redacted] for such [redacted] Prior to such [redacted], Cliffs Pellets will at all times be [redacted] and [redacted] of [redacted] or [redacted] created by or through AM or any of its affiliates that is [redacted] to the [redacted] to Cliffs.

(c) Cliffs shall retain title to the cargoes of Cliffs Pellets delivered during the Shipment Week. Title, and all risk of loss, damage or destruction of the Cliffs Pellets shall transfer from Cliffs to AM following the receipt of payment from AM.

7. **QUALITY.**

(a) Cliffs Pellets, when loaded for shipment, shall conform to the designated grades and their respective specifications as defined in the Typical Specifications and Analysis Limits set forth in Exhibit C. Conformity shall be based on the Certificate of Analysis issued by Cliffs Certified Laboratory.

(i) The Typical Specifications and Analysis Limits set forth in Exhibit C for the Mustang Pellet are transitional. Both parties understand that the Mustang Pellet is a new product and are working together to determine the Typical Specifications and Analysis Limits that are commercially reasonable for Cliffs to produce and AM to consume. Cliffs shall complete its Mustang Pellet trial period not later [redacted], or such earlier dates that Cliffs provides to AM with [redacted] months' written notice. During such trial period the parties agree that Cliffs shall make commercially reasonable efforts to comply with the Typical Specifications and Analysis Limits in Exhibit C for the Mustang Pellet but shall not be subject to the price adjustment in Exhibit C. From [redacted] through [redacted] or such earlier dates that Cliffs provides to AM with [redacted] months' written notice, the parties shall work together to determine what adjustments are required to produce a Mustang Pellet that is commercially reasonable for each party. On or before [redacted] the parties shall reduce to writing and both sign an amendment to this Agreement setting forth the mutually agreed upon Typical Specifications and Analysis Limits for the Mustang Pellets. In the event that Cliffs is unable to produce a Mustang Pellet that meets the following requirements: below [redacted] (at the [redacted]



) while being below by AM's obligation to buy Mustang Pellets, and AM's obligation to purchase the AM Indiana Harbor East Annual Tonnage Requirements under this Agreement shall be deemed void and of no further effect, and, further, AM's Annual Requirements shall be reduced by Tons for the remainder of the Term, unless otherwise determined by AM in its sole discretion.

(b) Cargos containing Cliffs Pellets that do not conform to the specification limits defined in the Typical Specifications and Analysis Limits set forth in Exhibit C shall be subject to price adjustments as defined in Exhibit C.

(c) If the value for % +1/4" BT as recorded on a Certificate of Analysis is less than the lower specification limit defined in the Typical Specifications and Analysis Limits in Exhibit C, AM, at its option, may segregate and screen the Cliffs Pellets from that cargo and charge the costs back to Cliffs, however Cliffs shall have the right to inspect the cargo of Cliffs Pellets and sample and test the Cliffs Pellets prior to such screening.

(d) Based on the Certificate of Analysis issued by Cliffs Certified Laboratory, when the result for any quality variable defined in the Typical Specifications and Analysis Limits of Exhibit C does not conform to specification limits, Cliffs shall prepare a non-conformance report and indicate the corrective actions taken to return to conformance on subsequent cargos. The report shall include notifications and actions for all variables not conforming to specification limits.

**8. SAMPLING AND ANALYSES.**

(a) Pellet sampling procedures and analytical tests conducted on Cliffs Pellets sold to AM to demonstrate conformance with Typical Specifications and Analysis Limits shall be performed on each vessel shipment. Sampling and test methods shall be in accordance with the appropriate current ASTM or ISO guidelines or Cliffs customary procedures and practices, or any other procedures and practices that may be mutually agreed to by Cliffs and AM.

(b) AM may, at any time, through one or more authorized representatives, and with prior notice Cliffs, be present to observe production, loading, sampling, and/or analysis of Cliffs Pellets being processed for shipment to AM. Requests shall be submitted to and coordinated by Cliffs' Director – Global Corporate Quality.

(c) Cliffs or Cliffs' agent shall sample the Cliffs Pellets for each shipment. Sampling shall be performed at the loading port or, when it is not possible to take a representative sample at the loading port, prior to loading into rail cars at Cliffs operations. Sampling systems shall be designed in accordance with ASTM guidelines. Cliffs shall collect at least one (1) Lot Composite Sample and prepare two (2) sample splits of no less than thirty (30) pounds from each Lot Composite Sample. Sample splits shall be promptly distributed at Cliffs' expense as follows:

(i) One sample split from each Lot Composite Sample to the Certified Laboratory for analysis; and

(ii) One sample split from each Lot Composite Sample shall be retained by Cliffs for at least sixty (60) days following the vessel departure date ("Retained Sample").

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

(d) AM may request additional splits from each Lot Composite Sample be taken and sent to a laboratory designated by AM. Cliffs shall provide identification information, including the type of Cliffs Pellet, date of sample, and vessel name for the requested sample. The costs associated with additional sample handling, preparation, and delivery to the designated laboratory shall be paid by AM. AM may change its designated laboratory upon advance written notice to Cliffs. AM's designated laboratory shall be certified to ISO 9001 or ISO 17025, and shall be capable of performing physical and chemical analyses on iron ore pellets and concentrates in accordance with applicable current ISO or ASTM guidelines.

(e) Physical and chemical analyses at the Certified Lab shall be performed in accordance with applicable current ISO or ASTM guidelines and, upon completion of the analysis, the Certificate of Analysis shall be immediately sent to AM or its designated Affiliate and to Cliffs.

(i) Cliffs shall make commercially reasonable efforts to deliver the COA from the Certified Lab to AM or the designated AM Affiliate within forty eight (48) hours after vessel departure. If the COA is not ready for distribution within forty-eight (48) hours, Cliffs will notify the designated AM contact listed in Section 8(e)(iii), prepare and distribute a preliminary COA including all results available, and issue a final certificate within seventy-two (72) hours of the vessel's departure.

(ii) If the results from Cliffs' Certified Laboratory and AM's designated laboratory are significantly different, AM should notify Cliffs and may request that the Retained Sample from the cargo in question be delivered to a third-party referee laboratory. The referee laboratory shall be registered to ISO-9001 or ISO 17025 and be capable of performing chemistry and physical testing on iron ore pellets and concentrates. The selection of a referee laboratory shall be mutually agreed upon by the parties. The results of the referee laboratory shall be conclusive for purposes of this Agreement.

(iii) Cliffs shall immediately notify all contacts listed below when, upon completion of a Certificate of Analysis, any test result does not conform to a specification limit defined in the Typical Specifications and Analysis Limits set forth in Exhibit C. Notifications shall be via email or telephone as indicated below. If Cliffs fails to promptly notify AM, reasonable costs, including demurrage charges or similar penalties, to the extent incurred as a result of Cliffs' failure or delay in delivering such notice, shall be paid by Cliffs. AM may change the designated notice recipients and Ore Sourcing Manager at any time upon written notice to Cliffs.

If destined for AM Indiana Harbor East:

(1) Joe Moore
Telephone: (219) 399-8650
Email: joseph.moore@arcelormittal.com

(2) Control Room, IH-7

Telephone: (219) 399-4507

If destined for AM Indiana Harbor West:

(1) Matt Collins
Telephone: (219) 399-4779

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

Email: matthew.collins@arcelormittal.com

If destined for AM Cleveland:

(1) Nick Pugliese
Telephone: (216) 429-7526
Email: nick.pugliese@arcelormittal.com

For all AM locations, notice must also be made to the following:

(1) Mickala Sherwood
Telephone: (219) 399-5842
Mickala.Sherwood@arcelormittal.com

(2) Email: AMUSAPurchasingContractAdministration@arcelormittal.com

**9. SHIPMENTS.** Shipments of Cliffs Pellets shall be in approximately equal amounts over the nine (9) month period of the Vessel Shipping Season each Year during the Term of this Agreement to ensure an adequate amount of inventory to allow a working pellet pile at AM's blast furnace ore docks.

**10. WEIGHTS.**

(a) Except as set forth in Section 10(b) below, vessel bill of lading weight shall be determined by railroad scale weights, belt scale weights, or bin scale weights calibrated and maintained in accordance with the manufacturers specification in effect from time to time at each of the loading ports, and shall be accepted by the parties as finally determining the amount (quantity) of Cliffs Pellets delivered to AM pursuant to this Agreement.

(b) In the event of a dispute, AM, at AM's expense, shall have the right to have a draft survey performed on vessels by an independent third party surveyor, mutually agreeable to both Cliffs and AM, to determine the weight of such shipment of Cliffs Pellets. If the vessel bill of lading weight is more than 3% higher or more than 3% lower than the draft survey weight, then the draft survey weight shall be the weight used in calculating the value of the cargo. In the event that the variance is greater than 3%, Cliffs and AM will investigate and remedy the cause of the variance.

**11. EMPLOYMENT OF VESSELS.** Cliffs assumes the obligation for arranging and providing appropriate vessel transportation of the Cliffs Pellets delivered by Cliffs to AM's blast furnace ore docks. Such delivery shall be in approximately equal amounts over the Vessel Shipping Season.

**12. WARRANTIES.** The Cliffs Pellets supplied by Cliffs pursuant to this Agreement will satisfy the quality and other specifications set forth in this Agreement and the Exhibits to this Agreement. THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, WHICH EXTEND BEYOND THE PROVISIONS OF THIS AGREEMENT, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR INTENDED PURPOSE. All claims for substantial variance in quality of the Cliffs Pellets, as described herein, shall be given in writing delivered to Cliffs within the thirty (30) calendar days after completion of discharge at port of discharge. No claim will be entertained after the Cliffs Pellets have been consumed. Each party shall afford the other party prompt and reasonable opportunity to inspect the Cliffs Pellets as to which any claim is made as above stated. The Cliffs Pellets shall not be returned without prior written consent of Cliffs. In no event shall Cliffs be liable for lost profits, injury to good will or any other special or consequential damages.

**13. FORCE MAJEURE.**

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

(a) No party hereto shall be liable for damages resulting from failure to produce, deliver or accept all or any of the Cliffs Pellets as described herein, if and to the extent that such production, delivery or acceptance would be contrary to or would constitute a violation of any regulation, order or requirement of a recognized governmental body or agency coming into effect after the date hereof, or if such failure is caused by acts of God, war, insurrections, interference by foreign powers, strikes, lockouts, labor disputes, fires, floods, embargoes, accidents, acts of terrorism, or uncontrollable delays at the mines or any Facility, on the railroads, docks or in transit, shortage of transportation facilities, disasters of navigation, or other causes, similar or dissimilar, that are not reasonably foreseeable and are beyond the reasonable control of the party charged with a failure to deliver or to accept the Cliffs Pellets (such occurrence, a "Force Majeure Event").

(b) The party declaring a Force Majeure Event shall provide written notice to the other party as soon as practicable of the occurrence or, as appropriate, notification by a third party of the anticipated imminent occurrence of a Force Majeure Event or notification by a governmental authority of an imminent change in law or regulation which would result in a Force Majeure Event, and the probable extent and duration of the Force Majeure Event. The party declaring the Force Majeure Event shall thereafter keep the other party regularly informed of all developments and of the status of its efforts to mitigate the impact of the Force Majeure Event.

(c) To the extent a Force Majeure Event is claimed hereunder by a party hereto, such Force Majeure Event shall relieve the other party from fulfilling its corresponding obligations hereunder to the party claiming such Force Majeure Event, but only for the period and to the extent of the claimed Force Majeure Event. The party that is subject to a Force Majeure Event shall use reasonable efforts to cure or remove the Force Majeure Event or overcome the effects of the Force Majeure Event as promptly as possible to resume performance of its obligations under this Agreement. The settlement of strikes, lockouts or other labor disputes or disturbances shall be entirely within the discretion of the party having the difficulty, and the foregoing requirement to use reasonable efforts to cure or mitigate the Force Majeure Event shall not require the settlement of such strikes, lockouts, labor disputes or disturbances.

(d) Upon cure of the Force Majeure Event, each party's obligations shall be renewed on a prorata basis for the period following such cure. For avoidance of doubt: The AM Annual Requirements, and Cliffs' corresponding delivery obligation, for the Year affected by the Force Majeure Event shall be reduced by the amount of Cliffs Pellets that the party affected by the Force Majeure Event could not deliver, or accept, as the case may be, during the Force Majeure Event. During the Force Majeure Event and upon cure of the Force Majeure Event, the party claiming a Force Majeure Event shall deliver to or take from the non-declaring party Cliffs Pellets, as may be available, on a prorata basis such that another supplier or customer does not receive disproportionate or inequitable treatment to the detriment of the non-declaring party.

(e) The non-claiming party may enter into reasonable alternative supply agreement or arrangements to mitigate the effects of the Force Majeure Event. In the event of a Force Majeure event lasting more than four (4) consecutive months, the parties shall meet and discuss options for how to proceed, which may include termination of the Agreement.

**14. NOTICES.**

(a) All notices and other communications authorized or required to be given hereunder shall be given in writing and shall be deemed to have been duly given (i) when delivered in person, (ii) one (1) business day after having been dispatched by a recognized overnight delivery service, (iii) five (5) business

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

days after having been mailed by registered or certified mail, return receipt requested, postage prepaid, or (iv) when dispatched by electronic mail (with confirmation of receipt), in each case addressed as follows:

If to any Cliffs Party:

Cliffs Natural Resources Inc.
200 Public Square – Suite 3300
Cleveland, Ohio 44114
Attention: Executive Vice President, Global Iron Ore
Electronic Mail: Terrence Mee.@cliffsnr.com

Further, a copy of required notices (excluding notices in the ordinary course of performance) to:

Cliffs Natural Resources Inc.
200 Public Square – Suite 3300
Cleveland, Ohio 44114
Attention: Chief Legal Officer
Electronic Mail: James.Graham@cliffsnr.com

If to AM:

ArcelorMittal USA LLC
3300 Dickey Road
East Chicago, IN 46312
Attention: Vice President of Procurement and Supply Chain
And a copy via email to: AMUSAPurchasing.ContractAdministration@arcelormittal.com

Further, a copy of required notices (excluding notices in the ordinary course of performance) to:

ArcelorMittal USA LLC
One South Dearborn, 19th Floor
Chicago, Illinois, 60603
Attention: General Counsel
And a copy via email to:
AMUSALawDepartment@arcelormittal.com

(b) Any party may change the contact information to which notices or other communications to it shall be sent by giving to the other parties written notice of such change in accordance with this Section 14.

**15. TERM; TERMINATION.**

(a) This Agreement shall commence as of October 31, 2016 and continue through December 31, 2026 (the "Term").

(b) This Agreement shall remain valid and fully enforceable for the fulfillment of obligations incurred prior to termination or expiration.

(c) This Agreement may be terminated at any time:

(i) by either party, in the event of a material breach of the Agreement by the other party that is not cured pursuant to Section 25(a);

(ii) by either party in accordance with the provisions of Section 17 (a); or

(iii) (x) by AM, if any of the following shall occur with respect to any Cliffs entity that is a party to this Agreement (each Cliffs entity, a "subject party" with respect to terminations by AM) or (y) by Cliffs, if any of the following shall occur to AM (the "subject party" with respect terminations by Cliffs):

(1) pursuant to or within the meaning of the United States Bankruptcy Code or any other federal or state law relating to insolvency or relief of debtors (a "Bankruptcy Law"), a subject party shall: (i) commence a voluntary case or proceeding; (ii) consent to the entry of an order for relief against it in an involuntary case; (iii) be subject to an involuntary petition for entry of an order for relief in a bankruptcy case or insolvency proceeding, which involuntary petition is not dismissed within sixty (60) days; (iv) consent to the appointment of a trustee, receiver, assignee, liquidator, or similar official; (v) make an assignment for the benefit of its creditors; (vi) be unable to pay its debts as they become due; or (vii) be or become insolvent; or

(2) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (i) is for relief against a subject party in an involuntary case, (ii) appoints a trustee, receiver, assignee, liquidator or similar official for the subject party or substantially all of the subject party's properties, or (iii) orders the dissolution or liquidation of the subject party, and, in each case, the order or decree is not dismissed within sixty (60) days.

**16. AMENDMENT.** This Agreement may not be modified or amended except by an instrument in writing signed by the parties hereto. An email string shall not constitute an amendment. An electronic pdf or other electronically duplicated signature shall be acceptable.

**17. MERGER, TRANSFER AND ASSIGNMENT.**

(a) Neither this Agreement nor any of the rights or obligations hereunder may be assigned without the prior written consent of the other party, which consent shall not be unreasonably withheld (but, in determining whether to grant such consent, the transferee's creditworthiness and position as a competitor, as applicable, may be considered).

(b) All the covenants, stipulations and agreements herein contained shall inure to the benefit of and bind the parties hereto and their respective successors, transferees and permitted assigns, and any of the latter's subsequent successors, transferees and permitted assigns.

**18. WAIVER.** No waiver of any of the terms of this Agreement shall be valid unless in writing. No waiver or any breach of any provision hereof or default under any provisions hereof shall be deemed a waiver of any subsequent breach or default of any kind whatsoever.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

**19. CONFIDENTIALITY.**

(a) Cliffs and AM acknowledge that this Agreement contains certain requirements, specifications, pricing, adjustment and term provisions which are confidential, proprietary or of a sensitive commercial nature and which would put Cliffs or AM at a competitive disadvantage if disclosed to the public, including Section 4 and Section 5 and all of the Exhibits hereto ("Confidential Information"). Cliffs and AM agree that all provisions of this Agreement shall be kept confidential and, without the prior written consent of the other party, shall not be disclosed to any party that is not a party to this Agreement, or that is not the legal adviser to a party under this Agreement, except as required by law or governmental or judicial order and except that disclosure of the existence of this Agreement shall not be precluded by this Section 19.

(b) If either party or an Affiliate of any party is required by law or governmental or judicial order or receives legal process or court or agency directive requesting or requiring disclosure of any of the Confidential Information contained in this Agreement, such party will promptly notify the other party prior to disclosure to permit such party to seek a protective order or take other appropriate action to preserve the confidentiality of such Confidential Information.

(c) If either party or Affiliate of any party determines to file this Agreement with the Securities and Exchange Commission ("Commission") or any other federal, state or local governmental or regulatory authority, or with any stock exchange or similar body, such determining party will use its reasonable commercial efforts to obtain confidential treatment of such Confidential Information pursuant to any applicable rule, regulation or procedure of the Commission and any applicable rule, regulation or procedure relating to confidential filings made with any such other authority or exchange. If the Commission (or any such other authority or exchange) denies such party's request for confidential treatment of such Confidential Information, such party will use its reasonable commercial efforts to obtain confidential treatment of the portions thereof that the other party designates. Each party will allow the other party to participate in seeking to obtain such confidential treatment for Confidential Information. In the event that the Commission approves the treatment of portions of this Agreement as confidential, Cliffs and AM shall collaborate in creating the version of this Agreement to be filed with the Commission.

(d) None of the parties hereto or their respective Affiliates will issue any press release or otherwise disclose or make any public statement with respect to the transactions contemplated hereby without the prior consent of a duly authorized officer of the other parties, except to the extent that the disclosing party determines in good faith that it is so obligated by law, in which case such disclosing party shall give notice to the other parties in advance of such party's intent to make such disclosure, announcement or issue such press release, and the parties hereto or their Affiliates shall use reasonable efforts to cause a mutually agreeable release or disclosure or announcement to be issued. Notwithstanding the foregoing provisions of this Section 19(c), AM acknowledges that Cliffs will be entitled to include, in any publicly-released, forward looking sales projections, Cliffs' projections of sales to AM, and AM will be entitled to include, in any publicly released, forward looking purchase projections, AM's projections of volumes purchased from Cliffs, but only to the extent required by law or regulation.

**20. GOVERNING LAW; DISPUTE RESOLUTION.**

(a) This Agreement shall in all respects, including matters of construction, validity and performance, be governed by and be construed in accordance with the laws of the State of New York.

(b) If a dispute, claim, question or disagreement ("Controversy") arises from or relates to this Agreement or the breach thereof, and if the dispute cannot be settled through direct discussions, the parties

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

agree to endeavor first to settle the dispute by mediation administered by the American Arbitration Association under its Commercial Mediation Procedures before resorting to arbitration. The parties further agree that any unresolved Controversies arising under, out of, relating to, or in connection with this Agreement shall be settled by arbitration administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. Both parties are domestic US entities and the parties specifically agree that the International Centre for Dispute Resolution rules shall not apply.

(c) The arbitration will be administered by a panel of three independent and impartial arbitrators ("Arbitral Panel"). The party initiating the arbitration shall nominate one (1) arbitrator at the same time it files its request for arbitration, and the responding party shall nominate one (1) arbitrator at the time it files its answer to the request for arbitration. If a party does not timely name an arbitrator, then the AAA shall appoint that arbitrator. By thirty (30) days after the appointment of the two (2) arbitrators, the arbitrators shall have conferred and, if possible, have agreed upon a third arbitrator, who shall serve as the chairperson of the Arbitral Panel. In the event that the two (2) confirmed arbitrators have not agreed upon a chairperson of the Arbitral Panel, by the thirty (30) day time period or within such other longer time as the parties may agree, then the AAA shall appoint the chairperson pursuant to AAA Rule R-14, or such other applicable rule as shall be in place at that time. None of the arbitrators shall be an employee, officer, director or consultant of, or of a direct competitor of, AM or Cliffs.

(d) The site of the arbitration shall be New York, New York, and all testimonial hearings shall be heard in New York unless both parties agree otherwise.

(e) Either party may apply to the arbitrators seeking injunctive relief until the arbitration award is rendered or the controversy is otherwise resolved. Either party also may, without waiving any remedy under this Agreement, seek from any court having jurisdiction any interim or provisional relief that is necessary to protect the rights or property of that party, pending the establishment of a mediator, or the arbitral tribunal, as the case may be.

(f) Consistent with the expedited nature of arbitration, each party will, upon the written request of the other party, promptly provide the other with copies of documents on which the producing party may rely or otherwise which may be relevant in support of or in opposition to any claim or defense; any dispute regarding discovery, or the relevance or scope thereof, shall be determined by the arbitrators, which determination shall be conclusive; and all discovery shall be completed within 45 days following the appointment of the third arbitrator.

(g) The award or decision shall be made within nine (9) months of the filing of the notice of intention to arbitrate, and the arbitrators shall agree to comply with this schedule before accepting appointment; *provided, however*, that this time limit may be extended by written agreement signed by both parties or by the arbitrators, if necessary.

(h) The Arbitral Panel shall issue a reasoned award. The Arbitral Panel shall be without authority to issue any consequential, indirect, special or lost profit damages, except as provided in Section 25(c).

(i) The judgment of the arbitrators shall be final and binding on the parties, and judgment upon the award rendered by the arbitrators may be entered and enforced by any court of the United States or any state thereof.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

(j) The apportionment of final costs and fees, but not the attorney's fees of the parties, shall be determined by the Arbitral Panel as part of the final award and the consideration in fixing the costs and fees shall be in the discretion of the arbitrators consistent with the AAA Rules. Each party shall each bear its own attorney's fees incurred as a result of any Controversy, including those incurred in the prosecution or defense of the arbitration.

**21. AUDITS.** At their own expense, Cliffs and AM shall have the right to have any and all calculations relating to this Agreement made by the other party (including, but not limited to, the Adjusted Annual Base Price and [REDACTED]) verified by an independent third-party auditor. Cliffs and AM reserve the right to challenge any calculation made by the other party relating to this Agreement. In the event that any such calculation is challenged by either party, the parties agree to reasonably cooperate to resolve the disputed calculation.

**22. REPRESENTATIONS AND WARRANTIES.**

(a) AM represents and warrants to Cliffs that (i) the execution and delivery of this Agreement by AM and the performance of its obligations hereunder have been duly authorized by all requisite corporate action, (ii) neither the execution and delivery of this Agreement, nor the performance of its obligations hereunder by AM shall, or after the lapse of time or giving of notice shall, conflict with, violate or result in a breach of, or constitute a default under the charter documents of AM or any law, statute, rule or regulation applicable to it, or conflict with, violate or result in a breach of or constitute a default under any material agreement to which it is a party or by which it or any of its properties is bound, or any judgment, order, award or decree to which AM is a party or by which it is bound, or require any approval, consent, authorization or other action by any court, governmental authority or regulatory body or any creditor of AM or any other Person or entity, and (iii) this Agreement constitutes a valid and binding obligation of AM and is enforceable against AM in accordance with its terms.

(b) The Cliffs entities that are parties to this Agreement represent and warrant to AM that: (i) the execution and delivery of this Agreement by the Cliffs entities and the performance of their obligations hereunder have been duly authorized by all requisite corporate actions, (ii) neither the execution and delivery of this Agreement nor the performance of their obligations hereunder by the Cliffs entities shall, or after the lapse of time or giving of notice shall, conflict with, violate or result in a breach of, or constitute a default under the charter documents of the Cliffs entities or any law, statute, rule or regulation applicable to them, or conflict with, violate or result in the breach of or constitute a default under any material agreement to which any of them is a party or by which they or any of their properties is bound, or any judgment, order, award or decree to which any of the Cliffs entities is a party or by which it is bound, or require any approval, consent, authorization or other action by any court, governmental authority or regulatory body or any creditor of any Cliffs entity or any other Person or entity, and (iii) this Agreement constitutes a valid and binding obligation of the Cliffs entities that are parties to this Agreement and is enforceable against each Cliffs entity that is a party to this Agreement in accordance with its terms.

(c) Each of the parties to this Agreement represents and warrants that it is a producer, processor, commercial user or merchandiser of Cliffs Pellets, and it is entering into this Agreement for commercial purposes related to its business as such.

**23. COUNTERPARTS.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

**24. COMPLIANCE WITH POLICIES.**

(a) Cliffs represents that it has read and understand AM's "Code of Business Conduct," which is currently accessible at http://www.arcelormittal.com/corp/corporate-responsibility/ethics-and-governance, and that it will make good faith efforts to comply with the Code of Business Conduct. Cliffs warrants and undertakes that it has not given, and will not give, any gift or commission or other material inducement, nor has agreed, and will not agree, to pay commission or other material inducement, to any AM employee, agent, servant or representative in connection with the making or performance of Agreement.

(b) Cliffs has read and understands AM's Anti-Corruption Guidelines currently accessible at http://www.arcelormittal.com/corp/corporate-responsibility/ethics-and-governance, and will make good faith efforts to comply with the Anti-Corruption Guidelines.

(c) Cliffs represents that it has read and understands AM's "Human Rights Policy," which is currently accessible at http://www.arcelormittal.com/corp/corporate-responsibility/ethics-and-governance, and will make good faith efforts to comply with the Human Rights Policy.

(d) AM represents that it has read and understands Cliffs' "Code of Business Conduct, Anti-Corruption Guidelines and Human Rights Policy" which is currently accessible at http://ir.cliffsnaturalresources.com/English/investors/corporate-governance/governance-highlights/default.aspx, and will make good faith efforts to comply with the Policy.

**25. RIGHTS AND REMEDIES; LIMITATIONS OF LIABILITY; NO LOST PROFITS OR CONSEQUENTIAL DAMAGES.**

(a) Except as explicitly provided to the contrary in this Agreement, the rights and remedies granted under this Agreement shall not be exclusive but shall be in addition to all other rights and remedies available at law or in equity in respect of the performance of this Agreement, including, but not limited to, claims for breach of contract; provided, however, that no party will have any right to offset or withhold performance under this Agreement due to any alleged or actual claims under any other agreement or matter. If a party has committed a material breach of one or more of its material obligations under this Agreement, such breaching party shall have the right to cure such material breach within thirty (30) days following the date of written notice of the material breach to such party by the non-breaching party, or if such material breach is not capable of cure within thirty (30) days, the breaching party shall have the right to commence efforts to cure within thirty (30) days and proceed diligently to cure the breach. In the absence of any such cure, the non-breaching party may exercise such rights and remedies, including specifically the right to terminate the Agreement as provided in Section 15(c) of this Agreement, as a result of such material breach.

(b) THE PARTIES AGREE THAT, EXCEPT AS OTHERWISE PROVIDED IN THIS SECTION 25, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR LOST PROFITS, INJURY TO GOOD WILL OR ANY OTHER INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES AS A RESULT OF A BREACH OF ANY PROVISION OF THIS AGREEMENT.

(c) In the case of any unexcused failure by a party to perform its obligations under this Agreement, the non-breaching party shall take commercially reasonable actions to mitigate its damages. All costs avoided by such actions and all net revenue generated by such actions shall reduce the damages chargeable to the breaching party for such nonperformance. The non-breaching party shall provide to the breaching party reasonable documentation to evidence that it took (or failed to take) such actions and to document the costs avoided and revenues generated by such actions.

(d) Costs of cover incurred by the non-breaching party or the Affiliates of the non-breaching party shall be invoiced as reasonably incurred, and the breaching party shall pay the non-breaching party the amount of such invoice within fifteen (15) days after the date of the invoice. If the breaching party disputes any of the invoiced amounts, it shall provide written notice to the non-breaching party of its objection, but shall still pay the full amount of the invoice when due.

(e) Each of the Cliffs entities that is a party to this Agreement will be jointly and severally liable to AM for any breach of this Agreement by any Cliffs entity that is a party to this Agreement.

**26. Forward Contract**. The parties intend that this Agreement constitutes a "forward contract" and a "commodity forward agreement" within the meaning, respectively, of Section 101(25) and Section 101(53B)(A)(i)(VII) of the United States Bankruptcy Code.

**27. Mutual Drafting.** Each of AM and Cliffs acknowledge that this Agreement has been prepared jointly by the parties and shall not be construed against either party.

**28. Entire Agreement.** This Agreement and the Exhibits attached hereto represent the sole, complete and exclusive statement of agreement between the parties hereto, which supersedes all prior proposals, oral or written, and all other prior communications between the parties relating to the subject matter of this Agreement, and shall constitute one agreement for the purchase of Cliffs Pellets (notwithstanding that different types of Cliffs Pellets are being nominated for different facilities).

[*Remainder of Page Intentionally Left Blank*]

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed and delivered by their respective authorized officers as of the date first written above.

ARCELORMITTAL USA LLC

DocuSigned by: Eric Knorr
72434A66BFB840D...

Name: Eric C. Knorr
Title: Vice President, Procurement AMUSA

ARCELORMITTAL USA LLC

DocuSigned by: Neil Kohlberg
7C8F9E8D63F744E...

Name: Neil Kohlberg
Title: Vice President, Finance, Strategy and Procurement AMUSA

CLIFFS NATURAL RESOURCES INC.

DocuSigned by: Terrence P Mee
2BF02C1A88E740C...

Name: Terrence Mee
Title:

THE CLEVELAND-CLIFFS IRON COMPANY

DocuSigned by: Terrence P Mee
2BF02C1A88E740C...

Name: Terrence Mee
Title:

CLIFFS MINING COMPANY

DocuSigned by: Terrence P Mee
2BF02C1A88E740C...

Name: Terrence Mee
Title:

*[Signature Page to Pellet Sale and Purchase Agreement]*

DocuSign Envelope ID: EE544102-96A5-4CD7-8FCE-D7A5B3AB1C9E Case 17-51210-CTG Doc 1107 Filed 06/18/25 Page 399 of 408

# Exhibit A

EXHIBIT A
ILLUSTRATIVE ANNUAL BASE PRICE ADJUSTMENT - CLEVELAND & INDIANA HARBOR
AS DESCRIBED IN SECTION 4. PRICE AND ADJUSTMENTS

| | Hibbing Standard | | Hibbing HC | | NORTHSHORE | | TILDEN | | UNITED | | Mustang | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CLW | IH | CLW | IH | CLW | IH | CLW | IH | CLW | IH | CLW | IH |
| **(a) 2016 (previous) Year** | | | | | | | | | | | | |
| Price Per GTU | | | | | | | | | | | | |
| Iron Natural (Expected) | 64.50 | 64.50 | 64.25 | 64.25 | 63.25 | 63.25 | 60.58 | 60.58 | 63.67 | 63.67 | 59.18 | 59.18 |
| Price Per WGT | | | | | | | | | | | | |
| **(b) 2017 (and subsequent years) Adjustments** | | | | | | | | | | | | |
| (i) Previous Year Platts Annual Price (y) | | | | | | | | | | | | |
| Current Year | | | | | | | | | | | | |
| Year Over Year Change (x) | | | | | | | | | | | | |
| % Change Platts Annual Price | | | | | | | | | | | | |
| (ii) Iron Unit Adjustment ( x price per GTU) | | | | | | | | | | | | |
| (iii) Current Year's Adjusted Base Price Per GTU | | | | | | | | | | | | |
| Iron Natural (Expected) | 64.50 | 64.50 | 64.25 | 64.25 | 63.25 | 63.25 | 60.58 | 60.58 | 63.67 | 63.67 | 59.18 | 59.18 |
| Current Year's Adjusted Base Price Per WGT | | | | | | | | | | | | |

**Illustrative Data to Calculate Platts Annual Price**

| | |
|---|---|
| Previous Year | |
| Previous Year Average | |
| Previous Year Average | |
| Previous Year Platts Annual Price | |
| Current Year | |
| Current Year Average | |
| Current Year Average | |
| Current Year Platts Annual Price | |

24

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER CLIFFS_000017795

# Exhibit B

[redacted]

| | 5 Illustrative [redacted] Calculation ([redacted]) | Example 1 (2017) | Example 2 (2018) | Example 3 (2019) | Example 4 (2020) |
|---|---|---|---|---|---|
| (a)(i) | [redacted] $/NT (defined for years 2017-2019, calculated years 2020-2026) | [redacted] | | | |
| | Illustrative [redacted] $/NT | | | | |
| (c)(i) | Difference between [redacted] and [redacted] $/NT | | | | |
| | [redacted] (Y/N) | Yes | Yes | No | Yes |
| | [redacted] Due (Cliffs/AM) | [redacted] | | | |
| (c)(ii) | Illustrative Current Year [redacted] $/Natural Gross Tons | | | | |
| | Northshore - Cleveland | $ 71.00 | $ 70.00 | $ 72.00 | $ 71.50 |
| | Mustang - Indiana Harbor | $ 74.00 | $ 73.00 | $ 75.00 | $ 74.50 |
| | United - Indiana Harbor | $ 71.00 | $ 70.00 | $ 72.00 | $ 71.50 |
| (c)(iii) | Illustrative Tonnage (Natural Gross Tons) | | | | |
| | Northshore - Cleveland | [redacted] | | | |
| | Mustang - Indiana Harbor | | | | |
| | United - Indiana Harbor | | | | |
| | [redacted] | [redacted] | | | |
| | Illustrative [redacted] Calculation (c)(i) [redacted] c)(ii) [redacted] c)(iii) [redacted] | [redacted] | | | |
| | Northshore - Cleveland | | | | |
| | Mustang - Indiana Harbor | | | | |
| | United - Indiana Harbor | | | | |
| | Total [redacted] | | | | |
| | **Illustrative [redacted] Price $/NT Calculation (applies to years 2020-2026)** | | | | |
| (a)(ii) | Previous Year [redacted] (y) | [redacted] | | | |
| | Current Year [redacted] | | | | |
| | Year over Year Change (x) | | | | |
| | [redacted] Adjustment Factor $/NT = [redacted] | | | | |
| | Previous Year [redacted] $/NT | | | | |
| | [redacted] Adjustment Factor | | | | |
| | [redacted] $/NT | | | | |
| | Illustrative Current Year [redacted] $/NT | | | | |

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

# Exhibit C

## Typical Specifications and Analysis Limits and Penalties and Premiums

### Exhibit C.1 - Hibbing Taconite High Compression Pellet Quality Specifications

| Parameter | Units | Typical | Max | Min | Quality |
|---|---|---|---|---|---|
| | | | | | |
| Moisture | % | | | | |
| Fe | % | 65.90 | | | Price adjustment based on Fe tons supplied. |
| SiO2 | % | | | | |
| P | % | | | | |
| Mn | % | | | | |
| Alumina | % | | | | |
| CaO | % | | | | |
| MgO | % | | | | |
| C/S | | | | | |
| M/S | | | | | |
| Basicity | | | | | |
| Na2O + K2O | % | | | | |
| | | | | | |
| % 1/4" Before Tumble | % | | | | |
| % 1/4" After Tumble | % | | | | |
| "Q" Index | % | | | | |
| | | | | | |
| CCS | lb/pellet | | | | |
| -300 lb | % | | | | |
| plus 1/2" | % | | | | |
| +3/8" -1/2" | % | | | | |
| | | | | | |
| | | | | | |
| Metallurgical | | | | | |
| LTD | % | | | | |
| Swelling | % | | | | |
| R40 | %/min | | | | |
| Contraction | % | | | | |

Notes:

1. Analyses will be performed on a cargo basis unless specified (Q) for quarterly composite analysis.
2. Cliffs will make every effort to keep processes centered on typical values and conform to minimum and/or maximum specifications.
3.
4.

Trace elements:

Cliffs will provide assay values for trace elements based on a quarterly composite analysis. Trace elements included in the quarterly report are: Zn, Cu, Cd, V, Co, Pb, B, Ti, Cr, S, Ni.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

## Exhibit C.2 - Hibbing Taconite Standard Compression Pellet Quality Specifications

| Parameter | Units | Typical | Max | Min | Quality |
|---|---|---|---|---|---|
| | | | | | |
| Moisture | % | | | | |
| Fe | % | 66.05 | | | Price adjustment based on Fe tons supplied. |
| SiO2 | % | | | | |
| P | % | | | | |
| Mn | % | | | | |
| Alumina | % | | | | |
| CaO | % | | | | |
| MgO | % | | | | |
| C/S | | | | | |
| M/S | | | | | |
| Basicity | | | | | |
| Na2O + K2O | % | | | | |
| | | | | | |
| % 1/4" Before Tumble | % | | | | |
| % 1/4" After Tumble | % | | | | |
| "Q" Index | % | | | | |
| | | | | | |
| CCS | lb/pellet | | | | |
| -300 lb | % | | | | |
| plus 1/2" | % | | | | |
| +3/8" -1/2" | % | | | | |
| | | | | | |
| | | | | | |
| Metallurgical | | | | | |
| LTD | % | | | | |
| Swelling | % | | | | |
| R40 | %/min | | | | |
| Contraction | % | | | | |

**Notes:**

1. Analyses will be performed on a cargo basis unless specified (Q) for quarterly composite analysis.
2. Cliffs will make every effort to keep processes centered on typical values and conform to minimum and/or maximum specifications.
3. 
4. 
5. 

**Trace elements:**

Cliffs will provide assay values for trace elements based on a quarterly composite analysis. Trace elements included in the quarterly report are: Zn, Cu, Cd, V, Co, Pb, B, Ti, Cr, S, Ni.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

## Exhibit C.3 - United Taconite Standard Compression Pellet Quality Specifications

| Parameter | Units | Typical | Max | Min | Quality |
|---|---|---|---|---|---|
| | | | | | |
| Moisture | % | | | | |
| Fe | % | 65.30 | | | Price adjustment based on Fe tons supplied. |
| SiO2 | % | | | | |
| P | % | | | | |
| Mn | % | | | | |
| Alumina | % | | | | |
| CaO | % | | | | |
| MgO | % | | | | |
| C/S | | | | | |
| M/S | | | | | |
| Basicity | | | | | |
| Na2O + K2O | % | | | | |
| | | | | | |
| % 1/4" Before Tumble | % | | | | |
| % 1/4" After Tumble | % | | | | |
| "Q" Index | % | | | | |
| | | | | | |
| CCS | lb/pellet | | | | |
| -300 lb | % | | | | |
| plus 1/2" | % | | | | |
| +3/8" -1/2" | % | | | | |
| | | | | | |
| | | | | | |
| Metallurgical | | | | | |
| LTD | % | | | | |
| Swelling | % | | | | |
| R40 | %/min | | | | |
| Contraction | % | | | | |

**Notes:**

1. Analyses will be performed on a cargo basis unless specified (Q) for quarterly composite analysis.
2. Cliffs will make every effort to keep processes centered on typical values and conform to minimum and/or maximum specifications.
3. 
4. 

**Trace elements:**

Cliffs will provide assay values for trace elements based on a quarterly composite analysis. Trace elements included in the quarterly report are: Zn, Cu, Cd, V, Co, Pb, B, Ti, Cr, S, Ni.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

## Exhibit C.4 - Northshore Mining Standard Compression Pellet Quality Specifications

| Parameter | Units | Typical | Max | Min | Quality |
|---|---|---|---|---|---|
| | | | | | |
| Moisture | % | | | | |
| Fe | % | 65.14 | | | Price adjustment based on Fe tons supplied. |
| SiO2 | % | | | | |
| P | % | | | | |
| Mn | % | | | | |
| Alumina | % | | | | |
| CaO | % | | | | |
| MgO | % | | | | |
| C/S | | | | | |
| M/S | | | | | |
| Basicity | | | | | |
| Na2O + K2O | % | | | | |
| | | | | | |
| % 1/4" Before Tumble | % | | | | |
| % 1/4" After Tumble | % | | | | |
| "Q" Index | % | | | | |
| | | | | | |
| CCS | lb/pellet | | | | |
| -300 lb | % | | | | |
| plus 1/2" | % | | | | |
| +3/8" -1/2" | % | | | | |
| | | | | | |
| | | | | | |
| Metallurgical | | | | | |
| LTD | % | | | | |
| Swelling | % | | | | |
| R40 | %/min | | | | |
| Contraction | % | | | | |

**Notes:**

1. Analyses will be performed on a cargo basis unless specified (Q) for quarterly composite analysis.
2. Cliffs will make every effort to keep processes centered on typical values and conform to minimum and/or maximum specifications.
3. 
4. 
5. 

**Trace elements:**

Cliffs will provide assay values for trace elements based on a quarterly composite analysis. Trace elements included in the quarterly report are: Zn, Cu, Cd, V, Co, Pb, B, Ti, Cr, S, Ni.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CLIFFS_000017800

## Exhibit C.5 - Tilden Hemflux Pellet Quality Specifications

| Parameter | Units | Typical | Max | Min | Quality |
|---|---|---|---|---|---|
| | | | | | |
| Moisture | % | | | | |
| Fe | % | 61.40 | | 60.90 | Price adjustment based on Fe tons supplied. |
| SiO2 | % | | | | |
| P | % | | | | |
| Mn | % | | | | |
| Alumina | % | | | | |
| CaO | % | | | | |
| MgO | % | | | | |
| C/S | | | | | |
| M/S | | | | | |
| Basicity | | | | | |
| Na2O + K2O | % | | | | |
| | | | | | |
| % 1/4" Before Tumble | % | | | | |
| % 1/4" After Tumble | % | | | | |
| "Q" Index | % | | | | |
| | | | | | |
| CCS | lb/pellet | | | | (Note 5) |
| -300 lb | % | | | | (Note 5) |
| plus 1/2" | % | | | | |
| +3/8" -1/2" | % | | | | |
| | | | | | |
| | | | | | |
| Metallurgical | | | | | |
| LTD | % | | | | |
| Swelling | % | | | | |
| R40 | %/min | | | | |
| Contraction | % | | | | |

**Notes:**

1. Analyses will be performed on a cargo basis unless specified (Q) for quarterly composite analysis.
2. Cliffs will make every effort to keep processes centered on typical values and conform to minimum and/or maximum specifications.
3.
4.
5.

**Trace elements:**

Cliffs will provide assay values for trace elements based on a quarterly composite analysis. Trace elements included in the quarterly report are: Zn, Cu, Cd, V, Co, Pb, B, Ti, Cr, S, Ni.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

## Exhibit C.6 - United Taconite Mustang Pellet Quality Specifications

| Parameter | Units | Typical | Max | Min | Quality |
|---|---|---|---|---|---|
| | | | | | |
| Moisture | % | | | | |
| Fe | % | | | | Price adjustment based on Fe tons supplied. |
| SiO2 | % | | | | |
| P | % | | | | |
| Mn | % | | | | |
| Alumina | % | | | | |
| CaO | % | | | | |
| MgO | % | | | | |
| C/S | | | | | |
| M/S | | | | | |
| Basicity | | | | | |
| Na2O + K2O | % | | | | |
| | | | | | |
| % 1/4" Before Tumble | % | | | | |
| % 1/4" After Tumble | % | | | | |
| "Q" Index | % | | | | |
| | | | | | |
| CCS | lb/pellet | | | | |
| -300 lb | % | | | | |
| plus 1/2" | % | | | | |
| +3/8" -1/2" | % | | | | |
| | | | | | |
| | | | | | |
| Metallurgical | | | | | |
| LTD | % | | | | |
| Swelling | % | | | | |
| R40 | %/min | | | | |
| Contraction | % | | | | |

**Notes:**

1. Analyses will be performed on a cargo basis unless specified (Q) for quarterly composite analysis or (D) for daily production composite analysis.
2. Cliffs will make every effort to keep processes centered on typical values and conform to minimum and/or maximum specifications.
3. 
4. 

**Trace elements:**

Cliffs will provide assay values for trace elements based on a quarterly composite analysis. Trace elements included in the quarterly report are: Zn, Cu, Cd, V, Co, Pb, B, Ti, Cr, S, Ni.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

# Exhibit 18

**Parties' Prior Agreement to Redact Deposition Testimony in Mesabi's Opening Brief for a Preliminary Injunction**

| **Page** | **Redacted Text and *Citation*** |
|---|---|
| Opening Br. page 9 | *Goncalves Dep. Tr. 240:17–23* |
| Opening Br. page 10 | *Johnson (30(b)(6)) Dep. Tr. 96:18–25* |
| Opening Br. page 10 | *Johnson (30(b)(6)) Dep. Tr. 130:13–18* |
| Opening Br. page 10 | *Johnson (30(b)(6)) Dep. Tr. 113:17–114:20* |
| Opening Br. page 21 | *Goncalves Dep. Tr. 239:3–241:8* |